TAB 17

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

**H**

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

Ashley v. Marlow Group Private Portfolio Management Inc.

David Ashley, Alex Chapman, Michael DePencier, Estate of Clive Bennett Mortimer, Bruce Heyland, David
Williams and Xenolith (Plaintiffs) and Marlow Group Private Portfolio Management Inc., Marlow Group Secur-
ities Inc., Marlow Group Inc., Marlow Private Estate Builders Inc. and Terrence W. Marlow (Defendants)

Ontario Superior Court of Justice [Commercial List]

Mesbur J.

Heard: January 6, 2006
Judgment: January 17, 2006[FN*]
Docket: 05-CL-005797

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights re-
served.

Proceedings: additional reasons at *Ashley v. Marlow Group Private Portfolio Management Inc.* (2006), 2006
CarswellOnt 3419 (Ont. S.C.J. [Commercial List])

Counsel: Tanya Pagliaroli for Plaintiffs (The "Ashley Group")

Derek J. Bell, Raj Sanhi for Receiver, A. Farber & Partners Inc.

Terrence J. O'Sullivan, M. Paul Mitchell for John Goudey, Thomas Abel, Shobana Ananth, Shane Anderson,
Donald Bayer, Michael Caicco, Charles Cutts, John Coudey, Arnold H. Hochman, Mark Irwin, Gary Levy, Kar-
en Malatest, Hamish McEwan, Pierre Meunier, Paul Oakley, Barry Reiter, Mike Stroud, Michelle Szames,
Stephen Szames, James Turner, John Unger, 2044102 Ontario Inc. (The "Goudey Group")

Arnie Herschorn for Paul Benson, Brenda Benson, 145403 Ontario Inc. (The "Benson Group")

O. Pasparakis for Goodman & Company, Investment Counsel Ltd.

M. McNaughton, B. Wong for Canadian Investor Protection Fund

Roy Lee for Superintendent in Bankruptcy

Jeff Carhart, Arthi Sambasivan for Ron Eden

Subject: Insolvency; Property

Bankruptcy and insolvency --- Property of bankrupt — Property in hands of bankrupt agent or broker — Stock-

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

brokers

Defendant, M Inc., was investment advisor and securities dealer — Plaintiffs G Group, B Group and E were customers of M Inc. — M Inc. held securities for plaintiffs which were registered in M Inc.'s name — Receiver was appointed over M Inc.'s assets — Receiver sought order declaring that only securities registered in names of M Inc.'s customers were "customer name securities" under Part XII of Bankruptcy and Insolvency Act, and placing remainder of securities into pool fund to be shared proportionally — G Group brought cross-motion to have its securities declared customer name securities or, alternatively, to have its securities returned under trust claim — B Group and E brought motion to have their securities in limited partnership, CMP, re-registered in their names prior to bankruptcy — Motion granted; cross-motions dismissed — G Group's securities were not customer name securities — Section 253 of Act defines customer name securities as those "registered in the name of the customer" — Fact that all customer assets held by M Inc. had been identified, and that respective owners had confirmed ownership, was not equivalent to registration as contemplated by s. 253 — Proposed re-wording of s. 253 in Bill C-55, adding "or recorded in appropriate manner" to definition of customer securities, offered no assistance — Ability to identify beneficial owner did not constitute recording in appropriate manner — G Group could not assert trust claim — Under s. 261 of Act, all securities held by M Inc. at date of bankruptcy vested in trustee, except for customer name securities — There was no basis upon which B Group and E could require register of CMP to be altered, as they were not subscribers — CMP's register showed M Inc. as subscriber for units in question.

Bankruptcy and insolvency --- Consolidation orders and orderly payment of debts

Substantive consolidation of bankrupt estates — Defendant, M, was sole shareholder and officer of four corporate defendants: M Inc., S Inc., E Inc., and G Inc. — M Inc. was investment advisor and securities dealer, S Inc. was securities dealer, E Inc. was life insurance agency, and G Inc. provided management services to other three companies — All four corporate defendants shared premises, telephone, fax, bank accounts, and accounting records — Receiver brought motion for substantive consolidation of bankruptcies of four corporate defendants — Motion dismissed — Receiver did not provide evidence concerning effect of substantive consolidation on creditors of corporate defendants, and whether rights of creditor of any individual company would be adversely affected — Substantive consolidation might not be possible since Part XII of Bankruptcy and Insolvency Act applied to only two corporate defendants — Part XII clearly applied to M Inc. and S Inc., but not to E Inc., as E Inc. was not securities firm — Substantive consolidation might have unintended effect of attempting to deal with E Inc.'s bankruptcy under Part XII — Dismissal was without prejudice to motion's being renewed on further and better material.

Bankruptcy and insolvency --- Assignments in bankruptcy — Procedure on assignment

Applicability of Part XII of Bankruptcy and Insolvency Act to proceedings — M Inc. was investment advisor and securities dealer — Receiver was appointed over M Inc.'s assets — Receiver brought motion for order that M Inc.'s bankruptcy should proceed under Part XII of Bankruptcy and Insolvency Act, on basis that M Inc. was "securities firm" under s. 258 of Act — Motion granted — M Inc. was securities firm as defined by s. 258 — Section 258 definition includes corporations that buy and sell securities for customers in course of doing business, even if they also engage in other commercial activities — M Inc. clearly bought and sold securities for its customers, whether it did so as its primary business, or ancillary to its primary business of providing investment advice.

**Cases considered by *Mesbur J.*:**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

*Aeric Inc. v. Canada Post Corp.* (1985), [1985] 1 F.C. 127, 56 N.R. 289, 16 D.L.R. (4th) 686, 1985 CarswellNat 23, 1985 CarswellNat 23F (Fed. C.A.) — considered

*Associated Freezers of Canada Inc., Re* (1995), 36 C.B.R. (3d) 227, 1995 CarswellOnt 944 (Ont. Bktcy.) — considered

*J.P. Capital Corp., Re* (1995), 31 C.B.R. (3d) 102, 1995 CarswellOnt 53 (Ont. Bktcy.) — considered

*New Brunswick v. Estabrooks Pontiac Buick Ltd.* (1982), *(sub nom. Estabrooks Pontiac Buick Ltd., Re)* 44 N.B.R. (2d) 201, *(sub nom. Estabrooks Pontiac Buick Ltd., Re)* 116 A.P.R. 201, *(sub nom. Fisherman's Wharf Ltd., Re)* 144 D.L.R. (3d) 21, *(sub nom. Fisherman's Wharf Ltd., Re)* 7 C.R.R. 46, 1982 CarswellNB 236 (N.B. C.A.) — considered

*Vantage Securities Inc., Re* (1998), 1998 CarswellBC 3138, 9 C.B.R. (4th) 169, 64 B.C.L.R. (3d) 148 (B.C. S.C. [In Chambers]) — followed

**Statutes considered:**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3

Generally — referred to

Pt. XII — considered

s. 5(4)(a) — considered

s. 14.06 [en. 1992, c. 27, s. 9(1)] — referred to

s. 67 — considered

s. 183 — considered

s. 253 — referred to

s. 253 "courtier en valeurs mobilières" — considered

s. 253 "customer compensation body" — considered

s. 253 "customer name securities" — considered

s. 253 "securities firm" — considered

s. 255 — considered

s. 261 — referred to

s. 261(1) — considered

s. 262(1) — considered

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

s. 262(2.1) [en. 1997, c. 12, s. 118] — considered

*Canadian Charter of Rights and Freedoms*, Part I of the Constitution Act, 1982, being Schedule B to the Canada Act 1982 (U.K.), 1982, c. 11

s. 18 — considered

*Limited Partnerships Act*, R.S.O. 1990, c. L.16

Generally — referred to

s. 4(1) — referred to

*Securities Act*, R.S.O. 1990, c. S.5

s. 1(1) "dealer" — referred to

**Regulations considered:**

*Limited Partnerships Act*, R.S.O. 1990, c. L.16

*General*, R.R.O. 1990, Reg. 713

s. 3a [en. O. Reg. 11/91] — referred to

**Words and phrases considered**

**securities firm**

Part of the firm's business must be the buying and selling of securities; it may be its primary business, or it may simply be a part of its overall business. If it is, it is a "securities firm" within the meaning of Part XII [of the *Bankruptcy and Insolvency Act*, R.S.C. 1985, s. 253], in both English and French.

. . .

It is important to note that the definition of "securities firm" under the *Bankruptcy and Insolvency Act* includes a person "required to be registered to enter into securities transactions with the public". . . . However, by stating that the definition includes such persons, it must, by implication be taken to mean that the definition is not limited to such persons. Thus, the definition must include persons who need not be registered in this way.

**held for a customer**

Surely the plain reading of [the definition of "customer name securities" in s. 253 of the *Bankruptcy and Insolvency Act*, R.S.C. 1985] suggests that cash and securities "held ...for a customer" must mean cash and securities held in trust or for the benefit of a customer.

MOTION by receiver for various orders pertaining to bankruptcy of four related corporate defendants; CROSS-MOTIONS by customers of one corporate defendant regarding securities held for them by that defendant.

***Mesbur J.*:**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

**Nature of the motion:**

1      There is very little jurisprudence concerning Part XII of the *Bankruptcy and Insolvency Act*. At issue on this motion is the correct interpretation of the term "securities firm" within the meaning of Part XII of *Act*, whether trust claims can be made to cash or securities under Part XII, and whether the court should consider compelling the re-registration of certain securities on the eve of a bankruptcy.

2      If the defendants or some of them are found to be securities firms, are assigned into bankruptcy, and if Part XII of the *Bankruptcy and Insolvency Act* applies, then the court must also address whether securities held for the Goudey Group[FN1], are "customer held securities" within the meaning of s.253 of the *Act*, or whether they would fall into the "customer pool fund" for distribution among all customers on a *pro rata* basis. It must also decide if certain limited partnership units held for the Benson Group[FN2] and Mr. Eden should be registered in their names prior to a bankruptcy.

3      In addition to the analysis of these broad issues, the court must also consider receiving the Receiver's Third Report, the Supplement to it, and the Receiver's Fourth Report and approving the Receiver's activities described in them. It must also determine whether to authorize the Receiver to assign the defendants other than Terrence W. Marlow into bankruptcy, and whether, in doing so, the court should procedurally and substantively consolidate their bankrupt estates into one bankruptcy estate, so that the assets of all would form one pool against which the creditors of all could claim.

**General Factual Background and the Various Stakeholders:**

4      The corporate defendants collectively referred to themselves as the "Marlow Group" or the "Marlow Financial Group". The companies making up the group are Marlow Group Private Portfolio Management Inc. ("Management Inc."), Marlow Group Securities Inc. ("Securities Inc."), Marlow Group Inc. ("Group Inc.") and Marlow Private Estate Builders Inc. ("Estate Builders Inc."). I am advised that the proper name of Estate Builders Inc. is "Private Estate Builders Inc.". The title of proceedings will be amended to reflect this correction. The defendant Terrence W. Marlow is the sole shareholder, officer and director of each of these corporate entities.

5      Mr. Marlow operated the four companies out of one office, with one telephone number, one fax number, one set of staff, one bank account, and one set of poorly kept books. He referred to them collectively as Marlow Group, and used letterhead styled "Marlow Financial Group".

6      Through the companies, Mr. Marlow provided a number of investor services. Management Inc. is an investment advisor and securities dealer that was registered as an investment counsel, portfolio manager and limited market dealer with the Ontario Securities Commission (the "OSC"). Securities Inc. is a securities dealer and registered investment dealer that was registered with the Investment Dealers Association of Canada (the "IDA"). Securities Inc. was also, until it ceased to be a member of the IDA, a member of the Canadian Investor Protection Fund (the "CIPF"). Estate Builders Inc. is a life insurance agency, and Group Inc. is a management company that provided services to the other three companies.

7      Mr. Marlow was registered with the OSC as a director and advising and trading officer of Management Inc., as well as its chief compliance officer. Mr. Marlow was also registered with the OSC as a trading officer of both Management Inc. and Securities Inc. Unfortunately, Mr. Marlow apparently suffers from an addiction to crack cocaine, for which he is currently receiving rehabilitative treatment.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

8       Because it was a registered investment counsel and portfolio manager, Management Inc. was required to file annual audited financial statements with the OSC within 90 days of its fiscal year ended December 31. It failed to do so following its 2003 year end. After that, the OSC imposed some conditions on Management Inc. One of these was to file a satisfactory reconciliation of its client accounts.

9       Management Inc. then hired a chartered accountant, Wally Rudensky, to help meet the OSC's demands. Mr. Rudensky's reconciliation concluded there was a significant deficiency between the actual cash that Management Inc. had in its accounts, and the amount it was supposed to be holding in trust for its clients. Mr. Rudensky concluded there would be a trust cash shortfall of about $3.3 million. As a result, the OSC immediately suspended Management Inc.'s operations until an audit was complete.

10       Mr. Rudensky worked to complete an audited version of his reconciliation. It disclosed that Management Inc. held a large number of securities for its customers, but very few of these were registered in their clients' names. Management Inc. mostly purchased large blocks of securities, and then allocated them to individual investors, although they did not register them in the clients' names. Some securities were registered in clients' names, but were held in their own personal accounts, unaffiliated with the Marlow Group.

11       The plaintiffs, who are referred to as the "Ashley Group" comprise a group of customers all of whom were essentially in a cash position at this time. They tried to reach an agreement to have Management Inc. return their securities and cash. When that failed, they moved to have the Receiver appointed. Justice Campbell made a Receivership Order on March 9, 2005, appointing A. Farber & Partners Inc. as Receiver over the corporate defendants' assets.

12       This motion began as the Receiver's motion to assign each of the corporate defendants into bankruptcy. Ancillary to that relief, the Receiver suggests that Management Inc. is a "securities firm" as defined in section 253 of the *Act*, and, as a result, the special provisions of Part XII of the *Act* would apply to this bankruptcy. The Receiver seeks a declaration that only those securities that were actually registered, or in the process of being registered, in the name of customers are to be considered as "customer name securities". It also wishes the bankruptcies of the corporate defendants to be consolidated both procedurally and substantively, so that the assets of all would be available to the creditors of all, and the estates would be administered as one estate. In this regard, it asks the court to consider all the corporate defendants as one entity, operating as a securities firm, and subject to Part XII on bankruptcy.

13       In response to the Receiver's motion, other parties and stakeholders responded, and filed cross motions. The Ashley Group supports the Receiver's position completely.

14       The other participants on this motion are other stakeholders. The Goudey Group comprises a group of customers where were in a securities position at the time of the receivership. The Benson Group was similarly situated, as was Mr Eden. The Benson and Eden holdings were in two limited partnerships. Management Inc. holds sufficient securities to meet all its obligations to hold securities for its customers. It is only in the trust cash area that there is a significant shortfall. The Goudey and Benson Groups, along with Mr. Eden, have all brought cross-motions and oppose the Receiver's motion.

15       The Canadian Investor Protection Fund (CIPF) is a fund that covers customers of CIPF members that have suffered or may suffer financial loss solely as a result of the insolvency of a member. CIPF is a "customer compensation body" under Part XII of the *Bankruptcy and Insolvency Act*. Of all the companies making up the Marlow Group, only Securities Inc. was a CIPF member. CIPF has participated on the motion in response to the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

Receiver's request for a substantive consolidation of the bankruptcies of the corporate defendants.

16    Finally, the Superintendent in Bankruptcy has intervened pursuant to the provisions of section 5(4)(a) of the *Act*. The guiding principles for the Superintendent's intervention under s 5(4)(a) are set out in subsection 2 of Section VIII of the *Superintendent in Bankruptcy's Programs Effective April 1, 1994*. The guiding principle is stated as:

> The Superintendent may intervene in court under this paragraph where it is a question of national interest or importance concerning the bankruptcy process or where the Superintendent feels it is in the public interest to do so.

17    The Superintendent intervenes here to make submissions on various questions of law relating to the interpretation of Part XII of the *Bankruptcy and Insolvency Act*. The Superintendent is of the view that the legal issues of what constitutes a securities firm, whether trust claims can be advanced under Part XII of the *Act*, and whether a creditor should be able to require a re-registration of securities in order to circumvent Part XII are issues of national importance.

**Positions of the various stakeholders:**

18    In order to understand the motion and cross motions, it is important to understand the positions of the various stakeholders on the various issues.

### The Receiver

19    The Receiver takes the position that the corporate defendants should be assigned into bankruptcy, and that bankruptcy should proceed under the provisions of Part XII of the *Act* because Management Inc. is a securities firm as that term is defined in the *Bankruptcy and Insolvency Act*, and all the companies acted essentially as one entity. The Receiver also says that Part XII prevails in any conflict between it and any other provisions of the *Act*. For that reason, the Receiver suggests that trust claims are not permitted in security firm bankruptcies.

20    The Receiver says that apart from some shares of Stealth Minerals Ltd. actually registered in Individual clients' names, the securities that Management Inc. held for the Goudey Group, the Benson Group, and Mr. Eden are not "customer name securities" as that term is defined in the *Act*. Thus, they say that these securities should, with the remaining cash, be placed in the customer pool fund, to be shared proportionally among all the customers.

21    The Receiver says that it would be contrary to public policy to permit the Benson Group and Mr. Eden to require that their shares be transferred into their names prior to a bankruptcy, and thus convert them into customer name securities in order to avoid their pooling with those of other customers.

### The Superintendent of Bankruptcy

22    The Superintendent of Bankruptcy has intervened on this motion in order to support the Receiver's interpretation of the definition of "securities firm", the Receiver's position that trust claims cannot be made to cash or securities under Part XII, and the Receiver's position that the court should not order the registration of certain securities in the names of certain investors on the eve of bankruptcy. The Superintendent says these legal issues are of national importance and require adjudication.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

### The Plaintiffs (the Ashley Group)

23      The Ashley Group supports the Receiver's position, and that of the Superintendent in Bankruptcy.

### The Goudey Group

24      The Goudey Group puts forward a number of arguments. First, it suggests that Management Inc. is not a securities firm. Second, they say that even if it is, and Part XII applies, their securities are customer name securities, because they can be identified as "theirs". Finally, even if the securities are not customer name securities, the Goudey Group says that they can assert a trust claim to the securities which should be returned to them, and not form part of the customer pool to be shared with other investors.

### The Benson Group

25      The Benson Group wants to have Benson's name and address entered on the Register of the CMP 2003 Resource Limited Partnership and the CMP 2004 Resource Limited Partnership ("CMP"). The Benson group has added Goodman & Company, Investment Counsel Ltd. to the motion. Goodman & Company is the Manager appointed by CMP to provide investment, management, administrative and other services in relation to these two limited partnerships. The Benson Group points to these securities being a particular type of tax shelter/limited partnership investment. They say that pursuant to the Limited Partnership Agreement and the provisions of the Prospectus, Goodman & Company is required to list them as the owners of their respective percentage holdings and has failed to do so. The want the court to make an order compelling this registration, prior to the bankruptcy, in order to become customer name securities, and not fall into the customer pool fund.

### Mr. Eden

26      Mr. Eden wants to be treated similarly to the Benson Group if they have success, or the Goudey Group, if they have success. Simply put, Mr. Eden wants securities to be returned to him, however that may be accomplished.

### Goodman & Company

27      Goodman & Company takes no position on whether it should re-register the CMP partnership units or not. However, it denies that it has acted improperly in failing to register any CMP units in the names of the Benson Group or Mr. Eden. It says that the actual subscriber for the limited partnership units was Management Inc. and that is who is recorded as the subscriber for CMP 2003 and CMP 2004 on the Partnership Register. Goodman & Company wishes to be exonerated of any wrongdoing or impropriety.

### Canadian Investor Protection Fund

28      The Canadian Investor Protection Fund has participated on this motion only to oppose the substantive consolidation of the bankruptcies. A substantive consolidation, it says, could prejudice their position. It also takes the position that there are no compelling reasons to order substantive consolidation.

### The Law and analysis:

29      In order to put the issues into context, it is important to consider Part XII of the *Bankruptcy and Insolvency Act*, and its purpose. It is a relatively new part of the *Act*, having come into force in 1997, in response to

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

what were seen as undue complexities involved in the bankruptcies of securities firms.

30    Part XII of the *Bankruptcy and Insolvency Act* was enacted to simplify and streamline the administration of a bankrupt securities firm's estate. Before Part XII, administration of these estates was time-consuming, complex, uncertain, and costly to both investors and creditors. Customers of the bankrupt firm would raise trust and tracing concepts, which proved difficult to determine. Often, while waiting for adjudication of these trust claims, the Trustee would have to continue to hold potentially volatile securities, whose value could plummet, while customers battled over their entitlement to them.

31    What Part XII does is to create a particular class of securities that are to be returned to customers. These are called "customer name securities". All other securities and cash held by the bankrupt firm are to be pooled in a "customer pool fund", and distributed among all the customers of the firm on a *pro rata* basis. It is easy to see why some customers would like to avoid the application of Part XII altogether, or, alternatively, have their securities designated as customer name securities, in order to avoid pooling them with other customers.

32    It should be noted that the customer pool fund is paid out before any creditors are paid at all. If significant securities are returned to customers and do not fall into the pool, the pool will obviously be smaller. Here, if the Receiver's position prevails, the customer pool fund of securities and cash will give all the customers a return of about 60 cents on the dollar. If the Ashley/Benson/Eden positions prevail, they will have securities returned to them, and realize about 95 cents on the dollar for their claims, while the Ashley Group customers will receive less than 5 cents on the dollar.

***Bankruptcy?***

33    Under the terms of the Receivership Order, the Receiver has the power to assign all the corporate defendants, apart from Securities Inc., into bankruptcy. Securities Inc.'s exclusion from this general power was made part of the Receivership Order at CIPF's request, presumably because of CIPF's particular potential obligations on the bankruptcy of one of its members. As a result, an order is required to put Securities Inc. into bankruptcy. As far as the other corporate defendants are concerned, the Receiver seeks approval of its decision to assign them into bankruptcy.

34    There is no question that all the corporate defendants are insolvent, and that it would be in the interests of all the customers and creditors for them to be assigned into bankruptcy. No one now opposes an assignment. The only issue is whether the bankruptcy should proceed under Part XII of the *Act*, or whether it should be a "regular" bankruptcy. Determination of this issue will depend on whether some or all of the corporate defendants are "securities firms", or indeed, whether the Marlow Group should be considered as a single entity which itself is a securities firm.

35    The "securities firm" issue has focused primarily on Management Inc., since it is the company that seems to holding the bulk of the securities and cash for the customers. As to the other corporate defendants, there is no question that Securities Inc. is a securities firm. It, however, has virtually no assets. Estate Builders Inc. is clearly not itself a securities firm. This may be relevant on the issue of substantive consolidation, but is essentially moot, since the company apparently has no assets either. Group Inc. simply provided management services to the other companies. It has some assets. This leaves the question of whether Management Inc. is a securities firm. If the bankruptcies are substantively consolidated, and Management Inc. is a securities firm, then presumably a consolidated bankruptcy would proceed under Part XII.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

*Securities Firm?*

36      Section 258 of the *Bankruptcy and Insolvency Act* defines the term "securities firm" as follows:

"securities firm" means a person who carries on the business of buying and selling securities from, to or for a customer, whether or not as a member of an exchange, as principal or agent, and includes any person required to be registered to enter into securities transactions with the public, but does not include a corporate entity that is not a corporation within the meaning of section 2.

37      The French version of the statute contains the following definition:

« courtier en valeurs mobilières » Toute personne, membre ou non d'une bourse de valeurs, qui achète des titres a un client ou pour celui-ci ou vend des titres a un client ou pour celui-ci, pour son compte ou en qualité de mandataire, et notamment celle qui a l'obligation de s'inscrire pour avoir le droit de conclure avec le public des opérations sur les titres, a l'exception des personnes qui sont exclues de la définition de « personne morale » a l'article 2.

38      The Goudey Group sets much store in the phrase "carries on the business" in the English definition. It takes the position that in order to qualify for treatment under Part XII, a firm's primary business must be the buying and selling of securities. It says that Management Inc. held itself out primarily as an advisor. It was registered as an investment counsel, portfolio manager and limited market dealer with the OSC. Since Management Inc. never carried on business as a limited market dealer, the Goudey Group concludes that this necessarily implies Management Inc. was no more than an investment counsel and portfolio manager, and thus cannot be considered a securities firm. While the Goudey Group concedes that Management Inc. did buy securities on their behalf, they say it was only incidental to their primary business of investment counsellors. Thus, they say Management Inc. cannot be held to be a securities firm.

39      The Superintendent points to the absence of the phrase "carries on the business" in the French version of the *Act*. Section 18 of the *Charter of Rights and Freedoms* provides in section 18 that both the English and French language versions of a Federal statute are equally authoritative. Therefore, the court must examine both to determine Parliament's intention. Each version "forms part of the context in which the other must be read". [FN3] The court must therefore find a common interpretation for both equally authoritative versions.

40      While the English version includes the term "carries on the business", the French version does not. A literal translation of the phrase "*Toute personne, membre ou non d'une bourse de valeurs, qui achète des titres a un client ou pour celui-ci ou vend des titres a un client ou pour celui-ci*", from the French version is "Every person, whether or not a member of an exchange, who buys securities from a customer or for him or sells securities to a customer or for him, ...".

41      The French version does not contain any language to suggest that buying and selling securities must be the person's *primary* business. This forms part of the context in which one must read the English version.

42      The Superintendent suggests[FN4] that "[u]nderstanding the definition of "securities firm" to include a corporation that buys and sells securities for its customers in the course of doing business even if it also engages in other commercial activities is both a reasonable interpretation of the English version and one that is consistent with the French version". I agree.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

43      The Goudey Group says that this approach is equivalent to "reading out" the phrase "carries on the busi-ness" in the English version, and thus cannot comply with the "shared meaning rule."[FN5] I disagree. What the Goudey Group really wants the court to do is to read in the word "primarily" into the English definition. There is no need to do this. When one gives the usual meaning to all the words in both English and French versions, there is no inconsistency between them. Part of the firm's business must be the buying and selling of securities; it may be its primary business, or it may simply be a part of its overall business. If it is, it is a "securities firm" within the meaning of Part XII, in both English and French. This interpretation is a reasonable interpretation of the English version, and is also consistent with the French version.

44      The Goudey Group goes on to suggest that "securities firm" should be interpreted to be consistent with the securities law definition of a securities dealer. In this regard, it points to section 1(1) of the *Securities Act* [FN6] and the definition there of the term "dealer" as "a person or company who trades in securities in the capa-city of principal or agent." They point out that this definition differs from the definition of an "advisor", namely "a person or company engaging in or holding himself, herself or itself out as engaging in the business of ad-vising others as to the investing in or the buying or selling of securities." They suggest that since Management Inc. was registered as an advisor under Ontario legislation, and the Goudey Group retained Management Inc. to provide them with investment advice, Management Inc. must therefore be an advisor, not a dealer, and hence not a securities firm.

45      It would have been an easy matter for Parliament to define "securities firm" in a parallel fashion to pro-vincial securities legislation. It did not. It has created a broad definition in Part XII. The definition carries no ambiguity.

46      Management Inc. clearly bought and sold securities for all of its customers, whether it did so as its primary business, or as ancillary to its primary business of providing investment advice. In this regard, I note that some of the customers signed Private Client Account Agreements with Management Inc. These Agreements provided: "Individual Securities, including stocks and bonds may be purchased from time to time." The Agree-ments authorized the Marlow Group "to place orders with brokers, investment dealers, banks or trust companies for the purchase and sale of securities."

47      It is important to note that the definition of "securities firm" under the *Bankruptcy and Insolvency Act* in-cludes a person "required to be registered to enter into securities transactions with the public". This, no doubt, includes firms the Goudey Group describes as brokerage firms, or stockbrokers, who must, of course be re-gistered as dealers. Such firms are firms defined as "dealers" under Ontario securities law. However, by stating that the definition includes such persons, it must, by implication be taken to mean that the definition is not lim-ited to such persons. Thus, the definition must include persons who need not be registered in this way. This would encompass a firm like Management Inc.

48      As a result, it is clear that Management Inc. "carried on the business of buying and selling securities from, to or for a customer, whether or not as a member of an exchange, as principal or agent, and includes any person required to be registered to enter into securities transactions with the public". I thus conclude they are a securities firm, and therefore Part XII will apply to their bankruptcy.

*Customer Name Securities?*

49      Part XII carves out a very limited class of securities that are to be returned to customers when a securit-ies firm goes bankrupt. These are defined as "customer name securities" in section 253 in the following way:

"customer name securities" means securities that on the date of bankruptcy of a securities firm are held by or on behalf of the securities firm for the account of a customer and are registered in the name of the customer or are in the process of being so registered.

50      The Goudey Group points to the fact that the term "registered" is nowhere defined in Part XII. They suggest that as a result, it is enough for the securities to be identifiable as belonging to a customer, in order to be a customer name security. They reason that since Management Inc. made allocations of various securities among its customers, those securities can be identified as belonging to the customers. They say that Mr. Rudensky's Account Balance Reconciliation confirms that all of the customer assets held by the Marlow Group have been identified, and the respective owners of those assets have confirmed their ownership. They conclude their argument by stating that this ability to identify the respective owners is equivalent to registration, as contemplated by section 253. To bolster this position, they rely on the re-wording of the section proposed in Bill C-55[FN7] . There, the definition of customer name securities reads as follows:

"customer name securities" means securities that on the date of bankruptcy of a securities firm are held by or on behalf of the securities firm for the account of a customer and are registered or recorded in the appropriate manner in the name of the customer or are in the process of being so registered or recorded, but does not include securities registered or recorded in the appropriate manner in the name of the customer that, by endorsement or otherwise, are negotiable by the securities firm.

[underlining in the original]

51      The Goudey Group suggests that this new definition clearly supports their view that it is enough simply to be able to identify the beneficial owner of a security, since this would constitute "recording in the appropriate manner" in the records of the securities firm. As a result, they say that their securities are customer name securities and must be returned to them. I disagree with this analysis.

52      In my view, the addition of the words "or recorded in the appropriate manner" in the amendments in Bill C-55 are designed to cover situations where there is no actual registration of securities, but there is another specified method of recording ownership. This, for example, would cover limited partnerships for whom the *Limited Partnership Act* requires that general partner to maintain a record of the limited partners. This would be a name "recorded in the appropriate manner."

53      Here, there is no evidence that any particular securities were recorded in any fashion in the names of the Ashley Group. Bill C-55 offers no assistance. The Ashley Group's securities are not customer name securities. They will form part of the customer pool fund, unless they can be excluded on the basis of a trust claim.

***Trust Claims allowed under Part XII?***

54      The provisions of Part XII of the *Act* are paramount if there is a conflict with other parts of the *Act*. Section 255 of Part XII says:

All the provisions of this Act, in so far as they are applicable, apply in respect of bankruptcies under this Part, but if a conflict arises between the application of the provisions of this Part and the other provisions of this Act, the provisions of this Part prevail.

55      In regular bankruptcies, section 67 of the *Act* applies. It clearly states that assets held in trust by the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

bankrupt do not form part of the bankrupt estate. In securities firm bankruptcies, Part XII creates a kind of "super-priority" for customers. Section 261(1) vests in the trustee any securities held by the firm itself, as well as any securities and cash held by or for the account of the securities firm for a customer. The trustee is then directed to use these securities and cash to create what is called the "customer pool fund". All other assets form what is called the "general fund".

56      By virtue of s. 262(1), the customer pool fund is allocated first to the costs of administration, if there are insufficient funds in the general fund to pay the costs, and then to distribute the balance to all the firm's customers (except deferred customers) on a *pro rata* basis. Any funds remaining after that distribution are paid into the general fund, which is disbursed according to s. 262(2.1).

57      What does the concept of the customer pool fund do to the notion of trust claims in a Part XII bankruptcy? To date, there is only one reported case in Canada dealing with this issue.[FN8]

58      In *Vantage*, Brenner J considered a Trustee's position that any trust claim to either cash or securities held by a securities firm at the date of bankruptcy vests in the Trustee. Justice Brenner held that the plain wording of the language of the section supported that view. In coming to this conclusion he considered both the plain language of the section, as well as the underlying policy of Part XII.

59      In order to discern the policy, Justice Brenner relied on an article by B.D. Turcotte, entitled "Securities Firm Bankruptcies"[FN9] . That article outlined the historical complexities of securities firm bankruptcies prior to Part XII, particularly the difficulties of sorting out ownership of, or claims to securities that securities firms generally hold in many different ways for their customers. Justice Brenner concluded:

> By passing Part XII, Parliament decided to try to simplify securities firm bankruptcies by doing away with the myriad of competing trust claims and the associated legal costs and time delays in securities firm bankruptcies. Parliament recognized that securities firms deal in principally two assets: cash and securities, and so for those two asset classes, Parliament enacted the new rules in Part XII. Under s. 261, Parliament removed the entire concept of trust law for securities (except where those securities are "customer named securities") and cash.

60      In the context of the *Vantage* case, Justice Brenner was dealing with the issue of cash. He concluded that by virtue of s. 261, all cash held by a securities firm at the date of bankruptcy vested in the trustee, not just the cash owned beneficially by the securities firm. Section 261 is equally applicable to securities, and I thus agree with Brenner J's analysis, and find that all securities held by a securities firm at the date of bankruptcy vest it the trustee, not just the securities owned beneficially by the firm. The only exclusion from the pool is those securities that fall into the definition of "customer name securities". Surely the plain reading of the section suggests that cash and securities "held ...for a customer" must mean cash and securities held in trust or for the benefit of a customer. If cash and securities held in trust for a customer are to vest in the trustee in a securities firm bankruptcy, then clearly this provision is in conflict with the general provisions of section 67 that exclude trust assets from the estate. Since there is a conflict, Part XII prevails, and trust claims must be prohibited.

61      Since I have held that Management Inc. is a securities firm, the Goudey Group's securities are not customer name securities, and have also found that they cannot assert a trust claim to them, their securities must vest in the trustee, and form part of the customer pool. This addresses the Goudey Group motion. I turn now to the arguments advanced by the Benson Group and Mr. Eden.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

***Require registration of the Benson Group and Eden securities?***

62        The Benson Group and Mr. Eden were also Management Inc. customers. They invested in two limited partnerships, CMP 2003 Resource Limited Partnership and CMP 2004 Resource Limited Partnership ("CMP"), as well as earlier CMP Limited Partnerships for prior years. The CMP limited partnership units are not registered in the Benson Group or Mr. Eden's names. They say their units should be registered in their names, and ask the court to require Goodman & Company to effect this registration, before any bankruptcy occurs. This, of course, would make their CMP units customer name securities that would be returned to them, since they would be registered in their names prior to bankruptcy.

63        Simply put, the Benson Group and Mr. Eden say that both the Limited Partnership Agreement and the *Limited Partnership Act*[FN10] require that the names and addresses of all limited partners of the Limited Partnership must be registered in the records of the limited partnership. They also say that Prospectuses for these two limited partnerships state that shares will be registered in the name of a partner, if the partner requests it. They say they have a right to demand registration, and they are doing so now. They go further, and say that Goodman & Company has acted improperly in failing to maintain their names as owners in the records, and further, has made a misrepresentation in the prospectus, namely that it would keep a record of the limited partners.

64        The Benson Group and Mr. Eden say that in the years before 2003, their investments in the CMP limited partnerships for the prior years were registered in their names. They also received their expected tax benefits from the investments, received tax receipts, and were acknowledged by the Limited Partnerships to be limited partners.

65        In the years since, they also received their expected tax receipts for CMP 2003 and 2004. They say that the Receiver says Marlow's records show Marlow was holding 4500 CMP units on behalf of its customers. They point to these facts to support their view that they must therefore be limited partners of the 2003 and 2004 CMP limited partnerships, and thus are entitled to registration of their interests. This will make the investments customer name securities.

66        Goodman & Company points out that as far as CMP and its records are concerned, in prior years, the Benson Group and Eden subscribed for the partnership units in their own names. They were recorded as limited partners for these investments. However, it was Management Inc. that subscribed for units in CMP 2003 and 2004. In compliance with its obligations under the *Limited Partnership Act*, and the Limited Partnership Agreement, CMP kept registers for unit subscribers for CMP 2003 and 2004. These register show Management Inc. as the subscriber for these units.

67        As it did for many other securities, Management Inc. purchased blocks of CMP as subscriber, and was thus registered as the holder in its own name. It later allocated them to clients. In my view, this puts the CMP units in exactly the same position as the other securities, which I have found, are not customer name securities. Although the Benson Group and Eden do not assert a trust claim to the CMP units, it is clear to me, on the basis of who subscribed for the units, that Management Inc. was the registered holder, and held the units in trust for the Benson Group and Eden. I see no basis upon which they can require the register to be altered, since they were not the subscribers for these units. I deny their request on this basis. As a result, I need not address whether there are also public policy grounds upon which to deny it as well.

68        This leaves the last issue; that is whether there should be both a procedural and substantive consolidation of the bankruptcies of the corporate defendants, essentially treating them as one bankruptcy of one securities

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

firm.

### *Procedural and Substantive Consolidation?*

69      All the stakeholders support procedural consolidation of the bankruptcy of all the corporate defendants. No one opposes a substantive consolidation apart from the CIPF. In order to assess its position, it is important to consider what the effect of a substantive consolidation would be.

70      Essentially, a substantive consolidation would treat all of the corporate defendants as one entity. The assets of each would fall into one common pool, to be shared by all their creditors on a *pari passu* basis.

71      There is no specific authority in the *Bankruptcy and Insolvency Act* to grant an order for substantive consolidation. It is common ground, however, that the court has the authority to do so under its equitable jurisdiction under section 183 of the *Act*.

72      Few Canadian cases have dealt with substantive consolidation, although the American courts have written extensively on the subject, setting out various, and disparate, tests to support an order for substantive consolidation. We have no such assistance here.

73      The Receiver seeks a substantive consolidation for a number of reasons. Just as it said the "Marlow Group" as a whole should be treated as a securities firm, so it says, the four corporate defendants should be treated as one legal entity for the purposes of bankruptcy. They say it is appropriate to consolidate bankrupt estates in order to avoid multiplicity of proceedings, and where the bankrupt companies have shared or pooled resources, assets, and bank accounts. Also, they say where related companies are organized in an intertwined manner, it will be reasonable that the estates be dealt with *en bloc* to realize the greatest value for all interested parties.[FN11]

74      The Receiver goes on to say that all four companies operated as an interrelated entity, with shared premises, telephone, fax, bank accounts and accounting records. The Receiver says that they were operated as a single, consolidated enterprise, and should be treated as such for bankruptcy purposes, because to do so would be most expedient and cost-effective.

75      What emerges from the few Canadian cases, however, is that although expediency is an appropriate consideration in deciding whether to grant consolidation, it should not be done at the expense or possible prejudice of any particular creditor.[FN12] I take this to include any possible prejudice to someone like the CIPF, which as a customer compensation body under the *Act* has some concerns about possible additional expose to claims if there is substantive consolidation, and all creditors, and perhaps customers, then have potential claims against Securities Inc, and thus against the Fund. While there is no evidence of this actually occurring, it is a concern.

76      CIPF also points out that the Receiver wishes to use the only assets of Securities Inc., some cash, to fund the bankruptcy, and thus there is no practical advantage to any of Securities Inc.'s creditors to having a substantive consolidation of all the estates.

77      CIPF says that substantive consolidation profoundly affects the substantive rights of debtors and creditors, and thus should be considered an extreme remedy and carefully scrutinized. It involves more than procedural convenience, which of course can be accomplished by the procedural consolidation that everyone supports.

78      The Receiver has not provided evidence concerning the effect on all the creditors of all the corporate de-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

fendants if there is a substantive consolidation, and whether this will adversely affect the rights of any creditor of any individual company. Without that evidence, I cannot determine whether a consolidation would occur at the expense or to the prejudice of any particular creditor. I echo the concerns of Chadwick J in *J.P. Capital Corp., Re*[FN13] where he stated:

> I am concerned with consolidating the actions which will provide for pari passu distribution without knowing the effect that such an order will have on all creditors. Although expediency is an appropriate consideration it should not be done at the possible prejudice or expense of any particular creditor.

79      I am also concerned about whether there can be a substantive consolidation where Part XII clearly applies to two of the bankrupt companies (Management Inc. and Securities Inc.), but not to Estate Builders Inc. It is a life insurance agency — there is no suggestion that it is also a securities firm. Because of this, I am not persuaded, on the record I have, that all four companies should be treated as a single securities firm for the purposes of Part XII. This has an impact on the claim for consolidation. Although Estate Builders Inc. may not have any assets, or indeed any creditors, substantive consolidation may have the unintended effect of attempting to deal with Estate Builder's bankruptcy under Part XII. Counsel for the receiver was not able to provide me with sufficient evidence to address either of my concerns.

80      For these reasons, the motion for substantive consolidation is dismissed, without prejudice to its being renewed on further and better material. The motion for procedural consolidation of all the corporate bankrupt estates is granted.

### Receiver's Third and Fourth Reports

81      There is no objection to the receipt of the Receiver's Third Report, the Supplement to it, and the Receiver's Fourth Report. There is no objection to approving the actions taken by the receiver to date. Accordingly, an order will go as requested in that regard.

82      The receiver raised an issue concerning paragraph 28 of the Receivership Order. It is of particular relevance now, given my disposition of the motion for substantive consolidation. That paragraph relates to the Receiver's use of the assets of Securities Inc. The only asset Securities Inc. has is cash of about $120,000. The Receiver needs access to this money in order to fund its fees as the Trustee on the bankruptcies. Without substantive consolidation, this may create some difficulty. No one opposes these funds being used by the Trustee to administer all the estates. An order will therefore go deleting paragraph 28 of the Receivership Order so that the receiver can access all the money in Securities Inc. to cover trustee's fees on the procedurally consolidated bankruptcy of the corporate defendants.

### Disposition:

83      For all these reasons, an order will go as follows:

> (a) Receiving the Third Report of the Receiver dated August 15, 2005, the Supplement to the Third report of the Receiver dated August 17, 2005, and the Fourth Report of the Receiver dated September 30, 2005, and approving the activities of the Receiver set out in them;

> (b) Authorizing and directing the Receiver to assign all of the corporate defendants into bankruptcy, and that A. Farber & Partners Inc. shall be the trustee in bankruptcy ("Trustee");

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

(c) The bankruptcy estates of the corporate defendants shall be procedurally consolidated and administered together;

(d) Dismissing the Receiver's motion for substantive consolidation, without prejudice to its being renewed on further and better material;

(e) The bankruptcies of Management Inc. and Securities Inc. will proceed under Part XII of the *Bankruptcy and Insolvency Act*;

(f) The Goudey Group's motion to have certain securities declared to be customer name securities, or alternatively for a trust to be imposed on them and their being returned is dismissed;

(g) The Benson Group's and Eden's motion for the re-registration of CMP 2003 and 2004 Limited Partnership units into their names is dismissed;

(h) Declaring the 3,346,667 shares in the capital of Stealth Minerals Limited described in paragraph 7 of the Third Report are the only "customer name securities" held by Management Inc. and Securities Inc., and that the remainder of the securities they hold are not customer name securities and shall be grouped into either the "customer pool fund" or the "general fund" as appropriate in accordance with Part XII of the *Bankruptcy and Insolvency Act*;

(i) Deleting paragraph 28 of the Receivership Order of Campbell J. dated March 9, 2005;

(j) That the Trustee shall be authorized to sell sufficient securities and any other property from the bankruptcy estates in order to realize up to $250,000 of net proceeds to fund the costs of the bankruptcy, including without limitation the fees and costs of the Trustee and its counsel, and that the Trustee may apply to the Court at any time and from time to time to sell any further securities or other property from the bankruptcy estate as it may deem necessary to fund the ongoing costs of the bankruptcy;

(k) That after the assigning the corporate defendants into bankruptcy, the Receiver is authorized and directed to bring a motion before this Court to terminate the Receivership in respect of the corporate defendants and to seek approval of its final statement of receipts and disbursements as Receiver, including approval of its fees and costs and fees and costs of its counsel and the costs payable from the estate pursuant to the Order of this Court made on March 9, 2005 to counsel for the Plaintiffs and to seek a discharge of the Receiver in respect of the corporate defendants;

(l) That the Receiver and the Trustee, upon its appointment, shall incur no liability or obligation as a result of the carrying out the provisions of this Order, except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Receiver by the Order dated March 9, 2005, or by section 14.06 of the *Bankruptcy and Insolvency Act*, or any other applicable legislation.

(m) Amending the title of proceedings to change the name "Marlow Private Estate Builders Inc." to "Private Estate Builders Inc.".

84    If the parties are unable to agree on the disposition of costs of the motion and cross motions, they may make brief written submissions to me. The Receiver's are to be delivered within 15 days of the release of these

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 3449, 22 C.B.R. (5th) 126, 270 D.L.R. (4th) 744

reasons, with all other parties delivering their responses within 15 days following.

*Order accordingly.*

FN* Additional reasons at *Ashley v. Marlow Group Private Portfolio Management Inc.* (2006), 2006 Carswell-lOnt 3419 (Ont. S.C.J. [Commercial List]).

FN1 John Goudey, Thomas Abel, Shobana Ananth, Shane Anderson, Donald Bayer, Michael Caicco, Charles Cutts, John Coudey, Arnold H. Hochman, Mark Irwin, Gary Levy, Karen Malatest, Hamish McEwan, Pierre Meunier, Paul Oakley, Barry Reiter, Mike Stroud, Michelle Szames, Stephen Szames, James Turner, John Unger, and 2044102 Ontario Inc.

FN2 Paul Benson, Brenda Benson and 145403 Ontario Inc.

FN3 *New Brunswick v. Estabrooks Pontiac Buick Ltd.* (1982), 44 N.B.R. (2d) 201 (N.B. C.A.), at paragraph 19, and *Aeric Inc. v. Canada Post Corp.* (1985), 16 D.L.R. (4th) 686 (Fed. C.A.) at p. 707

FN4 Superintendent's factum, paragraph 12

FN5 see Ruth Sullivan, *Sullivan and Driedger on the Construction of Statutes*, 4th ed. (Markham, Ont.: Butterworths, 2002) at 80

FN6 R.S.O. 1990 c. S.5

FN7 *An Act to establish the Wage Earner Protection Program Act, to amend the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act and to make consequential amendments to other Acts*

FN8 *Vantage Securities Inc., Re* (1998), 9 C.B.R. (4th) 169 (B.C. S.C. [In Chambers])

FN9 (1997) 17:3 *Insolvency Bulletin* 75

FN10 See s. 4(1) of the *Limited Partnership Act*, R.S.O. 1990 c. L.16, and s. 3a of Regulation 713 made under the *Limited Partnership Act*

FN11 *J.P. Capital Corp., Re* (1995), 31 C.B.R. (3d) 102 (Ont. Bktcy.), and *Associated Freezers of Canada Inc., Re*, [1995] O.J. No. 2862 (Ont. Bktcy.).

FN12 *Associated Freezers of Canada Inc., Re*, above, at paragraph 5

FN13 Note 10, above, at paragraph 19

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 18

278 F.Supp.2d 491
United States District Court,
E.D. Pennsylvania.

ASTRAZENECA AB, et al.,

v.

MUTUAL PHARMACEUTICAL CO., INC.

Civil Action No. 00–4731.   |   Aug. 21, 2003.

Owner of patent for extended release pharmaceutical preparations sued generic drug manufacturer for infringement. On cross-motions for summary judgment on defendant's invalidity defense, the District Court, Baylson, J., held that: (1) patent was not anticipated, and (2) patent was not obvious.

Plaintiff's motion granted; defendant's motion denied.

See also 221 F.Supp.2d 535 and 250 F.Supp.2d 506.

West Headnotes (18)

[1]    **Patents**
       👈 Sufficiency of evidence to offset effect of decision in general

       Party asserting invalidity must show that patent in suit is invalid by clear and convincing evidence. 35 U.S.C.A. § 282.

       Cases that cite this headnote

[2]    **Patents**
       👈 Conclusiveness and Effect of Decisions of Patent Office

       Burden of party asserting that prior art invalidates patent is especially difficult when Patent and Trademark Office, during patent prosecution, specifically considered prior art references being asserted by party.

       1 Cases that cite this headnote

[3]    **Patents**
       👈 Identity of Invention

Patent is invalid as "anticipated" if every limitation of claimed invention is found in single prior art reference. 35 U.S.C.A. § 102.

Cases that cite this headnote

[4]    **Patents**
       👈 Nature and Extent in General

That which would literally infringe if later in time anticipates if earlier than date of invention. 35 U.S.C.A. § 102.

Cases that cite this headnote

[5]    **Patents**
       👈 Identity of Invention

For patent to be found anticipated by prior art, there must be no difference between claimed invention and reference disclosure, as viewed by person of ordinary skill in field of invention. 35 U.S.C.A. § 102.

Cases that cite this headnote

[6]    **Patents**
       👈 Identity of Invention

Prior art reference may anticipate patent, even if it does not expressly set forth particular element of patent claim asserted to be anticipated, if that element is inherent in reference's disclosure. 35 U.S.C.A. § 102.

Cases that cite this headnote

[7]    **Patents**
       👈 Questions of law or fact
       **Patents**
       👈 Presence or absence of fact issues

Determination of whether patent claim is invalid as anticipated is question of fact and is susceptible to summary judgment only where no facts material to question are disputed. 35 U.S.C.A. § 102.

Cases that cite this headnote

[8]    **Patents**

⌇ Combination

To establish obviousness, party asserting patent's invalidity must make showing of some teaching, suggestion, or reason in prior art that would lead one of ordinary skill in art to combine various prior art references. 35 U.S.C.A. § 103(a).

Cases that cite this headnote

[9]    Patents
    ⌇ Invention and Obviousness in General
    Patents
    ⌇ Fact questions
    Patents
    ⌇ Secondary Factors Affecting Invention or Obviousness

Determination of whether patent claim is invalid as obvious is conclusion of law based on underlying findings of fact as to: (1) scope and content of prior art; (2) level of ordinary skill in prior art; (3) differences between claimed invention and prior art; and (4) objective evidence of nonobviousness. 35 U.S.C.A. § 103(a).

Cases that cite this headnote

[10]    Patents
    ⌇ General Rules of Construction

Patent claim construction adopted for infringement analysis was binding on invalidity analysis.

1 Cases that cite this headnote

[11]    Patents
    ⌇ Foreign patents

Foreign patents are capable of anticipating United States patents. 35 U.S.C.A. § 102(a, b, d).

Cases that cite this headnote

[12]    Federal Civil Procedure
    ⌇ Failure to respond; sanctions

Factors court weighs in deciding whether to exclude evidence as discovery sanction include: (1) prejudice or surprise in fact of party against

whom excluded witnesses would have testified; (2) ability of that party to cure prejudice; (3) extent to which waiver of rule against calling unlisted witnesses would disrupt orderly and efficient trial of case or of other cases in court; and (4) bad faith or willfulness in failing to comply with court's order. Fed.Rules Civ.Proc.Rule 37(c)(1), 28 U.S.C.A.

11 Cases that cite this headnote

[13]    Patents
    ⌇ Other matters

Exclusion of allegedly anticipating prior art reference, not asserted by patent challenger prior to its responsive summary judgment brief, was warranted as discovery sanction; patentee was prejudicially surprised by challenger's late reliance on reference, and it was too late to cure such prejudice. Fed.Rules Civ.Proc.Rule 37(c)(1), 28 U.S.C.A.

1 Cases that cite this headnote

[14]    Patents
    ⌇ Other matters

Experimental data an related expert testimony on issue of whether patent for pharmaceutical formulation was invalid as anticipated, offered after submission of proponent's expert report, was excludible as discovery sanction; patentee was prejudiced by late disclosure, and evidence was not crucial to proponent's invalidity claim. Fed.Rules Civ.Proc.Rule 37(c)(1), 28 U.S.C.A.

9 Cases that cite this headnote

[15]    Patents
    ⌇ Compositions, compounds, and medicinal preparations

Patent for extended release pharmaceutical preparations through use of solubilizer was not anticipated by prior art reference which advocated use of chemical additive which was capable of functioning as solubilizer under certain circumstances; reference did not teach use of chemical as solubilizer, and chemical did

not inherently act as solubilizer in reference. 35 U.S.C.A. § 102.

Cases that cite this headnote

[16] **Patents**
☞ Chemical compounds

Patent for extended release pharmaceutical preparations was not invalid as obvious, though it allegedly combined elements from various prior art references, absent showing of some teaching, suggestion, or reason in prior art that would have led one of ordinary skill in art to combine elements. 35 U.S.C.A. § 103(a).

Cases that cite this headnote

[17] **Patents**
☞ Original utility

4,369,172, 4,412,986, 4,673,564. Cited as Prior Art.

Cases that cite this headnote

[18] **Patents**
☞ Original utility

4,803,081. Valid.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*492** Lisa B. Pensabene, Michael P. McGraw, Jacob K. Baron, Christopher P. Borello, Lisa Wang, Dennis Gregory, Fitzpatrick Cella Harper & Scinto, New York, NY, John V. Gorman, Morgan Lewis & Bockius, Eric Kraeutler, Morgan Lewis & Bockius LLP, Philadelphia, PA, for Plaintiff.

**\*493** Thomas S. Biemer, Dilworth Paxson LLP, Philadelphia, PA, Robert F. Green, Leydig Voit And Mayer Limited, Christopher T. Griffith, Leydig Voit & Mayer Ltd, Chicago, IL, John J. Higson, Dilworth Paxson LLP, Philadelphia, PA, for Defendant.

***MEMORANDUM***

BAYLSON, District Judge.

The parties to this patent litigation have filed cross motions for summary judgment on May 2, 2003, relating to the Defendant's affirmative defense and counterclaim that the patent in suit, United States Patent 4,803,081 ("the #081 patent") is invalid. On August 19, 2002, following a *Markman* hearing, Judge Lowell A. Reed Jr. issued his Conclusions of Law regarding the construction of the patent claims at issue. *Astrazeneca AB v. Mutual Pharm. Co., Inc.,* 221 F.Supp.2d 535 (E.D.Pa.2002). The Court also denied Defendant's motion for reconsideration by Memorandum and Order dated October 3, 2002. *AstraZeneca AB v. Mutual Pharm. Co., Inc.,* No. Civ.A. 00–4731, 2002 U.S. Dist. LEXIS 20311 (E.D.Pa. Oct. 3, 2002). Thereafter, this matter was reassigned from the calendar of Judge Reed to the undersigned. On March 14, 2003, this Court granted the Plaintiffs' Motion for Summary Judgment of Literal Infringement, concluding that the Defendant, Mutual Pharmaceutical Company, Inc. ("Defendant") had infringed the #081 patent. *AstraZeneca AB v. Mutual Pharm. Co., Inc.,* 250 F.Supp.2d 506 (E.D.Pa.2003).

In addition to the cross motions for summary judgment that are now pending before this Court, Plaintiffs have filed a Motion to Exclude certain evidence and contentions, which, Plaintiffs claim, Defendant never disclosed during discovery, and only revealed for the first time, and belatedly, in conjunction with the present summary judgment motions. This Court heard oral argument related to all pending motions on July 31, 2003. For the reasons stated below, this Court will grant Plaintiffs' Motion to Exclude, deny Defendant's motion for summary judgment, and grant Plaintiffs' motion for summary judgment.

**I. Summary Background and Procedural History [1]**
Plaintiff Aktiebolaget Hassle is the assignee of the #081 patent, which relates to "extended release" pharmaceutical preparations of active compounds having very low solubility. One such compound with low solubility in the intestines is felodipine, a cardiovascular drug, which Plaintiffs market under the brand name Plendil.

On June 6, 2000, Defendant filed an Abbreviated New Drug Application ("ANDA") seeking approval from the Food and Drug Administration ("FDA") to manufacture and sell Defendant's proposed 10 mg generic version of felodipine. Defendant amended its ANDA twice, to apply for approval of

5 mg and 2.5 mg dosages. Thereafter, on September 19, 2000, Plaintiffs filed this patent infringement suit, alleging that the proposed drug formulations in Defendant's ANDA infringe the #081 patent.

Defendant, in its Answer, raised the affirmative defenses of noninfringement and invalidity. Specifically, on the invalidity defense, Defendant claimed that "[t]he #081 patent, and each of the claims thereof, is invalid for failure to satisfy one or more of the requirements of 35 U.S.C. §§ 102, **494** 103 and/or 112." Defendant's Answer, Affirmative Defenses and Counterclaim ¶¶ 24. Defendant also asserted a two-count counterclaim, seeking declaratory judgments that its proposed formulations would not infringe the patent, and that the patent itself is invalid.

In granting Plaintiffs' motion and entering summary judgment of literal infringement, this Court concluded, based on Judge Reed's claim construction, and after comparing Defendant's proposed products, component by component, with the elements of the #081 patent's claims, that Defendant's formulations embody every element of claims 1, 8, 12, 14, 15 and 17 in Plaintiffs' patent [2] —and that no genuine issue of material fact remained as to Defendant's infringement.

## II. Judicial Determinations as to Patent Validity

[1] The statute relating to patent validity and defenses to patent infringement actions provides:

> A patent shall be *presumed valid.* Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim.... *The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.*

35 U.S.C. § 282 (emphasis added). The party asserting invalidity must show that the patent in suit is invalid by clear and convincing evidence. *Beckson Marine, Inc. v. NFM, Inc.,* 292 F.3d 718, 725 (Fed.Cir.2002).

[2] A challenger may rely on references to prior art in order to meet its burden. However, the challenger's burden is

"especially difficult" when the Patent and Trademark Office ("PTO"), during patent prosecution, specifically considered the prior art references which the challenger is asserting in the litigation. *Hewlett–Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1467 (Fed.Cir.1990). Defendant in the present case cites to several separate prior art references, discussed in detail below. [3] Defendant asserts that the invention of the #081 patent is either anticipated by the prior art (under 35 U.S.C. § 102) or obvious (under 35 U.S.C. § 103).

### A. *Anticipation*

[3] [4] [5] Anticipation simply means that the patent lacks novelty. *Brown v. 3M,* 265 F.3d 1349, 1351 (Fed.Cir.2001). A patent is anticipated if every limitation of the claimed invention is found in a single prior art reference. *Id.* The United States Court of Appeals for the Federal Circuit has observed that the tests for literal infringement and anticipation are "very similar," and that "[t]hat which would literally infringe if later in time anticipates if earlier than the date of invention." *Mycogen Plant Science v. Monsanto Co.,* 243 F.3d 1316, 1324 (Fed.Cir.2001) (*quoting Lewmar Marine, Inc. v. Barient, Inc.,* 827 F.2d 744, 747 (Fed.Cir.1987)). Stated simply, for a patent to be found anticipated by the prior art, "[t]here must be no difference between the claimed invention and **495** the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Res. Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991).

[6] In some circumstances, though a prior art reference does not expressly set forth a particular element of the patent claim asserted to be anticipated, the reference still may anticipate if that element is "inherent" in the reference's disclosure. *In re Robertson,* 169 F.3d 743, 745 (Fed.Cir.1999). The Federal Circuit has explained that

> This modest flexibility in the rule that "anticipation" requires that every element of the claims appear in a single reference accommodates situations where the common knowledge of technologists is not recorded in the reference; that is, where technological facts are known to those in the field of the invention, albeit not known to judges. It is not, however, a substitute for determination of patentability.

*Continental Can Co. v. Monsanto Co.,* 948 F.2d 1264, 1269 (Fed.Cir.1991). The party asserting anticipation can establish "inherency" only if the extrinsic evidence clearly shows "that the missing descriptive matter is *necessarily present* in the thing described in the reference." *Robertson,* 169 F.3d at 745 (*quoting Continental Can,* 948 F.2d at 1268) (emphasis added). Moreover, the "mere fact that a certain thing *may result from a given set of circumstances* is not sufficient." *Id.* (*quoting Continental Can,* 948 F.2d at 1269) (emphasis added). That is, inherency may not be established by mere "probabilities or possibilities." *Id.* This Court will discuss the doctrine of inherent anticipation in more detail, *infra,* in Part VII(A)(1)(c)(ii)[B].

[7]    An anticipation inquiry entails two analytical steps, the first of which is to construe the claims of the patent in suit, as a matter of law. *Key Pharmaceuticals v. Hercon Laboratories Corp.,* 161 F.3d 709, 714 (Fed.Cir.1998). This Court has already construed the claims of the #081 patent to the extent necessary to decide Plaintiffs' earlier motion for summary judgment of literal infringement. The second step in an anticipation inquiry is to compare the construed claims to the prior art. *Id.* Like infringement, the determination of whether a patent claim is anticipated is a question of fact and is susceptible to summary judgment only where no facts material to the question are disputed. *Id.*

**B. *Obviousness***

Another basis for a finding of patent invalidity, asserted by Defendant, is that the claims of the patent in suit are obvious. Not to be confused with anticipation, "obviousness" means that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).

The correct inquiry is not whether each element existed in the prior art, but whether the prior art made obvious the invention of the patent in suit as a whole. *Hartness Int'l, Inc. v. Simplimatic Eng'g Co.,* 819 F.2d 1100, 1108 (Fed.Cir.1987).

[8]    To establish obviousness, the party asserting invalidity must make a showing of some "teaching, suggestion, or reason" in the prior art that would lead one of ordinary skill in the art to combine the various prior art references. *Winner Int'l Royalty Corp. v. Wang,* 202 F.3d 1340, 1348 (Fed.Cir.2000); *Gambro Lundia AB v. Baxter Healthcare Corp.,* 110 F.3d 1573, 1579 (Fed.Cir.1997) (stating that the "absence **\*496** of such a suggestion to combine is dispositive in an obviousness determination"). The Federal Circuit has stated:

> Evidence of a suggestion, teaching, or motivation to combine prior art references may flow, *inter alia,* from the references themselves, the knowledge of one of ordinary skill in the art, or from the nature of the problem to be solved. Although a reference need not expressly teach that the disclosure contained therein should be combined with another, the showing of combinability, in whatever form, must nevertheless be "clear and particular."

*Winner,* 202 F.3d at 1348–49 (citations omitted). *See also Crown Operations Intern., Ltd. v. Solutia Inc.,* 289 F.3d 1367, 1376 (Fed.Cir.2002) (noting that an obviousness finding cannot be based on the "hindsight" combination of components from various prior art references). This requirement of "combinability" presents a question of fact. *Winner,* 202 F.3d at 1348.

[9]    The determination of whether a patent claim is obvious is a conclusion of law based on underlying findings of fact. *Beckson Marine,* 292 F.3d at 725. These underlying factual inquiries are: "(1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness." *Id.* (*quoting In re Dembiczak,* 175 F.3d 994, 998 (Fed.Cir.1999)). Like anticipation, an obviousness determination entails two steps, the first of which is to construe the contested claims of the patent in suit as a matter of law. *Key Pharmaceuticals,* 161 F.3d at 714. The second step is to determine, as a legal matter, whether the challenged claims would have been obvious, based on the four factual inquiries noted just above. *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.,* 183 F.3d 1347, 1353 (Fed.Cir.1999). This Court may properly grant summary judgment on the obviousness issue only when those underlying factual inquiries "present no lingering genuine issues." *Beckson Marine,* 292 F.3d at 723.

**III. This Court's Construction of the #081 Patent [4]**

[10]    For purposes of determining issues of invalidity, this Court must adopt the same construction of the #081

patent's claims as it adopted in determining the infringement issue. *Amgen Inc. v. Hoechst Marion Roussel, Inc.,* 314 F.3d 1313, 1330 (Fed.Cir.2003) ("It is axiomatic that claims are construed the same way for both invalidity and infringement."). In this litigation, Plaintiffs have asserted infringement of claims 8, 12, 14, 15 and 17 of the #081 patent, and this Court has found that Defendant has infringed those claims. Though Plaintiffs have not specifically asserted claim 1 of the# 081 patent in this litigation, four of the asserted claims, namely 8, 12, 14 and 15, are dependent on claim 1, which contains the following limitations:

> 1. A solid preparation providing extended release of an active compound with very low solubility in water *comprising* a *solution or dispersion* of an effective amount *of the active compound in* a semi-solid or liquid nonionic *solubilizer,* wherein the amount by weight of the solubilizer is at least equal to the amount by weight of the active compound, **\*497** and a release controlling system to provide extended release.

United States Patent 4,803,081 (issued Feb. 7, 1989) (emphasis added).

The central issue of claim construction decided by this Court, in relation to Plaintiffs' previous motion for summary judgment of infringement, concerned the scope and meaning of the term "solubilizer." This Court held that "solubilizer," throughout the #081 patent, should be interpreted according to its "ordinary" meaning: a compound "that increases the solubility of a substance in a particular solvent." *Astrazeneca AB v. Mutual Pharm. Co., Inc.,* 221 F.Supp.2d 535, 548 (E.D.Pa.2002). Significantly, this Court found that the ordinary meaning of "solubilizer" includes both "surfactants" and "co-solvents." *Id.*

Whether the term "solubilizer" in the #081 patent includes co-solvents has been an important issue in this litigation, as Defendant's infringing products indisputably include the co-solvent polyethylene glycol 400 (herein "PEG 400"). *AstraZeneca AB v. Mutual Pharm. Co., Inc.,* 250 F.Supp.2d 506, 511 (E.D.Pa.2003). This Court has noted, and the parties have agreed, that PEG 400 *can* be used as a co-solvent solubilizer. *See id. at 511 n. 2;* Transcript of Oral Argument Hearing (Jan. 30, 2003) at 13–14, 57. Under this Court's claim construction, the term "solubilizer" in the #081 patent

covers any co-solvent, within a particular drug formulation, if that co-solvent would function as a solubilizer within that formulation.

In claim 1 of the #081 patent, the solubilizer limitation can be found within the greater phrase: "a solution or dispersion of an effective amount of the active compound *in* a semi-solid or liquid nonionic solubilizer." Defendant argued, at the infringement stage, that the word "in" should be construed to mean "in and only in," such that the patent would be limited to a solution in which an effective amount of the active compound is dissolved *in and only in the solubilizer,* and in nothing else. The Court rejected that argument, and held simply that the limitation, "*in* a semi-solid or liquid nonionic solubilizer," includes "all solutions in which the active compound is dissolved or dispersed in a nonionic solubilizer." *AstraZeneca,* 250 F.Supp.2d at 515. The Court further found that an accused formulation would meet this claim element even though the alleged infringer had also added to the accused formulation some extra ingredient, such as, in Defendant's case, ethanol. *Id.* at 515 and 520.

## IV. The Prior Art

In their summary judgment briefings, the parties focus on the following prior art references and their impact on this Court's invalidity analysis.

### A. *The Kawata Patent*

In relation to Plaintiffs' earlier motion for summary judgment of infringement, the parties raised numerous arguments related to United States Patent 4,673,564 (inventors, Hiroitsu Kawata, et al.) (issued June 16, 1987) (herein "the Kawata patent").[5] The Kawata patent was of central importance in determining whether Defendant had infringed Plaintiffs' #081 patent.

**\*498** The Kawata patent relates to "a sustained release pharmaceutical composition of a solid medical material," such as nifedipine. *Id.* (col.1, ln.17). The Kawata invention encompasses several elements, including a "first component" and an optional "second component." *Id.* (col.1, lns.50–56, 66–68). Kawata suggests, only by way of example, that the second component may be a surfactant, or polyethylene glycol (i.e. PEG 400). *Id.* (col. 2, ln. 1; col. 5; ln. 65).

In its infringement determination, this Court found that the Kawata patent actually teaches away from the use of solubilizers. *AstraZeneca,* 250 F.Supp.2d at 513. As

*Astrazeneca AB v. Mutual Pharmaceutical Co., Inc., 278 F.Supp.2d 491 (2003)*

Kawata explains, the inventors "found that a sustained release pharmaceutical composition of nicardipine can be obtained by using amorphous nicardipine *without adding any substance improving the solubility in the intestines.*" United States Patent 4,673,564 (col.3, lns.49–52) (emphasis added). Thus, although examples of the second component include surfactants and PEG 400, Kawata's process does not necessarily make use of these substances *as solubilizers.* In construing the claims of the #081 patent, and in determining whether those claims have been infringed by Defendant's products, this Court has determined that the #081 patent and Kawata use "entirely different processes." *AstraZeneca,* 250 F.Supp.2d at 513.

**B. *The 1983 Kawata Patent***

In its present motion for summary judgment, Defendant also cites United States Patent 4,412,986 (issued Nov. 1, 1983) (inventors, Hiroitsu Kawata, et al.). This patent was issued in 1983, several years prior to the PTO issuance of United States Patent 4,673,564—"the Kawata patent" discussed above. The Court will refer to this earlier patent as "the 1983 Kawata patent," to distinguish it from the later Kawata patent.

The 1983 Kawata patent relates to "a novel nifedipine-containing solid composition having high bioavailability and small bulk for facilitating the administration thereof." United States Patent 4,412,986 (col.1, ln.13–15). While Defendant does not assert that the 1983 Kawata patent itself anticipates the #081 patent, Defendant cites to this predecessor of Kawata in connection with its argument that Kawata anticipates the #081 patent.

**C. *The German #106 Patent***

 [11]    Defendant cites to a German patent, number DE 3400106 A1 ("the German #106 patent"), which relates to pharmaceutical preparations with a controlled drug release.[6] In its brief in opposition to Plaintiffs' present motion, Defendant, for the first time in this litigation, offers arguments and evidence related to the German #106 patent. Defendant never disclosed any contentions based on the German #106 patent at any time during the discovery, claim construction, or infringement phases of this litigation. As discussed below, Plaintiffs assert that Defendant's new contentions related to the German #106 patent should be excluded from consideration.

The inventors of the #081 patent—the patent presently in suit —actually cited to the German #106 patent in the Background

section of the #081 patent. The inventors of the #081 patent seemingly recognized that the German #106 patent contains a solubilizer.[7] United States Patent 4,803,081 **\*499** (col.1, lns.62–64). But the #081 patent inventors attempted to distinguish the German #106 patent, on the ground that, in that foreign patent, the ratio of solubilizer to active compound is much less than 1:1, by weight, whereas the #081 patent requires that "the amount by weight of the solubilizer [be] at least equal to the amount by weight of the active compound." *Id.* (col.8, lns.47–50). *See also id.* (col.1, lns.62–64) (stating that German #106 "is described to use a solubilizer in an amount by weight to the active compound which is much less than 1:1").

In their present cross motions, the parties focus their arguments on Example 8 of the German #106 patent. In Example 8, according to Defendant, the solubilizer is polyethylene glycol 600 (herein "PEG 600"). Defendant offers an expert declaration (which Plaintiffs claim must be precluded as untimely) to prove that in Example 8, the amount of solubilizer (PEG 600), by weight, is greater than the amount of active compound (flufenamic acid), thereby meeting the weight ratio requirement of the #081 patent. Declaration of R. Christian Moreton, Ph.D. ¶ 34 (5/30/03). Moreover, Defendant asserts that the German #106 patent embodies every limitation of certain claims of the #081 patent, thereby rendering such claims invalid as anticipated.

**D. *Other Prior Art***

Defendant also cites United States Patent 4,369,172 (issued Jan. 18, 1983) (inventors, Schor, Joseph M., et al.) ("the Schor patent"). The Schor patent relates to "a carrier base material, consisting essentially or predominantly of hydroxypropyl methylcellulose having a chemical structure and molecular weight which renders it suitable for use in prolonged release therapeutic compositions." United States Patent 4,369,172 (col.1, lns.12–17).

Additionally, Defendant relies on, as prior art, an article written by D.A. Alderman, published in a technical journal in 1984: D.A. Alderman, *A Review of Cellulose Ethers in Hydrophilic Matrices for Oral Controlled–Release Dosage Forms,* Int. J. Pharm. Tech. & Prod. Mfr., 5(3) at 1–9 (1984) ("the Alderman article").

**V. The Parties' Contentions**

Plaintiffs' Motion for Summary Judgment (Doc. No. 102) seeks dismissal of Defendant's affirmative defense and

Astrazeneca AB v. Mutual Pharmaceutical Co., Inc., 278 F.Supp.2d 491 (2003)

counterclaim of invalidity. Plaintiffs rely extensively on this Court's prior decisions, reviewed above, and also argue that because the prior art was submitted to the Patent and Trademark Office, not only do the Plaintiffs enjoy the statutory presumption of validity, and not only does the Defendant have the burden of proving invalidity by clear and convincing evidence, but also the burden is "most formidable." Plaintiff's Memorandum in Support of Its Motion for Summary Judgment at 14. Plaintiffs reiterate the arguments they made in the prior proceedings, that the Kawata patent teaches an entirely different process from that described in Plaintiffs' #081 patent, and that the #081 patent could not have been anticipated by Kawata because Kawata does not teach the use of a solubilizer.

 *500  Defendant's Motion for Summary Judgment (Doc. No. 103) initially asserts that Judge Reed's decision on claim construction was too expansive, and that this Court's ensuing decision finding literal infringement was erroneous in part because it relied on and followed Judge Reed. The main thrust of Defendant's position, expressed at pages 23–43 of its opening brief, is that the prior art, particularly the Kawata patent, discloses each element of each asserted claim of the #081 patent. While Defendant expends great effort in arguing that each and every element of claim 1 is present in Kawata, the central issue presented is whether Kawata contains "a semi-solid or liquid nonionic solubilizer," as required by claim 1. If Kawata does not contain such solubilizer element, it cannot anticipate claim 1.

Defendant renews its earlier argument that, because Kawata mentions PEG 400 as an example of a substance that could comprise its optional "second component," and because PEG 400 is capable of functioning as a solubilizer under certain circumstances, this Court must find that Kawata embodies a solubilizer element. *See* Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment ("Def.Brief") at 28. Defendant claims that its expert reports and experimental data reveal the unmistakable presence of a solubilizer function in Kawata.

Both sides filed two additional briefs, and substantial parts of their arguments are highly repetitive of their opening briefs.

Defendant's Memorandum in Opposition to the Plaintiffs' Motion is largely repetitive of its opening brief, arguing that the #081 patent's claims are invalid by virtue of the Court's claim construction and infringement decisions. However this brief, at page 34, brings a new theory into the case,

that a foreign patent (here referred to as "German #106"), anticipates the # 081 patent and renders it invalid. This argument, at this point in the litigation, is apparently the first time that the Defendant has asserted the German #106 patent in any detail.

Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment of invalidity (filed June 2, 2003) first argued that Defendant should be precluded from relying on new testing, theories and evidence not disclosed during fact discovery, not disclosed in response to contention interrogatories, and as to certain testing, not disclosed in the Defendant's experts' initial reports. [8]

Plaintiffs dispute that the Court's finding of literal infringement requires a finding of invalidity. Plaintiffs repeat their arguments from the claim construction and literal infringement stages of the case, that Kawata is an entirely different formulation system than the #081 patent, and also refute, at pp. 26–27, Defendant's assertion that PEG 400 acts as a solubilizer in Kawata. At pp. 27–36, Plaintiffs give their descriptions of the prior art, and refute Defendant's arguments that the prior art anticipates the #081 patent. Plaintiffs also assert that Defendant's argument that claims 14 and 15 are obvious, is insufficient.

Both parties then filed reply briefs on June 17, 2003. Plaintiffs' reply brief again **\*501** seeks exclusion of significant parts of Defendant's presentation on the cross Motions for Summary Judgment (including at pp. 43–48, reliance on the German #106 patent), disputes that Defendant has met its burden of producing clear and convincing evidence of invalidity, and repeats arguments made in the two prior briefs.

Defendant's reply brief asserts that it has not violated any court orders by submitting new evidence, asserts that Plaintiffs have acted inconsistently in this litigation, and ignore the effect of this Court's infringement decision on the issue of invalidity. Defendant argues that its own products use a co-precipitation process, and that, by virtue of the infringement decision, prior co-precipitation processes must also be encompassed by the asserted #081 claims, rendering the #081 patent claims invalid for anticipation. Specifically, Defendant also argues that Kawata is such a co-precipitation process, and discloses all of the elements of the #081 patent claims, including the solubilizer element.

## VI. Plaintiffs' Motion to Exclude

This Court entered an Order on June 27, 2003, allowing Plaintiffs to file a Motion to Exclude any factual materials or arguments relied on by Defendant in asserting invalidity, which Plaintiffs contend are improperly before the Court. Plaintiff did so (Doc. No. 113) and Defendant responded (Doc. No. 114).

### A. *Procedural History Related to Exclusion Issues*

### 1. *Contention Interrogatories*

During the discovery phase of the litigation, both parties propounded interrogatories to the other seeking their contentions. It is undisputed that Defendant at no point ever asserted any detailed contention based on the German #106 patent. It is at least arguable that under Rule 26(e), Defendant was under an obligation to supplement its answers to contention interrogatories, because its prior answers, omitting any details of Defendant's contentions concerning the German #106 patent, were "in some material respect ... incomplete ..." Fed.R.Civ.P. 26(e)(1). By Defendant's failure to make Plaintiff aware of any reliance on the German #106 patent, Plaintiffs never had any reason to include the topic of the German #106 patent in its discovery strategy, or to include any questions about it in taking depositions, or in gathering its own evidence, or including the German #106 patent among the topics that Plaintiff discussed with its experts.

In its initial answers to contention interrogatories, Defendant listed the German #106, along with approximately 60 other patents, in support of its theories of invalidity, without any further description or discussion. Plaintiffs promptly moved for supplemental answers, asserting that Defendant was obliged to provide reasons why each of the listed patents proved invalidity. Although Defendant did supplement its answers in response to that motion, Defendant continued to assert, only in conclusory terms, that the German #106 patent was grounds for a finding of invalidity, but never disclosed any reasons or details in support of its contention. Plaintiff's Memorandum in Support of Its Motion to Exclude, Ex. G, at 6.

It must be noted that this Court never entered an Order providing that a party would be precluded from ever asserting a certain theory unless it was set forth in answers to contention interrogatories.

### 2. *Expert Reports and Expert "Declarations"*

It is first important to note the schedule for the submission of expert reports. On the issue of invalidity, Defendant was required **\*502** to submit its opening expert report as of November 18, 2002. When it did so, it relied exclusively on the Kawata Patent and the Schor Patent, and served reports by Richard B. Silverman, Ph.D. and R. Christian Moreton, Ph.D. Plaintiffs responded with their expert report as of January 2, 2003. Defendant's reply expert reports were served on March 3, 2003 at which time Defendant additionally relied on the prior art article by Professor Alderman. Although the original Scheduling Order provided for expert depositions to follow the service of expert reports, both parties agreed to delay expert depositions, and they have not yet been taken.

When Defendant moved for summary judgment, pursuant to the pretrial schedule, on May 2, 2003, Defendant submitted a "Declaration" by Dr. Moreton dated May 1, 2003 (which included a "Declaration" by Dr. Silverman also dated May 1, 2003 as an attachment) (Doc. No. 103) which was substantively different from, and contained information not included in, the original expert report dated November 15, 2002. Although Defendant entitled this submission as a "Declaration," it is really a supplemental expert report, filed to support the Motion for Summary Judgment. This Court finds that such a filing was not contemplated by the parties or the Court in the pretrial schedule, and Defendant never moved for leave to supplement its prior expert reports.

Subsequently, when Defendant filed its brief in opposition to Plaintiffs' Motion for Summary Judgment on June 2, 2003, it submitted a further "Declaration" by Dr. Moreton dated May 30, 2003, which is substantively different from, and has additional material not contained in, Dr. Moreton's May 1, 2003 Declaration. (Doc. No. 104).

The most significant new material in the two May 2003 reports by Dr. Moreton relates to testing of PEG 400, supporting Dr. Moreton's opinion that PEG 400 acts as a solubilizer in Kawata. Declaration of Richard B. Silverman, Ph.D. ¶ 20; Declaration of R. Christian Moreton, Ph.D. ¶ 40 (5/30/03). This contention is discussed below. Dr. Moreton also renders an opinion on the impact of the German #106 patent. Declaration of R. Christian Moreton, Ph.D. ¶ 65 (5/30/03).

The expert reports served by Defendant on November 18, 2002, January 2, 2003 and March 3, 2003 did not contain any references whatsoever to the German #106 patent.

Furthermore, when Defendant moved for summary judgment in its opening brief on May 2, 2003, there was no mention of the German #106 patent. The first time that Defendant raised the German #106 patent was in Defendant's opposition brief filed on June 2, 2003. Plaintiffs responded in their reply brief with surprise, anger and indignation, and objected to the Court considering the German #106 patent for any reason—which, inter alia, led to the Court requesting that this issue be raised by a separate Motion to Exclude.

The Moreton Declaration dated May 30, 2003 contains extensive reasons as to why the German #106 patent requires a finding of invalidity. Declaration of R. Christian Moreton, Ph.D. ¶¶ 39–71 (5/30/03). The substantive discussion on this point is reviewed in Part VII(A)(2) below. Defendant asserts that its reliance on the German #106 patent should be no surprise to Plaintiffs, however late it may be, because Plaintiffs' own patent application cited the German # 106 patent. Defendant further asserts that because Plaintiffs did not provide an English translation to the German #106 patent with their patent application, they should be estopped from asserting any unfairness against Defendant in raising **\*503** the German #106 patent, however belatedly.

At oral argument, when asked by the Court why Defendant had not disclosed any contentions or expert reports related to the German #106 patent, Defense counsel explained that, at the time when it answered contention interrogatories, all that Defendant had, related to the German #106 patent, was a German-language copy of that patent. Transcript of Oral Argument Hearing (July 31, 2003) at 11. Counsel further explained that, although Plaintiffs' 081 patent briefly refers to the German #106 patent, the #081 patent treated the foreign patent as though it were of no significance, and Defendant simply accepted the #081 patent's assertion "at face value." Id. Thus, Defendant did not expend the resources necessary to have the German #106 patent translated any earlier. Counsel remarked, candidly, "I mean there are only so many rocks that one can, you know, can turn over in litigation and that rock was not a rock that was uncovered until much, much later." Id. at 11–12. Specifically, it was not until after this Court's March 14, 2003 infringement decision that Defendant finally decided to procure a translation and see for itself whether the German #106 patent had any significance. As counsel explained, Defendant chose to look into the German #106 patent, after this Court found that Defendant's product infringes the #081 patent, because, at that point, Defendant was left with only an invalidity defense, and had to focus on the #081 patent itself—including its brief mention of the

German # 106 patent—to develop its invalidity arguments. Id. at 19.

Even assuming that it was the March 14, 2003 decision which gave Defendant the wake-up call to get moving on the German #106 Patent, the Defendant's contentions based on German #106 were still not contained in Defendant's opening brief filed on May 2, 2003. When the German #106 issue was first raised, in the Defendant's opposition brief filed on June 2, 2003, Plaintiffs had only fourteen days to respond, hardly a sufficient or fair amount of time in which to address a brand new issue in a case with a complex litigation history. Plaintiffs' counsel has indicated the prejudice that Plaintiffs have suffered by Defendant's belated attempt to inject the German #106 Patent into this litigation. If the matter had been raised earlier, then Plaintiffs could have taken fact discovery, could have asked Defendant's 30(b)(6) witnesses about the German #106 Patent, and could have developed opinions from their own experts to include in their expert reports. Defendant's principal response is that Plaintiffs could not have been prejudiced because they knew enough about the German #106 Patent to put a reference about it in the #081 Patent in 1987, but by not securing and providing the PTO with an English translation, Plaintiffs did not live up to their obligations. Plaintiffs respond to these arguments by asserting that they did not have an obligation to provide an English translation, and that if the PTO had a genuine interest in the German # 106, it has its own translation facilities. The Court concludes that the Plaintiffs are the party most prejudiced, because they had no reason to believe that the German #106 patent was an issue in this litigation until it was too late to do anything about it.

In summary, no contentions about the German #106 patent were mentioned in Defendant's answers to contention interrogatories, in its expert reports exchanged as part of the pre-trial schedule, or as grounds for summary judgment in Defendant's Motion for Summary Judgment filed on May 2, 2003; neither did Defendant at any time move to supplement its interrogatory answers or expert reports.

**\*504 B. Third Circuit Law on Exclusion as a Discovery Sanction**

In broad terms, Plaintiff's Motion to Exclude focuses on the German #106 patent and the new Kawata testing and expert reports. Analysis as to whether this evidence should be excluded depends on analysis of appropriate Third Circuit law. The law of this circuit is binding even though the

Federal Circuit has jurisdiction over appeals in patent cases—although the cases within the Federal Circuit will be considered to the extent they do not contradict Third Circuit precedent.

Federal Rule of Civil Procedure 37(c)(1) provides that

> A party that *without substantial justification* fails to disclose information required by Rule 26(a) or 26(e)(1), or *to amend a prior response to discovery* as required by Rule 26(e)(2), is not, unless such failure is *harmless,* permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed.R.Civ.P. 37(c)(1) (emphasis added). Preclusion can also result if a party violates a scheduling order, Fed.R.Civ.P. 16(f), or if an important contention or theory, for which expert testimony is needed, is omitted from expert reports. *Stein v. Foamex Intern., Inc.,* No. Civ.A. 00–2356, 2001 WL 936566, at *6 (E.D.Pa. Aug. 15, 2001) (precluding affidavit filed by plaintiff as attachment to its opposition to motion for summary judgment, where plaintiff had neglected to supplement expert opinions formally, through amended or supplemented expert report, in that plaintiff "would have the Court allow him to file preliminary expert reports and then freely supplement them with information and opinions that should have been disclosed in the initial report. That result would effectively circumvent the requirement for the disclosure of a timely and complete expert report.").

[12]    The most frequently cited Third Circuit case on this general issue is *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 905 (3d Cir.1977), *overruled on other grounds by Goodman v. Lukens Steel Co.,* 777 F.2d 113 (3d Cir.1985), in which the court set forth several factors for district courts to weigh in deciding whether to exclude evidence as a discovery sanction. The *Meyers* factors include

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or

of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order.

*Id.* at 904–05. An important final consideration is "the importance of the excluded testimony" to the proffering party's case. *Id.* at 904; *Sowell v. Butcher & Singer, Inc.,* 926 F.2d 289, 302 (3d Cir.1991) (confirming circuit's "consistent position" that "the importance of the excluded testimony" is a factor); *Total Containment, Inc. v. Dayco Products, Inc.,* 177 F.Supp.2d 332, 341 (E.D.Pa.2001) (stating five-factor test, including four *Meyers* factors plus "importance" of evidence as fifth factor); *Gibson v. National R.R. Passenger Corp.,* 176 F.R.D. 190, 192 (E.D.Pa.1997) ("The importance of the excluded testimony is an important final consideration.").

The *Meyers* decision grew out of a civil rights action. The plaintiff alleged that the defendant home ownership association had discriminated against blacks in processing housing applications. At trial, the district court excluded two "key witnesses" **\*505** offered by the plaintiff on the ground that they were not listed in the plaintiff's pretrial memorandum. 559 F.2d at 903. These two witnesses—a land developer and a former president of the defendant association—would have testified that, in past years, blacks had unsuccessfully applied for housing with the defendant, and that the defendant had a reputation as an all white development. *Id.* at 904. Though these two witnesses were not listed in the plaintiff's pretrial memo, plaintiff's counsel had advised defense counsel of the new witnesses, after the pretrial memo was filed, and had invited any questions from defense counsel regarding their testimony. The trial court excluded the two witnesses' testimony and, following a bench trial, entered judgment for the defendant on the ground that the plaintiff had failed to prove discrimination. *Id.* at 897.

The Third Circuit in *Meyers* reviewed the exclusion decision for abuse of discretion, applying the factors set forth above. The Court of Appeals initially observed "how important such testimony might have been and how critical is its absence." *Id.* at 904. The court noted that the trial judge had made no finding of bad faith or motive to mislead the defendant. The excuse offered by plaintiff's counsel for his failure to list the witnesses was that he had not discovered them until after the pretrial memorandum was filed. The Court of Appeals found this to be apparently a bona fide representation. *Meyers,* 559 F.2d at 905. Weighing in favor of exclusion were the potential prejudice to the defendant and the possible disruptive effect of permitting the evidence. On balancing the various factors, the court held that the district court should have imposed "a

less drastic sanction," and, thus, remanded the case. *Id.* The court stressed that the exclusion of "critical" evidence is an "extreme" sanction, "not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent." *Id.* (quoting *Dudley v. South Jersey Metal, Inc.,* 555 F.2d 96, 99 (3d Cir.1977)).

Though the court's opinion in *Meyers* has been overruled on other grounds (relating to limitations periods in civil rights cases), *Meyers* is still the leading case on exclusion as a discovery sanction in this circuit. Moreover, the Court of Appeals has noted that courts should continue to apply the *Meyers* analytical framework in tandem with an analysis under Federal Rule of Civil Procedure 37. *In re TMI Litigation,* 193 F.3d 613, 721 (3d Cir.1999).

In the recent case of *Quinn v. Consolidated Freightways Corp. of Delaware,* 283 F.3d 572 (3d Cir.2002), the Court of Appeals reversed a district court judgment on the ground that a discovery sanction imposed by the lower court denied the plaintiff the "opportunity to present critical evidence to the jury." *Id.* at 574. The *Quinn* case was a sex discrimination suit. The plaintiff had testified in a deposition regarding an incident of sexual harassment in a hotel room, involving an executive of the defendant, alone with the plaintiff. *Id.* at 575. Later, the plaintiff's coworker testified at a deposition that she had witnessed an incident, in a hotel room, involving the same executive and the plaintiff. *Id.* Less than a week before trial was set to begin, the defendant learned, from reviewing a time line exhibit prepared by plaintiff's counsel, that the plaintiff planned to testify about two separate hotel room incidents. The plaintiff's interrogatory responses had identified only one hotel room incident, and she had never amended her responses following the coworker's deposition, to allege a second hotel room episode. Defense counsel complained that the second incident was a "dramatic addition" and a "brand new allegation," **\*506** and should be excluded. *Id.* The trial judge refused to permit any questioning of the coworker regarding the second incident. The plaintiff lost at trial and appealed. *Id.*

The Court of Appeals in *Quinn* recognized that the coworker's testimony about the hotel room incident "was clearly probative, highly relevant, and it had the potential to provide strong support for plaintiff's case." *Id.* at 577. The court found it clear that defense counsel could not have been surprised by the plaintiff's last-minute disclosure of a second hotel room incident, in light of the coworker's deposition testimony about a second incident which she had observed. *Id.* The coworker's

testimony inherently conflicted with the plaintiff's description of a hotel room incident, in which she was alone with the executive. In addition, any prejudice to the defendant from the coworker's testimony was neutralized by the defendant's ability to impeach the plaintiff based on the coworker's inconsistent description. *Id.* The Court held that to "exclude critical evidence for failing to amend interrogatory answers under these circumstances champions form over substance and denied [the plaintiff] her full day in court." *Id.* at 578.

In the present case, having reviewed the applicable law, this Court will first determine whether, and to what extent, to exclude Defendant's evidence and theories related to the German #106 patent, and will then determine whether, and to what extent, to exclude Defendant's recent testing evidence related to Kawata.

## C. *Should Defendant Be Precluded From Relying on the German #106 Patent ?*

[13]    Plaintiffs move for exclusion of the German #106 patent on the basis that Defendant never presented any evidence or theories as to that patent at any time prior to its responsive summary judgment brief. Applying the *Meyers* factors to the overall facts in this case, exclusion of the German # 106 patent is warranted.

Firstly, as to *Meyers's* prejudice prong, the Court notes that Plaintiffs must have known about the German #106 patent, at the time of the #081 patent application. Also, the German #106 patent appeared in Defendant's nondescript listing of patents in its interrogatory answers. However, Defendants did *not* list the German #106 patent when requested to state the reasons for reliance on prior patents. Plaintiff's Memorandum in Support of Its Motion to Exclude, Ex. G, at 6. Thus, Plaintiffs could not have predicted Defendant's eventual reliance on that foreign patent, and were surprised when Defendant did rely on it.

Plaintiffs urge that Defendant should be barred from asserting any theories not contained in its answers to contention interrogatories. Plaintiffs' strongest argument in this regard is the fact that Defendant requested, and secured, preclusion against Plaintiffs based on Plaintiffs' own failure to disclose their reliance on claim 10 of the #081 patent. Judge Reed agreed with Defendant and precluded Plaintiffs from relying on claim 10 because it had not been raised in response to contention interrogatories. *See Astrazeneca AB v. Mutual Pharm. Co., Inc.,* 221 F.Supp.2d at 543.

Plaintiffs understandably assert that since Defendant seized on Plaintiffs' omission and secured a preclusion order, thus, under what has been referred to as a "culinary rule" (i.e., what is sauce for the goose is sauce for the gander), because Defendant sought and received benefit from Plaintiffs' omission, it is only fair for Plaintiff to benefit from Defendant's omissions.

However, the Court would not exclude a Defendant's evidence solely for this reason. First, the pretrial schedule adopted **\*507** by Judge Reed did not state that a party would be precluded from relying on theories that had not been set forth in its answers to contention interrogatories.

Moreover, Judge Reed's ruling was in the context of claim construction, whereas the parties are now debating cross motions for summary judgment on invalidity, which, if granted, against defendants, would terminate the case. However, Plaintiffs have been prejudiced because, in the absence of notice that Defendant was relying on the German #106 patent, and without notice of Defendant's supporting reasons, Plaintiff had no reason to take discovery, investigate, or include this topic in discussions with its own experts.

As to the second *Meyers* prong, the Court has considered whether any prejudice that would be caused by introduction of the German #106 patent into the case at this point can be cured. Because the German #106 patent is important evidence (see substantive discussion below at Part VII(A)(2)), this Court has considered allowing additional discovery on the German #106 patent and Defendant's theories in that regard, and time to allow Plaintiffs to obtain their own expert testimony on the foreign patent's significance, as well as the opportunity to file a renewed summary judgment motion. However, the Court concludes that such a procedure would not only reward Defendant's multiple violations of pretrial procedures, but would also not be fair to Plaintiffs, and would, further, seriously delay any resolution of this litigation, which is only one month short of its third anniversary.

To require Plaintiff to re-open depositions and attempt to secure fact discovery (and expert opinions), at this time, on a theory of invalidity based on the German #106 patent, would be decidedly unfair. The opportunity is gone to depose witnesses when their recollection and testimony are based upon their own knowledge of the facts and issues. Fact witnesses may now give more "result-oriented" testimony, this late in the litigation, after summary judgment briefs have

been filed, and expert reports circulated. Thus the Court concludes that the prejudice to the Plaintiff cannot be cured.

Defendant has delayed, without any legitimate excuse, its own investigation of the German #106 patent. As noted above, the German #106 patent is mentioned in the #081 patent, and Defendant listed it in its initial answers to contention interrogatories. When Judge Reed's claim construction opinion was issued dated August 19, 2002, Defendant knew at that time that it had received an unfavorable ruling on claim construction, and was obliged to consider its impact on its theories in defending against infringement, and proceeding on its own claim of invalidity. In fact, the May 30, 2003 expert opinion of Dr. Moreton, at paragraph 32, notes that it was because of Judge Reed's construction of the #081 patent that the German #106 patent assumed a significance in the invalidity analysis. When asked at oral argument why Defendant did not proceed to investigation of the German #106 patent following Judge Reed's construction opinion, counsel implied that it was this Court's infringement decision dated March 14, 2003 that led to the inquiry. This is not a sufficient reason in view of the expert's report, as well as the common sense understanding of the impact of the claim construction on the validity issue.

This Court concludes that it was incumbent on Defendant, even if it could be excused for not asserting the German #106 patent in its answers to contention interrogatories, or in supplementing its prior answers, to have begun its investigation of the German #106 patent promptly upon a receipt of Judge Reed's claim construction ruling, and to have included it in the expert reports exchanged in late 2002 and early 2003. Defendant never moved to supplement these initial reports, which would have at least put Plaintiff on notice that the issue would be presented on summary judgment. The issue was not even raised in Defendant's opening summary judgment brief.

Although permitting evidence of the German #106 patent would not disrupt the orderly and efficient trial of this case, because no trial date has been set, this factor is not really at issue here. The issue is not whether a witness can be called at trial, but rather whether a specific contention not asserted during discovery, or in expert reports, or in opening summary judgment briefs, should be considered if subsequently raised in the summary judgment process, and supported by expert "Declarations" filed six months late. To permit Defendant to introduce such a contention, when Defendant has offered no bona fide excuse for its dilatory conduct, would be simply

to ignore the pre-trial scheduling orders and would cause the Court to extend the pre-trial proceedings into a fourth year.

Though Plaintiffs have not shown bad faith, the Defendant's oversight is not rationally explained and is surely prejudicial to Plaintiff. *See Trilogy Communications, Inc. v. Times Fiber,* 109 F.3d 739, 744 (Fed.Cir.1997) (noting that when scheduling orders are violated, "an opposing party is often prejudiced by the ensuing delay and resultant expense"). In *Trilogy,* the Federal Circuit upheld a district court's exclusion of expert testimony that supported the plaintiff's theory of infringement. Though the expert witness had submitted a report within the time period established by the district court, the report lacked certain information required under Fed.R.Civ.P. 26(a)(2), such as the identity of exhibits to be used in support of his opinions. The plaintiff thereafter submitted a second expert's report, a rebuttal report, and an affidavit by the expert, after the due date for expert's reports had passed. *Id.* The documents "contained new opinions and information and did not merely supplement the original report." *Id.* The district court excluded the supplemental reports to the extent they contained new opinions not found in the original report, as well as the expert's affidavit, which incorporated the new opinions. The Federal Circuit, applying the Fifth Circuit's framework for exclusion analysis, [9] which is remarkably similar to the Third Circuit *Meyers* framework, found no abuse of discretion. Quoting a Fifth Circuit precedent, the Federal Circuit observed that "[a]dherence to reasonable court deadlines is critical to restoring integrity in court proceedings. We will not lightly disturb a court's enforcement of those deadlines and find no reason for doing so here." *Id.* at 745.

Considering the Third Circuit and Federal Circuit precedent in this area, and all of the appropriate factors relating to sanctions under Rules 16 and 37, this Court will preclude Defendant from presenting its evidence and theories about the German #106 patent. It also must be noted that the leading Third Circuit cases cited above, *Meyers* and *Quinn,* involved individual plaintiffs, making civil rights claims. Courts are appropriately and necessarily indulgent to individual plaintiffs in cases **\*509** such as *Meyers* and *Quinn*—but need not be so indulgent in patent cases such as the present one involving two large business entities, with expertise in their respective fields, and with highly competent counsel representing them. The Federal Circuit's decision in *Trilogy* is a more relevant precedent here.

The carefully orchestrated pretrial process was designed to flush out each party's contentions during discovery, so as to allow fact discovery, expert opinions, and dispositive motions, in that order. Allowing Defendant to assert an entirely new basis of invalidity at the very end of the process is simply not fair to Plaintiffs. *Stein v. Foamex Intern., Inc., supra.* Plaintiffs in this Court are entitled to resolution of the case in accordance with the pretrial schedule.

**D.** *Defendant's New Testing and Expert Testimony Regarding Kawata*

[14]    Plaintiff also contends that certain newly-disclosed experimental data and expert testimony, purporting to show the inherent existence of a solubilizer in the Kawata patent, should be excluded due to Defendant's failure to disclose such evidence earlier.

The testing by Dr. Silverman, which is referenced in both of the Dr. Moreton reports, was intended to show the use of PEG 400 as a solubilizer in the Kawata patent. As defense counsel pointed out at oral argument, the testing done by Dr. Silverman, reflected in the May 1, 2003 and May 30, 2003 Dr. Moreton reports, was a continuum of testing that had been started by Dr. Silverman much earlier, and some of it was referred to in the opening reports by Dr. Silverman dated November 18, 2002, and in the supporting affidavit by Dr. Moreton dated November 15, 2002. The lab notebooks for Dr. Silverman show work beginning as of December 17, 2002, and continuing through April 28, 2003. Dr. Silverman's testing expanded on the Kawata-solubilizer premise by utilizing different chemicals and formulations over time.

The Court concludes that it would be unfair to allow Defendant to use and benefit from the testing done by Dr. Silverman and submitted after the final expert report on March 3, 2003. Defendant could offer no good reason at oral argument why this testing could not have been done earlier, and its submission as part of the reports dated May 1, 2003 and May 30, 2003 is entirely too late to allow Plaintiffs an adequate opportunity to contest it, rebut it or prepare their own tests. Transcript of Oral Argument Hearing (July 31, 2003) at 35–36. Further, Defendant did not file a motion to supplement its earlier reports or do anything to notify Plaintiffs about this new evidence. Although the object of the trial is to find the truth, enforcement of deadlines is sometimes necessary to preserve a level playing field.

Moreover, this evidence is not important to Defendant's claim of invalidity. Defendant will not be unduly prejudiced by this exclusion, because the general theory at the heart of the excluded data—namely, that PEG 400 increases the solubility of a given substance in another substance in Kawata—was to some extent developed in Defendant's opening expert reports. In considering the merits of the case, the Court will consider the Silverman testing and Moreton interpretation of that testing included in Defendant's earlier, and timely, expert reports, submitted as of November 18, 2002, January 2, 2003 and March 3, 2003.

An analysis under the *Meyers* factors supports this Court's decision not to allow Defendant's new Kawata evidence. Firstly, Plaintiffs are prejudiced by the new **\*510** Kawata information because Plaintiffs did not have any opportunity to adequately address this new and complex data and expert testimony. Secondly, the prejudice to Plaintiffs cannot be easily cured, considering that, even if this Court were to afford Plaintiffs more time in which to address the new data, Plaintiffs would be compelled to hire experts to perform testing, and as with the German #106 patent, discussed above, this would delay trial preparation and trial. Thirdly, permitting this new evidence would disrupt the summary judgment process. The parties have expended large resources in their cross motions for summary judgment, and are entitled to a decision based on the record established in accordance with an agreed court-ordered pretrial schedule. Finally, although Plaintiffs have not proven bad faith, Defendant surely could have requested a discovery extension in order to complete its experimentation. Defendant's ambush-like presentation of the new, untimely Kawata evidence persuades the Court that the only fair and reasonable result is total exclusion of that evidence.

Nevertheless, as shown below in Part VII(A)(1)(c)(ii), even if all of Defendant's newest evidence were introduced, Defendant would not be able to show the inherent presence of a solubilizer in the Kawata invention—which is essential to Defendant's theory that Kawata anticipates the #081 patent.

In sum, Defendant will be limited to the theories of invalidity it asserted in its answers to contention interrogatories, and in its timely expert reports and opening summary judgment brief. Defendant will not be allowed to rely on the German #106 Patent because it was not timely asserted as a reason for invalidity; Defendant will not be allowed to rely on new data in the Declarations of Dr. Moreton or Dr. Silverman dated May 1, 2003, or the Moreton Declaration of May 30,

2003, submitted along with the summary judgment briefing, because these "Declarations" are in reality expert reports and the deadline for Defendant's expert reports was March 3, 2003, as to reply reports.

## VII. Cross Motions for Summary Judgment

In their cross motions for summary judgment, the parties address two general theories of invalidity, namely, anticipation and obviousness. This Court will first consider each of the issues presented under Defendant's anticipation theory.

### A. *Anticipation*

Plaintiffs argue that Defendant cannot succeed in proving, by clear and convincing evidence, that any of the asserted claims of the #081 patent are anticipated by the prior art. To determine whether Defendant could prevail on its anticipation theory, it is necessary to consider each of Defendant's anticipation arguments separately.

### 1. *Comparison of the Kawata Patent to the Claims of the #081 Patent*

 [15]   In this litigation, Plaintiffs have asserted claims 8, 12, 14, 15 and 17 of the #081 patent, and this Court has found that Defendant has infringed those claims. Although Plaintiffs have not specifically asserted claim 1 of the #081 patent in this litigation, four of the asserted claims, namely 8, 12, 14 and 15, are dependent on claim 1. Therefore, to determine whether any of these dependent claims are anticipated by the prior art, it is necessary to first determine whether claim 1 itself is anticipated.

In arguing anticipation of claim 1, Defendant relies most heavily on the Kawata patent. While Defendant expends great effort in arguing that each and every element of claim 1 is present in Kawata, the **\*511** central issue presented is whether Kawata contains "a semi-solid or liquid nonionic solubilizer," as required by claim 1. If Kawata does not contain such solubilizer element, it cannot anticipate claim 1.

Defendant renews its earlier argument that, because Kawata mentions PEG 400 as an example of a substance that could comprise its optional "second component," and because PEG 400 is capable of functioning as a solubilizer under certain circumstances, this Court must necessarily find that Kawata embodies a solubilizer element. *See* Def. Brief at 28.

### a.) Defendant's Claims of Inconsistency and Admissions in Plaintiffs' Statements

Defendant accuses Plaintiffs of maintaining inconsistent positions regarding the possible presence of a solubilizer in Kawata. *See* Def. Brief at 17–21 and Defendant's Reply Memorandum ("Def.Reply") at 3–8. Defendant points out that Kawata teaches two separate embodiments, involving "milling" (or "micronizing") and "co-precipitation," respectively. Defendant asserts that any "teaching away" from solubilizers in Kawata is limited to the "milling" embodiment. Moreover, Defendant contends that Plaintiffs have recently admitted that Kawata has no "blanket" ban on solubilizers. Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Def.Opp.") at 18.

In Plaintiffs' brief in support of their present motion, Plaintiffs wrote: "With regard to the micronizing embodiment, Kawata says 'a sustained release pharmaceutical composition of nicardipine can be obtained by using amorphous nicardipine without adding any substance improving the solubility in the intestines.' " Plaintiff's Memorandum in Support of Its Motion for Summary Judgment at 19. Defendant suggests that, because Plaintiffs phrased a single sentence of its argument this way, Plaintiffs have tacitly recognized that the Kawata co-precipitation process may require a solubilizer. But Defendant ignores the fact that, on the very same page of their brief containing the above statement, Plaintiffs flatly assert, as they always have, that "Kawata does not teach the use of solubilizers." *Id.* Indeed, Plaintiffs have unambiguously asserted, throughout this litigation, that Kawata does not utilize a solubilizer.

Defendant argues that, if Plaintiffs had "come clean" earlier in this litigation, by admitting that Kawata only teaches against solubilizers with respect to its milling embodiment, this Court would have concluded that Defendant had not infringed the #081 patent. Def. Opp. at 19. Defendant's presumption as to what this Court would have decided regarding infringement—if Plaintiffs had identified the distinction between Kawata's two embodiments—is without foundation. This Court (including Judge Reed in relation to claim construction) conducted its own examination of Kawata and concluded that the Kawata patent, as a whole, taught against the use of solubilizers. This Court would not necessarily have come to the opposite conclusion, had Plaintiffs' counsel emphasized the distinction between Kawata's two embodiments. Indeed, Defendant has, in previous stages of this litigation, pointed out to the Court that Kawata has two separate embodiments, and has argued that

the co-precipitation embodiment "does not teach against the use of solubilizers." *AstraZeneca AB v. Mutual Pharm. Co.,* 2002 U.S. Dist. LEXIS 20311, at *8 (E. D.Pa. Oct. 3, 2002) (denying reconsideration of claim construction decision). Nevertheless, the Court determined, in its claim construction and infringement decisions, **\*512** that Kawata, as a whole, taught against the use of solubilizers.

In sum, Defendant's claims that Plaintiffs have taken inconsistent positions as to the possibility that Kawata may contemplate a solubilizer, are without merit.

### b.) Absence of an Explicit Solubilizer Component in Kawata

Defendant apparently acknowledges that the Kawata patent contains no explicit reference to any solubilizer component. Def. Brief at 23 (beginning Defendant's entire anticipation argument with a general discussion of "inherency"). The only express language in Kawata that could be construed as referring to solubilizers is the explanation, with respect to one of Kawata's two embodiments, that the Kawata invention can be employed "*without adding* any substance improving the solubility in the intestines." United States Patent 4,673,564 (col.3, lns.49–52) (emphasis added). This statement does not teach the use of solubilizers. Accordingly, no genuine issue of material fact exists as to the absence of any explicit solubilizer component in Kawata.

### c.) Defendant's Failure to Demonstrate an Inherent Solubilizer Component in Kawata

Because Kawata does not explicitly require a solubilizer, the only way that Defendant can succeed in showing that Kawata anticipates claim 1 of the #081 patent is via the doctrine of "inherency." As explained above, in certain rare cases, although a prior art reference does not expressly set forth a particular element of the patent claim asserted to be anticipated, that prior art reference may still anticipate if the particular element is "inherent" in the reference's disclosure. *In re Robertson,* 169 F.3d 743, 745 (Fed.Cir.1999). A finding of inherency is proper only if the missing element is "necessarily present" in the prior art reference. *Id.*

### i.) Defendant's Argument Based on the 1983–Kawata patent

Defendant asserts that PEG 400 inherently acts as a solubilizer in Kawata because it "increases the solubility of nifedipine in PVP [polyvinyl pyrrolidone]" in Kawata.

Def. Brief at 30. Defendant cites to the older 1983–Kawata patent as evidence that this is so. The 1983–Kawata patent requires several components, including a "2nd substance," which may be PEG 400. The inventors of the 1983 Kawata patent explained, in the patent's specification, that the second substance acts to increase the solubility of nifedipine in another substance, which can be, for example, PVP. United States Patent 4,412,986 (col.3, ln.14–17).

This reference in the 1983 Kawata patent to a function performed by PEG 400 in that patent cannot suffice to demonstrate that the later Kawata patent *necessarily* uses PEG 400 as a solubilizer. While the specification of the 1983 Kawata patent confirms that PEG 400 *can* be used as a solubilizer under certain circumstances—such as in the formulations disclosed in the 1983 Kawata patent—this amounts only to a showing of "probabilities or possibilities" regarding the function of PEG 400 in the later Kawata patent. See *Robertson,* 169 F.3d at 745. Such a showing is insufficient to establish inherency. Moreover, Defendant has cited no legal authority to support its implicit argument that, simply because the two Kawata patents contain certain similarities, the Court should read into the later Kawata patent an element that was present in the 1983 Kawata patent, but omitted from the specification of the later Kawata patent.

**\*513  ii.) *Defendant's Experimentation and Expert Analysis***

Defendant next asserts that its own recent experiments, purportedly based on the Kawata patent, reveal that, in Kawata, PEG 400 "would function to increase the solubility of nifedipine in DCM [dichloromethane]." Def. Brief at 30. *See also* Declaration of Richard B. Silverman, Ph.D. ¶ 20; Declaration of R. Christian Moreton, Ph.D. ¶ 40 (5/1/03). DCM is a volatile organic solvent disclosed in Kawata.

Plaintiffs argue that, even if Defendant's experiments prove that PEG 400 can increase the solubility of nifedipine *in DCM,* that would not make PEG 400 a claimed "solubilizer" as that term has been construed by this Court within the context of the #081 patent; that is, Plaintiffs claim that a substance can only be a claimed solubilizer if it increases the solubility of another substance *in water.* However, this Court has simply held that "solubilizer" means a compound "that increases the solubility of a substance in a particular solvent." The Court never stated that such particular solvent must be water. Thus, Plaintiffs' argument is unavailing.

Plaintiffs also argue that Defendant's experiments do not follow Kawata's methodology precisely, and that, as a result, the experiments cannot prove that Kawata inherently embodies a solubilizer. Plaintiffs' Reply Memorandum at 35–38. However, even assuming that Defendant's experiments followed Kawata's disclosures closely, Defendant's evidence still cannot fulfill the legal requirements for inherency, namely, that a person of ordinary skill in the art would recognize that PEG 400 necessarily functions as a claimed solubilizer in Kawata. *Id.* at 38.

**[A] *Nature of Defendant's Evidence***

As discussed above in Part VI(D), this Court will preclude Defendant from presenting certain untimely evidence related to Kawata, which was not properly disclosed during discovery. However, as shown below, even if this Court were to allow Defendant to introduce all of its evidence on Kawata, Defendant still cannot show the inherent presence of a solubilizer in the Kawata invention.

In his sworn declaration, Professor Richard B. Silverman, Ph.D., an expert witness for Defendant, states that in his opinion, "PEG 400 increases the solubility of nifedipine in [DCM]." Declaration of Richard B. Silverman, Ph.D. ¶ 9. Based on Dr. Silverman's experiments, Dr. R. Christian Moreton, another expert for Defendant, states his conclusion that the PEG 400 in the Kawata process "would function to increase the solubility of nifedipine in DCM." Declaration of R. Christian Moreton, Ph.D. ¶ 55 (5/30/03). The purpose of Defendant's experiments was to compare the solubility of nifedipine in DCM, in the absence of PEG 400, to the solubility of nifedipine in DCM when PEG 400 is included in the composition. Declaration of Richard B. Silverman, Ph.D. ¶ 4. The result of Defendant's first experiment was that the nifedipine was approximately 25% more soluble (in DCM) in the presence of PEG 400, than in the absence of PEG 400. *Id.* ¶ 9. Defendant conducted various other experiments, which, Defendant's experts contend, prove that PEG 400 increases the solubility of nifedipine in DCM. These experimental proofs fall far short of demonstrating that a solubilizer element is inherent in Kawata.

**[B] *Requirements for a Showing of Inherency***

The Federal Circuit issued its latest statement on the law of inherent anticipation on August 1, 2003.  **\*514  *Schering*

*Corp. v. Geneva Pharmaceuticals,* No. 02–1540, 339 F.3d 1373, 2003 WL 21767852 (Fed.Cir. Aug. 1, 2003). In *Schering,* the Court of Appeals confirmed that inherent anticipation does not require "recognition" in the prior art, but only recognition at a "later" time. *Id.,* at \*2.

The prior inherency cases were consistent regarding the basic meaning of the doctrine of inherency; that is, a prior art reference may anticipate the patent in suit without expressly disclosing a certain feature of the patent in suit if that missing characteristic is "necessarily present," or "inherent," in the anticipating reference. *Continental Can Co. v. Monsanto Co.,* 948 F.2d 1264, 1268 (Fed.Cir.1991).

Yet, certain Federal Circuit cases have referred to inherency as a two-prong determination, requiring not only "that the missing descriptive matter is *necessarily present* in the thing described in the reference, [but also] that it would be so *recognized* by persons of ordinary skill." *Id.* (emphasis added). One issue is whether the party claiming anticipation must show that a skilled artisan would have recognized the inherent characteristic before the issuance of the patent in suit, or whether it is sufficient to show that a skilled artisan would recognize the characteristic in the prior art at the time of the litigation, given all the benefits of hindsight and advancement in scientific knowledge.

Indeed, as recently as August 2002, a panel of the Federal Circuit actually stated that when anticipation is based on inherency, "it must be shown that the undisclosed information *was known to be present* in the subject matter of the reference." *Elan Pharmaceuticals, Inc. v. Mayo Found.,* 304 F.3d 1221, 1228 (Fed.Cir.2002) (emphasis added) (citing *Continental Can,* 948 F.2d at 1269), *reh'g en banc granted, opinion vacated,* 314 F.3d 1299 (Fed.Cir.2002). The Federal Circuit, *en banc,* later vacated that panel decision. 314 F.3d at 1299.

The case of *Atlas Powder Co. v. Ireco, Inc.,* 190 F.3d 1342 (Fed.Cir.1999), heavily relied upon by Defendant in its present motion papers, added some clarity to the "recognition" issue. In *Atlas Powder,* the district court, following two separate bench trials, found that the plaintiff's patent was invalid as anticipated by the prior art, and the Federal Circuit affirmed. Although the "sufficient aeration" element of the plaintiff's patent was not explicitly stated in the prior art, sufficient evidence at trial demonstrated that the missing element was inherent in the prior art. *Id.* at 1347. The plaintiff argued on appeal that the missing element could not

be present in the prior art because there was no evidence, in the total body of prior art, to suggest that persons of ordinary skill in the art would have recognized the presence of that element in the anticipating reference. *Id.* at 1349. The *Atlas Powder* court explained that

> Because "sufficient aeration" was inherent in the prior art, it is *irrelevant that the prior art did not recognize* the key aspect of [the plaintiff's invention] —that air may act as the sole sensitizer of the explosive composition. An inherent structure, composition, or function is *not necessarily known.* ... *Insufficient prior understanding* of the inherent properties of a known composition does not defeat a finding of anticipation.

*Id.* at 1348–49 (emphasis added). The court also observed that inherency "is not necessarily coterminous with the knowledge of those of ordinary skill in the art." [10] *Id.* at 1347.

**\*515** The *Schering* court held that a finding of inherent anticipation does not require proof that a skilled artisan would have recognized the inherent characteristic in the prior art. *Schering,* 339 F.3d 1373, 2003 WL 21767852, at \*4. Specifically, the Federal Circuit ruled that recognition by a person of ordinary skill in the art, before the date of the patent in suit, is not required. *Id.,* at \*2. Rather, inherency may be shown by evidence of "later recognition" of the inherent characteristics of the prior art. *Id.*

In the instant case, Defendant has proffered no evidence of "recognition" of an inherent solubilizer in Kawata, either in 2003, or at any earlier time. Defendant's proofs (even including the evidence which this Court has excluded on procedural grounds) nowhere demonstrate that a person of ordinary skill in the art, even with the benefit of hindsight, would recognize an inherent solubilizer in Kawata. All that Defendant has done is set up experiments which its experts contend show Kawata's solubilizer function. Defendant cites unpublished authorities. But persons of ordinary skill in the art would not have access to Defendant's data. Indeed, Defendant's experiments were undertaken only for purposes of this litigation (and are even subject to a protective order by this Court); thus, artisans in this field, without having observed such experiments, or having learned of their results afterward, would not reasonably be expected to "recognize" that which is purportedly proven by such experiments.

Nor has Defendant shown, by clear and convincing evidence, that a solubilizer function is "necessarily" present in the Kawata invention. Defendant's experimental evidence and expert declarations raise only a question of probabilities as to whether a solubilizer component is inherent in Kawata. Defendant's experts were obviously looking for evidence of a solubilizer function in Kawata (having been asked by Defendant to perform experiments directed to that hypothetical function), whereas another person of ordinary skill in the art would not have approached Kawata with the possibility of a solubilizer function already in mind.

As discussed in Part VI(D), *supra,* this Court has determined that Defendant should not be permitted to introduce certain expert reports and experimental data that were not timely disclosed per the Court's scheduling orders. It is important to note that, whether or not such new evidence is considered, Defendant cannot succeed in its inherency argument. Defendant's prior, and timely, expert reports cite various experiments in support of the conclusion that PEG 400 increases the solubility of a substance (i.e. nifedipine) in another substance (i.e. water). Reply Expert Report of Richard B. Silverman, Ph.D. ¶ 26. The new evidence only expands on this theory, by showing that, under certain laboratory conditions created by Defendant, PEG 400 acted as a solubilizer. But this new evidence still would not show that a solubilizer is always and "inevitably" present in the Kawata **\*516** invention. *Atlas Powder,* 190 F.3d at 1348.

### iii.) Defendant's "Nose of Wax" Argument

Defendant further asserts that its own proposed manufacturing process, which has been found by this Court to infringe the #081 patent, employs exactly the same process as Kawata. So, the argument goes, if Defendant's process infringed the #081 patent, Kawata must anticipate the #081 patent. As noted above, for purposes of determining issues of invalidity, this Court must adopt the same construction of the #081 patent's claims as it adopted in deciding the infringement issue. *Amgen Inc., supra,* 314 F.3d at 1330. Defendant stresses that a court may not interpret a patent one way to find infringement, and, like a "nose of wax," interpret the patent another way to avoid anticipation. *E.g. Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1351 (Fed.Cir.2001). But this argument must fail because, as shown above, Defendant cannot demonstrate the explicit or inherent presence of a solubilizer in Kawata. By

contrast, both the #081 patent and Defendant's infringing products contain a solubilizer. *AstraZeneca AB v. Mutual Pharm. Co., Inc.,* 250 F.Supp.2d 506 (E.D.Pa.2003).

In sum, because Defendant cannot establish that the Kawata patent contains a solubilizer, Defendant will be unable to prove that Kawata anticipates claim 1 of the #081 patent. Nor can Defendant demonstrate that Kawata anticipates claims 8, 12, 14 or 15 of the #081 patent, which are dependent on claim 1. Independent claim 17, which describes the process taught by the #081 patent, also, of course, requires a solubilizer. Because Kawata's process does not, explicitly or inherently, make use of a solubilizer, Kawata cannot anticipate claim 17. Therefore, Defendant cannot establish that the Kawata patent anticipates any of the asserted claims of the #081 patent.

### 2. If the Court Considered Defendant's Evidence on the German #106 Patent, It Would Possibly Result in a Genuine Issue of Material Fact

For the reasons discussed above, in Part VI(C), this Court precludes Defendant from introducing evidence related to the German #106 patent, because of the multiple incidents of untimeliness of Defendant's disclosure of its intention to rely on that patent, and its presentation of supporting evidence, to the prejudice of Plaintiffs. However, a review of Defendant's evidence on the German #106 patent, without considering arguments Plaintiffs might have made if Plaintiffs had known of this issue during discovery, indicates that the issue possibly creates a genuine issue of material fact.

Defendant's evidence would have been important, as can be seen from a simple comparison of the German #106 patent to Plaintiffs' #081 patent, shown below.

Defendant argues that the German #106 patent contains every element of claim 1 (as well as claims 12, 14 and 15) of the #081 patent. As noted above, the inventor of the #081 patent referred to the German #106 patent in the Background section of the #081 patent, but attempted to distinguish it from the #081 patent. United States Patent 4,803,081 (col.1, lns.62–64).

Claim 1 of the #081 patent (upon which claims 12, 14 and 15 are dependent) comprises several limitations relevant to this anticipation analysis:

> a solution or dispersion of an effective amount *of the active compound in* a semi-solid or liquid nonionic

*solubilizer,* wherein the amount by weight of the solubilizer is *at least equal* to the **\*517** amount by weight of the active compound, and a *release controlling system* to provide extended release.

*Id.* (claim 1) (emphasis added). Defendant claims that the German #106 patent contains each of these elements, thereby anticipating claim 1. The May 30, 2003 Declaration of one of Defendant's experts, Dr. Moreton, explains Defendant's reliance on the German #106 patent in demonstrating anticipation. As noted above, Plaintiffs have not had a fair opportunity to challenge Dr. Moreton's opinion on this topic.

Dr. Moreton verifies that the German #106 patent contains an "active compound" element, as required by the #081 patent. In Example 8 of the German #106 patent (an example to which the parties direct much attention) the active compound is flufenamic acid, which has very low solubility in water. Declaration of R. Christian Moreton, Ph.D. ¶ 34 (5/30/03). Example 8 states the following: "Eudispert hv® was dissolved in 90 g of PEG 600 at 100 to 120 C. 200–mg flufenamic acid was added to 0.3 g of this mixture, and the substance was placed in 0.5 g forms." German patent DE 3400106 A1 (Example 8).

Defendant's expert opines that the German #106 patent discloses a "nonionic solubilizer," as that term is used in the #081 patent, per this Court's claim construction. Declaration of R. Christian Moreton, Ph.D. ¶ 32 (5/30/03). According to the expert, in Example 8 of the German #106 patent, this solubilizer is PEG 600, but other solubilizers are used in different examples within the German #106 patent. *Id.* ¶¶ 32–34. The inventor of Plaintiffs' #081 patent also apparently recognized that the German #106 patent contains a solubilizer. United States Patent 4,803,081 (col.1, lns.62–64).

Next, Dr. Moreton states that, in his understanding, the German #106 patent contains a release controlling system providing an extended release function. Declaration of R. Christian Moreton, Ph.D. ¶ 32 (5/30/03). The expert opines that in Example 8 of the German #106 patent, such extended release function is performed by Eudispert, a polyacrylate derivative. *Id.* ¶ 33.

Finally, it is an important limitation of claim 1 of the #081 patent that the amount by weight of the solubilizer must be at least equal to the amount by weight of the active compound. The #081 patent inventors attempted to

distinguish the German #106 patent on the ground that, in that foreign patent, the ratio of solubilizer to active compound is less than 1:1, by weight. United States Patent 4,803,081 (col.1, lns.62 64) (stating that the German # 106 patent "is described to use a solubilizer in an amount by weight to the active compound which is much less than 1:1"). But Defendant argues, and its expert opines, that Example 8 of the German #106 patent actually discloses a formulation in which the amount of solubilizer, PEG 600, is greater than the amount of active compound, flufenamic acid, such that the German #106 patent adheres to the weight ratio limitation of claim 1. Def. Reply at 49; Declaration of R. Christian Moreton, Ph.D. ¶ 34 (5/30/03). Example 8 utilizes 90 g of PEG 600 and 200 mg of flufenamic acid, prior to mixing.

Thus, according to Defendant's expert, the German #106 patent discloses virtually every limitation required by claim 1 of the #081 patent. In this regard, Dr. Moreton's opinion is both unequivocal and apparently supported by the text of the foreign patent itself.

Plaintiffs' reply brief, pp. 45–48, substantively disputes Defendant's argument, first that there is no indication that Example 8 provides a solid dosage form, and second that the nonionic solubilizer element is not taught by the German #106 Example 8. On the face of this patent, **\*518** Plaintiffs have a sound argument. However, the Moreton Declaration, reviewed above, if it were allowed, creates a fact issue because he asserts that, in Example 8, PEG 600 is and acts as a nonionic solubilizer. Plaintiffs also assert that Defendant's evidence does not meet the required heightened burden; this may be true in a trial context, but this Court would not so rule as a matter of law on summary judgment.

This Court has set forth this explanation of Defendant's evidence and arguments so that a reviewing court may evaluate the relevancy of the excluded evidence, and if appropriate, Plaintiffs may offer arguments relevant on the issue.

### B. *Obviousness*

**[16]**   As explained above, a party asserting that the patent in suit is rendered obvious by the prior art must show some "teaching, suggestion, or reason" in the prior art that would lead one of ordinary skill in the art to combine the various prior art references. *Winner, supra,* 202 F.3d at 1348. The absence of such a suggestion to combine is dispositive in an obviousness inquiry. *Gambro Lundia, supra,* 110 F.3d at 1579.

In its briefs, Defendant makes a combinability argument with respect to claims 14 and 15 of the #081 patent (both of which claims refer to hydroxypropyl methylcellulose ("HPMC")). Def. Brief at 38–41. Defendant cites to the Schor patent and the Alderman article in an attempt to show that certain limitations of claims 14 and 15 would have been obvious to a person of ordinary skill in the art.

But nowhere in any of its papers does Defendant make a "clear and particular" showing of combinability with respect to the critical "solubilizer" limitation of the #081 patent. *Winner,* 202 F.3d at 1349. If the prior art does not render that element obvious, then it is of no matter whether or not certain other elements (i.e. pertaining to HPMC) were obvious. Accordingly, Defendant cannot prevail on its obviousness theory, and this Court will grant partial summary judgment for Plaintiffs as to that aspect of Defendant's invalidity case.

## VIII. Conclusion

For the reasons stated above, this Court will grant Plaintiffs' Motion to Exclude, will grant Plaintiffs' Motion for Summary Judgment, and will deny Defendant's Motion for Summary Judgment. An appropriate Order follows.

### ORDER

AND NOW, this day of August, 2003, it is hereby ORDERED that:

1. Plaintiffs' Motion to Exclude is GRANTED;

2. Plaintiffs' Motion for Summary Judgment Dismissing Mutual's Affirmative Defense and Counterclaim of Invalidity of the Asserted Claims of U.S. Patent 4,803,081 is GRANTED;

3. Defendant's Motion for Summary Judgment of Invalidity of U.S. Patent 4,803,081 is DENIED; and

4. Final judgment is entered in favor of Plaintiffs and against Defendant.

## Footnotes

1   The extensive procedural history and factual background of this case are set forth in this Court's March 14, 2003 Memorandum. *AstraZeneca AB v. Mutual Pharm. Co., Inc.,* 250 F.Supp.2d 506 (E.D.Pa.2003).

2   While Plaintiffs did not allege infringement of claim 1, in particular, because claims 8, 12, 14 and 15 were dependent on claim 1, this Court had to consider whether Defendant's products contained every element of claim 1, as a step in determining whether the dependent claims were infringed.

3   The two most important prior art references for purposes of the invalidity analysis in the present case—namely "Kawata" and "the German # 106 patent," discussed below—were both disclosed to the PTO during prosecution.

4   While the bulk of this Court's claim construction is contained in Judge Reed's August 19, 2002 Conclusions of Law, Defendant later raised several additional issues of claim construction, which this Court decided in its March 14, 2003 Order, granting summary judgment of literal infringement.

5   Two of the prior art patents to be considered in this Memorandum were issued to the same inventor, Hiroitsu Kawata. The earlier of these two patents, United States Patent 4,412,986, was issued in 1983, while the later patent, United States Patent 4,673,564, was issued in 1987. In its moving papers, Defendant refers to the later-issued patent as "Kawata II," and refers to the earlier patent as "Kawata I." Throughout this Memorandum, the Court will refer to the later patent simply as "the Kawata patent," and to the earlier patent as "the 1983 Kawata patent."

6   Foreign patents are capable of anticipating United States patents. 35 U.S.C. § 102(a), (b) and (d); *In re Kathawala,* 9 F.3d 942, 945 (Fed.Cir.1993).

7   Claim 1 of the German #106 patent, the only independent claim, covers

    1. Pharmaceutical preparations with controlled drug release containing:

    a.) one or a plurality of natural and/or semisynthetic and/or totally synthetic physiologically compatible polymers,

    b.) one or a plurality of physiologically compatible lipophilic and/or hydrophilic solvents and/or swelling agents suitable for dissolving and/or swelling of the polymers,

    c.) one or a plurality of therapeutically active medications, and

    d.) optionally physiologically compatible vehicles and/or excipients.

   German patent DE 3400106 A1 (claim 1) (translation procured by Defendant).

8    Because Plaintiffs' arguments for exclusion of certain evidence and contentions could not be analyzed based on the record then before the Court, the Court issued an Order on June 27, 2003 allowing Plaintiffs to file a Motion to Exclude, setting forth the reasons why any specific evidence or contentions should be excluded. Plaintiffs have since filed such a Motion to Exclude and Defendant has responded. This Motion is dealt with below at Part VI.

9    The Fifth Circuit framework consists of four factors: "(1) the importance of the excluded testimony, (2) the explanation of the party for its failure to comply with the court's order, (3) the potential prejudice that would arise from allowing the testimony, (4) the availability of a continuance to cure such prejudice." *E.E.O.C. v. General Dynamics Corp.,* 999 F.2d 113, 115 (5th Cir.1993).

10    The Federal Circuit in *Atlas Powder* also noted that a prior art reference may inherently contain a certain feature even though that prior art reference "teaches away" from the feature in question. *Id.* at 1349. The fact that the author of the prior art reference believed a certain element was not required for the prior art invention to work does not mean that the element was, in fact, not present in the prior art invention. The prior art reference's author could simply have been ignorant of that element's inherent presence in the prior art device. *Id. See also MEHL/Biophile Int'l Corp. v. Milgraum,* 192 F.3d 1362, 1366 (Fed.Cir.1999) ("Where ... the result is a necessary consequence of what was deliberately intended, it is of no import that the [prior art] article's authors did not appreciate the [inherent] results."). In the instant case, the fact that Kawata "teaches away" from the use of a solubilizer, with respect to at least one of its embodiments, cannot support a finding that a solubilizer is not inherently present in Kawata.

---

**End of Document**                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 19

1999 Copr.L.Dec. P 27,842

1998 WL 800344
United States District Court, E.D. Pennsylvania.

BENTLEY SYSTEMS, INCORPORATED, Plaintiff,

v.

INTERGRAPH CORPORATION, Defendant.

No. CIV. A. 98–3489.    |    Nov. 16, 1998.

Opinion

NEWCOMER.

*MEMORANDUM*

**\*1**  Presently before the Court is defendant's Motion for Summary Judgement, and plaintiff's response thereto. For the reasons that follow, said Motion will be denied.

**I. *Background***

Bentley is a privately held family-managed software development firm in Exton, Pennsylvania, that was founded in 1984. Bentley develops and distributes a family of software products used in computer-aided design and engineering ("CAD"), of which the principal product is a software application called "MicroStation." Intergraph is a publicly held company based in Huntsville, Alabama, that was founded in 1969. Intergraph's primary business is to supply systems solutions (hardware and software) for computer aided design/computer aided manufacturing.

In 1987, Intergraph and Bentley entered into an agreement whereby Intergraph bought 50% of the shares of Bentley,[1] and was given a worldwide exclusive license to distribute MicroStation, and Bentley received a royalty payment for each copy of the licensed programs distributed to end users by Intergraph. This exclusive license arrangement ended on December 31, 1994.

MicroStation allows users to view, print and plot lines, arcs, circles and other geometrical figures contained in data files generated and used by MicroStation. The limitation on MicroStation relevant for purposes of the instant lawsuit is that the above-enumerated functions of MicroStation can only be done locally at the personal computer where MicroStation is being used. Additional software is needed to make it useful in a network environment.

In 1993, Intergraph developed plotting software that allowed a MicroStation user to send data files to a server and then to a network plotter while the MicroStation user could continue design work. Since 1987, Intergraph has had some form of plotting software. Plotting software produces plots from designs created on CAD (MicroStation) software. Plots are drawings, frequently architectural or engineering drawings. Once the plot is created, it is then printed on paper using hardware known as a plotter. It is also possible to store the plot on the computer on magnetic media.

The plotting software is unable to convert the MicroStation data into a format usable by the plotting software without the help of a "stroker." A stroker converts the MicroStation design data into a lower level format that can be used by the plotting software. According to Bentley, because they were constantly providing upgrades of MicroStation, Intergraph was having to work very hard at converting the MicroStation data for its plotting product to keep pace. Intergraph asked Bentley to produce for them a "stroker". The second version of the stroker Bentley produced was called PlotLib, whose copyright is the subject of the instant suit.

In July of 1993, Bentley licensed PlotLib to Intergraph for free to enable Intergraph to develop and sell network plotting products that made plotting more convenient for MicroStation users. This license was memorialized in July of 1993 as amendment 12 to the original 1987 licensing agreement (that expired in 1994). The last version of PlotLib Bentley produced for Intergraph was dated November 10, 1994. Intergraph originally incorporated PlotLib into its plotting software known as IPLOT, and later into InterPlot.

**\*2**  Amendment 12 to the original licensing agreement expired with the agreement on December 31, 1994, but it continued in effect through a distribution agreement entered into between the parties. Much of this lawsuit comes down to the meaning of the language used in the agreements, the relevant portion of which is as follows,

> In connection with network plotting products, this library is not to be used for file viewing on graphic displays.

The interpretation of the phrase, "file viewing on graphic displays" is the subject of much debate between the parties. Bentley argues that this language was intended to have its broadest possible meaning, including that Intergraph could not develop a product that used PlotLib to assist in previewing

1999 Copr.L.Dec. P 27,842

on the screen what is about to be sent to the printer for printing ("print preview"). Intergraph, on the other hand, contends that all that was proscribed was Intergraph developing a product that allowed the user to view actual MicroStation design files, and that a print preview is not the equivalent of viewing design files. [2]

On July 25, 1994, at Intergraph's request, executives from Bentley and Intergraph met to discuss various issues relating to Intergraph's plotting products. At this meeting, Intergraph informed Bentley that it had used the PlotLib software in Intergraph's plotting software (IPLOT, which it was already selling) to perform file previews on screen. This file viewing feature was only capable of previewing the plot, and not to perform any other functions on the plot such as pan or zoom. According to Bentley, Keith Bentley, the President of the company, was not present at the meeting initially but sent a message that he rejected the idea of allowing Intergraph to offer a plot preview function, saying that it should be done using MicroStation. After personally coming to the meeting later in the day at Intergraph's request, Keith Bentley told Intergraph that, although the terms of the license prohibited file viewing altogether, Bentley would not object to Intergraph's use of PlotLib in IPLOT to perform plot previews, *but only if the user was operating IPLOT on a machine on which a licensed copy of MicroStation was also installed.* Keith Bentley insists in his sworn affidavit that he never gave unconditional consent to use PlotLib for file viewing. Intergraph remembers this meeting differently, and argues that Bentley representatives (including Keith Bentley) said that the plot preview was appropriate and not what was meant to be prohibited by the language in the agreement. Intergraph further contends that Keith Bentley also said that the reason for the file display language in the agreement was to prevent Intergraph from using PlotLib to develop a design file viewer product like MicroStation Review. Bentley vigorously disputes this, and both sides have submitted excerpts of depositions and sworn affidavits in support of their respective positions.

Bentley, through the affidavit of Mr. Church, argues that they restated their position on the appropriate use of PlotLib in IPLOT in an e-mail message.

**\*3**  In 1996, Intergraph released Version 8 of IPLOT. The press release described IPLOT as having a file preview capability, and never mentioned the necessity of using IPLOT in conjunction with MicroStation. An exchange of letters between the companies took place, revealing their differing recollections about what transpired in the July 25, 1994 meeting. On October 14, 1996 Bentley requested a copy of IPLOT Version 8, and on May 15, 1997, Intergraph sent Bentley a copy.

In April, 1998, Intergraph released InterPlot Version 9.0, the next and latest version of its family of plotting software. According to Intergraph, the significant differences between IPLOT Version 8 and InterPlot Version 9.0 is that InterPlot can plot data other than MicroStation, and InterPlot permits the archiving and distribution of digital plots on the World Wide Web. Bentley's chief complaint about Version 9.0 of InterPlot is the same as its complaint about Version 8.0 of IPLOT, that it permits the users to view the engineering data files created by MicroStation on a computer monitor without using or licensing from Bentley a copy of MicroStation, violating section 5.08 of the distribution agreement and, as they recall it, the extremely limited permission extended by Bentley in the July 1994 meeting relating to plot previews. Intergraph believes that it is acting within the scope of the license, and that this is merely a ploy by Bentley because Bentley is trying to develop their own network plotting software.

In their Amended Complaint, Bentley is claiming copyright infringement, breech of contract, and a breech of the duty of good faith and fair dealing. They are seeking a permanent injunction against Intergraph's commercial use of Version 8 of IPLOT and Version 9.0 of InterPlot, and damages. Intergraph has moved the Court for summary judgement on all three counts of the Amended Complaint.

## II. *Summary Judgement Standard*

A reviewing court may enter summary judgment where there are no genuine issues as to any material fact and one party is entitled to judgment as a matter of law. *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988). The evidence presented must be viewed in the light most favorable to the non-moving party. *Id.* "The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). [3] In deciding the motion for summary judgment, it is not the function of the Court to decide disputed questions of fact, but only to determine whether genuine issues of fact exist. *Id.* at 248–49.

1999 Copr.L.Dec. P 27,842

The moving party has the initial burden of identifying evidence which it believes shows an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988). The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 325. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings and designate specific facts, by use of affidavits, depositions, admissions, or answers to interrogatories, showing that there is a genuine issue for trial. *Id.* at 324. Moreover, when the nonmoving party bears the burden of proof, it must "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.,* 812 F.2d 141, 144 (3d Cir.1987) (quoting *Celotex,* 477 U.S. at 322). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *White,* 862 F.2d at 59 (quoting *Celotex,* 477 U.S. at 322).

## III. *Discussion*

### A. *Counts I and II.*

**\*4** Intergraph puts forth numerous arguments why it believes it is entitled to summary judgement on Bentley's copyright infringement claim, and summarily relies on the same arguments for summary judgement on Bentley's breech of contract claim. These arguments are dealt with in turn.

First, Intergraph argues that their use of PlotLib is within the scope of the license. Intergraph bases much of its argument on the language used by Bentley in their Amended Complaint, such as in ¶ 26 of the Amended Complaint where Bentley alleged,

> The use, reproduction and public distribution by defendant of the PlotLib software products within its own products *enable users to view MicroStation design files on graphic displays* are unauthorized and without permission or consent from Bentley. These activities are beyond the scope of the limited license granted by Bentley to defendant

in the Distribution Agreement, and constitute infringements of the exclusive rights owned by Bentley under copyright in and to each version of PlotLib registered by Bentley.

(Emphasis added.) Intergraph is arguing that what Bentley really believes violates the license is the ability of IPLOT and InterPlot, through the use of PlotLib, to view design files on graphic displays. Intergraph claims that what is being viewed is plot files, not design files, and they go to great length to distinguish the two. According to Intergraph, a design file is the engineering data base, the actual file on which the user has created the design. A plot is a picture of the design, and contains substantially less data than a design file. There are products that allow viewing of the design file,[4] which permits the viewer to shrink or enlarge windows, zoom and pan in and out of specific areas, and to interact with the design file. Since their products do not view design files, they argue, they are not infringing Bentley's copyright.

Bentley argues that their loose use of the descriptive phrase "design files" should not govern the case, but the language of the Distribution Agreement itself, which proscribes "file viewing on graphic displays" should control. Further, Bentley points to several instances in the complaint (¶¶ 12, 18, 2(prayer for relief p. 10), and 2(prayer for relief p. 11) where Bentley refers to the prohibited file viewing much more broadly than merely as "design files." There is also evidence that the differences between a plot file and a design file is not as great or as clear cut as Intergraph suggests. (Aff. of Keith Bentley ¶ 19). Finally, Bentley argues that, since the purpose of PlotLib is to take the design data contained in MicroStation design files and convert that data into another file format appropriate for plotting, there would never be a direct view of a design file but instead a view of reformatted data in a different file called a plot file. Presumably, this argument leads to the conclusion that the use of the phrase "deign files" in the Amended Complaint could never have been intended to mean what Intergraph suggests to the Court because it is simply not possible to view design files in the context Intergraph is suggesting with PlotLib. While the Court does believe that the Amended Complaint was carelessly plead, such carelessness is not fatal. Viewing the facts in the light most favorable to Bentley, including the language of the Distribution Agreement, reading the Amended Complaint as a whole, and considering the purpose of PlotLib, the Court concludes that there is a genuine material issue of fact for trial

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

1999 Copr.L.Dec. P 27,842

as to whether or not Intergraph's use of the PlotLib is within the scope of the license.

**\*5**  Next, Intergraph argues that a proper construction of the distribution agreement (which says that file viewing on graphic displays is prohibited) leads only to the conclusion that what was intended by the phrase file viewing was that the viewing of "design files" is all that is prohibited. Without addressing the merits of the argument, the Court finds that there is direct and contradictory evidence on this issue presented by both sides, making summary judgement inappropriate. This issue is better resolved at trial. [5]

Next, Intergraph argues that even if their use of PlotLib was outside the scope of the license in the Distribution Agreement, Bentley granted Intergraph an oral, non-exclusive license in connection with the plot preview function of IPLOT and InterPlot. They argue that this permission was granted at the July, 1994 meeting. As has been demonstrated above, however, exactly what was said at that meeting is vigorously contested by both sides through affidavits and excerpts of deposition testimony. Viewing the evidence in the light most favorable to Bentley, the Court finds that there is a genuine issue of material fact as to the existence of an oral license for Intergraph to use PlotLib in the manner they have.

Finally, Intergraph argues that Bentley is estopped from claiming infringement. The elements of estoppel are:

> (1)[T]he party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to this injury.

*Hampton v. Paramount Pictures Corp.,* 279 F.2d 100, 104 (9th Cir.), *cert. denied,* 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960). Intergraph claims that, based on the July 25, 1994 meeting, it is clear that BSI knew how PlotLib was being used and that it included a plot preview function, that Bentley advised Intergraph that Bentley did not consider this use to be infringing, and that Intergraph relied on this. The Court has already addressed the parties differing views of the July 24, 1994 meeting. Further, Bentley has produced evidence that they disapproved of Intergraph's use of PlotLib and made this known to them on several occasions, undermining the second and fourth elements of estoppel. Viewing the evidence in the

light most favorable to Bentley, this evidence is sufficient to defeat Intergraph's motion.

For the foregoing reasons, Intergraph's motion for summary judgement on Bentley's copyright infringement claims and breach of contract will be denied. [6]

**B.** *Count III*

In Count III of the Amended Complaint, Bentley alleges that Intergraph's conduct in using PlotLib in IPLOT and InterPlot "to enable users to view MicroStation design files on graphic displays constitutes a violation of defendant's duty of good faith and fair dealing under the Distribution Agreement." Intergraph argues that they are entitled to summary judgement because Bentley has failed to state a claim for a breach of the duty of good faith and fair dealing as a matter of law.

**\*6**  There is no dispute that under Delaware law, [7] the implied covenant of good faith and fair dealing exists in every contract. *See e.g., Merrill v. Crothall–American, Inc.,* 606 A.2d 96, 102 (Del.1992). The purpose of this implied covenant is to protect the reasonable expectations of parties to a contract. *Pierce v. Int'l Ins. Co. Of Ill.,* 671 A.2d 1361, 1366 (Del.1996). "[T]he legal test for implying contractual obligations [is] whether it was clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith and fair dealing had they thought to negotiate the matter." *Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Sys. Co.,* 708 A.2d 989, 992 (Del.1998). Based on this articulation, the Court will impose an implied contractual term when the parties express agreement does not specifically address the act complained of, but the act complained of upsets their reasonable expectations, and it is clear that the parties would have agreed to proscribe the act as a violation of the implied covenant had they considered it in their original negotiations.

In the instant case, the Court will impose the implied covenant if the Court finds that the Distribution Agreement, which forbids Intergraph from using PlotLib for "file viewing on graphic displays" does not contemplate Intergraph offering a print preview function in their plotting products that use PlotLib, and had the parties contemplated the issue, Intergraph in fact would not have been allowed to offer the print preview function.

1999 Copr.L.Dec. P 27,842

Intergraph argues that the implied covenant is inoperative in this case based on the fact that the express language in the contract forbidding the use of PlotLib for "file viewing on graphic displays" explicitly addresses the subject of the alleged wrong, namely the manner in which Intergraph has used PlotLib, relying on *Moore Business Forms, Inc. v. Cordant Holding Corp.,* 1995 Del. Ch. LEXIS 134.

The weakness in Intergraph's position is that, based on the arguments of both sides, it is unclear at the present time what "file viewing on graphic displays" actually means. Since the Court is unable to determine what the plain language of the above phrase means, and therefore must consider it in the context of the parties negotiations and understanding, which are highly contested, it is impossible to determine whether or not "file viewing on graphic displays" is meant to cover Intergraph's use of PlotLib in IPLOT Version 8 and InterPlot Version 9.0. Bentley argues that if the Court ultimately concludes that said language does not address Intergraph's use of PlotLib, they are entitled to recovery under this theory. The Court is hard pressed to see how it could conclude that the language in the distribution agreement does not address Intergraph's use of PlotLib based on the arguments of the parties in the present motion. However, since the Court is not clear what is meant by the language in the Distribution Agreement, it seems unwise at the present time to preclude recovery under this theory. The logical force of Bentley's position requires the Court to at least consider whether or not they can sustain their claim beyond the summary judgement stage. Viewing the evidence in the light most favorable to Bentley, they have amply demonstrated through the sworn affidavit of Keith Bentley that their reasonable expectations of limiting Intergraph's use of PlotLib to the narrowest possible scope in the license agreement would be upset, and that they would have insisted on a provision preventing Intergraph from using PlotLib in conjunction with another program to perform plot previews, had they considered the issue when they negotiated the language.

**\*7** IV. *Conclusion*

In conclusion, this Court determines that there are genuine issues of material fact on each of plaintiff's claims that can only be resolved at trial. Accordingly, defendant's motion for summary judgement will be denied. [8]

An appropriate Order follows. Clarence C. Newcomer, J.

### *ORDER*

AND NOW, this day of November, 1998, upon consideration of defendant's Motion for Summary Judgement, and plaintiff's response thereto, and consistent with the foregoing Memorandum, it is hereby ORDERED that said Motion is DENIED.

AND IT IS SO ORDERED.

**Parallel Citations**

1999 Copr.L.Dec. P 27,842

Footnotes

1    Intergraph's exact stock ownership is between 49 and 49.9 percent.

2    Both parties have submitted affidavits in support of their respective positions on the meaning of the language in the amendment based on, among other things, differing recollections of the 1993 negotiations that went into creating the language.

3    Although this is a bench trial, the Court's role on summary judgement is no different. *In re: Unisys Savings Plan Litigation,* 74 F.3d 420, 433 n. 10 (3d. Cir.), *cert. denied,* 519 U.S. 810 (1996).

4    MicroStation Review and DM/View are two.

5    Conversely, Bentley argues that the language "file viewing on graphic displays" is unambiguous and that they are entitled to summary judgement on the issue of whether or not Intergraph's use of PlotLib violates the limited license they granted to Intergraph. Not only is there sufficient evidence in the record for Intergraph to survive the summary judgement stage, Bentley's own use of the phrase "design files" throughout their pleadings creates ambiguity sufficient that the Court is uncertain at this stage what the plain meaning of "file viewing on graphic displays" actually is.

6    Intergraph also argues that several members of the IPLOT family do not use PlotLib at all or in such a way as Bentley claims is infringing. Unfortunately, they do not point the Court to any evidence in support of their contention. If this is in fact true, perhaps this is something the parties could stipulate to prior to trial.

7    Delaware law governs this case per the Distribution Agreement of the parties, at section 11.08.

Westlaw Next © 2014 Thomson Reuters. No claim to original U.S. Government Works.

8    Defendant also argues for an award of costs and attorney's fees, but since they did not prevail on this motion, the Court need not consider their request.

---

TAB 20

2006 CarswellOnt 2017, [2006] I.L.R. I-4498, 51 C.L.R. (3d) 1, 16 B.L.R. (4th) 1, 35 C.C.L.I. (4th) 163, 79 O.R.
(3d) 494, 266 D.L.R. (4th) 182, 211 O.A.C. 4



2006 CarswellOnt 2017, [2006] I.L.R. I-4498, 51 C.L.R. (3d) 1, 16 B.L.R. (4th) 1, 35 C.C.L.I. (4th) 163, 79
O.R. (3d) 494, 266 D.L.R. (4th) 182, 211 O.A.C. 4

Bridgewood Building Corp. (Riverfield) v. Lombard General Insurance Co. of Canada

BRIDGEWOOD BUILDING CORP. (RIVERFIELD) (Applicant / Respondent) and LOMBARD GENERAL
INSURANCE COMPANY OF CANADA (Respondent / Appellant)

BEIGE VALLEY DEVELOPMENTS LIMITED (Applicant / Respondent) and LOMBARD GENERAL INSUR-
ANCE COMPANY OF CANADA (Respondent / Appellant)

Ontario Court of Appeal

Catzman, Moldaver, Armstrong JJ.A.

Heard: February 20-21, 2006
Judgment: April 5, 2006
Docket: CA C43430, C43431

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights re-
served.

Proceedings: affirming *Bridgewood Building Corp. (Riverfield) v. Lombard General Insurance Co. of Canada*
(2005), 7 B.L.R. (4th) 46, 2005 CarswellOnt 2081, 26 C.C.L.I. (4th) 93, 46 C.L.R. (3d) 139 (Ont. S.C.J.)

Counsel: Hillel David, Eleni Maroudas for Appellant, Lombard General Insurance

Thomas J. Donnelly, Catherine P. Clark for Respondents, Bridgewood Building Corp., Beige Valley Develop-
ments Ltd.

Subject: Insurance; Contracts; Property

Insurance --- Principles of interpretation and construction — Exclusion of risk clauses

Insureds developed residential home projects — Insureds were insured by same insurer under same commercial
general liability ("CGL") policy forms — Policy excluded coverage for property damage to insured's own work,
but stated that exclusion did not apply if damaged work or work out of which damage arose was performed on
insured's behalf by subcontractor — New homes built by insured had structural defects due to defective concrete
supplied by one of insureds' subcontractors — Insureds' application for declaration that insurer was liable to in-
demnify them for costs of repairing defective work was granted — Insurer appealed — Appeal dismissed — Ap-
plication judge correctly interpreted insuring agreements — General principle that CGL policies are not intended
to cover repair or replacement costs for insured's own defective work or product does not automatically preclude
such coverage where provisions in policy evidence contrary intent — Plain reading of policy indicated that cov-

2006 CarswellOnt 2017, [2006] I.L.R. I-4498, 51 C.L.R. (3d) 1, 16 B.L.R. (4th) 1, 35 C.C.L.I. (4th) 163, 79 O.R. (3d) 494, 266 D.L.R. (4th) 182, 211 O.A.C. 4

erage would be provided if damaged work was performed on behalf of insured by subcontractor — Provision in policy exempting work of subcontractors would be redundant if general principle applied to exclude coverage — Insurer's submission that providing coverage for faulty work by subcontractors would encourage insureds to hire inexpensive subcontractors failed to account for practical business reality that contractors who hired incompetent subcontractors would soon find themselves out of work — Insurer had not chosen to incorporate standard industry endorsement excluding coverage for faulty work by subcontractors into its CGL policy.

**Cases considered by *Moldaver J.A.*:**

*Alie v. Bertrand & Frère Construction Co.* (2002), 1 C.C.L.I. (4th) 166, 26 C.L.R. (3d) 5, 2002 CarswellOnt 4255, [2003] I.L.R. I-4146, 62 O.R. (3d) 345, 167 O.A.C. 20, 222 D.L.R. (4th) 687 (Ont. C.A.) — considered

*American Family Mut. Ins. Co. v. American Girl, Inc.* (2004), 268 Wis. 2d 16, 673 N.W.2d 65 (U.S. Wis. S.C.) — considered

*Celestica Inc. v. ACE INA Insurance* (2003), 229 D.L.R. (4th) 392, 174 O.A.C. 278, 50 C.C.L.I. (3d) 190, [2003] I.L.R. I-4218, 2003 CarswellOnt 2693 (Ont. C.A.) — considered

*O'Shaughnessy v. Smuckler Corp.* (1996), 543 N.W.2d 99 (U.S. Minn. Ct. App.) — considered

*Qualls v. Country Mutual Insurance Co.* (1984), 123 Ill. App. 3d 831, 462 N.E.2d 1288, 78 Ill. Dec. 934 (U.S. Ill. Ct. App. 4 Dist.) — referred to

*Wanzek Const., Inc. v. Employers Ins. of Wausau* (2004), 679 N.W.2d 322 (U.S. Minn. Ct. App.) — referred to

*Westridge Construction Ltd. v. Zurich Insurance Co.* (2005), 44 C.L.R. (3d) 204, 25 C.C.L.I. (4th) 182, 2005 SKCA 81, 2005 CarswellSask 421, [2005] I.L.R. I-4426, 269 Sask. R. 1, 357 W.A.C. 1 (Sask. C.A.) — followed

APPEAL by insurer from judgment reported at *Bridgewood Building Corp. (Riverfield) v. Lombard General Insurance Co. of Canada* (2005), 7 B.L.R. (4th) 46, 2005 CarswellOnt 2081, 26 C.C.L.I. (4th) 93, 46 C.L.R. (3d) 139 (Ont. S.C.J.), requiring insurer to indemnify insureds for cost of repairing structural defects in new homes built by insureds.

*Moldaver J.A.*:

1    Lombard General Insurance Company of Canada (Lombard) appeals from two orders made by Stewart J. requiring Lombard to indemnify Bridgewood Building Corp. (Riverfield) and Beige Valley Developments Ltd. (the respondents) under the terms of two Commercial General Liability (CGL) policies for the cost of repairing a number of new homes built by the respondents. The homes contained structural defects due to defective concrete supplied by one of the respondents' subcontractors.

2    For purposes of this appeal, it is only necessary to reproduce two provisions from the policies.

3    Under the subheading "Insuring Agreement", the policies provide:

2006 CarswellOnt 2017, [2006] I.L.R. I-4498, 51 C.L.R. (3d) 1, 16 B.L.R. (4th) 1, 35 C.C.L.I. (4th) 163, 79 O.R. (3d) 494, 266 D.L.R. (4th) 182, 211 O.A.C. 4

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

Under the subheading "Exclusions", the policies state:

This insurance does not apply to:

. . . . .

    j. "Property damage" to

        1) that particular part of "your work",

        2) that particular part of machinery or equipment forming a part of "your work" described in 1) above, or

        3) a component or constituent of "your work" described in 1) above, whether such component or constituent is a separate physical part or an integral element of "your work",

that is defective or actively malfunctions. This exclusion applies only to "property damage" to "your work" included in the "products-completed operations hazard".

*This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor* [emphasis added].

4      Lombard submits that the application judge erred in ordering indemnification. It takes the position that "there is no coverage under a CGL policy for costs incurred by the insured for the repair or replacement of its own defective work or product." Lombard maintains that the "defective work or product" exclusion applies no matter whether the defects are caused by the insured or a subcontractor employed by the insured.

5      In support of its position, Lombard relies on the first sentence of the coverage clause in the Insuring Agreement (reproduced at paragraph 3 above) which says that Lombard "will pay those sums that the insured becomes legally obligated to pay as damages because of ... 'property damage' to which this insurance applies." Lombard submits that it is settled law that CGL policies are not intended to cover repair or replacement costs arising out of an insured's own defective work or product and that the words in the coverage clause "to which this insurance applies" incorporate that "general principle", thereby precluding the respondents from claiming coverage under the policies in question.

6      The application judge refused to give effect to that argument. Her reasons for rejecting it are set out in paras. 34 and 35 of her reasons. They are brief, but in fairness to her, the issue was raised by Lombard almost as an afterthought and it was overshadowed by other issues that the application judge addressed and that Lombard has chosen not to pursue on appeal:

Further, although Lombard has not relied on any "work" or "product" exclusion in the Policies it nevertheless mandates that a CGL policy, by its very nature, is intended only to cover an insured's tortious liability to third parties, not including the cost of repairing or replacing the insured's own defective work or product. I am not satisfied that this assertion provides a full answer to the Applicants' claims. Rather, I prefer the ap-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 2017, [2006] I.L.R. I-4498, 51 C.L.R. (3d) 1, 16 B.L.R. (4th) 1, 35 C.C.L.I. (4th) 163, 79 O.R. (3d) 494, 266 D.L.R. (4th) 182, 211 O.A.C. 4

proach taken in recent decisions of both the Ontario and British Columbia Courts of Appeal — that "the focus should be on the language of insuring agreements and their interpretation" (see: *Alie v. Bertrand & Frère Construction Co.*, [ (2003), 62 O.R. (3d) 345 (C.A.)], at para.26). As was noted by the British Columbia Court of Appeal in *Ellet Industries Ltd. v. Laurentian P & C Insurance Co.* (1996), 34 C.C.L.I. (2d) 294:

> While general descriptive terminology distinguishing different categories of insurance coverage no doubt serves a useful purpose in some contexts it cannot be determinative of the rights and duties of the parties to the policy. Those matters can only be resolved definitively by ascertaining the intent of the parties from the language used.

As already noted, I am of the view that the language of the policies should be interpreted in favour of the Applicants in this case.

In support of its assertion that a CGL policy is not meant to be a Performance Bond and that these Policies for CGL coverage do not extend to provide indemnity for anything that is the result of the fault of the insured, Lombard cites the public policy argument that extending coverage to shoddy workmanship or product would serve to encourage poor workmanship and manufacturing. Lombard maintains that if coverage is extended in this case, the liability policy effectively becomes "enormously expanded", opening the floodgates to claims that would include building code infractions, substitution of sinks, repair of chipped tiles, drywall repair and essentially all of the Applicants' work. In considering that position, I am cognizant of Lombard's election not to rely on certain other provisions of the Policies, including the "work" and "product" exclusions. Further, I am of the view that the facts of these cases, combined with the ONHWP [Ontario New Home Warranty Program, now Tarion Warranty Corporation] legislative requirements, raise public policy considerations that serve to outweigh Lombard's concerns.

7    I agree with the approach taken by the application judge and I am satisfied that she correctly interpreted the insuring agreements.

8    The approach taken by the application judge accords with the approach endorsed by the Saskatchewan Court of Appeal in *Westridge Construction Ltd. v. Zurich Insurance Co.* (2005), 25 C.C.L.I. (4th) 182 (Sask. C.A.), where, at paras. 33 and 34, Sherstobitoff J.A. observed:

> In the concluding paragraphs of his reasons for decision ... the trial judge found that the claims against Westridge did not fall within the insuring agreements. In doing so, he made no reference to the terms of the policies themselves, but appears to have relied on what he termed to be a fundamental principle of insurance law that a Comprehensive General Liability Policy is not intended to be a means for a contractor to cover the expenses to cover its own defective workmanship or materials, or to be a performance bond....

> While the statement of principle is sound, this was an erroneous approach, as the judge was obliged to decide the issue not upon general insurance principles, nor upon the general nature of the policies, but upon the exact terms of the insurance policies themselves. As noted by the Alberta Court of Appeal in *S.(J.A.) v. Gross*, [2002] 5 W.W.R. 54 at para. 29:

>> Further, the argument does not take into account the wording of the Policy. The key to coverage lies not in the general nature of the policy itself but in whether the alleged acts fall within its provisions and coverage is not excluded. As Justice Iacobucci noted at para. 67 of *Scalera [Non-Marine Underwriters*

2006 CarswellOnt 2017, [2006] I.L.R. I-4498, 51 C.L.R. (3d) 1, 16 B.L.R. (4th) 1, 35 C.C.L.I. (4th) 163, 79 O.R. (3d) 494, 266 D.L.R. (4th) 182, 211 O.A.C. 4

> *v. Scalera*, [2000] 1 S.C.R. 551], general principles of insurance contract interpretation are "merely in-
> terpretive aids that cannot decide any issues by themselves". The provisions of the Policy are discussed
> below.

See also, Gordon Hilleker, *Liability Insurance in Canada*, (3d ed.) (Toronto: Butterworths, 2001) at p. 147, which says:

> In construction cases the interplay between the insuring agreement in respect of property damage
> caused by an accident and the exclusions with respect to product and performance requires careful ana-
> lysis. Many courts approach these cases from the perspective that a liability insurance policy is not a
> performance bond, which, of course, is correct. Yet one must take care not to allow this perspective to
> lead to an overly narrow interpretation of the insuring agreement when, on a proper interpretation, the
> claim falls within the insuring agreement but is captured by one or more of the policy exclusions.

It is therefore necessary to turn to the policies. In doing so, it is well to repeat the general principles of inter-
pretation of such provisions referred to in paragraph [31 of *Monenco Ltd. v. Commonwealth Insurance Co.*,
[2001] 2 S.C.R. 699], that coverage provisions should be construed broadly, while exclusion clauses should
be given a narrow interpretation, and that the *contra proferentem* rule should be applied.

9    I agree with the *Westridge* approach and confirm that it was the proper one for Stewart J. to take in de-
termining what risks Lombard had chosen to cover in its policies with the respondents. In so concluding, I reject
Lombard's submission that the reasoning in *Westridge* conflicts with the approach adopted by this court in *Alie
v. Bertrand & Frère Construction Co.* [2002 CarswellOnt 4255 (Ont. C.A.)], *supra*, and *Celestica Inc. v. ACE
INA Insurance* (2003), 229 D.L.R. (4th) 392 (Ont. C.A.). I see no such conflict. The issue at hand is not the in-
tegrity of the "general principle" nor the policy considerations that underlie it, but the role it plays in determin-
ing what risks an insurer has agreed to cover in any particular CGL policy. In that regard, it is not now, nor, to
my knowledge, has it ever been the position of this court that, standing alone, the "general principle" precludes
coverage of an insured's own defective work or product regardless of provisions in the policy that evidence a
contrary intent. Rather, it constitutes an interpretative aid that can be helpful, though not decisive, when inter-
preting particular provisions of a CGL policy in an effort to determine the scope and extent of the risks that the
insurer has agreed to cover. (See *Alie* at paras. 24-27 and 51 and *Celestica* at para. 30).

10    The "interpretative aid" approach only makes sense. Otherwise, CGL policies would effectively become
traps for the unwary. The policies under consideration illustrate the point, as evidenced by the key provisions
that are reproduced again for convenience.

11    Under the subheading "Insuring Agreement", the policies provide:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily in-
> jury" or "property damage" to which this insurance applies.

Under the subheading "Exclusions", the policies state:

> This insurance does not apply to:

. . . . .

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 2017, [2006] I.L.R. I-4498, 51 C.L.R. (3d) 1, 16 B.L.R. (4th) 1, 35 C.C.L.I. (4th) 163, 79 O.R. (3d) 494, 266 D.L.R. (4th) 182, 211 O.A.C. 4

      j. "Property damage" to

          1) that particular part of "your work",

          2) that particular part of machinery or equipment forming a part of "your work" described in 1) above, or

          3) component or constituent of "your work" described in 1) above, whether such component or constituent is a separate physical part or an integral element of "your work",

that is defective or actively malfunctions. This exclusion applies only to "property damage" to "your work" included in the "products-completed operations hazard".

*This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor* [emphasis added].

12      On a plain reading, clause (j) would seem to indicate that coverage will be provided if the "damaged work or the work out of which the damage arises" is performed on behalf of the insured by a subcontractor. And yet, Lombard says that that is not what it means. When asked what it did mean, counsel for Lombard initially characterized it as "sloppy drafting". Upon further questioning, he retreated from that position and conceded, correctly in my view, that if the effect of the "general principle" was as he would have it, exclusion (j) was redundant, *i.e.* there would be no need to exempt faulty work performed by subcontractors if the "general principle" excluded such work from coverage in every case. And, as the respondents quite properly point out, if exclusion (j) is redundant, so too are five other exclusionary provisions in the same policy.

13     Despite this anomaly, counsel for Lombard maintained his position, citing authorities to the effect that an exception to an exclusion cannot restore coverage where coverage did not exist in the first place. (See *Qualls v. Country Mutual Insurance Co.*, 123 Ill. App. 3d 831 (U.S. Ill. Ct. App. 4 Dist. 1984), at 833 -34.) I take no issue with that principle. In my view, however, it is unhelpful here because it begs the question.

14     The approach suggested by Lombard is problematic for several reasons. It defies basic principles of contract interpretation — we are asked to read a host of exclusionary provisions out of the insuring agreement on the ground that they are redundant and thus meaningless. It turns the *contra proferentem* principle on its head — we are asked to construe ambiguities in an insurance policy against the insured. It ignores the historical evolution of clauses such as exclusion (j) and the reasonable expectation of the parties flowing from this — exclusion (j) and other like provisions are the product of a Broad Form Property Damage Endorsement (BFPD) implemented into the CGL in 1986 for the express purpose of bringing claims arising out of faulty work by subcontractors back into coverage through an exception to an exclusion. (See *American Family Mut. Ins. Co. v. American Girl, Inc.*, 673 N.W.2d 65 (U.S. Wis. S.C. 2004) at paras. 68-69; Patrick J. Wielinski, "CGL Coverage for Defective Workmanship — Current (and Ongoing Issues)" (Paper presented to the 16th Annual Construction Law Conference, State Bar of Texas, March 7, 2003); C.J. Shapiro, "Business Risk in Construction Coverage — The Business Risk Exclusions in CGL Policies," in *Insurance Coverage and Claims Institute 2005* (Chicago: Defence Research Institute, 2005), Chicago: Illinois; *O'Shaughnessy v. Smuckler Corp.*, 543 N.W.2d 99 (U.S. Minn. Ct. App. 1996), review denied (Minn. 1996) and *Wanzek Const., Inc. v. Employers Ins. of Wausau*, 79 N.W.2d 322 (U.S. Minn. Ct. App. 2004)).

2006 CarswellOnt 2017, [2006] I.L.R. I-4498, 51 C.L.R. (3d) 1, 16 B.L.R. (4th) 1, 35 C.C.L.I. (4th) 163, 79 O.R. (3d) 494, 266 D.L.R. (4th) 182, 211 O.A.C. 4

15    A concise statement of the purpose and effect of this revision of the CGL is found in *American Family Mutual*, *supra*, at para. 68:

> This subcontractor exception dates to the 1986 revision of the standard CGL policy form. Prior to 1986 the CGL business risk exclusions operated collectively to preclude coverage for damage to construction projects caused by subcontractors. Many contractors were unhappy with this state of affairs, since more and more projects were being completed with the help of subcontractors. In response to this changing reality, insurers began to offer coverage for damage caused by subcontractors through an endorsement to the CGL known as the Broad Form Property Damage Endorsement, or BFPD. Introduced in 1976, the BFPD deleted several portions from the business risk exclusions and replaced them with more specific exclusions that effectively broadened coverage. Among other changes, the BFPD extended coverage to property damage caused by the work of subcontractors. In 1986 the insurance industry incorporated this aspect of the BFPD directly into the CGL itself by inserting the subcontractor exception to the "your work" exclusion. See *generally* 21 Eric Mills Holmes, *Holmes' Appleman on Insurance*, § 132.9, 152-53.

16    Paragraphs 73 and 74 of the same decision are also instructive. They rebut Lombard's contention that the 1986 BFPD was of no consequence because clauses like the subcontractor exception in exclusion (j) could not restore coverage where none existed before:

> American Family cites conflicting authorities which appear to hold that damage to an insured's work caused by a subcontractor is not covered because of the "your work" exclusion, but these authorities are no longer controlling because they construed policies that did not include the subcontractor exception. Noting the apparent conflict between *O'Shaughnessy*, *Kalchthaler* [224 Wis 2d 387 (App. 1999)], and similar cases on the one hand, and contrary cases on the other, one commentator has pointed out that "those cases [finding no coverage] involved the older policy language while the current policy specifically provides that the 'own work' exclusion does not apply 'if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.'" 2 Jeffrey W. Stempel, *Law of Insurance Contract Disputes*, § 14.13[a]. 14-132

> *This interpretation of the subcontractor exception to the business risk exclusion does not "create coverage" where none existed before, as American Family contends. There is coverage under the insuring agreement's initial coverage grant. Coverage would be excluded by the business risk exclusionary language, except that the subcontractor exception to the business risk exclusion applies, which operates to restore the otherwise excluded coverage*

> [emphasis added].

17    Lombard's argument against the "interpretative aid" approach centres on the policy considerations that inform the "general principle". In short, Lombard maintains that the approach taken by the application judge converts CGL policies into performance bonds, something they were never meant to be. According to Lombard, such an approach provides general contractors, like the respondents, with a windfall. For low premiums, they are able to obtain insurance that permits and indeed encourages them to hire inexpensive subcontractors, comforted in the knowledge that they will be fully indemnified if the subcontractors do their work badly.

18    While I acknowledge Lombard's concerns, they do not alter my view that the "interpretative aid" ap-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 2017, [2006] I.L.R. I-4498, 51 C.L.R. (3d) 1, 16 B.L.R. (4th) 1, 35 C.C.L.I. (4th) 163, 79 O.R. (3d) 494, 266 D.L.R. (4th) 182, 211 O.A.C. 4

proach is the correct one. My reasons are threefold.

19      First, I find persuasive the response of the Court of Appeals of Minnesota in *O'Shaughnessy v. Smuckler Corp.*, *supra*, at p. 102, to this issue:

The rationale behind the Business Risk Doctrine has been articulated as follows:

If insurance proceeds could be used to pay for the repairing and/or replacing of poorly constructed products, a contractor or subcontractor could receive initial payment for its work and then receive subsequent payment from the insurance company to repair and replace it. Equally repugnant on policy grounds is the notion that the presence of insurance obviates the obligation to perform the job initially in a workmanlike manner. *Knutson Construction Co. v. St. Paul Fire & Marine Insurance Co.*, 396 N.W.2d 229 at235 (Minn. Sup. Ct. 1986) (quoting *Centex Homes Corp. v. Prestressed Systems*, 444 So.2d 66 at 66-67 (Fla. App. 1984)).

*We note that this rationale is less applicable to a claim by a general contractor for the defective work of its subcontractor. A general contractor has minimal control over the work of its subcontractors by definition, and the fact that the general contractor receives coverage will not relieve the subcontractor of ultimate liability for unworkmanlike or defective work. In such a case, an insurer will have subrogation rights against the subcontractor who performed the defective work. Presumably, the Business Risk Doctrine will preclude the subcontractor from recovering from its own insurer. Thus, the goal of the Business Risk Doctrine would still be achieved because ultimate responsibility for poor workmanship would lie with the one who performed it*

[emphasis added].

20      Second, Lombard's concerns fail to account for practical business realities. General contractors who make a habit of hiring incompetent subcontractors will soon find themselves out of work. The marketplace can be trusted to look after unscrupulous general contractors who, for the sake of a fast dollar, are prepared to risk their reputation by providing defective work product on a regular basis.

21      Third, and most important, if insurance companies do not wish to indemnify general contractors for the shortcomings of their subcontractors, they need only say so in clear and unambiguous language in their policies. As the respondents have pointed out, standard industry endorsements designed to accomplish just that have been available since December 1, 2001. The insurance industry drafted those endorsements to remove coverage for faulty work by subcontractors. (See Wielinski, "CGL Coverage for Defective Workmanship", *supra*, at pp. 53-54). Lombard does not challenge this. And yet, for reasons known only to itself, it has not chosen to incorporate these endorsements into its CGL policies.

22      For these reasons, I am satisfied that the application judge took the correct approach and came to the correct conclusion on the scope of coverage provided by the policies in issue. Accordingly, I would affirm her order and dismiss the appeal with costs to the respondents on a partial indemnity basis.

23      If the parties cannot agree on the amount of the costs, they may file brief submissions with the court (no longer than three pages double-spaced) within ten days of the release of these reasons.

***Catzman J.A.:***

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2006 CarswellOnt 2017, [2006] I.L.R. I-4498, 51 C.L.R. (3d) 1, 16 B.L.R. (4th) 1, 35 C.C.L.I. (4th) 163, 79 O.R. (3d) 494, 266 D.L.R. (4th) 182, 211 O.A.C. 4

I agree.

**Armstrong J.A.:**

I agree.

*Appeal dismissed.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 21

2014 CarswellOnt 4189, 2014 ONSC 1988, 119 O.R. (3d) 339, 239 A.C.W.S. (3d) 295



2014 CarswellOnt 4189, 2014 ONSC 1988, 119 O.R. (3d) 339, 239 A.C.W.S. (3d) 295

Champion Iron Mines Ltd., Re

In the Matter of an application under section 182 of the Ontario Business Corporations Act

In the Matter of a proposed plan of arrangement of Champion Iron Mines Limited involving Mamba Minerals Limited and 2401397 Ontario Inc. Champion Iron Mines Limited, Applicant

Ontario Superior Court of Justice [Commercial List]

D.M. Brown J.

Heard: March 28, 2014
Judgment: March 28, 2014
Docket: CV-14-10442-00CL

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: M. Kestenberg, A. McCoomb, for Applicant

E. Snow, for Mamba Minerals Limited

Subject: Civil Practice and Procedure; Corporate and Commercial; Evidence

Business associations --- Changes to corporate status — Arrangements and compromises — Under general corporate legislation

Arrangement agreement provided for M Ltd. and its wholly-owned subsidiary, 240 Inc., to acquire all of outstanding common shares of C Corp. in exchange for ordinary shares of M Ltd. or exchangeable shares of 240 Inc. according to fixed exchange ratio — C Corp. brought application for approval of plan of arrangement — Application granted — Proposed arrangement was fair and reasonable — Arrangement fell within definition of arrangement under s. 182(1) of Business Corporations Act — C Corp. complied with interim order that was made in respect of shareholders meeting — Application was put forward in good faith — Arrangement had valid purpose to provide sufficient funding for completion of feasibility study for project and enhance exploration potential of another project — Arrangement struck fair balance between interest of corporation and security holders.

Evidence --- Opinion — Experts — Expert reports — Admissibility

Arrangement agreement provided for M Ltd. and its wholly-owned subsidiary, 240 Inc., to acquire all of out-

2014 CarswellOnt 4189, 2014 ONSC 1988, 119 O.R. (3d) 339, 239 A.C.W.S. (3d) 295

standing common shares of C Corp. in exchange for ordinary shares of M Ltd. or exchangeable shares of 240 Inc. according to fixed exchange ratio — Management proxy circular distributed by C Corp. contained fairness opinion indicating that consideration to be received by shareholders was fair from financial point of view to shareholders of C Corp. other than M Ltd. and its subsidiaries — C Corp. brought application for approval of plan of arrangement — Application granted — Fairness opinion was inadmissible for purposes of final order and no weight was placed on it — Fairness opinion did not comply with requirements in R. 53.03(2.1) of Rules of Civil Procedure — Fairness opinion simply asserted opinion without disclosing reasons for it — Fairness opinion was devoid of analysis which reader could follow in order to understand how opinion was reached and what, if any, weight should be given to opinion.

**Cases considered by *D.M. Brown J.*:**

*BCE Inc., Re* (2008), *(sub nom. Aegon Capital Management Inc. v. BCE Inc.)* 383 N.R. 119, 71 C.P.R. (4th) 303, 52 B.L.R. (4th) 1, *(sub nom. Aegon Capital Management Inc. v. BCE Inc.)* 301 D.L.R. (4th) 80, 2008 SCC 69, *(sub nom. BCE Inc. v. 1976 Debentureholders)* [2008] 3 S.C.R. 560, 2008 CarswellQue 12595, 2008 CarswellQue 12596 (S.C.C.) — followed

**Statutes considered:**

*Business Corporations Act*, R.S.O. 1990, c. B.16

Generally — referred to

s. 182 — referred to

s. 182(1) "arrangement" — considered

*Securities Act of 1933*, 15 U.S.C. 2A

s. 3(a)(10) — considered

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194

R. 4.1 — referred to

R. 53.03(2.1) [en. O. Reg. 438/08] — referred to

R. 53.03(2.1) ¶ 6 [en. O. Reg. 438/08] — referred to

R. 53.03(2.1) ¶ 6 ¶ i [en. O. Reg. 438/08] — considered

R. 53.03(2.1) ¶ 6 ¶ ii [en. O. Reg. 438/08] — considered

R. 53.03(2.1) ¶ 6 ¶ iii [en. O. Reg. 438/08] — considered

APPLICATION for approval of plan of arrangement.

***D.M. Brown J.*:**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellOnt 4189, 2014 ONSC 1988, 119 O.R. (3d) 339, 239 A.C.W.S. (3d) 295

## I. Approval of an OBCA plan of arrangement; fairness opinions; and, the timing of final order applications

1      Champion Iron Mines Limited sought approval of a plan of arrangement amongst itself, Mamba Minerals Limited and 2401397 Ontario Inc. pursuant to section 182 of the *Ontario Business Corporations Act*, R.S.O. 1990, c. B.16. Earlier today I approved the plan of arrangement. These are my reasons for so doing.

## II. The proposed plan of arrangement and the interests being arranged

### A. *Champion Iron and its share structure*

2      Champion Iron is an *OBCA* corporation. Its business focuses on mineral exploration and development, particularly iron ore deposits in North-Eastern Quebec and Newfoundland and Labrador. Its shares are listed on the Toronto Stock Exchange. As at January 28, 2014, the issued securities of Champion Iron consisted of common shares, common share options and common share warrants.

### B. *Mamba Minerals Limited*

3      Mamba Minerals Limited is incorporated under the laws of Australia. It recently incorporated a wholly-owned subsidiary, 2401397 Ontario Inc. (now known as Champion Exchange Limited), for the purpose of effecting the proposed plan of arrangement.

### C. *The arrangement*

4      Under the Arrangement Agreement Mamba Minerals, together with Champion Exchange, will acquire all of the outstanding common shares of Champion Iron in exchange for ordinary shares of Mamba Minerals or exchangeable shares of Champion Exchange according to a fixed exchange ratio. Champion Option-holders will receive replacement options entitling them to acquire shares of Mamba Minerals in accordance with a negotiated exchange ratio. Champion Iron Warrants will be adjusted in accordance with their terms so that the holder will be entitled to acquire Mamba Minerals pursuant to an exchange formula.

## III. Governing principles

5      The applicable legal principles were set out by the Supreme Court of Canada in *BCE Inc., Re*.[FN1] In seeking approval of a plan of arrangement, the corporate applicant bears the onus of satisfying the court that: (i) the statutory procedures have been met; (ii) the application has been put forward in good faith; and, (iii) the arrangement is fair and reasonable. In reviewing the directors' decision on the proposed arrangement to determine if it is fair and reasonable, courts must be satisfied that (a) the arrangement has a valid business purpose, and (b) the objections of those whose legal rights are being arranged are being resolved in a fair and balanced way.

## IV. Analysis

### A. *Compliance with statutory requirements and the Interim Order*

6      The applicant has met the statutory requirements in that the Arrangement falls within the definition of an "arrangement" under *OBCA* s. 182(1) - it provides for an exchange of securities of a corporation for securities of another corporation. Wilton-Siegel J. made an Interim Order on February 7, 2014, in respect of the meeting of shareholders on March 27, 2014. The evidence disclosed that Champion Iron complied with the requirements of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellOnt 4189, 2014 ONSC 1988, 119 O.R. (3d) 339, 239 A.C.W.S. (3d) 295

the Interim Order.

### B. Has the application been put forward in good faith?

7    The evidence disclosed that Champion Iron negotiated an arm's-length transaction with Mamba Minerals in order to develop its mining business more effectively. Champion Iron struck a Special Committee of independent directors to supervise the negotiations with Mamba Minerals and the negotiated Arrangement would provide a significant premium to the shareholders of Champion Iron. As these are all indicia of good faith, I concluded that Champion Iron had put forward the application in good faith.

### C. Does the Arrangement have a valid business purpose?

8    The Arrangement has a valid business purpose, namely to provide sufficient funding for the completion of a feasibility study on one project, as well as to enhance the exploration potential of another project.

### D. Is the arrangement fair and reasonable?

9    Did the Arrangement strike a fair balance between the interests of the corporation and those of security holders in the circumstances of this case? For several reasons I was satisfied that it did:

> (i) As mentioned, the consideration represented a premium of approximately 72% to the shareholders of Champion Iron;

> (ii) The Arrangement Agreement allowed for the Board to entertain superior proposals at any time prior to the approval of the Arrangement Resolution by Champion Iron shareholders;

> (iii) The Board and the Special Committee reviewed the terms of the Arrangement and determined that the Arrangement was in the best interests of Champion Iron and its shareholders. The Board unanimously recommended that the shareholders vote for the Arrangement Resolution authorizing and approving the Arrangement;

> (iv) A significant number of shareholders were present at the March 27, 2014 meeting either in person or by proxy (45.09%), and the Arrangement Resolution received approval by (i) not less than two-thirds of the votes cast by shareholders in person or by proxy at the meeting (99.41%) and (ii) at least a simple majority of the votes cast by minority shareholders (99.35%); and,

> (v) The Arrangement offered rights of dissent to Champion Iron shareholders. One holder of 17 shares (0.0000001%) exercised a right to dissent. No shareholder filed a notice of appearance opposing the approval application.

### E. Conclusion

10    For those reasons I concluded that the proposed Arrangement was fair and reasonable, and I granted an order in accordance with the draft filed by Champion Iron, which I signed. I should note that in its evidence supporting the application Champion Iron specifically advised the Court that it intended to rely on the exemption from the requirements to register the distribution and/or exchange of securities to Champion Security-holders resident in the United States of America under Section 3(a)(10) of the United States *Securities Act of 1933*.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellOnt 4189, 2014 ONSC 1988, 119 O.R. (3d) 339, 239 A.C.W.S. (3d) 295

## V. Two concluding comments

### A. The evidentiary utility of the common form of fairness opinion[FN2]

11      The Management Proxy Circular distributed by Champion Iron contained a fairness opinion from Canaccord Genuity dated December 5, 2013. The opinion was expressed on the last page of the report, under the heading "Conclusion":

> Based upon and subject to the foregoing, Canaccord is of the opinion that, as of the date hereof, the Consideration to be received by Champion Shareholders pursuant to the Transaction is fair, from a financial point of view, to the shareholders of Champion other than Mamba and its subsidiaries and affiliates.

In terms of the "foregoing" referred to in that conclusion, earlier in its Fairness Opinion Canaccord had described (i) its engagement, (ii) its credentials, (iii) its independence, (iv) the scope of its review, (v) the assumptions and limitations to its analysis and (vi) its approach to fairness. I think it fair to say, however, that nowhere in its Fairness Opinion did Canaccord disclose the specifics of the actual analysis which it had performed — the "number crunching", so to speak — which could inform a reader on the issue of whether the offered consideration was within a minimum range that otherwise could have been obtained in a market-based transaction process.

12      From the evidence filed by Champion Iron it was clear that the applicant was aiming the results of the Fairness Opinion towards several different audiences. First, according to the February 5, 2014 affidavit sworn by Miles Nagamatsu, the Chief Financial Officer of Champion Iron, the Special Committee of the Board took the fairness opinion into account in concluding that the proposed arrangement was fair to Chamption Iron Shareholders and Option-holders, as well as in the best interests of the company. The Board as a whole also took the opinion into account for the Management Proxy Circular stated:

> The views of Canaccord expressed in the Fairness Opinion were an important consideration in the Special Committee's recommendation and the Champion Board's decision to proceed with the Arrangement.

13      Second, management included the fairness opinion in the Management Proxy Circular sent to shareholders with the caution that:

> The Fairness Opinion does not constitute a recommendation to any Champion Shareholder as to how to vote or act on any matter relating to the Arrangement. The Board urges the Champion Shareholders to read the Fairness Opinion, attached hereto as Appendix F, carefully and in its entirety.

From this I infer that the Board concluded that the Fairness Opinion contained information relevant to the decision-making process shareholders would have to undertake in deciding whether or not to support the arrangement.

14      The Management Proxy Circular also stated:

> Under its engagement letter with Canaccord, the (sic) Champion has agreed to pay a fee to Canaccord for its services as an independent financial advisor, including fees for the delivery of the Fairness Opinion.

The amount of the fees was not disclosed. Accordingly, it is difficult to ascertain what amount of work Canaccord performed in preparing the Fairness Opinion.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellOnt 4189, 2014 ONSC 1988, 119 O.R. (3d) 339, 239 A.C.W.S. (3d) 295

15      The final audience targeted by the applicant was the Court. In paragraph 63(f) of its factum Champion Iron identified the fact of the securing of the Fairness Opinion, as well as its favourable content, as evidence in support of a finding that the application had been put forward in good faith. In *BCE Inc., Re* the Supreme Court of Canada observed that in conducting a fairness analysis courts have considered "the presence of a fairness opinion from a reputable expert".[FN3]

16      In conducting the fairness analysis in the present case I placed no weight on the Canaccord Fairness Opinion. In the conclusion to its Fairness Opinion Canaccord expressly voiced an "opinion". Under our laws of evidence, opinion evidence may only be received by a court if adduced through a qualified expert witness (subject to certain exceptions which have no application to this case). Otherwise, opinion evidence is inadmissible.

17      Under the *Rules of Civil Procedure* which govern proceedings in the Superior Court of Justice, including plan of arrangement applications under corporate statutes, expert evidence must comply with (i) requirements concerning the contents of the expert report (Rule 53.03(2.1)) and (ii) requirements concerning the independence of the expert (Rule 4.1). While the Canaccord Fairness Opinion materially satisfied the independence requirements (although Canaccord did not file an acknowledgement of expert's duty), the Fairness Opinion did not comply with many of the Rule's content requirements, specifically the requirements that an expert's report contain the "expert's *reasons* for his or her opinion, including, (i) a description of the factual assumptions on which the opinion is based, (ii) a description of any research conducted by the expert that led him or her to form the opinion, and (iii) a list of every document, if any, relied on by the expert in forming the opinion."[FN4] The Fairness Opinion simply asserted an opinion, without disclosing the reasons for it. On its face, it was devoid of analysis which a reader could follow in order to understand how the opinion was reached and what, if any, weight should be given to the opinion.

18      Accordingly, I concluded that the Fairness Opinion, as written, was inadmissible for purposes of the final order application and I ignored it. That said, ample other admissible evidence was filed by Champion Iron to support the granting of the final order.

19      The form of Fairness Opinion filed by Champion Iron closely resembled the form of such opinions typically seen these days on plan of arrangement applications. It would not be stretching the language too far to characterize the *form* of such fairness opinions as "cookie cutter" in *appearance*. That is not to say that any particular fairness opinion in that form lacked substantive supporting reasoning. Perhaps such reasoning existed. My simple point is that the supporting reasoning typically is not apparent on the face of the fairness opinions. From an evidentiary point of view, that renders them inadmissible for the purpose of asking the court to rely on their content in support of granting the application.

### B. On plans of arrangements courts do not act as rubber stamps

20      Which leads me to make a larger point. As a judge in front of whom a fair number of final order applications pass on a regular basis, one sometimes develops the feeling that corporate lawyers regard the role of courts in the whole plan of arrangement process as nothing more than one box to check off on a closing agenda. As a result, applicants in these sorts of proceedings often tend to ignore two fundamental requirements of any court proceeding.

21      First, a court can only decide the case based upon admissible evidence, and I have expressed my view about the inadmissibility of the Fairness Opinion adduced in this case and others of its ilk. A court is not a

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellOnt 4189, 2014 ONSC 1988, 119 O.R. (3d) 339, 239 A.C.W.S. (3d) 295

boardroom. A court is just that — a court of law and evidence. Although the law-makers have injected the courts into the approval process for corporate transactions such as plans of arrangement, that does not alter the fact that the courts play a *judicial* role in the process, not an agenda checklist-type role.

22      Second, in order to discharge his or her judicial adjudicative function, a judge requires time to read, understand and assess the evidence put before him or her. Holding a shareholders' meeting on the morning of March 27, filing a two-volume final application record that same afternoon, and then informing the court that the final order must be granted in time to meet a 1:00 p.m. March 28 corporate filing deadline was not, with all due respect, a schedule which showed proper respect for the adjudicative function of the court. On the contrary. One could take from such a schedule that the deal-makers simply viewed the court as performing a rubber-stamp function in the overall transaction — an inconvenience imposed by the language of the statute.

23      While judges of the Toronto Region Commercial List work in a constant "real-time" environment, from my review of the materials in this case no reason appeared why a gap of at least one business day could not have been inserted between the holding of the shareholders' meeting and the attendance in court to seek a final order. That would have allowed ample time to deliver the final order application record to the judge early on the day before the hearing, permitting the judge some time to read the materials with care. In my view, counsel on final order applications must adopt a scheduling approach which affords judges adequate time to review and weigh the evidence and arguments put before them.

*Application granted.*

FN1 [2008] 3 S.C.R. 560 (S.C.C.).

FN2 The discussion which follows deals with the fairness opinions typically provided on plan of arrangement transactions by financial advisors, and not with the formal valuations required by section 4.3 of Multi-Lateral Instrument 61-101 as that section did not apply in the circumstances of this case.

FN3 *Ibid.*, para. 152

FN4 Rule 53.03(2.1) 6.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 22

2005 CarswellAlta 982, 2005 ABQB 500, 2005 I.L.R. 1-4439, [2005] A.W.L.D. 3003, [2005] A.W.L.D. 3004, [2005] A.W.L.D. 3005, 53 Alta. L.R. (4th) 391, [2006] 6 W.W.R. 723, 379 A.R. 125

▷

2005 CarswellAlta 982, 2005 ABQB 500, 2005 I.L.R. 1-4439, [2005] A.W.L.D. 3003, [2005] A.W.L.D. 3004, [2005] A.W.L.D. 3005, 53 Alta. L.R. (4th) 391, [2006] 6 W.W.R. 723, 379 A.R. 125

Commerce & Industry Insurance Co. Canada Inc. v. Singleton Associated Engineering Ltd.

Commerce & Industry Insurance Company Canada Inc. (Applicant) and Singleton Associated Engineering Ltd., Universal Ensco Inc., Colt Engineering Corporation, Jacobs Canada Inc., formerly known as Delta Hudson Engineering Ltd., Washington Group International, formerly known as Morrison Knudsen Corporation, Veco Canada Ltd., Reliance Insurance Company, Canadian Branch, In Liquidation, Liberty International Underwriters Canada, A Division of Liberty Mutual Insurance Company and Lumbermen's Mutual Casualty Company (Respondents)

Alberta Court of Queen's Bench

Wittmann A.C.J.Q.B.

Heard: June 29, 2005
Judgment: July 4, 2005
Docket: Calgary 0501-08326

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: David C. Bishop for Applicant

Alan J. McConnell for Veco Canada Ltd.

Jill M. Shore for Lumbermen's Mutual Casualty Company

Neo J. Tuytel for Liberty International Underwriters Canada

Gary M. Nijman for Reliance Insurance Company

William Kenny, Q.C. for Universal Ensco Inc.

Perry R. Mack, Q.C. for Colt Engineering Corporation

Dennis K. Yasui for Washington Group International

F. Tosto for Singleton Associated Engineering Ltd.

J. Patrick Peacock, Q.C., for Jacobs Canada Inc

D.A. McGillivray, Q.C., Louise Novinger Grant for Aux Sable Liquid Products L.P., Aux Sable Liquid Products Inc.

2005 CarswellAlta 982, 2005 ABQB 500, 2005 I.L.R. 1-4439, [2005] A.W.L.D. 3003, [2005] A.W.L.D. 3004, [2005] A.W.L.D. 3005, 53 Alta. L.R. (4th) 391, [2006] 6 W.W.R. 723, 379 A.R. 125

J.W. Rose, Q.C., for Alliance Pipeline Ltd., Alliance Pipeline Inc.

Subject: Insurance; Contracts; Civil Practice and Procedure

Insurance --- Claims — Duties of insured — General principles

A LP undertook development, design, construction and operation of pipeline — C insurer insured pipeline project with project professional liability policy for architects and engineers — Liability coverage limit of C policy was US$10 million — A LP procured second and third layer excess policies — Several arbitration and litigation proceedings had been commenced against insured in relation to pipeline project with total damages in excess of C$93 million, well in excess of liability limit of C policy — As result of arbitration and litigation proceedings, insured made several claims to C insurer under C policy — C insurer sought disclosure of insured's professional liability practice policies in force at time of events giving rise to respective claims — C insurer brought application to compel insured's disclosure of professional liability policies — Application granted — C policy required insured to cooperate for purpose of investigation and defence and that policy does not cover any claim covered by other valid and collectible insurance policy unless such policy was excess policy — Reasonable interpretation of C policy required disclosure of any policies that may provide other valid and collectible insurance — Professional liability practice were to be disclosed to C insurer on confidential basis.

Insurance --- Claims — Payment of insurance proceeds — General principles

A LP undertook development, design, construction and operation of pipeline — C insurer insured pipeline project with project professional liability policy for architects and engineers — Liability coverage limit of C policy was US$10 million — A LP procured second and third layer excess policies — Several arbitration and litigation proceedings had been commenced against insured in relation to pipeline project with total damages in excess of C$93 million, well in excess of liability limit of C policy — As result of arbitration and litigation proceedings, insured made several claims to C insurer under C policy — C insurer and insured were unable to agree on claims procedure — C insurer brought application to determine claims payment scheme — Claims were to be paid out on first come first served basis to policy liability limit — General rule was first come first served — Fact that C policy was project policy was not good reason to depart from general rule — Pro rata payment scheme would likely thwart commercial efficiency objective of reasonable settlement at early stage — Co-insured of insurance contract bore risk that coverage may be exhausted and expose them to uninsured risk — In accordance with C policy, payments for claims may be made in accordance with chronology of final award or judgment of claims until policy limits are exhausted — It was premature to declare C insurer's obligations were over once coverage limit exhausted since excess insurers had not had adequate time to review claim.

Insurance --- Claims — Settlement and release — General principles

A LP undertook development, design, construction and operation of pipeline — C insurer insured pipeline project with project professional liability policy for architects and engineers — Liability coverage limit of C policy was US$10 million — A LP procured second and third layer excess policies — Several arbitration and litigation proceedings had been commenced against insured in relation to pipeline project with total damages in excess of C$93 million, well in excess of liability limit of C policy — As result of arbitration and litigation proceedings, insured made several claims to C insurer under C policy — C insurer brought application to determine claims payment scheme — Consent of all insured was not required for insurer to settle any of project claims —

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellAlta 982, 2005 ABQB 500, 2005 I.L.R. 1-4439, [2005] A.W.L.D. 3003, [2005] A.W.L.D. 3004, [2005] A.W.L.D. 3005, 53 Alta. L.R. (4th) 391, [2006] 6 W.W.R. 723, 379 A.R. 125

Policy prohibited settlement by insurer without consent of named insured with insured liable for any costs in excess of recommended settlement if insured refused — Only reasonable interpretation of policy was that to settle claim, insurer only required consent of insured which was subject of that claim — Commercial practicalities also lead to interpretation.

### Cases considered by *Wittmann A.C.J.Q.B.*:

*Alberta Sports & Recreation Assn. for the Blind v. Edmonton (City)* (1993), 20 C.P.C. (3d) 101, 14 Alta. L.R. (3d) 301, 146 A.R. 117, [1994] 2 W.W.R. 659, 1993 CarswellAlta 192 (Alta. Q.B.) — referred to

*American States Insurance Co. of Texas v. Arnold* (1996), 930 S.W.2d 196 (U.S. Tex. Ct. App.) — referred to

*Athabasca Tribal Council v. Alberta (Minister of Environmental Protection)* (1998), 1998 CarswellAlta 980, 67 Alta. L.R. (3d) 232, 26 C.P.C. (4th) 98, [1999] 6 W.W.R. 20, *(sub nom. Ahyasou v. Alberta (Minister of Environmental Protection))* 235 A.R. 387, 13 Admin. L.R. (3d) 254, 1998 ABQB 875 (Alta. Q.B.) — referred to

*Brion v. Vigilant Insurance Co.* (1983), 651 S.W.2d 183 (U.S. Mo. Ct. App.) — referred to

*Cox v. Bankside Members Agency Ltd.* (1995), [1995] 2 Lloyd's Rep. 437 (Eng. C.A.) — followed

*Family Insurance Corp. v. Lombard Canada Ltd.* (2002), 2002 SCC 48, 2002 CarswellBC 1101, 2002 CarswellBC 1102, 212 D.L.R. (4th) 193, [2002] I.L.R. I-4092, 38 C.C.L.I. (3d) 165, 288 N.R. 373, 167 B.C.A.C. 161, 274 W.A.C. 161, [2002] 2 S.C.R. 695 (S.C.C.) — considered

*Harmon v. State Farm Mutual Automobile Insurance Co.* (1970), 232 So. 2d 206 (U.S. Fla. Ct. App.) — referred to

*Jayakar v. North Detroit General Hospital* (1989), 182 Mich. App. 108, 451 N.W.2d 518 (U.S. Mich. Ct. App.) — referred to

*Laidlaw Inc., Re* (2003), 2003 CarswellOnt 992, 46 C.C.L.I. (3d) 263 (Ont. S.C.J. [Commercial List]) — followed

*Legal Protection Groups Ltd. v. Secretary of State for Trade & Industry* (March 1, 1996), Rimer J. (Eng. Ch. Div.) — distinguished

*Liebnerman v. Employers Insurance of Wausau* (1997), 84 N.J. 325, 419 A.2d 417 (U.S. N.J. Sup. Ct.) — referred to

*Millers Mutual Insurance Assn. of Illinois v. Shell Oil Co.* (1997), 959 S.W.2d 864 (U.S. Mo. Ct. App.) — considered

*Pekin Insurance Co. v. Home Insurance Co.* (1985), 134 Ill. App. 3d 31, 479 N.E.2d 1078 (U.S. Ill. Ct. App. 5 Dist.) — referred to

*Solway v. Lloyd's Underwriters* (2005), 2005 CarswellOnt 1333, [2005] I.L.R. 4400, 22 C.C.L.I. (4th) 138 (Ont. S.C.J.) — followed

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellAlta 982, 2005 ABQB 500, 2005 I.L.R. 1-4439, [2005] A.W.L.D. 3003, [2005] A.W.L.D. 3004, [2005] A.W.L.D. 3005, 53 Alta. L.R. (4th) 391, [2006] 6 W.W.R. 723, 379 A.R. 125

*Travelers Indemnity Co. v. Citgo Petroleum Corp.* (1999), 166 F.3d 761 (U.S. C.A. 5th Cir.) — referred to

APPLICATION by insurer for declarations to compel insured to disclose professional liability policies, on claims payment scheme and on its defence and indemnification obligations.

**Wittmann A.C.J.Q.B.:**

**Introduction**

1      Commerce & Industry Insurance Company of Canada, Inc. ("Commerce") has applied to this Court for various orders and declarations concerning its indemnity and defence obligations under a project professional liability insurance policy. Specifically, Commerce seeks an order compelling the insureds to disclose their professional liability practice policies; a declaration setting out the process Commerce should follow to settle or pay out the claims; and a declaration that once the liability limit is reached, the defence and indemnity obligations of Commerce are exhausted.

**Facts**

2      Alliance Pipeline LP ("Alliance") undertook the development, design, construction and operation of a high pressure natural gas pipeline carrying natural gas from Fort St. John, British Columbia to Chicago, Illinois and of the Aux Sable Plant, a gas processing plant located in Channahon, Illinois ("the Project").

3      Commerce issued a project professional liability insurance policy for architects and engineers in relation to claims arising from the Project ("the Policy"). Singleton Associated Engineering Ltd., Universal Ensco Inc. ("UEI"), Jacobs Canada Inc. (formerly known as Delta Hudson Engineering Ltd.), Washington Group International ("WGI") (formerly known as Morrison Knudsen Corporation) and Colt Engineering Corporation, ("Colt") are named as insured under the Policy. Veco Canada is an unnamed insured under the Policy. Alliance procured and paid for the Policy and the second and third layer excess policies referred to below.

4      The Policy provides coverage, in excess of the deductible of $1,000,000 USD per claim, in the amount of $10,000,000 USD per claim and $10,000,000 USD in the aggregate for all covered claims during the policy period. Pursuant to the Policy, any defence expenses, costs and interest accrued in the United States on behalf of an insured are payable by Commerce from the liability limit of $10,000,000 USD. Defense expenses, costs and interest accrued in relation to Canadian claims are payable in addition to the liability limit. The Policy is the primary layer of insurance.

5      Reliance Insurance Company,("Reliance") issued a following form insurance policy in respect of the Project, which provides excess coverage of $15,000,000 USD per claim and in the aggregate in excess of $10,000,000 USD per claim and in the aggregate, with a $1,000,000 USD self insured retention per claim. The Reliance policy is the second layer of insurance.

6      Liberty International Underwriters Canada, a division of Liberty Mutual Insurance Company, ("Liberty") and Lumbermen's Mutual Casualty Company, ("Lumbermen's") also issued project professional liability insurance policies in respect of the Project. The liability limit of the Liberty policy is $7,500,000 per claim and in the aggregate, and the liability limit of the Lumbermen's policy is $67,500,000 per claim and in the aggregate. These polices form the third layer of coverage, providing $75,000,000 USD coverage per claim and in the aggregate in excess of $25,000,000 USD.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellAlta 982, 2005 ABQB 500, 2005 I.L.R. 1-4439, [2005] A.W.L.D. 3003, [2005] A.W.L.D. 3004, [2005] A.W.L.D. 3005, 53 Alta. L.R. (4th) 391, [2006] 6 W.W.R. 723, 379 A.R. 125

7    Several arbitration and litigation proceedings have been commenced in Canada and in the United States against Colt, UEI, Jacobs, WGI and Veco in relation to the Project. As a result these Respondents have made claims for liability insurance coverage against the Policy. Specifically:

Jacobs has made a claim in relation to allegations of negligence against it for which damages in excess of $50,000,000 are claimed;

WGI has made a claim against the Policy as a result of allegations that it provided negligent engineering and procurement services, damages for which are unspecified;

Colt and UEI have made claims in relation to arbitration and court proceedings against them, wherein damages are claimed in the amount of $5,150,000 CAD and $3,355,000 USD;

Colt has also made a separate claim in relation to a third party notice claiming contribution and indemnity from Colt in an action for $7,300,000 CAD;

Veco has made a claim as a result of allegations of negligence against it in an arbitration proceeding wherein damages in excess of $11,000,000 CAD are sought; and

UEI has made a claim as a result of an arbitration proceeding wherein it has been alleged to have acted negligently. Damages claimed in those proceedings are in excess of $15,000,000 USD.

8    The damages claimed in the legal or arbitration proceedings commenced against the various insureds claiming under the Policy are in excess of $93,000,000 CAD, which far exceeds the Policy's $10,000,000 USD liability coverage limit. Reliance is in liquidation. The evidence indicates that Reliance may pay 50% of a valid claim pursuant to the Orders of the Ontario Superior Court of Justice and that the remainder of a valid claim would for the time being remain a claim in the liquidation. As a consequence, there is a valid concern that there may be a gap in the second layer of insurance. Lumbermen's is in run off and is not writing any new business. The WGI deponent in his affidavit, expresses concern about Lumbermen's ability to pay.

9    The claim involving UEI is proceeding to arbitration in the United States on July 5, 2005. Liability and damages are in dispute in that claim.

10    Commerce sent a letter to Singleton, UEI, Colt, Jacobs, WGI and Veco seeking their respective positions regarding various possible Project claims resolution procedures. It suggested a protocol whereby the claims were paid out as they were settled or adjudicated on a claim by claim basis or, in the alternative, on a global pro rata basis. The parties were unable to agree on a pay out scheme.

**Issues**

1. Should Colt, UEI, Jacobs, WGI and Veco disclose to Commerce their professional liability practice policies in force at the time of the events giving rise to their respective claims or at the time that they were given notice of the claims against them?

2. In accordance with the terms of the Policy, should Commerce pay claims by settlement, award or judgment:

(a) in the order in which judgments, awards or settlements are made on a claim by claim basis until the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellAlta 982, 2005 ABQB 500, 2005 I.L.R. 1-4439, [2005] A.W.L.D. 3003, [2005] A.W.L.D. 3004, [2005] A.W.L.D. 3005, 53 Alta. L.R. (4th) 391, [2006] 6 W.W.R. 723, 379 A.R. 125

policy limits are exhausted;

(b) in accordance with a pro rata or other unified claims resolution process requiring the consent of some or all of the parties; or

(c) some other procedure.

3. Are Commerce's indemnification and defence obligations under the Policy exhausted once the liability limit of $10,000,000 USD is paid?

**Analysis**

***1. Disclosure of Practice Policies***

*(a) Position of the Parties*

11      It is common ground that a practice policy for the purpose of these proceedings is the Professional Liability Policy of an insured under the Policy which exists, if at all, independently, and in addition to, the Policy.

12      Commerce notes that Condition 6 of the Policy requires the insureds to cooperate with Commerce, upon its request, for the purpose of investigation and/or defence. Commerce submits that, in the event that payments must be made in respect of these claims, as the primary Project policy holder, it must determine whether any of the insureds had professional liability practice policies in place at the relevant times which give rise to indemnification and/or defence obligations in respect of the Project claims.

13      Lumbermen's also takes the position that disclosure is required; however, it is seeking much broader disclosure.

14      WGI opposes an order for disclosure of its practice policies. It argues that, before the production of practice policies is considered, Reliance, Lumbermen's and Liberty should first confirm that coverage is extended to the insureds. It contends that if the Court is inclined to consider this issue now, the "law of the United States" should govern the rights and obligations between itself and Commerce. Specifically, the American approach, which permits admission of extrinsic evidence to interpret the policies, should be adopted. Its submissions in this regard are premised on the fact that the insurance was obtained pursuant to a Construction Management Agreement between WGI and another American corporation in relation to a project located in the United States. Alternatively, it relies on *Family Insurance Corp. v. Lombard Canada Ltd.*, [2002] 2 S.C.R. 695, 2002 SCC 48 (S.C.C.) for the proposition that the Court may consider extrinsic evidence to determine which policies were intended to be primary. It submits that consideration of extrinsic evidence leads to the conclusion that the Policy was closest to the risk and is, therefore, primary to all of the insureds' practice policies.

*(b) Conclusion*

15      Dealing first with WGI's submissions, the application of a foreign law to the circumstances here is a red herring at best. WGI's counsel conceded during oral argument that whether extrinsic evidence was admissible to interpret an insurance contract still left the discrete question as to what the terms of the insurance contracts under consideration were. Put another way, the issue of parol or extrinsic evidence to interpret two insurance contracts and whether one is excess to the other, or must share with the other, involves looking at the two insurance contracts in the first instance.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellAlta 982, 2005 ABQB 500, 2005 I.L.R. 1-4439, [2005] A.W.L.D. 3003, [2005] A.W.L.D. 3004, [2005] A.W.L.D. 3005, 53 Alta. L.R. (4th) 391, [2006] 6 W.W.R. 723, 379 A.R. 125

16      The Supreme Court of Canada's decision in *Family Insurance Corp.* was concerned with mutually repugnant "other insurance" clauses. Similarly, the issue here would be between insurers, that is the primary policy and any practice policy in force. In this regard, Condition 10 of the Policy is relevant. It provides:

> This policy does not provide coverage for any claim covered by any other valid and collectible insurance. The only exception is if such other insurance is written specifically as excess of this policy.

17       When read with Condition 6, the Policy, reasonably interpreted, requires disclosure by any party claiming under it of any policies that may provide other valid and collectible insurance, in this case the professional liability practice policies.

18      Accordingly, I order that the insured who is claiming under the Policy provide to Commerce any practice policies in force at the time of the events giving rise to the claims or at the time that they were given notice of the claims. The practice policies will be disclosed to Commerce on a confidential basis and shall not be disclosed to any other party, and in particular shall not be disclosed at this time to the excess insurers.

19      The Lumbermen's policy was not put in evidence before me but evidence of its existence, uncontested, is contained in the affidavit of Raymond Short. Only the declarations and endorsements to the Reliance policy were in evidence. Whether the provisions of the excess policies including Lumbermen's entitle the excess carriers to disclosure of the professional liability practice policies of any insured claiming under them was not specifically put in issue in front of me.

20       Counsel for Jacobs indicated that the objection to producing the professional liability practice policies was an objection to producing them to the excess carriers, not to Commerce. The specific grounds for the objection were not articulated and are not in evidence. I therefore make no ruling as to the obligation of any insured under the excess policies to produce their practice policies to the excess insurers at this time and for greater certainty reserve to the excess insurers their ability to seek production of the practice policies in a future application if that production is in issue.

### 2. Settlement/ Pay Out Procedure

### (a) Positions of the Parties

21      Commerce and UEI argue that the first come first served principle ought to be applied in terms of paying out the Project claims under the Policy. They cite a number of Canadian, American and English authorities in support of their position.

22      Veco and Colt take the position that payments under the Policy should be paid out prorata to the properly assessed value of the claims. Before payout of the insurance proceeds can be made, they submit that: all of the claims must be determined and quantified; the position of the excess insurers must be identified and resolved; the ability of the excess insurers to respond to the claims must be determined; Commerce must make available to the insureds the information they require to assess the various claims; and finally, if an agreement cannot be reached, an application must be brought to allow the court to authorize a payment scheme.

23       WGI argues that this application is premature as none of the claims have been determined either through settlement or by judgment. If the application is not premature, WGI adopts the position of Veco and Colt, however, it would also agree to a pro rata sharing of the Policy proceeds based on the claims made against each

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellAlta 982, 2005 ABQB 500, 2005 I.L.R. 1-4439, [2005] A.W.L.D. 3003, [2005] A.W.L.D. 3004, [2005] A.W.L.D. 3005, 53 Alta. L.R. (4th) 391, [2006] 6 W.W.R. 723, 379 A.R. 125

of the insureds. Alternatively, WGI submits that, if the first come first served approach is adopted, it should be considered first in line as it proposed a settlement in relation to its claim in December, 2002. That settlement was rejected by Commerce on a number of bases, one of which was that the consent of all of the insureds was required.

24      Lumbermen's requested an adjournment of this issue which I denied. Alternatively, it argued that any declaration regarding the payment scheme to be applied to the insurance proceeds should be limited to providing an interpretation of the Policy and the Court should decline to authorize any specific payment to any particular insured.

*(b) Law*

25      The first come first served approach was approved in *Cox v. Bankside Members Agency Ltd.*, [1995] 2 Lloyd's Rep. 437 (Eng. C.A.). That case concerned a flood of actions commenced by Lloyd's names for negligence against Lloyd's members and managing agents. The agents were covered by errors and omissions insurance which was apparently inadequate to indemnify all of the agents. There, the English Court of Appeal determined that chronological priority, as opposed to rateable distribution, was appropriate.

26      One of the arguments raised by those opposed to chronological priority was that if such an approach were applied to the payout of the claims, those actions at the back of the queue would be unlikely to share in the coverage available, creating an injustice. The Master of the Rolls held at page 459-460:

> The ordinary rule of chronological priority involves obvious hardship to the plaintiff names who are not at the front of the queue. But there is obvious hardship for plaintiff names if, having obtained favourable judgments at very great expense, they are denied the fruits of their judgments, perhaps facing bankruptcy before the judgments can be effectively enforced. . . . One is of course sympathetic to all those who have suffered heavy losses in the Lloyd's insurance market, but I am not on balance persuaded that greater fairness would be achieved by a scheme of rateable allocation along the lines proposed . . ., even if this were feasible, than by application of the ordinary rule of chronological priority.

27      In a separate judgment Saville L.J. concluded at p. 466-467:

> I can see no reason why equity should intervene to require that those first to call on the policy should have to share their recoveries with later claimants if and when the insurance became exhausted. In the absence of an express or implied agreement to such an effect it seems to me that to impose such a regime on the parties would again be, in effect, retrospectively to adjust their rights and obligations for no good reason . . . when co-assured enter into insurance of the present kind which gives them several rights, each simply takes the risk that cover may become exhausted as time goes by, leaving all thereafter exposed to uninsured risk.

28      *Cox* has been followed twice in Canada by the Ontario Superior Court: *Laidlaw Inc., Re* (2003), 46 C.C.L.I. (3d) 263 (Ont. S.C.J. [Commercial List]), and *Solway v. Lloyd's Underwriters*, [2005] O.J. No. 1331 (Ont. S.C.J.).

29      In *Laidlaw* the applicant insurance company sought a number of declarations including: that it was obliged to pay out defence costs, settlements and judgments in the chronological order that they were incurred, agreed to or obtained; that those amounts constituted full and complete satisfaction of the insurer's obligations under the polices; and that all of the insured parties would be bound by the declarations. In that case, Farley J.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellAlta 982, 2005 ABQB 500, 2005 I.L.R. 1-4439, [2005] A.W.L.D. 3003, [2005] A.W.L.D. 3004, [2005] A.W.L.D. 3005, 53 Alta. L.R. (4th) 391, [2006] 6 W.W.R. 723, 379 A.R. 125

determined that, in accordance with the specific provisions in the subject policy, any resolved claims which triggered the insurer's obligation to pay, and thereby vested in the claimant a right to such sum, would be paid on a first come first served basis.

30     In that case the policy stated that no action would lie against the insurer until the amount of the insured's obligation to pay was finally determined either by judgment or agreement. In the present policy a similar provision is included at Condition 15.

31     Farley J. noted further that the policy at issue there, like the one here, did not contain any provisions that would allow or require the insurer to consider claims or potential claims that had not been finally determined before paying out claims that had been resolved. He concluded, at para. 13, that obliging the insurer to delay payment on that basis would amount to "an unwarranted rewriting of the subject Policies."

32     Farley J.'s analysis then turned to a consideration of the common law in relation to which he relied on *Cox*. He also cited *Harmon v. State Farm Mutual Automobile Insurance Co.*, 232 So. 2d 206 (U.S. Fla. Ct. App. 1970) wherein Hobson C.J. observed, at p. 208:

> . . . we feel that to impose a duty upon insurers to ascertain all claimants under their uninsured motorist coverages before settling with any, and to require them to settle such claims at their peril is contrary to the policy of encouraging compromises and speedy settlements, and would do more harm than good. If such a duty is to be imposed under the uninsured motorist statute, it must be done by the legislature.

33     In *Solway*, the other Canadian decision that followed *Cox*, the Court was concerned with two insureds, one of which had obtained judgment and the other which had initiated an action that had not yet proceeded to discovery. The issue was whether the potential claim should delay or reduce full payment of the judgment by the insurer which would effectively exhaust the amount of coverage available under the policy. The insured who had not proceeded to judgment argued that equity should operate against the first come first served principle. Specifically, it submitted that if that approach were followed it would discourage judicial economy by promoting races to judgment and thereby fostering competitive and potentially duplicative litigation.

34     The Court observed that there was no evidence indicating that the parties had agreed that the first action would proceed as a test case or that the first insured to obtain judgment would delay execution of its judgment. The Court concluded that the circumstances did not amount to an equitable reason justifying deviation from the first come first served principle. To the contrary, Stinson J. commented at para. 68 that "it would be inequitable to deprive the [judgment holders] of their entitlement to make first claim against the available insurance monies."

35     Commerce and UEI also cited a number of American authorities which, in various circumstances, have also adopted the first come first served principle: *Pekin Insurance Co. v. Home Insurance Co.*, 134 Ill. App. 3d 31 (U.S. Ill. Ct. App. 5 Dist. 1985); *Travelers Indemnity Co. v. Citgo Petroleum Corp.*, 166 F.3d 761 (U.S. C.A. 5th Cir. 1999); *American States Insurance Co. of Texas v. Arnold*, 930 S.W.2d 196 (U.S. Tex. Ct. App. 1996); and *Millers Mutual Insurance Assn. of Illinois v. Shell Oil Co.*, 959 S.W.2d 864 (U.S. Mo. Ct. App. 1997). In *Millers Mutual* the Missouri Court of Appeals stated at page 7:

> A settlement offer given to only one insured that would exhaust coverage under the liability limit of the policy creates a dilemma for the insurer. An insurer should not be precluded from accepting a reasonable settlement offer for fewer than all insureds. By accepting the offer the insurer would avoid being subjected

2005 CarswellAlta 982, 2005 ABQB 500, 2005 I.L.R. 1-4439, [2005] A.W.L.D. 3003, [2005] A.W.L.D. 3004, [2005] A.W.L.D. 3005, 53 Alta. L.R. (4th) 391, [2006] 6 W.W.R. 723, 379 A.R. 125

to liability exceeding the policy limits due to its rejection of a reasonable offer . . . Further, any settlement would benefit all insureds by decreasing the total amount of liability in the underlying suit.

36      UEI and Commerce also referred to *Legal Protection Groups Ltd. v. Secretary of State for Trade & Industry*, [1996] E.W.J. No. 1129 (Eng. Ch. Div.), however, that case is of little assistance as there the parties agreed that the insurer's primary obligation was to pay the party that first received a judgement or settlement and, if the previous claims did not exhaust the coverage available, any outstanding claimants would be entitled to claim for the surplus.

*(c) Conclusion*

37      Veco and Colt acknowledge that the first come first served principle is generally applicable. However, they cite *MacGillivray on Insurance Law (10th ed. By Nicholas Legh-Jones)* (London: Sweet and Maxwell, 2003) at para. 28-20, for the proposition that this principle may be departed from where there are good reasons for so doing. In this case, Veco and Colt rely on the fact that Alliance, as both the claimant and the purchaser of the policies, should be part of the coordinated resolution of the claims and that it would suffer no prejudice if the first come first served approach were not adopted. They submit further that the fact that this is an owner controlled, project specific policy of insurance, where the claimant is the architect of the insurance coverage, distinguishes the present circumstances from those in the authorities cited by Commerce and UEI.

38      Provision 1 under "Insuring Agreements" states:

The Insurer will pay on behalf of the Insured all sums in excess of the deductible, as set forth in Item 5 of the Declarations, that the Insured shall become legally obligated to pay resulting from any claim made against the Insured . . .

39      Condition 15 of the Policy prohibits the insured from bringing an action against the insurer until final judgment is obtained against the insured or settlement in accordance with the terms of the policy is achieved. Further, there is nothing in the Policy allowing Commerce to delay payment once the payout terms are met.

40      Nor, am I persuaded that the fact that the Policy is a project policy constitutes a good reason for departing from the general rule of first come first served. I acknowledge that there are potential inequities that arise in instituting the first come first served approach in circumstances where there may be a short fall in coverage. However, in eradicating the unfairness of uncertain coverage other inequities arise, namely that those against whom judgment has been obtained or settlement reached would be precluded from accessing their insurance until all claims in relation to the Project are determined. This result could leave those insureds who proceeded first to judgment or settlement without insurance proceeds available to satisfy their creditor, Alliance. An inability to access the Policy may also effectively delay access to excess insurance, which may become particularly problematic in light of the insolvency concerns here.

41      Moreover, commercial efficiency considerations should encourage reasonable settlement at an early stage of a claim. A pro rata scheme would likely thwart any reasonable possibility of achieving this objective.

42      There are myriad other potential problems that could arise if a pro rata scheme of pay out were imposed. For example: there may be different limitation periods in relation to an indemnity policy which applies in various jurisdictions; it may be unclear when the excess insurers' duty to defend arises and how it is effected by the pro rata payout. These are merely examples intended to demonstrate the difficulties inherent in the imposition of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellAlta 982, 2005 ABQB 500, 2005 I.L.R. 1-4439, [2005] A.W.L.D. 3003, [2005] A.W.L.D. 3004, [2005] A.W.L.D. 3005, 53 Alta. L.R. (4th) 391, [2006] 6 W.W.R. 723, 379 A.R. 125

a pro rata payment scheme not contemplated in the Policy.

43      In addition, I agree with Lord Saville's observation that co-insureds who choose to enter into a contract of insurance which affords them several rights, bear the risk that the coverage may be exhausted prior to their claims being heard, leaving them exposed to uninsured risk. In this case Veco and Colt argue that they were never given notice from Alliance obliging them to obtain extra insurance coverage. There is no evidence that they were precluded from obtaining additional insurance in the absence of receiving such notice.

44      Accordingly, I order that, in accordance with the terms of the Policy, should settlements be made or final award or final judgments be rendered, payments for covered claims under the Policy will be made according to the chronology of their making until the Policy limits are exhausted.

45      I hasten to add that the fundamental principle of *uberrima fides* will operate to defeat any conduct that creates a chronological priority in bad faith or for an improper purpose. There is no suggestion, nor any evidence, that the parties here are acting in any improper manner.

### 3. Consent Requirement

46      Although this issue was not included in the Originating Notice, in oral argument the issue of whether the consent of all of the insureds was required in order for Commerce to settle any of the Project claims arose. As I apprehend the issue, it was raised to buttress the argument against a first come first served pay out regime.

### (a) Positions of the Parties

47      Veco and Colt take the position that the Policy requires Commerce to obtain the consent of all of the insureds before it can settle any claims.

48      UEI and Commerce acknowledge that consent is required for settlement but argue that it is only the consent of the insured against whom the claim is made that is required. They describe the consent provision as a "pride provision" saying that it allows the affected insured to retain some control over settlement and thereby protect its professional reputation. In that regard they cite: *Liebnerman v. Employers Insurance of Wausau*, 84 N.J. 325, 419 A.2d 417 (U.S. N.J. Sup. Ct. 1997); *Brion v. Vigilant Insurance Co.*, 651 S.W.2d 183 (U.S. Mo. Ct. App. 1983); and *Jayakar v. North Detroit General Hospital*, 182 Mich. App. 108, 451 N.W.2d 518 (U.S. Mich. Ct. App. 1989).

### (b) Conclusion

49      "Insured" is defined in the Policy as the named insured in Item 1 of the Declarations which, in accordance with Endorsement 12, includes Singleton, UEI, Colt, Delta Hudson (Jacobs) and Morrison Knudsen (WGI) and all other consultants providing engineering or architectural services who were reported in accordance with the Policy.

50      Condition 8 of the Policy provides:

The Insurer shall not settle any claim without the consent of the Named Insured. If, however the Insured shall refuse to consent to any settlement recommended by the Insurer and shall elect to contest the claim or continue any legal proceedings in connection with such claim, then the Insurer's liability for the claim shall not exceed the amount for which the claim could have been settled plus the costs and expenses incurred

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellAlta 982, 2005 ABQB 500, 2005 I.L.R. 1-4439, [2005] A.W.L.D. 3003, [2005] A.W.L.D. 3004, [2005] A.W.L.D. 3005, 53 Alta. L.R. (4th) 391, [2006] 6 W.W.R. 723, 379 A.R. 125

with it's consent up to the date of such refusal, subject to the limit of liability of this policy, and to the deductible amount set forth in Item 5 of the Declarations.

51      In my view, the only reasonable interpretation of Condition 8 is that it requires the consent only of the insured who has made the claim for coverage which is the subject of the recommended settlement.

52      In interpreting a contract the court seeks to determine the intentions of the parties at the time of the formation of the contract. In doing so, the court must consider the words used in the contract and construe the provision in light of the entire contract. Absurdities are to be avoided and an interpretation that makes commercial sense should be adopted. As stated at para. 11-7 in *MacGillivray on Insurance Law*:

It is an accepted canon of construction that a commercial document, such as an insurance policy, should be construed in accordance with sound commercial principle and good business sense, so that its provisions receive a fair and sensible application.

53      Similarly, C. Brown, *Insurance Law in Canada* (Scarborough: Thomson Carswell, 1999) vol. 1 at page 8-7 states :

Courts seek to impose a "sensible" or commercially realistic interpretation on the assumption that this is what the parties would have intended if they had turned their minds to it when entering into the contract.

Another way of putting it is that the courts favour an interpretation which gives effect to a viable commercial arrangement over one that nullifies it.

54      The first sentence of Condition 8 of the Policy prohibits the Insurer from settling a claim without the "consent of the Named Insured." The next sentence then states that where the insured refuses to consent to a settlement recommended by the insurer and "elect[s] to contest the claims or continue any legal proceedings in connection with such claim. . ." the insured will be responsible for any costs in excess of the recommended settlement. As only the insured against whom the underlying claim is made would have the ability to "elect to contest" or "continue" the claim, it is clear that the intention of the parties was to require only the consent of that insured.

55      There are also a number of commercial practicalities that lead to this interpretation. Firstly, if the consent of all of the insureds were required, it may require the party against whom the claim was made to waive privilege and disclose the reasons for the recommended settlement. Otherwise, the consent would not be informed.

56      Secondly, if the provision required the consent of all of those defined as the "Insured," it would allow an insured who had made no claim of its own to withhold its consent for any reason. For instance, it could do so to advance its own interests to the disadvantage of a co-insured business competitor who would then, in accordance with the Policy, be required to pay any amounts exceeding the amount of the recommended settlement.

57      Thirdly, allowing an insurer to settle claims generally works to the advantages of all of the insureds under one policy, as it allows for the settlement of claims on better terms than what the insurer believes would be obtained following adjudication. This argument is reinforced in the present case by the fact that the American defence costs are also payable out of the liability limit.

58      Finally, it is absurd to suggest that the "pride" purpose of the clause is furthered by requiring several insureds to protect each other's reputations by granting or withholding consent to settle.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellAlta 982, 2005 ABQB 500, 2005 I.L.R. 1-4439, [2005] A.W.L.D. 3003, [2005] A.W.L.D. 3004, [2005] A.W.L.D. 3005, 53 Alta. L.R. (4th) 391, [2006] 6 W.W.R. 723, 379 A.R. 125

59      For the above reasons, I conclude that Commerce may settle a claim with the consent only of the insured that is the subject of the underlying action.

### 3. Indemnification and Defence Obligations

### (a) Positions of the Parties

60       Commerce is seeking a declaration that upon payment of the coverage limit under the policy, namely $10,000,000 USD in respect of indemnity, damages and US defence costs, its obligations under the Policy are exhausted.

61      Lumbermen's and Liberty argue that a declaration is premature at this stage. They point out that there is no urgency for a declaration of this nature as there are presently no settlements or judgements. They also advise that they have only recently received notice of the UEI claim and documents relevant to that claim and that they have not yet had an opportunity to assess their respective positions. Further, they argue regurgitating a term of the Policy on this issue by way of a declaration is not helpful because it is not really in issue at this time.

### (d) Conclusion

62      I agree. I decline to make any declaration regarding the cessation Commerce's defence and indemnity obligations at this time, as the excess insurers have not had adequate time to review the claim and there is no pressing need for such a declaration.

### Intervenor Application

63      Alliance Pipeline Ltd. and Alliance Pipeline Inc. ("Alliance Ltd."), the general partner of Alliance, have brought a Notice of Motion seeking intervenor status in "these proceedings." I reserved on Alliance Ltd.'s Motion on this issue until after the Commerce application was heard.

64      Initially, Alliance Ltd. requested an adjournment of the Commerce application, which I declined. I then heard the Commerce application, after which counsel for Alliance Ltd. advised that it was only in relation to the payment scheme issue that it wished to make submissions. He stated further that, having heard the arguments in that regard, he really had nothing more to add, other than "me, too", in support of the first come, first served principle as being applicable to the Policy.

65      There are no Rules in Alberta governing when an applicant should be granted intervenor status. Rather, the grant of such status is at the discretion of the court and in accordance with the common law considerations of whether the applicant will be directly affected by the ultimate decision and/or whether the presence of the party is necessary for the court to properly decide the matter: *Athabasca Tribal Council v. Alberta (Minister of Environmental Protection)*, 235 A.R. 387, 1998 ABQB 875 (Alta. Q.B.). The applicant need not demonstrate that it takes a unique position in relation to the issues: *Alberta Sports & Recreation Assn. for the Blind v. Edmonton (City)* (1993), 146 A.R. 117 (Alta. Q.B.).

66      It is difficult to see how Alliance Ltd.'s participation in the Commerce application could be necessary to the proper adjudication of the matter, in light of counsel's admission that he had nothing to add.

67      Although Alliance or its related entities may have an interest in the timing of the payment of proceeds under the Policy, any other possible interests that Alliance may have at this point are entirely speculative. For

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellAlta 982, 2005 ABQB 500, 2005 I.L.R. 1-4439, [2005] A.W.L.D. 3003, [2005] A.W.L.D. 3004, [2005] A.W.L.D. 3005, 53 Alta. L.R. (4th) 391, [2006] 6 W.W.R. 723, 379 A.R. 125

example, Alliance could be affected if it obtained a judgement against an insured and there is a pro rata payment scheme in place delaying access to the insurance proceeds and the judgement debtor has insufficient exigible assets to satisfy the judgement. In my view this does not amount to being "directly affected." In any event, I decline to exercise my discretion to grant intervenor status where there is such a tenuous interest in the outcome.

68      Aux Sable Liquid Products LP and Aux Sable Liquid Products Inc. ("Aux Sable") requested an adjournment to obtain standing as an interested party. Aux Sable has advanced claims against Jacobs and WGI. The request for an adjournment was declined. Counsel for Aux Sable was asked what status was being sought, what representations were to be made and what position it was taking on the issues. Counsel answered only that they had just been retained and had no instructions other than to apply for an adjournment.

**Costs**

69      If the parties are unable to agree as to costs, they may return the matter before me.

*Order accordingly.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 23

2008 WL 471574
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

COMMODITY FUTURES TRADING COMMISSION
v.
Paul M. EUSTACE, et al.

Civil Action No. 05–2973.    |    Feb. 19, 2008.

**Attorneys and Law Firms**

Gretchen L. Lowe, Michael J. Otten, William F. Longwitz,
Glenn Irwin Chernigoff, U.S. Commodity Future Trading
Commission, Washington, DC, for Plaintiff.

Paul M. Eustace, Ontario, Canada, pro se.

### *MEMORANDUM RE: SECOND INTERIM DISTRIBUTION*

BAYLSON, District Judge.

## I. Introduction

 **\*1**  This case involves a massive fraud incommodity futures
trading. [1] As discussed in greater detail below, a settlement
in a companion case (C.A. No. 06–1944) has resulted
in substantial settlement funds to be distributed to the
defrauded investors. The Court-appointed receiver has moved
to distribute funds on a *pro rata* basis to all defrauded
investors, but an objection to this distribution method has
been filed. The Court will uphold the propriety of the
receiver's proposed *pro rata* distribution plan.

## II. Procedural History

This complex case has a long and rather complicated
history. On June 22, 2005, the Commodity Futures
Trading Commission ("CFTC") instituted this action
against Paul M. Eustace ("Eustace"), an individual, and
Philadelphia Alternative Asset Management Company, LLC
("PAAMCo"), an entity which he controlled. The CFTC
sought the appointment of a receiver and other equitable
relief to address the fraudulent activities of Eustace and
PAAMCo. On June 23, 2005, Judge Padova, to whom this
case was originally assigned, issued a Statutory Restraining
Order which appointed C. Clark Hodgson, Jr. as the
Receiver (the "Receiver"), with the full powers of an equity

receiver. The Receiver was appointed for "PAAMCo and
its partners, affiliates, subsidiaries and related entities,"
which includes the funds that Eustace controlled, namely
the Philadelphia Alternative Asset Fund, Ltd. (the "Offshore
Fund"), Philadelphia Alternative Feeder, LLC (the "Feeder
Fund"), Option Capital Fund, LP ("Option Capital") and
Philadelphia Alternative Asset Fund, LP (the "LP Fund")
(collectively the "Receivership Funds"). On September 19,
2005, this Court entered a Consent Order, which, among other
things, made the Receiver the permanent Receiver again for
"PAAMCo and its partners, affiliates, subsidiaries and related
entities," with the full powers of an equity receiver.

After this Court entered the Consent Order, four investors
initiated *ex parte* proceedings in the Cayman Islands where
the Receivership Funds were organized and their assets held.
The Grand Court of the Cayman Islands found that liquidation
of the Offshore Fund should occur in the Cayman Islands
and appointed two individuals, the Joint Liquidators of
Philadelphia Alternative Asset Fund Ltd. (hereinafter "Joint
Liquidators") to carry out that task. The Receiver and the
Joint Liquidators entered into a Protocol approved by this
Court. One of the points of contention in the current dispute
involves an affidavit filed in the Cayman proceedings. In late
2005, a Cayman Judge had requested expert opinions on the
differences, if any, between U.S. and Cayman law regarding
distributing assets to creditors and/or defrauded investors.
To address the matter, the Receiver filed the affidavit of
an eminent bankruptcy and insolvency specialist, David T.
Sykes, Esq. (hereinafter "Sykes Affidavit"). The dispute
surrounding the Sykes Affidavit is discussed in greater detail
below.

 **\*2**  On May 8, 2006, in this Court, the Receiver initiated a
separate civil suit asserting claims against Man Financial, Inc.
("Man") [2] and a Man employee named Thomas Gilmartin
("Gilmartin"), Civil Action 06–1944, alleging that Man and
Gilmartin were liable to investors for acts and omissions
related to Eustace's fraud. Subsequently, the Receiver Ad
Litem, Stephen J. Harmelin, Esq., ("RAL") [3] filed a Second
Amended Complaint in CA 06–1944, naming UBS Fund
Services (Cayman), Ltd. ("UBS") as a second defendant,
and asserting claims based on the similar notion that UBS
participated in and permitted Eustace's fraud.

On December 21, 2007, this Court approved a settlement
agreement reached in C.A. 06–1944, between the RAL, Man,
and Gilmartin, (Doc. No. 509), pursuant to which Man and
Gilmartin paid $75 million to settle the claims asserted against

them. The Receiver now moves to distribute to defrauded investors $72 million of these settlement proceeds.

The $72 million would constitute the second interim distribution in this matter. On October 6, 2006, the Court authorized the first interim distribution to defrauded investors, pursuant to which the Receiver paid $40 million Offshore Fund investors and $3.2 million to Option and LP Fund investors. *See* Doc. Nos. 269 and 506.This first interim distribution was not made on a *pro rata* basis among the investors in all funds, but instead the Receiver allocated funds recovered from the Option/LP fund to investors in the Option/ LP fund, and allocated funds recovered from the Offshore Fund to investors in the Offshore Fund. *See* Doc. No. 264, ¶¶ 21–24.

For the Second Interim Distribution, the Receiver proposes a methodology different from that embraced in the First Interim Distribution. As noted above, the Receiver now seeks to distribute settlement funds on a *pro rata* basis among investors in all funds, and also asks this Court to authorize the creation of reserves to pay for any future liabilities the Receivership Funds may incur. *See* Doc. No. 506. The Receiver requests this Court's approval to reserve $25.25 million to cover receivership costs and potential indemnification obligations. The Receiver also requests approval to withhold distribution from investors who fail/ refuse to release the settling parties in the Man settlement.

The Receiver's position was initially set forth in his Motion of December 19, 2007 (Doc. No. 506). The Joint Liquidators objected to the Receiver's Proposed Distribution on January 11, 2008. *See* Doc. No. 517.[4] The CFTC filed a brief expressing the agency's general support for the Receiver but requesting that the Receiver further justify its position. *See* Doc. No. 519. In an apparent effort to respond to the CFTC's concerns and to further develop its arguments, the Receiver filed a Memorandum of Law in support of his Motion (Doc. No. 521) and a supporting affidavit from Michael Cordone, Esq. (Doc. No. 522) (hereinafter "Cordone Affidavit"). The Joint Liquidators also supplemented their objections with a letter to the Court, dated January 29, 2008,[5] and in that letter propose their own methodology for distributing the settlement funds.

**\*3** This Court held a hearing on the Receiver's Motion on January 31, 2008. At the conclusion of the hearing, the Court requested that the Receiver file a Reply Brief to address issues that arose at the hearing. The Receiver timely filed the requested brief (Doc. No. 531), and the contentions of the respective parties are addressed below.

### III. Contentions

### A. Receiver

According to the documents before the Court and the proceedings at the hearing of January 31, 2008, the Receiver seeks authorization to distribute the Man settlement funds on a *pro rata* basis to investors in the Offshore Fund and the LP/ Option Fund.[6] The Receiver's proposed *pro rata* allocation would distribute 88.93% of the settlement monies to Offshore Fund investors and 11.07% of the monies to LP/Option Fund investors. The computation is not disputed. Expenses would also be allocated *pro rata* between the Offshore Fund and LP/ Option Fund investors.

The Receiver provides several arguments in support of its proposed *pro rata* distribution plan, which essentially pools collected proceeds, from all sources, then deducts expenses on a *pro rata* basis and distributes 11.07% of the net proceeds to LP/Option Fund investors and 88.93% of the net proceeds to Offshore Fund investors. First, regarding the Man Settlement monies currently at issue, the Receiver disagrees with the Joint Liquidators' contention that the Man Settlement proceeds should only be distributed to Offshore Fund investors. The Receiver argues that the Option and LP Funds can not be excluded from the Man Settlement proceeds because the Option and LP Funds were named plaintiffs in the suit against Man, without objection. The Receiver also argues that the Man Settlement explicitly states that it settles the claims of the Offshore and Option/LP Funds, and thus it would make no sense to distribute the settlement proceeds only to the Offshore Fund investors.

In support of his plan to generally pool these and any future recovered proceeds before distributing them *pro rata,* the Receiver relies on evidence indicating that Eustace commingled funds and marketed them as being traded together. For example, according to the Receiver, Eustace used the purportedly successful investment results of the LP Fund to entice potential investors to invest in the Offshore Fund. The Receiver also argues that deposition testimony indicates that LP Fund investors believed that the LP Fund was being traded *pari passu* with the Offshore Fund. The Receiver contends that facts such as these support the pooling of Offshore Fund and Option/LP Fund proceeds and subsequent *pro rata* distribution. (*See* Cordone Affidavit, ¶¶ 12–16.)

At the hearing of January 31, 2008, the Receiver's counsel explained that when the Receiver moved for approval of the First Interim Distribution and stated that it did not appear "that Option Capital's or the LP Fund's assets were ever commingled with the assets of the Offshore Fund" (Doc. No. 264, ¶ 21), he did not have the benefit of the substantial evidence he has since uncovered. The Receiver argued that the uncovered evidence illustrates Eustace's commingling and joint marketing to the point where pooling the overall settlement funds for *pro rata* distribution would be fair and equitable.

 **\*4** According to the Receiver, the majority of courts favor *pro rata* distribution. The Receiver cites a non-precedential Third Circuit opinion, *SEC v. The Infinity Group,* 226 Fed. Appx. 217, 218–219 (3d Cir. Apr.6, 2007), as well as law from other circuits and the Supreme Court case of *Cunningham v. Brown,* 265 U.S. 1, 13, 44 S.Ct. 424, 68 L.Ed. 873 (1924).

In response to the Joint Liquidators' argument that the Sykes Affidavit indicates that *In re Owens Corning,* 419 F.3d 195 (3d Cir.2005) should apply, the Receiver contends that the Joint Liquidators misread the Sykes Affidavit. According to the Receiver, the Sykes Affidavit states that *Owens Corning* would apply if a party were seeking substantive consolidation of the funds. However, since no party is doing so, the Sykes affidavit does not opine that *Owens Corning* applies.

Furthermore, according to the Receiver, *Owens Corning* should not control because *Owens Corning* applies to courts exercising bankruptcy powers, and this Court does not exercise such powers. The Receiver also argues that since *Owens Corning* addressed a debtor's attempt to create a "deemed consolidation" of distinct corporate entities in a bankrupt estate in order to defeat a creditor's claim, *Owens Corning* differs factually from this case.

## B. Joint Liquidators [7]

The Joint Liquidators contend that instead of *pro rata* distribution, the most equitable methodology would entail distributing proceeds to fund investors based on each fund's legal entitlement to the proceeds. According to the Joint Liquidators, LP and Option Fund investors have no right to proceeds from the Man Settlement, and argue that such proceeds should go to Offshore Fund investors only.

The Joint Liquidators support their Objection with several arguments. As to the Man Settlement, the Joint Liquidators contend that the money that was the subject of Man's allegedly wrongful conduct was only Offshore Fund money, and the settlement proceeds should thus go only to Offshore Fund investors. The Joint Liquidators argue that the LP/Option Funds did not lose any money as the result of trades made at Man and that there is no evidence that Man intended to defraud the LP/Option Funds. The Joint Liquidators also contend that Eustace's marketing representations (for instance, that the Offshore Fund and LP/Option Funds would be traded *pari passu* ) are irrelevant as to the Man Settlement proceeds because there is no evidence that Man participated in making the marketing representations.

The Joint Liquidators state that to their knowledge, "there is not evidence of systematic commingling of funds."(Doc. No. 517, ¶ 3.) As to certain instances of commingling, the Joint Liquidators argue that the actual funds that were commingled could be distributed *pro rata,* but that isolated, traceable instances of commingling do not support a *pro rata* distribution of all monies. As to Eustace's general joint marketing of the Receivership Funds, the Joint Liquidators contend that if Eustace misrepresented the returns on the Option/LP Funds, those Funds have a claim against Eustace for fraud, but do not have claims against Man, UBS, and the Offshore Fund Directors, and should thus not benefit from settlement proceeds against those entities. [8]

 **\*5** The Joint Liquidators argue that *In re Owens Corning, supra,* controls. According to the Joint Liquidators, the case law cited by the Receiver applies to situations where there is a single fund, as opposed to this situation, where there are multiple funds. The Joint Liquidators argue that because the Receiver previously represented that there were no grounds for pooling and *pro rata* distribution, he should therefore not be permitted to change his position and seek *pro rata* distribution at this point, pointing to the Sykes Affidavit as indicative of the Receiver's previous position. As noted above, the Sykes Affidavit calls for the application of *Owens Corning* and was submitted by the Receiver in related proceedings in the Cayman Islands.

Finally, the Joint Liquidators contend that the Receiver's motion is too broad, in that it applies "to all recoveries, from whatever source."The Joint Liquidators oppose such a broad application of the Receiver's plan because, for example, it would unfairly apply to the potential future distribution of UBS settlement funds. The Joint Liquidators contend that

2008 WL 471574

because the claims against UBS were brought on behalf of the Offshore Fund only, any future settlement proceeds from UBS should be distributed to the Offshore Fund investors only.

## IV. Discussion

Courts have broad discretion in supervising an equity receivership. *SEC v. Black,* 163 F.3d 188, 199 (3d Cir.1998) ("where there is a receiver with equitable power in a proceeding before it, the District Court has wide discretion as to how to proceed"); *FDIC v. Bernstein,* 786 F.Supp. 170, 177 (E.D.N.Y.1992) ("one common thread keeps emerging out of the cases involving equity receiverships—that is, a district court has extremely broad discretion in supervising an equity receivership"). This discretion extends to the review of a receiver's proposed distribution plan. *See SEC v. Forex Asset Management LLC,* 242 F.3d 325 (5th Cir.2001) (analyzing the district court's approval of the receiver's distribution plan under an abuse of discretion standard because "the district court was 'acting pursuant to its inherent equitable powers' when it approved [the receiver's distribution] plan."(quoting *United States v. Durham,* 86 F.3d 70, 72 (5th Cir.1996))).

As noted above, this Court appointed the Receiver for "PAAMCo and its partners, affiliates, subsidiaries and related entities."The Receiver has a duty to act on behalf of all these entities. *See CFTC v. Eustace,* 2007 WL 1314663 at *6 (E.D.Pa. May 3, 2007)* ("The Receiver is a fiduciary to the Court and to the investors, appointed on motion of the CFTC.") *See also* P. Dawes, W. Meeske & M. Rappe, *Business and Commercial Litigation in Federal Courts,* § 14:63 (2d ed. ABA Litig. Sec.) (*quoting* 1 *Clark on Receivers* § 11(a) (3d ed. 1959) ("A receiver is 'an officer of the court to receive, collect, care for, administer and dispose of the property or the fruits of the property of another or others brought under the orders of the court ...' ".) Because the Receiver is a fiduciary and officer of this Court, this Court may and does give some weight to the Receiver's judgment of the most fair and equitable method of distribution.

**\*6** The Court agrees that *Owens Corning* does not control the result. As the first sentence of the *Owens Corning* opinion states, "We consider under what circumstances a court exercising bankruptcy powers may substantively consolidate affiliated entities."*Owens Corning,* 419 F.3d at 199. *Owens Corning* devotes considerable attention to the history of substantive consolidation and to the theories behind substantive consolidation. However, substantive consolidation is not at issue in this case. Furthermore, *Owens*

*Corning* applies to bankruptcy proceedings, and this Court does not exercise bankruptcy powers.

*Owens Corning* rejected substantive consolidation as an appropriate equitable remedy when debtors were separate legal entities and some creditors sought "deemed" substantive consolidation of the debtor entities so that they could obtain greater payments. *Owens Corning* does not apply to the case at bar because the facts are different, the current legal context differs, and there was no court-appointed equity receiver in *Owens Corning.*

The Court finds the role of the court-appointed equity receiver in this case to be very relevant and unique. In *Owens Corning,* the Third Circuit found that the proponents of substantive consolidation were engaged in a "ploy to deprive one group of creditors of their rights while providing a windfall to other creditors."*Owens Corning,* 419 F.3d at 200. In contrast, the Receiver was appointed by this Court to represent the interests of all of the Receivership Funds. The Receiver's proposed distribution represents the plan the Receiver has deemed the most fair to all groups of investors.

As to the Sykes Affidavit, its discussion of *Owens Corning* indeed assumes the context of substantive consolidation. The Sykes Affidavit states:

> [w]ere a motion seeking consolidation to be filed in the U.S. District Court, that court would likely refer to the law in the United States Third Circuit, particularly to decisions of the Court of Appeals for the Third Circuit ... The most recent decision of the Court of Appeals for the Third Circuit on substantive consolidation is *In re Owens Corning ...*

Sykes Affidavit, ¶ 18 (emphasis added.)

As an initial matter, the Court does not read this language to mean that *Owens Corning* applies outside the context of substantive consolidation. Perhaps more importantly, the relevance of the Sykes Affidavit to the matter at hand is questionable. The Sykes Affidavit was sworn on November 30, 2005, more than two years ago. Since that time, the Receiver has gained a considerably greater understanding of Eustace's fraud and the relationships among the Receivership Funds, among other things. Specifically the Sykes Affidavit was submitted to the Cayman Court "before the extensive discovery of Eustace, investors and others proving both the commingling and the joint marketing of the Receivership Funds."(Receiver's Reply Br., Doc. 531, p. 4.) As discussed above, the Receiver is court-appointed to represent the best

2008 WL 471574

interests of the Receivership Funds and may change his position as he obtains new information.

**\*7** The Sykes Affidavit states that as of November 30, 2005:

> the Receiver ha[d] not seen any evidence that the monies invested in the Fund and the Feeder Fund were commingled with monies invested in other funds organized and operated by Eustace. Further, the Receiver has maintained and preserved the separate assets of the Receivership Defendants and has indicated his intention to continue such course of action.

Sykes Affidavit, ¶ 18.

This language, as well as the methodology of the First Interim Distribution, discussed above, seems to indicate that the Receiver has indeed changed his position as to the appropriate distribution methodology, which is well within the discretion of a court-appointed equity receiver.[9]

The Receiver and the CFTC have both cited case law more closely related to the matter at hand. When an equity receivership is involved, case law concerning equity receiverships is generally more applicable than bankruptcy case law. *See CFTC v. Eustace, supra,* 2007 WL 1314663 at \*6. The Receiver relies on three cases from other circuits which affirm district court orders approving equity receivers who proposed *pro rata* distribution of funds from sources that at some point had been distinct from one another. *See SEC v. Forex Asset Management LLC,* 242 F.3d 325 (5th Cir.2001) (affirming district court's order that approved receiver's plan to distribute investment company's assets *pro rata* even though funds of one investor pair were segregated from those of other investors); *CFTC v. Topworth Int'l, Ltd.,* 205 F.3d 1107 (9th Cir.1999) (affirming order that adopted receiver's plan and overruled defrauded investor's objection to pooling of three funds and subsequent *pro rata* distribution); *SEC v. Elliot,* 953 F.2d 1560 (11th Cir.1992) (affirming district court's disallowance of tracing, treatment of three companies as a single entity, and approval of receiver's proposed *pro rata* distribution). The Joint Liquidators have not even attempted to show why these decisions should not be followed.

Furthermore, the Supreme Court has recognized that for purposes of equity, tracing principles can be suspended. *Cunningham v. Brown,* 265 U.S. 1, 13, 44 S.Ct. 424, 68 L.Ed. 873 (1924). Although it did not involve a receivership, *Cunningham* is instructive in that the Supreme Court refused to compel the use of tracing methods to distribute monies to victims of a Ponzi scheme and instead affirmed the order of *pro rata* distribution. *Id.*

The Receiver has pointed to many facts that support his *pro rata* distribution plan. Eustace's commingling was not necessarily systematic, but the instances of commingling indeed reflect Eustace's blurring of the distinction between the Receivership Funds. For example, Eustace took $607,000 from an Option Capital account and effectively deposited the money in the Offshore Fund, without any disclosure to investors. (Michael Cordone Affidavit, ¶ 8); (add cite to a SJ memo that addresses this fact). An additional $2,097,665.85 of LP Fund money was invested into the Feeder Fund (part of the Offshore Fund) without any disclosure to investors. (Michael Cordone Affidavit, ¶ 10). Also, at the hearing of January 31, 2008, counsel for the Receiver stated that there were LP Fund investors who thought their investments had been shifted over to the Offshore Fund, but in fact, the investments remained in the LP Fund. *See* transcript of hearing, January 31, 2008, p. 13.

**\*8** The Court also finds Eustace's joint marketing of the funds to be relevant because it encouraged investors to perceive the funds as a part of a whole. For example, according to the Receiver, investors in the LP Fund were told that their investments would be rolled into the Offshore Fund. (Michael Cordone Affidavit, ¶ 12.) Furthermore, "[t]he LP Fund investors and the individuals marketing all of the Receivership Funds actually believed that the Option Capital, LP Fund and the Offshore Fund were all being traded at the same place in the same pool of assets, and only one set of numbers was provided to reflect every fund's performance."*Id.* Offshore Fund investors were also enticed to invest in the Offshore Fund by the LP Fund performance data. (Michael Cordone Affidavit, ¶ 14.) At the January 31st hearing, the Receiver added a letter to the record (Receiver's Exhibit 1) dated October 27, 2004, from Eustace to investors, in which Eustace stated that the LP Fund and the Offshore Fund were traded *pari passu.*

The Court finds the Joint Liquidators' argument that the LP/Option Fund investors do not deserve any part of the Man Settlement proceeds to be an extreme and unsupportable position. Not only were the LP/Option Fund investors plaintiffs in the case against Man, the Settlement Agreement specifically references their claims as settled. Furthermore,

Commodity Futures Trading Com'n v. Eustace, Not Reported in F.Supp.2d (2008)

2008 WL 471574

the LP/Option Fund investors have been paying for the litigation against Man since its inception. [10]

## V. Conclusion

For the reasons stated above, this Court will grant the Receiver's Motion for a Second Interim Distribution and approve its *pro rata* distribution methodology as well as its creation of reserves.

The Court has just been advised that the remaining defendants in Civil Action 06–1944 have also settled, and pending court approval of these settlements, the distribution approved in this Memorandum may also apply to the remaining settlements. If a dispute arises about the distribution of remaining settlements, future pleadings should reference this Memorandum.

An appropriate order follows.

## Footnotes

1    For more detailed descriptions of the facts underlying this case and Civil Action 06–1944, *see* Memoranda reported at 2006 WL 3791341, 2006 WL 2869532, and 2006 WL 2707397.

2    Man Financial is now known as MF Global, Inc.

3    The background for the appointment of the RAL is addressed in the Court's Memorandum of May 3, 2007, filed in Civil Action 06–1944 (Doc. No. 241), 2007 WL 1314663.

4    There do not appear to be any objections, by the Joint Liquidators or others, to the Receiver's proposed creation of reserves. This memorandum therefore focuses on distribution methodology.

5    This letter became part of the record at the January 31st hearing, discussed *infra.*

6    The parties do not dispute that for present purposes, the Option Fund and the LP Fund may be treated as one entity. The Feeder Fund is considered part of the Offshore Fund.

7    The Joint Liquidators state that their Objection was authorized by the Investors' Committee of the Offshore Fund. Although there was some dispute about this, it is not material for the Court's decision. The Court would also like to note that it received three letters from investors and that at the hearing on January 31, 2008, counsel for an investor testified. The letters from investors supported the Receiver's proposed *pro rata* distribution plan. The testimony at the hearing was on behalf of two of the investors.

8    The Joint Liquidators take the position that six categories of funds are or may become available for distribution: 1) $72 million in Offshore Funds initially frozen by CFTC and the Receiver; 2) $6.4 million in Option/LP Funds initially frozen by CFTC and the Receiver; 3) $75 million in settlement funds from Man; 4) whatever settlement funds are obtained from UBS and approved by the Court; 5) whatever settlement funds are obtained from Lashbrook/Somerville and approved by the Court; and 6) any funds obtained from Paul and Laura Eustace, PAAMCo, and Wallace/Gobora.

9    According to the Receiver, the First Interim Distribution (using a different methodology than the methodology presently at issue) resulted in Offshore Investors receiving 91.905% of the distributed proceeds. *See* Receiver's Motion, Doc. No. 506, FN 1. The Receiver currently proposes that Offshore Investors receive 88 .93% of collected and future funds.

10    *See* transcript of hearing, January 31, 2008, pp. 16–17, where counsel for the Receiver explains that the Option/LP Fund has been paying 15.86% of Receivership costs and expenses, and the Offshore Fund has been paying 84.14% of Receivership costs and expenses.

---

End of Document                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 24

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732



2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

Computershare Trust Co. of Canada v. Crystallex International Corp.

APLICATION UNDER s. 241 of the Canada Business Corporations Act, R.S.C. 1985, c. C-44, as amended, and Rule 14.05(3) of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194

COMPUTERSHARE TRUST COMPANY OF CANADA, in its capacity as Trustee for the Holders of 9.375% Senior Unsecured Notes of Crystallex International Corporation due December 23, 2011 (Applicant) and CRYS-TALLEX INTERNATIONAL CORPORATION (Respondent)

Ontario Superior Court of Justice [Commercial List]

Newbould J.

Heard: December 3-4, 7, 2009
Judgment: December 16, 2009
Docket: CV-08-00007890-00CL

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: Robert W. Staley, Derek J. Bell, Gavin Finlayson for Applicant

Markus Koehnen, Amanda Klein for Respondent

Subject: Corporate and Commercial; Securities; Contracts; Civil Practice and Procedure

Securities --- Trading in securities — Sale of shares

Defendant had right to exploit Venezuelan mine under 2002 mining operation agreement for twenty-year term plus two ten-year extensions, with wholly owned government corporation — In December 2004, defendant raised $100 million to be used in development of mine project by selling units consisting of senior unsecured $1,000 note and 65 common shares, with notes maturing on December 30, 2011 — Prospectus for notes stated necessary permits were expected in first quarter of 2005 — Government corporation was responsible for obtaining required permits, which were formally denied on April 14, 2008 — Contract required defendant to purchase notes at 102 per cent of par upon occurrence of "Project Change of Control", defined as "occurrence of any transaction as a result of which the Corporation ceases to beneficially own, directly or indirectly, at least a majority interest in the Las Cristinas Project assets" — Under Venezuelan law, defendant had no property rights in lands or mineral deposits, as those belonged to Venezuela — Plaintiff trustee of noteholders brought application for declaration that "Project Change of Control" occurred requiring defendant to purchase notes — Application dismissed — Defendant continued to beneficially own its interest in assets and thus there was no change of con-

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

trol within meaning of trust indenture — Project change of control provision did not refer to loss of "beneficial interest" in asset but rather referred to ownership interest in assets — There would not be project change of control if transaction in question resulted in change of legal title to asset in question, i.e. contractual rights, but not beneficial or equitable title to that asset — Contract was in full force and effect.

Securities --- Trading in securities — Miscellaneous

Defendant had right to exploit Venezuelan mine under 2002 mining operation agreement for twenty-year term plus two ten-year extensions, with wholly owned government corporation — In December 2004, defendant raised $100 million to be used in development of mine project by selling units consisting of senior unsecured $1,000 note and 65 common shares, with notes maturing on December 30, 2011 — Prospectus for notes stated necessary permits were expected in first quarter of 2005 — Trust indenture provided that defendant was to use proceeds of notes to fund development of mine project — Government corporation was responsible for obtaining required permits, which were formally denied on April 14, 2008 — Defendant used $30 million of proceeds of notes to purchase mining equipment for project — In October 2009, defendant sold some generic mining equipment with book value of $22.1 million for $11.3 million, which by court order was distributed in amount of $4.3 million to defendant for its own account and purposes, $4.6875 million to noteholders in trust to be released when next interest payment was due to them, and balance to be held by in escrow by defendant — Trustee of noteholders brought application for declaration that defendant was in default of note indentures by failing to use proceeds of notes solely to fund development of mine, rendering notes immediately due and payable — Application dismissed — There was no express term preventing defendant from selling equipment — Trust indentures were silent as to what use could be made of funds if equipment was later sold — Judge was not prepared to imply term in trust indentures that would prevent defendant from selling equipment it did, or using proceeds as provided for in consent order — In any event, noteholders did not establish that any money going to defendant under court order for its own account was not or would not be spent on development of project in accordance with trust indentures — Trust indentures did not provide where funds were to come from to make remaining interest payments after first three payments — Noteholders agreed to payment of interest and they could not now complain of it.

Business associations --- Specific corporate organization matters — Shareholders — Shareholders' remedies — Relief from oppression — Orders for relief — General principles

Defendant had right to exploit Venezuelan mine under 2002 mining operation agreement for twenty-year term plus two ten-year extensions, with wholly owned government corporation — In December 2004, defendant raised $100 million to be used in development of mine project by selling units consisting of senior unsecured $1,000 note and 65 common shares, with notes maturing on December 30, 2011 — Prospectus for notes stated necessary permits were expected in first quarter of 2005 — Contract required defendant to purchase notes at 102 per cent of par upon occurrence of "Project Change of Control", defined as "occurrence of any transaction as a result of which the Corporation ceases to beneficially own, directly or indirectly, at least a majority interest in the Las Cristinas Project assets" — Government corporation was responsible for obtaining required permits, which were formally denied on April 14, 2008 — Trustee of noteholders brought application for declaration that defendant was acting in oppressive manner, and for order under s. 241 of Canada Business Corporations Act, appointing receiver over all assets, or alternatively, restraining defendant from dissipating further assets and requiring defendant to commence arbitration against Venezuela — Application dismissed — Noteholders failed to establish reasonable expectation that defendant would do anything in particular, including stop spending money, selling assets and pursuing arbitration — Nowhere in prospectus was there any discussion as to steps defendant

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

might take in event of delay or denial of permit, but prospective purchasers were warned of possibility — Thus, there could be no expectation of persons who bought notes at time of their issuance in December 2004 as to what defendant would do if faced with delay or denial of permit — Noteholders were sophisticated investors who accepted risks without protection — In any event, directors of defendant acted in good faith, their actions and decisions were reasonable and made on informed basis — Directors were protected by business judgment rule.

**Cases considered by *Newbould J.*:**

*BCE Inc., Re* (2008), 2008 CarswellQue 2229, 43 B.L.R. (4th) 79, 2008 QCCS 907, [2008] R.J.Q. 1119 (Que. S.C.) — considered

*BCE Inc., Re* (2008), *(sub nom. Aegon Capital Management Inc. v. BCE Inc.)* 383 N.R. 119, 71 C.P.R. (4th) 303, 52 B.L.R. (4th) 1, *(sub nom. Aegon Capital Management Inc. v. BCE Inc.)* 301 D.L.R. (4th) 80, 2008 SCC 69, [2008] 3 S.C.R. 560, 2008 CarswellQue 12595, 2008 CarswellQue 12596 (S.C.C.) — considered

*British Columbia v. Tener* (1985), 1985 CarswellBC 7, 17 D.L.R. (4th) 1, 36 R.P.R. 291, 32 L.C.R. 340, 59 N.R. 82, 28 B.C.L.R. (2d) 241, 1985 CarswellBC 2562, [1985] 1 S.C.R. 533, [1985] 3 W.W.R. 673 (S.C.C.) — distinguished

*Canadian Pacific Hotels Ltd. v. Bank of Montreal* (1987), 77 N.R. 161, [1987] 1 S.C.R. 711, 21 O.A.C. 321, 41 C.C.L.T. 1, 40 D.L.R. (4th) 385, 1987 CarswellOnt 760, 1987 CarswellOnt 962 (S.C.C.) — referred to

*Casurina Ltd. Partnership v. Rio Algom Ltd.* (2004), 2004 CarswellOnt 180, 181 O.A.C. 19, 40 B.L.R. (3d) 112 (Ont. C.A.) — followed

*Casurina Ltd. Partnership v. Rio Algom Ltd.* (2004), 2004 CarswellOnt 3999, 2004 CarswellOnt 4000, 335 N.R. 199 (note) (S.C.C.) — referred to

*Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Ltd.* (1994), 14 B.L.R. (2d) 125, [1994] I.L.R. 1-3068, *(sub nom. Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Inc.)* 19 O.R. (3d) 205, *(sub nom. Rowen (Charles P.) & Associates Inc. v. CIBA-Geigy Canada Inc.)* 72 O.A.C. 321, 1994 CarswellOnt 234 (Ont. C.A.) — considered

*Craighampton Investments Ltd. v. Ayerswood Developments Ltd.* (1984), 4 O.A.C. 124, 1984 CarswellOnt 1229 (Ont. C.A.) — referred to

*International Nickel Co. of Canada Ltd. v. Minister of National Revenue* (1971), [1971] C.T.C. 604, 71 D.T.C. 5332, 1971 CarswellNat 300, [1971] F.C. 213, 1971 CarswellNat 361 (Fed. T.D.) — distinguished

*Johnson's Asbestos Corp. v. Minister of National Revenue* (1965), [1965] C.T.C. 165, 65 D.T.C. 5089, 1965 CarswellNat 276, [1966] Ex. C.R. 212 (Can. Ex. Ct.) — distinguished

*Manitoba Fisheries Ltd. v. R.* (1978), [1979] 1 S.C.R. 101, 1978 CarswellNat 146, 1978 CarswellNat 565, [1978] 6 W.W.R. 496, 88 D.L.R. (3d) 462, *(sub nom. Manitoba Fisheries v. Government of Canada)* 23 N.R. 159 (S.C.C.) — distinguished

*Pente Investment Management Ltd. v. Schneider Corp.* (1998), 113 O.A.C. 253, *(sub nom. Maple Leaf Foods Inc. v. Schneider Corp.)* 42 O.R. (3d) 177, 1998 CarswellOnt 4035, 44 B.L.R. (2d) 115 (Ont. C.A.)

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

— considered

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 1998 CarswellOnt 2565, 63 O.T.C. 1, 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]) — referred to

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1999), 45 O.R. (3d) 417, *(sub nom. Toronto-Dominion Bank v. Leigh Instruments Ltd. (Bankrupt))* 124 O.A.C. 87, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, 1999 CarswellOnt 2812 (Ont. C.A.) — referred to

**Statutes considered:**

*Canada Business Corporations Act*, R.S.C. 1985, c. C-44

s. 241 — referred to

s. 241(2) — referred to

*Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.)

Generally — referred to

**Words and phrases considered**

**transaction**

In my view, the ordinary meaning of the word transaction requires more than one party to the action in question, and the denial of a permit by the Ministry of the Environment and Natural Resources and the failure of the Minister to respond to the appeal cannot amount to a transaction within the meaning of the trust indenture.

APPLICATION by trustee of noteholders for declaration that project change of control occurred, requiring defendant to purchase notes, for declaration that defendant was in default of note indentures, rendering notes immediately due and payable, for declaration that defendant was acting in oppressive manner, and for order under s. 241 of *Canada Business Corporations Act*, appointing receiver over all assets, or alternatively, restraining defendant from dissipating further assets and requiring defendant to commence arbitration.

***Newbould J.*:**

1      Crystallex International Corporation ("Crystallex") is a publicly traded company listed on the TSX and the AMEX. It has the right to exploit the Las Cristinas mine property in Venezuela under a mining operation agreement dated September 26, 2002 made with Corporacion Venezolana de Guayana ("CVG") a wholly owned Venezuelan government corporation (the "CVG Contract"). The CVG contract is for twenty years but contemplates two further ten-year extensions.

2      In December 2004 Crystallex raised $100 million[FN1] to be used in the development of the Las Cristinas project by selling units consisting of a senior unsecured $1,000 note and 65 common shares. The Notes mature on December 30, 2011.

3      At the time of the issuance of the Notes, the required mining permits had not yet been obtained. The prospectus for the Notes dated December 17, 2004 stated that Crystallex currently expected to receive the permit

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

and approvals necessary to commence the development of the Las Cristinas project during the first quarter of 2005. That did not occur. On April 14, 2008 the application for the permit was formally denied. An appeal process was taken, unsuccessfully. In the fall of 2008 and in January 2009, statements were made by the government of Venezuela, including President Chavez, that Venezuela was "taking back" the mine at Las Cristinas.

4      The trustee for the Noteholders brings this application seeking relief as the result of the inability of Crystallex to develop the Las Cristinas project as a result of the necessary permits not being issued. The Noteholders make three claims. First, they claim that there has been a "Project Change of Control" as defined in the indentures under which the Notes were issued and as such Crystallex is required to purchase the Notes at a price of 102% of par value plus accrued interest. Second, they claim that Crystallex is in default of the Note indentures by failing to use the proceeds of the Notes solely to fund the development of the mine, rendering the Notes immediately due and payable. Third, they claim that Crystallex is acting in an oppressive manner in the way in which it has reacted to the failure of the necessary permit being issued. They request an order under section 241 of the *Canada Business Corporations Act*, appointing a receiver over all of the assets of Crystallex, or in the alternative, restraining Crystallex from dissipating any further assets in connection with the Las Cristinas project and requiring Crystallex to commence arbitration against Venezuela.

5      In my view, for the reasons that follow, the application of the Noteholders should be dismissed.

## Las Cristinas Project

6      In early 1991, CVG called for bids to develop the Las Cristinas deposits. Placer Dome Inc. was the winning bidder and entered into a joint venture agreement with CVG through a joint venture company to explore and develop the gold mineral in the deposits. No gold was produced by the joint venture. In July 2001, Placer assigned its interest in the joint venture to Vannessa Ventures Ltd. In November 2001, CVG terminated the joint venture contract for cause and took possession of the Las Cristinas deposits and related assets. In March 2002, the Ministry of Energy and Mines declared the joint venture contract terminated and it repossessed the assets on behalf of Venezuela. In April 2002, by presidential decree, the Venezuelan government reserved for itself through the Ministry of Energy and Mines the direct exploration and exploitation rights of the gold mineral in the Las Cristinas deposits and granted to the Ministry the right to contract with CVG for the work required to carry out such exploration and exploitation.

7      In May 2002, the Ministry of Energy and Mines and CVG entered into an agreement pursuant to which the Ministry granted to CVG the rights to explore and exploit the Las Cristinas deposits and enter into operation agreements with third parties for such purposes.

8      On September 17, 2002, Crystallex and CVG executed the CVG contract under which CVG authorized Crystallex:

> . . . to make all the investments and works necessary to reactivate and execute in its totality the Mining Project of CRISTINA 4, CRISTINA 5, CRISTINA 6 and CRISTINA 7, design, construct the plant, operate it, process the gold material for its subsequent commercialization and sale . .

. . . . .

9      The CVG contract also requires Crystallex to fulfill an employment plan and program for the social devel-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

opment of the region, including the contracting of employees, assuming the maintenance, supply and other expenses for the local medical hospital to serve both the personnel for the project as well as the community, constructing at least thirty homes in the local community, installing a drinking water treatment plant, constructing sewage systems, improving and paving roads in the vicinity and maintaining scholarships and internships for students.

10      Under the CVG contract, it is the responsibility of CVG, and not Crystallex, to obtain the required environmental and mining permits. This was understandable as the president of CVG was the Minister of Mines and Energy.

11      Under Venezuelan mining law, all mineral deposits belong to Venezuela and are assets of public domain. Crystallex does not have any property rights in the lands or mineral deposits. Crystallex's interests are derived from the CVG contract, a mine operation agreement.

### Issuance of Notes

12      Under the offering, which closed in December 2004, 100,000 units of Crystallex were sold at a price of $1,000 per unit. Each unit comprised $1,000 principal amount of senior unsecured notes and 65 common shares of Crystallex. The Notes mature on December 30, 2011 and bear interest at the rate of 9.35%. All interest payments have been made to date.

13      The Notes are direct unsecured obligations of Crystallex ranking senior to debt which is convertible into common shares of the corporation, junior to project indebtedness incurred with respect to the Las Cristinas project and equally with all unsecured and unsubordinated indebtedness of Crystallex. At the time of the offering, Crystallex had cash of approximately US $65 million and bank indebtedness of approximately $6.5 million.

14      The net proceeds of the offering after expenses and underwriting fees were approximately $95.5 million, and according to the prospectus were to fund a portion of the costs of developing the Las Cristinas project, with $32.5 million being used for construction contracts, $30 million being used for equipment and the balance for additional purchase orders and service contracts awarded under an EPCM contract.

15      The net proceeds of the offering were deposited and held with the trustee for the Noteholders at the time, CIBC Mellon Trust Company, under an escrow agreement. The escrowed funds were to be deposited into two pools, one pool equal to the interest payable on the first three interest payments due on the Notes and the other pool equal to the balance of the escrow funds. With respect to the latter pool, the escrow agent was to release funds from that pool to pay approved capital budget expenditures that were specifically contemplated by the feasibility studies or the project control budget. There is no issue but that the funds were properly disbursed by the escrow agent, including the purchase of equipment for the project.

16      Other than Mr. Hope, the affiant of affidavits sworn on behalf of the applicants, the Noteholders have not disclosed when they purchased their notes. Mr. Hope is the manager and controlling mind of Outrider Management, LLC, an American hedge fund. The Outrider Fund began buying its notes in October 2005, after President Chavez had announced that he was taking Las Cristinas from Crystallex. The Outrider Fund is a debt fund that specializes in emerging markets.

17      In the summer of 2008 the group of Noteholders represented by the solicitors for the applicant took steps to replace CIBC Mellon Trust Company with Computershare Trust Company of Canada, which commenced this

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

application in December 2008.

**Change of Control Issue**

*(i) Trust provisions*

18      There are two trust indentures, being a Trust Indenture and a First Supplemental Trust Indenture, both made as of December 23, 2004. They are to be read together. The First Supplemental Trust Indenture contains a change of control provision in section 4.2, which requires Crystallex to purchase the Notes at 102% of par upon the occurrence of a Project Change of Control if requested to do so by a Noteholder. A Project Change of Control is defined as:

> **Project Change of Control** means the occurrence of any transaction as a result of which the Corporation ceases to beneficially own, directly or indirectly, at least a majority interest in the Las Cristinas Project assets.

19      The Trust Indenture defines the Las Cristinas Project as follows:

> **Las Cristinas Project** means the acquisition, exploration, development and exploitation of the mineral deposits located in the areas of the gold mineral concession known as Cristinas 4, 5, 6, and 7 in the Municipality of Sifontes, Bolivar State, Venezuela

20      The "Las Cristinas Project assets" is not a defined term. It is agreed that the "assets" include the CVG Contract. As Mr. Staley put it in argument, the "asset" must be the ability to acquire, explore, develop and exploit the mineral deposits, which language is taken from the definition of Las Cristinas Project, and the ability of Crystallex to do so is derived from the CVG Contract.

*(ii) Contention of Noteholders*

21      The Noteholders contend that as a result of the refusal of the applicable Ministry to issue a required environmental permit and events that followed, there has been a "transaction" as a result of which there has been a Project Change of Control requiring their Notes to be acquired under section 4.2. The facts they rely on are as follows:

> (a) In August 2004, Crystallex initiated the process for obtaining the required mining permit by submitting an environmental impact study to the CVG and the Ministry of the Environment and Natural Resources.

> (b) On March 14, 2008, the Ministry of the Environment and Natural Resources advised CVG that it was denying a request for the necessary permit.

> (c) On May 12, 2008, Crystallex filed a legal rebuttal entitled a Motion for Reconsideration to the denial of the permit, and stated publicly that it anticipated that CVG would be filing their rebuttal in due course. CVG did not do so.

> (d) On May 30, 2008 Crystallex received notice from the Ministry of the Environment and Natural Resources that the legal rebuttal filed by Crystallex had been denied.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

(e) On June 16, 2008 Crystallex filed an appeal with the Minister of the Environment and Natural Resources. The Minister had 90 days in which to issue a decision on the appeal. According to the evidence, the failure of the Minister to decide on the appeal within the 90 day period is treated as a deemed denial.

(f) On September 19, 2008, President Chavez was quoted by Reuters "We are taking back big mines, and one of them I one of the biggest in the world. And do you know what it is? It's gold, its gold." This was taken by Reuters to be a reference to Las Cristinas.

(g) On November 11, 2008 the Minister of Industry and Mines, also the president of CVG, was quoted in a government press release on matters, including "He also confirmed that, by 2009, the State will take back, operate and manage the Las Cristinas mine, previously owned by Cristalex., an international company.." It stated that Las Cristinas has one of the largest gold deposits in the world, with 31 million ounces of gold worth $35 billion.

(h) On November 28, 2008, Crystallex filed a notice of investment dispute with the Government of Venezuela under the Canada-Venezuelan Bilateral Investment Treaty. It stated that the measures taken by the Minister have caused Crystallex to suffer significant economic loss and damage and constituted a unilateral and fundamental violation of the legal framework applicable to Crystallex's investment in the Las Cristinas project as well as a breach of the treaty.

(i) On January 13, 2009, President Chavez, in a speech delivered to the National Assembly of Venezuela, said:

> In addition, the Government of Venezuela will proceed this year with the operation and control of the Las Cristinas gold deposit, one of Latin America's biggest gold deposits, located in the southeast corner of Venezuela, in Bolivar State at Kilometer 88. Las Cristinas is estimated to contain approximately 35.2 million ounces of gold, which translates into 1,094 metric tons of estimated reserves, 24.5 million ounces (762 tons) of which are classified as proven reserves.

> The Venezuelan Government will then control 30 billion dollars, which is the current estimated value of the deposit. The project will be divided into five concessions: Cristina IV, Cristina V, Cristina VI, Cristina VII, and Brisas del Cuyuni. This project, under socialist control, will promote economic growth and national development.

> In 2008, in the mining sector, together with Russia, we created VenRus, a Russian and Venezuelan company, which is a joint venture to operate the Las Cristinas deposits.

### (iii) Was there a change of control?

22     A trust indenture is a contract and normal principles of contract interpretation apply to its construction. In interpreting a contract, the goal is to determine the intent of the parties by reference to the words that they chose. The plain meaning of the words is to be given effect, read harmoniously and in the context of other provisions of the contract, and in light of the factual matrix as a whole. Interpretations that give effect to all the terms of a contract should be preferred over interpretations that render one or more terms superfluous or ineffective. A commercial contract should be interpreted in a manner that accords with sound commercial principles, good

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

business sense and that does not result in absurdities.

23      A trust indenture such as this is not a contract of adhesion and the doctrine of *contra proferentum* has no application to it. In *Casurina Ltd. Partnership v. Rio Algom Ltd.* (2004), 40 B.L.R. (3d) 112 (Ont. C.A.) at paras. 35-36, leave to appeal to the S.C.C. denied, [2004] S.C.C.A. No. 105 (S.C.C.), Feldman J.A. stated the following, which is apt to this case:

> The respondents point out that there is no basis to suggest that the trust indenture is a contract of adhesion or that its terms were not negotiated as part of the underwriting process at the time the debentures were issued. The appellants, as purchasers of the debentures in the market, purchased the debentures subject to the terms of the trust indenture. However, they had the opportunity to consider their prospective purchase in the context of the terms governing the debentures and on that basis must have made a decision whether to invest or not. That is not a contract of adhesion.

24      The first issue is whether there was a transaction within the meaning of the definition of change of control. The definition again for ease of reference is:

> **Project Change of Control** means the occurrence of any transaction as a result of which the Corporation ceases to beneficially own, directly or indirectly, at least a majority interest in the Las Cristinas Project assets.

25      The Noteholders contend that the denial of the necessary permit constituted a transaction. They submitted a definition of transaction from the Oxford English Dictionary as:

> 2. The action of passing or making over a thing from one person etc. to another; transference.

26      They contend that the denial of a permit was a transference to Venezuela of the right of Crystallex under the CVG Contract to develop and exploit the Las Cristinas project and that it was not necessary that there be more than the Government, i.e. more than one person to the transaction.

27      That definition, however, as pointed out by Mr. Koehnen, is stated in Oxford to be obsolete and one that was used only in the 17th century. The two current definitions are;

> 3. The action of transacting or fact of being transacted; the carrying on or completion of business etc. 4. That which is or has been transacted, esp. a piece of business; a deal.

28      In my view, the ordinary meaning of the word transaction requires more than one party to the action in question, and the denial of a permit by the Ministry of the Environment and Natural Resources and the failure of the Minister to respond to the appeal cannot amount to a transaction within the meaning of the trust indenture.

29      The Noteholders also contend that the statements of various Government officials, including President Chavez, that the mine will be taken from Crystallex amount to an expropriation of Crystallex's interests and therefore constitute a transaction whereby it has lost its interest in the CVG Contract. Assuming an expropriation could amount to a transaction, a threat of expropriation could not in my view amount to an expropriation.

30      Even if there were a transaction, the issue would then be whether as a result Crystallex has ceased "to beneficially own, directly or indirectly, at least a majority interest in the Las Cristinas Project assets". The Noteholders contend this to be the case. They rely on a definition of "beneficial interest" from Black's Law Diction-

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

ary as:

> Profit, benefit, or advantage resulting from a contract, or the ownership of an estate as distinct from the legal ownership or control.

31    The Noteholders say that Crystallex has lost the benefit or advantage of the CVG Contract to extract gold from the mine and thus has lost its "beneficial interest" in the Las Cristinas project. They read the definition of Project Change of Control to mean:

> **Project Change of Control** means the occurrence of any transaction as a result of which the Corporation ceases to ... own, directly or indirectly, at least a majority interest in the Las Cristinas Project assets <u>for its benefit</u>.

> or

> **Project Change of Control** means the occurrence of any transaction as a result of which the Corporation ceases to ... own, directly or indirectly, <u>for its benefit</u> at least a majority interest in the Las Cristinas Project assets.

> rather than the definition in the trust indenture:

> **Project Change of Control** means the occurrence of any transaction as a result of which the Corporation ceases to beneficially own, directly or indirectly, at least a majority interest in the Las Cristinas Project assets.

32    In my view, the Noteholders interpretation of the Project Change of Control definition in the trust indenture is incorrect. The Project Change of Control provision does not refer to a loss of a "beneficial interest" in the asset but rather refers to an ownership interest in the assets. The word "beneficially" is an adverb to distinguish the concept of "beneficially own" from the concept of "legally own". Its purpose is to make clear that there would not be a Project Change of Control if the transaction in question resulted in a change of the legal title to the asset in question, i.e. the CVG contractual rights, but not the beneficial or equitable title to that asset.

33    The CVG Contract is in full force and effect. This is not really disputed. CVG confirmed in a letter to Crystallex dated March 2, 2009 that the CVG Contract "is fully valid" "and has not been revoked or replaced."

34    Crystallex refers to evidence that during the negotiation of the Trust Indenture, Stikeman Elliott, acting for the underwriters whose interests would include trying to negotiate terms favourable to Noteholders that would make the Notes more marketable, tried to include a term that would have required Crystallex to redeem the bonds if Crystallex did not receive its environmental permit by March 31, 2005. Crystallex rejected this.

35    Crystallex contends that this fact may be taken into account in interpreting the change of control provision in the trust indenture. In my view, it may not. Unless there is ambiguity in a contract, extrinsic evidence of prior negotiations is not admissible. See *Craighampton Investments Ltd. v. Ayerswood Developments Ltd.* (1984), 4 O.A.C. 124 (Ont. C.A.) and *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]) at para 405 ( per Winkler J.); aff'd (1999), 50 B.L.R. (2d) 64 (Ont. C.A.). In my view, there is no ambiguity. The contract can be construed by its terms. If there were an ambiguity, the evidence would be admissible and it would tend to an interpretation that the change of control provision does not include the refusal of the permit.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

36    The Noteholders rely on the cases of *British Columbia v. Tener,* [1985] 1 S.C.R. 533 (S.C.C.) and *Manitoba Fisheries Ltd. v. R.* (1978), [1979] 1 S.C.R. 101 (S.C.C.) and submit they stand for the proposition that denial of an environmental permit can constitute expropriation.

37    Even if Canadian law were applicable, *Tener* and *Manitoba Fisheries* do not assist the Noteholders. In *Tener*, the claimants owned mineral rights to property but were denied a permit to mine them. It was held that under the applicable legislation, they were entitled to compensation even though they still had ownership rights to the minerals. Estey J stated:

> The denial of access to these lands occurred under the Park Act and amounts to a recovery by the Crown of a part of the right granted to the respondents in 1937. This acquisition by the Crown constitutes a taking from which compensation must flow. Such a conclusion is consistent with this Court's judgment in *Manitoba Fisheries Ltd. v. The Queen,* [1979] 1 S.C.R. 101. In that case the Province had established a Crown corporation with a commercial monopoly in the export of fish from Manitoba and other participating provinces. The establishment of the Crown corporation had the effect of putting Manitoba Fisheries out of business. This Court held that the Province's actions deprived Manitoba Fisheries of its goodwill as a going concern and that the goodwill so taken by the Crown entitled the company to compensation <u>despite the fact that they retained their physical assets, as those assets had been rendered virtually useless. Similarly in this case, the respondents are left with the minerals.</u>

> (underlining added)

38    Therefore, those cases if applied to the situation in which Crystallex finds itself would mean that even if the ability of Crystallex to exploit the mineral assets in Venezuela can be said to have been expropriated, it would entitle Crystallex to compensation even although its beneficial ownership in the assets had not been lost. The principle of those cases does not mean that Crystallex would have lost its beneficial ownership of its rights.

39    The notice of investment dispute filed by Crystallex with the Government of Venezuela was under the Canada-Venezuelan Bilateral Investment Treaty. That treaty, along with other principles of international law, would govern any arbitration that Crystallex commenced. The treaty requires fair and equitable treatment of investors by Venezuela and provides for no expropriation or measures having an effect equivalent to expropriation except under due process of law and with prompt and adequate compensation.

***(iv) Conclusion on change of control issue***

40    Crystallex continues to beneficially own its interest in the Las Cristinas assets and thus there has been no change of control within the meaning of the trust indenture requiring Crystallex to acquire the Notes under section 4.2 of the First Supplemental Trust Indenture.

**Section 5.1 and use of the proceeds of the Notes**

**(i) Indenture terms**

43. Section 5.1 of the First Supplemental Trust Indenture provides that Crystallex is to use the proceeds of the Notes to fund the development of the Las Cristinas project. It provides:

**5.1 Use of Proceeds**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

> The Corporation shall use the net proceeds of the Series 1 Notes to fund the development of the Las Cristinas Project, which funding may include the provision of cash collateral security for Branch Indebtedness.

41     Section 7.1(d) of the Trust Indenture makes it an event of default if there has been a failure by Crystallex to perform any covenant if such failure continues for 60 days after written notice thereof has been given to Crystallex by the Trustee of the Noteholders or Noteholders holding at least 25% of the aggregate principal amount of the Notes outstanding. Section 7.2 provides that if there has been an event of default, the Trustee shall within 10 days give notice to the Noteholders. Section 7.3 provides that if an event of default occurs, the Trustee or Noteholders holding at least 25% of the aggregate principal amount of the Notes outstanding may declare the principal of the Notes and any unpaid interest to be due and payable immediately.

*(ii) Sale of equipment*

42     Crystallex used $30 million of the proceeds of the Notes to purchase mining equipment for the project. In October 2009, Crystallex sold some mining equipment described as generic, non-project specific equipment with a book value of $22.1 million for $11.3 million. The Noteholders take the position that the proceeds of the sale have not been used in the project and thus Crystallex is in breach of the covenant in section 5.1.

43     The uncontradicted evidence of Mr. Fung, the Chairman and CEO of Crystallex, is that the equipment sold is generic in nature and can easily be replaced and it will not impede development of the Las Cristinas project if the permit is granted.

44     The sale of equipment took place in the following circumstances. The Crystallex financial statements for the six months ended June 30, 2009 stated that the company had positive working capital of $5.439 million including cash and cash equivalents of $13.381 million and that management estimated the funds would be sufficient to meet the company's obligations and budgeted expenditures into the fourth quarter of 2009, but might not be sufficient to cover its obligations falling due in January 2010. It stated that the company had a number of financing options available and it listed some, including selling equity, selling equipment and negotiating with the Noteholders to decrease its obligations to them, particularly interest costs.

45     On August 21, 2009, counsel for the Noteholders wrote to counsel for Crystallex advising that the Noteholders would treat any sale of equipment that did not enure to the benefit of the Noteholders as being an act of oppression and/or breach of the Indentures.[FN2]

46     On September 21, 2009, Crystallex advised the Noteholders that the Company intended to sell certain equipment. The Noteholders threatened to bring an injunction to stop the planned sale, on the basis that it would constitute a default under the Indenture. The parties settled the matter and a court order of Campbell J. dated October 7, 2009 was obtained that provided that the proceeds of the sale would be distributed as follows:

> (a) The first $4.3 million was to be paid to Crystallex for its own account and purposes.

> (b) The next $4.6875 million was to be paid to counsel for the Noteholders to be held in trust and released to the Noteholders on the earlier of a court order ordering $102 million to be paid to the Noteholders or January, 2010 when the next interest payment is due to the Noteholders.

> (c) The balance is to be held by Crystallex in escrow and not to be used by Crystallex or any person until December 14, 2009.

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

47      The equipment was sold under three contracts dated either October 2 or 6, 2009. When they closed is not in the record. Of the equipment sold, $8.6 million came from equipment originally purchased from funds advanced by the Noteholders and $3.2 million came from other funds. The Noteholders say the expenditure of the first two amounts referred to in the order of Campbell J. will breach the trust indenture. To be accurate, these amounts should be reduced to reflect the percentage of assets sold that were acquired in the first place with funds from the Noteholders (8.6/11.8 or 72.88%), resulting in $ 3.13 million under para (a) and $3.42 million under para (b) that is complained of by the Noteholders.

### (iii) Was there a breach of section 5.1?

48      The Noteholders contend that section 5.1 requires the proceeds of the Notes to be used to fund the "development" of the project, and that while the funds advanced by them went into the project, i.e. were used to fund the development, it would be a breach of the covenant if equipment purchased with money from the issuance of the Notes were later sold and the proceeds were not used for development of the project, which they assert is the case. They further contend that paying them back interest on their Notes from the proceeds of sale of the equipment bought with their funds cannot be considered to be using the funds for the development of the project.

49      Any term relied on by the Noteholders preventing Crystallex from selling the equipment and using the proceeds from the sale must be express or implied. It is not express. What is express is that the proceeds of the Notes were to be released from escrow on certain terms, which terms were followed. The trust indentures are silent as to what use can be made of funds if any equipment is later sold.

50      Can such a term be implied? A term may be implied in a contract to give business efficacy to the contract or otherwise meet the "officious bystander" test. See *Canadian Pacific Hotels Ltd. v. Bank of Montreal*, [1987] 1 S.C.R. 711 (S.C.C.) at para. 52 and *Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Ltd.* (1994), 19 O.R. (3d) 205 (Ont. C.A.) in which Galligan J.A. stated:

There are a number of tests which have been adopted in the cases for determining whether a term ought to be implied into a contractual relationship. One of them is found in the judgment of Lerner J. in *Woeller v. Orfus* (1979), 27 O.R. (2d) 298 at pp. 307-08, 106 D.L.R. (3d) 115 (H.C.J.):

Scrutton, L.J. in *Reigate v. Union Manufacturing Co. (Ramsbottom) Ltd.* et al., [1918] 1 K.B. 592 (C.A.) at p. 605, stated:

The first thing is to see what the parties have expressed in the contract; and then an implied term is not to be added because the Court thinks it would have been reasonable to have inserted it in the contract. A term can only be implied if it is necessary in the business sense to give efficacy to the contract; that is, if it is such a term that it can confidently be said that if at the time the contract was being negotiated some one had said to the parties, "What will happen in such a case", they would both have replied, "Of course, so and so will happen; we did not trouble to say that, it is too clear." Unless the Court comes to some such conclusion as that, it ought not to imply a term which the parties themselves have not expressed.

In *Alpha Trading Ltd. v. Dunnshaw-Patten Ltd.*, supra, Brandon L.J. at p. 490 adopted what has been called the officious bystander test:

Various tests have been propounded from time to time with regard to the implication of terms in a con-

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

tract. The officious bystander is one of the tests which have been used. It seems to me that the officious bystander, looking over the shoulders of Mr. Brodie and Mr. Marchant Lane, as they made the contract which they did, and asking himself whether the defendants could make a contract with Muellers and then break it without incurring any liability to the plaintiffs, would have answered, "No, that cannot be what is intended. It must be intended that, if they make the contract, after having had the buyer introduced to them, they will perform it and enable the agent to earn his remuneration."

51      I have more than a considerable doubt that in the circumstances of what occurred in this case, it can be implied that the trust indenture prohibits the sale of equipment and the use that can be made of the money. It could perhaps be argued that a term should be implied that in circumstances in which the project were still alive in the sense that a permit had been granted that Crystallex could not sell a portion of the equipment purchased with money from the Noteholders that would render Crystallex unable to perform its obligations under the CVG Contract. I would not, however, imply a term and find that it was intended in the circumstances in which Crystallex now finds itself that approximately 10% of the equipment purchased with the funds from the proceeds of the Notes, equipment that is generic and easily replaceable, could not be sold and the proceeds used for general corporate purposes for the Las Cristinas project, which is the only business of Crystallex. It would be difficult to say that such a term was necessary to give business efficacy to the contract, or that the parties would say "Of course we intended that; we did not trouble ourselves to state that in the trust indenture; it is too clear".

52      I am not prepared to imply a term in the trust indentures that would prevent Crystallex from selling the equipment that it did, or using the proceeds as provided for in the consent order of October 7, 2009. That is sufficient to dispose of the claim of a breach of section 5.1.

53      In any event, on my view of the evidence, the Noteholders have not established that any of the money going to Crystallex under para. (a) of the order of Campbell J. for its own account and purposes has not, or will not, be spent on the development of the Las Cristinas project in accordance with the trust indentures.

54      The Noteholders rely on a very narrow interpretation of the word "development" in section 5.1 which requires Crystallex to use the funds raised to "fund the development" of the Las Cristinas project. They assert in their factum that "development", in connection with mining, means "to uncover the body or area which is to be the subject matter of the extraction process". It is "the preparation of the deposit or mining site for actual mining." They contend that expenses relating to management, supervisory and administrative capacities cannot be described as "development" expenditures, particularly when a company is not actually undertaking any actual development. They rely for this proposition on *International Nickel Co. of Canada Ltd. v. Minister of National Revenue,* [1971] F.C. 213 (Fed. T.D.) and *Johnson's Asbestos Corp. v. Minister of National Revenue* (1965), [1966] Ex. C.R. 212 (Can. Ex. Ct.).

55      These cases are of no assistance to the Noteholders. They are tax cases that dealt with what expenditures could be deducted for income tax purposes as "development" expenses. The issue in those cases was whether expenses in building a townsite for miners could be said to be "development expenses incurred in searching for minerals in Canada" within the meaning of the *Income Tax Act*. These cases have no application to a consideration of what was intended by the trust indentures governing the rights of the Noteholders.

56      The Las Cristinas Project is defined in the trust indentures to mean the acquisition, exploration, development and exploitation of the mineral deposits located in the areas of the gold mineral concession known as Cristinas 4, 5, 6, and 7. Crystallex's right to do that is pursuant to the CVG Contract which requires it to do

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

many things, including making all the investments and works necessary to reactivate and execute in its totality the mining project, design, construct the plant, operate it and process the gold material for its subsequent commercialization and sale. The CVG contract also requires Crystallex to fulfill an employment plan and program for the social development of the region, including the contracting of employees, assuming the maintenance, supply and other expenses for the local medical hospital to serve both the personnel for the project as well as the community, constructing at least thirty homes in the local community, installing a drinking water treatment plant, constructing sewage systems, improving and paving roads in the vicinity and maintaining scholarships and internships for students.

57      Section 6.1 (d) of the Trust Indenture contains a covenant of Crystallex to "carry on and conduct its ...business in a proper...manner and in accordance with good business practice and diligently maintain, use and operate its ... properties so as to preserve and protect the earnings, incomes ... and profits thereof". Section 6.1 (e) contains a covenant that Crystallex shall "duly observe and conform to all ... covenants, terms and conditions upon or under which any ... of its property or rights are held". These covenants are broad enough to require Crystallex to comply with the terms of the CVG Contract. Any other interpretation would not give the Noteholders the protection of a covenant of Crystallex to properly carry out the CVG Contract. The obligation of Crystallex in section 5.1 to fund the development of the Las Cristinas project must be read taking these provisions into account. To suggest that the money raised by the Notes could only be used to uncover and mine the minerals ignores commercial reality and the terms of the CVG Contract and trust indentures.

58      The Noteholders say that development has ceased as a result of the denial of the permit. They point to a statement in the Crystallex 2008 annual report that says "If and when the Company is in a position to commence development activities at Las Cristinas, it will determine its overall funding requirements to cover the period through to commercial production". This statement does not literally mean that there has been no production, and the next sentence expressly states that the funding requirement will include the balance of capital required to complete the development. The Noteholders contend that the statement, however, makes clear there is no development currently taking place. Therefore they contend that the money from the sale of equipment bought with their funds cannot possibly be used in the development of the project.

59      This statement cannot mean that no funds are being spent pursuant to the CVG contract. The evidence is quite to the contrary. In the Management Discussion and Analysis (MD&A) dated May 21, 2009 that accompanied the 2008 annual report, it was reported that cash used for capital expenditures for the Las Cristinas project was $28.1 million in 2008 and $26.9 million in 2007, and that the majority of the expenditures in 2008 represented ongoing costs for administering, securing and maintaining the Las Cristinas camp and for storage costs for long lead time equipment stored outside of Venezuela. That would mean that at least $14 million, and perhaps more, was used for those purposes. The statement also stated that the company had construction activities related to restarting work on the medical facility and sewage treatment plant as part of the company's obligation under the CVG Contract, and that the estimated cost to complete both projects was approximately $1.5 million.

60      The MD&A also stated "In order to remain in compliance with the MOC [the CVG Contract], Crystallex continues to employ personnel at site, maintain and operate the Las Cristinas camp and complete the two remaining social infrastructure projects, namely a sewage treatment plant and a medical facility. Employing personnel at site and operating the camp requires providing security, catering and housekeeping services, staff transportation to and from the site, maintenance of temporary power facilities and the main access road, as well as various general and administrative functions".

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

61      In his affidavit of February 12, 2009 Mr. Fung described the kind of expenditure that Crystallex has been making under the CVG Contract. It includes hiring 149 people to provide security to the property covering approximately 9,600 acres, security that is required as the gold is alluvial and a target for illegal miners. They are currently managing 1,300 prosecutions relating to illegal mining.

62      It is quite apparent that Crystallex has or will spend far more under the CVG Contract than the $3.13 million that was paid to Crystallex under para. (a) of the order of Campbell J. from the proceeds of the sale of equipment paid for by funds from the issuance of the Notes. Counsel for the Noteholders filed in argument an analysis of Crystallex expenditures from the end of June, 2008 to the end of September, 2009 taken from the Crystallex quarterly statements. It discloses total cash expenditures of $56.6 million, including $14.06 million for interest to the Noteholders. Of the balance of $42.54 million, $25.14 million constituted capitalized Las Cristinas payments, and $17.40 million constituted non-capitalized payments. The expenditures of $28.1 million referred to in the 2008 MDA were also capitalized, and the fact that capitalized expenditures on the Las Cristinas project continue to be made in the order of magnitude disclosed by the statements, which is not surprising given the evidence of Mr. Fung as to the ongoing obligations, there is no basis to assume that the $3.13 million paid to Crystallex under para (a) of the order of Campbell J. has not or will not be used for the Las Cristinas project pursuant to the CVG Contract and required by the Trust Indenture provisions I have referred to, including sections 6.1 (d) and (e).

63      The Noteholders assert that on the cross-examination of Mr. Luis Felipe Cottin, the Executive President of Crystallex in Venezuela, Mr. Cottin admitted that the only remaining spending for the CVG Contract as at December 31, 2008 was $1.5 million dollars. That is not a fair reading of the evidence. Mr. Cottin was discussing only the social spending required, not the total spending required by the CVG Contract, and the translation of what he said in Spanish was that "we are close to 95 percent compliance of the social projects that we have contracted."

64      The Noteholders also complain that Crystallex refused to produce financial information as to what has been spent in 2007 and 2008 and, while Campbell J. refused an order that it be produced because of a "proportionality concern", he said that it is possible that an adverse inference could be drawn if it turns out the evidence is relevant. I do not think there is any basis for any adverse inference to be made that the $3.1 million was not or will not be spent on the project. What the Noteholders requested was a detailed statement of every expenditure made in respect of Las Cristinas and the CVG Contract in 2007 and 2008. What use a disclosure of every line by line expenditure over two years would be is not apparent. The financial disclosure made by Crystallex in its financial statements and other documents complies with the requirements of the TSX, the AMEX, the OSC, the SEC and corporate law. These financial statements disclose what has been spent and for what purposes. Mr. Hope, the affiant of affidavits sworn on behalf of the Noteholders, made clear in his cross-examination that the request for line by line expenditures is nothing more than a fishing expedition into irrelevant hypothetical matters.

65      With respect to the interest to be paid to the Noteholders from the sale of equipment as provided in the consent order of Campbell J. of October 7, 2009, the trust indentures did not contain any provisions preventing that and I would not imply a term in the trust indentures preventing that from occurring.

66      Apart from the first three interest payments that were to be made from the proceeds of the Notes, as provided in the First Supplementary Trust Indenture, the trust indentures did not provide where the funds were to come from to make the remaining interest payments. The factual matrix at the time of the trust indentures,

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

which may be looked at, was to some extent described in the prospectus. The prospectus disclosed that the earnings coverage ratio for Crystallex for the prior two years was less than one-to-one, which meant that Crystallex could not service its debt. The prospectus stated that in order to develop the Las Cristinas project, Crystallex would have to raise significant additional financing, which might include more debt or equity financing, and there was no assurance that it would be available on acceptable terms, or at all. Thus it was not known where the funds would come from to pay interest on the Notes after the first three payments.

67      It cannot be said that it was so clear that it need not have been stated that in the circumstances in which Crystallex now finds itself, Crystallex could not use the proceeds of the sale of equipment to make the next interest payment on the Notes. I would not imply such a term.

68      In any event, it hardly lies in the mouth of the Noteholders who negotiated for such payment to complain that the payment they negotiated amounts to a breach of the trust indenture entitling them to repayment now of all the entire indebtedness on the Notes. The Noteholders, having taken the position that they would view any sale of equipment that did not enure to their benefit as a breach of the trust indentures, can hardly now complain when the payment of interest is to their benefit. It is a classic *High Trees* situation.

69      The order of Campbell J. provides that the provision regarding the proceeds of the equipment sale does not constitute an admission by either party of any fact, and all parties reserve their rights with respect to all available arguments. Whatever that means, it does not mean that the fact of the payment agreed to be made to the Noteholders is without prejudice to the rights of the parties. It is being relied on by the Noteholders to assert their claim to a breach of section 5.1. If the provision in the order meant that the fact of the negotiated payment was without prejudice, the payment could not be relied on by the Noteholders.

70      The fact is that the Noteholders agreed to the payment of interest. They cannot now complain of it.

### (iv) Conclusion on section 5.1 issue

71      In my view, the Noteholders have not established a breach of section 5.1 of the First Supplemental Trust Indenture that would entitle them to an order that the Notes now be redeemed in full.

## Oppression Claim

### (i) Relevant principles

72      The Noteholders allege that the actions of Crystallex in responding to the denial of the permit have amounted to oppression within the meaning of section 241(2) of the Canada Business Corporations Act R.S., 1985, c. C-44. It contends that Crystallex's behaviour has been oppressive, has been unfairly prejudicial to the Noteholders and has unfairly disregarded their interests.

73      The general principles relevant to an oppression action are well known and need not be repeated in detail here. They were spelled out most recently in *BCE Inc., Re*, [2008] 3 S.C.R. 560 (S.C.C.). *BCE* stated the following principles that need be considered:

        (a) Oppression is an equitable remedy that gives a court broad, equitable jurisdiction to enforce not just what is legal but what is fair. Courts should look at business realities, not merely narrow legalities.

        (b) The duty of the directors to act in the best interests of the corporation comprehends a duty to treat

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

individual stakeholders affected by corporate actions equitably and fairly. There are no absolute rules. In each case, the question is whether, in all the circumstances, the directors acted in the best interests of the corporation.

(c) One should look first to the concept of reasonable expectations. If a breach of a reasonable expectation is established, one must go on to consider whether the conduct complained of amounts to "oppression", "unfair prejudice" or "unfair disregard" as set out in s. 241(2) of the *CBCA*.

(d) Factors that emerge from the case law that are useful in determining whether a reasonable expectation exists include: general commercial practice; the nature of the corporation; the relationship between the parties; past practice; steps the claimant could have taken to protect itself; representations and agreements; and the fair resolution of conflicting interests between corporate stakeholders.

(e) In determining whether a stakeholder expectation is reasonable, the court may consider whether the claimant could have taken steps to protect itself against the prejudice it claims to have suffered.

74    With respect to determining the reasonable expectations of persons who are debentureholders, which is equally applicable to the Noteholders in this litigation who are also referred to by the parties as bondholders, the trial judge in *BCE Inc., Re* [2008 CarswellQue 2229 (Que. S.C.)], Silcoff J. stated:

There are fundamental conceptual differences between shareholders and debentureholders and their respective rights and obligations. Shareholder rights and obligations are generally governed by statute. ...

Debentureholders, by contrast, generally purchase debentures that have been issued pursuant to trust indentures and prospectuses that define the rights and obligations of the issuers, the trustees and the debentureholders.

Debentureholders' reasonable expectations must be assessed on an objective basis and, absent other compelling reasons, must derive from the Trust Indentures themselves and the relevant prospectuses issued in connection with the debt offerings in question. They form the primary source of the Contesting Debentureholders' expectations and must be read carefully to determine whether their expectations were reasonable.

The reasonable expectations of debentureholders in general ... are more limited than those of shareholders who have not had the opportunity of negotiating adequate protection themselves.

75    Silcoff J. noted that the debentureholders in *BCE* knew or ought to have known about the risk of which they were complaining He said:

LBO risk was certainly a known phenomenon to the 1996 and 1997 Debentureholders. They should have foreseen the risk involved in purchasing these debentures without adequate event risk covenants. If they were not prepared to manage that risk, they should have taken appropriate steps to protect themselves. They chose not to and must accept the consequences of their decisions.

76    The Supreme Court of Canada upheld this reasoning in BCE. It stated:

The trial judge emphasized that the arrangement preserved the contractual rights of the debentureholders as negotiated. He noted that it was open to the debentureholders to negotiate protections against increased debt load or the risks of changes in corporate structure, had they wished to do so.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

We find no error in these conclusions. The arrangement does not fundamentally alter the debentureholders' rights. The investment and the return contracted for remain intact. Fluctuation in the trading value of debentures with alteration in debt load is a well-known commercial phenomenon. The debentureholders had not contracted against this contingency.

77      The business judgment rule is important in considering the actions of the board of Crystallex in this case. It was dealt with extensively in *Pente Investment Management Ltd. v. Schneider Corp.* (1998), 42 O.R. (3d) 177 (Ont. C.A.) by Weiler J.A. She stated:

The mandate of the directors is to manage the company according to their best judgment; that judgment must be an informed judgment; it must have a reasonable basis. If there are no reasonable grounds to support an assertion by the directors that they have acted in the best interests of the company, a court will be justified in finding that the directors acted for an improper purpose.

and

The law as it has evolved in Ontario ... has the ... requirements that the court must be satisfied that the directors have acted reasonably and fairly. The court looks to see that the directors made a reasonable decision not a perfect decision. Provided the decision taken is within a range of reasonableness, the court ought not to substitute its opinion for that of the board even though subsequent events may have cast doubt on the board's determination. As long as the directors have selected one of several reasonable alternatives, deference is accorded to the board's decision: Paramount, supra, at p. 45; Brant Investments, supra, at p. 320; *Thermadel Foundation v. Third Canadian General Investment Trust Ltd.* (1998), 38 O.R. (3d) 749 at p. 754 (C.A.). This formulation of deference to the decision of the Board is known as the "business judgment rule". The fact that alternative transactions were rejected by the directors is irrelevant unless it can be shown that a particular alternative was definitely available and clearly more beneficial to the company than the chosen transaction: Brant Investments, supra, at pp. 314-15.

### (ii) Contention of the Noteholders and Crystallex

78      Mr. Bell said in oral argument that the oppression claim could be summarized in one sentence. He said:

Given the five year history of chasing the permit, after the permit was denied and the rebuttal to the permit was denied, and the appeal to the Minister failed, the bondholders had a reasonable expectation that Crystallex would not spend $60 million of the "creditors recovery" pursuing a high risk and improbable outcome, when a tangible and real strategy existed to get Crystallex on a path to recovery of real value to the stakeholders.

79      What the Noteholders want is that Crystallex now sell off its assets and commence arbitration against the Government of Venezuela. Through their counsel, they have asserted this position for some time before the litigation commenced and afterwards. They argue that the steps Crystallex has taken are not reasonable and not protected by the business judgment rule.

80      Crystallex says that the directors have been faced with a difficult situation with risks involved in whatever they do and they have made reasonable decisions and taken reasonable steps with the help of appropriate legal advice. In doing so, they have considered the position of all stakeholders, including the Noteholders, and have made decisions in the best interests of Crystallex.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

### (iii) Analysis of reasonable Noteholders expectations

81      In my view, the Noteholders have not established a reasonable expectation that Crystallex would do any-thing in particular, including doing what the Noteholders contend should be done, i.e. stop spending money, sell assets and pursue arbitration.

82      The information available to the Noteholders who purchased their Notes from Crystallex at the time of their issuance consisted of company statements and the prospectus. At the annual general meeting on June 1, 2004, Crystallex said it expected to receive final permits in the fourth quarter of 2004 and be in commercial pro-duction in the first quarter of 2006. In a press release of November 9, 2004, one month before the issuance of the Notes, Crystallex said it was now at an advanced stage of the permitting phase and based on the current sched-ule, looked forward to the project commencing production in the first half of 2006. In the prospectus dated December 17, 2004 Crystallex said it currently expected to receive the permit and approvals necessary to com-mence development during the first quarter of 2005.

83      Nowhere in the prospectus was there any discussion as to the steps that Crystallex might take in the event of a delay or denial of the permit. There was, however, plenty of warning that delay or denial of a permit was a possibility. In the prospectus, prospective purchasers were warned of the history of the property, including the prior expropriation of the site from Placer Dome, the fact that permits were required for virtually every as-pect of the project, that it was possible there could be changes to the laws and regulations or their interpretation that could have a significant impact on the operations of Crystallex. The prospectus warned that Crystallex's activities might be adversely affected by political instability which could result in delays or the inability to ob-tain necessary government permits or the deprivation of contractual rights, including expropriation without fair compensation. It warned that Crystallex could not assure whether the necessary permits would be obtainable on acceptable terms or in a timely manner or at all.

84      Thus there could be no expectation of persons who bought Notes at the time of their issuance in Decem-ber 2004 as to what Crystallex would do if faced with a delay or denial of a necessary permit. Even when the permit was denied, Crystallex did not state what particular action it would take. In its press release of May 12, 2008 announcing the denial of the permit, it stated what the appeal procedures were and said that if at the end of these processes the answer was still negative, Crystallex "has a number of legal avenues to pursue both in and out of Venezuela in order to protect its shareholders' rights." No expectation could have been taken by the Note-holders that any particular course of action, such as stopping spending of money and commencing arbitration, would be taken.

85      Other than Mr. Hope, the affiant of affidavits sworn on behalf of the applicants, the Noteholders have not disclosed when they purchased their notes. Mr. Hope is the manager and controlling mind of Outrider Manage-ment, LLC, an American hedge fund that specializes in emerging markets. The Outrider Fund began buying its notes in October 2005. One month before that, President Chavez said in a televised speech that he was reclaim-ing the Las Cristinas mine and was "going to build a national mining company there." Mr. Hope knew about this speech before Outrider bought any bonds. There is certainly no objective basis to conclude that Mr. Hope had any reasonable expectation as to what Crystallex would do in the face of the denial of the permit.

86      *BCE* makes clear, both in the Supreme Court of Canada and at the trial level, that a factor in considering the reasonable expectations of the Noteholders is what steps they could have taken to protect themselves from known risks. Likewise, as stated by Feldman J.A. in *Casurina Ltd. Partnership v. Rio Algom Ltd.*, *supra*, pur-

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

chasers of the Notes had the opportunity to consider their prospective purchase in the context of the terms governing the debentures and on that basis decide whether or not to invest.

87        Apart from the warnings of the risks provided in the prospectus, information regarding political risk in Venezuela was widely available. News sources had reported on President Chavez's violent past, nationalist rhetoric, attacks on economic reform, negative attitude towards business, anti-democratic behaviour, threats to take over the National Bank of Venezuela if it did not surrender foreign currency reserves to him, and accusations of espionage and terrorist sabotage against foreign companies.

88        In the face of this, no protection against these risks was provided in the trust indentures. On her cross-examination, the Noteholders' expert, Marlene Puffer, stated that bondholders know that their interests may not align with the interests of shareholders and this difference of view makes contractual protection critical. She stated that the Noteholders should have reviewed the terms of the trust indenture before buying and if they did not like its contractual protections, they could have insisted that a covenant be added or could have decided not to buy the Notes.

89        Ms. Puffer stated that the trust indentures in this case could have contained protection for the Noteholders by providing for redemption if the permit were delayed or denied. During the negotiations of the trust indentures, Stikeman Elliott, acting for the underwriters whose interests would include trying to negotiate terms that would make the Notes marketable, tried to include a term that would have required Crystallex to redeem the bonds if Crystallex did not receive its environmental permit by March 31, 2005. Crystallex rejected this. The Noteholders knew or ought to have known that without this protection, it would be up to the board of directors of Crystallex to determine how long to pursue a permit and what to do in case of refusals.

90        When the bonds were issued, the prospectus disclosed that Crystallex's ability to pay even interest on the bonds depended on its ability to raise more money in the future. Crystallex raised several hundred million dollars after the Notes were issued. Ms. Puffer acknowledged that the Noteholders could have protected themselves by requiring a sinking fund into which a portion of these funds when later raised could be set aside and held in trust for the Noteholders. This would have protected the Noteholders against the risk of Crystallex pursuing the permit or other alternatives when they felt the repayment of their principal was at risk.

91        There were other clauses that could have protected the Noteholders, such as a put option allowing the Noteholders to demand repayment on specific dates that would allow a Noteholders to reassess the company's financial condition and decide whether their interests were sufficiently aligned with those of the company to continue holding the Notes. This too would have protected Noteholders against the risk that the permit was not obtained within a time frame acceptable to them and against the risk that Crystallex would pursue the permit longer than Bondholders wanted.

92        The Noteholders accepted the risks without the kind of protection discussed. The Noteholders' bond expert Ms. Puffer agreed on cross-examination that the use of covenants comes at a cost. The more covenant protection the trust indenture contains, the lower the interest rate on a bond or note. The greater the risk that shareholders will take actions that will benefit them at the expense of bondholders, the higher the yield on the bond or note.

93        The effective yield of the Crystallex Notes at the time of issue, taking into account the common notes issued with the Notes, was 14.32%. This was 10.42% higher than U.S. treasury notes of equivalent duration. This was also a full 4% higher than the yield associated with the lowest form of rated junk bonds. The yield of a bond

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

or note is the prime measure of risk. The true yield for the any Noteholder who acquired Notes after the initial issue depends on the price they paid. Outrider bought at prices as low as 25 cents on the dollar, with a yield on those bonds therefore of 37.5%.

94      The Noteholders knew they were accepting a large risk in acquiring the Notes. The effective yield on their Notes told them that, as did the express warnings in the prospectus. This is an important factor in considering what their reasonable expectations were. These were sophisticated investors well aware of the risks with no indication of what Crystallex would do if and when faced with a denial of the permit and a threat of expropriation.

95      The argument of the Noteholders is clothed in the language of reasonable expectations, but in reality their complaint is that they do not like the choices that the directors of Crystallex have made in dealing with the problem. The Noteholders would prefer that the directors make choices that the Noteholders perceive to be in their interest. This ignores a fundamental tenet of corporate law. The directors' fiduciary duties are to the corporation only. Directors in acting in the best interests of the corporation may be obliged to consider the impact of their decisions on corporate stakeholders, such as the Noteholders in this litigation. Sometimes the reasonable expectations of a stakeholder coincide with what is in the best interests of the corporation. However, where that is not the situation, it is important to understand that the directors owe their duty to the corporation and not to stakeholders, and that the reasonable expectation of stakeholders is simply that the directors act in the best interests of the corporation. See *BCE*, *supra*, at para 66.

96      In my view, the Noteholders have not established any reasonable expectation on their part that would provide an oppression remedy under s. 241(2) of the *CBCA*.

### (iv) Analyses of the reasonableness of the actions of the Crystallex directors

97      In any event, I am satisfied that the directors of Crystallex have acted in good faith, that their actions and decision have been reasonable and made on an informed basis and, where appropriate, after taking professional advice. The directors are protected in this case by the business judgment rule. No one alternative considered by the board of directors has been shown to be definitely available and clearly more beneficial to the company than other alternatives pursued by the directors.

98      The directors have had an obligation to consider appropriate ways out of the difficult predicament in which Crystallex finds itself. In doing so the directors have been required to weigh and balance risks.

99      Crystallex submits, and I accept, that the directors have balanced various risks at every stage. Over the course of the litigation, the landscape has shifted and the directors have been required to reassess the situation on numerous occasions. They have done so by informing themselves, obtaining appropriate advice, balancing the risks associated with various courses of action and choosing from a spectrum of reasonable alternatives. The directors received legal advice on their duties to the Noteholders in light of requests made on behalf of the Noteholders. The directors considered the interests of both the Noteholders and the shareholders, including those shareholders who have invested in a new financing after the issuance of the Notes. The directors were advised and considered the fact that it could not let the threat of a Noteholder lawsuit influence their judgment about what was in the best interests of the corporation. All of this was appropriate and reasonable.

### (v) Conclusion on oppression

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2009 CarswellOnt 7997, 65 B.L.R. (4th) 281, 183 A.C.W.S. (3d) 732

100      The Noteholders claim for oppression has not been made out. They have not established a reasonable expectation that should be protected by relief. The directors of Crystallex have acted in an informed reasonable manner and are protected by the business judgment rule.

*Application dismissed.*

## APPENDIX A

[101] Much of the factual circumstances involved in this case are covered by a confidentiality order. In coming to my conclusion I have reviewed the evidence and arguments submitted by both the Noteholders and Crystallex. I will set out further reasons in a separate document, Appendix A to these reasons, to be held by the parties subject to the terms of the protective order made by Campbell J. dated March 19, 2009 and not to be disclosed without court order.

**Order**

[102] This application is dismissed. Crystallex is entitled to its costs of this application. If the parties are unable to agree on costs. Crystallex may make written submissions with 10 days and the Noteholders shall have 10 days to respond.

FN1 All dollars in these reasons are US dollars.

FN2 The factum of the Noteholders states that on August 21, 2009, counsel for the Noteholders gave notice to Crystallex that the Noteholders would treat any sale of the equipment that did not enure to the benefit of the Noteholders as being a further act of oppression and/or breach of the Indentures. The letter from Bennett Jones does not expressly use the words "enure to the benefit of the Noteholders" in discussing a sale, but I think the statement in the factum of the Noteholders is a fair reading of the purport of the letter. The letter complained that until very shortly before, the Noteholders had been expecting to negotiate in a way that would advance their interests.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 25

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058



1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

Confederation Treasury Services Ltd., Re

Re bankruptcy of CONFEDERATION TREASURY SERVICES LIMITED

Ontario Court of Justice (General Division), In Bankruptcy

Farley J.

Heard: December 8, 1995
Judgment: December 12, 1995
Docket: Doc. 31-205220

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Lyndon A.J. Barnes*, *Gordon Marantz* and *Tristram Mallett*, for UBS Limited and Arm's Length Creditors Committee of Confederation Treasury Services Limited.

*Harry Fogul*, for Province of Ontario.

*Ronald N. Robertson, Q.C.*, and *Edmond Lamek* for UBS Limited.

*William G. Horton* and *Daniel V. Macdonald*, for U.S. rehabilitator of Confederation Life Insurance Company.

*Benjamin Zarnett* and *Gale Rubenstein*, for Peat Marwick Thorne Inc., agent to Superintendent of Financial Institutions, provisional liquidator of Confederation Life Insurance Company.

*Bruce Leonard* and *John R. Sandrelli* for National Organization of Life and Health Insurance Guaranty Associations.

*Charles F. Scott* and *Ulli Streit* for Compcorp.

*L.A. Wittlin*, for Deloitte & Touche Inc., monitor of Confederation Life Ins. Co. pursuant to *Companies' Creditors Arrangement Act*.

Subject: Corporate and Commercial; Insolvency

Trustees — Appointment — Motion for replacement nominee for trustee — Petitioning creditor bringing motion to have proposed nominee replaced — Other parties opposing nominee as being party that had done extensive forensic investigation on behalf of group of creditors — Motion granted — No evidence to suggest on-going relationship between creditors' group and nominee — No evidence to show that nominee could not fulfil duties in

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

impartial manner — Nominee already familiar with complex case.

In complex proceedings under the *Companies' Creditors Arrangement Act* ("CCAA"), the stay was lifted for the purpose of hearing a motion for a replacement nominee for the trustee. The proposed replacement nominee had done extensive forensic investigation on behalf of a group of creditors in the CCAA proceedings. Other parties opposed the substitution, fearing that the proposed replacement nominee would not be impartial in the bankruptcy proceedings, given its involvement on behalf of the creditors' group in the CCAA proceedings.

**Held:**

The motion was granted.

There was no evidence of an on-going relationship between the proposed nominee and the creditors' group that would influence the nominee from its neutral, impartial role as trustee acting in the best interests of the estate. The nominee was familiar with and knowledgeable about the complex and complicated case and there was no reason to disqualify it. To appoint another trustee would cause a significant delay as that trustee became acquainted with the case and a significant duplication of expense.

**Cases considered:**

*Batteries Included, Inc., Re* (1987), 67 C.B.R. (N.S.) 123 (Ont. S.C.) — *considered*

*Bryant, Isard & Co., Re* (1923), 4 C.B.R. 41, 24 O.W.N. 597 (S.C.) — *considered*

*Cadillac Fairview Inc., Re* (February 9, 1995), Doc. B348/94, Farley J. (Ont. Gen. Div. [Commercial List]) — *referred to*

*Drash, Re* (1930), 11 C.B.R. 402, 38 O.W.N. 295 (C.A.) — *referred to*

*Environdyne Industries, Re*, 150 B.R. 1008 (Bankr. N.D. Ill. 1993) — *referred to*

*Ethier, Re* (1991), 7 C.B.R. (3d) 268 (Ont. Bktcy.) — *referred to*

*Federal Trust Co. v. Frisina* (1976), 28 C.B.R. (N.S.) 201, 20 O.R. (2d) 32, 86 D.L.R. (3d) 591 (S.C.) — *considered*

*Gauthier Lumber Ltd., Re* (1960), 1 C.B.R. (N.S.) 127 (Que. S.C.) — *referred to*

*I. Caron Ltd. v. Robin Hood Mills Ltd.* (1935), 17 C.B.R. 101 (Que. S.C.) — *referred to*

*Lamb, Re; Ex parte Board of Trade*, 1 Mans. 373, 9 R. 636, [1894] 2 Q.B. 805 (C.A.)*considered*

*Martin, Re* (1888), 5 Morr. 129, 21 Q.B.D. 29 — *referred to*

*Micro-Time Management Systems, Re*, 102 B.R. 602 (Bankr. E.D. Mich. 1989) — *referred to*

*Orzy, Re* (1923), 3 C.B.R. 737, 53 O.L.R. 323 at 327, [1924] 1 D.L.R. 250 (C.A.) — *referred to*

*Prince Edward Island v. Bank of Nova Scotia* (1988), 70 C.B.R. (N.S.) 209, 72 Nfld. & P.E.I.R. 191, 223 A.P.R. 191, 2 T.C.T. 4090 (P.E.I. T.D.), reversed (1989), 77 C.B.R. (N.S.) 113, 81 Nfld. & P.E.I.R. 295,

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

255 A.P.R. 295, 2 T.C.T. 4304 (P.E.I. C.A.) — *considered*

*Quinte Nurseries Ltd., Re* (1982), 41 C.B.R. (N.S.) 156 (Ont. S.C.) — *referred to*

*REA Holding Corp., Re*, 4 Bankr. Ct. Dec. 1249 (Bankr. S.D.N.Y. 1979), reversed 2 B.R. 733 (1980) — *considered*

*R.J. Nicol Construction Ltd. (Trustee of) v. Nicol* (1995), 30 C.B.R. (3d) 90, 77 O.A.C. 395 (C.A.) — *referred to*

*Reed, Re* (1980), 34 C.B.R. (N.S.) 83, 28 O.R. (2d) 790, 111 D.L.R. (3d) 506 (C.A.) — *referred to*

*Rizzo Shoes (1989) Ltd., Re* (1995), 29 C.B.R. (3d) 270 (Ont. Gen. Div. [Commercial List]) — *referred to*

*Sharby v. N.R.S. Elgin Realty Ltd. (Trustee of)* (1991), 55 C.C.E.L. 305, 41 E.T.R. 193, 3 O.R. (3d) 129 (Gen. Div.) — *referred to*

*Shaw Co., Re*, 3 C.B.R. 198, 16 Sask. L.R. 275, [1922] 3 W.W.R. 119, 68 D.L.R. 616 (K.B.) — *considered*

*Tannis Trading Inc. v. Camco Food Services Ltd. (Trustee of)* (1988), 67 C.B.R. (N.S.) 1, 63 O.R. (2d) 775, 49 D.L.R. (4th) 128 (S.C.) — *considered*

*W.T. Grant, Re*, 4 B.R. 53 (Bankr. S.D.N.Y. 1980) — *considered*

*W.T. Grant Co. 1, Re*, 699 F.2d 599 (2d. Cir. N.Y. 1983) [cert. denied *Cosoff v. Rodman*, 464 U.S. 822, 70 L. Ed. 2d 97, 104 S. Ct. 89, 52 U.S.L.W. 3262 (1983)] — *referred to*

*Western Canada Beverage Corp., Re* (1993), 22 C.B.R. (3d) 10 (B.C. S.C.) — *referred to*

**Statutes considered:**

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3 —

s. 13.3

s. 13.3(2)

s. 14

s. 14.04

s. 43(9)

s. 102(5)

s. 163

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

Motion for order replacing nominee for trustee.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

*Farley J.*:

UBS Limited — "UBS"

Arm's Length Creditors Committee — "ALC Committee"

Confederation Treasury Services Limited — "Treasury"

Province of Ontario — "Ontario"

U.S. Rehabilitator of Confederation Life Insurance Company — "Rehabilitator"

National Organization of Life and Health Insurance Guaranty Associations — "NOLA"

Confederation Life Insurance Company — "CLIC"

Peat Marwick Thorne Inc. Agent to the Superintendent of Financial Institutions, Provisional Liquidator of CLIC — "Liquidator"

Deloitte & Touche Inc. — "Deloitte"

Richter & Partners Inc. — "Richter"

BDO Dunwoody Ltd. — "Dunwoody"

Doane Raymond Ltd. — "Doane"

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 as amended — "BIA"

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 — "CCAA"

1    Houlden J.A. is supervising the Treasury CCAA proceedings; he lifted the stay for the purpose of my hearing this motion regarding a replacement nominee for the trustee. It is expected that he will lift the stay generally on Dec. 15, 1995 or shortly thereafter once all pressing matters regarding the CCAA proceedings have been dealt with by him. It would then appear that everyone's expectation and desire is that Treasury immediately thereafter be placed in bankruptcy.

2    UBS (the replacement petitioning creditor in the bankruptcy proceedings) moved to amend the petition to nominate Richter as trustee in bankruptcy in place of Deloitte. It also sought a receiving order against Treasury (appointing Richter as trustee) effective immediately following the termination of the CCAA proceedings. As regards the latter motion, it would seem to me that this should be more appropriately dealt with once the CCAA proceedings have terminated. Mr. Barnes argued on behalf of UBS and the ALC Committee; he was supported by Mr. Robertson also acting for UBS and by Mr. Fogul on behalf of Ontario. Deloitte took no part of the argument; it had previously indicated that it was not willing to stand for appointment as trustee (either as sole trustee or in some joint or shared responsibility capacity) unless it had the endorsement of all three major stakeholders — the ALC Committee, Rehabilitator and Liquidator. The ALC Committee was opposed to Deloitte having a role as trustee. Instead it wished to have Richter, a firm which had done extensive forensic investigation on its behalf in the CCAA proceedings, the investigation being essentially of document review but no interviews or

examinations. The substitution of Richter as the trustee nominee was opposed by the remaining participants — Mr. Horton for the Rehabilitator, Mr. Zarnett for the Liquidator, Mr. Leonard for NOLA and Mr. Scott for Compcorp; they preferred that Dunwoody or Doane be the substitute since they submitted that Richter was not impartial in the bankruptcy proceedings given its involvement for the ALC Committee in the CCAA proceedings.

3      The Rehabilitator has tabled a motion which obstensively was to be heard at the same time as this motion for an order:

  1. Declaring that the bankruptcy of [Treasury] shall proceed in accordance with the provisions of the Protocol which is attached as Appendix A [to that motion record].

  2. In the alternative, declaring that section 69.3(1) of [BIA] does not operate with respect to the [Rehabilitator's] claims against [Treasury] as set forth in the draft Statement of Claim attached as Appendix "B" [to that motion record] (the "Ontario Proceedings").

  3. In the further alternative granting the [Rehabilitator] leave to issue and proceed in the Ontario Proceedings; and

  4. such further and other relief as to this Honourable Court seems just.

This motion was certainly premature since the stay had not been lifted for that purpose and it presupposed that the trustee in bankruptcy (once Treasury were declared bankrupt) would be preempted from this motion. I found this quite puzzling, especially since this matter had been previously informally canvassed and the same concerns expressed. This motion was adjourned to a more appropriate time once all interested parties had been canvassed. This overall battle amongst the stakeholders has been fought since the beginning of the CCAA proceedings some sixteen months ago. Despite this intimate, intensive and extensive involvement it was candidly volunteered by the Rehabilitator that the matter was complicated beyond any comprehension and that it could not be even described after all this time. Thus in the Michigan material there were claims advanced by the Rehabilitator on the basis of eleven separate (and distinct) grounds. It would not seem that the Rehabilitator is estopped from pleading in the alternative: see (*Sharby v. N.R.S. Elgin Realty Ltd. (Trustee of) (1991), 3 O.R. (3d) 129* (Gen. Div.) at pp. 140-1), at least at this stage of the proceedings.

4      I would also note that the estate is of the magnitude of some $630 million dollars, all of which except approximately $30 million dollars (plus or minus a very wide allowance) is in the form of "cash". Thus while the major percentage of the estate has been liquidated, it is clear that there is a sizeable absolute amount of the number of various types of assets to be gathered in, subject to of course assorted disputes. If this latter role were hived off, it would comprise a major bankruptcy estate by itself.

5      It would appear that Richter, Dunwoody and Doane are willing to be considered as nominees. Deloitte has removed itself from the running, based upon its unfulfilled condition. Other firms are conflicted out.

6      Perhaps it is the fact that

  (a) the major stakeholders have been warring in a very negative sense for over a year.

  (b) the potential losses for each are quite sizeable, in the hundreds of millions, when each with moral legit-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

imacy looks upon their own "ultimate" situation as an innocent who has been mugged,

(c) there is a great deal of money ($630 million dollars odd) which may be recovered out of the estate.

(d) under certain scenarios it is conceivable that a stakeholder could obtain a benefit before the others and under other scenarios the stakeholder might be shut out from that estate.

(e) tactics may appear at first glance to give more relief (or inflict a negative relief upon the others) than strategies,

(f) stakeholders may be unsure of their comparative positions and interests despite ample opportunity to reflect upon same,

(g) some undisclosed factor(s) or

(h) a combination of some or all of the foregoing,

which has resulted in all concerned attempting to introduce a lot of colour and atmosphere plus premature arguments into these proceedings. I would not think that helpful in the long run, neither for these proceedings in general nor for the interest of the stakeholders so advancing this tinged view of things and trying to set the stage for future battles. However on reflection I trust that counsel and their clients will appreciate that this is unproductive.

7      The ALC Committee and specifically UBS appear to represent creditors of Treasury who loaned funds to Treasury in a commercial situation, taking the benefits of that loan together with its commercial risk. The other side may to some degree or other have claims against the $630 million dollars which may be in the nature of property or trust claim (or something similar) which I will hereafter describe as a proprietary claim which would take some or all of the $630 million dollars out of the estate (and thus away from the potential dividend to be shared amongst the creditors). There also seems to be the possibility of a claim which although a "creditor claim" within the estate is advanced on the basis that it should enjoy a priority and be paid out before the "ordinary" creditor claims, this priority not being of a temporal nature but rather of a preference nature. I think it fair to observe that the rights and entitlements advanced are not so clear cut that, at least at this stage, it would be inappropriate for any trustee to acquiesce and hand over the funds. Unless there is some compromise achieved, it is painfully obvious that there will be litigation. This litigation may be as to a dispute between the trustee and someone claiming that it has a proprietary right which takes assets out of the estate (see the comments of Goodman J.A. in *R.J. Nicol Construction Ltd. (Trustee of) v. Nicol* (1995), 30 C.B.R. (3d) 90 (Ont. C.A.) at p. 94 or it may be a dispute amongst creditors within the estate (see the views of Ferguson J.A. in *Re Orzy* (1923), 3 C.B.R. 737 (Ont. C.A.) at p. 741 and of Hodgins J.A. at p. 738) or a combination thereof. While the trustee would have an active role in the proprietary claim dispute, it would seem to me on a casual observation of the trustee's role in a dispute between creditors in the estate would primarily be that of a true stakeholder (i.e. in its "original" sense of someone who merely holds the stakes being wagered or fought over as opposed to the "modern" additional sense used by the participants here of someone who claims to have a stake in the outcome of these proceedings) and, as may possibly be required, ensure that the participants observe the rules of the game, even if only on a report basis to the court or by asking for advice and directions.

8      In this regard and regard and generally the trustee is an officer of the court. As stated in *Houlden and Morawetz, Bankruptcy Law in Canada* (3rd ed. 1995) at pp. 1-61/2:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

The trustee is an officer of the court and should impartially represent the interests of creditors: *Re Roy* (1963), 4 C.B.R. (N.S.) 275 (Que. S.C.). He should act equitably and, as far as possible, hold an even hand between competing interests of various classes of creditors: *Re Reed* (1980), 34 C.B.R. (N.S.) 83, reversing 32 C.B.R. (N.S.) 203 (Ont. C.A.). In bringing proceedings, such as an application to set aside a fraudulent preference, he should not adopt an adversarial or hostile role: *Touche Ross Ltd. v. Weldwood of Canada Sales Ltd.* (1983), 48 C.B.R. (N.S.) 83, additional reasons at 49 C.B.R. (N.S.) 284 (Ont. S.C.). Rather, he should present the relevant facts to the court in a dispassionate, non-adversarial manner, and leave the matter to the court for decision.

. . . . .

The trustee's obligation is to act for the benefit of the general body of creditors, not just the benefit of unsecured creditors. He must not, therefore, act in a manner which is prejudicial and unfair to the interests of secured creditors: *Re Bell's Ltd.: Bank of Montreal v. Touche Ross Ltd.*, 60 C.B.R. (N.S.) 224, [1986] 4 W.W.R. 211, 48 Sask. R. 241 (Sask. Q.B.).

A trustee in bankruptcy does not function as an agent of the creditors in the ordinary sense, but as an administrative official required by law to gather in and realize on the assets of the bankrupt, and then to divide the proceeds among those entitled thereto in accordance with the scheme set out in the Bankruptcy Act: *Clarkson Co. v. Muir* (1982), 43 C.B.R. (N.S.) 259, 53 N.S.R. (2d) 609, 109 A.P.R. 609 (C.A.).

9      Mr. Barnes submitted that there were two issues before me — firstly that there was no legal impediment against Richter acting as trustee since there was nothing to prevent a person from becoming such merely because of an association of a nature such as here, where Richter has been acting as a forensic investigator for the ALC Committee (which includes representation of UBS) and secondly that Richter is an appropriate person to nominate (and appoint) in the circumstances.

10      I would observe that Richter does not appear on the material before me to have a problem of possible disqualification pursuant to s. 13.3. of BIA. If there were any potential conflict of interest as set forth in that section, it should disclosed at the time of appointment and at the first meeting of creditors if it falls within s. 13.3(2).

11      S. 43(9) BIA provides that:

On a receiving order being made, the court shall appoint a licensed trustee as trustee of the property of the bankrupt, having regard, as far as the court deems just, to the wishes of the creditors.

S. 102(5) BIA states:

The purpose of the first meeting of creditors shall be to consider the affairs of the bankrupt, to affirm the appointment of the trustee or substitute another in place thereof, to appoint inspectors and to give such directions to the trustee as the creditors may see fit with reference to the administration of the estate.

See also s. 14 and s. 14.04 of BIA. I did not find it helpful for Mr. Fogul to point out that Ontario could lead a move to appoint Richter as trustee at the first meeting of creditors if it were not so appointed as trustee upon the receiving order being made since such action would be, to my mind, quite inappropriate if I were to determine in

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

this motion that Richter were for some reason "disqualified" in the circumstances.

12        In *Re Quinte Nurseries Ltd.* (1982), 41 C.B.R. (N.S.) 156 (Ont. S.C.) at p. 160 Saunders J. observed:

> The choice of trustee is for the creditors and, in my opinion, the nominee of the petitioning creditor should be appointed pending the first meeting of creditors when the final determination will be made.

I would be of the view that Registrar Ferron's opening words in *Re Batteries Included, Inc.* (1987), 67 C.B.R. (N.S.) 123 (Ont. S.C.) at p. 123:

> The court is not bound to appoint a trustee named in the petition by the petitioning creditor, nor is the official receiver required to appoint a trustee named by the debtor as the assignee in an assignment.

must be taken in context. In that case he went on to examine the various reasons why he appointed another trustee than the one nominated by the petitioning creditor (recognizing this was an interim appointment until the first meeting of creditors). He observed at p. 124:

> I chose to appoint Yale, Kline, Geary Limited as the trustee in place of Collins Barrow Limited, named in the petition for several reasons, none of which have anything to do with competency and integrity.

> In my opinion, in this instance Yale, with whom the debtor filed its assignment, is in a better position to administer the estate. That firm has already been involved in a watching brief for a secured creditor, and has a fairly extensive knowledge of the debtor company.

> In addition Yale has identified the company's assets and liabilities, and has in fact prepared a preliminary statement of affairs which accompanied the assignment. That work will not now have to be duplicated.

> Further, four creditors of the debtor have expressed a preference for Yale, I suppose because of the above factors, and their wishes should at least be given some standing in the matter.

> Finally, there is a suggestion that the debt owing to petitioning creditor is disputed. It seems to me that it would not be appropriate in these circumstances to appoint Collins Barrow Limited as trustee because of the potential for conflict.

This fits within the philosophy of *Re Drash* (1930) 38 O.W.N. 295 (C.A.) at p. 296. See also *I. Caron Ltd. v. Robin Hood Mills Ltd.* (1935), 17 C.B.R. 101 (Que. S.C.) at p. 102.

13        Houlden J.A. for the court in *Re Reed* (1980), 34 C.B.R. (N.S.) 83 (Ont. C.A.) said at p. 86:

> ... Unless this inquiry is carried out, the credit union may be dealt with unfairly. A trustee in bankruptcy should act equitably and so far as possible hold an even hand between the competing interests of various classes of creditors. As James L.J. said in *Re Condon; Ex parte James* (1874), 9 Ch. App. 609 at 614 (L.JJ.):

> > I am of opinion that a trustee in bankruptcy is an officer of the Court. He has inquisitorial powers given him by the Court, and the Court regards him as its officer, and he is to hold money in his hands upon trust for its equitable distribution among the creditors.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

See also my view in *Re Rizzo Shoes (1989) Ltd.* (1995), 29 C.B.R. (3d) 270 (Ont. Gen. Div. [Commercial List]) at pp. 277-8 including my observation:

> I think it also fair to observe that in deciding whether or not the trustee has acted properly the court must be careful to judge the trustee's conduct in light of the circumstances as they existed at the time the trustee performed the act or made the decision: see *Cocks v. Chapman*, [1896] 2 Ch. 763 at 777 (C.A.).

14      A trustee may be removed for cause: see *Houlden and Morawetz, supra*, at p. 1-52 where the authors observe:

> "Cause" means misconduct, fraud, dishonesty, becoming bankrupt or otherwise incapable of acting as a trustee: *Re Herman* (1930), 11 C.B.R. 239 at 246. Cause is not, however, restricted to dishonest conduct; misconduct short of dishonesty is sufficient: *Re Bryant Isard* (1923), 4 C.B.R. 41, 24 O.W.N. 597 (S.C.).

> Cause exists: (a) if there is conduct showing that it is no longer fit that a person should continue as trustee; (b) if there is a danger to the estate property; (c) if there is a want of reasonable fidelity; (d) if circumstances prevent the creditors from working in harmony with the trustee; (e) if the trustee cannot act impartially; (f) if there has been an excess of power by the trustee; (g) if there has been a lack of *bona fides* by the trustee; or (h) if there has been unreasonable conduct by the trustee in relation to the bankrupt estate. The main principle upon which the jurisdiction of the court is exercised in ordering the removal of the trustee, is the welfare of the creditors and of the bankrupt estate. The trustee must not undertake a duty and put himself in a position that is in conflict with his duty as trustee, or act in a manner that is inconsistent with that duty. If the trustee has placed himself in a position of conflict, he cannot continue as trustee; he must resign or be removed by the court; *Re Commonwealth Investors Syndicate Ltd.* (1986), 61 C.B.R. (N.S.) 147, 69 B.C.L.R. 346 (S.C.), additional reasons at (1986), 62 C.B.R. (N.S.) 308 (B.C.S.C.). In the *Commonwealth* case, the trustee was removed because he had improperly delayed the winding up of the bankrupt estate for several years.

> . . . . .

> Even if a trustee is not dishonest, the court, if it is of the opinion that he has not acted in the best interests of creditors and that he cannot act in concord with the inspectors, may remove him and appoint a new trustee: *Re Gauthier Lumber Ltd.; Vanasse Tire Ltd. v. Tardif* (1960), 1 C.B.R. (N.S.) 127 (Que. S.C.).

> Where a trustee wishes to be relieved of its duties as trustee in bankruptcy, the court can appoint a substitute under s. 14.04. "Cause", in s. 14.04, embraces a trustee who is incapable of acting for any reason: *Re Philip's Manufacturing Ltd.* (1992), 16 C.B.R. (3d) 127 (B.C.S.C.). Where it would be difficult for a trustee to act impartially and impossible for it to sue itself, a substitute trustee will be appointed: *Re Philip's Manufacturing Ltd.*, supra.

In *Re Bryant, Isard & Co., supra*, Fisher J. was quite caustic with his comments about the actions of the trustee, he said at p. 52 [C.B.R.]:

> I find the trustee guilty of misconduct and abuse of his office in making these payments and retaining the cheques.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

. . . . .

The trustee who is an officer of the Court, has no right to make free with creditors' moneys committed to his charge.

However he did not remove the trustee, although he sanctioned the trustee with making the estate good on the inappropriate payment and indicated that his order was without prejudice to the creditors removing the trustee. Fisher J. in doing so observed at p. 53:

The Court, on an application to remove a trustee for cause, exercises a judicial discretion. The sole question for me to determine in this case is whether there is in the evidence submitted, sufficient cause shewn that the trustee, J.L. Thorne, is unfit to be continued as trustee in the administration of this estate. The estate is a large one, with many important and complicated business problems to solve before the estate can be finally wound up, and while it is the duty of the Court to vindicate the law but in doing so to abstain if possible from injury to those who are vitally, and beneficially interested, to inflict a needless injury on them and vindicate some legal principle should be avoided. Here to transfer the administration of the estate would involve the necessity of a large additional expense, and delay. Therefore, notwithstanding my findings, I will not adopt the extreme course of removing the trustee from office for the following reasons:

(1) It would add to the great expense already incurred in this estate.

(2) The trustee is conversant with the estate, and is in a much better position than a new trustee would be in assisting the Crown authorities in the pending criminal proceedings against N.P. Bryant, and also in the civil actions awaiting trial; and

(3) The creditors at the meeting of December 4, 1922, and the inspectors at the meeting in May, 1923, were not in favour of removing the trustee, and counsel representing Ottawa, Toronto and Montreal creditors urged before me that it the wish of their clients that the trustee should not be removed, but if what has come to light on this application should lead the creditors to change their opinions they have power to do so under the Act. An authorized trustee, as I have pointed out, is an officer of the Court and must administer the estate in his charge in accordance with *The Bankruptcy Act*.

So to in appointing a trustee the Court is exercising a judicial discretion. No one should take too lightly the burdens and responsibility of securing such an appointment. The appointment is not a franchise to make money (although a trustee should be rewarded for its efforts on behalf of the estate) nor to favour one party or one side. The trustee is an impartial officer of the Court; woe be to it if it does not act impartially towards the creditors of the estate. Miquelon J. in *Re Gauthier Lumber Ltd.* (1960), 1 C.B.R. (N.S.) 127 (Que. S.C.) said at pp. 135-6:

On ne peut certes pas affirmer que l'intimé a été malhonnête. Par ailleurs, la Cour ne peut non plus dire qu'il a été un gérant impartial, chargé qu'il était par la loi, de protéger les intérêts de tous les créanciers. Les créanciers garantis sont généralement en état de se protéger et leurs intérêts sont assez souvent contraires à ceux des créanciers ordinaires. Ce sont ceux-ci que le syndic représente d'abord et ils ont droit à ce que la conduite d'un syndic soit au-dessus de tout soupçon.

15      McQuaid J. in *Prince Edward Island v. Bank of Nova Scotia* (1988), 70 C.B.R. (N.S.) 209 (P.E.I. T.D.) reversed on other grounds (1989), 77 C.B.R. (N.S.) 113 (P.E.I. C.A.) had concerns about the propriety of ap-

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

pointing a former privately appointed receiver-manager as trustee. His concerns would appear to be expressed as part of his decision in an obiter fashion when he said at p. 220:

> It is clear that, immediately upon his appointment, the trustee in bankruptcy is in full, complete and exclusive control of the bankrupt business and all of the assets thereof, to the total exclusion of the owner, operator or manager of the business. I think it may be said that those erstwhile functionaries, whatever their capacity might have been, become functus upon that appointment. This would clearly include any receiver-manager who might have been in place at the time of the bankruptcy.

> It is the duty of the trustee, who is an officer of the court, to represent impartially the interests of all creditors; he is obligated to hold an even hand as between competing classes of creditors; he must act for the benefit of the general body of creditors; he is not an agent of the creditors, but an administrative official required by law to gather in and realize on the assets of the bankrupt and to divide the proceeds in accordance with the scheme of the *Bankruptcy Act* among those entitled. And perhaps most importantly, he must conduct himself in such a manner as to avoid any conflict, real or perceived, between his interest and his duty.

> *While it may not be incompatible with the scheme of the Bankruptcy Act, or, indeed, with the role of the trustee in bankruptcy, the propriety of appointing the former receiver-manager as trustee is a matter of serious import. The two functions are certainly incompatible, if not in actual conflict.*

> As in this instance, the receiver-manager is, in fact, the nominee of the major creditor, put into place as the watchdog on behalf of that creditor, essentially to preserve and hopefully to realize upon the assets of the business for the benefit of that creditor albeit as the agent of the company. That is normal, prudent business practice, not to be criticized, and something which happens regularly in the world of commerce.

> On the other hand, the trustee, who is in actuality an officer of the court, rather than a single creditor's nominee, must represent all creditors, and ensure that conflicting interests are resolved equitably. He must not only act without interest or bias, but must be clearly perceived to be acting without interest or bias.

> That perception may be difficult to maintain when he who yesterday was the man of a single creditor must today act, and be seen to act, as the man of all creditors. (Emphasis added).

As seen by the emphasized words he recognizes that such an appointment may not be incompitable with the BIA or the role of a trustee. It would appear on a reading of the case that McQuaid J. was concerned about there were aspects in which as a receiver-manager representing the interests of a secured creditor the firm in question was not recognizing various aspects which it should have as trustee. For instance he states at pp. 221-2:

> ... It is inconceivable to me that Doane Raymond would not know that Doane Raymond was sitting on a cash deposit representing the assets of the firm whose bankruptcy it was administering.

> I find it equally difficult to believe that "the funds realized from the sale by the Receiver [i.e., the corporate entity of Doane Raymond] of the assets of Island Jewellers were paid to the Bank without the participation or consent of the Trustee in Bankruptcy [i.e., the corporate entity of Doane Raymond]". Is the local office that large that the right hand does not know what the left hand is doing?

16      In *Federal Trust Co. v. Frisina* (1976), 20 O.R. (2d) 32 (S.C.) Galligan J. raised the question of percep-

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

tion or appearances as to a court appointed receiver-manager (i.e. one which was appointed by the court and not privately) when he observed at p. 35:

> Whatever may be required of a person whom a Court will appoint as receiver-manager of a property I think that such a person must be reasonably competent to perform the duties entrusted to him and must be disinterested and impartial so as to be able to deal with the rights of all persons with an interest in the property in a fair and even-handed manner. It ought to be remembered that a receiver-manager appointed by the Court under s. 19 of the *Judicature Act*, becomes an officer of the Court and is therefore very different from a person appointed manager by a mortgagee in possession. That person is simply the agent of the mortgagee.

> I think it follows that not only must the receiver-manager appointed by the Court be impartial, disinterested and able to deal with the rights of all interested parties in a fair and even-handed manner, but he ought to appear to have those qualities.

> A good part of the argument on the motion was taken up with a discussion of the relative competence of Geisel and Lousbury. If all else were equal, it would seem to me to be sensible to appoint that person whom the Court thought to be the more competent. In this case, it seems that both have sufficient competency to perform the duties of a receiver-manager, but because of the view I take of the case it is unnecessary for me to weigh the relative competence of them.

> The evidence discloses two facts that in my opinion seriously mar the appearance of impartiality and disinterestedness which I think Geisel ought to have if he is to be appointed the receiver-manager. I do not intend to cast aspersions upon him by suggesting that, in fact, he would not act impartially and be disinterested, but I do not think he ought to be appointed if circumstances exist which would raise in the mind of a reasonable and intelligent man a real apprehension that he lacked impartiality and disinterestedness.

However it is important to appreciate that the test here is of a reasonable and intelligent man, i.e. one who is objective and who has been informed of all material facts. However in that case it was determined that the receiver-manager in question, as an officer of the court would not pass muster on such an objective test since he had a close and direct business relationship with the second mortgagee applicant as he owed that trust company five million dollars and further that he owned a building which would be in direct competition for tenants with the building which was the subject of the receivership.

17      Thus there would appear to be healthy objective reasons for scepticism about the impartiality appearances in both *Federal Trust* and *Prince Edward Island, supra,* based on actual financial competition and *Federal Trust* and the incapability of simultaneously being involved in several roles in *Prince Edward Island.*

18      I think it instructive to read *Tannis Trading Inc. v. Camco Food Services Ltd. (Trustee of)* (1988), 67 C.B.R. (N.S.) 1 (Ont. S.C.) in conjunction with Dr. Morawetz's annotation found at pp. 2-3 of that report. In that case CCL was an audit client of the trustee's organization, which was found to be "an important and valued relationship" (p. 6). At that same page it was determined that "the claims [of the estate] against CCL ... are crucial to the administration of the estate". Saunders J. went on to say at pp. 6-7:

> It appears that the trustee and the inspectors feel that the trustee has acted impartially and will continue to do so. It is likely that such will be the case. That, however, is not the test. In a situation such as this, the

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

court must consider from an objective point of view whether it would be difficult for the trustee to act with impartiality: see *Re Shaw Co.*, 16 Sask. L.R. 275, 3 C.B.R. 198, [1922] 3 W.W.R. 119, 68 D.L.R. 616 (K.B.). In my opinion, the answer in this particular case is clearly in the affirmative. The trustee is, in effect, suing its own client. On the particular facts, I am of the opinion that there is a potential for a conflict of interest and, perhaps more importantly, there is an appearance of conflict. An unsecured creditor seeks the removal of the trustee. There is no suggestion that the request is not bona fide. In my opinion, in the special circumstances of this case, the trustee ought to stand aside or be replaced.

Dr. Morawetz observed at pp. 2-3:

> In ordering that the trustee should be removed, the court relied on the judgment of the Saskatchewan Court of King's Bench in the case of *Re Shaw Co.*, 16 Sask. L.R. 275, 3 C.B.R. 198, [1922] 3 W.W.R. 119, 68 D.L.R. 616, which in turn, relied on the English case of *Re Lamb*, [1894] 2 Q.B. 805, 64 L.J.Q.B. 71 at 74 (C.A.), and held that the court must consider from an objective point of view whether it would be difficult for the trustee to act with impartiality. The court was of the opinion, that there was a potential for a conflict of interest and, perhaps more importantly, there was an appearance of conflict.

> The judgment in the *Shaw Co.* case is very short, and no reference was made to one of the leading Ontario cases, *Re Bryant, Isard & Co.; Ex parte Higginson* (1923), 24 O.W.N. 597, 4 C.B.R. 41 (S.C.). In that case the court considered the removal of a trustee from office to be an extreme course and refused to remove the trustee because: it would add to the great expense already incurred in the estate; a new trustee would not be as conversant with the estate as the present trustee; and neither the inspectors nor the creditors were in favour of removing the trustee. Although in the *Bryant, Isard* case the court did not remove the trustee, the order was made without prejudice to the rights of the creditors to remove the trustee and appoint another in its place if so advised.

See also *Re Ethier* (1991), 7 C.B.R. (3d) 268 (Ont. Bktcy.) at p. 273.

19    In *Shaw, supra*, it should be noted at p. 199 that the trustee had as some (material) shareholders (and a director) persons who were making large claims in the estate of the bankrupt company. As for *Lamb, supra*, the trustee was a creditor of two estates which were in competition with each other as to ownership of the only asset of value as A.L. Smith L.J. said at pp. 820-1:

> Now, what is the salient point in this case? If a man has a pecuniary interest in the success of one estate which is the creditor of another estate, and he has no pecuniary interest in the success of the other estate, and he is called upon to act for both, it seems to me that a prima facie case is made out that he is placed in a difficulty as regards acting with impartiality between the two. It is obvious — everybody knows it who has any knowledge of life — that when a man has a pecuniary interest, his mind is naturally warped in favour of his own interest. It is human nature, and no one can doubt it. Beyond all question Mr. Gregson has a pecuniary interest as a creditor to the amount of 3,000*l.* in the success of Emerson's estate. As regards Lamb's estate he as a creditor has a pecuniary interest of only 400*l.*, and it is said that Emerson's estate is a creditor of Lamb's estate. Standing in this position between the two estates, can it be said with truth that Mr. Gregson's connection with Emerson's estate is not such as to make it difficult for him to act with impartiality towards Lamb's creditors? This is the real question, and that question my brother Vaughan Williams did not put to himself. If he had done so, I think he would have answered it in the same way as I am now doing. We are

not suggesting that Mr. Gregson is not a gentleman of probity — not a word has been said about that — but the question is, whether upon the facts of the case the objection of the Board of Trade to his appointment as trustee of Lamb's estate was a valid objection. In my judgment it was.

20     I think it instructive to recall what Cave J. said in *Re Martin* (1888), 21 Q.B.D. 29 at p. 33:

> The objection which is taken here is the third of those objections, namely, that the connection of this trustee with, or his relation to, the bankrupt or his estate makes it difficult for him to act with impartiality in the interests of the creditors generally. It is not easy to lay down any general rule, and indeed it is a question of fact with regard to which it is, to my mind, impossible to lay down any accurate general rule. Every case must depend more or less upon its circumstances, and, having regard to the expressions in the Act, one must see whether the facts are such as to lead to the conclusion that the trustee's connection with or relation to the bankrupt or his estate makes it difficult for him to act with impartiality.

21     Is there such a problem for Richter in these circumstances? I think not if one looks at the situation well informed and objectively. As Tysoe J. in *Re Western Canada Beverage Corp.* (1993), 22 C.B.R. (3d) 10 (B.C. S.C.) stated at p. 18:

> ... It has become fashionable to allege conflicts of interest but the Court will not act out of fashion.

It should almost go without saying (and would not be said but for the unfortunate wrangling history of this case) that once Richter were appointed trustee it bears allegiance to the creditors of the estate as an officer of the Court. It is not beholden to any of the creditors on an individual (or segregated) basis and certainly not to UBS, Ontario or the ALC Committee. Its loyalty is to the creditors as they are found — be it UBS, Ontario, other creditors represented by the ALC Committee, the Rehabilitator or Liquidator — as a collective group. So long as it does so then it will not have a problem with impartiality or conflict of interest.

22     NOLA submitted in its factum that it recommends the appointment of an independent, impartial trustee, citing at p. 6 thereof:

> See 11 U.S.C. s 101(14) (E). *In re Micro-Time Management Systems Inc.*, 102 B.R. 602 (Bankr. E.D.Mich. 1989) (Bankruptcy trustee held disqualified because of professional relationship with and consultant work for a major creditor of estate); *In re Envirodyne Industries Inc.*, 150 B.R. 1008, 1019 (Bankr. N.D. Ill. 1993) ("The key issue is whether the [allegedly disinterested] firm's interest in maintaining the client relationship with Salomon, the substantial party-in-interest, could impair the firm's ability to act with impartiality, even unconscious impartiality.")

This was responded to by American counsel (Chaim Fortgang) for the ALC Committee who faxed a submission as follows:

> In ¶17 of the factum of [NOLA], counsel cites two U.S. Cases for the proposition that under U.S. Law, representation of a creditors' Committee would be a basis to disqualify a professional from acting as trustee or as a professional for a trustee. The cases cited do not so hold at all. They stand for the proposition that prior representation of a *target* in a potential litigation against the target would disqualify a professional from act-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

ing on behalf of the estate, because he could not be expected to vigorously pursue a former client. The law in the U.S. clearly permits counsel for a creditors' committee to become counsel to a Trustee after the creditors' committee has been disbanded.

In a case remarkably similar to the instant situation a contested secured claimant objected to counsel for the creditors' committee functioning as counsel for the trustee. It was alleged inter alia, by the contested secured creditor, that counsel for the creditors' committee advised against a settlement of litigation involving subordinating the claim of the secured creditor proposed by the secured creditor and thus was not disinterested.

The court noted that disqualification motions are often used for purely tactical reasons and the impending conflict between the secured creditor and counsel was not a basis for disqualifying counsel for the trustee.

The objecting party argued that the bankruptcy Code intended to disqualify any person who in the slightest degree had some interest or relationship that would color the independent and impartial attitude required by the Code. Thus counsel should be disqualified. The court disagreed and said "It is *clear* that a law firm's prior representation of a Creditors' committee does not disqualify it from representing a trustee in bankruptcy." In a REA Holding Corporation 4 BCD 1249 (Bkptcy S.D.N.Y. 1979). In re W.T. Grant 4 B.R. (53 Bkptcy S.D.N.Y. 1980).

The Court further observed "Indeed, their previous familiarity with this case through their preparations on behalf of the creditors' committee will station this firm in a position where further delay and expense should be eliminated which might otherwise have been incurred if another law firm were brought into this case by the trustee to investigate the underlying events and transactions."

Counsel to NOLA apparently does not appreciate the distinction between having represented an individual creditor with an adverse interest which may be a basis for disqualification and having represented a creditors' committee (which *is* the estate) which *can not* be a basis for disqualification.

23    I have a number of varying observations concerning these submissions. While I appreciate that there are foreign elements in this matter, including American elements, what we have here is the nomination and appointment of a trustee for a bankrupt estate in Canada pursuant to BIA. That process if governed by Canadian law and a Canadian statute. That is not to say that judges of our court are chauvinistic or xenophobic. To the contrary, we will consider foreign jurisprudence in context and specifically where there appears to be a gap in our jurisprudence. As I said however in another case: *Re Cadillac Fairview*, unreported, released Feb. 9, 1995 at p. 7 for somewhat different purposes:

> Recognizing that this is a *CCAA* proceeding which will be governed by Canadian law, perhaps it would be highly desirable for Canadian counsel for all stakeholders to ensure that their clients (and their non-Canadian counsel) appreciate some of the differences between our reorganization law and procedures and that with which they may be more familiar.

When I speak of taking foreign cases in context, one of the most obvious aspects is to consider whether foreign statute law is substantially different in essential elements. However it may be appropriate, keeping in mind that the U.S. legislation has a detailed overwhelming impact on these American cases to review how that jurisdiction views potential conflict situations.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

24      Further I would observe that it is unfortunate that it was left up to this court to determine that *REA, supra*, had been ruled upon by the U.S. District Court (S.D.N.Y.) on January 14, 1980 (2 B.R. 733) and the case remanded back to the Bankruptcy Court for reconsideration (as to which see Bankr. L.Rep. (CCH) P67 483, 22 Collier Bankr. Cas. (MB) 1051 (Bankr. S.D.N.Y. 1980)). However it appears to me that this appellate decision was based upon a question of failure to disclose potential conflict of interest and not upon the fact of co-counsel's prior involvement with the creditors' committee in superseded chapter XI proceedings which had been found by the Bankruptcy Court not to conflict with its present role in the bankruptcy proceedings. The prior involvement with that creditors' committee did not appear to trouble the appellate court. As Galgay J. (the bankruptcy judge) said at p. 1253:

> The law firm served as counsel to the Official Creditors' Committee during the REA Chapter XI proceeding but at no point in the REA proceeding did Whitman & Ransom represent any particular railroad or airline. The role of counsel to an official creditors' committee is not adverse to or in conflict with the role of counsel to a bankruptcy trustee if liquidation should subsequently ensue.

25      In *Grant, supra*, decided a month after the release of the appellate decision in *REA*, Galgay J. said at pp. 82-3:

> ... It is also asserted that WGM's role as co-counsel to the Chapter XI Creditors' Committee constitutes a disqualification factor.

> [34] This Court recently had the opportunity to review the factors to be considered in entertaining a motion to disqualify attorneys for a trustee in re REA Holding Corp., 4 Bankr.Ct.Dec. 1249 (S.D.N.Y. 1979). The disqualification of both a trustee and his co-counsel was sought upon alleged conflicts of interest which prevented them from adequately representing the interests of the bankrupt estate. Among the alleged conflicts cited was the fact that the counsel for the trustee had represented the Creditors' Committee during the Chapter XI case that preceded an adjudication in bankruptcy and the retention of such counsel by the trustee. In considering that motion I was guided by the teachings of Emle Industries, Inc. V. Patentex, Inc., 478 F.2d 562 (2d Cir. 1973). Emle admonishes courts to recognize their "responsibility to preserve a balance, delicate though it may be, between an individual's right to his own freely chosen counsel and the need to maintain the highest ethical standards of professional responsibility." 4 Bankr.Ct.Dec. at 1253 (citation omitted). Additionally, I noted the difficulties involved in evaluating the claims asserted in the perspective of the guidelines provided by United States v. Standard Oil Company, 136 F.Supp. 345, 367 (S.D.N.Y. 1955), which states:

> When dealing with ethical principles, it is apparent that we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts of precise application of precedent.

> I concluded and reaffirm that "(t)he role of counsel to an official creditors' committee is not adverse to or in conflict with the role of counsel to a bankruptcy trustee if liquidation should subsequently ensue." 4 Bankr.Ct.Dec. at 1253.

In the appeal decision of *Re W.T. Grant Co. 1*, 699 F.2d 599 (2d. Cir. N.Y. 1983) Friendly J. in dismissing the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

appeal said at p. 613:

> We see no reason to disagree with Judge Galgay's reaffirmation, 4 B.R. at 83, of his conclusion in *In re REA Holding Corp.*, 4 Bankr.Ct.Dec. 1249, 1253 (Bankr.S.D.N.Y. 1979), vacated and remanded on other grounds, 2 B.R. 733 (S.D.N.Y. 1980), that "[t]he role of counsel to an official creditors' committee is not adverse to or in conflict with the role of counsel to a bankruptcy trustee if liqui dation should subsequently ensue." WGM's previous representation of one or more of the banks or their subsidiaries in unrelated matters is scarcely a ground for disqualification. There is no contention that WGM regularly served any of the banks in bankruptcy cases, and their having done so in one or more unrelated cases would not prevent a vigorous assertion of the claims of the subordinated debentureholders against the banks. On an issue of this sort particular weight should be given to the conclusion of the Bankruptcy Judge, who had abundant opportunities to observe the activities of WGM over many months and concluded "that the Trustee's attorneys have served him and the creditors of the bankrupt estate with vigor, objectivity and independence."

26    I think it appropriate to take a look at the fact situations in *Micro-Time* and *Envirodyne, supra*. In both there would appear to be a problem with ongoing relationships of significance with creditors who may be adverse in interest to the bankrupt estate. In *Envirodyne* at pp. 1018-9 Schwartz C.J. said:

> ... Judge Schmetterer based the American Printers decision, in part, on the reasoning in re Amdura Corp., 121 B.R. 862 (Bankr.D.Colo. 1990). In Amdura, a firm seeking to be employed as debtor's counsel represented the debtor's primary secured lender on an ongoing basis in matters unrelated to the bankruptcy case. The debtor commenced the bankruptcy case as result of its inability to reach an accommodation with the lender. A partner of the firm testified that other counsel would have to be employed to investigate and prosecute a potential suit against the lender because the firm would not "bite the hand that feeds it." In re Amdura, 121 B.R. at 867. During the February 10 hearing, Mr. Millstein argued that the facts in this case do not justify disqualifying Cleary, Gottlieb because, unlike the creditor in Amdura, Salomon is not the primary secured creditor in this case. Mr. Millstein apparently believes that the relative size of the creditor's claim vis-a-vis the estate's total debt is necessarily relevant to whether Debtors' counsel may continue to maintain a relationship with that creditor without violating the tests of Sec. 327(a).

> Counsel's argument is not persuasive. The key issue is whether the firm's interest in maintaining the client relationship with Salomon, a substantial party-in-interest, could impair the firm's ability to act with impartiality, even unconscious impartiality. The Amdura opinion correctly focuses on the law firm's ability to act impartially as the debtor's representative in all matters. The court in Amdura does not consider the relative size of the creditor's claim in a vacuum, but in conjunction with the creditor's status as a major client of the firm. Amdura, 121. B.R. at 869.

> The court must remain cognizant of the fact that Salomon is an insider, a 64% owner, and a substantial creditor of the Debtor Envirodyne. The negotiation of a plan of reorganization likely will necessitate negotiation with Salomon, a "substantial client" of Cleary, Gottlieb. Given these facts in this case, the Debtors' interests and the interests of the creditor body as a whole are not best represented at a negotiation table by a lawyer who faces a substantial client on the other side. (FN14)

27    In *Micro-Time* Rhodes J. stated at pp. 607-8:

[4] The facts in this case are essentially the same as those in re Gray, 64 B.R. 505 (Bankr.E.D.Mich.1986). Although the trustee and the accountants for the trustee are not prepetition creditors of the estate, Bohl's work for Comerica does present a potential, if not an actual, conflict of interest. Comerica was a major creditor of Micro-Time. The amount of its debt was very strongly disputed and there had been an adverse relationship between the principal of the debtor (Kirkland) and Comerica. When the trustee was appointed, it was clear that a successful resolution of Micro-Time's dispute with Comerica would be a necessary prerequisite to any successful chapter 11 reorganization of Micro-Time. Any hint of any prior or ongoing relationship between Comerica and Bohl would create at least the appearance of impropriety. This is sufficient under the case law and section 101(13) to disqualify John C. Bohl, Jr. as trustee and Parker, Bohl & Associates as accountants for the trustee.

Like the accounting firm in Gray, Bohl did not disclose his potentially disqualifying relationship with Comerica in either the trustee's declaration of disinterest or in the affidavit he submitted when he applied for approval to appoint Parker, Bohl & Associates as accountants for the trustee. Instead, Bohl swore in his affidavit that "To the best of my knowledge neither our firm nor any member thereof ... holds any interest adverse to the matters upon which we are to be engaged. Neither I nor any member of my firm has any relationship or interest in the above named debtor or any other parties of interest therein." These statements were false; Bohl had an ongoing relationship with Comerica.

*Micro-Time* and *Envirodyne* illustrate quite different concerns than the situation prevailing here. There is no suggestion of an ongoing relationship with the ALC Committee side which would possibly influence Richter from its neutral, impartial role as trustee, acting in the best interests of the estate.

28       Thus given that Richter is the preference of the petitioning creditor (and of the ALC Committee which appears to represent apparently unchallenged major creditors); it has the advantage of being quite familiar with and knowledgeable of the situation from its prior involvement as forensic investigator; the proprietary claims have been acknowledged as complex and difficult to describe; those advancing proprietary claims have had the advantage of advice from their own forensic investigators; it does not appear on the material before me that Richter has any ongoing relationship with any creditor and particularly not with any creditor or claimant which may have an adverse position to the estate, it would not seem to me appropriate to disqualify Richter as the nominee for trustee in place of Deloitte in the petition by UBS, but rather it would seem that Richter was adequately qualified to act as trustee. This result would avoid the estate taking a significant period of time to catch up with potential slippage exposure if the litigation heats up quickly and a duplication of expense for another firm to come to the same position as Richter now is on the learning curve. On a practical basis, given what is at stake in relation to the funds already expended as to Richter's investigation, I do not see this duplication as a major factor but certainly it is a reasonable factor to consider. To their credit the Rehabilitator and the Liquidator have acknowledged that they in essence expect a fair fight in the proprietary claim situation against a trustee which is adequately and well prepared; they were not opposing Richter on the basis of knocking out a worthy opponent. The Liquidator had no concern about Richter being hired as a consultant by any trustee; I understand the Rehabilitator's attitude to have been the same. They were concerned, I take it, that Richter was beholden to the ALC Committee and the creditors it represented. As discussed, that relationship is at an end and Richter must be indifferent to all creditors, whomsoever they may be. Certainly this aspect of neutrality must be demonstrated throughout the trusteeship, including any s. 163 examinations.

29       In the result I see no impediment to Richter replacing Deloitte as the nominee for trustee in the UBS petition order accordingly.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellOnt 1169, 37 C.B.R. (3d) 237, 59 A.C.W.S. (3d) 1058

30      As a postscript I would observe that my secretary and the manager of the Commercial List/Bankruptcy Office were bombarded with calls yesterday and today as to when my decision was going to be released and why it had not been then released. Counsel have advised that they had not done so. It may be that these enquiries were made by persons who were trading in or arbitraging claims. Such behaviour is not only inappropriate, but also counterproductive (looking at their self interest of having the decision as early as possible).

*Motion granted.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 26

722 F.2d 1542
United States Court of Appeals,
Federal Circuit.

Jerry F. CONNELL, Gary F. Burns and
Conelco, Inc., Appellants/Cross-Appellees,

v.

SEARS, ROEBUCK & CO., a
Corporation, Appellee/Cross-Appellant.

Appeals Nos. 83–841, 83–842.  |  Nov. 23, 1983.

An action was filed alleging infringement of a patent for a hair teasing and unsnarling implement. The alleged infringer counterclaimed for a declaratory judgment that the patent was invalid. The United States District Court for the Northern District of Alabama, 559 F.Supp. 229, U.W. Clemon, J., entered judgment notwithstanding the verdict finding the patent invalid due to obviousness, but denied a judgment notwithstanding the verdict that the patent was unenforceable for fraud. Appeal and cross appeal were taken. The Court of Appeals, Markey, Chief Judge, held that: (1) the jury's conclusion of nonobviousness was without factual foundation where it disregarded prior art; (2) although the conduct in concealing prior art patents from the Patent and Trademark Office was egregious, the finding that the patent was not unenforceable for fraud was supported by evidence; and (3) the patentee's appeal was frivolous and, therefore, the alleged infringer was entitled to double costs for the appeal.

Affirmed in part, modified in part, vacated and remanded in part.

West Headnotes (27)

**[1]    Jury**
    Re-examination or other review of questions of fact tried by jury

Court, though it remains ultimately responsible for upholding the law applicable to the facts found, cannot substitute its view for that of jury when to do so would be effective denial of right to trial by jury. U.S.C.A. Const.Amend. 7.

2 Cases that cite this headnote

**[2]    Jury**
    Re-examination or other review of questions of fact tried by jury

Deference due a jury's fact-findings in a civil case is not so great as to require acceptance of findings where they are clearly and unquestionably not supported by substantial evidence. U.S.C.A. Const.Amend. 7.

4 Cases that cite this headnote

**[3]    Federal Courts**
    Verdict

Following civil jury trial, naked general verdict for one of the parties involves presumption that jury found the facts and reached the legal conclusions undergirding its verdict. Fed.Rules Civ.Proc.Rules 49(a, b), 50(a, b), 51, 52, 59(a), 28 U.S.C.A.; U.S.C.A. Const.Amend. 7.

3 Cases that cite this headnote

**[4]    Federal Civil Procedure**
    Determination
**Federal Civil Procedure**
    Determination of issues

In determining whether to grant motion for directed verdict or for judgment notwithstanding the verdict, court should not be guided by its view of which side has better case or by what it would have done had it been serving on jury. Fed.Rules Civ.Proc.Rules 49(a, b), 50(a, b), 51, 52, 59(a), 28 U.S.C.A.; U.S.C.A. Const.Amend. 7.

2 Cases that cite this headnote

**[5]    Federal Civil Procedure**
    Determination
**Federal Civil Procedure**
    Determination of issues

If court is convinced upon record before jury that reasonable persons could not reach or could not have reached a verdict for the nonmover, it should grant motion for directed verdict or for judgment notwithstanding verdict. Fed.Rules

220 U.S.P.Q. 193

Civ.Proc.Rules 49(a, b), 50(a, b), 51, 52, 59(a), 28 U.S.C.A.; U.S.C.A. Const.Amend. 7.

7 Cases that cite this headnote

[6]    **Federal Civil Procedure**
　　👉 Determination

**Federal Civil Procedure**
　　👉 Determination of issues

In patent infringement suit, in ruling on motion for directed verdict or for judgment notwithstanding verdict, court must inquire, under legal standard of patentability, whether evidence and inferences reasonably drawn therefrom, when viewed in light most favorable to nonmoving party and without weighing credibility, is or is not substantial. Fed.Rules Civ.Proc.Rules 49(a, b), 50(a, b), 51, 52, 59(a), 28 U.S.C.A.; U.S.C.A. Const.Amend. 7.

45 Cases that cite this headnote

[7]    **Patents**
　　👉 Questions of law or fact

In patent litigation in which it is argued that claimed invention was obvious, it is not error to submit question of obviousness to jury. 35 U.S.C.A. § 103; U.S.C.A. Const.Amend. 7.

4 Cases that cite this headnote

[8]    **Jury**
　　👉 Nature of Cause of Action or Issue in General

So long as the Seventh Amendment stands, right to jury trial should not be rationed, nor should particular issues in particular types of cases be treated differently from similar issues in other types of cases. U.S.C.A. Const.Amend. 7.

8 Cases that cite this headnote

[9]    **Federal Civil Procedure**
　　👉 Particular actions or issues

In patent litigation in which it is argued that claimed invention is obvious, submission of obviousness question to jury should be

accompanied by detailed special interrogatories designed to elicit responses to factual inquiries relating to scope and content of prior art, differences between prior art and claims at issue, level of ordinary skill in the art and whatever objective evidence may be present as indicia of nonobviousness and should be based on presentations made at particular trial. 35 U.S.C.A. § 103.

24 Cases that cite this headnote

[10]    **Patents**
　　👉 Hearing

In patent litigation in which it is argued that claimed invention is obvious, submission of obviousness question to jury should be accompanied by appropriate instructions on the law which make it clear, at a minimum, that jury must consider invention as a whole and that each jury person must walk in shoes of one skilled in the art at the time the invention was made. Fed.Rules Civ.Proc.Rule 51, 28 U.S.C.A.; 35 U.S.C.A. § 103.

5 Cases that cite this headnote

[11]    **Federal Civil Procedure**
　　👉 Determination of issues

Submission of question of obviousness to jury in patent litigation does not preclude, in proper case, the granting of a motion for judgment notwithstanding the verdict. 35 U.S.C.A. § 103.

3 Cases that cite this headnote

[12]    **Patents**
　　👉 Nature of patent rights

Patent is form of property right and right to exclude recognized in a patent is but the essence of the concept of property. 35 U.S.C.A. § 261.

13 Cases that cite this headnote

[13]    **Patents**
　　👉 Prior art in general

Prior art disclosure that "almost" meets standard of disclosing all elements of claimed invention

arranged as in the claim may render claim invalid for obviousness, but it does not "anticipate." 35 U.S.C.A. §§ 102, 103.

76 Cases that cite this headnote

[14]  **Patents**
⚷  Combination
**Patents**
⚷  Cooperation of elements; synergism
**Patents**
⚷  New result

Virtually every invention is a combination of elements or process steps, and synergism, or its equivalent "new and different result," is not required for patentability.

3 Cases that cite this headnote

[15]  **Patents**
⚷  View of person skilled in art

Test for obviousness of claimed invention is whether claimed invention as a whole, not the features which distinguish it from the closest reference, in light of the teachings and references in their entireties, would have been obvious to one of ordinary skill in the art at the time the invention was made. 35 U.S.C.A. § 103.

11 Cases that cite this headnote

[16]  **Patents**
⚷  Weight and Sufficiency

In patent litigation, all the relevant evidence on obviousness issue must be considered before a conclusion is reached. 35 U.S.C.A. § 103.

Cases that cite this headnote

[17]  **Patents**
⚷  Conclusiveness and Effect of Decisions of Patent Office

Presumption of validity does not change upon introduction of "pertinent" and "any relevant" art not considered by Patent and Trademark Office, or at any other time; it is upon introduction of art more pertinent or more relevant than

that considered by PTO that patent challenger's burden may be more easily carried.

18 Cases that cite this headnote

[18]  **Patents**
⚷  Conclusiveness and Effect of Decisions of Patent Office

Patent challenger may prove facts capable of overcoming presumption of patent validity, but evidence relied on to prove those facts must be clear and convincing; introduction of art or other evidence not considered by Patent and Trademark Office does not change the burden and does not change the requirement that evidence establish presumption-defeating facts clearly and convincingly.

28 Cases that cite this headnote

[19]  **Patents**
⚷  Particular methods, devices, or products

Jury's conclusion that claimed invention of Patent No. 3,459,199 for hair teasing and unsnarling implement was not obvious was without factual foundation in the face of numerous clearly relevant prior art patents in the trial record. 35 U.S.C.A. § 103.

Cases that cite this headnote

[20]  **Patents**
⚷  Particular matters, sufficiency as to

Jury's finding that accused hair curlers were literal and equivalent infringements of patent for hair teasing and unsnarling implement was properly set aside as totally unsupportable where jury's finding that claimed invention was not obvious disregarded prior art in the trial record. 35 U.S.C.A. § 103.

6 Cases that cite this headnote

[21]  **Patents**
⚷  Requisites of application in general

Although patentee's behavior in concealing from Patent and Trademark Office at least five prior art patents was egregious, trial court's refusal to

set aside jury's determination that patent was not unenforceable was proper.

Cases that cite this headnote

[22]     **Patents**
          Operation and Effect of Decision

No claim of a patent declared invalid can be enforced, absent denial of a fair opportunity in the litigation that resulted in the declaration and a favorable outcome in a subsequent suit. 35 U.S.C.A. § 282.

2 Cases that cite this headnote

[23]     **Patents**
          Conclusiveness and Effect of Decisions of Patent Office

Each claim of a patent must be presumed valid independently of the validity of any other claim. 35 U.S.C.A. § 282.

1 Cases that cite this headnote

[24]     **Patents**
          Matters concluded

One of five claims involved in patent infringement litigation which was not before trial court, by way of testimony of otherwise, could not properly be held invalid based on invalidity of other claims. 35 U.S.C.A. § 282.

8 Cases that cite this headnote

[25]     **Patents**
          Determination and disposition of cause
         **Patents**
          Costs

Order in patent infringement litigation which provided that each party would pay its own costs could not stand, without explanation, where judgment notwithstanding the verdict entered in favor of alleged infringer taxed costs in favor of alleged infringer; remand was necessary for trial court's consideration of alleged infringer's motion for order retaxing costs against patentee. Fed.Rules Civ.Proc.Rule 54(d), 28 U.S.C.A.

4 Cases that cite this headnote

[26]     **Federal Civil Procedure**
          Appellate Costs

Appeal from order granting alleged infringer's motion for judgment notwithstanding the verdict in patent litigation was frivolous where patentee disputed no law or precedent or the applicability of either and, therefore, alleged infringer was entitled to double its costs on appeal. F.R.A.P.Rule 38, 28 U.S.C.A.; 28 U.S.C.A. § 1912.

16 Cases that cite this headnote

[27]     **Patents**
          Original utility

3,459,199. Valid.

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*1545** Thomas E. Davis, Gadsden, Ala., argued for appellants.

Walther E. Wyss, Chicago, Ill., argued for appellee. With him on brief were Neil M. Rose and C. Ronald Olbrysh, Chicago, Ill.

Before MARKEY, Chief Judge, SMITH, Circuit Judge, and COWEN, Senior Circuit Judge.

**Opinion**

MARKEY, Chief Judge.

Jerry F. Connell, et al. (Connell), appeals from a judgment notwithstanding the verdict (JNOV) of the United States District Court for the Northern District of Alabama Middle Division holding U.S. Patent No. 3,459,199 (the '199 patent), issued in 1969 for a hair "teasing on unsnarling implement", invalid for obviousness under 35 U.S.C. § 103, and finding noninfringement by certain hair curler devices. Sears, Roebuck and Co. (Sears), cross appeals the judgment that the patent was not unenforceable for fraud, and a denial

of costs. We affirm in part, modify in part, and vacate and remand in part.

## Background

On March 24, 1981, Connell sued Sears, charging that various hair curlers sold by Sears infringed the '199 patent. Sears denied infringement and counterclaimed for a declaratory judgment that the '199 patent was invalid. A seven day jury trial was conducted in September 1982. Proceeding under Fed.R.Civ.P. 49(b), the trial court submitted to the jury forms for a general verdict and fifteen written interrogatories. The jury made special written findings, Fed.R.Civ.P. 49(a), and indicated that the '199 patent was valid, enforceable, and infringed by the accused curlers. The jury found that Connell had not concealed "material" prior art and that no fraud occurred in prosecution of the Connell application.

Having moved for directed verdict at the close of Connell's case, and having renewed that motion at the close of all the evidence, Sears moved for JNOV under Rule 50, Fed.Rules Civ.P., on receiving the jury verdict.

Judge Clemon entered a final judgment in Sears' favor on February 11, 1983, holding the patent invalid for obviousness and finding that the claims in suit were not infringed by the accused hair curlers, on the ground that the jury's key related findings were unsupported by substantial evidence. *Connell v. Sears,* 559 F.Supp. 229, 232 (N.D.Ala.1983).

Affirmance of the judgment as correctly granted on the basis of obviousness under § 103 makes it unnecessary to discuss here the alternative bases asserted on appeal for invalidity under §§ 102 and 112, the jury findings on which were not disturbed.

The Final Judgment of February 11, 1983 awarded costs to Sears, but on March 4, 1983 the court, without reference to that judgment, signed an Order that each party bear its own costs.

## Issues

(1) Whether there was error in granting the motion for judgment notwithstanding the verdict.

(2) Whether denial of costs to Sears amounted to an abuse of discretion.

## OPINION

**(1)** *The Trial Court Did Not Err In Granting Judgment Notwithstanding the Verdict*

Our review of the judgment, the accompanying opinion, the record, the prior art, **\*1546** and the parties' briefs, convinces us that there is not and never has been a basis for denying the motion for JNOV filed in this case.

**[1]** Jury verdicts must be treated with great deference. The Seventh Amendment to the Constitution preserves the right to trial by jury in suits at common law and also provides that United States Courts shall not re-examine facts tried by jury except under the rules of common law. With the merger of law and equity, denial of the right in certain types of cases ceased. Permitting the jury to draw legal conclusions based on the jury's fact findings and reached in light of instructions on the law has been preserved as part of the right. The court, though it remains ultimately responsible for upholding the law applicable to the facts found, cannot substitute its view for that of the jury when to do so would be an effective denial of the right to trial by jury.

**[2]** Deference due a jury's fact findings in a civil case is not so great, however, as to require acceptance of findings where, as here, those findings are clearly and unquestionably not supported by substantial evidence. To so hold would be to render a trial and the submission of evidence a farce.

**[3]** Following a civil jury trial, a jury may return a naked general verdict for one of the parties. That verdict involves a presumption that the jury found the facts and reached the legal conclusions undergirding its verdict. That practice leaving a wide area of uncertainty on review, appellate judges have expressed grave concern over use of the general verdict in civil cases. Still, there are safeguards and alternatives. Rule 49(a) Fed.R.Civ.P., provides for special verdicts in which the jury answers specific fact questions. Rule 49(b) provides for general verdicts accompanied by the jury's answers to interrogatories. Rule 50(a) provides for a directed verdict at the close of the case presented by one side. Rule 50(b) provides for a judgment notwithstanding the jury's verdict such as that with which we here deal. Rule 51 provides for instructions to the jury on the law to guide its conclusions on legal questions. Rule 52 makes clear that the court must

make its own fact findings and reach its own conclusions of law when sitting with an advisory jury. Rule 59(a) provides for a new trial on many grounds, including a determination that a jury had reached its verdict as a result of passion and prejudice. In sum, the right to trial by jury in a civil case carries with it a number of procedural safeguards insuring the parties and the system against an improper outcome that might result from a posited unruly or "rogue elephant" jury. The rules have thus strengthened the right by insuring the reliability of jury verdicts.

To govern consideration of motions for a directed verdict and for judgment notwithstanding the verdict, guidelines consistent with the Seventh Amendment and the cited Rules have been set forth in the cases. *See Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc); *Mays v. Pioneer Lumber Corp.* 502 F.2d 106, 107 (4th Cir.1974), *cert. denied,* 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398 (1975); *Wyatt v. Interstate & Ocean Transport Co.,* 623 F.2d 888, 891 (4th Cir.1980).

[4]  [5]  Under these guidelines, a court must: (1) consider all the evidence; (2) in a light most favorable to the non-mover; (3) drawing reasonable inferences favorable to the non-mover; (4) without determining credibility of witnesses, and (5) without substituting its choice for that of the jury between conflicting elements in the evidence. The court should not be guided by its view of which side has the better case or by what it would have done had it been serving on the jury. If, after following those guidelines, the court is convinced upon the record before the jury that reasonable persons could not reach or could not have reached a verdict for the non-mover, it should grant the motion for directed verdict or for JNOV.

[6]  The listed guidelines are fully applicable in a patent infringement suit. The court must inquire, under the proper legal standard of patentability, whether the evidence and inferences reasonably drawn therefrom, when viewed in the light most **\*1547** favorable to the non-moving party and without weighing credibility, is or is not substantial. *See Pederson v. Stewart-Warner Corp.,* 400 F.Supp. 1262, 1264 (N.D.Ill.1975), *affirmed* 536 F.2d 1179 (7th Cir.1976).

The question of obviousness under 35 U.S.C. § 103 is a question of law. *Stevenson v. ITC,* 612 F.2d 546, 204 USPQ 276 (CCPA 1979). Like all legal conclusions, that on obviousness is reached after answers to a series of potential fact questions have been found, and in the light of those answers. In the ordinary patent case, the trier of fact must answer the factual inquiries outlined in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459 (1966) and relating to: (1) the scope and content of the prior art, (2) differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) whatever objective evidence may be present as indicia of nonobviousness.

[7]  [8]  We hold that it is not error to submit the question of obviousness to the jury. No warrant appears for distinguishing the submission of legal questions to a jury in patent cases from such submissions routinely made in other types of cases. So long as the Seventh Amendment stands, the right to a jury trial should not be rationed, nor should particular issues in particular types of cases be treated differently from similar issues in other types of cases. Scholarly disputes over use of jury trials in technically complex cases relate to the right to trial by jury itself, and center on whether lay juries are capable of making correct fact determinations, not over the propriety of submitting legal questions to juries. The obviousness issue may be in some cases complex and complicated, on both fact and law, but no more so than equally complicated, even technological, issues in product liability, medical injury, antitrust, and similar cases. Indeed, though the analogy like most is not perfect, the role of the jury in determining obviousness is not unlike its role in reaching a legal conclusion respecting negligence, putting itself in the shoes of one "skilled in the art" at the time the invention was made in the former and in the shoes of a "reasonable person" at the time of the events giving rise to the suit in the latter.

[9]  When a jury merely reports a general verdict for one of the parties, as above indicated, the decision on a motion for JNOV or on direct appeal requires assumptions respecting its consideration of the evidence. Submission of the obviousness question to the jury should therefore be accompanied by detailed special interrogatories designed to elicit responses to at least all the factual inquiries enumerated in *Graham, supra,* and based on the presentations made in the particular trial. In so holding, we note the similar views expressed by other courts: *Control Components, Inc. v. Valtek, Inc.,* 609 F.2d 763, 767, 204 USPQ 785, 788 (5th Cir.), *cert. denied, 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980); Velo-Bind Inc. v. Minnesota Mining & Mfg. Co.,* 647 F.2d 965, 971, 211 USPQ 926, 932 (9th Cir.), *cert. denied, 454 U.S. 1093, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); Manufacturing Research Corp. v. Graybar Electric Co.,* 679 F.2d 1355, 1365, n. 19, 215 USPQ 29, 36, n. 19 (11th Cir.1982).

**[10]**    Submission of the obviousness question to the jury should also be accompanied by appropriate instructions on the law. Rule 51, Fed.R.Civ.P. Though tailoring may be required in individual cases, such instructions should track the statute, 35 U.S.C. § 103, making it clear, at a minimum, that the jury must consider the invention as a whole and that each jury person must walk in the shoes of one skilled in the art at the time the invention was made. Like all legal conclusions, that on obviousness must, as above indicated, rest on a foundation constructed of all relevant and probative facts found in light of all the evidence. If that foundation crumbles, the legal conclusion on which it rests must fall.

**[11]**    Thus submission of the question of obviousness to a jury does not preclude, in a proper case, the grant of a motion for JNOV. If the facts found on substantial evidence be insufficient to support or contrary to a jury's legal conclusion, or if the facts found, though they would be capable **\*1548** of supporting the legal conclusion, were based on evidence less than substantial, a judge may, following the guidelines set forth above, grant the motion. The latter circumstance prevails here, where the facts underlying the jury's nonobviousness conclusion were not supported by substantial evidence.

### The Trial Court's Opinion

The reader of this opinion is respectfully referred to the exhaustive opinion published at 559 F.Supp. 229 (1983). There the reader will find, *inter alia,* a complete statement of the facts, a thorough discussion and evaluation of the two claims in suit, and the full discussion of the prior art mandated by *Graham, supra,* 383 U.S. at 17–18, 86 S.Ct. at 693–694, 148 USPQ at 67, along with numerous sketches and patent drawings.

Because the opinion correctly explicates a substantial portion of the law of patents, pause is given the fault-finder. Nonetheless, the uniformity imperative that informed the creation of this court impels a short discussion of some statements appearing in the opinion.

It should be said that most statements discussed in this section were quoted or apparently gleaned from opinions of various circuits issued before 1 October 1982. Though this court has not yet established a large body of guiding precedent, a beginning must be made toward the goal of uniformity

and reliability in the patent laws. A part of that beginning involves our stating disagreement when the same is present. It bears repeating, also, that of the 18 pages comprising the trial court's opinion, the following limited portions, which did not influence the judgment appealed from and are neither defended nor attacked on appeal, are deemed sufficiently misdirected to require discussion.

The opinion says a patent is invalid if it "subtracts from former resources freely available to skilled artisans", citing *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.,* 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). The meaning of the phrase is obscure. If it means an invalid patent, if enforced, would subtract resources that would otherwise be available, it is a mere truism. If it means that upholding a multi-element claim as valid "subtracts" those elements (resources), it is untrue. All such elements remain fully available, albeit not in the particular arrangement claimed or in appropriate equivalent arrangements.

**[12]**    The phrase "patent monopoly" appears at various points. Under the statute, 35 U.S.C. § 261, a patent is a form of property right, and the right to exclude recognized in a patent is but the essence of the concept of property. *Schenck v. Nortron Corp.,* 713 F.2d 782, 218 USPQ 698 (Fed.Cir.1983).

**[13]**    The opinion says anticipation may be shown by less than "complete anticipation" if one of ordinary skill may in reliance on the prior art "complete the work required for the invention", and that "it is sufficient for an anticipation 'if the general aspects are the same and the differences in minor matters is only such as would suggest itself to one of ordinary skill in the art.' " Those statements relate to obviousness, not anticipation. Anticipation requires the presence in a single prior art disclosure of all elements of a claimed invention arranged as in the claim. *Soundscriber Corp. v. U.S.,* 360 F.2d 954, 960, 148 USPQ 298, 301 (Ct.Cl.1966). A prior art disclosure that "almost" meets that standard may render the claim invalid under § 103; it does not "anticipate." Though it is never necessary to so hold, a disclosure that anticipates under § 102 also renders the claim invalid under § 103, for "anticipation is the epitome of obviousness," *In re Fracalossi,* 681 F.2d 792, 215 USPQ 569 (CCPA 1982). The reverse is not true, for the need to determine obviousness presumes anticipation is lacking.

**[14]**    The opinion says that where a "combination" patent is involved the "linchpin" is whether the "aggregation produced a new or different result or achieved a synergistic effect."

There is no support for those statements in the statute. There is no classification entitled "combination patents." *1549 Virtually every invention is a combination of elements or process steps, and synergism, or its equivalent "new and different result," is not *required* for patentability. *Chore-Time Equipment, Inc. v. Cumberland,* 713 F.2d 774, 218 USPQ 673 (Fed.Cir.1983); *Bowser, Inc. v. U.S.,* 388 F.2d 346, 156 USPQ 406 (Ct.Cl.1967). *See* Miller, "Factors of Synergism and Level of Ordinary Skill in the Pertinent Art in Section 103 Determinations," 8 APLA Jrl 321 (1980).

The opinion quotes a statement indicating that an invention meeting with great skepticism and great acclaim would nonetheless be unpatentable "if the elements comprising the invention are disclosed by an examination of the prior art." That cannot as stated be the law. Humans must work with old elements, most if not all of which will normally be found somewhere in an "examination of the prior art." Though all elements were old, the invention was held patentable precisely because experts were skeptical, for example, in *United States v. Adams,* 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572, 148 USPQ 479 (1966).

[15] The opinion says obviousness is established when "features that distinguish" the invention from the closest reference "are disclosed in analogous structures in which the features perform an identical function." It is not "features" but the subject matter of the invention "as a whole" that must be considered, 35 U.S.C. § 103. That features, even distinguishing features, are "disclosed" in the prior art is alone insufficient. As above indicated, it is common to find elements or features somewhere in the prior art. Moreover, most if not all elements perform their ordained and expected function. The test is whether the claimed invention as a whole, in light of all the teachings of the references in their entireties, would have been obvious to one of ordinary skill in the art at the time the invention was made. 35 U.S.C. § 103.

[16] The opinion says that when the *three* factual inquiries listed in *Graham, supra,* have been answered, the objective evidence of nonobviousness need not be considered. That approach ignores *Graham's* reference to a *fourth* inquiry, namely an inquiry into whatever objective evidence of nonobviousness (called "secondary considerations" and "indicia" in *Graham* ) may appear in the record. It is inappropriate and judicious to disregard any admissible evidence in any judicial proceeding. Hence, all relevant evidence on the obviousness issue must be considered before a conclusion is reached. *Stratoflex, Inc. v. Aeroquip*

*Corp.,* 713 F.2d 1530, 218 USPQ 871 (Fed.Cir.1983). Judge Clemon, however, considered and properly rejected the only such indicia apparently here raised, i.e., commercial success.

[17] The opinion says that where "pertinent" and "any relevant" art was not considered by the Patent and Trademark Office (PTO), the presumption of validity is "severely weakened" and "eroded." As above indicated, there is virtually always "pertinent" and "relevant" art apparently unconsidered in the PTO and available to a patent challenger. The presumption does not change upon introduction of that art, or at any other time. It is upon introduction of art *more* pertinent or *more* relevant than that considered by the PTO (as happened here) that the patent challenger's burden may be more easily carried. Such art may in a proper case serve to fully meet that burden. *See SSIH Equipment S.A. v. ITC,* 718 F.2d 365, 218 USPQ 678 (Fed.Cir.1983).

[18] The opinion also says that when "any relevant" non-considered art is introduced, the burden upon the patent challenger is thereby changed from a requirement for clear and convincing proof to one of proof by a mere preponderance. Proof, however, relates not to legal presumptions, but to facts. The patent challenger may indeed prove facts capable of overcoming the presumption, but the evidence relied on to prove those facts must be clear and convincing. Thus, the introduction of art or other evidence not considered by the PTO does not change the burden and does not change the requirement that that evidence establish presumption-defeating facts clearly and convincingly.

## *1550 *The Trial Court's Action*

[19] No error whatever occurred in granting Sears' motion for judgment NOV on the ground that the jury's conclusion of nonobviousness was without factual foundation supported by substantial evidence. The jury's legal conclusion disregarded (and cannot stand against a contrary conclusion resting on) prior art not considered in the PTO and far more pertinent than that the PTO did consider. Our independent consideration of the record under the above standard for grant of JNOV results in agreement with the trial court's action in which, without resolving credibility questions, he dismissed the relevant jury findings as unsupported by substantial evidence, and as findings that could not be made by reasonable minds in view of the evidence. We need not discuss the record in detail in view of findings not only unsupported by, but contrary to the evidence. As but one example of the latter, the jury finding

that there was "no prior art" could not possibly stand in the face of the numerous clearly relevant prior art patents in the trial record. The interested reader is referred to the portions of Judge Clemon's opinion headed "(a) The Teaching(s) of the Patent In Suit," (b) "Scope And Content Of The Prior Art," and (e) "Obviousness," 599 F.Supp. at 236–244.

[20]     Acting in the interest of judicial economy, the trial court proceeded to decide, correctly, the infringement issue, while fully recognizing that infringement of an invalid patent can create no legal liability. The jury's findings that the accused curlers were literal and equivalent infringements were properly set aside as totally unsupportable in light of the record, and as findings that could not have been made by persons of reasonable minds. The reader is referred to the section of trial court's opinion headed "The Infringement Evidence," 599 F.Supp. at 246–250.

Because there was no error in: (1) submitting the obviousness-nonobviousness issue to the jury, while recognizing that it is ultimately a question of law decidable by the court in response to a motion for JNOV; (2) evaluating the prior art of record, with all reasonable inferences resolved in Connell's favor; (3) evaluating the jury's answers to relevant interrogatories without resolving credibility questions; (4) determining that the jury's answers to those interrogatories were not supported by substantial evidence; and (5) determining that "reasonable [sic] minded persons can only reach the conclusion" upon the facts of record that the inventions of the asserted claims and of those discussed in the testimony would have been obvious under § 103, the grant of Sears' motion for JNOV must be and is affirmed.

### Unenforceability [1]

[21]     It is undisputed that Connell concealed from the PTO at least the five prior art patents he received from the patent lawyer he first consulted and who advised that his invention might not be patentable. Connell then sought new counsel, who filed and prosecuted the application and testified at the trial.

It is clear on the record that the PTO was told that tapered teeth of a particular shape were not disclosed in the prior art, that Connell knew teeth of that precise shape were disclosed in one of the concealed prior patents, and that, as the trial court indicated, the Connell patent would not have issued if that prior art disclosure had not been concealed.

The trial court did not disturb the jury's determination that the patent was not unenforceable. Judge Clemon stated, however, that had he been "sitting as trier of fact," he would have found otherwise, in  *1551  view of the prosecution history of the application in the PTO:

> The jury found that the '199 patent in suit is enforceable. If sitting as the trier of fact, the Court would find otherwise; based on the dealings between plaintiffs' counsel and the Patent Office [sic]. However, the role of the court on this issue is limited to determining whether the finding is supported by substantial evidence. The Court finds substantial, though not overwhelming, evidence for the jury's finding; and, accordingly it will not be disturbed.

Though unenforceability appears to have been thought a question of fact, and it is a question of law, the trial court's determination that there was substantial evidence in support of the jury's verdict on the question renders that erroneous label harmless. The legal conclusion on unenforceability, like that on fraud and all other legal conclusions, rests on fact findings and where, as here, the judge who heard all the evidence and observed the witnesses determined that the jury's findings were supported by substantial evidence in support of the conclusion, denial of the motion for JNOV was proper. To hold otherwise would be to render the jury a nullity.

Sears says the court's determination that the concealed art was more significant than that considered by the PTO is alone sufficient to make the question one of unclean hands and thus an equitable issue determinable only by a court. On that basis, it requests a remand to the trial court with instructions to award attorney fees incurred at trial. Sears' difficulty, however, is twofold. The merger of law and equity dissolved the distinction once governing issues submissible to a jury, and Sears has not shown that the verdict relating to enforceability was not supported by substantial evidence.

The counsel who represented Connell in prosecuting the application testified that in failing to disclose prior art he believed he was following the standard of candor due the PTO at the time. Though the record would have benefitted from a citation of the evidence the trial court viewed as supporting, it may well have been that testimony of counsel, doubtless credited by the jury as establishing a lack of intent to improperly mislead the PTO.

Sears' brief cites recent cases, dealing with the current and uncomprising duty of candor and good faith set forth in 37 CFR § 1.56(a). It is regrettable but true that the present standard was not earlier recognized, promulgated, and enforced. The earlier standard described by the witness apparently led him to find room for the kind of gamesmanship practiced in connection with the Connell application pre–1969, as reflected in his testimony. Nonetheless, the trial court and we are precluded by the jury's verdict, the standard governing JNOV, and the need to preserve the right to trial by jury, from acting on our own assessment of the credibility of that testimony.

Though the conduct here was egregious, and might well have been so considered under earlier standards, we are not at liberty either to apply the present standard retroactively in this case, or to overturn the refusal to disturb the jury's determination on enforceability. That refusal was entered by a judge who had presided at the trial, had observed the witnesses, and had demonstrated a willingness to set aside those jury determinations clearly not supported by substantial evidence. That he, and we, if at liberty to do so, might have found facts rendering the patent unenforceable, or might have applied 37 CFR § 1.56(a) as a codification of earlier case law, *see True Temper Corp. v. CF & I Steel Corp.,* 601 F.2d 495, 202 USPQ 412 (10th Cir.1979), are considerations not at issue. Application of personal predilections to achieve a result oriented thereby is not the role of judges. Nor are we free to impose a policy that would render inapplicable to patent cases motions for directed verdict, motions for JNOV, and jury instructions on the law, any more than we are to impose such a policy on any other type of case in which jury verdicts on the whole case are by the rules of our jurisprudence and the Constitution authorized.

 **\*1552** Sears, while asserting unenforceability for fraud as a basis for attorney fees, makes no effort to establish that reasonable persons could not have made fact findings underlying the conclusion reached by the jury on enforceability. Relying entirely on the sole fact of nondisclosure of known art, it has not demonstrated that reasonable persons could not reasonably have found an absence of the intent element of fraud. Having been shown no basis on which we can reverse the refusal to disturb the jury's determination, we deny the request for remand for determination of Sears' attorney fees incurred before this appeal was filed.

### *The Declaratory Judgment*

 **[22]**   **[23]**   No claim of a patent declared invalid can be enforced, absent denial of a fair opportunity in the litigation that resulted in the declaration and a favorable outcome in a subsequent suit. Though only claims 1 and 5 were allegedly infringed, the entire patent was declared invalid in response, apparently, to Sears' counterclaim for declaratory judgment that the patent was invalid. Neither party has questioned on appeal the propriety of a declaration that a "patent" is invalid when all claims were not separately considered, each on its merits. The statute, however, requires that courts refrain from applying to claims that do not form part of the record the invalidity conclusion applied to claims that do. Each claim must be presumed valid independently of the validity of any other claim. 35 U.S.C. § 282.

 **[24]**   The record has accordingly been reviewed to determine the claims subject to the declaratory judgment. Because Connell restricted, just before trial, its complaint for infringement to claims 1 and 5, most of the trial testimony centered on those claims. Nonetheless, jury interrogatories included those asking whether "any of the claims" were infringed, whether any of the earlier patents were "prior art to the '199 patent," whether "plaintiffs' invention presented something new and different," and whether plaintiffs filed suit in a "good faith belief that all the claims ... were valid." The trial court, though stating that only claims 1 and 5 were involved, and granting the motion on the ground that the inventions set forth in those claims would have been obvious, spoke at other points in broader terms indicating that all claims were invalid. There was substantial testimony in which claims 3 and 4 were compared with the prior art and from which the declaratory judgment that the patent was invalid may be seen as encompassing those claims.

Because dependent claim 2 was not before the trial court, by way of testimony or otherwise, and because that claim is not before this court, there is no basis on which we could properly rest a conclusion that that claim is invalid.

Though we are not at liberty to consider *de novo* the validity or invalidity of claim 2, and the declaratory judgment must be modified to remove that claim from its effect, preservation of claim 2 here in response to 35 U.S.C. § 282 raises no implication respecting its validity or invalidity. The claim is directed to the addition of rotating means to the structure of invalid claim 1. It may be expected, however, that our

affirmance of the JNOV will substantially impede if not end Connell's propensity for filing suit on the '199 patent, or for continuing to prosecute the case now pending in the trial court. (*Connell v. K–Mart, Inc.,* No. 82–C–1261–M (N.D.Ala.)).

**(2) *Costs of Trial***

Sears emphasizes that part of Rule 54(d) Fed.R.Civ.P. reading "costs shall be allowed as of course to the prevailing party," and cites cases requiring compelling circumstances to justify equal apportionment of costs. Connell emphasizes the next phrase in Rule 54(d) reading "unless the court otherwise directs." Because no reason was cited for the March 4, 1983 Order that each party pay its own costs, neither party is able to support their respective arguments that an abuse of discretion did and did not occur.

Sears cites cases indicating that an abuse lies in disregarding the presumption that costs should be awarded to the prevailing party when there has been no showing or **\*1553** finding of circumstances sufficient to overcome the presumption. It has been said that cost awards to winners are regarded as a fair price losers pay for using the judicial system, and that courts should deny costs to winners only when the award would be unjust. *See Sun Ship, Inc. v. Lehman,* 655 F.2d 1311, 1315 (D.C.Cir.1981).

 **[25]**   Connell sought and obtained costs following the jury verdict. The JNOV taxed costs in favor of Sears. Costs apparently remain taxed against but unpaid by Connell. As above indicated, the March 4, 1983 Order provided that each party would pay its own costs. Sears has moved in the trial court for an order retaxing costs against Connell and that motion is currently pending in that court.

The matter being one committed in the first instance to the sound discretion of the trial court, we will not in this case substitute our judgment at this stage with respect to the award of costs connected with the trial. The March 4, 1983 order must be vacated, and the question of costs must be remanded, so that the trial court may deal with Sears' currently pending motion. The trial court is of course at liberty to enter such order as it may deem just, including one reinstating either its March 4, 1983 Order or the award of costs made in its JNOV. If the trial court elects to reinstate the March 4, 1983 Order, it is anticipated that reasons for doing so will be entered on the record to facilitate review if reinstatement of that order should be appealed.

*Costs, Attorney Fees, and Sanction on Appeal*

 **[26]**   This is but one of five lawsuits filed on the '199 patent by Connell. Three were settled before trial for $30,000, $42,500, and $100,000, respectively. Counsel for defendants in all three of those suits testified in this case that they were convinced the Connell patent was invalid, but that the settlements were entered solely because those amounts were far less than the cost of litigation.

In finding no commercialization of Connell's invention and no commercial success whatever in the then entire 13 year life of the patent, the trial court noted that the only "success" Connell has had was in obtaining money in exchange for filing and then dropping lawsuits.

Before filing his application, Connell was told by patent counsel that the invention might not be patentable, and was told of very close, almost identical prior art supporting that opinion. Connell obtained new counsel and concealed that art from the PTO. As the trial court correctly observed, submission of that art would have expanded the PTO's view beyond the two patents it cited in response to Connell's limitation of his claims to a hair teasing and unsnarling device. Disregarding that limitation, Connell sued for infringement by hair curling devices virtually identical with prior art curlers. Informed well before trial of all the prior art now of record, and of the effect of his non-disclosure to the PTO, Connell nonetheless proceeded with the trial. The entire scenario thus represents an abuse of the patent system and the judicial process.

Continuing to abuse the judicial process, Connell filed and prosecuted this appeal. Connell's main brief on appeal begins with 25 pages on which portions of the testimony of all witnesses is repeated in counsel's words. The next three pages repeatedly set forth the unchallenged standard for grant of JNOV. The next three set forth the unchallenged authority for submission of the obviousness issue and interrogatories to the jury. The next two constitute the sole effort of Connell to demonstrate error on obviousness, and that effort consists only in citation of a legal opinion of nonobviousness given from the witness stand by the patent lawyer who prosecuted the Connell application. The brief nowhere discusses the jury's answer that there was "no" prior art. It calls the legal conclusion of obviousness a "finding."

The next four pages of Connell's main brief quote excerpts from testimony about an unsnarling "function" said to constitute substantial evidence on which a finding of infringement could be made. The last four pages repeat the JNOV standard, charge **\*1554** the court with denying the constitutional right to trial, substitute a mention by the court of the plaintiff's burden on infringement for the lack of substantial evidence standard clearly employed by the court, and argue that the Connell's tangle-free function was nonobvious, disregarding the structural elements of the claims in suit and the relationship of those elements to the prior art or the accused curlers.

Connell's main brief is essentially that filed in the trial court (including an erroneous statement that the jury found the invention obvious). That practice is not in itself impermissible, but Connell should not be surprised if it results in the same outcome. Sole reliance on a legal conclusion of a lawyer witness, while disingenuously describing it as factual evidence sufficient to preclude JNOV, results in a total failure to present a rational basis for reversal on the obviousness issue.

Connell's reply brief repeats the unchallenged standard for grant of JNOV, again argues obviousness as a fact finding matter, accusing the court of substituting its own "finding," argues that courts should never grant JNOV after submitting the obviousness issue to a jury, and again emphasizes patent counsel's legal conclusion as substantial evidence. In discussing infringement, the brief disparages nine prior patents as disclosing curlers which lacked the "non-tangling concept" of Connell, but nowhere applies the structural elements of the claims to the accused curlers.

Connell's briefs here continue its failed effort before the trial court (though successful before the jury) to improperly carry water on both shoulders. Connell deprecates the prior art devices as curlers, not teasing and unsnarling instruments; then, in asserting infringement, Connell insists that the Sears curlers (which are substantially identical to the prior art) "could be used" as teasing and unsnarling instruments. The trial court pointed to the legal impropriety of treating the structural claims in suit one way when considering validity and another when considering infringement, citing *Sterner Lighting, Inc. v. Allied Electrical Supply, Inc.,* 431 F.2d 539, 544, 166 USPQ 454, 459 (5th Cir.1970). Connell's repetition of its insupportable approach here, as though the trial court's opinion, *Sterner,* and the impropriety did not exist, reflects a regrettable lack of candor due this court.

Connell's reply brief contains a statement that this was the first patent trial for Connell's counsel and for the trial judge. That fact, if true, does not remove the impropriety of the present appeal. Inexperience does not affect the ability to read and apply the law to the simple facts in this record; nor does it justify the filing of an appeal when no basis for reversal in law or fact can be or is even arguably shown.

The definition of what constitutes a frivolous civil appeal is difficult. Courts must guard against an oversensitivity to what may be only an apparent abuse. It is clear that appeals having a small chance of success are not for that reason alone frivolous. One may legitimately argue, for example, that even overwhelming contrary precedent should be overruled or distinguished. In the present case, however, Connell disputes no law or precedent or the applicability of either. Its effort to show the presence of substantial evidence on nonobviousness in support of the jury's verdict is limited, as above indicated, to a lawyer's opinion statement from the witness stand that he thought the inventions nonobvious, while totally disregarding the presence in the record of unchallenged evidence destroying support for that opinion, ignoring the difference between fact evidence and a legal conclusion, and making no mention or recognition of the fundamental rule in American civil jurisprudence underlying Rule 50, i.e., that legal questions are ultimately reserved to the judge who bears a final responsibility for upholding the law when a jury's verdict is challenged as unsupported by substantial evidence.

Whatever the events in the district court, we are duty-bound to guard our segment of the judicial process against abuse. The present appeal was filed and maintained in the face of an unassailably proper grant of a judgment NOV, a grant supported and explained by an exhaustive opinion indicating **\*1555** the error-free nature of the conclusion on obviousness in light of the prior art. The impossibility of citing fact evidence in the record to support even minimally the jury findings relating to that issue is reflected in Connell's briefs. No legally cognizable error on which a reversal of the appealed judgment could possibly be based appears anywhere in the record, in Connell's briefs, or in the oral argument. Indeed, if ever there were a case in which a grant of JNOV was necessary and compelled, it is this case. The appeal is frivolous.

Connell was informed, on docketing the present appeal, of our views as expressed in *Asberry v. U.S. Postal Service,* 692

F.2d 1378 (1982). In the face of that notice, Connell elected to proceed with the appeal.

## DECISION

The grant of JNOV is affirmed. The declaratory judgment that the '199 patent is invalid is modified to exclude claim 2 from its effect. The Order of March 4, 1983 is vacated and the question of costs at trial is remanded. Under the provisions of Rule 38, Fed.R.App.P., and 28 U.S.C. § 1912, Sears is awarded double its costs on this appeal. In addition, Connell is ordered to pay the sum of $500 to Sears. Though strongly inclined to hold appellate counsel jointly and severally liable with Connell for the payment to Sears, the court has resolved doubt against that inclination for the sole reason that, a favorable jury verdict having been obtained, the recognized deference due jury verdicts appears to have exerted undue influence on the election to appeal.

AFFIRMED IN PART, MODIFIED IN PART, VACATED AND REMANDED IN PART.

### Parallel Citations

220 U.S.P.Q. 193

Footnotes

1    The issue has been presented and argued at trial and on appeal as related to enforceability, not fraud. Patents held nonenforceable can become enforceable upon discontinuance of the conduct which led to the holding. Fraud on the PTO may result in a holding of invalidity, the equivalent of permanent nonenforceability. In the present case, it would appear that the argument for nonenforceability rests on misrepresentation and failure to disclose to the PTO, conduct incurable with respect to the claims as presently drawn. In view of its treatment by the parties, the jury, and the trial court, however, we accept and dispose of the issue as presented.

End of Document                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 27



JUDGMENTS OF THE
SUPREME COURT OF CANADA

| Home | About | Contact Us | Français |

Decisions > Supreme Court Judgments > Consolidated-Bathurst v. Mutual Boiler

Help

## Supreme Court Judgments

Case name: Consolidated-Bathurst v. Mutual Boiler
Collection: Supreme Court Judgments
Date: 1979-12-21
Report: [1980] 1 SCR 888
Judges: Martland, Ronald; Ritchie, William Johnstone; Pigeon, Louis-Philippe; Dickson, Robert George Brian; Beetz, Jean; Estey, Willard Zebedee; McIntyre, William Rogers
On appeal from: Quebec
Subjects: Insurance





LEXUM

For 20 years now, the Lexum site has been the main public source for Supreme Court decisions.

Decisia
Efficient access to your decisions

Decisia is an online service for courts, boards and tribunals aiming to provide easy and professional access to their decisions from their own website.

Learn More

**SUPREME COURT OF CANADA**
**Consolidated-Bathurst v. Mutual Boiler, [1980] 1 S.C.R. 888**
**Date: 1979-12-21**

Consolidated-Bathurst Export Limited *(Plaintiff) Appellant;*

and

Mutual Boiler and Machinery Insurance Company *(Defendant) Respondent.*

1979: March 13; 1979: December 21,

Present: Martland, Ritchie, Pigeon, Dickson, Beetz, Estey, and McIntyre JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR QUEBEC

*Insurance — Interpretation of insurance contracts — Definition of accident — Direct and consequential damages.*

The appellant, a manufacturer of paper products, was required to shut down part of its facilities because of the failure of three heat exchangers and thereby suffered a loss of $158,289.24 of which $15,604.44 was direct damage to the tubes in the heaters. The respondent is the insurer under a policy issued in respect of certain property of the appellant including these heat exchangers. The respondent resists the appellant's claim for the above mentioned loss on the basis that the damage was caused by corrosion of the tubes inside the heat exchangers and this risk was specifically excluded from the coverage provided by the policy of insurance. This position was adopted in both the Superior Court and the Court of Appeal. Hence the appeal of the plaintiff to this Court.

*Held* (Martland, Ritchie and McIntyre JJ. dissenting): The appeal should be allowed.

*Per* Pigeon, Dickson, Beetz and Estey JJ.: The issue is whether the loss occasioned by the corrosion of the heat exchangers is recoverable under the terms of the policy. The heart of the argument is that while the definition of accident in the policy does not include the event of corrosion or similar events such as "wear and tear, deterioration, depletion, or erosion of material" the definition does include, in the appellant's submission, events which succeed and which may be due to the event of corrosion.

In interpreting an insurance contract, effect must first be given to the intention of the parties, to be gathered from the words they have used, just as in any other contract. Step two is the application, when ambiguity is found, of the *contra proferentem* doctrine by which any doubt as to the meaning and scope of the excluding or limiting term is to be resolved against the party who has inserted it and who is now relying on it. Even apart from

[Page 889]

this doctrine the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. There is no dispute that the heat exchangers were covered by the insurance contract. There is also no serious dispute that corrosion of the tubes

inside the heat exchanger, probably caused by the presence of sea water, was the effective cause of the breakdown of the heat exchanger. The insurer, as was its right, sought in the terms of the contract to limit its exposure to accidental loss and did so by seeking to confine the definition of accident. To interpret "corrosion" as that word is employed in the definition of accident in the manner sought by the respondent would be to eliminate from the insurance coverage any and all loss suffered by the insured mill operator by reason of the intervention of the condition of corrosion. Such an interpretation would necessarily result in a substantial nullification of coverage under the contract.

Per Martland, Ritchie and McIntyre JJ., dissenting: While the policy here covers damage to property other than the object itself, the coverage is limited to indemnity in respect of loss or damage to property of the insured directly caused to an object by an accident as that word is defined in the policy. Therefore an interpretation which would result in affording coverage to the insured for consequential damages whether it was due to corrosion or otherwise cannot be adopted. The only "direct" damage to any object in the appellant's plant was the damage to the tubes themselves and the plain language of the insuring agreement in defining "accident" appears to contemplate and exclude from coverage the very event which happened here, namely, damage being caused to an object which was the property of the insured as a result of "corrosion of . . material".

[Indemnity Insurance Company of North America v. Excel Cleaning Service, [1954] S.C.R. 169, followed; Pense v. Northern Life Assurance Co. (1907), 15 O.L.R. 131, aff'd (1908), 42 S.C.R. 246; Stevenson v. Reliance Petroleum Ltd.; Reliance Petroleum Ltd. v. Canadian General Insurance Co., [1956] S.C.R. 936; Cornish v.. Accident Insurance Co. (1889), 23 Q.B. 453 (C.A.) referred to.]

APPEAL from a judgment of the Court of Appeal of Quebec affirming a judgment of the Superior Court. Appeal allowed, Martland, Ritchie and McIntyre JJ. dissenting.

[Page 890]

Guy Desjardins, Q.C., for the appellant.

Marcel Cinq-Mars, Q.C., for the respondent.

The reasons of Martland, Ritchie and McIntyre JJ. were delivered by

RITCHIE J. (dissenting)—This is an appeal from a judgment of the Court of Appeal of the Province of Quebec affirming the judgment rendered at trial by Mr. Justice Bisson and dismissing the claim of the appellant against its insurer for damage sustained to its property located at a plant which it operated at New Richmond in the Province of Quebec, where it was engaged in the manufacture of paper and paper and wood products.

By reason of their malfunction, direct damage was caused to several tubes in the heaters employed for the heating of bunker "C" fuel with the consequence that temporary closing of the plant became necessary. The appellant's claim in this action encompasses not only the direct damage done to the tubes, but the consequential loss allegedly sustained because of the breakdown of the tubes.

I have had the privilege of reading the reasons for judgment prepared for delivery by my brother Estey in this case, but as I reach a different conclusion concerning the risk insured against by the policy in question, I have found it necessary to express my views separately.

The appellant's claim is made pursuant to the terms of an insurance agreement with the respondent which was in force at the time of the events above referred to whereby the respondent agreed

In consideration of the Premium the Company does hereby agree with the named Insured respecting loss from an Accident, as defined herein, as follows:

1. ... To pay the Insured for loss or damage to property of the Insured directly caused by such Accident to an Object, or if the Company so elects, to repair or replace such damaged property; ..

(The italics are my own.)

The objects covered by the policy are defined in the 1st Schedule thereof as follows:

[Page 891]

The Objects covered under this Schedule are of the type designated as follows:

1. Any metal fired or metal unfired pressure valve; and

> 2. Any piping, on or between premises of the Insured, connected with such vessel and which contains steam or other heat transfer medium or condensate thereof, air, refrigerant, or boiler feedwater between the feed pump or injector and a boiler, together with the valves, fittings, separators and traps on all such piping.

What is insured against by this agreement in my opinion is damage to the property of the insured "directly caused to an "object" by an "accident" as that word is defined in the policy. While the policy covers damage to property other than the object itself, it only covers that damage when it has been directly caused by "accident" to an "object". I am satisfied that the tubes were "objects" within the meaning of the above definition and that damage directly caused to the tubes would have been covered by the insurance agreement had it not been for the terms of the definition of "accident" contained therein which reads as follows:

> C. Definition of Accident—As respects any Object covered under this Schedule, 'Accident' shall mean any sudden and accidental occurrence to the Object, or a part thereof, which results in damage to the Object and necessitates repair or replacement of the Object or part thereof; but Accident shall not mean (a) *depletion, deterioration, corrosion, or erosion of material,* (b) wear and tear (c) leakage at any valve, fitting, shaft seal, gland packing, joint or connection, (d) the breakdown of any vacuum tube, gas tube or brush, (e) the breakdown of any structure or foundation supporting the Object or any part thereof, nor (f) the functioning of any safety device or protection device.

> (The italics are my own.)

Both the trial judge and the Court of Appeal were satisfied that the damage to the tubes was occasioned by corrosion and this conclusion is supported by the fact that quantities of salt water did flow through the pipes. Expert evidence was called on behalf of the appellant directed to supporting the submission that the damage was caused by an hydraulic hammer effect of sudden

[Page 892]

origin which placed an inordinate strain on the pipes and tubes causing them to break. This evidence was, however, not accepted either at trial or in the Court of Appeal and I do not find it necessary to discuss it. In the result it has been concurrently found at trial and on appeal that corrosion was the cause of the damage to the tubes and pipes and it follows from the terms of the "definition of accident" that this damage is not insured against by the policy in question.

It was contended also that even if the coverage afforded by the policy did not include damage by "depletion, deterioration, corrosion" or "wear and tear" within the meaning of the definition of "accident", it was nevertheless effective to make the insurer responsible for consequential loss suffered by the insured as a result of a sudden rupture of the heat exchanger, whether due to corrosion or not. In view of the fact that the coverage is limited to indemnity in respect of loss or "damage to property of the insured <u>directly</u> caused by such accident to an Object", I cannot adopt an interpretation which would result in affording coverage to the insured for <u>consequential</u> damage whether it was due to "corrosion" or otherwise. In my opinion, the only "direct" damage to any object in the appellant's plant was the damage to the tubes themselves and the plain language of the insuring agreement in defining "accident" appears to me to contemplate and exclude from coverage the very event which happened here, namely, damage being caused to an object which was the property of the insured as a result of "corrosion of ... material".

It has been suggested that the language employed in the policy should be construed against the insurance company which was the author of it in accordance with the *contra proferentem* rule which is frequently invoked in the construction of insurance contracts and is found that all other rules of construction fail to assist the Court in determining the true meaning of the policy.

In this regard my brother Estey has made reference to the reasons for judgment of Cartwright J., as he then was, in *Stevenson v. Reliance Petroleum Limited; Reliance Petroleum Limited v. Canadian General Insurance Company*[1]

[Page 893]

where he said at p. 953:

> The rule expressed in the maxim, *verba fortius accipiuntur contra proferentem,* was pressed upon us in argument, but resort is to be had to this rule only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document.

It will however be seen from what I have said that I do not find it necessary to resort to this rule in the interpretation of the policy here at issue.

My brother Estey has, however, adopted the view that in construing the policy and particularly the

definition of accident contained therein in the manner adopted in these reasons and in those of the majority of the Court of Appeal, the result is to "largely, if not completely, nullify the purpose for which the insurance was sold" which is "a circumstances to be avoided so far as the language used will permit". In this regard reliance is placed on the judgment of this Court in *Indemnity Insurance Company of North America v. Excel Cleaning Service*[2], at pp. 177-178, but with the greatest respect I am unable to relate the circumstances of that case to those with which we are here concerned.

The *Excel Cleaning Service* case was one in which an "on location cleaning service" business was covered by a property damage liability policy insuring it for damage to property caused by accident arising out of its work. This policy however contained an exclusion relating "to damage to or destruction of property owned, rented, occupied or used by or in the care, custody and control of the insured", and the insurer contended that a wall to wall carpet fixed to the floor of a house where the insured was employed which was damaged was "in the care, custody and control of the insured" and therefore excluded from the coverage. Consistent with this reasoning all of the customer's belongings on which the insured was working were similarly exclusions which would have meant that the policy afforded no coverage whatever for the business of the insured. It was in this connection that this Court said, at pp. 177-178:

[Page 894]

> Such a construction [as advanced by the insurer] would largely, if not completely, nullify the purpose for which the insurance was sold—a circumstance to be avoided, so far as the language used will permit.

I am respectfully of the opinion that this case involves a very different situation from the one with which we are here concerned. The construction sought to be placed on the Excel Cleaning Service Policy would have meant that although it purported to be a property damage liability policy covering the insured's business, it in fact insured nothing whereas the present policy affords insurance "for loss or damage to property of the insured" directly caused by an accident as defined therein. The meaning assigned to the word "accident" in the policy does not constitute an exclusion from the coverage but is rather a part of the definition of the risk insured against.

For all these reasons, as well as for those stated by Mr. Justice Turgeon, I would dismiss this appeal with costs.

The judgment of Pigeon, Dickson, Beetz and Estey JJ. was delivered by

ESTEY J.—The appellant operates a manufacturing facility for the production of paper products, including paper boxes, at New Richmond, Quebec, and the respondent is the insurer under a policy of insurance issued in respect of certain property of the appellant including the property with which this action is concerned, being three heat exchangers. The heat exchangers in question are described by the trial judge as follows:

> [TRANSLATION] The parts of this system with which we are particularly concerned are three heat exchangers, a type of pipe measuring fifteen feet long with an interior diameter of ten inches.

> Within each of these three exchangers there are 102 tubes thirteen feet long, with an exterior diameter of 5/8 inch and a metal casing measuring 1/16 inch, or .065 inch.

> Inside each exchanger at the ends the 102 pipes pass through a tubular metal plate one inch thick.

> Further, the 102 tubes of each exchanger are themselves divided into three groups of 34 tubes each, so that oil flowing in the tubes passes around the exchanger

[Page 895]

> three times and is heated to the right level before emerging and being directed towards the boilers as a fuel.

> Steam circulates in the exchangers, passing in through the left end immediately to the right of the tubular plate and emerging at the right end, just as it strikes the other tubular plate.

> Each exchanger is sealed at each end by a lid.

> As the exchanger measures fifteen feet and the tubes thirteen feet, it follows that a space of one foot remains at each end between the tubular plate and the lid closing the exchanger.

> The whole apparatus forms a sealed unit, which it was established cannot be opened without causing a breakdown and considerable damage.

Due to the failure of these heat exchangers, the appellant was required to shut down part of their facilities and thereby suffered a loss which the parties have agreed amounted to $158,289.24. This sum is set out in the Plaintiff's Declaration and includes "Direct Damage Loss" of $15,604.44. The insurer resists the appellant's claim on the basis that the damage was caused by corrosion of the tubes inside the heat exchanger and this risk was specifically excluded from the coverage provided by the policy of insurance. The material provisions of the policy of insurance issued by the respondent are as follows:

INSURING AGREEMENT

In consideration of the Premium the Company does hereby agree with the named Insured respecting loss from an Accident, as defined herein, as follows:

COVERAGE A—PROPERTY OF THE INSURED

1. ACTUAL CASH VALUE—To pay the Insured for loss of or damage to property of the Insured directly caused by such Accident to an Object, or if the Company so elects, to repair or replace such damaged property; and

The definition of accident as employed in the above excerpt is as follows:

As respects any Object covered under this Schedule, "Accident" shall mean any sudden and accidental occurrence to the Object, or a part thereof, which results in damage to the Object and necessitates repair or

[Page 896]

replacement of the Object or part thereof; but Accident shall not mean (a) depletion, deterioration, corrosion, or erosion of material, (b) wear and tear, (c) leakage at any value, fitting, shaft seal, gland packing, joint or connection, (d) the breakdown of any vacuum tube, gas tube or brush, (e) the breakdown of any structure or foundation supporting the Object or any part thereof, nor (f) the functioning of any safety device or protective device.

The employees of the appellant became aware of the failure of the heat exchangers when small fuel oil spots were noticed on linerboard being produced in the mill. The source of the oil was traced to the boiler and hence to the heat exchangers where a number of ruptured tubes were discovered.

The appellant advanced two main submissions:

(a) that the damage was caused by hydraulic hammer effect; and,

(b) alternatively, that the damage was caused by corrosion and that the terms of the policy do not exclude damage thus occasioned.

The learned trial judge found that the damage was caused by corrosion and discusses the contribution of pressure changes as follows:

[TRANSLATION] There is no doubt that the damage occurred suddenly, but the phenomenon which led up to it, namely the chemical process of corrosion, was not of a sudden and accidental nature, so that it could not be regarded as an "accident".

On December 4, 1968 some occurrence, probably a fall in the steam pressure in the heat exchanger, caused a failure in certain oil tubes, which moreover apparently broke in a relatively short space of time.

The fact remains, however, that corrosion was the cause of the damage.

The majority of the Court of Appeal found the damage was the result of corrosion and thereby excluded from policy coverage. Turgeon J.A. dealt with the hydraulic hammer theory as follows:

[TRANSLATION] This was a possibility, not a probability, mentioned by appellant's expert witness Mahoney in his examination in chief. However, when he was

[Page 897]

cross-examined, he admitted that he could not provide any direct evidence that a "hydraulic hammer" effect was produced, or that there was excessive pressure, or that the safety valves did not operate effectively.

Dissenting from the majority, Kaufman J.A. appears to have adopted in part the hydraulic hammer theory as being a "trigger" which precipitated the leaks in the tubes. The learned justice went on to state:

But where, as here, the pressure suddenly increased, it will not do for the insurer to point to the corrosion and say that, sooner or later, the tubes would have burst anyway.

Thus it will be seen that in both courts below the cause of the damage was found to be corrosion of the tubes which both courts went on to conclude was a risk or peril not covered by the insurance contract.

The issue is simply, therefore, whether the admitted loss suffered by the appellant and which was occasioned by the corrosion of the heat exchangers is a loss recoverable under the above-quoted terms of the policy of insurance issued by the respondent to the appellant. This leaves the alternative submission advanced by the appellant, namely that the term of the contract of insurance covers the damages suffered by the appellant. The heart of this argument is that while the definition of accident does not include the event of corrosion or similar events such as "wear and tear, deterioration, depletion, or erosion of material", the definition does include, in the appellant's submission, events which succeed and which may be due to the event of corrosion. Thus the insurer would not be liable under the contract for the cost of repairing or replacing any insured property damaged by "depletion, deterioration, corrosion, wear and tear, etc.", but would be responsible for any consequential loss to the insured following the sudden rupture of the heat exchanger whether or not it be due to "corrosion" or "wear and tear", etc.

In the preliminary provisions setting up the coverage under the policy of insurance, the definition of accident is, of course, fundamental, and stripping

[Page 898]

out the words not here relevant, the definition reads as follows:

Accident shall mean a sudden and accidental occurrence to the object ... but accident shall not mean ... corrosion...

Some light may be thrown on this interpretation difficulty by reference to a latter portion of the policy of insurance headed "Exclusions". The following excerpts illustrate the drafting technique employed in the policy where risks are to be excluded from its coverage:

EXCLUSIONS This policy does not apply to

1. WAR DAMAGE—Loss from an Accident caused directly or indirectly by

(a) Hostile or warlike action, including action in hindering, combating or defending against an actual, impending or expected attack, by

...

2. NUCLEAR HAZARDS—Loss, whether it be direct or indirect, proximate or remote.

(a) From an Accident caused directly or indirectly by nuclear reaction ...

(b) From nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, caused directly or indirectly by, contributed to or aggravated by an Accident;

3. MISCELLANEOUS PERILS—Loss under Coverages A and B from

...

(b) An Accident caused directly or indirectly by fire or from the use of water or other means to extinguish fire;

...

(d) Flood unless an Accident ensues and the Company shall then be liable only for loss from such ensuing Accident;

(Emphasis added.)

Thus it may be argued that when the draftsman wished to exclude consequences from an event, the words "directly or indirectly" were employed. Had

[Page 899]

this technique been adopted in the primary coverage provisions excerpted above, it would have read;

Accident does not mean that which directly or indirectly results from corrosion.

Alternatively, if the consequences of corrosion were intended by the parties to be beyond the protection of the contract, such circumstances would have been included under the heading "Exclusions" as a subparagraph comparable to one of those set out above.

At best, one must conclude that the definition of accident, including as it does the reference to corrosion, leaves two clear alternative interpretations open. Firstly, the definition may not include an event relating to corrosion. Secondly, the definition may exclude only the cost of making good the corrosion itself.

Insurance contracts and the interpretative difficulties arising therein have been before courts for at least two centuries, and it is trite to say that where an ambiguity is found to exist in the terminology employed in the contract, such terminology shall be construed against the insurance carrier as being the author, or at least the party in control of the contents of the contract. This is, of course, not entirely true because of statutory modifications to the contract, but we are not here concerned with any such mandated provisions. Meredith J.A. put the proposition in *Pense v. Northern Life Assurance Co.*[3] at p. 137:

> There is no just reason for applying any different rule of construction to a contract of insurance from that of a contract of any other kind; and there can be no sort of excuse for casting a doubt upon the meaning of such a contract with a view to solving it against the insurer, however much the claim against him may play upon the chords of sympathy, or touch a natural bias. In such a contract, just as in all other contracts, effect must be given to the intention of the parties, to be gathered from the words they have used. A plaintiff must make out from the terms of the contract a right to recover; a defendant must likewise make out any defence based upon the agreement. The onus of proof, if I may use such a term in reference to the interpretation of a writing, is, upon each party respectively, precisely the same. We are all, doubtless, insured, and none insurers,

[Page 900]

> and so, doubtless, all more or less affected by the natural bias arising from such a position; and so ought to beware lest that bias be not counteracted by a full apprehension of its existence.

(Adopted in this Court in 1908[4].)

Such a proposition may be referred to as step one in the interpretative process. Step two is the application, when ambiguity is found, of the *contra proferentem* doctrine. This doctrine finds much expression in our law, and one example which may be referred to is found in *Cheshire and Fifoot's Law of Contract* (9th ed.), at pp. 152-3:

> If there is any doubt as to the meaning and scope of the excluding or limiting term, the ambiguity will be resolved against the party who has inserted it and who is now relying on it. As he seeks to protect himself against liability to which he would otherwise be subject, it is for him to prove that his words clearly and aptly describe the contingency that has in fact arisen.

This Court applied the doctrine in *Indemnity Insurance Company of North America v. Excel Cleaning Service*[5] where at pp. 179-180 it was stated:

> It is, in such a case, a general rule to construe the language used in a manner favourable to the insured. The basis for such being that the insurer, by such clauses, seeks to impose exceptions and limitations to the coverage he has already prescribed and, therefore, should use language that clearly expresses the extent and scope of these exceptions and limitations and, in so far as he fails to do so, the language of the coverage should obtain ... Furthermore, the language of Lord Greene in *Woolfall & Rimmer, Ltd. v. Moyle*, [1942] 1 K.B. 66 at 73, is appropriate. He there states:
>
> > I cannot help thinking that, if underwriters wish to limit by some qualification a risk which, prima facie, they are undertaking in plain terms, they should make it perfectly clear what that qualification is.

As has already been stated, this is, of course, the second phase of interpretation of such a contract. Cartwright J., as he then was, stated in *Stevenson v. Reliance Petroleum Limited;*

[Page 901]

*Reliance Petroleum Limited v. Canadian General Insurance Company*[6] at p. 953:

The rule expressed in the maxim, *verba fortius accipiuntur contra proferentem,* was pressed upon us in argument, but resort is to be had to this rule only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document.

Lindley L.J. put it this way:

> In a case on the line, in a case of real doubt, the policy ought to be construed most strongly against the insurers; they frame the policy and insert the exceptions. But this principle ought only to be applied for the purpose of removing a doubt, not for the purpose of creating a doubt, or magnifying an ambiguity, when the circumstances of the case raise no real difficulty.

Cornish v. Accident Insurance Company [7], at p. 456.

Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result. It is trite to observe that an interpretation of an ambiguous contractual provision which would render the endeavour on the part of the insured to obtain insurance protection nugatory, should be avoided. Said another way, the courts should be loath to support a construction which would either enable the insurer to pocket the premium without risk or

[Page 902]

the insured to achieve a recovery which could neither be sensibly sought nor anticipated at the time of the contract.

The *Cornish* case, *supra,* illustrates a course generally taken when such contracts reach the courts. There the court was interpreting an insurance contract in the light of the death of the insured while crossing a railway track. The policy included an exception from insured risks resulting from "exposure of the insured to obvious risk of injury". Lindley L.J., in the course of judgment, stated:

> The words are "exposure *of* the insured to obvious risk of injury." These words suggest the following questions: Exposure by whom? Obvious when? Obvious to whom? It is to be observed that the words are very general. There is no such word as "wilful," or "reckless," or "careless"; and to ascertain the true meaning of the exception the whole document must be studied and the object of the parties to it must be steadily borne in mind. The object of the contract is to insure against accidental death and injuries, and the contract must not be construed so as to defeat that object, nor so as to render it practically illusory. A man who crosses an ordinary crowded street is exposed to obvious risk of injury; and, if the words in question are construed literally, the defendants would not be liable in the event of an insured being killed or injured in so crossing, even if he was taking reasonable care of himself. Such a result is so manifestly contrary to the real intention of the parties that a construction which leads to it ought to be rejected. But, if this be true, a literal construction is inadmissible, and some qualification must be put on the words used. (at p. 456)

An example of the application of the same principles is found in the *Indemnity Insurance Company of North America v. Excel Cleaning Service, supra,* where, at pp. 177-8, it was concluded:

> Such a construction [as advanced by the insurer] would largely, if not completely, nullify the purpose for which the insurance was sold—a circumstance to be avoided, so far as the language used will permit.

The appellant, as the owner and operator of a large forest products facility, sought insurance protection *of* the machinery employed in the plant in its industrial processes. There is no dispute that the heat exchangers in question were covered by the insurance contract. There is also no serious dispute, at least by the time the litigation had

[Page 903]

reached this Court, that corrosion of the tubes inside the heat exchanger, probably caused by the presence of sea water, was the effective cause of the breakdown of the heat exchanger, and the consequential release of oil into the processed steam. The insurer, as was its right, sought in the

terms of the contract to limit its exposure to accidental loss and did so by seeking to confine the definition of accident. If a court were to accept the submissions of the respondent, that loss suffered by the insured by reason of the failure of a machine due to wear and tear and the consequential downtime of the plant was excluded by the definition of accident, then the insured would have purchased, by its premiums, no coverage for what may well be the most likely source of loss, or certainly a risk pervasive through much of the plant. Similarly, to interpret corrosion as that word is employed in the definition of accident in the manner sought by the respondent would be to eliminate from the insurance coverage any and all loss suffered by the insured mill operator by reason of the intervention of the condition of corrosion. Such an interpretation would necessarily result in a substantial nullification of coverage under the contract. It may well be argued by insurers that the premium will reflect such a narrowed coverage. There is no evidence that such is the case here.

It may also be argued by the insurance industry that applying the more favourable construction to this ambiguous provision will be to unnecessarily and unfairly burden the carrier. The carrier under this policy has at least two defensive mechanisms which it can readily call to its aid: firstly, the right of inspection which was exercised here both before and during the contract; and secondly, the right to terminate in the event the insurance carrier determines that the condition of the insured machinery is such as to make it impractical to extend coverage in the manner required by the contract.

I therefore would allow the appeal, set aside the judgment at trial and of the Court of Appeal and direct the entry of judgment in favour of the appellant in the amount of $158,289.24 with interest from the 1st of April, 1969, as claimed (it

[Page 904]

being the date of submission of claim and which date has not been contested in any court in these proceedings), together with costs throughout. In the event the parties are in disagreement as to whether the "Direct Damage" in the amount of $15,604.44 mentioned above is, in fact, repairs of the actual corrosion damage and should not therefore, on the basis of these reasons be included in judgment granted, the matter shall be determined on application to a Judge of the Superior Court.

*Appeal allowed with costs,* MARTLAND, RITCHIE *and* MCINTYRE H. *dissenting.*

*Solicitors for the appellant: Desjardins, Ducharme, Desjardins & Bourque, Montreal.*

*Solicitors for the respondent: Martineau, Walker, Allison, Beaulieu, MacKell & Clermont, Montreal.*

---

[1] [1956] S.C.R. 936.

[2] [1954] S.C.R. 169.

[3] (1907), 15 O.L.R. 131.

[4] (1908), 42 S.C.R. 246.

[5] [1954] S.C.R. 169.

[6] [1956] S.C.R. 936.

[7] (1889), 23 Q.B. 453 (C.A.).