# TAB 28

566 F.3d 1069
United States Court of Appeals,
Federal Circuit.

COREBRACE LLC, Plaintiff–Appellant,

v.

STAR SEISMIC LLC, Defendant–Appellee.

No. 2008–1502.    |    May 22, 2009.

**Synopsis**

**Background:** Owner of patent directed to a brace for use in the fabrication of earthquake-resistant steel-framed buildings brought action against licensee of patent alleging breach of patent license agreement and patent infringement. The United States District Court for the District of Utah, Dale A. Kimball, J., dismissed owner's claims. Owner appealed.

**[Holding:]** The Court of Appeals, Lourie, Circuit Judge, held that licensee did not breach license by contracting with third parties to have the licensed products made for its own use.

Affirmed.

West Headnotes (6)

**[1]    Patents**
    Assignments and sublicenses

Under Utah law, as predicted by the district court, licensee of patent directed to a brace for use in the fabrication of earthquake-resistant steel-framed buildings did not breach license granting it a nonexclusive right to "make, use, and sell" licensed products by contracting with third parties to have the licensed products made for its own use, even though the license stated that licensee could not "assign, sublicense, or otherwise transfer" its rights to any party except an affiliated, parent, or subsidiary company, absent a clear intent in the contract to exclude "have made" rights.

5 Cases that cite this headnote

**[2]    Courts**
    Particular questions or subject matter

The question whether a motion to dismiss for failure to state a claim was properly granted in a patent infringement suit is a purely procedural question not pertaining to patent law, to which the Court of Appeals for the Federal Circuit applies the rule of the regional circuit.

26 Cases that cite this headnote

**[3]    Contracts**
    What law governs

The appropriate law for construing the terms of a contract is the law of the jurisdiction identified in the contract.

Cases that cite this headnote

**[4]    Patents**
    Construction and Operation of Licenses

Under Utah law, as predicted by the district court, the right to "make, use, and sell" a product inherently includes the right to have it made by a third party, absent a clear indication of intent to the contrary.

3 Cases that cite this headnote

**[5]    Contracts**
    Construction as a whole

**Contracts**
    Language of contract

Under Utah law, in construing a contract a court first looks to the plain language within the four corners of the agreement to determine the intentions of the parties, and attempts to harmonize the provisions in the agreement.

Cases that cite this headnote

**[6]    Patents**
    Original utility

7,188,452. Not Infringed.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*1070** Charles L. Roberts, Workman Nydegger, of Salt Lake City, UT, argued for plaintiff-appellant. With him on the brief were L. David Griffin, Matthew A. Barlow, and Chad E. Nydegger. Of counsel on the brief was Mark E. Wilkey, Core–Brace, LLC, of West Jordan, UT.

H. Dickson Burton, TraskBritt, PC, of Salt Lake City, UT, argued for defendant-appellee. With him on the brief were Brick G. Power, and Casey K. McGarvey.

Before LOURIE, FRIEDMAN, and PROST, Circuit Judges.

**Opinion**

LOURIE, Circuit Judge.

CoreBrace LLC ("CoreBrace") appeals from the judgment of the United States District Court for the District of Utah dismissing its claims for breach of a patent license agreement and for patent infringement. *See Corebrace LLC v. Star Seismic LLC,* No. 2:08–cv–11, 2008 U.S. Dist. Lexis 55471 (D.Utah July 18, 2008). Because the court did not err in concluding that Star Seismic LLC's ("Star's") license to make, use, and sell the patented product carried with it an implied license to have the product made by a third party, we affirm.

## BACKGROUND

CoreBrace owns U.S. Patent 7,188,452 ("the #452 patent"), which is directed to a brace for use in the fabrication of earthquake-resistant steel-framed buildings. On June 10, 2007, Star and the inventor of the #452 patent entered into a "Non–Exclusive License Agreement" ("License"), by which Star received a license under the #452 patent; the inventor later transferred his interest to CoreBrace. The License grants Star a nonexclusive right to "make, use, and sell" licensed products. It does not explicitly provide a right to have the licensed product made by a third party. The License does state that Star may not "assign, sublicense, or otherwise transfer" its rights to any party except an affiliated, parent, or subsidiary company. It also reserves to CoreBrace "all rights not expressly granted to [Star]." However, it provides that Star owns any technological improvements "by a third party whose services have been contracted by [Star]."

Star used third-party contractors to manufacture licensed products for its own use. CoreBrace contends that such use of third parties was a breach of the License because Star lacked the right to have a third party make products for Star. On January 4, 2008, CoreBrace sent a letter to Star stating that the License was terminated. The License provides that it can be terminated if it is breached, after written notice of the breach and after a thirty-day opportunity to cure. CoreBrace has not alleged that it provided notice of a breach or that it gave Star thirty days to cure such breach.

On January 4, 2008, the same day that it sent the termination letter, CoreBrace sued Star for breach of the License due to Star's use of third-party contractors and for patent infringement based on Star's use of patented products under a terminated License. Star moved to dismiss the **\*1071** complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim, and the district court granted Star's motion. The court held that Star did not breach the License by having third-party contractors make the licensed products. According to the court, under *Carey v. United States,* 164 Ct.Cl. 304, 326 F.2d 975 (1964), a patent licensee's right to "make" an article includes the right to engage others to do all of the work connected with its production. The court also relied on similar reasoning in *Advanced Micro Devices, Inc. v. Intel Corp.,* 9 Cal.4th 362, 36 Cal.Rptr.2d 581, 885 P.2d 994 (1994). The court further reasoned that, even when a license prohibits sublicensing, as in this case, "have made" rights are granted unless they are expressly prohibited. The court distinguished *Intel Corp. v. U.S. International Trade Commission,* 946 F.2d 821 (Fed.Cir.1991), as a case that was primarily about "foundry" rights, or a licensee's rights to make a product and sell it under a third party's name, and as having been based on the parol evidence of the parties' intent in that case not to grant such foundry rights. The court also examined the License and, based on its apparent acknowledgement of third-party manufacturers, concluded that nothing in the License precluded Star from having a third party manufacture the licensed product for Star. Thus, the court held that Star had the right to have a third party manufacture the licensed product for it.

The court then held that, even if Star had breached the License, CoreBrace did not properly terminate it because CoreBrace failed to follow the License's termination provisions. CoreBrace had conceded that it had not followed the termination provisions, but had argued that Star's breach of the License was incurable, so notice was not required prior to termination. According to the court, however, Star's

alleged breach was not incurable, as CoreBrace could have notified Star that it should make the product itself, cease using a third party, or have the third party obtain a license. Such action, according to the court, would not have been impossible or futile. Furthermore, the court found that the alleged breach did not frustrate the purpose of the License, as the inventor collected a royalty from Star on each product, no matter who manufactured it. Thus, according to the court, CoreBrace should have followed the prescribed procedure for terminating the License, and the failure to properly terminate it meant that Star retained its rights under the License.

Finally, the court held that, because the License was neither breached nor terminated, Star could not have infringed the patent under which it was licensed. CoreBrace timely appealed the district court's dismissal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

[1] CoreBrace argues that the district court erred in holding that the License was not breached. The License reserves to CoreBrace all rights not expressly granted, and, according to CoreBrace, the district court found that "have made" rights were not expressly granted. CoreBrace also asserts that "have made" rights are not inherent in the right to make, use, and sell, as a licensee can make the product itself rather than having it made by a third party. Thus, CoreBrace argues that Star did not have the right to have a third party make the products.

CoreBrace also argues that the court improperly distinguished Intel and relied on *Advanced Micro* and *Carey* to hold that a prohibition on "have made" rights must be explicit. According to CoreBrace, in **\*1072** *Intel*, this court held that "have made" rights were restricted by the reservation of rights clause in the license. CoreBrace asserts that *Advanced Micro* is inapposite because the ruling was on appeal from an arbitrator. CoreBrace also argues that *Carey* is inapposite because the exclusive license in that case granted the right to sublicense, which, according to CoreBrace, includes the right to "have made."

Finally, CoreBrace argues that, although certain provisions in the License mention "third parties," the License also mentions specific third parties, not including third-party manufacturers. Thus, according to CoreBrace, the License would have mentioned third-party manufacturers if the

parties had intended for such manufacturers to be permitted. Although the License mentions third parties in general whose services have been contracted for by Star, CoreBrace argues that those third parties might be architects, contractors, or others with a connection to Star, rather than manufacturers.

Star responds that the grant of a right to "make, use, and sell" inherently includes the right to have others make the product, as the Court of Claims held in *Carey*. Star also asserts that the facts of *Intel* differ from this case, as the question in *Intel* was whether the licensee could operate as a foundry, *i.e.*, make the product for a third party and sell it under the third party's name. Moreover, according to Star, the decision in *Intel* was based on strong parol evidence and applied the law of a different circuit. Furthermore, Star argues that the California Supreme Court later concluded in *Advanced Micro* that "have made" rights are included in a license to "make, use, and sell" unless they have been expressly excluded.

Star also argues that the License specifically provides that Star may contract with third parties to exercise its rights, which necessarily includes contracting with third-party manufacturers. Moreover, according to Star, the License requires Star to provide its supply and service contracts for inspection, implying that such supply and service contracts, including manufacturing contracts, are permissible.

[2] [3] We conclude that in granting the 12(b)(6) motion the district court correctly determined that Star was entitled to have contractors make the licensed product and did not breach the patent license in doing so. "The question ... whether a Rule 12(b)(6) motion was properly granted is a purely procedural question not pertaining to patent law, to which this court applies the rule of the regional [ ] circuit," in this case the Tenth Circuit. *Gen. Mills, Inc. v. Kraft Foods Global, Inc.,* 487 F.3d 1368, 1373 (Fed.Cir.2007) (quotation marks omitted). "Because the sufficiency of a complaint is a question of law, [the Tenth Circuit] review[s] *de novo* the district court's grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), applying the same standards as the district court." *Sunrise Valley, LLC v. Kempthorne,* 528 F.3d 1251, 1254 (10th Cir.2008) (quotation marks omitted). "A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief." *Jones v. Bock,* 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). The appropriate law for construing the terms of a contract is the law of the jurisdiction identified in the contract, in this case Utah law. *See Rash v. J.V. Intermediate, Ltd.,* 498 F.3d 1201, 1206 (10th Cir.2007).

91 U.S.P.Q.2d 1209

[4]  [5]  Star did not breach the License by contracting with third parties to have the licensed products made for it. The right to "make, use, and sell" a product inherently includes the right to have it made by a third party, absent a clear **\*1073** indication of intent to the contrary. No Utah Supreme Court case has addressed the scope of a right to "make, use, and sell" a product. However, "[w]here the state's highest court has not addressed the issue presented, the federal court must determine what decision the state court would make if faced with the same facts and issue." *Id.* at 1206 (quotation marks omitted). Utah follows general principles of contract law, which we will apply here. *See Cent. Fla. Invs., Inc. v. Parkwest Assocs.,* 40 P.3d 599, 605 (Utah 2002). Under Utah law, "we first look to the plain language within the four corners of the agreement to determine the intentions of the parties, and we attempt to harmonize the provisions in the ... agreement." *Id.* In addition, other courts have addressed the scope of the right to "make, use, and sell" a product, and we will look to them to guide our decision.

In *Carey,* the Court of Claims, one of our predecessor courts, whose decisions bind us, *see South Corp. v. United States,* 690 F.2d 1368, 1370–71 (Fed.Cir.1982), held that a license to "produce, use, and sell" a product inherently includes the right to have it made by a third party. The court stated that a license to produce, use, and sell "is not restricted to production by the licensee personally or use by him personally or sales by him personally. It permits him to employ others to assist him in the production, and in the use and in the sale of the invention. Nor need he take any personal part in the production." *Carey,* 326 F.2d at 979. Thus, "his license permits him to engage others to do all the work connected with the production of the article for him." *Id.*; *see also Advanced Micro,* 36 Cal.Rptr.2d 581, 885 P.2d at 1009 n. 15 (" '[H]ave-made' rights—the right of a licensee to have a chip made for it by a third party foundry —were not expressly excluded under the 1982 contract, and in the absence of any finding by the arbitrator we cannot say they were not included in the contractual right to make and sell a licensed product."). Thus, one of our predecessor courts and the California Supreme Court have both persuasively held that a "have made" right is implicit in a right to make, use, and sell, absent an express contrary intent. We consider that the Utah Supreme Court would therefore likely arrive at the same conclusion were it to consider the issue.

CoreBrace argues that the situation in *Carey* was different from the situation in this case because that license was exclusive and included a right to sublicense, which itself

would inherently include a right to have the product made. We disagree. The court in *Carey* did not base its conclusion on exclusivity or the right to sublicense, but the right to "produce, use, and sell." The court specifically stated that "[a] licensee having the right to produce, use and sell might be interested only in using the article or in selling it; in order to use it or sell it, the article must be produced; to have it produced, his license permits him to engage others" to produce it for him. *Carey,* 326 F.2d at 979. None of that logic relies on the licensee's right to sublicense; in other words, a right to have made is not a sublicense, as the contractor who makes for the licensee does not receive a sublicense from the licensee. *See Cyrix Corp. v. Intel Corp.,* 77 F.3d 1381, 1387–88 (holding that Cyrix's exercise of its expressly granted "have made" rights did not amount to a sublicense). The contractor cannot make or use for anyone other than the licensee or sell to third parties. Similarly, regarding the distinction between having an exclusive and nonexclusive license, a nonexclusive licensee who could make, use, and sell would still be entitled to have a product made for itself by another party in order to use or sell the product without making it, even if **\*1074** the patent owner granted other licenses. The distinction between an exclusive license and a nonexclusive license has no relevance to how a licensee obtains the product it is entitled to make, use, and sell. Thus, the logic of the holding in *Carey* is not limited to exclusive licenses or licenses that include a right to sublicense.

We also agree with Star that *Intel* is inapposite to this case. *Intel* was a special facts case. There, Intel sued Atmel for patent infringement, as Atmel was using Sanyo, a licensee, as a foundry for an allegedly infringing product of Atmel's design, *i.e.,* Atmel had Sanyo manufacture the product, and Atmel sold it under Atmel's own name. Atmel argued that Intel's license to Sanyo included foundry rights, which would have allowed Atmel to sell the licensed product under its own name because it was manufactured by Sanyo. *Intel,* 946 F.2d at 826. Thus, the sole issue was whether the license to Sanyo granted such foundry rights. In determining that Sanyo did not have the right under the license to act as a foundry, we discussed two provisions of the license, a reservation of rights clause and Intel's grant to Sanyo of the right to make, use, and sell only "Sanyo" products. *Id.* at 826 n. 9. We determined that Sanyo had no foundry rights under the contract, holding that the addition of the word "Sanyo" to limit the products covered under the license was intended to exclude foundry rights. *Id.* at 826–28. Otherwise, it would be tantamount to granting Sanyo a right to sublicense, a right it did not have. All Sanyo had was the right to manufacture for its own purposes.

CoreBrace LLC v. Star Seismic LLC, 566 F.3d 1069 (2009)
91 U.S.P.Q.2d 1209

In determining that the "Sanyo" limitation excluded foundry rights, we addressed "have made" rights. Unlike in this case, both parties in *Intel* agreed that Sanyo's license excluded "have made" rights. *Id.* at 287, 36 Cal.Rptr.2d 581, 885 P.2d 994. However, the parties disputed the textual source for such exclusion: whether it was the "Sanyo" limitation or the reservation of rights clause. Atmel argued that the "Sanyo" limitation was intended to exclude only "have made" rights, rather than foundry rights. *Id.* The administrative law judge of the International Trade Commission found that "have made" rights were excluded, not because of the "Sanyo" limitation, but because of the reservation of rights clause. *Id.* at 827–28. After first acknowledging the administrative law judge's reasoning, we stated another reason for denying "have made" rights, *viz.*, that "have made" rights were also precluded by the "Sanyo" limitation, as were foundry rights. *Id.* at 828. Thus, we did not base our holding in *Intel* on a determination that the reservation of rights clause precluded "have made" rights, but instead on a determination that the entire contract, including the "Sanyo" limitation, precluded "have made" rights. Because *Intel* was a case about foundry rights, rather than "have made" rights, and because our holding relied on the "Sanyo" limitation, we do not find *Intel* persuasive or controlling in this case. Instead, the *Carey* holding and reasoning control here.

CoreBrace argues that the reservation of rights clause in the License precludes an interpretation that the License includes "have made" rights. According to CoreBrace, because the License reserves to CoreBrace "[r]ights not expressly granted to [Star]," the License could not have implicitly granted "have made" rights to Star. We disagree. Because the right to "make, use, and sell" a product *inherently* includes the right to have it made, "have made" rights are included in the License and not excluded by the reservation of rights clause. A grant of a right to "make, use, and sell" a product, without more, inherently includes a right to have a third party make the product. A clear intent **\*1075** shown in a contract to exclude "have made" rights can negate what would otherwise be inherent. In this case, however, CoreBrace has failed to show a clear intent to exclude "have made" rights from the License. In fact, other provisions of the License appear to contemplate that Star may have the product made by a third party. For example, the License provides that Star owns any improvements to the technology "by a third party whose services have been contracted by [Star]." Although, as CoreBrace argues, that third party might be other than a manufacturer, nothing in the License precludes it from being a third-party manufacturer. In

fact, a likely party to improve the licensed technology is the manufacturer, so a third party who improves the technology is likely to be a third-party manufacturer. Similarly, the License requires Star to allow an "audit of its books and records relating to manufacturing ... [and] supply contracts." Those provisions indicate that the parties contemplated that third parties might manufacture the licensed products and supply them to Star.

Most importantly, nothing in the License indicates an intent to exclude "have made" rights. CoreBrace argues that the License's provision requiring Star to indemnify CoreBrace for all claims "arising out of [Star's] manufacture" demonstrates an intent that no third party manufacture the products. According to CoreBrace, if "have made" rights had been intended, the License would have required indemnification for all claims arising out of third parties' manufacture as well. However, that vague reference does not show a clear intent to exclude "have made" rights, especially in light of the provisions indicating that third parties might be involved in supplying goods and improving the technology in order for Star to exercise its rights under the License. CoreBrace has not pointed to any provision in the License that shows a clear intent to exclude "have made" rights from its grant.

We therefore hold that Star did not breach the License by contracting with third parties to have the licensed products made for its own use. As for CoreBrace's argument that the district court erred in holding that CoreBrace had failed to adequately terminate the License, the issue is moot because the license was not breached. CoreBrace was not entitled to terminate the license, and thus the License has not been terminated. Thus, Star cannot have infringed CoreBrace's patent under which it was licensed.

We have considered CoreBrace's remaining arguments and find them unpersuasive.

## CONCLUSION

Accordingly, the judgment of the district court dismissing the case for failure to state a claim is affirmed.

*AFFIRMED*

**Parallel Citations**

91 U.S.P.Q.2d 1209

**CoreBrace LLC v. Star Seismic LLC, 566 F.3d 1069 (2009)**

91 U.S.P.Q.2d 1209

---

**End of Document**                                  © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 29

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 9 of 398

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

2012 ONCA 404

Ontario Court of Appeal

Crystallex International Corp., Re

2012 CarswellOnt 7329, 2012 ONCA 404, 216 A.C.W.S. (3d)
550, 293 O.A.C. 102, 4 B.L.R. (5th) 1, 91 C.B.R. (5th) 207

# In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36 as amended

And In the Matter of a Plan of Compromise or Arrangement of Crystallex International Corporation

D. O'Connor A.C.J.O., R.A. Blair, Alexandra Hoy JJ.A.

Heard: May 11, 2012

Judgment: June 13, 2012 [*]

Docket: CA C55434, C55435

Proceedings: affirming *Crystallex International Corp., Re* (2012), 2012 ONSC 538, 2012 CarswellOnt 968, 89 C.B.R. (5th) 303 (Ont. S.C.J. [Commercial List]); additional reasons at *Crystallex International Corp., Re* (2012), 2012 CarswellOnt 9479, 2012 ONCA 527 (Ont. C.A.)

Counsel: Richard B. Swan, S. Richard Orzy, Derek J. Bell, Emrys Davis for Appellant, Computershare Trust Company of Canada

Andrew J.F. Kent, Markus Koehnen, Jeffrey Levine for Respondent, Crystallex International Corporation

Barbara L. Grossman for Tenor Capital Management Company, L.P. and Affiliates

Robert Frank for Forbes & Manhattan Inc., Aberdeen International Inc.

David Byers for Monitor Ernst & Young Inc.

Subject: Insolvency

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — General principles — Jurisdiction — Single judge**

Section 11.2 of the Companies Creditors Arrangement Act does not restrict the ability of the supervising judge, where appropriate, to approve the grant of a charge securing financing before a plan is approved that may continue after the company emerges from CCAA protection.

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Appeals**

Corporation moved for approval of DIP financing and management incentive plan against wishes of noteholders — Supervising judge found there could be no meaningful recovery, and therefore no successful restructuring, without financing of arbitration which was corporation's biggest asset — Appeal by noteholders dismissed — Supervising judge was in the best position to balance the interests of all stakeholders — Appellate court should not interfere where question is one of weight to be given to particular factors rather than failure to consider factors or correctness.

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Arrangements — Approval by creditors**

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

C Corp. sought court approval for agreement with T LP providing debtor in possession (DIP) financing — Agreement was opposed by C's noteholders who proposed their own DIP financing — Agreement with T LP approved — Appeal by noteholders dismissed — Supervising judge correct in finding agreement was not "plan of arrangement" or "compromise" requiring vote.

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Initial application — Miscellaneous**

C Corp. sought court approval for agreement with T LP providing management incentive plan (MIP) — Agreement was opposed by C's noteholders who had own proposed plan — Agreement with T LP approved — Appeal by noteholders dismissed — Supervising judge correctly held that independent committee had applied business judgment.

**Table of Authorities**

**Cases considered by *Alexandra Hoy J.A.*:**

*Air Canada, Re* (2004), 2004 CarswellOnt 469, 47 C.B.R. (4th) 169 (Ont. S.C.J. [Commercial List]) — considered

*Calpine Canada Energy Ltd., Re* (2007), 2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 415 A.R. 196, 33 B.L.R. (4th) 68 (Alta. Q.B.) — referred to

*Calpine Canada Energy Ltd., Re* (2007), 35 C.B.R. (5th) 27, 410 W.A.C. 25, 417 A.R. 25, 2007 ABCA 266, 2007 CarswellAlta 1097, 80 Alta. L.R. (4th) 60, 33 B.L.R. (4th) 94 (Alta. C.A. [In Chambers]) — referred to

*Cliffs Over Maple Bay Investments Ltd. v. Fisgard Capital Corp.* (2008), 2008 BCCA 327, 2008 CarswellBC 1758, 83 B.C.L.R. (4th) 214, 296 D.L.R. (4th) 577, 434 W.A.C. 187, 258 B.C.A.C. 187, 46 C.B.R. (5th) 7, [2008] 10 W.W.R. 575 (B.C. C.A.) — distinguished

*Computershare Trust Co. of Canada v. Crystallex International Corp.* (2009), 65 B.L.R. (4th) 281, 2009 CarswellOnt 7997 (Ont. S.C.J. [Commercial List]) — referred to

*Computershare Trust Co. of Canada v. Crystallex International Corp.* (2010), 70 B.L.R. (4th) 45, *(sub nom. Crystallex International Corp. v. Crystallex Corp.)* 263 O.A.C. 137, 2010 CarswellOnt 3374, 2010 ONCA 364 (Ont. C.A.) — referred to

*Computershare Trust Co. of Canada v. Crystallex International Corp.* (2011), 2011 CarswellOnt 10305, 2011 ONSC 5748 (Ont. S.C.J. [Commercial List]) — referred to

*Crystallex International Corp., Re* (2011), 2011 ONSC 7701, 2011 CarswellOnt 15034 (Ont. S.C.J. [Commercial List]) — referred to

*Grant Forest Products Inc., Re* (2009), 2009 CarswellOnt 4699, 57 C.B.R. (5th) 128 (Ont. S.C.J. [Commercial List]) — considered

*Imperial Oil Ltd. v. R.* (2006), *(sub nom. Imperial Oil Ltd. v. Minister of National Revenue)* 353 N.R. 201, [2007] 1 C.T.C. 41, 2006 SCC 46, 2006 CarswellNat 3176, 2006 CarswellNat 3177, *(sub nom. Imperial Oil Ltd. v. Canada)* 2006 D.T.C. 6660 (Fr.), *(sub nom. Imperial Oil Ltd. v. Canada)* 2006 D.T.C. 6639 (Eng.), *(sub nom. Inco Ltd. v. Canada)* 273 D.L.R. (4th) 450, *(sub nom. Imperial Oil Ltd. v. Canada)* [2006] 2 S.C.R. 447 (S.C.C.) — considered

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 11 of 398

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

*Ivaco Inc., Re* (2006), 2006 C.E.B. & P.G.R. 8218, 25 C.B.R. (5th) 176, 83 O.R. (3d) 108, 275 D.L.R. (4th) 132, 2006 CarswellOnt 6292, 56 C.C.P.B. 1, 26 B.L.R. (4th) 43 (Ont. C.A.) — considered

*New Skeena Forest Products Inc., Re* (2005), 7 M.P.L.R. (4th) 153, [2005] 8 W.W.R. 224, *(sub nom. New Skeena Forest Products Inc. v. Kitwanga Lumber Co.)* 210 B.C.A.C. 247, *(sub nom. New Skeena Forest Products Inc. v. Kitwanga Lumber Co.)* 348 W.A.C. 247, 2005 BCCA 192, 2005 CarswellBC 705, 9 C.B.R. (5th) 278, 39 B.C.L.R. (4th) 338 (B.C. C.A.) — considered

*Stelco Inc., Re* (2005), 253 D.L.R. (4th) 109, 75 O.R. (3d) 5, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 2005 CarswellOnt 1188, 196 O.A.C. 142 (Ont. C.A.) — referred to

*Ted Leroy Trucking Ltd., Re* (2010), *(sub nom. Century Services Inc. v. Canada (A.G.))* [2010] 3 S.C.R. 379, [2010] G.S.T.C. 186, 12 B.C.L.R. (5th) 1, *(sub nom. Century Services Inc. v. A.G. of Canada)* 2011 G.T.C. 2006 (Eng.), *(sub nom. Century Services Inc. v. A.G. of Canada)* 2011 D.T.C. 5006 (Eng.), *(sub nom. Leroy (Ted) Trucking Ltd., Re)* 503 W.A.C. 1, *(sub nom. Leroy (Ted) Trucking Ltd., Re)* 296 B.C.A.C. 1, 2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, 409 N.R. 201, *(sub nom. Ted LeRoy Trucking Ltd., Re)* 326 D.L.R. (4th) 577, 72 C.B.R. (5th) 170, [2011] 2 W.W.R. 383 (S.C.C.) — considered

*Timminco Ltd., Re* (2012), 2012 CarswellOnt 1466, 2012 ONSC 948, 95 C.C.P.B. 222, 86 C.B.R. (5th) 171 (Ont. S.C.J. [Commercial List]) — considered

**Statutes considered:**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
    Generally — referred to

*Bankruptcy Code*, 11 U.S.C.
    Chapter 15 — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
    Generally — referred to

    s. 6(1) — referred to

    s. 11 — considered

    s. 11.2 [en. 1997, c. 12, s. 124] — considered

    s. 11.2(1) [en. 2005, c. 47, s. 128] — considered

    s. 11.2(4) [en. 2005, c. 47, s. 128] — considered

    s. 11.2(4)(a) [en. 2005, c. 47, s. 128] — considered

    s. 11.2(4)(d) [en. 2005, c. 47, s. 128] — considered

    s. 11.5(1) [en. 1997, c. 12, s. 124] — considered

*Interpretation Act*, R.S.C. 1985, c. I-21
    s. 14 — considered

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 12 of 398

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

APPEALS from judgment reported at *Crystallex International Corp., Re* (2012), 2012 ONSC 538, 2012 CarswellOnt 968, 89 C.B.R. (5th) 303 (Ont. S.C.J. [Commercial List]) and *Crystallex International Corp., Re* (2012), 2012 ONSC 2125, 2012 CarswellOnt 4577 (Ont. S.C.J. [Commercial List]), granting orders approving agreement for debtor in possession financing, management incentive plan, extension of stay, and approval of actions of Monitor.

*Alexandra Hoy J.A.:*

## I. Overview

1     The primary issue in these appeals is the scope of financing the supervising judge can or should approve, without the sanction of creditors, while a company is under the protection of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA").

2     The respondent Crystallex International Corporation ("Crystallex") is a Canadian mining company. Its principal asset was the right to develop Las Cristinas in Venezuela, which is one of the largest undeveloped gold deposits in the world. Crystallex obtained this right through a contract with the Corporacion Venezolana de Guayana (the "CVG"), a state-owned Venezuelan corporation. On February 3, 2011, after Crystallex spent over $500 million on developing Las Cristinas, the CVG sent Crystallex a letter to "unilaterally rescind" the contract for reasons of "expediency and convenience". There is no suggestion in these proceedings that the rescission was due to any mismanagement by Crystallex.

3     As a result of the cancellation of the contract, Crystallex was unable to pay its $100 million in senior 9.375 per cent notes due December 23, 2011 (the "Notes"). It sought and, on December 23, 2011 obtained, protection under the CCAA.

4     At present, Crystallex's only asset of significance is an arbitration claim for US $3.4 billion against the government of Venezuela in relation to the cancellation of the contract. The arbitration claim is the "pot of gold" in the CCAA proceeding.

5     The appellant Computershare Trust Company of Canada, in its capacity as Trustee for the holders of the Notes (the "Noteholders"), appeals, with leave, three orders made by the supervising judge in the CCAA proceeding: (i) the January 20, 2012 CCAA Bridge Financing Order (with reasons released January 25, 2012 and reported at 2012 ONSC 538 (Ont. S.C.J. [Commercial List]) ) (the "Bridge Financing Reasons")) authorizing Crystallex to obtain bridge financing of $3.125 million (the "Bridge Loan") from the respondent Tenor Special Situations Fund, L.P. ("Tenor L.P."); (ii) the April 16, 2012 CCAA Financing Order authorizing Crystallex to obtain $36 million of what the supervising judge characterized as Debtor in Possession ("DIP") financing from Tenor Special Situation Fund I, LLC ("Tenor") (the "Tenor DIP Loan"); and (iii) the April 16, 2012 Management Incentive Plan Approval Order approving a Management Incentive Plan ("MIP") designed to ensure the retention of key executives until the arbitration is completed. The supervising judge's reasons for the CCAA Financing Order and Management Incentive Plan Approval Order are reported at 2012 ONSC 2125 (Ont. S.C.J. [Commercial List]) (the "DIP Financing Reasons").

6     Among other conditions, the Tenor DIP Loan, due December 31, 2016, entitles Tenor to 35 per cent of the net proceeds of the arbitration in addition to interest, provides governance rights that may continue after Crystallex exits from CCAA protection, and requires Tenor's approval to a range of options that might customarily be offered to unsecured creditors in seeking to negotiate a plan of compromise or arrangement.

7     Substantially all of the creditors opposed the approval of the Bridge Loan, the Tenor DIP Loan and the MIP. Crystallex represents that it hopes to negotiate a plan of arrangement or compromise with the Noteholders and other creditors before the current stay until July 30, 2012 expires.

8     The bulk of the $36 million Tenor DIP Loan comprises financing to pursue the arbitration claim, which may continue after the period of CCAA protection.

## II. The Legislative Framework

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

9      The CCAA was amended effective September 18, 2009 to add the following provisions regarding the grant of a charge to secure financing required by the debtor:

**Interim financing**

11.2 (1) On application by a debtor company and on notice to the secured creditors who are likely to be affected by the security or charge, a court may make an order declaring that all or part of the company's property is subject to a security or charge — in an amount that the court considers appropriate — in favour of a person specified in the order who agrees to lend to the company an amount approved by the court as being required by the company, having regard to its cash-flow statement. The security or charge may not secure an obligation that exists before the order is made.

. . .

**Factors to be considered**

(4) In deciding whether to make an order, the court is to consider, among other things,

    (a) the period during which the company is expected to be subject to proceedings under this Act;

    (b) how the company's business and financial affairs are to be managed during the proceedings;

    (c) whether the company's management has the confidence of its major creditors;

    (d) whether the loan would enhance the prospects of a viable compromise or arrangement being made in respect of the company;

    (e) the nature and value of the company's property;

    (f) whether any creditor would be materially prejudiced as a result of the security or charge; and

    (g) the monitor's report referred to in paragraph 23(1)(b), if any. [1]

Prior to the enactment of these provisions, the court relied on its general authority under the CCAA to approve DIP financing: see Lloyd W. Houlden, Geoffey B. Morawetz & Janis P. Sarra, *The 2012 Annotated Bankruptcy and Insolvency Act* (Toronto: Carswell, 2011), at p. 1175.

**III. The Background**

*A. Events Prior to the CCAA Filings*

10      Crystallex has filed a Request for Arbitration pursuant to the Canada-Venezuela Bilateral Investment Treaty, claiming $3.4 billion plus interest for the loss of its investment in Las Cristinas. The hearing of the arbitration is scheduled for November 11, 2013.

11      Crystallex's most significant liability is its debt to the Noteholders. In addition to amounts owed to the Noteholders, Crystallex has other liabilities of approximately CAD $1.2 million and approximately US $8 million.

12      The current Noteholders are hedge funds, some of whom purchased Notes after Venezuela announced its intention to expropriate Las Cristinas at prices as low as 25 cents on the dollar.

13      The relationship between Crystallex and the current Noteholders is hostile. Crystallex and the Noteholders have been in litigation since 2008. Prior to the maturity date of the Notes, the Noteholders twice, unsuccessfully, brought court proceedings against Crystallex alleging that an event had occurred which accelerated Crystallex's obligation to pay the Notes. Those

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

proceedings were also heard by the supervising judge: see *Computershare Trust Co. of Canada v. Crystallex International Corp.* (2009), 65 B.L.R. (4th) 281 (Ont. S.C.J. [Commercial List]), aff'd 2010 ONCA 364, 263 O.A.C. 137 (Ont. C.A.); and *Computershare Trust Co. of Canada v. Crystallex International Corp.*, 2011 ONSC 5748 (Ont. S.C.J. [Commercial List]).

### B. Commencement of Proceedings under the CCAA and Chapter 15

14    On December 22, 2011, one day prior to the maturity of the Notes, Crystallex and the Noteholders filed competing CCAA applications. The Noteholders' application contemplated that all existing common shares would be cancelled, an equity offering would be undertaken, and if, or to the extent, the equity proceeds were insufficient to pay out the Noteholders, the Notes would be converted to equity.

15    Crystallex sought authority to file a plan of compromise and arrangement, the authority to continue to pursue the arbitration in Venezuela, and the authority to pursue all avenues of interim financing or a refinancing of its business and to conduct an auction to raise financing. In his supporting affidavit sworn December 22, 2011, Robert Fung, Crystallex's Chairman and Chief Executive Officer, indicated that Crystallex wished to have all claims stayed against it until the arbitration settled or Crystallex realized the arbitration award. Crystallex had already received an unsolicited offer of financing from Tenor Capital Management.

16    It was (and is) expected that, if the arbitration is successful and the award is collected, there will be more than enough to pay the creditors and a significant amount will be available to shareholders.

17    On December 23, 2011, the supervising judge made an order granting Crystallex's CCAA application (the "Initial Order"). In his reasons released December 28, 2011, he explained that the Noteholders' proposal was not a fair balancing of the interests of all stakeholders: 2011 ONSC 7701 (Ont. S.C.J. [Commercial List]), at para. 26. The Noteholders did not appeal the Initial Order.

18    Crystallex obtained an order under chapter 15 of the United States Bankruptcy Code from the United States Bankruptcy Court for the District of Delaware, among other things giving effect to the Initial Order in the United States as the main proceeding.

### C. Crystallex Develops a DIP Auction Process

19    Paragraph 12 of the Initial Order authorized Crystallex to pursue all avenues of interim financing or a refinancing of its business or property, subject to the requirements of the CCAA and court approval, to permit it to proceed with an orderly restructuring. It further provided:

> Without limiting the foregoing, the Applicant may conduct an auction to raise interim or DIP financing pursuant to procedures approved by the Monitor and using such professional assistance as the Applicant may determine with the consent of the Monitor. If such approved procedures are followed to the satisfaction of the Monitor then the best offer as determined by the Applicant pursuant to the approved procedures shall be afforded the protection of the *Soundair* principles so that it will be too late to make topping offers thereafter and such offers will not be considered by this Court.

20    Crystallex hired an independent financial advisory firm, Skatoff & Company, LLC, and developed a set of procedures to govern the solicitation of bids to provide financing to Crystallex. The Monitor, Ernst & Young Inc., approved the bid procedures. The bid procedures indicated that Crystallex's objective was to obtain financing of not less than $35 million, net of costs, that, on completion of the CCAA and U.S. Chapter 15 reorganization proceedings, would roll into financing maturing not sooner than December 31, 2014. The bid deadline was February 1, 2012.

### D. The Bridge Loan

21    On January 20, 2012, the supervising judge considered competing proposals from Tenor L.P. and the Noteholders to provide bridge financing. Tenor L.P. offered $3.125 million with interest at 10 per cent per annum. The Noteholders offered $3 million with interest at 1 per cent per annum.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

22    The board of Crystallex, taking into account advice received from Mr. Skatoff, recommended the Tenor L.P. offer. Mr. Skatoff was concerned that the Noteholders' objective may have been to defeat the larger DIP financing process so that they could ultimately impose financing terms on Crystallex. It was also his view that Crystallex should avoid entering into an important financial relationship with a hostile party.

23    The supervising judge approved Tenor L.P.'s offer.

### E. The Noteholders Object to the DIP Auction Process

24    On January 20, 2012, the Noteholders brought a cross-motion to modify the DIP auction process then underway, which they severely criticized. They objected to the amount sought, the term, and the lender back-end entitlement a successful DIP lender could acquire. In their view, Crystallex was inappropriately seeking financing in excess of amounts required until a compromise or plan of arrangement could be arrived at between Crystallex and its creditors. Given their existing position in Crystallex, the Noteholders also objected to being required to sign a non-disclosure agreement containing a standstill provision in order to be a qualified bidder.

25    The supervising judge held that if the Noteholders wished to be considered as a qualified bidder, they would have to sign a non-disclosure agreement: Bridge Financing Reasons, at para. 27. As to their other concerns, he wrote, at para. 29:

> In my view these objections are premature and it is not necessary for me to consider their strength at this stage. The time for filing bids from qualified bidders has not yet expired and what bids will be received is unknown. It is when a successful bidder has been chosen and the DIP facility is before the court for approval that these issues raised by the Noteholders would be more appropriately dealt with. Until then, there is no factual foundation for judgment to be passed on the bid procedures for the DIP facility for which Crystallex will seek approval.

### F. Competing DIP Financing Offers: The Tenor DIP Loan and the Noteholders' Offer

26    The bidders who responded to the request for DIP financing included three hedge funds that hold approximately 77 per cent of the Notes and Tenor.

27    Those hedgefund Noteholders proposed a loan of $10 million with a simple interest rate of 1 per cent repayable on October 15, 2012.

28    The supervising judge described Tenor's proposed terms in the DIP Financing Reasons:

[23] The Tenor DIP facility contains the following material financial terms:

> (a) Tenor will advance $36 million to Crystallex due and payable on December 31, 2016. This period for the loan is based on Crystallex's arbitration counsel's assessment of the likely timing of a decision from the arbitral tribunal and collection of the award.

> (b) The advances will be in four tranches, being $9 million upon execution of the loan documentation and approval of the facility by court order in Ontario, the second being $12 million upon any appeal of the Ontario court order approving the facility being dismissed and upon a U.S court order approving the facility, the third being $10 million when Crystallex has less than $2.5 million in cash and the fourth being $5 million when Crystallex again has less than $2.5 million in cash.

> (c) The loans are to be used to (i) repay an interim bridge loan of $3.25 million advanced by Tenor with court approval of January 20, 2012 and payable on April 16, 2012, (ii) fees and expenses in connection with the facility, (iii) general corporate expenses of Crystallex including expenses of the restructuring proceedings and of the arbitration in accordance with cash flow statements and budgets of Crystallex approved by Tenor from time to time.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 16 of 398
Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

(d) Crystallex will pay Tenor a $1 million commitment fee.

(e) $35 million of the loan amount will bear PIK interest (payment in kind, meaning it is capitalized and payable only upon maturity of the loan or upon receipt of the proceeds of the arbitration) at the rate of 10% per annum compounded semiannually.

(f) Tenor will receive additional compensation equal to 35% of the net proceeds of any arbitral award or settlement, conditional upon the second tranche of the loan being advanced. Net proceeds of the award or settlement is defined as the amount remaining after payment of principal and interest on the DIP loan, taxes and proven and allowed unsecured claims against Crystallex, including the noteholders, the latter of which will have a special charge for the unsecured amounts owing. Alternatively, Tenor can convert the right to additional compensation to 35% of the common shares of Crystallex. This conversion right is apparently driven by tax considerations.

[24] The Tenor DIP facility also provides for the governance of Crystallex to be changed to give Tenor a substantial say in the governance of Crystallex. More particularly:

(a) Crystallex shall have a reduced five person board of directors, being two current Crystallex directors, two nominees of Tenor and an independent director selected by agreement of Crystallex and Tenor.

(b) The independent director shall be chair of the board of directors and shall not have a second-casting or tie-breaking vote.

(c) The independent director shall be appointed a special managing director and shall have all the powers of the board of directors to (i) the conduct of the reorganization proceedings in Canada and in the U.S. and the efforts of Crystallex to reorganize the pre-filing claims of the unsecured creditors, (ii) any matters relating to the rights of Crystallex and Tenor as against the other under the facility, (iii) the administration of the MIP to the extent not otherwise delegated to the bonus pool committee under the MIP, and (iv) to retain any advisor in respect of these matters. The special manager shall first consult with a non-board advisory panel, consisting of the three Crystallex directors who will step down from the board, and consider in good faith their recommendations.

(d) With respect to matters that may not at law be delegable to the special managing director, he will be required to obtain board approval. If the Tenor nominees use their votes to block that approval, Tenor will forfeit its 35% additional compensation.

[25] The Tenor DIP facility contains proscribed rights of Tenor in the event of default. Tenor may seize and sell assets other than the arbitration proceeding (i.e. any cash and unsold mining equipment). It may not sell the arbitration claim. If there is a default before any arbitration award, Tenor would have the right to apply to court to have the Monitor or a Canadian receiver and manager appointed to take control of the arbitration proceedings. If such application were not granted, Tenor would be entitled to exercise the rights and remedies of a secured creditor pursuant to an order, the loan documentation or otherwise at law.

29    Mr. Skatoff recommended, and the board of Crystallex agreed, to accept the Tenor DIP Loan. Mr. Skatoff indicated, in an affidavit sworn March 20, 2012, that he had recommended that the board reject the Noteholders' offer of a $10 million loan for 6 months because Crystallex could not be assured that it could borrow the balance of the required funds at the expiry of that period on the same terms as the Tenor DIP Loan.

***G. The Noteholders' Further, Competing Offer to Allay Mr. Skatoff's Concerns***

30    In his affidavit on behalf of the Noteholders, sworn March 27, 2012, Mr. Mattoni responded to Mr. Skatoff's concern by committing that the Noteholders would be prepared to,

Case 09-10138-MFW   Doc 14410-3   Filed 09/16/14   Page 17 of 398

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

... provide financing to Crystallex on the same terms as the [Tenor DIP Loan], in the event that prior to October 1, 2012, the Court orders that such long-term financing is appropriate and necessary. The Noteholders would reserve their complete and unfettered ability as creditors to continue to oppose stay extensions or attempts to secure such long-term financing outside of a Plan of compromise (including, specifically, financing to the extent contemplated by the Proposed Loan), but they will provide it if it is ordered by the Court on the same basis as currently proposed with Tenor...

### H. The Noteholders' Proposed Plan

31      Prior to the April 5, 2012 hearing, the Noteholders proposed a plan to indicate a good faith intention to bargain. They did not seek approval of this proposed plan at the April 5, 2012 hearing.

32      The plan's terms included that the Noteholders would provide a $10 million loan on the terms described above; exchange their debt for approximately 58 per cent of the equity; provide $35 million to Crystallex in exchange for 22.9 per cent of the equity; and provide incentives to management at a lesser level than the MIP. Their proposed plan left approximately 14 per cent of the equity for the existing shareholders.

### I. The Management Incentive Plan

33      The Noteholders had criticized the independent directors of Crystallex as not being sufficiently independent. As a result, the independent directors of Crystallex comprising the compensation committee retained Jay Swartz, a partner of Davies Phillips Vineberg, to determine, from the perspective of an independent director, what an appropriate MIP would be. He in turn retained an independent national executive compensation consulting firm to provide expert advice. Mr. Swartz opined that the overall compensation proposal for the establishment of the bonus pool for the benefit of Crystallex's management was reasonable in the circumstances. The independent directors of Crystallex comprising the compensation committee approved the MIP.

34      At para. 102 of the DIP Financing Reasons, the supervising judge described the MIP:

In sum, a pool of money, consisting of up to 10% of the net proceeds of the arbitration up to $700 million and 2% of any further net proceeds, after all costs and charges, including the amounts owing to noteholders, is to be set aside and money in this pool may be paid to the beneficiaries of the MIP, depending on the determination of an independent committee. The amounts to be allocated to participants by the compensation committee are discretionary and could be nil. No one will be entitled to any particular amount. Members of the compensation committee will not be eligible for any payments.

35      The MIP sets out a number of factors to be considered by the compensation committee in exercising its discretion. They include the amount and speed of recovery, the amount of time and energy expended by the individual, and the opportunity cost to the individual in staying with Crystallex.

36      In the view of the Noteholders, the MIP is too generous. They proposed that management receive 5 per cent through an equity participation in any after tax award. They also took issue with the range of persons eligible under the MIP.

### J. The April 5, 2012 motion

37      On April 5, 2012, Crystallex sought orders approving, among other things, the Tenor DIP Loan and the MIP. The Noteholders as well as Forbes & Manhattan Inc. and Aberdeen International Inc., creditors owed approximately $2.5 million by Crystallex, opposed both the Tenor DIP Loan and the MIP. The one shareholder who attended opposed the MIP.

38      The supervising judge approved the Tenor DIP Loan and the MIP. [2] He also extended the stay until July 30, 2012.

### K. Events since April 5, 2012

39      Tenor made the first, $9 million advance under the Tenor DIP Loan. The Bridge Loan was repaid out of the first advance.

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 18 of 398

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

40    At the hearing of this appeal, the Monitor advised that Crystallex would require further funds before the anticipated release of this court's decision. Crystallex accepted Tenor's offer to advance a further $4 million to Crystallex, on the same terms as the first, $9 million tranche of the Tenor DIP Loan. Accordingly, this further advance does not entitle Tenor to participate in any arbitration proceeds, or trigger any change in the governance of Crystallex. If the Noteholders' appeal succeeds, the additional amounts advanced by Tenor are, like the first tranche, to be immediately repaid with interest at the rate of 1 per cent per annum, and the Noteholders shall fund the repayment. No commitment fee is payable in respect of this additional advance.

## IV. The Supervising Judge's Reasons

### A. The Bridge Loan

41    The supervising judge noted, at para. 5 of the Bridge Financing Reasons, that Tenor L.P.'s bridge financing proposal was "really short-term DIP financing". With respect to the boards' recommendation — based on Mr. Skatoff's advice — that Tenor L.P.'s proposal be approved, he wrote, at para. 12:

> This was a business judgment protected by the business judgment rule so long as it was a considered and informed judgment made honestly and in good faith with a view to the best interests of Crystallex. See *Re Stelco Inc.* (200[5]), 9 C.B.R. (5th) 135 (Ont. C.A.) regarding the rule and its application to CCAA proceedings. I see no grounds for concluding that the decision of Crystallex to prefer the Tenor bridge financing proposal is not protected by the business judgment rule or that I should not give it appropriate deference. [Citation corrected.]

42    The supervising judge noted, at para. 13, that "the Monitor has no basis to say that the business judgment exercised by the Crystallex board of directors was unreasonable". The supervising judge accordingly approved the Bridge Loan.

43    Mr. Skatoff expressed concern that the Noteholders' objective in offering bridge financing on such advantageous terms (interest at the rate of 1 per cent, as opposed to the 10 per cent in the Tenor L.P. offer) was to undermine the DIP auction process. The supervising judge observed, at para. 14:

> Whether Mr. Skatoff is correct in his concerns, it seems to me that the relatively minor extra cost involving the Tenor proposed bridge financing for at most a few months must be weighed against the risk of harm to the longer-term DIP financing auction process, and that for the sake of that process, it is preferable not to run the risks that Mr. Skatoff is concerned about.

### B. The Tenor DIP Loan

44    The substance of the supervising judge's reasons for approving the Tenor DIP Loan — as set out in the DIP Financing Reasons — may be summarized as follows.

> i. The exercise of business judgment by the board of directors of Crystallex in approving the Tenor DIP Loan is a factor that can be taken into account by the court in considering whether to make an order under s. 11.2(1) of the CCAA (at para. 35).

> ii. The Tenor DIP Loan did not amount to a plan of arrangement or compromise. Notably, it did not take away the rights of the Noteholders as unsecured creditors to apply for a bankruptcy order or to vote on a plan of compromise or arrangement. A vote of the creditors was therefore not required (at para. 50). In coming to this conclusion, the supervising judge relied on *Calpine Canada Energy Ltd., Re*, 2007 ABQB 504, 415 A.R. 196 (Alta. Q.B.), leave to appeal refused, 2007 ABCA 266, 417 A.R. 25 (Alta. C.A. [In Chambers])).

> iii. Crystallex intended to negotiate a plan of compromise or arrangement with the Noteholders during the stay extension until July 30, 2012 (paras. 48, 126). The Tenor DIP Loan is therefore distinguishable from the financing rejected by the court in *Cliffs Over Maple Bay Investments Ltd. v. Fisgard Capital Corp.*, 2008 BCCA 327, 296 D.L.R. (4th) 577 (B.C. C.A.), because in that case the debtor did not have an intention to propose an arrangement or compromise to its creditors.

WestlawNext® CANADA    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 19 of 398

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

iv. Because the Tenor DIP Loan involves the grant of a financial interest in part of the assets of Crystallex, it is appropriate to consider the *Soundair* factors in deciding whether to approve it (at para. 59). Crystallex conducted a robust competitive bidding process (at para. 39).

v. Mr. Skatoff's evidence was that the Noteholders' proposed six month facility "would seriously erode the chances of Crystallex obtaining third party financing in October" (at para. 90). Counsel for Computershare had said during argument on the motion that the Noteholders "were not prepared to agree to such a $35 million facility at this time but only at some future time as the $10 million facility they now proposed became due" (at para. 27). While it would have been preferable if the Noteholders had been willing to lend on the basis of the terms of the Tenor DIP facility, "it was made clear during argument that the noteholders were not prepared at this time to do so" (at para. 91).

vi. As to the enumerated factors in s. 11.2(4):

(a) Given that Crystallex intends, if possible, to negotiate an acceptable plan of arrangement or compromise, the length of time during which Crystallex is expected to be subject to the CCAA proceedings is not a determinative factor. The financing will be required to pursue the arbitration (at para. 62) and, as the supervising judge noted, "the only way any of the creditors will receive any substantial cash payment is from the proceeds of the arbitration" (at para. 47);

(b) The management of the business and affairs of Crystallex "are a reasonable compromise between Crystallex and Tenor designed to protect the interests of the stakeholders, including the noteholders" (at para. 73). The fact that Tenor is given substantial governance rights does not in itself mean that the DIP Loan should not be approved. Tenor does not have the right to conduct the reorganization proceedings or the arbitration proceeding. Moreover, under s. 11.5(1) of the CCAA, the court may remove a director whom it is satisfied is unreasonably impairing or is likely to unreasonably impair the possibility of a viable compromise or arrangement being made. Arguably, a court could remove a Tenor nominee under this section without triggering an event of default under the Tenor DIP Loan (at paras. 63-71);

(c) While the Noteholders expressed "extreme displeasure" at Crystallex's management's delay in commencing arbitration proceedings, they do not oppose management having a continuing role in the arbitration (at para. 72);

(d) The Noteholders' argument that the terms of the Tenor DIP Loan — in particular, the fact that the refusal of the court to grant a stay or a bankruptcy are events of default, the grant of a 35 per cent interest in the arbitration proceeds, and the limits on the type of restructuring that can be concluded without the approval of Tenor — will effectively prevent any plan of arrangement was rejected (at paras. 74-82). While, as the Monitor points out, the introduction of a third party, Tenor, with consent rights to certain actions will add complexity to the negotiation of a CCAA plan (at para. 93), the Tenor DIP Loan would enhance the prospects of a viable compromise or arrangement (at para. 83):

... Crystallex requires additional financing to pay its expenses and continue the arbitration. A DIP loan allows the company to have the arbitration financed, which if it were not at this stage would impair the arbitration and perhaps the attitude of Venezuela towards the arbitration claim, and as such enhances the viability of a CCAA plan. I have not accepted the argument of the noteholders that the loan would prevent a plan of arrangement.

(e) The supervising judge noted that Crystallex's principal asset is its US $3.4 billion arbitration claim against Venezuela (at para. 12); and

(f) In considering the Noteholders' complaints of prejudice in the context of what the market is demanding for a DIP loan and in all the circumstances, the creditors have not been materially prejudiced by the Tenor DIP Loan (at para. 84).

*C. The Management Incentive Plan*

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

45    The supervising judge considered the Noteholders' objections to the quantum and method for providing an incentive to management, the inclusion of certain persons in the MIP, and the approval of the MIP before the negotiation of a plan.

46    In the DIP Financing Reasons, the supervising judge observed, at para. 109, that whether employee retention provisions should be ordered in a CCAA proceeding was a matter of discretion. He noted that the provisions of the MIP had been approved by an independent committee of the board of directors with impressive qualifications, relying on the opinion of Mr. Swartz. In providing that opinion, Mr. Swartz indicated that the absolute amount of the bonus pool could be very substantial and, in allocating it, the compensation committee "may have to carefully consider the absolute amounts to be paid to each member of the Management Group in order to satisfy its fiduciary duties": see DIP Financing Reasons, at para. 108. The supervising judge also noted that Mr. Swartz had retained an independent national executive compensation consulting firm to provide expert advice.

47    Citing *Grant Forest Products Inc. (Re)* (2009), 57 C.B.R. (5th) 128 (Ont. S.C.J. [Commercial List]) (st]) and *Timminco Ltd., Re,* 2012 ONSC 948 (Ont. S.C.J. [Commercial List])), the supervising judge wrote, at para. 112 of the DIP Financing Reasons, "I see no reason why the business judgment rule is not applicable, particularly when the provisions of the MIP have been approved by an independent committee of the board." He further noted, at para. 115, what appears to be the practice of approving employee retention plans before any plan has been negotiated and, at para.105, that the Tenor DIP Loan was conditional on the approval of a MIP acceptable to Crystallex and Tenor.

48    As to who should be eligible to participate in the MIP, at para. 117, the supervising judge noted that the independent committee had exercised its business judgment on the matter and that the participants were known to Mr. Swartz. Having reviewed the evidence, the supervising judge could not "say that any of the persons included in the MIP should not be there".

## V. The Parties' Submissions

### A. The Noteholders' Submissions

49    The Noteholders frame their opposition to the Tenor DIP Loan on a number of bases.

50    They argue that s. 11.2, titled "Interim financing", only permits a supervising judge to approve financing to meet the debtor's needs while it is developing a plan to present to its creditors.

51    The Noteholders also argue that the supervising judge's finding that the Tenor DIP Loan would enhance the prospects of a viable compromise or arrangement was unreasonable because it resulted from an error of principle, namely an improper focus on the fact that it provided financing for the arbitration.

52    The Noteholders submit that the supervising judge misapprehended the evidence in finding that the Noteholders were not willing to match the Tenor DIP Loan, and this error affected the outcome of the motion.

53    They argue that the supervising judge erred in deferring to the business judgment of the directors of Crystallex in approving both the Bridge Loan and the Tenor DIP Loan. They argue that directors always make a recommendation and, if Parliament had thought this was a relevant factor, it would have specifically enumerated it in s. 11.2(4) of the CCAA.

54    They argue that the supervising judge erred in principle in focusing on what was the most expedient way to fund the arbitration (as opposed to Crystallex's needs while negotiating a plan with the Noteholders) and, in doing so, committed the same error as the motion judge in *Cliffs Over Maple Bay*.

55    The Noteholders' position is that the Tenor DIP Loan is effectively an arrangement, in the guise of a financing, and Crystallex is misusing the CCAA to impose a restructuring without the requisite creditor approval.

56    The Noteholders submit that this court should order Crystallex to accept the Noteholders' "matching" DIP loan offer.

57    They also renew their objections to the MIP.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

### B. Crystallex's Submissions

58    Crystallex argues that the Noteholders' appeal with respect to the Bridge Loan is moot because the loan has been advanced, spent and repaid.

59    As to the Tenor DIP Loan, it argues that approving it was within the discretion of the supervising judge, the supervising judge exercised his discretion on a wide variety of findings of fact, capable of evidentiary support in the record, and there is no basis for this court to intervene. It relies on *Ted Leroy Trucking Ltd., Re*, 2010 SCC 60, [2010] 3 S.C.R. 379 (S.C.C.) [*Century Services*], which recently addressed the broad discretionary jurisdiction of a supervising judge under the CCAA. Crystallex also points to *Air Canada (Re)* (2004), 47 C.B.R. (4th) 169 (Ont. S.C.J. [Commercial List]), as an instance where exit financing was approved before a plan had been approved by creditors.

### C. Tenor's Submissions

60    Tenor argues that "interim financing" in the heading to s. 11.2 of the CCAA does not mean "short term", but rather refers to the interval between two points or events, and s. 11.2 does not contain anything that would fetter the discretion of the supervising judge to select an "end point" beyond the expected conclusion of a plan. It argues that the duration of the Tenor DIP Loan is tailored to Crystallex's unique circumstance: all stakeholders acknowledge that the arbitration must be pursued in order for there to be meaningful recovery. In any event, it argues, marginal notes, such as the heading "interim financing" in s. 11.2, are not part of the statute, and their value is limited when a court must address a serious problem of statutory interpretation, citing the *Interpretation Act*, R.S.C. 1985, c. I-21, s. 14, and *Imperial Oil Ltd. v. R.*, 2006 SCC 46, [2006] 2 S.C.R. 447 (S.C.C.), at para. 57.

61    Moreover, Tenor submits, the supervising judge was in the best position to perform the careful balancing of interests required to facilitate a successful restructuring.

## VI. Analysis

### A. The Appeal from the Bridge Financing Order

62    The Noteholders did not strongly pursue their appeal of the Bridge Financing Order. The relief sought at the conclusion of the hearing related to the Tenor DIP Loan and not the Bridge Loan. The Bridge Loan was disbursed, spent and repaid. I agree with the respondents that the Noteholders' appeal with respect to the Bridge Loan is moot. I will therefore confine my analysis to the Tenor DIP Loan and the MIP.

### B. The Appeal from the Tenor DIP Financing Order

#### (1) Century Services Inc. v. Canada (Attorney General)

63    The Supreme Court of Canada had occasion to interpret the CCAA for the first time in *Century Services*. It used that opportunity to make clear that the CCAA gives the courts broad discretionary powers. Those powers must, however, be exercised in furtherance of the CCAA's purposes: para. 59. Section 11, in particular, was drafted in broad language which provides that a supervising judge "may, subject to the restrictions set out in this Act ... make any order that it considers appropriate in the circumstances". [3] For the majority in *Century Services*, Deschamps J. wrote:

[69] The *CCAA* also explicitly provides for certain orders...

[70] The general language of the *CCAA* should not be read as being restricted by the availability of more specific orders. However, the requirements of appropriateness, good faith, and due diligence are baseline considerations that a court should always bear in mind when exercising *CCAA* authority. Appropriateness under the *CCAA* is assessed by inquiring whether the order sought advances the policy objectives underlying the *CCAA*. The question is whether the order will usefully further efforts to achieve the remedial purpose of the *CCAA* — avoiding the social and economic losses resulting from

**WestlawNext**® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

liquidation of an insolvent company. I would add that appropriateness extends not only to the purpose of the order, but also to the means it employs. Courts should be mindful that chances for successful reorganizations are enhanced where participants achieve common ground and all stakeholders are treated as advantageously and fairly as the circumstances permit.

64    It is with the Supreme Court's interpretation of the scope of judicial discretion under the CCAA in mind that I turn to s. 11.2 and the question of whether it permits a supervising judge to approve financing that may continue for a significant period after CCAA protection ends, without the approval of creditors.

*(2) Section 11.2 of the CCAA*

65    Section 11.2 is headed "Interim Financing". Headings may be used as an aid in interpreting the meaning of a statute: R. Sullivan, *Sullivan on the Construction of Statutes*, 5th ed. (Markham: LexisNexis Canada Inc., 2008), at p. 394, "Interim" generally means temporary or provisional: *Canadian Oxford Dictionary*, 2d ed. The weight to be given to a heading depends on the circumstances.

66    I agree with the Noteholders that s. 11.2 contemplates the grant of a charge, the primary purpose of which is to secure financing required by the debtor while it is expected to be subject to proceedings under the CCAA. A further purpose, however, is to enhance the prospects of a plan of compromise or arrangement that will lead to a continuation of the company, albeit in restructured form, after plan approval.

67    Section 11.2(4)(a) directs the court to consider the period during which the debtor is expected to be subject to proceedings under the CCAA. It stops short of confining the financing to the period that the debtor is subject to the CCAA. Section 11.2(4) (d) directs the court to consider if the financing would enhance the prospects of a viable compromise or arrangement.

68    Having regard to the broad remedial purpose of the CCAA and the broad residual authority of a supervising judge described in *Century Services*, in my view section 11.2 does not restrict the ability of the supervising judge, where appropriate, to approve the grant of a charge securing financing before a plan is approved that may continue after the company emerges from CCAA protection. Indeed, although in very different circumstances, financing to be available on the debtor's emergence from CCAA protection (sometimes called "exit financing") was approved before a plan was approved in *Air Canada*.[4] Both *Century Services* and section 11.2, however, in my view, signal that it would be unusual for a court to approve exit financing where opposed by substantially all of the creditors. Exit or post-plan financing is often a key element, or a pre-requisite, of the plan voted on by creditors.

69    The question becomes whether the unique facts of this case permitted the supervising judge to approve "interim financing" that was of such duration and structure that it could well outlast the CCAA protection period. This court should not substitute its decision for that of the supervising judge. I must ask this question through the lens of the applicable standard of review.

*(3) Standard of review*

70    Appellate review of a discretionary order under the CCAA is limited. Intervention is justified only for an error in principle or the unreasonable exercise of discretion: *Ivaco Inc. (Re)* (2006), 83 O.R. (3d) 108 (Ont. C.A.), at para. 71. An appellate court should not interfere with an exercise of discretion "where the question is one of the weight or degree of importance to be given to particular factors, rather than a failure to consider such factors or the correctness, in the legal sense, of the conclusion": *New Skeena Forest Products Inc., Re*, 2005 BCCA 192, 39 B.C.L.R. (4th) 338 (B.C. C.A.), at para. 26.

*(4) The supervising judge did not err in principle or unreasonably exercise his discretion*

71    As detailed below, I conclude that there is no basis for interfering with the supervising judge's exercise of discretion in approving the Tenor DIP Loan.

Case 09-10138-MFW Doc 14410-3 Filed 09/16/14 Page 23 of 398

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

72     Most significantly, in this case, the supervising judge found there could be no meaningful recovery, and therefore no successful restructuring, without the financing of the arbitration. Although the Noteholders characterized the Tenor DIP Loan as "exit financing", it furthered the remedial purpose of the CCAA. To that extent, it is appropriate in the first sense used by Deschamps J. in *Century Services*, even though it may well outlast the period of CCAA protection. The supervising judge's focus on the fact that the Tenor DIP Loan provided financing for the arbitration was not, in the circumstances, an error of principle.

73     In my view, the Noteholders' real argument is that the *means* by which the Tenor DIP Loan was approved were not appropriate. Ideally, a CCAA supervising judge is able to assist creditors and debtors in coming to a compromise. The creditors and Crystallex have not "achieved common ground" on a very significant matter. Effectively, the Noteholders argue that the creditors have not been treated as advantageously and fairly as the circumstances permit. They are the senior creditors and their offer to provide DIP financing on terms they argue matched those of the Tenor DIP Loan was not accepted. With sufficient financing in place to fund the arbitration, their leverage in negotiating a share of the arbitration proceeds has been reduced. Moreover, the Noteholders argue, the supervising judge erred in applying the business judgment rule, and, contrary to *Cliffs Over Maple Bay*, involuntarily stayed their rights during what they characterize as a restructuring. I consider each of these arguments below.

### a. The Noteholders' competing DIP loan offer

74     The Noteholders point to their affidavit on the April motion indicating they would submit to an order to advance funds on the same terms as the Tenor DIP Loan "in the event that prior to October 1, 2012, the Court orders that such longterm financing is appropriate and necessary". The supervising judge wrote that it would have been a preferable outcome if the Noteholders had been prepared to lend at the time of the April motion on the terms of the Tenor DIP facility: DIP Financing Reasons, at para. 91. The Noteholders argue that: they were prepared to advance funds on the terms of the Tenor DIP Loan, if so ordered; the supervising judge misapprehended the evidence; and, given the supervising judge's comment that it would have been preferable if the Noteholders had been prepared to lend, that misapprehension affected the outcome of the motion.

75     The supervising judge's comment at para. 91 of the DIP Financing Reasons makes his real concern clear. There, he stated that "at this time" the Noteholders were not prepared to lend on the terms of the Tenor DIP Loan. The Noteholders' view as of April 5, 2012 was that such long-term financing was not necessary, as the $10 million they offered to advance at that time met Crystallex's then cash requirements. The Noteholders reserved their rights to continue to oppose the approval of long term financing before they had come to an agreement with Crystallex about their entitlement, as creditors. Further hearings, and further arguments, were required. The supervising judge found, at para. 83 of the DIP Financing Reasons, that not putting sufficient financing in place to finance the arbitration "at this stage" would impair the arbitration. There was no suggestion from counsel for the Noteholders that on April 5, 2012 the Noteholders were prepared to waive the condition permitting them to continue to oppose the approval of long term financing. I am not satisfied that the supervising judge clearly misapprehended the evidence.

### b. Loss of leverage

76     In Crystallex's view, a reduction of the Noteholders' leverage was desirable. It points to the Noteholders' competing CCAA application, seeking to cancel all of the shareholders' equity, which the supervising judge rejected as not fairly balancing the interests of all stakeholders. The Noteholders' plan, subsequently proposed, would entitle them to 46 per cent of the equity in return for giving up their Notes, which Crystallex also views as excessive. [5]

77     Crystallex argues that the Noteholders are not contractually entitled to convert their Notes to equity, and should therefore not be entitled to do so. Moreover, they argue, in the event of bankruptcy, the Noteholders would only be entitled to recover their principal and interest at the statutory rate of 5 per cent under the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, and, if the arbitration is realized, they will be entitled to the higher rate of interest they are contractually entitled to under the Notes. As Deschamps J. noted at para. 77 of *Century Services*, participants in a reorganization "measure the impact of a reorganization against the position they would enjoy in liquidation".

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 24 of 398

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

78    The Noteholders counter that, contractually, they were entitled to be repaid on December 23, 2011 and, since they were not, and Crystallex proposes to defer repayment for several years and repay the Notes only if the arbitration is successful, the long delay entitles them to some equity participation. Moreover, contractually, Crystallex is restricted from incurring the Tenor DIP Loan, which will be senior to the Notes.

79    Crystallex points to the terms of the Initial Order, affording the "best offer" the protection of the *Soundair* principles, and providing that "topping offers" would not be considered by the court. Crystallex points out that the Noteholders did not appeal the Initial Order and argues that accepting the Noteholders' matching offer would offend the *Soundair* principles. In Crystallex's view, the Noteholders were treated fairly.

80    In turn, the Noteholders argue that the Initial Order authorized Crystallex to conduct an auction to raise *interim or DIP financing* pursuant to procedures approved by the Monitor. Since the outset, the Noteholders maintained their objection that the auction process sought more than interim or true DIP financing. The supervising judge deferred consideration of their objections until the DIP facility was before the court for approval.

81    The Noteholders are sophisticated parties. They pursued a strategy. It ultimately proved less successful than hoped. It appears that the supervising judge would have been prepared to approve the advance of funds to Crystallex by the Noteholders, on the terms of the Tenor DIP Loan, notwithstanding the *Soundair* principles, had the Noteholders agreed to do so, without condition, on April 5, 2012.

82    The facts of this case are unusual: there is a single "pot of gold" asset which, if realized, will provide significantly more than required to repay the creditors. The supervising judge was in the best position to balance the interests of all stakeholders. I am of the view that the supervising judge's exercise of discretion in approving the Tenor DIP Loan was reasonable and appropriate, despite having the effect of constraining the negotiating position of the creditors.

**c. The business judgment rule**

83    The supervising judge held that in addition to the factors in s. 11.2(4) of the CCAA, he could take into account the exercise or lack thereof of business judgment by the board of directors of a debtor corporation in considering DIP financing: DIP Financing Reasons, at paras. 32-35. He cited *Stelco Inc. (Re)* (2005), 75 O.R. (3d) 5 (Ont. C.A.), as authority for this proposition. [6]

84    The fact that a debtor's board of directors recommends interim financing is not a determinative factor, and in some cases may not be a material factor, in considering whether to make an order under s. 11.2. It would be unusual if the board did not recommend the financing for which the debtor seeks approval.

85    *Stelco* should not be read as authority for the principle that the recommendation of the directors of a debtor under CCAA protection is entitled to deference in evaluating whether financing should be approved under s. 11.2 of the CCAA where the factors outlined in s. 11.2(4) have not been complied with. In *Stelco*, the debtor did not seek court approval of a recommendation of the board. In the case of interim financing, the court must make an independent determination, and arrive at an appropriate order, having regard to the factors in s. 11.2(4). It may consider, but not defer to, and is not fettered by, the recommendation of the board.

86    The weight given by the supervising judge to the business judgment of the board of directors of Crystallex in recommending the Tenor DIP Loan is not, however, a basis for this court to interfere with his decision: *New Skeena Forest Products Inc., Re*, at para. 26.

**d. Cliffs Over Maple Bay is distinguishable**

87    In *Cliffs Over Maple Bay*, the debtor was the developer of a 300 acre site intended to include residential units, a golf course and a hotel. The debtor obtained protection under the CCAA and sought approval of financing that would permit it to

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

complete material parts of the development. It believed that the proceeds generated from the sale of units thus completed would be sufficient to fund the remaining portions of the development and that, if the development were completed, there would be sufficient sale proceeds to satisfy all of the debtor's obligations.

88     The motion judge approved the financing; the mortgagees of the development appealed. The British Columbia Court of Appeal noted, at para. 35, that it was not suggested that the debtor intended to propose an arrangement or compromise to its creditors before embarking on its restructuring plan. The court allowed the appeal, writing:

> [37] ... DIP financing should not be authorized to permit the debtor company to pursue a restructuring plan that does not involve an arrangement or compromise with its creditors ...

> [38] ... What the Debtor Company was endeavouring to accomplish in this case was to freeze the rights of all of its creditors while it undertook its restructuring plan without giving the creditors an opportunity to vote on the plan. The CCAA was not intended, in my view, to accommodate a non-consensual stay of creditors' rights while a debtor company attempts to carry out a restructuring plan that does not involve an arrangement or compromise upon which the creditors may vote.

89     I agree with the supervising judge that this case can be distinguished from *Cliffs Over Maple Bay*, which turned on the court's finding that the debtor did not intend to negotiate a plan with its creditors.

90     While Mr. Fung initially indicated that Crystallex's plan was to stay creditors' claims until the arbitration was settled or realized, his more recent evidence was that approval of the Tenor DIP Loan does not preclude further discussions about a plan with the creditors. In submissions before the supervising judge, and again before this court, counsel for Crystallex reiterated that Crystallex intended to exit from CCAA protection as soon as a plan was negotiated with the creditors and approved, and that Crystallex intended to negotiate a plan by the expiry of the stay on July 30, 2012. The supervising judge found that Crystallex intended to negotiate a plan with its creditors. There is some basis in the record for such a conclusion.

*(5) The Tenor DIP Loan is not an arrangement*

91     An arrangement or compromise cannot be imposed on creditors unless it has been approved by a majority in number representing two thirds in value of the creditors: see s. 6(1) of the CCAA.

92     The supervising judge rejected the argument that the Tenor DIP Loan was a plan of arrangement or compromise and therefore required the approval of the creditors. He held, at para. 50 of the DIP Financing Reasons:

> A "plan of arrangement" or a "compromise" is not defined in the CCAA. It is, however, to be an arrangement or compromise between a debtor and its creditors. The Tenor DIP facility is not on its face such an arrangement or compromise between Crystallex and its creditors. Importantly the rights of the noteholders are not taken away from them by the Tenor DIP facility. The noteholders are unsecured creditors. Their rights are to sue to judgment and enforce the judgment. If not paid, they have a right to apply for a bankruptcy order under the BIA. Under the CCAA, they have the right to vote on a plan of arrangement or compromise. None of these rights are taken away by the Tenor DIP.

93     I agree. While the approval of the Tenor DIP Loan affected the Noteholders' leverage in negotiating a plan, and has made the negotiation of a plan more complex, it did not compromise the terms of their indebtedness or take away any of their legal rights. It is accordingly not an arrangement, and a creditor vote was not required. In this case it was within the discretion of the supervising judge to approve the Tenor DIP Loan.

## C. The Appeal from the Management Incentive Plan Approval Order

94     In my view, the supervising judge did not err in principle or unreasonably exercise his discretion in approving the MIP. I see no basis for this court to intervene.

95     As the supervising judge noted, employee retention provisions are frequently authorized before a plan is negotiated. The supervising judge was alive to the exceptionally large amounts that might be paid to beneficiaries of the MIP (including Mr.

Case 09-10138-MFW   Doc 14410-3   Filed 09/16/14   Page 26 of 398

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

Fung) in this case. The supervising judge took specific note of the issues that the Noteholders had raised in the past regarding the extent to which the independent committee of the board that recommended the MIP was truly independent, and the steps taken by that committee to address those concerns.

96    The recommendation of an independent committee of the board that has obtained expert advice is entitled to more weight in the consideration of a MIP than is the recommendation of the board in the consideration of whether financing should be approved under s. 11.2 of the CCAA. The CCAA does not list specific factors to be considered by the court in the case of a MIP. Moreover, the board would have the best sense of which employees were essential to the success of its restructuring efforts.

97    In addition to considering the recommendation of the independent committee of the board and Mr. Swartz, the supervising judge also reviewed the evidence to consider whether any persons had been included in the MIP who should not have been. He did not rely solely on the board's recommendation.

## VII. Disposition

98    Accordingly, I would dismiss the appeals of the CCAA Bridge Financing Order, the CCAA Financing Order, and the Management Incentive Plan Approval Order.

## VIII. Costs

99    If the parties cannot agree, I would order that Crystallex and Tenor provide their submissions on the issue of costs within 14 days, and that the Noteholders, if so advised, provide their submissions in response within 10 days thereafter. No reply submissions are to be provided without leave.

### *D. O'Connor A.C.J.O.*:

I agree

### *R.A. Blair J.A.*:

I agree

*Appeals dismissed.*

Footnotes

*        Additional reasons at *Crystallex International Corp., Re* (2012), 2012 CarswellOnt 9479, 2012 ONCA 527 (Ont. C.A.).

1        Paragraph 23(1)(b) provides that the monitor shall "review the company's cash-flow statement as to its reasonableness and file a report with the court on the monitor's findings".

2        The MIP was approved subject to an amendment (agreed to by Crystallex) to provide that the value of any stock options ultimately realized by participants of the MIP would be deducted from the amount of any bonus awarded under the MIP on a tax neutral basis.

3        The full text of section 11 is as follows:

        11. Despite anything in the *Bankruptcy and Insolvency Act or the Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

4        In *Air Canada*, Farley J. approved a "global restructuring agreement" which included a commitment of an existing creditor to provide exit financing of approximately US $585 million on the company's emergence from CCAA. DIP financing was in place; the financing at issue was clearly recognized as exit financing. The restructuring agreement was not opposed by substantially all of the creditors. Nor was it argued that it adversely affected the ability of the creditors and the debtor to negotiate a compromise or arrangement.

5        The Noteholders proposed that they receive 22.9 per cent of the equity for the $36 million needed for the arbitration and 58 per cent of the equity in return for giving up their Notes, for a total of approximately 81 per cent of the equity. Assuming that the Noteholders

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

sought a maximum total entitlement of 81 per cent, if they advanced the $36 million on the terms of the Tenor DIP Loan, as they now seek to do, the amount of equity on conversion of their notes would be 46 per cent. See the DIP Financing Reasons, at para. 77.

6    An incorrect citation for *Stelco*  was given in the DIP Financing Reasons, at para. 33.

---

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 30



1990 CarswellOnt 915, 69 D.L.R. (4th) 567, 20 A.C.W.S. (3d) 372

Csak v. Aumon

Re Excel Wire Erosion (Canada) Limited

Miklos Nicholas Csak and Brian William Boon, Applicants v. George Aumon and Excel Wire Erosion (Canada) Limited, Respondents

Ontario Supreme Court

Lane J.

Judgment: April 9, 1990
Docket: Doc. RE2348/89

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Miss J. Demaray*, for the Applicants.

*Ms. L. Rosenblatt*, for the Respondents.

Subject: Corporate and Commercial

Corporations --- Shareholders — Shareholders' remedies — Relief from oppression — Standing to apply

Shareholders — Shareholders' remedies — Relief from oppression — Standing to apply — Use of oppression remedy in Act available to person claiming shares under pre-incorporation contract — Canada Business Corporations Act, R.S.C. 1985, c. C-44, ss. 2(1), 238(a), (d), 242(2).

Applicants agreed to provide expertise and funding under a pre-incorporation contract in return for shares in corporation. Upon incorporation, respondent president of the company, who was the sole incorporator, issued shares to himself alone, alleging that the conditions for issuance of the shares had not been met. Applicants brought an application for relief from oppression pursuant to the Act and corporation brought a motion for dismissal of the application on the grounds the Act did not apply. Held, the motion was dismissed. Being remedial legislation, the Act contemplated a large and sweeping jurisdiction. Unless there had been a reason inherent in the legislation, applicants were within the definition of "complainant" as contemplated in the Act. Applicants were also "security holders" as defined in s. 242(2) and entitled to claim the oppression remedy.

**Lane J.:**

1990 CarswellOnt 915, 69 D.L.R. (4th) 567, 20 A.C.W.S. (3d) 372

1    This application raises the issue of whether persons claiming under a pre-incorporation contract to be entitled to shares in a corporation can obtain these shares through the use of s. 241 of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44 ("CBCA"). By agreement, the issue of the entitlement of these applicants to employ the mechanism of the CBCA was argued as a threshold question of law.

2    The respondent George Aumon is the president, sole director and sole shareholder of the respondent Excel Wire Erosion (Canada) Limited which carries on business in the City of Brampton, Ontario as a spark erosion sub-contractor servicing the tool and dye industry in Canada. In 1978 and 1979, discussions were held between the applicants and the respondent Aumon as to the possibility of establishing a spark erosion sub-contract business employing the applicants' methods in Canada. The applicants say that in or about 1979 an agreement was reached between them and Aumon for the establishment of such a business. The applicants agreed to make start-up funding available and to provide on-going technical advice and assistance to the business. The applicants were to continue to carry on other business ventures elsewhere and Aumon was to be the full-time manager in Canada. The business was to be incorporated and the applicants say they were each to receive 33 1/3% of the shares. The respondent admits that discussions took place but says that any agreement as to providing shares to the applicants was premised on the applicant Csak moving to Canada within two years of the incorporation of Excel to assist in the running of the business. Csak did not move to Canada until October 1987.

3    Excel was incorporated by Aumon on July 16, 1979. Its initial financing included $125,000 obtained by Aumon as a loan from his bank and $165,600 advanced by the applicants as an interest free demand loan. The loan from the applicants was repaid on March 31, 1988.

4    The applicants also claim that they made technical advice and assistance available to Aumon and Excel between 1979 and 1987. Any such assistance given by the applicants is minimized to the point of triviality by Aumon.

5    The applicants' complaint is that the respondents have refused to issue shares to the applicants pursuant to the alleged agreement and have failed and are continuing to fail to provide the information which ought to be provided to shareholders. Put briefly, the status of the applicants as shareholders is denied. The gist of the applicants' position is that they qualify as "complainants" under s. 238 of the CBCA because they are "beneficial owners" of securities of Excel. They say that the refusal of Excel and Aumon to issue their share certificates to them is oppressive or unfairly prejudicial or unfairly disregards their interests as security holders of Excel within the meaning of s. 241 of the CBCA.

6    The gist of the respondents' position is that the applicants can neither bring themselves within the definition of complainant, nor within the last portion of s. 241(2) of the Act which defines the persons entitled to relief as follows:

> ...that is oppressive or unfairly prejudicial to or that unfairly disregards the interests of any security holder, creditor, director or officer, ...

They say in effect that persons who claim to be entitled to the issuance of shares are not security holders and hence are not persons for whom relief is available. They say that the remedies available under s. 241 of the Act are limited to remedies against the corporation and do not extend to situations where the remedy sought is based upon an agreement to which the corporation was not a party.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1990 CarswellOnt 915, 69 D.L.R. (4th) 567, 20 A.C.W.S. (3d) 372

7     *Are the applicants "complainants"*?:

8     Section 238 reads as follows:

9     *238.* In this Part, ...

     *"complainant"* means,

     (a) a registered holder or beneficial owner, and a former registered holder or beneficial owner, of a security of a corporation or any of its affiliates, ...

. . . . .

     (d) any other person who, in the discretion of a court, is a proper person to make an application under this Part.

Section 2 defines "beneficial ownership" as including "ownership through a trustee, legal representative, agent or other intermediary." The applicants say they are beneficial owners of securities within the meaning of the foregoing definitions. It is apparent from the language of the statute that it contemplates a class of complainant without registered ownership. The applicant argues that any person having an equitable claim to shares in the company would qualify as a beneficial owner whether or not there are shares issued and appropriated to that person but held in the name of someone else. The respondent submits that beneficial owner means a person whose shares have actually been issued but are held in the name of someone else as legal owner. In such circumstances, the acknowledged beneficial owner can bring the application directly without involving the registered owner. On the respondents' view of things, a person who claims to be the beneficial owner of shares which have not actually been issued is not able to take advantage of Part XX of the CBCA.

10     In my view, the applicants do fall within the phrase "beneficial owner" as it is used in s. 238. A beneficial owner is one who is the real owner of property even though it is in someone else's name. The nominal owner has legal title to the property but the real owner can require the nominal owner to convey the property to him and transfer legal title to him. See: *MacKeen Estate v. Minister of Finance of the Province of Nova Scotia* (1978), C.T.C. 557 (N.S.S.C., App. Div.). This is the very situation in which the applicants say they find themselves. The respondent Aumon is the registered owner of 100% of the issued shares of Excel and the applicants say he holds 2/3 of them in trust for them or that he is contractually bound to cause the company to issue to each of them the same number of shares as are held by him.

11     However, the respondent argues that the applicants' entitlement is a matter of dispute and until the dispute is resolved in favour of the applicants by the issue of a decree of specific performance, the applicants do not have standing as beneficial owners. In support of this proposition, counsel relied upon the case of *Bernstein v. 335861 (Alberta) Ltd. et al.*, unreported, decided by W.J. Quinn, Master in Chambers of the Court of Queen's Bench of Alberta on August 15, 1986. That case, like the present, involved a pre-incorporation agreement in which the applicant was to receive shares in a company to be incorporated in return for the applicant's efforts in developing the business opportunity which was to be explored by the company. The exact amount of the applicant's share ownership was not determined and in the end the other parties went ahead and incorporated the company without including the applicant. He applied to the Alberta Court under the corresponding provisions of the *Alberta Business Corporations Act*. He argued that he was a prospective shareholder of the company and as such

1990 CarswellOnt 915, 69 D.L.R. (4th) 567, 20 A.C.W.S. (3d) 372

was a proper person to be granted status pursuant to the Alberta equivalent of s 238(d) of the CBCA, that is that he was "any other person who, in the discretion of a court, is a proper person to make an application under this Part". Counsel for the respondent in that case submitted that the applicant was not "a security holder, creditor, director or officer" of the company pursuant to s. 234(2) of the Alberta Act (which is equivalent to s. 241(2) of the CBCA) and that accordingly the applicant as a mere "anticipated security holder" could not obtain relief. The Master dismissed the application on these grounds. It does not appear from the case that the possible effect of the reference to "beneficial owner" in the definition of complainant was drawn to the learned Master's attention.

12      In my opinion, the phrase "beneficial owner" in s. 238 is capable of bearing either of the meanings attributed to it by counsel in this case. It could be restricted to situations where issued shares are registered in someone else's name and the applicant is the acknowledged beneficial owner thereof; or it could refer to situations in which applicants claim to be beneficial owners of shares which ought to have been issued to them. The Act is remedial legislation and contemplates a large and somewhat sweeping jurisdiction. Unless there is some reason inherent in the legislation or of policy to restrict the meaning of beneficial owner to that contended for by the respondent, it would be in accord with the remedial nature of the Act to give the section the broader meaning.

13      An examination of the Act persuades me that there is no inherent reason to restrict the term "beneficial owner" to the narrower view. Firstly, the definition of "beneficial ownership" (supra) is inclusive, not exclusive and "complainant" includes not only the persons itemized in s. 238(a), (b) and (c), but also (d), "any other person who in the discretion of a court is a proper person...". Given this broad formulation of those who may seek the benefit of the Act it is hard to see why one who claims to be the beneficial owner of unissued shares should not qualify. Secondly, s. 238(a) refers to the ...beneficial owner...of a security of a corporation...". The term security is defined in s. 2(1) as follows:

> "security" means a share of any class or series of shares or a debt obligation of a corporation and *includes a certificate evidencing such a share* or debt obligation; (Emphasis added)

14      Applicant's counsel argued that the underlined words particularly "includes", indicate that ownership of a security means more than being the holder of a certificate and that a larger property notion than the certificate itself is intended by the term security. In my opinion this is a fair reading of that definition and lends support to the view that it is not necessary that an actual certificate be issued in order that someone may be the beneficial owner of securities within the meaning of s. 238. It should further be noted that the remedies available under s. 241(3) include "(d) an order directing an issue or exchange of securities". Parliament contemplated that a person without shares would be entitled to require them to be issued to him or her. In the context of a remedial act, it makes no sense to think that a person holding one registered share and claiming to be entitled to the issuance of a million more would be entitled to use the Act and the person holding no registered shares and claiming to be entitled to the issuance of a million would not be able to use it.

15      As to the policy involved, the argument was made that the CBCA was not intended as a shortcut to avoid the process of establishing rights by actions such as specific performance. It is apparent from the reasons of the learned Master that such thinking was a factor in his decision in *Bernstein, supra*. In my view, if any person claiming a relevant status under ss. 238 or 241 by reason of being a registered shareholder, beneficial owner, creditor, a director or the like, could be turned away without a hearing by the simple denial of the existence of the relevant status, much of the remedial effect of the CBCA would be demolished. In effect, the respondents'

1990 CarswellOnt 915, 69 D.L.R. (4th) 567, 20 A.C.W.S. (3d) 372

contention would re-write the legislation by redefining "creditor" in s. 241 as judgment creditor" and "beneficial owner" in s. 238 as "beneficial owner whose status as such has been confirmed by the Court or is not in any way contested." Since by definition a beneficial owner is one who does not have legal title, every such person is at risk that he may have to go to the law to enforce his right to turn beneficial ownership into legal ownership. In my view, Parliament did not intend the absence of legal title to prevent the applicants here from bringing an application under ss. 238 and 241 until some other court had passed upon the validity of their claim to beneficial ownership. Their status is to be dealt with within the CBCA application and not as a condition precedent.

16      Continuing with the policy analysis, one must ask whether Parliament intended to have issues such as a claim for specific performance of an agreement for shares tried on an application where the evidence, initially at least, is by affidavit. Cases of oppression present legal, factual and credibility problems every bit as difficult as are presented in specific performance actions, yet there is clear jurisdiction under the CBCA to deal with oppression claims on affidavit in a proper case or to direct the trial of an issue if that is required. I see no policy reason why the kind of claim made by the applicants here could not if necessary be the subject of the trial of an issue. Finally, a rule requiring a party to establish the status of creditor, beneficial owner or the like in a separate proceeding before coming to the court under the CBCA to obtain relief would multiply litigation to no good purpose.

17      For the foregoing reasons the applicants qualify under s. 238 as complainants by reason of their claim to be beneficial owners of securities of the respondent company.

18      *Are the applicants "security holders" within the meaning of s. 241(2)?*

19      Counsel for the respondent contends that the phrase "any security holder" found in s. 241 is not broad enough to include the present applicants because they are not registered security holders. She argues that even if the applicants qualify under s. 238 as complainants, they nevertheless are not entitled to relief because they are not security holders. In support of this, she relies upon the definition of "holder" in Part VII of the CBCA. Neither "security holder" nor "holder" are defined for the Act as a whole nor for Part XX, which contains the oppression remedy. However, s. 48(2) defines "holder" for the purposes of Part VII, as follows:

     "holder" means a person in possession of a security issued or endorsed to him or to bearer or in blank.

20      Counsel for the respondent argues that a similar restricted meaning should be given to "security holder" in s. 241. I do not agree. The definition of "holder" in s. 48(2) is expressly confined to Part VII of the Act, and thus has no necessary implication for the meaning of "security holder" in Part XX. It would, in my opinion, be an absurd construction to find that former registered security holders may be complainants, but are nevertheless to be denied relief. Counsel for the respondents relies also upon the case of *Michalak v. Biotech Electronics Ltd; Puetter et al.* (1986), 35 B.L.R. 1 (Que. S.C.) where the applicants were former shareholders. It was held that they qualified as complainants but were nevertheless denied a remedy. Counsel says that this case establishes that an applicant could qualify as a complainant and could show oppression but nevertheless not be entitled to relief because of not being a security holder. In my view, the gist of the decision was that the oppression complained of existed in the past and there was at the time of the application nothing in the nature of current oppression which could provide a foundation for relief: see the remarks of Martin J. at p. 11 (B.L.R.). Counsel further contends that s. 241(2) is deliberately different from s. 238 in that complainants who are "any other proper person" under s. 238(d) do not qualify for relief under s. 241(2) because they are not security holders. I do not accept this premise but for the present case the short answer is that the applicants here do not come before the

1990 CarswellOnt 915, 69 D.L.R. (4th) 567, 20 A.C.W.S. (3d) 372

Court as "any other person...", but as security holders alleging that their status as such is being oppressively denied to them.

21     I do not think that the differences between ss. 238 and 241 lead to the conclusion that relief is only available to registered security holders under s. 241. The Act specifically contemplates relief to unregistered shareholders by the use of the term beneficial owner in s. 238(a), by the provisions of s. 243 relating to rectification of the register and by the power in s. 241(3)(d) to order an issue of securities. Once again we return to the underlying issue. Is s. 241 confined to persons who have an undisputed status at the outset of the application? Bearing in mind the remedial nature of this Act and the considerations already discussed in connection with the analysis of s. 238, the answer must be that persons claiming the status of security holder are entitled to use the mechanism of the CBCA to attempt to prove that status as part of their effort to obtain relief against oppressive conduct. To establish a threshold requirement of undisputed status would undermine the broad, remedial scope of this Act.

22     The respondent further argues that since the corporation is not a party to the contract under which the shares were to be issued, there can be no claim against it and hence use of the oppression remedy is misconceived. She relies on *Canadian Commercial Bank v. Prudential Steel Ltd.* (1986), 66 C.B.R. 172 (Alta. Q.B.). In that case the Bank, as secured creditor of B. Ltd. sought to set aside, as a fraudulent preference, a re-sale for credit by B. Ltd. of certain inventory to the defendant, which was one of B. Ltd.'s suppliers. In addition, the Bank sought relief against the defendant as a complainant under s. 234 of the *Alberta Business Corporations Act*, where the definition of complainant is the same as that in the CBCA. It was held that the Bank was not a complainant because the security which it claimed to enforce was given to it by B. Ltd. and not by the defendant corporation. That case is quite distinguishable from the case at bar. The claim of the applicants here is to have the corporation recognize their status as shareholders. It can be brought only against the corporation whose shares they claim to own, the respondent Excel and its sole director. In my opinion, *Canadian Commercial Bank* (supra) is not a relevant authority in the case at bar. That the resolution of the applicants' right to be recognized as shareholders by Excel and Mr. Aumon involves the review of a pre-incorporation agreement is, in my view, no bar to the use of the CBCA oppression mechanism.

23     I am not to be taken as saying that the applicants' claim to the relevant status can never be challenged before the main hearing. If at any stage of the proceedings it becomes apparent that the applicants' claim to the relevant status of beneficial owner or creditor or the like is in bad faith, frivolous or a sham, the Court has ample powers to dispose of the application in a summary way.

24     As noted above, counsel agreed that only the so-called threshold question would be argued on this occasion. Accordingly the issue of whether the refusal of Aumon as a director of Excel to cause Excel to issue shares to the applicants is an act of oppression within the meaning of s. 241 is not before me and I express no opinion on it.

25     The respondents' motion to dismiss this application fails. Costs of this motion are reserved for disposition to the judge hearing the main application.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 31

44 S.Ct. 424
Supreme Court of the United States.

CUNNINGHAM

v.

BROWN et al.

No. 213.    |    Argued March 12,
1924.    |    Decided April 28, 1924.

On Certiorari to the Circuit Court of Appeals for the First
Circuit.

Separate suits in equity by James A. Lowell and others,
trustees in bankruptcy of Charles Ponzi, against Benjamin
Brown, against H. W. Crockford, against Patrick W. Horan,
against Frank W. Murphy, and against Thomas Powers,
respectively. All the trustees died pending the litigation, and
Henry V. Cunningham was substituted for the last survivor.
Decrees for defendants (280 Fed. 193) were affirmed by the
Circuit Court of Appeals (284 Fed. 936), and the trustee
brings certiorari. Reversed.

West Headnotes (5)

**[1]**    **Bankruptcy**

 Property Held by Debtor as Trustee, Agent,
or Bailee

Bankrupt's defrauded creditors can follow their
money wherever they can trace it, and assert
possession of it on the ground that there was a
resulting trust in their favor, or they can establish
a lien for what was due them in any particular
fund, of which he has made it a part, without
violating the bankruptcy rule against preference.

114 Cases that cite this headnote

**[2]**    **Bankruptcy**

 Preferences

Where it was impossible to trace the money
of bankrupt's defrauded creditors, they became
merely creditors to the extent of their loss, and
payment of their claims by bankrupt within the
prescribed four months is a preference.

31 Cases that cite this headnote

**[3]**    **Bankruptcy**

 Preferences

A defrauded minor, to whom bankrupt has made
a payment, is in no better situation than adults in
like situation, as a minor is not exempt from the
defeat of an unlawful preference by Bankruptcy
Act, § 60b, as amended by Act June 25, 1910, §
11 (Comp.St. § 9644).

1 Cases that cite this headnote

**[4]**    **Bankruptcy**

 Nature of Transfer

Where numerous creditors loaned bankrupt
money, accepting his notes promising them at the
end of 90 days $150 for every $100 loaned, or
to pay unmatured notes at par of the actual loan,
creditors who took advantage of the agreement
to pay before maturity, after they had reason
to believe that bankrupt was insolvent, secured
"voidable preferences," under Bankruptcy Act,
§ 60b, as amended by Act June 25, 1910, § 11
(Comp.St. § 9644).

66 Cases that cite this headnote

**[5]**    **Trusts**

 Mutual Rights and Liabilities of Cestuis
Que Trust

**Trusts**

 Effect of Payments or Withdrawals from
Commingled Funds

Where the fund with which wrongdoer is dealing
is wholly made up of fruits of frauds perpetrated
against a myriad of victims, the rule that
the first withdrawals from a fund, in which
were mingled the moneys of several defrauded
claimants insufficient to satisfy them all, are
charged against the first deposits, and claimants
are entitled to be paid in the inverse order in
which their moneys went into the account, has no
application.

82 Cases that cite this headnote



**Attorneys and Law Firms**

**\*\*425   \*2** Mr. Edward F. McClennen, of Boston, Mass., for petitioner.

Mr. John H. Devine, of Boston, Mass., for respondents Crockford and others.

**\*4** Mr. Louis Goldberg, of Boston, Mass., for respondent Brown.

**Opinion**

**\*7** Mr. Chief Justice TAFT delivered the opinion of the Court.

These were six suits in equity brought by the trustees in bankruptcy of Charles Ponzi to recover of the defendants sums paid them by the bankrupt within four months prior to the filing of the petition in bankruptcy on the ground that they were unlawful preferences. All the trustees have died or resigned pending the litigation, and Cunningham, having been substituted for the last survivor, is now the sole trustee. The actions were tried together in the District Court, and were argued together in the Circuit Court of Appeals, and all the bills were dismissed in both courts. The facts and defenses are the same in all the cases, except that, in that of Benjamin Brown, there was an additional defense that he was a minor

when the transactions occurred. We have brought the cases into this court by writ of certiorari.

The litigation grows out of the remarkable criminal financial career of Charles Ponzi. In December, 1919, with a capital of $150, he began the business of borrowing money on his promissory notes. He did not profess to receive money for investment for account of the lender. He borrowed the money on his credit only. He spread the false tale that on his own account he was engaged in buying international postal coupons in foreign countries and selling them in other countries at 100 per cent. profit, and that this was made possible by the excessive differences in the rates of exchange following the war. He was willing, he said, to give others the opportunity to share with him this profit. By a written promise in 90 days to pay them $150 for every $100 loaned, he induced thousands to lend him. He stimulated their avidity by **\*8** paying his 90-day notes in full at the end of 45 days, and by circulating the notice that he would pay any unmatured note presented in less than 45 days at 100 per cent. of the loan. Within eight months he took in $9,582,000, for which he issued his notes for $14,374,000. He paid his agents a commission of 10 per cent. With the 50 per cent. promised to lenders, every loan paid in full with the profit would cost him 60 per cent. He was always insolvent, and became daily more so, the more his business succeeded. He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes.

The defendants made payments to Ponzi as follows:

| | |
|---|---:|
| Benjamin Brown, July 20th............................................................................ | $ 600 |
| Benjamin Brown, July 24th............................................................................ | 600 |
| H. W. Crockford, July 24th........................................................................... | 1,000 |
| Patrick W. Horan, July 24th.......................................................................... | 1,600 |
| Frank W. Murphy, July 22d........................................................................... | 600 |
| Thomas Powers, July 24th............................................................................ | 500 |
| H. P. Holbrook, July 22d.............................................................................. | 1,000 |

By July 1st, Ponzi was taking in about $1,000,000 a week. Because of an investigation by public authority, Ponzi ceased selling notes on July 26th, but offered and continued to pay all unmatured notes for the amount originally paid in, and all matured notes which had run 45 days, in full. The report of the investigation caused a run on Ponzi's Boston office by investors seeking payment, and this developed into a wild

scramble when, August 2d, a Boston newspaper, most widely circulated, declared Ponzi to be hopelessly insolvent, with a full description of the situation, written by one of his recent employees. To meet this emergency, Ponzi concentrated all his available money from other banks in Boston and New England in the Hanover Trust Company, a banking concern in Boston, which had been his chief depository. There was no evidence of any general **\*9** attempt by holders of unmatured

notes to secure payment prior to the run which set in after the investigation July 26th.

The money of the defendants was paid by them between July 20th and July 24th and was deposited in the Hanover Trust Company. At the opening of business July 19th, the balance of Ponzi's deposit accounts at the Hanover Trust Company was $334,000. At the close of business July 24th it was $871,000. This sum was exhausted by withdrawals of July 26th of $572,000, of July 27th of $228,000, and of July 28th of $905,000, or a total of more than $1,765,000. In spite of this, the account continued to show a credit balance, because new deposits from other **426 banks were made by Ponzi. It was finally ended by an overdraft on August 9th of $331,000. The petition in bankruptcy was then filed. The total withdrawals from July 19th to August 10th were $6,692,000. The claims which have been filed against the bankrupt estate are for the money lent, and not for the 150 per cent. promised.

Both courts held that the defendants had rescinded their contracts of loan for fraud and that they were entitled to a return of their money; that other dupes of Ponzi who filed claims in bankruptcy must be held not to have rescinded, but to have remained creditors, so that what the latter had paid in was the property of Ponzi; that the presumption was that a wrongdoing trustee first withdrew his own money from a fund mingled with that of his cestui que trustent, and therefore that the respective deposits of the defendants were still in the bank and available for return to them in rescission; and that payments to them of these amounts were not preferences, but merely the return of their own money.

We do not agree with the courts below. The outstanding facts are not really in dispute. It is only in the interpretation of those facts that our difference of view arises.

*10   In the first place, we do not agree that the action of the defendants constituted a rescission for fraud and a restoration of the money lent on that ground. As early as April, his secretary testifies that Ponzi adopted the practice of permitting any who did not wish to leave his money for 45 days to receive it back in full without interest, and this was announced from time to time. Two of the defendants expressly testified to this. It was reiterated in the public press in July and by the investigating public authorities. There is no evidence that these defendants were consciously rescinding a contract for fraud. Certainly Ponzi was not returning their money on any admission of fraud. The lenders merely took advantage of his agreement to pay his unmatured notes at par of the actual loan. Such notes were paid under his agreement

exactly as his notes which were matured were paid at par and 50 per cent. The real transaction between him and those who were seeking him is shown by the fact that there were 500 to whom he gave checks in compliance with his promise, and who were defeated merely because there were no more funds.

The District Court found that, when these defendants were paid on and after August 2d, they had reason to believe that Ponzi was insolvent. The statute (section 60b of the Bankruptcy Act, as amended by Act June 25, 1910, c. 412, 36 St. 838, 842 [Comp. St. § 9644]), requires that, in order that a preference should be avoided, its beneficiary must have reasonable cause to believe that the payment to him will effect a preference; that is, that the effect of the payment will be to enable him to obtain a greater percentage of his debt than others of the creditors of the insolvent of the same class. The requirement is fully satisfied by the evidence in this case, no matter where the burden of proof. On the morning of August 2d, when news of Ponzi's insolvency was broadly announced, there was a scramble and *11 a race. The neighborhood of the Hanover Bank was crowded with people trying to get their money, and for eight days they struggled. Why? Because they feared that they would be left only with claims against an insolvent debtor. In other words, they were seeking a preference by their diligence. Thus they came into the teeth of the Bankruptcy Act, and their preferences in payment are avoided by it.

[2] [3] But, even if we assume that the payment of these unmatured notes was not according to the contract with Ponzi, and that what the defendants here did was a rescission for fraud, we do not find them in any better case. They had one of two remedies to make them whole. They could have followed the money wherever they could trace it and have asserted possession of it on the ground that there was a resulting trust in their favor, or they could have established a lien for what was due them in any particular fund of which he had made it a part. These things they could do without violating any statutory rule against preference in bankruptcy, because they then would have been endeavoring to get their own money, and not money in the estate of the bankrupt. But to succeed they must trace the money, and therein they have failed. It is clear that all the money deposited by these defendants was withdrawn from deposit some days before they applied for and received payment of their unmatured notes. It is true that by the payment into the account of money coming from other banks and directly from other dupes the bank account as such was prevented from being exhausted; but it is impossible to trace into the Hanover deposit of Ponzi after August 1st, from which defendants' checks were paid, the money which they paid him into that account before July

26th. There was, therefore, no money coming from them upon which a constructive trust, or an equitable lien could be fastened. Schuyler v. Little-field, 232 U. S. 707, 34 Sup. Ct. 466, 58 L. Ed. 806; In re *12 Mulligan (D. C.) 116 Fed. 715; In re Matthews' Sons, 238 Fed. 785, 151 C. C. A. 635; In re Stenning, [1895] 2 Ch. 433. In such a case, the defrauded lender becomes merely a creditor to the extent of his loss and a payment to him by the bankrupt within the prescribed period of four months is a preference. Clarke v. Rogers, 228 U. S. 534, 33 Sup. Ct. 587, 57 L. E. 953. In re Door, 196 Fed. 292, 116 C. C. A. 112; In re Kearney (D. C.) 167 Fed. 995.

[4] Lord Chancellor Eldon, in Clayton's **427 Case, [1816] Ch. 1 Merivale, 572, held that, in a fund in which were mingled the moneys of several defrauded claimants insufficient to satisfy them all, the first withdrawals were to be charged against the first deposits, and the claimants were entitled to be paid in the inverse order in which their moneys went into the account. Ponzi's withdrawals from his account with the Hanover Trust Company on July 26, 27, and 28 were made before defendants had indicated any purpose to rescind. Ponzi then had a defeasible title to the money he had received from them, and could legally withdraw it. By the end of July 28th he had done so, and had exhausted all that was traceable to their deposits. The rule in Clayton's Case has no application.

The courts below relied on the rule established by the English Court of Appeals in Knatchbull v. Hallett, L. R. 13 Ch. D. 696, in which it was decided by Sir George Jessel, Master of the Rolls, and one of his colleagues, that, where a fund was composed partly of a defrauded claimant's money and partly of that of the wrongdoer, it would be presumed that in the fluctuations of the fund it was the wrongdoer's purpose to draw out the money he could legally and honestly use rather than that of the claimant, and that the claimant might identify what remained as his res, and assert his right to it by way of an equitable lien on the whole fund, or a proper pro rata share of it. National Bank v. Insurance Co., 104 U. S. 54, 68, 26 L. Ed. 693; Hewitt v. Hayes, 205 Mass. 356, 91 N. E. 332, 137 Am. St. Rep. 448. To make the rule applicable here, we must infer that in the deposit and withdrawal *13 of more

than $3,000,000 between the deposits of the defendants prior to July 28th, and the payment of their checks after August 2d, Ponzi kept the money of defendants on deposit intact and paid out only his subsequent deposits. Considering the fact that all this money was the result of fraud upon all his dupes, it would be running the fiction of Knatchbull v. Hallett into the ground to apply it here. The rule is useful to work out equity between a wrongdoer and a victim; but, when the fund with which the wrongdoer is dealing is wholly made up of the fruits of the frauds perpetrated against a myriad of victims, the case is different. To say that, as between equally innocent victims, the wrongdoer, having defeasible title to the whole fund, must be presumed to have distinguished in advance between the money of those who were about to rescind and those who were not, would be carrying the fiction to a fantastic conclusion.

After August 2d the victims of Ponzi were not to be divided into two classes, those who rescinded for fraud and those who were relying on his contract to pay them. They were all of one class, actuated by the same purpose to save themselves from the effect of Ponzi's insolvency. Whether they sought to rescind, or sought to get their money as by the terms of the contract, they were, in their inability to identify their payments, creditors, and nothing more. It is a case the circumstances of which call strongly for the principle that equality is equity, and this is the spirit of the bankrupt law. Those who were successful in the race of diligence violated not only its spirit, but its letter, and secured an unlawful preference.

[5] We do not see that a minor whose money could not be identified is in a better situation that that of the other defendants. Like them, on August 2d, he was only a creditor of Ponzi, and was moved to avoid insolvency by a preference just as they were. A minor is not exempt *14 from the defeat of an unlawful preference by section 60b of the Bankruptcy Act as amended.

The decrees are reversed.

### Parallel Citations

44 S.Ct. 424, 68 L.Ed. 873

---

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 32

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 41 of 398

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

2012 ONCA 480
Ontario Court of Appeal

Downey v. Ecore International Inc.

2012 CarswellOnt 8459, 2012 ONCA 480, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7, 294 O.A.C. 200

# Paul Downey, Plaintiff (Respondent / Cross-Appellant) and Ecore International Inc., Defendant (Appellant / Respondent to Cross-Appeal)

K. Feldman, Janet Simmons, E.A. Cronk JJ.A.

Heard: April 12, 2012
Judgment: July 6, 2012
Docket: CA C54648

Proceedings: reversing *Downey v. Ecore International Inc.* (2011), 2011 CarswellOnt 12487, 2011 ONSC 6617 (Ont. S.C.J.)

Counsel: L. David Roebuck, Mark Hines, for Appellant / Respondent to cross-appeal
Timothy M. Lowman, Patrick J. Cotter, for Respondent / Cross-appellant

Subject: Contracts; Public; Civil Practice and Procedure; Employment

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Contracts --- Consideration — General principles**

Plaintiff was principal of company that entered into consulting agreement with predecessor of defendant — Consulting agreement was governed by laws of Ontario — Plaintiff's company was supposed to execute confidentiality agreement but plaintiff executed it in his personal capacity — Confidentiality agreement included forum selection clause stipulating disputes were to be heard in U.S. — Plaintiff commenced action in Ontario against defendant for damages for breach of assignment agreement or for rescission and accounting of profits — Defendant's motion for order dismissing action due to lack of jurisdiction dismissed on ground there was no consideration for confidentiality agreement — Appeal allowed — Consultancy and confidentiality agreements together constituted composite whole — Plaintiff would receive benefits arising from relationship with defendant whether directly or through the corporate vehicle — Mutual promises contained in provision constituted quid pro quo that formed basis for confidentiality agreement.

**Labour and employment law --- Employment law — Interpretation of employment contract — Particular covenants — Restrictive covenants — Miscellaneous**

Plaintiff was principal of company that entered into consulting agreement with predecessor of defendant — Consulting agreement was governed by laws of Ontario — Plaintiff's company was supposed to execute confidentiality agreement but plaintiff executed it in his personal capacity — Confidentiality agreement included forum selection clause stipulating disputes were to be heard in U.S. — Plaintiff commenced action in Ontario against defendant for damages for breach of assignment agreement or for rescission and accounting of profits — Defendant's motion for order dismissing action due to lack of jurisdiction dismissed on ground there was no consideration for confidentiality agreement — Defendant's appeal allowed — Plaintiff's cross-appeal dismissed — Consultancy and confidentiality agreements together constituted composite whole — Plaintiff would receive benefits arising from relationship with defendant whether directly or through the corporate vehicle — Mutual promises contained in provision constituted quid pro quo that formed basis for confidentiality agreement — Material language of provision that confidentiality agreement to apply "during and after"

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

plaintiff's employment confirmed that plaintiff's confidentiality obligations were to survive termination of his relationship with defendant.

**Contracts --- Construction and interpretation — General principles**

Plaintiff was principal of company that entered into consulting agreement with predecessor of defendant — Consulting agreement was governed by laws of Ontario — Plaintiff's company was supposed to execute confidentiality agreement but plaintiff executed it in his personal capacity — Confidentiality agreement included forum selection clause stipulating disputes were to be heard in U.S. — Plaintiff commenced action in Ontario against defendant for damages for breach of assignment agreement or for rescission and accounting of profits — Defendant's motion for order dismissing action due to lack of jurisdiction dismissed on ground there was no consideration for confidentiality agreement — Appeal allowed — Aim of contractual interpretation is to determine intentions of parties in accordance with language used in document, having regard to context in which it was signed — Consultancy and confidentiality agreements together constituted composite whole — Intent of parties in entering into contractual arrangements was to require execution of confidentiality agreement that bound plaintiff personally — Motion judge's interpretation would deprive defendant of any protection of its proprietary information from recipient of that information.

**Table of Authorities**

**Cases considered by** *E.A. Cronk J.A.:*

*Dumbrell v. Regional Group of Cos.* (2007), 55 C.C.E.L. (3d) 155, 220 O.A.C. 64, 85 O.R. (3d) 616, 2007 CarswellOnt 407, 25 B.L.R. (4th) 171, 279 D.L.R. (4th) 201, 2007 ONCA 59 (Ont. C.A.) — referred to

*Salah v. Timothy's Coffees of the World Inc.* (2010), 2010 CarswellOnt 7643, 2010 ONCA 673, 74 B.L.R. (4th) 161, 268 O.A.C. 279 (Ont. C.A.) — followed

*SeaWorld Parks & Entertainment LLC v. Marineland of Canada Inc.* (2011), 2011 ONCA 616, 2011 CarswellOnt 10329, 282 O.A.C. 339 (Ont. C.A.) — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
    R. 21 — referred to

**Words and phrases considered:**

**consideration**

In my view, the mutual promises contained in the Confidentiality Agreement afford good and valid consideration for [plaintiff's] execution of that agreement. This is sufficient to legally bind the parties in accordance with their express intentions as set out in the preamble to the agreement, quoted above. It was these promises and their fulfillment that permitted [plaintiff], both personally and through [his company], to realize the benefits of the Consulting Agreement, benefits he would not have received without executing the Confidentiality Agreement to which he was personally bound.

APPEAL by defendant; CROSS-APPEAL by plaintiff from decision reported at *Downey v. Ecore International Inc.* (2011), 2011 CarswellOnt 12487, 2011 ONSC 6617 (Ont. S.C.J.), dismissing defendant's application for stay or dismissal of action.

*E.A. Cronk J.A.:*

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

## I. Overview

1    Ecore International Inc. ("Ecore") appeals from the dismissal of its motion for an order staying or dismissing an Ontario action commenced against it by the respondent, Paul Downey ("Downey"). Ecore requested that the action be dismissed for want of jurisdiction of the Ontario Superior Court of Justice based on a forum selection clause ("FSC") in favour of the Pennsylvania courts, as found in a written confidentiality agreement between the parties ("Confidentiality Agreement").

2     The narrow issue on appeal is whether the motion judge erred by concluding that the Confidentiality Agreement fails to bind Downey for lack of consideration. Should Ecore succeed on its appeal, Downey cross-appeals, contending that the Confidentiality Agreement is unenforceable because it applied only "during or after" his employment with Ecore. As Downey was never an employee of Ecore, he argues that a necessary precondition to the operation of the Confidentiality Agreement was not satisfied.

3    For the reasons that follow, I would allow the appeal and dismiss the cross-appeal.

## II. Facts

4    Ecore, formerly known as Dodge-Regupol Inc. ("DRI"), [1] is a Pennsylvania-based manufacturer of recycled rubber and a wide array of rubber-related products. Downey is a professional engineer licensed and resident in Ontario.

### (1) Genesis of the Contracts

5     In the 1990s, Downey was employed by one of Ecore's competitors in Toronto. By 1999, he was seeking a new position in a senior business development or sales and marketing position, with the hope of a later transition to general management.

6     In August and September 1999, Downey had discussions with the President of Ecore, Art Dodge, regarding a potential role for him with Ecore. On September 9, 1999, Dodge wrote to Downey, enclosing an "employment proposal" and offering him employment with Ecore in the position of "Business Development Manager — Industrial Products". The letter indicates that Dodge anticipated Downey relocating to Pennsylvania in early 2001 or sooner. The letter states: "given your history and industry knowledge, coincident with your joining the company and as a condition of your employment, we will require you to sign an Employee Confidentiality Agreement."

7     Downey responded to Dodge on September 10, 1999 with a counter-proposal. He suggested various changes to the compensation arrangements outlined by Dodge and proposed that the parties operate, "albeit temporarily for the next 12 - 18 months as a business-to-business relationship rather than an employer-employee one". Downey described this arrangement as "necessary given Canadian tax law". He included a draft consulting agreement prepared by his lawyer, which contemplated that Downey's services would be provided to Ecore through his company, CSR Industries Inc. ("CSR"). The draft agreement provided that CSR would execute a copy of Ecore's standard confidentiality agreement.

8    Dodge replied to Downey on the same day with a modified proposal that accepted some, but not all, of Downey's suggested compensation arrangements, and that accepted all other terms and conditions in Downey's counter-proposal.

### (2) Consulting Agreement

9     CSR and Ecore executed a consulting agreement on September 14, 1999 ("Consulting Agreement"). The agreement is between Ecore as the "Client" and CSR as the "Consultant". Downey is not a named party to the Consulting Agreement. However, as will be discussed below, he is described in the terms of the agreement as "a Key Person of the Consultant".

10     The Consulting Agreement provides that CSR will provide defined "Services", including acting as Ecore's "Manager Business Development — Industrial Products" and sitting as a member of Ecore's management team. Additional services to be provided by CSR include "the investigation and development of new business opportunities within industrial market segments".

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 44 of 398

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

11    Section 3 requires Ecore to pay CSR an annual fee of $132,000 CDN, payable in weekly amounts, for the Services provided under the Agreement, as well as various bonuses in 2000. After 2000, CSR would be considered for participation in all company-wide bonus distributions.

12    Section 5 of the Consulting Agreement describes the relationship between Ecore and CSR as follows:

The Consultant's relationship with the Client as created by this Agreement is that of an independent contractor for the purposes of the *Income Tax Act* (Canada) and any similar provincial taxing legislation. It is intended that the Consultant shall have general control and direction over the manner in which its services are to be provided to the Client under this Agreement. Nothing contained in this Agreement shall be regarded or construed as creating any relationship (whether by way of employer/employee, agency, joint venture, association or partnership) between the parties other than as an independent contractor as set forth herein.

13    Section 7 recognizes Downey's role as CSR's "Key Person":

7. Key Person

(a) The parties acknowledge that Paul Downey is a Key Person of the Consultant and is integral to the successful performance of the Services by the Consultant under this Agreement. It is acknowledged by the Consultant that Paul Downey will perform all services of the Services, unless the Client otherwise consents in writing.

14    Section 8 requires CSR to execute a confidentiality agreement:

8. Confidential Information

The Consultant will execute a copy of the Client's standard confidentiality agreement, and said confidentiality agreement, upon execution, will form part of this agreement.

*(3) Confidentiality Agreement*

15    On Downey's first day of work with Ecore on October 4, 1999, Ecore asked him to sign its standard form confidentiality agreement, backdated to October 1, 1999. Downey executed the agreement in his personal capacity on or about October 4, 1999.

16    The Confidentiality Agreement is between Ecore, which is referred to as "Company", and Downey, who is referred to as "Employee". CSR is not a named party to the agreement and is not referenced in the document.

17    The preambles to the Confidentiality Agreement include this clause:

BACKGROUND: Company is prepared to engage Employee for employment with Company. Employee will be granted access to confidential and proprietary information of the Company as part of his employment. Employee is entering into this Agreement to grant to the Company protections regarding the Company's proprietary information. The parties of [sic] this Agreement agree and intend to be legally bound by the covenants as set forth in this Agreement.

18    Section 1 of the Confidentiality Agreement defines "Proprietary Information", while s. 2 obliges Downey to accept and hold all Proprietary Information as secret and confidential and not to use it for his own benefit, but only for the benefit of Ecore.

19    Section 3 of the Confidentiality Agreement contains the FSC at issue in this proceeding. The pertinent part of the FSC states:

Employee hereby consents to the exclusive jurisdiction in the courts of the Commonwealth of Pennsylvania and of the United States situate in the Commonwealth of Pennsylvania, in connection with any action or suit to enforce this Agreement, that relates to this Agreement, that arises out of or in any way relates to the Company's business relations with Employee.

**Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459**

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

20     Section 4 of the Confidentiality Agreement provides that "[a]ll inventions or discoveries which relate to [Ecore's] Proprietary Information shall be the exclusive property of the Company." This section obliges Downey to execute any instruments that Ecore deems necessary to confirm its exclusive rights to any invention or discovery under applicable intellectual property law.

21     Section 5 of the Confidentiality Agreement states:

This Agreement shall not constitute an employment agreement between Company and Employee, and, in the absence of written agreement to the contrary, Employee shall, at all times, be considered an employee at will. This Agreement shall apply during and after the Employee's employment with Employer.

*(4) Assignment Agreement*

22     Sometime in 2000, Downey invented a new form of impact sound insulation for use in the construction of flooring systems. He disclosed the inventions to Ecore in 2000. Downey believed that his inventions could lead to a new Ecore product line.

23     In a written agreement, dated October 10, 2001, Downey assigned all his rights, title and interest in the inventions to Ecore ("Assignment Agreement"). Downey acknowledged in the Assignment Agreement that he received "valuable consideration" from Ecore.

*(5) Subsequent Events*

24     In 2008, Ecore asked Downey to sign an "Amended and Restated Confidentiality Agreement" that sought to create joint and several obligations on the part of Downey and CSR. Downey declined to do so.

25     In February 2011, Downey commenced an action in Ontario against Ecore, alleging that it failed to honour an oral promise to "reasonably compensate" him for his assignment of the insulation inventions. Downey alleges in his claim that the inventions were made by him alone using public source materials information and without the use of any Proprietary Information of Ecore. Downey seeks damages or, in the alternative, rescission of his assignment of the inventions and an accounting of profits by Ecore.

26     In response to this action, Ecore terminated the Consulting Agreement effective July 2011. Ecore also moved under Rule 21 of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, to stay or dismiss Downey's action on the ground that the Pennsylvania courts have exclusive jurisdiction over it pursuant to the FSC in the Confidentiality Agreement.

### III. Motion Judge's Decision

27     The motion judge reviewed the circumstances leading to the execution of the Consulting and Confidentiality Agreements and the terms of both contracts. He found that, at Downey's request, the Consulting Agreement was between CSR and Ecore, rather than Ecore and Downey, because this structure was "advantageous to [Downey] from a Canadian tax perspective" and was "for his advantage" (at para. 30). He also found that while it was contemplated that "Downey's position or status might change to that of an employee of Ecore", this never happened.

28     As for the Confidentiality Agreement, the motion judge found that while CSR was obliged under the Consulting Agreement to execute the agreement, it did not do so. Instead, as requested by Ecore, Downey signed the Confidentiality Agreement in his personal capacity. The motion judge correctly held that Downey was bound by the FSC in the Confidentiality Agreement only if that agreement was a valid contract to which Downey was personally bound. He concluded, at para. 34, that the Confidentiality Agreement "fails for lack of consideration". The motion judge found that "it is CSR, not Downey, who is the party to the Consulting Agreement. The confidential information is provided to CSR, and the compensation, pursuant to the terms of the agreement, was to flow to CSR".

29     The motion judge summarized his conclusion this way, at para. 37:

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 46 of 398

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

Downey never received consideration for executing the Confidentiality Agreement and is not personally bound by its terms, including the FSC contained therein. The jurisdiction of this court to hear Downey's action against Ecore is therefore not ousted by the FSC contained in the Confidentiality Agreement dated October 1, 1999.

30     Although this conclusion was dispositive of Ecore's motion, the motion judge went on to consider the other issues raised by the parties concerning the enforceability of the Confidentiality Agreement against Downey. He held that: (1) the subject matter of Downey's action against Ecore falls within the scope of the FSC in the Confidentiality Agreement since the action arises out of and relates to Ecore's business relations with Downey (at paras. 38-41); and (2) Downey failed to show sufficient strong cause to avoid the enforcement of the FSC in the Confidentiality Agreement (at paras. 42-45). Downey did not challenge these additional findings before this court.

31     The motion judge's reasons for dismissing Ecore's motion are summarized in this succinct passage from his reasons, at para. 46:

The FSC in the Confidentiality Agreement should be enforced, and the stay of proceedings would be granted, but for the finding that the Confidentiality Agreement fails to bind Downey personally for lack of consideration.

## IV. Issues

32     There is one issue on the appeal: did the motion judge err by concluding that the Confidentiality Agreement, including the FSC, is unenforceable against Downey for lack of consideration?

33     If the motion judge so erred, the only issue on the cross-appeal is whether the Confidentiality Agreement is unenforceable against Downey on the alternative basis that a necessary precondition to its operation — Downey's employment with Ecore — was never satisfied.

## V. Analysis

### (1) The Appeal

34     Ecore's basic position is that the motion judge erred by concluding that the Confidentiality Agreement is unenforceable against Downey by reason of a failure of consideration.

35     Ecore submits that s. 8 of the Consulting Agreement evidences the parties' intentions that Ecore was to receive a confidentiality covenant that bound Downey personally as the Key Person. In addition, Ecore argues that the consideration for signing the Confidentiality Agreement was provided by the monies and benefits that flowed through CSR to Downey. Ecore also submits that consideration is found in the expressed premise of the Confidentiality Agreement that Downey would be granted access to Ecore's confidential information and that he was entering into the agreement to grant Ecore protection in respect of that information.

36     For the reasons that follow, I agree with Ecore that the motion judge erred by holding that the Confidentiality Agreement "fails" and is unenforceable against Downey due to a lack of consideration.

### (i) Principles of Contractual Interpretation

37     I begin with the well-established principles of contractual interpretation. As the courts have repeatedly affirmed, the aim of contractual interpretation is to determine the intentions of the parties in accordance with the language used in the written document, having regard to the context in which the contract was signed: see *Dumbrell v. Regional Group of Cos.* (2007), 85 O.R. (3d) 616 (Ont. C.A.), at paras. 47-56; *Salah v. Timothy's Coffees of the World Inc.*, 2010 ONCA 673, 268 O.A.C. 279 (Ont. C.A.), at para. 16; and *SeaWorld Parks & Entertainment LLC v. Marineland of Canada Inc.*, 2011 ONCA 616, 282 O.A.C. 339 (Ont. C.A.), at para. 16.

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

38     The contours of the exact bargain between the parties may sometimes require consideration of more than one contract. Nonetheless, the same principles of contractual interpretation apply. In *Salah*, at para. 16, Winkler C.J.O. provided this instructive overview of the applicable principles:

> When interpreting a contract, the court aims to determine the intentions of the parties in accordance with the language used in the written document and presumes that the parties have intended what they have said. The court construes the contract as a whole, in a manner that gives meaning to all of its terms, and avoids an interpretation that would render one or more of its terms ineffective. In interpreting the contract, the court must have regard to the objective evidence of the "factual matrix" or context underlying the negotiation of the contract, but not the subjective evidence of the intention of the parties. The court should interpret the contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. If the court finds that the contract is ambiguous, it may then resort to extrinsic evidence to clear up the ambiguity. *Where a transaction involves the execution of several documents that form parts of a larger composite whole — like a complex commercial transaction — and each agreement is entered into on the faith of the others being executed, then assistance in the interpretation of one agreement may be drawn from the related agreements.*

> [Citations omitted; Emphasis added.]

*(ii) The Wording of the Agreements and the Factual Matrix in this Case*

39     The motion judge's factual finding that CSR was the recipient of Ecore's Proprietary Information led to his conclusion that the Confidentiality Agreement fails for lack of consideration. In my view, this finding is not consistent with the wording of the Consulting and Confidentiality Agreements, having regard to the factual matrix in which these agreements were made. Nor, with respect, does the motion judge's interpretation of the effect of these agreements accord with sound commercial principles or good business sense.

40     From the outset of the parties' dealings, as revealed by Dodge's initial letter to Downey dated September 9, 1999, Ecore contemplated that Downey, personally, would join its "team" and sit as a member of its management group. Consistent with that view, Ecore's position was that Downey would be required to personally commit to protect Ecore's Proprietary Information as a condition of his relationship with Ecore.

41     There was no evidence on the motion to suggest that Ecore resiled from its initial position after Downey and his lawyer converted the original employment proposal into a proposed consulting arrangement with CSR. Indeed, both the wording of s. 5 of the Consulting Agreement and the motion judge's findings confirm that Downey proposed this arrangement solely as a means of advantaging his Canadian income tax position. The arrangement with CSR was simply a tax device that, in the motion judge's words, was implemented "at Downey's request and for his advantage" (at para. 30). This business reality is a critical component of the factual context in which the Consulting and Confidentiality Agreements were signed.

42     Moreover, the transaction between the parties was effected by the execution of both contracts. The Consulting Agreement was entered on the faith of the Confidentiality Agreement being executed. Consequently, these related contracts must be read together and, as Winkler C.J.O. explained in *Salah*, assistance in the interpretation of each agreement may be drawn from the other.

43     That the two agreements together constitute a composite whole is suggested by the language of the agreements themselves. Section 8 of the Consulting Agreement provides for the execution of Ecore's standard form confidentiality agreement by the Consultant. It further states that, upon execution, the confidentiality agreement would form part of the Consulting Agreement.

44     The Consulting Agreement does not specifically address the provision or protection of Ecore's Proprietary Information, nor does it refer to the intended recipient of that information. Instead, it confirms that Downey, in his personal capacity, is a "Key Person of the Consultant and is integral to the successful performance of the Services by the Consultant under this Agreement". CSR explicitly acknowledged that Downey would perform all Services, as defined in the Consulting Agreement, unless Ecore otherwise consented in writing.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

45    The Confidentiality Agreement fills in the gaps in the Consulting Agreement about the provision and protection of Ecore's Proprietary Information. It specifically addresses the disclosure of this information, providing not only that Downey "will be granted access to [Ecore's] confidential and proprietary information" but, also, that Downey was entering into the Confidentiality Agreement to "grant to [Ecore] protections regarding [Ecore's] proprietary information". It confirms that Downey intended "to be legally bound by the covenants as set forth in this Agreement", which include the confidentiality covenants and acknowledgements set out in the body of the agreement.

46    It is true, as the motion judge recognized, that CSR never signed a confidentiality agreement and that it was not a named party to the Confidentiality Agreement signed by Downey. However, when the Consulting Agreement and Confidentiality Agreement are read together, the terms of these agreements reveal the parties' intentions that Ecore's Proprietary Information was to be protected in the hands of the person who was to actually receive that information — Downey. It was only reasonable for the parties to intend that Downey — who was then employed by a known competitor of Ecore — would be subject to the terms of the Confidentiality Agreement. He was the person defined in s. 7 of the Consulting Agreement as the actual provider of all the consulting services to Ecore. Indeed, Downey admitted in cross-examination that he was the person who would get Ecore's information if a contract was entered into with Ecore.

47    The motion judge erred in finding that Ecore accepted that CSR would receive both the Proprietary Information and the benefits flowing from Downey's relationship with Ecore. The wording of the agreements and the overall factual matrix reveals that the *de facto* relationship between the parties was between Ecore and Downey. It was Downey, not CSR, who committed to perform the consulting services. And it was Downey who would receive the benefits arising from the relationship with Ecore, whether directly or through the corporate vehicle of CSR.

48    Two further comments by the motion judge require mention. The motion judge observed, at para. 32, that the Consulting Agreement could have required that both CSR and Downey sign the Confidentiality Agreement. He also commented that it was "[o]f significance" that, in 2008, Ecore asked Downey to sign an amended Confidentiality Agreement that would have bound both CSR and Downey.

49    In my view, with respect, these observations are beside the point. The fact that the Consulting Agreement did not require both CSR and Downey to sign the Confidentiality Agreement is explained by the factual matrix in which the agreements were made. At least for the purposes of the Confidentiality Agreement, the parties understood and intended that CSR and Downey were one and the same.

50    In addition, I view the 2008 effort to restate the Confidentiality Agreement as nothing more than a failed attempt by Ecore to formally commit CSR to the contractual protections it already enjoyed with Downey under the Confidentiality Agreement.

51    An additional point telling against the motion judge's interpretation of the interaction between the Consulting Agreement and the Confidentiality Agreement is that it fails "to accord with sound commercial principles and good business sense, and [to] avoid commercial absurdity": *Salah*, at para. 16. On the motion judge's approach to the interpretation of the two agreements, the Confidentiality Agreement serves no meaningful purpose. The motion judge viewed CSR as the recipient of Ecore's Proprietary Information. If this were the case, it would have served no logical purpose for Ecore to ask Downey to personally commit to protect Proprietary Information that he never received.

52    Moreover, on the motion judge's findings, neither Downey nor CSR is bound by the Confidentiality Agreement. Downey is not bound because, in the motion judge's view, there was no consideration for the agreement. And CSR is not bound because it is not a party to the agreement. On this interpretation, Ecore is deprived of the very protection of its intellectual property for which it bargained.

53    Such a result is inconsistent with the parties' demonstrated intentions at the time they entered into the Consulting and Confidentiality Agreements. It is also inconsistent with sound commercial principles and good business sense. An interpretation of the Consulting and Confidentiality Agreements that occasions such a commercially absurd result is to be avoided: *Salah*, at para. 16.

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

54     I therefore conclude that, properly interpreted, the intent of the parties in entering into their contractual arrangements was to require the execution of a confidentiality agreement that bound Downey personally. That s. 8 of the Consulting Agreement required CSR to execute such a confidentiality agreement does not relieve against the parties' joint objective. To conclude otherwise, as the motion judge did, would deprive Ecore of any protection of its Proprietary Information from the intended and actual recipient of that information. This unjust result would permit form to triumph over substance.

*(iii) Confidentiality Agreement is Supported by Valid Consideration*

55     It follows from this analysis that the motion judge erred by concluding that Downey's execution of the Confidentiality Agreement was unsupported by valid consideration. The motion judge rejected Ecore's suggestion that "the consideration received by Downey for executing the Confidentiality Agreement is the provision of confidential information by Ecore to the consultant, allowing the 'services' of the Consulting Agreement to be provided, thereby allowing the compensation contemplated in that agreement to flow" (at para. 34). According to the motion judge, at para. 35:

> [T]his submission overlooks the fact that it is CSR, not Downey, who is the party to the Consulting Agreement. The confidential information is provided to CSR, and the compensation ... was to flow to CSR. I am mindful that some of the funds owing to CSR pursuant to the Consulting Agreement were paid to Downey personally. However, [Ecore] cannot unilaterally change the parties to the Consulting Agreement by choosing who they pay. Further, the record suggests that these funds were treated by Downey as revenue of CSR.

56     In my opinion, the motion judge's conclusion that the Confidentiality Agreement fails for lack of consideration ignores the mutual promises contained in the Confidentiality Agreement. In particular, the motion judge failed to consider the "BACKGROUND" preamble to the Confidentiality Agreement, which reads:

> Employee will be granted access to confidential and proprietary information of the Company as part of his employment. Employee is entering into this Agreement to grant to the Company protections regarding the Company's proprietary information. The parties of [*sic*] this Agreement agree and intend to be legally bound by the covenants as set forth in this Agreement.

57     The mutual promises contained in this provision constitute a *quid pro quo* that formed the basis for the Confidentiality Agreement: Downey would be granted access to Ecore's Proprietary Information, which was necessary to allow him to perform the Services under the Consulting Agreement, and the information so disclosed would be subject to confidentiality protections in favour of Ecore. Contrary to the parties' original expectations, Downey never became an Ecore employee but instead continued to use his corporate vehicle for income tax purposes. However, the fact remains that Downey received Ecore's Proprietary Information.

58     In my view, the mutual promises contained in the Confidentiality Agreement afford good and valid consideration for Downey's execution of that agreement. This is sufficient to legally bind the parties in accordance with their express intentions as set out in the preamble to the agreement, quoted above. It was these promises and their fulfillment that permitted Downey, both personally and through CSR, to realize the benefits of the Consulting Agreement — benefits he would not have received without executing the Confidentiality Agreement to which he was personally bound.

*(iv) Conclusion*

59     I therefore conclude, contrary to the motion judge's ruling, that Downey's execution of the Confidentiality Agreement was supported by valid consideration. It follows that the Confidentiality Agreement, including the FSC, is fully enforceable against Downey.

**(2) The Cross-Appeal**

60     On his cross-appeal, Downey invokes s. 5 of the Confidentiality Agreement, which provides in part: "This Agreement shall apply *during and after* the Employee's employment with Employer" (emphasis added). Downey submits that even if he did

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 50 of 398

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

receive valid consideration for entering into the Confidentiality Agreement, it is nonetheless unenforceable against him since he never became an Ecore employee. The motion judge did not need to consider this alternative argument, having accepted that the Confidentiality Agreement was unenforceable against Downey due to a lack of consideration.

61      I do not read s. 5 of the Confidentiality Agreement in the manner urged by Downey. The material language of this provision — that the Confidentiality Agreement was to apply "during and after" Downey's employment with Ecore — simply confirms that Downey's confidentiality obligations were to survive the termination of his relationship with Ecore. This makes commercial sense given the purpose of the agreed protections for Ecore's Proprietary Information. It was precisely when Downey's relationship with Ecore fell apart, that those protections would be needed by Ecore.

62      It is telling, in this regard, that the relevant language in s. 5 does not provide that the Confidentiality Agreement or Downey's confidentiality covenants were to apply *only* if Downey was an employee of Ecore or that his employment by Ecore was a condition precedent to the triggering of those covenants. This language also accords with common and business sense. If Ecore's Proprietary Information was disclosed to Downey — in any capacity — the protection of that information was of vital concern to Ecore.

## VI. Disposition

63      For the reasons given, I am persuaded that the motion judge erred in his interpretation of the Confidentiality Agreement. That agreement forms part of a single transaction between Ecore, Downey and CSR, constituted by both the Consulting and the Confidentiality Agreements. The interpretation of each agreement is informed by the other. It is only when the two agreements are read together, in accordance with the principles of contractual interpretation referenced above, that the intentions of the parties and the true business reality of their relationship emerge.

64      Accordingly, I would allow the appeal, dismiss the cross-appeal, set aside the motion judge's order and substitute in its stead an order staying Downey's Ontario action on the basis of the FSC in the Confidentiality Agreement.

65      Ecore is entitled to its costs of the appeal and the cross-appeal, in the agreed amount of $13,000, inclusive of all disbursements and taxes.

*K. Feldman J.A.*:

I agree

*Janet Simmons J.A.*:

I agree

*Appeal allowed; cross-appeal dismissed.*

Footnotes

1      Prior to 2008, Ecore carried on business under the name of DRI. For convenience, DRI is treated in these reasons as being one and the same as Ecore.

End of Document      Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 33

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616



2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

Dumbrell v. Regional Group of Cos.

J. MICHAEL B. DUMBRELL (Plaintiff / Respondent) and THE REGIONAL GROUP OF COMPANIES INC. and STEVEN H. GORDON (Defendants / Appellants)

Ontario Court of Appeal

Doherty, M.J. Moldaver, R.J. Sharpe JJ.A.

Heard: October 23, 2006
Judgment: January 31, 2007
Docket: CA C43885

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: reversing in part *Dumbrell v. Regional Group of Cos.* (2005), 9 B.L.R. (4th) 26, 2005 CarswellOnt 2571, 42 C.C.E.L. (3d) 39 (Ont. S.C.J.)

Counsel: Benjamin Zarnett, Alexa Abiscott for Appellants

R.G. Slaght, Q.C. for Respondent

Subject: Employment; Public; Corporate and Commercial; Intellectual Property; Estates and Trusts; Contracts; Civil Practice and Procedure

Labour and employment law --- Employment law — Interpretation of employment contract — Performance or breach

Defendant was company involved in variety of different real estate services, including land development — Plaintiff was businessman with 25 years' experience in various aspects of real estate field — In 1998, company hired plaintiff as vice-president of commercial development — Employment agreement provided that plaintiff would receive no salary but fifty percent division of net profits of deals generated — During employment, plaintiff suggested investing in development of parcel of land in downtown Ottawa — Plaintiff spent most time in defendant's employ working on securing downtown land deal — Plaintiff resigned in late 1999 due to inability to earn money through employment agreement — Defendant's director finalized deal to invest in downtown land shortly after departure of plaintiff — Defendant and other investors made profit of one million dollars on investment — Plaintiff's action for payment of 50 percent of defendant's profit from deal was allowed — Plaintiff was awarded damages in amount of $500,000 — Trial judge found defendant breached employment contract by refusing to pay profit from deal — Trial judge found that through plaintiff's efforts and exertions

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

that defendant learned of desirability and value of property — Trial judge found plaintiff's contacts made it possible for defendant to pursue deal — Trial judge found defendant's determined efforts to keep deal secret was indication of lack of good faith he brought to relationship with plaintiff — Trial judge found that fact that crystallization of deal occurred after plaintiff left employment was not relevant — Defendant appealed — Appeal allowed in part — Plaintiff entitled to half of profits from deal — Determining factor of entitlement to profits was terms of contract between parties — Contracts to be interpreted objectively with consideration of context in which contract was made — Parties were sophisticated business people who contemplated short relationship — Contract was clear that payment must be earned from profits made as direct result of plaintiff's involvement with corporation — Termination clause did not modify meaning of profits as set out in contract — Trial judge reached proper conclusion regarding entitlement to payment — Trial judge erred in awarding damages based on profits owed to third party investors — Third party investors were bona fide investors and not merely relatives of defendant's director.

Business associations --- Nature of business associations — Nature of corporation — Distinct existence — From owner — Lifting the corporate veil

Defendant was company involved in variety of different real estate services, including land development — Plaintiff was businessman with 25 years' experience in various aspects of real estate field — In 1998, company hired plaintiff as vice-president of commercial development — Employment agreement provided that plaintiff would receive no salary but fifty percent division of net profits of deals generated — During employment, plaintiff suggested investing in development of parcel of land in downtown Ottawa — Plaintiff spent most time in defendant's employ working on securing downtown land deal — Plaintiff resigned in late 1999 due to inability to earn money through employment agreement — Defendant's director finalized deal to invest in downtown land shortly after departure of plaintiff — Defendant and other investors made profit of one million dollars on investment — Plaintiff's action for payment of 50 percent of defendant's profit from deal was allowed — Plaintiff was awarded damages in amount of $500,000 — Trial judge found defendant breached employment contract by refusing to pay profit from deal — Trial judge found that through plaintiff's efforts and exertions that defendant learned of desirability and value of property — Trial judge found plaintiff's contacts made it possible for defendant to pursue deal — Trial judge found defendant's determined efforts to keep deal secret was indication of lack of good faith he brought to relationship with plaintiff — Trial judge found that fact that crystallization of deal occurred after plaintiff left employment was not relevant — Defendant appealed — Appeal allowed in part — Plaintiff entitled to half of profits from deal — Determining factor of entitlement to profits was terms of contract between parties — Contracts to be interpreted objectively with consideration of context in which contract was made — Parties were sophisticated business people who contemplated short relationship — Contract was clear that payment must be earned from profits made as direct result of plaintiff's involvement with corporation — Termination clause did not modify meaning of profits as set out in contract — Trial judge erred in finding director of defendant personally liable — Plaintiff did not claim liability against director — Director did not commit fraud — Trial judge ordered liability against director and corporation, which is not consistent with piercing corporate veil.

### Cases considered by *Doherty J.A.*:

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority* (1993), 1993 CarswellBC 1254, [1993] 2 W.W.R. 321, [1993] 1 S.C.R. 12, 147 N.R. 81, 75 B.C.L.R. (2d) 145, 99 D.L.R. (4th) 577, 20 B.C.A.C. 241, 35 W.A.C. 241, 14 C.C.L.T. (2d) 233, 5 C.L.R. (2d) 173, 1993 CarswellBC 10 (S.C.C.) — referred to

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

*Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Ltd.* (1994), 14 B.L.R. (2d) 125, [1994] I.L.R. 1-3068, *(sub nom. Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Inc.)* 19 O.R. (3d) 205, *(sub nom. Rowen (Charles P.) & Associates Inc. v. CIBA-Geigy Canada Inc.)* 72 O.A.C. 321, 1994 CarswellOnt 234 (Ont. C.A.) — considered

*Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), *(sub nom. Exporta-tions Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 1979 CarswellQue 157, 1979 CarswellQue 157F, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — considered

*Eli Lilly & Co. v. Novopharm Ltd.* (1998), 227 N.R. 201, 152 F.T.R. 160 (note), 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 80 C.P.R. (3d) 321 (S.C.C.) — considered

*Investors Compensation Scheme Ltd. v. West Bromwich Building Society* (1997), [1998] 1 All E.R. 98, [1998] 1 W.L.R. 896 (U.K. H.L.) — referred to

*Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 1998 CarswellOnt 4170, 41 B.L.R. (2d) 42, 114 O.A.C. 357 (Ont. C.A.) — referred to

*Kepic v. Tecumseh Road Builders* (1987), *(sub nom. Kepic v Tecumseh Road Builders, division of Coun-tryside Farms Ltd.)* 18 C.C.E.L. 218, 1987 CarswellOnt 917, *(sub nom. Kepic v Tecumseh Road Builders, division of Countryside Farms Ltd.)* 23 O.A.C. 72 (Ont. C.A.) — referred to

*Leading Investments Ltd. v. New Forest Investments Ltd.* (1986), *(sub nom. H.W. Liebig & Co. v. Leading Investments Ltd.)* [1986] 1 S.C.R. 70, 65 N.R. 209, *(sub nom. H.W. Liebig & Co. v. Leading Investments Ltd.)* 38 R.P.R. 201, *(sub nom. H.W. Liebig & Co. v. Leading Investments Ltd.)* 14 O.A.C. 159, *(sub nom. H.W. Liebig & Co. v. Leading Investments Ltd.)* 25 D.L.R. (4th) 161, 1986 CarswellOnt 671, 1986 Carswel-lOnt 1000 (S.C.C.) — referred to

*Montreal Trust Co. of Canada v. ScotiaMcLeod Inc.* (1995), 129 D.L.R. (4th) 711, 9 C.C.L.S. 97, 23 B.L.R. (2d) 165, 87 O.A.C. 129, 1995 CarswellOnt 1203, *(sub nom. ScotiaMcLeod Inc. v. Peoples Jewellers Ltd.)* 26 O.R. (3d) 481 (Ont. C.A.) — referred to

*Mount Joy Farms Ltd. v. Waipahi Dairy Farm Ltd.* (2001), [2001] NZCA 372 (New Zealand C.A.) — re-ferred to

*Pagnan SpA v. Tradax Ocean Transportation SA* (1986), [1986] 2 Lloyd's Rep. 646, [1987] 1 All E.R. 81 (Eng. Q.B.) — referred to

*Pagnan SpA v. Tradax Ocean Transportation SA* (1987), [1987] 3 All E.R. 565 (Eng. C.A.) — referred to

*Prenn v. Simmonds* (1971), [1971] 3 All E.R. 237, [1971] 1 W.L.R. 1381 (U.K. H.L.) — referred to

*Said v. Butt* (1920), [1920] All E.R. Rep. 232, 90 L.J.K.B. 239, 124 L.T. 413, [1920] 3 K.B. 497 (Eng. K.B.) — referred to

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1999), 45 O.R. (3d) 417, *(sub nom. Toronto-Dominion Bank v. Leigh Instruments Ltd. (Bankrupt))* 124 O.A.C. 87, 178 D.L.R. (4th) 634, 50

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

B.L.R. (2d) 64, 1999 CarswellOnt 2812 (Ont. C.A.) — referred to

*Truckers Garage Inc. v. Krell* (1993), 3 C.C.E.L. (2d) 157, 68 O.A.C. 106, 1993 CarswellOnt 875 (Ont. C.A.) — referred to

APPEAL by defendant from judgment reported at *Dumbrell v. Regional Group of Cos.* (2005), 9 B.L.R. (4th) 26, 2005 CarswellOnt 2571, 42 C.C.E.L. (3d) 39 (Ont. S.C.J.), allowing plaintiff's action for breach of contract.

***Doherty J.A.:***

**I Overview**

1    The respondent, J. Michael B. Dumbrell ("Dumbrell"), was employed by the appellant, the Regional Group of Companies Inc. ("Regional"), for about one year beginning in November 1998. The appellant, Steven H. Gordon ("Gordon"), was the president, CEO, and directing mind of Regional.

2    Dumbrell left Regional's employment in November 1999. He subsequently sued Regional and Gordon claiming he was owed fifty percent of the profit earned on a commercial real estate transaction referred to as the "Queen Street project". The trial judge found that Dumbrell was entitled, under the terms of his employment contract, to fifty percent of the $1,000,000 profit earned on the Queen Street project.

3    Regional and Gordon appeal. Counsel raises three issues:

• Did the trial judge err in holding that Dumbrell was entitled to fifty percent of the profit earned on the Queen Street project even though that profit was earned long after the termination of his employment contract?

• Even if Dumbrell was entitled to the profits under the terms of the employment contract, did the trial judge err in awarding him fifty percent of the profit earned by entities other than Regional or Gordon?[FN1]

• Did the trial judge err in holding Gordon personally liable?

4    I would allow Regional's appeal in part. I would hold Regional liable under the contract but only for commission on profits earned by Gordon's company and his wife and children. I would not hold Regional liable for commission on profits earned by other investors brought into the project by Gordon.

5    I would allow Gordon's appeal. Dumbrell alleged various causes of action against Regional and Gordon at trial. The trial judge found a breach of contract, but rejected the other claims made by Dumbrell. Dumbrell's contract was with Regional and only Regional. He could have no reasonable expectation of recovery upon breach of the contract from any entity other than Regional. I see no legal basis upon which Gordon could be found personally liable for a breach of the contract made between Dumbrell and Regional. Nor can Gordon be liable for inducing Regional's breach of contract. Dumbrell did not plead that cause of action and did not adduce evidence capable of establishing that Gordon induced a breach of contract.

**II The Facts**

6    The trial lasted two weeks. The trial judge heard different versions of many events, some of which are not relevant to this appeal. I will summarize only those facts germane to the issues raised on appeal. My summary

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

also reflects the trial judge's findings of fact and her credibility assessments. Neither are challenged on appeal. The trial judge preferred Dumbrell's version of events over Gordon's whose evidence she found to be unworthy of belief in many respects.

### (a) Dumbrell's Employment with Regional

7    In the summer of 1998, Dumbrell was living in British Colombia. He had spent most of his working life in the real estate development business and was looking for an opportunity to get back into that business in Ottawa where he had previously worked for many years.

8    Regional operated a large, well established real estate business in the Ottawa area. Gordon had been Regional's CEO since 1984. He held all the voting shares. Regional provided a variety of services, including property management, property appraisals, land acquisitions, land development, and consulting.

9    Regional would sometimes put together groups of investors or syndicates to purchase and develop properties. The properties would be located by Regional and purchased in trust by a shell company for the investors. Regional would earn various fees for arranging the purchase, syndication, management, and development of the property. Investors in the syndicate often were officers or employees of Regional or relatives of Gordon. Gordon sometimes took an equity position in these developments through Regional or various other corporate entities he controlled.

10    Gordon had the final say in respect of all facets of Regional's operation. He decided which projects in which Regional would become involved, the fees Regional would charge, which corporate entities would be used, the roles those entities would play in a transaction, and which investors would be invited to join which syndicates.

11    Dumbrell met with an employee of Regional in the summer of 1998 to discuss the possibility of Dumbrell working with Regional. Dumbrell met with Gordon either at the same meeting or in a subsequent meeting shortly afterward. Dumbrell had considerable expertise in the commercial real estate field, an area in which Gordon wanted Regional to become more involved.

12    Gordon and Dumbrell agreed that Dumbrell would work for Regional and would have the title Vice-President, Commercial Development. Dumbrell understood that he would find commercial real estate projects, bring them to Regional and that Regional would then become involved in the purchase and development of those properties. Dumbrell would be paid a commission on the profits earned from the projects that he brought to Regional.

13    On Gordon's instructions, Regional's lawyer drafted an employment contract between Dumbrell and Regional. Three drafts were prepared and reviewed by Dumbrell, Gordon, and their respective lawyers. There were several changes made in the various drafts of the contract. Almost all of these changes reflected Gordon's and not Dumbrell's preferences. Eventually, in November 1998, they agreed on the terms and both signed the agreement. Gordon signed as president of Regional.

14    Some of the contract terms are set out in full below. Generally speaking, the contract provided that Dumbrell would be compensated exclusively on a commission basis. His commission would be calculated as a percentage of the profit generated from projects that he brought to Regional.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

### (b) The Queen Street Property

15      Like most people familiar with the Ottawa real estate market, Dumbrell knew of the Queen Street property in November 1998. The property was owned by Canadian Real Estate Investment Trust ("CREIT"). It occupied a full downtown city block in Ottawa and in late 1998 was being used as a parking lot. It was zoned for use as office space. Dumbrell believed that the price of the property would increase dramatically in the immediate future as the need for office space increased in Ottawa. He also believed that the property was ripe for development in late 1998. The property was not on the market, but Dumbrell mentioned it to Gordon as a potential project for development by Regional. Gordon encouraged him to look into the possibility of acquiring the Queen Street property.

16      In early 1999, Dumbrell began to assemble a file on the Queen Street property. He received information from an employee of CREIT pertaining to possible development plans for the property and certain rent schedules. CREIT gave the information to Dumbrell on the undertaking that it would be kept confidential.

17      Shortly after Dumbrell acquired information from CREIT, he contacted an architect who had worked on development plans for that property some years earlier. Dumbrell and the architect spoke at length and the architect gave Dumbrell a great deal of background information pertaining to the property. Based on the information he had accumulated, Dumbrell concluded that the Queen Street property was under priced and presented an excellent opportunity for a profitable development as an office tower. Regional decided to proceed with efforts to acquire the Queen Street property.

18      In February 1999, on Gordon's instructions, Dumbrell prepared and submitted an offer to purchase the Queen Street property for $7,745,000. That offer was in the name of Canadian Gateway, a consortium of five companies, including Regional, that had been assembled by Gordon. CREIT was not interested in selling the property on the terms of the offer.

19      Gordon instructed Dumbrell to submit a second offer in February 1999. This offer, also in the name of Canadian Gateway in the amount of $9,000,000, was rejected by CREIT. In March 1999, a third offer, also at $9,000,000, but providing for a shorter due diligence period, was submitted by Dumbrell on Gordon's instructions. This offer was also rejected.

20      The trial judge described, at para. 35, Dumbrell's role in these three offers as follows:

Mr. Dumbrell was the point man in these negotiations, drafting these offers at Mr. Gordon's direction and reporting back the reactions of Mr. Dansereau [the vendors' representative] who communicated only with Mr. Dumbrell.

21      Some time after the third offer was rejected, some of the partners in Canadian Gateway decided they were no longer interested in purchasing the Queen Street property. In July 1999, Dumbrell, on Gordon's direction, prepared a fourth offer. This offer showed Regional as the purchaser at a purchase price of $9.3 million. It also provided for a $300,000 commission payable to Regional on closing by CREIT. The corporate identity of the purchaser was irrelevant to Dumbrell. As far as he was concerned, he was working on a "Regional" project and it was up to Gordon to decide what corporate entities would be used to effect the transactions and subsequent development of the property.

22      CREIT knew that Regional would not be the ultimate purchaser and developer of its property. It, there-

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

fore, wanted to know the identity of Regional's investors. Negotiations broke down when Regional could not or would not identify its investors. The July offer was rejected in August 1999.

23      In August, Gordon told Dumbrell that he was no longer interested in the Queen Street property. Dumbrell had spent most of his time since he commenced employment with Regional in November 1998 working on the Queen Street property. His interest in the property continued even after Gordon told him that he was no longer interested in the property.

24      In October 1999, Gordon spoke with a government official who told him that there would be a significant increase in the demand for downtown office space in Ottawa in the immediate future. This information made the Queen Street property more attractive.

25      In late October 1999, Mr. Samuel Grosz, a friend of Gordon's and a real estate developer whose Ottawa properties were managed by Regional, visited Ottawa primarily to look at his properties. Gordon showed Mr. Grosz the Queen Street property and gave him all of the information that Dumbrell had assembled, including the confidential information that had been provided to him by CREIT in January 1999. Mr. Grosz soon became interested in the Queen Street property.

26      Shortly after Gordon alerted Mr. Grosz to the possibility of purchasing the Queen Street property, Mr. Grosz learned that Philip Reichman and his company, O. & Y. Properties Inc. ("O. & Y."), were about to make an offer to purchase the Queen Street property. Mr. Grosz and Mr. Reichman knew each other well and decided to proceed by way of a joint venture with each holding a fifty percent interest in the Queen Street property if they were able to purchase it from CREIT.

27      By early November 1999, it was clear that the working relationship between Gordon and Dumbrell was not going to last. None of the projects that Dumbrell had worked on had produced any profit for Regional. Dumbrell had not received any remuneration in the year he had been at Regional. Gordon had refused Dumbrell's request for an advance on his commissions. Gordon was also systematically excluding Dumbrell from meetings and the decision-making process at Regional. On November 4, 1999, Dumbrell resigned effective November 22, 1999. He had decided to go into business for himself.

28      On November 19, 1999, after Dumbrell had tendered his resignation from Regional, but while he was still employed there, Mr. Grosz told Gordon that Mr. Grosz and O. & Y. were considering making an offer on the Queen Street property. Mr. Grosz asked Gordon to determine the status of the property. He also told Gordon that because Gordon had brought the property to his attention, he was prepared to allow Gordon to participate with he and O. & Y. in the joint venture. Mr. Grosz indicated that Gordon could purchase one-half of Mr. Grosz's fifty percent interest in the joint venture. This would mean that Gordon would have a twenty-five percent interest in the Queen Street property if the joint venture could acquire it.

29      Mr. Grosz and O. & Y. were respected and high profile participants in the Ottawa commercial real estate market. They did not need Regional's participation to complete the purchase. Gordon wanted to be involved in a joint venture with them. At Mr. Grosz's suggestion, Gordon prepared an offer to purchase the Queen Street property in the name of Regional. When he did so, he anticipated that Regional would purchase the property in trust for Mr. Grosz (twenty-five percent), Gordon or his corporate nominee (twenty-five percent), and O. & Y. (fifty percent).

30      The offer to purchase the Queen Street property prepared by Gordon in November 1999 was very similar

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

to the offer prepared by Dumbrell in July 1999. Both offers provided for a purchase price of $9.3 million with a commission of $300,000 payable to Regional. The only significant difference between the two offers was that the July offer identified Dumbrell as the contact person at Regional and the November offer identified Gordon as the contact person.

31     The asking price for the Queen Street property had dropped by about $1 million since July when Regional had submitted its offer at $9.3 million. Unlike Dumbrell, Gordon was not familiar with the commercial real estate market in Ottawa and was unaware that the asking price for the property had gone down. Gordon did not speak to Dumbrell before preparing this offer. The offer prepared by Gordon was reviewed by his putative partners. Mr. Reichman of O. & Y. learned that the offer prepared by Gordon was about one million dollars more than the current asking price for the Queen Street property. He decided that he would take over any negotiations to purchase the Queen Street property. He submitted an offer in the name of O. & Y. at $8,000,000. That offer did not provide for any commissions payable to Regional.

32     The offer submitted by O. & Y. was accepted by CREIT on or about November 25, 1999. The transaction was completed on December 2, 1999and closed on January 24, 2000. The Queen Street property was purchased in trust by a numbered company. The numbered company was owned fifty percent by O. & Y., and fifty percent by a numbered company owned equally by Mr. Grosz and a company controlled by Gordon. Gordon's company held its twenty-five percent interest in the property in trust for a syndicate assembled by Gordon. The syndicate consisted of Gordon, his wife and children, several cousins, and his lawyer. Gordon, his wife and his children owned 73.33 percent of the syndicate. In total, the syndicate advanced about $1,200,000 toward the project. Some of the payments went through Regional.

33     Gordon acknowledged in cross-examination that this was not a typical syndication for which Regional would charge a fee for bringing the investors together. Regional did all of the work that had to be done for the syndicate on the project, but did not charge any fees until it submitted an invoice in late May 2002 after the interest in the property was sold. The trial judge was dubious as to the *bona fides* of that invoice.

34     Early in 2000, Dumbrell learned through a contact at O. & Y., that O. & Y. had agreed to purchase the Queen Street property. Dumbrell spoke with Gordon and asked him about his or Regional's involvement in that purchase. Gordon lied to Dumbrell. He told him that he was unaware of the proposed purchase of the Queen Street property by O. & Y. and that neither Regional nor Gordon had anything to do with the purchase. Dumbrell subsequently learned of Gordon's involvement and commenced this lawsuit in October 2000. At that time, the syndicate put together by Gordon still held a twenty-five percent interest in the Queen Street property.

35     Under the terms of the agreement between O. & Y., Mr. Grosz and Gordon's syndicate, O. & Y. had an option to purchase the interests held by the other partners. In May 2002, O. & Y. exercised its option and bought out Gordon's syndicate. The syndicate's twenty-five percent interest was sold at a profit of slightly more than $1,000,000. Dumbrell amended his statement of claim and alleged that he was entitled to fifty percent of that profit.

### III Issue #1 — Did the trial judge err in holding that Dumbrell was entitled to fifty percent of the profit under the terms of the employment contract?

#### (a) The trial judge's analysis

36     The trial judge found that the potential value of the Queen Street property as a development was made

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

known to Gordon and Regional through Dumbrell's efforts. She further held that it was through those efforts that Regional established contacts with CREIT, assembled a file containing a great deal of information on the property, and was in a position to provide that information to Mr. Grosz when he expressed an interest in the property in October 1999. Mr. Grosz in turn offered Regional/Gordon a twenty-five percent interest in the property because of the information he had received from Gordon.

37     On the trial judge's findings, Dumbrell was directly responsible for the syndicate, under Gordon's direction and control, obtaining a twenty-five percent interest in the Queen Street property. The syndicate ultimately made a one million dollar profit from its involvement in the transaction.

38     The trial judge rejected Gordon's evidence that he and Dumbrell had agreed that the Queen Street project would not be covered by the terms of Dumbrell's employment contract. She noted that it made no sense that Dumbrell would spend the vast majority of his time over several months trying to secure a property that was excluded from the terms of his employment contract. She then turned to the terms of that agreement.

39     The contract was between Regional and Dumbrell. It described Dumbrell as "an employee". The services to be provided to Regional by Dumbrell were described in Schedule "A" to the agreement:

> The Corporation and the Employee agree that the Employee will be charged with the responsibility <u>to provide the Corporation with Development, Acquisitions, Financing and Syndications and Consulting Services. Employee to research, investigate, report and recommend real property capital asset purchases suitable for development or syndication.</u> Employee shall not bind the Corporation to any contract or legal commitment without the prior written authority of the Corporation. [Emphasis added.]

40     The contract was for a term of six months with an expiry date of May 1, 1999 and provided for renewal for an additional term of six months on mutual agreement of the parties. Although the contract was not formally renewed, the parties agreed that it was renewed and was in effect when Dumbrell resigned in November 1999.

41     The agreement provided for termination "at the end of the Term hereof", and further provided that neither party could commence an action under the contract more than one year after the expiration of the term of the contract. Dumbrell commenced this action in October 2000, less than one year after he quit. This initial claim eventually developed into one for commission on a profit realized more than two years after the contract was terminated.

42     The provision of the contract governing Dumbrell's compensation is found under the heading "Employee Earnings":

> 1. <u>EMPLOYEE EARNINGS</u>

> The Corporation shall pay to the Employee the sum of <u>[as per the commissions payable as set out in Schedule "B" attached].</u> The Corporation is responsible for making source deductions, including payments on account of Canada Pension Plan and Employment Insurance. Employee shall be entitled to participate in Corporation's Health Benefit Package as exists as of the date hereof and as amended from time to time. [Emphasis in original.]

43     Schedule "B" referred to in the above clause reads as follows:

> <u>SCHEDULE "B"</u>

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

DESCRIPTION OF REMUNERATION PACKAGE TO EMPLOYEE

1(1)[FN*] The remuneration package for the Employee will be based on performance of the Employee payable as follows:

(a) For each project, *profits* to be split 50% to the Employee and 50% to the Corporation.

1(2) For purposes of this Agreement, "*profit*" shall include monies earned and actually received by the Corporation as completed Acquisition Fees, Development Fees and Syndication Fees earned as a result of the Employee's direct involvement for completed and closed projects in accordance with standard operating policy of the Corporation on the following business activities:

(a) Development projects;

(b) Syndication projects:

(c) Special consulting and brokerage fees payable to the Division.

1(3) "*Profit*" shall be defined as the Gross Revenues received for a particular Project less expenses directly related to the negotiation, acquisition, development and sale of the project. All such expenses shall be deducted from Gross Revenues as would a prudent accountant applying generally accepted accounting principles. Expenses shall include, but not limited to:

(a) Acquisition cost of the property;

(a) Governmental and development fees;

(a) Professional advice (accountants, engineers, lawyers, third party consultants);

(a) Financing fees, brokers fees, interest and carrying charges;

(a) Fees paid to investors for the project;

(a) Costs and disbursements paid pursuant to any syndication agreement;

(a) Realtor's fees; and

(a) Construction costs and related site improvements.

[Emphasis added.]

44      The trial judge did not find that the contract of employment provided for payment of commission to Dumbrell on profits earned after the termination of the employment agreement. Rather, she equated the relationship between Regional and Dumbrell with a principal-agent relationship. Relying on *Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Ltd.* (1994), 19 O.R. (3d) 205 (Ont. C.A.), the trial judge held that since Regional accepted the benefit of the work done by Dumbrell regarding the Queen Street property, Regional was obligated to pay for that work in the absence of an agreement to the contrary. Next, she examined the language of the employment contract and concluded at para. 131:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

The fact that crystallization of the deal [the sale of the syndicate's interest in the Queen Street property], and the culminating events occurred after the employee left his employment, is not, in my view, relevant. ... <u>The contract did not deal with this situation and therefore the entitlement is as set out in *Charles P. Rowen & Associates Inc. et al. v. Ciba-Geigy Canada Inc., supra.*</u> [Emphasis added.]

45      I agree with the trial judge's conclusion that Dumbrell was entitled to compensation for profits earned after the termination of the agreement, but my analysis is somewhat different than hers. I do not regard *Charles P. Rowen*, *supra*, as controlling. In *Charles P. Rowen*, the court was faced with a true principal-agent relationship, the terms of which had not been reduced to writing by the parties. The reasoning of the majority blends notions of *quantum meruit* and implied terms of a contract to resolve a problem that the parties had not addressed when establishing their relationship.

46      In the present case, the parties did consider the nature of their working relationship. After considerable negotiation and legal assistance, they entered into an employment contract which described Dumbrell as an "employee" and addressed the nature of his compensation. In my view, the question of whether Dumbrell was entitled to commission on the profits earned on the Queen Street project depends on an interpretation of the language used in the contract. If he is entitled to commission on the profits from the Queen Street property, that entitlement must be found in the language of the agreement he entered into with Regional.

### (b) Contractual interpretation

47      Judges spend most of their working time deciphering the meaning of various kinds of legal documents, including written contracts: see e.g. Lord Justice Johan Steyn, "The Intractable Problem of the Interpretation of Legal Texts" (2003) 25 Sydney L. Rev. 5; Sir Christopher Staughton, "How Do the Courts Interpret Commercial Contracts?" (1998) 58 Cambridge L.J. 303. Most Canadian judges faced with interpreting a written commercial contract, cite either or both of *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co. (1979),* [1980] 1 S.C.R. 888 (S.C.C.), at 901, and *Eli Lilly & Co. v. Novopharm Ltd.,* [1998] 2 S.C.R. 129 (S.C.C.) at paras. 52-56. Professor Ruth Sullivan has observed that these two authorities can be read as advancing different notions of contractual intent. She observes that *Consolidated-Bathurst*, *supra*, arguably looks to the subjective intention of the contracting parties at the time the contract was made, while *Eli Lilly*, *supra*, looks to the intent as discerned from the words used in the written contract. Professor Sullivan refers to the former approach as the intentionalist approach, and the latter as the textualist approach: see Ruth Sullivan, "Contract Interpretation in Practice and Theory" (2000) 13 Sup. Ct. L. Rev. (2d) 369 at 375-86, 392.

48      In *Eli Lilly*, *supra*, at paras. 52-54, Iacobucci J. refers to *Consolidated-Bathurst*, *supra*, with approval. He clarifies, at para. 54, what is meant in *Consolidated-Bathurst* by "the true intent of the parties" for contractual purposes:

The trial judge appeared to take *Consolidated-Bathurst* to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. In my view, this approach is not quite accurate. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time.

49      On the approach taken in *Eli Lilly*, *supra*, the focus is on the meaning of the words used in the contract. Evidence of the subjective intention of the parties has "no independent place" in the interpretative process: *Eli*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

*Lilly*, at para. 54; see also Staughton, "How Do the Courts Interpret Commercial Contracts?", *supra*, at 304-306; *Investors Compensation Scheme Ltd. v. West Bromwich Building Society* (1997), [1998] 1 All E.R. 98 (U.K. H.L.) at 114-15.

50     In my view, when interpreting written contracts, at least in the context of commercial relationships, it is not helpful to frame the analysis in terms of the subjective intention of the parties at the time the contract was drawn. This is so for at least two reasons. First, emphasis on subjective intention denudes the contractual arrangement of the certainty that reducing an arrangement to writing was intended to achieve. This is particularly important where, as is often the case, strangers to the contract must rely on its terms. They have no way of discerning the actual intention of the parties, but must rely on the intent expressed in the written words. Second, many contractual disputes involve issues on which there is no common subjective intention between the parties. Quite simply, the answer to what the parties intended at the time they entered into the contract will often be that they never gave it a moment's thought until it became a problem: see Kim Lewison, *The Interpretation of Contracts*, 3d ed. (London: Sweet & Maxwell, 2004) at 18-31.

51     *Eli Lilly*, *supra*, instructs that the words of the contract drawn between the parties must be the focal point of the interpretative exercise. The inquiry must be into the meaning of the words and not the subjective intentions of the parties. In this sense, my approach is textualist. However, the meaning of the written agreement must be distinguished from the dictionary and syntactical meaning of the words used in the agreement. Lord Hoffmann observed in *Investors Compensation Scheme Ltd.*, *supra*, at 115:

> The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean.

52     No doubt, the dictionary and grammatical meaning of the words (sometimes called the "plain meaning") used by the parties will be important and often decisive in determining the meaning of the document. However, the former cannot be equated with the latter. The meaning of a document is derived not just from the words used, but from the context or the circumstances in which the words were used. Professor John Swan puts it well in *Canadian Contract Law* (Markham, Ont.: Butterworths, 2006) at 493:

> There are a number of inherent features of language that need to be noted. Few, if any words, can be understood apart from their context and no contractual language can be understood without some knowledge of its context and the purpose of the contract. Words, taken individually, have an inherent vagueness that will often require courts to determine their meaning by looking at their context and the expectations that the parties may have had.

53     The text of the written agreement must be read as a whole and in the context of the circumstances as they existed when the agreement was created. The circumstances include facts that were known or reasonably capable of being known by the parties when they entered into the written agreement: see *BG Checo International Ltd. v. British Columbia Hydro & Power Authority*, [1993] 1 S.C.R. 12 (S.C.C.), at 23-24; *Leading Investments Ltd. v. New Forest Investments Ltd.*, [1986] 1 S.C.R. 70 (S.C.C.), at 80-81, La Forest J.; *Prenn v. Simmonds*, [1971] 1 W.L.R. 1381 (U.K. H.L.), at 1383-84; Staughton, "How Do the Courts Interpret Commercial Contracts?", *supra*, at 307-308.

54     A consideration of the context in which the written agreement was made is an integral part of the inter-

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

pretative process and is not something that is resorted to only where the words viewed in isolation suggest some ambiguity. To find ambiguity, one must come to certain conclusions as to the meaning of the words used. A conclusion as to the meaning of words used in a written contract can only be properly reached if the contract is considered in the context in which it was made: see McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2005) at 710-11.

55      There is some controversy as to how expansively context should be examined for the purposes of contractual interpretation: see Geoff R. Hall, "A Curious Incident in the Law of Contract: The Impact of 22 Words from the House of Lords" (2004) 40 Can. Bus. L.J. 20. Insofar as written agreements are concerned, the context, or as it is sometimes called the "factual matrix", clearly extends to the genesis of the agreement, its purpose, and the commercial context in which the agreement was made: *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 (Ont. C.A.) at 363.

56      I would adopt the description of the interpretative process provided by Lord Justice Steyn, "The Intractable Problem of the Interpretation of Legal Texts", *supra*, at 8:

In sharp contrast with civil legal systems the common law adopts a largely objective theory to the interpretation of contracts. <u>The purpose of the interpretation of a contract is not to discover how the parties understood the language of the text, which they adopted. The aim is to determine the meaning of the contract against its objective contextual scene. By and large the objective approach to the question of construction serves the needs of commerce.</u>[FN2] [Emphasis added.]

### (c) The interpretation of this contract

57      The context in which the written words used in this agreement must be understood begins with the parties who negotiated the agreement. Both were sophisticated, experienced, successful businessmen who could reasonably be expected to negotiate a commercially sensible and workable agreement. When they agreed to work together, it was anticipated that Dumbrell, whose expertise lay in finding commercial real estate projects, would investigate and, where appropriate, bring potentially profitable large-scale commercial developments to Regional. Regional had the ability to finance and develop these projects. It did so in various ways using whatever corporate vehicle Gordon deemed appropriate.

58      The agreement reached by the parties contemplated a relatively short working relationship of between six months and one year. It also contemplated that Dumbrell would receive nothing unless he brought projects to Regional which earned profits for Regional. If he did that, his compensation would be significant (fifty percent of the profits). In tying Dumbrell's compensation to profits as opposed to, for example, fees earned by Regional, the parties anticipated that Dumbrell's entitlement to commissions would not be known until a project was complete and Regional's net profit on the project could be determined.

59      Given Regional's business history, it could reasonably be anticipated when the employment agreement was made that when projects were brought to it by Dumbrell, Regional would be involved in various ways and that its involvement could yield profits through a variety of methods at different stages of Regional's involvement in any given project. On the findings made by the trial judge, Dumbrell was not taking employment with a company whose sole source of profits came through various forms of fees, but was taking employment with a company whose profits could come through various kinds of involvement in different projects.

60      I turn from the context in which the employment agreement was made to the words used in the agree-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

ment and in particular the words used in Schedule "B". Schedule "B" begins by stating that Dumbrell's remuneration will be based on his performance. He must produce to be paid. Schedule "B" then describes his remuneration as fifty percent of "profits" for each project. "Profits" are described in paras. 1(2) and 1(3).

61      Paragraph 1(2) makes it clear that profits must be earned as a result of Dumbrell's direct involvement in the project. In addition, the project must be "completed and closed ... in accordance with standard operating policy of the Corporation". The reference to "standard operating policy" is of no assistance as it is common ground that there was no such thing.

62      Paragraph 1(2) sets out certain kinds of fees that are included in the meaning of profits, such as acquisition fees, development fees, and syndication fees. The fees described in para. 1(2) are not an exhaustive list of the kinds of payments to Regional that can constitute profits. Lastly, para. 1(2) refers to business activities which constitute projects for the purpose of the calculation of profits, including "Syndication projects".

63      Paragraph 1(3) sets out a formula by which profits are to be determined by deducting certain expenses from "Gross Revenues". The reference in para. 1(3) to "Gross Revenues" and the types of expenses identified in that paragraph indicates two things. First, the question of whether Regional earned any profit and, if so, the amount of that profit may well not be determined until the end of Regional's involvement in a particular project. Second, Regional's involvement in projects could take forms other than a fee for service basis. The reference to "Gross Revenues" and many of the expenses described in para. 1(3) are consistent with Regional taking equity positions in a project and realizing a profit upon a sale of that equity position.

64      On my reading of Schedule "B", Dumbrell was entitled to a fifty percent commission on profits if:

    • he was directly responsible for the project in that it was secured for Regional through his efforts;

    • Regional had earned and actually received monies on the project;

    • the project was "completed and closed", that is Regional's involvement was completed; and

    • using the method described in para. 1(3), Regional had earned a profit.

65      Nothing in the language of Schedule "B" limits Dumbrell's potential remuneration to projects that are completed and closed as of the date of termination of his employment contract. The context in which the contract was made contraindicates imposing any such limitation on profits. Reasonable people in the position of Dumbrell and Gordon would have appreciated that Regional's involvement in the kind of complex large scale commercial projects that it was anticipated Dumbrell would bring to it may well not be completed within the relatively short time span contemplated by the employment contract. Similarly, the method used for calculating Dumbrell's compensation by reference to profit as calculated in para. 1(3) contemplates that the projects could well extend over a considerable period of time with the ultimate determination of whether any profit was made and, therefore, any remuneration owed to Dumbrell being based on events that occurred well after the relatively brief period of employment contemplated by the agreement. On my reading of Schedule "B", Dumbrell was entitled to fifty percent of Regional's profits even if the profits were made after the employment contract was terminated.

66      The appellants rely on the termination provision:

    1.1 This contract shall terminate:

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

1.1.1 at the end of the Term hereof.

1.1 Upon termination or other expiration of this contract the Employee shall forthwith return to the Corporation all papers, materials, equipment and other properties of the Corporation held for the purpose of execution of the contract. In addition, each party will assist the other party in the orderly termination of the contract and the transfer of all aspects hereof, tangible and intangible, as may be necessary for the orderly, non-disrupted business continuation of the Corporation.

1.1 Neither party may commence an action under this contract more than one (1) year after the expiration of its term, or, in the event of default, more than one (1) year after the occurrence of said default. [Emphasis added.]

67      The termination provision does not assist in defining profits for the purpose of calculating Dumbrell's compensation. The first part of the termination clause speaks to the point at which the contractual relationship ends. It does not purport to terminate obligations that existed under the contract when the contract came to an end. If, as I would hold, profits as defined in Schedule "B" include profits earned and calculated after the termination of the contract, the obligation to pay those profits, when and if they arise, is an obligation that exists under the contract as of the date of termination albeit in an inchoate form.

68      The last paragraph in the termination clause is also a relevant consideration. That paragraph answers one of the arguments relied on by the appellants. They submitted that a definition of profits that included profits made after the termination date of the contract would create indefinite and potentially open-ended liability by Regional to Dumbrell for profits earned on projects many years down the road. The limitation provision in the termination clause excludes any claim by Dumbrell that is not advanced within one year of the termination of the contract. This provision effectively places limits on Regional's potential liability to Dumbrell. As it happens, the limitation clause does not assist Regional here because Dumbrell had commenced his action within the one year period.

69      In summary, like the trial judge, I conclude that Dumbrell was entitled to fifty percent of the profits earned by Regional on the Queen Street project. I reach that conclusion through a reading of Schedule "B" of the agreement in the context of the circumstances in which the agreement was made. I do not read the termination clause as modifying the meaning of profits in the agreement.

**IV Issue #2 — Was Dumbrell entitled to fifty percent of the profits earned by entities other than Regional/ Gordon?**

70      As outlined above, through Dumbrell's efforts, and at Mr. Grosz's invitation, Regional/Gordon acquired a twenty-five percent interest in the Queen Street property early in 2000.

71      At Gordon's direction, the twenty-five percent interest in the Queen Street property was held by one of his companies in trust for a syndicate of investors. Another Gordon company (LPH), his wife and his children held 73.33 percent of the syndicate. Several of Gordon's cousins and his lawyer, who practised with one of the cousins, held the other 26.67 percent of the syndicate.

72      The accounting breakdown on the syndicate's investment in the Queen Street property, prepared at Gordon's request, but accepted by Dumbrell at trial, showed that the syndicate advanced about $1,200,000 on the Queen Street project and received about $2,200,000 on that project resulting in a profit of just over $1,000,000.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

The accounting records indicate that the funds were distributed in accordance with the percentage of ownership in the syndicate. Gordon and his immediate family received about $732,000 of the $1,000,000 profit earned by the syndicate.

73      In oral argument, Mr. Zarnett acknowledged that if Dumbrell was entitled to compensation on the Queen Street project under the terms of the employment contract, no distinction could be drawn between profits earned directly by Regional and profits earned by other corporate entities used by Gordon to generate the profit. I would extend the same reasoning to cover profits earned by Gordon's wife and children. On this approach, Dumbrell was entitled to fifty percent of the profits earned by LPH, Gordon's wife and Gordon's children.

74      Counsel submits, however, that profits earned by other investors in the syndicate cannot be treated as the same as Regional's profits. The accounting records demonstrate that profits were paid out to the other investors when the syndicate sold its twenty-five percent interest in the Queen Street property to O. & Y.

75      In her reasons, the trial judge accepted, at para. 158, that there were "third parties investing and risking money". I take this to mean that the trial judge accepted that Gordon's cousins and his lawyer were *bona fides* investors who helped finance the twenty-five percent interest in the Queen Street property. She went on to hold, however, that Gordon's resort to other investors could not affect the compensation owed to Dumbrell. She said, at paras. 159-60:

> In calculating damages, there is no evidentiary foundation of any kind on which to assess legitimate costs which might have been set off against this profit.

> Without a scintilla of such evidence, the court is unable to do other than order damages of $500,000, pursuant to the first part of the paragraph in the employment contract dealing with employee remuneration.

76      I cannot agree with this analysis. To the extent that the syndicate was owned by third parties who genuinely invested funds in the project, I do not see how profits payable to those investors can become the profits of Regional for the purposes of calculating Dumbrell's compensation. The accounting records do provide evidence that 26.67 percent of the profit realized on the sale of the twenty-five percent interest in the Queen Street project was paid to third party investors and not to Regional, Gordon, his companies, or his immediate family. The calculation of Dumbrell's compensation on the Queen Street project should not have extended to a percentage of the profits earned by third party investors. If my arithmetic is correct, Dumbrell should have received fifty percent of the profits realized by a 73.33 percent interest in the syndicate.

### V Issue #3 — Did the trial judge err in holding Gordon personally liable for breach of contract?

77      In his statement of claim, Dumbrell alleged several causes of action against Regional and Gordon. At trial, he succeeded only on the breach of contract claim. In the statement of claim, Dumbrell alleged a breach of contract against only Regional. In her initial reasons for judgment, the trial judge found both Regional and Gordon liable for breaching the contract. She did not separately address Gordon's personal liability for breaching a contract to which he did not appear to be a party. Gordon's liability for breach of contract as distinct from Regional's liability was not addressed by counsel in closing argument.

78      After the trial judge released her initial reasons, and at the request of counsel for Regional and Gordon, she heard further argument on Gordon's personal liability for breach of contract. The trial judge gave additional reasons in which she confirmed her initial finding that Regional and Gordon were both liable for the breach of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

contract.

79      I have difficulty understanding the basis upon which the trial judge found Gordon liable for breach of contract. She spoke of "piercing the corporate veil" and described Regional as Gordon's agent for the purposes of the contract. However, she found both Regional and Gordon liable for breaching the contract. I agree with Mr. Zarnett's submission that if Regional acted as Gordon's agent for the purposes of the contract, only Gordon could be liable for breaching that contract. The trial judge's finding that Regional was liable along with Gordon for breaching the contract was also inconsistent with the trial judge's conclusion, at para. 187, that she should "pierce the corporate veil" and hold Gordon liable. Either Regional had a separate legal persona for the purposes of the contract or it did not.

80      The concepts of piercing the corporate veil and holding that a corporation acts as an agent for the individual who controls that corporation achieve the same result in that they both impose personal liability for what appear to be corporate actions. They achieve that result, however, in different ways. The agency relationship assumes that the corporation and the controlling mind are distinct, but that on the relevant facts the former acted as agent for the latter. Piercing the corporate veil ignores the legal persona of the corporation: Bruce L. Welling, *Corporate Law in Canada: The Governing Principles*, 2d ed. (Markham, Ont.: Butterworths, 1991) at 122-36.

81      There is no basis in this record for describing Regional as Gordon's agent for the purpose of entering into the employment contract with Dumbrell. Dumbrell did not plead that Regional acted as Gordon's agent. The terms of the contract offer no suggestion that Regional was acting in an agency capacity. Finally, Dumbrell's evidence does not suggest that he regarded Regional as Gordon's agent for the purposes of the contract.

82      Nor is any case made out for ignoring Regional's separate legal persona. There can be no doubt that Dumbrell contracted with Regional and only Regional in November 1998. The employment contract clearly describes Dumbrell as Regional's employee. Dumbrell's pleadings and his evidence do not suggest otherwise. Gordon's total ownership and control of Regional and the fact that he made all decisions on behalf of Regional in respect of its dealings with Dumbrell does not detract from Regional's standing as a separate and distinct legal entity. Corporations must necessarily act at the instance and under the direction of those fixed with the responsibility and authority to direct the affairs of the corporation: see *Montreal Trust Co. of Canada v. ScotiaMcLeod Inc.* (1995), 26 O.R. (3d) 481 (Ont. C.A.) at 492.

83      The separate identity of a corporation can be ignored where the corporation is inserted into a transaction for a fraudulent or dishonest purpose. Corporations used in that way often have no assets, no corporate history, and no reason for existence other than facilitating a particular transaction. None of those indicia apply to Regional. Regional cannot be described as a shell or corporation of convenience put in place by Gordon for the purpose of entering into the contract with Dumbrell. As of November 1998, Regional had been a thriving well established corporate entity for many years. It participated in many different real estate transactions and employed many people. Dumbrell chose to become one of those employees. There is no suggestion in the evidence that the creation of the employer/employee relationship between Regional and Dumbrell was tainted by fraud or dishonesty on the part of Gordon. There is simply nothing to suggest that Gordon set out to deceive or trick Dumbrell when he and Dumbrell negotiated the employment contract which created the contractual relationship between Dumbrell and Regional, and not between Dumbrell and Gordon. Dumbrell knew full well he was contracting with Regional. He could only reasonably expect to look to Regional for compensation in the event of a breach of the terms of the contract.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

84      The trial judge's reasons also suggest a second basis for holding Gordon liable. She referred to authorities that hold a directing mind of a company liable for inducing a breach of contract by that company: see e.g. *Said v. Butt*, [1920] 3 K.B. 497 (Eng. K.B.), at 504-506; *Truckers Garage Inc. v. Krell* (1993), 68 O.A.C. 106 (Ont. C.A.), at 114-15; *Kepic v. Tecumseh Road Builders* (1987), 23 O.A.C. 72 (Ont. C.A.) at 74.

85      Cases where an individual has been held liable for inducing a corporation's breach of contract have nothing to do with piercing the corporate veil or the concept of agency. These cases acknowledge the separate legal identity of the corporation and its directing mind. They hold the directing mind liable for the discrete tort of inducing the breach of contract and not for breach of contract itself. The measure of damages for inducing the breach of contract may or may not be the same as would apply to the breach of contract.

86      Gordon cannot be liable for inducing a breach of the contract between Regional and Dumbrell. That cause of action was not pleaded. Nor do I understand counsel at trial or on appeal to have argued that Gordon's liability could be based on the separate tort of inducing a breach of contract. An allegation of inducing a breach of contract is very different from a claim that a person is liable for breaching the contract. In the absence of any pleading which expressly or impliedly alleges the tort of inducing a breach of contract, I do not think the principles underlying that tort can be relied on to render Gordon liable for the breached contract.

87      The difficulties inherent in transforming an allegation of a breach of contract into a finding of inducing a breach of that contract are apparent in the trial judge's reasons. To establish the tort of inducing a breach of contract by the directing mind of the contracting party, it must be shown, among other things, that the conduct of the directing mind was not *bona fides* in the best interest of the corporation. In the addendum to her reasons, the trial judge indicates that Gordon's conduct caused Regional to lose certain fees on the Queen Street property. She states, at para. 173:

> His [Gordon's] secretive and misleading conduct eventually caused a serious loss to his company when the company became unable to make the offer which would have resulted in another $300,000. - $400,000. fee.

88      I cannot agree that anything Gordon did caused Regional to act to its detriment in respect of the Queen Street property. The trial judge found that as a result of Dumbrell's efforts, Regional/Gordon acquired a twenty-five percent interest in the Queen Street property. That is the only interest that was available to Gordon in the joint venture that ultimately purchased the property. As the trial judge found, the calculation of Regional's profits and, therefore, Dumbrell's commission, did not depend on what part of the profits Regional described as fees. Had Gordon chosen to describe some of the profits generated for the syndicate from the sale of its interests as fees payable to Regional, it would not have increased the overall profit earned by the syndicate and would have had no effect on the quantification of Dumbrell's compensation. There is no evidentiary basis to hold that Gordon's conduct in respect of the Queen Street property cost Regional anything. On my reading of Gordon's cross-examination, it was not suggested to him that his conduct had somehow deprived Regional of profits that it would otherwise have earned. A finding that Gordon acted against Regional's best interests in connection with the profit earned on the Queen Street property has no foundation in either the pleadings or the evidence.

## VI Conclusion

89      I would allow Gordon's appeal, set aside the trial judge's finding regarding Gordon's personal liability, and dismiss the action against Gordon. I would allow Regional's appeal in part and vary the trial order to provide that Dumbrell is entitled to fifty percent of the profit from the Queen Street project earned by LPH, Gordon's wife and Gordon's two daughters.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 407, 55 C.C.E.L. (3d) 155, 25 B.L.R. (4th) 171, 220 O.A.C. 64, 279 D.L.R. (4th) 201, 85 O.R. (3d) 616

90      Counsel should make written submissions (no more than ten pages each) as to costs both at the trial and on appeal.

**M.J. Moldaver J.A.:**

I agree.

**R.J. Sharpe J.A.:**

I agree.

*Appeal allowed in part.*

FN1 In their factum, the appellants argued that under the terms of the employment contract, Dumbrell was entitled only to fifty percent of Regional's profits and that none of the profit from the Queen Street project was earned by Regional. In oral argument, counsel accepted that the terms of the employment contract would reach profits earned by Regional or other entities controlled by Gordon.

FN* In the contract, all of the paragraphs in Schedule "B" are numbered "1". For ease of reference, I have added the numbers in parentheses.

FN2 Lord Steyn has taken the same approach in his judgments: see *Pagnan SpA v. Tradax Ocean Transportation SA* (1986), [1987] 1 All E.R. 81 (Eng. Q.B.), Steyn J., aff'd [1987] 3 All E.R. 565 (Eng. C.A.). See also *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1999), 178 D.L.R. (4th) 634 (Ont. C.A.), at 639; Lewison, *The Interpretation of Contracts*, *supra*, at 5, 22-24; *Mount Joy Farms Ltd. v. Waipahi Dairy Farm Ltd.*, [2001] NZCA 372 (New Zealand C.A.) at para. 38.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 34

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 72 of 398

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

1998 CarswellNat 1061
Supreme Court of Canada

Eli Lilly & Co. v. Novopharm Ltd.

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129, [1998] S.C.J.
No. 59, 152 F.T.R. 160 (note), 161 D.L.R. (4th) 1, 227 N.R. 201, 80 C.P.R. (3d) 321

# Novopharm Limited, Appellant v. Eli Lilly and Company and Eli Lilly Canada Inc., Respondents and The Minister of National Health and Welfare, Respondent

## Apotex Inc., Appellant v. Eli Lilly and Company and Eli Lilly Canada Inc., Respondents and The Minister of National Health and Welfare, Respondent

L'Heureux-Dubé, Gonthier, Cory, McLachlin, Iacobucci, Major, Bastarache JJ.

Judgment: July 9, 1998
Docket: 25402, 25348

Proceedings: reversing (1996), 197 N.R. 291 (Fed. C.A.); reversing (1995), 60 C.P.R. (3d) 181 (Fed. T.D.); and reversing (1996), 195 N.R. 378 (Fed. C.A.); affirming (1995), 60 C.P.R. (3d) 206 (Fed. T.D.)

Counsel: *Harry B. Radomsky*, *Richard Naiberg* and *David Scrimger*, for the appellant Apotex Inc.
*Donald N. Plumley, Q.C.*,*Mark Mitchell* and *Stephanie Chong*, for the appellant Novopharm Limited.
*Anthony G. Creber* and *David Watson, Q.C.*, for the respondents Eli Lilly and Company and Eli Lilly Canada Inc.

Subject: Intellectual Property; Property; Family; Civil Practice and Procedure

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

#### Patents --- Transfer of interest — Licence — General

Sublicence versus supply agreement — What constitutes sublicence — N, holder of compulsory licence for nizatidine, agreed to supply A with specified quantities of nizatidine — N and A each independently applied for notice of compliance for 150mg and 300mg capsules of nizatidine — E, holder of Canadian patents for nizatidine, obtained prohibition orders preventing issuance of notice of compliance to A and N — N and A, respectively, appealed from decisions which found that supply agreement conferred sublicence — Appeals were allowed — For N to have granted sublicence to A, it must have granted, expressly or impliedly, right to do something which A would otherwise be prohibited from doing, and which N was permitted to do only by virtue of its compulsory licence — Essence of sublicence is that unlicensed party is permitted to exercise licensed rights independently of licensed party — Regardless of level of control that might be exercised by A over arranging and facilitating acquisition of licensed materials for its own benefit, no actual acquisition would be possible without N's involvement — Fact that agreement required licensed party to comply with terms of its licence suggested that parties did not intend to grant sublicences — Agreement did not on its face or in its actual legal effect amount to sublicence.

#### Brevets --- Cession — Licence — En général

Sous-licence par opposition à accord d'approvisionnement — Ce qui constitue une sous-licence — N, titulaire d'une licence obligatoire pour la nizatidine, a accepté d'approvisionner A en certaines quantités déterminées de nizatidine — N et A ont déposé séparément une demande d'avis de conformité pour les gélules de 150 mg et de 300 mg de nizatidine — E, détentrice des brevets canadiens relatifs à la nizatidine, a obtenu des ordonnances interdisant la délivrance d'un avis de

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

conformité à A et N — N et A, respectivement, se sont pourvues à l'encontre de ces décisions qui concluaient que l'accord d'approvisionnement avait conféré une sous-licence — Pourvois ont été accueillis — Pour que N ait accordé une sous-licence à A, elle doit avoir, expressément ou implicitement, accordé à A le droit de faire quelque chose qu'il lui aurait par ailleurs été interdit de faire, et que N n'aurait été autorisée à faire qu'en vertu de sa licence obligatoire — Essence de la sous-licence est que la partie non titulaire d'une licence a le droit d'exercer les droits conférés par la licence indépendamment de la partie qui en est titulaire — Peu importe l'importance du contrôle que A pourrait exercer sur les mesures prises pour organiser et faciliter l'acquisition à son propre profit des substances brevetées, aucune acquisition réelle n'est possible sans la participation de N — Fait que l'accord d'approvisionnement exige que la partie titulaire d'une licence se conforme aux conditions de sa licence suggère que les parties n'avaient pas l'intention d'accorder des sous-licences — Accord ne constituait une sous-licence ni à première vue ni en vertu de son effet juridique réel.

### Patents --- Transfer of interest — Licence — Compulsory licence — Practice and procedure — General

N, holder of compulsory licence for nizatidine, agreed to supply A with specified quantities of nizatidine — N and A each independently applied for notice of compliance for 150mg and 300mg capsules of nizatidine — E, holder of Canadian patents for nizatidine, obtained prohibition orders preventing issuance of notice of compliance to A and N, and purported to exercise its option to terminate N's compulsory licence on basis that N breached terms of its licence by granting sublicence to A — N and A appealed respective decisions which found that supply agreement conferred sublicence — Appeals were allowed — Appropriate date for assessing notice of allegation where prohibition order is sought by patentee is date of hearing and not date on which notice was issued — As of date of hearing, seven years had expired since first notice of compliance was issued to E so pursuant to s. 39.14, N was entitled to use patented invention for production of medicine and therefore had a valid non-infringing way to obtain bulk nizatidine — As of hearing date, N's notice of allegation was not premature — Since supply agreement was not sublicence, E was not justified in terminating N's compulsory licence — N's request for declaratory relief was denied — Given nature of inquiry on these judicial review proceedings, it was not appropriate for court to make binding declaration, for purposes other than appeal on hand, that agreement did not constitute sublicence or transfer of compulsory licence from N to A — Patent Act, R.S.C. 1985, c. P-4, s. 39.14.

### Brevets --- Cession — Licence — Licence obligatoire — Pratique et procédure — En général

N, titulaire d'une licence obligatoire pour la nizatidine, a accepté d'approvisionner A en certaines quantités déterminées de nizatidine — N et A ont déposé séparément une demande d'avis de conformité pour les gélules de 150 mg et de 300 mg de nizatidine — E, détentrice des brevets canadiens relatifs à la nizatidine, a obtenu des ordonnances interdisant la délivrance d'un avis de conformité à A et N, et a voulu exercer sa faculté d'annuler la licence obligatoire de N pour le motif que N avait violé les conditions de sa licence en accordant une sous-licence à A — N et A se sont pourvues à l'encontre des décisions respectives qui concluaient que l'accord d'approvisionnement avait conféré une sous-licence — Pourvois ont été accueillis — Date appropriée pour évaluer un avis d'allégation lorsqu'une ordonnance d'interdiction est demandée par le breveté est celle de l'audition et non celle du dépôt de l'avis — À la date de l'audition, sept années s'étaient écoulées depuis la délivrance du premier avis de conformité à E et, en vertu de l'art. 39.14, N avait le droit de fabriquer le médicament elle-même et disposait en conséquence d'un moyen valide n'emportant pas contrefaçon d'obtenir de la nizatidine en vrac — À la date de l'audition, l'avis d'allégation de N n'était pas prématuré — Comme l'accord d'approvisionnement ne constituait pas une sous-licence, E n'était pas fondée d'annuler la licence obligatoire de N — Demande de jugement déclaratoire présentée par N a été rejetée — En raison de la nature limitée des présentes procédures de contrôle judiciaire, il ne convenait pas que la Cour déclare péremptoirement, et à des fins autres que celles des présents pourvois, que l'accord d'approvisionnement ne constituait ni une sous-licence ni une cession de la licence obligatoire de N à A — Loi sur les brevets, L.R.C. 1985, c. P-4, art. 39.14.

### Patents --- Actions for infringement — When infringement arises — General

N, holder of compulsory licence for nizatidine, agreed to supply A with specified quantities of nizatidine — A applied for notice of compliance for 150mg and 300mg capsules of nizatidine and issued notice of allegation alleging that no claim for nizatidine would be infringed — E, holder of Canadian patents for nizatidine, obtained prohibition order preventing issuance of notice of compliance to A on ground that reformulation of nizatidine for consumption in Canada would infringe

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

E's patent — A's appeal against prohibition was dismissed — Appeal allowed — In absence of express conditions to contrary, purchaser of licensed article is entitled to deal with article as he sees fit, so long as such dealings do not infringe rights conferred by patent — Reformulation of nizatidine into final dosage form would not create new substance but is more akin to repackaging substance into commercially usable form — Bulk medicine produced by patentee or licensee remains unchanged throughout reformulation process and exists in same chemical form in final dosage product as in bulk product — In absence of express prohibition in compulsory licence, right to reformulate should be seen as inherent to purchaser's right to deal with licensed material as he or she sees fit — Reformulation of nizatidine by A into final dosage form would not infringe patent held by E.

### Brevets --- Actions en contrefaçon — Survenance d'une contrefaçon — En général

N, titulaire d'une licence obligatoire pour la nizatidine, a accepté d'approvisionner A en certaines quantités déterminées de nizatidine — A a déposé une demande d'avis de conformité pour les gélules de 150 mg et de 300 mg de nizatidine et a déposé un avis d'allégation prétendant qu'aucune revendication pour la nizatidine ne serait contrefaite — E, détentrice des brevets canadiens relatifs à la nizatidine, a obtenu une ordonnance interdisant la délivrance d'un avis de conformité à A au motif que la préparation de la nizatidine sous une autre forme pour fins de consommation au Canada violerait les brevets de E — Appel de A à l'encontre de l'ordonnance d'interdiction a été rejeté — A s'est pourvue à l'encontre de cette décision — Pourvoi accueilli — En l'absence de conditions contraires expresses, l'acheteur d'un article breveté a le droit d'en disposer à son gré pourvu que, ce faisant, il ne viole pas les droits conférés par le brevet — Préparation de la nizatidine sous forme posologique définitive n'aurait pas pour effet de créer une nouvelle substance mais s'apparente plutôt à un nouveau conditionnement de la substance sous une forme commercialement utilisable — Médicament en vrac produit par le breveté ou le titulaire d'une licence demeure inchangé pendant tout le processus de préparation sous une autre forme et existe dans le produit sous forme posologique définitive sous la même forme chimique que dans le produit en vrac — En l'absence d'interdiction expresse dans la licence obligatoire, le droit de préparation sous une autre forme devrait être considéré comme inhérent au droit de l'acheteur de disposer à son gré de la substance brevetée — Préparation de la nizatidine par A sous forme posologique définitive ne violerait pas le brevet détenu par E.

### Patents --- Transfer of interest — Licence — Compulsory licence — Food and medicine — Medicine

N, holder of compulsory licence for nizatidine, agreed to supply A with specified quantities of nizatidine — A applied for notice of compliance for 150mg and 300mg capsules of nizatidine and issued notice of allegation alleging that no claim for nizatidine would be infringed — E, holder of Canadian patents for nizatidine, obtained prohibition order preventing issuance of notice of compliance to A on ground that reformulation of nizatidine for consumption in Canada would infringe E's patent — A's appeal against prohibition was dismissed — A appealed dismissal — Appeal allowed — In absence of express conditions to contrary, purchaser of licensed article is entitled to deal with article as he sees fit, so long as such dealings do not infringe rights conferred by patent — Reformulation of nizatidine into final dosage form would not create new substance but is more akin to repackaging substance into commercially usable form — Bulk medicine produced by patentee or licensee remains unchanged throughout reformulation process and exists in same chemical form in final dosage product as in bulk product — In absence of express prohibition in compulsory licence, right to reformulate should be seen as inherent to purchaser's right to deal with licensed material as he or she sees fit — Reformulation of nizatidine by A into final dosage form would not infringe patent held by E.

### Brevets --- Actions en contrefaçon — Survenance d'une contrefaçon — En général

N, titulaire d'une licence obligatoire pour la nizatidine, a accepté d'approvisionner A en certaines quantités déterminées de nizatidine — A a déposé une demande d'avis de conformité pour les gélules de 150 mg et de 300 mg de nizatidine et a déposé un avis d'allégation prétendant qu'aucune revendication pour la nizatidine ne serait contrefaite — E, détentrice des brevets canadiens relatifs à la nizatidine, a obtenu une ordonnance interdisant la délivrance d'un avis de conformité à A au motif que la préparation de la nizatidine sous une autre forme pour fins de consommation au Canada violerait les brevets de E — Appel de A à l'encontre de l'ordonnance d'interdiction a été rejeté — A s'est pourvue à l'encontre de cette décision — Pourvoi accueilli — En l'absence de conditions contraires expresses, l'acheteur d'un article breveté a le droit d'en disposer à son gré pourvu que, ce faisant, il ne viole pas les droits conférés par le brevet — Préparation de

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

Case 09-10138-MEW    Doc 14410-3    Filed 09/16/14    Page 75 of 398

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

la nizatidine sous forme posologique définitive n'aurait pas pour effet de créer une nouvelle substance mais s'apparente plutôt à un nouveau conditionnement de la substance sous une forme commercialement utilisable — Médicament en vrac produit par le breveté ou le titulaire d'une licence demeure inchangé pendant tout le processus de préparation sous une autre forme et existe dans le produit sous forme posologique définitive sous la même forme chimique que dans le produit en vrac — En l'absence d'interdiction expresse dans la licence obligatoire, le droit de préparation sous une autre forme devrait être considéré comme inhérent au droit de l'acheteur de disposer à son gré de la substance brevetée — Préparation de la nizatidine par A sous forme posologique définitive ne violerait pas le brevet détenu par E.

**Table of Authorities**

**Cases considered by/Jurisprudence citée par *Iacobucci J.*:**

*Badische Anilin und Soda Fabrik v. Isler*, [1906] 1 Ch. 605, 75 L.J. Ch. 411, 94 L.T. 367, 22 T.L.R. 326 (Eng. Ch. Div.) — applied

*Betts v. Willmott* (1871), 6 Ch. App. 239, 25 L.T. 188, 19 W.R. 367 (Eng. C.A.) — referred to

*Carey v. United States* (1964), 164 Ct. Cl. 304, 326 F.2d 975 (U.S. Cl. Ct.) — referred to

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), (sub nom. *Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.*) [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — referred to

*Cyrix Corp. v. Intel Corp.* (1996), 77 F.3d 1381, 37 U.S.P.Q.2d 1884 (U.S. Fed. Cir.) — considered

*E.I. Du Pont de Nemours & Co. v. Shell Oil Co.* (1985), 498 A.2d 1108, 227 U.S.P.Q. 233 (U.S. Del.) — distinguished

*Eli Lilly & Co. v. Apotex Inc.* (1996), 195 N.R. 378, 66 C.P.R. (3d) 329, 111 F.T.R. 80 (note) (Fed. C.A.) — referred to

*Gillette v. Rea* (1910), 15 O.W.R. 345, 1 O.W.N. 448 (Ont. Ch.) — referred to

*Glaxo Wellcome Inc. v. Canada (Minister of National Health & Welfare)* (1997), 75 C.P.R. (3d) 129, 134 F.T.R. 220 (Fed. T.D.) — considered

*Howard & Bullough Ltd. v. Tweedales & Smalley Ltd.* (1895), 12 R.P.C. 519, 40 Sol. Jo. 32, 12 T.L.R. 28 (Eng. Ch. Div.) — referred to

*Indian Molybdenum Ltd. v. R.*, [1951] 3 D.L.R. 497 (S.C.C.) — referred to

*Intel Corp. v. ULSI System Technology Inc.* (1993), 27 U.S.P.Q.2d 1136, 995 F.2d 1566 (U.S. Fed. Cir.) — considered

*Joy Oil Co. v. R.*, [1951] S.C.R. 624, [1951] 3 D.L.R. 582 (S.C.C.) — considered

*Lampson v. Quebec (City)* (1920), 28 R.L. 6, [1921] 1 A.C. 294, 54 D.L.R. 344 (Quebec P.C.) — applied

*Libbey-Owens-Ford Glass Co. v. Ford Motor Co.* (1968), [1969] 1 Ex. C.R. 529, [1969] 1 C.L.R. 440, 40 Fox Pat. C. 149, 57 C.P.R. 155 (Can. Ex. Ct.) — referred to

*Libbey-Owens-Ford Glass Co. v. Ford Motor Co.,* [1970] S.C.R. 833, 62 C.P.R. 223, 14 D.L.R. (3d) 210 (S.C.C.) — referred to

*Merck & Co. v. Apotex Inc.* (1994), 59 C.P.R. (3d) 133, 88 F.T.R. 260 (Fed. T.D.) — referred to

*Merck & Co. v. Apotex Inc.,* 60 C.P.R. (3d) 356, 180 N.R. 373, [1995] 2 F.C. 723, 95 F.T.R. 160 (note) (Fed. C.A.) — considered

*Merck Frosst Canada Inc. v. Canada (Minister of National Health & Welfare)* (1994), 55 C.P.R. (3d) 302, 169 N.R. 342 (Fed. C.A.) — considered

*Merck Frosst Canada Inc. v. Canada (Minister of National Health & Welfare)* (July 9, 1998), 25419 (S.C.C.) — applied

*National Phonograph Co. of Australia v. Menck,* [1911] A.C. 336 (Australia P.C.) — applied

*Pharmacia Inc. v. Canada (Minister of National Health & Welfare)* (1994), 58 C.P.R. (3d) 209, *(sub nom. David Bull Laboratories (Canada) Inc. v. Pharmacia Inc.)* 176 N.R. 48, *(sub nom. David Bull Laboratories (Canada) Inc. v. Pharmacia Inc.)* [1995] 1 F.C. 588, [1995] 1 C.F. 588 (Fed. C.A.) — referred to

*Rucker Co. v. Gavel's Vulcanizing Ltd.* (1985), 6 C.I.P.R. 137, 7 C.P.R. (3d) 294 (Fed. T.D.) — referred to

**Statutes considered by / Législation citée par *Iacobucci J.*:**

*Patent Act/Loi sur les brevets*, R.S.C./L.R.C. 1985, c. P-4
    Generally/en général — referred to

    s. 39 — considered

    s. 39(4) — considered

    s. 39.11 [en./ad. R.S.C./L.R.C. 1985, c. 33 (3rd Supp.), s. 15] — referred to

    s. 39.11(1) [en./ad. R.S.C./L.R.C. 1985, c. 33 (3rd Supp.), s. 15] — referred to

    s. 39.11(2)(c) [en./ad. R.S.C./L.R.C. 1985, c. 33 (3rd Supp.), s. 15] — referred to

    s. 39.14 [en./ad. R.S.C./L.R.C. 1985, c. 33 (3rd Supp.), s. 15] — considered

    s. 39.14(1) [en./ad. R.S.C./L.R.C. 1985, c. 33 (3rd Supp.), s. 15] — referred to

    s. 56 — referred to

*Patent Act Amendment Act, 1992/Loi sur les brevets, Loi de 1992 modifiant la* , S.C./L.C. 1993, c. 2
    Generally/en général — considered

    s. 11(1) — referred to

**Regulations considered by/Règlements cités par *Iacobucci J.*:**

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

*Food and Drugs Act*, R.S.C./L.R.C. 1985, c. F-27
　　*Food and Drug Regulations*, C.R.C. 1978, c. 870

　　s. C.08.004

*Patent Act*, R.S.C./L.R.C. 1985, c. P-4
　　*Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133

　　Generally/en général

　　s. 3

　　s. 4

　　s. 4(1)

　　s. 5

　　s. 5(3)

　　s. 5(3)(b)

　　s. 6

　　s. 6(1)

　　s. 6(2)

　　s. 7

　　s. 7(2)(b)

**Words and phrases considered**

**Contra proferentum**

*Contra proferentem* operates to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party, by interpreting any ambiguity against the drafting party. When both parties are in agreement as to the proper interpretation of the contract, however, it is not open to a third party to assert that *contra proferentem* should be applied to interpret the contract against *both* contracting parties. Indeed, a third party has no basis at all upon which to rely upon *contra proferentem*: see G. H. L. Fridman, *The Law of Contract in Canada* (3rd ed. 1994), at p. 471

**Termes et locutions considerés**

**Contra proferentem**

Cette règle [contra proferentem] a pour effet de protéger une partie à un contrat contre les conditions ambiguës ou déroutantes introduites d'une façon détournée par l'autre partie, en privilégiant une interprétation de l'ambiguïté au détriment de la partie qui les a rédigées. Toutefois, lorsque les deux parties s'entendent sur la façon d'interpréter le contrat, il n'est pas loisible à un tiers d'affirmer que la règle *contra proferentem* devrait être appliquée pour interpréter le contrat au détriment des *deux* parties contractantes. En fait, un tiers n'a aucune raison d'invoquer la règle *contra proferentem* : voir G.H.L. Fridman, *The law of Contract in Canada* (3e éd. 1994), à la p. 471.

WestlawNext© CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

APPEAL by appellant from judgment reported at (1996), 197 N.R. 291 (Fed. C.A.), allowing appeal from (1995), 60 C.P.R. (3d) 181 (Fed. T.D.) dismissing application for prohibition order; APPEAL by appellant from judgment reported at (1996), 195 N.R. 378 (Fed. C.A.) dismissing appeal from (1995), 60 C.P.R. (3d) 206 (Fed. T.D.) prohibiting issuance of notice of compliance.

POURVOI de l'appelante à l'encontre du jugement publié à (1996), 197 N.R. 291 (Fed. C.A.), accueillant l'appel du jugement publié à (1995), 60 C.P.R. (3d) 181 (Fed. T.D.) lequel a rejeté la demande d'une ordonnance d'interdiction; POURVOI de l'appelante à l'encontre du jugement publié à (1996), 195 N.R. 378 (Fed. C.A.) qui a rejeté l'appel du jugement publié à (1995), 60 C.P.R. (3d) 206 (Fed. T.D.) interdisant la délivrance d'un avis de conformité.

**Iacobucci J.:**

1      A single agreement entered into by Novopharm Limited ("Novopharm") and Apotex Inc. ("Apotex"), competitors in the pharmaceutical industry, has given rise to litigation resulting in no fewer than three appeals to this Court. In addition to the two instant cases, which I shall refer to as "*Novopharm*" and "*Apotex #1*", reasons in *Merck Frosst Canada Inc. v. Canada (Minister of National Health & Welfare)* (July 9, 1998), Doc. 25419 (S.C.C.) ("*Apotex #2*") are also being released today. The issue common to all three is whether the agreement in question constitutes a simple supply agreement, as alleged by the two parties to the agreement, or, as alleged by the various respondents, a sublicence to exercise the rights acquired by Novopharm pursuant to compulsory licences obtained prior to recent changes to the legislative regime which governs patented medicines. This determination is key to the resolution of the issues in these appeals because, as shall be discussed, the grant of a sublicence by Novopharm could justify the termination by the patentee of the compulsory licence in question and render the supply agreement useless.

2      Owing to the intertwining nature of the lower court decisions in *Novopharm* and *Apotex #1*, I shall deal with these two appeals in one set of reasons. In addition to the common issue of interpretation, each case raises a number of other issues, which I shall endeavour to deal with appropriately as they arise.

## I. Background

### A. The patents and the compulsory licence

3      Prior to February, 1993, there existed in Canada a compulsory licensing regime with respect to patents for pharmaceuticals. Under s. 39(4) of the *Patents Act*, R.S.C., 1985, c. P-4, as it then existed, in respect of any patent intended or capable of being used for medicine or for the preparation or production of medicine, any person could make an application for a licence:

> **39**....
>
> (4)...
>
> > (*a*) where the invention is a process, to use the invention for the preparation or production of medicine, import any medicine in the preparation or production of which the invention has been used or sell any medicine in the preparation or production of which the invention has been used, or
> >
> > (*b*) where the invention is other than a process, to import, make, use or sell the invention for medicine or for the preparation or production of the medicine...

According to the terms of s. 39(4), the Commissioner of Patents was obliged to grant to the applicant a licence to do the things specified in the application unless there existed a good reason not to grant such licence.

4      These appeals relate to two Canadian patents owned by Eli Lilly and Company ("Eli Lilly") in respect of the medication nizatidine: one in respect of the medicine itself and one in respect of the process by which the medicine is made. On December 31, 1987, the Department of National Health and Welfare granted a notice of compliance ("NOC") to Eli Lilly Canada Inc. ("Eli Lilly Canada"), pursuant to s. C.08.004 of the *Food and Drug Regulations*, C.R.C., c. 870, thereby permitting Eli Lilly

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

Canada to market 150 mg and 300 mg final-dosage form capsules of nizatidine for consumption in Canada. To date, no other company has been issued a NOC in respect of nizatidine.

5    On January 17, 1990, Novopharm applied under s. 39(4) of the *Patent Act* for a compulsory licence under the patents owned by Eli Lilly. The application was vigorously contested by Eli Lilly, but, it was found that none of the objections constituted a valid reason to refuse the application and the Commissioner of Patents accordingly granted the licence, as he was obliged to do under the Act as it then existed. The licence, which, unless validly terminated by Eli Lilly (a very contentious issue in the instant appeals), is still in force, permits Novopharm to use the patented process to make nizatidine for the preparation or production of medicine, and to import and/or sell medicine made by the process. It also permits Novopharm to make, use, sell and import either or both of the invention for medicine and the invention for the preparation or the production of medicine. The royalty rate to be paid by Novopharm to Eli Lilly Canada on sales of the medicine in final dosage form is fixed at 6% of the selling price. Commissioner of Patents, in a decision dated October 21, 1991, found that the licence is not restricted to the forms of medicine listed by Novopharm in its application, as such "would place unnecessary limits on [Novopharm's] operations under the licence."

6    Certain other specific terms and conditions of the licence are also relevant. Paragraph 1 contains terms and conditions pertaining to the calculation of royalties for the sale of nizatidine to arm's length purchasers and contemplates the sale of the medication by Novopharm in both final dosage and bulk forms, stipulating royalty rates for each. Novopharm is also required, under paragraphs 3 and 4, to obtain quarterly statements showing the descriptions, quantities, net selling prices and royalty computations resulting from the operations of arm's length purchasers of the medicine, non-arm's length purchasers of the medicine in final dosage form, and any subsequent non-arm's length purchasers from the latter.

7    Paragraph 9 of the licence, which is of paramount importance to this appeal, provides Eli Lilly with the option to terminate the licence upon any breach of its terms by Novopharm by giving notice in writing. In the event that Novopharm fails to rectify the breach within 30 days, the licence is terminated automatically. However, under paragraph 10, if Novopharm disputes the breach by written notice to Eli Lilly, the licence is not terminated pending adjudication by the courts or arbitration as agreed upon by the parties. Finally, paragraph 12 stipulates that the licence is non-transferable, and that Novopharm is prohibited from granting "any sublicence."

### B. The supply agreement between Novopharm and Apotex

8    On November 27, 1992, Novopharm and Apotex entered into what they described as a "supply agreement", in anticipation of proposed changes to the *Patent Act*, then embodied in Bill C-91. It was expected that this bill, if passed, would both eliminate the then-existing compulsory licensing regime and threaten the existing licences and licence applications of both companies. The agreement was drafted, apparently without the advice of counsel, by Dr. Bernard Sherman, the president of Apotex, and Mr. Leslie Dan, the president of Novopharm, and reads as follows:

WHEREAS THE Federal Government has introduced Bill C-91 which, if passed, would eliminate compulsory licensing under the Patent Act,

AND WHEREAS Apotex and Novopharm have various licences and licence applications pending which are threatened by Bill C-91,

AND WHEREAS, depending on the cut-off dates that will pertain when Bill C-91 is finalized, it is expected that the parties hereto each may hold valid licences for products for which the other may not hold valid licences, details of which cannot be predicted at this time,

AND WHEREAS for their mutual benefit in relation to other competitors, the parties wish to ensure that they have available for use licences on the maximum number of products,

AND WHEREAS the parties have thus agreed that they will share their rights under licences for any product for which only one of the parties may hold a useable licence,

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 80 of 398

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

NOW THEREFORE in consideration of the premises and the mutual covenants and other good and valuable consultations, receipt of which is hereby acknowledged, the parties hereto agree as follows:

1. At any time subsequent to the date upon which Bill C-91 or any Bill derived therefrom is enacted and proclaimed, for any product for which one party (hereinafter the "licensed" party) shall hold a useable licence and the other party (hereinafter called the "unlicensed party") shall not, the licensed party shall, at the request of the unlicensed party, use its licence for the benefit of the unlicensed party in the manner hereinafter set out.

2. In the event that the licence is a licence to import, the licensed party shall import from such source, in such quantity, and on such terms as the unlicensed party shall direct, and shall resell the imported goods to the unlicensed party at the cost thereof together with such royalties as shall be payable under the terms of the licence.

3. In the event that the licence is a licence to manufacture in Canada, the licensed party shall enter into such contracts with Canadian chemical manufacturers as the unlicensed party shall direct for the manufacture of the relevant material and shall sell the manufactured materials to the unlicensed party at the cost thereafter together with such royalties as shall be payable under the terms of the licence.

4. In the event that the licensed party has a source of material from which it imports or in the event that the licensed party is producing the material under a licence to manufacture, and in the event that it is not possible for the unlicensed party to find another source from which to import, or at which to arrange for the manufacture of material, then the licensed party shall supply material to the unlicensed party from the licensed party's source at a price equal to the fair market price of the material together with such royalties as shall be payable under the terms of the licence. Any disagreement as to fair market price shall be settled by binding arbitration.

5. In addition to the payments provided for in paragraphs 2, 3 and 4 hereof, the unlicensed party shall pay to the licensed party a fee equal to 4% of the unlicensed party's net sales of product covered by any unexpired patent included in the licensed party's licence and purchased from the licensed party.

Within 60 days of the end of each quarter year the unlicensed party shall deliver to the licensed party payment of the fee on sales made during the previous quarter along with a statement certified by an independent auditor setting out the quantities sold, the net dollar sales, and the fee payable thereon.

6. The licensed party shall comply with the terms of the licence.

7. The licensed party shall not be excused from performing any act as directed by the unlicensed party pursuant to paragraphs 2 or 3 or 4 hereof, on the grounds that there is doubt as to whether or not the licence had remained in force or permits the requested acts, nor on the basis of litigation or threatened litigation by the patentee, provided that the unlicensed party shall undertake to defend any lawsuit against the licensed party resulting from such act and hold the licensed party harmless for the costs of such lawsuit any damage award arising therefrom.

8. For greater clarity, the foregoing paragraphs shall not be limiting, and the licensed party shall cooperate fully with the unlicensed party and follow the directions of the unlicensed party to enable the unlicensed party to enjoy the use of the licence to the same extent that would be possible if the unlicensed party itself held such licence, so long as the licensed party is held harmless from any such use.

9. The unlicensed party shall resell any product purchased from the licensed party only under its own label and shall not sell the product for resale under a label other than that of the unlicensed party.

10. Neither party will engage in preventing or blocking the accessibility [*sic*] of HPB clearance of any raw material affecting present and future pharmaceutical products.

11. This agreement shall expire on December 31, 1994 unless extended by mutual agreement.

WestlawNext© CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

12. Notwithstanding paragraph 11 hereof, if Bill C-91 is passed into law with an amendment that permits companies to continue to apply for and obtain compulsory licenses for any product for which a licence was issued to any one or more licences [*sic*] prior to December 20, 1991, then this agreement shall be terminated.

13. Notwithstanding paragraph 11 hereof, in relation to any specific licence in respect of which the unlicensed party shall have on or before December 31, 1994 advised the licensed party of an intention to utilize such licence, this agreement shall continue in force until expiry of the last patent covered by such licence.

9      On February 15, 1993, most of the provisions of the *Patent Act Amendment Act, 1992*, S.C. 1993, c. 2, were proclaimed into force. On March 12, 1993, the *Patented Medicines* (*Notice of Compliance*) *Regulations*, SOR/93-133, (the "Regulations"), came into force and radically altered the procedures governing the issuance of NOCs, strengthening the monopoly position of the patentee by eliminating the compulsory licensing scheme and curtailing the ability of generic drug companies to obtain approval to market a patented medicine until the expiry of all relevant product and use patents. The new NOC regime is lucidly summarized in the following excerpt from the judgment of Teitelbaum J. in *Glaxo Wellcome Inc. v. Canada (Minister of National Health & Welfare)* (1997), 75 C.P.R. (3d) 129 (Fed. T.D.) at pp. 131-32:

A NOC, which formally authorizes a drug to be sold, is issued by the Minister after a drug manufacturer has complied on two fronts. The first element of compliance concerns the overall safety and efficacy of the drug: (see regulation C.08.004 of the *Food and Drug Regulations*, C.R.C. 1978, c. 870). The second element of compliance figures on the drug manufacturer's non-infringement of certain patents embodied in the drug. This second, rather more unexpected, patent-related requirement came into existence after changes to the compulsory licensing regime. Formerly, under a compulsory license, a generic drug manufacturer could obtain a licensed supply of a patented drug from the patent owner. The NOC process did not then concern itself with questions of patent infringement. However, with the abolition of compulsory licenses under the *Patent Act Amendment Act, 1992*, ... (the "*Patent Act*") the regime for obtaining NOCs also changed. Generic drug manufacturers now seeking NOCs must file what is called a Notice of Allegation under Section 5 of the *Regulations*.

. . . . .

In effect, under Subsection 5(3) of the *Regulations*, in a "Notice of Allegation", the generic drug manufacturer, the "second person", signals its compliance with the patents embodied in a medicine. Under Section 4 of the *Regulations*, the patent owner or licensee, usually a brand name drug manufacturer like the applicants, submits a list of the patents that contain claims for the medicine itself or the use of the medicine. Under Section 3 of the *Regulations*, the Minister compiles the patent lists into a public document called the "Patent Register".

10      As required under s. 4(1) of the new Regulations, Eli Lilly Canada submitted a patent list, dated April 6, 1993, to the Minister of National Health and Welfare, which included the patents for nizatidine for which it held the NOC.

11      Apotex commenced efforts to obtain a NOC for 150 mg and 300 mg capsules of nizatidine under the new scheme, and accordingly sent a letter to Eli Lilly Canada, dated April 28, 1993, which constituted a Notice of Allegation ("NOA") as required by s. 5(3)(*b*) of the Regulations. In the NOA, Apotex alleged that no claim for the patented medicine itself or for the use of the medicine would be infringed by its making, constructing, using or selling the specified nizatidine capsules. In support of this allegation, Apotex relied upon the licence issued to Novopharm for nizatidine and upon the "mutual understanding" whereby Novopharm, the licensed party, would supply Apotex with raw materials obtained pursuant to its licence. Apotex stated that it had given Novopharm notice of its intention to obtain nizatidine, and undertook not to obtain, use, or sell any nizatidine other than from Novopharm until such time as the patents had expired.

12      The letter of intention referred to, also dated April 28, 1993, indicated that, because Apotex did not yet have a NOC to permit it to market nizatidine in Canada, it could not provide Novopharm with any specifics as to its requirements, but that it would advise in due course as to the required quantity and the manufacturer from whom the nizatidine should be purchased.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

Although Apotex did apparently locate a source for the nizatidine, it had not, by the date of the hearing of this appeal, disclosed the identity of the source to Novopharm, and the evidence remained sealed as confidential information.

13    Eli Lilly and Eli Lilly Canada brought an application, under s. 6(1) of the Regulations, for an order prohibiting the Minister from issuing a NOC to Apotex at all or, alternatively, until after December 31, 1997, ten years after the issuance of the NOC to Eli Lilly Canada, which, under s. 39.11 of the *Patent Act*, would be the first date on which Apotex, without a NOC, would be entitled to import the patented medicine for consumption in Canada. This application forms the basis of the litigation in *Apotex #1*, upon which I shall elaborate shortly.

14    On July 15, 1993, Eli Lilly purported to exercise its option to terminate Novopharm's compulsory licence by providing 30 days' notice in writing to Novopharm. In support of the notice of termination, Eli Lilly alleged that Novopharm had breached the terms of the licence by granting a sublicence to Apotex. Novopharm denied this allegation, stating that the commercial agreement into which it had entered with Apotex did not constitute a sublicence or any transfer of rights under the licence. Novopharm apprised the Commissioner of Patents of the purported termination and its having disputed the allegations of breach.

*C. The Novopharm proceeding*

15    On July 30, 1993, Novopharm issued a NOA in support of its own application for a NOC in relation to 150 mg and 300 mg capsules of nizatidine. It relied on its own compulsory licence as the basis for the non-infringement of the patents owned by Eli Lilly. On September 15, 1993, Eli Lilly and Eli Lilly Canada brought an application before the Federal Court-Trial Division, requesting a prohibition order to enjoin the Minister from issuing the requested NOC to Novopharm, on the grounds that Novopharm's licence had been terminated and that Novopharm could not, therefore, obtain the bulk medicine in a non-infringing way.

16    Meanwhile, Eli Lilly also brought a separate application in the Ontario Court of Justice (General Division), seeking a declaration that Novopharm's licence was terminated by virtue of its granting a sublicence to Apotex, contrary to the terms of the licence. Forget J. found that that court had concurrent jurisdiction with the Federal Court-Trial Division to grant the relief sought, but, applying the convenient forum test, held that the matter ought to be decided by the Federal Court in the context of the prohibition proceedings. Eli Lilly and Eli Lilly Canada then brought an interlocutory motion in the Federal Court to amend the originating notice of motion by adding a claim for declaratory relief. Pinard J. dismissed the motion, stating that, in dealing with the originating notice of motion (i.e., the prohibition application), the Court had jurisdiction to make an incidental finding that the compulsory licence in question had been terminated, which would be sufficient to justify an order prohibiting the Minister from issuing a NOC.

17    On July 20, 1993, Mr. Dan of Novopharm wrote to Dr. Sherman of Apotex, stating that the two companies did not have an agreement to transfer licences or to sublicence, and asking Apotex to refrain from claiming in its applications for NOCs that licences would be transferred. He confirmed that the supply agreement contemplated that Novopharm would supply Apotex, as a third party customer, with specific licensed products, but stipulated that Novopharm never intended to create a sublicence, given that such would be "contrary to the standard conditions of all compulsory licenses". Dr. Sherman responded by letter the next day, stating that Apotex had never suggested that any transfer of rights or sublicensing would occur, only that Novopharm would be supplying materials to Apotex, as a third-party purchaser.

18    Mr. Dan also filed an affidavit concerning his intentions as to the nature of the agreement with Apotex. On cross-examination, he testified that Novopharm and Apotex had intended to create a supply agreement, and that the statement in the preamble as to sharing of rights was improperly worded. He further testified that Apotex had not yet requested Novopharm to supply it with nizatidine, but that, if and when a request was made to obtain nizatidine from a foreign source, it would be Novopharm which would approach various sources, obtain quotations, import the bulk material, and finally sell it to Apotex on the terms agreed upon with the supplier. He stated that, if there was only one supplier for a given medicine, the accepted commercial practice would be that "if we have access, they should have access". Also, responding to a question concerning provisions of the *Patent Act* which would prohibit the importation and manufacture of nizatidine until December 31, 1997 and December 31, 1994, respectively, Mr. Dan asserted that "[w]e have to abide by the regulations".

**Westlaw**Next. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 83 of 398

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

19    McGillis J. of the Federal Court-Trial Division dismissed Eli Lilly's application for judicial review, finding that the agreement between Novopharm and Apotex did not constitute a sublicence, that the licence, therefore, could not be terminated on that ground by Eli Lilly, and, accordingly, that Eli Lilly had failed to prove that Novopharm's notice of allegation was not justified. This decision was reversed by a unanimous panel of the Federal Court of Appeal, which, relying on its earlier decision in *Apotex #1, infra*, held that a sublicence had in fact been conferred by virtue of the supply agreement.

### D. The Apotex #1 proceeding

20    In cross-examination on the hearing of the application for a prohibition order in *Apotex #1*, the background of which is detailed above, Dr. Sherman of Apotex testified that the supply agreement with Novopharm did not enable Apotex to import or manufacture nizatidine, but only to require Novopharm to import or manufacture the medicine under the terms of its licence and to sell the material to Apotex. He testified that Apotex would in fact be acquiring the nizatidine from Novopharm and, if the NOC were granted, formulating it into 150 mg and 300 mg capsules for sale in Canada. He was of the view that this would not constitute an infringement of Eli Lilly's patents, given that no further licence would be necessary once the licensed material was purchased from Novopharm. However, he did appear to make reference at one point to Apotex's "having rights" under the licence.

21    Relying on her analysis in *Novopharm*, McGillis J. of the Federal Court-Trial Division found that the supply agreement between Novopharm and Apotex did not constitute a sublicence. Nonetheless, she granted the prohibition order on the basis that Apotex's allegations of non-infringement were not justified, as its formulation of nizatidine capsules for consumption in Canada would infringe Eli Lilly's patents.

22    The Federal Court of Appeal, Pratte J.A. dissenting, dismissed Apotex's appeal, but on different grounds. It found that, despite the parties' apparent intention to avoid conferring sublicences on one another, this was in fact the legal effect of the written contract which they had completed. Therefore, Novopharm's licence was properly terminated and thus Apotex had no non-infringing means by which to obtain the nizatidine. While it was not necessary to decide the question, it was nevertheless unanimously held, contrary to the view of McGillis J., that Apotex's reformulation of nizatidine into final dosage form would not have infringed the patents.

## II. Relevant statutory provisions

23    *Patent Act*, R.S.C., 1985, c. P-4

**39.11** (1) Subject to this section but notwithstanding anything in section 39 or in any licence granted under that section, no person shall under a licence granted under that section in respect of a patent for an invention pertaining to a medicine, regardless of when the licence was granted, have or exercise any right,

> (*a*) where the invention is a process, to import the medicine in the preparation or production of which the invention has been used, if the medicine is for sale for consumption in Canada; or

> (*b*) where the invention is other than a process, to import the invention for medicine or for the preparation or production of medicine, if the medicine is for sale for consumption in Canada.

(2) The prohibition under subsection (1) expires in respect of a medicine

. . . . .

> (*c*) ten years after the date of the notice of compliance that is first issued in respect of the medicine where that notice of compliance is issued after June 27, 1986.

**39.14** (1) Notwithstanding anything in section 39 or in any licence granted under that section, where the notice of compliance that is first issued in respect of a medicine is issued after June 27, 1986, no person shall, under a licence granted under that section in respect of a patent for an invention pertaining to the medicine, have or exercise any right,

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

(*a*) where the invention is a process, to use the invention for the preparation or production of medicine, or

(*b*) where the invention is other than a process, to make or use the invention for medicine or for the preparation or production of medicine

for sale for consumption in Canada, until the expiration of seven years after the date of that notice of compliance.

**Patented Medicines (Notice of Compliance) Regulations, SOR/93-133**

5. (1) Where a person files or, before the coming into force of these Regulations, has filed a submission for a notice of compliance in respect of a drug and wishes to compare that drug with, or make a reference to, a drug that has been marketed in Canada pursuant to a notice of compliance issued to a first person in respect of which a patent list has been submitted, the person shall, in the submission, with respect to each patent on the patent list,

(*a*) state that the person accepts that the notice of compliance will not issue until the patent expires; or

(*b*) allege that

(i) the statement made by the first person pursuant to paragraph 4(2)(*b*) is false,

(ii) the patent has expired,

(iii) the patent is not valid, or

(iv) no claim for the medicine itself and no claim for the use of the medicine would be infringed by the making, constructing, using or selling by that person of the drug for which the submission for the notice of compliance is filed.

(2) Where, after a second person files a submission for a notice of compliance, but before the notice of compliance is issued, a patent list is submitted or amended in respect of a patent pursuant to subsection 4(5), the second person shall amend the submission to include, in respect of that patent, the statement or allegation that is required by subsection (1).

(3) Where a person makes an allegation pursuant to paragraph (1)(*b*) or subsection (2) the person shall

(*a*) provide a detailed statement of the legal and factual basis for the allegation; and

(*b*) serve a notice of the allegation on the first person and proof of such service on the Minister.

6.(1) A first person may, within 45 days after being served with a notice of an allegation pursuant to paragraph 5(3)(*b*), apply to a court for an order prohibiting the Minister from issuing a notice of compliance until after the expiration of one or more of the patents that are the subject of an allegation.

(2)The court shall make an order pursuant to subsection (1) in respect of a patent that is the subject of one or more allegations if it finds that none of those allegations is justified.

(3) The first person shall, within the 45 days referred to in subsection (1), serve the Minister with proof that an application referred to in that subsection has been made.

(4) Where the first person is not the owner of each patent that is the subject of an application referred to in subsection (1), the owner of each such patent shall be made a party to the application.

7. (1) The Minister shall not issue a notice of compliance to a second person before the latest of

(*a*)the expiration of 30 days after the coming into force of these Regulations,

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW    Doc 14410-3    Filed 09/16/14    Page 85 of 398

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

(*b*)the day on which the second person complies with section 5,

(*c*)subject to subsection (3), the expiration of any patent on the patent list that is not the subject of an allegation,

(*d*)subject to subsection (3), the expiration of 45 days after the receipt of proof of service of a notice of any allegation pursuant to paragraph 5(3)(b) in respect of any patent on the patent list,

(*e*)subject to subsections (2), (3) and (4), the expiration of 30 months after the receipt of proof of the making of any application referred to in subsection 6(1), and

(*f*)the expiration of any patent that is the subject of an order pursuant to subsection 6(1).

(2) Paragraph (1)(*e*) does not apply if at any time, in respect of each patent that is the subject of an application pursuant to subsection 6(1),

(*a*)the patent has expired; or

(*b*)the court has declared that the patent is not valid or that no claim for the medicine itself and no claim for the use of the medicine would be infringed.

(3) Paragraphs (1)(*c*), (*d*) and (*e*) do not apply in respect of a patent if the owner of the patent has consented to the making, constructing, using or selling of the drug in Canada by the second person.

(4) Paragraph (1)(*e*) ceases to apply in respect of an application referred to in subsection 6(1) if the application is withdrawn or is finally dismissed by the court.

(5) A court may shorten or extend the time limit referred to in paragraph (1)(*e*) in respect of an application where the court has not yet made an order pursuant to subsection 6(1) in respect of that application and where the court finds that a party to the application failed to reasonably cooperate in expediting the application.

## V. Judicial history

### A. Novopharm Ltd. v. Eli Lilly and Co.

*(1) Federal Court-Trial Division (1995), 60 C.P.R. (3d) 181 (Fed. T.D.)*

24     As a preliminary matter, McGillis J. considered the nature of the proceedings before the court. She observed that an application for prohibition under s. 6(1) of the *Regulations* is a judicial review proceeding which is intended to determine expeditiously whether a NOC should be issued. In this connection, she referred to *Pharmacia Inc. v. Canada (Minister of National Health & Welfare)* (1994), [1995] 1 F.C. 588 (Fed. C.A.), where Strayer J.A. held that the issues to be decided in such proceedings are of a limited or preliminary nature, only for the limited purpose above stated, and that, if a full trial of validity or infringement issues is required, it is to be obtained in the usual way, by commencing an action.

25     Turning to the question of whether the allegations of non-infringement made by Novopharm in requesting the NOC were justified, McGillis J. noted that, since Novophar's position was premised on its licence, the key issue was the proper interpretation to be given the November, 1992 agreement between Apotex and Novopharm. If the agreement was in substance a sublicence, then the licence would have been properly terminated by Eli Lilly, and Novopharm would have been left with no non-infringing way in which to obtain the medication for which the NOC was requested.

26     Relying on the decision of this Court in *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.), McGillis J. identified the task at hand (at p. 197) as ascertaining the "true intent of the parties at the time of the entry into the contract." She rejected the submissions by Eli Lilly that the evidence of Mr. Dan, both in his affidavit and his cross-examination, as to his intention at the time the supply agreement was drafted was inadmissible

on the basis of the parol evidence rule. In her view, Mr. Dan was entitled to tender direct evidence concerning his intention at the time of drafting. As to the exchange of letters between Mr. Dan and Dr. Sherman, McGillis J.A. declined to rule on their admissibility, inasmuch as even if they were admissible, she would have accorded them no weight on the basis that they were written to clarify the intent of the parties long after the supply agreement had been signed, and apparently only in response to the threatened termination of the licence held by Novopharm.

27      With regard to the intentions of Mr. Dan at the time of drafting, McGillis J. concluded on the basis of his direct evidence that he intended to enter into a supply agreement with Apotex. However, she recognized (at p. 199) the need to examine the agreement as a whole in order to determine whether the words used by the parties reasonably expressed their intent, bearing in mind that "a sublicence could only have been created if Novopharm granted some or all of its rights under the licence to Apotex." In her view, at p. 199, the true nature of the agreement was that of "'a supply agreement dressed up to look like a sublicence'". In other words, despite the presence in the supply agreement of wording which might tend to suggest the conferral of a sublicence, the actual operative provisions of the agreement did not amount to the granting of any of Novopharm's licensed rights to Apotex.

28      In the view of McGillis J., the plain fact that the supply agreement contemplated Novopharm's entering into contracts with third parties at the direction of Apotex did not itself amount to a sublicence. Indeed, if the licensed rights had in fact been sublicensed to Apotex, Novopharm's continued involvement in the transactions would have been unnecessary. On balance, McGillis J. was of the view that none of the provisions of the agreement conferred any of Novopharm's licensed rights upon Apotex, and that paragraph 6, by stipulating that the licensed party must comply with the terms of its licence, including the prohibition against sublicensing, strongly suggested that the parties did not intend to create a sublicence.

29      Therefore, McGillis J. found that no sublicence was granted by Novopharm to Apotex. In her view, this interpretation served to promote the true intent of the parties at the time of entry into the supply agreement and to produce a sensible commercial result from their perspective, which she viewed as an important interpretive goal, based on *Consolidated-Bathurst, supra*. Indeed, she stated that to find that a sublicence had been created would have defeated the parties' entire objective in entering into the supply agreement, as the compulsory licences could then have been terminated by the patentees. She also stipulated that, even had she not considered the extrinsic evidence given by Mr. Dan as to his intention, she would have reached the same conclusion based on the plain wording of the agreement as a whole. On this basis, McGillis J. concluded that Eli Lilly and Eli Lilly Canada had failed to establish, on a balance of probabilities, that the allegation of Novopharm in its NOA was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she dismissed the application for a prohibition order.

30      As to the question of whether the licence had been terminated, McGillis J. declined jurisdiction to decide this matter, despite the earlier orders of Forget J. and Pinard J. She felt bound by the subsequent ruling in *Pharmacia Inc., supra*, that the court lacks jurisdiction, in the context of a judicial review proceeding to determine an application for a prohibition order of this kind, to determine ancillary or incidental questions which pertain solely to the rights of two private parties. However, in the event that she was wrong in this conclusion, she expressed the opinion that her finding that Novopharm had not granted a sublicence to Apotex necessarily led to the conclusion that the licence had not been breached.

*(2) Federal Court of Appeal (1996), 67 C.P.R. (3d) 377 (Fed. C.A.)*

31      In oral reasons delivered from the bench, Stone J.A. (MacGuigan and McDonald JJ. A. concurring) dismissed the appeal. The appeal was heard three weeks after the hearing of the appeal in *Apotex #1, infra*, and at the hearing, the court invited submissions as to the possible application of that decision to the outcome of the instant appeal. Eli Lilly argued that the decision was dispositive, in that the court there held that the supply agreement contravened the sublicensing prohibition in the compulsory licence, and that, by notice, Eli Lilly had succeeded in terminating the licence. For its part, Novopharm argued that the decision should not be applied because the facts of the instant appeal differed materially from the facts in the previous case, and also because, while a decision on a prohibition order application binds the parties to the specific litigation, it has little precedential value for other cases.

32      The court held that, while the previous decision was not *res judicata*, it was nonetheless binding on the court unless it could be distinguished on its facts or was manifestly wrong owing to the failure of the court to consider a relevant legal rule. The

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 87 of 398

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

latter was not alleged. As to the former, while the court recognized that there were some factual differences and that some of the evidence which was before the court in *Apotex #1* was not part of the record in the instant case, the same compulsory licence and the same supply agreement were at issue and in evidence in both cases. To the extent that it was unaffected by evidence unique to its own record, the analysis of the supply agreement in *Apotex #1* could therefore be applied to *Novopharm*. While it was true that paragraph 6 of the supply agreement required Novopharm to act in compliance with the terms of its licence, the court concluded that this clause was to be read together with the other clauses of the agreement, leading to the conclusion that a sublicence had indeed been granted. Accordingly, the appeal was allowed.

### B. Apotex Inc. v. Eli Lilly and Co

*(1) Federal Court-Trial Division (1995), 60 C.P.R. (3d) 206 (Fed. T.D.)*

33    In this proceeding, the basis for Eli Lilly's claim of non-justification was that Novopharm's licence for nizatidine had been terminated by virtue of its grant of a sublicence to Apotex, and that Apotex therefore had no non-infringing way of obtaining the bulk nizatidine in order to formulate the capsules that were the subject of the NOC request. Alternatively, it was argued that the formulation of the capsules would itself constitute an infringement of Eli Lilly's patent rights.

34    In concluding in *Novopharm, supra*, that the arrangement between Apotex and Novopharm was not a sublicence but merely a supply agreement, McGillis J. had considered the evidence of Mr. Dan of Novopharm concerning his intent at the time he drafted the agreement with Dr. Sherman. While this evidence was not part of the record in the instant matter, McGillis J. had indicated in *Novopharm* that she would have reached the same conclusion even without considering that evidence. Accordingly, she was of the view that her conclusion as to the nature of the agreement in *Novopharm* applied equally to the case at bar.

35    Turning, then, to the question of whether the formulation of capsules from the bulk material would infringe Eli Lilly's patent rights, McGillis J. considered the decision of MacKay J. in *Merck & Co. v. Apotex Inc.* (1994), 59 C.P.R. (3d) 133 (Fed. T.D.) and agreed with his conclusion that this processing activity would in fact constitute an infringement, as "an unlicensed third party purchaser acquires none of the exclusive rights granted to a patentee merely by virtue of the fact that he has purchased bulk material from a licensed supplier."

36    Therefore, McGillis J. found that Eli Lilly had established, on a balance of probabilities, that the allegation of non-infringement made by Apotex in its notice of allegation was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she allowed the application for judicial review and prohibited the Minister from issuing a NOC to Apotex until after the expiry of Eli Lilly's patents.

*(2) Federal Court of Appeal (1996), 66 C.P.R. (3d) 329 (Fed. C.A.)*

*(a) MacGuigan J.A. (Robertson J.A. concurring)*

37    In reviewing the facts and the evidence, MacGuigan J.A. observed that, on several occasions, Dr. Sherman had emphasized that all decisions under the supply agreement would be made by Apotex and communicated to Novopharm. Apotex's stated intention was to deal with a Canadian manufacturer, independent of Novopharm, and it in fact refused to communicate to Novopharm the identity of this manufacturer until such was convenient for Apotex. But Dr. Sherman insisted that Novopharm, not Apotex, would purchase the material and sell it to Apotex, within the terms of its licence.

38    MacGuigan J.A. noted that the conclusion of McGillis J. in *Novopharm* as to the proper characterization of the Apotex-Novopharm agreement was premised, to some extent, on the evidence of Mr. Dan as to his intention at the time the agreement was drafted. He observed not only that this evidence did not form part of the record in the case before him, but also that any direct evidence as to the intention of the parties was to be excluded from consideration under the parol evidence rule. In his view, the question as to the meaning of the agreement was a legal one which was to be determined from its text. Although McGillis J. had made clear that she would have reached the same conclusion even absent the extrinsic evidence, MacGuigan J.A. observed that she also appeared to have been influenced in her decision by two particular legal propositions: that a sublicence could only

Case 09-10138-MEW    Doc 14410-3    Filed 09/16/14    Page 88 of 398

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

have been created if Novopharm had granted some or all of its rights under the licence to Apotex, and that, when interpreting a contract, courts should favour an interpretation which promotes a sensible commercial result: *see Consolidated-Bathurst, supra*.

39    MacGuigan J.A. relied on the decision of the Delaware Supreme Court in *E.I. Du Pont de Nemours & Co. v. Shell Oil Co.*, 227 U.S.P.Q. 233 (U.S. Del.1985) ("*Du Pont*"), which, although it dealt with somewhat different facts, considered what was in his view essentially the same type of transaction, that is, one in which the patented product was produced not for the licensed party but for an unlicensed party. In that case, the court, relying on *Carey v. United States* 326 F.2d 975 (U.S. Cl. Ct. 1964), held that the test for a sublicence is whether the production of the licensed item is by or for the use of the original licensee or the alleged sublicensee, and concluded that the application of this test revealed a sublicence in a situation where an unlicensed party purported to manufacture a patented item as the agent of the licensee, only to purchase the item from the licensee immediately upon its manufacture, each transfer of property being nothing more than a paper transaction.

40    In the view of MacGuigan J.A., a similar form of "legerdemain" occurred in the present case. He found that, under the supply agreement, the separate contracts between Novopharm and its suppliers and Novopharm and Apotex were to be maintained only to avoid a direct contractual link between Apotex and the suppliers. He viewed this as a matter of form only. Because Apotex was in reality the directing mind, with Novopharm using its licence for Apotex's benefit, he found that the arrangement between the two was, contrary to the view of McGillis J., "a sublicence dressed up to look like a supply agreement." While he recognized that the *subjective* intention of the parties was to avoid creating a sublicence, he found that this was at odds with the *objective* intention of the document they executed. The legal effect of the contract, in other words, was to create a sublicence.

41    MacGuigan J.A. also found that, in accordance with his reading of *Consolidated-Bathurst, supra*, any consideration of whether this interpretation would promote a "sensible commercial result" must be accorded only a "tertiary status", behind the "primary" rule of interpretation -- the objective analysis of the actual words used by the parties -- and the application of the *contra proferentum* doctrine to interpret any ambiguity against the drafting party. In his view, at p. 338, the primary rule governed in the present case, as there was no ambiguity in "the words they used, as I interpret the reality behind them".

42    Therefore, MacGuigan J.A. dismissed Apotex's appeal, finding that Novopharm's licence had been properly terminated by Eli Lilly. Although he found it unnecessary to decide the issue of infringement by formulation, he stated that he would have agreed with the reasons of Pratte J.A. on the matter.

*(b) Pratte J.A., dissenting*

43    Pratte J.A. differed from the majority on the issue of contractual interpretation. In his view, there was nothing obscure in the text of the supply agreement such as to require further interpretation. Although both the intention and the effect of the contract was to afford the parties, as far as possible, the same benefits they would have obtained under mutual sublicences, the supply agreement did not provide for the granting of any sublicence. As to Eli Lilly's contention that the agreement did not disclose the true nature of the arrangement -- that each party would give sublicences to each other and then, for the sake of appearances, act as the sublicensee's agent in procuring the drug -- there was, in the view of Pratte J.A. at p. 342, "absolutely no evidence that the parties ever intended to enter into such a surrealistic arrangement." In his view, Eli Lilly had not succeeded in proving that the arrangement was a sham merely by showing that the parties could have obtained the same advantages by entering into a different agreement. Therefore, he concluded that Novopharm had not breached the terms of its licence.

44    Turning to the question of non-infringement by Apotex's actual activities, Pratte J.A. was of the view, at pp. 342-43, that "Apotex, by purchasing from Novopharm bulk nizatidine manufactured or imported by that company under its compulsory licence, would acquire the right to use that drug and, as an incident of that right, the right to make capsules from it." He found that, by selling a patented article, a patentee transfers the ownership of that article to the purchaser. The patentee no longer has any right with respect to the article, and the purchaser, as the new owner, "has the exclusive right to possess, use, enjoy, destroy or alienate it" (p. 343) without fear of infringing the vendor's patent. The patentee, in other words, has impliedly renounced his exclusive right of use and sale. In the view of Pratte J.A., with whom the majority concurred on this point, the same principles apply to the sale of a patented article by a licensee who is entitled by the licence to sell without restrictions, and therefore,

Case 09-10138-MEW   Doc 14410-3   Filed 09/16/14   Page 89 of 398

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

Apotex was entitled to make capsules from the nizatidine obtained from Novopharm without infringing Eli Lilly's patent. For these reasons, Pratte J.A. would have allowed the appeal.

## IV. Issues

45     As I have already stated, the issue common to both appeals is whether the supply agreement between Apotex and Novopharm constituted a sublicence, such as to justify the termination by Eli Lilly of Novopharm's compulsory licence for nizatidine. If it did, then the NOAs issued by both Novopharm and Apotex were not justified and the requested prohibition order should issue. However, each appeal also raises other discrete issues, which I shall consider in turn.

46     Specifically, in the *Novopharm* proceeding, this Court is asked to determine: (1) whether the Federal Court of Appeal erred in applying its decision in *Apotex #1* to the *Novopharm* appeal, whether as *res judicata* or otherwise; (2) whether Novopharm's NOA was not justified, regardless of whether its compulsory licence was terminated by breach, because the licence did not permit the activities which it proposed; and (3) whether the Federal Court had the jurisdiction to grant declaratory relief on a limited judicial review proceeding of this type. In *Apotex #1*, it is further alleged that, apart from the primary issue of infringement, Apotex's proposed reformulation of the nizatidine into final-dosage form would itself constitute an infringement of the patents held by Eli Lilly, and that the prohibition order should therefore have issued regardless of whether or not the supply agreement constituted a sublicence.

## V. Analysis

### A. The agreement between Apotex and Novopharm

47     The primary argument advanced by Eli Lilly is that the supply agreement constituted the grant of a sublicence by Novopharm to Apotex in direct violation of paragraph 12 of Novopharm's compulsory licence for nizatidine. It is undisputed that such a breach would, pursuant to paragraph 8 of the licence, entitle Eli Lilly to terminate the licence, which would in turn preclude Novopharm from manufacturing, using, importing or selling nizatidine without infringing Eli Lilly's patent. In this event, neither Novopharm's nor Apotex's NOA would be justified.

### (1) The nature of a sublicence

48     Relatively little argument was directed at defining what a sublicence is. As a general matter, a sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. That is, the licensee in effect transfers or licenses some or all of his or her rights to the sublicensee, which means that the sublicence has similar incidents to the primary licence, including the right to exercise independently certain rights enjoyed by the licensee pursuant to its licence. It has been said, in fact, that "a sublicence is simply another name for the indirect granting of a licence": see Leslie W. Melville, *Forms and Agreements on Intellectual Property and International Licensing* (3rd ed. 1997), at §3.18.

49     To understand the nature of a sublicence, then, it is first necessary to appreciate the nature of a licence. In Harold G. Fox, *Canadian Law and Practice relating to Letters Patent for Inventions* (4th ed. 1969), the concept is expressed as follows (at p. 285):

> A licence, even though exclusive, does not give the licensee all the rights of the patentee. A licence does not set up rights as between the licensee and the public, but only permits him to do acts that he would otherwise be prohibited from doing. He obtains merely a right of user. But a licence is a grant of a right and does not merely confer upon the licensee a mere interest in equity. A licence is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the patent. <u>A licence prevents that from being unlawful which, but for the licence, would be unlawful; it is a consent by an owner of a right that another person should commit an act which, but for that licence, would be an infringement of the right of the person who gives the licence. A licence gives no more than the right to do the thing actually licensed to be done.</u> [Emphasis added.]

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

In other words, by the grant of a licence, the patentee grants to the licensee the right to act in a certain way *vis à vis* the patented article, a right which, but for the licence, the licensee would not enjoy. The licensee's rights, however, are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the licence.

50     Moreover, I should note, as an aside, that, unless the intention is expressed or implied in the licence, a licensee is not at liberty to grant a sublicence without the permission of the licensor: see, for example, *Howard & Bullough Ltd. v. Tweedales & Smalley Ltd.* (1895), 12 R.P.C. 519 (Eng. Ch. Div.), at p. 528. This may be viewed as an effort by the law to protect the property rights of the owner of the property, notwithstanding that the exclusive nature of these rights has been compromised by the granting of a licence. Thus, even without the express prohibition against sublicensing in the compulsory licence, Novopharm would not have been permitted to grant a sublicence to Apotex. The effect of the express prohibition, however, in the context of this licence as a whole, is that the grant of a sublicence by Novopharm would occasion a breach which could lead to the termination of the compulsory licence at the instance of Eli Lilly.

51     For Novopharm to have granted a sublicence to Apotex by means of the supply agreement, it must have transferred some or all of its rights under its compulsory licence to Apotex. Simply put, the question comes down to this: did Novopharm grant to Apotex, either expressly or impliedly, the right to do something which Apotex would otherwise be prohibited from doing, and which Novopharm was permitted to do only by virtue of its compulsory licence for nizatidine? This may have occurred in one of two ways: either some express provision or provisions, apparent on the face of the agreement, may reveal that the intentions of the parties was to create a sublicensing arrangement, or the legal effect of the document may be such that a sublicence was created in spite of the parties' contrary intentions. I will examine each of these possibilities in turn.

*(2) Contractual interpretation and the intentions of the parties*

52     In order to ascertain whether the supply agreement conferred or had the effect of conferring a sublicence upon Apotex, it is first necessary to consider the proper approach to the interpretation of such a contract, and, in particular, the evidence which may be considered in this respect. In *Consolidated-Bathurst, supra*, at p. 901, Estey J., writing for himself and Pigeon, Dickson, and Beetz JJ., offered the following analysis:

> Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation ... which promotes a sensible commercial result.

53     From this passage emerge a number of important principles of contractual interpretation. Not all of these, however, apply to the instant appeal. One which surely does not is the doctrine of *contra proferentem. Contra proferentem* operates to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party, by interpreting any ambiguity against the drafting party. When both parties are in agreement as to the proper interpretation of the contract, however, it is not open to a third party to assert that *contra proferentem* should be applied to interpret the contract against *both* contracting parties. Indeed, a third party has no basis at all upon which to rely upon *contra proferentem*: see G. H. L. Fridman, *The Law of Contract in Canada* (3rd ed. 1994), at p. 471. Therefore, I would, as a preliminary matter, reject the suggestion that the doctrine should apply to read any ambiguity in the contract against the drafting parties, in this case both Novopharm and Apotex.

54     The trial judge appeared to take *Consolidated-Bathurst* to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. In

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

my view, this approach is not quite accurate. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination.

55     Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. In the words of Lord Atkinson in *Lampson v. Quebec (City)* (1920), 54 D.L.R. 344 (Quebec P.C.):

> ...the intention by which the deed is to be construed is that of the parties as revealed by the language they have chosen to use in the deed itself .... [I]f the meaning of the deed, reading its words in their ordinary sense, be plain and unambiguous it is not permissible for the parties to it, while it stands unreformed, to come into a Court of justice and say: "Our intention was wholly different from that which the language of our deed expresses...."

56     When there is no ambiguity in the wording of the document, the notion in *Consolidated-Bathurst* that the interpretation which produces a "fair result" or a "sensible commercial result" should be adopted is not determinative. Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the goal is to ascertain their true contractual intent. However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if it is presumed that the parties intended the legal consequences of their words. This is consistent with the following dictum of this Court, in *Joy Oil Co. v. R.*, [1951] S.C.R. 624 (S.C.C.):

> ...in construing a written document, the question is not as to the meaning of the words alone, nor the meaning of the writer alone, but the meaning of the words as used by the writer.

57     In my view, there was no ambiguity to the contract entered into between Apotex and Novopharm. No attempt was made to disguise the true purpose of the arrangement, or the circumstances surrounding its drafting. Clearly, the agreement was meant to minimize the deleterious effects of the amendments to the *Patent Act*, which were expected to and did eventually place severe restrictions on the former scheme of compulsory licensing, by maximizing the access of each party to as wide a variety of patented medicines as possible. This was to be accomplished by obliging each party to obtain such material for the other in the event that one party possessed a licence which the other lacked and could no longer readily obtain. All of this is evident on a plain reading of the recitals to the supply agreement. Leaving aside the question of circumventing the legislation, which has no bearing on the interpretation of the contract, the parties' intentions are clear on the face of the agreement. Accordingly, it cannot properly be said, in my view, that the supply agreement contains any ambiguity that cannot be resolved by reference to its text. No further interpretive aids are necessary.

58     More specifically, there is no need to resort to any of the evidence tendered by either Apotex or Novopharm as to the subjective intentions of their principals at the time of drafting. Consequently, I find this evidence to be inadmissible by virtue of the parol evidence rule: see *Indian Molybdenum Ltd. v. R.*, [1951] 3 D.L.R. 497 (S.C.C.), at pp. 502-503.

59     Moreover, even if such evidence were required, that is not the character of the evidence tendered in this case, which sheds no light at all on the surrounding circumstances. It consisted only of the subjective intentions of the parties: Mr. Dan's subjective intention at the time of drafting and Dr. Sherman's subjective intention to implement the agreement in a certain way.

60     Therefore, I am of the opinion that the trial judge erred, in the *Novopharm* proceeding, in considering the evidence of Mr. Dan as to his intention at the time the contract was made. However, I am also cognizant of her clear statement that she would have reached the same conclusion even without considering the evidence and thus I would not reject her interpretation of the supply agreement for this reason alone. Appropriately, McGillis J. did not appear to consider the evidence of Dr. Sherman in *Apotex #1*, although the same cannot be said for MacGuigan J.A. in his disposition of that case. Indeed, he seemed to have been influenced heavily by this evidence, which necessarily casts doubt on the validity of his conclusions.

61     Having established that no extrinsic evidence is admissible, what does the text of the agreement say about the intentions of the parties? Despite the somewhat strident submissions to the contrary by Eli Lilly, one thing which it most assuredly does not say is that, pursuant to its terms, Apotex is entitled to the independent use of any compulsory licence owned by Novopharm for its own benefit. Nor does it say that Apotex is entitled to exercise any right enjoyed by Novopharm pursuant to any such licence.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

Rather, it simply provides, in paragraph 1, that Novopharm will, at the direction of Apotex, "use its licence for the benefit of" Apotex. To my mind, this does not satisfy the definition of a sublicence, as previously set out. The only right acquired by Apotex pursuant to this provision is the right to require Novopharm to exercise its licensed rights in a particular way, that is, to enable it to set in motion and benefit from Novopharm's exercise of its own rights to obtain and sell certain patented medicines. Apotex acquires no right to obtain these medicines independently of Novopharm. Indeed, it remains abundantly clear that Novopharm is still the only party actually entitled to *act* pursuant to the licence.

62     Thus, it is really of no consequence that the agreement gives Apotex the right to direct Novopharm as to who should make the medicine, from whom it should be purchased, and at what price, or that Novopharm is contractually obliged to follow these directions. Nor does it matter that Novopharm is to receive a royalty for supplying to Apotex the licensed materials so obtained. In some ways, these provisions create nothing more than an elaborate agreement to agree. That is, the agreement sets out a procedure by which the unlicensed party may require the licensed party to enter into another agreement, one of purchase and sale, the specific terms of which may be set substantially by the unlicensed party except that the licensed party is always entitled to the same rate of return: 4% of the cost of the material sold. In this way, the royalty does no more than assure the licensed party a certain margin of profit in consideration of its role in these anticipated future transactions. The arguments of the respondent notwithstanding, I do not see how this can be indicative of either an intention to confer, or the actual conferral of, a sublicence.

63     It is true that, in the recitals, the parties refer to a mutual intention to "share their rights", which itself might well be taken to suggest an intention to create a sublicence. However, this provision must be read in light of the rest of the agreement, which clearly discloses the intention *not* to create a sublicence. In particular, the requirement in paragraph 6 that the licensed party comply with the terms of its licence militates against the conclusion that the parties intended by the agreement to grant sublicences to one another. It simply would not be possible for Novopharm to grant a sublicence while still complying with the terms of its compulsory licence for nizatidine, given the express prohibition in that licence against the conferral of sublicences. On the evidence, there is no reason to conclude that Novopharm intended to breach both the supply agreement and its compulsory licence by granting a sublicence to Apotex.

64     Moreover, I do not read paragraph 7 of the agreement, which provides that "[t]he licensed party shall not be excused from performing any act as directed by the unlicensed party ... *on the grounds that there is doubt as to whether or not the licence ... permits the requested acts ...*" (emphasis added), provided also that the unlicensed party is obliged to defend the licensed party from any ensuing litigation, as either permitting or requiring the conferral of a sublicence in this case. If paragraph 6 is to have any meaning at all, it must at least be seen as prohibiting acts which would be in clear violation of the licence held by the licensed party. I can conceive of no clearer violation than the conferral of a sublicence. There is no "doubt" as to whether the licence permits such an act; rather, it is expressly prohibited by paragraph 12 of the licence. Consequently, I do not believe that paragraph 7 has any application in the circumstances; certainly, it does not oust the effect of paragraph 6.

65     Paragraph 8, which requires the licensed party to "cooperate fully with the unlicensed party and follow the directions of the unlicensed party *to enable the unlicensed party to enjoy the use of the licence* to the same extent that would be possible if the unlicensed party itself held such licence" (emphasis added), is admittedly an unusual and arguably unfortunately worded clause. Indeed, if anyone were to question whether the supply agreement was actually drafted without the benefit of counsel, as asserted by both Novopharm and Apotex, this paragraph would stand as cogent evidence in support of that claim. However, it too must be read in light of the rest of the agreement, which simply does not permit the unlicensed party to "enjoy the use of the licence" in the active sense, that is, to actually use it. Rather, it permits only *indirect* enjoyment: the enjoyment of the licensed party's use of the licence. It is certainly true that the licensed party is obliged to follow the directions of the unlicensed party and to take all legal steps possible to enable the unlicensed party to benefit from the existence of the license, when requested. However, this stops short of actually permitting the unlicensed party to exercise licensed rights independently of the licensed party, which is the essence of a sublicence.

66     In short, I can find nothing in the wording of the document to suggest that the parties intended to grant sublicences to each other. Rather, every indication is that they intended to establish a commercial arrangement whereby the unlicensed party would enjoy the right to require the licensed party to use its various licences for the benefit of the unlicensed party by acquiring, potentially at the direction of the unlicensed party, and subsequently reselling to the unlicensed party, various patented

medicines. Indeed, it is worth noting that the creation of sublicences really would not have been in the parties' commercial interests, as this would have justified the termination of the various compulsory licences held by each company and thereby not only rendered the supply agreement itself useless but also jeopardized the business operations of both. While it is true, as submitted by Eli Lilly, that no express words of grant are required to create a sublicence, clearly the supply agreement, to have this character, must have transferred to Apotex more than simply the right to compel Novopharm to use its licence in a given way. But it is apparent that, in the context of the agreement as a whole, this is all that was meant by sharing rights.

*3. The legal effect of the supply agreement*

67    Eli Lilly contends that the legal effect of the agreement was that a sublicence was granted by each party to the other, despite what they may have intended. In light of the foregoing analysis, however, I do not see how this argument can be sustained. Apotex and Novopharm intended to create a specific type of supply agreement, not a sublicence, and I believe they succeeded in doing so. However, to the extent that Eli Lilly's argument may be premised upon some confusion as to the distinction between a sublicence and an ordinary agreement of purchase and sale, that distinction does merit some brief examination at this stage.

*(i) Sublicence versus purchase and sale*

68    By virtue of its compulsory licence, Novopharm is entitled to manufacture and/or import bulk nizatidine, subject to the temporal restrictions imposed by the *Patent Act*, and to sell the nizatidine so obtained to Apotex or any other third party. Apotex, having acquired the nizatidine from Novopharm, would then be free to use it in any way that did not infringe the patents held by Eli Lilly. Thus, no sublicence could have been created by an agreement that was confirmatory of these rights and simply conferred upon Apotex the additional right to require Novopharm to acquire and sell to it bulk nizatidine at a certain rate. In other words, to prove the existence of a sublicence, it must be established that the agreement was, in substance if not form, more than merely an elaborate arrangement under which future contracts for purchase and sale might be completed.

69    As I have said, a sublicence requires the conferral of licensed rights by a licensee upon a third party, the sublicensee. This may create some confusion between a sublicence and an ordinary contract of purchase and sale, though, as a third party may acquire similar rights under each of these arrangements. That is, just as a sublicensee can obtain the rights to use and sell a patented article if this right is enjoyed by the licensee and transferred accordingly, so too is the sale by a licensee of a patented article presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": *Badische Anilin und Soda Fabrik v. Isler*, [1906] 1 Ch. 605 (Eng. Ch. Div.), at p. 610; see also *Gillette v. Rea* (1910), 1 O.W.N. 448 (Ont. Ch.); *Betts v. Willmott* (1871), 6 Ch. App. 239 (Eng. C.A.), at 245. In other words, unless otherwise stipulated in the licence, a licensee is generally entitled to pass to a purchaser the right to use or resell the patented article without fear of infringing the patent.

70    But the sale of a licensed article obviously does not have the automatic effect of constituting the purchaser a sublicensee, and thus the fact that a third party enjoys rights of use and alienation cannot alone be indicative of the existence of a sublicence. Indeed, as Apotex points out, both the case law and common sense disclose any number of ways in which a licensee can sell a licensed article to a third party with the complete range of ordinary incidents of ownership, without constituting that party a sublicensee. These range from the ordinary casual purchase to the licensee's manufacturing, at the purchaser's instigation and direction, and according to the purchaser's own design specifications, products which incorporate the subject matter of the licence: see *Intel Corp. v. ULSI System Technology Inc.* 995 F.2d 1566 (U.S. Fed. Cir. 1993).

71    Thus, practically speaking, the rights of use and alienation can only be *determinative* of the existence of a sublicence in cases in which it is clear that no transfer of property rights has occurred, i.e., that there has been no sale of the licensed article to the third party. In such a case, a right of use could only be derived from a sublicence of some type, and an untrammelled right of alienation could not be enjoyed at all, as it would be impossible for a third party to transfer good title without first having any proprietary right in the article. Where the rights of the unlicensed party are derived from a sale of licensed material, however, it would be misleading to rely on the rights of use and alienation as a basis for the conclusion that a sublicence has been or is to be granted.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

Case 09-10138-MEW    Doc 14410-3    Filed 09/16/14    Page 94 of 398

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

72     In the present case, it is plainly the latter situation which is contemplated by the supply agreement between Novopharm and Apotex. Under the agreement, any right Apotex might enjoy to sell nizatidine would obviously emanate from its first having purchased such material from Novopharm. As I have stated, the possibility that the material might be acquired by Novopharm at and subject to Apotex's direction is of no consequence. What is important, rather, is that the supply agreement in no way permits Apotex to exercise rights licensed to Novopharm in order to manufacture, or otherwise acquire independently, patented material for which it is not itself licensed. If the agreement were in substance a sublicence, Novopharm's involvement would be entirely unnecessary; Apotex could deal directly with the manufacturer or exporter of the material, or manufacture the drugs itself. But no such rights in fact exist under the supply agreement.

73     A number of recent U.S. cases support the view that establishing the existence of a sublicence in situations analogous to the one before us will typically depend on demonstrating that the unlicensed party is exercising the licensee's right to manufacture or import the licensed material. For example, in *Intel, supra*, it was held that the sale of microchips by the licensee, Hewlett-Packard ("HP"), to a third party, ULSI, did not constitute a sublicence, notwithstanding that the chips were built by HP according to the design and specifications of ULSI and were then resold by ULSI. The court in that case did acknowledge, however, that HP's empowering ULSI to make the chips itself would have constituted a sublicence.

74     In the instant appeals, the Federal Court of Appeal relied on *Du Pont, supra*, for the proposition that, in effect, a sublicence is created whenever a patented product is made for the benefit of the unlicensed party rather than the licensee. However, with respect, I view *Du Pont* as readily distinguishable from the cases before us, and do not, in any event, believe that it stands for the legal principle propounded. In *Du Pont*, it was more significant that the unlicensed party actually *manufactured* the licensed article, allegedly as the agent of the licensee, only then to "purchase" the article from the licensee immediately upon its manufacture. This arrangement was characterized by the Delaware Supreme Court as a sham, and rightfully so. The only factor which distinguished it from an overt situation of an unlicensed party's manufacturing a patented article strictly for its own benefit was a series of paper transactions carried out between a subsidiary corporation and its parent for the purpose of obscuring the true character of the arrangement.

75     But the situation is manifestly different in a case where the manufacturer and the end user are embodied in two different legal *personnae*, and legitimate transfers of property do, in fact, take place. In *Cyrix Corp. v. Intel Corp.* 77 F.3d 1381 (U.S. Fed. Cir. 1996), the licensed party agreed to supply a third party with microprocessors which it was entitled to manufacture pursuant to a licence conferred upon it by the patentee. The licensed party, in turn, had the processors made by another corporation (affiliated but not a subsidiary), which then sold them to the licensed party for resale to the third party. It was argued that this arrangement constituted in essence a sublicence granted by the licensed party to the third-party manufacturer, and that the licensed party's "have made" rights under the licence extended only to the manufacture of goods for its own benefit. The court rejected this argument, finding that the licensed party was entitled to have the licensed products made by an agent and to resell them as it saw fit. It distinguished *du Pont, supra*, on the basis that the manufacturer and the end user were two completely separate entities, and so the arrangement could not be characterized as a sham.

76     In my view, *Cyrix* is much more closely analogous than *Du Pont* to the instant appeal, a case in which two arm's-length companies, one licensed and the other unlicensed, have contracted for the prospective purchase and sale of patented goods. They have agreed that the licensed party, in this case Novopharm, will, at and according to the direction of the unlicensed party, Apotex, either manufacture or import the goods, acquire property rights in them, and sell them to Apotex. The only real difference is that, where in *Cyrix* the licensee presumably had the chips made on such terms as would ensure that a profit would be earned on the agreement of purchase and sale previously completed with the third party, in the present circumstances, the profit of which Novopharm is assured is based not on its arrangement with its supplier, but from the guaranteed 4% royalty payable by Apotex. This distinction alone cannot transform the supply agreement into a sublicence.

77     Because the supply agreement has not yet been implemented, the evidence certainly does not establish that this is a case where the unlicensed party is manufacturing the goods itself, as in *Du Pont*. Consequently, I need not decide whether a sublicence would be granted in this hypothetical situation. Indeed, it has not been argued, and I cannot simply presume that the supply agreement has been or is intended to be carried out in this manner. Moreover, I note again that the supply agreement

expressly provides, in paragraph 6, that the licensed party must comply with the terms of the licence, which, *inter alia*, precludes it from granting sublicences. Therefore, while it is theoretically possible that this arrangement could someday be implemented in a way that would result in the grant of a sublicence, it must be presumed for the present purposes that, if the agreement is ever actually acted upon, the parties will act in accordance with the law.

78      Pursuant to the terms of the contract as it stands, Apotex is simply permitted to direct Novopharm to the third party manufacturer which it favours and with whom it has negotiated terms, which would then oblige Novopharm to deal with that manufacturer and acquire the patented medicine on the terms negotiated. Despite this considerable degree of control by Apotex, it remains the case that separate entities are involved, that Apotex is in no way ultimately responsible for the supply of the goods that Novopharm will eventually sell to it, and that a legitimate and *de facto* transfer of property must occur between Novopharm and the third party before any proprietary rights can be acquired by Apotex. Therefore, only if Apotex's designation of a preferred source or manufacturer would *necessarily* render it a sublicensee of Novopharm would the agreement between the two companies amount to a breach of the terms of the compulsory licence. Since it is possible for Apotex to exercise this contractual right without the benefit of licensed rights transferred to it by Novopharm, it would be incorrect to say that the supply agreement necessarily infringes the licence.

79      As I have already made clear, Apotex enjoys no rights of its own under the licence as a consequence of the supply agreement with Novopharm, regardless of the parties' apparent intention to "share their rights". At bottom, the agreement amounts to nothing more than an agreement to agree, a mutual obligation for the parties to enter into future contractual arrangements with one another. Neither the text of the agreement nor the manner in which the parties purported to implement it supports the conclusion that it is in substance a sublicence.

*(4) The agency argument*

80      In the alternative, Eli Lilly submitted that the supply agreement ought to be interpreted as a sublicence because the degree of control likely to be exercised by Apotex over the acquisition of nizatidine would result in a situation where Novopharm in reality would be acting as Apotex's agent. Novopharm would not be acting on its own behalf in the acquisition but rather on behalf of Apotex, which would imply that Apotex has acquired licensed rights from Novopharm. As a variation on this theme, it is suggested that Novopharm would in effect be unlicensed to make these acquisitions because it would be standing in the shoes of Apotex, an unlicensed entity. The latter submission, then, stands as an alternative to the sublicence argument, and remains even if the supply agreement is not considered a sublicence.

81      To my mind, both forms of this argument must fail, for one very simple reason. It is abundantly clear that, under the supply agreement, any contractual relations that might be established for the purchase of nizatidine would be between Novopharm and the third-party supplier. Apotex would not be a party to the contract; Novopharm would not be entering into the contract "on behalf of" Apotex in any sense. The notion of an agent's entering into contractual relations with the third party is inimical to the entire concept of agency, which contemplates the agent's binding the principal, not itself, to contractual relations and obligations. The completion of a contract between Novopharm and a third-party supplier would prevent the formation of an agency relationship because, even if contemplated, such a relationship could not be embodied by a transaction which resulted in the completion of a contract between the third party and the agent rather than the principal.

*(5) Conclusion as to the nature of the supply agreement*

82      The arrangement entered into by Apotex and Novopharm is not a sublicence. Regardless of the level of control that might be exercised by Apotex over arranging and facilitating the acquisition of licensed materials for its own benefit, no actual acquisition is itself possible without the involvement of Novopharm. The agreement does not grant Apotex the right to do independently of Novopharm anything which only Novopharm is licensed to do, nor does it purport or disclose any contractual intent to do so. In other words, no licensed rights are transferred by Novopharm to Apotex. Thus, the substance of the arrangement, while perhaps resulting in an unconventional commercial situation, is ultimately inconsistent with the grant of a sublicence. To the extent that the Federal Court of Appeal held otherwise, it was, with respect, in error.

Case 09-10138-MEW    Doc 14410-3    Filed 09/16/14    Page 96 of 398

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

83    That is not to say, however, that it would be impossible to implement the agreement in such a manner as to create a sublicence. For example, while I need not decide this hypothetical issue, I would again observe that, if the domestic supplier from which Apotex directed Novopharm to obtain the nizatidine were found to be Apotex itself, the agreement would likely be seen as a sham, just as in *Du Pont, supra*. Similarly, if Novopharm were to be less than vigilant in enforcing the terms of the agreement and permit Apotex to contract directly with a third party supplier for the purchase of nizatidine, this relaxation of terms might well be shown to result in the effective conferral of a sublicence. But these are hypotheticals, not our facts. Indeed, there can be no possible evidence in this case of the manner in which the agreement was implemented by the parties because, at the time of the hearing, it had not been implemented at all. On the other hand, if the agreement has subsequently been implemented so as to create a sublicence, or if it is so implemented in the future, it would certainly then be open to the patentee to move to terminate the compulsory licence or to seek whatever other relief might be appropriate under the *Patent Act* or otherwise. However, this has no bearing on the justification of the NOAs here at issue.

84    Accordingly, I would emphasize that the conclusions reached in this case should not be taken to characterize every supply agreement similar to the one here at issue as insulating the parties to it from any allegation of sublicensing. Rather, this decision is to be substantially confined to its facts: a case in which an agreement has been entered into between companies dealing at arm's length, which is not on its face a sublicence, and which had not been implemented at any time material to the litigation. Depending on the implementation of the agreement, the identities of the parties, or any number of other distinguishing factors, it is entirely possible that a different result might be reached on the specific facts of another case.

### B. Other issues in the Novopharm appeal

*(1) Did the Federal Court of Appeal err in applying its decision in Apotex #1 to its decision in Novopharm?*

85    Novopharm submits that, even if the supply agreement were properly interpreted by the Federal Court of Appeal as conferring a sublicence upon Apotex, it nonetheless should not be considered a sublicence for the purposes of the *Novopharm* appeal. The reason advanced for this distinction is that nothing on the face of the agreement can be seen as constituting a sublicence, and, whereas the conclusion of the court in *Apotex #1* may have been premised in part on Dr. Sherman's evidence as to the manner in which Apotex expected the agreement to be implemented, no steps had actually been taken to implement the agreement. Thus, it is argued that, while it might have been open to the court to grant the requested prohibition order in *Apotex #1* if Dr. Sherman's proposed implementation would have resulted in the conferral of a sublicence, this evidence was not before the court in *Novopharm* and, in fact, was inconsistent with Mr. Dan's evidence as to his understanding of the agreement. To the extent that the Federal Court of Appeal failed to take into consideration this material evidentiary difference, it is suggested, this constituted an error of law.

86    It is certainly true that each case must be considered on its own facts, and I have already expressed the view that the implementation of the agreement in a certain way might well result, hypothetically, in the creation of a sublicence. As such, I agree that it would have been inappropriate for the Federal Court of Appeal to apply its decision in the first appeal to the second, whether as *res judicata* or otherwise, without considering any material factual differences which might have existed between the two cases. However, in light of my earlier conclusion as to the character of the supply agreement, together with the fact that the agreement had not been implemented at the material time, it is not necessary to decide this issue. None of the parol evidence considered by the Federal Court of Appeal has had any bearing on the conclusions I have reached.

*(2) Was Novopharm's notice of allegation premature and therefore not justified?*

87    Even the unequivocal conclusion as to the character of the supply agreement does not put the *Novopharm* matter to rest. Still to be determined is whether, as alleged by Eli Lilly, Novopharm's NOA was not justified regardless of whether its compulsory licence for nizatidine was successfully terminated.

88    Pursuant to s. 39.11(2)(c) of the *Patent Act*, Novopharm was prohibited from importing, under its compulsory licence, medicine in respect of which a previous NOC had been granted after June 27, 1986, until 10 years after the date of the issuance of that NOC. While this section was repealed by the *Patent Act Amendment Act, 1992*, s. 11(1) of that Act provides that licences

Case 09-10138-MEW    Doc 14410-3    Filed 09/16/14    Page 97 of 398

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

granted under the former s. 39 prior to December 20, 1991, continue in effect according to their terms, and ss. 39 to 39.14 of the former Act continue to apply to such licences as if those sections had not been repealed.

89      A NOC in respect of nizatidine was granted to Eli Lilly Canada on December 31, 1987. Accordingly, it is submitted by Eli Lilly that Novopharm's NOA, which was issued on July 30, 1993, could not have been justified before December 31, 1997, the first date on which it would have been entitled, under its compulsory licence, to import nizatidine. Thus, Eli Lilly argues that, even if no sublicence was granted and the termination of Novopharm's licence was not therefore justified, Novopharm would nonetheless have infringed Eli Lilly's patents if it had received a NOC for nizatidine, as it had no non-infringing way in which to obtain the bulk medicine.

90      However, this submission appears to ignore the fact that Novopharm's NOA does not seem to disclose any specific intention to import the nizatidine. Rather, the request was for a NOC to make, construct, use, and/or sell nizatidine in 150 mg and 300 mg capsules. No mention was made of how Novopharm proposed to obtain the bulk medicine, and no evidence was led to suggest that it was to be imported. Indeed, while Mr. Dan acknowledged in his written answers to undertakings on cross-examination that, at the time of the hearing, Novopharm's suppliers were located outside of Canada, he also indicated that Novopharm was aware of the prohibition against its importing nizatidine before December 31, 1997, and intended to abide by the relevant provisions of the *Patent Act*. Further, he indicated that Novopharm might locate a Canadian supplier between December 31, 1994, and December 31, 1997, and expressly disavowed any intention to import nizatidine prior to the latter date.

91      Pursuant to s. 39.14 of the *Patent Act*, Novopharm was entitled to use the patented invention for the preparation or production of medicine -- that is, to manufacture the medicine itself or through Canadian agents -- after the expiration of seven years after the date of the issue of the first NOC to Eli Lilly Canada. This seven-year period expired on December 31, 1994, and while Novopharm served its NOA on Eli Lilly Canada on July 30, 1993, the application was not heard until January 30, 1995. Thus, as of the date of hearing, Novopharm was entitled to manufacture or have made the drug for its own use, for sale for consumption in Canada.

92      In *Apotex #2*, the companion to the instant appeals, I have held that the appropriate date for assessment of a NOA, where a prohibition order is sought by a patentee, is the date of hearing and not the date on which the NOA was issued. Accordingly, I cannot conclude that Novopharm's NOA was premature and therefore not justified. As of the date of hearing, it did indeed have a non-infringing way to obtain bulk nizatidine, and, in the absence of evidence to the contrary, I presume that its intention was, as Mr. Dan asserted, to operate within the restrictions of the *Patent Act* by obtaining the medicine either from a Canadian supplier or not at all.

*(3) Jurisdiction to grant declaratory relief*

93      The final issue to be determined with respect to the *Novopharm* appeal is whether this Court has the jurisdiction, on a summary judicial review proceeding concerning an application for a prohibition order against the issuance of a NOC, to grant declaratory relief. Specifically, Novopharm asks that this Court declare: (1) that Eli Lilly has failed to show that the notice of allegation was not justified; (2) that Eli Lilly has failed to show that it was entitled to terminate the compulsory licence; and (3) that the supply agreement does not constitute a sublicence or a transfer of the compulsory licence from Novopharm to Apotex.

94      In my view, the first two requests are unnecessary. The finding that the supply agreement was not a sublicence necessarily leads to the conclusion, at least for the purposes of this appeal, that Eli Lilly was not entitled to terminate Novopharm's compulsory licence. Indeed, no other breach was alleged, such as to trigger paragraph 9 of the licence. Similarly, this finding, in combination with the finding that Novopharm's NOA was not premature, leads to the conclusion that Eli Lilly has failed to show that the NOA was not justified. I can see no reason to grant what would be superfluous declaratory relief on these issues, when all that is necessary is to determine whether or not the Federal Court of Appeal erred by granting the prohibition orders as requested.

95      As for the third request, I am of the view that it would be inappropriate for this Court to grant the requested relief in light of the nature of these proceedings. As McGillis J. correctly observed, the summary judicial review that is to be conducted on

Case 09-10138-MEW    Doc 14410-3    Filed 09/16/14    Page 98 of 398

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

an application for a prohibition order under the Regulations is highly fact-specific and is generally considered to be binding only on the parties in the specific litigation. This is only appropriate, given the limited nature of the proceedings, the question that is to be answered, and the record generated for this limited purpose. In *Merck Frosst Canada Inc. v. Canada (Minister of National Health & Welfare)* (1994), 55 C.P.R. (3d) 302 (Fed. C.A.), at pp. 319-20, Hugessen J.A. made this point in the following terms, with which I agree:

> In determining whether or not the allegations are "justified" (s. 6(2)), the court must then decide whether, on the basis of such facts as have been assumed or proven, the allegations would give rise in law to the conclusion that the patent would not be infringed by the respondent.

> In this connection, it may be noted that, while s. 7(2)(*b*) seems to envisage the court making a declaration of invalidity or non-infringement, it is clear to me that such declaration could not be given in the course of the s. 6 proceedings themselves. Those proceedings, after all, are instituted by the patentee and seek a prohibition against the Minister; since they take the form of a summary application for judicial review, it is impossible to conceive of them giving rise to a counterclaim by the respondent seeking such a declaration. Patent invalidity, like patent infringement, cannot be litigated in this kind of proceeding. [Emphasis added.]

96    This point was reinforced more recently by Strayer J.A. in *Pharmacia Inc., supra*, at p. 600:

> If the Governor in Council had intended by these Regulations to provide for a final determination of the issues of validity or infringement, a determination which would be binding on all private parties and preclude future litigation of the same issues, it surely would have said so. This Court is not prepared to accept that patentees and generic companies alike have been forced to make their sole assertion of their private rights through the summary procedure of a judicial review application. As the Regulations direct that such issues as may be adjudicated at this time must be addressed through such a process, this is a fairly clear indication that these issues must be of a limited or preliminary nature. If a full trial of validity or infringement issues is required this can be obtained in the usual way by commencing an action. [Emphasis added.]

97    While the relief requested of the Federal Court of Appeal in these cases touched on issues pertaining to the infringement and/or invalidity of the actual patents, not the effect of an external agreement, I believe that the reasoning involved is also applicable to the *Novopharm* appeal. The nature of the inquiry on this judicial review proceeding requires only a determination as to whether or not the NOA was justified in the circumstances of this case. While this necessarily entails a decision as to whether, in these particular circumstances, the supply agreement constituted a sublicence and thus justified the termination of the licence, this is not to be taken as a final decision on the nature of the agreement for all purposes. For this Court to make a binding declaration concerning the private rights and obligations of the parties to the agreement would go well beyond the limited scope of the proceeding. Accordingly, I would deny the declaratory relief requested by Novopharm.

### C. Other issues in the Apotex #1 appeal

*(1) Would the reformulation of nizatidine by Apotex into final-dosage form infringe the patent held by Eli Lilly?*

98    Even assuming that the supply agreement did not constitute a sublicence, that Novopharm's licence remains in force, and that Apotex is therefore able to purchase bulk nizatidine under the supply agreement as a third-party purchaser, the possibility remains that the use to which Apotex proposes, in its NOA, to put the drug would infringe Eli Lilly's patent. In this vein, Eli Lilly submits that the Federal Court of Appeal erred in holding that the formulation of final-dosage capsules by Apotex would not infringe the patent. Specifically, it is submitted that the rights of use and sale that are inherent in the unrestricted purchase of a licensed article do not permit the making of a new article.

99    In the Federal Court of Appeal, Pratte J.A., with whom the majority agreed on this point, disposed of this argument in the following concise and useful passage, at p. 343 with which I agree:

> If a patentee makes a patented article, he has, in addition to his monopoly, the ownership of that article. And the ownership of a thing involves, as everybody knows, "the right to possess and use the thing, the right to its produce and accession,

Case 09-10138-MEW    Doc 14410-3    Filed 09/16/14    Page 99 of 398

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

and the right to destroy, encumber or alienate it".... If the patentee sells the patented article that he made, he transfers the ownership of that article to the purchaser. This means that, henceforth, the patentee no longer has any right with respect to the article which now belongs to the purchaser who, as the new owner, has the exclusive right to possess, use, enjoy, destroy or alienate it. It follows that, <u>by selling the patented article that he made, the patentee impliedly renounces, with respect to that article, to [sic] his exclusive right under the patent of using and selling the invention. After the sale, therefore, the purchaser may do what he likes with the patented article without fear of infringing his vendor's patent.</u>

<u>The same principles obviously apply when a patented article is sold by a licensee who, under his licence, is authorized to sell without restrictions.</u> It follows that, if Apotex were to purchase bulk Nizatidine manufactured or imported by Novopharm under its licence, Apotex could, without infringing Lilly's patents, make capsules from that substance or use it in any other possible way. [Emphasis added.]

100      Perhaps the principles underlying this well-founded statement of the law merit some brief elaboration at this stage. As I have already noted in connection with the distinction between a sublicence and an ordinary agreement of purchase and sale of a patented or licensed article, the sale of a patented article is presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": see *Badische Anilin und Soda Fabrik v. Isler, supra*. Unless otherwise stipulated in the licence to sell a patented article, the licensee is thus able to pass to purchasers the right to use or resell the article without fear of infringing the patent. Further, any limitation imposed upon a licensee which is intended to affect the rights of subsequent purchasers must be clearly and unambiguously expressed; restrictive conditions imposed by a patentee on a purchaser or licensee do not run with the goods unless they are brought to the attention of the purchaser at the time of their acquisition: see *National Phonograph Co. of Australia v. Menck*, [1911] A.C. 336 (Australai P.C.).

101      Therefore, it is clear that, in the absence of express conditions to the contrary, a purchaser of a licensed article is entitled to deal with the article as he sees fit, so long as such dealings do not infringe the rights conferred by the patent. On this score, Eli Lilly alleges that the reformulation of nizatidine would in this case exceed the scope of the rights obtained by the purchaser because it would constitute not simply the resale of the material purchased, but rather, the creation of a new article in violation of Eli Lilly's patent. However, I can find no basis, either in the evidence or in the case law cited by Eli Lilly, for this submission. In my view, the reformulation of nizatidine into final-dosage form does not have the effect of creating a new article. Rather, it is more akin to repackaging the substance into a commercially usable form, which I do not view as violating any rights under the patents.

102      No specific evidence was led in the instant appeal concerning the nature of the process by which bulk medicine is reformulated into final-dosage form. However, in *Merck & Co. v. Apotex Inc., supra*, at p. 155, MacKay J. offered a useful summary of the process. While it is possible that the process employed in the reformulation of nizatidine may differ slightly from the reformulation of the medicine at issue in that case, namely enalapril maleate, the gist of MacKay J.'s description is nonetheless apposite: the basic patented compound at issue, that is, the bulk medicine produced by the patentee or licensee, remains unchanged throughout the reformulation process. It exists in the same chemical form in the final-dosage product as in the bulk product. However, the two products are substantially different, in that the bulk form is essentially a powder without other form or shape, while the final-dosage form is a coloured tablet, consisting of the bulk medicine and other ingredients and shaped in a form associated with a particular dosage. Indeed, in the view of MacKay J., the process so described was such a significant transformation that the final-dosage form of enalapril maleate sold by Apotex was not protected by s. 56 of the *Patent Act*, which authorizes the use and sale of a "specific" patented article by a party who purchased, constructed, or acquired the article before the patent application became open to the inspection of the public. In other words, MacKay J. was unwilling to accept that the final-dosage form was the same "specific article" as the bulk enalapril maleate purchased by Apotex prior to the date on which Merck's patent application became open for inspection.

103      However, this conclusion was rejected by the Federal Court of Appeal, in a judgment reported at [1995] 2 F.C. 723 (Fed. C.A.). At p. 738, MacGuigan J.A., writing for a unanimous court, expressed the view that "the right to use or sell the 'specific article, etc.' is independent of the form in which the invention is purchased: *any form* of the invention may be used or sold within the immunity conferred by s. 56" (emphasis in original). In so holding, MacGuigan J.A. relied on the following

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 100 of 398

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

statement of Hall J. in *Libbey-Owens-Ford Glass Co. v. Ford Motor Co.*, [1970] S.C.R. 833 (S.C.C.), at p. 839, affirming the judgment of Thurlow J. (as he then was) in the court below (reported at (1968), [1969] 1 Ex. C.R. 529 (Can. Ex. Ct.)):

> The question in this case is with respect to the extent of the meaning of "using" and it arises because with respect to "vending" the right of the owner of the specific machine or other thing is expressed as that of vending it, not as that of vending its output. However, it is obvious that in the case of a machine designed for the production of goods, there would really be no worthwhile protection allowed by s. 58 [now s. 56] *if the owner could not put it to the only use for which it is usable without being liable for infringement*. [Emphasis added.]

104    Accordingly, MacGuigan J.A. concluded, at p. 741, that

> The use and sale of the product of a machine, <u>particularly if production is the only possible use of the machine</u>, is accorded protection under s. 56 as a use of the machine itself... In my view, use must be given the same sense in the case of a chemical invention. [Emphasis added.]

105     The *Merck v. Apotex* decision highlights the fact that there is really no commercial use for bulk medicine other than its reformulation into final-dosage form, for consumption by the ultimate consumer. In order to realize any utility from the acquisition, then, the purchaser must take steps to convert it into this commercially usable form. In my view, MacGuigan J.A.'s conclusion that the right to use and sell an article includes the right to use and sell things produced with the article, though reached in the specific context of a s. 56 defence, applies with equal force to the case at bar. That is, the right of use and sale which Apotex would acquire inherently, through its acquisition of nizatidine from Novopharm, must be seen as encompassing the right to use and sell things produced with this nizatidine, including capsules in final-dosage form. It follows, therefore, that Apotex would not infringe the patents held by Eli Lilly simply by selling the medicine in the form contemplated by the NOA. This is particularly so when, as in the case at bar, the exclusive rights enjoyed by the patentee under the patent are limited, in essence, to the formulation of bulk medicine according to the patented process. Nothing in the reformulation process can be seen as infringing upon this right.

106    Any doubt as to this conclusion of non-infringement must, in my view, be eliminated by an examination of Novopharm's compulsory licence, which specifically contemplates the sale of the licensed material in bulk form by providing a formula for calculating royalties on product thus sold. As I see it, because there is no other practical use for bulk medicine, this must also be taken to contemplate and implicitly permit the reformulation of the product by the purchaser into final dosage form. This conclusion is only reinforced, in my view, by the fact that the contemplated royalty rates are based on the amounts received by subsequent purchasers in consideration of the sale of final dosage forms to the retail trade. Had the Commissioner of Patents intended to restrain such use of the medication, he would have provided for this expressly, or, at least, would not have specifically delineated the procedure that is to compensate the patentee for such use.

107    Therefore, Eli Lilly is incorrect to assert that the reformulation proposed by Apotex would either have to be carried out pursuant to a sublicence granted by Novopharm, which would justify the termination of Novopharm's compulsory licence and, therefore, the sublicence, or would be entirely unauthorized and infringe Eli Lilly's patents. The better view, as I have stated, is that the right to reformulate is premised on the inherent right of an owner of property to deal with that property as he or she sees fit. In the absence of some express term in the compulsory licence, prohibiting purchasers of bulk nizatidine from Novopharm from reformulating it into final-dosage form, the weight of the case law supports the view that Apotex, having validly acquired the bulk medicine, would be free to reformulate it for resale without fear of infringing any right under Eli Lilly's patents.

108    I would emphasize, however, that this conclusion is in no way premised upon, and should not be taken to have any bearing on, the well-established rules concerning the acceptable limits on the repair of a patented article: see, for example, *Rucker Co. v. Gavel's Vulcanizing Ltd.* (1985), 7 C.P.R. (3d) 294 (Fed. T.D.) Here, we are not considering the repair of a patented article, but its resale in a somewhat different form. I would also add that I am unconvinced by the authorities cited by Eli Lilly in support of the proposition that the rights of the purchaser do not include the right to reformulate.

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

109      In light of the foregoing, I am in agreement with Pratte J.A. and the majority of the Federal Court of Appeal, and conclude that the reformulation of the bulk nizatidine into final-dosage form would not infringe Eli Lilly's patent. Accordingly, I conclude that Eli Lilly has failed in its various efforts to establish that Apotex's NOA was not justified and that a prohibition order should thus be issued.

## VI. Disposition

### A. Novopharm Ltd. v. Eli Lilly and Co.

110      For the foregoing reasons, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and restore the judgment of the Federal Court - Trial Division, with costs to the appellant throughout. However, I would deny the appellant's request for declaratory relief.

### B. Apotex Inc. v. Eli Lilly and Co.

111      Also for the foregoing reasons, and after a full consideration of the factual differences existing between the two appeals considered herein, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and dismiss the application for an order of prohibition. The appellant shall have its costs throughout.

*Appeals allowed.*

*Pourvois accueillis.*

---

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 35

2009 WL 3683390
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States Court of Federal Claims,
Office of the Special Masters.

Chad EMKEY, by Frank Emkey
and Mailene Emkey, Petitioners,
v.
SECRETARY OF HEALTH AND
HUMAN SERVICES, Respondent.

No. 08−160V.   |   Oct. 20, 2009.

**Attorneys and Law Firms**

Andrew D. Downing, Tulsa, OK, for Petitioners.

Lynn E. Ricciardella, United States Department of Justice, Washington, D.C., for Respondent.

***ORDER GRANTING IN PART AND DENYING IN PART RESPONDENT'S MOTION TO DISMISS*** [1]

LORD, Special Master.

**I. *INTRODUCTION***

*\*1 Mr. and Mrs. Emkey allege that vaccinations caused their son, Chad, to develop autism. The issue presented is whether the Petition was filed more than 36 months after the first symptom of Chad's autism disorder. Chad's father, Frank Emkey, states that there was no sign or symptom of Chad's autism until he reached four years of age, following a vaccination. Chad's medical records indicate, however, that Chad was slow to speak and that his parents noticed his speech delay at around two years of age. There are several other signs of developmental delay in the record, even before Chad reached age two. [2] These include late walking, late development of fine motor skills, late babbling, as well as late expressive and receptive language skills. Pet'r Ex. 3 at 135, 137.

The record contains medical literature as well as testimony admitted in the Omnibus Autism Proceeding (OAP) showing that speech delay is one symptom—if not, indeed, the most prominent symptom—of autism in children between the ages of one and three. There is no medical evidence in the record to the contrary. The abundance and consistency of the medical evidence leave no doubt that the medical community would recognize speech delay as an early symptom in a child subsequently diagnosed with autism.

The special master must dismiss as untimely the claim that Chad's autism was caused by vaccines administered in 2003 in light of Chad's medical history, the reliable evidence that speech delay is recognized as an early symptom of autistic disorders, and the binding precedent concerning application of the statute of limitations in Vaccine Act proceedings. The claim that Chad's condition was significantly aggravated by vaccines he received in 2006 is not dismissed at this time.

**II. *FACTUAL AND PROCEDURAL BACKGROUND***

**A. *The Petition***
On March 7, 2008, Chad Emkey, by his parents Frank B. and Mailene Emkey (hereinafter "Petitioners"), filed a Short–Form Autism Petition (hereinafter "Petition") for Vaccine Compensation under the National Childhood Vaccine Injury Act (hereinafter "Vaccine Act" or the "Act") pursuant to Autism General Order # 1, which adopted the Master Autism Petition for Vaccine Compensation. [3] Short–Form Autism Petition for Vaccine Compensation (hereinafter Pet.) at 1. [4] Petitioners alleged that Chad developed autism as a result of vaccinations he received on February 5, 2003, and again on May 25, 2006, including the measles/mumps/rubella (MMR) and polio (IPV) vaccines. Statement Regarding Onset (hereinafter "Statement") at 1; Petitioners' Exhibit 2 (hereinafter "Pet'r Ex.") at 53.

**B. *The Medical Record***
Chad was born on January 24, 2002, at the Franklin Square Hospital Center in Baltimore, Maryland after a full-term pregnancy. Pet'r Ex. 1 at 1. According to the medical records, Chad did not descend normally through the birth canal. Umbilical cord compression and heart decelerations were noted and an urgent Cesarean section was required. *See* Pet'r Ex. 6, part 2 at 240–242 (progress notes from Franklin Square Hospital Center at pages 23–25 of 55 of the filing). Chad required resuscitation at birth. *See* Pet'r Ex. 1 at 14 (progress notes from Franklin Square Hospital Center at page 14 of the filing). He was not breathing, was characterized as "floppy," and "[t]hick meconium" had to be suctioned from

his stomach. Pet'r Ex. 1 at 3 (medical records from Franklin Square Hospital, p. 5 of 56); Pet'r Ex. 1 at 14. [5]

**\*2** His APGAR scores were four at one minute and nine at five minutes. *Id.* at 12. [6] He weighed seven pounds, 15 ounces and measured 21 inches. *Id.* at 3. On January 25, 2002, at one day old, Chad was diagnosed with "O/A incompatibility" with "elevated bili[rubin]" and prescribed phototherapy. Pet'r Ex. 1 at 11. [7] Phototherapy was discontinued the next day. *Id.* at 7. On January 28, 2002, Chad received his first Hepatitis B vaccination and was discharged from the hospital. Pet'r Ex. 2 at 53. At the time of his discharge, Chad was described as jaundiced, with a decreasing bilirubin count.

On March 1, 2002, Chad received his second Hepatitis B (Hep B) vaccination. Pet'r Ex. 2 at 53. On March 25, 2002, Chad received his first diphtheria-tetanus-acellular-pertusis (DTaP) vaccination. *Id.* He received an inactivated polio vaccination (IPV) and a Hemophilus influenza vaccination (Hib) on March 28, 2002. On May 29, 2002, Chad received his second IPV, Hib and DTaP vaccinations. *Id.* He received his third Hep B, Hib and DTaP vaccinations on July 31, 2002. *Id.* Chad received multiple childhood vaccinations during 2003, including his first measles-mumps-rubella vaccination (MMR) and pneumococcal conjugate (PCV) vaccinations. *Id.* After his vaccinations in 2003, Chad did not receive any vaccinations until May 25, 2006, when he received MMR, IPV, Hib and DTaP vaccinations. *Id.*

Chad received routine pediatric medical care from Dr. Don J. Alfonso of Ardent Family Care in Florida. There is a dearth of records concerning Chad's early development until September 29, 2006, when he was diagnosed with an autism spectrum disorder based on a Neurological Assessment at the University of Florida Developmental Pediatric Center in Jacksonville, Florida. Pet'r Ex. 3 at 140. The Neurodevelopmental Assessment (hereinafter "Assessment") by David O. Childers, Jr., M.D., was performed at the request of Chad's parents and Dr. Alfonso, due to concerns about Chad's language deficits. *Id.* at 133.

The Assessment stated that, "Initial concerns regarding Chad's development began at 'the age of 2 years old, he was not talking much.' " *Id.* at 135. Other developmental delays dating back two or more years are recorded in the Assessment, including delayed fine motor skills (using spoon, fork, scribbling, and toileting); "Expressive Language" (babbling, saying mama/dada, reaching for wants, index finger pointing) *id.* at 135; and "Receptive Language" (reciprocal smiling,

waving bye-bye, following gestures, identifying body parts, following two-step commands, localizing his mother, understanding "no," and following ungestured commands). Pet. Ex. 3 at 137. [8] The historical information recorded in the Assessment was based on the report of Chad's mother. Pet'r Ex. 3 at 140 ("This diagnosis is based on both the developmental history provided by Mrs. Emkey and the neurodevelopmental assessment of Chad which were consistent with each other.")

**\*3** On June 5, 2007, Chad was evaluated at Florida Hospital "for concerns over speech and language development." Pet'r Ex. 3 at 130. That evaluation noted that Chad's father reported: "Chad was not one of those children who developed language and then appeared to 'lose it' ... Chad has historically been slow to speak." *Id.*

Chad's father, in an Affidavit (hereinafter "Affidavit") submitted August 5, 2008, stated that Chad developed "at what appeared to be a normal rate up through his second birthday," and had no developmental delays at that time. Pet'r Ex. 12 at 1, ¶ 4 (Emkey Aff.). The Affidavit is silent as to Chad's development between his second and fourth years, but states that Mr. Emkey noticed a marked change in Chad's development after his immunizations in May 2006 (when he was age four and one-half years old) "with delays and an actual digression [*sic* ] in his acquired language." *Id.,* ¶ 5. [9]

### C. *Proceedings Regarding Timeliness of the Petition*
On March 20, 2008, the special master then assigned ordered Petitioners to file the medical records required by 42 U.S.C. § 300aa–11(c)(2). Order, March 20, 2008. Petitioners also were notified of the potential applicability of the statute of limitations and that the Office of Special Masters (OSM) has no authority to compensate a case unless it is timely filed. *Id.* The special master instructed Petitioners to provide sufficient evidence, through medical records or the statement of a doctor, "to establish the 'first symptom of onset' that is 'objectively recognizable as a sign of a vaccine injury by the medical profession at large,' in order to demonstrate that Petitioners filed the instant case within 36 months following that 'first symptom or manifestation of onset.' " *Id.* (*citing and quoting Markovich v. Sec'y of Dep't of Health and Human Services,* 477 F.3d 1353, 1360 (Fed.Cir.2007)). Petitioners also were required to file, with Chad's medical records, a statement "clearly" stating when, in Petitioners' view, the first symptom or manifestation of onset or of the significant aggravation of Chad's injury occurred. *Id.*

In their Statement, Petitioners contended that the onset of Chad's symptoms did not occur "until the 2006 time frame," after Chad received his final set of vaccinations, when "the family noticed significant differences in Chad's behavior as compared to that of" other children. Statement at 2. In support of this Statement, Petitioners referred to the DSM–IV criteria for diagnosis of autism. Statement at 2; *see also,* Pet'r Ex. 7 at 1–2. Petitioners also asserted, as an alternative ground for awarding compensation, that the medical record "warrants at least a finding of aggravation of Chad's condition." *Id.* at 3. In support of this contention, Petitioners stated that his condition was aggravated by the administration of vaccines containing mercury "over the course of his young life, and even in May, 2006," because he suffers, according to the Statement, from a toxic accumulation of mercury and other heavy metals in his system. *Id.* at 3; *see also* Pet'r Ex. 5 (analysis of urinary porphyrins). [10]

**\*4**  On September 2, 2008, Respondent filed a Motion to Dismiss (hereinafter "Respondent's Motion") alleging that the Petition was filed outside the statutorily prescribed limitations period. Respondent's Motion to Dismiss (Resp't Mot.) at 1. The Secretary asserted that the first symptom or manifestation of onset of Chad's alleged vaccine-related injury occurred no later than June 2003, when he was approximately 18 months old. Resp't Mot. at 3, 5 note 1. The date of June 2003 was based on a letter, dated April 14, 2008, written by Chad's pediatrician, Dr. Alfonso, to United Healthcare Children's Foundation, in which Dr. Alfonso sought assistance for Chad from the Foundation. Dr. Alfonso stated, "This letter is written in behalf of Chad Emkey who was diagnosed with autism spectrum disorder since an early age of 18 months old." *See* Pet. Ex. 3 at 32. Based on this letter, the instant Petition would have been filed more than five years after Chad's diagnosis. [11]  The Secretary, in the motion to dismiss, also relied on treating physician records from 2006, *see supra,* which described Chad as historically " ' slow to speak,' " and noted that, according to his parents, "[i]nitial concerns regarding Chad's development began at 'the age of two years old, he was not talking much.' " *Id.* at 3–4. Piecing together the chronology from the treatment records, the Secretary argued that the first symptom of Chad's autism was apparent no later than 2004, when Chad was two years old, and that the Petition, filed March 7, 2008, therefore was untimely. *Id.* at 5, note 1. With regard to the claim of aggravation, the Secretary maintained that there was no medical evidence linking a marked deterioration in Chad's condition after May 25, 2006, to the vaccinations he received on that date. *Id.* at 6.

Petitioners filed a Response (hereinafter "Response") on October 22, 2008. Petitioners argued that Chad's vaccine injury was not manifested until his autism was diagnosed on September 29, 2006, and that, up until the date of his last round of vaccinations on May 25, 2006, there was no evidence of "even any concern that could be categorized as a 'symptom' of autism." Response at 3–4. Petitioners discounted the evidence of Chad's speech delay documented in the Assessment by his neurodevelopmental pediatrician, arguing that it was irrelevant absent additional symptoms sufficient to support a diagnosis of autism under the criteria set forth in the DSM–IV at 299.00. *Id.* at 4–6; *see* Pet'r Ex. 7.

On February 9, 2009, the Secretary filed a Reply to the Petitioners' Response (hereinafter "Reply"), asserting that the records of Dr. Childers, the neurodevelopmental pediatrician who examined Chad in 2006, indicated that Chad's parents were concerned about his language problems in 2004, and that he was noticeably delayed in meeting other developmental milestones. Reply at 3–4. The Secretary reiterated that under existing precedent a first symptom of a disorder triggers the statute of limitations even if it is not recognized at the time as symptomatic of a vaccine-related injury. *Id.* at 5. With regard to the claim that Chad's autism was aggravated by the vaccinations he received on May 25, 2006, the Secretary again asserted that there was no medical evidence that Chad suffered a substantial deterioration in health following those vaccinations. *Id.* at 6. According to the Secretary, "there is no reasonable basis to support petitioners' claim of significant aggravation." *Id.* at 2, 6.

**\*5**  On February 13, 2009, Petitioners filed a Surreply to Respondent's Reply (hereinafter "Surreply") asserting that the pertinent question is not when the first symptom of Chad's autism occurred, but when the first event occurred that is objectively recognizable by the medical profession at large as a sign of a vaccine injury. Surreply at 2, *citing Markovich.* Regarding the aggravation claim, the Petitioners stated that there "is no timeliness issue" because petitioners' allegations must be accepted at this stage of the proceedings, and they must be afforded the right to provide evidentiary support for their claims at a later date. Surreply at 3, *citing Jones v. Sec'y of Dep't of Health and Human Services,* 2008 WL 2156746 \*9 (Fed.Cl. April 30, 2008).

On July 8, 2009, the undersigned special master issued an Order directing the parties, if they so chose, to file any additional evidence regarding the timeliness issue

on or before Thursday, August 13, 2009.[12] Respondent filed additional evidence on August 3, 2009, consisting of medical literature and expert testimony admitted in the OAP. Petitioner did not file any additional evidence and did not seek an extension of time in which to do so.

On September 3, 2009, the special master issued an Order to Show Cause requiring an explanation as to why a decision dismissing the Petition should not be entered. Order, September 3, 2009. Petitioners filed their response one day later. Petitioners' Response To Order To Show Cause filed September 4, 2009 ("Show Cause Response").

In the Show Cause Response, Petitioners asserted that the special master should "rely heavily on the treating physician," specifically on Dr. Alfonso's letter dated October 20, 2008, which stated, "I have nothing in my records or within my knowledge that would support a finding that Chad had autism spectrum disorder at the age of 18 months." Show Cause Response at 1–2. The Petitioners did not mention the contradictory letter by Dr. Alfonso to United Healthcare Children's Foundation, dated April 14, 2008, in which the doctor stated he was writing on "behalf of Chad Emkey who was diagnosed with autism spectrum disorder since an early age of 18 months old." Pet'r Ex. 3 at 86.

Petitioners declared: "at no time was there any documentation of any concerns or issues that can be used to start the running of the statute of limitations." Show Cause Response at 2. Petitioners did not account for the Assessment by Chad's treating physician, Dr. Childers, dated June 5, 2007, which recorded Chad's history of delayed speech and other developmental delays, or the documentation concerning speech delay by the professionals at Florida Hospital. *See e.g.* Pet'r Ex. 3 at 130, 135, 140.

Finally, Petitioners contended that, even if their claim that his vaccinations caused the onset of Chad's autism was filed out of time, they still had a viable claim in the alternative for relief based on significant aggravation of Chad's condition by vaccines he received in May 2006, at age four and one-half. Show Cause Response at 2–4. Petitioners asserted that Rule 8(d) of the Federal Rules of Civil Procedure allows claimants to plead in the alternative.

**D.** *Evidence That Delayed Speech Is Recognized in the Medical Community As An Early Symptom Of Autism*

**\*6** The following materials were submitted by Respondent (hereinafter "Respondent" or the "Secretary") in response to the Order dated July 8, 2009, to prove that language and speech delays are among the first signs of an autism disorder generally recognized in the medical community. Petitioners submitted no such evidence in response to the July 8, 2009 Order. *See infra* at p. 13, and note 16.

1. Rhiannon J. Luyster et al., "Language Assessment and Development in Toddlers with Autism Spectrum Disorders," 38 J. Autism Dev. Disord. 1426 (2008) (Resp't Ex. A at 2):

> Delays and deficits in language acquisition are among the key diagnostic criteria for autism spectrum disorders (American Psychiatric Association 1994), and the absence of first words and phrases is the foremost reason reported by caregivers of children with ASD for their initial concern about their child's development (DeGiacomo and Fombonne 1998; Wetherby et al.2004).

2. Rebecca J. Landa, "Diagnosis of Autism Spectrum Disorders in the First 3 years of life," 4(3) Nature Clinical Practice Neur. 138 (March 2008) (Resp't Ex. B at 3):

> Parental concerns that a child has an ASD can arise as early as the first year of life, but they are most likely to arise when a child who is later diagnosed with an ASD is at a mean age of 18 months. Approximately 80% of parents of children with ASDs notice abnormalities in their child by 24 months of age, which usually involve delays in speech and language development....

3. Testimony of Dr. Eric Fombonne, Resp't Ex. D at 50 (*see Cedillo v. Sec'y of Dep't of Health and Human Services,* No. 98–916V, 2009 WL 811449, (Fed.Cl.Spec.Mstr. Feb. 12, 2009) (Trial Tr. at 1266A, June 18, 2007) C, regarding "abnormalities in language and communication:[13]

[P]articularly as they present young infants, for instance, often there is language delay. There is no babbling. There can be no babbling in a young infant or the babbling can be very limited.

For instance, you could recognize that the amount of babbling is reduced and the quality of the babble is also altered. There would be very little babbling not directed to communicate. It would be self-directed, not used with a communicative intent.

From the same testimony, *id.* at 49 (*see* Cedillo Trial Tr. at 1284):

[O]ne of the first concerns which is often noted by parents is the lack of development of language.

Typically at age 15, 16, 18 months parents become worried because their child is not talking yet, and they can see that other children have started to develop words, many words by then.

4. Testimony of Dr. Max Wiznitzer, Resp't Ex. E at 49 (see *Cedillo,* Trial Tr. at 1619A), No. 98–916V, at, describing a "typical timeline" for the progression of children with autism:

This is a pattern that children may follow where in the second year of life the children really don't have well developed imitation. They don't have good language. There's a problem with socialization.

**\*7** Resp't Ex. E at 55 (*Cedillo,* Trial Tr. at 1642):

[W]hen we are looking at communicative ability, we look at— not only do we look at what sounds they are making, whether they are making vowel sounds when they are young in infancy, whether they are babbling when they are in the later portion of infancy, and whether they are using words when they are in the second year of life, but also what they are doing with it and how much they are doing with it.

Resp't Ex. E at 56 (*Cedillo,* Trial Tr. at 1643):

If I have a child who does vocalize, but the vocalization that is present is minimal, it's not as much as I would expect, in other words, the quantity is not as much as I would expect, that's something that raises questions in my mind about what's going on.

Resp't Ex. E at 57 (*Cedillo,* Trial Tr. at 1644):

[R]ealizing that these early features may not be as flagrant as the autistic features that we will see at age 2 or 3 years, but they will be different than what we would normally expect for the behavior of an infant or a young child in the second year of life....

5. Testimony of Sir Michael L. Rutter, M.D. (hereinafter "Dr. Rutter"): Resp't Ex. E at 25 (*see King v. Sec'y of Dep't of Health and Human Services,* No 03–583V) (Tr. 3259):

a child's parents typically begin recognizing developmental problems in a child who turns out to be autistic at around 18 to 24 months.

Resp't Ex. E at 26 (*see King v. Sec'y of Dep't of Health and Human Services,* No 03–583V) (Tr. 3260):

"The communication problems and the lack of social reciprocity are often the first things to be picked up ... They are picking up the social and communicative abnormalities as a rule.

The special master also notes the following article, which has been entered into the record:

6. Chris Plauche Johnson, "Recognition of Autism Before Age Years," Pediatrics in Review (2008) at 89 (Court Ex. 1002 at 4):

"Historically, delays and deviances in language development have been the most common presenting signs in children later diagnosed with autism." [14]

## III. DISCUSSION

### A. The Claim That Chad's Autism Was Originally Caused by Vaccines Is Untimely.

#### 1. Applicable Law Regarding the Statute of Limitations

In pertinent part, Section 300aa–16(a)(2) of the Vaccine Act states: [i]n the case of ...

> (2) a vaccine set forth in the Vaccine Injury Table which is administered after October 1, 1988, if a vaccine-related injury occurred as a result of the administration of such vaccine, no petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury.

The statute of limitations under the Vaccine Act must be "strictly and narrowly construed" because it is a condition of the waiver of the government's sovereign immunity. Markovich, 477 F.3d at 1360 (quoting Brice v. Sec'y of Dep't of Health and Human Services, 240 F.3d 1367, 1370 (Fed.Cir.2001) ( "Brice I" )). Under the Act, the statute of limitations may be triggered by a "first symptom" or "manifestation of onset." A symptom "may be indicative of a variety of conditions or ailments, and it may be difficult for lay persons to appreciate the medical significance of a symptom with regard to a particular injury." Markovich at 1357. "[A]ny observable 'symptom or manifestation' may be the first evidence of injury." Markovich at 1358 (quoting Shalala v. Whitecotton, 514 U.S. 268, 274, 115 S.Ct. 1477, 131 L.Ed.2d 374 (1995)) (emphasis in original). As the court stated in Markovich at 1359 (citing Brice v. Sec'y of Dep't of Health and Human Services, 36 Fed. Cl. 474, 477 (1996)), "Congress intended the limitations period to commence to run prior to the time a petitioner has actual knowledge that the vaccine recipient suffered from an injury that could result in a viable cause of action under the Vaccine Act."[15]

**\*8** These binding authorities establish that diagnosis of a disorder allegedly caused by a vaccine is not required to trigger the statute of limitations. See Cloer v. Sec'y of Dep't of Health and Human Services, 85 Fed. Cl. 141, 144–45 (2008),

appeal docketed, No.2009–5052 (Fed.Cir. Mar. 9, 2009); Lemire v. Sec'y of Dep't of Health and Human Services, No. 01–0647V, 2008 WL 2490654 (Fed. Cl. Spec. Mstr. June 3, 2008) (holding that recognizable signs of autism occurred well before diagnosis. Even where the medical community would not have been able to diagnose the symptoms as manifesting a particular disorder, the statute of limitations commences "on the date the first symptom or manifestation of onset occurs." Cloer, 85 Fed. Cl. at 145. "[T]he limitations period begins to run at the first occurrence of a symptom even though an exact diagnosis may be impossible until some future date when more symptoms or medical data are forthcoming." Cloer, 85 Fed. Cl. at 149 (citing Markovich, 477 F.3d at 1358–59). Further, to trigger the statute of limitations, a symptom or manifestation of an injury need not be accepted by the medical profession at large as an injury linked to a vaccine; it need only be identifiable as a symptom or manifestation of an injury. See Bono ex rel. Bono v. Sec'y of Dep't of Health and Human Services, 87 Fed. Cl. 98, 102–03 (2009). Cf. Surreply at 2.

#### 2. Application of the Law to This Case

Based on clear precedent, resolution of the timeliness issue requires only the application of established law to the facts in the record. There appears to be no genuine issue of fact regarding recognition by the medical community of speech delay as an early symptom of autism, and no genuine issue of fact as to the content (as opposed to the legal interpretation) of the medical record.

Respondent's submissions of expert evidence focused appropriately on the early symptoms of autistic disorders that are recognized by the medical community. The evidence in the medical literature identified speech delay as one of the first symptoms of autistic disorders. See, e.g., Resp't Ex. A at 2 ("the absence of first words and phrases is the foremost reason reported by caregivers of children with ASD for their initial concern about their child's development"); Resp't Ex. B at 3 ("Approximately 80% of parents of children with ASDs notice abnormalities in their child by 24 months of age, which usually involve delays in speech and language development...."); Court Ex. 2 at 4 (Johnson) ("Historically, delays and deviances in language development have been the most common presenting signs in children later diagnosed with autism.")

The expert testimony from the OAP similarly demonstrated that the medical community recognizes language delay as a common early symptom of autism. Dr. Eric Fombonne

testified that children who are later diagnosed as autistic present as "young infants" with language delay. Resp't Ex. D at 50 ("There is no babbling. There can be no babbling in a young infant or the babbling can be very limited.") Dr. Fombonne testified further that speech delays "typically" concern parents of autistic children at age "15, 16, 18 months." *Id.* ("They can see that other children have started to develop words, many words by then.") Dr. Max Wiznitzer echoed the testimony that children who turn out to have autism follow a pattern such that, "in the second year of life," they "don't have good language." Resp't Ex. E at 49. Dr. Wiznitzer's testimony took account of the normal variation in child development but made it clear that, notwithstanding the acknowledged variation, children later diagnosed as autistic typically exhibit impairment of language skills as "an infant or a young child in the second year of life...." *Id.* at 57. Dr. Rutter similarly opined that "a child's parents typically begin recognizing developmental problems in a child who turns out to be autistic at around 18 to 24 months, when "communication problems and the lack of social reciprocity" are "the first things to be picked up." Resp't Ex. E at 25–26.

**\*9** A special master may draw conclusions from medical evidence even if medical experts have not commented on it during the particular Vaccine Program proceeding. *Cf. Moberly v. Sec'y of Dep't of Health and Human Services,* 85 Fed. Cl. 571, 597–98 (2009), *appeal docketed,* No.2009–5057 (Fed.Cir. Mar. 17, 2009) ("Court has no trouble concluding that a special master may interpret and apply the conclusions of a medical study introduced into the record by a party, without the guidance of expert witnesses"). This record contains reliable medical evidence that speech delay, in particular, is an "event objectively recognizable as a sign" of an autism spectrum disorder "by the medical profession at large." *Markovich,* 477 F.3d at 1360. No evidence has been submitted to the contrary.

The special master has examined Chad's records with a view to finding objective evidence of the early symptoms of autism recognized in the medical community. The record is sufficient to persuade the special master that Chad exhibited early symptoms of autism long before age four and one-half. The delays in Chad's motor development and language, as well as the documented reports of Chad's infant behavior, *see supra* at p. 4, are recognized as early symptoms of autism in children who are later diagnosed, according to the experts in the field.

Most prominently, the medical record reveals that Chad's speech was delayed and that the delay was observed by his parents at about the age of two. Pet'r Ex. 3 at 135. The speech delay (as well as other significant developmental deviations) was reported to Chad's medical providers, in particular, the neurodevelopmental pediatrician who ultimately diagnosed his autism, under circumstances that support the reliability of the Emkeys' report. *Id.; see also Curcuras v. Sec'y of Dep't of Health and Human Services,* 993 F.2d 1525, 1528 (Fed.Cir.1993) (noting trustworthiness of medical records created with "proper treatment hanging in the balance."). On this record, the statute of limitations commenced to run, at the latest, on January 24, 2004, when Chad reached the age of two. The claim for relief based on the allegation that Chad's autism was originally caused by his vaccines, filed on March 7, 2008, therefore is out of time.

**B.** *Petitioners Have Not Met Their Burden to Establish That The Claim of Original Causation Was Timely Filed.*

**1.** *Petitioners' Burden To Establish Jurisdiction*
In their Show Cause Response, Petitioners argued that the special master must accept their allegations as true and construe the facts in the light most favorable to them, citing Rule 12 of the Rules of the Court of Federal Claims. *See* Show Cause Response at 2, 4. This view of the evidentiary burden is erroneous.

The statute of limitations under the Act is jurisdictional. *See, e.g., Brice v. Sec'y of Dep't of Health and Human Services,* 358 F.3d 865, 868 (Fed.Cir.2004) ("*Brice II* "); *Kay v. Sec'y of Dep't of Health and Human Services,* 80 Fed. Cl. 601, 603–04 (2008), *aff'd per curiam,* 298 F. App'x 985 (Fed.Cir.2008) (unpublished). *See generally, John R. Sand & Gravel v. U.S.,* 552 U.S. 130, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008), 128 S.Ct. 750,753 (2008) (distinguishing between the treatment of typical limitations defenses and jurisdictional statutes of limitations). As a result, the burden is on Petitioners to establish that their claim is timely. Initially, the party asserting jurisdiction must make a *prima facie* showing of jurisdictional facts to defeat the motion to dismiss. *See, e.g., Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988) and cases cited therein (under Tucker Act, plaintiff bears burden of establishing waiver of sovereign immunity). Where there is "a factual attack on jurisdiction, however, the court 'is obliged to look beyond the pleadings and decide for itself those facts, even if in dispute, which are necessary for a determination of [the] jurisdictional merits.' " *Raymark Industries, Inc. v. U.S.,* 15 Cl.Ct. 334, 335 (1988); *see also Figueroa v. U.S.,* 57 Fed. Cl. 488, 492 (2003) ("If, however, the motion challenges the truth of the jurisdictional

facts alleged in the complaint, the court may consider relevant evidence in order to resolve the factual dispute.") (*citing Rocovich v. U.S.,* 933 F.2d 991 (Fed.Cir.1991).

**\*10** In its Motion to Dismiss, Respondent challenged the factual basis for the Petitioners' assertion of jurisdiction, pointing to evidence in the record indicating that the first symptoms of Chad's autistic disorder preceded the filing of Petitioners' claim by more than 36 months. The standards applicable to a motion to dismiss based solely on the pleadings, therefore, no longer applies. Instead, the special master must look beyond the pleadings to determine the facts necessary to establish whether the Petition is timely. *See Rocovich,* 933 F.2d at 993–94 ("In determining whether a motion to dismiss should be granted, the Claims Court may find it necessary to inquire into jurisdictional facts that are disputed."). In addition, where the movant makes a factual showing challenging the timeliness of a claim, the burden of going forward with the evidence shifts back to the party seeking to establish jurisdiction to show that the claim is within the applicable limitations period. The burden of proof, "i.e., the burden of ultimate persuasion," never shifts. *Cf., e.g., Grapevine Imports, Ltd., et al., v. U.S.,* 71 Fed Cl. 324, 343 (2006) (describing shifting burden of production under a non-jurisdictional statute of limitations). The result is that Petitioners may not rest on their *prima facie* allegations but must respond with persuasive evidence to counter Respondent's showing that Chad exhibited the first symptoms of autism more than 36 months before the Petition was filed.

To prevail, moreover, Petitioners must establish jurisdiction by a preponderance of the evidence. When a decision on jurisdiction requires consideration of facts beyond those alleged in the pleadings, the "appropriate quantum of the burden that the plaintiff [i.e., the non-moving party] must clear" in order to resist a motion to dismiss "will rest upon such factors as the nature of the proceeding and the type of evidence that the plaintiff is permitted to present." *Raymark,* 15 Cl.Ct. at 337 (citations omitted). "[T]he limits imposed by the trial judge upon pretrial proceedings will dictate the burden the plaintiff is required to meet." *Id.* Where proceedings are limited to written materials, the plaintiff's written materials "must make only a prima facie showing of jurisdictional facts." *Id.* at 338. Where proceedings are not so limited and the court accepts evidence in order to resolve contested factual issues, the plaintiff must then be put to its full burden of proof. *Id.* In that circumstance, "plaintiff must establish the jurisdictional facts by a preponderance of the

evidence, just as [it] would have to do at trial." *Id. See Data Disc, Inc. v. Systems Tech. Ass'n, Inc.,* 557 F.2d 1280, 1285 (9th Cir.1977).

Petitioners' contention that they need to make only a *prima facie* showing to establish jurisdiction is incorrect in the context of this proceeding, in which both sides have submitted evidence well beyond the pleadings. *See* Show Cause Response at 4–5. A full evidentiary hearing has not been held, but there has been no request for such a hearing. Petitioners did not avail themselves of the multiple opportunities to present additional evidence on the timeliness issue. *See e.g.,* Order, Jan. 7, 2009; Order, July 8, 2009; Order to Show Cause, Sept. 3, 2009. Contrary to Petitioners' contention that the special master must accept all of their allegations as true, in these circumstances Petitioners fairly are held to the burden of demonstrating that jurisdiction exists by a preponderance of the evidence.

## 2. *Petitioners' evidence and arguments are not persuasive.*

### a. *Dr. Alfonso's letters*

**\*11** In the Show Cause Response, Petitioners asserted that their claim that Chad's autism was originally caused by his vaccines was timely filed, based largely upon a statement in the October 20, 2008 letter from Dr. Alfonso. *See supra* at note 11. The special master does not rely on Dr. Alfonso's statement for several reasons.

- Dr. Alfonso's letters contradict each other; one of his letters says Chad was diagnosed with autism at 18 months, the other says he did not have an autism spectrum disorder at 18 months. *Compare* Pet'r Ex.3 at 86 *with* Pet'r Ex. 13. Given this conflict, the special master is not comfortable placing reliance on the statements in either letter.

- Dr. Alfonso's letters concerned the date of Chad's *diagnosis,* which is not necessarily the operative date for determining the onset of the limitations period, as discussed herein. In the context of the statue of limitations, we focus on the symptoms Chad exhibited, not on whether he had "autism spectrum disorder at 18 months." *See* Pet'r Ex. 3 at 86. If Dr. Alfonso were to testify, consistent with Petitioners' arguments and the letters, that Chad was not *diagnosed* with autism at an early age, that testimony would be irrelevant under binding precedent. *See Markovich.*

• To the extent that Dr. Alfonso's second letter could be interpreted as an opinion that Chad never exhibited early symptoms of autism, that information would conflict with the evidence in the treatment records of the experts on pediatric neurodevelopment who noted that Chad's father reported his speech delay at age two. Dr. Alfonso's "opinion" would not outweigh factual information in the records of Chad's other treating physicians.

• The reported absence of information in Dr. Alfonso's possession concerning Chad's autism, *see* Pet'r Ex. 13 ("I have nothing in my records or within my knowledge that would support a finding that Chad had autism spectrum disorder at the age of 18 months."), is less probative than the presence of such records in Dr. Childers' possession (records that Dr. Alfonso specifically references as being in his own records as well, *see* Pet'r Ex. 13), and in the records of other treating professionals. *See* Pet'r Ex. 3 at 140 (Florida Hospital records noting Chad's father's report of "historically" slow speech). "Since medical records typically record only a fraction of all that occurs, the fact that reference to an event is omitted from the medical records may not be very significant." *Murphy v. Sec'y of Dep't of Health and Human Services,* 23 Cl.Ct. 726, 733 (1991), *aff'd per curiam,* 968 F.2d 1226 (Fed.Cir.1992) (unpublished) (*citing and quoting Clark v. Sec'y of Dep't of Health and Human Services,* No. 90–45V, slip op. at 3, 1991 WL 57051 (Cl.Ct.Spec.Mstr. March 28, 1991).

• Dr. Alfonso's second letter plainly was prepared for the purpose of this litigation, unlike the letter it purportedly corrected, which apparently was authored by Dr. Alfonso to assist Chad in obtaining financial support. *See* Pet'r Ex. 13. Specifically, the second letter was prepared only after Respondent, based in part on Dr. Alfonso's first letter, moved to dismiss on limitations grounds. Neither letter was created in the normal course of Chad's treatment, thus neither bears the indicia of enhanced reliability customarily pertaining to the records of a treating physician. *See Curcuras,* 993 F.2d at 1528 (noting trustworthiness of medical records created with "proper treatment hanging in the balance.")

**\*12** • Unlike *Andreu v. Sec'y of Dep't of Health and Human Services,* 569 F.3d 1367 (Fed.Cir.2009), this is not a case in which a treating physician's opinion is offered to establish whether a vaccine caused an injury. Dr. Alfonso's statements relate not to medical opinion

rendered in the absence of definitive factual information, but to historical facts that can be established based on the medical records. Dr. Alfonso's letters present no factual evidence that contradicts the evidence in the records of Chad's other treating physicians that Chad exhibited symptoms of autism by the age of two.

• Even if Dr. Alfonso were to testify in this context, the relevant questions would be (1) what are the early symptoms of autism recognized in the medical community at large; and (2) when did Chad first exhibit those symptoms? On the first question, Dr. Alfonso might agree with the many authorities who are on record stating that speech delay is one of the earliest symptoms, or he might disagree. If he disagreed, his testimony would not overcome the great weight of the evidence cited herein from recognized experts on autism. On the second question, as explained above, whether Dr. Alfonso testified as to a lack of knowledge of Chad's symptoms, or offered an opinion that Chad had no such symptoms, his testimony would not outweigh the clear record evidence of Chad's speech delay. [16]

**b.** *Chad's Pre-school evaluation*

Under the teaching of *Curcuras,* it is significant that the history of Chad's speech delay was reported to Dr. Childers and others whose assistance Petitioners specifically sought because of their expertise in childhood developmental disorders. Petitioners, in contrast, relied on a standard, pre-school evaluation form completed when Chad was age three and one-half. Show Cause Response at 7–8. That form, filled in by a nurse practitioner, noted that Chad had no physical infirmities that would preclude participation "in school activities including physical education." Pet'r Ex. 3 at 75. The form did not address the developmental problems noted elsewhere in Chad's medical records, on which the special master relies. [17]

**c.** *Court's exhibits on early symptoms of autism*

Petitioners responded specifically to one exhibit of the many that were offered to establish that speech delay is an early symptom of autism. Show Cause Response at 5–6; *see* Court Ex. 1002: Chris Plauche Johnson, M.D., "Recognition of Autism Before Age 2 Years," 28(3) Pediatrics in Review (2008). This exhibit, an article on the recognition of autism, stated: "Absent or delayed speech has been the most common presenting sign in children who have autism." Court Ex. 1002 at 1. (Johnson article 86). The article recommended that

children with delayed speech should be referred to a speech and language pathologist "to evaluate both expressive and receptive language." *Id.* If the child's receptive language is normal, a 'wait and see' approach may be appropriate...." *Id.* "If hearing is normal but receptive language is delayed, the [primary care physician] must consider the possibility of autism...." *Id.*

**\*13** From the quoted passage, Petitioners derived the message that "receptive" language delay is the type of language delay that must be found for a physician to suspect autism. Show Cause Response at 6–7. They asserted that Chad exhibited "no evidence whatsoever" of "receptive" language delay. *Id.* at 7. Petitioners apparently discounted the evidence in the Assessment by Dr. Childers, which indicated that Chad's receptive language skills were significantly delayed. Pet'r Ex. 3 at 137. Under "Receptive Language History," the Assessment records that Chad was late to engage in reciprocal smiling, wave bye-bye, follow gestures, indicate one body part, follow two-step commands, localize his mother, understand "no," follow ungestured commands, and indicate multiple body parts. *Id.* In addition to this oversight, Petitioners missed the significance of the expert's opinion. The Johnson article recommended that a child with any speech delay, expressive or receptive, should be evaluated, because speech delay may be an early symptom of an autistic disorder. Depending on the nature of the speech problem, autism may or may not be diagnosed at that time, but the child's development should be monitored regardless. *See* Court Ex. 1002 at 1 ("a 'wait and see' approach may be appropriate").

Petitioners also misread expert evidence concerning infant behavior as indicative of future autism. The same article quoted above stated: "Some infants later diagnosed with autism are unusually quiet and make few vocalizations." Court Ex. 1002 at 5; *see also* Court Ex. 1001 at 4. Petitioner did not offer any evidence to dispute this statement. Petitioners asserted instead that the paragraph in which the statement appears "says nothing other than that all children are different." Show Cause Response at 6. This is not a fair characterization of the quoted passage. The exhibit pertinently identified a number of speech and behavior patterns exhibited even in infancy that are characteristic of children who are later diagnosed with autism. *Id.* at 5. *See* Court Ex. 1002 at 5.

To be certain, every good baby is not destined to develop autism. Infants who make atypical vocalizations may not be

autistic, and the same holds true for inconsolable infants who cry for extended periods of time. *See* Court Ex. 1002 at 5. But the medical community recognizes these behaviors as characteristic of many young children who later are diagnosed with autism. These are therefore the types of behaviors that are useful in deciding when the statute of limitations begins to run.

The underlying flaw in Petitioners' arguments is the apparent misinterpretation of the Federal Circuit's instruction on how to apply the statute of limitations. Petitioners adopt the position that there must be enough evidence in the medical record to make a diagnosis of autism before the statute of limitations can commence. That is not the proper focus of the inquiry. Consistent with the Federal Circuit's decisions concerning onset of a injury in the statute of limitations context, we do not look solely at an initial symptom to determine if, at the time the symptom occurred, a doctor would have diagnosed autism. Instead, we look back from the date of diagnosis to determine when, as a historical matter, a symptom of the injury that we know will eventually be diagnosed as autism first appeared. Then we determine whether the petition was filed within 36 months after the appearance of that first symptom. The statute of limitations begins to run from the date the first symptom or manifestation of autism appeared that would be recognized by the medical community at large. *Markovich,* 477 F.3d at 1359, 1360 ("Congress intended the limitations period to commence to run prior to the time a petitioner has actual knowledge that the vaccine recipient suffered from an injury that could result in a viable cause of action under the Vaccine Act.")

## C. *The Significant Aggravation Claim*

**\*14** The Act defines significant aggravation as "any change for the worse in a preexisting condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health." 42 U.S.C. § 300aa–33(4); *see Shalala,* 514 U.S. at 272. Under *Whitecotton,* unless Chad had a "preexisting condition," Petitioners cannot establish a significant aggravation of his condition under the Act.

Petitioners maintained that Chad had no developmental disorder (much less an autism spectrum disorder) before May 2006 when he was re-vaccinated, or "even any concern" of such a disorder, *see* Response at 3–4. If the Petitioners' factual contentions concerning Chad's condition are true, the vaccinations in May 2006 cannot as a matter of law have resulted in significant aggravation of his disorder, because there would have been no "preexisting condition" to be

aggravated. Either Chad had a disorder before he was re-vaccinated in May 2006, or he had no disorder before May 2006, in which case there was no condition to be aggravated.

To overcome this obstacle, Petitioners cited Rule 8(d) of the Federal Rules of Civil Procedure, which permits a party to "set out" alternative claims or defenses, "regardless of consistency." [18] Petitioners' analysis is insufficient to save the significant aggravation claim.

Rule 8 of the Federal Rules of Civil Procedure (hereinafter "FRCP Rule 8") eliminated the doctrine of election of remedies, establishing that litigants may plead alternative and even inconsistent claims. *See, e.g., American Int'l Adjustment Co. v. Galvin,* 86 F.3d 1455, 1460 (7th Cir.1996); *Kwan v. Schlein,* 246 F.R.D. 447, 451 (S.D.N.Y.2007). This principle extends to inconsistent facts as well as legal theories. Under FRCP Rule 8, consequently, "a factual allegation in one claim should not be construed as an admission against another alternative or inconsistent claim." *In re McCann,* 318 B.R. 276, 288 (S.D.N.Y.2004) (citations omitted).

The rationale for the liberal pleading provisions of FRCP Rule 8 is that, prior to discovery in federal court case, a litigant may not know the facts that will entitle him or her to relief at the end of the day.

> [I]n the early stages of litigation, a plaintiff is permitted both to rely on alternative theories of recovery and to incorporate inconsistent facts in separate counts ... It is often not until discovery that a plaintiff is able to determine which of his claims is sustainable, or if additional facts exist which will allow him to pursue multiple claims without contradiction.

*Tibor Machine Products, Inc. v. Freudenberg–Nok General Partnership,* 967 F.Supp. 1006, 1013 (N.D.Ill.1997). *Accord, e.g., McCann,* 318 B.R. at 289 (Rule 8 allows inconsistent positions in the pleadings " '[e]specially at the early stages of litigation.' ") (*citing and quoting Molsbergen v. United States,* 757 F.2d 1016, 1019 (9th Cir.1985).

**\*15** Alternative pleading, however, still must conform to the requirements of FRCP Rule 11. *Kwan,* 246 F.R.D. at 451.[19] "As for the abolition of election of remedies, a pleader may assert contradictory statements of fact only when

legitimately in doubt about the facts in question." *American Int'l,* 86 F.3d at 1461 (citing FRCP Rule 11); *Great Lakes Higher Education Corp. v. Austin Bank of Chicago,* 837 F.Supp. 892, 894 (N.D.Ill.1993) ("[A] pleader may only assert contradictory statements of fact when the pleader legitimately is in doubt about the fact in question.") (*citing* FRCP Rule 11). A party is not free to plead any and all facts that might entitle it to relief simply because inconsistency of factual allegations is permissible under Rule 8. A party

> 'should not set forth inconsistent, or alternative ... pleadings unless, after a reasonable inquiry, the pleader legitimately is in doubt about the factual background or legal theories supporting the claims or defenses....'

*Kwan,* 246 F.R.D. at 451–52, citing and quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1285 (3d ed.2004). *Accord, e.g., Ohio Midland, Inc. v. Proctor,* No. C2–05–1097, 2006 WL 3793311 at \*4 (S.D.Ohio Nov.28, 2006) ("Plaintiffs may not, under Rule 11 limitations, assert contradictory statements of fact unless Plaintiffs are legitimately in doubt about the facts in question.") (*citing American Int'l* ); *Swormstedt v. Santa Maria Valley RR,* 3, No. CV–04–0372 DSF (SHx), 2004 WL 5458405 at \* (C.D.Cal. April 13, 2004) ("a pleader may only assert contradictory statements of fact when the pleader legitimately is in doubt about the facts in question").

Consistent with the reasoning that a party should not be forced to adopt one or another set of inconsistent facts before the party knows what the facts may show, the liberal rules regarding pleading in a federal court apply at the outset of the litigation, before discovery has taken place. A litigant who already knows the pertinent facts at the outset of the case, on the other hand, has no need for discovery to learn them. Such a litigant should plead only facts that are consistent with what he knows—not facts that are inconsistent with what he knows. *See Ohio Midland, Inc.* 2006 WL at \*4. For example, where the contradictory facts "are uniquely within [the litigant's] knowledge ... it would be illogical to find that he was in doubt as to what happened." *Gardner v. City of Waukegan,* 1999 WL 4100009 (No. 98 C 5372 June 4, 1999 N.D. Ill.) *See also Ohio Midland,* 2006 WL at \*5 (where cause of action alleged depends on the intention of the pleading party, the pleading party "must know the underlying facts relatively well").

Chad's condition was known to Petitioners from the time they filed their claim. Pet'r Ex. 12 at 1; *see also* Pet. If Chad had a developmental disorder before May 2006 (a necessary prerequisite to establishing a claim based on

significant aggravation), then Petitioners knew at the outset of this proceeding that Chad had such a disorder. The record reveals that Petitioners informed Chad's treating physicians and other providers of his early developmental delays. It thus appears that Petitioners could not have been surprised by the facts concerning Chad's speech delays and other developmental issues. The rationale supporting permissive pleading of inconsistent facts in the alternative therefore does not apply here. [20] Dismissal is appropriate when, as appears in this instance, inconsistent factual allegations were made not because of uncertainty concerning the facts, but to avoid the legal effect of facts that were known from the beginning. [21]

**\*16** The jurisdictional nature of the statute of limitations under the Vaccine Act heightens the concern that "alternative" pleading in this instance may be impermissible. Allowing circumvention of the statute of limitations would expand the government's waiver of sovereign immunity, in violation of well-established law. *See John R. Sand & Gravel Co.,* 552 U.S. at 753, 128 S.Ct. at 753 (*citing United States v. Dalm,* 494 U.S. 596, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990)); *Brice,* 240 F.3d at 1370 ("courts should be careful not to interpret [a waiver] in a manner that would extend the waiver beyond that which Congress intended."); *Markovich,* 477 F.3d at 1360 (*citing and quoting Brice* ). The limits upon federal jurisdiction "must be neither disregarded nor evaded." *RHI Holdings, Inc. v. United States,* 142 F.3d 1459, 1461 (Fed.Cir.1998) (*citing and quoting Owen Equip. & Erection Co., v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978)).

Based on the authorities set forth above, the claim of significant aggravation in this case, raised solely as an alternative ground for entitlement without evidentiary support, could be summarily dismissed on jurisdictional grounds. Notwithstanding, the claim of significant aggravation is not dismissed at this time because it could have been presented differently, and a different presentation would have avoided the problems raised by pleading inconsistent facts. Petitioners could have maintained that they observed Chad's developmental delays but did not associate them with autism and still do not believe that they represented the early symptoms of Chad's autistic disorder. If the special master found, to the contrary, that Chad's symptoms were recognizable by the medical community as early signs of an autistic disorder, Petitioners could have claimed entitlement to relief under the significant aggravation cause of action.

Presentation along those lines would have resulted in no factual or legal inconsistency. The claim that Chad's autism was originally caused by his vaccines would have been dismissed as untimely filed but the significant aggravation claim would have been preserved. We are reluctant to dismiss a claim under the Vaccine Program in these circumstances, without offering Petitioner a full and fair opportunity to submit evidence and argument in support of the significant aggravation claim. Allowing the significant aggravation claim to proceed at this time does not impermissibly expand the government's limited waiver of sovereign immunity under the Vaccine Act because the claim could have been presented properly, as described above.

Respondent has repeatedly argued that the significant aggravation claim should be dismissed because Petitioners have offered no evidence to substantiate that claim. The special master will defer consideration of Respondent's motion in order to afford Petitioners additional time in which to submit evidence supporting their claim to entitlement under the significant aggravation provision of the Act. Absent proof of such entitlement, the significant aggravation claim also will be dismissed.

### IV. *CONCLUSION*

**\*17** In an Order dated July 8, 2009, the special master offered the parties the opportunity to submit additional expert evidence on the issues surrounding application of the statute of limitations. Accordingly,

(1) For the reasons stated herein, the undersigned finds that Petitioners have not submitted preponderant evidence to establish the timeliness of their claim that Chad's autism was originally caused by vaccines. Under the rules governing allocation of the burden of proof on timeliness, Petitioners have failed to carry their burdens of production and persuasion. Therefore, Petitioners' claim that Chad's vaccinations caused the onset of his autism is dismissed as untimely; and

(2) Petitioners' claim that Chad's vaccinations significantly aggravated his autism is not dismissed and shall be subject to further proceedings.

**IT IS SO ORDERED.**

## Footnotes

1   As provided by Vaccine Rule 18(b), each party has 14 days within which to request redaction "of any information furnished by that party (1) that is trade secret or commercial or financial information and is privileged or confidential, or (2) that are medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the entire decision will be available to the public. *Id.*

2   Medical records "warrant consideration as trustworthy evidence ." *Curcuras v. Sec'y of Dep't of Health and Human Services,* 993 F.2d 1525, 1528 (Fed.Cir.1993). Moreover, because medical records are contemporaneous documentary evidence, conflicting oral testimony "deserves little weight." *Id.* (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

3   The National Vaccine Injury Compensation Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub.L. No. 99–660, 100 Stat. 3755, codified as amended, 42 U.S.C. § 300aa of the Vaccine Act.

4   By electing to file a Short–Form Autism Petition for Vaccine Compensation Petitioners alleged that

   [a]s a direct result of one or more vaccinations covered under the National Vaccine Injury Compensation Program, the vaccinee in question has developed a neurodevelopmental disorder, consisting of an Autism Spectrum Disorder or a similar disorder. This disorder was caused by a measles-mumps-rubella (MMR) vaccination; by the "thimerosal" ingredient in certain Diphtheria–Tetanus–Pertussis (DTP), Diphtheria–Tetanus–acellular Pertussis (DTaP), Hepatitis B, and Hemophilus Influenza Type B(HIB) vaccinations; or by some combination of the two....

   The petition is being filed within three years after the first symptom of the disorder, or within three years after the first symptom a vaccine-caused significant aggravation of the disorder. (If the vaccine-related death is alleged, the petition is being filed within two years after the date of death and no later than 48 months after onset of the injury from which death resulted.)

   Autism General Order # 1 filed July 3, 2002, Exhibit A, Master Autism Petition for Vaccine Compensation at 2.

5   Neonatal resuscitation is performed to prevent "the morbidity and mortality associated with hypoxic-ischemic tissue (brain, heart, kidney) injury and to reestablish adequate spontaneous respiration and cardiac output." Nelson Textbook of Pediatrics 723 (Robert Kliegman, M.D., et al. eds., 18th ed.2007). Meconium is a dark, viscous material that is normally passed within the first 48 hours of life. Nelson at 1521. Meconium staining of the amniotic fluid may be an indication of fetal stress and may require emergency medical attention. Nelson at 725–26.

6   An APGAR score is "a numerical expression of the condition of a newborn infant, usually determined at 60 seconds after birth, being the sum of points gained on assessment of the heart rate, respiratory effort, muscle tone, respiratory effort, muscle tone, reflex irritability, and color." Dorland's Illustrated Medical Dictionary 1670 (30th ed.2003).

7   Chad was diagnosed with hyperbilirubinemia on January 10, 2002. Pet'r Ex. 1 at 10. Hyperbilirubinemia is a common neonatal condition caused by excessive bilirubin, which may lead to jaundice. Dorland's Illustrated Medical Dictionary 879 (30th ed.2003).

8   The Assessment also reports that Chad, as an infant, was "especially quiet and good." *Id.* at 135. Some children who are eventually diagnosed as autistic are reported to have been exceptionally quiet babies. *See, e.g.,* Chris Plauche Johnson, "Recognition of Autism Before Age 2 Years," 28(3) Pediatrics in Review 90 (2008) ("Some infants later diagnosed with autism are unusually quiet and make few vocalizations.") (Court Exhibit 1002 at 5) (hereinafter "Court Ex."); *see also,* R.L. Schum, Ph.D., "Language Screening in the Pediatric Office Setting," 54 Pediatr. Clin. of N. Amer. 428 (2007) (Court Ex. 1001 at 4) (describing "Case 1: the child who has delayed onset of words: The parents might have described this child as a quiet baby who was not fussy or demanding.").

9   If Chad has autism, which seems to be undisputed, it is unlikely, according to the medical experts, that the manifestations of his condition first appeared at age four and one-half. Autism generally manifests by the age of 36 months. Pet'r Ex. 7 at 1–2; Resp't Ex. E at 21; Resp't Ex. F at 20. Autism disorders are characterized by developmental problems in three areas: social reciprocity; social communication; and unusual circumscribed interests and repetitive patterns of behavior. "It's the co-occurrence of those three plus the fact that the origin is in early life, which are the distinctive features." Resp't Ex. F at 16 (quoting Dr. Michael Rutter).

   Petitioners' contention that Chad's condition was "at least" aggravated by the vaccinations in 2006, *see* Petitioners Response to Respondent's Motion to Dismiss at 6, impliedly concedes that Chad's problems existed before those vaccinations.

10   Because the assertion of "hypersensitivity to heavy metals" is not linked to any injury other than autism, the same trigger for the statute of limitations applies to the allegation of heavy-metal poisoning. *See Bono ex rel. Bono v. Sec'y of Dep't of Health and Human Services,* 87 Fed. Cl. 98, 102 (2009).

11   Dr. Alfonso subsequently submitted another letter, dated October 20, 2008, stating that the information he had provided earlier was wrong, that his records did not reflect that Chad had autism spectrum disorder at the age of 18 months, and that "this statement should have indicated that Chad had been diagnosed 18 months prior to the time of the [first] letter," which would have been October 2006, less than two years before the Petition was filed. *See* Pet'r Ex. 13 at 1; *infra* at p. 16.

12   Specifically, the July 8, 2009 Order required the parties to file, if they so chose, any additional expert evidence:

1) supporting their respective positions regarding the event that constitutes the first symptom or manifestation of petitioner's autism spectrum disorder; and/or

(2) bearing directly on the question of what events are generally considered by the medical profession to constitute the first symptoms or manifestations of onset of an autism spectrum disorder. *See* 42 U.S.C. 300aa–16(a)(2).

(Emphasis in original.)

**13** Transcripts for the OAP may be accessed at the following website: http://www.uscfc.uscourts.gov/omnibus-autism-proceeding (last checked on October 19, 2009). The qualifications of the experts whose opinions are cited appear in the records of the OAP.

**14** Information concerning language delay as an early of autism is widely available to the public. *See* National Institute of Child Health and Human Development (NICHH) website, "Autism Overview: When do people usually show signs of autism?" http:// www.nichd.nih.gov/publications/pubs/autism/overview/showSigns .cfm (last checked Oct. 19, 2009). The NICHH states that, "A number of the behavioral symptoms of autism are observable by 18 months of age," including problems with language. "[I]n many cases, a delay in the child's starting to speak around age two bring problems to parents' attention, even though other, less noticeable signs may be present at an earlier age." *Id.* (Footnotes omitted). *See also,* http://cdc.gov/ncbddd/autism/facts/html (last checked October 20, 2009).

**15** *Accord, e.g., Hebert v. Sec'y of Dep't of Health and Human Services,* 66 Fed. Cl. 43, 47, 49 (2005); *Wilkerson v. Sec'y of Dep't of Health and Human Services,* 2009 WL 1583527 (2009); *Hedrick v. Sec'y of Dep't of Health and Human Services,* 2008 WL 5049439 at * 3 (Fed.Cl. Nov.3, 2008); *Staley v. Sec'y of Dep't of Health and Human Services,* 2007 WL 268779 at * 3–4 (Fed.Cl.2007).

**16** As noted above, Petitioners have not requested an evidentiary hearing. Were they to do so, the special master would have discretion to decide the case on the written record, provided that each party has been afforded a full and fair opportunity to present its case. *See* 42 U.S.C. § 300aa–12(d)(3)(B)(v); Vaccine Rule 8(b). *Accord, e.g., O'Connell v. Sec'y of Dep't of Health and Human Services,* 63 Fed. Cl. 49, 57 n. 7 (2004) (affirming the special master's decision not to hold formal hearings); *Hovery v. Sec'y of Dep't of Health and Human Services,* 38 Fed. Cl. 397, 400–01 (1997) (affirming special master's decision denying petitioners' request for an evidentiary hearing). In this instance, the parties specifically were offered two opportunities to present expert testimony on the early symptoms of autism spectrum disorder: a Court Order issued on July 8, 2009, and the Show Cause Order issued on September 3, 2009. Respondent submitted expert medical evidence, Petitioners did not.

**17** The nurse left blank the boxes indicating problems in Vision, Hearing, Speech/Language, Physical, Social/Behavioral, and Cognitive functions. *See* Show Cause Response at 8; Pet'r Ex. 3 at 75. The nurse practitioner did note on the page of the exhibit following the one cited by Petitioners that Chad was "not being cooperative" during the examination. Pet'r Ex. 3 at 76. This would be consistent with the behavioral problems that eventually led to his diagnosis. Affidavit at ¶ 5.

**18** Rule 8(d) of the Rules of the Court of Federal Claims is identical to the federal rule. *Compare* Fed.R.Civ.P. 8(d) (hereinafter "FRCP"), and Fed. Cl. R. 8(d) (hereinafter "RCFC").

**19** Rule 11 of the Court of Federal Claims is identical to the FRCP Rule 11. *Compare* FRCP Rule 11 and RCFC Rule 11.

**20** This is not to say that Petitioners engaged in conduct that would be sanctionable under FRCP Rule 11, but simply to refute the proposition that there is no limit on a party's ability to allege alternative theories based upon inconsistent facts.

**21** *See, e.g., Daniels v. United States,* 532 U.S. 374, 121 S.Ct. 1578, 1580, 149 L.Ed.2d 590 (2001) ("A contrary rule would effectively permit challenges far too stale to be brought in their own right, and sanction an end run around statutes of limitation and other procedural barriers....")

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 36

**Euro-Excellence Inc.**   *Appellant*

*v.*

**Kraft Canada Inc., Kraft Foods Schweiz AG and Kraft Foods Belgium SA**   *Respondents*

and

**Retail Council of Canada and Alliance of Manufacturers & Exporters Canada**   *Interveners*

INDEXED AS: EURO-EXCELLENCE INC. *v.* KRAFT CANADA INC.

Neutral citation: 2007 SCC 37.

File No.: 31327.

2007: January 16; 2007: July 26.

Present: McLachlin C.J. and Bastarache, Binnie, LeBel, Deschamps, Fish, Abella, Charron and Rothstein JJ.

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

*Intellectual property — Copyright — Infringement — Secondary infringement — Exclusive licences — Exclusive Canadian distributor of imported chocolate bars bringing copyright infringement action against unauthorized distributor of bars after logos were registered in Canada as copyrighted artistic works — Whether Canadian distributor can establish hypothetical primary infringement — Whether chocolate bar can be copyrighted because of protected works appearing on its wrapper — Whether accessories or incidental works exempted from copyright protection — Copyright Act, R.S.C. 1985, c. C-42, s. 27(2)(e).*

KCI is the exclusive Canadian distributor of Côte d'Or and Toblerone chocolate bars in Canada for its parent companies KFB and KFS. Notwithstanding the exclusivity agreements, Euro continued to import and distribute Côte d'Or and Toblerone bars which it had acquired in Europe. In 2002, in order to allow KCI to mount the present case, KFB registered three Côte

**Euro-Excellence Inc.**   *Appelante*

*c.*

**Kraft Canada Inc., Kraft Foods Schweiz AG et Kraft Foods Belgium SA**   *Intimées*

et

**Conseil canadien du commerce de détail et Alliance des manufacturiers et des exportateurs du Canada**   *Intervenants*

RÉPERTORIÉ : EURO-EXCELLENCE INC. *c.* KRAFT CANADA INC.

Référence neutre : 2007 CSC 37.

Nᵒ du greffe : 31327.

2007 : 16 janvier; 2007 : 26 juillet.

Présents : La juge en chef McLachlin et les juges Bastarache, Binnie, LeBel, Deschamps, Fish, Abella, Charron et Rothstein.

EN APPEL DE LA COUR D'APPEL FÉDÉRALE

*Propriété intellectuelle — Droit d'auteur — Violation du droit d'auteur — Violation à une étape ultérieure — Licences exclusives — Distributeur exclusif canadien de tablettes de chocolat importées intentant une action pour violation du droit d'auteur contre un distributeur non autorisé de ces tablettes après que des logos eurent été enregistrés au Canada comme étant des œuvres artistiques protégées par le droit d'auteur — Le distributeur canadien peut-il établir l'existence d'une violation initiale hypothétique? — Une tablette de chocolat peut-elle faire l'objet d'un droit d'auteur en raison de la présence d'œuvres protégées sur son emballage? — Les éléments ou les œuvres accessoires sont-ils soustraits à la protection du droit d'auteur? — Loi sur le droit d'auteur, L.R.C. 1985, ch. C-42, art. 27(2)e).*

KCI est le distributeur exclusif au Canada des tablettes de chocolat Côte d'Or et Toblerone fabriquées par ses sociétés mères KFB et KFS. Malgré les contrats d'exclusivité, Euro a continué d'importer et de mettre en circulation des tablettes de chocolat Côte d'Or et Toblerone qu'elle avait achetées en Europe. En 2002, afin de permettre à KCI de monter le présent dossier,

d'Or logos in Canada as copyrighted artistic works and granted KCI an exclusive licence in the works as used in association with confectionary products. KFS did the same with two Toblerone logos. KCI then called upon Euro to cease and desist distribution of any product to which the copyrighted works were affixed. When Euro refused, KCI brought an action against Euro alleging that it had engaged in secondary infringement under s. 27(2) of the *Copyright Act* by importing copies of KFS and KFB's copyrighted works into Canada for sale or distribution. KCI does not rely on its rights as a trademark holder. At trial, KCI was awarded $300,000 in damages and Euro was restrained from selling, distributing, exposing or offering for sale any copies of the copyrighted works. It was also ordered to render the product non-infringing. KCI's motion for reconsideration was refused. The Federal Court of Appeal refused an appeal on the merits, but referred the matter of damages back to the trial judge. On hearing further submissions, the trial judge confirmed his original award.

*Held* (McLachlin C.J. and Abella J. dissenting): The appeal should be allowed.

*Per* Binnie, Deschamps and Rothstein JJ.: The *Copyright Act* does not exempt incidental works from the protection of copyright, and it is not for this Court to create such an exemption. The rights and remedies provided by the *Copyright Act* are also exhaustive. All artistic works, including logos, receive the protection of copyright if they meet the requisite standards of "skill and judgment", and there is no dispute in this case that the logos in question are legitimate subjects of copyright. The *Copyright Act* does not support the introduction of a new equitable doctrine of "legitimate economic interest" to read down the legislation and to exclude logos on wrappers from the domain of copyright. In enacting s. 64(3)(*b*) of the Act, Parliament has authorized concurrent copyright and trade-mark protection for labels. Until Parliament provides otherwise, the courts are bound to conclude that a logo on a chocolate bar wrapper can receive concurrent trade-mark and copyright protection. [4-5] [7-8] [13]

KFB a enregistré au Canada trois logos de Côte d'Or en tant qu'œuvres artistiques protégées par le droit d'auteur, en plus de concéder à KCI une licence exclusive pour l'utilisation des œuvres en liaison avec des produits de confiserie. KFS a fait la même chose avec deux logos de Toblerone. KCI a ensuite mis Euro en demeure de cesser de distribuer tout produit sur lequel figuraient les œuvres protégées par le droit d'auteur. Devant le refus opposé par Euro, KCI a intenté contre celle-ci une action dans laquelle elle alléguait qu'Euro avait commis une violation à une étape ultérieure, au sens du par. 27(2) de la *Loi sur le droit d'auteur*, en important des exemplaires d'œuvres protégées par le droit d'auteur appartenant à KFS et à KFB dans le but de les vendre ou de les mettre en circulation au Canada. KCI n'invoque pas ses droits en tant que titulaire de marques de commerce. Lors du procès, KCI a obtenu la somme de 300 000 $ à titre de dommages-intérêts et Euro s'est vu interdire de mettre en vente, mettre en circulation, exposer ou offrir en vente des exemplaires des logos protégés par le droit d'auteur. Elle s'est également vu ordonner d'empêcher que le produit ne constitue une contrefaçon du droit d'auteur. La requête en réexamen présentée par KCI a été rejetée. La Cour d'appel fédérale a rejeté un appel au fond, mais elle a renvoyé l'affaire au juge de première instance pour qu'il tranche la question des dommages-intérêts. Après avoir entendu des observations additionnelles, le juge de première instance a confirmé son ordonnance initiale.

*Arrêt* (la juge en chef McLachlin et la juge Abella sont dissidentes) : Le pourvoi est accueilli.

*Les juges* Binnie, Deschamps et Rothstein : La *Loi sur le droit d'auteur* ne soustrait pas les œuvres accessoires à la protection du droit d'auteur, et il n'appartient pas à notre Cour de le faire. Les droits et recours que prévoit la *Loi sur le droit d'auteur* sont également exhaustifs. Toutes les œuvres artistiques, y compris les logos, sont protégées par le droit d'auteur si elles satisfont aux normes requises du « talent et du jugement », et personne ne conteste en l'espèce que les logos en question sont légitimement visés par le droit d'auteur. La *Loi sur le droit d'auteur* ne justifie pas l'introduction d'une nouvelle théorie d'equity de l'« intérêt économique légitime » pour atténuer la portée de la mesure législative et pour exclure du champ d'application du droit d'auteur les logos figurant sur les emballages. En adoptant l'al. 64(3)*b*) de la Loi, le législateur a permis que les étiquettes bénéficient à la fois de la protection conférée par le droit d'auteur et de celle conférée par la marque de commerce. Jusqu'à ce qu'il prévoie le contraire, les tribunaux sont tenus de conclure que le logo apposé sur l'emballage d'une tablette de chocolat peut bénéficier à la fois de la protection conférée par la marque de commerce et de celle conférée par le droit d'auteur. [4-5] [7-8] [13]

This case turns on a straightforward application of s. 27(2)(*e*) of the *Copyright Act*. For KCI to succeed, it must show that Euro imported works that would have infringed copyright if they had been made in Canada by the persons who made them. However, this hypothetical primary infringement cannot be established in this case. KFB and KFS made the impugned copies of the works in Europe. They would not have infringed copyright if they had produced the Côte d'Or and Toblerone logos in Canada because they are, respectively, the owners of the Canadian copyright in those logos. Because a copyright owner cannot be liable to its exclusive licensee for infringement, there is no hypothetical primary infringement, and thus no violation of s. 27(2)(*e*) in this case by Euro. [14-15] [20] [23-24]

Section 27(2)(*e*) of the *Copyright Act*, read in context with the definitional and liability provisions, leads to the necessary conclusion that an exclusive licensee may sue third parties for infringement, but not the owner-licensor of the copyright. The exclusive licensee's only remedy against the owner-licensor lies in contract. Although the Act elevates exclusive licensees above mere licensees and permits exclusive licensees to acquire a limited property interest in the copyright, the treatment of exclusive licensees and assignees under the Act clearly manifests Parliament's intent to treat exclusive licensees differently from copyright owners and assignees. First, express statutory language puts assignees on an equal footing with copyright owners, but no similar language applies to exclusive licensees. Second, unlike assignees, the exclusive licensee lacks the capacity to sue for infringement without joining the owner-licensor as a party. Third, the language of s. 2.7 defining "exclusive licence" as an "authorization" suggests an interest short of ownership. Had Parliament wanted exclusive licensees to be able to sue the owner-licensor for infringement, it would have put exclusive licensees on an equal footing with assignees or given exclusive licensees this right in the words of the legislation. [15] [31] [34] [40-41] [48] [50]

Pour trancher le présent pourvoi, il faut simplement appliquer l'al. 27(2)*e*) de la *Loi sur le droit d'auteur*. Pour avoir gain de cause, KCI doit démontrer qu'Euro a importé des œuvres qui auraient constitué une violation du droit d'auteur si elles avaient été produites au Canada par les personnes qui les ont produites. Toutefois, il n'est pas possible en l'espèce d'établir l'existence de cette violation initiale hypothétique. KFB et KFS ont produit les exemplaires contestés des œuvres en Europe. Elles n'auraient pas violé le droit d'auteur si elles avaient produit les logos de Côte d'Or et de Toblerone au Canada parce qu'elles sont, respectivement, les titulaires du droit d'auteur sur ces logos au Canada. Étant donné que le titulaire du droit d'auteur ne peut pas être responsable de la violation de ce droit envers son licencié exclusif, il n'y a en l'espèce aucune violation hypothétique et, partant, aucune contravention à l'al. 27(2)*e*) de la part d'Euro. [14-15] [20] [23-24]

Lorsque l'al. 27(2)*e*) de la *Loi sur le droit d'auteur* est interprété dans son contexte et conjointement avec les dispositions définitoires et celles relatives à la responsabilité, la conclusion qui s'impose est que le licencié exclusif peut intenter une action pour violation du droit d'auteur contre des tiers, mais non contre le titulaire-concédant du droit d'auteur. Le seul recours dont le licencié exclusif dispose contre le titulaire-concédant est une action fondée sur la responsabilité contractuelle. Bien que la Loi place les licenciés exclusifs au-dessus des simples licenciés et qu'elle leur permette d'acquérir un intérêt de propriété limité dans le droit d'auteur, le traitement que la Loi réserve aux licenciés exclusifs et aux cessionnaires traduit nettement l'intention du législateur de traiter les licenciés exclusifs différemment des titulaires du droit d'auteur et des cessionnaires. Premièrement, le législateur a expressément indiqué qu'il plaçait les cessionnaires sur un pied d'égalité avec les titulaires du droit d'auteur, mais il ne l'a pas fait en ce qui concerne les licenciés exclusifs. Deuxièmement, contrairement au cessionnaire, le licencié exclusif n'est pas habilité à intenter une action pour violation du droit d'auteur sans être constitué partie avec le titulaire-concédant. Troisièmement, en définissant la « licence exclusive » comme étant une « autorisation », l'art. 2.7 porte à croire qu'il est question d'un intérêt qui ne constitue pas un droit de propriété. Si le législateur avait voulu que le licencié exclusif puisse intenter une action pour violation du droit d'auteur contre le titulaire-concédant, il aurait placé les licenciés exclusifs sur un pied d'égalité avec les cessionnaires ou il aurait expressément accordé ce droit aux licenciés exclusifs dans le texte de la Loi. [15] [31] **[34] [40-41]** [48] [50]

*Per* Fish J.: There is agreement with Rothstein J.'s reasons, but, without so deciding, grave doubt was expressed as to whether the law governing the protection of intellectual property rights in Canada can be transformed into an instrument of trade control not contemplated by the *Copyright Act*, as KCI seeks to do. [56]

*Per* Bastarache, LeBel and Charron JJ.: The merely incidental presence of the copyrighted works on the wrappers of the chocolate bars does not bring the chocolate bars within the protections offered by the *Copyright Act*. Section 27(2) of the Act, which prohibits parallel importation into Canada of copyrighted works, cannot be used to prevent Euro from importing genuine Côte d'Or and Toblerone chocolate bars into Canada for the purpose of selling, renting, distributing or trading, on the basis that the logos are copyrighted. [57]

The *Copyright Act* ought to be interpreted with an eye to the internal coherence of its own scheme and consistently with the *Trade-marks Act*. Trade-mark law protects market share in commercial goods, whereas copyright protects the economic gains resulting from an exercise of skill and judgment. The law of copyright should not be used to protect market share if that requires contorting it outside its normal sphere of operation where the economic interest at stake is only tangentially related to the copyrighted work. [83]

Section 27(2) is meant to protect authors from the unauthorized appropriation of the gains of their authorship, but this protection does not extend to include any and all economic gains claimed by an author or copyright owner. If the work in question is merely incidental to another consumer good, and it is that consumer good which is being sold or distributed, or dealt with by way of trade, s. 27(2) cannot be invoked. It is only when it is the work itself which is the subject of the sale or other commercial dealing that it can properly be said that the section applies and its protection becomes available. Section 27(2) is not meant to protect manufacturers from the unauthorized importation of consumer goods on the basis of their having a copyrighted work affixed to their wrapper, this work being merely incidental to their value as consumer goods. The rights transferred to a licensee must be limited in the same way as those of the original creator of the work to the legitimate

*Le juge* Fish : Il y a accord avec les motifs du juge Rothstein, mais, sans trancher cette question, un doute sérieux est exprimé quant à la possibilité de transformer, comme KCI cherche à le faire, le droit régissant la protection de la propriété intellectuelle au Canada en un instrument de contrôle du commerce qui n'est pas envisagé par la *Loi sur le droit d'auteur*. [56]

*Les juges* Bastarache, LeBel et Charron : La présence simplement accessoire des œuvres protégées sur les emballages des tablettes de chocolat ne rend pas applicables à ces dernières les protections offertes par la *Loi sur le droit d'auteur*. Le paragraphe 27(2) de la Loi, qui interdit l'importation parallèle au Canada d'œuvres protégées par le droit d'auteur, ne peut pas être invoqué pour empêcher Euro d'importer au Canada de véritables tablettes de chocolat Toblerone et Côte d'Or en vue de leur mise en vente ou en location, de leur mise en circulation ou de leur utilisation dans un but commercial, pour le motif que les logos sont des œuvres protégées par le droit d'auteur. [57]

Il faut interpréter la *Loi sur le droit d'auteur* en tenant compte de la cohérence interne du régime qu'elle établit et d'une manière compatible avec la *Loi sur les marques de commerce*. La législation sur les marques de commerce protège les parts de marché des biens commerciaux, alors que le droit d'auteur protège les gains économiques résultant de l'exercice du talent et du jugement. Il n'y a pas lieu de recourir à la législation sur le droit d'auteur pour protéger une part de marché si cela oblige à la sortir de son champ d'application normal dans le cas où l'intérêt économique en jeu n'est qu'accessoirement lié à l'œuvre protégée par le droit d'auteur. [83]

Le paragraphe 27(2) est censé protéger les auteurs contre l'appropriation non autorisée des gains découlant de leur qualité d'auteur, mais cette protection ne s'étend pas à la totalité des gains économiques revendiqués par l'auteur ou le titulaire du droit d'auteur. Ce paragraphe ne peut pas être invoqué si l'œuvre en cause est simplement un élément accessoire d'un autre bien de consommation et que c'est ce bien qui est vendu, mis en circulation ou utilisé dans un but commercial. Ce n'est que si l'œuvre elle-même fait l'objet de la vente ou de l'autre utilisation commerciale que l'on peut dire, à juste titre, que la disposition s'applique et que la protection est offerte. Le paragraphe 27(2) n'a pas pour objet de protéger les fabricants contre l'importation non autorisée de biens de consommation dont l'emballage reproduit une œuvre protégée par le droit d'auteur, laquelle œuvre est simplement accessoire à la valeur de ces biens en tant que biens de consommation. Les droits transférés au licencié doivent,

economic interests resulting from the exercise of skill and judgment. [80] [86] [93]

Liability under s. 27(2)(*e*) relies on a finding that the defendant intended to commit an act enumerated in s. 27(2)(*a*) to (*c*): selling or renting out copies of a work, distributing copies of a work with prejudicial effect, or dealing with copies of a work by way of trade. If a reasonable consumer undertaking a commercial transaction does not think that the copyrighted work is what he or she is buying or dealing with, it is likely that the work is merely incidental to the consumer good and that s. 27(2) cannot be invoked. [89] [93-94]

There is agreement with the minority that, had s. 27(2) of the *Copyright Act* been applicable in this case, the exclusive licensee would have been able to sue the owner-licensor of the copyright. [75]

*Per* McLachlin C.J. and Abella J. (dissenting): KCI has the right to seek remedies under the *Copyright Act* to prevent Euro from selling or distributing the copyrighted works (the logos). First, the copyrighted work is being "sold" or "distributed" when it is printed on the wrapper of a consumer product. There is nothing in the Act to endorse a restrictive definition of "sell" and s. 64(3)(*b*) of the Act extends copyright protection to trademarks and labels. Once a work falls within s. 27(2)(*a*) to (*c*) and is otherwise entitled to copyright protection, the Act grants no scope for judicially created limits to that protection based on whether the logos on the wrapper are "incidental" or whether the copyright holder has a "legitimate economic interest". Second, an exclusive licensee in Canada can claim protection against secondary infringement when the copyrighted work was produced by the owner-licensor. Where the owner of a copyright has granted an exclusive licence, it has temporarily granted a proprietary interest in the copyright itself to the exclusive licensee (s. 13(7)). The scope of the precise interest granted is shaped by the terms of the licensing agreement. Here, the agreement grants KCI the sole and exclusive right, in Canada, to produce, reproduce, use, distribute, and sell the products. These terms, read together with the rights granted to an exclusive licensee in ss. 2.7 and 13(7) of the *Copyright Act*, as well as the rights in s. 36(1) to protect and enforce its rights and interests through remedies provided by that Act, give the exclusive licensee the right to invoke the Act for copyright infringement not only against third parties, but also against the owner-licensor. An owner-licensor is, technically, still the owner of the copyright,

à l'instar de ceux du créateur de l'œuvre, être limités aux intérêts économiques légitimes résultant de l'exercice du talent et du jugement. [80] **[86] [93]**

Pour qu'il y ait responsabilité au regard de l'al. 27(2)*e*), il faut donc conclure que le défendeur avait l'intention d'accomplir un acte énuméré aux al. 27(2)*a*) à *c*), soit la vente, la location, la mise en circulation ayant un effet préjudiciable ou l'utilisation dans un but commercial d'exemplaires d'une œuvre. Si un consommateur raisonnable qui effectue une opération commerciale ne croit pas que c'est l'œuvre protégée par le droit d'auteur qu'il achète ou utilise, il est probable que l'œuvre est simplement un élément accessoire du bien de consommation visé par l'opération et que le par. 27(2) ne peut pas être invoqué. [89] [93-94]

Il y a accord avec les juges dissidentes pour dire que, si le par. 27(2) de la *Loi sur le droit d'auteur* avait été applicable en l'espèce, le licencié exclusif aurait pu poursuivre le titulaire-concédant du droit d'auteur. [75]

*La* juge en chef McLachlin et la juge Abella (dissidentes) : KCI a le droit d'exercer les recours prévus par la *Loi sur le droit d'auteur* afin d'empêcher Euro de vendre ou de mettre en circulation les œuvres protégées par le droit d'auteur (les logos). Premièrement, l'œuvre protégée par le droit d'auteur est « vendue » ou « mise en circulation » lorsqu'elle est imprimée sur l'emballage d'un produit de consommation. Rien dans la Loi ne milite en faveur d'une définition restrictive du terme « vente », et l'al. 64(3)*b*) de la Loi étend aux marques de commerce et aux étiquettes la protection conférée par le droit d'auteur. Dès qu'une œuvre est visée par les al. 27(2)*a*) à *c*) et qu'elle peut par ailleurs bénéficier de la protection conférée par le droit d'auteur, la Loi ne permet pas aux tribunaux de limiter cette protection en fonction de la question de savoir si les logos apposés sur l'emballage sont « accessoires » ou si le titulaire du droit d'auteur a un « intérêt économique légitime ». Deuxièmement, le titulaire d'une licence exclusive au Canada peut-il invoquer une protection contre la violation à une étape ultérieure lorsque l'œuvre protégée par le droit d'auteur a été produite par le titulaire-concédant. Le titulaire d'un droit d'auteur qui a concédé une licence exclusive a concédé temporairement au licencié exclusif un intérêt propriétal dans le droit d'auteur même (par. 13(7)). La portée de l'intérêt précisément concédé est déterminée par les conditions du contrat de licence. En l'espèce, le contrat confère à KCI le droit exclusif de produire, de reproduire, d'utiliser, de mettre en circulation et de vendre les produits au Canada. Ces termes, interprétés conjointement avec les droits concédés au licencié exclusif à l'art. 2.7 et au par. 13(7) de la

but it is nonetheless liable to an exclusive licensee if it breaches the copyright interest it has granted. [108-112] [121-123] [128]

*Loi sur le droit d'auteur*, ainsi qu'avec le droit, énoncé au par. 36(1), de soutenir et faire valoir ses droits et intérêts par l'exercice des recours prévus par la Loi, confèrent au licencié exclusif le droit d'invoquer la Loi relativement à une violation du droit d'auteur, non seulement contre des tiers mais aussi contre le titulaire-concédant. Le titulaire-concédant demeure, à proprement parler, le titulaire du droit d'auteur, mais il est néanmoins responsable envers le licencié exclusif s'il viole l'intérêt dans le droit d'auteur qu'il lui a concédé. [108-112] [121-123] [128]

**Cases Cited**

By Rothstein J.

**Jurisprudence**

Citée par le juge Rothstein

**Distinguished:** *Théberge v. Galerie d'Art du Petit Champlain inc.*, [2002] 2 S.C.R. 336, 2002 SCC 34; *Kirkbi AG v. Ritvik Holdings Inc.*, [2005] 3 S.C.R. 302, 2005 SCC 65; **referred to:** *Bell ExpressVu Limited Partnership v. Rex*, [2002] 2 S.C.R. 559, 2002 SCC 42; *CCH Canadian Ltd. v. Law Society of Upper Canada*, [2004] 1 S.C.R. 339, 2004 SCC 13; *Bishop v. Stevens*, [1990] 2 S.C.R. 467; *Compo Co. v. Blue Crest Music Inc.*, [1980] 1 S.C.R. 357; *Dictionnaires Robert Canada S.C.C. v. Librairie du Nomade Inc.* (1987), 11 F.T.R. 44; *A & M Records of Canada Ltd. v. Millbank Music Corp.* (1984), 1 C.P.R. (3d) 354; *Fly by Nite Music Co. v. Record Wherehouse Ltd.*, [1975] F.C. 386; *Clarke, Irwin & Co. v. C. Cole & Co.* (1960), 33 C.P.R. 173; *Thomas v. Sorrell* (1673), Vaughan 330, 124 E.R. 1098; *Robertson v. Thomson Corp.*, [2006] 2 S.C.R. 363, 2006 SCC 43; *Ritchie v. Sawmill Creek Golf & Country Club Ltd.* (2004), 35 C.P.R. (4th) 163; *United States Naval Institute v. Charter Communications, Inc.*, 936 F.2d 692 (1991); *Architectronics, Inc. v. Control Systems, Inc.*, 935 F.Supp. 425 (1996); *Griggs Group Ltd. v. Evans*, [2004] F.S.R. 31, [2003] EWHC 2914.

**Distinction d'avec les arrêts :** *Théberge c. Galerie d'Art du Petit Champlain inc.*, [2002] 2 R.C.S. 336, 2002 CSC 34; *Kirkbi AG c. Gestions Ritvik Inc.*, [2005] 3 R.C.S. 302, 2005 CSC 65; **arrêts mentionnés :** *Bell ExpressVu Limited Partnership c. Rex*, [2002] 2 R.C.S. 559, 2002 CSC 42; *CCH Canadienne Ltée c. Barreau du Haut-Canada*, [2004] 1 R.C.S. 339, 2004 CSC 13; *Bishop c. Stevens*, [1990] 2 R.C.S. 467; *Compo Co. c. Blue Crest Music Inc.*, [1980] 1 R.C.S. 357; *Dictionnaires Robert Canada S.C.C. c. Librairie du Nomade Inc.* (1987), 11 F.T.R. 44; *A & M Records of Canada Ltd. c. Millbank Music Corp.* (1984), 1 C.P.R. (3d) 354; *Fly by Nite Music Co. c. Record Wherehouse Ltd.*, [1975] C.F. 386; *Clarke, Irwin & Co. c. C. Cole & Co.* (1960), 33 C.P.R. 173; *Thomas c. Sorrell* (1673), Vaughan 330, 124 E.R. 1098; *Robertson c. Thomson Corp.*, [2006] 2 R.C.S. 363, 2006 CSC 43; *Ritchie c. Sawmill Creek Golf & Country Club Ltd.* (2004), 35 C.P.R. (4th) 163; *United States Naval Institute c. Charter Communications, Inc.*, 936 F.2d 692 (1991); *Architectronics, Inc. c. Control Systems, Inc.*, 935 F.Supp. 425 (1996); *Griggs Group Ltd. c. Evans*, [2004] F.S.R. 31, [2003] EWHC 2914.

By Fish J.

**Referred to:** *Robertson v. Thomson Corp.*, [2006] 2 S.C.R. 363, 2006 SCC 43.

Citée par le juge Fish

**Arrêt mentionné :** *Robertson c. Thomson Corp.*, [2006] 2 R.C.S. 363, 2006 CSC 43.

By Bastarache J.

**Referred to:** *R. & A. Bailey & Co. v. Boccaccio Pty. Ltd.* (1986), 84 F.L.R. 232; *CCH Canadian Ltd. v. Law Society of Upper Canada*, [2004] 1 S.C.R. 339, 2004 SCC 13; *Théberge v. Galerie d'Art du Petit Champlain inc.*, [2002] 2 S.C.R. 336, 2002 SCC 34; *Society of Composers, Authors and Music Publishers of Canada v. Canadian Assn. of Internet Providers*, [2004] 2 S.C.R. 427, 2004 SCC 45; *Kirkbi AG v. Ritvik Holdings Inc.*, [2005] 3 S.C.R. 302, 2005 SCC 65; *AstraZeneca Canada Inc. v. Canada (Minister of Health)*, [2006]

Citée par le juge Bastarache

**Arrêts mentionnés :** *R. & A. Bailey & Co. c. Boccaccio Pty. Ltd.* (1986), 84 F.L.R. 232; *CCH Canadienne Ltée c. Barreau du Haut-Canada*, [2004] 1 R.C.S. 339, 2004 CSC 13; *Théberge c. Galerie d'Art du Petit Champlain inc.*, [2002] 2 R.C.S. 336, 2002 CSC 34; *Société canadienne des auteurs, compositeurs et éditeurs de musique c. Assoc. canadienne des fournisseurs Internet*, [2004] 2 R.C.S. 427, 2004 CSC 45; *Kirkbi AG c. Gestions Ritvik Inc.*, [2005] 3 R.C.S. 302, 2005 CSC 65; *AstraZeneca Canada Inc. c. Canada*

2 S.C.R. 560, 2006 SCC 49; *British Leyland Motor Corp. v. Armstrong Patents Co.*, [1986] 1 All E.R. 850; *Houle v. Canadian National Bank*, [1990] 3 S.C.R. 122; *Wallace v. United Grain Growers Ltd.*, [1997] 3 S.C.R. 701.

By Abella J. (dissenting)

    *Théberge v. Galerie d'Art du Petit Champlain inc.*, [2002] 2 S.C.R. 336, 2002 SCC 34; *Compo Co. v. Blue Crest Music Inc.*, [1980] 1 S.C.R. 357; *Bishop v. Stevens*, [1990] 2 S.C.R. 467; *CCH Canadian Ltd. v. Law Society of Upper Canada*, [2004] 1 S.C.R. 339, 2004 SCC 13; *Bouchet v. Kyriacopoulos* (1964), 45 C.P.R. 265; *Robertson v. Thomson Corp.*, [2006] 2 S.C.R. 363, 2006 SCC 43; *Éditions de la Table ronde s.a. v. Cousture*, [1995] Q.J. No. 1519 (QL); *Dynabec Ltée v. Société d'informatique R.D.G. Inc.* (1985), 6 C.P.R. (3d) 322; *Fonds Gabrielle Roy v. Éditions internationales Alain Stanké ltée*, [1993] Q.J. No. 2525 (QL); *British Actors Film Co. v. Glover*, [1918] 1 K.B. 299.

## Statutes and Regulations Cited

17 U.S.C. § 101.
*Copyright Act*, R.S.C. 1985, c. C-42, ss. 2 "copyright", "infringing", 2.7, 3, 13(4), (5), (6), (7), 27, 36(1), (2), 64.
*Copyright Act, 1911* (U.K.), 1 & 2 Geo. 5, c. 46.
*Copyright Act, 1921*, S.C. 1921, c. 24.
*Copyright Act 1968* (Cth.), No. 63, s. 10(1).
*Copyright Amendment Act (No. 1) 1998* (Cth.), No. 104, Schedule 2.
*Copyright, Designs and Patents Act 1988* (U.K.), 1988, c. 48, ss. 90(1), 92(1), 101(1).
*Patent Act*, R.S.C. 1985, c. P-4.
*Trade-marks Act*, R.S.C. 1985, c. T-13, s. 13(2).

## Authors Cited

Bently, L., and B. Sherman. *Intellectual Property Law*, 2nd ed. Oxford: Oxford University Press, 2004.
Côté, Pierre-André. *The Interpretation of Legislation in Canada*, 3rd ed. Scarborough, Ont.: Carswell, 2000.
Drassinower, Abraham. "Taking User Rights Seriously". In Michael Geist, ed., *In the Public Interest: The Future of Canadian Copyright Law*. Toronto: Irwin Law, 2005, 462.
Driedger, Elmer A. *Construction of Statutes*, 2nd ed. Toronto: Butterworths, 1983.
Judge, Kathryn. "Rethinking Copyright Misuse" (2004), 57 *Stan. L. Rev.* 901.
Laddie, Hugh, et al. *The Modern Law of Copyright and Designs*, vol. 1, 3rd ed. London: Butterworths, 2000.

*(Ministre de la Santé)*, [2006] 2 R.C.S. 560, 2006 CSC 49; *British Leyland Motor Corp. c. Armstrong Patents Co.*, [1986] 1 All E.R. 850; *Houle c. Banque Canadienne Nationale*, [1990] 3 R.C.S. 122; *Wallace c. United Grain Growers Ltd.*, [1997] 3 R.C.S. 701.

Citée par la juge Abella (dissidente)

    *Théberge c. Galerie d'Art du Petit Champlain inc.*, [2002] 2 R.C.S. 336, 2002 CSC 34; *Compo Co. c. Blue Crest Music Inc.*, [1980] 1 R.C.S. 357; *Bishop c. Stevens*, [1990] 2 R.C.S. 467; *CCH Canadienne Ltée c. Barreau du Haut-Canada*, [2004] 1 R.C.S. 339, 2004 CSC 13; *Bouchet c. Kyriacopoulos* (1964), 45 C.P.R. 265; *Robertson c. Thomson Corp.*, [2006] 2 R.C.S. 363, 2006 CSC 43; *Éditions de la Table ronde s.a. c. Cousture*, [1995] A.Q. n$^o$ 1519 (QL); *Dynabec Ltée c. Société d'informatique R.D.G. Inc.*, [1985] C.A. 236; *Fonds Gabrielle Roy c. Éditions internationales Alain Stanké ltée*, [1993] J.Q. n$^o$ 2525 (QL); *British Actors Film Co. c. Glover*, [1918] 1 K.B. 299.

## Lois et règlements cités

17 U.S.C. § 101.
*Copyright Act, 1911* (R.-U.), 1 & 2 Geo. 5, ch. 46.
*Copyright Act 1968* (Cth.), No. 63, art. 10(1).
*Copyright Amendment Act (No. 1) 1998* (Cth.), No. 104, Schedule 2.
*Copyright, Designs and Patents Act 1988* (R.-U.), 1988, ch. 48, art. 90(1), 92(1), 101(1).
*Loi de 1921 concernant le droit d'auteur*, S.C. 1921, ch. 24.
*Loi sur le droit d'auteur*, L.R.C. 1985, ch. C-42, art. 2 « contrefaçon », « droit d'auteur », 2.7, 3, 13(4), (5), (6), (7), 27, 36(1), (2), 64.
*Loi sur les brevets*, L.R.C. 1985, ch. P-4.
*Loi sur les marques de commerce*, L.R.C. 1985, ch. T-13, art. 13(2).

## Doctrine citée

Bently, L., and B. Sherman. *Intellectual Property Law*, 2nd ed. Oxford : Oxford University Press, 2004.
Côté, Pierre-André. *Interprétation des lois*, 3$^e$ éd. Montréal : Thémis, 1999.
Drassinower, Abraham. « Taking User Rights Seriously ». In Michael Geist, ed., *In the Public Interest : The Future of Canadian Copyright Law*. Toronto : Irwin Law, 2005, 462.
Driedger, Elmer A. *Construction of Statutes*, 2nd ed. Toronto : Butterworths, 1983.
Judge, Kathryn. « Rethinking Copyright Misuse » (2004), 57 *Stan. L. Rev.* 901.
Laddie, Hugh, et al. *The Modern Law of Copyright and Designs*, vol. 1, 3rd ed. London : Butterworths, 2000.

McKeown, John S. *Fox on Canadian Law of Copyright and Industrial Designs*, 4th ed. Toronto: Thomson/Carswell, 2003 (loose-leaf updated 2007, release 1).

Megarry, Robert Edgar. *A Manual of the Law of Real Property*, 8th ed. by A. J. Oakley. London: Sweet & Maxwell, 2002.

Nimmer, Melville B., and David Nimmer. *Nimmer on Copyright*, vol 3. New York: Matthew Bender, 1981 (loose-leaf updated December 2006, release 71).

Scassa, Teresa. "Using Copyright Law to Prevent Parallel Importation: A Comment on *Kraft Canada, Inc. v. Euro Excellence, Inc.*" (2006), 85 *Can. Bar Rev.* 409.

Tamaro, Normand. *The 2006 Annotated Copyright Act*. Toronto: Thomson Carswell, 2006.

Vaver, David. "The Exclusive Licence in Copyright" (1995), 9 *I.P.J.* 163.

Ziff, Bruce H. *Principles of Property Law*, 4th ed. Toronto: Thomson Carswell, 2006.

McKeown, John S. *Fox on Canadian Law of Copyright and Industrial Designs*, 4th ed. Toronto : Thomson/Carswell, 2003 (loose-leaf updated 2007, release 1).

Megarry, Robert Edgar. *A Manual of the Law of Real Property*, 8th ed. by A. J. Oakley. London : Sweet & Maxwell, 2002.

Nimmer, Melville B., and David Nimmer. *Nimmer on Copyright*, vol 3. New York : Matthew Bender, 1981 (loose-leaf updated December 2006, release 71).

Scassa, Teresa. « Using Copyright Law to Prevent Parallel Importation : A Comment on *Kraft Canada, Inc. v. Euro Excellence, Inc.* » (2006), 85 *R. du B. can.* 409.

Tamaro, Normand. *The 2006 Annotated Copyright Act*. Toronto : Thomson Carswell, 2006.

Vaver, David. « The Exclusive Licence in Copyright » (1995), 9 *I.P.J.* 163.

Ziff, Bruce H. *Principles of Property Law*, 4th ed. Toronto : Thomson Carswell, 2006.

APPEAL from a judgment of the Federal Court of Appeal (Desjardins, Noël and Pelletier JJ.A.), [2006] 3 F.C.R. 91, 265 D.L.R. (4th) 555, 346 N.R. 104, 47 C.P.R. (4th) 113, [2005] F.C.J. No. 2082 (QL), 2005 FCA 427, reversing in part a decision of Harrington J., [2004] 4 F.C.R. 410, 252 F.T.R. 50, 33 C.P.R. (4th) 246, [2004] F.C.J. No. 804 (QL), 2004 FC 652. Appeal allowed, McLachlin C.J. and Abella J. dissenting.

*François Boscher* and *Pierre-Emmanuel Moyse*, for the appellant.

*Timothy M. Lowman* and *Kenneth D. McKay*, for the respondents.

*Howard P. Knopf* and *Elizabeth G. Elliott*, for the intervener the Retail Council of Canada.

*R. Scott Jolliffe* and *James H. Buchan*, for the intervener the Alliance of Manufacturers & Exporters Canada.

The reasons of Binnie, Deschamps and Rothstein JJ. were delivered by

Rothstein J. — I have read the reasons of Bastarache J. While I agree with his conclusion, I am respectfully unable to agree with his analysis. I have three main concerns with his reasons.

POURVOI contre un arrêt de la Cour d'appel fédérale (les juges Desjardins, Noël et Pelletier), [2006] 3 R.C.F. 91, 265 D.L.R. (4th) 555, 346 N.R. 104, 47 C.P.R. (4th) 113, [2005] A.C.F. n° 2082 (QL), 2005 CAF 427, qui a infirmé en partie une décision du juge Harrington, [2004] 4 R.C.F. 410, 252 F.T.R. 50, 33 C.P.R. (4th) 246, [2004] A.C.F. n° 804 (QL), 2004 CF 652. Pourvoi accueilli, la juge en chef McLachlin et la juge Abella sont dissidentes.

*François Boscher* et *Pierre-Emmanuel Moyse*, pour l'appelante.

*Timothy M. Lowman* et *Kenneth D. McKay*, pour les intimées.

*Howard P. Knopf* et *Elizabeth G. Elliott*, pour l'intervenant le Conseil canadien du commerce de détail.

*R. Scott Jolliffe* et *James H. Buchan*, pour l'intervenante l'Alliance des manufacturiers et des exportateurs du Canada.

Version française des motifs des juges Binnie, Deschamps et Rothstein rendus par

Le juge Rothstein — J'ai lu les motifs du juge Bastarache. Je suis d'accord avec sa conclusion, mais, en toute déférence, je ne puis faire mienne son analyse. J'ai trois réserves importantes au sujet de ses motifs.

1

(1)  The Concerns

2

This Court has repeatedly adopted Driedger's approach to statutory interpretation:

Today there is only one principle or approach, namely, the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament.

(E. A. Driedger, *Construction of Statutes* (2nd ed. 1983), at p. 87; see also *Bell ExpressVu Limited Partnership v. Rex*, [2002] 2 S.C.R. 559, 2002 SCC 42, at para. 26; *CCH Canadian Ltd. v. Law Society of Upper Canada*, [2004] 1 S.C.R. 339, 2004 SCC 13, at para. 9.)

3

I am concerned that Bastarache J.'s approach in this case is inconsistent with this Court's approach to statutory interpretation. The "modern" or "purposive" approach requires that the words of the statute "in their grammatical and ordinary sense" be read harmoniously with the objects of the Act. It does not, however, give judges licence to substitute their policy preferences for those of Parliament. This Court has consistently held that "copyright is a creature of statute and the rights and remedies provided by the *Copyright Act* are exhaustive": see *CCH*, at para. 9; *Théberge v. Galerie d'Art du Petit Champlain inc.*, [2002] 2 S.C.R. 336, 2002 SCC 34, at para. 5; *Bishop v. Stevens*, [1990] 2 S.C.R. 467, at p. 477; *Compo Co. v. Blue Crest Music Inc.*, [1980] 1 S.C.R. 357, at pp. 372-73. In my respectful view, Bastarache J.'s reasons depart from this doctrine.

4

Throughout his reasons, Bastarache J. relies on a distinction between copyrighted works that are sold and works that are "merely incidental" to the item being sold. He concludes that since the Toblerone and Côte d'Or logos are merely incidental to the thing being sold (the chocolate bar), they do not receive copyright protection. I understand this distinction to be the crux of his analysis. However, I see no statutory authority for the proposition that "incidental" works are not protected by the

(1)  Les réserves

Notre Cour a adopté, à maintes reprises, la méthode d'interprétation législative proposée par Driedger :

[TRADUCTION] Aujourd'hui, il n'y a qu'un seul principe ou solution : il faut lire les termes d'une loi dans leur contexte global en suivant le sens ordinaire et grammatical qui s'harmonise avec l'esprit de la loi, l'objet de la loi et l'intention du législateur.

(E. A. Driedger, *Construction of Statutes* (2e éd. 1983), p. 87; voir également *Bell ExpressVu Limited Partnership c. Rex*, [2002] 2 R.C.S. 559, 2002 CSC 42, par. 26; *CCH Canadienne Ltée c. Barreau du Haut-Canada*, [2004] 1 R.C.S. 339, 2004 CSC 13, par. 9.)

Je crains que l'approche du juge Bastarache en l'espèce soit incompatible avec la méthode d'interprétation législative adoptée par notre Cour. Selon la méthode « moderne » ou « téléologique », les termes de la Loi doivent être lus « en suivant le sens ordinaire et grammatical » qui s'harmonise avec les objets de la Loi. Toutefois, les juges ne sont pas pour autant autorisés à substituer leurs préférences en matière de politique générale à celles du législateur. La Cour a constamment jugé que « le droit d'auteur tire son origine de la loi, et les droits et recours que prévoit la *Loi sur le droit d'auteur* sont exhaustifs » : voir *CCH*, par. 9; *Théberge c. Galerie d'Art du Petit Champlain inc.*, [2002] 2 R.C.S. 336, 2002 CSC 34, par. 5; *Bishop c. Stevens*, [1990] 2 R.C.S. 467, p. 477; *Compo Co. c. Blue Crest Music Inc.*, [1980] 1 R.C.S. 357, p. 372-373. J'estime, en toute déférence, que les motifs du juge Bastarache dérogent à cette théorie.

Tout au long de ses motifs, le juge Bastarache s'appuie sur une distinction entre les œuvres protégées par le droit d'auteur qui sont vendues et les œuvres qui sont un « simple élément accessoire » de l'article vendu. Il conclut que, puisque les logos de Toblerone et de Côte d'Or représentent un simple élément accessoire de l'article vendu (la tablette de chocolat), ils ne bénéficient pas de la protection conférée par le droit d'auteur. Si je comprends bien, cette distinction est au cœur de

*Copyright Act*, R.S.C. 1985, c. C-42. This Court's holding in *CCH* confirms that all artistic works receive the protection of copyright if they meet the requisite standards of "skill and judgment": *CCH*, at para. 16. The *Copyright Act* does not exempt so-called "incidental" works from its protection. Neither Bastarache J. nor any of the parties contest that the Côte d'Or and Toblerone logos resulted from exercises of skill and judgment. As such, they are legitimate subjects of copyright.

I note that the "incidental" approach is similar to the Australian approach to this issue. However, the Australian approach was prescribed by statute and not by judges. In 1998 the Australian Parliament made a deliberate policy decision to amend its *Copyright Act 1968* (Cth.), No. 63, to exclude "accessories" from the domain of copyright for the purposes of parallel importation (*Copyright Amendment Act (No. 1) 1998* (Cth.), No. 104, Schedule 2). Under s. 10(1) of the Australian *Copyright Act 1968*, as amended, an infringing work includes a work that was "imported without the licence of the owner of the copyright, [and] would have constituted an infringement of that copyright if the article had been made in Australia by the importer, <u>but does not include: . . . (g) a non-infringing accessory whose importation does not constitute an infringement of that copyright</u>". The Australian Act defines "*accessory*" so as to include the labels and packaging that accompany an article. The Canadian *Copyright Act*, in contrast, has not exempted accessories or incidental works from the protection of copyright, and it is not for this Court to create such an exemption.

Even if one were to accept that "incidental" works are not protected under Canadian copyright law, it is not apparent from Bastarache J.'s reasons when a work will be considered "merely incidental". The "reasonable consumer" test proposed at

son analyse. Cependant, je ne vois rien dans la loi qui permette d'affirmer que les œuvres « accessoires » ne sont pas protégées par la *Loi sur le droit d'auteur*, L.R.C. 1985, ch. C-42. L'arrêt *CCH* de notre Cour confirme que toutes les œuvres artistiques sont protégées par le droit d'auteur si elles satisfont aux normes requises du « talent et du jugement » : *CCH*, par. 16. La *Loi sur le droit d'auteur* ne soustrait pas les œuvres dites « accessoires » à sa protection. Ni le juge Bastarache ni aucune des parties ne conteste que les logos de Côte d'Or et de Toblerone résultent de l'exercice du talent et du jugement. Pour cette raison, les logos sont légitimement visés par le droit d'auteur.

Je remarque que la méthode du caractère « accessoire » s'apparente à la méthode adoptée à cet égard en Australie. La méthode australienne a toutefois été prescrite par une loi et non par des juges. En 1998, le Parlement australien a délibérément choisi de modifier sa *Copyright Act 1968* (Cth.), No. 63, de manière à exclure les [TRADUCTION] « éléments accessoires » du champ d'application du droit d'auteur pour les besoins de l'importation parallèle (*Copyright Amendment Act (No. 1) 1998* (Cth.), No. 104, Schedule 2). Aux termes du par. 10(1) de la *Copyright Act 1968* australienne et ses modifications, l'œuvre qui viole le droit d'auteur est une œuvre [TRADUCTION] « importée sans l'autorisation du titulaire du droit d'auteur, [et qui] aurait constitué une violation du droit d'auteur si l'article en question avait été produit en Australie par l'importateur, <u>à l'exclusion de : [. . .] g) l'élément accessoire qui ne viole pas le droit d'auteur et dont l'importation ne viole pas ce droit d'auteur</u> ». Selon la Loi australienne, l'expression « *accessory* » (élément accessoire) s'entend des étiquettes et de l'emballage qui accompagnent un article. Par contre, la *Loi sur le droit d'auteur* canadienne ne soustrait pas les éléments ou les œuvres accessoires à la protection du droit d'auteur, et il n'appartient pas à notre Cour de le faire.

Même si l'on acceptait que la législation canadienne sur le droit d'auteur ne protège pas les œuvres « accessoires », les motifs du juge Bastarache n'indiquent pas dans quels cas une œuvre sera considérée comme étant un « simple

5

6

para. 94 offers little guidance on how to determine whether a work is "merely incidental". Paragraph 95 draws a distinction between a small logo and a larger painting of that same logo on a t-shirt. However, according to Canadian copyright law, it is skill and judgment — not the size of the work — that determines whether a work receives protection under the *Copyright Act*.

7    To support his argument for the "incidental" approach to copyright law, Bastarache J. introduces a concept of "legitimate economic interests" to read down rights expressly granted by the *Copyright Act*. The term "legitimate economic interest" was used by this Court in *Théberge*, but in a different context. The legitimate economic interest described in *Théberge* was the right of the creator of an artistic work to receive a reward for that work. The issue in *Théberge* was whether the transferring of an artistic work from a paper backing to a canvas backing constituted reproduction contrary to the "legitimate economic interests" of the artist. Binnie J., for the majority, found that reproduction did not occur on the facts of that case. Binnie J.'s holding relied on the concepts of originality and reproduction, which are firmly rooted in the words of the *Copyright Act*.

8    In this case, Bastarache J. expands the concept of "legitimate economic interest" to exclude logos on wrappers from the domain of copyright. I find no authority in the Act or in our jurisprudence for Bastarache J.'s theory of "legitimate economic interests". As this Court has often stated, "the rights and remedies provided by the *Copyright Act* are exhaustive": *CCH*, at para. 9. I would not depart from this approach by introducing a new equitable doctrine of "legitimate economic interest" to read down the legislation.

élément accessoire ». Le critère du « consommateur raisonnable » qu'il propose au par. 94 donne peu d'indications sur la façon de déterminer si l'œuvre est simplement « un élément accessoire ». Au paragraphe 95, une distinction est établie entre un petit logo et une reproduction plus grande du même logo sur un tee-shirt. Toutefois, d'après la législation canadienne sur le droit d'auteur, c'est l'exercice du talent et du jugement — et non la taille de l'œuvre — qui détermine si une œuvre bénéficie de la protection conférée par la *Loi sur le droit d'auteur*.

Pour étayer son point de vue favorable à une interprétation de la législation sur le droit d'auteur fondée sur le caractère « accessoire », le juge Bastarache introduit la notion d'« intérêts économiques légitimes » pour atténuer la portée des droits expressément conférés par la *Loi sur le droit d'auteur*. Notre Cour a employé l'expression « intérêt économique légitime » dans l'arrêt *Théberge*, mais dans un contexte différent. L'intérêt économique légitime décrit dans l'arrêt *Théberge* était le droit du créateur d'une œuvre artistique d'être récompensé pour cette œuvre. Dans cet arrêt, la question était de savoir si l'entoilage d'une œuvre artistique sur support papier constituait une reproduction allant à l'encontre des « intérêts économiques légitimes » de l'artiste. Le juge Binnie, s'exprimant au nom des juges majoritaires, a conclu qu'il n'y avait pas reproduction selon les faits de l'affaire. Sa conclusion reposait sur les notions d'originalité et de reproduction qui sont profondément enracinées dans le libellé de la *Loi sur le droit d'auteur*.

En l'espèce, le juge Bastarache élargit la notion d'« intérêt économique légitime » de manière à exclure du champ d'application du droit d'auteur les logos figurant sur les emballages. J'estime que rien dans la Loi ou notre jurisprudence n'appuie la théorie des « intérêts économiques légitimes » préconisée par le juge Bastarache. Comme l'a souvent affirmé notre Cour, « les droits et recours que prévoit la *Loi sur le droit d'auteur* sont exhaustifs » : *CCH*, par. 9. Je ne m'écarterais pas de ce point de vue en introduisant une nouvelle théorie d'equity de l'« intérêt économique légitime » pour atténuer la portée de la mesure législative.

I accept, of course, that the *Copyright Act* is to be given a purposive interpretation. However, I distinguish between an approach that is rooted in the words of the Act and the approach taken by my colleague Bastarache J. that involves reading words into the legislation that are at odds with Parliament's intent. Section 64 of the *Copyright Act*, which can be found, along with the other relevant provisions of the *Copyright Act*, in the Appendix, addresses the very issue that is fundamental to my colleague's approach: can a work of art appearing on a label and receiving trade-mark protection also be the subject of copyright protection? Parliament concluded that works can receive concurrent copyright and trade-mark protection.

To that end, Parliament adopted s. 64 of the current Act, which excludes certain functional articles from copyright protection, but affirms that copyright shall subsist in "a trade-mark or a representation thereof or a label". Parliament enacted this provision after having turned its mind to the possibility of overlap between trade-mark and copyright law. Were the Court to hold that the Kraft labels cannot be subjects of trade-mark and copyright concurrently, we would be substituting a different policy preference from that chosen by Parliament.

It is for this reason that I must respectfully disagree with Bastarache J.'s attempted analogy between the present case and *Kirkbi AG v. Ritvik Holdings Inc.*, [2005] 3 S.C.R. 302, 2005 SCC 65. In *Kirkbi*, this Court held that trade-mark law cannot be leveraged to extend protection to subjects that are ordinarily the domain of patent law. Bastarache J. suggests that *Kirkbi* stands for the further proposition that the subjects of copyright law and trade-mark law must not overlap and that because it is trade-mark law that ordinarily protects market share and

Je reconnais évidemment que la *Loi sur le droit d'auteur* doit recevoir une interprétation téléologique. Cependant, j'établis une distinction entre une approche fondée sur le libellé de la Loi et celle que mon collègue le juge Bastarache a adoptée et qui consiste à ajouter dans la Loi des mots qui vont à l'encontre de l'intention du législateur. L'article 64 de la *Loi sur le droit d'auteur*, qui, en plus des autres dispositions pertinentes de cette loi, est reproduit dans l'annexe, traite de la question même qui est un élément fondamental de l'approche de mon collègue : une œuvre d'art figurant sur une étiquette et bénéficiant de la protection conférée par la marque de commerce peut-elle également bénéficier de la protection conférée par le droit d'auteur? Le législateur a conclu que des œuvres peuvent bénéficier à la fois de la protection conférée par le droit d'auteur et de celle conférée par la marque de commerce.

À cet égard, le législateur a adopté l'art. 64 de la Loi actuelle, qui soustrait certains objets fonctionnels à la protection conférée par le droit d'auteur, mais qui confirme que le droit d'auteur existe sur les « marques de commerce, ou leurs représentations, ou étiquettes ». Le législateur a adopté cette disposition après avoir réfléchi à la possibilité d'un chevauchement entre la législation sur les marques de commerce et celle sur le droit d'auteur. Si la Cour concluait que les étiquettes Kraft ne peuvent pas bénéficier à la fois de la protection conférée par la marque de commerce et de celle conférée par le droit d'auteur, elle se trouverait alors à substituer sa préférence en matière de politique générale à celle du législateur.

C'est pourquoi je ne puis, en toute déférence, souscrire à l'analogie que le juge Bastarache tente d'établir entre le présent dossier et l'affaire *Kirkbi AG c. Gestions Ritvik Inc.*, [2005] 3 R.C.S. 302, 2005 CSC 65. Dans l'arrêt *Kirkbi*, notre Cour a décidé que la législation sur les marques de commerce ne saurait être utilisée pour protéger des matières qui relèvent normalement du droit des brevets. Le juge Bastarache affirme que l'arrêt *Kirkbi* permet, en outre, d'affirmer que les matières visées par le droit d'auteur et le droit des marques

9

10

11

goodwill, copyright holders cannot use copyright to protect their market share or the goodwill associated with their brand.

12    I do not read *Kirkbi* as underpinning a broad doctrine of copyright misuse. Although the Court in *Kirkbi* cautioned against interpreting trade-mark law in a way that undermined the *Patent Act*, R.S.C. 1985, c. P-4, the decision in that case was anchored in the language of the *Trade-marks Act*, R.S.C. 1985, c. T-13, itself and not in a vague notion of trade-mark misuse. In *Kirkbi*, this Court held that the *Trade-marks Act* had expressly incorporated the "doctrine of functionality" in s. 13(2) of the Act (para. 42). LeBel J., writing for the Court, held that "[t]his doctrine recognizes that trademarks law is not intended to prevent the competitive use of utilitarian features of products, but that it fulfills a source-distinguishing function": *Kirkbi*, at para. 43. By incorporating the doctrine of functionality, s. 13(2) of the *Trade-marks Act* had precluded the granting of trade-mark protection to functional works, which are the subjects of patent law.

13    The difficulty in attempting to analogize this case and *Kirkbi* is that the Court in *Kirkbi* relied on a provision of the *Trade-marks Act* in order to find that there could be no overlap between trademark and patent. In contrast, s. 64(3)(*b*) of the *Copyright Act* permits a single work to be the subject of both copyright and trade-mark protection. In other words, Parliament has authorized an overlap between copyright and trade-mark. I do not doubt the wisdom of LeBel J.'s general statement, at para. 37 of *Kirkbi*, that it is important to bear in mind the "basic and necessary distinctions between different forms of intellectual property and their legal

de commerce ne doivent pas se recouper, et que, puisque c'est normalement la législation sur les marques de commerce qui protège la part de marché et l'achalandage, les titulaires du droit d'auteur ne peuvent se servir du droit d'auteur pour protéger leur part de marché ou l'achalandage rattaché à leur marque.

Je ne considère pas que l'arrêt *Kirkbi* est à la base d'une théorie générale de l'abus du droit d'auteur (*copyright misuse*). Bien que, dans l'arrêt *Kirkbi*, la Cour ait indiqué qu'il faut se garder d'interpréter la législation sur les marques de commerce d'une manière qui porte atteinte à la *Loi sur les brevets*, L.R.C. 1985, ch. P-4, la décision dans cette affaire reposait sur le libellé même de la *Loi sur les marques de commerce*, L.R.C. 1985, ch. T-13, et non sur une vague notion d'abus d'une marque de commerce. Dans l'arrêt *Kirkbi*, par. 42, notre Cour a conclu que la *Loi sur les marques de commerce* avait expressément incorporé le « principe de la fonctionnalité » à son par. 13(2). Le juge LeBel a affirmé, au nom de la Cour, que « [s]elon ce principe, le droit des marques de commerce ne vise pas à empêcher l'utilisation concurrentielle des particularités utilitaires d'un produit, mais sert plutôt à distinguer les sources des produits » : *Kirkbi*, par. 43. En incorporant le principe de la fonctionnalité, le par. 13(2) de la *Loi sur les marques de commerce* avait empêché que les œuvres fonctionnelles qui sont visées par le droit des brevets bénéficient de la protection conférée par la législation sur les marques de commerce.

Le problème que pose la tentative d'établir une analogie entre le présent dossier et l'affaire *Kirkbi* tient au fait que, dans l'arrêt *Kirkbi*, la Cour s'est fondée sur une disposition de la *Loi sur les marques de commerce* pour conclure qu'il ne pouvait y avoir de chevauchement entre les marques de commerce et les brevets. En revanche, l'al. 64(3)*b*) de la *Loi sur le droit d'auteur* permet qu'une œuvre bénéficie à la fois de la protection conférée par le droit d'auteur et de celle conférée par la marque de commerce. En d'autres termes, le législateur a autorisé un chevauchement entre le droit d'auteur et la marque de commerce. Je ne doute

and economic functions". However, this guiding principle must be qualified by the proviso: except where Parliament provides otherwise. Parliament has authorized concurrent copyright and trade-mark protection for labels. Until it provides otherwise, the courts are bound to conclude that a logo on a chocolate bar wrapper can receive concurrent trade-mark and copyright protection.

aucunement de la sagesse de l'affirmation générale du juge LeBel, au par. 37 de l'arrêt *Kirkbi*, selon laquelle il importe de se rappeler les « distinctions fondamentales nécessaires entre diverses formes de propriété intellectuelle et leurs fonctions juridiques et économiques ». Il faut toutefois assortir ce principe directeur de la réserve suivante : sauf si le législateur prévoit le contraire. Le législateur a permis que les étiquettes bénéficient à la fois de la protection conférée par le droit d'auteur et de celle conférée par la marque de commerce. Jusqu'à ce qu'il prévoie le contraire, les tribunaux sont tenus de conclure que le logo apposé sur l'emballage d'une tablette de chocolat peut bénéficier à la fois de la protection conférée par la marque de commerce et de celle conférée par le droit d'auteur.

(2)  The Purposive Approach to the *Copyright Act*

(2)  L'interprétation téléologique de la *Loi sur le droit d'auteur*

*Overview*

*Aperçu*

In my view, this case turns on a straightforward application of s. 27(2)(*e*) of the *Copyright Act*. The Kraft companies allege that Euro-Excellence Inc. is liable for secondary infringement under s. 27(2)(*e*). However, Kraft Canada Inc. has failed to establish "hypothetical infringement", which is one of the three constitutive elements required to ground a claim under s. 27(2)(*e*). For Kraft Canada to succeed, it must show that Euro-Excellence imported works that *would have infringed copyright if they had been made in Canada by the persons who made them*. It fails to do so.

J'estime que, pour trancher le présent pourvoi, il faut simplement appliquer l'al. 27(2)(*e*) de la *Loi sur le droit d'auteur*. Les sociétés Kraft allèguent qu'Euro-Excellence Inc. est responsable d'une violation à une étape ultérieure au sens de l'al. 27(2)(*e*). Kraft Canada Inc. n'a toutefois pas établi l'existence d'une « violation hypothétique », qui est l'un des trois éléments constitutifs requis pour justifier une action fondée sur l'al. 27(2)(*e*). Pour avoir gain de cause, Kraft Canada doit démontrer qu'Euro-Excellence a importé des œuvres qui *auraient constitué une violation du droit d'auteur si elles avaient été produites au Canada par les personnes qui les ont produites*. Elle ne l'a pas fait.

14

Under the Kraft companies' argument, the putative "hypothetical infringers" (the persons who *would have infringed* copyright if they made the impugned works in Canada) are the Kraft parent companies, Kraft Foods Belgium SA ("KFB") and Kraft Foods Schweiz AG ("KFS"). But KFB and KFS are also, respectively, the owners of the Côte d'Or and Toblerone copyrights at issue in this

Selon l'argument des sociétés Kraft, les présumés « auteurs de la violation hypothétique » (les personnes qui *auraient violé* le droit d'auteur si elles avaient produit les œuvres contestées au Canada) sont les sociétés mères Kraft, Kraft Foods Belgium SA (« KFB ») et Kraft Foods Schweiz AG (« KFS »). Cependant, KFB et KFS sont aussi, respectivement, les titulaires des droits d'auteur de

15

case. The copyright itself was not assigned to Kraft Canada. Therefore, to accept the Kraft companies' argument, this Court would have to find that copyright owners can infringe their own copyright if they have licensed copyright to an exclusive licensee despite their retention of the copyright. In my view, the *Copyright Act* does not permit exclusive licensees to sue the copyright owner-licensor for infringement of its own copyright. If KFS or KFB had reproduced Kraft labels in Canada in violation of its licensing agreement with Kraft Canada, Kraft Canada's only remedy would lie in breach of contract and *not in copyright infringement*. Because a copyright owner cannot be liable to its exclusive licensee for infringement, there is no hypothetical infringement and thus no violation of s. 27(2)(*e*) in this case by Euro-Excellence.

16    Bastarache J., at para. 75, suggests that on my reading of the Act, the Kraft companies could have circumvented the purposes of the Act by calling their agreements "assignments" rather than "exclusive licences". However, the distinction between assignments and exclusive licences is important and meaningful. By granting an assignment, the copyright owner intends to bestow upon the assignee the full panoply of rights and interests reserved for copyright owners. An exclusive licence, by contrast, permits owners to convey to licensees a more limited interest in the copyright. In my respectful view, an approach that conflates exclusive licences and assignments must be rejected. By enabling copyright owners to grant an interest in copyright either by assignment or exclusive licence, Parliament intended to provide copyright owners with two qualitatively different mechanisms by which to transfer their interests in whole or in part. Disregarding the distinctions between the two would lead to an unjustifiable narrowing of the owner's options in dealing with its interest.

Côte d'Or et de Toblerone dont il est question en l'espèce. Le droit d'auteur même n'a pas été cédé à Kraft Canada. Pour retenir l'argument des sociétés Kraft, la Cour devrait donc conclure que les titulaires du droit d'auteur peuvent violer leur propre droit d'auteur s'ils ont concédé le droit d'auteur à un licencié exclusif tout en conservant ce droit d'auteur. À mon avis, la *Loi sur le droit d'auteur* ne permet pas aux licenciés exclusifs d'intenter contre le titulaire-concédant du droit d'auteur une action pour violation de son propre droit d'auteur. Si KFS ou KFB avait reproduit les étiquettes de Kraft au Canada en violation du contrat de licence conclu avec Kraft Canada, le seul recours dont disposerait Kraft Canada serait une action pour rupture de contrat et *non pour violation du droit d'auteur*. Étant donné que le titulaire du droit d'auteur ne peut pas être responsable de la violation de ce droit envers son licencié exclusif, il n'y a en l'espèce aucune violation hypothétique et, partant, aucune contravention à l'al. 27(2)*e*) de la part d'Euro-Excellence.

Au paragraphe 75, le juge Bastarache indique que, selon mon interprétation de la Loi, les sociétés Kraft auraient pu contourner l'objet de la Loi en qualifiant leurs contrats de « cessions » au lieu de « licences exclusives ». Cependant, la distinction entre les cessions et les licences exclusives est importante et significative. En effectuant une cession, le titulaire du droit d'auteur entend conférer au cessionnaire toute la gamme des droits et intérêts réservés aux titulaires du droit d'auteur. Par contre, une licence exclusive permet au titulaire de transmettre au licencié un intérêt plus limité dans le droit d'auteur. J'estime, en toute déférence, qu'il faut rejeter une approche qui confond licences exclusives et cessions. En habilitant les titulaires du droit d'auteur à concéder un intérêt dans le droit d'auteur au moyen d'une cession ou d'une licence exclusive, le législateur a voulu offrir aux titulaires du droit d'auteur deux moyens qualitativement différents de transférer leurs intérêts en totalité ou en partie. Ne pas tenir compte des distinctions entre les deux entraînerait une restriction injustifiable des mesures que le titulaire peut prendre à l'égard de son intérêt.

*Why there is no hypothetical infringement by KFS and KFB and therefore no secondary infringement by Euro-Excellence*

Section 27 of the *Copyright Act* describes infringement under the Act. Section 27(1) describes what is known as "primary infringement". It provides that:

It is an infringement of copyright for any person to do, without the consent of the owner of the copyright, anything that by this Act only the owner of the copyright has the right to do.

Section 3 sets out the catalogue of rights that the copyright owner possesses under the Act. These rights include the sole right to produce and reproduce copies of the copyrighted work. For the purposes of this case, primary infringement would have arisen if Euro-Excellence had produced copies of the Toblerone or Côte d'Or logos.

But Euro-Excellence does not want to produce labels with the Toblerone or Côte d'Or logos, and the Kraft companies have not alleged that it has done so. The Kraft companies seek to enjoin Euro-Excellence from importing into Canada works that have been produced lawfully in Europe by the Kraft parent companies, KFS and KFB.

The Kraft companies thus allege that Euro-Excellence has engaged in "secondary infringement" by importing for sale or distribution copies of KFS and KFB's copyrighted works into Canada. Secondary infringement is dealt with under s. 27(2) of the Act. In *CCH*, at para. 81, this Court held that three elements must be proven to establish secondary infringement: (1) a primary infringement; (2) the secondary infringer should have known that he or she was dealing with a product of infringement; and (3) the secondary infringer sold, distributed or exposed for sale the infringing goods. Perhaps the most straightforward form of secondary infringement arises when one sells a copy of an infringing work. Under s. 27(2)(*a*), "[i]t is an infringement of

*Raisons pour lesquelles il n'y a aucune violation hypothétique de la part de KFS et de KFB et, partant, aucune violation à une étape ultérieure de la part d'Euro-Excellence*

L'article 27 de la *Loi sur le droit d'auteur* définit ce qui constitue une violation au sens de la Loi. Le paragraphe 27(1) décrit ce qui est connu sous le nom de « violation initiale ». Voici le texte de cette disposition :

Constitue une violation du droit d'auteur l'accomplissement, sans le consentement du titulaire de ce droit, d'un acte qu'en vertu de la présente loi seul le titulaire a la faculté d'accomplir.

L'article 3 dresse la liste des droits que le titulaire du droit d'auteur possède en vertu de la Loi. Ces droits comprennent notamment le droit exclusif de produire et reproduire des exemplaires d'une œuvre protégée par le droit d'auteur. Pour les besoins de la présente affaire, il y aurait eu violation initiale si Euro-Excellence avait produit des exemplaires des logos de Toblerone ou de Côte d'Or.

Or, Euro-Excellence ne veut pas produire des étiquettes sur lesquels sont apposés les logos de Toblerone ou de Côte d'Or, et les sociétés Kraft n'ont pas prétendu qu'elle l'a fait. Elles cherchent plutôt à enjoindre à Euro-Excellence de cesser d'importer au Canada des œuvres produites légalement en Europe par les sociétés mères Kraft, KFS et KFB.

Les sociétés Kraft allèguent ainsi qu'Euro-Excellence a commis une « violation à une étape ultérieure » en important des exemplaires d'œuvres protégées par le droit d'auteur appartenant à KFS et à KFB dans le but de les vendre ou de les mettre en circulation au Canada. Le paragraphe 27(2) de la Loi traite de la violation à une étape ultérieure. Dans l'arrêt *CCH*, par. 81, notre Cour a statué que trois éléments sont requis pour prouver la violation à une étape ultérieure : (1) une violation initiale du droit d'auteur; (2) l'auteur de la violation à une étape ultérieure aurait dû savoir qu'il utilisait le produit d'une violation initiale du droit d'auteur; (3) l'auteur de la violation à une étape ultérieure a vendu, mis en circulation ou mis en vente des

copyright for any person to . . . sell . . . a copy of a work . . . that the person knows or should have known infringes copyright".

20     Section 27(2)(*e*) stands out as an apparent exception to the rule in *CCH* that secondary infringement first requires primary infringement because, unlike s. 27(2)(*a*) to (*d*), it does not require *actual* primary infringement. Instead, it requires only *hypothetical* primary infringement. Under s. 27(2)(*e*),

> [i]t is an infringement of copyright for any person to . . . import . . . a copy of a work . . . that the person knows . . . <u>would infringe copyright if it had been made in Canada by the person who made it</u>.

Section 27(2)(*e*) substitutes hypothetical primary infringement for actual primary infringement. It is possible that the infringing imports may have been lawfully made outside of Canada. Still, they are deemed to infringe copyright if the importer has imported into Canada works that *would have infringed* copyright if those works had been made in Canada by the persons who made the works abroad.

21     The apparent purpose of s. 27(2)(*e*) is to give Canadian copyright holders an added layer of protection where the Canadian copyright holder does not hold copyright in that work in foreign jurisdictions. Section 27(2)(*e*) protects Canadian copyright holders against "parallel importation" by deeming an infringement of copyright even where the imported works did not infringe copyright laws in the country in which they were made. Without s. 27(2)(*e*), the foreign copyright holder who could manufacture the work more cheaply abroad could flood the Canadian market with the work,

marchandises **constituant des contrefaçons**. La forme sans doute la plus simple de violation à une étape ultérieure consiste à vendre un exemplaire de la contrefaçon d'une œuvre. Suivant l'al. 27(2)*a*), « [c]onstitue une violation du droit d'auteur [la vente de] l'exemplaire d'une œuvre [. . .] alors que la personne qui accomplit sait ou devrait savoir que la production de l'exemplaire constitue une violation de ce droit ».

L'alinéa 27(2)*e*) semble faire figure d'exception à la règle énoncée dans l'arrêt *CCH* selon laquelle la violation à une étape ultérieure exige d'abord qu'il y ait eu une violation initiale puisque, à la différence des al. 27(2)*a*) à *d*), il n'est pas nécessaire qu'il y ait violation initiale *réelle*. Il exige plutôt uniquement une violation initiale *hypothétique*. Aux termes de l'al. 27(2)*e*),

> [c]onstitue une violation du droit d'auteur [l'importation de] l'exemplaire d'une œuvre [. . .] alors que la personne qui accomplit l'acte sait [. . .] que la production de l'exemplaire [. . .] <u>constituerait une [violation de ce droit] si l'exemplaire avait été produit au Canada par la personne qui l'a produit</u>.

L'alinéa 27(2)*e*) substitue une violation initiale hypothétique à une violation initiale réelle. Il se peut que les contrefaçons importées aient légalement été produites à l'étranger. Toujours est-il qu'elles sont réputées constituer une violation du droit d'auteur si l'importateur importe au Canada des œuvres qui *auraient constitué une violation* du droit d'auteur si elles avaient été produites au Canada par les personnes qui les ont produites à l'étranger.

L'alinéa 27(2)*e*) vise apparemment à accorder une protection supplémentaire au titulaire du droit d'auteur canadien qui ne détient pas le droit d'auteur sur l'œuvre en question à l'étranger. L'alinéa 27(2)*e*) protège le titulaire du droit d'auteur canadien contre l'« importation parallèle » en présumant qu'il y a violation du droit d'auteur même lorsque les œuvres importées ne violent pas les lois sur le droit d'auteur dans le pays où elles ont été produites. Sans l'al. 27(2)*e*), le titulaire du droit d'auteur étranger qui pourrait fabriquer l'œuvre à un coût moindre à l'étranger pourrait venir saturer

thereby rendering the Canadian copyright worthless. Section 27(2)(*e*) thus represents Parliament's intention to ensure that Canadian copyright holders receive their just rewards even where they do not hold copyright abroad: see, e.g., *Dictionnaires Robert Canada S.C.C. v. Librairie du Nomade Inc.* (1987), 11 F.T.R. 44; *A & M Records of Canada Ltd. v. Millbank Music Corp.* (1984), 1 C.P.R. (3d) 354 (F.C.T.D.); *Fly by Nite Music Co. v. Record Wherehouse Ltd.*, [1975] F.C. 386 (T.D.); *Clarke, Irwin & Co. v. C. Cole & Co.* (1960), 33 C.P.R. 173 (Ont. H.C.).

On the facts of this case, the Kraft companies have not made out all of the constitutive elements of a claim under s. 27(2)(*e*). Hypothetical infringement has not been established. The Kraft companies cannot prove that the impugned works imported and distributed by Euro-Excellence *would have infringed copyright if they had been made in Canada by the persons who made them in Europe.*

The persons who made the impugned copies of the works in Europe were the Kraft parent companies, KFB and KFS. However, KFB and KFS would *not* have infringed copyright if they had produced the Côte d'Or and Toblerone logos in Canada.

This is because KFB and KFS are, respectively, the owners of the Canadian copyright in the Côte d'Or and Toblerone logos. On the Kraft companies' argument, KFB and KFS would be the hypothetical copyright infringers. The Kraft companies argue that KFB and KFS would have infringed copyright if they produced the copyrighted works in Canada because they had licensed the Toblerone and Côte d'Or copyrights to Kraft Canada. Accepting this argument would mean that KFB and KFS have infringed their own copyrights — a proposition that is inconsistent with copyright law and common sense. Under s. 27(1), infringement arises when a person, *without the consent of the owner*, does something that under the Act *only the owner has the right to do.* By definition, no

le marché canadien de son œuvre, ce qui dépouillerait de toute utilité le droit d'auteur canadien. L'alinéa 27(2)*e*) traduit ainsi l'intention du législateur d'assurer que le titulaire du droit d'auteur canadien obtienne une juste récompense même s'il ne détient pas le droit d'auteur à l'étranger : voir, par exemple, *Dictionnaires Robert Canada S.C.C. c. Librairie du Nomade Inc.* (1987), 11 F.T.R. 44; *A & M Records of Canada Ltd. c. Millbank Music Corp.* (1984), 1 C.P.R. (3d) 354 (C.F. 1$^{re}$ inst.); *Fly by Nite Music Co. c. Record Wherehouse Ltd.*, [1975] C.F. 386 (1$^{re}$ inst.); *Clarke, Irwin & Co. c. C. Cole & Co.* (1960), 33 C.P.R. 173 (H.C. Ont.).

Selon les faits de la présente affaire, les sociétés Kraft n'ont pas établi l'existence de tous les éléments constitutifs d'un recours fondé sur l'al. 27(2)*e*). L'existence d'une violation hypothétique n'a pas été établie. Les sociétés Kraft ne peuvent pas prouver que les œuvres contestées qui ont été importées et mises en circulation par Euro-Excellence *auraient constitué une violation du droit d'auteur si elles avaient été produites au Canada par les personnes qui les ont produites en Europe.*

Ce sont les sociétés mères Kraft, KFB et KFS, qui ont produit les exemplaires contestés des œuvres en Europe. Toutefois, elles n'auraient *pas* violé le droit d'auteur si elles avaient produit les logos de Côte d'Or et de Toblerone au Canada.

Cela s'explique par le fait que KFB et KFS sont, respectivement, les titulaires du droit d'auteur sur les logos de Côte d'Or et de Toblerone au Canada. Selon l'argument des sociétés Kraft, KFB et KFS seraient les auteurs de la violation hypothétique du droit d'auteur. Celles-ci prétendent que KFB et KFS auraient violé le droit d'auteur si elles avaient produit les œuvres protégées par le droit d'auteur au Canada, du fait qu'elles avaient concédé par licence à Kraft Canada les droits d'auteur relatifs à Toblerone et à Côte d'Or. Retenir cet argument signifierait que KFB et KFS ont violé leurs propres droits d'auteur — ce qui est incompatible avec la législation sur le droit d'auteur et contraire au bon sens. Suivant le par. 27(1), constitue une violation du droit d'auteur l'accomplissement, *sans*

22

23

24

person can simultaneously be owner and infringer of copyright: see also *CCH*, at para. 37.

25    The Kraft companies allege that KFB and KFS can, hypothetically, infringe copyright because they had licensed the exclusive rights to produce and reproduce the copyrighted works in Canada to Kraft Canada, their Canadian subsidiary. The Kraft companies thus assume that an exclusive licensee becomes the owner of the copyright and able to sue the licensor for infringement. This assumption is incorrect. Under the *Copyright Act*, exclusive licensees are not able to sue the owner-licensor for infringement. I arrive at this conclusion after considering the *Copyright Act*'s provisions on copyright ownership and licensing.

*Licensing Under the Copyright Act*

26    This case turns on the nature and scope of an exclusive licensee's rights under the *Copyright Act*. An exclusive licence under copyright law exists when the following conditions are met: (a) the copyright owner (the licensor) permits another person (the licensee) to do something within the copyright; (b) the licensor promises not to give anyone else the same permission for the duration of the licence; and (c) the licensor itself promises not to do those acts that have been licensed to the licensee for the duration of the licence: *Copyright Act*, s. 2.7; see also D. Vaver, "The Exclusive Licence in Copyright" (1995), 9 *I.P.J.* 163, at pp. 164-65. The parties agree that the agreements between Kraft Canada and the Kraft parent companies are exclusive licence agreements.

27    Under the common law, a licensee does not enjoy property rights: "A licence is merely a **permission**

*le consentement du titulaire de ce droit*, d'un acte qu'en vertu de la Loi *seul ce titulaire a la faculté d'accomplir*. Par définition, personne ne peut être à la fois le titulaire d'un droit d'auteur et l'auteur d'une violation de ce droit : voir également *CCH*, par. 37.

Selon les sociétés Kraft, KFB et KFS peuvent, en théorie, violer le droit d'auteur parce qu'elles ont concédé par licence à Kraft Canada, leur filiale canadienne, les droits exclusifs de produire et reproduire les œuvres protégées par le droit d'auteur au Canada. Les sociétés Kraft présument donc que le licencié exclusif devient le titulaire du droit d'auteur et qu'il peut poursuivre le concédant pour violation du droit d'auteur. Cette présomption est erronée. Aux termes de la *Loi sur le droit d'auteur*, les licenciés exclusifs ne peuvent pas intenter contre le titulaire-concédant une action pour violation du droit d'auteur. J'arrive à cette conclusion après avoir examiné les dispositions de la *Loi sur le droit d'auteur* qui s'appliquent à la possession du droit d'auteur et à la concession de licences.

*Concession de licence en vertu de la Loi sur le droit d'auteur*

L'issue du présent pourvoi dépend de la nature et de la portée des droits que la *Loi sur le droit d'auteur* confère au licencié exclusif. Il y a licence exclusive au sens de la législation sur le droit d'auteur lorsque les conditions suivantes sont remplies : a) le titulaire du droit d'auteur (le concédant) permet à une autre personne (le licencié) d'accomplir un acte visé par ce droit d'auteur; b) le concédant promet de ne pas donner cette permission à quelqu'un d'autre pendant la durée de la licence; c) le concédant lui-même promet que, pendant la durée de la licence, il n'accomplira pas les actes qu'il autorise le licencié à accomplir : art. 2.7 de la *Loi sur le droit d'auteur*; voir également D. Vaver, « The Exclusive Licence in Copyright » (1995), 9 *I.P.J.* 163, p. 164-165. Les parties s'entendent pour dire que les contrats conclus entre Kraft Canada et les sociétés mères Kraft sont des contrats de licence exclusive.

Selon la common law, le licencié ne jouit d'aucun droit de propriété : [TRADUCTION] « La licence n'est

to do that which would otherwise amount to a trespass" (B. H. Ziff, *Principles of Property Law* (4th ed. 2006), at p. 270). In contrast, an assignee receives a property interest from the original owner and steps into the shoes of the owner with respect to those rights assigned. As the recipient of a property interest, the assignee enjoys a right against the world, including the right to sue others (including the assignor) in trespass. The licensee's rights, on the other hand, are contractual, and the licensee is empowered only to sue the owner for breach of contract; it cannot sue in trespass: Ziff, at p. 270; R. E. Megarry, *A Manual of the Law of Real Property* (8th ed. 2002), at p. 475; see also *Thomas v. Sorrell* (1673), Vaughan 330, 124 E.R. 1098, at p. 1109.

A contextual reading of the *Copyright Act* reveals that Parliament has preserved the traditional distinction between assignees and licensees with some modification. Under the present Act, there is a distinction between "assignee", "licensee" and "exclusive licensee". An assignee possesses full ownership rights in the copyright with respect to the rights assigned. A non-exclusive licensee has no property rights in the copyright, and enjoys only contractual rights *vis-à-vis* the owner-licensor. As a result, it cannot sue for infringement. An exclusive licensee, on the other hand, has a limited property interest in the copyright. For reasons explained below, this limited property interest enables the exclusive licensee to sue third parties for infringement but precludes the exclusive licensee from suing the owner-licensor for infringement.

Under the Act, the nature of the assignee's interest in the copyright is clear. Section 13(5) states expressly that assignees of copyright are, with the exception of moral rights, on equal footing with the original copyright owner:

qu'une autorisation de faire ce qui constituerait par ailleurs une violation du droit de propriété » (B. H. Ziff, *Principles of Property Law* (4e éd. 2006), p. 270). Par contre, le cessionnaire se voit conférer un intérêt de propriété par le titulaire initial et prend la place de ce dernier en ce qui concerne les droits cédés. À titre de bénéficiaire d'un intérêt de propriété, le cessionnaire jouit d'un droit opposable à tous, y compris le droit d'intenter contre autrui (dont le cédant) une action pour violation du droit de propriété. En revanche, les droits du licencié sont de nature contractuelle et celle-ci peut seulement intenter contre le titulaire du droit d'auteur une action pour rupture de contrat et non pour violation du droit de propriété : Ziff, p. 270; R. E. Megarry, *A Manual of the Law of Real Property* (8e éd. 2002), p. 475; voir également *Thomas c. Sorrell* (1673), Vaughan 330, 124 E.R. 1098, p. 1109.

28     Selon une interprétation contextuelle de la *Loi sur le droit d'auteur*, le législateur a maintenu la distinction traditionnelle entre les cessionnaires et les licenciés, sous réserve de certaines modifications. Dans la présente Loi, une distinction est établie entre « cessionnaire », « licencié ou titulaire d'une licence » et « licencié exclusif ou titulaire d'une licence exclusive ». Le cessionnaire a les pleins droits de propriété sur le droit d'auteur en ce qui concerne les droits cédés. Le licencié non exclusif n'a aucun droit de propriété sur le droit d'auteur, et jouit seulement de droits contractuels à l'égard du titulaire-concédant. Il ne peut donc pas intenter une action pour violation du droit d'auteur. Le licencié exclusif a, par contre, un intérêt de propriété limité dans le droit d'auteur. Pour les raisons qui suivent, cet intérêt de propriété limité permet au licencié exclusif d'intenter contre des tiers une action pour violation du droit d'auteur, mais il ne lui permet pas de le faire contre le titulaire-concédant.

29     Dans la Loi, la nature de l'intérêt du cessionnaire est évidente. Le paragraphe 13(5) prévoit expressément que les cessionnaires du droit d'auteur sont sur un pied d'égalité avec le titulaire initial du droit d'auteur, sauf pour ce qui est des droits moraux :

Where, under any partial assignment of copyright, the assignee becomes entitled to any right comprised in copyright, the assignee, with respect to the rights so assigned, and the assignor, with respect to the rights not assigned, shall be treated for the purposes of this Act as the owner of the copyright, and this Act has effect accordingly.

The assignee of an interest in copyright is a copyright owner, and thus enjoys rights against the world, including the right to sue the assignor for infringement. This is because the assignor is no longer the owner of the copyright with respect to the right assigned. This is further reflected by the fact that, under s. 36(2), the assignee is not required to join the assignor as co-plaintiff in an action for copyright infringement. In light of these provisions, I have no difficulty in concluding that an assignee, as a holder of a full property interest in copyright, can sue the assignor for copyright infringement.

30    The status of copyright licensees is different. Parliament has manifested its intent to preserve a distinction between assignees and licensees. There is no provision analogous to s. 13(5) that purports to put licensees or exclusive licensees on equal footing with copyright owners.

31    The Act does however elevate "exclusive licensees" above mere licensees. Exclusive licensees are not licensees in the common law sense because exclusive licensees under the Act do have a limited proprietary interest in the copyright that has been licensed to them. The rights of exclusive licensees are set out in ss. 2.7, 13(4), 13(6) and 13(7) of the Act. These provisions do not state expressly whether or not an exclusive licensee can sue the licensor for infringement. However, by necessary implication, they enable exclusive licensees to sue third parties but not the owner-licensor for copyright infringement.

Lorsque, en vertu d'une cession partielle du droit d'auteur, le cessionnaire est investi d'un droit quelconque compris dans le droit d'auteur, sont traités comme titulaires du droit d'auteur, pour l'application de la présente loi, le cessionnaire, en ce qui concerne les droits cédés, et le cédant, en ce qui concerne les droits non cédés, les dispositions de la présente loi recevant leur application en conséquence.

Le cessionnaire d'un intérêt dans le droit d'auteur est titulaire du droit d'auteur et il jouit ainsi de droits opposables à tous, y compris celui de poursuivre le cédant pour violation du droit d'auteur. Il en est ainsi parce que le cédant n'est plus le titulaire du droit d'auteur en ce qui concerne le droit cédé. Cela ressort également du fait que, suivant le par. 36(2), le cessionnaire n'est pas tenu d'être constitué codemandeur avec le cédant dans une action pour violation du droit d'auteur. Compte tenu de ces dispositions, je n'ai aucune hésitation à conclure qu'en tant que titulaire d'un plein intérêt de propriété dans le droit d'auteur le cessionnaire peut intenter contre le cédant une action pour violation du droit d'auteur.

La situation des titulaires d'une licence sur un droit d'auteur est différente. Le législateur a manifesté son intention de maintenir une distinction entre les cessionnaires et les licenciés. Il n'existe aucune disposition analogue au par. 13(5) qui est censée placer les licenciés ou les licenciés exclusifs sur un pied d'égalité avec les titulaires du droit d'auteur.

La Loi place toutefois les « licenciés exclusifs » au-dessus des simples « licenciés ». Les licenciés exclusifs ne sont pas des licenciés au sens de la common law parce que les licenciés exclusifs au sens de la Loi ont un intérêt de propriété limité dans le droit d'auteur qui leur a été concédé par licence. Les droits des licenciés exclusifs sont énoncés à l'art. 2.7 et aux par. 13(4), 13(6) et 13(7) de la Loi. Ces dispositions ne précisent pas si le licencié exclusif peut poursuivre le concédant pour violation du droit d'auteur. Toutefois, par déduction nécessaire, elles autorisent les licenciés exclusifs à intenter une action pour violation du droit d'auteur contre des tiers, mais non contre le titulaire-concédant.

Section 2.7 defines "exclusive licence" as "an <u>authorization</u> to do any act that is subject to copyright to the exclusion of all others including the copyright owner". The deliberate choice of the term *authorization* is inconsistent with the granting of property or ownership rights. In *CCH*, at para. 38, this Court agreed that "authorize" meant "sanction, approve and countenance". This is consistent with the common law definition of licence (i.e., permission to do something that would otherwise amount to an infringement).

Section 36(2) further suggests that an exclusive licensee does not possess a full property interest in the copyright. Section 36(1) enables exclusive licensees to sue for infringement, but s. 36(2) states that where "a person other than the copyright owner", namely the exclusive licensee, sues for infringement, "the copyright owner must be made a party to those proceedings". In the present case, KFB and KFS were joined as co-plaintiffs throughout the proceedings. The requirement of joining the licensor to an infringement action suggests that the exclusive licensee does not have a full property interest in the copyright. If the exclusive licensee held a full property interest, it should not need to join the owner in an action for infringement because a property interest — which is a right against the world — implies the right to sue for infringement in one's own name.

I recognize that other provisions of the Act suggest that exclusive licensees can acquire a property interest in the copyright. However, I am of the opinion that the property interest so acquired is limited and does not include an interest that defeats the ownership interest of the licensor or that could constitute the licensor an infringer of its own copyright.

Section 13(4) states:

L'article 2.7 définit la « licence exclusive » comme étant « l'<u>autorisation</u> accordée au licencié d'accomplir un acte visé par un droit d'auteur de façon exclusive [. . .] l'exclusion vis[ant] tous les titulaires », y compris le titulaire du droit d'auteur. Le choix délibéré du terme *autorisation* est incompatible avec la concession de droits de propriété. Dans l'arrêt *CCH*, par. 38, notre Cour a convenu qu'« autoriser » signifiait « sanctionner, appuyer ou soutenir ». Cela est compatible avec la définition d'une licence en common law (savoir, la permission de faire ce qui constituerait par ailleurs une violation du droit d'auteur).

En outre, le par. 36(2) indique que le licencié exclusif ne possède pas un plein intérêt de propriété dans le droit d'auteur. Le paragraphe 36(1) permet aux licenciés exclusifs d'intenter une action pour violation du droit d'auteur, mais le par. 36(2) ajoute que, lorsqu'« une personne autre que le titulaire du droit d'auteur », notamment le licencié exclusif, intente une telle action, « le titulaire du droit d'auteur [. . .] doit être constitué partie à ces procédures ». En l'espèce, KFB et KFS ont été constituées codemanderesses tout au long des procédures. L'obligation de constituer le concédant partie à l'action pour violation du droit d'auteur indique que le licencié exclusif ne possède pas un plein intérêt de propriété dans le droit d'auteur. S'il possédait un tel intérêt, il n'aurait pas à être constitué codemandeur avec le titulaire du droit d'auteur dans une action pour violation du droit d'auteur, étant donné qu'un intérêt de propriété — qui est un droit opposable à tous — comporte le droit d'intenter, en son propre nom, une action pour violation du droit d'auteur.

Je reconnais que d'autres dispositions de la Loi indiquent que les licenciés exclusifs peuvent acquérir un intérêt de propriété dans le droit d'auteur. J'estime cependant que l'intérêt de propriété ainsi acquis est limité et que ce n'est pas un intérêt qui fait obstacle à l'intérêt de propriété du concédant ou qui pourrait faire du concédant l'auteur d'une violation de son propre droit d'auteur.

Le paragraphe 13(4) prévoit ceci :

32

33

34

35

The owner of the copyright in any work may assign the right, either wholly or partially, and either generally or subject to limitations relating to territory, medium or sector of the market or other limitations relating to the scope of the assignment, and either for the whole term of the copyright or for any other part thereof, and may grant any interest in the right by licence, but no assignment or grant is valid unless it is in writing signed by the owner of the right in respect of which the assignment or grant is made, or by the owner's duly authorized agent.

Section 13(7) was enacted in 1997 to clarify the meaning of s. 13(4) with respect to exclusive licensees. It states that

For greater certainty, it is deemed always to have been the law that a grant of an exclusive licence in a copyright constitutes the grant of an interest in the copyright by licence.

The use of the term "grant of an interest" in ss. 13(4) and 13(7) would seem to refer to the granting of a property right. This language stands out in comparison to s. 2.7, which suggests that an exclusive licence is not a "grant of an interest" but rather a non-proprietary "authorization" to do something that would otherwise amount to infringement.

36    The "grant of an interest" referred to in ss. 13(4) and 13(7) meant "grant of a property interest": *Robertson v. Thomson Corp.*, [2006] 2 S.C.R. 363, 2006 SCC 43. At para. 56 of that case, the majority of this Court adopted the following passage from *Ritchie v. Sawmill Creek Golf & Country Club Ltd.* (2004), 35 C.P.R. (4th) 163 (Ont. S.C.J.), at para. 20:

The "grant of an interest" referred to in s. 13(4) is the transfer of a property right as opposed to a permission to do a certain thing. The former gives the licensee the capacity to sue in his own name for infringement, the latter provides only a defence to claims of infringement. To the extent there was any uncertainty as to the meaning of "grant of an interest" and whether this section applied to non-exclusive licences, the issue was resolved in 1997 when the *Copyright Act* was amended to include s. 13(7). . . . [Emphasis added.]

Le titulaire du droit d'auteur sur une œuvre peut céder ce droit, en totalité ou en partie, d'une façon générale ou avec des restrictions relatives au territoire, au support matériel, au secteur du marché ou à la portée de la cession, pour la durée complète ou partielle de la protection; il peut également concéder, par une licence, un intérêt quelconque dans ce droit; mais la cession ou la concession n'est valable que si elle est rédigée par écrit et signée par le titulaire du droit qui en fait l'objet, ou par son agent dûment autorisé.

Le paragraphe 13(7) a été adopté en 1997 afin de préciser le sens du par. 13(4) à l'égard des licenciés exclusifs. En voici le texte :

Il est entendu que la concession d'une licence exclusive sur un droit d'auteur est réputée toujours avoir valu concession par licence d'un intérêt dans ce droit d'auteur.

L'emploi de l'expression « concession [. . .] d'un intérêt » aux par. 13(4) et 13(7) semblerait désigner la concession d'un droit de propriété. Ce libellé se différencie de celui de l'art. 2.7, qui indique qu'une licence exclusive n'est pas une « concession d'un intérêt » mais plutôt une « autorisation » non propriétale de faire ce qui constituerait par ailleurs une violation du droit d'auteur.

La « concession [. . .] d'un intérêt » dont il est question aux par. 13(4) et 13(7) signifie la « concession [. . .] d'un intérêt de propriété » : *Robertson c. Thomson Corp.*, [2006] 2 R.C.S. 363, 2006 CSC 43. Au paragraphe 56 de cet arrêt, la Cour à la majorité a retenu le passage suivant tiré du par. 20 de la décision *Ritchie c. Sawmill Creek Golf & Country Club Ltd.* (2004), 35 C.P.R. (4th) 163 (C.S.J. Ont.) :

[TRADUCTION] La « concession par licence d'un intérêt », dont il est question au par. 13(4), est le transfert d'un droit de propriété par opposition à l'autorisation de faire une certaine chose. Dans le premier cas, le titulaire de la licence peut intenter en son nom une action en contrefaçon; dans le second, il ne peut que contester cette action. Dans la mesure où il existait une certaine incertitude quant au sens de l'expression « concession par licence d'un intérêt » et quant à savoir si elle visait les licences non exclusives, cette incertitude a été résolue en 1997 lorsque la *Loi sur le droit d'auteur* a été modifiée pour y inclure le par. 13(7). . . [Je souligne.]

According to this Court's decision in *Robertson*, the Act permits licensors to convey a *property interest* in the copyright to the exclusive licensee. However, neither *Robertson* nor the words of the Act delineate the precise scope of the exclusive licensee's property interest.

In my view, the exclusive licensee's property interest in the copyright is limited. An exclusive licence is not a complete assignment of copyright. The owner-licensor retains a residual ownership interest in the copyright. The owner-licensor's residual ownership interest precludes it from being liable for copyright infringement. An owner-licensor is liable to its exclusive licensee for breach of the licensing agreement but not for copyright infringement.

In para. 75, Bastarache J. suggests that I have read down the words of s. 2.7 in order to reach this conclusion. And the Kraft companies argued that the words "to the exclusion of all others including the copyright owner" means that the exclusive licensee has standing to sue the owner-licensor for infringement. I would respectfully disagree with both. Section 2.7 must be interpreted with an eye to the other provisions of the Act. Section 2.7 states:

For the purposes of this Act, an exclusive licence is an authorization to do any act that is subject to copyright to the exclusion of all others including the copyright owner, whether the authorization is granted by the owner or an exclusive licensee claiming under the owner.

An exclusive licence is an "authorization to do any act that is subject to copyright". Under s. 2 of the Act,

"copyright" means the rights described in

   (*a*)   section 3, in the case of a work,

.  .  .

Section 3 includes, *inter alia*, the right to produce and reproduce a work.

Suivant l'arrêt *Robertson* de notre Cour, la Loi autorise les concédants à conférer au licencié exclusif un *intérêt de propriété* dans le droit d'auteur. Toutefois, ni l'arrêt *Robertson* ni le libellé de la Loi ne circonscrit la portée précise de l'intérêt de propriété du licencié exclusif.

37

J'estime que l'intérêt de propriété du licencié exclusif dans le droit d'auteur est limité. Une licence exclusive ne constitue pas une cession complète du droit d'auteur. Le titulaire-concédant conserve un intérêt de propriété résiduel dans le droit d'auteur. Son intérêt de propriété résiduel l'empêche d'être responsable d'une violation du droit d'auteur. Le titulaire-concédant est responsable envers son licencié exclusif d'une rupture du contrat de licence, mais non d'une violation du droit d'auteur.

38

Au paragraphe 75, le juge Bastarache affirme que, pour arriver à cette conclusion, j'ai interprété de façon atténuante le libellé de l'art. 2.7. Puis, les sociétés Kraft allèguent que les termes « l'exclusion vise tous les titulaires », y compris le titulaire du droit d'auteur, signifient que le licencié exclusif a qualité pour intenter contre le titulaire-concédant une action pour violation du droit d'auteur. En toute déférence, je ne partage pas leur avis. Il faut interpréter l'art. 2.7 en fonction des autres dispositions de la Loi. L'article 2.7 est libellé ainsi :

Pour l'application de la présente loi, une licence exclusive est l'autorisation accordée au licencié d'accomplir un acte visé par un droit d'auteur de façon exclusive, qu'elle soit accordée par le titulaire du droit d'auteur ou par une personne déjà titulaire d'une licence exclusive; l'exclusion vise tous les titulaires.

39

Une licence exclusive est « l'autorisation accordée au licencié d'accomplir un acte visé par un droit d'auteur ». Aux termes de l'art. 2 de la Loi,

« droit d'auteur » S'entend du droit visé :

   *a*)   dans le cas d'une œuvre, à l'article 3;

.  .  .

L'article 3 mentionne notamment le droit de produire et reproduire une œuvre.

2007 SCC 37 (CanLII)

40      Section 2.7 is a definitional section, which enshrines the common law definition of exclusive licence in the *Copyright Act*. Section 2.7 defines an exclusive licence as an authorization to do any act that is a right described in s. 3 to the exclusion of all others including the copyright owner (i.e., the right to produce and reproduce a work to the exclusion of all others including the copyright owner). But it says nothing about the consequences of violating that exclusive right. Those consequences and remedies for a violation of an exclusive licence are dealt with in other provisions of the Act, e.g. ss. 27(1) and 36(1). As discussed above, when the definitional and liability provisions are read in context, the necessary conclusion is that an exclusive licensee may sue third parties for infringement, but not the owner of the copyright who is liable only for breach of contract.

41      Comparing the treatment of exclusive licensees and assignees under the Act supports this conclusion. If the exclusive licensee could sue the owner-licensor for infringement, then the rights of exclusive licensees would be identical to those of assignees. However, Parliament has clearly manifested its intent to treat exclusive licensees differently from copyright owners and assignees. First, Parliament used express language in putting assignees on equal footing with copyright owners, but refrained from doing the same with exclusive licensees (s. 13(5)). Second, unlike assignees, the exclusive licensee lacks the capacity to sue for infringement alone; it must join the owner-licensor as a party (s. 36(2)). Third, the language of s. 2.7 defining "exclusive licence" as an "authorization" suggests an interest short of ownership. These are all reasons why the Canadian *Copyright Act* should be interpreted so that an exclusive licensee's property interest in a copyright is limited, such that the exclusive licensee does not have a right against the licensor-owner for

L'article 2.7 est une disposition définitoire qui consacre, dans la *Loi sur le droit d'auteur*, la définition de licence exclusive en common law. L'article 2.7 définit la licence exclusive comme étant l'autorisation d'accomplir un acte qui constitue un droit décrit à l'art. 3 de façon exclusive, cette exclusion visant tous les titulaires y compris le titulaire du droit d'auteur (c'est-à-dire le droit de produire et reproduire une œuvre de façon exclusive, laquelle exclusion vise tous les titulaires, y compris le titulaire du droit d'auteur). Toutefois, cette disposition ne renseigne en rien sur les conséquences de la violation de ce droit exclusif. Ces conséquences et les recours qui peuvent être exercés pour la violation d'une licence exclusive sont traités dans d'autres dispositions de la Loi, notamment aux par. 27(1) et 36(1). Comme nous l'avons vu, lorsque les dispositions définitoires et celles relatives à la responsabilité sont interprétées dans leur contexte, la conclusion qui s'impose est que le licencié exclusif peut intenter une action pour violation du droit d'auteur contre des tiers, mais non contre le titulaire du droit d'auteur, qui ne peut être tenu responsable que de rupture de contrat.

La comparaison du traitement que la Loi réserve aux licenciés exclusifs avec celui qu'elle réserve aux cessionnaires vient étayer cette conclusion. Si le licencié exclusif pouvait intenter contre le titulaire-concédant une action pour violation du droit d'auteur, les droits des licenciés exclusifs seraient alors identiques à ceux des cessionnaires. Le législateur a toutefois clairement manifesté son intention de traiter les licenciés exclusifs différemment des titulaires du droit d'auteur et des cessionnaires. Premièrement, le législateur a expressément indiqué qu'il plaçait les cessionnaires sur un pied d'égalité avec les titulaires du droit d'auteur, mais il s'est abstenu de le faire relativement aux licenciés exclusifs (par. 13(5)). Deuxièmement, contrairement au cessionnaire, le licencié exclusif n'est pas habilité à intenter seul une action pour violation du droit d'auteur; il doit être constitué partie avec le titulaire-concédant (par. 36(2)). Troisièmement, en définissant la « licence exclusive » comme étant une « autorisation », l'art. 2.7 porte à croire qu'il est question d'un intérêt qui ne

infringement of the copyright owned by the licensor-owner.

The U.S. and the U.K. copyright regimes are helpful in elucidating the Canadian approach. Under U.S. copyright law, exclusive licensees have the right to sue the owner-licensor for infringement. U.K. copyright law, by contrast, does not permit exclusive licensees to sue the owner-licensor for infringement.

*U.S. Copyright Law*

Under U.S. copyright law, "the licensor may be liable to the exclusive licensee for copyright infringement, if the licensor exercises rights that have theretofore been exclusively licensed": *Nimmer on Copyright* (loose-leaf), vol. 3, at pp. 12-58 and 12-59; *United States Naval Institute v. Charter Communications, Inc.*, 936 F.2d 692 (2d Cir. 1991), at p. 695; *Architectronics, Inc. v. Control Systems, Inc.*, 935 F.Supp. 425 (S.D.N.Y. 1996), at p. 434.

However, there are some notable differences between the American and the Canadian statutes. Under the U.S. Act (17 U.S.C. § 101), a "transfer of copyright ownership" is defined as

an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

Unlike the Canadian Act, the U.S. statute appears to put exclusive licensees on equal footing with

constitue pas un droit de propriété. Voilà autant de raisons pour lesquelles il y a lieu d'interpréter la *Loi sur le droit d'auteur* du Canada de manière à ce que l'intérêt de propriété du licencié exclusif soit limité et à ce que le licencié exclusif n'ait pas un droit opposable au titulaire-concédant en cas de violation du droit d'auteur dont ce dernier est titulaire.

42

Les régimes de droits d'auteur en vigueur aux États-Unis et au Royaume-Uni sont utiles pour clarifier l'approche canadienne. Suivant la législation américaine sur le droit d'auteur, les licenciés exclusifs ont le droit d'intenter contre le titulaire-concédant une action pour violation du droit d'auteur. Par contre, la législation du Royaume-Uni sur le droit d'auteur ne les autorise pas à le faire.

*Législation américaine sur le droit d'auteur*

43

Suivant la législation américaine sur le droit d'auteur, [TRADUCTION] « le concédant peut être responsable de violation du droit d'auteur envers le licencié exclusif s'il exerce des droits qu'il a antérieurement concédés par licence exclusive » : *Nimmer on Copyright* (feuilles mobiles), vol. 3, p. 12-58 et 12-59; *United States Naval Institute c. Charter Communications, Inc.*, 936 F.2d 692 (2d Cir. 1991), p. 695; *Architectronics, Inc. c. Control Systems, Inc.*, 935 F.Supp. 425 (S.D.N.Y. 1996), p. 434.

44

Les lois américaine et canadienne comportent toutefois des différences importantes. La Loi américaine (17 U.S.C. § 101) définit le [TRADUCTION] « transfert de la possession du droit d'auteur » comme étant

[TRADUCTION] une cession, hypothèque, licence exclusive ou toute autre mesure de transport, d'aliénation ou de nantissement d'un droit d'auteur ou de tout droit exclusif compris dans le droit d'auteur, peu importe que ces mesures soient limitées sur le plan temporel ou géographique, mais à l'exclusion d'une licence non exclusive.

Contrairement à la Loi canadienne, la Loi américaine paraît placer les licenciés exclusifs et les

assignees. Under U.S. copyright law, there would be no functional difference between an "exclusive license" and an "assignment". The two terms had emerged from the 1909 Act, which had put assignees but not exclusive licensees on equal footing with copyright owners. That distinction has since been eliminated under the current Act: *Nimmer on Copyright*, at pp. 10-1 to 10-22. Because exclusive licensees are equated with copyright owners, the exclusive licensee can sue for infringement as an owner, which means that it can sue even the owner-licensor for copyright infringement.

*U.K. Copyright Law*

45    Under the *Copyright, Designs and Patents Act 1988* (U.K.), 1988, c. 48, the exclusive licensee lacks the capacity to sue the copyright owner-licensor. Under s. 101(1) of the U.K. Act,

[a]n exclusive licensee has, <u>except against the copyright owner</u>, the same rights and remedies in respect of matters occurring after the grant of the licence as if the licence had been an assignment.

U.K. commentators have taken this provision to mean that "[t]he exclusive licensee may sue in his own name to restrain infringements occurring after the grant of the licence as if the licence had been an assignment", and that "[e]xcept as against the owner of the right he has the same rights and remedies for infringement of the right as if the licence had been an assignment": H. Laddie et al., *The Modern Law of Copyright and Designs* (3rd ed. 2000), vol. 1, at p. 905; see also L. Bently and B. Sherman, *Intellectual Property Law* (2nd ed. 2004), at pp. 254-55. Consequently, the exclusive licensee is able to sue third parties but not the owner-licensor for infringement: *Griggs Group Ltd. v. Evans*, [2004] F.S.R. 31, [2003] EWHC 2914 (Ch), at para. 58.

46    Although our Act is not explicit as is the U.K. Act in this regard, a contextual reading of the Canadian

cessionnaires **sur un pied d'égalité. Selon la législa**lation américaine sur le droit d'auteur, il n'y aurait aucune différence pratique entre une « licence exclusive » et une « cession ». Les deux expressions émanent de la Loi de 1909, qui avait placé les cessionnaires, mais non les licenciés exclusifs, sur un pied d'égalité avec les titulaires du droit d'auteur. Cette distinction n'existe plus dans la Loi actuelle : *Nimmer on Copyright*, p. 10-1 à 10-22. Vu qu'ils sont assimilés aux titulaires du droit d'auteur, les licenciés exclusifs peuvent, en qualité de titulaire du droit d'auteur, intenter une action pour violation du droit d'auteur, ce qui signifie qu'ils peuvent même intenter une telle action contre le titulaire-concédant.

*Législation du Royaume-Uni sur le droit d'auteur*

Aux termes de la *Copyright, Designs and Patents Act 1988* (R.-U.), 1988, ch. 48, le licencié exclusif n'est pas habilité à poursuivre le titulaire-concédant du droit d'auteur. Suivant le par. 101(1) de la Loi du Royaume-Uni,

[TRADUCTION] [l]e licencié exclusif possède, <u>sauf à l'égard du titulaire du droit d'auteur</u>, les mêmes droits et recours que dans le cas d'une cession, en ce qui concerne les situations qui surviennent après la concession de la licence.

Les commentateurs du Royaume-Uni ont considéré que cette disposition signifie que [TRADUCTION] « [l]e licencié exclusif peut, comme dans le cas d'une cession, intenter une action en son propre nom pour freiner les violations de droit d'auteur qui surviennent après la concession de la licence », et que « [s]auf à l'égard du titulaire du droit d'auteur, il possède, relativement à la violation de ce droit, les mêmes droits et recours que dans le cas d'une cession » : H. Laddie et autres, *The Modern Law of Copyright and Designs* (3$^e$ éd. 2000), vol. 1, p. 905; voir également L. Bently et B. Sherman, *Intellectual Property Law* (2$^e$ éd. 2004), p. 254-255. Le licencié exclusif peut donc intenter une action pour violation du droit d'auteur contre des tiers, mais non contre le titulaire-concédant : *Griggs Group Ltd. c. Evans*, [2004] F.S.R. 31, [2003] EWHC 2914 (Ch), par. 58.

Bien que notre Loi ne soit pas aussi explicite que la Loi du Royaume-Uni à cet égard, une interprétation

Act reveals that exclusive licensees lack the capacity to sue the owner-licensor for infringement. Our Act shares a number of similarities with the U.K. Act, including common origins. In Canada, *The Copyright Act, 1921*, S.C. 1921, c. 24, the precursor to the current Act, was based largely on the British *Copyright Act, 1911*, 1 & 2 Geo. 5, c. 46. Since the 1921 Act was enacted, there have been successive rounds of amendments, but our provisions on licensing and assignments are more similar to that of the U.K. than to the U.S.

Unlike the U.S. statute, which puts exclusive licensees on equal footing with assignees, the Canadian and U.K. Acts preserve the distinction between exclusive licensees and assignees. Whereas the U.S. statute permits transfers of copyright ownership by way of exclusive licence, the U.K. Act states that a transfer of ownership in copyright can occur only "by assignment, by testamentary disposition or by operation of law, as personal or moveable property" (s. 90(1)). Similarly, s. 13(5) of the Canadian Act states that only the assignee "shall be treated for the purposes of this Act as the owner of the copyright". On their face, the Canadian and U.K. statutes do not permit transfer of copyright ownership by exclusive licence.

Moreover, the Canadian and U.K. Acts define exclusive licence in similar terms. Section 92(1) of the U.K. Act states:

In this Part an "exclusive licence" means a licence in writing signed by or on behalf of the copyright owner authorising the licensee to the exclusion of all other persons, including the person granting the licence, to exercise a right which would otherwise be exercisable exclusively by the copyright owner.

This definition is almost identical to s. 2.7 of the Canadian Act. These similarities between the

contextuelle de la Loi canadienne révèle que les licenciés exclusifs ne sont pas habilités à intenter une action pour violation du droit d'auteur contre le titulaire-concédant. Notre Loi présente un certain nombre de similitudes avec la Loi du Royaume-Uni, dont une origine commune. Au Canada, la *Loi de 1921 concernant le droit d'auteur*, S.C. 1921, ch. 24, qui a précédé la Loi actuelle, était en grande partie fondée sur le *Copyright Act, 1911* (R.-U.), 1 & 2 Geo. 5, ch. 46. Depuis l'adoption de la Loi de 1921, des séries de modifications se sont succédées, mais nos dispositions concernant les concessions de licence et les cessions ressemblent davantage à celles du Royaume-Uni qu'à celles des États-Unis.

Contrairement à la Loi américaine, qui place les licenciés exclusifs sur un pied d'égalité avec les cessionnaires, la Loi canadienne et celle du Royaume-Uni maintiennent une distinction entre les licenciés exclusifs et les cessionnaires. Alors que la Loi américaine autorise le transfert, par licence exclusive, de la possession du droit d'auteur, la Loi du Royaume-Uni prévoit que le transfert de la possession du droit d'auteur ne peut être effectué que [TRADUCTION] « par cession, par disposition testamentaire ou par application de la loi, à titre de bien personnel ou meuble » (par. 90(1)). De même, le par. 13(5) de la Loi canadienne précise que seuls les cessionnaires « sont traités comme titulaires du droit d'auteur, pour l'application de la présente loi ». À première vue, la Loi canadienne et celle du Royaume-Uni n'autorisent pas le transfert, par licence exclusive, de la possession du droit d'auteur.

Qui plus est, la Loi canadienne et celle du Royaume-Uni donnent une définition similaire de la licence exclusive. Le paragraphe 92(1) de la Loi du Royaume-Uni prévoit ceci :

[TRADUCTION] Dans la présente partie, « licence exclusive » s'entend d'une licence rédigée par écrit et signée par le titulaire du droit d'auteur, ou en son nom, qui autorise le licencié à exercer de façon exclusive un droit qui, par ailleurs, ne pourrait être exercé que par le titulaire du droit d'auteur; l'exclusion vise tous les titulaires.

Cette définition est presque identique à l'art. 2.7 de la Loi canadienne. Les similitudes que présentent

Canadian and U.K. Acts suggest that our Parliament has created a copyright licensing regime similar to that of the U.K. If our Parliament had wanted exclusive licensees to be able to sue the owner-licensor for infringement, it would have put exclusive licensees on equal footing with assignees (as the U.S. Congress has done under its Act) or given exclusive licensees this right in the words of the legislation. The fact that our Parliament has retained a distinction between exclusive licensees and assignees suggests that exclusive licensees under our Act have a limited property interest in the copyright that falls short of ownership. The procedural machinery of the Act enables the exclusive licensee to sue third parties for infringement. However, the owner-licensor is liable to the exclusive licensee only in contract.

### (3) Application to This Case

49    To establish a claim under s. 27(2)(*e*) against Euro-Excellence, Kraft Canada must show that the makers of the impugned works — the Kraft parent companies — would have infringed copyright if they had made the Toblerone and Côte d'Or labels in Canada instead of Europe. Under the exclusive licence agreements, the Kraft parent companies are not permitted to produce or reproduce the copyrighted works in Canada. However, if, hypothetically, KFS were to produce a copy of a Toblerone logo in Canada, Kraft Canada's only remedy would lie in breach of contract. As owners of the Canadian copyright in the Toblerone and Côte d'Or logos, the Kraft parent companies cannot infringe their own copyright. Although Kraft Canada, as an exclusive licensee, has a property interest in the copyright that enables it to sue third parties for infringement, the Kraft parent companies retain a residual ownership interest in the copyright, which prevents Kraft Canada from suing them for infringement. Kraft Canada has thus failed to establish "hypothetical infringement", which is necessary

la Loi canadienne et celle du Royaume-Uni tendent à indiquer que notre législateur a établi un régime de concession de licence sur le droit d'auteur semblable à celui du Royaume-Uni. Si notre législateur avait voulu que le licencié exclusif puisse intenter une action pour violation du droit d'auteur contre le titulaire-concédant, il aurait placé les licenciés exclusifs sur un pied d'égalité avec les cessionnaires (comme le Congrès américain l'a fait dans sa Loi) ou il aurait expressément accordé ce droit aux licenciés exclusifs dans le texte de la Loi. Le fait que notre législateur ait maintenu une distinction entre les licenciés exclusifs et les cessionnaires porte à croire que les licenciés exclusifs visés par notre Loi ont, dans le droit d'auteur, un intérêt de propriété limité qui ne constitue pas un droit de propriété. Le mécanisme procédural de la Loi habilite le licencié exclusif à intenter contre des tiers une action pour violation du droit d'auteur. Toutefois, le titulaire-concédant n'est responsable que sur le plan contractuel envers le licencié exclusif.

### (3) Application à la présente affaire

Pour justifier une action contre Euro-Excellence fondée sur l'al. 27(2)*e*), Kraft Canada doit démontrer que les auteurs des œuvres contestées — les sociétés mères Kraft — auraient violé le droit d'auteur s'ils avaient fabriqué les étiquettes de Toblerone et de Côte d'Or au Canada plutôt qu'en Europe. Les contrats de licence exclusive n'autorisent pas les sociétés mères Kraft à produire ou à reproduire au Canada les œuvres protégées par le droit d'auteur. Toutefois, dans l'hypothèse où KFS produirait un exemplaire du logo de Toblerone au Canada, le seul recours dont disposerait Kraft Canada serait une action pour rupture de contrat. En tant que titulaires du droit d'auteur canadien sur les logos de Toblerone et de Côte d'Or, les sociétés mères Kraft ne peuvent pas violer leur propre droit d'auteur. Bien que, à titre de titulaire d'une licence exclusive, Kraft Canada ait, dans le droit d'auteur, un intérêt de propriété qui l'habilite à intenter contre des tiers une action pour violation du droit d'auteur, les sociétés mères Kraft conservent, dans ce droit, un intérêt de propriété résiduel qui empêche Kraft

to ground a claim against Euro-Excellence under s. 27(2)(*e*).

The Canadian *Copyright Act* does not extend protection against parallel importation to exclusive licensees. Section 27(2)(*e*) of the *Copyright Act*, read in context with the provisions discussed above, shows that an exclusive licensee cannot sue for secondary infringement where the licensor is the hypothetical infringer because the owner-licensor cannot infringe its own copyright and cannot be sued for copyright infringement. If Parliament decides that this result is problematic, it can amend the *Copyright Act*. In the meantime, this Court must apply the Act that Parliament has given us.

As there is no hypothetical primary infringement, Euro-Excellence cannot have engaged in secondary infringement. I would allow the appeal with costs in this Court and in the courts below.

The following are the reasons delivered by

Fish J. — I agree with the reasons of Justice Rothstein and would dispose of the appeal as he suggests.

Had it been necessary to do so, I would have been inclined to determine whether the appellant is in any event entitled to succeed on its alternative ground relating to the integrity of Canadian law regarding intellectual property rights.

Kraft Foods Belgium SA and Kraft Foods Schweiz AG manufacture and sell chocolate packaged in Europe. The issue in this case is whether the *Copyright Act*, R.S.C. 1985, c. C-42, entitles them to prevent the sale in Canada of that very same chocolate, packaged exactly as it was when they sold it. Their claim that it does is based on

Canada de les poursuivre pour violation du droit d'auteur. Kraft Canada n'a donc pas établi l'existence de la « violation hypothétique » nécessaire pour justifier une action contre Euro-Excellence fondée sur l'al. 27(2)*e*).

Au Canada, la *Loi sur le droit d'auteur* ne protège pas les licenciés exclusifs contre l'importation parallèle. L'alinéa 27(2)*e*) de la *Loi sur le droit d'auteur*, interprété dans son contexte et conjointement avec les dispositions examinées précédemment, montre qu'un licencié exclusif ne peut pas intenter une action pour violation à une étape ultérieure dans le cas où le concédant est l'auteur de la violation hypothétique, du fait que le titulaire-concédant ne peut pas violer son propre droit d'auteur et faire l'objet de poursuites à cet égard. Si le législateur décide que ce résultat pose un problème, il peut modifier la *Loi sur le droit d'auteur*. Dans l'intervalle, la Cour doit appliquer la Loi telle qu'elle a été adoptée par le législateur.

En l'absence de violation hypothétique initiale, Euro-Excellence ne peut pas avoir commis une violation à une étape ultérieure. Je suis d'avis d'accueillir le pourvoi avec dépens devant notre Cour et les tribunaux d'instance inférieure.

Version française des motifs rendus par

Le juge Fish — Je souscris aux motifs du juge Rothstein et je suis d'avis de trancher le pourvoi de la façon qu'il propose.

Si cela avait été nécessaire, j'aurais été enclin à déterminer si l'appelante peut, de toute manière, invoquer avec succès son moyen subsidiaire concernant l'intégrité du droit canadien en matière de propriété intellectuelle.

Kraft Foods Belgium SA et Kraft Foods Schweiz AG fabriquent et vendent du chocolat emballé en Europe. La question en l'espèce est de savoir si la *Loi sur le droit d'auteur*, L.R.C. 1985, ch. C-42, leur permet d'empêcher la vente au Canada du même chocolat contenu dans le même emballage que lorsqu'elles l'ont vendu. Leur argument selon

50

51

52

53

54

agreements between commonly owned corporations — agreements that have more to do with a monopoly on the sale in Canada of those chocolates than with copyright protection of the "works" that appear on the package. In virtue of identical and simultaneous agreements, and for a nominal amount of $1,000 in each instance, Kraft Belgium and Kraft Schweiz granted Kraft Canada exclusive licences to use those "works".

55   I think it worth noting that the trial judge, in upholding Kraft's claim, proceeded on the assumption that "the sole purpose of [Kraft Belgium and Kraft Schweiz] registering copyright in Canada and then assigning rights to Kraft Canada Inc. was to mount the very attack upon [Euro-Excellence] which is currently before this Court" (*Kraft Canada Inc. v. Euro Excellence Inc.*, [2004] 4 F.C.R. 410, 2004 FC 652, at para. 44 (emphasis added)). For the true purpose of the *Copyright Act*, see *Robertson v. Thomson Corp.*, [2006] 2 S.C.R. 363, 2006 SCC 43, at para. 69.

56   Without so deciding, I express grave doubt whether the law governing the protection of intellectual property rights in Canada can be transformed in this way into an instrument of trade control not contemplated by the *Copyright Act*.

The reasons of Bastarache, LeBel and Charron JJ. were delivered by

Bastarache J. —

I.   Introduction

57   Can a chocolate bar be copyrighted because of protected works appearing on its wrapper? In particular, can s. 27(2) of the *Copyright Act*, R.S.C. 1985, c. C-42, which prohibits parallel importation into Canada of copyrighted works, be used by the respondent Kraft Canada Inc. to prevent the

lequel la Loi les autorise à le faire repose sur des contrats conclus entre des sociétés ayant un même propriétaire — lesquels contrats concernent davantage l'établissement d'un monopole sur la vente du chocolat en question au Canada que la protection conférée par le droit d'auteur à l'égard des « œuvres » figurant sur l'emballage. Dans des contrats identiques conclus simultanément et en contrepartie de la somme symbolique de 1 000 $ dans chaque cas, Kraft Belgium et Kraft Schweiz ont concédé à Kraft Canada des licences exclusives pour l'utilisation de ces « œuvres ».

Il convient, selon moi, de noter que, pour faire droit à l'action de Kraft, le juge de première instance a présumé que « le seul objectif que visait l'enregistrement du droit d'auteur au Canada [par Kraft Belgium et Kraft Schweiz], puis la cession des droits à Kraft Canada Inc., était d'élaborer contre [Euro Excellence] l'attaque même dont la Cour est présentement saisie » (*Kraft Canada Inc. c. Euro Excellence Inc.*, [2004] 4 R.C.F. 410, 2004 CF 652, par. 44 (je souligne)). En ce qui concerne l'objet véritable de la *Loi sur le droit d'auteur*, voir *Robertson c. Thomson Corp.*, [2006] 2 R.C.S. 363, 2006 CSC 43, par. 69.

Sans me prononcer sur cette question, j'exprime un doute sérieux quant à la possibilité de transformer ainsi le droit régissant la protection de la propriété intellectuelle au Canada en un instrument de contrôle du commerce qui n'est pas envisagé par la *Loi sur le droit d'auteur*.

Version française des motifs des juges Bastarache, LeBel et Charron rendus par

Le juge Bastarache —

I.   Introduction

Une tablette de chocolat peut-elle faire l'objet d'un droit d'auteur en raison de la présence d'œuvres protégées sur son emballage? Plus précisément, le par. 27(2) de la *Loi sur le droit d'auteur*, L.R.C. 1985, ch. C-42, qui interdit l'importation parallèle au Canada d'œuvres protégées par le droit d'auteur,

appellant, **Euro-Excellence Inc.**, from, in the words of s. 27(2), importing, for the purpose of selling, renting, distributing or trading, genuine Toblerone and Côte d'Or chocolate bars into Canada, without obscuring the logos of those chocolate bars, on the basis that the logos are copyrighted? I conclude that it cannot. Both s. 27(2) and the *Copyright Act* as a whole are about the protection of copyrighted works, not about the importation and sale of consumer goods in general. The merely incidental presence of the copyrighted works on the wrappers of the chocolate bars does not bring the chocolate bars within the protections offered by the *Copyright Act*. This appeal is allowed for the reasons set out below.

peut-il être invoqué par l'intimée, Kraft Canada Inc., pour empêcher l'appelante Euro-Excellence Inc. — pour reprendre les termes du par. 27(2) — d'importer au Canada de véritables tablettes de chocolat Toblerone et Côte d'Or en vue de leur mise en vente ou en location, de leur mise en circulation ou de leur utilisation dans un but commercial, sans dissimuler les logos sur ces produits, pour le motif que les logos sont des œuvres protégées par le droit d'auteur? Je conclus que non. Tant le par. 27(2) que la *Loi sur le droit d'auteur* dans son ensemble concernent la protection d'œuvres protégées par le droit d'auteur, et non l'importation et la vente de biens de consommation en général. La présence simplement accessoire des œuvres protégées sur les emballages des tablettes de chocolat ne rend pas applicables à ces dernières les protections offertes par la *Loi sur le droit d'auteur*. Le présent pourvoi est accueilli pour les motifs exposés ci-après.

## II.  Facts

Kraft Foods Belgium SA ("KFB") and Kraft Foods Schweiz AG ("KFS") make Côte d'Or and Toblerone chocolate bars in, respectively, Belgium and Switzerland. Kraft Canada Inc. ("KCI") has distributed Toblerone bars in Canada as exclusive Canadian distributor since 1990. KCI was an authorized Canadian distributor of Côte d'Or bars before 1997, and in 2001 entered into an exclusive agreement to distribute the bars in Canada.

Euro-Excellence also imports both Toblerone and Côte d'Or bars into Canada and distributes those bars here. Beginning in 1993, Euro-Excellence was an authorized distributor of Côte d'Or bars, and for a period of approximately three years ending in 2000, Euro-Excellence was the exclusive Canadian distributor of Côte d'Or bars; that distribution contract was not renewed. Since 2000, Euro-Excellence has been importing genuine Côte d'Or bars as an unauthorized distributor. In 2001, Euro-Excellence began importing and distributing genuine Toblerone bars, also on an unauthorized basis.

## II.  Faits

Kraft Foods Belgium SA (« KFB ») et Kraft Foods Schweiz AG (« KFS ») fabriquent les tablettes de chocolat Côte d'Or et Toblerone en Belgique et en Suisse, respectivement. Kraft Canada Inc. (« KCI ») est le distributeur exclusif des tablettes de chocolat Toblerone au Canada depuis 1990. KCI était un distributeur autorisé des tablettes de chocolat Côte d'Or au Canada avant 1997; en 2001, elle a conclu un accord qui en faisait le distributeur exclusif de ces tablettes au Canada.

Euro-Excellence importe et met elle aussi en circulation les tablettes de chocolat Toblerone et Côte d'Or au Canada. Euro-Excellence est devenue un distributeur autorisé des tablettes de chocolat Côte d'Or en 1993 et, pendant une période d'environ trois ans se terminant en 2000, elle en a été le distributeur exclusif au Canada. Toutefois, son contrat de distribution n'a pas été renouvelé. Depuis 2000, Euro-Excellence importe de véritables tablettes de chocolat Côte d'Or sans en être un distributeur autorisé. En 2001, Euro-Excellence a commencé à importer et à mettre en circulation de véritables tablettes de chocolat Toblerone, sans en être non plus un distributeur autorisé.

58

59

60    Thus, from 2001 until the present litigation commenced, KCI was the exclusive licensed Canadian distributor of both Côte d'Or and Toblerone bars (that is, KCI had exclusive importation and distribution contracts with KFB and KFS, respectively). Notwithstanding these exclusivity agreements, Euro-Excellence continued to import and distribute both Côte d'Or and Toblerone bars which it had acquired legally in Europe. Euro-Excellence was successful enough in its distribution of the chocolate bars to give KCI cause to attempt to find a way to prevent Euro-Excellence from importing and distributing them.

61    It is not contested that KCI is the owner in Canada of the trade-marks "Côte d'Or" and "Toblerone". KCI does not rely in this dispute on its rights as trade-mark holder.

62    On October 25, 2002, KFB registered three Côte d'Or logos in Canada as copyrighted works in the artistic category. That same day, a licensing agreement between KFB and KCI was also registered, pursuant to which KCI purported to acquire

the sole and exclusive right and license in the Territory to produce, reproduce and adapt the Works or any substantial part thereof, in any material form whatever, and to use and publicly present the Works in association with the manufacture, distribution or sale in Canada of confectionery products, including, but not limited to, chocolate.

The agreement provided that KCI pay KFB $1,000 per year for the licence.

63    Also on October 25, 2002, KFS registered two Toblerone logos in Canada as copyrighted works in the artistic category, and entered into a substantially similar licensing agreement with KCI. Again, KCI was to pay $1,000 per year for the licence.

Ainsi, de 2001 jusqu'à la naissance du présent litige, KCI était, au Canada, le seul distributeur autorisé des tablettes de chocolat Côte d'Or et Toblerone (c'est-à-dire que KCI avait avec KFB et KFS, respectivement, des contrats d'exclusivité pour l'importation et la mise en circulation de ces produits). Malgré ces contrats d'exclusivité, Euro-Excellence a continué d'importer et de mettre en circulation les tablettes de chocolat Côte d'Or et Toblerone qu'elle avait achetées en toute légalité en Europe. Euro-Excellence a suffisamment bien réussi à mettre en circulation ces tablettes de chocolat pour que KCI cherche un moyen de l'empêcher d'en faire l'importation et la mise en circulation.

Personne ne conteste que KCI est, au Canada, le titulaire des marques de commerce « Côte d'Or » et « Toblerone ». Dans le présent litige, KCI n'invoque pas ses droits en tant que titulaire de marques de commerce.

Le 25 octobre 2002, KFB a enregistré au Canada trois logos de Côte d'Or en tant qu'œuvres protégées par le droit d'auteur dans la catégorie des œuvres artistiques. Le même jour, le contrat de licence conclu entre KFB et KCI a aussi été enregistré, lequel conférait à KCI

[TRADUCTION] l'autorisation et le droit exclusifs de produire, de reproduire et d'adapter les œuvres ou une partie importante de celles-ci sur le territoire, sous une forme matérielle quelconque, et d'utiliser et de présenter publiquement les œuvres en liaison avec la fabrication, la mise en circulation ou la vente au Canada de produits de confiserie, notamment du chocolat.

Aux termes de ce contrat, KCI devait verser à KFB la somme annuelle de mille dollars pour la licence.

Le 25 octobre 2002 également, KFS a enregistré au Canada deux logos de Toblerone en tant qu'œuvres protégées par le droit d'auteur dans la catégorie des œuvres artistiques et a conclu avec KCI essentiellement le même type de contrat de licence. Là encore, KCI était tenue de verser la somme annuelle de mille dollars pour la licence.

Armed with these new copyrights, KCI called upon Euro-Excellence to cease and desist distribution of any product to which the copyrighted works were affixed. When Euro-Excellence refused, KCI brought this action.

III. Judicial History

A. *Federal Court*, [2004] 4 F.C.R. 410, 2004 FC 652

In the Federal Court, Harrington J. described KCI's copyright action as an "interesting strategy in an effort to thwart Euro Excellence's distribution of" the chocolate bars (para. 4). (I will henceforth refer to the Côte d'Or and Toblerone bars collectively as "the chocolate bars" since there are no substantial differences in the treatment of the bars for the purposes of these reasons.) Harrington J. first found that at least some of the logos were original artistic works which were properly subject to copyright (paras. 34 and 37). (For simplicity's sake I will refer only to those logos from this point on.) Having made this determination, he then turned to an analysis of s. 27(2) of the Act, and held that, consistent with the modern approach to statutory interpretation, s. 27(2) gave KCI a monopoly in the use of the copyrighted logos (para. 53).

In response to Euro-Excellence's argument that "copyright in a work cannot be used to prevent competitive distribution of goods, or at least in circumstances such as this where the copyright works are merely ancillary to the main product", the trial judge declined to interpret the Act in such a way as to limit KCI's rights (paras. 55-60). Harrington J. referred to the Australian case of *R. & A. Bailey & Co. v. Boccaccio Pty. Ltd.* (1986), 84 F.L.R. 232 (N.S.W.S.C.), in which a claim similar to KCI's was allowed; he also noted that the Australian copyright legislation was thereafter amended to provide that copyright in a work is not infringed by importation of an article if the work is an accessory (such

Munie de ces nouveaux droits d'auteur, KCI a mis Euro-Excellence en demeure de cesser de distribuer tout produit sur lequel figuraient les œuvres protégées par le droit d'auteur. Devant le refus opposé par Euro-Excellence, KCI a intenté la présente action.

III. Historique des procédures judiciaires

A. *Cour fédérale*, [2004] 4 R.C.F. 410, 2004 CF 652

En Cour fédérale, le juge Harrington a qualifié l'action pour violation du droit d'auteur intentée par KCI de « stratégie intéressante pour déjouer la distribution [des tablettes de chocolat] par Euro Excellence » (par. 4). (J'utiliserai ci-après le terme « les tablettes de chocolat » pour désigner collectivement les tablettes de chocolat Côte d'Or et Toblerone, puisque rien ne les distingue vraiment pour les besoins des présents motifs.) Le juge Harrington a d'abord conclu que certains logos, tout au moins, étaient effectivement des œuvres artistiques originales qui étaient visées à juste titre par le droit d'auteur (par. 34 et 37). (Par souci de simplicité, il ne sera question ci-après que de ces logos.) Après avoir tranché ce point, le juge Harrington a analysé le par. 27(2) de la Loi et a statué que, conformément à la méthode moderne d'interprétation législative, le par. 27(2) conférait à KCI un monopole sur l'utilisation des logos protégés par le droit d'auteur (par. 53).

En réponse à l'argument d'Euro-Excellence selon lequel « le droit d'auteur sur une œuvre ne saurait être utilisé pour empêcher la distribution concurrentielle de marchandises, ou du moins, dans des circonstances comme en l'espèce, lorsque les œuvres protégées par le droit d'auteur ne sont qu'accessoires au produit principal », le juge de première instance a refusé d'interpréter la Loi de manière à restreindre les droits de KCI (par. 55-60). Le juge Harrington a mentionné l'arrêt australien *R. & A. Bailey & Co. c. Boccaccio Pty. Ltd.* (1986), 84 F.L.R. 232 (N.S.W.S.C.), dans lequel une action semblable à celle de KCI a été accueillie. Il a ajouté que la loi australienne sur le droit d'auteur a

64

65

66

as a label or package) to the imported article. In light of the Australian history, Harrington J. found in favour of KCI:

> Although, of course, not binding, I find the Bailey's Irish Cream case persuasive and come to the same conclusion under our Act. I am not prepared to simply use the *Copyright Act* as a touchstone for an imaginative frolic of my own. The language is clear, and the very purpose of the Act is to prevent unauthorized distribution of copyrighted works. [para. 60]

67     On the basis of this logic, Harrington J. awarded KCI damages in the amount of \$300,000 and an injunction restraining Euro-Excellence from selling, distributing, exposing or offering for sale any copies of the copyrighted logos. He did not enjoin Euro-Excellence from distributing the bars altogether. Instead, he held that the appropriate order was "that the product be rendered non-infringing" (para. 64).

68     Subsequent to his original order, Harrington J. refused a motion for reconsideration ((2004), 33 C.P.R. (4th) 242, 2004 FC 832) and provided instructions on negotiations between KCI and Euro-Excellence regarding Euro-Excellence's attempts to conform to the terms of the injunction by covering the copyrighted material with opaque self-sticking plastic film ((2004), 35 C.P.R. (4th) 193, 2004 FC 1215).

B. *Federal Court of Appeal*, [2006] 3 F.C.R. 91, 2005 FCA 427

69     The Federal Court of Appeal refused to allow an appeal of the decision of Harrington J. Writing for Noël and Pelletier JJ.A., Justice Desjardins found that the only two issues which warranted

été modifiée par la suite de façon à prévoir que l'importation d'un article comportant une œuvre protégée ne constitue pas une violation du droit d'auteur si l'œuvre en question est un élément accessoire (comme une étiquette ou un emballage) de l'article importé. À la lumière de la décision australienne, le juge Harrington a rendu une décision favorable à KCI :

> Bien qu'elle ne soit évidemment pas obligatoire, j'estime convaincante la décision dans l'affaire Baileys Irish Cream et je tire la même conclusion en vertu de notre Loi. Je ne suis pas disposé à n'utiliser la *Loi sur le droit d'auteur* que comme pierre de touche pour une fantaisie de mon imagination. Le libellé est clair et le véritable objet de la Loi est d'empêcher la distribution non autorisée d'œuvres protégées par le droit d'auteur. [par. 60]

Se fondant sur ce raisonnement, le juge Harrington a accordé à KCI des dommages-intérêts de 300 000 \$ et une injonction interdisant à Euro-Excellence de mettre en vente, mettre en circulation, exposer ou offrir en vente des exemplaires des logos protégés par le droit d'auteur. Il n'a pas enjoint à Euro-Excellence de cesser purement et simplement de mettre en circulation les tablettes de chocolat. Il a plutôt estimé qu'il convenait de prononcer une ordonnance « pour empêcher que le produit ne constitue une contrefaçon du droit d'auteur » (par. 64).

Après avoir rendu son ordonnance initiale, le juge Harrington a rejeté une requête en réexamen ([2004] A.C.F. nᵒ 1015 (QL), 2004 CF 832) et a donné des directives applicables aux négociations entre KCI et Euro-Excellence portant sur les tentatives d'Euro-Excellence de se conformer à l'injonction en recouvrant le matériel protégé par le droit d'auteur d'une pellicule de plastique opaque autoadhésive ([2004] A.C.F. nᵒ 1464 (QL), 2004 CF 1215).

B. *Cour d'appel fédérale*, [2006] 3 R.C.F. 91, 2005 CAF 427

La Cour d'appel fédérale a rejeté l'appel interjeté contre la décision du juge Harrington. S'exprimant en son propre nom et en celui des juges Noël et Pelletier, la juge Desjardins a estimé que seules

consideration by the Court of Appeal were the interpretation of s. 27(2) of the *Copyright Act* and the appropriateness of the damages award.

Desjardins J.A. focussed her analysis on whether KCI's claim required proof that the copies of the works imported by Euro-Excellence would have infringed copyright had they been made in Canada. She noted that *CCH Canadian Ltd. v. Law Society of Upper Canada*, [2004] 1 S.C.R. 339, 2004 SCC 13, at para. 82, held that "[a]bsent primary infringement, there can be no secondary infringement", but distinguished it on the grounds that the wording of s. 27(2)(*e*) did not require proof of primary infringement abroad in order to ground a finding of secondary infringement by way of importation. In her view:

[S]ubsection 27(2) itself provides that secondary infringement occurs when any of the things referred to in paragraphs 27(2)(*a*) to (*c*) is done, when the production or reproduction of the work in question would be an infringement if the copy had been made in Canada by the person who made it. [para. 60]

Since KCI held the exclusive right of reproduction for Canada, even as against KFB and KFS, the mere fact that KFB and KFS were entitled to reproduce the protected works abroad did not excuse Euro-Excellence of liability for importing them. Desjardins J.A.'s reasons do not address the wording of paras. (*a*) to (*c*) of s. 27(2), or the question of whether Euro-Excellence's activities had violated the terms of those paragraphs in any detail.

Desjardins J.A. allowed the appeal in part and dismissed the cross-appeal. She referred the matter of damages back to the trial judge. Harrington J. heard further submissions and confirmed his original order that damages be awarded in the amount of $300,000 ((2006), 50 C.P.R. (4th) 425, 2006 FC 453).

les questions de l'interprétation du par. 27(2) de la *Loi sur le droit d'auteur* et de la justesse de la condamnation à des dommages-intérêts méritaient d'être examinées par la Cour d'appel.

La juge Desjardins a mis l'accent sur la question de savoir si l'action intentée par KCI obligeait celle-ci à prouver que les exemplaires des œuvres importés par Euro-Excellence auraient constitué une violation du droit d'auteur s'ils avaient été produits au Canada. Elle a souligné que, dans l'arrêt *CCH Canadienne Ltée c. Barreau du Haut-Canada*, [2004] 1 R.C.S. 339, 2004 CSC 13, par. 82, notre Cour a jugé qu'en « l'absence de violation initiale, il ne peut y avoir de violation à une étape ultérieure », mais elle a établi une distinction avec cet arrêt en affirmant que le libellé de l'al. 27(2)*e*) n'exigeait pas la preuve d'une violation initiale à l'étranger pour qu'il soit possible de conclure à une violation à une étape ultérieure du fait de l'importation. Elle a exprimé l'avis suivant :

[De] par les termes mêmes du paragraphe 27(2) de la Loi, [. . .] il y a violation du droit d'auteur à une étape ultérieure dans l'accomplissement des actes énumérés aux alinéas 27(2)*a*) à *c*), quand la production ou la reproduction de l'œuvre en question constituerait une violation si elle avait été produite au Canada par la personne qui l'a produite. [par. 60]

Étant donné que KCI détenait le droit de reproduction exclusif pour le Canada, qu'elle pouvait même opposer à KFB et à KFS, Euro-Excellence n'était pas dégagée de toute responsabilité relative à l'importation des œuvres en question du seul fait que KFB et KFS avaient le droit de reproduire les œuvres protégées à l'étranger. Dans ses motifs, la juge Desjardins n'examine pas en détail le libellé des al. 27(2)*a*) à *c*) ou la question de savoir si, par ses activités, Euro-Excellence avait contrevenu à ces alinéas.

La juge Desjardins a accueilli l'appel en partie et a rejeté l'appel incident. Elle a renvoyé l'affaire au juge de première instance pour qu'il tranche la question des dommages-intérêts. Le juge Harrington a entendu des observations additionnelles et a confirmé son ordonnance initiale accordant des dommages-intérêts de 300 000 $ ([2006] A.C.F. n° 563 (QL), 2006 CF 453).

70

71

IV. Analysis

A. *The Issue*

72     The issue that needs to be determined in this appeal is the proper interpretation of s. 27(2) of the *Copyright Act*. It provides as follows:

It is an infringement of copyright for any person to

(*a*)   sell or rent out,

(*b*)   distribute to such an extent as to affect prejudicially the owner of the copyright,

(*c*)   by way of trade distribute, expose or offer for sale or rental, or exhibit in public,

(*d*)   possess for the purpose of doing anything referred to in paragraphs (*a*) to (*c*), or

(*e*)   import into Canada for the purpose of doing anything referred to in paragraphs (*a*) to (*c*),

a copy of a work, sound recording or fixation of a performer's performance or of a communication signal that the person knows or should have known infringes copyright or would infringe copyright if it had been made in Canada by the person who made it.

73     As the wording of the provision makes clear, KCI's claim against Euro-Excellence, which is made under para. (*e*), stands or falls on the interpretation of paras. (*a*) to (*c*). Paragraph (*e*) is violated only if the defendant can be shown to have imported the copyrighted works for the purposes of doing one of the acts set out in paras. (*a*) to (*c*).

74     Given this structure, what is needed is an interpretation of s. 27(2)(*a*) to (*c*) of the Act. At para. 9 of this Court's decision in *CCH*, the Chief Justice set out the proper approach to interpreting the *Copyright Act*:

In interpreting the scope of the *Copyright Act*'s rights and remedies, courts should apply the modern approach to statutory interpretation whereby "the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the

IV. Analyse

A. *La question en litige*

La question devant être tranchée en l'espèce est celle de l'interprétation que doit recevoir le par. 27(2) de la *Loi sur le droit d'auteur*, qui est ainsi libellé :

Constitue une violation du droit d'auteur l'accomplissement de tout acte ci-après en ce qui a trait à l'exemplaire d'une œuvre, d'une fixation d'une prestation, d'un enregistrement sonore ou d'une fixation d'un signal de communication alors que la personne qui accomplit l'acte sait ou devrait savoir que la production de l'exemplaire constitue une violation de ce droit, ou en constituerait une si l'exemplaire avait été produit au Canada par la personne qui l'a produit :

*a*)   la vente ou la location;

*b*)   la mise en circulation de façon à porter préjudice au titulaire du droit d'auteur;

*c*)   la mise en circulation, la mise ou l'offre en vente ou en location, ou l'exposition en public, dans un but commercial;

*d*)   la possession en vue de l'un ou l'autre des actes visés aux alinéas *a*) à *c*);

*e*)   l'importation au Canada en vue de l'un ou l'autre des actes visés aux alinéas *a*) à *c*).

Comme l'indique clairement le libellé de cette disposition, l'issue de l'action que KCI a intentée contre Euro-Excellence sur le fondement de l'al. *e*) dépend de l'interprétation que doivent recevoir les al. *a*) à *c*). L'alinéa *e*) n'est enfreint que s'il est possible de démontrer que le défendeur a importé des œuvres protégées par le droit d'auteur en vue de l'un ou l'autre des actes visés aux al. *a*) à *c*).

En raison de cette structure, il faut interpréter les al. 27(2)*a*) à *c*) de la Loi. Au paragraphe 9 de l'arrêt *CCH* de notre Cour, la Juge en chef a énoncé la façon dont la *Loi sur le droit d'auteur* doit être interprétée :

Pour définir les droits et recours conférés par la *Loi sur le droit d'auteur*, les tribunaux doivent recourir à l'approche moderne en matière d'interprétation législative selon laquelle « il faut lire les termes d'une loi dans leur contexte global en suivant le sens ordinaire

scheme of the Act, the object of the Act, and the intention of Parliament": *Bell ExpressVu Limited Partnership v. Rex*, [2002] 2 S.C.R. 559, 2002 SCC 42, at para. 26, citing E. A. Driedger, *Construction of Statutes* (2nd ed. 1983), at p. 87.

Thus, to properly interpret s. 27(2), we need to turn to an examination of the scheme and object of the *Copyright Act*. My colleague Rothstein J., at para. 4 of his reasons, would require a precise statutory provision to determine the scope of the protection afforded under s. 27(2). He believes that I am introducing a concept of legitimate interests to read down rights afforded by the *Copyright Act* (para. 7), that I am even introducing a new equitable doctrine (para. 8) or trying to substitute my policy preferences to those of Parliament (para. 3). I am simply applying our rules of statutory interpretation consistently to determine legislative intent and must, in doing so, give proper attention to the legislative context by looking at the provisions under scrutiny, the Act in general and the other legislative provisions that apply to related concepts. Rothstein J. does recognize in his own reasons that this legislation has to be interpreted in its proper legislative context and that it is not true that this Act is worded in such a way that no inferences have to be made. At paras. 34, 35 and 37 for instance, he finds that an exclusive licensee's property interest is limited, and restricts the application of ss. 13(6) and 36(1), ascribing a particular meaning and scope to the word "authorization" in s. 2.7, where the legislator clearly said that an exclusive licensee could do any act that is subject to copyright to the exclusion of all others "including the copyright owner". At para. 31, he speaks of limitations on the rights of exclusive licensees that are found by "necessary implication". I think the purpose of s. 27(2) is determinative and that I need not deal with the licensing issue. I would however agree with Abella J. that the language of s. 2.7 is perfectly clear (para. 114), that a grant is a grant (para. 115), and that the grant in the present case is for an exclusive licence giving the "sole and exclusive right" to the copyright (para. 123). That right can be enforced under s. 36(1). It is obvious to me that Rothstein J. must therefore be wrong when he states at para. 22 that hypothetical infringement has not been made out. The Kraft

et grammatical qui s'harmonise avec l'esprit de la loi, l'objet de la loi et l'intention du législateur » : *Bell ExpressVu Limited Partnership c. Rex*, [2002] 2 R.C.S. 559, 2002 CSC 42, par. 26, où notre Cour cite E. A. Driedger, *Construction of Statutes* (2ᵉ éd. 1983), p. 87.

Pour interpréter correctement le par. 27(2), il faut donc examiner l'économie et l'objet de la *Loi sur le droit d'auteur*. Au paragraphe 4 de ses motifs, mon collègue le juge Rothstein est d'avis qu'il faudrait une disposition législative précise pour déterminer l'étendue de la protection offerte par le par. 27(2). Il estime que j'introduis une notion d'intérêts légitimes pour atténuer la portée des droits conférés par la *Loi sur le droit d'auteur* (par. 7), que j'introduis même une nouvelle théorie d'equity (par. 8) ou que je tente de substituer mes préférences en matière de politique générale à celles du législateur (par. 3). Je ne fais qu'appliquer systématiquement nos règles d'interprétation législative afin de déterminer l'intention du législateur et, ce faisant, je dois dûment tenir compte du contexte législatif en examinant les dispositions en cause, la Loi en général et les autres dispositions législatives qui s'appliquent à des concepts connexes. En fait, le juge Rothstein reconnaît dans ses propres motifs que la présente loi doit être interprétée dans son véritable contexte législatif et qu'il est inexact qu'elle est libellée d'une façon telle qu'aucune inférence n'est nécessaire. Aux paragraphes 34, 35 et 37, par exemple, il conclut que l'intérêt de propriété conféré au licencié exclusif est limité, et il restreint l'application des par. 13(6) et 36(1) en attribuant une signification et une portée particulières au mot « autorisation » figurant à l'art. 2.7, où le législateur affirme clairement que le licencié exclusif peut accomplir un acte visé par le droit d'auteur de façon exclusive, « l'exclusion vis[ant] tous les titulaires », y compris le titulaire du droit d'auteur. Au paragraphe 31, le juge Rothstein évoque les limites des droits des licenciés exclusifs, auxquelles il faut conclure « par déduction nécessaire ». Selon moi, l'objet du par. 27(2) est déterminant et je n'ai pas à me pencher sur la question de la concession d'une licence. Toutefois, je serais d'accord avec la juge Abella pour dire que le libellé de l'art. 2.7 est parfaitement clair (par. 114), qu'une concession est une concession (par. 115) et que la concession en

parent companies in Europe could not have made a copy of the work in Canada without infringing the copyright. Furthermore, I see no legal justification for limiting the right of the licensee to a claim in contract (para. 27); this would be a clear contradiction of the terms of s. 36(1). Still I see no point in pursuing this course when the reasons of Rothstein J. clearly imply that the purpose of the Act could be circumvented by an assignment of the copyright rather than by the granting of a licence.

B.  *The Purpose of the Copyright Act*

76     In *Théberge v. Galerie d'Art du Petit Champlain inc.*, [2002] 2 S.C.R. 336, 2002 SCC 34, Binnie J. set out the dual objectives of the *Copyright Act*, at paras. 30-31:

The *Copyright Act* is usually presented as a balance between promoting the public interest in the encouragement and dissemination of works of the arts and intellect and obtaining a just reward for the creator . . . .

The proper balance among these and other public policy objectives lies not only in recognizing the creator's rights but in giving due weight to their limited nature.

As the Chief Justice noted in *CCH*, at para. 10, applications of the *Copyright Act* should attempt "to maintain an appropriate balance between these two goals". It is also important to keep in mind Binnie J.'s holding in *Théberge* which limits copyright protection to the "<u>legitimate</u> economic interests" of the copyright holder (para. 38 (emphasis added)).

77     The *CCH* decision recognized the "limited nature" of the rights of a copyright holder in two

l'espèce est celle d'une licence exclusive conférant le « droit exclusif » au droit d'auteur (par. 123). Ce droit peut être exercé en vertu du par. 36(1). Il est évident, selon moi, que le juge Rothstein doit donc avoir tort d'affirmer, au par. 22, que l'existence d'une violation hypothétique n'a pas été établie. Les sociétés mères Kraft en Europe ne pouvaient pas avoir reproduit l'œuvre au Canada sans violer le droit d'auteur. J'estime, en outre, que restreindre le droit du licencié à un recours fondé sur la responsabilité contractuelle n'est aucunement justifié sur le plan juridique (par. 27); cela contredirait clairement le libellé du par. 36(1). Je ne vois toujours pas l'utilité d'emprunter cette voie alors que les motifs du juge Rothstein impliquent manifestement qu'il serait possible de contourner l'objet de la Loi par la cession du droit d'auteur plutôt que par la concession d'une licence.

B.  *L'objet de la Loi sur le droit d'auteur*

Dans l'arrêt *Théberge c. Galerie d'Art du Petit Champlain inc.*, [2002] 2 R.C.S. 336, 2002 CSC 34, le juge Binnie a énoncé, aux par. 30-31, le double objectif de la *Loi sur le droit d'auteur* :

La Loi est généralement présentée comme établissant un équilibre entre, d'une part, la promotion, dans l'intérêt du public, de la création et de la diffusion des œuvres artistiques et intellectuelles et, d'autre part, l'obtention d'une juste récompense pour le créateur . . .

On atteint le juste équilibre entre les objectifs de politique générale, dont ceux qui précèdent, non seulement en reconnaissant les droits du créateur, mais aussi en accordant l'importance qu'il convient à la nature limitée de ces droits.

Comme la Juge en chef l'a souligné au par. 10 de l'arrêt *CCH*, les tribunaux doivent s'efforcer de « maintenir un juste équilibre entre ces deux objectifs » en appliquant la *Loi sur le droit d'auteur*. Il importe également de se rappeler que, dans l'arrêt *Théberge*, le juge Binnie a conclu que la protection conférée par le droit d'auteur ne vise que les « intérêts économiques <u>légitimes</u> » du titulaire du droit d'auteur (par. 38 (je souligne)).

Dans l'arrêt *CCH*, la Cour a reconnu, de deux façons importantes, la « nature limitée » des droits

important ways: in its definition of originality and in its treatment of fair dealing.

The *Copyright Act* protects original works only. In *CCH*, the Chief Justice held that, to be considered original in the sense required by the Act, a work must be the result of "an exercise of skill and judgment" (para. 16). This standard is consistent with the purpose of the Act, in that it provides a just reward for the labour of the creator; a "creativity" standard of originality was rejected insofar as it required novelty or uniqueness for copyright protection and failed to take account of the division between copyright and patent: *CCH*, at para. 24. However the skill and judgment standard does not provide a reward for *all* types of labour: the "sweat of the brow" standard of originality was rejected in *CCH* because it fails to take account of the "knowledge, developed aptitude or practised ability" and "capacity for discernment or ability to form an opinion or evaluation" which are the special hallmarks of the types of labour which produce the type of works protected by the *Copyright Act* (*CCH*, at paras. 16 and 24).

The *CCH* decision recognized the limited nature of the rights of a copyright holder in its treatment of fair dealing, which recognized that, unlike other exceptions, fair dealing is an essential part of copyright protection, and therefore that fair dealing is constitutive of the idea of the wrong in copyright law. Not every substantial reproduction of a copyrighted work counts as an infringement of copyright. This logic is clarified by Professor Abraham Drassinower in his article "Taking User Rights Seriously", in M. Geist, ed., *In the Public Interest: The Future of Canadian Copyright Law* (2005), 462. As Drassinower writes, at p. 470, "Fair dealing stands for the proposition that responding to another's work in one's own does not mean that one's work is any less one's own. Thus the defendant who makes out the fair dealing defence is an author in her own right." This is consistent with the understanding of copyright discussed above: sometimes

du titulaire du droit d'auteur : dans sa définition du mot « originalité » et dans sa façon de traiter l'utilisation équitable.

La *Loi sur le droit d'auteur* protège uniquement les œuvres originales. Dans l'arrêt *CCH*, la Juge en chef a déclaré que, pour être originale au sens de la Loi, une œuvre doit résulter de « l'exercice du talent et du jugement » (par. 16). Ce critère est conforme à l'objet de la Loi en ce sens qu'il accorde une juste récompense pour le travail du créateur. Le critère d'originalité fondé sur la « créativité » a été rejeté parce qu'il exigeait que l'œuvre soit nouvelle ou unique pour être protégée par le droit d'auteur et parce qu'il ne tenait pas compte de la différence entre droit d'auteur et brevet : *CCH*, par. 24. Toutefois, le critère de l'exercice du talent et du jugement n'accorde pas une récompense pour *tous* les types de travail : le critère d'originalité fondé sur « l'effort » a été rejeté dans l'arrêt *CCH* parce qu'il ne tient compte ni du recours « aux connaissances personnelles, à une aptitude acquise ou à une compétence issue de l'expérience », ni de « la faculté de discernement ou [de] la capacité de se faire une opinion ou de procéder à une évaluation », lesquels caractérisent les types de travail qui produisent les types d'œuvres protégés par la *Loi sur le droit d'auteur* (*CCH*, par. 16 et 24).

Dans l'arrêt *CCH*, la Cour a reconnu la nature limitée des droits du titulaire du droit d'auteur dans sa façon de traiter l'utilisation équitable, en admettant que, contrairement aux autres exceptions, l'utilisation équitable constitue une partie essentielle de la protection conférée par le droit d'auteur et que, par conséquent, elle permet de déterminer ce qui constitue une faute en matière de droit d'auteur. La reproduction d'une partie importante d'une œuvre protégée par le droit d'auteur ne constitue pas toujours une violation du droit d'auteur. Le professeur Abraham Drassinower explique ce raisonnement dans son article intitulé « Taking User Rights Seriously », dans M. Geist, dir., *In the Public Interest : The Future of Canadian Copyright Law* (2005), 462. Comme il l'écrit à la p. 470, [TRADUCTION] « [l]'utilisation équitable signifie qu'on n'est pas nécessairement dans une moindre mesure l'auteur d'une œuvre parce qu'on y répond

78

79

a substantial reproduction of a copyrighted work will not be an infringement, because copyright protection is limited to protection of legitimate economic interests which are the result of an exercise of skill and judgment, and that protection must not be extended beyond its proper limits.

80     The *CCH* decision thus confirms that in order to protect the essential balance which lies at the heart of copyright law, care must be taken to ensure that copyright protection is not allowed to extend beyond the legitimate interests of a copyright holder. Copyright will not be granted to works which are not the result of an exercise of skill and judgment, which is the special kind of labour for which copyright is the appropriate protection. Similarly, once copyright is granted in a given work, the protection that it provides must not be extended beyond its natural limits, and must take proper account of user rights such as the right to deal fairly with a copyrighted work. It is useful to note here that, while copyright protection results from an action of an individual — that is, the exercise of skill and judgment in creating an original work — that protection inheres in the work created, rather than its creator. In this manner, a copyrighted work is a form of property which may be transferred or licensed to others. But the rights transferred to a licensee must be limited in the same way as those of the original creator of the work to the legitimate economic interests resulting from the exercise of skill and judgment.

81     This Court's recent decision in *Society of Composers, Authors and Music Publishers of Canada v. Canadian Assn. of Internet Providers*, [2004] 2 S.C.R. 427, 2004 SCC 45, confirms this purposive interpretation of the Act. In that case, Binnie J. wrote, at para. 116: "'Caching' is dictated by the need to deliver faster and more economic

à l'œuvre d'un autre auteur. Ainsi, le défendeur qui invoque l'utilisation équitable comme moyen de défense est lui-même un auteur. » Cette observation s'accorde avec l'interprétation du droit d'auteur analysée plus haut : il peut arriver que la reproduction d'une partie importante d'une œuvre protégée ne constitue pas une violation du droit d'auteur parce que la protection conférée par le droit d'auteur vise uniquement les intérêts économiques légitimes qui résultent de l'exercice du talent et du jugement, et ne doit pas être étendue au-delà des limites qu'elle doit avoir.

Ainsi, l'arrêt *CCH* confirme que, pour maintenir l'équilibre essentiel qui se trouve au cœur de la législation sur le droit d'auteur, il faut veiller à ce que la protection conférée par le droit d'auteur n'aille pas au-delà des intérêts légitimes du titulaire de ce droit. Le droit d'auteur ne peut pas être accordé à l'égard des œuvres ne résultant pas de l'exercice du talent et du jugement, qui est le type particulier de travail pour lequel le droit d'auteur offre la protection appropriée. De même, dès que le droit d'auteur est accordé à l'égard d'une œuvre, la protection qu'il confère ne doit pas excéder ses limites naturelles et doit dûment tenir compte des droits des utilisateurs, tel celui d'utiliser équitablement une œuvre protégée par le droit d'auteur. Il est utile de noter ici que, même si elle découle de l'action d'une personne — c'est-à-dire de l'exercice du talent et du jugement requis pour créer une œuvre originale —, la protection conférée par le droit d'auteur s'applique à l'œuvre et non à son créateur. De ce fait, l'œuvre protégée constitue une forme de propriété qui peut faire l'objet d'un transfert ou d'un contrat de licence. Cependant, les droits transférés au licencié doivent, à l'instar de ceux du créateur de l'œuvre, être limités aux intérêts économiques légitimes résultant de l'exercice du talent et du jugement.

Notre Cour confirme cette interprétation téléologique de la Loi dans l'arrêt récent *Société canadienne des auteurs, compositeurs et éditeurs de musique c. Assoc. canadienne des fournisseurs Internet*, [2004] 2 R.C.S. 427, 2004 CSC 45. Le juge Binnie y a écrit, au par. 116 : « La "mise en antémémoire" est dictée par la nécessité d'offrir

service, and should not, <u>when undertaken only for such technical reasons</u>, attract copyright liability" (emphasis added). While "caching" is certainly an instance of substantial reproduction, it is a technical process only; as such it does not consist in an attempt to appropriate the legitimate economic interests of the copyright holder, and therefore does not constitute infringement.

The logic of this view of copyright has also been held to extend to other forms of intellectual property. In *Kirkbi AG v. Ritvik Holdings Inc.*, [2005] 3 S.C.R. 302, 2005 SCC 65, LeBel J., for the Court, noted, at para. 37, the importance of "basic and necessary distinctions between different forms of intellectual property and their legal and economic functions". He then went on to review the purposes of trade-marks and patents, noting that "[p]atent rights focus on the patented product or process", but that "[i]n the case of trade-marks, the focus shifts from the product itself to the distinctiveness of its marketing": see paras. 38-39. This focus on the fundamental natures and purposes of different sorts of intellectual property protections and the necessary divisions between them suggests that each form of protection relies on some core normative notion which must ground the economic interests claimed. Thus, a trade-mark, which protects distinctiveness of marketing and goodwill, cannot be leveraged to extend protection to products themselves, which is usually granted by patent.

The approach in *Kirkbi* is consistent with the principle of statutory interpretation which requires coherent interpretation of statutes *in pari materia*: see P.-A. Côté, *The Interpretation of Legislation In Canada* (3rd ed. 2000), at pp. 342 ff. According to this principle, the *Copyright Act* ought not only to be interpreted with an eye to the internal coherence of its own scheme; it must also not be interpreted

un service plus rapide et plus économique et ne devrait pas emporter la violation du droit d'auteur <u>lorsqu'elle a lieu uniquement pour de telles raisons techniques</u> » (je souligne). La « mise en antémémoire » est sûrement un exemple de reproduction d'une partie importante d'une œuvre, mais elle n'est qu'un processus technique; à ce titre, elle ne représente pas une tentative d'appropriation des intérêts économiques légitimes du titulaire du droit d'auteur et, partant, ne constitue pas une violation du droit d'auteur.

On a également conclu que la logique de cette conception du droit d'auteur s'applique à d'autres formes de propriété intellectuelle. Dans l'arrêt *Kirkbi AG c. Gestions Ritvik Inc.*, [2005] 3 R.C.S. 302, 2005 CSC 65, par. 37, le juge LeBel, s'exprimant au nom de la Cour, a souligné l'importance des « distinctions fondamentales nécessaires entre diverses formes de propriété intellectuelle et leurs fonctions juridiques et économiques ». Il a ensuite examiné les objets des marques de commerce et des brevets, en faisant remarquer que « [l]es droits conférés par brevet portent sur le produit ou le procédé breveté », mais que, « [d]ans le cas des marques de commerce, la perspective se déplace du produit lui-même au caractère distinctif de sa mise en marché » : voir les par. 38-39. Cette insistance sur la nature et les objets fondamentaux des diverses formes de protection de la propriété intellectuelle et sur les distinctions nécessaires entre celles-ci porte à croire que chaque forme de protection repose sur une notion normative essentielle qui doit servir de fondement aux intérêts économiques revendiqués. Ainsi, une marque de commerce qui protège le caractère distinctif de la mise en marché et de l'achalandage ne saurait être utilisée pour étendre aux produits eux-mêmes une protection qui est habituellement accordée par un brevet.

L'approche adoptée dans l'arrêt *Kirkbi* est conforme au principe d'interprétation législative qui exige que les lois portant sur la même matière (*in pari materia*) soient interprétées d'une manière cohérente : voir P.-A. Côté, *Interprétation des lois* (3ᵉ éd. 1999), p. 433 et suiv. Selon ce principe, il faut non seulement interpréter la *Loi sur le droit d'auteur* en tenant compte de la cohérence

82

83

in a fashion which is inconsistent with the *Trade-marks Act*, R.S.C. 1985, c. T-13. Trade-mark law protects market share in commercial goods; copyright protects the economic gains resulting from an exercise of skill and judgment. If trade-mark law does not protect market share in a particular situation, the law of copyright should not be used to provide that protection, if that requires contorting copyright outside its normal sphere of operation. The protection offered by copyright cannot be leveraged to include protection of economic interests that are only tangentially related to the copyrighted work. This Court's decision in *AstraZeneca Canada Inc. v. Canada (Minister of Health)*, [2006] 2 S.C.R. 560, 2006 SCC 49, which was based on a simultaneous interpretation of "two regulatory systems with sometimes conflicting objectives" (para. 12), is also consistent with the principle.

84    With this view of the purpose of the Act, which provides us with a principled fulcrum on which we may undertake copyright's balance, we may turn now to an examination of the purpose of s. 27(2) of the Act.

### C. *The Purpose of Section 27(2)(e) of the Copyright Act*

85    The Act protects only the legitimate economic interests of copyright holders. It protects the economic benefits of skill and judgment; it does not protect all economic benefits of all types of labour. Section 27(2) of the Act is meant to prohibit secondary infringement resulting from the wrongful appropriation of the gains of another's skill and judgment by way of the acts enumerated in paras. (*a*) to (*c*). Conversely, other economic interests — although they may seem to be closely associated with the interests legitimately protected as emanating from that skill and judgment — are not protected. In particular, if a work of skill and judgment (such as a logo) is attached to some other consumer good (such as a chocolate bar), the economic gains associated with the sale of the consumer good must

interne du régime qu'elle établit, mais encore il faut éviter de lui donner une interprétation incompatible avec la *Loi sur les marques de commerce*, L.R.C. 1985, ch. T-13. La législation sur les marques de commerce protège les parts de marché des biens commerciaux; le droit d'auteur protège les gains économiques résultant de l'exercice du talent et du jugement. Si la législation sur les marques de commerce ne protège pas une part de marché dans un cas particulier, il n'y a pas lieu de recourir à la législation sur le droit d'auteur pour offrir cette protection si cela oblige à sortir le droit d'auteur de son champ d'application normal. La protection offerte par le droit d'auteur ne saurait être appliquée aux intérêts économiques qui ne sont qu'accessoirement liés à l'œuvre protégée par le droit d'auteur. L'arrêt de notre Cour *AstraZeneca Canada Inc. c. Canada (Ministre de la Santé)*, [2006] 2 R.C.S. 560, 2006 CSC 49, qui reposait sur l'interprétation simultanée de « deux systèmes réglementaires aux objectifs parfois divergents » (par. 12), est également conforme à ce principe.

Compte tenu de cette interprétation de l'objet de la Loi, qui nous fournit un moyen rationnel d'établir le juste équilibre en matière de droit d'auteur, nous pouvons maintenant passer à l'examen de l'objet du par. 27(2) de la Loi.

### C. *L'objet de l'al. 27(2)e) de la Loi sur le droit d'auteur*

La Loi protège uniquement les intérêts économiques légitimes des titulaires du droit d'auteur. Elle protège les avantages économiques résultant de l'exercice du talent et du jugement, mais pas tous les avantages économiques résultant de tous les types de travail. Le paragraphe 27(2) de la Loi vise à interdire la violation à une étape ultérieure qui résulte de l'appropriation illicite des gains résultant de l'exercice du talent et du jugement d'une autre personne au moyen des actes énumérés aux al. *a*) à *c*). À l'inverse, les autres intérêts économiques — même s'ils peuvent sembler étroitement liés aux intérêts légitimement protégés du fait qu'ils résultent de l'exercice de ce talent et de ce jugement — ne sont pas protégés. Plus particulièrement, si une œuvre résultant de l'exercice du talent et du

not be mistakenly viewed as the legitimate economic interests of the copyright holder of the logo that are protected by the law of copyright.

Thus s. 27(2)(*e*) is meant to protect copyright holders from the unauthorized importation of works which are the result of their skill and judgment. It is not meant to protect manufacturers from the unauthorized importation of consumer goods on the basis of their having a copyrighted work affixed to their wrapper, this work being merely incidental to their value as consumer goods.

I should note here that, contrary to what was argued before this Court at the hearing, s. 27(2) is not meant to protect manufacturers from the importation of counterfeit versions of their consumer goods. The laws of trade-mark and passing off provide protection to manufacturers who fear the importation of cheap imitations of their products with a copy of the logo of the real product affixed to them. Indeed, this protection is central to the purpose of trade-mark law, as identified by LeBel J. in *Kirkbi*, at para. 39: "Trade-marks seek to indicate the source of a particular product, process or service in a distinctive manner, so that, ideally, consumers know what they are buying and from whom." While it is certainly true that one work can be the subject of both copyright and trade-mark protection (see s. 64(3)(*b*) of the Act), it is equally certain that different forms of intellectual property protect different types of economic interests. To ignore this fact would be to ignore the "basic and necessary distinctions between different forms of intellectual property and their legal and economic functions", as noted by LeBel J. at para. 37 of *Kirkbi*.

jugement (tel un logo) est jointe à un autre bien de consommation (comme une tablette de chocolat), les gains résultant de la vente du bien de consommation ne doivent pas être confondus avec les intérêts économiques légitimes du titulaire du droit d'auteur sur le logo, qui sont protégés par la législation sur le droit d'auteur.

L'alinéa 27(2)*e*) vise donc à protéger les titulaires du droit d'auteur contre l'importation non autorisée d'œuvres résultant de l'exercice de leur talent et de leur jugement. Il n'a pas pour objet de protéger les fabricants contre l'importation non autorisée de biens de consommation dont l'emballage reproduit une œuvre protégée par le droit d'auteur, laquelle œuvre est simplement accessoire à la valeur de ces biens en tant que biens de consommation.

Je tiens à souligner ici que, contrairement à ce qui a été plaidé devant notre Cour à l'audience, le par. 27(2) ne vise pas à protéger les fabricants contre l'importation de contrefaçons des biens de consommation qu'ils produisent. Les lois régissant les marques de commerce et la commercialisation trompeuse assurent une protection aux fabricants qui craignent l'importation d'imitations bon marché de leurs produits, sur lesquelles serait reproduit le logo du produit véritable. En fait, cette protection est au cœur de l'objet de la législation sur les marques de commerce, que le juge LeBel décrit en ces termes, au par. 39 de l'arrêt *Kirkbi* : « Les marques de commerce servent à indiquer, de façon distinctive, la source d'un produit, d'un procédé ou d'un service, afin qu'idéalement les consommateurs sachent ce qu'ils achètent et en connaissent la provenance. » Bien qu'il n'y ait aucun doute qu'une œuvre peut bénéficier à la fois de la protection conférée par le droit d'auteur et de celle conférée par la marque de commerce (voir l'al. 64(3)*b*) de la Loi), il est tout aussi certain que différentes formes de propriété intellectuelle protègent différents types d'intérêts économiques. Ne pas tenir compte de ce fait reviendrait à ne pas tenir compte des « distinctions fondamentales nécessaires entre diverses formes de propriété intellectuelle et leurs fonctions juridiques et économiques », comme l'a fait remarquer le juge LeBel, au par. 37 de l'arrêt *Kirkbi*.

86

87

88    This interpretation of s. 27(2) respects copyright's insistence that only *legitimate* economic interests receive copyright protection. To allow s. 27(2) to protect all interests of manufacturers and distributors of consumer goods would upset the copyright balance. Far from ensuring a "just reward" for creators of copyrighted works, it would allow a copyright to be leveraged far beyond the use intended by Parliament, allowing rights to be artificially enlarged into protection over consumer goods. This undue expansion of copyright would certainly be a failure to give heed to Binnie J.'s insistence, at para. 31 of *Théberge*, that the law give due weight to the limited nature of the rights of a copyright holder.

D.  *The Correct Interpretation of Paragraphs (a) to (c) of Section 27(2)*

89    As mentioned above, para. (*e*) of s. 27(2) prohibits the importation into Canada of any copy of a work that would have infringed copyright had it been made in Canada by the person who made it, if that importation is for the purpose of doing anything referred to in paras. (*a*) to (*c*) of s. 27(2). Liability under para. (*e*) therefore relies on a finding that the defendant intended to commit an act enumerated in paras. (*a*) to (*c*), which prohibit the selling, renting out, distribution with a prejudicial effect, or dealing with by way of trade of copies of a work. How are we to interpret these prohibitions in light of the foregoing review of the purpose of s. 27(2)(*e*) and of the *Copyright Act* as a whole?

90    Paragraph (*b*) provides that "[i]t is an infringement of copyright for any person to . . . distribute to such an extent as to affect prejudicially the owner of the copyright . . . a copy of a work". Parliament's inclusion of the word "prejudicially" here is another

Cette interprétation du par. 27(2) cadre avec l'accent mis, en matière de droit d'auteur, sur le fait que seuls les intérêts économiques *légitimes* bénéficient de la protection conférée par le droit d'auteur. Permettre que le par. 27(2) protège tous les intérêts des fabricants et distributeurs de biens de consommation aurait pour effet de rompre l'équilibre en matière de droit d'auteur. Loin d'assurer une « juste récompense » aux créateurs d'œuvres protégées, on se trouverait alors à permettre une utilisation du droit d'auteur qui excéderait de beaucoup celle prévue par le législateur, et à élargir artificiellement la portée des droits de manière à protéger des biens de consommation. Cet élargissement injustifié de la portée du droit d'auteur ne tiendrait sûrement pas compte de l'insistance du juge Binnie — au par. 31 de l'arrêt *Théberge* — sur le fait que la loi doit accorder l'importance qu'il convient à la nature limitée des droits du titulaire du droit d'auteur.

D.  *L'interprétation correcte des al. 27(2)a) à c)*

Comme nous l'avons vu, l'al. 27(2)*e*) interdit l'importation au Canada de tout exemplaire d'une œuvre dont la production constituerait une violation du droit d'auteur si cet exemplaire avait été produit au Canada par la personne qui l'a produit et s'il avait été importé au Canada en vue de l'un ou l'autre des actes visés aux al. 27(2)*a*) à *c*). Pour qu'il y ait responsabilité au regard de l'al. *e*), il faut donc conclure que le défendeur avait l'intention d'accomplir un acte énuméré aux al. *a*) à *c*), qui interdisent la vente, la location, la mise en circulation ayant un effet préjudiciable ou l'utilisation dans un but commercial d'exemplaires d'une œuvre. Comment faut-il interpréter ces interdictions à la lumière de l'examen que nous avons fait de l'objet de l'al. 27(2)*e*) et de la *Loi sur le droit d'auteur* dans son ensemble?

Aux termes de l'al. *b*), « [c]onstitue une violation du droit d'auteur [. . .] la mise en circulation [d'un exemplaire d'une œuvre] de façon à porter préjudice au titulaire du droit d'auteur ». L'utilisation du terme « préjudice » par le législateur est un

important key to the interpretation of s. 27(2) as a whole. One can imagine many ways that the distribution of a copyrighted work could prejudicially affect the copyright holder which surely would not be considered secondary infringement. As a somewhat trivial example, consider a book containing accurate and damning portrayals of the author's family, written under a pseudonym unbeknownst to the family of the author. Distribution of copies of this book — bought in full compliance with the Act — to the author's family would certainly tend to "affect prejudicially" the owner of the copyright; nevertheless, I am sure that this situation is not intended to fall within s. 27(2)(*b*). This hypothetical situation suggests that to "affect prejudicially" a copyright holder has a more limited meaning: this phrase limits protection to the interests of the copyright holder *as author*. That is, only those distributions which affect the *legitimate* economic interests protected by copyright will be held to affect prejudicially the owner of the copyright. Economic consequences of unauthorized importation of consumer goods are not, generally speaking, the types of legitimate economic interests protected by the copyright in a work which is merely incidental to the sale or distribution of the consumer good to which it is attached. The effects of such importation do not meet the requirement of prejudice which is embedded in para. (*b*), which informs all of s. 27(2).

Paragraph (*a*) provides that "[i]t is an infringement of copyright for any person . . . to sell or rent out" a copy of a work. Simply put, to sell a consumer good with a copyrighted work attached as a logo is not to sell that work. The work, *qua* work, is merely incidental to the consumer good, and thus a sale of the latter cannot be said in any real sense to be a sale of the former. While it is true that a logo affixed to a package can play an essential role in the sale of that package, that is the role of the logo as a trade-mark, not as a copyright. A finding that s. 27(2)(*a*) is violated requires that the work be sold

autre élément indispensable pour interpréter le par. 27(2) dans son ensemble. On peut imaginer de nombreuses façons dont la mise en circulation d'une œuvre protégée pourrait porter préjudice au titulaire du droit d'auteur sans pour autant constituer une violation à une étape ultérieure. À titre d'exemple plutôt banal, prenons le cas d'un livre dans lequel un écrivain pseudonyme brosse des portraits fidèles et accablants de certains membres de sa famille, à l'insu de ces derniers. La remise d'exemplaires de ce livre — achetés d'une manière tout à fait conforme à la Loi — aux membres de la famille de l'auteur tendrait sûrement à « porter préjudice » au titulaire du droit d'auteur; je suis néanmoins certain que cette situation n'est pas censée être visée par l'al. 27(2)*b*). Cette situation hypothétique permet de penser que l'expression « porter préjudice » au titulaire du droit d'auteur a un sens plus restreint : la protection est limitée aux intérêts du titulaire du droit d'auteur *en tant qu'auteur*. En d'autres termes, seules les mises en circulation qui portent atteinte aux intérêts économiques *légitimes* protégés par le droit d'auteur seront jugées préjudiciables au titulaire du droit d'auteur. En général, les conséquences économiques de l'importation non autorisée de biens de consommation ne comptent pas parmi les types d'intérêts économiques légitimes protégés par le droit d'auteur sur une œuvre qui est simplement un élément accessoire de la vente ou de la mise en circulation du bien de consommation auquel elle est jointe. Les effets d'une telle importation ne satisfont pas à l'exigence de préjudice inscrite à l'al. *b*), qui sous-tend l'ensemble du par. 27(2).

L'alinéa *a*) prévoit que « [c]onstitue une violation du droit d'auteur [. . .] la vente ou la location » d'un exemplaire d'une œuvre. En termes simples, le fait de vendre un bien de consommation sur lequel figure un logo qui est une œuvre protégée ne revient pas à vendre cette œuvre. L'œuvre en tant que telle est simplement un élément accessoire du bien de consommation et, partant, la vente de ce bien ne saurait à proprement parler être considérée comme étant la vente de l'œuvre. Un logo apposé sur un emballage peut certes jouer un rôle essentiel dans la vente de l'article contenu dans cet emballage, mais

91

as something more than a mere incident of the sale of some other item.

92    Similar logic applies to para. (*c*). It provides that it is an infringement to, "by way of trade distribute, expose or offer for sale or rental, or exhibit in public" a copy of a work. It must be noted that the modifier "by way of trade" clearly applies to all of the actions referred to in para. (*c*). This can be seen more clearly by referring to the French version of the provision which refers to "*la mise en circulation, la mise ou l'offre en vente ou en location, ou l'exposition en public, dans un but commercial*". When para. (*c*) is seen in this way, consistent with the purpose of the rest of s. 27(2) and the Act as a whole, it is clear that its protection is limited to those instances where the *work itself* is what is being distributed, exposed, offered for sale or exhibited in public. In other words, when the "trade" taking place, or the "*but commercial*" being sought, concerns the work itself; when the trade is a trade in some consumer good with which the work is only incidentally related, para. (*c*) is not triggered.

93    Each of paras. (*a*) to (*c*) must be interpreted in a manner consistent with the view that s. 27(2) is meant to protect authors from the unauthorized appropriation of the gains of their authorship; protection does not extend to include any and all economic gains claimed by an author or copyright owner. In each case, the wording of the provision, read in light of the purpose of s. 27(2) and the purpose of the *Copyright Act* as a whole, makes it clear that if the work in question is merely incidental to another consumer good, and it is that consumer good which is being sold or distributed, or dealt with by way of trade, s. 27(2) cannot be invoked. It is only when it is the work itself which is the subject of the sale or other commercial dealing that it can properly be said that the section applies and its protection becomes available.

c'est le rôle qu'il joue en tant que marque de commerce et non en tant qu'œuvre protégée par le droit d'auteur. Pour qu'on puisse conclure à la violation de l'al. 27(2)*a*), l'œuvre vendue doit être davantage qu'un simple élément accessoire de la vente d'un autre article.

Le même raisonnement s'applique à l'al. *c*), qui prévoit que « [c]onstitue une violation du droit d'auteur [. . .] la mise en circulation, la mise ou l'offre en vente ou en location, ou l'exposition en public, dans un but commercial » d'un exemplaire d'une œuvre. Il faut noter que la nuance « dans un but commercial » s'applique clairement à tous les actes mentionnés à l'al. *c*). Lorsque l'al. *c*) est envisagé de cette manière, conformément à l'objet du reste du par. 27(2) et de l'ensemble de la Loi, il est évident que la protection s'applique uniquement aux cas où c'est l'*œuvre elle-même* qui est mise en circulation, mise ou offerte en vente ou exposée en public. En d'autres termes, elle s'applique seulement lorsque le « but commercial » recherché concerne l'œuvre elle-même; lorsque le but commercial a trait à un bien de consommation dont l'œuvre ne constitue qu'un élément accessoire, l'al. *c*) n'entre pas en jeu.

Chacun des al. *a*) à *c*) doit être interprété d'une manière compatible avec le point de vue selon lequel le par. 27(2) est censé protéger les auteurs contre l'appropriation non autorisée des gains découlant de leur qualité d'auteur. Cette protection ne s'étend pas à la totalité des gains économiques revendiqués par l'auteur ou le titulaire du droit d'auteur. Dans chaque cas, il ressort clairement du libellé de la disposition — interprété en fonction de l'objet du par. 27(2) et de celui de l'ensemble de la *Loi sur le droit d'auteur* — que le par. 27(2) ne peut pas être invoqué si l'œuvre en cause est simplement un élément accessoire d'un autre bien de consommation et que c'est ce bien qui est vendu, mis en circulation ou utilisé dans un but commercial. Ce n'est que si l'œuvre elle-même fait l'objet de la vente ou de l'autre utilisation commerciale que l'on peut dire, à juste titre, que la disposition s'applique et que la protection est offerte.

The determination of when a work is merely incidental to a consumer good will not always be an easy one. Some factors which may be useful in making such a determination could include the nature of the product, the nature of the protected work and the relationship of the work to the product. If a reasonable consumer undertaking a commercial transaction does not think that the copyrighted work is what she is buying or dealing with, it is likely that the work is merely incidental to the consumer good.

Contrary to what Rothstein J. seems to argue at para. 4, the previous analysis does not suggest that the simple fact of a work being attached to a consumer good would preclude that work from copyright protection: the Act is clear that protection extends to, *inter alia*, works produced or reproduced "in any material form whatever" (s. 3(1)). The "merely incidental" analysis goes to secondary liability under s. 27(2) only; rather than being about what is and is not copyrightable, its intention is to prevent that section from being improperly leveraged to use the *Copyright Act* as a protection of commercial interests completely unrelated to copyright's intended domain. Thus, the sale of a t-shirt with a reproduction of a painting on its front may constitute the sale of the work (the painting); on the other hand, the location of a small logo on the corner of a shirt pocket would not thereby transform an otherwise plain shirt into a copyrighted work, as the logo *qua* copyrighted work would be merely incidental to the shirt being sold (and, as noted above, any value the logo has as identifying a brand would be protected by trade-mark law, rather than by copyright). To take a slightly different example, a copyrighted instruction booklet included in the box of some consumer good would, as copyrighted work, be merely incidental to the good for the purposes of s. 27(2): see *British Leyland Motor Corp. v. Armstrong Patents Co.*, [1986] 1 All E.R. 850 (H.L.).

Il ne sera pas toujours facile de déterminer si une œuvre constitue simplement un élément accessoire d'un bien de consommation. À cette fin, il pourrait être utile de tenir compte notamment de la nature du produit et de l'œuvre protégée, ainsi que du lien entre l'œuvre et le produit. Si un consommateur raisonnable qui effectue une opération commerciale ne croit pas que c'est l'œuvre protégée par le droit d'auteur qu'il achète ou utilise, il est probable que l'œuvre est simplement un élément accessoire du bien de consommation visé par l'opération.

Contrairement à ce que le juge Rothstein semble affirmer au par. 4, l'analyse précédente ne tend pas à indiquer que le simple fait qu'une œuvre soit jointe à un bien de consommation l'empêcherait d'être protégée par le droit d'auteur. La Loi précise clairement que la protection vise notamment les œuvres produites ou reproduites « sous une forme matérielle quelconque » (par. 3(1)). L'analyse de « l'élément simplement accessoire » ne concerne que la responsabilité découlant de la violation du droit d'auteur à une étape ultérieure, prévue au par. 27(2); au lieu de porter sur ce qui peut ou ne peut pas bénéficier de la protection du droit d'auteur, cette analyse a pour objet d'empêcher que cette disposition ne permette indûment d'utiliser la *Loi sur le droit d'auteur* pour protéger des intérêts commerciaux n'ayant absolument aucun rapport avec le champ d'application prévu du droit d'auteur. Ainsi, la vente d'un tee-shirt sur lequel est reproduit un tableau peut représenter la vente de l'œuvre (le tableau). Par contre, la présence d'un petit logo au coin de la poche d'une chemise n'aurait pas pour effet de transformer une chemise ordinaire en œuvre protégée, puisque le logo en tant qu'œuvre protégée ne constituerait qu'un élément accessoire de la chemise vendue (et, comme nous l'avons vu, toute valeur du logo en tant que symbole d'une marque serait protégée par la législation sur les marques de commerce plutôt que par le droit d'auteur). Prenons un exemple légèrement différent : une notice de mode d'emploi protégée par le droit d'auteur et se trouvant dans la boîte d'un bien de consommation constituerait simplement, en tant qu'œuvre protégée, un élément accessoire de ce bien de consommation pour l'application du par. 27(2) : voir *British Leyland Motor Corp. c. Armstrong Patents Co.*, [1986] 1 All E.R. 850 (H.L.).

94

95

2007 SCC 37 (CanLII)

E. *Other Considerations*

96  In my view, this purposive interpretation of s. 27(2), which views the provision in light of the purpose and scheme of the *Copyright Act* as a whole, is sufficient to deal with the problem of parallel importation. This interpretation means that two other arguments, raised before us by the appellant, become unnecessary. However, I think it would be useful to mention those arguments briefly.

97  The appellant argued that an attempt to extend copyright protection to prevent parallel importation of consumer goods could trigger the application of the civilian doctrine of *abus de droit*. This doctrine, which was recognized by this Court in *Houle v. Canadian National Bank*, [1990] 3 S.C.R. 122, provides that a party may not exercise a right in an unreasonable manner. (See also *Wallace v. United Grain Growers Ltd.*, [1997] 3 S.C.R. 701, at para. 145, with respect to a similar concept in the common law.) Given the analysis above, I do not see an appeal to this doctrine as necessary to resolve this issue.

98  Similarly, the appellant argued that the newly developing American doctrine of "copyright misuse" applies to parallel importation of consumer goods. This doctrine is meant to act as a sort of equitable defence when "a copyright holder attempts to extend his copyright beyond the scope of the exclusive rights granted by Congress in a manner that violates [federal antitrust law or] the public policy embodied in copyright law": see K. Judge, "Rethinking Copyright Misuse" (2004), 57 *Stan. L. Rev.* 901, at p. 904. The doctrine has been adopted by some Federal Circuit Courts of Appeal, but has not as of yet found favour at the United States Supreme Court (Judge, at pp. 902-3). As with the concept of *abus de droit*, my analysis renders an appeal to this developing doctrine unnecessary to deal with parallel importation of consumer goods. However, this is not to comment on the possible application of this doctrine in

E. *Autres considérations*

  À mon avis, cette interprétation téléologique du par. 27(2), qui tient compte de l'objet et de l'économie de la *Loi sur le droit d'auteur* dans son ensemble, permet à elle seule de régler la question de l'importation parallèle. Elle rend inutiles deux autres arguments que l'appelante a invoqués devant notre Cour, mais qu'il serait utile de mentionner brièvement, selon moi.

  L'appelante a soutenu que la tentative d'élargir la protection conférée par le droit d'auteur de manière à empêcher l'importation parallèle de biens de consommation pourrait déclencher l'application de la théorie civiliste de l'abus de droit. Selon cette théorie, reconnue par notre Cour dans l'arrêt *Houle c. Banque Canadienne Nationale*, [1990] 3 R.C.S. 122, une partie ne peut exercer un droit de manière déraisonnable. (Voir également l'arrêt *Wallace c. United Grain Growers Ltd.*, [1997] 3 R.C.S. 701, par. 145, en ce qui concerne une notion similaire en common law.) Compte tenu de l'analyse qui précède, je ne crois pas qu'il soit nécessaire de recourir à cette théorie pour régler cette question.

  De même, l'appelante a fait valoir que la théorie de l'abus du droit d'auteur (*copyright misuse*), apparue récemment en droit américain, s'applique à l'importation parallèle de biens de consommation. Cette théorie est censée tenir lieu en quelque sorte de moyen de défense en equity lorsque [TRADUCTION] « le titulaire d'un droit d'auteur tente d'étendre la portée de ce droit au-delà de celle des droits d'exclusivité accordés par le Congrès, et ce, d'une manière contraire [à la législation antitrust ou] à la politique gouvernementale contenue dans la législation sur le droit d'auteur » : voir K. Judge, « Rethinking Copyright Misuse » (2004), 57 *Stan. L. Rev.* 901, p. 904. Adoptée par certaines cours d'appel de circuit fédérales, elle n'a pas encore été retenue par la Cour suprême des États-Unis (Judge, p. 902-903). Comme c'est le cas pour la notion d'abus de droit, mon analyse rend inutile le recours à cette théorie en évolution pour statuer

Canada; a determination on that issue is best left for another day.

sur l'importation parallèle de biens de consommation. Cependant, il ne s'agit pas là d'un commentaire sur la possibilité d'appliquer la théorie de l'abus du droit d'auteur au Canada; il est préférable d'attendre une autre occasion pour trancher cette question.

V.   Application to the Facts

It is clear on the facts of the appeal before us that the protected works in question — the Côte d'Or and Toblerone logos, considered as copyrighted works — cannot be seen as anything other than merely incidental to the chocolate bars to which they are affixed. Therefore, Euro-Excellence's dealings with the chocolate bars are not caught within the language of s. 27(2) of the Act. I reach this conclusion on the basis of a consideration of the role of the logos as merely incidental to the sale of the chocolate bars in general.

V.   Application aux faits

Il ressort clairement des faits du présent pourvoi que les œuvres protégées dont il est question en l'espèce — les logos Côte d'Or et Toblerone, considérés comme des œuvres protégées par le droit d'auteur — ne sauraient être tenues pour autre chose que de simples éléments accessoires des tablettes de chocolat auxquelles elles sont apposées. Par conséquent, les activités d'Euro-Excellence à l'égard des tablettes de chocolat ne sont pas visées par le libellé du par. 27(2) de la Loi. Cette conclusion repose sur le fait que je considère que les logos ne jouent en général qu'un rôle accessoire dans la vente des tablettes de chocolat.

99

As discussed above, to be brought within the protection of s. 27(2), a copyrighted work must be more than merely incidental to the consumer good to which it is affixed. Only when that condition is satisfied can it accurately be said that it is the copyrighted work itself which is the subject of one of the activities described in paras. (*a*) to (*c*) of s. 27(2).

Comme nous l'avons vu, pour qu'elle puisse bénéficier de la protection offerte par le par. 27(2), une œuvre protégée par le droit d'auteur doit être davantage qu'un simple élément accessoire du bien de consommation auquel elle est apposée. Ce n'est que si cette condition est remplie que l'on pourra dire à juste titre que c'est l'œuvre protégée par le droit d'auteur elle-même qui est visée par l'une des activités décrites aux al. 27(2)*a*) à *c*).

100

In this appeal, the logos, considered as copyrighted works, are unarguably best described as merely incidental to the chocolate bars themselves. It cannot be reasonably maintained that in the course of a commercial transaction in which a customer buys a Côte d'Or or a Toblerone chocolate bar from a merchant, the customer is actually paying for a copyrighted work. This is not a situation in which the copyrighted work, as such, is an important aspect of the consumer transaction: it is a logo on a wrapper for a product which serves to identify the product's origins, nothing more.

En l'espèce, il est indéniable que les logos, considérés comme des œuvres protégées par le droit d'auteur, peuvent être décrits de façon plus juste comme étant simplement des éléments accessoires des tablettes de chocolat elles-mêmes. On ne saurait raisonnablement soutenir que, dans une opération commerciale où un client achète à un commerçant une tablette de chocolat Côte d'Or ou Toblerone, ce client paie en fait une œuvre protégée par le droit d'auteur. Il ne s'agit pas d'un cas où l'œuvre protégée constitue en soi un aspect important de l'opération effectuée par le consommateur; cette œuvre n'est rien de plus qu'un logo qui est apposé sur l'emballage d'un produit et qui sert à identifier la provenance de ce produit.

101

102    Thus it cannot be said that Euro-Excellence is selling the copyrighted works themselves, as proscribed by para. (*a*); it cannot be said that Euro-Excellence is distributing those works to the extent of prejudicing KCI's interest as author or copyright holder, as prohibited by para. (*b*), when those interests are properly limited to the legitimate economic interests protected by the Act; and it cannot be reasonably maintained that Euro-Excellence is in contravention of para. (*c*) by dealing with those works "by way of trade" once it is understood that it is the works themselves which must be dealt with by way of trade rather than the chocolate bars to which they are attached. Thus, as Euro-Excellence's importation of the Côte d'Or and Toblerone bars was not done "for the purpose of doing anything referred to in paragraphs (*a*) to (*c*)" of s. 27(2), Euro-Excellence has not violated s. 27(2)(*e*).

103    The above does not imply that the Côte d'Or or Toblerone logos are not copyrightable works. Quite the opposite: the logos have been properly registered and there is no reason to dispute the trial judge's conclusions that the logos meet the Act's originality threshold and are therefore copyrightable works. KCI, as holder of those copyrights in Canada, would surely succeed in an action for copyright infringement against a defendant who produced and distributed posters of the logos, for example. However, it is necessary to ensure that this legitimate copyright protection is not illegitimately leveraged into a protection for a market in consumer goods.

104    Similarly, I do not mean to suggest that logos play no role whatsoever in the sale of chocolate bars. So I think it is therefore useful to stress, once again, that in the s. 27(2) analysis the logos must be viewed strictly through the copyright lens *as works*. The analysis does not speak to the possibility — indeed, the certainty — that the logos, as trade-marks, can play a large role in the sale of chocolate bars and are of great value to KCI. It is not disputed that part of the reason that a consumer

On ne peut donc pas dire qu'Euro-Excellence met en vente les œuvres protégées elles-mêmes, ce qu'interdit l'al. *a*), ni qu'elle met en circulation ces œuvres de façon à porter préjudice aux intérêts de KCI en tant qu'auteur ou titulaire du droit d'auteur, en violation de l'al. *b*), alors que seuls les intérêts économiques légitimes de cette dernière sont à juste titre protégés par la Loi. On ne peut pas non plus raisonnablement soutenir qu'Euro-Excellence contrevient à l'al. *c*) en utilisant ces œuvres « dans un but commercial », étant donné qu'il faudrait que les œuvres elles-mêmes soient utilisées dans un tel but, et non les tablettes de chocolat auxquelles elles sont apposées. Ainsi, puisqu'elle n'a pas importé les tablettes de chocolat Côte d'Or et Toblerone « en vue de l'un ou l'autre des actes visés aux alinéas *a*) à *c*) » du par. 27(2), Euro-Excellence n'a pas contrevenu à l'al. 27(2)*e*).

Les propos qui précèdent ne signifient pas que les logos Côte d'Or ou Toblerone ne sont pas des œuvres susceptibles d'être protégées par le droit d'auteur. Bien au contraire, ces logos ont été dûment enregistrés et il n'y a aucune raison de mettre en doute les conclusions du juge de première instance selon lesquelles les logos satisfont au critère d'originalité établi par la Loi et constituent, de ce fait, des œuvres susceptibles d'être protégées par le droit d'auteur. KCI, en tant que titulaire de ces droits d'auteur au Canada, obtiendrait sûrement gain de cause dans une action pour violation du droit d'auteur intentée contre un défendeur ayant produit et mis en circulation des affiches des logos, par exemple. Toutefois, il faut prendre garde que cette protection légitime conférée par le droit d'auteur ne soit utilisée de manière illégitime pour protéger un marché de biens de consommation.

De même, je ne veux pas dire par là que les logos ne jouent absolument aucun rôle dans la vente des tablettes de chocolat. Il me semble donc utile de souligner une fois de plus que, dans l'analyse concernant le par. 27(2), les logos doivent être considérés strictement *comme des œuvres*, du point de vue du droit d'auteur. L'analyse ne tient pas compte de la possibilité — voire de la certitude — que les logos, en tant que marques de commerce, jouent un rôle important dans la vente des

buys a Côte d'Or bar or a Toblerone bar is because of the reputation and goodwill associated with each brand. But that is not a consideration which is relevant under the *Copyright Act*. It cannot be reasonably maintained that anyone buys a Côte d'Or or Toblerone because of the logos as works of art.

Côte d'Or and Toblerone are chocolate bars. When a consumer buys one of these bars, the bar is exactly what he or she is buying. The logo may play a role in that transaction *qua* trade-mark, but *qua* copyright it cannot be seen as anything other than a mere incident to the chocolate bars. Thus, Euro-Excellence did nothing for the purpose of selling the logos as copyrighted works, or dealing with those works by way of trade; nor did Euro-Excellence distribute the logos as works to the extent of prejudicially affecting the legitimate interests of KCI as copyright holder. In short, Euro-Excellence did not violate or intend to violate the terms of paras. (*a*) to (*c*) of s. 27(2), and therefore cannot be found liable under s. 27(2)(*e*).

## VI. Conclusion

For the above reasons, the appeal should be allowed with costs in all courts.

The reasons of McLachlin C.J. and Abella J. were delivered by

Abella J. (dissenting) — The central issue in this appeal is whether an exclusive licensee of a copyright can claim remedies under the *Copyright Act*, R.S.C. 1985, c. C-42, when the copyrighted work is displayed on the label of a product imported in circumstances envisioned by s. 27(2) of the Act.

tablettes de chocolat et aient une valeur considérable pour KCI. Personne ne conteste que le consommateur achète une tablette de chocolat Côte d'Or ou Toblerone en raison, notamment, de la réputation de chacune de ces marques et de l'achalandage qui s'y rattache. Toutefois, ce n'est pas un élément pertinent pour l'application de la *Loi sur le droit d'auteur*. On ne saurait raisonnablement soutenir que des gens achètent une tablette Côte d'Or ou Toblerone en raison des logos en tant qu'œuvre d'art qui y sont apposés.

105 Côte d'Or et Toblerone sont des tablettes de chocolat. Lorsqu'un consommateur achète une tablette Côte d'Or ou Toblerone, il n'achète rien d'autre que cette tablette de chocolat. Le logo, en tant que marque de commerce, peut jouer un rôle dans cette opération, mais, en tant qu'œuvre protégée par le droit d'auteur, il ne peut pas être perçu autrement que comme un simple élément accessoire des tablettes de chocolat. Par conséquent, Euro-Excellence n'a rien fait pour mettre en vente les logos en tant qu'œuvres protégées, ou pour les utiliser dans un but commercial; elle n'a pas non plus mis en circulation les logos en tant qu'œuvre de façon à porter préjudice aux intérêts légitimes de KCI en tant que titulaire du droit d'auteur. Bref, Euro-Excellence n'a ni contrevenu ni eu l'intention de contrevenir aux al. 27(2)*a*) à *c*), et elle ne peut donc pas être déclarée responsable au regard de l'al. 27(2)*e*).

## VI. Conclusion

106 Pour les motifs qui précèdent, il y a lieu d'accueillir le pourvoi avec dépens devant toutes les cours.

Version française des motifs de la juge en chef McLachlin et de la juge Abella rendus par

107 La juge Abella (dissidente) — La question qui est au cœur du présent pourvoi est de savoir si le titulaire d'une licence exclusive sur un droit d'auteur peut exercer les recours prévus par la *Loi sur le droit d'auteur*, L.R.C. 1985, ch. C-42, lorsque l'œuvre protégée par le droit d'auteur figure sur l'étiquette d'un produit importé dans les circonstances envisagées au par. 27(2) de la Loi.

108    Like the trial judge and the Federal Court of Appeal, it is my view that Kraft Canada Inc. has the right to seek remedies under the Act to prevent Euro-Excellence from selling or distributing the copyrighted works. Section 27(2) of the *Copyright Act* states:

It is an infringement of copyright for any person to

(*a*)  sell or rent out,

(*b*)  distribute to such an extent as to affect prejudicially the owner of the copyright,

(*c*)  by way of trade distribute, expose or offer for sale or rental, or exhibit in public,

(*d*)  possess for the purpose of doing anything referred to in paragraphs (*a*) to (*c*), or

(*e*)  <u>import into Canada for the purpose of doing anything referred to in paragraphs (*a*) to (*c*),</u>

a copy of a work, sound recording or fixation of a performer's performance or of a communication signal that the person knows or should have known infringes copyright or <u>would infringe copyright if it had been made in Canada by the person who made it.</u>

109    Resolving this appeal depends on the answers to two questions. First, is the copyrighted work being "sold" or "distributed" when it is printed on the wrapper of a consumer product? Second, can an exclusive licensee in Canada claim protection against secondary infringement when the copyrighted work was produced by the owner-licensor?

110    On the first issue, I agree with the conclusion reached by Rothstein J. There is nothing in the Act to endorse a restrictive definition of "sell". Section 64(3)(*b*) of the Act extends copyright protection to trade-marks and labels. When a product is sold, title to its wrapper is also transferred to the purchaser. The Act is indifferent as to whether the sale of the wrapper is important to the consumer.

À l'instar du juge de première instance et de la Cour d'appel fédérale, j'estime que Kraft Canada Inc. a le droit d'exercer les recours prévus par la *Loi* afin d'empêcher Euro-Excellence de vendre ou de mettre en circulation les œuvres protégées par le droit d'auteur. Le paragraphe 27(2) de la *Loi sur le droit d'auteur* est ainsi rédigé :

Constitue une violation du droit d'auteur l'accomplissement de tout acte ci-après en ce qui a trait à l'exemplaire d'une œuvre, d'une fixation d'une prestation, d'un enregistrement sonore ou d'une fixation d'un signal de communication alors que la personne qui accomplit l'acte sait ou devrait savoir que la production de l'exemplaire constitue une violation de ce droit, ou <u>en constituerait une si l'exemplaire avait été produit au Canada par la personne qui l'a produit</u> :

*a*)  la vente ou la location;

*b*)  la mise en circulation de façon à porter préjudice au titulaire du droit d'auteur;

*c*)  la mise en circulation, la mise ou l'offre en vente ou en location, ou l'exposition en public, dans un but commercial;

*d*)  la possession en vue de l'un ou l'autre des actes visés aux alinéas *a*) à *c*);

*e*)  l'importation au Canada en vue de l'un ou l'autre des actes visés aux alinéas *a*) à *c*).

L'issue du présent pourvoi dépend des réponses données à deux questions. Premièrement, l'œuvre protégée par le droit d'auteur est-elle « vendue » ou « mise en circulation » lorsqu'elle est imprimée sur l'emballage d'un produit de consommation? Deuxièmement, le titulaire d'une licence exclusive au Canada peut-il invoquer une protection contre la violation à une étape ultérieure lorsque l'œuvre protégée par le droit d'auteur a été produite par le titulaire-concédant?

Quant à la première question, je souscris à la conclusion du juge Rothstein. Rien dans la *Loi* ne milite en faveur d'une définition restrictive du terme « vente ». L'alinéa 64(3)*b*) de la *Loi* étend aux marques de commerce et aux étiquettes la protection conférée par le droit d'auteur. Lorsqu'un produit est vendu, la propriété de l'emballage est également transférée à l'acquéreur. Il importe peu, du point de vue de la *Loi*, que la vente de l'emballage soit importante ou non pour le consommateur.

Like Bastarache J., I agree with the trial judge that the logos are copyrighted works. I respectfully disagree with his view, however, that no infringement is made out because the elephant and bear logos are incidental to the chocolate bars and are therefore not protected by s. 27(2). To inject an exception for logos on the basis that they are "incidental" would be to introduce unnecessary uncertainty, inviting case-by-case judicial explorations into the uncharted area of what is "merely" incidental, "somewhat" incidental, or not incidental at all. Such an approach also takes insufficient account of the reality that many products are, to a significant extent, sold on the basis of their logo or packaging.

Nor do I share the view that s. 27(2)(*e*), which on its face appears to me to be applicable, "protects only the legitimate economic interests of copyright holders", that is, "the unauthorized importation of works which are the result of their skill and judgment" (paras. 85-86). It seems to me, with respect, that once a work falls within s. 27(2)(*a*) to (*c*) and otherwise meets the requirements established by the Act as prerequisites to copyright protection, there is no scope for a judicially created limit to that protection based on what might — or might not — be a "legitimate economic interest". I do not believe that *Théberge v. Galerie d'Art du Petit Champlain inc.*, [2002] 2 S.C.R. 336, 2002 SCC 34, stands for such a proposition.

The answer to the second question depends on how one defines the rights of exclusive licensees. Copyright law in Canada, as Estey J. stated in *Compo Co. v. Blue Crest Music Inc.*, [1980] 1 S.C.R. 357, at pp. 372-73, is

neither tort law nor property law in classification, but is statutory law. It neither cuts across existing rights in property or conduct nor falls between rights and

À l'instar du juge Bastarache, je souscris à l'avis du juge de première instance selon lequel les logos sont des œuvres protégées par le droit d'auteur. En toute déférence, je ne puis toutefois souscrire à son point de vue selon lequel l'existence d'une violation du droit d'auteur n'est pas établie parce que les logos représentant un éléphant et un ours sont des éléments accessoires des tablettes de chocolat et ne sont donc pas protégés par le par. 27(2). Établir une exception pour les logos pour le motif qu'ils sont « accessoires » aurait pour effet de créer une incertitude inutile, en invitant les tribunaux à explorer, cas par cas, le domaine inconnu de la question de savoir ce qui est « simplement » accessoire, « quelque peu » accessoire ou aucunement accessoire. Une telle approche ne tient pas suffisamment compte du fait que de nombreux produits sont, dans une large mesure, vendus en raison de leur logo ou de leur emballage.

Je ne suis pas non plus d'accord pour dire que l'al. 27(2)*e*), qui me paraît applicable à première vue, « protège uniquement les intérêts économiques légitimes des titulaires du droit d'auteur », c'est-à-dire qu'il protège ces derniers contre « l'importation non autorisée d'œuvres résultant de l'exercice de leur talent et de leur jugement » (par. 85-86). Il me semble, en toute déférence, que dès qu'une œuvre est visée par les al. 27(2)*a*) à *c*) et qu'elle satisfait par ailleurs aux exigences que la Loi établit à titre de conditions préalables de l'application de la protection conférée par le droit d'auteur, rien ne permet aux tribunaux de limiter cette protection en fonction de ce qui pourrait — ou ne pourrait pas — constituer un « intérêt économique légitime ». Je ne crois pas que l'arrêt *Théberge c. Galerie d'Art du Petit Champlain inc.*, [2002] 2 R.C.S. 336, 2002 CSC 34, permet d'affirmer cela.

La réponse à la seconde question dépend de la façon de définir les droits des licenciés exclusifs. Comme l'a affirmé le juge Estey, dans l'arrêt *Compo Co. c. Blue Crest Music Inc.*, [1980] 1 R.C.S. 357, p. 372-373, le droit d'auteur au Canada

n'est pas régi par les principes de la responsabilité délictuelle ni par le droit de propriété mais par un texte législatif. Il ne va pas à l'encontre des droits existants en

111

112

113

obligations **heretofore existing** in the common law. Copyright legislation simply creates rights and obligations upon the terms and in the circumstances set out in the statute.

Copyright today remains an exclusively statutory creation: *Théberge*; *Bishop v. Stevens*, [1990] 2 S.C.R. 467; *CCH Canadian Ltd. v. Law Society of Upper Canada*, [2004] 1 S.C.R. 339, 2004 SCC 13.

114    In my view, the clear language of the Act is determinative. "Exclusive licence" is defined in s. 2.7:

... an authorization to do any act that is subject to copyright to the exclusion of all others including the copyright owner, whether the authorization is granted by the owner or an exclusive licensee claiming under the owner.

115    Clarification of the nature and quality of the rights enjoyed by an exclusive licensee is found in a combination of ss. 13(4), 13(6), 13(7) and 36(1) of the Act, which state:

**13.** . . .

(4)  The owner of the copyright in any work may assign the right, either wholly or partially, and either generally or subject to limitations relating to territory, medium or sector of the market or other limitations relating to the scope of the assignment, and either for the whole term of the copyright or for any other part thereof, and may grant any interest in the right by licence, but no assignment or grant is valid unless it is in writing signed by the owner of the right in respect of which the assignment or grant is made, or by the owner's duly authorized agent.

.   .   .

(6)  For greater certainty, it is deemed always to have been the law that a right of action for infringement of copyright may be assigned in association with the assignment of the copyright or the grant of an interest in the copyright by licence.

(7)  For greater certainty, it is deemed always to have been the law that a grant of an exclusive licence in a copyright constitutes the grant of an interest in the copyright by licence.

.   .   .

matière de propriété et de conduite et il ne relève pas des droits et obligations existant autrefois en *common law*. La loi concernant le droit d'auteur crée simplement des droits et obligations selon certaines conditions et circonstances établies dans le texte législatif.

Encore aujourd'hui, le droit d'auteur est d'origine exclusivement législative : *Théberge*; *Bishop c. Stevens*, [1990] 2 R.C.S. 467; *CCH Canadienne Ltée c. Barreau du Haut-Canada*, [2004] 1 R.C.S. 339, 2004 CSC 13.

Selon moi, le libellé clair de la Loi est déterminant. L'expression « licence exclusive » est définie, à l'art. 2.7, comme étant

l'autorisation accordée au licencié d'accomplir un acte visé par un droit d'auteur de façon exclusive, qu'elle soit accordée par le titulaire du droit d'auteur ou par une personne déjà titulaire d'une licence exclusive; l'exclusion vise tous les titulaires.

Lus ensemble, les par. 13(4), 13(6), 13(7) et 36(1) de la Loi clarifient la nature et la qualité des droits dont jouit le licencié exclusif :

**13.** . . .

(4)  Le titulaire du droit d'auteur sur une œuvre peut céder ce droit, en totalité ou en partie, d'une façon générale ou avec des restrictions relatives au territoire, au support matériel, au secteur du marché ou à la portée de la cession, pour la durée complète ou partielle de la protection; il peut également concéder, par une licence, un intérêt quelconque dans ce droit; mais la cession ou la concession n'est valable que si elle est rédigée par écrit et signée par le titulaire du droit qui en fait l'objet, ou par son agent dûment autorisé.

.   .   .

(6)  Il est entendu que la cession du droit d'action pour violation du droit d'auteur est réputée avoir toujours pu se faire en relation avec la cession du droit d'auteur ou la concession par licence de l'intérêt dans celui-ci.

(7)  Il est entendu que la concession d'une licence exclusive sur un droit d'auteur est réputée toujours avoir valu concession par licence d'un intérêt dans ce droit d'auteur.

.   .   .

**36**. (1)  Subject to this section, the owner of any copyright, or <u>any person</u> or persons <u>deriving any right</u>, title or interest by assignment or grant in <u>writing from the owner</u>, <u>may</u> individually for himself or herself, as a party to the proceedings in his or her own name, <u>protect and enforce any right that he or she holds</u>, and, to the extent of that right, title and interest, is <u>entitled to the remedies provided by this Act</u>.

Under s. 13(4) and s. 13(6), the owner of a copyright is free to divest itself of *any* interest in the copyright, in whole or in part, either by assignment *or* by licence: J. S. McKeown, *Fox on Canadian Law of Copyright and Industrial Designs* (4th ed. (loose-leaf)), at p. 19-24.

A copyright holder's ability to alienate its interest either through licensing or assignment is perfectly consistent with the statutory scheme. Vertical and horizontal divisibility is, arguably, a hallmark of copyright: see *Bouchet v. Kyriacopoulos* (1964), 45 C.P.R. 265 (Ex. Ct.). And, as Binnie J. noted in *Théberge*, at para. 12, the economic objectives of copyright law are furthered through the transferability of either full or partial copyright interests.

Section 13(7) clarifies that an exclusive licence is the grant of a proprietary interest in the copyright itself: see *Robertson v. Thomson Corp.*, [2006] 2 S.C.R. 363, 2006 SCC 43, at para. 56. And s. 36(1) stipulates that any such grant of an interest in the copyright can be protected through the remedies provided in the Act.

The effect of s. 13(7) is to limit the distinction between the rights of assignees and exclusive licensees: McKeown, at p. 19-25; T. Scassa, "Using Copyright Law to Prevent Parallel Importation: A Comment on *Kraft Canada, Inc. v. Euro Excellence, Inc.*" (2006), 85 *Can. Bar Rev.* 409, at p. 416; N. Tamaro, *The 2006 Annotated Copyright Act* (2006). The interest granted under s. 13(7) therefore includes a right, under s. 36(1), to protect that interest as against all others, including the owner-licensor, by availing itself of the remedies in the Act.

**36.** (1) Sous réserve des autres dispositions du présent article, le titulaire d'un droit d'auteur, ou <u>quiconque possède un droit</u>, un titre ou un intérêt acquis par cession ou concession consentie <u>par écrit par le titulaire peut</u>, individuellement pour son propre compte, ou en son propre nom comme partie à une procédure, <u>soutenir et faire valoir les droits qu'il détient</u>, et il <u>peut exercer les recours prévus par la présente loi</u> dans toute l'étendue de son droit, de son titre et de son intérêt.

Aux termes des par. 13(4) et 13(6), le titulaire du droit d'auteur peut aliéner, en totalité ou en partie, un intérêt *quelconque* dans ce droit, par cession *ou* par licence : J. S. McKeown, *Fox on Canadian Law of Copyright and Industrial Designs* (4$^e$ éd. (feuilles mobiles)), p. 19-24.

La capacité du titulaire du droit d'auteur d'aliéner son intérêt par cession ou par licence est parfaitement compatible avec l'économie de la Loi. On pourrait soutenir que la divisibilité verticale et horizontale est une caractéristique du droit d'auteur : voir *Bouchet c. Kyriacopoulos* (1964), 45 C.P.R. 265 (C. de l'É.). Puis, comme l'a souligné le juge Binnie dans l'arrêt *Théberge*, par. 12, la transférabilité de la totalité ou d'une partie des intérêts dans le droit d'auteur favorise la réalisation des objectifs économiques de la législation sur le droit d'auteur.

Le paragraphe 13(7) précise que la concession d'une licence exclusive est la concession d'un intérêt propriétal dans le droit d'auteur lui-même : voir l'arrêt *Robertson c. Thomson Corp.*, [2006] 2 R.C.S. 363, 2006 CSC 43, par. 56. De plus, le par. 36(1) prévoit que cette concession d'un intérêt dans le droit d'auteur peut être protégée par l'exercice des recours prévus par la Loi.

Le paragraphe 13(7) a pour effet de restreindre la distinction entre les droits des cessionnaires et ceux des licenciés exclusifs : McKeown, p. 19-25; T. Scassa, « Using Copyright Law to Prevent Parallel Importation : A Comment on *Kraft Canada, Inc. v. Euro Excellence, Inc.* » (2006), 85 *R. du B. can.* 409, p. 416; N. Tamaro, *The 2006 Annotated Copyright Act* (2006). L'intérêt concédé aux termes du par. 13(7) comprend donc, en vertu du par. 36(1), le droit de protéger cet intérêt contre tous, y compris le titulaire-concédant, par l'exercice des recours prévus par la Loi.

120    In other words, when the owner-licensor transfers an interest to the exclusive licensee, that licensee becomes, under the Act, the owner of a defined interest in the copyright: see *Éditions de la Table ronde s.a. v. Cousture*, [1995] Q.J. No. 1519 (QL) (S.C.), and *Dynabec Ltée v. Société d'informatique R.D.G. Inc.* (1985), 6 C.P.R. (3d) 322 (Que. C.A.).

121    Where the owner of a copyright has granted an exclusive licence, therefore, it has, to the extent of the duration, territorial scope, and terms of that licence, temporarily granted that interest in the copyright to the exclusive licensee.

122    The scope of the precise interest granted is shaped by the terms of the licensing agreement: see *Fonds Gabrielle Roy v. Éditions internationales Alain Stanké ltée*, [1993] Q.J. No. 2525 (QL) (S.C.); and *British Actors Film Co. v. Glover*, [1918] 1 K.B. 299, at p. 307. In this case, the agreement stated:

2.01    The Licensor grants to the Licensee the sole and exclusive right and license in the Territory to produce, reproduce and adapt the Works or any substantial part thereof, in any material form whatever, and to use and publicly present the Works in association with the manufacture, distribution or sale in Canada of confectionery products, including, but not limited to, chocolate.

123    This is the grant of the "sole and exclusive right", in Canada, to "produce", "reproduce", "adapt", "use", "distribute" and "sell" the products. These terms, read together with the rights granted to an exclusive licensee in ss. 2.7 and 13(7), as well as the rights in s. 36(1) to protect and enforce its rights and interests through remedies provided by the Act, give the exclusive licensee the right to invoke the Act for copyright infringement not only against third parties, but, as s. 2.7 confirms, against the owner-licensor as well.

124    The trial judge, not unreasonably, treated this exclusive licence as an assignment: *Kraft Canada*

En d'autres termes, lorsque le titulaire-concédant transfère un intérêt au licencié exclusif, ce dernier devient, aux termes de la Loi, le titulaire d'un intérêt défini dans le droit d'auteur : voir *Éditions de la Table ronde s.a. c. Cousture*, [1995] A.Q. nᵒ 1519 (QL) (C.S.), et *Dynabec Ltée c. Société d'informatique R.D.G. Inc.*, [1985] C.A. 236.

Le titulaire d'un droit d'auteur qui a concédé une licence exclusive a donc — aux conditions et pour la durée de cette licence et sur le territoire qu'elle vise — concédé temporairement au licencié exclusif l'intérêt en question dans le droit d'auteur.

La portée de l'intérêt précisément concédé est déterminée par les conditions du contrat de licence : voir *Fonds Gabrielle Roy c. Éditions internationales Alain Stanké ltée*, [1993] J.Q. nᵒ 2525 (QL) (C.S.), et *British Actors Film Co. c. Glover*, [1918] 1 K.B. 299, p. 307. En l'espèce, le contrat comportait la clause suivante :

[TRADUCTION]

2.01    Le concédant confère au licencié l'autorisation et le droit exclusifs de produire, de reproduire et d'adapter les œuvres ou une partie importante de celles-ci sur le territoire, sous une forme matérielle quelconque, et d'utiliser et de présenter publiquement les œuvres en liaison avec la fabrication, la mise en circulation ou la vente au Canada de produits de confiserie, notamment du chocolat.

Il y a donc concession du « droit exclusi[f] » de « produire », de « reproduire », d'« adapter », d'« utiliser », de « mettre en circulation » et de « vendre » les produits au Canada. Ces termes, interprétés conjointement avec les droits concédés au licencié exclusif à l'art. 2.7 et au par. 13(7), ainsi qu'avec le droit, énoncé au par. 36(1), de soutenir et faire valoir ses droits et intérêts par l'exercice des recours prévus par la Loi, confèrent au licencié exclusif le droit d'invoquer la Loi relativement à une violation du droit d'auteur, non seulement contre des tiers mais aussi, comme le confirme l'art. 2.7, contre le titulaire-concédant.

Le juge de première instance a, de manière non déraisonnable, assimilé cette licence exclusive à

*Inc. v. Euro Excellence Inc.*, [2004] 4 F.C.R. 410, 2004 FC 652, at para. 39. However, even as an exclusive licence, the proprietary interest clearly extends to the production and distribution of copyrighted works in Canada.

I accept that exclusive licences are distinct from assignments under the Act. This difference is recognized in s. 13(5) of the Act, dealing with partial assignments of copyright:

(5)  Where, under any partial assignment of copyright, the assignee becomes entitled to any right comprised in copyright, the assignee, with respect to the rights so assigned, and the assignor, with respect to the rights not assigned, shall be treated for the purposes of this Act as the owner of the copyright, and this Act has effect accordingly.

This provision is interpretive in nature, clarifying that a partial assignee enjoys complete control over what was assigned to it, while the assignor retains ownership rights in what was not assigned.

As Rothstein J. notes, there is no analogous provision with respect to licensees. But, in my view, the absence of such a provision does not derogate from the rights the Act *does* unambiguously assign to exclusive licensees.

An exclusive licence which did not prevent others, including the owner-licensor, from performing the acts addressed in the licensing agreement, would no longer be exclusive. It would also render meaningless the statutory definition found in s. 2.7 of an exclusive licensee as the holder of rights "to the exclusion of all others including the copyright owner".

While an owner-licensor is, technically, still the owner of the copyright, it is nonetheless liable to an exclusive licensee if it breaches the copyright interest it has granted. Otherwise, the owner-licensor could continue to assert that despite having granted an exclusive interest in its copyright, it was free to compete with the exclusive licensee without fear of attack from the Act's remedial tentacles. The

une cession : *Kraft Canada Inc. c. Euro Excellence Inc.*, [2004] 4 R.C.F. 410, 2004 CF 652, par. 39. Toutefois, même dans le cas d'une licence exclusive, l'intérêt propriétal vise de toute évidence la production et la mise en circulation au Canada des œuvres protégées par le droit d'auteur.

125   Je reconnais que la Loi établit une distinction entre la licence exclusive et la cession. Cette différence se reflète au par. 13(5) de la Loi, qui traite de la cession partielle du droit d'auteur :

(5)  Lorsque, en vertu d'une cession partielle du droit d'auteur, le cessionnaire est investi d'un droit quelconque compris dans le droit d'auteur, sont traités comme titulaires du droit d'auteur, pour l'application de la présente loi, le cessionnaire, en ce qui concerne les droits cédés, et le cédant, en ce qui concerne les droits non cédés, les dispositions de la présente loi recevant leur application en conséquence.

Cette disposition de nature interprétative précise que le cessionnaire partiel a la pleine maîtrise de ce qui lui a été cédé, alors que le cédant conserve des droits de propriété sur ce qui n'a pas été cédé.

126   Comme le fait observer le juge Rothstein, il n'y a pas de disposition analogue à l'égard des licenciés. J'estime toutefois que l'absence d'une telle disposition ne change rien aux droits que la Loi *confère* sans équivoque aux licenciés exclusifs.

127   Une licence exclusive qui n'empêcherait pas autrui, y compris le titulaire-concédant, d'accomplir les actes énoncés dans le contrat de licence ne serait plus exclusive. Elle viderait également de tout son sens la définition que l'art. 2.7 de la Loi donne du licencié exclusif comme étant celui qui détient des droits opposables à tous, y compris le concédant (« *to the exclusion of all others including the copyright owner* »).

128   Bien que le titulaire-concédant demeure, à proprement parler, le titulaire du droit d'auteur, il est néanmoins responsable envers le licencié exclusif s'il viole l'intérêt dans le droit d'auteur qu'il lui a concédé. Sinon, le titulaire-concédant pourrait continuer de maintenir que, même s'il a concédé un intérêt exclusif dans son droit d'auteur, il était libre de faire concurrence au licencié exclusif, sans

legislation, in my view, contradicts such immunity from the statute and, on the contrary, clearly entitles an exclusive licensee to sue for secondary infringement, even where the work was reproduced by the owner-licensor.

129   Copyright confers a limited monopoly to "produce or reproduce" the work in any material form whatever. In this case, KCI purchased the exclusive licence to the copyrighted work precisely because it wanted copyright on chocolate bar wrappers. Euro-Excellence purchased chocolate bars with labels displaying the copyrighted works; it imported those works into Canada after being notified of KCI's Canadian copyright interest; its purpose in importing the chocolate bars and the wrappers was to sell them or distribute them by way of trade. A s. 27(2)(*e*) infringement is therefore made out. KCI is entitled to the remedies provided by the Act.

130   I would dismiss the appeal and, as requested by KCI, return the matter to Harrington J. for a reassessment of damages.

### APPENDIX

*Copyright Act*, R.S.C. 1985, c. C-42

**2.** [Definitions] . . .

"copyright" means the rights described in

   (*a*)   section 3, in the case of a work,

.   .   .

"infringing" means

   (*a*)   in relation to a work in which copyright subsists, any copy, including any colourable imitation, made or dealt with in contravention of this Act,

   (*b*)   in relation to a performer's performance in respect of which copyright subsists, any fixation or copy of a fixation of it made or dealt with in contravention of this Act,

craindre de faire l'objet des recours prévus par la Loi. J'estime que cette immunité n'est pas possible selon le libellé de la Loi; la Loi habilite clairement le licencié exclusif à intenter une action pour violation à une étape ultérieure, même dans le cas où l'œuvre a été reproduite par le titulaire-concédant.

Le droit d'auteur confère un monopole limité de la « production ou reproduction » de l'œuvre sous une forme matérielle quelconque. En l'espèce, KCI a acquis la licence exclusive sur l'œuvre protégée par le droit d'auteur justement parce qu'elle souhaitait avoir un droit d'auteur sur les emballages des tablettes de chocolat. Euro-Excellence a acheté des barres de chocolat dont les étiquettes arboraient les œuvres protégées; elle a importé ces œuvres au Canada après avoir été avisée de l'intérêt de KCI dans le droit d'auteur canadien; elle a importé les tablettes de chocolat et les emballages pour en faire la vente ou la mise en circulation dans un but commercial. L'existence d'une contravention à l'al. 27(2)*e*) est donc établie. KCI a le droit d'exercer les recours prévus par la Loi.

Je suis d'avis de rejeter le pourvoi et, comme l'a demandé KCI, de renvoyer l'affaire au juge Harrington pour qu'il procède à une nouvelle évaluation des dommages-intérêts.

### ANNEXE

*Loi sur le droit d'auteur*, L.R.C. 1985, ch. C-42

**2.** [Définitions] . . .

« contrefaçon »

   *a*)   À l'égard d'une œuvre sur laquelle existe un droit d'auteur, toute reproduction, y compris l'imitation déguisée, qui a été faite contrairement à la présente loi ou qui a fait l'objet d'un acte contraire à la présente loi;

   *b*)   à l'égard d'une prestation sur laquelle existe un droit d'auteur, toute fixation ou reproduction de celle-ci qui a été faite contrairement à la présente loi ou qui a fait l'objet d'un acte contraire à la présente loi;

   *c*)   à l'égard d'un enregistrement sonore sur lequel existe un droit d'auteur, toute reproduction de celle-ci

(*c*)  in relation to a sound recording in respect of which copyright subsists, any copy of it made or dealt with in contravention of this Act, or

(*d*)  in relation to a communication signal in respect of which copyright subsists, any fixation or copy of a fixation of it made or dealt with in contravention of this Act.

The definition includes a copy that is imported in the circumstances set out in paragraph 27(2)(*e*) and section 27.1 but does not otherwise include a copy made with the consent of the owner of the copyright in the country where the copy was made;

.  .  .

**2.7**  [Exclusive licence] For the purposes of this Act, an exclusive licence is an authorization to do any act that is subject to copyright to the exclusion of all others including the copyright owner, whether the authorization is granted by the owner or an exclusive licensee claiming under the owner.

.  .  .

**3.** (1) [Copyright in works] For the purposes of this Act, "copyright", in relation to a work, means the sole right to produce or reproduce the work or any substantial part thereof in any material form whatever, to perform the work or any substantial part thereof in public or, if the work is unpublished, to publish the work or any substantial part thereof, and includes the sole right

(*a*)  to produce, reproduce, perform or publish any translation of the work,

.  .  .

and to authorize any such acts.

.  .  .

**13.** . . .

(4) [Assignments and licences] The owner of the copyright in any work may assign the right, either

qui a été faite contrairement à la présente loi ou qui a fait l'objet d'un acte contraire à la présente loi;

*d*)  à l'égard d'un signal de communication sur lequel existe un droit d'auteur, toute fixation ou reproduction de la fixation qui a été faite contrairement à la présente loi ou qui a fait l'objet d'un acte contraire à la présente loi.

La présente définition exclut la reproduction — autre que celle visée par l'alinéa 27(2)*e*) et l'article 27.1 — fait avec le consentement du titulaire du droit d'auteur dans le pays de production.

.  .  .

« droit d'auteur » S'entend du droit visé :

*a*)  dans le cas d'une œuvre, à l'article 3;

.  .  .

**2.7** [Licence exclusive] Pour l'application de la présente loi, une licence exclusive est l'autorisation accordée au licencié d'accomplir un acte visé par un droit d'auteur de façon exclusive, qu'elle soit accordée par le titulaire du droit d'auteur ou par une personne déjà titulaire d'une licence exclusive; l'exclusion vise tous les titulaires.

.  .  .

**3.** (1) [Droit d'auteur sur l'œuvre] Le droit d'auteur sur l'œuvre comporte le droit exclusif de produire ou reproduire la totalité ou une partie importante de l'œuvre, sous une forme matérielle quelconque, d'en exécuter ou d'en représenter la totalité ou une partie importante en public et, si l'œuvre n'est pas publiée, d'en publier la totalité ou une partie importante; ce droit comporte, en outre, le droit exclusif :

*a*)  de produire, reproduire, représenter ou publier une traduction de l'œuvre;

.  .  .

Est inclus dans la présente définition le droit exclusif d'autoriser ces actes.

.  .  .

**13.** . . .

(4) [Cession et licences] Le titulaire du droit d'auteur sur une œuvre peut céder ce droit, en totalité ou en

wholly or partially, and either generally or subject to limitations relating to territory, medium or sector of the market or other limitations relating to the scope of the assignment, and either for the whole term of the copyright or for any other part thereof, and may grant any interest in the right by licence, but no assignment or grant is valid unless it is in writing signed by the owner of the right in respect of which the assignment or grant is made, or by the owner's duly authorized agent.

(5) [Ownership in case of partial assignment] Where, under any partial assignment of copyright, the assignee becomes entitled to any right comprised in copyright, the assignee, with respect to the rights so assigned, and the assignor, with respect to the rights not assigned, shall be treated for the purposes of this Act as the owner of the copyright, and this Act has effect accordingly.

(6) [Assignment of right of action] For greater certainty, it is deemed always to have been the law that a right of action for infringement of copyright may be assigned in association with the assignment of the copyright or the grant of an interest in the copyright by licence.

(7) [Exclusive licence] For greater certainty, it is deemed always to have been the law that a grant of an exclusive licence in a copyright constitutes the grant of an interest in the copyright by licence.

. . .

**27.** (1) [Infringement generally] It is an infringement of copyright for any person to do, without the consent of the owner of the copyright, anything that by this Act only the owner of the copyright has the right to do.

(2) [Secondary infringement] It is an infringement of copyright for any person to

(*a*)  sell or rent out,

(*b*)  distribute to such an extent as to affect prejudicially the owner of the copyright,

(*c*)  by way of trade distribute, expose or offer for sale or rental, or exhibit in public,

(*d*)  possess for the purpose of doing anything referred to in paragraphs (*a*) to (*c*), or

(*e*)  import into Canada for the purpose of doing anything referred to in paragraphs (*a*) to (*c*),

partie, d'une façon générale ou avec des restrictions relatives au territoire, au support matériel, au secteur du marché ou à la portée de la cession, pour la durée complète ou partielle de la protection; il peut également concéder, par une licence, un intérêt quelconque dans ce droit; mais la cession ou la concession n'est valable que si elle est rédigée par écrit et signée par le titulaire du droit qui en fait l'objet, ou par son agent dûment autorisé.

(5) [Possession dans le cas de cession partielle] Lorsque, en vertu d'une cession partielle du droit d'auteur, le cessionnaire est investi d'un droit quelconque compris dans le droit d'auteur, sont traités comme titulaires du droit d'auteur, pour l'application de la présente loi, le cessionnaire, en ce qui concerne les droits cédés, et le cédant, en ce qui concerne les droits non cédés, les dispositions de la présente loi recevant leur application en conséquence.

(6) [Cession d'un droit de recours] Il est entendu que la cession du droit d'action pour violation du droit d'auteur est réputée avoir toujours pu se faire en relation avec la cession du droit d'auteur ou la concession par licence de l'intérêt dans celui-ci.

(7) [Licence exclusive] Il est entendu que la concession d'une licence exclusive sur un droit d'auteur est réputée toujours avoir valu concession par licence d'un intérêt dans ce droit d'auteur.

. . .

**27.** (1) [Règle générale] Constitue une violation du droit d'auteur l'accomplissement, sans le consentement du titulaire de ce droit, d'un acte qu'en vertu de la présente loi seul ce titulaire a la faculté d'accomplir.

(2) [Violation à une étape ultérieure] Constitue une violation du droit d'auteur l'accomplissement de tout acte ci-après en ce qui a trait à l'exemplaire d'une œuvre, d'une fixation d'une prestation, d'un enregistrement sonore ou d'une fixation d'un signal de communication alors que la personne qui accomplit l'acte sait ou devrait savoir que la production de l'exemplaire constitue une violation de ce droit, ou en constituerait une si l'exemplaire avait été produit au Canada par la personne qui l'a produit :

*a*)  la vente ou la location;

*b*)  la mise en circulation de façon à porter préjudice au titulaire du droit d'auteur;

a copy of a work, sound recording or fixation of a performer's performance or of a communication signal that the person knows or should have known infringes copyright or would infringe copyright if it had been made in Canada by the person who made it.

*c*)  la mise en circulation, la mise ou l'offre en vente ou en location, ou l'exposition en public, dans un but commercial;

*d*)  la possession en vue de l'un ou l'autre des actes visés aux alinéas *a*) à *c*);

*e*)  l'importation au Canada en vue de l'un ou l'autre des actes visés aux alinéas *a*) à *c*).

· · ·

**36.** (1) [Protection of separate rights] Subject to this section, the owner of any copyright, or any person or persons deriving any right, title or interest by assignment or grant in writing from the owner, may individually for himself or herself, as a party to the proceedings in his or her own name, protect and enforce any right that he or she holds, and, to the extent of that right, title and interest, is entitled to the remedies provided by this Act.

· · ·

**36.** (1) [Protection des droits distincts] Sous réserve des autres dispositions du présent article, le titulaire d'un droit d'auteur, ou quiconque possède un droit, un titre ou un intérêt acquis par cession ou concession consentie par écrit par le titulaire peut, individuellement pour son propre compte, ou en son propre nom comme partie à une procédure, soutenir et faire valoir les droits qu'il détient, et il peut exercer les recours prévus par la présente loi dans toute l'étendue de son droit, de son titre et de son intérêt.

(2)  [Where copyright owner to be made party] Where proceedings referred to in subsection (1) are taken by a person other than the copyright owner, the copyright owner must be made a party to those proceedings, except

(2)  [Partie à l'action] Lorsque des procédures sont engagées en vertu du paragraphe (1) par une personne autre que le titulaire du droit d'auteur, ce dernier doit être constitué partie à ces procédures sauf :

(*a*)  in respect of proceedings taken under section 44.1, 44.2 or 44.4;

*a*)  dans le cas de procédures engagées en vertu des articles 44.1, 44.2 ou 44.4;

(*b*)  in respect of interlocutory proceedings unless the court is of the opinion that the interests of justice require the copyright owner to be a party; and

*b*)  dans le cas de procédures interlocutoires, à moins que le tribunal estime qu'il est dans l'intérêt de la justice de constituer le titulaire du droit d'auteur partie aux procédures;

(*c*)  in any other case, if the court is of the opinion that the interests of justice do not require the copyright owner to be a party.

*c*)  dans tous les autres cas où le tribunal estime que l'intérêt de la justice ne l'exige pas.

· · ·

**64.** . . .

· · ·

**64.** . . .

(2)  [Non-infringement re certain designs] Where copyright subsists in a design applied to a useful article or in an artistic work from which the design is derived and, by or under the authority of any person who owns the copyright in Canada or who owns the copyright elsewhere,

(2)  [Non-violation : cas de certains dessins] Ne constitue pas une violation du droit d'auteur ou des droits moraux sur un dessin appliqué à un objet utilitaire, ou sur une œuvre artistique dont le dessin est tiré, ni le fait de reproduire ce dessin, ou un dessin qui n'en diffère pas sensiblement, en réalisant l'objet ou toute reproduction graphique ou matérielle de celui-ci, ni le fait d'accomplir avec un objet ainsi réalisé, ou sa reproduction, un acte réservé exclusivement au titulaire du droit, pourvu que l'objet, de par l'autorisation du titulaire — au Canada ou à l'étranger — remplisse l'une des conditions suivantes :

(*a*)  the article is reproduced in a quantity of more than fifty, or

(*b*)  where the article is a plate, engraving or cast, the article is used for producing more than fifty useful articles,

it shall **not thereafter be an infringement of the copy-**right or **the moral rights for anyone**

(*c*) to reproduce the design of the article or a design not differing substantially from the design of the article by

(i) making the article, or

(ii) making a drawing or other reproduction in any material form of the article, or

(*d*) to do with an article, drawing or reproduction that is made as described in paragraph (*c*) anything that the owner of the copyright has the sole right to do with the design or artistic work in which the copyright subsists.

(3) [Exception] Subsection (2) does not apply in respect of the copyright or the moral rights in an artistic work in so far as the work is used as or for

.   .   .

(*b*) a trade-mark or a representation thereof or a label;

.   .   .

*a*) être reproduit à plus de cinquante exemplaires;

*b*) s'agissant d'une planche, d'une gravure ou d'un moule, servir à la production de plus de cinquante objets utilitaires.

(3) [Exception] Le paragraphe (2) ne s'applique pas au droit d'auteur ou aux droits moraux sur une œuvre artistique dans la mesure où elle est utilisée à l'une ou l'autre des fins suivantes :

.   .   .

*b*) marques de commerce, ou leurs représentations, ou étiquettes;

.   .   .

*Appeal allowed with costs,* McLachlin C.J. *and* Abella J. *dissenting.*

*Solicitor for the appellant: François Boscher, Montréal.*

*Solicitors for the respondents: Sim, Lowman, Ashton & McKay, Toronto.*

*Solicitors for the intervener the Retail Council of Canada: Macera & Jarzyna, Ottawa.*

*Solicitors for the intervener the Alliance of Manufacturers & Exporters Canada: Gowling Lafleur Henderson, Toronto.*

*Pourvoi accueilli avec dépens, la juge en chef* McLachlin *et la juge* Abella *sont dissidentes.*

*Procureur de l'appelante : François Boscher, Montréal.*

*Procureurs des intimées : Sim, Lowman, Ashton & McKay, Toronto.*

*Procureurs de l'intervenant le Conseil canadien du commerce de détail : Macera & Jarzyna, Ottawa.*

*Procureurs de l'intervenante l'Alliance des manufacturiers et des exportateurs du Canada : Gowling Lafleur Henderson, Toronto.*

2007 SCC 37 (CanLII)

# TAB 37

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 182 of 398

37 F.3d 41
United States Court of Appeals,
Second Circuit.

GENERAL ELECTRIC CAPITAL CORPORATION,
as Successor in Interest to General Electric
Credit Corporation, Plaintiff-Appellant,

v.

Eva ARMADORA, S.A., and Christina
Armadora, S.A., Defendants-Appellees.

No. 1573, Docket 93-9282.    |    Argued
April 26, 1994.    |    Decided Sept. 22, 1994.

Lender brought action against borrower to recover special interest payments allegedly due under loan agreement. The United States District Court for the Southern District of New York, Motley, J., at 821 F.Supp. 1530, denied relief, finding term in contract to be ambiguous and construing it against lender. Lender appealed. The Court of Appeals, Winter, Circuit Judge, held that borrower, which had been informed by lender that lender expected special interest payment in range of $3 million to $3,500,000 in exchange for permitting prepayment and termination of loan, but which failed to state its view of proper interpretation until after lender had given up its right to block prepayment by agreeing to addendum, was equitably estopped from challenging lender's interpretation of agreement.

Reversed and remanded.

Van Graafeiland, Circuit Judge, concurred in result.

West Headnotes (3)

[1]    **Estoppel**
        Essential Elements
       Equitable estoppel under New York law requires showing of: act constituting concealment of facts or false representation; intention or expectation that such acts will be relied upon; actual or constructive knowledge of true facts by wrongdoers; and reliance upon misrepresentations that causes innocent party to change its position to its substantial detriment.

50 Cases that cite this headnote

[2]    **Estoppel**
        Failure to Assert Claim
       **Estoppel**
        Silence
       Borrower, which had been informed by lender that lender expected special interest payment in range of $3 million to $3,500,000 in exchange for permitting prepayment and termination of loan, but which failed to state its view of proper interpretation until after lender had given up its right to block prepayment by agreeing to addendum, was equitably estopped under New York law from challenging lender's interpretation of agreement; borrower failed to state its view of proper interpretation until after lender gave up its right to block prepayment by agreeing to addendum, instead making ambiguous statements that borrower intended to be governed by terms of contract, without stating exactly what deductions they believed permissible.

6 Cases that cite this headnote

[3]    **Estoppel**
        Silence
       Silence in face of explicit contrary assumption by innocent party may be "concealment of facts" or "misrepresentation" for estoppel purposes.

24 Cases that cite this headnote

**Attorneys and Law Firms**

**\*42** Mark C. Flavin, New York City (Alan Heblack, Andrea Fischer, Haight, Gardner, Poor & Havens, of counsel), for plaintiff-appellant.

James P. Rau, Cardillo & Corbett, New York City, for defendants-appellees.

Before: FEINBERG, VAN GRAAFEILAND and WINTER, Circuit Judges.

General Elec. Capital Corp. v. Armadora, S.A., 37 F.3d 41 (1994)

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 183 of 398

## Opinion

WINTER, Circuit Judge:

General Electric Capital Corporation ("GECC") appeals from a judgment entered following a bench trial before Judge Motley directing Eva Armadora, S.A., and Christina Armadora, S.A. (collectively "Armadora") to pay GECC $492,418.50 in principal, interest, and attorneys' fees for breach of contract. GECC sought an additional sum of over two million dollars based upon the "Special Interest Payment" term of the contract. The district court denied this relief because it found the "Special Interest Payment" term to be ambiguous and construed it against GECC based on extrinsic evidence. We disagree. Whatever the original intent underlying the "Special Interest Payment," Armadora's conduct estops it from challenging GECC's interpretation. For that reason we reverse. We remand for a recalculation of attorney's fees.

On February 28, 1986, Armadora obtained a three-year loan from GECC to pay for two tanker ships that Armadora's principal, T. Peter Pappas, had commissioned from a Spanish shipyard. In return for financing equal to the total value of the vessels, $18,000,000, Armadora agreed to make a payment over and above the repayment of the loan following any sale or refinancing of the vessels. Section 2.09 of the Loan Agreement, entitled "Special Interest Payment," thus specified that:

(a) After the principal of, and interest at the Interest Rate, on a Note and any other amounts required ... have been repaid or prepaid in full ... [Armadora] shall pay to GECC, as additional interest ("Special Interest Payment") on the Loan in respect of which such Note was issued:

. . . . .

(ii) On the date of sale or Loss Payment Date respecting a Vessel, 30% of the excess of (x) the total gross proceeds received from the sale, loss or other disposition of such Vessel received by [Armadora] over (y) the aggregate of (A) the amount of expenses paid or incurred by [Armadora] and directly related to the sale, loss, or other disposition of the Vessel and (B) any amounts due or paid which are described in clauses (i) through (iv) of the definition of Excess Income.

The Loan Agreement defined "Excess Income" as follows:

"Excess Income " for each Vessel during any period shall mean ... all earnings received in respect of such Vessel ... less [certain operating expenses] ... plus (x) as to any refinancing occurring during such period, the principal amount of any increase over existing indebtedness of [Armadora] at the time of such refinancing and (y) any interest earned by [Armadora] **43 less the aggregate of (i) commissions paid to independent charter brokers, (ii) operating expenses directly related to such Vessel including drydocking expenses paid by the relevant borrower under the Bareboat Charter, (iii) management fees due to a manager under a management contract approved by GECC, (iv) principal and interest paid for the relevant period in respect of any outstanding indebtedness respecting such Vessel.

In September 1987, Armadora sought to refinance the loan, pre-pay it, and terminate its agreement with GECC. Pursuant to the Loan Agreement, the pre-payment and termination required GECC's consent. Pappas engaged Paul Gurtler to negotiate for this consent on Armadora's behalf with GECC's Steven Gonzalez. In the course of these negotiations, Gonzalez and Gurtler discussed the timing of the termination, its treatment as a "deemed sale" in the amount of $26,400,000, and the calculation of the Special Interest Payment. At trial, both Gonzalez and Gurtler testified that Gonzalez had calculated this payment for Gurtler as approximately $3,000,000. On October 15, 1987, Gurtler sent a letter to Gonzalez confirming the substance of these discussions, including a reference to the "30% 'profit sharing' element," but without referring to Gonzalez's calculation of approximately $3,000,000 for that payment. On October 27, 1987, Gonzalez responded in a letter to Gurtler that "state[s] my understanding of the current state of negotiations." This letter spelled out Gonzalez's calculation of the Special Interest Payment as follows:

The amount of the 30% "Special Interest Payment" referred to in the Loan Agreement shall be fixed at 30% of the difference between $26.4MM ... less the aggregate loan principle balance on the Vessels on the date of payment.

Under its interpretation, GECC would permit a deduction from the deemed sale price only of the $14,951,484 of outstanding principal at the time of repayment. At trial, Pappas conceded that, were the calculation of the Special Interest Payment embodied in the October 27 letter to govern, GECC would be entitled to a Special Interest Payment in excess of $3,000,000.

Gonzalez's October 27 letter closed with a request for Gurtler to discuss the matter with Pappas and, if Pappas was "in general agreement," to have counsel prepare a written agreement for GECC to review and execute. Following the receipt of the October 27 letter, Gurtler and Gonzalez spoke again and, as Gurtler testified, Gonzalez once again referred to the approximately $3,000,000 he expected as the Special Interest Payment. According to Gurtler, Gurtler responded that the Loan Agreement provided for "certain deductions" but that Gonzalez had characterized those as "minor."

On November 12, 1987, Pappas sent Gonzalez by telecopier the draft of an addendum that would become "Addendum 1" to the Loan Agreement. Pappas included a cover letter to Gonzalez that stated, "THIS ADDENDUM FORMALIZES THE AGREEMENT WHICH WE HAVE REACHED AS RECAPITULATED IN YOUR LETTER ADDRESSED TO MR. PAUL GURTLER DATED OCTOBER 27, 1987." In Addendum 1, GECC consented to the pre-payment and termination of the agreement. However, Addendum 1 failed to specify the method of calculation of special interest and merely stated that, "[w]ith respect to the Special Interest Payment provided for in Section 2.09 of the Loan Agreement this transaction shall be treated as a sale to a third party on the date of pre-payment with the sale price fixed at $26.4 million...." It concluded that "[a]ll other terms and conditions of the Loan Agreement dated as of February 28, 1986 shall remain in full force and effect."

Just before the execution of Addendum 1, Gonzalez spoke with Robert Miliaresis, an officer of Armadora, to discuss the language of Addendum 1, including the language referring to the Special Interest Payment. Gonzalez testified that Miliaresis characterized the deductions as minor. Miliaresis denied this but admitted that he had neither sent Gonzalez his own calculation of the deductions applicable to the Special Interest Payment nor directly disputed GECC's calculation. He did testify that he informed Gonzalez that Armadora would insist that the Loan **\*44** Agreement would govern the terms of the pre-payment.

On November 17, 1987, GECC signed Addendum 1, thus giving up its right to block pre-payment and termination. Soon thereafter, Armadora began openly to insist upon an interpretation of Section 2.09 at odds with that embodied in the October 27 letter. In a telephone conversation in late January 1988, Miliaresis told Gonzalez that Armadora wanted to deduct the entire amount of the principal and interest, $21,000,000. As the district court found, this was the first time that Armadora revealed to GECC its interpretation of Section 2.09. Gonzalez responded to Pappas once again that GECC's interpretation of the Special Interest Payment calculation was that Armadora would be allowed to deduct only the present outstanding balance of approximately $15 million. Pappas wrote back indicating that he disagreed with GECC's calculation and that "[t]he amount of the special interest payment was to be calculated strictly in accordance with the Loan Agreement." Following this exchange, on February 26, 1988, the parties signed a second addendum ("Addendum 2") which defined the Special Interest Payment by reference to Addendum 1 and the Loan Agreement and stated that

> [a]s of the date hereof [Armadora] and GECC have not agreed on the aggregate amount of the Special Interest Payment to be made, and [Armadora] and GECC covenant[ ] and agree[ ] to negotiate in good faith to reach mutually acceptable sum which shall be payable to GECC as the Special Interest Payment.

However, the agreement added that Armadora's delivery of letters of credit in the amount of $3,000,000 with $1,000,000 drawable by GECC between 180 days and 210 days after the execution of Addendum 2 and a personal guarantee by Pappas of $400,000 were without prejudice to Armadora's position as to the amount of the Special Interest Payment, and that,

> [t]he delivery by GECC of the documents [releasing the mortgage in return for payments of principal and interest] and the acceptance by GECC of the Letter of Credit and the Guaranty are entirely without prejudice to GECC's position as to the amount of the Special Interest Payment due under the Loan Agreement.

The district court held that Section 2.09 of the Loan Agreement was ambiguous and therefore susceptible to interpretation through examination of extrinsic evidence. *General Elec. Capital Corp. v. Eva Armadora, S.A.,* 821 F.Supp. 1530, 1545 (S.D.N.Y.1993). Following extensive testimony and examination of the letters exchanged by the parties, the district court held that Armadora was entitled to deduct the principal and interest already paid to GECC during the loan period as well as the principal still outstanding. *Id.* at 1550. The district court held that Gonzalez's letter of October 27 and Pappas' response of November 12 "did not constitute an offer and acceptance embodying a new agreement that superseded the provisions of section 2.09 in the Loan Agreement." *Id.* at 1546. Under this holding, Armadora owed GECC a balance due on the Special Interest Payment of $325,862.90 plus interest. The district court also awarded GECC attorneys' fees in the amount of $30,000 for successfully arguing that Armadora could not deduct unapproved management fees from the calculation of the Special Interest Payment.

The district court focused on the question of whether Section 2.09 of the Loan Agreement was ambiguous, concluded that it was, and construed it against GECC based on extrinsic evidence. The district court's view in this regard may be correct, but we do not regard those issues as dispositive.

The parties agree that Gonzalez's letter of October 27 unambiguously spelled out GECC's interpretation of the proper method for calculating the Special Interest Payment. Pappas' November 12 letter stated his assent to "THE AGREEMENT WHICH WE HAVE REACHED AS RECAPITULATED IN YOUR LETTER ADDRESSED TO MR. PAUL GURTLER DATED OCTOBER 27, 1987." A more explicit adoption of GECC's interpretation would be difficult to draft.

Arguably, these events resulted in an agreement on the correct interpretation of Section 2.09. The exchange of letters thus might constitute an offer and acceptance, **\*45** while GECC's consent to pre-payment was undeniably a valuable consideration. Armadora argues, and the district court agreed, that the reference to the terms of the Loan Agreement in the Addenda merely continued the original ambiguity and that there was no meeting of the minds upon the correct interpretation of the Loan Agreement. However, Pappas had agreed to Gonzalez's view of Section 2.09 in the November 12 cover letter, and Addendum 1's unelaborated reference to Section 2.09 might simply be viewed as incorporating

the parties' agreed resolution of its ambiguity. The district court appears to have found otherwise, however, but, because we believe that Armadora is in any event estopped from challenging GECC's interpretation of Section 2.09, we need not decide whether the district court's findings are clearly erroneous. [1]

This is not a case in which parties to a contract have disputed the meaning of a provision, arguably resolved it, disagreed again, and, having preserved their rights, go to court. In such a case, the court would determine, first, whether the parties reached a binding resolution of the dispute, and, if not, would go on to determine the meaning of the original provision. This case differs because GECC gave up valuable contractual rights in signing Addendum 1, and GECC claims that even if there was no meeting of the minds as a result of the November 12 letter, Armadora is now estopped as a result of its own conduct from challenging GECC's view of Section 2.09.

 **[1]**   Under New York law, equitable estoppel requires a showing of

(1) An act constituting a concealment of facts or a false misrepresentation;

(2) An intention or expectation that such acts will be relied upon;

(3) Actual or constructive knowledge of the true facts by the wrongdoers;

(4) Reliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment.

*Special Event Entertainment v. Rockefeller Ctr.,* 458 F.Supp. 72, 76 (S.D.N.Y.1978) (citations omitted); *see Broadworth Realty Assocs. v. Chock 336 B'way Operating, Inc.,* 168 A.D.2d 299, 562 N.Y.S.2d 630, 632 (1990). We believe that these factors have been shown in the present case.

 **[2]**   Whatever the ultimate merits of GECC's interpretation of Section 2.09 as a matter of contract law, it at all times made its view clear to Armadora that it expected to receive a special interest payment in the range of $3,000,000 to $3,500,000 in exchange for permitting pre-payment and termination. Armadora in turn failed to state its view of the proper interpretation until January 1988, after GECC had given up its right to block pre-payment by agreeing

Case 09-10138-MFW  Doc 14410-3  Filed 09/16/14  Page 186 of 398

General Elec. Capital Corp. v. Armadora, S.A., 37 F.3d 41 (1994)

to Addendum 1. Instead, Armadora's representative made ambiguous statements that they intended to be governed by the terms of Section 2.09. They never stated exactly what deductions they believed permissible or specified the amount Armadora expected to pay as special interest. At the time GECC signed Addendum 1 and gave up its right to block pre-payment, it had in hand the November 12 cover letter. Any reasonable reader of that letter would view it as an explicit adoption by Armadora of the terms of the October 27 letter regarding the meaning of Section 2.09. To be sure, the attached Addendum did not track the letter. But it also did not facially contradict it by stating Armadora's view that it had a right to deduct the paid and unpaid principal and interest, resulting in a special interest payment of less than one-third of what GECC expected-and what Armadora knew GECC expected-to receive.

[3]    Silence in the face of an explicit contrary assumption by an innocent party may constitute a concealment of facts or a false misrepresentation for estoppel purposes. *See, e.g.,* **\*46** *Payroll Express Corp. v. Aetna Casualty & Sur. Co.,* 659 F.2d 285, 290 (2d Cir.1981); *Broadworth Realty Assocs.,* 562 N.Y.S.2d at 632. Armadora's silence in the face of GECC's assertion of its interpretation of Section 2.09 of the Loan Agreement falsely misrepresented its intent to

challenge that calculation. The November 12 cover letter, by appearing to adopt the terms of Gonzalez's letter of October 27, affirmatively misrepresented Armadora's intent, a misrepresentation upon which GECC then relied to its detriment in forgoing its right to block the pre-payment of the loan. Pappas admitted that the method of calculation embodied in the October 27 letter differed substantially from the yet unannounced method he had decided to insist upon. He thus had actual knowledge of the true facts. Finally, Armadora's failure to assert its own position until GECC had given away its right to block pre-payment reflects an intent to cause GECC to rely upon the misleading November 12 cover letter.

For the reasons stated above, we reverse the district court's order and remand to the district court for the calculation of the amount owed by Armadora, interest on this amount, and the recalculation of attorneys' fees based on GECC's successful assertion of its larger claim.

VAN GRAAFEILAND, Circuit Judge:

I concur in the result.

---

Footnotes

1    Much of the district court's conclusion rests primarily on the view that the November 12 cover letter has no legal force because it stated that the Addendum was to be the formal agreement and described the October 27 letter as a recapitulation, thus suggesting that the October 27 letter is "non-binding." The language of the November 12 letter, however, seems plainly to say that the parties had "reached" an "agreement" that is "recapitulated" in the October 27 letter, and the Addendum is intended to formalize that "agreement."

---

**End of Document**                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 38

2003 CarswellMan 229, 2003 MBCA 71, 10 R.P.R. (4th) 1, 173 Man. R. (2d) 300, 34 C.P.C. (5th) 21, [2003] 9 W.W.R. 385, 293 W.A.C. 300



2003 CarswellMan 229, 2003 MBCA 71, 10 R.P.R. (4th) 1, 173 Man. R. (2d) 300, 34 C.P.C. (5th) 21, [2003] 9 W.W.R. 385, 293 W.A.C. 300

Geoffrey L. Moore Realty Inc. v. Manitoba Motor League

GEOFFREY L. MOORE REALTY INC. (Applicant/Appellant) and THE MANITOBA MOTOR LEAGUE, carrying on business under the firm name and style of CAA MANITOBA (Respondent/Respondent)

Manitoba Court of Appeal

Kroft, Steel, Hamilton JJ.A.

Heard: March 10, 2003
Judgment: May 29, 2003
Docket: AI 02-30-05303

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: reversing 2002 CarswellMan 602 (Man. Q.B.)

Counsel: R.L. Zaparniuk for Appellant

C.J. Phelan, Q.C. for Respondent

Subject: Property; Civil Practice and Procedure

Landlord and tenant --- Premises — Restrictions on user — Particular covenants

Tenant automobile association entered into lease of premises in shopping centre on September 28, 1993 — Lease permitted use of premises to provide "full services" of motor league outlet, but prohibited use which was contradictory to exclusive rights of "any then existing tenant" — General insurance broker subsequently entered into lease of premises in shopping centre — In 2000, automobile association began selling home insurance to its members from various locations — Landlord's application for declaration that automobile association was in breach of lease and for injunction restraining association from selling home insurance at location was granted in part — Motions judge did not grant declaratory relief requested, but granted injunction to allow association to sell home insurance from single source as agent of one insurance company and only to its members — Landlord appealed — Appeal allowed — Use of premises clause in lease was clear and unambiguous — Motions judge erred in failing to consider restriction on competition in clause which referred to exclusive rights of "any then existing tenant" — By restrictive covenant, association agreed not to change array of services after September 28, 1993 if it would then be in competition with other tenant — As home insurance was not part of array of services provided by association at that time, association was in breach of negative covenant in lease — In consideration of lease as whole, in light of surrounding circumstances as at date of execution, "full services" of motor

2003 CarswellMan 229, 2003 MBCA 71, 10 R.P.R. (4th) 1, 173 Man. R. (2d) 300, 34 C.P.C. (5th) 21, [2003] 9 W.W.R. 385, 293 W.A.C. 300

league outlet was not broad enough to include sale of home insurance in light of exclusive right of tenant insurance broker.

### Cases considered by *Hamilton J.A.*:

*Controls & Equipment Ltd. v. Ramco Contractors Ltd.*, 1999 CarswellNB 19, 43 C.L.R. (2d) 208, 209 N.B.R. (2d) 1, 535 A.P.R. 1 (N.B. C.A.) — referred to

*Eco-Zone Engineering Ltd. v. Grand Falls-Windsor (Town)*, 2000 NFCA 21, 2000 CarswellNfld 315, [2000] G.S.T.C. 106, 5 C.L.R. (3d) 55 (Nfld. C.A.) — referred to

*Eli Lilly & Co. v. Novopharm Ltd.*, 227 N.R. 201, 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 152 F.T.R. 160 (note), 80 C.P.R. (3d) 321 (S.C.C.) — followed

*Glimmer Resources Inc. v. Exall Resources Ltd.*, 1999 CarswellOnt 1084, 119 O.A.C. 78 (Ont. C.A.) — referred to

*Hi-Tech Group Inc. v. Sears Canada Inc.*, 2001 CarswellOnt 9, 52 O.R. (3d) 97, 11 B.L.R. (3d) 197, 4 C.P.C. (5th) 35 (Ont. C.A.) — referred to

*Hill v. Nova Scotia (Attorney General)*, 142 D.L.R. (4th) 230, 206 N.R. 299, [1997] 1 S.C.R. 69, 157 N.S.R. (2d) 81, 462 A.P.R. 81, 60 L.C.R. 161, 1997 CarswellNS 10, 1997 CarswellNS 11 (S.C.C.) — referred to

*Krahn Enterprises Ltd. v. Big Apple Imports Ltd.* (1992), 26 R.P.R. (2d) 116, 82 Man. R. (2d) 106, [1993] 1 W.W.R. 364, 1992 CarswellMan 141 (Man. Q.B.) — referred to

*Langley Lo-Cost Builders Ltd. v. 474835 B.C. Ltd.*, 2000 BCCA 365, 2000 CarswellBC 1229, 76 B.C.L.R. (3d) 278, [2000] 7 W.W.R. 46, 5 B.L.R. (3d) 31, 34 R.P.R. (3d) 56, 140 B.C.A.C. 182, 229 W.A.C. 182 (B.C. C.A.) — considered

*Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co.* (1968), [1969] 1 O.R. 469, 3 D.L.R. (3d) 161 (Ont. H.C.) — referred to

*London Drugs Ltd. v. Truscan Realty Ltd.*, 3 R.P.R. (2d) 60, 1988 CarswellBC 646 (B.C. S.C.) — considered

*London Drugs Ltd. v. Truscan Realty Ltd.* (March 20, 1989), Doc. CA009718 (B.C. C.A.) — considered

*MacMillan Bloedel Ltd. v. British Columbia Hydro & Power Authority* (1992), 72 B.C.L.R. (2d) 273, 19 B.C.A.C. 215, 34 W.A.C. 215, 98 D.L.R. (4th) 492, [1993] 2 W.W.R. 127, 1992 CarswellBC 304 (B.C. C.A.) — referred to

*Manitoba Hydro Electric Board v. John Inglis Co.*, 1999 CarswellMan 509, [2000] 1 W.W.R. 516, *(sub nom. Manitoba Hydro Electric v. John Inglis Co.)* 181 D.L.R. (4th) 470, 142 Man. R. (2d) 1, 212 W.A.C. 1 (Man. C.A.) — referred to

*Manulife Bank of Canada v. Conlin*, 6 R.P.R. (3d) 1, 30 O.R. (3d) 577 (note), 94 O.A.C. 161, 203 N.R. 81, [1996] 3 S.C.R. 415, 139 D.L.R. (4th) 426, 30 B.L.R. (2d) 1, 1996 CarswellOnt 3941, 1996 CarswellOnt 3942 (S.C.C.) — referred to

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellMan 229, 2003 MBCA 71, 10 R.P.R. (4th) 1, 173 Man. R. (2d) 300, 34 C.P.C. (5th) 21, [2003] 9 W.W.R. 385, 293 W.A.C. 300

*Miller v. Toews* (1990), 49 B.L.R. 316, [1991] 2 W.W.R. 604, 70 Man. R. (2d) 4, 40 C.P.R. (3d) 424, 1990 CarswellMan 242 (Man. C.A.) — referred to

*National Trust Co. v. Mead*, 12 R.P.R. (2d) 165, [1990] 2 S.C.R. 410, 71 D.L.R. (4th) 488, 112 N.R. 1, [1990] 5 W.W.R. 459, 87 Sask. R. 161, 1990 CarswellSask 165, 1990 CarswellSask 412 (S.C.C.) — referred to

*Paddon-Hughes Development Co. v. Pancontinental Oil Ltd.*, 1998 CarswellAlta 940, 223 A.R. 180, 183 W.A.C. 180, 67 Alta. L.R. (3d) 104, [1999] 5 W.W.R. 726 (Alta. C.A.) — referred to

*Prenn v. Simmonds*, [1971] 3 All E.R. 237, [1971] 1 W.L.R. 1381 (U.K. H.L.) — considered

*Reardon Smith Line v. Hansen-Tangen*, [1976] 1 W.L.R. 989, [1976] 3 All E.R. 570 (U.K. H.L.) — considered

*Scanlon v. Castlepoint Development Corp.*, 29 R.P.R. (2d) 60, 59 O.A.C. 191, 11 O.R. (3d) 744, 99 D.L.R. (4th) 153, 1992 CarswellOnt 633 (Ont. C.A.) — referred to

*Scanlon v. Castlepoint Development Corp.*, 32 R.P.R. (2d) 160 (note), 102 D.L.R. (4th) vii, 64 O.A.C. 320 (note), 157 N.R. 400 (note), [1993] 2 S.C.R. x (S.C.C.) — referred to

*White v. Central Trust Co.*, 7 D.L.R. (4th) 236, 54 N.B.R. (2d) 293, 17 E.T.R. 78, 140 A.P.R. 293, 1984 CarswellNB 38 (N.B. C.A.) — considered

**Statutes considered:**

*Manitoba Motor League Incorporation Act*, R.S.M. 1990, c. 99

Generally — referred to

**Rules considered:**

*Queen's Bench Rules*, Man. Reg. 553/88

R. 39.01(5) — referred to

APPEAL by landlord from judgment reported at 2002 CarswellMan 602 (Man. Q.B.), granting in part application for declaration that tenant was in breach of lease and for injunction restraining tenant from selling home insurance from location.

***Hamilton J.A.:***

1      This appeal requires the interpretation of a written lease to determine whether the respondent Manitoba Motor League (MML) is entitled to sell home insurance from its location in a shopping centre on McPhillips Street in Winnipeg. The appellant landlord says MML is in breach of its lease by doing so because Dowling Insurance Ltd. (Dowling Insurance), another tenant in the shopping centre, has the exclusive right to sell this type of insurance. By application to the Court of Queen's Bench, the landlord sought a declaration to that effect and an injunction prohibiting the sale of home insurance by MML from that location.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellMan 229, 2003 MBCA 71, 10 R.P.R. (4th) 1, 173 Man. R. (2d) 300, 34 C.P.C. (5th) 21, [2003] 9 W.W.R. 385, 293 W.A.C. 300

2      MML is a non-share capital corporation owned by its members. It was originally incorporated by statute in 1918 and continued as a corporation under *The Manitoba Motor League Incorporation Act*, R.S.M 1990, c. 99 (the *Act*). MML and several related corporate entities carry on business under the business name "CAA Manitoba," as an auto club affiliated with the Canadian Automobile Association and the American Automobile Association. Dowling Insurance is a general insurance broker licensed to sell all types of insurance, including household insurance. MML only started selling home insurance to its members from its various Manitoba Motor League outlets in 2000 as an agent for one insurance provider.

3      While the motions judge did not make the specific declaration as sought by the landlord, he did order that MML was only entitled to sell home insurance from the McPhillips Street location to its members as an agent for one insurance provider.

4      The application before the motions judge proceeded on the basis of affidavit evidence from John Karasevich, the lawyer who represented the landlord in negotiating and drafting the lease, and Michael Mager, Vice-President of Finance and Administration of MML. Mr. Karasevich was cross-examined on his affidavit. Charles Dowling, the President of Dowling Insurance, was also cross-examined. Mr. Mager was not.

5      The principles of contract interpretation are essential to the analysis required by this appeal. Before I comment on these principles, it is important to know the lease provisions that are at the heart of this dispute.

6      The landlord and MML entered into their written lease agreement on September 28, 1993. It was renewed without amendment for five more years in 1998. On December 13, 1993, the landlord entered into a written lease agreement with Dowling Insurance. It, too, was renewed without amendment for a further five years in 1999.

7      The MML lease contains a "Use of Premises" clause that reads as follows (at para. 4.03):

**Use of Premises.**

(1) The premises shall be used by the Tenant during the entire term for the purpose of providing **full services of a Manitoba MotorLeague outlet** and for no other purpose. In particular without limiting the generality of the foregoing, **the Tenant covenants and agrees that it shall not use any part of the Premises for any use other than the said permitted use if any such use would be contradictory to the exclusive rights of any then existing tenant of the Shopping Centre**.

(2) The Landlord covenants with the Tenant that during the entire term and any renewal thereof the Tenant shall have the exclusive right within the entire Shopping Centre to carry on the business of a Travel Agency and/or Auto Club, and the Landlord shall not allow the occupancy or use of any other space within the Shopping Centre for such purpose.

[emphasis added]

8      The landlord and MML agree that the phrase "any then existing tenant" in the second sentence of subpara. 4.03(1) refers to a time frame when MML engages in activity which is outside the permitted use of providing "full services of a Manitoba Motor League outlet."

9      The "Use of Premises" clause in the Dowling Insurance lease reads as follows (at para. 4.03):

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellMan 229, 2003 MBCA 71, 10 R.P.R. (4th) 1, 173 Man. R. (2d) 300, 34 C.P.C. (5th) 21, [2003] 9 W.W.R. 385, 293 W.A.C. 300

> (1) The premises shall be used by the Tenant during the entire term for the purpose of operating a general Insurance Brokerage, Autopac Outlet and related financial services including the sale of Registered RSP's, RRIF, Registered Educational Funds, Tax Plans and legal assistance and for no other purpose. In particular without limiting the generality of the foregoing, the Tenant covenants and agrees that it shall not use any part of the Premises for any use other than the said permitted use if any such use would be contradictory to the exclusive rights of any then existing tenant of the Shopping Centre.

> (2) The Landlord covenants with the Tenant that during the entire term and any renewal thereof the Tenant shall have the exclusive right within the entire Shopping Centre to carry on the business of a general Insurance Brokerage, Autopac Outlet and/or the sale of household insurance and the Landlord shall not allow any other party or tenant to carry on other business which shall be in direct competition with the Tenant.

10      As can be seen from the excerpts noted above, subpara. 4.03(2) in both leases are exclusive use provisions that protect the tenant. By subpara. 4.03(2) of the Dowling lease, Dowling Insurance has the exclusive right to sell household insurance in the shopping centre. There is no issue that the home insurance sold by MML is the same type of insurance as household insurance sold by Dowling Insurance. The issue here is whether the sale of home insurance by MML from its McPhillips Street location is permitted because it falls within the "full services of a Manitoba Motor League outlet."

**Principles of Contract Interpretation**

11      The cardinal principle of contract interpretation is that the court "should give effect to the intentions of parties as expressed in their written document." See *Manulife Bank of Canada v. Conlin*, [1996] 3 S.C.R. 415 (S.C.C.) at para. 79. If the contract is clear and unambiguous, the contract itself should be all that is required to determine the parties' intentions. That is, it will not be necessary to consider extrinsic evidence to assist in interpreting the contract. In *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (S.C.C.), Iacobucci J. wrote (at para. 55):

> Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face.

And later (at para. 57):

> [I]t cannot properly be said, in my view, that the supply agreement contains any ambiguity that cannot be resolved by reference to its text. No further interpretative aids are necessary.

12       There are three other well-known principles of contract interpretation that should not be overlooked when considering the text of a contract:

> 1) all the words in the contract are to be given meaning, if possible (*National Trust Co. v. Mead*, [1990] 2 S.C.R. 410 (S.C.C.));

> 2) the contract should be construed as a whole (*Scanlon v. Castlepoint Development Corp.* (1992), 11 O.R. (3d) 744 (Ont. C.A.); leave to appeal to the Supreme Court of Canada denied [1993] 2 S.C.R. x (S.C.C.); and

> 3) the absence of words may be considered (*Controls & Equipment Ltd. v. Ramco Contractors Ltd.* (1999), 209 N.B.R. (2d) 1 (N.B. C.A.)).

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellMan 229, 2003 MBCA 71, 10 R.P.R. (4th) 1, 173 Man. R. (2d) 300, 34 C.P.C. (5th) 21, [2003] 9 W.W.R. 385, 293 W.A.C. 300

13      It is important to remember that the principle to exclude extrinsic evidence does not require the court to consider the text of a contract in a vacuum. The case law is clear that context, or what some call the surrounding circumstances or the factual matrix, may be considered by the court when interpreting the contract.

14      In *Eli Lilly*, Iacobucci J. observed (at para. 54):

   The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time.

15      Surrounding circumstances are often important because, in the real world, the task of ascertaining contractual intention can be difficult as words do not have immutable or absolute meanings. Rather, words often take their meaning from a multitude of contextual factors including the nature of the relationship created by the agreement and the purpose of the agreement. This point is made in many appellate and Supreme Court of Canada decisions. For example, in *White v. Central Trust Co.* (1984), 7 D.L.R. (4th) 236 (N.B. C.A.), La Forest J.A. (as he then was), wrote (at p. 248):

   [I]n determining what was contemplated by the parties, the words used in a document need not be looked at in a vacuum. The specific context in which a document was executed may well assist in understanding the words used. It is perfectly proper, and indeed may be necessary, to look at the surrounding circumstances in order to ascertain what the parties were actually contracting about.

See also *Hill v. Nova Scotia (Attorney General)*, [1997] 1 S.C.R. 69 (S.C.C.) and *Manitoba Hydro Electric Board v. John Inglis Co.* (1999), 142 Man. R. (2d) 1 (Man. C.A.), where the above quote is cited with approval.

16      The importance of surrounding circumstances was also referred to in the often-quoted judgment of Lord Wilberforce in *Reardon Smith Line v. Hansen-Tangen*, [1976] 3 All E.R. 570 (U.K. H.L.). After indicating that particular evidence in that case concerning certain industry practices in Japan was not admissible to construe the contract, he wrote (at p. 574):

   But it does not follow that, renouncing this evidence, one must be confined within the four corners of the document. No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

17      As made clear by Justice Iacobucci in *Eli Lilly*, a court's reference to surrounding circumstances is to circumstances at the time of execution of the contract. This point is made by G.H.L. Fridman, *The Law of Contract in Canada*, 4th ed. (Toronto: Carswell, 1999) at 478:

   The paramount test of the meaning of words in a contract is the intention of the parties. That is to be determined in the operative sense by reference to the surrounding circumstances at the time of signing the contract.

18      It is also important to remember that when determining the intention of the parties, it is in the objective sense of a reasonable person by reference to the surrounding circumstances at the time of the signing of the con-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellMan 229, 2003 MBCA 71, 10 R.P.R. (4th) 1, 173 Man. R. (2d) 300, 34 C.P.C. (5th) 21, [2003] 9 W.W.R. 385, 293 W.A.C. 300

tract. See *Reardon Smith Line Ltd.*, and *MacMillan Bloedel Ltd. v. British Columbia Hydro & Power Authority* (1992), 72 B.C.L.R. (2d) 273 (B.C. C.A.).

19      If evidence of surrounding circumstances is admissible, what is meant by inadmissible extrinsic evidence? Most commonly it is evidence of subjective intention or of the negotiations leading to the final contract. In *Eli Lilly*, the extrinsic evidence in question concerned the subjective intentions of the parties' principals. See also *Glimmer Resources Inc. v. Exall Resources Ltd.* (1999), 119 O.A.C. 78 (Ont. C.A.), in which evidence of subjective intention was excluded.

20      In the well-known decision *Prenn v. Simmonds*, [1971] 3 All E.R. 237 (U.K. H.L.), Lord Wilberforce began by noting the obvious reasons why evidence of negotiations should be excluded (at p. 240):

> There were prolonged negotiations between solicitors, with exchanges of draft clauses, ultimately emerging in cl 2 of the agreement. The reason for not admitting evidence of these exchanges is not a technical one or even mainly one of convenience (although the attempt to admit it did greatly prolong the case and add to its expense). It is simply that such evidence is unhelpful. By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter, are changing and until the final agreement, although converging, still divergent. It is only the final document which records a consensus. If the previous documents use different expressions, how does construction of those expressions, itself a doubtful process, help on the construction of the contractual words?

21      He continued by commenting on the importance of evidence of the "genesis" and "aim" of the transaction (at p. 241):

> In my opinion, then, evidence of negotiations, or of the parties' intentions, . . . ought not to be received, and evidence should be restricted to evidence of the factual background known to the parties at or before the date of the contract, including evidence of the "genesis" and objectively the "aim" of the transaction.

22      The importance of the consideration of the genesis of a transaction was repeated a few years later by Lord Wilberforce in *Reardon Smith Line Ltd.*, as seen in the quote from that judgment at para. 16 above.

23      More recent cases, while recognizing the basic principle that evidence of negotiations is not admissible, have considered evidence of negotiations in reference to the commercial objective and factual matrix. One illustrative example is *Langley Lo-Cost Builders Ltd. v. 474835 B.C. Ltd.*, [2000] 7 W.W.R. 46, 2000 BCCA 365 (B.C. C.A.), which relies on the principles articulated in *Prenn v. Simmonds*, McEachern C.J.B.C. opined (at para. 29):

> [I]t is important to remember that negotiations between the parties are not relevant in determining the meaning of the language used by the parties. This is because parties often change their views and positions during negotiations. The fact that the parties were in negotiations, and the reasons for these negotiations, however, including the commercial objectives of the parties is relevant as a part of the factual matrix, or factual underpinning of the agreement: *Prenn v. Simmonds*, . . . .

24      When there is no ambiguity, the courts are not often called upon to consider the commercial reality of the transaction in the sense of determining a "sensible commercial result." Iacobucci J. commented on this in *Eli Lilly* (at para. 56):

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellMan 229, 2003 MBCA 71, 10 R.P.R. (4th) 1, 173 Man. R. (2d) 300, 34 C.P.C. (5th) 21, [2003] 9 W.W.R. 385, 293 W.A.C. 300

When there is no ambiguity in the wording of the document, the notion in *Consolidated-Bathurst* [[1980] 1 S.C.R. 888] that the interpretation which produces a "fair result" or a "sensible commercial result" should be adopted is not determinative. Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the goal is to ascertain their true contractual intent. However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if it is presumed that the parties intended the legal consequences of their words.

25       When is a contract or a phrase ambiguous? Difficulty in interpreting a contract is not synonymous with ambiguity (*Paddon-Hughes Development Co. v. Pancontinental Oil Ltd.* (1998), [1999] 5 W.W.R. 726 (Alta. C.A.)). An ambiguous phrase has been described as one that is "reasonably susceptible of more than one meaning" (*Hi-Tech Group Inc. v. Sears Canada Inc.* (2001), 52 O.R. (3d) 97 (Ont. C.A.) at para. 18 (C.A.), and as one with a "double or devious meaning, that is to say, one word or one expression or a series of expressions capable on its face or in its application of two or more meanings" (*Eco-Zone Engineering Ltd. v. Grand Falls-Windsor (Town)* (2000), 5 C.L.R. (3d) 55, 2000 NFCA 21 (Nfld. C.A.) at para. 9, quoting *Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co.* (1968), [1969] 1 O.R. 469 at 524 (Ont. H.C.). This cannot be determined until the full text of the contract is considered, in light of the surrounding circumstances at the time of its execution, if necessary.

26       In brief summary then, to determine the intentions of the parties expressed in a written contract, one looks to the text of the contract as a whole. In doing so, meaning is given to all of the words in the text, if possible, and the absence of words may also be considered. If necessary, the text is considered in light of the surrounding circumstances as at the time of execution of the contract. The goal is to determine the objective intentions of the parties in the sense of a reasonable person in the context of those surrounding circumstances and not the subjective intentions of the parties. If, after that analysis, the text in question is ambiguous, extrinsic evidence may be considered.

**Motions Judge's Ruling**

27       The motions judge identified the issue as a narrow one, being the interpretation of clause 4.03(1) and (2) of the MML lease. He noted that "the primary source of the contract between the parties is obviously the words of the agreement." He went on to say:

The other matters raised, such as intent, background, what the entities do at the time the contract is entered into and so on, is really a back up way of getting to the primary issue, which is the intent of the parties, as reflected in the agreement, that is, to assist in interpreting ambiguities or issues that are not clear cut in the wording.

28       With respect to the meaning of "full services," the motions judge had this to say:

The lease also refers to providing full services. It is, I feel, quite obvious that the parties knew and understood that this is a growing and changing business. It engages in certain activities that are inherent in the nature of a Manitoba Motor League outlet. This phrase is in conjunction with sub-section (2) which talks about an exclusive right within the shopping center to carry on the business of a travel agency and/or auto club. . . . .

 . . .  I prefer to deal with the two paragraphs together and treat paragraph two as if it is almost different wording for paragraph one and tends to explain its meaning or to give it context and outline its boundaries.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellMan 229, 2003 MBCA 71, 10 R.P.R. (4th) 1, 173 Man. R. (2d) 300, 34 C.P.C. (5th) 21, [2003] 9 W.W.R. 385, 293 W.A.C. 300

The question then becomes what are the full services of a Manitoba Motor League outlet; what is the business of a travel agency and/or auto club? I do not accept and I do not think that counsel was suggesting that it is the business as defined in a 1914 enabling statute. I believe that at the time the lease was signed it was understood that this is a member organization. The lease spoke about full services. They knew it was not static.

. . . . .

I have come to the conclusion that one has to read as qualifying words into that paragraph that the parties intended that these be legitimate, these full services, that they be a reasonable expansion and growth of an auto club and a Manitoba Motor League. If the issue develops in another case of what is a reasonable addendum or expansion or growth of the Manitoba Motor League well, then one will look at the various circumstances at that time.

29    The motions judge noted that MML was already selling out of province auto/travel insurance; that the insurance in issue here is "single source insurance"; and that MML is "only an agent for that insurance company" and does not act as broker for multiple insurance companies. He also noted that it was important that MML was selling the insurance to members only. He concluded that:

[S]elling home insurance from a single source to members only is reasonably included within the notion of providing full services as a Manitoba Motor League outlet, in carrying on as a travel agency and/or auto club.

30    The motions judge then purported to grant an injunction to allow MML to sell home insurance from a single source as an agent of one insurance company and to sell it to members only. All other sales of home insurance were prohibited. The effect of the ruling was that MML was not in breach of its lease and that it could continue selling home insurance in the manner that it had been doing.

31    Both counsel referred at some length to the trial and appeal decisions in *London Drugs Ltd. v. Truscan Realty Ltd.* (1988), 3 R.P.R. (2d) 60 (B.C. S.C.), [1989] B.C.J. No. 823 (B.C. C.A.), before the motions judge and in this appeal. In *London Drugs* the plaintiff pharmacy, relying on a restrictive covenant in its lease, successfully objected to a food supermarket in the same shopping mall expanding to include a pharmacy to sell prescription drugs. The landlord relied on the reasoning of Legg J. in that case, which was upheld by the British Columbia Court of Appeal. To reach his conclusion, Legg J. looked at the wording of the lease and the surrounding circumstances. In doing so, he applied the basic principles outlined earlier. Of particular significance was the principle that "the meaning of a term in a written agreement is to be determined in accordance with the circumstances existing at the time of entering into the agreement" (at p. 68). At the time of the execution of the lease in question, Legg J. found the surrounding circumstances that supermarkets in British Columbia did not include in-store pharmacies and that the supermarket in question was not licensed to sell prescription drugs. The latter finding led to the inference that there was no intention at the time of lease execution for the supermarket to sell prescription drugs.

32    The Court of Appeal ruled that Legg J. appropriately considered "the factual matrix as revealed by the documentary and oral evidence, and he considered other clauses of the agreement in reaching his decision . . . ." The Court of Appeal did not accept the supermarket's argument that the wording of its lease should be interpreted in a flexible manner. In doing so, the court noted that words such as "from time to time" were not included in the lease as they were, for example, in the London Drugs lease. In that lease, the "use" clause used the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellMan 229, 2003 MBCA 71, 10 R.P.R. (4th) 1, 173 Man. R. (2d) 300, 34 C.P.C. (5th) 21, [2003] 9 W.W.R. 385, 293 W.A.C. 300

following words: "all other items normally carried in other London Drug[s] outlets from time to time." The Court of Appeal stated that these words:

> . . . indicate in themselves a flexible interpretation so that as the lease progresses, if there is a change in the character of the business, that change in character will be permitted as a use provided it is a normal use throughout that type of business.

33      The motions judge determined that there was an important difference between *London Drugs* and the circumstances here, which he explained in this way:

> In the <u>London Drugs</u> case, the core nature or the fundamental nature of the entity involved was not in dispute or was not in issue. By that I mean it was a business that sells things. The only dispute was what it can sell and what it cannot sell. We are dealing here with not only a business that sells things. As we see in the wording of the lease, it talks about providing full services of a Manitoba Motor League outlet.

> The nature of the entity that we are dealing with here is a member organization. It is not an entity that sells to anybody that walks in through the door but only to members.

**Decision**

34      The landlord says that the interpretation given by the motions judge to subpara. 4.03(1) of the MML lease was too broad and that he erred in a number of ways:

> 1. by distinguishing the *London Drugs* case from the facts here on the basis that the *London Drugs* case involves restrictions on sales, and here the issue relates to "full services of a Manitoba Motor League outlet";

> 2. by finding the nature of the business of MML is not static, and this allowed MML to render services that it did not render nor contemplate at the time it entered into the MML lease;

> 3. by making a distinction between the sale of a product or services to a "member" as opposed to the public; and

> 4. by finding that the sale as agent for a single insurance company did not breach the restrictive covenant.

35      MML appropriately does not take serious issue with appeal grounds three and four. While the distinction between a member of the MML and a member of the public is obviously an important distinction for MML, it is a distinction without a difference for the issue here because of Dowling Insurance's exclusive right to sell household insurance in the shopping centre. Neither is there a relevant distinction to be drawn between selling insurance as agent for a single insurance company and selling it as an insurance broker.

36      Both parties maintain that the "Use of Premises" clause in the MML lease is clear and unambiguous. MML says that the words "full services of a Manitoba Motor League outlet" are permissive in nature because member services are not static and the services that are provided from the McPhillips Street outlet are defined by the services that are provided at the other Manitoba Motor League outlets in Manitoba. In effect, MML argues that these words show the intention of the parties that MML has the flexibility to determine what "full services" are from time to time during the lease term. Therefore, from the time home insurance was sold at one of the oth-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellMan 229, 2003 MBCA 71, 10 R.P.R. (4th) 1, 173 Man. R. (2d) 300, 34 C.P.C. (5th) 21, [2003] 9 W.W.R. 385, 293 W.A.C. 300

er Manitoba Motor League outlets, it could also be sold from MML's McPhillips Street location.

37    MML acknowledges the restrictive covenant in the second sentence of the "Use of Premises" clause, but argues that it only restricts MML from providing a service at its McPhillips Street location that is not provided in another Manitoba Motor League outlet.

38    The landlord responds by saying that the intention of the parties is to be determined in accordance with the plain, ordinary and popular meaning of the words used in the lease, applying an objective meaning that is determined in accordance with the circumstances existing at the time of entering into the agreement. The landlord contends that the issue is therefore simply one of determining what were the full services of a Manitoba Motor League on September 28, 1993, the date the MML lease was executed. To answer this, the landlord relies on the following surrounding circumstances as at that time:

   • The express purpose of MML, as stated in the *Act*, to further " . . . the interests of motorists, demonstrating the need of good roads, posting signs and marking touring routes, co-operating with other associations having similar objects and promoting social intercourse among members." There is no reference to home insurance.

   • No Manitoba Motor League outlets sold home insurance.

   • The existence of the restriction on competition with "then existing tenant" contained in the second sentence of subpara. 4.03(1) of the MML lease.

39    The landlord also relies on the fact that the words "and its affiliated companies" were deleted from subpara. 4.03(1) of the MML lease during the course of negotiations between the submission of a letter of intent and the execution of the final lease document. It is an affiliated company that sells the home insurance.

40    While I agree with much of the argument of the landlord, I wish to make two comments. For the reasons that I will explain more fully in a moment, the restriction on competition contained in the second sentence of subpara. 4.03(1) of the MML lease is very important. But it is not a surrounding circumstance. It is simply a part of the text of the MML lease that must be given meaning. Secondly, unless the evidence of the deletion of the words "and its affiliated companies" can be considered as evidence of surrounding circumstances going to the "genesis" or "aim" of the transaction, this evidence is not admissible unless the words "full services of a Manitoba Motor League outlet" are ambiguous. For the reasons that follow, I conclude that they are not.

41    On its own, the phrase "full services" has little, if any, meaning other than it is indicative of an array of services. In that respect there is a sense of generality and flexibility. But it is not open-ended generality and flexibility as MML argues. The phrase "full services" finds its meaning in certain text of the MML lease and the surrounding circumstances as at the time of its execution.

42    The text analysis commences with the phrase "a Manitoba Motor League outlet." I agree with the motions judge that the words in para. 4.03(2) assist in interpreting this phrase. In this exclusive use covenant, MML's use of the premises as an auto club/travel agency is protected. While this protection is not necessarily definitive of all of the services that can be provided by a Manitoba Motor League outlet, the reference to auto club/travel agency is certainly indicative of services that are provided by a Manitoba Motor League outlet. This is particularly so when those services are consistent with the purpose of MML described in its own incorporating statute and is consistent with the core services of CAA Manitoba described in Mr. Mager's affidavit as "Emer-

2003 CarswellMan 229, 2003 MBCA 71, 10 R.P.R. (4th) 1, 173 Man. R. (2d) 300, 34 C.P.C. (5th) 21, [2003] 9 W.W.R. 385, 293 W.A.C. 300

gency Road Service . . . towing, starting, boosting, lock out service, extrication, fuel delivery or tire service to the member."

43     The covenant by MML not to compete with "any then existing tenant" is perhaps more important. By this covenant, the landlord addressed its concern that "any use other than the said permitted use" of MML might compete with a tenant in the shopping centre to whom the landlord had granted an exclusive right of use, as it did with Dowling Insurance. To have meaning, these words must have a point of reference. In my view, that point of reference must be the array of services of a Manitoba Motor League outlet on September 28, 1993. The words "without limiting the generality of the foregoing" do not derogate from this interpretation, as argued by MML. Rather, they simply acknowledge that MML is entitled to provide an array of services. By the restrictive covenant, MML agreed not to change the array of services after September 28, 1993, if it would then be in competition with a tenant protected by a restrictive covenant.

44     Finally, it is telling that the words "from time to time," or other words denoting complete flexibility, are not used in the "Use of Premises" clause, as was the case in the London Drugs lease. Those words would have gone a long way to provide the flexibility MML argues is intended by the words "full services."

45     The most important surrounding circumstance is that MML did not sell home insurance on September 28, 1993. Home insurance was not part of the array of services provided at that time. The fact that MML sold various types of travel insurance in September 1993, is simply consistent with its travel agency services and nothing more, because travel insurance is so different from home insurance.

46     I pause to note that this is not a case where it is necessary to consider the commercial reality of the transaction. I say this because, while each party has something to gain by pressing for its interpretation to be accepted, both interpretations are consistent with the commercial purpose of the transaction which was for the landlord to rent space to MML for use as a Manitoba Motor League outlet.

47     The motions judge appeared to understand the importance of determining the intentions of the parties by referring to the words used in the lease and to some surrounding circumstances. However, he erred when he failed to consider the restriction on competition in the second sentence of subpara. 4.03(1) of the MML lease and when he read into that clause a meaning of "reasonable expansion and growth of an auto club and a Manitoba Motor League" as determined by the circumstances at a particular time.

48     Therefore, looking at the lease as a whole, in light of the surrounding circumstances as at the date of execution, I can come to only one conclusion. "Full services of a Manitoba Motor League outlet" is not broad enough to include the sale of home insurance in light of the exclusive right of Dowling Insurance to sell household insurance. By selling home insurance, MML is in breach of its lease.

49     While this analysis was not free of some difficulty, after applying the principles of contract interpretation, there was no ambiguity in meaning. As a result, and notwithstanding there was no objection from MML to this evidence, I did not consider the evidence of the deletion of the words "and affiliated companies" relied upon by the landlord as an interpretative aid. Nor did I consider it as part of the surrounding circumstances pertaining to the genesis of the transaction. If I had done so, this evidence would have simply underscored my conclusion. In reaching my conclusion, I also did not consider certain evidence contained in para. 9 of Mr. Mager's affidavit. The landlord raised an objection to this evidence because the information contained in the paragraph is simply based on the belief of Mr. Mager, but does not state the source of that belief. The landlord argued that this offends Queen's Bench Rule 39.01(5), which stipulates that affidavits filed with respect to applications can only

2003 CarswellMan 229, 2003 MBCA 71, 10 R.P.R. (4th) 1, 173 Man. R. (2d) 300, 34 C.P.C. (5th) 21, [2003] 9 W.W.R. 385, 293 W.A.C. 300

contain matters relating to information and belief on non-contentious issues. In that this paragraph deals specifically with the sale of home insurance by other auto clubs affiliated with the Canadian and American Automobile Associations, it does deal with a contentious issue. But I find it unnecessary to rule on the Queen's Bench Rule objection because I agree with the landlord's other contention that what other auto clubs outside of Manitoba do is simply irrelevant to the determination of the issue before this court.

**Injunctive Relief**

50    By selling home insurance MML is in breach of its negative covenant not to compete with a tenant with an exclusive right to use its premises in a certain manner; in this case, Dowling Insurance's exclusive right to sell household insurance in the shopping centre. Before MML commenced to sell home insurance, the exclusive right in favour of Dowling Insurance was brought to the attention of MML by the landlord. MML chose to breach its negative covenant by ignoring the demand not to sell home insurance.

51    The landlord seeks an injunction prohibiting MML from selling home insurance from its McPhillips Street location. There are no special circumstances here, be it by way of evidence that the landlord will not suffer irreparable harm or that the balance of convenience favours MML, to dissuade me from the presumption that I should exercise my discretion in favour of enforcing the negative covenant. See *Miller v. Toews* (1990), 70 Man. R. (2d) 4 (Man. C.A.) and *Krahn Enterprises Ltd. v. Big Apple Imports Ltd.* (1992), 82 Man. R. (2d) 106 (Man. Q.B.). The permanent injunction sought by the landlord is granted.

**Conclusion**

52    The appeal is allowed. There will be judgment declaring that MML is not entitled to sell home insurance from its McPhillips Street outlet and granting a permanent injunction prohibiting MML from selling home insurance from that location so long as Dowling Insurance sells household insurance from its premises in the shopping centre. The landlord is entitled to its costs on appeal and in the Court of Queen's Bench.

*Appeal allowed.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 39

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31 A.C.W.S. (2d) 123...

1985 CarswellOnt 727
Ontario Supreme Court, Court of Appeal

Greenberg v. Meffert

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31
A.C.W.S. (2d) 123, 37 R.P.R. 74, 50 O.R. (2d) 755, 7 C.C.E.L. 152, 9 O.A.C. 69

# GREENBERG v. MEFFERT et al.

Zuber, Morden and Robins JJ.A.

Heard: February 6, 1985
Judgment: May 16, 1985

Counsel: *Ronald Carr*, for appellant.
*Morley Wolfe, Q.C.*, for respondents Montreal Trust Company and Eric H. Meffert.
*Martin Kerbel, Q.C.*, for respondent Donato Melfi.

Subject: Contracts; Torts; Property; Employment

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

  **Agency --- Real estate agents — Rights of agent — Commission — Commission of employees of agent**

  Real estate agents — Contracts — Discretion — Real estate commission for listing payable to agent "at sole discretion" of employer in event sale completed after termination of employment — Discretion required to be exercised reasonably, honestly and in good faith.

  The employment contract between the plaintiff salesman and the defendant real estate company provided that if the plaintiff's employment was terminated prior to the sale of a property, any commission otherwise payable for listing of that property was "at the sole discretion of the company". The plaintiff obtained a listing for the sale of a large property, and participated in negotiations for the sale. The sale was completed after the termination of the plaintiff's employment, to a purchaser found by M, another sales agent with the defendant company. M arranged to secretly split the listing agent's commission with the defendant company's office manager. The plaintiff's action for the listing commission against all of the defendants was dismissed at trial, and he appealed.

  **Held:**

  The appeal should be allowed.

  The plaintiff's entitlement to a commission was conditional on his being an agent of the defendant company on the date the property was sold or listed, and "the sole discretion of the company" had to be exercised reasonably, honestly and in good faith to deprive a former salesman of a commission earned for a listing during his employment. The defendant company, not having shown any valid reason for denying the plaintiff his commission, is to be treated as having exercised its discretion favourably to the plaintiff.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31 A.C.W.S. (2d) 123...

**Table of Authorities**

**Cases considered:**

Minster Trust Ltd. v. Traps Tractors Ltd., [1954] 1 W.L.R. 963, [1954] 3 All E.R. 136 — *applied*

**Authorities considered:**

Corbin on Contracts (1960), Vol. 3A, ss. 644-648.

4 Hals. (4th ed.), p. 612, paras. 1198-99.

Hudson's Building and Engineering Contracts (10th ed., 1970), c. 7.

Restatement, Contracts (2nd ed.), s. 228.

Williston on Contracts (3rd ed.), ss. 675A, 675B.

**Words and phrases considered:**

sole discretion

APPEAL from trial judgment dismissing plaintiff's claim for commission.

**The judgment of the Court was delivered by *Robins J.A.*:**

1    This appeal concerns the effect to be given to a clause in a contract of employment which grants a company "the sole discretion" to determine whether a salesman whose employment has been terminated shall receive commissions to which he would have been entitled had the employment relationship not been terminated.

2    The appellant is an experienced real estate salesman who initially became associated with the respondent Montreal Trust Company as the manager of its investment property office in Toronto. He had set up the office for the company and was paid a percentage of its profits together with any commissions he might earn as a salesman. In June 1980, the company instituted a new policy which required that all managers be salaried employees and not act as sales agents. This was not satisfactory to the appellant and it was agreed that he would relinquish his managerial position and continue with the company as a salesman.

3    The terms of his employment in this capacity are set forth in a "contract of employment" dated June 26, 1980. The contract stipulates the "commission split" between the company and the appellant and, among other things, provides that a company manual entitled "Terms of Relationship Between Montreal Trust Company and its Sales Agents" shall form part of the contract. The manual is some six pages in length but I shall make reference only to cl. 11 which is headed "Commissions & Listings" and is crucial to this appeal. It reads:

The sales agent is prohibited by law from taking any listings in his or her own name, and agrees that all listings shall be taken in the name of the company and turned over to the company within one day of receiving information. *In the event that a listing is sold after the sales agent's employment is terminated, any commission he or she receives will be at the sole discretion of the company, and the commission earned on the listing will be disbursed at the company's discretion.* It is further provided that the sales agent has no authority to change, alter, reduce or waive any commission earned by the company on transactions involving himself or herself, other sales agents or brokers, without the express consent of the company. The sales person is not entitled to any listing commission for a listing held in his or her possession or any listing that is given in conjunction with any offer.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31 A.C.W.S. (2d) 123...

> *It is understood that all listings shall be the property of the company and that you shall be entitled to commission or other remuneration only if you are an agent of the company on the date the property is sold or listed.*

(Emphasis added.)

4    During the summer of 1980, the appellant on his own initiative sought and obtained a listing from Costain Limited, a major real estate corporation, for the sale of a very large residential complex in the City of Ottawa. This listing, while an open listing, was expressly found by the trial Judge to constitute "a listing" within the meaning and intent of cl. 11. The correctness of that finding, with which I respectfully agree, was not disputed in this appeal.

5    Having obtained the listing, the appellant then proceeded to inspect the property, to photograph it, to assemble the necessary financial data and other relevant information, and to prepare a brochure for presentation to prospective purchasers. In July, he procured an offer for $8.8 million which was accepted by Costain but was cancelled when certain conditions could not be satisfied. Shortly thereafter, the respondent Donato Melfi, another sales agent with Montreal Trust, found a purchaser who was interested in acquiring the property. Together with the appellant, he commenced negotiations which, as matters developed, extended over several months and followed a course not unusual in transactions of this magnitude. In January 1981, an agreement was finally reached and the property was sold by Costain to the purchaser introduced by Melfi for $9.1 million. As a result, the Montreal Trust Company received a commission of $175,000.

6    The company refused to pay the appellant any part of that commission, and as a result this action was instituted against it and the respondents Melfi and Eric Meffert, the latter being the manager of the company's office at the time. The appellant's claim against the company was based on its alleged breach of contract in not paying him the listing agent's commission or, alternatively, on the basis of quantum meruit; as against the other respondents, his claim was based on statements which allegedly constituted agreements requiring these respondents to pay the listing agent's commission or, alternatively, on the basis that they had themselves improperly received the listing agent's commission and on the doctrine of unjust enrichment were obliged to pay it to the appellant. The action was dismissed at trial against all respondents.

7    Had the appellant been in the employ of the company when the sale took place, he would unquestionably have been entitled to the listing agent's share of the commission. His employment relationship, however, was terminated during the currency of the negotiations. It appears that on September 18, 1980, apparently without prior notice, the company closed its investment property office and moved its sales personnel to a residential sales office at another location. This led to the resignation of a number of agents including the appellant. The facts surrounding the incident are of no consequence to this appeal save that the termination of the appellant's employment as of September 18, 1980, clearly brought into play cl. 11 of his contract. Thereafter, his entitlement to commission as the listing agent of the property in question became dependent on the provisions of that clause.

8    After leaving the company, the appellant, not surprisingly, became concerned about his potential commission. By then the negotiations were progressing favourably, and the prospect of a sale was good. Indeed, an agreement between Costain and Melfi's client was executed as early as October 27, 1980, but for reasons irrelevant to this appeal that agreement was later terminated. After further negotiations, the parties successfully concluded the agreement of January 1981, on the basis of which the transaction was closed.

9    Since I am of the opinion that the appellant's appeal must stand or fall on the basis of the written contract, I think it unnecessary to detail all that transpired between the date of termination of the appellant's relationship with the company and the date the commission was received by the company. It is, however, important to note that the appellant sought assurances that his commission as the listing agent would be protected. For this purpose he contacted both the respondent Melfi and the respondent Meffert. Meffert, as I have indicated, was the manager of the Montreal Trust office and admittedly was the person through whom the company acted throughout this matter. He was assured by Melfi that "whatever happens he [Melfi] would take care of me"; and, more important, was assured by Meffert, "Don't worry, the company won't screw you." The trial Judge found those statements to have been made, but concluded that they did not of themselves constitute promises of such a nature as to provide the basis for a cause of action.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31 A.C.W.S. (2d) 123...

10    Accepting that conclusion, it is nonetheless clear that the statements could not have been made honestly or in good faith. They no doubt were designed to forestall any action by the appellant that might interfere with the negotiations or the closing of the transaction. The fact is that these respondents had devised a scheme whereby they would divide the listing agent's commission between themselves and the appellant would receive no part of it. The trade record sheets of the company relating to the sale from the time of the incompleted October 27, 1980, agreement were drawn so as to show Melfi as both the "listing salesman" and the "selling salesman". These documents were prepared by Meffert and signed by Melfi both of whom were fully aware that the appellant, and not Melfi, was the listing salesman. According to the trade record sheet upon which the commission was divided, the $175,000 commission when received by the company was to be paid as follows:

Listing Salesman, Don Melfi ...... $57,625.00

Selling Salesman, Don Melfi ...... $65,625.00

Office, M.T.C. 1992 Yonge St. ...... $51,750.00

11    Meffert, as manager of the company, authorized payment accordingly and, as the evidence revealed, when Melfi received the listing and selling commissions he in turn paid Meffert $30,000. Since Meffert, as manager, held a salaried position and was not entitled to any commission, he was asked at trial to explain the basis upon which he received these moneys. He testified, as did Melfi, that the $30,000 payment represented, to the extent of $2,000, the repayment of a loan and, to the extent of $28,000, the payment of a "consulting fee". The so-called "consulting fee" was purportedly paid in consideration of Meffert's assistance to Melfi with respect to certain unnamed and incompleted transactions and was said to be entirely unrelated to the subject transaction. The trial Judge did not believe this. He characterized the payment of $28,000 as "a bribe" saying:

Meffert accepted a payment of $28,000.00 from Melfi which, in my opinion, amounted to a bribe to exercise his discretion and as such his company's discretion in favour of Melfi in so far as the selling [sic, listing] commission was concerned.

12    However, notwithstanding his view as to the patent impropriety of the respondents' conduct, the trial Judge went on to dismiss the appellant's claim insofar as it was based upon an alleged breach of the terms of the employment contract for the brief reasons set forth in the following paragraph of his judgment:

... I am prepared to accept that the obtaining of the information from Costain by Greenberg constituted a 'listing' within the provisions of the employment agreement. In my opinion, those parts of the employment agreement already quoted [cl. 11] can be read together. In order to be paid a commission the selling agent must have been employed by the company on the date the 'listing' was obtained but can only obtain payment 'at the sole discretion of the company'. Meffert may well have been bribed by Melfi to exercise the company's discretion in the way that it did but this exercise of discretion is not reviewable by a court as is the exercise of a discretion by some boards or tribunals.

13    With deference, I am unable to agree with that disposition of the case. The learned trial Judge's reference to the law relating to judicial review of the discretionary power of administrative tribunals is not apt. This is an action in contract. Whether a Court may interfere with the exercise of a discretion conferred by a contract depends upon the interpretation of the contract and the effect to be given its terms.

14    Clause 11, as I indicated earlier, is critical to the dispute in this case. The concluding paragraph of the clause, to repeat it, reads:

It is understood that all listings shall be the property of the company and that you shall be entitled to commission or other remuneration only if you are an agent of the company on the date the property is sold or listed.

15    Plainly, an agent's entitlement to commission is conditional upon his being an agent of the company on the date the property is either sold or listed. Here, the appellant was in fact an agent of the company on the date the property was listed and it follows, reading this part of cl. 11 alone, is entitled to the listing agent's share of the commission. Had he remained in the company's employ, he would without question have been entitled to the commission he earned by obtaining the listing. That

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31 A.C.W.S. (2d) 123...

entitlement, at least insofar as this provision is concerned, would be unaffected by the termination of his employment. On what basis then may he be deprived of his commission?

16    This brings into consideration the earlier provision of cl. 11 which deals specifically with a listing that is sold after a sales agent's employment is terminated. This provision, which must be read together with the concluding paragraph of cl. 11, states:

> In the event that a listing is sold after the sales agent's employment is terminated, any commission he or she receives will be at the sole discretion of the company, and the commission earned on the listing will be disbursed at the company's discretion.

17    From that, the company contends that the determination of whether a former sales agent is to be paid any commission on a listing is wholly within its discretion. That discretion, being a "sole discretion", may be exercised on the basis of purely personal or subjective considerations so that, the argument goes, if the company denies payment in circumstances which, viewed objectively, may appear unreasonable or even arbitrary, its decision is nonetheless not open to challenge. In short, the company's position is that a sales agent whose employment is terminated is not entitled to receive the commission earned on a listing if for any reason the company sees fit not to make the payment.

18    Notwithstanding the able argument of counsel for the company, that contention must fail. In my opinion, the company's discretion in this matter is not unbridled, firstly, because the nature of this contract and the subject matter of the discretion are such that the company's decision should be construed as being controlled by objective standards; and secondly, because the exercise of the discretion, whether measured by subjective or objective standards, is subject to a requirement of honesty and good faith.

19    Provisions in agreements making payment or performance subject to "the discretion", "the opinion" or "the satisfaction" of a party to the agreement or a third party, broadly speaking, fall into two general categories. In contracts in which the matter to be decided or approved is not readily susceptible of objective measurement — matters involving taste, sensibility, personal compatibility or judgment of the party for whose benefit the authority was given — such provisions are more likely construed as imposing only a subjective standard. On the other hand, in contracts relating to such matters as operative fitness, structural completion, mechanical utility or marketability, these provisions are generally construed as imposing an objective standard of reasonableness. See, generally, 4 Hals. (4th ed.), p. 612, paras. 1198-99; Corbin on Contracts (1960), Vol. 3A, ss. 644-648; Williston on Contracts (3rd ed.), ss. 675A and 675B; Hudson's Building and Engineering Contracts (10th ed., 1970), c. 7.

20    In any given transaction, the category into which such a provision falls will depend upon the intention of the parties as disclosed by their contract. In the absence of explicit language or a clear indication from the tenor of the contract or the nature of the subject matter, the tendency of the cases is to require the discretion or the dissatisfaction to be reasonable: Minster Trust Ltd. v. Traps Tractors Ltd., [1954] 1 W.L.R. 963, [1954] 3 All E.R. 136 at 145. This construction imposes the least hardship in that it produces a result that cannot be said to be unfair or unjust to either of the parties. Other things being equal, I think it preferable that provisions of this kind be construed as implying the less arbitrary standards of the objective test: Restatement, Contracts (2d), s. 228.

21    Returning to the instant case, it is significant that the clause in issue appears in a detailed manual defining the terms of the employment relationship which was prepared by the company and is weighted in its favour. Counsel concedes, and properly so, that any ambiguity or uncertainty in the clause should by the familiar rule of interpretation be construed most favourably to the appellant, and I approach the clause accordingly.

22    The subject matter of the discretion in this case is "the commission earned on the listing". It is significant that that commission was earned while the appellant was in the company's employ; the services rendered to earn the commission were fully performed before the employment was terminated; and, but for the termination, the appellant would have been entitled to the commission when the property was sold. Regardless of whether the agent remained with the company, the company profited from his performance when a sale of the listing was effected. In the context of this employment relationship, it is my view that

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31 A.C.W.S. (2d) 123...

the sole discretion held by the employer ought not to be construed so as to authorize the employer to deprive a former salesman of commission earned through services performed during his employment without reasonable grounds for so doing.

23    Clause 11 makes it clear that all listings obtained by the agent become and remain the property of the company. On that understanding, as I view the clause, the company agrees to pay the agent his commission provided he is an agent on the date the property is either sold or listed. That promise is modified in the case of listings sold after the agent's employment is terminated; in that event the commission will be payable at the discretion of the company. To construe the discretionary power as the company urges it should be construed, the clause would mean no more than "We will pay you your commission only if we feel like it." That construction renders the clause meaningless, indeed, illusory.

24    A sales agent signing this contract has the right to expect that he will be dealt with fairly. Termination of employment does not automatically eliminate his entitlement to commission, call for the imposition of a penalty, or relieve the company of all obligation towards him. The clause does not so provide; quite to the contrary, its presence serves to assure the agent that notwithstanding termination, the company will make a discretionary decision with respect to the commission earned on the listing. If this provision is to have purpose and substance, the discretion must be exercised in a reasonable way, not arbitrarily or capriciously but for good reason. Simple fairness dictates that construction, and particularly so where the exercise of the discretion can result in a windfall to the company. It can keep for itself a commission which but for the termination it would not have obtained, while the agent whose listing led to the sale receives nothing. In this employment relationship, based as it is upon a splitting of commissions, I think it only fair and just, and not too onerous, to require the employer company to show that in the circumstances relevant to the transaction its decision was not unreasonable.

25    Manifestly, in this case the exercise of the discretion was not based on reasoned considerations. Meffert admittedly represented the company in this matter. He, in collusion with Melfi, directed payment of the listing agent's commission to Melfi so that the commission could be divided between them. This kick-back arrangement, or bribe as the trial Judge termed it, obviously formed the basis of the purported exercise of discretion on the company's behalf. The company, it is to be noted, did not seek to disassociate itself from the individual respondents but throughout these proceedings has sought to justify their conduct. Its failure to recognize any contractual responsibility to act fairly or reasonably towards the appellant in the exercise of its discretionary power is evidenced by the testimony at trial of its Ontario manager, who indicated that the company had no interest in the arrangements between Melfi and Meffert. "What Mr. Melfi does with his share of the commission", he said, "is Mr. Melfi's business and that has nothing to do with the company."

26    Apart altogether from the question of reasonableness, a discretion must be exercised honestly and in good faith. That proposition is so fundamental as to require no elaboration. The collusive conduct here clearly deprived the discretion of those qualities and contaminated the decisional process. That patently improper conduct vitiated not only the reasonableness required in the objective criteria but the good faith and honesty required whether the discretion is objective or subjective. In either case the decision to deprive the appellant of any commission was not made honestly and in good faith and cannot stand. Fair dealing is implicit in the contract. The clause in issue, in my opinion, ought not to be construed so as to shield the company's improper exercise of discretion from any review.

27    In light of the unjustifiable basis upon which the company purported to discharge its contractual obligation and in the absence of any valid reason for denying the appellant his commission, the matter must now be dealt with by treating the discretion as having been exercised favourably to the appellant. It follows that the appellant is entitled to the commission earned on the listing. The company, it might be added, has made no claim over against the individual respondents and has not sought to compel them to disgorge this commission. Having reached this conclusion I need not consider the appellant's alternate claim against the company, nor need I consider his claims against the individual respondents to which I referred earlier and which, as framed, were correctly dismissed by the learned trial Judge.

28    In the result, I would allow the appeal and award the appellant judgment against Montreal Trust Company in the amount of $57,625 together with the costs of the appeal and the trial. The appellant is entitled also to prejudgment interest, the calculation of which I would leave to counsel. If they are unable to agree, they may make written submissions to the Court. The appeal against the respondents Meffert and Melfi is dismissed but, in the circumstances, without costs.

WestlawNext CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Greenberg v. Meffert, 1985 CarswellOnt 727**

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31 A.C.W.S. (2d) 123...

*Appeal allowed.*

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 40

# COURT OF APPEAL FOR ONTARIO

CITATION: Guergis v. Novak, 2013 ONCA 449
DATE: 20130628
DOCKET: C56052

Weiler, Sharpe and Rouleau JJ.A.

BETWEEN

Helena Guergis

Applicant (Appellant)

and

V. Raymond Novak, Arthur Hamilton, Cassels Brock & Blackwell LLP,
The Right Honourable Stephen Harper, Guy Giorno, Shelly Glover,
The Honourable Lisa Raitt, Axelle Pellerin, Conservative Party of Canada
and Derrick Snowdy

Defendants (Respondents)

Stephen Victor, Q.C. and David Cutler, for the appellant

Robert W. Staley, Derek J. Bell and Jonathan G. Bell, for the respondents, The
Right Honourable Stephen Harper, V. Raymond Novak, Shelley Glover and The
Honourable Lisa Raitt

Wendy J. Wagner, for the respondent Axelle Pellerin

Peter N. Mantas, for the respondent, Guy Giorno

Paul D'Angelo, for the respondent, Conservative Party of Canada

Heard: April 17, 2013

On appeal from the order of Justice Charles T. Hackland of the Superior Court of
Justice, dated August 24, 2012, with reasons reported at 2012 ONSC 4579.

**By the Court:**

2013 ONCA 449 (CanLII)

Page:  2

2013 ONCA 449 (CanLII)

## A.    OVERVIEW

[1]    The appellant is a former Minister of State for the Status of Women, member of the Conservative Party of Canada ("CPC") caucus, and Member of Parliament for the Electoral District of Simcoe-Grey.

[2]    She alleges that on April 9, 2010, following a conversation with the Prime Minister, she was pressured to resign from Cabinet and did so under duress. On the same day, the Prime Minister issued a public statement; Novak wrote a letter to the RCMP; and Giorno wrote a letter to the Conflict of Interest and Ethics Commissioner. Ultimately, Guergis was removed from caucus and denied a further candidacy in her riding.

[3]    On March 31, 2011, the appellant complained to the Canadian Human Rights Commission against the Prime Minister and the CPC. The Commission decided not to deal with the appellant's complaint on the basis that her removal from Cabinet was protected by Crown prerogative and her removal from caucus by parliamentary privilege making her complaints non-justiciable.  In addition, the Commission held her complaint against the CPC did not satisfy the statutory requirements of the *Canadian Human Rights Act*, R.S.C. 1985, c. H-6.

Page:  3

[4]    Approximately one month later, the appellant brought this action seeking general damages of $800,000 and aggravated and punitive damages of $250,000 each from the defendants, who include:

- The Conservative Party of Canada;

- The Right Honourable, Stephen Harper, the Prime Minister of Canada;

- Guy Giorno, the Prime Minister's Chief of Staff, at the relevant time;

- Raymond Novak, the Prime Minister's Principal Secretary, at the relevant time;

- The Honourable Lisa Raitt, a federal Cabinet minister;

- Axelle Pellerin, an official on Minister Raitt's staff, at the relevant time;

- Shelly Glover, a Conservative Member of Parliament;

- Arthur Hamilton, a lawyer with the firm Cassels Brock & Blackwell LLP, who was the lawyer for the Prime Minister and the CPC, at the relevant time;

- Cassels Brock, the law firm of the Prime Minister and the CPC, at the relevant time; and

- Derrick Snowdy, an individual.

[5]    Snowdy did not participate in the motion nor is he a respondent in this appeal. Hamilton and Cassels Brock are not respondents in this appeal.

2013 ONCA 449 (CanLII)

[6]     The tort claims the appellant advanced against the respondents to this appeal include defamation against all of the respondents other than the CPC, as well as the torts of conspiracy, negligence, intentional infliction of mental suffering, misfeasance in public office, and alleged breach of a duty of care.

[7]     The respondents' brought a motion to strike pursuant to Rule 21.01(1)(b) on the basis that the claim disclosed no reasonable cause of action. They submitted that (i) the tort claims arising from the appellant's no longer being in Cabinet and caucus were not justiciable because such claims related to the exercise of Crown prerogative and parliamentary privilege; (ii) the alleged defamatory statements were either not defamatory or protected by absolute privilege or both; and (iii) the CPC and Prime Minister had authority to refuse the plaintiff's nomination.   The respondents' motion was also based on the plaintiff's action being an abuse of process pursuant to rules 21.01(3)(d) and 25.11(c). They submitted the plaintiff was estopped from pursuing her claim because of the holding in the earlier administrative proceeding before the CHRC.

[8]     The motion judge granted the respondents' motion. While he held that the action was an abuse of process, he independently assessed the statement of claim and concluded that it was plain and obvious that the action could not succeed. He struck the claims without leave to amend, with the exception of the

2013 ONCA 449 (CanLII)

2013 ONCA 449 (CanLII)

claims made against Hamilton and Cassels Brock for which he granted leave to amend on terms.

[9]    The appellant appeals the motion judge's conclusion that she is estopped from bringing her action and that it is an abuse of process. In relation to whether her statement of claim discloses a cause of action, the appellant submits that Crown prerogative and the Parliamentary privilege do not prevent an action in tort for the *manner* in which they were exercised and that it is not plain and obvious that her tort actions could not succeed. She seeks to have the motion judge's order striking the claims against the respondents set aside. Alternatively, the appellant seeks an order granting her leave to amend the statement of claim against them.

[10]   For the reasons that follow, we would dismiss this appeal with the exception of the pleading in relation to the respondent Glover.

[11]   In relation to the other respondents, quite apart from the question of whether the appellant is estopped from pursuing her action against them on the basis of her prior CHRC claim, we agree with the motion judge that it is plain and obvious that the tort claims, including   alleged defamatory statements, cannot succeed.

Page:  6

[12]   We first will address the motion judge's holding that the appellant's claim is an abuse of process and second, will turn to whether the claim discloses a reasonable cause of action.

## B.   THE MOTION JUDGE'S HOLDING THAT THE ACTION IS AN ABUSE OF PROCESS

[13]   As we conclude that, with the exception of the claim against Glover, the motion judge correctly concluded that the statement of claim should be struck under Rule 21.01(1)(b), we find it unnecessary to decide this issue. However, for the sake of completeness, we offer the following comments.

[14]   The CHRC's decision was that Guergis's core complaints were not justiciable. The motion judge held that it was an abuse of process for her to seek to have such determinations re-litigated.

[15]   It is a fundamental principle that where any judicial tribunal having proper jurisdiction gives judgment, then that judgment will be *res judicata* not only as to the point actually decided but also with respect to any other issues necessary to the decision. In *Toronto (City) v. Canadian Union of Public Employees (C.U.P.E.), Local 79,* 2003 SCC 63, [2003] 3 S.C.R. 77, at para. 37, the Supreme Court held that Canadian courts ought to apply the doctrine of abuse of process to preclude litigation in circumstances where the strict requirements of issue estoppel are not met but where allowing the litigation to proceed would violate

2013 ONCA 449 (CanLII)

the principles of judicial economy, consistency, finality, and the integrity of the administration of justice.

[16]   Before us, the respondents submitted that the fact Guergis elected to add additional defendants and derivative tort claims did not make less abusive her effort to re-litigate issues determined in the CHRC proceeding.

[17]   Since the decision of the motion judge, the legal landscape has changed with the Supreme Court of Canada's decision in *Penner v. Niagara (Regional Police Services Board),* 2013 SCC 19. In that case a majority of the Court held that Penner, who had complained about the conduct of certain police officers, could not reasonably have contemplated that their acquittal at a disciplinary hearing would be determinative of the outcome of his civil action against them. The court held that a party's decision to commence an administrative proceeding cannot be divorced from the party's reasonable expectations about what is at stake in those proceedings. The parties' reasonable expectations are shaped by the scope and effect of the administrative proceedings. The text and purpose of the legislative scheme must be considered.

[18]   Where there is a significant difference between the purposes, processes, or stakes involved in the administrative proceeding and the action, a court must decide whether it is fair to use the results of the administrative proceeding to preclude a civil action. In *Penner*, the majority of the court determined that it

2013 ONCA 449 (CanLII)

would be unfair to apply the discretionary remedy of estoppel and held it should not be granted.

[19]   The motion judge's decision of whether or not estoppel should apply would have to be reconsidered in the way the law has now evolved under *Penner*. In relation to the respondents other than Glover, It is not necessary for us to do so, because, as we have indicated, we would dismiss the appeal against them.

[20]    Glover's statement would not have been estopped under the law as it existed prior to *Penner*. The statement was not within the ambit of Guergis's complaint to the CHRC and the issue raised by the complaint was not necessary to the CHRC's decision. The complaint has a factual foundation that is independent of the facts forming the basis of the CHRC complaint. The motion judge erred in lumping Glover in with the other respondents on the issue of whether it would be an abuse of process for her claim to proceed.

## C.    WHETHER THE STATEMENT OF CLAIM DISCLOSES A CAUSE OF ACTION

[21]   For the purposes of both the motion before the motion judge and this appeal, the facts pleaded in Ms. Guergis's statement of claim must be taken as true and assumed to be proven. We will briefly summarize one chain of allegations of fact in the pleading. The alternative pleadings will be discussed at a later point in these reasons.

Page:  9

### (a)    The Statement of Claim

[22]    The facts pleaded in the statement of claim may be summarized as follows.

[23]    On or after September 2009, certain of the defendants began excluding the appellant from meetings and activities taking place within caucus and Cabinet and acting without regard to the appellant. "This conduct was the result of negative media coverage respecting the Plaintiff's spouse and constituted a deliberate and calculated attempt to marginalize the Plaintiff…" (para.30). The respondents entered into a conspiracy to engage in unlawful acts to remove and/or justify the appellant's removal from her positions.

[24]    In or about December 2009 or early 2010, Minister Raitt made a statement to Pellerin, a person on her staff that she had seen the appellant using cocaine in the bathroom of an Ottawa restaurant.   In or about December 2009 or early 2010, Pellerin advised Giorno, the Prime Minister's chief of staff, what she had been told by Raitt regarding the appellant's conduct.

[25]    On or about April 8, 2010, Snowdy, an individual, told Hamilton, a lawyer for the CPC at Cassels Brock, of serious criminal allegations about the appellant's conduct. Hamilton told Novak, the Prime Minister's principal

secretary, Giorno, the Prime Minister, and/or others of Snowdy's allegations about the appellant's conduct.

[26]   On April 9, 2010, the Prime Minister, Novak, and Giorno sent a letter to the RCMP Commissioner and a letter to the Conflict of Interest and Ethics Commissioner that reported on allegations received by the Prime Minister's Office without vouching for their truth. They discussed the contents of the RCMP letter with each other. The same day, the Prime Minister had a discussion with the appellant in which he told her that he had received allegations about her conduct and had communicated those allegations to the RCMP. He accepted the veracity of those allegations without conducting an investigation or waiting for the result of a third-party investigation. The Prime Minister told the appellant that she would not be permitted to remain in caucus pending an investigation of the allegations by the RCMP.   She resigned from Cabinet as a result of the Prime Minister's advice.

[27]   The Prime Minister also made a public statement on April 9, 2010 that his office had become aware of the allegations against the appellant and had referred the allegations to the RCMP and the Conflict of Interest and Ethics Commissioner.

[28]   On or about May 5, 2010, the appellant was removed as a candidate for the CPC.   It was effected at the direction of the Prime Minister and in furtherance

2013 ONCA 449 (CanLII)

2013 ONCA 449 (CanLII)

of the conspiracy.    The appellant was not re-elected as the Member of Parliament for the Electoral District of Simcoe-Grey in the federal election of 2011.

[29]   During a May 16, 2010 CTV interview with Craig Oliver, Glover, a Conservative MP, stated, " I can assure you that there is far more to come out," and "This isn't finished" in reference to the appellant and the allegations of her having been engaged in criminal conduct.

[30]   Though the RCMP's investigation that resulted from Novak's letter was ultimately terminated in the appellant's favour, she suffered damages. The statements in the letter resulted in injury to the appellant's reputation, political career, health, and well-being.

[31]   Against all of the respondents to this appeal, except the CPC, the statement of claim alleges that their statements were false, defamatory, and in pursuance of the conspiracy pleaded. They engaged in "intentional infliction of mental suffering and negligence". The appellant also claims that the Prime Minister, Novak, and Giorno are guilty of misfeasance in public office. As against, the CPC the appellant claims against it for conspiracy, breach of duty of good faith, and negligence.

[32] "Certain of the respondents" are alleged to have aggravated the appellant's damages by not advising her of the particular allegations against her, not providing her with a forum or process to respond to the allegations in breach of the principles of due process and natural justice, and making further public comment and statements in a tone of language intended to discredit and belittle her. Exemplary damages are also claimed to ensure the defendants are appropriately punished and to deter such conduct in the future.

### (b)    The Motion Judge's Decision

[33]    The motion judge's main conclusions on this issue are summarized below.

> i. The removal of the appellant as a Cabinet Minister was an exercise of the Crown prerogative. The Court lacked the jurisdiction to review the tort allegations related to the Prime Minister's actions. (para. 22)
>
> ii. The removal of the appellant from the CPC caucus was protected by parliamentary privilege and the Court lacked the jurisdiction to review the tort allegations related to such removal. (para. 21)
>
> iii. The Prime Minister's refusal to endorse the appellant as a candidate for the CPC was contemplated by statute and could not be tortious in and of itself. (para. 28)
>
> iv. The complained of conversations between the Prime Minister and his senior advisors Giorno and Novak, the RCMP Letter, and Raitt's alleged defamatory statements "fall squarely within [the] absolute privilege accorded to officers of state and their senior advisors" and accordingly cannot give rise to a defamation claim. (para. 32)

2013 ONCA 449 (CanLII)

2013 ONCA 449 (CanLII)

v. The alleged defamatory statements by Pellerin to Giorno are also protected by absolute privilege. They relate to state matters and were within the scope of her duties as a federal public servant. (para. 33)

vi. The additional tort claims are "'dressed up' defamation claims, inserted in the pleading for the purpose of avoiding the application of the absolute privilege defence otherwise available" to the defendants. (para. 34)

vii.    The RCMP Letter, the Conflicts Letter and the Prime Minister's public statement of April 9, 2012 "are neither defamatory on their face nor are they reasonably capable of bearing the implications of criminal activity suggested". (para. 36)

viii. Given that the RCMP    Letter and the Conflicts Letter are protected  by absolute privilege and  are  not defamatory  on  their face, then it naturally follows that sending the letters cannot constitute a misfeasance in public office. (para. 39)

ix. Glover's statements "cannot reasonably bear the implications pleaded". (para. 37)

x.    The    Conservative    Party    of    Canada    is    an unincorporated association and is not an entity capable of being sued in tort. (paras. 44-45)

xi.    Significant    portions    of    the    pleading    are "incomprehensible as pleaded". (para. 48)

xii. The claims against the Prime Minister's counsel, Hamilton, and his law firm, Cassels Brock, were struck because they were contradictory and lacked particularity but with leave to amend on terms. (para. 51)

### (c)    General Principles

[34]    The purpose of rule 21.01(1)(b) is to strike a pleading that does not have a chance of succeeding. The well-known test for determining whether a pleading should be struck is set out in *Hunt v. Carey Canada Inc.,* [1990] 2 S.C.R. 959: assuming that the facts alleged in the statement of claim can be proven, is it plain and obvious that no reasonable cause of action is disclosed? In *Hunt*, the court stated, at p. 980:

> Neither the length and complexity of the issues, the novelty of the cause of action, nor the potential of the defendants to present a strong defence should prevent the plaintiff from proceeding with his or her case. Only if the action is certain to fail….should the relevant portions of the plaintiff's statement of claim be struck out.

[35]    As the authors of *Ontario Superior Court Practice 2013* point out, rule 21.01(b) may be used to strike a pleading because there is an unanswerable defence to the claim: Todd Archibald, Gordon Killeen and James C. Morton, *Ontario Superior Court Practice 2013* (Toronto.: LexisNexis Canada, 2013).  The authors note at p. 908:

> The rule in *Hunt* does not preclude a court from striking out a claim on the basis that it discloses no cause of action because of the existence of an unanswerable defence.  The issue is whether, assuming the alleged facts to be true, the action is nevertheless certain to fail. [Citation to *Louie v. Lastman* (2002) 61 O.R. (3d) 459 (Ont. C.A.).]

Page:  15

[36]   In making the determination under rule 21.01(b),  the principle of equality before the law requires that the court not give extra scrutiny to the statement of claim because of who the parties are: *Black v. Canada (Prime Minister)* (2001), 54 O.R. (3d) 215 (C.A.), at para. 21. The statement of claim must be read as generously as possible with a view to accommodating any inadequacies in the allegations.   With these general principles in mind, we will now deal with the claims advanced.

### (d)    The Defamation Claims

[37]    In *Color Your World Corp. v. C.B.C.* (1998), 156 D.L.R. (4th) 27 (Ont. C.A.), at p. 36, Abella J.A. defined defamation as follows:

> A defamatory statement is one which has a tendency to injure the reputation of the person to whom it refers; which tends, that is to say, to lower him [or her] in the estimation of right-thinking members of society generally and in particular to cause him [or her] to be regarded with feelings of hatred, contempt, ridicule, fear, dislike, or disesteem. The statement is judged by the standard of an ordinary, right-thinking member of society. Hence the test is an objective one...

[38]   When considering a reasonable or ordinary member of the public, the bar should be set in a middle ground: "[i]t should not be so low as to stifle free expression unduly, nor so high as to imperil the ability to protect the integrity of a person's reputation" (p. 36). The meaning of a particular communication should be considered from the perspective of a reasonable person who is reasonably

2013 ONCA 449 (CanLII)

thoughtful and informed. "A degree of common sense must be attributed to viewers": *Color Your World*, at pp. 36-37.

[39]    A defamation claim requires the plaintiff to prove three elements: 1) the defendant made a defamatory statement, in the sense that the impugned words would tend to lower the plaintiff's reputation in the eyes of a reasonable person; 2) the words in fact referred to the plaintiff; and 3) the words were communicated to at least one person other than the plaintiff: *Grant v. Torstar Corp.*, 2009 SCC 61, [2009] 3 S.C.R. 640, at para. 28.

[40]    Whether or not a statement is capable of being defamatory is a question of law whereas the issue of whether the statement actually conveyed the defamatory meaning is a question of fact: *Young v. Toronto Star Newspapers Ltd.* (2005), 77 O.R. (3d) 680 (C.A.), at para. 68. "In ruling on meaning, the court is not determining the actual meaning of the words but delimiting the outside boundaries of the possible range of meanings and setting the 'ground rules' for the trial.": *Gatley on Libel and Slander,* 10th ed. (UK: Sweet & Maxwell, 2008), at para. 3.13.

[41]    When a defendant seeks to strike a pleading on the basis that the statement in issue is not capable of a defamatory meaning, the court will only strike the pleading in the clearest of cases; otherwise, the court will leave it to the trier of fact to decide the question at trial: *Halsbury's Laws of Canada-Cumulative*

2013 ONCA 449 (CanLII)

2013 ONCA 449 (CanLII)

*Supplement, April 20, 2012 - Defamation* - "Elements of the Cause of Action – Preliminary Rulings" (Toronto: LexisNexis: 2012), at HDE-36.

[42]   In this case, in addition to the issue of whether the alleged statements are capable of being defamatory, a further issue in relation to some of the respondents is whether privilege attaches to the communications made. Each defamation claim must be analyzed separately.

### (i)    Raitt and Pellerin

[43]   In the statement of claim, at paras. 91 and 98, the appellant alleges that in or about December 2009 or early 2010, Raitt, a Cabinet Minister, advised Pellerin that she saw the appellant using cocaine with two other people in the bathroom of an Ottawa restaurant and that Pellerin advised Giorno of what she had been told by Raitt.

[44]   These statements are defamatory on their face. The motion judge held that the statements were protected by the absolute privilege recognized in *Dowson v. The Queen* (1981), 124 D.L.R. (3d) 260 (F.C.A.). As stated in *Dowson,* at p. 269, "there are three conditions for this category of absolute privilege: (a) the statement must have been made by one officer of state to another officer of state; b) it must relate to state matters; c) it must be made by an officer of state in the course of his official duty." A person who makes a statement as the agent of another takes the benefit of the absolute privilege: *Dowson*, at pp. 271-2.

2013 ONCA 449 (CanLII)

[45]    After citing *Dowson,* the motion judge held at para. 33:

> The alleged statements were made by Ms. Pellerin, an employee of the Government of Canada, working at the direction of a Minister of the Crown, to the chief of staff to the prime minister. Therefore, the statements satisfy the *Dowson* requirement of a communication from one officer of state to another.   The alleged defamatory statements related to state matters and were made by Ms. Pellerin within the scope of her duties as a federal public servant. It was in the ordinary course of affairs for Ms. Pellerin, as an employee of the Government of Canada, working at the direction of a Minister of the federal Crown, to report to Mr. Giorno criminal conduct allegedly engaged in by another Minister of the Crown.

[46]    The appellant submits that the motion judge incorrectly made what amounted to a factual finding that Raitt made her statement to senior officials in the Prime Minister's Office when there was no basis in the statement of claim for doing so. Nor is there an allegation that Raitt's statement to Pellerin was part of her official duties. On a rule 21.01(1)(b) motion to strike a claim, a motion judge is restricted to the facts as pleaded and is prohibited from finding facts not pleaded in the statement of claim. As a result, the appellant argues that, as pleaded, the requirement of a communication from one officer of state to another is not satisfied.

[47]    Instead of reading the paragraphs in the statement of claim in isolation, as the appellant would have us do, we must read the statement of claim as a whole. Paragraphs 17, 19, and 20 are of particular note:

2013 ONCA 449 (CanLII)

17. Giorno is an individual who, at all material times, was the Chief of Staff to the Prime Minister of Canada, working closely with and at the direction of Harper.

…

19. Raitt is an individual who, at all material times, was the Member of Parliament for the Electoral District of Halton and the Minister of Labour, working closely with Pellerin and working under the direction of Harper.

20. Pellerin is an individual who, at all material times, was an employee of the Government of Canada, working closely with and at the direction of Raitt.

[48]   When these paragraphs are read together with the pleading alleging what Raitt told Pellerin and what Pellerin told Giorno, the pleading clearly alleges that Pellerin, at the direction of Raitt, made the statement to Giorno, who as Chief of Staff to the Prime Minister of Canada was working under his direction. The motion judge did not go beyond his function and find facts outside the statement of claim. He did what he was entitled to do; he considered the claim as a whole and assessed the pleading on the basis of all the facts pleaded.

[49]   The appellant also submits that Raitt's statement to Pellerin was merely a statement to an employee and not a "high officer of state" as required by *Dowson*. However, *Dowson* did not definitively decide whether the privilege was limited to "high officers of state" because the court had no need to do so. There, as here, the government employee was entitled to the benefit of the Minister's privilege because the communication in issue was made at the direction of a

2013 ONCA 449 (CanLII)

Minister, a high officer of state. Here, the statements made were made by, and then at the direction of, Raitt in her capacity as a Minister.

[50]   The communication allegedly made by Raitt and Pellerin claimed criminal conduct by a Minister of the Crown, namely the consumption of cocaine. Possession of cocaine is a criminal offence and consumption of cocaine has an effect on a person's mental state. The communication was important to the effective functioning of government, a matter of state.

[51]   The motion judge properly found that the communication was made by one officer of state to another officer of state and that the conditions for absolute privilege, including that the communication relate to a matter of state, were met.

[52]   Further, the appellant alleges in paragraph 98 of her statement of claim that Pellerin "spoke defamatory words about the Plaintiff" not only to Giorno but "and/or others". The right to plead that a defamatory statement was made to certain unnamed persons is restricted to the case where a plaintiff has made out a *prima facie* case that the statement was made to a named person and has produced uncontradicted evidence of publication to other persons: *Jaffe v. Americans for International Justice Foundation,* [1987] O.J. No. 2370 (H. Ct. J.), at para.10. These two requirements have not been met. No prima facie case exists that the defamatory statements were made against named persons as that pleading has been struck. Nor are the facts to support publication to other

Page:  21

persons pleaded. All that remains is a bald allegation of publication to "others". Accordingly, the pleading against "others" is also properly struck.

### (ii)   The Prime Minister

[53]   The statement of claim alleges that Hamilton told the Prime Minister of the allegations on or about April 8 or 9, 2010. The Prime Minister then told the appellant of the allegations in his telephone call with her and obtained her resignation from Cabinet.

[54]   The statement made by the Prime Minister on April 9, 2010  to the public was as follows:

> Last night, my office became aware of serious allegations regarding the conduct of the Honourable Helena Guergis. These allegations relate to the conduct of Ms. Guergis and do not involve any other minister, MP, senator or federal government employee, I've referred the allegations to the Conflict of Interest and Ethics Commissioner and to the RCMP.  Under the circumstances, I will not comment on them further.

[55]   The appellant submits that the statement is capable of a defamatory meaning and would be understood to mean that she was involved in fraudulent activity and/or other criminal conduct.

[56]   As indicated, in determining whether a statement is defamatory, the words are to be construed in context, according to the meaning they would be given by reasonable persons of ordinary intelligence, knowledge, and experience. The

2013 ONCA 449 (CanLII)

2013 ONCA 449 (CanLII)

question is whether the impugned words might tend to expose the plaintiff to hatred, contempt, or ridicule or whether they lower the plaintiff in the estimation of reasonable persons who have common sense and who are reasonably thoughtful and well-informed but who do not have an overly fragile sensibility. They should not be given some unusual meaning that persons might succeed in extracting from them: *Color your World*. See also *Mantini v. Smith Lyons, LLP (No. 2)* (2003), 64 O.R. (3d) 516 (C.A.), at paras. 10 and 13-18, leave to appeal dismissed, [2003] S.C.C.A. No. 344; *Myers v. C.B.C.* (1999), 47 C.C.L.T. (2d) 272, var'd on other grounds (2001), 54 O.R. (3d) 626, leave to appeal dismissed [2001] S.C.C.A. No. 433.

[57]    A reasonably thoughtful and informed reader would understand the difference between allegations and proof of guilt. Such a person would bear in mind that an accused person is presumed innocent until proven guilty: *Miguna v. Toronto (City) Police Services Board,* [2004] O.J. No. 2455 (S.C.), at paras. 4-6, aff'd [2005] O.J. No. 107 (C.A.), at para. 4. In this case, the motion judge did not err in holding that, as a matter of law, the public statement was not capable of bearing the defamatory meaning alleged by the appellant. The same is true of the Prime Minister's conversation with the appellant.

[58]    The Prime Minister's public statement is one step further removed than the situation in *Miguna*. In that case, the plaintiff was charged; here, the appellant

was never charged. The statement makes it clear that allegations of criminal conduct about the appellant had been made and that those allegations had been referred to the Conflict of Interest and Ethics Commissioner as well as to the RCMP. These were the appropriate authorities to deal with the allegations. Although the appellant submits that, in assessing whether the statements were capable of having a defamatory meaning, the motion judge should have taken into account as true her pleading that the statements resulted in injury to her reputation, political career, health and wellbeing, the test is not a subjective one. As indicated by Abella J.A. in *Color Your World,* it is an objective one – that of the reasonable person.

### (iii)    Novak and Giorno

[59]    The appellant alleges that the statements between Novak and Giorno and the letters drafted by them at the direction of the Prime Minister on April 9, 2010 were defamatory. The claim alleges that Giorno defamed Guergis because he participated in the drafting and delivery of the letter by Novak to the RCMP Commissioner. The contents of the letter from Novak to the RCMP Commissioner is as follows:

> Dear Commissioner:
>
> The Prime Minister has asked me to provide the following information on his behalf.

2013 ONCA 449 (CanLII)

Page:  24

2013 ONCA 449 (CanLII)

Late last night our office  became aware of the specifics of allegations  made by Mr. Derrick Snowdy, a private investigator, concerning the conduct of Mr. Rahim Jaffer and the Hon. Helena Guergis. The allegations are numerous and include fraud, extortion, obtaining benefits by false pretences and involvement in prostitution. The extent of the allegations makes it impossible for me to summarize them completely in this brief letter.

Our office has no first-hand knowledge of these allegations and our office has not communicated directly with Mr. Snowdy.    Communication was conducted through the Conservative Party's legal counsel, Mr. Arthur Hamilton of Cassels Brock, Toronto.

I have been informed that Mr. Snowdy states that he has collected evidence to corroborate his allegations and that he can be reached by telephone at ... I understand that Mr. Snowdy says the information was already shared with the RCMP and the OPP, but I want to ensure that you are aware of it.

Mr. Hamilton is also available to be contacted by members of the RCMP.  He can be reached at…

If there is any more assistance that we can provide, please let me know.

The content of the letter from Giorno to the Conflict of Interest and Ethics Commissioner is as follows:

Dear Commissioner:

I have been instructed by the Prime Minister to provide you with the following information on his behalf.

Late last night our office became aware of the specifics of allegations made by Mr. Derrick Snowdy, a private investigator, concerning the conduct of the Hon. Helena Guergis. In particular, Mr. Snowdy alleges that Ms Guergis attended meetings at which she promised to

2013 ONCA 449 (CanLII)

> advance private business interests.   Mr. Snowdy makes
> additional allegations about the MP's conduct,
> allegations that may or may not be relevant to her
> responsibilities under the Conflict of Interest Act and/or
> the Conflict of Interest Code for Members of the House
> of Commons.
>
> Our office has no first-hand knowledge of these
> allegations and our office has not communicated
> directly with Mr. Snowdy. Communication was
> conducted through the Conservative Party's legal
> counsel.   However, I am aware that Mr. Snowdy states
> that he has collected evidence to corroborate his
> allegations. I believe that Mr. Snowdy can be reached
> by telephone at ...

[60]    The motion judge held that the April 9, 2010 communications between the

Prime Minister and his senior advisors, Novak and Giorno, fall within the doctrine

of absolute privilege accorded to officers of state and their senior advisers when

communicating on matters within their official duties. He applied the same

rationale to the letter from Novak to the RCMP commissioner.    The RCMP

Commissioner is appointed by the Governor in Council and is under the direction

of the Minister of Public Safety and Emergency Preparedness: *Royal Canadian

Mounted Police Act,* R.S.C. 1985, c. R-10, s. 5. (1). Thus, the RCMP

Commissioner is an officer of state. We agree with the motion judge. Novak is an

officer of state communicating with respect to a matter of state to the RCMP

Commissioner, another officer of state.

[61]    A second reason the motion judge struck these paragraphs is that each of

the April 9, 2010 letters – by Novak to the RCMP commissioner and by Giorno to

the Ethics Commissioner[1] – was not defamatory on its face. The letters were not capable of bearing the implications asserted by the appellant in her statement of claim. Again, we agree with motion judge. The tenor of the two letters is the same as the public statement by the Prime Minister. The rationale respecting the public statement by the Prime Minister applies to these two letters.

### (iv)    Glover

[62]    The issue in respect of Glover is whether it is plain and obvious that her comments during a CTV interview on May 16, 2010, that "I can assure you that there is far more to come out" and "This isn't finished" do not constitute defamation.

[63]    The appellant pleads that the words complained of were intended to mean and would be understood to mean that she was involved in criminal conduct and that further evidence would be made public in the future confirming this. Counsel for Glover submits that when the context of the statements is considered, Glover was supporting the plaintiff rather than disparaging her because, immediately

---

[1] Defamation with respect to Giorno's letter to the Ethics Commissioner was not specifically pled in the appellant's statement of claim. However, the appellant's amended factum asserts that it was defamatory. Assuming that the omission in the statement of claim was an oversight for which leave to amend could be granted, we have addressed the point. The Conflict of Interest and Ethics Commissioner is appointed pursuant to the *Parliament of Canada Act,* R.S.C. 1985 c. P-1, s. 81(1), by the Governor in Council after consultation with the leader of every recognized party in the House of Commons and approval of the appointment by resolution of that House. As such, the Conflict of Interest and Ethics Commissioner is also an office of state. The same reasoning would apply.

after making this statement, she added, "It's unfortunate this family has been…they have suffered enough."

[64]    The motion judge reviewed the video and transcript of the interview and concluded that Glover's statements could not possibly bear the implication pleaded, namely, that evidence Guergis was involved in criminal conduct would be made available in the future.

[65]    The words in issue must be considered in the context of the entire CTV interview.

[66]    The interviewer, Craig Oliver, was speaking to three members of a Parliamentary committee studying whether there was undue influence by lobbyists into a multi-million dollar green infrastructure fund. Siobhan Coady, a Liberal Member of the committee, said that Snowdy brought forward allegations that Guergis's husband, Jaffir, offered and was able to provide back door access to the Conservative government. The Committee was "trying to figure out what part of the allegations related to the green fund." Craig Oliver then pressed Glover as to whether the Prime Minister had gone too far on "very thin information" in removing Guergis from her positions without giving her a chance to defend herself.  Glover replied, "Well there has been evidence that has been brought forward that Mr. Jaffer did in fact use the cabinet minister's office for personal business.  Our government turned over that information. "

2013 ONCA 449 (CanLII)

Page:  28

[67]    Pat Martin, an NDP Member of the Parliamentary committee commented that the Prime Minister had ruined Guergis's life and he added, "I ask people to, you know, stay tuned for a few more weeks because on June 9th we intend to wrap up this study.   We are going to invite Mr. Jaffer and Ms. Guergis to the committee and one last time they will be able to at least justify some of the inconsistencies in testimony and explain perhaps so we can close this file and move onto other things."

[68]    Coady then responded to Craig Oliver's question about whether Guergis, her husband, and Snowdy could be believed. Coady commented that Canadians have a right to know what criminal behaviour may have occurred. She stated, "We have witnesses coming forward saying that Mr. Giorno, the Chief of Staff has probably misrepresent[ed] some or the things that are happening here."

[69]    Craig Oliver then gave Glover the last word. She stated that what the committee was doing was not right and not fair. She argued that there is no justice to be found in the way that the committee functions:

> …in the way that you are limited to [interruption and comment by Coady]…the amount of questioning. I can assure you I lived in a just and fair system when I was a police officer.   This is far from what I would expect a member of parliament to suggest.   I can assure you that there is far more to come out…[interruption and comment by Coady] there is far more to come out because this isn't finished.   It's unfortunate this family has been….[interruption by Craig Oliver: 'It is and there is more to come for sure'] they have suffered enough.

2013 ONCA 449 (CanLII)

[70]   The sentence "There is far more to come out" is incomplete because Glover was interrupted.   The complete sentence is, "There is far more to come out because this isn't finished."

[71]   Depending on the interpretation given to the word, "this" Glover's statements are capable of being interpreted in two different ways. One interpretation takes as its context that Glover's response to Oliver was critical of the way committees run their affairs. The word "this" refers to the committee and properly interpreted, her statement is, "there is far more to come out because [the committee's investigation into illegal lobbying] isn't finished.   Glover's next statement, "It's unfortunate this family has been …they have suffered enough" would mean "it's unfortunate this family has been [put through the committee's process] they have suffered enough."

[72]   The other interpretation takes as its context that Glover was defending the Prime Minister's actions in removing Guergis from her positions. In this context, "this" refers to the evidence that has come out against Guergis so far and "there is far more to come" means more evidence against her would come out in the following weeks.

[73]   The possible range of meanings in relation to the statement in issue includes one that is defamatory. Because the statement in question has two possible meanings, one defamatory and one not, this is not a clear case enabling

the pleading to be struck, and the motion judge erred in doing so. The matter should be allowed to proceed to trial where the question of the actual meaning will be determined as a matter of fact.

### (e)    Conspiracy and the other tort claims; alternative pleading

[74]    In addition to defamation, the appellant pleaded other tort claims against the respondents, namely, conspiracy, negligence, intentional infliction of mental suffering, misfeasance in public office, and breach of a duty of care.

[75]    In doing so, she pleaded on the one hand, at para. 67, that the Prime Minister had not received information as to allegations of the appellant's criminal activity and then, at para. 69, "in the alternative" that he had. In essence, she alleged that the Prime Minister made up his statement that he had received information alleging criminal wrongdoing by her as part of a conspiracy to obtain her resignation.

[76]    The motion judge held that this "alternative" pleading was incomprehensible as pleaded. In addition, the motion judge held that the other tort claims were based entirely on the alleged defamatory communications and, as such, were "dressed up" defamation claims. He struck them.

[77]    The appellant submits that she is entitled to make inconsistent allegations in a pleading.  Indeed, rule 25.06(4) provides:

Page:  31

> A party may make inconsistent allegations in a pleading where the pleading makes it clear that they are being pleaded in the alternative.

[78]    Relying on this rule and its application in such cases as *Royal Bank of Canada v. Société Générale (Canada),* [2007] O.J. No. 2262 (S.C.), the appellant submits that her pleading should be allowed to stand.

[79]    In our opinion, the motion judge did not err in dismissing the other tort claims for three reasons.

[80]    First, viewed as a whole, the alternative pleadings do not succeed in achieving a key purpose of the statement of claim: to enable the defendants to know what facts are alleged so as to be able to respond to them.  Having regard to the statement of claim as a whole, the alternatives presented in it are:

- Mr. Snowdy either did or did not report allegations of misconduct to Mr. Hamilton;

- Mr. Hamilton either did or did not report allegations of misconduct to Mr. Giorno, Mr. Novak, and the Prime Minister;

- The Prime Minister either was not informed of any allegations made against the appellant or he was told of allegations but failed to investigate them;

- The Prime Minister's Office either was not informed of the allegations of misconduct or it was informed and the allegations were not of such seriousness that they merited investigation by the RCMP; and

2013 ONCA 449 (CanLII)

- Minister Raitt either did or did not communicate allegations relating to cocaine use to Ms. Pellerin.

[81]   With the alternatives taken together, the statement of claim does not clearly set out the facts on which the case is asserted. There is no indication of how the various alternatives interact with one another. The pleadings serve to confuse rather than clarify what exactly is being pleaded.

[82]   The present pleadings are distinguishable from *Royal Bank* on the basis that, in that case, the motion judge specifically held the defendants knew the precise allegations against them, in part, due to the long history in the proceedings.

[83]   Where, as here, portions of a pleading contain bare allegations, including unfounded attacks on the integrity of a party and unsupported allegations of defamation, those portions of the pleading may be struck: *Ontario Superior Court Practice,* at p. 98; Linda Abrams and Kevin McGuinness, *Canadian Civil Procedure Law,* (Toronto: LexisNexis, 2010), at p. 753. See also *McCarthy Corp PLC v. KPMG LLP,* [2006] O.J. No. 1492 (S.C.) in which Spies J. struck the statement of claim in part on the basis that it was internally inconsistent.

[84]   Second, the other torts pleaded are derivative of the defamation allegation and are not based on independent facts. For example, as pleaded, the conspiracy claim against the Prime Minister and other respondents relies on their

Page:  33

committing an unlawful act. The purported unlawful act relates to the alleged defamatory statements and letters.   As we have held that the statements and letters in issue were not capable of being defamatory or are protected by privilege, they are not unlawful and thus a required element for the tort of conspiracy is lacking.

[85]    Third, in seeking to pursue tort claims, such as negligence, based on the manner of her removal from Cabinet and caucus, while acknowledging that the Prime Minister's decision to remove her is not justiciable because it is protected by the exercise of Crown privilege and parliamentary prerogative, the appellant is attempting a distinction without a difference.

[86]    The Prime Minister's exercise of the Crown prerogative and Parliamentary privilege extends not only to the fact of removal from office but also to how it was exercised.   As Laskin J.A. held at para. 65 of *Black:*

> Once [the Prime Minister's] exercise of the honours prerogative is found to be beyond review by the courts, *how the Prime Minister exercised the prerogative is also beyond review.* Even if the advice was wrong or careless or negligent, even if his motives were questionable, they cannot be challenged by judicial review. [Emphasis added.]

[87]    The motion judge did not err in dismissing the other tort claims and in striking the so-called alternative pleadings.

Page:  34

2013 ONCA 449 (CanLII)

### (f)    Claims based on denial of the appellant's candidacy

[88]    The appellant further alleges that the CPC's committee removed her as the candidate for the CPC in the electoral district of Simcoe-Grey and that such removal was effected at the direction of the Prime Minister in furtherance of the conspiracy.

[89]    The motion judge, relying on existing jurisprudence, including this court's decision in *Longley v. Canada (Attorney General)*, 2007 ONCA 852, 88 O.R. (3d) 408, held that, as an unincorporated association, the CPC could not be sued in tort. Accordingly, he struck the claims against the CPC. We agree with him.

[90]    Even if the allegation regarding the Prime Minister's involvement is read as proven, s. 67(4)(c) of the *Canada Elections Act,* S.C. 2000 c.9, gives the leader of a political party the authority to refuse to endorse a candidate. As it is statutorily allowed, it therefore cannot be an unlawful act.

[91]    The claims of conspiracy were properly struck

### (g)    Leave to Amend

[92]    The appellant submits that the motions judge erred in not allowing her leave to amend the statement of claim in respect of the respondents. She relies on jurisprudence indicating that it is uncommon for the court to strike portions of a statement of claim without granting leave to amend and that it is even rarer for

the court to strike a statement of claim in its entirety without granting leave to amend.

[93]   An opportunity to amend a pleading should be granted unless the claim clearly has no chance of success. That is the situation here. The alleged defamatory statements were either not defamatory or are protected by absolute privilege. Subsidiary torts pleaded to evade defamation law defences are also to be struck without leave to amend: see *Byrne v. Maas,* [2007] O.J. NO. 4457 (S.C.), at paras. 8-10; *Baker v. Poser,* 2004 CarswellOnt 4983 (S.C.), at paras. 28-31. Complaints that are untenable as a matter of law are not amenable to amendment.

[94]   With the exception of the paragraphs in relation to Glove, the motion judge correctly struck the appellant's claim without leave to amend.   We realize, however, that in relation to Glover, it may be necessary for the plaintiff to amend the pleading to provide proper context.

## D.    CONCLUSION

[95]   With the exception of the statement by Glover during the CTV interview, we agree with the motion judge that the statements and letters upon which the allegations of defamation are based are either not capable of being defamatory or are protected by absolute privilege.   The other tort claims are simply "dressed-

2013 ONCA 449 (CanLII)

Page:  36

up" defamation claims. The factual basis and elements necessary to sustain these claims are not present in the pleading.

[96]  Furthermore, the tort claims arise from the appellant's removal from Cabinet and from caucus. They are an attempt to get around the non-justiciability of the Prime Minister's exercise of prerogative power and Parliamentary privilege. The torts based on the denial of the appellant's candidacy for election are also certain to fail on the basis that the leader of a political party has the statutory authority to refuse to endorse a candidate and the CPC, as an unincorporated body, cannot be sued.

[97]  Accordingly, with the exception of the paragraphs relating to Glover in the statement of claim, the appeal is dismissed.

## E.    COSTS

[98]  Although the respondents have been largely successful on this appeal, the appellant has achieved a measure of success.

[99]  The respondents seek costs totalling in excess of $100,000. Had the appellant been entirely successful, she would have sought costs in the order of $35,000. The amount claimed by Mr. Staley, counsel for Novak, the Prime Minister, Glover and the Hon. Lisa Raitt, currently public officials, is in excess of the amounts actually being charged because the amount being charged to the

client is a discounted rate.   Although Giorno and Pellerin are completely allied in interest with the respondents represented by Mr. Staley, separate counsel were retained.   The court was advised this was because they are no longer public officials.  Yet, all the actions in question  occurred while they were public officials.

[100] The CPC seeks costs on a substantial indemnity basis because it submits it should not have been included in the appeal. It argues that because it was an unincorporated entity, it was obvious that the appeal against the CPC had no chance of success. We do not agree that including the CPC in the appeal is the kind of conduct that should give rise to costs on a substantial indemnity basis.

[101] Having considered the submissions of counsel, we are of the opinion that one counsel fee for the Prime Minister's Group, Giorno, and Pellerin is appropriate. Accordingly,   we would award costs inclusive of disbursements and all applicable  taxes as follows:

> The Prime Minister's Group, Giorno, and Pellerin: $25,000 to be divided among themselves as they think fit;

> The CPC: $8,000

Released:  June 28, 2013                    "Karen M. Weiler J.A."
  "KMW"                                     "Robert J. Sharpe J.A."
                                            "Paul Rouleau  J.A."

2013 ONCA 449 (CanLII)

# TAB 41

H.H. Robertson, Co. v. United Steel Deck, Inc., 820 F.2d 384 (1987)

2 U.S.P.Q.2d 1926

820 F.2d 384
United States Court of Appeals,
Federal Circuit.

H.H. ROBERTSON, COMPANY, Plaintiff/Appellee,

v.

UNITED STEEL DECK, INC. and Nicholas
J. Bouras, Inc., Defendants/Appellants.

No. 86-1410.   |   May 27, 1987.

Patent owners brought infringement action relating to patent on bottomless sub-assembly for producing underfloor electrical cable trench, and moved for preliminary injunction against alleged infringers. The United States District Court for the District of New Jersey, Dickinson R. Debevoise, J., granted motion, and alleged infringers appealed. The Court of Appeals, Pauline Newman, Circuit Judge, held that: (1) District Court did not err in refusing to reopen proceedings which resulted in grant of preliminary injunction against alleged infringers in order to consider reference proffered by alleged infringers after preliminary injunction was issued; (2) even where irreparable injury is presumed and not rebutted, it is still necessary to consider balance of hardships in determining whether preliminary injunction is appropriate remedy in patent infringement action; and (3) District Court did not abuse its discretion in granting preliminary injunction against alleged infringers.

Affirmed.

West Headnotes (14)

[1]     Patents
          Grounds in general

        Standards applied to grant of preliminary injunction are no more or less stringent in patent cases than in other areas of law.

        18 Cases that cite this headnote

[2]     Patents
          Establishment of validity of patent in general

        Burden or proving invalidity of patent is with party attacking validity; evidence adduced in connection with motion for preliminary relief must be considered in this light.

        36 Cases that cite this headnote

[3]     Patents
          Effect of previous adjudications in general

        Substantial weight may be given to patent's litigation history in connection with motion for relief pendente lite; prior adjudication upholding patent validity after fully litigated trial, including similar issues of fact and law, contributes strong support to grant of preliminary injunction.

        16 Cases that cite this headnote

[4]     Patents
          Establishment of validity of patent in general

        District court's conclusion that holder of patent had demonstrated reasonable likelihood that it would prevail on issue of patent validity was not erroneous, where conclusion was based upon its determination that accused infringers in different case failed to establish invalidity of claims, which were at issue in current case; thus, injunction pendente lite, which enjoined alleged infringers from making, using and selling certain structures which were found to infringe patent on concrete deck structure sub-assembly for distributing electrical wiring, was properly issued.

        18 Cases that cite this headnote

[5]     Patents
          Continuing, modifying, vacating, or dissolving

        District court did not err in refusing to reopen proceedings which resulted in grant of preliminary injunction against alleged infringers, based upon "newly identified" reference, where that patent was issued over 30 years ago, and was not offered as newly discovered evidence.

        4 Cases that cite this headnote

[6]     Patents

2 U.S.P.Q.2d 1926

🔑 **Scope and extent of review in general**

Reference offered by alleged infringers to district court after district court granted preliminary injunction against alleged infringers was not properly before Court of Appeals, and could not be considered on appeal, where reference, though placed in record by district court, was not subject of testimony or any other form of evaluation by district court.

2 Cases that cite this headnote

**[7]** **Patents**

🔑 **Questions of Fact, Verdicts, and Findings**

Claim construction is reviewed as matter of law; however, interpretation of claim may depend on evidentiary material about which there is factual dispute, requiring resolution of factual issues as basis for interpretation of claim.

6 Cases that cite this headnote

**[8]** **Patents**

🔑 **Grounds in general**

Grant of preliminary injunction does not require that infringement be proved beyond all question, or that there be no evidence supporting viewpoint of accused infringers; grant turns on likelihood that patent holder will meet its burden at trial proving infringement.

37 Cases that cite this headnote

**[9]** **Patents**

🔑 **Establishment of infringement**

District court properly concluded that there was reasonable probability that patent holder for bottomless sub-assembly for producing underfloor electrical cable trench would eventually establish that alleged infringers induced infringement of patent, despite expert testimony presented by alleged infringers supporting claim that their trenches were only partially bottomless.

1 Cases that cite this headnote

**[10]** **Patents**

🔑 **Irreparable or comparative injury**

In matters involving patent rights, irreparable harm, as required for preliminary injunction against alleged infringers, is presumed when clear showing has been made of patent validity and infringement; this presumption derives in part from finite term of patent grant, as patent expiration is not suspended during litigation and passage of time can work irremediable harm.

76 Cases that cite this headnote

**[11]** **Patents**

🔑 **Preliminary Injunction**

Nature of patent grant weighs against holding that monetary damages will always suffice to make infringed patentee whole, in that principal value of patent is at statutory right to exclude.

20 Cases that cite this headnote

**[12]** **Patents**

🔑 **Irreparable or comparative injury**

Even where irreparable injury is presumed and not rebutted in patent infringement action seeking preliminary injunction against alleged infringers, it is still necessary to consider balance of hardships; magnitude of threatened injury to patent owner is weighed, in light of strength of showing of likelihood of success on merits, against injury to accused infringer if preliminary decision is in error.

80 Cases that cite this headnote

**[13]** **Patents**

🔑 **Scope and extent of review in general**

Grant of preliminary injunction against alleged patent infringer, if not based on legal error or serious misjudgment of evidence, is reviewable only to ascertain whether grant was within reasonable range of discretion.

10 Cases that cite this headnote

**[14]** **Patents**

🔑 **Grounds in general**

2 U.S.P.Q.2d 1926

District court did not abuse its discretion in issuing preliminary injunction against alleged patent infringers of bottomless sub-assembly for producing underfloor electrical cable trench, under equitable considerations, where patent did not have many more years to run, though alleged infringers claimed that it would lose business and lose jobs as result of grant of injunction.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*386**  John G. Gilfillan, III, Carella, Byrne, Bain & Gilfillan, Roseland, N.J., argued, for defendants/appellants.

Arland T. Stein, Reed Smith Shaw & McClay, Pittsburgh, Pa., argued, for plaintiff/appellee. With him on the brief, were Joseph W. Klein and Michael J. Kline. Also on the brief were Michael P. Griffinger and Ann M. McCormick, Crummy, Del Deo, Dolan, Griffinger and Vecchione, Newark, N.J.

Before NEWMAN and BISSELL, Circuit Judges, and NEWMAN, Senior Judge. *

**Opinion**

PAULINE NEWMAN, Circuit Judge.

United Steel Deck, Inc. (USD) and Nicholas J. Bouras, Inc., (Bouras) appeal the Order of Preliminary Injunction of the United States District Court for the District of New Jersey in favor of the H.H. Robertson Company (Robertson). USD and Bouras were enjoined pendente lite from making, using, and selling certain structures which were found to infringe United States Patent No. 3,721,051 (the '051 or Fork patent). *H.H. Robertson Co. v. United Steel Deck, Inc.,* No. 84-5357 (D.N.J. March 31, 1986). We affirm.

*Background*

Robertson is the owner of the '051 patent, invention of Frank W. Fork, issued on March 20, 1973 and entitled "Bottomless Sub-Assembly for Producing an Underfloor Electrical Cable Trench". The invention is a concrete deck structure sub-assembly for distributing electrical wiring. A detailed description of the invention and its development appears in *H.H. Robertson Co. v. Bargar Metal Fabricating*

*Co.,* 225 USPQ 1191, 1192-96 (N.D. Ohio 1984), [Available on WESTLAW-DCT database] and need not be repeated.

Robertson charged Bouras and its affiliated manufacturing company USD with infringement (inducing and contributory infringement) of claims 1, 2, 4, 6, 9, 13, and 14 of the Fork patent. In moving for preliminary injunction Robertson alleged that "there is a reasonable probability of eventual success on the patent infringement claim"; that "the Fork patent was held valid, infringed, contributorily infringed and enforceable by the United States District Court for the Northern District of Ohio in ... *Bargar* "; that the "accused structures of USD and Bouras are the same or substantially the same as those held ... to infringe in *Bargar* "; that "[w]here, as here, the patent has been held valid and infringed, irreparable harm is presumed ... and the harm ... cannot be fully compensated by money damages"; and that the "balance of equities heavily weighs in favor of Robertson."

The district court held a four-day hearing on the motion, during which witnesses including experts testified on the issues of patent validity and infringement. The legal and equitable issues were briefed and argued. The court concluded that Robertson had "established a basis for the relief it seeks," and granted the preliminary injunction. *Robertson,* slip op. at 25.

*Analysis*

Injunctive relief in patent cases is authorized by statute:

> **\*387**  The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable.

35 U.S.C. § 283. *See generally Smith International, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1577-79, 219 USPQ 686, 689-90 (Fed Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687, 220 USPQ 385 (1983).

[1]    The standards applied to the grant of a preliminary injunction are no more nor less stringent in patent cases than in other areas of the law. The court in *Smith International* discussed the so-called "more severe" rule that has at times weighed against the grant of preliminary injunctions in patent

cases, stating: "The basis for the more severe rule appears to be both a distrust of and unfamiliarity with patent issues and a belief that the ex parte examination by the Patent and Trademark Office is inherently unreliable." *Id.* at 1578, 219 USPQ at 690. *See also Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1233, 227 USPQ 289, 292 (Fed.Cir.1985) ("burden upon the movant should be no different in a patent case than for other kinds of intellectual property"). The existing standards for relief pendente lite, fairly applied, can accommodate any special circumstances that may arise.

The grant or denial of a preliminary injunction is within the discretionary authority of the trial court. Appellate review is on the basis of whether the court "abused its discretion, committed an error of law, or seriously misjudged the evidence." *Smith International,* 718 F.2d at 1579, 219 USPQ at 691. *See also Roche Products, Inc. v. Bolar Pharmaceutical Co.,* 733 F.2d 858, 865, 221 USPQ 937, 942 (Fed.Cir.), *cert. denied,* 469 U.S. 856, 105 S.Ct. 183, 83 L.Ed.2d 117, 225 USPQ 792 (1984) ("trial court ... has considerable discretion in determining whether ... to issue an injunction").

The district court applied to Robertson's motion the Third Circuit standard:

An applicant for a preliminary injunction against patent infringement must show:

... (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted.... Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."

*E.g., Eli Lilly and Co. v. Premo Pharmaceutical Labs., Inc.,* 630 F.2d 120, 136 (3d Cir.), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).

*Robertson,* slip op. at 11. In *Eli Lilly* the Third Circuit applied to a patent case the "well settled" standard set forth in the (non-patent) case *Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811, 814-15 (3d Cir.1978). This is substantially the same standard enunciated by this court. See, for example, *Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1270-73, 225 USPQ 345, 347-50

(Fed.Cir.1985), and *Atlas Powder,* 773 F.2d at 1231-34, 227 USPQ at 290-93.

### Patent Validity

The first question before the district court was whether the movant Robertson had demonstrated a reasonable likelihood that USD and Bouras would fail to meet their burden at trial of proving, by clear and convincing evidence, that the Fork patent claims were invalid.

**[2]**    The burden of proving invalidity is with the party attacking validity. *See Roper Corp.,* 757 F.2d at 1270, 225 USPQ at 347 (in a preliminary injunction case the burden of establishing invalidity remains on the challenger). The evidence adduced in connection with a motion for preliminary relief must be considered in this light.

Robertson retained the burden of showing a reasonable likelihood that the attack on its patent's validity would fail. Indeed, the district court placed a greater burden on Robertson than was required, referring **\*388** to our statement in *Atlas Powder,* 773 F.2d at 1233, 227 USPQ at 292, that a patentee seeking a preliminary injunction must " 'clearly show[ ]' that his patent is valid".

This court's statement in *Atlas Powder* does not change the immutable allocation to the challenger of the burden of proving invalidity, but rather reflects the rule that the burden is always on the movant to demonstrate entitlement to preliminary relief. Such entitlement, however, is determined in the context of the presumptions and burdens that would inhere at trial on the merits. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986), wherein the Court observed that in deciding a motion for summary judgment the trial court must be cognizant of "the substantive evidentiary standard of proof that would apply at the trial on the merits". A similar cognizance is appropriate to a motion for preliminary injunction.

Before the district court, USD and Bouras argued that all of the Fork patent claims at issue were invalid for obviousness in terms of 35 U.S.C. § 103, and that claim 2 was invalid in terms of 35 U.S.C. § 112. The asserted invalidity for obviousness was based on references that had been before the Ohio court in *Bargar,* including references that had been before the patent examiner during prosecution of the Fork patent application, and three references that were newly presented. The patent

claims, the details of the references, and the evidence and argument offered by both sides, need not be here repeated.

The district court in its opinion referred to the detailed analysis by the Ohio court and to its decision that the accused infringers in that case had failed to establish the invalidity of the claims. The district court stated that the "finding of validity of the Fork '051 patent in *Bargar* is persuasive evidence of validity" with respect to the references before that court. *Robertson,* slip op. at 14-17. The district court further held, upon reviewing the three additional references, that "considering them as part of the prior art does not render obvious the Fork bottomless trench invention." *Id.* We discern no error in the court's conclusion that "the finding in *Bargar* and the evidence submitted in the present case lead to the conclusion that there is a reasonable probability that Robertson will ultimately succeed on the issue of obviousness". *Id.* at 17.

The issue of validity of claim 2 under section 112 raised the question of whether the written description was enabling to one skilled in this art. Reviewing the evidence, including expert testimony, the district court held that "the patent requirements of § 112 are met". *Id.* at 18-19. The court's determination that the disclosure had not been proven not to be enabling has not been shown to be in error.

 [3]    Bouras accuses the district court of giving undue weight to the Ohio court's decision of validity and infringement against a different defendant. The district court stated that it "did not rely on *Bargar* as evidence of infringement" but only as evidence of validity with respect to the references actually considered by the Ohio court. *Id.* at 14-17, 20. There was no error in its so doing. Substantial weight may be given to a patent's litigation history in connection with a motion for relief pendente lite. *Atlas Powder,* 773 F.2d at 1232, 227 USPQ at 291; *Smith International,* 718 F.2d at 1579, 219 USPQ at 691. Even the "severe rule" against the grant of preliminary injunctions in patent cases was tempered when a patent had been upheld in other forums or its validity had been acquiesced in by others. *See* 8 A.W. Deller, *Deller's Walker on Patents* § 686, 416-22 (2d ed. 1973 & Supp.1985) and cases cited therein. A prior adjudication upholding patent validity after a fully litigated trial, including similar issues of fact and law, contributes strong support to the grant of a preliminary injunction.

 [4]    The decision for our review is not a final judgment of patent validity. Rather, we ascertain whether the district

court correctly concluded that Robertson had demonstrated a reasonable likelihood that it will prevail on this issue. On the record before us, the court's conclusion is based on factual findings that have not been **\*389** shown to be clearly erroneous, it was not error to place weight on the Ohio district court's ruling on validity, and no error in law has been shown.

### The Wiesmann Patent

Following the district court's grant of the preliminary injunction, USD and Bouras moved for a stay, requesting additional discovery and a supplemental hearing for the purpose of presenting a "newly identified" reference, U.S. Patent No. 2,680,775 (the Wiesmann patent) assigned to Robertson, which USD and Bouras stated was significant to the issue of validity. Robertson reports that this patent had issued on June 6, 1954 and that it was not offered as newly discovered evidence, and argues that in any event this patent if considered would not change the result.

 [5]    The district court denied the motion, but held that this reference "is considered to be part of the record of this matter although not considered substantively by the Court". *H.H. Robertson Co. v. United States Steel Deck, Inc.,* No. 84-533F (D.N.J.) (Order of May 27, 1986). There was no error in the district court's refusal to reopen the proceedings or otherwise to consider the reference, in the circumstances.

 [6]    USD and Bouras ask this court to consider the Wiesmann patent in full substance. They argue that because this reference had first been offered to the district court it is not in fact presented for the first time on appeal. But this reference, although placed in the record by the district court, was not the subject of testimony or any other form of evaluation by that court. Initial consideration of evidence is not the appellate role. *Thomas & Betts Corp. v. Litton Systems, Inc.,* 720 F.2d 1572, 1581 n. 6, 220 USPQ 1, 7 n. 6, (Fed.Cir.1984). The reference is not properly before us and has not been considered.

### Infringement

The accused structures are described by the buildings in which they have been installed: the Maiden Lane, the Daily News, and the Blue Cross-Blue Shield. USD and Bouras argue that their current trench, the Blue Cross-Blue Shield design, is not "truly bottomless", and that the claims must

be interpreted as a matter of law to exclude trenches that are only partially bottomless. To the district court USD and Bouras presented expert testimony in support of this position, countered by expert testimony on behalf of Robertson. The witnesses testified at length concerning the prosecution history and its impact on the interpretation and scope of the claims.

[7]    Claim construction is reviewed as a matter of law. *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569, 219 USPQ 1137, 1140 (Fed.Cir.1983). However, interpretation of a claim may depend on evidentiary material about which there is a factual dispute, requiring resolution of factual issues as a basis for interpretation of the claim. *See Moeller v. Ionetics, Inc.,* 794 F.2d 653, 656, 229 USPQ 992, 995 (Fed.Cir.1986); *Palumbo v. Don-Joy Co.,* 762 F.2d 969, 974, 226 USPQ 5, 8 (Fed.Cir.1985). In this case, there was extensive testimony on the issue of claim construction, including the conflicting views of experts on both legal and factual questions. Those factual considerations that are pertinent to the district court's construction of the term "bottomless" are reviewed under the clearly erroneous standard.

The district court's construction of the claims is explained in relation to its holding on infringement, the court stating that the "key portion of the trench remains bottomless, *i.e.,* the portions giving direct access to the cells." *Robertson,* slip op. at 22. We are not persuaded of error in the district court's construction of the term "bottomless" to apply to the "key portion" of the trench, based on the evidence before it.

The accused structures, and the application thereto of the patent claims, were the subject of analysis and explanation by witnesses on both sides, aided by the physical exhibits. Our review shows thorough exposition of the opposing positions. The district court found that the accused subassemblies are "bottomless in that upper surface portions of the cellular units of the **\*390** metal subfloor in the region between said opposite sides cooperate with the sub-assembly to create an underfloor electrical cable trench, confront the cover plate, and are exposed to view when the cover plate is removed." *Id.* at 21. The court found that "the horizontal metal sections ... and the horizontal metal strip ... serve no function [and the] key portion of the trench remains bottomless." *Id.* at 21-22.

In its factual application of the claims to the accused devices, the findings of the district court have not been shown to be clearly in error.

[8]    [9]    The grant of a preliminary injunction does not require that infringement be proved beyond all question, or that there be no evidence supporting the viewpoint of the accused infringer. *Atlas Powder,* 773 F.2d at 1233, 227 USPQ at 292. The grant turns on the likelihood that Robertson will meet its burden at trial of proving infringement. We sustain the district court's conclusion that "there is a reasonable probability that Robertson will eventually establish that Bouras and USD induced infringement of the Fork '051 patent". *Robertson,* slip op. at 23.

### *Equitable Considerations*

The movant for preliminary injunction must show not only a reasonable likelihood of success on the merits, but also the lack of adequate remedy at law or other irreparable harm.

[10]    In matters involving patent rights, irreparable harm has been presumed when a clear showing has been made of patent validity and infringement. *Smith International,* 718 F.2d at 1581, 219 USPQ at 692. This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm. The opportunity to practice an invention during the notoriously lengthy course of patent litigation may itself tempt infringers. *Teledyne Industries, Inc. v. Windmere Products, Inc.,* 433 F.Supp. 710, 739-40, 195 USPQ 354, 378 (S.D.Fla.1977).

[11]    The nature of the patent grant thus weighs against holding that monetary damages will always suffice to make the patentee whole, for the principal value of a patent is its statutory right to exclude. *See Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1548, 220 USPQ 193, 198 (Fed.Cir.1983) ("right to exclude recognized in a patent is but the essence of the concept of property"). The presumption of irreparable harm in patent cases is analogous to that applicable to other forms of intellectual property, as discussed in *Roper Corp.,* 757 F.2d at 1271-72, 225 USPQ at 348.

The district court held that irreparable injury was presumed because Robertson had established a "strong likelihood of success in establishing validity and infringement." *Robertson,* slip op. at 24. Such presumption of injury was not, however, irrebuttable. *Roper Corp.,* 757 F.2d at 1272, 225 USPQ at 349 (the presumption "is rebuttable by clear evidence"). The parties gave scant attention in their appellate briefs to

the issues of irreparable injury and the balance of harms. During oral argument, in response to an inquiry from the bench, USD and Bouras urged that money damages are an adequate remedy. In response, Robertson emphasized the few remaining years of patent life.

[12]  Even when irreparable injury is presumed and not rebutted, it is still necessary to consider the balance of hardships. *Datascope Corp. v. Kontron Inc.,* 786 F.2d 398, 401, 229 USPQ 41, 42 (Fed.Cir.1986). The magnitude of the threatened injury to the patent owner is weighed, in the light of the strength of the showing of likelihood of success on the merits, against the injury to the accused infringer if the preliminary decision is in error. Results of other litigation involving the same patent may be taken into account, and the public interest is considered. No one element controls the result. *Litton Systems, Inc. v. Sundstrand Corp.,* 750 F.2d 952, 956-60, 224 USPQ 252, 255-59 (Fed.Cir.1984).

When the movant has shown the likelihood that the acts complained of are unlawful, the preliminary injunction "preserves the status quo if it prevents future trespasses **\*391** but does not undertake to assess the pecuniary or other consequences of past trespasses." *Atlas Powder Co.,* 773 F.2d at 1232, 227 USPQ at 291. The court in *Atlas Powder* thus distinguished between remedies for past infringement, where there is no possibility of other than monetary relief, and prospective infringement, "which may have market effects never fully compensable in money." *Id.* The cautionary

corollary is that a preliminary injunction improvidently granted may impart undeserved value to an unworthy patent.

Thus substantial deference is due the district court's equitable judgment. The district court in its opinion referred to the USD/Bouras portrayal of disruption, loss of business, and loss of jobs, *Robertson,* slip op. at 24, and to Robertson's business needs and patent rights. Observing that "[t]his patent does not have many more years to run", the court held "the equities weigh heavily against the wrongdoer." *Id.* The court stated that the "protection of patents furthers a strong public policy ... advanced by granting preliminary injunctive relief when it appears that, absent such relief, patent rights will be flagrantly violated." *Id.* at 24-25.

[13]  [14]  The grant of a preliminary injunction, if not based on legal error or a serious misjudgment of the evidence, is reviewable only to ascertain whether the grant was within a reasonable range of discretion. We have considered all of the arguments of the parties, and the record before us. The district court's conclusion reflects a reasonable consideration and balance of the pertinent factors, evaluated in accordance with the established jurisprudence, and does not exceed the court's discretionary authority.

AFFIRMED.

**Parallel Citations**

2 U.S.P.Q.2d 1926

---

Footnotes

\*      The Honorable Bernard Newman, Senior Judge, United States Court of International Trade, sitting by designation.

---

      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 42

1988 CarswellOnt 340, 25 C.P.C. (2d) 14, 8 A.C.W.S. (3d) 57



1988 CarswellOnt 340, 25 C.P.C. (2d) 14, 8 A.C.W.S. (3d) 57

Hunter v. Ellenberger

HUNTER v. ELLENBERGER et al.

Ontario Supreme Court, High Court of Justice

Barr J.

Heard: January 15, 1988
Judgment: January 21, 1988
Docket: No. 506/85

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights re-
served.

Counsel: *S.M. Merrifield*, for plaintiff.

*D.S. Thompson*, for defendants.

Subject: Civil Practice and Procedure

Practice --- Costs — Particular items of costs — Disbursements — Expert reports

Practice --- Costs — Particular items of costs — Witness fees and expenses — Expert witness — General

Practice --- Costs — Offers to settle or payment into court — Offers to settle — Failure to accept offer — Gen-
eral

Costs — Offers to settle or payment into court — Offers to settle — Failure to accept offer — Plaintiff making
offer to settle 3 days before trial — Plaintiff recovering judgment more favourable than offer to settle —
Plaintiff awarded party-and-party costs — Ontario Rules of Civil Procedure, r. 49.10.

Costs — Particular items of costs — Disbursements — Expert reports — Plaintiff failing to serve report in time
required by Rules — Prejudice in excluding evidence being greater than in admitting evidence — Evidence ad-
mitted — Plaintiff penalized in costs.

Costs — Particular items of costs — Witness fees and expenses — Expert witness — No allowance permitted
for actuarial report delivered late or for attendance of expert — Allowance permitted for medical report and
medical expert notwithstanding that medical report delivered and medical expert called to give oral testimony —
Evidence not able to have been produced as effectively by way of medical report — Evidence Act, R.S.O. 1980,
c. 145, s. 52(4).

1988 CarswellOnt 340, 25 C.P.C. (2d) 14, 8 A.C.W.S. (3d) 57

The plaintiff made an offer to settle 3 days before the commencement of trial. The offer was in an amount less than the plaintiff ultimately recovered at trial.

An actuarial report used by the plaintiff was not served within the time required by r. 53.03.

A physician was called to give oral evidence rather than simply filing his report.

Following trial, the plaintiff requested costs on a solicitor-and-client basis including disbursements for the actuarial report and the physician's evidence.

**Held:**

The plaintiff was awarded costs on a party-and-party basis. The plaintiff was allowed to claim for its medical expert and the medical report but not for the actuarial report.

The offer to settle was not made 7 days before trial as required by r. 49.10 and there were no countervailing factors. Thus, costs should be on a party-and-party basis.

Although the actuarial report was useful to the Court, it was not filed in time, thus, no costs should be awarded.

The plaintiff was justified in calling the physician since the evidence could not have been produced as effectively by way of a medical report.

In considering whether to receive expert evidence when there has been a lack of timely delivery of the expert's report, the Court must weigh the prejudice to justice in receiving the evidence against the prejudice to justice in excluding it.

**Statutes considered:**

Evidence Act, R.S.O. 1980, c. 145 —

s. 52(4)

**Rules considered:**

Ontario Rules of Civil Procedure —

r. 49.10

r. 53.03

r. 53.03(1)

r. 53.03(2)

ADJUDICATION on costs.

***Barr J.:***

1988 CarswellOnt 340, 25 C.P.C. (2d) 14, 8 A.C.W.S. (3d) 57

1      This is a motion relating to costs. As both counsel practise in London, it was conducted by conference telephone call. I am giving short reasons as counsel complain of the lack of authority on the points in issue.

2      The action was tried at London on November 26, 27 and 30, 1987. Judgment was reserved. When judgment was given the plaintiff was awarded costs but the reasons provided that I would hear representations from counsel, if desired, before the formal judgment was taken out.

3      On the motion, counsel agreed that the plaintiff had offered to settle before trial for an amount less than the judgment. Plaintiff's counsel asked for solicitor-and-client costs from the time of the offer. However, the offer was delivered at 4:16 p.m. on Friday, November 20, 1987. Under the Rules this was only 3 days before the trial which commenced on the following Thursday. The offer to settle, therefore, was not made within the 7 days provided by r. 49.10. Accordingly the cost consequences of r. 49.10 do not apply. While I have jurisdiction to award solicitor-and-client costs, I see no reason to depart from the usual order as to costs. The plaintiff will therefore have his costs on a party-and-party basis.

4      The second issue relates to the cost of an actuarial report and of the actuary in attending at Court. An actuarial report was obtained and served in 1986 but by the time of trial this was out of date. The plaintiff's counsel therefore obtained a further report dated November 25, 1987, which was amended on the day of argument, November 30. On that day the actuary attended to give evidence if necessary.

5      The later report was useful to me in assessing the plaintiff's damages. However, as the report was not filed in the time required by r. 53.03, defense counsel objected to it being received. I have heard that on occasion a Court has refused to permit evidence to be given where the expert's report was not served on the opposing party within time. This is clearly authorized by the wording of r. 53.03 which provides:

> 53.03(1) A party who intends to call an expert witness at trial shall, not less than ten days before the commencement of the trial, serve on every other party to the action a report, signed by the expert, setting out his or her name, address and qualifications and the substance of his or her proposed testimony.

> (2) No expert witness may testify, except with leave of the trial judge, unless subrule (1) has been complied with.

6      It may be that late delivery of a report may cause such prejudice to the opposing party that the evidence cannot be permitted lest injustice result. Such cases must be very rare indeed, particularly if the trial is without a jury and an adjournment can be granted without undue inconvenience.

7      In my view, it should be remembered that any time a Court excludes relevant evidence the Court's ability to reach a just verdict is compromised. Relevant evidence should not be excluded on technical grounds, such as lack of timely delivery of a report, unless the Court is satisfied that the prejudice to justice involved in receiving the evidence exceeds the prejudice to justice involved in excluding it. In the instant case, I received the report but gave defence counsel 10 days within which to consult with his actuary and decide whether or not he wished the trial to resume and to hear the opposing experts. Within the 10-day period defence counsel advised me that he did not wish to take advantage of this opportunity. I then proceeded to use the report of the plaintiff's actuary. Defence counsel now submits that he should not be required to pay, as part of the plaintiff's costs, the expert's fees for preparation of the second report nor for the attendance of the actuary for the purposes of giving evidence at trial.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1988 CarswellOnt 340, 25 C.P.C. (2d) 14, 8 A.C.W.S. (3d) 57

8       There are opposing views. Counsel cannot fail to comply with the rules without suffering some penalty if the rules are to be effective.

9       For the plaintiff it might be said that the evidence was relevant and of assistance to Court. Counsel can seldom foresee with any degree of accuracy when a trial will start. Experts will often be slow in delivering reports. To the extent that the plaintiff has to pay the costs in question, the damages he receives will be eroded. The plaintiff had a legitimate claim. The defendant failed to settle and failed to accept an offer which events have shown to be reasonable.

10      I have some sympathy with both views. Although I feel that the effects of late delivery have been overcome by the opportunity afforded to defence counsel to reconvene the trial, I feel that there must be some penalty against the delinquent party.

11      I therefore order that the plaintiff shall not be entitled to include, in his costs recoverable against the defendant, the cost of the actuary for attending at trial and for his second report.

12      The third issue relates to the costs of a medical expert called by the plaintiff. The defendant submits that the plaintiff's medical evidence could have been given by filing the medical reports without calling oral evidence. He relies on the *Evidence Act*, R.S.O. 1980, c. 145, which provides as follows:

> 52.-(4) Where a legally qualified medical practitioner has been required to give evidence *viva voce* in an action and the court is of the opinion that the evidence could have been produced as effectively by way of a medical report, the court may order the party that required the attendance of the medical practitioner to pay as costs therefor such sum as it considers appropriate.

13      In my view, the key requirement of this subsection is that the Court be of the opinion that the evidence could have been produced as effectively by way of a medical report. While a substantial measure of agreement was reached between the two medical specialists, this only emerged in the course of their giving evidence and even then there was a measure of disagreement. In the circumstances I am quite satisfied that the evidence could not have been produced as effectively by way of a medical report. I might add that my experience has been that, generally speaking, reports outlining medical history, complaints, treatment and other routine  matters can usefully be received in evidence but opinion evidence as to diagnosis, the mechanics of injury and the prognosis can seldom be given effectively by report except in cases where the opinions of the experts are not at variance. I therefore hold that the plaintiff was justified in calling his medical expert to give evidence. As he could not have given evidence unless a report under s. 53.03 had first been filed, it follows that the costs of the report as well as the costs of the doctor attending in Court are proper items to be included in the plaintiff's costs.

14      As success is divided, there will be no order as to costs of this motion.

*Order accordingly.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 43

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

1998 CarswellNfld 224
Newfoundland Court of Appeal

Imperial Oil Ltd. v. Young

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65, 513 A.P.R. 280

## James Young and King's Bridge Service Station Limited, Appellants and Imperial Oil Limited, Respondent

O'Neill, Cameron, Green JJ.A.

Heard: May 26, 1997
Judgment: September 18, 1998
Docket: 96/129

Proceedings: affirming (1996), 8 R.P.R. (3d) 214 (Nfld. T.D.)

Counsel: *Michael Crosbie* , for the Appellants.
*Janet Henley Andrews* , for the Respondent.

Subject: Property

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Easements --- Creation of easements — Express grant — General**

Garage owner and gas company owned adjoining lands — Settlement agreement granted garage owner permission to continue parking vehicles on gas company's land — Year later, garage owner given 30 days notice to remove vehicles — Application for order directing removal granted and counter-application for removal of barrier dismissed — Parties had not intended to create easement — Contractual licence created — Garage owner's appeal was dismissed.

**Easements --- Definitions — Licence**

Garage owner and gas company owned adjoining lands — Settlement agreement granted garage owner permission to continue parking vehicles on gas company's land — Year later, garage owner given 30 days notice to remove vehicles — Application for order directing removal granted and counter-application for removal of physical barrier dismissed — Parties had not intended to create easement — Contractual licence created — Agreement terms were to continue only so long as mutually satisfactory — Licence revocable by gas company at any time and reasonable notice had been given — Garage owner's appeal was dismissed.

**Estoppel --- Estoppel in pais — Elements — Detrimental reliance — Necessity for prejudice**

Garage owner and gas company owned adjoining lands — Settlement agreement granted garage owner permission to continue parking vehicles on gas company's land — Year later, garage owner given 30 days notice to remove vehicles — Application for order directing removal granted and counter-application for removal of physical barrier dismissed — No evidence of detrimental reliance on part of garage owner or encouragement by gas company — Garage owner's appeal was dismissed — Neither doctrine of estoppel nor doctrine of licence acted upon applicable.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

Adjoining commercial properties were owned by a garage owner and a gas company. The garage owner leased the gas company's property and operated a gas bar for it. The contractual arrangement and the lease were terminated. The settlement granted the garage owner permission to continue to park vehicles on the property. The gas company erected a barrier diminishing the parking area after tearing down the gas bar, removing the gas tanks and decontaminating the soil. One year later, the garage owner was given 30 days notice to cease parking vehicles on the property. The gas company brought an application for an order directing the garage owner to remove the vehicles after he refused. The garage owner brought a counter-application for an order directing the gas company to remove the barrier and provide an area for parking. The application was granted by the trial judge and the counter-application was dismissed. The garage owner appealed the decision.

**Held:** The appeal was dismissed.

Per Cameron J.A. (O'Neill J.A. concurring): The trial judge correctly found that there was no intention to create an easement based on the lack of precision and vagueness of terms in the agreement and that the language used suggested a personal right or licence rather than a right attached to the land. A contractual licence was created by the agreement. There was no property right associated with the licence and an obligation not to revoke the licence could not be implied from the nature of the parking arrangement. The licence was not irrevocable by application of the doctrine of estoppel. There was no evidence that the garage owner was requested or encouraged to spend money on the occupancy of the land or that there was a reasonable understanding by the gas company that any money spent on the land was done so in expectation of being able to remain on the land. The parking was a repetitive act, not a permanent one. The doctrine of licence acted upon was also not applicable.

References in the document to businesses on both properties indicated an intention by the parties to continue their symbiotic relationship as long as both businesses were in existence. After this, the relationship could be terminated upon reasonable notice. The termination by the gas company was permitted and the notice period specified by the trial judge was acceptable.

Per Green J.A. (dissenting): The trial judge correctly rejected the arguments for characterizing the arrangement as an easement or supportable by the doctrine of estoppel. The parking privileges were in the nature of a contractual licence. However, the trial judge incorrectly interpreted the settlement agreement by deciding that the agreement was one which could be unilaterally changed and terminated by one party to the prejudice of the other.

The use of the phrase "mutually satisfactory" did not lead to the conclusion that the gas company could unilaterally decide to terminate the parking privileges if it chose not to agree on an alteration of terms. It is clear that the parties intended to make a contract. They intended to settle all outstanding matters existing between them and create new legal rights by the termination of the lease, the payment of money and creation of a right of first refusal. It was not reasonable to assume that they did not intend to finalize their legal position respecting parking. The only reasonable interpretation of the agreement was that the garage owner had agreed in part in return for the continuation of the parking privileges. The parking privileges were not regarded as something trifling or capable of being eliminated in a perfunctory manner. The nature of the arrangement was that there was to be a mutual accommodation of each party's respective interests. The notion of good faith performance and a duty to cooperate in the accommodation of the mutual interests of the parties gave meaning to the "mutually satisfactory" requirement. It required each party to attempt to accommodate in good faith before exercising any right to terminate. This interpretation arose naturally out of the express language of the clause, was supported by the surrounding background circumstances and was not inconsistent with the words of the agreement. The gas company had not acted in good faith in its dealings with the garage owner and made no attempt to accommodate. The gas company was in breach of the agreement and the appeal should be allowed with remedies as set out.

## Table of Authorities

**Cases considered by *Cameron J.A.* (*O'Neill J.A.* concurring):**

Westlaw**Next**. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 263 of 398

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

*Armstrong v. Sheppard & Short Ltd.*, [1959] 2 Q.B. 384 (Eng. Q.B.) — considered

*Chandler v. Kerley*, [1978] 2 All E.R. 942 (Eng. C.A.) — referred to

*Coniagas Reduction Co. v. Ontario Hydro-Electric Power Commission*, [1933] 3 W.W.R. 134, [1933] 3 D.L.R. 337 (Ontario P.C.) — distinguished

*E.R. Ives Investments Ltd. v. High*, [1967] 2 Q.B. 379, [1967] 1 All E.R. 504 (Eng. C.A.) — referred to

*Errington v. Errington*, [1952] 1 All E.R. 149, [1952] 1 K.B. 290 (Eng. C.A.) — referred to

*Fort Frances (Town) v. Boise Cascade Canada Ltd.*, *(sub nom. Boise Cascade Canada Ltd. v. R.)* [1983] 1 S.C.R. 171, 143 D.L.R. (3d) 193, 46 N.R. 108 (S.C.C.) — referred to

*Gill Brothers v. Mission Sawmills Ltd.*, [1945] 2 W.W.R. 337, [1945] 3 D.L.R. 506 (B.C. C.A.) — considered

*Gypsum Carrier Inc. v. R.* (1977), [1978] 1 F.C. 147, 78 D.L.R. (3d) 175 (Fed. T.D.) — referred to

*Hopgood v. Brown*, [1955] 1 W.L.R. 213, [1955] 1 All E.R. 550 (Eng. C.A.) — distinguished

*Hurst v. Picture Theatres Ltd.*, [1915] 1 K.B. 1 (Eng. K.B.) — considered

*Inwards v. Baker*, [1965] 2 Q.B. 29, [1965] 1 All E.R. 446 (Eng. C.A.) — referred to

*Liggins v. Inge* (1831), [1824-34] All E.R. 754, 7 Bing. 682, 5 Moo. & P. 712 (Eng. C.P.) — distinguished

*Llanelly Railway & Dock Co. v. London & North Western Railway* (1873), 8 Ch. App. 942, 29 L.T. 357, 42 L.J. Ch. 884, 21 W.R. 889 (Eng. C.A.) — considered

*Llanelly Railway & Dock Co. v. London & North Western Railway* (1875), L.R. 7 H.L. 550 (U.K. H.L.) — referred to

*London Borough of Hounslow v. Twickenham Garden Developments Ltd.*, [1970] 3 All E.R. 326, [1971] 1 Ch. 233, [1970] 3 W.L.R. 538, 114 Sol. Jo. 603 (Eng. Ch.) — considered

*Plimmer v. Wellington Corp.* (1884), 9 App. Cas. 699 (New Zealand P.C.) — referred to

*Robinson v. Galt Chemical Products Ltd.*, [1933] O.W.N. 502 (Ont. C.A.) — referred to

*Spenborough (Borough) v. Cooke Sons & Co.*, [1968] 1 Ch. 139 (Eng. Ch. Div.) — applied

*Stiles v. Tod Mountain Development Ltd.* (1992), 22 R.P.R. (2d) 143, 64 B.C.L.R. (2d) 366, 88 D.L.R. (4th) 735 (B.C. S.C.) — referred to

*Vaughan v. Hampson* (1875), 33 L.T. 15 — referred to

*Ward v. Kirkland* (1965), [1967] Ch. 194, [1966] 1 All E.R. 609 (Eng. Ch. Div.) — referred to

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

*Winter v. Brockwell* (1807), 103 E.R. 359 (Eng. K.B.) — distinguished

*Winter Garden Theatre (London) Ltd. v. Millenium Productions Ltd.* (1947), [1948] A.C. 173, [1947] 2 All E.R. 331 (U.K. H.L.) — considered

*Wyatt v. Franklin* (1993), 122 N.S.R. (2d) 252, 338 A.P.R. 252 (N.S. S.C.) — referred to

**Cases considered by *Green J.A.* (dissenting):**

*Atlific (Nfld.) Ltd. v. Hotel Buildings Ltd.* (1994), 120 Nfld. & P.E.I.R. 91, 373 A.P.R. 91 (Nfld. C.A.) — referred to

*Atlific (Nfld.) Ltd. v. Hotel Buildings Ltd.* (1995), 185 N.R. 400 (note), 139 Nfld. & P.E.I.R. 90 (note), 433 A.P.R. 90 (note) (S.C.C.) — referred to

*Bank of New Zealand v. Simpson*, [1900] A.C. 182, 48 W.R. 591 (New South Wales P.C.) — considered

*Beer v. Bowden* (1976), [1981] 1 W.L.R. 522, [1981] 1 All E.R. 1070 (Eng. C.A.) — considered

*Canada Law Book Co. v. Boston Book Co.* (1922), 64 S.C.R. 182, 66 D.L.R. 209 (S.C.C.) — referred to

*Canada Square Corp. v. Versafood Services Ltd.* (1981), 34 O.R. (2d) 250, 15 B.L.R. 89, 130 D.L.R. (3d) 205 (Ont. C.A.) — considered

*Dahl v. Nelson, Donkin & Co.* (1881), 6 App. Cas. 38, [1881-5] All E.R. Rep. 572, 29 W.R. 543, 4 Asp. Mar. Law Cas. 392 (U.K. H.L.) — considered

*Empress Towers Ltd. v. Bank of Nova Scotia* (1990), 50 B.C.L.R. (2d) 126, [1991] 1 W.W.R. 537, 14 R.P.R. (2d) 115, 48 B.L.R. 212, 73 D.L.R. (4th) 400 (B.C. C.A.) — considered

*Foley v. Classique Coaches Ltd.*, [1934] 2 K.B. 1 (Eng. C.A.) — considered

*Fort Frances (Town) v. Boise Cascade Canada Ltd.*, *(sub nom. Boise Cascade Canada Ltd. v. R.)* [1983] 1 S.C.R. 171, 143 D.L.R. (3d) 193, 46 N.R. 108 (S.C.C.) — distinguished

*Gill Brothers v. Mission Sawmills Ltd.*, [1945] 2 W.W.R. 337, [1945] 3 D.L.R. 506 (B.C. C.A.) — referred to

*Gill Brothers v. Mission Sawmills Ltd.*, [1945] S.C.R. 766, [1945] 4 D.L.R. 449 (S.C.C.) — referred to

*Greenberg v. Meffert* (1985), 50 O.R. (2d) 755, 18 D.L.R. (4th) 548, *(sub nom. Greenberg v. Montreal Trust Co.)* 9 O.A.C. 69, 7 C.C.E.L. 152, 37 R.P.R. 74 (Ont. C.A.) — considered

*Greenberg v. Meffert*, 64 N.R. 156 (note), 56 O.R. (2d) 320 (note), 30 D.L.R. (4th) 768 (note), 14 O.A.C. 240 (note), [1985] 2 S.C.R. ix (note) (S.C.C.) — referred to

*Hillas & Co. v. Arcos Ltd.*, 38 Com. Cas. 23, [1932] All E.R. Rep. 494, 147 L.T. 503, 40 Lloyd's Rep. 307 (U.K. H.L.) — considered

**WestlawNext**® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 265 of 398

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

*Hurst v. Picture Theatres Ltd.*, [1915] 1 K.B. 1 (Eng. K.B.) — referred to

*Labrador Inuit Assn. v. Newfoundland (Minister of Environment & Labour)* (1997), 152 D.L.R. (4th) 50, 155 Nfld. & P.E.I.R. 93, 481 A.P.R. 93, 25 C.E.L.R. (N.S.) 232 (Nfld. C.A.) — considered

*Llanelly Railway & Dock Co. v. London & North Western Railway* (1873), 8 Ch. App. 942, 29 L.T. 357, 42 L.J. Ch. 884, 21 W.R. 889 (Eng. C.A.) — referred to

*Llanelly Railway & Dock Co. v. London & North Western Railway* (1875), L.R. 7 H.L. 550 (U.K. H.L.) — referred to

*London Borough of Hounslow v. Twickenham Garden Developments Ltd.*, [1970] 3 All E.R. 326, [1971] 1 Ch. 233, [1970] 3 W.L.R. 538, 114 Sol. Jo. 603 (Eng. Ch.) — referred to

*McKinlay Motors Ltd. v. Honda Canada Inc.* (1989), 46 B.L.R. 62, 80 Nfld. & P.E.I.R. 200, 249 A.P.R. 200 (Nfld. T.D.) — considered

*"Moorcock" (The)* (1889), 14 P.D. 64 (Eng. C.A.) — referred to

*Newfoundland (Attorney General) v. Churchill Falls (Labrador) Corp.* (1983), 49 Nfld. & P.E.I.R. 181, 145 A.P.R. 181 (Nfld. T.D.) — referred to

*Reardon Smith Line v. Hansen-Tangen*, [1976] 1 W.L.R. 989, [1976] 3 All E.R. 570 (U.K. H.L.) — considered

*Shirlaw v. Southern Foundries (1926) Ltd.*, [1939] 2 K.B. 206, [1939] 2 All E.R. 113 (Eng. C.A.) — referred to

*Spenborough (Borough) v. Cooke Sons & Co.*, [1968] 1 Ch. 139 (Eng. Ch. Div.) — considered

*Trentham Ltd. v. Archital Luxfer Ltd.*, [1993] 1 Ll. L. Rep. 25 (Eng. C.A.) — considered

*Winter Garden Theatre (London) Ltd. v. Millenium Productions Ltd.* (1947), [1948] A.C. 173, [1947] 2 All E.R. 331 (U.K. H.L.) — considered

*Wyatt v. Franklin* (1993), 122 N.S.R. (2d) 252, 338 A.P.R. 252 (N.S. S.C.) — considered

**Statutes considered by *Green J.A.* (dissenting):**

*Judicature Act*, R.S.N. 1990, c. J-4
    Generally — referred to

APPEAL from judgment reported at (1996), 8 R.P.R. 214 , 142 Nfld. & P.E.I.R. 280, 445 A.P.R. 280 (Nfld. T.D.) granting application for order directing removal of vehicles from property.

***Cameron J.A.* (O'Neill J.A. concurring):**

1    This is an appeal from a decision of Puddester J. of the Trial Division in which he held that an arrangement for parking of vehicles contained in a Settlement Agreement between the parties was, at most, a contractual licence for an indefinite period, which could be terminated upon reasonable notice. Though the trial judge held that reasonable notice had been given by the respondent to the appellants, he granted the appellants 60 days from the date of the formal order to remove vehicles and other

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

equipment parked on the respondent's land. The appellants were also enjoined from further parking or otherwise using the respondent's land following the expiration of the 60 day period.

**Background**

2    The appellants [1] and the respondent are owners of adjoining lands on King's Bridge Road, St. John's, Newfoundland. For a number of years Young leased the neighbouring Imperial property and operated the gas bar at that location, selling, of course, Imperial products. At the same time Young had a garage and tire sales business on the "Young property." During the time the gas bar was operated by him, Young began parking vehicles associated with the garage (i.e., customers' or employees' vehicles) on the "Imperial property". This arrangement worked well as long as Young was controlling the activities on both parcels of land.

3    About June of 1985, Imperial and Young agreed to terminate their contractual relationship, including the lease of the Imperial property. This agreement to terminate was arrived at in the context of an ongoing dispute between the parties respecting amounts owned by the one to the other for products sold. The interpretation of the Settlement Agreement signed by the parties at that time is central to this appeal and therefore it is reproduced in full.

THIS AGREEMENT made the 18th day of June, Anno Domini, One thousand nine hundred and eight-five

BETWEEN JAMES YOUNG of St. John's, in the Province of Newfoundland Company Director, and KING'S BRIDGE SERVICE STATION COMPANY LIMITED, (hereinafter collectively called "Young") of the one part

AND IMPERIAL OIL LIMITED , a body corporate incorporated under the laws of Canada and having an office at St. John's, in the Province of Newfoundland, (hereinafter called "Imperial") of the other part

WHEREAS pursuant to an Esso Dealer Service Station Lease dated May 1, 1977, (the "Lease") made between Imperial as the Lessor of the one part and James Young as Lessee of the other part, Imperial leased to Young certain premises for the purpose of the retail sale of gasoline and other motor fuels at King's Bridge Road, St. John's, Newfoundland, subject to the terms and conditions set forth therein;

AND WHEREAS Imperial and Young have mutually agreed to sever their relationship subject to the terms and conditions hereinafter appearing with the objective that another party will operate the said facilities commencing on or about June 15, 1985;

NOW THEREFORE THIS AGREEMENT WITNESSETH that for and in consideration of the mutual covenants and conditions hereinafter appearing, the parties hereto mutually covenant and agree as follows:

1. Imperial shall pay to Young on or before the execution of this Agreement the sum of Forty thousand dollars ($40,000.00) in full and final settlement of any and all severance entitlement which Young has in respect of the termination of his retail motor fuel sales outlet at King's Bridge Road, St. John's, Newfoundland.

2. Young agrees to surrender the Lease to Imperial and to release Imperial from any claims, demands, actions or suits of any kind whatsoever in any way connected with or in any way arising form the relationship between Young and Imperial in respect of the said outlet at St. John's, Newfoundland.

3. Imperial acknowledges that Young has enjoyed certain parking privileges on the property subject to the Lease in respect of Young's tire sales operation on property of Young immediately adjacent to the property described in the Lease. Imperial undertakes to continue these parking privileges beyond the termination of the Lease on a basis mutually satisfactory to Imperial and Young.

4. In respect of the service station building owned by Young immediately adjacent to the property subject to the Lease, Young agrees to grant Imperial the right of first refusal to purchase or lease the said building of Young and the land thereon on the terms of any bona fide written offer received by Young which Young is willing to accept. Young shall send such written offer to Imperial and Imperial shall have thirty (30) days within which to notify Young that it elects

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

to purchase or lease the property on the terms of such offer. If the offer does not consist wholly of cash, Imperial shall have the right to meet the terms of such offer with a reasonable equivalent in cash. In the event that Imperial does not exercise its right to purchase or lease the said property, Young shall be at liberty at the expiration of the said period of thirty (30) days to sell or lease the property on the terms and conditions contained in the bona fide written offer.

IN WITNESS WHEREOF the parties hereto have hereunto their hands and seals subscribed and set the day and year first before written.

SIGNED SEALED AND DELIVERED
by JAMES YOUNG in the presence of:                                    "JAMES YOUNG"
"WILLIAM ROWE"                                                                            (SEAL)
A Barrister
THE CORPORATE SEAL of KING'S BRIDGE SERVICE          KING'S BRIDGE SERVICE STATION
STATION                                                                                 COMPANY LIMITED
COMPANY LIMITED was hereunto affixed in the presence of:   "JAMES YOUNG"
WILLIAM N. ROWE"                                                             "GERALDINE YOUNG"
                                                                                                    (SEAL)
SIGNED SEALED AND DELIVERED                                       IMPERIAL OIL LIMITED
by IMPERIAL OIL LIMITED in the presence of:

                                                                                         PER: "R. W. SMITH"
                                                                                         Retail Area Manager - Newfoundland


[illegible ]

4     The 1977 lease referred to in the Settlement Agreement was for three years from May 1, 1977. Imperial's position is that effective May 1, 1980 the proper characterization of the lease of the Imperial property was a "month to month tenancy" and consequently on relatively short notice, Imperial could have terminated the lease. Unfortunately the lease was not placed in evidence and the trial judge was unable to make a finding on that point. At para. 172 he said:

I do not think significant weight can be placed on this aspect, for or against the position of either party here. The most that can be said is that there would presumably have been some contractual right under the previous arrangement by which the defendants' right to occupy the plaintiff's land could have been brought to an end. (Whether such a step would have resulted in a claim for ancillary damages by or against either party is another issue.)

5     Between June 1985 and December 1993, when another person operated the gas bar for Imperial, Young was able to continue to use the Imperial property for parking, essentially as he had done before. Young, in turn, permitted patrons of the gas bar to use the washroom at the garage. In December 1993 Imperial ceased operating a gas bar at its King's Bridge property. Thereafter buildings were removed, as were storage tanks (both above and underground) and contaminated soil. Young continued to use the Imperial property for parking, or, more accurately, that portion of the Imperial property that was outside a barrier erected by Imperial in February 1994. (It is Young's position that prior to the erection of the barrier there was room to park up to 25 vehicles, now there is room for only up to 7 vehicles.)

6     An environmental assessment of the Imperial property carried out in 1994 identified two areas of residual soil contamination. One of those areas is near the land which continues to be used by Young for parking. Imperial claims that to complete the efforts to remove contamination it needs access to the area on Imperial property, currently being used by Young for parking vehicles, and also that once the clean-up is completed, it does not want further use of Imperial property by Young for parking of vehicles, thereby risking recontamination of the soil.

7     In August 1994, solicitors for Imperial gave notice to the solicitors for Young that parking privileges would cease in thirty days. Young took the position that Imperial had no right to terminate its parking privileges. Imperial brought an application in Trial Division for an order directing Young to remove vehicles parked by Young or at Young's direction on the Imperial property and requested an injunction prohibiting further use of the land by Young. Young, in turn, sought an order directing Imperial

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

to remove the barrier erected by Imperial which interfered with Young's ability to park vehicles on the Imperial property and other directions regarding the future use of the property.

8    Before this Court and the Trial Division, the argument centred around the interpretation of the Settlement Agreement. The trial judge, as noted above, held that the arrangement between the parties respecting parking amounted, at most, to a contractual licence for an indefinite period, which was terminable upon reasonable notice and further that reasonable notice had been given in this case.

**Arguments of the appellants**

*(1) presumption of irrevocability*

9    In support of the position that the trial judge is in error, Young makes several submissions, some intertwined, some independent of each other. The first submission, based on *Llanelly Railway & Dock Co. v. London & North Western Railway* (1873), 8 Ch. App. 942 (Eng. C.A.) , and *Gill Brothers v. Mission Sawmills Ltd.*, [1945] 2 W.W.R. 337 (B.C. C.A.) , is that *prima facie* every contract is irrevocable, in the absence of something in the contract itself or in the nature of the contract from which it can be inferred that it was not intended to be permanent and perpetual, that is the way contracts will be interpreted.

10    There is no specific reference in the Settlement Agreement to a method of terminating the parking arrangement. However, I believe that the appellant states the principles, if indeed it can be described as a principle, too broadly. The House of Lords affirmed the *Llanelly* decision ((1875), L.R. 7 H.L. 550 (U.K. H.L.)). Lord Selbourne said at p. 567:

> ...an agreement *de futuro* , extending over a tract of time which, on the face of the instrument, is indefinite and unlimited, must (in general) throw upon anyone alleging that it is not perpetual, the burden of proving that allegation, either from the nature of the subject, or from some rule of law applicable thereto.

Lord Selbourne's statement may be at best limited support for the proposition put by the appellants. He appears to acknowledge, at least, that certain types of contract would not be considered perpetual.

11    *Winter Garden Theatre (London) Ltd. v. Millenium Productions Ltd.* (1947), [1948] A.C. 173 (U.K. H.L.) concerned the right of one party to terminate a licence to use a theatre for producing stage plays, the right of the other to do so having been specified in the contract. In that case Lord MacDermott, in finding a right to terminate, expressed the view that the above quote from Lord Selbourne in *Llanelly* was not a universal rule of construction and doubted that it was intended to deal with situations such as occurred in *Winter Garden* . Lord Porter, at p. 195 of *Winter Garden* , went so far as to express the opinion that, prima facie, licences are revocable. [2]  In *Spenborough (Borough) v. Cooke Sons & Co.*, [1968] 1 Ch. 139 (Eng. Ch. Div.) at p. 147 Buckley J. concluded that there is no presumption one way or the other.

12    In Canada, there has been similar controversy respecting the application of a presumption. In *Gill* , cited by the appellants, while the Supreme Court of Canada appears, in dicta, to accept that contracts with no stipulation as to duration are prima facie perpetual, the Supreme Court proceeds upon the basis that no appeal was taken from the trial judge's decision that the contract was terminable upon reasonable notice.

13    In the context of this case, I see no need to rely on any presumption. I find myself in agreement with the statement of Buckley J in *Spenborough* when he said at pp.146-47:

> Authority establishes that, where an agreement does not in terms confer on the parties or one of them a power to determine the agreement, whether such a power should be inferred is a question of construction of the agreement to be determined in accordance with the ordinary principles applicable to such a question. ...Since ex hypothesi such an agreement contains no provision expressly dealing with determination by the party who asserts that this should be inferred, the question is not one of construction in the narrow sense of putting a meaning on language which the parties have used, but in the wider sense of ascertaining, in the light of all the admissible evidence and in the light of what the parties have said or omitted to say in the agreement, what the common intention of the parties was in the relevant respect when they entered into the agreement.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

...An agreement which is silent about determination will not be determinable unless the facts of the case, such as the subject of the agreement, the nature of the contract or the circumstances in which the agreement was made support a finding that the parties intended that it should be determinable, ....

#### (2) easement

14     The appellants did not argue, nor is there a factual basis to support the creation of an easement for parking by prescription or an easement of necessity. The trial judge while holding that it was possible to have an easement for parking of motor vehicles, particularly by means of a written agreement, rejected the submission that one existed in this case.

15     The trial judge's examination of the parking arrangement was based on the generally stated elements required for an easement: the existence of both a dominant and servient tenement, the absence of unity of ownership or occupancy of both tenements, the nature of the use in question being to benefit or improve the enjoyment of the dominant tenement, and the use being a type which is capable of being granted at law. Further, the use in question cannot be totally inconsistent with the continuing possessory rights of the owner of the servient property over its land. However, the trial judge also noted, quoting *Gypsum Carrier Inc. v. R.* (1977), 78 D.L.R. (3d) 175 (Fed. T.D.) , that the presence of all of the elements is not determinative of the issue as that question must, particularly in the case of a written agreement, be determined on the basis of the intent of the parties. I agree with the trial judge that in deciding this case one must look to the intention of the parties both as to the characterization of the parking arrangement and to ascertain if the agreement may be terminated. There are, of course, a number of interests or rights that resemble easements. Indeed, Bruce Ziff, in *Principles of Property Law* (2d ed.) (1996), illustrates this point by saying at p. 333:

> Think of a simple agreement between landowners to allow B's car to be parked on A's driveway. This arrangement could take the form of a lease of a parking space, an easement, a licence, or a bailment.

So then, although the elements of an easement may be present one must still look to the intent of the parties to determine if they intended to create an easement or some other type of arrangement for parking. The analysis which follows of the settlement agreement is directed to determining just what type of interest, if any, was acquired by the appellants. That same analysis becomes important again when examining the question of termination of any rights which the appellants might have acquired.

#### (3) the settlement agreement

16     The trial judge looked to the wording of Clause 3 which said:

> Imperial <u>acknowledges</u> that Young has enjoyed certain <u>privileges on the property subject to the Lease</u> in respect of Young's tire sales operation on property of Young immediately adjacent to the property described in the Lease. <u>Imperial undertakes to continue these parking privileges</u> beyond the termination of the Lease <u>on a basis mutually satisfactory to Imperial and Young.</u>

> (Emphasis added)

The argument of the appellants includes a submission that the conclusions of the trial judge respecting the wording used in Clause 3 were in error.

#### (a) wording of Clause 3

17     Young argues that words and phrases such as "acknowledges", "Imperial undertakes to continue", "parking privileges", "on a basis mutually satisfactory to Imperial and Young" all indicate the intention of the parties that the arrangement be continued perpetually, or at least do not indicate the contrary.

18     The submission of the appellants regarding the word "acknowledge" merely asks the question why use "acknowledge" if parking was not intended to be something of permanence? (In fact, both parties could use this approach respecting the language

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

used in the Agreement as there certainly were better and more precise methods of creating an easement, if that was intended, or being more specific about notice of termination, if the parties intended that the parking arrangement could be terminated by either party.) As to "acknowledge", I am unable to conclude that that word signifies permanence. The fact is that the appellants had been using the Imperial property for parking for some time prior to the signing of the Settlement Agreement because the appellants had possession of both the Young and the Imperial properties, one as owner and the other as lessee. Neither that fact, nor the acknowledgement that parking privileges existed in the past, aid in determining the nature of the parking arrangement under the Settlement Agreement.

19     The appellants argue that the use of the word "undertakes" connotes not just a covenant to continue but a solemn vow to continue - a personal bond or guarantee. The "tone" of the word "undertakes" in the appellant's submission, is that the parties intended something of permanence. The trial judge agreed that "undertakes" seemed stronger than "will" or "shall" but he was not prepared to accept that the use of the word itself implied non-revocability. I see no error in that conclusion.

20     The appellants, quoting from Black's Law Dictionary (6th ed) (1990), state that privilege means:

Particular and peculiar benefit or advantage enjoyed by a person, company or class, beyond the common advantages of other citizens. An exceptional or extraordinary power or exemption, a peculiar right, advantage, exemption, power, franchise or immunity held by a person or class, not generally possessed by others.

The respondent does not quarrel with this definition. The appellants argue that the use of the words "parking privileges" are "descriptive of the situation in 1985 and do not derogate from the connotation of permanence created by the other words used in the parking clause."

21     Prior to the Settlement Agreement the parking privileges which had been exercised were those given by James Young, as lessee of the Imperial property, to himself or the corporate appellant which he controlled. Such an arrangement could only last during the currency of the lease. Under such an arrangement it was easy, and beneficial, for Young to ensure that the parking related to the tire sales business did not interfere with this operation of the gas bar. As there had been unity of occupancy of both tenements prior to the Settlement Agreement, there could be no easement prior to 1985 and if the parties intended to "*continue these parking privileges* " in the same form as had existed prior to the Agreement, they did not intended an easement.

22     The appellants argue that the phrase "on a basis mutually satisfactory to Imperial and Young" indicates the intention of the parties that any change to the parking privileges must be agreed to by both parties; that had it been intended that Imperial be able to terminate the arrangements, Clause 3 would have contained an undertaking to continue the parking privileges until notice by Imperial or on a basis solely satisfactory to Imperial. However, the appellants seem to acknowledge that this is not a completely subjective decision when they say "the meaning of those words is that Imperial has to provide parking on its property of a nature and type that would be satisfactory to two people in the objective circumstances of Imperial and the Appellants acting reasonably and in good faith."

23     The respondent submits that "on a basis mutually satisfactory to Imperial and Young" makes it clear that it was not intended that a specific right be granted but that the parking arrangement would continue on a basis which, from time to time, was satisfactory not only to the appellants but also to the respondent. In other words, the parking would continue as long as it was agreeable to both parties. This of course is in direct contradiction to the view of the appellants which is that to change the parking arrangements the agreement of both parties was required.

24     Interestingly, the written argument of the appellants illustrates, I believe, the error in the logic of their submission on this point. In the factum there is a passage which says:

If parking is satisfactory to only one party, then it is not mutually satisfactory; it is only self-satisfactory and self-satisfactory is not what the Settlement Agreement requires. It is a breach of the Settlement Agreement if the parking privileges are discontinued on a basis satisfactory only to Imperial. In order for the parking privileges to be discontinued, discontinuance of the parking privileges has to be on a basis mutually satisfactory to the Appellants and Imperial.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

In the second sentence of the quote the focus switches from continuing the parking privileges and the requirement that the basis for the continuance be the satisfaction of both parties, to the requirement that both parties must agree before any change is made.

25    The trial judge found the lack of precision and vagueness of the terms of the Settlement Agreement was support for the view that the parties did not intend to create an easement, but something less than a "formal" interest in land by way of an easement. The appellants submit that failure to be specific was not an indication of some desire for a less formal arrangement but an indication that the parties wanted an easement rather than a deed of grant which might have been the nature of the arrangement had the parties detailed the number and location of the parking spots. The trial judge further concluded that the language used - referring to the existence of a parking privilege connected with Young's business - suggests a personal right (licence) rather than a right which attaches to the land itself. The appellants argue that, contrary to the trial judge's reasoning, the fact that there was a reference to the location of Young's business indicates that it was not intended that there be a personal right but that the parking right be associated with Young's business which was located next door. I would agree with the trial judge's assessment on this point - the references to Young's having enjoyed privileges and to Young's tire sales are indicative of personal permission being granted rather than some right attaching to the land.

26    The appellants further submit that the words "Imperial undertakes to continue" contain an express or, alternatively, an implied obligation not to revoke the parking privileges. As support for this submission *Hurst v. Picture Theatres Ltd.*, [1915] 1 K.B. 1 (Eng. K.B.) ; *London Borough of Hounslow v. Twickenham Garden Developments Ltd.* (1970), [1971] 1 Ch. 233 (Eng. Ch.) ; and *Coniagas Reduction Co. v. Ontario Hydro-Electric Power Commission*, [1933] 3 D.L.R. 337 (Ontario P.C.) are cited. The first two cases, along with *Vaughan v. Hampson* (1875), 33 L.T. 15 , are also cited for the alternative argument that if the interest created by the Settlement Agreement is a licence then it is a licence coupled with an interest, which is irrevocable. The analysis of the Settlement Agreement as an instrument creating a licence will be discussed below and I found the cases cited helpful in that context but of no benefit in determining the meaning of "Imperial undertakes to continue." I have already indicated that the use of the word continue could be said to support the view that the parking arrangement was not to be an easement.

*(b) nature of the settlement agreement*

27    The appellants also argue that the nature of the Settlement Agreement itself indicates the intention of the parties to create an irrevocable arrangement for parking. The factors cited by the appellants in support of this interpretation are as follows: (i) the agreement severed a long relationship; (ii) the nature of settlement agreements is that they are intended to be permanent; (iii) it is not logical to think that the appellants would enter into an agreement where three covenants are permanent and one can be terminated upon notice, particularly it is illogical to construe the agreement so that Imperial gets a perpetual right of first refusal on the sale of the Young property but Young gets only a licence to park revocable upon notice; (iv) the parking privileges were given not for periodic payments but for permanent surrender of the lease; and (v) the covenants are mutual and interdependent and cannot be severed the one from the other but Imperial is seeking to terminate only one of them.

28    Before this Court, as they had in their submissions to the trial judge, the appellants argue, that aside from the common sense of the argument that the parties intended that all of the covenants be perpetual, the Settlement Agreement specifically provides that the undertakings and covenants by one side are the consideration for the undertakings and covenants by the other.[3] The appellants note that they were permanently surrendering a lease to Imperial, were permanently granting a first right of refusal in respect of the Young property and were permanently releasing Imperial from any claims arising out of the relationship between the parties in respect of the motor fuel sales outlet located on Imperial property. They submit it would be illogical for them to accept a parking arrangement which could be terminated at any time.

29    In fact, when one examines the document itself, the payment of $40,000 is said to be "in full and final settlement of any and all severance entitlement which Young has in respect of the termination of this retail motor fuel sales outlet at King's Bridge Road, St. John's, Newfoundland." So then, by Clause 1 of the Settlement Agreement it is the payment of the $40,000 which settled the matter of the money owing between the parties. There is no mention of other consideration, or the other covenants in that Clause.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

30    However, the trial judge appeared to accept that the covenants were mutual and this review of his conclusion proceeds on the premise that he was right in that conclusion. The trial judge quoted from *Odgers' Construction of Deeds and Statutes* , (5th ed) (1997) at p. 210:

Where the dependency arises from the *nature* of the covenants, if A is the *sole* consideration for B, A must be done or be offered to be done before suing for B. That is to say, the covenants are dependent; but if A is only *part* of the consideration for B and the non-performance of A can be compensated by damages, an action can be brought in respect of B without averring performance or offer of performance of A. In other words, the covenants are independent.

. . . . .

Lord Mansfield said in **Boone v. Eyre** (1779), 1 H.B. 1 . 273 said:

The distinction is very clear: where mutual covenants go to the whole of the consideration on both sides, they are mutual covenants, the one precedent to the other. But where they go only to a part, where a breach may be paid for in damages, it is a different thing.

31    As to the argument that the parking privileges must be perpetual because the other "mutual" convenants are perpetual, the trial judge said:

... it is not correct to say that in a negotiated contract, because the consideration granted by one side is 'permanent', the consideration granted in return is implied as being of the same duration. It is quite logical that in this, and in any other, contractual arrangement a party may agree to exchange certain permanent and irrevocable consideration, in return in whole or in part for some benefit itself of a fixed term, or indeed which is determinable by mutual agreement, or even by a failure to be able to reach agreement on its continuation.

Later he notes that the appellants acknowledged that, in principle, circumstances could occur under which it would be unreasonable to expect that Imperial continue to permit parking, though of course, the appellants deny that such circumstances are present in this case.

32    In *Spenborough* , as noted above, Buckley J. takes the position that there is no presumption either in favour or against permanence of a licence. He also takes into consideration whether the interpretations proposed by the parties are commercially sensible.

33    The appellants argue that Imperial is not seeking termination of the whole Settlement Agreement, but just the clause respecting parking privileges. In light of the fact that Young cannot be restored to its original position, it is submitted that Imperial should not be permitted to be relieved of its bargain while retaining contractual benefits. The appellants rely on *Fort Frances (Town) v. Boise Cascade Canada Ltd.*, [1983] 1 S.C.R. 171 (S.C.C.) at p. 191 in support of that position. It should be noted that the Supreme Court of Canada did not have to decide whether a contract of indefinite duration was terminable unilaterally, the parties having agreed that termination in the circumstances of the case was not possible. That case, described by one author as "highly idiosyncratic", [4] concerned a 1905 agreement to supply the electrical requirements of a town at a certain rate. The context of the case included a legislative scheme for development of hydro-electric power. Interestingly, *Fort Francis* is a case where the payment of money periodically supports an undertaking to perform in perpetuity.

34    There appears to be an acceptance that for certain kinds of cases courts are generally unwilling to accept that the parties intended that they be perpetually bound. I would include in that class, *ordinary* business relationships. See *Robinson v. Galt Chemical Products Ltd.*, [1933] O.W.N. 502 (Ont. C.A.) at p. 504. *Fort Frances (Town)* would not fall into that class; neither would *Llanelly* which concerned a contract between two railway companies. The court considered provisions of the agreement and surrounding circumstances, including loan arrangements between the parties and the fact that the railways were subject to regulation which could have ordered one company to have running rights on the other's line in concluding the agreement was intended to be a perpetual one.

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

35    Indeed, the nature of the relationship was a factor considered by the trial judge in this case when he said:

The case here, on the other hand, is one of a purely commercial, business relationship, with each party having commercial value to its own use of the land in question. In such circumstances the cases suggest it is more difficult to imply perpetuity, or even long term duration. From another viewpoint, it might well be expected that in a commercial setting, if a 'minimum' duration was anticipated it would be specified, and that the absence of such specification should tell against such an 'extended term'.

36    On considering all the arguments the trial judge concluded that the appellants had not established the 1985 agreement constitutes an easement in the appellant's favour. I agree with that conclusion.

*(4) licence*

37    On rejecting the argument that an easement had been created by the Settlement Agreement, the trial judge had little difficulty characterizing the arrangement between the parties as that of licensor - licensee. The issue then became what kind of licence. The trial judge found it to be a contractual licence.

38    The appellants argue that if the interest created by the Settlement Agreement is a licence, it is a licence coupled with an interest, which is irrevocable. The *Hydro-Electric* case was concerned with the interpretation of an agreement for supply and purchase of power where one party had been expressly given the power of termination and the other had not. It does not contain similar wording to this case and the fact that termination was addressed for one party distinguishes the circumstances from those in this case. The *Hurst* case concerned a ticket for a seat at a cinema. The court found that the right to see the performance amounted to a grant or interest. As Megarry J. pointed out in *Hounslow, Hurst* has been criticised on the basis that for the purpose of deciding whether there is a licence coupled with an interest or grant, the right to see a performance cannot fairly be described as an interest or be the subject-matter of a grant. Megarry J. added: "No authoritative definition of what suffices as an interest for this purpose ever seems to have been given. The examples usually put forward are proprietary in nature, such as the rights that I have mentioned to enter and sever growing timber or crops, to take away timber or crops already severed, and so on." There was, however, an alternative reasoning in both *Hounslow* and *Hurst* : if there is a licence with an agreement not to revoke the licence, that, if given for value, is an enforceable right. *Hounslow* and *Hurst* accepted the idea that if the contract specifies specific rights for specific events there must be at least an implied negative obligation not to revoke the licence (otherwise than in accordance with the contract) while the period is still running. (In that same case Megarry J. expresses doubt about *Vaughan v. Hampson* which suggests that an interest in attending a meeting is sufficient.)

39    In *Megarry's Manual of The Law of Real Property* (7th ed) (1993) at p. 428 a licence coupled with an interest is described as follows:

A licence may be coupled with an interest in the land or chattels thereon. Thus the right to enter another man's land to hunt and take away the deer killed, or to cut down a tree and remove it, involves the grant of an interests in the deer or tree and also a licence annexed to it to come on the land. The interest must be a recognised interest in property, and it must have been validly created. Thus at law a right to take game or minerals, being a profit à prendre, must have been created by deed or prescription, whereas no formalities are required for the grant of a right to take away chattels, such as felled timber or cut hay....

A licence coupled with an interest is irrevocable and also assignable, though only with the interest with which it is coupled. It binds successors in title to the land in the same way as that interest.

In his submissions, counsel for the appellants states that the right to park vehicles - the ability to bail vehicles - is a property right.

40    The licence is to park vehicles upon the Imperial land. There is no property right associated with it. Imperial does not have an interest in the vehicles parked and does not attempt to give Young any right in any land or chattel in addition to the parking privilege. Further, unlike the licence to see a cinema show or for access to a property for the purpose of performing a

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

contract, an obligation not to revoke the licence cannot be implied from the nature of a parking arrangement which lacks the limited time frame for the licence which is evident in the examples given above.

41    I agree with the trial judge that the agreement creates a licence and that the nature of the licence is contractual. I shall return later to the interpretation of that licence.

### (5) estoppel and licence acted upon

42    The appellants argue, in the alternative, that if they have a licence to park on Imperial property by virtue of the Settlement Agreement, then that licence is irrevocable either by application of the doctrine of estoppel or pursuant to the doctrine of a licence acted upon. These arguments are similar and are based on the submission that the appellants acted to their own detriment by granting a right of first refusal to Imperial, by giving up the right to sue Imperial and by building up its tire and sales business on the Young property, and that it would be "unjust and unfair and against good conscience to allow Imperial to revoke the parking privileges without returning the Appellants to their original position."

43    The appellants cite, in particular, *Hopgood v. Brown,* [1955] 1 All E.R. 550 (Eng. C.A.) at p. 561:

> There was, therefore, something in the nature of mutual licences and it seems to me, as a matter of plain justice and of law, that a person who is enjoying one part of such reciprocal licences cannot at the same time purport to revoke the other part which imposes a burden on him.

In this submission the appellants attempt to draw an analogy between the mutual licences in *Hopgood* and the mutual and reciprocal covenants in the Settlement Agreement. Certainly there are no mutual licences here: the analogy is not appropriate.

44    The trial judge considered six of the eight cases cited by the appellants in support of their position respecting the application of the doctrine of estoppel. (See *Plimmer v. Wellington Corp.* (1884), 9 App. Cas. 699 (New Zealand P.C.) ; *Hopgood v. Brown* , supra; *Inwards v. Baker,* [1965] 1 All E.R. 446 (Eng. C.A.) ; *Chandler v. Kerley,* [1978] 2 All E.R. 942 (Eng. C.A.) ; *Stiles v. Tod Mountain Development Ltd.* (1992), 22 R.P.R. (2d) 143 (B.C. S.C.) and *Wyatt v. Franklin* (1993), 122 N.S.R. (2d) 252 (N.S. S.C.) .) The other two, *Errington v. Errington,* [1952] 1 All E.R. 149 (Eng. C.A.) and *E.R. Ives Investments Ltd. v. High,* [1967] 1 All E.R. 504 (Eng. C.A.) , in my view, add nothing to the principles enunciated in the six specifically dealt with by the trial judge. In *Errington* , the court of appeal held that the arrangement under consideration was a licence with a contractual right to remain on the property. *E.R. Ives* followed, on the issue of estoppel and acquiescence, *Inwards v. Baker* .

45    As to Young building up the tire and sales business on the ability to park on Imperial property, the trial judge was unable to make the factual findings to support such a position. He held:

> While it is indeed a fair implication from the affidavits as a whole respecting the "history" of the matter, that the defendants have made use of the plaintiff's land for parking, that is substantially different from asserting, much less establishing, that on the basis of reliance on such parking arrangements, either as they were prior to the agreement or more particularly as at the date of execution of the agreement itself, the defendants have taken any step to their prejudice in "building up" their business or otherwise. As I see it, on this aspect the facts establish that the defendants have indeed historically used the plaintiff's land for parking customer vehicles in connection with the defendant's ongoing business - nothing more and nothing less.

Later he said:

> Even if it occurred, increased business operations can hardly be said to be a detriment; rather it may be properly viewed as a benefit derived by the defendants. Beyond this, there is no evidence of the expenditure of funds or similar 'detriment' other than the argued presumed 'increase in business' itself.

In respect of this argument the trial judge held:

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

In summary with respect to the defendants' arguments based on estoppel, in all of the circumstances here I am not persuaded that the facts of this case establish an estoppel operating in favour of the defendants against the plaintiff, precluding revocation of the contractual licence on reasonable notice. I find no evidence of either positive representation, or acquiescence, beyond the terms of the contractual agreement itself, which must be separately considered. I conclude that there is no proof of detrimental conduct following the execution of the agreement, and certainly none as would reasonably bring to the attention of the plaintiff the fact that the defendants must be proceeding on the basis of a perpetual, or even long term, right of use. Similarly, I find no 'estoppel by convention' to arise on the facts of this case.

46      The trial judge conducted a very thorough examination of the estoppel issue. I see no error in his reasoning in rejecting it as a basis for finding an irrevocable licence in this case. First, he found that there was no evidence that the appellants were requested or encouraged by Imperial to spend money on or with respect to their occupancy of Imperial's land, nor that they spent such money, let alone showing a reasonable understanding with Imperial that any money which may have been spent was expended in the expectation of being able to remain permanently. In this analysis the trial judge examined only the actions of the parties subsequent to the Settlement Agreement. I agree with this approach. The Settlement Agreement was analysed in the context of whether the agreement itself created an easement or an irrevocable licence and should not be part of the analysis under the estoppel issue.

47      The appellants also argue, citing *Winter v. Brockwell* (1807), 103 E.R. 359 (Eng. K.B.) ; *Liggins v. Inge* (1831), [1824-34] All E.R. 754 (Eng. C.P.) ; *Armstrong v. Sheppard & Short Ltd.*, [1959] 2 Q.B. 384 (Eng. Q.B.) ; *Ward v. Kirkland* (1965), [1966] 1 All E.R. 609 (Eng. Ch. Div.) and *London Borough of Hounslow v. Twickenham Garden Developments Ltd.* (1970), [1971] 1 Ch. 233 (Eng. Ch.) that they, by entering into the covenants they did under the Settlement Agreement, acted upon Imperial's covenant to continue the parking privileges and Imperial cannot now revoke those privileges.

48      I see no application of those cases here. *Hounslow* , though referring to it, did not apply the doctrine of licence acted upon. In *Liggins* the owner of a dominant tenement authorized an act of a permanent nature (to cut down and lower a bank and to erect a weir) on the servient tenement. The act having been done and the expense having been incurred, the plaintiff could not retract his consent. Indeed, *Liggins* may be said to be a case of abandonment of a right rather than acquisition of one. The same is true of *Winter* where the plaintiff gave the defendant parol licence to put a sky light over the defendant's area, which interfered with light entering the plaintiff's house. The sky light having been completed at the defendant's expense, the plaintiff could not "recall" the licence, or now assert a right to light which he had abandoned.

49      In *Armstrong* , Lord Evershed M.R. summarized the law as follows, at p. 399:

It is, I think, true to say ... that if A gives authority to B for the doing of an act on A's land, and the act is done and completed, then, whatever be the strict description of the authority, whether it be called a permission or a licence, it is, generally speaking at any rate, too late for A who gave the authority, to complain of it.

In each of the cases cited it is the completion of an act such as building a wall or installing pipe, an act of a relatively permanent nature, which had been done with the consent or licence of the person now complaining, which leads the law to deny the complainant the right to revoke a licence or enforce a right. Here the nature of the right granted - to park different vehicles at different times in different places and so as not to interfere with the use of the land by Imperial - is not permanent but repetitive in nature. Entering into the covenants under the Settlement Agreement are not acts by Young pursuant to the licence given by Imperial under Clause 3. The doctrine of licence acted upon has no application to this case.

## Termination of the Licence

50      Historically, at common law, of the three types of licence - bare licence, licence coupled with a grant and contractual licence - a licence coupled with a grant could be irrevocable, while a bare licence or a contractual licence could be revoked at any time, even though in the latter case the revocation might amount to breach of contract. However, equity has changed that - or at least has made available equitable remedies in appropriate cases to prevent revocation in breach of contracts.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

51    The current position is described in *Cheshire and Burn's Modern Law of Real Property* (13th ed.) at p. 555 as follows:

> The matter was authoritatively settled by the House of Lords in **Winter Garden Theatre (London) Ltd. v. Millennium Productions** . This case finally established that the rights of the parties to a contractual licence must be determined upon the proper construction of the contract. Their Lordships favoured the argument that, if on its construction a contractual licence is irrevocable, then, even though it is not coupled with a grant, its revocation in breach of the contract should be prevented where possible by the grant of an injunction. In other words, equity does what it can by means of a decree of injunction to preserve the sanctity of a bargain and by that remedy it is prepared to restrain a revocation that would derogate from the right of occupation conferred by the contract. If the contract does not expressly state the time for which the licence is to last, a promise by the licensor must be implied that he will not revoke the permission in a manner contrary to the intention of the parties. The exact scope of the implied promise, if any, must be ascertained in each case, for it will, of course, vary with the circumstances.

While I adopt this concise and clear statement of the law, I recognize that the position of the contractual licence has been the subject of much discussion. (See, for example, *Equity Doctrines* & *Remedies* (3rd ed.) by Meagher, Gummow and Lehane at pp. 576-582).

52    Green, J.A. and I agree with the trial judge that this case is concerned with a contractual licence. We also agree on the generally applicable principles to interpretation of contractual licences. However, we differ with each other and with the trial judge on the result of the application of this principle to this case.

53    The trial judge concluded that the agreement provided "that all of the terms respecting parking including the duration of the arrangement itself required the plaintiff's [respondent's] agreement as time progresses. Parking is to continue only as long as indeed satisfactory to both parties, including the [respondent]." As a result of this interpretation the parking licence could be terminated upon reasonable notice, as presumably could have been done as soon as the ink was dry on the agreement. One gets the view from the decision of the trial judge that this case was argued before him on an all or nothing basis with one party submitting the licence was irrevocable and the other that it could be revoked at any time, albeit on reasonable notice.

54    Green, J.A., on the other hand, interprets the undertaking in terms of the ability (objectively determined) of the respondent to accommodate the appellant's parking requirements whatever the respondent's use or non use of the land and requires the respondent to establish that it can no longer accommodate the appellant's parking vehicles on its property.

55    The appellants acknowledge that there might be a requirement to adjust the parking arrangements from time to time on the basis of business decisions, for example, if there were an increase in the number of pumps. In the context of this agreement, termination at will of the parking arrangement does not make commercial sense for Young. By the same token a grant of an irrevocable licence does not make sense for Imperial. However, the references in the document to the continuation of the gas bar, to be operated by another party, and continuation of "those parking privileges" associated with the tire sales business would indicate that the parties intended to continue this symbiotic relationship as long as the gas bar and tire sales were both in existence. Thereafter the relationship could be terminated upon reasonable notice. So then, while the trial judge and I see the duration of the parking arrangement somewhat differently, in the result the action of Imperial in terminating the licence is permitted under the contract and the period of notice specified by the trial judge is acceptable.

56    I would therefore deny the appeal with costs to the respondent.

**Green J.A.** (dissenting):

57    This appeal raises questions concerning the approach to be taken to the construction and application of a written agreement in which parking privileges were conferred on the appellant (Young) arising out of a prior commercial dispute between Young and the respondent (Imperial), who were adjacent land owners. The legal characterization of the rights purportedly conferred by the agreement and the nature, duration and manner of their exercise are central to the disposition of this case.

**WestlawNext**® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

58    The trial judge held that the arrangement between Young and Imperial was in the nature of a contractual licence which could be terminated unilaterally by Imperial on reasonable notice, notwithstanding the fact that the parking privileges were expressed in the agreement to continue "on a basis mutually satisfactory to Imperial and Young".

59    In my view, with the greatest respect, the solution arrived at by the trial judge does violence to the reasonable expectations of the parties and effectively converts an agreement which had as its touchstone the requirement for mutual cooperation and good faith accommodation for its application and alteration, into an arrangement that could be unilaterally changed and terminated by one party to the prejudice of the other. I have concluded that a true construction of the language of the agreement, according to proper principles of contractual interpretation, does not lead to such an inappropriate result.

**Background**

60    Since 1941, Young, either directly or through his corporate alter ego, King's Bridge Service Station Limited, owned and operated a service station on land on King's Bridge Road in St. John's. For some time Young had also leased the adjacent property owned by Imperial and had operated a "gas bar" from that location, selling gasoline supplied by Imperial. From his own property he operated a general garage and tire sales business. The operation of the gas bar provided an integrated operation for services to the motoring public. Young's own property was very cramped. The garage building occupied most of the site. Accordingly, Young began parking vehicles (both customer and employee) on the leased gas bar property. He was able to achieve this result by virtue of his control of the use of the Imperial property as tenant. There was, apparently, no objection from Imperial.

61    The business relationship between Young and Imperial began to deteriorate. Accusations were made from time to time by both sides, alleging that the other had failed to comply with the gas bar lease arrangement. Matters came to a head in 1984-1985. Young made certain approaches to Imperial offering to sell his interest in the gas lease and/or his service station property to Imperial. Imperial responded with an offer to buy out the lease of the gas bar for an amount that was not acceptable to Young. This led to an exchange of letters in the spring of 1985 whereby Young reiterated his previous allegation that Imperial had been attempting to downgrade the gas bar property by failing to honour its obligations under the lease while at the same time attempting to acquire certain other properties in the area to set up another operation in competition with Young. He threatened legal action. In response, by letter dated April 2, 1985, Imperial purported to terminate the gas bar lease arguing that it was merely a month to month tenancy terminable on one month's notice. Young, through his solicitor, replied taking issue with the right of Imperial to terminate the lease, referring to certain other "clear obligations" which Imperial had allegedly covenanted to perform under the lease. He also held out the possibility of a negotiated settlement.

62    It should be noted at this point that the lease documents were not placed in evidence nor was there any evidence presented that could confirm Imperial's assertion, made in its factum on appeal, that the tenancy arrangement was simply a month to month tenancy. Indeed, the trial judge refused to make such a factual finding on the evidence, and pointed out that Young both in correspondence and in argument had challenged Imperial's rights to terminate the tenancy on the basis that it was from month to month.

63    Discussions towards settlement of the dispute ensued. On May 31, 1985 Young's solicitor wrote the solicitor for Imperial with reference to a previous "counter offer" that had apparently been made by telephone four days earlier. It described the basis of the offer with which Young "reluctantly agreed" as:

> (a) $40,000 from your client to mine as severance settlement respecting my client's operation of your client's petroleum product outlet on your client's property on King's Bridge Road;

> (b) A reasonable arrangement regarding parking spaces on your client's property in conjunction with my client's present operation on my client's adjoining property;

> (c) Your client to have a first right of refusal in the event of my client's contemplated acceptance of a bonafide offer to purchase my client's adjoining property.

**WestlawNext** CANADA    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

Young's counsel also assured Imperial that: "my client is prepared to operate the adjoining business in a spirit of friendly, neighbourly cooperation with your client".

64    Imperial's counsel responded with a draft settlement agreement "formalizing the arrangements between the parties". He stated:

> In particular, the agreement calls for a surrender of the lease and a release of all claims of Imperial. The agreement also calls for the payment of $40,000 and also provides for reasonable parking arrangements in favour of Mr. Young.

> Finally, the agreement provides for a right of first refusal in respect of Mr. Young's adjacent service station building.

65    The agreement, as ultimately executed, after referring to the existence of the gas bar lease, provided in pertinent part as follows:

> <u>AND WHEREAS</u> Imperial and Young have mutually agreed to sever their relationship subject to the terms and conditions hereinafter appearing with the objective that another party will operate the said facilities commencing on or about June 15, 1985.

> <u>NOW THEREFORE THIS AGREEMENT WITNESSETH</u> that for and in consideration of the mutual covenants and conditions hereinafter appearing, the parties hereto mutually covenant and agree as follows:

> (1) Imperial shall pay to Young on or before the execution of this agreement the sum of forty thousand dollars ($40,000) in full and final settlement of any and all severance entitlement which Young has in respect of the termination of his retail motor fuel sales outlet at King's Bridge Road, St. John's, Newfoundland.

> (2) Young agrees to surrender the Lease to Imperial and to release Imperial from all claims, demands, actions or suits of any kind whatsoever in any way connected with or in any way arising from the relationship between Young and Imperial in respect of the said outlet at St. John's, Newfoundland.

> (3) Imperial acknowledges that Young has enjoyed certain parking privileges on the property subject to the lease in respect of Young's tire sales operation on property of Young immediately adjacent to the property described in the lease. Imperial undertakes to continue these parking privileges beyond the termination of the lease on a basis mutually satisfactory to Imperial and Young.

> (4) In respect of the service station building owned by Young immediately adjacent to the property subject to the Lease, Young agrees to grant Imperial the right of first refusal to purchase or lease the said building of Young and the land thereon on the terms of any bonafide written offer received by Young which Young is willing to accept....

66    The reference to "Young" in the agreement was defined to include King's Bridge Service Station Limited. In like manner, references to Young in these Reasons should be taken, unless the context indicates otherwise, as including the corporate entity as well.

67    Imperial paid the $40,000 contemplated by the agreement and, following the termination of the gas bar lease, entered into a new arrangement with another tenant to operate the gas bar. Young continued to use the gas bar property, without objection from the new tenant, for the parking of vehicles associated with his garage and tire sales business. It was conceded by Imperial in its written argument that the new operator was operating the gas bar *for* Imperial. Allowing Young to continue to use the land for parking was therefore consistent with the obligation undertaken by Imperial in the settlement agreement. Young's uncontradicted evidence was that both before and after the settlement agreement, upwards of twenty-five cars could be and were parked from time to time on the gas bar property, mostly around the rear perimeter of the property, so as not to interfere with the gas bar operations. The relationship between Young and the successive dealers installed in the gas bar premises by Imperial was very amicable and Young in fact permitted patrons of the gas bar to use the washrooms in the garage.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

68    In late 1993, Young became aware of plans by Imperial to cease operating a gas bar on the property and of a rumour that Imperial intended to fence the property to prevent any parking thereon. Young, through his counsel, wrote Imperial to remind them about the parking privileges conferred by the settlement agreement and stated that he did not wish to have its business interrupted "due to a lack of parking on your property." Imperial did not respond. Instead it commenced decommissioning the property by digging up and removing the gas tanks. Some soil contamination was apparently discovered. This activity caused some disruption to the continued use of the property for parking but Young was able to accommodate this problem by continuing to park in areas which were not being actively dug up.

69    In February 1994 Imperial, without consulting Young, fenced off most of the property leaving Young with a cramped narrow area which could accommodate no more than seven vehicles. Young complained to Imperial that they had restricted him to too small a parking area. From December of 1993 to August of 1994 Young made approaches to Imperial suggesting that they attempt to agree on revisions to the original parking arrangement to accommodate the new events which had occurred, namely the closing of the gas bar, cleanup of the site and restriction of the general public from it. Young characterized these as "reasonable wishes" and stated "King's Bridge was prepared to see an adjustment to the parking privileges from the perimeter of the property to a specific area adjacent to King's Bridges' own property." At one point, Imperial had responded with the suggestion that the discussion as to a new arrangement should address issues of parking lot size, the erection of a gate on the property, insurance coverage and a provision to cancel the agreement if Imperial sold the property. Young's solicitor asserted that it had an irrevocable easement over the property.

70    Young continued to assert a right to park and alleged that the area delineated by Imperial for this purpose was too small. In a letter dated June 30, 1994, his counsel wrote: "our client is not seeking very much additional space and we fail to understand how the granting of additional space would be inconvenient or unsatisfactory to your client".

71    Imperial's counsel responded with allegations that Young had wrongfully removed part of the fencing and commenced to park on a larger portion of the property than had been identified by Imperial for Young's use. It was also alleged that cars being repaired at the garage were dripping oil and gasoline on the property and that this could have an eventual impact on the environmental condition of the site. Imperial went on to advise that if environmental remediation of the site were required, it might be necessary for Imperial to have access to the complete site, including the area currently designated for parking. Young's counsel responded with the offer that Young would be "prepared at any time to discuss a movement of the parking area so that Imperial can remediate the area currently parked upon by King's Bridge".

72    On August 19, 1994, Imperial gave Young thirty days notice of termination of the parking privileges. The stated reason for the termination was given as:

> In order to remediate the property and bring it to a standard acceptable to the Department of Environment and Lands, our client needs access to the entire property. Once the remediation has been completed, our client will determine what it wishes to do with the property. However, at the present time, Imperial Oil has no intention of permitting uses of the property which have the potential to contaminate it once it has been remediated.

73    The only evidence provided to the trial judge of the need for environmental remediation was in the form of certain statements in the Originating Application which were verified, in the usual form, by affidavit of an official of Imperial. Imperial had previously refused to provide Young with a copy of the environmental assessment report submitted by Imperial to the Department of Environment and Lands, nor was that report provided to the court. The only evidence before the court consisted of statements from Imperial that early in 1994 the Environment Department had requested a thorough environmental assessment of the property and that as a result of the assessment, Imperial had determined that two areas had residual soil contamination. One of the areas was "near" the area then being used by Young for parking and Imperial needed access to the rest of the property to remediate that area. Imperial further stated:

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

Once the cleanup is completed, which could take several years, the plaintiff wishes to fence or post all of the plaintiff's property and to preclude further parking by the defendants to avoid any risk of new contamination of the property from vehicles which could leak oil or gasoline onto the surface of the land.

No evidence was presented as to whether there was in fact any risk of contamination of the property as a result of continued parking by Young.

74    Young refused to vacate the property, taking the position that Imperial had no right to terminate the parking privileges. He also stated in a letter dated August 23, 1994:

King's Bridge does not understand why Imperial has such an antagonistic attitude in this matter. King's Bridge can appreciate that Imperial has a contamination problem which it wishes to deal with, but surely Imperial can appreciate that King's Bridge has a right to park on Imperial's property and has to have somewhere to park its customers vehicles. King's Bridge simply does not understand why Imperial has refused to meet to discuss these matters and why there has been no attempt to look for a solution which would satisfy the concerns of both parties.

75    Imperial then made application to the Trial Division for an order directing Young to remove vehicles from the property and prohibiting further use. Young responded by seeking an order directing Imperial to remove the barrier which reduced the parking area which Young had previously enjoyed.

**The Trial Decision (1996), 142 NFLD. & P.E.I.R. 280 (Nfld. T.D.)**

76    The essential question that had to be resolved by the trial judge was whether or not Imperial could, of its own motion and without considering the interests of Young, revoke the parking privileges. The position of Imperial was that it could. The position taken by Young was at the other end of the continuum, namely, that the parking privileges could be enjoyed in perpetuity. Young sought to justify this position by reference to concepts of easement, estoppel, irrevocable licence and contractual right.

77    It is apparent from the reasons of the trial judge that he was concerned about two "preliminary" matters one of which had not been raised by the parties. The first related to the reference in Clause 3 to the continuation of parking privileges on a basis "mutually satisfactory" to the parties. At the outset of the trial he raised with counsel the question as to whether or not the agreement merely amounted to an "agreement to agree" and was hence unenforceable. The result of such analysis would have meant that Imperial could have revoked the parking privileges with impunity. The judge having raised the issue, both parties addressed it. (Indeed, it surfaced again as an argument on appeal). In the result, however, the trial judge determined that it was not necessary to rule on the issue for the purpose of his decision although, as will become apparent later in these Reasons, I believe his concerns as to this matter may have unduly influenced him in respect of his interpretation of the effect of the settlement agreement on the scope of the parking privileges in issue.

78    The second preliminary matter addressed by the trial judge involved the use that could be made of the background history of the relationship between the parties, including the discussions and negotiations leading up to the termination of the lease and the signing of a settlement agreement for the purpose of giving meaning and content to the language used in the agreement. Imperial took the position that the dispute fell to be determined solely by reference to the written agreement which, it said, was not ambiguous and that therefore the parol evidence rule excluded any reference to extrinsic evidence. Young, understandably, took the opposite view. The parties agreed, however, that all of the evidence concerning the background of the matter would be placed before the court subject to objection by Imperial that certain portions of it should not be considered by the trial judge for the purpose of interpreting the agreement.

79    After noting that parol evidence could be admitted as an aid to interpretation of a written document where there is some ambiguity in the language used, the trial judge concluded that there was a "basic and patent ambiguity" with respect to the "crucial question" of whether the continuation of parking privileges was to be in essence perpetual, "leaving only the scope of those privileges to be mutually agreed" or whether "the 'mutually agreeable basis' referred to in the agreement is to include the duration of the parking privileges per se". [I note at this point that the judge is talking in terms of a requirement

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

for "mutual agreement" whereas the agreement itself talks in terms of the continuation of the parking privileges "on a basis mutually satisfactory" to the parties. The significance of this misreading of language of the agreement will be dealt with later in these Reasons]. The judge noted, however, that even in the case of ambiguity, direct evidence as to the actual intentions of the parties, as distinct from evidence of the surrounding factual background and circumstances under which they operated, would still not be admissible. Accordingly he ruled that:

> ...the uses to which the affidavits may be put in resolving ambiguity within that part of the agreement relating to parking is ... limited to the portions setting out as background facts known to the parties, and excluding evidence of actual negotiations and other 'abstract' statements of the parties' intentions.

80    The trial judge then proceeded to deal with the legal bases advanced on behalf of Young in support of the argument that the parking privileges could be enjoyed in perpetuity. He concluded that the agreement did not create an easement because: (i) considering the wording of the agreement in light of the surrounding circumstances, including the fact that the parking "privileges" were a continuation of a pre-existing informal arrangement that resulted from the fact that Young had control of both parcels of land, there was no intention to create a proprietary right in the nature of an easement; (ii) the vagueness of the description as to the nature and scope of the privileges did not meet the requirements of precision and certainty for an easement; and (iii) the nature of the privileges conferred, which were for the enhancement of Young's business, and not for the enhancement of the land itself, suggested that it was intended to be a personal right of use instead of the attachment of a right to the realty.

81    Having concluded that the right conferred did not and was not intended to constitute an easement, the trial judge nevertheless acknowledged that the agreement,

> ...did intend to create at least a permission for the defendants to use the plaintiff's land for parking customer vehicles, albeit a permission which was subject to "mutual" agreement.

[Again, note is taken of the fact that the requirement of mutuality was expressed by the judge in terms of "agreement" as opposed to "satisfactory" and that the permission to park was "subject to" that agreement].

82    The judge then went on to consider whether the right was a species of licence. Recognizing that consideration had been furnished, he rejected the notion that what Young had was a bare licence. He also summarily disposed of the argument that the right could be a licence coupled with a grant of an interest. Although no analysis was undertaken by the judge, I would observe in passing that there is no evidence that the permission to enter the land and park vehicles thereon was to enable Young to exercise some other right in relation to Imperial's land.

83    Having disposed of those species of licence, that left the categories of contractual licence and licence by estoppel. He rejected the argument that the licence was irrevocable by virtue of the operation of the doctrine of estoppel because: (i) there was no evidence that Young had been requested or encouraged by Imperial to spend money on or with respect to Young's occupancy of Imperial's land, or that in reliance thereon Young did in fact expend money; and (ii) there was no evidence showing acts by Imperial, outside of the terms of the agreement itself, amounting to representations or acquiescence in the face of mistaken assumptions by Young as to the duration of the parking rights, which Young relied or acted on to his detriment.

84    He concluded that the matter fell to be considered on the basis of a contractual licence. In light of the fact that the agreement contained no express provision dealing with the duration of the parking privileges, he characterized Young's "main argument" that Imperial had granted a perpetual licence as being that the agreement, properly construed, contained an implied term that it would not be revoked.

85    Without doing justice to the full flavour of the trial judge's thorough and extensive reasons, I hope I am not being unfair in giving, as an outline of his reasoning process, the following brief analysis. In essence, the trial judge ruled that: (i) where a contract by its terms is for an indefinite duration, it is *prima facie* terminable on reasonable notice, rather than perpetual; (ii) the language of the agreement could not be construed to indicate that the parking privileges were intended to be perpetual; (iii) no term could be implied to the effect that the parking privileges were to be co-extensive in duration with the operation of Young's

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

business on the adjoining land; (iv) the licence to park being indefinite as to duration, it was terminable on reasonable notice; (v) given the lapse of time between the giving of notice of termination by Imperial and the date of trial, a reasonable time had already expired, but it was nevertheless fair to extend a further "grace period" to Young to vacate the property.

86     In the result, Young was ordered to remove the vehicles from Imperial's property and to vacate it within sixty days of the entry of judgment.

**Issues on Appeal**

87     As is evident, the case at trial, and on appeal, was argued on a number of different bases. Young variously submitted that the case could be decided in his favour by characterizing the rights conferred by the agreement as an easement, a contractual licence to be enjoyed in perpetuity, or a right protected by the doctrine of promissory estoppel. Regardless of whether the facts fit neatly into one or the other of any of these, or any other, pigeon holes, however, the key to the determination of the nature and extent of Young's rights depends upon a proper construction and application of the settlement agreement.

88     It is sufficient for me to state that I agree with the rejection by the trial judge of the arguments in favour of characterizing the arrangement as an easement or as supportable by the doctrine of estoppel. My colleague, Cameron, J.A. has also examined these issues in some detail in her reasons for decision and I am also in essential agreement with her analysis and conclusions in that regard.

89     I also agree that the parking privileges enjoyed by Young were, inasmuch as they were conferred by agreement, in the nature of a contractual licence. The question therefore resolves itself into a determination as to the nature and extent of the parking privileges conferred by the express or implied terms of the contract, as properly interpreted.

90     The construction of written instruments involves a question of mixed law and fact: *Atlific (Nfld.) Ltd. v. Hotel Buildings Ltd.* (1994), 120 Nfld. & P.E.I.R. 91 (Nfld. C.A.) at p. 101 (leave to appeal to S.C.C. refused (1995), 139 Nfld. & P.E.I.R. 90 (note) (S.C.C.) ). Here, there is no dispute as to the facts leading up or subsequent to the execution of the agreement. In any event, much of the evidence is in documentary form and there was no cross-examination on the affidavit evidence submitted. As emphasised in *Atlific* , an appellate court is in as good a position as the trial judge to examine all the evidence in such circumstances and to reach its own conclusions as to the proper interpretation of the agreement. See also *Labrador Inuit Assn. v. Newfoundland (Minister of Environment & Labour)* (1997), 152 D.L.R. (4th) 50 (Nfld. C.A.) at p. 67.

91     Furthermore, insofar as the implication of terms is engaged, it is also well-recognized that the implication of a term is a matter of law for the court. See *Chitty On Contracts* (25th ed.) Volume 1, p. 451.

92     Accordingly, the rulings of the trial judge as to the meaning and effect of the settlement agreement and whether or not terms ought to be implied therein are amenable to appellate review.

93     I would therefore re-state the issue to be considered on this appeal as:

Did the learned trial judge err in his interpretation of the settlement agreement as to the nature and extent of the parking privileges conferred by the agreement?

**Analysis**

*(a) The Agreement*

94     For ease of reference, I will repeat the clause in question, which was one of four paragraphs in an agreement that expressed the consideration to be "the mutual covenants and conditions hereinafter appearing", as follows:

Imperial **acknowledges** that Young has enjoyed certain **parking privileges** on the property subject to the lease **in respect of Young's tire sales operation** on property of Young immediately adjacent to the property described in the Lease. Imperial

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 283 of 398

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

**undertakes** *to continue* **these parking privileges** *beyond the termination of the Lease* **on a basis mutually satisfactory** to Imperial and Young.

The words and phrases in *bold* and *italicized* type received special attention in argument and are relevant to a determination of the true meaning and effect of the clause.

95     Although clearly providing that certain parking privileges were intended to extend "beyond the termination of the lease", the clause does not, as already noted, expressly define the period of time during which the privileges were to be enjoyed (if, indeed - which is a matter of dispute - any limitation was intended). Nor does it give any indication as to how, if at all, such privileges could be brought to an end. Furthermore, and what is equally important, the nature and extent of the parking privileges, during their period of enjoyment, whatever that might be, are not defined.

*(b) Arguments in Favour of Perpetual Parking Privileges*

*(i) Presumptions as an Aid to Interpretation*

96     Appellants' counsel argued that, as a starting point, interpretation of the settlement agreement should be approached on the basis that agreements of indefinite duration are *prima facie* perpetual and that in such case it lies on the party saying the agreement is revocable to show either some expression in the contract or something in the circumstances from which it can reasonably be implied that it was not intended to be perpetual. In support, he cites *Llanelly Railway & Dock Co. v. London & North Western Railway* (1875), L.R. 7 H.L. 550  (U.K. H.L.) ; aff'g (1873), 8 Ch. App. 942 (Eng. C.A.); and *Gill Brothers v. Mission Sawmills Ltd.*, [1945] 4 D.L.R. 449 (S.C.C.) ; aff'g [1945] 3 D.L.R. 506 (B.C. C.A.) .

97     The respondent counters with the submission that the true principle is that agreements which on their face are of indefinite duration are generally subject to an implied term that they are terminable on reasonable notice.

98     As general statements, neither of these propositions is very helpful in concrete situations. It must be remembered that we are not dealing here with the termination of an agreement as such, merely the potential termination of one of the benefits conferred by the agreement. Furthermore, to determine whether an agreement is indefinite involves a contextual examination of the language used in the contract. Usually this process will result in a determination, by means of a purposive interpretation, or the operation of the doctrine of implied terms, as to what was intended by the parties. Once the intentions are ascertained, the appropriate result follows. I agree with the observations of Buckley, J. in *Spenborough (Borough) v. Cooke Sons & Co.*, [1968] 1 Ch. 139 (Eng. Ch. Div.) at p. 147 as stating the modern approach:

> ...the question is not one of contruction in the narrow sense of putting a meaning on language which the parties have used, but in the wider sense of ascertaining, in the light of all the admissible evidence and in light of what the parties have said or omitted to say in the agreement, what the common intention of the parties was in the relevant respect when they entered into the agreement.

> ... there is ... no presumption one way or the other.

99     This approach is exemplified by the House of Lords' decision in *Winter Garden Theatre (London) Ltd. v. Millenium Productions Ltd.* (1947), [1948] A.C. 173 (U.K. H.L.) , a contractual licence case, where Lord MacDermott, doubting the applicability of the *Llanelly* principle as a general rule of construction, refused, on a construction of the contract, "ascertained in conformity with the ordinary principles applicable to the interpretation of written instruments", to hold that the licence was perpetual; rather, he concluded that it was a fair implication from the "whole tenor" of the contractual relationship that the licence to occupy the theatre was not revocable instantly but only after a period of reasonable notice. Viscount Simon expressed agreement with the result in *Hurst v. Picture Theatres Ltd.*, [1915] 1 K.B. 1 (Eng. K.B.) and regarded it as standing for the proposition that the contractual licence to attend a theatre production was implicitly subject to the term that it was irrevocable for the duration of the performance contemplated by the contract. The discussion of the law in *Winter Garden* illustrates quite well that the choice, in construing the incidents of the licence, is rarely the stark one of chosing in the abstract between perpetuity and unilateral revocability. There may well be an intermediate position which is dictated by the reasonable expectations of

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

the parties, as disclosed not only by the words used but the background context. This position may be able to be effectuated by implication of an appropriate term that protects the licencee from unilateral termination and at the same time avoids the imposition of a perpetual restriction on the licensor's future rights.

100    In my respectful view, the trial judge fell into error in his approach to resolution of the revocation issue. He appears to have accepted the view that, as a matter of principle, an indefinite contract is terminable on reasonable notice. Having concluded that the language of the agreement did not indicate perpetuity and that the specific arguments of Young could be rejected, he concluded that it automatically followed that Imperial could unilaterally decide to revoke on reasonable notice. The following passages illustrate this reasoning:

> ...the duration of the parking arrangements is indeed truly "indefinite" rather than either fixed or perpetual.

> <u>This being so</u> , as noted in the cited authorities, the issue then becomes what is the reasonable notice period required to terminate the arrangement [paras. 169-170]

> [Emphasis Added]

and:

> ...the matter falls to be considered simply on the basis of the existence of a contractual licence which, as the authorities cited by both parties clearly show, is terminable on the giving of reasonable notice. [para. 237]

101    Aside from a brief excursus into the question of whether there might be an implied term that the parking privileges could be enjoyed, if not in perpetuity, at least for so long as Young continued to operate his business on the adjoining land, the judge did not engage in a full interpretative exercise as to what the contract, as disclosed by the words and its context, actually meant, uninfluenced by any presumption one way or the other. Instead, he appears to have made the analytical jump from a conclusion that the licence was not perpetual to the conclusion that it necessarily followed that Imperial's position in favour of unilateral revocability must therefore be sustained.

*(ii) Language*

102    Young argues that the words chosen by the parties in Clause 3, far from suggesting revocability, in fact imply permanence. Counsel fastens on the words "acknowledges" (one would not acknowledge the existence of something transitory), "undertakes" (a solemn vow of permanence) and "privileges" (a particular or peculiar benefit enjoyable beyond the advantages of other citizens), as supporting his interpretation.

103    While, as will be apparent from these reasons, I agree that this choice of words, read in context, does in fact suggest something that is more than of a merely transient nature and indicates something other than a right to terminate unilaterally, it does not follow that they necessarily or even reasonably imply permanence. I am not persuaded that such language is a signpost for an intention to make the parking privileges perpetual.

104    Counsel for Young also relied on the phrase "on a basis mutually satisfactory to Imperial and Young" as indicating that it was intended to make the parking privileges perpetual unless the parties subsequently agreed on another mutually satisfactory arrangement. Imperial, on the other hand, relied on these same words for the opposite argument that it was intended that the parking could only continue if it remained satisfactory to Imperial as well as Young. The trial judge in effect accepted Imperial's interpretation by reading the phrase as making the duration of the privileges "subject to mutual agreement" [para. 125].

105    Inasmuch as I have concluded - for reasons to be given later - that this phrase relates to the manner of exercise of the parking privileges and not their duration, I will pass over this argument here, except to say that because the phrase has a different function than that argued for by either party, it does not assist Young with respect to his argument of irrevocability, nor does it assist Imperial with its argument that its continued satisfaction is a pre-condition to the continuation of the parking arrangement.

*(iii) Structure of The Agreement*

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

106    The appellants also stress the mutuality of the obligations contained in the agreement ("in consideration of the mutual covenants and conditions") and argue that because the consideration flowing from Young was of a one-time or permanent nature (perpetual release, right of first refusal, one-time payment in "full and final settlement", and permanent surrender of lease) it was a reasonable conclusion that the parking privileges "continued" by Imperial were intended to be permanent also.

107    The trial judge concluded, correctly in my view, that just because the consideration given by one party to a contract is of a "permanent" nature, it does not follow that the reciprocal consideration must necessarily have the same quality. The nature of the particular arrangement may make it quite logically reasonable for a permanent consideration to be exchanged for some other type of a fixed or subsequently terminable type.

108    Young argued that it would not be reasonable to assume that he would, in the circumstances, have intended to exchange the permanent rights he gave up for parking rights that could be terminated at any time by Imperial. That would be tantamount to taking a gamble on Imperial's good nature. He relied on the statement of Buckley, J. in *Re: Spenborough* at p. 149:

> If, as in ***Llanelly Railway & Dock Co. v. London and North-Western Railway Co.***, the consideration moving from the licencee or a substantial part of it consists of an immediate benefit conferred on the licensor, this may afford a strong reason for inferring that the licensor was not intended to have a right to determine the licence.

109    Even accepting, as I do, the principle as stated, it does not lead to the conclusion that the rights conferred were to be perpetual. It would be equally consistent with some other arrangement that did not place Young solely at Imperial's mercy. It might simply mean that Imperial was not intended to have a right of unilateral termination, which is not the same thing as saying that the right is perpetual.

110    Counsel for Young also argues, relying on *Fort Frances (Town) v. Boise Cascade Canada Ltd.* (1983), 46 N.R. 108 (S.C.C.) , that it could not have been intended that Imperial could unilaterally terminate Young's parking privileges when, because of the nature of the other consideration, Imperial could not restore Young to the position it enjoyed prior to execution of the agreement. In *Fort Francis* , the courts below had held that an agreement to supply the electrical requirements of a town without termination date could not be terminated unilaterally by notice. Estey, J. noted that the issue was not argued at length before the Supreme Court, and that both parties had conceded:

> ...that it is difficult to contemplate the termination of an agreement where the terminating party cannot restore the other party to the position enjoyed prior to the execution of the agreement.

Estey, J. also observed that:

> ...the parties have specified the extent of the company's obligation to the Town in the terms of the agreement. It cannot be said, therefore, that they did not agree to be bound in the circumstances that have arisen.

111    The *Fort Francis* case proceeded on the basis that the contract, by its terms, excluded the possibility of unilateral termination. That is not the case here, where the issue is what in fact is the nature of the right conferred. If on a true construction it is determined that the privileges conferred do not contemplate perpetuity, then effect should be given to that conclusion. The result of termination of the privileges would not be the complete unravelling of the agreement, only a contemplated cessation of one of the benefits created thereunder. I conclude that the *Fort Francis* case is irrelevant to a determination of the present appeal.

*(iv) Effect of No Finding of Perpetuity*

112    It follows from the foregoing that I do not accept the appellant's argument that the parking privileges were intended to be exercisable in perpetuity. However I do not accept that it necessarily follows that Imperial's position of being able to terminate the licence unilaterally on reasonable notice should be accepted.

113    The trial judge, faced with the question as to what was the nature and extent of the parking privileges conferred by the agreement, was under a duty to construe the agreement to determine the true nature of the rights involved. He did not do

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

this except in the context of determining whether the specific arguments by Young in favour of perpetuity were appropriate. He fell into error in adopting this approach.

114    It is therefore necessary for this Court to complete the analysis and it is to that process which I now turn.

*(c) Agreement to Agree*

115    Both parties on the appeal dealt with the issue as to whether the clause with respect to parking privileges was unenforceable on the grounds of incompleteness or uncertainty, resulting from the use of the phrase "on a basis mutually satisfactory to Imperial and Young", suggesting that what the parties had agreed to do was simply to negotiate in the future. Imperial's position, advanced in the alternative to its main argument that any licence conferred by the agreement was revocable on reasonable notice, was that:

> ...clause 3 of the Agreement is unenforceable since it leaves an essential term in relation to the parking privileges, namely, the term of those privileges, to be negotiated between the parties.

116    As indicated, this issue also surfaced at the trial as a result of the trial judge raising it. Although the judge ultimately concluded that he did not have to deal with the issue, it is apparent that his concern about whether the parties had merely agreed to agree in the future on the issue of parking was never far from his mind.

117    He appears consistently to have read the phrase "mutually satisfactory" as requiring "mutual agreement". For example, when discussing the admission of extrinsic evidence on the basis of the existence of an ambiguity, he refers to the fact that one interpretation was that only the scope of the parking privileges was to be "mutually agreed" and that another interpretation was that the "'mutually agreeable basis' referred to in the agreement" was to include the duration of the parking privileges as well. (para. 26) Both possible interpretations were couched in terms of there being a requirement for future agreement. Again, at a later point in his judgment, in describing Young's position with respect to the meaning and effect of the phrase "mutually satisfactory", he characterized the argument as being that there was a "requirement for 'agreement'" with respect to terms of exercise of the licence and not its duration. [para. 151] Furthermore, and perhaps most tellingly, in concluding that the parking privileges conferred by the agreement amounted to a licence, he described the permission as one which was nevertheless "subject to 'mutual' agreement". [para. 125] The injection of the conditional phrase "subject to" brings his analysis closely in line with the phraseology, "subject to contract", which is often regarded as the hallmark of an unenforceable agreement to agree.

118    Finally, the judge also commented at paragraph [167] of his judgment:

> Overall, I find persuasive the very language of the provision itself. Recognizing the existence of past parking arrangements in connection with the defendants' business, in brief words it obliges [Imperial] to continue such privileges, but only on such terms as are satisfactory to it ...

> [Emphasis added]

This passage makes clear the transmutation in the thinking of the judge in his reading of the phrase "mutually satisfactory". Now, the effect of the clause is that it simply required the terms to be individually satisfactory to Imperial, not mutually satisfactory to both. In effect, Imperial could terminate unilaterally. The subtle progression in analysis is as follows: "mutually satisfactory" means "mutual agreement"; "mutual agreement" means that the obligations are "subject to" future agreement; and, finally, the requirement for future agreement means simply that all terms must be satisfactory to Imperial.

119    Although not the explicit reason for upholding Imperial's right to terminate the parking privileges, I am satisfied that the judge was nevertheless influenced by his perception of the effect of the language used on the interpretation of the agreement.

120    In my respectful view, the notion of contractual uncertainty, epitomized by the judge's discussion of the issue in terms of "agreement to agree" was a brooding, behind-the-scenes presence in his interpretation and analysis of the agreement and certainly coloured the result. It is therefore both appropriate and important to address this issue to determine what effect, if any, it ought properly to have either directly on the disposition of this appeal or indirectly with respect to the interpretation of the language used by the parties.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

121    In my view, the use of the phrase "mutually satisfactory" does not, either as a matter of the law relating to incompleteness or uncertainty of agreement or as a matter of interpretation in the context of the agreement, lead to the conclusion that Imperial could unilaterally decide to terminate the parking privileges, if it chose not to agree on an alteration of terms.

122    The notions of uncertainty and incompleteness in contract law are conceptually distinct, but in practice the arguments as to their application often shade into one another. Incompleteness refers to the notion of putative contractual parties failing to express or otherwise indicate adequately by their words or actions, objectively determined, that they have completed an agreement. Uncertainty, on the other hand, presupposes that the parties have in principle reached an agreement but it is impossible for the court, within the rules of evidence, to give any clear or substantial meaning to the agreement which is sought to be enforced, with the result that the court has no choice but to declare the agreement or a particular clause void and unenforceable. In practical terms, however, whether the use of vague language is indicative of uncertainty as to what is meant by the agreement or is indicative of a failure to be complete enough to convince the court that a meeting of the minds on the essentials of the agreement has occurred, really does not matter to the end result. In either case, it is the infelicitous use or non-use of language which creates the problem for enforce ability, leading the court to conclude that it cannot make a contract for the parties where they have not sufficiently indicated what their intentions and expectations are.

123    What is clear from the cases is that the courts are very reluctant to hold a putative contract void or unenforceable on the basis of uncertainty or incompleteness. Having apparently attempted to make a contract, the parties' reasonable expectations, if they can be gleaned at all, ought to be allowed to be fulfilled. In the words of Morden, J.A. in *Canada Square Corp. v. Versafood Services Ltd.* (1981), 130 D.L.R. (3d) 205 (Ont. C.A.) at p.218, "A court should not be too astute to hold that there is not that degree of uncertainty in any of its essential terms which is the requirement of a binding contract". In *Hillas & Co. v. Arcos Ltd.*, [1932] All E.R. Rep. 494 (U.K. H.L.) Lord Wright observed at p.503 that: "It is ... the duty of the court to construe such documents fairly and broadly, without being too astute or subtle in finding defects".

124    While it is true that before enforcing putative contractual obligations, the court must first satisfy itself that the parties intended to make a contract in the broad sense of intending to create legal relations, that general intention can often be gleaned from the general circumstances surrounding the discussions and actions of the parties. One factor that will likely lead the court to conclude that the parties intended to contract is the fact that the putative contract has been executed and performed either in whole or in part by either one or both of the parties. The matter was well expressed by Steyn, L. J. in *Trentham Ltd. v. Archital Luxfer Ltd.*, [1993] 1 Ll. L. Rep. 25 (Eng. C.A.) at p.27:

> The fact that the transaction was performed on both sides will often make it unrealistic to argue that there was no intention to enter into legal relations. It will often make it difficult to submit that the contract is void for vagueness or uncertainty. Specifically, the fact that the transaction is executed makes it easier to imply a term resolving any uncertainty.... Clearly, similar considerations may sometimes be relevant in partly executed transactions.

125    The earlier English Court of Appeal decision in *Foley v. Classique Coaches Ltd.*, [1934] 2 K.B. 1 (Eng. C.A.) illustrates the same idea. The owner of a gas station sold adjoining land to a bus company. The sale was made subject to the bus company agreeing to purchase from the gas station all gas required for their business "at a price to be agreed by the parties in writing and from time to time". For three years, the bus company purchased its gas from the gas station but thereafter repudiated the agreement, alleging that it had no binding force because it was simply an agreement to agree. The Court of Appeal nevertheless enforced the agreement, holding that it was a binding contract, by implying a term that the bus company would purchase fuel at a reasonable price. Scrutton, L.J. stated at pp. 7 and 8:

> It is quite clear that unless the [bus company] had agreed to this [the purchase of fuel] they would never have got the land... It is quite clear that the parties intended to make an agreement, and for the space of three years no doubt entered the mind of the [bus company] that they had a business agreement, for they acted on it during that time .

> [Emphasis added]

Maugham, L.J. observed at p. 13:

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

...it is quite plain from the surrounding circumstances that the agreement as to the sale and purchase of the petrol was intended to be a binding contract and it formed part of the inducement for the sale of the land.

126      While it is true that the court in *Foley* was assisted, in coming to its conclusion that the parties intended an agreement and that a term must be implied to pay a reasonable price, by the fact that the parties had inserted a clause in the agreement that disputes as to the construction of the agreement should be submitted to arbitration, the existence of such a clause is not essential for the court to reach the type of result that occurred in *Foley* . In *Beer v. Bowden* (1976), [1981] 1 W.L.R. 522 (Eng. C.A.) Goff, L.J. noted at p. 526:

> It is fair to say that if one looks only at the judgement of Maugham, L.J. at p. 16 [in **Foley** ], he did appear to be relying substantially upon the arbitration clause in arriving at his conclusion. But I do not think that is the true ratio of the case. Where you have got an arbitration clause, then if you imply a term that there shall be a reasonable price (as it was in that case) or a fair rent (as it would be in this), any dispute as to what is reasonable or fair falls within the arbitration clause; and, if you have not got one, it falls to be resolved by the court. But, in my judgement, the presence or absence of an arbitration clause does not matter ... So, again, one implies a term on general principles, and then only turns to the arbitration clause to resolve any dispute arising from the implied term.

127      In *Foley* , as in the instant case, the obligation in issue was part of a larger enforceable transaction. That fact in itself made it much more difficult to argue that the clause relating to agreement "from time to time" was not intended to have binding effect. Once that hurdle is overcome, and the court is satisfied that the parties intended something more than a right of unilateral repudiation by either of them, the court becomes the arbiter of what a reasonable solution should be.

128      Applying these principles to the instant case, it is clear that the parties did intend to make a contract. They intended to affect their respective legal positions and claims by settling all outstanding matters existing between them. They intended to alter their respective positions and to create new legal rights by the termination of the lease, the payment of money and the creation of a right of first refusal as well as the release of other claims. In the circumstances, it is not reasonable to assume that given the evident intent to formalize their legal affairs on so many issues, they nevertheless intended not to finalize their legal position respecting parking but to leave it to future agreement. As the correspondence passing between their solicitors during the negotiations leading up to the agreement indicates, the continuation of parking privileges was important to Young, and Imperial, through its counsel, knew this.

129      In *Foley* , it is significant that the court laid emphasis upon the fact that the agreement to purchase gasoline was part of the inducement for the sale of the land and that without it, the bus company could never have been able to acquire the land. Greer, L.J. specifically described the consideration for the purchase of the land as consisting of two parts: money and the promise of future gas purchases. Waddams in his text *The Law of Contracts* (3d ed.) at pp. 32-33, in his discussion of *Foley* emphasises the connection between the part of the agreement sought to be enforced and the rest of the overall transaction and suggests that, in such circumstances, reliance on the alleged agreement by the person seeking to enforce it is an important factor in convincing the court not to refuse enforcement. He similarly interprets *Hillas & Co. v. Arcos Ltd.* , noting at p. 33 footnote 89 "the agreement to be enforced was an option that was part of a larger transaction. The plaintiff might never have agreed to the transaction as a whole had it not believed that the option in question was enforceable".

130      In the instant case, there were four clauses, two of which could broadly be said to be for Young's benefit and two of which could be said to be for Imperial's benefit. The opening sentence of the operative part of the agreement stated the consideration to be "the mutual covenants and conditions hereinafter appearing". There can be no other reasonable interpretation than that the agreement of Young to settle the severance entitlement, surrender the lease and release Imperial from any other claims as well as to grant Imperial a right of first refusal to purchase Young's land were given in part in return for the continuation of the parking privileges. While it is true that in Clause 1 of the agreement, the payment by Imperial of $40,000 to Young was expressed to be given in return for settlement of only severance entitlement (and therefore could be said not to be part of the consideration for the remainder of the agreement) that does not affect the conclusion that the making of that portion of the agreement was in itself a consideration for the other clauses. In any event, the other clauses involving Young's surrender of the lease and other

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

claims to Imperial and the granting of a right of first refusal to Imperial are clearly expressed to be, by the opening words of the operative part of the agreement, the mutual consideration for the continuation of Young's parking privileges.

131    Accordingly, I conclude that the fact that Young purported to act under the agreement by continuing to park vehicles on Imperial's land in the same way as before and Imperial agreed and acquiesced in this is a strong factor in concluding that the parties intended to enter into legal relations with respect to parking and that, accordingly, the language used by the parties is not indicative of an agreement to agree and ought not to be relied upon in construing what the parties intended their agreement to be. This conclusion is buttressed by the fact that the granting of the parking privileges was part of a larger transaction and that from the construction of the agreement, as well as the negotiations leading up to the agreement (which indicated that parking was important to Young), Young would not have entered into the transaction unless his basic concerns respecting parking formed part of the deal.

132    There is also a further reason why the use of the phrase "mutually satisfactory" should not influence the court to come to a conclusion that what was intended was that Imperial could unilaterally terminate the arrangement. There were two fundamental issues involved in the parking arrangement. One was the duration of the arrangement and the second involved the size of the area that could be used to accommodate Young's vehicles. Having "acknowledged" the existence of the parking privileges, the obligation of Imperial was expressed in terms of an undertaking "to continue these parking privileges beyond the termination of the lease on a basis mutually satisfactory to Imperial and Young." The undertaking was "to continue" the existing parking privileges "beyond the termination of the lease". Thus, notwithstanding the removal of Young's rights to the land as tenant (which up to that time, supported his ability to park cars on the land), Imperial undertook to continue the arrangement in any event.

133    Given the importance of parking to Young and Imperial's knowledge of this through its solicitor and otherwise, it is not reasonable to assume that it was intended by the parties that the extent of Imperial's obligation in terms of the duration of continuation of the arrangement was to be left solely to Imperial's whim. The use of the word "continue" without more, indicates an indefinite duration. As indicated earlier in the discussion of the *Llanelly, Spenborough* and *Winter Garden* cases, there is no presumption either in favour of perpetuity or unilateral revocability flowing from language importing indefiniteness; rather the court must attempt to ascertain in the light of all admissible evidence what the common intention of the parties was. The determination of what the parties agreed to with respect to "continuation" of parking privileges on an indefinite basis must be resolved by a contextual and circumstantial interpretation of the language aided by the doctrine of implied terms. The phrase "mutually satisfactory" relates more to the basis upon which the parking privileges were to be enjoyed, namely, the portion or portions of Imperial's land that was to be affected and the number of cars that could be parked thereon. In like manner, the reference in Clause 3 to "*these* parking privileges" serves to identify the physical extent of the continued parking, in terms of number of cars and their location (by basing it on what had previously existed).

134    The use of the terminology "mutually satisfactory" does not therefore, by any affinity with the notion of "agreement to agree", assist an interpretation that leads to the conclusion that it must have been intended that Imperial was to have a right unilaterally to choose to terminate the parking privileges.

135    What then can it be said the parties actually agreed to?

### (d) Approaches to Interpretation

136    The purpose of the law of contract is to facilitate the achievement of the reasonable expectations of the parties (or to provide substitutional remedies in lieu thereof) as manifested in their voluntary agreements, objectively determined. This is to be initially achieved by an examination of the words used, considered in their context, both in relation to the other language of the agreement and the factual background surrounding the making of the agreement.

137    The time is long passed when the courts applied (if they ever did) a literalist approach to ascertaining the meaning of the words used in a written agreement, buttressed by a strict application of the parol evidence rule. As Waddams in his text, *The Law of Contracts* , 3d ed. (1993) observes at p. 215: "words do not have immutable or absolute meanings; they take their

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

meaning from their context." Context is not limited to the written document but includes the circumstances surrounding the making of the agreement insofar as those circumstances indicate what the parties were attempting to achieve by their bargain. As O'Neill, J.A., speaking for the Court in *Atlific (Nfld.) Ltd. v. Hotel Buildings Ltd.* , said at p. 109:

> Where ... a term used in an agreement has no accepted or specific meaning in law, and is not defined in the agreement in which it is used, it is permissible for a court to have regard to extrinsic evidence to discover the intention of the parties by interpreting the words of the agreement in the light of the circumstances in which they were used. Further, a court can look to the history of the transaction and to the commercial setting in which the agreement evolved, in order to discover the real intention of the parties from the words used in the agreement.

Earlier, he referred to the process as seeking the meaning within "the factual matrix surrounding the agreement."

138     The reconciliation of this approach with the parole evidence rule is illustrated by the comments of Lord Wilberforce in *Reardon Smith Line v. Hansen-Tangen*, [1976] 3 All E.R. 570 (U.K. H.L.) at p. 574:

> It is often said that, in order to be admissible in aid of construction, these extrinsic facts must be within the knowledge of both parties to the contract, but this requirement should not be stated in too narrow a sense. When one speaks of the intention of the parties to the contract, one is speaking objectively - the parties cannot themselves give direct evidence of what their intention was - and what must be ascertained is what is to be taken as the intention which reasonable people would have had if placed in the situation of the parties. Similarly, when one is speaking of aim, or object, or commercial purpose, one is speaking objectively of what reasonable persons would have in mind in the situation of the parties.

139     It is often said that the court may not have reference to the prior negotiations of the parties leading up to the conclusion of the final agreement as a means of interpreting the words that were ultimately chosen. For example, in *Labrador Inuit Assn. v. Newfoundland (Minister of Environment & Labour)* (1997), 152 D.L.R. (4th) 50 (Nfld. C.A.) , the Court stated at para. 48:

> There is considerable danger in having regard to positions taken, and statements of prior intention made by the parties, as well as to prior negotiating drafts as compared with the final document, for the purpose of interpreting particular language in an agreement. The addition or dropping of a particular word or phrase in a later draft may have many motivations, spoken and unspoken. One can never be sure whether a stated position leading to language change is truly reflective of a party's intent. The choice of final language may well be the result of a reconsideration of that party's understanding of the implication and importance of the use or non-use of a word that was regarded as crucial previously.

As an indication of a party's actual intent, therefore, negotiating history is often regarded as being irrelevant. One reason for this is that the process of interpretation is based on an objective theory of contract formation, as emphasised in *Reardon Smith* , and does not involve a search for the parties' actual expressions of intent.

140     The trial judge ruled that extrinsic evidence of "background facts known to the parties" was admissible to assist in the interpretation of the agreement relating to parking privileges which he regarded as being ambiguous in its language. He ruled, however, that "evidence of actual negotiations and other "abstract statements of the parties' intentions" should be excluded. He was certainly right in excluding evidence of actual statements of the parties' intentions and of the negotiating history leading up to the conclusion of the agreement, insofar as those negotiations involved actual statements of the parties' understanding of the meaning of the words used. However, general evidence of the nature of the negotiations of the parties is nevertheless relevant in assisting the court in determining the background of the transaction - its factual matrix. In that sense, it assists in helping the court to discern the genesis and aim of the transaction and thereby become informed as to what the reasonable expectations of the parties were. To that extent, the negotiations of the parties were relevant to the interpretative process.

141     The words chosen by the parties to express their agreement must therefore be read against the court's understanding of the reasonable expectations of the parties gleaned from the extrinsic evidence forming the factual matrix of the transaction. It is that information which breathes life into the express language of the agreement and allows the court to interpret that language in a way which will facilitate, not frustrate, the reasonable expectations of the parties.

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

142    In *Canada Law Book Co. v. Boston Book Co.* (1922), 64 S.C.R. 182 (S.C.C.) , Duff, J. quoted Lord Davie in *Bank of New Zealand v. Simpson*, [1900] A.C. 182 (New South Wales P.C.) to the effect that "extrinsic evidence is always admissible not to contradict or vary the contract but to apply it to the facts which the parties ... were negotiating about."

143    The achievement of the reasonable expectations of the parties provides one of the justifications for the implication of terms. As Waddams states at p. 100:

> A reasonable expectation need not mean that all the implications must be spelled out in the mind of the promisee. All promises, even those we call express promises, contain elements of implication. So it is a proper part of the objective theory of contract formation that reasonable expectations will be protected even though the promisee had not subjectively directed her mind to the particular circumstances that in fact arise.

144    The traditional tests for implication of terms, namely the test of business efficacy stemming from *"Moorcock" (The)* (1889), 14 P.D. 64 (Eng. C.A.) and the test of the obvious inference, judged by the officious bystander, who would answer "of course" to a question as to whether a particular arrangement not expressed was intended to be part of the arrangement (*Shirlaw v. Southern Foundries (1926) Ltd.*, [1939] 2 K.B. 206 (Eng. C.A.) ) are, in a sense, manifestations of a desire to facilitate the achievement of the reasonable expectations of the parties, objectively determined from the language used in the context of their negotiations. It is, of course, not the subjective expectations of one party which should be protected: rather it is the reasonable expectations shared by the parties or held by one party and of which the other was aware or ought to have been aware was the basis of the conclusion of the transaction. This determination is judged on the basis of what reasonable persons in the contracting milieu facing the parties could be said to have expected.

145    By definition, implication of terms only becomes necessary where the parties have failed, by their express language, to deal with the matter in issue, leaving their objectively-determined intentions unascertained. Once the court is satisfied that there was an intention to do something more than to agree to agree in the future but, instead to enter into a legal relationship, it will be reluctant to refuse enforcement on the basis of uncertainty unless, in the words of Goodridge, J. in *Newfoundland (Attorney General) v. Churchill Falls (Labrador) Corp.* (1983), 49 Nfld. & P.E.I.R. 181 (Nfld. T.D.) at p. 270, the terms are not only "unascertained" but also "unascertainable" by the use of interpretive techniques such as the implication of terms.

146    Applying this approach to the interpretation of Clause 3 of the agreement, containing Imperial's acknowledgment that Young had enjoyed certain parking privileges in the past in respect of Young's tire sales operation, and Imperial's undertaking to continue those privileges beyond the termination of the lease on a basis mutually satisfactory to Imperial and Young, the question is what reasonable interpretation can be placed upon the language used bearing in mind the surrounding circumstances leading up to the conclusion of the agreement and bearing in mind that: (i) the lack of an expressed definitive duration for the "continued" parking privileges does not necessarily lead to a presumption of irrevocability or unilateral termination on reasonable notice or otherwise; and (ii) the use of the phrase "mutually satisfactory" does not in itself lead to the conclusion that the lack of satisfaction by either party would entitle that party unilaterally to terminate.

147    I agree with the trial judge's conclusion that the language used in Clause 3 is ambiguous. The surrounding circumstances, other than express statements of actual intention, are admissible to assist in the construction of the language used.

### *(e) True Effect of the Agreement*

148    The first thing to note is that in the recital to the agreement the parties acknowledge that they were severing their relationship "subject to" the terms of the agreement. There was an express recognition, therefore, that the relationship between them was to continue beyond termination of the lease in certain respects. The creation of the right of first refusal in favour of Imperial over Young's land would be one example. The other example would be the continuation of the parking privileges. Of interest is that the language in the agreement does not expressly deal with the duration of either of these rights. The recital also states the objective of the severance of the relationship to be that "another party" will commence operating the gas bar facilities. It is clear that both parties recognized that Imperial intended to lease the gas bar to another tenant and then Imperial's land would continue to receive the same sort of use as it had in the past. That being so, in principle, it could continue to accommodate

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

Young's use as a parking lot so long as it did not interfere with the future contemplated use of the land by Imperial. The insertion of Clause 3 relating to continuation of parking privileges was therefore not inconsistent with Imperial's immediate objectives. Imperial's interests could continue to be advanced notwithstanding the use of part of the land for parking because the uses were not incompatible.

149     A second thing to note is that Clause 3 itself relates the parking privileges to "Young's tire sales operations *on* property of Young". It is the existing tire sales business operated by Young which appears to be intended to benefit from the parking arrangement, and not the land itself, whether owned by Young or not. The parking arrangement was therefore personal to the business being operated by Young.

150     It is also not without significance that although Clause 3 appears to tie the continuation of the parking privileges to the continued operation of Young's tire sales business, there is nothing in the clause itself which purports referentially to tie the parking to the continued operation of a gas bar on Imperial's land. The reference to operation of a gas bar by "another party" is relegated to a recital, thereby merely recognizing the existing plan once Young's lease was terminated. It must be remembered that Young had previously accused Imperial of trying to set up in the area in competition with Young. The reference to continued gas bar operation in the recital at least brought home to Young that there was no commitment by Imperial that it would not continue gas bar operations on the site through another operator.

151     A third point to note is that in the correspondence passing between the solicitors for the parties the emphasis in relation to parking was on reasonableness and cooperation. In Young's solicitor's letter of May 31st, 1985, in which he purported to summarize a previous offer made by Imperial's solicitor, he talked in terms of "a reasonable arrangement regarding parking spaces" and emphasised that Young was prepared to operate his adjoining business "in a spirit of friendly, neighbourly cooperation" with Imperial. Imperial's solicitor's correspondence in reply, which included the settlement agreement for signing, noted specifically that the agreement provided for "reasonable parking arrangements" in favour of Young. Whilst these expressions of view might not be able to be relied upon in themselves to read the word "reasonable" directly into the agreement, they represent the background circumstances and knowledge by the parties of the other's respective position which led up to the formalization of the agreement with the words "mutually satisfactory" included therein.

152     The history of the negotiations clearly indicates that the continuation of parking privileges was a significant matter in the final settlement. The emphasis on "reasonableness" demonstrates that the parking privileges were regarded as something that would not be trifling or capable of being eliminated in a perfunctory manner. The reasonable expectations of the parties, gleaned from an objective consideration of the evidence is that Young believed that he was getting something of substance with Imperial's agreement to continue the parking privileges and Imperial knew that Young so regarded it and that in agreeing to the continuation of the parking privileges, it was an inducement to Young to complete the overall settlement transaction.

153     On the position advanced by Imperial in argument, the requirement that the parking privileges be "mutually satisfactory" means that both must agree and that if one does not agree, it can effectively block any agreement, thereby leading to the conclusion that Imperial could terminate at any time unilaterally. On that interpretation, before the ink was dry on the agreement, Imperial could have given notice to Young that it intended to withdraw the parking privileges and then, following expiration of a period of reasonable notice (or perhaps even no notice) walk away from that part of the arrangement. Viewed objectively, I cannot conceive that if the parties were asked immediately before appending their signatures to the agreement whether Imperial could act in such a manner, either would have asserted that that was what was intended. Knowing that the continuation of parking was important for the operation of Young's business, it is not reasonable to impute an intention to the parties that the parking arrangements could be terminated immediately and unilaterally by Imperial.

154     Although I have previously concluded (see paras. [102]-[105]) that the language used by the parties to the agreement does not imply perpetuity in the exercise by Young of his parking privileges, I have also concluded that the words "acknowledges," "undertakes" and "continue" do imply, especially when read against the factual matrix of the transaction, something that is more than of a transient nature capable of being withdrawn unilaterally at the whim of the other party. As a sign post of the parties' reasonable expectations, therefore, the language used militates against any interpretation that would accord Imperial such a unilateral right and supports an interpretation that accords to Young a degree of greater protection.

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

155    The nature of the arrangement was that there was to be a mutual accommodation of each party's respective interests. Imperial needed to be able to continue to deal with the land, and proposed to do so in the same manner as before and which was not inconsistent with Young's continued use of part of it for parking. Young, for his part, needed additional parking to facilitate his business. An officious bystander cognizant of the background and of the interests of the parties would conclude that the reasonable expectations of the parties embodied in the agreement were that neither side was to be held hostage to the whims of the other. The opportunity of Young to use the land for parking and the opportunity of Imperial to use the property for other purposes that would be manifestly inconsistent with continued parking were to be accommodated to the extent possible.

156    Once it is concluded that the requirement that the parking privileges be "mutually satisfactory" does not mean that Imperial could unilaterally walk away from the parking arrangement and that, equally, Young could not indefinitely hold Imperial hostage in a relationship regardless of the impact on Imperial's future needs for the property, it follows that an obligation of reasonable accommodation by both sides must have been part of the reasonable expectations of the parties.

157    The problem in this case is to give an appropriate alternative meaning to the phrase "mutually satisfactory" while at the same time defining, based upon the reasonable expectations of the parties, the duration of the parking privileges and the means whereby they were to be exercised and ultimately brought to an end. The answer to this conundrum is, I believe, to be found in notions of good faith, implemented by the doctrine of implied terms.

158    While many would doubt the existence of a general doctrine of good faith performance in Canadian contract law, there are nevertheless instances where notions of good faith have been used to supplement contractual obligations. This is usually accomplished, not by way of enunciation of a general legal obligation, but by the use of implied terms as the exigencies of a particular case require to give business efficacy to contractual relationships. As Waddams points out at p. 329, "the cases implying terms into contracts often also conceal a judicial control over agreements that would otherwise be unfair. The power to imply terms into contracts is a flexible judicial tool". In *Dahl v. Nelson, Donkin & Co.* (1881), 6 App. Cas. 38 (U.K. H.L.) Lord Watson observed at p. 59 that a court:

> must assume that the parties intended to stipulate for that which is fair and reasonable, having regard to their mutual interests and to the main objects of the contract.

159    Increasingly, in recent years express contractual provisions that appear to permit a decision seriously affecting a party to be made at the other party's sole discretion require that other party to act reasonably, honestly and in good faith. For example, in *Greenberg v. Meffert* (1985), 18 D.L.R. (4th) 548 (Ont. C.A.) ; (leave to appeal refused (1985), 30 D.L.R. (4th) 768 (note) (S.C.C.) ) the terms of an agreement between a defendant real estate company and a plaintiff sales person provided that in the event that a listed property was sold after the agent's employment was terminated, any commission receivable by the agent "will be at the sole discretion of the company". The Ontario Court of Appeal held that those words meant that the defendant must act reasonably in exercising its discretion and must also act honestly and in good faith. Robins, J.A. stated at pp. 554-555:

> In my opinion, the company's discretion in this matter is not unbridled, firstly, because the nature of this contract and the subject matter of the discretion are such that the company's decision should be construed as being controlled by objective standards; and secondly, because the exercise of the discretion whether measured by subjective or objective standards, is subject to a requirement of honesty and good faith.

> ... if this provision is to have purpose and substance, the discretion must be exercised in a reasonable way, not arbitrarily or capriciously but for good reason.

160    In *McKinlay Motors Ltd. v. Honda Canada Inc.* (1989), 80 Nfld. & P.E.I.R. 200 (Nfld. T.D.) Wells, J. held that provisions in an automobile dealer franchise agreement allowing for the discretionary allocation of vehicles by the manufacturer to a particular dealer was subject to an implied term that the parties act towards each other in their business dealings in good faith.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

161     Thus, even where the language of an agreement appears to give an unfettered discretion to one party to act with reference solely to his or her own interests, such a discretion may be circumscribed by obligations of good faith once the language is construed in the context of the relationship of the parties.

162     The notion of good faith surfaces in other areas as well. The notion of an implied duty of cooperation to facilitate the performance of a contract has been noted. See *Burrows* , "*Contractual Cooperation and the Implied Term* (1968), 31 Mod. L.R. 390; *Stoljar* , "*Prevention and Cooperation in the Law of Contract* " (1953), 31 Can.B.Rev. 231.

163     Furthermore, the notion of an obligation to negotiate in good faith and not to withhold agreement unreasonably has been recognized in some cases where the parties have stipulated for mutual agreement in the future in situations where the court holds that the agreement is not void for uncertainty or incompleteness. In *Empress Towers Ltd. v. Bank of Nova Scotia (1990), 73 D.L.R. (4th) 400* (B.C. C.A.) a tenant had an option to renew a lease at market value "as mutually agreed" between the tenant and the landlord. The lease also provided if the parties could not agree, either could terminate the agreement. Prior to the expiration of the term, the tenant proposed a new and higher rent for the option term and indicated a willingness to negotiate. The landlord did not respond until the day of expiry of the term, stating it wanted to renew on a month to month basis with advance payment of a substantial sum of money. On the tenant's refusal, the landlord sought possession. A majority of the British Columbia Court of Appeal held that the option agreement was not an agreement to agree and that it was not void for uncertainty. The majority further held that the requirement for mutual agreement on the renewal market rent meant that it should not be construed as giving the landlord a unilateral right to stipulate whatever arrangement it wished and, if not agreed to by the other side, to walk away from the arrangement; rather the agreement was subject to an implied term that the landlord would negotiate in good faith and that agreement would not be unreasonably withheld.

164     Lambert, J.A. stated, for the majority, at pp. 404-405:

> ...the courts will try, wherever possible, to give the proper legal effect to any clause that the parties understood and intended was to have legal effect.

> In this case, if the parties had intended simply to say that if the tenant wished to renew it could only do so at a rent set by or acceptable to the landlord, then they could have said so. Instead, they said that if the tenant wished to renew it could do so at the market rental prevailing at the commencement of the renewal term. If nothing more had been said then the market rental could have been determined on the basis of valuations and, if necessary, a court could have made the determination. It would have been an objective matter. But the clause goes on to say that not only must the renewal rental be the prevailing market rental but also it must be the prevailing market rental as mutually agreed between the landlord and the tenant. It could be argued that the additional provision for mutual agreement meant only that the first step was to try to agree but if that step failed then other steps should be adopted to set the market rental. However, the final sentence of cl. 23, which contemplates a failure to agree giving rise to a right of termination, precludes the acceptance of that argument. In my opinion, the effect of the requirement for mutual agreement must be that the landlord cannot be compelled to enter into a renewal tenancy at a rent which it has not accepted as the market rental. But, in my opinion, that is not the only effect of the requirement of mutual agreement. It also carries with it, first, an implied term that the landlord will negotiate in good faith with the tenant with the objective of reaching an agreement on the market rental rate and, secondly, that agreement on a market rental will not be unreasonably withheld. Those terms are to be implied under the officious bystander and business efficacy principles in order to permit the renewal clause, which was clearly intended to have legal effect, from being struck down as uncertain. The key to implying the terms that I have set out is that the parties agreed that there should be a right of renewal at the prevailing market rental.

165     Whilst the circumstances under which an implied duty of good faith performance arises are many and varied, and the extent to which such a duty can be said to be implied as a matter of law into all contractual relationships is still a matter of debate, the fact remains that the courts in individual cases are prepared to imply such duties as the individual circumstances require so as to ensure that the reasonable expectations of the parties otherwise ascertainable are not frustrated and rendered nugatory.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

166    In the instant case this notion of good faith performance and a duty to cooperate in the accommodation of the mutual interests of the parties so as to facilitate the achievement of the main objects of the contract, gives meaning to the requirement in Clause 3 that the continuation of the parking privileges shall be on a basis "mutually satisfactory" to both parties. It requires each party in good faith to attempt to accommodate the interests of the other with respect to the use of the land for parking before being in a position to exercise any right to terminate or arbitrarily to insist on continuation.

167    As in the *Empress Towers* case, if Imperial and Young had intended simply to say that if Young wished to continue his existing parking privileges beyond the termination of the gas bar lease it could only do so if the nature and extent of those privileges were acceptable to Imperial, they could have said so. Instead, they provided that the nature and extent of the future arrangement was to be "mutually" satisfactory. Furthermore, the parties stipulated, either expressly or by implication, the standard to be applied in defining the nature and extent of the future parking arrangement: the existing parking arrangement (i.e. approximately 25 cars, parked around the perimeter of the property) was to be "continued" subject to future adjustment based on mutual accommodation of the parties' reasonable changed requirements.

168    That having been said, the question then arises as to whether there are any outside parameters which in any event would limit the period of time during which this duty of cooperation would be operative. This brings us back to the question of duration. Although Clause 3 does not expressly deal with the matter, it is appropriate to imply terms into the agreement that will have the effect of fulfilling the objectively determined reasonable expectations of the parties, as previously described. Any implied terms so derived should arise out of the provisions of Clause 3, viewed against the background circumstances, and not be inconsistent with that clause.

169    In *Wyatt v. Franklin* (1993), 122 N.S.R. (2d) 252 (N.S. S.C.) in a dispute between an uncle and his nephew as to the ownership and use of certain land occupied by the uncle, Goodfellow, J. held that the agreement between the parties was an indefinite licence to use the land. Noting that the terms of the licence were not spelled out, he nevertheless rejected the suggestion that the licence was terminable on six months notice because "it completely overlooks the true nature of the licence agreement between the parties" (p. 262). Nevertheless, taking account of the nature of the relationship between the parties and the circumstances under which the arrangement was entered into, the judge drew the inference that the licence was to be of considerable duration upon terms which included provisions that the licence: was to terminate on the death of either or both parties (because the licence was personal in nature); was to terminate on the retirement or departure of the licensee from his construction business (because the foundation of the licence was the use of the land in the carrying out of the business), would continue until such time as the licensor had a bona fide alternate use for the property; and would be defeated by either party selling or disposing of his respective property. Goodfellow, J. observed at p. 263:

> While it is clear that the parties never expressed the terms that I have inferred in their licence, they are clearly established by the relationship of the parties and represent what they clearly intended and would have expressed had they done so in 1976.

170    What is significant about the *Wyatt* case is that the court was prepared to imply terms concerning the duration of an indefinite licence in order to give meaning and effect to the reasonable expectations of the parties which were gleaned from the surrounding circumstances.

171    In like manner, similar terms can be implied in this case.

172    The key factors affecting the continued use of Imperial's property for parking can be said to be the following:

(1) The continued operation of Young's tire sale business from the adjacent property.

(2) The future use of Imperial's property for a purpose that was incompatible with the continued use of the property by Young for parking cars.

(3) Because a licence is personal to the parties and does not constitute an interest in the land, the contemplated bona fide sale of the property by Imperial to a third party at arm's length.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

With respect to the nature and extent of the parking rights, as to the number of cars to be parked and the area to be occupied, inasmuch as the parking privileges which Imperial undertook to "continue" were "these parking privileges", i.e., those which Young had previously enjoyed, the area and the number of cars would be generally the same as had existed previously; but because of the need to limit parking to circumstances where Imperial does not have a bona fide use which is incompatible with parking, the areal extent of the privileges would be subject to adjustment (and potentially elimination) as may be required by bona fide future uses of the property by Imperial.

173    It may be said that the reference in the recitals of the settlement agreement to the continued operation of the gas bar by another party implies that the licence to park was intended only to last so long as the land was used as a gas bar. The reference to continued gas bar use, however, is significant not as an indication that the parties intended to terminate parking when the gas bar ceased to operate but, rather, as a signpost that Imperial was content to allow the parking to continue so long as the parking could be accommodated with respect to future use. Imperial was prepared to agree to continued parking because it did not interfere with future plans for the property. So long as that situation obtained, there would be no need for Imperial to change its position, provided of course any future bona fide use (including a proposed sale) that became incompatible with continuation of the existing parking arrangement, in whole or in part, would not be frustrated.

174    The tying of the duration of the licence strictly to the continued existence of the gas bar is much too arbitrary, if the essence of the arrangement is the good faith accommodation of the parties' changed circumstances. What if the use was changed from a gas bar to, say, a car wash, but the new use could equally accommodate parking? Could it be said, applying the officious bystander test at the time the agreement was signed, that Imperial if asked, would necessarily say that the closing of the gas bar would allow for unilateral termination of parking even though Young's interests were not incompatible with the new use? I do not believe so. It is more likely, given the concept of reasonable accommodation underlying the arrangement, that the response would be more along the lines that Young could continue to park so long as it did not interfere with Imperial.

175    Indeed, the cessation of the gas bar use as a termination point for the parking licence might also be too long, rather than too short. It might well have been, for example, that a major expansion of the gas bar might have made operation in its extended format incompatible with continued parking. The notion of reasonable accommodation should equally apply in such circumstances to require Young to limit, move or perhaps even cease, parking as the circumstances of the change and expanded use dictated.

176    Furthermore, as previously noted, it is not without significance that although Clause 3 expressly references the continuation of Young's tire sales business, it does not do so in relation to the continuation of a gas bar but, instead relegates that reference to a recital. An implied term that would limit future parking privileges to the duration of future gas bar use could not therefore be said to arise out of the clause itself.

177    It follows, therefore, that the notion of reasonable accommodation underlying the arrangement means that the duration of the licence is not limited by any specific use, such as a gas bar operation, but by the concept of incompatibility of conflicting uses whatever they may be. It is the principle of future incompatibility which is the touchstone for an understanding of the arrangement which best reflects the reasonable expectations of the parties, objectively determined.

178    On this analysis, a proper construction of the agreement leads to the conclusion that Imperial and Young agreed, for consideration, that:

A. Young would have the right, not terminable unilaterally by Imperial or enjoyable in perpetuity by Young, to park cars associated with Young's business on Imperial's property for such period of time which was the shorter of:

(i) The date upon which Young or his family, either directly or through the alter ego of Kings Bridge Service Station Limited, ceased to operate a tire sales operation on the adjacent property;

(ii) The date upon which Imperial bona fide decided to sell the property to a third party at arms length to Imperial; and

(iii) The date upon which Imperial bona fide decided to use the property for a use that was incompatible with the continued use of the property by Young for parking cars, and so reasonably notified Young of that intention.

B. The nature and extent of the parking rights as to the number of cars to be parked and the area to be occupied by them, would generally be that which was previously enjoyed by Young, but subject to adjustment on the basis of discussions of the parties, acting in good faith, or as may reasonably be required by subsequent changes by Imperial in the use of the property.

In the event that the parties could not, after good faith discussion, agree on appropriate accommodations with respect to any revised circumstance, the court would break the deadlock based on an objective standard of reasonableness. Unlike the *Empress Tower* case, where the parties expressly stipulated for the right to terminate in the event there was no mutual agreement arrived at following good faith negotiations, the possibility of judicial resolution in the face of lack of agreement between the parties remains an option in the instant case because they did not stipulate for the right to terminate in such an eventuality.

179    On this interpretation, the phrase "mutually satisfactory," imports into the agreement the notion of good faith, cooperation and accommodation in the future with respect to adjustment of the areal extent of the parking privileges to accommodate any good faith changes by Imperial in the use of the property. The fulfilment of this obligation would require the parties to keep each other informed of their future plans and to discuss in good faith alternative means whereby parking could still be accommodated without impairing, in a material way, Imperial's proposed alternative use of the property.

180    This interpretation of the phrase "mutually satisfactory" best accords with the reasonable expectations of the parties and does not subject one party either to the threat of unilateral termination or the other to the possibility of perpetual interference with proprietary rights. It subjects the future relationship of the parties to a continuation of the nature of the existing parking arrangement, imposes on them a requirement to make true efforts at mutual accommodation and requires the parties to discuss and reach a solution varying the existing agreement that is truly mutually satisfactory. It arises naturally out of the express language of Clause 3, is supported by the surrounding background circumstances, and is not inconsistent with the words of the parties' agreement.

## (f) Application to the Facts

181    As of the date of trial, Young still owned and operated his tire sale business on the adjacent property and Imperial had not sold or disposed of the property. What had happened, however, was that Imperial, having closed the gas bar operation, commenced to environmentally remediate the property. Imperial claimed that it was required to do this by the Department of the Environment. It did not, however, provide, either to Young or to the court, information as to the extent of the problem or the specific requirements for remediation.

182    As indicated earlier, Imperial unilaterally fenced off most of the property leaving Young with a narrow area which could accommodate no more than seven vehicles. Despite approaches by Young suggesting that the two sides attempt to agree on revisions to the original arrangement to accommodate the new events which had occurred, ie. the closing of the gas bar and cleanup of the site, Imperial did not engage in any meaningful discussion with Young with respect to these matters. Instead, it unilaterally purported to terminate the parking privileges. It took the position that once the cleanup of the area was completed, it wished to fence all of the property and to prevent any further parking "to avoid any risk of new contamination of the property from vehicles which could leak oil or gasoline onto the surface of the land". No evidence was presented as to whether there was in fact any risk of contamination that would have been of any concern to the Department of Environment from the leaking of oil or gasoline from parked vehicles. The singular absence of any evidence of the nature of the problem identified by the Department of Environment and whether the complete exclusion of any further vehicles from the property would have been necessary to avoid the risk of any further contamination, was noteworthy.

183    I conclude from this that Imperial did not act in good faith in its dealings with Young with respect to whether or not the new (or restricted) usages contemplated by Imperial could nevertheless accommodate some or all of the originally contemplated continued parking by Young. It would have been incumbent upon Imperial to discuss with Young the possibility of using other

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

areas of the property for parking at a time when it was necessary to excavate the original parking area as part of the environmental remediation, and, after the remediation was completed, to determine whether or not some arrangement could be reached to allow continued parking in a manner that would not have future environmental repercussions. The mere assertion of an inability to accommodate further parking and the unilateral taking of action by Imperial to restrict Young does not fulfill this obligation.

184    I recognize, of course, that the trial judge made a finding of fact that the parties acted in good faith towards one another. This finding does not conflict with the inference that I draw. The trial judge's use of the notion of good faith essentially embodied a conclusion that Imperial did not act in bad faith, and in that sense, maliciously, to harm Young. In the sense in which it is used in this judgment, however, good faith refers to the obligation to take account of the interests of the other party and to attempt to reach an accommodation where those interests conflict with one's own interest before asserting one's own strict legal rights. In that sense, Imperial did not act in good faith. Young continuously held out the possibility of discussions leading to a possible accommodation of their mutual interests. Imperial's response was to attempt to terminate the parking rights. There was no attempt at good faith negotiations. It appears that Young was regarded simply as a nuisance who could be dealt with and disposed of by refusing any accommodation.

185    Accordingly, I conclude that Imperial was in breach of its agreement with Young and, not having, as of the date of trial, attempted to work out a reasonable accommodation, was still in breach.

186    At common law a contractual licence could effectively by revoked at any time by the licensor, with any remedy for wrongful revocation being limited to a claim for damages for breach of contract. With the fusion of the administration of law and equity by the *Judicature Acts* , however, came the possibility of the grant of an injunction to restrain the revocation of the licence before expiration of its intended duration, on the basis of an implied obligation not to revoke it, except in accordance with the contract, while the licence period was still running. See, *London Borough of Hounslow v. Twickenham Garden Developments Ltd.* (1970), [1971] 1 Ch. 233 (Eng. Ch.) , per Megarry, J. at pp. 245-248, who found support in *Hurst* and *Winter Garden* for this position.

187    The contract in this case is subject to an implied term that the parking privileges will continue until the occurrence of certain events, including a future use of the land by Imperial for a purpose inconsistent with continued parking. Applying *Hounslow* , there is also an implied negative obligation not to revoke before the happening of that event. Young is thereby entitled to an injunction restraining Imperial from revoking the parking privileges except in accordance with rights conferred by the agreement.

**Disposition**

188    Accordingly, I would grant the following remedies:

1. It is declared that James Young and Kings Bridge Service Station Limited have the right, not terminable unilaterally by Imperial or enjoyable in perpetuity by Young, to park vehicles associated with Young's business on Imperial's adjacent property for such period of time which is the shorter of:

(i) The date upon which Young or his family, either directly or through the medium of Kings Bridge Service Station Limited, cease to operate a tire sales business on the adjacent property;

(ii) The date upon which Imperial bona fide decides to sell, and does sell, the property to a third party at arms length from Imperial; and

(iii) The date upon which Imperial bona fide decides to use the property for a use that is incompatible with the continued use of all of the property by Young and/or Kings Bridge Service Station Limited for parking cars, and so reasonably notifies Young of that intention.

2. It is further declared that the nature and extent of the parking rights as to the number of vehicles to be parked and the area to be occupied by them shall be the same as that which was previously enjoyed by Young and/or Kings Bridge Service

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 299 of 398

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

Station Limited prior to termination of the gas bar lease, but subject to adjustment on the basis of mutual agreement of the parties acting in good faith, or as may reasonably be required by subsequent changes by Imperial in the use of the property. In the event of disagreement after good faith discussion, as to how the interests of the parties can be accommodated as a result of changed circumstances, the court may determine whether: (a) future use bona fide proposed by Imperial is in fact incompatible in whole or in part with continued use of the land for parking; (b) the area and extent, if at all, which the land with its new use can accommodate any parking; (c) any reasonable adjustment of parking should be ordered; (d) future parking should be terminated.

3. It is ordered that Imperial, its servants and agents and any one acting on their behalf be and are hereby enjoined from interfering with or preventing the exercise of the parking rights enjoyed by James Young and/or Kings Bridge Service Station Limited on property of Imperial adjacent to the service station property of Kings Bridge Service Station Limited, except in accordance with the rights of the parties as declared in paragraphs 1 and 2.

4. It is ordered that Imperial shall forthwith remove any and all barriers and obstructions presently existing on the property that prevent the present exercise by James Young and/or Kings Bridge Service Station Limited of car parking in any manner that is less extensive in area than that which was enjoyed immediately prior to the termination of the Imperial lease.

5. It is ordered that Imperial pay to James Young and/or Kings Bridge Service Station Limited, as their interests may appear, damages for trespass in an amount to be assessed.

6. Imperial shall pay the costs of the appellants on this appeal and at trial, on a party and party basis, to be taxed.

*Appeal dismissed.*

Footnotes

1    Before the trial judge the parties made no distinction between the corporate appellant and James Young, nor will one be made in this decision. Both, collectively and separately are referred to as Young unless otherwise noted.

2    I shall return later in this decision to the principle espoused in *Winter Garden* respecting construction of contractual licences.

3    The preamble to the covenants states, in part, "*NOW THEREFORE THIS AGREEMENT WITNESSETH* that for and in consideration of the mutual covenants and conditions hereinafter appearing, the parties hereto mutually covenant and agree as follows:"

4    The Supreme Court Law Review, Vol. 6, p. 131

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 44

377 B.R. 148
United States Bankruptcy Court,
D. Delaware.

In re ARGOSE, INC., Debtor.

No. 04–12533 (MFW).    |    Oct. 19, 2007.

**Synopsis**

**Background:** Chapter 7 trustee moved to modify order approving stipulation that authorized him to use lenders' cash collateral to liquidate debtor's assets, seeking to reduce unsecured creditors' carveout to permit greater payout to trustee's general counsel. The Bankruptcy Court, 372 B.R. 705, denied motion. Trustee moved for reconsideration.

**[Holding:]** The Bankruptcy Court, Mary F. Walrath, J., held that modification of order approving stipulation was warranted.

Motions for modification and reconsideration granted.

West Headnotes (3)

**[1]**    **Bankruptcy**
　　🔑 Carrying out provisions of Code

**Bankruptcy**
　　🔑 Judgment or Order

Modification of order approving stipulation that authorized Chapter 7 trustee to use lenders' cash collateral to liquidate debtor's assets, so as to permit reduction of anticipated distribution to unsecured creditors to permit greater payout to trustee's general counsel, in the amount necessary to pay trustee's commission, was warranted, pursuant to statute authorizing orders necessary or appropriate to carry out Bankruptcy Code, given that modification would not offend any provisions of Code and that all of estate's assets were collateral of lenders, which agreed to use of collateral in manner sought by trustee. 11 U.S.C.A. § 105(a).

Cases that cite this headnote

**[2]**    **Bankruptcy**
　　🔑 Evidence; witnesses

In deciding Chapter 7 trustee's motion for reconsideration of his earlier motion to modify order approving stipulation that authorized him to use creditor's cash collateral to liquidate debtor's assets, so as to reduce unsecured creditors' carveout and permit greater payout to trustee's general counsel, bankruptcy court would take judicial notice of schedules filed in debtor's case, which evidenced that there were no priority claims and that general unsecured claims totaled only $155,193.39.

1 Cases that cite this headnote

**[3]**    **Bankruptcy**
　　🔑 Equitable powers and principles

Equitable remedies under statute authorizing orders necessary or appropriate to carry out Bankruptcy Code are limited, and should be used only to further the substantive provisions of the Code. 11 U.S.C.A. § 105(a).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*148**  Steven K. Kortanek, Womble Carlyle Sandridge & Rice, PLLC, Wilmington, DE, for Debtor.

Shannon D. Leight, Esquire Ciardi & Ciardi P.C., Wilmington, DE, for Trustee.

***MEMORANDUM OPINION*** [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the chapter 7 Trustee's Motion for Reconsideration of this Court's Order entered on August 6, 2007, denying the Trustee's Motion for Entry of an Order Modifying Final Order Approving the Stipulation Authorizing Chapter 7 Trustee to Use Cash Collateral and Agreement for Liquidation of Debtor's

Collateral and Approving Limited Notice (the "Modification **\*149** Motion"). For the reasons set forth below, the Reconsideration Motion and Modification Motion will be granted.

## I. BACKGROUND

The factual background to the Modification Motion is detailed in the Memorandum Opinion accompanying the Order denying that Motion and will only be repeated here as necessary.

Argose, Inc. (the "Debtor") filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on September 4, 2004. George L. Miller (the "Trustee") was appointed the chapter 7 Trustee. On December 3, 2004, the Court approved a stipulation between the Trustee and INVESCO Private Capital, Inc. (the "Lender") authorizing the Trustee to use cash collateral to liquidate the Debtor's assets for the benefit of the Lender (the "Stipulation"). The Stipulation provided a carve-out from the Lender's collateral of $50,000 for the Trustee's general counsel fees and $50,000 for the unsecured creditors.

The Court approved the final fee applications of the Trustee's general counsel, which totaled $81,393.50. [2] Even though the allowed fees exceeded the Stipulation's cap, the Trustee paid them.

The Trustee filed the Modification Motion which sought an increase in the cap on general counsel's fees and concomitant reduction in the unsecured creditors' carve-out because of "unanticipated" complexity in the protection, marketing and sale of the assets. After a hearing held on May 9, 2007, the Court denied the Modification Motion because (1) it was unclear why the modification was needed as there appeared to be sufficient funds in the estate to pay the unsecured creditors' carve-out and the increased counsel fees and (2) there appeared to be no basis for the requested relief.

The Trustee filed the Reconsideration Motion on August 16, 2007, and a hearing was held on September 19, 2007. No objections were filed. The matter is ripe for decision.

## II. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C §§ 1334 & 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(M).

## III. DISCUSSION

### A. Clarification

At the hearing on the Reconsideration Motion, counsel for the Trustee clarified that the relief requested in the Modification Motion is necessary notwithstanding the fact that the estate has more than $52,500 in cash on hand. Counsel explained that, although all professionals have been paid, the Trustee's commission (which statutorily could be as high as $16,165.91) has not been paid. Therefore, counsel contends there would be insufficient funds to pay unsecured creditors the $50,000 carve-out allotted them in the Stipulation with the Lenders.

In addition to clarifying the amount of fees already approved for it, counsel explained that it was not seeking any fees in addition to the $81,393.50 already paid. Counsel noted that the Stipulation provided that the carve-out for general counsel fees of $50,000 "will be renegotiated depending upon the complexity of sale of the Post–Petition Collateral." (Stipulation at § D.4b(b).) That was done when the sale **\*150** of the assets of the estate took longer and realized fewer proceeds than anticipated.

Counsel argued that, because the unsecured creditors in the case had not been parties to the Stipulation, they had no expectation of receiving the $50,000 carve-out.

### B. Modification

 **[1]**   Based on the representations of counsel for the Trustee and after review of the Stipulation and record in this case, the Court is convinced that the relief requested in the Trustee's Motions should be granted.

 **[2]**   In the Stipulation, the Trustee acknowledged that the Lenders had secured claims of approximately $8.3 million as of the filing of this case. (Stipulation at § C.1.) The Court takes judicial notice of the Schedules filed in this case which evidence that there are no priority claims and general unsecured claims total only $155,193.39.

The Stipulation provided for a carve-out of the expenses necessary to administer this case, as well as a recovery for unsecured creditors. At the time, it was anticipated that the assets of the estate would be sold for enough to pay these carve-outs and provide a recovery for the Lenders. Unfortunately, that did not materialize. The principal assets of the estate were sold for only $50,000.

[3]  The Court has the power under section 105(a) of the Code to modify an order if equity so requires. *See, e.g., In re Marcus Hook Dev. Park, Inc.,* 943 F.2d 261, 265 n. 5 (3d Cir.1991) (holding that the court retains jurisdiction under section 105 to modify sale order under Rule 60(b) if it is appropriate to do so); *In re Olsen,* 861 F.2d 188, 189 (8th Cir.1988) (stating that bankruptcy courts have general authority to change terms of their own orders when equity so requires); *In re Radco Merch. Servs., Inc.,* 111 B.R. 684, 689 (N.D.Ill.1990) ("[l]ike a court of equity, the bankruptcy court has the power to amend, modify, or vacate its earlier orders."). Equitable remedies under section 105(a) are limited, however, and should be used only to further the substantive provisions of the Code. *In re Joubert,* 411 F.3d 452, 455 (3d Cir.2005) (following *In re Morristown & Erie R.R. Co.*, 885 F.2d 98, 100 (3d Cir.1990)); *see also In re Jamo,* 283 F.3d 392, 403 (1st Cir.2002); *United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986); Lawrence P. King, Collier on Bankruptcy ¶ 105.01 [2], at [105–7]–[105–8] (15th ed. rev.2007).

In this case, the Court concludes that a modification will not offend any provision of the Code. Because all the assets of the estate were the collateral of the Lenders and because the Lenders agreed to the use of that collateral in the manner now requested by the Trustee, the Court will grant the Modification Motion and permit the reduction of the anticipated distribution to unsecured creditors in an amount necessary to pay the Trustee's commission as may be approved by this Court.

## IV. *CONCLUSION*

For the reasons stated above, the Trustee's Motion for Reconsideration and Motion for Modification will be granted.

An appropriate order is attached.

### *ORDER*

**AND NOW,** this **19th** day of **OCTOBER, 2007,** upon consideration of the Motion of Chapter 7 Trustee for Reconsideration of the Order denying the Trustee's Motion for Entry of an Order Modifying Final Order Approving the Stipulation Authorizing Chapter 7 Trustee to Use Cash Collateral and Agreement for Liquidation **\*151** of Debtor's Collateral and Approving Limited Notice, it is hereby

**ORDERED** that the Motion for Reconsideration is **GRANTED;** and it is further

**ORDERED** that the Motion to Modify is **GRANTED.**

cc: Shannon D. Leight, Esquire [1]

Footnotes

[1]  This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014.

[2]  The original Memorandum Opinion incorrectly stated that counsel fees had been approved in the amount of $77,505.

[1]  Counsel is to serve a copy of this Order and accompanying Memorandum Opinion on all interested parties and file a Certificate of Service with the Court.

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 45

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

432 F.3d 507
United States Court of Appeals,
Third Circuit.

In re ARMSTRONG WORLD
INDUSTRIES, INC., Appellant.

No. 05–1881.    |    Argued Oct.
24, 2005.    |    Dec. 29, 2005.

**Synopsis**

**Background:** Objections were filed to confirmation of Chapter 11 debtor's proposed reorganization plan. The United States District Court for the District of Delaware, Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania, sitting by designation, 320 B.R. 523, denied confirmation, and debtor appealed.

**[Holding:]** The Court of Appeals, Anne E. Thompson, District Judge, sitting by designation, held that plan violated absolute priority rule.

Affirmed.

West Headnotes (10)

**[1]    Bankruptcy**
         Finality

In bankruptcy cases, finality, for purpose of taking appeal, is construed more broadly than for other types of civil cases. 28 U.S.C.A. § 1291.

1 Cases that cite this headnote

**[2]    Bankruptcy**
         Finality

Factors appellate court considers in determining whether district court's decision in a bankruptcy case is final are as follows: (1) impact on assets of bankruptcy estate; (2) need for further fact-finding on remand; (3) preclusive effect of decision on merits; and (4) interests of judicial economy. 28 U.S.C.A. § 1291.

8 Cases that cite this headnote

**[3]    Bankruptcy**
         Finality

Order denying confirmation of proposed Chapter 11 plan, on ground it violated absolute priority rule, was sufficiently final to warrant appellate review; order would likely affect distribution of assets between different creditor classes, and issue on appeal raised discrete question of law that would have preclusive effect on certain provisions of plan. 11 U.S.C.A. § 1129(b)(2); 28 U.S.C.A. § 1291.

9 Cases that cite this headnote

**[4]    Bankruptcy**
         Conclusions of law;  de novo review

Whether proposed Chapter 11 reorganization plan violates absolute priority rule is question of law, reviewed de novo. 11 U.S.C.A. § 1129(b)(2).

6 Cases that cite this headnote

**[5]    Statutes**
         Plain language;  plain, ordinary, common, or literal meaning
**Statutes**
         Relation to plain, literal, or clear meaning;  ambiguity

If meaning of statute is plain, construing court will make no further inquiry unless literal application of the statute will end in result that conflicts with Congressional intentions, which are controlling.

8 Cases that cite this headnote

**[6]    Bankruptcy**
         Preservation of priority

Proposed Chapter 11 plan provision, issuing new stock warrants to unsecured senior class of creditors for automatic transfer to junior class of equity holders if co-equally senior impaired class rejected plan, violated absolute priority rule; rule



Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 306 of 398

In re Armstrong World Industries, Inc., 432 F.3d 507 (2005)

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

could not be evaded through fiction that creditor was free to transfer its distribution, and value of warrants far exceeded value of any intercompany claims given up by equity holders. 11 U.S.C.A. § 1129(b)(2)(B)(ii).

16 Cases that cite this headnote

**[7]**    **Bankruptcy**
  👉 Equitable powers and principles
  **Bankruptcy**
  👉 Preservation of priority

Equitable considerations did not warrant approval of proposed Chapter 11 plan that violated absolute priority rule by issuing new stock warrants to equity holders over objection of senior impaired class of creditors, even though numerical majority of senior class's members had accepted plan and warrant issuance would not negatively affect distribution to senior class. 11 U.S.C.A. § 1129(b)(2)(B)(ii).

14 Cases that cite this headnote

**[8]**    **Bankruptcy**
  👉 Preservation of priority
  **Estoppel**
  👉 Claim inconsistent with previous claim or position in general

Senior class of unsecured creditors was not judicially estopped from raising absolute priority rule objection to proposed Chapter 11 plan, even though it had participated in plan negotiations, initially endorsed plan, and subsequently withdrawn its support of plan for unrelated reason. 11 U.S.C.A. § 1129(b)(2)(B)(ii).

7 Cases that cite this headnote

**[9]**    **Estoppel**
  👉 Claim inconsistent with previous claim or position in general

"Judicial estoppel" can be applied when party asserts certain position in legal proceeding and prevails, only to assert contrary position later on because of changed interests; its purpose is to protect judicial process by preventing parties

from deliberately changing positions according to exigencies of moment.

12 Cases that cite this headnote

**[10]**    **Estoppel**
  👉 Claim inconsistent with previous claim or position in general

In deciding whether to apply judicial estoppel, court considers such factors as whether party's position is clearly inconsistent with its earlier position and whether party changing position would gain unfair advantage over opposing party.

10 Cases that cite this headnote

**Attorneys and Law Firms**

**\*508** Gregory S. Coleman (Argued), Weil, Gotshal & Manges LLP, Austin, TX, Stephen Karotkin, Debra A. Dandeneau, Weil, Gotshal & Manges LLP, New York, NY, Mark D. Collins, Rebecca L. Booth, Richards, Layton & Finger, P.A., Wilmington, DE, for Appellant Armstrong World Industries, Inc.

Mark E. Felger, Jeffrey R. Waxman, Cozen & O'Connor, Wilmington, DE, Stephen J. Shimshak (Argued), Andrew N. Rosenberg, Curtis J. Weidler, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Appellee Official Committee of Unsecured Creditors of Armstrong World Industries, Inc.

Marla R. Eskin, Campbell & Levine, LLC, Wilmington, DE, Elihu Inselbuch, Caplin & Drysdale, Chartered, New York, NY, Peter Van N. Lockwood, Nathan D. Finch, Caplin & Drysdale, Chartered, Washington, D.C., for Appellee Official Committee of Asbestos Claimants of Armstrong World Industries, Inc.

James L. Patton, Jr., Sharon M. Zieg, Edwin J. Harron, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, DE, Michael J. Crames, Andrew A. Kress, Kaye Scholer, LLP, New York, NY, for Appellee Dean M. Trafelet, Legal Representative for Future Asbestos Personal Injury Claimants of Armstrong World Industries, Inc.

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

Before SLOVITER and FISHER, Circuit Judges, and THOMPSON, [*] District Judge.

**Opinion**

### OPINION OF THE COURT

ANNE E. THOMPSON, [*] District Judge.

This matter is before the Court on Armstrong Worldwide Industries, Inc.'s **\*509** ("AWI") appeal of the District Court's decision to deny confirmation of AWI's bankruptcy reorganization plan. In its decision, the District Court concluded that the plan could not be confirmed because the distribution of warrants to AWI's equity interest holders over the objection of the class of unsecured creditors violated the absolute priority rule, as codified in 11 U.S.C. § 1129(b)(2)(B). AWI filed a timely appeal, contending that (1) the issuance of warrants does not violate the absolute priority rule, and (2) an equitable exception to the absolute priority rule applies. For the following reasons, we affirm the judgment of the District Court.

### I.

### FACTS AND PROCEDURAL HISTORY

AWI designs, manufactures, and sells flooring products, kitchen and bathroom cabinets, and ceiling systems. Due to asbestos litigation liabilities, AWI and two of its subsidiaries filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware on December 6, 2000. The United States Trustee for the District of Delaware appointed two committees to represent AWI's unsecured creditors: (1) the Official Committee of Asbestos Personal Injury Claimants ("APIC"), and (2) the Official Committee of Unsecured Creditors ("UCC"). The Bankruptcy Court appointed Dean M. Trafelet as the Future Claimants' Representative ("FCR").

After holding negotiations with APIC, UCC, and FCR, AWI filed its Fourth Amended Plan of Reorganization (the "Plan") and Amended Disclosure Statement with the Bankruptcy Court in May 2003. Under the Plan, AWI's creditors were divided into eleven classes, and AWI's equity interest holders were placed into a twelfth class. Relevant to this appeal are Class 6, a class of unsecured creditors; Class 7, a

class of present and future asbestos-related personal injury claimants; and Class 12, the class of equity interest holders who own AWI's common stock. (App. at 1146–47, 1151.) The only member of Class 12 is Armstrong Worldwide, Inc. ("AWWD"), the parent company of AWI, which is in turn wholly owned by Armstrong Holdings, Inc. ("Holdings"). Classes 6 and 7 hold equal priority, and have interests senior to those of Class 12. (App. at 0019.) All three are impaired classes because their claims or interests would be altered by the Plan. 11 U.S.C. § 1124.

The Plan provided that AWI would place approximately $1.8 billion of its assets into a trust for Class 7 pursuant to 11 U.S.C. § 524(g). (App. at 1147–49.) Class 7's members would be entitled to an initial payment percentage from the trust of 20% of their allowed claims. (App. at 1177.) Meanwhile, Class 6 would recover about 59.5% of its $1.651 billion in claims. (App. at 1146–47.) The Plan would also issue new warrants to purchase AWI's new common stock, estimated to be worth $35 to $40 million, to AWWD or Holdings (Class 12). If Class 6 rejected the Plan, then the Plan provided that Class 7 would receive the warrants. (App. at 1149.) However, the Plan also provided that Class 7 would automatically waive receipt of the warrants, which would then be issued to AWWD or Holdings (Class 12).

The Bankruptcy Court set September 22, 2003 as the deadline for voting on the Plan and for the parties to object to the Plan's confirmation. Because the Plan would distribute property to AWI's equity interest holders without fully paying off the unsecured creditors' claims, all impaired unsecured creditor classes were required to approve the Plan under 11 U.S.C. § 1129(a)(8). If any impaired class objected to the Plan, then the Plan could only be "crammed down" if it was "fair and **\*510** equitable" to the objecting class. See 11 U.S.C. § 1129(b)(1).

UCC represented all of the classes of unsecured creditors, including Class 6, during the negotiations that led to the Plan. Although UCC initially approved of the Plan in May 2003, it later filed a conditional objection to the Plan's confirmation on September 22, 2003 based on (1) the greater potential distribution to creditors that would result if federal asbestos legislation was passed (namely, the FAIR Act), and (2) the possible applicability of the absolute priority rule, as codified in 11 U.S.C. § 1129(b), if the Plan was not accepted by all classes.

As indicated in its conditional objection, UCC's reservations about the Plan were prompted in part by the proposal of the

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

FAIR Act, which was reported out of the Senate Judiciary Committee in July 2003.[1] If passed, the FAIR Act would remove asbestos-related personal injury claims from the courts and absolve asbestos defendants of liability in return for mandatory contributions to a federally supervised trust. (App. at 0017–18.) AWI's contribution to the FAIR Act trust was estimated to range from $520 to $805 million, far less than the $1.8 billion it would put in trust for the Class 7 asbestos claimants under the Plan. Thus, if the FAIR Act passed, approximately $1 billion could be freed up for distribution among AWI's other creditors, including the class of unsecured creditors.

In response to UCC's concerns about the FAIR Act, the Bankruptcy Court extended the final deadline for voting to October 31, 2003. (App. at 0018.) To accept the Plan, class members holding at least fifty percent of the number of claims and two-thirds of the amount of the claims would need to vote for the Plan. *See* 11 U.S.C. § 1126(c). Although 88.03% of Class 6 claim holders voted for the Plan, only 23.21% of the amount of the claims voted to accept the Plan. (App. at 1456.) As a result, Class 6 rejected the Plan. Classes 7 and 12 accepted the Plan, but Class 12's acceptance was rescinded under the Plan due to Class 6's rejection. (App. at 0020.)

Following a hearing on November 17 and 18, 2003, the Bankruptcy Court recommended confirmation of the Plan to the District Court in its December 19, 2003 Proposed Findings and Conclusions. (App. at 1430.) The Bankruptcy Court found that the absolute priority rule, as codified in section 1129(b)(2) of the Bankruptcy Code, was satisfied because the warrants were distributed to the holder of equity interests because of the waiver by Class 7, citing *In re Genesis Health Ventures, Inc.,* 266 B.R. 591 (Bkrtcy. D.Del.2001), and *In re SPM Mfg. Corp.,* 984 F.2d 1305 (1st Cir.1993). In addition, the Bankruptcy Court found that UCC had waived its right to object to the Plan when it "entered into a consensual plan encompassing" the Plan provisions. (App. at 1502–03.) Because the Plan included a channeling injunction under section 524(g) of the Bankruptcy Code, the District Court was required to affirm the Bankruptcy Court's Proposed Findings and Conclusions before the Plan could go into effect. (App. at 1468.)

UCC filed objections to the Bankruptcy Court's Proposed Findings and Conclusions with the United States District Court for the District of Delaware. The District Court held a hearing on the objections on December 15, 2004 and issued a memorandum and order on February 23, 2005 denying **\*511**

confirmation of the Plan. The District Court found that (1) the issuance of warrants to the equity interest holders violated the absolute priority rule, and (2) no equitable exception to the absolute priority rule applied. *In re Armstrong World Indus., Inc.,* 320 B.R. 523 (D.Del.2005).

AWI now appeals the District Court's decision, and is joined by Appellees APIC and FCR, who jointly submitted a brief adopting and supporting AWI's arguments.

## II.

### *DISCUSSION*

#### A. *Jurisdiction*

[1] [2] This Court has jurisdiction to hear appeals of "all *final* decisions of the district courts." 28 U.S.C. § 1291 (emphasis added); *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). In bankruptcy cases, finality is construed more broadly than for other types of civil cases. *In re Marvel Entm't Group, Inc.,* 140 F.3d 463, 470 (3d Cir.1998). Because bankruptcy proceedings are often protracted, and time and resources can be wasted if an appeal is delayed until after a final disposition, our policy has been to quickly resolve issues central to the progress of a bankruptcy. *See In re Owens Corning,* 419 F.3d 195, 203 (3d Cir.2005). We consider four factors to determine whether a district court's decision in a bankruptcy case is final: (1) the impact on the assets of the bankruptcy estate; (2) the need for further fact-finding on remand; (3) the preclusive effect of a decision on the merits; and (4) the interests of judicial economy. *See id.* (citing *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV,* 229 F.3d 245, 250 (3d Cir.2000)).

[3] Although Appellee UCC contends that we cannot hear this appeal because it involves an interlocutory order rather than a final order, we find jurisdiction after considering the above four factors. First, the District Court's denial of confirmation will likely affect the distribution of assets between the different creditor classes. *See Buncher Co.,* 229 F.3d at 250. Second, the issue presented here requires no additional fact-finding. Third, this appeal would require us to address a discrete question of law that would have a preclusive effect on certain provisions of the Plan. Lastly, practical considerations in the interests of judicial economy require that we hear this appeal now. Because we find

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 309 of 398

In re Armstrong World Industries, Inc., 432 F.3d 507 (2005)

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

jurisdiction under 28 U.S.C. § 1291, we will not address whether we also have jurisdiction under 28 U.S.C. § 158(d).

**B. *Standard of Review***

 **[4]**    We review the District Court's decision using a de novo standard for conclusions of law, and a clearly erroneous standard for findings of fact. *In re PWS Holding Corp.,* 228 F.3d 224, 235 (3d Cir.2000). Whether a reorganization plan violates the absolute priority rule is a question of law. *See In re Johnston,* 21 F.3d 323, 328–29 (9th Cir.1994).

**C. *Confirmation of a Reorganization Plan***

Confirmation of a proposed Chapter 11 reorganization plan is governed by 11 U.S.C. § 1129. A court will confirm a plan if it meets all of the requirements set out in section 1129(a). Only one of these requirements concerns us in this appeal, and that is the requirement that the plan be consensual, with unanimous acceptance by all of the impaired classes.[2] 11 U.S.C. § 1129(a)(8). If the plan is not consensual, ***512** a court may still confirm as long as the plan meets the other requirements of section 1129(a), and "does not discriminate unfairly, and is fair and equitable" as to any dissenting impaired class. 11 U.S.C. § 1129(b)(1); *see Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,* 526 U.S. 434, 441, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) [hereinafter *LaSalle* ]. The latter type of confirmation is also called a "cram down," as the court can cram a plan down over the objection of an impaired class. *See generally* Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,* 53 Am. Bankr.L.J. 133 (1979).

**1. *The Absolute Priority Rule***

The issues in this case require us to examine the "fair and equitable" requirement for a cram down, which invokes the absolute priority rule. The absolute priority rule is a judicial invention that predated the Bankruptcy Code. It arose from the concern that because a debtor proposed its own reorganization plan, the plan could be "too good a deal" for that debtor's owners. *LaSalle,* 526 U.S. at 444, 119 S.Ct. 1411. In its initial form, the absolute priority rule required that "creditors ... be paid before the stockholders could retain [equity interests] for any purpose whatever." *Id.* (quoting *N. Pac. Ry. Co. v. Boyd,* 228 U.S. 482, 508, 33 S.Ct. 554, 57 L.Ed. 931 (1913)) (emphasis added).

The absolute priority rule was later codified as part of the "fair and equitable" requirement of 11 U.S.C. § 1129(b). Under the

statute, a plan is fair and equitable with respect to an impaired, dissenting class of unsecured claims if (1) it pays the class's claims in full, or if (2) it does not allow holders of any junior claims or interests to receive or retain any property under the plan "on account of" such claims or interests. 11 U.S.C. § 1129(b)(2)(B)(i)-(ii); *LaSalle,* 526 U.S. at 441–42, 119 S.Ct. 1411.

At the heart of this appeal is the Plan provision that distributes warrants to AWI's equity interest holders (Class 12) through Class 7 in the event that Class 6 rejects the Plan. Appellant AWI argues that this provision does not violate the absolute priority rule because (1) legislative history and historical context indicate that the rule does not prohibit the transfer of warrants to the equity interest holders under the current circumstances; (2) case law establishes that Class 7 can transfer part of its distribution under the Plan to another claimant; and (3) the Plan did not give the warrants to Class 12 "on account of" its equity interests. We address each of these contentions in turn.

**a. *Interpreting the Absolute Priority Rule***

 **[5]**    First, AWI suggests that this Court should apply a flexible interpretation of the absolute priority rule based on its legislative history and historical context. Because the absolute priority rule is now codified as part of the Bankruptcy Code, we will interpret it using standard principles of statutory construction. We begin by looking at the plain language of the statute. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). If the meaning is plain, we will make no further inquiry unless the literal application of the statute will end in a result that conflicts with Congress's intentions. *Id.* at 242–43, 109 S.Ct. 1026. In such a case, the intentions of Congress will control. *Id.*

 **[6]**    AWI contends that application of the absolute priority rule would be contrary to Congress's intentions because the rule was designed to prevent the " 'squeezing out' [of] *intermediate* unsecured creditors." *See In re Wabash Valley Power Ass'n,* 72 F.3d 1305, 1314 (7th Cir.1995) (citing *N.* ***513** *Pac. Ry. Co.,* 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931) (emphasis added). AWI supports its claim with floor statements by Representative Don Edwards and Senator Dennis DeConcini, key legislators of the Bankruptcy Code. *See Begier v. I.R.S.,* 496 U.S. 53, 64 n. 5, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990) (considering these remarks as "persuasive evidence of congressional intent"). These statements indicate that "a senior class will not be able to give

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 310 of 398

In re Armstrong World Industries, Inc., 432 F.3d 507 (2005)

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

up value to a junior class over the dissent of an *intervening class* unless the *intervening class* receives the full amount, as opposed to value, of its claims or interests." 124 Cong. Rec. 32,408 & 34,007 (1978) (remarks of Rep. Edwards on Sept. 28, 1978 and remarks of Sen. DeConcini on Oct. 5, 1978, respectively) (emphasis added). AWI argues that this language demonstrates that the absolute priority rule was not meant to apply to the situation before us because Class 6 is not an intervening (or intermediate) class, and is not being squeezed out by Class 7's transfer of warrants to Class 12 under the Plan.

The absolute priority rule, as codified, ensures that "the holder of any claim or interest that is junior to the claims of [an impaired dissenting] class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii). The plain language of the statute makes it clear that a plan cannot give property to junior claimants over the objection of a more senior class that is impaired, but does not indicate that the objecting class must be an intervening class.

We find that the plain meaning of the statute does not conflict with Congress's intent. The legislative history shows that section 1129(b) was at least designed to address "give-up" situations where a senior class gave property to a class junior to the dissenting class. Other statements in the legislative history of section 1129(b), however, appear to apply the statute more broadly. For example, the House Report for H.R. 8200, the bill that was eventually enacted, states that section 1129(b) "codifies the absolute priority rule from the dissenting class on down." H.R.Rep. No. 95–595, at 413 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6369. Despite amendments to the original version of H.R. 8200, the House Report has been considered an authoritative source of legislative history for section 1129(b). *See* 124 Cong. Rec. 32,408 & 34,007 (1978) (remarks of Rep. Edwards on Sept. 28, 1978 and remarks of Sen. DeConcini on Oct. 5, 1978, respectively) ("[T]he House report remains an accurate description of confirmation of section 1129(b)."). In addition, the floor statements of Representative Edwards and Senator DeConcini do not rule out the possibility that an impaired class may object to a co-equal class's distribution of property to a junior class. *See id.* ("As long as senior creditors have not been paid more than in full, and classes of equal claims are being treated so that the dissenting class of impaired unsecured claims is not being discriminated against unfairly, the plan may be confirmed if the impaired class of unsecured claims receives less than 100 cents on the dollar (or nothing at

all) as long as no class junior to the dissenting class receives anything at all."). As a result, we will apply the plain meaning of the statute. Under this reading, the statute would be violated because the Plan would give property to Class 12, which has claims junior to those of Class 6. This finding does not end our consideration of this appeal, as AWI makes further arguments regarding exceptions to the absolute priority rule.

**b.** *Transfers of Bankruptcy Distributions Between Creditors and Equity Interest Holders*

Second, AWI contends that Class 7 may distribute the property it will receive under **\*514** the Plan to Class 12 without violating the absolute priority rule. AWI derives this result from application of the so-called *"MCorp–Genesis"* rule, which is based on a line of cases where creditors were allowed to distribute their proceeds from the bankruptcy estate to other claimants without offending section 1129(b). *See SPM,* 984 F.2d 1305 (permitting senior secured creditors to share bankruptcy proceeds with junior unsecured creditors while skipping over priority tax creditors in a Chapter 7 liquidation); *Genesis Health,* 266 B.R. at 602, 617–18 (allowing senior secured lenders to (1) give up a portion of their proceeds under the reorganization plan to holders of unsecured and subordinated claims, without including holders of punitive damages claims in the arrangement, and (2) allocate part of their value under the plan to the debtor's officers and directors as an employment incentive package); *In re MCorp Fin., Inc.,* 160 B.R. 941, 948 (S.D.Tex.1993) (permitting senior unsecured bondholders to allocate part of their claim to fund a settlement with the FDIC over the objection of the junior subordinated bondholders).

The District Court rejected this argument, and found that the *MCorp–Genesis* line of cases was distinguishable. It began its analysis with *SPM,* a First Circuit opinion cited by both the *MCorp* and *Genesis Health* courts to support the legality of the distribution schemes presented to them. *SPM,* 984 F.2d 1305. The District Court differentiated *SPM* from the current case in three ways: (1) *SPM* involved a distribution under Chapter 7, which did not trigger 11 U.S.C. § 1129(b)(2)(B)(ii); (2) the senior creditor had a perfected security interest, meaning that the property was not subject to distribution under the Bankruptcy Code's priority scheme; and (3) the distribution was a "carve out," a situation where a party whose claim is secured by assets in the bankruptcy estate allows a portion of its lien proceeds to be paid to others. *Armstrong,* 320 B.R. at 539; *see generally* Richard B. Levin, *Almost All You Ever Wanted to Know About Carve Out,* 76 Am.

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

Bankr.L.J. 445 (2002). Similarly, *Genesis Health* involved property subject to the senior creditors' liens that was "carved out" for the junior claimants. *Armstrong,* 320 B.R. at 539. In addition, the District Court found *MCorp* distinguishable on its facts because the senior unsecured creditor transferred funds to the FDIC to settle pre-petition litigation. *Id.*

We adopt the District Court's reading of these cases, and agree that they do not stand for the unconditional proposition that creditors are generally free to do whatever they wish with the bankruptcy proceeds they receive. Creditors must also be guided by the statutory prohibitions of the absolute priority rule, as codified in 11 U.S.C. § 1129(b)(2)(B). Under the plan at issue here, an unsecured creditor class would receive and automatically transfer warrants to the holder of equity interests in the event that its co-equal class rejects the reorganization plan. We conclude that the absolute priority rule applies and is violated by this distribution scheme.

In addition, the structure of the Plan makes plain that the transfer between Class 7 and Class 12 was devised to ensure that Class 12 received the warrants, with or without Class 6's consent. The distribution of the warrants was only made to Class 7 if Class 6 rejected the Plan. In turn, Class 7 automatically waived the warrants in favor of Class 12, without any means for dissenting members of Class 7 to protest. Allowing this particular type of transfer would encourage parties to impermissibly sidestep the carefully crafted strictures of the Bankruptcy Code, and would undermine Congress's intention to give unsecured creditors bargaining power **\*515** in this context. *See* H.R.Rep. No. 95–595, at 416, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6372 ("[Section 1129(b)(2)(B)(ii) ] gives intermediate creditors a great deal of leverage in negotiating with senior or secured creditors who wish to have a plan that gives value to equity.").

### c. *On Account of*

Third, AWI argues that the warrants would not be distributed to Class 12 on account of their equity interests, but rather would be given as consideration for settlement of their intercompany claims. UCC disputes the existence of any such settlement, alleging that such an arrangement should have been brought to the attention of the Bankruptcy Court. In response, AWI indicates that the settlement was detailed in the Plan's Disclosure Statement, which the Bankruptcy Court approved on June 2, 2003. (Appellee's Br. 4.) The relevant portion of the Disclosure Statement reads as follows:

In the ordinary course of business, such intercompany claims have been recorded on the books and records of Holdings, AWWD and AWI and, assuming that all such intercompany claims are valid, the *net intercompany claim so recorded is in favor of Holdings in the approximate amount of $12 million.* In consideration of, among other things, AWI's agreement under the Plan to fund the reasonable fees and expenses associated with the Holdings Plan of Liquidation, the treatment of Holdings, AWWD, and their respective officers and directors as PI Protected Parties under the Asbestos PI Permanent Channeling Injunction, the simultaneous release by AWI of any claims (known and unknown) AWI has against Holdings and AWWD, and the *issuance of the New Warrants to AWWD,* and to avoid potentially protracted and complicated proceedings to determine the exact amounts, nature and status under the Plan of all such claims and to facilitate the expeditious consummation of the Plan and the completion of Holdings' winding up, Holdings and AWWD will, effective upon and subject to the occurrence of the Effective Date, release all such intercompany claims (known and unknown) against AWI or any of AWI's subsidiaries[.]

(App. at 1138) (emphasis added).

As stated earlier, section 1129(b)(2)(B)(ii) provides that holders of junior claims or interests "will not receive or retain [any property] under the plan *on account of* such junior claim or interest." 11 U.S.C. § 1129(b)(2)(B)(ii) (emphasis added). In *LaSalle,* the Supreme Court interpreted "on account of" to mean "because of," or a "causal relationship between holding the prior claim or interest and receiving and retaining property." 526 U.S. at 450–51, 119 S.Ct. 1411. Although the Supreme Court did not decide what degree of causation would be necessary, its discussion on that topic revealed that the absolute priority rule, as codified, was not in fact absolute. First, it indicated that the "on account of" language would

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 312 of 398

*In re Armstrong World Industries, Inc.*, 432 F.3d 507 (2005)
55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

be redundant if section 1129(b) was read as a categorical prohibition against transfers to prior equity. *Id.* at 452–53, 119 S.Ct. 1411. Second, it noted that a "less absolute prohibition" stemming from the "on account of language" would "reconcile the two recognized policies underlying Chapter 11, of preserving going concerns and maximizing property available to satisfy creditors." *Id.* at 453–54, 119 S.Ct. 1411.

In keeping with these observations, we noted in *PWS* that the "on account of" language "confirms that there are some cases in which property can transfer to junior interests not 'on account of' those interests but for other reasons." 228 F.3d at 238 (discussing *LaSalle,* 526 U.S. at 451–52, 119 S.Ct. 1411). In *PWS,* the **\*516** debtors released their legal claims against various parties to facilitate their reorganization, including an avoidance claim that would have allowed them to avoid certain aspects of a previous recapitalization. *Id.* at 232–35. The appellants in *PWS* argued that releasing the avoidance claim resulted in a prohibited transfer of value to equity interest holders who had participated in the recapitalization. We held that "without direct evidence of causation, releasing potential claims against junior equity does not violate the absolute priority rule in the particular circumstance [where] the claims are of only marginal viability and could be costly for the reorganized entity to pursue." *Id.* at 242.

AWI would analogize AWWD and Holdings's release of intercompany claims in exchange for warrants to the release of claims in *PWS.* [3] We disagree. According to the Disclosure Statement, the warrants have an estimated value of $35 to $40 million. (App. at 1157.) In contrast, the intercompany claims were valued at approximately $12 million. This settlement would amount to a substantial benefit for Class 12, especially as the warrants were only part of the consideration for which the intercompany claims were released. Among other things, the intercompany claims were also ostensibly released in exchange for the simultaneous release of any claims by AWI against AWWD or Holdings and facilitation of the reorganization process. (App. at 1138.) AWI gives no adequate explanation for this difference in value, leading us to conclude that AWWD or Holdings (Class 12) would receive the warrants on account of their status as equity interest holders. *See LaSalle,* 526 U.S. at 456, 119 S.Ct. 1411.

**D.** *Equity*

**1.** *Applicability of Penn Central*

**[7]** Appellant AWI further contends that this Court should apply equitable considerations to allow an exception to the absolute priority rule. It finds such an exception in the case of *In re Penn Central Transportation Co.,* 596 F.2d 1127, 1142 (3d Cir.1979), and points to language in *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), that indicates that exceptions to the absolute priority rule may indeed exist. *See id.* at 206, 108 S.Ct. 963 (stating that the enactment of section 1129(b) "bar[s] any expansion of any exception to the absolute priority rule beyond that recognized" in pre–1978 Bankruptcy Code cases).

*Penn Central* involved a "monumental [reorganization] plan designed to resolve what [at the time was] the most complex set of interrelated and conflicting claims ever addressed under ... the Bankruptcy Act." 596 F.2d at 1129. Penn Central Transportation Company, which was formed in 1968 by the merger of the Pennsylvania Railroad Company and the New York Central Railroad Company, filed a petition for reorganization under the Bankruptcy Code in 1970. *Id.* at 1133. Thereafter, to prevent a rail transportation crisis and to address the particular difficulties of that reorganization, Congress passed the Regional Rail Reorganization Act of 1973, which directed that major portions of Penn Central's rail assets be conveyed to Conrail, a new company formed under the Act to continue operation of some of the routes served by Penn Central. *Id.* at 1134. In light of these exceptional circumstances, we found that "[o]ur construction and application of precedents **\*517** such as the absolute priority rule must necessarily take account of the unique facts of this Plan and proceed in an environment pervaded more by relativity than by absolutes." *Id.* at 1142.

AWI argues that the facts of the case before us are similarly unique, and also warrant a more equitable and flexible application of the absolute priority rule. (Appellant's Br. 36.) Among the facts that AWI finds unique are: (1) the involvement of UCC in the negotiation and drafting of the Plan; (2) UCC's endorsement of the Plan, as indicated by its signature on the cover letter accompanying the disclosure statement; (3) the lack of a negative effect on Class 6's distribution from the granting of warrants to Class 7; (4) the relatively small value of the warrants compared to the entire bankruptcy estate; (5) the acceptance of the Plan by the majority in number of UCC's constituents; and (6) the delay caused by UCC's objection, which was primarily lodged in anticipation of the passage of the FAIR Act. We do not find these facts to be as compelling as those that led us to

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 313 of 398

In re Armstrong World Industries, Inc., 432 F.3d 507 (2005)

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

apply a more flexible absolute priority rule in the past. AWI's bankruptcy due to asbestos liabilities simply does not involve the kind of exigent circumstances present in *Penn Central,* where Congress intervened in the reorganization process to avoid a rail transportation crisis of national import.

In addition, our application of equitable considerations in *Penn Central* did not mean that the absolute priority rule was abandoned. Rather, we held firm to the idea that the rule still "required ... that provision be made for satisfaction of senior claims prior to satisfaction of junior claims." *Id.* at 1153.

## 2. *Judicial Estoppel*

 **[8]**    AWI also argues that UCC waived its right to object to the Plan because of its conduct during the reorganization process, specifically referring to UCC's role in shaping the Plan, its initial endorsement of the Plan, and then its subsequent objections to the Plan based on the possible passage of the FAIR Act. The Bankruptcy Court agreed with this argument and found that UCC waived its right to object to the Plan because its behavior was "too sharp even for a bankruptcy case." (App. at 1503–04.) The District Court took a different view, noting that

> [e]ven if the Unsecured Creditors changed their minds based on political calculus that the FAIR Act would be passed, this was their prerogative. In the absence of bad faith, which was not alleged here, and particularly in light of the changed circumstances, until a party consents and the consent is final, that party may walk away from the table for a good or bad reason or no reason at all.

*Armstrong,* 320 B.R. at 534 n. 24 (citing *In re Huckabee Auto. Co.,* 33 B.R. 141, 149 (Bankr.M.D.Ga.1981)).

 **[9]**    **[10]**    We agree with the District Court, but recast the issue of waiver as an issue of judicial estoppel. Judicial estoppel can be applied when a party asserts a certain position in a legal proceeding and prevails, only to assert a contrary position later on because of changed interests. *See New Hampshire v. Maine,* 532 U.S. 742, 749–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Its purpose is to protect the judicial process by preventing parties from "deliberately changing positions according to the exigencies of the moment." *Id.* at 750, 121 S.Ct. 1808 (quoting *United States v. McCaskey,* 9

F.3d 368, 378 (5th Cir.1993)). In deciding whether to apply judicial estoppel, a court considers various factors, including whether the party's position is clearly inconsistent with its earlier position and whether the party changing position would gain an unfair advantage over **\*518** the opposing party. *Id.* at 750–51, 121 S.Ct. 1808.

UCC clearly changed its position when it lodged a conditional objection to the Plan after it had endorsed the disclosure statement and recommended acceptance of the Plan to its constituents. The confirmation process, however, entitled UCC to lodge an objection against the Plan before the objection deadline. *See* 11 U.S.C. § 1129(a)(8). We recognize that an objection based on speculation that legislation will be passed can be cause for concern. *See EEOC v. Bethlehem Steel Corp.,* 727 F.Supp. 952, 955 & n. 1 (E.D.Pa.1990) (commenting on the problems that stem from delaying judgment because of pending legislation). UCC's objection, however, was not based solely on the impact of the pending FAIR Act, but was also based on a violation of section 1129(b).

Furthermore, UCC's change in position could not be entirely prejudicial to AWI because the Plan and its disclosure statement were conditioned on the approval of all impaired classes. In fact, Class 6, one of UCC's constituents, did not accept the Plan. While the voting outcome of Class 6 raises the troubling possibility that a small number of hold-outs owning a large percentage of claims were causing costly delay in the reorganization process, this is contemplated by the Bankruptcy Code, which requires at least a majority vote for the number of claims and a supermajority vote for the amount of claims for a class to accept a plan. *See* 11 U.S.C. § 1126(c). In consideration of these factors, we will not apply judicial estoppel to silence UCC's objection merely because it was an active participant in the reorganization process.

## III.

## *CONCLUSION*

We recognize that the longer that the reorganization process takes, the less likely that the purposes of Chapter 11 (preserving the business as a going concern and maximizing the amount that can be paid to creditors) will be fulfilled. Nevertheless, we conclude that the absolute priority rule applies in this case. We will accordingly affirm the District Court's decision to deny confirmation of AWI's Plan.

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 314 of 398

In re Armstrong World Industries, Inc., 432 F.3d 507 (2005)
55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

**Parallel Citations**

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

Footnotes

| | |
|---|---|
| * | Honorable Anne E. Thompson, United States District Judge for the District of New Jersey, sitting by designation. |
| 1 | *See generally* Patrick M. Hanlon, *Asbestos Legislation: The FAIR Act Two Years On,* 1 Pratt's J. Bankr.L. 207 (2005). As it happened, the FAIR Act did not pass, but similar bills have been reintroduced in subsequent sessions of Congress. (Appellant's Br. 15; App. at 1243.) |
| 2 | A class is impaired if its legal, equitable, or contractual rights are altered under the reorganization plan. 11 U.S.C. § 1124. |
| 3 | Because AWI does not assert any argument regarding a new value exception to the absolute priority rule, we do not address that issue. |

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 46

791 F.2d 524
United States Court of Appeals,
Seventh Circuit.

In the Matter of CHICAGO,
MILWAUKEE, ST. PAUL AND PACIFIC
RAILROAD COMPANY, Debtor.
Appeals of CHICAGO, MILWAUKEE, ST.
PAUL AND PACIFIC RAILROAD COMPANY,
Chicago Milwaukee Corporation, and Chicago,
Milwaukee, St. Paul and Pacific Railroad Bond
and Debenture Holders Protective Committee.

Nos. 85-2364, 85-2428.    |    Argued
Feb. 25, 1986.    |    Decided May 20, 1986.

Appeal was taken from judgment of the United States District Court for the Northern District of Illinois, Eastern Division, Thomas R. McMillen, J., holding that debenture holders were entitled to receive $56 million in principal, plus interest on that principal for every year during which debentures were in default, and appeal and cross appeal were taken. The Court of Appeals, Posner, Circuit Judge, held that: (1) repayment of principal was properly accelerated; (2) interest was allowable in years in which there was no available net income; (3) five percent was proper rate; and (4) interest on interest should not have been allowed.

Affirmed in part, reversed in part and remanded with directions.

West Headnotes (9)

**[1]** **Bankruptcy**
 Railroad Reorganization

Under Illinois law, holders of income debentures providing that in event of default indenture trustee would be entitled to declare principal immediately due and payable were entitled to acceleration when railroad defaulted, where all railroad's creditors would be paid in full and competing equities of shareholders were weak.

3 Cases that cite this headnote

**[2]** **Bankruptcy**
 Equitable Powers and Principles

Fact that a bankruptcy proceeding is equitable does not give judge free floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be.

50 Cases that cite this headnote

**[3]** **Bankruptcy**
 Equitable Powers and Principles

Function of equitable considerations in bankruptcy proceeding is to guide division of pie that is too small to allow each creditor to get slice for which he originally contracted.

17 Cases that cite this headnote

**[4]** **Bankruptcy**
 Claims Allowable;  What Constitutes "Claim."

If bankrupt in reorganization is solvent, task for bankruptcy court is simply to enforce creditors' rights according to tenor of contracts that created those rights.

14 Cases that cite this headnote

**[5]** **Bankruptcy**
 Interest

Under Illinois law, when railroad petitioned for bankruptcy, trustee could declare default under clause relating to institution of bankruptcy proceedings, which accelerated principal, thereby precipitating default under clause relating to defaults in payment of principal of debenture "when the same shall become due and payable either by the terms thereof or otherwise as herein provided," which caused suspension of indenture provision that railroad would pay holders of debentures interest installments every year, at rate of five percent, provided that railroad had "available net income," and therefore, debenture holders were entitled to five percent interest on principal regardless of available net income.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

[4 Cases that cite this headnote](#)

**[6]**    **Bankruptcy**

    👈 Post-Petition Interest

Where there is not enough money to pay all creditors, bankruptcy court can refuse to award interest that accrues on creditor's claim after petition for bankruptcy is filed.

[5 Cases that cite this headnote](#)

**[7]**    **Bankruptcy**

    👈 Interest

Under Illinois law, upon railroad's default, debenture holders were entitled to no more than five percent interest on overdue principal provided by debenture.

[Cases that cite this headnote](#)

**[8]**    **Bankruptcy**

    👈 Post-Petition Interest

Railroad debenture holders had no right, under Illinois law, to interest on five percent interest installments that had accrued, but had not been paid at time railroad filed for reorganization, where indenture was silent on matter of interest on interest.

[Cases that cite this headnote](#)

**[9]**    **Bankruptcy**

    👈 Effect of State Law, in General

Bankruptcy law provides federal machinery for enforcing creditors' rights, but rights themselves are created by state law.

[12 Cases that cite this headnote](#)

**Attorneys and Law Firms**

**\*525** Keith F. Bode, Jenner & Block, Chicago, Ill., for appellant.

Lawrence P. Bemis, Kirkland & Ellis, Chicago, Ill., for appellee.

Before BAUER and POSNER, Circuit Judges, and MOODY, District Judge [*].

**Opinion**

POSNER, Circuit Judge.

In 1955 the Chicago, Milwaukee, St. Paul and Pacific Railroad Company, known as the Milwaukee Road, issued $56 million in income debentures. The debenture indenture provided that the railroad would pay the holders of the debentures interest installments every year, at the rate of 5 percent, provided that the railroad had "available net income"-income in excess of various fixed expenses, in particular interest due secured creditors. This was to continue for 100 years, at the end of which time the principal would be repaid. In 1977 the railroad petitioned for reorganization under section 77 of the Bankruptcy Act, **\*526** 11 U.S.C. § 205 (1952 ed.) (which has since been repealed but remains applicable to this proceeding, see Bankruptcy Reform Act of 1978, [Pub.L. 95-598, § 403(a), 92 Stat. 2683](#)), precipitating an avalanche of litigation unnecessary to recount here; for a thumbnail sketch see *[In re Chicago, Milwaukee St. Paul & Pac. R.R.](#)*, 713 F.2d 274, 277-78 (7th Cir.1983). A month later the indenture trustee declared the debentures in default. After selling off many of the railroad's lines the Milwaukee Road's trustee in bankruptcy in 1985 sold the remaining lines to the Soo Railroad, see *[In re Chicago, Milwaukee, St. Paul & Pac. R.R.,](#)* 756 F.2d 508 (7th Cir.1985), and turned over the proceeds to the CMC Real Estate Corporation, as the debtor has since been renamed. CMC Real Estate Corporation is a wholly owned subsidiary of Chicago Milwaukee Corporation; to simplify exposition, we shall refer to parent and subsidiary interchangeably as CMC. With the proceeds of the various sales, and the nonrail assets (chiefly real estate) that have never been sold, CMC will emerge from bankruptcy with a net worth of more than $400 million after paying off all of the Milwaukee Road's creditors, including the debenture holders, at the highest valuation of their claims.

The issue is how much the debenture holders should receive. The district judge presiding over the reorganization held that they should receive the $56 million principal, plus interest on that principal for every year during which the debentures were in default-even though there was available net income sufficient to pay interest during only two of them-plus interest

on this interest. The total is $92 million. CMC has appealed, contending that repayment of the principal should not be accelerated, that no interest is due for the years in which there was no available net income, and that interest on interest should not be allowed. The interest for the two years in which there was available net income comes to $6 million. The present value of $56 million in 2055, when added to the present value of 5 percent interest for 70 years (2055-1985), is $24 million. (The discount rate used to make this calculation was 12 percent; its correctness is not an issue in this appeal.) Hence CMC is arguing that the debenture holders should get the equivalent of $30 million ($24 million plus $6 million), rather than the $92 million that the judge awarded.

The debenture holders have cross-appealed, making two arguments. One, which we shall not have to address, is that the judge used too low an interest rate in computing the interest due on interest. The other is that the debenture holders are entitled to interest on the overdue principal at a rate higher than 5 percent. We shall have to decide only four issues: whether repayment of the principal should have been accelerated, whether interest should have been allowed in years in which there was no available net income, whether if so 5 percent was the proper rate, and finally whether interest on interest should have been allowed.

1. The indenture provides that in the event of a default the indenture trustee shall be entitled to declare the principal immediately due and payable. There was a default; the trustee made the required declaration; hence the indenture by its terms entitled the debenture holders to receive the full $56 million in principal immediately rather than having to wait till the year 2055. Nevertheless they concede that the reorganization court had the power to make them wait ("decelerate"). *In re Atlanta Int'l Raceway, Inc.,* 513 F.2d 546, 549 n. 7 (5th Cir.1975). CMC argues that the court should have exercised this power-that because of the rise in interest rates since 1955, acceleration will confer an enormous windfall on the debenture holders, giving them $56 million when, but for the default, the present value of the debentures would be as we said only $24 million (and that only if they could be sure of receiving 5 percent interest every year from now to then). Many of the debenture holders bought the debentures at a tremendous discount from face value, after the inflationary rise in interest rates had reduced the debentures' market value- **\*527** though the risk of nonpayment of principal or interest or both may have been an even larger factor in the reduction. CMC has offered to give the debenture holders an ironclad guarantee that they will get 5 percent a

year until 2055 and the full principal then; and given CMC's net worth, such a guarantee should not be hard to arrange. So the debenture holders will do no worse than if there had been no default.

[1]   Nevertheless, the district judge did not err in allowing acceleration. The only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full. All of the Milwaukee Road's creditors will be paid in full, even if the debenture holders are paid out at the highest valuation of their claim. The only competing equities are those of CMC's shareholders, and are weak, quite apart from the fact that many or for that matter all of them may have bought their shares after the Milwaukee Road went into bankruptcy and may therefore have lost nothing because of the bankruptcy-admittedly a fact that does not distinguish them from the debenture holders.

The important point is that back in 1955 the Milwaukee Road unequivocally promised to repay the principal of the debentures immediately in the event of a default (provided, for some forms of default, that the indenture trustee demanded immediate repayment, but he did so here, as we shall see), and the Milwaukee Road did default, and it can honor its promise without hurting any other creditor. In these circumstances the presumption in favor of acceleration is a strong one, perhaps conclusive, and certainly is not overcome by pointing out that some or even all of the debenture holders are speculators. The provision for acceleration was part of the consideration for the Milwaukee Road's being able to borrow money for 100 years without having to amortize the loan. The debenture holders got in exchange a distribution of possible outcomes: probably they would receive interest for 100 years and the principal at the end of that time, but possibly they would get their principal back sooner. CMC proposes to truncate that distribution.

What it describes as a windfall gain to the debenture holders is simply the coming to pass of one of the contingencies for which they or their predecessors bargained. If you pay $1 for a lottery ticket and win $1,000 in the lottery, your winnings are not a windfall; you bought the chance to get them. The debenture holders bought the chance to get the principal back early, at a time when a rise in interest rates might enable them to reinvest it more advantageously elsewhere, as they will now be able to do. This chance was a hedge against the risk of lending money for 100 years at a fixed interest rate. A

sharp rise in interest rates might (as it did) signify a general disturbance of business conditions which would make the Milwaukee Road more likely to default; and if it did default, the debenture holders would be able to reinvest the principal of the debentures at the then higher rates. If the original debenture holders bought this right, then the current holders acquired it, for value, when they bought the debentures; enforcing the right will therefore confer no windfall on the current holders either.

The indenture provided for acceleration not only if there was a default but also if there was a purely voluntary liquidation. The Milwaukee Road's stockholders might well have decided to liquidate the corporation after the sale of its remaining assets to the Soo; for what remained was not an enterprise but a portfolio. If they had liquidated they would have had to repay the $56 million immediately. Maybe they did not liquidate because if the principal is not accelerated they will have 70 years of 5 percent money to play with (admittedly, tax considerations may also have played a role in this decision). It is not the objective of the bankruptcy laws to confer windfalls on debtors. See Blum, *Full Priority and Full Compensation in Corporate Reorganizations: A Reappraisal,* 25 U.Chi.L.Rev. 417, 423 (1958).

 **\*528**  **[2]**   **[3]**   **[4]**   CMC's appeal to equity is misplaced for another reason. The fact that a proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be. See *Shondel v. McDermott,* 775 F.2d 859, 867-68 (7th Cir.1985); *Piper Aircraft Corp. v. Wag-Aero, Inc.,* 741 F.2d 925, 939 (7th Cir.1984) (concurring opinion). The function of equitable considerations in a bankruptcy proceeding is to guide the division of a pie that is too small to allow each creditor to get the slice for which he originally contracted. See *Boston & Maine Corp. v. Chicago Pacific Corp.,* 785 F.2d 562, 565 (7th Cir.1986). Hence if the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights; and one of those rights in this case was the right to accelerate the repayment of principal.

2. The issue with regard to interest in years when the railroad had no available net income requires close consideration of several provisions of the indenture. Article V sets forth the method of determining available net income. Section 6 thereof states: "The provisions of this Article V are hereby made expressly subject to each and all of the remedies of

the Trustee or the Debentureholders as set forth in Article XI, and the operation of the provisions of this Article V shall be suspended during the continuance of either of the Events of Default specified in clause (a) or clause (b) of Section 2 of Article XI." We go to Article XI, and find that clause (a) relates to defaults in the payment of the principal of the debentures "when the same shall become due and payable either by the terms thereof or otherwise as herein provided," while clause (b) relates to defaults in the payment of any installment of interest "when and as such interest shall become due and payable as therein and in the Indenture expressed and such default shall continue for 60 days." The indenture trustee, however, declared the Milwaukee Road's default under another clause of Article XI, clause (f), which relates to the institution of bankruptcy proceedings, and which is not mentioned in Article V. CMC argues that since the default was declared under clause (f), the provisions regarding available net income were not suspended, and hence the debenture holders are not entitled to income during any year of reorganization in which the railroad lacked available net income.

Notice that section 6 of Article V, quoted above, has two clauses. The second (beginning "and the operation ...") provides for automatic suspension of the provisions on available net income if the railroad defaults in paying either principal or (for 60 days) interest; the suspension begins at the moment of default in the case of a default in principal and on the 61st day following default in the case of a default in interest. The first clause of section 6, however, merely subjects Article V to the remedies that the trustee and the debenture holders have under Article XI, and thus is not self-executing. Article XI provides that in the event of a default other than in the payment of principal, the trustee may, and if the holders of at least 25 percent of the face amount of the debentures so request must, declare the principal to be due and payable immediately. This is the acceleration clause, on which the district judge based his ruling that CMC must repay the principal without waiting till the year 2055.

 **[5]**   A month elapsed between the petition for bankruptcy and the indenture trustee's demand for repayment of principal on the ground of a clause (f) default, and the debenture holders concede that the provisions on available net income were not suspended until that demand was made. They argue, however, correctly in our view, that when the Milwaukee Road did not repay the principal in response to the demand made pursuant to clause (f), this placed the Milwaukee Road in default under clause (a) (refusal to repay principal "when the same

shall become due and payable either by the terms thereof or otherwise as herein provided"); the second clause of Article V, section 6 therefore **\*529** kicked in; and from that moment on, the provisions on available net income were suspended by the express terms of section 6. The indenture trustee could not have invoked clauses (a) or (b) in the first instance, because until the Milwaukee Road declared bankruptcy the principal of the debentures was not due and neither was interest, for the railroad had no available net income at the time. But once the Milwaukee Road petitioned for bankruptcy, the trustee could and did declare a default under clause (f), which accelerated the principal, thereby precipitating a default under (a), which caused the provisions on available net income to be suspended.

It is not a good answer that, once bankruptcy was declared, a default under (a) was impossible because the debtor could not have repaid the principal immediately even if it had wanted to do so. Defaults often are involuntary. The purpose of clause (a) is not to guarantee that the principal will be repaid immediately, because that might be impossible, but to accelerate repayment as much as possible. The indenture contemplates that repayment may indeed not follow immediately upon default: Article XI provides that in the event of a default in principal, interest shall be payable on the overdue principal at the rate of 5 percent. There is no reference to available net income. When the trustee exercised his right under Article XI to declare the principal immediately due and payable, the principal began to accrue interest at 5 percent regardless of available net income; and that is the interest which the district judge awarded for the period until the principal is repaid.

All this seems eminently sensible. Once the principal is accelerated by the declaration of a default, it becomes a matter of very little interst to the debenture holders whether the railroad has available net income. The contract has been broken, they want out, and they negotiated for 5 percent interest on their overdue principal until they got out.

[6]     We have not forgotten the venerable principle that a bankruptcy court can refuse to award interest that accrues on a creditor's claim after the petition for bankruptcy is filed. See, e.g., *Sexton v. Dreyfus,* 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244 (1911) (Holmes, J.); *New York v. Saper,* 336 U.S. 328, 330-32, 69 S.Ct. 554, 555-57, 93 L.Ed. 710 (1949). But it is designed for cases where there is not enough money to pay all the creditors-so that there is a question whether one creditor should get interest while another doesn't even

recover principal-and not for cases like this, where the debtor is solvent. See *Ruskin v. Griffiths,* 269 F.2d 827, 830-31 (2d Cir.1959); *In re Manville Forest Products Corp.,* 43 B.R. 293, 300 (Bankr.S.D.N.Y.1984). It can be argued that the principle casts light on the question whether the contract was intended to apply to a default that ends up in bankruptcy court. But we think it was. The parties provided expressly for interest on overdue principal, and though the debenture holders must have known there was a chance that this contractual right would not be enforced in bankruptcy, they did everything they could to maximize the likelihood that it would be.

[7]     3. The debenture holders want more than 5 percent, but we think the district court was right to reject this request. The contract is the measure of their rights. Whatever rights to prejudgment interest they might otherwise have are merged in their contractual understanding. As will become clear from our analysis of the fourth issue, the fact that if the default had occurred outside of bankruptcy the debenture holders might have collected the overdue principal faster and therefore have been able to invest it at a higher interest rate (the current market rate) does not alter this conclusion.

4. The district judge awarded the debenture holders interest on the 5 percent interest installments that had accrued but had not been paid, from the date of accrual. (Interest on interest may seem a detail, but is not; it could be as much as $15 million if the debenture holders' contentions with regard to the proper rate of interest were accepted.) His analysis of this question **\*530** was exceedingly terse; essentially he treated the date of accrual of each installment as if it were the date on which a judgment or its equivalent had been entered against the Milwaukee Road. Actually they were just the due dates of the installments.

[8]     To repeat an earlier point, which indeed is the main point in this opinion, when the debtor is solvent the judicial task is to give each creditor the measure of his contractual claim, no more and no less. Cf. *Ruskin v. Griffiths, supra,* 269 F.2d at 831.* By this standard the debenture holders have no right to interest on interest. The exact language of the acceleration clause is that in the event of a default in paying either principal or interest the railroad will, upon the indenture trustee's demand, pay him "the whole amount then due and payable on such Debentures and coupons, for principal or interest, or both, as the case may be, with interest on the overdue principal at the rate of 5% per annum...." Both the overdue principal and the overdue interest must be paid but only the former shall carry interest. All events of default are covered;

and we know that the indenture specifies that one such event is declaring bankruptcy. It is inconceivable that the only default contemplated in the provision on overdue principal and interest was one that did not involve bankruptcy. Not only does the indenture expressly contemplate the possibility of bankruptcy, but that possibility must have been pointedly present to the minds of the draftsmen given the history of the Milwaukee Road. It had been placed in an equity receivership (the equivalent of bankruptcy) in 1925, see *Chicago, M., St. P. & P.R. Co. v. United States,* 33 F.2d 582, 584 (N.D.Ill.1929), had emerged in 1928, and had entered reorganization in bankruptcy in 1935, not to emerge till the 1940s, see *In re Chicago, M., St. P. & P.R. Co.,* 36 F.Supp. 193 (N.D.Ill.1940), rev'd, *124 F.2d 754 (7th Cir.1941),* rev'd in part, under the name of *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R.,* 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943)-so that in 1955 it had been out of reorganization for only a few years.

Another reason to think the omission to require interest on interest deliberate is that under the law of Illinois, which would govern a dispute over the meaning of the indenture since it was negotiated and signed in Illinois and no other state has a closer connection to the negotiation or performance of the indenture, interest on interest will not be awarded in a breach of contract action unless expressly provided for in the contract. See *Harrington v. Kay,* 136 Ill.App.3d 561, 569-70, 91 Ill.Dec. 214, 221, 483 N.E.2d 560, 567 (1985), and cases cited there. Hence the debenture holders could not have thought it likely that if the indenture was silent on whether they were entitled to interest on interest, they could still obtain it in a suit growing out of a default. It is true of course that prejudgment interest is generally allowed in cases where the plaintiff's claim is for a fixed sum; and that would describe not only the indenture trustee's claim for overdue principal but also his claim for overdue interest at the rate fixed in the indenture (5 percent). But *Harrington v. Kay* shows that the courts of Illinois make an exception for the case where, since the underlying claim is a claim for interest, the prejudgment interest would be interest on interest, which is sufficiently disfavored (for reasons unclear to us) to require that the plaintiff negotiate for it explicitly if he wants to get it. One may wonder why, since prejudgment interest on principal is allowed, the indenture bothers to provide expressly for interest on overdue principal; that is just another name for prejudgment interest. But apart from wanting to make assurance doubly sure (a desire that explains much apparently superfluous language in contracts), the indenture fixes the prejudgment interest rate at 5 percent.

If this had been a simple default, then, the debenture holders would not have gotten interest on overdue interest; why should they do better merely because the Milwaukee Road exercised its statutory right to declare bankruptcy? A possible answer is that bankruptcy takes longer than a simple collection case. If the Milwaukee **\*531** Road had simply defaulted, the debenture trustee would have accelerated repayment of the overdue principal and distributed it to the holders of the debentures, who would have invested it and earned compound interest. Of course we cannot be sure that every cent would have been invested rather than used for consumption, but that does not matter; a rational person will forgo an interest-producing investment only if consumption yields him more utility, and in that case the loss of interest is a minimum estimate of his actual loss. The bankrupt corporation was allowed to appropriate this benefit during the reorganization proceeding. Not to compel payment of interest on interest thus gives the bankrupt an incentive to spin out the reorganization proceeding, something we don't need, cf. Blum, *Treatment of Interest on Debtor Obligations Under the Bankruptcy Code,* 50 U.Chi.L.Rev. 430, 432 (1983), and gives the creditor less in present-value terms than he would have had if there had been no such proceeding, cf. *In re Murel Holding Corp.,* 75 F.2d 941, 942 (2d Cir.1935) (L. Hand, J.); Baird & Jackson, *Corporate Reorganizations and the Treatment of Diverse Ownership Interests: A Comment on Adequate Protection of Secured Creditors in Bankruptcy,* 51 U.Chi.L.Rev. 97, 115-16, 126-28 (1984).

Nevertheless there are compelling objections to awarding interest on interest in this case. One is that to award it from the date of original default, as sought by the debenture holders, would give them a windfall, for they would not have obtained the principal and begun investing it (at compound interest) the very day it became overdue. Collection proceedings are not instantaneous, especially with a debt of $56 million-a bit too large for small-claims court. The debenture holders knew this; there would have been no reason to provide in the indenture for interest on overdue principal if they had been confident of being able to collect the principal in full the day it became overdue. The potential for delay in paying overdue interest was particularly great since the railroad's obligation to pay interest depended on the intricacies of the available-net-income concept; the debenture trustee might have had to sue to enforce his entitlement to the overdue interest. He was not in the position of a secured creditor who could seize assets of the debtor to collect his claim. And as we said earlier he could

not have gotten prejudgment interest on the interest part of his claim; he would have had to wait till judgment was entered before interest on interest began to accrue.

All this leaves quite speculative the question how much interest the debenture holders actually lost by virtue of the fact that the default was precipitated by a bankruptcy. That depends as we have said on how long it would have taken their trustee to enforce any claim to overdue interest in the event of a nonbankruptcy default.

The objections go deeper. We have said that in the case of a solvent bankrupt the bankruptcy court should be guided by the contract between the bankrupt and its creditors rather than by distinct principles of equity jurisprudence. Not only does the debenture indenture not entitle the holders of the debentures to interest on interest in the case of an ordinary default, but there is reason to believe that they were compensated for relinquishing any such contractual entitlement in bankruptcy as well. Back in 1955, with *Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), which had held that the payment of interest on interest was contrary to the equitable principles of bankruptcy, only eight years old, it could not have seemed likely that interest on interest would be awarded if the Milwaukee Road again went into bankruptcy. Granted, *Vanston* was not a solvent-debtor case. *Debentureholders Protective Comm. v. Continental Investment Corp.,* 679 F.2d 264, 271-72 (1st Cir.1982), was, and hinted strongly that the debenture holders there were entitled to interest on interest. But even if that decision had been anticipated in 1955, how likely was it that if the Milwaukee Road went broke again, it would emerge from bankruptcy **\*532** able to pay all of its creditors in full? The holders of the debentures had to be thinking about the possibility of bankruptcy, and its attendant delays in repaying creditors; must therefore have assumed the risk that they would not get compound interest if there was a bankruptcy; and presumably were compensated for bearing this risk by some other term in the debenture indenture.

 [9]    Awarding interest on interest in this case also would circumvent Illinois' policy of not awarding prejudgment interest on interest unless the contract sued on provides expressly for such interest. The Supreme Court held in *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), that a bankruptcy court is not allowed to give

a creditor rights that state law has withheld from him. Bankruptcy law provides a federal machinery for enforcing creditors' rights but the rights themselves are created by state law. The debenture holders are asking for a right to prejudgment interest that Illinois law does not give them.

*Butner* casts something of a shadow over the First Circuit's *Debentureholders* decision, which, without citing *Butner,* suggested that the debenture holders might have a right to interest on interest even though the applicable state law, as in this case, did not recognize such a right. After *Butner,* the *Vanston* decision seems to stand for the proposition not that federal law controls the creditor's right to interest in bankruptcy, but that the creditor's right may be cut down as a matter of equity if that is necessary for the protection of competing creditors (*Sexton* ); the right itself, however, is created by state, not federal, law. See *In re Madeline Marie Nursing Homes,* 694 F.2d 433, 436-39 (6th Cir.1982).

Our conclusion regarding interest on interest is also pertinent to the debenture holders' argument (issue 3) that they should get interest on the overdue principal at a greater than 5 percent rate because if they had collected a state court judgment for the overdue principal they could immediately have invested it at the current interest rate, which was much higher than 5 percent. True enough, but they could also have negotiated in the indenture for payment of interest on overdue principal at market rates rather than a fixed 5 percent rate. Perhaps anticipating (extraordinary as this may seem in 1986) that interest rates would fall below 5 percent, they rejected this option. They must be held to their choice.

To summarize, the district judge was right to accelerate the repayment of principal and give the debenture holders 5 percent interest on that principal without regard to available net income, so these parts of his decision are affirmed. But he was wrong to order the payment of interest on those past-due interest payments, and this part of his decision is reversed, and the case remanded to the reorganization court for the entry of a new judgment, subtracting the interest on interest. Each party shall bear its own costs in this court.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.

Footnotes

\*      Hon. James T. Moody of the Northern District of Indiana, sitting by designation.

---

**End of Document**                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 47

391 F.3d 190
United States Court of Appeals,
Third Circuit.

In re: COMBUSTION ENGINEERING, INC.
First State Insurance Company; Hartford
Accident and Indemnity Company, Appellants
Certain Cancer Claimants, being those
individuals identified on a Rule 2019
Disclosure filed in the Bankruptcy Court
for the District of Delaware and creditors of
Combustion Engineering, Inc., Appellants
Certain Underwriters at Lloyd's, London;
Certain London Market Companies, Appellants
Allstate Insurance Company, as successor-
in-interest to Northbrook Excess &
Surplus Insurance Company, formerly
Northbrook Insurance Company, Appellant
Allianz Insurance Company, Appellant
Everest Reinsurance Co., f/k/a
Prudential Reinsurance Co., Appellant
Century Indemnity Company (as successor to
CCI Insurance Company, successor to Insurance
Company of North America); Pacific Employers
Insurance Company; Central National Insurance
Company of Omaha (solely with respect to policies
issued through its managing general agent, Cravens,
Dargan & Company, Pacific Coast), Appellants
Onebeacon America Insurance Company, f/k/a
Commercial Union Insurance Company, Appellant
North River Insurance Company; TIG Insurance
Company, solely as successor by merger to
International Insurance Company, Appellants
Certain Underwriters at Lloyd's, London;
Certain London Market Companies, Appellants
Everest Reinsurance Co., f/k/a
Prudential Reinsurance Co., Appellant
Continental Casualty Company; Transportation
Insurance Company, Appellants.

Nos. 03–3392, 03–3415, 03–3425, 03–
3436, 03–3445, 03–3446, 03–3450, 03–
3558.    |    Argued June 3, 2004.    |    Dec.
2, 2004.    |    As Amended Feb. 23, 2005.

## Synopsis

**Background:** Debtor subject to personal injury liabilities
arising from asbestos-related litigation filed prepackaged
Chapter 11 reorganization plan that extended proposed
asbestos liability shield to two non-debtor affiliates. The
Bankruptcy Court, 295 B.R. 459, recommended confirmation
with certain modifications. The United States District Court
for the District of Delaware, Alfred M. Wolin, J. [*], confirmed
plan with additional modifications. Insurers and certain
cancer claimants appealed, and appeals were consolidated.

**Holdings:** The Court of Appeals, Scirica, Chief Judge, held
that:

[1] liability insurers had limited standing to challenge plan;

[2] insurers with prepetition indemnity agreements with
debtor lacked standing to challenge valuation of indemnity
claims for confirmation purposes;

[3] cancer claimants had standing to appeal confirmation
issues except as to non-debtor affiliate against which they
held no independent claims;

[4] "related to" bankruptcy jurisdiction did not exist over
independent asbestos-related claims against affiliates;

[5] bankruptcy court's equitable powers could not be used to
extend channeling injunction to independent asbestos-related
claims against affiliates;

[6] proposed plan appeared to violate policy of equality of
distribution, warranting remand for further factual findings;
and

[7] remand was required on issues arising from use of "stub
claims" to obtain plan confirmation.

Vacated and remanded.

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

West Headnotes (56)

**[1]**   **Bankruptcy**
   👈 Conclusions of law;  de novo review

**Bankruptcy**
   👈 Discretion

**Bankruptcy**
   👈 Clear error

On appeal in bankruptcy proceedings, Court of Appeals reviews district court's conclusions of law de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof.

2 Cases that cite this headnote

**[2]**   **Bankruptcy**
   👈 Right of review and persons entitled;  parties;  waiver or estoppel

Standing to appeal in a bankruptcy case is limited to persons aggrieved by an order of the bankruptcy court.

15 Cases that cite this headnote

**[3]**   **Bankruptcy**
   👈 Right of review and persons entitled;  parties;  waiver or estoppel

"Persons aggrieved" test is prudential standing requirement that limits bankruptcy appeals to persons whose rights or interests are directly and adversely affected pecuniarily by an order or decree of the bankruptcy court.

20 Cases that cite this headnote

**[4]**   **Bankruptcy**
   👈 Right of review and persons entitled;  parties;  waiver or estoppel

To be "persons aggrieved" by order of bankruptcy court, and thus have standing to appeal, parties must show that order to be challenged on appeal diminishes their property, increases their burdens, or impairs their rights.

18 Cases that cite this headnote

**[5]**   **Bankruptcy**
   👈 Right of review and persons entitled;  parties;  waiver or estoppel

Whether someone is a person aggrieved, and thus has standing to appeal in bankruptcy case, is normally a question of fact.

5 Cases that cite this headnote

**[6]**   **Bankruptcy**
   👈 Right of review and persons entitled;  parties;  waiver or estoppel

Appellate standing in the bankruptcy context is more restrictive than Article III standing, which need not be financial and need only be fairly traceable to the alleged illegal action. U.S.C.A. Const. Art. 3, § 2, cl. 1.

7 Cases that cite this headnote

**[7]**   **Bankruptcy**
   👈 Right of review and persons entitled;  parties;  waiver or estoppel

Standing to appeal in bankruptcy case is not dispensed in gross, but rather is determined by the specific claims presented.

1 Cases that cite this headnote

**[8]**   **Bankruptcy**
   👈 Right of review and persons entitled;  parties;  waiver or estoppel

Insurers providing primary and excess liability coverage to Chapter 11 debtor and its non-debtor affiliates became exposed to possibility that provisions of proposed reorganization plan could affect aspects of pertinent insurance policies and settlements when, by narrowing provision to apply to insurers' rights respecting "claims" as defined by Bankruptcy Code, district court modified super-preemption provision that was added to proposed plan by bankruptcy court to clarify that plan, which sought to shield debtor and affiliates from further asbestos-related liability, would not impair insurers' prepetition rights under policies and settlements, and therefore insurers had limited standing, on

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 327 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

appeal from plan confirmation, to challenge modification. Bankr.Code, 11 U.S.C.A. §§ 1124, 1126(f).

17 Cases that cite this headnote

**[9]    Bankruptcy**

　　🗝 Right of review and persons entitled; parties; waiver or estoppel

Neutrality provision that was added by district court to Chapter 11 plan seeking to shield debtor and non-debtor affiliates from future asbestos-related liability, which protected prepetition rights and obligations of both debtor and insurers under plan by preserving "any and all claims, defenses, rights or causes of action" under pertinent insurance policies and settlement agreements, did not impair rights or increase burdens of insurers providing primary and excess liability coverage to debtor and affiliates, and therefore insurers lacked standing to challenge addition of neutrality provision on appeal from plan confirmation order.

10 Cases that cite this headnote

**[10]    Bankruptcy**

　　🗝 Insurance policies and liabilities thereon

Under Bankruptcy Code, proceeds paid under Chapter 11 debtor's primary and excess liability insurance policies could be assigned to bankruptcy estate even if policies purported to prohibit such assignments. Bankr.Code, 11 U.S.C.A. §§ 541(c)(1), 1123(a)(5).

3 Cases that cite this headnote

**[11]    Bankruptcy**

　　🗝 Insurance policies and liabilities thereon

**Bankruptcy**

　　🗝 Right of review and persons entitled; parties; waiver or estoppel

To the extent that primary and excess liability insurance policies were jointly held by Chapter 11 debtor and non-debtor affiliate, Bankruptcy Code's preemption of policies' anti-assignment provisions applied only to debtor's interest in such shared policies, and insurers had appellate

standing to challenge any assignment of policy proceeds, under confirmed plan, that violated anti-assignment provisions in policies held by non-debtor affiliates. Bankr.Code, 11 U.S.C.A. § 541(c)(1).

9 Cases that cite this headnote

**[12]    Bankruptcy**

　　🗝 Interest of debtor in general

Bankruptcy Code prohibits restrictions on the interests of debtor, but does not place similar restrictions on the interests of non-debtors. Bankr.Code, 11 U.S.C.A. § 541(a), (c)(1).

2 Cases that cite this headnote

**[13]    Bankruptcy**

　　🗝 Right of review and persons entitled; parties; waiver or estoppel

Insurers that entered into prepetition settlement agreements with Chapter 11 debtor that required debtor to indemnify insurers for related litigation costs and liabilities were not aggrieved by valuation of their indemnity claims for limited purpose of determining their rights with respect to plan voting and confirmation, and thus lacked standing to challenge valuations on appeal from plan confirmation.

3 Cases that cite this headnote

**[14]    Courts**

　　🗝 Previous Decisions as Controlling or as Precedents

**Judgment**

　　🗝 Scope and Extent of Estoppel in General

A ruling or finding on a moot issue can have no precedential or collateral estoppel effect.

Cases that cite this headnote

**[15]    Bankruptcy**

　　🗝 Right of review and persons entitled; parties; waiver or estoppel

Party may not appeal from a judgment or decree in his favor for the purpose of obtaining a review

of findings he deems erroneous which are not necessary to support the decree.

Cases that cite this headnote

[16] **Bankruptcy**
👉 Right of review and persons entitled; parties; waiver or estoppel

As creditors of Chapter 11 estate, claimants who suffered from cancers allegedly caused by exposure to asbestos in debtor's products had interests that were directly and pecuniarily affected by order which confirmed plan that channeled present and future asbestos-related claims against debtor and two non-debtor affiliates to post-confirmation trust, and thus had appellate standing to challenge plan confirmation, including extension of injunctive relief to non-debtor affiliate against which claimants held independent claims, propriety of channeling injunction, and issue of whether plan obtained valid confirming vote; however, claimants could not challenge such issues as they related to non-debtor affiliate against which claimants had no independent claims. Bankr.Code, 11 U.S.C.A. §§ 105(a), 524(g).

10 Cases that cite this headnote

[17] **Bankruptcy**
👉 Conclusions of law; de novo review

Issue of whether district court had subject matter jurisdiction over non-derivative third-party claims against Chapter 11 debtor's non-debtor affiliates was subject to de novo review by Court of Appeals on appeal from plan confirmation order.

3 Cases that cite this headnote

[18] **Bankruptcy**
👉 Issues between non-debtors

**Bankruptcy**
👉 Evidence; witnesses

Record evidence of an indemnity obligation under which action against non-debtor automatically depletes the assets of debtor's estate may be relevant to ascertaining an identity

of interest between the debtor and non-debtor and also support "related to" jurisdiction. 28 U.S.C.A. § 1334(b).

1 Cases that cite this headnote

[19] **Bankruptcy**
👉 Bankruptcy Jurisdiction

**Bankruptcy**
👉 Carrying out provisions of Code

Statute permitting bankruptcy court to issue any order, process, or judgment necessary or appropriate to carry out Bankruptcy Code does not provide an independent source of federal subject matter jurisdiction. Bankr.Code, 11 U.S.C.A. § 105(a, c).

9 Cases that cite this headnote

[20] **Bankruptcy**
👉 Limited, in personam, and in rem jurisdiction

The exercise of bankruptcy power must be grounded in statutory bankruptcy jurisdiction.

2 Cases that cite this headnote

[21] **Bankruptcy**
👉 Bankruptcy Jurisdiction

**Bankruptcy**
👉 Core, Non-Core, or Related Proceedings in General; Nexus

**Bankruptcy**
👉 Core or non-core proceedings

**Bankruptcy**
👉 Related proceedings

Bankruptcy court jurisdiction potentially extends to four types of matters, including (1) cases under Title 11, (2) proceedings arising under Title 11, (3) proceedings arising in a case under Title 11, and (4) proceedings related to a case under Title 11, and cases under Title 11, proceedings arising under Title 11, and proceedings arising in a case under Title 11 are referred to as "core proceedings." while proceedings "related to" a case under Title 11 are referred to as "non-core proceedings."

Case 09-10138-MFW   Doc 14410-3   Filed 09/16/14   Page 329 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

23 Cases that cite this headnote

**[22]** **Bankruptcy**
🔑 Bankruptcy Jurisdiction

As used in statute establishing bankruptcy jurisdiction, term "cases under title 11," refers merely to the bankruptcy petition itself, while term "proceeding" refers to the steps within the case and to any subaction within the case that may raise a disputed or litigated matter. 28 U.S.C.A. § 1334(a, b).

18 Cases that cite this headnote

**[23]** **Bankruptcy**
🔑 Bankruptcy Jurisdiction

In the context of bankruptcy jurisdiction, anything that occurs within a case is a "proceeding," including all controversies, adversary proceedings, contested matters, suits, actions, or disputes. 28 U.S.C.A. § 1334.

5 Cases that cite this headnote

**[24]** **Bankruptcy**
🔑 Related proceedings

For purposes of bankruptcy jurisdiction, proceedings "related to" a Title 11 case include causes of action owned by debtor that become property of the bankruptcy estate, as well as suits between third parties that conceivably may have an effect on the bankruptcy estate. Bankr.Code, 11 U.S.C.A. § 541(a); 28 U.S.C.A. § 1334.

36 Cases that cite this headnote

**[25]** **Bankruptcy**
🔑 Issues between non-debtors

Corporate affiliation between Chapter 11 debtor and two non-debtor affiliates did not, by itself, provide basis for exercising "related to" bankruptcy jurisdiction over asbestos-related claims against affiliates as to which debtor did not have derivative liability, given that corporate relationship derived from holding company structure and common parent corporation which did not seek bankruptcy protection, and that

debtor and affiliates were independent corporate entities, with separate and distinct management and operations. 28 U.S.C.A. § 1334(b).

6 Cases that cite this headnote

**[26]** **Bankruptcy**
🔑 Issues between non-debtors

"Related to" bankruptcy jurisdiction did not extend to independent, asbestos-related claims against Chapter 11 debtor's non-debtor affiliates, even though financial contributions that non-debtor parent corporation was to make under debtor's proposed reorganization plan purportedly depended upon plan providing for channeling injunction that shielded affiliates, along with debtor, from further asbestos-related liability. Bankr.Code, 11 U.S.C.A. § 524(g); 28 U.S.C.A. § 1334(b).

7 Cases that cite this headnote

**[27]** **Bankruptcy**
🔑 Consent to or Waiver of Objections to Jurisdiction or Venue

Subject matter jurisdiction cannot be conferred by consent of the parties.

2 Cases that cite this headnote

**[28]** **Bankruptcy**
🔑 Consent to or Waiver of Objections to Jurisdiction or Venue

**Bankruptcy**
🔑 Good faith and legality

When a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement, even in a bankruptcy plan of reorganization.

1 Cases that cite this headnote

**[29]** **Bankruptcy**
🔑 Limited, in personam, and in rem jurisdiction

**Bankruptcy**
🔑 Good faith and legality

Although federal bankruptcy jurisdiction is deliberately expansive and conspicuous for its breadth, it is not without limitation, and boundaries of bankruptcy jurisdiction cannot be extended simply to facilitate a particular plan of reorganization, even if court perceives plan to be in the public interest.

Cases that cite this headnote

**[30]**   **Bankruptcy**
   🔑 Issues between non-debtors

Asbestos-related personal injury claims against Chapter 11 debtor and its non-debtor affiliates, which arose from different products, involved different asbestos-containing materials, and were sold to different markets, did not establish unity of interest between debtor and affiliates supporting exercise of "related to" bankruptcy jurisdiction over independent third-party claims against affiliates, based on possibility that, despite lack of statutory or contractual indemnification obligations on debtor's part, affiliates would assert contribution or indemnification claims against debtor which would affect Chapter 11 estate, notwithstanding common production sites shared by debtor and affiliates. 28 U.S.C.A. § 1334(b).

10 Cases that cite this headnote

**[31]**   **Bankruptcy**
   🔑 Issues between non-debtors

That Chapter 11 debtor and two non-debtor affiliates shared certain insurance coverage with respect to asbestos-related personal injury claims did not support exercise of "related to" bankruptcy jurisdiction over independent third-party claims against affiliates in the absence of factual findings regarding terms, scope, and coverage of allegedly shared policies that would support determination that claims against affiliates would deplete proceeds available to debtor, thereby reducing assets available to bankruptcy estate. 28 U.S.C.A. § 1334(b).

6 Cases that cite this headnote

**[32]**   **Bankruptcy**
   🔑 Related proceedings
   **Bankruptcy**
   🔑 Issues between non-debtors

Although, in certain situations, "related to" bankruptcy jurisdiction over third-party proceedings may be determined by speculating whether the ultimate outcome of the litigation could conceivably affect the bankruptcy estate, this determination must meet the requirements of "related to" jurisdiction, and also must be supported by findings of fact, not merely the general assertions of plan proponents. 28 U.S.C.A. § 1334(b).

21 Cases that cite this headnote

**[33]**   **Bankruptcy**
   🔑 Settlement, adjustment, or enforcement of claims

To be entitled to injunction channeling asbestos-related claims to personal injury trust created under Bankruptcy Code, Chapter 11 debtor must satisfy the prerequisites set forth in statute providing for such injunction in addition to standard plan confirmation requirements. Bankr.Code, 11 U.S.C.A. § 524(g).

3 Cases that cite this headnote

**[34]**   **Bankruptcy**
   🔑 Settlement, adjustment, or enforcement of claims

Bankruptcy Code provision allowing court confirming Chapter 11 reorganization plan of debtor dealing with asbestos-related liabilities to enter injunction supplementing injunctive effect of discharge did not authorize injunction that would channel to post-confirmation trust independent asbestos-related claims against Chapter 11 debtor's non-debtor affiliates. Bankr.Code, 11 U.S.C.A. § 524(g).

12 Cases that cite this headnote

**[35]**   **Bankruptcy**
   🔑 Equitable powers and principles

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 331 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

**Bankruptcy**

☞ Settlement, adjustment, or enforcement of claims

Bankruptcy court's equitable powers to implement Bankruptcy Code could not be used to extend injunction which, as part of proposed Chapter 11 plan, channeled asbestos-related personal injury claims against debtor to post-confirmation trust so as to include independent, non-derivative asbestos-related claims against debtor's non-debtor affiliates, inasmuch as such relief violated statute authorizing injunctive relief supplementing discharge under Chapter 11 reorganization plan of debtor dealing with asbestos-related liabilities, improperly extended bankruptcy relief to non-debtors, and jeopardized interests of affiliates' future claimants. Bankr.Code, 11 U.S.C.A. §§ 105(a), 524(g)(4)(A).

24 Cases that cite this headnote

[36] **Bankruptcy**

☞ Equitable powers and principles

Bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.

4 Cases that cite this headnote

[37] **Bankruptcy**

☞ Equitable powers and principles

As courts of equity, bankruptcy courts have broad authority to modify creditor-debtor relationships.

2 Cases that cite this headnote

[38] **Bankruptcy**

☞ Carrying out provisions of Code

Statute permitting bankruptcy court to issue any order, process, or judgment necessary or appropriate to carry out Bankruptcy Code does not give the court the power to create substantive rights that would otherwise be unavailable under the Code. Bankr.Code, 11 U.S.C.A. § 105(a).

5 Cases that cite this headnote

[39] **Bankruptcy**

☞ Equitable powers and principles

General grant of equitable power contained in Bankruptcy Code cannot trump Code's specific provisions, and must be exercised within the parameters of Code itself. Bankr.Code, 11 U.S.C.A. § 105(a).

14 Cases that cite this headnote

[40] **Bankruptcy**

☞ Equitable powers and principles

When the Bankruptcy Code provides a specified means for a debtor to obtain a specific form of equitable relief, those standards and procedures must be observed notwithstanding bankruptcy court's equitable powers. Bankr.Code, 11 U.S.C.A. § 105(a).

3 Cases that cite this headnote

[41] **Statutes**

☞ General and specific terms and provisions; ejusdem generis

Specific statutory provisions prevail over more general provisions.

4 Cases that cite this headnote

[42] **Bankruptcy**

☞ Remand

Chapter 11 plan appeared to discriminate against certain claimants with asbestos-related personal injury claims against debtor in violation of bankruptcy policy of equality of distribution, warranting remand, on appeal from confirmation order, for further factual findings, given that plan used two-trust structure which relied on prepetition settlement trust possibly funded by avoidable preferential transfers, appeared to provide claimants who were not parties to prepetition settlement with demonstrably unequal share of debtor's fund, and purportedly treated disparately current and future asbestos claimants and malignant and non-malignant

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 332 of 398

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

asbestos claimants. Bankr.Code, 11 U.S.C.A. §§ 524(g)(2)(B)(ii)(V), 547(b).

11 Cases that cite this headnote

[43]    **Bankruptcy**
        👉 The Plan

When investigation of totality of circumstances surrounding Chapter 11 reorganization plan discloses the existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special benefits for the reorganizers, or the need for protection of investors against an inside few, or of one class of investors from the encroachments of another, the court has ample power to adjust the remedy to meet the need.

2 Cases that cite this headnote

[44]    **Bankruptcy**
        👉 Remand

Chapter 11 debtor's use of "stub claims" of asbestos injury claimants who participated in prepetition settlement arrangement to obtain plan confirmation warranted remand, on appeal from order confirming plan, for further consideration of issues of whether use of stub claims violated requirement that plan be proposed in good faith, constituted artificial impairment of class of claims in violation of requirement that plan be accepted by at least one impaired class of creditors, or involved impermissible payments in exchange for votes favoring plan, in that use of stub claims resulted in ratification of plan by asbestos injury claimants who received preferential treatment as compared to those claimants who had no representation or participation in settlement negotiations, such that plan possibly lacked requisite indicia of support among creditors. Bankr.Code, 11 U.S.C.A. §§ 1126(e), 1129(a)(3, 10).

15 Cases that cite this headnote

[45]    **Bankruptcy**
        👉 Requisites of Confirmable Plan

Chapter 11 plan of reorganization must satisfy all statute requirements: (1) plan's compliance with

Bankruptcy Code, (2) proponent's compliance with Code, (3) good faith proposal of plan, (4) disclosure of payments, (5) identification of management, (6) regulatory approval of rate changes, if applicable, (7) "best interest" test, requiring that each claim holder in impaired class accept plan or receive no less than would be received in Chapter 7 liquidation, (8) acceptance of plan by each impaired class, (9) treatment of administrative and priority claims in accordance with statute, (10) acceptance by at least one impaired class of claimants, (11) feasibility of plan, (12) payment of bankruptcy fees, and (13) payment of retiree benefits. Bankr.Code, 11 U.S.C.A. § 1129(a).

7 Cases that cite this headnote

[46]    **Bankruptcy**
        👉 Impairment of Claims or Interests

In the context of confirmation of Chapter 11 reorganization plan, "artificial impairment" occurs when a plan imposes an insignificant or de minimis impairment on a class of claims to qualify those claims as impaired for purposes of establishing plan acceptance. Bankr.Code, 11 U.S.C.A. §§ 1124, 1129(a)(10).

7 Cases that cite this headnote

[47]    **Bankruptcy**
        👉 By one class

Purpose of requirement for confirmation that proposed Chapter 11 reorganization plan be accepted by at least one impaired class is to provide some indicia of support for plan by affected creditors and prevent confirmation where such support is lacking. Bankr.Code, 11 U.S.C.A. § 1129(a)(10).

7 Cases that cite this headnote

[48]    **Bankruptcy**
        👉 Classification of claims

In determining whether asbestos claimants are "similarly situated" for claim classification purposes in Chapter 11 reorganization case, relevant inquiry does not turn solely on the

time the outstanding personal injury claims were filed; rather, the substance, or the "legal character," of the claims is also relevant.

4 Cases that cite this headnote

**[49]    Constitutional Law**
  👆 Bankruptcy

Minimal due process requirements extend to bankruptcy proceedings. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[50]    Bankruptcy**
  👆 Effect of state law, in general

Bankruptcy Code relies upon applicable non-bankruptcy law to determine whether claims are enforceable for bankruptcy purposes. Bankr.Code, 11 U.S.C.A. § 502.

3 Cases that cite this headnote

**[51]    Bankruptcy**
  👆 Effect of state law, in general

Claim against the bankruptcy estate will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against debtor outside of bankruptcy. Bankr.Code, 11 U.S.C.A. § 502.

3 Cases that cite this headnote

**[52]    Bankruptcy**
  👆 Compromises, Releases, and Stipulations

By mandating that participants enforce their remaining claims in bankruptcy, prepetition settlement agreement between Chapter 11 debtor and certain asbestos injury claimants simply required that terms of agreement be recognized in bankruptcy, and thus did not violate requirement that, to be allowable in bankruptcy, claim had to be enforceable against debtor outside of bankruptcy. Bankr.Code, 11 U.S.C.A. § 502.

1 Cases that cite this headnote

**[53]    Bankruptcy**
  👆 Acceptance

When the process for voting on Chapter 11 plan's acceptance is managed almost entirely by proxy, it is reasonable to require a valid power of attorney for each ballot to ensure that claimants are properly informed about plan and that their votes are valid.

Cases that cite this headnote

**[54]    Bankruptcy**
  👆 Conclusions of law;  de novo review

**Bankruptcy**
  👆 Particular cases and issues

District court's determinations of fact regarding good faith in proposing Chapter 11 plan are reviewed for clear error, while conclusions of law are subject to plenary review. Bankr.Code, 11 U.S.C.A. § 1129(a)(3).

1 Cases that cite this headnote

**[55]    Bankruptcy**
  👆 Construction, execution, and performance

Requirement that asbestos personal injury trust created under Bankruptcy Code be "funded in whole or in part by the securities of 1 or more debtor involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends," requires that the reorganized debtor be a going concern, such that it is able to make future payments into the trust to provide an evergreen funding source for future asbestos claimants. Bankr.Code, 11 U.S.C.A. § 524(g)(2)(B)(i)(II).

9 Cases that cite this headnote

**[56]    Bankruptcy**
  👆 Right of review and persons entitled;  parties;  waiver or estoppel

On appeal from confirmation of Chapter 11 plan creating asbestos personal injury trust, debtor's liability insurers lacked standing to argue that plan did not satisfy "going concern" requirement

Case 09-10138-MFW   Doc 14410-3   Filed 09/16/14   Page 334 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

for creation of such trust. Bankr.Code, 11 U.S.C.A. § 524(g)(2)(B)(i)(II).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*198** Seth P. Waxman, (Argued), Craig Goldblatt, Wilmer, Cutler, Pickering, Hale & Dorr, Washington, Michelle K. McMahon, Connolly Bove Lodge & Hutz LLP, Wilmington, for Appellants, First State Insurance Company; Hartford Accident and Indemnity Company.

Gregory M. Harvey, (Argued), Natalie D. Ramsey, Baldo M. Carnecchia, Jr., Montgomery, McCracken, Walker & Rhoads, LLP, Philadelphia, Elizabeth Wall Magner, New Orleans, for Appellants, Certain Cancer Claimants.

Joseph L. Ruby, (Argued), Baach Robinson & Lewis PLLC, Washington, for Appellants, Certain Underwriters at Lloyd's, London; Certain London Market Companies.

James S. Yoder, Wilmington, for Appellants, Allstate Insurance Company; Allianz Insurance Company.

Elit R. Felix, II, Margolis Edelstein, Philadelphia, for Appellant, Allianz Insurance Company.

Joseph L. Schwartz, Riker, Danzig, Scherer, Hyland & Perretti LLP, Morristown, Neil B. Glassman, The Bayard Firm, Wilmington, for Appellant, Everest Reinsurance Co., f/k/a Prudential Reinsurance Co.

Mark D. Plevin, (Argued), Crowell & Moring LLP, Washington, Brian L. Kasprzak, Marks, O'Neill, O'Brien & Courtney, P.C., Wilmington, for Appellants, Century **\*199** Indemnity Company; Pacific Employers Insurance Company; Central National Insurance Company of Omaha; OneBeacon America Insurance Company f/k/a Commercial

Union Insurance Company; The North River Insurance Company; TIG Insurance Company.

Kevin Gross, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Merril J. Hirsh, Thomas T. Locke, Erik M. Pritchard, Ross, Dixon & Bell, L.L.P., Washington, Mohsin N. Khambati, Stephanie A. Petersmarck, McDermott Will & Emery, Chicago, for Appellants, Continental Casualty Company; Transportation Insurance Company.

Laura A. Foggan, Wiley Rein & Fielding LLP, Washington, for Amicus Curiae–Appellant, Complex Insurance Claims Litigation Association.

Laura D. Jones, Pachulski, Stang, Ziehl, Young, Jones & Weintraub, P.C., Wilmington, for Appellee, Combustion Engineering, Inc.

David M. Bernick, (Argued), John Donley, Kirkland & Ellis LLP, Chicago, Theodore L. Freedman, Kirkland & Ellis LLP, New York, Christopher Landau, Eric B. Wolff, Kirkland & Ellis LLP, Washington, for Appellee, Asea Brown Boveri, Inc.

Elihu Inselbuch, (Argued), Caplin & Drysdale, New York, Joseph D. Frank, Neal Gerber & Eisenberg, Chicago, Michael R. Lastowski, Duane Morris LLP, Wilmington, for Appellee, The Official Committee of Unsecured Creditors of Combustion Engineering, Inc.

Roger L. Frankel, (Argued), Swidler Berlin Shereff Friedman, LLP, Washington, John C. Phillips, Jr., Phillips, Goldman & Spence, P.A., Wilmington, for Appellee, David T. Austern, Future Claimants' Representative.

Before SCIRICA, Chief Judge, AMBRO and FUENTES, Circuit Judges.

**OPINION OF THE COURT**

SCIRICA, Chief Judge.

## TABLE OF CONTENTS

OPINION OF THE COURT ................................................................................................ 199

I. Overview .......................................................................................................... 200

   A. Combustion Engineering's Asbestos–Induced Bankruptcy .................................... 201

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 335 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

B. Issues Presented on Appeal..................................................................... 202

II. Background.......................................................................................... 203

    A. Combustion Engineering........................................................................ 203

    B. The Master Settlement Agreement......................................................... 204

    C. The Pre–Pack Plan.............................................................................. 205

    D. Plan Voting and Approval..................................................................... 207

    E. The Bankruptcy Court Proceedings........................................................ 208

    F. District Court Proceedings and Plan Confirmation......................... ........ 211

    G. The Consolidated Appeals..................................................................... 213

III. Standing............................................................................................. 214

    A. Background............................................................................... ........ 214

    B. Objecting Insurers and London Market Insurers............................. ........ 215

    C. Indemnified Insurers............................................................... ........ 220

    D. Certain Cancer Claimants..................................................................... 223

IV. "Related to" Jurisdiction................................................................. ........ 224

    A. Overview................................................................................ ........ 225

    B. Jurisdiction Over Independent Claims Against Non–Debtors.......... ........ 227

        1. Corporate Affiliation............................................................................ 227

        2. Financial Contributions........................................................................ 228

        3. Related Liability.................................................................................. 230

        4. Shared Insurance................................................................................ 232

V. Section 105(a) Equitable Injunction.................................................. ........ 233

    A. The Requirements of Section 524(g)(4)(A)................................... ........ 234

    B. Section 105(a)..................................................................................... 235

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 336 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

VI. Two–Trust Structure.......................................................................................... 238

    A. Discriminatory Treatment of Claims.......................................................... 239

    B. Creation of the "Stub Claims"................................................................... 242

VII. Going Concern Requirement: Section 524(g)(2)(b)(i)(II)............................................. 248

VIII. Conclusion..................................................................................................... 248

**\*200** This case involves twelve [1] consolidated appeals from the District Court's order approving Combustion Engineering's bankruptcy Plan of Reorganization under 11 U.S.C. § 1101 *et seq.* [2] We will vacate and remand.

### I. Overview

For decades, the state and federal judicial systems have struggled with an avalanche of asbestos lawsuits. For reasons well known to observers, a just and efficient resolution of these claims has often eluded our standard legal process—where an injured person with a legitimate claim (where liability and injury can be proven) obtains appropriate compensation without undue cost and undue delay. *See* Fed.R.Civ.P. 1 (goal "to secure the just, speedy and inexpensive determination of every action"). The difficulties with asbestos litigation have been well documented by RAND and others. [3]

Efforts to resolve the asbestos problem through global settlement class actions under Fed.R.Civ.P. 23(b)(3) and 23(b)(1)(B) have so far been unsuccessful. *See Amchem Prods. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (affirming denial of class certification of nationwide settlement class of asbestos claimants); *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (reversing grant of class certification in **\*201** limited fund class action under Fed.R.Civ.P. 23(b)(1)(B)). More than once, the Supreme Court has called on Congress to enact legislation creating a "national asbestos dispute-resolution scheme," but Congress has yet to act. *Amchem,* 521 U.S. at 598, 117 S.Ct. 2231; *Ortiz,* 527 U.S. at 822, 119 S.Ct. 2295.

For some time now, mounting asbestos liabilities have pushed otherwise viable companies into bankruptcy. The current appeal represents a major effort to extricate a debtor and two non-debtor affiliates from asbestos liability through a prepackaged Chapter 11 bankruptcy reorganization that includes 11 U.S.C. §§ 524(g) and 105(a) "channeling injunctions" and a post-confirmation trust fund for asbestos claimants. The Plan has been presented as a pre-packaged Chapter 11 reorganization plan, but it more closely resembles, in form and in substance, a liquidation of the debtor with a post-confirmation trust funded in part by non-debtors. Although pre-packaged bankruptcy may yet provide debtors and claimants with a vehicle for the general resolution of asbestos liability, we find the Combustion Engineering Plan defective for the reasons set forth.

### A. Combustion Engineering's Asbestos–Induced Bankruptcy

Combustion Engineering defended asbestos-related litigation for nearly four decades until mounting personal injury liabilities eventually brought the company to the brink of insolvency. In the fall of 2002, Combustion Engineering and its parent company, Asea Brown Boveri, Inc. ("U.S.ABB"), attempted to resolve Combustion Engineering's asbestos problems, as well as those of two U.S. ABB affiliates, ABB Lummus Global, Inc. and Basic, Inc., through a pre-packaged Chapter 11 bankruptcy reorganization. [4]

To this end, Combustion Engineering contributed half of its assets to a pre-petition trust (the "CE Settlement Trust") to pay asbestos claimants with pending lawsuits for part, but not the entire amount, of their claims. The remaining, unpaid portion of these claims, known as "stub claims," provided prepetition trust participants with creditor status under the Bankruptcy Code. Combustion Engineering then filed a prepackaged bankruptcy Plan of Reorganization under Chapter 11. The centerpiece of the Plan is an injunction in favor of Combustion Engineering that channels all of its

Case 09-10138-MEW    Doc 14410-3    Filed 09/16/14    Page 337 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

asbestos claims to a post-confirmation trust (the "Asbestos PI Trust") created under § 524(g) of the Bankruptcy Code. The Plan also extends this asbestos liability shield to the non-debtor affiliates Basic and Lummus. Millions of dollars in cash and other assets have been offered to the post-confirmation trust by Combustion Engineering, Basic and Lummus, as well as their respective parent companies, U.S. ABB and ABB Limited, to compensate asbestos claimants and to cleanse the companies of asbestos liability.

After considerable negotiation, the Plan won approval from the majority of the asbestos claimants over the objections of several insurers and certain persons suffering **\*202** from asbestos-related injuries. The Bankruptcy Court recommended confirmation of the Plan, but made two significant modifications. First, it added a "super-preemptory" provision to protect the pre-petition rights of certain insurers. Second, it reconfigured the § 524(g) injunction in favor of Basic and Lummus as an equitable injunction under § 105(a).

The District Court adopted the Bankruptcy Court's findings of fact and conclusions of law and confirmed the Plan with two changes. The District Court modified the language of the "super-preemptory" provision and added a "neutrality" provision purporting to protect the debtor's and insurers' prepetition rights under certain insurance policies.

### B. Issues Presented on Appeal

Although several difficult issues are presented on appeal, three are paramount. First, on the facts of this case, does the Bankruptcy Court have "related to" jurisdiction over the derivative and non-derivative claims against the non-debtors Basic and Lummus? Second, can a non-debtor that contributes assets to a post-confirmation trust take advantage of § 105 of the Bankruptcy Code to cleanse itself of non-derivative asbestos liability? Third, did the two-trust structure and use of "stub claims" in the voting process—which allowed certain asbestos claimants who were paid as much as 95% of their claims prepetition to vote to confirm a Plan under which they appear to receive a larger recovery than other asbestos claimants—comply with the Bankruptcy Code? Also implicated are issues involving appellate standing and the propriety of the voting process.

We summarize our holding. On the appellate standing issues, we conclude the Objecting Insurers and London Market

Insurers have limited standing—that is, they only have standing to challenge the District Court's modification of the super-preemptory provision. On that issue, we will vacate the District Court's modification of the super-preemptory provision, and reinstate paragraph 17 of the Plan as initially drafted by the Bankruptcy Court. The Certain Cancer Claimants have standing to challenge Plan confirmation, including the propriety of the voting process, entry of the § 105(a) injunction in favor of Lummus (but not Basic), and issues relating to the validity of the two-trust structure.

Based in part on the lack of factual findings in support of "related to" subject matter jurisdiction, we will vacate the § 105(a) injunction in favor of non-debtors Basic and Lummus. As the Plan's proponents contend, and both the Bankruptcy Court and District Court found, extending the injunction to Basic and Lummus was essential to the Plan. As a practical matter, therefore, vacating the § 105(a) injunction defeats the proposed Plan of Reorganization. While we would normally remand for additional fact finding on the issue of subject matter jurisdiction, none is required here because the § 105(a) injunction must be rejected on substantive grounds as well. On the facts of this case, we hold the Bankruptcy Code precludes the use of § 105(a) to extend a channeling injunction to non-derivative third-party actions against a non-debtor.

With regard to the two-trust structure, we believe the pre-petition payments to the CE Settlement Trust participants and the use of stub claims to secure confirmation votes may violate the Bankruptcy Code and the "equality among creditors" principle that underlies it, requiring a remand to the District Court for further development and review in considering any revised reorganization proposal.

### \*203  II. Background

### A. Combustion Engineering

The story of Combustion Engineering sounds a familiar refrain in the asbestos world. From the 1930s through the 1960s, Combustion Engineering manufactured steam boilers containing asbestos insulation. The company was first named as a defendant in an asbestos-related lawsuit in the 1960s, and its asbestos liability increased steadily over the next thirty years. By the mid–1970s, Combustion Engineering was receiving a few hundred asbestos-related claims per year.

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

That number grew to 19,000 annual cases by 1990, and jumped again to over 79,000 cases by 2002.

Declining insurance reimbursements over the same period exacerbated the financial strain on the company. Prior to the mid–1990s, two-thirds of Combustion Engineering's asbestos liability was covered by insurance. By 2002, some of the company's insurers took the position that only one-third of Combustion Engineering's asbestos liabilities were reimbursable. As a result, between 1990 and 2002 Combustion Engineering received only $517 million in insurance reimbursements for $950 million in asbestos-related liabilities. These factors left Combustion Engineering unable to meet its asbestos obligations without significant capital infusions from its parent corporation, U.S. ABB. [5]

U.S. ABB acquired Combustion Engineering in 1990 in a leveraged buyout for $1.6 billion as part of a global acquisition of power technology companies by its parent company, ABB Limited, a diversified holding company of over 2,000 corporate entities based in Zurich, Switzerland. Between May 2000 and March 2002, U.S. ABB contributed $900 million in cash and other assets toward Combustion Engineering's asbestos obligations. By late 2002, Combustion Engineering's asbestos liability began to threaten ABB Limited's financial viability as well. ABB Limited had borrowed heavily to finance an aggressive global expansion during the 1990s. As these acquisition costs came due, ABB Limited faced a $1.5 billion debt repayment obligation in December 2002, followed by another $2.1 billion repayment obligation in 2003. At the same time, ABB Limited experienced falling demand in its core businesses and a debt downgrade that reduced the conglomerate's historical sources of liquidity. Significant debt obligations and Combustion Engineering's rising asbestos liabilities threatened ABB Limited's survival. With the conglomerate facing insolvency, ABB Limited's lenders demanded immediate action and insisted that ABB take steps to resolve Combustion Engineering's asbestos liabilities before extending additional credit. Some creditors threatened to institute an involuntary bankruptcy against U.S. ABB. [6]

ABB Limited devised a divestment and restructuring program to resolve this financial crisis. ABB Limited's lenders determined that certain businesses should be sold as part of the restructuring program, including Lummus and the rest of the oil, gas and petrochemical division of ABB, of **\*204** which Lummus was part. ABB's lenders purportedly determined these units could not be sold so long as Lummus

carried asbestos liabilities. [7] Therefore, ABB attempted to cleanse Lummus of asbestos-related liabilities before putting the company up for sale. In October 2002, Combustion Engineering and ABB began to formulate a voluntary Chapter 11 pre-packaged bankruptcy reorganization to cleanse not only Combustion Engineering, but also Basic and Lummus, of asbestos liability once and for all.

Combustion Engineering and ABB Limited communicated with several key players in the world of asbestos litigation to facilitate the design and implementation of a pre-pack plan, including an attorney to serve as advisor on the interests of current claimants, and the general counsel of the Johns–Manville trust and president of the Claims Resolution Management Corporation (which manages claims processing for the Johns–Manville trust) to represent the interests of future claimants. [8]

By late October 2002, the parties had negotiated the basic structure of a pre-packaged plan of reorganization. Combustion Engineering would place half its assets into a pre-petition settlement trust (the "CE Settlement Trust") to pay Combustion Engineering asbestos claimants who had claims in the legal system. Subsequently, Combustion Engineering, ABB Limited and several non-debtor subsidiaries of ABB Limited would contribute assets to a post-confirmation bankruptcy trust (the "Asbestos PI Trust") created under § 524(g) of the Bankruptcy Code. The pre-pack plan would release certain parties from asbestos liability, including Combustion Engineering, Basic and Lummus, by channeling asbestos claims against those entities to the post-confirmation bankruptcy trust.

### B. The Master Settlement Agreement

The parties funded and implemented the pre-petition CE Settlement Trust through a Master Settlement Agreement on November 22, 2002. To fund the trust, Combustion Engineering contributed $5 million in cash, a promissory note in the principal amount of approximately $100 million, and a $402 million loan agreement between U.S. ABB as borrower and Combustion Engineering as lender payable on demand. ABB Limited guaranteed both the note and the loan. These contributions comprised approximately half of Combustion Engineering's total assets.

The District Court found that participation in the CE Settlement Trust was offered to all pre-petition claimants

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 339 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

with **205** claims pending against Combustion Engineering as of November 14, 2002.[9] Participation was not expressly conditioned upon a vote in favor of the pre-pack Plan, although the Master Settlement Agreement provided that counsel for participating claimants would recommend, consistent with their ethical obligations, that each participating claimant accept the pre-pack Plan of Reorganization. Non-participating Combustion Engineering claimants were left to recover in the bankruptcy proceeding.

The Master Settlement Agreement initially provided for three categories of distribution from the CE Settlement Trust to current Combustion Engineering asbestos personal injury claimants, depending upon the status of their respective claims. Category One included claimants who had reached a final enforceable settlement with Combustion Engineering to be paid prior to November 15, 2002. Given the advanced stage of their respective settlement agreements, the Plan's proponents allegedly believed this group of claimants might force Combustion Engineering into involuntary bankruptcy if not paid immediately. Category One claimants were to receive 95% of their settled claim value. Category Two included claimants who also had satisfied all conditions and requirements for settlement with Combustion Engineering, but had settlement payments due after November 14, 2002 and prior to March 1, 2003. Category Two claimants were to receive 85% of their settled claim value. Category Three provided a catch-all category for all otherwise eligible Combustion Engineering personal injury claimants who did not satisfy the requirements of Categories One or Two. Category Three claimants were to receive an initial payment of 37.5% of their settled claim value upon submission of certain required information, followed by a second payment not to exceed an additional 37.5% (for a maximum recovery of 75%) taken pro-rata from the CE Settlement Trust after all Category One and Two claims had been paid at the applicable rates.

Late in the pre-pack negotiations, 25,000–30,000 additional claimants qualifying for payment under the Master Settlement Agreement appeared. These claimants were concentrated in jurisdictions with historically high asbestos claims payment averages. Once these additional Combustion Engineering claimants were factored in, it became clear the existing pre-petition trust assets were insufficient to pay participating claims under the original payment terms. ABB Limited, therefore, agreed to contribute an additional $30 million in cash to the CE Settlement Trust to pay these newly identified claimants—designated as Category Four claimants—under

the terms of a separate settlement agreement. The Category Four claimants agreed to accept less than 37.5% payment on their liquidated claim value, and to subordinate their right to any second payment to the other settling claimants.

In exchange for these payments, CE Settlement Trust participants agreed to forbear the prosecution of claims against Combustion Engineering outside of bankruptcy, but reserved the right to pursue the remainder of their claims in bankruptcy. These "stub claims" provided CE Settlement Trust participants with creditor status in bankruptcy, which allowed them to vote on the pre-pack Plan and share proportionally in the post-confirmation trust.

### C. The Pre–Pack Plan

Concurrent with the CE Settlement Trust negotiations, the claimants' representatives **206** undertook a due diligence review of Combustion Engineering and its affiliates. This included an assessment of ABB Limited's financial condition and an examination of certain transactions between ABB entities and Combustion Engineering for evidence, among other things, of possible fraudulent transfers. In addition, the Combustion Engineering future claimants' representative, Mr. Austern, retained several advisors to determine the value of available insurance assets, the financial condition of ABB Limited, and its ability to contribute to the Asbestos PI Trust. Following this review, Mr. Austern insisted that ABB Limited augment its financial contributions to the Plan.[10] The Official Committee of Unsecured Creditors likewise demanded several modifications to the trust distribution procedures. The parties settled on the final terms in January 2003.

The centerpiece of the pre-pack Plan involved an injunction in favor of debtor Combustion Engineering and non-debtors Basic and Lummus, channeling all asbestos-related claims against those companies to a single asbestos trust (the "Asbestos PI Trust") created under 11 U.S.C. § 524(g) and prohibiting claims other than against the Asbestos PI Trust (the "channeling injunction"). The parties agreed the post-confirmation trust would be funded by contributions from Combustion Engineering, ABB Limited, U.S. ABB, Lummus and Basic. The Bankruptcy Court found that under the Plan Combustion Engineering would contribute its rights to proceeds under certain insurance policies and settlement agreements with a face amount exceeding $320 million.[11] It would **207** also contribute $51 million in cash, future

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 340 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

excess cash flows and a $20 million secured note convertible into 80% of the equity of the restructured entity. ABB Limited would contribute 30,298,913 shares of its common stock (with an estimated value of $82 million), $250 million in cash from 2004 to 2006, and an additional $100 million between 2006 and 2011, contingent in part on its future financial performance. This commitment was guaranteed by various ABB Limited affiliates. ABB Limited also agreed to release all claims and interests in insurance policies covering Combustion Engineering's asbestos personal injury claims. U.S. ABB agreed to indemnify all of Combustion Engineering's environmental liabilities (estimated at the time at more than $100 million), to release its indemnification rights against Combustion Engineering for asbestos claims asserted after June 30, 1999, and to contribute a $5 million Limited Carrier Indemnity. Contingent upon the sale of Lummus within eighteen months of the effective date of the Plan, U.S. ABB would make additional payments of $5 million to the Asbestos PI Trust and $5 million to the pre-petition CE Settlement Trust. In addition, U.S. ABB agreed to contribute almost $38 million, deposited into a segregated account, to pay asbestos claims attributed solely to Basic and Lummus. Basic and Lummus agreed to release and assign to the Asbestos PI Trust all of their rights to proceeds under insurance policies covering asbestos personal injury claims.

Distributions from the Asbestos PI Trust were governed by trust distribution procedures similar to those historically used by the Connecticut Valley Claims Service Company ("CVCSC") in servicing Combustion Engineering's asbestos claims. [12] Combustion Engineering and the Asbestos PI Trust were given the exclusive right to determine whether to allow asbestos claims under the trust distribution procedures. [13] Under the pre-pack Plan, participating insurers were therefore excluded from the Asbestos PI Trust's claims determination process.

### D. Plan Voting and Approval

Solicitation for the pre-pack Plan began on or around January 22, 2003, when documents including a Disclosure Statement, the proposed Plan of Reorganization, a ballot, and letters from the current creditors' representative and futures' representative were sent to approximately 350 asbestos plaintiffs' counsel. These solicitations, seeking approval of the Plan, were extended to any firms representing plaintiffs with claims against Combustion Engineering, Basic or Lummus. The packages included both master

and individual ballots. Master ballots for multiple claim holders required the agent casting the ballot to include a valid power of attorney, proxy, or other written evidence **\*208** of agency for every Asbestos PI Trust claim holder identified on the ballot. CVCSC, Combustion Engineering's claims processing organization, or Trumbull Associates, Combustion Engineering's balloting agent, would communicate with any law firm that submitted a master ballot without a valid power of attorney.

Approximately 232,000 ballots were cast by the February 19, 2003 voting deadline, with 186,000 votes in favor of the Plan and 46,000 votes against. More than 107,908 of these ballots were not counted or were invalidated by Combustion Engineering's balloting agent because they were not accompanied by a valid power of attorney. An additional 8,432 ballots were invalidated for other reasons. Of the resulting 115,787 valid ballots, 111,986 Combustion Engineering claimants voted in favor of the Plan (approximately 97% of total remaining claimants) while 3,594 voted against. [14] Of the 8,017 pending Lummus personal injury claims, 1,846 voted in favor of the Plan, and two voted against. Of the 3,715 pending Basic personal injury claims, 206 Basic claimants voted in favor of the Plan, and fourteen voted against. An estimated 99,000 of the tabulated votes appear to have been "stub claim" votes cast by CE Settlement Trust participants.

### E. The Bankruptcy Court Proceedings

On February 17, 2003, Combustion Engineering filed a voluntary petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code, along with a proposed Disclosure Statement and Plan of Reorganization, in the United States Bankruptcy Court for the District of Delaware. On March 31, 2003, this Court issued an order designating Judge Alfred M. Wolin as the district court judge and providing that the parties "will have an opportunity to be heard as to which aspects of the matter Judge Wolin will hear in the District Court and which matters will remain with ... the Bankruptcy Court."

On May 9, 2003, Judge Wolin entered an order referring the case to the Bankruptcy Court. The order designated all matters to be adjudicated as part of Plan confirmation, including matters arising under 11 U.S.C. §§ 524(g) and 502(c), as non-core matters subject to de novo review and final order by the District Court.

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 341 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

The Bankruptcy Court conducted hearings on the Disclosure Statement and the Plan between April and June of 2003. Various parties objected to the Disclosure Statement, the Plan and the pre-pack solicitation procedures. Certain insurance companies argued that Plan provisions assigning policy proceeds to the Asbestos PI Trust violated existing policies and/or settlement agreements with Combustion Engineering. Other insurers who had negotiated pre-petition settlements with Combustion Engineering (the "Indemnified Insurers") objected to the Plan on the ground that it impermissibly channeled indemnities under the settlements to the post-confirmation trust without providing sufficient funding to pay those indemnities. As a result, the Indemnified Insurers argued they were entitled to vote on Plan confirmation. The Certain Cancer Claimants argued the Plan impaired their substantive rights to recover **\*209** through the tort system. [15] The Bankruptcy Court allowed discovery on these objections, which resulted in several modifications to the proposed Plan and Disclosure Statement.

On June 23, 2003, the Bankruptcy Court entered findings of fact and conclusions of law regarding core matters, and proposed findings of fact and conclusions of law as to non-core matters. *In re Combustion Eng'g, 295 B.R. 459 (Bankr.D.Del.2003)*. The Bankruptcy Court overruled all objections raised by the insurers and Certain Cancer Claimants as to core matters, and recommended the District Court overrule all remaining objections as to non-core matters. *Id.* at 462. The Bankruptcy Court found the trust distribution procedures provided the same protocol as the CVCSC previously used to adjudicate and pay asbestos claims, and therefore did "not change whatever rights the insurers had pre-petition regarding the payment of claims." *Id.* at 473. "Although the [trust distribution procedures] do not provide for insurers to have a say in what claims are paid ... the insurers did not have such input pre-petition." *Id.* But recognizing the Plan should not modify the contractual rights of insurers, the court added a provision to make clear the Plan did not alter the contractual rights of insurers under any insurance policy or settlement agreement. The super-preemptory provision provided:

> [N]otwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in

anyway [sic] operate to, or have the effect of, impairing the insurers' legal, equitable or contractual rights, if any, in any respect. The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements as applicable.

*Id.* at 494. The Bankruptcy Court explained, "the Plan has been modified to make clear that *nothing* impairs [the insurers'] rights." *Id.* at 474 (emphasis in original). As a result, the Bankruptcy Court concluded the Objecting Insurers did not have a right to vote on Plan confirmation because the Plan expressly stated that "the rights of insurers shall be determined under the subject insurance policies or subject insurance agreements as applicable and nothing in the Plan is to affect that." *Id.* The court also found there was "no litigation pending that would implicate the indemnities." *Id.* at 475.

The Bankruptcy Court further determined the Plan satisfied the confirmation requirements set forth in §§ 1129(a) and 524(g) of the Bankruptcy Code. The Bankruptcy Court noted that, as a practical matter, the Plan offered the only feasible mechanism for ensuring Combustion Engineering's creditors would receive any recovery. Moreover, the court found the purpose of negotiating the Master Settlement Agreement and CE Settlement Trust was to "buy immediate peace from thousands of asbestos lawsuits (pending and potential) against Combustion Engineering **\*210** so that Combustion Engineering could file a prepackaged bankruptcy plan rather than face a freefall bankruptcy." *Id.* at 466. Contrary to the objections of the Certain Cancer Claimants, the Bankruptcy Court found that "[p]articipation in the [Master Settlement Agreement] was offered to all pre-petition claimants," and participation "was not conditioned upon a favorable vote on the proposed plan." *Id.* at 468.

With respect to the Asbestos PI Trust, the Bankruptcy Court concluded § 524(g)(4)(A)(ii) of the Code did not permit the inclusion of independent claims against non-debtors Basic and Lummus in the channeling injunction. But the Bankruptcy Court granted precisely the same relief —that is, channeling asbestos-related claims against Basic and Lummus to the Asbestos PI Trust—under § 105(a). Analyzing the factors announced in *In re Dow Corning Corp., 280 F.3d 648, 658 (6th Cir.2002)* (*"Dow Corning II"* ), the Bankruptcy Court determined it was appropriate to enjoin

Case 09-10138-MFW   Doc 14410-3   Filed 09/16/14   Page 342 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

the independent, non-derivative claims against Basic and Lummus under § 105(a).

In *Dow Corning II,* the Court of Appeals for the Sixth Circuit held that a bankruptcy court may permanently enjoin third-party claims against a non-debtor if seven factors are met:

> (1) there is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the nondebtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

> (2) the nondebtor has contributed substantial assets to the reorganization;

> (3) the injunction is essential to the reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;

> (4) the impacted class, or classes, has overwhelmingly voted to accept the plan;

> (5) the plan provides a mechanism to pay all, or substantially all, of the class or classes affected by the injunction;

> (6) the plan provides an opportunity for those claimants who choose not to settle to recover in full[;] and ...

> (7) the bankruptcy court made a record of specific factual findings that support its conclusions.

*In re Combustion Eng'g,* 295 B.R. at 483 (citing *Dow Corning II,* 280 F.3d at 658).

The Bankruptcy Court concluded the injunction satisfied *Dow Corning II* factors one, two, three, six and seven. On the first factor, the court found Combustion Engineering shared an "identity of interest" with non-debtors Basic and Lummus because "ABB's need to sell Lummus ... instigated ABB's willingness to contribute to Combustion Engineering's plan funding." *Id.* at 484. On factor two, the court found that Basic and Lummus contributed to the Asbestos PI Trust their rights to certain shared insurance policies. The court determined the injunction satisfied factor three because it allowed ABB to restructure its debt and contribute substantial assets to the post-confirmation trust. The court found the injunction satisfied factor six because the $38 million in assets segregated to pay Basic's and Lummus' asbestos liabilities

was "sufficient to provide the opportunity to pay any non-accepting creditor." *Id.*

But the Bankruptcy Court initially held the Plan did not satisfy *Dow Corning II* factors four and five. The court concluded it was unclear from the record "what, if any, effort was made to identify, notify and solicit votes from creditors with claims only against Lummus and only against Basic; i.e., not shared with Combustion Engineering." **\*211** *Id.* Likewise, the court did not believe the Plan provided the requisite funding and distribution processes to pay the direct creditors of Lummus and Basic. Therefore, despite its approval of the Disclosure Statement and Plan, as modified through June 4, 2003, the Bankruptcy Court recommended the District Court withhold confirmation for ten days to allow the Plan's proponents to provide additional information concerning the Basic and Lummus claimants. Specifically, the Bankruptcy Court ordered the Plan proponents to submit supplemental documentation showing that Basic and Lummus creditors were provided sufficient notification of the injunction, as well as establishing the process by which these creditors would be paid and identifying the source of funds.

On July 10, 2003, the Bankruptcy Court entered a Supplemental and Amendatory Order Making Additional Findings and Recommending Confirmation of the Plan of Reorganization. In its supplemental order, the Bankruptcy Court found, *inter alia:* the notice given to Lummus and Basic creditors comported with due process "under the unique circumstances of the case"; Basic claimants would receive more than they would receive without the Plan and Lummus claimants would receive at least as much as they would receive without the Plan; and the trust distribution procedures establish a sufficient method of paying Basic and Lummus claimants.

## F. District Court Proceedings and Plan Confirmation

In reviewing the Bankruptcy Court's proposed Findings of Fact and Conclusions of Law, the District Court acknowledged the proposed Plan of Reorganization was not without defect: "Today we consider for confirmation a pre-packaged bankruptcy plan. The plan is not perfect, but then we operate in an imperfect system and will substitute fairness and the greatest good for the greatest number for perfection." The District Court recognized the Plan was "fragile," and had to be confirmed "promptly to preserve ABB's economic viability." The District Court

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 343 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)
43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

further explained that "[w]ere ABB to become insolvent, the possibility that Combustion Engineering could emerge as a reorganized debtor would be remote," as would the "prospect of a viable trust to pay persons suffering from exposure to Combustion Engineering's asbestos."

In an unpublished oral opinion, the District Court rejected or overruled objections to Plan confirmation. The District Court concluded the insurers lacked standing to object to Plan confirmation because their pecuniary interests were not "directly and adversely affected" by the order of the Bankruptcy Court. The court explained the super-preeemptory provision added by the Bankruptcy Court made clear the insurers' pre-petition rights would not be altered by the Plan:

> [T]he plan specifically provides that payment of claims is subject to the rights of insurers under their policies or other agreements. Should the insurers claim that this provision [i.e., the super-preemptory provision] has been violated in the course of the administration of the personal injury trust, that will be the time to determine the rights of insurers in an appropriate proceeding.

Nonetheless, on the motion of the Future Claimants Representative and the Official Committee of Unsecured Creditors, the District Court modified the super-preemptory provision to state:

> Notwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision **\*212** that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing the insurers' legal, equitable or contractual rights, if any, *in respect of any claims (as defined in Section 101(5) of the Bankruptcy Code)*. The rights of insurers shall be determined under the Subject Insurance Policies or Subject

Insurance Settlement Agreements, as applicable, *and under applicable law*.

(emphasis added to indicate changes). In addition, the District Court supplemented the super-preemptory provision with the following "neutrality provision":

> Nothing in the Plan or in the Confirmation Order shall preclude any Entity from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any Subject Insurance Policy or any Subject Insurance Settlement Agreement. Nothing in the Plan or the Confirmation Order shall be deemed to waive any claims, defenses, rights or causes of action that any Entity has or may have under the provisions, terms, conditions, defenses and/or exclusions contained in the Subject Insurance Policies and the Subject Insurance Settlement Agreements, including, but not limited to, any and all such claims, defenses, rights or causes of action based upon or arising out of Asbestos PI Trust Claims that are liquidated, resolved, discharged, channeled, or paid in connection with the Plan.

The District Court provided no rationale for these modifications.

Proceeding to the substantive objections, the District Court found the pre-petition trust payments did not induce CE Settlement Trust participants to vote in favor of the Plan, and rejected the argument that the pre-petition payments and creation of the stub claims were intended to manufacture a confirming vote. Instead, the District Court concluded Combustion Engineering created the stub claims because it had "insufficient funds to pay the settlement trust claimants 100 percent of their claims," and that the purpose of such payments was to provide Combustion Engineering "a little time, a breathing space, while the pre-packaged plan was negotiated." Moreover, the court found the votes of the stub claims were not invalid as a result of a Master Settlement Agreement provision prohibiting CE Settlement

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

Trust participants from pursuing their stub claims outside of bankruptcy.

The District Court found the Plan satisfied all requirements of 11 U.S.C. § 1129. Specifically, the District Court found the Plan provided between two and three times more assets than would a Chapter 7 liquidation, satisfying the § 1129(a)(7) "best interests of the creditors" test. In so holding, the District Court rejected the argument that the pre-petition transfer of assets to the CE Settlement Trust constituted a voidable preference under § 547 of the Bankruptcy Code, reasoning that this argument was "simply a restatement of the argument already dispensed with by comparing the liquidation value of the company with the value paid to claimants under the plan." The District Court also found the Plan had been proposed in good faith under § 1129(a)(3).

The District Court rejected all challenges to the § 524(g) channeling injunction. The District Court found the contention that the Plan violated § 524(g) by treating present and future claimants differently was not supported by the record. Specifically, it found that all present claimants were free to participate in the Plan, and that the Asbestos PI Trust (from which future claimants would be paid) and the CE Settlement Trust employed substantially the same claims handling procedures. *213 The court recognized that pre-petition settlement participants might receive more for their claims than non-participants, but reasoned this did not violate § 524(g) because these persons "simply were not similarly situated." The District Court also found the reorganized Combustion Engineering satisfied the "going concern" requirement of § 524(g) because it would own and operate a real estate business after emerging from bankruptcy. The court rejected the argument that § 524(g)(2)(B)(i)(II) required Combustion Engineering to pay dividends, instead concluding § 524(g) merely required any dividends the company in fact paid be included in future payments to the Asbestos PI Trust. The court found the fact that the Bankruptcy Court did not estimate the total value of all asbestos claims did not defeat Plan confirmation, noting the Plan did not prevent estimation of claims in the future, if feasible.

The District Court concluded the Bankruptcy Court correctly analyzed the application of § 105(a) under *Dow Corning II* and properly extended the channeling injunction to non-debtors Basic and Lummus. In support of this conclusion, the District Court found the non-debtors' asbestos liability was, in many cases, derivative of Combustion Engineering's asbestos

liability, and the channeling injunction was integral to the Plan.

On the issue of jurisdiction over claimants with independent claims against the non-debtors, the District Court found the analysis of the § 105(a) injunction and the "related to" jurisdiction inquiry "substantially overlap." The court described a "unity of interest" between Combustion Engineering and the non-debtors that provided a basis for exercising "related to" jurisdiction over the independent claims against the non-debtors:

> Here we have corporate affiliates, shared insurance, even joint operations at single sites leading to the asbestos personal injury claims at issue. The premises on which the plan is based establish the extensive financial inter-dependence between the entities.

Having dismissed all appeals and overruled all objections to the Plan, the District Court affirmed and adopted the Bankruptcy Court's proposed findings of fact and conclusions of law, and confirmed Combustion Engineering's Plan of Reorganization.

### G. The Consolidated Appeals

[1] Primary and excess insurers [16] of Combustion Engineering, Lummus and Basic filed thirteen separate appeals challenging aspects of the District Court's confirmation order. [17] The Certain Cancer Claimants filed a separate appeal. [18] Appellant First State Insurance Company *214 filed emergency motions with this Court seeking a stay to prevent the possibility that the appeal would become equitably moot if the Plan of Reorganization were allowed to proceed. The parties entered a stipulated "standstill agreement" to halt implementation of the Plan pending appeal before we could rule on those motions. We accepted the parties' stipulation by order dated August 19, 2003. We consolidated the appeals and heard oral argument. [19]

### III. Standing

### A. Background

Case 09-10138-MFW   Doc 14410-3   Filed 09/16/14   Page 345 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

**[2]** **[3]** **[4]** **[5]** As a threshold matter, we must determine whether appellants have standing to challenge confirmation of the Plan of Reorganization. *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 546 n. 8, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) ("The rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of the prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention.") (citations omitted). Standing to appeal in a bankruptcy case is limited to "persons aggrieved" by an order of the bankruptcy court. *Gen'l Motors Acceptance Corp. v. Dykes (In re Dykes),* 10 F.3d 184, 187 (3d Cir.1993). Originally set forth in the Bankruptcy Act of 1898,[20] the "persons aggrieved" test now exists as a prudential standing requirement that limits bankruptcy appeals to persons "whose rights or interests are 'directly and adversely affected pecuniarily' by an order or decree of the bankruptcy court."[21] *In re Dykes,* 10 F.3d at 187 (citing *In re Fondiller,* 707 F.2d 441, 443 (9th Cir.1983)). "[P]erson[s] aggrieved" must show the order of the bankruptcy court "diminishes their property, increases their burdens, or impairs their rights." *In re PWS Holding Corp.,* 228 F.3d at 249 (citing *In re Dykes,* 10 F.3d at 187). Whether someone is a person aggrieved is normally a question of fact. *In re Dykes,* 10 F.3d at 188.

**\*215** **[6]** **[7]** Appellate standing in the bankruptcy context is more restrictive than Article III standing, which "need not be financial and need only be 'fairly traceable' to the alleged illegal action." *Travelers,* 45 F.3d at 741 (citation omitted). This more stringent appellate standing requirement rests on the "particularly acute" need to limit appeals in bankruptcy proceedings, which often involve a "myriad of parties ... indirectly affected by every bankruptcy court order[.]" *Id.* (citing *Kane v. Johns–Manville Corp.,* 843 F.2d 636, 642 (2d Cir.1988)); *see also In re DuPage Boiler Works, Inc.,* 965 F.2d 296, 297 (7th Cir.1992) ("The 'person aggrieved' test insures that bankruptcy proceedings are not unreasonably delayed by protracted litigation by allowing only those persons whose interests are directly affected by a bankruptcy court order to appeal."); *In re Fondiller,* 707 F.2d at 443 ("Efficient judicial administration requires that appellate review [in bankruptcy proceedings] be limited to those persons whose interests are directly affected."). As such, we have denied standing to parties involved in bankruptcy proceedings "who, even though they may be exposed to some potential harm incident to the bankruptcy court's order, are not 'directly affected' by that order." *Travelers,* 45 F.3d at 741. Standing is not dispensed in gross, but rather is determined by the specific claims presented. *See Lewis v. Casey,* 518 U.S. 343, 358 n. 6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Int'l Primate Prot. League v. Adm'r of Tulane Educ. Fund,* 500 U.S. 72, 77, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991).

There are four groups of appellants in this case whose claims must be examined for purposes of appellate standing. The first group consists of the Objecting Insurers—those providing primary and excess insurance coverage to Combustion Engineering.[22] The second group consists of the London Market Insurers—the insurers providing primary and excess insurance coverage for non-debtors Basic and Lummus.[23] The third group is the Indemnified Insurers—insurance companies that entered pre-petition settlement agreements with Combustion Engineering to resolve contested coverage issues. Finally, the Certain Cancer Claimants consist of 291 individuals (or, if deceased, their legal representatives) who suffer from asbestos-related injuries.

### B. Objecting Insurers and London Market Insurers

**[8]** The Objecting Insurers and the London Market Insurers raise several **\*216** challenges to Plan confirmation on appeal. Our task in assessing the appellate standing of the Objecting Insurers and the London Market Insurers is informed by the "super-preemptory" and "neutrality" provisions of the Plan.

The Bankruptcy Court added the "super-preemptory" provision to the Plan in response to arguments by certain insurers that they were impermissibly excluded from the confirmation vote.[24] As originally drafted, the "super-preemptory" provision provided that nothing in the Plan would impair the insurers' pre-petition rights under subject insurance policies and settlements. As such, in addressing the insurers' voting argument, the Bankruptcy Court emphasized the Plan had been "modified to make clear that *nothing* impairs their rights." *In re Combustion Eng'g,* 295 B.R. at 474 (emphasis in original). The Bankruptcy Court found the assignment of insurance proceeds to the Asbestos PI Trust did not impair the rights of insurers because the "rights of insurers shall be determined under the subject insurance policies or subject insurance settlement agreements as applicable and nothing in the Plan is to affect that." *Id.*

The District Court similarly concluded the insurers lacked standing to appeal or object to Plan confirmation because

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 346 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

their "pecuniary interests [were] not 'directly or adversely affected' " by the Plan. The District Court reasoned the Plan did not modify insurers' rights by excluding them from the determination of asbestos claims because "the plan specifically provides that payment of claims is subject to the rights of the insurers under their policies or other agreements." However, on the motions of the Official Committee of Unsecured Creditors and Future Claimants' Representatives, the District Court then modified the super-preemptory provision to refer to the rights of insurers, "if any, in respect of any claims (as defined by section 101(5) of the Bankruptcy Code)." [25] The District Court also added the "neutrality" provision to provide reciprocal protections for the debtor's pre-petition rights under the subject insurance policies. [26]

*217   Among other things, the Objecting Insurers and London Market Insurers contend the District Court's modifications to the Plan altered their pre-petition contractual rights, thus providing them with appellate standing as "parties in interest" within the meaning of §§ 1128(b) and 1109(b) of the Bankruptcy Code. As discussed, however, we apply a "persons aggrieved" standard, not a "party in interest" standard, to determine bankruptcy appellate standing. *See In re Dykes,* 10 F.3d at 187. Therefore, the Objecting Insurers and London Market Insurers have standing to challenge a provision of the Plan only if that provision "diminishes their property, increases their burdens, or impairs their rights." *In re PWS Holding Corp.,* 228 F.3d at 249 (quoting *In re Dykes,* 10 F.3d at 187). Applying the "persons aggrieved" standard, we conclude the Objecting Insurers and London Market Insurers have limited appellate standing to challenge only the modification of the super-preemptory provision but not the neutrality provision.

The super-preemptory provision drafted by the Bankruptcy Court provides that nothing in the Plan "shall in anyway [sic] operate to, or have the effect of, impairing insurers' legal, equitable or contractual rights, if any, in any respect." As both the Bankruptcy Court and District Court recognized, this language broadly preserves insurers' pre-petition rights under the subject insurance policies and settlements. The insurers are not obligated to pay amounts exceeding their pre-existing policy limits. So long as claims are paid in a manner consistent with the rights and conditions set forth in the subject policies, the Objecting Insurers and London Market Insurers are not "aggrieved" for purposes of bankruptcy appellate standing. The trust distribution procedures do not permit insurers to participate in the payment of claims (the

Asbestos PI Trust trustee and claims reviewers evaluate them). But, as the Bankruptcy Court found, the insurers did not have this right pre-petition. *In re Combustion Eng'g,* 295 B.R. at 473 ("[T]he plan does not change whatever rights the insurers had prepetition regarding payment of claims."). Moreover, even though insurers are excluded from claims processing (as they were pre-petition), they may still dispute coverage under specific policies, and may raise any of the same challenges or defenses to the payment of claims available pre-petition. For these reasons, we conclude the Plan as originally drafted does not diminish the rights of insurers or increase their burdens under the subject insurance policies and settlements.

The District Court modified the super-preemptory provision to apply more narrowly to "the insurers' legal, equitable or contractual rights, if any, *in respect of any claims* (as defined by section 101(5) of the Bankruptcy Code)" (emphasis added). The Official Committee of Unsecured Creditors argues the super-preemptory provision was initially included in the Plan to make clear the "claims" of insurers were unimpaired by the Plan, and thus not entitled to vote on the Plan's confirmation. According to the Official Committee, by referring to "rights" instead of "claims," the language in the Bankruptcy Court's order was "broader than the protection meant to be afforded under section 1124." The Official Committee contends the District Court's modification was necessary to *218   track the applicable language in § 1124(1) referring to "claims," and not "rights."

The Official Committee of Unsecured Creditors concedes too much by noting the District Court's modification narrowed the protections originally afforded to insurers under the Plan. We agree the District Court's version more closely tracks the "impairment" language of § 1124(1), and in that sense more explicitly addresses the insurers' voting argument. But for purposes of standing, the question is not whether the Plan impaired the claims of insurers, but whether it "diminishes their property, increases their burdens, or impairs their rights." *In re PWS Holding Corp.,* 228 F.3d at 249 (quoting *In re Dykes,* 10 F.3d at 187). As originally drafted, the super-preemptory provision made clear that any pre-petition contractual rights remained unaltered and that insurer claims were therefore unimpaired for voting purposes. But by limiting the scope of the super-preemptory provision only to "claims" and not to broader "rights," the District Court exposed the Objecting Insurers and London Market Insurers to the possibility that other Plan provisions could affect aspects of subject policies and settlement agreements.

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 347 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)
43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

As such, we conclude the Objecting Insurers and London Market Insurers have standing to challenge this modification. Although the District Court found that "all substantive rights of the insurers were expressly preserved under the Plan per the order of" the Bankruptcy Court, it nevertheless altered the language of the provision in a manner the insurers claim was adverse to their rights. We agree with the insurers on this point. To resolve this matter, we note that at oral argument Combustion Engineering stated it would be amenable to reinstating the super-preemptory provision as drafted by the Bankruptcy Court. In this context, we will vacate the District Court's modification, restoring the provision as drafted by the Bankruptcy Court.

 [9]    In contrast to the super-preemptory provision, the neutrality provision added by the District Court protects the pre-petition rights and obligations of both the debtor and the insurers under the Plan by preserving for "any Entity ... any and all claims, defenses, rights or causes of action" under subject insurance policies and settlement agreements. Unlike the modifications to the super-preemptory provision, which provided limited protection to "claims," the neutrality provision applies broadly to all "claims, defenses, rights or causes of action." Therefore, the practical effect of the neutrality provision is to extend the protections afforded to insurers under the super-preemptory to include debtor Combustion Engineering. Affirming the pre-petition contractual obligations of the Objecting Insurers and London Market Insurers does not impair their rights or increase their burdens under the subject insurance policies. We conclude, therefore, the Objecting Insurers and London Market Insurers have no appellate standing to challenge the addition of the neutrality provision.

 [10]    [11]    [12]    The London Market Insurers also contend the Plan impairs their rights under the anti-assignment provisions of the relevant insurance policies. With respect to the anti-assignment provisions, we agree with the District Court that even if the subject insurance policies purported to prohibit assignment of Combustion Engineering's insurance proceeds, these provisions would not prevent the assignment of proceeds to the bankruptcy estate.[27] This *219 is not the case, however, with respect to anti-assignment provisions in the Basic and Lummus primary and excess insurance policies issued by the London Market Insurers and North River Insurance. Section 541(c)(1) of the Bankruptcy Code provides, in part:

Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—(A) that restricts or conditions transfer of *such interest by the debtor.*

11 U.S.C. § 541(c)(1) (emphasis added). Put simply, § 541 prohibits restrictions on the interests of the debtor, which includes the insurance policies held by Combustion Engineering. It does not, however, place similar restrictions on the interests of non-debtors. *See* 11 U.S.C. § 541(1)(a) ( "The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of ... all legal or equitable interests of the debtor in property as of the commencement of the case."); *see also* Legislative Statement to 11 U.S.C. § 541(1)(a) ("As section 541(a)(1) clearly states, the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. To the extent such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate except to the extent that defenses which are personal against the debtor are not effective against the estate."). To the extent the subject insurance policies are jointly held by Combustion Engineering and a non-debtor, in this case Basic or Lummus, the § 541 preemption of anti-assignment provisions applies only to Combustion Engineering's interest in the shared policies. Accordingly, the London Market Insurers have appellate standing to challenge any assignment of policy proceeds that violated anti-assignment provisions in the excess and primary policies held by non-debtors Basic and Lummus. That said, however, we are unable to consider the merits of this issue because neither the Bankruptcy Court nor the District Court made any findings of fact regarding the terms or operation of anti-assignment provisions in the Basic and Lummus policies. We would ordinarily remand for additional fact finding on this issue, but, as we discuss, that will be unnecessary because we vacate Plan confirmation on other grounds.

In sum, the Objecting Insurers and London Market Insurers have limited appellate standing to challenge the operation of the super-preemptory provision as modified by the District Court. The London Market Insurers also have standing to challenge those aspects of the Bankruptcy Court's order that purport to violate anti-assignment provisions in the primary and *220 excess insurance policies of Basic and Lummus. The remaining issues raised by the Objecting Insurers and

London Market Insurers do not directly and pecuniarily affect their rights under the insurance policies and settlements. [28] Therefore we will dismiss the remaining challenges to Plan confirmation raised by the Objecting Insurers and London Market Insurers for lack of appellate standing.

### C. Indemnified Insurers

The Indemnified Insurers include certain insurance companies that entered into pre-petition settlement agreements with Combustion Engineering. [29] These settlement agreements provided for payment to Combustion Engineering in exchange for the full release of insurance policies and all claims under such policies (including asbestos claims), and required Combustion Engineering to indemnify the settling insurers for related litigation costs and liabilities. [30] Prior to the commencement of the Combustion Engineering bankruptcy proceedings, the Indemnified Insurers had been named in certain class-action suits brought under state unfair claims handling statutes in West Virginia and Massachusetts. [31] In those cases, a class of asbestos claimants who had settled claims against Combustion Engineering asserted the Indemnified Insurers were responsible for the deficiency between the settlement paid by Combustion Engineering and the amount they allegedly should have recovered. Indemnified Insurers Century Indemnity Company and One Beacon America Insurance Company, f/k/a Commercial Union Insurance, each sought indemnification by Combustion Engineering for expenses incurred in defending those suits, including any resulting liability.

The Indemnified Insurers objected to the Plan of Reorganization, arguing they were impermissibly excluded from the confirmation vote. Following these objections, Combustion Engineering modified the Plan to classify the indemnity claims as either Class Three workers compensation claims, Class Four general unsecured claims, or administrative claims—all of which were considered unimpaired claims. Because unimpaired claims are not entitled **\*221** to vote on plan confirmation, *see* 11 U.S.C. § 1126(f), this modification rendered the Indemnified Insurers' voting objections moot.

The Indemnified Insurers then argued that, notwithstanding this modification, Combustion Engineering had not shown the $3 million set aside to pay the Class Three, Class

Four and administrative claims would be sufficient to pay their indemnification claims in full. In response, Combustion Engineering agreed to retain all of its current cash (approximately $50 million) for payment of allowed Class Three, Class Four and administrative claims, and U.S. ABB guaranteed an additional $5 million for the payment of insurer indemnities. Based on the understanding that these proposed modifications would be accepted, the Indemnified Insurers withdrew their feasibility objection.

In its Proposed Findings of Fact and Conclusions of Law, the Bankruptcy Court found the Indemnified Insurers' voting objection was moot because the Plan left "the insurers unimpaired and, if and when their indemnity claims are allowed, they will be paid 100 percent in either Class 3 or Class 4." *In re Combustion Eng'g,* 295 B.R. at 474. The Bankruptcy Court noted that few insurers actually had indemnity agreements with Combustion Engineering. Moreover, not only was there no current litigation that would implicate the indemnity agreements, it also was unlikely they would ever come into play. The Bankruptcy Court found the state court lawsuits that allegedly implicated the indemnities did not involve contractual indemnities, but rather involved allegations of conspiracy among insurance companies to commit unfair settlement practices under state law. Based on these findings, the Bankruptcy Court estimated the value of current indemnity claims at zero for voting and Plan confirmation purposes:

> The indemnities that Combustion Engineering gave under the settlements with insurers are for claims arising under the policies which were released through the settlements. Those claims are not at issue in *Wise* or *Cashman.* The insurers' argument seems to be that, nonetheless, someone may raise the issue[,] thereby triggering the indemnity. Of course, anyone can sue for anything. The question is, whether the plaintiff can win, something which is improbable. Therefore, the indemnities are valued at zero for purposes of plan voting.

*Id.* at 479 n. 32.

In addition, based upon the enhanced pool of assets available to pay Combustion Engineering's indemnity obligations,

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 349 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

the Bankruptcy Court found Combustion Engineering had sufficient assets to pay the Class Three, Class Four and administrative claims in full. In concluding the Plan was "feasible," the Bankruptcy Court seemed to suggest the Indemnified Insurers still maintained a feasibility objection. *See id.* at 475 ("The insurers contend that the Plan is not feasible in that there will be insufficient funds to pay the indemnities, which I have valued at zero."). The Bankruptcy Court denied the Indemnified Insurers' subsequent request to settle these rulings as moot. However, in its supplemental order, the Bankruptcy Court made clear that its findings concerning the scope of the insurers' indemnity claims were made "solely for the purpose of determining issues regarding voting or feasibility of the Plan."

The District Court adopted the findings of the Bankruptcy Court with respect to the assertions that the Indemnified Insurers had been denied the right to vote on the Plan. The District Court overruled the objection, holding that the indemnity **\*222** claims were unimpaired and unlikely to succeed, and that the Indemnified Insurers lacked standing to raise objections.

The Indemnified Insurers now contend the rulings and findings made by both courts regarding the estimation of indemnity claims constitute impermissible advisory opinions. Accordingly, the Indemnified Insurers request that we vacate the rulings and factual findings made by the Bankruptcy Court and District Court regarding the scope of Combustion Engineering's indemnity obligations.

[13] In addressing the Indemnified Insurers' appeal, we begin with the threshold issue of bankruptcy appellate standing, which, as mentioned, is limited to "persons aggrieved" by an order of a bankruptcy court. Under this standard, the Indemnified Insurers have standing to challenge the factual findings related to the value of the indemnification claims only if those findings "diminish[ ] their property, increase[ ] their burdens, or impair [ ] their rights." *In re PWS Holding Corp.,* 228 F.3d at 249 (quoting *In re Dykes,* 10 F.3d at 187). We do not believe the Indemnified Insurers are aggrieved by the valuation of the indemnity claims for the limited purpose of Plan voting and confirmation.

[14] [15] The injury complained of here relates to the possibility that a future court will mistakenly rely on the Bankruptcy Court's valuation of the indemnification claims as zero for purposes of voting and Plan confirmation as a ruling on the merits of those claims. We fail to see

how this speculative event rises to the level of "direct and pecuniary" harm required for bankruptcy appellate standing. The Bankruptcy Court made clear the estimation of the value of the indemnity claims was limited for purposes of plan confirmation. *In re Combustion Eng'g,* 295 B.R. at 475 n. 23. To make the point more explicit, the Bankruptcy Court did not foreclose the possibility that future litigation might alter its valuation of the indemnities: "In the event that there is litigation that kicks the indemnities into play, the merits of the claims will be addressed at that time." *Id.* at 475. Based upon these clear limitations on the scope of its findings, we believe a future court will understand the limited relevance of the Bankruptcy Court's estimations on the operation of those indemnities and merits of any related claims. Moreover, even assuming the findings of the Bankruptcy Court and District Court on the valuation of the indemnities are moot, no injury can result from those findings. A ruling or finding on a moot issue can have no precedential or collateral estoppel effect. It is well-settled that a "party may not appeal from a judgment or decree in his favor, for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree." *Elec. Fittings Corp. v. Thomas & Betts Co.,* 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263 (1939); *see also In re Arthur Treacher's Franchise Litig.,* 689 F.2d 1137, 1149 n. 16 (3d Cir.1982).

The Indemnified Insurers rely on our opinion in *New Jersey v. Heldor Indus., Inc.,* 989 F.2d 702 (3d Cir.1993), for the proposition that a bankruptcy court has no authority to render a decision on a moot issue, and that such rulings and any related findings of fact must be vacated. In *Heldor,* the New Jersey Department of Environmental Protection ("DEP") objected to a debtor's proposed settlement agreement relating to the sale of certain assets in bankruptcy. The DEP contended the settlement agreement did not set aside sufficient funds to comply with a New Jersey environmental statute. After pressing its argument in the settlement agreement hearing, but before the bankruptcy judge issued its opinion, the DEP withdrew its objection. Nearly one month **\*223** later, the bankruptcy court issued a memorandum opinion overruling DEP's previously withdrawn objection, and holding that various parts of the New Jersey statute were unconstitutional as violating the Supremacy Clause of U.S. Constitution Article VI and the Takings Clause of the Fifth Amendment. The District Court affirmed, and we reversed on appeal, vacating the bankruptcy court's order as moot:

> [N]o "case" or "controversy" existed
> between the DEP and the Debtor
> by   August   9,   1991   or,   at   the

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 350 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

latest, when the bankruptcy judge learned of the withdrawal of DEP's objection on August 28, 1991. After that withdrawal, the controversy between DEP and the Debtor was moot, and the September 6, 1991 memorandum necessarily became an answer to a question not asked. The memorandum was, therefore, in every sense "advisory."

*Heldor,* 989 F.2d at 707.

We do not believe *Heldor* compels the remedy the Indemnified Insurers seek here. *Heldor* involved a mootness challenge to a Bankruptcy Court order that addressed the constitutionality of a state statute despite withdrawal of the relevant objection by the state agency charged with enforcing the challenged statute. While acknowledging the withdrawal of the objection in its order, the Bankruptcy Court explained that it nevertheless reached the constitutional issue because of the amount of time it had already expended in writing the opinion. *Id.* at 705. Under those circumstances, we found it appropriate to vacate the entire order of the Bankruptcy Court because it purported to adjudicate a dispute between the debtor and the DEP that no longer existed.

In this case, by contrast, several insurers raised feasibility and voting objections during the Plan confirmation proceedings. As such, these issues remained "live controversies" before the Bankruptcy Court and District Court which had to be resolved prior to Plan confirmation. The valuation determinations were necessary to Plan confirmation, and both courts expressly limited the preclusive effect of their estimates of the indemnities. We see nothing here to confer standing on the Indemnified Insurers as "persons aggrieved."

### D. Certain Cancer Claimants

 **[16]**    Finally, we consider the bankruptcy appellate standing of the Certain Cancer Claimants.[32] The Plan proponents previously challenged the Certain Cancer Claimants's standing to object to the use of § 105(a) to extend the channeling injunction to discharge present and future claims against non-debtors. The Bankruptcy Court sustained the standing of the Certain Cancer Claimants to litigate this question as to non-debtor Lummus, but found that they lacked standing to challenge the channeling injunction as

to non-debtor Basic. The District Court affirmed. None of the Plan proponents—Combustion Engineering, ABB, Future Claimants' Representative or Official Committee of Unsecured Creditors—contend the Certain Cancer Claimants lack standing to appeal the confirmation order.

As creditors of the bankruptcy estate, the Certain Cancer Claimants' interests **\*224** are directly and pecuniarily affected by the order of the Bankruptcy Court. Therefore, the Certain Cancer Claimants have appellate standing to challenge Plan confirmation, including the District Court's grant of injunctive relief under § 105(a) to non-debtor Lummus, the propriety of the § 524(g) injunction, and whether the Plan obtained a valid confirming vote. However, because the Certain Cancer Claimants do not hold any independent claims against non-debtor Basic, we conclude they lack appellate standing to challenge those issues as they relate to Basic.[33]

### IV. "Related to" Jurisdiction

 **[17]**    At issue is whether the District Court properly exercised "related to" jurisdiction over the non-derivative asbestos claims against non-debtors Basic and Lummus.[34] Neither the Bankruptcy Court nor the District Court made jurisdictional findings in support of "related to" jurisdiction. The District Court concluded, however, that the Bankruptcy Court implicitly made the requisite jurisdictional findings as part of its analysis of the § 105(a) channeling injunction. As such, the District Court exercised "related to" jurisdiction over the independent, non-derivative claims based on a "unity of interest" between Combustion Engineering, Basic and Lummus:

> Here we have corporate affiliates, shared insurance, even joint operations at single sites leading to the asbestos personal injury claims at issue. The premises on which the plan is based establish the extensive financial inter-dependence between the entities. The Court is satisfied that there exists a unity of interest here to support jurisdiction in this court over independent asbestos claims against the non-debtors.

 **[18]**    **[19]**    **[20]**    While aspects of the § 105(a) analysis may be relevant to the "related to" jurisdiction inquiry,[35] these inquiries are analytically distinct. Section 105(a) permits a bankruptcy court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the

Case 09-10138-MFW   Doc 14410-3   Filed 09/16/14   Page 351 of 398

*In re Combustion Engineering, Inc., 391 F.3d 190 (2004)*

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

Bankruptcy Code. 11 U.S.C. § 105(a). [36] But as the statute makes clear, **225 § 105 does not provide an independent source of federal subject matter jurisdiction. [37] *See also In re Johns–Manville Corp.*, 801 F.2d 60, 63 (2d Cir.1986) ("Section 105(a) does not, however, broaden the bankruptcy court's jurisdiction, which must be established separately[.]"). "Related to" jurisdiction must therefore exist independently of any plan provision purporting to involve or enjoin claims against non-debtors. *In re Zale Corp.*, 62 F.3d 746, 756 (5th Cir.1995). Although the Plan proponents argue that it is efficacious to use § 105(a) to extend injunctive relief in favor of non-debtors in order to create a "bigger pot" of assets for all of the asbestos claimants, the exercise of bankruptcy power must be grounded in statutory bankruptcy jurisdiction.

### A. Overview

Federal bankruptcy jurisdiction is defined by 28 U.S.C. § 1334. Section 1334(b) confers upon the district courts "original and exclusive jurisdiction of all cases under title 11," and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Section 157(a) of the Bankruptcy Code permits district courts to refer most matters to a bankruptcy court. *See* 28 U.S.C. §§ 157(a), 151. This broad jurisdictional grant allows bankruptcy courts to "deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984)).

[21] [22] [23] [24] "Bankruptcy court jurisdiction potentially extends to four types of title 11 matters: '(1) cases under title 11, (2) proceeding[s] arising under title 11, (3) proceedings arising in a case under title 11, and (4) proceedings related to a case under title 11.' " *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 162 (3d Cir.2004) (quoting *Torkelsen v. Maggio (In re Guild & Gallery Plus)*, 72 F.3d 1171, 1175 (3d Cir.1996)). Cases under title 11, and proceedings arising under title 11, and proceedings arising in a case under title 11 are referred to as "core" proceedings; whereas proceedings "related to" a case under title 11 are referred to as "non-core" proceedings. [38] *In* **226 *re Resorts Int'l, Inc.*, 372 F.3d at 162 (citing 1 Collier on Bankruptcy, ¶ 3.02[2], at 3–35 (15th ed. rev.2003)). Proceedings "related to" a title 11 case include causes of

action owned by the debtor that become property of the bankruptcy estate under 11 U.S.C. § 541(a), as well as suits between third parties that conceivably may have an effect on the bankruptcy estate. *Celotex*, 514 U.S. at 308 n. 5, 115 S.Ct. 1493. We focus our attention on the latter type of proceeding.

Although not defined by statute, we set forth what has become the seminal test for determining "related to" jurisdiction over third-party claims in *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir.1984). [39] In that case, John and Louise Higgins brought suit in state court against Pacor, a chemical supplies distributor, for injuries allegedly caused by exposure to asbestos contained in Pacor's products. Pacor filed a third-party complaint impleading Johns–Manville, the initial asbestos manufacturer. Johns–Manville subsequently filed for Chapter 11 bankruptcy, and the plaintiffs sought to remove their case to the bankruptcy court where the Johns–Manville bankruptcy was proceeding. The bankruptcy court denied removal, and we affirmed.

In evaluating the scope of "related to" bankruptcy jurisdiction, we acknowledged that Congress intended to grant bankruptcy courts broad authority to deal expeditiously with all matters pertaining to the bankruptcy. But we also noted that this power was not without limitation. In defining the appropriate balance, we stated:

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy....* An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*Pacor*, 743 F.2d at 994 (emphasis in original) (citations omitted).

Applying this test, we concluded "related to" jurisdiction did not extend to the civil proceeding between non-debtors Higgins and Pacor because, "[a]t best, [the lawsuit] is a mere precursor to the potential third party claim for indemnification by [defendant] against [the debtor]." *Id.*

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)
43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 352 of 398

at 995. We noted that other cases finding "related to" jurisdiction over actions involving non-debtors involved contractual indemnity obligations between the debtor and non-debtor that automatically resulted in indemnification liability against the debtor. *Id.* (citing cases). By contrast, we found that any judgment against Pacor in the third-party action "could not itself result in even a contingent claim against Manville, since Pacor would still be obligated to bring an entirely separate proceeding to receive indemnification." *Id.* As such, we concluded that because the debtor Johns–Manville could not be bound automatically by the Higgins–Pacor action, that action was not "related to" the debtor's Chapter 11 case.

Recently we affirmed the validity of the *Pacor* test in *In re Federal–Mogul Global, Inc.,* 300 F.3d 368 (3d Cir.2002). As in the current case, *Federal–Mogul* involved an asbestos-related bankruptcy. Thousands **\*227** of individuals brought personal injury claims in state courts seeking damages for asbestos exposure to certain "friction products," such as automobile brake pads. Plaintiffs asserted claims against both manufacturers and distributors of friction products, including Federal–Mogul, and also against companies that made products containing friction products, in particular automobile manufacturers that used asbestos-containing brake pads.

Federal–Mogul filed for reorganization under Chapter 11. Thereafter, certain automobile manufacturers sought to remove asbestos-related personal injury claims from state court to the Federal–Mogul bankruptcy proceeding. The automobile manufacturers asserted these claims were "related to" Federal–Mogul's bankruptcy because they had purchased and used Federal–Mogul's friction products and therefore would seek indemnification or contribution from Federal–Mogul. The District Court disagreed and denied removal for lack of subject matter jurisdiction, reasoning that "related-to bankruptcy jurisdiction [does] not extend to a dispute between non-debtors unless that dispute, by itself, creates at least the logical possibility that the estate will be affected." *In re Federal–Mogul Global, Inc.,* 282 B.R. 301, 309 (D.Del.2002).

On appeal, the automobile manufacturers again argued the friction products claims were "related to" the Federal–Mogul bankruptcy. Relying in part on *Dow Corning I,* the automobile manufacturers asserted the potential indemnification and contribution claims by the non-debtors against Federal–Mogul provided a sufficient basis for "related to" jurisdiction

over claims against the non-debtors. 300 F.3d at 381 n. 8 (citing *Lindsey v. O'Brien* (*In re Dow Corning Corp.*), 86 F.3d 482 (6th Cir.1996) ("*Dow Corning I*" )). We disagreed, reiterating that *Pacor,* and not *Dow Corning I*, provides the controlling standard for assessing "related to" bankruptcy jurisdiction. *Id.* at 381. We also clarified that the potentially expansive language in *Pacor* was subject to the limiting principles announced in that case: "The test articulated in *Pacor* for whether a lawsuit could 'conceivably' have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy without the intervention of yet another lawsuit." *Id.* at 382. Because the potential indemnification and contribution claims against Federal–Mogul had not yet accrued and would require another lawsuit before they could affect Federal–Mogul's bankruptcy estate, we concluded the district court correctly held it lacked subject matter jurisdiction over the third-party friction product claims.

With these principles in mind we turn to the question whether the non-derivative asbestos claims against non-debtors Basic and Lummus are sufficiently "related to" Combustion Engineering's Chapter 11 bankruptcy to give rise to federal subject matter jurisdiction.

## B. Jurisdiction Over Independent Claims Against Non–Debtors

### 1. Corporate Affiliation

[25] The "corporate affiliation" between Combustion Engineering, Basic and Lummus identified by the District Court cannot by itself provide a sufficient basis for exercising "related to" jurisdiction. Any corporate relationship between Combustion Engineering, Basic and Lummus derives from the ABB holding company structure and a common parent that is not seeking bankruptcy protection. The record demonstrates that Combustion Engineering, Basic and Lummus are independent corporate entities, with separate and distinct management and operations. **\*228** Combustion Engineering does not currently own or control non-debtors Basic and Lummus. A corporate affiliation between lateral, peer companies in a holding company structure, without more, cannot provide a sufficient basis for exercising federal subject matter jurisdiction. Such an affiliation could be relevant to the jurisdictional inquiry if supported by factual findings demonstrating that a suit against Basic or Lummus would deplete the estate or affect its administration. But, as

Case 09-10138-MFW Doc 14410-3 Filed 09/16/14 Page 353 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

discussed in greater detail, neither the Bankruptcy Court nor the District Court made such findings.

## 2. Financial Contributions

[26] Combustion Engineering asserts the corporate relationship between itself, ABB, Basic and Lummus gives rise to "related to" jurisdiction because ABB's significant financial contributions to the Asbestos PI Trust hinged upon a channeling injunction in favor of Lummus. For this reason, Combustion Engineering argues the "entire plan is contingent on the inclusion of claims against Lummus and Basic within the scope of the channeling injunction. If the channeling injunction does not extend to claims against Lummus and Basic, there is no plan; it is that simple."

The Bankruptcy Court found it was necessary for ABB Limited to sell Lummus in order to contribute the 30 million plus shares of ABB Limited stock to the Plan, and the sale was not possible while Lummus retained asbestos liability:

> Without an injunction in favor of Basic and Lummus, the shared insurance would not be available to the Asbestos PI Trust, ABB would not contribute and its subsidiaries would not guarantee ABB's contributions to the Plan and the creditors would not receive the substantial benefits ABB is providing.

*In re Combustion Eng'g,* 295 B.R. at 483. The District Court likewise concluded that "absent the injunction [in favor of Basic and Lummus,] ABB Limited would not be able to restructure its debt and could not make necessary contributions to the plan."

[27] [28] [29] Although ABB Limited's contributions to the Asbestos PI Trust may depend on freeing Lummus and Basic of asbestos liability, and these contributions may inure to the benefit of certain Combustion Engineering asbestos claimants, these factors alone do not provide a sufficient basis for exercising subject matter jurisdiction. If that were true, a debtor could create subject matter jurisdiction over any non-debtor third-party by structuring a plan in such a way that it depended upon third-party contributions. As we have made clear, "[s]ubject matter jurisdiction cannot be conferred by consent of the parties. Where a court lacks subject matter jurisdiction over a dispute, the parties cannot

create it by agreement even in a plan of reorganization." *In re Resorts Int'l, Inc.,* 372 F.3d at 161 (internal citations omitted). *See also Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) ("[N]o action of the parties can confer subject-matter jurisdiction upon a federal court."). Although federal bankruptcy jurisdiction is "deliberately expansive" and "conspicuous for its breadth," *Morales v. TWA, Inc.,* 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (citations omitted), it is not without limitation. *See Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.,* 502 U.S. 32, 40, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991) (noting Congress has vested the bankruptcy courts with "limited authority"). As such, the boundaries of bankruptcy jurisdiction cannot be extended simply to facilitate a particular plan of reorganization, *see* **\*229** *In re Resorts Int'l, Inc.,* 372 F.3d at 161 ("The source of the bankruptcy court's subject matter jurisdiction is neither the Bankruptcy Code nor the express terms of the Plan. The source ... is 28 U.S.C. §§ 1334 and 157."), even if we perceive the plan to be in the public interest. *See In re Hechinger Inv. Co. of Del., Inc.,* 335 F.3d 243, 256 (3d Cir.2003) ( "[I]t is not for us to substitute our view of ... policy for the legislation which has been passed by Congress.").

Nevertheless, the Plan proponents insist that any unresolved asbestos liability of non-debtor Lummus impedes Combustion Engineering's ability to craft a plan that includes contributions from ABB Limited. In this regard, Combustion Engineering relies on our decision in *CoreStates Bank, N.A. v. Huls Am., Inc.,* 176 F.3d 187 (3d Cir.1999), for the proposition that if litigation against non-debtors prevents the debtor from crossing the finish-line and confirming a plan, then the effect on the estate is immediate and fully sufficient to justify "related to" jurisdiction. We do not read *CoreStates* so broadly.

*CoreStates* addressed the question of "related to" jurisdiction over an inter-creditor dispute. Both CoreStates and Huls America, Inc. had extended substantial credit to the debtor, United Chemical Technologies, Inc. ("UCT"), and subsequently entered into a subordination agreement to clarify their respective rights to payment from UCT. Under the terms of the agreement, UCT's debts to Huls were subordinated to debts owed to CoreStates. Huls further agreed it would not retain any payment by UCT, including payments under a bankruptcy plan, until UCT had paid off its indebtedness to CoreStates in full. After UCT filed for bankruptcy, but before the plan was confirmed, UCT

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 354 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)
43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

paid $600,000 to Huls in satisfaction of its debt. Citing their subordination agreement, CoreStates demanded Huls pay this sum over to it, and objected to plan confirmation on the ground that the proposed payment to Huls unfairly discriminated among creditors. CoreStates then filed a suit in federal court, alleging Huls was obligated under the subordination agreement to turn over the $600,000 payment. The district court concluded CoreStates's claim was precluded because CoreStates could have raised its claim in the bankruptcy proceeding along with its objection, but failed to do so. We affirmed.

As a threshold matter, we found that a claim based on the subordination agreement fell within the court's "related to" jurisdiction. Huls, a creditor of the estate, gave up a claim against the debtor for over $3 million in exchange for an up-front payment of $600,000 under the plan. We reasoned that without this payment Huls "might not have consented to the Plan" and "UCT might have had a much more difficult time having the Plan confirmed." *Id.* at 204. We found "related to" jurisdiction because resolution of the subordination dispute "conceivably might have impacted upon the debtor's options in crafting a plan that met with [one of the creditor's] approval and thereby affected the handling of the bankruptcy estate." *Id.*

We believe *CoreStates* can be distinguished on its facts. It does not support extending "related to" jurisdiction to non-derivative claims against the non-debtors in this case. *CoreStates* involved an inter-creditor dispute that directly concerned assets of the debtor's estate. As creditors, either CoreStates or Huls had the ability to impede plan confirmation, thereby affecting directly the administration of the bankruptcy estate. By contrast, claimants with independent claims against non-debtors Basic and Lummus are not creditors of Combustion Engineering, and have no ability to affect directly plan administration. **\*230** [40] Moreover, the matter at issue in *CoreStates* purported to alter the priority of creditors in the bankruptcy process, which would have had an obvious effect on the administration of the bankruptcy estate. *See Pacor,* 743 F.2d at 995–96 (dismissing claim for lack of "related to" jurisdiction, noting, *inter alia,* that "[a]ny judgment obtained would thus have no effect on the arrangement, standing, or priorities of [debtor's] creditors"). By contrast, the claims asserted against Basic and Lummus would not alter the priority of Combustion Engineering's creditors.

Finally, and most importantly, *CoreStates* involved a dispute regarding assets of the debtor's bankruptcy estate. By contrast, there are no record findings of fact demonstrating that the independent, non-derivative claims against Basic and Lummus involve assets of the bankruptcy estate. In fact, the Plan currently provides that these claims will be paid from $38 million in assets contributed by ABB Limited, not Combustion Engineering.

In sum, "related to" jurisdiction cannot be extended to the independent claims against non-debtors Basic and Lummus simply because contributions to the Plan by ABB Limited, itself a non-debtor, purportedly depend on a channeling injunction in their favor.

### 3. Related Liability

[30]    Combustion Engineering insists the Bankruptcy Court properly exercised "related to" jurisdiction over the independent, non-derivative claims against Basic and Lummus for the additional reason that the bankruptcy estate could be affected by future contribution or indemnification claims by a non-debtor. Though Combustion Engineering does not cite to any statutory indemnity obligations or express agreements that would automatically give rise to indemnification obligations with respect to Basic or Lummus, it nonetheless argues the factual findings made by the courts support the possibility of indemnification claims against it. The District Court described a "unity of interest" between Combustion Engineering, Basic and Lummus, based in part on "joint operations at single sites leading to the asbestos personal injury claims at issue," and "extensive financial inter-dependence." Furthermore, in discussing the shared insurance policies, the District Court noted that personal injury claims against the "non-debtors would inevitably lead to indemnification claims over against their former parent, Combustion Engineering." There is also evidence in the record indicating a large majority of Lummus claimants have also asserted claims against Combustion Engineering. [41]

We believe this factual record does not support "related to" jurisdiction and is readily distinguishable from cases exercising "related to" jurisdiction based on the possibility of contribution or indemnification claims by third parties. For example, in *Dow Corning I* the court found "related to" jurisdiction based on the "identity" of interest created by shared insurance policies and potential claims for contribution and indemnification against *Dow Corning by*

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 355 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

non-debtors. 86 F.3d 482, 493 (6th Cir.1996). In that case, the personal injury liability of both the debtor and non-debtors was based on a single product: silicone gel breast implants. Dow Corning manufactured nearly 50% of all breast implants **231** sold in the market and supplied the silicone raw materials to all other manufacturers. *Id.* at 485. In other words, every silicone breast implant involved Dow Corning as either the primary manufacturer or the supplier of the key product input. As one court discussing the facts of *Dow Corning I* explained, "each of the co-defendants was closely involved in using the same material, originating with the debtor, to make the same, singular product, sold to the same market and incurring substantially similar injuries. This circumstance created a unity of identity between the debtor and the co-defendants not present here." *Arnold v. Garlock, Inc.,* 278 F.3d 426, 440 (5th Cir.2001).

The theory of "related to" jurisdiction in *Dow Corning I* was based on the near certainty that Dow Corning would be directly or derivatively liable for any injury resulting from a silicone breast implant because it either manufactured or contributed key supplies to every breast implant on the market. Other courts exercising "related to" jurisdiction over personal injury claims against non-debtors based on the potential for indemnification claims against the debtor have similarly involved either express indemnification obligations not present here, *see A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, 1007–08 (4th Cir.1986), or derivative liability, *see MacArthur Co. v. Johns–Manville,* 837 F.2d 89, 92–93 (2d Cir.1988).

By contrast, the asbestos-related personal injury claims asserted against Combustion Engineering, Basic and Lummus arise from different products, involved different asbestos-containing materials, and were sold to different markets. The record demonstrates that asbestos-related claims against Combustion Engineering arise from exposure to asbestos insulation used in boilers manufactured by Combustion Engineering for use in power plants and industrial facilities. The asbestos claims against Lummus arise from exposure to water heaters manufactured by Lummus that included asbestos-containing gaskets. Basic's asbestos liabilities arise from its manufacture of an acoustical plaster containing asbestos. As such, a review of the asbestos-related claims asserted against Combustion Engineering, Basic and Lummus reveals little evidence of derivative liability. Although a majority of the active asbestos claims against Lummus also assert claims against Combustion Engineering, only one Lummus claimant has asserted that

Combustion Engineering is derivatively liable for Lummus' asbestos liability. These distinct products and customers do not establish a "unity of interest" between Combustion Engineering and the non-debtors.

Moreover, we have rejected "related to" jurisdiction over third-party claims involving asbestos or asbestos-containing products supplied by the debtor when the third-party claim did not directly result in liability for the debtor. For example, *Pacor* involved a third-party personal injury suit against a non-debtor for damages allegedly caused by asbestos supplied by the non-debtor but manufactured by the debtor. Even though the debtor, Johns–Manville, manufactured the asbestos giving rise to the third-party claim, we found no "related to" jurisdiction because the "primary action"—i.e., the suit between the two non-debtors—would not, itself, result in an indemnification claim against the debtor. *See Pacor,* 743 F.2d at 995 ("[T]he primary action between Higgins and Pacor would have no effect on the Manville bankruptcy estate.... At best, it is a mere precursor to the potential third party claim for indemnification.").

Likewise, in *Federal–Mogul* we found no "related to" jurisdiction over independent claims against the non-debtor automobile **232** manufacturers, even though the manufacturers' products physically incorporated the debtor's asbestos products. 300 F.3d at 382 ("[W]hether a lawsuit could 'conceivably' have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy without the intervention of yet another lawsuit."). In both cases the unity of exposure created by asbestos contained in a common product was insufficient to give rise to "related to" jurisdiction when the third-party claim would not directly result in liability for the debtor.

At oral argument, Combustion Engineering suggested that common production sites shared by Combustion Engineering, Basic and Lummus were likely to give rise to future indemnification claims. Neither the Bankruptcy Court nor the District Court made any findings of fact on this issue. In any event, we do not believe common production sites alone provide a sufficient basis for the kind of "unity of interest" that could give rise to "related to" jurisdiction. Moreover, any indemnification claims against Combustion Engineering resulting from a shared production facility would require the intervention of another lawsuit to affect the bankruptcy estate, and thus cannot provide a basis for "related to" jurisdiction.

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 356 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

#### 4. Shared Insurance

[31]    The record includes testimony that Combustion Engineering, Basic and Lummus share certain insurance coverage. [42]  Based on this testimony, the Bankruptcy Court assumed that independent claims against Lummus and Basic would reduce the insurance proceeds available to the estate. *See In re Combustion Eng'g,* 295 B.R. at 483 ("Continued lawsuits against Basic and Lummus may drain insurance so that it is not available to fund [Combustion Engineering's] Plan."). The District Court made the same assumption ("Insurance policies for which Combustion Engineering, Lummus and/or Basic are co-insureds would be drawn upon by Lummus and Basic claimants, reducing the proceeds available for the personal injury trust."). The Plan proponents contend that certain insurance policies Combustion Engineering shares with Basic and Lummus operate as indemnification obligations, such that asbestos-related personal injury claims against Basic and Lummus would automatically deplete the insurance proceeds available to Combustion Engineering and thus reduce the assets available to the bankruptcy estate.

Neither the Bankruptcy Court nor the District Court made factual findings regarding the terms, scope or coverage of the allegedly shared insurance policies. [43]  Courts finding "related to" jurisdiction over claims against non-debtors based in part on shared insurance policies have relied not only on extensive record findings   **233** regarding the terms and operation of the subject policies, but also on additional evidence of automatic liability against the debtor. For example, in *A.H. Robins,* 788 F.2d 994 (4th Cir.1986), the Court of Appeals for the Fourth Circuit found "related to" jurisdiction over non-debtor co-defendants (directors and officers of the debtor) after finding they were entitled to statutory indemnification and were co-insureds under the policies. In reviewing the factual record, the court noted: "The rights of [the non-debtor co-defendants] to indemnity and their status as additional insureds under Robins' insurance policy are undisputed on the record. That there are thousands of Dalkon Shield actions and claims pending is a fact established in the record and the limited fund available under Robins' insurance policy is recognized in the record." *Id.* at 1008.

[32]    There are no comparable findings of fact in this case with respect to Basic and Lummus, nor any findings on the operative terms of the policies. Although the Plan proponents

assured us at oral argument that "[t]he shared insurance has one cap and that all insureds are under the same cap," we cannot rest the exercise of subject matter jurisdiction on this assertion alone. [44]  *Agathos v. Starlite Motel,* 60 F.3d 143, 151 (3d Cir.1995) ("[S]itting as an appellate court we are not in a position to make findings of fact."). Given *Pacor* and *Federal–Mogul's* constraints on related-to jurisdiction, the lack of indemnification obligations (present in *A.H. Robins* ), the lack of derivative liability or unity of interest (present in *Dow Corning I* ), the minimal corporate affiliation of Combustion Engineering with Lummus and Basic, and the indirect effects on the Plan, it is doubtful whether shared insurance would be sufficient grounds upon which to find related-to jurisdiction over independent claims against Basic and Lummus.

Because there are insufficient findings of fact on the current record to assess the matter, we would ordinarily remand on the shared insurance issue. However, because we conclude § 105(a) does not permit the extension of a channeling injunction to the non-derivative claims against non-debtors Basic and Lummus, no further fact finding is required on this point.

### V. Section 105(a) Equitable Injunction

The Bankruptcy Court entered a channeling injunction under § 524(g) in favor of Combustion Engineering and also in favor of Basic and Lummus for their derivative asbestos-related claims. The court correctly found that § 524(g) did not authorize a channeling injunction over the independent, non-derivative third-party actions against non-debtors Basic and Lummus. To extend the channeling injunction to include the non-derivative claims against the non-debtors, the Bankruptcy Court relied upon its equitable powers under § 105(a).

Based on the facts here, we do not believe that § 105(a) can be employed to extend a channeling injunction to non-  **234** debtors in an asbestos case where the requirements of § 524(g) are not otherwise met. Because the injunctive action on independent non-derivative claims against non-debtor third parties in this case would violate § 524(g) (4)(A), would improperly extend bankruptcy relief to non-debtors, and would jeopardize the interests of future Basic and Lummus claimants, we will vacate the § 105(a) injunction.

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 357 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

### A. The Requirements of Section 524(g)(4)(A)

[33]  [34]  Section 524(g) provides a special form of supplemental injunctive relief for an insolvent debtor facing the unique problems and complexities associated with asbestos liability. Channeling asbestos-related claims to a personal injury trust relieves the debtor of the uncertainty of future asbestos liabilities. This helps achieve the purpose of Chapter 11 by facilitating the reorganization and rehabilitation of the debtor as an economically viable entity. At the same time, the rehabilitation process served by the channeling injunction supports the equitable resolution of asbestos-related claims. In theory, a debtor emerging from a Chapter 11 reorganization as a going-concern cleansed of asbestos liability will provide the asbestos personal injury trust with an "evergreen" source of funding to pay future claims. This unique funding mechanism makes it possible for future asbestos claimants to obtain substantially similar recoveries as current claimants in a manner consistent with due process. To achieve this relief, a debtor must satisfy the prerequisites set forth in § 524(g) [45] in addition to the standard plan confirmation requirements. [46]

Importantly for this case, § 524(g) limits the situations where a channeling injunction may enjoin actions against third parties to those where a third party has derivative liability for the claims against the debtor:

> Notwithstanding the provisions of section 524(e), such an injunction may bar **235** any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor[.]

11 U.S.C. § 524(g)(4)(A)(ii). [47] More specifically, the statute identifies the four circumstances under which such third-party liability will arise: "the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor," 11 U.S.C. § 524(g)(4)(A)(ii)(I); "the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party," 11 U.S.C. § 524(g)(4)(A)(ii)(II);

"the third party's provision of insurance to the debtor or a related party," 11 U.S.C. § 524(g)(4)(A)(ii)(III); or "the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party." 11 U.S.C. § 524(g)(4)(A)(ii)(IV).

The Plan proponents do not contend that Basic and Lummus are "liable for the conduct of, claims against, or demands on" Combustion Engineering, as required by § 524(g)(4)(A)(ii). As the Bankruptcy Court correctly noted, "[t]he Debtor owned [Basic and Lummus]; they did not own Debtor." *In re Combustion Eng'g,* 295 B.R. at 482 n. 41. Certain claims against Basic and Lummus allege independent liability, wholly separate from any liability involving Combustion Engineering. As the plain language of the statute makes clear, § 524(g)(4)(A) does not permit the extension of a channeling injunction to include these non-derivative third-party actions.

### B. Section 105(a)

[35]  Recognizing the limitations imposed by § 524(g), the Bankruptcy Court instead relied upon its equitable powers under § 105(a) to expand the scope of the channeling injunction.

[36]  [37]  Bankruptcy courts are "courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process." *Schwartz v. Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.),* 352 F.3d 671, 680–81 (2d Cir.2003) (citation omitted); *see also Local Loan Co. v. Hunt,* 292 U.S. 234, 240, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) ("[C]ourts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity."). As courts of equity, bankruptcy courts "have broad authority to modify creditor-debtor relationships." *United States v. Energy Res. Co.,* 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990); *see also Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548, 568 (3d Cir.2003) (en banc) (describing bankruptcy court's equitable powers to "craft flexible remedies that, while not expressly **236** authorized by the Code, effect the result the Code was designed to obtain").

Section 105(a) of the Bankruptcy Code expressly provides bankruptcy courts the equitable power to "issue any order, process, or judgment that is necessary or appropriate to carry

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 358 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

out the provisions of this title." 11 U.S.C. § 105(a). This section has been construed to give a bankruptcy court "broad authority" to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings. *Energy Res. Co.,* 495 U.S. at 549, 110 S.Ct. 2139 ("[Section 105(a) is] consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships.").

[38]    Nevertheless, the equitable powers authorized by § 105(a) are not without limitation, and courts have cautioned that this section "does not 'authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.' " *In re Aquatic Dev. Group, Inc.,* 352 F.3d at 680–81 (citation omitted). Importantly for this case, § 105(a) does not " 'give the court the power to create substantive rights that would otherwise be unavailable under the Code.' " *United States v. Pepperman,* 976 F.2d 123, 131 (3d Cir.1992) (quoting *In re Morristown & Erie R.R. Co.,* 885 F.2d 98, 100 (3d Cir.1989)); *see also In re Barbieri,* 199 F.3d 616, 620–21 (2d Cir.1999) (warning the "equitable powers emanating from § 105(a) ... are not a license for a court to disregard the clear language and meaning of the bankruptcy statutes and rules") (citations omitted).

[39]    [40]    The general grant of equitable power contained in § 105(a) cannot trump specific provisions of the Bankruptcy Code, and must be exercised within the parameters of the Code itself. *See generally Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) ("Whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."). When the Bankruptcy Code provides a specified means for a debtor to obtain a specific form of equitable relief, those standards and procedures must be observed. *See In re Fesco Plastics Corp.,* 996 F.2d 152, 154–55 (7th Cir.1993) ("[W]hen a specific Code section addresses an issue, a court may not employ its equitable powers to achieve a result not contemplated by the Code."); *Resorts Int'l v. Lowenschuss (In re Lowenschuss),* 67 F.3d 1394, 1402 (9th Cir.1995) ("Section 105 does not authorize relief inconsistent with more specific law"); *In re Zale Corp.,* 62 F.3d at 760 (5th Cir.1995) ("A § 105 injunction cannot alter another provision of the [C]ode.").

[41]    Here, the Bankruptcy Court relied upon § 105(a) to achieve a result inconsistent with § 524(g)(4)(A). Although the Bankruptcy Court has broad equitable authority to craft

remedies necessary to facilitate the reorganization of a debtor, this power is cabined by the Code. *Ahlers,* 485 U.S. at 206, 108 S.Ct. 963. As both the plain language of the statute and its legislative history make clear, § 524(g) provides no specific authority to extend a channeling injunction to include third-party actions against non-debtors where the liability alleged is not derivative of the debtor. [48] Because § 524(g) expressly contemplates  **237** the inclusion of third parties' liability within the scope of a channeling injunction—and sets out the specific requirements that must be met in order to permit inclusion [49]—the general powers of § 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g). [50]

It also bears noting that the practical effect of the § 105(a) injunction here is to extend bankruptcy relief to two non-debtor companies outside of bankruptcy. While the § 105(a) injunction may facilitate Combustion Engineering's reorganization by permitting significant contributions by ABB Limited and its affiliates to the Asbestos PI Trust, it also allows Basic and Lummus to cleanse themselves of non-derivative asbestos liability without enduring the rigors of bankruptcy. Despite their own asbestos-related liabilities, there is no evidence that either Basic or Lummus need to reorganize under Chapter 11. If they do, as U.S. companies facing asbestos liabilities both Basic and Lummus could conceivably petition for Chapter 11 reorganization and injunctive relief from those liabilities under § 524(g). Although some asbestos claimants here may benefit from an augmented fund, equity does not permit non-debtor affiliated entities to secure the benefits of Chapter 11 in contravention of the plain language of § 524(g).

In addition, the use of § 105(a) to enjoin and channel the claims of future Basic and Lummus asbestos claimants may jeopardize the rights of those claimants. The several prerequisites set forth in § 524(g) are designed to protect the interests of future claimants whose claims are permanently enjoined. Among these, the plan must be approved by a super-majority of current claimants, and must provide substantially similar treatment to present and future claimants. Furthermore, the court must appoint a futures representative to act as fiduciary for the interests of future claimants. *See* 11 U.S.C. §§ 524(g)(2)(B)(ii)(IV)(bb), 524(g)(4)(B)(I), 524(g)(2)(B)(i)(V).

Neither court here made explicit findings whether the § 524(g) requirements were satisfied with respect to the channeling injunction as applied to the independent, non-

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 359 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

derivative claims against Basic **\*238** and Lummus. Nor did the Bankruptcy Court formally appoint a separate representative to act on behalf of future asbestos claimants asserting non-derivative claims against Basic and Lummus. There is some evidence in the record that Mr. Austern agreed to act in this capacity while also serving as the Combustion Engineering futures representative. *See supra* note 8. But the interests of the future Basic and Lummus asbestos claimants are not necessarily aligned with those of future Combustion Engineering asbestos claimants. The future asbestos claimants of the non-debtors might prefer having recourse against solvent entities [51] rather than being limited to proceeding against the Asbestos PI Trust, a limited fund subject to depletion by current and future Combustion Engineering asbestos claimants. As such, the channeling injunction against these future asbestos claimants may not have accorded them the requisite protections. We will vacate the Basic and Lummus channeling injunction because § 105(a) under these facts cannot be used to circumvent the more specific requirements of § 524(g).

## VI. Two–Trust Structure

Eighty-seven days before filing its pre-pack bankruptcy, Combustion Engineering transferred more than $400 million in assets to the CE Settlement Trust to partially pay personal injury claims of participating Combustion Engineering asbestos claimants. At the time, the Plan proponents allegedly feared that claimants with settlements pending or awaiting payment would force Combustion Engineering into involuntary bankruptcy and stymie its reorganization effort. *See In re Combustion Eng'y,* 295 B.R. at 467 n. 9. Accordingly, payments from the CE Settlement Trust were based upon the length of time a claimant's case had been pending. Claimants who had settled with Combustion Engineering and were awaiting payment received the greatest compensation (95% of the full liquidated value of their claim); claimants who had agreed to settlement or a dispute resolution process, and whose payment was due at a future date, received less (85%); a third, catch-all category of claimants received an initial payment of 37.5%, with the possibility, if sufficient funds remained, of later recovering up to 75%; and a fourth group of claimants, who came into the process late in the negotiations, agreed to a lesser sum. None of the participating Combustion Engineering claimants received full payment, and the remaining, unpaid portion of each claim was treated as surviving for purposes of bankruptcy creditor status. The surviving "stub claims"

enabled CE Settlement Trust participants to vote on the reorganization Plan.

The Bankruptcy Court determined that payments from the CE Settlement Trust were designed "to compensate people who already had claims in the tort system or on file with [Combustion Engineering] and to provide [Combustion Engineering] with a reprieve from litigation." The District Court likewise determined the purpose of the CE Settlement Trust was to provide Combustion Engineering "a little time, a breathing space, while the pre-packaged plan was negotiated." The court reasoned the CE Settlement Trust only partially paid claims because "there were simply insufficient funds to pay the settlement trust claimants 100 percent of their **\*239** claims," and not because the settling parties sought to "gerrymander" the vote. The District Court concluded that payments from the CE Settlement Trust did not induce participants to vote in favor of the Plan or otherwise manipulate the voting process.

The Certain Cancer Claimants lodge two primary objections to the two-trust structure. First, they contend it violates the Bankruptcy Code's "equality among creditors" principle because the CE Settlement Trust participants effectively receive greater compensation for their asbestos claims than similarly situated non-participants. Second, the Certain Cancer Claimants argue the funding of the CE Settlement Trust and creation of the stub claims violate the Code by "artificially impairing" the claims of participants in order to effect an impermissible manipulation of the voting process.

## A. Discriminatory Treatment of Claims

[42] "Equality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier v. IRS,* 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). The Certain Cancer Claimants contend the Plan violates this principle, as well as the specific requirements of §§ 524(g)(2)(B)(ii)(V) and 547(b), because the two-trust structure provides the CE Settlement Trust participants with preferential treatment over non-participant asbestos personal injury claimants. The Plan proponents maintain this framework complies with the literal terms of the Code. Nonetheless, we believe the Combustion Engineering bankruptcy Plan may impermissibly discriminate against certain asbestos personal injury claimants. Because the record is inadequate to resolve the issue, we will remand for additional fact-finding.

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 360 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)
43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

The Bankruptcy Code furthers the policy of "equality of distribution among creditors" by requiring that a plan of reorganization provide similar treatment to similarly situated claims. Several sections of the Code are designed to ensure equality of distribution from the time the bankruptcy petition is filed. Section 1122(a) provides that only "substantially similar" claims may be classified together under a plan of reorganization. Section 1123(a)(4) requires that a plan of reorganization "provide the same treatment for each claim or interest of a particular class." And § 524(g) states that "present claims and future demands that involve similar claims" must be paid "in substantially the same manner."

To complement these provisions, which address the treatment of claims post-petition, § 547 operates to ensure that equality among creditors is not undermined by transfers to creditors in contemplation of bankruptcy. Section 547(b) provides that a bankruptcy trustee may avoid any transfer by the debtor:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; ... and

(5) that enables such creditor to receive more than such creditor would receive if-

(A) the case were a case under chapter 7 of this title; [and]

(B) the transfer had not been made ...

11 U.S.C. § 547(b).

Section 547(b) furthers equality of distribution among creditors by preventing the **\*240** debtor from favoring one creditor or group of creditors over others by transferring property shortly before filing for bankruptcy. The Supreme Court has noted the preference avoidance rule contained in § 547 serves an important purpose in managing the debtor-creditor relationship:

> A preference is a transfer that enables a creditor to receive payment of a greater percentage of his claim against the

> debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankrupt estate.... [T]he preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally.

*Union Bank v. Wolas,* 502 U.S. 151, 160–61, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991) (citing H.R.Rep. No. 95–595 at 177–78 (1977)).

Based on the record, we believe the pre-petition payments to the CE Settlement Trust may constitute voidable preferences. [52] Eighty-seven days before filing for bankruptcy, while the company was insolvent, Combustion Engineering transferred payment for outstanding asbestos liability to a group of CE Settlement Trust participants who received up to 95% of their claim value—far more than they would have received in a Chapter 7 liquidation had no transfer been made. This suggests that the payments to the settlement trust satisfy at least four of the five criteria under § 547(b).

Prior to filing for bankruptcy, Combustion Engineering transferred over $400 million, or approximately half of its assets, to the CE Settlement Trust for the benefit of participating asbestos claimants, who were then creditors of Combustion Engineering. 11 U.S.C. § 547(b)(1). As such, partial payments from the CE Settlement Trust constituted payments for antecedent debts owed by the debtor. 11 U.S.C. § 547(b)(2). Moreover, Combustion Engineering was insolvent when it funded the pre-petition trust on November 22, 2002, and its petition for voluntary Chapter 11 bankruptcy was filed on February 17, 2003—eighty-seven days after funding the CE Settlement Trust. 11 U.S.C. § 547(b)(3) and 11 U.S.C. § 547(b)(4).

The only remaining issue is whether the assets transferred to the CE Settlement Trust entitled participants in that Trust to receive more than they otherwise would have received in a Chapter 7 liquidation. 11 U.S.C. § 547(b)(5). Crediting the liquidation analysis conducted by Pamela Zilly, senior managing director of the Blackstone Group, and testimony by Mr. Austern, the Bankruptcy Court concluded the Plan would pay more to future claimants than would be paid

Case 09-10138-MFW Doc 14410-3 Filed 09/16/14 Page 361 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

under a Chapter 7 bankruptcy or no bankruptcy at all. *See In re Combustion Eng'g,* 295 B.R. at 488. Specifically, the Bankruptcy Court found the assets available to Combustion Engineering in Chapter 7 would be between $210 and $250 million, while assets available under the Plan would be between $640 and $789 million as a result of the additional contributions by ABB Limited and other non-debtors. [53] *Id.* at 485–86. The District *241 Court likewise dismissed the argument that the pre-petition transfer constituted a voidable preference:

> [T]he allegation that the establishment of the settlement trust was a voidable preference is simply a restatement of the argument already dispensed with by comparing the liquidation value of the company with the value paid to claimants under the plan. Without the settlement trust, there would be no plan. It has already been established that future claimants will fare better with the plan than without it.

This analysis was incorrect as a matter of law because a comparison of the funds available for future claimants is not the proper inquiry. Section 547(b)(5) refers to transfers for the "benefit of a creditor" that "enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title." 11 U.S.C. § 547(b)(5). As this provision specifies, the relevant question is whether the CE Settlement Trust participants—not the future claimants—received more or less than they would have received under Chapter 7 if the pre-petition payments had not been made.

The record suggests that pre-petition settlement participants received more for their asbestos claims than they would have received in a Chapter 7 liquidation. The CE Settlement Trust paid participants up to 95% of their claim value, and, according to the Certain Cancer Claimants' expert, provided an average payout to participants of 59%. A Chapter 7 liquidation, in contrast, may have yielded an average payout to asbestos claimants of significantly less, perhaps 28% of their claim value. [54] Were this disparity established as a matter of fact, the CE Settlement Trust preferences would be voidable under § 547(b).

 [43]   The pre-petition transfer in this case also implicates the fundamental bankruptcy policy of "equality of distribution among creditors." In this regard, we consider the bankruptcy scheme as an integrated whole in order to evaluate whether

Plan confirmation is warranted. [55] Viewing *242 the Combustion Engineering pre-pack bankruptcy as a whole, the record reveals that it may lack the requisite equality of distribution among creditors. The Plan, as it relates to asbestos claimants, consists of two elements: the pre-petition CE Settlement Trust and the post-petition Asbestos PI Trust. [56] Under this interdependent, two-trust framework, the Certain Cancer Claimants, the future asbestos claimants, and other non-parties to the pre-petition settlement appear to receive a demonstrably unequal share of the limited Combustion Engineering fund. The Certain Cancer Claimants' expert testified that while CE Settlement Trust participants recover, on average, 59% of the liquidated value of their claims, future claimants would recover 18% of the liquidated value of their claims under the Asbestos PI Trust. This disparity, if in fact it exists, is even more striking when considering that Category One claimants in the CE Settlement Trust received 95% of the liquidated value of their claims. But neither the District Court nor the Bankruptcy Court made findings with respect to the recovery of CE Settlement Trust participants relative to non-participating asbestos claimants.

Additionally, there are two considerations here that are absent in the ordinary commercial bankruptcy: the Plan's treatment of current asbestos claimants relative to future asbestos claimants, and its treatment of malignant asbestos claimants relative to non-malignant asbestos claimants. [57] The Certain Cancer Claimants challenge the disparate treatment of current and future asbestos claimants under the two-trust structure, and also whether the most seriously injured asbestos claimants received fair treatment under the Plan. Again, the record is insufficient to rule on these contentions. Neither the Bankruptcy Court nor the District Court evaluated the CE Settlement Trust's treatment of current, future, malignant and non-malignant asbestos claimants, or evaluated the overall Plan from the perspective of settlement participants versus non-participants and malignant versus non-malignant asbestos claimants. Even absent the Plan's other defects, the two-trust structure requires a remand for further findings on these issues.

## B. Creation of the "Stub Claims"

 [44]   [45]   [46]   The Certain Cancer Claimants contend the CE Settlement Trust "artificially impaired" or contrived the stub claims in order to garner sufficient votes in favor of confirmation. [58] As a condition of *243 plan

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 362 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

confirmation,[59] the court must find "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). A claim is not impaired if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest" or if the plan cures or compensates for past default. 11 U.S.C. § 1124(1). "Artificial" impairment occurs when a plan imposes an insignificant or de minimis impairment on a class of claims to qualify those claims as impaired under § 1124. The chief concern with such conduct is that it potentially allows a debtor to manipulate the Chapter 11 confirmation process by engineering literal compliance with the Code while avoiding opposition to reorganization by truly impaired creditors. While there is nothing in either §§ 1129(a)(10) or 1124 expressly prohibiting a debtor from "artificially impairing" the claims of creditors,[60] courts have found this practice troubling.[61]

In the context of this asbestos-related bankruptcy, so do we. Unlike the ordinary commercial bankruptcy, where stub claims may be used to facilitate a workout plan in the overall best interests of creditors, the use of stub claims in this case may constitute "artificial impairment" under § 1129(a)(10).

[47]    "The purpose of [§ 1129(a)(10) ] is 'to provide some indicia of support [for a plan of reorganization] by affected creditors and prevent confirmation where such **244 support is lacking.' " In re Windsor on the River Assocs., 7 F.3d at 131 (quoting In re Lettick Typografic, Inc., 103 B.R. at 38). As such, § 1129(a)(10) requires that a plan of reorganization pass muster in the opinion of creditors whose rights to repayment from the debtor are implicated by the reorganization. By providing impaired creditors the right to vote on confirmation, the Bankruptcy Code ensures the terms of the reorganization are monitored by those who have a financial stake in its outcome. Bankruptcy provides a framework for the consensual and cooperative reorganization of an insolvent debtor, and "stub claims" negotiated pre-petition may play a role in this process.

But in this case, Combustion Engineering made a pre-petition side arrangement with a privileged group of asbestos claimants, who as a consequence represented a voting majority despite holding, in many cases, only slightly impaired "stub claims." On the facts here, the monitoring function of § 1129(a)(10) may have been significantly weakened. See generally John Hancock Mut. Life Ins.

Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 158 (3d Cir.1993) (stating § 1129(a)(10) "would be seriously undermined if a debtor could gerrymander classes"). This type of manipulation is especially problematic in the asbestos context, where a voting majority can be made to consist of non-malignant claimants whose interests may be adverse to those of claimants with more severe injuries. See Stephen J. Carroll, et al., Asbestos Litigation Costs and Compensation: An Interim Report 46 (RAND 2002) (reporting that non-malignant claimants typically represent 80% to 90% of outstanding asbestos claims); S. Elizabeth Gibson, Symposium—Mass Torts: A Response to Professor Resnick: Will This Vehicle Pass Inspection?, 148 U. Pa. L.Rev.2095, 2112 (2000) ("A distinct minority—for example, those tort claimants with especially serious injuries and strong cases—might get outvoted by a large number of holders of small claims who favor a quick pay-out of relatively small amounts with little proof required.").[62]

[48]    Here, Combustion Engineering made pre-petition payments to current asbestos claimants that exceeded any recovery obtainable by other current asbestos claimants (such as the Certain Cancer Claimants) in bankruptcy.[63] As a result, the CE Settlement Trust participants, many of whom received as much as 95% of the full liquidated value of their claims pre-petition, had little incentive to scrutinize the terms of the proposed Plan. Rather, their incentive appears to have been otherwise, given that the favorable pre-petition settlements were conditioned, at least implicitly, on a subsequent vote in favor of the Plan.

Furthermore, the Plan initially provided a release for all avoidance and/or preference **245 actions against participants in the CE Settlement Trust. Although the release was subsequently removed from the Plan, this did not occur until after the solicitation and voting process was completed. Thus, when participants in the pre-petition CE Settlement Trust voted on the Plan, they possessed a significant financial incentive directly opposed to nonparticipants, whose only recourse was to the post-petition Asbestos PI Trust. This conflict was not considered by either the Bankruptcy Court or the District Court. In these circumstances, Combustion Engineering's use of stub claims may constitute "artificial impairment" in violation of § 1129(a)(10).

[49]    The Combustion Engineering stub claims also implicate due process.[64] In the resolution of future asbestos liability, under bankruptcy or otherwise, future claimants must be adequately represented throughout the process.

Case 09-10138-MFW  Doc 14410-3  Filed 09/16/14  Page 363 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

*Amchem,* 521 U.S. at 625–28, 117 S.Ct. 2231; *Ortiz,* 527 U.S. at 856, 119 S.Ct. 2295; 11 U.S.C. § 524(g)(4)(B)(I). [65] Here, the first phase of the integrated, global settlement —the establishment of the CE Settlement Trust—included neither representation nor funding for future and other non-participating claimants.

 **[50]  [51]  [52]  [53]**  Had the future and other non-participating asbestos claimants been adequately represented throughout the reorganization process, including the CE Settlement Trust negotiations, then perhaps the corresponding stub claims would demonstrate the "indicia of support by affected creditors" required under § 1129(a)(10). *In re Windsor on the River Assocs.,* 7 F.3d at 130–32. But they were not. Instead, as discussed, a disfavored group of asbestos claimants, including the future claimants and the Certain Cancer Claimants, were not involved in the first phase of this integrated settlement. The result was a Plan ratified by a majority of "stub votes" cast by the very claimants who obtained preferential treatment from the debtor. As noted, an estimated 99,000 of the approximately 115,000 "valid" confirmation votes appear to have been stub claim votes. Given this structural inadequacy, *see Ortiz,* 527 U.S. at 855–57, 119 S.Ct. 2295, the Plan may have lacked the requisite "indicia of support" among creditors. We recognize that stub claims are often used in ordinary commercial bankruptcies without generating the problems described here. But in this case, their use is problematic. We will remand for further consideration of "artificial impairment" under § 1129(a)(10). [66]

 **\*246  [54]**  Additionally, the Certain Cancer Claimants contend that the use of stub claims within a two-trust framework violates the good faith requirement of the Bankruptcy Code. As a condition of plan confirmation, a debtor must propose a plan of reorganization "in good faith and not by any means forbidden by law." [67]  11 U.S.C. § 1129(a)(3). Courts and commentators have recognized the good faith requirement provides an additional check on a debtor's intentional impairment of claims. *See In re Greate Bay Hotel & Casino, Inc.,* 251 B.R. at 240 ("Of course, the classification and treatment of classes of claims is always subject to the good faith **\*247** requirements under § 1129(a)(3)."); *see also* 7 Collier on Bankruptcy ¶ 1129.03[10], at 1129–62 (15th ed. rev.2000) ("Because the test of [§ 1129(a)(10) ] is somewhat mechanical on its face, and thus would not under a plain meaning analysis permit of an inquiry into motive, courts have indicated that attempts to manufacture artificially, or to gerrymander, classes to obtain an accepting

impaired non-insider class raise questions of good faith."). Although the Code does not define "good faith" in the context of § 1129(a)(3), we have stated that "[f]or purposes of determining good faith under section 1129(a)(3) ... the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re PWS Holding Corp.,* 228 F.3d at 242 (citing *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 150 n. 5 (3d Cir.1986)).

Both the Bankruptcy Court and District Court found the Plan satisfied the good faith requirement of § 1129(a)(3). In rejecting the proposition the Plan had been proposed in bad faith, the District Court concluded "it cannot be seriously argued that the good faith requirements of section 1129 would bar a plan intended to pay victims and resolve crippling and uncertain tort liabilities." The District Court found Combustion Engineering created the stub claims merely to purchase "a little time, a breathing space," and because "there were simply insufficient funds to pay the settlement trust claimants 100 percent of their claims."

The District Court also found the purported goal of the Plan in paying asbestos claimants and definitively resolving the asbestos liabilities of the debtor was consistent with the objectives of the Bankruptcy Code. The Certain Cancer Claimants contend the purpose of the two-trust framework was to secure improperly the required confirmation votes from a privileged group of claimants at the expense of the future and other non-participating claimants. We will remand for further consideration of good faith in light of the issues we have identified with the two-trust structure. [68]

### \*248  VII. Going Concern Requirement: Section 524(g)(2)(B)(i)(II)

 **[55]  [56]**  Section 524(g)(2)(B)(i)(II) provides that the asbestos personal injury trust must be "funded in whole or in part by the securities of 1 or more debtor involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends." The implication of this requirement is that the reorganized debtor must be a going concern, such that it is able to make future payments into the trust to provide an "evergreen" funding source for future asbestos claimants. [69] Both the Bankruptcy Court and the District Court found the reorganized Combustion Engineering would engage in business operations after consummation of the Plan. The

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 364 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)
43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

Bankruptcy Court found Combustion Engineering "had a continuing real estate business .... [and] is continuing in business post-confirmation." *In re Combustion Eng'g*, 295 B.R. at 485. The District Court likewise overruled a challenge to the § 524(g) channeling injunction after concluding "the reorganized Combustion Engineering will have a real estate business in which it will own and lease properties."

The record demonstrates the following facts. Combustion Engineering's post-confirmation business operations would be, at most, minimal. Combustion Engineering would emerge from Chapter 11 with no employees, no products or services, and in a cash neutral position. Its sole business activity would relate to the ownership of an environmentally contaminated piece of real estate in Connecticut (a so-called "brown field") and related lease activities. [70]

Although it is debatable whether Combustion Engineering could satisfy § 524(g)(2)(B)(i)(II), it does not appear that the

Certain Cancer Claimants raised this issue. They are the only parties, however, with standing to do so. While the Objecting Insurers argue that § 524(g)(2)(B)(i)(II) is not satisfied, they do not have standing to raise this matter. Therefore, we need not address it.

## VIII. Conclusion

For the foregoing reasons, we will vacate the order of the District Court confirming Combustion Engineering's Plan of Reorganization and remand to the District  **\*249**  Court for proceedings consistent with this opinion.

### Parallel Citations

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

---

Footnotes

\*      Sitting by designation.

1      The Travelers Indemnity Company and certain affiliates and Travelers Casualty and Surety Company f/k/a The Aetna Casualty and Surety Company withdrew its appeal on June 2, 2004, following a settlement of its coverage with Combustion Engineering. Likewise, appellant Evanston Insurance Company settled its dispute with Combustion Engineering prior to oral argument, and stipulated dismissal of its appeal on January 7, 2004.

2      The District Court's Confirmation Order, entered August 13, 2003, affirmed three separate recommendations of the Bankruptcy Court: (1) Order Approving The Disclosure Statement But Recommending Withholding Of Confirmation Of The Plan Of Reorganization For Combustion Engineering For Ten Days, *In re Combustion Eng'g*, 295 B.R. 459 (Bankr.D. Del. 2003); (2) Findings Of Fact And Conclusions Of Law Regarding Core Matters And Proposed Findings Of Fact And Conclusions Of Law Regarding Non–Core Matters, *In re Combustion Eng'g*, 295 B.R. 459 (Bankr.D.Del. June 23, 2003); and (3) Supplemental And Amendatory Order Making Additional Findings And Recommending Confirmation Of Plan Of Reorganization.

3      *See, e.g.,* Stephen J. Carroll et al., *Asbestos Litigation Costs and Compensation: An Interim Report* (RAND 2002); Deborah Hensler et al., *Asbestos in the Courts: The Challenge of Mass Toxic Torts* (RAND 1985); James Kakalik et al., *Costs of Asbestos Litigation* (RAND 1983).

4      A pre-packaged (or "pre-pack") bankruptcy allows a debtor to obtain votes of its creditors on a plan of reorganization before actually filing a petition for Chapter 11 relief. At the time the debtor files for relief, it presents the bankruptcy court with a plan of reorganization and a tally of creditors' votes approving the plan. To gain approval, the plan must receive (1) a majority of votes by number by class and (2) two-thirds of votes weighted by the amount of allowed claims for that class. 11 U.S.C. § 1126(c). In addition, if, as here, the plan contains a § 524(g) channeling injunction, it must be approved by 75% of the debtor's current asbestos claimants by number. *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

5      By the time its bankruptcy petition was filed, Combustion Engineering had exhausted its primary insurance coverage for products liability or settled with its primary insurance carriers. The Bankruptcy Court found that the pre-petition insurance settlements with Combustion Engineering account for total payments of $90.5 million, and further found there was approximately $200 million in unexhausted excess insurance policy limits, although certain excess insurance carriers dispute coverage. *In re Combustion Eng'g*, 295 B.R. at 464.

6      As a Swiss Corporation, ABB Limited is not subject to the United States bankruptcy laws. U.S. ABB, however, is incorporated in the State of Delaware.

7      We note that counsel for Certain Underwriters at Lloyd's of London claimed at oral argument that ABB sold its oil, gas and petrochemical division earlier this year for $950 million, but retained ownership of ABB Lummus Global. An ABB press release

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 365 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

indicates it sold the group in January 2004 to a private equity consortium for $925 million, with potential deferred consideration of an additional $50 million. ABB Lummus Global was not included in the sale.

8    Mr. David Austern was appointed to act as future claims representative for Combustion Engineering under 11 U.S.C. § 524(g)(4)(B)(i). There is conflicting evidence regarding Mr. Austern's role as representative for future Basic and Lummus claimants. In a letter from Mr. Austern to Lummus, dated April 10, 2003, Mr. Austern indicated he was asked to serve as futures representative for Lummus and Basic. The record also demonstrates that Mr. Austern conducted certain due diligence regarding the proposed treatment of future Basic and Lummus claims under the Plan. But Mr. Austern was not officially appointed by the Bankruptcy Court to serve as futures representative for Basic and Lummus claimants, and he testified that as of January 19, 2003, there was no representative for future Basic and Lummus claimants.

9    The Master Settlement Agreement was amended on January 29, 2003 to allow additional qualified claimants to enter the CE Settlement Trust through February 20, 2003.

10   These enhancements included: (1) guarantees by ABB subsidiaries as credit support for ABB Limited's obligations under the Plan; (2) assurances that the applicability of the § 524(g) injunction would be reevaluated if ABB Limited defaulted on its obligations under the Plan; (3) limited consent by ABB Limited to United States jurisdiction; (4) an additional $100 million payment by ABB Limited between 2006–2011 with $50 million of such payment contingent upon ABB Limited's EBIT (earnings before income tax) margins; (5) credit support for all of ABB Limited's $350 million contribution; (6) modification of Combustion Engineering's stock contribution to a $20 million note convertible to 80% of Combustion Engineering's outstanding stock upon successful completion of environmental remediation of certain Combustion Engineering properties; (7) U.S. ABB assuming liability for remediating one of Combustion Engineering's environmental liability sites (with the cost of remediation estimated at $100 million); (8) payment by ABB Limited of $5 million in cash to the Asbestos PI Trust upon the successful sale of Lummus; and (9) acceleration of $250 million in payments from ABB Limited from five years to three years.

11   The insurance-related contributions to the Asbestos PI Trust are governed by an Insurance Assignment Agreement. Under that agreement, Combustion Engineering, ABB Limited, Lummus and Basic transferred to the Asbestos PI Trust their respective rights to receive $94.5 million under various insurance settlement agreements. The settlement proceeds include pre-petition settlements negotiated between Combustion Engineering and the Indemnified Insurers that released the Indemnified Insurers from further obligations under their respective policies. Under these so-called insurance "buy-backs" Combustion Engineering was to receive a settlement payment and the insurers were to be released of all costs and burdens arising out of Combustion Engineering's asbestos liability. As part of the settlement agreements, Combustion Engineering also agreed to indemnify the settling insurers for costs and expenses incurred in defending suits involving Combustion Engineering's asbestos liability.

It is unclear from the record how the Bankruptcy Court arrived at an estimate of $320 million for the insurance proceeds contributed by Combustion Engineering to the Asbestos PI Trust. Combustion Engineering represents that its policies and settlement agreements covering asbestos personal injury claims are collectively worth between $242 and $294 million. The actual coverage under policies with a face amount estimated at $200 million has yet to be determined.

12   Combustion Engineering and its primary insurers entered into an agreement in 1983 under which Travelers Indemnity Co. exclusively handled Combustion Engineering's asbestos claims. In 1989, Combustion Engineering and Travelers agreed Combustion Engineering would remain solely responsible for handling asbestos claims. Since that time, Combustion Engineering has delegated claims handling responsibility to CVCSC.

13   Article 7.2.13 of the Plan gives the Asbestos PI Trust the power to "initiate, prosecute, defend, settle, maintain, administer, preserve, pursue and resolve all actions arising from or related to the Asbestos Insurance Rights." Although Article 7.4.2 enjoins all entities (except the Asbestos PI Trust and the reorganized Combustion Engineering) from pursuing asbestos-related claims against the qualifying insurers, the Trust retains the right to "assign a cause of action against Asbestos Insurance Entity to a holder of an Asbestos PI Trust Claim."

14   There is a factual discrepancy in the record on this point. The Declaration of Wendy Cappola certifying the tabulation of ballots states the total number of valid ballots as 115,787. This declaration does not provide information on the total number of valid accepting or rejecting votes. Combustion Engineering's confirmation hearing exhibit places the number of accepting votes at 111,986, and the number of rejecting votes at 3,594. These numbers add up to 115,580.

15   The Certain Cancer Claimants are 291 persons, or their legal representatives if deceased, suffering from cancers caused by exposure to asbestos contained in Combustion Engineering's products. All of the Certain Cancer Claimants are creditors of Combustion Engineering under § 101(10) of the Bankruptcy Code and are identified in a Bankruptcy Rule 2019 statement. In addition, some of the Certain Cancer Claimants hold independent claims against Lummus. Others still hold claims against both Combustion Engineering and Lummus. There is no indication in the record or the briefs of the parties that any of the Certain Cancer Claimants hold independent claims against Basic.

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

16    The appellant insurance companies include Allianz Insurance Company, Allstate Insurance Company, Century Indemnity Company, Continental Casualty Company and Transportation Insurance Company, Certain Underwriters at Lloyd's London and Certain London Market Insurance Companies, Evanston Insurance Company, Everest Reinsurance Company, f/k/a Prudential Reinsurance Company, First State Insurance Company, Hartford Accident and Indemnity Company, North River Insurance Company and TIG Insurance Company, OneBeacon America Insurance Company, f/k/a Commercial Union Insurance Company, and Travelers Indemnity Company and Certain affiliates and Travelers Casualty and Surety Company f/k/a The Aetna Casualty and Surety Company. Evanston Insurance Company and Travelers either settled or stipulated dismissal of their appeals before we heard argument.

17    Nos. 03–3392, 03–3414, 03–3425, 03–3436, 03–3437, 03–3445, 03–3446, 03–3450, 03–3451, 03–3452, 03–3458, 03–3468, 03–3492.

18    No. 03–3415.

19    The Confirmation Order constitutes a final order of the District Court under its original jurisdiction under 28 U.S.C. §§ 157(c)(1) and 1334. Our jurisdiction is based on 28 U.S.C. § 1291. See *In re PWS Holding Corp.,* 228 F.3d 224, 235 (3d Cir.2000); *In re Marvel Entm't Group, Inc.,* 140 F.3d 463, 470 (3d Cir.1998). We review the District Court's conclusions of law de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof. *Gillman v. Cont'l Airlines (In re Cont'l Airlines ),* 203 F.3d 203, 208 (3d Cir.2000).

20    The "persons aggrieved" standard appeared originally in section 39(c) of the Bankruptcy Act of 1898. *See* 11 U.S.C. § 67(c) (1976) (limiting appellate standing in bankruptcy cases to "persons aggrieved by an order of a referee"). Although this provision was eliminated in the 1978 amendments to the Bankruptcy Code, federal courts retained the "persons aggrieved" standard as a prudential standing limitation for bankruptcy appeals. *See Travelers Ins. Co. v. H.K. Porter Co.,* 45 F.3d 737, 741 (3d Cir.1995).

21    This restrictive approach to bankruptcy appellate standing contrasts with the broad right of participation in the early stages of a bankruptcy proceeding. Under Bankruptcy Code § 1128(b), any "party in interest" may object to plan confirmation during the confirmation hearing. 11 U.S.C. § 1128(b). The Code defines "party in interest" to include "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee." *Id.* § 1109(b). This list is not exhaustive, however, *id.* § 102(3), (5), and § 1109(b) has been construed to create a broad right of participation in Chapter 11 cases. *See In re Amatex Corp.,* 755 F.2d 1034, 1042 (3d Cir.1985) ("[T]he predecessor provisions of section 1109(b) of the Code constituted an effort to encourage and promote greater participation in reorganization cases .... [and] [s]ection 1109(b) continues in this tradition[.]") (citations omitted); *In re PWS Holding Corp.,* 228 F.3d at 249 (Section 1109(b) "confers broad standing at the trial level").

22    The Objecting Insurers include appellants Allianz Insurance Company, Continental Casualty Company and Transportation Insurance Company, Evanston Insurance Company, Everest Reinsurance Co. f/k/a Prudential Reinsurance Co., First State Insurance Company, Hartford Accident and Indemnity Company, and North River Insurance Company and TIG Insurance Company. Appellants North River Insurance Company and TIG Insurance Company are situated somewhat differently than the other Objecting Insurers. North River and TIG International, as successor by merger to International Insurance Company, are also plaintiffs in an adversary proceeding pending in the Bankruptcy Court in which they contend they have no further obligations under certain of their insurance policies included in Debtor's Plan of Reorganization. In the event their positions are ultimately rejected in the Bankruptcy Court, they join in the briefs of First State. However, North River's policies were issued only to non-debtor Basic. As such, North River contends its interests are also similar to those of the London Market Insurers, and joins in the London Market Insurers' brief in the event its arguments to the Bankruptcy Court are ultimately rejected.

23    As noted, Appellant North River Insurance Company issued insurance policies only to non-debtor Basic, and joins in the London Market Insurers' brief in the event its arguments currently pending before the Bankruptcy Court are rejected.

24    Only classes of creditors that are "impaired" by the plan are entitled to vote on plan confirmation. 11 U.S.C. § 1126(f). "Impairment" is defined in § 1124, which provides in part:

    ... a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan -
        (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest.

    11 U.S.C. § 1124.

25    As noted, the super-preemptory provision, as modified by the District Court, provides:

    [N]otwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan Documents (including any other provision that purports to be preemptory or supervening), shall in anyway operate to, or have the effect of, impairing the insurers' legal, equitable or contractual rights, if any, *in respect of any claims (as defined by section 101(5) of the Bankruptcy Code).* The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements, *and under applicable law* (emphasis added to show District Court's changes).

26    As noted, the "neutrality" provision provides:

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 367 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

Nothing in the Plan or in the Confirmation Order shall preclude any Entity from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any Subject Insurance Policy or any Subject Insurance Settlement Agreement. Nothing in the Plan or the Confirmation Order shall be deemed to waive any claims, defenses, rights or causes of action that any Entity has or may have under the provisions, terms, conditions, defenses and/or exclusions contained in the Subject Insurance Policies and the Subject Insurance Settlement Agreements, including, but not limited to, any and all such claims, defenses, rights or causes of action based upon or arising out of Asbestos PI Trust Claims that are liquidated, resolved, discharged, channeled, or paid in connection with the Plan.

27   Section 541 effectively preempts any contractual provision that purports to limit or restrict the rights of a debtor to transfer or assigns its interests in bankruptcy. 11 U.S.C. § 541(c)(1) ("[A]n interest of the debtor in property becomes property of the estate ... notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—(A) that restricts or conditions transfer of such interest by the debtor"). The Bankruptcy Code expressly contemplates the inclusion of debtor insurance policies in the bankruptcy estate. Section 1123(a)(5) provides:

Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

...

(5) provide adequate means for the plan's implementation, such as

...

(B) transfer of all or any part of property of the estate to one or more entities, whether organized before or after the confirmation of such plan.

11 U.S.C. § 1123(a)(5).

28   As discussed, standing to challenge the super-preemptory provision does not provide the Objecting Insurers or London Market Insurers standing to challenge all aspects of Plan confirmation. See Int'l Primate Prot. League, 500 U.S. at 77, 111 S.Ct. 1700 ("[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents"). We also note that the issues raised in the Objecting Insurers' appeal largely mirror those raised by the Certain Cancer Claimants. We have generally taken a restrictive view of third-party prudential standing in the bankruptcy context. See In re PWS Holding Corp., 228 F.3d at 248 ("Third-party standing is of special concern in the bankruptcy context, where ... one constituency ... seeks to disturb a plan of reorganization based on the rights of third-parties[.] In this context ... courts have often denied standing as to any claim that asserts only third-party rights.").

29   The Indemnified Insurers include: Century Indemnity Company (as successor to CCI Insurance Company, successor to Insurance Company of North America); Pacific Employers Insurance Company; Central National Insurance Company of Omaha (solely with respect to policies issued through its managing general agent, Cravens, Dargan & Company, Pacific Coast); and OneBeacon America Insurance Company, f/k/a Commercial Union Insurance Company.

30   As they state in their brief, the Indemnified Insurers are not the only insurers to have entered into pre-petition settlement agreements that imposed indemnification obligations on Combustion Engineering.

31   See Wise v. Travelers Indem. Co., No. 01–C–599 (Cir. Ct. of Berkeley County, W. Va. filed Oct. 25, 2001), and Cashman v. Travelers Indem. Co., No. 02–2–56–H (Super. Ct. of Suffolk County, Mass. filed May 9, 2002).

32   As noted, the Certain Cancer Claimants are 291 persons, or (if deceased) their legal representatives, suffering from cancers allegedly caused by exposure to asbestos contained in Combustion Engineering's products. All of the Certain Cancer Claimants are creditors under § 101(10) of the Bankruptcy Code and are identified in a Bankruptcy Rule 2019 Statement. Some of the Certain Cancer Claimants hold separate claims against both Combustion Engineering and Lummus; none hold separate or joint claims involving Basic.

33   Nevertheless, because the District Court lacked jurisdiction over non-derivative claims against Basic, and because we will vacate confirmation of the Plan on substantive grounds, Basic's § 105(a) channeling injunction is also invalid.

34   The parties do not dispute that the District Court properly exercised subject matter jurisdiction over the asbestos personal injury claims against Combustion Engineering. We review de novo whether the District Court had subject matter jurisdiction over non-derivative third-party claims against non-debtors Basic and Lummus. Bracken v. Matgouranis, 296 F.3d 160, 162 (3d Cir.2002).

35   For example, record evidence of an indemnity obligation under which a suit against a non-debtor automatically depletes the assets of the debtor's estate may be relevant to ascertaining an "identity of interest" between the debtor and non-debtor and also support "related to" jurisdiction. See, e.g., Dow Corning II, 280 F.3d at 658 (holding that a "bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor" where, among other conditions, "[t]here is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate"). By contrast, other aspects of the § 105(a) inquiry—for example, whether the injunction is essential to the reorganization, or the non-debtor contributed substantial assets to the reorganization—may have little or no bearing on the threshold jurisdictional inquiry.

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 368 of 398

*In re Combustion Engineering, Inc.*, 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

36  Section 105 provides bankruptcy courts with powers of equity similar to those granted to federal courts under the All Writs Act, including writs of injunction. *See* H.R.Rep. No. 95595, at 316–17 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6273–74 ("Section 105 is similar in effect to the All Writs Statute, 28 U.S.C. § 1651.... The section is repeated here for sake of continuity from current law and ease of reference, and to cover any powers traditionally exercised by a bankruptcy court that are not encompassed by the All Writs Statute."). The All Writs Act provides that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions." 28 U.S.C. § 1651. *See generally* Ralph Brubaker, *Nondebtor Releases and Injunctions in Chapter 11,* 72 Am. Bankr.L.J. 1, 15–16 (1998).

37  Section 105(c) provides:

> The ability of any district judge or other officer or employee of a district court to exercise any of the authority or responsibilities conferred upon the court under this title shall be determined by reference to the provisions relating to such judge, officer, or employee set forth in [the Judicial Code]. This subsection shall not be interpreted to exclude bankruptcy judges ... from its operation.
>
> 11 U.S.C. § 105(c).

38  "[C]ases under Title 11," as used in 28 U.S.C. § 1334(a), "refers merely to the bankruptcy petition itself." *In re Marcus Hook Dev. Park, Inc.,* 943 F.2d 261, 264 (3d Cir.1991) (quoting *Matter of Wood,* 825 F.2d 90, 92 (5th Cir.1987)). The term "proceeding," on the other hand, as used in 28 U.S.C. § 1334(b), refers "to the steps within the 'case' and to any subaction within the case that may raise a disputed or litigated matter." *In re Wolverine Radio Co.,* 930 F.2d 1132, 1141 n. 14 (6th Cir.1991) (citing 2 Collier on Bankruptcy ¶ 301.03 (15th ed.1990)). Put differently, "anything that occurs within a case is a proceeding," *see* 1 Collier on Bankruptcy ¶ 3.01[4] [b] at 3–19 (15th ed. rev.2003) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 1977)), including all "controversies, adversary proceedings, contested matters, suits, actions or disputes." *Id.* ¶ 3.01[3] at 3–13.

39  The Supreme Court has affirmed the *Pacor* test for "related to" jurisdiction. *Celotex,* 514 U.S. at 308, 115 S.Ct. 1493.

40  Of course, the creditor status of third-party litigants in a civil proceeding is not a prerequisite for establishing "related to" jurisdiction.

41  Specifically, out of the 8,017 active Lummus claims, 7,446 also assert claims against Combustion Engineering.

42  The record states: "Lummus and Basic shared, at some point, respectively, in the Combustion Engineering insurance program" (testimony of Scott Gilbert); ("Q: Lummus is—Lummus and Combustion Engineering have shared insurance applicable to asbestos personal injury claims in certain periods of time? A: Yes, they have.") (testimony of John P. Brett); ("Since 1990, both Lummus and Combustion Engineering were insured under the ABB insurance program and were covered by ABB insurance policies that extended to ABB companies.") (deposition of John P. Brett).

43  Although there is testimony in the record that both Combustion Engineering and Lummus were insured under an ABB insurance program, the Bankruptcy Court made no findings in this regard. Moreover, although the Bankruptcy Court found that Combustion Engineering and Lummus shared insurance for the period of 1963 to 1985, it did not make any findings regarding the terms, scope or operation of those policies.

44  Although we have said in certain situations that "related to" jurisdiction may be determined by "speculating whether the ultimate outcome of the litigation could conceivably affect the bankrupt estate," *Copelin v. Spirco, Inc.,* 182 F.3d 174, 179 (3d Cir.1999), this determination must meet the requirements of "related to" jurisdiction that we have set forth and also must be supported by findings of fact and not merely the general assertions of the plan proponents. Moreover, *Copelin* is not analogous. In *Copelin,* we held that the Bankruptcy Court had "related to" jurisdiction over the debtor's motion to enforce its reorganization plan ahead of a state court judgment creditor's enforcement action. The debtor's motion, though it involved the enforcement of a state court judgment, had as its underlying subject matter the rights and liabilities of the bankrupt estate, and it was clear its outcome could conceivably affect the estate.

45  There are many statutory prerequisites imposed by § 524(g). To qualify for its protections, a court must find that the debtor has been named in an action for damages allegedly caused by asbestos, that the debtor is likely to be subject to substantial demands for payment in the future arising out of the same or similar conduct, that the amounts and timing of such future claims are uncertain, and that permitting the pursuit of such claims outside the trust mechanism would threaten the plan's attempts to deal equitably with current and future demands. 11 U.S.C. §§ 524(g)(2)(B)(i)(I), (ii)(I-III). The trust itself must also satisfy certain standards under § 524(g) in order to qualify for the issuance of a channeling injunction directing all future claims to the trust: the trust must assume the liabilities of the debtor for current and future claims and must be funded at least in part by the securities of the debtor; the trust must either own, or be entitled to own, the majority of the voting shares of the debtor, its parent, or its subsidiary; the trust must use its assets to pay future claims and demands; and the trust must provide for mechanisms ensuring its ability to value and pay present and future claimants in substantially the same manner. 11 U.S.C. §§ 524(g)(2)(B)(i)(I)-(IV), (ii)(V).

> Many of these requirements are specifically tailored to protect the due process rights of future claimants. For example, a court employing a § 524(g) channeling injunction must determine that the injunction is "fair and equitable" to future claimants, 11 U.S.C. § 524(g)(4)(B)(ii), and must appoint a futures representative to represent their interests. 11 U.S.C. § 524(g)(4)(B)(I). The court

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 369 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

must also determine that the plan treats "present claims and future demands that involve similar claims in substantially the same manner." 11 U.S.C. § 524(g)(2)(B)(ii)(V). Finally, the statute requires that a 75% super-majority of claimants whose claims are to be addressed by the trust vote in favor of the plan. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

46 The injunctive relief available under § 524(g) may only be exercised "in connection with" an "order confirming a plan of reorganization under Chapter 11." 11 U.S.C. § 524(g)(1)(A).

47 We note this provision is consistent with the purposes underlying § 524(g). The channeling injunction issued in the Johns–Manville bankruptcy, after which § 524(g) was modeled, see 140 Cong. Rec. H10752, H10765 (1994) (in codifying the Manville "trust/ injunction mechanism" in § 524(g), Congress set forth "explicit requirements simulating those met in the Manville case"), was limited to third-party actions against non-debtors in which the liability alleged was derivative of the debtor. See MacArthur Co. v. Johns– Manville, 837 F.2d at 92–93 (2d Cir.1988) (explaining that the channeling injunction applied only to "third parties [who] seek to collect out of the proceeds of Manville's insurance policies on the basis of Manville's conduct").

48 Outside the context of § 524(g), § 524(e) provides statutory authority for limiting the extension of bankruptcy relief to non-debtors. See 11 U.S.C. § 524(e) ("[D]ischarge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.").

49 The well-settled maxim that specific statutory provisions prevail over more general provisions supports our conclusion that the explicit limitations and requirements set forth in § 524(g) preclude the use of § 105(a) to extend application of the trust/injunction mechanism to the non-derivative claims against non-debtors Basic and Lummus. See Varity Corp. v. Howe, 516 U.S. 489, 511, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (interpreting the "the specific governs the general" canon of statutory construction as "a warning against applying a general provision when doing so would undermine limitations created by a more specific provision"); see also Sea Harvest Corp. v. Riviera Land Co., 868 F.2d 1077, 1080 (9th Cir.1989) (Section 105(a) "does not empower courts to issue orders that defeat rather than carry out the explicit provisions of the Bankruptcy Code[.]"); see generally 2 Collier on Bankruptcy, ¶ 105.04 at 105–15 n.5; In re Am. Hardwoods, Inc., 885 F.2d 621, 625–26 (9th Cir.1989) ("[S]ection 105 does not authorize relief inconsistent with more specific law.").

50 The Plan proponents cite to several cases where § 105(a) injunctions in favor of non-debtors were approved, including In re Dow Corning Corp. (Dow Corning IV), 280 F.3d 648, 656 (6th Cir.2002); In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 292 (2d Cir.1992); and In re A.H. Robins Co., 880 F.2d 694, 700–02 (4th Cir.1989). But these cases are readily distinguishable, given that none involved either asbestos or § 524(g). Whatever may be the limits of § 105(a) in other contexts, we hold only that § 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g), which is the means Congress prescribed for channeling the asbestos liability of a non-debtor.

51 While it is clear that Lummus was solvent, there is a discrepancy in the record regarding Basic. The Bankruptcy Court made no explicit findings of fact on this point, but commented in a footnote that Basic appears to be insolvent. See In re Combustion Eng'g, 295 B.R. at 484 n. 43. On the other hand, Basic's president testified that while Basic does not have ongoing operations, it does have assets and sufficient funds to pay its liabilities.

52 Appellants also argued the pre-petition payments violate Delaware's preference statute, 10 Del.Code § 7387. Neither the District Court nor the Bankruptcy Court made findings with respect to this claim. Therefore, we will remand on this issue.

53 Ms. Zilly did not consider the approximately $400 million contributed by Combustion Engineering to the CE Settlement Trust in her Chapter 7 liquidation analysis because "it would be very difficult to get those monies back and .... any sort of a preference action would not be sustainable and would take an extraordinary length of time and ultimately not recover value under a liquidation recovery." Whether or not this is the case, Ms. Zilly's analysis is not the correct one for determining whether a transfer constitutes a voidable preference under § 547(b).

54 Combustion Engineering's assets were between $800 million and $1 billion prior to the pre-petition settlement. With respect to Combustion Engineering's outstanding asbestos liability, the Certain Cancer Claimants' expert, Dr. Timothy Wyant, estimated it to be approximately $3.6 billion. The Plan proponents contest the methodology employed by Dr. Wyant in arriving at this figure, and the Bankruptcy Court did not credit his testimony. But neither the Bankruptcy Court nor the District Court adopted contrary findings. Assuming Dr. Wyant's estimate is correct, asbestos claimants would have recovered, at most, an average of 28% ($1 billion in assets divided by $3.6 billion in liability) of their claim value in a Chapter 7 liquidation.

55 Clarke v. Rogers, 228 U.S. 534, 548, 33 S.Ct. 587, 57 L.Ed. 953 (1913) ("Equality between creditors is necessarily the ultimate aim of the bankrupt[cy] law, and to obtain it we must regard the essential nature of transactions[.]"). Only after analyzing the totality of circumstances surrounding a reorganization plan can the court exercise the " 'informed, independent judgment' which is an essential prerequisite for confirmation of a plan." Am. United Mut. Life Ins. Co. v. Avon Park, 311 U.S. 138, 146, 61 S.Ct. 157, 85 L.Ed. 91 (1940) (internal citations omitted). "Where such investigation discloses the existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special benefits for the reorganizers, or the need for protection of investors against an inside few, or of one class of investors from the encroachments of another, the court has ample power to adjust the remedy to meet the need." Id.

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 370 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

56    The record establishes that the CE Settlement Trust was a necessary element of the overall reorganization Plan. The parties entering the pre-petition settlement expressly contemplated the subsequent reorganization; the settlement itself provided that participating counsel "recommend to each Participating Claimant the acceptance of a CE Plan of Reorganization"; and the "stub claims" represent a direct link between the pre-petition trust and the reorganization vote.

57    *See generally Ortiz,* 527 U.S. at 854–55, 119 S.Ct. 2295 (emphasizing that a limited-fund asbestos settlement must provide for "equity among members of the class" and "fairness of the distribution of the fund among class members"). Though *Ortiz* was decided under Fed.R.Civ.P. 23(b)(1)(B), the Court's requirement of fair treatment for all claimants—a principle at the core of equity—also applies in the context of this case.

58    The Certain Cancer Claimants also argue the plan violates the supermajority voting requirement set forth in 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb). Their arguments in this regard largely mirror the various challenges to Combustion Engineering's alleged manipulation of the voting process.

59    A Chapter 11 plan of reorganization must satisfy all of the requirements of § 1129(a). They are: (1) the plan's compliance with title 11, (2) the proponent's compliance with title 11, (3) the good faith proposal of the plan, (4) the disclosure of payments, (5) the identification of management, (6) the regulatory approval of rate changes, if applicable, (7) the "best interest" test (i.e., each claim holder in an impaired class has accepted the plan or will receive no less than would be received in a Chapter 7 liquidation), (8) acceptance of the plan by each impaired class, (9) treatment of administrative and priority claims in accordance with § 1129(a)(9), (10) acceptance by at least one impaired class of claimants, (11) the feasibility of the plan (i.e., confirmation of the plan is not likely to be followed by liquidation or further reorganization except as contemplated in the plan), (12) the payment of bankruptcy fees, and (13) the payment of retiree benefits.

60    Some courts have concluded there is nothing in the plain language of § 1129(a)(10) to prevent a debtor from "artificially" impairing claims. *See, e.g., In re Greate Bay Hotel & Casino, Inc.,* 251 B.R. 213, 240 (Bankr.D.N.J.2000) ("Under the statutory scheme for the classification and treatment of claims, a plan proponent may impair a class of claims. If an impaired class accepts the plan, the requirement of section 1129(a)(10) is satisfied."); *In re Duval Manor Assocs.,* 191 B.R. 622, 628 (Bankr.E.D.Pa.1996) (concluding that "artificial impairment, while perhaps philosophically not the better view, is nevertheless clearly permitted under the plain meaning of the statute"); *see also L & J Anaheim Assocs.,* 995 F.2d 940, 943 (9th Cir.1993) (holding that § 1124 does not differentiate between artificial and actual impairment of claims).

61    *See, e.g., Windsor on the River Assocs. v. Balcor Real Estate Fin. (In re Windsor on the River Assocs.),* 7 F.3d 127, 132 (8th Cir.1993) ("[F]or purposes of 11 U.S.C. § 1129(a)(10), a claim is not impaired if the alteration of rights in question arises solely from the debtor's exercise of discretion."); *Beal Bank, S.S.B. v. Waters Edge L.P.,* 248 B.R. 668, 690–91 (D.Mass.2000) (concluding 1129(a)(10) is not satisfied unless creditors' rights are "legitimately impaired" for a proper business purpose); *In re Daly,* 167 B.R. 734, 737 (Bankr.D.Mass.1994) ( "A Debtor may not satisfy § 1129(a)(10) by manufacturing an impaired class for the sole purpose of satisfying § 1129(a)(10)[.]"); *In re Lettick Typografic, Inc.,* 103 B.R. 32, 39 (Bankr.D.Conn.1989) ("While the debtor may have achieved literal compliance with § 1129(a)(10), this engineered impairment so distorts the meaning and purpose of that subsection that to permit it would reduce (a)(10) to a nullity.").

62    There is evidence in the record that Combustion Engineering's asbestos liability profile mirrors nationwide trends, and that a majority of Combustion Engineering claimants suffer from non-malignant injuries. But the record does not establish the precise breakdown, by disease category, of either Combustion Engineering claimants as a whole or CE Settlement Trust participants.

63    The District Court concluded that non-participants in the CE Settlement Trust (such as the Certain Cancer Claimants) "simply were not similarly situated" to the settlement participants by virtue of the different status of their claims. But in determining whether asbestos claimants are "similarly situated" for bankruptcy classification purposes, the relevant inquiry does not turn solely on the time the outstanding personal injury claims were filed. The substance—or the "legal character"—of the claims is also relevant. *In re AOV Indus. Inc.,* 792 F.2d 1140, 1150 (D.C.Cir.1986).

64    Minimal due process requirements extend to bankruptcy proceedings. *See Jones v. Chemetron Corp.,* 212 F.3d 199, 209 (3d Cir.2000); *Fogel v. Zell,* 221 F.3d 955, 962 (7th Cir.2000).

65    *See generally* Geoffrey C. Hazard Jr., *Symposium—Mass Torts: The Futures Problem,* 148 U. Pa. L.Rev.1901 (2000).

66    The Certain Cancer Claimants raise several additional (and related) challenges to the voting process concerning the two-trust structure. The Certain Cancer Claimants argue the stub claim votes are not allowable because the Master Settlement Agreement states that CE Settlement Trust participants "shall not seek to recover from [Combustion Engineering] ... any amount of the Settlement Amount or other make any claims against [Combustion Engineering] ... or seek to recover against [Combustion Engineering] ... except that nothing herein shall preclude filing a proof of claim in a [Combustion Engineering] bankruptcy." Because their claims are not enforceable against the estate outside of bankruptcy, the Certain Cancer Claimants argue, the stub claimants had no right to vote on Plan confirmation.

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 371 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

The right to vote on plan confirmation belongs to holders of those claims "allowed under section 502." 11 U.S.C. § 1126(a). Under § 502(b)(1), however, a claim will not be allowable if it "is unenforceable against the debtor, and property of the debtor under any agreement [.]" 11 U.S.C. § 502(b)(1). To determine whether claims are enforceable for bankruptcy purposes, § 502 relies upon applicable non-bankruptcy law. See 4 Collier on Bankruptcy ¶ 502.03[2][b][ii] (15th rev. ed. 2003) ("The validity and legality of claims is generally determined by applicable non-bankruptcy law."). A claim against the bankruptcy estate, therefore, "will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy." United States v. Sanford, 979 F.2d 1511, 1513 (11th Cir.1992). Ultimately, the effect of § 502 is to provide a bankruptcy trustee with the same rights and defenses to claims as held by the debtor prior to bankruptcy. See Collier ¶ 502.03[2][b][I]; see also 11 U.S.C. § 558 (making defenses available to debtor available to the estate).

The Master Settlement Agreement accomplishes this by affirming the validity of the stub claims in bankruptcy. See Master Settlement Agreement § 5.02 ("Each Qualified Claimant agrees ... CE is liable for payment on the Settlement Amount"). The Master Settlement Agreement provision mandating that CE Settlement Trust participants enforce their stub claims in the bankruptcy proceedings merely requires that the terms of the agreement be recognized in bankruptcy. This does not violate § 502.

The Certain Cancer Claimants also argue that requiring a power of attorney to accompany each ballot violates the Federal Bankruptcy Rules of Procedure. Fed. R. Bankr.P. 9010(c) provides "[t]he authority of any agent, attorney in fact, or proxy to represent a creditor for any purpose other than the execution and filing of a proof of claim or the acceptance or rejection of a plan shall be evidenced by a power of attorney conforming substantially to the appropriate Official Form." While Rule 9010(c) does not mandate a power of attorney to accompany every ballot, neither does it prohibit a debtor from requiring one. Here, the entire solicitation and voting process was conducted through a small group of law firms who collectively represented hundreds of thousands of individual claimants. Where the voting process is managed almost entirely by proxy, it is reasonable to require a valid power of attorney for each ballot to ensure claimants are properly informed about the plan and that their votes are valid.

67    There are numerous "good faith" requirements associated with the bankruptcy reorganization process. In addition to § 1129(a)(3), a court may "designate" (i.e., disqualify from voting) the ballot of "any entity whose acceptance or rejection" of the plan "was not in good faith, or was not solicited or procured in good faith." 11 U.S.C § 1126(e); see also Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter Ltd.), 118 F.3d 635, 638 (9th Cir.1997). We have also recognized good faith as a threshold requirement for filing a Chapter 11 bankruptcy petition. See NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108, 112 (3d Cir.2004) (holding bankruptcy petition was not filed in good faith); In re SGL Carbon Corp., 200 F.3d 154, 167 n. 19 (3d Cir.1999) ("Although it is true the proposed plan may be subject to a separate 'good faith' determination by the bankruptcy court before it could implemented, see 11 U.S.C. § 1129(a)(3), that is only appropriate if the bankruptcy petition properly belongs before the bankruptcy court. In a case, such as this one, where a debtor attempts to abuse the bankruptcy process, proceedings should end well before formal consideration of the plan."). We focus here on the statutory good faith requirements. The District Court's determinations of fact on good faith are reviewed for clear error, In re PWS Holding Corp., 228 F.3d at 242, while conclusions of law are subject to plenary review. In re Gioioso, 979 F.2d 956, 959 (3d Cir.1992).

68    The Certain Cancer Claimants also contend the pre-petition payments to the CE Settlement Trust participants and creation of the stub claims violate the good faith requirement of § 1126(e) because they amount to payments in exchange for votes in favor of the plan. As noted (see supra note 67), under § 1126(e), a bankruptcy court may designate the vote of any entity "whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions" of the Bankruptcy Code. 11 U.S.C. § 1126(e); see also Century Glove, Inc. v. First Am. Bank, 860 F.2d 94, 97 (3d Cir.1988) (Section 1126(e) "grants the bankruptcy court discretion to sanction any conduct that taints the voting process, whether it violates a specific provision or is in 'bad faith.' ").

Section 1126(e) is often used to monitor the conduct of creditors who seek to gain an untoward advantage over others in the bankruptcy process. In interpreting the predecessor provision to § 1126(e), § 203 of the Bankruptcy Act, the Supreme Court noted:

Its purpose was to prevent creditors from participating who 'by the use of obstructive tactics and hold-up techniques exact for themselves undue advantages from the other stockholders who are cooperating.' Bad faith was to be attributed to claimants who opposed a plan for a time until they were 'bought off'; those who 'refused to vote in favor of a plan unless .... given some particular preferential advantage.'

Young v. Higbee Co., 324 U.S. 204, 211 n. 10, 65 S.Ct. 594, 89 L.Ed. 890 (1945) (citing Revision of the Bankruptcy Act: Hearings Before the Committee on the Judiciary of the House of Representatives, 75th Cong., 1st Sess. on H.R. 6439, Serial 9, at 180–82). The Court concluded § 203 was meant to apply to creditors "whose selfish purpose was to obstruct a fair and feasible reorganization in the hope that someone would pay them more than the ratable equivalent of their proportionate part of the bankrupt assets." Id. at 211, 65 S.Ct. 594. See also In re Figter Ltd., 118 F.3d at 639 ("If a person seeks to secure some untoward advantage over other creditors for some ulterior motive, that will indicate bad faith. But that does not mean that creditors are expected to approach reorganization plan votes with a high degree of altruism[.]") (internal citation omitted).

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 372 of 398

In re Combustion Engineering, Inc., 391 F.3d 190 (2004)

43 Bankr.Ct.Dec. 271, Bankr. L. Rep. P 80,206

This issue is also remanded for further consideration.

69    *See* 140 Cong. Rec. S4521–01, S4523 (Apr. 20, 1994) (statement of Senator Heflin) ("[W]hen an asbestos-producing company goes into bankruptcy and is faced with present and future asbestos-related claims, the bankruptcy court can set up a trust to pay the victims. The underlying company funds the trust with securities and the company remains viable. Thus, the company continues to generate assets to pay claims today and into the future. In essence, the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims.")

70    But there are additional factors here. One is the significant financial contributions to the Asbestos PI Trust by non-debtors ABB Limited, Basic and Lummus. From the claimants' perspective, it may make little economic difference whether the source of future funds comes from the debtor or a third-party, so long as a sufficient and reliable pool of assets remains available to pay their claims.
Counterposed against this is the fact that the Asbestos PI Trust is a closed fund, raising a possible concern should it hold insufficient funds to pay all allowed claims against it.

---

**End of Document**                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 48

2009 WL 3806683
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
S.D. New York.

In re M. FABRIKANT & SONS, INC., et al., Debtors.
Buchwald Capital Advisors LLC, as
Trustee of the MFS GUC Trust, Plaintiff,
v.
JP Morgan Chase Bank, N.A., ABN Amro
Bank N.V., Bank of America, N .A., HSBC
Bank USA, National Association, Bank: Leumi
USA, Israel Discount Bank of New York,
Antwerpse Diamantbank, N.V., Antwerpse
United Diamant, N.V., Sovereign Precious
Metals, LLC, and Sovereign Bank, Defendants.

Bankruptcy No. 06–12737 (SMB).  |  Adversary
Nos. 07–02780, 08–01734.  |  Nov. 10, 2009.

**Attorneys and Law Firms**

Susman Godfrey LLP, Arun Subramanian, Esq., Stephen D. Susman, Esq., Jacob W. Buchdahl, Esq., Jonathan J. Ross, Esq., Robert Rivera, Jr., Esq., Of Counsel, New York, NY, for Plaintiff.

Hahn & Hessen LLP, Steven J. Mandelsberg, Esq., Of Counsel, New York, NY, for Defendant JP Morgan Chase Bank, N.A.

Cadwalader, Wickersham & Taft LLP, Gregory M. Petrick, Esq., Ingrid Bagby, Esq., Of Counsel, New York, NY, for Defendant ABN Amro Bank N.V.

Reimer & Braunstein LLP, Paul S. Samson, Esq., Of Counsel, Boston, MA, for Defendant Bank of America, N.A.

Phillips Lytle LLP, William J. Brown, Esq., Of Counsel, New York, NY, for Defendant HSBC Bank USA.

Cullen and Dykman LLP, Garden City, NY, Matthew G. Roseman, Esq., Of Counsel, for Defendant Antwerpse Diamantbank, N.V.

Milbank, Tweed, Hadley & McCloy LLP, New York, NY, Douglas W. Henkin, Esq., Of Counsel, for Defendants Sovereign Precious Metals, LLC and Sovereign Bank.

Herrick, Feinstein LLP, New York, NY, Andrew C. Gold, Esq., Frederick E. Schmidt, Esq., Of Counsel, for Defendant Bank Leumi USA.

Sheppard, Mullin, Richter & Hampton LLP Elizabeth M. Rotenberg–Schwartz, Esq., Russell L. Reid, Esq., Of Counsel, New York, NY, for Defendant Israel Discount Bank of New York.

**MEMORANDUM DECISION AND ORDER
GRANTING IN PART AND DENYING
IN PART MOTION TO DISMISS THE
SECOND AMENDED COMPLAINT**

STUART M. BERNSTEIN, Chief Bankruptcy Judge.

**\*1** This lawsuit arose out of the bankruptcy of M. Fabrikant & Sons, Inc. ("MFS") and Fabrikant–Leer International, Ltd. ("FLI," and collectively with MFS, "Fabrikant" or the "debtors"). In its Second Amended Complaint ("SAC"), dated Dec. 5, 2008 (ECF Doc. # 63), [1] the General Unsecured Creditors Trust ("GUC Trust" or "Plaintiff") asserts a variety of claims to avoid certain obligations and transfers, and to recover the value of the liens securing the obligations or the property transferred. The Defendants jointly moved to dismiss the SAC. They also moved to dismiss a separate complaint that asserts preference claims and disallowance claims under 11 U.S.C. § 502(d). For the reasons that follow, the motion is granted in part and denied in part. The Plaintiff's request for leave to replead is also granted in part and denied in part.

**BACKGROUND** [2]

The debtors are corporations organized under New York law. (¶¶ 13–14.) MFS has been in the diamond and jewelry business since 1895, and for many years, was one of the largest and most prominent diamond and jewelry wholesalers in the world. (¶ 27.) Charles Fortgang and Matthew Fortgang own approximately 32% of the stock of MFS. (¶ 28.) At all relevant times, Charles and Matthew Fortgang served, respectively, as the chairman and president of the debtors, and controlled both debtors. (¶ 28; see ¶ 29.) The remainder of MFS's stock is owned through a trust by Marjorie Fortgang and Susan Fortgang and by employees or former employees of MFS. (¶ 28.) Finally, MFS owns 82% of the stock of FLI. (Id.)

Charles and Matthew Fortgang, and trusts of which Charles, Matthew and Susan Fortgang were beneficiaries, own a group of 47 companies engaged in the diamond and jewelry business (the "Fortgang Affiliates"). (¶ 30.) With few exceptions, neither debtor had any ownership interest in any of the Fortgang Affiliates. (*Id.*) The Fortgang Affiliates are listed on Exhibit A to the SAC.

MFS became insolvent no later than January 2003, (¶ 31), and FLI became insolvent no later than January 13, 2006. (¶ 32.) The debtors filed their chapter 11 petitions on November 17, 2006 (the "Petition Date"), and the cases have been jointly administered.

## A. The "Scheme" Transactions (Counts I through IV)

### 1. The Debtors and the Lending Banks

For many years prior to the Petition Date, the debtors borrowed money from J.P. Morgan Chase Bank, N.A. ("JPMC"), ABN AMRO Bank N.V. ("ABN"), Bank of America ("BOA"), HSBC Bank USA, N.A. ("HSBC"), Bank Leumi USA ("BL"), Israel Discount Bank of New York ("IDB"), Antwerpse Diamantbank, N.V. ("ADB," and collectively, the "Lending Banks"). (*See* ¶¶ 53, 115.) Between January 2003 and the Petition Date, and while insolvent, the debtors incurred the following aggregate obligations to the Lending Banks:

| Lending Bank | Amount ($) |
|---|---|
| JPMC | 35,838,000 |
| ABN | 44,290,000 |
| BOA | 10,475,000 |
| HSBC | 12,075,000 |
| BL | 11,592,000 |
| IDB | 9,660,000 |
| ADB | 5,454,000 |
| **Total** | **129,384,000** |

**\*2** (¶ 115.)

At the same time that the Lending Banks were making loans to the debtors, the debtors were transferring funds to the Fortgang Affiliates. Pursuant to an arrangement with the Lending Banks, MFS made large transfers to the Fortgang Affiliates each December to allow the Fortgang Affiliates to "clean up" their loans, and those Fortgang Affiliates transferred funds back to MFS every January to enable MFS to "clean up" its own loans to the Banks. (¶¶ 33–35 .) Between January 1, 2003 and the Petition Date, MFS transferred almost $67 million more to the Fortgang Affiliates than it received in return. (¶ 39.) During the same period, FLI transferred $1,422,445.10 more to the Fortgang Affiliates than it received in return. (¶ 41.) The funds transferred to the Fortgang Affiliates were derived from the proceeds of the loans made by the Lending Banks to the debtors. (¶¶ 44, 48–49.) The debtors did not receive reasonably equivalent value

in exchange for their transfers to the Fortgang Affiliates, and the transfers were not made in good faith. (¶¶ 40, 42; *see* ¶ 47.)

In October 2004, it became evident that the debtors would not be able to satisfy their yearly "clean up." (¶ 109.) To further protect themselves, the Lending Banks demanded and obtained security interests in all of the debtors' assets as collateral for their previously unsecured debts. (*Id.*) On January 13, 2006, MFS guaranteed the $8.5 million debt that FLI owed to defendants ABN and BL. (¶ 54.) That same day, FLI guaranteed $92 million of existing obligations owed by MFS to the Lending Banks, thereby incurring all of MFS's pre-existing obligations to the Banks during the two-year period prior to the Petition Date. (¶¶ 32, 55.) FLI did not receive reasonably equivalent value in exchange for its guaranty. (¶¶ 32, 56.)

**2. The Debtors and SPM**

Separately, on July 7, 2006, the debtors each became jointly and severally obligated to SPM for $32 million on account of MFS's purchase of gold from SPM. (¶ 58.) By this date, at least $22 million worth of gold had been delivered to certain Fortgang Affiliates, and the purchase was made for their benefit. (¶ 59.)

**3. The Fraudulent Nature of the Scheme**

The transfers by the debtors to the Fortgang Affiliates described above, in the net amount of at least $90 million, (*see* ¶ 62), were made with actual and constructive fraudulent intent as evidenced by the following facts: (i) the senior officers of the debtors were owners of the Fortgang Affiliates (¶ 63), (ii) the value of the consideration received in exchange for the transfers to the Fortgang Affiliates was not reasonably equivalent to the value of the transfers (¶¶ 61, 63), (iii) the debtors were in a distressed financial condition at the time of the transfers (¶ 63), and (iv) MFS transferred massive sums to the Fortgang Affiliates immediately after drawing down on its bank lines of credit. (¶ 50; *see SAC,* Exs. B1 and B2.)

**\*3** The Lending Banks and SPM made the loans or extended the credit to fund the transfers to the Fortgang Affiliates in disregard of actual or constructive knowledge of the facts that rendered those transfers fraudulent. (¶ 64.) Specifically, they knew that (i) the Fortgang Affiliates were not owned by MFS, (ii) MFS engaged in the practice of funding the Fortgang Affiliates, (iii) a substantial portion of the funding which the Banks advanced to MFS was thereafter transferred to Fortgang Affiliates, and (iv) MFS's financial condition was deteriorating from January 2001 to the Petition Date. (*Id.*)

**B. The Subsequent Transfers (Counts V through VII)**

Counts V and VI of the SAC allege that between January 2006 and the Petition Date, the debtors made actual or constructively fraudulent transfers in the aggregate amount of $38,890,000 to several Fortgang Affiliates—Alpha Diamond Co., Inc., Diamfab PVBA, Fabrikant Trading India, and Fabrikant HK Trading Ltd.—and the Fortgang Affiliates used those proceeds to repay their own debts to defendants HSBC, ABN, and IDB in the following amounts:

| Bank | Amount ($) |
|---|---|
| ABN | 8,364,265 |
| HSBC | 14,025,784 |
| IDB | 5,946,592 |
| **Total** | **28,336,641** |

(¶¶ 106, 137–144.)

In addition, from January 2005 until the Petition Date, the debtors made actual or constructive fraudulent transfers in the total amount of $10,535,000 to another Fortgang Affiliate, VSI, LLC ("VSI"). (¶¶ 139, 147.) VSI paid $9,882,351 from these funds to defendant Sovereign Bank ("Sovereign") in satisfaction of VSI's own debt. (¶¶ 140, 148.) Counts V and VI seek to avoid the initial transfers from the debtors to the

Fortgang Affiliates, and through Count VII, the Plaintiff seeks to recover the value of those transfers from the transferee banks.

**C. The Preferential Payments (Count VIII)**

Count VIII seeks to avoid and recover the following preferential transfers made by the debtors to various defendants within 90 days of the Petition Date:

| Defendant | Amount ($) |
|---|---|
| ABN | 7,695,943 |
| ADB | 397,933 |
| Antwerpse United Diamant, N.V. ("Antwerpse United") | 70,480 |
| BOA | 2,064,495 |

| | |
|---|---|
| BL | 644,195 |
| HSBC | 696,112 |
| IDB | 563,186 |
| JPMC | 7,732,672 |
| Sovereign | 1,346,022 |
| SPM | 754,974 |
| **Total** | **21,966,013** |

(¶ 160.)[3]  The SAC alleges that these transfers were made on account of antecedent debts, while the debtor was insolvent, and the transfers enabled these defendants to receive more than they would have received in a hypothetical chapter 7 case if the transfers had not been made, and instead, the defendants received payment of their claims under chapter 7 of the Bankruptcy Code. (*See* ¶¶ 160–66.)

### D. The Post–Petition Bankruptcy Sale

As of the Petition Date, the Lending Banks and SPM held alleged secured claims against the debtors in the sum of $161.3 million. (¶ 112.) The debtors acknowledged these claims in the *Final Order Authorizing Debtors' Use of Cash Collateral and Granting Adequate Protection Claims and Liens,* dated Dec. 18, 2006 (the "FCCO")(Case No. 06–12737, ECF Doc. # 93), subject to Committee's right to object. (¶ 112.) After the Petition Date, the Lending Banks and SPM sold their secured claims for an amount believed to be in excess of 50% of the amount of their claims. (*Id.*) On May 21, 2007, all of MFS' remaining assets were sold at an auction. (¶ 113.) Wilmington Trust Company, the agent for the purchasers of the secured debt, purchased the majority of the assets for $38.5 million. (*Id.*) Surya Capital purchased the remaining assets for $10.4 million. (*Id.*) The sale proceeds, added to over $35 million transferred post-petition to the Lending Banks and SPM, establishes that the value of their collateral was no less than $80 million. (*Id.*)

### E. This Adversary Proceeding

#### 1. The Amended Complaint and First Motion to Dismiss

 **\*4**  The Plaintiff's predecessor, the Official Committee of Unsecured Creditors ("Committee"), commenced this adversary proceeding on October 1, 2007 (*see* ECF Doc. # 1), and subsequently filed an amended complaint. (*Amended Complaint,* dated Mar. 27, 2008 ("*Amended Complaint* ")) (ECF Doc. # 54.) The Amended Complaint included seven claims for relief. Like the SAC, Counts I through IV alleged, in substance, that the Lending Banks and SPM had made loans to the debtors knowing that the debtors would thereafter fraudulently transfer the proceeds or goods purchased with the loans to the Fortgang Affiliates. The Committee sought to avoid the obligations to these defendants, and recover the value of the liens given to them by the debtors. Similarly, Counts V through VII sought to avoid transfers by the debtors to certain Fortgang Affiliates that, in turn, were allegedly transferred to ABN, IDB, HSBC and Sovereign to pay down the Affiliates' obligations to these defendants, and to recover the value of the transfers from the transferee defendants.

Each Defendant moved to dismiss the Amended Complaint, and the motions were granted in part and denied in part. *See Official Committee of Unsecured Creditors v. JP Morgan Chase, N.A. (In re M. Fabrikant & Sons, Inc.), 394 B.R. 721 (Bankr.S.D.N.Y.2008)*("*Prior Decision* "). The Court dismissed Counts I through IV, noting two main deficiencies. First, the claims of actual fraudulent transfer did not satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *Prior Decision, 394 B.R. at 734.* Second, although the Amended Complaint adequately pleaded claims sounding in constructive fraudulent transfer, it did "not set forth a plausible claim that the Pre–Petition Banks or SPM knew or should have known that the debtors were engaged in a multi-year scheme to make constructive fraudulent transfers of the Pre–Petition Bank loans and the SPM gold to the Fortgang Affiliates." *Id. at 739.* Similarly, the Court dismissed the claims based on actual fraudulent transfers in Counts V and VI for failure to satisfy Rule 9(b), but denied the motion to dismiss the constructive fraudulent transfer claims.

*Id.* at 740. The Court granted the Committee leave to amend. *Id.* at 746–47.

The Plaintiff filed the "corrected" SAC on December 5, 2008. The SAC is divided into four parts and contains the following nine counts:

**2. The SAC** [4]

| Count | Defendant | Description of Claim(s) |
|-------|-----------|------------------------|
| 1 | Lending Banks and SPM | Avoiding the obligations incurred by both debtors in the amounts of $44,290,000 to ABN, $12,075,000 to HSBC, $9,660,000 to IDB, $5,454,000 to ADB, $11,592,000 to BL, $10,475,000 to BoA, $35,838,000 to JPMC, and $32,000,000 to SPM under Bankruptcy Code § 544. (¶¶ 115–21.) |
| 2 | Lending Banks and SPM | Avoiding the obligations incurred by FLI in the amounts of $44,290,000 to ABN, $12,075,000 to HSBC, $9,660,000 to IDB, $5,454,000 to ADB, $11,592,000 to BL, $10,475,000 to BoA, $35,838,000 to JPMC, and $32,000,000 to SPM under Bankruptcy Code § 548. (¶¶ 122–26.) |
| 3 | Lending Banks and SPM | Avoiding the obligations incurred by MFS in the amounts of $16,790,000 to ABN, $2,075,000 to HSBC, $9,660,000 to IDB, $1,521,628 to ADB, $4,592,000 to BL, $5,075,000 to BoA, $22,338,000 to JPMC, and $32,000,000 to SPM under Bankruptcy Code § 548. (¶¶ 127–31.) |
| 4 | Lending Banks and SPM | Avoiding of the liens securing the fraudulent obligations alleged in Counts I through III, and recovering the value of the collateral received by the defendants from the debtors under Bankruptcy Code § 550. (¶¶ 132–36.) |
| 5 | ABN, IDB, HSBC, & Sovereign | Avoiding the transfers made by the debtors of $14,025,784 to HSBC, $8,364,265 to ABN, $5,946,592 to IDB and $9,882,351 to Sovereign under Bankruptcy Code § 544. (¶¶ 137–44.) |
| 6 | ABN, IDB, HSBC, & Sovereign | Avoiding, under § 548, the transfers made by the debtors in the amounts of $14,025,784 to HSBC, $8,364,265 to ABN, $5,946,592 to IDB and $9,882,351 to Sovereign under Bankruptcy Code § 548. (¶¶ 145–53.) |
| 7 | ABN, IDB, HSBC, & Sovereign | Recovering the value of the payments made by the Fortgang Affiliates to |

| 8 | All Defendants | defendants ABN, IDB, HSBC and Sovereign under Bankruptcy Code § 550. (¶¶ 154–59.) |
| | | Recovering preferential transfers in the amount of $7,695,943 to ABN, $397,933 to ADB, $70,480 to Antwerpse United Diamant, $2,064,495 to BoA, $644,195 to BL, $696,112 to HSBC, $563,186 to IDB, $7,732,672 to JPMC, $1,346,022 to Sovereign, and $754,974 to SPM under Bankruptcy Code § 547. (¶¶ 160–68.) |
| 9 | All Defendants | Disallowance of Claims under Bankruptcy Code § 502(d). (¶ 171.) |

### 3. The Motion to Dismiss

**\*5** The Defendants moved to dismiss on various grounds. They contend that the SAC continues to fall short of the pleading requirements for claims sounding in both actual and constructive fraud. (*Memorandum of Law in Support of Defendants' Motion to Dismiss,* dated Jan. 20, 2009, at 7–27)(ECF Doc. # 71.) Counts VIII and IX assert unauthorized claims, (*id.* at 28), but in any event, the Plaintiff lacks standing to assert these claims and they are also barred by the statute of limitations.[5] (*Id.* at 28–33.) Finally, Count II, which is based on the FLI guaranty, must be dismissed as a result of the substantive consolidation of the debtors under the Plan. (*Id.* at 34–37.) The moving memorandum includes some arguments made by certain specific defendants, (*id.* at 38–50), but for the most part, these fall into one of the general categories just mentioned.

### DISCUSSION

### A. Count VIII

Count VIII asserts preference claims against each of the defendants. These claims were originally raised in the Preference Complaint, and subsequently reasserted in the SAC. The defendants have moved to dismiss the preference claims in both pleadings, citing two fatal flaws: the Plaintiff lacks standing to assert the claims, and moreover, they are barred by the applicable statutes of limitation.

"[S]tanding, ... in both its constitutional and prudential dimensions, is a prerequisite to federal subject matter jurisdiction ." *Wight v. BankAmerica Corp.,* 219 F.3d 79, 89 (2d Cir.2000); *accord Allocco Recycling, Ltd. v. Doherty,* 378

F.Supp.2d 348, 356 (S.D.N.Y.2005). Thus, the assertion of a lack of standing is the equivalent of a motion to dismiss for lack of subject matter jurisdiction. Where a party moves to dismiss for lack of subject matter jurisdiction, a court must accept the material factual allegations in the complaint as true, but unlike a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, need not draw inferences favorable to the plaintiff. *J.S. v. Attica Cent. Schools,* 386 F.3d 107, 110 (2d Cir.2004), *cert. denied,* 544 U.S. 968, 125 S.Ct. 1727, 161 L.Ed.2d 616 (2005); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). A court may also consider materials outside of the pleadings to resolve any jurisdictional disputes, but cannot rely on conclusory or hearsay evidence. *J.S.,* 386 F.3d at 110; *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000); *see* 2 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE, § 12.30[3], at 12–42 (3d ed. rev.2009)("[T]he court need not confine its evaluation to the face of the pleadings, but may review or accept any evidence, such as affidavits, or it may hold an evidentiary hearing.").

### 1. The Final Cash Collateral Order ("FCCO")

The challenge to the Plaintiff's standing begins with a discussion of the FCCO. As of the Petition Date, the debtors owed the Lending Banks, Sovereign and SPM (collectively, the "FCCO Lenders")[6] roughly $162 Million. (FCCO, at p. 6.) Under the FCCO, the FCCO Lenders agreed to allow the debtors to use their cash collateral, and the debtors agreed to provide adequate protection. As an additional inducement to obtain the FCCO Lenders' consent to the use of their cash collateral, the debtors acknowledged the extent and validity of the FCCO Lenders' claims and liens, agreed not to seek to avoid or challenge them, and released and waived all claims

against the FCCO Lenders. (*Id.* at ¶ 21.) It is undisputed that the debtors' acknowledgment, release and waiver covered the avoidance claims at issue in this litigation.

**\*6** In exchange for the debtors' acknowledgment, release and waiver, the FCCO granted the Committee a limited period to commence an adversary proceeding against the FCCO Lenders for the purpose, *inter alia,* of challenging their pre-petition claims or liens, avoiding or challenging "any transfer made by or on behalf of the Debtors to or for the benefit of [the FCCO Lenders] prior to the Petition Date," or seeking damages or equitable relief against the FCCO Lenders arising from or related to their pre-petition business relationship with the debtors (collectively defined in the FCCO as a "Challenge"). (*Id.* at ¶ 22.) The FCCO also conferred standing on the Committee to commence the Challenge without further order of the Court. (*Id.*) If the Committee failed to act within the limited period, "[t]he Committee shall be barred forever from commencing a Challenge." (*Id.*)

The parties agree that the Committee's Challenge period, which was extended beyond the original 120 day period, expired on October 1, 2007. On that day, the Committee commenced this adversary proceeding, and on March 27, 2008, filed an Amended Complaint that joined Sovereign as a defendant. The Prior Decision addressed the legal sufficiency of the allegations in the Amended Complaint. Neither the original Complaint nor the Amended Complaint asserted any preference claims or claim objections under 11 U.S.C. § 502(d).

### 2. The Plan

On May 12, 2008, the Court signed an order confirming the *Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code of the Official Committee of Unsecured Creditors, the Debtors' Current Lenders, Wilmington Trust Company, as Agent to the Current Lenders, and the Debtors,* dated Nov. 7, 2007 (the "*Plan* ")(Case No. 06–12737, ECF Doc. # 458). The Plan created two entities to receive the estates' causes of action—the Shared Asset Trust ("SAT") and the General Unsecured Creditor Trust, or GUC Trust, the Plaintiff in this adversary proceeding.

The GUC Trust received the "Original Lenders Litigation Claims." (*Id.* § 7.02.) The "Original Lender Litigation Claims" referred to "Claims and Causes of Action of the Debtors, the Estates, or the Committee against the *Original Lenders or their affiliates* arising from their actions or failures to act prior to the Petition Date in connection with the Debtors

or the Non–Debtor Affiliates." (*Id.* § 1.01, at 10)(emphasis added.) The definition of "Original Lenders" included the Lending Banks and SPM, but did not expressly include Sovereign or Antwerpse United. (*Id.*) Sovereign concedes, however, that it is an affiliate of SPM, (Transcript of Hearing, held Feb. 26, 2009 ("Tr."), at 74–75)(Case No. 06–12737, ECF Doc. # 976), and accordingly, the definition of "Original Lender Litigation Claims" includes claims against Sovereign. All other claims not released under the Plan, including avoidance claims, vested in the SAT. (*Plan,* § 7.02.)

**\*7** The definition of "Original Lender Litigation Claims" is arguably broad enough on its face to encompass the preference claims alleged in the Preference Complaint and Count VIII. Nevertheless, the Plan, when viewed in its entirety, belies this interpretation. Exhibit B to the Plan Supplement, dated Nov. 30, 2007, (Case No. 06–12737, ECF Doc. # 494), entitled "Schedule of Estate Causes of Action to be Transferred to Shared Asset Trust" confirmed that the SAT would receive "[a]voidance claims, including, without limitation, fraudulent conveyance and preference claims against all transferees (including subsequent as well as initial transferees) of property of the Debtors and all entities in whose favor obligations were incurred by the Debtors." (*Id.* at 1.) The final paragraph stated that the "parties against whom such claims may be asserted also include those identified in schedules submitted by the Debtors in response to Questions 3A and 3B of the Debtors' respective Statements of Financial Affairs, copies of which are annexed hereto as Schedules 1 and 2." (*Id.* at 3.)

The attached Schedules listed the transfers made by each debtor within the 90 day period preceding the Petition Date. [7] The Schedules included the same defendants and transfers incorporated in the Preference Complaint and Count VIII. The *Order Confirming Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code,* dated May 12, 2008 (Case No. 06–12737, ECF Doc. # 652) confirmed the allocation of rights. (*Id.* at ¶ 22.) In short, the Plan Supplement unambiguously assigned the preference claims to the SAT.

The Disclosure Statement, approved on November 7, 2007, (Case No. 06–12737, ECF Doc. # 458), bolsters this conclusion. The Disclosure Statement included a section entitled "Original Lender Litigation Claims," (*see Disclosure Statement,* at § V.K, at 25), that referred to the claims asserted in the original Complaint under sections 544 and 548 of the Bankruptcy Code, but did not mention the preference claims. That omission, coupled with the specific provisions of

the Plan Supplement that expressly allocated the preference claims to the SAT, compels the conclusion that the preference claims were not included in the general definition of "Original Lender Litigation Claims."

This result is also consistent with the rule of contract interpretation that "specific terms and exact terms are given greater weight than general language." *Aramony v. United Way of Am.,* 254 F.3d 403, 413 (2d Cir.2001)(quoting RESTATEMENT (SECOND) OF CONTRACTS § 203(c) (1981)); *accord Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 150 N.Y.S.2d 171, 133 N.E.2d 688, 690 (N.Y.1956)(Even if there was an inconsistency between a specific provision and a general provision of a contract ..., the specific provision controls."). Although this principle of construction is a "guide" and not a "rule requiring blind adherence," *see Aramony,* 254 F.3d at 414 n. 5, the specific terms of the Plan Supplement are susceptible of only one reasonable interpretation. Accordingly, the Plaintiff lacks standing to assert the preference claims.

**\*8** The Plaintiff maintains that even if the Plan gave the SAT the right to assert the preference claims, the SAT abandoned that right to the Plaintiff. Section 5.12 of the Plan states that if the Shared Assets Beneficiary Committee abandons any claims included among the Trust Assets, the GUC Trust has the option to pursue the abandoned claims at its own expense. The Shared Assets Trust Agreement provides that "the Shared Assets Trustee shall obtain the approval of the Beneficiary Committee prior to taking any action regarding ... abandonment ... and/or election not to pursue of any Cause of Action or any other litigation by the Shared Assets Trust wherein the amount in controversy exceeds $250,000." (*Shared Assets Trust Agreement,* § 2.3(a).)[8] Finally, Section 2.2 of the Shared Assets Trust Agreement sets forth the procedures that the Beneficiary Committee must follow in order to take action, including the abandonment of the preference claims.

The SAC does not allege that the SAT abandoned the preference claims, and the evidence submitted by the Plaintiff does not show that it did. The proof is limited to an email exchange between the attorneys for the SAT and the GUC Trust. (*See Declaration of Arun S. Subramanian in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss,* dated Feb. 23, 2009 ("*Subramanian Declaration* ") (ECF Doc. # 77), Ex. C.) The SAT's attorney, Philip Bentley, Esq., sent a November 12, 2008 email to Christopher Caruso, Esq., the GUC Trust's lawyer, questioning whether the GUC

Trust intended to pursue the preference claims. (*Id.*) Bentley expressed the concern that time was getting short (the statute of limitations under 11 U.S.C. § 546(a) was due to expire five days later), and the SAT would have to scramble if the GUC Trust did not pursue them. (*Id.*) Caruso responded the same day that there was no need to scramble because the Plaintiff's lawyers in this adversary proceeding intended to pursue the preference claims on behalf of the GUC Trust. (*Id.*)

This exchange does not demonstrate that an abandonment had occurred. To the contrary, the SAT was still considering the possibility of asserting the claims, which it could not do if they had been abandoned at any time prior to the email exchange. Furthermore, there is no evidence that the Beneficiary Committee ever abandoned these claims in accordance with the procedures set forth in the Shared Assets Trust Agreement. Instead, the proof suggests that the lawyers decided who would bring the claims without regard to the formalities of abandonment.

### 3. Antwerpse United

The Plaintiff lacks standing to assert the preference claims against Antwerpse United for an additional reason. The definition of "Original Lenders" did not mention Antwerpse United. (*Plan,* § 1.01.) However, the "Original Lender Litigation Claims" included claims against the unnamed affiliates of the named "Original Lenders." (*Id.*) The SAC alleges that Antwerpse United was an affiliate of ADB, a named "Original Lender," benefited from ADB's loans, 'shared the lenders' knowledge, participated in those entities' bad acts, and [is] liable for fraudulent and preferential transfers as described in Counts Five through Nine below." (¶ 1, at n. 1.) ADB's counsel stated at oral argument that "[t]here is no relationship between the new Antwerp entity and the original lender." (Tr., at 53.) Absent a concession from Antwerpse United, the conclusory allegation of affiliation in the SAC footnote, without any factual allegation to support the conclusion, is not entitled to any consideration.

**\*9** Accordingly, the Plaintiff lacks standing to pursue the preference claims in Count VIII and the Preference Complaint. The Plaintiff may be able to plead a basis for standing (*e.g.,* abandonment), if given another chance, and accordingly, the Court will grant the Plaintiff leave to replead Count VIII.

The preference claims asserted in the Preference Complaint are dismissed with prejudice although this will not affect the Plaintiff's ability to replead Count VIII. The Preference

Complaint was filed more than one year after the October 1, 2007 FCCO statute of limitations had run. There is no original pleading to which these claims can relate back, *see* FED.R.CIV.P. 15(c)(1), and any amendment would be futile. If the Plaintiff is to allege legally sufficient preference claims, it must do so through an amendment to Count VIII. [9]

## B. Count IX

Section 502(d) states, in substance, that the court shall disallow the claim of a transferee of an avoidable transfer unless the transferee turns over the property or pays its value. [10] Section 502(d) does not provide for affirmative relief against the creditor. Furthermore, it may be asserted as a basis to disallow a claim even after the statute of limitations has run on the corresponding avoidance claim. *In re Asia Global Crossing, Ltd.,* 344 B.R. 247, 251 (Bankr.S.D.N.Y.2006).

The Ninth Claim for Relief alleges, upon information and belief, that the defendants filed one or more proofs of claim or were scheduled as creditors, they received voidable transfers, and their claims must, therefore, be disallowed. (¶¶ 169–71.) The Committee previously objected to claims filed by HSBC, ADB, IDB and ABN, (*Official Committee of Unsecured Creditors' Omnibus Objection to Certain Lender Claims,* dated Nov. 30, 2007)(Case No. 06–12737, ECF Doc. # 493), and the objection is still pending. The objection attached the original Complaint in this adversary proceeding, and asserted, in substance, that the claims should be disallowed under § 502(d) because those lenders had received the fraudulent transfers identified in the Complaint. Count IX now asserts the same claim against all of the Lending Banks, Sovereign and SPM.

The § 502(d) claim unquestionably arises out of the same transactions as the claims asserted in the Complaint, and relates back to the filing of the original Complaint. *See* FED.R.CIV.P. 15(c). [11] The FCCO Lenders nevertheless contend that the Plaintiff is barred from asserting the § 502(d) objection because it raised the objection after October 1, 2007, and the "relation back" principle does not apply to the rights granted under the FCCO.

The FCCO does not support this interpretation. Nothing in the FCCO suggests that it cut off the Committee's ability to amend a timely complaint to challenge the same transfers under a different theory. Furthermore, the FCCO limited the Committee's standing to bring adversary proceedings, but §

502(d) does not require an adversary proceeding and can be raised through a claim objection. Finally, § 502(d) states that the Court "shall disallow" the claim of any creditor that received an avoidable transfer and failed to repay it. The claim disallowance is automatic if the estate representative prevails on the underlying avoidance claim.

**\*10**   Accordingly, the motion to dismiss Count IX is denied. The § 502(d) claim asserted in the Preference Complaint duplicates Count IX, and does not provide the Plaintiff with any procedural or substantive advantages. Consequently, it will be dismissed, thereby disposing of the Preference Complaint.

## C. Substantive Consolidation

The defendants contend that Count II is based on the FLI guaranty, and the claim fails because the Plan substantively consolidated FLI and MFS. The Plan did not expressly provide for substantive consolidation, and separately classified the creditors of MFS and FLI, respectively, in Classes 4 and 5. Nevertheless, the two classes received identical treatment, and both were to be paid from a common fund consisting of the assets of both debtors. Under the circumstances, the plan effected a *de facto* substantive consolidation. *See In re New Century TRS Holdings, Inc.* 407 B.R. 576, 591–92 (D.Del.2009)(aggregating multiple debtors to pay claims from a consolidated pool of assets effects substantive consolidation).

The Plan's effect was not lost on the proponents. They submitted the *Declaration of Michael A. O'Hara in Support of Confirmation of Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code,* dated Dec. 17, 2007 (Case No. 06–12737, ECF Doc. # 548), which included a detailed discussion of the elements of substantive consolidation. (*Id.* at ¶¶ 26–47.) Citing O'Hara's declaration, counsel for the proponents stated at the confirmation hearing that the "two estates were being substantively consolidated ." (Transcript of Hearing, held Dec. 19, 2007, at 21)(Case No. 06–12737, ECF Doc. # 601.)

The *de facto* substantive consolidation of FLI and MFS defeats any claim to avoid the FLI guaranty. [12] *See In re 599 Consumer Elecs.,* 195 B.R. 244, 246 (S.D.N.Y.1996) ("[T]he consolidation of the estates of the companies that received the disputed payments with the estates of the companies that made them generally defeats fraudulent conveyance claims, because the merger of the two estates [leaves]

no party unjustly enriched and no creditors looking to an impoverished asset pool for payment.")(internal quotation marks and citations omitted). The creditors of FLI were not harmed by the guaranty because the substantive consolidation under the Plan accomplished the same result, effectively rendering FLI liable for all of the debts owed to the MFS creditors, and *vice versa.*

In fact, Count I of the SAC implicitly recognizes the effect of substantive consolidation. It asserts the claim under 11 U.S.C. § 544 on behalf of "Fabrikant," which refers collectively to FLI and MFS, (¶ 115), and alleges that they incurred the obligations to the Lending Banks and SPM that provide the basis for their single damage claim under Count IV. [13] Similarly, Counts V and VI treat both debtors as one entity, alleging that certain defendant banks were the subsequent transferees of transfers made by "Fabrikant," and Count VII asserts a damage claim on behalf of "Fabrikant."

 **\*11** That said, it does not necessarily follow that Count II should be dismissed, at least on this basis. First, Count II does not expressly invoke the guaranty. Second, the same Court order that substantively consolidated the estates and nullified the harmful effect of the guaranty essentially rendered FLI liable for MFS's debts anyway. Thus, the circumstances of this case raise the question of whether substantive consolidation allows each of the debtors to challenge all of the transfers and obligations, regardless of which debtor made the transfer or incurred the obligation prior to their substantive consolidation. It may be appropriate to assert one claim for relief on behalf of "Fabrikant" under 11 U.S.C. § 544(b), as in Count I, and one claim for relief on behalf of "Fabrikant" under 11 U.S.C. § 548. [14]

The Court need not decide this issue because Counts I through IV will be dismissed with leave to replead for the reasons discussed below. I therefore leave to the Plaintiff in the first instance the proper way to plead its claim.

## D. The Motion to Dismiss Under Rules 12(b)(6) and 9(b).

### 1. Introduction

The Prior Decision discussed the standards governing a motion to dismiss under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. *See Prior Decision,* 394 B.R. at 730–36. After the Prior Decision was issued, the Supreme Court decided *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Amplifying its earlier

opinion in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Court explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal,* 129 S.Ct. at 1949 (citations omitted). *Iqbal* outlined a two-step approach in deciding a motion to dismiss. *Fowler v. U.P.M.C. Shadyside,* 578 F.3d 203, 210 (3d Cir.2009) ("The Supreme Court's opinion in *Iqbal* extends the reach of *Twombly* [to civil cases] .... [and offers] a two-part analysis."). First, the court should begin by "identifying pleadings that, because they are no more than [legal] conclusions, are not entitled to the assumption of the truth." *Iqbal,* 129 S.Ct. at 1950. Threadbare recitals of the elements of a cause of action supported by conclusory statements are not factual. *See id.* Second, the court should give all "well-pleaded factual allegations" an assumption of veracity and determine whether, together, they plausibly give rise to an entitlement of relief. *Id.* Plausibility requires more than a "sheer possibility" of wrongdoing—the plaintiff must plead sufficient factual content to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. Determining whether a claim is plausible, is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

## 2. Counts I through IV

### a. The Lending Banks

 **\*12** Counts I through IV continue to rely on the "collapsing" theory discussed in the Prior Decision. As explained there, the collapsing theory involves two prongs: (1) the consideration that Fabrikant received from the Lending Banks must have been retransferred fraudulently to the Fortgang Affiliates, and (2) the Lending Banks must have had actual or constructive knowledge of the entire scheme that that rendered the exchanges between Fabrikant and the Fortgang Affiliates fraudulent. *See Prior Decision,* 394 B.R. at 731–32.

Exhibits B–1 and B–2 attached to the SAC span 157 pages and apparently detail every transfer from the Lending Banks to Fabrikant and from Fabrikant to the Fortgang Affiliates during the approximate four year period covered by the SAC. By rough estimate, Exhibit B–1 identifies 5,600 transactions involving MFS and Exhibit B–2 lists another 500 or so transactions involving FLI. The Exhibits do not lack for specificity. They identify the date and amount of each transfer, as well as the identity of the transferor and transferee.

The specificity now present in the SAC illustrates the problems that were previously noted in the Amended Complaint. The $90 million in alleged fraudulent transfers by the debtors to the Fortgang Affiliates is a "net total amount." (¶ 62.) In other words, the $90 million reflects the difference between what the debtors transferred and what the Fortgang Affiliates repaid. This allegation makes no sense unless all of the transfers from the debtors to the Fortgang Affiliates were fraudulent. If a transfer was not fraudulent for any reason, *e.g.*, if Fabrikant reconveyed a Lending Bank's funds to the Fortgang Affiliate for adequate consideration, the transfer should not be counted in computing the "net total amount," and furthermore, the transaction cannot be collapsed. [15] *See HBE Leasing Corp. v. Frank,* 48 F.3d 623, 635 (2d Cir.1995).

The documents that the Court may consider, including the JPMC Field Audit [16] and MFS's audited financial statements, [17] show the implausibility of the Plaintiff's underlying contention that all of the transfers from the debtors to the Fortgang Affiliates were fraudulent. The parties made numerous transfers to each other in connection with their respective businesses. For example, the JPMC Field Audit, which was discussed in the Court's earlier opinion, *see Prior Decision,* 394 B.R. at 738, documented the extent to which MFS depended on the Fortgang Affiliates to provide most of its inventory, and relied on their credit to obtain it; MFS owed far more to the Fortgang Affiliates than they owed to MFS. [18] If anything, the JPMC Field Audit implied that MFS used the proceeds of the Lending Banks' loans, in large part, to fund legitimate business transactions with the Fortgang Affiliates.

The audited financial statements confirmed that MFS purchased a substantial amount of merchandise from the Fortgang Affiliates. For the year ended July 31, 2003, those purchases totaled $208,389,921. (*Appendix,* Ex. K, at 8.) Subsequent statements did not list the amount of purchases, but each stated that "[a] significant portion of the Company's purchases are from affiliated companies." (*Appendix,* Ex. L, at 8; Ex. M, at 8; Ex. N, at 8; Ex. O, at 8; Ex. P, at 9.)

**\*13** In this regard, the vast majority of transfers by Fabrikant to the Fortgang Affiliates depicted on the SAC Exhibits B–1 and B–2 are for relatively small and odd-numbered amounts. For example, the first page of Exhibit B–1 includes transfers of $28.27, $42.91, $60.80 and $73.20. Others are for a few hundred or a few thousand dollars. The 157 pages comprising Exhibits B–1 and B–2 (with approximately 40 transfers per

page) are replete with these types of entries, and the Court cannot "draw the reasonable inference" that these transfers were fraudulent. Instead, common sense dictates that such transfers reflect payments on account of contemporaneous purchases or antecedent debts. [19]

In addition, the net transfer theory assumes that every promise by the Fortgang Affiliates to repay a transfer by the debtors was valueless simply because some of the transfers were never repaid. But a good receivable that turns bad does not turn a valid transaction into an avoidable transfer. The fraudulent nature of each transfer, including the value that the transferor received, must be determined at the time of the transfer without the benefit of hindsight. *In re Hannover Corp.,* 310 F.3d 796, 802 (5th Cir.2002) ( "[C]onsistent with economic reality, this and other circuits unequivocally hold that for purposes of § 548 the value of an investment, even a risky one, such as we have before us now, is to be determined at the time of purchase."), *cert. denied,* 538 U.S. 1032, 123 S.Ct. 2075, 155 L.Ed.2d 1060 (2003); In *re Fairchild Aircraft Corp.,* 6 F.3d 1119, 1126 (5th Cir.1993)("[W]e cannot use hindsight to recalibrate the risk-or the potential reward-of Fairchild's [the debtor's] investment."); *Cooper v. Ashley Commc'ns, Inc (In re Morris Commc'ns, NC, Inc.),* 914 F.2d 458, 466 (4th Cir.1990)("The critical time is when the transfer is 'made.' Neither subsequent depreciation in nor appreciation in value of the consideration affects the value question whether reasonable equivalent value was given."). The value of a receivable must, therefore, be determined at the time the promise to pay was made and not after a default. *Smith v. Woodforest Nat'l Bank (In re IFS Fin. Corp.),* Adv. No. 04–3841, 2007 WL 1308321, at * 8 (Bankr.S.D.Tex. May 3, 2007)("The fact that the Notes ultimately proved to be of limited value does not affect the determination of value on the date of the transfer.")

The SAC alleges that "[t]he value of these [Affiliate] receivables severely degraded over time...." (¶ 36.) This implies that the Affiliate receivables had greater value at the time they were acquired in exchange for the transfers. Furthermore, the net transfer theory necessarily implies that some, perhaps most, receivables were repaid by the Fortgang Affiliates. In short, it is implausible to argue that the debtors never received reasonably equivalent value—measured at the time of each transfer—in exchange for each transfer to a Fortgang Affiliate.

This conclusion does not, however, end the inquiry. The Plaintiff does not have to prove that every transfer by

Fabrikant to the Fortang Affiliates was fraudulent. The SAC identified nine sets of transactions—transfers by some of the Lending Banks to Fabrikant followed by transfers by Fabrikant to the Fortang Affiliates—that, at first blush, arguably fit within the collapsing paradigm. (¶ 50.) There may be others, but the Court is not inclined to undertake the burden of hunting through 157 pages and over 6,000 transactions to guess at the few that might, if alleged separately, survive a motion to dismiss. The preferable course is to dismiss the SAC, and give the Plaintiff the opportunity to identify the alleged fraudulent transfers that support its collapsing theory.

**\*14** Furthermore, the alternative of denying the motion would open up expensive and time-consuming discovery, and might have the *in terrorem* effect of forcing the Lending Banks to settle without regard to the merits of the Plaintiff's claims. *See Twombly*, 550 U.S. at 557–58 ("[S]omething beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.")(internal quotation marks and citations omitted). Right now, the SAC involves over 6,000 transactions, and each transaction raises a host of factual issues. The discovery and trial burdens will be enormous unless the Plaintiff eliminates those transactions that do not raise a plausible specter of actual or constructive fraud.

Accordingly, Counts I through IV will be dismissed with leave to replead to the extent that the allegations are directed at the Lending Banks. Upon repleading, the plaintiff should identify those transactions among the approximate 6,000 identified in Exhibits B–1 and B–2 that it has a good faith basis to believe constitute fraudulent transfers. This may necessitate dropping certain Lending Banks as defendants. In light of this conclusion, the Court does not reach the other issues raised by the Lending Banks (or SPM), including whether the SAC adequately alleges that they knew or should have known about the Fortgangs' "scheme."

**b. SPM**
Although included as part of Counts I through IV, the SAC contains discrete allegations directed at SPM, which was not a Lending Bank. The SAC alleges that on July 31, 2006, and while insolvent, Fabrikant incurred a $32 million debt to SPM on account of the MFS's purchase of gold. (¶¶ 52, 58.) At least $22 million of the gold was purchased for the benefit of Fortang Affiliates—Clover, SHR, Simmons, and AM–Gold—to whom the gold had been transferred on a nearly

monthly basis between January 16, 2003 and July 31, 2006. (¶¶ 59–60.) Fabrikant incurred this obligation to SPM with the intent to hinder and defraud their creditors, Fabrikant did not receive fair consideration, and the obligation to SPM was incurred in bad faith. (¶¶ 61, 63, 117, 118, 123, 124, 128, 129.) In addition, Fabrikant was insolvent at the time it incurred the obligation, or satisfied one of the other financial tests associated with a constructive fraudulent transfer claim. (*See* ¶¶ 31, 32, 52, 119, 125, 130.)

The Court previously dismissed the actual fraudulent transfer claim under Rule 9(b) of the Federal Rules of Civil Procedure because the Amended Complaint failed "to identify which Fortang Affiliates were the transferees or the dates of the transfers." *Prior Decision*, 394 B.R. at 734. According to the Plaintiff, the SAC cured this defect. Paragraph 60 alleges that "[i]t was July 31, 2006, when the obligation to SPM was ultimately incurred, and thus when the fraudulent transfers were effectively made." (*Memorandum of Law in Opposition to Defendants' Motion to Dismiss*, dated Feb. 23, 2009, at 12) (ECF Doc. # 76.) In other words, the dates when the goods were consigned to the Fortang Affiliates are irrelevant.

**\*15** The claims against SPM mischaracterize the transaction on which they are based. According to documents referred to by both SPM and the Plaintiff, the Rhode Island Hospital Trust National Bank (the "RI Bank") entered into a gold consignment agreement with MFS and Fabrikant, Hong Kong Ltd. on November 14, 1988, and following a series of transfers, RI Bank's successor, BankBoston, N.A. ("BankBoston"), and MFS entered into an *Amended and Restated Consignment Agreement as of December 31, 1998* ("*Amended Consignment*"). [20] Among other things, BankBoston agreed to deliver gold on consignment to MFS from time to time, (*Amended Consignment*, at ¶ 2), at MFS's location or such other locations approved by BankBoston. (*Id.* at ¶ 3.) BankBoston held legal title to the gold, until it was purchased, (*id.* at ¶ 4), and MFS had the right, subject to certain limitations, to purchase any consigned gold upon appropriate notice and payment of the purchase price and any additional fees. (*Id.* at ¶ 5.)

SPM eventually succeeded to the interests of BankBoston, and on July 7, 2006, SPM, Sovereign and MFS entered into the *Eighth Amendment to Amended and Restated Consignment Agreement Dated as of December 31, 1998.* ("*Eighth Amendment*"). [21] The Eighth Amendment provided for the creation of a $33,000 loan (the "Demand Loan") from Sovereign to MFS to enable MFS to purchase 50,760 fine

troy ounces of gold that SPM had previously consigned to MFS under the consignment agreement. (*Eighth Amendment* at ¶ 2.) In addition, SPM assigned to Sovereign the security interest that MFS had granted to SPM under the *Second and Amended Security Agreement,* dated as of January 13, 2006, to secure the Demand Loan. (*See id.* at ¶ 4.)

The claims against SPM ignore both the consignment relationship and Sovereign's role in the transaction. Once SPM delivered gold on consignment, MFS incurred the obligation to return the gold (which it did not own) or buy it. Plaintiff does not challenge these obligations. The only new obligation that MFS incurred on July 7, 2006 was to repay Sovereign's Demand Loan. The Plaintiff does not challenge this obligation either, and Sovereign is not even a party on Counts I through IV. Furthermore, the only transfer of a security interest on July 7, 2006 occurred between SPM and Sovereign.

Accordingly, Counts I through IV are also dismissed as against SPM with leave to replead. Any newly amended complaint should, at a minimum, state the claims against SPM (or any other non-Lending Bank) separately from the counts asserted against the Lending Banks. *See* FED.R.CIV.P. 10(b).

### 3. Counts V through VII

Counts V through VII repeat the claims asserted in the corresponding counts of the Amended Complaint. These claims do not depend on the collapsing doctrine and consist of two components. First, between January 2006 and the Petition Date, Fabrikant transferred the aggregate sum of $38,890,000 "to several Fortgang Affiliates, specifically Alpha Diamond Co., Inc., Diamfab PVBA, Fabrikant Trading India, and Fabrikant HK Trading Ltd." (¶¶ 137, 145.) These Fortgang Affiliates "used the Debtors' transfers to pay down their debts to defendants HSBC, ABN, and IDB in the following amounts: $14,025,784 to HSBC, $8,364,265 to ABN, and $5,946,592." (¶¶ 138, 146.) Second, between January 2005 and the Petition Date, Fabrikant transferred the aggregate amount of $10,535,000 to Fortgang Affiliate, VSI. (¶¶ 139, 147.) VSI "used the Debtors' transfers to pay down its debts to defendant Sovereign in the amount of $9,882,351." (¶¶ 140, 148.) According to the SAC, the initial transfers from the debtors to the Fortgang Affiliates were

actively or constructively fraudulent, (¶¶ 141–43, 150–52), and Sovereign knew it. (¶ 149.)

**\*16** The Court's earlier opinion concluded that the intentional fraudulent transfer allegations in the Amended Complaint were legally insufficient. Among other things, the Amended Complaint failed to identify the date and amount of each transfer, and instead, aggregated transfers occurring over a two to three year period. *Prior Decision,* 394 B.R. at 740. Furthermore, except in the case of VSI, the Amended Complaint also failed to identify which Fortgang Affiliate received a particular transfer, and instead, lumped the transfers and the transferees together. *Id.* The Amended Complaint was similarly vague in alleging the subsequent transfers from the Fortgang Affiliates to Sovereign. Except in the case of VSI, it failed to identify which Fortgang Affiliate received a particular transfer, and instead, lumped the transfers and the transferees together. *Id.*

The SAC is only a slight improvement. It continues to lump transfers spanning a two to three year period, and fails to particularize the initial transfers or subsequent transfers. As this Court previously stated, "allegations that a debtor made an aggregate amount or series of cash or other transfers over a period of time, without further particularization, are insufficient to state an intentional fraudulent transfer claim." *Id.* at 733. Accordingly, Counts V and VI fail to state a claim based upon an initial actual fraudulent transfer. The Plaintiff is granted leave to replead its intentional fraudulent claim, but it must adhere to the requirements discussed in this opinion and the Prior Decision.

On the other hand, the Court previously concluded that allegations in the Amended Complaint based on constructive fraudulent transfers were legally sufficient, *id.* at 736, and the Court adheres to that conclusion. Sovereign's arguments that the VSI payments discharged a pre-existing guaranty obligation owed by MFS and that VSI released its obligations to Sovereign, to the extent they are relevant, are outside the pleadings and should not be raised on a motion to dismiss.

Settle order on notice consistent with this opinion. To the extent that the Plaintiff has been granted leave to replead, the Plaintiff must file and serve its amended complaint within 45 days of the date of this opinion.

Footnotes

1    Unless otherwise noted, the ECF Doc. # s refer to entries in Adv. Proc. No. 07–2780.

2    The "Background" discussion is derived from the SAC. The parenthetical notation "(¶ ____)" refers to paragraphs in the SAC.

3    The SAC alleges these transfers with specificity.

4    Prior to filing the SAC, the plaintiff filed a separate adversary proceeding on November 17, 2008 asserting the preference and § 502(d) claims that mirror Counts VIII and IX (the "Preference Complaint"). The two adversary proceedings have been consolidated for pre-trial purposes.

5    The defendants also contend that the Plaintiff lacks standing to assert the claims in the Preference Complaint.

6    The FCCO did not cover Antwerpse United.

7    The Schedules also listed the transfers to insiders within one year of the Petition Date, but these transfers are not relevant.

8    An unexecuted copy of the Shared Assets Trust Agreement is included as Exhibit A to the *Plan Supplement*. (Case no. 06–12737, ECF Doc. # 469).

9    While the Court does not decide the issue, it is difficult to imagine a set of facts that would render transfers to the Lending Banks preferential. The only such transfers that the Original and Amended Complaints sought to recover in Count IV "were the liens and security interests and proceeds thereof" received by the Lending Banks (and SPM) from the debtors. If the Plaintiff avoids the obligations to the Lending Banks, the transfers of "liens and security interests and proceeds thereof," while arguably fraudulent, would not have been made for or on account of an antecedent debt. *See* 11 U.S.C. § 547(b)(2). Conversely, if the Plaintiff fails to avoid the obligations to the Lending Banks, the liens and security interests will be valid, and the transfer of the proceeds of the collateral on account of the Lending Banks' secured claims will not be preferential because of the operation of 11 U.S.C. § 547(b)(5). *See Savage & Assocs., P.C. v. County of Fairfax, Virginia (In re Teligent Servs., Inc.),* No. 06 Civ. 3721(KMW), 2009 WL 2152320, at * 4 (S.D.N.Y. July 17, 2009)("A general rule in preference actions, which derives from the fifth element of the § 547(b) test, is that payments on account of secured debts are not preferential.")

10   Section 502(d) provides:

> (d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11   Rule 15(c)(1)(B) provides in pertinent part:

> An amendment to a pleading relates back to the date of the original pleading when ... the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.

12   The defendants also argue that the substantive consolidation mooted any claims based on intercompany loans between MFS and FLI. That may be so, but none of the Plaintiff's claims appears to be based on intercompany loans.

13   In contrast, Counts II and III assert separate claims under 11 U.S.C. § 548, respectively, against FLI and MFS. There is no explanation for the inconsistent approach.

14   The dispute involving the guaranty claim has no practical consequence. The Plaintiff has standing to avoid the transfers and obligations made or incurred by each debtor, and if need be, can pursue them separately. In the end, it is entitled to only one satisfaction, and any recovery will be part of the common fund available on an equal basis to the unsecured creditors of both debtors.

15   The Plaintiff's net transfer theory sounds like a claim that the Fortgangs breached their fiduciary duties to the debtors through self-dealing, and the defendants aided and abetted the breach by providing the necessary funds. In that case, the net amount of unrepaid transfers might well represent the debtor's damages. The Plaintiff, however, lacks standing to assert breach of fiduciary duty claims against the Fortgangs, which were asserted by the SAT and ultimately settled. Moreover, the Plaintiff lacks standing under the Plan to assert aiding and abetting claims against the defendants, and probably also lacks standing to assert those claims under *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114 (2d Cir.1991).

16   The JPMC Field Audit is attached as Exhibit A to the *Reply Declaration of Steven J. Mandelsberg in Further Support of Defendants' Motions to Dismiss Complaint,* dated Mar. 4, 2008 ("JPMC Field Audit")(ECF Doc. # 49). The SAC referred to and relied on the JPMC Field Audit in ¶¶ 82 and 83.

17   The *Appendix of Exhibits to the Joint Motion to Dismiss,* dated January 20, 2009 (the "Appendix")(ECF Doc. # 70), includes several sets of financial statements pertaining to Fabrikant covering the period from January 31, 2003 through January 31, 2006. (*Id.,* Exs. J–P.) The SAC refers generally to Fabrikant's financial statements, and plaintiff's counsel agreed during oral argument that the Court could consider these Exhibits. (*Tr.* at 86–87.)

18   The Court previously remarked on the near overlap between the affiliates identified in the JPMC Field Audit and the Fortgang Affiliates identified in Exhibit A to the Amended Complaint. *Prior Decision,* 394 B.R. at 737 n. 17. An identical Exhibit A is attached to the SAC.

19   The net transfer theory only makes sense when all of the transfers are presumptively fraudulent, as in the case of a Ponzi scheme. *See Wing v. Horn,* No. 2:09–cv–00342, 2009 WL 2843342, at *4 (D.Utah Aug.28, 2009) ("[T]he Court draws on its common sense

and experience in relying on the thoroughly plausible inference that the transfers made by the operator of a Ponzi scheme during the course of perpetuating that fraudulent activity are made with fraudulent intent.") This presumption allows the trustee of a bankrupt Ponzi scheme operator to "clawback" the net transfers made to the "winners." The SAC does not state or imply that Fabrikant was run as a Ponzi scheme.

20      A copy of the Amended Consignment is annexed to the Subramanian Declaration as Exhibit F.

21      A copy of the Eighth Amendment is annexed to the Subramanian Declaration as Exhibit E.

---

**End of Document**                                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 49

30 ERC 1926, 19 Bankr.Ct.Dec. 1477, Bankr. L. Rep. P 73,080, 20 Envtl. L. Rep. 20,015

885 F.2d 98
United States Court of Appeals,
Third Circuit.

In re MORRISTOWN & ERIE
RAILROAD COMPANY.
Appeal of MORRISTOWN &
ERIE RAILWAY, INC., Appellant.

No. 89–5077.    |    Argued July 17, 1989.
|    Decided Sept. 15, 1989.    |    Rehearing
and Rehearing In Banc Denied Jan. 30, 1990.

Bankruptcy trustee moved to require debtor railroad to initiate accelerated state administrative procedures required for conveyance of its property. The United States District Court for the District of New Jersey, Harold A. Ackerman, J., held for trustee, and debtor appealed. The Court of Appeals, Stapleton, Circuit Judge, held that district court lacked authority to issue injunction requiring debtor to initiate accelerated procedures with state environmental protection agency, including posting of bond which debtor claimed to be financially incapable of furnishing, as prerequisite for conveyance of debtor's property.

Reversed and remanded.

West Headnotes (2)

[1]    **Bankruptcy**
        👉 Equitable Powers and Principles

        Bankruptcy Code provision authorizing bankruptcy court to exercise equitable powers does not give court power to create substantive rights which would otherwise be unavailable under Code. Bankr.Code, 11 U.S.C.A. § 105(a).

        48 Cases that cite this headnote

[2]    **Bankruptcy**
        👉 Administrative Proceedings and Governmental Actions

        District court lacked authority to issue injunction requiring debtor railroad to initiate accelerated procedures with state environmental protection

agency, including posting of bond which debtor claimed to be financially incapable of furnishing, as prerequisite for conveyance of debtor's property, absent showing that debtor had contractual or statutory obligation to assume such liability. Bankr.Code, 11 U.S.C.A. § 105(a).

5 Cases that cite this headnote

**Attorneys and Law Firms**

*98  Roger C. Ward (argued), Steven J. Halpern, Pitney, Hardin, Kipp & Szuch, Morristown, N.J., for appellant.

David J. Sheehan (argued), Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, N.J., for appellee.

Peter N. Perretti, Jr., Atty. Gen. of New Jersey, Kenneth W. Elwell, Deputy Atty. Gen., State of N.J., Div. of Law, Environmental Protection Section, Trenton, N.J., for New Jersey Dept. of Environmental Protection.

Before STAPLETON, SCIRICA and ROSENN, Circuit Judges.

**OPINION OF THE COURT**

STAPLETON, Circuit Judge:

This appeal raises an issue concerning the scope of a district court's injunctive powers under section 105(a) of the Bankruptcy Code. The trustee in bankruptcy, seeking to expedite the bankruptcy proceedings, sought an order from the district court requiring the Morristown & Erie Railway (the Railway) to supply financial assurance and apply for a permit from the New Jersey Department of Environmental Protection (DEP) that would allow the trustee to convey certain real property of the debtor's to the Railway. The district court issued a mandatory injunction to that effect. We hold that the district court had no authority to do so under section 105(a) and we will therefore reverse.

**I.**

The Morristown & Erie Railroad Co. (the Debtor) has been in bankruptcy proceedings since 1977. The Morristown & Erie Railway (the Railway) operated the Debtor's railroad prior

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 391 of 398

In re Morristown & Erie R. Co., 885 F.2d 98 (1989)
30 ERC 1926, 19 Bankr.Ct.Dec. 1477, Bankr. L. Rep. P 73,080, 20 Envtl. L. Rep. 20,015

to the approval in 1982 of a reorganization plan proposed by, among others, the Railway. Under the plan, the Railway agreed to purchase all of the Debtor's operating assets and all of its real property. Since approval of the plan, the Railway has operated the railroad for its own account.

In 1986, the Railway entered into a tripartite agreement with the Trustee (John **\*99** L. Ard) and the Prudential Insurance Co. Pursuant to the agreement, Prudential agreed to purchase certain of the Debtor's real property subject to the reorganization plan. The proceeds of the sale were split between the Trustee and the Railway. Under this agreement, the Railway assumed liability for the costs of bringing a parcel of the Debtor's property, known as the Rockaway site, into compliance with the New Jersey Environmental Cleanup Responsibility Act, N.J.Stat.Ann. 13:1K–6 et seq. (ECRA). The parties believed that the Rockaway site might present environmental problems, and under ECRA, real property containing an "industrial establishment" cannot be conveyed without DEP approval. Accordingly, the parties agreed that the Railway would withhold the $80,000 purchase price for Rockaway until conveyance was cleared by the DEP. This agreement was not reduced to writing.

DEP approval proved to be a lengthy and expensive process. First, the Trustee's environmental consultant submitted a cleanup plan, but the DEP responded that further, expensive steps would have to be taken before it would grant a permit. Railway, concerned with the costs of these measures, then hired its own expert to perform testing and to prepare a plan. The DEP gave conditional approval to this plan, but it also proposed further requirements.

Concerned that approval was far from imminent, the Trustee moved the district court to order the Railway to apply to the DEP for an expedited approval, known as an administrative consent order (ACO). Under the usual procedures, the DEP does not issue a permit until it approves a detailed cleanup plan. N.J.Admin.Code 7:26B–4.3 & 5.1. Under the ACO procedures, a detailed cleanup plan does not have to be approved by the DEP. N.J.Admin.Code 7:26B–5.1(c). An ACO may be granted in the discretion of the DEP, but only if financial assurance is supplied in an amount at least equal to the DEP's estimate of the cleanup cost. N.J.Admin.Code 7:26B–7.3. The financial assurance can be supplied by a purchaser. Id. When an ACO is executed, the land may be conveyed. Id. at 7:26B–5.1(c).

The Railway opposed the order on several grounds. First, it noted that the DEP, in determining the amount of security to be posted for an ACO, tends to set the figure very high because the actual scope of the cleanup remains unknown when the ACOs are issued. The Railway therefore asserted, and the Trustee did not disagree, that the DEP was likely to request a bond of between $500,000 and $750,000. The Railway then argued that it was financially unable to supply such assurance.

Next, the Railway stated that it feared that the ACO would cut off its rights to explore further its own cleanup proposals, and that it would instead be forced to execute the cleanup in whatever manner would be specified by the DEP. Finally, the Railway challenged the authority of the district court to force the Railway to carry out the ACO application process.

The district court grounded its authority to issue the requested order solely on section 105(a) of the Bankruptcy Code. The judge concluded that requiring Railway to apply for and post security for an ACO was warranted because "[t]he creditors cannot be denied their claims for much longer." The court noted that, even if Railway did not apply for an ACO but instead took the more time-consuming option of submitting a clean-up plan for DEP approval, the Railway would nevertheless still have to post security to cover cleanup costs under ECRA's requirements, N.J.Admin.Code 7:26B–6.1. Without further explanation, the district judge concluded that, since "[t]he only question is whether [the Railway] must pay sooner [rather] than later," App. at 30, he did not need to consider further Railway's financial-impossibility argument.

Finally, as to the Railway's argument that it needed more time to examine other cleanup options, the court concluded that if in the future the Railway were to formulate less costly cleanup options, they could be submitted to the DEP and the DEP might reduce the amount of the bond. Accordingly, the district court ordered Railway to "initiate, with speed, the process for **\*100** obtaining an Administrative Consent Order and pay the necessary security under the N.J. Administrative Code." App. at 30. In resolving a motion for reargument against Railway, the district judge reiterated in somewhat greater detail this rationale, and described his original order as requiring Railway "to provide the requisite financial assurance to the DEP in conjunction with an ACO, if the DEP issues one." App. at 121.

30 ERC 1926, 19 Bankr.Ct.Dec. 1477, Bankr. L. Rep. P 73,080, 20 Envtl. L. Rep. 20,015

## II.

On appeal, the Railway argues that it is financially incapable of furnishing the security that the DEP might require for an ACO, and that the district court lacked the authority to issue its injunction. We need only reach the latter issue, since we conclude that the district court misconstrued the nature of its powers under section 105(a).

The relevant portion of 11 U.S.C. § 105(a) provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

**[1]**  Section 105(a) authorizes the bankruptcy court, or the district court sitting in bankruptcy, to fashion such orders as are required to further the substantive provisions of the Code. Section 105(a) gives the court general equitable powers, but only insofar as those powers are applied in a manner consistent with the Code. *See* Lawrence P. King, *Collier on Bankruptcy* ¶ 105.04 at 105–15 & n. 5 (15th ed.1989). Nor does section 105(a) give the court the power to create substantive rights that would otherwise be unavailable under the Code. *See Southern Ry. Co. v. Johnson Bronze Co., 758 F.2d 137, 141 (3d Cir.1985)* (holding that a bankruptcy court does not have the authority under § 105 to create a lien to secure payment of environmental cleanup costs when the contract obligating the debtor to pay such costs did not provide for such a lien).

**[2]**  We turn, then, to the district court's application of section 105(a) in this case. Despite the fact that the oral agreement was never reduced to writing, the parties agree as to the nature of the Railway's undertaking pursuant to the trilateral agreement with Prudential. Most importantly, the Trustee has not argued that the agreement obligated the Railway to take the steps required of it by the district court's order. Indeed, the Trustee expressly conceded this point at oral argument. Thus it is clear that the agreement obligated the Railway to assume financial responsibility for the cleanup of the Rockaway parcel, but it did not require the Railway to

take steps under New Jersey environmental laws to see that a permit allowing conveyance was obtained. Accordingly, the district judge could not rely on the contract as a source of his power to require the Railway to proceed with the ACO requirements.

That being the case, the judge's exercise of power under section 105(a) was legitimate only to the extent that some provision of the Code gives the Trustee the right to require of parties in the Railway's position that they shoulder the administrative responsibilities vis-a-vis the debtor's property that were here imposed upon the Railway. We have not been cited to, nor are we aware of, any such provision.

The issue is brought into relief by considering the court's authority had there been no agreement by the Railway to assume liability for the cleanup of the Rockaway parcel. In such a case, we do not think it could be seriously proposed that the court could force, under the authority of section 105(a) or any other provision of the Code, the Railway to assume that liability. The district court in this case, however, seemed to feel that, having gone as far as it had in assuming financial responsibility, the Railway could be required to incur further responsibilities by virtue of section 105(a). The court believed, in other words, that section 105(a) empowered it to expand the contractual obligations of the parties, if the balance of equities favored such an expansion. Such a proposition runs afoul of the principle that section 105(a) is not a substantive source of rights. Accordingly, the district court was without the authority to **\*101** order the Railway to apply and post security for the ACO.

## III.

For the foregoing reasons, we will reverse the order of the district court and the case will be remanded to the district court with an instruction that it deny the Trustee's motion.

**Parallel Citations**

30 ERC 1926, 19 Bankr.Ct.Dec. 1477, Bankr. L. Rep. P 73,080, 20 Envtl. L. Rep. 20,015

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 50

In re NWFX, Inc., 864 F.2d 588 (1988)

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 394 of 398

20 Collier Bankr.Cas.2d 101, 18 Bankr.Ct.Dec. 1028, Bankr. L. Rep. P 72,500

864 F.2d 588
United States Court of Appeals,
Eighth Circuit.

In Re: NWFX, INC., Debtor.
Northwest Financial Express, Inc.; NWFX,
Inc.; and Gold Financial Express, Inc.
Allen W. BIRD, II, Trustee, Appellant,
v.
CROWN CONVENIENCE; Derby
Refining Co., et al., Appellees.

No. 87–2360.    |    Submitted May
13, 1988.    |    Decided Nov. 30, 1988.

On appeal from judgment of the United States District Court for the Western District of Arkansas, H. Franklin Waters, Chief Judge, holding that approximately $600,000 claimed by Chapter 11 debtor was not property of the estate and therefore not subject to order of turnover, the Court of Appeals, Beam, Circuit Judge, held that: (1) bankruptcy judge's finding that grocery store chain had not entered into agreement for sale of debtor's noninsured money orders was supported by evidence, but (2) chain would be unjustly enriched under Texas law if it were allowed to retain all proceeds of those money orders, and equitable interests—equal to reasonable value of excess benefits received by chain from its dealings with debtor—constituted property of the estate subject to turnover.

Affirmed in part, reversed in part, and remanded.

Sneed, Senior Circuit Judge, sitting by designation, concurred in part and dissented in part and filed opinion.

West Headnotes (4)

[1]    **Contracts**
        👉 Questions for Jury

Whether or not contract is formed in particular instance is question of law.

Cases that cite this headnote

[2]    **Bankruptcy**
        👉 Evidence and Fact Questions

Bankruptcy court's finding, that grocery store chain which had agreed to sell FDIC-insured money orders had not agreed to sell noninsured "proprietary" money orders, was supported by evidence in proceeding by Chapter 11 trustee for money order marketer to force chain to turn over unremitted proceeds from sale of uninsured money orders. Bankr.Code, 11 U.S.C.A. § 542.

2 Cases that cite this headnote

[3]    **Bankruptcy**
        👉 Equitable Powers and Principles

Overriding consideration in bankruptcy is that equitable principles govern, and those principles must be directed toward care and preservation of the estate.

3 Cases that cite this headnote

[4]    **Bankruptcy**
        👉 Rights of Action;  Contract Rights Generally
        **Bankruptcy**
        👉 Turnover by Custodians
        **Implied and Constructive Contracts**
        👉 Unjust Enrichment

Grocery store chain which sold debtor's uninsured money orders to customers would be unjustly enriched under Texas law if it were allowed to retain all proceeds of those money orders; thus, equitable interest equal to reasonable value of excess benefits that chain had received from its dealings with debtor constituted property of the estate and, as property in chain's possession, was subject to turnover. Bankr.Code, 11 U.S.C.A. § 542(a), (a)(1).

2 Cases that cite this headnote

**Attorneys and Law Firms**

*588 Allen W. Bird, II, Little Rock, Ark., for appellant.

C. Henry Kollenberg, Houston, Tex., for appellees.

20 Collier Bankr.Cas.2d 101, 18 Bankr.Ct.Dec. 1028, Bankr. L. Rep. P 72,500

Before BEAM, Circuit Judge, and BRIGHT and SNEED, [*] Senior Circuit Judges.

**Opinion**

BEAM, Circuit Judge.

Allen W. Bird, II, the Trustee for the bankruptcy estate of Northwest Financial Express (Northwest) appeals from an order of the district court holding that approximately $600,000 claimed by Northwest was not property of the estate and therefore **\*589** not subject to an order of turnover under 11 U.S.C. § 542.

**BACKGROUND**

Northwest marketed money orders through retail grocery stores. The stores would sell money orders to their customers and then remit the proceeds to Northwest. Rice Food Markets, Inc., a grocery chain with stores located throughout the Houston, Texas, area, had an arrangement with Northwest.

In fact, in May of 1984, Rice and Northwest entered into a written agreement for Rice to sell Northwest's money orders. At that time, Northwest marketed money orders issued by Northwest National Bank. Each such money order was F.D.I.C. insured.

In November of 1984, Northwest converted to City National Bank money orders. Rice and Northwest entered into another written agreement, this time, concerning Rice issuing the City National Bank money orders to Rice customers. These money orders were also F.D.I.C. insured.

Pursuant to the written agreement of November of 1984, Rice would sell the money orders to its customers; deposit the currency in one of Rice's bank accounts, and collect interest on the money. Each Thursday, Rice would forward an amount equal to the face value of the money orders sold prior to the most recent Sunday. In addition, Rice would pay to Northwest 11 cents for each money order sold. Rice's compensation was the interest earned on the deposited proceeds between remittance dates plus any additional fee Rice might charge its customers for issuing the particular money order.

In May of 1985, Northwest began marketing its own "proprietary" money orders which were not F.D.I.C. insured. In essence, the new money orders were checks issued by Northwest in exchange for cash. These money orders were then payable at the Northwest National Bank in Fayetteville, Arkansas, provided that Northwest had sufficient funds in its checking account at that bank.

Rice's customers generally used their money orders for paying many of the same bills for which other citizens write checks. The bulk of Rice's clientele, however, were people who did not maintain checking accounts. Between May of 1985 and July 28, 1986, Rice sold these customers the new Northwest proprietary money orders.

On July 28, 1986, Rice learned that Northwest would no longer honor its money orders. Between July 14, and July 28, 1986, Rice had issued $878,713.98 in money orders. Rice has since declined to remit $653,713.98 of the proceeds from these sales. Instead, Rice has been refunding all money orders purchased at its stores—either through arrangements with local banks to make good on Northwest money orders returned "not sufficient funds" (NSF), or by refunding their customers directly. As of November 30, 1986, Rice had paid out $541,658.77. [1]

On August 1, 1986, Northwest filed a petition in bankruptcy for protection under Chapter 11. The Trustee commenced this proceeding against Rice to force Rice to turn over the $653,713.98 to the estate. A hearing was held before the bankruptcy court on December 16, 1986, to determine whether the proceeds were property of the estate, or alternatively, whether Rice owed a debt to the estate in the amount of $653,713.98. The bankruptcy court concluded that the proceeds were not property of the estate and thus negated a claim under **\*590** 11 U.S.C. § 542(a). It also held that Rice had no contractual obligation to pay the funds to the estate. The district court affirmed. The Trustee now appeals.

**A. MODIFICATION OF NOVEMBER 1984 AGREEMENT**

[1]    Both courts found that the parties did not mutually agree to modify, either orally or in writing, the terms of the November, 1984, agreement, to encompass the sale of noninsured money orders. This presented a question of contract formation. Whether or not a contract is formed in a particular instance is a question of law. *See Lemmers v. Hart Schaffner & Marx,* 701 F.Supp. 728, 732 (D.Neb.1987); *see also Neff v. World Publishing Co.,* 349 F.2d 235, 252–53 (8th Cir.1965).

20 Collier Bankr.Cas.2d 101, 18 Bankr.Ct.Dec. 1028, Bankr. L. Rep. P 72,500

There was some dispute as to whether an original contract encompassing noninsured money orders was ever prepared and presented by NWFX. Mr. Caldwell, an NWFX employee, testified that such had occurred and two employees for Rice testified to the contrary. Because the bankruptcy court was in the best position to observe the demeanor of the witnesses and to assess their credibility, we give great weight to its finding that Mr. Caldwell's testimony was not credible. *See In re Bush, 696 F.2d 640, 643 (8th Cir.1983).* The question before us is whether the bankruptcy court was correct in finding that the parties had not entered into an agreement for the sale of noninsured money orders. We agree with the district court that the bankruptcy judge's finding in this regard is well supported by the evidence and we adopt the bankruptcy court's position on that issue. [2]

## B. EQUITABLE INTEREST AS PROPERTY OF THE ESTATE

[2] On appeal, the Trustee also argues that it was error for the lower courts not to find that the estate had an equitable interest in the proceeds independent of any agreement of the parties. Initially, we note that the Trustee pursued recovery solely on the theory that subsequent negotiations and the conduct of the parties established that an agreement had in fact been reached whereby Rice would either hold the proceeds in trust, or as Northwest's agent.

[3] The overriding consideration in bankruptcy, however, is that equitable principles govern. *Matter of Tucson Yellow Cab, 789 F.2d 701, 704 (9th Cir.1986)* (citing *Bank of Marin v. England, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966)*). Equitable principles must be directed toward the care and preservation of the estate. *See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 527, 104 S.Ct. 1188, 1196, 79 L.Ed.2d 482 (1984).* Because we believe that the estate does have an equitable interest in some of the proceeds held by Rice, we now define that interest.

[4] In determining whether Northwest has an equitable interest in any of the money collected by Rice through issuance of Northwest's money orders, we look to state law to define the interest. 4 Collier ¶ 547.03, at 547–22. We will assume that the parties still intend Texas law to govern as they did when the November 1984, agreement was in effect.

In the absence of a contract governing the subject matter (here, the proceeds of uninsured money orders) a plaintiff may recover under the doctrine of quantum meruit where the plaintiff has (1) provided valuable services or materials; (2) the services *591 and materials are accepted; and (3) the services and materials are accepted under such circumstances as to reasonably notify the recipient that the plaintiff intended to be paid. *See Corpus Christi v. S.S. Smith & Sons Masonry, 736 S.W.2d 247, 248 (Tex.App.1987).*

The theory of recovery is one of implied or quasi contract. It is based on a promise implied by law to pay for benefits rendered, knowingly accepted, and retained against the principles of equity and good conscience. *See Allen v. Berrey, 645 S.W.2d 550, 553 (Tex.App.1982).* The measure of recovery is, as indicated, referred to as quantum meruit, *see Knebel v. Capital Nat. Bk., 505 S.W.2d 628, 631–32 (Tex.Civ.App.), aff'd in part, 518 S.W.2d 795 (Tex.Sup.Ct.1974),* and is, in practice, reimbursement for unjust enrichment that stems from failure to make restitution of the benefits received under the circumstances. *Allen, 645 S.W.2d at 553.*

While we recognize that the money orders and the proceeds of their sale may be neither goods nor services, we believe that under Texas law, Northwest has an interest in at least some of the proceeds presently held by Rice. "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." Restatement of Restitution § 1, at 12 (1937). At least one Texas court has adopted this Restatement section. *See Muller v. Nelson, Sherrod & Carter, 563 S.W.2d 697, 701 (Tex.Civ.App.1978).*

Unjust enrichment occurs where there is a "failure to make restitution of *benefits* received under such circumstances as to give rise to [an] implied or quasi-contract to repay." *Allen, 645 S.W.2d at 553* (emphasis added). Recovery is permitted in quantum meruit to prevent unjust enrichment. *Angroson, Inc. v. Independent Communications, 711 S.W.2d 268, 273 (Tex.App.1986).* The measure of recovery is reimbursement for unjust enrichment that stems from failure to make restitution of the benefits received under the circumstances. *Allen, 645 S.W.2d at 553.* Texas courts find a quasi-contract where a claimant has shown the right to recover in quantum meruit. *See id. at 553.*

We believe that there is unjust enrichment in allowing Rice to retain all monies held. Rice has profited. It knew that Northwest was supplying money orders with the intent of being paid, and in fact it did pay the face value and a fee to Northwest on the uninsured money orders for over a year.

In re NWFX, Inc., 864 F.2d 588 (1988)

Case 09-10138-MFW    Doc 14410-3    Filed 09/16/14    Page 397 of 398

20 Collier Bankr.Cas.2d 101, 18 Bankr.Ct.Dec. 1028, Bankr. L. Rep. P 72,500

We understand, as earlier indicated, that the money orders themselves may be neither materials nor services. We are not, however, addressing restitution based on the face value of the money orders. Rather, we are considering the benefits unjustly retained by Rice. Thus, we are confident that Texas courts would allow a claim in this case. *Cf. Goswami v. Metropolitan Sav. & Loan,* 751 S.W.2d 487, 491 (Tex.Sup.Ct.1988) (pleading that alleged payment of money may state a claim in quantum meruit); *Montes v. Naismith & Trevino Constr. Co.,* 459 S.W.2d 691, 692–94 (Tex.Civ.App.1970) (restitution ordered in the amount of the dollar value of materials supplied).

As other bankruptcy cases have indicated, *see Matter of Tucson Yellow Cab,* 789 F.2d 701, 704 (9th Cir.1986), one permissible measure of reasonable value is the value that the parties established in their last valid agreement. Here, that would be the amount of the interest collected on proceeds withheld beyond the date upon which the November agreement required remittance, plus the agreed upon fee of 11 cents per order.

On the issue of the refunded proceeds, however, no basis appears upon which such proceeds can be ordered turned over. Because Rice has refunded that amount, it cannot be said to be unjustly enriched. As to the proceeds not yet paid out, they should now be remitted to the estate except to the extent that Rice can clearly establish obligations to make further refunds during the life of the money orders. This is because retention in the absence of refunding unjustly enriches Rice, and because the estate apparently has claims against it from **\*592** the holders of these unredeemed money orders.

## CONCLUSION

The findings of the lower courts that the parties were not operating pursuant to a modified version of the November 1984, contract is affirmed.

Despite the absence of a legally valid agreement, however, there is an equitable interest equal to the reasonable value of the excess benefits Rice has received from its dealings with Northwest. These equitable interests constitute property of the estate. 11 U.S.C. § 541(a)(1). As NWFX property in Rice's possession, it is subject to turnover under 11 U.S.C. § 542(a).

Accordingly, the order appealed from is affirmed in part and reversed in part and this matter is remanded to the district court for further findings and orders consistent with this opinion.

SNEED, Circuit Judge, concurring in part and dissenting in part.

I concur in part and dissent in part with the majority opinion. My disagreement is with the manner in which the opinion measures Rice's unjust enrichment.

Judge Beam's opinion concludes that the unjust enrichment of Rice did not include refunded proceeds. I disagree. Rice has been unjustly enriched by all of the proceeds that it has received from the sale of the money orders. The record in this case does not suggest that Rice had an obligation to refund its customers. It was not a guarantor of the money orders it sold. Holders of Northwest's money orders have claims against Northwest, not Rice. Rice therefore should have turned over to Northwest all of the proceeds from its money order sales. Its decision not to do so kept its customers happy and maintained its good will at no cost to it. Northwest's creditors, other than Rice's customers, provided the funds by which Rice enhanced its reputation. Rice's customers have received payment in full on their claims against Northwest while all other creditors of Northwest will not.

It is doubtful that Texas law supports the position of the majority. Its method of measuring Rice's unjust enrichment stands in conflict with the authority the majority cites to support its finding that unjust enrichment has occurred. The Restatement of Restitution says that "[i]n an action of restitution in which the benefit received was money, the measure of recovery for this benefit is the amount of money received." Restatement of Restitution § 150 (1936); *see Holloway v. International Bankers Life Ins. Co.,* 354 S.W.2d 198, 213 (Tex.Civ.App.), *rev'd on other grounds,* 368 S.W.2d 567 (Tex.1962) (citing the chapter of the Restatement that includes section 150). The majority holds that a party is unjustly enriched, not to the extent it has received money, but to the extent the money received has not been dissipated. I do not think that the Texas courts would uphold such a rule.

My result would not impose on Rice a double liability, one to its customers and another to Northwest. Although the issue is not before the court, Rice, after reimbursing its customers, could assert their claims against Northwest. Rice could argue either that the customers assigned to Rice their money orders claims or that Rice acquired the customer's claims under a theory of equitable subrogation. *See Smart v. Tower Land and Inv. Co.,* 597 S.W.2d 333, 337 (Tex.1980). To the extent that Rice would not receive full payment on these claims in the bankruptcy court at distribution, to that extent it would have

20 Collier Bankr.Cas.2d 101, 18 Bankr.Ct.Dec. 1028, Bankr. L. Rep. P 72,500

paid for the maintenance of its goodwill. Moreover, it would have paid for it with its own money.

**Parallel Citations**

20 Collier Bankr.Cas.2d 101, 18 Bankr.Ct.Dec. 1028, Bankr. L. Rep. P 72,500

Footnotes

\*    The HONORABLE JOSEPH T. SNEED, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

1    The concurring and dissenting opinion makes the point that holders of money orders had no claim against Rice. However, the trial court did not determine this issue. For what it is worth, the Texas Attorney General apparently assumed that Rice had an obligation to holders because it was indicated at oral argument that he directed Rice to make refunds to its customers. In any event, Judge Sneed concurs in the premise that no contract existed and that quantum meruit provides the basis for determining the amount due to NWFX. Under the circumstances, it is difficult to discern an interest of NWFX in the proceeds that exceeds the interest of Rice. Rice's customers provided the money which was refunded to them and the refunds obliterated any claims by them against NWFX. In our view, creditors of NWFX had no greater interest in the Rice proceeds than the NWFX bankruptcy estate, whose limited interest is otherwise outlined in this opinion.

2    Because we agree that there was no subsequent modification or renegotiation of the November, 1984, contract, and since the November agreement did not encompass proceeds from the money orders at issue here, we need not address whether or not the terms of such an agreement would have made Rice a trustee of the proceeds with Northwest as the beneficiary, or whether Rice was acting as Northwest's agent under such agreement. With regard to a trust, the court's finding of no agreement precludes finding a critical element of a trust—intent to establish a trust by the parties. *See Trustees of Graceland Cem. v. United States,* 515 F.2d 763, 775, 206 Ct.Cl. 609 (1975). Similarly, the court's ruling precludes finding acceptance by Rice of the authority to act as Northwest's agent for the sale of noninsured money orders. *See* W. Seavey, Agency § 18, at 32 (1964).

**End of Document**                                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.