# TAB 51

In re Owens Corning, 419 F.3d 195 (2005)

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 2 of 540

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

419 F.3d 195
United States Court of Appeals,
Third Circuit.

In re: OWENS CORNING, a Delaware
Corporation Credit Suisse First Boston, as Agent
for the prepetition bank lenders, Appellant.

No. 04–4080.   |   Argued Feb. 7,
2005.   |   Opinion filed Aug. 15, 2005.
|   As Amended Aug. 23, 2005, Sept. 2,
2005, Oct. 12, 2005 and Nov. 1, 2007.

**Synopsis**
**Background:** Chapter 11 debtor-parent corporation and its
subsidiaries, the manufacturers of asbestos products, filed
motion for substantive consolidation, and bank consortium
objected. The United States District Court for the District of
Delaware, John P. Fullam, J., 316 B.R. 168, granted motion
for substantive consolidation, and appeal was taken.

**[Holding:]** The Court of Appeals, Ambro, Circuit Judge, held
that lower court should not have permitted the "deemed"
consolidation of Chapter 11 estates of corporate-debtor-
borrowers and related corporate entities that guaranteed their
loan obligations, to extent that consolidation was sought as
sword, primarily to disadvantage lender by depriving it of
guarantees for which it had bargained.

Reversed.

West Headnotes (22)

**[1]    Bankruptcy**
      **Finality**
Court of Appeals applies broader concept of
finality when deciding whether order entered
in bankruptcy proceeding is "final order," from
which appeal will lie. 28 U.S.C.A. § 1291.

4 Cases that cite this headnote

**[2]    Bankruptcy**

**Decisions Reviewable**
Four factors that Court of Appeals considers in
deciding whether it should exercise jurisdiction
over bankruptcy appeal are as follows: (1) impact
on assets of bankruptcy estate; (2) necessity for
further fact-finding on remand; (3) preclusive
effect of Court's decision on merits of further
litigation; and (4) interests of judicial economy.
28 U.S.C.A. § 1291.

5 Cases that cite this headnote

**[3]    Bankruptcy**
      **Finality**
As general rule, bankruptcy court order
substantively consolidating different estates is
"final order," from which appeal will lie as of
right, as order which has profound effect on
assets of consolidated entities, which appellate
court can review without necessity of additional
fact-finding, which clearly will have preclusive
effect in subsequent litigation, and which is best
reviewed immediately in order to serve interest
of judicial economy. 28 U.S.C.A. § 1291.

6 Cases that cite this headnote

**[4]    Bankruptcy**
      **Finality**
District court's order substantively consolidating
assets and liabilities of debtor-borrowers and the
subsidiaries that guaranteed their obligations on
loan, in anticipation of plan of reorganization
that was to be filed in Chapter 11 case, was
"final order," from which appeal would lie as of
right, although order would be implemented only
when plan was confirmed and payment became
obligatory thereunder. 28 U.S.C.A. § 1291.

5 Cases that cite this headnote

**[5]    Bankruptcy**
      **Transfer and Consolidation of Cases**
**Bankruptcy**
      **Equitable powers and principles**
Substantive consolidation of bankruptcy estates
is construct of federal common law, emanating
from equity.

In re Owens Corning, 419 F.3d 195 (2005)
45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 3 of 540

**[6]**    **Bankruptcy**
👉 Transfer and Consolidation of Cases

When debtors are substantively consolidated, they are merged into a single survivor which is left with all of the cumulative assets and liabilities, except for inter-entity liabilities, which are erased; result is that claims of creditors against separate debtors morph to claims against the consolidated survivor.

21 Cases that cite this headnote

**[7]**    **Bankruptcy**
👉 Grounds and objections; factors considered

Substantive consolidation of debtors' estates cannot be justified vis-a-vis the claims of objecting creditor that relied on separateness of debtor entities.

5 Cases that cite this headnote

**[8]**    **Bankruptcy**
👉 Transfer and Consolidation of Cases

**Bankruptcy**
👉 Equitable powers and principles

Bankruptcy courts must respect entity separateness, absent compelling circumstances calling equity, and possibly substantive consolidation, into play.

4 Cases that cite this headnote

**[9]**    **Bankruptcy**
👉 Transfer and Consolidation of Cases

**Bankruptcy**
👉 Fraudulent conveyances in general

**Bankruptcy**
👉 Inequitable conduct

Harms that substantive consolidation addresses are nearly always those caused when debtors, and entities that they control, disregard separateness; harms caused by creditors typically are remedied by fraudulent transfer avoidance or equitable

subordination claims. Bankr.Code, 11 U.S.C.A. §§ 510(c), 548.

9 Cases that cite this headnote

**[10]**    **Bankruptcy**
👉 Grounds and objections; factors considered

Mere benefit to administration of bankruptcy case is insufficient basis for calling substantive consolidation into play.

Cases that cite this headnote

**[11]**    **Bankruptcy**
👉 Transfer and Consolidation of Cases

Substantive consolidation of bankruptcy estates is extreme and imprecise remedy, and court should employ this "rough justice" remedy only rarely and as matter of last resort after considering and rejecting other remedies.

2 Cases that cite this headnote

**[12]**    **Bankruptcy**
👉 Grounds and objections; factors considered

While substantive consolidation of bankruptcy estates may be used defensively in order to remedy identifiable harms caused by entangled affairs, it may not be used offensively, such as with primary purpose of disadvantaging tactically a group of creditors in plan process, or so as to alter creditor rights.

12 Cases that cite this headnote

**[13]**    **Bankruptcy**
👉 Grounds and objections; factors considered

What must be proven, absent consent, concerning the entities for whom substantive consolidation is sought is (1) that prepetition they disregarded separateness so significantly that their creditors relied on breakdown of entity borders and treated them as one legal entity; or (2) that postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 4 of 540

10 Cases that cite this headnote

**[14]**    **Bankruptcy**

👉 Grounds and objections;  factors considered

When substantive consolidation is ordered based on debtor-entities' prepetition disregard of their separateness, with result that their creditors began to treat them as single entity, rationale for consolidating debtors' estates is to protect prepetition expectations of creditors.

15 Cases that cite this headnote

**[15]**    **Bankruptcy**

👉 Grounds and objections;  factors considered

When substantive consolidation is ordered based on the scrambled nature of debtors' assets and liabilities, rationale for consolidating debtors' estates is at bottom one of practicality because, without consolidation and in light of difficulties of unscrambling assets and liabilities which have been hopelessly commingled, all creditors will be worse off, and there is threat that bankruptcy case will be operated solely for benefit of bankruptcy professionals.

2 Cases that cite this headnote

**[16]**    **Bankruptcy**

👉 Proceedings;  evidence

Proponents of substantive consolidation bear burden of showing one of the two rationales on which such consolidation may be premised.

Cases that cite this headnote

**[17]**    **Bankruptcy**

👉 Grounds and objections;  factors considered

**Bankruptcy**

👉 Proceedings;  evidence

Prima facie case exists for substantive consolidation of bankruptcy estates where, based upon parties' prepetition dealings, a proponent proves corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity;

creditor proponents of consolidation must show that they actually and reasonably relied on debtors' supposed unity, while creditor opponents can defeat this prima facie showing if they can prove that they are adversely affected and actually relied upon debtors' separate existence.

4 Cases that cite this headnote

**[18]**    **Bankruptcy**

👉 Particular cases

District court should not have substantively consolidated Chapter 11 estates of corporate-debtor-borrowers and related corporate entities that guaranteed their loan obligations, where lender had relied on debtors' separateness in insisting on guarantees from affiliated entities that, unlike debtor-borrowers, had no potential exposure on asbestos claims, where there was no hopeless commingling of debtors' assets and liabilities but only the risk of some inaccuracies in separating them, and where consolidation that was sought was not true substantive consolidation, but a deemed consolidation that would operate primarily to disadvantage lender by depriving it of guarantees for which it had bargained.

12 Cases that cite this headnote

**[19]**    **Bankruptcy**

👉 Grounds and objections;  factors considered

Commingling of assets and liabilities of debtor-entities justifies the substantive consolidation of their estates only when separately accounting for assets and liabilities of these distinct entities will reduce recovery of every creditor, i.e., when every creditor will benefit from the consolidation; moreover, this benefit should be from cost savings that make assets available, rather than from shifting of assets to benefit one group of creditors at another's expense.

2 Cases that cite this headnote

**[20]**    **Bankruptcy**

👉 Grounds and objections;  factors considered

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 5 of 540

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

Neither the impossibility of perfection in untangling affairs of debtor-entities nor likelihood of some inaccuracies in efforts to do so is sufficient to justify substantive consolidation of debtors' estates.

Cases that cite this headnote

[21]    **Bankruptcy**
         👉 Grounds and objections; factors considered

Substantive consolidation of bankruptcy estates should be used defensively to remedy identifiable harms, not offensively to achieve advantage over one group in plan negotiation process nor as "free pass" to spare debtors or any other group from proving challenges, like fraudulent transfer claims.

5 Cases that cite this headnote

[22]    **Bankruptcy**
         👉 Transfer and Consolidation of Cases

         **Bankruptcy**
         👉 Equitable powers and principles

Substantive consolidation of bankruptcy estates is at its core an equitable remedy, and its exercise must lead to equitable result.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*198** Martin J. Bienenstock, (Argued), John J. Rapisardi, Richard A. Rothman, Timothy E. Graulich, Weil, Gotshal & Manges LLP, New York, NY, Ellen R. Nadler, Jeffrey S. Trachtman, Kenneth H. Eckstein, Philip S. Kaufman, Kramer, Levin, Naftalis & Frankel LLP, New York, NY, Roy T. Englert, Jr., Robbins, Russell, Englert, Orseck & Untereiner LLP, Washington, DC, Rebecca L. Butcher, Adam G. Landis, Richard S. Cobb, Landis, Rath & Cobb LLP, Wilmington, DE, for (Appellant) Credit Suisse First Boston Corp., as Agent for the prepetition bank lenders.

Alexandra A.E. Shapiro, Mitchell A. Seider, Alan Leavitt, Latham & Watkins LLP, New York, NY, Amanda P. Biles, Latham & Watkins LLP, Reston, Virginia, for (Amicus-

appellants) The Loan Syndications and Trading Association, Inc. and Clearing House Association L.L.C.

Richard M. Kohn, Andrew R. Cardonick, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz Ltd., Chicago, IL, Jonathan N. Helfat, Otterbourg, Steindler, Houston & Rosen, P.C., New York, NY, for (Amicus-appellant) Commercial Financial Association.

Robert K. Rasmussen, Milton Underwood Professor of Law, Vanderbilt Law School, Nashville, TN, for (Amicus-appellants) Robert K. Rasmussen, Barry Adler, Susan Block–Lieb, G. Marcus Cole, Marcel Kahan, Ronald J. Mann, and David A. Skeel, Jr.

Adam H. Isenberg, Saul Ewing LLP, Philadelphia, PA, Norman L. Pernick, J. Kate Stickles, Saul Ewing LLP, Wilmington, DE, Charles O. Monk, II, (Argued), Joseph M. Fairbanks, Henry R. Abrams, Dan Friedman, Saul Ewing LLP, Baltimore, MD, for (Appellee) Owens Corning, a Delaware Corporation; CDC Corp.; Engineered Yarns American Inc.; Exterior Systems Inc.; Falcon Foam Corp.; Fibreboard Corp.; HomeExperts; Integrex; Integrex Professional Services; Integrex Testing Systems; **\*199** Integrex Supply Chain Solutions LLC; Integrex Ventures LLC; Jefferson Holdings Inc.; Owens–Corning Fiberglass Technology Inc.; Owens–Corning HT, Inc.; Owens–Corning Overseas Holdings, Inc.; Owens–Corning Remodeling Systems, LLC; Soltech, Inc.

Elihu Inselbuch, Caplin & Drysdale, Chartered, New York, NY, Peter Van N. Lockwood, Nathan D. Finch, Walter B. Slocombe, Caplin & Drysdale, Chartered, Washington, DC, Marla R. Eskin, Campbell & Levine, LLC, Wilmington, DE, for (Appellee) Official Committee of Unsecured Creditors.

Michael J. Crames, Jane W. Parver, Edmund M. Emrich, Andrew A. Kress, Kaye Scholer LLP, New York, NY, James L. Patton, Jr., Joseph M. Barry, Young, Conaway, Stargatt & Taylor LLP, Wilmington, DE, for (Appellee) James J. McMonagle, Legal Representative for Future Claimants.

J. Andrew Rahl, (Argued), John B. Berringer, John H. Doyle, III, Howard Ressler, Dennis J. Artese, Anderson, Kill & Olick, P.C., New York, NY, Francis A. Monaco, Jr., Monzack & Monaco P.A., Wilmington, DE, for (Appellee) Official Representatives of the Bondholders and Trade Creditors f/k/a Official Committee of Unsecured Creditors of Owens Corning.

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 6 of 540

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

Howard A. Rosenthal, Alan R. Gordon, Pelino & Lentz P.C., Philadelphia, PA, Laurence J. Kaiser, Law Office of Laurence J. Kaiser, New York, NY, for (Amicus-appellee) Commercial Law League America.

Before ROTH, AMBRO and FUENTES, Circuit Judges.

**Opinion**

## OPINION OF THE COURT

AMBRO, Circuit Judge.

We consider under what circumstances a court exercising bankruptcy powers may substantively consolidate affiliated entities. Appellant Credit Suisse First Boston ("CSFB") is the agent for a syndicate of banks (collectively, the "Banks")[1] that extended in 1997 a $2 billion unsecured loan to Owens Corning, a Delaware corporation ("OCD"), and certain of its subsidiaries. This credit was enhanced in part by guarantees made by other OCD subsidiaries. The District Court granted a motion to consolidate the assets and liabilities of the OCD borrowers[2] and guarantors in anticipation of a plan of reorganization.

The Banks appeal and argue that the Court erred by granting the motion, as it misunderstood the reasons for, and standards for considering, the extraordinary remedy of substantive consolidation, and in any event did not make factual determinations necessary even to consider its use. Though we reverse the ruling of the District Court, we do so aware that it acted on an issue with no opinion on point by our Court and differing rationales by other courts.

While this area of law is difficult and this case important, its outcome is easy with the facts before us. Among other problems, the consolidation sought is "deemed." Should we approve this non-consensual arrangement, the plan process would proceed as though assets and liabilities of separate entities were merged, but in fact they remain separate with the twist that the guarantees to the Banks are eliminated. From this we conclude that the **\*200** proponents of substantive consolidation request it not to rectify the seldom-seen situations that call for this last-resort remedy but rather as a ploy to deprive one group of creditors of their rights while providing a windfall to other creditors.

## I. Factual Background and Procedural History

### A. Owens Corning Group of Companies

OCD and its subsidiaries (which include corporations and limited liability companies) comprise a multinational corporate group. Different entities within the group have different purposes. Some, for example, exist to limit liability concerns (such as those related to asbestos), others to gain tax benefits, and others have regulatory reasons for their formation.

Each subsidiary was a separate legal entity that observed governance formalities. Each had a specific reason to exist separately, each maintained its own business records, and intercompany transactions were regularly documented.[3] Although there may have been some "sloppy" bookkeeping, two of OCD's own **\*201** officers testified that the financial statements of all the subsidiaries were accurate in all material respects. Further, through an examination of the subsidiaries' books, OCD's postpetition auditors (Ernst & Young) have eliminated most financial discrepancies, particularly with respect to the larger guarantor subsidiaries.

### B. The 1997 Credit Agreement

In 1997 OCD sought a loan to acquire Fibreboard Corporation. At this time OCD faced growing asbestos liability and a poor credit rating that hindered its ability to obtain financing. When CSFB was invited to submit a bid, it included subsidiary guarantees in the terms of its proposal. The guarantees gave the Banks direct claims against the guarantors for payment defaults. They were a "credit enhancement" without which the Banks would not have made the loan to OCD. All draft loan term sheets included subsidiary guarantees.

A $2 billion loan from the Banks to OCD closed in June 1997. The loan terms were set out primarily in a Credit Agreement. Among those terms were the guarantee provisions and requirements for guarantors, who were defined as "present or future Domestic Subsidiar[ies] ... having assets with an aggregate book value in excess of $30,000,000." Section 10.07 of the Agreement provided that the guarantees were "absolute and unconditional" and each "constitute[d] a guarant[ee] of payment and not a guarant[ee] of collection."[4] A "No Release of Guarantor" provision in § 10.8 stated that "the obligations of each guarantor ... shall not be reduced, limited or terminated, nor shall such guarantor be discharged

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 7 of 540

*In re Owens Corning, 419 F.3d 195 (2005)*
45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

from any such obligations, for any reason whatsoever," except payment and performance in full or through waiver or amendment of the Credit Agreement. Under § 13.05 of the Credit Agreement, a guarantor could be released only through (i) the unanimous consent of the Banks for the guarantees of Fibreboard subsidiaries or through the consent of Banks holding 51% of the debt for other subsidiaries, or (ii) a fair value sale of the guarantor if its cumulative assets totaled less than 10% of the book value of the aggregate OCD group of entities.

CSFB negotiated the Credit Agreement expressly to limit the ways in which OCD could deal with its subsidiaries. For example, it could not enter into transactions with a subsidiary that would result in losses to that subsidiary. Importantly, the Credit Agreement contained provisions designed to protect the separateness of OCD and its subsidiaries. The subsidiaries agreed explicitly to maintain themselves as separate entities. To further this agreement, they agreed to keep separate books and financial records in order to prepare separate financial statements. The Banks were given the right to visit each subsidiary and discuss business matters directly with that subsidiary's management. The subsidiaries also were prohibited from merging into OCD because both entities were required to survive a transaction under § 8.09(a)(ii)(A) of the Credit Agreement. This provision also prohibited guarantor subsidiaries from merging with other subsidiaries unless there would be no effect on the guarantees' value.

## C. Procedural History
On October 5, 2000, facing mounting asbestos litigation, OCD and seventeen of its **\*202** subsidiaries (collectively, the "Debtors") filed for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.*[5] Twenty-seven months later, the Debtors and certain unsecured creditor groups (collectively, the "Plan Proponents") proposed a reorganization plan (as amended, the "Plan") predicated on obtaining "substantive consolidation" of the Debtors along with three non-Debtor OCD subsidiaries.[6] Typically this arrangement pools all assets and liabilities of the subsidiaries into their parent and treats all claims against the subsidiaries as transferred to the parent. In fact, however, the Plan Proponents sought a form of what is known as a "deemed consolidation," under which a consolidation is deemed to exist[7] for purposes of valuing and satisfying creditor claims, voting for or against the Plan, and making distributions for allowed claims under it. Plan § 6.1. Yet "the Plan would not result in the merger of or the transfer or commingling of any

assets of any of the Debtors or Non–Debtor Subsidiaries, ... [which] will continue to be owned by the respective Debtors or Non–Debtors." Plan § 6.1(a). Despite this, on the Plan's effective date "all guarantees of the Debtors of the obligations of any other Debtor will be deemed eliminated, so that any claim against any such Debtor and any guarantee thereof ... will be deemed to be one obligation of the Debtors with respect to the consolidated estate." Plan § 6.1(b). Put another way, "the Plan eliminates the separate obligations of the Subsidiary Debtors arising from the guarant[e]es of the 1997 Credit Agreement." Plan Disclosure Statement at A–9897.

The Banks objected to the proposed consolidation. Judge Alfred Wolin held a hearing on this objection.[8] He was subsequently recused from the Debtors' bankruptcy proceedings in light of *In re Kensington Int'l Ltd.,* 368 F.3d 289 (3d Cir.2004), and Judge John Fullam was designated by the Chief Judge of our Court to replace him. Judge Fullam reviewed the transcripts and exhibits of the hearing, ordered additional briefing and on October 5, 2004, granted the consolidation motion in an order accompanied by a short opinion. *In re Owens Corning,* 316 B.R. 168 (Bankr.D.Del.2004).

Judge Fullam concluded that there existed "substantial identity between ... OCD and its wholly-owned subsidiaries." *Id.* at 171. He further determined that "there [was] simply no basis for a finding that, in extending credit, the Banks relied upon the separate credit of any of the subsidiary guarantors." *Id.* at 172. In Judge Fullam's view, it was "also clear that substantive consolidation would greatly simplify and expedite the successful completion of this entire bankruptcy proceeding. **\*203** More importantly, it would be exceedingly difficult to untangle the financial affairs of the various entities." *Id.* at 171. As such, he held substantive consolidation should be permitted, as not only did it allow "obvious advantages ... [, but was] a virtual necessity." *Id.* at 172. In any event, Judge Fullam wrote, "[t]he real issue is whether the Banks are entitled to participate, *pari passu,* with other unsecured creditors, or whether the Banks' claim is entitled to priority, in whole or in part, over the claims of other unsecured creditors." *Id.* But this issue, he stated, "cannot now be determined." *Id.*

CSFB appeals on the Banks' behalf.

## II. Appellate Jurisdiction

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 8 of 540

In re Owens Corning, 419 F.3d 195 (2005)
45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

The Plan Proponents moved to dismiss the appeal of the District Court's order granting consolidation on the ground that it is not a "final decision" from which an appeal may be taken pursuant to 28 U.S.C. § 1291. [9] We denied that motion prior to oral argument in this case and noted that our reasoning would follow in this opinion.

[1]    Recognizing the "protracted nature of many bankruptcy proceedings, and the waste of time and resources that might result if immediate appeal [is] denied," *United States Trustee v. Gryphon at the Stone Mansion, Inc.,* 166 F.3d 552, 556 (3d Cir.1999), "[w]e apply a broader concept of 'finality' when considering bankruptcy appeals under § 1291 than we do when considering other civil orders under the same section." *In re Marvel Entm't Group, Inc,* 140 F.3d 463, 470 (3d Cir.1998). *See also Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV,* 229 F.3d 245, 250 (3d Cir.2000) (noting that we impose a "relaxed standard" of finality because of unique considerations in bankruptcy cases); 16 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3926.2 at 274 (2d ed.1996) (describing the "Third Circuit's especially flexible approach to bankruptcy finality"). Particularly relevant to our case is that "[t]o delay resolution of discrete claims until after final approval of a reorganization plan ... would waste time and resources, particularly if the appeal resulted in reversal of a bankruptcy court order necessitating re-appraisal of the entire plan." *Clark v. First State Bank (In re White Beauty View, Inc.),* 841 F.2d 524, 526 (3d Cir.1988). We have also stressed that "issues central to the progress of the bankruptcy petition, those 'likely to affect the distribution of the debtor's assets, or the relationship among the creditors,' should be resolved quickly." *Century Glove, Inc. v. First Am. Bank,* 860 F.2d 94, 98 (3d Cir.1988) (quoting *Southeastern Sprinkler Co., Inc. v. Meyertech Corp. (In re Meyertech ),* 831 F.2d 410, 414 (3d Cir.1987)).

[2]    [3]    We consider four factors in determining whether we should exercise jurisdiction over a bankruptcy appeal: "(1) [t]he impact on the assets of the bankrupt estate; (2) [the][n]ecessity for further fact-finding on remand; (3) [t]he preclusive effect of [the Court's] decision on the merits of further litigation; and (4) [t]he interest of judicial economy." *Buncher,* 229 F.3d at 250. All four factors weigh heavily in favor of our jurisdiction to consider the appeal of an order granting substantive consolidation. We thus join the four Courts of Appeal that have exercised jurisdiction in this context. *Alexander v. Compton (In re Bonham ),* 229 F.3d

750, 762 (9th Cir.2000); *First Nat'l Bank of El* **\*204** *Dorado v. Giller (In re Giller ),* 962 F.2d 796, 797–98 (8th Cir.1992); *Eastgroup Props. v. S. Motel Ass'n,* 935 F.2d 245, 248 (11th Cir.1991); and *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.),* 860 F.2d 515, 516–17 (2d Cir.1988).

First, substantive consolidation has a profound effect on the assets of the consolidated entities. *See, e.g., Nesbit v. Gears Unlimited,* 347 F.3d 72, 86–87 (3d Cir.2003). Second, there is no need for additional fact-finding to assess the propriety of an order granting substantive consolidation. In this case, for example, Judge Fullam reached his decision after a thirteen-day evidentiary hearing was held by Judge Wolin, and after Judge Fullam reviewed "the transcript of the testimony, and ... the voluminous documentary record compiled in the course of the hearing, and [had] the benefit of post-trial briefing and argument." *In re Owens Corning,* 316 B.R. at 169. Third, a substantive consolidation order clearly has a preclusive effect on the merits of further litigation. In this case, the order precludes at least the Banks from asserting any right compromised or eliminated by virtue of the substantive consolidation. Last, the interests of judicial economy are best served by an immediate review of a substantive consolidation order. A later reversal of such an order risks rendering meaningless any proceedings premised on the viability of a plan that calls for a consolidation (even if for only a temporary period).

[4]    Having concluded that we generally have jurisdiction to review appeals of substantive consolidation orders, we inquire whether anything is "different" about this case. The Plan Proponents argue that

> [t]he District Court Order lacks finality because it will be implemented, if at all, only following approval of a disclosure statement, the solicitation and vote of creditors as to the terms of the Proposed Plan, and, assuming the requisite vote, final confirmation of the Proposed Plan, before which creditors other than the Bank Debt Holders shall be given the opportunity to contest substantive consolidation. [Bankruptcy Code] § 1129. Thus, the District Court Order is conditioned upon plan confirmation.... The District Court Order has no present impact

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 9 of 540

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

on the Debtors' estates and does not change the status quo.

Plan Proponents' Mot. to Dismiss at 10. In support of this contention, the Plan Proponents rely primarily on *In re A.S.K. Plastics, Inc.,* No. Civ. A. 04–2701, 2004 WL 1903322 (E.D.Pa. Aug. 24, 2004). Yet the conclusion that the Court lacked jurisdiction in *A.S.K. Plastics* was premised on the fact that "[u]nder no reasonable construction of the law could the Order's *conditional* consolidation be viewed as effect[ing] a 'practical termination' of anything." *Id.* at *2 (emphasis in original). That order "emphasized [that] ... [w]hen a final reorganization plan [was] submitted to the Bankruptcy Court, [the party appealing the order] [was] free to object to consolidation." *Id.* In effect, the *A.S.K. Plastics* order was designed to postpone consideration of the substantive consolidation issue until the plan confirmation stage.

That is not our case. For the Banks the District Court's determination is hardly conditional. It concluded "that substantive consolidation should be permitted." *In re Owens Corning,* 316 B.R. at 172. It made no provision for the Banks to reassert their objection to substantive consolidation at the plan confirmation stage; the order is final against them and is thus a practical termination of the substantive consolidation litigation.

**\*205** Lastly, we address the Plan Proponents' argument that a substantive consolidation order must immediately take effect in order to be final for purposes of our jurisdiction. What they ignore is that the order approving substantive consolidation is the foundation on which the Plan is built. To assert that the actual substantive consolidation can only be implemented in conjunction with the effectiveness of an approved plan puts form over function. As the Banks point out, "[t]here is no support for the proposition that final orders lose their finality because of a delay in implementation." CSFB Opp'n to Mot. to Dismiss at 13. Certainly, decisions resolving most disputes (notably, disputes over the validity and value of claims) are not implemented until a plan is confirmed and payment under the plan becomes obligatory. Yet we exercise jurisdiction to review many of these decisions before that "final" order issues. *See, e.g., Hefta v. Official Comm. of Unsecured Creditors (In re Am. Classic Voyages Co.),* 405 F.3d 127 (3d Cir.2005). No reason exists for us to vary that routine here.

We conclude readily that we have appellate jurisdiction to consider the Banks' appeal under 28 U.S.C. § 1291.

### III. Substantive Consolidation

**[5]  [6]**    Substantive consolidation, a construct of federal common law, emanates from equity. It "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor." *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.),* 402 F.3d 416, 423 (3d Cir.2005). Consolidation restructures (and thus revalues) rights of creditors and for certain creditors this may result in significantly less recovery.

While we have not fully considered the character and scope of substantive consolidation, we discussed the concept in *Nesbit,* 347 F.3d at 86–88 (surveying substantive consolidation case law for application by analogy to the Title VII inquiry of when to consolidate employers for the purpose of assessing a discrimination claim), and *In re Genesis Health Ventures,* 402 F.3d at 423–24 (examining, *inter alia,* whether a "deemed" consolidation for voting in connection with, and distribution under, a proposed plan of reorganization is a substantive consolidation for purposes of calculating U.S. Trustee quarterly fees under 28 U.S.C. § 1930(a)(6)). Other courts, including the Supreme Court itself in an opinion that spawned the concept of consolidation, have holdings more on point than heretofore have we. We begin with a survey of key cases, drawing from them when substantive consolidation may apply consistent with the principles we perceive as cabining its use, and apply those principles to this case.

### A. History of Substantive Consolidation

The concept of substantively consolidating separate estates begins with a commonsense deduction. Corporate disregard [10] as a fault may lead to corporate disregard as a remedy.

Prior to substantive consolidation, other remedies for corporate disregard were (and remain) in place. For example, where a subsidiary is so dominated by its **\*206** corporate parent as to be the parent's "alter ego," the "corporate veil" of the subsidiary can be ignored (or "pierced") under state law. Kors, *supra,* at 386–90 (citing as far back as I. Maurice Wormser, *Piercing the Veil of Corporate Entity,* 12 Colum. L.Rev. 496 (1912)). Or a court might mandate that the assets transferred to a corporate subsidiary be turned over to its

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 10 of 540

In re Owens Corning, 419 F.3d 195 (2005)
45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

parent's mechanism in bankruptcy for wrongs such as fraudulent transfers, Kors, *supra*, at 391, in effect bringing back to the bankruptcy estate assets wrongfully conveyed to an affiliate. If a corporate parent is both a creditor of a subsidiary and so dominates the affairs of that entity as to prejudice unfairly its other creditors, a court may place payment priority to the parent below that of the other creditors, a remedy known as equitable subordination, which is now codified in § 510(c) of the Bankruptcy Code. *See generally id.* at 394–95.

Adding to these remedies, the Supreme Court, little more than six decades ago, approved (at least indirectly and perhaps inadvertently) what became known as substantive consolidation. [11] *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941). In *Sampsell* an individual in bankruptcy had transferred assets prepetition to a corporation he controlled. (Apparently these became the corporation's sole assets.) When the bankruptcy referee ordered that the transferred assets be turned over by the corporation to the individual debtor's trustee, a creditor of the non-debtor corporation sought distribution priority with respect to that entity's assets. In deciding that the creditor should not be accorded priority (thus affirming the bankruptcy referee), the Supreme Court turned a typical turnover/fraudulent transfer case into the forebear of today's substantive consolidation by terming the bankruptcy referee's order (marshaling the corporation's assets for the benefit of the debtor's estate) as "consolidating the estates." *Id.* at 219, 61 S.Ct. at 907.

Each of these remedies has subtle differences. "Piercing the corporate veil" makes shareholders liable for corporate wrongs. Equitable subordination places bad-acting creditors behind other creditors when distributions are made. Turnover and fraudulent transfer bring back to the transferor debtor assets improperly transferred to another (often an affiliate). Substantive consolidation goes in a direction different (and in most cases further) than any of these remedies; it is not limited to shareholders, it affects distribution to innocent creditors, and it mandates more than the return of specific assets to the predecessor owner. It brings all the assets of a group of entities into a single survivor. Indeed, it merges liabilities as well. "The result," to repeat, "is that claims of creditors against separate debtors morph to claims against the consolidated survivor." *In re Genesis Health Ventures,* 402 F.3d at 423. The bad news for certain creditors is that, instead of looking to assets of the subsidiary with whom they dealt, they now must share those assets with all creditors of

all consolidated entities, raising the specter for some of a significant distribution diminution.

Though the concept of consolidating estates had Supreme Court approval, Courts of Appeal (with one exception) were slow to follow suit. *Stone v. Eacho (In re Tip Top Tailors, Inc.),* 127 F.2d 284 (4th Cir.1942), *cert. denied,* 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942), was the first to

**\*207** pick up on *Sampsell's* new remedy. [12] Little occurred thereafter for more than two decades, until the Second Circuit issued several decisions—*Soviero v. National Bank of Long Island,* 328 F.2d 446 (2d Cir.1964); *Chemical Bank New York Trust Co. v. Kheel (In re Seatrade Corp.),* 369 F.2d 845 (2d Cir.1966); *Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.),* 432 F.2d 1060 (2d Cir.1970); and *James Talcott, Inc. v. Wharton (In re Continental Vending Machine Corp.),* 517 F.2d 997 (2d Cir.1975)—that brought substantive consolidation as a remedy back into play and premise its modern-day understanding.

Other Circuit Courts fell in line in acknowledging substantive consolidation as a possible remedy. *See, e.g., FDIC v. Hogan (In re Gulfco Inv. Corp.),* 593 F.2d 921, 927–28 (10th Cir.1979); *Pension Benefit Guar. Corp. v. Ouimet Corp.,* 711 F.2d 1085, 1092–93 (1st Cir.1983), *cert. denied,* 464 U.S. 961, 104 S.Ct. 393, 78 L.Ed.2d 337 (1983); *Drabkin v. Midland–Ross Corp. (In re Auto–Train Corp.),* 810 F.2d 270, 276 (D.C.Cir.1987); *Eastgroup,* 935 F.2d at 248; *In re Giller,* 962 F.2d at 799; *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.),* 974 F.2d 712, 720 (6th Cir.1992); *Reider v. FDIC (In re Reider),* 31 F.3d 1102, 1105–07 (11th Cir.1994); and *In re Bonham,* 229 F.3d at 771.

The reasons of these courts for allowing substantive consolidation as a possible remedy span the spectrum and often overlap. For example, *Stone* and *Soviero* followed the well-trod path of alter ego analysis in state "pierce-the-corporate-veil" cases. *Stone,* 127 F.2d at 287–89; *Soviero,* 328 F.2d at 447–48. *Accord In re Gulfco Inv. Corp.,* 593 F.2d at 928–29. *Kheel* dealt with, *inter alia,* the net-negative practical effects of attempting to thread back the tangled affairs of entities, separate in name only, with "interrelationships ... hopelessly obscured." 369 F.2d at 847. *See also, e.g., In re Augie/Restivo,* 860 F.2d at 518–19. In re Continental Vending Machine balanced the "inequities" involved when substantive rights are affected against the "practical considerations" spawned by "accounting difficulties (and expense) which may occur where the interrelationships of the corporate group are highly complex,

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 11 of 540

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

or perhaps untraceable." 517 F.2d at 1001. *See also, e.g., In re Auto–Train,* 810 F.2d at 276; *Eastgroup,* 935 F.2d at 249; *In re Giller,* 962 F.2d at 799; *In re Reider,* 31 F.3d at 1107–08. *See generally* Kors, *supra,* at 402–06.

Ultimately most courts slipstreamed behind two rationales—those of the Second Circuit in *Augie/Restivo* and the D.C. Circuit in *Auto–Train.* The former found that the competing "considerations are merely variants on two critical factors: (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit, **\*208** ... or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors...." *In re Augie/Restivo,* 860 F.2d at 518 (internal quotation marks and citations omitted). *Auto–Train* touched many of the same analytical bases as the prior Second Circuit cases, but in the end chose as its overarching test the "substantial identity" of the entities and made allowance for consolidation in spite of creditor reliance on separateness when "the demonstrated benefits of consolidation 'heavily' outweigh the harm." *In re Auto–Train,* 810 F.2d at 276 (citation omitted).

Whatever the rationale, courts have permitted substantive consolidation as an equitable remedy in certain circumstances. [13] No court has held that substantive consolidation is not authorized, [14] though there **\*209** appears nearly unanimous consensus that it is a remedy to be used "sparingly." *In re Augie/Restivo,* 860 F.2d at 518; *see also In re Bonham,* 229 F.3d at 767 (explaining that "almost every other court has noted [that substantive consolidation] should be used 'sparingly' ") (citing *In re Flora Mir,* 432 F.2d at 1062–63). [15]

**\*210 B. Our View of Substantive Consolidation**

 **[7]**  Substantive consolidation exists as an equitable remedy. But when should it be available and by what test should its use be measured? As already noted, we have commented on substantive consolidation only generally in *Nesbit,* 347 F.3d at 86–88, and *In re Genesis Health Ventures,* 402 F.3d at 423–24. The latter nonetheless left little doubt that, if presented with a choice of analytical avenues, we favor essentially that of *Augie/Restivo. Id.* at 423. The *Auto–Train* approach (requiring "substantial identity" of entities to be consolidated, plus that consolidation is "necessary to avoid some harm or realize some benefit," 810 F.2d at 276) adopts, we presume, one of the *Augie/Restivo* touchstones for substantive consolidation while adding the low bar of avoiding some harm or discerning some benefit by consolidation. To us

this fails to capture completely the few times substantive consolidation may be considered and then, when it does hit one chord, it allows a threshold not sufficiently egregious and too imprecise for easy measure. For example, we disagree that "[i]f a creditor makes [a showing of reliance on separateness], the court may order consolidation ... if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm." *Id.* at 276 (citation omitted); *see also Eastgroup,* 935 F.2d at 249. If an objecting creditor relied on the separateness of the entities, consolidation cannot be justified *vis-à-vis* the claims of that creditor. [16]

In assessing whether to order substantive consolidation, courts consider many factors (some of which are noted in *Nesbit,* 347 F.3d at 86–88 nn. 7 & 9). They vary (with degrees of overlap) from court to court. Rather than endorsing any prefixed factors, in *Nesbit* we "adopt[ed] an intentionally open-ended, equitable inquiry ... to determine when substantively to consolidate two entities." *Id.* at 87. While we mentioned that "in the bankruptcy context the inquiry focuses primarily on financial entanglement," *id.,* this comment primarily related to the hopeless commingling test of substantive consolidation. But when creditors deal with entities as an indivisible, single party, "the line between operational and financial [factors] may be blurred." *Id.* at 88. We reiterate that belief here. Too often the factors in a checklist fail to separate the unimportant from the important, or even to set out a standard to make the attempt. *Accord* Br. of Law Professors [17] as *Amici Curiae* at 11–12. This often results in rote following of a form containing factors where courts tally up and spit out a score without an eye on the principles that give the rationale for substantive consolidation (and why, as a result, it should so seldom be in play). *Id.* **\*211** ("Differing tests with a myriad of factors run the risk that courts will miss the forest for the trees. Running down factors as a check list can lead a court to lose sight of why we have substantive consolidation in the first instance ... and often [to] fail [to] identify a metric by which [it] can ... [assess] the relative importance among the factors. The ... [result is] resort to ad hoc balancing without a steady eye on the ... [principles] to be advanced....").

 **[8]   [9]   [10]   [11]   [12]**  What, then, are those principles? We perceive them to be as follows.

(1) Limiting the cross-creep of liability by respecting entity separateness is a "fundamental ground rule[ ]." Kors, *supra,* at 410. As a result, the general expectation of state law and of the Bankruptcy Code, and thus of commercial

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 12 of 540

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

markets, is that courts respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play.

(2) The harms substantive consolidation addresses are nearly always those caused by *debtors* (and entities they control) who disregard separateness. [18] Harms caused by creditors typically are remedied by provisions found in the Bankruptcy Code (*e.g.,* fraudulent transfers, §§ 548 and 544(b)(1), and equitable subordination, § 510(c)).

(3) Mere benefit to the administration of the case (for example, allowing a court to simplify a case by avoiding other issues or to make postpetition accounting more convenient) is hardly a harm calling substantive consolidation into play.

(4) Indeed, because substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this "rough justice" remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies (for example, the possibility of more precise remedies conferred by the Bankruptcy Code).

(5) While substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights).

 [13]    [14]    [15]    The upshot is this. In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, [19] or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. [20]

 *212 [16]    [17]    Proponents of substantive consolidation have the burden of showing one or the other rationale for consolidation. The second rationale needs no explanation. The first, however, is more nuanced. A *prima facie* case for it typically exists when, based on the parties' prepetition dealings, a proponent proves corporate disregard creating

contractual expectations of creditors [21] that they were dealing with debtors as one indistinguishable entity. Kors, *supra,* at 417–18; Christopher W. Frost, *Organizational Form, Misappropriation Risk, and the Substantive Consolidation of Corporate Groups,* 44 Hastings L.J. 449, 457 (1993). Proponents who are creditors must also show that, in their prepetition course of dealing, they actually and reasonably relied on debtors' supposed unity. Kors, *supra,* at 418–19. Creditor opponents of consolidation can nonetheless defeat a *prima facie* showing under the first rationale if they can prove they are adversely affected and actually relied on debtors' separate existence. [22]

## C. Application of Substantive Consolidation to Our Case

 [18]    With the principles we perceive underlie use of substantive consolidation, the outcome of this appeal is apparent at the outset. Substantive consolidation fails to fit the facts of our case and, in any event, a "deemed" consolidation cuts against the grain of all the principles.

To begin, the Banks did the "deal world" equivalent of "Lending 101." They loaned $2 billion to OCD and enhanced the credit of that unsecured loan indirectly by subsidiary guarantees covering less than half the initial debt. What the Banks got in lending lingo was "structural seniority"— a direct claim against the guarantors (and thus against their assets levied on once a judgment is obtained) that other creditors of OCD did not have. This kind of lending occurs every business day. To undo this bargain is a demanding task.

## 1. NO PREPETITION DISREGARD OF CORPORATE SEPARATENESS

Despite the Plan Proponents' pleas to the contrary, there is no evidence of the prepetition disregard of the OCD entities' separateness. To the contrary, OCD (no less than CSFB) negotiated the 1997 lending transaction premised on the separateness of all OCD affiliates. Even today no allegation exists of bad faith by anyone concerning the loan. [23] In this context, OCD and the other Plan Proponents cannot now ignore, or have us ignore, the very ground rules OCD put in place. Playing by these rules means that obtaining the guarantees of separate entities, made separate *213 by OCD's choice of how to structure the affairs of its affiliate group of companies, entitles a lender, in bankruptcy or out, to look to any (or all) guarantor(s) for payment when the time comes. As such, the District Court's conclusions of "substantial identity" of OCD and its subsidiaries, and the

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 13 of 540

In re Owens Corning, 419 F.3d 195 (2005)
45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

Banks' reliance thereon, are incorrect. For example, testimony presented by both the Banks and the Debtors makes plain the parties' intention to treat the entities separately. CSFB presented testimony from attorneys and bankers involved in negotiating the Credit Agreement that reflected their assessment of the value of the guarantees as partially derived from the separateness of the entities. As OCD concedes, these representatives "testified that the guarant[e]es were ... intended to provide 'structural seniority' to the banks," and were thus fundamentally premised on an assumption of separateness. Debtors Ans. Br. at 26.

In the face of this testimony, Plan Proponents nonetheless argue that the Banks intended to ignore the separateness of the entities. In support of this contention, they assert, *inter alia,* that because the Banks did not receive independent financial statements for each of the entities during the negotiating process, they must have intended to deal with them as a unified whole. Because the Banks were unaware of the separate financial makeup of the subsidiaries, the argument goes, they could not have relied on their separateness. [24]

This argument is overly simplistic. Assuming the Banks did not obtain separate financial statements for each subsidiary, they nonetheless obtained detailed information about each subsidiary guarantor from OCD, including information about that subsidiary's assets and debt. Moreover, the Banks knew a great deal about these subsidiaries. For example, they knew that each subsidiary guarantor had assets with a book value of at least $30 million as per the terms of the Credit Agreement, that the aggregate value of the guarantor subsidiaries was over $900 million and that those subsidiaries had little or no debt. Additionally, the Banks knew that Fibreboard's subsidiaries (including the entities that became part of ESI) had no asbestos liability, would be debt-free post-acquisition and had assets of approximately $700 million.

Even assuming the Plan Proponents could prove prepetition disregard of Debtors' corporate forms, we cannot conceive of a justification for imposing the rule that a creditor must obtain financial statements from a debtor in order to rely reasonably on the separateness of that debtor. Creditors are free to employ whatever metrics **\*214** they believe appropriate in deciding whether to extend credit free of court oversight. We agree with the Banks that "the reliance inquiry is not an inquiry into lenders' internal credit metrics. Rather, it is about the *fact* that the credit decision was made in reliance on the existence of separate entities...." CSFB Opening Br. at 31 (emphasis in original). [25] Here there is no serious dispute as to that fact.

## 2. NO HOPELESS COMMINGLING EXISTS POSTPETITION

There also is no meaningful evidence postpetition of hopeless commingling of Debtors' assets and liabilities. Indeed, there is no question which entity owns which principal assets and has which material liabilities. Likely for this reason little time is spent by the parties on this alternative test for substantive consolidation. It is similarly likely that the District Court followed suit.

[19]    The Court nonetheless erred in concluding that the commingling of assets will justify consolidation when "the affairs of the two companies are so entangled that consolidation *will be beneficial." In re Owens Corning, 316 B.R. at 171* (emphasis added). As we have explained, commingling justifies consolidation only when separately accounting for the assets and liabilities of the distinct entities will reduce the recovery of *every* creditor—that is, when every creditor will benefit from the consolidation. Moreover, the benefit to creditors should be from cost savings that make assets available rather than from the shifting of assets to benefit one group of creditors at the expense of another. Mere benefit to some creditors, or administrative benefit to the Court, falls far short. The District Court's test not only fails to adhere to the theoretical justification for "hopeless commingling" consolidation—that no creditor's rights will be impaired—but also suffers from the infirmity that it will almost always be met. That is, substantive consolidation will nearly always produce some benefit to some in the form of simplification and/or avoidance of costs. Among other things, following such a path misapprehends the degree of harm required to order substantive consolidation.

But no matter the legal test, a case for hopeless commingling cannot be made. Arguing nonetheless to the contrary, Debtors assert that "it would be practically impossible and prohibitively expensive in time and resources" to account for the voluntary bankruptcies of the separate entities OCD has created and maintained. Debtors Ans. Br. at 63. In support of this contention, Debtors rely almost exclusively on the District Court's findings that

> it would be exceedingly difficult
> to untangle the financial affairs of
> the various entities ... [and] there
> are ... many reasons for challenging
> the accuracy of the results achieved
> [in accounting efforts thus far]. For

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 14 of 540

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

example, transfers of cash between subsidiaries and parent did not include any payment of interest; and calculations of royalties are subject to question.

*In re Owens Corning,* 316 B.R. at 171. Assuming *arguendo* that these findings are correct, they are simply not enough to establish that substantive consolidation is warranted.

[20]    Neither the impossibility of perfection in untangling the affairs of the entities nor the likelihood of some inaccuracies in efforts to do so is sufficient to justify consolidation. We find *R 2 Investments, LDC v. World Access, Inc.* ( **\*215** *In re World Access, Inc.*), 301 B.R. 217 (Bankr.N.D.Ill.2003), instructive on this point. In *World Access* the Court noted that the controlling entity "had no uniform guidelines for the recording of intercompany interest charges" and that the debtors failed to "allocate overhead charges amongst themselves." *Id.* at 234. The Court held, however, that those accounting shortcomings were "merely imperfections in a sophisticated system of accounting records that were conscientiously maintained." *Id.* at 279. It ultimately concluded that "all the relevant accounting data ... still exist[ed]," that only a "reasonable review to make any necessary adjustments [was] required," and, thus, that substantive consolidation was not warranted. *Id.*

The record in our case compels the same conclusion. At its core, Debtors' argument amounts to the contention that because intercompany interest and royalty payments were not perfectly accounted for, untangling the finances of those entities is a hopeless endeavor. Yet imperfection in intercompany accounting is assuredly not atypical in large, complex company structures. For obvious reasons, we are loathe to entertain the argument that complex corporate families should have an expanded substantive consolidation option in bankruptcy. And we find no reason to doubt that "perfection is not the standard in the substantive consolidation context." *Id.* We are confident that a court could properly order and oversee an accounting process that would sufficiently account for the interest and royalty payments owed among the OCD group of companies for purposes of evaluating intercompany claims—dealing with inaccuracies and difficulties as they arise and not in hypothetical abstractions.

On the basis of the record before us, the Plan Proponents cannot fulfill their burden of demonstrating that Debtors'

affairs are even tangled, let alone that the cost of untangling them is so high relative to their assets that the Banks, among other creditors, will benefit from a consolidation. [26]

**3. OTHER CONSIDERATIONS DOOM CONSOLIDATION AS WELL**

Other considerations drawn from the principles we set out also counsel strongly against consolidation. First of all, holding out the possibility of later giving priority to the Banks on their claims does not cure an improvident grant of substantive consolidation. Among other things, the prerequisites for this last-resort remedy must still be met no matter the priority of the Banks' claims.

[21]    Secondly, substantive consolidation should be used defensively to remedy identifiable harms, not offensively to achieve advantage over one group in the plan negotiation process (for example, by deeming assets redistributed to negate plan voting rights), nor a "free pass" to spare Debtors or any other group from proving challenges, like fraudulent transfer claims, that are liberally brandished to scare yet are hard to show. If the Banks are so vulnerable to the fraudulent transfer challenges Debtors have teed up (but have not swung at for so long), then the game should be played to the finish in that arena. [27]

 **\*216** But perhaps the flaw most fatal to the Plan Proponents' proposal is that the consolidation sought was "deemed" (*i.e.,* a pretend consolidation for all but the Banks). If Debtors' corporate and financial structure was such a sham before the filing of the motion to consolidate, then how is it that post the Plan's effective date this structure stays largely undisturbed, with the Debtors reaping all the liability-limiting, tax and regulatory benefits achieved by forming subsidiaries in the first place? In effect, the Plan Proponents seek to remake substantive consolidation not as a remedy, but rather a stratagem to "deem" separate resources reallocated to OCD to strip the Banks of rights under the Bankruptcy Code, favor other creditors, and yet trump possible Plan objections by the Banks. Such "deemed" schemes we deem not Hoyle.

**IV. Conclusion**

[22]    Substantive consolidation at its core is equity. Its exercise must lead to an equitable result. "Communizing" assets of affiliated companies to one survivor to feed all creditors of all companies may to some be equal (and

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 15 of 540

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

hence equitable). But it is hardly so for those creditors who have lawfully bargained prepetition for unequal treatment by obtaining guarantees of separate entities. *Accord Kheel,* 369 F.2d at 848 (Friendly, J., concurring) ("Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite...."). No principled, or even plausible, reason exists to undo OCD's and the Banks' arms-length negotiation and lending arrangement, especially when to do so punishes the very parties that conferred the prepetition benefit—a $2 billion loan unsecured by OCD and guaranteed by others only in part. To overturn this bargain, set in place by OCD's own pre-loan choices of organizational form, would cause chaos in the marketplace, as it would make this case the Banquo's ghost of bankruptcy.

With no meaningful evidence supporting either test to apply substantive consolidation, there is simply not the nearly "perfect storm" needed to invoke it. Even if there were, a "deemed" consolidation—"several zip (if not area) codes away from anything resembling substantive consolidation," *In re Genesis Health Ventures,* 402 F.3d at 424—fails even to qualify for consideration. Moreover, it is here a tactic used as a sword and not a shield.

We thus reverse and remand this case to the District Court.

**Parallel Citations**

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

Footnotes

1   Though CSFB is the named appellant, the real parties in interest are the Banks (which include CSFB). Thus, unless the context requires otherwise, CSFB and the Banks are referred to interchangeably in this opinion.

2   For ease of reference, we refer hereinafter solely to OCD as the borrower.

3   For example, Owens–Corning Fiberglass Technology, Inc. ("OCFT") was created as an intellectual property holding company to which OCD assigned all of its domestic intellectual property. OCFT licensed this intellectual property back to OCD in return for royalty payments. OCFT also entered into licensing agreements with parties outside of the OCD family of companies. This structure served to shield OCD's intellectual property assets (valued at over $500 million) from liability. OCFT operated as an autonomous entity. It prepared its own accounting and financial records and paid its own expenses from its separate bank accounts. OCFT had its own employees working at its Summit, Illinois plant, which contained machinery and equipment for research and development.
    IPM, Inc. ("IPM") was incorporated as a passive Delaware investment holding company by OCD to consolidate the investments of its foreign subsidiaries. IPM shielded the foreign subsidiaries' investments from OCD liability and likewise shielded OCD from the liability of those foreign subsidiaries. OCD transferred ownership of its foreign subsidiaries to IPM and entered into a revolving loan agreement under which IPM loaned dividends from those subsidiaries to OCD. OCD paid interest on this revolving loan. IPM, like OCFT, entered into agreements with parties unaffiliated with the OCD group and operated as an autonomous entity. IPM also prepared its own accounting and financial records and paid its own expenses from its separate bank accounts. IPM's officers oversaw all investment activity and maintained records of investment activity in IPM subsidiaries.
    Both OCFT and IPM operated outside of OCD's business units. Neither company received administrative support from OCD and both paid payroll and business expenses from their own accounts. Although summaries of their accounting ledgers were entered into OCD's centralized cash management system, the underlying records were created and maintained by the subsidiaries, not OCD. OCFT and IPM even had their own company logos and trade names.
    Integrex was formed by OCD as an asbestos liability management company. For OCD's asbestos liability, Integrex ultimately processed only settled asbestos claims. The company also provided professional services (such as litigation management and materials testing) to the public. It had its own trade name and trademarked logo, its own business unit and its own financial team for business planning, and began several startup businesses that ultimately failed.
    As discussed at Section I(B), *infra,* in 1997 OCD acquired Fibreboard Corporation. Subsequently, OCD formed Exterior Systems, Inc. ("ESI") as a separate entity after several subsidiaries of Fibreboard merged in 1999 in order to shield itself from successor liability for Fibreboard's asbestos products. Although the directors and managers of ESI and OCD overlapped, ESI observed corporate formalities in electing its directors and appointing its officers. In addition, it filed its own tax returns and kept its own accounting records. ESI held substantial assets, including over $1 billion in property, 20 factories, and between 150 and 180 distribution centers.

4   This standard guarantee term means simply that, once the primary obligor (here OCD) defaults, the Banks can proceed against the guarantors directly and immediately without first obtaining a judgment against OCD and collecting against that judgment to determine if a shortfall from OCD exists.

5   For convenience we refer hereinafter simply to "Bankruptcy Code § ___" when citing to a Code section.

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

6   As the Plan's consolidation provisions affected so significantly voting on the Plan and the manner of proceeding at any confirmation hearing, the Plan Proponents filed a motion for a ruling on consolidation in anticipation of those events. "While not a routine procedure, it is not at all unusual for a plan proponent, or a plan opponent, to seek a determination prior to the plan confirmation hearing as to the legitimacy of a particular provision of a proposed plan." *In re Stone & Webster, Inc.,* 286 B.R. 532, 542 (Bankr.D.Del.2002) (Walsh, J.).

7   "[A]ll assets and liabilities of each Subsidiary Debtor ... *will be treated as though* they were merged into and with the assets and liabilities of OCD...." Plan § 6.1(b) (emphasis added).

8   Pursuant to 28 U.S.C. § 157(d), Judge Wolin withdrew the reference of, *inter alia,* the consolidation motion to the Bankruptcy Court, thus making the District Court the judicial forum for the motion to proceed.

9   This provision, rather than 28 U.S.C. § 158(d), applies when the reference to a bankruptcy court is withdrawn.

10   A term used by Mary Elisabeth Kors in her comprehensive and well-organized article entitled *Altered Egos: Deciphering Substantive Consolidation,* 59 U. Pitt. L.Rev. 381, 383 (1998) (hereinafter "Kors").

11   The actual term was not used in a reported case until 1975. *See James Talcott, Inc. v. Wharton (In re Continental Vending Machine Corp.),* 517 F.2d 997, 1004 n.3 (2d Cir.1975).

12   Another case oft-mentioned, and preceding both *Sampsell* and *Stone,* is *Fish v. East,* 114 F.2d 177 (10th Cir.1940). Determining that a corporate subsidiary was simply the parent's "instrumentality," *id. at 191,* the Tenth Circuit affirmed the turnover of the subsidiary's assets to the parent. Though asserting that a "corporate entity may be disregarded where not to do so will defeat public convenience, justify wrong or protect fraud," *id.,* "consolidation" was not mentioned. Indeed, as creditors of the subsidiary in *Fish* were given first priority as to its assets, *id.,* a complete consolidation did not occur. *Accord* Kors, *supra,* at 391 ("true consolidation" occurs only when creditors of consolidated entities share *pari passu* ).

   A case from our Court—*In re Pittsburgh Rys. Co.,* 155 F.2d 477 (3d Cir.1946), *cert. denied sub nom. Phila. Co. v. City of Pittsburgh,* 329 U.S. 731, 67 S.Ct. 90, 91 L.Ed. 632 (1946)—cited *Stone, id. at 484–85 n. 15,* in granting the request of the City of Pittsburgh to exercise bankruptcy jurisdiction over non-debtor companies controlled by the debtor Pittsburgh Railways Company. While guided by the practical need to "strip [ ] off" corporate "cloak[s]," *id. at 484,* in reorganizing Pittsburgh's transportation system, our Court pointed out that "[t]he reorganization court cannot indefinitely be called upon to provide ... unification," *id. at 481.* In so doing, it emphasized that "we are in no way passing upon the fairness of any plan [of reorganization]." *Id. at 485; see also id. at 481.*

13   Indeed, they have not restricted the remedy to debtors, allowing the consolidation of debtors with non-debtors, *see, e.g., In re Bonham,* 229 F.3d at 765 (explaining that "[c]ourts have permitted the consolidation of non-debtor and debtor entities in furtherance of the equitable goals of substantive consolidation") (citing *In re Tureaud,* 810 F.2d at 275; *In re Tureaud,* 59 B.R. 973, 974, 978 (N.D.Okla.1986); *In re Munford, Inc.,* 115 B.R. 390, 395–96 (Bankr.N.D.Ga.1990)); *Soviero,* 328 F.2d 446, and in some cases consolidation retroactively (known also as *nunc pro tunc* consolidation), *see, e.g., In re Bonham,* 229 F.3d at 769–71; *In re Baker & Getty Fin. Servs.,* 974 F.2d at 720–21; *Kroh Bros. Development Co. v. Kroh Bros. Management Co. (In re Kroh Bros. Development Co.),* 117 B.R. 499, 502 (W.D.Mo.1989); *see also Auto–Train,* 810 F.2d at 277 (acknowledging that *nunc pro tunc* consolidations can occur, though not in that case).

   In addition, though we do not permit the consolidation sought in this case, no reason exists to limit it under the right circumstances to any particular form of entity. (Indeed, this case involves corporations and limited liability companies.) *Accord* 2 *Collier on Bankruptcy* ¶ 105.09[1] [c] (15th rev. ed.2005).

14   *See In re Bonham,* 229 F.3d at 765 (explaining that "the equitable power [of substantive consolidation] undoubtedly survived enactment of the Bankruptcy Code" and noting that "[n]o case has held to the contrary"); *but see In re Fas Mart Convenience Stores, Inc.,* 320 B.R. 587, 594 n. 3 (Bankr.E.D.Va.2004) (noting "there is persuasive academic argument that there is no authority in bankruptcy law for substantive consolidation") (citing Daniel B. Bogart, *Resisting the Expansion of Bankruptcy Court Power Under Section 105 of the Bankruptcy Code: The All Writs Act and an Admonition from Chief Justice Marshall,* 35 Ariz. St. L.J. 793, 810 (2003); J. Maxwell Tucker, *Grupo Mexicano and the Death of Substantive Consolidation,* 8 Am. Bankr.Inst. L.Rev. 427 (2000) (hereinafter "Tucker")).

   Since the Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999) (federal district courts lack the equitable power to enjoin prejudgment transfers of assets, as such an equitable remedy did not exist at the time federal courts were created under the Judiciary Act of 1789), some argue that substantive consolidation, judge-made law not expressly codified in the Bankruptcy Code adopted in the late 1970s, does not qualify as an available equitable remedy. *See, e.g.,* Tucker, *supra* at 442–45. This argument has two facets. The first is that bankruptcy courts are limited to exercising only the equitable remedies extant at the time of the adoption of the Judiciary Act of 1789. As substantive consolidation is a relatively recent remedy nowhere contemplated in 1789, *Grupo Mexicano* by analogy bars substantive consolidation just as it does prejudgment preliminary injunctions forbidding asset transfers. *Id.* The second (and corollary) facet of the argument is that, as substantive consolidation is not specifically authorized in the Bankruptcy Code, authority to confer it

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 17 of 540

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

can exist, if at all, only in § 105(a) of the Bankruptcy Code (bankruptcy courts "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title"). Even if § 105(a) "constitutes a direct, fresh grant of supplemental power to the bankruptcy courts, independent of the judicial power granted to the federal courts under title 28 [of the United States Code]," *id.* at 447, it can only implement powers already expressed in the provisions of the Bankruptcy Code. *Id.* at 447–48. *See In re Combustion Eng'g, Inc.,* 391 F.3d 190, 236 (3d Cir.2004) ("The general grant of equitable power contained in § 105(a) ... must be exercised within the parameters of the Code itself."); *In re Kmart Corp.,* 359 F.3d 866, 871 (7th Cir.2004) ("[T]he power conferred by § 105 is one to implement rather than override."). But for joint spouse estates in Bankruptcy Code § 302, consolidation is permitted only in the context of a confirmed plan of reorganization and the requirements that entails. Tucker, *supra,* at 449 (citing to, *inter alia,* Bankruptcy Code § 1123(a)(5)(C)).

The first facet of the argument is, at the outset, premature. Consolidating estates (indeed, consolidating debtor and non-debtor entities) traces to the Supreme Court's *Sampsell* decision in 1941. 313 U.S. at 219, 61 S.Ct. 907. What the Court has given as an equitable remedy remains until it alone removes it or Congress declares it removed as an option. *See In re Stone & Webster,* 286 B.R. at 540 (quoting *Official Comm. of Asbestos Claimants v. G–I Holdings, Inc.* (*In re G–I Holdings, Inc.*), Adv. No. 01–3065(RG) (Bankr.D.N.J. March 12, 2001) (Hearing Tr. at 71–2)).

In addition, at the core of *Grupo Mexicano* was the extent of general, unarticulated equity authority in the federal courts (which, the Court held, can only be justified by reference to 1789 equity authority). It was *not* a bankruptcy case. The extensive history of bankruptcy law and judicial precedent renders the issue of equity authority in the bankruptcy context different to such a degree as to make it different in kind. Notably, in the only two instances in which the word "bankruptcy" appears in Justice Scalia's majority opinion in *Grupo Mexicano,* he uses the *existence* of court authority in the bankruptcy context as a reason to support the conclusion that the district court did not have the authority under generalized equity powers to implement the remedy it imposed. First, he pointed out that "*[t]he law of fraudulent conveyances and bankruptcy was developed to prevent [the] conduct [at issue];* an equitable power to restrict a debtor's use of his unencumbered property before judgment was not." *Grupo Mexicano,* 527 U.S. at 322, 119 S.Ct. at 1970 (emphasis added). Second, he stressed that finding the authority to justify the District Court's remedy in generalized equity power would "add[ ], through judicial fiat, a new and powerful weapon to the creditor's arsenal[;] the new rule could radically alter the balance between debtor's and creditor's rights *which has been developed over centuries through many laws-including those relating to bankruptcy, fraudulent conveyances, and preferences.*" *Id.* at 331, 119 S.Ct. at 1974 (emphasis added). In short, the Court's opinion in *Grupo Mexicano* acknowledged that bankruptcy courts *do* have the authority to deal with the problems presented by that case. One way to conceptualize this idea is to recognize that, had the company in *Grupo Mexicano* been in bankruptcy, the bankruptcy court would have had the authority to implement the remedy the district court lacked authority to order under general equity power outside the bankruptcy context.

As for the argument's second facet, it begins with a concession. Bankruptcy Code § 1123(a)(5)(C)'s very words allow for "consolidation of the debtor with one or more persons" pursuant to a plan "[n]otwithstanding any otherwise applicable non-bankruptcy law." *Accord* Tucker, *supra,* at 448–49. *See also In re Stone & Webster,* 286 B.R. at 540–43. Whether § 105(a) allows consolidation outside a plan is an issue we need not address—though that arguably is what the Plan Proponents propose by moving for a "deemed" consolidation—because, as we note below, consolidation, no matter how it is packaged, cannot pass muster in this case.

In this context, we also need not address the argument, made in the *Amicus Curiae* Brief of the Commercial Finance Association, that substantive consolidation fails the "best interests test" of Bankruptcy Code § 1129(a)(7) (a requirement for plan confirmation that each creditor that does not vote to accept the plan must receive or retain property under the plan at least equal to its recovery in a Bankruptcy Code Chapter 7 liquidation). *See generally In re Stone & Webster,* 286 B.R. at 544–46.

15 Thus we disagree with the assertion of a "liberal trend" toward increased use of substantive consolidation—*e.g., Eastgroup,* 935 F.2d at 248 (describing "a 'modern' or 'liberal' trend toward allowing substantive consolidation") (citing *In re Murray Indus., Inc.,* 119 B.R. 820, 828 (Bankr.M.D.Fla.1990); *In re Vecco Constr. Indus., Inc.,* 4 B.R. 407, 409 (Bankr.E.D.Va.1980)).

16 This opens the question whether a court can order partial consolidation (such a consolidation order "could provide that ... [a creditor relying on separateness] would receive a distribution equal to what [it] would have received absent consolidation and that the remainder of the assets and liabilities be consolidated.") Kors, *supra,* at 450–51. Because this theoretical issue is not before us—and in any event (i) facts bringing it to the fore are unlikely, *id.* at 451 ("If circumstances lead one party to rely on the single status of the one debtor, it is unlikely that other creditors are relying on the joint status of the two entities, especially as reliance must be reasonable."), and (ii) may present practical concerns depending on the facts of a particular case—we do not decide it in this case.

17 They are Robert K. Rasmussen of Vanderbilt Law School, Barry Adler of the NYU School of Law, Susan Block–Leib of Fordham University School of Law, G. Marcus Cole of Stanford Law School, Marcel Kahan of the NYU School of Law, Ronald J. Mann of the University of Texas Law School, and David A. Skeel, Jr. of the University of Pennsylvania School of Law.

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 18 of 540

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

18   Though creditors conceivably can cause debtors to conflate separate organizational forms, the specter of lender liability (which came to the fore in only the last two decades) makes this theoretical possibility all the more remote.

19   This rationale is meant to protect in bankruptcy the prepetition expectations of those creditors. *Accord* Kors, *supra,* at 419. The usual scenario is that creditors have been misled by debtors' actions (regardless whether those actions were intentional or inadvertent) and thus perceived incorrectly (and relied on this perception) that multiple entities were one.

20   This rationale is at bottom one of practicality when the entities' assets and liabilities have been "hopelessly commingled." *In re Gulfco Inv. Corp.,* 593 F.2d at 929; *In re Vecco Constr. Indus.,* 4 B.R. at 410. Without substantive consolidation all creditors will be worse off (as Humpty Dumpty cannot be reassembled or, even if so, the effort will threaten to reprise *Jarndyce and Jarndyce,* the fictional suit in Dickens' *Bleak House* where only the professionals profited). With substantive consolidation the lot of all creditors will be improved, as consolidation "advance[s] one of the primary goals of bankruptcy—enhancing the value of the assets available to creditors ...—often in a very material respect." Kors, *supra,* at 417 (citation omitted).

21   "[T]ort and statutory claimants, who, as involuntary creditors, by definition did not rely on anything in becoming creditors," Kors, *supra,* at 418, are excluded, leaving only those creditors who contract with an entity for whom consolidation is sought.

22   As noted already, *supra* n. 16, we do not decide here whether such a showing by an opposing creditor defeats totally the quest for consolidation or merely consolidation as to that creditor.

23   The bondholders do claim certain Banks misled them in purchasing OCD debt subsequent to the 1997 loan. But we know of no claim of wrong by the Banks in connection with the 1997 transaction.

24   Debtors make a similar argument on the basis of the Banks' failure to exercise their right to monitor the entities independently. For much the same reasoning that follows in the text, we reject that argument as well.

We reject outright Debtors' claim that the Banks' alleged reliance on corporate separateness fails because they did not obtain a third-party legal opinion from counsel that substantive consolidation was unlikely to occur were OCD or the guarantors subject to bankruptcy. By custom and practice this type of counsel opinion is requested and given for newly formed entities whose "special purpose" is to obtain structured financing (*i.e.,* where "a defined group of assets ... [are] structurally isolated, and thus serve as the basis of a financing...." Committee on Bankruptcy and Corporate Reorganization of The Association of the Bar of the City of New York, *Structured Financing Techniques,* 50 Bus. Law. 527, 529 (1995)). It is customarily not given (nor even requested) for entities in existence for any significant period of time or set up for other than a structured financing transaction. *See* Tribar Opinion Committee, *Opinions in the Bankruptcy Context: Rating Agency, Structured Financing, and Chapter 11 Transactions,* 46 Bus. Law, 717, 726 & n. 42 (1991).

25   Further, a creditor's lack of diligence is relevant only insofar as it bears on the credibility of its assertion of reliance on separateness.

26   For example, we simply cannot imagine that it would cost Debtors even 1% of the Banks' asserted $1.6 billion claim to account for the allegedly incalculable intercompany interest and royalty payments.

27   The same sentiment applies to the argument of the bondholders that, subsequent to the 1997 loan to OCD, the Banks defrauded them in connection with a prospectus distributed with respect to a sale of OCD bonds underwritten by some of the Banks. If the bondholders have a valid claim, they need to prove it in the District Court and not use their allegations as means to gerrymander consolidation of estates.

---

End of Document                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 52

124 Fed.Appx. 724
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also Third Circuit
LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,
Third Circuit.

In re: TELEPHONE WAREHOUSE INC., Debtor,

Nextel Retail Stores Inc.,

v.

LTCW Trust, Successor to the Debtors,

U.S. Trustee, Trustee,

LTCW Trust, Successor to Let's Talk Cellular &
Wireless, Inc., Telephone Warehouse, Inc., Cellular
Warehouse, Inc., Cellular USA, National Cellular
Incorporated, and Sosebee Enterprises, Inc., as
debtors and debtors in possession, Appellant.

No. 04-1616.    |    Argued Jan. 26,
2005.    |    Decided Feb. 15, 2005.

**Synopsis**
**Background:** Chapter 11 debtors' successor brought
adversary proceeding against escrow agent, seeking to
compel disbursement of escrowed funds based on buyer's
delay in notifying escrow agent of debtors' alleged
nonperformance of its post-closing obligations in sale of
substantially all of debtors' assets. Buyer intervened and
opposed disbursement. The United States Bankruptcy Court
for the District of Delaware granted successor's motion for
summary judgment. Buyer appealed. The District Court,
Joseph J. Farnan, Jr., J., 305 B.R. 622, reversed and remanded.
Successor appealed.

**Holding:** The Court of Appeals, Rendell, Circuit Judge,
held that bankruptcy court lacked power to ignore parties'
contractual agreements so as to avoid effect of late notice
given by buyer.

Vacated and remanded.

West Headnotes (1)

**[1]**    **Bankruptcy**
⚷    Equitable Powers and Principles

**Bankruptcy**
⚷    Manner and Terms

Even as a court of equity, bankruptcy court
lacked power to ignore parties' contractual
agreements so as to avoid effect of late notice
to escrow agent given by buyer of substantially
all of Chapter 11 debtors' assets and of buyer's
late notice that certain leases were to be excluded
from sale, inasmuch as buyer pointed to nothing
that justified modification of unambiguous and
enforceable terms by which parties had agreed to
be bound.

1 Cases that cite this headnote

***725** Appeal from the United States District Court for the
District of Delaware. (D.C. Civil No. 02-cv-01251). District
Judge: Honorable Joseph J. Farnan, Jr.

**Attorneys and Law Firms**

Glenn M. Kurtz [Argued], White & Case, New York, NY,
Jeffrey M. Schlerf, The Bayard Firm, Wilmington, DE, John
K. Cunningham, Scott A. Griffin, White & Case, Miami, FL,
for Appellant.

Curtis J. Crowther, Young, Conaway, Stargatt & Taylor,
Wilmington, DE, Fordham E. Huffman [Argued], Jones Day,
Columbus, OH, Mary E. Tait, Jones Day, Columbus, OH, for
Appellee.

Before SCIRICA, Chief Judge, RENDELL and FISHER,
Circuit Judges.

**OPINION OF THE COURT**

RENDELL, Circuit Judge.

Appellant LTCW Trust ("Trust"), successor to the Debtors
in the underlying bankruptcy proceeding, appeals the District
Court's reversal of the Bankruptcy Court's grant of summary
judgment to the Trust. The Trust's principal argument is

that the District Court erred in ruling that the Bankruptcy Court could use its equitable power to avoid a contractual deadline on Appellee Nextel's right to exclude certain short-term leases from a sale of substantially all the Debtors' assets and demand the release of escrow funds where Nextel was late in providing notice of which leases it wanted to exclude from the sale and in making the demand on the escrow agent. The Trust characterizes the disputed contract provision as an "option" that must be strictly enforced, whereas Nextel characterizes enforcement of the provision as effecting an inequitable "forfeiture."

The District Court had jurisdiction to hear an appeal from the Bankruptcy Court pursuant to 28 U.S.C. § 158(a). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 158(d). Because we conclude on the facts in this case that the Bankruptcy Court cannot use its equitable power to avoid a clearly enforceable contractual term, we will vacate the District Court's order and remand to the Bankruptcy Court for further proceedings.

## I.

As we write solely for the parties, and the facts are known to them, we will discuss only those facts pertinent to this appeal. This matter arises from the sale by the Debtors of substantially all of their assets to Nextel. To transact the sale, the parties executed an Asset Purchase Agreement, an Escrow Agreement, a Letter **\*726** Agreement (dated February 1, 2001), and an Amendment to the Letter Agreement (dated April 27, 2001). Under the terms of the Asset Purchase Agreement and the Escrow Agreement, $3.2 million (10%) of the $32 million purchase price for the Debtors' assets was to be retained in escrow with the Bank of New York ("escrow agent") after closing to secure the Debtors' post-closing obligations. Under the terms of the Escrow Agreement, Nextel was required to give written notice to the escrow agent "not later than ninety (90) days" from the closing date if it sought disbursement from the retained funds.

The retained escrow funds were intended to secure the Debtors' obligation under the Letter Agreement to assign certain short-term leases to Nextel with extensions and renewals of at least one year. The Letter Agreement, as modified by the April 27, 2001 Amendment, provided:

1. If Seller is unable to assign a Short-Term Lease to Purchaser on or before the date which is 90 days after the Closing Date together with an extension or renewal of the lease term of at least one year (but no more than three years) from the expiration date set forth in such Short-Term Lease with an Acceptable Modification, as defined in paragraph 3 below, then Purchaser may elect in writing (the "Notice") within ten ninety days from the Closing Date to treat such Short-Term Lease as an Excluded Asset under the Agreement (an "Excluded Lease") and to recover from the Indemnity Escrow Funds an amount equal to $125,000 for such Excluded Lease (the "Lease Agreement"), in accordance with the terms of Article VIII of the Agreement and the Escrow Agreement.

2. If Purchaser elects to treat a Short-Term Lease as an Excluded Lease and receive a Lease Adjustment, Purchaser covenants and agrees that, for a period of one year from the Closing Date, Purchaser and its Affiliates shall not own, lease, or operate (directly or indirectly) any retail or commercial facility at or within the shopping center or mall in which such Excluded Lease is located

(Letter Agreement, app. at 117a; Amendment to Letter Agreement, app. at 122a (strike-through indicates omission, double-underline indicates addition).) In short, under the Letter Agreement, if the Debtors were not able to assign a short-term lease with an extension or renewal to Nextel by ninety days after the closing date, Nextel could notify the Trust that it wished to exclude the lease from the sale and recover $125,000 per lease from the retained escrow funds, but Nextel would then be barred from opening a facility in the same shopping complex for a year. Under another provision of the Letter Agreement, Nextel could recover from the escrow funds any rent increases of greater than 10% for the leases the Debtors were successful in assigning.

According to the affidavit of Rand S. Bailin, then Director of Strategic Planning in charge of negotiating the transaction between Nextel and the Debtors, at closing on May 1, 2001, Bailin informed a representative of the Trust that Nextel intended to make an immediate demand on the escrow agent for a disbursement of funds for certain leases Nextel wished to exclude from the asset purchase. As the Debtors desired "the opportunity to continue negotiating with the landlords in order to try to arrange lease extensions that would be acceptable to Nextel" and "the Parties were in the process of ongoing negotiations at that time concerning the extensions of certain of the Short-Term Leases," Bailin "agreed to wait to make a demand until a final refund amount could be determined." (Bailin Aff. ¶ 10, at 134a.)

**\*727** By July 30, 2001, the Debtors had not obtained the desired extensions of the short-term leases. According to Bailin, the representative for the Trust telephoned him and "requested that [they] negotiate a further amendment to the agreements so that [the Debtors] would have additional time to negotiate extensions of the remaining Short-Term Leases." (Bailin Aff. ¶ 13, at 134a.) They "discussed the best way to give the Debtors additional time to perform. In the end, the decision was made to give notice to the Escrow Agent of a demand for disbursement in an indefinite amount. Nextel agreed to allow the Debtors to continue negotiations with the lessors, in an attempt to complete their performance under the Asset Purchase Agreement." (*Id.*) Nextel has not argued that, in this conversation or otherwise, the Letter Agreement was ever modified, nor has it contended that any assurances were ever given upon which a claim of promissory estoppel could be based.

Nextel gave a general notice of a desire to draw on the escrow on July 31, 2001. It did not state that it desired to exclude any leases from the transaction. On August 23, 2001, the Trust made a demand on the escrow agent for a disbursement of the remaining escrow funds, claiming that Nextel gave its notice a day late, *i.e.,* on the 91st day after closing. The next day, Nextel made a demand on the escrow agent for a disbursement of $1,625,000, corresponding to the non-assignment of thirteen (13) leases, and $77,858, corresponding to rent increases of greater than 10% in leases that were assigned. The Trust filed an action against the escrow agent to compel disbursement, and Nextel intervened and opposed the disbursement, claiming it was entitled to $2.2 million of the funds for the short-term leases as to which extensions had not been obtained.

Before the Bankruptcy Court, Nextel argued that the Court could use its equitable power to disregard the fact that Nextel provided notice one day late as the escrow was meant to secure the Debtors' obligation and the forfeiture the day's delay would work on Nextel would be inequitable given the circumstances. The Bankruptcy Court, however, concluded that even as a court of equity it did not have the power "to ignore the parties' contractual agreements," and "under the strict terms of the escrow agreement," the escrow agent was obligated to disburse the funds to the Trust. (Oral Dec. of Bankr.Ct., app. at 720a.) The obligation to pay funds to Nextel rather than to the Trustee would only arise if leases had been excluded.

Nextel appealed this ruling to the District Court. Under a plenary standard of review, the District Court concluded that the Bankruptcy Court could exercise its equitable power "to avoid working an unfair forfeiture on Nextel." The District Court found that: (1) Nextel had substantially performed its obligations under the agreements and continually cooperated with the Trust by granting it additional time; (2) there was no evidence that the one day delay worked any prejudice on the Trust; and (3) the circumstances of the case indicated that Nextel worked cooperatively and in good faith in providing several extensions. Therefore, "strict compliance with the terms of the Escrow Agreement was not necessarily required, and ... the Bankruptcy Court should have considered the application of equitable principles to avoid effectuating a forfeiture on Nextel." (Dist. Ct. Op., app. at 21a.)

## II.

"Although this Court's jurisdiction is over the decision of the District Court, 28 U.S.C. § 158(d), 'review of the District **\*728** Court's decision effectively amounts to review of the bankruptcy court's opinion in the first instance." ' *In re Integrated Telecom Express, Inc.,* 384 F.3d 108, 118 (3d Cir.2004) (quoting *In re Hechinger Inv. Co. of Del.,* 298 F.3d 219, 224 (3d Cir.2002)). Therefore, "[i]n undertaking our review, we stand in the shoes of the district court, applying a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions." *In re Krystal Cadillac Oldsmobile GMC Truck, Inc.,* 142 F.3d 631, 635 (3d Cir.1998).

## III.

As noted above, the principal issue on appeal is the District Court's conclusion that the Bankruptcy Court could use its equitable power to avoid the effect of Nextel's late notice to the escrow agent and its late notice that leases were intended to be excluded. We agree with the Bankruptcy Court's initial conclusion on this matter, *i.e.,* that even as a court of equity, on the facts of this case, it was without power "to ignore the parties' contractual agreements." The clear terms of the parties' agreement, specifically, the Letter Agreement, as modified by the April 27, 2001 Amendment, required Nextel to exclude leases within ninety days from the closing date. The parties agree that this term was not amended, despite some discussion on July 30, 2001 regarding another extension of time.

Although the District Court held, and Nextel argues, that the Bankruptcy Court can use its equitable power to avoid effecting a forfeiture on Nextel and grant a windfall to the Trust for leases it did not satisfactorily extend, we believe that there is no room for equity to interfere with the unambiguous and enforceable terms to which the parties have agreed to be bound. *See In re 1616 Reminc Ltd. Partnership,* 13 B.R. 948, 951 (Bankr.D.Va.1981) ("[T]he parties are bound as to those matters which they, by mutual agreement, express in the terms and conditions of a written agreement entered into freely by them. To allow [the defendant] to receive the funds in the escrow account under a forfeiture theory 'would result in effectively nullifying the specific agreement of the parties.' ") (quoting *Melfi v. Goodman,* 73 N.M. 320, 388 P.2d 50, 52 (1963)). Without passing upon Nextel's characterization of the situation as a "forfeiture" (as to which no evidence was offered in the Bankruptcy Court) or the Trust's construction

of the term as an "option," we conclude that, as a matter of contract law, the parties have pointed to nothing that would justify a modification of their agreement, and the Bankruptcy Court's equitable power cannot be invoked to avoid the agreement's otherwise enforceable terms. [1]

## IV.

Accordingly, we will VACATE the District Court's order reversing the Bankruptcy Court's grant of summary judgment to the Trust, and we will REMAND to the Bankruptcy Court for proceedings consistent with this opinion.

**Parallel Citations**

2005 WL 351246 (C.A.3 (Del.))

Footnotes

1    In light of our ruling, we need not address the Trust's argument that the District Court erred in denying it leave to supplement the record to clarify alleged misstatements of fact by Nextel regarding the amount of escrow funds to which it is entitled.

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 53

169 B.R. 182
United States Bankruptcy Court,
N.D. Indiana,
South Bend Division.

In the Matter of TERRY LIMITED
PARTNERSHIP, Debtor.

Bankruptcy No. 90–30864–
RKR.    |    March 31, 1993.

Third mortgagee objected to oversecured second mortgagee's claim against Chapter 11 debtor for postpetition interest calculated at 17.25% contractual default rate. The Bankruptcy Court, Robert K. Rodibaugh, J., held that equity did not preclude recovery at default rate.

Objection denied.

Appeal decided, 27 F.3d 241.

West Headnotes (4)

[1]    **Bankruptcy**
           Interest

       **Interest**

          Contract as to Rate After Maturity

       Oversecured second mortgagee was entitled to postpetition interest from Chapter 11 debtor at 17.25% default interest rate, where default rate was only three percent greater than contract rate, default rate was within range of rates being charged by other institutions when loan was negotiated, only third mortgagee would be affected by awarding default rate, and third mortgagee knew that debtor's collateral was encumbered by two senior liens when it bargained with debtor in arms length transaction. Bankr.Code, 11 U.S.C.A. § 506(b).

       Cases that cite this headnote

[2]    **Interest**

          Contract as to Rate After Maturity

No standard test governs determination of whether equity requires that contractual default interest rate should not be used to compensate oversecured creditor, and court must look to all circumstances in particular case. Bankr.Code, 11 U.S.C.A. § 506(b).

       Cases that cite this headnote

[3]    **Bankruptcy**
          Interest

Oversecured creditor must have right under state law to receive interest at contract or default rate before bankruptcy court may determine whether equity requires alteration of creditor's rights. Bankr.Code, 11 U.S.C.A. § 506(b).

       Cases that cite this headnote

[4]    **Interest**
          Contract as to Rate After Maturity

When differential between contract and default interest rates is not excessive and falls within usual and customary range, default rate is legitimately related to purpose for which it was designed and should not be construed as burdensome or unconscionable penalty in determining whether oversecured creditor is entitled to default rate. Bankr.Code, 11 U.S.C.A. § 506(b).

       Cases that cite this headnote

**Attorneys and Law Firms**

*182 Jeffrey E. Kehl and Edward Benchik, South Bend, IN, for Invex Holdings, N.V. and Invex Finance, B.V.

Michael B. Watkins, Barnes & Thornburg, South Bend, IN, for Equitable Life Ins. Co. of Iowa.

Alex Edgar, Asst. U.S. Trustee, South Bend, IN.

William A. Thorne, Thorne, Grodnik, Ransel, Duncan, Byron & Hostetler, Elkhart, IN, for debtor.

### DECISION and ORDER

ROBERT K. RODIBAUGH, Bankruptcy Judge.

This matter is before the court on OBJECTION TO CLAIM OF EQUITABLE LIFE INSURANCE COMPANY OF IOWA, which was filed by Invex Holdings, N.V. and Invex Finance, B.V. (referred to jointly as "Invex") on October 6, 1992. Equitable Life Insurance Company of Iowa filed its response on October 15, 1992. A hearing was held on December 21, 1992. Both parties subsequently filed briefs, and the matter was taken under advisement on February 22, 1993. Invex objects to the claim of Equitable Life Insurance Company of Iowa to the extent that such claim is for post-petition interest calculated at the contractual default rate.

### Jurisdiction

This decision shall represent findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable in this proceeding by Federal Rules of Bankruptcy Procedure 7052 and 9014. This **\*183** matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), over which the court has jurisdiction pursuant to 28 U.S.C. § 157(b)(1).

### Background

Invex Finance initiated this bankruptcy proceeding by filing an involuntary Chapter 11 petition against Terry Limited Partnership ("Debtor" herein) on April 27, 1990. Debtor consented to the proceeding, and an Order for Relief was entered on June 12, 1990.

In December 1983, Debtor purchased the Society Bank Building, located in South Bend, Indiana, from Invex Finance, granting Invex Finance a wraparound mortgage which was subordinate to and encompassed a first mortgage on the building held by Roosevelt Savings Bank ("Roosevelt"), a second mortgage held by Equitable Life Insurance Company of Iowa ("Equitable"), and a wraparound mortgage held by Invex Holdings, N.V. [1] The Society Bank Building was Debtor's major asset. [2] By order dated November 22, 1991, the court found the value of the

building to be $5,350,000. Both Roosevelt and Equitable had oversecured claims.

Roosevelt, Equitable, and Invex are the primary creditors in this bankruptcy proceeding. Only Invex and the Indiana Department of Revenue have filed proofs of claim. The Indiana Department of Revenue's claim is less than $500. Equitable's claim arises from a June 1, 1984 promissory note in the principal amount of $2,100,000 executed by the Debtor in Equitable's favor, and secured by a mortgage on the Society Bank Building. [3] Under the terms of the promissory note Debtor was to pay interest on the debt at the rate of 14¼% per annum, and, in the event of default at the rate of 17¼% per annum. [4] The note was originally payable on February 1, 1990, but, at the request of the Debtor, extended to April 1, 1990. The Debtor defaulted on the note by failing to pay the principal balance and deferred interest by April 1, 1990.

Debtor's promissory note to Invex Holdings called for interest at the rate of 17.25% per annum, and matured in December 1987. Debtor's wraparound note to Invex Finance provided for interest at the rate of 17.5% per annum, and also matured in December 1987. The Debtor defaulted on both notes.

After Invex filed its involuntary petition against Debtor, Debtor filed a proposed plan of reorganization which was predicated upon obtaining a loan from some third party in an amount not less than $3,330,000. Debtor was negotiating for a loan commitment with ITT. Invex Finance, which had submitted its own proposed plan of reorganization, filed its objection to Debtor's plan. Equitable and the Debtor then reached an agreement which was approved by the court on June 10, 1992 ("Stipulated Agreement"), and which was not objected to by Invex.

Under the Stipulated Agreement, Equitable promised to compromise the amount of its claim as well as the rate of interest accruing from December 1, 1991. Equitable additionally agreed not to object to Debtor's plan of reorganization. Equitable's agreement with Debtor was conditioned upon Debtor (1) making adequate protection payments when due, (2) obtaining the necessary loan commitment by September 1, 1992, (3) receiving a final, nonappealable order of confirmation by September 1, 1992, and finally, (4) payment in full to Equitable by October 1, 1992. Debtor would be considered in default if it failed to comply with any one of the four **\*184** conditions. The parties further agreed that if Debtor should default, after notice to the court, Equitable would be entitled to have the automatic

stay lifted and the Society Bank Building abandoned from the estate, or to have the building sold pursuant to 11 U.S.C. § 363. In addition, Equitable's claim would consist of the outstanding principal balance, the unpaid deferred interest which had accrued to the date of maturity, interest accruing at the default rate after maturity, and attorney's fees and costs.

On September 1, 1992, Debtor had neither obtained the requisite loan commitment nor received an order of confirmation. As a result of Debtor's default, the court ordered the Society Bank Building sold at public auction to the highest bidder. At the auction held on December 21, 1992, the building was sold to Invex Holdings for $4,005,001. Roosevelt's claim was paid from the proceeds of the sale. Equitable's claim, calculated at the contract rate of interest, was also paid. Excess proceeds in the amount of $170,800 were segregated and deposited with the Debtor. This amount represents the difference between interest accrued from the date of maturity to the date of sale on Equitable's outstanding balance calculated at the contract rate of 14¼% per annum and calculated at the default rate of 17¼% per annum.[5] The Debtor makes no claim to these funds. Invex argues that Equitable's claim should be calculated at the contract rate of 14¼%, since applying the default rate would be inequitable to Invex and other inferior creditors.[6]

### Discussion

 [1]    There is no dispute that Equitable is an oversecured creditor entitled to interest under § 506(b) which states:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b) (Callaghan 1992–93). The parties also agree that generally courts do not rigidly apply or deny the default rate, but make the determination after considering the equities of the case.[7] The court, having reviewed the case law, agrees with this position[8] and, after analyzing

the equities in the present case, concludes that Equitable is entitled to receive interest at the default rate of 17¼%.

Invex cites *In re Sheppley & Co.*, 62 B.R. 271 (Bankr.N.D.Iowa 1986) to support its opinion that "courts have devised an equitable two part analysis when deciding which interest rate should apply." [Invex's memorandum at 6.] Invex argues that under the *Sheppley* test the court should determine the risk of nonpayment which the oversecured creditor faced, and determine the interest rates prevailing in the relevant market during the pendency of the bankruptcy. However, the court does not agree that *Sheppley* has set forth a blanket "test" to be applied in all cases. Rather, the *Sheppley* court simply **\*185** considered the above to be pertinent factors in that particular case. *Id.* at 278. In fact, the *Sheppley* court described five, rather than only two, factors which it considered germane to its determination.

 [2]    [3]    When deciding whether equity requires that a contractual default rate should not be utilized, there is no hard and fast rule or standard test to apply which governs the decision.[9]  In each case the court must look to all of the circumstances existing in that particular case. *See Matter of Laymon*, 958 F.2d 72 (5th Cir.1992); *In re Hollstrom*, 133 B.R. 535, 539 (Bankr.D.Colo.1991) (acknowledging that under certain circumstances equity warrants deviating from the contractual default interest rate, but noting that "there is no clear, emerging, definite enumeration of these special circumstances or equitable considerations"). While the court took *Sheppley* into account, it did not consider the *Sheppley* factors conclusive in the present case.

 [4]    The 17¼% interest rate is not unreasonable, and, at the time Debtor obtained the loan, was well within the range of rates being charged by other lending institutions. Mr. Schefmeyer, who testified on behalf of Invex, reported that default interest rates are commonly found in loan documents, and that the default rate is often expressed as a percentage increase over the contract rate. Mr. Schefmeyer further testified that default rates are generally 2½ to 4½ percent over the contract rate. Equitable's default rate is 3% greater than its contract rate, and so falls well within the customary range described by Mr. Schefmeyer. The standard practice of charging a higher interest rate after default is designed as an incentive to the debtor to make timely payments. However, its second purpose is to compensate the lender for any loss resulting from the default such as increased expenses administering the loan and delayed use of the money. The lender's loss on any given defaulted

loan will rarely be exactly the additional amount received by charging interest at the default rate. Sometimes the loss will be greater, and sometimes less. A lender cannot know at the time it extends a loan the exact amount of loss it will suffer in the event of a default. Instead, the lender relies on a default interest rate which it has determined is a reasonable approximation of its potential loss. When the differential between the contract and default rates is not excessive and falls within the usual and customary range, it is legitimately related to the purpose for which it was designed and should not be construed as a burdensome or unconscionable penalty. *E.g., In re Schaumburg Hotel Owner Ltd. Partnership,* 97 B.R. 943, 951 (Bankr.N.D.Ill.1989); *In re White,* 88 B.R. 494, 498 (Bankr.D.Mass.1988); *In re Skyler Ridge,* 80 B.R. 500, 511 (Bankr.C.D.Cal.1987). *Cf. Matter of Timberline Property Development, Inc.,* 136 B.R. 382 (Bankr.D.N.J.1992) (finding that a 3% increase upon default was unenforceable under New Jersey state law as a penalty where the lender testified that the higher rate was designed to coerce prompt payment). Invex would have the court deprive Equitable of interest payments calculated at a reasonable default rate of 17¼% in order that Invex might realize more on its own claim calculated at its regular contract rate of 17.25% (Invex Holdings)/17.5% (Invex Finance). The court is satisfied that equity does not require such a result.

"The only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full." *Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad Company,* 791 F.2d 524, 527 (7th Cir.1986). No creditors other than Invex will be affected by awarding Equitable its default rate. This is not a situation where numerous creditors, who have unexpectedly found themselves in a low priority unsecured position, are facing a minimal payment, or no payment at all. Invex knew at the time it entered into its transaction with the Debtor that its collateral was already encumbered by **\*186** two senior liens. It most likely also knew the extent of Debtor's obligation to the senior creditors, including the rate of interest being charged by each of them. In an arms length transaction Invex bargained for its third place position. The evidence does not suggest that the value of the Society Bank Building plummeted dramatically subsequent to Invex extending its loan to Debtor, and therefore, Invex has always been only a partially secured creditor. [10] Outside the

bankruptcy context, had Equitable foreclosed immediately after the Debtor defaulted, Roosevelt and Equitable would have been paid in full before Invex received any payment. The bankruptcy proceeding has not changed the relative position of the parties. The court may diminish one creditor's bargained for rights in order to protect a second creditor's bargained for rights. There is nothing equitable, however, in diminishing one creditor's bargained for rights in order to augment the rights bargained for by a second creditor.

The court has also considered the effect of the Stipulated Agreement on the present dispute. Under the Stipulated Agreement Equitable promised to compromise its claim and refrain from objecting to Debtor's proposed plan of reorganization on the condition that Debtor obtained financing and a confirmed plan within certain time limits. In consideration for Equitable's promise, the Debtor agreed that if it could not meet the time limitations, Equitable would be entitled to its full claim, including interest at the default rate. This Stipulated Agreement was approved by the court and became binding on the parties. Invex neither objected to the Stipulated Agreement, nor appealed the court's order approving the Stipulated Agreement. Equitable originally bargained for a 17¼% default interest rate. Invex, knowing that there was a senior lien on the Society Bank Building and that the lienholder was entitled to interest at the default rate of 17¼% per annum, nevertheless granted Debtor a loan and accepted its position as junior lienholder on the building. Equitable bargained a second time for the 17¼% default rate, and Invex failed to object. Had Invex objected, and had the court found that Equitable could not claim the 17¼% interest, the terms of the Stipulated Agreement would have been altered. Equitable would have had the opportunity to withdraw from the agreement as altered. The court is not inclined to now revise the rights and obligations created by the Stipulated Agreement, approved by the court, and depended upon by Equitable.

Accordingly, the court will deny Invex's objection to Equitable's claim, and authorize the Debtor to release to Equitable the excess sale proceeds of $170,800 which Debtor has been holding pending resolution of this dispute. It is

SO ORDERED.

Footnotes

1     Invex Finance is a wholly owned subsidiary of Invex Holdings, N.V. The Society Bank Building had been sold to Lake County Trust Company as trustee under a trust agreement. Invex Holdings, N.V. was the beneficiary of the trust. Invex Holdings, N.V. sold its interest in the building to Invex Finance. On the same day Invex Finance proceeded to sell its newly purchased interest in the building to Debtor. Invex Finance realized a profit of $774,000 on this resale.

2     As a practical matter this was a single asset case.

3     The promissory note restates a prior loan made to the Debtor by Cohen Financial Corporation which was subsequently assigned to Equitable.

4     The promissory note also called for Debtor to make monthly payments in an amount less than the accruing interest. At the time the note matured, Debtor was to pay the principal amount and the accrued but unpaid interest.

5     The amount owed to Equitable as of December 15, 1992, calculated at the default rate was $3,153,194.81. Calculated at the contract rate the amount owing was $2,982,394.81.

6     Invex originally contended that Equitable's claim should be calculated at the federal judgment rate, but now agrees that Equitable should receive the contract rate of 14¼%.

7     Equitable states "(C)ourts applying Code section 506 consistently and uniformly hold that an oversecured creditor is entitled to claim and receive interest at the higher default rate specified in the agreement from which the claim arose unless the equities dictate application of the lesser contract rate." [Equitable's memorandum filed January 20, 1993, at 7.]

    Invex states "(A) bankruptcy court has the equitable power to modify a contract provision that calls for the assessment of a higher interest rate on the oversecured creditor's claim when the award of the higher rate would adversely impact the distribution of a bankruptcy estate's assets to other creditors." [Invex's memorandum filed January 21, 1993, at 5.]

8     The Supreme Court has stated that "(i)t is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditor and debtor." *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 165, 67 S.Ct. 237, 241, 91 L.Ed. 162 (1946).

9     A creditor's right to receive interest at either the contract or default rate may be altered in bankruptcy. However, the right itself is created by state law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Thus, before the bankruptcy court proceeds with its equity analysis, the creditor must have a right to the subject interest rate enforceable under state law. There is no dispute that Equitable has such a right.

10     Debtor's wraparound promissory note in favor of Invex Holdings was in the principal amount of $5,171,000. However, since it was negatively amortized, the balance owing at maturity was $6,161,304. The original principal amount of Debtor's wraparound promissory note to Invex Finance was $5,945,000. This note was also negatively amortized so that the amount owing at maturity was $7,043,376.

---

**End of Document**        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 54

122 L.R.R.M. (BNA) 2389, 104 Lab.Cas. P 11,944, Bankr. L. Rep. P 71,127...

789 F.2d 701
United States Court of Appeals,
Ninth Circuit.

In the Matter of TUCSON YELLOW
CAB COMPANY, INC., Debtor,
TEAMSTERS LOCAL NO. 310, Appellee,
v.
Mary K. INGRUM, Appellant.

No. 85–2058.   |   Argued and Submitted
March 14, 1986.   |   Decided May 6, 1986.

Union filed claims for severance pay on behalf of taxicab drivers whose employment was terminated by debtor-in-possession. The United States District Court for the District of Arizona, William D. Browning, J., reversed an order of the bankruptcy court denying administrative priority to such claims, and motorcycle passenger, who had lost lower part of one leg in collision with taxicab and was principal creditor of debtor, appealed. The Court of Appeals, Noonan, Circuit Judge, held that in quantum meruit, "wages" owed to taxicab drivers on date their employment was terminated by debtor included severance pay which had been a benefit under collective bargaining agreement which had been rejected by debtor and, as a cost of administering the estate, were entitled to priority over unsecured claim of motorcycle passenger, where drivers, who knew their discharge was inevitable, did not know date it would take effect and continued to work in reasonable belief that their "wages," including severance pay, had been unchanged.

Affirmed.

See also, 27 B.R. 621.

West Headnotes (4)

[1]   **Bankruptcy**
      👉 Wage and Pension Fund Claims

      Pay at termination of employment, in lieu of two weeks' notice of termination, constitutes "wages" within meaning of Bankr.Code, 11 U.S.C.A. § 503(b)(1)(A), giving priority to administrative expenses, including actual, necessary costs and expenses of preserving the estate; to be due, however, such pay must be spelled out by contract or calculable as owed in quantum meruit.

      14 Cases that cite this headnote

[2]   **Bankruptcy**
      👉 Collective Bargaining Agreements

      Never having been assumed with approval of bankruptcy court, collective bargaining agreement remained open to the rejection which did, in fact, take place. Bankr.Code, 11 U.S.C.A. § 365.

      7 Cases that cite this headnote

[3]   **Bankruptcy**
      👉 Determination of Priority

      In quantum meruit, "wages" owed to taxicab drivers on date their employment was terminated by debtor-in-possession included severance pay which had been a benefit under collective bargaining agreement which had been rejected by debtor and, as a cost of administering the estate, were entitled to priority over unsecured claim of motorcycle passenger who had lost lower part of one leg in collision with taxicab, where drivers, who knew their discharge was inevitable, did not know date it would take effect and continued to work in reasonable belief that their "wages," including severance pay, had been unchanged. Bankr.Code, 11 U.S.C.A. § 503(b)(1)(A).

      14 Cases that cite this headnote

[4]   **Bankruptcy**
      👉 Equitable Powers and Principles

      Overriding consideration in bankruptcy is that equitable principles govern; nonetheless, principles of equity may not be invoked in freewheeling fashion and must be directed to care and preservation of the estate.

      12 Cases that cite this headnote

122 L.R.R.M. (BNA) 2389, 104 Lab.Cas. P 11,944, Bankr. L. Rep. P 71,127...

**Attorneys and Law Firms**

**\*702** John A. Baade, Miller & Pitt, Tucson, Ariz., for appellee.

John R. Clemency, Donald L. Gaffney, Steich, Lang, Weeks & Cardon, Phoenix, Ariz., for appellant.

Appeal from the United States District Court for the District of Arizona.

Before KENNEDY, FARRIS, and JOHN T. NOONAN, Jr., Circuit Judges.

**Opinion**

NOONAN, Circuit Judge:

Mary K. Ingrum, the principal creditor of the bankrupt Tucson Yellow Cab Company, appeals from an order of the district court giving priority to severance pay to members of Teamsters Local No. 310. The bankruptcy court denied such priority. Finding a clear error of law, the district court reversed. The case has been ably and vigorously argued by both sides. Equitable considerations crowd against the established rules but do not prevail over the clear law. We affirm the district court.

1. *Events.* On September 1, 1978, Mary K. Ingrum lost the lower part of one **\*703** leg in a collision between a taxicab and a motorcycle on which she was a passenger. She sued the taxi company for negligence and received a judgment of $437,016. The judgment was upheld. *Ingrum v. Tucson Yellow Cab Co.,* 131 Ariz. 523, 642 P.2d 868 (1981). The Arizona Supreme Court denied further review February 23, 1982. Because the company carried the bare minimum of insurance, Ingrum received only $100,000 of her award, and the company on January 27, 1981 entered proceedings under Chapter 11 of the Bankruptcy Code.

As debtor-in-possession, the company continued to operate its business. A collective bargaining agreement had been in force since 1979 between the company and Local No. 310. For fourteen months this agreement was neither assumed nor rejected with the bankruptcy court's approval nor rejected. In March 1982, a month after the tort judgment was final, the company found a purchaser for the company satisfactory to Ingrum. One of the conditions of the purchase was that the collective bargaining agreement be rejected. On March 12, 1982, the company asked the court to approve the rejection. The union objected,

stating that rejection would cause the employees to lose seniority, welfare, pensions "and other valuable benefits." The company pointed out that its franchise expired in July 1982, that its old owner and director had recently died, and that no better offer had been made; the sale was the company's last chance to satisfy the general creditors. The offer was $175,000.

On April 1, 1982, the bankruptcy court orally approved rejection. On April 5, 1982 the order was formally entered. On April 7, 1982 the union in a commendable effort to facilitate the new enterprise, waived its right to appeal. On April 12, 1982 the assets were transferred to the new purchaser. On April 16, 1982 the employees were fired by the debtor. The new owner of the cabs dealt with the drivers as independent contractors.

The company had failed to bargain about the abandonment of the contract as required by *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 526, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984). For this failure, the Board found the company guilty of an unfair labor practice and awarded two weeks' back wages, *Tucson Yellow Company,* 275 N.L.R.B. No. 32, 1985 NLRB Apr. (CCH) ¶ 17,214 (1985).

2. *Issue.* The collective bargaining agreement specified:

> Any employee laid off by the company
> shall be given two weeks notice or in
> lieu thereof, two weeks pay.

On May 3, 1982, the union filed the employees' claims for this pay. Mary Ingrum does not dispute that severance pay is due, nor does she dispute the amounts claimed. She objects to the priority assigned it by the district court.

**[1]** 3. *Analysis.* A dictum in this circuit approves the rule that "pay at termination in lieu of notice" is entitled to priority payment as a cost of administration. *In re Health Maintenance Foundation,* 680 F.2d 619, 621 (9th Cir.1982), citing *In re Public Ledger, Inc.,* 161 F.2d 762, 771 (3d Cir.1947). Such pay constitutes wages within the meaning of 11 U.S.C. § 503(b)(1)(A) giving priority to administrative expenses including "the actual, necessary costs and expenses of preserving the estate ...." To be due, however, it must be spelled out by the contract or calculable as owed in quantum meruit.

**[2]** At the date of termination of employment, the express contract was no longer in existence. The collective bargaining

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 33 of 540

Matter of Tucson Yellow Cab Co., Inc., 789 F.2d 701 (1986)

122 L.R.R.M. (BNA) 2389, 104 Lab.Cas. P 11,944, Bankr. L. Rep. P 71,127...

agreement had been rejected under 11 U.S.C. § 365 with the approval of the bankruptcy court. Like the labor agreement that had been operative for eight months in *Bildisco,* this agreement had been operative. It had been performed on both sides for over fourteen months. Never having been assumed with the court's approval, it remained open to the rejection that did take place, *Bildisco,* 465 U.S. at 526, 104 S.Ct. at 1196.

*Bildisco* instructs us that the subsequently rejected contract may be a fair measure of the value of the services that **\*704** were rendered during the period that the decision to reject or assume the contract was pending. *Id.* at 531, 104 S.Ct. 1199. In the circumstances no better measure appears. The taxi business is a special kind of service with strains and hardships that make it distinct from several other kinds of driving for hire. Night shifts, split shifts, and exceptionally long hours are characteristic. The taxi industry has narrow profit margins and has to monitor its costs closely, see G. Gorman Gilbert, Raymond J. Burby, and Charles E. Feibel, *Taxicab Operating Characteristics* (Report to the Office of Budget and Policy, Urban Mass Transportation Administration, 1982) 28–29. No reason appears why the debtor would have paid its employees greater wages than what their work was worth. While the decision to assume or reject was pending, those wages included severance pay. If the employees had been fired on April 4, 1982, their claim to severance pay would have had priority as an administrative expense.

The order approving rejection of the agreement became effective with its entry on the docket on April 5, 1982, Bankruptcy Rule 921. The question, then, is the fair value of the employees' services between April 5 and April 16. Ingrum has dropped the contention, advanced in the district court, that these services did not benefit the estate. Payment for them is entitled to priority. The only question is what they were worth. *Bildisco,* which addresses the measure of value "pending rejection," does not speak to this question.

 [3]    Once the agreement was dead, Mary Ingrum argues, the employees were owed no more than they received in weekly compensation. She presses to the letter the union's earlier contention that rejection would end their valuable benefits. But the nonexistence of the contract does not prevent reference to the contract to determine the fair value of the work performed. If for over fourteen months the fair value was the amount set by the agreement, no reason appears why the work of the last eleven days should be valued at a lower figure. The debtor, free in April to propose changes in the wages, did not do so. We hold that in quantum meruit the

wages owed on April 16, 1982 included severance pay as a cost of administering the estate.

Against this conclusion, several equitable arguments are mobilized. The workers won two weeks back pay from the NLRB; that too has priority as an administrative expense. *Yorke v. NLRB,* 709 F.2d 1138 (7th Cir.1983), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1276, 79 L.Ed.2d 680 (1984). Mary Ingrum's large claim is going to be largely disappointed by the wage priorities. And her large claim has more significance to her than any of the severance pay claims will have to their individual beneficiaries. Moreover, although no formal notice was given in compliance with the collective bargaining agreement, on March 12, 1982 when the debtor sought its rejection, or on April 1, 1982 when the court orally announced that rejection was authorized, the employees had the information that the cabs were going to be sold. They knew that soon they would be out of their old jobs without the protection of a collective bargaining agreement and that they would have to deal with the cabs' new owner. To give them pay in lieu of notice is to give them money for failure to provide information which arguably they had. Should not equity consider done what ought to have been done and find that the notice provision was in substance complied with?

 [4]    The "overriding consideration" in bankruptcy is that "equitable principles govern." *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). The old equity notions—equity loves equality, equity *is* equality, equity considers done what ought to be done—still have vitality. Nonetheless, the principles of equity may not be invoked in freewheeling fashion. They must be directed to the care and preservation of the estate. *Bildisco,* 465 U.S. at 527, 104 S.Ct. at 1197. They also necessarily operate within the boundaries set by statute. We are satisfied that the work done by the employees after April 5, 1982 was necessary to the **\*705** preservation of the estate. Although they knew that their discharge was inevitable, they did not know the date it would take effect. They continued to work in the reasonable belief that their wages had been unchanged. Payment for that work has statutory priority which destroys the equality Mary Ingrum seeks. The work's fair value includes severance pay.

AFFIRMED.

## Parallel Citations

122 L.R.R.M. (BNA) 2389, 104 Lab.Cas. P 11,944, Bankr. L. Rep. P 71,127, 7 Employee Benefits Cas. 1870

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 55

2013 WL 3354390
Only the Westlaw citation is currently available.
United States District Court, N.D. California
San Jose Division

Innovus Prime, LLC, Plaintiff,

v.

Panasonic Corporation and Panasonic
Corporation of North America, Inc., Defendant.

Case No. C–12–00660–RMW    |    July 2, 2013

**Attorneys and Law Firms**

John Wade Carpenter, Law Offices of John W. Carpenter,
LLC, New Orleans, LA, for Plaintiff

Adam C. Hemlock, David L. Yohai, Weil Gotshal and
Manges LLP, New York, NY, Christopher J. Cox, Weil
Gotshal & Manges, Redwood Shores, CA, for Defendants

Opinion

**ORDER GRANTING PLAINTIFF'S MOTION
TO STRIKE AND GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**[Re Docket Nos. 53, 64]**

RONALD M. WHYTE, United States District Judge

*1 Defendants Panasonic Corporation and Panasonic
Corporation of North America, Inc. (collectively
"Panasonic") move for summary judgment that they do not
infringe U.S. Patent No. 5,280,350 ( "#350 Patent"). Plaintiff
Innovus Prime, LLC ("Innovus") acquired the #350 Patent on
April 17, 2011, as the fourth owner in a chain of assignees.
Panasonic relies on a 1982 non–assertion agreement between
itself and the original owner of the # 350 Patent ("1982
Agreement") as the basis for its authority to practice the
invention of the #350 Patent for the duration of the patent's
term. Because the court concludes that the 1982 Agreement
authorized Panasonic to practice the patented invention for
the life of the #350 Patent (which is now expired), and for
the reasons explained below, the court GRANTS Panasonic's
motion for summary judgment of noninfringement.

## I. BACKGROUND

The United States Patent and Trademark Office issued the
#350 Patent on January 18, 1994 to U.S. Philips Corporation,
a subsidiary of N.V. Philips Gloeilampenfabrieken, currently
doing business as Koninklijke Philips Electronics ("Philips").
The #350 Patent relates to an apparatus for processing picture
signals for television.

On December 20, 1982, Philips entered into an agreement
with Panasonic whereby each party agreed not to assert
against the other any patents relevant to "audio and video
products" that were filed (or entitled to priority) before
January 1, 2005. [1] Watanabe Decl., Ex. 1 at 1, Dkt. No. 53–4
("1982 Agreement"). There is no dispute that the #350 Patent
is relevant to a video product and was filed before 2005, and
thus was subject to the 1982 Agreement between Philips and
Panasonic (at least before the patent was assigned). In 2007,
Philips and Panasonic entered into a new agreement in which
they clarified the definitions of "audio and video products" in
the 1982 Agreement (to include six new products that did not
exist in 1982). Watanabe Decl., Ex. 2 at 1, 6 Dkt. No. 53–5
("2007 Agreement").

On February 1, 2008, Philips assigned its interest in the
#350 Patent to NXP B.V., "subject to all existing rights,
commitments, licenses, non-assertion agreements and the like
made by Assignor, [Philips] and/or its affiliates under said
Patent Rights and to any extensions of term and/or renewal
thereof." Yohai Decl., Ex. 3 at Reel 021411, Frame 0447,
Dkt. No. 53–9 ("1st Assignment"). On February 7, 2010,
approximately two years following the assignment from
Philips, NXP B.V. assigned all rights to the #350 Patent to
NXP Holding 1 B.V. (Now Trident Microsystems (Far East)
LTD). Yohai Decl., Ex. 4 at Reel 023928, Frame 0496, 0502–
0506, Dkt. No. 53–10 ("2nd Assignment"). In April 2011,
Trident Microsystems (Far East) assigned all its rights to the
#350 Patent to plaintiff Innovus Prime, LLC ("Innovus").
Yohai Decl., Ex. 5 at Reel 026156, Frame 0365–59, Dkt. No.
53–11 ("3rd Assignment"). The #350 Patent expired shortly
thereafter, in August 2011. 35 U.S.C. § 154(c) (twenty years
from the filing date).

*2 In August 2011, Innovus initially brought a patent
infringement action against Panasonic and three other
defendants alleging infringement of the #350 Patent.
However, the court dismissed Panasonic from the case on
misjoinder grounds. On February 9, 2012, Innovus filed

2013 WL 3354390

the instant patent infringement action against Panasonic. Panasonic moves for summary judgment of noninfringement based on its non-assertion rights under the 1982 and 2007 Agreements.

## II. ANALYSIS

### A. Evidentiary Rulings on Innovus's Motions to Strike

Innovus moves to strike portions of the declarations submitted by Panasonic in support of their motion for summary judgment on the basis that they contain parol evidence, are not supported by personal knowledge, and make legal conclusions. [2] Dkt. Nos. 56 and 64. [3] Innovus also moved for an expedited hearing on the motion to strike in conjunction with the present motion for summary judgment. Dkt. No. 65. [4]

Civil Local Rule 7–3(a) provides that "[a]ny evidentiary and procedural objections to the motion must be contained within the brief or memorandum" filed in opposition to the motion. Innovus improperly filed its motion separately on two occasions, Dkt. Nos. 56 and 64, but the court nevertheless considers the motions under Federal Rule of Civil Procedure ("Rule") 56(e) because the court agrees that the contested portions of the declarations make impermissible legal conclusions and are improper.

Under Rule 56(e), an affidavit "must be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Any affidavit which does not conform to these specifics must be stricken. Civil Local Rule 7–5(b) further provides that

> [a]n affidavit or declaration may contain only facts, must conform as much as possible to the requirements of FRCivP 56(e), and must avoid conclusions and argument. Any statement made upon information or belief must specify the basis therefore. An affidavit or declaration not in compliance with this rule may be stricken in whole or in part.

Civ. L.R. 7–5(b). An affidavit is conclusory if the facts contained are speculative or in the form of legal conclusions, but not if they are based on the affiant's recollection of the

events. See Orsini v. O/S SeaBrooke O.N., 247 F.3d 953, 960 n.4 (9th Cir. 2001).

Those who participate in the negotiations of contracts are entitled to testify as to their interpretation of ambiguous terms, however their testimony "must be grounded in ... the parties' expressed intent and understanding during the course of negotiations, rather than simply the witness's own subjective interpretation of the contract." Onyx Pharma., Inc. v. Bayer Corp., 863 F.Supp.2d 894, 897–98 (N.D. Cal. 2011). The court finds that the contested portions of the declarations are nothing more than impermissible subjective interpretations of the meaning of the 1982 and 2007 Agreements. The Agreements speak for themselves, and the court strikes the contested portions of the declarations.

### B. Choice of Law

*3 The parties disagree on whether this dispute should be governed by the laws of the United States or the laws of England and Wales. Innovus contends that English law applies because Article 6.10 of the 2007 Agreement provides that "the applicable substantive law of the Agreement shall be the laws of England and Wales." Panasonic asserts that the #350 Patent is governed exclusively by the 1982 Agreement which contains no choice of law language. Panasonic further argues that this is a question of patent licensing and exhaustion which is to be governed exclusively by United States federal law.

The interpretation of contracts for rights under patents and patent licenses is "generally governed by state law." Rhone–Poulenc Agro, S.A. v. DeKalb Genetics Corp., 284 F.3d 1323, 1327–28 (Fed. Cir. 2002); see also Int'l Nutrition Co. v. Horphag Research LTD, 257 F.3d 1324, 1329 (Fed. Cir. 2001) ("A contractual agreement to apply French law as to ownership is just as valid as an agreement to apply the law of a particular state."); Hilgraeve Corp. v. Symantec Corp., 265 F.3d 1336, 1341 (Fed. Cir. 2001) (resolving a contractual licensing dispute under Ontario law).

In contrast to issues of pure contract interpretation, however, federal law applies to both substantive and procedural issues "intimately involved in the substance of enforcement of the patent right." Arma Refrigeration, Inc. v. Quadlus, Inc., 172 F.3d 852, 855 (Fed. Cir. 1999). The Federal Circuit has explained that the effect of *a patent assignment* under a contract, as opposed to the interpretation of contract terms themselves, is an issue unique to patent law that is governed by federal law. See Sky Tech v. SAP AG, 576 F.3d 1374, 1379

2013 WL 3354390

(Fed. Cir. 2009) ("Usually, federal law is used to determine the validity and terms of an assignment...."); *DDB Tech., LLC v. MLB Adv. Media, LP,* 517 F.3d 1284, 1290 (Fed. Cir. 2008) (The determination of whether a patent assignment clause creates automatic assignment or obligation to assign is treated as a matter of federal law.).

Here, the parties do not dispute whether the #350 Patent is an audio-video product subject to the 1982 Agreement, or the meaning of any other terms in the 1982 Agreement. Instead, the parties' dispute whether the mutual non-assertion agreement between Philips and Panasonic affected later assignees' patent rights. The effect of the assignments in this case on Panasonic's non-assertion rights is an issue unique to patent law that is "intimately involved in the substance of the enforcement" of the #350 Patent. *See Sky Tech,* 576 F.3d at 1379. Therefore, this dispute is governed by United States federal law.

The court does not agree with Innovus that the choice of law provision in the 2007 Agreement requires this dispute to be resolved under the laws of England and Wales. As discussed *infra,* the 2007 Agreement does not expressly limit or supersede the rights provided in the 1982 Agreement.[5] Regardless of whether the 2007 Agreement affects the 1982 Agreement, however, this dispute centers on the effect of Philip's *assignment* as opposed to general contract interpretation, and United States federal law applies.

### C. Effect of the Assignments of the #350 Patent on Panasonic's Non–Assertion Rights

 **\*4** The relevant inquiry is whether the covenant not to sue between Philips and Panasonic affected later assignees' patent rights. After examining the 1982 Agreement, the 2007 Agreement, and the chain of assignments, this court concludes that Innovus is bound by the terms of the 1982 Agreement.

#### 1. The parties' arguments

Panasonic asserts that the unambiguous language of the 1982 Agreement and the long history of the parties' operations under the agreement illustrate that the parties both created and intended to create an unconditional covenant not to sue for all audio and video patents issued before January 1, 2005, which extended for the full lives of the patents covered. Panasonic argues that, under *TransCore, LLC v. Electric Transaction*

*Consultants Corporation,* 563 F.3d 271 (Fed. Cir. 2009), unconditional covenants not to sue are equivalent to a non-exclusive license, and that all assignees of patents are bound by prior licenses. Therefore, Panasonic insists that Innovus, a subsequent assignee of the #350 Patent covered by the 1982 Agreement, does not possess the right to sue Panasonic for infringing the #350 Patent.

Innovus counters that the 2007 Agreement is controlling and expressly limits the effect of the non-assertion agreement to the first assignment. According to Innovus, the 2007 Agreement creates nothing more than a conditional covenant not to sue (conditioned on the patent being an audio or video patent issued before January 1, 2005), which is not equivalent to a license, and *is not transferable* to subsequent assignees. At oral argument, Innovus relied on *Hilgraeve Corp. v. Symantec Corp.* to support this proposition. 265 F.3d at 1346 (concluding that a covenant-not-to sue "does not grant a *transferable* license to the patent."). Innovus attempts to distinguish this case from *TransCore* on the grounds that the parties in *TransCore* were the initial signatories of the covenant not to sue, whereas Innovus is the fourth assignee after the agreement. Finally, Innovus contends that the terms of the 2007 Agreement indicate that Panasonic's non-assertion rights were not automatically transferable by assignment because: (1) the 2007 Agreement did not expressly provide that the non-assertion agreement would be automatically binding on future assignees, but rather (2) provided for indemnification in the event that the non-assertion agreement was not *contractually extended* to future assignees.

In response, Panasonic argues that the 2007 Agreement supplements, but does not supersede, the 1982 Agreement, to include six new products not at issue here. Under the 1982 Agreement, as modified by the 2007 Agreement, Panasonic contents that it obtained the unconditional right not to be sued for the full life of the #350 Patent. Panasonic further rebukes Innovus's attempts to distinguish *TransCore,* asserting that the principle in *TransCore*—that a license and a covenant not to sue are both "authorizations"—is not negated by an assignment. Finally, Panasonic replies that any contractual clause expressly providing for automatic assignment of the covenant not to sue would be redundant because the #350 Patent could not be transferred free of the covenant as a matter of law.

### 2. Unconditional covenants not to sue are equivalent to non-exclusive licenses

**\*5** Under federal law, there is no substantive difference between an unconditional covenant not to sue and a non-exclusive license. *TransCore,* 563 F.3d at 1276 ("The real question, then, is not whether an agreement is framed in terms of a 'covenant not to sue' or a 'license.' That difference is one of form, not substance–both are properly viewed as 'authorizations.' "). In *TransCore,* the Federal Circuit held that the patentee's covenant-not-to sue authorized the covenantee, Mark IV, to sell the patented invention to the defendant, Electronic Transaction Consultants ("ETC"). *Id.* at 1274. The court reasoned that the covenant not to sue "authorize[d] all acts that would otherwise be infringements: making, using, offering for sale, selling, or importing." *Id.* Thus, for the purposes of patent exhaustion, the court held that the patentee's rights were exhausted with respect to the patented articles sold to ETC by the Mark IV. *Id.*

A patent license is nothing more than a promise by the patent owner not to sue the licensee. *See TransCore,* 536 F.3d at 1276; *see also De Forest Radio Tel. & Tel. Co. v. United States,* 273 U.S. 236, 242 (1927) ("As a license passes no interest in the monopoly, it has been described as a mere waiver of the right to sue by the patentee."). No particular language or form is necessary to give a license its effect, "[a]ny language ... from which [one] may properly infer that the owner consents to his use of the patent in making or using it, or selling it ... constitutes a license." *De Forest Radio,* 273 U.S. at 241. Here, although Philip's "authorization" to Panasonic was in the form of a covenant not to sue, it had the same substantive effect of a non-exclusive license. *See TransCore,* 526 F.3d at 1274; *De Forest Radio,* 273 U.S. at 241–42. The issue is whether Philips could assign the # 350 Patent free and clear of the covenant not to sue Panasonic.

It is a longstanding principle that an assignee of a patent takes the patent subject to prior licenses. *Keystone Type Foundry v. Fastpress Co.,* 272 F. 242, 245 (2d Cir. 1921); *see also L.L. Brown Paper Co. v. Hydroiloid, Inc.,* 118 F.2d 674, 677 (2d Cir. 1941) ("The assignee of a patent taking title subsequent to the granting of a license under patent receives no more than the former owner's interest, including the usual rights of a patent owner diminished by the licensee's right to use the patented process within scope of its license."). Patent owners cannot transfer an interest greater than what they possess, so assignees "take[ ] a patent subject to the legal encumbrances

thereon." *Datatreasury Corp. v. Wells Fargo & Co.,* 522 F.3d 1368, 1372–72 (Fed. Cir. 2008) (explaining that agreements involving the actual use of the patent "run with the patent" and are binding on subsequent owners, but holding that arbitration clauses in license agreements do not involve actual use and do not run with the patent). Thus, assignment results in the assignee "stepping into the shoes with regard to the rights that the assignor held and not in an expansion of those rights." *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.,* 247 F.3d 44, 60 (3d Cir. 2001); *see also Epistar Corp. v. Int'l Trade Comm'n,* 566 F.3d 1321, 1333 (Fed. Cir. 2009) ("Black letter contract law states that the assignment of a contract to an assignee ... only changes the obligated party, not the scope of the obligation."). Assignment transfers assignor's contract rights, "leaving them in full force and effect." *Medtronic,* 247 F.3d at 60. In sum, "one cannot convey what one does not own." *TransCore,* 563 F.3d at 1275.

This occurs whether or not an assignee had notice. A subsequent assignee "takes title to the patent subject to such licenses, of which he must inform himself as best he can at his own risk." *Jones v. Berger,* 58 F. 1006, 1007 (C.C.D. Md. 1893); *see also V–Formation, Inc. v. Benetton Group SpA,* No. 02–2259, 2006 WL 650374, at \*7 (D.Colo. Mar. 10, 2006) (extending this reasoning to covenants not to sue). In *V–Formation,* K–2 Corporation entered into a covenant not to sue with defendant Benetton Group, which included the two patents at issue. *Id.* at \* 1. K–2 later *assigned* all of its rights to those two patents to V–Formation, Inc. (to settle a separate litigation). *Id.* at \*2. V–Formation was unaware of K–2's covenant not to sue Benetton. *Id.* The issue, like the issue here, was whether V–Formation (assignee) could sue Benetton (recipient of covenant not to sue). The court held that V–Formation could not sue Benetton for infringement, because K–2 did not possess the right to sue Benetton, and K–2 *could not have assigned this right* to V–Formation. *Id.* at \*5. The court reasoned that "upholding the covenant not to sue ... does not deprive V–Formation of its ownership interest in the patents; it merely limits its right to sue one entity (Benetton) for infringement." *Id.* at \*8. The court also held that V–Formation's lack of knowledge of the covenant not to sue did not entitle it to bring suit. *Id.* at \*7 ("The court does not agree that that the doctrine of 'bona fide purchaser' as urged by V–Formation precludes Benetton from asserting the covenant not to sue as a defense in this case."). This case is analogous to the situation here.

### 3. *Hilgraeve*

**\*6** At oral argument, Innovus relied on *Hilgraeve* for the proposition that the covenant not to sue in this case is *not transferable* in the same way as a license would be. In *Hilgraeve,* the patent owner, Hilgraeve Corp., granted a covenant not to sue to covenantee Delrina, Corp. with respect to patents for software. 265 F.3d at 1345. The covenant was contained in a Technology Transfer Agreement transferring Hilgraeve's *copyrights* in that software to Delrina. *Id.* at 1340, 1345. Delrina subsequently licensed its intellectual property rights to defendant Symantec Corp. *Id.* at 1340. Hilgraeve sued Symantec for patent infringement, and Symantec argued as one of its defenses to infringement that it had obtained a license to the patent at issue from Delrina. *Id.* at 1344. The Federal Circuit rejected Symantec's argument on the grounds that "Delrina ... itself never acquired a transferable license to practice the [patent in suit], and Delrina ... therefore could not sub-license the [patent in suit]." *Id.*The court first concluded that the Technology Transfer Agreement did not transfer any rights to the patent, only the copyrights. *Id.* at 1345. The court also held that the covenant not to sue with respect to the patents did "not grant a *transferable* license to the patent." *Id.* at 1346 (emphasis in original).

Unlike the situation in *Hilgraeve,* here, Panasonic is not attempting to convey a license to anyone. Instead, Panasonic is merely seeking *not to be sued,* the right which is possesses under the 1982 and 2007 Agreements. While it is true that Panasonic may not be able to *grant a license* to the # 350 Patent to a third party, it is not attempting to do so. The question is whether Philips can convey the right to sue Panasonic, a right which it does not possess, to *assignees*.

### 4. Application

The 1982 Agreement between the Panasonic and Philips was a mutual agreement that neither party would assert patent rights for video and audio patents filed or entitled to a priority date before January 1, 2005 against the other. 1982 Agreement at 1 ("It has always been understood between us that ... neither [Panasonic] nor Philips shall assert against the other any patent rights."). The language of the 1982 Agreement is clear that the covenant not to sue extended "for the respective full lives of the patent rights concerned." 1982 Agreement at 2. The #350 Patent issued to Philips on January 18, 1994, and is thus a covered patent under the Agreements.

The agreement between the parties, regardless of the formal language used, unconditionally authorized Panasonic to make, use, or sell the invention of the #350 Patent for the full life of the patent, and thus has the same effect as a license. *See TransCore,* 563 F.3d at 1276; *De Forest Radio,* 273 U.S. at 241–*Id.* Nothing in the 2007 Agreement affects Panasonic's non-assertion rights with respect to the #350 Patent. The 2007 Agreement, by its terms, is a formal supplement to the 1982 Agreement, to aid the parties in the interpretation of the term "audio and video products" under the 1982 Agreement with respect to six new product categories. 2007 Agreement at 1 ("WHEREAS, the Parties have been engaged in a dispute regarding the interpretation of the term 'audio and video products' under the Original Agreement with respect to the Six Product Categories."). Nothing in the 2007 Agreement explicitly alters or is inconsistent with the scope of the rights defined in the 1982 Agreement. [6] The #350 Patent was issued in 1994, under the first five year continuation of the 1982 Agreement, it was not one of the six disputed products, and it is therefore covered by the 1982 Agreement. Thus, the covenant not to sue with respect to the #350 Patent began on its issuance in 1994 and extended for the life of the patent.

**\*7** In addition to the unambiguous language of the contract, the parties have operated for years as if consenting to each other's use, without any objection. *See also Old Colony Trust Co. v. Omaha,* 23 U.S. 100, 118 (1913) ("The practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed to have great, if not controlling influence."). The parties' conduct bolsters what the plain and unambiguous language of the contract creates: an implied non-exclusive license.

While this court understands the unfairness that may arise from an assignee not being on notice of a prior covenant not to sue or license, it is well settled that assignees take a patent subject to any prior licenses. *See In re Cybernetic Servs.,* 252 F.3d 1039, 1052 (9th Cir. 2001). And licenses are not required to be recorded any more than covenants not to sue. *See id.* (holding that security interests that do not involve transfers of rights do not need to be recorded as they are "a 'mere license'" ... [and] not an 'assignment, grant or conveyance' within the meaning of 25 U.S.C. § 261"; *see also Keystone,* 272 F. at 245 (" [I]t had long passed into the text-books that ... an assignee acquired title subject to prior licenses of which the assignee must inform himself as best he can, and at his own risk."). The assignee's duty to inform himself of encumbrances on the patent rights exists regardless of the

formal definition of the agreement as a covenant not to sue. As such, the fact that Innovus is a fourth generation assignee does not change the fact that Innovus did not acquire the right to sue Panasonic under the #350 Patent because neither Philips nor any later assignee could "convey what [it] does not own." *TransCore,* 563 F.3d at 1275.

Moreover, the first assignment, from Philips to NXP B.V., specifically states that the Assignee, NXP B.V., took the patent

> subject to Assignor [Philips] retaining a royalty free, world wide, nonexclusive, irrevocable and unrestricted license ... and further subject to all existing rights, commitments, licenses, non-assertion agreements and the like made by the Assignor ... and/or its affiliates under said Patent Rights and to any extension of term and/or renewals thereof.

1st Assignment at Reel 021411, Frame 0447. Thus, NXP B.V. expressly took the patent subject not only to Philip's continued license, but also subject to Panasonic's non-assertion rights. A patent owner cannot transfer an interest greater than what it possesses. *TransCore,* 563 F.3d at 1275; *Epistar,* 566 F.3d at 1321. Because Philips never possessed the right to sue Panasonic, Philips could not convey that right to NXP B.V., NXP B.V. could not convey that right to NXP Holdings, and NXP Holdings could not convey that right to Innovus. All of these assignments are available as a matter of public record, including the first assignment from Philips to NXP B.V., which contains the express limitations on the rights transferred and should have put Innovus on notice of the non–assertion rights (although notice is not required, as explained *supra*).

The court is also not persuaded that the analysis changes in view of: (1) the absence of an explicit clause in the 1982 or 2007 Agreements binding all future assignees; (2) Article 6.5.4 of the 2007 Agreement; or (3) Article 4 of the 2007 Agreement. First, the court agrees with Panasonic that any explicit clause in the 1982 or 2007 Agreements binding all future assignees to the non-assertion agreement would be redundant because, as explained, Philips could not convey the right to sue Panasonic in any event.

**\*8** Second, Article 6.5.4 of the 2007 Agreement only confirms that Philips did not possess the right to sue

Panasonic. The provision states that nothing in either Agreement "shall be construed as: conferring by implication, estoppel or otherwise, upon any Party hereunder, any license or other right under any Patent, except the *non-assertion rights* expressly granted herein." 2007 Agreement, Article 6.5.4 (emphasis added). This plain language is clear that the clause was not intended to limit the continued application of the covenant not to sue.

Finally, neither does Article 4 of the 2007 Agreement—which refers to what should be done in the event of acquisition of subsidiaries, divestiture of business, and transfer of patent rights falling within the scope of the agreement—change the analysis. Article 4.4 requires that, in the event of transfer of rights, each party should

> contractually require the entity acquiring said Patents to continue to provide the rights granted under the [1982] Agreement and this Agreement to the other Party. In the event that a Party transfers one or more of the Patents but fails to comply with the requirements of this ... said Party shall indemnify and hold harmless the other Party.

This clause merely reiterates what the law already requires: subsequent parties are bound by the existing agreement. At most, this clause provides a guarantee of notice to the future assignee, ideally to avoid lawsuits like the instant one.[7] Similarly, the letter from NXP B.V., the first assignee, to Panasonic merely acknowledged that they would continue to honor the non-assertion agreement with respect to the #350 Patent. Watanabe Decl., Ex. 3 Dkt. No. 53–3 ("NXP B.V. Letter"). As explained, however, this acknowledgment does not change the fact that Philips could not convey the right to sue Panasonic, a right which it did not possess.

Therefore, whether the Philips–Panasonic agreement is referred to as a "non-exclusive license" or a "covenant not to sue," under either name, it took away Philip's right to exclude Panasonic from practicing the invention of the #350 Patent. Philips, then, could not convey the right to exclude Philips to NXP B.V. and so on, to Innvus. Innovus does not possess the right to sue Panasonic for infringement of the #350 Patent.[8]

2013 WL 3354390

### III. ORDER

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

Footnotes

1       The original agreement initially covered patents filed or entitled to priority before January 1, 1990, but pursuant to its terms, the agreement automatically extended for five year periods until one party elected not to extend and gave the requisite notice. On October 22, 2003, Philips elected not to renew the 1982 Agreement and it thus expired as of January 1, 2005.

2       Specifically, with regard to the Watanabe Declaration, Innovus asks the court to strike the second sentence of ¶ 5, the entirety of ¶ 6, the second and third sentences of ¶ 7, and the entirety of ¶ 8. With regard to the Peters Declaration, Innovus asks the court to strike the first sentence of ¶ 3 and the entirety of ¶¶ 4–7.

3       Innovus filed the same motion on two occasions: (1) once in conjunction with its opposition brief, and (2) again one week later accompanied by a motion to expedite.

4       The court considers Innovus's motion to strike in conjunction with the present motion for summary judgment.

5       The plain language of the 2007 Agreement makes clear that the choice of law provision only applies to the 2007 Agreement. *Compare* 2007 Agreement, Article 6.10 ("The applicable substantive law of *the Agreement* shall be the laws of England and Wales") (emphasis added) *with* 2007 Agreement, Articles 6.2–6.9 (all of which contain either "of *this* Agreement *and* the [1982] Agreement" or "of *this* Agreement *or* the [1982] Agreement") (emphases added).

6       Specifically, Article 5 of the 2007 Agreement refers to "Interpretation of the Original Agreement," and Article 2 states: "[t]he parties confirm and agree that the Six Product Categories are within the scope ... [of] the [1982] Agreement." This clearly indicates that the 2007 Agreement acknowledges the Original Agreement to still be in effect and not superseded. Moreover, nothing in Article 5 alters any of the parties' non-assertion rights.

7       Innovus alleges that under English law's purposive interpretation of contracts, it would be a breach of contract for Philips or any later assignee transfer the patent without a limitation written into the assignment. Whether Philips is in breach of contract, however, does not change the fact that the Philips could not convey the right to sue Panasonic.

8       Panasonic also argues that Innovus's patent rights were exhausted. The court concludes that a patent exhaustion analysis is not required to reach the conclusion that Innovus does not possess the right to sue Panasonic.

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 56

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956



2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

Jacobs v. Yehia

Paul Jacobs, 657947 BC Ltd. and Columbia Cottage Ltd., Plaintiffs and Sam Yehia, The Cambie Malone's Corporation, Cambie Holdings (Vancouver) Corp., 494989 BC Ltd. Cambie Holdings (Nanaimo) Corp., 0828508 BC Ltd., Esquimalt Holdings Corp. and 0790012 BC Ltd., Defendants

British Columbia Supreme Court

Dickson J.

Heard: April 8, 2013; April 9, 2013; April 11, 2013; April 15, 2013; April 16, 2013; April 17, 2013; April 18, 2013; April 19, 2013; April 25, 2013; May 3, 2013; June 25, 2013; June 28, 2013; July 2, 2013; July 3, 2013; July 22, 2013; July 29, 2013; July 30, 2013; August 19, 2013; February 20, 2014
Judgment: May 12, 2014
Docket: Vancouver S106849

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: J.D. Vilvang, Q.C., R.J.M. Yalowsky, for Plaintiffs

R.J. King, K.A. McLean, for Defendants

Subject: Civil Practice and Procedure; Contracts; Corporate and Commercial; Evidence; Insolvency; Property; Restitution

Business associations --- Creation and organization of business associations — Partnerships — Evidence of partnership — Intention of parties

Individual plaintiff, J, owned plaintiff companies and individual defendant Y, owned defendant companies — Over almost eight years, J worked for Y and invested $967,000 in Y's restaurant and bar business — J alleged that despite promising otherwise, Y kept all profits — Y terminated relationship with J repaid him $967,000 — Plaintiffs brought action for declaration of partnership, accounting or damages and equitable compensation — Action allowed in part — Essential ingredients of partnership not present — Parties did not proceed beyond "intended partners" stage — Parties' conduct evinced intention to carry on business in common for profit, Y persuaded J that they were partners and parties held themselves out as partners in many ways — Nevertheless, important terms of underlying partnership contract were uncertain and business, as joint enterprise, was not in fact commenced or carried on in common — There was no meeting of minds on shared ownership issue, nor effective mechanism in place for its determination — Consensus ad idem on how and when profits would be divided, as well as exit strategy option, was never reached or evidenced orally, in writing or by contract — Defendants liable to plaintiffs for breach of agreement to pay interest on loan and unjust enrichment by J's

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

provision of investment funds.

Contracts --- Construction and interpretation — Miscellaneous

Individual plaintiff, J, owned plaintiff companies and individual defendant Y, owned defendant companies — In 2002, parties agreed that J would advance funds to Y as investment in Y's restaurant and bar business — During six-month "honeymoon period", interest would be paid to J and parties would explore long-term relationship — J advanced payments of $200,000 and $500,000, secured by promissory notes, and began working for Y's business — J invoiced Y's management company for services and expenses — In 2004, Y stopped paying interest on loans and J advanced further $267,000 — In 2005 and 2009, parties reached some agreements regarding their relationship — 2009 agreements included agreement regarding J's loan and management services agreement — In 2010, Y terminated relationship with J and repaid him $967,000 — Plaintiffs brought action for declaration of partnership, accounting or damages and equitable compensation — Action allowed in part — Partnership not established — 2002 loan agreement encompassed entire $967,000 advanced by J — Although no promissory note note signed for third payment, parties treated it throughout as part of overall loan transaction — Parties agreed that 12 per cent interest would apply to all funds advanced pursuant to 2002 agreement — "Honeymoon period" was essentially extended into 2005, when new agreement terminated 2002 agreement — Y breached 2002 agreement by failing to pay interest between 2003 and 2005 while parties negotiated intended partnership — Oral management consultancy agreement governed parties' working relationship until it was terminated by 2009 agreements — Although language of 2009 agreements was imprecise and awkward, meaning of essential terms could be discerned — 2009 agreements renewed 2002 loan agreement, replaced oral management consultancy agreement and were not unconscionable — Defendants breached 2009 agreement by failing to pay interest due and owing — Plaintiffs entitled to accounting and judgment for damages and interest.

Civil practice and procedure --- Limitation of actions — Actions in contract or debt — Statutory limitation periods — General principles

Loan agreement — Individual plaintiff, J, owned plaintiff companies and individual defendant Y, owned defendant companies — In 2002, parties agreed that J would advance funds to Y as investment in Y's restaurant and bar business and that during six month "honeymoon period", interest would be paid and parties would explore long-term relationship — J advanced payments of $200,000 and $500,000, secured by promissory notes, and began working for Y's business — In 2004, Y stopped paying interest on loans and J advanced further $267,000 to Y — In 2005 and 2009, parties reached some agreements regarding their business relationship — In 2010, Y terminated relationship with J and repaid him $967,000 — Plaintiffs brought action for declaration of partnership, accounting or damages and equitable compensation — Action allowed in part — Partnership not established — Y breached 2002 agreement by failing to pay interest between 2003 and 2005 while parties continued to negotiate intended partnership — Action not statute-barred — Promissory notes attached to 2005 agreement acknowledged Y's indebtedness to J with respect to loans, including principal sum and accrued interest — Acknowledgment amounted to confirmation within meaning of s. 5 of former Limitation Act (B.C.) — Notice of civil claim was filed within six years of confirmation.

Restitution and unjust enrichment --- Benefits conferred in anticipation of reward — Miscellaneous

Individual plaintiff, J, owned plaintiff companies and individual defendant Y, owned defendant companies — In 2002, parties agreed that J would advance funds to Y as investment in Y's restaurant and bar business — During six month "honeymoon period", interest would be paid to J and parties would explore long-term relationship — J advanced payments of $200,000 and $500,000, secured by promissory notes, and began working for Y's business — J invoiced Y's management company for his services and expenses — In 2004, Y stopped paying interest on loans and J advanced further $267,000

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

— In 2005 and 2009, parties reached some agreements regarding their relationship — 2009 agreements included agreement regarding J's loan and management services agreement — In 2010, Y terminated relationship with J and repaid him $967,000 — Plaintiffs brought action for declaration of partnership, accounting or damages and equitable compensation — Action allowed in part — Partnership not established — Defendants were enriched by J's investment funds, which were used to operate, renovate and develop properties and businesses — Defendants' access to and use of funds constituted causal link between contribution and enrichment — Between 2005 and 2009, defendants did not access funds loaned by J pursuant to valid contract as Y had persuaded J that they were partners — Based on parties' history and Y's representations, between 2005 and 2009, J reasonably expected to share in profits if he left $967,000 investment with Y — Y failed to deal with J with commercial good conscience by rebuffing attempts to resolve partnership impasse while paying no interest on investment, renouncing liability for repayment and purporting to erode J's equity entitlement — Unjust to permit defendants to retain benefits conferred by J during that period — Monetary award based on valued survived approch was most appropriate.

**Cases considered by *Dickson J.*:**

*Athwal v. Black Top Cabs Ltd.* (2012), 2012 CarswellBC 703, 2012 BCCA 107, 316 B.C.A.C. 296, 537 W.A.C. 296, 30 B.C.L.R. (5th) 17, 348 D.L.R. (4th) 83 (B.C. C.A.) — followed

*Atlas Cabinets & Furniture Ltd. v. National Trust Co.* (1990), 1990 CarswellBC 76, 38 C.L.R. 106, 45 B.C.L.R. (2d) 99, 68 D.L.R. (4th) 161, 37 E.T.R. 16 (B.C. C.A.) — referred to

*Backman v. R.* (2001), [2001] 2 C.T.C. 11, 196 D.L.R. (4th) 193, *(sub nom. Backman v. Canada)* [2001] 1 S.C.R. 367, 2001 SCC 10, 2001 CarswellNat 246, 2001 CarswellNat 247, 2001 D.T.C. 5149, *(sub nom. Backman v. Minister of National Revenue)* 266 N.R. 246, 11 B.L.R. (3d) 165 (S.C.C.) — followed

*Biehl v. Strang* (2011), 2011 CarswellBC 2616, 2011 BCSC 1373, 91 B.L.R. (4th) 1 (B.C. S.C.) — referred to

*Blue Line Hockey Acquisition Co. v. Orca Bay Hockey Ltd. Partnership* (2008), 2008 BCSC 27, 2008 CarswellBC 36, 40 B.L.R. (4th) 83 (B.C. S.C.) — considered

*Blue Line Hockey Acquisition Co. v. Orca Bay Hockey Ltd. Partnership* (2009), 52 B.L.R. (4th) 108, [2009] 8 W.W.R. 83, 266 B.C.A.C. 71, 449 W.A.C. 71, 89 B.C.L.R. (4th) 120, 2009 CarswellBC 177, 2009 BCCA 34 (B.C. C.A.) — referred to

*Bruyninckx v. Bruyninckx* (1995), 1995 CarswellBC 194, 4 B.C.L.R. (3d) 341, [1995] 5 W.W.R. 683, 13 R.F.L. (4th) 199, 7 E.T.R. (2d) 1, 57 B.C.A.C. 1, 94 W.A.C. 1 (B.C. C.A.) — referred to

*Continental Bank of Canada v. R.* (1998), *(sub nom. Continental Bank Leasing Corp. v. Minister of National Revenue)* 229 N.R. 58, 1998 CarswellNat 1496, 1998 CarswellNat 1497, *(sub nom. Continental Bank Leasing Corp. v. Canada)* 163 D.L.R. (4th) 385, *(sub nom. Continental Bank Leasing Corp. v. R.)* 98 D.T.C. 6505, [1998] 4 C.T.C. 119, *(sub nom. Continental Bank Leasing Corp. v. Canada)* [1998] 2 S.C.R. 298 (S.C.C.) — referred to

*Craiggs v. Owens* (2012), 2012 CarswellBC 27, 2012 BCSC 29, 346 D.L.R. (4th) 558 (B.C. S.C.) — referred to

*DeJesus v. Sharif* (2010), 93 R.P.R. (4th) 168, 71 B.L.R. (4th) 159, 2010 BCCA 121, 2010 CarswellBC 524, 284 B.C.A.C. 244 (B.C. C.A.) — referred to

*Dirom v. Perera* (2004), 2004 ABQB 657, 2004 CarswellAlta 1160, 41 Alta. L.R. (4th) 263, [2005] 10 W.W.R. 678, 372 A.R. 50, 47 B.L.R. (3d) 86, 10 E.T.R. (3d) 239 (Alta. Q.B.) — referred to

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

*Faryna v. Chorny* (1951), 1951 CarswellBC 133, 4 W.W.R. (N.S.) 171, [1952] 2 D.L.R. 354, [1952] 4 W.W.R. 171 (B.C. C.A.) — referred to

*Galaxy Sports Inc. v. Umbro Holdings Ltd.* (2005), 14 E.T.R. (3d) 126, 2005 BCSC 278, 2005 CarswellBC 481 (B.C. S.C.) — referred to

*Gorisek v. Aeckerle* (2011), 2011 CarswellBC 1168, 2011 BCSC 624 (B.C. S.C.) — followed

*Guarantee Co. of North America v. Gordon Capital Corp.* (1999), [2000] I.L.R. I-3741, 126 O.A.C. 1, 247 N.R. 97, 49 B.L.R. (2d) 68, [1999] 3 S.C.R. 423, 15 C.C.L.I. (3d) 1, 178 D.L.R. (4th) 1, 1999 CarswellOnt 3171, 1999 CarswellOnt 3172, 39 C.P.C. (4th) 100 (S.C.C.) — considered

*Hawkeye Power Corp. v. Sigma Engineering Ltd.* (2012), 329 B.C.A.C. 38, 560 W.A.C. 38, 2012 CarswellBC 3159, 2012 BCCA 414, 70 C.E.L.R. (3d) 175, 37 B.C.L.R. (5th) 217, [2013] 1 W.W.R. 213 (B.C. C.A.) — distinguished

*Ibbotson v. Fung* (2013), 2013 CarswellBC 916, 2013 BCCA 171, [2013] 7 W.W.R. 625, 361 D.L.R. (4th) 42, 27 R.F.L. (7th) 280, 43 B.C.L.R. (5th) 299, 336 B.C.A.C. 279, 574 W.A.C. 279 (B.C. C.A.) — referred to

*Kerr v. Baranow* (2011), 14 B.C.L.R. (5th) 203, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 93 R.F.L. (6th) 1, 300 B.C.A.C. 1, 509 W.A.C. 1, 274 O.A.C. 1, [2011] 1 S.C.R. 269, 2011 SCC 10, 2011 CarswellBC 240, 2011 Carswell-BC 241, 328 D.L.R. (4th) 577, 411 N.R. 200, *(sub nom. Vanasse v. Seguin)* 108 O.R. (3d) 399 (S.C.C.) — followed

*Khan v. Miah* (2000), 97 (45) L.S.G. 41, [2000] 1 W.L.R. 2123, [2001] 1 All E.R. 20, [2001] 1 All E.R. (Comm) 282, 150 N.L.J. 1658, 144 S.J.L.B. 282 (U.K. H.L.) — considered

*Kosaka v. Chan* (2009), [2010] 5 W.W.R. 430, 79 C.C.E.L. (3d) 1, 312 D.L.R. (4th) 32, 1 B.C.L.R. (5th) 1, 65 B.L.R. (4th) 83, 2009 BCCA 467, 2009 CarswellBC 3002 (B.C. C.A.) — considered

*Lee v. 1137434 Alberta Ltd.* (2009), 2009 CarswellBC 519, 2009 BCSC 284 (B.C. S.C.) — followed

*Lore Krill Housing Co-operative v. Ramirez* (2012), 2012 CarswellBC 1541, 2012 BCCA 223, 322 B.C.A.C. 61, 549 W.A.C. 61, 34 B.C.L.R. (5th) 354 (B.C. C.A.) — considered

*Loychuk v. Cougar Mountain Adventures Ltd.* (2012), 347 D.L.R. (4th) 591, 2012 BCCA 122, 2012 CarswellBC 520, 31 B.C.L.R. (5th) 23, 96 B.L.R. (4th) 192, 318 B.C.A.C. 204, 541 W.A.C. 204, 90 C.C.L.T. (3d) 181 (B.C. C.A.) — considered

*M. (K.) v. M. (H.)* (1992), 142 N.R. 321, *(sub nom. M. c. M.)* [1992] 3 S.C.R. 6, 96 D.L.R. (4th) 289, 57 O.A.C. 321, 14 C.C.L.T. (2d) 1, 1992 CarswellOnt 998, 1992 CarswellOnt 841 (S.C.C.) — considered

*McNeill v. Vandenberg* (2010), 2010 CarswellBC 3473, 2010 BCCA 583 (B.C. C.A.) — referred to

*Pacific Hunter Resources Inc. v. Moss Management Inc.* (2008), 48 B.L.R. (4th) 90, 2008 BCSC 960, 2008 CarswellBC 1518 (B.C. S.C.) — referred to

*Pineda v. Lai* (2014), 2014 CarswellBC 362, 2014 BCCA 46 (B.C. C.A.) — referred to

*Red Burrito Ltd. v. Hussain* (2007), 2007 CarswellBC 1936, 2007 BCSC 1277, 33 B.L.R. (4th) 205 (B.C. S.C.) — followed

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

*Robert Porter & Sons Ltd. v. Armstrong* (1926), [1926] 2 D.L.R. 340, [1926] S.C.R. 328, 1926 CarswellBC 105 (S.C.C.) — referred to

*Sangha v. Reliance Investment Group Ltd.* (2011), 2011 CarswellBC 2536, 2011 BCSC 1324 (B.C. S.C.) — referred to

*Scragg v. Lotzkar* (2005), 2005 BCCA 596, 2005 CarswellBC 2961, 10 B.L.R. (4th) 173, 219 B.C.A.C. 53, 361 W.A.C. 53 (B.C. C.A.) — considered

*Soleil Hotel & Suites Ltd. v. Soleil Management Inc.* (2009), 2009 CarswellBC 2553, 2009 BCSC 1303 (B.C. S.C.) — considered

*Sucher v. Immediate Images Inc.* (2009), 2009 CarswellBC 2653, 2009 BCSC 1361 (B.C. S.C.) — referred to

*Surerus Construction & Development Ltd. v. Rudiger* (2000), 11 B.L.R. (3d) 21, 2000 BCSC 1746, 2000 CarswellBC 2513 (B.C. S.C.) — referred to

*Wilson v. Fotsch* (2010), 81 R.F.L. (6th) 241, 2010 BCCA 226, 8 B.C.L.R. (5th) 1, 57 E.T.R. (3d) 159, 286 B.C.A.C. 276, 484 W.A.C. 276, 2010 CarswellBC 1158, [2010] 11 W.W.R. 29, 319 D.L.R. (4th) 26 (B.C. C.A.) — followed

*Zhu v. Li* (2007), 2007 BCSC 1467, 2007 CarswellBC 2367, 43 R.F.L. (6th) 376 (B.C. S.C.) — referred to

**Statutes considered:**

*Interest Act*, R.S.C. 1985, c. I-15

    s. 3 — considered

*Limitation Act*, R.S.B.C. 1996, c. 266

    Generally — referred to

    s. 3(3) — referred to

    s. 3(5) — referred to

    s. 5 — considered

    s. 5(1) — considered

    s. 5(2)(a)(i) — considered

    s. 5(2)(b) — considered

    s. 5(5) — considered

*Limitation Act*, S.B.C. 2012, c. 13

    Generally — referred to

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

s. 30 — considered

*Partnership Act*, R.S.B.C. 1996, c. 348

Generally — referred to

s. 1 — referred to

s. 1 "business" — considered

s. 2 — considered

s. 2 "partnership" — considered

s. 4 — considered

s. 4(c)(i) — considered

s. 4(c)(ii) — considered

s. 4(c)(iv) — considered

s. 11 — considered

s. 14 — referred to

s. 15 — referred to

s. 19 — referred to

s. 21 — considered

s. 22 — referred to

s. 27 — considered

s. 27(a) — considered

s. 27(c) — considered

s. 27(d) — considered

s. 27(e) — considered

s. 27(f) — considered

s. 27(g) — considered

**Words and phrases considered:**

**renew**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

It is, however, possible to renew both an existing and a terminated contract.

This is apparent from the *Concise Oxford English Dictionary* definition of the word

"renew", which is to:

1. resume or re-establish after an interruption. 2 give fresh life or strength to. 3. extend the period of validity of (a licence, subscription, or contract). 4 replace or restore (something broken or worn out)

**supplant**

In so doing, [the Loan Agreement] expressed a shared intention "to supplant any and all previous agreements" with the Loan Agreement

. . . . .

. . . . .

According to the *Concise Oxford English Dictionary* (11th Edition, revised,

Oxford University Press) to "supplant" means to "supersede and replace".

ACTION for declaration of partnership and relief for breach of contract and unjust enrichment.

***Dickson J.:***

**Introduction**

1      For many years Paul Jacobs believed he and Sam Yehia were business partners. Based on this belief, he worked hard for Mr. Yehia and invested $967,000 in his bar and restaurant companies. The two men shared their daily work lives, planned for the future and made agreements with one another regarding the business. They did not, however, share its profits. While promising otherwise, Mr. Yehia kept those entirely for himself.

2      Eventually Mr. Yehia decided he was done with Mr. Jacobs. He informed him the relationship was over and it was time to move on. Thirty days later he repaid the $967,000, tied off a few loose ends and claimed he owed Mr. Jacobs nothing further. Mr. Jacobs thought differently and commenced this action. In it he seeks, amongst other things, a declaration of partnership and trust, together with an accounting, or, alternatively, damages and equitable compensation.

3      By agreement, the trial was bifurcated. These reasons for judgment address issues of liability alone. The question at the heart of the case is whether Mr. Jacobs was right about the nature of the business relationship and, if not, whether Mr. Yehia was unjustly enriched by what Mr. Jacobs did for him.

**Issues**

4      The issues for determination are:

   1. Were Messrs. Jacobs and Yehia partners?

   2. How is the November 2002 Loan Agreement to be construed and did the defendants breach it by failing to pay interest?

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

Page 8

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

3. If the November 2002 Loan Agreement was breached, is any part of the claim for damages statute barred?

4. How is the Oral Management Consultancy Agreement to be construed?

5. How are the October 2009 Agreements to be construed and were they unconscionable?

6. Did Mr. Yehia repudiate the October 2009 Agreements?

7. If Messrs. Jacobs and Yehia were not partners, was Mr. Yehia unjustly enriched and, if so, how?

8. Is any of the relief sought by the plaintiffs precluded by an equitable doctrine?

9. If the plaintiffs are entitled to a remedy, what remedy is appropriate?

10. Are the defendants entitled to a remedy and, if so, what remedy is appropriate?

**Factual Background**

*The Parties*

5      Paul Jacobs is an affable, hard-working 55-year-old businessman. Born in London and raised in Ireland, he began work early in life in his family's manufacturing and wholesale garment business in Dublin. Mr. Jacobs worked part-time while attending secondary school and then completed the first two years of a four-year accounting program at a local college. Thereafter, he worked for several years in senior sales positions in the garment industry.

6      In 1981, Mr. Jacobs married Lynn Jacobs. Like her husband, Ms. Jacobs grew up in a business-oriented family. After they married, the Jacobs both worked in the garment business in Ireland. In the 1990s, they worked together in their own event planning business.

7      In 1998, the Jacobs decided to move their family to Canada. They had three young sons at the time. A fourth was born after they arrived in this country in January, 1999.

8      When they arrived in Canada the Jacobs' goal was to find a new and interesting business opportunity. They soon decided to open a bed and breakfast in Vancouver. They purchased a property through Mr. Jacobs' company, Columbia Cottage Ltd., and refurbished it. By March 1999, the bed and breakfast was opened for business.

9      Mr. Jacobs operated the bed and breakfast for about three years after it opened. In 2002, however, he decided to sell and look for a new business opportunity. He mentioned this plan to a realtor, who offered to introduce him to an individual described as well-known in the Vancouver hospitality business. Mr. Jacobs accepted the offer. In the fall of 2002, he was thus introduced to Sam Yehia.

10      Mr. Yehia is an aggressive, hard-working 58-year-old businessman. Like Mr. Jacobs, in his youth he attended school while working in his family's business. The Yehia family owned and operated a restaurant in Vancouver and Mr. Yehia carried on working in that field after completing his high school education. Like Mr. Jacobs, he also married and had a family.

11      Over the years Mr. Yehia owned and operated restaurants, bars, and hostels in several locations in British Columbia. He conducted these businesses through various solely owned companies. The corporate defendants, which may be loosely described as the Cambie Malone Group, are some of those companies.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

12      Mr. Yehia is both skilled and successful. A self-described workaholic, he is knowledgeable in all aspects of his businesses, ambitious in his plans and goals, and determined in seeing them through.

13      While Messrs. Jacobs and Yehia share much in common, they are also very different. Mr. Jacobs is a prototypical "people person" who trusts easily, tends to overlook detail and actively avoids confrontation. He is also inclined to let unpleasant things slide and sometimes fails reasonably to protect his own interests. In contrast, Mr. Yehia is a hard-nosed, detail-oriented individual who is strongly focused on self-interest. He is also inclined to control what he can and reacts aggressively to real or perceived challenge.

14      The differences between the two men infused and informed their relationship from its enthusiastic inception to its acrimonious conclusion. They also surfaced in their approaches to giving evidence, with implications for both in connection with credibility and reliability.

### Credibility and Reliability of the Parties

15      The credibility and reliability of Messrs. Jacobs' and Yehia's evidence is a key issue for determination. In fact, several months after closing arguments concluded Mr. Yehia's counsel applied to reopen the trial on the basis that new evidence which reflected badly on Mr. Jacobs' credibility had been discovered and should be received before judgment was handed down. The new evidence concerned Mr. Jacobs' post-trial conduct in certain tax appeals. According to Mr. Yehia's counsel, that conduct was starkly inconsistent with his trial testimony and cast doubt on his veracity.

16      I declined to reopen the trial because it was clear from a summary of the new evidence there was no risk of a mis-carriage of justice if the trial was not re-opened. On the contrary, even if it was admitted and interpreted as urged by Mr. Yehia's counsel the new evidence could not reasonably be expected to affect my assessment of Mr. Jacobs' credibility or the trial's outcome: *Zhu v. Li*, 2007 BCSC 1467 (B.C. S.C.). The significance of the credibility issue was, however, high-lighted by the very fact that the application was brought.

17      In many respects I found Mr. Jacobs to be a straightforward and well-intentioned witness. I reach this conclusion despite the fact that, on September 12, 2012, he pleaded guilty to tax evasion and a conditional sentence order was im-posed. I am also mindful that Mr. Jacobs was sometimes careless as to detail in his written communications and when testifying about his dealings with Mr. Yehia. In addition, he was inclined to speculate and deflect responsibility for some of his actions onto professional advisors. He was also surprisingly unfamiliar with certain key trial documents.

18      Despite the foregoing, Mr. Jacobs impressed me as a witness who, for the most part, tried to provide an accurate account of what transpired over the course of a dysfunctional business relationship. Overall I conclude that his account was not always reliable or clear, but it was not deliberately misleading or skewed.

19      Mr. Yehia, on the other hand, was clear and firm in his grasp of the facts wherever they supported his position. He was, however, unfairly dismissive of Mr. Jacobs and hesitant to acknowledge facts when they were unhelpful from his point of view. In addition, he was strikingly disingenuous in his efforts to explain away his written communications and at least as quick as Mr. Jacobs to deflect responsibility onto professional advisors. He was also inclined to misstate facts to his own advantage in some of his letters and emails.

20      Overall I found Mr. Yehia's evidence to be less than forthright and distinctly slanted on several occasions. On many others, however, I found it accurate and reliable.

21      Given the foregoing, I approach the evidence of both Messrs. Jacobs and Yehia with a measure of caution. In so

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

doing, I bear in mind the need to consider whether it is consistent with the probabilities affecting the case as a whole and shown to be in existence at the time: *Faryna v. Chorny* (1951), [1952] 2 D.L.R. 354 (B.C. C.A.). In undertaking this exercise, I am assisted by the contemporaneous documents and the evidence of certain particularly credible witnesses. One is Ms. Jacobs, who testified fairly and forthrightly. Another is Mr. Fernback, who did the same.

### The Relationship Begins

22      Messrs. Jacobs and Yehia met in early October, 2002 at Mr. Yehia's Vancouver office. First impressions were positive and they agreed to explore the possibility of forming a long-term business relationship. To this end they met repeatedly in the following weeks and communicated frequently via email. They also introduced their wives, travelled together and socialised.

23      When Messrs. Jacobs and Yehia met Mr. Yehia owned, through his companies, four parcels of land on which restaurant, bar and hostel businesses were operated. These included: a restaurant, bar and hostel on Cambie and Cordova Streets in Vancouver (the "Cambie"); a restaurant, bar and hostel on Seymour and Pender Streets in Vancouver ("Malone's"); a restaurant, bar and hostel, with adjacent leased premises in Nanaimo ("Nanaimo"); and a bar and tenanted premises in Esquimalt ("Esquimalt"). He also held a leasehold interest in a restaurant in Kitsilano.

24      Mr. Yehia had owned and operated the lands and businesses in question for varying periods. He acquired the Cambie in 1990; Malone's in 1995; Nanaimo in 1995; and Esquimalt in 2000.

25      Mr. Jacobs had up to $1 million available to invest in a business opportunity when he met Mr. Yehia. He was also interested in securing work in the areas of marketing and business strategy. For his part, Mr. Yehia was asset rich but he needed substantial cash for planned remodelling, development and expansion of his buildings and businesses. It was, however, difficult for him to get bank financing and he claimed to be lonely operating without a partner. The needs and goals of both men appeared to align.

26      Throughout October and early November 2002, Mr. Jacobs toured the Cambie Malone Group properties at Mr. Yehia's invitation. Amongst others, he met senior staff members and the businesses' bank managers. Mr. Yehia told Mr. Jacobs about the businesses and described the existing financing arrangements. He also told him about four appraisals commissioned in September, 2002 for purposes of obtaining bank financing for planned remodelling, development and expansion of the properties and businesses (the "Appraisals").

27      Messrs. Jacobs and Yehia discussed many ideas of possible mutual benefit. From the outset words like "partnership" and "equity stake" were bandied about. For example, in an October 19, 2002 email Mr. Jacobs proposed that he loan up to $1 million to Mr. Yehia and his companies with an option to convert the loans to an equity stake, subject to negotiation and due diligence. He stated the equity participation would be subject to a shareholder agreement, a buy-sell mechanism and annual dividends, and described his prospective role as an "investor partner, with a broad base of general day to day duties". He further proposed that these duties be discharged through Columbia Cottages Ltd. and compensated at a rate of $60,000 per annum, plus GST and expenses.

28      Mr. Yehia responded to Mr. Jacobs' email with a counter-proposal. In an October 23, 2002 email he stated his wife was "... encouraging us to try working together before committing to a partnership". He then proposed that "in the spirit of getting this potential partnership underway" Mr. Jacobs advance "a $200,000 promissory note" to the Cambie Group by November 7, 2002, which loan would earn 12 per cent interest annually, be paid at a rate of $2,000 monthly, mature in five years and be personally secured by Mr. Yehia.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

29      Mr. Yehia went on to propose that Mr. Jacobs would have the option to convert the loan and invest an additional $800,000 into the Cambie Group in equity or debt by May 7, 2003, subject to negotiating a mutually acceptable share-holder agreement and on mutually acceptable terms. He also stated the Cambie Group would retain Mr. Jacobs to assist and participate in expansion of the existing properties for a retainer fee of $3,000 per month.

30      Shortly after this exchange, Mr. Jacobs and Mr. Yehia agreed that Mr. Jacobs would advance funds to Mr. Yehia for investment in the Cambie Malone Group. They also agreed to a six-month "honeymoon period" in which the possibil-ity of a long-term relationship would be explored and interest would be paid on the loans (the "November 2002 Loan Agreement").

### The Six-Month Honeymoon Period

31      On November 8, 2002 Mr. Jacobs advanced $200,000 to Mr. Yehia through Columbia Cottage Ltd. The loan was secured by a promissory note dated November 4, 2002 and signed by both parties.

32      The promissory note provided:

FOR VALUE RECEIVED, I SAM YEHIA, promise to pay to COLUMBIA COTTAGE LTD. At Vancouver, British Columbia, the sum of Two Hundred Thousand Dollars ($200,000.00) together with interest at the rate of 12% per an-num, calculated yearly not in advance, from the first day following receipt of the monies, until fully repaid, in equal monthly installments of $2,000.00 each from and including the 1st day of December 2002 to an (sic) including the 1st day of November 2007, when the balance of the said sum of Two Hundred Thousand Dollars together with any outstanding interest thereon shall become due and payable.

This promissory note can be paid out at any time, prior to maturity, without penalty. If the undersigned fails to pay an installment on its due date, and such installment remains unpaid for 7 days following notice having been received, the balance of the principal with accrued interest on this note shall become due and payable.

33      At approximately the same time he made the $200,000 advance Mr. Jacobs began to work as a marketing and business strategy consultant for the Cambie Malone Group. A written agreement in this regard was not signed, nor even proposed. At Mr. Yehia's suggestion Mr. Jacobs incorporated 657947 BC Limited ("657"). He invoiced Mr. Yehia's man-agement company for his services and expenses through 657 (the "Oral Management Consultancy Agreement").

34      Mr. Jacobs was provided with an office at the Cambie Malone Group head office and began immediately to fa-miliarise himself with the properties and businesses. Thereafter, amongst other things, he disposed of old files and intro-duced changes to the hostel reservation system. He also began dealing with a range of financing issues.

35      On January 27, 2003 Mr. Jacobs advanced a second loan of $500,000 to Mr. Yehia through Columbia Cottage Ltd. Like the first loan, the second was secured by a promissory note.

36      The promissory note provided:

FOR VALUE RECEIVED, I SAM YEHIA, promise to pay to COLUMBIA COTTAGE LTD. At Vancouver, British Columbia, the sum of Five Hundred Thousand Dollars ($500,000.00) together with interest at the rate of 12% per an-num, calculated yearly not in advance, from the first day following receipt of the monies, until fully repaid, in equal monthly installments of $5,000.00 each from and including the 1st day of February 2003 to an (sic) including the 1st day of January 2008, when the balance of the said sum of Five Hundred Thousand Dollars together with any out-standing interest thereon shall become due and payable.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

This promissory note can be paid out at any time, prior to maturity, without penalty. If the undersigned fails to pay an installment on its due date, and such installment remains unpaid for 7 days following notice having been received, the balance of the principal with accrued interest on this note shall become due and payable.

37       Mr. Yehia deposited the funds he received from Mr. Jacobs into his personal bank account at the North Shore Credit Union. Thereafter, he advanced the funds received to the Cambie Malone Group as and when he chose. As planned, he used the funds to operate, renovate and develop the properties and businesses. He accounted for the advances as shareholder loans from himself to the companies.

38       None of Cambie Malone Group companies recorded the existence of a loan from Mr. Jacobs with respect to the funds he advanced to Mr. Yehia.

39       During the honeymoon period Messrs. Jacobs and Yehia discussed the compensation to be paid for Mr. Jacobs' management consultancy services. Unfortunately, the testimony and documentary evidence regarding these discussions is inconsistent and vague. On balance, however, I am satisfied that Messrs. Jacobs and Yehia agreed Mr. Jacobs would be paid $36,000 per annum ($3,000 per month), plus expenses, for his services for the year 2003. In reaching this conclusion I note that, in his October 23, 2002 email, Mr. Yehia proposed the Cambie Malone Group retain Mr. Jacobs for a monthly fee of $3,000.

40       According to Mr. Yehia, the sum agreed upon represented the fair market value of Mr. Jacobs' services. Mr. Jacobs testified, however, that he disagreed with Mr. Yehia's assessment of their value. I accept this testimony as accurate. I find that although Messrs. Yehia and Jacobs agreed Mr. Jacobs would be paid $36,000 for the year 2003 they did not agree that this sum represented the fair market value of his services. In fact, as revealed by an August 2004 email, Mr. Jacobs was under the "impression" that "we agreed on the $36k for 03 year end in order to keep tax exposure to a minimum".

41       Unfortunately, Messrs. Jacobs and Yehia proceeded forward without clarifying impressions or resolving differences. Although Mr. Jacobs was not happy with it, he accepted Mr. Yehia's offer of $36,000 compensation for 2003. I find he did so based in part on Mr. Yehia's assurances that he could submit invoices for more than $3,000 monthly if he needed greater cash flow. He also relied on Mr. Yehia's assurances that they could later agree on some (unspecified) form of adjustment in future partnership draws if his invoices exceeded the fair market value of his services.

42       From the outset Mr. Jacobs submitted invoices pursuant to the Oral Management Consultancy Agreement that exceeded $3,000 per month, as suggested by Mr. Yehia. Although his testimony regarding these amounts was confused, documents filed by Mr. Yehia revealed the actual sums. For example, a ledger marked Exhibit 79 (the "Ledger") shows that in January and February, 2003 Mr. Jacobs' invoices amounted to $7,000 per month; in March, 2003 to $12,645; and in each of April, May and June 2003 to $12,000 per month. I find the Ledger was generally accurate regarding the amounts invoiced and paid.

43       For reasons I cannot identify, Mr. Jacobs did not include a claim for GST on his invoices until 2009, nor even file income tax returns until 2007. These failures reflect a lack of diligence and responsibility on Mr. Jacobs' part in connection with his tax obligations. I do not accept that any part of this failure is attributable to Mr. Yehia not providing Mr. Jacobs with promised accounting assistance. It was plainly up to Mr. Jacobs to meet and fulfill his own tax-related responsibilities.

44       As Mr. Yehia promised, Mr. Jacobs' invoices were paid by the Cambie Malone Group.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

45        Throughout the honeymoon period Mr. Yehia also paid interest on the $700,000 that Mr. Jacobs had loaned to him.

**The 2003 Post-Honeymoon Period**

46        By May of 2003 the honeymoon period was ending. Mr. Jacobs was working hard and performing a range of tasks for the Cambie Malone Group. Amongst other things, these included fundraising, marketing and various forms of administration. They also included overseeing improvements to the properties and businesses, and acquiring permits and approvals for their operation and development.

47        Mr. Yehia expressed satisfaction with Mr. Jacobs' efforts and the developing work relationship. He told Mr. Jacobs they could move forward together as partners, build "generational wealth" for their families, and share in the growth and profits of the businesses. Mr. Jacobs was pleased and confirmed that he wished to convert his loans into equity. With this in mind, throughout the latter half of 2003 they embarked on a long series of discussions and negotiations.

48        As their discussions progressed Messrs. Jacobs and Yehia agreed that Mr. Jacobs' loans would be converted to equity and they would operate the Cambie Malone Group businesses as partners. The conversion would be achieved by Mr. Jacobs receiving shares in the companies and both parties signing a shareholder agreement. The terms of the shareholder agreement would address matters such as dividend rights, corporate governance and dispute resolution. The percentage of Mr. Jacobs' equity interest would be based on the "as is" values of the Cambie Malone Group properties in the Appraisals.

49        Unfortunately, although Messrs. Jacobs and Yehia agreed on the general concept of converting the loans to equity they had quite different ideas about a key element of the arrangement. In particular, they did not share a common understanding of the "as is" values in the Appraisals and thus the percentage of equity to which Mr. Jacobs would be entitled. Indeed, as the trial progressed it became apparent that Mr. Jacobs did not fully understand the nature of the "as is" values in the Appraisals, either in his discussions with Mr. Yehia or when he was testifying. On the contrary, I find that Mr. Jacobs misunderstood the meaning and implications of the Appraisals on this centrally important point.

**The "As Is" Values in the Appraisals**

50        As noted, Mr. Yehia commissioned the Appraisals in September 2002 for the purpose of obtaining financing for planned remodelling and development of the Cambie Malone Group properties and businesses. This was also his goal when he met Mr. Jacobs in October 2002 and began their discussions regarding a long term business relationship. The appraiser, Mr. Anderson, had prepared four separate Appraisals: one each for the Cambie, Malone's, Nanaimo, and Esquimalt. In so doing, he employed standard appraisal language and methodology.

51        Each Appraisal included a section headed "Value Estimate Assuming Remodelled per the Current Proposal and Operating at a Stabilized Level of Occupancy with Stabilized Liquor Store Plus Food and Beverage Sales". This section described the fair market value of the property in September 2002 based on its highest and best use taking into account the applicable remodelling proposal and assuming the property was fully operational with stabilized sales (the "Remodelled Value").

52        The remodelling proposal for each property was outlined in another section of the Appraisals. Different methods of assessing the Remodelled Value were described and applied by Mr. Anderson, yielding differing results. The Appraisals also included several appendices, one of which was headed "Certification". In the Certification appendix Mr. Anderson set out his final estimate of the Remodelled Value of each property.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

53        In Mr. Anderson's opinion, the Remodelled Value of the Cambie was $7.8 million; the Remodelled Value of Malone's was $5.1 million; the Remodelled Value of Nanaimo was $3.5 million; and the Remodelled Value of Esquimalt was $3.15 million.

54        In the Esquimalt Appraisal, Mr. Anderson also included two additional value estimates in the Certification appendix. One was described as an estimate of value of the property "(B) As Is, With Existing Building and Occupancies" ($2,237,000); the other as "(C) Assuming Redeveloped Per The Current Proposal and Operating At a Stabilized Level of Occupancy With Stabilized Liquor Store Plus Food and Beverage Sales, Stabilized 200 Bed Hostel Facilities and Revenues, and fully Leased Fast Food Restaurant" ($5.3 million).

55        The Esquimalt Appraisal was the only one in which the words "As Is" were used in the Certification appendix with regard to the property's estimated value. In explaining his opinion on Esquimalt "As Is, With Existing Building and Occupancies" Mr. Anderson wrote: "In this scenario, the market value of the subject property was felt to be entirely within the underlying land value."

56        Each Appraisal also included an appendix headed "Residual Property Value in Current Physical Condition". This section described the residual value of the property in its current physical condition assuming its highest and best use was the remodelling proposal and the property would be remodelled as proposed (the "Residual Value").

57        The Residual Value is the Remodelled Value, less the assumed construction costs of remodelling, less the present value of the assumed lost income stream due to the need to continue operating in the present state of development until the assumed date of completion of the proposed remodelling. It represents the amount a developer could afford to pay for the property assuming it would be remodelled as proposed and achieve the anticipated revenue.

58        In Mr. Anderson's opinion, the Residual Value of the Cambie was $6.84 million; the Residual Value of Malone's was $4,735,000; the Residual Value of Nanaimo was $2,916,000; and the Residual Value of Esquimalt was $2,304,000.

59        After Mr. Jacobs concluded his trial testimony, his counsel admitted on his behalf that the Residual Value of each of the four properties was their respective "as is" value as of September, 2002. In other words, he admitted the Residual Value was the fair market value of the properties in their present physical condition, before remodelling, but based on the assumption that the proposed remodelling would require the time and expense estimated in the Appraisals.

60        It was sensible for Mr. Jacobs and his counsel to make this admission. The admission differed considerably, however, from Mr. Jacobs' testimony about his understanding of the "as is" values in the Appraisals. It also differed from his written and oral communications to Mr. Yehia on this issue. In those communications he rejected the notion that the Residual Values in the Cambie, Malone's and Nanaimo Appraisals corresponded to their "as is" values for purposes of establishing his equity share.

61        Mr. Yehia took the position that Mr. Jacobs' equity share should be a percentage of the total net equity in the Cambie Malone Group properties based on the relative size of his investment. In his view, the total net equity should be calculated based on the Residual Values in the Appraisals. In contrast, Mr. Jacobs took the position that the "as is" values of the properties were unrelated to any planned remodelling and, therefore, the total net equity should be calculated differently. As outlined above, the Residual Values in the Appraisals were based on both the remodelling plans and the costs associated with such remodelling.

62        Mr. Jacobs' testimony on the "as is" values issue changed somewhat in the course of his direct and cross examination. It eventually emerged, however, that he believed the "as is" values of all four properties could be calculated by pro-

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

rating the Remodelled Values to arrive at a figure attributable to the value of each without regard to the planned remodelling. Although it was far from clear, it appears he based this view on the fact that he and Mr. Yehia agreed the "as is" value of Esquimalt was $2.2 million for purposes of calculating total net equity and determining his equity participation. The $2.2 million figure roughly corresponded to the figure labelled the "As Is, With Existing Building and Occupancies" value of Esquimalt in the Appraisal.

63      The $2.2 million figure that Messrs. Jacobs and Yehia agreed upon for Esquimalt was similar, though not identical, to the Residual Value in the Appraisal. In other words, in Mr. Anderson's opinion the highest and best use of the Esquimalt property was similar to the underlying value of the land. The Appraisals for the Cambie, Malone's and Nanaimo did not, however, include similar or comparable opinions. Further, as noted, the Esquimalt Appraisal was the only one in which the words "As Is" were used regarding an estimated value.

64      I am unable to identify the reason(s) for Mr. Jacobs' view on the "as is" values issue prior to the trial admission. As Mr. Yehia's counsel suggested, it may be that he did not fully grasp the highest and best use concept underlying the Appraisals or the standard methodology employed to arrive at the values included therein. It also may be that he believed the Appraisal values other than Esquimalt were unduly inflated for purposes of obtaining bank financing and should, therefore, be modified for purposes of establishing his equity stake.

65      Regardless of the explanation, however, Mr. Jacobs' pro-rating approach to determining "as is" values was misconceived and unjustified. It was not based on the values in the Appraisals, which included assumptions as to proposed remodelling. In contrast Mr. Yehia's approach was realistic and based on the Appraisals. This was the method the parties identified for establishing Mr. Jacobs' equity entitlement.

### The Effect of the Parties' Positions on the "As Is" Values

66      Throughout the latter half of 2003 Messrs. Jacobs and Yehia repeatedly discussed the contentious "as is" values issue in relation to Mr. Jacobs' equity entitlement. They did not reach agreement, however, except with respect to Esquimalt.

67      The practical effect of the differing positions was significant.

68      By Mr. Yehia's calculation, based on the Residual Values for the Cambie, Malone's and Nanaimo and $2,237,000 for Esquimalt ($16,728,000) and after deducting liabilities ($8,486,000), the total net equity in the Cambie Malone Group properties was $8,242,000. On this analysis, depending on how Mr. Jacobs' $967,000 investment was to be treated, his equity entitlement would be something in the range of a 10 to 12 per cent interest.

69      In contrast, by Mr. Jacobs' calculation, based on "as is" values determined by pro-rating the Remodelled Values ($10.8 million) and after deducting liabilities ($8 million), the total net equity in the Cambie Malone Group properties was $2.8 million. On this analysis, Mr. Jacobs' equity entitlement would be something in the range of a 34 to 35 per cent interest.

### Mr. Yehia Stops Paying Interest

70      As noted, throughout the honeymoon period Mr. Yehia paid interest on the $700,000 that Mr. Jacobs had then loaned to him. In their testimony, the parties concurred that, in total, he paid $70,633 in interest.

71      According to Mr. Jacobs, Mr. Yehia stopped making interest payments six months after the loans were made to him. If this is accurate, however, the total interest payable on the two promissory notes would have been less than

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

$70,633. According to Mr. Yehia, interest payments on the loans were made until October 2003. If this is accurate, however, the total interest payable on the promissory notes would have been greater than $70,633.

72      All things considered, I conclude that Mr. Yehia paid interest on the loans to Mr. Jacobs until shortly after the honeymoon period ended. Although I cannot determine precisely when he stopped paying, I am satisfied it was sometime between July and September of 2003.

73      Counsel for Mr. Yehia submits that at approximately the same time Mr. Jacobs confirmed he wanted to convert his loans into equity he also agreed to forego interest on the loans in consideration of Mr. Yehia's agreement to increase his monthly consulting fee payments to $10,000. He submits that Mr. Jacobs' offer to forego interest was made so that he could increase his monthly cash flow. He goes on to submit that Mr. Yehia accepted Mr. Jacobs' offer, Mr. Jacobs increased his monthly invoices and Mr. Yehia increased the corresponding monthly payments. He says further that Mr. Yehia believed all amounts paid in excess of the value of Mr. Jacobs' services would be accounted for when the loans were converted into equity.

74      At certain points in his cross-examination, Mr. Jacobs' testimony seemed consistent with the foregoing submission. I find, however, that Mr. Jacobs was confused and mistaken in some of what he said. In fact, as revealed by the Ledger, the invoices submitted by Mr. Jacobs and paid by Mr. Yehia did not increase at the point identified by Mr. Yehia's counsel (or, for that matter, testified to by Mr. Jacobs). Rather, between December, 2002 and December 2003 Mr. Jacobs invoiced and was paid as follows:

December, 2002 - $ 4,633.33; January, 2003 - $7,000.00; February, 2003 - $7,000.00; March, 2003 - $12,645.16; April, 2003 - $12,000.00; May, 2003 -$12,000.00; June, 2003 - $12,000.00; July, 2003 - $17,000.00; August, 2003 - $8,000.00; September, 2003 - $9,000.00; October, 2003 -$9,000.00; November, 2003 - $9,000.00; December, 2003 - $9,000.00

75      Taking into account the entire body of evidence, including the Ledger, I conclude that when Mr. Jacobs told Mr. Yehia he wanted to convert his loans to equity he did not offer to forego interest in consideration of Mr. Yehia increasing his monthly consultancy fee payments. On the contrary, as previously noted, Mr. Jacobs submitted invoices well in excess of the $3,000 monthly sum agreed for his 2003 services from the outset of the business relationship. When the honeymoon period ended (or, more accurately, was extended) that established practice simply continued. What did change is that Messrs. Jacobs and Yehia agreed to enter into a long-term business relationship, convert the loans into equity and operate the businesses together as partners with shared ownership.

76      I also conclude there was a direct connection between the cessation of interest payments and the decision to operate as partners. In particular, I find that Mr. Yehia stopped paying interest between July and September of 2003 specifically because he and Mr. Jacobs agreed the loans would be converted to equity and they would operate as partners. For the same reason, Mr. Jacobs did not pursue payment of monthly interest installments on the funds loaned to Mr. Yehia pursuant to the November 2002 Loan Agreement.

77      As before, Mr. Yehia believed any amounts paid to Mr. Jacobs in excess of the fair market value of his services would eventually be adjusted in future partnership drawings. This had, however, always been an aspect of the prospective partnership and part of how the Oral Management Consultancy Agreement was administered. In so far as Mr. Jacobs may have been overpaid for his services those overpayments were unrelated to the matter of interest owed under the November 2002 Loan Agreement.

78      I find that Mr. Yehia did *not* increase Mr. Jacobs' monthly payments in exchange for an agreement to forego in-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

terest. In other words, the payments made on Mr. Jacobs' monthly invoices did not include "notional payment for interest", nor were they made "in lieu of interest", as submitted by counsel for the defendants.

79      I am unable to reach a conclusion at this juncture regarding the actual fair market value of Mr. Jacobs' services. This was a matter upon which the parties disagreed and concerning which there was limited objective evidence presented in this phase of the trial.

*2004*

80      On January 27, 2004 Mr. Jacobs advanced an additional $267,000 to Mr. Yehia. He did so despite the fact that they did not agree on the percentage of his equity entitlement, did not agree on the fair market value of his services and had no shareholder agreement. Unlike the two earlier advances, however, there was no promissory note executed and no express terms regarding interest or repayment. I conclude that Mr. Jacobs advanced the $267,000 in this manner because he trusted Mr. Yehia and believed they were about to become partners.

81      The additional $267,000 brought the total sum advanced by Mr. Jacobs to Mr. Yehia to $967,000.

82      Mr. Yehia did not pay any interest on the $267,000.

83      At one point, Mr. Jacobs testified he understood that he and Mr. Yehia were partners when he had invested the entire sum of $967,000. I do not accept this testimony as a reliable description of his state of mind at the time. Rather, taking into account their written communications, I infer that throughout 2004 Messrs. Jacobs and Yehia both believed issues such as the extent of Mr. Jacobs' equity entitlement and the terms of a shareholder agreement had to be resolved before the partnership would crystallise. I also conclude that Mr. Jacobs genuinely believed resolution would soon be achieved.

84      Mr. Jacobs' belief that he and Mr. Yehia were moving toward partnership was based on many factors. For example, Mr. Yehia repeatedly assured him that they were building "generational wealth" together as partners and made similar remarks to others, including Ms. Jacobs. He also granted signing privileges to Mr. Jacobs for food and drink at the businesses, provided cell phones to Mr. and Ms. Jacobs, and used partnership language (such as referring to their "draws") in many of his communications.

85      On the other hand, Mr. Yehia did not actually treat Mr. Jacobs as a partner. For example, he did not share corporate decision-making power, authority or profits with him. He also did not operate partnership bank accounts with him or share joint responsibility for most of the debts and liabilities of the Cambie Malone Group.

86      In addition to continuing his work for the Cambie Malone Group, Mr. Jacobs took other steps based on his belief that he and Mr. Yehia were moving toward partnership. At Mr. Yehia's request, he and Ms. Jacobs arranged for a $146,000 second mortgage on their family home to enable the businesses to obtain financing at a residential mortgage rate rather than a higher commercial rate (the "Second Mortgage").

87      The monthly payments on the Second Mortgage were made by the Cambie Malone Group.

88      Mr. Yehia persuaded Ms. Jacobs to agree to the Second Mortgage based on statements to the effect that her husband was his "soul mate" and partner. He also promised to pay for a holiday for the Jacobs family if she would agree, which, eventually, she did.

89      Despite his promise, Mr. Yehia did not pay for a holiday for the Jacobs family.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D.
3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

90    Mr. Yehia also asked Mr. Jacobs to secure financing for the Cambie Malone Group by obtaining a small business improvement loan for which he (Mr. Yehia) was not eligible (the "SBIL Loan"). Mr. Jacobs did so by borrowing approximately $250,000 through his personal company, 657, and, in the process, providing a partial personal guarantee of $62,000.

91    The SBIL Loan funds were used by the Cambie Malone Group to develop a liquor store on the Esquimalt property. As part of the lender's requirements, 657 took a leasehold interest in the Esquimalt liquor store.

92    The SBIL Loan payments were made through 657 by the Cambie Malone Group.

93    Throughout 2004 Messrs. Jacobs and Yehia continued to discuss what they both called their partnership. They made some limited progress on certain issues, but much remained unresolved. In April, 2004, they agreed that "key man insurance" of $1 million on both of their lives would be acquired and the Cambie Malone Group would repay $45,000 of the funds Mr. Jacobs had advanced so that he could repay a related demand loan. As promised, in May, 2004 the Cambie Malone Group repaid $45,000 to Mr. Jacobs.

94    No progress was made, however, in the primary areas of contention. In particular, Messrs. Jacobs and Yehia did not agree on the percentage of Mr. Jacobs' equity entitlement or on the fair market value to be attributed to his services. They did agree, however, that the value of both of their services would be assessed and considered in determining their partnership draws.

95    In an April 2004 email, Mr. Jacobs identified various points he said needed to be addressed in order to move forward. These included a loan note for the $267,000 advance, a shareholder agreement and an agreement on distribution of profits for 2002/03 and 2003/04. In the email he also referred to his "drawings" in 2002/03 and 2003/04.

96    From January, 2004 to September, 2004 Mr. Jacobs submitted invoices of $9,000 per month for his services pursuant to the Oral Management Consultancy Agreement. From October, 2004 onward he increased the invoices to $10,000 per month.

97    As before, Mr. Jacobs' invoices were paid by the Cambie Malone Group.

98    In an email dated October 29, 2004 and headed "Reconciliation with Revisions" Mr. Jacobs advised Mr. Yehia that he wished to resolve the outstanding issues before year-end to complete "this process". In response, Mr. Yehia wrote a letter dated December 14, 2004 and headed "Investing in the Cambie Group of Companies" (the "December 2004 Letter").

### The December 2004 Letter

99    Mr. Yehia began the December 2004 Letter by identifying his intention "to summarize the state of our dealings in respect of the funds which you provided and the return which you will receive, from time to time". He stated that the funds were advanced "to provide you with the opportunity to share in the success of the Cambie Group of Companies". He went on to state "success in a business translates into an increase in the overall value for such businesses" and noted that a baseline value at the time of the investment was required.

100    Mr. Yehia referenced the Appraisals and identified the total net equity in the Cambie Malone Group as $8,242,000 based on the Residual Values. He then stated:

We considered your advance of $967,000 as a proportion of this value, this means that you acquired an aggregate of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

an 10.5% interest in the Cambie Group of Companies (the "Original Equity Interest") (subject to any erosion of such interest as discussed further in this letter) (ie. $967,000/$8,242,000 + $967,000).

101     Mr. Yehia turned next to the issue of value for services rendered. He began by stating:

Prior to evaluating a return on your investment, we must consider the nature of any monies which are paid to either of us, and provide for the payment of an appropriate amount to both of us to reflect the value for the services which we are providing. In this way, we will ensure that amounts paid to either of us are properly recognized as either a fee for our services, or a return on our investment. Any amounts paid to you (or me) in excess of the fair market value of our services contributed, must be on account of a return on our investment (or possibly an erosion of our capital invested).

102     This was the first time Mr. Yehia had ever suggested to Mr. Jacobs that his capital might be eroded by virtue of any overpayment for his services. In so doing, Mr. Yehia claimed that he and Mr. Jacobs had mutually agreed on the values to be attributed to both of their services for 2003 and 2004. In particular, he stated the agreed upon sums were $30,000 for 2003 and $36,000 for 2004 for Mr. Jacobs and $120,000 for 2003 and $125,000 for 2004 for himself. In fact, no such agreement had ever been made.

103     As noted, Messrs. Jacobs and Yehia agreed to value Mr. Jacobs' services at $36,000 for 2003, not $30,000 as claimed by Mr. Yehia in the December 2004 Letter. In addition, they did not agree on the fair market value of Mr. Jacobs' services for 2004. On the contrary, this issue remained a matter of significant contention.

104     Mr. Yehia went on to propose "the manner in which your investment shall be evidenced and the manner in which you will receive a return on such investment". His proposal included several sub-paragraphs, including the following:

(b) The Investment shall be recorded as a subscription for shares by you in each of the Cambie Group of Companies, as at January 30, 2003. *You will have acquired your Original Equity Interest in each of the Cambie Group of Companies, as at January 30, 2003.* I will arrange for the records of each of the companies to reflect your equity interest in each such company. *Until such time as these records have been updated to reflect such interest, I shall hold your Original Equity Interest in trust for you, and will account to you for all profits or income associated with your interest* in the Cambie Group of Companies.

[emphasis added]

105     Mr. Yehia concluded the December 2004 Letter by asking Mr. Jacobs to sign it, thereby confirming his agreement with its contents. In the alternative, he asked Mr. Jacobs to identify any points of disagreement.

### Mr. Jacobs' Reply to the December 2004 Letter

106     On January 14, 2005 Mr. Jacobs replied to the December 2004 Letter. In so doing, he rejected Mr. Yehia's approach to calculating net equity based on the Residual Values in the Appraisals. He claimed the Appraisal valuations were "used to meet the requirements of the Banks" and expressed discomfort with the 10.5 per cent interest calculated by Mr. Yehia. He suggested:

... if we are unable to agree on what we each think is an agreeable final figure a qualified professional third party could determine the 2002 valuation based on the then as is values not subject to remodelling or any other plans we have devised for the buildings post November 2002...

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

107      Mr. Jacobs also rejected Mr. Yehia's approach to valuing his consultancy services. As with the net equity, he suggested referring the matter to a professional third party if he and Mr. Yehia could not agree. He strongly disputed Mr. Yehia's assertion that his equity might be eroded and stated:

> ... Realistically if I was unable to fulfill my perfunctory duties and deemed incompetent or superfluous to the businesses requirements I could be relieved of these duties and this would not effect the terms of the equity investment we agree on. Any amounts paid in excess of the agreed compensation are considered drawings against the company profits that are distributed through the shareholders agreement of which we will agree on annually. I do not intend to erode my holding in any way once we agree on the above points again for obvious reasons. Your holdings will always be greater than mine unless I have misunderstood the erosion concept. I feel a base $17 per hour compensation is unacceptable and needs to be discussed...

108      Mr. Jacobs went on to address other matters that required attention and reconciliation. These included an exit strategy option, management structure and division of responsibilities. He concluded by asking that he and Mr. Yehia meet to negotiate.

### The February 2005 Agreements

109      Messrs. Jacobs and Yehia met in January, 2005 to negotiate the outstanding issues regarding their business relationship. They did not, however, agree on the "as is" values, and thus the extent of Mr. Jacobs' equity entitlement, or on the value attributable to Mr. Jacobs' services.

110      Despite the absence of agreement, Mr. Yehia assured Mr. Jacobs that they could and should move forward as partners. He told Mr. Jacobs that outside professionals would be retained to assist them in addressing the outstanding issues. He also told Mr. Jacobs not to worry about his compensation level because the attribution of value was nothing more than an accounting exercise. He said further that they were building "generational wealth" for their families, the businesses were doing well and there was more than enough for them to share.

111      Mr. Yehia produced two letters for Mr. Jacobs to sign in connection with their business relationship. The first was headed "Shareholders Agreement in the Cambie Group of Companies". The second was headed "Investing in the Cambie Group of Companies". On February 1, 2005, in reliance upon Mr. Yehia's assurances, Mr. Jacobs signed both letters, as did Mr. Yehia (together, the "February 2005 Agreement").

112      The letter headed "Shareholders Agreement in the Cambie Group of Companies" provided:

> Further to my letter dated December 14, 2004, your response dated January 14 2005 and our letter of January 25 2005 *confirming your equity participation as a partner into the existing, future and associated operating businesses and real estate holdings of*:
>
> [listed operations]
>
> To provide clarity and avoid any confusion in the future, we have agreed that a shareholders agreement outlining the interests and rights for both Paul Jacobs and Sam Yehia and the estates needs to be drawn and executed.
>
> *In the spirit of efficiency I would like to suggest we retain professional(s) who would represent the best interest of the companies and instruct them to assist us in the reconciliation of all of the points which would be included in the shareholders agreement.*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

[emphasis added]

113      The letter headed "Investing in the Cambie Group of Companies" provided:

Further to my letter dated December 14 2004 and your response dated January 14 2005 with respect to the nature of the relationship between the parties, equity partner or lender, I am writing to provide clarity and avoid any confusion whatsoever in the future.

On or about November 2002 Paul Jacobs loaned $200,000 to Sam Yehia which was evidence by the execution of a promissory note and hereby attached. On or about January 2003 Paul Jacobs loaned another $500,000 to Same Yehia which was also evidenced by the execution of a promissory note and hereby attached. On or about January 2004 Paul Jacobs advanced to Sam Yehia an additional $267,000 which resulted in a total of $967,000 being invested in the Cambie Group of Companies for equity participation.

***In July of 2003, Paul Jacobs agreed to convert all of the promissory notes into an equity position*** into the operating businesses and real estate holdings of:

[listed operations]

***By executing below you acknowledge that all of the promissory notes which were advanced to me, which notes suggested a personal obligation owed by me to you, are null and void and that I am not personally liable for the repayment to you of any amounts on account of such notes.***

[emphasis added]

114      According to Mr. Yehia, after Mr. Jacobs signed the February 2005 Agreement he believed that he was no longer responsible to repay the $967,000. In response to a question posed on examination for discovery about whether, at that point, anyone still owed Mr. Jacobs the $967,000 Mr. Yehia replied "I'm not sure how I can answer that question".

115      According to Mr. Jacobs, after he signed the February 2005 Agreement he believed that he and Mr. Yehia "became partners completely". I accept that he genuinely held this belief, although much still remained unresolved. I also accept that Mr. Jacobs believed he and Mr. Yehia would soon break the impasse by retaining third-party professionals to assist in clarifying these matters. I further accept that he believed Mr. Yehia would soon issue him shares in the Cambie Malone Group in a percentage agreed upon based on their advice.

***2005 - 2009***

116      The impasse was not broken. On the contrary, for the next four years Messrs. Jacobs and Yehia carried on without resolving much of anything. Mr. Yehia continued to call Mr. Jacobs his partner without actually sharing profits, liabilities or decision-making authority with him. He also continued to pay no interest on the funds Mr. Jacobs had advanced pursuant to the November 2002 Agreement.

117      For his part, Mr. Jacobs continued working for the Cambie Malone Group. Amongst other things he raised substantial funds and maintained investor relations. For example, he worked regularly on a Heritage Investment Fund project, which fund raised approximately $3.7 million. He also dealt with municipal officials and bankers, developed marketing strategies, and liaised with appraisers regarding the properties.

118      Throughout this period Messrs. Yehia and Jacobs met regularly to discuss and plan for the Cambie Malone

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

Group businesses. The Yehia and Jacobs families also socialized with one another frequently and Messrs. Yehia and Jacobs worked out together at the gym. Mr. Yehia described Mr. Jacobs as his partner to others in both business and social contexts. He also referred to him as his partner in written communications.

119    As before, Mr. Jacobs submitted monthly invoices of $10,000 for his services pursuant to the Oral Management Consultancy Agreement.

120    As before, Mr. Jacobs' invoices were paid.

121    Mr. Yehia testified that, throughout this period, Mr. Jacobs' work was unsatisfactory and his role in the Cambie Malone Group "indefensible". I do not accept this testimony as accurate. Rather, I am satisfied that Mr. Jacobs performed his "ambassadorial" and other duties in a generally acceptable manner. Had it been otherwise, I have no doubt Mr. Yehia would have terminated them promptly. For several years, he did nothing of the sort.

122    Although Mr. Yehia acknowledged in the February 2005 Agreement that third-party professionals would be retained to assist regarding a shareholder agreement, he did not actually retain anyone for this purpose. Whenever Mr. Jacobs raised the subject, which he did, Mr. Yehia brushed him off and refused to act on his suggestions.

123    According to his counsel, Mr. Yehia continuously proposed that third parties be retained to help resolve the outstanding issues but Mr. Jacobs equivocated. I do not accept this submission. Rather, I find it was Mr. Yehia, not Mr. Jacobs, who stonewalled on the matter of retaining third-party assistance to break the impasse.

124    Strangely, Mr. Jacobs did not press the point or retain his own professional advisors to move matters forward. I do not accept, as he suggests, that this was because he could not afford to do so. Rather, I infer that Mr. Jacobs failed to act independently because he disliked confrontation and feared offending Mr. Yehia if he took the initiative. This failure contributed to Mr. Jacobs' growing sense of frustration and concern.

125    On March 5, 2007 Mr. Yehia wrote the first in a series of annual letters to Mr. Jacobs. In the letter he purported to summarize the status of Mr. Jacobs' "investment and equity participation" based on what he characterised as an erosion of Mr. Jacobs' equity interest.

126    According to Mr. Yehia, Mr. Jacobs' initial investment of $967,000 had diminished due to "withdrawals" in excess of the value of his services. He claimed that, as of September 2006, Mr. Jacobs' equity had eroded to $567,074. He also unilaterally attributed a value to Mr. Jacobs' services for purposes of his calculation.

127    Mr. Jacobs responded on March 13, 2007 with surprise, distress and a measure of indignation. In so doing, he disputed much of what Mr. Yehia said in his March 5 letter. For example, Mr. Jacobs emphasized that he and Mr. Yehia had never discussed a formula which would erode his equity and complained about Mr. Yehia's unilateral devaluation of his services. He also complained about the absence of a shareholder agreement, partnership meetings or distribution of profits.

128    Mr. Jacobs concluded his rejoinder letter as follows:

Our partnership is unique. You and I are unique, and our collective ideas are what makes this relationship tick. I feel frustrated that I cannot complete this deal with you. *I want you to finish this with me before the end of June and lock it away until we retire.* This must be a negotiation that recognises the partnership and what I brought to the table and not the standard grind applied to everyone outside our partnership. I want to conclude this so we and our families have "peace of mind". *If we are unable to reconcile then we can use the services of professionals who spe-*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

*cialize in partnership agreements.* I am the minority in this partnership and fully understand the risks and rewards associated with that position, however it is in both our best interests to finalise this matter. ***I am suggesting we meet and discuss the partnership and suggest Saturday May 5 morning at the office.*** [all emphasis added]

129      A meeting might have been held thereafter, but Messrs. Jacobs and Yehia did not "finish this". They did not reconcile on the outstanding issues. They did not retain third-party professionals. They just carried on.

130      Similar letters were exchanged in the next two years, followed by similar inaction.

131      In his April 19, 2008 letter Mr. Yehia claimed that, as of September 30, 2007, Mr. Jacobs' equity had eroded to $477,513. Again, he unilaterally attributed a value to Mr. Jacobs' services for purposes of his calculation. He went on to say:

Many options exist going forward, and I want to be certain that all options be addressed. Namely, should I elect to leverage some of the equity that the buildings have acquired it might be reasonable for me to choose to pay back the present value of your investment, in effect buying out of our present arrangement...

132      In his May 1, 2008 rejoinder letter, amongst other things, Mr. Jacobs wrote:

...I refuse to argue the FMV point as it is unethical, belittling and demeaning...

*... **I am the minority in this partnership and fully understand the risks associated with that position, however you have a duty and a responsibility which comes with the total control you have over the businesses and properties. You insisted on that mandate in order to maximise your success and I have not stood in your way.*** I do not expect us to agree on everything, and some of the projects I have been involved in have to date proved impossible to pull off, not from the lack of effort from my side, but more to do with the politics of the project.

***If you feel you need to retire our partnership by leveraging equity in the buildings, I have no issue with that proposal,*** you deserve everything you harvest ...

[emphasis added]

133      Despite this exchange, the self-described partnership was not "retired".

134      At some point in 2008 Mr. Yehia stopped paying expenses for which Mr. Jacobs submitted invoices. Mr. Jacobs found this situation upsetting and embarrassing. And yet he carried on.

135      In his April 20, 2009 letter, Mr. Yehia claimed that, as of September 30, 2008, Mr. Jacobs' equity had eroded to $392,428, based on his unilateral attribution of value to his services. He also stated "... the markets have evolved to our benefit have appreciated and increased our equity by $9,497,390 in value or 115 per cent above their appraised values since you joined us". He went on to suggest that Mr. Jacobs either raise more money annually or reduce his draws.

136      Mr. Yehia's statement that the Cambie Malone Group had increased in value was accurate. As subsequent appraisals revealed, the equity in the businesses increased significantly after Mr. Jacobs advanced the funds to Mr. Yehia.

137      Mr. Jacobs testified that he did not agree to any erosion of his equity interest in the Cambie Malone Group companies. His letters are consistent in this regard and I accept that no such agreement was made. I reach this conclusion despite the fact that, for reasons he failed to explain, Mr. Jacobs recorded a non-corresponding form of erosion on the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

Columbia Cottage Ltd. books with respect to the funds advanced to Mr. Yehia. I infer that he believed there was some sort of advantage to making these entries, although the basis for his belief is not apparent. As with his failure to claim for GST, this conduct reflected, at best, a distinct lack of diligence in matters of corporate administration.

138      Mr. Jacobs also testified, and I accept, that he did not argue with Mr. Yehia about the alleged equity erosion or fair market value issues beyond sending his annual rejoinder letters. When the topic arose in conversation, Mr. Yehia would typically placate him and sometimes take him out for dinner. On such occasions, Mr. Yehia would repeat his previous reassurances: that everything was fine, the annual letters were just an accounting exercise, and the businesses were increasing in value.

139      For his part, Mr. Yehia testified that, from 2005 to 2009, he kept hoping Mr. Jacobs would follow through and convert his loans into shares, as agreed upon and expected. He claimed to be frustrated by Mr. Jacobs' failure to convert the loans because, he said, this caused undesirable ambiguity for the businesses. He also claimed to want to find a solution to enable conversion and thus bring clarity and certainty to the relationship. I do not accept these claims with regard to the period 2005 to mid-2009.

140      I accept that Mr. Yehia's position on the "as is" values issue was far superior to that of Mr. Jacobs. I find, however, that for most of 2005-2009 he was content to carry on paying no interest on the $967,000 while assigning low values to Mr. Jacobs' services and purporting to erode his equity rather than trying to break the impasse regarding his percentage entitlement. In my view, this conclusion is most harmonious with the preponderance of probabilities evident in the surrounding circumstances.

141      From 2002 onward, the businesses were flourishing and equity in the Cambie Malone Group was increasing. It was, therefore, plainly in Mr. Jacobs' interest to nail down his entitlement as soon as possible and thereby share in the increased value, as promised by Mr. Yehia. As a practical matter, however, Mr. Jacobs could not convert his loans until the contentious "as is" values issue was resolved and the extent of his entitlement established. Given the contention, both Messrs. Jacobs and Yehia recognized that outside assistance was needed before conversion could take place.

142      From 2004 onward, Mr. Jacobs repeatedly asked that Mr. Yehia retain professional assistance to assist in achieving clarity and reconciliation on the outstanding issues. In 2005, Mr. Yehia presented him with the February 2005 Agreement and indicated professionals would be retained to assist in reconciling on all points. Mr. Jacobs agreed and signed. Nevertheless, Mr. Yehia continued thereafter to respond to Mr. Jacobs' requests by putting him off and rebuffing him: proclaiming willingness, but failing actually to retain anyone. Simply put, Mr. Yehia's actions did not match his words.

143      Mr. Yehia was far better able to move matters forward than was Mr. Jacobs. He controlled the Cambie Malone Group completely and could easily have hired someone to help break the impasse had this truly been his desire. It was not. On the contrary, I find that, until mid-2009, Mr. Yehia preferred to keep the status of Mr. Jacobs' investment ambiguous while repeatedly reassuring him that they were partners. He also preferred to continue paying no interest whatsoever on the $967,000 while retaining full control and all profits and purporting to erode Mr. Jacobs' equity stake.

144      Given Mr. Yehia's stonewalling, Mr. Jacobs could not convert his loans and actively share in the Cambie Malone Group's increasing value.

145      I am satisfied the increased value in the Cambie Malone Group from 2002 onward was due in part to Mr. Yehia's use of Mr. Jacobs' $967,000 investment. Indeed, its purpose from the outset was to enable their development and expansion. That is precisely what occurred. I am also satisfied that other contributions made by Mr. Jacobs, including the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D.
3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

Second Mortgage and the SBIL Loan, increased the value of the Cambie Malone Group.

### Mr. Fernback is Hired

146      By the spring of 2009, the Olympics were approaching and the businesses were booming. At this point, Mr. Ye-
hia decided to change his approach to Mr. Jacobs and his investment. He decided it was time to address the impasse and
clarify the status of the business relationship in a manner that would best serve his interests.

147      In April, 2009 Mr. Yehia hired Timothy Fernback as a consultant to the Cambie Malone Group. Shortly there-
after, he appointed Mr. Fernback chief financial officer and chief operating officer.

148      Mr. Yehia introduced Mr. Fernback to Mr. Jacobs, whom he described variously as a partner, senior manager,
personal lender and company employee. Amongst other things, he assigned Mr. Fernback the task of clarifying Mr. Jac-
obs' status and relationship with the Cambie Malone Group, taking into account his $967,000 investment. He also asked
him to assess the value of Mr. Jacobs' contribution over the years and provide recommendations regarding the way for-
ward.

149      Mr. Fernback interviewed Messrs. Jacobs and Yehia to ascertain their competing perspectives. He reviewed rel-
evant documents and developed some preliminary views on the questions he was asked to answer. In general terms, he
saw the ambiguity regarding Mr. Jacobs' investment and relationship to the Cambie Malone Group as a corporate irritant
which interfered with access to future financing. As a result, he recommended that the Cambie Malone Group hire Paul
Woodhouse, a chartered business valuator, to assist in clarifying matters and achieving resolution.

150      Mr. Fernback knew Mr. Woodhouse and considered him a highly competent valuator. He suggested that Mr.
Woodhouse provide a retrospective evaluation of the Cambie Malone Group to address the impasse regarding the nature,
extent and implications of Mr. Jacobs' investment. He also suggested that Mr. Woodhouse assist in properly characteriz-
ing the original investment, identifying a fair return and allocating the annual pay-outs to Mr. Jacobs between his invest-
ment return and management compensation.

151      Mr. Fernback informed Messrs. Yehia and Jacobs of Mr. Woodhouse's estimated fees, which were in the range
of $10,000 to $15,000, and obtained their tentative agreement to the retainer. Thereafter, he spoke with Mr. Woodhouse
based on his understanding of the background facts and issues for resolution. In response Mr. Woodhouse produced a
draft of letter of engagement, which Mr. Fernback provided to Messrs. Jacobs and Yehia.

### The September 17, 2009 Meeting

152      On September 17, 2009 Messrs. Jacobs and Yehia met to discuss Mr. Woodhouse's proposed retainer. Mr. Jac-
obs produced a document headed "Discussion paper for Partnership Valuation 2002-2009 SY-PJ Sept 17[th] 2009" in con-
nection with this meeting. In the discussion paper he identified various issues for resolution. The first was "Agree on
property "as is" valuations November 1[st] 2002". Others included: "Agree on a percentage that reflects our equity position
at 2002"; "Agree on profits from each operation for each year 2002-2009 inclusive"; "Agree on salaries 2002-2009"; and
"Agree on a new role/position within the company going forward from October 5[th] 2009".

153      The September 17 meeting was not productive. Mr. Yehia claimed to agree that a valuator could be retained, but
expressed concern about Mr. Woodhouse's estimated fees. He also insisted that any proposed valuation be based on an
agreed set of preconditions which included the alleged erosion of Mr. Jacobs' original investment to approximately
$300,000. Not surprisingly, Mr. Jacobs was unwilling to agree to such preconditions.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

154      Messrs. Jacobs and Yehia communicated throughout the day, in person and via email. During one of their in-person meetings Mr. Yehia yelled at Mr. Jacobs, claiming that he was not performing a defensible role in the organization and stating that his draws would be cut in half. This was extremely distressing for Mr. Jacobs, who, at one point in the day, sat in his car and wept for half an hour. From his perspective, the partner with whom he had worked hard for many years was squeezing him in a way he could not comprehend.

*After the September 17 Meeting*

155      In the days immediately after the September 17 meeting the atmosphere in the office was distinctly unpleasant. For the most part Mr. Yehia refused to speak to Mr. Jacobs, who became increasingly agitated and upset as each day went by.

156      On September 23, 2009 Mr. Jacobs wrote yet another rejoinder letter to Mr. Yehia. In it, he characterized Mr. Yehia's position as "utterly unacceptable" and expressed indignation at what had transpired. Amongst other things, he stated:

> ... Suggesting and writing to me annually that my investment is being diluted through draws without me knowing or revealing the true profits of the core business I invested in and having no agreement in place between us on the fair distribution of those profits (see previous correspondence) needs to be addressed.
>
> ***If I had wanted to buy a job with my investment and have it written down each year until it was worth nothing while the business and assets grew substantially I would not have entered into this partnership***. This fact has been has been discussed with you at length since the beginning of the partnership ...
>
> ...You have the best business partner imaginable and you cant see it - ***all you see is the money and all I see are the relationships and that's why this works*** so why do you want to destroy it? ...
>
> [emphasis added]

157      I accept that Mr. Jacobs genuinely believed what he wrote in the September 23 rejoinder letter. In my view, however, it is extraordinary that he could believe "this works" while simultaneously describing how it did not.

158      In the weeks that followed Messrs. Jacobs and Yehia continued their conversation. Many of their communications went through Mr. Fernback and Brandon Smith (in-house counsel to the Cambie Malone Group), who acted as intermediaries between the two. Throughout this process, Mr. Jacobs was distressed and worried about his family's future financial well-being. Above all else, he wished to resolve matters and obtain a measure of security with respect to his investment.

159      Mr. Jacobs' worries were based on several factors. Mr. Yehia had purported to reduce his equity significantly and was now intending to cut his draws, which would cause a serious cash flow problem for the Jacobs family. In addition, although Mr. Yehia had promised to issue him shares this had not happened and, since February 2005, he had no security for the funds advanced to Mr. Yehia. All things considered, Mr. Jacobs believed he was in a very difficult position. He was right.

160      On October 6, 2009 Mr. Yehia invited Mr. Jacobs to join him for a dinner meeting at Hy's restaurant to discuss their business relationship. He provided Mr. Jacobs, via email, with a draft agreement in advance of the proposed meeting. He called the draft a proposal for reconciliation.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

161    Mr. Jacobs accepted Mr. Yehia's invitation to meet.

162    The draft agreement was headed "Business Partnership/Loan Review Agreement". It referenced the fact that Mr. Jacobs "did lend or make available the use" of $967,000, which was defined as the "Investment". The draft contemplated the retention of a third-party appraiser to assess the value of the Investment, as well as the fair market value of Mr. Jacobs' services. It also contemplated, as a pre-condition, the conclusion of an agreed set of (unspecified) facts for use by the appraiser.

### The October 6, 2009 Meeting

163    On October 6, 2009 Messrs. Jacobs and Yehia met over dinner at Hy's restaurant. In summary, Mr. Yehia told Mr. Jacobs that they were partners at a crossroads. Depending on whether they could agree, he said, they would either settle their differences and go "to the moon" together or head downward "into the abyss" of litigation. He went on to say that he was experienced in and good at litigation. Mr. Jacobs replied that he had never litigated in his life and was frightened by the prospect.

164    Mr. Yehia told Mr. Jacobs he was happy to have him at the Cambie Malone Group but that he wanted to settle things between them. At one point, he suggested that it might be best if Mr. Jacobs simply remained a lender rather than hold an equity interest. At another, he asked Mr. Jacobs what it was that he wanted.

165    Mr. Jacobs responded that he believed Mr. Yehia had a duty to issue him shares in the Cambie Malone Group, but noted that he had failed to do so. As a result, he said, he believed that Mr. Yehia had never truly wanted to issue shares to him. Mr. Yehia did not respond or react to these remarks.

166    Eventually, Mr. Jacobs asked if Mr. Yehia would consider granting him a 12 per cent annuity for the rest of his life if he left his money with him. He also asked if he could continue working with the Cambie Malone Group in a role of his choice, which role he described as a "thingy". Mr. Yehia did respond to these remarks, although he did not make any commitments. Rather, he agreed that these were issues for further discussion.

167    Messrs. Jacobs and Yehia did not reach an agreement at the Hy's dinner meeting.

168    Mr. Yehia claimed in his testimony that he was surprised when Mr. Jacobs said he was willing to remain a lender and give up his equity interest in the Cambie Malone Group. He also claimed that, up to this point, he had hoped Mr. Jacobs would follow through and convert his loans into shares. I do not accept this testimony.

169    I find that, as of October 6, 2009, Mr. Yehia well knew it would cost him a lot for Mr. Jacobs to share in the equity of the Cambie Malone Group. This was particularly true because its value had increased over the years. Mr. Yehia did not want to share with Mr. Jacobs. As a result, he set out to pressure him to give up his equity entitlement and characterise his investment as a loan.

### After the October 6 Meeting

170    The day after the October 6 meeting Mr. Jacobs sent an email to Mr. Yehia. In it, he said he was happy to move forward "on the terms proposed" subject to clearing certain hurdles. The first few he identified related to the proposed 12 per cent annuity. He also identified retirement of the Second Mortgage and the SBIL Loan, as well as an annual performance bonus, as hurdles to be cleared.

171    Over the next two weeks Messrs. Jacobs and Yehia negotiated, at times assisted by Messrs. Fernback and Smith.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D.
3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

Eventually, Mr. Smith drafted two documents: one headed "Loan Agreement", the other "Management Services Agreement". Mr. Jacobs reviewed the drafts and discussed them with Mr. Fernback, who provided feedback and acted as a go-between. A few of Mr. Jacobs' suggestions were incorporated in later drafts. Most were not.

172      Eventually, Mr. Smith produced final versions of the Loan Agreement and Management Services Agreement based on Mr. Yehia's instructions.

173      Remarkably, Mr. Jacobs chose not to seek independent legal advice regarding the proposed Loan Agreement and Management Services Agreement. Although he suggested in his testimony that he could not afford such advice I do not accept this explanation.

174      Mr. Jacobs was financially strained, but he was not penniless. He was being paid $10,000 every month and was able and willing to share the cost of retaining Mr. Woodhouse a few weeks before. He was also acquainted with several lawyers, both personally and professionally. All things considered, I conclude Mr. Jacobs made this poor choice because he was very anxious to end the negotiation and obtain what he saw as a measure of security going forward.

175      On October 23, 2009, despite the absence of independent legal advice, Mr. Jacobs signed the final versions of both agreements produced by Mr. Smith (the "October 2009 Agreements"). Mr. Yehia also signed the October 2009 Agreements. Mr. Smith witnessed both signatures.

176      Messrs. Jacobs and Yehia both read and generally understood the October 2009 Agreements before they signed them.

177      Messrs. Jacobs and Yehia both intended, subjectively, to resolve their outstanding debates and rely upon the October 2009 Agreements going forward.

178      Messrs. Jacobs and Yehia both felt happy immediately after signing the October 2009 Agreements. Mr. Yehia told Mr. Jacobs they could now put this behind them, their families could expect "generational wealth" and they could go together to the "promised land" as partners for life. They shook hands and went for a beer.

179      Copies of the October 2009 Agreements are attached as Appendix "A" and "B" to these reasons for judgment.

### *The October 2009 Agreements*

180      As the October 2009 Agreements are attached I will not recite all of their content. I note, however, that they include the following features:

**The Loan Agreement**

i. Messrs. Yehia and Jacobs are the parties to the Loan Agreement. After identifying them as such, the preamble provides:

WHEREAS, IN SEPTEMBER OF 2002 AN AGREEMENT WAS ENTERED INTO BY THE PARTIES WHEREIN THE SECOND PARTY DID LEND OR MAKE AVAILABLE THE USE OF NINE HUNDRED SIXTY SEVEN THOUSAND DOLLARS ($967,000) TO OR BY THE FIRST PARTY (HEREINAFTER THE "INVESTMENT");

AND WHEREAS SUCH AGREEMENT, HAVING BEEN RELIED UPON BY THE PARTIES OVER THE

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D.
3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

COURSE OF THE SUBSEQUENT SEVEN (7) YEARS, REQUIRES A RENEWAL OF THE AGREEMENT
IN ORDER TO FACILITATE THE PARTIES GOING FORWARD;

THE PARTIES HERETO DO ENTER INTO AN AGREEMENT, INTENDING BYSODOING, TO SUPPLANT
ANY AND ALL PREVIOUS AGREEMENTS BETWEEN THE PARTIES WITH RESPECT TO THE ABOVE
MENTIONED LOAN AMOUNT;

THE PARTIES AGREE THAT:

 . . .

ii. Seven numbered paragraphs follow the preamble. They provide, in part:

1. Paul Jacobs, the Lender has lent to Sam Yehia, the Borrower nine hundred sixty-seven thousand dollars
($967,000) in good Canadian currency;

2. The Borrower will provide the Lender with a personal guarantee for the entire amount owing under this agree-
ment;

3. Consideration for the loan shall be $1.00 per year;

4. [a term regarding the Borrower having the right to purchase life insurance on the Lender]

5. [a term regarding confidentiality]

6. The term of this agreement shall renew automatically in one (1) year increments at the end of the year or the
date on which the loan is paid in full;

7. [a term setting out addresses for notice purposes]

iii. After the numbered paragraphs the Loan Agreement provides:

This agreement supplants and is paramount to any precedent agreement. Where any correspondence, contract or
other agreement of any kind whatsoever conflicts with this agreement it is agreed by the parties that this agree-
ment has paramountcy.

It is the intention of the parties that for the purposes of this agreement that TIME IS OF THE ESSENCE.

This agreement is made pursuant to the laws of British Columbia, Canada.

By signing below each of the parties attests to the fact that they have been informed of their right to independent
legal advice and independent accounting advice and that this agreement is executed in full knowledge of the im-
portance of seeking such independent counsel and under no duress or misconception about the party's rights at
law whatsoever.

**ALL OF THE ABOVE IS SIGNED, SEALED AND DELIVERED AT THE CITY OF** <u>VANCOUVER</u> ...

[signatures of both parties and witness]

iv. The Loan Agreement does not include any provision for the payment of interest. There is also no mention of an

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

annuity.

**The Management Services Agreement**

v. The Cambie Malone's Corp. and 657 (described as the "Services Provider") are the parties to the Management Services Agreement. After identifying them as such, the preamble provides:

> **WHEREAS**, the above Parties to this agreement have operated, since September 2002, as if in agreement and wish to express hereby the terms and conditions under which that relationship had been operative and moreover to enter into an agreement which shall continue throughout the term and periods of renewal, as effected hereby.

> THEREFORE THE PARTIES DO HEREBY AGREE THAT:

> . . .

vi. Nine numbered paragraphs follow the preamble. They provide, in part:

> 1. [a term regarding confidentiality and attaching the Loan Agreement as Schedule A]

> 2. For management services rendered to the Company, (hereinafter the "Services"), the Company shall pay Ten Thousand (10,000) dollars of Canadian currency per month plus GST (the "Fee") to the Services Provider; Any change in the shareholding of 657947 B.C. Ltd., whether affecting ownership or not, shall not constitute a breach of this agreement, and it is the intention of the Parties that this agreement shall continue unless terminated pursuant to the relevant sections herein.

> 3. [a term regarding the nature of the services]

> 4. In addition to the Fee, the Service Provider is eligible for an annual performance bonus (the "Bonus") at the end of each annual period following the commencement of this agreement. The exact amount of the Bonus will be determined by either an independent business consultant who is acceptable to both Parties of this agreement, or by the compensation committee of the Company's board of directors comprising of a majority of independent directors. The criteria for eligibility for payment of a Bonus will be based solely on the initiation, implementation, completion and success of initiatives completed by the Service Provider for the benefit of the Company. The results of these initiatives must deliver a measurable benefit to the Company. The Bonus will be paid based on a market rate for such successful initiatives.

> 5. [a term regarding reimbursement of pre-approved expenses]

> 6. The Company will provide the following additional conditional benefits (the "Conditional Benefits") to the Service Provider:

> > a) Health Benefits;

> > b) Motor vehicle allowance not to exceed CDN $1,000 per year; and

> > c) A promotional budget for food and beverage at the Company's restaurants and pubs not to exceed CDN $2,000 per year.

> These Conditional Benefits as itemized in clause 6 herein will be advanced by the Company to the Service Pro-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

vider during the term of this contract. Furthermore, the Conditional Benefits, at cost, will be deducted from any eligible Bonus payable for each annual period. If the eligible Bonus is less than the value of the Conditional Benefits, the difference will be due to the Company from the Service Provider.

7. Either party may terminate this agreement by providing no less than thirty (30) days notice to the other party, in writing and delivered to the following addresses: [addresses set out]

8. The term for this agreement shall be one (1) year and shall renew automatically for subsequent annual periods subject to any termination as described in section 8 above.

9. Upon the termination of this agreement, the Company will:

a) pay out the personal loan, and any associated interest, made by Mr. Paul Jacobs, Principal of the Service Provider, to Mr. Sam Yehia, Principal of the Company. The original amount of the principal outstanding of such loan as of September 2002 was CDN $967,000.

b) pay out or replace the second mortgage on the residence of the principal of the Service Provider (Mr. Paul Jacobs) that has been incurred on the Company's behalf ...

c) pay out any amounts owing to the Service Provider pursuant to this agreement, and

d) replace any personal guarantee(s) provided by Mr. Paul Jacobs on the Company's behalf.

[signatures of both parties and witness]

181     Mr. Jacobs testified that he signed the October 2009 Agreements because he felt backed into a corner. He said he was desperate to obtain some sort of security regarding his investment because he had received no shares, his equity was purportedly eroding and his draws were about to be cut in half. In these circumstances, he said, he felt emotionally fragile, isolated and betrayed by Mr. Yehia. All things considered, he thought it essential to settle and at least obtain a personal guarantee so that "I had something to start with again".

182     Mr. Jacobs also testified that after he signed the October 2009 Agreements he believed Mr. Yehia would "give me the annuity, and we would just continue working together as partners". Given the content of the agreements, as well as the parties' history, this belief reflects an extraordinary level of naivety. Nevertheless, I accept that Mr. Jacobs accurately described his mental and emotional state at the time.

183     Mr. Yehia testified that he signed the October 2009 Agreements to end the ambiguity in the business relationship. He also said he was relieved when the agreements were signed. I accept that Mr. Yehia accurately described his mental and emotional state at the time.

### After the October 2009 Agreements

184      In the months that followed execution of the October 2009 Agreements Mr. Jacobs continued to perform services for the Cambie Malone Group. He came into the office less frequently, however, and also occasionally participated in unrelated projects. As before, he worked on financing and investor relations for the Cambie Malone Group businesses. He also worked on a range of tasks in connection with the up-coming Olympics.

185     Mr. Jacobs continued to submit monthly invoices for $10,000 to the Cambie Malone Group.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

186     As before, Mr. Jacobs' invoices were paid.

187     Mr. Yehia continued to refer to Mr. Jacobs as his partner in some of their written and oral communications. He also continued to meet with him regularly to discuss and plan for the businesses.

188     In 2009 the CRA conducted an audit of the Cambie Malone Group. The audit revealed Mr. Jacobs' failure to in-voice appropriately for GST. As a result he was asked to bring 657's filings up to date, and did so. His subsequent con-viction for tax evasion relates to Mr. Jacobs' serious underreporting in response to this request.

189     On July 1, 2010 Mr. Yehia called Mr. Jacobs into his office and announced that he had decided to pay him out. Shortly thereafter, he gave him formal written notice that the October 2009 Agreements were being terminated.

190     Mr. Jacobs was shocked and upset by the termination notice. It was, for him, an unexpected and unwelcome turn of events.

191     On July 2, 2010 Mr. Yehia sent an email to Mr. Jacobs. In it, he expressed "keen interest" in reconsidering a new loan and services agreement "notwithstanding the attached notice". All things considered, Mr. Jacobs found this communication bewildering. Nevertheless, he asked Mr. Yehia to send him the proposed new agreement (the "Proposed New Agreement").

192     On July 15, 2010, Mr. Yehia sent the Proposed New Agreement to Mr. Jacobs. It was headed "Loan Agreement" and, in the opening recitals, purported to alter the terms of the October 2009 Agreement (inaccurately described as hav-ing been entered on September 30, 2009). Again, the principal sum identified was $967,000. However, the interest rate was altered to 7.5 per cent. Other terms concerned matters such as "further remuneration", the term of the loan and a for-mula for eroding the principal.

193     Mr. Jacobs reviewed the Proposed New Agreement, but considered it "pure nonsense". He did not sign.

194     On July 15, 2010 Mr. Jacobs acknowledged receipt of the termination notice. He wrote:

I confirm reciept [sic] of your notice letter of July 1st 1020 and confirm that persuant [sic] to your notice letter that you will be discharging my loan to you of $967,000.00, discharging the second mortgage of $146,000 on 5655, Westhaven Road, West Vancouver, and removing the personal guarantee for $60,000.00 on the SBIL loan raised through 657947 BC Limited for the Esquimalt Property on August 1st 2010.

195     On July 30, 2010 Mr. Yehia paid $967,000 to Mr. Jacobs.

196     Mr. Smith asked Mr. Jacobs to sign a release in connection with the $967,000 payment. He refused.

197     On August 2, 2010 Mr. Jacobs sent an email to Mr. Yehia headed "Completion of outstanding accounts between PJ/SY and Cambie Malones Corp." In it, he provided a list of items he said needed to be addressed. These included dis-charge of the SBIL Loan and personal guarantee, discharge of the Second Mortgage, and payment of a GST invoice for the years 2002 - 2009. Other items concerned reimbursement for various expenses and administrative matters. The petty cash reimbursement he claimed was $8,181.

198     Mr. Yehia did not promptly discharge the SBIL Loan and Second Mortgage, nor did he address several other matters raised in Mr. Jacobs' August 2 email.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

199      At some point in mid-August, 2010 Mr. Jacobs was advised by his bank that the Cambie Malone Group had not made the monthly payment on the Second Mortgage. As a result, bank officials told Mr. and Ms. Jacobs they were liable to make the mortgage payment.

200      Mr. Jacobs felt deeply aggrieved by all that had transpired. In an act of impulsive anger and frustration, he altered a signed Cambie Malone's Corp. cheque, wrote in his name, the sum of $8,181 and a reference to petty cash. He deposited the altered cheque in his bank account.

201      Mr. Yehia quickly discovered the altered cheque and instructed his bank to reverse the deposit. Mr. Jacobs quickly recognised his error and agreed to the reversal.

202      Given all of the foregoing, Mr. Jacobs finally decided to retain legal counsel. In late August, 2010 he retained David Wende of the law firm Alexander Holburn.

203      On August 23, 2010 Mr. Wende wrote to Mr. Yehia. In his letter, he asserted that the October 2009 Agreements were executed under economic duress. He went on to state:

> On July 1, 2010, you purported to terminate these October 23, 2009 agreements. However, you have failed to honour your obligations under those agreements by removing the $146,000 second mortgage on 5655 West Haven Road, West Vancouver and discharging Mr. Jacobs' personal guarantee with HSBC Bank Canada in the approximate amount of $60,000 raised through 657947 B.C. Ltd. for the "Esquimalt Property".

> Your failure to complete your obligations under the October 23, 2009 agreement constitutes a repudiation of those agreements. Please be advised that Mr. Jacobs and 657947 B.C. Ltd. accept your repudiation and will be commencing action against you ...

204      Mr. Yehia was angered and offended by Mr. Wende's letter. In response, however, he did arrange to discharge the SBIL Loan, the personal guarantee and the Second Mortgage. From that point forward, he considered Mr. Jacobs his adversary.

205      Mr. Yehia and the Cambie Malone Group did not pay Mr. Jacobs' GST invoices of $50,004.

206      In January 2012 Mr. Jacobs attended at the Cambie Malone Group offices to retrieve a couch he owned that had not been returned to him. He was accompanied by Peter Barteaux, a former employee. Mr. Yehia was not present when they arrived at the office for this purpose. In the process of fulfilling it, they disrupted a business meeting.

207      After retrieving the couch, Mr. Jacobs wrote an angry letter to Mr. Yehia. In it, he described Mr. Yehia as "... self righteous, idiosyncratic double dealing, lying cheating, thieving ... " and generally impugned his character.

208      The Notice of Civil Claim was filed on October 15, 2010.

209      A Response to Civil Claim and Counterclaim was filed on April 29, 2011. In the Counterclaim, Mr. Yehia seeks judgment for the $45,000 inadvertently repaid twice and $57,124 for reimbursed expenses described as "ineligible".

**Discussion**

*Were Messrs. Jacobs and Yehia partners?*

*Legal Framework*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

## Characteristics of a Partnership

210      A partnership is a relationship, created by contract, between individuals carrying on business in common. It is defined in s. 2 of the *Partnership Act*, R.S.B.C. 1996, c. 348 (the "*Act*") as "the relation which subsists between persons carrying on business in common with a view of profit": *Blue Line Hockey Acquisition Co. v. Orca Bay Hockey Ltd. Partnership*, 2008 BCSC 27 (B.C. S.C.) at para. 37-38; aff'd 2009 BCCA 34 (B.C. C.A.); s. 2, *Act*.

211      The definition in the *Act* codifies the three essential ingredients of a partnership at common law: i) a business, ii) carried on in common, iii) with a view to profit: *Continental Bank of Canada v. R.*, [1998] 2 S.C.R. 298 (S.C.C.) [hereinafter Continental Bank Leasing Corp.]; *Red Burrito Ltd. v. Hussain*, 2007 BCSC 1277 (B.C. S.C.) at para. 26-27; s. 1, *Act*.

## The First Ingredient: a Business

212      The first essential ingredient of a partnership is carrying on a business. Section 1 of the *Act* defines a "business" as including "every trade, occupation or profession". In *Backman v. R.*, 2001 SCC 10 (S.C.C.), the Supreme Court of Canada identified several possible definitions of a business. One was "to hold one's self out to others as engaged in the selling of good or services". Another required at least three elements to be present: i) the occupation of time, attention and labour; ii) the incurring of liabilities to other persons; and iii) the purpose of a livelihood or profit: *Backman*, para. 19.

213      The court in *Backman* went on to note that the existence of a valid partnership does not depend on the creation of a new business. On the contrary, partnerships may be formed where two parties agree to carry on the existing business of one of them. Nor is it necessary to show that partners carried on business for a long period. The parties must, however, do more than simply agree to carry on a business. They must, in fact, carry it on: *Backman*, para 20; *Khan v. Miah* (2000), [2001] 1 All E.R. 20 (U.K. H.L.); *Blue Line Hockey* at paras. 34-46; s. 1, *Act*.

214      In *Blue Line Hockey*, Newbury J.A. described the bright line courts have traditionally drawn between "intended" partnerships and those that had actually commenced carrying on business. In so doing, she referenced the expression of general principle by the authors of *Lindley on Partnership* in 1995:

> An agreement between two or more persons to carry on business at a future time cannot render them partners before they actually start to carry on that business. It is the carrying on of a business, not a mere agreement to carry it on, which is the test of partnership, hence the importance of distinguishing between actual and contemplated partnerships. As Lord Lindley put it:
>
> > Persons who are only contemplating a future partnership, or who have only entered into an agreement that they will at some future time become partners, cannot be considered as partners before the arrival of the time agreed upon.
>
> So long as an agreement to form a partnership remains executory, no partnership will be created. Subject to the point noted in the previous paragraph, intending partners will retain that status if the chosen commencement date has not yet arrived or if some act still remains to be done before the business can be commenced...

215      Newbury J.A. went on to discuss developments in the law since 1995 in cases involving new businesses which have not yet commenced trading. Given the facts in *Blue Line Hockey*, she focused on so-called "pursuit partnerships". She acknowledged that cases such as *Khan* have broadened the meaning of "carrying on business", but emphasized that

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

contractual underpinnings remain an essential element of a partnership. She also emphasized the need to examine the facts of each case closely in determining whether a partnership is merely intended or has actually commenced.

216      As Newbury J.A. pointed out in *Blue Line Hockey*, whether the parties have begun to carry on business depends on how the partnership's object or enterprise is characterized. In *Scragg v. Lotzkar*, 2005 BCCA 596 (B.C. C.A.) at para. 34, Ryan J.A. identified the real question as:

> ... whether it can be said ... that the partnership's enterprise had commenced. That is, had the parties done enough to be found to have commenced the joint enterprise in which they had agreed to engage.

### The Second Ingredient: Carried on in Common

217      The second essential ingredient of a partnership is that the business is carried on in common. One relevant consideration in this regard is whether a party has authority to bind the partnership, although this factor alone is not determinative. So long as all partners agree, management authority may rest with a single partner: *Backman*, at para. 21.

218      The common purpose of the partnership is usually found in the partnership agreement: *Blue Line Hockey* at para. 54-55.

### The Third Ingredient: a View to Profit

219      The third essential ingredient of a partnership is that the business is carried on with the partners expecting to receive a profit. The expectation of profit need not override, but it must form part of the parties' intentions: *Backman*, at para. 22; *Blue Line Hockey* at para 56.

### Implications of Partnership

220      At common law, a partnership does not exist apart from its members; rather, "the partners are the firm, the firm is the partners". Once established, the law imposes onerous duties upon members of a partnership: *Blue Line Hockey* at paras. 35-36, 81-89; see also s. 22, *Act*.

221      Pursuant to s. 11 of the *Act*, a partner is jointly liable with the other partners for all firm debts and obligations incurred while he or she is a partner. Other joint liabilities are also set out in the *Act*: see, for example, ss. 14, 15 and 19, *Act*.

222      Section 21 of the *Act* allows for variation of the rights and duties of partners by consent, which may be express or inferred from a course of dealing. Section 27 goes on to outline rules for determining their rights and duties in relation to partnership. It provides, in part:

> 27. Subject to any agreement express or implied between the partners, the interests of partners in the partnership property and their rights and duties in relation to the partnership must be determined by the following rules:
>
> a) all the partners are entitled to share equally in the capital and profits of the business and must contribute equally towards the losses, whether of capital or otherwise, sustained by the firm; ...
>
> c) a partner making, for the purpose of the partnership, any actual payment or advance beyond the amount of capital that he or she has agreed to subscribe is entitled to interest at a fair rate from the date of the payment or advance;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

d) a partner is not entitled, before the ascertainment of profits, to interest on the capital subscribed by him or her;

e) every partner may take part in the management of the partnership business;

f) a partner is not entitled to remuneration for acting in the partnership business;

g) a person may not be introduced as a partner without the consent of all existing partners; ...

**Dissolution of a Partnership**

223      At common law, in the absence of agreement to the contrary, a partnership is dissolved when a partner leaves and its composition is thereby altered. The *Act* includes provisions, however, that modify the common law with respect to dissolution: *Blue Line Hockey* at paras. 90-100.

**Proof of a Partnership**

224      Cogent evidence is required to establish the existence of a partnership. Although a formal partnership agreement is unnecessary, the underlying contract must meet all the pre-requisites of a valid contract. These include: an offer containing all essential terms and acceptance of the offer (i.e., a meeting of the minds or *consensus ad idem*); certainty of terms; consideration; and an intention to create legal relations: *Red Burrito Ltd.* at para. 25-27; *Sangha v. Reliance Investment Group Ltd.*, 2011 BCSC 1324 (B.C. S.C.) at para 526; *Blue Line Hockey* at paras. 36, 40.

225      The test for determining the intention to create legal relations is objective. It depends on how the promisor's conduct would strike a reasonable person in the promisee's position, not on the promisor's state of mind: *Soleil Hotel & Suites Ltd. v. Soleil Management Inc.*, 2009 BCSC 1303 (B.C. S.C.), para. 324-325.

226      Courts strive to uphold contractual obligations solemnly and freely undertaken. The parties must express themselves with a reasonable degree of certainty, however, for a contract to be enforceable. If the essential terms of an agreement are vague, ambiguous or incomplete it cannot be said the parties came to a meeting of the minds. On the other hand, if, on close analysis, definite meaning can be discerned from the words used courts adopt a fair and broad approach to construing contracts: *Le Soleil*, paras. 321 & 339-341.

227      Partnership agreements typically contemplate a long-term business relationship between the partners. That being so, it may be impossible for the parties to anticipate and agree upon all future decisions to be made. In these circumstances, the underlying contract will not fail for uncertainty so long as an effective mechanism for their determination has been established. In addition, the law occasionally permits terms to be implied to give business efficacy to a bargain. If, however, essential terms are missing "...it is not for the court to make a contract for the parties that they did not make for themselves": *Le Soleil*, para. 332, 340; *Pacific Hunter Resources Inc. v. Moss Management Inc.*, 2008 BCSC 960 (B.C. S.C.), paras. 105-106; *Dirom v. Perera*, [2004] A.J. No. 990 (Alta. Q.B.). para. 183.

228      Parties may reach agreement and intend to be bound before formal documents are executed. Whether they have done so is a matter of construction of the contract: *Le Soleil*, para. 330-331; *Pacific Hunter Resources Inc. v. Moss Management Inc.*, 2008 BCSC 960 (B.C. S.C.), paras. 105-106.

229      A valid contract of partnership may be evidenced orally, in writing, by conduct, or by a combination thereof. Each case will turn on its own unique facts. The key question is always whether an agreement has been reached on all es-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

sential terms, regardless of its form: *Le Soleil*, para. 323; *Robert Porter & Sons Ltd. v. Armstrong*, [1926] S.C.R. 328 (S.C.C.), at 329.

**Indicia of a Partnership**

230    As noted, the court must examine the facts closely in cases of alleged partnership. In *Backman*, the court described the analytical approach to be adopted in this way:

> 25. ... In other words, to ascertain the existence of a partnership the courts must inquire into whether the objective, documentary evidence and the surrounding facts, including what the parties actually did, are consistent with a subjective intention to carry on business in common with a view to profit.

> 26. Courts must be pragmatic in their approach to the three essential ingredients of partnership. Whether a partnership has been established in a particular case will depend on an analysis and weighing of the relevant factors in the context of all the surrounding circumstances ...

231    Several criteria which indicate the existence of a partnership have been judicially recognized in the case law. The indicia of partnership include "the contribution of money, property, effort, knowledge, skill or other assets to a common undertaking, a joint property interest in the subject-matter of the adventure, the sharing of profits and losses, a mutual right of control or management of the enterprise, the filing of income tax returns as a partnership and joint bank accounts". In addition, while not determinative, the fact that parties hold themselves out as partners is a relevant factor for consideration: *Continental Bank Leasing Corp.* at paras. 24, 36; *Red Burrito* at para 28; *Surerus Construction & Development Ltd. v. Rudiger*, 2000 BCSC 1746 (B.C. S.C.) at para. 33.

232    Section 4 of the *Act* sets out rules for determining the existence of a partnership. It provides, in part:

> 4. In determining whether a partnership does or does not exist, regard must be had to the following rules:

> . . .

> (c) the receipt by a person of a share of the profits of a business is proof in the absence of evidence to the contrary that he or she is a partner in the business, but the receipt of a share, or of a payment contingent on or varying with the profits of a business, does not of itself make him or her a partner in the business, and in particular

>> i) the receipt by a person of a debt or other liquidated amount by installments or otherwise out of the accruing profits of a business does not of itself make him or her a partner in the business or liable as a partner,

>> ii) a contract for the remuneration of an employee or agent of a person engaged in a business by a share of the profits of the business does not of itself make the employee or agent a partner in the business or liable as a partner, ...

>> iv) the advance of money by way of loan to a person engaged or about to engage in a business, on a contract between that person and the lender under which the lender is to receive a rate of interest varying with the profits or is to receive a share of the profits arising from carrying on the business, does not of itself make the lender a partner with the person carrying on the business or liable as a partner, as long as the contract is in writing and signed by or on behalf of all the parties to it, and ...

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

*Positions of the Parties*

233     The plaintiffs submit that Messrs. Jacobs and Yehia were partners. They agreed to carry on business in common and did so for almost eight years. The business in question was the Cambie Malone Group bar, restaurant and hostel enterprise. It was conducted with a view to profit and the creation of "generational wealth".

234     According to the plaintiffs, the partnership made sense given the complementary skills and contributions of Messrs. Jacobs and Yehia. They both fully committed their time and energy to the joint enterprise and agreed to share in its profits. Although they did not iron out every detail of the arrangement or commit it to writing, detailed formal agreement is not required to prove a partnership. Rather, a partnership is proved where minds meet on the three essential ingredients: a business, carried on in common, with a view to profit. All three, they say, were present in this case.

235     In support of their submission, the plaintiffs argue the parties must have intended to be partners. If it were otherwise, their arrangement would not have made sense. If, for example, Mr. Jacobs was simply a lender he would have earned $116,040 annually in interest without ever working a day, which is far from what actually happened. On the defendants' analysis, however, he must be taken to have agreed to leave $967,000 in the business, receive no interest from mid-2003 onward, and work hard for nearly eight years for $30,000 to $42,000 per annum. According to the plaintiffs, "that arrangement defies all logic".

236     The plaintiffs also say it would be illogical for Mr. Yehia to purchase insurance on Mr. Jacobs' life if their relationship was truly one of lender and borrower. On the contrary, if life insurance was required in such a context Mr. Jacobs would be the purchaser, not Mr. Yehia. However, the October 2009 Agreements contemplate Mr. Yehia purchasing life or first-to-die insurance with respect to Mr. Jacobs: a common term in agreements between partners. According to the plaintiffs, its presence in the October 2009 Agreement reflects the parties' shared view that Messrs. Jacobs and Yehia were, in fact, partners.

237     In further support of their submission, the plaintiffs emphasize that Mr. Jacobs conducted himself at a partner at the behest of Mr. Yehia. For example, he entered into obligations with third parties on behalf of the Cambie Malone Group by taking the Second Mortgage, taking the lease on the Esquimalt premises and personally guaranteeing the SBIL Loan. This, they say, is not the conduct of a mere investor or employee. He and Mr. Yehia also described themselves as partners to one another and to others on a regular basis. In addition, by agreement, they were both compensated by notional fees for service or investment returns rather than as ordinary employees.

238     The plaintiffs concede that Messrs. Jacobs and Yehia disagreed on the extent of Mr. Jacobs' equity entitlement in the joint enterprise. They submit, however, that this is not fatal to the existence of a partnership. Although the number was not agreed upon, a method for its determination was established: a relative percentage of the 2002 "as is" value of the Cambie Malone Group properties and businesses. In these circumstances, they say, the partnership agreement was sufficiently certain to be valid and binding.

239     According to the plaintiffs this case is analogous to *Red Burrito*. In *Red Burrito*, the plaintiff operated four Mexican food restaurants. It entered into a "Letter of Understanding" with the defendants to create a fifth restaurant to be owned and operated by a new holding company with an assigned leasehold interest. The new company was never incorporated, nor was the lease assigned, but the restaurant opened briefly before the parties fell out and the defendants locked out the plaintiff.

240     The plaintiff in *Red Burrito* contended there was a fully formed partnership. The defendants contended the Letter of Understanding was no more than an agreement to agree and, in any event, its terms were unfulfilled. The court held

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

the common law and statutory criteria for a partnership had been established. The plaintiffs in this case say the same analysis applies here.

241      The defendants respond that Messrs. Jacobs and Yehia were not partners. In their submission there was no valid contract of partnership, as required by the authorities cited above. This is so, they say, because Messrs. Jacobs and Yehia failed to agree on essential terms such as their respective interests in the Cambie Malone Group or partnership governance. According to the defendants, while partnership was an option this was subject to terms and preconditions, many of which were never fulfilled.

242      The defendants go on to emphasize that several indicia of partnership were strikingly absent. For example, partnership financial statements or tax filings were not prepared, profits were never actually shared, and Mr. Jacobs had no authority to bind the Cambie Malone Group companies. In addition, Mr. Jacobs had no management control and, contrary to s. 27(f) of the *Act*, was remunerated monthly for his consultancy services. Further, there were no partnership bank accounts and, other than the Second Mortgage and SBIL Loan guarantee, Mr. Jacobs was not responsible for Cambie Malone Group debts and liabilities.

*Analysis*

243      There is force in aspects of both submissions. After weighing the relevant factors in the context of the surrounding circumstances, however, I conclude that Messrs. Jacobs and Yehia did not proceed beyond the "intended partners" stage in their business relationship.

244      I accept that, between mid-2003 and the October 2009 Agreements, Messrs. Jacobs and Yehia conducted themselves in a manner which, viewed objectively, evinced an intention to carry on business in common for profit. I also accept that Mr. Yehia persuaded Mr. Jacobs they actually were partners and they held themselves out as such in many different ways. Nevertheless, important terms of the underlying partnership contract were uncertain and the business, as a *joint* enterprise, was not, in fact, commenced or carried on in common. Accordingly, the essential ingredients of a partnership were not yet present.

245      This is not a case such as *Red Burrito* in which a new business was being established. In such circumstances, the joint enterprise may well include preparatory steps before trading is commenced. In this case, however, the joint enterprise was continuation and expansion of the existing Cambie Malone Group under newly shared ownership, with associated profit distribution and corporate governance. In my view, at a minimum, until the parties' ownership interests were determined or determinable and basic governance agreed upon the joint enterprise could not and did not commence.

246      Despite the able submissions of plaintiffs' counsel I am not persuaded there was a meeting of minds on the shared ownership issue, nor on an effective mechanism for its determination. On the contrary, Messrs. Jacobs and Yehia held distinctly different views on this key element of the intended partnership. In particular, they disagreed on the "as is" values in the Appraisals and thus on the formula for calculating their respective equity entitlement.

247      The "as is" values in the Appraisals were also just a baseline for negotiation, not a method for precise calculation. It is significant in this regard that Messrs. Jacobs and Yehia both testified they agreed the "as is" value of Esquimalt for equity entitlement purposes was $2.2 million. In contrast, however, the "as is" value found in the Esquimalt Appraisal was actually $2.3 million: a close, but not identical, figure to that agreed upon.

248      The fact that Mr. Yehia alone controlled the Cambie Malone Group was not necessarily inconsistent with the existence of partnership. The same is true of the fact Mr. Jacobs was paid for his services pursuant to the Oral Management

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

Consultancy Agreement. As noted in *Backman*, if all partners agree management authority may rest with a single partner and the *Act* provides that its rules for determining the rights and duties of partners may be varied by agreement. Both the authorities and the *Act* contemplate partners reaching a range of possible agreements designed to meet their own wishes and needs.

249      In this case it is unclear if, and, if so, when, the parties agreed that Mr. Yehia would retain total management control of the Cambie Malone Group while it was operated as a partnership. In early correspondence, Mr. Jacobs described management structure and division of responsibilities as two of the issues that needed to be addressed. In later letters, however, he seemed to express acceptance of Mr. Yehia's total control, which was, in fact, how business was continuously conducted. If Mr. Jacobs did agree to this arrangement, however, he did so based on his belief that Mr. Yehia also assumed concomitant duties and responsibilities.

250      The correspondence also reveals that Messrs. Jacobs and Yehia agreed they would both be compensated for the fair market value of their services. That compensation would be considered in calculating the returns payable on their investments. They went on to agree that any overpayment made to Mr. Jacobs for his services under the Oral Management Consultancy Agreement would be adjusted in future partnership draws. In my view, if an effective mechanism for determining fair market value was identified, agreements of this sort would be compatible with the existence of a partnership.

251      The uncertainty as to ownership interests is, however, fatal to the underlying partnership contract. Important matters of corporate governance also remained uncertain to an untenable degree. While I accept a formal shareholder agreement was not required, *consensus ad idem* on matters such as how and when profits would be divided, as well as an "exit strategy option", were never reached or evidenced orally, in writing or by conduct. On the contrary, all were repeatedly identified as matters for further negotiation.

252      I accept the submission of plaintiffs' counsel that it would "defy all logic" to find Mr. Jacobs agreed to leave nearly $1 million with Mr. Yehia, receive no interest and work hard for many years for very little compensation. I make no such finding on the facts of this case. I also accept that Mr. Jacobs did not conduct himself as a mere investor or employee, nor did Mr. Yehia treat him in such a manner. However, this does not mean it would be right for the court to make a contract for the parties that they did not make for themselves. Rather, the right approach is to go on and consider whether any of the other claims have been established despite the absence of a valid partnership contract: *Pineda v. Lai*, 2014 BCCA 46 (B.C. C.A.).

**How is the November 2002 Loan Agreement to be construed and did the defendants breach it by failing to pay interest?**

*Legal Framework*

253      A loan is a specific form of contract. As such, it requires mutual concordance between the parties as to the existence, nature and scope of their respective rights and duties. Like other contracts, it may be evidenced orally, in writing, by conduct or by a combination thereof: *Biehl v. Strang*, 2011 BCSC 1373 (B.C. S.C.), paras. 326-330; *Le Soleil*, para. 323.

254      The essential elements of a loan were discussed by Satanove J. in *Lee v. 1137434 Alberta Ltd.*, 2009 BCSC 284 (B.C. S.C.). As she noted, they have been described as: i) a principal sum; ii) placed with a borrower; iii) on agreed terms for the payment of interest; and iv) liability on the borrower's part for return of the principal with accrued interest. A loan has also been defined as delivery by one party and receipt by another of money on agreement, express or implied, to re-

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

pay the money with or without interest: *Lee*, paras 9-10.

255      If the parties agree a loan shall bear no interest the third essential element is present because there are "agreed terms for the payment of interest" (ie, the loan is interest-free). On the other hand, the parties may agree, expressly or by inference, that interest is payable without fixing the rate. In such circumstances, pursuant to s. 3 of the *Interest Act* R.S.C., 1985, c. I-15, a default rate of interest will be applied to the loan contract. Section 3 of the *Interest Act* provides:

> 3. Whenever any interest is payable by the agreement of parties or by law, and no rate is fixed by the agreement or by law, the rate of interest shall be five percent per annum.

256      The basic principles of contractual interpretation apply to a loan contract. In *Athwal v. Black Top Cabs Ltd.*, 2012 BCCA 107 (B.C. C.A.), D. Smith J.A. summarised those principles as follows:

> [42] The contractual intent of parties to a written contract is objectively determined by construing the plain and ordinary meaning of the words of the contract in the context of the contract as a whole and the surrounding circumstances (or factual matrix) that existed at the time the contract was made, unless to do so would result in an absurdity. Where the language of a contract is not ambiguous (that is, when viewed objectively it raises only one reasonable interpretation), the words of the written contract are presumed to reflect the parties' intention. An interpretation that renders one or more of the contract's provisions ineffective will be rejected.

> [43] Extrinsic evidence to explain the meaning of an unambiguous contractual provision is not admissible. Evidence of a party's subjective intention in executing the contract, or of their understanding of the meaning of the words used in the contract, is not admissible to vary, modify, add to or contradict the express words of the written contract. This is particularly so where a contract contains an "entire agreement" clause. As was noted by the authors of *Cheshire, Fifoot and Furmston's Law of Contract*, 13th ed. (London, UK: Butterworths, 1996) at p. 127, "the court is usually concerned not with the parties' actual intentions but with their manifested intention."

> . . .

> [46] Thus, evidence of the factual matrix or surrounding circumstances in which a contract is reached is admissible for the purpose of determining the meaning of the words of the contract as they would be understood by an "objective reasonable bystander" in the circumstances of the parties. See G.H.L. Fridman, *The Law of Contract in Canada*, 5th ed. (Toronto: Thomson Canada Limited, 2006) at 15. Ambiguity is not a pre-condition to the admissibility of such evidence. However, the scope of the contextual evidence must not overwhelm the inquiry into the parties' objective contractual intention or no certainty would be achieved by reducing an agreement to writing.

> [47] If after the contextual inquiry into the circumstances in which the agreement was reached, the language of the contract remains ambiguous (that is the meaning of the words is vague, inconsistent or in conflict with other provisions of the contract, redundant, or overly general), extrinsic evidence of what was said, done or known by the parties when the contract was made, is admissible for the purpose of determining the parties' common intention.

*Positions of the Parties*

257      The plaintiffs submit the November 2002 Loan Agreement encompassed the first two advances of $200,000 and $500,000. Depending on my findings as to partnership, it may also have encompassed the third tranche of $267,000. The term of the November 2002 Loan Agreement was up to five years in duration, subject to early termination. It was terminated early when Messrs. Jacobs and Yehia became partners, or, alternatively, by virtue of the February 2005 Agreement.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

While it remained in force, Mr. Yehia was obliged to pay interest to Mr. Jacobs at an annual rate of 12 per cent.

258      Despite his obligation to do so, Mr. Yehia failed to pay interest to Mr. Jacobs from mid-2003 onward. The plaintiffs submit this failure amounts to a breach of the loan contract. In consequence, they seek an accounting for unpaid interest that remains due and owing and a judgment for damages to be assessed.

259      The defendants submit that Mr. Yehia did not breach the November 2002 Loan Agreement by failing to pay interest. Rather, they say, the November 2002 Agreement was amended by the parties in mid-2003 with respect to payment of interest.

260      According to the defendants, Mr. Jacobs agreed to forego interest on the loans in exchange for an increase in payments for his monthly consultancy fees and an option to convert the loans into equity in the Cambie Malone Group. Thereafter, the monthly payments made to him under the Oral Management Consultancy Agreement were a combination of consultancy fees and "notional interest".

261      In the defendants submission, the February 2005 Agreement was merely an attempt to clarify the nature of the parties' relationship and extend the existing conversion option. In these circumstances, they say, Mr. Yehia was not obliged to pay any further interest and his failure to do so was not a breach of contract.

*Analysis*

262      I find the November 2002 Loan Agreement encompassed the entire $967,000 advanced by Mr. Jacobs to Mr. Yehia. Although a promissory note was not signed for the third tranche, the parties treated it throughout as part of the overall loan transaction. From the outset of the business relationship, Mr. Jacobs made all three loans with a view to investing in the Cambie Malone Group and possibly converting them into equity. There was, however, no option agreement or amendment to the November 2002 Loan Agreement of the sort described by counsel for the defendants.

263      As the February 2005 Agreement indicates, the parties "agreed to agree" on conversion of the loans as part of the intended partnership. The proposed conversion was, however, on unspecified terms, at an unspecified time, in an unspecified way. It is trite law that an agreement to agree does not amount to an enforceable contract, whether in original form or by way of later amendment. In addition, there was no consideration to support the option amendment alleged by the defendants.

264      I am satisfied the parties agreed that an annual interest rate of 12 per cent would apply to all funds advanced pursuant the November 2002 Loan Agreement. Accordingly, interest accrued on the full amount for so long as the contract remained in force. The 12 per cent rate agreed upon is evidenced by the promissory notes regarding the first two tranches of $200,000 and $500,000. It can also be inferred from the parties' course of dealings and the surrounding circumstances as applying to the third tranche of $267,000.

265      I have concluded that Messrs. Jacobs and Yehia did not reach an enforceable partnership agreement. Accordingly, I find the November 2002 Loan Agreement was not terminated by their partnership, as submitted by the plaintiffs. I have also concluded that Mr. Jacobs did not agree to forego interest in exchange for increased payments for his consultancy services, nor for any other reason. Accordingly, I find the November 2002 Loan Agreement was not amended with respect to interest, as submitted by the defendants.

266      I am satisfied, however, that the November 2002 Loan Agreement was terminated by the February 2005 Agreement. When it was executed, the parties agreed Mr. Yehia was no longer responsible to repay the $967,000 advanced by

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

Mr. Jacobs in 2002, 2003 and 2004. In these circumstances, an essential element of a loan contract was removed: liability on the borrower's part for return of the principal with accrued interest (see *Lee*, paras. 9-10). In consequence, by mutual agreement, the November 2002 Loan Agreement came to an end when the February 2005 Agreement was executed.

267      Between September, 2003 and February, 2005 the "honeymoon period" was essentially extended as Messrs. Jacobs and Yehia continued to negotiate the intended partnership. Throughout this period, Mr. Yehia did not pay the interest that was due and owing pursuant to the November 2002 Loan Agreement. Although Mr. Jacobs did not insist on payment at the time, he did so because he expected that partnership was imminent. Unlike the plaintiffs in some of the cases discussed below, he did not confer a gratuitous benefit on Mr. Yehia by choosing to forego interest as part of a negotiating strategy. Rather, he did not pursue immediate enforcement of an obligation because he was being strung along.

268      As events unfolded, Mr. Jacobs' expectation of partnership did not come to fruition. In these circumstances, Mr. Yehia remained obliged to pay interest under the November 2002 Loan Agreement unless and until it was terminated. That did not occur until February, 2005.

269      It follows that Mr. Yehia failed to meet his contractual obligation to pay interest to Mr. Jacobs from September 2003 to February 2005. Accordingly, I find the November 2002 Loan was breached. The remedy for the breach is addressed below.

**If the November 2002 Loan Agreement was breached, is any part of the claim for damages statute barred?**

*Legal Framework*

270      The *Limitation Act* R.S.B.C. 1996, c. 266, since repealed (the "*Former Limitation Act*"), provided for a six-year limitation period on a claim based on breach of contract and a 10-year limitation period on a claim based on trust: ss. 3(3) & 3(5), *Former Limitation Act*.

271      Pursuant to s. 5 of the *Former Limitation Act*, when a party against whom an action lies confirms the cause of action time runs, for limitation purposes, from the date of confirmation. Section 5 provided, in relevant part:

5 (1) If, after time has begun to run with respect to a limitation period set out by this Act, but before the expiration of the limitation period, a person against whom an action lies confirms the cause of action, the time during which the limitation period runs before the date of the confirmation does not count in the reckoning of the limitation period for the action by a person having the benefit of the confirmation against a person bound by the confirmation.

(2) For the purposes of this section

(a) a person confirms a cause of action only if the person

(i) acknowledges a cause of action, right or title of another, or

. . .

(b) an acknowledgment of a judgment or debt has effect

(i) whether or not a promise to pay can be implied from it, and

(ii) whether or not it is accompanied by a refusal to pay.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

. . .

(5) For the purposes of this section, an acknowledgment must be in writing and signed by the maker.

272      On June 1, 2013, the *Limitation Act*, SBC 2012, c. 13 (the "*New Act*") replaced the *Former Limitation Act*. Pursuant to s. 30 of the *New Act*, limitation periods established by the *Former Limitation Act* continue to govern if a pre-existing claim arose and was discovered before the *New Act* came into force.

*Positions of the Parties*

273      The plaintiffs submit their contract claims were acknowledged in writing in the February 2005 Agreement by Mr. Yehia. In addition, in the December 2004 Letter Mr. Yehia confirmed that he held Mr. Jacobs' "Original Equity Interest" in trust for him and would account for all profits or income associated with that interest. The Notice of Civil Claim was filed on October 15, 2010, within six years of the written confirmation. In these circumstances, they say, none of their claims is statute barred.

274      The defendants submit that, if the plaintiffs did not agree to forego interest, they had a right to claim it on the date each installment came due from one month to another. That being so, they say any claim for interest installments due before October 15, 2004 is statute barred. They deny acknowledging or confirming any cause of action relating to outstanding installments of interest.

*Analysis*

275      I agree with the plaintiffs. The promissory notes are attached to the February 2005 Agreement. They acknowledge Mr. Yehia's indebtedness to Mr. Jacobs with respect to the loans, which indebtedness included both the principal sum and accrued interest. In my view, this amounts to confirmation within the meaning of s. 5 of the *Former Limitation Act*. Alternatively, the October 2009 Agreements served as confirmation.

276      If I am wrong, however, I conclude that, pursuant to the terms of the promissory notes, the balance of principal and accrued interest did not come due unless and until Mr. Jacobs provided seven days' notice regarding a missed monthly installment of interest. No such notice was given. Therefore, they came due upon the termination or expiration of the November 2002 Loan Agreement.

277      As noted, the November 2002 Loan Agreement terminated when the February 2005 Agreement was concluded. Alternatively, pursuant to the terms of the promissory notes, the November 2002 Loan Agreement expired on November 1, 2007 or January 1, 2008.

278      Taking into account the foregoing, I conclude that none of the plaintiffs' claims is statute barred.

**How is the Oral Management Consultancy Agreement to be construed?**

*Legal Framework*

279      The legal framework for construction of the Oral Management Consultancy Agreement is set out above.

*Positions of the Parties*

280      The plaintiffs submit the Oral Management Consultancy Agreement encompassed the provision of management

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

and consulting services in exchange for monthly payment of their fair market value. It also required payment of associated expenses and taxes that were due. The Cambie Malone Group made the required payments except for GST, which debt remains outstanding. They further submit that none of these payments included any "notional interest" on the loans. Rather, Mr. Yehia's obligations under the November 2002 Loan Agreement were unrelated to the Oral Management Consultancy Agreement.

281    The plaintiffs go on to challenge Mr. Yehia's assertions that overpayment on the Oral Management Consultancy Agreement somehow eroded Mr. Jacobs' equity entitlement. On the contrary, they say, the parties expressly agreed that any overpayments made would be adjusted in future partnership drawings. They also challenge his assertions that Mr. Jacobs was overpaid for his services based on their fair market value. In their submission, the payments were reasonable compensation for the services provided. In addition, is so far as any adjustment may have been appropriate it was made impossible by Mr. Yehia's stonewalling in connection with conversion.

282     The defendants agree the Oral Management Consultancy Agreement encompassed provision of Mr. Jacobs' management and consulting services in exchange for payment of their fair market value. They submit, however, that the Cambie Malone Group paid Mr. Jacobs far more than that because he required greater regular cash flow. The overpayments were made, however, on the basis that they would be accounted for when he converted his loans. Through no fault of Mr. Yehia's, that never happened.

283    The defendants go on to say the parties' disagreements on the fair market value and equity erosion issues led to difficulty in their business relationship. As a result, in 2009 they decided to resolve their differences on all matters and start afresh. Resolution was achieved by means of the October 2009 Agreements. Amongst other things, those agreements terminated and replaced the Oral Management Consultancy Agreement.

*Analysis*

284     I conclude the Oral Management Consultancy Agreement encompassed provision of Mr. Jacobs' management and consultancy services to the Cambie Malone Group in exchange for payment of his monthly invoices. As previously noted, I also conclude it was unrelated to Mr. Yehia's obligations under the November 2002 Loan Agreement. I further conclude the Oral Management Consultancy Agreement governed the parties' working relationship between November 2002 and October 2009. In other words, I agree with the defendants that it was terminated by the October 2009 Agreements.

285    Pursuant to the terms of the Oral Management Consultancy Agreement, Mr. Jacobs was entitled to submit invoices for his services, eligible expenses and taxes, and receive payment. The term of the agreement was not fixed. Except for the year 2003, the same is true of the compensation rate.

286    Messrs. Jacobs and Yehia agreed that Mr. Jacobs was entitled to compensation of $36,000 for the year 2003 and the fair market value of his services from 2004 onward. They also agreed he could submit monthly invoices in excess of those amounts and expect the invoices to be paid. They further agreed that any payments made over and above the fair market value of Mr. Jacobs' services would be adjusted in future partnership drawings. They did not, however, establish an effective mechanism for determining the fair market value of Mr. Jacobs' services, nor did they agree that Mr. Yehia could unilaterally assign one. Accordingly, I find this essential term of the Oral Management Consultancy Agreement was unenforceable because it was uncertain and vague.

287    As discussed above, I cannot determine the actual fair market value of Mr. Jacobs' services from 2004 to 2009 at this juncture. I also cannot determine whether he was paid for any ineligible expenses on the evidence presented. As dis-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

cussed below, given my other conclusions on the plaintiffs' claims these matters may be addressed in the second part of the trial.

***How are the October 2009 Agreements to be construed and were they unconscionable?***

*Legal Framework*

**Construction of Contract**

288    The legal framework for construction of the October 2009 Agreements is set out above.

**Unconscionability**

289    A contract may be aside on the grounds of unconscionability if two elements are established. The first is inequality in the position of the parties arising from the ignorance, need or distress of the weaker, which left him in the power of the stronger. The second is proof of substantial unfairness in the bargain: *McNeill v. Vandenberg*, 2010 BCCA 583 (B.C. C.A.), para. 15.

290    In *Loychuk v. Cougar Mountain Adventures Ltd.*, 2012 BCCA 122 (B.C. C.A.), Frankel J.A. stated:

In my opinion, questions as to whether use of power was unconscionable, an advantage was unfair or very unfair, a consideration was grossly inadequate, or bargaining power was grievously impaired, to select words from both statements of principle, the Morrison case and the Bundy case, are really aspects of one single question. That single question is whether the transaction, seen as a whole, is sufficiently divergent from community standards of commercial morality that it should be rescinded.

291    The mere fact that a bargain might later be considered improvident is not a ground to find that it was unconscionable. As explained by G.H.L. Fridman in *The Law of Contract in Canada* (Carswell 2986) at p. 736:

The equitable power is to give relief in cases involving unconscionable transactions, not all those which may, originally or subsequently, prove to be foolhardy, burdensome, or otherwise undesirable and improvident.

*Positions of the Parties*

292    The plaintiffs submit the October 2009 Agreements, construed together, fail for uncertainty and lack of consideration.

293    According to the plaintiffs, the October 2009 Agreements are uncertain because: i) neither the Loan Agreement or Management Services Agreement define the loan amount as of October 23, 2009; ii) the Management Services Agreement refers to "associated interest" but neither agreement specifies an interest rate or terms of calculation; iii) the Loan Agreement does not specify a date when the loan becomes due or circumstances in which repayment could be demanded; and iv) the "automatic renewal" term is nonsensical as it contemplates renewal of the loan following its full repayment. Given such uncertainty, they say the October 2009 Agreements are invalid and unenforceable.

294    The plaintiffs also say there was an absence of consideration. In their submission, several factors support this view. For example, on the face of it the Loan Agreement does not include a promise to repay anything. Mr. Yehia was the borrower so the promise to provide a personal guarantee in paragraph 2 must refer to a third-party guarantor, but a third-party guarantee was never obtained. In addition, the nominal consideration of $1 referred to in paragraph 3 is un-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

clear and was apparently not provided.

295      The plaintiffs go on to submit that if the October 2009 Agreements do not fail for uncertainty or lack of consideration they are unconscionable. In support of this submission they say that the consideration, if it existed at all, was grossly inadequate. They argue that, pursuant to the Management Services Agreement, Mr. Jacobs could only obtain repayment of his $967,000 by quitting his job and giving up his claims to interest and equity in the Cambie Malone Group. They also emphasize that, when the October 2009 Agreements were negotiated, Mr. Yehia was in a much stronger financial position than Mr. Jacobs, was threatening to cut his draws in half and was claiming his equity had eroded. As a result, Mr. Jacobs was distressed, needy and in the power of Mr. Yehia.

296      All things considered, the plaintiffs submit the test for unconscionability has been met on the evidence presented. In consequence, they say the October 2009 Agreements should be set aside.

297      The defendants submit the plaintiffs did not plead that the October 2009 Agreements fail for uncertainty or lack of consideration. Rather, they made this argument for the first time in response to a memorandum from the court posing questions regarding their proper construction. In these circumstances, the defendants say the plaintiffs' submissions on the points should not be considered. In support of this submission, they rely on the Court of Appeal's recent decision in *Hawkeye Power Corp. v. Sigma Engineering Ltd.*, 2012 BCCA 414 (B.C. C.A.), which, they say, applies by analogy.

298      The defendants go on to say that if the plaintiffs' submissions regarding uncertainty and lack of consideration are to be considered, they lack any merit. Given the relevant context, sound commercial principles and good business sense, they submit the October 2009 Agreements are clear, unambiguous and supported by consideration

299      According to the defendants, all the parties' past disputes regarding their business relationship were resolved by the October 2009 Agreements and all their previous agreements were supplanted. These previous agreements included the November 2002 Loan Agreement, the Oral Consultancy Agreement and the alleged option to convert the loans into equity. The consideration for the bargain was the mutual covenants and concessions of both parties regarding their respective positions on the contentious issues and avoidance of litigation.

300      Pursuant to the terms of the October 2009 Agreements, the defendants say Mr. Yehia's clear and unequivocal obligation to repay Mr. Jacobs $967,000 was recorded. The same is true of the Cambie Malone Group's obligation to pay Mr. Jacobs $10,000 monthly for his services throughout the life of the Management Services Agreement. In sum, the defendants say, the October 2009 Agreements "clarified their past relationship by confirming that Mr. Jacobs had been solely a lender and a consultant, and confirmed that he would remain so going forward".

301      As to unconscionability, the defendants submit there was no inequality of bargaining power between Messrs. Jacobs and Yehia. On the contrary, Mr. Jacobs was at least as sophisticated as Mr. Yehia and well aware of his rights when he chose to execute the agreements following lengthy and detailed negotiations. Thereafter, he accepted monthly payments of $10,000 for his services without complaint until after the October 2009 Agreements were terminated. He also accepted repayment of the $967,000.

302      The defendants go on to submit the October 2009 Agreements were not substantially unfair, as alleged by the plaintiffs or otherwise. Rather, they were fair and reasonable given the state of ambiguity in the parties' relationship and their shared desire to move forward on clarified terms.

303      In support of their submission, the defendants emphasize the parties were mired in disputes and neither accepted the other's position prior to the October 2009 Agreements. Contentious issues such as the fair market value of Mr. Jacobs'

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

services and the percentage of his equity entitlement were repeatedly raised, but remained resolved. Nevertheless, from November 2002 to July 2010 Mr. Jacobs was paid a total of $1,021,123.09 by Mr. Yehia and the Cambie Malone Group through a combination of consulting fees, interest, and perks, as well as early repayment of $45,000 in loan principal. All things considered, the defendants say the October 2009 Agreements brought fair and welcome clarity to the relationship to the benefit of all concerned.

*Analysis*

**Construction of the October 2009 Agreements**

304      In my view, it is appropriate to consider the plaintiffs' arguments on certainty of terms and consideration in construing the October 2009 Agreements. This case is different from *Hawkeye*, where the court found a contract was modified when modification was neither pleaded nor argued at trial. In those circumstances, MacKenzie J.A. held the court committed a procedural error by failing to provide the parties an opportunity to address the modification issue. In reaching this conclusion she noted that different documentary and testimentary evidence may have been adduced and different arguments advanced had such an opportunity been forthcoming.

305      As stated in *Lore Krill Housing Co-operative v. Ramirez*, 2012 BCCA 223 (B.C. C.A.) at para. 17:

Fairness requires that judges should not on their own initiative determine a matter on a pivotal point not raised by the parties without drawing their attention to it, and giving them an opportunity to address it: *R. v. Whincup*, 2011 BCCA 520at para. 11, 314 B.C.A.C. 75; *Canada Trustco Mortgage Co. v. Renard*, 2008 BCCA 343at para. 42, 298 D.L.R. (4th) 216.

306      In this case, the meaning of the October 2009 Agreements has been an issue from the outset. A comprehensive body of evidence regarding the circumstances of their negotiation and conclusion was adduced and written submissions on their construction were exchanged following an inquiry from the court. Although the plaintiffs did not plead uncertainty of terms and lack of consideration, the defendants are not prejudiced if these issues are now analysed. No further evidence is required and the defendants responded to my inquiry and the plaintiffs' written submissions. Accordingly, I consider it fair to deal with both arguments on certainty of terms and consideration in construing the October 2009 Agreements.

307      In undertaking the construction exercise I bear in mind the principles articulated in *Athwal* and other related authorities. I am particularly mindful that I must consider the plain and ordinary meaning of the words of the October 2009 Agreements in the context of the contract as a whole and the surrounding circumstances. I am also mindful that the test for determining intention to create legal relations is objective. For this reason I am concerned only with the parties' manifested intention, not their subjective intent.

308      The language of the October 2009 Agreements is decidedly loose and confusing in some respects and inaccurate in others. For example, in the Loan Agreement the original loan agreement is said to have been entered in September 2002, which was a month before the parties had even met. In addition, the literal meaning of paragraph 6 is that the renewed loan automatically renews in one-year term increments even after full repayment, which, as the plaintiffs point out, is nonsensical. Further, the Loan Agreement does not specify an interest rate for the renewed loan, but is attached as a schedule to the Management Services Agreement which refers to repayment of "any associated interest".

309      The foregoing are but three examples of the imprecise and awkward language used in the October 2009 Agreements. Nevertheless, on close analysis I find that I am able objectively to discern the meaning of its essential terms. That

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

meaning may not always accord with the parties' subjective intentions or their submissions regarding the contract's proper construction. In my view, however, it does reflect the parties' manifested intentions. It also permits the court to uphold a bargain they intended to have binding effect.

310      The October 2009 Agreements were executed in the context of an ongoing, ill-defined and troubled business relationship. Pursuant to the November 2002 Loan Agreement Mr. Jacobs loaned the principal sum of $967,000 at an interest rate of 12 percent per annum to Mr. Yehia, but in February 2005 that agreement came to an end. Nevertheless, Mr. Yehia continued to retain and use the funds although their nature and status was unclear and controversial. The same was true of the nature and status of the ongoing business relationship.

311      By October 2009, the situation was untenable from both parties' perspective. For this reason, they expressed a mutual intention in the Loan Agreement to renew the original loan "in order to facilitate the parties going forward". They also expressed a mutual wish in the Management Services Agreement "to express hereby the terms and conditions under which [their] relationship had been operative" and "enter into an agreement which shall continue throughout the term and periods of renewal".

312      I have rejected the plaintiffs' submission that, by October 2009, Messrs. Jacobs and Yehia were in a relationship of partnership. I have also rejected the defendants' submission that there was an option agreement to convert Mr. Jacobs' loans into equity. I further reject the defendants' submission that the October 2009 Agreements clarified, confirmed or otherwise impacted the parties' *past* relationship or obligations. In particular, I reject the submission that the October 2009 Agreements confirmed "Mr. Jacobs *had been solely* a lender and a consultant" in so far as it suggests, ex post facto, that he was a lender continuously from 2002 to 2009. He was not, and the parties did not agree that he was.

313      I find the October 2009 Agreements, considered as a whole and in context, expressed a meeting of the minds on the way forward given what had transpired in the past, regardless of how the past was characterised. The opening recital of the Management Services Agreement referenced the past relationship and a "wish" to "express" how the relationship "had been operative", but failed to do so. On the contrary, the terms agreed upon thereafter concern only the future relationship and are unrelated on their face to the past relationship or its characterisation. The same is true of the Loan Agreement, which referenced the original loan because it was being renewed.

314      The Loan Agreement did not clarify or alter the past effect of the November 2002 Loan Agreement, nor did it purport to do so. Rather, it recorded the fact that Mr. Jacobs had previously loaned $967,000 to Mr. Yehia and a renewal was required for the business relationship to go forward. In so doing, it expressed a shared intention "to supplant any and all previous agreements" with the Loan Agreement. It did not, however, cancel any prior unmet obligations (such as liability for unpaid interest) or purport retroactively to extend the life of the November 2002 Loan Agreement over the pre-renewal period.

315      According to the *Concise Oxford English Dictionary* (11th Edition, revised, Oxford University Press) to "supplant" means to "supersede and replace". I interpret the words "any and all previous agreements" in the Loan Agreement to mean any and all existing agreements with respect to the $967,000. I have concluded there were no such agreements as of October 23, 2009. A terminated contract such as the November 2002 Loan Agreement is not "an agreement" which can be superseded or replaced because it has no present existence. The same is true of an intended partnership because it never did.

316      It is, however, possible to *renew* both an existing and a terminated contract. This is apparent from the *Concise Oxford English Dictionary* definition of the word "renew", which is to:

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

1. resume or re-establish after an interruption. 2 give fresh life or strength to. 3 extend the period of validity of (a licence, subscription, or contract). 4 replace or restore (something broken or worn out)

317    Taking into account the plain and ordinary meaning of the words in the October 2009 Agreements in the context of the contract as a whole and the surrounding circumstances, I find the October 2009 Agreements renewed the November 2002 Loan Agreement and replaced the existing Oral Management Consultancy Agreement. When read as a whole, they contain all the essential elements of a loan agreement. They also contain all the essential elements of a management services agreement.

**Essential Elements of a Loan Agreement**

318    As the plaintiffs note, the October 2009 Agreements do not define the loan amount outstanding as of the date of their execution. The Loan Agreement does, however, renew the November 2002 Loan Agreement (recitals, para. 1) and thus resume liability for the amount owed thereunder after an interruption. Accordingly, I find the October 2009 Agreements established an effective mechanism for determination of the amount of the renewed loan.

319    Application of the established mechanism is straightforward. The November 2002 Loan Agreement encompassed a total principal sum of $967,000 advanced in three tranches, plus annual interest at a rate of 12 per cent (see also Management Services Agreement, para. 9 a)). The outstanding principal was reduced by $45,000 in May 2004 and interest was paid monthly until approximately September 2003. Thereafter, interest accrued until February 2005, when the November 2002 Loan Agreement was terminated.

320    As the plaintiffs also note, the October 2009 Agreements do not identify an interest rate applicable to the renewed loan, although the Management Services Agreement contemplates liability for repayment of "any associated interest". In these circumstances, one possible interpretation is the parties agreed the renewed loan would, in future, be interest-free. Another is they agreed interest would be payable but failed to fix a rate so an annual rate of 5 per cent should be fixed pursuant to s. 3 of the *Interest Act*. Considering the October 2009 Agreements in context, however, I infer the parties shared an intention to renew liability for both the outstanding principal and interest at an annual rate of 12 per cent as previously provided in the November 2002 Loan Agreement.

321    The foregoing interpretation is most consistent with the surrounding circumstances and language of the October 2009 Agreements, including the reference to "associated interest". One relevant circumstance in this regard is the parties' vague pre-contractual discussions regarding a 12 per cent "annuity" if Mr. Jacobs' left his funds with the Cambie Malone Group, which he did. Another is Mr. Yehia's post-contractual attempt to secure an amendment to the October 2009 Agreements with the Proposed New Agreement. Pursuant to the Proposed New Agreement interest at a rate of 7.5 per cent per annum would be payable on the outstanding principal. I find it inherently unlikely that Mr. Yehia would have made such a proposal if he believed the renewed loan in its current form was interest-free.

322    The parties also agreed the principal was placed with a borrower, Sam Yehia. Mr. Yehia assumed personal liability to ensure its return to Mr. Jacobs (para. 2 of the Loan Agreement and para. 9 b) of the Management Services Agreement). Although para. 2 of the Loan Agreement is awkwardly worded, I interpret it as his personal guarantee to ensure repayment of the loan in his capacity as borrower. On the other hand, if, as the plaintiffs argue, para. 2 is properly construed as referring to a third-party guarantee, such a guarantee is included in para. 9 of the Management Services Agreement. In para. 9 the Cambie Malone Group provides a third-party guarantee of repayment of the renewed loan and any associated interest to Mr. Jacobs.

323    Liability for repayment of the outstanding principal and associated interest when the loan comes due is recorded

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D.
3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

in para. 9 a) of the Management Services Agreement. The loan comes due when the Management Services Agreement is
terminated, which termination may be triggered by either party on thirty days' notice (para. 9 a) of the Management Ser-
vices Agreement). Other obligations also arise on termination, as provided in paras. 9 b), c) and d) of the Management
Services Agreement.

**Essential Elements of a Management Services Agreement**

324      The October 2009 Agreements supplanted the Oral Management Consultancy Agreement. Accordingly, from
October 2009 to July 2010 it governed the parties' working relationship.

325      Like its predecessor, the Management Services Agreement encompassed provision of Mr. Jacobs' management
and consultancy services to the Cambie Malone Group in exchange for payment of a monthly fee. Unlike its predecessor,
it clearly defined the fee for his services ($10,000 per month, plus GST, para. 2). It also addressed matters such as pre-
approved expenses, a performance bonus and conditional benefits (paras. 4, 5 and 6). It could be terminated by either
party on thirty days' notice (para. 7).

**Consideration**

326      The consideration for the bargain was the mutual covenants of both parties and avoidance (or, more accurately,
delay) of litigation.

**Unconscionability**

327      I am not satisfied that either element of the test for unconscionability has been met in this case.

328      Messrs. Jacobs and Yehia were not in unequal bargaining positions in the sense contemplated by the case au-
thorities. While Mr. Yehia was undoubtedly wealthier and more Machiavellian than Mr. Jacobs, both were educated and
experienced businessmen. Both understood the stakes and content of the October 2009 Agreements. Both were capable
of independent action and appropriately informed choice.

329      Mr. Jacobs knew who he was dealing with when he bargained with Mr. Yehia. He was well aware of his history
of unfulfilled promises and distorted claims in connection with their business relationship. He was rightly distressed by
Mr. Yehia's bullying tactics in the lead up to the October 2009 Agreements and understandably concerned by his own
vulnerable position. Nevertheless, he had realistic options available to protect himself and stop the exploitation, such as
seeking legal advice and, if necessary, commencing action. Instead, he chose to avoid confrontation and relieve the pres-
sure by cutting his losses. He was moderately successful in so doing, but this prolonged the dysfunction and inevitable
breakdown of the business relationship.

330      I do not intend to suggest that Messrs. Jacobs and Yehia share equal blame for the dysfunction or its con-
sequences, as urged by Mr. Yehia's counsel. On the contrary, in my view naivety and self-deception occupy a quite dif-
ferent place on the blameworthiness scale than deceitfulness and exploitation. In the context of this unconscionability
analysis, however, I find the parties' bargaining positions were not sufficiently unequal to justify the court's intervention
in their bargain. Given my conclusions on the proper construction of the October 2009 Agreements I also find the bar-
gain they struck was not substantially unfair.

***Did Mr. Yehia repudiate the October 2009 Agreements?***

*Legal Framework*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

331     A contract may be repudiated when, by conduct or words, a party evinces an intention not to be bound. In *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423 (S.C.C.) at para. 40 the Supreme Court of Canada stated:

> 40 Repudiation, by contrast, occurs "by words or conduct evincing an intention not to be bound by the contract. It was held by the Privy Council in *Clausen v. Canada Timber & Lands Ltd.*, [1923] 4 D.L.R. 751], that such an intention may be evinced by a refusal to perform, even though the party refusing mistakenly thinks that he is exercising a contract right" (S.M. Waddams, The Law of Contracts (4th ed. 1999), at para. 620). Contrary to rescission, which allows the rescinding party to treat the contract as if it were void ab initio, the effect of a repudiation depends on the election made by the non-repudiating party. If that party treats the contract as still being in full force and effect, the contract "remains in being for the future on both sides. Each (party) has a right to sue for damages for past or future breaches" (emphasis in original): Cheshire, Fifoot and Furmston's Law of Contract (12th ed. 1991), by M.P. Furmston, at p. 541. If, however, the non-repudiating party accepts the repudiation, the contract is terminated, and the parties are discharged from future obligations. Rights and obligations that have already matured are not extinguished. Furmston, supra, at pp. 543-44.

*Positions of the Parties*

332     The plaintiffs submit that Mr. Yehia refused to perform his obligations under the October 2009 Agreements when he failed promptly to remove the Second Mortgage and discharge Mr. Jacobs' SBIL personal guarantee. In so doing, he evinced an intention not to be bound by their terms. Mr. Jacobs accepted the repudiation and communicated his acceptance through his lawyer, Mr. Wende, on August 26, 2010.

333     The normal remedy for repudiation is damages, not rescission. According to the plaintiffs, however, in this case damages should be calculated as if the October 2009 Agreements were void *ab initio* in order to obtain a just result.

334     The defendants submit that Mr. Yehia did not repudiate the October 2009 Agreements. Rather, he notified Mr. Jacobs of their termination, repaid the $967,000 and was in the process of discharging the Second Mortgage and personal guarantee when he received Mr. Wende's letter. Shortly thereafter, he completed the discharge process thereby fulfilling all of his obligations under the October 2009 Agreements. In these circumstances, a repudiation analysis does not apply.

335     The defendants go on to submit that even if the October 2009 Agreements were repudiated it did not give rise to rescission. The plaintiffs cannot restore the status quo by repaying the $967,000 and reinstating the ambiguous and unsatisfactory business relationship. In addition, the plaintiffs did not suffer damages given that Mr. Yehia promptly fulfilled all of his obligations under the October 2009 Agreements. Further, the plaintiffs affirmed and reaffirmed the validity of the October 2009 Agreements by retaining the monthly $10,000 payments made between October 2009 and July 2010. In consequence, he is estopped from challenging their validity.

*Analysis*

336     I agree with the defendants. Mr. Yehia did not repudiate the October 2009 Agreements. Although he was slow in discharging his ancillary obligations following termination, this did not evince an intention not to be bound. On the contrary, Mr. Yehia's prompt repayment of the $967,000 principal was strong evidence he did intend to comply with its terms.

**If Messrs. Jacobs and Yehia were not partners, was Mr. Yehia unjustly enriched and, if so, how?**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

*Legal Framework*

337     The doctrine of unjust enrichment is equitable in nature. When applied, it restores a benefit to the plaintiff which justice does not permit the defendant to retain: *Gorisek v. Aeckerle*, 2011 BCSC 624 (B.C. S.C.), para. 99.

338     While often analysed in the context of domestic relationships, unjust enrichment principles are generally applicable. They must, however, be applied flexibly and tailored to the particular dispute. In the context of a commercial dispute, the focus of analysis is honest dealing and commercial good conscience. The presence or absence of both informs the concept of injustice and guides application of the tests: *Biehl*, para. 339; *Atlas Cabinets & Furniture Ltd. v. National Trust Co.*, [1990] B.C.J. No. 719 (B.C. C.A.); *Kerr v. Baranow*, 2011 SCC 10 (S.C.C.), at para. 34.

**The Elements of Unjust Enrichment**

339     In *Gorisek*, Pearlman J. summarized the three essential elements of a claim for unjust enrichment. He stated:

[99] ... In order to obtain a remedy for unjust enrichment, the plaintiff must establish: (a) an enrichment of or benefit to the defendant, (b) a corresponding deprivation to the plaintiff, and (c) the absence of a juristic reason for the enrichment: *Kerr v. Baranow*, 2011 SCC 10at paras. 31, 32. See also: *Pettkus v. Becker*, [1980] 2 S.C.R. 834; *Garland v. Consumer's Gas Co.*, 2004 SCC 25, [2004] 1 S.C.R. 629.

[100] The benefit provided and the detriment suffered by the plaintiff must be substantial before a claim of unjust enrichment will be allowed: *Kiyon v. Lanegraff*, 2007 BCSC 1299at para. 75, citing *Strudwick v. Strudwick Estate*, [1996] B.C.J. No. 776at para. 16 (B.C.S.C.).

[101] An enrichment can be a tangible benefit, or "relief from the 'negative', such as saving the defendant from an expense that he or she would otherwise have been required to make": *Pacific National Investments Ltd. v. Victoria (City)*, 2004 SCC 75, [2004] 3 S.C.R. 575at para. 15.

[102] With respect to the third element, juristic reasons to deny recovery include the intention to make a gift, a contract, or a disposition of law: *Kerr* at para 41. In *Garland*, the Court formulated a two-step process for the analysis of the absence of juristic reason: at para. 44. First, the plaintiff must show that no juristic reason from an established category exists to deny recovery. If there is no juristic reason from an established category, the plaintiff has made out a prima face case under the juristic reason component of the analysis.

[103] The onus then shifts to the defendant to show that there is another reason to deny recovery. At this second stage of the analysis, the court will consider the reasonable expectations of the parties and any public policy considerations that provide a juristic reason for the retention of the benefit by the defendant: *Garland* at para. 46. As the Court stated in *Kerr*: "[t]he question is whether the parties' expectations show that retention of the benefits is just": at para. 124.

340     The elements of enrichment and deprivation are usually considered together. This is because a finding of deprivation often flows naturally from a finding of a benefit. So long as a plaintiff can establish a causal link between the contribution and the enrichment, where a defendant has received a benefit a deprivation will usually be found: *Wilson v. Fotsch*, 2010 BCCA 226 (B.C. C.A.); see also *Bruyninckx v. Bruyninckx*, [1995] B.C.J. No. 524 (B.C. C.A.).

341     As Pearlman J. noted in *Gorisek*, the existence of a contract may amount to a juristic reason to deny recovery for unjust enrichment. This is true in part because the plaintiff may have a contractual remedy for the defendant's unjustifiable gain and, therefore, equitable principles need not be applied. On the other hand, an unenforceable contract will not

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

amount to a juristic reason because it provides no such remedy. The same is true of a terminated contract: *Biehl*, paras. 357-360; see also *Galaxy Sports Inc. v. Umbro Holdings Ltd.*, [2005] B.C.J. No. 446 (B.C. S.C.), para. 122.

342      Where parties are negotiating toward an agreement to replace another and one party voluntarily provides bene-fits to the other in anticipation of success there is no unjust enrichment. Rather, the parties are governed by the existing contract. Similarly, where one party benefits another in an effort to persuade while negotiating but agreement is not achieved the receiving party will not be held responsible for the conferring party's poor business decision: *Galaxy Sports*, para. 124-125; see also *Sucher v. Immediate Images Inc.*, 2009 BCSC 1361 (B.C. S.C.).

343      In *Kosaka v. Chan*, 2009 BCCA 467 (B.C. C.A.), the Court of Appeal upheld the trial court's dismissal of a claim for unjust enrichment. The case concerned negotiations for increased equity in a greenhouse operation while a management services agreement was in place. In finding against the appellant, the court emphasized the limits of the un-just enrichment doctrine in the context of commercial negotiations. At paras. 16-18, Newbury J.A. stated:

16 The real crux of Mr. Wiebach's argument on behalf of Mr. Kosaka is that Mr. Kosaka relied on the assurances he was given by the defendants and that it is simply "unfair" that in the end, he did not receive a share of the profits al-legedly received by the defendants on the sale to the income trust. But Equity does not, and could not, provide a remedy to every person who has tried to negotiate a contract and felt unfairly dealt with when the negotiations proved unsuccessful. As the Court noted in *Pacific National Investments Ltd. v. Victoria (City)*, [2004] 3 S.C.R. 575, "The use of the expression 'juristic reason' emphasizes that "unjust' is to be addressed as a matter of law and legal reasoning rather than a free-floating conscience that may risk being overly subjective ..." (Para. 28.) The objective component of the analysis is the absence of juristic reason and that component was not met in this case.

17 Counsel was not aware of any authority in which unjust enrichment had been found where a valid and enforceable contract provided the reason for the conferring of the benefit on the defendant and the deprivation of the plaintiff. If a court were to allow recovery in these circumstances, the negotiation of contracts between arm's-length parties would be an undertaking fraught with risk and the security of concluded agreements would be threatened. As Mad-daugh and McCamus write in the *Law of Restitution*:

Where the enrichment results from the performance of a valid contractual obligation, <u>the general policy favour-ing the security of transactions weighs against the intervention of restitutionary claims</u>. Only if the transactions can be found to be unenforceable for a reason recognized either at law or in equity can the possibility of a resti-tutionary claim for the value of benefits conferred be entertained. [At 3-27]

18 In summary, there was a juristic reason in this case for Mr. Kosaka's continued services, and on the state of the law as it now exists, that fact is fatal to the claim that the defendants were unjustly enriched by Mr. Kosaka's con-tinuing services. I would dismiss the appeal.

## Remedies for Unjust Enrichment

344      Pearlman J. went on in *Gorisek* to discuss remedies for unjust enrichment. At paras. 104 to 106 he stated:

104 The object of the remedy of unjust enrichment is to provide restitution by requiring the defendant to repay or re-verse the unjustified enrichment. A successful claim for unjust enrichment may give rise to either a monetary or a proprietary remedy: *Kerr* at para. 46. See also: *Lac Minerals v. International Corona Resources Ltd.*, [1989] 2 S.C.R. 574 at 669.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

105 The court will first consider whether a monetary award will provide a sufficient remedy for the unjust enrichment. Because the remedy should reflect the flexibility of the unjust enrichment principle and allow the court to respond appropriately to the substance of the problem before it, a monetary remedy should match, to the extent possible, the extent of the enrichment unjustly retained by the defendant: *Kerr* at para. 73.

106 The monetary remedy for unjust enrichment is not restricted to the fee for services approach. However, where an unjust enrichment claim is based on a fee for services approach, it is analogous to a *quantum meruit* claim. Taking any benefits conferred by the defendant on the plaintiff into account at the remedy stage is consistent with the general principles of *quantum meruit* claims: *Kerr* at paras. 100.

345      When a monetary award is quantified based on a fee-for-services approach, it is described as the "value received" approach to quantification. Other possible options for a monetary remedy include the "value survived" approach or an accounting for profits.

346      In *Wilson*, Huddart J.A. described the value survived approach as follows:

60 On the value survived approach, there is no requirement to determine the precise value of the services and other benefits received by the defendant. As a general rule, a party's proportionate contribution to the value of an asset will entitle that party to a comparable share in its value. A ten percent contribution will yield a value equivalent to 10% of the asset; likewise a 50% contribution will yield a half-share. Once the proportionate share has been determined, it need only be assessed against the value of the asset to determine the *quantum* of the award...

347      In *Kerr*, the court held that the value survived approach is to be favoured over the value received approach in cases involving joint family ventures: *Kerr*, paras. 78-79.

348      Where a monetary remedy would be inappropriate or insufficient, the court may choose to award a proprietary remedy such as a constructive trust: *Ibbotson v. Fung*, 2013 BCCA 171 (B.C. C.A.).

*Positions of the Parties*

349      The plaintiffs submit the defendants were enriched by Mr. Jacobs' $967,000 investment and he was correspondingly deprived of those funds and the ability to invest them elsewhere. The defendants were also enriched by his services and other contributions to the businesses, such as the Second Mortgage and SBIL loan. If there was no partnership, they say there was no juristic reason for the defendants to retain and use the funds or other benefits provided by Mr. Jacobs.

350      According to the plaintiffs, the enrichment at issue is the increased value of the Cambie Malone Group over the relevant period.

351      In support of their submission, the plaintiffs emphasize the November 2002 Loan Agreement was nullified by the February 2005 Agreement and the Cambie Malone Group was not obliged to repay the $967,000. They also rely on their submission that the October 2009 Agreements should be set aside. In all of the circumstances, they say, they are entitled to an award for compensation calculated on a value survived basis. The amount of the compensation award will be determined at the next phase of the trial.

352      The defendants submit the plaintiffs have not established they were enriched by the $967,000 loan made to Mr. Yehia. On the contrary, they say any appreciation in the value of the Cambie Malone Group was due to increased land values, which land was owned long before the funds were advanced. Accordingly, there was no causal link between the alleged benefit and the alleged detriment.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

353      The defendants go on to say the Cambie Malone Group raised investment capital of $3.7 million between 2005 and 2009. Accordingly, the $967,000 loan represented only about 20 per cent of the total new financing injected into the companies. In these circumstances, even if the appreciation in their value could be attributed to financing (which it cannot), the defendants say the increase is not solely attributable to the loans.

354      The defendants further submit that if there was a benefit and corresponding deprivation the benefit came about for juristic reasons. The juristic reasons were the contracts between the parties, including the November 2002 Loan Agreement, the Oral Management Consultancy Agreement and the October 2009 Agreements. All things considered, the defendants say the elements of unjust enrichment are entirely absent. In consequence, the unjust enrichment claim should be dismissed.

*Analysis*

355      I find the defendants were enriched by Mr. Jacobs' $967,000 investment. The investment funds were used to operate, renovate and develop the Cambie Malone Group properties and businesses. I also find Mr. Jacobs was correspondingly deprived.

356      There is a causal link between the contribution and the enrichment. The causal link was the defendants' access to and use of the investment funds.

357      As previously noted, Mr. Yehia needed substantial cash for planned remodelling, development and expansion of the Cambie Malone Group properties and businesses. Bank financing was not, however, readily available for these purposes. In November 2002, Mr. Yehia found an alternate source of financing: Mr. Jacobs. From that point forward, he had access to the needed funds.

358      Mr. Jacobs' funds allowed Mr. Yehia to convert his plans into reality. Combined with the properties and businesses in their "as is" state, they jointly contributed to the increased value of the Cambie Malone Group over time.

359      As the plaintiffs' submit, Mr. Jacobs also enriched the Cambie Malone Group in other ways. He worked hard for almost eight years and conferred additional benefits such as the Second Mortgage and the SBIL Loan personal guarantee. There is, however, a distinct difference between those benefits and the $967,000: a juristic reason for the enrichment. The same distinction applies at different points in time to the $967,000.

360      Mr. Jacobs provided his services to the Cambie Malone Group throughout pursuant to a valid and enforceable contract. From November 2002 to October 2009 the contract was the Oral Management Consultancy Contract. From October 2009 to July 2010 it was the October 2009 Agreements. Accordingly, there is a juristic reason to deny recovery for the retention of those benefits.

361      In contrast, the Second Mortgage and SBIL Loan guarantee were not provided pursuant to a contract. Rather, Mr. Jacobs initially conferred them while working toward an intended partnership with Mr. Yehia. At the time he expected a partnership would soon crystallise but did not believe they were yet partners. In these circumstances, I find he chose to benefit his prospective partner in an effort to smooth the negotiations; therefore, there is a juristic reason to deny recovery for any enrichment during the 2004 period. After February 2005, there is not.

362      Between November 2002 and February 2005 the defendants also accessed and used the $967,000 pursuant to a valid and enforceable contract: the November 2002 Loan Agreement. The same is true of the period after the October 2009 Agreements. Between February 2005 and October 2009, however, there was no such contract in place because Mr.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

Yehia persuaded Mr. Jacobs they were "partners completely". Although naïve, this belief was held in good faith and was based on the cumulative effect of Mr. Yehia's conduct and representations.

363    Simply put, Mr. Jacobs was conned.

364    Based on their history and Mr. Yehia's representations, between February 2005 and October 2009 Mr. Jacobs reasonably expected to share in the profits of the Cambie Malone Group if he left the $967,000 investment, Second Mort- gage and SBIL loan guarantee with Mr. Yehia. He did so. The profits he expected to share in were the increase in net equity of the Cambie Malone Group, including any increase in land values. They were to be calculated taking into ac- count any difference between the fair market value of his services and those of Mr. Yehia.

365    Mr. Jacobs also reasonably expected that his share entitlement would be a relative percentage of the Cambie Malone Group's "as is" value, as outlined in the Appraisals. For purposes of this unjust enrichment analysis, I accept as accurate Mr. Yehia's repeated assertions that it was reasonable for Mr. Jacobs to expect to receive 11.73 per cent of the net equity in the Cambie Malone Group.

366    The defendants have failed to show a reason it would be just for them to retain the benefits from February 2005 to October 2009. Mr. Yehia had no such reasonable expectation.

367    In reaching the foregoing conclusion I have considered the parties' entire course of dealings. I find that Mr. Ye- hia consciously and deliberately strung Mr. Jacobs along regarding his intentions and the nature of their relationship. In particular, he persuaded Mr. Jacobs they were partners in order to retain access to and use of his $967,000 for the benefit of the Cambie Malone Group. In so doing, he failed to deal with Mr. Jacobs with commercial good conscience by rebuff- ing his attempts to resolve the partnership impasse while simultaneously paying no interest on the $967,000, renouncing liability for its repayment and purporting to erode Mr. Jacobs' equity entitlement.

368    All things considered, I conclude it would not be just to permit the defendants to retain the benefits so conferred.

369    I agree with the plaintiffs that a monetary award based on a value survived approach is most appropriate. Such an award will match the parties' reasonable expectations and the extent of the enrichment unjustly retained by the defend- ants. In particular, it will allow Mr. Jacobs' proportionate contribution to the overall value of the Cambie Malone Group to be reflected in a comparable share in its value throughout the relevant period.

***Is any of the relief sought by the plaintiffs precluded by an equitable doctrine?***

*Legal Framework*

370    Laches is a defence to a claim for unjust enrichment. In *M. (K.) v. M. (H.)*, [1992] 3 S.C.R. 6 (S.C.C.) at para. 98, the Supreme Court of Canada cited the following definition of the doctrine with approval:

It is a defence which requires that a defendant can successfully resist an equitable (although not a legal) claim made against him if he can demonstrate that the plaintiff, by delaying the institution or prosecution of his case, has either (a) acquiesced in the defendant's conduct or (b) caused the defendant to alter his position in reasonable reliance on the plaintiff's acceptance of the status quo, or otherwise permitted a situation to arise which it would be unjust to dis- turb ...

371    Other equitable considerations may also defeat a claim for unjust enrichment. One is the maxim "he who comes into equity must come with clean hands". Pursuant to the clean hands doctrine, if the plaintiff has engaged in related mis-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

conduct equitable relief may be refused: *Craiggs v. Owens*, 2012 BCSC 29 (B.C. S.C.), para. 38-39; *DeJesus v. Sharif*, 2010 BCCA 121 (B.C. C.A.), para. 87

372      The clean hands doctrine applies only where there is an "immediate and necessary relation" between the relief sought and the misconduct in question. It does not require that a plaintiff has led a blameless life in order to obtain equit-able relief. Further, where a plaintiff's claim is established without reliance on the misconduct, equitable relief will not be barred: *Craiggs*, para. 38-39; *DeJesus*, para. 87

*Positions of the Parties*

373      The defendants submit that Mr. Jacobs complained about his consulting fees from 2003 onward, but delayed un-reasonably in taking legal action. In consequence, they say his equitable claim for unjust enrichment is barred by the doc-trine of laches. They also say he comes before the court with unclean hands because he fraudulently altered a cheque and wrote a venomous letter to Mr. Yehia in the context of their dispute about the business relationship. In the defendants' submission, this conduct was deplorable and related to the subject matter of the action. In consequence, they say equit-able relief should be denied.

374      The plaintiffs submit that any misconduct on Mr. Jacobs' part was relatively minor, transient and unrelated to his claims in equity. His actions in altering the cheque and writing the letter were momentary lapses in judgment which oc-curred after the events related to his unjust enrichment claim. He does not rely on those actions to establish his claims, which are supported by a compelling and large body of unrelated evidence. In these circumstances, they say, the doctrine of unclean hands does not apply.

*Analysis*

375      I agree with the plaintiffs for the reasons summarised above.

**If the plaintiffs are entitled to a remedy, what remedy is appropriate?**

376      The plaintiffs are entitled to a declaration that Mr. Yehia breached the November 2002 Loan Agreement and the defendants breached the October 2009 Agreement by failing to pay interest that was due and owing. They are also en-titled to an order for an accounting for the interest and judgment for damages and interest to be determined at the second stage of the trial.

377      They plaintiffs are entitled to a declaration that the defendants have been unjustly enriched for the period Febru-ary 2005 to October 2009 and they are entitled to equitable relief and compensation arising from that unjust enrichment in an amount to be determined at the second stage of the trial.

378      The plaintiffs are entitled to judgment for $50,004 plus court order interest for the unpaid GST.

**Are the defendants entitled to a remedy and, if so, what remedy is appropriate?**

379      The defendants are entitled to a declaration that the $45,000 repaid twice may be set off against the compensa-tion awarded to the plaintiffs. They are also entitled to set off the value of any ineligible expenses paid to the plaintiffs over the course of the Oral Management Consultancy Agreement or the October 2009 Agreements.

**Conclusion**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

380     As noted, these reasons for judgment address issues of liability alone. The parties are now at liberty to schedule the second stage of the trial.

*Action allowed in part.*

## Appendix A

**Loan Agreement**

*THIS AGREEMENT IS DATED 23rd OF October, 2009,*

**Between Sam Yehia (of the First Part) and Paul Jacobs (of the Second Part) (Together Hereinafter the "Parties")**

*WHEREAS,* Paul Jacobs is a businessman and a resident of West Vancouver, BC; and

*WHEREAS,* Sam Yehia is a businessman and a resident of West Vancouver, BC; and

*WHEREAS,* IN SEPTEMBER OF 2002 AN AGREEMENT WAS ENTERED INTO BY THE PARTIES WHEREIN THE SECOND PARTY DID LEND OR MAKE AVAILABLE THE USE OF NINE HUNDRED SIXTY SEVEN THOUSAND DOLLARS ($967,000) TO OR BY THE FIRST PARTY (HEREINAFTER THE "INVESTMENT");

AND WHEREAS SUCH AGREEMENT, HAVING BEEN RELIED UPON BY THE PARTIES OVER THE COURSE OF THE SUBSEQUENT SEVEN (7) YEARS, REQUIRES A RENEWAL OF THE AGREEMENT IN ORDER TO FACILITATE THE PARTIES GOING FORWARD;

THE PARTIES HERETO DO ENTER INTO AN AGREEMENT, INTENDING BYSODOING, TO SUPPLANT ANY AND ALL PREVIOUS AGREEMENTS BETWEEN THE PARTIES WITH RESPECT TO THE ABOVE MENTIONED LOAN AMOUNT;

*THE PARTIES AGREE THAT:*

1. Paul Jacobs, the Lender has lent to Sam Yehia, the Borrower nine hundred sixty-seven thousand dollars ($967,000) in good Canadian currency;

2. The Borrower will provide the Lender with a personal guarantee for the entire amount owing under this agreement;

3. Consideration for the loan shall be $1.00 per year;

4. The Borrower shall have the right to purchase a life insurance policy on the Lender and/or joint and first-to-die policy including coverage of the spouse of the Borrower, or whatsoever policy as agreed between the parties.

5. This agreement, the terms and conditions hereof, and the process by which this agreement was reached, including any and all correspondence and communications of any kind are confidential;

6. The term of this agreement shall renew automatically in one (1) year increments at the end of the year or the date on which the loan is paid in full;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

7. The following are offices of notice for the purposes of this agreement:

| For the Lender: | For the Borrower: |
|---|---|
| Paul Jacobs | Sam Yehia |
| 400-525 Seymour St. | 400 - 525 Seymour St. |
| Vancouver, BC | Vancouver, BC |
| V6B3H7 | V6B3H7 |
| 5655 Westhaven Rd. | 3390 Radcliffe Ave. |
| West Vancouver, BC | West Vancouver, BC |
| V7W1T7 | V7V1G6 |

This agreement supplants and is paramount to any precedent agreement. Where any correspondence, contract or other agreement of any kind whatsoever conflicts with this agreement it is agreed by the parties that this agreement has para-mountcy.

It is the intention of the parties that for the purposes of this agreement that TIME IS OF THE ESSENCE.

This agreement is made pursuant to the laws of British Columbia, Canada.

By signing below each of the parties attests to the fact that they have been informed of their right to independent legal advice and independent accounting advice and that this agreement is executed in full knowledge of the importance of seeking such independent counsel and under no duress or misconception about the party's rights at law whatsoever.

*ALL OF THE ABOVE IS SIGNED, SEALED AND DELIVERED AT THE CITY OF VANCONVER, _____.*



Graphic 1

### Appendix B

**Management Services Agreement Between: The Cambie Malone's Corp. ("The Company") and 657947 B.C. Ltd. ("Services Provider")**

*WHEREAS*, The Cambie Malone's Corp. (hereinafter referred to as the "Company") is a duly incorporated company in

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

the Province of British Columbia with establishments in Vancouver, Esquimau and Nanaimo; and

*WHEREAS*, 657947 BC Ltd. (hereinafter referred to as the "Services Provider") is a duly incorporated company in the Province of British Columbia, in good standing, providing professional services in the City of Vancouver; and

*WHEREAS*, the above Parties to this agreement have operated, since September 2002, as if in agreement and wish to express hereby the terms and conditions under which that relationship had been operative and moreover to enter into an agreement which shall continue throughout the term and periods of renewal, as effected hereby.

THEREFORE THE PARTIES DO HEREBY AGREE THAT:

1. All correspondence between the Parties with respect to this agreement, or with respect to the Loan Agreement between Sam Yehia and Paul Jacobs, attached hereto as Schedule A, is confidential correspondence and shall be deemed to be WITHOUT PREJUDICE, irrespective of whether or not such correspondence is explicitly described as such, and without limitation.

2. For management services rendered to the Company, (hereinafter the "Services"), the Company shall pay Ten Thousand (10,000) dollars of Canadian currency per month plus GST (the "Fee") to the Services Provider; Any change in the shareholding of 657947 B.C. Ltd., whether affecting ownership or not, shall not constitute a breach of this agreement, and it is the intention of the Parties that this agreement shall continue unless terminated pursuant to the relevant sections herein.

3. The Services shall specifically include activities as requested by the principal of the Company, and as agreed to by the principal of the Services Provider on a day-to-day basis.

4. In addition to the Fee, the Service Provider is eligible for an annual performance bonus (the "Bonus") at the end of each annual period following the commencement of this agreement. The exact amount of the Bonus will be determined by either an independent business consultant who is acceptable to both Parties of this agreement, or by the compensation committee of the Company's board of directors comprising of a majority of independent directors. The criteria for eligibility for payment of a Bonus will be based solely on the initiation, implementation, completion and success of initiatives completed by the Service Provider for the benefit of the Company. The results of these initiatives must deliver a measurable benefit to the Company. The Bonus will be paid based on a market rate for such successful initiatives.

5. The Company will reimburse the Service Provider for any pre-approved expenses incurred on behalf of the Company within 30 days of invoicing for the recovery of the same expense.

6. The Company will provide the following additional conditional benefits (the "Conditional Benefits") to the Service Provider:

a) Health Benefits;

b) Motor vehicle allowance not to exceed CDN$1,000 per year; and

c) A promotional budget for food and beverage at the Company's restaurants and pubs not to exceed CDN$2,000 per year.

These Conditional Benefits as itemized in clause 6 herein will be advanced by the Company to the Service Provider

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956

during the term of this contract. Furthermore, the Conditional Benefits, at cost, will be deducted from any eligible Bonus payable for each annual period. If the eligible Bonus is less than the value of the Conditional Benefits, the difference will be due to the Company from the Service Provider.

7. Either party may terminate this agreement by providing no less than thirty (30) days notice to the other party, in writing and delivered to the following addresses:

| For The Company: | For the Services Provider: |
|---|---|
| 400 - 525 Seymour St., | 400 - 525 Seymour St., |
| Vancouver, BC V6B 3H7 | Vancouver, BC V6B 3H7 |
| 3390 Radcliffe Avenue | 5655 Westhaven Rd |
| West Vancouver, BC V7V 1G6 | West Vancouver, BC V7W 1T7 |

8. The term for this agreement shall be one (1) year and shall renew automatically for subsequent annual periods subject to any termination as described in section 8 above.

9. Upon the termination of this agreement, the Company will:

a) pay out the personal loan, and any associated interest, made by Mr. Paul Jacobs, Principal of the Service Provider, to Mr. Sam Yehia, Principal of the Company. The original amount of the principal outstanding of such loan was of September 2002 was CDN$967,000.

b) pay out or replace the second mortgage on the residence of the principal of the Service Provider (Mr. Paul Jacobs) that has been incurred on the Company's behalf. The original amount of the principal outstanding at the time of funding and based on a facility letter issued by HSBC on or about August 2004 being CDN$146,000.

c) pay out any amounts owing to the Service Provider pursuant to this agreement, and

d) replace any personal guarantee(s) provided by Mr. Paul Jacobs on the Company's behalf.

For this agreement TIME IS OF THE ESSENCE.

This agreement is made, pursuant to the laws of the Province of British Columbia and is agreed to hereby at the City of Vancouver, on this *23rd* day of *October*, 2009.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2014 CarswellBC 1331, 2014 BCSC 845, [2014] B.C.W.L.D. 3705, [2014] B.C.W.L.D. 3734, [2014] B.C.W.L.D. 3718, [2014] B.C.W.L.D. 3852, 242 A.C.W.S. (3d) 956



Witness:

Brandon J. Smith

400-525 Seymour St.

Vancouver, BC V6B 7H7

Authorized Signatory for
The Cambie Malone's Corp.

Witness:

Brandon J. Smith

400-525 Seymour St.

Vancouver, BC V6B 3H7

Authorized Signatory for 657947 BC Ltd.

**Graphic 2**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 57

34 Fed.Appx. 858
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also Third Circuit
LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,
Third Circuit.

Victor JOHNSON,

v.

VANGUARD MANUFACTURING, INC.;
and Lynn Ladder and Scaffolding Co., Inc.

No. 01–1589, 01–1742.    |    Submitted
Under Third Circuit LAR 34.1(a) Feb.
25, 2002.    |    Filed May 8, 2002.

Worker brought products liability action in state court against
manufacturer and seller of allegedly defective scaffold that
collapsed, resulting in injuries. Upon removal, the United
States District Court for the Eastern District of Pennsylvania,
Berle M. Schiller, J., entered judgment in favor of defendants.
Worker appealed. The Court of Appeals, Roth, Circuit
Judge, held that trial court did not abuse its discretion
in excluding part of worker's expert's testimony regarding
whether defective ladder caused worker's injury.

Affirmed.

West Headnotes (1)

[1]    **Federal Civil Procedure**
👉 Failure to respond;  sanctions

Trial court did not abuse its discretion in
excluding part of worker's expert's testimony
regarding whether defective ladder caused
worker's injury; it was within the court's
discretion to find that the testimony that worker
attempted to elicit from expert was properly
excluded since it was not provided in his expert
report, and moreover, evidentiary exclusion did
not preclude expert from testifying on the issue
of causation, and expert presented testimony as

to causation later in his testimony. Fed.Rules
Civ.Proc.Rule 26(a)(2)(B), 28 U.S.C.A.

3 Cases that cite this headnote

**\*858**  Appeal from the United States District Court for the
Eastern District of Pennsylvania (D.C. Civil Action No. 98–
cv–03171) District Judge: Honorable Berle M. Schiller.

Before ROTH and FUENTES, Circuit Judges GIBSON [*],
Circuit Judge.

**OPINION**

ROTH, Circuit Judge.

Plaintiff Victor Johnson appeals the judgment of the United
States District Court for the Eastern District of Pennsylvania.
Johnson sought damages in a products liability action
against Vanguard Manufacturing, Inc., and Lynn Ladder
and Scaffolding Co., Inc. Johnson's claim arose from a
construction accident that occurred on June 4, 1996. Johnson
and a co-worker, each standing on his own scaffold, were
engaged in the demolition of a wall. They successfully
toppled the wall, but a few moments after the wall gave
way, Johnson's scaffold collapsed. As a result, Johnson fell
and was injured. Johnson originally filed a complaint in the
Court of Common Pleas of Philadelphia County, claiming
that the scaffold was defectively designed and manufactured
by defendant Vanguard Manufacturing, Inc., and sold by
defendant Lynn Ladder and Scaffolding Co., Inc. On June 19,
1998, the defendants removed the case to the United States
**\*859**  District Court for the Eastern District of Pennsylvania.
After a two day trial, the jury returned a verdict in favor of
Vanguard. This appeal followed.

At trial, Johnson presented his testimony, the testimony of his
co-worker, and that of a single expert. The expert was Dr.
Campbell Laird, a metallurgist and accident reconstructionist
from the University of Pennsylvania School of Engineering
and Applied Science. Based on his investigations, Dr. Laird
testified that a pin on the scaffold fractured from fatigue in the
course of normal operations, that the pin was manufactured
from the wrong type of iron, and that the fracture of the pin
and resulting instability of the scaffold was the direct cause
of Johnson's injury. While Johnson was prepared to call an

expert in the field of accident reconstruction, he rested his case at the conclusion of Dr. Laird's testimony.

The defense called several expert witnesses. The defense metallurgist explained that the normal use of the scaffold would not cause a fatigue fracture of the pin, contradicting Laird's testimony. The accident reconstructionist employed by the defense explained that the accident occurred as a result of the scaffold tipping as Johnson pushed on the wall. He testified that the pin fracture might have resulted from falling scaffold but that the fracture itself did not cause the collapse.

The jury concluded that while the scaffold was defective, the defect was not a substantial factor in causing Johnson's accident, and found in favor of Vanguard.

Johnson contends that the District Court abused its discretion in excluding part of Dr. Laird's testimony as to accident causation, and that this exclusion prevented Johnson from properly presenting his case. During Johnson's direct examination of Dr. Laird, Vanguard objected when he was questioned as to observations made in the preparation of his report. The objection was based on the fact that the observations were not recorded in Dr. Laird's report. Pursuant to Fed.R.Civ.P. 26(a)(2)(B), an expert witness's report must contain a complete statement of all opinions to be expressed and the data or other information considered by the witness in forming those opinions. A party that fails to disclose evidence required by Rule 26(a) will not be allowed to use that evidence unless the failure to disclose the evidence is harmless. See Fed.R.Civ.P. 37(c)(1).

After reviewing the record, we find that the trial court did not abuse its discretion in excluding part of Dr. Laird's testimony. It was within the court's discretion to find that the testimony that Johnson attempted to elicit from Dr. Laird was properly excluded since it was not provided in his expert report as required by Fed.R.Civ.P. 26(a)(2)(B). Moreover, this evidentiary exclusion did not preclude Dr. Laird from testifying on the issue of causation. The record shows that Dr. Laird presented his testimony as to causation later in his testimony.

For the foregoing reasons, we will affirm the judgment of the District Court. We will, however, deny appellee's request for an award of sanctions and costs under Fed. R.App. P. 38 and 28 U.S.C. § 1927.

**Parallel Citations**

2002 WL 957330 (C.A.3 (Pa.))

Footnotes

*        Honorable John R. Gibson, Senior Circuit Court Judge for the Eighth Circuit, sitting by designation.

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 58

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

1998 CarswellOnt 4170

Ontario Court of Appeal

Kentucky Fried Chicken Canada v. Scott's Food Services Inc.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

# Kentucky Fried Chicken Canada, a Division of Pepsi-Cola Canada Ltd., Plaintiff (Respondent) and Scott's Food Services Inc. and Scott's Hospitality Inc., Defendants (Appellants)

Moldaver, Goudge JJ.A., Ferrier J. (ad hoc)

Heard: May 4-5, 1998
Judgment: November 2, 1998
Docket: CA C28208

Proceedings: reversing (1997), 35 B.L.R. (2d) 21 (Ont. Gen. Div.); additional reasons at (November 5, 1997), Doc. 96-CU-103096 (Ont. Gen. Div.)

Counsel: *Dennis R. O'Connor, Q.C.*, *David Stockwood, Q.C.*, *Nancy J. Spies* and *Timothy H. Mitchell*, for the appellants. *David R. Byers*, *Katherine L. Kay* and *Christopher J. Cosgriffe*, for the respondent.

Subject: Intellectual Property; Corporate and Commercial; Contracts; Torts; Property; Civil Practice and Procedure; Evidence

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

### Contracts --- Franchising contracts — Construction and interpretation — General

Corporation's subsidiary and licensor entered into license agreement for operation of franchise outlets — Agreement restrained licensee from transferring or assigning agreement or rights without consent of licensor — Corporation subsequently entered into transaction which included transfer of shares in subsidiary to newly formed corporation, without consent of licensor — Licensee brought application for interpretation of licence agreement, and licensor brought action for breach of contract — Action allowed — Trial judge held that corporation was obligated to seek approval and consent of licensor to any sale of majority control of voting shares of corporation or licensee — Failure to obtain such approval was breach of licence agreement — Appeal by licensee allowed — Agreement did not give licensor right to approve change in controlling shareholder of licensee — Ordinary meaning of language in agreement suggested licensor had right on entering franchise agreement to know and approve shareholders of licensee — Nothing in agreement suggested right to approve change in shareholders seven years later — Throughout relationship licensee had made it clear that it would not agree to any restriction on changes of ownership of licensee — Deemed transfer provisions which gave rise to licensor's right to approve change in shareholders of other franchisees under standard franchise agreements were absent from agreement between licensee and licensor — It would lead to commercial absurdity to interpret right of approval as continuing right — Provision in agreement requiring licensee to give licensor information about shareholders of prospective purchaser would be superfluous if licensor had continuing right to approve shareholders of licensee — Given history of parties, it could not be said that it did not make good business sense to restrict right of approval to time parties entered into agreement — Strong bargaining position of licensee made generally accepted industry practice of little use in interpreting agreement — Change in shareholders of licensee did not constitute licensee dealing with its interest under license agreement — Licensor did not have right to prior written consent to corporation's sale of assets — Corporation's transaction did not give rise to right of first refusal on part of licensor as there was no offer to licensee.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

**Corporations --- Nature of corporation — Distinct existence — From owner — Lifting the corporate veil**

Corporation's subsidiary and licensor entered into license agreement for operation of franchise outlets — Agreement restrained licensee from transferring or assigning agreement or rights without consent of licensor — Corporation subsequently entered into transaction which included transfer of shares in subsidiary to newly formed corporation, without consent of licensor — Licensee brought application for interpretation of licence agreement, and licensor brought action for breach of contract — Licensor argued parent corporation was bound by terms of agreement because subsidiary executed it as alter ego, and agreement gave licensor control over transfer of shares of subsidiary and parent corporation — Subsidiary not alter ego of parent corporation — Both parties knew licence agreement was between licensor and subsidiary — Parent corporation completely controlled subsidiary for primary purposes of licence agreement, but took no part in its daily management — Appeal by licensee allowed on other grounds.

**Agency --- General principles**

Corporation's subsidiary and licensor entered into license agreement for operation of franchise outlets — Agreement restrained licensee from transferring or assigning agreement or rights without consent of licensor — Corporation subsequently entered into transaction which included transfer of shares in subsidiary to newly formed corporation, without consent of licensor — Licensee brought application for interpretation of licence agreement, and licensor brought action for breach of contract — Licensor argued parent corporation was bound by terms of agreement because subsidiary executed it as agent, and agreement gave licensor control over transfer of shares of subsidiary and parent corporation — Subsidiary not agent of parent corporation — Both parties knew licence agreement was between licensor and subsidiary — Parent corporation completely controlled subsidiary for purposes of licence agreement, but took no part in its daily management — Fact that parent corporation made major policy and financial decisions carried out by subsidiary not determinative — Profits of subsidiary were treated as profits of parent corporation on consolidated balance sheet only — Profits of subsidiary not directly traceable to skill and direction of parent corporation — Appeal by licensee allowed on other grounds.

**Evidence --- Parol evidence rule — Interpretation — Usage, custom, course of dealings — General**

Parties entered into franchise licence agreement — Licensor brought action involving interpretation of agreements and moved to exclude extrinsic parol evidence — Motion allowed in part — Extrinsic evidence admissible to enable court to determine latent ambiguity in written agreement and to construe true intention of parties — Evidence of subjective intention with respect to agreement, and of negotiations and drafts leading to execution of agreement, was not admissible — Relationship between parties and custom in industry were part of factual matrix that must be looked at to interpret agreement — Evidence of licence agreements between licensor and other franchisees in Canada, and between licensor's associated companies and franchisees in other countries, were admissible as relevant to custom in industry — Appeal by licensee allowed on other grounds — Agreement to be interpreted objectively, in accordance with sound commercial principles and good business sense.

**Equity --- Equitable doctrines — Relief against penalty and forfeiture — General**

Corporation's subsidiary and licensor entered into license agreement for operation of franchise outlets — Agreement restrained licensee from transferring or assigning agreement or rights without consent of licensor — Corporation subsequently entered into transaction which included transfer of shares in subsidiary to newly formed corporation, without consent of licensor — Licensee brought application for interpretation of licence agreement, and licensor brought action for breach of contract — Action allowed — Transactions were in breach of licence agreement and gave licensor right to terminate agreement, subject to claim for relief from forfeiture — Licensee knowingly committed breach of licence agreement — Relief from forfeiture not insurance policy for party taking chance on interpretation of essential term of its contractual rights and losses — Conduct of licensor in vigorously opposing what it considered to be breach of licence agreement was not exceptional or unconscionable — No valid reason to grant relief from forfeiture — Appeal by licensee allowed on other grounds.

**Contracts --- Franchising contracts — Performance or breach — Duty of franchisees — General**

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

License agreement provided licensor could require renovations and remodelling of franchise outlets to its standards — Agreement required licensee to upgrade all outlets in accordance with "world image" standards and obtain "outlet certification agreements" for each outlet — Development agreement provided for annual enhancement program covering at least 10 per cent of outlets — Licensee upgraded more than 10 per cent of outlets each year from 1990 to 1996, except for 1991, but failed to have 10 per cent of outlets certified every year — Licensee admitted 69 outlets were not upgraded to "world wide image" standards, but were upgraded within its interpretation of agreements — At end of 1996, 28 per cent of outlets did not comply with upgrade provisions of development agreement — Trial judge held that licensee was in substantial breach of development agreement, and provided licensee with three months to remedy default — Licensee brought appeal against finding that licensee must enhance all of its outlets within three months and not just sufficient number so that failure becomes less than material and substantive — Appeal allowed — License agreement permitted licensor to terminate if licensee failed in "material and substantive manner" to meet enhancement obligations — Trial judge held that licensee was in substantive breach where more than five to ten percent of outlets fell below required standard — To correct failure, licensee was only required to ensure that no more than five percent of its outlets were substandard.

### Practice --- Costs — Jurisdiction and discretion as to costs

In written submissions at end of trial both parties referred to provision of license agreement between them and claimed full indemnity of their costs — Law was clear that contractual right should be followed by court unless there are special circumstances or where there had been inequitable conduct — In present case had been no inequitable conduct nor special circumstances relating to action — Trial judge ordered there be no costs of trial on basis of provision in license agreement — Appeal of judgment by licensee allowed — Trial judge's order as to costs affirmed — Licensee entitled to costs of appeal.

### Practice --- Judgments and orders — Amending or varying — General

From notes it could be seen that counsel had conceded that plaintiff had not called any evidence regarding monetary damages, not as mistakenly put into reasons that plaintiff had not suffered any monetary damages — Reasons for judgment were amended to take this into account — Appeal of judgment allowed on other grounds.

**Table of Authorities**

**Cases considered by *Goudge J.A.*:**

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), *(sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — applied

*GATX Corp. v. Hawker Siddeley Canada Inc.* (1996), 1 O.T.C. 322, 27 B.L.R. (2d) 251 (Ont. Gen. Div. [Commercial List]) — distinguished

*Reardon Smith Line v. Hansen-Tangen*, [1976] 1 W.L.R. 989, [1976] 3 All E.R. 570 (U.K. H.L.) — applied

*Scanlon v. Castlepoint Development Corp.* (1992), 29 R.P.R. (2d) 60, 59 O.A.C. 191, 11 O.R. (3d) 744, 99 D.L.R. (4th) 153 (Ont. C.A.) — applied

*Toronto (City) v. W.H. Hotel Ltd.*, [1966] S.C.R. 434, 56 D.L.R. (2d) 539 (S.C.C.) — applied

APPEAL by licensee from judgment reported at (1997), 35 B.L.R. (2d) 21 (Ont. Gen. Div.), allowing licensor's action for breach of license agreement.

**The judgment of the court was delivered by *Goudge J.A.*:**

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

1    This appeal was heard on May 4 and 5, 1998. This court's reasons for judgment were ready for release on July 9, 1998 when the parties contacted the court to request that this not be done. On the basis of the reasons given by the parties for this request, the court agreed to refrain from releasing its judgment until November 1, 1998 but made clear that the judgment would then be released unless prior to October 31, 1998 both parties notified the court in writing that the matter had been fully and finally settled and that the appellant wished to withdraw the appeal. This has not happened and these reasons are therefore being released.

2    The appellant Scott's Food is the largest Kentucky Fried Chicken ("KFC") franchisee in the world. Its franchise agreement (the "license agreement") with the respondent covers some four hundred outlets, approximately half of all KFC outlets in Canada.

3    Up until 1996, Scott's Food was owned by the appellant Scott's Hospitality whose other major business was a school bus operation. At that point, as part of a transaction with Laidlaw Inc. ("Laidlaw") in which Laidlaw acquired the school bus business, the shareholders of Scott's Hospitality replaced it as the sole shareholder of the franchisee with a new company, Scott's Restaurants. As a result, these shareholders then owned Scott's Restaurants which in turn owned Scott's Food. This change was made without the respondent's consent.

4    There were two main issues at trial. The second, which the parties call the enhancement issue, was whether, apart altogether from the corporate changes entailed by the Laidlaw transaction, Scott's Food had upgraded its outlets as required by its contract. At trial, Steele J. found that it had not. I will come in due course to the limited appeal taken from the judgment below on this issue.

5    The first and indeed the fundamental issue at trial, called the transfer issue, was whether the license agreement required the appellants (to whom I will refer jointly as "Scott's") to obtain the respondent's consent to the change in ownership of the franchisee failing which the respondent could terminate the agreement. Steele J. interpreted the contract as requiring consent, thereby giving the respondent the right to terminate since no consent was obtained. For the reasons that follow, I have come to the opposite conclusion and I would therefore allow the appeal on the transfer issue.

**The Transfer Issue**

*The Relevant Facts*

6    The license agreement that is the subject of this litigation was signed on June 9, 1989, effective January 1, 1989. The respondent was the franchisor and the appellant Scott's Food the franchisee. The latter was a wholly-owned subsidiary of Scott's Hospitality which was not a party to the agreement.

7    At the time the license agreement was made, Scott's operated about one-half of all the KFC outlets in Canada and more than ten times as many as the next largest franchisee in the country. Unlike most franchisees, Scott's had very significant bargaining power in the negotiations which led up to the agreement.

8    For the purposes of the transfer issue, the critical paragraphs of the license agreement are the following:

**16. Transfer**

16.1 The grant of the License hereunder is personal to Licensee. The grant of the License hereunder is based upon full disclosure in writing by the Licensee to KFC, and approval by KFC, of all directors and holders of majority control of the voting shares of Licensee and of any corporation or corporations which directly or indirectly (whether by means of any intermediate corporations or otherwise) own or control or have an interest in the shares of the Licensee. Licensee acknowledges that the restrictions provided in this Paragraph 16 are reasonable and necessary to protect the KFC System and the KFC Marks and are for the benefit and protection of all KFC licensees as well as KFC.

16.2 Licensee agrees that it shall not sell, transfer, assign, encumber, sub-license or otherwise deal with this Agreement or its rights or interest hereunder (hereinafter referred to as "transfer"), without KFC's prior written consent and Licensee's

Kentucky Fried Chicken Canada v. Scott's Food Services Inc., 1998 CarswellOnt 4170

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

compliance in all respects with the terms and conditions of this Paragraph 16. Any transfer or any attempt to do so, contrary to Paragraph 16 shall be a breach of this Agreement and shall be void but shall give KFC the right of termination as provided in Paragraph 17.2(d).

9    Paragraph 17.2(d) reads as follows:

17.2 KFC may, without prejudice to any other rights or remedies contained in this Agreement or at law or in equity, terminate the License upon immediate notice (or in the event advance notice is required by law, upon the giving of such notice) in the event that:

. . . . .

(d) Licensee makes or permits a transfer contrary to the provision of Paragraph 16;

10    The history of Scott's as a KFC franchisee predates the license agreement by twenty years. It goes back to 1969 when Scott's Hospitality entered into an agreement to become a franchisee operating KFC outlets in Canada. The franchisor then was Col. Sanders Kentucky Fried Chicken Limited ("Colonel Sanders"), the owner of the KFC trademarks in Canada. This agreement was to run until January 1, 1994. It is noteworthy that it contained no clause like the current paragraph 16.1. It did not specify that the rights of Scott's Hospitality were personal to it, nor were there any provisions restricting the transfer of its shares. There was, however, a provision restricting the transfer of the license without the prior written consent of the franchisor.

11    By 1985, the franchisor had developed a standard franchise agreement ("the 1985 Agreement") containing certain restrictions on the transfer of shares in the franchisee which, at that point, were standard in all KFC franchise agreements in Canada except that with Scott's Hospitality.

12    While paragraph 16.1 of the 1985 Agreement reads identically to paragraph 16.1 in the license agreement, paragraph 16.2 of the 1985 Agreement when coupled with paragraph 16.4 contains significant differences. These two paragraphs are reproduced below, highlighting the words that do not appear in the license agreement:

16.2 The Franchisee agrees that it shall not sell, transfer, assign, encumber, sub-license or otherwise deal with this Agreement or its rights or interest hereunder (hereinafter referred to as "transfer"), **and shall not suffer or permit any deemed sale, transfer or assignment of this Agreement or its rights or interest hereunder (hereinafter referred to as "deemed transfer" and more particularly defined in paragraph 16.4)**, without KFC's prior written consent and **Franchisee's** compliance in all respects with the terms and conditions of this Paragraph 16. Any transfer **or deemed transfer**, or any attempt to do so, contrary to this Paragraph 16 shall be a breach of this Agreement and shall be void but shall give KFC the right of termination as provided in paragraph 17.2(d).

**16.4 For the purposes of this Paragraph 16, a deemed transfer of this Agreement or the rights and interest hereunder shall include**:

(a) ...

**(b) in the event that Franchisee is a corporation, any change (including but without limitation any issuance, sale, assignment, transfer, redemption or cancellation of, or conversion of any securities into, voting shares of the corporate Franchisee or any other corporation referred to in paragraph 16.1, or any amalgamation, merger or other reorganization of the corporate Franchisee or any such other corporation) in any of the holdings of voting shares referred to in paragraph 16.1; provided that, in the case of any such corporation the voting shares of which are listed and publicly traded on a stock exchange, no such change in any of the holdings of its voting shares shall constitute a deemed transfer unless, in the sole opinion of KFC, direct or indirect control of the corporate Franchisee would thereby be changed.**

13    In 1987, Col. Sanders sold its entire interest in the KFC trademarks in Canada to Kentucky Fried Chicken's corporation ("KFC Corp." or "KFC") which held those rights for the rest of the world.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

14    Just prior to this sale, by letter agreement dated July 16, 1987, KFC Corp. agreed that when the sale from Col. Sanders was concluded, it would grant Scott's Hospitality a ten-year renewal of the 1969 agreement. This letter agreement suggested no constraint on the transfer of shares of the franchisee.

15    Pursuant to the 1987 letter agreement, negotiations ensued between KFC and Scott's Hospitality. In these negotiations, Scott's Hospitality refused to agree to terms in the language of the 1985 agreement, just as it had previously refused to do with Col. Sanders. The Scott's representative made clear to KFC that Scott's would not agree to any restrictions on changes of ownership in the licensee.

16    The relative bargaining power of Scott's and KFC in these negotiations was the subject of some considerable attention at trial. The chief KFC negotiator testified that Scott's was at least the equal of KFC in bargaining power. The leading expert for KFC testified that it was unusual for a franchisee to be in such a position.

17    Because of these unique circumstances, the trial judge concluded that the evidence of the experts as to the usual practice in the franchising industry must be applied with caution. Ultimately, he found that Scott's had sufficient bargaining power to negotiate a contract in which there would be no restriction on the transferability of shares. The question he had to decide was whether the resulting license agreement contained such a restriction.

18    The first of the two Laidlaw transactions, which triggered the need to answer this question, began in January 1996 with an unsolicited offer from Laidlaw to purchase all of the shares of Scott's Hospitality. Laidlaw's intention was that following a successful takeover, it would sell off Scott's Food and retain the school bus business operated by Scott's Hospitality. Laidlaw's offer contained a condition that it be satisfied that there was no impediment to its disposing of the shares of Scott's Food to a third party without affecting the franchisee's rights under the license agreement. KFC was not prepared to give its consent to this transaction and indeed commenced this litigation in response. As a result, this Laidlaw proposal could not be completed within its time frame and hence it did not proceed.

19    Rather, a second Laidlaw transaction was structured in which Scott's Restaurants was incorporated as a subsidiary of Scott's Hospitality. Scott's Hospitality then transferred its shares in Scott's Food to Scott's Restaurants in exchange for shares of Scott's Restaurants which were dividended out to the shareholders of Scott's Hospitality. The shareholders of Scott's Hospitality thereby became the owners of Scott's Restaurants which, in turn, became the owner of the franchisee, Scott's Food. Laidlaw then purchased the shares of Scott's Hospitality thereby acquiring the school bus business.

20    KFC was kept fully informed of this transaction but continuously opposed it. Indeed, its consent was never expressly sought. The simple question at trial was whether that consent was required.

*The Judgment Below*

21    The trial judge found that while Scott's Food as franchisee was bound by the license agreement, Scott's Hospitality was not bound by its terms. He concluded that Scott's Food was neither the alter ego nor the agent of Scott's Hospitality. The respondent does not contest this conclusion.

22    He then went on to his core finding on the transfer issue, namely, the construction of paragraph 16.1 of the license agreement. He construed that paragraph to contain a continuing obligation on the part of the franchisee to obtain approval of KFC to any transfer of the shares of either Scott's Food or its controlling shareholder. He put his findings in these terms:

> In my opinion the disclosure and approval of the directors and holders of majority control would be meaningless unless it was a continuing obligation and not merely at the time of execution. Based on good business sense section 16.1 must be construed as being a continuing obligation.
>
> . . . . .
>
> In my opinion there is nothing in section 16 that prohibits or gives the right of approval to KFC of trading of shares of Scott's Food or Hospitality provided that there is no issue of a change of control.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

There are no clearly expressed words requiring the approval of KFC to any transfer of the shares of Scott's Food or its controlling shareholders. However section 16.1 referring to the grant being personal and the reference to the directors and holders of majority control of the shares of Scott's Food and the broad reference to any other corporations with control make it clear that any transfer of the controlling shares of Scott's Food or Hospitality are subject thereto. To interpret the section otherwise would defeat the personal aspect and not make good business sense and would be contrary to the generally accepted practice in the franchise industry.

23      He then moved directly and without elaboration to a finding that paragraph 16.2 prohibits a transfer or an attempted transfer of the license agreement without consent and since the first Laidlaw proposal was an attempted transfer and the second was an actual transfer, each breached paragraph 16.2 and gave KFC the right to terminate the license agreement pursuant to paragraph 17.2(d).

*Analysis*

24      The question to be determined on the transfer issue is one of contractual interpretation: properly construed, does either paragraph 16.1 or paragraph 16.2 of the license agreement require KFC's consent to either Laidlaw transaction? The trial judge determined that this was not a case of ambiguity and on this basis, he declined to consider evidence of the subjective intentions of the parties which were not communicated to each other. Equally he excluded the various draft documents leading up to the license agreement. He did, however, consider the relationship between the parties and the custom of the industry, including the license agreements between the respondent and other franchisees in Canada, as part of the factual matrix that must be looked at in interpreting the agreement.

25      I agree with this approach. While the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its "factual matrix" will also provide the court with useful assistance. In the famous passage in *Reardon Smith Line v. Hansen-Tangen*, [1976] 1 W.L.R. 989 (U.K. H.L.) at 995-96 Lord Wilberforce said this:

> No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

26      The scope of the surrounding circumstances to be considered will vary from case to case but generally will encompass those factors which assist the court "... to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract.": *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at 901.

27      Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity [1] . Rather, the document should be construed in accordance with sound commercial principles and good business sense [2] . Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

28      With these broad principles of interpretation in mind, I turn first to the construction to be given to paragraph 16.1 of the license agreement. Properly construed, does it give KFC the right to approve a change in the controlling shareholder of the franchisee? It is the second Laidlaw transaction that requires this question to be answered. Given that the first Laidlaw transaction was not proceeded with, KFC did not argue at trial or on appeal that it breached paragraph 16.1.

29      It is helpful at this point to set out the provision again:

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

16.1 The grant of the License hereunder is personal to Licensee. The grant of the License hereunder is based upon full disclosure in writing by the Licensee to KFC, and approval by KFC, of all directors and holders of majority control of the voting shares of Licensee and of any corporation or corporations which directly or indirectly (whether by means of any intermediate corporations or otherwise) own or control or have an interest in the shares of the Licensee. Licensee acknowledges that the restrictions provided in this Paragraph 16 are reasonable and necessary to protect the KFC System and the KFC Marks and are for the benefit and protection of all KFC licensees as well as KFC.

30    I have concluded that this clause does not give KFC a right to approve a change in the controlling shareholder of its franchisee Scott's Food. In other words, paragraph 16.1 does not extend to the second Laidlaw transaction. I say this for a number of reasons.

31    First, the license agreement was signed in 1989. The Laidlaw transactions occurred in 1996. The ordinary meaning of the language used in paragraph 16.1 suggests that the franchisor KFC had the right on entering the contract to know and approve the shareholders of the franchisee. There is nothing to suggest a right to approve a change in those shareholders some seven years later.

32    Second, such a right would mean a significant change from the agreement which had governed this franchise relationship since 1969 which clearly contained no such right. Moreover, Scott's had refused to enter into an agreement like the 1985 standard franchise agreement which did provide the franchisor with this right. The trial judge found that prior to executing the license agreement, KFC knew this and had been told that Scott's would not agree to any restriction on changes of ownership in the franchisee.

33    Third, the language of the 1985 standard franchise agreement is revealing. In 1989, when the license agreement was concluded, every other KFC franchise agreement in Canada expressly provided for the franchisor's right to approve a change in the shareholders of the franchisee. This was done not by means of paragraph 16.1 but rather through the "deemed transfer" language of paragraphs 16.2 and 16.4. Paragraph 16.1 in the license agreement ought not to be construed to provide the franchisor with this right where the identical language in the 1985 standard franchise agreement was clearly not intended to have that effect. The corollary to this is that the deemed transfer language which does provide this right to the franchisor in the 1985 standard franchise agreement is conspicuously absent from the license agreement.

34    Fourth, paragraph 16.1 extends the right of approval to the holders of majority control of the franchisee and any corporation which has an interest in the shares of the franchisee. If this language is read to give KFC a right to approve any subsequent change in the majority shareholder of the franchisee, it must also give KFC the right to approve a subsequent change in shareholder control of any corporation which owns any interest in the franchisee, even if it is only a single share. In argument, the respondent conceded that this would be a commercial absurdity. To find, as the trial judge did, that the franchisor's right of approval is limited to a change of control in the franchisee is, in my opinion, to read out of paragraph 16.1 the phrase "have an interest in". By contrast, to extend this right of approval to the majority shareholder and also to shareholders who have an interest in the shares of the franchisee does not create a commercial absurdity if that right applies simply at the point of entering the license agreement.

35    Fifth, paragraph 16.4 provides support for this interpretation. It requires the franchisee to seek KFC's consent to a transfer to a third party of the franchisee's interest under the license agreement. To allow an informed consent, this paragraph expressly obliges the franchisee to give KFC the same information about the shareholders of the third party that paragraph 16.1 provided concerning the franchisee. However, if paragraph 16.1 contained an ongoing right of KFC to be informed of and approve the shareholders of the party holding the franchise, paragraph 16.4 would be superfluous.

36    Finally, and with respect, it is my view that the three reasons offered by the trial judge for the opposite interpretation of paragraph 16.1 do not withstand scrutiny.

37    The first reason given by the trial judge was that the meaning I would accord to paragraph 16.1 would defeat the personal aspect of the license agreement. That paragraph certainly makes clear that the grant of the license is personal to the licensee.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

However, that licensee is clearly and expressly Scott's Food, not its controlling shareholder. A change in the latter leaves the licensee unchanged. Following the second Laidlaw transaction, the license is still granted personally to Scott's Food.

38      The second reason was that it would not make good business sense to read paragraph 16.1 so that it did not extend to a change in the shareholders of the franchisee. While this might not make good business sense from the perspective of the franchisor, it might well make good business sense for the franchisee. In my view, neither of these is helpful in the required task of contractual interpretation. Rather, in applying objectively the interpretive principle of what accords with sound commercial principles and good business sense, the key fact is that for twenty years, from 1969 to 1989, this franchise relationship operated with apparent viability without the right of approval contended for by the respondent. In light of this history, it cannot be concluded that the meaning I give to paragraph 16.1 would not make good business sense.

39      Finally, it was said that reading paragraph 16.1 as I do would be contrary to the generally accepted practice in the franchise industry. The fallacy in this reasoning is that, as the trial judge recognized, this was a very unusual franchising relationship. This franchisee appeared to have bargaining power at least equal to that of KFC and certainly sufficient power to achieve a contract with no restriction on the transferability of shares. By contrast, the trial judge found the industry standard to be that the franchisor has control over the franchisee. In these circumstances, the generally accepted industry practice is of little use in interpreting this particular license agreement.

40      Hence, I conclude that paragraph 16.1 of the license agreement cannot be construed to give KFC the right to approve a change in the shareholders of Scott's Food. This paragraph, therefore, was not breached when Scott's did not obtain KFC's approval of the second Laidlaw transaction.

41      It is next necessary to consider the proper interpretation to be given to paragraph 16.2 of the license agreement. It is helpful to reproduce this provision a second time:

> 16.2 Licensee agrees that it shall not sell, transfer, assign, encumber, sub-license or otherwise deal with this Agreement or its rights or interest hereunder (hereinafter referred to as "transfer"), without KFC's prior written consent and Licensee's compliance in all respects with the terms and conditions of this Paragraph 16. Any transfer or any attempt to do so, contrary to Paragraph 16 shall be a breach of this Agreement and shall be void but shall give KFC the right of termination as provided in Paragraph 17.2(d).

42      The respondent's primary argument was that the second Laidlaw transaction engaged the last sentence of this paragraph. It was said to be a transfer contrary to paragraph 16.1 which, because of paragraph 16.2, triggered the right of termination in paragraph 17.2(d). Given the conclusion I have reached concerning paragraph 16.1, this argument must fail.

43      Apart altogether from paragraph 16.1, however, the respondent also argues that for the purposes of paragraph 16.2, the first Laidlaw transaction was an attempted transfer and the second was an actual transfer and that KFC's prior written consent was therefore required.

44      In my view, this argument also must fail. On the ordinary meaning of the words used in paragraph 16.2, it is the licensee Scott's Food that is constrained from dealing with its interest under the license agreement. Once the alter ego argument is dismissed, this paragraph simply cannot reach Scott's Hospitality, the shareholder of the franchisee. Nor does it reach the shareholders of Scott's Hospitality. Neither an attempted change nor an actual change in the shareholders of the franchisee constitutes the franchisee dealing with its interest under the license agreement.

45      This conclusion is assisted by examining the language of the counterpart paragraph 16.2 in the 1985 standard franchise agreement. The two Laidlaw transactions would be encompassed by that provision only because of the inclusion of the "deemed transfer" concept. As I have said, this concept is conspicuously absent from paragraph 16.2 of this license agreement.

46      The respondent argues that its proposed reading of paragraph 16.2 is consistent with good business sense and industry practice. However, as I have indicated in connection with the argument on paragraph 16.1, in the circumstances of this case,

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

neither of these aids to interpretation requires that paragraph 16.2 be read to give KFC the right to consent to a change in the shareholders of its franchisee.

47    Finally, the respondent relies on *GATX Corp. v. Hawker Siddeley Canada Inc.* (1996), 27 B.L.R. (2d) 251 (Ont. Gen. Div. [Commercial List]) to assert a broad meaning for the phrase "or otherwise deal with" as found in paragraph 16.2. That case is different from this one in that, there, the contracting party was clearly dealing indirectly with its interest under the agreement. Here, neither Laidlaw transaction involved the franchisee dealing in any way with its interest under the license agreement.

48    I therefore find that, properly construed, paragraph 16.2 does not give KFC the right to prior written consent to either Laidlaw transaction.

49    Given my conclusions about paragraphs 16.1 and 16.2 of the license agreement, it is unnecessary to deal with the appellant's alternative arguments: that paragraph 16.1 is limited to a change in ultimate control of the franchisee; that KFC could not have reasonably refused its approval of the second Laidlaw transaction; that a breach of paragraph 16.1 entitles KFC to terminate only if it was a fundamental breach of the license agreement; but in any event, for KFC to terminate would be a breach of its good faith duty under the license agreement; and finally, that the appellants are entitled to relief from forfeiture. Nor is it necessary to deal with the respondent's alternative argument that a breach of paragraph 16.1 allows it to terminate through direct resort to paragraph 17.3 of the license agreement.

50    Before leaving the transfer issue, the remaining matter required to be dealt with arises from the finding below that pursuant to paragraph 16.3 of the license agreement, KFC had a right of first refusal in the circumstances of both Laidlaw transactions. That paragraph reads in part as follows:

> 16 3 In the event that **Licensee receives** a bona fide offer, which **licensee is willing to accept**, from a third party to purchase or otherwise acquire any of the Licensee's rights and interest in this Agreement, ..., Licensee shall first offer to sell the same to KFC at the same price and on the same terms and conditions as in the third party's offer... In the event that KFC so accepts such offer to sell, a binding agreement of purchase and sale shall thereby be constituted between Licensee and KFC at the said price and upon the said terms and conditions....

> [Emphasis added.]

51    The reasons below reveal no analysis of the language in this paragraph by the trial judge in reaching his conclusion.

52    In my opinion, the ordinary meaning of the words used in the paragraph dictates the opposite conclusion -- that neither Laidlaw transaction triggered a right of first refusal. Neither an offer to purchase the shares of Scott's Hospitality nor an offer to change the controlling shareholder of Scott's Food is an offer which the franchisee receives or one which the franchisee can accept. The licensee cannot receive a takeover bid for the licensee's parent or for the licensee itself.

53    In summary, therefore, the appellant did not breach either paragraph 16.1 or paragraph 16.2 of the license agreement because of the Laidlaw transactions and KFC does not have the right to terminate the license agreement as a result. Nor did either Laidlaw transaction give KFC a right of first refusal.

54    I would accordingly allow the appeal on the transfer issue and set aside the declarations in paras. 1, 2, 3 and 4 of the judgment below. Instead, an order will go dismissing the claims for these declarations. Finally, I would set aside para. 13 of the judgment below and would grant the declaration sought therein.

## The Enhancement Issue

55    The other major issue at trial was whether Scott's Food had failed to meet its obligations to enhance its KFC outlets. These obligations are contained in the license agreement and the addendum to it, the Master Development Agreement, signed at the same time. The trial judge's two principal findings on this issue were that Scott's Food had failed to enhance its outlets as required by paragraph 7.2 of the Master Development Agreement and, secondly, because more than five to ten per cent of the outlets had not been enhanced as required, the failure was material and substantive, thereby entitling KFC to terminate the

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

license agreement pursuant to paragraph 17.2(e) unless Scott's Food corrects the failure within three months. The appellants appeal neither of these findings. Indeed, they raise only two grounds of appeal in connection with the enhancement issue.

56    Firstly, they appeal the declaration that KFC is also entitled to terminate the license agreement pursuant to paragraphs 17.2(e) and 17.3 because Scott's Food's enhancement failures were breaches of paragraphs 3.2, 5 and 6 of the license agreement. While the judgment contains this declaration, the reasons for judgment do not reveal the basis upon which the declaration was made.

57    Second, they appeal the finding that to avoid KFC's right to terminate under paragraph 17.2(e), Scott's Food must, within three months, enhance all of its outlets, not just a sufficient number that the failure becomes less than material and substantive.

58    Turning to the first of these two grounds of appeal, it is helpful to set out paragraphs 17.2(e) and 17.3 of the license agreement:

17.2 KFC may, without prejudice to any other rights or remedies contained in this Agreement or at law or in equity, terminate the License upon immediate notice (or in the event advance notice is required by law, upon the giving of such notice) in the event that:

. . . . .

(e) Licensee fails to satisfy, in a material and substantive manner, the requirements for enhancement and development contained in Articles 3.3, 3.4, 7.2 and 7.3 of the Addendum, provided that notice of any such failure is delivered to Licensee and Licensee shall not have corrected such failure within (3) months from the delivery of such notice.

17.3 The License will terminate on the termination date specified in any notice by KFC to Licensee (without any further notice of termination unless required by law), provided that (a) the notice is hand delivered or mailed at least thirty (30) days (or such longer period as may be required by law) in advance of the termination date, (b) the notice reasonably identifies one or more breaches or defaults in Licensee's obligations or performance hereunder, (c) the notice specifies the manner in which the breach(es) or default(s) are not fully remedied before, and as of, the termination date.

59    In my view, paragraph 17.2(e) deals explicitly and exhaustively with the enhancement obligations on the franchisee that, if not met, give KFC the right to terminate the license agreement. None of paragraphs 3.2, 5 or 6 of the license agreement is included in that list.

60    Moreover, as indicated by the trial judge, paragraph 17.3 merely sets out the procedure of formal notice. It does not accord to KFC a substantive right to terminate for any failure by Scott's Food to discharge its enhancement obligations. To so interpret paragraph 17.3 would fly in the face of paragraph 17.2 where the parties have carefully selected the enhancement obligations that, if breached, justify termination. Hence I would reverse the declaration that because the franchisee's enhancement failures breached paragraphs 3.2, 5 and 6 of the license agreement, KFC is entitled to terminate pursuant to paragraphs 17.2(e) and 17.3.

61    As to the second ground of appeal on the enhancement issue, paragraph 17.2(e) of the license agreement provides that failure *in a material and substantive manner* (my emphasis) to meet the franchisee's enhancement obligations as specified therein gives KFC the right to terminate if the failure is not corrected within three months. As I have said, the trial judge found that where more than five to ten per cent of the outlets fall below this required standard, Scott's Food was in substantial breach for the purposes of this paragraph. He went on to say this:

...KFC must give three months' notice from the date of this judgment to Scott's to allow it to remedy the default found in this decision on the enhancement issue. In other words, Scott's must be given three months in which to upgrade all of its remaining outlets to certification standards. If it chooses not to do so, it may close those stores under other termination procedures.

62    There is nothing in the actual judgment appealed from that requires the franchisee to enhance or close all of its remaining outlets to avoid termination. Hence, I propose to make no order on this ground of appeal.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

63      However, in my opinion, if failure in a material and substantive manner to meet the enhancement requirements occurs when five to ten per cent of the outlets are below standard, correcting that failure means enhancing at least enough outlets so that there is no possibility of this line being crossed. This means that to correct that failure within three months, Scott's Food must ensure that no more than five per cent of its outlets are substandard. I would therefore not think it necessary that to correct the failure, the franchisee must sufficiently upgrade all its remaining outlets. To do so would make the correction incongruent with the failure contrary to what I think is meant by the final phrase of paragraph 17.2(e).

64      The view I have expressed is also consistent with paragraph 6.3 of the Master Development Agreement. It contemplates that the franchisee could operate outlets for a limited period of time even if they had not been enhanced to the required standard. This paragraph is inconsistent with a correction requirement that would compel the franchisee to properly enhance all of its remaining outlets.

65       In summary, I would allow the appeal on the enhancement issue. I would set aside the declaration in para. 9 of the judgment below and order that the claim for this declaration be dismissed.

**Costs**

66      The trial judge ordered that there be no costs of the trial on the basis of paragraph 18.3 of the license agreement which required this result unless one party prevailed entirely, something that did not occur at this trial.

67      Before us, neither party sought to disturb this order and I do not do so. Both parties submitted that costs of the appeal should follow the result. I can see no reason why this should not happen.

68      In conclusion, I would allow the appeals with costs on the transfer issue and the enhancement issue in accordance with these reasons. The trial judgment is otherwise undisturbed.

*Appeal allowed.*

Footnotes

1       *Toronto (City) v. W.H. Hotel Ltd.* (1966), 56 D.L.R. (2d) 539 (S.C.C.) at 548.

2       *Scanlon v. Castlepoint Development Corp.* (1992), 11 O.R. (3d) 744 (Ont. C.A.) at 770.

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 59

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1700, [2011] W.D.F.L. 1657, [2011] W.D.F.L. 1651, [2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 411 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399,

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1700, [2011] W.D.F.L. 1657, [2011] W.D.F.L. 1651, [2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 411 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

Kerr v. Baranow

Margaret Patricia Kerr (Appellant) and Nelson Dennis Baranow (Respondent)

Michele Vanasse (Appellant) and David Seguin (Respondent)

Supreme Court of Canada

McLachlin C.J.C., Binnie, LeBel, Abella, Charron, Rothstein, Cromwell JJ.

Heard: April 21, 2010
Judgment: February 18, 2011
Docket: 33157, 33358

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: reversing in part *Kerr v. Baranow* (2009), 2009 CarswellBC 642, 2009 BCCA 111, 266 B.C.A.C. 298, 449 W.A.C. 298, [2009] 9 W.W.R. 285, 93 B.C.L.R. (4th) 201, 66 R.F.L. (6th) 1 (B.C. C.A.); additional reasons at *Kerr v. Baranow* (2010), [2010] 4 W.W.R. 465, 2 B.C.L.R. (5th) 197, 2010 CarswellBC 108, 2010 BCCA 32, 78 R.F.L. (6th) 305 (B.C. C.A.); reversing in part *Kerr v. Baranow* (2007), 2007 CarswellBC 3047, 2007 BCSC 1863, 47 R.F.L. (6th) 103 (B.C. S.C.); and reversing *Vanasse v. Seguin* (2009), 2009 ONCA 595, 2009 CarswellOnt 4407, 77 R.F.L. (6th) 118, 96 O.R. (3d) 321, 252 O.A.C. 218 (Ont. C.A.); reversing *Vanasse v. Seguin* (2008), 2008 CarswellOnt 4265 (Ont. S.C.J.); additional reasons at *Vanasse v. Seguin* (2009), 2009 CarswellOnt 606, 77 R.F.L. (6th) 109 (Ont. S.C.J.)

Counsel: Armand A. Petronio, Geoffrey B. Gomery for Appellant, Margaret Kerr

Susan G. Label, Marie-France Major for Respondent, Nelson Baranow

John E. Johnson for Appellant, Michele Vanasse

H. Hunter Phillips for Respondent, David Seguin

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1700, [2011] W.D.F.L. 1657, [2011] W.D.F.L. 1651,

Subject: Restitution; Family; Property; Estates and Trusts

Restitution and unjust enrichment --- Benefits conferred in anticipation of reward — Family — Common law spouses

V and S lived together in common law relationship from 1993 until March 2005 — In 2000, S sold company for approximately $11 million — Parties separated almost 5 years later — V brought proceedings claiming unjust enrichment — Trial judge concluded that relationship of parties could be divided into three distinct periods and that S had been unjustly enriched by V in second period — Trial judge determined that V was entitled to one-half interest in prorated increase of S's net worth during period of unjust enrichment — S appealed, conceding unjust enrichment during period — Court of Appeal directed that proper approach to valuation was to place monetary value on services provided by V to family taking due account of S's own contributions — V appealed — Appeal allowed — Monetary award for unjust enrichment need not, as matter of principle, always be calculated on fee-for-service basis — Trial judge had concluded that V was at least equal contributor to family enterprise throughout relationship and that during period of unjust enrichment her contributions had significantly benefitted S — There were several factors which suggested that throughout relationship S and V were working collaboratively toward common goals — There were number of findings of fact that indicated that V and S considered their relationship to be joint family venture — There was strong inference from factual findings that, to S's knowledge, V relied on relationship to her detriment — Not only were S and V engaged in joint family venture but there was clear link between V's contribution to it and accumulation of wealth — Trial judge's approach to calculation was reasonable in circumstances.

Family law --- Division of family property — Determination of ownership of property — Application of trust principles — Resulting and constructive trusts — Resulting trusts generally

K and B began living together in common law relationship in 1981 — In 1991, K suffered massive stroke and cardiac arrest, leaving her paralyzed on her left side and unable to return to work — In 2002, B took early retirement — In 2006, K was transferred to extended care facility — K brought claim for unjust enrichment, resulting trust and spousal support — B brought counterclaim for unjust enrichment — Trial judge allowed K's claim both by way of resulting trust and by way of remedial constructive trust as remedy for her successful claim in unjust enrichment and rejected B's counterclaim — B successfully appealed — Court of Appeal concluded that K's claims for resulting trust and in unjust enrichment should be dismissed and that B's claim for unjust enrichment should be remitted to trial court for determination — K appealed — Appeal allowed in part — Court of Appeal was right to set aside trial judge's findings of resulting trust and unjust enrichment and did not err in directing that B's counterclaim be returned to court for hearing — Court of Appeal was correct to intervene and conclude that transfer was not gratuitous — Common intention resulting trust has no further role to play in resolution of disputes such as this one — Resulting trust should not have been imposed on property on basis of finding of common intention between parties.

Restitution and unjust enrichment --- Benefits conferred in anticipation of reward — Family — Miscellaneous

K and B began living together in common law relationship in 1981 — In 1991, K suffered massive stroke and cardiac arrest, leaving her paralyzed on her left side and unable to return to work — In 2002, B took early retirement — In 2006, K was transferred to extended care facility — K brought claim for unjust enrichment, resulting trust and spousal support — B brought counterclaim for unjust enrichment — Trial judge allowed K's claim both by way of resulting trust and by way of remedial constructive trust as remedy for her successful claim in unjust

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 49 I N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

enrichment and rejected B's counterclaim — B successfully appealed — Court of Appeal concluded that K's claims for resulting trust and in unjust enrichment should be dismissed and that B's claim for unjust enrichment should be remitted to trial court for determination — K appealed — Appeal allowed in part — Court of Appeal was right to set aside trial judge's findings of resulting trust and unjust enrichment and did not err in directing that B's counterclaim be returned to court for hearing — K's unjust enrichment claims should not have been dismissed but rather new trial ordered — Court of Appeal erred in assessing B's contributions as part of juristic reason analysis — Trying counterclaim separated from K's claim would be artificial and potentially unfair way of proceeding — K's claim was not presented, defended or considered by courts pursuant to joint family venture analysis — Even assuming K made out her claim in unjust enrichment, it was not possible to fairly apply joint family venture approach using record available.

Family law --- Support — Spousal support under Divorce Act and provincial statutes — Retroactivity of order

K and B began living together in common law relationship in 1981 — In 1991, K suffered massive stroke and cardiac arrest — In 2002, B took early retirement — In 2006, K was transferred to extended care facility — K brought claim for unjust enrichment, resulting trust and spousal support — K was awarded $1,739 per month in spousal support effective date she commenced proceedings — B successfully appealed — Court of Appeal concluded that order for support should be effective as of first day of trial — K appealed — Appeal allowed in part — Court of Appeal's order with respect to commencement date of spousal support order was set aside and order of trial judge restored — There was little concern about certainty of B's obligations and there was little need to provide further incentives for K or others in her position to proceed with more diligence — It was unreasonable for Court of Appeal to attach such serious consequences to fact that interim application was not pursued — There was virtually no delay in applying for support nor was there any inordinate delay between date of application and date of trial — K was in need throughout relevant period, suffered from serious physical disability and her standard of living was markedly lower than it was while she lived with B — B had means to provide her support, had prompt notice of her claim and there was no indication in Court of Appeal's reasons that it considered judge's award imposed on him hardship so as to make award inappropriate.

Family law --- Support — Spousal support under Divorce Act and provincial statutes — Miscellaneous

K and B began living together in common law relationship in 1981 — In 1991, K suffered massive stroke and cardiac arrest — In 2002, B took early retirement — In 2006, K was transferred to extended care facility — K brought claim for unjust enrichment, resulting trust and spousal support — K was awarded $1,739 per month in spousal support effective date she commenced proceedings — B successfully appealed — Court of Appeal concluded that order for support should be effective as of first day of trial — K appealed — Appeal allowed in part — Court of Appeal's order with respect to commencement date of spousal support order was set aside and order of trial judge restored — There was little concern about certainty of B's obligations and there was little need to provide further incentives for K or others in her position to proceed with more diligence — It was unreasonable for Court of Appeal to attach such serious consequences to fact that interim application was not pursued — There was virtually no delay in applying for support nor was there any inordinate delay between date of application and date of trial — K was in need throughout relevant period, suffered from serious physical disability and her standard of living was markedly lower than it was while she lived with B — B had means to provide her support, had prompt notice of her claim and there was no indication in Court of Appeal's reasons that it considered judge's award imposed on him hardship so as to make award inappropriate.

Restitution et enrichissement injustifié --- Avantages conférés dans l'attente d'un retour — Famille — Conjoints

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1700, [2011] W.D.F.L. 1657, [2011] W.D.F.L. 1651,

V et S ont fait vie commune entre 1993 et mars 2005 — En 2000, S a vendu son entreprise pour la somme d'environ 11 millions $ — Parties se sont séparées pratiquement 5 années plus tard — V a entamé des procédures, invoquant l'enrichissement injustifié — Juge de première instance a conclu que la relation des parties pouvait se diviser en trois périodes distinctes et que S s'était injustement enrichi grâce à V au cours de la deuxième période — Juge de première instance a déterminé que V avait droit à la moitié de l'augmentation proportionnelle de l'avoir net de S pendant la période de l'enrichissement injustifié — S a interjeté appel, admettant l'enrichissement injustifié au cours de la deuxième période — Cour d'appel a statué que la meilleure façon de procéder à l'évaluation était de calculer la valeur monétaire des services fournis par V à la famille en considérant de façon adéquate la contribution de S — V a formé un pourvoi — Pourvoi accueilli — Il n'est pas toujours nécessaire, en principe, de calculer une indemnité pécuniaire pour enrichissement injustifié en fonction de la rémunération des services rendus — Juge de première instance a conclu que V avait contribué au moins autant pendant la relation à la coentreprise familiale et que, pendant la période de l'enrichissement injustifié, ses contributions avaient grandement avantagé S — Plusieurs facteurs donnaient à penser que, pendant toute la durée de leur relation, V et S collaboraient en vue d'atteindre des buts communs — Certain nombre de conclusions de fait indiquaient que V et S considéraient leur relation comme une coentreprise familiale — Il y avait de fortes raisons d'inférer des conclusions de fait que, à la connaissance de S, V se fiait sur la relation à son détriment — Non seulement V et S étaient engagés dans une coentreprise familiale, mais il y avait aussi un lien clair entre la contribution de V à celle-ci et l'accumulation de la richesse — Approche adoptée par la juge de première instance au sujet du calcul était raisonnable dans les circonstances.

Droit de la famille --- Partage du patrimoine familial — Détermination de la propriété des biens — Application des principes de fiducie — Fiducie résultoire et fiducie constructoire — Fiducies résultoires en général

K et B ont commencé à faire vie commune en 1981 — En 1991, K a été victime d'un grave accident vasculaire cérébral et d'un arrêt cardiaque qui l'ont laissée paralysée du côté gauche et qui l'ont rendue inapte au travail — B a pris une retraite anticipée en 2002 — En 2006, K a été transférée dans un établissement de soins prolongés — K a présenté une réclamation fondée sur la fiducie résultoire, l'enrichissement injustifié et le droit à une pension alimentaire — B a présenté une demande reconventionnelle fondée sur l'enrichissement injustifié — Juge de première instance a accueilli la réclamation de K sur le fondement de la fiducie résultoire et de la fiducie constructoire de nature réparatoire comme réparation pour enrichissement injustifié et a rejeté la demande reconventionnelle de B — B a interjeté appel avec succès — Cour d'appel a conclu que la réclamation de K, fondée sur la fiducie résultoire et l'enrichissement injustifié, devrait être rejetée et que la réclamation de B, fondée sur l'enrichissement injustifié, devrait être renvoyée au tribunal de première instance pour réexamen — K a formé un pourvoi — Pourvoi accueilli en partie — Cour d'appel a eu raison d'écarter les conclusions du juge de première instance en ce qui concernait la fiducie résultoire et l'enrichissement injustifié et n'a pas commis d'erreur en ordonnant le renvoi de la demande reconventionnelle de B au tribunal — Cour d'appel a eu raison d'intervenir et de conclure que le transfert n'a pas été fait à titre gratuit — Fiducie résultoire fondée sur l'intention commune n'avait plus aucun rôle à jouer dans le règlement d'un litige tel que celui-ci — Fiducie résultoire n'aurait pas dû être imposée à l'égard de la propriété sur la base de l'intention commune des parties.

Restitution et enrichissement injustifié --- Avantages conférés dans l'attente d'un retour — Famille — Divers

K et B ont commencé à faire vie commune en 1981 — En 1991, K a été victime d'un grave accident vasculaire cérébral et d'un arrêt cardiaque qui l'ont laissée paralysée du côté gauche et qui l'ont rendue inapte au travail —

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 419 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

B a pris une retraite anticipée en 2002 — En 2006, K a été transférée dans un établissement de soins prolongés — K a présenté une réclamation fondée sur la fiducie résultoire, l'enrichissement injustifié et le droit à une pension alimentaire — B a présenté une demande reconventionnelle fondée sur l'enrichissement injustifié — Juge de première instance a accueilli la réclamation de K sur le fondement de la fiducie résultoire et de la fiducie constructoire de nature réparatoire comme réparation pour enrichissement injustifié et a rejeté la demande reconventionnelle de B — B a interjeté appel avec succès — Cour d'appel a conclu que la réclamation de K, fondée sur la fiducie résultoire et l'enrichissement injustifié, devrait être rejetée et que la réclamation de B, fondée sur l'enrichissement injustifié, devrait être renvoyée au tribunal de première instance pour réexamen — K a formé un pourvoi — Pourvoi accueilli en partie — Cour d'appel a eu raison d'écarter les conclusions du juge de première instance en ce qui concernait la fiducie résultoire et l'enrichissement injustifié et n'a pas commis d'erreur en ordonnant le renvoi de la demande reconventionnelle de B au tribunal — Réclamations de K fondées sur l'enrichissement injustifié n'auraient pas dû être rejetées mais une nouvelle audition de ces demandes aurait dû être ordonnée — Cour d'appel a commis une erreur en évaluant les contributions de B dans le cadre de l'analyse du motif juridique — Il serait artificiel et potentiellement injuste d'entendre la demande reconventionnelle séparément de celle de K — Demande de K n'a pas été présentée, défendue ni examinée par les tribunaux suivant la méthode d'analyse de la coentreprise familiale — Même à supposer que K avait réussi à établir ses prétentions au sujet de l'enrichissement injustifié, il n'était pas possible d'appliquer équitablement la méthode d'analyse de la coentreprise familiale sur la base du dossier.

Droit de la famille --- Aliments — Pensions alimentaires pour époux en vertu de la Loi sur le divorce ou des lois provinciales — Application rétroactive de l'ordonnance

K et B ont commencé à faire vie commune en 1981 — En 1991, K a été victime d'un grave accident vasculaire cérébral et d'un arrêt cardiaque — B a pris une retraite anticipée en 2002 — En 2006, K a été transférée dans un établissement de soins prolongés — K a présenté une réclamation fondée sur la fiducie résultoire, l'enrichissement injustifié et le droit à une pension alimentaire — K a obtenu une pension alimentaire mensuelle de 1 739 $ payable à la date où elle a entamé les procédures — B a interjeté appel avec succès — Cour d'appel a conclu que l'ordonnance de pension alimentaire devrait être applicable à compter du premier jour de l'audition — K a formé un pourvoi — Pourvoi accueilli en partie — Conclusion de la Cour d'appel au sujet de la date d'exécution de l'ordonnance alimentaire devrait être annulée et l'ordonnance de première instance rétablie — Il n'y avait pas vraiment lieu de s'interroger sur la certitude des obligations de B et il n'était pas vraiment nécessaire de mettre en place d'autres mesures propres à inciter K, ou d'autres personnes dans sa situation, à procéder de façon plus diligente — Il était déraisonnable pour la Cour d'appel d'attribuer des conséquences aussi graves au fait qu'une demande provisoire n'avait pas été présentée — K n'a pas tardé à déposer sa demande de pension alimentaire et il n'y a pas eu de retard excessif entre la date de la demande et le début de l'audition — K avait besoin de soutien pendant toute la période pertinente; elle souffrait d'une grave invalidité physique et son niveau de vie était nettement inférieur à celui qu'elle avait lorsqu'elle habitait avec B — B avait les moyens de lui verser une pension, il avait reçu sans délai un avis de sa réclamation, et rien dans les motifs de la Cour d'appel n'indiquait qu'elle considérait que la pension alimentaire imposée par le juge lui créait une situation financière difficile, au point de rendre l'ordonnance inappropriée.

Droit de la famille --- Aliments — Pensions alimentaires pour époux en vertu de la Loi sur le divorce ou des lois provinciales — Divers

K et B ont commencé à faire vie commune en 1981 — En 1991, K a été victime d'un grave accident vasculaire cérébral et d'un arrêt cardiaque — B a pris une retraite anticipée en 2002 — En 2006, K a été transférée dans un

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011]

W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1670, 14 Adm. L.R. (5th) 201, 11 R.F.L. (7th) 1, J.E. 2011-333, 93 C.C.P.B. 201 (headnote only), 329 D.L.R. (4th) 257, 412 N.R. 1, 14 B.C.L.R. (5th) 203, 301 B.C.A.C. 39, 511 W.A.C. 39

l'enrichissement injustifié et le droit à une pension alimentaire — K a obtenu une pension alimentaire mensuelle de 1 739 $ payable à la date où elle a entamé les procédures — B a interjeté appel avec succès — Cour d'appel a conclu que l'ordonnance de pension alimentaire devrait être applicable à compter du premier jour de l'audition — K a formé un pourvoi — Pourvoi accueilli en partie — Conclusion de la Cour d'appel au sujet de la date d'exécution de l'ordonnance alimentaire devrait être annulée et l'ordonnance de première instance rétablie — Il n'y avait pas vraiment lieu de s'interroger sur la certitude des obligations de B et il n'était pas vraiment nécessaire de mettre en place d'autres mesures propres à inciter K, ou d'autres personnes dans sa situation, à procéder de façon plus diligente — Il était déraisonnable pour la Cour d'appel d'attribuer des conséquences aussi graves au fait qu'une demande provisoire n'avait pas été présentée — K n'a pas tardé à déposer sa demande de pension alimentaire et il n'y a pas eu de retard excessif entre la date de la demande et le début de l'audition — K avait besoin de soutien pendant toute la période pertinente; elle souffrait d'une grave invalidité physique et son niveau de vie était nettement inférieur à celui qu'elle avait lorsqu'elle habitait avec B — B avait les moyens de lui verser une pension, il avait reçu sans délai un avis de sa réclamation, et rien dans les motifs de la Cour d'appel n'indiquait qu'elle considérait que la pension alimentaire imposée par le juge lui créait une situation financière difficile, au point de rendre l'ordonnance inappropriée.

B and K separated after a common law relationship of more than 25 years. In 1991, K suffered a massive stroke and cardiac arrest leaving her unable to return to work. B took early retirement in 2002. After surgery in 2005, K was transferred to an extended care facility. K claimed support and a one-third share of the property held in her partner's name based on resulting trust and unjust enrichment principles. B brought a counterclaim that K had been unjustly enriched at his expense. The trial judge awarded K one-third of the value of the couple's residence, grounded in both resulting trust and unjust enrichment claims. The trial judge did not address B's counterclaim. The trial judge also awarded substantial monthly support for K effective as of the date she applied to the court for relief. B appealed. The Court of Appeal allowed the appeal, concluding that K's claim for resulting trust and in unjust enrichment should be dismissed, that B's claim for unjust enrichment should be remitted to the trial court for determination and that the order for spousal support should be effective as of the first day of trial, not as of the date proceedings were commenced.

V and S lived together in a common law relationship for approximately 12 years. During the first four years the couple diligently pursued their respective careers. In 1997, V took a leave of absence. During the next three and one-half years, the couple had two children and V took care of the domestic labour while S devoted himself to developing his business. In 2000, S's business was sold after which V continued to assume most of the domestic responsibilities. V and S separated in 2005. At the time of separation, V's net worth was about $332,000 and S's net worth was about $8,450,000. V brought an action for spousal support and child custody, and claimed unjust enrichment. The trial judge concluded that the relationship could be divided into three distinct periods and that S had been unjustly enriched by V during the second period. The trial judge concluded that throughout the relationship V had been at least an equal contributor to the family enterprise and that V's efforts during this second period were directly linked to S's business success. The trial judge concluded that a monetary award was appropriate and determined that V was entitled to a one-half interest in the prorated increase in S's net worth during the period of unjust enrichment. The trial judge awarded just under $1 million. S appealed, conceding unjust enrichment during the second period. The Court of Appeal set aside the trial judge's finding and held that V should be treated as an unpaid employee, not a co-venturer. Both K and V appealed.

**Held:** The appeal by V was allowed and the appeal by K was allowed in part.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 49 T.N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

Per Cromwell J. (McLachlin C.J.C., Binnie, LeBel, Abella, Charron, Rothstein JJ. concurring): The time had come to acknowledge that there was no continuing role for the "common intention" resulting trust. First, the "common intention" resulting trust was doctrinally unsound. It was inconsistent with the underlying principles of resulting trust law. Second, the notion of common intention may be highly artificial, particularly in domestic cases. Third, the "common intention" resulting trust in Canada evolved from a misreading of some imprecise language in early authorities from the House of Lords. Finally, the principles of unjust enrichment, coupled with the possible remedy of a constructive trust, provided a much less artificial, more comprehensive and more principled basis to address the wide variety of circumstances that lead to claims arising out of domestic partnerships.

The law of unjust enrichment had been the primary vehicle to address claims of inequitable distribution of assets on the breakdown of a domestic relationship. A critical early question — whether the provision of domestic services could support a claim for unjust enrichment — was conclusively resolved in a 1993 decision. Remedies for unjust enrichment were restitutionary in nature. The first remedy was always a monetary award. Restricting the money remedy to a fee-for-services calculation was inappropriate for four reasons. First, it failed to reflect the reality of the lives of many domestic partners. Second, it was inconsistent with the inherent flexibility of unjust enrichment. Third, it ignored the historical basis of quantum meruit claims. Finally, it was not mandated by the Court's judgment in the 1993 case. Where the unjust enrichment was best characterized as an unjust retention of a disproportionate share of assets accumulated during the course of a "joint family venture" to which both partners had contributed, the monetary remedy should reflect that fact. When the parties had been engaged in a joint family venture, and the claimant's contributions to it were linked to the generation of wealth, a monetary award for unjust enrichment should be calculated according to the share of the accumulated wealth proportionate to the claimant's contributions. To be entitled to a monetary remedy of that nature, the claimant must show both that there was in fact a joint family venture and that there was a link between his or her contributions to it and the accumulation of assets and/or wealth. Whether there was a joint family venture was a question of fact and may be assessed by having regard to all the relevant circumstances, including factors relating to mutual effort, economic integration, actual intent and priority of the family.

Unjust enrichment analysis in domestic situations was often complicated by the fact that there had been a mutual conferral of benefits. Mutual enrichments should mainly be considered at the defence and remedy stages but they may be considered at the juristic reason stage to the extent that the provision of reciprocal benefits constituted relevant evidence of the existence of juristic reason for the enrichment. The parties' reasonable or legitimate expectations had little role to play in deciding whether the services were provided for a juristic reason within the existing categories. In some cases, the facts that mutual benefits were conferred or that the benefits were provided pursuant to the parties' reasonable expectations may be relevant evidence of whether one of the existing categories of juristic reasons was present. The parties' reasonable or legitimate expectations had a role to play at the second step of the juristic reason analysis.

In the V appeal, the trial judge's order should be restored. The money compensation for unjust enrichment need not always be calculated on a quantum meruit basis. The trial judge's findings of fact and analysis indicated that the unjust enrichment of S at the expense of V ought to be characterized as retention by S of a disproportionate share of the wealth generated from a joint family venture. There were several factors which suggested that throughout their relationship the parties were working collaboratively towards common goals. There was a pooling of resources. There were a number of findings of fact that indicated that the parties considered their relationship to be joint family venture. Not only were the parties engaged in a joint family venture but that there was a clear link between V's contribution to it and the accumulation of wealth. The trial judge's approach was reasonable in the circumstances. The trial judge took a realistic and practical view of the evidence before her and gave

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011]
B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011]
B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647,
[2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L.
1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011]
W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1700, [2011] W.D.F.L. 1657, [2011] W.D.F.L. 1651,
330 D.L.R. (4th) 76, 14 B.C.L.R. (5th) 203

In the K appeal, the Court of Appeal was right to set aside the trial judge's findings of resulting trust and unjust
enrichment. It also did not err in directing that B's counterclaim be returned to the Supreme Court of British
Columbia for hearing. The Court of Appeal was correct to conclude that the transfer was not gratuitous. The trial
judge apparently based his conclusions about the resulting trust on his finding of a common intention on the part
of K and B to share in the property. The common intention resulting trust had no further role to play in the resol-
ution of such disputes. K's claim for unjust enrichment should be returned for a new trial. The first consideration
in support of a new trial was that the Court of Appeal directed a hearing of B's counterclaim. Trying the counter-
claim separated from K's claim would be an artificial and potentially unfair way of proceeding. More funda-
mentally, K's claim was not presented, defended or considered by the courts below pursuant to the joint family
venture analysis that had been set out. Attempting to resolve K's unjust enrichment claim on its merits, using the
record before this Court, involved too much uncertainty and risked injustice. With respect to the date of the
spousal support order, the order of the trial judge should be restored. The Court of Appeal made two main er-
rors. First, it erred in finding that the circumstances of K were such that there was no need prior to the trial.
Second, the Court of Appeal was wrong to fault K for not bringing an interim application. There was virtually
no delay in applying for maintenance nor was there any inordinate delay between the date of application and the
date of trial. B had the means to provide support, had prompt notice of K's claim and there was no indication in
the Court of Appeal's reasons that indicated that it had considered the trial judge's award a hardship so as to
make that award inappropriate.

K et B se sont séparés après plus de 25 ans de vie commune. En 1991, K a été victime d'un grave accident vas-
culaire cérébral et d'un arrêt cardiaque qui l'ont rendue inapte au travail. B a pris une retraite anticipée en 2002.
À la suite d'une intervention chirurgicale, en 2005, K a été transférée dans un établissement de soins prolongés.
Sur le fondement de la fiducie résultoire et de l'enrichissement injustifié, K a réclamé une pension alimentaire et
un tiers des biens détenus au nom de son conjoint. Par demande reconventionnelle, B a cherché à faire
reconnaître que K s'était injustement enrichie à ses dépens. Le juge de première instance a accordé à K un tiers
de la valeur de la maison du couple, sur le fondement de la fiducie résultoire et de l'enrichissement injustifié. Le
juge de première instance ne s'est pas prononcé au sujet de la demande reconventionelle de B. Le juge de
première instance a également accordé à K une pension alimentaire mensuelle importante, rétroactive à la date
d'introduction de l'instance. B a interjeté appel. La Cour d'appel a accueilli l'appel, concluant que la réclamation
de K, fondée sur la fiducie résultoire et l'enrichissement injustifié, devrait être rejetée, que la réclamation de B,
fondée sur l'enrichissement injustifié, devrait être renvoyée au tribunal de première instance pour réexamen et
que l'ordonnance concernant la pension alimentaire devrait être rétroactive à la date du début de l'audition et non
à la date d'introduction de l'instance.

V et S ont fait vie commune pendant environ 12 ans. Au cours des quatre premières années, les parties ont dili-
gemment continué leur carrière respective. En 1997, V a pris un congé. Au cours des trois années et demie qui
ont suivi, les parties ont eu deux enfants et V s'est occupée des travaux domestiques pendant que S se consacrait
à la croissance de son entreprise. En 2000, l'entreprise de S a été vendue et V a continué de s'acquitter de la plu-
part des obligations familiales. V et S se sont séparés en 2005. Au moment de la séparation, l'avoir net de V était
d'environ 332 000 $ tandis que l'avoir net de S était d'environ 8 450 000 $. V a déposé une action visant à ob-
tenir une pension alimentaire et la garde des enfants ainsi a invoqué l'enrichissement injustifié. La juge de première
instance a conclu que la relation pouvait se diviser en trois périodes distinctes et que S s'était injustement enrichi
grâce à V au cours de la deuxième période. La juge de première instance a conclu que tout le long de la relation,
V avait contribué au moins autant à la coentreprise familiale et que les efforts déployés par V pendant cette

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 417 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

deuxième période étaient directement liés au succès professionnel de S. La juge de première instance a conclu qu'une indemnité pécuniaire était appropriée et a déterminé que V avait droit à la moitié de l'augmentation proportionnelle de l'avoir net de S pendant la période de l'enrichissement injustifié. La juge de première instance a accordé un montant d'un peu moins d'un million de dollars. S a interjeté appel, admettant l'enrichissement injustifié au cours de la deuxième période. La Cour d'appel a annulé la conclusion de la juge de première instance et a conclu que V devait être considérée comme une employée non rémunérée, et non comme une co-entrepreneure. K et V ont toutes les deux formé un pourvoi.

**Arrêt:** Le pourvoi formé par V a été accueilli et le pourvoi formé par K a été accueilli en partie.

Cromwell, J. (McLachlin, J.C.C., Binnie, LeBel, Abella, Charron, Rothstein, JJ., souscrivant à son opinion) : Il était temps de reconnaître que la fiducie résultoire fondée sur l'« intention commune » avait perdu sa raison d'être. Premièrement, la fiducie résultoire basée sur l'« intention commune » était mal fondée sur le plan théorique. Elle était incompatible avec les principes sous-jacents du droit des fiducies résultoires. Deuxièmement, la notion d'intention commune peut être extrêmement artificielle, surtout en matière familiale. Troisièmement, la fiducie résultoire fondée sur « l'intention commune » au Canada tirait son origine d'une interprétation erronée de quelques formulations imprécises dans l'ancienne jurisprudence de la Chambre des lords. Finalement, les principes de l'enrichissement injustifié, conjugués au recours possible à la fiducie constructoire, fournissaient un fondement beaucoup moins artificiel, plus complet et plus rationnel pour traiter de la grande variété des circonstances donnant lieu à des réclamations découlant d'unions conjugales.

Les règles relatives à l'enrichissement injustifié ont été le principal moyen utilisé pour régler les réclamations pour partage inéquitable des biens après la rupture d'une relation conjugale. Une question cruciale qui consistait au début à savoir si la prestation de services domestiques pouvait appuyer une action pour enrichissement injustifié a été définitivement réglée dans un arrêt de 1993. Les moyens utilisés pour corriger l'enrichissement injustifié étaient de nature réparatoire. La réparation pécuniaire était toujours considérée en premier. Il était inapproprié de calculer la réparation pécuniaire en fonction de la rémunération des services rendus, et ce, pour quatre raisons. Premièrement, ce type de calcul ne reflétait pas la réalité de nombreux conjoints vivant en union libre. Deuxièmement, il était incompatible avec la souplesse inhérente à l'enrichissement injustifié. Troisièmement, il ne tenait pas compte de l'historique des réclamations fondées sur le quantum meruit. Enfin, l'arrêt de la Cour de 1993 ne l'imposait pas. Dans les cas où la meilleure façon de qualifier l'enrichissement injustifié était de le considérer comme une rétention injuste d'une part disproportionnée des biens accumulés dans le cadre d'une « coentreprise familiale » à laquelle les deux conjoints avaient contribué, la réparation pécuniaire devrait refléter ce fait. Quand les parties ont été engagées dans une coentreprise familiale, et que les contributions du demandeur sont liées à l'accumulation de la richesse, il convenait de calculer une indemnité pécuniaire pour enrichissement injustifié en fonction de la part proportionnelle de la contribution du demandeur à cette accumulation de la richesse. Pour avoir droit à une réparation pécuniaire de cette nature, le demandeur doit prouver qu'une coentreprise familiale existait effectivement et qu'il existait un lien entre ses contributions à la coentreprise et l'accumulation de l'avoir ou de la richesse. La question de savoir s'il existait une coentreprise familiale était une question de fait et on pouvait l'apprécier en prenant en considération toutes les circonstances pertinentes, y compris les facteurs relatifs à l'effort commun, à l'intégration économique, à l'intention réelle et à la priorité accordée à la famille.

L'analyse de l'enrichissement injustifié en matière familiale se compliquait souvent du fait qu'il y avait eu des avantages réciproques. Les enrichissements mutuels devraient être examinés principalement au stade de la défense ou à celui de la réparation, mais il était aussi possible de le faire au stade de l'analyse du motif juridique

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011]
B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011]
B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647,
[2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L.
1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011]
W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1700, [2011] W.D.F.L. 1704, 329 D.L.R. (4th) 257

une fraude ou d'un autre acte répréhensible constituant une preuve pertinente de l'existence d'un mo-
tif juridique justifiant l'enrichissement. Les attentes raisonnables ou légitimes des parties jouaient un rôle négligeable
au moment de décider si les services ont été fournis pour un motif juridique appartenant à une catégorie établie.
Dans certains cas, le fait que des avantages réciproques aient été conférés ou le fait que les avantages aient été
fournis conformément aux attentes raisonnables des parties pouvait constituer une preuve pertinente pour
déterminer si l'une des catégories établies de motifs juridiques s'appliquait. Les attentes raisonnables ou
légitimes des parties jouaient un rôle à la deuxième étape de l'analyse du motif juridique.

Dans le pourvoi de V, l'ordonnance de la juge de première instance devrait être rétablie. Il n'est pas toujours
nécessaire de calculer une indemnité pécuniaire pour enrichissement injustifié en fonction du quantum meruit.
Selon les conclusions de fait et l'analyse de la juge de première instance, l'enrichissement injustifié de S au
détriment de V tenait à la conservation, par S, d'une part disproportionnée de la richesse générée par la coentre-
prise familiale. Plusieurs facteurs donnaient à penser que, pendant toute la durée de leur relation, les parties col-
laboraient en vue d'atteindre des buts communs. Il y avait une mise en commun des ressources. Un certain
nombre de conclusions de fait indiquaient que les parties considéraient leur relation comme une coentreprise fa-
miliale. Non seulement les parties étaient engagées dans une coentreprise familiale, mais il y avait aussi un lien
clair entre la contribution de V et l'accumulation de la richesse. L'approche adoptée par la juge de première in-
stance était raisonnable dans les circonstances. La juge de première instance s'est prononcée de manière réaliste
et pratique quant à la preuve dont elle disposait et a suffisamment tenu compte des contributions de S.

Dans le pourvoi de K, la Cour d'appel a eu raison d'écarter les conclusions de première instance en ce qui con-
cernait la fiducie résultoire et l'enrichissement injustifié. Elle n'a pas non plus commis d'erreur en ordonnant le
renvoi de la demande reconventionnelle de B à la Cour suprême de la Colombie-Britannique. La Cour d'appel a
eu raison de conclure que le transfert n'avait pas été fait à titre gratuit. Le juge de première instance semblait
avoir fondé ses conclusions relatives à la fiducie résultoire sur l'existence d'une intention commune, de la part de
K et de B, de partager la propriété. La fiducie résultoire fondée sur l'intention commune n'avait plus aucun rôle à
jouer dans le règlement d'un litige tel que celui-ci. Il convenait de renvoyer la demande de K fondée sur
l'enrichissement injustifié pour qu'elle fasse l'objet d'une nouvelle audition. La première considération à l'appui
d'une nouvelle audition était que la Cour d'appel avait ordonné l'audition de la demande reconventionnelle de B.
Il serait artificiel et potentiellement injuste d'entendre la demande reconventionnelle séparément de celle de K.
Fondamentalement, la demande de K n'a pas été présentée, défendue ni examinée par les tribunaux d'instance
inférieure suivant la méthode d'analyse de la coentreprise familiale qui a été exposée. Tenter de trancher sur le
fond la demande de K fondée sur l'enrichissement injustifié, sur la base du dossier soumis à la Cour, présentait
trop d'aléas et des risques d'injustice. En ce qui concernait la date d'exécution de l'ordonnance alimentaire,
l'ordonnance de première instance devrait être rétablie. La Cour d'appel a commis deux erreurs principales.
Premièrement, elle a commis une erreur en concluant que la situation de K était telle qu'elle n'avait pas besoin
de soutien avant l'audition. Deuxièmement, la Cour d'appel a eu tort de reprocher à K de ne pas avoir présenté
une demande provisoire. K n'a pas tardé à déposer sa demande de pension alimentaire et il n'y a pas eu de retard
excessif entre la date de la demande et le début de l'audition. B avait les moyens de lui verser une pension, il
avait reçu sans délai un avis de sa réclamation, et rien dans les motifs de la Cour d'appel n'indiquait qu'elle
considérait que la pension alimentaire imposée par le juge créait une situation financière difficile, au point de
rendre l'ordonnance inappropriée.

### Cases considered by *Cromwell J.*:

*Becker v. Pettkus* (1980), 1980 CarswellOnt 299, 1980 CarswellOnt 644, [1980] 2 S.C.R. 834, 117 D.L.R.
(3d) 257, 34 N.R. 384, 8 E.T.R. 143, 19 R.F.L. (2d) 165 (S.C.C.) — considered

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 491 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

*Bell v. Bailey* (2001), 2001 CarswellOnt 2914, 148 O.A.C. 333, 203 D.L.R. (4th) 589, 20 R.F.L. (5th) 272 (Ont. C.A.) — referred to

*Birmingham v. Ferguson* (2004), 2004 CarswellOnt 3119 (Ont. C.A.) — referred to

*Cadbury Schweppes Inc. v. FBI Foods Ltd.* (1999), 235 N.R. 30, 83 C.P.R. (3d) 289, 42 B.L.R. (2d) 159, 117 B.C.A.C. 161, 191 W.A.C. 161, 59 B.C.L.R. (3d) 1, [1999] 5 W.W.R. 751, [1999] 1 S.C.R. 142, [2000] F.S.R. 491, 167 D.L.R. (4th) 577, 1999 CarswellBC 77, 1999 CarswellBC 78 (S.C.C.) — referred to

*Clarke v. Clarke* (1990), 28 R.F.L. (3d) 113, 1990 CarswellNS 261, 1990 CarswellNS 49, 113 N.R. 321, [1990] 2 S.C.R. 795, 73 D.L.R. (4th) 1, 101 N.S.R. (2d) 1, 275 A.P.R. 1 (S.C.C.) — considered

*Dyer v. Dyer* (1788), 30 E.R. 42, 2 Cox Eq. Cas. 92 (Eng. Ch. Div.) — referred to

*Ford v. Werden* (1996), 78 B.C.A.C. 126, 128 W.A.C. 126, 27 B.C.L.R. (3d) 169, [1997] 2 W.W.R. 245, 25 R.F.L. (4th) 372, 1996 CarswellBC 1550 (B.C. C.A.) — referred to

*Garland v. Consumers' Gas Co.* (1998), 114 O.A.C. 1, 40 O.R. (3d) 479 (headnote only), 165 D.L.R. (4th) 385, 129 C.C.C. (3d) 97, [1998] 3 S.C.R. 112, 1998 CarswellOnt 4053, 1998 CarswellOnt 4054, 231 N.R. 1, 20 C.R. (5th) 44, 49 M.P.L.R. (2d) 77 (S.C.C.) — referred to

*Garland v. Consumers' Gas Co.* (2004), 2004 CarswellOnt 1558, 2004 CarswellOnt 1559, 2004 SCC 25, 72 O.R. (3d) 80 (note), 237 D.L.R. (4th) 385, 319 N.R. 38, 43 B.L.R. (3d) 163, 9 E.T.R. (3d) 163, 42 Alta. L. Rev. 399, 186 O.A.C. 128, [2004] 1 S.C.R. 629 (S.C.C.) — followed

*Giles v. McEwan* (1896), 11 Man. R. 150 (Man. C.A.) — referred to

*Gissing v. Gissing* (1970), [1970] 3 W.L.R. 255, [1970] 2 All E.R. 780, [1971] A.C. 886 (U.K. H.L.) — referred to

*Harrison v. Kalinocha* (1994), 1994 CarswellBC 177, 1 R.F.L. (4th) 313, 112 D.L.R. (4th) 43, 90 B.C.L.R. (2d) 273 (B.C. C.A.) — referred to

*Herman v. Smith* (1984), 1984 CarswellAlta 142, 18 E.T.R. 169, 56 A.R. 74, 34 Alta. L.R. (2d) 90, 42 R.F.L. (2d) 154 (Alta. Q.B.) — referred to

*International Corona Resources Ltd. v. LAC Minerals Ltd.* (1989), 44 B.L.R. 1, 35 E.T.R. 1, *(sub nom. LAC Minerals Ltd. v. International Corona Resources Ltd.)* 69 O.R. (2d) 287, *(sub nom. LAC Minerals Ltd. v. International Corona Resources Ltd.)* 61 D.L.R. (4th) 14, 101 N.R. 239, 36 O.A.C. 57, *(sub nom. LAC Minerals Ltd. v. International Corona Resources Ltd.)* [1989] 2 S.C.R. 574, 6 R.P.R. (2d) 1, *(sub nom. LAC Minerals Ltd. v. International Corona Resources Ltd.)* 26 C.P.R. (3d) 97, 1989 CarswellOnt 126, 1989 CarswellOnt 965 (S.C.C.) — referred to

*MacFarlane v. Smith* (2003), 49 E.T.R. (2d) 52, 2003 NBCA 6, 2003 CarswellNB 31, 2003 CarswellNB 32, 224 D.L.R. (4th) 127, 35 R.F.L. (5th) 112, 256 N.B.R. (2d) 108, 670 A.P.R. 108 (N.B. C.A.) — referred to

*Mack v. Canada (Attorney General)* (2002), 217 D.L.R. (4th) 583, 2002 CarswellOnt 2927, 96 C.R.R. (2d) 254, 165 O.A.C. 17, 24 Imm. L.R. (3d) 1, 60 O.R. (3d) 737, 60 O.R. (3d) 756 (Ont. C.A.) — referred to

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, 330 D.L.R. (4th) 1669, [2011] W.A.C. 1700, 530, 11 W.D.F.L. 1657, 730 D.L.R. (4th) 1651, 93 R.F.L. (6th) 221, 256 D.L.R. (4th) 385 (Ont. C.A.) — referred to

*McDougall v. Gesell Estate* (2001), [2001] 3 W.W.R. 391, 153 Man. R. (2d) 54, 238 W.A.C. 54, 2001 MBCA 3, 2001 CarswellMan 2, 11 R.F.L. (5th) 342 (Man. C.A.) — referred to

*Murdoch v. Murdoch* (1973), [1974] 1 W.W.R. 361, 1973 CarswellAlta 119, 13 R.F.L. 185, 41 D.L.R. (3d) 367, [1975] 1 S.C.R. 423, 1973 CarswellAlta 156 (S.C.C.) — considered

*Nance v. British Columbia Electric Railway* (1951), 1951 CarswellBC 72, 67 C.R.T.C. 340, [1951] 2 All E.R. 448, [1951] 2 T.L.R. 137, 95 S.J. 543, [1951] A.C. 601, 2 W.W.R. (N.S.) 665, [1951] 3 D.L.R. 705 (British Columbia P.C.) — referred to

*Nasser v. Mayer-Nasser* (2000), 32 E.T.R. (2d) 230, 2000 CarswellOnt 530, 5 R.F.L. (5th) 100, 130 O.A.C. 52 (Ont. C.A.) — referred to

*Pacific National Investments Ltd. v. Victoria (City)* (2004), 34 B.C.L.R. (4th) 1, 327 N.R. 100, [2004] 3 S.C.R. 575, 206 B.C.A.C. 99, 338 W.A.C. 99, 42 C.L.R. (3d) 76, [2005] 3 W.W.R. 1, 3 M.P.L.R. (4th) 1, 2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, 245 D.L.R. (4th) 211 (S.C.C.) — referred to

*Panara v. Di Ascenzo* (2005), 2005 CarswellAlta 135, 2005 ABCA 47, 42 Alta. L.R. (4th) 1, 361 A.R. 382, 339 W.A.C. 382, 16 R.F.L. (6th) 177, 13 E.T.R. (3d) 159, 250 D.L.R. (4th) 620, [2005] 9 W.W.R. 282 (Alta. C.A.) — referred to

*Pecore v. Pecore* (2007), 2007 SCC 17, 2007 CarswellOnt 2752, 2007 CarswellOnt 2753, 32 E.T.R. (3d) 1, 37 R.F.L. (6th) 237, 361 N.R. 1, 224 O.A.C. 330, 279 D.L.R. (4th) 513, [2007] 1 S.C.R. 795 (S.C.C.) — considered

*Peel (Regional Municipality) v. Canada* (1992), *(sub nom. Peel (Regional Municipality) v. Ontario)* 144 N.R. 1, 1992 CarswellNat 15, 55 F.T.R. 277 (note), 12 M.P.L.R. (2d) 229, 98 D.L.R. (4th) 140, [1992] 3 S.C.R. 762, 59 O.A.C. 81, 1992 CarswellNat 659 (S.C.C.) — followed

*Peter v. Beblow* (February 16, 1988), Doc. Vernon 8600296 (B.C. S.C.) — referred to

*Peter v. Beblow* (1990), 50 B.C.L.R. (2d) 266, 29 R.F.L. (3d) 268, 39 E.T.R. 113, [1991] 1 W.W.R. 419, 1990 CarswellBC 237 (B.C. C.A.) — referred to

*Peter v. Beblow* (1993), [1993] 3 W.W.R. 337, 23 B.C.A.C. 81, 39 W.A.C. 81, 101 D.L.R. (4th) 621, [1993] 1 S.C.R. 980, 150 N.R. 1, 48 E.T.R. 1, 77 B.C.L.R. (2d) 1, 44 R.F.L. (3d) 329, [1993] R.D.F. 369, 1993 CarswellBC 44, 1993 CarswellBC 1258 (S.C.C.) — followed

*Pettitt v. Pettitt* (1969), [1970] A.C. 777, [1969] 2 W.L.R. 699, [1969] 2 All E.R. 385, 20 P. & C.R. 991 (U.K. H.L.) — referred to

*Pickelein v. Gillmore* (1997), 87 B.C.A.C. 193, 143 W.A.C. 193, 30 B.C.L.R. (3d) 44, 16 E.T.R. (2d) 1, [1997] 5 W.W.R. 595, 1997 CarswellBC 307, 27 R.F.L. (4th) 51 (B.C. C.A.) — referred to

*Rathwell v. Rathwell* (1978), 1978 CarswellSask 36, 1978 CarswellSask 129, [1978] 2 S.C.R. 436, [1978] 2

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 491 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

W.W.R. 101, 83 D.L.R. (3d) 289, 19 N.R. 91, 1 E.T.R. 307, 1 R.F.L. (2d) 1 (S.C.C.) — considered

*Reference re Excise Tax Act (Canada) (1992), (sub nom. Reference re Goods & Services Tax)* [1992] 4 W.W.R. 673, *(sub nom. Reference re Goods & Services Tax)* 138 N.R. 247, *(sub nom. Reference re Goods & Services Tax)* 127 A.R. 161, *(sub nom. Reference re Goods & Services Tax)* [1992] 2 S.C.R. 445, *(sub nom. Reference re Goods & Services Tax (Alberta))* 94 D.L.R. (4th) 51, 1992 CarswellAlta 469, *(sub nom. Reference re GST Implementing Legislation)* 5 T.C.T. 4165, *(sub nom. Reference re Goods & Services Tax)* 2 Alta. L.R. (3d) 289, *(sub nom. Reference re Goods & Services Tax)* 20 W.A.C. 161, *(sub nom. Reference re Bill C-62)* [1992] G.S.T.C. 2, 1992 CarswellAlta 61 (S.C.C.) — referred to

*S. (D.B.) v. G. (S.R.) (2006),* 61 Alta. L.R. (4th) 1, 31 R.F.L. (6th) 1, 391 A.R. 297, 377 W.A.C. 297, 2006 SCC 37, 2006 CarswellAlta 976, 2006 CarswellAlta 977, 351 N.R. 201, [2006] 10 W.W.R. 379, 270 D.L.R. (4th) 297, [2006] 2 S.C.R. 231 (S.C.C.) — referred to

*S. (L.) v. P. (E.) (1999),* 67 B.C.L.R. (3d) 254, 50 R.F.L. (4th) 302, [1999] 12 W.W.R. 718, 1999 BCCA 393, 1999 CarswellBC 1402, 126 B.C.A.C. 28, 206 W.A.C. 28, 175 D.L.R. (4th) 423 (B.C. C.A.) — considered

*Shannon v. Gidden (1999),* 178 D.L.R. (4th) 395, 1 R.F.L. (5th) 105, 71 B.C.L.R. (3d) 40, 129 B.C.A.C. 257, 210 W.A.C. 257, 1999 CarswellBC 2049, 1999 BCCA 539 (B.C. C.A.) — referred to

*Sorochan v. Sorochan (1986),* 1986 CarswellAlta 714, [1986] 2 S.C.R. 38, [1986] 5 W.W.R. 289, 29 D.L.R. (4th) 1, 69 N.R. 81, 46 Alta. L.R. (2d) 97, 74 A.R. 67, 23 E.T.R. 143, 2 R.F.L. (3d) 225, [1986] R.D.I. 448, [1986] R.D.F. 501, 1986 CarswellAlta 143 (S.C.C.) — followed

*Soulos v. Korkontzilas (1997),* [1997] 2 S.C.R. 217, 212 N.R. 1, 1997 CarswellOnt 1490, 1997 CarswellOnt 1489, 9 R.P.R. (3d) 1, 46 C.B.R. (3d) 1, 17 E.T.R. (2d) 89, 32 O.R. (3d) 716 (headnote only), 146 D.L.R. (4th) 214, 100 O.A.C. 241 (S.C.C.) — referred to

*Thomas v. Fenton (2006),* 2006 BCCA 299, 2006 CarswellBC 1465, 228 B.C.A.C. 82, 376 W.A.C. 82, 269 D.L.R. (4th) 376, 29 R.F.L. (6th) 229, 27 E.T.R. (3d) 7, 57 B.C.L.R. (4th) 204 (B.C. C.A.) — referred to

*Walsh v. Bona (2002),* 211 N.S.R. (2d) 273, 659 A.P.R. 273, 2002 SCC 83, 2002 CarswellNS 511, 2002 CarswellNS 512, 102 C.R.R. (2d) 1, 32 R.F.L. (5th) 81, *(sub nom. Nova Scotia (Attorney General) v. Walsh)* 221 D.L.R. (4th) 1, 297 N.R. 203, *(sub nom. Nova Scotia (Attorney General) v. Walsh)* [2002] 4 S.C.R. 325 (S.C.C.) — referred to

*Wilson v. Fotsch (2010),* 81 R.F.L. (6th) 241, 2010 BCCA 226, 8 B.C.L.R. (5th) 1, 57 E.T.R. (3d) 159, 286 B.C.A.C. 276, 484 W.A.C. 276, 2010 CarswellBC 1158, [2010] 11 W.W.R. 29, 319 D.L.R. (4th) 26 (B.C. C.A.) — referred to

**Statutes considered:**

*Divorce Act*, R.S.C. 1985, c. 3 (2nd Supp.)

    Generally — referred to

*Family Relations Act*, R.S.B.C. 1996, c. 128

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1700, [2011] W.D.F.L. 1657, [2011] W.D.F.L. 1651, [2011] W.D.F.L. 1709, [2011] W.D.F.L. 1600.

s. 93(1) — referred to

s. 93(5)(d) — considered

*Matrimonial Property Act*, S.N.S. 1980, c. 9

Generally — referred to

APPEALS from judgments reported at *Kerr v. Baranow* (2009), 2009 CarswellBC 642, 2009 BCCA 111, 266 B.C.A.C. 298, 449 W.A.C. 298, [2009] 9 W.W.R. 285, 93 B.C.L.R. (4th) 201, 66 R.F.L. (6th) 1 (B.C. C.A.) and *Vanasse v. Seguin* (2009), 2009 ONCA 595, 2009 CarswellOnt 4407, 77 R.F.L. (6th) 118, 96 O.R. (3d) 321, 252 O.A.C. 218 (Ont. C.A.).

POURVOIS à l'encontre des jugements publiés à *Kerr v. Baranow* (2009), 2009 CarswellBC 642, 2009 BCCA 111, 266 B.C.A.C. 298, 449 W.A.C. 298, [2009] 9 W.W.R. 285, 93 B.C.L.R. (4th) 201, 66 R.F.L. (6th) 1 (B.C. C.A.) et à *Vanasse v. Seguin* (2009), 2009 ONCA 595, 2009 CarswellOnt 4407, 77 R.F.L. (6th) 118, 96 O.R. (3d) 321, 252 O.A.C. 218 (Ont. C.A.).

*Cromwell J.*:

## I. Introduction

1      In a series of cases spanning 30 years, the Court has wrestled with the financial and property rights of parties on the breakdown of a marriage or domestic relationship. Now, for married spouses, comprehensive matrimonial property statutes enacted in the late 1970s and 1980s provide the applicable legal framework. But for unmarried persons in domestic relationships in most common law provinces, judge-made law was and remains the only option. The main legal mechanisms available to parties and courts have been the resulting trust and the action in unjust enrichment.

2      In the early cases of the 1970s, the parties and the courts turned to the resulting trust. The underlying legal principle was that contributions to the acquisition of a property, which were not reflected in the legal title, could nonetheless give rise to a property interest. Added to this underlying notion was the idea that a resulting trust could arise based on the "common intention" of the parties that the non-owner partner was intended to have an interest. The resulting trust soon proved to be an unsatisfactory legal solution for many domestic property disputes, but claims continue to be advanced and decided on that basis.

3      As the doctrinal problems and practical limitations of the resulting trust became clearer, parties and courts turned increasingly to the emerging law of unjust enrichment. As the law developed, unjust enrichment carried with it the possibility of a remedial constructive trust. In order to successfully prove a claim for unjust enrichment, the claimant must show that the defendant has been enriched, the claimant suffered a corresponding detriment, and there is no "juristic reason" for the enrichment. This claim has become the pre-eminent vehicle for addressing the financial consequences of the breakdown of domestic relationships. However, various issues continue to create controversy, and these two appeals, argued consecutively, provide the Court with the opportunity to address them.

4      In the *Kerr* appeal, a couple in their late-sixties separated after a common law relationship of more than 25 years. Both had worked through much of that time and each had contributed in various ways to their mutual welfare. Ms. Kerr claimed support and a share of property held in her partner's name based on resulting trust and

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 417 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

unjust enrichment principles. The trial judge awarded her one-third of the value of the couple's residence, grounded in both resulting trust and unjust enrichment claims (2007 BCSC 1863, 47 R.F.L. (6th) 103 (B.C. S.C.)). He did not address, other than in passing, Mr. Baranow's counterclaim that Ms. Kerr had been unjustly enriched at his expense. The judge also ordered substantial monthly support for Ms. Kerr pursuant to statute, effective as of the date she applied to the court for relief. However, the resulting trust and unjust enrichment conclusions of the trial judge were set aside by the British Columbia Court of Appeal (2009 BCCA 111, 93 B.C.L.R. (4th) 201 (B.C. C.A.)). Both lower courts addressed the role of the parties' common intention and reasonable expectations. The appeal to this Court raises the questions of the role of resulting trust law in these types of disputes, as well as how an unjust enrichment analysis should take account of the mutual conferral of benefits and what role the parties' intentions and expectations play in that analysis. This Court is also called upon to decide whether the award of spousal support should be effective as of the date of application, as found by the trial judge, the date the trial began, as ordered by the Court of Appeal, or some other date.

5      In the *Vanasse* appeal, the central problem is how to quantify a monetary award for unjust enrichment. It is agreed that Mr. Seguin was unjustly enriched by the contributions of his partner, Ms. Vanasse; the two lived in a common law relationship for about 12 years and had two children together during this time. The trial judge valued the extent of the enrichment by determining what proportion of Mr. Seguin's increased wealth was due to Ms. Vanasse's efforts as an equal contributor to the family venture (2008 CanLII 35922). The Court of Appeal set aside this finding and, while ordering a new trial, directed that the proper approach to valuation was to place a monetary value on the services provided by Ms. Vanasse to the family, taking due account of Mr. Seguin's own contributions by way of set-off (2009 ONCA 595, 252 O.A.C. 218 (Ont. C.A.)). In short, the Court of Appeal held that Ms. Vanasse should be treated as an unpaid employee, not a co-venturer. The appeal to this Court challenges this conclusion.

6      These appeals require us to resolve five main issues. The first concerns the role of the "common intention" resulting trust in claims by domestic partners. In my view, it is time to recognize that the "common intention" approach to resulting trust has no further role to play in the resolution of property claims by domestic partners on the breakdown of their relationship.

7      The second issue concerns the nature of the money remedy for a successful unjust enrichment claim. Some courts take the view that if the claimant's contribution cannot be linked to specific property, a money remedy must always be assessed on a fee-for-services basis. Other courts have taken a more flexible approach. In my view, where both parties have worked together for the common good, with each making extensive, but different, contributions to the welfare of the other and, as a result, have accumulated assets, the money remedy for unjust enrichment should reflect that reality. The money remedy in those circumstances should not be based on a minute totting up of the give and take of daily domestic life, but rather should treat the claimant as a co-venturer, not as the hired help.

8      The third area requiring clarification relates to mutual benefit conferral. Many domestic relationships involve the mutual conferral of benefits, in the sense that each contributes in various ways to the welfare of the other. The question is how and at what point in the unjust enrichment analysis should this mutual conferral of benefits be taken into account? For reasons I will develop below, this issue should, with a small exception, be addressed at the defence and remedy stage.

9      Fourth, there is the question of what role the parties' reasonable or legitimate expectations play in the unjust enrichment analysis. My view is that they have a limited role, and must be considered in relation to whether

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1700, [2011] W.D.F.L. 1657, [2011] W.D.F.L. 1651, more is a jurisdiction for the enforcement.

10    Finally, there is the issue of the appropriate date for the commencement of spousal support. In my respectful view, the Court of Appeal erred in setting aside the trial judge's selection of the date of application in the circumstances of the *Kerr* appeal.

11    I will first address the law of resulting trusts as it applies to the breakdown of a marriage-like relationship. Next, I will turn to the law of unjust enrichment in this context. Finally, I will address the specific issues raised in the two appeals.

## II. Resulting Trusts

12    The resulting trust played an important role in the early years of the Court's jurisprudence relating to property rights following the breakdown of intimate personal relationships. This is not surprising; it had been settled law since at least 1788 in England (and likely long before) that the trust of a legal estate, whether in the names of the purchaser or others, "results" to the person who advances the purchase money: *Dyer v. Dyer* (1788), 2 Cox Eq. Cas. 92, at p. 93, 30 E.R. 42 (Eng. Ch. Div.). The resulting trust, therefore, seemed a promising vehicle to address claims that one party's contribution to the acquisition of property was not reflected in the legal title.

13    The resulting trust jurisprudence in domestic property cases developed into what has been called "a purely Canadian invention", the "common intention" resulting trust: A H. Oosterhoff, et al., *Oosterhoff on Trusts: Text, Commentary and Materials* (7th ed. 2009) at p. 642. While this vehicle has largely been eclipsed by the law of unjust enrichment since the decision of the Court in *Becker v. Pettkus,* [1980] 2 S.C.R. 834 (S.C.C.), claims based on the "common intention" resulting trust continue to be advanced. In the *Kerr* appeal, for example, the trial judge justified the imposition of a resulting trust, in part, on the basis that the parties had a common intention that Mr. Baranow would hold title to the property by way of a resulting trust for Ms. Kerr. The Court of Appeal, while reversing the trial judge's finding of fact on this point, implicitly accepted the ongoing vitality of the common intention resulting trust.

14    However promising this common intention resulting trust approach looked at the beginning, doctrinal and practical problems soon became apparent and have been the subject of comment by the Court and scholars: see, e.g., *Pettkus*, at pp. 842-43; Oosterhoff, at pp. 641-47; D.W.M. Waters, M.R. Gillen and L.D. Smith, eds., *Waters' Law of Trusts in Canada* (3rd ed. 2005) ("*Waters'*") at pp. 430-35; J. Mee, *The Property Rights of Cohabitees: An Analysis of Equity's Response in Five Common Law Jurisdictions* (1999), at pp. 39-43; T. G. Youdan, "Resulting and Constructive Trusts" in *Special Lectures of the Law Society of Upper Canada* 1993 - *Family Law: Roles, Fairness and Equality* (1994), 169 at pp. 172-74.

15    In this Court, since *Pettkus*, the common intention resulting trust remains intact but unused. While traditional resulting trust principles may well have a role to play in the resolution of property disputes between unmarried domestic partners, the time has come to acknowledge that there is no continuing role for the common intention resulting trust. To explain why, I must first put the question in the context of some basic principles about resulting trusts.

16    That task is not as easy as it should be; there is not much one can say about resulting trusts without a well-grounded fear of contradiction. There is debate about how they should be classified and how they arise, let alone about many of the finer points: see, for example, *Rathwell v. Rathwell,* [1978] 2 S.C.R. 436 (S.C.C.), at

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 417 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

pp. 449-50; *Waters'*, at pp. 19-22; P. H. Pettit, *Equity and the Law of Trusts* (11th ed. 2009), at p. 67. However, it is widely accepted that the underlying notion of the resulting trust is that it is imposed "to return property to the person who gave it and is entitled to it beneficially, from someone else who has title to it. Thus, the beneficial interest 'results' (jumps back) to the true owner": Oosterhoff, at p. 25. There is also widespread agreement that, traditionally, resulting trusts arose where there had been a gratuitous transfer or where the purposes set out by an express or implied trust failed to exhaust the trust property: *Waters'*, at p. 21.

17        Resulting trusts arising from gratuitous transfers are the ones relevant to domestic situations. The traditional view was they arose in two types of situations: the gratuitous transfer of property from one partner to the other, and the joint contribution by two partners to the acquisition of property, title to which is in the name of only one of them. In either case, the transfer is gratuitous, in the first case because there was no consideration for the transfer of the property, and in the second case because there was no consideration for the contribution to the acquisition of the property.

18        The Court's most recent decision in relation to resulting trusts is consistent with the view that, in these gratuitous transfer situations, the actual intention of the grantor is the governing consideration: *Pecore v. Pecore*, 2007 SCC 17, [2007] 1 S.C.R. 795 (S.C.C.), at paras. 43-44. As Rothstein J. noted at para. 44 of *Pecore*, where a gratuitous transfer is being challenged, "[t]he trial judge will commence his or her inquiry with the applicable presumption and will weigh all of the evidence in an attempt to ascertain, on a balance of probabilities, the *transferor's actual intention*" (emphasis added).

19        As noted by Rothstein J. in this passage, presumptions may come into play when dealing with gratuitous transfers. The law generally presumes that the grantor intended to create a trust, rather than to make a gift, and so the presumption of resulting trust will often operate. As Rothstein J. explained, a presumption of a resulting trust is the general rule that applies to gratuitous transfers. When such a transfer is made, the onus will be on the person receiving the transfer to demonstrate that a gift was intended. Otherwise, the transferee holds that property in trust for the transferor. This presumption rests on the principle that equity presumes bargains and not gifts (*Pecore*, at para. 24).

20        The presumption of resulting trust, however, is neither universal nor irrebuttable. So, for example, in the case of transfers between persons in certain relationships (such as from a parent to a minor child), a presumption of advancement — that is, a presumption that the grantor intended to make a gift — rather than a presumption of resulting trust applies: see *Pecore*, at paras. 27-41. The presumption of advancement traditionally applied to grants from husband to wife, but the presumption of resulting trust traditionally applied to grants from wife to husband. Whether the application of the presumption of advancement applies to unmarried couples may be more controversial: Oosterhoff, at pp. 681-82. Although the trial judge in *Kerr* touched on this issue, neither party relies on the presumption of advancement and I need say nothing further about it.

21        That brings me to the "common intention" resulting trust. It figured prominently in the majority judgment in *Murdoch v. Murdoch* (1973), [1975] 1 S.C.R. 423 (S.C.C.). Quoting from Lord Diplock's speech in *Gissing v. Gissing*, [1970] 2 All E.R. 780 (U.K. H.L.), at pp. 789 and 793, Martland J. held for the majority that, absent a financial contribution to the acquisition of the contested property, a resulting trust could only arise "where the court is satisfied by the words or conduct of the parties that it was their common intention that the beneficial interest was not to belong solely to the spouse in whom the legal estate was vested but was to be shared between them in some proportion or other": *Murdoch*, at p. 438.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, [2011] W.D.F.L. 1667, [2011] W.D.F.L. 1700, 2011 CarswellBC 657, 329 D.L.R. (4th)...

This approach was repeated and refined by a majority of the Court three years later in *Rathwell*, at pp. 451-53, although the Court also unanimously found there had been a direct financial contribution by the claimant. In *Rathwell*, there is, as well, some blurring of the notions of contribution and common intention; there are references to the fact that a presumption of resulting trust is sometimes explained by saying that the fact of contribution evidences the common intention to share ownership: see p. 452, *per* Dickson J. (as he then was); p. 474, *per* Ritchie J. This blurring is also evident in the reasons of the Court of Appeal in *Kerr*, where the court said, at para. 42, that "a resulting trust is an equitable doctrine that, by operation of law, imposes a trust on a party who holds legal title to property that was gratuitously transferred to that party by another *and where there is evidence of a common intention that the property was to be shared by both parties*" (emphasis added).

23     The Court's development of the common intention resulting trust ended with *Pettkus*, in which Dickson J. (as he then was) noted the "many difficulties, chronicled in the cases and in the legal literature" as well as the "artificiality of the common intention approach" to resulting trusts: at pp. 842-3. He also clearly rejected the notion that the requisite common intention could be attributed to the parties where such an intention was negated by the evidence: p. 847. The import of *Pettkus* was that the law of unjust enrichment, coupled with the remedial constructive trust, became the more flexible and appropriate lens through which to view property and financial disputes in domestic situations. As Ms. Kerr stated in her factum, the "approach enunciated in *Becker v. Pettkus* has become the dominant legal paradigm for the resolution of property disputes between common law spouses" (para. 100).

24     This, in my view, is as it should be, and the time has come to say that the common intention resulting trust has no further role to play in the resolution of domestic cases. I say this for four reasons.

25     First, as the abundant scholarly criticism demonstrates, the common intention resulting trust is doctrinally unsound. It is inconsistent with the underlying principles of resulting trust law. Where the issue of intention is relevant to the finding of resulting trust, it is the intention of the grantor or contributor alone that counts. As Professor Waters puts it, "In imposing a resulting trust upon the recipient, Equity is never concerned with [common] intention (*Waters'*, at p. 431)." The underlying principles of resulting trust law also make it hard to accommodate situations in which the contribution made by the claimant was not in the form of property or closely linked to its acquisition. The point of the resulting trust is that the claimant is asking for his or her own property back, or for the recognition of his or her proportionate interest in the asset which the other has acquired with that property. This thinking extends artificially to claims that are based on contributions that are not clearly associated with the acquisition of an interest in property; in such cases there is not, in any meaningful sense, a "resulting" back of the transferred property: *Waters'*, at p. 432. It follows that a resulting trust based solely on intention without a transfer of property is, as Oosterhoff puts it, a doctrinal impossibility: "... a resulting trust can arise only when one person has transferred assets to, or purchased assets for, another person and did not intend to make a gift of the property": p. 642. The final doctrinal problem is that the relevant time for ascertaining intention is the time of acquisition of the property. As a result, it is hard to see how a resulting trust can arise from contributions made over time to the improvement of an existing asset, or contributions in kind over time for its maintenance. As Oosterhoff succinctly puts it at p. 652, a resulting trust is inappropriate in these circumstances because its imposition, in effect, forces one party to give up beneficial ownership which he or she enjoyed before the improvement or maintenance occurred.

26     There are problems beyond these doctrinal issues. A second difficulty with the common intention resulting trust is that the notion of common intention may be highly artificial, particularly in domestic cases. The search for common intention may easily become "a mere vehicle or formula" for giving a share of an asset, di-

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 411 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

vorced from any realistic assessment of the actual intention of the parties. Dickson J. in *Pettkus* noted the artificiality and undue malleability of the common intention approach: at pp. 843-44.

27     Third, the "common intention" resulting trust in Canada evolved from a misreading of some imprecise language in early authorities from the House of Lords. While much has been written on this topic, it is sufficient for my purposes to note, as did Dickson J. in *Pettkus*, at p. 842, that the principles upon which the common intention resulting trust jurisprudence developed are found in the House of Lords decisions in *Pettitt v. Pettitt (1969), [1970] A.C. 777* (U.K. H.L.), and *Gissing*. However, no clear majority opinion emerged in those cases and four of the five Law Lords in *Gissing* spoke of "resulting, implied or constructive trusts" without distinction. The passages that have been most influential in Canada on this point, those authored by Lord Diplock, in fact relate to constructive rather than resulting trusts: see, e.g., *Waters'*, at pp. 430-35; Oosterhoff, at pp. 642-43. I find persuasive Professor Waters' comments, specifically approved by Dickson J. in *Pettkus*, that where the search for common intention becomes simply a vehicle for reaching what the court perceives to be a just result, "[i]t is in fact a constructive trust approach masquerading as a resulting trust approach": D. Waters, Comment (1975), 53 *Can. Bar Rev.* 366, at p. 368.

28     Finally, as the development of the law since *Pettkus* has shown, the principles of unjust enrichment, coupled with the possible remedy of a constructive trust, provide a much less artificial, more comprehensive and more principled basis to address the wide variety of circumstances that lead to claims arising out of domestic partnerships. There is no need for any artificial inquiry into common intent. Claims for compensation as well as for property interests may be addressed. Contributions of all kinds and made at all times may be justly considered. The equities of the particular case are considered transparently and according to principle, rather than masquerading behind often artificial attempts to find common intent to support what the court thinks for unstated reasons is a just result.

29     I would hold that the resulting trust arising solely from the common intention of the parties, as described by the Court in *Murdoch* and *Rathwell*, no longer has a useful role to play in resolving property and financial disputes in domestic cases. I emphasize that I am speaking here only of the common intention resulting trust. I am not addressing other aspects of the law relating to resulting trusts, nor am I suggesting that a resulting trust that would otherwise validly arise is defeated by the existence in fact of common intention.

## III. Unjust Enrichment

### A. Introduction

30     The law of unjust enrichment has been the primary vehicle to address claims of inequitable distribution of assets on the breakdown of a domestic relationship. In a series of decisions, the Court has developed a sturdy framework within which to address these claims. However, a number of doctrinal and practical issues require further attention. I will first briefly set out the existing framework, then articulate the issues that in my view require further attention, and finally propose the ways in which they should be addressed.

### B. The Legal Framework for Unjust Enrichment Claims

31     At the heart of the doctrine of unjust enrichment lies the notion of restoring a benefit which justice does not permit one to retain: *Peel (Regional Municipality) v. Canada*, [1992] 3 S.C.R. 762 (S.C.C.), at p. 788. For recovery, something must have been given by the plaintiff and received and retained by the defendant without juristic reason. A series of categories developed in which retention of a conferred benefit was considered unjust.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1704...

where, for example: benefits conferred under mistake of fact or law; under compulsion; out of necessity; as a result of ineffective transactions; or at the defendant's request: see *Peel*, at p. 789; see generally, G. H. L. Fridman, *Restitution* (2nd ed. 1992), c. 3-5, 7, 8 and 10; and Lord Goff of Chieveley and G. Jones, *The Law of Restitution* (7th ed., 2007), c. 4-11, 17 and 19-26).

32    Canadian law, however, does not limit unjust enrichment claims to these categories. It permits recovery whenever the plaintiff can establish three elements: an enrichment of or benefit to the defendant, a corresponding deprivation of the plaintiff, and the absence of a juristic reason for the enrichment: *Pettkus*; *Peel*, at p. 784. By retaining the existing categories, while recognizing other claims that fall within the principles underlying unjust enrichment, the law is able "to develop in a flexible way as required to meet changing perceptions of justice": *Peel*, at p. 788.

33    The application of unjust enrichment principles to claims by domestic partners was resisted until the Court's 1980 decision in *Pettkus*. In applying unjust enrichment principles to domestic claims, however, the Court has been clear that there is and should be no separate line of authority for "family" cases developed within the law of unjust enrichment. Rather, concern for clarity and doctrinal integrity mandate that "the basic principles governing the rights and remedies for unjust enrichment remain the same for all cases" (*Peter v. Beblow*, [1993] 1 S.C.R. 980 (S.C.C.), at p. 997).

34    Although the legal principles remain constant across subject areas, they must be applied in the particular factual and social context out of which the claim arises. The Court in *Peter* was unanimously of the view that the courts "should exercise flexibility and common sense when applying equitable principles to family law issues with due sensitivity to the special circumstances that can arise in such cases" (p. 997, *per* McLachlin J. (as she then was); see also p. 1023, *per* Cory J.). Thus, while the underlying legal principles of the law of unjust enrichment are the same for all cases, the courts must apply those common principles in ways that respond to the particular context in which they are to operate.

35    It will be helpful to review, briefly, the current state of the law with respect to each of the elements of an unjust enrichment claim and note the particular issues in relation to each that arise in claims by domestic partners.

## C. The Elements of an Unjust Enrichment Claim

### (1) Enrichment and Corresponding Deprivation

36    The first and second steps in the unjust enrichment analysis concern first, whether the defendant has been enriched by the plaintiff and second, whether the plaintiff has suffered a corresponding deprivation.

37    The Court has taken a straightforward economic approach to the first two elements — enrichment and corresponding deprivation. Accordingly, other considerations, such as moral and policy questions, are appropriately dealt with at the juristic reason stage of the analysis: see *Peter*, at p. 990, referring to *Pettkus*, *Sorochan v. Sorochan*, [1986] 2 S.C.R. 38 (S.C.C.), and *Peel*, affirmed in *Garland v. Consumers' Gas Co.*, 2004 SCC 25, [2004] 1 S.C.R. 629 (S.C.C.), at para. 31.

38    For the first requirement — enrichment — the plaintiff must show that he or she gave something to the defendant which the defendant received and retained. The benefit need not be retained permanently, but there must be a benefit which has enriched the defendant and which can be restored to the plaintiff *in specie* or by

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 419 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

money. Moreover, the benefit must be tangible. It may be positive or negative, the latter in the sense that the benefit conferred on the defendant spares him or her an expense he or she would have had to undertake (*Peel*, at pp. 788 and 790; *Garland*, at paras. 31 and 37).

39      Turning to the second element — a *corresponding* deprivation — the plaintiff's loss is material only if the defendant has gained a benefit or been enriched (*Peel*, at pp. 789-90). That is why the second requirement obligates the plaintiff to establish not simply that the defendant has been enriched, but also that the enrichment corresponds to a deprivation which the plaintiff has suffered (*Pettkus*, at p. 852; *Rathwell*, at p. 455).

*(2) Absence of Juristic Reason*

40      The third element of an unjust enrichment claim is that the benefit and corresponding detriment must have occurred without a juristic reason. To put it simply, this means that there is no reason in law or justice for the defendant's retention of the benefit conferred by the plaintiff, making its retention "unjust" in the circumstances of the case: see *Pettkus*, at p. 848; *Rathwell*, at p. 456; *Sorochan*, at p. 44; *Peter*, at p. 987; *Peel*, at pp. 784 and 788; *Garland*, at para. 30.

41      Juristic reasons to deny recovery may be the intention to make a gift (referred to as a "donative intent"), a contract, or a disposition of law (*Peter*, at pp.990-91; *Garland*, at para. 44; *Rathwell*, at p. 455). The latter category generally includes circumstances where the enrichment of the defendant at the plaintiff's expense is required by law, such as where a valid statute denies recovery (P.D. Maddaugh, and J. D. McCamus, *The Law of Restitution* (1990), at p. 46; *Reference re Excise Tax Act (Canada)*, [1992] 2 S.C.R. 445 (S.C.C.); *Mack v. Canada (Attorney General)* (2002), 60 O.R. (3d) 737 (Ont. C.A.)). However, just as the Court has resisted a purely categorical approach to unjust enrichment claims, it has also refused to limit juristic reasons to a closed list. This third stage of the unjust enrichment analysis provides for due consideration of the autonomy of the parties, including factors such as "the legitimate expectation of the parties, the right of parties to order their affairs by contract (*Peel*, at p. 803).

42      A critical early question in domestic claims was whether the provision of domestic services could support a claim for unjust enrichment. After some doubts, the matter was conclusively resolved in *Peter*, where the Court held that they could. A spouse or domestic partner generally has no duty, at common law, equity, or by statute, to perform work or services for the other. It follows, on a straightforward economic approach, that there is no reason to distinguish domestic services from other contributions (*Peter*, at pp. 991 and 993; *Sorochan*, at p. 46). They constitute an enrichment because such services are of great value to the family and to the other spouse; any other conclusion devalues contributions, mostly by women, to the family economy (*Peter*, at p. 993). The unpaid provision of services (including domestic services) or labour may also constitute a deprivation because the full-time devotion of one's labour and earnings without compensation may readily be viewed as such. The Court rejected the view that such services could not found an unjust enrichment claim because they are performed out of "natural love and affection". (*Peter*, at pp. 989-95, *per* McLachlin J., and pp. 1012-16, *per* Cory J.).

43      In *Garland*, the Court set out a two-step analysis for the absence of juristic reason. It is important to remember that what prompted this development was to ensure that the juristic reason analysis was not "purely subjective", thereby building into the unjust enrichment analysis an unacceptable "immeasureable judicial discretion" that would permit "case by case 'palm tree' justice": *Garland*, at para. 40. The first step of the juristic reason analysis applies the established categories of juristic reasons; in their absence, the second step permits con-

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, 2011...

In addition to the expectations of the parties and public policy considerations to assess whether recovery should be denied:

> First, the plaintiff must show that no juristic reason from an established category exists to deny recovery [...] The established categories that can constitute juristic reasons include a contract (*Pettkus*, *supra*), a disposition of law (*Pettkus*, *supra*), a donative intent (*Peter*, *supra*), and other valid common law, equitable or statutory obligations (*Peter*, *supra*). If there is no juristic reason from an established category, then the plaintiff has made out a *prima facie* case under the juristic reason component of the analysis.
>
> The *prima facie* case is rebuttable, however, where the defendant can show that there is another reason to deny recovery. As a result, there is a *de facto* burden of proof placed on the defendant to show the reason why the enrichment should be retained. This stage of the analysis thus provides for a category of residual defence in which courts can look to all of the circumstances of the transaction in order to determine whether there is another reason to deny recovery.
>
> As part of the defendant's attempt to rebut, courts should have regard to two factors: the reasonable expectations of the parties, and public policy considerations. [paras. 44-46]

44     Thus, at the juristic reason stage of the analysis, if the case falls outside the existing categories, the court may take into account the legitimate expectations of the parties (*Pettkus*, at p. 849) and moral and policy-based arguments about whether particular enrichments are unjust (*Peter*, at p. 990). For example, in *Peter*, it was at this stage that the Court considered and rejected the argument that the provision of domestic and childcare services should not give rise to equitable claims against the other spouse in a marital or quasi-marital relationship (pp. 993-95). Overall, the test for juristic reason is flexible, and the relevant factors to consider will depend on the situation before the court (*Peter*, at p. 990).

45     Policy arguments concerning individual autonomy may arise under the second branch of the juristic reason analysis. In the context of claims for unjust enrichment, this has led to questions regarding how (and when) factors relating to the manner in which the parties organized their relationship should be taken into account. It has been argued, for example, that the legislative decision to exclude unmarried couples from property division legislation indicates the court should not use the equitable doctrine of unjust enrichment to address their property and asset disputes. However, the court in *Peter* rejected this argument, noting that it misapprehended the role of equity. As McLachlin J. put it at p. 994, "It is precisely where an injustice arises without a legal remedy that equity finds a role." (See also *Walsh v. Bona*, 2002 SCC 83, [2002] 4 S.C.R. 325 (S.C.C.), at para. 61.)

*(3) Remedy*

46     Remedies for unjust enrichment are restitutionary in nature; that is, the object of the remedy is to require the defendant to repay or reverse the unjustified enrichment. A successful claim for unjust enrichment may attract either a "personal restitutionary award" or a "restitutionary proprietary award". In other words, the plaintiff may be entitled to a monetary or a proprietary remedy (*International Corona Resources Ltd. v. LAC Minerals Ltd.*, [1989] 2 S.C.R. 574 (S.C.C.), at p. 669, *per* La Forest J.).

**(a) Monetary Award**

47     The first remedy to consider is always a monetary award (*Peter*, at pp. 987 and 999). In most cases, it will be sufficient to remedy the unjust enrichment. However, calculation of such an award is far from straight-

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 491 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

forward. Two issues have given rise to disagreement and difficulty in domestic unjust enrichment claims.

48        First, the fact that many domestic claims of unjust enrichment arise out of relationships in which there has been a mutual conferral of benefits gives rise to difficulties in determining what will constitute adequate compensation. While the value of domestic services is not questioned (*Peter*; *Sorochan*), it is unjust to pay attention only to the contributions of one party in assessing an appropriate remedy. This is not only an important issue of principle; in practice, it is enormously difficult for the parties and the court to "create, retroactively, a notional ledger to record and value every service rendered by each party to the other" (R. E. Scane, "Relationships 'Tantamount to Spousal', Unjust Enrichment, and Constructive Trusts" (1991), 70 *Can. Bar Rev.* 260, at p. 281). This gives rise to the practical problem that one scholar has aptly referred to as "duelling *quantum meruits*" (J. D. McCamus, "Restitution on Dissolution of Marital and Other Intimate Relationships: Constructive Trust or Quantum Meruit?", in J.W. Neyers, M. McInnes and S.G.A. Pitel, eds., *Understanding Unjust Enrichment* (2004), 359, at p. 376). McLachlin J. also alluded to this practical problem in *Peter*, at p. 999.

49        A second difficulty arises from the fact that some courts and commentators have read *Peter* as holding that when a monetary award is appropriate, it must invariably be calculated on the basis of the monetary value of the unpaid services. This is often referred to as the *quantum meruit*, or "value received" or "fee-for-services" approach. This was followed in *Bell v. Bailey* (2001), 203 D.L.R. (4th) 589 (Ont. C.A.). Other appellate courts have held that monetary relief may be assessed more flexibly — in effect, on a value survived basis — by reference, for example, to the overall increase in the couple's wealth during the relationship: *Wilson v. Fotsch*, 2010 BCCA 226, 319 D.L.R. (4th) 26 (B.C. C.A.), at para. 50; *Pickelein v. Gillmore* (1997), 30 B.C.L.R. (3d) 44 (B.C. C.A.); *Harrison v. Kalinocha* (1994), 90 B.C.L.R. (2d) 273 (B.C. C.A.); *MacFarlane v. Smith*, 2003 NBCA 6, 256 N.B.R. (2d) 108 (N.B. C.A.), at paras. 31-34 and 41-43; *Shannon v. Gidden*, 1999 BCCA 539, 71 B.C.L.R. (3d) 40 (B.C. C.A.), at para. 37. With respect to inconsistencies in how *in personam* relief for unjust enrichment may be quantified, see also: *Matrimonial Property Law in Canada*, vol 1, by J.G. McLeod and A.A. Mamo, eds.(loose-leaf), at pp. 40.78-40.79.

**(b) Proprietary Award**

50        The Court has recognized that, in some cases, when a monetary award is inappropriate or insufficient, a proprietary remedy may be required. *Pettkus* is responsible for an important remedial feature of the Canadian law of unjust enrichment: the development of the remedial constructive trust. Imposed without reference to intention to create a trust, the constructive trust is a broad and flexible equitable tool used to determine beneficial entitlement to property (*Pettkus*, at pp. 843-44 and 847-48). Where the plaintiff can demonstrate a link or causal connection between his or her contributions and the acquisition, preservation, maintenance or improvement of the disputed property, a share of the property proportionate to the unjust enrichment can be impressed with a constructive trust in his or her favour (*Pettkus*, at pp. 852-53; *Sorochan*, at p. 50). *Pettkus* made clear that these principles apply equally to unmarried cohabitants, since "[t]he equitable principle on which the remedy of constructive trusts rests is broad and general; its purpose is to prevent unjust enrichment in whatever circumstances it occurs" (pp. 850-51).

51        As to the nature of the link required between the contribution and the property, the Court has consistently held that the plaintiff must demonstrate a "sufficiently substantial and direct" link, a "causal connection" or a "nexus" between the plaintiff's contributions and the property which is the subject matter of the trust (*Peter*, at pp. 988, 997 and 999; *Pettkus* at p. 852; *Sorochan*, at pp. 47-50; *Rathwell*, at p. 454). A minor or indirect contribution will not suffice (*Peter*, at p. 997). As Dickson C.J. put it in *Sorochan*, the primary focus is on whether the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245,
[2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011]
B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647,
[2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L.
1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011]

contribution has made on 'clear proportionate' relationship' (p. 300, citing Pettkus. Cf. McCamus on Warren v. *Herman v. Smith* (1984), 42 R.F.L. (2d) 154 (Alta. Q.B.), at p. 156). Indirect contributions of money and direct contributions of labour may suffice, provided that a connection is established between the plaintiff's deprivation and the acquisition, preservation, maintenance, or improvement of the property (*Sorochan*, at p. 50; *Pettkus*, at p. 852).

52      The plaintiff must also establish that a monetary award would be insufficient in the circumstances (*Peter*, at p. 999). In this regard, the court may take into account the probability of recovery, as well as whether there is a reason to grant the plaintiff the additional rights that flow from recognition of property rights (*Lac Minerals*, at p. 678, *per* La Forest J.).

53      The extent of the constructive trust interest should be proportionate to the claimant's contributions. Where the contributions are unequal, the shares will be unequal (*Pettkus*, at pp. 852-53; *Rathwell*, at p. 448; *Peter*, at pp. 998-99). As Dickson J. put it in *Rathwell*, "The court will assess the contributions made by each spouse and make a fair, equitable distribution having regard to the respective contributions" (p. 454).

### D. Areas Needing Clarification

54      While the law of unjust enrichment sets out a sturdy legal framework within which to address claims by domestic partners, three areas continue to generate controversy and require clarification. As mentioned earlier, these are as follows: the approach to the assessment of a monetary award for a successful unjust enrichment claim, how and where to address the mutual benefit problem, and the role of the parties' reasonable or legitimate expectations. I will address these in turn.

### E. Is a Monetary Award Restricted to Quantum Meruit?

#### (1) Introduction

55      As noted earlier, remedies for unjust enrichment may either be proprietary (normally a remedial constructive trust) or personal (normally a money remedy). Once the choice has been made to award a monetary rather than a proprietary remedy, the question of how to quantify that monetary remedy arises. Some courts have held that monetary relief must always be calculated based on a value received or *quantum meruit* basis (*Bell*), while others have held that monetary relief may also be based on a value survived (i.e. by reference to the value of property) approach (*Wilson*; *Pickelein*; *Harrison*; *MacFarlane*; *Shannon*). If, as some courts have held, a monetary remedy must invariably be quantified on a *quantum meruit* basis, the remedial choice in unjust enrichment cases becomes whether to impose a constructive trust or order a monetary remedy calculated on a *quantum meruit* basis. One scholar has referred to this approach as the false dichotomy between constructive trust and *quantum meruit* (McCamus, at pp. 375-76). Scholars have also noted this area of uncertainty in the case law, and have suggested that an *in personam* remedy using the value survived measure is a plausible alternative to the constructive trust (McCamus, at p. 377; P. Birks, *An Introduction to the Law of Restitution* (1985), at pp. 394-95). As I will explain below, *Peter* is said to have established this dichotomy of remedial choice. However, in my view, the focus in *Peter* was on the availability of the constructive trust remedy, and that case should not be taken as limiting the calculation of monetary relief for unjust enrichment to a *quantum meruit* basis. In appropriate circumstances, monetary relief may be assessed on a value survived basis.

56      I will first briefly describe the genesis of the purported limitation on the monetary remedy. Then I will explain why, in my view, it should be rejected. Finally, I will set out my views on how money remedies for unjust enrichment claims in domestic situations should be approached.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 491 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

*(2) The Remedial Dichotomy*

57      As noted, there is a widespread, although not unanimous, view that there are only two choices of remedy for an unjust enrichment: a monetary award, assessed on a fee-for-services basis; or a proprietary one (generally taking the form of a remedial constructive trust), where the claimant can show that the benefit conferred contributed to the acquisition, preservation, maintenance, or improvement of specific property. Some brief comments in *Peter* seem to have spawned this idea, which is reflected in a number of appellate authorities. For instance, in the *Vanasse* appeal, the Ontario Court of Appeal reasoned that since Ms. Vanasse could not show that her contributions were linked to specific property, her claim had to be quantified on a fee-for-services basis. I respectfully do not agree that monetary awards for unjust enrichment must always be calculated in this way.

*(3) Why the Remedial Dichotomy Should Be Rejected*

58      In my view, restricting the money remedy to a fee-for-services calculation is inappropriate for four reasons. First, it fails to reflect the reality of the lives of many domestic partners. Second, it is inconsistent with the inherent flexibility of unjust enrichment. Third, it ignores the historical basis of *quantum meruit* claims. Finally, it is not mandated by the Court's judgment in *Peter*. For those reasons, this remedial dichotomy should be rejected. The discussion which follows is concerned only with the quantification of a monetary remedy for unjust enrichment; the law relating to when a proprietary remedy should be granted is well established and remains unchanged.

**(a) Life Experience**

59       The remedial dichotomy would be appropriate if, in fact, the bases of all domestic unjust enrichment claims fit into only two categories — those where the enrichment consists of the provision of unpaid services, and those where it consists of an unrecognized contribution to the acquisition, improvement, maintenance or preservation of specific property. To be sure, those two bases for unjust enrichment claims exist. However, all unjust enrichment cases cannot be neatly divided into these two categories.

60       At least one other basis for an unjust enrichment claim is easy to identify. It consists of cases in which the contributions of both parties over time have resulted in an accumulation of wealth. The unjust enrichment occurs following the breakdown of their relationship when one party retains a disproportionate share of the assets which are the product of their joint efforts. The required link between the contributions and a specific property may not exist, making it inappropriate to confer a proprietary remedy. However, there may clearly be a link between the joint efforts of the parties and the accumulation of wealth; in other words, a link between the "value received" and the "value surviving", as McLachlin J. put it in *Peter*, at pp. 1000-1001. Thus, where there is a relationship that can be described as a "joint family venture", and the joint efforts of the parties are linked to the accumulation of wealth, the unjust enrichment should be thought of as leaving one party with a disproportionate share of the jointly earned assets.

61       There is nothing new about the notion of a joint family venture in which both parties contribute to their overall accumulation of wealth. It was recognition of this reality that contributed to comprehensive matrimonial property legislative reform in the late 1970s and early 1980s. As the Court put it in *Clarke v. Clarke*, [1990] 2 S.C.R. 795 (S.C.C.), at p. 807 (in relation to Nova Scotia's *Matrimonial Property Act*), "... the Act supports the equality of both parties to a marriage and *recognized the joint contribution of the spouses, be it financial or otherwise, to that enterprise*. ... The Act is accordingly remedial in nature. It was designed to alleviate the inequities of the past when the contribution made by women to the economic survival and growth of the family was not

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1700, [2011] W.D.F.L. 1657, [2011] W.D.F.L. 1651, ...

62      Unlike much matrimonial property legislation, the law of unjust enrichment does not mandate a presumption of equal sharing. However, the law of unjust enrichment can and should respond to the social reality identified by the legislature that many domestic relationships are more realistically viewed as a joint venture to which the parties jointly contribute.

63      This reality has also been recognized many times and in many contexts by the Court. For instance, in *Murdoch*, Laskin J. (as he then was), in dissent, would have imposed constructive trust relief, on the basis that the facts were "consistent with a pooling of effort by the spouses" to establish themselves in a ranch operation (p. 457), and that the spouses had worked together for fifteen years to improve "their lot in life through progressively larger acquisitions of ranch property" (p. 446). Similarly, in *Rathwell*, a majority of the judges agreed that Mr. and Mrs. Rathwell had pooled their efforts to accumulate wealth as a team. Dickson J. emphasized that the parties had together "decided to make farming their way of life" (p. 444), and that the acquisition of property in Mr. Rathwell's name was only made possible through their "joint effort" and "team work" (p. 461).

64      A similar recognition is evident in *Pettkus* and *Peter*.

65      In *Pettkus*, the parties developed a successful beekeeping business, the profits from which they used to acquire real property. Dickson J., writing for the majority of the Court, emphasized facts suggestive of a domestic and financial partnership. He observed that "each started with nothing; each worked continuously, unremittingly and sedulously in the joint effort" (p. 853); that each contributed to the "good fortune of the common enterprise" (p. 838); that Wilson J.A. (as she then was) at the Court of Appeal had found the wealth they accumulated was through "joint effort" and "teamwork" (p. 849); and finally, that "[t]heir lives and their economic well-being were fully integrated" (p. 850).

66      I agree with Professor McCamus that the Court in *Pettkus* was "satisfied that the parties were engaged in a common venture in which they expected to share the benefits flowing from the wealth that they jointly created" (p. 367). Put another way, Mr. Pettkus was not unjustly enriched because Ms. Becker had a precise expectation of obtaining a legal interest in certain properties, but rather because they were in reality partners in a common venture.

67      The significance of the fact that wealth had been acquired through joint effort was again at the forefront of the analysis in *Peter* where the parties lived together for 12 years in a common law relationship. While Mr. Beblow generated most of the family income and also contributed to the maintenance of the property, Ms. Peter did all of the domestic work (including raising the six children of their blended family), helped with property maintenance, and was solely responsible for the property when Mr. Beblow was away. The reality of their joint venture was acknowledged when McLachlin J. wrote that the "joint family venture, in effect, was no different from the farm which was the subject of the trust in *Becker v. Pettkus*" (p. 1001).

68      The Court's recognition of the joint family venture is evident in three other places in *Peter*. First, in reference to the appropriateness of the "value survived" measure of relief, McLachlin J. observed, "[I]t is more likely that a couple expects to share in the wealth generated from their partnership, rather than to receive compensation for the services performed during the relationship" (p. 999). Second, and also related to valuing the extent of the unjust enrichment, McLachlin J. noted that, in a case where both parties had contributed to the "family venture", it was appropriate to look to all of the family assets, rather than simply one of them, to approximate the value of the claimant's contributions to that family venture (p. 1001). Third, the Court's justification for af-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 491 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

firming the value of domestic services was, in part, based on reasoning that such services are often proffered in the context of a common venture (p. 993).

69    Relationships of this nature are common in our life experience. For many domestic relationships, the couple's venture may only sensibly be viewed as a joint one, making it highly artificial in theory and extremely difficult in practice to do a detailed accounting of the contributions made and benefits received on a fee-for-services basis. Of course, this is a relationship-specific issue; there can be no presumption one way or the other. However, the legal consequences of the breakdown of a domestic relationship should reflect realistically the way people live their lives. It should not impose on them the need to engage in an artificial balance sheet approach which does not reflect the true nature of their relationship.

**(b) Flexibility**

70    Maintaining a strict remedial dichotomy is inconsistent with the Court's approach to equitable remedies in general, and to its development of remedies for unjust enrichment in particular.

71    The Court has often emphasized the flexibility of equitable remedies and the need to fashion remedies that respond to various situations in principled and realistic ways. So, for example, when speaking of equitable compensation for breach of confidence, Binnie J. affirmed that "the Court has ample jurisdiction to fashion appropriate relief out of the full gamut of available remedies, including appropriate financial compensation": *Cadbury Schweppes Inc. v. FBI Foods Ltd.*, [1999] 1 S.C.R. 142 (S.C.C.), at para. 61. At para. 24, he noted the broad approach to equitable remedies for breach of confidence taken by the Court in *Lac Minerals*. In doing so, he cited this statement with approval: "... the remedy that follows [once liability is established] should be the one that is most appropriate on the facts of the case rather than one derived from history or over-categorization" (from J. D. Davies, "Duties of Confidence and Loyalty", [1990] *Lloyds' Mar. & Com. L.Q.* 4, at p. 5). Similarly, in the context of the constructive trust, McLachlin J. (as she then was) noted that "[e]quitable remedies are flexible; their award is based on what is just in all the circumstances of the case": *Soulos v. Korkontzilas*, [1997] 2 S.C.R. 217 (S.C.C.), at para. 34.

72    Turning specifically to remedies for unjust enrichment, I refer to Binnie J.'s comments in *Pacific National Investments Ltd. v. Victoria (City)*, 2004 SCC 75, [2004] 3 S.C.R. 575 (S.C.C.) at para. 13. He noted that the doctrine of unjust enrichment, while predicated on clearly defined principles, "retains a large measure of remedial flexibility to deal with different circumstances according to principles rooted in fairness and good conscience". Moreover, the Court has recognized that, given the wide variety of circumstances addressed by the traditional categories of unjust enrichment, as well as the flexibility of the broader, principled approach, its development has been characterized by, and indeed requires, recourse to a number of different sorts of remedies depending on the circumstances: see *Peter*, at p. 987; *Sorochan*, at p. 47.

73    Thus, the remedy should mirror the flexibility inherent in the unjust enrichment principle itself, so as to allow the court to respond appropriately to the substance of the problem put before it. This means that a monetary remedy must match, as best it can, the extent of the enrichment unjustly retained by the defendant. There is no reason to think that the wide range of circumstances that may give rise to unjust enrichment claims will necessarily fall into one or other of the two remedial options into which some have tried to force them.

**(c) History**

74    Imposing a strict remedial dichotomy is also inconsistent with the historical development of the unjust

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011]
B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011]
B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647,
[2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L.
1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011]

remedial principle. Unjust enrichment developed through several particular categories. *Quantum
meruit*, the origin of the fee-for-services award, was only one of them. *Quantum meruit* originated as a common
law claim for compensation for benefits conferred under an agreement which, while apparently binding, was
rendered ineffective for a reason recognized at common law. The scope of the claim was expanded over time,
and the measure of a *quantum meruit* award was flexible. It might be assessed, for example, by the cost to the
plaintiff of providing the service, the market value of the benefit, or even the value placed on the benefit by the
recipient: P.D. Maddaugh and J.D. McCamus, *The Law of Restitution* (loose-leaf), vol. 1 at § 4:200.30. The im-
portant point, however, is that *quantum meruit* is simply one of the established categories of unjust enrichment
claims. There is no reason in principle why one of the traditional categories of unjust enrichment should be used
to force the monetary remedy for all present domestic unjust enrichment cases into a remedial straitjacket.

### (d) Peter v. Beblow

75    *Peter* does not mandate strict adherence to a *quantum meruit* approach to money remedies for unjust en-
richment. One must remember that the focus of *Peter* was on whether the plaintiff's contributions entitled her to
a constructive trust over the former family home. While it was assumed by both McLachlin J. and Cory J., who
wrote concurring reasons in the case, that a money award would be fashioned on the basis of *quantum meruit*,
that was not an issue, let alone a holding, in the case.

76    There are, in fact, only two sentences in the judgments that could be taken as supporting the view that
this rule should always apply. At p. 995, McLachlin J. said, "Two remedies are possible: an award of money on
the basis of the value of the services rendered, i.e. *quantum meruit*; and the one the trial judge awarded, title to
the house based on a constructive trust"; at p. 999, she wrote that "[f]or a monetary award, the 'value received'
approach is appropriate". Given that the focus of the case was deciding whether a proprietary remedy was appro-
priate, I would not read these two brief passages as laying down the sweeping rule that a monetary award must
always be calculated on a fee-for-services basis.

77    Moreover, McLachlin J. noted that the doctrine of unjust enrichment applies to a variety of situations,
and that successful claims have been addressed through a number of remedies, depending on the circumstances.
Only one of these remedies is a payment for services rendered on the basis of *quantum meruit*: p. 987. There is
nothing in this observation to suggest that the Court decided to opt for a one-size-fits-all monetary remedy, espe-
cially when such an approach would be contrary to the very flexibility that the Court has repeatedly affirmed
with regards to the law of unjust enrichment and corresponding remedies.

78    This restrictive reading of *Peter* is not consistent with the underlying nature of the claim founded on the
principles set out in *Pettkus*. As Professor McCamus has suggested, cases like *Pettkus* rest on a claimant's right
to share surplus wealth created by joint effort and teamwork. It follows that a remedy based on notional fees for
services is not responsive to the underlying nature of that claim: McCamus, at pp. 376-77. In my view, this reas-
oning is persuasive whether the joint effort has led to the accumulation of specific property, in which case a re-
medial constructive trust may be appropriate according to the well-settled principles in that area of trust law, or
where the joint effort has led to an accumulation of assets generally. In the latter instance, when appropriate,
there is no reason in principle why a monetary remedy cannot be fashioned to reflect this basis of the enrichment
and corresponding deprivation. What is essential, in my view, is that, in either type of case, there must be a link
between the contribution and the accumulation of wealth, or to use the words of McLachlin J. in *Peter*, between
the "value received" and the "value surviving". Where that link exists, and a proprietary remedy is either inap-
propriate or unnecessary, the monetary award should be fashioned to reflect the true nature of the enrichment

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 411 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

and the corresponding deprivation.

79    Professor McCamus has suggested that the equitable remedy of an accounting of profits could be an appropriate remedial tool: p. 377. While I would not discount that as a possibility, I doubt that the complexity and technicality of that remedy would be well-suited to domestic situations, which are more often than not rather straightforward. The unjust enrichment principle is inherently flexible and, in my view, the calculation of a monetary award for a successful unjust enrichment claim should be equally flexible. This is necessary to respond, to the extent money can, to the particular enrichment being addressed. To my way of thinking, Professor Fridman was right to say that "where a claim for unjust enrichment has been made out by the plaintiff, the court may award whatever form of relief is most appropriate so as to ensure that the plaintiff obtains that to which he or she is entitled, regardless of whether the situation would have been governed by common law or equitable doctrines or whether the case would formerly have been considered one for a personal or a proprietary remedy" (p. 398).

*(4) The Approach to the Monetary Remedy*

80    The next step in the legal development of this area should be to move away from the false remedial dichotomy between *quantum meruit* and constructive trust, and to return to the underlying principles governing the law of unjust enrichment. These underlying principles focus on properly characterizing the nature of the unjust enrichment giving rise to the claim. As I have mentioned above, not all unjust enrichments arising between domestic partners fit comfortably into either a "fee-for-services" or "a share of specific property" mold. Where the unjust enrichment is best characterized as an unjust retention of a disproportionate share of assets accumulated during the course of what McLachlin J. referred to in *Peter* (at p. 1001) as a "joint family venture" to which both partners have contributed, the monetary remedy should reflect that fact.

81    In such cases, the basis of the unjust enrichment is the retention of an inappropriately disproportionate amount of wealth by one party when the parties have been engaged in a joint family venture and there is a clear link between the claimant's contributions to the joint venture and the accumulation of wealth. Irrespective of the status of legal title to particular assets, the parties in those circumstances are realistically viewed as "creating wealth in a common enterprise that will assist in sustaining their relationship, their well-being and their family life" (McCamus, at p. 366). The wealth created during the period of cohabitation will be treated as the fruit of their domestic and financial relationship, though not necessarily by the parties in equal measure. Since the spouses are domestic and financial partners, there is no need for "duelling *quantum meruits*". In such cases, the unjust enrichment is understood to arise because the party who leaves the relationship with a disproportionate share of the wealth is denying to the claimant a reasonable share of the wealth accumulated in the course of the relationship through their joint efforts. The monetary award for unjust enrichment should be assessed by determining the proportionate contribution of the claimant to the accumulation of the wealth.

82    This flexible approach to the money remedy in unjust enrichment cases is fully consistent with *Walsh*. While that case was focused on constitutional issues that are not before us in this case, the majority judgment was clearly not intended to freeze the law of unjust enrichment in domestic cases; the judgment indicates that the law of unjust enrichment, including the remedial constructive trust, is the preferable method of responding to the inequities brought about by the breakdown of a common law relationship, since the remedies for unjust enrichment "are tailored to the parties' specific situation and grievances" (para. 61). In short, while emphasizing respect for autonomy as an important value, the Court at the same time approved of the continued development of the law of unjust enrichment in order to respond to the plethora of forms and functions of common law relation-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011]
B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011]
B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647,
[2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L.
1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011]
W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1700, [2011] W.D.F.L. 1657, [2011] W.D.F.L. 1651,

83     A similar approach was taken in *Peter*. Mr. Beblow argued that the law of unjust enrichment should not
provide a share of property to unmarried partners because the legislature had chosen to exclude them from the
rights accorded to married spouses under matrimonial property legislation. This argument was succinctly — and
flatly — rejected with the remark that it is "precisely where an injustice arises without a legal remedy that equity
finds a role": p. 994.

84     It is not the purpose of the law of unjust enrichment to replicate for unmarried partners the legislative
presumption that married partners are engaged in a joint family venture. However, there is no reason in principle
why remedies for unjust enrichment should fail to reflect that reality in the lives and relationships of unmarried
partners.

85     I conclude, therefore, that the common law of unjust enrichment should recognize and respond to the
reality that there are unmarried domestic arrangements that are partnerships; the remedy in such cases should ad-
dress the disproportionate retention of assets acquired through joint efforts with another person. This sort of
sharing, of course, should not be presumed, nor will it be presumed that wealth acquired by mutual effort will be
shared equally. Cohabitation does not, in itself, under the common law of unjust enrichment, entitle one party to
a share of the other's property or any other relief. However, where wealth is accumulated as a result of joint ef-
fort, as evidenced by the nature of the parties' relationship and their dealings with each other, the law of unjust
enrichment should reflect that reality.

86     Thus the rejection of the remedial dichotomy leads us to consider in what circumstances an unjust en-
richment may be appropriately characterized as a failure to share equitably assets acquired through the parties'
joint efforts. While this approach will need further refinement in future cases, I offer the following as a broad
outline of when this characterization of an unjust enrichment will be appropriate.

*(5) Identifying Unjust Enrichment Arising From a Joint Family Venture*

87     My view is that when the parties have been engaged in a joint family venture, and the claimant's contri-
butions to it are linked to the generation of wealth, a monetary award for unjust enrichment should be calculated
according to the share of the accumulated wealth proportionate to the claimant's contributions. In order to apply
this approach, it is first necessary to identify whether the parties have, in fact, been engaged in a joint family
venture. In the preceding section, I reviewed the many occasions on which the existence of a joint family ven-
ture has been recognized. From this rich set of factual circumstances, what emerge as the hallmarks of such a re-
lationship?

88     It is critical to note that cohabiting couples are not a homogeneous group. It follows that the analysis
must take into account the particular circumstances of each particular relationship. Furthermore, as previously
stated, there can be no presumption of a joint family venture. The goal is for the law of unjust enrichment to at-
tach just consequences to the way the parties have lived their lives, not to treat them as if they ought to have
lived some other way or conducted their relationship on some different basis. A joint family venture can only be
identified by the court when its existence, in fact, is well-grounded in the evidence. The emphasis should be on
how the parties actually lived their lives, not on their *ex post facto* assertions or the court's view of how they
ought to have done so.

89     In undertaking this analysis, it may be helpful to consider the evidence under four main headings: mutual

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 491 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

effort, economic integration, actual intent and priority of the family. There is, of course, overlap among factors that may be relevant under these headings and there is no closed list of relevant factors. What follows is not a checklist of conditions for finding (or not finding) that the parties were engaged in a joint family venture. These headings, and the factors grouped under them, simply provide a useful way to approach a global analysis of the evidence and some examples of the relevant factors that may be taken into account in deciding whether or not the parties were engaged in a joint family venture. The absence of the factors I have set out, and many other relevant considerations, may well negate that conclusion.

### (a) Mutual Effort

90       One set of factors concerns whether the parties worked collaboratively towards common goals. Indicators such as the pooling of effort and team work, the decision to have and raise children together, and the length of the relationship may all point towards the extent, if any, to which the parties have formed a true partnership and jointly worked towards important mutual goals.

91       Joint contributions, or contributions to a common pool, may provide evidence of joint effort. For instance, in *Murdoch*, central to Laskin J.'s constructive trust analysis was that the parties had pooled their efforts to establish themselves in a ranch operation. Joint contributions were also an important aspect of the Court's analyses in *Peter*, *Sorochan*, and *Pettkus*. Pooling of efforts and resources, whether capital or income, has also been noted in the appellate case law (see, for example, *Birmingham v. Ferguson* [2004 CarswellOnt 3119 (Ont. C.A.)], 2004 CanLII 4764; *McDougall v. Gesell Estate*, 2001 MBCA 3, 153 Man. R. (2d) 54 (Man. C.A.), at para. 14). The use of parties' funds entirely for family purposes may be indicative of the pooling of resources: *McDougall*. The parties may also be said to be pooling their resources where one spouse takes on all, or a greater proportion, of the domestic labour, freeing the other spouse from those responsibilities, and enabling him or her to pursue activities in the paid workforce (see *Nasser v. Mayer-Nasser (2000), 5 R.F.L. (5th) 100* (Ont. C.A.) and *Panara v. Di Ascenzo*, 2005 ABCA 47, 361 A.R. 382 (Alta. C.A.), at para. 27).

### (b) Economic Integration

92       Another group of factors, related to those in the first group, concerns the degree of economic interdependence and integration that characterized the parties' relationship (*Birmingham*; *Pettkus*; *Nasser*). The more extensive the integration of the couple's finances, economic interests and economic well-being, the more likely it is that they should be considered as having been engaged in a joint family venture. For example, the existence of a joint bank account that was used as a "common purse", as well as the fact that the family farm was operated by the family unit, were key factors in Dickson J.'s analysis in *Rathwell*. The sharing of expenses and the amassing of a common pool of savings may also be relevant considerations (see *Wilson; Panara*).

93       The parties' conduct may further indicate a sense of collectivity, mutuality, and prioritization of the overall welfare of the family unit over the individual interests of the individual members (McCamus, at p. 366). These and other factors may indicate that the economic well-being and lives of the parties are largely integrated (see, for example, *Pettkus*, at p. 850).

### (c) Actual Intent

94       Underpinning the law of unjust enrichment is an appropriate concern for the autonomy of the parties, and this is a particularly important consideration in relation to domestic partnerships. While domestic partners might not marry for a host of reasons, one of them may be the deliberate choice not to have their lives economically in-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, 201 C.R.R. (2d) 105...

Thus, in considering whether there is a joint family venture, the actual intentions of the parties must be given considerable weight. Those intentions may have been expressed by the parties or may be inferred from their conduct. The important point, however, is that the quest is for their actual intent as expressed or inferred, not for what in the court's view "reasonable" parties *ought* to have intended in the same circumstances. Courts must be vigilant not to impose their own views, under the guise of inferred intent, in order to reach a certain result.

95    Courts may infer from the parties' conduct that they intended to share in the wealth they jointly created (P. Parkinson, "Beyond *Becker v. Pettkus*: Quantifying Relief for Unjust Enrichment" (1993), 43 U.T.L.J. 217, at p. 245). The conduct of the parties may show that they intended the domestic and professional spheres of their lives to be part of a larger, common venture (*Pettkus*; *Peter*; *Sorochan*). In some cases, courts have explicitly labelled the relationship as a "partnership" in the social and economic sense (*Panara*, at para. 71; *McDougall*, at para. 14). Similarly, the intention to engage in a joint family venture may be inferred where the parties accepted that their relationship was "equivalent to marriage" (*Birmingham*, at para. 1), or where the parties held themselves out to the public as married (*Sorochan*). The stability of the relationship may be a relevant factor as may the length of cohabitation (*Nasser*; *Sorochan*; *Birmingham*). When parties have lived together in a stable relationship for a lengthy period, it may be nearly impossible to engage in a precise weighing of the benefits conferred within the relationship (*McDougall*; *Nasser*).

96    The title to property may also reflect an intent to share wealth, or some portion of it, equitably. This may be the case where the parties are joint tenants of property. Even where title is registered to one of the parties, acceptance of the view that wealth will be shared may be evident from other aspects of the parties' conduct. For example, there may have been little concern with the details of title and accounting of monies spent for household expenses, renovations, taxes, insurance, and so on. Plans for property distribution on death, whether in a will or a verbal discussion, may also indicate that the parties saw one another as domestic and economic partners.

97    The parties' actual intent may also negate the existence of a joint family venture, or support the conclusion that particular assets were to be held independently. Once again, it is the parties' actual intent, express or inferred from the evidence, that is the relevant consideration.

**(d) Priority of the Family**

98    A final category of factors to consider in determining whether the parties were in fact engaged in a joint family venture is whether and to what extent they have given priority to the family in their decision making. A relevant question is whether there has been in some sense detrimental reliance on the relationship, by one or both of the parties, for the sake of the family. As Professor McCamus puts it, the question is whether the parties have been "[p]roceeding on the basis of understandings or assumptions about a shared future which may or may not be articulated" (p. 365). The focus is on contributions to the domestic and financial partnership, and particularly financial sacrifices made by the parties for the welfare of the collective or family unit. Whether the roles of the parties fall into the traditional wage earner/homemaker division, or whether both parties are employed and share domestic responsibilities, it is frequently the case that one party relies on the success and stability of the relationship for future economic security, to his or her own economic detriment (Parkinson, at p. 243). This may occur in a number of ways including: leaving the workforce for a period of time to raise children; relocating for the benefit of the other party's career (and giving up employment and employment-related networks as a result); foregoing career or educational advancement for the benefit of the family or relationship; and accepting under-

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 411 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

employment in order to balance the financial and domestic needs of the family unit.

99      As I see it, giving priority to the family is not associated exclusively with the actions of the more finan-
cially dependent spouse. The spouse with the higher income may also make financial sacrifices (for example,
foregoing a promotion for the benefit of family life), which may be indicative that the parties saw the relation-
ship as a domestic and financial partnership. As Professor Parkinson puts it, the joint family venture may be
identified where

> [o]ne party has encouraged the other to rely to her detriment by leaving the workforce or forgoing other ca-
> reer opportunities for the sake of the relationship, and the breakdown of the relationship leaves her in a
> worse position than she would otherwise have been had she not acted in this way to her economic detriment.
> [p. 256].

*(6) Summary of Quantum Meruit Versus Constructive Trust*

100     I conclude:

> 1. The monetary remedy for unjust enrichment is not restricted to an award based on a fee-for-services ap-
> proach.

> 2. Where the unjust enrichment is most realistically characterized as one party retaining a disproportionate
> share of assets resulting from a joint family venture, and a monetary award is appropriate, it should be cal-
> culated on the basis of the share of those assets proportionate to the claimant's contributions.

> 3. To be entitled to a monetary remedy of this nature, the claimant must show both (a) that there was, in
> fact, a joint family venture, and (b) that there is a link between his or her contributions to it and the accumu-
> lation of assets and/or wealth.

> 4. Whether there was a joint family venture is a question of fact and may be assessed by having regard to all
> of the relevant circumstances, including factors relating to (a) mutual effort, (b) economic integration, (c)
> actual intent and (d) priority of the family.

**F. Mutual Benefit Conferral**

*(1) Introduction*

101     As discussed earlier, the unjust enrichment analysis in domestic situations is often complicated by the
fact that there has been a mutual conferral of benefits; each party in almost all cases confers benefits on the oth-
er: Parkinson, at p. 222. Of course, a claimant cannot expect both to get back something given to the defendant
and retain something received from him or her: Birks, at p. 415. The unjust enrichment analysis must take ac-
count of this common sense proposition. How and where in the analysis should this be done?

102     The answer is fairly straightforward when the essence of the unjust enrichment claim is that one party
has emerged from the relationship with a disproportionate share of assets accumulated through their joint efforts.
These are the cases of a joint family venture in which the mutual efforts of the parties have resulted in an accu-
mulation of wealth. The remedy is a share of that wealth proportionate to the claimant's contributions. Once the
claimant has established his or her contribution to a joint family venture, and a link between that contribution
and the accumulation of wealth, the respective contributions of the parties are taken into account in determining

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1700, [2011] W.D.F.L. 1667, 201 A.C.W.S. (3d) 1

the claimant's proportionate share on the basis of weighing the proportionate contributions of the parties is not an exact science, it generally does not call for a minute examination of the give and take of daily life. It calls, rather, for the reasoned exercise of judgment in light of all of the evidence.

103    Mutual benefit conferral, however, gives rise to more practical problems in an unjust enrichment claim where the appropriate remedy is a money award based on a fee-for-services-provided approach. The fact that the defendant has also provided services to the claimant may be seen as a factor relevant at all stages of the unjust enrichment analysis. Some courts have considered benefits received by the claimant as part of the benefit/detriment analysis (for example, at the Court of Appeal in *Peter v. Beblow* (1990), 50 B.C.L.R. (2d) 266 (B.C. C.A.)). Others have looked at mutual benefits as an aspect of the juristic reason inquiry (for example, *Ford v. Werden* (1996), 27 B.C.L.R. (3d) 169 (B.C. C.A.), and the Court of Appeal judgment in *Kerr*). Still others have looked at mutual benefits in relation to both juristic reason and at the remedy stage (for example, as proposed in *Wilson*). It is apparent that some clarity and consistency is necessary with respect to this issue.

104    In my view, there is much to be said about the approach to the mutual benefit analysis mapped out by Huddart J.A. in *Wilson*. Specifically, I would adopt her conclusions that mutual enrichments should mainly be considered at the defence and remedy stages, but that they may be considered at the juristic reason stage to the extent that the provision of reciprocal benefits constitutes relevant evidence of the existence (or non-existence) of juristic reason for the enrichment (para. 9). This approach is consistent with the authorities from this Court, and provides a straightforward and just method of ensuring that mutual benefit conferral is fully taken into account without short-circuiting the proper unjust enrichment analysis. I will briefly set out why, in my view, this approach is sound.

105    At the outset, however, I should say that this Court's decision in *Peter* does not mandate consideration of mutual benefits at the juristic reason stage of the analysis: see, e.g., *Ford*, at para. 14; *Thomas v. Fenton*, 2006 BCCA 299, 269 D.L.R. (4th) 376 (B.C. C.A.), at para. 18. Rather, *Peter* made clear that mutual benefit conferral should generally not be considered at the benefit and detriment stages; the Court also approved the trial judge's decision to take mutual benefits into account at the remedy stage of the unjust enrichment analysis.

106    In *Peter*, the trial judge found that all three elements of unjust enrichment had been established. Before Ms. Peter and Mr. Beblow started living together, he had a housekeeper whom he paid $350 per month. When Ms. Peter moved in with her children and assumed the housekeeping and child-care responsibilities, the housekeeper was no longer required. The trial judge valued Ms. Peter's contribution by starting with the amount Mr. Beblow had paid his housekeeper, but then discounting this figure by one half to reflect the benefits Ms. Peter received in return. The trial judge then used that discounted figure to value Ms. Peter's services over the 12 years of the relationship: (B.C. S.C.).

107    The Court of Appeal, at (1990), 50 B.C.L.R. (2d) 266 (B.C. C.A.), set aside the judge's finding on the basis that Ms. Peter had failed to establish that she had suffered a deprivation corresponding to the benefits she had conferred on Mr. Beblow. The court reasoned that, although she had performed the services of a housekeeper and homemaker, she had received compensation because she and her children lived in Mr. Beblow's home rent free and he contributed more for groceries than she had.

108    This Court reversed the Court of Appeal and restored the trial judge's award. The Court was unanimous that Ms. Peter had established all of the elements of unjust enrichment, including deprivation. Cory J. (with whom McLachlin J. agreed on this point) made short work of Mr. Beblow's submission that Ms. Peter had not

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 491 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

shown deprivation. He observed, "As a general rule, if it is found that the defendant has been enriched by the efforts of the plaintiff there will, almost as a matter of course be deprivation suffered by the plaintiff": at p. 1013. The Court also unanimously upheld the trial judge's approach of taking account of the benefits Ms. Peter had received at the remedy stage of his decision. As noted, the trial judge had reduced the monthly amount used to calculate Ms. Peter's award by 50 percent to reflect benefits she had received from Mr. Beblow. McLachlin J. did not disagree with this approach, holding at p. 1003 that the figure arrived at by the judge fairly reflected the value of Ms. Peter's contribution to the family assets. Cory J., at p. 1025, referred to the trial judge's approach as "a fair means of calculating the amount due to the appellant". Thus, the Court approved the approach of taking the mutual benefit issue into account at the remedy stage of the analysis. *Peter* therefore does not support the view that mutual benefits should be considered at the benefit/detriment or juristic reason stages of the analysis.

*(2) The Correct Approach*

109     As I noted earlier, my view is that mutual benefit conferral can be taken into account at the juristic reason stage of the analysis, but only to the extent that it provides relevant evidence of the existence of a juristic reason for the enrichment. Otherwise, the mutual exchange of benefits should be taken into account at the defence and/or remedy stage. It is important to note that this can, and should, take place whether or not the defendant has made a formal counterclaim or pleaded set-off.

110     I turn first to why mutual benefits should not be addressed at the benefit/detriment stage of the analysis. In my view, refusing to address mutual benefits at that point is consistent with the *quantum meruit* origins of the fee-for-services approach and, as well, with the straightforward economic approach to the benefit/detriment analysis which has been consistently followed by this Court.

111     An unjust enrichment claim based on a fee-for-services approach is analogous to the traditional claim for *quantum meruit*. In *quantum meruit* claims, the fact that some benefit had flowed from the defendant to the claimant is taken into account by reducing the claimant's recovery by the amount of the countervailing benefit provided. For example, in a *quantum meruit* claim where the plaintiff is seeking to recover money paid pursuant to an unenforceable contract, but received some benefit from the defendant already, the claim will succeed but the award will be reduced by an amount corresponding to the value of that benefit: Maddaugh and McCamus (loose-leaf), vol. 2, at § 13:200. The authors offer as an example *Giles v. McEwan* (1896), 11 Man. R. 150 (Man. C.A.). In that case, two employees recovered in *quantum meruit* for services provided to the defendant under an unenforceable agreement, but the amount of the award was reduced to reflect the value of benefits the defendant had provided to them. Thus, taking the benefits conferred by the defendant into account at the remedy stage is consistent with general principles of *quantum meruit* claims. Of course, if the defendant has pleaded a counterclaim or set-off, the mutual benefit issue must be resolved in the course of considering that defence or claim.

112     Refusing to take mutual benefits into account at the benefit/detriment stage is also supported by a straightforward economic approach to the benefit/detriment analysis which the Court has consistently followed. *Garland* is a good example. The class action plaintiffs claimed in unjust enrichment to seek restitution for late payment penalties that had been imposed but that this Court (in an earlier decision) found had been charged at a criminal rate of interest: see *Garland v. Consumers' Gas Co.*, [1998] 3 S.C.R. 112 (S.C.C.). The company argued that it had not been enriched because its rates were set by a regulatory mechanism out of its control, and that the rates charged would have been even higher had the company not received the late payment penalties as part of its revenues. That argument was accepted by the Court of Appeal, but rejected on the further appeal to this Court. Iacobucci J., for the Court, held that the payment of money, under the "straightforward economic ap-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011]

sumers' Gas received the monies represented by the [late payment penalties] and had that money available for use in the carrying on of its business. ...We are not, at this stage, concerned with what happened to this benefit in the ongoing operation of the regulatory scheme." The Court held that the company was in fact asserting the "change of position" defence (that is, the defence that is available when "an innocent defendant demonstrates that it has materially changed its position as a result of an enrichment such that it would be inequitable to require the benefit to be returned": para. 63). This defence is considered only after the three elements of an unjust enrichment claim have been established: para. 37. Thus the Court declined to get into a detailed consideration at the benefit/detriment stage of the defendant's submissions that it had not benefitted because of the regulatory scheme.

113      While *Garland* dealt with the payment of money, my view is that the same approach should be applied where the alleged enrichment consists of services. Provided that they confer a tangible benefit on the defendant, the services will generally constitute an enrichment and a corresponding deprivation. Whether the deprivation was counterbalanced by benefits flowing to the claimant from the defendant should not be addressed at the first two steps of the analysis. I turn now to the limited role that mutual benefit conferral may have at the juristic reason stage of the analysis.

114      As previously set out, juristic reason is the third of three parts to the unjust enrichment analysis. As McLachlin J. put it in *Peter*, at p. 990, "It is at this stage that the court must consider whether the enrichment and detriment, morally neutral in themselves, are 'unjust'." The juristic reason analysis is intended to reveal whether there is a reason for the defendant to retain the enrichment, not to determine its value or whether the enrichment should be set off against reciprocal benefits: *Wilson*, at para. 30. *Garland* established that claimants must show that there is no juristic reason falling within any of the established categories, such as whether the benefit was a gift or pursuant to a legal obligation. If that is established, it is open to the defendant to show that a different juristic reason for the enrichment should be recognized, having regard to the parties' reasonable expectations and public policy considerations.

115      The fact that the parties have conferred benefits on each other may provide relevant evidence of their reasonable expectations, a subject that may become germane when the defendant attempts to show that those expectations support the existence of a juristic reason outside the settled categories. However, given that the purpose of the juristic reason step in the analysis is to determine whether the enrichment was just, not its extent, mutual benefit conferral should only be considered at the juristic reason stage for that limited purpose.

*(3) Summary*

116      I conclude that mutual benefits may be considered at the juristic reason stage, but only to the extent that they provide evidence relevant to the parties' reasonable expectations. Otherwise, mutual benefit conferrals are to be considered at the defence and/or remedy stage. I will have more to say in the next section about how mutual benefit conferral and the parties' reasonable expectations may come into play in the juristic reason analysis.

### G. Reasonable or Legitimate Expectations

117      The final point that requires some clarification relates to the role of the parties' reasonable expectations in the domestic context. My conclusion is that, while in the early domestic unjust enrichment cases the parties' reasonable expectations played an important role in the juristic reason analysis, the development of the law, and particularly the Court's judgment in *Garland*, has led to a more limited and clearly circumscribed role for those

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 491 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

expectations.

118     In the early cases of domestic unjust enrichment claims, the reasonable expectations of the claimant and the defendant's knowledge of those expectations were central to the juristic reason analysis. For example, in *Pettkus*, when Dickson J. came to the juristic reason step in the analysis, he said that "where one person in a relationship tantamount to spousal prejudices herself in the reasonable expectation of receiving an interest in property and the other person in the relationship freely accepts benefits conferred by the first person in circumstances where he knows or ought to have known of that reasonable expectation, it would be unjust to allow the recipient of the benefit to retain it" (p. 849). Similarly, in *Sorochan*, at p. 46, precisely the same reasoning was invoked to show that there was no juristic reason for the enrichment.

119     In these cases, central to the Court's concern was whether it was just to require the defendant to pay — in fact to surrender an interest in property — for services not expressly requested. The Court's answer was that it would indeed be unjust for the defendant to retain the benefits, given that he had continued to accept the services when he knew or ought to have known that the claimant was providing them with the reasonable expectation of reward.

120     The Court's resort to reasonable expectations and the defendant's knowledge of them in these cases is analogous to the "free acceptance" principle. The notion of free acceptance has been invoked to extend restitutionary recovery beyond the traditional sorts of *quantum meruit* claims in which services had either been requested or provided under an unenforceable agreement. The law's traditional reluctance to provide a remedy for claims where no request was made was based on the tenet that a person should generally not be required, in effect, to pay for services that he or she did not request, and perhaps did not want. However, this concern carries much less weight when the person receiving the services knew that they were being provided, had no reasonable belief that they were a gift, and yet continued to freely accept them: see P. Birks, *Unjust Enrichment* (2nd ed. 2005), at pp. 56-57.

121     The need to engage in this analysis of the claimant's reasonable expectations and the defendant's knowledge thereof with respect to domestic services has, in my view, now been overtaken by developments in the law. *Garland*, as noted, mandated a two-step approach to the juristic reason analysis. The first step requires the claimant to show that the benefit was not conferred for any existing category of juristic reasons. Significantly, the fact that the defendant also provided services to the claimant is not one of the existing categories. Nor is the fact that the services were provided pursuant to the parties' reasonable expectations. However, the fact that the parties reasonably expected the services to be provided might afford relevant evidence in relation to whether the case falls within one of the traditional categories, for example a contract or gift. Other than in that way, mutual benefit conferral and the parties' reasonable expectations have a very limited role to play at the first step in the juristic reason analysis set out in *Garland*.

122     However, different considerations arise at the second step. Following *Peter* and *Garland*, the parties' reasonable or legitimate expectations have a critical role to play when the defendant seeks to establish a new juristic reason, whether case-specific or categorical. As Iacobucci J. put it in *Garland*, this introduces a category of residual situations in which "courts can look to all of the circumstances of the transaction in order to determine whether there is another reason to deny recovery" (para. 45). Specifically, it is here that the court should consider the parties' reasonable expectations and questions of policy.

123     It will be helpful in understanding how *Peter* and *Garland* fit together to apply the *Garland* approach to

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, 201 L.A.C. (4th) 1, [2011] A.W.L.D. 1658, [2011] A.W.L.D. 1651

Mr. Peel touched on the unresolved issue, in *Walsh v. Peter*, on whether a claim based on the provision of domestic services could be defeated on the basis that the services had been provided as part of the bargain between the parties in deciding to live together. While the Court concluded that the claim failed on the facts, it did not hold that such a claim would inevitably fail in all circumstances: p. 991. It seems to me that, in light of *Garland*, where a "bargain" which does not constitute a binding contract is alleged, the issue will be considered at the stage when the defendant seeks to show that there is a juristic reason for the enrichment that does not fall within any of the existing categories; the claim is that the "bargain" represents the parties' reasonable expectations, and evidence about their reasonable expectations would be relevant evidence of the existence (or not) of such a bargain.

124    To summarize:

1. The parties' reasonable or legitimate expectations have little role to play in deciding whether the services were provided for a juristic reason within the existing categories.

2. In some cases, the facts that mutual benefits were conferred or that the benefits were provided pursuant to the parties' reasonable expectations may be relevant evidence of whether one of the existing categories of juristic reasons is present. An example might be whether there was a contract for the provision of the benefits. However, generally the existence of mutual benefits flowing from the defendant to the claimant will not be considered at the juristic reason stage of the analysis.

3. The parties' reasonable or legitimate expectations have a role to play at the second step of the juristic reason analysis, that is, where the defendant bears the burden of establishing that there is a juristic reason for retaining the benefit which does not fall within the existing categories. It is the mutual or legitimate expectations of both parties that must be considered, and not simply the expectations of either the claimant or the defendant. The question is whether the parties' expectations show that retention of the benefits is just.

125    I will now turn to the two cases at bar.

**IV. The *Vanasse* Appeal**

*A. Introduction*

126    In the Vanasse appeal, the main issue is how to quantify a monetary award for unjust enrichment. The trial judge awarded a share of the net increase in the family's wealth during the period of unjust enrichment. The Court of Appeal held that this was the wrong approach, finding that the trial judge ought to have performed a *quantum meruit* calculation in which the value that each party received from the other was assessed and set off. This required an evaluation of the defendant Mr. Seguin's non-financial contributions to the relationship which, in the view of the Court of Appeal, the trial judge failed to perform. As the record did not permit the court to apply the correct legal principles to the facts, it ordered a new hearing with respect to compensation and consequential changes to spousal support.

127    In this Court, the appellant Ms. Vanasse raises two issues:

1. Did the Court of Appeal err by insisting on a strict *quantum meruit* (i.e. "value received") approach to quantify the monetary award for unjust enrichment?

2. Did the Court of Appeal err in finding that the trial judge had failed to consider relevant evidence of Mr.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 491 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

Seguin's contributions?

128      In my view, the appeal should be allowed and the trial judge's order restored. For the reasons I have developed above, my view is that money compensation for unjust enrichment need not always, as a matter of principle, be calculated on a *quantum meruit* basis. The trial judge here, although not labelling it as such, found that there was a joint family venture and that there was a link between Ms. Vanasse's contribution to it and the substantial accumulation of wealth which the family achieved. In my view, the trial judge made a reasonable assessment of the monetary award appropriate to reverse this unjust enrichment, taking due account of Mr. Seguin's undoubted and substantial contributions.

## B. Brief Overview of the Facts and Proceedings

129      The background facts of this case are largely undisputed. The parties lived together in a common law relationship for approximately 12 years, from 1993 until March 2005. Together, they had two children who were aged 8 and 10 at the time of trial.

130      During approximately the first four years of their relationship (1993 to 1997), the parties diligently pursued their respective careers, Ms. Vanasse with the Canadian Security Intelligence Service ("CSIS") and Mr. Seguin with Fastlane Technologies Inc., marketing a network operating system he had developed.

131      In March of 1997, Ms. Vanasse took a leave of absence to move with Mr. Seguin to Halifax, where Fastlane had relocated for important business reasons. During the next three and one-half years, the parties had two children; Ms. Vanasse took care of the domestic labour, while Mr. Seguin devoted himself to developing Fastlane. The family moved back to Ottawa in 1998, where Mr. Seguin purchased a home and registered it in the names of both parties as joint tenants. In September 2000, Fastlane was sold and Mr. Seguin netted approximately $11 million. He placed the funds in a holding company, with which he continued to develop business and investment opportunities.

132      After the sale of Fastlane, Ms. Vanasse continued to assume most of the domestic responsibilities, although Mr. Seguin was more available to assist. He continued to manage the finances.

133      The parties separated on March 27, 2005. At that time, they were in starkly contrasting financial positions: Ms. Vanasse's net worth had gone from about $40,000 at the time she and Mr. Seguin started living together, to about $332,000 at the time of separation; Mr. Seguin had come into the relationship with about $94,000, and his net worth at the time of separation was about $8,450,000.

134      Ms. Vanasse brought proceedings in the Superior Court of Justice. In addition to seeking orders with respect to spousal support and child custody, Ms. Vanasse claimed unjust enrichment. She argued that Mr. Seguin had been unjustly enriched because he retained virtually all of the funds from the sale of Fastlane, even though she had contributed to their acquisition through benefits she conferred in the form of domestic and childcare services. She alleged her contributions allowed Mr. Seguin to dedicate most of his time and energy to Fastlane. She sought relief by way of constructive trust in Mr. Seguin's remaining one half interest in the family home, and a one-half interest in the investment assets held by Mr. Seguin's holding company.

135      Mr. Seguin contested the unjust enrichment claim. While conceding he had been enriched during the roughly three-year period where he was working outside the home full time and Ms. Vanasse was working at home full time (May 1997 to September 2000), he argued there was no corresponding deprivation because he

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, [2011] W.D.F.L. 1669, [2011] W.D.F.L. 1799, 200 A.C.W.S. (3d) 657, 329 D.L.R. (4th) 1...

Mr. Seguin's one-half interest in the family home and his approximately \$445,000 in Registered Retirement Saving Plans ("RRSPs"). In the alternative, Mr. Seguin submitted that a constructive trust remedy was inappropriate because there was no link between Ms. Vanasse's contributions and the property of Fastlane.

136    The trial judge, Blishen J., concluded that the relationship of the parties could be divided into three distinct periods: (1) From the commencement of cohabitation in 1993 until March 1997 when Ms. Vanasse left her job at CSIS; (2) From March 1997 to September 2000, during which both children were born and Fastlane was sold; and (3) From September 2000 to the separation of the parties in March 2005. She concluded that neither party had been unjustly enriched in the first or third periods; she held that their contributions to the relationship during these periods had been proportionate. In the first period, there were no children of the relationship and both parties were focused on their careers; in the third period, both parents were home and their contributions had been proportional.

137    In the second period, however, the trial judge concluded that Mr. Seguin had been unjustly enriched by Ms. Vanasse. Ms. Vanasse had been in charge of the domestic side of the household, including caring for their two children. She had not been a "nanny/housekeeper" and, as the trial judge held, throughout the relationship she had been at least "an equal contributor to the family enterprise". The trial judge concluded that Ms. Vanasse's contributions during this second period "significantly benefited Mr. Seguin and were not proportional" (para. 139).

138    The trial judge found as fact that Ms. Vanasse's efforts during this second period were directly linked to Mr. Seguin's business success. She stated, at para. 91, that

> Mr. Seguin was enriched by Ms. Vanasse's running of the household, providing child care for two young children and looking after all the necessary appointments and needs of the children. Mr. Seguin could not have made the efforts he did to build up the company but for Ms. Vanasse's assumption of these responsibilities. Mr. Seguin reaped the benefits of Ms. Vanasse's efforts by being able to focus his time, energy and efforts on Fastlane.

> [Emphasis added.]

Again at para. 137, the trial judge found that

> Mr. Seguin was unjustly enriched and Ms. Vanasse deprived for three and one-half years of their relationship, during which time Mr. Seguin often worked day and night and traveled frequently while in Halifax. Mr. Seguin could not have succeeded, as he did, and built up the company, as he did, without Ms. Vanasse assuming the vast majority of childcare and household responsibilities. Mr. Seguin could not have devoted his time to Fastlane but for Ms. Vanasse's assumption of those responsibilities. ... Mr. Seguin reaped the benefit of Ms. Vanasse's efforts by being able to focus all of his considerable energies and talents on making Fastlane a success.

> [Emphasis added.]

139    The trial judge concluded that a monetary award in this case was appropriate, given Mr. Seguin's ability to pay, and lack of a sufficiently direct and substantial link between Ms. Vanasse's contributions and Fastlane or Mr. Seguin's holding company, as required to impose a remedial constructive trust.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 411 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

140      With respect to quantification, Blishen J. noted that Ms. Vanasse had received a one-half interest in the family home, but concluded that this was not adequate compensation for her contributions. The trial judge compared the net worths of the parties and determined that Ms. Vanasse was entitled to a one-half interest in the prorated increase in Mr. Seguin's net worth during the period of unjust enrichment. She reasoned that his net worth had increased by about $8.4 million dollars over the 12 years of the relationship. Although she noted that the most significant increase took place when Fastlane was sold towards the end of the period of unjust enrichment, she nonetheless prorated the increase over the full 12 years of the relationship, yielding a figure of about $700,000 per year. Starting with the $2.45 million increase attributable to the three and one-half years of unjust enrichment, the trial judge awarded Ms. Vanasse 50 percent of that amount, less the value of her interest in the family home and her RRSPs. This produced an award of just under $1 million.

141      Mr. Seguin did not appeal Blishen J.'s unjust enrichment finding, and conceded unjust enrichment between 1997 and 2000 on appeal. Therefore, the trial judge's findings that there had been an unjust enrichment during that period and that there was no unjust enrichment during the other periods are not in issue. The sole issue for determination in this Court is the propriety of the trial judge's monetary award for the unjust enrichment which she found to have occurred.

### C. Analysis

#### (1) Was the Trial Judge Required to Use a Quantum Meruit Approach to Calculate the Monetary Award?

142      I agree with the appellant that a monetary award for unjust enrichment need not, as a matter of principle, always be calculated on a fee-for-services basis. As I have set out earlier, an unjust enrichment is best characterized as one party leaving the relationship with a disproportionate share of wealth that accumulated as a result of the parties' joint efforts. This will be so when the parties were engaged in a joint family venture and where there is a link between the contributions of the claimant and the accumulation of wealth. When this is the case, the amount of the enrichment should be assessed by determining the claimant's proportionate contribution to that accumulated wealth. As the trial judge saw it, this was exactly the situation of Ms. Vanasse and Mr. Seguin.

#### (2) Existence of a Joint Family Venture

143      The trial judge, after a six-day trial, concluded that "Ms. Vanasse was not a nanny/housekeeper". She found that Ms. Vanasse had been at least "an equal contributor to the family enterprise" throughout the relationship and that, during the period of unjust enrichment, her contributions "significantly benefited Mr. Seguin" (para. 139).

144      The trial judge, of course, did not review the evidence under the headings that I have suggested will be helpful in identifying a joint family venture, namely "mutual effort", "economic integration", "actual intent" and "priority of the family". However, her findings of fact and analysis indicate that the unjust enrichment of Mr. Seguin at the expense of Ms. Vanasse ought to be characterized as the retention by Mr. Seguin of a disproportionate share of the wealth generated from a joint family venture. The judge's findings fit conveniently under the headings I have suggested.

#### (a) Mutual Effort

145      There are several factors in this case which suggest that, throughout their relationship, the parties were

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] C.R.P.S. 1...

working collaboratively towards common goals. First, as previously mentioned, the trial judge found that Ms. Vanasse's role was not as a "nanny/housekeeper" but rather as at least an equal contributor throughout the relationship. The parties made important decisions keeping the overall welfare of the family at the forefront: the decision to move to Halifax, the decision to move back to Ottawa, and the decision that Ms. Vanasse would not return to work after the sale of Fastlane are all clear examples. The parties pooled their efforts for the benefit of their family unit. As the trial judge found, during the second stage of their relationship from March 1997 to September 2000, the division of labour was such that Ms. Vanasse was almost entirely responsible for running the home and caring for the children, while Mr. Seguin worked long hours and managed the family finances. The trial judge found that it was through their joint efforts that they were able to raise a young family and acquire wealth. As she put it, "Mr. Seguin could not have made the efforts he did to build up the company but for Ms. Vanasse's assumption of these responsibilities" (para. 91). While Mr. Seguin's long hours and extensive travel reduced somewhat in September 1998 when the parties returned to Ottawa, the basic division of labour remained the same.

146    Notably, the period of unjust enrichment corresponds to the time during which the parties had two children together (in 1997 and 1999), a further indicator that they were working together to achieve common goals. The length of the relationship is also relevant, and their 12-year cohabitation is a significant period of time. Finally, the trial judge described the arrangement between the parties as a "family enterprise", to which Ms. Vanasse was "at least, an equal contributor" (paras. 138-39).

**(b) Economic Integration**

147      The trial judge found that "[t]his was not a situation of economic interdependence" (para. 105). That said, there was a pooling of resources. Ms. Vanasse was not employed and did not contribute financially to the family after the children were born, and thus was financially dependent on Mr. Seguin. The family home was registered jointly, and the parties had a joint chequing account. As the trial judge put it, "She was 'the C.E.O. of the kids' and he was 'the C.E.O. of the finances'" (para. 105).

**(c) Actual Intent**

148      The actual intent of the parties in a domestic relationship, as expressed by the parties or inferred from their conduct, must be given considerable weight in determining whether there was a joint family venture. There are a number of findings of fact that indicate these parties considered their relationship to be a joint family venture.

149      While a promise to marry or the discussion of legal marriage is by no means a prerequisite for the identification of a joint family venture, in this case the parties' intentions with respect to marriage strongly suggest that they viewed themselves as the equivalent of a married couple. Mr. Seguin proposed to Ms. Vanasse in July 1996 and they exchanged rings. While they were "devoted to one another and still in love", a wedding date was never set (para. 14). Mr. Seguin raised the topic of marriage again when Ms. Vanasse found out she was pregnant with their first child. Although they never married, the trial judge found that there had been "mutual expectations [of marriage] during the first few years of their 12 year relationship" (para. 64). Mr. Seguin continued to address Ms. Vanasse as "my future wife", and she was viewed by the outside world as such (para. 33).

150      The trial judge also referred to statements made by Mr. Seguin that were strongly indicative of his view that there was a joint family venture. As the trial judge put it, at para. 28, upon the sale of Fastlane

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 411 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

> Mr. Seguin became a wealthy man. He told Ms. Vanasse that they would never have to worry about finances as their parents did; their children could go to the best schools and they could live a good life without financial concerns.

Again, at para. 98:

> After the sale of the company, Mr. Seguin indicated they could retire, the children could go to the best schools and the family would be well cared for. The family took travel vacations, enjoyed luxury cars, bought a large cabin cruiser which they used for summer vacations and purchased condominiums at Mont-Tremblant.

151      While the trial judge viewed Mr. Seguin's promises and reassurances as contributing to a reasonable expectation on the part of Ms. Vanasse that she was to share in the increase of his net worth during the period of unjust enrichment, in my view these comments are more appropriately characterized as a reflection of the reality that there was a joint family venture, to which the couple jointly contributed for their mutual benefit and the benefit of their children.

**(d) Priority of the Family**

152      There is a strong inference from the factual findings that, to Mr. Seguin's knowledge, Ms. Vanasse relied on the relationship to her detriment. As the trial judge found, in 1997 Ms. Vanasse gave up a lucrative and exciting career with CSIS, where she was training to be an intelligence officer, to move to Halifax with Mr. Seguin. In many ways this was a sacrifice on her part; she left her career, gave up her own income, and moved away from her family and friends. Mr. Seguin had moved to Halifax in order to relocate Fastlane for business reasons. Ms. Vanasse then stayed home and cared for their two small children. As I have already explained, during the period of the unjust enrichment, Ms. Vanasse was responsible for a disproportionate share of the domestic labour. It was these domestic contributions that, in part, permitted Mr. Seguin to focus on his work with Fastlane. Later, in 2003, the "family's decision" was for Ms. Vanasse to remain home after her leave from CSIS had expired (para. 198). Ms. Vanasse's financial position at the breakdown of the relationship indicates she relied on the relationship to her economic detriment. This is all evidence supporting the conclusion that the parties were, in fact, operating as a joint family venture.

153      As a final point, I would refer to the arguments made by Mr. Seguin, which were accepted by the Court of Appeal, that the trial judge failed to give adequate weight to sacrifices Mr. Seguin made for the benefit of the relationship. Later in my reasons, I will address the question of whether the trial judge actually failed in this regard. However, the points raised by Mr. Seguin to support this argument actually serve to reinforce the conclusion that there was a joint family venture. Mr. Seguin specifically notes a number of factors, including: agreeing to step down as CEO of Fastlane in September 1997 to make himself more available to Ms. Vanasse, causing friction with his co-workers and partners, and reducing his remuneration; agreeing to relocate to Ottawa at Ms. Vanasse's request in 1998; and making increased efforts to work at home more and travel less after moving back to Ottawa. These facts are indicative of the sense of mutuality in the parties' social and financial relationship. In short, they support the identification of a joint family venture.

**(e) Conclusion on Identification of the Joint Family Venture**

154      In my view, the trial judge's findings of fact clearly show that Ms. Vanasse and Mr. Seguin engaged in a joint family venture. The remaining question is whether there was a link between Ms. Vanasse's contributions

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1700, [2011] W.D.F.L. 1657, [2011] W.D.F.L. 1651,

*(3) Link to Accumulation of Wealth*

155     The trial judge made a clear finding that there was a link between Ms. Vanasse's contributions and the family's accumulation of wealth.

156     I have referred earlier, in some detail, to the trial judge's findings in this regard. However, to repeat, her conclusion is expressed particularly clearly at para. 91 of her reasons:

> Mr. Seguin could not have made the efforts he did to build up the company but for Ms. Vanasse's assumption of these [household and child-rearing] responsibilities. Mr. Seguin reaped the benefits of Ms. Vanasse's efforts by being able to focus his time, energy and efforts on Fastlane.

157     Given that and similar findings, I conclude that not only were these parties engaged in a joint family venture, but that there was a clear link between Ms. Vanasse's contribution to it and the accumulation of wealth. The unjust enrichment is thus best viewed as Mr. Seguin leaving the relationship with a disproportionate share of the wealth accumulated as a result of their joint efforts.

*(4) Calculation of the Award*

158     The main focus of the appeal was on whether the award ought to have been calculated on a *quantum meruit* basis. Very little was argued before this Court regarding the way the trial judge approached her calculation of a proportionate share of the parties' accumulated wealth. I conclude that the trial judge's approach was reasonable in the circumstances, but I stress that I do not hold out her approach as necessarily being a template for future cases. Within the legal principles I have outlined, there may be many ways in which an award may be quantified reasonably. I prefer not to make any more general statements about the quantification process in the context of this appeal, except this. Provided that the correct legal principles are applied, and the findings of fact are not tainted by clear and determinative error, a trial judge's assessment of damages is treated with considerable deference on appeal: see, e.g., *Nance v. British Columbia Electric Railway*, [1951] A.C. 601 (British Columbia P.C.). A reasoned and careful exercise of judgment by the trial judge as to the appropriate monetary award to remedy an unjust enrichment should be treated with the same deference. There are two final specific points that I must address.

159     Mr. Seguin submits, very briefly, that a proper application of the "value survived" approach in this case would require a careful determination of the contributions by third parties to the growth of Fastlane during the period his own contributions were diminished, as a result of what counsel characterizes as Ms. Vanasse's "demands" that he reduce his hours and move back to Ottawa. This argument is premised on the notion that the money he received from the sale was not justly his to share with Ms. Vanasse. I cannot accept this premise. Unexplained is why he received more than his share when the company was sold or why, having received more than he was due, Ms. Vanasse is still not entitled to an equitable share of what he actually received.

160     Second, there is the finding of the Court of Appeal that the trial judge failed to take into account evidence of Mr. Seguin's numerous and significant non-financial contributions to the family. I respectfully cannot accept this view. The trial judge specifically alluded to these contributions in her reasons. Moreover, by confining the period of unjust enrichment to the three and one-half year period, the trial judge took into account the periods during which Ms. Vanasse's contributions were not disproportionate to Mr. Seguin's. In my view, the tri-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 411 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

al judge took a realistic and practical view of the evidence before her and gave sufficient consideration to Mr. Seguin's contributions.

### D. Disposition

161     I would allow the appeal, set aside the order of the Court of Appeal, and restore the order of the trial judge. The appellant should have her costs throughout.

## V. The *Kerr* Appeal

### A. Introduction

162     When their common law relationship of more than 25 years ended, Ms. Kerr sued her former partner, Mr. Baranow, advancing claims for unjust enrichment, resulting trust, and spousal support. Mr. Baranow counterclaimed that Ms. Kerr had been unjustly enriched by his housekeeping services provided between 1991 and 2006, and by his early retirement in order to provide her personal assistance. The trial judge awarded Ms. Kerr $315,000, holding that she was entitled to this amount both by way of resulting trust (to reflect her contribution to the acquisition of property) and by way of remedial constructive trust (as a remedy for her successful claim in unjust enrichment). He also awarded Ms. Kerr $1,739 per month in spousal support effective the date she commenced proceedings. Although the trial judge rejected Mr. Baranow's assertion that Ms. Kerr had been unjustly enriched at his expense, the reasons for judgment and the order after trial do not otherwise address Mr. Baranow's counterclaim.

163     Mr. Baranow appealed. The Court of Appeal allowed the appeal, concluding that Ms. Kerr's claims for a resulting trust and in unjust enrichment should be dismissed, that Mr. Baranow's claim for unjust enrichment should be remitted to the trial court for determination, and that the order for spousal support should be effective as of the first day of the trial, not as of the date proceedings were commenced.

164     Ms. Kerr appeals, submitting that the Court of Appeal erred by setting aside the trial judge's findings that:

   (1) a resulting trust arose in her favour;

   (2) she had unjustly enriched Mr. Baranow; and

   (3) spousal support should begin as of the date she instituted proceedings.

165     In my view, the Court of Appeal was right to set aside the trial judge's findings of resulting trust and unjust enrichment. It also did not err in directing that Mr. Baranow's counterclaim be returned to the Supreme Court of British Columbia for hearing. However, my view is that Ms. Kerr's unjust enrichment claim should not have been dismissed, but rather a new trial ordered. While the trial judge's errors certainly were not harmless, it is not possible to say on this record, which includes findings of fact tainted by clear error, that her unjust enrichment claim would inevitably fail if analyzed using the clarified legal framework set out above. With respect to the commencement date of the spousal support order, I would set aside the order of the Court of Appeal and restore the trial judge's order.

### B. Overview of the Facts

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, [2011] W.D.F.L. 1669, ...

166    The trial judge's disposition of both the restitution trust and unjust enrichment claim turned on his conclusion that Ms. Kerr had provided $60,000 worth of equity and assets at the beginning of the relationship. This fact, in the trial judge's view, supported awarding her one-third of the value of the home she shared with Mr. Baranow at the time of separation. According to the trial judge, this $60,000 of equity and assets consisted of three elements: her $37,000 of equity in the Coleman Street home she had shared with her former husband; the value of an automobile; and the value of furniture which she brought into her relationship with Mr. Baranow. The trial judge did not make specific findings of fact about the value of either Ms. Kerr's or Mr. Baranow's nonmonetary contributions to the relationship. As previously noted, while the judge rejected in a single sentence Mr. Baranow's contention that Ms. Kerr had been unjustly enriched at his expense, the judge did not explain the basis of that conclusion. Mr. Baranow's counterclaim was not otherwise addressed.

167    The trial judge's findings of fact, of course, must be accepted unless tainted with clear and determinative error. In this case, however, the Court of Appeal's intervention on some of the judge's key findings was justified, because those findings simply were not supported by the record. I will have to delve into the facts, more than might otherwise be required, to explain why.

168    The parties began to live together in Mr. Baranow's home on Wall Street in Vancouver in May 1981. Shortly afterward, they moved into Ms. Kerr's former matrimonial home on Coleman Street. They had met at their mutual place of work, the Port of Vancouver, where she worked as a secretary and he as a longshoreman. Ms. Kerr was in midst of a divorce. Through her separation agreement, Ms. Kerr received her husband's interest in their former matrimonial home on Coleman Street in North Vancouver, all of the furniture in the house, and a 1979 Cadillac Eldorado. However, Ms. Kerr's ex-husband owed more than $400,000 and Ms. Kerr was guarantor of some of that debt.

169    In the summer of 1981, the Coleman Street property was the subject of foreclosure proceedings and, according to the evidence, was about to be foreclosed on July 29, 1981. Ms. Kerr testified at trial that, at the time, she had two teenage children, was earning under $30,000 a year, and had no money to save the house.

170    Ms. Kerr instructed her lawyer to place the titles to the Coleman Street property and the vehicle into Mr. Baranow's name. Mr. Baranow paid $33,000 in cash to secure the property against outstanding debts, and guaranteed a $100,000 mortgage at a rate of 22 percent. He then began to make the mortgage payments and eventually refinanced the mortgage, together with that on his Wall Street property, and assumed that new mortgage himself.

171    The couple lived together for the next 25 years, first in the Wall Street property, then at Coleman Street, then in a temporary apartment, and finally in their "dream home" which they constructed on Mr. Baranow's Wall Street property.

172    While the parties lived together in the Coleman Street property (from September 1981 to December 1985), Mr. Baranow retained the $450 per month he received by renting out his Wall Street property. The trial judge found that, although the parties kept their financial affairs separate, there was an arrangement by which Mr. Baranow would pay the property taxes and mortgage payments on both the Coleman Street and the Wall Street properties. The mortgage on both properties was paid off before July 1985. However, Mr. Baranow took out a $32,000 mortgage on the Wall Street property in July 1985, which was paid in full by August 1988.

173    The Coleman Street property was sold in August 1985 for $138,000. This sale was at a considerable loss, taking into account the real estate commission, the $33,000 in cash Mr. Baranow had contributed at the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 419 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

time of the transfer to him, and the mortgage payments he alone had made between the transfer in the summer of 1981 and the sale in the summer of 1985.

174      The parties moved into an apartment (from August 1985 until October 1986) while they constructed their "dream home" at the Wall Street location. The existing dwelling was torn down and replaced. Mr. Baranow spent somewhere between $97,000 and $105,000 on its construction, with additional amounts spent for materials, labour and permits. Ms. Kerr, the trial judge found, was involved with the planning, interior decorating and cleaning. She also planted sod, tended the flower garden, and paid for some wood paneling in the downstairs bedroom. In addition, she made contributions towards the purchase of furniture, appliances, and other chattels for the Wall Street property. Her son paid $350 per month in rent, which Mr. Baranow retained. At one point in his reasons, the trial judge stated that Ms. Kerr paid "all of the household expenses and the insurance on the new house ... even after the $32,000.00 mortgage was paid off by [Mr. Baranow] in August 1988" (para. 24). However, at another point, the judge noted that Ms. Kerr paid the utilities and insurance and bought "some groceries" (para. 36). Mr. Baranow, he found, paid the property-related expenses, consisting of property taxes (less the disability benefit attributable to Ms. Kerr) and upkeep (which was minimal in the new house). The trial judge found that the current value of the Wall Street property was $942,500, compared with $205,000 in October of 1986. He then concluded that, given there were no mortgage payments after 1988, Ms. Kerr's share of the expenses "was probably higher" than Mr. Baranow's for approximately 18 years before they stopped living together.

175      In 1991, Ms. Kerr suffered a massive stroke and cardiac arrest, leaving her paralyzed on her left side and unable to return to work. Her health steadily deteriorated, and relations between the couple became increasingly strained. Mr. Baranow took an early retirement in 2002. The trial judge acknowledged that Mr. Baranow claimed to have done this to care for Ms. Kerr, but noted that early retirement was also favourable to him. The trial judge found that Mr. Baranow started to experience "caregiver fatigue" and began exploring institutional care alternatives in June 2005. The next summer, in August 2006, Ms. Kerr had to undergo surgery on her knee. After the surgery, Mr. Baranow made it clear to the hospital staff that he was not prepared to have her return home. Ms. Kerr was transferred to an extended care facility where she remained at the time of trial. The trial judge found that, in the last 18 months Ms. Kerr resided at the Wall Street property, Mr. Baranow did most of the housework and helped her with her bodily functions.

*C. Analysis*

*(1) The Resulting Trust Issue*

176      The trial judge found that Mr. Baranow held a one-third interest in the Wall Street property by way of resulting trust for Ms. Kerr, on three bases. The Court of Appeal found that each of these holdings was erroneous. I respectfully agree.

**(a) Gratuitous Transfer**

177      The trial judge found that the transfer of the Coleman Street property to Mr. Baranow was gratuitous, therefore raising the presumption of a resulting trust in Ms. Kerr's favour. At the time of transfer to Mr. Baranow, roughly $133,000 was required to save the property (it was subject to a first mortgage of just under $80,000, a second mortgage of just under $35,000, a judgment in favour of the Bank of Montreal of just under $12,000, and other miscellaneous debts and charges, adding up to roughly $133,000). There was also a $26,500 judgment in favour of CIBC, which was of concern to Ms. Kerr, although it is not listed in the payouts required

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245,
[2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011]
B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647,
[2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L.
1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011]
W.D.F.L. 1706, 201 I.L.W. 2454...

...that she
declared bankruptcy in 1983 in relation to $15,000 of debt for which she had co-signed with her former husband.

178      The Court of Appeal reversed the trial judge's resulting trust finding, holding that the transfer was not gratuitous. The court pointed to the contributions and liabilities undertaken by Mr. Baranow to make the transfer possible, and concluded that the trial judge's finding in this regard constituted a palpable and overriding error.

179      On this point, I respectfully agree with the Court of Appeal. There is no dispute that Mr. Baranow injected roughly $33,000 in cash, and guaranteed a $100,000 mortgage, so that the property would not be lost to the bank in the foreclosure proceedings. This constituted consideration, and the transfer therefore cannot reasonably be labelled gratuitous. The respondent would have us hold otherwise on the basis of technical arguments about the lack of a precise coincidence between the time of the transfer and payments, and the lack of payment directly to Ms. Kerr because Mr. Baranow's payments were made to her creditors. These arguments have no merit. An important element of the trial judge's finding of a resulting trust was his conclusion that there was "no evidence" that Mr. Baranow's payment of $33,000 in cash and his guarantee of the $100,000 mortgage "were in connection with the transfer or part of an agreement between the parties so as to constitute consideration for the transfer" (para. 76). Putting to one side for the moment whether this finding reflects a correct understanding of a gratuitous transfer, the judge clearly erred in making this statement; there was in fact much evidence to that precise effect. Mr. Baranow testified that Ms. Kerr had "tearfully asked" Mr. Baranow for help to save the property from the creditors. Ms. Kerr's solicitor recorded in his reporting letter that Ms. Kerr felt she had little choice but to convey the property to Mr. Baranow "faced with the large outstanding debts of [her] husband which include[d] a Judgment taken by C.I.B.C. for a debt outstanding in the amount of $26,500.00". At trial, Ms. Kerr was asked whether she had requested Mr. Baranow to save the house; she responded, "I guess so". Thus, contrary to the judge's finding, there was in fact considerable evidence that Mr. Baranow's paying off of the debts and guaranteeing the mortgage were in connection with the transfer of the property to him. This evidence shows that he accepted the transfer and assumed the financial obligations at Ms. Kerr's request, and in order to further her purpose of preventing the creditors from foreclosing on the property.

180      The Court of Appeal was correct to intervene on this point and conclude that the transfer was not gratuitous. The trial judge's imposition of a resulting trust on one-third of the Wall Street property on this basis accordingly cannot be sustained.

**(b) Ms. Kerr's Contributions**

181      The trial judge also based his finding of resulting trust on Ms. Kerr's financial and other contributions to the acquisition of the new home on the Wall Street property. He found Ms. Kerr had contributed a total of $60,000: $37,000 in equity from the transfer of the Coleman Street property to Mr. Baranow; $20,000 for the value of the Cadillac she also transferred to Mr. Baranow; and $3,000 for the furniture in the Coleman Street property. In addition, the trial judge noted that, in obtaining the legal title of Coleman, Mr. Baranow was able to "remortgage both properties for $116,000.00 and apply the $16,000.00 toward the acquisition of the Wall Street Property" (para. 82). Furthermore, Mr. Baranow would not have been able to pay off the mortgages with the same efficiency but for Ms. Kerr's contributions to household expenses. However, the trial judge did not attach any value to these last two matters in his determination of the extent of the resulting trust which he imposed on the Wall Street property.

182      The Court of Appeal reversed this finding as not being supported by the record. The court noted that

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 419 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

Ms. Kerr did not have $37,000 in equity in the Coleman Street property when Mr. Baranow took title, Mr. Baranow did not receive any beneficial interest in the vehicle, and there was no evidence of the value of the furnishings.

183      I agree with the Court of Appeal's disposition of this issue. As it pointed out, the evidence showed that, in addition to Mr. Baranow paying cash and guaranteeing a mortgage, he paid the monthly mortgage payments, taxes and upkeep expenses on the Coleman property until it was sold in 1985 for $138,000 (less real estate commission). Mr. Baranow received no beneficial interest in the vehicle and the judge made no finding about the value of the furnishings. There was not, in any meaningful sense of the word, any equity in the Coleman property for Ms. Kerr to contribute to the acquisition or improvement of the Wall Street property. I would affirm the conclusion of the Court of Appeal on this point.

**(c) Common Intention Resulting Trust**

184      The trial judge also appears to have based his conclusions about the resulting trust on his finding of a common intention on the part of Ms. Kerr and Mr. Baranow to share in the Wall Street property. For the reasons I have given earlier, the "common intention" resulting trust has no further role to play in the resolution of disputes such as this one. I would hold that a resulting trust should not have been imposed on the Wall Street property on the basis of a finding of common intention between these parties.

**(d) Conclusion With Respect to Resulting Trust**

185      In my view the Court of Appeal was correct to set aside the trial judge's conclusions with respect to the resulting trust issues.

*(2) Unjust Enrichment*

186      The trial judge also found that Mr. Baranow had been unjustly enriched by Ms. Kerr to the extent of $315,000, the value of the one-third interest in the Wall Street property determined during the resulting trust analysis. The judge found that Ms. Kerr had provided the following benefits to Mr. Baranow:

a. $37,000 equity in the Coleman Street property

b. the automobile

c. the furnishings

d. $16,000 in refinancing permitted by the Coleman transfer and applied to the Wall Street property

e. $22,000 gained on the resale of the Coleman Street property

f. household expenses and insurance paid on both properties

g. spousal services such as housework, entertaining guests and preparing meals until Ms. Kerr's disability made it impossible to continue

h. assistance with planning and decoration of the Wall Street house

i. financial contributions towards the purchase of chattels for the new home

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011]
B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011]
B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647,
[2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L.
1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011]
W.D.F.L. 1709, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1700, [2011] W.D.F.L. 1657, [2011] W.D.F.L. 1651,

k. approximately five years' worth of rental income from Ms. Kerr's son

187     Turning to the element of corresponding deprivation, the trial judge noted that it was "unlikely" that Ms. Kerr had given up any career or educational opportunities over the course of the relationship. Furthermore, her income remained unchanged, even following her stroke, due to her receipt of disability pensions and other benefits. The judge found that she had lived rent-free for the entire relationship. He concluded, however, that she had suffered a deprivation because, had she not contributed her equity in the Coleman Street property, it was "reasonable to infer that she would have used it to purchase an asset in her own name, invest for her own benefit, use it for some personal interest, or otherwise avail herself of beneficial financial opportunity": para. 92. He also concluded, without elaboration, that the benefits that she received from the relationship did not overtake her contributions.

188     The Court of Appeal set aside the trial judge's finding of unjust enrichment. It found that Mr. Baranow's direct and indirect contributions, by which Ms. Kerr was enriched and for which he was not compensated, constituted a juristic reason for any enrichment which he experienced at her expense. The court found that, for reasons mentioned earlier, there was no $60,000 contribution by Ms. Kerr and therefore her claim rested on her indirect contributions. The court also concluded that the trial judge's analysis failed to assess the extent of Mr. Baranow's direct and indirect contributions to Ms. Kerr, including: his payment of accommodation expenses for the duration of the relationship; his contribution to the purchase price of the van which Ms. Kerr still possesses; her receipt of almost half of his lifetime amount of union medical benefits, used to pay for her health care expenses; his taking early retirement with a reduced monthly pension to care for Ms. Kerr; and his provision of extensive personal caregiver and domestic services without compensation. Moreover, in the Court of Appeal's view, the trial judge had failed to note that Mr. Baranow's payment of her living expenses permitted her to save about $272,000 over the course of the relationship.

189     The appellant challenges the Court of Appeal's decision on two bases. First, she argues that the court improperly interfered with the trial judge's finding of fact with respect to Ms. Kerr's $60,000 contribution to the relationship. Second, she submits that the court improperly considered the question of mutual benefits through the lens of juristic reason, and that this resulted in the court failing to consider globally who had been enriched and who deprived. Ms. Kerr's submission on this latter point is that consideration of mutual benefit conferral should occur during the first two steps of the unjust enrichment analysis: enrichment and corresponding deprivation. Once that has been established, she argues that the legitimate expectations of the parties may be considered as part of the analysis of whether there was a juristic reason for the enrichment. The main point is that, in the appellant's submission, it was open to the trial judge to conclude that the parties' legitimate expectation was that they would accumulate wealth in proportion to their respective incomes; without a share of the value of the real property acquired during the relationship, that reasonable expectation cannot be realized.

190      More fundamentally, the appellant urges the Court to adopt what she calls the "family property approach" to unjust enrichment. In essence, the appellant submits that her contributions gave rise to a reasonable expectation that she would have an equitable share of the assets acquired during the relationship.

191     I will deal with these submissions in turn.

**(a) Findings of Fact Regarding the $60,000 Contribution**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 411 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

192      As noted earlier, the Court of Appeal was right to set aside the trial judge's conclusion that the appellant had contributed $60,000 to the couple's assets. There was, in no realistic sense of the word, any "equity" to contribute from the Coleman Street property to acquisition of the new Wall Street "dream home". Furthermore, the appellant retained the beneficial use of the motor vehicle, and there was no satisfactory evidence of the value of the furniture. The judge's findings on this point were the product of clear and determinative error.

**(b) Analysis of Offsetting Enrichments**

193      On this issue, I cannot accept the conclusions of either the trial judge or the Court of Appeal. As noted, in his determination of the extent of Ms. Kerr's unjust enrichment, the trial judge largely ignored Mr. Baranow's contributions. However, for the reasons I have developed earlier, the Court of Appeal erred in assessing Mr. Baranow's contributions as part of the juristic reason analysis; this analysis prematurely truncated Ms. Kerr's *prima facie* case of unjust enrichment. I have set out the correct approach to this issue earlier in my reasons. As, in my view, there must be a new trial of both Ms. Kerr's unjust enrichment claim and Mr. Baranow's counterclaim, it is not necessary to say anything further. The principles set out above must accordingly be applied at the new trial of these issues.

**(c) The "Family Property Approach"**

194      I turn finally to Ms. Kerr's more general point that her claim should be assessed using a "family property approach". As set out earlier in my reasons, for Ms. Kerr to show an entitlement to a proportionate share of the wealth accumulated during the relationship, she must establish that Mr. Baranow has been unjustly enriched at her expense, that their relationship constituted a joint family venture, and that her contributions are linked to the generation of wealth during the relationship. She would then have to show what proportion of the jointly accumulated wealth reflects her contributions. Of course, this clarified template was not available to the trial judge or to the Court of Appeal. However, these requirements are quite different than those advanced by the appellant and accordingly her "family property approach" must be rejected.

**(d) Disposition of the Unjust Enrichment Appeal**

195      I conclude that the findings of the trial judge in relation to unjust enrichment cannot stand. The next question is whether, as the Court of Appeal decided, Ms. Kerr's claim for unjust enrichment should be dismissed or whether it ought to be returned for a new trial. With reluctance, I have concluded the latter course is the more just one in all of the circumstances.

196      The first consideration in support of a new trial is that the Court of Appeal directed a hearing of Mr. Baranow's counterclaim. Given that the trial judge unfortunately did not address that claim in any meaningful way, the Court of Appeal's order that it be heard and decided is unimpeachable. There was evidence that Mr. Baranow made very significant contributions to Ms. Kerr's welfare such that his counterclaim cannot simply be dismissed. As I noted earlier, the trial judge also referred to various other monetary and non-monetary contributions which Ms. Kerr made to the couple's welfare and comfort, but he did not evaluate them, let alone compare them with the contributions made by Mr. Baranow. In these circumstances, trying the counterclaim separated from Ms. Kerr's claim would be an artificial and potentially unfair way of proceeding.

197      More fundamentally, Ms. Kerr's claim was not presented, defended or considered by the courts below pursuant to the joint family venture analysis that I have set out. Even assuming that Ms. Kerr made out her claim in unjust enrichment, it is not possible to fairly apply the joint family venture approach to this case on appeal,

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, 201 A.C.W.S. (3d) 656...

using the record of this Court or the Court of Appeal for resolving the key question of whether the parties' relationship constituted a joint family venture. Moreover, even if one were persuaded that the evidence permitted resolution of the joint family venture issue, the record is unsatisfactory for deciding whether Ms. Kerr's contributions to a joint family venture were linked to the accumulation of wealth and, if so, in what proportion. The trial judge found that her payment of household expenses and insurance payments, along with the "proceeds" from the Coleman Street property, allowed Mr. Baranow to pay off the $116,000 mortgage on both properties before July 1985. There is, thus, a finding that her contributions were linked to the accumulation of wealth, given that the Wall Street property was valued at $942,500 at the time of trial. However, as the judge's findings with respect to Ms. Kerr's equity in the Coleman Street property cannot stand, this conclusion is considerably undermined. For much the same reason, there is no possibility on this record of evaluating the proportionate contributions to a joint family venture. In short, to attempt to resolve Ms. Kerr's unjust enrichment claim on its merits, using the record before this Court, involves too much uncertainty and risks injustice.

198      In this respect, the *Kerr* appeal is in marked contrast to the *Vanasse* appeal. There, an unjust enrichment was conceded and the trial judge's findings of fact closely correspond to the analytical approach I have proposed. In the present appeal, while the findings made do not appear to demonstrate a joint family venture or a concomitant link to accumulated wealth, it would be unfair to reach that conclusion without giving an opportunity to the parties to present their evidence and arguments in light of the approach set out in these reasons.

199      Reluctantly, therefore, I would order a new trial of Ms. Kerr's unjust enrichment claim, as well as affirm the Court of Appeal's order for a hearing of Mr. Baranow's counterclaim.

*(3) Effective Date of Spousal Support*

200      The final issue is whether, as the Court of Appeal held, the trial judge erred in making his order for spousal support in favour of Ms. Kerr effective on the date she had commenced proceedings rather than on the first day of trial. In my respectful view, the Court of Appeal erred in its application of the relevant factors and ought not to have set aside the trial judge's order.

201      The trial judge found that the appellant's income in 2006 was $28,787 and the respondent's income was $70,520, on the basis of their respective income tax returns. He then applied the Spousal Support Advisory Guidelines ("SSAG") to arrive at a range of $1,304 to $1,739 per month. He settled on an amount at the higher end of that range in order to assist Ms. Kerr in pursuing a private bed while waiting for a subsidized bed in a suitable facility closer to her family.

202      The Court of Appeal agreed with the trial judge that Ms. Kerr was entitled to an award of spousal support given the length of the parties' relationship, her age, her fixed and limited income and her significant disability; she was entitled to a spousal support award that would permit her to live at a lifestyle that is closer to that which the parties enjoyed when they were together; and that the judge had properly determined the quantum of support. The Court of Appeal concluded, however, that the trial judge had erred in ordering support effective the date Ms. Kerr had commenced proceedings. It faulted the judge in several respects: for apparently having made the order as a matter of course rather than applying the relevant legal principles; for failing to consider that, during the interim period, Ms. Kerr had no financial needs beyond her means because she had been residing in a government-subsidized care facility and had not had to encroach on her capital; for failing to take account of the fact she had made no demand of Mr. Baranow to contribute to her interim support and had provided no explanation for not having done so; and for ordering retroactive support where, in light of the absence of an interim ap-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 411 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

plication, there was no blameworthy conduct on Mr. Baranow's part.

203    The appellant submits that the decision to equate the principles pertaining to retroactive spousal support with those of retroactive child support has been done without any discussion or legal analysis. Furthermore, she argues that the Court of Appeal's reasoning places an untoward and inappropriate burden on applicants, essentially mandating that they apply for interim spousal support or lose their entitlement. Lastly, she argues that there is a legal distinction between retroactive support before and after the application is filed, and that in the latter circumstance there is less need for judicial restraint. I agree with the second and third of these submissions.

204    There is no doubt that the trial judge had the discretion to award support effective the date proceedings had been commenced. This is clear from the British Columbia *Family Relations Act*, R.S.B.C. 1996, c. 128 ("*FRA*"), s. 93(5)(d):

> (5) An order under this section may also provide for one or more of the following:
>
> . . . . .
>
> (d) payment of support in respect of <u>any period before the order is made</u>;

205    The appellant requested support effective the date her writ of summons and statement of claim were issued and served. She was and is not seeking support for the period before she commenced her proceedings, or for any period during which another court order for support was in effect. I note that she was obliged by statute to seek support within a year of the end of cohabitation: s. 1(1), definition of "spouse" para. (b), of the *FRA*. Ms. Kerr made her application just over a month after the parties ceased living together.

206    I will not venture into the semantics of the word "retroactive": see *S. (D.B.) v. G. (S.R.)*, 2006 SCC 37, [2006] 2 S.C.R. 231 (S.C.C.), at paras. 2 and 69-70; *S. (L.) v. P. (E.) (1999), 67 B.C.L.R. (3d) 254* (B.C. C.A.), at paras. 55-57. Rather, I prefer to follow the example of Bastarache J. in *S. (D.B.)* and consider the relevant factors that come into play where support is sought in relation to a period predating the application.

207    While *S. (D.B.)* was concerned with child as opposed to spousal support, I agree with the Court of Appeal that similar considerations to those set out in the context of child support are also relevant to deciding the suitability of a "retroactive" award of spousal support. Specifically, these factors are the needs of the recipient, the conduct of the payor, the reason for the delay in seeking support and any hardship the retroactive award may occasion on the payor spouse. However, in spousal support cases, these factors must be considered and weighed in light of the different legal principles and objectives that underpin spousal as compared with child support. I will mention some of those differences briefly, although certainly not exhaustively.

208    Spousal support has a different legal foundation than child support. A parent-child relationship is a fiduciary relationship of presumed dependency and the obligation of both parents to support the child arises at birth. It that sense, the entitlement to child support is "automatic" and both parents must put their child's interests ahead of their own in negotiating and litigating child support. Child support is the right of the child, not of the parent seeking support on the child's behalf, and the basic amount of child support under the *Divorce Act*, R.S.C. 1985, c. 3 (2nd Supp.), (as well as many provincial child support statutes) now depends on the income of the payor and not on a highly discretionary balancing of means and needs. These aspects of child support reduce

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011]...

somewhat different with concern to both delay and diligence in seeking child support. With respect to notice, the payor parent is or should be aware of the obligation to provide support commensurate with his or her income. As for delay, the right to support is the child's and therefore it is the child's, not the other parent's position that is prejudiced by lack of diligence on the part of the parent seeking child support: see *S. (D.B.)*, at paras. 36-39, 47-48, 59, 80 and 100-104. In contrast, there is no presumptive entitlement to spousal support and, unlike child support, the spouse is in general not under any legal obligation to look out for the separated spouse's legal interests. Thus, concerns about notice, delay and misconduct generally carry more weight in relation to claims for spousal support: see, for example, M.L. Gordon, "Blame Over: Retroactive Child and Spousal Support in the Post-Guideline Era" (2004-2005), 23 C.F.L.Q. 243, at pp. 281 and 291-92.

209    Where, as here, the payor's complaint is that support could have been sought earlier, but was not, there are two underlying interests at stake. The first relates to the certainty of the payor's legal obligations; the possibility of an order that reaches back into the past makes it more difficult to plan one's affairs and a sizeable "retroactive" award for which the payor did not plan may impose financial hardship. The second concerns placing proper incentives on the applicant to proceed with his or her claims promptly (see *S. (D.B.)*, at paras. 100-103).

210     Neither of these concerns carries much weight in this case. The order was made effective the date on which the proceedings seeking relief had been commenced, and there was no interim order for some different amount. Commencement of proceedings provided clear notice to the payor that support was being claimed and permitted some planning for the eventuality that it was ordered. There is thus little concern about certainty of the payor's obligations. Ms. Kerr diligently pursued her claim to trial and that being the case, there is little need to provide further incentives for her or others in her position to proceed with more diligence.

211    In *S. (D.B.)*, Bastarache, J. referred to the date of effective notice as the "general rule" and "default option" for the choice of effective date of the order (paras. 118 and 121; see also para. 125). The date of the initiation of proceedings for spousal support has been described by the Ontario Court of Appeal as the "usual commencement date", absent a reason not to make the order effective as of that date: *MacKinnon v. MacKinnon (2005), 75 O.R. (3d) 175* (Ont. C.A.), at para. 24. While in my view, the decision to order support for a period before the date of the order should be the product of the exercise of judicial discretion in light of the particular circumstances, the fact that the order is sought effective from the commencement of proceedings will often be a significant factor in how the relevant considerations are weighed. It is important to note that, in *S. (D.B.)*, all four litigants were requesting that child support payments reach back to a period in time preceding their respective applications; such is not the case here.

212    Other relevant considerations noted in *S. (D.B.)* include the conduct of the payor, the circumstances of the child (or in the case of spousal support, the spouse seeking support), and any hardship occasioned by the award. The focus of concern about conduct must be on conduct broadly relevant to the support obligation, for example concealing assets or failing to make appropriate disclosure: *S. (D.B.)*, at para. 106. Consideration of the circumstances of the spouse seeking support, by analogy to the *S. (D.B.)* analysis, will relate to the needs of the spouse both at the time the support should have been paid and at present. The comments of Bastarache J. at para. 113 of *S. (D.B.)* may be easily adapted to the situation of the spouse seeking support: "A [spouse] who underwent hardship in the past may be compensated for this unfortunate circumstance through a retroactive award. On the other hand, the argument for retroactive [spousal] support will be less convincing where the [spouse] already enjoyed all the advantages (s)he would have received [from that support]". As for hardship, there is the risk that a retroactive award will not be fashioned having regard to what the payor can currently afford and may disrupt the payor's ability to manage his or her finances. However, it is also critical to note that this Court in *S. (D.B.)*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

[2011] W.D.F.L. 1690, [2011] 3 W.W.R. 575, 64 E.T.R. (3d) 1, 14 B.C.L.R. (5th) 203, 421 N.R. 200, 328 D.L.R. (4th) 577, 93 R.F.L. (6th) 1, 274 O.A.C. 1, 300 B.C.A.C. 1, 509 W.A.C. 1, [2011] 1 S.C.R. 269, 108 O.R. (3d) 399, 199 A.C.W.S. (3d) 1214

emphasized the need for flexibility and a holistic view of each matter on its own merits; the same flexibility is appropriate when dealing with "retroactive" spousal support.

213    In light of these principles, my view is that the Court of Appeal made two main errors.

214    First, it erred by finding that the circumstances of the appellant were such that there was no need prior to the trial. The trial judge found, and the Court of Appeal did not dispute, that the appellant was entitled to non-compensatory spousal support, at the high end of the range suggested by the SSAG, for an indefinite duration. Entitlement, quantum, and the indefinite duration of the order were not appealed before this Court. It is clear that Ms. Kerr was in need of support from the respondent at the date she started her proceedings and remained so at the time of trial. The Court of Appeal rightly noted the relevant factors, such as her age, disability, and fixed income. However, the Court of Appeal did not describe how Ms. Kerr's circumstances had changed between the commencement of proceedings and the date of trial, nor is any such change apparent in the trial judge's findings of fact. As I understand the record, one of the objectives of the support order was to permit Ms. Kerr to have access to a private pay bed while waiting for her name to come up for a subsidized bed in a suitable facility closer to her son's residence. From the date she commenced her proceedings until the date of trial, she resided in the Brock Fahrni Pavilion in a government-funded extended care bed in a room with three other people. In my respectful view, her need was constant throughout the period. If the Court of Appeal's rationale was that Ms. Kerr's need would only arise once she actually had secured the private pay bed, its decision to make the order effective the first day of trial seems inconsistent with that approach. The Court of Appeal did not suggest that her need was any different on that day than on the day she had commenced her proceedings. Nor did the court point to any financial hardship that the trial judge's award would have on Mr. Baranow.

215    Respectfully, the Court of Appeal erred in principle in setting aside the judge's order effective as of the date of commencement of proceedings on the ground that Ms. Kerr had no need during that period, while upholding the judge's findings of need in circumstances that were no different from those existing at the time proceedings were commenced.

216    Second, the Court of Appeal in my respectful view was wrong to fault Ms. Kerr for not bringing an interim application, in effect attributing to her unreasonable delay in seeking support for the period in question. Ms. Kerr commenced her proceedings promptly after separation and, in light of the fact that the trial occurred only about thirteen months afterward, she apparently pursued those proceedings to trial with diligence. There was thus clear notice to Mr. Baranow that support was being sought and he could readily take advice on the likely extent of his liability. Given the high financial, physical, and emotional costs of interlocutory applications, especially for a party with limited means and a significant disability such as Ms. Kerr, it was in my respectful view unreasonable for the Court of Appeal to attach such serious consequences to the fact that an interim application was not pursued. The position taken by the Court of Appeal to my way of thinking undermines the incentives which should exist on parties to seek financial disclosure, pursue their claims with due diligence, and keep interlocutory proceedings to a minimum. Requiring interim applications risks prolonging rather than expediting proceedings. The respondent's argument based on the fact that a different legal test would have applied at the interim support stage is unconvincing. After a full trial on the merits, the trial judge made clear and now unchallenged findings of need on the basis of circumstances that had not changed between commencement of proceedings and trial.

217    In short, there was virtually no delay in applying for maintenance, nor was there any inordinate delay between the date of application and the date of trial. Ms. Kerr was in need throughout the relevant period, she

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellBC 240, 2011 SCC 10, J.E. 2011-333, [2011] B.C.W.L.D. 2347, [2011] B.C.W.L.D. 2245, [2011] B.C.W.L.D. 2321, [2011] B.C.W.L.D. 2316, [2011] B.C.W.L.D. 2346, [2011] B.C.W.L.D. 2441, [2011] B.C.W.L.D. 2322, [2011] B.C.W.L.D. 2440, [2011] W.D.F.L. 1685, [2011] W.D.F.L. 1648, [2011] W.D.F.L. 1647, [2011] W.D.F.L. 1701, [2011] W.D.F.L. 1702, [2011] W.D.F.L. 1649, [2011] W.D.F.L. 1680, [2011] W.D.F.L. 1646, [2011] W.D.F.L. 1715, [2011] W.D.F.L. 1714, [2011] W.D.F.L. 1668, [2011] W.D.F.L. 1631, [2011] W.D.F.L. 1706, [2011] W.D.F.L. 1660, [2011] W.D.F.L. 1700, 200 A.C.W.S. (3d) 888

suffered from a serious physical disability, and her standard of living was markedly lower than it was while she lived with the respondent. Mr. Baranow had the means to provide support, had prompt notice of her claim, and there was no indication in the Court of Appeal's reasons that it considered the judge's award imposed on him a hardship so as to make that award inappropriate.

218    While it is regrettable that the judge did not elaborate on his reasons for making the order effective as of the date proceedings had been commenced, the relevant legal principles applied to the facts as he found them support the making of that order and the Court of Appeal erred in holding otherwise.

219    In summary, I conclude that the Court of Appeal erred in setting aside the portion of the judge's order for support between the commencement of proceedings and the beginning of trial. I would restore the order of the trial judge making spousal support effective September 14, 2006.

### D. Disposition

220    I would allow the appeal in part. Specifically, I would:

a. allow the appeal on the spousal support issue and restore the order of the trial judge with respect to support;

b. allow the appeal with respect to the Court of Appeal's decision to dismiss Ms. Kerr's unjust enrichment claim and order a new trial of that claim;

c. dismiss the appeal in relation to Ms. Kerr's claim of resulting trust and the ordering of a new hearing of Mr. Baranow's counterclaim and affirm the order of the Court of Appeal in relation to those issues.

221    As Ms. Kerr has been substantially successful, I would award her costs throughout.

*Appeal by V allowed; appeal by K allowed in part.*

*Pourvoi de V accueilli; pourvoi de K accueilli en partie.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 60

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520



2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

King v. Operating Engineers Training Institute of Manitoba Inc.

Robert King, (Plaintiff / Respondent) and Operating Engineers Training Institute of Manitoba Inc., (Defendant / Appellant)

Manitoba Court of Appeal

Michel A. Monnin, Freda M. Steel, Barbara M. Hamilton JJ.A.

Heard: December 17, 2010
Judgment: September 27, 2011
Docket: AI 10-30-07356

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: affirming *King v. Operating Engineers Training Institute of Manitoba Inc.* (2010), 252 Man. R. (2d) 121, 2010 MBQB 44, 2010 CarswellMan 68 (Man. Q.B.)

Counsel: M.T. Green, for Appellant

G.M. Fleetwood, for Respondent

Subject: Employment; Public; Contracts; Evidence

Labour and employment law --- Employment law — Wages and benefits — Contractual terms regarding wages — Miscellaneous

Contracts --- Formation of contract — Consensus ad idem — Certainty of terms — Miscellaneous

Defendant hired plaintiff to teach course training heavy equipment operators — Plaintiff claimed that, in conversations held prior to signing of employment contracts, defendant agreed to pay plaintiff's salary net of taxes — Revenue Canada demanded that plaintiff pay income tax owing — Defendant denied any agreement to pay net amount — Plaintiff successfully brought action to force defendant to fulfil its commitment and indemnify him for taxes payable — Defendant appealed — Appeal dismissed — Parol evidence rule did not apply where there was allegation that contract was partially in writing and partially oral, or that collateral contract existed — In such cases, certain extrinsic evidence was admissible to substantiate those allegations — Also, evidence with respect to surrounding circumstances or factual matrix was admissible to aid court in understanding and interpreting language and meaning of written contract, even where no collateral contract was alleged.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

Evidence --- Parol evidence rule — Collateral agreements — Miscellaneous

Defendant hired plaintiff to teach course training heavy equipment operators — Plaintiff claimed that, in conversations held prior to signing of employment contracts, defendant agreed to pay plaintiff's salary net of taxes — Revenue Canada demanded that plaintiff pay income tax owing — Defendant denied any agreement to pay net amount — Plaintiff successfully brought action to force defendant to fulfil its commitment and indemnify him for taxes payable — Defendant appealed — Appeal dismissed — Parol evidence rule did not apply where there was allegation that contract was partially in writing and partially oral, or that collateral contract existed — In such cases, certain extrinsic evidence was admissible to substantiate those allegations — Also, evidence with respect to surrounding circumstances or factual matrix was admissible to aid court in understanding and interpreting language and meaning of written contract, even where no collateral contract was alleged.

**Cases considered by *Freda M. Steel J.A.*:**

*Barcode Systems Inc. v. Symbol Technologies Canada Inc.* (2008), 419 W.A.C. 312, 44 B.L.R. (4th) 33, 2008 MBCA 47, 2008 CarswellMan 166, 225 Man. R. (2d) 312 (Man. C.A.) — referred to

*Bauer v. Bank of Montreal* (1980), 1980 CarswellOnt 141, 33 C.B.R. (N.S.) 291, 1980 CarswellOnt 638, [1980] 2 S.C.R. 102, 32 N.R. 191, 10 B.L.R. 209, 110 D.L.R. (3d) 424 (S.C.C.) — considered

*Bell Mobility Inc. v. MTS Allstream Inc.* (2009), 2009 MBCA 28, 2009 CarswellMan 80, 236 Man. R. (2d) 167, 448 W.A.C. 167, [2009] 8 W.W.R. 292, 67 C.P.C. (6th) 118 (Man. C.A.) — referred to

*Canada (Director of Investigation & Research) v. Southam Inc.* (1997), 50 Admin. L.R. (2d) 199, 144 D.L.R. (4th) 1, 71 C.P.R. (3d) 417, [1997] 1 S.C.R. 748, 209 N.R. 20, 1997 CarswellNat 368, 1997 CarswellNat 369 (S.C.C.) — considered

*Carman Construction Ltd. v. Canadian Pacific Railway* (1982), [1982] 1 S.C.R. 958, 42 N.R. 147, 18 B.L.R. 65, 136 D.L.R. (3d) 193, 1982 CarswellOnt 124, 1982 CarswellOnt 729 (S.C.C.) — considered

*Castledowns Law Office Management Ltd. v. 1131102 Alberta Ltd.* (2009), 2009 ABCA 148, 4 Alta. L.R. (5th) 40, 2009 CarswellAlta 558, 454 A.R. 328, [2009] 9 W.W.R. 43, 78 R.P.R. (4th) 1 (Alta. C.A.) — referred to

*Casurina Ltd. Partnership v. Rio Algom Ltd.* (2004), 2004 CarswellOnt 180, 181 O.A.C. 19, 40 B.L.R. (3d) 112 (Ont. C.A.) — referred to

*Casurina Ltd. Partnership v. Rio Algom Ltd.* (2004), 2004 CarswellOnt 3999, 2004 CarswellOnt 4000, 335 N.R. 199 (note) (S.C.C.) — referred to

*Double N Earthmovers Ltd. v. Edmonton (City)* (2005), 6 M.P.L.R. (4th) 25, 41 Alta. L.R. (4th) 205, 2005 ABCA 104, 2005 CarswellAlta 276, 363 A.R. 201, 343 W.A.C. 201, [2005] 10 W.W.R. 1 (Alta. C.A.) — referred to

*Dumbrell v. Regional Group of Cos.* (2007), 55 C.C.E.L. (3d) 155, 220 O.A.C. 64, 85 O.R. (3d) 616, 2007 CarswellOnt 407, 25 B.L.R. (4th) 171, 279 D.L.R. (4th) 201, 2007 ONCA 59 (Ont. C.A.) — considered

*Eco-Zone Engineering Ltd. v. Grand Falls-Windsor (Town)* (2000), 2000 NFCA 21, 2000 CarswellNfld 315, 5 C.L.R. (3d) 55, [2000] G.S.T.C. 106 (Nfld. C.A.) — considered

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

*Eli Lilly & Co. v. Novopharm Ltd.* (1998), 227 N.R. 201, 152 F.T.R. 160 (note), 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 80 C.P.R. (3d) 321 (S.C.C.) — considered

*Gallen v. Allstate Grain Co.* (1984), 25 B.L.R. 314, 9 D.L.R. (4th) 496, *(sub nom. Gallen v. Butterley)* 53 B.C.L.R. 38, 1984 CarswellBC 104 (B.C. C.A.) — considered

*Geoffrey L. Moore Realty Inc. v. Manitoba Motor League* (2003), 10 R.P.R. (4th) 1, 173 Man. R. (2d) 300, 293 W.A.C. 300, 34 C.P.C. (5th) 21, 2003 CarswellMan 229, 2003 MBCA 71, [2003] 9 W.W.R. 385 (Man. C.A.) — considered

*Glaswegian Enterprises Inc. v. BC Tel Mobility Cellular Inc.* (1997), 49 B.C.L.R. (3d) 317, 101 B.C.A.C. 62, 164 W.A.C. 62, 1997 CarswellBC 2836 (B.C. C.A.) — considered

*Hawrish v. Bank of Montreal* (1969), [1969] S.C.R. 515, 2 D.L.R. (3d) 600, 66 W.W.R. 673, 1969 Carswell-Sask 9 (S.C.C.) — considered

*Hayes Forest Services Ltd. v. Weyerhaeuser Co.* (2008), 2008 CarswellBC 121, 79 B.C.L.R. (4th) 17, 250 B.C.A.C. 286, 416 W.A.C. 286, 2008 BCCA 31, 289 D.L.R. (4th) 230, [2008] 7 W.W.R. 74, 42 B.L.R. (4th) 1 (B.C. C.A.) — referred to

*Hill v. Nova Scotia (Attorney General)* (1997), 142 D.L.R. (4th) 230, 206 N.R. 299, 1997 CarswellNS 10, 1997 CarswellNS 11, [1997] 1 S.C.R. 69, 157 N.S.R. (2d) 81, 462 A.P.R. 81, 60 L.C.R. 161 (S.C.C.) — considered

*Housen v. Nikolaisen* (2002), 10 C.C.L.T. (3d) 157, 211 D.L.R. (4th) 577, 286 N.R. 1, [2002] 7 W.W.R. 1, 2002 CarswellSask 178, 2002 CarswellSask 179, 2002 SCC 33, 30 M.P.L.R. (3d) 1, 219 Sask. R. 1, 272 W.A.C. 1, [2002] 2 S.C.R. 235 (S.C.C.) — considered

*Investors Compensation Scheme Ltd. v. West Bromwich Building Society* (1997), [1998] 1 All E.R. 98, [1998] 1 W.L.R. 896, [1997] UKHL 28 (U.K. H.L.) — referred to

*Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 1998 CarswellOnt 4170, 41 B.L.R. (2d) 42, 114 O.A.C. 357 (Ont. C.A.) — referred to

*L. (H.) v. Canada (Attorney General)* (2005), 2005 SCC 25, 2005 CarswellSask 268, 2005 CarswellSask 273, 333 N.R. 1, 8 C.P.C. (6th) 199, 24 Admin. L.R. (4th) 1, 262 Sask. R. 1, 347 W.A.C. 1, [2005] 8 W.W.R. 1, 29 C.C.L.T. (3d) 1, 251 D.L.R. (4th) 604, [2005] 1 S.C.R. 401 (S.C.C.) — referred to

*Langley Lo-Cost Builders Ltd. v. 474835 B.C. Ltd.* (2000), 5 B.L.R. (3d) 31, 34 R.P.R. (3d) 56, 2000 CarswellBC 1229, 2000 BCCA 365, [2000] 7 W.W.R. 46, 76 B.C.L.R. (3d) 278, 140 B.C.A.C. 182, 229 W.A.C. 182 (B.C. C.A.) — referred to

*MacDougall v. MacDougall* (2005), 2005 CarswellOnt 7257, 205 O.A.C. 216, 262 D.L.R. (4th) 120 (Ont. C.A.) — referred to

*MacMillan Bloedel Ltd. v. British Columbia Hydro & Power Authority* (1992), 72 B.C.L.R. (2d) 273, 19 B.C.A.C. 215, 34 W.A.C. 215, 98 D.L.R. (4th) 492, [1993] 2 W.W.R. 127, 1992 CarswellBC 304 (B.C. C.A.) — referred to

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

*Manulife Bank of Canada v. Conlin* (1996), 1996 CarswellOnt 3941, 1996 CarswellOnt 3942, 6 R.P.R. (3d) 1, 94 O.A.C. 161, 203 N.R. 81, [1996] 3 S.C.R. 415, 139 D.L.R. (4th) 426, 30 O.R. (3d) 577 (note), 30 B.L.R. (2d) 1 (S.C.C.) — referred to

*McGarry v. Co-operators Life Insurance Co.* (2011), 2011 C.E.B. & P.G.R. 8434, 18 B.C.L.R. (5th) 353, [2011] I.L.R. I-5139, [2011] 8 W.W.R. 653, 96 C.C.L.I. (4th) 169, 2011 CarswellBC 998, 2011 BCCA 214, 333 D.L.R. (4th) 533, 304 B.C.A.C. 238, 513 W.A.C. 238 (B.C. C.A.) — referred to

*Midnight Marine Ltd. v. Lloyd's Underwriters* (2010), 76 B.L.R. (4th) 1, 95 C.P.C. (6th) 8, 2010 NLCA 64, 2010 CarswellNfld 309, *(sub nom. Oppenheim v. Midnight Marine Ltd.)* [2010] I.L.R. I-5060, *(sub nom. Midnight Marine Ltd. v. Oppenheim)* 325 D.L.R. (4th) 254, 90 C.C.L.I. (4th) 1, *(sub nom. Midnight Marine Ltd. v. Underwriters, Lloyd's, London)* 302 Nfld. & P.E.I.R. 85, *(sub nom. Midnight Marine Ltd. v. Underwriters, Lloyd's, London)* 938 A.P.R. 85 (N.L. C.A.) — considered

*Nevin v. British Columbia Hazardous Waste Management Corp.* (1994), 1994 CarswellBC 2287 (B.C. S.C.) — referred to

*Nevin v. British Columbia Hazardous Waste Management Corp.* (1995), 15 C.C.E.L. (2d) 165, 129 D.L.R. (4th) 569, 1995 CarswellBC 985, 14 B.C.L.R. (3d) 314, [1996] 3 W.W.R. 237, 66 B.C.A.C. 116, 108 W.A.C. 116 (B.C. C.A.) — considered

*Plan Group v. Bell Canada* (2009), 2009 CarswellOnt 3807, 2009 ONCA 548, *(sub nom. Bell Canada v. The Plan Group)* 96 O.R. (3d) 81, 81 C.L.R. (3d) 9, 62 B.L.R. (4th) 157, 252 O.A.C. 71 (Ont. C.A.) — considered

*Prairie Petroleum Products Ltd. v. Husky Oil Ltd.* (2008), 2008 MBCA 87, [2008] 9 W.W.R. 249, 2008 CarswellMan 358, 46 B.L.R. (4th) 174, 295 D.L.R. (4th) 146, 231 Man. R. (2d) 1, 437 W.A.C. 1 (Man. C.A.) — referred to

*Prenn v. Simmonds* (1971), [1971] 3 All E.R. 237, [1971] 1 W.L.R. 1381 (U.K. H.L.) — considered

*Reardon Smith Line v. Hansen-Tangen* (1976), [1976] 1 W.L.R. 989, [1976] 3 All E.R. 570 (U.K. H.L.) — considered

*River Wind Ventures Ltd. v. British Columbia* (2011), 299 B.C.A.C. 310, 508 W.A.C. 310, 2011 BCCA 79, 2011 CarswellBC 285, 15 B.C.L.R. (5th) 40, 79 B.L.R. (4th) 260 (B.C. C.A.) — referred to

*River Wind Ventures Ltd. v. British Columbia* (2011), 2011 CarswellBC 2215, 2011 CarswellBC 2216 (S.C.C.) — referred to

*Roorda v. MacIntyre* (2010), 495 W.A.C. 213, 487 A.R. 213, [2010] 10 W.W.R. 246, 26 Alta. L.R. (5th) 110, 2010 CarswellAlta 944, 2010 ABCA 156 (Alta. C.A.) — referred to

*Thorburn Wharf Fisheries Ltd. v. ING Insurance Co. of Canada* (2010), 2010 CarswellNS 765, 2010 NSCA 96, 296 N.S.R. (2d) 197, 940 A.P.R. 197, 92 C.C.L.I. (4th) 27 (N.S. C.A.) — referred to

*Water Street Pictures Ltd. v. Forefront Releasing Inc.* (2006), 2006 BCCA 459, 2006 CarswellBC 2476, [2006] 11 W.W.R. 381, 26 E.T.R. (3d) 197, 57 B.C.L.R. (4th) 212, 381 W.A.C. 189, 231 B.C.A.C. 189

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

(B.C. C.A.) — considered

*885704 Alberta Ltd. v. Oxford Properties Group Inc.* (2005), 2005 ABCA 274, 2005 CarswellAlta 1109, 55 Alta. L.R. (4th) 237, 34 R.P.R. (4th) 159, 371 A.R. 178, 354 W.A.C. 178 (Alta. C.A.) — referred to

APPEAL by defendant from judgment reported at *King v. Operating Engineers Training Institute of Manitoba Inc.* (2010), 252 Man. R. (2d) 121, 2010 MBQB 44, 2010 CarswellMan 68 (Man. Q.B.), in which plaintiff successfully brought action to force defendant to fulfil its commitment and indemnify him for taxes payable.

*Freda M. Steel J.A.:*

**Introduction**

1    This appeal raises the difficult, and often confusing, issue of the "parol evidence rule" and contractual interpretation.

2    The case involves the interpretation of a contract between Robert King and the Operating Engineers Training Institute of Manitoba Inc. (OETIM). King was hired as an instructor for a heavy equipment operator course being offered by OETIM. The parties disagree on whether the remuneration referred to in the written contract was to be "net" of income taxes and other deductions, or "gross."

3    King did not claim the above remuneration as income and, as events transpired, he was later assessed back taxes by Canada Revenue Agency (CRA). He sued the defendant, claiming that the remuneration specified in the contract was to be "clear of tax."

4    The trial judge found that the language of the written contract was clear, but also found, as a result of considering the evidence of prior oral discussions and written memoranda, that the written contract was not intended to be the complete agreement between the parties. He accepted the plaintiff's position that the evidence of prior discussions and memoranda was admissible to determine the question of whether the pay was to be "gross" or "net."

5    OETIM appeals, taking the position that the trial judge erred in his interpretation and application of the "parol evidence" rule.

**Background**

6    OETIM is a joint labour/management, non-profit organization. One of its main purposes is to train hoisting and heavy equipment operators. It does so primarily through the holding of periodic training courses which are conducted by qualified heavy equipment operators. Funding for the courses comes mainly from the federal government.

7    King is a heavy equipment operator. He has been operating heavy equipment for 20 years and can run multiple pieces of equipment. He works for several companies in the oil and gas industry building pipelines; some in his personal capacity and some through his personal business, B.K. Inspections.

8    When working through his business, he would negotiate a fee agreement and collect GST on the amount. When working in his personal capacity, he would be offered jobs through the union and be paid in accordance with the National Pipeline Agreement (the NPA). During the period in question (1997-1999), when working

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

through the union, he would earn approximately $2,500 per week, net.

9     King served as an instructor for three separate pipeline courses given during the years in question. Written contracts were entered into between the parties in each of the three years for each of the training courses. The portion relating to remuneration in the 1997 contract read, in part:

> 1. The Institute agrees to pay the Instructor a sum of TWO THOUSAND DOLLARS ($2000.00) per week as remuneration for the position of Instructor for the purpose of training approximately 12 adults in the occupation of Pipeline Backhoe Operator for a period of 180-200 hours commencing April 14th to May 10th, 1997. This 4 week period will include course preparation and follow-up as determined by the Operating Engineers Training Institute of Manitoba. The sum total remuneration per Instructor for the entire project will be a <u>maximum</u> of TWELVE THOUSAND DOLLARS ($12,000.00) should the period of employment be up to six weeks. That is, $1,500.00 per week plus $500.00 per week living allowance.

Except for the amount of remuneration, the contracts for 1998 and 1999 contained the same wording.

10     Before the 1998 written contract was entered into, the Director of the Educational Programs for OETIM, Kathy Milne-Watts, sent a written memorandum to King on April 3, 1998, offering him the position as Chief Instructor on the Backhoe Course. In the memorandum, she stated, "Your rate per week will be $3,000.00 per week over a four week period *clear after taxes*." The next year, she sent him another memo dated March 16, 1999, offering him the same position, once again stating "Your rate per week will be $3,500.00 per week over a six-week period *clear after taxes*." (Emphases added.)

11     Four other heavy equipment operators hired by OETIM to act as instructors during various years testified at trial. Each gave evidence that it is common in the oil industry to speak in reference to "clear pay," that the NPA rates were such that employees would take home between $2,000 and $3,000 per week, that Milne-Watts advised them over the phone and/or during the instructor's meeting that the pay would be net and that they would not have taken the job if the pay was gross, as there was other work available at the NPA rates.

12     King alleged that the amount stated in the written contract was to be an amount net of taxes, which taxes were to be paid by the defendant.

13     OETIM alleged that all instructors were clearly informed that they were being hired as independent consultants and that they would not be receiving T4 slips as they were not being treated as employees by OETIM. King received a T4 slip in 1999 because the accountants for OETIM advised that inasmuch as the courses were being held on a more regular basis, the instructors should be given T4 slips containing a statement of earnings, which would also be provided to the CRA.

14     Damages were agreed to as between the parties at $34,295.81 plus interest.

**Trial Decision**

15     The trial judge held that even though he found the wording of the written contracts clear and unambiguous, he was still entitled to refer to extrinsic evidence to assist him in the interpretation of the written contract so long as that evidence was not used to contradict anything contained in the written contract.

16     Referring to the other evidence adduced by King, the trial judge found that the parties intended the remuneration referred to in the contract to be net of income taxes.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

17    The trial judge also noted that Milne-Watts admitted that by the time the instructors came to the meeting and signed the memoranda, they had already discussed and accepted the offer to teach the course. She also agreed that it would not be possible to understand the entire agreement between the parties on the basis of the memorandum of agreement alone.

18    OETIM produced another copy of the April 1998 memorandum, which stated that the remuneration was to be "clear of taxes." However, this copy had a handwritten note by Milne-Watts at the end of which it states "Note — for Bob's purpose only — regular wages as last year." Milne-Watts testified that this was her note to herself to indicate and confirm that the memo was not accurate, and that she provided it only at King's request to get out of a previous job commitment. However, the trial judge rejected her evidence in this respect and found it not to be credible. Instead, he accepted the evidence of King and the other four course instructors.

**Standard of Review**

19    The parties disagree on the standard of review in this case, and therefore, some comment should be made on this point.

20    Until recently, the standard of review in contractual interpretation matters was always considered to be a question of law reviewable by an appellate court on a standard of correctness (Geoff R. Hall, *Canadian Contractual Interpretation Law* (Markham: LexisNexis Canada Inc., 2007) at 106-7).

21    At present, the standard of review is dependent on the nature of the question. The appropriate standard will depend upon the degree to which the trial judge made factual findings based on the particular case in question to come to his decision. So, for example, errors of law reviewable on a standard of correctness, in the area of contractual interpretation, include the application of an incorrect principle, the failure to consider a required element of a legal test, or the failure to consider a relevant factor. See *Prairie Petroleum Products Ltd. v. Husky Oil Ltd.*, 2008 MBCA 87 at para. 36, 231 Man. R. (2d) 1 (Man. C.A.); *Plan Group v. Bell Canada*, 2009 ONCA 548 at para. 135, 96 O.R. (3d) 81 (Ont. C.A.), Gillesse J.A., dissenting; and *Midnight Marine Ltd. v. Lloyd's Underwriters*, 2010 NLCA 64 at para. 44, 325 D.L.R. (4th) 254 (N.L. C.A.).

22    A trial judge's determination of the factual matrix or surrounding circumstances, drawing inferences from a finding of fact, findings as to credibility or good faith, consideration of extrinsic evidence and consideration of the evidence as a whole, are questions of fact and reviewable on a standard of palpable and overriding error (Hall at p. 109), or the functional equivalent of "palpable and overriding error" such as, "clearly wrong," "unreasonable" or "not reasonably supported by the evidence." See *L. (H.) v. Canada (Attorney General)*, 2005 SCC 25 at para. 110, [2005] 1 S.C.R. 401 (S.C.C.). And see *Castledowns Law Office Management Ltd. v. 1131102 Alberta Ltd.*, 2009 ABCA 148 at para. 61, 78 R.P.R. (4th) 1 (Alta. C.A.), by Slatter J.A.

23    Most commonly, issues of contractual interpretation raise questions of mixed fact and law. Generally, a question of mixed fact and law arises when the trial judge applies the legal principles to the language of the specific contract in the context of the relevant facts and inferences. Such questions are generally reviewable on the palpable and overriding error standard (Hall at p. 109).

24    It is not always easy to identify a question of mixed fact and law and distinguish it from a pure question of law or one of pure fact. In fact, Blair J.A. in the case of *Bell Canada*, questions whether the leading case on the standard of appellate review, *Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 S.C.R. 235 (S.C.C.), is totally applicable to contract interpretation. He states (at para. 27):

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

Where the matter referred to is more a matter of legal principle and sits towards the error of law end of the spectrum, the standard is correctness. Where the matter is one in which the legal principle and the facts are inextricably intertwined — where the facts dominate, as it were — it falls more towards the factual end of the spectrum, and significant deference must be accorded. Contractual interpretation, in my opinion, is generally the type of case that falls within the former category, negligence one that generally falls into the latter.

25      Most appellate courts accept, as do I, that the *Housen* principles, despite arising from a negligence case, inform the standard of review to be applied by appellate courts when reviewing contract cases as well, and moreover, that interpretation of the language of a contract in the context of the factual matrix is a question of mixed fact and law. See *Hayes Forest Services Ltd. v. Weyerhaeuser Co.*, 2008 BCCA 31 at para. 44, 289 D.L.R. (4th) 230 (B.C. C.A.); *Casurina Ltd. Partnership v. Rio Algom Ltd.* (2004), 40 B.L.R. (3d) 112 (Ont. C.A.) at para. 34, leave to appeal to S.C.C. refused, [2004] S.C.C.A. No. 105 (S.C.C.); *MacDougall v. MacDougall* (2005), 262 D.L.R. (4th) 120 (Ont. C.A.) at para. 32.

26      However, the palpable and overriding error standard is applicable to questions of mixed fact and law *only* where they are inextricably intertwined. If the question of law can be separated or "extricated" from the factual considerations involved and the task of interpretation is to put meaning to the words, then it can be treated as a question of law and evaluated on the standard of correctness. See *Prairie Petroleum* at para. 36; *Bell Mobility Inc. v. MTS Allstream Inc.*, 2009 MBCA 28 at paras. 30-35, 236 Man. R. (2d) 167 (Man. C.A.); *Barcode Systems Inc. v. Symbol Technologies Canada Inc.*, 2008 MBCA 47 at para. 29, 225 Man. R. (2d) 312 (Man. C.A.).

27      If the question of law cannot be separated out because the factual determinations and the law are inextricably intertwined, such as where the court has to make factual findings in order to determine the essential terms of a contract, then the question can be said to be one of mixed fact and law and subject to review on the standard of palpable and overriding error. See *McGarry v. Co-operators Life Insurance Co.*, 2011 BCCA 214 at para. 79, 333 D.L.R. (4th) 533 (B.C. C.A.); *Roorda v. MacIntyre*, 2010 ABCA 156 at para. 12, 26 Alta. L.R. (5th) 110 (Alta. C.A.); *Thorburn Wharf Fisheries Ltd. v. ING Insurance Co. of Canada*, 2010 NSCA 96 at para. 10, 92 C.C.L.I. (4th) 27 (N.S. C.A.); *Double N Earthmovers Ltd. v. Edmonton (City)*, 2005 ABCA 104 at para. 17, 6 M.P.L.R. (4th) 25 (Alta. C.A.); and *885704 Alberta Ltd. v. Oxford Properties Group Inc.*, 2005 ABCA 274 at para. 18, 34 R.P.R. (4th) 159 (Alta. C.A.).

28      The majority of the Supreme Court of Canada in *Housen* and *Canada (Director of Investigation & Research) v. Southam Inc.*, [1997] 1 S.C.R. 748 (S.C.C.), recognized the difficulty of determining the level of deference in relation to questions of mixed law and fact. They offered the following advice, as quoted with approval in *Midnight Marine Ltd.* (at para. 30):

.... [W]hether a purely legal question may be extricated from what appears to be a question of mixed fact and law often comes down to "whether the dispute is over a general proposition that might qualify as a principle of law or over a very particular set of circumstances that is not apt to be of much interest to judges and lawyers in the future."

29      Thus, determining the legal principles related to the parol evidence rule raises a question of law reviewable on a standard of correctness. Determinations of the factual matrix, the essential terms of the contract in this case, and findings as to credibility, are findings of fact reviewable on a standard of palpable and overriding error. Application of the parol evidence rule to the disputed facts as determined by the trial judge is a question of

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

mixed fact and law to be reviewed on a standard of palpable and overriding error.

**Analysis and Decision**

30      OETIM argues that the trial judge erred in his application of the parol evidence rule. That rule, it submits, is simply stated. If the language of the written contract is clear and unambiguous, no extrinsic evidence (i.e. no evidence outside of the four corners of the written document) may be considered.

31      In this case, it is submitted, since the trial judge held the words of the contract to be unambiguous, he erred when he considered extrinsic evidence, such as the other memoranda or the testimony of other witnesses, in coming to his conclusion as to the nature of the remuneration to be paid to King.

32      As well, OETIM points out that the parol evidence rule has been a part of the common law for good reason in that it is desirable, from both a legal and a commercial standpoint, to have finality and certainty in contractual obligations.

33      King submits that the parol evidence rule does not apply here because:

• the written document does not represent the entire agreement between the parties. The agreement was actually partly oral and partly written;

• the evidence explains or qualifies the written document. It is not inconsistent with it; and, as well,

• evidence of the circumstances surrounding the contract (the factual matrix) is admissible and must be considered when interpreting the written contract.

*What is the parol evidence rule?*

34      Some authors have suggested that it is misleading to refer to this principle of law as the "parol evidence rule." It is neither limited to oral evidence nor is it a rule of evidence. The rule encompasses all types of evidence and it is a rule of substantive law. S. M. Waddams, "Do We Need A Parol Evidence Rule" (1991) 19 Can. Bus. L.J. 385, states (at p. 387):

.... It has, indeed, evidentiary consequences in that it makes evidence of such extrinsic statements irrelevant, and for that reason inadmissible, but this does not make it a rule of evidence. ....

There is no shortage of articles and reports examining the "parol evidence rule." See, for example, Arnie Herschorn, "The Parol Evidence Rule" (1998) 20 Advocates' Q. 176; Paul M. Perell, "A Riddle Inside an Enigma: The Entire Agreement Clause" (1998) 20 Advocates' Q. 287; Paul M. Perell, "The Ambiguity Exception to the Parol Evidence Rule" (2001) 36 Can. Bus. L.J. 21 and Manitoba Law Reform Commission, *The Parol Evidence Rule* (Manitoba Library and Archives Canada, 2010).

35      Basically, the rule can be stated as follows: where the whole of a contract has been reduced to writing, extrinsic evidence is not admissible to add to, subtract from, vary or contradict that written contract. Extrinsic statements and promises cannot affect the parties' obligations as stated in the written agreement.

36      However, there are a myriad of exceptions to the rule, or circumstances where the rule is inapplicable. (Some academics have suggested that there is a subtle distinction to be drawn between exceptions to the parol

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

evidence rule and the inapplicability of the parol evidence rule. See Waddams at p. 390 and Angela Swan, *Canadian Contract Law*, 2d ed. (Markham: LexisNexis Canada Inc., 2009) at para. 8.47. In my opinion, it matters little.) OETIM's position that because the language of the contract is unambiguous, no extrinsic evidence is admissible, is an oversimplification of the rule. Ambiguity in the written contract is only one exception to the application of the parol evidence rule.

37      In the often cited decision of *Gallen v. Allstate Grain Co.* (1984), 9 D.L.R. (4th) 496 (B.C. C.A.), Lambert J.A. identified a long list of circumstances to which the rule does not apply. For our purposes, in particular, he mentioned two examples of exceptions to the rule; evidence that demonstrates the written document does not represent the whole agreement, and evidence that goes to the surrounding circumstances or factual matrix of the agreement (at p. 506):

> So the rule does not extend to cases where the document may not embody all the terms of the agreement. And even in cases where the document seems to embody all the terms of the agreement, there is a myriad of exceptions to the rule. I will set out some of them. Evidence of an oral statement is relevant and may be admitted, even where its effect may be to add to, subtract from, vary or contradict the document:
>
> . . .
>
> > (b) to dispel ambiguities, to establish a term implied by custom, or to demonstrate the factual matrix of the agreement;
>
> . . .
>
> > (e) to establish a collateral agreement;
>
> > (f) in support of an allegation that the document itself was not intended by the parties to constitute the whole agreement;
>
> . . .

**The Rule Does Not Apply Where the Written Document is Not the Complete Agreement or Where There is a Collateral Agreement**

38      The first task of a judge in contractual interpretation matters is to determine the terms of the contract. If the court finds, as it did in this case, that the contract is partly in writing and partly oral, the problem of the parol evidence rule does not arise because the rule is not applicable. The rule only comes into operation when the court is satisfied that it was the parties' intention that the writing represents the *exclusive* record of the parties' agreement.

39      The oral and written parts of the contract must then be considered together and interpreted as one inclusive contract. Hall states at pp. 44-45:

> Except where the terms of a written agreement would be contradicted, the parol evidence rule does not apply where the parties did not intend to encompass all contractual terms in their written agreement, or where they have entered into a collateral agreement (which is often, but not necessarily, oral). Taken together, these circumstances create a broad exception to the operation of the parole evidence rule. ....

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

40     Therefore, all relevant evidence will be admissible if there is an allegation that the written document was not intended to be a complete reflection of the terms of the contract. See *Gallen* (at p. 507):

> So, if it is said that an oral representation, that was made before the contract document was signed, contains a warranty giving rise to a claim for damages, evidence can be given of the representation, even if the representation adds to, subtracts from, varies or contradicts the document, if the pleadings are appropriate, and if the party on whose behalf the evidence is tendered asserts that from the factual matrix it can be shown that the document does not contain the whole agreement. The oral representation may be part of a single agreement, other parts of which appear in the document. (The one-contract theory.) Alternatively, the document may record a complete agreement, but there may be a separate collateral agreement with different terms, one of which is the oral representation. (The two-contract theory.)

41     For example, in the *Gallen* case, the Allstate Grain Company made an oral representation to Gallen that weeds would not be a problem in the growing of a new type of buckwheat seed. Gallen signed Allstate's standard buckwheat marketing agreement, which contained a clause that Allstate gave no warranty as to the productiveness of the seed. The weeds destroyed the buckwheat crop. The British Columbia Court of Appeal held that evidence of the statement was admissible to show that it was a part of the contract, or that it constituted a collateral contract.

42     Another example arises in the case of *Nevin v. British Columbia Hazardous Waste Management Corp.* (1995), 129 D.L.R. (4th) 569 (B.C. C.A.), where the British Columbia Court of Appeal dealt with a wrongful dismissal. The plaintiff was offered a position as a communications expert for the defendant and signed a one-page offer letter setting out her position, salary and benefits. Evidence was adduced that she was told that her position would last for at least three and one-half years. The Court of Appeal, reversing the trial judge in *Nevin* ( [1994] B.C.J. No. 524 (B.C. S.C.)), held that the parol evidence rule did not apply in the circumstances as it does not exclude evidence of oral terms of a contract unless a written document is intended by the parties to be a complete reflection of all the terms of a contract. Commenting on the judge's rejection of the evidence based on the parol evidence rule, the court stated (at paras. 10-11):

> With respect, this would appear to be a case in which one of the exceptions to the rule — or perhaps more correctly, an instance of the inapplicability of the rule — can be invoked. Even if the letter had some contractual force, the rule does not exclude evidence of oral terms unless the written document was intended as a complete reflection of the terms of the contract. ....

> In my view, the letter quoted above was not intended as a complete statement of the terms under which Ms Nevin was hired, and whether it had contractual force or not — that is, whether the parties' agreement was an oral one or partly written and partly oral — the evidence of the parties' oral discussions would allow the reasonable observer to conclude that Ms Nevin was hired for a fixed term ending August 31, 1995. This objective conclusion must prevail over any subjective intentions that Dr. Woznow may have had.

43     The point is that appropriate allegations in the pleadings that the written document does not represent the entire contract between the parties will require that relevant and material evidence be admitted. It may eventually be rejected by the judge, but it must at least be admitted for consideration.

44     However, OETIM argues that the statement of claim did not plead collateral contract, and therefore, there were no appropriate allegations in the pleadings.

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3
W.W.R. 269, 341 D.L.R. (4th) 520

45    OETIM is technically correct that there is no specific reference to a collateral contract in the originating statement of claim. Instead, the pleading alleges that there was "an express and/or implied term of the employ-ment contract between the parties." The term "written" is not mentioned in the statement of claim.

46    Therefore, since King has denied the fact that the written document represents the final expression of the party's intention, this opens the door to evidence that is relevant to the determination of that issue. Moreover, the evidence led in this case, to prove either that a collateral contract existed or that the contract was partially oral and partially written, was significant and sufficient for the trial judge to come to the decision that he did.

47    In fact, Milne-Watts admitted that the written memorandum was not intended to be a complete reflection of the terms of the agreement between the parties. She acknowledged that by the time the instructors came to the meeting and signed the memoranda, they had already accepted the offer to teach the course. She also agreed that it would not be possible to understand the entire agreement between the parties on the basis of the memorandum of agreement alone.

48    In particular, Milne-Watts was cross-examined at trial as follows:

    Q And [the written contract] doesn't say whether the pay is gross or net?

    A No.

    Q So, when somebody signed a contract on April the 14th, 1997, how would they know?

    A They would know because they were told.

    Q Because of the discussions that you say you had with them?

    A Yes.

    Q Okay.

49    As well, four other instructors each gave evidence, which the trial judge accepted to the effect that:

    • It was common in the oil industry to speak in reference to clear pay.

    • At the material times, the NPA rates were such that employee would take home between $2,000 to $3,000 net per week.

    • Instructors were contacted by phone and advised of the terms of the retainer verbally which they accepted prior to attending the instructors meeting.

    • Milne-Watts advised them over the phone and/or during the instructors meeting that the pay would be net.

    • They would not have taken the job if the pay was gross, as there was other work available at the NPA rates.

50    In addition, the written memoranda sent by Milne-Watts to King in 1998 and 1999 — which are the only documents evidencing an agreement which were signed on behalf of OETIM — clearly state that compensation is to be "clear of taxes." The trial judge specifically found Ms Milne-Watts not to be credible when she testified

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

that the phrase "clear of taxes" was added just as a favour to King. Accordingly, while the memorandum constitutes part of the agreement between the parties, there was evidence to show that it was not intended by the parties to represent the entire agreement.

51      In his reasons, the trial judge does not mention the phrase "collateral contract" nor does he make it clear that he believes the agreement is partly oral and partly written. Instead, he speaks of evidence that does not contradict the contract, but qualifies or explains it (at paras. 42-43):

> .... However, failing an express stipulation that this is the total payment, a modification or explanation of the amount is not precluded as being contradictory and I quote the learned author [G.H.L. Fridman, *The Law of Contract in Canada*, 4th ed. (Toronto: Thomson Canada Limited, 1999)] at p. 484 where he says as follows:
>
> > Third, there are situations in which evidence may be given of some *oral* agreement between the parties which does not contradict the written agreement that is being construed, but modifies or qualifies it, or explains its true application.
>
> Since the contract did not explicitly stipulate that the amount was "gross", evidence of a commitment to a "net" payment does not contradict the contract but qualifies or explains it. ....

While collateral contracts are not mentioned in the extract from G.H.L. Fridman, *The Law of Contract in Canada*, 4th ed. (Toronto: Thomson Canada Limited, 1999) reproduced by the trial judge, a full examination of the text itself shows that the author was indeed talking about collateral contracts (at p. 484).

52      OETIM argues further that even if a collateral contract is an exception to the rule, and even if a collateral contract existed in this case, the trial judge erred in admitting extrinsic evidence that was contradictory to the written words of the contract.

53      In the *Gallen* case, the written clause was interpreted so as not to contradict the oral statement. This is consistent with the principle that arises from the Supreme Court of Canada cases of *Hawrish v. Bank of Montreal*, [1969] S.C.R. 515 (S.C.C.), *Bauer v. Bank of Montreal*, [1980] 2 S.C.R. 102 (S.C.C.); and *Carman Construction Ltd. v. Canadian Pacific Railway*, [1982] 1 S.C.R. 958 (S.C.C.). Those three leading cases from the Supreme Court of Canada limited proof of collateral contracts by asserting that no collateral contract can be proven that is inconsistent with the written document. See also *River Wind Ventures Ltd. v. British Columbia*, 2011 BCCA 79, 299 B.C.A.C. 310 (B.C. C.A.), leave to appeal to the S.C.C. refused, [2011] S.C.C.A. No. 179 (S.C.C.).

54      The principle was stated plainly by the Supreme Court of Canada, in *Carman Construction*, where Mr. Justice Martland states that "a collateral agreement cannot be established where it is inconsistent with or contradicts the written agreement" (at p. 969).

55      The principle has been criticized as being difficult to apply. Waddams, for example, at p. 391 states that "[i]t seems doubtful whether inconsistency is a workable criterion in this context." Moreover, Lambert J.A. in *Gallen* argues that this principle cannot be an absolute one, but rather is analogous to a presumption, the strength of which varies with the circumstances. *Gallen* states (at p. 511):

> The fifth point is that the *rationale* of the principle, as discussed in the first point, above, does not apply with equal force where the oral representation adds to, subtracts from, or varies the agreement recorded in

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

the document, as it does where the oral representation contradicts the document. As far as "adding to" is concerned, there is nothing inherently unreasonable about two agreements which add to each other. "Subtracting from" and "varying" represent a half-way stage between "adding to", on the one hand, which is wholly reasonable, and "contradicting", on the other hand, which is wholly unreasonable.

56      Consistent with the difficulty present in this whole area, it is not always easy to determine whether a term adds to or contradicts the written document. As Swan stated (at para. 8.72):

.... It is very hard to know what evidence will contradict or supplement the terms of an agreement. In *Gallen v. Allstate Grain Co. Ltd.* the agreement contained the following clause:

23. Allstate gives no warranty as to the productiveness or any other matter pertaining to the seed sold to the producer and will not in any way be responsible for the crop.

Nevertheless, a majority of the British Columbia Court of Appeal held that an oral assurance by the defendant's manager that there would be no problem with weeds was held not to contradict the written agreement and to be enforceable.

57      I need not enter that debate since in the case at bar, whether one treats it as a collateral contract or a contract partly in writing and partly oral, the term that payment is to be net of taxes does not contradict the written terms of the contract, which simply refer to remuneration. The contract does not explicitly speak of either a gross or net amount. It is silent on this aspect. I agree with the trial judge that the evidence as to the defendant's promise that compensation would be net does not contradict the express written terms of the memorandum, but rather fills the gap in the memorandum.

### *Extrinsic Evidence Demonstrating the Surrounding Circumstances or Factual Matrix of the Agreement*

58      As well, I think that the admission of the extrinsic evidence could be justified as evidence of the circumstances surrounding the contract at the time of its execution, or evidence of the "factual matrix."

59      What constitutes the "factual matrix" or what is also sometimes referred to as "the surrounding circumstances" or "contextual evidence" or "background facts," and whether it may be relied on when interpreting a contract, has been another source of significant confusion in an already confusing area.

60      The cardinal principle of contractual interpretation is, of course, to give effect to the intention of the parties as expressed in their written agreement. The goal is to determine the intent of the parties at the time of the execution of the contract. See *Manulife Bank of Canada v. Conlin*, [1996] 3 S.C.R. 415 (S.C.C.) at para. 79.

61      I understand that it is important to be careful of admitting parol evidence under the guise of "context," as wrongful admission of such evidence can expand trials on simple issues about written contracts from days to weeks. However, the language of a contract cannot be properly understood outside the context, or factual matrix, in which that language was placed when the contract was entered into. See *Investors Compensation Scheme Ltd. v. West Bromwich Building Society* (1997), [1998] 1 All E.R. 98 (U.K. H.L.) Lord Hoffmann.

62      In *Hill v. Nova Scotia (Attorney General)*, [1997] 1 S.C.R. 69 (S.C.C.), the Supreme Court of Canada approved of the view that, in interpreting a contract, it need not be looked at in a vacuum. "It is perfectly proper, and indeed may be necessary, to look at the surrounding circumstances in order to ascertain what the parties were really contracting about" (at para. 20).

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

Page 15

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

63      The necessity of interpreting a contract within the appropriate context was also discussed by Iacobucci J. in *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (S.C.C.), when he stated (at para. 54):

  .... The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. ....

64      Since that comment in the *Eli Lilly* case, many subsequent courts have also made plain that the focus of the interpretation exercise is to determine, in an objective sense, what the parties would reasonably have been understood to mean using the words in the contract against the relevant background. Thus, they have read *Eli Lilly* as being consistent with the principle that evidence of surrounding circumstances or context is admissible if it is relevant and material.

65      In Manitoba, in the case of *Geoffrey L. Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71 at para. 13, 173 Man. R. (2d) 300 (Man. C.A.), Hamilton J.A. accepted that evidence of surrounding circumstances was admissible to assist a court in determining the meaning of a provision. See also Hall at p. 10 and Paul M. Perell, "The Ambiguity Exception to the Parol Evidence Rule" at p. 21.

66      The nature of the evidence that constitutes the factual matrix, will, of necessity, vary from case to case and is highly contextual, but generally it consists of the "background of relevant facts that the parties must clearly have been taken to have known and to have had in mind when they composed the written text of their agreement" (*Glaswegian Enterprises Inc. v. BC Tel Mobility Cellular Inc.* (1997), 101 B.C.A.C. 62 (B.C. C.A.) at para. 18, Lambert J.A.).

67      More recently, in *Water Street Pictures Ltd. v. Forefront Releasing Inc.*, 2006 BCCA 459 at para. 24, 26 E.T.R. (3d) 197 (B.C. C.A.), Lowry J.A. described the scope of the factual matrix (at para. 24):

  Thus, the court looks first to the words of the agreement, read as a whole, aided, if necessary, by evidence of the circumstances or what is referred to as the factual matrix existing when the agreement was made. Such evidence is generally restricted to circumstances known to both parties that illuminate the meaning a reasonable person would give to the words employed: *Glaswegian Enterprises Inc. v. BC Tel Mobility Cellular Inc.* (1997), 49 B.C.L.R. (3d) 317 (B.C.C.A.) at paras. 18 to 20. ....

68      See also, *Eco-Zone Engineering Ltd. v. Grand Falls-Windsor (Town)*, 2000 NFCA 21 at para. 10, 5 C.L.R. (3d) 55 (Nfld. C.A.), where the court refers to Lord Wilberforce's comments on this matter in *Reardon Smith Line v. Hansen-Tangen*, [1976] 3 All E.R. 570 (U.K. H.L.), where he said (at p. 574):

  .... No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating. ....

69      In particular, Cameron J.A., in *Eco-Zone Engineering Ltd.* (at para. 10), specifically noted that the factual matrix could be considered even in the absence of an ambiguity. In the often cited case of *Prenn v. Simmonds*, [1971] 3 All E.R. 237 (U.K. H.L.), at 239-40, Lord Wilberforce used the phrase "matrix of facts" to describe the circumstances which could, if not should, be considered by a trial judge in interpreting a contract, even in the absence of ambiguity. Hall makes that point as well when he states (at p. 15):

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

.... Because language always draws meaning from context, the factual matrix constitutes an essential element of contractual interpretation in all cases, even when there is no ambiguity in the language.

70      While the surrounding circumstances may be referred to even in the absence of an ambiguity, those circumstances, or factual matrix, should consist of objective evidence of the background facts at the time of the execution of the contract, not the subjective evidence of one party's intention or of the negotiations leading to the final contract. See *Eli Lilly* at para. 54, *Moore Realty Inc.* at para. 19, and *Prenn v. Simmonds* at p. 240.

71      Doherty J.A. explains this in the case of *Dumbrell v. Regional Group of Cos.* (2007), 85 O.R. (3d) 616 (Ont. C.A.) (at para. 50):

In my view, when interpreting written contracts, at least in the context of commercial relationships, it is not helpful to frame the analysis in terms of the subjective intention of the parties at the time the contract was drawn. This is so for at least two reasons. First, emphasis on subjective intention denudes the contractual arrangement of the certainty that reducing an arrangement to writing was intended to achieve. This is particularly important where, as is often the case, strangers to the contract must rely on its terms. They have no way of discerning the actual intention of the parties, but must rely on the intent expressed in the written words. Second, many contractual disputes involve issues on which there is no common subjective intention between the parties. Quite simply, the answer to what the parties intended at the time they entered into the contract will often be that they never gave it a moment's thought until it became a problem: see Kim Lewison, *The Interpretation of Contracts*, 3rd ed. (London: Sweet & Maxwell, 2004) at 18-31.

72      So, generally, the factual matrix will include, among other things:

• evidence of the commercial purpose of the contract, its aims and objectives: *Langley Lo-Cost Builders Ltd. v. 474835 B.C. Ltd.*, 2000 BCCA 365 at para. 29, [2000] 7 W.W.R. 46 (B.C. C.A.);

• evidence of the nature or custom of the market or industry in which the contract was executed: *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 41 B.L.R. (2d) 42 (Ont. C.A.); and

• evidence of the objective intention of the parties.

But not,

• evidence of the subjective intention of the parties;

• evidence of the negotiations; and

• evidence of the subsequent conduct of the parties after the contract was entered into.

73      In summary, when interpreting a contract, the court's search for the intention of the parties is aided by reference to the surrounding circumstances or factual matrix at the time of the execution of the contract as viewed objectively by a reasonable person at the time of the signing of the contract. See Fridman at p. 478; *Mac-Millan Bloedel Ltd. v. British Columbia Hydro & Power Authority* (1992), [1993] 2 W.W.R. 127 (B.C. C.A.); and *Moore Realty Inc.*, Hamilton J.A. at para. 18.

74      The trial judge stated that if the wording of the memorandum was considered, *failing any other evidence* (i.e., absent the factual matrix), the normal everyday meaning that would be given to a clause which did not spe-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3
W.W.R. 269, 341 D.L.R. (4th) 520

cify compensation on a gross or net basis would be that compensation was intended to be gross.

75    However, the judge was entitled to consider the factual matrix in this case, which included the evidence of other instructors who testified as to the usual practice of net pay in the oil patch and/or heavy equipment industry business. Also, the evidence was that, at the material times, union rates were such that employees would take home between $2,000 and $3,000 net per week. As such, it would not have been objectively commercially reasonable for instructors to accept the job if the pay was gross.

76    In his later "Conclusions of Fact," the trial judge wrote (at para. 30):

... [O]n the core issue their evidence was explicit, adamant and consistent, namely that they were told repeatedly that the amount was a net amount after taxes. They accepted this because it was consistent with the usual terminology in the heavy equipment industry and the pay earned on other jobs. The only reasonable explanation for this is that they are telling the truth. There is no evidence for an alternative theory that they got together and conspired to commit perjury.

77    The trial judge also reviewed the evidence of Milne-Watts and noted that her actions had been misleading. He wrote (at para. 31):

.... She clearly did have a motive to encourage the instructors to come on board since it was her job to set up the education program which could not be done without instructors. As to her not telling the truth because of that motive, even on her own evidence, she participated in a misleading exercise in order to get the plaintiff to come. ....

78    Even more damaging from OETIM's side was that Milne-Watts provided written memoranda to the plaintiff indicating that his pay would be "clear after taxes."

79    The trial judge had no difficulty in preferring King's evidence and witnesses. He wrote (at para. 32):

I have no hesitation in concluding that the conversations described by the plaintiff and his witnesses did in fact take place both before and during the meeting at which the contracts were signed. <u>Given these findings, the issues that remain to be resolved are the legal issues.</u>

[emphasis added]

80    From this review of the evidence, especially the reference to "the practice in the industry" (at para. 37), the trial judge was, in essence, relying on the factual matrix and the custom of the trade in determining that "[t]he agreement was that the amount would be net of taxes" (*ibid.*).

**Misapprehension of Evidence**

81    OETIM also argues that the trial judge committed a palpable and overriding error in finding that "[t]he evidence is clear that the parties entered into the written contracts on the understanding that the amount stipulated therein is an amount net of taxes and it was their intention at the time that this understanding form part of the contract" (at para. 44).

82    I do not find such an error justifying appellate intervention. As described throughout these reasons, there was ample evidence to support the judge's findings.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellMan 485, 2011 MBCA 80, 207 A.C.W.S. (3d) 455, 270 Man. R. (2d) 63, 524 W.A.C. 63, [2012] 3 W.W.R. 269, 341 D.L.R. (4th) 520

**Conclusion**

83      The parol evidence rule does not apply where there is an allegation that the contract is partially in writing and partially oral, or that a collateral contract exists. In such cases, certain extrinsic evidence is admissible to substantiate those allegations.

84      Also, evidence with respect to the surrounding circumstances or factual matrix is admissible to aid the court in understanding and interpreting the language and meaning of the written contract, even where no collateral contract is alleged.

85      I would dismiss the appeal with costs.

*Barbara M. Hamilton J.A.*:

I agree:

*Michel A. Monnin J.A.*:

I agree:

*Appeal dismissed.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 61



KRYSTAL CADILLAC-OLDSMOBILE GMC TRUCK, INC., Appellants v.
GENERAL MOTORS CORPORATION AND GENERAL MOTORS AC-
CEPTANCE CORPORATION

No. 01-2952

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

337 F.3d 314; 2003 U.S. App. LEXIS 14965; Bankr. L. Rep. (CCH) P78,900; 50 Col-
lier Bankr. Cas. 2d (MB) 1211; 41 Bankr. Ct. Dec. 183

September 19, 2002, Argued
July 28, 2003, Filed

**SUBSEQUENT HISTORY:** US Supreme Court certio-
rari denied by Krystal Cadillac-Oldsmobile-Gmc v.
GMC, 2004 U.S. LEXIS 3429 (U.S., May 17, 2004)

**PRIOR HISTORY:**    [**1]  On Appeal from the
United States District Court for the Middle District of
Pennsylvania. District Judge: Hon. Sylvia H. Rambo.
Krystal Cadillac-Oldsmobile-Gmc Truck, Inc. v. GM
Corp., 232 B.R. 622, 1999 U.S. Dist. LEXIS 4291 (E.D.
Pa., 1999)

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals >
Standards of Review > Clear Error Review*
*Bankruptcy Law > Practice & Proceedings > Appeals >
Standards of Review > De Novo Review*
*Civil Procedure > Appeals > Standards of Review > De
Novo Review*
[HN1] In reviewing the decision of the district court, the
court of appeals applies the same standard of review the
district court employed in reviewing the bankruptcy
court's decision. The court of appeals reviews factual
findings for clear error, and the court exercises plenary
review over any legal conclusions.

*Civil Procedure > Judgments > Preclusion & Effect of
Judgments > Estoppel > Judicial Estoppel*
[HN2] A plaintiff, who has obtained relief from an ad-
versary by asserting and offering proof to support one
position, may not be heard later in the same court to con-

tradict himself in an effort to establish against the same
adversary a second claim inconsistent with his earlier
contention. Courts have the intrinsic ability to dismiss an
offending litigant's complaint without considering the
merits of the underlying claims when such dismissal is
necessary to prevent a litigant from playing fast and
loose with the courts. The doctrine of judicial estoppel
should only be applied to avoid a miscarriage of justice.
The basic principle of judicial estoppel is that absent any
good explanation, a party should not be allowed to gain
an advantage by litigation on one theory, and then seek
an inconsistent advantage by pursuing an incompatible
theory.

*Civil Procedure > Judgments > Preclusion & Effect of
Judgments > Estoppel > Judicial Estoppel*
*Civil Procedure > Sanctions > General Overview*
[HN3] Judicial estoppel is not intended to eliminate all
inconsistencies no matter how slight or inadvertent they
may be. There are certain criteria for determining when
seemingly inconsistent litigation stances justify applica-
tion of the doctrine. First, the party to be estopped must
have taken two positions that are irreconcilably incon-
sistent. Second, judicial estoppel is unwarranted unless
the party changed his or her position in bad faith --i.e.,
with intent to play fast and loose with the court. Finally,
a district court may not employ judicial estoppel unless it
is tailored to address the harm identified and no lesser
sanction would adequately remedy the damage done by
the litigant's misconduct. Equity requires that the presid-
ing court give the party to be estopped a meaningful op-
portunity to provide an explanation for its changed posi-
tion.

337 F.3d 314, *; 2003 U.S. App. LEXIS 14965, **;
Bankr. L. Rep. (CCH) P78,900; 50 Collier Bankr. Cas. 2d (MB) 1211

***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel***
[HN4] In the context of judicial estoppel, a rebuttable inference of bad faith arises when averments in the pleadings demonstrate both knowledge of a claim and a motive to conceal that claim in the face of an affirmative duty to disclose.

***Bankruptcy Law > Debtor Benefits & Duties > General Overview***
***Bankruptcy Law > Reorganizations > Plans > Disclosure Statements***
***Torts > Negligence > Duty > Affirmative Duty to Act > General Overview***
[HN5] Under 11 U.S.C.S. § 1125(b), a party seeking Chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing adequate information to enable a creditor to make an informed judgment about the plan. 11 U.S.C.S. § 1125(a)(1). Debtors must therefore identify and disclose all property of the estate including all of the debtor's legal and equitable property interests.

***Bankruptcy Law > Debtor Benefits & Duties > General Overview***
***Bankruptcy Law > Reorganizations > Plans > Disclosure Statements***
[HN6] A long-standing tenet of bankruptcy law requires one seeking benefits under its terms to satisfy a companion duty to schedule, for the benefit of creditors, all his interests and property rights. Therefore, preparing and filing a disclosure statement is a critical step in the reorganization of a Chapter 11 debtor. It is the pivotal concept in reorganization of a Chapter 11 debt.

***Bankruptcy Law > Case Administration > Administrative Powers > Stays > General Overview***
***Business & Corporate Law > Distributorships & Franchises > Causes of Action > Breach of Contract***
***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Law of the Case***
[HN7] The Bankruptcy Code requires that a debtor list potential causes of action, not claims it actually intends to sue on at the time of the required disclosure. It has been held that a debtor must disclose any litigation likely to arise in a non-bankruptcy context.

***Bankruptcy Law > Reorganizations > Plans > Disclosure Statements***

[HN8] Courts do not require debtors to list hypothetical claims that are so tenuous as to be fanciful. Creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan; therefore, the importance of full and honest disclosure cannot be overstated.

***Bankruptcy Law > Reorganizations > Plans > Disclosure Statements***
[HN9] If the debtor has enough information prior to confirmation to suggest that it may have a possible cause of action, then that is a known cause of action such that it must be disclosed.

***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel***
[HN10] Judicial estoppel is only appropriate when the inconsistent positions are tantamount to a knowing misrepresentation to or even fraud on the court. The doctrine is to be used sparingly and reserved for the most egregious case.

***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel***
[HN11] The application of judicial estoppel does not turn on whether the estopped party actually benefitted from its attempt to play fast and loose with the court. The presence or absence of any such benefit is merely a factor in determining whether the evidence would support a conclusion of bad faith. The doctrine of judicial estoppel in the Third Circuit contains no such requirement. The critical issue is what the party contended in the underlying proceeding, rather than what the jury found. Whether the party sought to be estopped benefitted from its earlier position or was motivated to seek such a benefit may be relevant insofar as it evidences an intent to play fast and loose with the courts. It is not, however, an independent requirement for application of the doctrine of judicial estoppel.

***Civil Procedure > Sanctions > General Overview***
[HN12] The fact that a sanction is to be used sparingly does not mean that it is not to be used when appropriate.

***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel***
[HN13] A district court need not always conduct an evidentiary hearing before finding the existence of bad faith for judicial estoppel purposes.

337 F.3d 314, *; 2003 U.S. App. LEXIS 14965, **;
Bankr. L. Rep. (CCH) P78,900; 50 Collier Bankr. Cas. 2d (MB) 1211

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Judicial Estoppel*
[HN14] If the pleadings show (1) the fact of non-disclosure of the asset combined with (2) a debtor's obvious knowledge of the existence of the asset, a court need not take testimony in order to make a finding of bad faith for purposes of judicial estoppel.

**COUNSEL:** GERARD J. JACKSON, ESQ. (Argued), Cherry Hill, NJ, Attorney for Appellant.

JAMES A. MOLLICA, ESQ. (Argued), TIMOTHY MURRAY, ESQ., Pittsburgh, PA, Attorneys for Appellees.

**JUDGES:** Before: SCIRICA, * Chief Judge, ALITO, and MCKEE, Circuit Judges.

    *    Judge Scirica began his term as Chief Judge on May 4, 2003.

**OPINION BY:** McKEE

**OPINION**

    [*316] **OPINION OF THE COURT**

    McKEE, *Circuit Judge*.

    Krystal Cadillac-Oldsmobile-GMC Truck, Inc., a Chapter 11 debtor, appeals an order of the District Court affirming the Bankruptcy Court's dismissal of the suit Krystal filed against GMC for breach of contract and related causes of action. The District Court concluded that the Bankruptcy Court correctly relied upon the doctrine of judicial estoppel in dismissing all of the counts in Krystal's complaint. We agree that judicial estoppel was properly invoked by the Bankruptcy Court, and we will affirm the order of the District Court. [1]

    1    The District Court had jurisdiction pursuant to 28 U.S.C. § 548(a). We have appellate jurisdiction pursuant to 28 U.S.C. §§ 158(d) and 1291.

    [HN1] In reviewing the decision of the District Court, we apply the same standard of review the District Court employed in reviewing the Bankruptcy Court's decision. We review factual findings for clear error, and we exercise plenary review over any legal conclusions. *See In Re Woskob*, 305 F.3d 177 (3d Cir. 2002).

    [**2]    [*317]  **I. FACTUAL AND PROCEDURAL BACKGROUND**

**A. Termination of the Franchise Agreement**

    Since 1987, Krystal Cadillac has operated a General Motors automobile dealership in Gettysburg, Pennsylvania pursuant to a franchise agreement with GM. Under the terms of that agreement, Krystal maintained a line of credit from a financial institution in order to finance Krystal's purchase of new GM vehicles. [2] In October 1991, Krystal lost its "floor plan" financing with General Motors Acceptance Corporation, GM's financial arm, and Krystal was not able to secure any other financing. This constituted a default under the franchise agreement. Consequently, on July 13, 1993, GM notified Krystal that GM intended to terminate the dealer agreements. Following an extension, that termination was to become effective on August 12, 1993. However, on August 11, 1993, the day before the termination became effective, Krystal initiated a proceeding before the Pennsylvania Board of Vehicle Manufacturers, Dealers, and Salespersons ("Vehicle Board") challenging the legality of the franchise termination. [3]

    2    Article 6.4.1 of the Dealer Agreement between Krystal and GM requires Krystal "to have a reasonable quantity and variety of . . . Motor Vehicles in inventory." Article 10 requires Krystal "to maintain a separate line of credit . . . to finance its purchase of new vehicles."

    [**3]

    3    The Board of Vehicles Act of December 22, 1983, P.L. 306, *as amended*, 63 P.S. § 818.9(c) provides, in pertinent part, the following:

        Canceling of franchises.--It shall be a violation of this act for any manufacturer, distributor, officer, agent or any representative whatsoever of a vehicle manufacturer to unfairly, without due regard to the equities of said dealer and without just provocation, cancel the franchise of any vehicle dealer . . . . At any time before the effective date of such termination . . . the dealer or distributor may appeal to the board for a hearing on the merits, and following due notice to all parties concerned, such a hearing shall be promptly held. No such termination . . . shall become effective until final determination of the issue by the board. In the event of a dealer . . . appeal of the termination . . . of its franchise, the burden of proof shall be on the manufacturer or

337 F.3d 314, *; 2003 U.S. App. LEXIS 14965, **;
Bankr. L. Rep. (CCH) P78,900; 50 Collier Bankr. Cas. 2d (MB) 1211

importer to show that such termi-
nation . . . was based on the deal-
er's failure to comply substantially
with the reasonable and material
requirements of the franchise. The
manufacturer shall not meet its
burden of proof to terminate . . .
the franchise if the acts of the
manufacturer, in whole or in sig-
nificant part, caused the dealer to
be unable to comply substantially
with the reasonable and material
requirements of the franchise.

[**4]  The Vehicle Board held a hearing on Krys-
tal's petition on August 8, 1994, and entered an Order
and Adjudication upholding GM's termination of the
dealership agreements on September 27, 1994. [4] Krystal
thereafter appealed that Order to the Commonwealth
Court of Pennsylvania, but that court affirmed the ruling
of the Vehicle Board on November 6, 1995.

4    The Board found that GM's termination of
Krystal's franchise was proper because Krystal
had failed to comply with the reasonable and ma-
terial franchise requirements for obtaining a line
of credit, and had failed to maintain an adequate
inventory of new vehicles.

**B. The Proceedings in the Bankruptcy Court
(Krystal I).**

On September 8, 1994, (approximately three weeks
before the Vehicle Board rendered its decision), Krystal
filed for Chapter 11 protection. Thereafter, on June 15,
1995, Krystal filed a Plan of Reorganization in which it
provided for the sale of its GM franchise in order to raise
funds to pay creditors. GM objected to the plan arguing
[**5]  that it had properly terminated [*318] the
franchise agreement with Krystal pursuant to the terms
of that agreement. The appropriate state agency had up-
held the termination, and the Commonwealth Court had
affirmed the agency's determination that the termination
was proper. Thus, according to GM, the franchise was
not an asset of the estate available for sale in the bank-
ruptcy proceedings. On October 24, 1995, Krystal filed
an Amended Reorganization Plan and an Amended Dis-
closure Statement. Article V of the Disclosure Statement
stated:

Debtor also holds an Automobile
Franchise Agreement with General Mo-
tors Corporation. However, the status of
this franchise is now in litigation. General
Motors terminated the franchise prior to

the commencement of the case and the
matter was in litigation at the time the
Chapter 11 petition was filed. General
Motors nevertheless proceeded with ter-
mination and the matter is now on appeal
in the Commonwealth Court. Debtor takes
the position, which is vigorously contest-
ed by General Motors, that this franchise
agreement remains an asset of the case.

GM responded by filing a separate objection to the
plan and disclosure statement based upon its continuing
[**6]  contention that Krystal's franchise was not an
asset of the estate and could not be sold by Krystal or the
Trustee to satisfy Krystal's creditors.

The Bankruptcy Court affirmed GM's objections and
ruled that the franchise had been validly terminated by
GM. Accordingly, the court held that the franchise could
not be sold as part of the bankrupt's estate. The District
Court subsequently affirmed that ruling, and Krystal then
appealed to us. We reversed. We held that inasmuch as
Krystal had filed for bankruptcy before GM terminated
the franchise agreement, GM's termination of that
agreement was a violation of the automatic stay imposed
under § 362 of the Code. See, In Re Krystal Cadillac
Oldsmobile GMC Truck, Inc., 142 F.3d 631 (3d Cir.
1998) ("Krystal I"). [5]

5    We concluded that, under Pennsylvania law,
termination of a franchise does not become effec-
tive "until final determination of the issue by the
board." Krystal Cadillac, 142 F.3d at 636 (3d
Cir. 1998). Since the Vehicle Board did not issue
its final determination on Krystal's appeal of
GM's purported termination until after Krystal
filed for bankruptcy, the subsequent termination
of the franchise was a violation of the automatic
stay and therefore invalid. Id.

[**7]  **C. Krystal II: The Instant Dispute**

On September 25, 1998, Krystal filed the instant ac-
tion in the District Court for the Eastern District of
Pennsylvania against GM. Krystal's claims for relief
arise from GM's violation of the automatic stay by ter-
minating Krystal's franchise agreement after Krystal filed
for Chapter 11 protection. More specifically, Krystal
seeks damages on each of the following seven grounds:
(1) violation of the automatic stay provisions of the
Bankruptcy Code, 11 U.S.C. § 362(h); (2) breach of con-
tract; (3) violations of Federal Dealer's Day in Court Act,
15 U.S.C. § 1221 and of the Pennsylvania Board of Ve-
hicles Act, 63 P.S. § 818 et seq.; (4) conspiracy; (5)
conversion; (6) tortious interference with contractual

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 204 of 540

Page 5

337 F.3d 314, *; 2003 U.S. App. LEXIS 14965, **;
Bankr. L. Rep. (CCH) P78,900; 50 Collier Bankr. Cas. 2d (MB) 1211

relations; and (7) violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1-7.

The Eastern District Court referred Krystal's suit to the District Court for the Middle District of Pennsylvania because the claims were interwoven with the bankruptcy action then pending in the Bankruptcy Court for the Middle District. Although GM filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6), [**8] the court never [*319] ruled on that motion. Rather, the court *sua sponte* dismissed Krystal's complaint in its entirety under the doctrine of judicial estoppel. In doing so, the court noted that Krystal's complaint could also be dismissed for (1) failure to state a claim upon which relief could be granted, and (2) expiration of the applicable statutes of limitations. As noted above, the District Court affirmed the Bankruptcy Court's application of the doctrine of judicial estoppel, and this appeal followed. [6]

6   Krystal's bankruptcy case was still pending in Bankruptcy Court when this case was argued.

## II. DISCUSSION

Krystal makes several arguments as to why judicial estoppel was improperly applied here. However, before we address any of those specific arguments, it will be helpful to first provide a brief overview of that doctrine as a framework for our analysis.

## A. Judicial Estoppel In General

We first articulated the doctrine of judicial estoppel in *Scarano v. Central R. Co. of N.J.*, 203 F.2d 510 (3rd Cir. 1953). [**9]  There, we stated that [HN2] "a plaintiff, who has obtained relief from an adversary by asserting and offering proof to support one position, may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention." *Id.* at 513. In doing so, we recognized the intrinsic ability of courts to dismiss an offending litigant's complaint without considering the merits of the underlying claims when such dismissal is necessary to prevent a litigant from "playing fast and loose with the courts." *Id.* [7] (internal quotation marks omitted).

7   *See also*, *Delgrosso v. Spang and Co.*, 903 F.2d 234 (3rd Cir. 1990) (stating that unlike the concept of equitable estoppel, which focuses on relationship between parties, judicial estoppel focuses on relationship between litigant and judicial system, and seeks to preserve integrity of system).

Since *Scarano*, we have consistently stated that the doctrine [**10]  should only be applied to avoid a mis-

carriage of justice. *See Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773 (3rd Cir. 2001). Thus, in *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996), we stated: "[t]he basic principle of judicial estoppel . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Id.*

[HN3] Judicial estoppel is therefore not intended to eliminate all inconsistencies no matter how slight or inadvertent they may be. *See, In re Chambers Development Co., Inc.*, 148 F.3d 214 (3rd Cir. 1998). In *Montrose Medical Group*, we identified certain criteria for determining when seemingly inconsistent litigation stances justify application of the doctrine. We concluded:

> First, the party to be estopped must have taken two positions that are *irreconcilably inconsistent*. Second, judicial estoppel is unwarranted unless the party *changed his or her position "in bad faith* --i.e., with intent to play fast and loose with [**11]  the court." Finally, a district court may not employ judicial estoppel unless it is "tailored to address the harm identified" and *no lesser sanction would adequately remedy the damage* done by the litigant's misconduct.

[*320]  243 F.3d at 779-80 (emphasis added) (citations omitted). We also noted that equity requires that the presiding court give the party to be estopped a meaningful opportunity to provide an explanation for its changed position. *Id.* at 780.

With these principles in mind, we turn to Krystal's alleged inconsistent representations here.

## B. Krystal's Inconsistent Representations

As noted above, each of the claims in Krystal's seven count complaint is related to, and arises from, GM's termination of Krystal's Franchise Agreement. The primary claim is the violation of the automatic stay contained in count I. All of Krystal's other claims against GM rest upon that violation. [8]

8   For reasons best known to GM and/or its attorneys, GM spends considerable time and energy in this appeal arguing that its violation of the automatic stay was not willful. *See* Appellee's Br. at 17-21. For example, GM argues "In [*Krystal I*], this Court held that GM had violated the automatic stay, but did *not* reach the issue of whether

337 F.3d 314, *; 2003 U.S. App. LEXIS 14965, **;
Bankr. L. Rep. (CCH) P78,900; 50 Collier Bankr. Cas. 2d (MB) 1211

GM's conduct also constituted a *willful* violation under § 362(h)." Br. at 17-8. (emphasis in original). GM obviously knows that we have already ruled that its attempt to terminate the franchise agreement was a violation of the automatic stay. We can not, and will not, revisit that issue here.

Moreover, although § 362(h) requires a "willful" violation as a condition precedent to recovering damages, we have noted that this does not mean that the creditor must intend to violate the stay. "It is a willful violation of the automatic stay when a creditor violates the stay with knowledge that the bankruptcy petition has been filed. Willfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional." *Lansdale Family Restaurants Inc. v. Weis Food Service*, 977 F.2d 826, 829 (3rd Cir. 1992) (internal citations and quotation marks omitted).

[**12] When Krystal filed its Amended Disclosure Statement, it knew about each of the claims it has now included in this action. However, as quoted above, the Amended Reorganization Plan and Amended Disclosure Statement merely referenced Krystal's position that the dealer agreements were part of the bankruptcy estate and the ongoing state proceedings wherein Krystal was attempting to undo GM's termination of them.

The Bankruptcy Court found that Krystal limited the reference to the instant claim in order to conceal the claims from creditors in the hope of retaining any recovery for itself. While Krystal concedes that the schedules and statements it initially filed with the Bankruptcy Court on October 24, 1995 "failed to specifically list as a potential asset of Debtor's estate any claims against General Motors or GMAC," Appellant's Br. at 14, and 21, it vigorously denies taking two irreconcilably inconsistent positions in this case.

Krystal argues that although it did not list the instant claim as an asset in the October 24, 1995, Amended Disclosure Statement, the language of that disclosure was nevertheless adequate to inform creditors of claims Krystal had against GM and therefore they [**13] knew of the contingent asset of a potential damage award.

Alternatively, Krystal argues that even if the disclosure was insufficient, it could amend the disclosure statement under Bankruptcy Rule 1009 and thereby cure any inadequacy because the bankruptcy case is still open. Krystal insists that it did effectively amend the disclosure as soon as the Bankruptcy Court notified Krystal of the possible application of judicial estoppel. [9] Therefore, argues Krystal, [*321] it legitimately cured "any conceivable defect in a previously filed schedule or

non-disclosure." The Bankruptcy Court was not impressed by Krystal's eleventh hour candor and neither are we.

> 9    Krystal thereafter added the following amendment to Schedule B which asks disclosure of contingent and unliquidated claims:
>
> > "Tort, contract and violation of automatic stay claims against General Motors Acceptance Corporation."
>
> It also noted that it did not know the value of the claims.

As the Bankruptcy Court properly noted, the language in the [**14] Amended Disclosure Statement was "little more than boilerplate." It did not specify any of the claims contained in the instant complaint against GM, much less attempt to place any monetary value on them. We agree that such boilerplate language is simply not adequate to provide the level of notice required. The bankruptcy rules were clearly not intended to encourage this kind of inadequate and misleading disclosure by creating an escape hatch debtors can duck into to avoid sanctions for omitting claims once their lack of candor is discovered.

> Allowing [Krystal] to back-up, . . . and amend [its] bankruptcy filings, only after [its] omission has been [detected], suggests that a debtor should consider disclosing potential assets only if . . . caught concealing them. This so-called remedy would only diminish the necessary incentive to provide the Bankruptcy Court with a truthful disclosure of the debtors' assets.

*Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1288 (11th Cir. 2002).

As noted above, judicial estoppel is properly applied only when appropriate to redress the problem the doctrine was designed to remedy. Krystal argues that the doctrine [**15] of judicial estoppel is too drastic a remedy to apply here because the "[p]lan calls for a one hundred (100%) percent payment to all creditors." Appellant's Br. at 22. However, as GM is quick to point out, full payment is contingent upon Krystal's ability to sell its GM franchises for some undetermined profit. *See* App. 95, and 104, Appellee's Br. at 13. Moreover, GM represents without contradiction that Krystal still has not paid its creditors in full, and that the Amended Plan not-

ed the necessity of Krystal's owner ("Pappas") getting creditors to compromise their claims. According to GM, creditors may not have been willing to compromise their claims as much, if at all, had they known of the possible addition of damages from the instant law suit.

## C. Bad Faith

In *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 416-18 (3d Cir. 1988), we concluded that [HN4] a rebutable inference of bad faith arises when averments in the pleadings demonstrate both knowledge of a claim and a motive to conceal that claim in the face of an affirmative duty to disclose. That is precisely Krystal's situation here. Accordingly, the record is sufficient to support the [**16] Bankruptcy Court's finding of bad faith.

### 1. Krystal's Knowledge of the Assets

[HN5] Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing "adequate information" to "enable a creditor to make 'an informed judgment' about the Plan." 11 U.S.C. § 1125(a) (1). Debtors must therefore identify and disclose all "property of the estate" including all of the debtor's "legal and equitable" property interests. This includes such contingent assets as any cause of action Krystal may have against GM, and Krystal does not argue to the contrary. The nature of Krystal's purported misrepresentations [*322] here can fully be appreciated if we place them within the proper context.

[HN6] "A long-standing tenet of bankruptcy law requires one seeking benefits under its terms to satisfy a companion duty to schedule, for the benefit of creditors, all his interests and property rights." *Oneida*, 848 F.2d at 416. Therefore, "preparing and filing a disclosure statement is a critical step in the reorganization of a Chapter 11 debtor." *Id*. at 417. [**17] It has been called by one commentator, "the pivotal concept in reorganization of a Chapter 11 debtor." *Id*.

> The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information.

*Oneida*, 848 F.2d at 417 (internal quotation marks omitted).

Krystal relies upon the history of this dispute in arguing that it did not have any claim to disclose until we ruled in *Krystal I*, that GM's termination of the franchise agreement violated the automatic stay. Until then, argues Krystal, the appropriate state agencies had ruled that GM properly terminated the franchise agreement and there was therefore no cause of action against GM to include in the disclosure statement of October 24, 1995. Therefore, according to Krystal, when the Bankruptcy Court confirmed the Plan in October of 1997, the "law of the case" was that (1) Krystal had no ownership interest in the dealership franchise and (2) GM had not violated the automatic stay provisions of the Bankruptcy [**18] Code. Therefore, there was no cause of action to disclose. Appellant's Br. at 21.

However, Krystal was aware of every allegation currently asserted in Counts II through VII of its complaint when it filed its Statement and Plan. Each of the events alleged in those counts had already occurred when Krystal made the applicable filings under the Bankruptcy Code. Moreover, Krystal's argument that it could not know that GM violated the automatic stay as it alleges in Count I, is also unpersuasive. Krystal clearly knew of this potential claim because it vigorously argued that GM violated the automatic stay when it appeared before us in *Krystal I*.

Although it is true that the relevant state agencies had upheld GM's right to terminate the lease, the agencies were never asked to consider the issue of Krystal's alleged violation of the automatic stay, and Krystal knew this when it filed its disclosure statement in the Bankruptcy Court on October 24, 1995. The Vehicle Board's Adjudication and Order did not reach this issue, and the Commonwealth Court's November 6, 1995 decision had not yet been filed. Therefore the "law of the case" did not negate Krystal's duty to disclose its claims against [**19] GM.

Krystal's attempt to seek refuge in the law of the case doctrine ignores the scope of the disclosure requirement as well as the precise issues before the Vehicle Board and Commonwealth Court. [HN7] The Code requires that a debtor list *potential* causes of action, not claims it actually intends to sue on at the time of the required disclosure. "It has been held that a debtor must disclose any litigation likely to arise in a non-bankruptcy context." *Oneida*, 848 F.2d at 416. Thus, Krystal's own actions belie its contention that it did not know it had a potential claim against GM. Krystal has consistently and vigorously maintained that GM's termination of the franchise agreement violated the automatic stay. That claim was not within the purview of the proceeding Krystal brought [*323] before the Vehicle Board or Commonwealth Court, and the record belies any argument that it was not then within Krystal's contemplation.

337 F.3d 314, *; 2003 U.S. App. LEXIS 14965, **;
Bankr. L. Rep. (CCH) P78,900; 50 Collier Bankr. Cas. 2d (MB) 1211

To the contrary, it appears that Krystal continuously believed that GM had violated the automatic stay. Nothing here supports Krystal's current position that it had to await a court decision to disclose this potential claim. Moreover, Krystal ignores the rather [**20] damning fact that it included the franchise as an asset of the estate in its disclosure statement even though the Vehicle Board had already upheld GM's termination of it. App. at 142.

[HN8] Although we do not require debtors to list hypothetical claims that are so tenuous as to be fanciful, we do require them to advise creditors of the kind of potential claims that Krystal is asserting here. "[C]reditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, [therefore] the importance of full and honest disclosure cannot be overstated." *Ryan*, 81 F.3d at 362.

The Bankruptcy Court properly concluded that Krystal had enough information prior to confirmation to know it might have a claim against GM. [HN9] "'[I]f the debtor has enough information . . . prior to confirmation to suggest that it may have a possible cause of action, then that is a 'known' cause of action such that it must be disclosed.'" *In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999) *(citations omitted)*. It is difficult to understand why Krystal would list the franchise as an asset after the administrative [**21] rulings upholding GM's termination of it and yet fail to disclose a potential suit against GM for what Krystal has always argued was an improper and ineffective cancellation other than an intent to hide the claim from creditors.

### 2. Krystal's Motive to Conceal the Claims

The Bankruptcy Court found that (1) Krystal's owner ("Pappas") agreed to contribute substantial funds toward the [*324] payment of claims and expenses associated with Krystal's reorganization and (2) the owner was also engaged in negotiating unsecured claims downward to minimize the amount Pappas would have to pay. [10] Krystal therefore had every reason to minimize its assets so that creditors would conclude they had no choice but to significantly compromise their claims and approve Krystal's reorganization. Indeed, the argument that Krystal made in support of its planned reorganization confirms this. The liquidation analysis Krystal set forth in its Disclosure Statement provides as follows:

> [S]ecured and priority claims far exceed the value of the Debtor's assets. This means that in the event of a liquidation no unsecured creditor will receive any dividend. In fact, it is most likely that in the event of [**22] a Chapter 7 liquidation

> secured and priority claims will not be paid in full.

> Although Debtor's proposed Plan actually amounts to a liquidation of all Debtor's assets, it is nevertheless asserted that all creditors will still be treated much better under the Plan than under a Chapter 7 liquidation. This is because the Plan provides for substantial cash payments to almost all creditors.

> The reason Debtor can propose cash payments under the Plan, and none can be expected under a Chapter 7 liquidation, is because Mr. Pappas is willing to contribute substantial cash toward the payment of claims and expenses associated with this reorganization.

App. 27. Against this background, it is undeniable that creditors should have been informed of this contingent asset.

10    GMAC's $ 114,486 claim was negotiated down to $ 23,000. App. 12.

### 3. Harm To Creditors

[HN10] Judicial estoppel is only appropriate when the inconsistent positions are "tantamount to a knowing misrepresentation to or even fraud on the court." *Total Petroleum, Inc. v. Davis*, 822 F.2d 734-38 (8th Cir. 1987). [**23] Not surprisingly, Krystal reminds us of this, as well as the fact that the doctrine is to be used sparingly and reserved for the most egregious case. According to Krystal, employing that doctrine and the sanction of dismissal here was "overkill," even if the doctrine is otherwise appropriate.

This position is based upon Krystal's assertion that under the Plan, (1) the secured creditors receive 100% payment; (2) unsecured creditors received 75% and stand to receive full payment upon the sale of the franchise; and (3) the legal claims are contingent assets of a highly speculative nature and therefore would have been valued at zero dollars even if disclosed. Krystal concludes that since the creditors experienced no financial harm, the court erred by finding that there was bad faith.

In making this argument, Krystal compares itself to the debtor in *Ryan*. There, we held that a Chapter 11 debtor-builder's failure to disclose causes of action against suppliers of allegedly defective wood trim in bankruptcy proceedings did not bar debtor from pursuing those claims outside of bankruptcy. Although the contingent assets represented by those claims were not dis-

337 F.3d 314, *; 2003 U.S. App. LEXIS 14965, **;
Bankr. L. Rep. (CCH) P78,900; 50 Collier Bankr. Cas. 2d (MB) 1211

closed in the bankruptcy proceedings, [**24] we rejected the Bankruptcy Court's application of judicial estoppel because the debtor did not attempt to "play fast and loose" with the court.

We also held that [HN11] the application of judicial estoppel does not turn on whether the estopped party actually benefitted from its attempt to play fast and loose with the court. We concluded that the presence or absence of any such benefit is merely a factor in determining whether the evidence would support a conclusion of bad faith. After raising the issue of whether Ryan actually received a benefit from the omissions there, we stated: "We readily conclude that the doctrine of judicial estoppel in this circuit contains no such requirement." 81 F.3d at 361. We then explained:

the critical issue is what the [party] contended in the underlying proceeding, rather than what the jury found. Whether the party sought to be estopped benefitted from its earlier position or was motivated to seek such a benefit may be relevant insofar as it evidences an intent to play fast and loose with the courts. It is not, however, an independent requirement for application of the doctrine of judicial estoppel.

*Id.* (Internal citations [**25] and quotation marks omitted).

The totality of the circumstances in *Ryan* lead us to conclude that the debtor did not omit any information in bad faith. Ryan omitted certain assets from its disclosures, but it also omitted counterbalancing liabilities. Therefore, largely the "balance of assets and liabilities . . . may have been unaffected by the failure to list [certain] claims as assets." 81 F.3d at 363. Ryan did not benefit from the omission. [11] [*325] Despite Krystal's argument to the contrary, that is not the situation here.

11  Because, as we have noted, the estopped party need not have benefitted from the misrepresentation, we note the absence of a benefit in *Ryan* only because it was relevant to an inquiry into that debtor's bad faith. For the same reason, we note that Krystal benefitted from the omission here. At the very least, the record certainly supports the Bankruptcy Court's finding that it tried to derive such a benefit.

The Bankruptcy Court could not accept Krystal's argument [**26] that its creditors were not harmed, and neither can we. The Bankruptcy Court also reasoned that the impact of this nondisclosure must be measured in more than monetary terms. Such nondisclosures affect creditors' willingness to negotiate their claims and enhance the debtor's bargaining position by making the pot that creditors look to for recovery appear smaller than it really is. That is particularly important here because, as noted above, Krystal's owner negotiated very substantial compromises of claims against Krystal.

### 4. Lesser Sanctions

[HN12] The fact that a sanction is to be used sparingly does not mean that it is not to be used when appropriate. Applying a lesser sanction here (such as requiring Krystal to pay unsecured creditors the balance of their claims out of any damages Krystal might recover from the instant action) would reward Krystal for what appears to be duplicitous conduct in the course of its bankruptcy proceeding. Krystal would still reap the benefit of any recovery beyond the amount paid to satisfy outstanding debts. In addition, the integrity of both the bankruptcy process and the judicial process would suffer. In short, allowing Krystal the lesser sanction [**27] it advocates would send a message that "a debtor should consider disclosing potential assets only if he is caught concealing them." *Pemco*, 291 F.3d at 1288. The Bankruptcy Court was understandably reluctant to allow Krystal to use sleight of hand to show its cards to its creditors and so are we. Dismissal is necessary to prevent Krystal from profiting from its omission. It is also "required to preserve the integrity of the earlier proceedings." *Oneida*, 848 F.2d at 418.

### 5. Opportunity to Explain

Lastly, Krystal argues that the Bankruptcy Court's finding of bad faith is undermined by the absence of any testimony on this issue. It maintains that it never had an adequate opportunity to explain. However, "[w]e have held that [HN13] a District Court need not always conduct an evidentiary hearing before finding the existence of bad faith for judicial estoppel purposes." *Montrose Medical Group*, 243. F.3d at 780 n.5.

In *Oneida*, we held that [HN14] if the pleadings show (1) the fact of non-disclosure of the asset combined with (2) a debtor's obvious knowledge of the existence of the asset, a court need not take testimony in order to make a finding of bad [**28] faith. Although the Bankruptcy Court here raised the issue of judicial estoppel *sua sponte,* the court gave Krystal the opportunity to fully brief this issue and gave both parties the opportunity for oral argument. We conclude that Krystal had a fair opportunity to argue that the doctrine did not apply and to ask the Bankruptcy Court not to dismiss its complaint. We find no error in the Bankruptcy Court's ruling, and we conclude that the District Court properly affirmed it.

337 F.3d 314, *; 2003 U.S. App. LEXIS 14965, **;
Bankr. L. Rep. (CCH) P78,900; 50 Collier Bankr. Cas. 2d (MB) 1211

**III. CONCLUSION**

For all of the above reasons, the judgment of the District Court will be affirmed.

TAB 62

971 A.2d 872
Court of Chancery of Delaware.

Kenzo KURODA, Plaintiff,

v.

SPJS HOLDINGS, L.L.C., Liberty Square
Asset Management, L.L.C., WGL Capital
Corp., Warren G. Lichtenstein, Thomas J.
Niedermeyer, Jr., and Claire A. Walton, Defendants.

Civil Action No. 4030-CC.    |    Submitted:
Jan. 30, 2009.    |    Decided: April 15, 2009.

**Synopsis**
**Background:** Investment advisor, who was a non-managing member of limited liability company (LLC) that invested in Japanese corporations, brought breach of contract, tortious interference, breach of implied covenant of good faith and fair dealing, conversion, unjust enrichment, and conspiracy action against the LLC, LLC's managing members, and the operators of the managing members. Defendants moved to dismiss some of investment advisor's claims for failure to state a claim.

**Holdings:** The Court of Chancery, Chandler, Chancellor, held that:

[1] issue of whether LLC's managing members were liable for LLC's breach of the LLC agreement could not be resolved on a motion to dismiss;

[2] investment advisor did not assert factual allegations indicating that operators of LLC's managing members acted outside the scope of their authority, as required in order to maintain tortious interference with contract claim;

[3] investment advisor did not allege that he was individually damaged as a result of defendants disseminating false and misleading information, as required in order to maintain a tortious interference with prospective economic advantage claim;

[4] investment advisor did not state a claim for the breach of the implied covenant of good faith and fair dealing;

[5] investment advisor did not have a conversion claim against defendants;

[6] investment advisor did not have an unjust enrichment claim; and

[7] investment advisor did not allege an underlying wrong that could support a civil conspiracy claim.

Motion to dismiss granted in part and denied in part.

West Headnotes (43)

**[1]**    **Pretrial Procedure**
           👍 Construction of pleadings
        **Pretrial Procedure**
           👍 Presumptions and burden of proof

On a motion to dismiss for failure to state a claim upon which relief can be granted, a court must accept the factual allegations in the complaint as true and make all reasonable inferences from those facts in the plaintiff's favor. Chancery Court Rule 12(b)(6).

Cases that cite this headnote

**[2]**    **Pretrial Procedure**
           👍 Construction of pleadings

Conclusory allegations without supporting factual allegations will not be accepted as true, on a motion to dismiss for failure to state a claim. Chancery Court Rule 12(b)(6).

1 Cases that cite this headnote

**[3]**    **Pretrial Procedure**
           👍 Availability of relief under any state of facts provable

On a motion to dismiss for failure to state a claim, if the plaintiff pleads any set of facts that would entitle him to relief, then the motion must fail. Chancery Court Rule 12(b)(6).

Cases that cite this headnote

**[4]**    **Corporations and Business Organizations**

☞ **Organizing documents; operating agreement**

Limited liability companies (LLCs) are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members.

7 Cases that cite this headnote

[5] **Corporations and Business Organizations**
☞ **Organizing documents; operating agreement**

A limited liability company's (LLC) LLC agreement defines when members of the LLC can be liable for breach of provisions of that agreement.

8 Cases that cite this headnote

[6] **Corporations and Business Organizations**
☞ **Organizing documents; operating agreement**

As with any contract, a court must look to the language of a limited liability company's (LLC) agreement to determine the potential liabilities of the parties.

5 Cases that cite this headnote

[7] **Pretrial Procedure**
☞ **Evidence**

In analyzing a contract on a motion to dismiss for a failure to state a claim, a court must interpret ambiguous provisions in the light most favorable to the nonmoving party. Chancery Court Rule 12(b)(6).

Cases that cite this headnote

[8] **Pretrial Procedure**
☞ **Fact questions**

Issues, whether managing members of limited liability company (LLC) that invested in Japanese corporations were liable for LLC's failure to pay incentive allocations owed to investment advisor who was a non-managing member of the LLC and whether they were liable for LLC's failure to honor investment advisor's request to withdraw the full balance of his investment capital account, could not be resolved on managing members' motion to dismiss for failure to state a claim as to investment advisor's breach of contract claims against managing members, as the managing members had signed the LLC agreement, and there were factual dispute regarding whether the LLC agreement limited a member's liability for reasons other than status as a member, and whether the LLC agreement precluded breach of contracts claims asserted by one member against other members. Chancery Court Rule 12(b)(6).

Cases that cite this headnote

[9] **Corporations and Business Organizations**
☞ **Pleading**

Investment advisor, who was a Japanese citizen and a non-managing member of limited liability company (LLC) that invested in Japanese corporations, did not assert he was damaged as a result of LLC's issuance of a federal schedule that allegedly improperly assigned taxable income, as required in order for investment advisor to plead a breach of contract claim for improper income tax allocations against LLC and LLC's managing members; investment advisor did not allege that he paid or owed taxes in the United States or that he paid higher taxes or suffered any adverse tax consequences as a result of the issuance of the schedule.

Cases that cite this headnote

[10] **Contracts**
☞ **Grounds of action**

To state a claim for breach of contract, a plaintiff must demonstrate: (1) the existence of the contract, whether express or implied; (2) the breach of an obligation imposed by that contract; and (3) the resultant damage to the plaintiff.

4 Cases that cite this headnote

[11] **Specific Performance**

👉 Bill, Complaint, or Petition

A plaintiff must properly allege each element of a breach of contract claim, even where the plaintiff is seeking an equitable remedy such as specific performance.

1 Cases that cite this headnote

**[12]    Torts**

👉 Pleading

Investor advisor, who was a non-managing member of limited liability company (LLC) that invested in Japanese corporations, did not assert factual allegations indicating that operators of managing members of the LLC acted outside the scope of their authority when they allegedly caused LLC to breach LLC's contract obligations to investment advisor, as required in order for investment advisor to maintain tortious interference with contract claims against the operators of the managing members; to state a claim for tortious interference with contract a complaint had to contain factual allegations that supported a reasonable inference that the defendants were strangers to both the contract and the business relationship giving rise to the contract, and investment advisor's complaint only stated conclusory allegations that operators of managing members acted for personal reasons and therefore exceeded the scope of their authority.

1 Cases that cite this headnote

**[13]    Torts**

👉 Tortfeasor as stranger to contract or relationship, in general

A party to a contract cannot be held liable for breaching the contract and for tortiously interfering with that contract.

1 Cases that cite this headnote

**[14]    Torts**

👉 Pleading

To state a claim for tortious interference with contract a complaint must contain factual allegations that support a reasonable inference

that the defendants were each a stranger to both the contract and the business relationship giving rise to and underpinning the contract.

2 Cases that cite this headnote

**[15]    Declaratory Judgment**

👉 Corporations

**Declaratory Judgment**

👉 Subjects of relief in general

Investor advisor, who was a non-managing member of limited liability company (LLC) that invested in Japanese corporations, could not seek a declaration that his departure from the LLC was legally permissible against the operators of the LLC's managing members, as the operators of the managing members were not parties to the LLC agreement.

Cases that cite this headnote

**[16]    Torts**

👉 Business relations or economic advantage, in general

**Torts**

👉 Pleading

Investment advisor, who was a non-managing member of limited liability company (LLC) that invested in Japanese corporations, did not allege that he individually suffered damages as a result of the LLC, LLC's managing members or the operators of the managing members of the LLC disseminating false and misleading information in the business media concerning investment advisor's separation from the LLC, as required in order for investment advisor to state a tortious interference with prospective economic advantage claim, where all of the alleged harms were suffered by new investment fund established by investment advisor and the alleged harms only affected investment advisor through his interest in the new fund.

1 Cases that cite this headnote

**[17]    Torts**

👉 Prospective advantage, contract or relations; expectancy

**Torts**
👉 Pleading

To survive dismissal on a claim for tortious interference with prospective economic advantage, a plaintiff must allege: (1) the reasonable probability of a business opportunity; (2) the intentional interference by defendant with that opportunity; (3) proximate causation; and (4) damages.

1 Cases that cite this headnote

[18] **Torts**
👉 Employees and agents; corporate entities

Direct claims for tortious interference with prospective economic advantage are available to a member of a limited liability company (LLC) only where the member has suffered damage that is independent of any damage suffered by the LLC.

3 Cases that cite this headnote

[19] **Corporations and Business Organizations**
👉 Pleading

Investment advisor, who was a non-managing member of limited liability company (LLC) that invested in Japanese corporations, did not allege that the LLC, LLC's managing members or the operators of the managing members of the LLC breached an implied rather than an express covenant, or identify any contractual benefits he was denied a result of defendants' conduct, as required in order for investment advisor to state a claim for breach of the covenant of good faith and fair dealing against LLC, managing members, or operators of the managing members; the terms of the LLC agreement controlled investment advisor's claim to the extent it was premised on defendants' failure to pay him money due under the agreement, and investment advisor only pled an injury to his contractual interest as a result of the breach of the implied obligation in a conclusory way.

7 Cases that cite this headnote

[20] **Contracts**
👉 Terms implied as part of contract

The implied covenant of good faith and fair dealing inheres in every contract and requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.

13 Cases that cite this headnote

[21] **Contracts**
👉 Terms implied as part of contract

The implied covenant of good faith and fair dealing cannot be invoked to override the express terms of a contract.

13 Cases that cite this headnote

[22] **Contracts**
👉 Terms implied as part of contract

Rather than constituting a free floating duty imposed on a contracting party, the implied covenant of good faith and fair dealing can only be used conservatively to ensure the parties' reasonable expectations are fulfilled.

8 Cases that cite this headnote

[23] **Contracts**
👉 Grounds of action

To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.

36 Cases that cite this headnote

[24] **Contracts**
👉 Sufficiency of statement of cause of action in general

General allegations of bad faith conduct are not sufficient to state a claim for the breach of the implied covenant of good faith and fair dealing; rather, the plaintiff must allege

a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff the fruits of the contract.

30 Cases that cite this headnote

**[25]    Contracts**
    Terms implied as part of contract

Consistent with its narrow purpose, the implied covenant of good faith and fair dealing is only rarely invoked successfully.

10 Cases that cite this headnote

**[26]    Corporations and Business Organizations**
    Nature and form of remedy

Investment advisor, who was a non-managing member of limited liability company (LLC) that invested in Japanese corporations, did not have a claim for the return of money in his capital account at the LLC that was either not duplicative of his breach of contract claim or a claim to return the identical money, as required in order to maintain a conversion claim against the LLC, LLC's managing members and the operators of the managing members; the only right that investment advisor had for the return of his money was his right to the money under the LLC agreement, and such claim could be satisfied by the payment of money generally.

2 Cases that cite this headnote

**[27]    Conversion and Civil Theft**
    Assertion of ownership or control in general

Conversion is any distinct act of dominion wrongfully exerted over the property of another, in denial of the plaintiff's right, or inconsistent with it.

6 Cases that cite this headnote

**[28]    Action**
    Nature of Action
**Torts**
    Breach of contract in general

When a plaintiff's claim arises solely from a breach of contract, the plaintiff generally must sue in contract, and not in tort.

6 Cases that cite this headnote

**[29]    Torts**
    Duty, breach, or wrong independent of contract

In order to assert a tort claim along with a contract claim, a plaintiff must generally allege that the defendant violated an independent legal duty, apart from the duty imposed by contract.

5 Cases that cite this headnote

**[30]    Conversion and Civil Theft**
    Money and commercial paper;  debt

Generally, an action in conversion will not lie to enforce a claim for the payment of money.

3 Cases that cite this headnote

**[31]    Conversion and Civil Theft**
    Money and commercial paper;  debt

An action for conversion of money will lie only where there is an obligation to return the identical money delivered by the plaintiff to the defendant.

5 Cases that cite this headnote

**[32]    Implied and Constructive Contracts**
    Effect of Express Contract

Claims of investment advisor, who was a non-managing member of limited liability company (LLC) that invested in Japanese corporations, for the return of money in his capital account at the LLC and the payment of incentive allocations were governed by an express contract, and thus investment advisor could not maintain a claim alleging that the LLC, LLC's managing members and the operators of the managing members were unjustly enriched by the retention of his money; investment advisor claimed that such monies was owed to him pursuant to the terms of the LLC agreement, and investment advisor could not use unjust enrichment to circumvent basic contract principles and extend liability for the

breach of the LLC agreement to operators of LLC's managing members, who were not parties to the agreement.

1 Cases that cite this headnote

**[33]** **Implied and Constructive Contracts**
    ☞ Unjust enrichment

Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.

5 Cases that cite this headnote

**[34]** **Implied and Constructive Contracts**
    ☞ Effect of Express Contract

A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim.

22 Cases that cite this headnote

**[35]** **Implied and Constructive Contracts**
    ☞ Effect of Express Contract

If a contract is the measure of a plaintiff's right, there can be no recovery under an unjust enrichment theory independent of it.

6 Cases that cite this headnote

**[36]** **Implied and Constructive Contracts**
    ☞ Effect of Express Contract

When a complaint alleges an express, enforceable contract that controls the parties' relationship, a claim for unjust enrichment will be dismissed.

16 Cases that cite this headnote

**[37]** **Implied and Constructive Contracts**
    ☞ Effect of Express Contract

**Implied and Constructive Contracts**
    ☞ Persons liable

Unjust enrichment cannot be used to circumvent basic contract principles recognizing that a person not a party to a contract cannot be held liable to it.

2 Cases that cite this headnote

**[38]** **Conspiracy**
    ☞ Pleading

Investment advisor, who was a non-managing member of limited liability company (LLC) that invested in Japanese corporations, did not allege the elements of an underlying wrong, as required in order to maintain a civil conspiracy claim against the LLC, LLC's managing members and the operators of the managing members; though investment advisor properly alleged breach of contract claims against LLC and managing members for failing to return money in his LLC capital account and failing to pay him incentive allocations as required by the LLC agreement, breach of contract could not constitute an underlying wrong on which a civil conspiracy claim could be based, and investment advisor failed to properly pled the elements of tortious interference, conversion, unjust enrichment or breach of fiduciary duty.

1 Cases that cite this headnote

**[39]** **Conspiracy**
    ☞ Nature and Elements in General

Civil conspiracy is not an independent cause of action; it must be predicated on an underlying wrong.

11 Cases that cite this headnote

**[40]** **Conspiracy**
    ☞ Nature and Elements in General

If a plaintiff fails to adequately allege the elements of an underlying claim, a civil conspiracy claim must be dismissed.

8 Cases that cite this headnote

**[41]** **Conspiracy**
    ☞ Nature and Elements in General

Unless the breach also constitutes an independent tort, a breach of contract cannot constitute an underlying wrong on which a claim for civil conspiracy could be based.

10 Cases that cite this headnote

[42]    **Conspiracy**
       Nature and Elements in General

A claim for civil conspiracy cannot be predicated on a breach of the implied contractual covenant of good faith and fair dealing unless the breach also constitutes an independent tort.

9 Cases that cite this headnote

[43]    **Conspiracy**
       Nature and Elements in General

Just as a plaintiff generally cannot use a claim for tortious interference with contract to impose additional damages on contracting parties or their agents, a plaintiff cannot use a claim for civil conspiracy to impose on contracting parties or their agents additional damages for breach of a contract, beyond those available under contract law for breach of the contract.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*877** Collins J. Seitz, Jr., David E. Ross, and Ryan P. Newell, of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware; of Counsel: Reid M. Figel, David L. Schwarz, and Kelly P. Dunbar, of Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., Attorneys for Plaintiff.

Edward McNally, Lewis H. Lazarus, and Jason C. Jowers, of Morris James LLP, Wilmington, Delaware; of Counsel: Howard J. Kaplan, Lisa C. Solbakken, and Sara Welch, of Arkin Kaplan Rice LLP, New York, New York, Attorneys for Defendants.

## OPINION

CHANDLER, Chancellor.

Plaintiff's primary claim in this case is that he is owed money pursuant to a limited liability company agreement. From around 2002 to 2006, plaintiff served as an investment adviser for a group of entities that invested in publicly traded Japanese corporations. As part of this arrangement, plaintiff entered into various agreements with defendants, including the limited liability company agreement at issue in this case. Plaintiff alleges that he did not receive the payments to which he was entitled under this agreement and that he was assigned excess income for tax purposes in violation of the agreement. Plaintiff also seeks a declaration of his right under the agreement to receive certain payments in the future and a declaration that his formation of an investment fund did not violate the terms of the agreement. In addition, plaintiff brings claims for tortious interference with contract, tortious interference with prospective economic advantage, breach of the implied covenant of good faith and fair dealing, conversion, unjust enrichment, and civil conspiracy.

Defendants moved to dismiss some, but not all, of plaintiff's claims under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons set forth below, defendants' motion to dismiss the breach of contract claims against Liberty Square Asset Management, L.L.C. and WGL Capital Corp. is denied. On the conditions set forth below, plaintiff's claims for (1) breach of contract for the improper tax allocation, (2) tortious interference with contract, (3) tortious interference with prospective economic advantage, (4) breach of the implied covenant of good faith and fair dealing, (5) conversion, (6) unjust enrichment, and (7) civil conspiracy, are all dismissed for failure to state a claim upon which relief can be granted.

## I. BACKGROUND

Plaintiff Kenzo Kuroda is a sophisticated investment adviser, with more than twenty years of experience working on highly specialized corporate finance and mergers and acquisitions transactions involving publicly **\*878** traded Japanese corporations. [1] Defendants Thomas J. Niedermeyer, Jr. and Warren G. Lichtenstein were introduced to Kuroda through a mutual acquaintance in late 2000. During 2001, the parties explored the formation of a private investment fund that would invest in Japanese public corporations.

In 2001, Niedermeyer and Lichtenstein, acting through defendants Liberty Square Asset Management, L.L.C. ("Liberty Square") and WGL Capital Corp. ("WGL Capital")

respectively, formed a private fund to invest in small to mid-size, publicly traded Japanese companies. [2] Liberty Square is operated by defendants Niedermeyer and Claire A. Walton, and WGL Capital is operated by Lichtenstein. The structure of the fund involved the creation of two investment funds-Steel Partners Japan Strategic Fund (Offshore), L.P. ("Master Fund") and Steel Partners Japan Strategic Fund, L.P. ("Feeder Fund")-as well as a series of affiliated entities to manage and provide investment advice to those funds. [3] The Master Fund was to serve as the principal investment vehicle for making investments in Japanese companies, while the Feeder Fund was structured to serve as a vehicle for United States investors to invest in the Master Fund.

At all relevant times, defendant SPJS Holdings, L.L.C. ("SPJS Holdings"), a Delaware limited liability company, has been the general partner of the Master Fund. SPJS Holdings is governed by the Second Amended and Restated Limited Liability Company Agreement of SPJS Holdings ("LLC Agreement"), which was executed by WGL Capital, Liberty Square, Kuroda, and non-party Yusuke Nishi. The LLC Agreement establishes that Kuroda and Nishi are non-managing members of SPJS Holdings and that Liberty Square and WGL Capital are managing members of SPJS Holdings. Non-party Steel Partners Japan Asset Management, which is principally owned by Liberty Square and WGL Capital, was created to provide management services to the Master Fund.

In November 2001, Kuroda and Nishi formed Steel Partners Japan, K.K. ("SPJ-KK"), a Japanese corporation, to provide investment advisory services to defendants. [4] SPJ-KK entered into a consulting agreement with Steel Partners Japan Asset Management, and pursuant to this agreement, Kuroda provided a variety of management services for the benefit of defendants.

Plaintiff alleges that he was compensated for his services in two ways. First, as a non-managing member of SPJS Holdings, Kuroda had a right to 16-2/3% of any incentive allocations that SPJS Holdings received from the Master Fund pursuant to the July 1, 2004 Amended and Restated Limited Partnership Agreement of Steel Partners Japan Strategic Fund (Offshore), L.P. [5] Second, as a shareholder of SPJ-KK, **\*879** Kuroda shared (with Nishi) approximately one-third of the 2% management fee (after deducting out expenses) paid to Steel Partners Japan Asset Management.

From on or about January 1, 2002 to June 30, 2006, Kuroda provided consulting and investment advice to defendants. During this time, Kuroda, acting through SPJ-KK, was a primary source of investment ideas for the Master Fund. Kuroda was responsible for the identification of potential investments in Japanese corporations, for conducting due diligence on the Master Fund's investments, for providing advice on the terms and structuring of those investments, and for reviewing the operations of the companies in which the Master Fund invested. Kuroda was also a principal spokesperson on behalf of defendants.

At the end of 2005, Kuroda began to have significant and increasing differences of opinion with Lichtenstein and Niedermeyer regarding the appropriate methods for pursuing shareholder activism in Japan. Kuroda, a Japanese national with extensive experience in Japanese business practices, believed that the increasingly confrontational approach being advocated and pursued by Lichtenstein and Niedermeyer would be counterproductive and reflected a fundamental lack of sophistication about business practices in Japan. Kuroda was also uncomfortable with actions taken by WGL Capital, Liberty Square, Lichtenstein, Niedermeyer, and Walton that, Kuroda believed, improperly disadvantaged the non-managing members of SPJS Holdings. Ultimately, these disagreements led Kuroda to inform defendants that he could no longer serve as an adviser to the Steel Partners entities. Kuroda indicated that he was willing to negotiate his withdrawal as a non-managing member of SPJS Holdings and as a shareholder of SPJ-KK, but that he intended to preserve his rights until the parties had reached a complete agreement.

Lichtenstein, Niedermeyer, and Walton expressed concerns about the impact that Kuroda's departure would have on current and potential investors, including the possibility that a public dispute among the initial partners would cause investors to lose confidence in the Master Fund and withdraw their investments. In an attempt to minimize the effect of Kuroda's departure, Lichtenstein, Niedermeyer, and Walton agreed with Kuroda to publicly disclose that Kuroda's departure was mutually amicable. To further allay investor concerns, Kuroda agreed to continue to provide investment advice to defendants and to delay the date of his formal separation until June 30, 2006. In mid-2006, Kuroda and several partners founded a private investment fund, Fugen Capital Management LLC ("Fugen"), to invest in Japanese corporations.

The parties engaged in negotiations regarding Kuroda's separation from SPJS Holdings. During these negotiations, defendants made offers that Kuroda believed did not reflect the fair market value of Kuroda's membership interest in SPJS Holdings and the funds he would be entitled to receive under the LLC Agreement. The parties were unable to reach an agreement, and Kuroda initiated this action. In the complaint, Kuroda alleges that defendants refused to pay him incentive allocations owed to him under the parties' agreements. The complaint also alleges that in 2007, Liberty Square, Walton, and Niedermeyer caused SPJS Holdings to issue Kuroda an inaccurate Schedule K-1 that purported to assign Kuroda nearly $10 million of income for the 2006 tax year despite the fact that SPJS Holdings refused to recognize Kuroda's contractual right to share in the incentive allocations earned by SPJS Holdings during the tax year.

**\*880** Kuroda also alleges that during the negotiations Kuroda formally requested an immediate payment of all specific amounts held for his direct and indirect benefit in his capital accounts at the Master Fund and SPJS Holdings. Kuroda received a payment reflecting 90% of the amount of the then-current balance in his investment capital account at SPJS Holdings. Defendants have refused, however, to pay Kuroda the 10% that remained in his investment capital account as of June 30, 2006, allegedly in violation of the relevant agreements.

Kuroda further alleges that defendants attempted to undermine his reputation and interfere with his economic opportunities in order to save the personal reputations of Lichtenstein, Niedermeyer, and Walton. The complaint alleges that defendants: (1) threatened Kuroda repeatedly with baseless legal claims; (2) caused the dissemination of false and misleading information in the business media concerning Kuroda's separation from SPJS Holdings, falsely suggesting that Kuroda had been forced out of SPJS Holdings for performance reasons; and (3) violated the LLC Agreement and their duties to Kuroda repeatedly while engaging in bad faith and unreasonable negotiating tactics.

On October 27, 2008, defendants moved to dismiss some, but not all, of the claims in the complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[6] This is my decision on defendants' motion to dismiss.

## II. ANALYSIS

[1] [2] [3] On a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state claim upon which relief can be granted, the Court must accept the factual allegations in the complaint as true and make all reasonable inferences from those facts in the plaintiff's favor.[7] Conclusory allegations, however, without supporting factual allegations, will not be accepted as true.[8] Under this standard, if Kuroda pleads any set of facts that would entitle him to relief, then the motion to dismiss must fail.

### A. Breach of Contract Claims Against Liberty Square and WGL Capital

The complaint alleges that SPJS Holdings, WGL Capital, and Liberty Square breached the LLC Agreement by failing to pay Kuroda incentive allocations he is owed, by failing to honor Kuroda's request to withdraw the full balance of his investment capital account, and by issuing Kuroda a federal Schedule K-1 that improperly assigned him taxable income. Defendants Liberty Square and WGL Capital contend that the breach of contract claims against them should be dismissed because they are not liable for SPJS Holdings' purported breaches of the LLC Agreement. Because I am not convinced that defendants' interpretation of the LLC Agreement is the only reasonable interpretation, the breach of contract claims against Liberty Square and WGL Capital cannot be dismissed.

[4] [5] [6] [7] Limited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members. Among other things, a company's LLC **\*881** agreement defines when members of the LLC can be liable for breach of provisions of that agreement. Accordingly, as with any contract, the Court must look to the language of the LLC Agreement to determine the potential liabilities of the parties. In analyzing a contract on a motion to dismiss under Rule 12(b)(6), the Court must interpret ambiguous provisions in the light most favorable to the nonmoving party.[9]

Liberty Square and WGL Capital contend that as Class A Managing Members of SPJS Holdings they are insulated from liability arising from the contractual obligations of SPJS Holdings by § 1.06 of the LLC Agreement. Section 1.06 provides, in part, that:

> Except as otherwise expressly provided in the Delaware Act, the

debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member. [10]

Defendants argue that this language makes clear that only SPJS Holdings can be held liable for the payments at issue, and that Liberty Square and WGL Capital cannot be held liable for those payments.

In response, plaintiff contends that he does not seek to hold Liberty Square or WGL Capital liable "solely by reason of [their] being a Member" of SPJS Holdings. Rather, plaintiff argues, the breach of contract claims are asserted against Liberty Square and WGL Capital on the grounds that as managing members they are assigned authority to carry out the business and affairs of SPJS Holdings [11] and that they took affirmative steps in contravention of their own obligations under a contract to which they are signatories-the LLC Agreement. According to plaintiff, there is nothing in the LLC Agreement that would allow the managing members to refuse to return funds in violation of the LLC Agreement and then claim immunity from suit.

Plaintiff also argues that both § 1.06 of the LLC Agreement and § 18-303 of the Delaware Limited Liability Company Act limit the liability of members to third parties and not to other members for breach of the LLC Agreement. Section 1.06 of the LLC Agreement is substantively identical to § 18-303(a), which is entitled "Liability to 3rd parties." Thus, plaintiff argues, § 1.06 applies solely to liability to third parties and has no bearing on the liability between members. This interpretation of the language of § 1.06 of the LLC Agreement, which tracks the language of § 18-303(a), is supported by case **882 law. [12] Additionally, plaintiff points to § 205(a) of the LLC Agreement, which provides, in part, as follows:

No Member or Affiliate (collectively, the "Indemnifying Parties") shall be liable to any Member, Affiliate or the Company (collectively, the "Indemnified Parties") for mistakes of judgment or for any action or inaction, unless such mistakes, action or inaction arise out of, or are

attributable to, the gross negligence, willful misconduct or bad faith of the Indemnifying Party, in which case such Indemnifying Party shall be liable to the Indemnified Parties....

Plaintiff argues that because the breach of the LLC Agreement alleged by Kuroda constitutes a type of "action or inaction," § 2.05(a) clearly contemplates that members can be liable to one another for their breach of provisions of the LLC Agreement.

[8] Liberty Square and WGL Capital, in turn, contend that the relevant question is not whether they are insulated from liability, but whether they can be held responsible for SPJS Holdings' obligation to pay Kuroda under the LLC Agreement. Liberty Square and WGL Capital argue that they are not liable for the debts of SPJS Holdings unless they agree to be so bound, and that there is no provision in the LLC Agreement making them responsible for the payments.

Liberty Square and WGL Capital argue that, as a matter of law, they cannot be held liable for breach of the provisions of the LLC Agreement-a binding contract to which they are signatories. While this is certainly one reasonable interpretation of the LLC Agreement, I am not convinced that it is the only reasonable interpretation. Sections 1.06 and 2.05(a) purport to limit the liability of members of SPJS Holdings, but under at least one reasonable interpretation, neither of these provisions limits the liability of managing members for the kinds of breaches alleged in the complaint. Section 1.06 of the LLC Agreement states that no member shall be liable "solely by reason of being a Member" of the LLC. Thus, under at least one reasonable interpretation, it does not limit liability for reasons other than status as a member. Section 2.05(a) specifies that members of SPJS Holdings shall not be liable to another member "for mistakes of judgment or for any action or inaction, unless such mistakes, action or inaction arise out of, or are attributable to, the gross negligence, willful misconduct or bad faith" of the member. Breach of the provisions of the LLC Agreement can reasonably be described as "any action or inaction," and defendants have not argued that they are exculpated from liability under the terms of this section. Thus, the language of § 2.05(a) suggests that the parties to the LLC Agreement knew how to clearly define their liability to each other **883 and chose not to limit that liability so as to preclude the breach of contract claims alleged in the complaint. [13]

Finally, the provisions of the LLC Agreement under which Kuroda is suing do not make clear whether a managing member of SPJS Holdings could be liable for breach of

the provisions of the LLC Agreement, assuming, as I must, that the managing member would not be exculpated under § 1.06 or § 2.05(a). Kuroda alleges that Liberty Square and WGL Capital breached the terms of several provisions of the LLC Agreement, including §§ 3.04, 3.05, 3.06, 3.07, 3.09, 4.03, 6.01, and 8.02. These provisions do no specify whether members can be held responsible for their breach. Given the ambiguity in these provisions regarding whether managing members and signatories to the LLC Agreement can be liable for their breach, and the ambiguity created by §§ 1.06 and 2.05(a), I am unable to conclude that defendants' interpretation-that the managing members cannot, as a matter of law, be liable for breach of the provisions of the LLC Agreement-is the only reasonable interpretation of the LLC Agreement. Accordingly, Liberty Square and WGL Capital are not entitled to dismissal of the breach of contract claims. [14]

### B. Breach of Contract for the Income Tax Allocations

[9]    In count IV of the complaint, Kuroda alleges that SPJS Holdings, Liberty Square, and WGL Capital breached provisions of the LLC Agreement by improperly assigning taxable income to Kuroda in his 2006 federal Schedule K-1. Because plaintiff has failed to properly allege the essential element of damages, count IV of the complaint must be dismissed.

[10]    [11]    To state a claim for breach of contract, Kuroda "must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." [15] A plaintiff must properly allege each of these elements, even where the plaintiff is seeking an equitable remedy such as specific performance. Kuroda argues that the issuance of a Schedule K-1 that overstates his income causes him harm by allocating to him tax liability for income that he was never paid. Absent from the complaint, however, is any allegation **\*884** that Kuroda paid taxes on money that he never received. Kuroda is a Japanese citizen and does not allege that he paid or even owes taxes in the United States or that he paid higher taxes or suffered any adverse tax consequences as a result of the issuance of the improper schedule.

Kuroda contends that an audit by the tax authorities is a logical and reasonably foreseeable consequence of the issuance of the improper tax schedule. This contention, however, is contained only in plaintiff's brief, and not in

the complaint. Additionally, even if the complaint contained such an allegation, it would still constitute little more than speculation, especially considering that Kuroda has not alleged that he pays taxes in the United States. The possibility of such a speculative harm is not sufficient to state a claim for breach of contract. Unless this Court is more certain of whether and when plaintiff will suffer any harm as a result of the allegedly improper allocation of income, it would be a waste of judicial resources to render an advisory opinion on the issue. [16] Accordingly, the complaint does not properly allege an essential element of the breach of contract claim in count IV, and that claim must be dismissed. [17]

### C. Tortious Interference with Contract

[12]    In count VI of the complaint, Kuroda alleges that Lichtenstein, Niedermeyer, and Walton tortiously interfered with Kuroda's contractual interests under the LLC Agreement. The complaint alleges that Kuroda had a valid and binding contract, that these defendants had knowledge of the contract, and that they caused SPJS Holdings, WGL Capital, and Liberty Square to breach the contract. Because the complaint fails to make factual allegations that support a reasonable inference that Lichtenstein, Niedermeyer, and Walton acted outside the scope of their authority, the tortious interference claims against them must be dismissed.

[13]    [14]    It is well settled that a party to a contract cannot be held liable for breaching the contract and for tortiously interfering with that contract. [18] Thus, to state a claim for tortious interference with contract the complaint must contain factual allegations that support a reasonable inference that Lichtenstein, Niedermeyer, and Walton were each "a stranger to both the contract and the business relationship giving rise to and underpinning the contract." [19] According to the allegations in the complaint, Lichtenstein controlled WGL Capital and Niedermeyer and Walton controlled Liberty Square. Liberty Square and WGL Capital, as managing members, controlled SPJS Holdings. Thus, as long as Lichtenstein, Niedermeyer, and Walton were acting with the scope of their authority in their respective roles in Liberty Square, WGL Capital, and SPJS Holdings, they cannot be liable for tortious interference with contract. [20]

**\*885** Plaintiff contends that the allegations in the complaint are sufficient to state a cause of action for tortious interference because Lichtenstein, Niedermeyer, and Walton exceeded the scope of their agency. The complaint, however, does

not contain *factual* allegations to support this claim. The complaint states only conclusory allegations that defendants acted for personal reasons and therefore exceeded the scope of their authority. For example, the complaint alleges that defendants interfered with Kuroda's contractual relations as part of a campaign of personal retaliation in which they sought both "to protect [their] personal reputations and interests" and "to enrich themselves at Mr. Kuroda's expense." [21] Plaintiff contends that because defendants disagree with this assertion, there is a factual dispute that cannot be resolved on a motion to dismiss.

Despite plaintiff's efforts to create a factual dispute, the allegations in the complaint are not sufficient to state a claim for tortious interference against Lichtenstein, Niedermeyer, and Walton, even under the liberal notice pleading standard of our rules. The Court is not required to accept mere conclusory allegations as true, and Kuroda's claims that Lichtenstein, Niedermeyer, and Walton acted because of a personal agenda, without more, do not adequately allege that they exceeded the scope of their authority.

[15]   The conclusory allegations in the complaint stand in contrast to the factual allegations that have been found sufficient to state a claim in other cases. For example, in *Nye v. University of Delaware*, [22] the Court found that the plaintiff "clearly alleged *facts* sufficient" to sustain a claim for tortious interference with contractual relations. [23] Among the facts alleged in *Nye* were allegations that defendants, the provost of the University and the chair of a committee appointed to evaluate the Dean of a college at the University, circulated a petition of "no confidence" against the Dean, misrepresented the results of the petition to the committee, refused to allow the members of the committee to see the results of the petition, refused to allow the Dean to meet with the committee, and lied to the Dean by telling him that the committee was not interested in his side of the story. [24]   It was these facts, among others, that led the *Nye* Court to conclude that the plaintiff had adequately alleged facts to support an inference that the defendants had acted outside the scope of their authority. [25] Similarly, in *Nelson v. Fleet National Bank*, [26] the defendant was alleged to have "harassed and mistreated [the plaintiffs] because of their sex," which led the District Court to conclude that the plaintiff had stated a claim for tortious interference with contract because "such allegations could, but do not necessarily, support a finding that [the defendant] acted outside the scope of his employment." [27] In contrast to the factual allegations in *Nye* and *Nelson,* the

complaint in this case is devoid of any *factual* allegations that lead to a reasonable inference that Lichtenstein, Niedermeyer, or Walton acted  **\*886**  outside the scope of their authority. [28] Accordingly, the claim in count VI for tortious interference with contract must be dismissed. [29]

### D. Tortious Interference with Prospective Economic Advantage

[16]   In count VII of the complaint, Kuroda seeks to recover from defendants for their alleged tortious interference with his economic expectancies. The complaint alleges that defendants tortiously interfered with Kuroda's economic expectancies by consciously disparaging Kuroda's business acumen and threatening Kuroda with baseless litigation. Specifically, the complaint alleges that on February 20, 2007, Bloomberg Japan posted a story online that stated that Kuroda left SPJS Holdings as a result of performance issues. Later that day, Bloomberg published a correction of the story and stated that the correction was a result of a request from Steel Partners. Thus, plaintiff alleges, the selective correction of the article left the impression that defendants had ratified the remaining incorrect factual statements in the article regarding Kuroda's reasons for leaving SPJS Holdings. Kuroda also alleges that defendants threatened him with litigation to deter him from pursuing legitimate business ventures. The complaint further alleges that defendants were aware of Kuroda's new business ventures and that their conduct was motivated by a desire to destroy Kuroda's reputation and salvage the reputations of Lichtenstein, Niedermeyer, and Walton. Kuroda contends that, as a result, he "had concrete economic opportunities foreclosed to him," and that he "turned away potential investors in Fugen and some prospective investors have held off further discussion with Fugen because" of defendants' conduct. [30] Because the complaint does not properly allege that Kuroda was harmed individually, apart from his interest in Fugen, the claim for tortious interference with economic advantage must be dismissed.

[17]   [18]   To survive dismissal on the claim for tortious interference with prospective economic advantage, Kuroda must allege: "(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d)  **\*887**  damages." [31] Additionally, Delaware law is clear that direct claims are available only where the member has suffered damage that is independent of any damage suffered by the

limited liability company.[32] Kuroda has failed to allege any harm to himself individually because all of Kuroda's alleged harms flow through his involvement with Fugen. For example, the complaint states that "Kuroda had a reasonable probability and concrete expectation of economic advantage through his participation in Fugen" and that defendants "had knowledge of Mr. Kuroda's economic expectancies via Fugen."[33] Kuroda also alleges that defendants "intentionally interfered with Mr. Kuroda's economic expectancies arising from Fugen" and that Kuroda was harmed because he turned away potential investors in Fugen and because some prospective investors held off further discussions with Fugen because of the threats of litigation.[34] Plaintiff has not made any *factual* allegations that would support a reasonable inference that he personally had a reasonable probability of a business opportunity and was denied that opportunity as a result of defendants' conduct. All the harms that Kuroda allegedly suffered as a result of defendants' allegedly tortious conduct only affected Kuroda through his interest in Fugen. Accordingly, any claim for those damages must be asserted by Fugen, and Kuroda has not properly asserted a derivative claim on behalf of Fugen.

Although Kuroda states that he was harmed individually and is claiming damages based on a direct injury, he has made no *factual* allegations that support a reasonable inference that he suffered an injury apart from injury that flows to him as a result of his interest in Fugen. Accordingly, the claim in count VII for tortious interference with prospective economic advantage must be dismissed.[35]

### E. Breach of the Implied Covenant of Good Faith and Fair Dealing

[19] In count VIII of the complaint, Kuroda alleges that SPJS Holdings, Liberty Square, and WGL Capital breached the implied covenant of good faith and fair dealing through "arbitrary, unreasonable, and/or deceitful conduct," including (1) failing to pay Kuroda monies that they know he is due, (2) using threats of litigation to coerce Kuroda and to retaliate against him, (3) sabotaging negotiations in an effort to reduce the amounts due to Kuroda, and (4) disparaging Kuroda in connection with his work with defendants.[36] The complaint alleges that this conduct has "prevented Mr. Kuroda from realizing the full benefits of his contractual relationships" with defendants.[37] Because plaintiff has failed to articulate a contractual benefit he was denied as a result of defendants' breach of an implied provision of the contract, the claim for

breach of the implied covenant of good faith and fair dealing must be dismissed.

**\*888** [20] [21] [22] [23] [24] [25] The implied covenant of good faith and fair dealing inheres in every contract and "requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain."[38] The implied covenant cannot be invoked to override the express terms of the contract.[39] Moreover, rather than constituting a free floating duty imposed on a contracting party, the implied covenant can only be used conservatively "to ensure the parties' 'reasonable expectations' are fulfilled."[40] Thus, to state a claim for breach of the implied covenant, Kuroda "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[41] General allegations of bad faith conduct are not sufficient. Rather, the plaintiff must allege a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff the fruits of the contract. Consistent with its narrow purpose, the implied covenant is only rarely invoked successfully.[42]

The allegations in the complaint fail to state a claim for breach of the implied covenant of good faith and fair dealing. To the extent that Kuroda's implied covenant claim is premised on the failure of defendants to pay money due under the contract, the claim must fail because the express terms of the contract will control such a claim. Again, the implied covenant cannot be invoked to override express provisions of a contract. Additionally, the complaint fails to draw a sufficient connection between the alleged violations of the implied covenant and a specific implied obligation in the contract. For example, the allegation that defendants disparaged Kuroda with respect to his work in the Steel Partners entities is not tied to an implied obligation in the contract. Moreover, even assuming that the allegations of "sabotaging" negotiations, threatening "baseless" litigation, and disparaging Kuroda with respect to his work for Steel Partners could be tied to an implied obligation in the contract, Kuroda has failed to allege any contractual benefit he was denied as a result of this conduct. The complaint only states in the most conclusory way that "SPJS Holdings', WGL Capital's, and Liberty Square's wrongful conduct has prevented Mr. Kuroda from realizing the full benefits of his contractual relationships with the Steel Partners Japan Entities."[43] Again, the purpose of the implied covenant is

to ensure that a party to a contract is not prevented "from receiving the fruits of the bargain." [44] Thus, to properly plead a claim for breach of the implied covenant, Kuroda must allege some injury to his contractual interest **889 as a result of the breach of the implied obligation. The complaint fails to plead such an injury except in the most conclusory way. Additionally, Kuroda's alleged injuries that result from defendants' purported failure to pay him amounts to which he is entitled under the LLC Agreement are, according to the complaint, governed by express provisions of the LLC Agreement. [45] Accordingly, the claim for breach of the implied covenant of good faith and fair dealing must be dismissed. [46]

### F. Conversion

[26]  In count IX of the complaint, Kuroda brings a claim for conversion. The complaint alleges that "SPJS Holdings, WGL Capital, and Liberty Square have exercised wrongful dominion and control" over specific monies-10% of the approximately $6.3 million-in Kuroda's "Investment Capital Account" at SPJS Holdings. [47] Kuroda further alleges that he is entitled to "the return of the specific amounts remaining in his Investment Capital Account" "independent of any obligation or duty arising under contract." [48] Although the allegations in the complaint recite the elements of conversion, the complaint fails to state a claim for conversion because the claim is duplicative of Kuroda's breach of contract claim and because the claim does not fall into the narrow exception to the general rule prohibiting claims for the conversion of money.

[27]  [28]  [29]  Conversion is "any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it." [49] Where, however, the plaintiff's claim arises solely from a breach of contract, the plaintiff "generally must sue in contract, and not in tort." [50] Thus, in order to assert a tort claim along with a contract claim, the plaintiff must generally allege that the defendant violated an independent legal duty, apart from the duty imposed by contract. [51]

Plaintiff attempts to meet this requirement by alleging that defendants' exercise of control over Kuroda's property "breaches the common-law duty against the conversion of property" and is unlawful "independent of any obligation or duty arising under contract." [52] While the complaint recites

the standard for pleading a tort claim along with a contract claim, it is **890 devoid of any substantive allegation that defendants violated a duty in tort. Merely alleging that defendants violated their duty against conversion of property is circular, and the Court is not required to accept such a conclusory allegation as true. [53] As I explained, conversion is the wrongful exercise of dominion over the property of another, in denial of that person's right, or inconsistent with it. Thus, to establish a claim for conversion apart from the contract claim, Kuroda would have to show that he had a right to the money-other than a right pursuant to the contract-that was violated by the defendants' exercise of dominion over the money. The only right articulated in the complaint is Kuroda's right to the money pursuant to the contract. Because the complaint fails to identify the interference with a right to the money independent of rights granted under the contract, the conversion claim must be dismissed.

[30]  [31]  Moreover, the complaint fails to state a claim for conversion because Kuroda's conversion claim does not fall into the narrow exception to the general rule prohibiting claims for the conversion of money. Generally, an action in conversion will not lie to enforce a claim for the payment of money. [54] Although other jurisdictions have recognized a narrow exception to this general rule, plaintiff points to no Delaware cases that recognize an exception that would encompass plaintiff's claim. [55] Moreover, the allegations in the complaint would not fall within the narrow exception recognized in other jurisdictions, which allows a claim for conversion of money "only when it can be described or identified as a specific chattel, but not where an indebtedness may be discharged by the payment of money generally." [56] Thus, "an action for conversion of money will lie only where there is an 'obligation to return the identical money' delivered by the plaintiff to the defendant." [57]

The conversion claim asserted in the complaint does not fall within this exception. Kuroda is not seeking the return of money that could be described or identified as a specific chattel. Although Kuroda argues that he seeks "specific" or "segregated" funds in an "Investment Capital Account," what plaintiff is seeking is still satisfaction of a contractual obligation that could be satisfied "by the payment of money generally." [58] Accordingly, the conversion claim must be dismissed.

### G. Unjust Enrichment

**[32]**    In count X of the complaint, plaintiff alleges that defendants were unjustly enriched at Kuroda's expense. The complaint alleges that Kuroda's services "were an important part of performance of the Master Fund during all relevant periods," but that "Kuroda has not been adequately compensated for the unique value he bestowed upon the Master Fund," while defendants have been so compensated.[59] The complaint further alleges that there is "no reasonable justification" for the enrichment of defendants at the expense of Kuroda personally and that "Mr. Kuroda has no adequate remedy at law in the event [the] subject matter of Mr. Kuroda's claims is not governed by enforceable contracts."[60] Because Kuroda's unjust enrichment claim cannot lie alongside his breach of contract claim, the unjust enrichment claim must be dismissed.

**[33]**    **[34]**    **[35]**    **[36]**    Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[61] A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim. In other words, if "the contract is the measure of [Kuroda's] right, there can be no recovery under an unjust enrichment theory independent of it."[62] Thus, "[w]hen the complaint alleges an express, enforceable contract that controls the parties' relationship ... a claim for unjust enrichment will be dismissed."[63]

Kuroda alleges the existence of, and brings claims for the breach of, contracts between himself and certain of the defendants. Kuroda contends that he is owed money pursuant to the terms of the LLC Agreement, and that defendants have failed to pay him in violation of their contractual obligations. In count X of the complaint, plaintiff alleges that defendants were unjustly enriched by the services "he provided pursuant to the Consulting Agreement."[64] It is thus clear from the face of the complaint that plaintiff's relationship with the defendants is governed by an express contract.[65]

**[37]**    Plaintiff argues that the unjust enrichment claim should not be dismissed as to the individual defendants because they are not party to the relevant contracts. This argument fails, however, because unjust enrichment cannot be used "to circumvent basic contract principles [recognizing] that a person not a party to [a] contract cannot be held liable to it."[66]    **\*892**    Thus, Kuroda cannot use a claim for unjust enrichment to extend the obligations of a contract to Lichtenstein, Niedermeyer, and Walton, who are not parties to the contract. Accordingly, plaintiff's claim for unjust enrichment must be dismissed.[67]

## H. Civil Conspiracy

**[38]**    Count XI of the complaint brings a claim against defendants for civil conspiracy. The complaint alleges that "[d]efendants knowingly entered into a confederation or combination to pursue unlawful ends vis-à-vis Mr. Kuroda, including violations of implied covenants of good faith and fair dealing and tortious interference with Mr. Kuroda's contractual interests and economic expectancies."[68] This claim must be dismissed because plaintiff has failed to properly allege the elements of an underlying wrong that would be actionable in the absence of a conspiracy.[69]

**[39]**    **[40]**    **[41]**    **[42]**    **[43]**    Civil conspiracy is not an independent cause of action; it must be predicated on an underlying wrong.[70] Thus, if plaintiff fails to adequately allege the elements of the underlying claim, the conspiracy claim must be dismissed.[71] None of the acts alleged in the complaint constitute an underlying wrong on which a claim of conspiracy could be based. As explained above, plaintiff's claims for (1) tortious interference with contract, (2) tortious interference with economic advantage, and (3) breach of the implied covenant of good faith and fair dealing, all fail to state a claim upon which relief can be granted. Plaintiff has thus failed to state a claim for civil conspiracy because he has not properly alleged an underlying wrong on which a claim of conspiracy could be based.[72] Additionally, unless the breach also constitutes an independent tort, a breach of contract cannot constitute an underlying wrong on which a claim for civil conspiracy could be based; similarly, a claim for civil conspiracy cannot be predicated on a breach of the implied *contractual* covenant of good faith and fair dealing unless the breach also constitutes an independent tort.[73] Accordingly, the claim for conspiracy  **\*893**  must be dismissed.[74]

## III. CONCLUSION

The core of plaintiff's claim in this case is that he is owed money pursuant to a limited liability company agreement to which he is a party. Generally, when a plaintiff's claims are governed by a contract, the available remedies will be limited

to those available for breach of that contract. Accordingly, it should come as no surprise that the complaint has failed to state a claim upon which relief can be granted for many of the non-contractual claims that were asserted in the complaint.

The parties will confer and submit a form of order consistent with this Opinion.

Footnotes

1    The facts herein are drawn from the Verified Complaint ("complaint") and are assumed true for purposes of the motion to dismiss.

2    Liberty Square is a Delaware LLC with its principal place of business in Boston, Massachusetts. WGL Capital is a Colorado corporation with its principal place of business in New York, New York.

3    The Master Fund is a partnership formed under the laws of the Cayman Islands. The Feeder Fund is a Delaware limited partnership. The principal place of business of the Master Fund and the Feeder Fund is Boston, Massachusetts.

4    Kuroda owns 50% of the outstanding stock of SPJ-KK.

5    SPJS Holdings annually receives 20% of any increase in the value of the Master Fund's investments.

6    Lichtenstein, Niedermeyer, and Walton moved to dismiss under *Rule 12(b)(6)* for failure to state a claim and under *Rule 12(b)(2)* for lack of personal jurisdiction. The motion to dismiss for lack of personal jurisdiction is not yet before the Court.

7    *Great Lakes Chem. Corp. v. Pharmacia Corp.,* 788 A.2d 544, 548 (Del.Ch.2001).

8    *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 65-66 (Del.1995).

9    *VLIW Tech., LLC v. Hewlett-Packard Co.,* 840 A.2d 606, 615 (Del.2003) ("Because the provisions at issue in the Agreement are susceptible to more than one reasonable interpretation, for purposes of deciding a motion to dismiss, their meaning must be construed in the light most favorable to the non-moving party.").

10   Section 1.06 tracks the language of *6 Del. C. § 18-303*(a), which is entitled "Liability to 3rd parties" and provides that:

   Except as otherwise provided by this chapter, the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company.

11   *See* LLC Agreement § 2.01(a).

12   *See Pepsi-Cola Bottling Co. of Salisbury, Md. v. Handy,* 2000 WL 364199 (Del.Ch. Mar.15, 2000). The Court in *Pepsi-Cola* emphasized the importance of the word "solely" in *§ 18-303*(a) when it stated that:

   [The] phrase, "solely by reason of being a member ..." does imply that there are situations where LLC members and managers would not be shielded by this provision. As two leading Delaware corporation law treatise commentators have observed: "The word 'solely,' which is used in *Section 18-303*, indicates that a member or manager will not be liable for the debts, obligations, or liabilities of a Delaware LLC only by reason of being a member or manager; however, other acts or events could result in the imposition of liability upon or assumption of liability by a member or manager."

   *Id.* at *3 (quoting R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* 20-6 (3rd ed.1998)).

13   Again, in reaching this conclusion, and only for purposes of the motion to dismiss, I construe contract provisions that are susceptible to more than one meaning in the light most favorable to plaintiff.

14   Kuroda seeks an accounting of the performance of the Master Fund and the incentive allocations earned by SPJS Holdings on investments made prior to June 30, 2006. In connection with this claim, Kuroda seeks to examine the relevant books and records of the Master Fund and requests that the Court order SPJS Holdings, WGL Capital, and Liberty Square to provide Kuroda with access to relevant materials. Defendants argue that this claim should be dismissed because it is a books and records claim that must be brought in a separate proceeding. Kuroda is seeking an adjustment of SPJS Holdings' accounts to reflect the incentive allocations he is owed under the LLC Agreement, and argues that the fact that the inspection of certain books and records may be required to complete the accounting does not implicate any separate inspection rights that would have to be brought in a separate proceeding. I decline to dismiss this claim at this stage of the proceedings. Although defendants are correct that a books and records action must generally be brought as a separate proceeding, it is not clear that plaintiff is seeking such an inspection. It may still be necessary for plaintiff to inspect some records in order to properly determine his entitlement to an adjustment of the accounts of SPJS Holdings.

15   *VLIW Tech.,* 840 A.2d at 612.

16   *See generally Schick Inc. v. Amalgamated Clothing & Textile Workers Union,* 533 A.2d 1235, 1239 (Del.Ch.1987) ("[J]udicial resources are limited and must not be squandered on disagreements that have no significant current impact and may never ripen into legal actions seeking coercive relief.").

17    The breach of contract claim in count IV is dismissed without prejudice. If plaintiff pays higher taxes (or suffers any other injury) as a result of the allegedly improper allocation of income, he is free to re-file the claim.

18    *Shearin v. E.F. Hutton Group, Inc.,* 652 A.2d 578, 590 (Del.Ch.1994).

19    *Tenneco Auto., Inc. v. El Paso Corp.,* 2007 WL 92621, at *5 (Del.Ch. Jan.8, 2007) (quoting *Atlanta Mkt. Ctr. Mgmt. Co. v. McLane,* 503 S.E.2d 278, 283 (1998)).

20    *See Shearin,* 652 A.2d at 590 ("[I]t has been held that employees or directors of a contracting corporation cannot be held personally liable for inducing a breach of contract by their corporations when they act within their role.") (citations omitted); *Fisk Ventures, LLC v. Segal,* 2008 WL 1961156, at *12 n. 56 (Del.Ch. May 7, 2008).

21    Compl. ¶ 126.

22    2003 WL 22176412 (Del.Super.Ct. Sept.17, 2003).

23    *Id.* at *7 (emphasis added).

24    *Id.* at *2.

25    *Id.* at *7.

26    949 F.Supp. 254 (D.Del.1996).

27    *Id.* at 263-64.

28    In a footnote in plaintiff's opposition to defendants' motion to dismiss, Kuroda argues that the Court cannot dismiss the tortious interference with contract claim because to do so would require the Court to conclude that Lichtenstein, Niedermeyer, and Walton were acting in the interests of Liberty Square and WGL Capital when they allegedly caused them to breach their contractual and fiduciary obligations to Kuroda. It is not so. The claim is dismissed because Kuroda has failed to meet his burden to plead facts that, with the benefit of reasonable inferences, could give rise to a claim upon which relief could be granted. Moreover, although some cases may have rejected the position that managers of an LLC have no fiduciary duty at all to ensure that the LLC lives up to its contractual obligations, that is not an invitation for the Court to allow claims for tortious interference with contract against LLC managers (or those who control the managers) any time a plaintiff alleges that the LLC breached a contractual duty to a member of an LLC. *See Shearin,* 652 A.2d at 590.

29    In count V of the complaint, Kuroda seeks a declaratory judgment that his departure from SPJS Holdings and his formation of Fugen were legally permissible. Defendants argue that this claim should be dismissed as to Lichtenstein, Niedermeyer, and Walton because they are not personally parties to the SPJS Holdings LLC Agreement or members of SPJS Holdings. I agree, and the declaratory judgment claim is dismissed as to Lichtenstein, Niedermeyer, and Walton to the extent that it seeks a declaration based on Kuroda's duties under the LLC Agreement or as a member of SPJS Holdings.

30    Compl. ¶ 133.

31    *DeBonaventura v. Nationwide Mut. Ins. Co.,* 428 A.2d 1151, 1153 (Del.1981) (quoting *DeBonaventura,* 419 A.2d 942, 947 (Del.Super.Ct.1980)).

32    *See* 6 *Del. C.* § 18-1001; *Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1033 (Del.2004).

33    Compl. ¶¶ 129-30.

34    Compl. ¶¶ 131-33.

35    This claim is dismissed without prejudice, and plaintiff is granted leave to re-plead this claim if he can make factual allegations that he was injured personally, apart from injury he suffered as a result of his interest in Fugen.

36    Compl. ¶ 137.

37    *Id.* ¶ 139.

38    *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 442 (Del.2005) (quoting *Wilgus v. Salt Pond Inv. Co.,* 498 A.2d 151, 159 (Del.Ch.1985)).

39    *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.,* 622 A.2d 14, 23 (Del.Ch.1992) ("[W]here the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play.").

40    *Dunlap,* 878 A.2d at 442.

41    *Fitzgerald v. Cantor,* 1998 WL 842316, at *1 (Del.Ch. Nov.10, 1998).

42    *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.,* 2006 WL 2521426, at *6 (Del.Ch. Aug.25, 2006) ("[I]mposing an obligation on a contracting party through the covenant of good faith and fair dealing is a cautious enterprise and instances should be rare.")

43    Compl. ¶ 139.

44    *Dunlap,* 878 A.2d at 442 (internal quotation marks omitted).

45    Kuroda alleges that defendants delayed or sabotaged negotiations in order to reduce the amounts due to Kuroda. Compl. ¶ 137(f), (h). Kuroda does not allege, or even explain in his brief, how such tactics have denied him a benefit under the contract such that he

would have a claim for breach of the implied covenant even in the face of express provisions in the LLC Agreement that govern his rights. Kuroda is suing defendants for their failure to pay him under the provisions of the LLC Agreement, and according to the complaint, those provisions govern his right to receive the payments he seeks.

46    Defendants have not yet answered the complaint or otherwise taken a position regarding the enforceability and interpretation of the contract. The claim for breach of the implied covenant of good faith and fair dealing is therefore dismissed without prejudice.

47    Compl. ¶¶ 142-143.

48    *Id.* ¶¶ 145-147.

49    *Drug, Inc. v. Hunt,* 168 A. 87, 93 (Del.1933).

50    *Data Mgmt. Internationale, Inc. v. Saraga,* 2007 WL 2142848, at *3 (Del.Super.Ct. July 25, 2007) ("In preventing gratuitous 'bootstrapping' of contract claims into tort claims, courts recognize that a breach of contract will not generally constitute a tort.") (citations omitted).

51    *Id.*

52    Compl. ¶ 145.

53    *See Int'l Bus. Machs. Corp. v. Comdisco, Inc.,* 1993 WL 259102, at *4 (Del.Super.Ct. June 30, 1993) ("Plaintiffs begin their conversion argument by stating that while an immediate right to possession is an element of conversion, [the defendant's] tortious conversion of the system gave [the plaintiff] an immediate right to possession. This reasoning is circular, and functions to eliminate an element of the tort.").

54    *See Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* 1995 WL 694397, at *16 (Del.Ch. Nov.21, 1995); *Goodrich v. E.F. Hutton Group, Inc.,* 542 A.2d 1200, 1203 (Del.Ch.1988).

55    I express no opinion on whether Delaware should or will recognize an exception to the general rule in different circumstances. I only hold that Delaware does not recognize an exception that would allow Kuroda to bring a conversion claim in these circumstances.

56    *Goodrich,* 542 A.2d at 1203.

57    *Id.* (quoting *Lyxell v. Vautrin,* 604 F.2d 18 (5th Cir.1979)).

58    *Id.*

59    Compl. ¶¶ 150-52.

60    *Id.* at ¶¶ 153-54.

61    *Schock v. Nash,* 732 A.2d 217, 232 (Del.1999) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.,* 539 A.2d 1060, 1062 (Del.1988)).

62    *Wood v. Coastal States Gas Corp.,* 401 A.2d 932, 942 (Del.1979).

63    *Bakerman v. Sidney Frank Importing Co.,* 2006 WL 3927242, at * 18 (Del.Ch. Oct.10, 2006) (revised Oct. 16, 2006); *In re Lear Corp. S'holder Litig.,* 2008 WL 4053221, at * 13 & n. 72 (Del.Ch. Sept.2, 2008); *MetCap Sec. LLC v. Pearl Senior Care, Inc.,* 2007 WL 1498989, at *5 & n. 41 (Del.Ch. May 16, 2007).

64    Compl. ¶ 150.

65    *Albert v. Alex. Brown Mgmt. Servs., Inc.,* 2005 WL 2130607, at *8 (Del.Ch. Aug.26, 2005) ("In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls.").

66    *See MetCap,* 2007 WL 1498989, at *6 (modifications in original) (quoting *WSFS v. Chillibilly's Inc.,* 2005 WL 730060, at * 19 (Del.Super.Ct. Mar.30, 2005)).

67    The unjust enrichment claim is dismissed without prejudice. As plaintiff points out, defendants have not yet answered the complaint or stipulated to the existence of a binding contract. Accordingly, plaintiff is free to re-file his unjust enrichment claim to the extent it is not governed by an enforceable contract.

68    Compl. ¶ 157.

69    *Connolly v. Labowitz,* 519 A.2d 138, 143 (Del.Super.Ct.1986) ("To be actionable a civil conspiracy must embody an underlying wrong which would be actionable in the absence of the conspiracy.").

70    *Ramunno v. Cawley,* 705 A.2d 1029, 1039 (Del.1998).

71    *Transched Sys. Ltd. v. Versyss Transit Solutions, LLC,* 2008 WL 948307, at *4 (Del.Super.Ct. Apr.2, 2008) ("To succeed on a claim of civil conspiracy Plaintiff must first have a valid underlying claim."); *see also Interim Health Care v. Fournier,* 1994 WL 89007, at *8 n. 18 (Del.Ch. Feb.28, 1994) ("Because [the plaintiff] has failed to prove by a preponderance of the evidence that the defendants misappropriated its proprietary and confidential information, it has also failed to establish that the defendants committed any unlawful acts in furtherance of a conspiracy. The plaintiff's civil conspiracy claim therefore fails.").

72    *Brooks-McCollum v. Shareef,* 2006 WL 3587246, at *3 (Del.Super.Ct. Nov.1, 2006) ("It is not the conspiracy itself, but rather the underlying wrong that must be actionable, even without the alleged conspiracy.").

73    Just as a plaintiff generally cannot use a claim for tortious interference with contract to impose additional damages on contracting parties (or their agents), a plaintiff cannot use a claim for civil conspiracy to impose on contracting parties (or their agents) additional damages for breach of a contract, beyond those available under contract law for breach of the contract. *See E.I. DuPont de Nemours & Co. v. Pressman,* 679 A.2d 436, 445 (Del.1996) ("Unless the bad faith rises to the level of an independent tort, which itself would support an award of punitive damages, mere bad faith on the part of a party to a contract will not give rise to punitive damages.") (quoting Anderson, *Damages Under the Uniform Commercial Code* § 11:35 (1992 & Supp.1995)). This rule is consistent with the theory of efficient breach, which would be undermined if contracting parties and their agents were subject to potential liability for civil conspiracy based on a breach of a contract or the implied covenant. *See id.* at 445-46.

74    On page 38 of his brief in opposition to defendants' motion to dismiss, plaintiff alleges that "[t]he Complaint additionally pleads facts establishing that WGL Capital and Liberty Square violated fiduciary duties that they owed to the members of SPJS Holdings." The complaint, however, does not assert a claim for civil conspiracy based on an underlying wrong of breach of fiduciary duty. Moreover, I am not convinced that Kuroda has alleged facts that lead to a reasonable inference that Lichtenstein, Niedermeyer, and Walton acted for personal reasons and thus exceeded the scope of their agency. Therefore, plaintiff has not adequately alleged facts that support a claim that the affiliated entities under common control conspired with one another or with Lichtenstein, Niedermeyer, and Walton. *See In re Transamerica Airlines, Inc.,* 2006 WL 587846, at *6 (Del.Ch. Feb, 28, 2006) ("[A] corporation generally cannot be deemed to have conspired with its wholly owned subsidiary, or its officers and agents."); *Amaysing Techs. Corp. v. CyberAir Commc'ns, Inc.,* 2005 WL 578972, at *7 (Del.Ch. Mar.3, 2005).

---

**End of Document**                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 63

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592...

134 S.Ct. 1188
Supreme Court of the United States

Stephen LAW, Petitioner

v.

Alfred H. SIEGEL, Chapter 7 Trustee.

No. 12–5196.    |    Argued Jan. 13,
2014.    |    Decided March 4, 2014.

**Synopsis**

**Background:** Chapter 7 trustee brought adversary proceeding to avoid lien on debtor's residential property as fraudulent transfer, and moved to surcharge debtor's $75,000 homestead exemption based upon debtor's alleged misconduct in fraudulently representing that lien existed on property, leaving no equity available for creditors. The United States Bankruptcy Court for the Central District of California, Thomas B. Donovan, J., granted surcharge motion. Debtor appealed. The United States Bankruptcy Appellate Panel of the Ninth Circuit, 2006 WL 6810960, reversed. Trustee appealed. The United States Court of Appeals for the Ninth Circuit, 308 Fed.Appx. 161, affirmed. Trustee filed renewed motion to surcharge homestead exemption. The Bankruptcy Court, Donovan, J., 401 B.R. 447, ordered that exemption be surcharged in its entirety. Debtor appealed. The Bankruptcy Appellate Panel, 2009 WL 7751415, affirmed. Debtor appealed. The Court of Appeals, 435 Fed.Appx. 697, affirmed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Scalia, held that:

[1] by surcharging debtor's exemption, bankruptcy court exceeded its statutory and inherent sanction powers, and

[2] federal law provides no authority for bankruptcy courts to deny an exemption on a ground not specified in the Bankruptcy Code, abrogating *Latman v. Burdette*, 366 F.3d 774, *In re Yonikus*, 996 F.2d 866, *In re Doan*, 672 F.2d 831, and *Stewart v. Ganey*, 116 F.2d 1010.

Reversed and remanded.

West Headnotes (16)

**[1]    Bankruptcy**
    Carrying out provisions of Code
    **Bankruptcy**
    Frivolity or bad faith; sanctions

In addition to its statutory authority to issue order, process, or judgment necessary or appropriate to carry out provisions of Bankruptcy Code, bankruptcy court may possess inherent power to sanction abusive litigation practices. 11 U.S.C.A. § 105(a).

9 Cases that cite this headnote

**[2]    Bankruptcy**
    Frivolity or bad faith; sanctions

In exercising its statutory and inherent powers to sanction abusive litigation practices, bankruptcy court may not contravene specific statutory provisions. 11 U.S.C.A. § 105(a).

8 Cases that cite this headnote

**[3]    Bankruptcy**
    Carrying out provisions of Code

Statute authorizing bankruptcy court to "carry out" provisions of Bankruptcy Code does not allow court to override explicit mandates of other sections of Code. 11 U.S.C.A. § 105(a).

7 Cases that cite this headnote

**[4]    Statutes**
    General and specific terms and provisions; ejusdem generis
    **Statutes**
    General and specific statutes

Statute's general permission to take actions of a certain type must yield to specific prohibition found elsewhere.

2 Cases that cite this headnote

**[5]    Federal Civil Procedure**

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592...

Inherent authority

Courts' inherent sanctioning powers are subordinate to valid statutory directives and prohibitions.

2 Cases that cite this headnote

**[6]    Bankruptcy**

Equitable powers and principles

Whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.

10 Cases that cite this headnote

**[7]    Bankruptcy**

Carrying out provisions of Code

**Bankruptcy**

Frivolity or bad faith;  sanctions

**Bankruptcy**

Operation and effect

**Bankruptcy**

Preference, fraudulent transfer, or concealment

**Bankruptcy**

Professional services;  attorney fees

Reasonable attorney fees that Chapter 7 trustee incurred in defeating fraudulent lien on debtor's residential property was administrative expense, and therefore bankruptcy court violated express terms of statute which entitled debtor, by reference to state law, to exempt $75,000 of equity in his home from his estate and which made that $75,000 not liable for payment of any administrative expense by ordering funds protected by exemption to be made available to pay trustee's fees, exceeding both court's statutory authority to carry out provisions of Bankruptcy Code and its inherent powers to sanction abusive litigation practices. 11 U.S.C.A. §§ 105(a), 327(a), 330(a)(1), 503(b)(2), 522(b)(3)(A), (k); West's Ann.Cal.C.C.P. § 704.730(a)(1).

3 Cases that cite this headnote

**[8]    Statutes**

Similarity or difference

Normal rule of statutory construction is that words repeated in different parts of the same statute generally have the same meaning.

4 Cases that cite this headnote

**[9]    Bankruptcy**

Time

Trustee's failure to make timely objection prevents trustee from challenging exemption claimed by debtor.

1 Cases that cite this headnote

**[10]    Bankruptcy**

Property Exempt

**Bankruptcy**

Waiver or Loss of Exemption

Bankruptcy statute governing exemption of property from estate does not give courts discretion to grant or withhold exemptions based on whatever considerations they deem appropriate; rather, statute exhaustively specifies criteria that will render property exempt. 11 U.S.C.A. § 522(b, d).

4 Cases that cite this headnote

**[11]    Bankruptcy**

Who May Claim

**Bankruptcy**

Property Exempt

**Bankruptcy**

Waiver or Loss of Exemption

Subject of words "may exempt" in bankruptcy statute governing exemptions is the debtor, not the court, and so it is the debtor in whom the statute vests discretion, such that a debtor need not invoke an exemption to which the statute entitles him, but if he does, the court may not refuse to honor the exemption absent a valid statutory basis for doing so. 11 U.S.C.A. § 522(b).

Law v. Siegel, 134 S.Ct. 1188 (2014)

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592...

8 Cases that cite this headnote

**[12]    Bankruptcy**
    Property Exempt

**Bankruptcy**
    Waiver or Loss of Exemption

Courts are not authorized to create additional exceptions beyond carefully calibrated exceptions and limitations set forth in bankruptcy statute governing exemptions. 11 U.S.C.A. § 522.

Cases that cite this headnote

**[13]    Bankruptcy**
    Effect of State Law

When a debtor claims a state-created exemption, the exemption's scope is determined by state law, which may provide that certain types of debtor misconduct warrant denial of the exemption.

5 Cases that cite this headnote

**[14]    Bankruptcy**
    Property Exempt

**Bankruptcy**
    Waiver or Loss of Exemption

Federal law provides no authority for bankruptcy courts to deny an exemption on a ground not specified in the Bankruptcy Code; abrogating *Latman v. Burdette,* 366 F.3d 774; *In re Yonikus,* 996 F.2d 866; *In re Doan,* 672 F.2d 831; *Stewart v. Ganey,* 116 F.2d 1010. 11 U.S.C.A. § 522.

1 Cases that cite this headnote

**[15]    Bankruptcy**
    Exemptions

It is not for courts to alter the balance struck by statute governing exemptions in bankruptcy. 11 U.S.C.A. § 522.

Cases that cite this headnote

**[16]    Bankruptcy**
    Frivolity or bad faith;  sanctions

Because it arises postpetition, a bankruptcy court's monetary sanction imposed upon the debtor survives the bankruptcy case and is thereafter enforceable through the normal procedures for collecting money judgments. 11 U.S.C.A. § 727(b).

3 Cases that cite this headnote

**\*1190  *Syllabus*** [*]

Petitioner Law filed for Chapter 7 bankruptcy. He valued his California home at $363,348, claiming that $75,000 of that value was covered by California's homestead exemption and thus was exempt from the bankruptcy estate. See 11 U.S.C. § 522(b)(3)(A). He also claimed that the sum of two voluntary liens—one of which was in favor of "Lin's Mortgage & Associates"—exceeded the home's nonexempt value, leaving no equity recoverable for his other creditors. Respondent Siegel, the bankruptcy estate trustee, challenged the "Lin" lien in an adversary proceeding, but protracted and expensive litigation ensued when a supposed "Lili Lin" in China claimed to be the beneficiary of Law's deed of trust. Ultimately, the Bankruptcy Court concluded that the loan was a fiction created by Law to preserve his equity in the house. It thus granted **\*1191** Siegel's motion to "surcharge" Law's $75,000 homestead exemption, making those funds available to defray attorney's fees incurred by Siegel in overcoming Law's fraudulent misrepresentations. The Ninth Circuit Bankruptcy Appellate Panel and the Ninth Circuit affirmed.

*Held* : The Bankruptcy Court exceeded the limits of its authority when it ordered that the $75,000 protected by Law's homestead exemption be made available to pay Siegel's attorney's fees. Pp. 1194 – 1198.

(a) A bankruptcy court may not exercise its authority to "carry out" the provisions of the Code, 11 U.S.C. § 105(a), or its "inherent power ... to sanction 'abusive litigation practices,' " *Marrama v. Citizens Bank of Mass.,* 549 U.S. 365, 375– 376, 127 S.Ct. 1105, 166 L.Ed.2d 956, by taking action prohibited elsewhere in the Code. Here, the Bankruptcy Court's "surcharge" contravened § 522, which (by reference to California law) entitled Law to exempt $75,000 of equity in his home from the bankruptcy estate, § 522(b)(3)(A), and which made that $75,000 "not liable for payment of any

Law v. Siegel, 134 S.Ct. 1188 (2014)

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 234 of 540

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592...

administrative expense," § 522(k), including attorney's fees, see § 503(b)(2). The surcharge thus exceeded the limits of both the court's authority under § 105(a) and its inherent powers. Pp. 1194 – 1196.

(b) Siegel argues that an equitable power to deny an exemption by "surcharging" exempt property in response to a debtor's misconduct can coexist with § 522. But insofar as that argument equates the surcharge with an outright denial of Law's homestead exemption, it founders on this case's procedural history. The Bankruptcy Appellate Panel recognized that because no one timely objected to the homestead exemption, it became final before the surcharge was imposed. And a trustee who fails to make a timely objection cannot challenge an exemption. *Taylor v. Freeland & Kronz,* 503 U.S. 638, 643–644, 112 S.Ct. 1644, 118 L.Ed.2d 280. Assuming the Bankruptcy Court could have revisited Law's entitlement to the exemption, § 522 specifies the criteria that render property exempt, and a court may not refuse to honor a debtor's invocation of an exemption without a valid statutory basis. Federal courts may apply state law to disallow state-created exemptions, but federal law itself provides no authority for bankruptcy courts to deny an exemption on a ground not specified in the Code. Pp. 1195 – 1197.

(c) Neither the holding of *Marrama v. Citizens Bank* nor its dictum points toward a different result. There, the debtor's bad faith kept him from converting his bankruptcy from a Chapter 7 liquidation to a Chapter 13 reorganization as permitted by § 706(a). But that was because his conduct prevented him from qualifying under Chapter 13, and thus he could not satisfy § 706(d), which expressly conditions conversion on the debtor's ability to qualify under Chapter 13. Pp. 1197 – 1198.

(d) This ruling forces Siegel to shoulder a heavy financial burden due to Law's egregious misconduct and may produce inequitable results for other trustees and creditors, but it is not for courts to alter the balance that Congress struck in crafting § 522. Cf. *Guidry v. Sheet Metal Workers National Pension Fund,* 493 U.S. 365, 376–377, 110 S.Ct. 680, 107 L.Ed.2d 782. Pp. 1197 – 1198.

(e) Ample authority remains to address debtor misconduct, including denial of discharge, see § 727(a)(2)–(6); sanctions for bad-faith litigation conduct under the Bankruptcy Rules, § 105(a), or a bankruptcy court's inherent powers; enforcement of monetary sanctions through the normal procedures for collecting money **\*1192** judgments, see § 727(b); or possible prosecution under 18 U.S.C. § 152. Pp. 1197 – 1198.

435 Fed.Appx. 697, reversed and remanded.

SCALIA, J., delivered the opinion for a unanimous Court.

## Attorneys and Law Firms

Matthew S. Hellman, Washington, DC, for Petitioner.

Neal K. Katyal, Washington, DC, for Respondent.

Sarah E. Harrington, for the United States as amicus curiae, by special leave of the Court, supporting the Respondent.

Catherine L. Steege, Jenner & Block LLP, Chicago, IL, Carl N. Wedoff, Jenner & Block LLP, New York, NY, Matthew S. Hellman, Counsel of Record, Jessica Ring Amunson, Adam G. Unikowsky, Matthew S. McKeen, Caroline M. DeCell, Jenner & Block LLP, Washington, DC, for Petitioner.

Neal Kumar Katyal, Counsel of Record, Mary Helen Wimberly, Elizabeth B. Prelogar, Jonathan D. Shaub, Hogan Lovells US LLP, Washington, DC, Steven T. Gubner, Ezra Brutzkus Gubner LLP, Woodland Hills, CA, for Respondent.

## Opinion

Justice SCALIA delivered the opinion of the Court.

The Bankruptcy Code provides that a debtor may exempt certain assets from the bankruptcy estate. It further provides that exempt assets generally are not liable for any expenses associated with administering the estate. In this case, we consider whether a bankruptcy court nonetheless may order that a debtor's exempt assets be used to pay administrative expenses incurred as a result of the debtor's misconduct.

### I. Background

### A

Chapter 7 of the Bankruptcy Code gives an insolvent debtor the opportunity to discharge his debts by liquidating his assets to pay his creditors. 11 U.S.C. §§ 704(a)(1), 726, 727. The filing of a bankruptcy petition under Chapter 7 creates a bankruptcy "estate" generally comprising all of the debtor's property. § 541(a)(1). The estate is placed under the control

Law v. Siegel, 134 S.Ct. 1188 (2014)

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 235 of 540

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592...

of a trustee, who is responsible for managing liquidation of the estate's assets and distribution of the proceeds. § 704(a)(1). The Code authorizes the debtor to "exempt," however, certain kinds of property from the estate, enabling him to retain those assets post-bankruptcy. § 522(b)(1). Except in particular situations specified in the Code, exempt property "is not liable" for the payment of "any [prepetition] debt" or "any administrative expense." § 522(c), (k).

Section 522(d) of the Code provides a number of exemptions unless they are specifically prohibited by state law. § 522(b)(2), (d). One, commonly known as the "homestead exemption," protects up to $22,975 in equity in the debtor's residence. § 522(d)(1) and note following § 522; see *Owen v. Owen*, 500 U.S. 305, 310, 111 S.Ct. 1833, 114 L.Ed.2d 350 (1991). The debtor may elect, however, to forgo the § 522(d) exemptions and instead claim whatever exemptions are available under applicable state or local law. § 522(b)(3)(A). Some States provide homestead exemptions that are more generous than the federal exemption; some provide less generous versions; but nearly every State provides some type of homestead exemption. See López, **\*1193** State Homestead Exemptions and Bankruptcy Law: Is It Time for Congress To Close the Loophole? 7 Rutgers Bus. L.J. 143, 149–165 (2010) (listing state exemptions).

**B**

Petitioner, Stephen Law, filed for Chapter 7 bankruptcy in 2004, and respondent, Alfred H. Siegel, was appointed to serve as trustee. The estate's only substantial asset was Law's house in Hacienda Heights, California. On a schedule filed with the Bankruptcy Court, Law valued the house at $363,348 and claimed that $75,000 of its value was covered by California's homestead exemption. See Cal. Civ. Proc. Code Ann. § 704.730(a)(1) (West Supp. 2014). He also reported that the house was subject to two voluntary liens: a note and deed of trust for $147,156.52 in favor of Washington Mutual Bank, and a second note and deed of trust for $156,929.04 in favor of "Lin's Mortgage & Associates." Law thus represented that there was no equity in the house that could be recovered for his other creditors, because the sum of the two liens exceeded the house's nonexempt value.

If Law's representations had been accurate, he presumably would have been able to retain the house, since Siegel would have had no reason to pursue its sale. Instead, a few months after Law's petition was filed, Siegel initiated an adversary

proceeding alleging that the lien in favor of "Lin's Mortgage & Associates" was fraudulent. The deed of trust supporting that lien had been recorded by Law in 1999 and reflected a debt to someone named "Lili Lin." Not one but two individuals claiming to be Lili Lin ultimately responded to Siegel's complaint. One, Lili Lin of Artesia, California, was a former acquaintance of Law's who denied ever having loaned him money and described his repeated efforts to involve her in various sham transactions relating to the disputed deed of trust. *That* Lili Lin promptly entered into a stipulated judgment disclaiming any interest in the house. But that was not the end of the matter, because the second "Lili Lin" claimed to be the true beneficiary of the disputed deed of trust. Over the next five years, *this* "Lili Lin" managed—despite supposedly living in China and speaking no English—to engage in extensive and costly litigation, including several appeals, contesting the avoidance of the deed of trust and Siegel's subsequent sale of the house.

Finally, in 2009, the Bankruptcy Court entered an order concluding that "no person named Lili Lin ever made a loan to [Law] in exchange for the disputed deed of trust." *In re Law*, 401 B.R. 447, 453 (Bkrtcy.Ct.C.D.Cal.). The court found that "the loan was a fiction, meant to preserve [Law's] equity in his residence beyond what he was entitled to exempt" by perpetrating "a fraud on his creditors and the court." *Ibid.* With regard to the second "Lili Lin," the court declared itself "unpersuaded that Lili Lin of China signed or approved any declaration or pleading purporting to come from her." *Ibid.* Rather, it said, the "most plausible conclusion" was that Law himself had "authored, signed, and filed some or all of these papers." *Ibid.* It also found that Law had submitted false evidence "in an effort to persuade the court that Lili Lin of China—rather than Lili Lin of Artesia—was the true holder of the lien on his residence." *Id.*, at 452. The court determined that Siegel had incurred more than $500,000 in attorney's fees overcoming Law's fraudulent misrepresentations. It therefore granted Siegel's motion to "surcharge" the entirety of Law's $75,000 homestead exemption, making those funds available to defray Siegel's attorney's fees.

The Ninth Circuit Bankruptcy Appellate Panel affirmed. **\*1194** BAP No. CC–09–1077–PaMkH, 2009 WL 7751415 (Oct. 22, 2009) (*per curiam* ). It held that the Bankruptcy Court's factual findings regarding Law's fraud were not clearly erroneous and that the court had not abused its discretion by surcharging Law's exempt assets. It explained that in *Latman v. Burdette*, 366 F.3d 774 (2004), the Ninth Circuit had recognized a bankruptcy court's power

Law v. Siegel, 134 S.Ct. 1188 (2014)

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592...

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 236 of 540

to "equitably surcharge a debtor's statutory exemptions" in exceptional circumstances, such as "when a debtor engages in inequitable or fraudulent conduct." 2009 WL 7751415, at *5, *7. The Bankruptcy Appellate Panel acknowledged that the Tenth Circuit had disagreed with *Latman,* see *In re Scrivner,* 535 F.3d 1258, 1263–1265 (2008), but the panel affirmed that *Latman* was correct. 2009 WL 7751415, at *7, n. 10. Judge Markell filed a concurring opinion agreeing with the panel's application of *Latman* but questioning "whether *Latman* remains good policy." 2009 WL 7751415, at *10.

The Ninth Circuit affirmed. *In re Law,* 435 Fed.Appx. 697 (2011) (*per curiam* ). It held that the surcharge was proper because it was "calculated to compensate the estate for the actual monetary costs imposed by the debtor's misconduct, and was warranted to protect the integrity of the bankruptcy process." *Id.,* at 698. We granted certiorari. 570 U.S. ——, 133 S.Ct. 2824, 186 L.Ed.2d 883 (2013).

## II. Analysis

### A

**[1]    [2]**    A bankruptcy court has statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). And it may also possess "inherent power ... to sanction 'abusive litigation practices.' " *Marrama v. Citizens Bank of Mass.,* 549 U.S. 365, 375–376, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007). But in exercising those statutory and inherent powers, a bankruptcy court may not contravene specific statutory provisions.

**[3]    [4]    [5]    [6]**    It is hornbook law that § 105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code." 2 Collier on Bankruptcy ¶ 105.01[2], p. 105–6 (16th ed. 2013). Section 105(a) confers authority to "carry out" the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits. That is simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere. See *Morton v. Mancari,* 417 U.S. 535, 550–551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *D. Ginsberg & Sons, Inc. v. Popkin,* 285 U.S. 204, 206–208, 52 S.Ct. 322, 76 L.Ed. 704 (1932). [1] Courts' inherent sanctioning powers are likewise subordinate to valid statutory directives and prohibitions.

*Degen v. United States,* 517 U.S. 820, 823, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996); *Chambers v. NASCO, Inc.,* 501 U.S. 32, 47, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). We have long held that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of" the Bankruptcy Code. **\*1195** *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); see, *e.g., Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 24–25, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000); *United States v. Noland,* 517 U.S. 535, 543, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996); *SEC v. United States Realty & Improvement Co.,* 310 U.S. 434, 455, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940).

**[7]    [8]**    Thus, the Bankruptcy Court's "surcharge" was unauthorized if it contravened a specific provision of the Code. We conclude that it did. Section 522 (by reference to California law) entitled Law to exempt $75,000 of equity in his home from the bankruptcy estate. § 522(b)(3)(A). And it made that $75,000 "not liable for payment of any administrative expense." § 522(k). [2] The reasonable attorney's fees Siegel incurred defeating the "Lili Lin" lien were indubitably an administrative expense, as a short march through a few statutory cross-references makes plain: Section 503(b)(2) provides that administrative expenses include "compensation ... awarded under" § 330(a); § 330(a)(1) authorizes "reasonable compensation for actual, necessary services rendered" by a "professional person employed under" § 327; and § 327(a) authorizes the trustee to "employ one or more attorneys ... to represent or assist the trustee in carrying out the trustee's duties under this title." Siegel argues that even though attorney's fees incurred responding to a debtor's fraud qualify as "administrative expenses" for purposes of determining the trustee's right to reimbursement under § 503(b), they do not so qualify for purposes of § 522(k); but he gives us no reason to depart from the " 'normal rule of statutory construction' " that words repeated in different parts of the same statute generally have the same meaning. See *Department of Revenue of Ore. v. ACF Industries, Inc.,* 510 U.S. 332, 342, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994) (quoting *Sorenson v. Secretary of Treasury,* 475 U.S. 851, 860, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986)).

The Bankruptcy Court thus violated § 522's express terms when it ordered that the $75,000 protected by Law's homestead exemption be made available to pay Siegel's attorney's fees, an administrative expense. In doing so, the

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592...

court exceeded the limits of its authority under § 105(a) and its inherent powers.

**B**

Siegel does not dispute the premise that a bankruptcy court's § 105(a) and inherent powers may not be exercised in contravention of the Code. Instead, his main argument is that the Bankruptcy Court's surcharge did not contravene § 522. That statute, Siegel contends, "establish[es] the procedure by which a debtor may seek to claim exemptions" but "contains no directive requiring [courts] to allow [an exemption] regardless of the circumstances." Brief for Respondent 35. Thus, he says, recognition of an equitable power in the Bankruptcy Court to deny an exemption by "surcharging" the exempt property in response to the debtor's misconduct can coexist comfortably with § 522. The United States, appearing in support of Siegel, agrees, arguing that § 522 "neither gives debtors an absolute right to retain exempt property nor limits a court's authority to impose an equitable surcharge on such property." Brief for United States as *Amicus Curiae* 23.

[9]    Insofar as Siegel and the United States equate the Bankruptcy Court's surcharge **\*1196** with an outright denial of Law's homestead exemption, their arguments founder upon this case's procedural history. The Bankruptcy Appellate Panel stated that because no one "timely oppose[d] [Law's] homestead exemption claim," the exemption "became final" *before* the Bankruptcy Court imposed the surcharge. 2009 WL 7751415, at \*2. We have held that a trustee's failure to make a timely objection prevents him from challenging an exemption. *Taylor v. Freeland & Kronz,* 503 U.S. 638, 643–644, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992).

[10]    [11]    But even assuming the Bankruptcy Court could have revisited Law's entitlement to the exemption, § 522 does not give courts discretion to grant or withhold exemptions based on whatever considerations they deem appropriate. Rather, the statute exhaustively specifies the criteria that will render property exempt. See § 522(b), (d). Siegel insists that because § 522(b) says that the debtor "may exempt" certain property, rather than that he "*shall* be entitled" to do so, the court retains discretion to grant or deny exemptions even when the statutory criteria are met. But the subject of "may exempt" in § 522(b) is the debtor, not the court, so it is the debtor in whom the statute vests discretion. A debtor need not invoke an exemption to which the statute entitles him; but

if he does, the court may not refuse to honor the exemption absent a valid statutory basis for doing so.

[12]    Moreover, § 522 sets forth a number of carefully calibrated exceptions and limitations, some of which relate to the debtor's misconduct. For example, § 522(c) makes exempt property liable for certain kinds of prepetition debts, including debts arising from tax fraud, fraud in connection with student loans, and other specified types of wrongdoing. Section 522(*o*) prevents a debtor from claiming a homestead exemption to the extent he acquired the homestead with nonexempt property in the previous 10 years "with the intent to hinder, delay, or defraud a creditor." And § 522(q) caps a debtor's homestead exemption at approximately $150,000 (but does not eliminate it entirely) where the debtor has been convicted of a felony that shows "that the filing of the case was an abuse of the provisions of" the Code, or where the debtor owes a debt arising from specified wrongful acts— such as securities fraud, civil violations of the Racketeer Influenced and Corrupt Organizations Act, or "any criminal act, intentional tort, or willful or reckless misconduct that caused serious physical injury or death to another individual in the preceding 5 years." § 522(q) and note following § 522. The Code's meticulous—not to say mind-numbingly detailed—enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions. See *Hillman v. Maretta,* 569 U.S. ——, ——, 133 S.Ct. 1943, 1953, 186 L.Ed.2d 43 (2013); *TRW Inc. v. Andrews,* 534 U.S. 19, 28–29, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001).

[13]    [14]    Siegel points out that a handful of courts have claimed authority to disallow an exemption (or to bar a debtor from amending his schedules to claim an exemption, which is much the same thing) based on the debtor's fraudulent concealment of the asset alleged to be exempt. See, *e.g., In re Yonikus,* 996 F.2d 866, 872–873 (C.A.7 1993); *In re Doan,* 672 F.2d 831, 833 (C.A.11 1982) (*per curiam* ); *Stewart v. Ganey,* 116 F.2d 1010, 1011 (C.A.5 1940). He suggests that those decisions reflect a general, equitable power in bankruptcy courts to deny exemptions based on a debtor's bad-faith conduct. For the reasons we have given, the Bankruptcy Code admits no such power. It is of course true that when a debtor claims a **\*1197** *state-created* exemption, the exemption's scope is determined by state law, which may provide that certain types of debtor misconduct warrant denial of the exemption. *E.g., In re Sholdan,* 217 F.3d 1006, 1008 (C.A.8 2000); see 4 Collier on Bankruptcy ¶ 522.08[1]–[2], at 522–45 to 522–47. Some of the early decisions on which

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592...

Siegel relies, and which the Fifth Circuit cited in *Stewart,* are instances in which federal courts applied state law to disallow state-created exemptions. See *In re Denson,* 195 F. 857, 858 (N.D.Ala.1912); *Cowan v. Burchfield,* 180 F. 614, 619 (N.D.Ala.1910); *In re Ansley Bros.,* 153 F. 983, 984 (E.D.N.C.1907). But *federal law* provides no authority for bankruptcy courts to deny an exemption on a ground not specified in the Code.

**C**

Our decision in *Marrama v. Citizens Bank,* on which Siegel and the United States heavily rely, does not point toward a different result. The question there was whether a debtor's bad-faith conduct was a valid basis for a bankruptcy court to refuse to convert the debtor's bankruptcy from a liquidation under Chapter 7 to a reorganization under Chapter 13. Although § 706(a) of the Code gave the debtor a right to convert the case, § 706(d) "expressly conditioned" that right on the debtor's "ability to qualify as a 'debtor' under Chapter 13." 549 U.S., at 372, 127 S.Ct. 1105. And § 1307(c) provided that a proceeding under Chapter 13 could be dismissed or converted to a Chapter 7 proceeding "for cause," which the Court interpreted to authorize dismissal or conversion for bad-faith conduct. In light of § 1307(c), the Court held that the debtor's bad faith could stop him from qualifying as a debtor under Chapter 13, thus preventing him from satisfying § 706(d)'s *express condition* on conversion. *Id.,* at 372–373, 127 S.Ct. 1105. That holding has no relevance here, since no one suggests that Law failed to satisfy any express statutory condition on his claiming of the homestead exemption.

True, the Court in *Marrama* also opined that the Bankruptcy Court's refusal to convert the case was authorized under § 105(a) and might have been authorized under the court's inherent powers. *Id.,* at 375–376, 127 S.Ct. 1105. But even that dictum does not support Siegel's position. In *Marrama,* the Court reasoned that if the case had been converted to Chapter 13, § 1307(c) would have required it to be either dismissed or reconverted to Chapter 7 in light of the debtor's bad faith. Therefore, the Court suggested, even if the Bankruptcy Court's refusal to convert the case had not been expressly authorized by § 706(d), that action could have been justified as a way of providing a "prompt, rather than a delayed, ruling on [the debtor's] unmeritorious attempt to qualify" under § 1307(c). *Id.,* at 376, 127 S.Ct. 1105. At most, *Marrama* 's dictum suggests that in some circumstances a bankruptcy court may be authorized to dispense with futile

procedural niceties in order to reach more expeditiously an end result required by the Code. *Marrama* most certainly did not endorse, even in dictum, the view that equitable considerations permit a bankruptcy court to contravene express provisions of the Code.

**D**

[15] We acknowledge that our ruling forces Siegel to shoulder a heavy financial burden resulting from Law's egregious misconduct, and that it may produce inequitable results for trustees and creditors in other cases. We have recognized, however, that in crafting the provisions of § 522, "Congress balanced the difficult choices that exemption limits impose on debtors with the economic harm that exemptions **\*1198** visit on creditors." *Schwab v. Reilly,* 560 U.S. 770, 791, 130 S.Ct. 2652, 177 L.Ed.2d 234 (2010). The same can be said of the limits imposed on recovery of administrative expenses by trustees. For the reasons we have explained, it is not for courts to alter the balance struck by the statute. Cf. *Guidry v. Sheet Metal Workers Nat. Pension Fund,* 493 U.S. 365, 376–377, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990).

* * *

[16] Our decision today does not denude bankruptcy courts of the essential "authority to respond to debtor misconduct with meaningful sanctions." Brief for United States as *Amicus Curiae* 17. There is ample authority to deny the dishonest debtor a discharge. See § 727(a)(2)-(6). (That sanction lacks bite here, since by reason of a postpetition settlement between Siegel and Law's major creditor, Law has no debts left to discharge; but that will not often be the case.) In addition, Federal Rule of Bankruptcy Procedure 9011—bankruptcy's analogue to Civil Rule 11—authorizes the court to impose sanctions for bad-faith litigation conduct, which may include "an order directing payment ... of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." Fed. Rule Bkrtcy. Proc. 9011(c)(2). The court may also possess further sanctioning authority under either § 105(a) or its inherent powers. Cf. *Chambers,* 501 U.S., at 45–49, 111 S.Ct. 2123. And because it arises postpetition, a bankruptcy court's monetary sanction survives the bankruptcy case and is thereafter enforceable through the normal procedures for collecting money judgments. See § 727(b). Fraudulent conduct in a bankruptcy case may also subject a debtor to criminal prosecution under 18 U.S.C.

§ 152, which carries a maximum penalty of five years' imprisonment.

But whatever other sanctions a bankruptcy court may impose on a dishonest debtor, it may not contravene express provisions of the Bankruptcy Code by ordering that the debtor's exempt property be used to pay debts and expenses for which that property is not liable under the Code.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**Parallel Citations**

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592, 14 Cal. Daily Op. Serv. 2285, 2014 Daily Journal D.A.R. 2640, 24 Fla. L. Weekly Fed. S 577

Footnotes

*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1   The second sentence of § 105(a) adds little to the analysis. It states: "No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." Even if the "abuse of process" language were deemed to confer additional authority beyond that conferred by the first sentence (which is doubtful), that general authority would also be limited by more specific provisions of the Code.

2   The statute's general rule that exempt assets are not liable for administrative expenses is subject to two narrow exceptions, both pertaining to the use of exempt assets to pay expenses associated with the avoidance of certain voidable transfers of exempt property. § 522(k)(1)-(2). Neither of those exceptions is relevant here.

End of Document    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 64

2014 WL 3748623
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

LIBERTY INSURANCE CORP., Plaintiff,
v.
Glenn BOWLES and Kyle Valentine, Defendants.

No. 13–13784.   |   Signed July 30, 2014.

**Synopsis**
**Background:** Insurer brought action against its insured seeking declaration that it had no duty under homeowners policy to defend or indemnify him in a state court action where he was being sued by his former romantic partner for negligence and, in the alternative, assault and battery. Insurer moved for judgment on the pleadings.

**Holdings:** The District Court, Terrence G. Berg, J., held that:

[1] underlying suit did not allege an occurrence covered by insurer's homeowners policy, and

[2] policy's exception to expected or intended injury exclusion did not apply.

Motion granted.

West Headnotes (8)

[1]    **Insurance**
       
       Under Michigan law, the duty of the insurer to defend the insured depends upon the allegations in the complaint of the third party in his action against the insured.

       Cases that cite this headnote

[2]    **Insurance**
       

The insurer's duty to defend under Michigan law is not limited to meritorious suits and may even extend to actions which are groundless, false or fraudulent, so long as the allegations against the insured even arguably come within the policy coverage.

Cases that cite this headnote

[3]    **Insurance**
       

An insurer has a duty to defend under Michigan law, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy.

Cases that cite this headnote

[4]    **Insurance**
       

The insurer's duty to defend under Michigan law cannot be limited by the precise language of the pleadings.

Cases that cite this headnote

[5]    **Insurance**
       

Under Michigan law, the insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible, and thus whether it has a duty to defend; in a case of doubt as to whether or not the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor.

Cases that cite this headnote

[6]    **Insurance**
       

Under Michigan law, underlying suit brought against insured by his former romantic partner, alleging insured intentionally assaulted his partner in their bedroom by repeatedly slamming her against the wall, hitting her head with his fist, pulling her hair, and forcing her down until

her head was against the floor, did not allege an "occurrence" covered by insured's homeowners policy; although complaint asserting claims for negligence or, in the alternative, assault and battery, it alleged physical abuse that was not the negligent breach of duty of care, but rather intentional conduct, intended to cause harm.

Cases that cite this headnote

[7]    **Insurance**


Under Michigan law, homeowner's policy's exception to the policy's expected or intended injury exclusion, for bodily injury resulting from the use of reasonable force to protect persons or property, did not apply to allow for coverage in underlying suit against insured brought by his former romantic partner, alleging insured physically abused her; although insured asserted that any injuries sustained by his former partner were the result of his engaging in self-defense, there was no self-defense exception to the policy's sexual molestation, corporal punishment, or physical or mental abuse exclusion.

Cases that cite this headnote

[8]    **Insurance**


Under Michigan law, the insurer's duty to defend is broader than the duty to indemnify.

Cases that cite this headnote

**Attorneys and Law Firms**

Nathan G. Peplinski, Michael F. Schmidt, Harvey, Kruse, Troy, MI, for Plaintiff.

Benjamin J. Aloia, Aloia & Associates, P.C., Mount Clemens, MI, Fred L. Gibson, F.L. Gibson Group, P.C., Clinton Township, MI, for Defendants.

*OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS*

TERRENCE G. BERG, District Judge.

**\*1**   This case is a declaratory judgment action arising out of a homeowner's insurance policy. Plaintiff Liberty Insurance Corporation ("Liberty") is seeking a declaration of its rights under the terms of a policy held by its insured, Defendant Glenn Bowles. Specifically, Liberty is asking the Court to declare that it has no duty to defend or indemnify Bowles in a state court action where he is being sued by his former romantic partner, Defendant Kyle Valentine, for "negligence" and, in the alternative, assault and battery.

For the reasons discussed below, judgment on the pleadings is appropriate in this case; accordingly, Plaintiff's Motion for Judgment on the Pleadings is GRANTED.

## I. BACKGROUND AND PROCEDURAL HISTORY

The present insurance coverage dispute relates to an underlying state court action between the defendants in this case, Kyle Valentine and Glenn Bowles. In a complaint filed in the Macomb County Circuit Court, Valentine alleges that on or around September 7, 2010, Defendant Bowles "engaged in activity with [Defendant Valentine] that resulted in severe and grievous injuries [to Valentine]," and that the alleged "activity" was in the nature of either negligence or assault and battery. Although Count I of the complaint sets forth a theory of "negligence," the complaint goes on to allege the following facts in an alternative Count II:

> 16. That on or about September 7, 2010, after [Valentine] and [Bowles] awoke from having spent the night cohabitating, as defendant prepared for work, [Valentine] noted on [Bowles] cell phone that [Bowles] was continuing to communicate with another woman, despite [Valentine's] many earlier pleas that he discontinue the relationship with the other woman.

> 17. [Valentine] then confronted [Bowles] with the information she had found on his cell phone.

> 18. In response, [Bowles] lost his composure, began yelling, and then—by example but not limitation:

> a. Forcefully slammed [Valentine] up against the wall;

b. Struck [Valentine] in the head with his hand and fist;

c. Grabbed [Valentine's] head and repeatedly slammed [Valentine's] head into the wall;

d. Grabbed [Valentine's] hair, and with all the force he could muster, forced her to the floor by pulling her hair / head down;

e. Once [Valentine] was on the floor, setting 'indian style', [Bowles] grabbed [Valentine's] head and, without warning, pushed her head forward down to the floor, in an unnatural position.

f. Despite [Valentine's] screams and pleas that he stop, [Bowles] continued forcing [Valentine's] head to the floor until his uncontrolled rage subsided; [and]

g. Blamed [Valentine] for making him angry and losing control.

...

24. That [Valentine] did not want, ask for, or invite the malicious and brutal beating knowingly and willfully inflicted upon her by [Bowles].

Dkt. 20, Ex. C, First Am. Compl., Macomb Cnty. Civ. Action No. 13–2159, ¶¶ 16–18, 24.

Prior to the date of the alleged incident, Bowles had obtained a Homeowners Insurance Policy from Liberty, No. H37–248–350670–4002 (the "Policy"), which provided coverage, under certain circumstances, for accidents occurring at Bowles' home, 43755 Dunham Ct., Clinton Township, MI 48038. The Policy was in effect at the time of the alleged incident, and the alleged incident was suggested to have occurred at the covered address.

**\*2** Pursuant to the Policy, Liberty agreed to defend Bowles, as it had in a prior iteration of the Defendants' state-court action (i.e., Macomb County Civil Action No. 11–1971), subject to a written reservation of rights. *See* Dkt. 15, Ex. 2, 3, and 8.

Then, on September 5, 2013, Liberty filed the instant suit, seeking a declaration that it does not have a duty to provide coverage or defend Bowles in the underlying state court action.

On November 13, 2013, Defendant Bowles filed a Motion to Dismiss (Dkt.13) pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), asking the Court to decline to exercise jurisdiction over this case. That motion was fully briefed and on January 13, 2014, the Court heard oral argument. At the conclusion of the hearing, the Court denied Defendant Bowles' motion and informed the parties that it intended to construe Plaintiff's response to the motion (Dkt.15) as a cross-motion for judgment on the pleadings, and Defendant Bowles' reply (Dkt.16) as a response to that motion. The Court subsequently set forth a briefing schedule, allowing both parties time to file supplemental briefs. Having thoroughly reviewed and considered the parties' papers, the Court will now determine the pending motion without additional argument.

## II. ANALYSIS

As stated above, the Court construed Plaintiff's response to Bowles' motion to dismiss as being a request for judgment on the pleadings. "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment. A motion brought pursuant to Rule 12(c) is appropriately granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Coyer v. HSBC Mort. Servs., Inc.,* 701 F.3d 1104, 1107–08 (6th Cir.2012) (citation and internal quotation marks omitted).

Defendants assert that judgment on the pleadings is unwarranted because there are factual issues in need of resolution. The Court finds that the material facts pertaining to this action are not in dispute and that the only question before the Court is purely legal: is Liberty obligated to provide Bowles with a defense (or otherwise provide insurance coverage) in the state-court action now pending between Bowles and Valentine? Considering the language of the Policy at issue, and having reviewed the law of the state of Michigan on this question, the Court concludes that there is no such duty to defend.

[1] [2] [3] [4] [5] Under Michigan law,

The duty of the insurer to defend the insured depends upon the allegations in the complaint of the third party in his

action against the insured. This duty is not limited to meritorious suits and may even extend to actions which are groundless, false or fraudulent, so long as the allegations against the insured even arguably come within the policy coverage. An insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy. The duty to defend cannot be limited by the precise language of the pleadings. *The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible.* In a case of doubt as to whether or not the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor.

**\*3** *Smorch v. Auto Club Group Ins. Co.,* 179 Mich.App. 125, 445 N.W.2d 192, 193 (Mich.Ct.App.1989) (internal citations omitted) (emphasis added).

**[6]** Here, the terms of the Policy provide insurance coverage in the event that "a claim is made or a suit is brought against an 'insured' for damages because of 'bodily injury' or 'property damage' caused by an 'occurrence' to which this coverage applies." Dkt. 1, Ex. B, p. 11. Further, the Policy defines the term "occurrence" as meaning "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in: a. 'Bodily injury'; or b. 'Property damage.' " *Id.* at p. 1, 445 N.W.2d 192. Although undefined by the Policy, the term "accident" has been defined by Michigan courts as meaning " 'an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected.' " *Hawkeye–Security Ins. Co. v. Vector Constr. Co.,* 185 Mich.App. 369, 460 N.W.2d 329 (1990) (quoting *Guerdon Industries, Inc. v. Fidelity & Cas. Co. of New York,* 371 Mich. 12, 18–19, 123 N.W.2d 143 (1963) (quoting 10 Couch on Insurance (2d ed) § 41:6, p. 27)).

Bowles' chief argument in favor of coverage is that the underlying state court action outlines two separate, alternative theories as to what happened on September 7, 2010, one of which is negligence, and that a claim of negligence

could form the basis of an insurable occurrence. Although it is possible to plead alternative legal theories, Bowles' argument for coverage is only viable if the Court is willing to entertain wholly inconsistent sets of alternative facts. Either something happened between Defendants at Bowles' home on September 7, 2010, or it did not. If nothing happened, then there would be no "occurrence" to trigger coverage in the first place. But, if something did happen, the only *facts* available to the Court are those set forth in paragraphs 16–18 of the First Amended Complaint in the underlying state court action. Accepting those facts as true, there would still be no "occurrence" under the terms of the Policy, as there is nothing "accidental" (nor negligent) about what is alleged to have occurred on September 7, 2010. The complaint alleges that Bowles intentionally assaulted Valentine in their bedroom by repeatedly slamming her against the wall, hitting her head with his fist, pulling her hair, and forcing her down until her head was against the floor. Domestic violence is never an accident; physical abuse is not the negligent breach of one's duty of care, but rather intentional conduct, intended to cause harm.

**[7]** Bowles also attempts to rely upon the Policy's exception to the "expected or intended injury" exclusion, for " 'bodily injury' resulting from the use of reasonable force to protect persons or property" (Dkt.20, Ex. B, p. 2), asserting that any injuries sustained by Valentine were the result of Bowles' engaging in self-defense. Setting aside the fact that it is intellectually dishonest to both claim that nothing happened, and then insist that anything which *might* have happened was purely the result of "self-defense," there is no self-defense exception to the Policy's "sexual molestation, corporal punishment, or physical or mental abuse" exclusion. [1] Even assuming for the sake of argument that there was an insurable "occurrence," this exclusion would still preclude coverage. *See Mount Vernon Fire Ins. Co. v. Hicks,* 910 F.Supp. 316, 322 (E.D.Mich.1995) (Gadola, J.).

**\*4** **[8]** This case is nothing more than "a transparent attempt to trigger insurance coverage by characterizing allegations of tortious conduct under the guise of 'negligent' activities." *Smorch,* 445 N.W.2d at 193 (citing *Aetna Casualty & Surety Co. v. Sprague,* 163 Mich.App. 650, 654, 415 N.W.2d 230 (1987)). In circumstances such as this, Michigan law is clear that there is no duty to defend. *Id.; see also Mount Vernon Fire,* 910 F.Supp. at 322; *Auto Club Group Ins. Co. v. Burchell,* 249 Mich.App. 468, 642 N.W.2d 406 (Mich.Ct.App.2001); and *Century Mutual Ins. Co. v. Paddock,* 168 Mich.App. 747, 425 N.W.2d 214

(Mich.Ct.App.1988). Accordingly, Plaintiff does not have a duty to defend Bowles in Macomb County Civil Action No. 13–2159. Likewise, because "the duty to defend is broader than the duty to indemnify," *American Bumper & Mfg. Co. v. Hartford Fire Ins. Co.,* 452 Mich. 440, 450, 550 N.W.2d 475 (1996), Plaintiff shall not be responsible for indemnifying Defendant Bowles in the unlikely event that Defendant Valentine prevails against him on her negligence theory.

### III. CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Judgment on the Pleadings is **GRANTED.**

**SO ORDERED.**

Footnotes

1    The incident between Bowles and Valentine, as alleged in the complaint, was clearly a domestic dispute that involved physical abuse. This exclusion precludes coverage regardless of whether Bowles should claim that Valentine "started the fight."

**End of Document**                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.    5

TAB 65

52 F.3d 967
United States Court of Appeals, Federal Circuit.

Herbert MARKMAN and Positek,
Inc., Plaintiffs–Appellants,
v.
WESTVIEW INSTRUMENTS, INC. and Althon
Enterprises, Inc., Defendants–Appellees.

No. 92–1049.    |    April 5, 1995.

Holder of patent for inventory control method for use in dry cleaning business brought patent infringement action against competitor. The United States District Court for the Eastern District of Pennsylvania, Marvin Katz, J., ruled that patent was not infringed, and patentee appealed. The Court of Appeals, en banc, Archer, Chief Judge, held that: (1) construction of patent claims, which define scope of patentee's rights under patent, is matter of law exclusively for court; (2) patent specification and prosecution history established that term "inventory" in patent meant "articles of clothing," rather than cash or inventory receipts; and (3) requiring court, rather than jury, to construe and determine scope of patent claims did not violate Seventh Amendment right to jury trial.

Affirmed.

Mayer, Circuit Judge, filed opinion concurring in judgment.

Rader, Circuit Judge, filed opinion concurring in judgment.

Pauline Newman, Circuit Judge, filed dissenting opinion.


West Headnotes (27)

**[1]  Patents**
      👉 Questions of law or fact

Construction of patent claims, which define scope of patentee's rights under patent, is matter of law exclusively for court.

206 Cases that cite this headnote

**[2]  Federal Courts**
      👉 Taking case or question from jury; judgment as a matter of law

On appeal, Court of Appeals reviews de novo correctness of district court's grant of judgment as matter of law (JMOL) by applying JMOL standard. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

6 Cases that cite this headnote

**[3]  Federal Courts**
      👉 Taking case or question from jury; judgment as a matter of law

Factual findings made by jury in arriving at its verdict are to be upheld on appeal unless party moving for judgment as matter of law (JMOL) shows that, when correct legal standard is applied, there is not substantial evidence to support finding in favor of nonmovant. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

41 Cases that cite this headnote

**[4]  Federal Civil Procedure**
      👉 Determination of issues
      **Federal Courts**
      👉 Taking case or question from jury; judgment as a matter of law

While jury's factual findings receive substantial deference on motion for judgment as matter of law (JMOL), legal standards that jury applies, expressly or implicitly, in reaching its verdict are considered by district court and appellate court de novo to determine whether those standards are correct as matter of law. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

60 Cases that cite this headnote

**[5]  Federal Courts**
      👉 Taking case or question from jury; judgment as a matter of law

Notwithstanding jury's verdict, on review of motion for judgment as matter of law (JMOL), court retains power and duty to see what correct law is, and then to examine factual issues submitted to jury and determined whether findings thereon are supported by substantial

evidence and support verdict under the law. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

16 Cases that cite this headnote

**[6]    Federal Civil Procedure**
🔑 Necessity; waiver

Generally, when reviewing law on properly laid and renewed motion for judgment as matter of law (JMOL), appellate court is not bound by instructions given jury, even if they were not objected to. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

2 Cases that cite this headnote

**[7]    Patents**
🔑 Scope and extent of review in general

Court of Appeals was not required to defer to jury's construction of patent claims on grounds district court instructed jury to interpret claims and alleged infringer did not object to that instruction.

145 Cases that cite this headnote

**[8]    Patents**
🔑 Comparison with claims of patent

Patent infringement analysis entails two steps: first step is determining meaning and scope of patent claims asserted to be infringed; second step is comparing properly construed claims to device accused of infringing.

1002 Cases that cite this headnote

**[9]    Patents**
🔑 Construction in general

**Patents**
🔑 Construction of language of claims in general

Terms "claim interpretation" and "claim construction" mean one and the same thing in patent law.

147 Cases that cite this headnote

**[10]    Patents**
🔑 Questions of law or fact

In case tried to jury, court has power and obligation to construe as matter of law meaning of language used in patent claims.

704 Cases that cite this headnote

**[11]    Patents**
🔑 Specifications and drawings, construction with

Patent claims must be read in view of specification, of which they are a part.

693 Cases that cite this headnote

**[12]    Patents**
🔑 Construction in general

**Patents**
🔑 Specifications and drawings, construction with

Patentee is free to be his or her own lexicographer; however, any special definition given to word must be clearly defined in patent specification.

101 Cases that cite this headnote

**[13]    Patents**
🔑 Rejection and Amendment of Claims

To construe claim language, court should consider patent's prosecution history, if it is in evidence.

427 Cases that cite this headnote

**[14]    Patents**
🔑 Construction in general

**Patents**
🔑 General Rules of Construction

Court has broad power to look as matter of law to prosecution history of patent in order to ascertain true meaning of language used in patent claims.

111 Cases that cite this headnote

Markman v. Westview Instruments, Inc., 52 F.3d 967 (1995)

63 USLW 2663, 34 U.S.P.Q.2d 1321

---

[15]    Patents

🔑  Rejection and Amendment of Claims

Although prosecution history can and should be used to understand language used in patent claims, it cannot enlarge, diminish of vary limitations in claims.

124 Cases that cite this headnote

[16]    Patents

🔑  Extrinsic evidence in general

"Extrinsic evidence" consists of all evidence external to patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises; this evidence may be helpful to explain scientific principles, meaning of technical terms, and terms of art that appear in patent and prosecution history.

804 Cases that cite this headnote

[17]    Patents

🔑  Extrinsic evidence in general

Court may, in its discretion, receive extrinsic evidence in order to aid court in coming to correct conclusion as to true meaning of language employed in patent.

49 Cases that cite this headnote

[18]    Patents

🔑  Extrinsic evidence in general

Extrinsic evidence is to be used for court's understanding of patent, not for purpose of varying or contradicting terms of the claims.

127 Cases that cite this headnote

[19]    Patents

🔑  Questions of law or fact

When, after considering extrinsic evidence, court finally arrives at understanding of language as used in patent and prosecution history, court must then pronounce as matter of law meaning of that language; this ordinarily can be accomplished by court in framing its charge to jury, but may also be done in context

of dispositive motions such as those seeking judgment as matter of law.

213 Cases that cite this headnote

[20]    Patents

🔑  Admissibility

Trial court did not abuse its discretion in patent infringement case when it admitted extrinsic evidence offered by patentee, including patentee's testimony and testimony of patentee's expert, on issue of claim construction.

68 Cases that cite this headnote

[21]    Patents

🔑  Extrinsic evidence in general

Trial court properly rejected extrinsic evidence on claim construction in patent infringement case to extent it contradicted court's construction of patent claims based on specification and prosecution history.

380 Cases that cite this headnote

[22]    Patents

🔑  Specifications, Drawings, and Models

Patents

🔑  Rejection and Amendment of Claims

Patent specification and prosecution history established that term "inventory" in patent for inventory-control system for use in dry cleaning business meant "articles of clothing," rather than cash or inventory receipts; claim language indicating that system was designed to detect and localize spurious additions to and deletions from inventory would not have made sense if applied to cash receipts, and patentee's explanation of claims to patent examiner indicated that patent was designed to track articles of clothing.

453 Cases that cite this headnote

[23]    Patents

🔑  Weight and Sufficiency

Markman v. Westview Instruments, Inc., 52 F.3d 967 (1995)

63 USLW 2663, 34 U.S.P.Q.2d 1321

Testimony of patentee and his patent attorney on proper construction of patent claims was not entitled to deference.

21 Cases that cite this headnote

[24]   **Patents**
        👈 Extrinsic evidence in general

Extrinsic evidence of record cannot be relied on to change meaning of patent claims.

5 Cases that cite this headnote

[25]   **Jury**
        👈 Patent and copyright cases

Requiring court, rather than jury, to construe and determine scope of patent claims did not violate Seventh Amendment right to jury trial. U.S.C.A. Const.Amend. 7.

11 Cases that cite this headnote

[26]   **Patents**
        👈 General Rules of Construction

Construing patent claims was not analogous to construing and interpreting contracts, deeds, or wills.

9 Cases that cite this headnote

[27]   **Jury**
        👈 Patent and copyright cases

Statutory interpretation model is more accurate model than contractual one for purposes of determining whether constitutional protections are violated by assigning patent claim construction exclusively to judges. U.S.C.A. Const.Amend. 7.

17 Cases that cite this headnote

## Attorneys and Law Firms

**\*970**  William B. Mallin, Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, argued for plaintiffs-appellants. With

him on the brief were Lewis F. Gould, Jr., Timothy P. Ryan and Brian M. Martin.

Frank H. Griffin, III, Gollatz, Griffin, Ewing & McCarthy, Philadelphia, PA, argued for defendants-appellees. With him on the brief were Peter A. Vogt and Polly M. Shaffer.

Morton Amster, Anthony F. LoCicero, Joel E. Lutzker and David H. Kagan, Amster, Rothstein & Ebenstein, New York City, for amici curiae, Matsushita Elec. Corp. of America and Matsushita Elec. Indus. Co., Ltd.

Gregory A. Long and Kent R. Raygor, Sheppard, Mullin, Richter & Hampton, Los Angeles, CA, Charles Fried and Arthur R. Miller, Cambridge, MA, Donald Chisum, Morrison & Foerster, Seattle, WA and William Alsup, Morrison & Foerster, San Francisco, CA, for amicus curiae, Acuson Corp. and Honeywell, Inc.

R. Carl Moy, Asst. Professor, William Mitchell College of Law, Saint Paul, MN, for amicus curiae R. Carl Moy.

Sidney David, Charles P. Kennedy, William L. Mentlik and Roy H. Wepner, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, for amici curiae, Ohmeda, Inc.

S. Leslie Misrock, Rory J. Radding, Steven I. Wallach, Pennie & Edmonds, New York City, for amicus curiae, Ad Hoc Committee to Promote Uniformity in the Patent System.

Gary L. Newtson, President, American Intellectual Property Law Ass., Roger W. Parkhurst, Parkhurst, Wendel & Rossi, of Alexandria, and Harold C. Wegner, Wegner, Cantor, Mueller & Player, and Nancy J. Linck, Cushman, Darby & Cushman, Washington, DC

Roy E. Hofer, President, The Federal Circuit Bar Ass'n, Washington, DC, Anne E. Brookes, Honigman Miller Schwartz & Cohn, Houston, TX, and Robert J. Carlson, Christensen, O'Connor, Johnson & Kindness, of Seattle, WA, for amicus curiae, Federal Circuit Bar Ass'n.

Before ARCHER, Chief Judge,[*] and RICH, NIES, NEWMAN, MAYER, MICHEL, PLAGER, LOURIE, CLEVENGER, RADER, and SCHALL, Circuit Judges.[**]

## Opinion

Opinion for the Court filed by Chief Judge ARCHER, in which Circuit Judges RICH, NIES, MICHEL, PLAGER, LOURIE, CLEVENGER, and SCHALL join. Concurring

Markman v. Westview Instruments, Inc., 52 F.3d 967 (1995)

63 USLW 2663, 34 U.S.P.Q.2d 1321

opinions filed by Circuit Judges MAYER, and RADER. Dissenting opinion filed by Circuit Judge NEWMAN.

ARCHER, Chief Judge.

[1]    Herbert Markman and Positek, Inc. (collectively referred to as Markman) appeal from the judgment of the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 91–0940 (entered Oct. 1, 1991), that Westview Instruments, Inc. and Althon Enterprises, Inc. (collectively referred to as Westview) did not infringe claims 1 or 10 of United States Reissue Patent No. 33,054, notwithstanding the jury's verdict to the contrary. We have ordered that this case be reheard in banc. [1] We affirm the judgment of noninfringement. In doing so, we conclude that the interpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law exclusively for **\*971** the court. Thus, in this case the district court properly discharged its obligation to delineate the scope of the claim on motion for judgment as a matter of law when the jury had rendered a verdict that was incompatible with a proper claim construction.

# I.

A. In the dry-cleaning industry, articles of clothing typically are taken in from customers, recorded in some form, and then sorted according to criteria such as type of clothing and type of cleaning required. During the sorting process, articles of clothing belonging to one customer may be combined together, and also may be combined with similar clothing belonging to other customers, in order to make the cleaning process more efficient and less costly. After the articles of clothing are sorted, they may be cleaned in the same establishment or transported to another establishment for cleaning. During the cleaning process, the articles of clothing move through different locations in the establishment. After cleaning, of course, the articles of clothing must be unsorted and returned to the respective customers.

Markman is the inventor named in and the owner of United States Reissue Patent No. 33,054 (the '054 patent), titled "Inventory Control and Reporting System for Drycleaning Stores." Markman's original patent No. 4,550,246 was reissued and the reissue is the patent in suit. Positek is a licensee under the patent in the dry-cleaning business.

The '054 patent is directed to an inventory-control system that assertedly solves inventory-related problems prevalent in the dry-cleaning business. As the '054 patent specification discusses, articles of clothing can be lost in the sorting and cleaning process, and it has been found in the dry-cleaning business that even a small percentage-loss of articles of clothing will generate great consumer dissatisfaction. Also, attendant personnel might send clothing through the cleaning process but pocket the proceeds of the transactions and destroy or fail to do the appropriate paperwork, thereby servicing the customers adequately but stealing from the business. In such circumstances it is difficult for the business owner to locate the loss of profits and to deter such activities.

The invention of the '054 patent is described in detail in the specification which states that the inventory control system is "capable of monitoring and reporting upon the status, location and throughput of inventory in an establishment," and that by using the invention of the '054 patent, "the progress of articles through the laundry and drycleaning system can be completely monitored." In this way, the business owner can "reconcile[ ] [the inventory] at any point in the sequence" of sorting, cleaning, and unsorting clothing, and can "detect and localize spurious additions to inventory as well as spurious deletions therefrom."

According to the specification's description of the invention, as customers bring in their articles of clothing for cleaning, the articles are accumulated by an attendant. The attendant enters information on a keyboard identifying at least the particular customer, the type of articles being deposited, and the particular cleaning operations to be performed. Other information may be entered depending upon the complexity of the system.

A data processor stores and processes the data entered by the attendant, associating sequential customers and transactions with a unique indicium such as a number. The processor is connected to a printer that generates a written record of the stored information associated with the particular customers and transactions. No transaction can proceed without generating a written record, thereby ensuring that each transaction is accounted for.

The patent specification specifies that the written record is to have different portions. For example, the written record includes a customer ticket or receipt, a management ticket copy, and a plurality of article tags. The article tags are to be attached to individual articles or groups of articles in

inventory. The management ticket and the article tags contain a bar code and a unique indicium such as a number associated with a customer, transaction, and other information. The bar code records are custom printed sequentially, as sequential customer transactions occur. **\*972** The tags thus not only associate a bar code with transactions, but also with an article or group of articles, persons, physical items in inventory, and other information again depending upon the system's complexity.

Optical detector devices are then used to read the bar code indicia, and they may be located at various points in the cleaning process, including at least at the customer service station. The articles are logged through a particular station by scanning the tags containing the bar codes with the detector. The bar codes are used to call up information associated with the customer or transaction, and used to generate reports containing information such as the location of articles within the system, the number of articles located at a particular point in the system, etc. Obviously, the more optical detectors, the tighter the inventory control. After the articles have been processed, optical detection of the bar codes can be used to reorganize the articles into customer packages. The overall result is that additions to and deletions from inventory can be located—wherever an optical detector appears—and can be associated with particular customers and articles of clothing. In this way the inventory can be fully reconciled.

In claim 1, the only independent claim involved in this appeal, Markman claims his invention to be (emphasis added):

> 1. The inventory control and reporting system, comprising:
>
> a data input device for manual operation by an attendant, the input device having switch means operable to encode information relating to sequential transactions, each of the transactions having articles associated therewith, said information including transaction identity and *descriptions of each of said articles* associated with the transactions;
>
> a data processor including memory operable to record said information and *means to maintain an inventory total,* said data processor having means to associate sequential transactions with unique sequential indicia and *to generate at least one report of said total* and said transactions, the unique sequential indicia and the descriptions of articles in the sequential transactions being reconcilable against one another;

> a dot matrix printer operable under control of the data processor to generate a written record of the indicia associated with sequential transactions, the written record including optically-detectable bar codes having a series of contrasting spaced bands, the bar codes being printed only in coincidence with each said transaction and at least part of the written record bearing a portion *to be attached to said articles;* and,
>
> at least one optical scanner connected to the data processor and operable to detect said bar codes *on all articles* passing a predetermined station,
>
> whereby said system can detect and *localize spurious additions to inventory* as well as spurious deletions therefrom.

In dependent claim 10, Markman specifies that in the invention of claim 1, the input device is an alpha-numeric keyboard wherein single keys may be used to enter attributes of items being entered.

B. Markman sued Westview and Althon for infringement of claims 1, 10, and 14 of the '054 patent. Westview makes and sells specialty electronic devices, including the system accused of being an infringement of the '054 patent. Althon owns and operates two dry-cleaning sites and uses Westview's device in one of its shops.

The accused Westview device consists of two separate pieces of equipment, which Westview calls the DATAMARK and the DATASCAN. The DATAMARK is a stationary unit comprising a keyboard, electronic display, processor, and printer. When a customer brings articles of clothing in for cleaning, an attendant enters on a keypad information about the customer, articles to be cleaned, and charges for the cleaning. The DATAMARK then prints a bar-coded ticket or invoice listing the information about the customer, the clothes to be cleaned, and the charges for the cleaning. The DATAMARK retains permanently in memory only the invoice number, date, and cash total. The DATAMARK is thus used to print bar-coded **\*973** tickets for the articles and to retain an invoice list.

The DATASCAN is a portable unit comprising a microprocessor and an optical detector for reading bar-coded tickets or invoices at any location in the dry-cleaning establishment. To use the DATASCAN, first the invoice list is transferred from the DATAMARK to the DATASCAN.

63 USLW 2663, 34 U.S.P.Q.2d 1321

Then, the DATASCAN is carried about to read the bar-codes on tickets or invoices in the establishment. As it does this, it can report any discrepancy between the particular invoice read (or not read) and the invoice list. In this way the DATASCAN identifies extra or missing *invoices.*

C. At a jury trial on the issue of infringement, Markman presented the testimony of four witnesses: (1) an expert on bar-code technology who testified about the manner in which Westview's device operates, (2) Markman, the inventor, who testified about his patent and its claims, (3) a "patent expert"—that is, a practicing patent lawyer—who testified in his capacity as a patent lawyer about the meaning of the claim language and how the claims allegedly read on the accused system, (4) an accountant who testified as to the number of allegedly infringing systems sold. Also included in evidence were the actual Westview device and its operating manuals, brochures, and computer program. At the conclusion of Markman's case in chief, Westview moved for a directed verdict. [2] The district court deferred ruling on the motion. Westview then presented the testimony of a single witness, its president, who demonstrated the operation of the Westview device and testified about its capabilities.

The district court charged the jury on infringement, instructing it to "determine the meaning of the claims ... using the relevant patent documents including the specifications, the drawings and the file histories." The court continued that "[a]lso relevant are other considerations that show how the terms of a claim would normally be understood by those of ordinary skill in the art." The court then instructed the jury to compare the claims with the Westview device to determine if it infringes. The jury returned answers to general interrogatories finding that Westview infringed independent claim 1 and dependent claim 10 but did not infringe independent claim 14. [3]

The district court then heard argument on and granted Westview's deferred motion for judgment as a matter of law (JMOL). Stating that claim construction was a matter of law for the court, the district court provided its construction of the claims. The court held that "inventory" as used in the claims meant "articles of clothing" and not simply transaction totals or dollars. Under the district court's construction, the claims require that the system be able to track articles of clothing through the dry-cleaning process, detect and localize missing and additional articles of clothing, and generate reports about the status and location of the articles of clothing. It is undisputed that Westview's system is incapable of doing

this because it does not retain information regarding the particular articles of clothing, but rather only a listing of the invoices and the cash total of the inventory. Among other things, the court concluded that Westview's device does not have the "means to maintain an inventory total" required by claim 1, and cannot "detect and localize spurious additions to inventory as well as spurious deletions therefrom," and directed a verdict of noninfringement of claims 1 and 10.

## II.

A. Markman appealed from the district court's grant of JMOL of noninfringement of claims 1 and 10. In this court, Markman's principal argument is that the district court erred in granting the JMOL, stating:

> Requiring the jury to interpret certain terms of the patent was quite proper, and indeed required, as the meaning of certain terms of Claim 1 was contested at trial. *See Polumbo v. Don–Joy Co.* [*sic.*], 762 F.2d 969, 974, 226 USPQ 5, 8 (Fed.Cir.1985) (when the meaning of a claim term is **\*974** disputed a "factual question arises, and construction of the claim should be left to the trier or jury under appropriate instruction.")

> ....

> Despite entrusting the jury with interpreting the claim, the trial court thwarted [Markman's] right to a jury determination of this factual issue simply because it disagreed with the jury's interpretation. At the root of the district court's astonishing opinion is its mistaken belief that it had a license to re-find the facts and reinterpret the claims as if there were no jury and no jury verdict because, in different appropriate cases, claims of a patent may be interpreted as a matter of law....

> ... Indeed the deference due to a jury's claim construction was stated positively by this court in *Tol–O–Matic* [*, Inc. v. Proma Produkt–Und Marketing Gesellschaft m.b.H.,* 945 F.2d 1546, 1550–52, 20 USPQ2d 1332, 1336–38 (Fed.Cir.1991).] ...

> ....

> ... While in appropriate circumstances, claims may be interpreted as a matter of law by the court, in this case the jury was asked to and did interpret the patent as part of reaching its finding of infringement. Once the jury was assigned this task and rendered its verdict, the trial court

was not permitted to discredit the verdict and substitute its evaluation of the evidence for the jury's.

In particular, Markman argues that the district court erroneously substituted its construction of the disputed claim term "inventory" for the jury's implied construction.

As the above quotation shows, Markman contends that the jury was properly given the question of claim construction and that the jury's claim construction and verdict thereon is supported by substantial evidence. The evidence Markman points to in support of the jury verdict is not the language of the patent specification or prosecution history, but rather Markman's own testimony as inventor and the testimony of his patent expert. He also relies on use of the word "inventory" in Westview's product literature and on the testimony of its president. Markman's position essentially is that all the evidence of the meaning of the word "inventory," from the patent, prosecution history, experts, and documents, was properly lumped together and submitted to the jury for it to resolve what in fact is the meaning of "inventory," and that the result of this process is entitled to highly deferential review both by the trial court on motion for JMOL and by this court on appeal from the grant or denial of JMOL.

Setting aside the issue of who properly determines the ultimate scope of the claims, Markman further argues that the district court misconstrued the term "inventory" to mean "articles of clothing" in addition to "cash" or "invoice totals" in order to find that claim 1 defines a system that "tracks" articles of clothing through the dry-cleaning process. Markman says that based on all the evidence presented at trial the term "inventory" as used in claim 1 means "articles of clothing" *or* "dollars" *or* "cash" *or* "invoices," and is not necessarily limited to a construction that always includes "articles of clothing."

Westview on the other hand focuses almost exclusively on the patent and prosecution history to inform the meaning of "inventory." It argues that the patent and prosecution history are in conflict with the testimony and other evidence relied on by Markman and therefore Markman's evidence should be disregarded by the court in favor of the meaning revealed by the patent. This task of assigning the meaning to "inventory," and the meaning assigned are, in the view of Westview, all legal matters for the court and subject to *de novo* review.

It is undisputed that when the claim term "inventory" is construed to mean "the physical articles of clothing" or to require "articles of clothing" as part of its meaning, the

Westview system lacks "means to maintain an inventory total" and does not and cannot "detect and localize spurious additions to inventory as well as spurious deletions therefrom," as claim 1 would thus require.[4]   ***975** Markman's appeal therefore turns on (1) whether the district court acted properly by construing the term "inventory" as a matter of law notwithstanding a contrary construction given the term by some of Markman's witnesses and by the jury, and (2) regardless of whether the court or the jury determines the scope of the claims, whether the term "inventory" requires as part of its meaning "articles of clothing."

**[2]**   B. Where a party moves for JMOL in a case that has been tried to a jury, the district court

> must determine whether there exists evidence of record upon which a jury might properly have returned a verdict in [the non-movant's] favor when *the correct legal standard is applied.* If there is not, [the movant] was entitled to have the question removed from the jury and decided as a matter of law.

*Jamesbury Corp. v. Litton Indus. Prods., Inc.,* 756 F.2d 1556, 1560, 225 USPQ 253, 257 (Fed.Cir.1985) (emphasis added). On appeal, we review *de novo* the correctness of the district court's grant of JMOL by reapplying the JMOL standard. *Id; see Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 762, 9 USPQ2d 1417, 1421 (Fed.Cir.1988).

**[3]**   Embedded within the above description of JMOL are two aspects. Factual findings made by the jury in arriving at its verdict are to be upheld unless the party moving for JMOL shows that (when the correct legal standard is applied) there is not substantial evidence to support a finding in favor of the nonmovant. *See Read Corp. v. Portec, Inc.,* 970 F.2d 816, 821, 23 USPQ2d 1426, 1431 (Fed.Cir.1992).

**[4]**   **[5]**   **[6]**   **[7]**   While the jury's factual findings receive substantial deference on motion for JMOL, the legal standards that the jury applies, expressly or implicitly, in reaching its verdict are considered by the district court and by the appellate court *de novo* to determine whether those standards are correct as a matter of law. *Baltimore & Carolina Line, Inc. v. Redman,* 295 U.S. 654, 660, 55 S.Ct. 890, 893, 79 L.Ed. 1636 (1935) ("[A] federal court may take a verdict subject to the opinion of the court on a question of law...."); *Read Corp.,* 970 F.2d at 821, 23 USPQ2d at 1431; *see Elder v. Holloway,* 510 U.S. 510, ——, 114 S.Ct.

1019, 1023, 127 L.Ed.2d 344 (1994) ( "[Q]uestion [s] of law ... must be resolved *de novo* on appeal."); *Bradley v. Secretary of Health and Human Servs.,* 991 F.2d 1570, 1574 n. 3 (Fed.Cir.1993) ("Legal conclusions are, of course, always reviewed *de novo.* "); *Heisig v. United States,* 719 F.2d 1153, 1158 (Fed.Cir.1983); *see also Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984) ("[A]n appellate court[ ] [has] power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law."). Notwithstanding the jury's verdict, on review of a motion for JMOL the court retains the power and duty to say what the correct law is, and then to examine the factual issues submitted to the jury and determine whether findings thereon are supported by substantial evidence and support the verdict under the law. *Read Corp.,* 970 F.2d at 821, 23 USPQ2d at 1431; *Senmed, Inc. v. Richard–Allan Medical Indus., Inc.,* 888 F.2d 815, 818, 12 USPQ2d 1508, 1511 (Fed.Cir.1989); *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1550, 220 USPQ 193, 200 (Fed.Cir.1983). [5]

**\*976** Since matters of law must be reviewed *de novo* and matters of fact must be accorded substantial deference, the review of a grant of JMOL requires careful distinction between fact and law. In this case which involves claim construction and a grant of JMOL of noninfringement based on claim construction, in order to determine whether that grant was correct, we must distinguish law from fact.

[8]    [9]    C. An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. *Read Corp.,* 970 F.2d at 821, 23 USPQ2d at 1431. The second step is comparing the properly construed claims to the device accused of infringing. *Id.* It is the first step, commonly known as claim construction or interpretation, [6] that is at issue in this appeal.

### III.

A. The opinions of this court have contained some inconsistent statements as to whether and to what extent claim construction is a legal or factual issue, or a mixed issue. Markman cites some of our cases which have statements that claim construction may be a factual or mixed issue, including *Tol–O–Matic, Inc. v. Proma Produkt–Und Mktg. Gesellschaft m.b.H.,* 945 F.2d 1546, 1550–52, 20 USPQ2d 1332, 1336–38

(Fed.Cir.1991), and *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 974, 226 USPQ 5, 8 (Fed.Cir.1985).

At its inception, the Federal Circuit held that claim construction was a matter of law. Our first opinion deciding a question of claim construction, *SSIH Equip. S.A. v. United States Int'l Trade Comm'n,* 718 F.2d 365, 376, 218 USPQ 678, 688 (Fed.Cir.1983) (originally reported at 713 F.2d 746–60), said so explicitly, resting on the authority of *Winans v. Denmead,* 56 U.S. (15 How.) 330, 14 L.Ed. 717 (1853). Cases following *SSIH* include *Kalman v. Kimberly–Clark Corp.,* 713 F.2d 760, 770–71, 218 USPQ 781, 788 (Fed.Cir.1983), *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569–71, 219 USPQ 1137, 1140–42 (Fed.Cir.1983), and *SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1118–22, 1138–40, 227 USPQ 577, 583–86, 596–97 (Fed.Cir.1985) (in banc).

The first Federal Circuit case to deviate from this precedent and state that claim construction may have underlying factual inquiries that must be submitted to a jury was *McGill Inc. v. John Zink Co.,* 736 F.2d 666, 221 USPQ 944 (Fed.Cir.1984). In *McGill,* the court stated that

> [i]f ... the meaning of a term of art in the claims is disputed and extrinsic evidence is needed to explain the meaning, construction of the claims could be left to a jury. *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753 [221 USPQ 473] (Fed.Cir.1984); *cf. Hong Kong Export Credit Insurance Corp. v. Dun & Bradstreet,* 414 F.Supp. 153, 157 (S.D.N.Y.1975). In the latter instance, the jury cannot be directed to the disputed meaning for the term of art. *Cf. Butler v. Local Union 823, International Brotherhood of Teamsters,* 514 F.2d 442, 452 (8th Cir.), *cert. denied,* 423 U.S. 924, 96 S.Ct. 265, 46 L.Ed.2d 249 (1975).

*Id.* at 672, 221 USPQ at 948. A review of the authority relied on for this statement of law, however, is revealing. In contradistinction to the proposition for which it is cited, *Envirotech* in fact states "[t]he patented invention as indicated by the language of the claims must first be defined (*a question of law* ), and then the trier must judge whether the claims cover the accused device (a question of fact)." *Id.* at 758, 221 USPQ at 477 (emphasis added). Thus *Envirotech* is entirely

consistent with the earlier precedent.[7] The other **\*977** two cases relied upon, the district court opinion in *Hong Kong Export Credit* and the Eighth Circuit opinion in *Butler,* are contract cases. Thus this court's earliest pronouncement of jury triable fact issues in claim construction cites no authoritative support.

Cases following the *McGill* view of claim construction provide no firmer basis for the view. Nevertheless, a significant line of cases has developed in our precedent stating (although rarely holding) that there may be jury triable fact issues in claim construction, relying on *McGill* (and its erroneous interpretation of *Envirotech* ) and its progeny. *See Bio–Rad Labs, Inc. v. Nicolet Instrument Corp.,* 739 F.2d 604, 614, 222 USPQ 654, 661 (Fed.Cir.1984) (relying on *Envirotech* ); *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 974, 226 USPQ 5, 8 (Fed.Cir.1985) (no authority cited);[8] *Moeller v. Ionetics, Inc.,* 794 F.2d 653, 657, 229 USPQ 992, 995 (Fed.Cir.1986) (citing *Palumbo* ); *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 389, 2 USPQ2d 1926, 1929 (Fed.Cir.1987) (citing *Moeller* and *Palumbo* ); *Perini America, Inc. v. Paper Converting Machine Co.,* 832 F.2d 581, 584, 4 USPQ2d 1621, 1624 (Fed.Cir.1987) (citing *Palumbo* and *McGill* ). The language from these opinions, to the effect that disputes over the meaning of claim language may raise factual questions reviewed for substantial evidence or clear error, as the case may be, continued to propagate through our precedent. This line of cases culminated in *Tol–O–Matic, Inc. v. Proma Produkt–Und Mktg. Gesellschaft m.b.H.,* 945 F.2d 1546, 20 USPQ2d 1332 (Fed.Cir.1991), in which this court affirmed a denial of a motion for judgment n.o.v., reasoning that

> [i]nterpretation of the claim words [at issue] required that the jury give consideration and weight to several underlying factual questions, including in this case the description of the claimed element in the specification, the intended meaning and usage of the claim terms by the patentee, what transpired during the prosecution of the patent application, and the technological evidence offered by the expert witnesses.
>
> *Id.* at 1550, 20 USPQ2d at 1336.

On the other hand, a second line of Federal Circuit opinions has continued to follow the earlier pronouncements that claim construction is strictly a question of law for the court. *See Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 986, 6 USPQ2d 1601, 1604 (Fed.Cir.1988); *Senmed,* 888 F.2d at 818–20, 12 USPQ2d at 1511–13; *Unique Concepts,*

*Inc. v. Brown,* 939 F.2d 1558, 1561–63, 19 USPQ2d 1500, 1503–04 (Fed.Cir.1991); *Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1387–88, 21 USPQ2d 1383, 1386–87 (Fed.Cir.1992); *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 822–23, 23 USPQ2d 1426, 1432–33 (Fed.Cir.1992).

B. Notwithstanding the apparent inconsistencies in our opinions, the Supreme Court has repeatedly held that the construction of a patent claim is a matter of law exclusively for the court. *Hogg v. Emerson,* 47 U.S. (6 How.) 437, 484, 12 L.Ed. 505 (1848); *Silsby v. Foote,* 55 U.S. (14 How.) 218, 225, 14 L.Ed. 391 (1853); *Winans v. Denmead,* 56 U.S. (15 How.) at 338; *Winans v. New York & Erie R.R. Co.,* 62 U.S. (21 How.) 88, 100, 16 L.Ed. 68 (1859); *Bischoff v. Wethered,* 76 U.S. (9 Wall.) 812, 816, 19 L.Ed. 829 (1870); *Heald v. Rice,* 104 U.S. 737, 749, 26 L.Ed. 910 (1882); *Coupe v. Royer,* 155 U.S. 565, 579–80, 15 S.Ct. 199, 205, 39 L.Ed. 263 (1895); *Market St. Cable Ry. Co. v. Rowley,* 155 U.S. 621, 625, 15 S.Ct. 224, 226, 39 L.Ed. 284 (1895); *Singer Mfg. Co. v. Cramer,* 192 U.S. 265, 275, 24 S.Ct. 291, 295, 48 L.Ed. 437 (1904); *see also* 2 William C. Robinson, *The Law of Patents for Useful Inventions* § 731, at 481 (1890) (hereinafter Robinson on Patents); George T. Curtis, *A Treatise on the Law of Patents for Useful Inventions* § 222, at 251 (4th ed. 1873) (hereinafter *Curtis on Patents* **\*978** ).[9] Time and again the Supreme Court has itself resolved disputes over the construction of claims as a matter of law. *See, e.g., Coupe v. Royer,* 155 U.S. at 574–75, 579, 15 S.Ct. at 203, 205 (stating that court defines the scope of the claims and reversing the trial judge's erroneous claim construction); *Keystone Bridge Co. v. Phoenix Iron Co.,* 95 U.S. 274, 275, 24 L.Ed. 344 (1877) (resolving claim construction contentions on the basis of an exhaustive review of the patent and its discussion of the relevant art).

The reason that the courts construe patent claims as a matter of law and should not give such task to the jury as a factual matter is straightforward: It has long been and continues to be a fundamental principle of American law that "the construction of a written evidence is exclusively with the court." *Levy v. Gadsby,* 7 U.S. (3 Cranch) 180, 186, 2 L.Ed. 404 (1805) (Marshall, C.J.); *Eddy v. Prudence Bonds Corp.,* 165 F.2d 157, 163 (2d Cir.1947) (Learned Hand, J.) ("[A]ppellate courts have untrammelled power to interpret written documents."); 4 Samuel Williston, *Williston on Contracts* § 601, at 303 (3d ed. 1961) (hereinafter *Williston on Contracts* ) ("Upon countless occasions, the courts have declared it to be the responsibility of the judge to interpret

Markman v. Westview Instruments, Inc., 52 F.3d 967 (1995)

63 USLW 2663, 34 U.S.P.Q.2d 1321

and construe written instruments, whatever their nature.") (footnotes omitted).

The patent is a fully integrated written instrument. By statute, the patent must provide a written description of the invention that will enable one of ordinary skill in the art to make and use it. 35 U.S.C. § 112, para. 1. Section 112, para. 2, also requires the applicant for a patent to conclude the specification with claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." It follows, therefore, from the general rule applicable to written instruments that a patent is uniquely suited for having its meaning and scope determined entirely by a court as a matter of law. *Bates v. Coe,* 98 U.S. at 38 ("[T]he claims of the patent, like other provisions in writing, must be reasonably construed...."); *Merrill v. Yeomans,* 94 U.S. 568, 571, 24 L.Ed. 235 (1877) (construing the patent in part by applying "well-settled rules of construing all instruments"); *accord Doble Eng'g Co. v. Leeds & Northrup Co.,* 134 F.2d 78, 83, 56 USPQ 426, 432 (1st Cir.1943) ("It appears to be firmly established that ... a patent is subject to the same general rules of construction as any other written instrument."); 2 *Robinson on Patents, supra,* § 732, at 481–82; 1 Anthony W. Deller, *Patent Claims* § 21 (2d ed. 1971).

There is much wisdom to the rule that the construction of a patent should be a legal matter for a court. A patent is a government grant of rights to the patentee. 35 U.S.C. § 154. By this grant, the patentee owns the rights for a limited time to exclude others from making, using, or selling the invention as claimed. *Id.; see Bloomer v. McQuewan,* 55 U.S. (14 How.) 539, 548, 14 L.Ed. 532 (1852). Infringement of the patentee's right to exclude carries with it the potential for serious consequences: The infringer may be enjoined and required to pay increased damages, costs and attorney fees. *See* 35 U.S.C. §§ 283–285. When a court construes the claims of the patent, it "is as if the construction fixed by the court had been incorporated in the specification," *Curtis on Patents, supra,* § 452, at 609, and in this way the court is defining the federal legal rights created by the patent document.

Further, it is only fair (and statutorily required) that competitors be able to ascertain to a reasonable degree the scope of the patentee's right to exclude. *Merrill v. Yeomans,* 94 U.S. at 573–74 ("It seems to us that nothing can be more just and fair, both to the patentee and to the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent."); *Hogg v. Emerson,* 47 U.S. (6 How.) at 484. They may

understand what is the scope of the patent **\*979** owner's rights by obtaining the patent and prosecution history—"the undisputed public record," *Senmed,* 888 F.2d at 819 n. 8, 12 USPQ2d at 1512 n. 8—and applying established rules of construction to the language of the patent claim in the context of the patent. Moreover, competitors should be able to rest assured, if infringement litigation occurs, that a judge, trained in the law, will similarly analyze the text of the patent and its associated public record and apply the established rules of construction, and in that way arrive at the true and consistent scope of the patent owner's rights to be given legal effect.

Arriving at a true and consistent scope of the claims also works to the benefit of the patentee, as Professor Robinson eloquently observed:

> To treat the nature of the patented invention as a matter of fact, to be inquired of and determined by a jury, would at once deprive the inventor of the opportunity to obtain a permanent and universal definition of his rights under the patent, and in each case of infringement it would subject him to the danger of false interpretation, from the consequences of which he could not escape. By confiding this duty to the court, however, its decision as to the nature of the patented invention becomes reviewable to the same extent as any other legal question, and when his patent has received the interpretation of the Supreme Court of the United States the inventor can maintain his privilege, as thus interpreted, against all opponents without further controversy in reference to its true limitations.

2 *Robinson on Patents, supra,* § 733, at 483–84.

 **[10]**    We therefore settle inconsistencies in our precedent and hold that in a case tried to a jury, the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim. As such, "[a] patent covers the invention or inventions which the court, in construing its provisions, decides that it describes and claims." 3 *Robinson on Patents, supra,* § 1019, at 247. Because claim construction is a matter of law, the

construction given the claims is reviewed *de novo* on appeal. Accordingly, Markman's principal argument that the district court erred in taking the issue of claim construction away from the jury is itself legally erroneous.

## IV.

A. Markman argues that the jury's implied construction of the claims is correct and that the district court's construction of the claims is wrong, thereby necessitating that this court reinstate the jury's verdict. Markman contends that the jury properly considered all the evidence of record on the disputed claim term "inventory" in reaching its implicit conclusion that the term does not require articles of clothing. We find that these arguments are not convincing and we reach a conclusion that is in accord with the district court's construction of the claims.

"To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history." *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1561 (Fed.Cir.1991); *accord Autogiro Co. of Am. v. United States,* 384 F.2d 391, 396–98, 181 Ct.Cl. 55, 155 USPQ 697, 701–03 (1967). "Expert testimony, including evidence of how those skilled in the art would interpret the claims, may also be used." *Fonar Corp. v. Johnson & Johnson,* 821 F.2d 627, 631 (Fed.Cir.1987). In construing the claims in this case, all these sources, as well as extrinsic evidence in the form of Westview's sales literature, were included in the record of the trial court proceedings.

**[11]** **[12]** Claims must be read in view of the specification, of which they are a part. *Autogiro,* 384 F.2d at 397, 155 USPQ at 702; *see Winans v. Denmead,* 56 U.S. (15 How.) at 338; *Bates v. Coe,* 98 U.S. at 38–39. The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *See In re Vogel,* 422 F.2d 438, 441, 164 USPQ 619, 621 (CCPA 1970) ("Occasionally the disclosure will serve as a dictionary for terms appearing **\*980** in the claims, and in such instances the disclosure may be used in interpreting the coverage of the claim."). As we have often stated, a patentee is free to be his own lexicographer. *Autogiro,* 384 F.2d at 397, 155 USPQ at 702. The caveat is that any special definition given to a word must be clearly defined in the specification. *Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1388, 21 USPQ2d

1383, 1386 (Fed.Cir.1992). The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims.

**[13]** **[14]** **[15]** To construe claim language, the court should also consider the patent's prosecution history, if it is in evidence. *Graham v. John Deere Co.,* 383 U.S. 1, 33, 86 S.Ct. 684, 701, 15 L.Ed.2d 545, 148 USPQ 459, 473 (1966). This "undisputed public record" of proceedings in the Patent and Trademark Office is of primary significance in understanding the claims. *See Autogiro,* 384 F.2d at 397, 155 USPQ at 702 (the "file wrapper" is "part [ ] of the patent"). The court has broad power to look as a matter of law to the prosecution history of the patent in order to ascertain the true meaning of language used in the patent claims:

> Th[e] construction of the patent is confirmed by the avowed understanding of the patentee, expressed by him, or on his half [sic], when his application for the original patent was pending.... [W]hen a patent bears on its face a particular construction, inasmuch as the specification and claim are in the words of the patentee, ... such a construction may be confirmed by what the patentee said when he was making his application.

*Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 227, 26 L.Ed. 149 (1880); *see Singer Mfg. Co.,* 192 U.S. at 278–85, 24 S.Ct. at 296–99 (construing the claims in light of the prosecution history as a matter of law). [10] Although the prosecution history can and should be used to understand the language used in the claims, it too cannot "enlarge, diminish, or vary" the limitations in the claims. *Goodyear Dental Vulcanite Co.,* 102 U.S. at 227; *Intervet Am., Inc. v. Kee–Vet Labs., Inc.,* 887 F.2d 1050, 1054, 12 USPQ2d 1474, 1477 (Fed.Cir.1989).

**[16]** Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises. This evidence may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history. Extrinsic evidence may demonstrate the state of the prior art at the time of the invention. It is useful "to show what was then old, to distinguish what was new, and to aid the court in the

63 USLW 2663, 34 U.S.P.Q.2d 1321

construction of the patent." *Brown v. Piper,* 91 U.S. 37, 41, 23 L.Ed. 200 (1875).

**[17]** The court may, in its discretion, receive extrinsic evidence in order "to aid the court in coming to a correct conclusion" as to the "true meaning of the language employed" in the patent. *Seymour v. Osborne,* 78 U.S. (11 Wall.) 516, 546, 20 L.Ed. 33 (1871) (reviewing a decree in equity); *see United Carbon Co. v. Binney & Smith Co.,* 317 U.S. 228, 233, 63 S.Ct. 165, 168, 87 L.Ed. 232, 55 USPQ 381, 384 (1942) (the court construed the claim by relying in part on the testimony of one of the patentees as the "clearest exposition of the significance which the terms employed in the claims had for those skilled in the art"); **\*981** *U.S. Indus. Chems., Inc. v. Carbide & Carbon Chems. Corp.,* 315 U.S. 668, 678, 62 S.Ct. 839, 844, 86 L.Ed. 1105, 53 USPQ 6, 10 (1942) ("[I]t is permissible, and often necessary, to receive expert evidence to ascertain the meaning of a technical or scientific term or term of art so that the court may be aided in understanding ... what [the instruments] actually say."); *Winans v. New York & Erie R.R. Co.,* 62 U.S. (21 How.) at 101 ("[P]rofessors or mechanics cannot be received to prove to the court or jury what is the proper or legal construction of any instrument of writing. A judge may obtain information from them, if he desire it, on matters which he does not clearly comprehend, but cannot be compelled to receive their opinions as matter of evidence."); *Marsh v. Quick–Meal Stove Co.,* 51 F. 203 (C.C.D.Mo.1892) ("It is the province of the court to construe the claims of the patent that has been offered in evidence. That construction, of course, is to be made in the light of such expert testimony as has been offered."); 3 *Robinson on Patents, supra,* §§ 1012–15, 1019–20; *accord Seattle Box Co. v. Industrial Crating & Packing, Inc.,* 731 F.2d 818, 826, 221 USPQ 568, 573 (Fed.Cir.1984) ("A trial judge has sole discretion to decide whether or not he needs, or even just desires, an expert's assistance to understand a patent. We will not disturb that discretionary decision except in the clearest case."); *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.,* 887 F.2d 1070, 1076, 12 USPQ2d 1539, 1544 (Fed.Cir.1989) (Newman, J., dissenting) ("The purpose of expert testimony is to provide *assistance to the court* in understanding, when the claims are technologically complex or linguistically obscure, how a technician in the field, reading the patent, would understand the claims.") (emphasis added).

**[18]** **[19]** Extrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims. *U.S. Indus. Chems.,*

*Inc.,* 315 U.S. at 678, 62 S.Ct. at 844, 53 USPQ at 10; *Catalin Corp. of Am. v. Catalazuli Mfg. Co.,* 79 F.2d 593, 594, 27 USPQ 371, 373 (2d Cir.1935) (Learned Hand, J.) ("If the doctrine of the 'integration' of a written instrument has any basis at all, surely it should apply to such a document ... [as the patent]."); 3 *Robinson on Patents, supra,* § 1019, at 247–48. When, after considering the extrinsic evidence, the court finally arrives at an understanding of the language as used in the patent and prosecution history, the court must then pronounce as a matter of law the true meaning of that language. *See Loom Co. v. Higgins,* 105 U.S. 580, 586, 26 L.Ed. 1177 (1881). This ordinarily can be accomplished by the court in framing its charge to the jury, but may also be done in the context of dispositive motions such as those seeking judgment as a matter of law.

Through this process of construing claims by, among other things, using certain extrinsic evidence that the court finds helpful and rejecting other evidence as unhelpful, and resolving disputes *en route* to pronouncing the meaning of claim language as a matter of law based on the patent documents themselves, the court is *not* crediting certain evidence over other evidence or making factual evidentiary findings. Rather, the court is looking to the extrinsic evidence to assist in its construction of the written document, a task it is required to perform.[11] The district court's claim construction, enlightened by such extrinsic evidence as may be helpful, is still based upon the patent and prosecution history. It is therefore still construction, and is a matter of law subject to *de novo* review.

**[20]** **[21]** B. Applying this analysis of claim construction, we conclude that (1) the trial court did not abuse its discretion when it admitted the extrinsic evidence offered by Markman —Markman's testimony and the testimony of Markman's "patent expert"—on the issue of claim construction, and that (2) the trial court properly rejected this extrinsic evidence to the extent it contradicted the court's construction of the claims based on the specification and prosecution history. Although in this case the trial court might have granted Westview's motion for directed verdict and should have instructed the jury **\*982** as to the meaning of the claims (including the disputed term "inventory"), its failure to do so was rendered harmless by the court's subsequent response to Westview's post-trial motion.

**[22]** We agree with the trial court that the term "inventory" refers, at least in part, to articles of clothing, contrary to Markman's contention that "inventory" may be limited to

Markman v. Westview Instruments, Inc., 52 F.3d 967 (1995)

63 USLW 2663, 34 U.S.P.Q.2d 1321

just cash or inventory receipts. As the district court noted, the claim phrase "detect and localize spurious additions to inventory as well as spurious deletions therefrom" does not make sense using Markman's definition of "inventory." Dollars or invoice totals are not "localized" since dollars do not travel through the cleaning process and the location of invoices is irrelevant. Location is relevant to clothing, since it moves through and sometimes without the establishment, where it can be lost, stolen, or damaged. Also, "spurious" additions and deletions logically relate to clothing because "dollars" would not be spuriously added to a dry-cleaner's inventory. Thus, the language of the claim itself suggests the conclusion that the dry-cleaner's "inventory" includes clothing.

The patent specification confirms this. The specification is pervasive in using the term "inventory" to consist of "articles of clothing." Rather than set forth each instance, we refer the reader to a few examples:

> This invention relates to inventory control devices capable of monitoring and reporting upon the status, location and throughput of inventory in an establishment. [Col. 1, lines 12–17.]

> The best inventory control and management reporting information systems has [sic] the ability to determine and report the current location of any given article [ 12 ] in inventory. [Col. 5, lines 14–17.]

> Every transaction is recorded, including identification of the articles placed in inventory. [Col. 5, lines 8–10.]

> [I]ncoming articles to be placed in inventory are accumulated over a counter.... [Col. 6, lines 7–8.]

> [A]rticles to be cleaned are associated with a unique bar code indicia for later automatic or semiautomatic optical scanning and data input, whereby the progress of articles through the laundry and drycleaning systems can be completely monitored. [Col. 2, lines 53–57.]

The prosecution history is also in accord. During prosecution of the original patent application in this case, Markman amended claim 1 in order to overcome an obviousness rejection by adding limitations reciting among other things "whereby said system can detect and localize spurious additions to inventory as well as spurious deletions therefrom." Markman argued in his remarks to the examiner that

> unlike the usual system in which apparatus generates non-unique indicia (e.g., Stewart's price indicia) and/or indicia that is [sic] not produced concurrently with the commencement of a transaction (e.g., pre-printed tags), applicant's system is operable to keep a running reconcilable inventory total by adding input articles and subtracting output articles, *and also* protects against the possibility of undocumented or spuriously-documented articles entering the system. [Emphasis in original.]

Markman also referred the examiner to "features present" in claim 1, explaining:

> Means are also provided for reconciling the very same unique and concurrently-generated indicia at later points during processing whereby the entry or exit of inventory articles in irregular ways can be localized.

Also, the prosecution history of the patent on reissue conflicts with Markman's argument now that claim 1 does not require "tracking" of articles of clothing. In order to obtain other claims in the reissue patent broader than claim 1, which was carried through to the reissue patent, Markman explained the scope of the original claims thusly:

1. *Tracking of Individual Articles*

It may be argued that the claims are limited to a system that tracks individual articles such as individual pieces of clothing brought by a single consumer to a **\*983** drycleaning establishment or the like. I believe that tracking of a transaction whether it involves one article or several is properly disclosed and allowable. The claim language recites entry of "descriptions of each of said articles associated with the transactions". This passage is more limited than I had a right to claim because, although individual articles, e.g. a pair of pants, could be accounted for by individual marking, scanning and reconciliation in reports, the grouping of such articles into sets for tracking (e.g., a suit comprising pants under jacket and/or a suit and a Dress or other spearable [sic] articles grouped together) is

63 USLW 2663, 34 U.S.P.Q.2d 1321

reasonably disclosed as forming part of the invention and is allowable over the prior art.

It is evident from Markman's explanation of the claims to the examiner that he used "inventory" in the patent and the examiner understood "inventory" to consist of "articles of clothing." The prosecution history thus confirms the meaning of "inventory" as including "articles of clothing."

Markman argues that the extrinsic evidence of record provides substantial evidence in support of the jury's and his claim construction. Markman testified as an inventor of the patent in suit and as one of ordinary skill in the art (or, perhaps more accurately, one of "extraordinary" skill in the art) that "inventory" did not need to include articles of clothing. Markman's "patent expert" testified likewise, when giving his opinion on the proper construction of the claims. Finally, Markman argues that the testimony of Westview's president and some of its sales literature also support such claim construction. We do not find Markman's arguments persuasive.

[23]    First, the testimony of Markman and his patent attorney on the proper construction of the claims is entitled to no deference. For example, they both testified as to how the patent should be construed based on the text of the patent. This testimony about construction, however, amounts to no more than legal opinion—it is precisely the process of construction that the court must undertake. Thus, as to these types of opinions, the court has complete discretion to adopt the expert legal opinion as its own, to find guidance from it, or to ignore it entirely, or even to exclude it. *See Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 797, 17 USPQ2d 1097, 1100 (Fed.Cir.1990). When legal "experts" offer their conflicting views of how the patent should be construed, or where the legal expert's view of how the patent should be construed conflicts with the patent document itself, such conflict does not create a question of fact nor can the expert opinion bind the court or relieve the court of its obligation to construe the claims according to the tenor of the patent. This opinion testimony also does not change or affect the *de novo* appellate review standard for ascertaining the meaning of the claim language. Thus, to the extent they were testifying about construction itself, we reject Markman's and Markman's patent expert's testimony as having any controlling effect on what the court below and we perceive to be the meaning of "inventory" as used in the patent and prosecution history.

[24]    Second, the extrinsic evidence of record cannot be relied on to change the meaning of the claims. In this case, as fully discussed above, the patent and prosecution history make clear that "inventory" in claim 1 includes in its meaning "articles of clothing." The district court exercised its discretion in finding unhelpful Markman's testimony that he meant "inventory," or that one of ordinary skill in the art would understand "inventory," to mean something to the contrary, and furthermore the district court rejected the testimony as conflicting with the meaning derived from the patent and prosecution history. In our construction of the claim term "inventory," we too find unhelpful and reject Markman's testimony. Similarly, even if they in fact used "inventory" to mean other than articles of clothing, Westview's sales literature and the testimony of its president do not dissuade us from our legal construction of the claim, based on the patent and prosecution history, that the claim term "inventory" means articles of clothing.

## V.

[25]    A. This decision that claim construction is properly viewed solely as a question **\*984** of law is consistent with precedent of the Supreme Court and much of this court's precedent. Yet the dissenting and one of the concurring opinions assert that our decision violates the Seventh Amendment. A close analysis of the bases underlying their arguments reveals, however, that they are unsupported by logic and precedent.

The Seventh Amendment provides "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII. Thus, if an action could be tried to a jury in 1791, the right to a jury trial is preserved. The Seventh Amendment has also been judicially interpreted as extending the right to jury trial to statutory causes of action analogous to common law actions. *Tull v. United States,* 481 U.S. 412, 417, 107 S.Ct. 1831, 1835, 95 L.Ed.2d 365 (1987).

The dissenting and one of the concurring opinions express in somewhat different ways why they believe our holding deprives plaintiffs of the constitutional right to a jury trial in patent infringement cases. The dissenting opinion argues there are jury triable factual inquiries involved in determining the scope of a claim and this determination is part of and often dispositive of patent infringement questions. One concurring opinion, which apparently acknowledges that

63 USLW 2663, 34 U.S.P.Q.2d 1321

sometimes claim construction is a legal question for the court, nonetheless finds a majority effort to indirectly create a "complexity exception" to the right to jury trial in patent infringement cases that will allow a three judge panel of this court to "do pretty much what it wants under its de novo retrial."

These arguments do not ring true. In this opinion we do not deprive parties of their right to a jury trial in patent infringement cases. Our opinion merely holds that part of the infringement inquiry, construing and determining the scope of the claims in a patent, is strictly a legal question for the court. [13] The patentee's right to a jury trial on the application of the properly construed claim to the accused device is preserved as it was in 1791.

Any constitutional concerns raised by this opinion must be limited to the issue of claim construction. It is significant that neither the dissenting nor the concurring opinions cite any cases supporting the proposition that claim construction was a question of fact or involved triable issues of fact to a jury in or prior to 1791. None of the briefs of the parties or amici cite such a case, nor have we found any. The search for such a case may well be a fruitless one because of the manifest differences in patent law in eighteenth century England and patent law as it exists today in Title 35 of the United States Code. *See Hogg,* 47 U.S. (6 How.) at 479–83 (citing the significant differences between English law and United States law and cautioning against reliance on the former when applying the latter); Emerson Stringham, *Outline of Patent Law* § 5000, at 266–67 (1937) ("The patent claim, *first developed in the United States,* is now largely relied upon as defining the scope of protections....") (emphasis added). *See generally,* P.J. Federico, *Origin and Early History of Patents,* 11 J.Pat.Off.Soc'y 292 (1929).

[26] B. The dissenting and one of the concurring opinions attempt to make the case that construing claims is analogous to construing and interpreting contracts, deeds, and wills. Traditionally courts have treated the construction of these documents as being a legal question for the court, but have stated that under certain circumstances the interpretation of an agreement may raise jury triable questions. Thus, by analogy, the argument is made that although claim construction may indeed be a question of law for the court, it also involves (or, in the argument of the concurrence, may involve) triable issues of fact.

The analogy of a patent to a contract may appear to some extent to be an appropriate **\*985** way of describing the circumstances surrounding the issuance of a patent. [14] The inventor is required to make full disclosure of his invention to the Patent and Trademark Office (PTO) and to the public in his patent specification, which he is otherwise not obligated to do. In return, the law allows the government to confer a property right to exclude anyone else from making, using, or selling the invention covered by the claims for seventeen years, which it is otherwise not obligated to do.

The analogy of a patent to a contract is not useful, however, in the context of a patent infringement suit. Patents are not contracts per se and patent infringement actions have never been viewed as breach of contract actions. Patent infringement has often been described as a tort. In a patent infringement suit, the inventor sues a competitor for infringing upon his right to exclude. The competitor is never a party to the so-called "contract" between the government and the inventor. *See Keystone,* 95 U.S. at 279 ("As patents are procured *ex parte,* the public is not bound by them, but the patentees are."). Nor does the competitor ever breach this contract between the government and the inventor by making, using, or selling the accused devices.

Questions of fact may arise in construing contracts, deeds, or wills in two contexts. First, the document may not reflect the agreement between, or the intent of, the two parties. Thus, unless the document is fully integrated and the parol evidence rule (or its equivalent in the other areas of law) applies, extrinsic evidence may be offered to demonstrate different or additional terms. There is no parol evidence rule in patent law for obvious reasons. It is axiomatic that the invention protected by the patent must be covered by the claims, otherwise it is lost. *Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871 (1917). Parol or other extrinsic evidence cannot add, subtract, or vary the limitations of the claims.

A question of fact may also arise in construing contracts, deeds, or wills when there is an ambiguous term. In this situation, the parol evidence rule does not apply and extrinsic evidence may be offered to demonstrate what the parties intended when they used the term. Thus the factual inquiry for the jury in these cases focuses on the subjective intent of the parties when they entered into the agreement.

No inquiry as to the subjective intent of the applicant or PTO is appropriate or even possible in the context of

Markman v. Westview Instruments, Inc., 52 F.3d 967 (1995)

63 USLW 2663, 34 U.S.P.Q.2d 1321

a patent infringement suit. The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history). *See Senmed,* 888 F.2d at 817 n. 8, 12 USPQ2d at 1512 n. 8. In fact, commonly the claims are drafted by the inventor's patent solicitor and they may even be drafted by the patent examiner in an examiner's amendment (subject to the approval of the inventor's solicitor). *See* Manual of Patent Examining Procedure (MPEP) § 1302.04 (Rev. 15, Aug. 1993) ("Examiner's Amendments and Changes"). While presumably the inventor has approved any changes to the claim scope that have occurred via amendment during the prosecution process, it is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is after allowance by the PTO. *See generally Senmed,* 888 F.2d at 819 n. 8, 12 USPQ2d at 1521 n. 8. Of course the views of the other party to the "patent contract," the government, are generally not **\*986** obtainable, except as reflected in the prosecution history. *See Western Elec. Co. v. Piezo Tech., Inc.,* 860 F.2d 428, 432–33, 8 USPQ2d 1853, 1856–57 (Fed.Cir.1988); MPEP § 1701.01 ("Office personnel not to testify").

Thus the focus in construing disputed terms in claim language is not the subjective intent of the parties to the patent contract when they used a particular term. Rather the focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean.

Moreover, ideally there should be no "ambiguity" in claim language to one of ordinary skill in the art that would require resort to evidence outside the specification and prosecution history. Section 112 of Title 35 requires that specifications "contain a written description of the invention, and of the manner and process of making and using it, in such *full, clear, concise, and exact* terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same ..." and requires that the specification "shall conclude with one or more claims *particularly pointing out and distinctly claiming* the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 (emphasis added). This statutory language has as its purpose the avoidance of the kind of ambiguity that allows introduction of extrinsic evidence in the contract law analogy. *See, e.g., Keystone,* 95 U.S. at 278 ("When the terms of a claim in a patent are clear and distinct (*as they always should be* ), the patentee, in a suit brought upon the patent, is

bound by it.") (emphasis added). Patent applications, unlike contracts, are reviewed by patent examiners, quasi-judicial officials trained in the law and presumed to "have some expertise in interpreting the [prior art] references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents." *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359, 220 USPQ 763, 770 (Fed.Cir.1984). *See also Western Electric,* 860 F.2d at 431, 8 USPQ2d at 1857. If the patent's claims are sufficiently unambiguous for the PTO, there should exist no factual ambiguity when those same claims are later construed by a court of law in an infringement action. *See Intervet Am.,* 887 F.2d at 1053, 12 USPQ2d at 1476 ("Ambiguity, undue breadth, vagueness, and triviality are matters that go to claim *validity* for failure to comply with 35 U.S.C. § 112–¶ 2, not to interpretation or construction.") (emphasis in original).

This does not mean there is never a need for extrinsic evidence in a patent infringement suit. A judge is not usually a person conversant in the particular technical art involved and is not the hypothetical person skilled in the art to whom a patent is addressed. Extrinsic evidence, therefore, may be necessary to inform the court about the language in which the patent is written. But this evidence is not for the purpose of clarifying ambiguity in claim terminology. It is not ambiguity in the document that creates the need for extrinsic evidence but rather unfamiliarity of the court with the terminology of the art to which the patent is addressed.

Accordingly, the contract, deed, and will cases relied upon in the dissenting and concurring opinions serve only to highlight the differences between claim construction in a patent infringement case and contract interpretation in a breach of contract suit or construction/interpretation of a will in a will contest. They reflect the court's concern with finding the "true" intention of the parties to an agreement, deed, or will. [15] This **\*987** sort of inquiry is not appropriate, or even possible, in the context of patent litigation. Infringement litigation may involve multiple actions against different defendants none of whom has any personal knowledge of or participation in the PTO proceedings where the give and take that results in the negotiated claim language occurs. Thus there can be no search for the defendant party's intent.

C. The more appropriate analogy for interpreting patent claims is the statutory interpretation analogy. Statutory interpretation is a matter of law strictly for the court. There can be only one correct interpretation of a statute that applies to all persons. Statutes are written instruments that all persons

63 USLW 2663, 34 U.S.P.Q.2d 1321

are presumed to be aware of and are bound to follow. Statutes, like patents, are enforceable against the public, unlike private agreements between contracting parties. When interpreting statutes, a court looks to the language of the statute and construes it according to the traditional tools of statutory construction, including certain well known canons of construction. *United States v. John C. Grimberg Co., 702 F.2d 1362, 1365, 1368 (Fed.Cir.1983).* A court may also find it necessary to review the legislative history of the statute, which is itself a matter of public record, just as the specification and prosecution history of a patent are public records. *Id. at 1369.* While a court may seek from the public record to ascertain the collective intent of Congress when it interprets a statute, the subjective intent of any particular person involved in the legislative process is not determinative. Thus the members of Congress, or staffpersons who draft legislation, are not deposed or called on to testify in actions involving statutory interpretation. Similarly, the subjective meaning that a patentee may ascribe to claim language is also not determinative. Thus, it is from the public record that a court should seek in a patent infringement case to find the meaning of claim language.

[27] There are, of course, differences between a statute and a patent. But because both of these public instruments may create liability in third persons who were not participants in the legislative process or the PTO proceedings, as the case may be, we conclude that the statutory interpretation model is a more accurate model than the contractual one for purposes of determining whether constitutional protections are transgressed by assigning claim construction exclusively to judges.

D. The dissenting opinion and one of the concurring opinions, along with Markman and certain of the amici, contend that assigning claim construction exclusively to judges is in conflict with certain decisions of the Supreme Court. We are not persuaded. The dissenting and concurring opinions place heavy reliance on two Supreme Court cases, *Silsby v. Foote,* 55 U.S. (14 How.) 218, 14 L.Ed. 391 (1852), and *Bischoff v. Wethered,* 76 U.S. (9 Wall.) 812, 19 L.Ed. 829 (1869), for the proposition that questions of fact may arise in the determination of the scope of a patent claim. A close examination of these cases, however, reveals they do not support that argument. [16]

In *Silsby v. Foote,* the Court affirmed a trial judge who left the question of what elements were "essential" for the claimed invention to the jury. According to the Court, the

claim in that case stated: "I also claim the combination, above described, by which the regulation of the heat of the stove, or other structure in which it may be used, is effected." *Id., 55 U.S. at 226.* The Court agreed with the petitioner that "[t]he construction of the claim was undoubtedly for the court." *Id. at 225.* The Court continued, however, that "[w]hen a claim does not point out and designate the particular elements **\*988** which compose a combination, but only declares, as it properly may, that the combination is made up of so much of the described machinery as effects a particular result, it is a question of fact which of the described parts are essential to produce that result." *Id. at 226.* Thus the Court concluded that where a combination claim does not point out the elements of the claim but rather describes "machinery as effects a particular result," the jury may determine "which of the described parts are essential to produce that result." Otherwise, the question of claim scope belonged to the court.

It is difficult to see how *Silsby* supports the views set forth in the dissenting and concurring opinions. This is especially so because applicants are now required by 35 U.S.C. § 112 to particularly point out and distinctly claim the subject matter the applicant regards as his invention and this requirement applies with equal force to claims having means-plus-function limitations. The only jury-triable issue described in *Silsby* on the question of claim scope is now statutorily foreclosed. Further, a jury is not allowed to canvass the patent specification to evaluate what portions of a combination claim are "essential" to produce a particular result. *See Keystone,* 95 U.S. at 278 ("This provision [the predecessor to section 112, para. 2] was inserted in the law for the purpose of relieving the courts from the duty of ascertaining the exact invention of the patentee by inference and conjecture, derived from a laborious examination of the previous inventions, and a comparison thereof with that claimed by him."). Both this court and the Supreme Court have made clear that all elements of a patent claim are material, with no single part of a claim being more important or "essential" than another. *See Fay v. Cordesman,* 109 U.S. 408, 420–21, 3 S.Ct. 236, 243–45, 27 L.Ed. 979 (1883); *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 936, 4 USPQ2d 1737, 1741 (Fed.Cir.1987) (in banc).

The reliance on *Bischoff v. Wethered* is even more puzzling. *Bischoff* did not even involve an infringement issue but rather involved a question of invalidity in a breach of contract action. The plaintiff, who sought to invalidate the patent on the basis of a prior art patent, argued that the court, and not the jury, should have decided the question of "identity

or diversity of the inventions." *Bischoff, 76 U.S. at 816.*
The Court disagreed. While the Court again acknowledged
that "*construction* of written instruments is the province of
the court alone," it concluded that in this case "[i]t is not
the *construction of the instrument,* but the *character of the
thing invented,* which is sought in questions of identity and
diversity of inventions." *Id. at 816.*

Markman's case does not involve a question of identity or
diversity of inventions. The word "claim" does not even
appear in the *Bischoff* case. Rather *Bischoff* is concerned with
divining the "character of the thing invented" from the patent
in suit and the prior art patent. It is difficult, if not impossible,
to discern any legal principle from *Bischoff* that relates to
claim construction in the context of patent infringement.
To the extent the dissenting and concurring opinions view
claim construction in an infringement case as a search for the
"character" of the thing invented, we disagree.

Finally, the concurring opinions consider that much of our
opinion is dictum because there is no "genuine" dispute as
to the claim term "inventory." As we have demonstrated,
Markman squarely raised the issue of whether the court
acted within its power in granting JMOL after the jury
had construed the claims. The trial court viewed claim
construction as a legal question and determined that it could
decide the meaning of the term "inventory" as a matter of
law based on the patent document and prosecution history.
Markman, on the other hand, viewed the construction of the
claim as one of fact with the jury verdict being supported by
the evidence.

## CONCLUSION

Correctly reasoning that claim construction is a matter of law
for the court, the district court properly rejected the jury's
verdict and granted JMOL. Upon our *de novo* review of
the court's construction of the claim language, we agree that
"inventory" in claim 1 includes within its meaning "articles
of clothing." It is undisputed that Westview's **\*989** device
does not and cannot track articles of clothing. Accordingly,
there is no substantial evidence to support the jury's finding
of infringement of claims 1 and 10 of United States Reissue
Patent No. 33,054 when those claims are correctly construed.
The district court's grant of judgment of noninfringement as
a matter of law is

*AFFIRMED.*

MAYER, Circuit Judge, concurring in the judgment.
Today the court jettisons more than two hundred years of
jurisprudence and eviscerates the role of the jury preserved
by the Seventh Amendment of the Constitution of the United
States; it marks a sea change in the course of patent law that
is nothing short of bizarre. Sadly, this decision represents
a secession from the mainstream of the law. It portends
turbulence and cynicism in patent litigation. For this is not
just about claim language, it is about ejecting juries from
infringement cases. All these pages and all these words cannot
camouflage what the court well knows: to decide what the
claims mean is nearly always to decide the case.

But today's action is of a piece with a broader bid afoot to
essentially banish juries from patent cases altogether. If it
succeeds juries will be relegated, in those few cases where
they have any presence at all, to rubber stamps, their verdicts
preordained by "legal" and "equitable" determinations that
brook only one "reasonable" result. Indeed, this movement
would vest authority over patent disputes in legislative courts,
unconstrained by Article III and the Seventh Amendment. *See
In re Lockwood,* 50 F.3d 966, 970 (Fed.Cir.1995) (opinion
dissenting from order denying rehearing in banc) ("A
constitutional jury right to determine validity of a patent does
not attach to this public grant. Congress could place the issue
of validity entirely in the hands of an Article I trial court with
particular expertise if it chose to do so."). Declaiming that
the jury is a "black box" incapable of a "reasoned decision",
several judges of the court have already advised that they are
aboard this campaign. *Id., at 990.* The quest to free patent
litigation from the "unpredictability" of jury verdicts, and
generalist judges, results from insular dogmatism inspired by
unwarrantable elitism; it is unconstitutional.

The question is whether the interpretation of patent claims
is a purely legal exercise—always decided by the judge as a
matter of law and never raising a question of fact—or rather a
mixed question of law and fact, in which some factual matters
might need to be resolved by the factfinder on the way to
construing the claims as a matter of law. The answer is critical
to how questions of claim interpretation are decided at the
trial level and how we review them on appeal.

The ultimate issue of patent scope, depending as it does on the
legal effect of the words of the claims, is a question of law. But
it does not necessarily follow that the judge is to decide every
question that arises during the course of claim construction as
a matter of law. *Cf. Graham v. John Deere Co.,* 383 U.S. 1,

63 USLW 2663, 34 U.S.P.Q.2d 1321

17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966) (obviousness is a legal conclusion with underlying factual determinations). [1] Instead, characterization of claim construction as "legal" begs the questions whether fact issues may arise subsidiary to the ultimate legal conclusion, how such issues are to be decided, and by whom.

Contrary to what it says today, this court (including the judges in the majority) has always held that claim interpretation is a matter of law depending on underlying factual inquiries. *See, e.g.,* **\*990** *Arachnid Inc. v. Medalist Mktg. Corp.,* 972 F.2d 1300, 1302, 23 USPQ2d 1946, 1948 (Fed.Cir.1992) (though claim construction is issue of law for the court, it "may require the factfinder to resolve certain factual issues such as what occurred during the prosecution history"); *Lemelson v. General Mills Inc.,* 968 F.2d 1202, 1206, 23 USPQ2d 1284, 1288 (Fed.Cir.1992) (same, noting that "underlying factual issues in dispute become the jury's province to resolve in the course of rendering its verdict on infringement"); *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1579, 12 USPQ2d 1382, 1386 (Fed.Cir.1989) ("A disputed issue of fact may, of course, arise in connection with interpretation of a term in a claim if there is a genuine evidentiary conflict created by the underlying probative evidence pertinent to the claim's interpretation. However, without such evidentiary conflict, claim interpretation may be resolved as an issue of law by the court...." (citation omitted); *see also Tol–O–Matic Inc. v. Proma Produkt–Und Mktg.,* 945 F.2d 1546, 1552, 20 USPQ2d 1332, 1338 (Fed.Cir.1991) (substantial evidence supported jury's presumed fact findings on disputed terms and prosecution history); *Smithkline Diagnostics Inc. v. Helena Lab. Corp.,* 859 F.2d 878, 885, 8 USPQ2d 1468, 1474 (Fed.Cir.1988) (fact findings on disputed prosecution history clearly erroneous); *Perini America v. PCM Co.,* 832 F.2d 581, 586, 4 USPQ2d 1621, 1625 (Fed.Cir.1987) (in bench trial, court's interpretation of disputed claim terms not clearly erroneous); *Tillotson Ltd. v. Walbro Corp.,* 831 F.2d 1033, 1039, 4 USPQ2d 1450, 1454 (Fed.Cir.1987) (vacating summary judgment where construction turns on factual disputes arising from specification, prosecution history, and industry practice); *Tandon Corp. v. ITC,* 831 F.2d 1017, 1021, 4 USPQ2d 1283, 1286 (Fed.Cir.1987) (Commission's findings on prosecution history and meaning of terms supported by substantial evidence); *H.H. Robertson Co. v. United Steel Deck Inc.,* 820 F.2d 384, 389, 2 USPQ2d 1926, 1929 (Fed.Cir.1987) (in bench trial, court's fact findings on claim terms not clearly erroneous); *Howes v. Medical Components Inc.,* 814 F.2d 638, 646, 2 USPQ2d 1271, 1275 (Fed.Cir.1987) (vacating summary judgment because

of fact issues surrounding prosecution history); *Moeller v. Ionetics, Inc.,* 794 F.2d 653, 657, 229 USPQ 992, 995 (Fed.Cir.1986) (vacating summary judgment where terms create underlying fact dispute); *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 976, 226 USPQ 5, 9 (Fed.Cir.1985) (vacating summary judgment where fact question of equivalents of "means plus function" claim disputed); *Bio–Rad Lab., Inc. v. Nicolet Instrument Corp.,* 739 F.2d 604, 614, 222 USPQ 654, 662 (Fed.Cir.1984) (substantial evidence supported jury interpretation of disputed terms); *McGill Inc. v. John Zink Co.,* 736 F.2d 666, 675, 221 USPQ 944, 951 (Fed.Cir.1984) (reversing jury verdict where construction premised on facts not supported by substantial evidence). So it is remarkable that the court so casually changes its collective mind, especially when the just cited precedent was compelled by the Seventh Amendment and not the mere preference of a sufficient number of judges. [2] The court's revisionist reading of precedent to loose claim interpretation from its factual foundations will have profoundly negative consequences for the well-established roles of trial judges, juries, and our court in patent cases.

## I.

Anyone who wants to know what a patent protects must first read its claims, for they are the measure of its scope. *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 339, 81 S.Ct. 599, 601, 5 L.Ed.2d 592 (1961). Claim language does not exist in a vacuum; it must be understood by reference to the documents annexed to the patent grant, including the specification, of which the claims are a part, and any drawings. **\*991** *Autogiro Co. of Am. v. United States,* 384 F.2d 391, 397, 181 Ct.Cl. 55, 155 USPQ 697, 702 (1967). The prosecution history often proves useful in determining a patent's scope, for it reveals the course of dealing with the Patent Office, which may show a particular meaning attached to the terms, or a position taken by the applicant to ensure that the patent would issue. *Graham v. John Deere Co.,* 383 U.S. at 33, 86 S.Ct. at 701. These documents are always available during the course of claim interpretation; they are not extrinsic evidence, though some opinions so characterize them, because they are essentially incorporated into the patent itself.

Patents are directed to those skilled in the art. The task of determining just what the claims mean to skilled artisans falls, in the first instance, to the court. But if, after consideration of all of this documentation, the judge cannot readily resolve

the meaning of the claims, he resorts to extrinsic evidence to shed light on them. *Moeller,* 794 F.2d at 657, 229 USPQ at 995 (trial judge's failure to allow expert testimony was abuse of discretion). This evidence, in the form of prior art documentary evidence or expert testimony, can show what the claims would mean to those skilled in the art. The content of the prior art and the testimony of technical experts can reveal how others use and understand technical terms that may appear ambiguous or opaque to the judge, who rarely has the knowledge of those skilled in the field of the patent. The inventor himself may qualify as an expert and testify what his claims would mean in the relevant art.[3] The judge can even advert to the testimony of patent law experts—that is, patent lawyers—for advice on the interpretation of claims.[4] If this information clarifies the meaning of the claims and is uncontested, the judge may rule as a matter of law.

But sometimes extrinsic evidence results in a genuine dispute over the meaning of a term or an event during prosecution.[5] When that happens, it falls to the finder of fact to settle it. *Lemelson,* 968 F.2d at 1206, 23 USPQ2d at 1288; *Tol–O–Matic Inc. v. Proma Produkt–Und Mktg.,* 945 F.2d at 1550, 20 USPQ2d at 1336; *Smithkline Diagnostics Inc. v. Helena Lab. Corp.,* 859 F.2d at 882, 8 USPQ2d at 1472; *Palumbo v. Don–Joy Co.,* 762 F.2d at 974, 226 USPQ at 8.

When a question of claim construction arrives here on appeal, this court reviews the ultimate construction given the claims under the de novo standard applicable to all legal conclusions. But any facts found in the course of interpreting the claims must be subject to the same standard by which we review any other factual determinations: for clear error in facts found by a court; for substantial evidence to support a jury's verdict. *Fed.R.Civ.P. 52(a);* *Perini America v. PCM Co.,* 832 F.2d at 584, 4 USPQ2d at 1624; *McGill Inc. v. John Zink Co.,* 736 F.2d at 672, 221 USPQ at 948.

This standard recognizes the jury's important role in making factual determinations, **\*992** and the role of the trial court as the primary decisionmaker in bench trials. A trial is "the 'main event' ... rather than a 'tryout on the road.'" *Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). By broadly proclaiming all aspects of claim interpretation to be legal, the court today usurps a major part of the functions of both trial judge and jury in patent cases, obliterating the traditional, defined differences between the roles of judge and jury, and trial and appellate courts.

## II.

Beyond any policy argument supporting the traditional roles of judge and jury in patent cases, the court's decision today flies in the face of the constitutional right to a jury promised by the Seventh Amendment of the Constitution. That promise, "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved," protects litigants' right to a jury trial where legal, as opposed to equitable, causes are to be determined. *Chauffers, Teamsters & Helpers Local No. 391 v. Terry,* 494 U.S. 558, 564, 110 S.Ct. 1339, 1344, 108 L.Ed.2d 519 (1990). The amendment does not create an independent right to trial by jury but gives parties rights equivalent in scope to those that existed at common law, in England in 1791, when the Bill of Rights was ratified. *Tull v. United States,* 481 U.S. 412, 417, 107 S.Ct. 1831, 1835, 95 L.Ed.2d 365 (1987). It does not stop there, however; it extends as well to statutory actions subsequently created by Congress if they are analogous to actions decided in the law courts of eighteenth century England. *Id.*

The Seventh Amendment does not guarantee the right to have a jury decide all issues in a case. It properly resolves only factual questions, while legal matters are for the court. Even within the realm of factual questions, whether a particular question must always go to the jury depends "on whether the jury must shoulder this responsibility as necessary to preserve the 'substance of the common-law right of trial by jury.'" *Id.* at 426, 107 S.Ct. at 1840 (quoting *Colgrove v. Battin,* 413 U.S. 149, 152, 93 S.Ct. 2448, 2450, 37 L.Ed.2d 522 (1973)). The Seventh Amendment was intended not to formalize any particular rigid procedural rules, but "to preserve the basic institution of trial by jury in only its most fundamental elements...." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 337, 99 S.Ct. 645, 658, 58 L.Ed.2d 552 (1979) (quoting *Galloway v. United States,* 319 U.S. 372, 392, 63 S.Ct. 1077, 1088, 87 L.Ed. 1458 (1943)); *see also Baltimore & Carolina Line, Inc. v. Redman,* 295 U.S. 654, 657, 55 S.Ct. 890, 891, 79 L.Ed. 1636 (1935) ( "particularly to retain the common-law distinction between the province of the court and that of the jury"). But where a particular issue goes to these "fundamental elements" or the "substance of the common-law right of trial by jury," no court may constitutionally remove it from the jury. *See Walker v. New Mexico & So. Pac. R. Co.,* 165 U.S. 593, 596, 17 S.Ct. 421, 422, 41 L.Ed. 837 (1897) (Seventh Amendment "requires that questions of fact in common law actions shall be settled by a jury,

and that the court shall not assume directly or indirectly to take from the jury or to itself such prerogative."); *see also Granfinanciera S.A. v. Nordberg,* 492 U.S. 33, 51, 109 S.Ct. 2782, 2795, 106 L.Ed.2d 26 (1989) (even Congress "lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury."). The court's action in this case does just that.

An action for patent infringement is one that would have been heard in the law courts of old England. *See, e.g., Bramah v. Hardcastle,* 1 Carp.P.C. 168 (K.B.1789), *reprinted in* I *Decisions on the Law of Patents for Inventions* 51, 53 (Benjamin V. Abbott ed.) (1887) [hereinafter Abbott] (jury trial of infringement action; jury instructed that patent was invalid, but jury verdict for plaintiff not disturbed); *Morris v. Bramsom,* 1 Carp.P.C. 30 (K.B.1776), *reprinted in* Abbott, *supra,* at 21 (jury trial of infringement action); *see also Boulton v. Bull,* 1 Carp P.C. 117 (C.P.1795), *reprinted in* Abbott, *supra,* at 59, 74 ("[I]nfringement or not, is a question for the jury; in order to decide this case, they must understand the nature of the improvement or thing infringed...."). In this country, a jury trial has always been available in patent cases where damages are sought. Indeed, **\*993** the first Patent Act, in 1790, expressly provided that a patent owner was entitled to "such damages as shall be assessed by a jury." Act of April 10, 1790, ch. 7, § 4, 1 Stat. 109. In such cases, the jury has been entrusted with ruling on the ultimate question of infringement, as well as any factual disputes that arise subsidiary to the determination of the legal question of patent validity.

Not infrequently, the ultimate question of infringement, indisputably a matter for the jury, is effectively dictated by the construction given the patent claims. This happens, of course, when the judge affirmatively takes the question from the jury by granting summary judgment or judgment as a matter of law, as it did here; it can also occur when, even though the judge sends the question to the jury, his interpretation of the claims forces the jury's decision on infringement. That is to say, choosing between contending interpretations of a claim can decide the matter of infringement for all intents and purposes. Our constitutional mandate to preserve the right to jury trial therefore demands that we view any intrusion on the jury's role in deciding infringement with deep suspicion. *See Dimick v. Schiedt,* 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935) ("Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with utmost care.").

Today's decision also threatens to do indirectly what we have declined to do directly, that is, create a "complexity exception" to the Seventh Amendment for patent cases. *See SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1130, 227 USPQ 577, 592 (Fed.Cir.1985) (Markey, C.J., additional views). But there is simply no reason to believe that judges are any more qualified than juries to resolve the complex technical issues often present in patent cases. *Id.* at 1128 & n. 7, 227 USPQ at 591 & n. 7. Indeed, the effect of this case is to make of the judicial process a charade, for notwithstanding any trial level activity, this court will do pretty much what it wants under its de novo retrial. We have consistently stressed that the same rules apply to patent cases as apply to all other civil disputes. *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1547, 220 USPQ 193, 197 (1983) ("So long as the Seventh Amendment stands, the right to a jury trial should not be rationed, nor should particular issues in particular types of cases be treated differently from similar issues in other types of cases."). The court subverts this principle and the demands of the Seventh Amendment by the ruse of reclassifying factual questions as legal ones.

### III.

Those who argue for interpretation of claims solely as a matter of law by the judge spew a panoply of cases ostensibly in support. Close examination of these cases, however, reveals that, like the one before us today, interpretation of the claims at issue before the deciding court presented no real factual question. Thus, for example, in *Hogg v. Emerson,* 47 U.S. (6 How.) 437, 484, 12 L.Ed. 505 (1848), the Court stated that "without the aid of experts and machinists, [we have] no difficulty in ascertaining, from the language used here," the meaning of the claims. Similarly, *Winans v. New York & Erie R.R. Co.,* 62 U.S. (21 How.) 88, 100, 16 L.Ed. 68 (1858), allowed the possibility that "experts may be examined to explain terms of art, and the state of the art at any given time. They may explain to the court and jury the machines, models, or drawings exhibited." But the Court went on to say that there was only one construction of the patent "which the language of this specification will admit" and "it would be wholly superfluous to examine experts to teach the court, what they could clearly perceive without such information." *Id.,* 62 U.S. at 101. *Brown v. Piper,* 91 U.S. 37, 41, 23 L.Ed. 200 (1847), recognized that evidence on "what was old and in general use at the time of the alleged invention" was admitted at the trial but that it was unnecessary. "[W]e think

63 USLW 2663, 34 U.S.P.Q.2d 1321

the patent was void on its face, and that the court might have stopped short at that instrument, and without looking beyond it into the answers and testimony, *sua sponte,* if objection were not taken by counsel, well have adjudged in favor of the defendant." *Id.,* 91 U.S. at 44. **\*994** *See also U.S. Indus. Chem., Inc. v. Carbide & Carbon Chem. Corp.,* 315 U.S. 668, 677, 62 S.Ct. 839, 844, 86 L.Ed. 1105 (1942) ("[O]n the face of the papers, the process described in the original patent included a step [omitted from the reissue]," and the trial court erroneously relied on unnecessary expert opinion in its improper conclusion that the reissue was not invalid.); *Exhibit Supply Co. v. Ace Corp.,* 315 U.S. 126, 134, 62 S.Ct. 513, 518, 86 L.Ed. 736 (1942) ("examination of the drawings and specifications indicates clearly enough" the meaning of the claim); *Smith v. Snow,* 294 U.S. 1, 14, 55 S.Ct. 279, 284, 79 L.Ed. 721 (1935) ("Examination of the claim, in light of both [undisputed] scientific fact and of the particular form in which the petitioner reduced the claim to practice as described in the specifications, makes it plain" what are the claim's relevant limitations.).

These cases simply do not address the effect of extrinsic evidence giving rise to a legitimate fact question. They are cases where the documentary record alone was wholly adequate to derive the patent's proper construction. [6] It is hardly surprising that courts would treat claim interpretation under these circumstances as a matter of law, for it could not be otherwise. *See* Fed.R.Civ.P. 50(a) (court may grant judgment as a matter of law where underlying facts could not support reasonable jury verdict to the contrary), and 56(c) (summary judgment appropriate where there is no genuine issue as to any material fact); *Newell Companies, Inc. v. Kenney Mfg. Co.,* 864 F.2d 757, 762, 763, 9 USPQ2d 1417, 1421–22 (1988) (approving use of judgment as a matter of law and summary judgment on obviousness where underlying facts are not disputed).

Indeed, some cases cited in support of a purported rule that claim construction is always entirely a matter of law expressly limit the rule to those cases where the patent may be understood on the basis of the documents alone, without resort to extrinsic evidence; these cases acknowledge that fact questions could be raised that would require submission to a jury. In *Heald v. Rice,* 104 U.S. 737, 749, 26 L.Ed. 910 (1881), the Supreme Court explained:

> That is, if it appears from the face of the instruments that extrinsic evidence is not needed to explain terms of art,

or to apply the descriptions to the subject-matter, so that the court is able from mere comparison to say what is the invention described in each, and to affirm from mere comparison that the inventions are not the same, but different, then the question of identity is one of pure construction, and not of evidence, and consequently is a matter of law for the court, without any auxiliary matter of fact to be passed upon by a jury, if the action be at law.

The Court there determined that it had a case in which the question could be determined "from the mere reading of the two specifications" and that it was "too plain for argument that they are perfectly distinct." *Id.,* 104 U.S. at 753; *see also Singer Mfg. Co. v. Cramer,* 192 U.S. 265, 275, 24 S.Ct. 291, 295, 48 L.Ed. 437 (1904) ("As in each of the patents in question it is apparent from the face of the instrument that extrinsic evidence is not needed ... the question of infringement or no infringement is one of law...."); *Market St. Cable Ry. Co. v. Rowley,* 155 U.S. 621, 625, 15 S.Ct. 224, 226, 39 L.Ed. 284 (1894) (same as *Heald v. Rice* ). These cases recognize that where extrinsic evidence is required and raises a real factual dispute, the question is no longer one of "pure construction," so that the jury must play its role in the construction of the claims.

**\*995** But where the question has arisen—where the proper construction of claims depends on the resolution of a factual dispute—the Supreme Court has stated in no uncertain terms that the jury has the duty to decide. These are cases where the meaning of a patent may not be derived from its terms alone, forcing the judge to go beyond the documentary evidence for aid. This gives rise to issues of historical fact the resolution of which must be left to a jury.

The claim before the court in *Silsby v. Foote,* 55 U.S. (14 How.) 218, 14 L.Ed. 391 (1852), was directed to "the combination, above described, by which the regulation of the heat of the stove, or other structure in which it may be used, is effected." *Id.,* 55 U.S. at 226. The specification disclosed a stove containing a number of discrete parts. To be sure, the judge "construed the claim"; he instructed the jury that it covered "a combination of such of the described parts as were combined and arranged for the purpose of producing a particular effect, viz., to regulate the heat of a stove." *Id.* at 225. But the defendants asked the judge to rule as a matter of law that the parts referred to in the claim were "the index, the

63 USLW 2663, 34 U.S.P.Q.2d 1321

detaching process, and the pendulum." *Id.* at 226. The trial court refused, holding that this question was for the jury.

The Supreme Court affirmed asking, "How could the Judge know this as a matter of law?" *Id.* Once the trial court had construed the claim and instructed the jury, "it therefore became a question for the jury, upon the evidence of experts, or an inspection by them of the machines, or upon both, what parts described did in point of fact enter into, and constitute an essential part of this combination." *Id.* Only then could the jury determine if the accused device contained all of these elements and was therefore an infringement. The Court said the "defendants' counsel exhibited to the court the models of the machines of the defendants and the plaintiff, for the purpose of satisfying the court the jury must have understood *they were at liberty to construe the claim,* and that *they did in truth so construe it,* as to exclude from the combination claimed by the plaintiff, what is called the detaching process." *Id.* (emphasis added).

Again in *Winans v. Denmead,* 56 U.S. (15 How.) 330, 14 L.Ed. 717 (1853), the court "construed" the claim in a general manner and left it for the jury to fill in the specifics. The claim at issue was directed to a rail car for the transportation of coal "in the form of a frustum of a cone, substantially as herein described, whereby the force exerted by the weight of the load presses equally in all directions." *Id.,* 56 U.S. at 342. The defendant requested the jury be instructed that the claim was limited to a circular form only, as was described in the specification and did not cover the defendant's rectilinear design. The Supreme Court affirmed the trial court's refusal of the instructions, stating that "where the whole substance of the invention may be copied in a different form, it is the duty of the courts and juries to look through the form for the substance of the invention—for that which entitled the inventor to his patent, and which the patent was designed to secure." *Id.* at 343.

The Court considered how far an alleged infringing car could depart from the form of a perfect circle and still infringe, and determined that the claim encompassed anything "so near to a true circle as substantially to embody the patentee's mode of operation, and thereby attain the same result as was reached by his invention." *Id.* at 344. It cited evidence, including expert testimony as to the mode of operation of the patentee's car and whether the accused car attained the same results as the claimed car. The Court unmistakably left it to the jury to determine the meaning of the claim, its scope, and refused to proclaim it a matter of law outside the province of the jury. *Id.*

These cases are especially relevant because they show that the jury has always had a role in determining a patent's scope. This historic reliance on juries to aid the court in deciding exactly what patents protect matters here because the Seventh Amendment demands that courts preserve the right to jury trial as it existed at common law. Old cases are obviously instructive under this peculiar standard. Accordingly, efforts to distinguish *Silsby* and *Winans* because of **\*996** their age are disingenuous. This court has no office to invoke desuetude to evade the Seventh Amendment and the Supreme Court.

Our patent laws have always required inventors to point out their inventions in detail sufficient to both distinguish the prior art and tell the public what protection the patent confers. The very first patent act required that letters patent "describ[e] the said invention or discovery, clearly, truly, and fully." Act of Apr. 10, 1790, ch. 7, § 1, 1 Stat. 109. The applicant for a patent was at the time required to submit "a specification in writing, containing a description ... of the thing or things by him or them invented or discovered, ... which specification shall be so particular ... as ... to distinguish the invention or discovery from other things before known and used." *Id.* § 2. The word "claim" first appeared in the Act of 1836, ch. 357, § 6, 5 Stat. 117 (July 4, 1836), requiring that the applicant "shall particularly specify and point out the part, improvement, or combination, which he claims as his own invention." Claims, per se, were not expressly required until the Act of 1870, ch. 230, § 26, 16 Stat. 198 (July 8, 1870), which said the applicant "shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery," but they were in common use much earlier in rudimentary form. *See, e.g., Evans v. Eaton,* 20 U.S. (7 Wheat.) 356, 428, 5 L.Ed. 472 (1822) (Specification concluded: "I claim as my invention, the peculiar properties or principles which this machine possesses, in spreading, turning and gathering the meal, at one operation, and the rising and lowering its arms, by its motion, to accommodate itself to any quantity of meal it has to operate on.").

In light of this history, it is apparent that the 1870 Act simply codified the preference for particular claiming already expressed by the Supreme Court. *See Brooks v. Fiske,* 56 U.S. (15 How.) 212, 215, 14 L.Ed. 665 (1853) (specification and drawings to be considered "only for the purpose of enabling us to correctly interpret the claim"). This change from a regime of "central" claiming to one of "peripheral" claiming may seem a major step in the patent discipline, but the distinction it represents is irrelevant to the Seventh

Amendment. When the trial court in *Silsby* construed the claim there at issue, it was performing essentially the same task of claim construction as courts perform today. When the judge then left it for the jury to clarify the ambiguity as to just what elements the claims encompassed, he recognized the existence of a jury question precisely the same as that which the court rejects today.

Even if it were correct that the 1870 Act created a new and different claiming requirement out of whole cloth, I see no evidence that Congress thereby intended to strip the jury of its traditional role in determining patent scope. Indeed, the Seventh Amendment's command that we preserve jury trial rights as they existed at common law dictates that Congress could not have taken the question from the jury even if it wanted to. *See Granfinanciera,* 492 U.S. at 51, 109 S.Ct. at 2795 (Congress "lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury"; private rights involve "the liability of one individual to another under the law as defined" (quoting *Crowell v. Benson,* 285 U.S. 22, 50, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932))).

Cases involving patent interpretation in the validity context reach the same result.[7] For example, in *Bischoff v. Wethered,* 76 U.S. (9 Wall.) 812, 19 L.Ed. 829 (1869), the Court explained that although it was normally the "province of the court, and not the jury, to construe the meaning of documentary evidence," the "specifications of patents for inventions are documents of a peculiar kind." *Id.,* 76 U.S. at 815. The Court stated further that inventions, the subjects of patents, "have their existence *in pais,* outside of the documents themselves; and which are commonly described by terms of art or mystery to which they respectively belong; and these **\*997** descriptions and terms of art often require peculiar knowledge and education to understand them aright." *Id.* Accordingly, an understanding of the patented invention "is to be properly sought, like the explanation of all latent ambiguities arising from the description of external things, by evidence *in pais,*" outside of the patent document. *Id.* This inquiry "belong[s] to the province of evidence, and not that of construction," and thus falls to the jury. *Id.* at 816.

This illustrates how claim construction may sometimes require the resolution of factual matters before a claim can be authoritatively construed. The exercise is further informed by decisions interpreting analogous instruments, for patents are legal documents like contracts or deeds. *See Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 227, 26 L.Ed. 149 (1880) (patent as contract); *Motion Picture Patents Co.*

*v. Universal Film Mfg. Co.,* 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871 (1917) (patent as deed). The analogies are most apt. A patent can be conceived of as a contract between the inventor and the government. In return for full disclosure of the invention the government gives a monopoly of sorts for a time. The rest of us may be third party beneficiaries of this deal, partaking of the advancement of knowledge the patent represents. Or a patent may be thought of as a form of deed which sets out the metes and bounds of the property the inventor owns for the term and puts the world on notice to avoid trespass or to enable one to purchase all or part of the property right it represents. The public holds a vested future interest in the property. Accordingly, patents should be interpreted under the same rules as govern interpretation of kindred documents. *Merrill v. Yeomans,* 94 U.S. 568, 571, 24 L.Ed. 235 (1877).

The interpretation of a contract or a deed, like a patent, is ultimately a question of law. There is nothing novel about the principle that, in the words of Justice Story, "the interpretation of written documents properly belongs to the Court, and not to the jury." *William & James Brown & Co. v. McGran,* 39 U.S. (14 Pet.) 479, 493, 10 L.Ed. 550 (1840). This principle has been routinely evoked in the context of contract law. *See Levy v. Gadsby,* 7 U.S. (3 Cranch) 180, 186, 2 L.Ed. 404 (1805) ("the construction of a written evidence is exclusively with the court"); *Goddard v. Foster,* 84 U.S. (17 Wall.) 123, 142, 21 L.Ed. 589 (1872) ("[I]t is well-settled law that written instruments are always to be construed by the court...."); *see also Meredith v. Picket,* 22 U.S. (9 Wheat.) 573, 575, 6 L.Ed. 163 (1824) (interpreting a deed, "[t]he Judges must construe the words of an entry, or any other title paper, according to their own opinion of the words as they are found in the instrument itself").

In light of such emphatic Supreme Court language, one might conclude that the meaning of a contract is first and last a question of law which in no instance should be resolved by a factfinder. But as Justice Story also was careful to point out in *McGran,* "there certainly are cases, in which, from the different senses of the words used, or their obscure and indeterminate reference to unexplained circumstances, the true interpretation of the language may be left to the consideration of the jury for the purpose of carrying into effect the real intention of the parties." 39 U.S. (14 Pet.) at 493.

Story used the facts of *McGran* to illustrate the point. One issue was the meaning of certain words used by the parties in letters which formed an agreement on the sale of cotton. The

language was susceptible of more than one interpretation and its meaning would depend on the surrounding circumstances. Therefore, the trial judge properly refused to tell the jury what the letters meant, because to do so would have removed from the jury "matters of fact in controversy before the jury upon which it was exclusively their province to decide." *Id.*

*Goddard v. Foster* similarly held that written instruments are for the court "except when they contain technical words, or terms of art, or when the instrument is introduced in evidence collaterally, and where its effect depends not merely on the construction and meaning of the instrument, but upon extrinsic facts and circumstances, in which case the inference to be drawn from it must be left to the jury." 84 U.S. (17 Wall.) at 142. *See also* **\*998** *Reed v. Proprietors of Locks & Canals on Merrimac River,* 49 U.S. (8 How.) 274, 289, 12 L.Ed. 1077 (1850) (allowing jury to interpret vague or ambiguous deed, where "it necessarily becomes a fact for the jury to decide, whether the land in controversy is included therein").

The principle that documentary interpretation is a matter of law has become a basic tenet of modern contract law. Equally established, however, is the caveat that extrinsic evidence, such as custom and usage of the trade and course of dealing between the parties, akin to prior art, level of skill in the art, and events in the Patent Office, may be introduced to inform the meaning of terms in the contract. And when such evidence is brought in and creates a real conflict, it results in a question of fact for the jury. *Great N. Ry. Co. v. Merchants Elevator Co.,* 259 U.S. 285, 292, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922); *cf. Reed,* 49 U.S. (8 How.) at 290 (meaning of deed). This is true even though in some circumstances the factual exercise of assigning meaning to a term of a contract serves to decide the meaning of the contract. Until today, the same rule has applied in the interpretation of patents. [8]

RADER, Circuit Judge, concurring in the judgment.

The result in this case is the same whether or not claim construction may sometimes involve subsidiary fact issues. In this case, the claims, specification, and prosecution history irrefutably show that cash transaction totals are not "inventory." Inventor Markman's "after-the-fact testimony" to the contrary "is of little weight compared to the clear import of the patent disclosure itself." *North Am. Vaccine, Inc. v. American Cyanamid Co.,* 7 F.3d 1571, 1577, 28 USPQ2d 1333, 1337 (Fed.Cir.1993), *cert. denied,* 511 U.S. 1069, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994). The testimony of Markman's patent law expert is not evidence at all. *Cf.*

*Nutrition 21 v. United States,* 930 F.2d 867, 871 n. 2, 18 USPQ2d 1347, 1350 n. 2 (Fed.Cir.1991). In sum, the record lacks substantial evidence supporting Markman's asserted claim interpretation. Thus, the trial court correctly granted judgment as a matter of law that Westview did not infringe. *See Read Corp. v. Portec, Inc.,* 970 F.2d 816, 821, 23 USPQ2d 1426, 1431 (Fed.Cir.1992).

To dispose of this case, this court need not decide whether subsidiary fact issues may sometimes arise. Markman cannot manufacture a fact issue where none exists. This court's extensive examination of subsidiary fact issues is dicta.

In commenting on this concurrence, the court claims that whether claim construction can involve subsidiary fact issues "is before us and it is our obligation to decide it." The court, however, neglects the logically antecedent question of whether substantial evidence supports the jury finding rejected by the trial court. *See Read,* 970 F.2d at 821. Where, as here, substantial evidence does not support the finding, it does not matter whether the issue is one of law or fact.

Whether claim construction can involve subsidiary fact issues is *not* before us. It is our duty *not* to rule on this question. The court should decline to answer a question better left to a case that truly raises it, and therefore provides an informed basis for its resolution.

Transaction totals are not, as a matter of law, "inventory." Westview infringes only if transaction totals are "inventory." Therefore, the district court correctly granted **\*999** judgment as a matter of law that Westview does not infringe. I concur in the judgment.

PAULINE NEWMAN, Circuit Judge, dissenting.

## I

## INTRODUCTION

The issue is the role of the jury in patent infringement cases. The majority opinion resolves the issue by designating, as law, factual disputes about the meaning and scope of the technologic terms and words of art used to define patented inventions. By holding that these disputed technologic questions are matters of law, the court holds that issues of patent infringement, previously triable to a jury as of right,

63 USLW 2663, 34 U.S.P.Q.2d 1321

will now be decided by the trial judge and then re-decided *de novo* by this court on appeal.

Patent infringement is a factual question. Its resolution often requires finding the factual meaning and scope of the terms of scientific art and technology and usage by which the patentee described and claimed the invention. These findings usually require testamentary and documentary evidence and occasionally experiments or demonstrations, as illustrated in many of our previous decisions that are now overruled.

Deciding the meaning of the words used in the patent is often dispositive of the question of infringement. Thus in the case at bar the infringement controversy is decided by finding the meaning and scope of the term "inventory" in Markman's patent, in light of the accused Westview system: if "inventory" is limited to clothing, the patent is not infringed; if "inventory" includes invoices, it is. The majority holds that this is a matter of law, devoid of any factual component; and subject to *de novo* appellate determination. The jury is eliminated, and new and uncertain procedures are imposed on trial judges.

This holding not only raises a constitutional issue of grave consequence, but the court creates a litigation system that is unique to patent cases, unworkable, and ultimately unjust. Thus I must, respectfully, dissent.

I shall discuss three principal concerns:

### *1. The Meaning of Disputed Technologic Terms and Words of Art*

Patents are technologic disclosures, written by and for the technologically experienced: those "of skill in the art." The meaning and scope of the terms that define the patented technology is often in dispute in infringement litigation, for it often decides the case. In resolving such dispute the trier of fact often makes findings that depend on the weight, credibility, and probative value of conflicting evidence, such as that offered on behalf of Markman and Westview. Heretofore, the disputed meaning of technologic terms and words of art has been treated by Federal Circuit precedent as an "underlying fact" on which the legal effect of the patent is based. The majority now simply rules that these are not "underlying factual inquiries." However, the meaning and scope of disputed technologic and other terms of art in particular usage are classical questions of fact. Their nature as fact does not change because their finding, like most findings

in litigation, has a legal consequence. By redesignating fact as "law" the court has eliminated the jury right from most trials of patent infringement.

### *2. The Trial and Appellate Roles in Technologic Disputes*

The trial process is the vehicle for determining truth. Thus the trier of fact is present in the courtroom along with the witnesses, the advocates, the exhibits, and the demonstrations. Indeed, when the technologic issues are complex, appellate fact finding is probably the least effective path to accurate decisionmaking. And if a factual question is technologically simple, it is not thereby transformed into a matter of law and removed from the trial process. Even were there no constitutional infirmity, I doubt that the correct resolution of technologic or scientific disputes is more likely to be achieved by removing disputed facts from the procedures of trial and consigning them to the appellate court. Appellate briefs and fifteen minutes per side of attorney argument are not designed for *de novo* findings of disputed technologic questions.

### *1000  3. The Constitution

Jury trial in patent cases is protected by the Seventh Amendment. Elimination of the jury is not this court's choice to make.

The constitutional right alone bars the majority's new rule. The majority today denies 200 years of jury trial of patent cases in the United States, preceded by over 150 years of jury trial of patent cases in England, by simply calling a question of fact a question of law. The Seventh Amendment is not so readily circumvented.

### II

### FACT AND LAW IN PATENT INFRINGEMENT

### A. LEGAL "CONSTRUCTION" v. FACTUAL "INTERPRETATION"

The majority's explanation for removing these factual issues from the jury is that it is "construing" the patent claims, and that the "construction" of documents is a matter of law. The legal construction of documents—patent documents and other documents—is indeed a matter of law. The legal effect

of the patent claim is to establish the metes and bounds of the patent right to exclude; this is a matter of law. But this does not deprive the underlying facts of their nature as fact. These facts are found on evidence that includes the patent specification, relevant prior art, the prosecution history, the testimony of experts in the field, and other relevant evidence such as tests and demonstrations, all as I shall discuss *post*. These findings do not become rules of law because they relate to a document whose legal effect follows from the found facts.

An extensive body of law, statutory and judgemade, governs the construction and legal effect of patent claims; for example, that a claim is construed the same way in determining both patent validity and infringement; that a dependent claim includes all of the limitations of the independent claim; that the claims as filed are part of the technical disclosure; that the right to exclude is divisible into making, using, or selling the claimed subject matter; that a claim is not infringed unless every element thereof is met in the accused device, either literally or by an equivalent. These and other rules of law are applied when appropriate to the facts of the particular case: either undisputed facts, or facts that are found by the trier of fact. The procedure of applying law to facts does not convert the finding of facts into a matter of law.

In patent infringement litigation there is often a factual dispute as to the meaning and scope of the technical terms or words of art as they are used in the particular patented invention. When such dispute arises its resolution is not a ruling of law, but a finding of fact. Such findings of meaning, scope, and usage have been called the "interpretation" of disputed terms of a document, as contrasted with the "construction" or legal effect of a document. Professor Corbin has explained this distinction, in the context of contracts, as reflecting the difference between "language" and the "legal operation" of language:

> It may be helpful to note that the word interpretation is commonly used with respect to *language* itself—to the symbols (the words and acts) of expression. In about the same degree, we speak of the construction of a *contract*. It is true that we also speak of construing language and of interpreting a contract; but by the latter phrase is certainly meant interpreting the *words* of a contract. The word "contract" has

been variously defined; but it is seldom identified with mere symbols of expression. By "interpretation of language" we determine what ideas that language induces in other persons. By "construction of the contract," as that term will be used here, we determine its legal operation—its effect upon the action of courts and administrative officials.

3 Arthur L. Corbin, *Corbin on Contracts* § 534 (1960) (footnotes omitted). The *Restatement (Second) of Contracts § 200* and Comment c (1981) describes the distinction between "construction" and "interpretation" as reflecting the difference between the "meaning" of a term and its "legal effect":

> Interpretation of a promise or agreement or a term thereof is the ascertainment of its meaning.

\* \* \* \* \* \*

> **\*1001** Interpretation is not a determination of the legal effect of words or other conduct.

The Reporter's Note explains that the purpose is "to make it clear that 'interpretation' relates to meaning and to avoid confusion with the ascertainment of legal operation or effect, sometimes called 'construction.' " (Citations omitted.) The analogy is apt, although a patent is not a contract, for this distinction has been recognized for many kinds of written instruments. *See, e.g., In re XTI Xonix Technologies Inc., 156 B.R. 821, 829 n. 6 (D.Ore.1993)* (proceeding in bankruptcy):

> Interpretation and construction of written instruments are not the same. A rule of construction is one which either governs the effect of an ascertained intention, or points out what the court should do in the absence of express or implied intention, while a rule of interpretation is one which governs the ascertainment of the meaning of the maker of the instrument.

*Williams v. Humble Oil & Ref. Co., 432 F.2d 165, 179 (5th Cir.1970), cert. denied, 402 U.S. 934, 91 S.Ct. 1526, 28 L.Ed.2d 868 (1971)* (contract):

In the law of contracts (conventional obligations) a proper distinction exists between the "interpretation" of written instruments and their "construction." "Interpretation" refers to the process of determining the meaning of the words used; that process is traditionally thought to be a function of the jury. On the other hand, the process of determining the legal effect of the words used—once we know their meaning—is properly labelled "construction"; it is peculiarly a function of the court.

*Hornick v. Owners Ins. Co.,* 511 N.W.2d 370 (Iowa 1993) (insurance policy):

Construction of an insurance policy—the process of determining its legal effect—is a question of law for the court. Interpretation—the process of determining the meaning of words used—is also a question of law for the court unless it depends on extrinsic evidence or a choice among reasonable inferences to be drawn.

*In re Union Trust Co.,* 89 Misc. 69, 151 N.Y.S. 246, 249–50 (Sur.Ct.1915) (will):

A rule of construction is one which either governs the effect of an ascertained intention or points out what a court should do in the absence of express or implied intention. A rule of interpretation is one which governs the ascertainment of the meaning of the maker of a written document.

*Reed v. Proprietors of Locks & Canals on Merrimac River,* 49 U.S. (8 How.) 274, 288–89, 12 L.Ed. 1077 (1850) (deed):

It is true, that it was the duty of the court to give a construction to the deed in question, so far as the intention of the parties could be elicited therefrom.... But after all this is done, it is still a question of fact to be discovered from evidence dehors

the deed ... for the jury to decide, whether the land in controversy is included therein, or, in other words, was *intended* by the parties so to be.

It is indeed well understood that the legal effect or construction of the terms of a document, a matter of law, is not to be confused with resolution of disputes concerning the factual meaning of the terms. The former is for the court, the latter for the jury. That the thing whose terms require interpretation is a patent, instead of a deed or a will or a contract, does not convert the finding of disputed facts into a matter of law. Factual findings concerning a particular patented invention do not become matters of law simply because the patent document serves a legal purpose.

Although purity of language has occasionally slipped, for the words "construction" and "interpretation" have been loosely used, the distinction between the concepts has been recognized when it mattered. For example, Walker in his 1904 *Textbook* used the phrase "construction of the patent," but he left no doubt as to the role of the jury as trier of fact:

[W]here the question of infringement depends on the construction of the patent, and that construction depends upon a doubtful question in the prior art, the latter question should be left for the jury; and the dependent question of infringement should also be left for the jury to decide.

**\*1002** A.H. Walker, *Textbook on the Patent Laws of the United States of America* § 536 (4th ed. 1904).

This recognition that the factual issues that underlie the "construction of the patent," and that determine patent infringement, are for the jury is manifest even in the early Supreme Court cases that are relied on by the majority, as I discuss in Part IV–C, *post.* The majority's authority does not show removal of factual disputes from the jury. Indeed, several of the cases that are relied upon were bills in equity, and irrelevant to jury trials.

## B. EVIDENCE RELEVANT TO CLAIM INTERPRETATION

The areas of evidentiary inquiry commonly encountered in patent infringement cases are illustrated in Markman's case. The infringement trial (validity and damages were severed)

Markman v. Westview Instruments, Inc., 52 F.3d 967 (1995)

63 USLW 2663, 34 U.S.P.Q.2d 1321

included evidence relating to the patent specification, the patent claims, the prosecution history, the inventor's usage of "inventory," and the defendant's understanding of the term. Although Markman's invention was not complex, this phase of the trial took three days.

### 1. The Specification

The patent specification contains the description of the invention, including the claims. It fulfills the inventor's obligation to make known the technology for which the patent is granted, and must meet certain legal requirements. It must be written, and clear. It must be complete yet concise. It must enable one of skill in the field to make and use the invention, but need not include that which is known to the field. It must describe the best mode known to the inventor. It is a technical document, written for persons experienced in the technology. *See* 2 Irving Kayton et al., *Patent Practice* 9–1 to 9–3 (4th ed. 1989) (describing thirteen functions of the patent specification).

The claims are part of the specification. Their purpose is to identify—"particularly pointing out and distinctly claiming," 35 U.S.C. § 112—that which is the subject of the patent grant. Patent claims are terse summaries, and do not repeat the technologic content of the specification. When there arises a question as to whether a term in a patent claim is of a meaning and scope that reaches particular subject matter, the interested public and in turn the courts look to the body of the specification for elaboration and illustration of the usage of the term to define the patented technology.

When litigation ensues, it may be helpful to the trier of fact to hear from the inventor what he/she meant by the terms of art and science and technology used to describe the invention. Markman, as the inventor, testified on this aspect. It may also be helpful to hear, from others in the field of the invention, what was conveyed to them by the now-disputed terms. Markman's witness and Westview's president so testified. Not unexpectedly, the evidence was conflicting. The trier of fact may have to assess the technical content, weight, and credibility of all of the evidence, including but not limited to the specification, in finding the meaning and scope of disputed terms as used in the patent. Whether the term "inventory" in Markman's Claim 1 includes Westview's invoices can not be found in the abstract, nor by consulting a dictionary; it is found on the evidence of this case, for the specific invention and the specific accused system. This has historically been a question of fact. [1]

The Federal Circuit has explained the relationship between law and fact in claim interpretation in many cases, all now overruled, as I illustrate in Part IV–A, B, *post*. For example, in *Perini America, Inc. v. Paper Converting Mach. Co.,* 832 F.2d 581, 4 USPQ2d 1621 (Fed.Cir.1987) the patented invention related to machines having embosser rolls **\*1003** used in manufacturing paper towels. Typical of the technologic terms in dispute was "the projections in one web intermediate the projections in the other web" to describe the alignment of the embosser rolls. This court recognized that the meaning of this term was a factual issue, and explained that claim interpretation rests on underlying facts:

> Like all legal conclusions, that conclusion [that a claim must be interpreted in a certain way] rises out of and rests on a foundation built of established (undisputed or correctly found) facts. Interpretation of a claim, or of its scope, should not be assayed until a foundation is in place. If the meaning of terms in the claim, the specification, other claims, or prosecution history is disputed, that dispute must be resolved as a question of fact before interpretation can begin.

*Id.* at 584, 4 USPQ2d at 1624. The court observed that the finding of disputed facts can "dictate" the ultimate conclusion of what the claim means:

> Confusion may be caused by the circumstance in which resolution of the question of the meaning of a term or terms dictates the interpretation of the claim, but that is not unusual, legal conclusions being dictated by established facts and not the other way around, and does not change the nature of the meaning-of-terms inquiry from one of fact to one of law.

*Id.* The majority now criticizes and expressly overrules these statements in *Perini,* holding that these facts are not fact, but "law," and that they are removed from the trier of fact and are determined *de novo* on appeal. In my view the *Perini* court's analysis is in accord with precedent, and properly preserves the role of the trier of fact, whether trial is to the bench or to a jury.

### 2. Prior Art

When there is a dispute as to the meaning and scope of a technologic term or word of art in a patent claim, it is often helpful to look at the prior art: that is, what was known to persons in the field of the invention at the time the invention was made. The scope and content of the prior art, the differences between the claimed invention and the prior art, the level of ordinary skill in the field of the invention, are all questions of fact, *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966), and are not subject to reclassification by us. [2]

The prior art may provide evidence of how the disputed technologic terms and words of art or science were used by others in the field of the invention, and thus evidence of what was conveyed to the field by the terms as used by the patentee. Indeed, the infringement analysis can sometimes stop with the prior art, for if the accused device is found in the prior art, then it is a rule of law that the patent claims can not be interpreted to reach that device. This too requires findings of the scope and content of the prior art, a question of fact, *Graham v. John Deere,* that is found with an eye upon the accused device.

I do not attempt to catalogue the myriad kinds of information, findings, and inferences that may flow from the prior art, in determining the technologic scope of the patentee's invention. This evidence, and the findings and inferences that are drawn, are the province of the trier of fact. The majority's insistence that these are purely legal matters of "claim construction" does indeed serve to replace the trier of fact with the Federal Circuit; I doubt that it improves the quality of the decision, at great cost to efficiency of the trial/appellate process.

### 3. The Prosecution History

The prosecution history is the record in the Patent and Trademark Office of what transpired during examination of the patent application. It is a public record. It sometimes is lengthy and detailed, sometimes **\*1004** sketchy and brief. The prosecution history may provide evidence of how the inventor or the patent examiner viewed the now-disputed technologic and other terms. In *Howes v. Medical Components, Inc.,* 814 F.2d 638, 645, 2 USPQ2d 1271, 1274–75 (Fed.Cir.1987) this court observed that "during the prosecution of a patent, claim language may take on new meanings, possibly different from that which was originally

intended." The way patentability was argued by the inventor, concessions made or positions adjusted, may be relevant to the factual issue in dispute, and may create an estoppel against the patentee's now-proposed interpretation.

The determination of what occurred in the prosecution of the patent application is a factual matter, *Smithkline Diagnostics Inc. v. Helena Lab. Corp.,* 859 F.2d 878, 882, 8 USPQ2d 1468, 1471–72 (Fed.Cir.1988), specific to the particular patent. It is often based on technological arguments, experimental evidence submitted to the patent office, discussions of the meaning and relevance of prior publications and prior knowledge, explanations of the technical content of the specification, and other evidence of the applicant's and the examiner's positions. This evidence, and appropriate findings and inferences, are for the trier of fact.

The majority refers to the "undisputed" prosecution history, in asserting that there are no factual aspects to this evidence. Indeed, the official government record is fixed. But the significance of the exchanges, compromises, and explanations contained in the correspondence between the inventor and the examiner; the inferences to be drawn as to the technology, the invention, and the meaning and scope of now-disputed technologic terms or words of art; may depend on this and other evidence. If disputed, their finding is for the trier of fact. The meaning, significance, and weight of the content of a documentary record does not become a matter of law simply because the content of the record is not in dispute.

### 4. Technologic/Scientific Facts

Decision of the question of patent infringement usually turns on findings of technologic fact; sometimes relatively simple technology, sometimes at the frontier of scientific advance and its practical applications. When scientific and technologic disputes arise in litigation, they are subject to the rules of evidence and procedure. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (discussing issues of scientific evidence). The complexity of the technologic/scientific evidence will of course vary with the issue. *See, e.g., Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555, 24 USPQ2d 1401 (Fed.Cir.1992) (color video display semiconductor chips); *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 18 USPQ2d 1001 (Fed.Cir.1991) (blood clotting factor VIII); *Halliburton Co. v. Schlumberger Technology Corp.,* 925 F.2d 1435, 17 USPQ2d

1834 (Fed.Cir.1991) (neutron logging of oil wells); *Bey v. Kollonitsch,* 806 F.2d 1024, 231 USPQ 967 (Fed.Cir.1986) (irreversible enzyme inhibitors); *Fromson v. Advance Offset Plate, Inc.,* 755 F.2d 1549, 225 USPQ 26 (Fed.Cir.1985) (silicated lithography plates).

The Court stressed in *Daubert* that the admissibility of scientific evidence depends on its reliability and relevance, and that the judge's responsibility, when the trier of fact is a jury, is to assure the adequacy of the methodology upon which the evidence is based. 509 U.S. at ____ – ____, 113 S.Ct. at 2795–96. This emphasis on methodology is as well suited to practical applications of technology and engineering as to basic scientific principles. Evidence in patent cases is often provided by scientists or engineers as expert witnesses, and may include explanations of the technology and its scientific basis, comparisons with the prior art or with the accused device, experiments, demonstrations, and interpretations. The evaluation of technologic evidence is often required of the trier of fact. *See* Lee Loevinger, *Science as Evidence,* 35 Jurimetrics J. 153 (1995); Jack B. Weinstein, *The Effect of Daubert on the Work of Federal Trial Judges,* 2 Shepard's Expert and Scientific Evidence Quarterly 1 (1994).

Nor is it rare in patent cases to encounter incomplete data, theoretical uncertainties, untested inferences, and speculative conclusions. **\*1005** Experimental procedures, the sources of data, and the bases of opinions that are offered to prove/ disprove a technologic fact are often in evidentiary conflict in patent disputes. Engineers and scientists know very well the uncertainties of the experimental process, the fluctuations and glitches in the data, the human and machine error, the forks in the road to objective truth. Indeed, understanding of the fallibility of technologic and scientific experimentation is soon acquired by those who labor in the field of litigation. "The community of trial lawyers and judges knows perhaps better than any other professional group just how unruly science often is in practice." Sheila Jasanoff, *What Judges Should Know About the Sociology of Science,* 77 Judicature 77, 80 (1993) (discussing the "social dimension [that] gives legitimacy to particular scientific 'facts' ").

Now that the Federal Circuit holds that resolution of disputes as to the meaning and scope of technologic terms and words of art as used in a particular patent is law, not fact, removing the jury from this issue, is the trial judge excused from determining the admissibility and relevance of technologic evidence? What about the requirement that "[c]redibility determinations, the weighing of the evidence, and the drawing

of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). In a patent case the trier of fact may receive extensive evidence related to the meaning and scope of technologic or scientific terms or words of art, their usage and their perception in the field of a particular invention. The evidence often includes technical publications, scientific articles, experimental data, demonstrations, and opinion testimony. The factual nature of such evidence can not be squared with the majority's criticism of such cases as *Palumbo v. Don–Joy,* 762 F.2d 969, 226 USPQ 5 (Fed.Cir.1985), which is today overruled for its holding that "when the meaning of a term in a claim is disputed and extrinsic evidence is necessary to explain that term, then an underlying factual question arises." *Id.* at 974, 226 USPQ at 8. In addition to my concern about how a record will be developed for the Federal Circuit's *de novo* decision, I doubt that an appellate court's *de novo* finding of technologic facts is more likely to attain accuracy, than the decision of a jury or judge before whom a full trial was had:

> Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources.

*Anderson v. City of Bessemer City,* 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

### 5. The Testimony of Experts

Disputed questions of the meaning and scope of technologic terms and words of art are decided from the viewpoint of persons of skill in the specific field of technology. It is rare to come upon a technologic issue in litigation for which differing and often plausible views are not offered by qualified witnesses. The Federal Rules of Evidence contemplate the provision of specialized knowledge to assist the trier of fact:

> **R. 702.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto....

In *Moeller v. Ionetics, Inc.,* 794 F.2d 653, 229 USPQ 992 (Fed.Cir.1986) this court held that the trial court's rejection of expert testimony in that case was an abuse of discretion:

Although use of experts is generally a matter of discretion with the trial judge, that discretion is not unlimited. In a patent case involving complex scientific principles, it is particularly helpful to see how those skilled in the art would interpret the claim.

*Id.* at 657, 229 USPQ at 995 (citations omitted). In *Moeller* the claims related to an electronic process for measuring the concentration of cations, the dispute centering on the particular meaning of the term "electrode body." *Moeller* too is now criticized and overruled for its statement that

although claim construction is a legal question, underlying fact disputes may arise **\*1006** pertaining to extrinsic evidence that might preclude summary judgment treatment of claim construction.

*Id.* (citation omitted). I do not see how the Federal Circuit could have decided, *de novo* on appeal, the meaning of "electrode body" in this particular invention without finding disputed technologic facts.

The majority's stated recognition that expert testimony may be useful, while holding that "extrinsic evidence of record cannot be relied on to change the meaning of the claims," majority op. at 998, denying all deference to the trier of fact's findings based on that evidence, illustrate the confusion in the court's plan of *de novo* claim interpretation as a matter of law. The majority has created a procedural quandary, for extrinsic evidence can apparently be received, but no jury can weigh it. When the extrinsic evidence is in conflict—as it invariably is—what then? Will the Federal Circuit itself weigh the evidence of expert witnesses? Will we receive a collection of self-serving affidavits, without examination and cross-examination? Such a procedure surely is not optimal for cases that may require decision of complex engineering or electronics, or chemical or biological processes.

The Court in *Daubert* referred to the value of the adversary system in matters of scientific proof. The cross-examination of technical experts, with the adversarial guidance of other technical experts, can be as rigorous as any "peer review" process. *See generally* Margaret A. Berger, *Procedural Paradigms for Applying the Daubert Test,* 78 Minn.L.Rev. 1345 (1994). In resolving litigation controversy

by determining mechanical or chemical or electronic truth, it is hard to understand why justice should be handicapped in the Federal Circuit by replacement of a live trial with cold documents.

In eliminating all sources of "fact" that might implicate the jury right, the majority has denied to the trial of patent cases the assistance that Federal Rule of Evidence 702 is designed to provide, as well as the benefits of Rules 403, 703, and 706. The purpose of these rules is "that the truth may be ascertained and proceedings justly determined." Fed.R.Evid. 102. It seems to me that we have constructed a Hobson's choice whereby either (1) there will indeed be factual evidence of technologic meaning entered into the trial record, for *de novo* decision on the record by the Federal Circuit, (2) there will be scant evidence admitted at trial, in view of our pronouncement that there is only law in claim interpretation. Either way, one might call this the "omniscience of the learned man" theory of dispute resolution in the Federal Circuit. [3]

Findings of the meaning of technologic terms and words of art in particular usages are the province of the trier of fact. Discussing words and their jurisprudential treatment, Justice Holmes wrote:

A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.

*Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918). In *Autogiro Co. of America v. United States,* 384 F.2d 391, 397, 181 Ct.Cl. 55, 155 USPQ 697, 702 (1967) one of our predecessor courts remarked: "The very nature of words would make a clear and unambiguous [patent] claim a rare occurrence." Justice Story explained the roles of judge and jury with respect to the meaning of "words of art, and technical phrases" in patent documents:

In respect to another objection, viz. that the court was bound to state what in point of law the invention claimed by the patentee was, I agree, that this is generally true, so far as the construction of the words of the patent, and specification is concerned. But then this doctrine is to be received

with qualifications, and sub modo, as the very opinion of Mr. Baron Parke, cited by the counsel, in the case of *Neilson v. Harford,* Webster Pat.Cas. 295, 370, [ [ 4 ] abundantly shows; and *the jury are to judge of* **\*1007** *the meaning* of words of art, and technical phrases, in commerce and manufactures, and of the surrounding circumstances, which may materially affect, enlarge or control the meaning of the words of the patent and specification.

*Washburn v. Gould,* 29 F.Cas. 312, 325 (C.C.D.Mass.1844) (emphasis added). Justice Story recognized that the meaning of words of art may depend on "the surrounding circumstances." Indeed, the Federal Circuit recognized that words do not always have the same meaning when they are adapted to new uses. *See Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569, 219 USPQ 1137, 1140 (Fed.Cir.1983) (patentee may be his own lexicographer).

Inventors' usages of words to describe their inventions, and the meaning thereby conveyed to persons skilled in the field, are questions of fact, not matters of law, in patent documents as in other written instruments. Disputes concerning the meaning and usage of technical terms and words of art arise in many areas of law. These disputes are resolved by the triers of fact, whether judge or jury, in their established roles in the adjudicatory process. For example, the role of the jury with respect to technical terms in a contract for drilling oil wells was explained in *Startex Drilling Co. v. Sohio Petroleum Co.,* 680 F.2d 412 (5th Cir.1982):

> It is more apt to say that the undefined technical terms on which the contract's application to the present dispute depends convey little meaning without explanation. So, while we agree with Sohio that we are free to determine the ambiguity question anew, we also affirm the district court's ruling that the contract is ambiguous. Thus it was proper to submit to the jury the evidence from both sides as to the meaning attached to these technical terms by the parties, and by the industry.

*Id.* at 415 (citation omitted). In *Zell v. American Seating Co.,* 138 F.2d 641 (2d Cir.1943), Judge Frank wrote for the court that:

> Thayer delightfully described the fatuous notion of a "lawyer's Paradise, where all words have a fixed, precisely ascertained meaning; where men may express their purposes, not only with accuracy, but with fullness; and where, if the writer has been careful, a lawyer, having a document referred to him, may sit in his chair, inspect the text, and answer all questions without raising his eyes."

*Id.* at 648 n. 26 (quoting Thayer, *A Preliminary Treatise on Evidence* (1898)).

It has not heretofore been seriously challenged that findings of the weight and credibility of evidence are for the jury, whether the issues are technologic, scientific, or otherwise. *See Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944):

> [The weight and credibility of a witness' testimony] "belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men; and so long as we have jury trials they should not be disturbed in their possession of it, except in a case of manifest and extreme abuse of their function."

*Id.* at 628, 64 S.Ct. at 729 (quoting *Aetna Life Ins. Co. v. Ward,* 140 U.S. 76, 88, 11 S.Ct. 720, 724, 35 L.Ed. 371 (1891)). In *Railroad Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506, 220 USPQ 929 (Fed.Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984) this court instructed a party who sought *de novo* appellate review after a jury trial:

> Thus [Railroad Dynamics] misconceives our role as an appellate court. In the concert hall of justice, each musician has a part to play. When one on whim plays not his own but another's part, discord is certain. Moreover, our parts are played under well defined rules.

*Id.* at 1514, 220 USPQ at 937.

Implementing this court's departure from the established appellate role, in reviewing Markman's case on this appeal the majority does not mention the jury instructions, or discuss whether a reasonable jury could have reached the verdict that

was reached on the evidence adduced, or decide whether there was substantial credible evidence of such content and weight as could support the jury's verdict. The majority finds for itself **\*1008** the disputed fact of whether the term "inventory" includes the invoices of the Westview system, without any deference to the trial process. Whether or not this court believes that it is a superior finder of technologic fact, that is not our place in the judicial structure.

I wonder how this new system will work. The majority states that the trial judge should have decided the meaning of "inventory" before giving the case to the jury, [5] but that the error was harmless since the trial judge reached the correct meaning "as a matter of law" after the jury verdict. There was no return to the jury after the trial judge re-decided what "inventory" meant, making the jury superfluous. The Federal Circuit now decides *de novo* whether "inventory" includes "invoices," ignoring the trial. What of the trial process, if trial judge and jury are ciphers upon appellate review? In the Introduction to the *Reference Manual on Scientific Evidence* (1994), Judge Schwarzer wrote:

> The bedrock of [the justice] system is the adversary process, which depends on attorneys to present evidence on behalf of their clients, judges to make the necessary and appropriate rulings concerning admissibility, and juries to resolve disputed issues of fact.
>
> *Id.* at 1.

In patent cases, no less than for other causes of action, it is the trier of fact on whom the system of justice is founded. The extensive exposition of disputed facts that is available at trial can not be duplicated on appeal. Even were there no constitutional infirmity, I can discern no practical benefit sufficient to justify this court's departure from the established procedures of trial and appeal. Implicit in the appellate process is an expected degree of deference to the trial process. The majority's elimination of the jury as trier of fact, and elimination of the deference owed to the judge upon bench trial of disputed facts, removes from the parties the benefit of the trial process. It distorts the trial/appellate relationship in a manner unique to patent litigation, and manifests a heady misperception of our assignment as a national appellate court.

## C. THE "CLASSIFICATION POWER"—TURNING FACT INTO LAW

Commentators have remarked on the temptation of appellate courts to redefine questions of fact as questions of law in order to impose the court's policy viewpoint on the decision. Professor Martin Louis calls the appellate assertion of power to treat fact as law "drastic in that it amounts to a direct judicial assault on the prerogatives of fact finders." Martin B. Louis, *Allocating Adjudicative Decision Making Authority Between the Trial and Appellate Levels: A Unified View of the Scope of Review, the Judge/Jury Question, and Procedural Discretion,* 64 N.C.L.Rev. 993, 1018 (1986). Louis observes that the "classification of ultimate facts as questions of law amounts to a manipulation of the law-fact doctrine to take questions from the jury or to subject the trial level's resolution of questions to free appellate review." *Id.* at 1028. Although the Seventh Amendment has provided a safeguard **\*1009** against this autocracy of the judiciary, concerned observers have long counselled vigilance. Thus definitions of fact and law—the methodology of this appellate power—have attracted the attention of legal scholars.

"Law" is usually defined as a statement of the general principle or rule, predicated in advance, awaiting application to particular facts as they may arise. *See* Francis H. Bohlen, *Mixed Questions of Law and Fact,* 72 U.Pa.L.Rev. 111, 112 (1924). Louis, *supra,* at 994, states the principle:

> Declarations of law are fact-free general principles that are applicable to all, or at least to many, disputes and not simply to the one sub judice.

There is an additional element to "law;" that is, the duty of judicial enforcement. As Professor Thayer explained, "nothing is law that is not a rule or standard which it is the duty of judicial tribunals to apply and enforce." James B. Thayer, "*Law and Fact" in Jury Trials,* 4 Harv.L.Rev. 147, 153 (1890).

Thayer defines "fact" as follows:

> ["Fact"] is what Locke expresses when he speaks of "some particular existence, or, as it is usually termed, matter of fact." The fundamental conception is that of a thing as existing, or being true. It is not limited to what is tangible, or visible, or in any way the object of sense; things invisible, mere thoughts, intentions, fancies of the mind, propositions, when conceived of as existing or being true, are conceived of as facts. The question of whether a thing be a fact or not, is the question of whether it is, whether it exists, whether it be true. All inquiries into the truth, the reality, the actuality of things are inquires into the fact about them.

*Id.* at 151–52. A compilation of definitions of "fact" is provided in *Black's Law Dictionary* 591–92 (6th ed. 1990):

A thing done; an action performed or an incident transpiring; an event or circumstance; an actual occurrence; an actual happening in time or space or an event mental or physical; that which has taken place.

....

.... "Fact" means reality of events or things the actual occurrence or existence of which is to be determined by evidence.

In sum, the law is a general proposition, while the fact is a case-specific inquiry. Clarence Morris, *Law and Fact,* 55 Harv.L.Rev. 1303, 1304 (1942), observed that a controlling distinction between law and fact is whether evidence is needed, for a question of fact usually calls for proof, whereas matters of law are established not by evidentiary showing but by intellectual abstraction.

These distinctions have often been discussed, usually in the course of considering the complexities that can arise, and how they have been, or should be, treated. Thus commentators and judges have written to explain the distinctions among historical facts, ultimate facts, and mixed law/fact questions, in the course of relating these distinctions to trial procedures and judicial review. The nicety that has been generated was criticized in *Armour & Co. v. Wilson & Co.,* 274 F.2d 143, 124 USPQ 115 (7th Cir.1960), as follows:

We have come to speak of questions of "fact," "primary facts," "subsidiary facts," "evidentiary facts," "ultimate facts," "physical facts," "documentary facts," "oral evidence," "inferences," "reasonable inferences," "findings of fact," "conclusions," "conclusions of law," "questions of fact," "questions of law," "mixed questions of law and fact," "correct criteria of law," and so on *ad infinitum.* The simple answer is that we are all too frequently dealing in semantics, and our choice of words does not always reflect the magic we would prefer to ascribe to them.

274 F.2d at 155, 124 USPQ at 124–25 (footnote omitted). *See generally* Steven A. Childress & Martha S. Davis, *Federal Standards of Review* (2d ed. 1992).

The character of what is a fact does not change, even in those special cases that have been held to warrant plenary appellate review.[6] The subject matter that the majority **\*1010** now designates as "law"—the disputed meaning and scope of technologic terms and words of art as used in particular inventions—is not law, but fact. On any definition of fact and law, the question of whether "inventory" as used in Markman's Claim 1 means only clothing or can include invoices is a question of fact: on Thayer's criterion of whether the fact exists; on Morris' criterion of whether there is a need for evidence; on Bohlen's inquiry of whether the meaning is specific to the situation *sub judice.* The meaning of "inventory" is specific to this invention, this patent, this claim, this system, this defendant. Its determination is for the trier of fact.

### III

### THE CONSTITUTION

The most egregious lapse in the majority's ruling is its discard of the jury right in patent cases. As I stated at the outset, patent infringement has been tried to a jury in the United States for two hundred years, and in England since at least 1623. Disputes concerning "letters patent" for inventions were tried in the English courts, as for other forms of letters patent, as I shall illustrate. Patent infringement trials at common law included determination of validity as well as infringement. Whatever version of "law/fact" this court now chooses to adopt, it can not redact the history of jury trials. The judicial obligation to safeguard the constitutional right is not defeasible by calling a patent a "statute," or otherwise diminishing the vitality of the Seventh Amendment.

Thus the court, sitting *en banc* to overrule its contrary precedent, removes the jury from its role as the trier of fact. That right is assured by the Seventh Amendment:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII.

63 USLW 2663, 34 U.S.P.Q.2d 1321

The importance of the jury right to the Framers can not be overemphasized. Alexander Hamilton wrote:

> The friends and adversaries of the plan of the convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury; or if there is any difference between them it consists in this: the former regard it as a valuable safeguard to liberty; the latter represent it as the very palladium of free government.

The Federalist No. 83, at 499 (Clinton Rossiter ed., 1961). In discussing the history of the jury in England and in the United States, Judge Arnold has explained:

> It is almost impossible to exaggerate the centrality of the institution of the jury to almost all the important episodes of Anglo–American legal history. Many of the central ideas of the American and English common law owe their origin to the fact that the jury was the chief mechanism for trying factual disputes. It is the single most important institution in the history of Anglo–American law.

Morris Sheppard Arnold, *The Civil Jury in Historical Perspective, in The American Civil Jury* 9, 10 (1987).

The value that the Framers placed on this "palladium of free government" has been guarded by the courts:

> Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.

*Dimick v. Schiedt,* 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935).

The deference that courts give to jury verdicts is the mechanism by which the Constitution protects the jury right from encroachment by judges. It is not this court's **\*1011** option to violate that right, whether by denying such deference or by taking from the jury the trial of factual issues.

Whatever one's personal view of the relative capabilities of a jury and the Federal Circuit in finding technologic facts in patent cases, it is not within our authority to readjust that role to our taste:

> The Seventh Amendment ... requires that questions of fact in common law actions shall be settled by a jury, and that the court shall not assume directly or indirectly to take from the jury or to itself such prerogative.

*Walker v. New Mexico & So. Pac. R. Co.,* 165 U.S. 593, 596, 17 S.Ct. 421, 422, 41 L.Ed. 837 (1897).

The Federal Circuit early affirmed its inheritance of this responsibility, as we undertook our assignment to provide nationwide uniformity in patent cases. In *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1547, 220 USPQ 193, 197 (Fed.Cir.1983) the court stated:

> So long as the Seventh Amendment stands, the right to a jury trial should not be rationed, nor should particular issues in particular types of cases be treated differently from similar issues in other types of cases.

In *Railroad Dynamics v. Stucki,* 727 F.2d at 1515, 220 USPQ at 937, the court stated:

> There is, of course, no reason for considering patent cases as somehow out of the mainstream of the law and rules of procedure applicable to jury trials for centuries under our jurisprudence.

In many ensuing decisions we reaffirmed this obligation. However, this court's fidelity to fundamental law slipped in recent years, culminating in today's trivializing of our heritage as we defeat the jury right in patent infringement cases.

## A. THE HISTORICAL TEST

There are no fine lines to be drawn in interpreting the Seventh Amendment, for all cases at common law in England were tried to a jury. In explaining the "historical test," Justice Story described England as "the grand reservoir of all our jurisprudence":

Beyond all question, the common law here alluded to [in the Seventh Amendment] is not the common law of any individual state, (for it probably differs in all), but is the common law of England, the grand reservoir of all our jurisprudence. It cannot be necessary for me to expound the grounds for this opinion, because they must be obvious to every person acquainted with the history of the law.

*United States v. Wonson,* 28 F.Cas. 745, 750 (1812). The historical test assured the largeness of the embrace of the Amendment. I can find no support in history for the restriction today adopted. In England in 1791, as of at least 1623, actions of the "force and validity" of letters patent were tried according to the rules of the common law.

Letters patent were grants of the Crown, made for a variety of purposes. During the 1500s to early 1600s, the Star Chamber considered all infringements of letters patent to be contempts of royal authority. *See Millar v. Taylor,* 4 Burr. 2303, 2374 (K.B.1769) (contempt proceeding applied by the Star Chamber to infringement of "any patent the Crown thought proper to grant"); Coke, 3 Inst. 182–83 (discussing abuses). In 1623 the Statute of Monopolies prohibited all monopolies except patents for inventions, which continued to be granted for terms that were limited to fourteen years. Section 6 of the Statute stated:

6. Provided also, that any declaration before mentioned, shall not extend to any letters patents and grants of privilege for the term of fourteen years or under, hereafter to be made, of the sole working or making of any manner of new manufactures within this realm to the true and first inventor and inventors of such manufactures, which others at the time of making such letters patents and grants shall not use, so as also they be not contrary to the law nor mischievous to the state by raising prices of commodities at home, or hurt of trade, or generally inconvenient ...

21 Jac. I, c. 3, s. 6 (1623).[7]  Section 2 of the Statute provided that the "force and validity" **\*1012** of the subject matter of the Statute shall be "examined, heard, tried, and determined" according to the common law:

2. And all monopolies, and all such commissions, grants, licenses, charters, letters patent, proclamations, inhibitions, restraints, warrants of assistance, and all other matters and things tending as aforesaid, and the force and validity of them, and every of them, ought to be, and shall be for ever hereafter examined, heard, tried, and determined, by and according to the common laws of this realm, and not otherwise.

21 Jac. I, c. 3, s. 2 (1623). Lord Coke explained that the purpose of Section 2 was to remedy the "mischief" of Star Chamber actions by placing the authorized grants under the common law. 3 Inst. at 183.

The litigation procedures that applied to letters patent for inventions did not differ from those applied to other letters patent. *See* Benjamin Vaughan Abbott, *Decisions on the Law of Patents for Inventions Rendered by English Courts* 8 n. 2 (1887) (the rules for letters patent stated in the case of *Rex v. Mussary* (K.B.1738) were also generally applicable to letters patent for inventions). English cases of the period show similar procedures whether the subject was a charter, an invention, a literary work, a trademark, an interest in land, or a trade route.

Trial by jury was the way of the common law, and did not depend on the subject of the letters patent. *See, e.g., East India Company versus Sandys,* 1 Vern. 127 (Ch.1682) (validity of grant of exclusive trade route tried to jury); *Mayor of Kingston upon Hull versus Horner,* 1 Cowp. 102, 108 (K.B.1774) (dispute concerning meaning of terms of a charter from the Crown relating to a port "most proper to be left to the decision of the jury"); *Blanchard v. Hill,* 2 Atk. [2d ed. 1794] 484 (Ch.1742) (injunction to restrain the use of a tradesman's mark granted by the Crown could not be issued without a hearing at law); *Anon,* 1 Vern. 120 (Ch.1682) (the Lord Keeper (or Chancellor) required trial at law to determine the validity of letters patent for printing of the Bible); *Collins v. Sawrey,* 4 Bro.P.C. [2d ed. 1803] 692 (H.L.1772) (rejecting argument that since the issue depended on written evidence, the "construction" of the letters patent for a vicarage was for the chancery court); *Donaldson v. Beckett,* 2 Bro. P.C. [2d ed. 1803] 129, 138 (H.L.1774) ("Between such inventions and copies of books, no sensible distinction can be drawn."); *Millar v. Taylor,* 4 Burr. at 2323:

In letters patent, all conditions required by 21 Jac. 1 must be observed. Patentees for new inventions are left, by that statute, to the common law, and the remedies which follow in their nature.

There simply is no way, in 1995, to rewrite the history of England and the place of the jury under the common law in 1791.

Actions for infringement of letters patent for inventions were initiated either in the law courts or in Chancery, depending on the relief sought. [8] When equitable relief was sought, patent actions began with the filing of a bill in the Ordinary side of Chancery (called the Petty Bag or Latin Side), for that **\*1013** is where the letters patent were "enrolled." Issues relating to invalidity and noninfringement, if raised by the defendant, were directed by the Chancellor to the courts of law for trial to a jury, and then returned to Chancery if the verdict warranted. The procedure of filing a bill in Chancery and then trying the issue at law was explained by Davies:

> [T]he Court of Chancery never decides upon the validity of a patent, the practice there being nothing more than to grant an injunction, at the prayer of the patentee, against any person infringing his patent, and to order an account of profits; but if any question arises upon the validity of the patent, novelty of the invention, or the sufficiency of the specification, it is uniformly referred to a court of law.

John Davies, *A Collection of the Most Important Cases Respecting Patents of Invention and the Rights of Patentees* ix (1816).

In infringement suits, the Chancery court could grant the patentee's bill seeking an injunction, or a writ of *scire facias* to repeal the patent, after trial to a jury in a court of law. *See, e.g., Brewster v. Weld,* 6 Mod. 229 (1704) (a *scire facias* to repeal letters patent may be sued in Chancery by any person prejudiced by a patent, as well as by the Crown; when Chancery issues writ returnable to Queen's Bench [requiring trial to a jury] Chancery neither has jurisdiction nor can it supersede such writ); *Rex v. Else,* 1 Carp.P.C. 103 (K.B., N.P. 1785) (proceeding brought by writ of *scire facias* to repeal patent on ground that there was no new invention described in the specification; tried in King's Bench wherein the jury rendered a verdict for the Crown). Not all matters required the Chancellor to direct issues to the law courts to be tried. For example, when the Crown granted letters patent,

for invention or otherwise, the grant had to be enrolled in Chancery's Petty Bag Office within four months for the patent to be enforceable. Thus a bill could be filed in Chancery to seek equitable relief for a patentee's failure to enroll the patent before the time expired. *E.g., Ex parte Beck,* 1 Bro.P.C. [2d ed. 1803] 578 (Ch.1784).

These relationships were well established by the date of the Seventh Amendment. Issues of patent infringement and validity were tried only to a jury, in the courts of King's Bench, Common Pleas, or Assize. In a common procedure the patentee would seek an injunction against infringement, the defendant would assert invalidity, and the matter would be directed to a court of law for trial. This process is illustrated in *Newsham v. Gray,* a patent infringement action that started with a bill in equity, seeking to enjoin Gray, the alleged infringer. The Lord Keeper directed the plaintiff to bring an action at law. The following is from Lord Chancellor Hardwicke's opinion in the subsequent proceeding in Chancery, where Gray was seeking to recover costs since the plaintiff was nonsuited for failure to prosecute:

> The plaintiff had obtained letters patent of the crown for a new invention of fire engines.

> A bill was brought by him to establish his letters patent, and for a perpetual injunction against the defendant, who had taken upon him to make and vend these engines, notwithstanding the plaintiff had sole right and property under the letters patent.

> The defendant, by his answer, insisted it was not a new invention, so as to entitle the plaintiff to an injunction.

> There was no replication, but the cause came on at the Rolls, upon bill and answer, in *September* 1740, before Mr. Justice *Parker,* who, not thinking the answer sufficient, directed an action at law to be brought by the plaintiff, for a breach of the letters patent, and retained the bill for a twelvemonth; the plaintiff was nonsuited at law upon the merits; and the cause is now set down by the defendant for a dismission of the bill, and for costs.

2 Atk. [2d ed. 1794] 286, 286–87 (Ch.1742).

When the patentee did not seek equitable relief, the action was brought directly at law. The cause of action was trespass on the case. The action was an offspring of the criminal law, and knew no form but trial by jury. *See* H.G. Hanbury and D.C.M. Yardley, *English Courts of Law* 64 (5th ed. 1979) (1944). The defendant could assert defenses including invalidity **\*1014**

**Markman v. Westview Instruments, Inc., 52 F.3d 967 (1995)**

63 USLW 2663, 34 U.S.P.Q.2d 1321

and noninfringement. All issues, including damages, were for the jury.

The burden of proof was on the patentee. Since letters patent of invention were issued without examination, simply upon declaration, actions to enforce the patent began with proof of entitlement to the patent, if disputed by the defendant. The burden of proving infringement was also on the plaintiff, if infringement was disputed. The English reports show that often patent infringement actions turned on the issue of entitlement or validity, whereupon when validity was found, verdict would be rendered for infringement. For example, *Dolland's Case,* 1 Carp.P.C. 28 (C.P.1766)[9] was an action for trespass on the case, seeking damages resulting from infringement of Dolland's 1758 patent on a telescope. The defendant asserted invalidity due to prior use. The jury verdict was for Dolland.

*Morris v. Bramson,* 1 Carp.P.C. 30 (K.B.1776) was an action for infringement of Morris' patent, a patent previously tried and adjudged valid and infringed in *Morris v. Else.* (*Morris v. Else* is unreported in the English Reports; the case is discussed in *Boulton v. Bull,* 2 H.Bl. at 489.) In *Morris v. Bramson* the defendant argued that an addition to an old machine was not patentable as a matter of law. The judge instructed the jury on the law, and the jury found for the plaintiff, awarding 500 pounds in damages for infringement. 1 Carp.P.C. at 31.

*Bramah v. Hardcastle,* 1 Carp.P.C. 168 (K.B.1789), was an action in trespass on the case for infringement of letters patent for a new construct of a water closet. The defendant asserted invalidity due to prior use and lack of novelty. Lord Kenyon is reported as telling the jury "the patent was void, the invention not being new," *id.* at 171, and that they should find for the defendant.[10] The jury sustained the patent, and found infringement. The court entered judgment in accordance with the jury verdict.

*Arkwright v. Nightingale,* 1 Carp.P.C. 38 (C.P.1785), was an action for infringement of a 1775 letters patent for "machines of utility in preparing silk, cotton, flax and wool for spinning." At trial the defendant claimed that the patent was invalid because of an inadequate disclosure in the specification. At the close of the trial, Lord Loughborough provided a lengthy summary of the evidence, and concluded his charge with: "Therefore the single question is, whether you believe these five witnesses are perjured, or that they speak the truth. According as you are of the opinion, one way or the other, you will find your verdict for the plaintiff or the defendant." 1

Carp.P.C. at 53. The jury rendered a verdict for the plaintiff, that is, infringement by the defendant.

*Rex v. Arkwright,* 1 Carp.P.C. 53 (K.B.1785): After the decision in *Arkwright v. Nightingale, supra,* a *scire facias* was filed with the High Court of Chancery to repeal the patent from the rolls, the petitioner asserting in part that the invention was not new as to use in England, and that Arkwright was not the inventor. The issue was tried to a jury in King's Bench. After the close of the evidence, the court instructed the jury:

> Gentlemen, thus the case stands as to the several component parts of this machine; and if upon them you are satisfied none of them were inventions unknown at the time this patent was granted, or that they were not invented by the defendant; upon either of these points the prosecutor is entitled to your verdict.

1 Carp.P.C. at 101. The jury found for the prosecutor.

*Turner v. Winter,* 1 T.R. 602 (K.B.1787), reports a ruling on a motion to set aside a jury verdict of patent infringement and grant **\*1015** a new trial. The court granted the motion, explaining that:

> And if it appear that there is any unnecessary ambiguity affectedly introduced into the specification, or anything which tends to mislead the public, in that case the patent is void. Here it does appear to me, that there is at least such a doubt on the evidence, that I cannot say this matter has been so fully and fairly examined, as to preclude any further investigation of the subject.

1 T.R. at 605. The case was remanded for a new trial.

*Administrators of Calthorp v. Waymans,* 3 Keb. 710 (K.B.1676) was an action for infringement of a patent on an engine. The jury was instructed that English law required novelty only in England, and did not require that an importer/patentee of a device new to England be the actual inventor. The jury found for the patentee, the report of the case explaining that "it appeared in evidence to a jury at Bar, that

the fashion came out of Holland, and was there used above fifty years since, but never before used in England." 3 Keb. at 710.

I again stress that actions at law were tried to a jury. With respect to letters patent for inventions, and in accordance with the Statute of Monopolies, in seventeenth- and eighteenth-century England patent infringement was tried at common law. I have come upon no exception in the cases reported during this period.

## B. CONTINUITY IN THE UNITED STATES

The reports of English patent cases do not manifest the turmoil in preserving the jury right in England, the imprisonment of jurors before 1670, and attempts to limit the jury right in England as well as in the American colonies. Reflecting this experience, there was in the new United States a reverence for the place of the jury as, in the words of Thomas Jefferson, "the only anchor yet imagined by man, by which a government can be held to the principles of its constitution." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 343 n. 10, 99 S.Ct. 645, 658 n. 10, 58 L.Ed.2d 552 (1979) (Rehnquist, J., dissenting) (quoting 3 *The Writings of Thomas Jefferson* 71 (Washington ed. 1861)).

The Supreme Court summarized a long history in the statement:

> The trial by jury is justly dear to the American people. It has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy.

*Parsons v. Bedford,* 28 U.S. (3 Pet.) 433, 445, 7 L.Ed. 732 (1830). Justice Story made clear that the right was not limited to the precise causes of action that existed in the law courts of England. *Id.,* 28 U.S. at 446–47. *See generally* James Fleming, Jr., *Right to a Jury Trial in Civil Actions,* 72 Yale L.J. 655 (1963). In *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) the Court wrote:

> Although the thrust of the Amendment was to preserve the right to jury trial as it existed in 1791, it has long been settled that the right extends

beyond the common-law forms of action recognized at that time.

415 U.S. at 193, 94 S.Ct. at 1007. In *Tull v. United States,* 481 U.S. 412, 417, 107 S.Ct. 1831, 1835, 95 L.Ed.2d 365 (1987) the Court reiterated that the right to jury trial extends to causes of action created by Congress which are similar to common law forms of action. As a recent example, in *Chauffeurs, Teamsters, and Helpers Local No. 391 v. Terry,* 494 U.S. 558, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990), the Court considered whether a suit in which an employee sought back pay, for breach of a union's duty of fair representation, carried the right to a jury trial. The Court stated:

> To determine whether a particular action will resolve legal rights, we examine both the nature of the issues involved and the remedy sought. "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Tull, supra* [481 U.S.], at 417–18 [107 S.Ct. at 1835] (citations omitted). The second inquiry is the more important **\*1016** in our analysis. *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 42 [109 S.Ct. 2782, 2790, 106 L.Ed.2d 26] (1989).

494 U.S. at 565, 110 S.Ct. at 1345 (footnote omitted). Observing that the cause of action of a union's duty was unknown in eighteenth-century England, the Court looked to analogous actions, including an action to set aside an arbitration award, an action of a beneficiary against a trustee, and an attorney malpractice action. *Id.* at 565–66, 110 S.Ct. at 1344–45. The Court held that the respondents were entitled to a jury trial under the Seventh Amendment, despite the equitable nature of the underlying action, since the relief sought was legal in nature. *See, e.g., Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959):

> As this Court said in *Scott v. Neely,* 140 U.S. 106, 109–110 [11 S.Ct. 712, 714, 35 L.Ed. 358 (1891) ]: "In the Federal courts this [jury] right cannot be dispensed with, except by the assent of the parties entitled to it, nor can it be impaired by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action or during its pendency."

359 U.S. at 510, 79 S.Ct. at 956–57 (footnote omitted). *See also Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977).

63 USLW 2663, 34 U.S.P.Q.2d 1321

On this history, it is jarring to come upon the majority's argument that the Seventh Amendment no longer applies because there are now "claims" in United States patents, whereas the old English patents did not have claims as we know them. The removal of the jury right is not so casually achieved:

> [T]he Constitution is concerned, not with form, but with substance. All of vital significance in trial by jury is that issues of fact be submitted for determination with such instructions and guidance by the court as will afford opportunity for that consideration by the jury which was secured by the rules governing trials at common law.

*Gasoline Prods. Co. v. Champlin Ref. Co.,* 283 U.S. 494, 498, 51 S.Ct. 513, 514, 75 L.Ed. 1188 (1931).

However, the argument about claims does bring out a point of curiosity, for the law of eighteenth-century England required specificity in "particularly describing" what was patented, and the patent grant ended with a concise summary of the subject matter, with details annexed in the specification; patent "claims," in turn, are concise summaries of the subject matter, with details annexed in the specification. Following is a portion of a representative letters patent dated March 28, 1764:

> To all to whom these presents shall come, John Morris, of the town of Nottingham, hosier, sendeth greeting.—

> Whereas, the King's Most Excellent Majesty, by letters patent under the Great Seal of Great Britain, bearing the date at Westminster, [gave and granted to the inventors] sole privilege ... to make, use, exercise, and vend their invention ... in which said letters patent is contained a proviso that if the said Thomas and John Morris, and John and William Betts, or any one of them should not *particularly describe the nature of the said invention and in what manner the same is to be performed* by an instrument, in writing under their hands and seals, or the hand and seal of one of them, and cause the same to be enrolled in the High Court of Chancery ...

> [The specification ending with:] Now know ye, that I, the said John Morris, in pursuance of the said proviso in the said letters patent contained, do hereby declare that the said invention of an engine or machine, on which is fixed a

set of working needles, which engine or machine is fixed to a stocking-frame for the making of oilet-holes or net-work in silk, thread, cotton, or worsted, as mitts, gloves, hoods, aprons, handkerchiefs, and other goods usually manufactured upon stocking-frames by a method entirely new, is particularly described in the plans hereunderto annexed.

*Morris v. Bramson,* 1 Carp. P.C. at 31–32 n. * (emphasis added). The requirement that the inventor "particularly describe" the invention was carried into the United States Patent Act of 1790:

> **\*1017** Sec. 2. *And be it further enacted,* That the grantee or grantees of each patent shall, at the time of granting the same, deliver to the Secretary of State a specification in writing, containing a description, accompanied with drafts or models, and explanations and models (if the nature of the invention or discovery will admit of a model) of the thing or things, by him or them invented or discovered, and described as aforesaid, in the said patents; *which specification shall be so particular, and said models so exact, as not only to distinguish the invention* or discovery from other things before known and used, but also to enable a workman or other person skilled in the art or manufacture, whereof it is a branch, or wherewith it may be nearest connected, to make, construct, or use the same....

Patent Act of 1790, ch. 7, § 2, 1 Stat. 109, 110 (1790) (emphasis added).

This requirement was continued in all subsequent revisions, which were successively more explicit. In 1836 the Patent Act required that the inventor "particularly specify the part, improvement, or combination which he claims as his own invention." Ch. 357, § 6, 5 Stat. 117, 119. Again revised in 1870, the statute required that the inventor "particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." Ch. 230, § 26, 16 Stat. 198, 201. The present statute, enacted in 1952, states that "the specification shall conclude with one or more claims particularly pointing out and distinctly

claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. This evolution in statutory directive, requiring the inventor to be more specific as to what had been invented, did not remove the jury from trial of patent infringement cases.

The majority's other response to the Constitution is to call a patent a "statute," arguing that "statutory interpretation" is not for the jury. Designating a patent a statute in order to avoid the Seventh Amendment simply denies history and our heritage. Our judicial responsibility is to uphold the Constitution, not devise ways to circumvent it.

## IV

## PRECEDENT

### A. FEDERAL CIRCUIT CASES SELECTED FOR CRITICISM AND OVERRULE

The Federal Circuit early in its existence deplored the "risk of effectively denying the constitutional right spelled out in the first clause of the Seventh Amendment." *Railroad Dynamics v. Stucki,* 727 F.2d at 1515, 220 USPQ at 937–38. Many Federal Circuit decisions implemented the correct standard of trial and appellate review in patent infringement cases. The majority now expressly disapproves appellate deference to the trier of fact on the issues of fact that are determined in the course of "construing" the meaning and scope of patent claims, issues of fact that are dispositive of the question of patent infringement. The majority singles out seven cases for specific criticism, and fatally taints the many other cases that applied the correct standard of deference to the trier of fact.

The majority explains that it overrules these cases because this court held that the interpretation of disputed technologic terms in patent claims raises jury-triable issues, or because the panel applied a deferential standard of appellate review. Majority op. at 993–994. The majority does not tell us how such cases will be tried, now that appeal includes mandatory *de novo* adjudication of what were once recognized as triable facts. Even the least cynical observer must wonder at the court's capacity for this technological overload. A glance at the subject matter of the seven expressly disapproved cases illustrates these problems.

**1.** *McGill, Inc. v. John Zink Co.,* 736 F.2d 666, 221 USPQ 944 (Fed.Cir.), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984).

The disputed technical term in the patent claim was "recovered liquid hydrocarbon absorbent." On McGill's view of what this term meant, the Zink process would infringe McGill's claim; on Zink's view, the Zink process *1018 would not infringe. There was conflicting testimony of technical experts, and the issue was submitted to the jury. On appeal the Federal Circuit made the now-excoriated statement:

> If, however, the meaning of a term of art in the claims is disputed and extrinsic evidence is needed to explain the meaning, construction of the claims could be left to the jury. In the latter instance, the jury cannot be directed to the disputed meaning for the term of art.

*Id.* at 672, 221 USPQ at 948 (citations omitted). On appellate review the court considered the meaning of the claims upon the following criterion:

> In the instant case, the jury's finding of infringement was predicated on construction of claim 2. To obtain a reversal, Zink must demonstrate that no reasonable juror could have interpreted the claim in the fashion that supports the infringement finding.... Zink must convince us that there is no set of facts, consistent with McGill's interpretation, that was supported by substantial evidence.

*Id.* The majority now holds that the meaning of "recovered liquid hydrocarbon absorbent" and the other disputed technical terms that were at issue was not a jury triable issue, and that the Federal Circuit should have, and hereafter will, decide such questions as a matter of law.

**2.** *Bio–Rad Labs., Inc. v. Nicolet Instrument Corp.,* 739 F.2d 604, 222 USPQ 654 (Fed.Cir.), *cert. denied,* 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984).

63 USLW 2663, 34 U.S.P.Q.2d 1321

The patented device was an interferometer that contained an oscillating mirror that varied the lengths of two of four possible paths of split beams of reflected light, whereby the thickness of the epitaxial layer of a semiconductor was determined from the points of locally maximum constructive interference, by comparing phase differences. The jury trial lasted forty-four days. On appeal this court stated that we review to determine

> whether reasonable jurors, after reviewing all the evidence, could have interpreted the claims to include the sequence of events followed by [the accused optical apparatus].

*Id.* at 613, 222 USPQ at 661 (citing *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893, 221 USPQ 669, 673 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984)). This court declined the losing party's request that we make a *de novo* interpretation of the claims:

> We emphasize that our task is not to interpret the claims as though no trial occurred. Both parties submitted testimony in support of their interpretation before the jury. Bio–Rad's interpretation prevailed and was not overturned by the trial judge. On appeal, we consider only whether reasonable jurors could have interpreted the claim in the manner presumed.

*Id.* at 614, 222 USPQ at 661–62. This practice can no longer be followed, and the Federal Circuit shall somehow conduct these technological analyses for ourselves, as a matter of law.

**3.** *Palumbo v. Don–Joy Co.,* **762 F.2d 969, 226 USPQ 5 (Fed.Cir.1985).**

This case too is criticized for its holding that the findings of disputed facts of the meaning of claim terms is for the trier of fact. The appeal reached us on summary judgment. Palumbo sued Don–Joy for infringement of a patent to a patellar brace used in diagnosis and treatment of patellar subluxation (dislocation of the kneecap). In holding that summary judgment was improperly granted, this court referred to the disputed factual issues that had been raised in the depositions, as well as ambiguity in the prosecution history and the need

for expert witnesses to present the viewpoint of those of skill in this art. The court stated:

> If the language of a claim is not disputed, then the scope of the claim may be construed as a matter of law. But when the meaning of a term in a claim is disputed and extrinsic evidence is necessary to explain that term, then an underlying factual question arises, and construction of the claim should be left to the trier or jury under appropriate instruction.

*Id.* at 974, 226 USPQ at 8. Overruling the statement that the meaning of claim terms **\*1019** can raise underlying factual questions and that disputed "claim construction" should be left to the trier or jury, the majority now requires that the Federal Circuit shall make these decisions *de novo.*

**4.** *Moeller v. Ionetics, Inc.,* **794 F.2d 653, 229 USPQ 992 (Fed.Cir.1986).**

As I mentioned *supra,* the majority also disapproves this case, criticizing its holding that "disputes over the meaning of claim language may raise factual questions reviewed for substantial evidence or clear error as the case may be," in the majority's words. The invention was a system of selectively measuring the concentration of certain cations in the presence of other components, by interposing a membrane barrier and using specified electrodes whereby cation-specific components such as nonactin, gramicidin, and valinomycin form positively charged complexes with the sensing device. The disputed term claims were "electrode," "electrode body," and "disposed in said body." The technologic meaning of these terms, in this usage and this invention, decided whether the terms encompassed the accused system. On appeal this court observed that the meanings of these terms were "clearly disputed," referring to conflicting evidence, and held that the matter required trial, vacating the grant of summary judgment. It appears that this court will now decide what these terms mean as a matter of law.

**5.** *H.H. Robertson Co. v. United Steel Deck, Inc.,* **820 F.2d 384, 2 USPQ2d 1926 (Fed.Cir.1987).**

In connection with a motion for preliminary injunction, the dispositive issue before the district court was the meaning of "bottomless trench" in a patent for a concrete deck structure

63 USLW 2663, 34 U.S.P.Q.2d 1321

for distributing electrical wiring. The defendants argued that their structure was not "truly bottomless" because "horizontal metal sections" and a "horizontal metal strip" constituted a partial bottom. After a four-day hearing, the district court granted the preliminary injunction. In affirming, this court described its standard of review:

> Claim construction is reviewed as a matter of law. However, interpretation of a claim may depend on evidentiary material about which there is a factual dispute, requiring resolution of factual issues as a basis for interpretation of the claim. In this case, there was extensive testimony on the issue of claim construction, including the conflicting views of experts on both legal and factual questions. Those factual considerations that are pertinent to the district court's construction of the term "bottomless" are reviewed under the clearly erroneous standard.

*Id.* at 389, 2 USPQ2d at 1929 (citations omitted). The majority condemns this case for its recognition that "claim construction" may require resolution of factual issues, and the use of the clearly erroneous standard of review for those factual findings. Not only juries, but trial judges, will now be denied the deference owed to their factual findings.

**6.** *Perini America, Inc. v. Paper Converting Mach. Co.,* **832 F.2d 581, 4 USPQ2d 1621 (Fed.Cir.1987).**

This too was a bench trial, and had been fully tried to the court. As I mentioned *supra,* the dispute related to various aspects of machines used in manufacturing paper towels. This court recognized that these were factual issues, reviewed on the clearly erroneous standard:

> A trial court's conclusions on the scope of the claims are reviewable as matters of law, but findings on disputed meanings of terms in the claims and on the infringement issue must be shown to have been clearly erroneous.

*Id.* at 584, 4 USPQ2d at 1624 (citations omitted). The court observed that "legal conclusions [are] dictated by established

facts and not the other way around, and does not change the nature of the meaning-of-terms inquiry from one of fact to one of law." *Id.* The majority strongly criticizes, and overrules, these statements.

**7.** *Tol–O–Matic, Inc. v. Proma Produkt–Und Marketing Gesellschaft m.b.H,* **945 F.2d 1546, 20 USPQ2d 1332 (Fed.Cir.1991).**

This was a jury trial. The technology related to rodless piston-cylinders. The invention **\*1020** was for a yoke structure that reduces the forces tending to widen the slit through which the external load is moved by the piston, thereby avoiding loss of cylinder pressure. At issue was the meaning of the term "to provide for lateral support of the portions of the cylinder separated by the slit and spanned by the yoke." The decision required a choice between Tol–O–Matic's position that this term meant that the yoke must prevent all widening of the slit, and Proma's position that this term required only some resistance to slit widening. At the trial there was testimony by engineers representing both sides, who ran tests on rodless cylinders under various conditions and reached inconsistent results. The jury was instructed to consider all of the evidence and find the meaning of the disputed term, and then to apply it to the accused device. On appeal this court endorsed the procedure:

> The interpretation of claims is defined as a matter of law based on underlying facts. Interpretation of the claim words "provide for lateral support" *required that the jury give consideration and weight to several underlying factual questions,* including in this case the description of the claimed element in the specification, the intended meaning and usage of the claim terms by the patentee, what transpired during the prosecution of the patent application, and the technological evidence offered by the expert witnesses. *When the meaning of a term in a patent claim is unclear, subject to varying interpretations, or ambiguous, the jury may interpret the term en route to deciding the issue of infringement.* The jury's verdict of noninfringement is reviewed, in accordance with the rules governing

review of jury determinations, to
ascertain whether reasonable jurors
could have interpreted the claim in a
way that supports the verdict.

*Id.* at 1549–50, 20 USPQ2d at 1335–36 (emphases added)
(citations omitted).

This case is severely criticized for the emphasized statements.
According to the majority these questions are not factual, can
not be given to the jury, are not reviewed with deference to
the trier of fact, and will be decided *de novo* by the Federal
Circuit.

### B. OTHER IMPUGNED FEDERAL CIRCUIT CASES

The court in *Tol–O–Matic* cited *Tillotson, Ltd. v. Walbro
Corp.,* 831 F.2d 1033, 4 USPQ2d 1450 (Fed.Cir.1987);
*Tandon Corp. v. United States Int'l Trade Comm'n,* 831 F.2d
1017, 4 USPQ2d 1283 (Fed.Cir.1987); *Howes v. Medical
Components, Inc.; Moeller v. Ionetics, Inc.; Snellman
v. Ricoh Co., Ltd.,* 862 F.2d 283, 8 USPQ2d 1996
(Fed.Cir.1988), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3199,
105 L.Ed.2d 707 (1989); *Vieau v. Japax, Inc.,* 823 F.2d
1510, 3 USPQ2d 1094 (Fed.Cir.1987); *Data Line Corp.
v. Micro Technologies, Inc.,* 813 F.2d 1196, 1 USPQ2d
2052 (Fed.Cir.1987); *Palumbo v. Don–Joy Co.; Bio–Rad
Labs., Inc. v. Nicolet Instrument Corp.; Perkin–Elmer Corp.
v. Computervision Corp.;* and *McGill, Inc. v. John Zink
Co..* Only some of these decisions are today singled out
for criticism; but all explicitly recognized the now-rejected
difference between fact and law as applied to the meaning of
disputed terms in patent claims, and all deferred, on appellate
review, to the findings of the trier of fact.

For example, *Data Line v. Micro Technologies* related
to computer technology wherein the jury, hearing expert
testimony, interpreted "means for sensing the presence or
absence of output data"; this court on appeal rejected
the appellant's argument that the trial court should have
"determine[d] the scope and construction of claim 1," and
instead gave deferential review to the jury verdict. In
*Snellman v. Ricoh* the jury verdict was reviewed on the
substantial evidence standard, not *de novo.* In *Delta–X Corp.
v. Baker Hughes Production Tools, Inc.,* 984 F.2d 410, 415,
25 USPQ2d 1447, 1450 (Fed.Cir.1993), this court approved
the trial procedure whereby "because of disputes over claim
terms, the judge instead left resolution of these disputes to the
jury."

There are many more cases than those I have listed, in which
the jury decided technological and other factual disputes
concerning the meaning and scope of terms of patent claims,
thereby also deciding the fact of infringement, and where the
jury verdict was reviewed on the usual substantial evidence
**\*1021** /reasonable jury standard. There are many more
cases than those I have listed, in which the district court at
bench trial found the facts of what the claim terms mean and
cover, and on appellate review this court applied the clearly
erroneous standard of review. These procedures, which are in
accord with factual determinations in other areas of litigation,
have now been rejected. The new and unique treatment
of disputed facts in patent cases does not appear to offer
advantages to outweigh its disadvantages. [11]

### C. THE MAJORITY'S CITED AUTHORITY

The authority on which the majority relies simply does not
support its statement that "the Supreme Court has repeatedly
held that construction of a patent claim is a matter of law
exclusively for the court." Majority op. at 994. That statement
is of course correct when deciding the legal effect of a
patent claim, and when stating the law to be applied by
the trier of fact in interpreting disputed terms. However, it
is not correct with respect to findings of disputed factual
issues, issues that usually relate to the meaning and scope
of the technologic terms and words of technical art that
define the invention. Even the majority's selected authority
recognized that such issues are factual, to be found by the jury.
Although the majority now equates these factual findings with
"construction of a patent," the Supreme Court did not.

In *Winans v. Denmead,* 56 U.S. (15 How.) 330, 14 L.Ed.
717 (1854) the invention was the conical shape of a coal-
carrying railroad car, whereby the car could carry several
times its weight in coal. The car described and claimed in
Winans' patent had a circular cross-section; the accused car
of Denmead had an octagonal cross-section. The trial court
instructed the jury that since the patent described the circular
shape, it was so limited. The Supreme Court held that the
instruction was in error, and that the jury should have been
instructed on the legal rule that the thing patented was not
limited to the exact shape or form illustrated, but depended
on whether the same function was performed in substantially
the same way and with the same result—the rule now called
the "doctrine of equivalents."

Markman v. Westview Instruments, Inc., 52 F.3d 967 (1995)

63 USLW 2663, 34 U.S.P.Q.2d 1321

As the majority states, the Court indeed "construed" the "thing patented." 56 U.S. at 338. The "construction" was the legal rule that the claim could be infringed by an equivalent structure. Having corrected this error of law in the jury instructions, the Court did not then answer the factual question for itself, as now does the Federal Circuit. The Court remanded for retrial to the jury, on the correct instruction of law:

> Whether, in point of fact, the defendant's cars did copy the plaintiff's invention, in the sense above explained, is a question for the jury, and the court below erred in not leaving that question to them upon the evidence in the case, which tended to prove the affirmative.

56 U.S. at 344.

In *Silsby v. Foote*, 55 U.S. (14 How.) 218, 14 L.Ed. 391 (1853), also relied on by the majority, the Court again did not remove factual issues from the jury. The Court construed the patent claim as a combination claim, and stated that the trial judge correctly instructed the jury on the law that all of the necessary parts of the claimed combination must be present in an infringing device. These were indeed matters of law. The Court stated that the trial judge properly left to the jury the question of which parts of the claimed device were necessary to its operation (which was to regulate the heat of a stove by automatically varying the position of the damper in response to temperature changes), as well as whether the defendants used these necessary parts.

The defendants had argued that the trial judge had impermissibly left a question of **\*1022** law to the jury. The Court pointed out that the question of which parts were necessary to regulate the heat of the stove was not a matter of law, but a question of fact to be decided by the jury:

> The substance of the charge is, that the jury were instructed by the Judge, that the third claim in the specification was for a combination of such parts of the described mechanism as were necessary to regulate the heat of the stove; that the defendants had not infringed the patent, unless they had used all the parts embraced in the plaintiff's combination; and he left it to the jury to find what those parts were, and whether the defendants had used them.

We think this instruction was correct. The objection made to it is, that the court left to the jury what was matter of law. But an examination of this third claim, and of the defendants' prayers for instruction, will show that the Judge left nothing but matter of fact to the jury. The construction of the claim was undoubtedly for the court. The court rightly construed it to be a claim for a combination of such of the described parts as were combined and arranged for the purpose of producing a particular effect, viz., to regulate the heat of a stove.

....

.... But the defendants also desired the Judge to instruct the jury that the index, the detaching process, and the pendulum, were constituent parts of this combination. How could the Judge know this as matter of law?

*Id.* 55 U.S. at 225–26. The Court affirmed that the factual question of what the claim covered was for the jury to decide, in the course of determining the question of infringement. Indeed, the Court's query was pointed: "How could the Judge know this as a matter of law?" *Id.* at 226.

In *Coupe v. Royer,* 155 U.S. 565, 15 S.Ct. 199, 39 L.Ed. 263 (1895) the Court held that there was legal error in the trial judge's description of the invention to the jury, and in the withdrawal of the question of infringement from the jury. The Court held that the trial judge had omitted a limitation contained in the claims of the patent (*viz.,* that the orientation of the machine was vertical). It was indeed legal error to omit a claim limitation, then as now, and the Court, correcting this error, remanded for a new trial to the jury. The Court declined to give a peremptory instruction to the jury, stating that all of the differences are "the subject of legitimate consideration by the jury":

> [T]he question of infringement, arising upon a comparison of the Royer patent and the machine used by the defendants, should be submitted to the jury, with proper instructions as to the nature and scope of the plaintiffs' patent as hereinbefore defined, and as to the character of the defendants' machine.

155 U.S. at 579–80, 15 S.Ct. at 205. This case again illustrates the Court's role as assuring that the law is correctly stated to

Markman v. Westview Instruments, Inc., 52 F.3d 967 (1995)

63 USLW 2663, 34 U.S.P.Q.2d 1321

the jury, and the jury's role as trier of fact. Again, a case relied on by the majority does not support the majority's position.

In *Bischoff v. Wethered,* 76 U.S. (9 Wall.) 812, 19 L.Ed. 829 (1870) the Court distinguished between the construction of the patent as a legal instrument, and the factual nature of the thing invented:

> It is not the construction of the instrument, but the character of the thing invented, which is sought in questions of identity and diversity of inventions.

76 U.S. at 816. The issue was identity of invention, and the Court reiterated that the meaning of disputed terms of art is "a question of fact for the jury." *Id.* at 814. The majority includes *Bischoff* as authority for its removal of these findings of fact from the jury. That is a curious reading of the holding in *Bischoff:*

> A case may sometimes be so clear that the court may feel no need of an expert to explain the terms of art or the descriptions contained in the respective patents, and may, therefore, feel authorized to leave the question of identity to the jury, under such general instructions as the nature of the documents seems to require. And in such plain cases the court would probably feel authorized to set aside a verdict unsatisfactory to itself, as against the weight of the evidence. But in all such cases *the question* **\*1023** *would still be treated as a question of fact for the jury, and not as a question of law for the court.* And under this rule of practice, counsel would not have the right to require the court, as a matter of law, to pronounce upon the identity or diversity of the several inventions described in the patents produced.

*Id.* (emphasis added). Indeed, only two years later the Court again considered the issue, and in *Tucker v. Spalding,* 80 U.S. (13 Wall.) 453, 20 L.Ed. 515 (1872) the Court held that a prior patent and related expert testimony on the issue of "diversity or identity" were improperly withheld from the jury, describing the issue as a "mixed question of law and fact," and stating:

> Whatever may be our personal opinions of the fitness of the jury as a tribunal to determine the diversity or identity in principle of mechanical instruments, it cannot be questioned that when the plaintiff, in the exercise of the option which the law gives him, brings his suit in the law in preference to the equity side of the court, that question must be submitted to the jury, if there is so much resemblance as raises the question at all. And though the principles by which the question must be decided may be very largely propositions of law, it still remains the essential nature of the jury trial that while the court may on this mixed question of law and fact, lay down to the jury the law which should govern them, so as to guide them to truth, and guard them against error, and may, if they disregard instructions, set aside their verdict, the ultimate response to the question must come from the jury.

80 U.S. at 455.

In *Winans v. New York and Erie R. Co.,* 62 U.S. (21 How.) 88, 16 L.Ed. 68 (1859) infringement was conceded, and the issue at trial was "originality." The Court stated that the trial judge "has given the only construction which the language of this specification will admit," *id.,* 62 U.S. at 101, in explaining to the jury that the invention was in the manner of arranging the wheels and the car body. Having explained the invention to the jury, the question of originality was held to be for the jury, not the court.

In discussing the appropriate use of expert witnesses, the *Winans* Court stated that "professors or mechanics" can not prove "legal construction of any instrument of writing," but may testify on matters of art or science:

> Experts may be examined to explain terms of art, and the state of the art, at any given time. They may explain to the court and jury the machines, models, or drawings, exhibited. They

may point out the difference or identity of the mechanical devices involved in their construction. The maxim of "unique in sua arte credendum" permits them to be examined to questions of art or science peculiar to their trade or profession; but professors or mechanics cannot be received to prove to the court or jury what is the proper or legal construction of any instrument of writing.

62 U.S. at 100–01. On this aspect, too, the case does not stand for the removal of factual findings from the jury; indeed the Court recognized the various kinds of evidentiary facts on which technical experts routinely testify in patent cases.

In *Heald v. Rice,* 104 U.S. 737, 26 L.Ed. 910 (1882) the Court stated that when there was no dispute about the technology, no need for evidence, and no question of fact requiring resolution by a jury, the "mere comparison" of a reissue and original patent was a matter of law for the court. Other cases related to a directed verdict when no fact was in dispute, *e.g., Singer Mfg. Co. v. Cramer,* 192 U.S. 265, 24 S.Ct. 291, 48 L.Ed. 437 (1904) (the trial court should have granted a directed verdict when there was no dispute as to the meaning of any term of art and no substantial evidence of infringement); or the grant of a new trial, *e.g., Market St. Cable Ry. Co. v. Rowley,* 155 U.S. 621, 15 S.Ct. 224, 39 L.Ed. 284 (1895) (since the facts were not disputed and no extrinsic evidence was given or needed, the court should have instructed the jury on lack of patentable novelty; the Court remanded with directions to set aside the verdict and grant a new trial). The new trial and the directed verdict are modes of judicial management of the trial process, and quite different from the majority's decision simply to eliminate the jury.

**\*1024** *Hogg v. Emerson,* 47 U.S. (6 How.) 437, 12 L.Ed. 505 (1848), another case relied on by the majority, was part of a lengthy litigation. There was a jury trial, review by a circuit panel, retrial to a jury, and two appeals to the Court. In this appeal the Court considered which documents were properly considered when "construing" the patent, in view of the fire that destroyed the Patent Office files in 1836. In reviewing the question of whether the patent in suit covered the entire steam engine or only the improvement, the Court "construed" the patent as covering only the improvement. *Id.,* 47 U.S. at 484. The Court affirmed the trial court, which the report states "left the question of fact as to reasonable diligence of the patentee or not in this respect, and also all questions of fact involved

in the points of the case for the defendants, to the jury." *Id.* at 445.

The majority also relies on *Levy v. Gadsby,* 7 U.S. (3 Cranch) 180, 2 L.Ed. 404 (1805), wherein the Court ruled that a certain document was a contract and not some other form of transaction, and was subject to the usury law. This was legal construction of a document, and was decided by the Court. This case says nothing about removing disputed factual questions from the jury. The majority also cites *Eddy v. Prudence Bonds Corp.,* 165 F.2d 157, 163 (2d Cir.1947), *cert. denied,* 333 U.S. 845, 68 S.Ct. 664, 92 L.Ed. 1128 (1948), wherein the court, reviewing the legal operation of a court-approved Supplemental Trust Agreement in bankruptcy in view of a court order, stated that "appellate courts have untrammeled power to interpret written documents." This determination of legal effect is indeed "construction" of a legal document.

I shall not dwell on the majority's reliance on other cases that were bills of equity and tried to the court, for they do not raise the issue of the jury right. *See Loom Co. v. Higgins,* 105 U.S. 580, 26 L.Ed. 1177 (1881) (determining if patentee was the true inventor, and whether patent claim was sufficiently described in the specification); *Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 26 L.Ed. 149 (1880) (limiting Goodyear's claims to dentures manufactured by vulcanization); *Bates v. Coe,* 98 U.S. 31, 25 L.Ed. 68 (1878) (determining which elements constituted the invention and which constituted equivalents); *Merrill v. Yeomans,* 94 U.S. 568, 24 L.Ed. 235 (1876) (construing patent claim in light of specification as only for process of manufacture); and *Seymour v. Osborne,* 78 U.S. (11 Wall.) 516, 546, 20 L.Ed. 33 (1871) (discussing "scientific witnesses to aid the court in coming to a correct conclusion"). The majority cites *Merrill v. Yeomans* as "applying 'well-settled rules of construing all instruments.' " The rule the Court applies at this quotation is that words and phrases are to be construed so as to give them meaning. 94 U.S. at 571. This is indeed a rule of law; the Court did not convert findings of fact into rules of law. Nor should it be necessary to point out that when cases are tried "to the court," majority op. at 996–997, the resolution of disputes as to what claim terms mean is indeed "for the court."

*Exhibit Supply Co. v. Ace Patents Corp.,* 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736, 52 USPQ 275 (1942), also cited by the majority, turned on prosecution history estoppel resulting from an amendment to the claims in the Patent Office. The Court stated the rule of law that "what the patentee, by a strict

63 USLW 2663, 34 U.S.P.Q.2d 1321

construction of the claim, has disclaimed ... cannot now be regained by recourse to the doctrine of equivalents, which at most operates, by liberal construction." There was no dispute as to the meaning of technical terms, and the Court applied this rule of law to the undisputed facts. This had been a bench trial, on bill of equity. *Ace Patents Corp. v. Exhibit Supply Co.,* 119 F.2d 349, 48 USPQ 667 (7th Cir.1941). It is difficult to discern the relevance of this case to the issues in *Markman.*

Many dozens of patent cases reached the Supreme Court. Some of those relied on by the majority as support for trial to the court were bills in equity. Of those in law, most were tried to a jury. It is not possible to diminish the great weight of precedent wherein patent infringement was tried to a jury, the jury deciding disputed factual questions of what the patent covered, and applying these findings to the accused device. The court today effects a dramatic realignment **\*1025** of jury, judge, and the appellate process.

### D. THE SPECIAL RESPONSIBILITY OF THE FEDERAL CIRCUIT

The Federal Circuit is responsible for establishing consistent national law in its areas of assigned subject matter. The court early in its existence took note that patent cases were only one of many areas of commercial dispute, only one of many areas of intellectual property dispute, that are tried in the district courts. We have striven to assure that unnecessary burdens are not placed upon the district courts of the nation by virtue of the separate path of appellate review of patent cases. We acted to assure that the same procedures would apply in the trial of patent cases as in other civil actions. *See, e.g., Allen Organ Co. v. Kimball Int'l, Inc.,* 839 F.2d 1556, 1563, 5 USPQ2d 1769, 1774 (Fed.Cir.) (for matters not unique to patent law the procedural law of the regional circuit applies in patent trials), *cert. denied,* 488 U.S. 850, 109 S.Ct. 132, 102 L.Ed.2d 104 (1988). Thus the litigation process that served other civil disputes also served in patent litigation. Today's ruling, with its departures from the rules of evidence, its changed standards of deference and review, its conflict with established jury and bench procedures, challenges the principle on which this comity was based.

Patent cases are not unique in their usage of specialized terms and words of art, in their reliance on technologic or scientific evidence, in their dependence on findings of technologic fact. Evidentiary conflicts with respect to technology and science arise in a variety of cases; and the conflicting testimony of expert witnesses is ubiquitous. Trial judges have extensive experience in assuring a fair trial, and finding, within human limitations, the truth. [12] Today this court severs patent cases from all others, requiring different (and uncertain) procedures at trial, taking unto ourselves a different, and uncertain, appellate role.

It is the responsibility of the appellate court to assure that the law is correctly stated. The rules of patent law include an ever-enlarging body of nuance and clarification, flowing from twelve years of Federal Circuit jurisprudence and the rich history on which we have built. This court has undertaken the fine-tuning of the law, appropriate to the importance of technology in today's world. Much of this fine-tuning relates to new fields of science and technology (computers, biotechnology, materials); but it also relates to traditional concepts of patent law as applied to modern technologic and commercial needs.

The appellate role is to apply these principles in wise implementation of the policy of the law, as litigants probe the grey areas that test conflicting policy considerations. The appeal is not designed for *de novo* finding of the facts. I doubt the practical feasibility of the majority's holding that this court will "construe" the meaning of technical terms and words of art without benefit of the trial experience. It is of course appropriate for this court to be alert to methodologies of resolution of disputes that involve science and technology. The trial of scientific/technologic disputes was explored, for example, in the Report of the Carnegie Commission, *Science and Technology in Judicial Decision Making* (1993); the Report of the Brookings Institution, *Charting a Future for the Civil Jury System* (1992); and in ongoing studies and Reports of the Federal Judicial Center. However, in this complexity of problems and solutions, it is an illusion to think that patent litigation difficulties can be resolved by turning factual issues into matters of law and assigning them to the Federal Circuit.

The deference that appellate courts must give to the trial process is fundamental to the **\*1026** efficiency, and the effectiveness, of the judicial system. It implements the two-tier litigation right, and provides stability to the trial process while preserving appellate authority for the law, its policy and its purposes. The court's decision today denies the critical values of the trial, and moves the Federal Circuit firmly out of the juridical mainstream.

**V**

63 USLW 2663, 34 U.S.P.Q.2d 1321

### THE MERITS

Both sides testified on the meaning and scope of the term "inventory," as used by Markman and in light of the Westview system. The issue was whether "inventory" meant only clothing, or could reach the invoices of the Westview system. Markman presented four witnesses. Westview presented one witness. After the jury verdict in favor of Markman the district court, applying recent Federal Circuit panel opinions that required *de novo* determination of the issue (foreshadowing today's *en banc* holding), reviewed the evidence independently and decided in favor of Westview. The district court did not discuss the jury verdict, or state whether there was evidentiary support for the jury verdict.

The district court did not apply the proper standard on post-trial motions, *viz.* whether there was substantial credible evidence of such quality and weight that a reasonable jury could have reached the verdict that was reached by this jury. It is for the trial judge to decide, in the first instance, whether the jury verdict can stand, or whether the judgment should have been directed, or whether a new trial should be granted. I would remand for redetermination on the correct standard.

### Parallel Citations

63 USLW 2663, 34 U.S.P.Q.2d 1321

#### Footnotes

\*      Chief Judge Archer assumed the position of Chief Judge on March 18, 1994.

\*\*     Circuit Judge Bryson joined the Federal Circuit on October 7, 1994 and has not participated in the disposition of this appeal.

1      A panel of this court heard oral argument in the appeal. On November 5, 1993, this court ordered *sua sponte* that the appeal be reheard in banc. The court also requested additional briefing and has been helped by the supplemental briefs of the parties and by the several briefs *amicus curiae*.

2      "Directed verdict" has since been renamed "judgment as a matter of law" and is hereinafter referred to as such. *See* Fed.R.Civ.P. 50.

3      The finding of noninfringement of independent claim 14 is not at issue in this appeal.

4      Markman makes much of the distinction between tracking "individual" articles of clothing and tracking "batches" of clothing and says the district court erroneously restricted the invention to the former. For purposes of this appeal, this distinction is irrelevant because Westview's system tracks neither individual articles of clothing nor batches of clothing.

5      The general rule is that in reviewing the law on a properly laid and renewed motion for JMOL, the appellate court is not bound by the instructions given the jury, even if they were not objected to. *Boyle v. United Technologies, Corp.,* 487 U.S. 500, 513–14, 108 S.Ct. 2510, 2519, 101 L.Ed.2d 442 (1988) (unobjected to jury instructions are not law of the case for purposes of JMOL); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 120, 108 S.Ct. 915, 922, 99 L.Ed.2d 107 (1988); 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2537, at 599–600 (1971). We therefore reject Markman's argument that we must defer to the jury's claim construction simply because the district court instructed the jury to interpret the claims and Westview did not object to this instruction. *See* Wright & Miller, *supra,* § 2521.

6      The dissenting opinion draws a distinction between claim interpretation and claim construction based on the distinction made in contract law. We do not make the same distinction for, in our view, the terms mean one and the same thing in patent law. *See Senmed, Inc. v. Richard–Allan Medical Indus., Inc.,* 888 F.2d 815, 818, 12 USPQ2d 1508, 1511 (Fed.Cir.1989); *Intervet Am., Inc. v. Kee–Vet Labs., Inc.,* 887 F.2d 1050, 1053, 12 USPQ2d 1474, 1476 (Fed.Cir.1989). For consistency we use the term construction when referring to the first step in an infringement analysis.

7      The views of the "special concurrence" in *Envirotech,* contending that the claims on appeal had been properly submitted to the jury and were not reviewed *de novo* on appeal, were not adopted by the majority opinion. 730 F.2d at 763, 221 USPQ at 481 (Baldwin, J., specially concurring). Accordingly, the concurrence's "spin" on the case is not the position of the court.

8      *Palumbo* also presented the issue of construction of means-plus-function claim limitations under 35 U.S.C. § 112, para. 6. As that issue is not before us today, we express no opinion on the issue of whether a determination of equivalents under § 112, para. 6 is a question of law or fact.

9      The Supreme Court has also in equity cases considered the scope of a patent to be a matter of law, not subject to deferential review. *See Seymour v. Osborne,* 78 U.S. (11 Wall.) 516, 546, 20 L.Ed. 33 (1871); *Bates v. Coe,* 98 U.S. 31, 38–39, 25 L.Ed. 68 (1879); *Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 224, 26 L.Ed. 149 (1880); *Exhibit Supply Co. v. Ace Patents Corp.,* 315 U.S. 126, 134, 62 S.Ct. 513, 517, 86 L.Ed. 736, 52 USPQ 275, 279 (1942).

10     *Accord SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1120, 227 USPQ 577, 585 (Fed.Cir.1985) (in banc) ("the district court's construction of the claims in light of the prosecution history [is] a question of law"); *Lemelson v. United States,* 752 F.2d 1538, 1550, 1552, 224 USPQ 526, 533 (Fed.Cir.1985) ("The prosecution histories being admitted into evidence, the court should have

considered them in its construction of the claims."); *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1270, 229 USPQ 805, 811 (Fed.Cir.1986) ("[T]he prosecution history can and should, where relevant, be assessed (along with, e.g., claim language and specification) in properly interpreting claim language."); *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.,* 793 F.2d 1279, 1283, 230 USPQ 45, 47 (Fed.Cir.1986) ("in view of the prosecution history the district court correctly interpreted the literal meaning of" the claim language at issue); 6 Ernest B. Lipscomb III, *Walker on Patents* § 21:1, at 261 (3d ed. 1987) ("The words of a patent or patent application, like the words of specific claims therein, always raise a question of law for the court....").

11  For an example of very thorough appellate review of claim construction based on the patent in view of extrinsic evidence, see *Mitchell v. Tilghman,* 86 U.S. (19 Wall.) 287, 379–90, 22 L.Ed. 125 (1874).

12  It is undisputed that "article" means "article of clothing."

13  Our opinion also holds that we review district court determinations on questions of claim construction under a *de novo* standard of review, like other legal questions. In this regard, we emphasize that we are reiterating the long-recognized appellate review standard for issues of law in the trial proceeding, regardless of whether the case was tried to a judge or a jury. Contrary to the contentions of the dissenting opinion, this does not "effect[ ] a dramatic realignment of jury, judge, and the appellate process."

14  A patent, however, is not a contract. Contracts are executory in nature—they contain promises that must be performed. *See* E. Allan Farnsworth, *Contracts* § 1.1, at 3–4 (2d ed. 1990). Once a patent is issued, any purported exchange of promises between the applicant and the Patent and Trademark Office (PTO) has been fully executed. A patent is a statutory grant of the right to exclude others from making, using, or selling the invention recited in the claims, read in light of the specification. 35 U.S.C. § 154. There is no discretion on the part of the PTO as to whether or not to grant the patent—if the statutory requirements are met, a patent is issued. 35 U.S.C. § 151. Likewise, the other party to the transaction, the patentee, cannot "contract" with any one other than the federal government to receive a right to exclude others from making, using, or selling his invention. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 162, 109 S.Ct. 971, 983, 103 L.Ed.2d 118 (1989).

15  Illustrative of the search for the intent of the parties or the makers are the following opinions cited in the dissenting and concurring opinions. *Goddard v. Foster,* 84 U.S. (17 Wall.) 123, 142–43, 21 L.Ed. 589 (1873) (in a contract between two parties, courts "are not denied the same light and information the parties enjoyed when the contract was executed, but they may acquaint themselves with the persons and circumstances that are the subjects of the statements in the written agreement"); *Brown & Co. v. McGran,* 39 U.S. (14 Pet.) 479, 493, 10 L.Ed. 550 (1840) ("[T]he true interpretation of the language may be left to the consideration of the jury for the purpose of carrying into effect the real intention of the parties."); *Startex Drilling Co. v. Sohio Petroleum Co.,* 680 F.2d 412, 415 (5th Cir.1982) (submitting case to jury "to determine what the parties meant" by ambiguous terms in the contract); *In re Union Trust Co.,* 89 Misc. 69, 151 N.Y.S. 246, 249 (Sur.Ct.) ("The first and cardinal rule of interpretation of wills is the application of the meaning of the testator, not the meaning of the adjudications."), *modified,* 179 A.D. 176, 156 N.Y.S. 32 (1915); *see also Reed v. Proprietors of Locks & Canals on Merrimac River,* 49 U.S. (8 How.) 274, 288, 12 L.Ed. 1077 (1850) ("Whereas the intention of the parties is to be found in their deed alone, which it is the duty of the court to construe.").

16  One concurring opinion also relies on *Winans v. Denmead,* 56 U.S. (15 How.) 330, 14 L.Ed. 717 (1853), as a case where the court "construed" the claim in a general manner and left it for the jury to fill in specifics. As correctly noted by the dissent, this case is more properly understood as one involving the doctrine of equivalents infringement notwithstanding the literal language of the claims.

1  While the ultimate question of patent validity is one of law, *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966), there are a number of underlying inquiries that raise questions of fact. In addition to obviousness, these include anticipation, *Atlas Powder Co. v. E.I. DuPont de Nemours & Co.,* 750 F.2d 1569, 1573, 224 USPQ 409, 411 (Fed.Cir.1985), prior public use or sale, *U.S. Envtl. Prods., Inc. v. Westall,* 911 F.2d 713, 715, 15 USPQ2d 1898, 1900 (Fed.Cir.1990) (a legal conclusion supported by underlying facts), and sufficiency of a specification's disclosure, *Utter v. Hiraga,* 845 F.2d 993, 998, 6 USPQ2d 1709, 1714 (Fed.Cir.1988) (same).

2  The court pretends there is a line of contrary authority. *Ante* at 986–87. But most of its cases arrived at this court after bench trials —a puzzling source for guidance on the commands of the Seventh Amendment; others actually implicating the right to a jury trial sprang from facts simply inadequate to support a reasonable jury verdict. Indeed, the one case that pays lip service to this novel rule, *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 822–23, 23 USPQ2d 1426, 1432–33 (Fed.Cir.1992), like this case, did not require excursion beyond the patent documents themselves. There may be a reason why the court is hellbent for its result, but it does not emanate from the cases.

3  Of course, the inventor's testimony as to what he intended or how he understands the patent, as opposed to his testimony as an expert, may be relevant, but is entitled to little weight in the face of evidence to the contrary. *See North American Vaccine v. American Cyanamid Co.,* 7 F.3d 1571, 1577, 28 USPQ2d 1333, 1337 (Fed.Cir.1993) (inventor's "after-the-fact testimony is of little weight compared to the clear import of the patent disclosure itself"); *Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1387, 21 USPQ2d 1383, 1386 (Fed.Cir.1992) ("where a disputed term would be understood to have its ordinary meaning by one of skill in the art from

the patent and its history, extrinsic evidence that the inventor may have subjectively intended a different meaning does not preclude summary judgment.").

4    A fact dispute cannot arise solely from testimony of a patent law expert. While this sort of testimony is acceptable, even if often overdone, as an interpretive aid to the court, it is not evidence and cannot create a genuine fact question for the jury. *See Nutrition 21 v. United States,* 930 F.2d 862, 871 n. 2, 18 USPQ2d 1347, 1350 n. 2 (Fed.Cir.1991) (patent law expert's "opinion on the ultimate legal conclusion is neither required nor indeed 'evidence' at all"); *see also Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.,* 853 F.2d 1557, 1564, 7 USPQ2d 1548, 1554 (Fed.Cir.1988) (conflicting opinions of legal experts create no material issue of fact).

5    Of course, not every disagreement gives rise to a genuine fact question. *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1580, 12 USPQ2d 1382, 1386 (Fed.Cir.1989); *see also Senmed Inc. v. Richard–Allen Medical Indus.,* 888 F.2d 815, 819 n. 8, 12 USPQ2d 1508, 1512 n. 8 (1989) (inventor's testimony as to meaning of "on" contrary to ordinary meaning raised no real "dispute").

6    In one case where it appeared the Court "avail[ed] itself of the light furnished by the evidence to enable it to understand the terms used in the patent and the devices and operations described or alluded to therein," *Webster Loom Co. v. Higgins,* 105 U.S. 580, 586, 26 L.Ed. 1177 (1881), the evidence was examined in ruling on the issue of enablement, i.e., whether those of skill in the art would understand the terms of the patent. Even given the conflicting testimony, the Court concluded that the terms of the patent were "sufficiently clear and full in the description of the invention." *Id.* 105 U.S. at 589. When it reached the question of infringement, however, it did not mention any evidence other than the specification and claims and stated "if we examine the language of the claim [in light of the specification], it seems to us that all doubt as to its meaning is removed." *Id. at 598.* There was no reliance on any extrinsic evidence in construing the claims for purposes of infringement.

7    Cases about patent validity are authoritative on the issue of claim construction. A claim must be interpreted the same for both validity and infringement. *E.g., Smithkline Diagnostics Inc. v. Helena Lab. Corp.,* 859 F.2d 878, 882, 8 USPQ2d 1468, 1471 (Fed.Cir.1988). A claim must be construed before determining its validity just as it is first construed before deciding infringement.

8    After emphasizing that patents are construed according to the same rules that apply to other legal instruments, the court decides that a patent is like a contract or a deed in the context of disputes over its creation or its validity, but that when it comes to the question of infringement, a patent is like a statute. Wholly aside from the metaphysical implications of this curious duality to the traditional rule that patents are interpreted for validity just as they are for infringement, it is simply a bogus analogy.

Patents cannot be baby statutes because they are prepared *ex parte* by interested parties, drafted in the lower reaches of an executive department, and issued ministerially by a political officer. They have none of the indicia of a real statute, but the court imbues them with a transconstitutional power to compromise the role of juries in the third branch of government. Not even a congressionally passed, presidentially signed law can match that. *See Granfinanciera S.A. v. Nordberg,* 492 U.S. 33, 51, 109 S.Ct. 2782, 2795, 106 L.Ed.2d 26 (1989).

1    The Federal Circuit, finding this fact *en banc,* holds that the inventor Markman's testimony is "of little or no probative weight" to explain his invention, apparently because he was represented by an attorney before the patent office. The majority states that it is "not unusual" for the inventor not to know what his attorney has patented. Maj. op. at 986. This will be a revelation to the nation's patentees. The majority earlier in its opinion "rejects" Markman's testimony, maj. op. at 983, apparently based on its weight, a question of fact, not on its admissibility, a ruling of law.

2    In *Graham v. John Deere* the Court described the issue of "obviousness" in patent cases as one of law based on underlying facts. An analogous pattern has heretofore applied in connection with "claim construction", *i.e.,* as a question of law based on underlying facts. I suggest that these ultimate questions have a strong policy component, and that the Federal Circuit's responsibility for imparting consistency to patent decisions is a significant factor in the law/fact dichotomy.

3    Nathan Isaacs, *The Law and the Facts,* 22 Colum.L.Rev. 1, 13 (1922) (warning courts of "medieval assumptions as to the omniscience of the learned man").

4    English patent cases were cited by United States courts well into the nineteenth century.

5    Attempting to understand how this procedure would work for complex technologies, at the *en banc* argument I inquired of Westview's counsel:

J. Newman: If the claim is sufficiently complex—technologically or just complex in general—that the judge can't decide what it means without taking testimony, hearing the experts, hearing the inventor, hearing whatever else it is that each side needs to, wants to, adduce that the judge permits ... I can envision, can't you, that a judge would have to hold some kind of evidentiary hearing, at least, if not a mini-trial, in order to learn enough about the claim to decide, as a matter of law, disputed issues?

Mr. Griffin: Yes your honor.

J. Newman: We are assuming the issues are disputed, that this is not just a matter of explanation, but a matter of requiring a choice between one side's viewpoint and another. And that the judge should then have a preliminary trial to decide what the claim means by making whatever choices need to be made, and then tell the jury: "Take it from here now, apply this to the accused device"?

Mr. Griffin: Yes your honor.

J. Newman: That is quite unusual, is it not? Have you seen this done?

Mr. Griffin: Personally no your honor.

J. Newman: I wonder how the trial judges would take to that.

Mr. Griffin: Probably would not like it your honor, because that would impose a burden which in most cases can be avoided.

6    Among the rare exceptions to deferential appellate review of factual findings are the "constitutional facts", discussed in *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). In *Bose* the Court cautioned against enlarging its holding beyond the conflict between constitutional provisions there exemplified. The "constitutional fact" exemplified in *Bose* does not place all facts in the hands of appellate courts for *de novo* finding. Such exceptions to the otherwise firm rule of deference to the trier of fact have always been narrow. *See generally* Frank R. Strong, *Dilemmic Aspects of the Doctrine of "Constitutional Fact",* 47 N.C.L.Rev. 311 (1969).

7    The date of the Statute of Monopolies is variously reported as 1623 or 1624 depending on whether the old or new English calendar is used. Edward C. Walterscheid, *The Early Evolution of the United States Patent Law: Antecedents (Part 2),* 76 J.Pat. & Trademark Off.Soc'y 849, 873 n. 98 (1994).

8    There were two courts in Chancery, the Ordinary court and the Extraordinary court. The Extraordinary side of Chancery was so termed because matters requiring the exercise of the King's Conscience were there addressed, for extraordinary relief. Abridgment at 127; Coke, 4 Inst. at 79. The Ordinary side of Chancery has been referred to as "common-law chancery," see *Kirker v. Owings,* 98 F. 499, 506 (6th Cir.1899), and proceeded according to the laws and statutes of England, exercising the ordinary powers of Chancery. Middle Temple, *General Abridgment of Cases in Equity* 127 (1739) ("Abridgment"); Coke, 4 Inst. at 79.

The Ordinary court had the power to repeal letters patent, by plea of *scire facias.* However, if the matter "descended to issue" the court was without jurisdiction to try it to a jury, and the Chancellor would direct the issue to a court of law, where the issue would be tried to a jury, "because for that Purpose both Courts are but one." Abridgment at 128; *see* Coke, 4 Inst. at 80. After trial, with jury verdict rendered, the cause was returned to Chancery for further disposition consistent with the verdict. Abridgment at 130 ("A Cause shall not be examined upon Equity in the Court of Requests, Chancery, or other Court of Equity, after Judgment at the Common Law.")

9    Carpmael lists the date of the decision as 1758, and Abbott, *supra,* at 9, states the date as 1766. The date of the patent grant is 1758, suggesting that Abbott may be correct. There is no official report of *Dolland's Case,* but the decision is discussed in *Boulton v. Bull,* 2 H.Bl. 463, 482–87 (K.B.1795).

10   Hanbury, *supra,* at 87–88, explains that the court was not instructing the jury on what verdict it must render. The practice was for the judge to summarize the evidence and the testimony, and frequently provide a "hint" to the jury. However, this did not diminish the authority of the jury to decide the matter.

11   Although some *amici curiae* encouraged the Federal Circuit to find technological facts for ourselves, none explained the procedure by which we are to do so. Are we to read the entire record of the trial, re-create the demonstrations, decipher the literature of the science and art; are we to seek our own expert advice; must the parties be told the technical training of our law clerks and staff attorneys? No *amicus* explained how improved technological correctness—that is, truth—would be more likely to be achieved during the appellate process of page-limited briefs and fifteen minutes per side of argument.

12   Many aids to the trial process are at hand when the issues are scientific and technologic. The *Manual for Complex Litigation, Second* (1985) points out the utility of special verdicts and interrogatories, *see* § 21.633, and that Fed.R.Evid. 706 is particularly useful when experts have divergent opinions, *see* § 21.51. Important studies have been made, see the Federal Judicial Center's *Reference Manual of Scientific Evidence* (1994). No study that I have seen or heard of proposes simply to turn complex factual determinations of technical issues over to the appellate court. To replace the trier of fact with the Federal Circuit is as unfriendly to the search for truth, as it is unworkable.

---

**End of Document**                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 66

**Naeem v. McKesson Drug Co., 444 F.3d 593 (2006)**

97 Fair Empl.Prac.Cas. (BNA) 1589, 152 Lab.Cas. P 60,199, 24 IER Cases 660

444 F.3d 593
United States Court of Appeals,
Seventh Circuit.

Sally NAEEM, Plaintiff–Appellee,

v.

MCKESSON DRUG COMPANY and
Dan Montreuil, Defendants–Appellants.

No. 04–3816.    |    Argued Sept. 15,
2005.    |    Decided April 12, 2006.

**Synopsis**

**Background:** Terminated employee sued employer and manager, asserting Illinois law claim for intentional infliction of emotional distress. Following jury trial, the United States District Court for the Northern District of Illinois, Joan B. Gottschall, J., 2002 WL 975315, entered judgment for employee. Employer and manager appealed.

**Holdings:** The Court of Appeals, Ripple, Circuit Judge, held that:

[1] emotional distress claim was not preempted by Illinois Human Rights Act (IHRA);

[2] jury's determination that employer's conduct was extreme and outrageous was supported by sufficient evidence;

[3] jury's determination that employer intended to cause employee emotional distress was supported by sufficient evidence;

[4] jury's determination that employee suffered emotional distress was supported by sufficient evidence;

[5] erroneous admission of professor's purported expert testimony was not reversible error;

[6] admission of expert testimony regarding Department of Transportation (DOT) regulations was not plain error; and

[7] District Court's error of comparing employee's award of damages with awards in federal courts was harmless.

Affirmed.

**West Headnotes (37)**

[1]    **Civil Rights**
👉 Existence of other remedies;  exclusivity

**Torts**
👉 Nature and form of remedy

The Illinois Human Rights Act (IHRA) does not preclude courts from exercising jurisdiction over all tort claims factually related to incidents of sexual harassment. S.H.A. 775 ILCS 5/8–111(C).

9 Cases that cite this headnote

[2]    **Civil Rights**
👉 Existence of other remedies;  exclusivity

**Torts**
👉 Nature and form of remedy

When the sexual harassment aspect of an employee's case is merely incidental to what are otherwise ordinary common law tort claims, the employee's tort claims are not preempted by the Illinois Human Rights Act (IHRA). S.H.A. 775 ILCS 5/8–111(C).

19 Cases that cite this headnote

[3]    **Civil Rights**
👉 Existence of other remedies;  exclusivity

**Torts**
👉 Nature and form of remedy

The distinction between claims that are preempted by the Illinois Human Rights Act (IHRA) and claims that are not preempted turns on the legal duty that the defendant allegedly breached; that is, if the conduct would be actionable even aside from its character as a civil rights violation because the IHRA did not furnish the legal duty that the defendant was alleged to have breached, the IHRA does not preempt a state law claim seeking recovery for it. S.H.A. 775 ILCS 5/8–111(C).

34 Cases that cite this headnote

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**[4]    Civil Rights**

🔑 Existence of other remedies;  exclusivity

**Damages**

🔑 Preemption

Employee's claim against employer for intentional infliction of emotional distress, consisting of pattern of behavior creating impossible deadlines, setting up obstacles to employee's performance of her job, and sabotaging her work, was not preempted by Illinois Human Rights Act (IHRA), inasmuch as employer's alleged actions constituted tort independent of any duties not to discriminate against employee, and would constitute tort no matter what its motives were. S.H.A. 775 ILCS 5/8–111(C).

13 Cases that cite this headnote

**[5]    Civil Rights**

🔑 Existence of other remedies;  exclusivity

**Damages**

🔑 Preemption

Proper inquiry into whether employee's claim against employer for intentional infliction of emotional distress was preempted by Illinois Human Rights Act (IHRA) was not whether facts supporting emotional distress claim could also have supported discrimination claim, but whether employee could prove elements of intentional infliction of emotional distress independent of legal duties furnished by IHRA. S.H.A. 775 ILCS 5/8–111(C).

36 Cases that cite this headnote

**[6]    Damages**

🔑 Elements in general

Under Illinois law, a plaintiff may recover damages for intentional infliction of emotional distress only if she establishes that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress; and (3) the

defendant's conduct did cause severe emotional distress.

23 Cases that cite this headnote

**[7]    Federal Courts**

🔑 Taking case or question from jury;  judgment as a matter of law

The Court of Appeals reviews a district court's order denying a motion for judgment as a matter of law de novo.

Cases that cite this headnote

**[8]    Federal Courts**

🔑 Taking case or question from jury;  judgment as a matter of law

**Federal Courts**

🔑 Taking case or question from jury;  judgment as a matter of law

On a defendant's motion for judgment as a matter of law, the Court of Appeals will not reverse unless no reasonable juror could have found that the plaintiff established all of the elements of her claim, and the Court must view all evidence in the light most favorable to the plaintiff and draw all reasonable inferences in her favor.

2 Cases that cite this headnote

**[9]    Federal Courts**

🔑 New Trial, Rehearing, or Reconsideration

The Court of Appeals reviews a district court's order denying a new trial for abuse of discretion.

1 Cases that cite this headnote

**[10]    Federal Courts**

🔑 Taking case from jury;  judgment as a matter of law

**Federal Courts**

🔑 Damages or Other Monetary Relief

Because employer's liability for intentional infliction of emotional distress (IIED) was based on an Illinois tort, role of district court, on motion for judgment as matter of law or for new trial, was to determine whether jury's verdict was

based on sufficient proof to satisfy claim for damages under Illinois law.

3 Cases that cite this headnote

**[11]**   **Damages**
👈  Sex and gender

Jury's determination, that employer's conduct was extreme and outrageous, as required for employee to recover under Illinois law for intentional infliction of emotional distress, was supported by sufficient evidence, including evidence that employee was forced to climb unstable metal stairway during her pregnancy, that her computer was sabotaged, that manager publicly criticized her work during meetings, that her office and files were moved so that she was unable to locate necessary paperwork, and that employer increased amount of work due under performance improvement plan (PIP) while knowing employee would not be able to meet deadlines.

5 Cases that cite this headnote

**[12]**   **Damages**
👈  Sex and gender

Jury's determination, that employer intended to cause employee emotional distress, as required for employee to recover under Illinois law for intentional infliction of emotional distress, was supported by sufficient evidence, including human resources manager's admission that management, in implementing performance improvement plan (PIP) was trying to "send [employee] a message," "affect [her] mental processes," and "get [her] attention."

3 Cases that cite this headnote

**[13]**   **Damages**
👈  Sex and gender

Jury's determination, that employee suffered emotional distress, as required for employee to recover from employer under Illinois law for intentional infliction of emotional distress, was supported by sufficient evidence, even though employee did not seek psychiatric help until

years after her employment terminated, where employee testified that initially she was too ashamed to seek psychiatric help and could not afford to do so, and psychiatrist testified that employee suffered from post-traumatic stress disorder (PTSD), which could be traced to her experiences with employer.

1 Cases that cite this headnote

**[14]**   **Evidence**
👈  Matters involving scientific or other special knowledge in general
    **Evidence**
👈  Necessity and sufficiency

*Daubert,* as extended to all expert testimony including non-scientific expert testimony, requires the district court to perform the role of gatekeeper and to ensure the reliability and relevancy of expert testimony. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

36 Cases that cite this headnote

**[15]**   **Federal Courts**
👈  Expert evidence and witnesses

So long as a district court adheres to *Daubert's* requirements regarding expert testimony, the Court of Appeals shall not disturb the district court's findings unless they are manifestly erroneous. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

1 Cases that cite this headnote

**[16]**   **Evidence**
👈  Necessity and sufficiency

While a district court does not have to recite the *Daubert* standard for expert testimony mechanically, it is nonetheless crucial that a *Daubert* analysis of some form in fact be performed. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

4 Cases that cite this headnote

**[17]**   **Federal Courts**

97 Fair Empl.Prac.Cas. (BNA) 1589, 152 Lab.Cas. P 60,199, 24 IER Cases 660

🔑 Expert evidence and witnesses

Admission of expert testimony would not be given deference normally afforded to district court under "manifestly erroneous" standard, where district court explained admission in only one sentence, stating that purported expert had sufficient expertise. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

[18] **Evidence**
🔑 Necessity and sufficiency

When a district court fails to consider an essential *Daubert* factor for admitting expert testimony, such as reliability, it has abused its discretion. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

8 Cases that cite this headnote

[19] **Evidence**
🔑 Damages

Testimony by professor of management, in employee's action against employer for intentional infliction of emotional distress, was not sufficiently reliable to constitute expert testimony, in that his opinions were not tied to specific portions of policy manual, and appeared to be general observations regarding what is normal or usual business practice. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

5 Cases that cite this headnote

[20] **Federal Civil Procedure**
🔑 Evidence

**Federal Courts**
🔑 Expert and opinion testimony

Even if the admission of a plaintiff's purported expert testimony is in error, the defendants must show that the introduction of such evidence violated their substantial rights in order to be entitled to a new trial or setting aside of the verdict. Fed.Rules Evid.Rule 702, 28 U.S.C.A; Fed.Rules Civ.Proc.Rule 61, 28 U.S.C.A.

4 Cases that cite this headnote

[21] **Federal Courts**
🔑 Expert and opinion testimony

Erroneous admission of professor's purported expert testimony in support of employee's claim against employer for intentional infliction of emotional distress was not reversible error, in that the objectionable testimony was corroborated by other witnesses, elicited on cross-examination, or otherwise discredited on cross-examination. Fed.Rules Evid.Rule 702, 28 U.S.C.A; Fed.Rules Civ.Proc.Rule 61, 28 U.S.C.A.

Cases that cite this headnote

[22] **Federal Courts**
🔑 Estoppel to Allege Error; Invited Error

When error is invited, not even plain error permits reversal.

Cases that cite this headnote

[23] **Federal Courts**
🔑 In general; necessity

To preserve an issue for appellate review, a party must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection.

2 Cases that cite this headnote

[24] **Federal Courts**
🔑 Admission or exclusion of evidence

When a defendant does not object to the admission of evidence during the trial, the objection is waived and cannot be raised for the first time in a motion for new trial or on appeal.

7 Cases that cite this headnote

[25] **Federal Courts**
🔑 Evidence and Witnesses

Defendant waived its objection that expert's testimony impermissibly provided conclusions of law when defendant failed to raise such objection in its motion in limine or during testimony itself.

1 Cases that cite this headnote

**[26]    Federal Courts**
👉 Admission or exclusion of evidence

Even if expert provided impermissible testimony in employee's action against employer for intentional infliction of emotional distress, in saying that employee's failure to have worker tested for drugs was not violation of Department of Transportation (DOT) regulations, admission of such testimony was not plain error, where manager admitted at trial that he knew that worker was not covered by DOT regulations. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[27]    Federal Courts**
👉 Damages or Other Monetary Relief

Because employee was awarded damages against employer solely on her state-law intentional infliction of emotional distress claim, Illinois law governed review of that award.

5 Cases that cite this headnote

**[28]    Damages**
👉 Weight and Sufficiency

Under Illinois law, the evidence need only tend to show a basis for the computation of damages with a fair degree of probability.

6 Cases that cite this headnote

**[29]    New Trial**
👉 Remission or Reduction of Excess of Recovery

Under Illinois law, a damages award will not be subject to remittitur if it falls within the flexible range of conclusions which can be reasonably supported by facts because the assessment of damages is primarily an issue of fact for jury determination.

4 Cases that cite this headnote

**[30]    Federal Courts**
👉 Judgment and Relief

District court's error of comparing employee's award of $240,000 in damages on her Illinois claim for intentional infliction of emotional distress with awards in Seventh Circuit and other federal courts, rather than making that determination under Illinois law, was harmless, given employee's presentation of evidence of pain and suffering, including testimony from family members about her emotional state and diminished capabilities, testimony from her psychiatrist, and her own testimony regarding her emotional state.

2 Cases that cite this headnote

**[31]    Appeal and Error**
👉 Amount of Recovery

In reviewing damage awards, Illinois courts give great deference to the jury.

2 Cases that cite this headnote

**[32]    Damages**
👉 Questions for Jury

Under Illinois law, it is the jury's function to consider the credibility of witnesses and to determine an appropriate award of damages.

3 Cases that cite this headnote

**[33]    Federal Courts**
👉 Altering, amending, modifying, or vacating judgment or order; proceedings after judgment

A district court's decision to deny a motion to vacate a jury's award based on a manifest error of law will be reviewed for abuse of discretion, and its interpretation of the law will be reviewed de novo. Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.

Cases that cite this headnote

**[34]    Damages**
👉 Natural and probable consequences of torts

The general rule of damages in a tort action in Illinois is that the wrongdoer is liable for

97 Fair Empl.Prac.Cas. (BNA) 1589, 152 Lab.Cas. P 60,199, 24 IER Cases 660

all injuries resulting directly from the wrongful acts, whether they could or should not have been foreseen by him, provided the particular damages are the legal and natural consequences of the wrongful act imputed to the defendant, and are such as might reasonably have been anticipated.

Cases that cite this headnote

[35]    **Damages**
        👉 Loss of earnings or services

        **Damages**
        👉 Impairment of earning capacity

Under Illinois law, employee could be awarded past and future lost earnings and benefits in her Illinois law action against employer for intentional infliction of emotional distress, where employer's actions, including hiding her files and failing to change deadlines in her performance improvement plan (PIP), caused her loss of wages.

Cases that cite this headnote

[36]    **Damages**
        👉 Particular cases

Under Illinois law, jury's award of $150,000 for lost earnings and benefits to date, and $75,000 for future lost earnings and benefits, to employee on her claim of intentional infliction of emotional distress, was not against weight of the evidence, where actuary calculated present value of employee's lost earnings and benefits to be between $337,570 and $510,382.

Cases that cite this headnote

[37]    **Damages**
        👉 Loss of earnings, services, or consortium

Under Illinois law, in order to recover lost earnings, all the law requires is that the plaintiff present evidence which will establish, with a fair degree of probability, a basis for the assessment of damages.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*597** Constantine J. Gekas (Argued), Gekas & Associates, Chicago, IL, for Plaintiff–Appellee.

Thomas J. Piskorski (Argued), Seyfarth & Shaw, Chicago, IL, for Defendants–Appellants.

Before FLAUM, Chief Judge, and RIPPLE and KANNE, Circuit Judges.

**Opinion**

RIPPLE, Circuit Judge.

Sally Naeem filed this action against McKesson Drug Company ("McKesson") and McKesson employees Hank Weinmaster and Dan Montreuil, after McKesson terminated her employment on February 2, 1996. In her second amended complaint, Ms. Naeem alleged three counts: (1) sexual discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., (2) retaliatory sexual discrimination in violation of Title VII, and (3) a state-law claim for intentional infliction of emotional distress. Counts 1 and 3 were tried to a jury in August 2001. The jury reached a verdict in favor of McKesson on Count 1, and a verdict in favor of Ms. Naeem against McKesson and Dan Montreuil on Count 3. Count 2 is not at issue in this appeal and was ultimately dismissed with prejudice on September 27, 2004. After this dismissal, the defendants renewed their motion for judgment as a matter of law, or alternatively, for a new trial on Counts 1 and 3. The district court denied the defendants' motion on all grounds. For the reasons set forth in the **\*598** following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

McKesson is a wholesale distributor of pharmaceuticals, over-the-counter drugs and other products. In 1978, Ms. Naeem began her career at McKesson as a keypunch operator. She worked her way up to the post of operations manager at McKesson's Houston, Texas, Distribution Center. In March, 1992, she was transferred to McKesson's distribution center in Romeoville, Illinois, and worked there as the computer room

Naeem v. McKesson Drug Co., 444 F.3d 593 (2006)

97 Fair Empl.Prac.Cas. (BNA) 1589, 152 Lab.Cas. P 60,199, 24 IER Cases 660

supervisor. Ms. Naeem aspired to be the operations manager at the Romeoville distribution center, and, in 1993, she agreed to assume the role of transportation coordinator, a full-time job, while continuing to serve as computer room supervisor. [1] As a practical matter, therefore, she was working two full-time jobs. There was no job description that established a priority between the two positions. Although McKesson employees testified at trial that they had observed various problems with her performance, Ms. Naeem nevertheless received a 4.0% merit-based pay increase in 1993 with an explanation that she exceeded most objectives. She also received a 3.7% merit-based increase in 1994.

In March 1994, Ms. Naeem's manager, Jerry Moultry, made a sexual proposition to her that she rebuffed. Moultry later was given a written warning for inappropriate behavior based on this incident. Jeanette Maggio, the human resources director, testified at trial that Moultry was very upset when he was disciplined, and he worried that the incident would hinder his career. The warning letter was not placed in Mr. Moultry's personnel file; instead it was kept in a separate file to which few employees had access.

In July 1994, Ms. Naeem applied for the position of operations manager. Her bid for this position was unsuccessful; the position was awarded ultimately to Hank Weinmaster, who was then serving as the operations manager at a McKesson warehouse in Omaha. Ms. Naeem then filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") in October 1994. She alleged that she had not been promoted to operations manager due to sex discrimination and retaliation, attributing her lack of success in obtaining the position largely to Mr. Moultry's negative input. In its defense, McKesson explained to the EEOC that Ms. Naeem had not been promoted because she was having difficulty meeting performance standards in her position as transportation coordinator/computer room supervisor.

In early 1995, Ms. Naeem became pregnant with her fourth child. She experienced a difficult pregnancy, suffering from gestational diabetes, hypertension and other complications. In May 1995, Moultry was replaced by Dan Montreuil. Ms. Naeem claims that, after Mr. Montreuil became manager of the distribution center, her workload increased significantly: she was to be available to take calls from drivers at all times of the day and night, and was given many responsibilities for a pending warehouse reconfiguration. As part of the reconfiguration project, she was put in charge of setting up computers. **599** This project involved climbing up a metal stairway onto a raised mezzanine level and crawling under furniture to set up the machines. She performed this task herself although, given her pregnancy, it was difficult for her.

Ms. Naeem testified that she spoke with Maggio, the human resources director, and advised her that she was not feeling well and that her work was becoming overwhelming. She also spoke with Mr. Weinmaster who, according to Ms. Naeem, did not offer any help.

On July 17, 1995, Ms. Naeem placed her concerns in a grievance memo. Several days later, she met with Mr. Montreuil, Weinmaster and Jan Hartley, a human resources manager. Ms. Naeem testified that Mr. Montreuil was very angry at the meeting and yelled that she would receive no additional help, stated that she would have to continue working the two full-time jobs, and demanded a doctor's note. Mr. Montreuil presented another version of the meeting; he claimed that he had informed Ms. Naeem that he would help her and had asked that she prepare a specific list of items on which she needed assistance. He further testified that she never prepared such a list. Ms. Naeem saw her physician the following Monday. He recommended that she go on short-term medical disability. She followed that advice and took leave from July 25, 1995 until October 30, 1995.

Upon her return to work, Ms. Naeem was given a disciplinary warning for having failed to complete assignments before beginning her leave. Consequently, she was placed on a "Performance Improvement Plan" ("PIP"). The PIP detailed a number of projects that Ms. Naeem was to complete, in addition to her normal job duties, as well as due dates for the various projects. Ms. Naeem testified that the PIP was very onerous and that she had to work long hours to try to meet plan deadlines. Ms. Hartley, the human resources manager, admitted at trial that the PIP was implemented to "get Sally's attention," to "send Sally a message" and to "affect [her] mental processes." Tr.XV at 2591.

Additionally, while Ms. Naeem was absent, her transportation office was relocated during the warehouse reconfiguration. Ms. Naeem claims that many of the transportation records were lost in the process. She testified that it was difficult to finish some of the tasks in the PIP because the transportation records needed to complete projects were missing after the office relocation.

Ms. Naeem received a second written disciplinary warning on December 7, 1995, for failing to complete truck inspections properly. Ms. Naeem attributed the errors in the inspection to her inability to find the necessary files. Ms. Naeem also testified that, during this time period, after she returned from leave, Mr. Montreuil reprimanded and humiliated her at management staff meetings.

Ms. Naeem completed her first PIP and was given a second PIP on December 27, 1999. Ms. Naeem thought it would be extremely difficult to accomplish this PIP, which was more burdensome than the previous PIP, but she tried to work longer hours to complete the tasks. In addition to her normal job responsibilities, the tasks she was to complete for the PIP included driving to Indiana to train truck drivers about drug testing requirements and drafting reports for the upcoming inventory. Ms. Naeem also testified that, during this period, Mr. Montreuil tampered with information in her computer and changed the password so she would be unable to access her computer to meet pending deadlines.

**\*600**  On January 8, 1996, Ms. Naeem's two-year-old son became ill, and she took a week off from work, consistent with the Family and Medical Leave Act, to care for him. According to Ms. Naeem, Mr. Montreuil called her about five times during her leave to insist that she come back into work; Ms. Naeem refused each time. When she returned to work, Mr. Montreuil did not extend or excuse the PIP deadlines due to her son's illness.

On Tuesday, January 23, 1996, Mr. Montreuil and Hartley suspended Ms. Naeem for three days after she failed to order post-accident drug testing of a driver, Dave Barden, who was involved in a truck accident on December 29, 1995 ("the Barden incident"). The suspension stated that the failure to order a drug test was in violation of United States Department of Transportation ("DOT") regulations. Ms. Naeem claims that the DOT regulations did not apply because the truck involved was too small and that it was Mr. Montreuil who failed to order the testing.

When Ms. Naeem returned to work on the following Monday, January 29, she was given until noon on that Friday, February 2, to complete the listed tasks on the PIP. Ms. Naeem testified that she was "working round the clock to get all this done," but that it was "an impossible task." Tr.IX at 1272–73. Mr. Montreuil testified, however, that she had sufficient time to complete the tasks in both PIPs and that he had offered to help her with her other duties, so that she could focus on PIP

tasks. She did not complete the tasks, and was fired on Friday, February 2, 1996.

At trial, Ms. Naeem presented evidence of the emotional distress that she suffered during this time period. She testified that, before she was fired, she was working almost around the clock, that she was getting into arguments with her family and that she was suffering physical symptoms of anxiety including headaches and a recurring upset stomach. Her husband and son offered testimony that she became unable to eat, got into arguments, cried for hours, was unable to breast-feed her new infant son and refused sexual relations with her husband. She also suffered hair loss. Her behavior drove one of her older sons from the home. She testified that she did not seek psychiatric help after she was fired because she was ashamed and because it was too expensive. She began to contemplate suicide and, finally, saw a psychiatrist who diagnosed her with major depressive disorder and post-traumatic stress disorder. After her discharge, she was unable to find a job, and instead ran a convenience store with her family, where she was robbed at gun point. [2] Ms. Naeem later obtained a job as an entry-level computer operator.

## B. District Court Proceedings

On May 27, 1997, Ms. Naeem filed her second amended complaint, alleging three counts against McKesson: (1) sexual discrimination in violation of Title VII, (2) retaliatory sexual discrimination in violation of Title VII and (3) intentional infliction of emotional distress, an Illinois tort claim. Ms. Naeem also brought Count 3 against Montreuil and Weinmaster. As noted earlier, Count 2 has a long procedural history; it was ultimately dismissed with prejudice on September 27, 2004, and is not at issue in this case.

Counts 1 and 3 were tried to a jury in August 2001. After the close of Ms. Naeem's case, the defendants moved for **\*601** judgment as a matter of law on the intentional infliction of emotional distress claim. They argued that Ms. Naeem did not present sufficient evidence that the defendants' conduct rose to the level of extreme or outrageous. The district court orally denied the motion on the ground that sufficient evidence had been presented. The jury found in favor of McKesson on Count 1, but found McKesson and Dan Montreuil liable on Count 3. [3] Damages for the intentional infliction of emotional distress claim, to be paid to Ms. Naeem by McKesson, were awarded in the amounts of: $235,000 for pain and suffering, $35,000 for past and future medical care, $150,000 for lost earnings and benefits to date and $75,000 for future lost

earnings and benefits. R.160 at 4–6. The jury also awarded Ms. Naeem $5,000 for pain and suffering to be paid by Mr. Montreuil. *Id.*

After trial, the defendants renewed their motion for judgment as a matter of law, or alternatively, for a new trial. The defendants argued there was insufficient evidence to support an intentional infliction of emotional distress claim. They further contended: (1) that the jury's award of front and back pay had to be vacated because such damages are not available in an intentional infliction of emotional distress case; (2) that an award of $240,000 for pain and suffering was excessive, and (3) that the $35,000 award for medical expenses was speculative. The district court denied the motion. It noted that Ms. Naeem had "produced adequate evidence to support the jury's verdict on her [intentional infliction of emotional distress] claim." R.208 at 1. The district court next ruled that, with respect to the loss of front and back pay, the damages are not "front and back pay," as contemplated by Title VII, but rather are compensation for the value of earnings and benefits lost as a result of the defendants' tortious actions. *Id.* at 1. With regard to the award for pain and suffering, the district court held that the award was not "monstrously excessive" based on the evidence presented to the jury:

> [p]laintiff's evidence revealed a course of conduct which threatened her physical health and the health of her fetus, seriously affected the emotional well-being of her family, and caused severe and possibly permanent emotional damage, for which she ultimately sought and has been found to need continuing professional therapy.

*Id.* at 2. The district court compared the award with other cases from this and other federal circuits and concluded that the award was not "out of line with the awards in cases involving similar evidence of emotional damage." *Id.* at 3.

The defendants again moved for judgment as a matter of law, and submitted that the intentional infliction of emotional distress claim was preempted by the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1–101 et seq. The district court denied this motion, ruling that the

> plaintiff presented abundant evidence at trial of defendants' intentionally extreme and outrageous behavior,

such as their incessant public criticism of her work performance, their deliberate sabotaging of her computer files, and their piling on of extra work that they knew one person could not accomplish without great difficulty or error.

R.256 at 2. The district court further noted that the "defendants' behavior toward plaintiff is actionable in tort apart from defendants' duty as an employer not to discriminate in the workplace." *Id.*

**\*602  II**

**DISCUSSION**

**A. Preemption by the Illinois Human Rights Act**

The IHRA gives the Illinois Human Rights Commission ("IHRC") exclusive jurisdiction over civil rights violations. 775 ILCS 5/8–111(C) (stating that "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act."). A violation of the IHRA includes employment discrimination based on sex or handicap. *Id.* 5/1–103(I), (O), (Q); *Id.* 5/1–102(A). Employment discrimination, in turn, is defined as incidents in which an employer acts with respect to "promotion, renewal of employment ... discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination or citizenship status." *Id.* 5/2–102(A).

The defendants contend that Ms. Naeem's intentional infliction of emotional distress claim is preempted by the IHRA because she bases her claim on the same course of behavior that gave rise to her Title VII retaliation claim. The district court determined that the relevant inquiry was whether Ms. Naeem can establish the necessary elements of her intentional infliction of emotional distress claim "independent of any legal duties furnished by the IHRA, not whether the two claims happen to arise from the same course of conduct." R.258 at 2. The district court then concluded that there was "abundant evidence" at trial of extreme and outrageous behavior on the part of the defendants that could be the basis of an intentional infliction of emotional distress claim, including "their incessant public criticism of her work performance, their deliberate sabotaging of her computer files, and their piling on of extra work that they knew

97 Fair Empl.Prac.Cas. (BNA) 1589, 152 Lab.Cas. P 60,199, 24 IER Cases 660

one precedent could not accomplish without great difficulty or error." *Id.* Therefore, the district court held that Ms. Naeem's intentional infliction of emotional distress claim was not preempted by the IHRA.

**[1]** **[2]** The Supreme Court of Illinois twice has addressed IHRA preemption. In *Geise v. Phoenix Co. of Chicago, Inc.,* 159 Ill.2d 507, 203 Ill.Dec. 454, 639 N.E.2d 1273, 1277 (1994), the Supreme Court of Illinois ruled that claims of negligent hiring and retention that are "inextricably linked" to the concept of sexual harassment are preempted by the IHRA. The court also held that framing a claim in terms of a tort does not "alter the fundamental nature of [a] cause of action." *Id.* The court revisited the issue of IHRA preemption in *Maksimovic v. Tsogalis,* 177 Ill.2d 511, 227 Ill.Dec. 98, 687 N.E.2d 21 (1997). It held that a plaintiff's claims of assault, battery and false imprisonment were not "inextricably linked" with claims of sexual harassment because the plaintiff could establish "the necessary elements of each tort independent of any legal duties created by the Act." *Id.* at 22. *Maksimovic* clarified the court's earlier reasoning in *Geise,* stating:

> The rule from *Geise* is not that the Act precludes the circuit court from exercising jurisdiction over *all* tort claims related to sexual harassment. Rather, whether the circuit court may exercise jurisdiction over a tort claim depends upon whether the tort claim is inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the Act itself.

*Id.* at 23 (emphasis in original). Therefore, the IHRA does not preclude courts from exercising jurisdiction over all tort claims factually related to incidents of sexual harassment. *Id.* According to the court in *Maksimovic,* if a plaintiff can allege **\*603** facts sufficient to establish elements of a tort, that tort is not preempted by the IHRA. *Id.* at 23–24 (observing that there intended to abolish common law torts). When, as in *Maksimovic,* the sexual harassment aspect of the case is "merely incidental to what are otherwise ordinary common law tort claims," *id.* at 23, the claim is not preempted.

Appellate courts of Illinois twice have examined the scope of the *Maksimovic* holding in the context of an employment-related tort claim. In *Benitez v. KFC National Management Co.,* 305 Ill.App.3d 1027, 239 Ill.Dec. 705, 714 N.E.2d 1002

(1999), restaurant employees sued their employer after their supervisor and fellow employees poked holes in the ceiling of the restroom and used those holes to watch and photograph the plaintiff-employees undressing. The appellate court found that their claim of intentional infliction of emotional distress was not preempted because "the elements of intentional infliction of emotional distress are quite different from those necessary to establish a civil rights violation under the [IHRA]," and the plaintiffs had alleged sufficient facts to support the elements of intentional infliction of emotional distress. *Id.* at 1009 (citations omitted). In *Veazey v. LaSalle Telecommunications, Inc.,* the appellate court found that an employee who raised claims against his employer for terminating him "because he was Black" had no tort basis independent of the IHRA for imposing liability upon his employer, and thus the claim was preempted. 334 Ill.App.3d 926, 268 Ill.Dec. 750, 779 N.E.2d 364, 371 (2002).

There are also pre-*Maksimovic* cases in Illinois that support the view that claims of intentional infliction of emotional distress are not categorically preempted by the IHRA. In *Sutton v. Overcash,* the Illinois Appellate Court found that an intentional infliction of emotional distress claim based on sexual harassment was not preempted by the IHRA because the tort claim required more proof than is necessary to state a claim under the IHRA. 251 Ill.App.3d 737, 191 Ill.Dec. 230, 623 N.E.2d 820, 833 (1993); *see also Pavilon v. Kaferly,* 204 Ill.App.3d 235, 149 Ill.Dec. 549, 561 N.E.2d 1245, 1250–51 (1990) (same). [4]

**\*604** **[3]** We similarly have held that "discrimination and intentional infliction of emotional distress are different wrongs," and so torts that do not depend on a civil rights violation are not preempted. *See Sanglap v. LaSalle Bank FSB,* 345 F.3d 515, 519 (7th Cir.2003). However, we also have held that a claim of intentional infliction of emotional distress was preempted by the IHRA when "the core of [the plaintiff's] theory" was that the plaintiff was a victim of racial harassment. *Smith v. Chicago Sch. Reform Bd.,* 165 F.3d 1142, 1151 (7th Cir.1999). Similarly, in the context of sexual harassment, we have found an intentional infliction of emotional distress claim to be preempted when it "depend[ed] on allegations of sexual harassment," where the plaintiff's claim centered on the conduct of her superior, who propositioned her, grabbed her breasts and forcibly kissed her. *Quantock v. Shared Mktg. Servs. et al.,* 312 F.3d 899, 902, 905 (7th Cir.2002) (per curiam). The distinction between claims that are preempted and claims that are not preempted turns on the legal duty that the defendant allegedly breached; "that

97 Fair Empl.Prac.Cas. (BNA) 1589, 152 Lab.Cas. P 60,199, 24 IER Cases 660

is, if the conduct would be actionable even aside from its character as a civil rights violation because the IHRA did not 'furnish[ ] the legal duty that the defendant was alleged to have breached,' the IHRA does not preempt a state law claim seeking recovery for it." *Krocker v. City of Chicago,* 203 F.3d 507, 516–17 (7th Cir.2000) (citing *Maksimovic,* 227 Ill.Dec. 98, 687 N.E.2d at 23).

[4]    [5]    In Ms. Naeem's case, the district court ruled correctly when it determined that her claim for intentional infliction of emotional distress was not preempted. Following the *Maksimovic* test, the proper inquiry was not whether the facts that support Ms. Naeem's intentional infliction of emotional distress claim could also have supported a discrimination claim, but instead whether Ms. Naeem can prove the elements of intentional infliction of emotional distress independent of legal duties furnished by the IHRA. *See also Sanglap,* 345 F.3d at 519–20.

[6]    Under Illinois law, a plaintiff may recover damages for intentional infliction **\*605** of emotional distress only if she establishes that: "(1) the defendant's conduct was extreme and outrageous, (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress, and (3) the defendant's conduct did cause severe emotional distress." *Van Stan v. Fancy Colours & Co.,* 125 F.3d 563, 567 (7th Cir.1997). Given the extreme behavior outlined by the district court, and presented to the jury, we must conclude the defendants committed a tort independent of any duties not to discriminate against Ms. Naeem. The conduct that she alleges is not just sexually harassing conduct; instead, she alleges a pattern of behavior by the defendants that created impossible deadlines, set up obstacles to her performing her job, and sabotaged her work. The defendants' conduct will be discussed in more detail below; however, it is clear that her claim rests not just on behavior that is sexually harassing, but rather behavior that would be a tort no matter what the motives of the defendant. Therefore, her claim is not preempted by the IHRA.

**B. Sufficiency of the Evidence**
The defendants also claim that Ms. Naeem presented insufficient evidence to establish a claim of intentional infliction of emotional distress and, consequently, that they are entitled to judgment as a matter of law or, alternatively, a new trial. As we have noted earlier, under Illinois law, a plaintiff establishes intentional infliction of emotional distress by showing that: "(1) the defendant's conduct was

extreme and outrageous, (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress, and (3) the defendant's conduct did cause severe emotional distress." *Van Stan,* 125 F.3d at 567.

[7]    [8]    We shall review the district court's order denying a motion for judgment as a matter of law de novo. *Id.* However, we shall not reverse unless "no reasonable juror" could have found that Ms. Naeem established all of the elements of her claim, and "we must view all evidence in the light most favorable" to Ms. Naeem and "draw all reasonable inferences" in her favor. *Id.*

[9]    [10]    We shall review the district court's order denying a new trial for abuse of discretion. *Scaggs v. Consol. Rail Corp.,* 6 F.3d 1290, 1293 (7th Cir.1993). Because liability is based on an Illinois tort, the role of the district court was to determine whether the jury's verdict was based on sufficient proof to satisfy the claim for damages under Illinois law. *McClain v. Owens–Corning Fiberglas Corp.,* 139 F.3d 1124, 1125 (7th Cir.1998).

[11]    First, the defendants claim that their conduct was not "extreme and outrageous." As they point out, Illinois courts have been hesitant to find intentional infliction of emotional distress in the workplace because, "if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *Graham v. Commonwealth Edison Co.,* 318 Ill.App.3d 736, 252 Ill.Dec. 320, 742 N.E.2d 858, 867 (2000). Yet, Illinois courts have found extreme and outrageous behavior to exist in the employer/employee context when the employer "clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Honaker v. Smith,* 256 F.3d 477, 491 (7th Cir.2001). In this case, viewing the evidence in a light most favorable **\*606** to Ms. Naeem, the actions taken against Ms. Naeem clearly go far beyond typical on-the-job disagreements, including the following: forcing Ms. Naeem to climb up an unstable metal stairway to hook up computer equipment during her pregnancy; sabotaging Ms. Naeem's computer to deny her access and alter her files; publicly criticizing Ms. Naeem's work during meetings with other supervisors; moving her office and her transportation files, causing her to be unable to locate necessary paperwork; and increasing the amount of

work due under the PIPs, knowing that Ms. Naeem would not be able to meet the deadlines.

The jury also was entitled to consider that the defendants knew that Ms. Naeem was pregnant at the time, and, consequently, was particularly susceptible to emotional distress. *See Patterson v. Xerox Corp.,* 901 F.Supp. 274, 279 (N.D.Ill.1995) (holding that an employer who chastised a pregnant employee at work and berated that employee over the phone at home had acted in an "extreme and outrageous" manner); *see also Wall v. Pecaro,* 204 Ill.App.3d 362, 149 Ill.Dec. 388, 561 N.E.2d 1084, 1088 (1990) (holding that "by reason of her pregnancy, [the plaintiff] was peculiarly susceptible to emotional distress").

[12]   There was also sufficient evidence presented to the jury on the second element, intent to cause emotional distress. Hartley admitted at trial that McKesson management was trying to "send Sally a message," "affect [her] mental processes" and "get [her] attention." Tr.XV at 2591. Viewing this evidence in the light most favorable to Ms. Naeem, the jury could have found that the McKesson employees intended to cause emotional distress.

[13]   Finally, there was sufficient evidence of the third element, that Ms. Naeem actually suffered emotional distress. The defendants argue that, because Ms. Naeem did not seek psychiatric help until years after her employment with McKesson terminated, she did not suffer severe emotional distress. However, we previously have held that seeking psychiatric help is not a necessary condition to a finding that a defendant actually suffered from severe emotional distress. *See Bristow v. Drake Street, Inc.,* 41 F.3d 345, 350 (7th Cir.1994) (holding that the only effect of such a necessity "would be to increase psychiatrists' incomes"). Ms. Naeem's own testimony establishes that, after she was fired, her "self-esteem and self-confidence were zero," she was "so angry and depressed [she] didn't want to talk or deal with anybody," she and her husband "didn't have a relationship" and she considered committing suicide. Tr.IX at 1289–90, 1297. While preparing for depositions in this case, she was "having nightmares" of Mr. Montreuil "yelling at [her] and embarrassing [her] in front of every-body." *Id.* at 1295. Also, Ms. Naeem testified at trial that she was too ashamed to seek psychiatric help after her employment with McKesson was terminated, nor could she afford to go to a psychiatrist. Her family members also testified about their observations of her mental state; her husband testified that, by late 1995, she was losing her hair, that they did not have any marital

relations, that she was unable to breast-feed her newborn son, and that she would "cry[ ] for hours." Tr.VII at 854–56. Ms. Naeem's distress was similar to the distress found actionable in *Bristow,* where a woman who faced sexual discrimination at work sued for intentional infliction of emotional distress. 41 F.3d at 349–50. We found her emotional distress to be severe when she suffered stomach pains and vomiting, stopped eating, cried all the time, appeared frightened, was not a happy person, and was not functioning well, **\*607** even though she did not seek psychiatric help. *Id.*

Additionally, Ms. Naeem's psychiatrist, Dr. Lahmeyer, testified that Ms. Naeem suffered from post-traumatic stress disorder and major depressive disorder, which can be traced to her experiences at McKesson. Dr. Lahmeyer testified that he still meets regularly with Ms. Naeem, and that she is being treated with antidepressant, anti-anxiety medication. Ms. Naeem presented sufficient evidence from her psychiatrist, and from her own testimony, to support her claim that she suffered severe emotional distress. *See Pavilon v. Kaferly,* 204 Ill.App.3d 235, 149 Ill.Dec. 549, 561 N.E.2d 1245, 1252 (1990) (jury had sufficient evidence to find severe emotional distress when plaintiff testified she needed continuing psychotherapy, and when her psychotherapist testified that she was "scared, angry, unable to cope with her child, her work, and her relationship with men").

Viewing all of the evidence in the light most favorable to Ms. Naeem, a reasonable juror certainly could find that she had established all the elements of her claim. The district court did not abuse its discretion in denying defendants' motion for a new trial.

## C. Objections to Expert Witness Testimony

The defendants next claim that the district court erred in allowing the testimony of two of Ms. Naeem's expert witnesses. We shall discuss the testimony of each witness below separately.

### 1. Professor William Anthony

At trial, William Anthony, a professor of management at Florida State University, testified for Ms. Naeem as a human resources expert and gave his opinion as to whether McKesson followed its own human resources policies in dealing with Ms. Naeem. Prior to trial, the defendants filed a motion in limine seeking to exclude Prof. Anthony's testimony on the ground that it was inadmissible under Federal Rules of Evidence 402, 403 and 702. The district

97 Fair Empl.Prac.Cas. (BNA) 1589, 152 Lab.Cas. P 60,199, 24 IER Cases 660

court granted the motion in part, excluding Prof. Anthony's testimony regarding whether McKesson followed accepted human resource policies, but allowing testimony regarding whether McKesson followed its own policies.

[14]  [15]  The admissibility of expert testimony is governed by Federal Rule of Evidence 702,[5] as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "We first undertake a *de novo* review of whether or not the district court properly followed the framework set forth in *Daubert*." *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534 (7th Cir.2005) (citation omitted). *Daubert*, as extended to all expert testimony including non-scientific expert testimony, requires the district court to perform the role of gatekeeper and to "ensure the reliability and relevancy of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). So long as the district court adhered to *Daubert's* requirements, **\*608** we shall not "disturb the district court's findings unless they are manifestly erroneous." *Fuesting*, 421 F.3d at 534.

[16]  [17]  [18]  In ruling on the defendants' motion in limine, the district court simply stated that "[Prof.] Anthony has sufficient expertise to be able to assist the jury in understanding the meaning of a company's employment policies." R.150 at 5. We have said that judges merely need to follow *Daubert* in making a Rule 702 determination. While the *Daubert* standard does not have to be recited mechanically, "it is nonetheless crucial that a *Daubert* analysis of some form in fact be performed." *Fuesting*, 421 F.3d at 535. In *Fuesting*, we held that conclusory statements by the district court were not sufficient to show that a *Daubert* analysis was performed adequately. *Id.* (holding that a district court's statements finding an expert's credentials to be sufficient was not enough; the district court also needed to assess the reliability of the methodology used by the expert). Similarly, in this case, the district court's one sentence, stating that Prof. Anthony has sufficient expertise, is not enough to show that the district court applied the *Daubert* standard; the court provided no analysis of Prof. Anthony's methodology. Therefore, the admission of Prof. Anthony's testimony should not be given the deference normally afforded to a district court under the "manifestly erroneous" standard. When a district court fails to consider an essential *Daubert* factor, such as reliability, it has abused its discretion. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 717 (7th Cir.2000).

[19]  The defendants contend that Prof. Anthony's testimony gave opinions [6] that were not founded in scientific, technical or specialized knowledge. Defendants' Br. at 30. We have stated that "experts' work is admissible only to the extent that it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir.2000).

Prof. Anthony did testify that he examined a number of depositions from McKesson employees, as well as the McKesson personnel policy manual, when formulating his opinions. However, his opinions in court were not tied to specific portions of the policy manual, and appeared to be general observations regarding what is normal or usual business practice.[7] As such, his testimony did not meet the requisite level of reliability. *See Kumho Tire Co.*, 526 U.S. at 152, 119 S.Ct. 1167 (holding that the objective of *Daubert* is to ensure that "an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

[20]  [21]  [22]  Even though the admission of Prof. Anthony's testimony was in error, the defendants must show that the introduction of such evidence violated their "substantial rights" in order to be entitled to relief under **\*609** Federal Rule of Civil Procedure 61.[8] The defendants objected to specific statements made by Prof. Anthony: (1) noting that there was no written job description for Ms. Naeem's position and opining that the absence of one is abnormal; (2) concluding that there was no consistency from one supervisor to another; (3) stating that Ms. Naeem's job duties as computer room supervisor and transportation coordinator seemed to be incompatible; and (4) stating that some of Ms. Naeem's job duties were extremely unusual. Defendants' Br. at 30. However, Ms. Hartley corroborated statements (1) and (2) while testifying when she admitted that there was no written job description for Ms. Naeem's position and that there were no written documents that set forth changes in the job responsibilities and duties expected of Ms. Naeem by her current supervisor as compared to her previous supervisors.[9] Tr.V at 386–87, 391–92. Moreover, Prof. Anthony's opinion that some of Ms. Naeem's job duties were "extremely unusual" was elicited by the defendants on cross-examination, Tr.VI at 517–18, and, when error is invited, not even plain error permits reversal.

Naeem v. McKesson Drug Co., 444 F.3d 593 (2006)

97 Fair Empl.Prac.Cas. (BNA) 1589, 152 Lab.Cas. P 60,199, 24 IER Cases 660

See *United States v. Fulford*, 980 F.2d 1110, 1116 (7th Cir.1992) (holding that a party who introduces testimony cannot later claim that such testimony is irrelevant and prejudicial). Finally, the defendants cross-examined Prof. Anthony regarding his statement that Ms. Naeem's duties as computer room supervisor and transportation coordinator were incompatible, and Prof. Anthony admitted that he did not perform a job analysis nor did he know the full extent of what she was expected to do in her position. Tr.VI at 513–14. Given that the objectionable testimony by Prof. Anthony was corroborated by other witnesses, elicited on cross-examination or otherwise discredited on cross-examination, there was no reversible error in the admission of Prof. Anthony's testimony.

**2. David LaPorte**

At trial, David LaPorte testified for Ms. Naeem as an expert on DOT regulations governing post-accident drug testing. He testified that Ms. Naeem's failure to have Barden tested for drugs after his December 29, 1995, accident was not a violation of DOT regulations. The defendants offered no objection during Mr. LaPorte's direct examination when he was asked to give an opinion regarding whether the failure to test for drugs was a DOT violation. Tr.V at 307–08.

Before trial, however, the defendants filed a motion in limine to exclude the testimony of LaPorte. The defendants contended that his testimony about the applicable DOT regulations was irrelevant to the questions to be decided by the jury. They stressed that what was at issue was Mr. Montreuil's state of mind in **\*610** suspending Ms. Naeem, not whether he was actually correct in believing that DOT regulations required drug testing after the Barden incident. The defendants further argued that LaPorte's testimony regarding McKesson's drug and alcohol testing policies was not needed to help the jury understand the evidence, and that such an opinion would usurp the jury's fact-finding role in their determination as to whether Mr. Montreuil acted reasonably under the McKesson policies. No additional argument was made at trial during LaPorte's testimony. The defendants did not raise their current argument, that LaPorte impermissibly provided conclusions of law, until their renewed motion for judgment as a matter of law or, alternatively, for a new trial. *See* R.288 at 12. In that motion, they argued that the testimony of David LaPorte was admitted in error because it allowed an expert witness to provide "a legal interpretation and application of a federal regulation." *See id.* In their view, the court should instruct the jury on the applicable law, not witnesses.

**[23] [24] [25]** To preserve an issue for appellate review, a party "must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection." *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir.1988). An objection is proper when "a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context...." Fed.R.Evid. 103(a)(1). "Neither a general objection to the evidence nor a specific objection on other grounds will preserve the issue for review." *Wynn*, 845 F.2d at 1442; *see also United States v. Laughlin*, 772 F.2d 1382, 1392 (7th Cir.1985) (holding that defendant's objection to the admission of photographs on the ground of irrelevancy did not preserve objection under Federal Rule of Evidence 404(b)). When a defendant does not object to the admission of evidence during the trial, the objection is waived and cannot be raised for the first time in a motion for new trial or on appeal. *United States v. Hack*, 205 F.2d 723, 727 (7th Cir.1953). In this case, the defendants did not raise their current objection to LaPorte's testimony in either their motion in limine or during the testimony itself. The defendants therefore waived their current objection to LaPorte's testimony.

In any event, we previously have stated that allowing a witness to testify as to a legal conclusion may cause the jury to accord too much weight to that testimony, and may infer that the jury should look to that witness for legal guidance. *See Bammerlin v. Navistar Int'l Transp. Co.*, 30 F.3d 898, 900 (7th Cir.1994); *Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 366 (7th Cir.1991). In *Bammerlin* and *Harbor Insurance*, the expert witnesses were offering "opinions about legal issues that ... determine[d] the outcome of a case." *United States v. Sinclair*, 74 F.3d 753, 757–58 n. 1 (7th Cir.1996) (citing cases). However, in the present case, the DOT regulations at issue do not determine the outcome of Ms. Naeem's claims; rather, they are only a piece of evidence regarding whether one of the disciplinary actions against Ms. Naeem was justified.

**[26]** Moreover, even if LaPorte did provide impermissible testimony, it would not be grounds for reversal. Mr. Montreuil admitted at trial that he knew that the truck driven by Barden was not covered by the DOT regulations at the time he disciplined Ms. Naeem for failing to order post-accident drug testing. Therefore, his testimony was consistent with the testimony of Mr. LaPorte, and, consequently, there was no plain error. *See also United States v. Duvall*, 272 F.3d 825,

829 (7th Cir.2001) (holding that, even if expert testimony opining that drugs were **611** packaged for distribution was admitted in error, the error was harmless because the defendant admitted he intended to distribute the drugs in question).

## D. Jury Award for Pain and Suffering

The defendants submit that the jury's award of $240,000 for pain and suffering is excessive and not in line with comparable cases. The district court denied the defendants' renewed motion for judgment as a matter of law or, alternatively, for a new trial on this ground. The court applied the federal standard for review of compensatory damages, asking "whether the award is monstrously excessive; whether there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and whether the award is roughly comparable to awards made in similar cases." *EEOC v. AIC Sec. Investigations, Ltd.,* 55 F.3d 1276, 1285 (7th Cir.1995) (citations omitted). The court held that the award was not "monstrously excessive" and that the defendants had failed to establish that such an award was out of line with comparable cases. R.208 at 3–4.

[27] Because Ms. Naeem was awarded damages solely on her state-law intentional infliction of emotional distress claim, Illinois law governs review of that award. *Medcom Holding Co. v. Baxter Travenol Labs., Inc.,* 106 F.3d 1388, 1397 (7th Cir.1997). That conclusion is mandated by *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 431, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996), in which the Supreme Court held that a federal district court must defer to state standards of review of damages for state law claims because *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), "precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court." A federal appellate court must review the district court's determination only for abuse of discretion. *Id.* at 438, 116 S.Ct. 2211.

[28] [29] Under Illinois law, "the evidence need only tend to show a basis for the computation of damages with a fair degree of probability." *Medcom Holding Co.,* 106 F.3d at 1398 (citation omitted). A damages award will not be subject to remittitur if it "falls within the flexible range of conclusions which can be reasonably supported by facts because the assessment of damages is primarily an issue of fact for jury determination." *Id.* (citations omitted). Illinois courts, in applying this standard, have "traditionally declined to

make ... comparisons [with amounts awarded in other cases] in determining whether a particular award is excessive." *Richardson v. Chapman,* 175 Ill.2d 98, 221 Ill.Dec. 818, 676 N.E.2d 621, 628 (1997) (citing cases); *see also Tierney v. Cmty. Mem'l Gen. Hosp.,* 268 Ill.App.3d 1050, 206 Ill.Dec. 279, 645 N.E.2d 284, 294 (1994) (holding that "[w]ith regard to defendants' arguments that the jury's verdict should be compared to other similar awards and thereby found to be excessive, this is simply not the law in Illinois") (citing cases).

[30] In this case, the district court failed to apply the Illinois standard for review of damages. It compared the award to Ms. Naeem with awards to other plaintiffs in other cases in the Seventh Circuit and other federal courts around the nation. Although making such comparisons is the federal standard for review of compensatory damages, it is not the established methodology employed by Illinois courts. By using such a standard, a district court may allow a larger recovery than would be allowable under Illinois law, or, conversely, it may preclude an award that would be allowable under Illinois law. *Gasperini* prohibits such a result. 518 U.S. at 431, 116 S.Ct. 2211. Indeed, *Gasperini* stresses that substantial differences **612** between federal and state court damage awards may result if the federal court does not apply state standards. *See id.* at 430–31, 116 S.Ct. 2211. The possibility of such differences is even more pronounced in this case because the district court compared the damage awards to cases outside the state of Illinois and even outside the Seventh Circuit. Therefore, we must conclude that, in employing this methodology, the district court committed error. However, after a review under the correct Illinois standards, we must conclude that the district court's error was harmless.

[31] [32] In reviewing damage awards, Illinois courts give great deference to the jury. Illinois law makes clear that it is "the jury's function to consider the credibility of witnesses and to determine an appropriate award of damages." *Richardson,* 221 Ill.Dec. 818, 676 N.E.2d at 628. Indeed, the Supreme Court of Illinois has stated that an award of damages "will be deemed excessive if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience." *Best v. Taylor Mach. Works, et al.,* 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057, 1079 (1997) (citations omitted). In this case, Ms. Naeem presented evidence of her pain and suffering, including: testimony from family members about her emotional state and diminished capabilities, testimony from her psychiatrist and her own testimony regarding her emotional state while employed at McKesson and after her

Naeem v. McKesson Drug Co., 444 F.3d 593 (2006)
97 Fair Empl.Prac.Cas. (BNA) 1589, 152 Lab.Cas. P 60,199, 24 IER Cases 660

termination. The jury had ample evidence to form the basis of their award of $240,000, and we cannot say that such an award "shocks the conscience." *See id.*

### E. Jury Award of Front and Back Pay

[33]   The jury awarded $150,000 for lost earnings and benefits to date, and $75,000 for future lost earnings and benefits. R.160 at 5. After judgment was entered, the defendants moved for the district court to vacate these damages. They contended that vacation was possible under Federal Rule of Civil Procedure 59, which allows for a judgment to be altered or amended when there has been a "manifest error of law." *See Russell v. Delco Remy Div. of Gen. Motors Corp.,* 51 F.3d 746, 749 (7th Cir.1995). The defendants contend that it was a manifest error of law to award what it classifies as "front and back pay"[10] to Ms. Naeem, because an award for an intentional infliction of emotional distress claim is intended to compensate the victim for the emotional distress suffered as a result of the tortious conduct; awards for past and future loss of income and benefits, according to the defendants, are not "logical" for an intentional infliction of emotional distress claim. Defendants' Br. at 34–35. The district court denied defendants' motion; we review the district court's decision for abuse of discretion, and review its interpretation of the law de novo. *See Boyd v. Illinois State Police,* 384 F.3d 888, 897 (7th Cir.2004).

[34]   [35]   The general rule of damages in a tort action in Illinois is that:

> the wrongdoer is liable for all injuries resulting directly from the wrongful acts, whether they could or should not have been foreseen by him, provided the particular damages are the legal and natural consequences of the wrongful act **\*613** imputed to the defendant, and are such as might reasonably have been anticipated.

*Sutton v. Overcash,* 251 Ill.App.3d 737, 191 Ill.Dec. 230, 623 N.E.2d 820, 838 (1993) (citing *Siemieniec v. Lutheran Gen. Hosp.,* 117 Ill.2d 230, 111 Ill.Dec. 302, 512 N.E.2d 691 (1987)). In *Sutton,* the court allowed a jury instruction on lost wages for the plaintiff's intentional infliction of emotional distress claim against her employer after the plaintiff presented evidence that the defendant's actions caused the plaintiff to leave her job, and initially to take a job that paid her less. *Id.* at 838–39. Although the defendants

attempt to distinguish *Sutton* on the ground that the plaintiff voluntarily left her job, while Ms. Naeem was discharged, we do not believe this is a meaningful distinction. Just as in *Sutton,* the defendants' actions caused Ms. Naeem's loss of wages. These actions, as previously described, included hiding necessary files and failing to change deadlines in her PIP. These actions all contributed to her discharge. As the district court stated when allowing Ms. Naeem to present evidence of lost earnings, "if you were to believe the plaintiff's testimony, you could find that ... the plaintiff's failure to do the things she had to do to keep her job was caused by the defendants' tortious conduct." Tr.X at 1484. Ms. Naeem also testified that she was unable to find a job after a job search,[11] and that her depression caused her difficulties in making good decisions. Tr.IX at 1288–94.

[36]   [37]   The defendants also argue that the award for lost earnings and benefits is against the weight of the evidence. Under Illinois law, "[i]n order to recover lost earnings, all the law requires is that the plaintiff present evidence which will establish, with a fair degree of probability, a basis for the assessment of damages." *Sutton,* 191 Ill.Dec. 230, 623 N.E.2d at 838. As noted above, Ms. Naeem presented testimony with respect to how the defendants caused her to lose her job and how she had difficulty finding another job after her termination. Ms. Naeem also presented the testimony of Sandor Goldstein, an actuary, who calculated the present value of Ms. Naeem's lost earnings and benefits[12] to be between $337,570 and $510,382. Tr.XI at 1594–96. Therefore, there was an evidentiary basis for the jury's conclusion that defendants' actions caused a loss of past and future earnings, as well as relevant evidence for the jury to consider in calculating those losses. It was not an abuse of discretion for the district court to find the evidence provided the proof of damages. *See McClain v. Owens–Corning Fiberglas Corp.,* 139 F.3d 1124, 1126 (7th Cir.1998) (holding that "[g]enerally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court" (citing *Harrington v. DeVito,* 656 F.2d 264, 269 (7th Cir.1981))).

### Conclusion

For the reasons set forth in this opinion, the judgment of the district court is affirmed.

AFFIRMED

97 Fair Empl.Prac.Cas. (BNA) 1589, 152 Lab.Cas. P 60,199, 24 IER Cases 660

### Parallel Citations

97 Fair Empl.Prac.Cas. (BNA) 1589, 152 Lab.Cas. P 60,199, 24 IER Cases 660

Footnotes

1    Ms. Naeem's duties in her role as computer room supervisor included overseeing the computer room employees, who coordinated the processing of product orders on the computer. Her duties as transportation coordinator included the supervision of drivers: setting work schedules, coordinating routes, and handling truck delivery issues.

2    McKesson argues that the robbery is the reason that Ms. Naeem sought psychiatric help.

3    The jury also found in favor of Hank Weinmaster on Count 3.

4    The application of *Maksimovic v. Tsogalis*, 177 Ill.2d 511, 227 Ill.Dec. 98, 687 N.E.2d 21 (1997) by federal district courts has led to sometimes inconsistent results. *Compare Spahn v. Int'l Quality & Productivity*, 211 F.Supp.2d 1072, 1075 n. 2 (N.D.Ill.2002) (noting that "claims for [intentional infliction of emotional distress] are generally not preempted by the IHRA when there is an underlying sexual harassment claim" (citations omitted)), *with Simon v. City of Naperville*, 71 F.Supp.2d 882, 884 (N.D.Ill.1999) (holding that an intentional infliction of emotional distress claim that is based on facts which also constitute sexual harassment is "surely preempted" under the IHRA). Several district courts have determined that an intentional infliction of emotional distress claim is not preempted by the IHRA, even when the plaintiff also claims discrimination or retaliation based on sex. *See, e.g., Temores v. SG Cowen*, 289 F.Supp.2d 996, 1006–07 (N.D.Ill.2003); *Spahn*, 211 F.Supp.2d at 1076; *Warnell et al. v. Ford Motor Co. et al.*, 48 F.Supp.2d 1095, 1097 (N.D.Ill.1999). However, in others, the court has determined that a plaintiff who claims sexual or other discrimination does face preemption of their intentional infliction of emotional distress claim by the IHRA. *See, e.g., Beard v. City of Chicago*, 299 F.Supp.2d 872, 874–75 (N.D.Ill.2004); *Thomas v. Habitat Co.*, 213 F.Supp.2d 887, 899 (N.D.Ill.2002); *Haswell v. Marshall Field & Co.*, 16 F.Supp.2d 952, 965 (N.D.Ill.1998).

Despite *Maksimovic* 's holding that preemption should rest on an examination of legal duties, not on the factual basis of claims, district courts have found IHRA preemption of an intentional infliction of emotional distress claim when a plaintiff alleged the same conduct to support intentional infliction of emotional distress as was alleged to support a claim of disability, racial or sexual harassment. *See Stansberry v. Uhlich Children's Home*, 264 F.Supp.2d 681, 690 (N.D.Ill.2003) (noting these claims are "inextricably linked"); *see also Thomas*, 213 F.Supp.2d. at 899; *Haywood v. Lucent Techs.*, 169 F.Supp.2d 890, 914 (N.D.Ill.2001) (stating that an intentional infliction of emotional distress claim was preempted when the same conduct alleged to support intentional infliction of emotional distress claim also was alleged to support discrimination claim); *Simon*, 71 F.Supp.2d at 884 (same); *Haswell*, 16 F.Supp.2d at 965 (holding that an intentional infliction of emotional distress claim was preempted because the "same allegations surface in [the plaintiff's] disability discrimination claim" under the Americans with Disabilities Act).

However, in other district court cases, the district court has correctly looked to the source of the legal duty in determining preemption. In *Roberts v. County of Cook,* the plaintiff alleged sexual harassment by her employer who engaged "in a pattern of verbal and physical sexual discrimination." 213 F.Supp.2d 882, 884 (N.D.Ill.2002). Nevertheless, the district court found that an intentional infliction of emotional distress action was not preempted by IHRA, even though it involved sexual elements, because it did "not depend on the prohibitions against sex discrimination for its survival." *Id.* at 887 (citation omitted); *see also Arnold v. Janssen Pharmaceutica, Inc.*, 215 F.Supp.2d 951, 955 (N.D.Ill.2002) ("That extreme and offensive conduct might also constitute sexual harassment ... does not affect the viability of a tort claim for [intentional infliction of emotional distress]."); *Spahn*, 211 F.Supp.2d at 1076 (holding that it is "perfectly clear that the critical analysis focuses on legal duties, not facts"). Another district court noted that if an employer acts in an extreme and outrageous manner, and thus commits intentional infliction of emotional distress, it is "irrelevant whether the motive for this harassment" was based on a discriminatory intent. *Jimenez v. Thompson Steel Co., Inc.*, 264 F.Supp.2d 693, 696 (N.D.Ill.2003).

5    Federal Rule of Evidence 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

6    An example of such an opinion, cited by defendants, is the testimony that: "I concluded that in Sally's case they didn't lay out the duties and responsibilities clearly enough, since there was no written job description. And that's normally how you do that." Tr.VI at 501.

Naeem v. McKesson Drug Co., 444 F.3d 593 (2006)

97 Fair Empl.Prac.Cas. (BNA) 1589, 152 Lab.Cas. P 60,199, 24 IER Cases 660

7    Another example of such an opinion is Prof. Anthony's testimony that "some of the things that [Ms. Naeem] was asked to do in the performance plan were extremely unusual for any job. Like managing three shifts, for example." Tr.VI at 517–18.

8    Federal Rule of Civil Procedure 61 states, in relevant part: "No error in either the admission or exclusion of evidence ... is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice."

9    No defense witness testified that the absence of a written job description for Ms. Naeem's position was "abnormal." Ms. Hartley was asked about the McKesson personnel policy manual, which stated that "Every employee should have a job description [and] specific position guide." Tr.V at 362–63. Ms. Hartley testified that the personnel policy that mandated a written job description was not the policy that was used at the time of Ms. Naeem's employment in Romeoville. *Id.* at 366. Her testimony was later impeached by the interrogatory answered by Ms. Miller, vice president of McKesson, who stated that the policy regarding written job descriptions in question was in place during Ms. Naeem's employment at Romeoville. Tr.VI at 481–83.

10   The district court noted in its ruling on the defendants' renewed motion for judgment as a matter of law, or, alternatively for new trial that the jury's award was not technically for "front and back pay" because those terms connote Title VII damages. R.208 at 2. Instead, the jury was instructed that it could award damages for "[t]he value of earnings and benefits lost" and "[t]he present cash value of the earnings and benefits reasonably certain to be lost in the future." *See id.;* Illinois Pattern Instruction–Civil, No. 30.07.

11   Ms. Naeem testified that her attempts to find another job included: getting addresses of other drug companies from the library and sending them resumes, calling human resources directors for drug companies to inquire about available positions, and looking through the newspaper to find job listings. Tr.IX at 1288–90.

12   Goldstein made these calculations based on an assumption that Ms. Naeem would stay employed at McKesson, and took into account the difference between her McKesson salary and her current salary. Tr.XI at 1593–94.

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 67

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 321 of 540

Norwest Bank Worthington v. Ahlers, 485 U.S. 197 (1988)
108 S.Ct. 963, 99 L.Ed.2d 169, 56 USLW 4225, 18 Collier Bankr.Cas.2d 262...

108 S.Ct. 963
Supreme Court of the United States

NORWEST BANK
WORTHINGTON, et al., Petitioners
v.
James R. AHLERS, et ux.

No. 86-958.    |    Argued Jan. 12,
1988.    |    Decided March 7, 1988.

Chapter 11 debtors, who operated family farm, appealed orders of the United States District Court for the District of Minnesota, Donald D. Alsop, Chief Judge, concerning adequate protection payments. The Court of Appeals, Heaney, Circuit Judge, 794 F.2d 388, reversed and remanded, and creditors sought certiorari review. The Supreme Court, Justice White, held that absolute priority rule barred Chapter 11 debtors' retention of equity interest in farm over objections of creditors' senior unsecured claims.

Reversed and remanded.

Justice Kennedy took no part in the consideration or decision of this case.

Order on remand, 844 F.2d 587.

West Headnotes (5)

[1]    **Bankruptcy**
        Preservation of Priority
        "Absolute priority rule" provides that dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under reorganization plan. Bankr.Code, 11 U.S.C.A. § 1129(b)(2)(B)(ii).

        146 Cases that cite this headnote

[2]    **Bankruptcy**
        Preservation of Priority
        Absolute priority rule barred Chapter 11 debtors' retention of equity interest in their farm over objections of creditors with senior unsecured

claims; debtors' yearly contributions of labor, experience and expertise did not constitute contribution of "money or money's worth," within meaning of exception to absolute priority rule, in that, viewed from time of approval of plan, debtors' promise of future services was intangible, inalienable, and probably unenforceable. Bankr.Code, 11 U.S.C.A. § 1129(b)(2)(B).

        257 Cases that cite this headnote

[3]    **Bankruptcy**
        Preservation of Priority
        Statutory language and legislative history of Bankruptcy Code provision providing absolute priority rule for reorganization plans barred any expansion of any exception to rule beyond that judicially recognized at time Congress enacted Code provision. Bankr.Code, 11 U.S.C.A. § 1129(b).

        174 Cases that cite this headnote

[4]    **Bankruptcy**
        Equitable Powers and Principles
        Whatever equitable powers remain in bankruptcy courts must and can only be exercised within confines of Bankruptcy Code.

        487 Cases that cite this headnote

[5]    **Bankruptcy**
        Preservation of Priority
        Any interest Chapter 11 debtors would retain in farm property under reorganization plan would be "property," within meaning of absolute priority rule, and thus could only be retained pursuant to plan accepted by creditors or formulated in compliance with absolute priority rule. Bankr.Code, 11 U.S.C.A. § 1129(b)(2)(B)(ii).

        161 Cases that cite this headnote

108 S.Ct. 963, 99 L.Ed.2d 169, 56 USLW 4225, 18 Collier Bankr.Cas.2d 262...

**963  *Syllabus* *

 *197  Respondents, who operate a family farm, obtained
secured loans from petitioners. Following a 1984 default on
the loan payments, one petitioner filed a state-court replevin
action seeking possession of the farm equipment pledged as
security, but respondents obtained an automatic stay of the
action when they filed a petition for reorganization under
Chapter 11 of the Bankruptcy Code (Code). On petitioners'
motions for relief from the automatic stay, the District Court
found respondents' reorganization plan to be unfeasible and
affirmed  **964  the Bankruptcy Court's decision to grant
petitioners relief. The Court of Appeals reversed, finding
that respondents could file a feasible reorganization plan (as
suggested by the court), and rejecting petitioners' contention
that the Code's "absolute priority rule," 11 U.S.C. § 1129(b)
(2)(B)(ii) (1982 ed. and Supp. IV)-which provides that a
dissenting class of unsecured creditors must be provided for in
full before any junior class can receive or retain any property
under the plan-barred confirmation of any plan which allowed
respondents to retain their equity interest in the farm, which
was junior to creditors' unsecured claims. The court held
that under *Case v. Los Angeles Lumber Products Co.,* 308
U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110, the absolute priority
rule did not bar respondents from retaining their equity
interest if they contributed "money or money's worth" to
the reorganized enterprise, and that their yearly contributions
of "labor, experience, and expertise" would constitute
such a contribution, therefore permitting confirmation of a
reorganization plan over petitioners' objections.

*Held:* The absolute priority rule applies, and respondents'
promise of future labor warrants no exception to its operation.
Pp. 966-971.

(a) The dicta in *Case v. Los Angeles Lumber Products Co.,*
relied upon by the Court of Appeals, is not applicable here.
Viewed from the time of the plan's approval, respondents'
promise of future services was intangible, inalienable, and,
in all likelihood, unenforceable. Unlike "money or money's
worth," such promise cannot be exchanged in any market
for something of value to the creditors today. No broader
exception to the absolute priority rule than that suggested in
*Los Angeles Lumber* 's dicta exists. The statutory language
and § 1129(b)'s legislative history bar any expansion of any
exception to the absolute priority  *198  rule beyond that
recognized in this Court's cases at the time Congress enacted
the 1978 Bankruptcy Code. Pp. 966-968.

(b) The provisions of the Code do not support the contentions
that the equitable nature of bankruptcy proceedings prevents
petitioners from voting in the class of unsecured creditors, and
requires confirmation of a "fair and equitable" reorganization
plan in the best interests of all creditors and debtors; and
that respondents' wholly unsecured creditors (as opposed
to petitioners, who have undersecured claims) would fare
better under the proposed reorganization plan than if the
farm was liquidated. Whatever equitable powers remain in
the bankruptcy courts must be exercised within the Code's
confines. Pp. 968-969.

(c) There is no merit to respondents' argument that the
absolute priority rule does not apply on the ground that,
because the farm has no "going concern" value (apart from
their own labor on it), any equity interest they retain in a
reorganization is worthless to the senior unsecured creditors
and therefore is not "property" under the rule. Even where
debts far exceed the current value of assets, a debtor who
retains his equity interest in the enterprise retains "property."
The legislative history suggests that Congress' meaning of
"property" was broad, including both tangible and intangible
property. The interest respondents would retain under any
reorganization must be considered "property," and therefore
can only be retained pursuant to a plan accepted by their
creditors or formulated in compliance with the absolute
priority rule. Pp. 969-970.

(d) Relief from current problems facing farm families cannot
come from a misconstruction of the bankruptcy laws, but
rather only from action by Congress. Moreover, the Family
Farmers Bankruptcy Act of 1986 creates a new Chapter 12
bankruptcy proceeding whereby family farmers can retain an
equity interest in their farms while making loan repayments
under a reorganization plan. To uphold the Court of Appeals'
decision would create a method of proceeding under Chapter
11 which would be far more advantageous to farmers than
 **965  is Chapter 12; this would be contrary to Congress'
intent. Pp. 970-971.

794 F.2d 388 (CA8 1986), reversed and remanded.

WHITE, J., delivered the opinion of the Court, in which all
other Members joined, except KENNEDY, J., who took no
part in the consideration or decision of the case.

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 323 of 540

Norwest Bank Worthington v. Ahlers, 485 U.S. 197 (1988)
108 S.Ct. 963, 99 L.Ed.2d 169, 56 USLW 4225, 18 Collier Bankr.Cas.2d 262...

**Attorneys and Law Firms**

*Gordon B. Conn, Jr.,* argued the cause for petitioners. With him on the brief were *Michael R. Stewart, Dennis M. Ryan, A. Patrick Leighton,* and *David A. Kastelic.*

 **\*199** *William L. Needler* argued the cause for respondents. With him on the brief were *James C. Truax* and *Francis E. Stepnowski.\**

\* Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Cohen,* and *Roy T. Englert, Jr.;* for the American Bankers Association by *John J. Gill III* and *Michael F. Crotty;* for the American College of Real Estate Lawyers by *Robert M. Zinman, Bruce S. Lane, Edward I. Cutler,* and *David A. Richards;* for the American Council of Life Insurance by *Phillip E. Stano, Jack H. Blaine, Robert M. Zinman,* and *Edward J. Zimmerman;* and for the Nebraska Bankers Association, Inc., by *William B. Brandt.*

A brief of *amici curiae* urging affirmance was filed for the State of Arkansas et al. by *Phillip L. Kunkel* and *Raymond T. Nimmer,* and by the Attorneys General for their respective States as follows: *Steve Clark* of Arkansas, *Joseph I. Lieberman* of Connecticut, *Thomas J. Miller* of Iowa, *Neil F. Hartigan* of Illinois, *David L. Armstrong* of Kentucky, *Hubert H. Humphrey III* of Minnesota, *Mike Greely* of Montana, *Robert M. Spire* of Nebraska, *Robert Abrams* of New York, *Nicholas Spaeth* of North Dakota, *T. Travis Medlock* of South Carolina, *Roger Tellinghuisen* of South Dakota, and *Jim Mattox* of Texas.

**Opinion**

Justice WHITE delivered the opinion of the Court.

In this case, the Court of Appeals found that respondents' promise of future "labor, experience, and expertise" permitted confirmation of their Chapter 11 reorganization plan over the objections of their creditors, even though the plan violated the "absolute priority rule" of the Bankruptcy Code. Because we find this conclusion at odds with the Code and our cases, we reverse.

**I**

Respondents operate a failing family farm in Nobles County, Minnesota. Between 1965 and 1984 they obtained loans

from petitioners, securing the loans with their farmland, machinery, crops, livestock, and farm proceeds. In November 1984, respondents defaulted on their loan payments to petitioner Norwest Bank Worthington; at the time, **\*200** the aggregate loan balance owed the petitioners exceeded $1 million.

Following the default, Norwest filed a replevin action in Minnesota state court seeking possession of the farm equipment respondents had pledged as security. However, two weeks later respondents obtained an automatic stay of the replevin proceedings, when they filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. See 11 U.S.C. § 362(a) (1982 ed. and Supp. IV).

Petitioners filed motions in the Bankruptcy Court for relief from the automatic stay. 11 U.S.C. § 362(d) (1982 ed., Supp. IV). After decisions by the Bankruptcy and the District Courts, these motions were ultimately considered by the Court of Appeals, which prohibited petitioners from repossessing any equipment, pending a determination by the District Court of the probability of success of a reorganization plan to be filed by respondents. App. to Pet. for Cert. A-76-A-77. On remand, the District Court found respondents' reorganization plan to be "utter[ly] unfeasibl[e]." *Id.,* at A-86. It therefore affirmed the Bankruptcy Court's initial decision to grant petitioners relief from the automatic stay.

On appeal, the Court of Appeals reversed. It found that respondents could file a feasible reorganization plan. 794 F.2d 388, 399 (CA8 1986). Consequently, the Court of Appeals remanded the case with instructions that the Bankruptcy Court entertain and confirm a reorganization plan which comported with an outline suggested in a lengthy appendix to the Eighth Circuit's opinion. *Id., at 408-414.*

In reaching this conclusion, the Court of Appeals rejected petitioners' contention that, because of the "absolute priority rule" in the Bankruptcy Code, 11 U.S.C. § 1129(b)(2)(B)(ii) (1982 ed. and Supp. IV), their legitimate objections to any reorganization plan which allowed respondents to retain an interest in the farm property was sufficient to bar confirmation **\*201** of such a plan. [1] Petitioners contended that the absolute **\*\*966** priority rule prohibited respondents from retaining their equity interest in the farm, which is junior to the creditors' unsecured claims. But the Court of Appeals, relying on this Court's decision in *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), held that the absolute priority rule did not

Case 09-10138-MFW Doc 14410-4 Filed 09/16/14 Page 324 of 540

Norwest Bank Worthington v. Ahlers, 485 U.S. 197 (1988)

108 S.Ct. 963, 99 L.Ed.2d 169, 56 USLW 4225, 18 Collier Bankr.Cas.2d 262...

bar respondents from retaining their equity interest in the farm if they contributed "money or money's worth" to the reorganized enterprise. It further concluded that respondents' "yearly contributions of labor, experience, and expertise" would constitute a contribution of "money or money's worth," and therefore would permit confirmation of a reorganization plan over petitioners' objections. 794 F.2d, at 402–403. Judge John Gibson, in dissent, criticized the majority's application of the absolute priority rule and its reading of *202 *Los Angeles Lumber* as "unprecedented, illogical, and unfair." 794 F.2d, at 406. He concluded that the absolute priority rule barred respondents' retention of an equity interest in the farm over petitioners' legitimate objections.

After the Eighth Circuit-sharply divided-denied rehearing en banc, *id.,* at 414–415, petitioners sought review by this Court. We granted certiorari to consider the Court of Appeals' application of the absolute priority rule, 483 U.S. 1004, 107 S.Ct. 3227, 97 L.Ed.2d 733 (1987), and now reverse.

## II

[1] As the Court of Appeals stated, the absolute priority rule "provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan." 794 F.2d, at 401. The rule had its genesis in judicial construction of the undefined requirement of the early bankruptcy statute that reorganization plans be "fair and equitable." See *Northern Pacific R. Co. v. Boyd,* 228 U.S. 482, 504–505, 33 S.Ct. 554, 560, 57 L.Ed. 931 (1913); *Louisville Trust Co. v. Louisville, N.A. & C.R. Co.,* 174 U.S. 674, 684, 19 S.Ct. 827, 830, 43 L.Ed. 1130 (1899). The rule has since gained express statutory force, and was incorporated into Chapter 11 of the Bankruptcy Code adopted in 1978. See 11 U.S.C. § 1129(b) (2)(B)(ii) (1982 ed., Supp. IV). Under current law, no Chapter 11 reorganization plan can be confirmed over the creditors' legitimate objections (absent certain conditions not relevant here) if it fails to comply with the absolute priority rule.

[2] There is little doubt that a reorganization plan in which respondents retain an equity interest in the farm is contrary to the absolute priority rule. [2] The Court of Appeals did not *203 suggest otherwise in ruling for respondents, but found that such a plan could be confirmed over petitioners' **967 objections because of an "exception" or "modification" to the absolute priority rule recognized in this Court's cases.

The Court of Appeals relied on the following dicta in *Case v. Los Angeles Lumber Products Co., supra,* 308 U.S., at 121–122, 60 S.Ct., at 10:

"It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor....

"[W]e believe that to accord 'the creditor of his full right of priority against the corporate assets' where the debtor is insolvent, the stockholder's participation must be based on a contribution in money or money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder."

The Court of Appeals found this language applicable to this case, concluding that respondents' future contributions of "labor, experience, and expertise" in running the farm-because they have "value" and are "measurable"-are "money or money's worth" within the meaning of *Los Angeles Lumber.* 794 F.2d, at 402. We disagree. [3]

*204 *Los Angeles Lumber* itself rejected an analogous proposition, finding that the promise of the existing shareholders to pledge their "financial standing and influence in the community" and their "continuity of management" to the reorganized enterprise was "[in]adequate consideration" that could not possibly be deemed "money's worth." 308 U.S., at 122, 60 S.Ct., at 10. No doubt, the efforts promised by the *Los Angeles Lumber* equity holders-like those of respondents-had "value" and would have been of some benefit to any reorganized enterprise. But ultimately, as the Court said in *Los Angeles Lumber,* "[t]hey reflect merely vague hopes or possibilities." *Id.,* at 122–123, 60 S.Ct., at 11. The same is true of respondents' pledge of future labor and management skills.

Viewed from the time of approval of the plan, respondents' promise of future services is intangible, inalienable, and, in all likelihood, unenforceable. It "has no place in the asset column of the balance sheet of the new [entity]." *Los Angeles Lumber,* 308 U.S., at 122–123, 60 S.Ct., at 11. Unlike "money or money's worth," a promise of future services cannot be exchanged in any market for something of value to the creditors *today.* In fact, no decision of this Court or any Court of Appeals, other than the decision below, has ever found a promise to contribute future labor, management, or expertise sufficient to qualify for the *Los Angeles Lumber* exception to the absolute priority rule. [4] In short, there is no *205 **968 way to distinguish between the promises respondents proffer here and those of the shareholders in *Los Angeles Lumber;*

neither is an adequate contribution to escape the absolute priority rule.

[3]    Respondents suggest that, even if their proposed contributions to the reorganized farm do not fit within the *Los Angeles Lumber* dicta, they do satisfy some broader exception to the absolute priority rule. Brief for Respondents 23-24. But no such broader exception exists. Even if Congress meant to retain the *Los Angeles Lumber* exception to the absolute priority rule when it codified the rule in Chapter 11-a proposition that can be debated, see n. 3, *supra* -it is clear that Congress had no intention to expand that exception any further. When considering adoption of the current Code, Congress received a proposal by the Bankruptcy Commission to modify the absolute priority rule to permit equity holders to participate in a reorganized enterprise based on their contribution of "continued management ... essential to the business" or other participation beyond "money or money's worth." See H.R.Doc. No. 93-137, pt. 1, pp. 258-259 (1973). This proposal-quite similar to the Court of Appeals' holding in this case-prompted adverse reactions from numerous sources. [5] Congress ultimately rejected the proposed liberalization of *206 the absolute priority rule and adopted the codification of the rule now found in 11 U.S.C. § 1129(b)(2)(B)(ii) (1982 ed. and Supp. IV). "This [section] codifies the absolute priority rule from the dissenting class on down." See H.R.Rep. No. 95-595, p. 413 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6369. We think the statutory language and the legislative history of § 1129(b) clearly bar any expansion of any exception to the absolute priority rule beyond that recognized in our cases at the time Congress enacted the 1978 Bankruptcy Code.

In sum, we find no support in the Code or our previous decisions for the Court of Appeals' application of the absolute priority rule in this case. We conclude that the rule applies here, and respondents' promise of future labor warrants no exception to its operation.

### III

Respondents advance two additional arguments seeking to obviate the conclusion mandated by the absolute priority rule.

### A

Respondents first advance a variety of "equitable arguments" which, they say, prevent the result we reach today. Respondents contend that the nature of bankruptcy proceedings-namely, their status as proceedings in "equity"-prevents petitioners from inequitably voting in the class of unsecured creditors, and requires that a "fair and equitable" reorganization plan in the best interests of all creditors and debtors be confirmed. See Brief for Respondents 14-16, 23-24. Similarly, the Court of Appeals found it significant that-in its view-respondents' wholly unsecured creditors (as opposed to petitioners, who have partially secured claims) would fare better under the proposed reorganization plan than if the farm was liquidated. 794 F.2d, at 402.

**969 [4]    The short answer to these arguments is that whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code. The Code provides that undersecured creditors can *207 vote in the class of unsecured creditors, 11 U.S.C. § 506(a), the Code provides that a "fair and equitable" reorganization plan is one which complies with the absolute priority rule, 11 U.S.C. § 1129(b)(2)(B)(ii) (1982 ed. and Supp. IV), and the Code provides that it is up to the creditors-and not the courts-to accept or reject a reorganization plan which fails to provide them adequate protection or fails to honor the absolute priority rule, 11 U.S.C. § 1126 (1982 ed. and Supp. IV).

The Court of Appeals may well have believed that petitioners or other unsecured creditors would be better off if respondents' reorganization plan was confirmed. But that determination is for the creditors to make in the manner specified by the Code. 11 U.S.C. § 1126(c). Here, the principal creditors entitled to vote in the class of unsecured creditors (*i.e.*, petitioners) objected to the proposed reorganization. This was their prerogative under the Code, and courts applying the Code must effectuate their decision.

### B

Respondents further argue that the absolute priority rule has no application in this case, where the property which the junior interest holders wish to retain has no value to the senior unsecured creditors. In such a case, respondents argue, "the creditors are deprived of nothing if such a so-called 'interest' continues in the possession of the reorganized debtor." Brief for Respondents 19. Here, respondents contend, because the farm has no "going concern" value (apart from their own labor

on it), any equity interest they retain in a reorganization of the farm is worthless, and therefore is not "property" under 11 U.S.C. § 1129(b)(2)(B)(ii) (1982 ed. and Supp. IV).

We join with the consensus of authority which has rejected this "no value" theory. [6] Even where debts far exceed the **\*208** current value of assets, a debtor who retains his equity interest in the enterprise retains "property." Whether the value is "present or prospective, for dividends or only for purposes of control" a retained equity interest is a property interest to "which the creditors [are] entitled ... before the stockholders [can] retain it for any purpose whatever." *Northern Pacific R. Co. v. Boyd,* 228 U.S., at 508, 33 S.Ct., at 561. Indeed, even in a sole proprietorship, where "going concern" value may be minimal, there may still be some value in the control of the enterprise; obviously, also at issue is the interest in potential future profits of a now-insolvent business. See *SEC v. Canandaigua Enterprises Corp.,* 339 F.2d 14, 21 (CA2 1964) (Friendly, J.). And while the Code itself does not define what "property" means as the term is used in § 1129(b), the relevant legislative history suggests that Congress' meaning was quite broad. " '[P]roperty' includes both tangible and intangible property." See H.R.Rep. No. 95-595, at 413, U.S.Code Cong. & Admin.News 1978, at 6369.

Moreover, respondents' "no value" theory is particularly inapposite in this case. This argument appears not to have been presented to the Eighth Circuit, which implicitly concluded-to the contrary of respondents' position here-that the equity interest respondents desire to retain has **\*\*970** some value. See 794 F.2d, at 402-403. Even cursory consideration reveals that the respondents' retained interest under the plan might be "valuable" for one of several reasons. For example, the Court of Appeals provided that respondents would be entitled to a share of any profits earned by the sale of secured property during the reorganization period, **\*209** *id., at 403, and n. 18*-an interest which can hardly be considered "worthless." And there is great common sense in petitioners' contention that "obviously, there is some going concern value here, or the parties would not have been litigating over it for the last three years." Tr. of Oral Arg. 15-16.

[5]   Consequently, we think that the interest respondents would retain under any reorganization must be considered "property" under § 1129(b)(2)(B)(ii), and therefore can only be retained pursuant to a plan accepted by their creditors or formulated in compliance with the absolute priority rule. Since neither is true in this case, the Court of Appeals' judgment for respondents cannot stand.

**IV**

In rejecting respondents' position, we do not take lightly the concerns which militated the Eighth Circuit towards its result. As a Bankruptcy Judge commented on the Court of Appeals' decision in this case:

> "We understand the motivation behind the majority opinion in [In re] *Ahlers* [794 F.2d 388 (CA8 1986) ]. Farm bankruptcies are in a state of crisis and we, too, sympathize with the plight of the American farmer. Nevertheless, the solution proposed by the *Ahlers* majority is contrary to the Bankruptcy Code and a long line of case law." *In re Stegall,* 64 B.R. 296, 300 (Bkrtcy.Ct.CD Ill.1986).

Family farms hold a special place in our Nation's history and folklore. Respondents and *amici* paint a grim picture of the problems facing farm families today, and present an eloquent appeal for action on their behalf. [7] Yet relief from current farm woes cannot come from a misconstruction of the applicable bankruptcy laws, but rather, only from action by Congress. [8]

**\*210**  The error of the Court of Appeals' approach is further revealed by an examination of a measure Congress has recently enacted to cope with these very same concerns, the Family Farmers Bankruptcy Act of 1986, Pub.L. 99-554, § 255, 100 Stat. 3105-3114. The Act creates a new Chapter 12 bankruptcy proceeding, under which family farmers can retain an equity interest in their farms while making loan repayments under a reorganization plan. See 11 U.S.C. § 1201 *et seq.* (1982 ed., Supp. IV). [9]

The legislative history of the Act makes it clear that one of Congress' principal concerns in adopting Chapter 12 was the difficulties farmers encountered in seeking to reorganize under Chapter 11. [10] And yet, **\*\*971** as respondents concede, the Court of Appeals' decision here creates a method of proceeding under Chapter 11 which is far more advantageous to farmers than is Chapter 12. See Brief for Respondents 6-9; Tr. of Oral Arg. 23-25. Thus, given respondents' reading of Chapter 11, Congress enacted a relief provision in Chapter 12 **\*211** which is less favorable to its intended beneficiaries than is current law. But in adopting Chapter 12, Congress thought it was doing just the opposite. [11] "[W]here, as here, Congress adopts a new law ...

Case 09-10138-MFW   Doc 14410-4   Filed 09/16/14   Page 327 of 540

Norwest Bank Worthington v. Ahlers, 485 U.S. 197 (1988)

108 S.Ct. 963, 99 L.Ed.2d 169, 56 USLW 4225, 18 Collier Bankr.Cas.2d 262...

[it] normally can be presumed to have had knowledge of the interpretation given to the [old] law." *Lorillard v. Pons, 434 U.S. 575, 581, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978).* We think Congress' understanding of Chapter 11 and its absolute priority rule-and not respondents'-is the correct one. We do not believe that Congress created, in Chapter 12, an option for farm reorganizations *less* accessible to most farmers than current Chapter 11 proceedings.

### V

In sum, because we find the decision below to be contrary to the Bankruptcy Code and this Court's previous cases, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice KENNEDY took no part in the consideration or decision of this case.

### Parallel Citations

108 S.Ct. 963, 99 L.Ed.2d 169, 56 USLW 4225, 18 Collier Bankr.Cas.2d 262, 17 Bankr.Ct.Dec. 201, Bankr. L. Rep. P 72,186

Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.*

1    In relevant part, 11 U.S.C. § 1129(b) (1982 ed. and Supp. IV) provides:

"(1) ... [T]he court ... shall confirm the plan ... if the plan ... is fair and equitable....

"(2) ... [T]he condition that a plan be fair and equitable ... includes the following requirements:

"(B) With respect to a class of unsecured claims-

"(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

"(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."

Petitioners contended, and the Court of Appeals agreed, that they must be treated as unsecured creditors for purpose of any reorganization plan because their claims were substantially undersecured. See 794 F.2d 388, 399 (CA8 1986); 11 U.S.C. § 506(a). Petitioners further argued, and the Court of Appeals also agreed, that any reorganization plan for respondents could not comply with § 1129(b)(2)(B)(i), because respondents could not possibly provide petitioners with property equal to the allowed amount of their claims. See 794 F.2d, at 401.

Thus, the Court of Appeals concluded that respondents' reorganization plan would have to comply with § 1129(b)(2)(B)(ii)-the codification of the absolute priority rule-in order to be confirmed. *Ibid.*

2    Respondents do not contest this conclusion, but rather, argue (1) that their proposal to retain an equity interest in the farm and equipment is confirmable under an exception to the absolute priority rule, Brief for Respondents 21-25, and (2) that the rule does not (or should not) apply to their reorganization plan for various reasons, *id.,* at 14-21. For reasons we discuss *infra,* at ----, and in Part III, we find these arguments unpersuasive.

3    The United States, as *amicus curiae,* urges us to reverse the Court of Appeals, ruling and hold that codification of the absolute priority rule has eliminated any "exception" to that rule suggested by *Los Angeles Lumber.* See Brief for United States as *Amicus Curiae* 17-23. Relying on the statutory language and the legislative history, the United States argues that the 1978 Bankruptcy Code "dropped the infusion-of-new-capital exception to the absolute priority rule." *Id.,* at 22.

We need not reach this question to resolve the instant dispute. As we discuss *infra,* at ----, we think it clear that even if the *Los Angeles Lumber* exception to the absolute priority rule has survived enactment of the Bankruptcy Code, this exception does not encompass respondents' promise to contribute their "labor, experience, and expertise" to the reorganized enterprise.

Thus, our decision today should not be taken as any comment on the continuing vitality of the *Los Angeles Lumber* exception-a question which has divided the lower courts since passage of the Code in 1978. Compare, *e.g., In re Sawmill Hydraulics, Inc., 72 B.R. 454, 456, and n. 1 (Bkrtcy.Ct.CD Ill.1987),* with, *e.g., In re Pine Lake Village Apartment Co., 19 B.R. 819, 833 (Bkrtcy.Ct.SDNY 1982).* Rather, we simply conclude that even if an "infusion-of-'money-or-money's-worth' " exception to the

108 S.Ct. 963, 99 L.Ed.2d 169, 56 USLW 4225, 18 Collier Bankr.Cas.2d 262...

absolute priority rule has survived the enactment of § 1129(b), respondents' proposed contribution to the reorganization plan is inadequate to gain the benefit of this exception.

4    "[P]revious attempts to qualify non-capital equity in the absolute priority context have been unanimously rejected." Koger & Acconcia, In re Ahlers: Capitalizing on Sweat, 42 J.Mo.Bar 455, 458 (1986). See also 794 F.2d, at 407 (Gibson, J., dissenting); *In re Baugh,* 73 B.R. 414, 418 (Bkrtcy.Ct.ED Ark.1987); *In re Pecht,* 57 B.R. 137, 139-141 (Bkrtcy.Ct.ED Va.1986).

In support of their position, respondents rely extensively on *SEC v. United States Realty & Improvement Co.,* 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940). See Tr. of Oral Arg. 31-33, 35-37. However, the relevant portion of that case concerned a chapter of the old bankruptcy statutes under which the absolute priority rule did not apply. See *SEC v. United States Realty & Improvement Co., supra,* at 453-454, 60 S.Ct., at 1052. Thus, that case is wholly inapposite here.

5    See, *e.g.,* Hearings on S. 235 and S. 236 before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., pt. 2, p. 1044 (1975) (statement of Prof. Vernon Countryman); *id.,* at 710 (statement of Phillip A. Loomis, Jr., Comm'r of the Securities and Exchange Comm'n); Brudney, The Bankruptcy Commission's Proposed "Modifications" of the Absolute Priority Rule, 48 Am.Bankr.L.J. 305, 336-339 (1974).

6    Respondents note that one Bankruptcy Court has accepted the "no value" theory in a case similar to this one. See *In re Star City Rebuilders, Inc.,* 62 B.R. 983, 988-989 (WD Va.1986). But even in so doing, the Bankruptcy Court acknowledged that the bulk of authority was to the contrary. See *id.,* at 989; see also *In re Modern Glass Specialists, Inc.,* 42 B.R. 139, 140-141 (Bkrtcy.Ct.ED Wisc.1984); *In re Huckabee Auto Co.,* 33 B.R. 132, 141 (Bkrtcy.Ct.MD Ga.1981); *In re Landau Boat Co.,* 8 B.R. 436, 438-439 (Bkrtcy.Ct.WD Mo.1981).

Petitioners contend that the *Star City* decision is the *only* one to accept the "no value" theory. See Tr. of Oral Arg. 16. Respondents did not contest this assertion or provide authority to the contrary.

7    See Brief for Respondents 8-11; Brief for State of Arkansas et al. as *Amici Curiae* 1-2.

8    Even if current farm problems "justified" a judicial modification of the absolute priority rule along the line of the Court of Appeals' opinion, not the least of the problems with the decision below is that there is no way to limit it to family farms, or even to small businesses generally. The shareholders of any corporate debtor might be able to evade the absolute priority rule under the Eighth Circuit's reasoning; such a result surely cannot be squared with the case law or the Code as they are discussed *supra.*

9    Respondents apparently cannot qualify for relief under Chapter 12 because they do not meet the requirements that Congress has adopted in defining what is an eligible "family farm" for purposes of Chapter 12. See Tr. of Oral Arg. 23; 11 U.S.C. § 101(17) (1982 ed., Supp. IV).

In addition, respondents may be disqualified from filing under Chapter 12 because they had previously filed under Chapter 11. The Bankruptcy Courts are divided on the issue. Compare, *e.g., In re Big Dry Angus Ranch, Inc.,* 69 B.R. 695, 699-701 (Mont.1987), with, *e.g., In re B.A.V., Inc.,* 68 B.R. 411, 412-413 (Colo.1986).

10   See 132 Cong.Rec. 28592 (1986) (statement of Sen. Thurmond); *id.,* at 28593 (statement of Sen. Grassley). Congress seemed particularly aware of the specific obstacle that the absolute priority rule posed to farm reorganizations. See Anderson, An Analysis of Pending Bills to Provide Family Farm Debtor Relief Under the Bankruptcy Code, reprinted in 132 Cong.Rec. 28593, 28599 (1986).

11   "Under this new chapter, it will be easier for a family farmer to confirm a plan of reorganization." Joint Explanatory Statement of the Committee of Conference, reprinted in 132 Cong.Rec. H8998, H8999 (Oct. 2, 1986).

---

End of Document                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 68

Official Committee of Unsecured Creditors of Cybergenics..., 330 F.3d 548 (2003)
41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

330 F.3d 548
United States Court of Appeals,
Third Circuit.

The OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF CYBERGENICS
CORPORATION, on Behalf of CYBERGENICS
CORPORATION, Debtor in Possession, Appellant

v.

*Kathleen CHINERY, Executrix of the
Estate of Scott Chinery; L&S Research
Corporation; Lincolnshire Management
Inc.; Lincolnshire Equity Fund, L.P.

No. 01–3805.    |    Argued Feb.
19, 2003.    |    May 29, 2003.

After Chapter 11 debtor-in-possession (DIP) refused its
request to pursue avoidance claims, unsecured creditors
committee sought derivative standing to sue on the estate's
behalf to avoid the purportedly fraudulent transfers. The
United States Bankruptcy Court for the District of New Jersey
entered order authorizing committee to proceed derivatively,
and committee filed its complaint. Defendants moved to
dismiss on theory that fraudulent transfer claims had been
sold to third party as part of court-approved sale of debtor's
assets. The District Court entered order dismissing complaint,
and committee appealed. The Court of Appeals, 226 F.3d
237, reversed and remanded. On remand, defendants renewed
their motions to dismiss, asserting, inter alia, that only
the trustee could avoid fraudulent transfers. The District
Court, Garrett E. Brown Jr., J., granted the motions, and
committee appealed. On rehearing en banc, the Court of
Appeals, Becker, Circuit Judge, held that: (1) the Supreme
Court's decision in *Hartford Underwriters* did not prevent
the bankruptcy court from authorizing the committee's suit,
and (2) the Bankruptcy Code empowers bankruptcy courts,
as courts of equity, to authorize creditors committees to sue
derivatively to recover property for the benefit of the estate.

Judgment of the district court reversed; case remitted to
original panel.

Fuentes, Circuit Judge, filed dissenting opinion in which
Circuit Judges Sloviter, Alito, and Smith joined.

Opinion, 304 F.3d 316, withdrawn.

West Headnotes (28)

[1]    Statutes
         Language
Congress says in a statute what it means and
means in a statute what it says there.

Cases that cite this headnote

[2]    Statutes
         Plain Language;  Plain, Ordinary, or
         Common Meaning
When a statute's language is plain, the sole
function of the courts, at least where the
disposition required by the text is not absurd, is
to enforce it according to its terms.

1 Cases that cite this headnote

[3]    Statutes
         Similarity or difference
There is a natural presumption that identical
words used in different parts of the same act are
intended to have the same meaning.

1 Cases that cite this headnote

[4]    Statutes
         Similarity or difference
Presumption that identical words used in
different parts of the same act are intended to
have the same meaning may be overcome only
when there is such variation in the connection
in which the words are used as reasonably to
warrant the conclusion that they were employed
in different parts of the act with different intent.

2 Cases that cite this headnote

[5]    Bankruptcy
         Construction and Operation
       Statutes
         Statute as a Whole;  Relation of Parts to
         Whole and to One Another

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

Statutory construction is a holistic endeavor, and this is especially true of the Bankruptcy Code.

10 Cases that cite this headnote

**[6]**    **Courts**
　　　👉 **Dicta**

Although the Supreme Court's dicta are not binding on the Court of Appeals, the Court of Appeals does not view such dicta lightly.

7 Cases that cite this headnote

**[7]**    **Courts**
　　　👉 **Dicta**

Court of Appeals should not idly ignore considered statements the Supreme Court makes in dicta; the Supreme Court uses dicta to help control and influence the many issues it cannot decide because of its limited docket, and appellate courts that dismiss these expressions in dicta and strike off on their own increase the disparity among tribunals, for other judges are likely to follow the Supreme Court's marching orders, and frustrate the evenhanded administration of justice by giving litigants an outcome other than the one the Supreme Court would be likely to reach were the case heard there.

10 Cases that cite this headnote

**[8]**    **Bankruptcy**
　　　👉 **Reorganization cases;  right to be heard**

Section of the Bankruptcy Code permitting parties in interest, including creditors committees, to raise and appear and be heard on any issue in a case under Chapter 11 evinces Congress's intent for creditors committees to play a vibrant and central role in Chapter 11 adversarial proceedings. Bankr.Code, 11 U.S.C.A. § 1109(b).

1 Cases that cite this headnote

**[9]**    **Statutes**
　　　👉 **General and specific terms and provisions;  ejusdem generis**

Interpretive canon "ejusdem generis" provides that where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.

1 Cases that cite this headnote

**[10]**    **Bankruptcy**
　　　👉 **In general;  standing**

**Bankruptcy**
　　　👉 **Rights of Debtor or Injured Creditors**

Catch-all provision of section of the Bankruptcy Code governing powers and duties of creditors committees does not confer the sort of blanket authority necessary for a committee independently to initiate an adversarial proceeding, including an avoidance proceeding to recover fraudulent transfers. Bankr.Code, 11 U.S.C.A. §§ 544(b), 1103(c)(5).

8 Cases that cite this headnote

**[11]**    **Statutes**
　　　👉 **Express mention and implied exclusion; expressio unius est exclusio alterius**

It is presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.

2 Cases that cite this headnote

**[12]**    **Bankruptcy**
　　　👉 **Administrative expenses in general**

Section of the Bankruptcy Code allowing for the priority payment of the expenses of a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by debtor, is not limited to direct causes of action brought by the creditor; instead, the section recognizes and rewards monetarily the practice of permitting creditors committees, with court authorization, to pursue derivative actions. Bankr.Code, 11 U.S.C.A. § 503(b)(3)(B).

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 332 of 540

Official Committee of Unsecured Creditors of Cybergenics..., 330 F.3d 548 (2003)
41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

15 Cases that cite this headnote

**[13]    Bankruptcy**

🗝 Leave to sue

In the Bankruptcy Code, Congress recognized and approved of derivative standing for creditors committees to sue to recover property for the benefit of the estate, with the approval of the bankruptcy court. Bankr.Code, 11 U.S.C.A. §§ 503(b)(3)(B), 544(b), 1103(c)(5), 1109(b).

44 Cases that cite this headnote

**[14]    Bankruptcy**

🗝 Equitable powers and principles

Enactment of the Bankruptcy Code increased the degree of regulation Congress imposed upon bankruptcy proceedings, but it did not alter bankruptcy courts' fundamental nature as courts of equity.

3 Cases that cite this headnote

**[15]    Bankruptcy**

🗝 Rights of Debtor or Injured Creditors

Bankruptcy Code empowers bankruptcy courts, as courts of equity, to authorize creditors committees to sue derivatively to recover property for the benefit of the estate; although the Code evidences an intent to channel avoidance actions through the trustee, who acts as a gatekeeper and prevents independent avoidance actions by creditors that might prejudice the estate and rival creditors, bankruptcy court has equitable power to substitute itself as gatekeeper when trustee is delinquent, and to allow creditors committee to pursue an avoidance action for the estate's direct benefit rather than its own, and the end result of this equitable remedy, the estate's recovery of fraudulently transferred property, is precisely what Congress envisioned. Bankr.Code, 11 U.S.C.A. §§ 503(b)(3)(B), 544(b), 1103(c)(5), 1109(b).

64 Cases that cite this headnote

**[16]    Equity**

🗝 Application and operation in general

Equity eschews mechanical rules; it depends on flexibility.

Cases that cite this headnote

**[17]    Bankruptcy**

🗝 Equitable powers and principles

There is inherent in the courts of equity, such as bankruptcy courts, a jurisdiction to give effect to the policy of the legislature.

2 Cases that cite this headnote

**[18]    Bankruptcy**

🗝 Construction and Operation

Court of Appeals does not read the Bankruptcy Code to erode past bankruptcy practice absent clear indication that Congress intended such departure.

4 Cases that cite this headnote

**[19]    Bankruptcy**

🗝 Avoidance rights and limits thereon, in general

Bankruptcy Code's avoidance powers are intended, inter alia, to deter managerial overreaching and to encourage creditors to allow a debtor a measure of breathing room. Bankr.Code, 11 U.S.C.A. § 544(b).

1 Cases that cite this headnote

**[20]    Bankruptcy**

🗝 Avoidance rights and limits thereon, in general

Fraudulent avoidance actions are intended to afford unsecured creditors peace of mind. Bankr.Code, 11 U.S.C.A. § 544(b).

1 Cases that cite this headnote

**[21]    Bankruptcy**

🗝 In general;  nature and purpose

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

Premise of a reorganization under Chapter 11 is to ensure that the debtor emerges from bankruptcy as a viable concern.

Cases that cite this headnote

**[22]**   **Bankruptcy**
☞ Debtor in possession, in general

In Chapter 11 cases where no trustee is appointed, the Bankruptcy Code provides that the debtor-in-possession, that is, the debtor's management, enjoys the powers that would otherwise vest in the bankruptcy trustee, as well as the trustee's fiduciary duty to maximize the value of the bankruptcy estate. Bankr.Code, 11 U.S.C.A. § 1107(a).

9 Cases that cite this headnote

**[23]**   **Bankruptcy**
☞ Presumption against appointment

Appointing a trustee in a Chapter 11 case is an extraordinary remedy, and there is a corresponding strong presumption that the debtor should be permitted to remain in possession. Bankr.Code, 11 U.S.C.A. § 1104.

11 Cases that cite this headnote

**[24]**   **Bankruptcy**
☞ Costs and Fees
**Bankruptcy**
☞ Creditors' committees

Although a creditors committee suing derivatively is entitled to recover its costs, unlike a trustee, a creditors committee is not entitled to a statutory fee in addition to those expenses. Bankr.Code, 11 U.S.C.A. §§ 326(a), 330(a), 503(b)(3)(B).

1 Cases that cite this headnote

**[25]**   **Bankruptcy**
☞ Appointment; Election
**Bankruptcy**
☞ Presumption against appointment

Idea that existing management is best positioned to rescue a debtor from bankruptcy is precisely the reason why the appointment of a trustee is exceptional in Chapter 11 reorganizations, but occurs immediately in Chapter 7 liquidations. Bankr.Code, 11 U.S.C.A. § 1104.

6 Cases that cite this headnote

**[26]**   **Bankruptcy**
☞ Examiner's functions and duties

Examiner's duties include investigation of the debtor, the debtor's business, and any other matter relevant to the case or to the formation of a plan. Bankr.Code, 11 U.S.C.A. § 1106(b).

Cases that cite this headnote

**[27]**   **Bankruptcy**
☞ Examiner's functions and duties

Bankruptcy Code's broad grant of authority to appointed examiners is most naturally interpreted to authorize only acts relating directly to investigation. Bankr.Code, 11 U.S.C.A. § 1106(b).

Cases that cite this headnote

**[28]**   **Bankruptcy**
☞ Avoidance rights and limits thereon, in general
**Bankruptcy**
☞ Examiner's functions and duties

Examiner cannot serve as a substitute for either a trustee or a creditors committee for the purpose of avoiding fraudulent transfers. Bankr.Code, 11 U.S.C.A. §§ 544(b), 1106(b).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*551** Gary D. Sesser (Argued), James Gadsden, Roxanna D. Nazari, Carter, Ledyard & Milburn, New York, for Appellant Official Committee of Unsecured Creditors of Cybergenics Corp.

Official Committee of Unsecured Creditors of Cybergenics..., 330 F.3d 548 (2003)
41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

Brian J. Molloy (Argued), Lauren D. Daloisio, Wilentz, Goldman & Spitzer, Woodbridge, for Appellees Chinery and L&S Research Corporation.

Bruce E. Fader (Argued), Scott A. Eggers, Proskauer Rose LLP, New York, for Appellees Lincolnshire Management, Inc.

Jonathan C. Lipson,[**] Assistant Professor of Law, University of Baltimore School of Law, Baltimore, Amicus Law Professors in support of Appellant.

G. Eric Brunstad, Jr. (Argued), Julia Frost–Davies, Rheba Rutkowski, Bryan D. Short, Tanya Tymchenko, Melissa G. Liazos, Justin M. O'Sullivan, Seth A. Schwartz, Rachel A. Viscomi, Steven M. Ackley–Ortiz, Serena D. Madar, Bingham McCutchen LLP, Boston, Amicus in support of Appellant.

Teresa K.D. Currier, Eric Lopez Schnabel, Jeffrey R. Waxman, Klett Rooney Lieber & Schorling, Wilmington, Daniel H. Golden, David H. Botter, Robert J. Stark, Akin Gump Strauss Hauer & Feld LLP, New York, for Amicus Committee of Unsecured Creditors of Hayes Lemmerz International, Inc. in support of Appellant.

Luc A. Despins, Susheel Kirpalani, Roy C. Studness, Milbank, Tweed, Hadley & McCloy LLP, New York, for Amicus Official Committee of unsecured Creditors of Safety–Kleen Corp. in support of Appellant.

George R. Hirsch (Argued), Elyssa S. Kates, Bressler, Amery & Ross, P.C., Morristown, for Amicus Smurfit–Stone Corp. in support of Appellees.

Keith Sharfman, Associate Professor of Law, Rutgers University School of Law, Newark, Amicus in support of Appellees.

Before BECKER,[***] Chief Judge, SLOVITER, SCIRICA,[****] ALITO, ROTH, McKEE, RENDELL, BARRY, AMBRO, FUENTES and SMITH, Circuit Judges.

**\*552  OPINION OF THE COURT**

BECKER, Circuit Judge.

# CONTENTS

I. Introduction............................................................................ 552

II. Facts and Procedural History.................................................. 553

III. How Does *Hartford Underwriters* Affect this Case?................ 555

    A. What happened in *Hartford Underwriters*?..................... 556

    B. Did *Hartford Underwriters* take place in an analogous context?................ 557

IV. Do Derivative Suits under § 544(b) Survive *Hartford Underwriters?*................ 559

    A. The Code Itself......................................................... 559

        1. The Need to Interpret Chapter 11 as a Whole............ 559

        2. Section 1109(b)........................................... 560

        3. Section 1103(c)(5).......................................... 562

        4. Section 503(b)(3)(B)........................................ 563

Case 09-10138-MFW   Doc 14410-4   Filed 09/16/14   Page 335 of 540

Official Committee of Unsecured Creditors of Cybergenics..., 330 F.3d 548 (2003)

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

5.   A Textual Conclusion.................................................................................................................. 566

B.  Bankruptcy Courts as Courts of Equity............................................................. ........ 567

V.  Pre–Code Practice.......................................................................................................... 569

VI.  Does Derivative Standing for Creditors' Committees Advance Congress's Goals?  ........ 572

A.  The Salutary Effects of Derivative Standing for Creditors' Committees.......... ........ 572

B.  Potential Drawbacks of Derivative Standing for Creditors' Committees.......... ......... 574

1.   Might derivative suits dissipate the value of the estate........................................................... 574

2.   Might bankruptcy courts be unable to identify meritorious claims.......................................... 575

3.   Might derivative suits consume judicial resources.................................................................. 576

C.  Possible Substitutes for Derivative Standing for Creditors' Committees.......... ........ 576

1.   Appointment of a bankruptcy trustee...................................................................... ............ 576

2.   Appointment of an examiner with authority to sue................................................................ 577

3.   Moving the court to order the debtor-in-possession to sue..................................................... 578

4.   Converting the bankruptcy case to Chapter 7....................................................................... 578

5.   Moving the bankruptcy court to authorize a committee to bring a post-confirmation avoidance
     action................................................................................................................................. 579

6.   Summary................................................................................................................ ............ 579

VII.  Conclusion.................................................................................................. ........ 580

## I. Introduction

This is an appeal from an Order of the District Court, which set aside an Order of the Bankruptcy Court authorizing a creditors' committee ("the Committee") to sue on the estate's behalf to avoid a fraudulent transfer in a Chapter 11 proceeding. Before seeking derivative standing, the Committee had unsuccessfully petitioned the debtor-in-possession to pursue the avoidance claim. In granting derivative standing, the Bankruptcy Court determined that such a suit would be in the estate's best interest. The question on appeal is whether the decision of the United States Supreme Court in *Hartford Underwriters Ins. Co. v. Union*

*Planters Bank*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000), a Chapter 7 case which interpreted the text of 11 U.S.C. § 506(c) to foreclose anyone other than a trustee from seeking to recover administrative costs on its own behalf, operates to prevent the Bankruptcy Court from authorizing the suit described above.

We conclude that it does not. While the question in *Hartford Underwriters* was **\*553** one of a *nontrustee's right* unilaterally to circumvent the Code's remedial scheme, the issue before us today concerns a *bankruptcy court's equitable power* to craft a remedy when the Code's envisioned scheme breaks down. We believe that Sections 1109(b), 1103(c)(5), and 503(b)(3)(B) of the Bankruptcy Code evince

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

Congress's approval of derivative avoidance actions by creditors' committees, and that bankruptcy courts' equitable powers enable them to authorize such suits as a remedy in cases where a debtor-in-possession unreasonably refuses to pursue an avoidance claim. Our conclusion is consistent with the received wisdom that "[n]early all courts considering the issue have permitted creditors' committees to bring actions in the name of the debtor in possession if the committee is able to establish" that a debtor is neglecting its fiduciary duty. 7 *Collier on Bankruptcy* ¶ 1103.05[6][a] (15th rev. ed. 2002).

Accordingly, we will reverse the judgment of the District Court and remit the case to the original Panel so that it may consider the other grounds for the District Court's reversal of the Bankruptcy Court's Order, which were not argued before the *en banc* Court.

## II. Facts and Procedural History

Scott Chinery founded L&S Research Corporation ("L&S") in 1985.[1] L&S, with Chinery as its sole shareholder, marketed nutritional food supplements for bodybuilding and weight loss under the brand name "Cybergenics." In 1994, Lincolnshire Management, Inc. ("Lincolnshire") initiated negotiations with Chinery to buy L&S, and the parties reached an agreement for an aggregate consideration of approximately $110.5 million.[2] Lincolnshire established Cybergenics Acquisition, Inc., an equity investment affiliate, which later became Cybergenics Corporation ("Cybergenics"), to acquire substantially all of L&S's assets. Lincolnshire's equity investment affiliate provided the largest equity stake and became the majority shareholder in Cybergenics, although several banks and various other lenders ("the Lenders") helped finance the asset purchase. These financiers also agreed to provide working capital for Cybergenics after the acquisition. The buyout was memorialized in a writing dated October 13, 1994.

Cybergenics's financial outlook soon worsened. Despite increased equity investments by Lincolnshire and the Lenders, in August 1996, Cybergenics filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As is customary in Chapter 11 reorganizations, the bankruptcy court allowed Cybergenics to remain in control of its assets as a debtor-in-possession, so that no bankruptcy trustee was appointed. As is also customary, the United States trustee appointed a creditors' committee ("the Committee") to represent the interests of Cybergenics's unsecured creditors.

Although the traditional Chapter 11 case involves a business reorganization rather than a liquidation, Cybergenics soon determined that its situation was unsalvageable, and it chose to sell its assets through a court-supervised auction. At the auction, a third party successfully bid $2.65 million for all of Cybergenics's assets, and the Bankruptcy Court approved the sale in October 1996. Cybergenics then moved to **\*554** dismiss the bankruptcy case, but the Committee objected, asserting that certain transactions relating to the leveraged buyout could give rise to substantial fraudulent transfer actions and that a debtor-in-possession has a fiduciary duty to maximize the value of the estate.

In June 1997, Cybergenics notified the bankruptcy court that it would not pursue any fraudulent transfer claims, arguing that the probability of recovery was sufficiently low that the costs of litigation would likely outweigh any benefits. The Committee responded by volunteering to bear all of the costs so that the avoidance action would go forward, but when Cybergenics still refused to pursue the claims, the Committee sought leave from the Bankruptcy Court to bring a derivative action to avoid the transfers for the benefit of the estate. After a hearing, the Bankruptcy Court concluded that the fraudulent transfer claims were colorable and that Cybergenics's refusal to prosecute them was unreasonable given the Committee's offer to bear the litigation costs. It therefore authorized the Committee to proceed derivatively. The Committee filed its complaint in March 1998 under 11 U.S.C. § 544(b), seeking to avoid fraudulent transfers to the Lenders, Lincolnshire, L & S, and Chinery.

The defendants filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(1), arguing, *inter alia,* that the fraudulent transfer claims that the Committee asserted had been sold in the 1996 bankruptcy asset sale. The District Court granted the defendants' motions and dismissed the Committee's complaint for lack of subject matter jurisdiction. It held that the fraudulent transfer claims were assets of the debtor, and that because the 1996 bankruptcy asset sale disposed of all of Cybergenics's assets, the claims were no longer property of the bankruptcy estate, so the Committee could not raise them on the estate's behalf. On appeal, we reversed and remanded, holding that while sections 544 and 1107 combine to give a debtor the power to pursue these remedies normally reserved for creditors, these causes of action are not "assets" of the debtor, and therefore were not transferred in a sale of the debtor's assets. *In re Cybergenics Corp.,* 226 F.3d 237, 245 (3d Cir.2000).

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 337 of 540

Official Committee of Unsecured Creditors of Cybergenics..., 330 F.3d 548 (2003)

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

On remand, the defendants again moved to dismiss. They raised several grounds for dismissal that they had asserted in their previous motions to dismiss and that we had declined to reach in *Cybergenics.* 226 F.3d at 241 n. 5. They also argued for the first time that, while fraudulent transfer claims technically "belong" to creditors, § 544(b) states only that "the trustee may" avoid fraudulent transfers—it does not mention creditors' committees. They further argued that pursuant to the Supreme Court's reasoning in *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (interpreting "the trustee may" in § 506(c) of the Bankruptcy Code to exclude all parties except the trustee), § 544(b)'s grant of standing is exclusive and does not extend to creditors' committees.

On October 31, 2001, the District Court granted the defendants' renewed motions to dismiss and held that the Committee could not bring suit under § 544(b). It concluded that the Supreme Court's interpretation of "the trustee may" in *Hartford Underwriters* governed the meaning of the same language in § 544(b). In so doing, it rejected the Committee's argument that the holding in *Hartford Underwriters* did not extend to analysis of *derivative* standing, even though the Supreme Court had explicitly noted that derivative standing was not at stake in that case. *See* **\*555** *Hartford Underwriters,* 530 U.S. at 13 n. 5, 120 S.Ct. 1942 ("Whatever the validity of [derivative standing], it has no analogous application here.... Petitioner asserted an independent right to use § 506(c), which is what we reject today."). The District Court also provided several alternative grounds for dismissal. [3]

The Committee timely appealed, and in an opinion dated September 20, 2002, a Panel of this Court affirmed the District Court's holding that § 544(b) did not authorize derivative standing for creditors' committees to sue to avoid allegedly fraudulent transfers. *Official Committee of Unsecured Creditors of Cybergenics Corporation v. Chinery,* 304 F.3d 316 (3d Cir.2002). The Panel's analysis did not reach the District Court's alternate grounds for dismissal, as those rationales assumed the existence of derivative standing.

On November 18, 2002, we granted the Committee's timely motion for rehearing *en banc* and accordingly vacated the Panel decision. We have since accepted extensive supplemental briefing, including a number of amicus briefs, and heard oral argument by the parties and *amicus curiae.*

## III. How Does *Hartford Underwriters* Affect this Case?

The District Court's conclusion that the Code does not permit creditors' committees derivatively to prosecute fraudulent transfer claims was grounded in its determination that the language in § 544(b) vests exclusive standing in the trustee. Section 544(b)(1) states that:

> Except as provided in paragraph (2), *the trustee may* avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b) (emphasis added). The District Court's determination of exclusivity relied critically on *Hartford Underwriters,* 530 U. S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000), in which the Supreme Court determined that identical language in § 506(c) of the Code foreclosed the right of any nontrustee to prosecute that particular action. The District Court concluded that "there is no principled basis under which the Court can apply different meanings to the words 'the trustee may' in separate sections of the Code," so it considered *Hartford Underwriters* dispositive.

### A. What happened in *Hartford Underwriters?*

In *Hartford Underwriters,* debtor Hen House Interstate, Inc. obtained workers' compensation insurance from petitioner Hartford Underwriters as part of its Chapter 11 reorganization strategy. Although Hen House repeatedly failed to pay its monthly premiums, Hartford, which knew nothing of Hen House's bankruptcy, continued to provide insurance. When the reorganization attempt fell through, Hen House converted its case to a Chapter 7 liquidation and a trustee was appointed. Hartford, alerted to the bankruptcy, sought to recover approximately $50,000 in overdue premiums from the bankruptcy estate but found it almost entirely without unencumbered assets.

**\*556** Section 503(b)(1)(A) of the Bankruptcy Code provides that "the actual, necessary costs and expenses of preserving the estate" are treated as administrative expenses, and § 507(a)(1) provides that such administrative expenses are entitled to priority over pre-petition unsecured

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

claims. Hartford and Hen House agreed that the overdue
premiums constituted administrative expenses, but Hartford
was nevertheless stymied, for virtually all of Hen House's
assets were held by *secured* creditors, whose claims are
superior to administrative claims. *See* 11 U.S.C. § 506.
Hartford then looked to § 506(c), which provides an important
exception to that priority. It states that *"[t]he trustee may*
recover from property securing an allowed secured claim the
reasonable, necessary costs and expenses of preserving, or
disposing of, such property to the extent of any benefit to the
holder of such claim." 11 U.S.C. § 506(c) (emphasis added).
Hartford argued that this provision entitled it to recover the
premiums even though it was an administrative claimant
rather than a trustee, and the bankruptcy court ruled in favor
of Hartford, and the district court and an Eighth Circuit panel
affirmed. *In re Hen House Interstate, Inc.,* 150 F.3d 868 (8th
Cir.1998). The panel decision was subsequently vacated, and
the Eighth Circuit, sitting *en banc,* held § 506(c) unavailable
to an administrative claimant like Hartford. 177 F.3d 719 (8th
Cir.1999) (en banc).

A unanimous Supreme Court affirmed the *en banc* decision.
It began "with the understanding that Congress says in a
statute what it means and means in a statute what it says
there," *Hartford Underwriters,* 530 U.S. at 6, 120 S.Ct.
1942 (quoting *Connecticut Nat. Bank v. Germain,* 503 U.S.
249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)), and
reiterated the longstanding maxim that, "when the statute's
language is plain, the sole function of the courts—at least
where the disposition required by the text is not absurd
—is to enforce it according to its terms." *Id.* (citations
omitted). Turning to § 506(c), the Court found that it
"appears quite plain[ly]" to mean that only the trustee may
recover administrative expenses ahead of secured claims. *Id.*
Although it acknowledged that the statute does not expressly
bar non-trustees from recovery, it had "little difficulty" in
inferring that "exclusivity is intended." *Id.*

The Court's first rationale was contextual. A bankruptcy
trustee's role in Chapter 7 liquidation proceedings is central by
design, and this "unique role ... makes it entirely plausible that
Congress would provide a power to him and not to others."
*Id.* at 7, 120 S.Ct. 1942. The Court further reasoned that, "had
no particular parties been specified [in § 506(c),] ... the trustee
is the most obvious party who would have been thought
empowered to use the provision." *Id.* The Court therefore
found little reason to doubt the maxim that "a situation in
which a statute authorizes specific action and designates a
particular party empowered to take it is surely among the least

appropriate in which to presume nonexclusivity." *Id.* (citing
2A N. Singer, *Sutherland on Statutory Construction* § 47.23,
p. 217 (5th ed.1992)). Buttressing this conclusion was the
logic that, "had Congress intended the provision to be broadly
available, it could simply have said so, as it did in describing
the parties who could act under other sections of the Code."
*Id.*

Having determined from its textual inquiry that "by far the
most natural reading of § 506(c) is that it extends only
to the trustee," the Court declared that Hartford's "burden
of persuading us that the section must be read to allow
its use by other parties is 'exceptionally heavy.' " *Id.* at
9 (quoting *Patterson v. Shumate,* 504 U.S. 753,
760, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992)). It then
turned to Hartford's arguments based on pre-Code practice
and policy considerations. Regarding pre-Code practice,
the Court found that Section 506(c)'s provision for the
charge of certain administrative expenses against lienholders
continued a practice that existed under the Bankruptcy
Act of 1898. *Id.* (citations omitted). Even then, however,
"[i]t was the norm that recovery of costs from a secured
creditor would be sought by the trustee," rather than by an
administrative claimant. *Id.* (citations omitted). Still, Hartford
cited "a number of lower court cases [ ] in which—without
meaningful discussion of the point—parties other than the
trustee were permitted to pursue such charges under the
Act [of 1898], sometimes simultaneously with the trustee's
pursuit of his own expenses," *id.* (citing cases), and the
Court recognized that some of its early decisions had allowed
individual claimants to seek recovery from secured assets.
*See, e.g., Louisville, E. & St. L.R. Co. v. Wilson,* 138 U.S. 501,
11 S.Ct. 405, 34 L.Ed. 1023 (1891).

The Court nevertheless concluded that "[i]t is questionable
whether these precedents establish a bankruptcy practice
sufficiently widespread and well recognized to justify the
conclusion of implicit adoption by the Code. We have no
confidence that the allowance of recovery from collateral by
nontrustees is the type of rule that ... Congress was aware
of when enacting the code." *Id.* (quoting *United States v.
Ron Pair Enterprises, Inc.,* 489 U.S. 235, 246, 109 S.Ct.
1026, 103 L.Ed.2d 290 (1989)). *Cf. Kelly v. Robinson,* 479
U.S. 36, 46, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) (giving
weight to pre-Code practice that was "widely accepted" and
"established"). Indeed, the Court strongly implied that even
a more convincing historical showing would not have carried
the day for Hartford: "Where the meaning of the Bankruptcy
Code's text is itself clear ... its operation is unimpeded by

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

contrary ... prior practice.... In this case, we think the language of the Code leaves no room for clarification by pre-Code practice," for it "cannot transform § 506(c)'s reference to 'the trustee' to 'the trustee and other parties in interest.' " *Id.* at 11, 120 S.Ct. 1942 (citations omitted).

Finally, the Court engaged Hartford's contention that its interpretation was necessary as a matter of public policy. Hartford argued that in some cases the trustee may lack an incentive to pursue payment for administrative expenses, so that if the Code is to encourage such lenders to finance a corporation's administrative needs throughout its bankruptcy, it must allow those lenders later to bring their own actions to recover their investments. Hartford also suggested that affording standing to administrative claimants might encourage the provision of post-petition services to debtors on more favorable terms, since such claimants would presumably always be willing vigorously to defend their financial interests whereas a trustee might be more reluctant. *Id. at 11–12, 120 S.Ct. 1942.* The Court, however, determined that "it is far from clear that the policy implications favor petitioner's position," and even suggested that Hartford's interpretation might "itself lead to results that seem undesirable as a matter of policy." *Id. at 12, 120 S.Ct. 1942.* It ultimately declined to weigh the competing concerns, explaining that "we do not sit to assess the relative merits of different approaches to bankruptcy problems. It suffices that the natural reading of the text produces the result we announce. Achieving a better policy outcome—if what petitioner urges is that—is a task for Congress, not the courts." *Id. at 13–14, 120 S.Ct. 1942.*

### B. Did *Hartford Underwriters* take place in an analogous context?

Based on the above reasoning, the *Hartford Underwriters* Court interpreted the "  **\*558**  trustee may" in § 506(c) to mean that *only* the trustee may bring an action. In the case at bar, the District Court concluded that, faced with the same language in § 544(b), the same conclusion must there obtain. But the *Hartford Underwriters* Court expressly reserved the question before us today. In a footnote critical to understanding the scope of that decision, the Supreme Court stated:

> We do not address whether a bankruptcy court can allow other interested parties to act in the trustee's stead in pursuing recovery under § 506(c). *Amici* American Insurance Association and National Union Fire

Insurance Co. draw our attention to the practice of some courts of allowing creditors or creditors' committees a derivative right to bring avoidance actions when the trustee refuses to do so, even though the applicable Code provisions, *see* 11 U.S.C. §§ 544, 545, 547(b), 548(a), 549(a), mention only the trustee. *See, e.g., In re Gibson Group, Inc.,* 66 F.3d 1436, 1438 (6th Cir.1995). Whatever the validity of that practice, it has no analogous application here, since petitioner did not ask the trustee to pursue payment under § 506(c) and did not seek permission from the Bankruptcy Court to take such action in the trustee's stead. Petitioner asserted an independent right to use § 506(c), which is what we reject today.

*Id.* at 13 n. 5, 120 S.Ct. 1942. The District Court nevertheless concluded that the Committee failed sufficiently to distinguish *Hartford Underwriters'* s method of interpretation, which it found to yield equally compelling results when applied to § 544(b).

We agree that *Hartford Underwriters* is most useful for the interpretive methodology it offers, but it is critical to note the context in which that decision arose, for it is materially unlike the one before us today. The petitioner in *Hartford Underwriters* was an insurer who, by continuing coverage despite Hen House's failure to pay its premiums, became an administrative lender with claims subordinate to those of the secured creditors. When it learned of Hen House's bankruptcy, it attempted to use § 506(c) to recover the premiums it was owed, but it did so in a strikingly unilateral fashion. The insurance premiums were not costs incurred by the trustee that, if recovered, would have yielded a common benefit. Instead, they would have satisfied only Hartford's outstanding claim. Nor did Hartford seek the court's or the trustee's permission to recoup the expense, but rather it sued in its own name and for its own direct benefit.

The situation at bar is markedly different. When the Committee discovered that certain transfers made by Cybergenics were potentially avoidable as fraudulent, it first petitioned the Cybergenics management to file an avoidance action under § 544(b). [4] But management refused

Official Committee of Unsecured Creditors of Cybergenics..., 330 F.3d 548 (2003)

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 340 of 540

to file that action, claiming that the costs would likely outweigh the benefits, and it maintained this position even after the Committee volunteered to bear all litigation costs. The Committee, finding management's stance unreasonable, petitioned the bankruptcy court for permission to pursue a § 544(b) avoidance action *in Cybergenics's name and on its behalf*—any recovery would not go to the Committee, but to the estate itself. The Bankruptcy Court concluded that the fraud claims were colorable, and that the Committee's offer to bear the litigation costs insulated the estate from risk. Noting that the debtor-in-possession has a duty to maximize the value of the estate, the court concluded **\*559** that management's refusal to act was unreasonable even given the usual judicial deference to business judgment, and it authorized the Committee to sue in Cybergenics's name.

This difference in contexts is crucially important, for while the question in *Hartford Underwriters* was one of a *nontrustee's right* unilaterally to circumvent the Code's remedial scheme, the issue before us today concerns a *bankruptcy court's equitable power* to craft a remedy when the Code's envisioned scheme breaks down. With this perspective in mind, we turn to the question whether derivative suits may be maintained under § 544(b) after *Hartford Underwriters.*

### IV. Do Derivative Suits under § 544(b) Survive *Hartford Underwriters?*

#### A. The Code Itself

[1]  [2]  [3]  [4]   As did the Court in *Hartford Underwriters,* "we begin with the understanding that Congress says in a statute what it means and means in a statute what it says there." *Hartford Underwriters,* 530 U.S. at 6, 120 S.Ct. 1942 (quoting *Connecticut Nat. Bank.,* 503 U.S. at 254, 112 S.Ct. 1146). When "the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Id.* (citations omitted). Chinery and Lincolnshire ("Lincolnshire") contend that, as the same language is used in §§ 544(b) and 506(c), there is a presumption that it means the same thing in each instance: "Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932). That presumption may be overcome only when "there is such variation in the connection in which the words are used as reasonably to warrant the

conclusion that they were employed in different parts of the act with different intent." *Id.* Lincolnshire therefore submits that the Committee's "burden of persuading us that the section must be read to allow its use by other parties is exceptionally heavy." *Hartford Underwriters,* 530 U.S. at 9, 120 S.Ct. 1942 (citation omitted).

The Committee does not dispute this assessment—it concedes that, as in *Hartford Underwriters,* "the trustee may" cannot be read to mean "the trustee and other parties in interest may." But it submits that this point is neither here nor there, for it does not seek to "use" § 544(b) in that sense. In its estimation, § 544(b) is important only insofar as it does not *preclude the bankruptcy court* from authorizing the Committee to sue derivatively when the trustee, the party explicitly empowered to use § 544(b), improperly refuses to exercise its power. Of course, even under this view we must determine whether such an equitable remedy is consistent with the Bankruptcy Code's statutory scheme, of which § 544(b) is a part. We are satisfied that it is.

#### 1. The Need to Interpret Chapter 11 as a Whole

[5]   As the Supreme Court has often noted, "[s]tatutory construction [ ] is a holistic endeavor," *United Savings Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), and this is especially true of the Bankruptcy Code. In *Kelly v. Robinson,* a case interpreting § 523, the Court stated that "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." 479 U.S. 36, 43, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) (citations omitted). The *Hartford Underwriters* Court interpreted the **\*560** Code holistically in determining that "the trustee may" in § 506(c) is exclusive, but in that case, there was no "whole law" to interpret, for § 506(c) is effectively self-contained. This is evident in two ways. First, there is no other provision in Chapter 7 of the Code that even arguably authorizes a party to "recover [administrative expenses] from property securing an allowed secured claim," so the Court saw no need to look beyond § 506(c) to understand the mechanics of the cause of action. Second, the Court concluded that "the fact that the sole party named—the trustee—has a unique role in bankruptcy proceedings makes it entirely plausible that Congress would provide a power to him and not to others." *Hartford Underwriters,* 530 U.S. at 7, 120 S.Ct. 1942. It therefore saw no reason to look beyond § 506(c) to determine standing to bring that cause of action.

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

In contrast, reading § 544(b) in isolation leads immediately to incoherence. While, as the Court explained, the trustee serves a "unique role" in Chapter 7, nothing could be further from the truth in Chapter 11, where trustees rarely exist. *See In re Sharon Steel Corp.,* 871 F.2d 1217, 1226 (3d Cir.1989) ("It is settled that appointment of a trustee should be the exception, rather than the rule."); 7 *Collier on Bankruptcy* ¶ 1104.02[1] (15th rev. ed. 1998) (noting that appointment of a trustee in a Chapter 11 case is an "extraordinary" remedy). Reading § 544(b) alone would lead to the fatuous conclusion that Congress vested its cause of action exclusively in a party that usually does not exist. Only by looking beyond § 506(c) can one make sense of this situation, in that § 1107(a) gives a Chapter 11 debtor-in-possession (here, Cybergenics) the rights and powers of a trustee in the event that no trustee is appointed.

It is therefore clear that § 544(b) must be viewed as merely a part, albeit an important part, of the Chapter 11 framework that is designed to help debtors reorganize while continuing as viable concerns.[5] The Committee submits that, just as one must read § 1107(a) in conjunction with § 544(b) to understand who "the trustee" is for § 544(b) purposes, one must consider three other Chapter 11 sections – 1109(b), 1103(c)(5), and 503(b)(3)(B)—to determine whether derivative standing is a permissible equitable remedy in cases where the court determines that the trustee has unreasonably refused to bring an avoidance claim under § 544(b). These sections shed light on the role Congress intended creditors' committees to play in the reorganization process, and we will examine each in turn.

## 2. Section 1109(b)

Section 1109(b) provides that:

> A party in interest, including the debtor, the trustee, *a creditor's committee,* an equity security holder's committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under [Chapter 11].

11 U.S.C. § 1109(b) (emphasis added). The Committee submits that, "[a]lthough 1109 would not provide an independent right for the Committee to initiate a suit, absent bankruptcy court approval, it does support the authority of bankruptcy courts to permit creditors' committees to bring

claims *on behalf of* the debtor in possession **\*561** *for the benefit of the estate."* (Committee's Reply Brief at 7.) There is precedent for this view. *Collier* explains that, "consistent with the broad right of participation conferred by § 1109(b), the court may authorize a party in interest to commence litigation on behalf of the estate if certain conditions are satisfied." 7 *Collier on Bankruptcy* ¶ 1109.05 (citing *Fogel v. Zell,* 221 F.3d 955, 965–66 (7th Cir.2000)) ("If a trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim of a creditor, the creditor may obtain the permission of the bankruptcy court to bring the action in place of, and in the name of, the trustee.").

Lincolnshire contends that, whatever the theoretical appeal of this position, it does not survive *Hartford Underwriters,* where Hartford argued "that § 1109(b) evidences the right of a nontrustee to recover under § 506(c)." *Hartford Underwriters,* 530 U.S. at 8, 120 S.Ct. 1942. While noting that § 1109(b) was "by its terms inapplicable" because it applied only to Chapter 11 reorganizations, and the debtor had previously converted its case to Chapter 7, *id.,* the Court nonetheless stated in dictum that "we do not read § 1109(b)'s general provision of a right to be heard as broadly allowing a creditor to pursue substantive remedies that other Code provisions make available only to other specific parties." *Id. Cf.* 7 L. King, *Collier on Bankruptcy* ¶ 1109.05 (15th rev. ed. 1999) ("In general, section 1109 does not bestow any right to usurp the trustee's role as representative of the estate with respect to the initiation of certain types of litigation that belong exclusively to the estate."). In Lincolnshire's view, § 1109(b) allows a committee to intervene in an adversary proceeding initiated by a trustee, but it does not allow a committee to initiate or prosecute an action independent of the trustee.

The Committee responds that § 1109(b) must mean something more than a right to intervene, for "a general right to be heard would be an empty grant unless those who had such right were allowed to act when those who should act did not." (Committee's Brief at 26) (*quoting* 5 *Collier on Bankruptcy* § 1109.02 [3] (15th ed. 1986)). It submits that we should not give great weight to the Supreme Court's interpretation in dictum of a provision that the Court itself noted was "by its terms inapplicable," especially since the Committee here does not assert an independent right of the sort the *Hartford Underwriters* Court considered.

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

**[6]  [7]**  Although the Committee is doubtless correct that the Supreme Court's dicta are not binding on us, we do not view it lightly. As we have stated:

> [W]e should not idly ignore considered statements the Supreme Court makes in dicta. The Supreme Court uses dicta to help control and influence the many issues it cannot decide because of its limited docket. "Appellate courts that dismiss these expressions [in dicta] and strike off on their own increase the disparity among tribunals (for other judges are likely to follow the Supreme Court's marching orders) and frustrate the evenhanded administration of justice by giving litigants an outcome other than the one the Supreme Court would be likely to reach were the case heard there."

*In re McDonald,* 205 F.3d 606, 612–13 (3d Cir.2000) (brackets in original) (quoting *United States v. Bloom,* 149 F.3d 649, 653 (7th Cir.1998)). Nevertheless, we are satisfied that the case at bar is not the situation the Court's dictum anticipated. The Court's clear concern was that a party might use § 1109(b) to "usurp[ ] the trustee's role as representative of the estate," *Hartford Underwriters,* 530 U.S. at 8, 120 S.Ct. 1942, thus defeating Congress's intention that the trustee act as a gatekeeper, weighing the potential benefits of litigation **\*562** against the costs it might incur. No risk of usurpation exists here, for the Committee took no unsanctioned action. Instead, it petitioned the Bankruptcy Court for permission to sue in the estate's name, and that Court conferred such authority only after it determined that the debtor was neglecting its statutory duty to act in the estate's interest. This exercise of judicial power does not implicate the usurpation concerns expressed in *Hartford Underwriters.* Yet it is precisely because the issue at bar involves judicial power that § 1109(b) cannot, alone, provide a definitive resolution. Read fairly, § 1109(b) addresses only a committee's direct rights – it says nothing whatever about a *court's power* to allow derivative standing to remedy a violation of those rights.

**[8]**  Section 1109(b) is helpful to the Committee insofar as it evinces Congress's intent for creditors' committees to play a vibrant and central role in Chapter 11 adversarial proceedings. *Amicus* G. Eric Brunstad offers an etymological perspective on that intent. Section § 1109(b) derives from Section 206 of the former Bankruptcy Act, 11 U.S.C. § 606, and former Chapter X Rule 10–210(a). *See In re Amatex Corp.,* 755 F.2d 1034, 1042 (3d Cir.1985). These two provisions were designed to broaden creditor participation in reorganization proceedings in order to remedy the deficiencies of prior

procedures, which were deemed to be unduly restrictive. *See In re Marin Motor Oil, Inc.,* 689 F.2d 445, 451 (3d Cir.1982). Significantly, however, § 1109(b) is broader than either of those provisions—while they authorized creditors "to be heard on all matters," neither authorized creditors to "raise" issues. Given our conclusion *infra* that derivative standing for creditors' committees was common in the pre-Code days of Section 206 and Chapter X Rule 10–210(a), it would be odd to conclude that Congress abolished derivative standing at the same time as it broadened committees' adversarial role through § 1109(b).

### 3. Section 1103(c)(5)

The Committee next turns for support to Section 1103(c)(5), which states: "A committee appointed under section 1102 of this title may perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5). Because the Bankruptcy Court found that the assertion of fraudulent transfer claims would benefit the estate, the Committee submits that it should be able to represent the estate for the purpose of prosecuting those claims.

**[9]**  Lincolnshire has several responses. It first represents that the Committee's interpretation of § 1103(c)(5) would amount to a free-roving power for the Committee to do whatever it considers to be in the estate's interest, a role that would eviscerate the debtor-in-possession's role as gatekeeper. It next notes that the powers granted to committees in § 1103(c)(1)-(4) are very specific, including the power to: (1) consult with the debtor concerning the case; (2) investigate the debtor's acts and financial condition; (3) participate in the formulation of a plan; and (4) request the appointment of a trustee or examiner. Lincolnshire suggests that interpreting the (c)(5) catch-all provision to allow committees to take any action in the debtor's interest would render superfluous the specific grants in (1) to (4), and would also violate the interpretive canon *ejusdem generis,* which states that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 114–15, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (quoting 2A N. Singer, *Sutherland on Statutes and Statutory Construction* **\*563** § 47.17 (1991)). Insofar as the grants of power in (1) to (4) are quite narrow and non-adversarial, it concludes, the catch-all power should be similarly confined.

**[10]** We agree that § 1103(c)(5) does not confer the sort of blanket authority necessary for the Committee independently to initiate an adversarial proceeding, including one under § 544(b). Like § 1109(b), however, § 1103(c)(5) suggests that Congress intended for creditors' committees to perform services on behalf of the estate, and that Congress consciously built a measure of flexibility into the scope of those services. As the question before us today is whether a bankruptcy court can authorize a creditors' committee to represent the estate when the usual representative is delinquent, the "flexible representation" role evidenced in § 1103(c)(5) militates in the affirmative.

## 4. Section 503(b)(3)(B)

While Sections 1109(b) and 1103(c)(5) provide clear evidence that Congress envisioned a central role for creditors' committees in Chapter 11 proceedings, their focus on creditors' committees themselves provides at best indirect evidence that Congress granted bankruptcy courts the power to confer derivative standing upon those committees. A third Code section, however, provides far more direct insight into bankruptcy courts' powers. Section 503(b)(3)(B) allows for the priority payment of the expenses of "a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor." 11 U.S.C. § 503(b)(3)(B). Brunstad argues that the only explanation for this provision is that it rewards monetarily the practice of permitting creditors, with court authorization, to pursue causes of action on behalf of bankrupt debtors. It would make little sense, he urges, to provide for the reimbursement of a "creditor that recovers," if standing to recover is limited exclusively to the trustee —that interpretation would render § 503(b)(3)(B) entirely superfluous.

*Amicus* Official Committee of Unsecured Creditors of Safety–Kleen Corp. ("The Safety–Kleen Committee") agrees, and it provides an historical perspective on § 503(b)(3)(B). Derivative standing for creditors was recognized judicially as early as 1900. *See Chatfield v. O'Dwyer,* 101 Fed. 797, 799 (8th Cir.1900); 3A James Wm. Moore et al., *Collier on Bankruptcy* ¶ 64.104 n.6 (14th ed. rev. 1975). In 1903, Congress allowed for reimbursement for such services by adding Section 64(a)(1) to the Bankruptcy Act of 1898:

> The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order

of payments shall be: (1) ... where the property of the bankrupt, transferred or concealed by him either before or after the filing of the petition, *is recovered for the benefit of the estate and at the cost and expense of one or more creditors,* the reasonable costs and expenses of such recovery ...

11 U.S.C. § 104(a)(1) (redesignated from § 64 in 1938) (repealed 1978) (emphasis added). Courts interpreted § 64 as not only allowing for recovery of expenses incurred while suing derivatively, but also as authorizing derivative standing in the first instance. *See, e.g., In re Eureka Upholstering Co.,* 48 F.2d 95, 96 (2d Cir.1931) (allowing the bankruptcy court to authorize derivative standing under § 64); *In re Stearns Salt & Lumber Co.,* 225 Fed. 1, 3 (6th Cir.1915) (stating that a trustee could authorize derivative standing under § 64). A creditor's ability to sue derivatively was, however, limited by the requirement that a creditor obtain permission either from the trustee or the court before acting, the rationale being that those entities served a **\*564** salutary gatekeeping function. *See, e.g., In re Eureka,* 48 F.2d at 96.

When Congress enacted the Bankruptcy Code in 1978, it made clear its intent for the new § 503(b)(3)(B) to continue the policies of § 64(a)(1) regarding the reimbursement of expenses incurred while recovering property for the benefit of the estate. *See* H.R. Doc. No. 93–137, 93d Cong. 1st Sess., Pts I and II (1973), *available in* Collier 15th ed. at App. Pt. 4(c) (explaining that the proposed § 503(b)(3)(B) "continues the policy of § 64(a)(1) and allows a creditor to recover expense incurred which actually benefits the estate"). The Safety–Kleen Committee submits that the only substantive modification contained in § 503(b)(3)(B) is a clarification that only the bankruptcy court—not the bankruptcy trustee —can authorize derivative suits. (Safety–Kleen Committee Brief at 16) (citing *In re Godon, Inc.,* 275 B.R. 555, 562 (Bankr.E.D.Ca.2002)).

Lincolnshire, however, strongly disputes the notion that § 503(b)(3)(B) authorizes derivative standing. It observes that "[f]ederal courts have consistently held that § 503(b)(3)(B) does not confer standing to creditors to sue on behalf of the bankruptcy estate." (Lincolnshire's Response to *Amici* at 15– 16) (quoting *Surf N Sun Apts., Inc., v. Dempsey,* 253 B.R. 490, 492 (M.D.Fla.1999)) (citing cases). Lincolnshire instead contends that the provision merely allows the recovery of expenses incurred in actions that a creditor has a *direct* right to

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

bring. For example, a creditor might assist a debtor in locating assets owed to the estate by conducting a Bankruptcy Rule 2004 examination of a transferee, a step available to "any party in interest" that obtains court approval. *See* Fed. R. Bankr.Proc. 2004. *Amicus* Professor Keith Sharfman agrees, and offers by way of example the situation where a creditor brings a state law fraudulent transfer claim against a party to whom the debtor had transferred the creditor's collateral. He submits that such an action would need "the court's approval," *i.e.,* the grant of a motion to lift the automatic stay that would otherwise block the action from proceeding. *See* 11 U.S.C. §§ 362(d) and 362(f). Any surplus value recovered would presumably be "for the benefit of the estate," as it would have to be turned over to the estate pursuant to 11 U.S.C. § 542.

[11]    Lincolnshire also asserts that, even if Section 503 does recognize derivative standing, it "does not address, even inferentially, the power of a creditors' committee. It addresses only the ability of a 'a creditor,' not 'a creditors' committee,' to recover certain expenses. Congress obviously knew the difference." (Lincolnshire Reply to *Amici* at 16.) For example, in § 1109(b), discussed at length *supra,* Congress granted the right to appear and be heard to a "party in interest, including the debtor, the trustee, *a creditors' committee,* an equity security holders' committee, [or] *a creditor.*" 11 U.S.C. § 1109(b) (emphasis added). This contention is not merely semantic, for the Supreme Court presumes "that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

[12]    Although Lincolnshire's arguments are not without force, we conclude that the most natural reading of § 503(b)(3)(B) is that it recognizes and rewards monetarily the practice of permitting creditors' committees, with court authorization, to pursue derivative actions. We are convinced that the provision is not limited to direct causes of action, for property recovered in a direct action is not recovered "for the benefit of the estate." The offered examples are not to the contrary. While a creditors' committee may **\*565** certainly assist a debtor in locating property under Bankruptcy Rule 2004, that investigative assistance would not implicate § 503(b)(3)(B) because the committee would not itself *recover* the property. More promising is Professor Sharfman's suggestion of a creditor who independently pursues a state law fraud claim and relinquishes to the estate any surplus recovery. Yet this hypothetical fails as well, for no surplus recovery is possible. Relevant law provides that

a transfer or obligation may be avoided only "to the extent necessary to satisfy the creditor's claim." *See* 7A Uniform Laws Annotated, Uniform Fraudulent Transfer Act § 8; 7A Uniform Laws Annotated, Uniform Fraudulent Conveyance Act § 9. Because an oversecured creditor cannot directly recover any property beyond that necessary to satisfy its own claim, it cannot recover property for the benefit of the estate unless it sues derivatively.

Generalizing from these examples, we "cannot conceive of a situation in which a creditor has independent standing which would allow it to pursue the recovery of property transferred or concealed by the debtor." *In re Blount,* 276 B.R. 753, 762 (Bankr.M.D.La.2002). While it is possible that such a situation exists, we are at all events unwilling to interpret § 503(b)(3)(B) as anticipating obscure possibilities when a far more natural interpretation is apparent. Especially given the statutory history, we are satisfied that Congress intended § 503(b)(3)(B) to allow bankruptcy courts to reward derivative suits prosecuted by creditors' committees. [6]

Of course, that determination does little to help the Committee if only individual creditors may bring derivative actions. Lincolnshire is correct in its observation that § 503(b)(3)(B) speaks only of a "creditor ... that recovers," and says nothing about creditors' committees. *Amicus* Brunstad submits that this is a mere technicality, for under section 102(7) of the Bankruptcy Act, "the singular includes the plural." He reasons that, if all of the creditors could simultaneously bring an identical action, there is no reason to disallow the simpler step of allowing a representative committee to bring that same action, especially given the flexible authority in § 1103(c)(5) for committees to "perform such other services as are in the interest of those represented." (Transcript of Oral Argument at 33.)

To be sure, several Code provisions identify both creditors and creditors' committees as parties with authority to take action, *see, e.g.,* § 1109(b), and this lends some weight to Lincolnshire's suggestion **\*566** that the absence of "committees" in § 503(b)(3)(B) is meaningful. But we are realists, and we recognize that if we disallow the Committee's derivative suit but sanction derivative suits by individual creditors, the individual creditors could simply substitute themselves as plaintiffs under Fed. R. Civ. Proc. 17(a) and move forward with litigation. Forcing that step would be a make-work, for those individual cases would likely be consolidated into one substantively identical to that at bar. Given the flexible role of committees evidenced in § 1103(c)

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

(5) and the Code's general presumption that the singular means the plural, we are satisfied that the purpose of § 503(b)(3)(B) is served by allowing the Committee to recover expenses incurred in pursuing a derivative suit. Any other result would render that provision superfluous, for absent a judicial power to authorize derivative suits by creditors, it makes no sense to speak of rewarding a creditor who sues, with court permission, to recover property for the benefit of the estate.

### 5. A Textual Conclusion

 [13]   For all of the foregoing reasons, we are satisfied that the most natural reading of the Code is that Congress recognized and approved of derivative standing for creditors' committees. Sections 1109(b) and 1103(c)(5), taken together, evince a Congressional intent for committees to play a robust and flexible role in representing the bankruptcy estate, even in adversarial proceedings. Several cases decided after *Hartford Underwriters* have concluded that these two sections alone are sufficient to confer upon creditors' committees the right to sue derivatively. In *In re Commodore Int'l Ltd.,* 262 F.3d 96 (2d Cir.2001), the Second Circuit outlined its requirements for derivative standing, stating:

> [W]e hold that a creditors' committee may sue on behalf of the debtors, with the approval and supervision of a bankruptcy court, not only where the debtor in possession unreasonably fails to bring suit on its claims, but also where the trustee or the debtor in possession consents.

*Id.* at 100. Lincolnshire submits that *Commodore* "has no bearing on the present issue with regard to standing because neither that Court nor the lower court even acknowledged the [*Hartford Underwriters*] decision." (Lincolnshire Brief at 29.) The implication is that the Second Circuit Court of Appeals, and the parties before it, somehow failed to notice an on-point Supreme Court decision issued less than a year earlier. We doubt that explanation; more plausible is that the Second Circuit thought *Hartford Underwriters* to be irrelevant insofar as it did not address – indeed, it eschewed – derivative standing. Any doubt on that score is erased by the Second Circuit's subsequent decision in *Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re Caldor Corp.),* 303 F.3d 161 (2d Cir.2002). There, the Court mentioned *Hartford Underwriters* after stating its belief that Sections 1103(c)(5) and 1109(b) "impl[y] a qualified right for

creditors' committees to initiate adversary proceedings where the trustee or debtor in possession unjustifiably failed to bring suit." *Id.* at 166 (citing *In re STN Enterprises,* 779 F.2d 901, 904 (2d Cir.1985)). The Second Circuit clearly believes that Sections 1103(c)(5) and 1109(b) authorize derivative standing even after *Hartford Underwriters.*

The Seventh Circuit reached a similar decision in *Fogel,* 221 F.3d at 955, a post-*Hartford Underwriters* case in which it stated that:

> If a trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim of a creditor, the creditor may obtain the permission of the bankruptcy **\*567** court to bring the action in place of, and in the name of, the trustee.... In such a suit, the creditor corresponds to the shareholder, and the trustee to management, in a shareholder derivative action.

*Id.* at 966 (citations omitted). Again, although *Fogel* does not mention *Hartford Underwriters,* we doubt that it escaped the court's notice.

At all events, after an exhaustive examination of *Hartford Underwriters,* we agree with the Second and Seventh Circuits, except insofar as the Second Circuit in *Term Loan* implied that the power to initiate derivative suits flows entirely from Sections 1103(c)(5) and 1109(b). We do not read those two sections so broadly, but when they are paired with § 503(b)(3)(B), it becomes unmistakably clear that Congress approved of creditors' committees suing derivatively to recover property for the benefit of the estate. Avoiding fraudulent transfers through § 544(b) is a perfect application of that function.

Yet a piece of the puzzle is missing. The Code clearly demonstrates that Congress approved of derivative standing, but none of the three sections discussed—1109(b), 1103(c)(5), or 503(b)(3)(B)—seems directly to *authorize* such standing. Section 503 comes closest, but read fairly, that provision merely empowers bankruptcy courts to reimburse creditors' committees for the expenses they incur while suing derivatively. It does not authorize derivative actions in the first instance. To be sure, that section would be meaningless unless authority existed, but such reasoning by negative implication is less than satisfying. We believe that the missing

link is supplied by bankruptcy courts' equitable power to craft flexible remedies in situations where the Code's causes of action fail to achieve their intended purpose.

**B. Bankruptcy Courts as Courts of Equity**

[14]    The Supreme Court has long recognized that bankruptcy courts are equitable tribunals that apply equitable principles in the administration of bankruptcy proceedings. *See Local Loan Co. v. Hunt,* 292 U.S. 234, 240, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) ("[C]ourts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity."). The enactment of the Code in 1978 increased the degree of regulation Congress imposed upon bankruptcy proceedings, but it did not alter bankruptcy courts' fundamental nature. *See* H.R. Rep. No. 95–595, at 359 (1977), *reprinted in* U.S.C.C.A.N. 5963, 6315 (stating that, under the Bankruptcy Code, "[t]he bankruptcy court will remain a court of equity" (citing *Local Loan Co.,* 292 U.S. at 240, 54 S.Ct. 695). Any lingering doubt on that point is dispelled by a string of post-enactment Supreme Court decisions—*see Young v. United States,* 535 U.S. 43, 50, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002) ("[B]ankruptcy courts [ ] are courts of equity and 'apply the principles and rules of equity jurisprudence.' ") (quoting *Pepper v. Litton,* 308 U.S. 295, 304, 60 S.Ct. 238, 84 L.Ed. 281 (1939)); *United States v. Energy Resources Co.,* 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990) ("[B]ankruptcy courts, as courts of equity, have broad authority to modify creditor–debtor relationships.")—and by the Code itself. *See* 11 U.S.C. § 105(a) ("The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.").

*568    The concept of derivative standing arose when, despite a lack of express statutory authorization, courts of equity allowed shareholders to pursue valuable actions when the nominal plaintiff (the corporation) unreasonably refused to do so. *See generally* Bert S. Prunty, Jr., *The Shareholders' Derivative Suit: Notes on Its Derivation,* 32 N.Y.U. L. Rev. 980 (1957) (tracing the historical development of derivative suits). In *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), the Supreme Court explained the utility of derivative standing as a means of providing equitable redress, not only from "faithless officers and directors," but also directly from "third parties who had damaged or

threatened the corporate properties and whom the corporation through its managers refused to pursue." 396 U.S. at 534, 90 S.Ct. 733. It also addressed the doctrine's standards, including the requirement "that the corporation itself [must have] refused to proceed after suitable demand, unless excused by extraordinary conditions." 396 U.S. at 534, 90 S.Ct. 733.

[15]    [16]    [17]    We believe that the ability to confer derivative standing upon creditors' committees is a straightforward application of bankruptcy courts' equitable powers. In § 544(b), Congress made clear that it intended for the estate to recover property fraudulently transferred by the debtor. The mechanism Congress designed to ensure this recovery was to vest in the trustee (or the debtor-in-possession) both the power to bring an avoidance action and the duty to bring one if it would likely benefit the estate. *See, e.g., In re Cybergenics,* 226 F.3d at 243 ("A paramount duty of a trustee or debtor in possession in a bankruptcy case is to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors."). Congress clearly envisioned that the trustee or debtor would avoid fraudulent transfers, thus maximizing the value of the estate and allowing creditors to recover their claims from that estate.

The problem at bar is that the intended system broke down. The debtor refused to bring an action that the Bankruptcy Court found would benefit the estate, and thereby violated its fiduciary duty to maximize the estate's value. It is in precisely this situation that bankruptcy courts' equitable powers are most valuable, for the courts are able to craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain. As the Supreme Court has noted, "[e]quity eschews mechanical rules; it depends on flexibility," *Holmberg v. Armbrecht,* 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1946), and "there is inherent in the Courts of Equity a jurisdiction to ... give effect to the policy of the legislature." *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960) (quoting *Clark v. Smith,* 13 Pet. (38 U.S.) 195, 203, 10 L.Ed. 123 (1839)).

The policy concern evident in § 544(b) is the need to channel avoidance actions through the trustee, who acts as a gatekeeper and prevents independent avoidance actions by creditors that might prejudice the estate and rival creditors. The Supreme Court stated as much in *Hartford Underwriters* when it expressed concern about parties "usurp[ing] the trustee's role as representative of the estate." 530 U.S. at 8–9, 120 S.Ct. 1942. This representative role explains why §

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

544(b) allows the trustee, but not a creditors' committee, to bring an avoidance action on its own authority, *i.e.,* without court permission. But that provision does not foreclose a bankruptcy court's equitable power to substitute *itself* as gatekeeper when the trustee is delinquent, and to allow a creditors' committee to pursue an avoidance action *for the estate's direct benefit* rather than **\*569** its own. The end result of this equitable remedy – the estate's recovery of fraudulently transferred property – is precisely what Congress envisioned, and Code Sections 1109(b), 1103(c)(5), and 503(b)(3)(B) anticipate the court's means of achieving that result.

We are therefore satisfied that the Bankruptcy Court acted within its power in conferring derivative standing upon the Committee. As further evidence that its decision was provident, however, we observe that there is a lengthy history of bankruptcy courts conferring derivative standing in analogous situations.

### V. Pre–Code Practice

In *Hartford Underwriters,* Hartford urged that administrative claimants have a right to bring direct actions under § 506(c). As evidence of this power, it cited a string of cases purporting to demonstrate that such actions were common in the years before the Bankruptcy Code, and noted the Supreme Court's declaration that, "[w]hen Congress amends the bankruptcy laws, it does not write 'on a clean slate.' " *Dewsnup v. Timm,* 502 U.S. 410, 419, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). *See Cohen v. de la Cruz,* 523 U.S. 213, 221, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) ("We [ ] will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.") (citations omitted). *See also Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) (relying on clear pre-Code practice). After surveying Hartford's cases, however, the Court concluded that:

> It is questionable whether these precedents establish a bankruptcy practice sufficiently widespread and well recognized to justify the conclusion of implicit adoption by the Code. We have no confidence that the allowance of recovery from collateral by nontrustees is the type of rule that ...

Congress was aware of when enacting the Code.

*Hartford Underwriters,* 530 U.S. at 9, 120 S.Ct. 1942 (quoting *Ron Pair Enterprises, Inc.,* 489 U.S. at 246, 109 S.Ct. 1026). It also explained that, at all events, the text of § 506(c) was so clear as to "leave[ ] no room for clarification by pre-Code practice." *Id.* at 10, 120 S.Ct. 1942.

Compared to the evidence offered in *Hartford Underwriters,* the pre-Code tradition of allowing courts to confer derivative standing upon creditors is compelling. Indeed, it is precisely the sort of practice of which Congress would have been aware when drafting the Code. Of course, as was true in *Hartford Underwriters,* even the most compelling pre-Code practice cannot overcome clear text, but we do not look to it for that purpose—as explained *supra,* we believe that the most natural reading of the Code itself is that it allows bankruptcy courts equitably to confer derivative standing on creditors in this situation. While that favorable text is alone sufficient, we believe that it is instructive to explore the prevalence of derivative standing in pre-Code years, for it confirms that the Bankruptcy Court's decision was not only proper, but also prudent.

The concept of derivative standing was first applied in the bankruptcy context in the case of *Chatfield v. O'Dwyer,* 42 C.C.A. 30, 101 F. 797 (8th Cir.1900), where the Eighth Circuit explained:

> [W]e recognize the right of a creditor to apply to the bankrupt[cy] court for an order permitting him to prosecute an appeal in the name of the trustee, when he has called upon the trustee to take an appeal from the allowance of a claim against the bankrupt's estate, and the latter has declined to appeal. As the trustee is an officer of the bankrupt[cy] court, and subject to its orders, that **\*570** court has an undoubted power either to direct the trustee to appeal when it entertains doubts of the verity of its judgment, or to make an order permitting a creditor who so desires to appeal from the allowance in the name of the trustee when the latter declines to appeal.

Official Committee of Unsecured Creditors of Cybergenics..., 330 F.3d 548 (2003)

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

Case 09-10138-MFW   Doc 14410-4   Filed 09/16/14   Page 348 of 540

*Id.* at 800. In 1915, the Sixth Circuit recognized a trustee's power to confer derivative standing upon creditors, *see In re Stearns Salt & Lumber Co.,* 225 F. 1, 3 (6th Cir.1915), and in 1931, the Second Circuit recognized the bankruptcy court's power to do so. *See In re Eureka Upholstering Co.,* 48 F.2d 95 (2d Cir.1931). As Judge Hand explained:

> The receiver is responsible for the collection of the assets ... and he alone can authorize any charges against them. If any creditor, petitioning or other, learns facts which lead him to suppose that property has been concealed, he may, and indeed he should, advise the receiver, and *if the receiver prove slack, he may apply to the referee [the bankruptcy judge] to stir him to action. The referee or the [district] judge may then authorize the creditor to proceed,* and he will be entitled to his reward under [§ 64], but not otherwise.

*Id.* at 96. Cases adhering to this view are legion, and we set forth further examples in the margin. [7]

We also place great weight on the fact that the 1978 version of the authoritative *Collier on Bankruptcy,* in summarizing practice under the pre-Code Bankruptcy Act, references in six different volumes creditors' ability to obtain court permission to pursue actions on behalf of the estate. *See* 4B *Collier on Bankruptcy* (14th ed. 1978) ¶ 70.92 ("If the creditors then believe that a suit or other proper proceeding should be commenced for avoidance or recovery, they have the right to petition the bankruptcy court wherein the proceedings are pending for an order compelling the trustee to act, or for leave to prosecute the suit in the name of the trustee and on behalf of the estate."); 3 *Collier on Bankruptcy* (14th ed. 1978) ¶ 60.57[2] ("The **\*571** right of creditors to maintain an action for the recovery of a preference prior to the appointment of a trustee is impliedly recognized in § 64a(1) of the Act."); 4 *Collier on Bankruptcy* (14th ed.1978) ¶ 67.48[2] ("If the creditor is permitted to act in the name of the trustee, it will be noted that the trustee, in whom the right ... vests under the Act, will be plaintiff ... and any recovery would inure to the estate. In the case of recovery this would be a proper situation for the application of § 64a(1)."); 2A *Collier on Bankruptcy* (14th ed.1978) ¶ 47.03 ("If the trustee fails to do his duty, any interested creditor may make demand on him for appropriate action, and if he fails to act promptly, the creditor may, with permission of the court, act on behalf of the estate and in the name of the trustee."); 3A *Collier on Bankruptcy* (14th ed.1978) ¶ 64.104 ("After appointment of a trustee, a condition upon the creditor's right to sue and receive reimbursement therefor is an application to him or to the court. Until the trustee's appointment, however, and in the absence of a receiver – or if the trustee has refused or is unable to act – this provision entitles creditors to initiate proceedings without any condition precedent."); 13 *Collier on Bankruptcy* (14th ed. 1978) ¶ 610.09 ("Creditors may ask the court to compel the trustee to act, or for leave to prosecute the action in the trustee's name."). *Collier's* view is persuasive on such matters, for the Supreme Court has itself cited to it as evidence that a particular practice was "widely accepted" under the Bankruptcy Act. *See Kelly,* 479 U.S. at 46, 107 S.Ct. 353 (determining that criminal penalties under the Act were non-dischargeable).

*Amicus* Professor Keith Sharfman submits, however, that later pre-Code caselaw rejected derivative standing for creditors. For example, in *Klebanow v. New York Produce Exchange,* the court held that limited partners of a bankruptcy debtor are more like shareholders, who may maintain derivative suits, than like "mere creditors," who may not sue derivatively. 344 U.S. 294, 297 (2d Cir.1965). Given the dictum in that case, Professor Sharfman contends that "it would be inaccurate to suggest that the Bankruptcy Code was enacted in an environment where derivative standing was a well-established norm." (Sharfman Brief at 9.) Interestingly, however, in 1985, the Second Circuit in *In re STN Enterprises* cited pre-Code practice in recognizing the qualified right of creditors' committees to initiate avoidance suits, with the approval of the bankruptcy court, when the trustee or debtor-in-possession unjustifiably failed to bring suit to avoid a transfer. *In re STN Enterprises,* 779 F.2d at 904. *See also Mediators, Inc. v. Manney (In re The Mediators, Inc.),* 105 F.3d 822 (2d Cir.1997). If the Second Circuit meant what it said in dictum in *Klebanow,* it changed its mind thereafter.

[18] At all events, complete doctrinal uniformity in caselaw is hardly to be expected where powers of equity are concerned. Especially given *Collier's* sense of the law, we are satisfied that the overwhelming balance of pre-Code opinion supports courts' power to confer derivative standing upon creditors. *See Midlantic Nat'l Bank,* 474 U.S. at 500–01, 106 S.Ct. 755 (finding that three cases constituted "clear" pre-Code practice.) The historical record here is far more compelling than it was in *Hartford Underwriters,* a relatively

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 349 of 540

Official Committee of Unsecured Creditors of Cybergenics..., 330 F.3d 548 (2003)

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

easy case in which, at most, the cases supporting Hartford's ability to sue under § 506(c) slightly outnumbered those rejecting that ability. Therefore, to the extent that we do "not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure," *Cohen,* 523 U.S. at 221, 118 S.Ct. 1212 (1998), we believe a presumption exists in favor of **572** courts' power to confer derivative standing in this instance.

Our decision today, however, does not depend on this presumption, for the Code itself anticipates the existence of derivative standing. We believe that the historical acceptance of derivative standing is most valuable for the accumulated experience it evidences, *i.e.,* that derivative standing is a prudent way for bankruptcy courts to remedy lapses in a trustee's execution of its fiduciary duty. The Bankruptcy Court's decision in this case is in perfect harmony with that received wisdom.

## VI. Does Derivative Standing for Creditors' Committees Advance Congress's Goals?

Lincolnshire submits that the Bankruptcy Code provides many explicit remedies for situations where, as here, a debtor unreasonably refuses to pursue an action on behalf of the estate. Its implication is that, by providing bankruptcy courts with a range of remedies, Congress intended for that range to be comprehensive, and it notes that it is not for courts to substitute their policy judgment for Congress's. *See Hartford Underwriters,* 530 U.S. at 13–14, 120 S.Ct. 1942 ("[W]e do not sit to assess the relative merits of different approaches to various bankruptcy problems.... Achieving a better policy outcome – if what petitioner urges is that – is a task for Congress, not the courts."). We agree, at least insofar as policy rationales cannot override contrary text. But as explained *supra,* there is no text to override because the Code itself anticipates derivative standing.

The critical question is thus whether bankruptcy courts' equitable powers are sufficient to allow them to confer the derivative standing that the Code anticipates. For the reasons set forth above, we believe that they are. Indeed, the very fact that equitable powers are at issue renders public policy concerns more important than they were in *Hartford Underwriters,* for as the Supreme Court has said, "there is inherent in the Courts of Equity a jurisdiction *to ... give effect to the policy of the legislature."* *Mitchell,* 361 U.S. at 292, 80 S.Ct. 332 (emphasis added). *See also* 11 U.S.C. § 105(a)

(empowering a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title"). Put another way, although we concluded above that bankruptcy courts have equitable power to confer derivative standing upon creditors' committees in this situation, it is important to support that conclusion by assessing the public policy concerns underpinning Chapter 11.

Despite the existence of other potential remedies, we are satisfied that derivative standing in this instance achieves Congress's policy goals. We will proceed first by exploring those goals, and then by assessing the adequacy of the other remedies Lincolnshire identifies.

## A. The Salutary Effects of Derivative Standing for Creditors' Committees

Before bankruptcy, a debtor's management and its most powerful creditors typically try to "work out" the debtor's financial distress. In this process, managers frequently experience pressure to take extreme measures to protect the company. (Brief of *Amicus* Law Professors at 9.) They may make extraordinary concessions to providers of critical services, such as granting new lines on unencumbered property, agreeing to an excessive rate of interest, committing to lavish retention bonuses, or doing virtually anything else to avoiding filing for bankruptcy. *See, e.g.,* Eduardo Porter & Mitchell Pacelle, *Judge Increases Severance Pay to Former Enron Employees,* Wall St. J., Aug. 29, 2002, at **573** A3 (discussing multi-million dollar retention bonuses paid by Enron insiders before bankruptcy). Whether or not these radical actions are ultimately successful, they often reduce the assets available to the debtor's creditors.

[19]  [20]  The Bankruptcy Code's avoidance powers are intended, *inter alia,* to deter this kind of managerial overreaching and to encourage creditors to allow a debtor a measure of breathing room. *See* H.R. Rep. No. 95–595, at 177 (1977) ("By permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during [its] slide into bankruptcy."). Fraudulent avoidance actions, such as those provided for in § 544(b), are intended to afford unsecured creditors peace of mind, for those creditors are usually the principal victims of managerial misfeasance.

[21]  [22]  Although fraudulent transfers are of concern in many chapters of the Bankruptcy Code, including in Chapter

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

7 liquidations, they present a particularly vexing problem in reorganizations conducted under Chapter 11. The premise of a reorganization is to ensure that the debtor emerges from bankruptcy as a viable concern. This explains why trustees are a fixture in Chapter 7 liquidations, but they are exceptional in Chapter 11—it is thought that a debtor's existing management will be more familiar with the company than would be a court-appointed trustee, and that it would therefore be better able to guide the debtor back into solvency. *See Sharon Steel Corp.,* 871 F.2d at 1226 ("It is settled that appointment of a trustee should be the exception, rather than the rule."); 7 *Collier on Bankruptcy* ¶ 1104.02[1] (15th rev. ed. 1998) (noting that appointment of a trustee in a Chapter 11 case is an "extraordinary" remedy). In Chapter 11 cases where no trustee is appointed, § 1107(a) provides that the debtor-in-possession, *i.e.,* the debtor's management, enjoys the powers that would otherwise vest in the bankruptcy trustee. Along with those powers, of course, comes the trustee's fiduciary duty to maximize the value of the bankruptcy estate.

This situation immediately gives rise to the proverbial problem of the fox guarding the henhouse. If no trustee is appointed, the debtor—really, the debtor's management—bears a fiduciary duty to avoid fraudulent transfers that it itself made. One suspects that if managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it. *See, e.g., Louisiana World Exposition v. Fed. Ins. Co.,* 858 F.2d 233 (5th Cir.1988). For that reason, courts and commentators have acknowledged that the debtor-in-possession "often acts under the influence of conflicts of interest." *Canadian Pa. Forest Prod. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.),* 66 F.3d 1436, 1441 (6th Cir.1995). These conflicts of interest can arise even in situations where there is no concern that a debtor's management is trying to save its own skin. For example, a debtor may be unwilling to pursue claims against individuals or businesses, such as critical suppliers, with whom it has an ongoing relationship that it fears damaging. *Id.* at 1439. Finally, even if a bankrupt debtor is willing to bring an avoidance action, it might be too financially weakened to advocate vigorously for itself. In any of these situations, the real losers are the unsecured creditors whose interests avoidance actions are designed to protect.

The possibility of a derivative suit by a creditors' committee provides a critical safeguard against lax pursuit of avoidance actions. *Amicus* Law Professors explain that parties to bankruptcy workouts are **\*574** typically sophisticated, and that they understand that their actions will likely be

scrutinized after the fact. (Law Professors' Brief at 10.) They also understand that, even though a debtor's management may be reluctant to pursue an avoidance action, a creditors' committee will not be so hesitant. Therefore, the mere threat of a creditors' committee suit is often a potent deterrent to overreaching by creditors and insiders. *See In re W. Pac. Airlines, Inc.,* 219 B.R. 575, 577–78 (D.Colo.1998) (discussing a creditors' committee's "watchdog" role). This deterrent effect remains important even after commencement of the bankruptcy case itself. [8]

## B. Potential Drawbacks of Derivative Standing for Creditors' Committees

### 1. Might derivative suits dissipate the value of the estate?

Despite these clear benefits stemming from derivative standing, *amicus* Professor Sharfman identifies reasons why it might be harmful from a policy perspective. He first argues that, although the purpose of derivative suits is presumably to maximize the value of the estate, academic research has shown that such suits frequently result in awards only large enough to pay the litigants' legal bills. *See* Roberta Romano, *The Shareholder Suit: Litigation Without Foundation?,* 7 Journal of Law, Economics and Organization 55 (1991); Jonathan R. Macey & Geoffrey P. Miller, *The Plantiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform,* 58 U. Chi. L.Rev. 1 (1991). Sharfman submits that creditors' derivative suits are even less likely to add value than are shareholders' derivative suits, for the possibility of setting aside transfers as fraudulent would make it riskier for financially distressed firms to persuade potential lenders and suppliers to do business. (Sharfman Brief at 14.) The Supreme Court recognized this concern in *Hartford Underwriters,* where it stated that "[t]he possibility of being targeted ... by various administrative claimants could make secured creditors less willing to provide postpetition financing." 530 U.S. at 13, 120 S.Ct. 1942.

**\*575** We are untroubled by this argument. To be sure, there are situations where derivative suits recover only enough to pay the lawyers, but that concern is lessened by the need to obtain bankruptcy court approval before pursuing an action. There is no inherent reason why a debtor would be able to prosecute an avoidance claim more cheaply than a creditors' committee could, so there is no reason why a creditor suing derivatively would dissipate more value than would a debtor suing directly. Likewise, although the possibility of an avoidance action might trouble a prospective supplier or

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

lender, that is an argument not against derivative standing, but against avoidance actions generally. Congress, however, has clearly decided that such actions are valuable to the Chapter 11 process, and we will not second-guess that judgment. The concern that derivative suits might be "value-dissipating" is adequately served by affording a debtor the deference normally accorded pursuant to the business judgment rule. When a debtor's action is beyond the scope of that deference, however, Congress's intent is best served by ensuring that an action is filed, even if by a creditors' committee. At all events, the Bankruptcy Court in this case concluded that the estate *ought* to have brought the avoidance claim in question.

## 2. Might bankruptcy courts be unable to identify meritorious claims?

Professor Sharfman also takes issue with the idea that a bankruptcy court can serve as a competent gatekeeper for the purpose of deciding when to authorize derivative standing. He submits that the idea that "judges in bankruptcy cases will permit only value enhancing derivative litigation to go forward (rather than all litigation that is merely colorable) is more wishful thinking than serious argument. It is often hard to tell at the outset when permission to prosecute derivative litigation is sought whether a claim is meritorious, and judges understandably can make mistakes." (Sharfman Brief at 15) (citing Frank H. Easterbrook & Daniel R. Fischel, *The Economic Structure of Corporate Law* 102 (1991)). From this observation, he concludes that "creditors could well recover more in the aggregate if creditor derivative suits were impermissible across the board." (*Id.* at 16.)

It is doubtless true that judges, like trustees or debtors, sometimes lack sufficient information to determine *ex ante* whether a claim is value-enhancing or merely colorable. But it does not follow that creditors would likely recover more if derivative suits were impermissible. First, this assumes that the debtor-in-possession would be better able to identify valuable claims than a bankruptcy court would be. There is no reason this should be true, for, as discussed above, conflicts of interest can often cloud debtors' judgment—it is difficult objectively to determine whether a potential action is meritorious when one would be a defendant in that action.

Second, this argument assumes that creditors' committees are rather unsophisticated, for it predicts that the estate, and hence its creditors, would be better off if no avoidance actions took place. If that were true, presumably creditors' committees would know it, and would not seek to bring the sort of action at issue today. Third, this critique overlooks the fact that

the choice at hand is not between derivative actions and no actions. Instead, if a bankruptcy court cannot authorize a derivative suit when it concludes that a debtor is unreasonably refusing to pursue an action, it will likely take the alternative step of ordering the debtor itself to pursue that action. That step is unlikely to yield a vigorous prosecution of the claim, yet it **\*576** would incur all of the costs of a derivative suit.

Most fundamentally, however, the problem with the "courts cannot identify meritorious claims" critique is that it is one of futility. The proposition that a bankruptcy court cannot reliably determine when a debtor is not maximizing value is, at bottom, an argument that bankruptcy courts are not capable of doing many of the things we depend on them to do. They are, for example, instrumental in approving the bankruptcy plan itself and determining whether to appoint an examiner or trustee, and they are frequently called upon to weigh the merits of proposed first-day orders. It seems to us that we have no choice but to presume the competency of bankruptcy courts throughout the process, and we are therefore unwilling to place much stock in the claim that they are unable to determine when a debtor is unreasonably refusing to pursue an avoidance action.

## 3. Might derivative suits consume judicial resources?

Lastly, *amicus* Professor Sharfman warns that determining whether a derivative suit should be maintained and, if so, who should maintain it, takes time and effort on the part of the court. The Court in *Hartford Underwriters* was concerned about this cost, observing that "the possibility of multiple [ ] claimants" created by "[a]llowing recovery to be sought at the behest of parties other than the trustee could [ ] impair the ability of the bankruptcy court to coordinate proceedings, as well as the trustee to manage the estate." 530 U.S. at 12–13, 120 S.Ct. 1942. Professor Sharfman points out that in the case at bar, the issue of whether the Committee could pursue a derivative claim consumed significant judicial time and effort that would not have been necessary if creditors lacked derivative standing. We disagree. Rather, we believe that the cost that Sharfman laments arises from uncertainty regarding the propriety of derivative suits, a matter resolved by this appeal. If derivative standing is unambiguously permissible, it is not unduly burdensome to determine whether any particular creditor or committee should have that standing.

In general, although we agree that derivative standing does not come without costs, we are satisfied that on the whole it is an immensely valuable tool for bankruptcy courts and creditors alike. It helps to deter fraudulent transfers in the first

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

instance, and it provides courts with a viable remedy when those transfers nonetheless occur.

## C. Possible Substitutes for Derivative Standing for Creditors' Committees

Lincolnshire does not deny that derivative standing for creditors' committees is potentially beneficial, but it contends that such standing is not as critical as the Committee suggests because bankruptcy courts, and committees themselves, have many other remedies available. We explore these in turn.

### 1. Appointment of a bankruptcy trustee

Lincolnshire first argues that, although the usual Chapter 11 case proceeds without a bankruptcy trustee, a creditors' committee can move to appoint one pursuant to § 1104. That provision allows any "party in interest" (including a creditors' committee) to request appointment of a trustee "for cause," or if the appointment would be "in the interests of creditors." 11 U.S.C. § 1104(a). "Cause" to appoint a trustee may include "fraud, dishonesty, incompetence, or gross mismanagement ... either before or after commencement of the case." Id. § 1104(a)(1). Lincolnshire posits that a trustee's independent nature would allow it to pursue avoidance claims **\*577** without the conflicts of interest that can affect debtors-in-possession.

[23]    [24]    [25]    *Amici* Law Professors aptly respond that disallowing derivative suits and forcing creditors' committees to move to appoint trustees would amount to "replac[ing] the scalpel of derivative suit with a chainsaw." (Law Professors' Brief at 13.) Appointing a trustee in a Chapter 11 case is an "extraordinary" remedy, 7 *Collier on Bankruptcy* ¶ 11402[1] (15th rev. ed. 1998), and there is a corresponding "strong presumption" that the debtor should be permitted to remain in possession. *In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 471 (3d Cir.1998). The problem is that appointing a trustee amounts to replacing much of a debtor's high-level management, and that creates immense costs in two ways. First, there is a statutory fee (which can be substantial) to which trustees are entitled for their services. *See* 11 U.S.C. §§ 326(a) (setting forth fee schedule), 330(a) (setting forth trustee's right to compensation); *cf.* 11 U.S.C. § 1107(a) (providing that debtors-in-possession are not entitled to statutory trustee's fees).[9] More important, however, is the cost implicit in replacing current management with a team that is less familiar with the debtor specifically and its market generally. The idea that existing management is best positioned to rescue a debtor from bankruptcy is precisely

the reason why the appointment of a trustee is exceptional in Chapter 11 reorganizations, but occurs immediately in Chapter 7 liquidations. *See* Kenneth N. Klee & K. John Shaffer, *Creditors' Committees Under Chapter 11 of the Bankruptcy Code,* 44 S.C. L. Rev. 995, 1045, 1049 (1993) (observing generally that "the incremental costs" of a trustee usually "outweigh[ ] the benefits," and that "maximization of value rarely lies down this path.").

In short, we believe that appointing a trustee is too drastic a step to constitute a serious alternative to allowing derivative suits by creditors' committees. Indeed, because much of Chapter 11 is premised on allowing current management to remain in control of the debtor, it is unlikely that Congress intended to force a court to displace that management in the relatively commonplace event that a debtor makes a questionable decision not to prosecute a fraudulent avoidance claim.

### 2. Appointment of an examiner with authority to sue

[26]    *Amicus* Smurfit–Stone Corporation submits that, if appointing a trustee is too radical an alternative, a creditors' committee might instead move the court to appoint an examiner under § 1104(c). That provision states that "a party in interest" may request the appointment of an examiner "to conduct such an investigation of the debtor as is appropriate," and that the court may order an appointment after notice and a hearing. An examiner's duties include investigation of the debtor, the debtor's business, and "any other matter relevant to the case or to the formation of a plan." *See* § 1106(b). Smurfit–Stone observes that a debtor's management remains in place when an examiner is appointed. Perhaps most important, however, is the fact that an examiner has all "of the duties of a trustee that the court orders the debtor in possession not to perform." 11 U.S.C. § 1106(b). At least one court has interpreted this language to mean that an examiner may initiate and pursue causes of action on behalf of the debtor. *See In re Carnegie International* **\*578** *Corp.,* 51 B.R. 252, 256 (Bankr.S.D.Ind.1984).

[27]    [28]    Although this alternative is less drastic than the appointment of a trustee, we nevertheless harbor doubts about its ability to substitute for derivative suit. One concern is that, like a trustee, an examiner would incur direct costs through its fees, so to that extent this remedy is inferior to the alternative of derivative suit by a creditors' committee. The more serious problem, however, is that it is less than obvious that § 1106(b) actually *does* permit examiners to

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

initiate actions on the debtor's behalf. The full text of that section states:

> An examiner appointed under section 1104(d) of this title shall perform the duties specified in paragraphs (3) and (4) of subsection (a) of this section, and, except to the extent that the court orders otherwise, any other duties of the trustee that the court orders the debtor in possession not to perform.

11 U.S.C. § 1106(b). Although this catch-all language is expansive, it is subject to the interpretive canon *ejusdem generis,* which states that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar to those enumerated by the preceding specific words." *Circuit City Stores,* 532 U.S. at 114–15, 121 S.Ct. 1302 (citation omitted). Sections (3) and (4) allow the examiner to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other [relevant] matter," and also to "file a statement of investigation." 11 U.S.C. §§ 1106(a)(3)-(4). Critically, these sections permit only investigating and reporting on that investigation – they stop far short of authorizing examiners to litigate based on their findings.

Therefore, although an examiner's proper role in Chapter 11 proceedings is hardly at issue in this case, we conclude that § 1106(b)'s broad grant is most naturally interpreted to authorize only acts relating directly to investigation. This conclusion comports with Congress's evident understanding of the examiner's role, for the sponsors of the Code stated: "The investigation of the examiner is to proceed on an independent basis from the procedure of the reorganization under chapter 11 in order to ensure that the examiner's report will be expeditious and fair." 124 Cong. Rec. H11,103 (daily ed. Sept. 28, 1978), *reprinted in* 1978 U.S.C.C.A.N. 6472–73. This independent role would likely be jeopardized by an examiner's litigation against a debtor, and we therefore do not believe that an examiner can serve as a substitute for either a trustee or a creditors' committee for the purpose of avoiding fraudulent transfers.

### 3. Moving the court to order the debtor-in-possession to sue

The third option advanced is that a creditors' committee could move the bankruptcy court to order the debtor to file an avoidance action. In the case at bar, the Bankruptcy Court would no doubt have granted the Committee's motion to compel that action, for it made a finding of fact that the debtor's refusal to bring suit was unreasonable. But this solution is not realistic—given management's sometimes severe conflicts of interest, a court order to file an avoidance action would frequently amount to instructing management to sue itself. To put it mildly, that is unlikely to result in vigorous prosecution of the claim.

### 4. Converting the bankruptcy case to Chapter 7

The District Court observed that if the Committee could not bring a derivative **\*579** avoidance action, it might instead convert the case to a Chapter 7 liquidation or dismiss the petition pursuant to 11 U.S.C. § 1112. These solutions are far more radical than even the appointment of a trustee. Converting the case to Chapter 7 would cause the immediate appointment of a trustee, the option rejected *supra,* and would cause dissolution of the Committee. More importantly, though, Chapter 7 proceedings are liquidations, and this option would amount to instructing management: "Pursue this action, or we will move to dissolve your company." While that might yield results, such coercion is unlikely to yield a zealous prosecution of the claim. It also washes out the baby with the bath water, for the principal purpose of Chapter 11 is to avoid liquidating viable businesses.

Moving to dismiss the bankruptcy petition makes no more sense. Bankruptcy brings with it many advantages for a debtor, such as the power to avoid union contracts and to defer or even avoid short-term financial commitments. Dismissing a bankruptcy petition might therefore be the equivalent of forcing a company to close its doors. That, of course, is hardly an alternative to derivative standing.

### 5. Moving the bankruptcy court to authorize a committee to bring a post-confirmation avoidance action

Finally, *amicus* Smurfit–Stone notes that a creditors' committee might be authorized to bring a post-confirmation avoidance action in a plan of reorganization. *See* 11 U.S.C. § 1123(b)(3)(B). It submits that this would give a creditors' committee the ability to protect its interest in a variety of ways. First, although § 1121(b) provides a debtor-in-possession with 120 days of exclusivity in which to file a plan of reorganization, any extension of that period requires leave of court. *See* 11 U.S.C. § 1121(d). Smurfit–Stone suggests

that a committee might object to any motion to extend that period unless the debtor-in-possession agrees to pursue the action itself, or to file a plan permitting the committee to pursue the action. Alternatively, a committee may safeguard its interests by filing its own plan of reorganization once the exclusivity period expires. Finally, the committee might move to terminate the exclusivity period in order to expedite the filing of its own plan.

These are indeed options open to committees, but like the other alternatives discussed *supra,* they would be far more disruptive to the reorganization process than the simple step of allowing a creditors' committee to sue derivatively. The problem with ending exclusivity, either by moving immediately or objecting to an extension of the initial 120–day window, is that it would lead immediately to a sea of direct claims that were previously channeled through the debtor. In other words, although a particular creditor might be able to sue to recover its fraudulently conveyed property, so too might every other creditor and claimant. To the extent Congress has determined that exclusivity is valuable to a reorganization, this would be a highly disruptive substitute. There is no reason to suppose that Congress intended to leave only this option available to creditors' committees when a debtor unreasonably refuses to pursue an avoidance action.

**6. Summary**

We conclude that, on balance, derivative standing is a valuable tool for creditors and courts alike in Chapter 11 proceedings, and we do not believe that any of the proffered alternatives could serve as a realistic substitute for that standing. Because it helps to ensure that creditors' claims are not frustrated by fraudulent transfers, derivative standing seems clearly to "give effect to the policy of the legislature."
 **\*580** *Mitchell,* 361 U.S. at 292, 80 S.Ct. 332, and bankruptcy courts' equitable powers therefore allow them to confer such standing upon creditors' committees.

**VII. Conclusion**

For the foregoing reasons, we are satisfied that bankruptcy courts can authorize creditors' committees to sue derivatively to avoid fraudulent transfers for the benefit of the estate. We will therefore reverse the District Court's decision denying the Committee derivative standing. We will remit to the original Panel of this Court the issues whether: (1) the Committee was required to identify a present creditor in order to sustain its

fraudulent transfer claims; (2) Cybergenics had at least one unpaid creditor at the time of the alleged fraudulent transfer; (3) the heightened pleading standard of Fed. R. Civ. Proc. 9(b) is applicable to the Committee's complaint; (4) the Committee was entitled to amend its complaint under Fed. R. Civ. Proc. 17(a); and (5) the Committee has abandoned its claim of equitable subordination.

FUENTES, Circuit Judge, with whom Circuit Judges Sloviter, Alito and Smith join, dissenting.

In this case, the majority interprets the phrase "the trustee may," in § 544(b)(1) of the Bankruptcy Code, to mean that the trustee *and* a creditors' committee may seek recovery under the statute. Although the majority does not conclude that the phrase is ambiguous or that its meaning is in any way obscure, it has, nonetheless, broadened the statute to add a party that Congress specifically omitted. The majority reasons that, while no specific statutory authority grants a creditors' committee standing, several Code provisions, pre-Code practice, public policy, and the bankruptcy court's equitable powers all combine to afford a creditors' committee "derivative" standing under § 544(b)(1). I respectfully disagree. The majority's view is inconsistent with the plain and natural reading of § 544, is not supported by the Code provisions it cites, is not adequately grounded in prior practice and, perhaps more importantly, is inconsistent with the Supreme Court's plain meaning analysis of the identical phrase in *Hartford Underwriters.* Accordingly, I respectfully dissent.

**I.**

The central question here is whether the Committee has standing to seek relief under § 544(b)(1). I begin, as did the Supreme Court in *Hartford Underwriters,* with the observation that "Congress 'says in a statute what it means and means in a statute what it says there.' " 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (quoting *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)). I note as well that the "analysis of any statute, including the Bankruptcy Code, must not begin with external sources, but with the text itself." *Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 459, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) (Thomas, J., concurring) (citing *Germain,* 503 U.S. at 253–54, 112 S.Ct. 1146; *Union Bank v. Wolas,* 502 U.S. 151, 154, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991)).

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

Section 544(b)(1) contains no textual ambiguity. The statute, by its express terms, provides for specific action and authorizes only the trustee to act. In *Hartford Underwriters,* the Supreme Court recognized that, " '[w]here a statute ... names the parties granted [the] right to invoke its provisions, ... such parties only may act.' " 530 U.S. at 6–7, 120 S.Ct. 1942 (quoting 2A N. Singer, Sutherland on Statutory Construction § 47.23, p. 217 (5th ed. 1992)). The Court also observed that "a situation in which a statute authorizes specific **581 action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity." *Id.* at 6, 120 S.Ct. 1942. That is precisely the circumstance here. Section 544 provides for the avoidance of "any transfer of an interest" of the debtor's property and it designates the trustee, and only the trustee, as the party who may act under the statute. We should not, therefore, presume that we have a free hand to broaden a right which Congress has made exclusive.

Clearly if Congress had wanted to authorize a party other than the trustee to invoke the remedies of § 544, it could simply have done so as it has in many other provisions of the Bankruptcy Code.[1] Since Congress has specifically authorized a creditors' committee to act in various other provisions of the Code, but has not done so with regard to § 544, we should " 'presume[ ] that Congress act[ed] intentionally and purposely in the disparate ... exclusion.' " *Duncan v. Walker,* 533 U.S. 167, 173, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (quoting *Bates v. United States,* 522 U.S. 23, 29–30, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997)). Indeed, as the Court noted in *Hartford Underwriters,* "the fact that the sole party named—the trustee—has a unique role in bankruptcy proceedings makes it entirely plausible that Congress would provide a power to him and not to others." 530 U.S. at 7, 120 S.Ct. 1942.[2]

As the Supreme Court stated, when the language of a statute is plain, as it is here, " 'the sole function of the courts'—at least where the disposition required by the text is not absurd—'is to enforce it according to its terms.' " *Hartford Underwriters,* 530 U.S. at 6, 120 S.Ct. 1942 (quoting *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting **582 *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))). The plain text of § 544 makes clear that only the trustee may invoke the remedies under the statute.

**II. Other Code Provisions**

The majority does not contend that enforcing § 544 as written would produce an absurd result. Nevertheless, the majority looks beyond the text of § 544 to determine whether a creditors' committee has "derivative" standing. Specifically, the majority asserts that §§ 1109(b) and 1103(c)(5) of the Bankruptcy Code, paired with § 503(b)(3)(B), make it "unmistakably clear that Congress approved of creditors' committees suing derivatively to recover property for the benefit of the estate." I respectfully disagree. The majority also contends that § 544 must be considered in light of the equitable powers of the bankruptcy courts, pre-Code practice, and policy concerns. I address these arguments in turn.

**A. *Section 1109(b)***

Section 1109(b) states that a "party in interest, including the debtor, the trustee, a *creditors' committee,* an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, *may raise and may appear and be heard on any issue in a case under [Chapter 11]."* 11 U.S.C. § 1109(b) (emphasis added). This Court has liberally construed § 1109(b) to grant a creditors' committee a broad right to be heard, including among other powers, an unconditional right to intervene in a Chapter 11 adversary proceeding that has been initiated by a trustee. *See Phar–Mor, Inc. v. Coopers & Lybrand,* 22 F.3d 1228, 1232 (3d Cir.1994); *Matter of Marin Motor Oil, Inc.,* 689 F.2d 445, 446 (3d Cir.1982), *cert. denied,* 459 U.S. 1207, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983).

However, this provision does not confer authority upon a creditors' committee to *initiate* an action when the trustee or debtor-in-possession declines to bring suit. Section 1109(b) only establishes a right to be heard by way of *intervention* as a party plaintiff when a proceeding has already been brought by the statutorily authorized party. Courts that have found authority for creditors to bring avoidance actions under this provision have noted that "a general right to be heard would be an empty grant unless those who had such a right were allowed to act when those who should act did not." *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1363 (5th Cir.1986) (quoting 5 *Collier on Bankruptcy* ¶ 1109.02(3) (15th ed. 1986)). Yet § 544(b), read in light of *Hartford Underwriters,* grants an exclusive right of action to the trustee, and a broad "right to be heard" provision may not

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 356 of 540

Official Committee of Unsecured Creditors of Cybergenics..., 330 F.3d 548 (2003)
41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

expand the intent evidenced by the plain, specific language used by Congress in § 544(b).

Any doubt on this question is eliminated by the Supreme Court's statement in *Hartford Underwriters,* albeit in dicta, indicating that the Court would not read § 1109(b) to allow a non-trustee to bring suit under a provision stating only that "the trustee may." After acknowledging that § 1109(b) was "by its terms inapplicable" in *Hartford Underwriters* because the case arose under Chapter 7 rather than Chapter 11, the Court stated, "[i]n any event, we do not read § 1109(b)'s general provision of a right to be heard as broadly allowing a creditor to pursue substantive remedies that other Code provisions make available only to specific parties." 530 U.S. at 8–9, 120 S.Ct. 1942 (citing 7 L. King, Collier on Bankruptcy & ¶ 1109.05 (rev. 15th ed. 1999) ("In general, section 1109 does not bestow any right to usurp the trustee's role as representative of the estate with respect to the initiation of certain types of litigation that belong exclusively to the estate.")). This is consistent **\*583** with our prior interpretation of § 1109(b), and it strengthens my view of the statute.

### B. *Section 1103(c)(5)*

Section 1103(c)(5) of the Bankruptcy Code provides that "[a] committee appointed under section 1102 of this title may perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5). This section does not, as the majority acknowledges, confer express authority for the Committee "independently to initiate an adversary proceeding, including one under § 544(b)." Nonetheless the majority argues that such authority may be found in the "flexible representation" role of a creditors' committee evidenced by § 1103(c)(5). I do not read § 1103(c)(5) to suggest, in any way, a committee's authority to file a lawsuit.

The powers granted to committees under § 1103(c)(1)-(4) are very specific. They include the power to (1) *consult* with the trustee or debtor, (2) *investigate* the debtor's acts and financial condition, (3) *participate* in the bankruptcy plan, and (4) *request* the appointment of an examiner.

None of these provisions support the authority to initiate a lawsuit. Since the grants of power in (1) to (4) are quite narrow and non-adversarial, the catch-all power should be similarly confined. *See Federal Maritime Comm'n v. Seatrain Line, Inc.,* 411 U.S. 726, 734, 93 S.Ct. 1773, 36 L.Ed.2d 620

(1973); *see also Norfolk and Western Ry. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 129, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) ("Under the principle of *ejusdem generis,* when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration."). Because Congress authorized only limited, discrete rights of participation for a committee in § 1103(c)(1)-(4), we should not read § 1103(c)(5) to grant a broad, implied power to initiate a suit under general language regarding "other services as are in the interest of those represented."

### C. *Section 503(b)(3)(B)*

The majority argues that, while §§ 1109 and 1103 provide "at best indirect evidence that Congress granted bankruptcy courts the power to confer derivative standing" upon creditors' committees, a third section, 503(b)(3)(B), provides "far more direct insight into bankruptcy courts' powers." I disagree on this point as well.

Federal courts have consistently held that § 503(b)(3)(B) does not itself confer standing. Instead, this section merely authorizes the recovery of certain administrative expenses incurred by "a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor." 11 U.S.C. § 503(b)(3)(B). Thus, this section "only authorizes recovery of expenses to a creditor who successfully recovered property, which is to say, a creditor who had standing in the first place." *In re SRJ Enterprises, Inc.,* 151 B.R. 189, 193 n. 1 (Bankr.N.D.Ill.1993). *See also In re Vogel Van & Storage, Inc.,* 210 B.R. 27, 32 n. 4 (N.D.N.Y.1997); *Surf N Sun Apts., Inc. v. Dempsey,* 253 B.R. 490, 492 (M.D.Fla.1999). If a creditor does not have standing to prosecute a claim under § 503(b)(3)(B), there would seem to be even less support for the idea that this section confers *derivative* standing on a committee of creditors.

Nevertheless, the majority argues that "the most natural reading of § 503(b)(3)(B) is that it recognizes and rewards monetarily the practice of permitting creditors' committees ... to pursue derivative actions." I again disagree. The plain reading of § 503(b)(3)(B) is that it permits "a creditor," not a creditors' committee, to recover expenses. Indeed, the most prevalent **\*584** use of § 503(b)(3)(B), based on my review of the cases citing this provision, is to compensate *individual creditors* who object to discharge and then successfully locate

Official Committee of Unsecured Creditors of Cybergenics..., 330 F.3d 548 (2003)

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

and bring into the estate assets that had been transferred or concealed by the debtor. *See, e.g., In re George,* 23 B.R. 686, 687 (Bankr.S.D.Fla.1982); *In re Antar,* 122 B.R. 788, 791 (Bankr.S.D.Fla.1990); *In re Spencer,* 35 B.R. 280, 281 (Bankr.N.D.Ga.1983); *In re Rumpza,* 54 B.R. 107, 108 (Bankr.D.S.D.1985); *In re Humphreys Pest Control Co., Inc.,* 1990 WL 191859, at *2 (Bankr.E.D.Pa. Nov. 30, 1990), *aff'd,* 1991 WL 136195 (E.D.Pa. July 18, 1991). *See also* Judy Simmons Henry, *Recovery of Creditors' Costs from the Bankruptcy Estate: Reasonable, Necessary, and ... Uncertain,* 18 U. ARK. LITTLE ROCK L.J., 199, 208–19 (1996) (discussing cases in which *individual* creditors have been allowed to recover their expenses under § 503(b)(3) (B)); Gregg D. Johnson, *Recovering a Creditor's Expenses and Legal and Accounting Fees as an Administrative Claim,* 5 BANKR. DEV. J. 463, 470–79 (1988) (same). In light of the plain language of the statute and its prevalent use, the majority's view that § 503(b)(3)(B) rewards creditors' committees for pursuing derivative actions is unpersuasive.

In fact, committees recover expenses under a different Code provision. That is because creditors' committees are typically represented by an attorney and § 330 of the Code specifically provides compensation for fees and expenses of the committee's representative. Sections 330(a)(1)(A) and (B) allow for "reasonable compensation" as well as "reimbursement for actual, necessary expenses" incurred by the committee's representative. 11 U.S.C. §§ 330(a)(1)(A), (B). In sum, § 503(b)(3)(B) is not the proper provision for awarding creditors' committees expenses and is not an appropriate basis from which to infer that Congress authorized creditors' committee derivative actions under § 544. *See In re S.W.G. Realty Associates, II, L.P.,* 265 B.R. 534, 539 (E.D.Pa.2001) (explaining that creditors' committees' eligibility for compensation is based on § 330(a), not § 503(b)(3)(B)); *In re UNR Industries, Inc.,* 736 F.2d 1136, 1139 (7th Cir.1984) (stating that § 330 "provides for reimbursement of expenses incurred by professional persons hired by the Committee with court approval ...").

Neither §§ 1109(b), 1103(c)(5), or 503(b)(3)(B), taken separately or together, provide sufficient statutory authority for the practice invoked by the Committee and approved by the bankruptcy court in this case. Because these Chapter 11 provisions granting significant authority to creditors' committees do not go as far as to allow such committees to initiate avoidance actions, no matter whether the trustee fails to act and/or the creditors secure court approval, I cannot distinguish *Hartford Underwriters,* as the majority

does, simply on the basis that *Hartford Underwriters* was a Chapter 7 case while here we consider a case under Chapter 11. The Committee urges this Court to go beyond a "cursory reading" of § 544(b) and examine other provisions of the Code. I have done so, and can find no provision which grants the Committee the authority denied to it in § 544(b).

### III. Reliance on Equity to Confer Standing

The majority writes that while "none of the three sections discussed—1109(b), 1103(c)(5), or 503(b)(3)(B)—seems directly to *authorize* ... standing .... [w]e believe that the missing link is supplied by bankruptcy courts' equitable power...." To be sure, bankruptcy courts are equitable tribunals that apply equitable principles. But courts of equity must still follow the law. *See* **\*585** *Magniac v. Thomson,* 56 U.S. 281, 299, 15 How. 281, 14 L.Ed. 696 (1853) ("[w]herever the rights or the situation of parties are clearly defined and established by law, equity has no power to change or unsettle those rights or that situation, but in all such instances the maxim *equitas sequitur legem* is strictly applicable."). The Code is the law here and equity cannot be used to change the clear and plain language of a Code provision. This is especially true regarding a provision in which Congress explicitly specified the party authorized to act. As the Supreme Court has observed, whatever equitable powers bankruptcy courts have, they "must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). In this regard, this Court has noted that equity does not " 'give the court the power to create substantive rights that would otherwise be unavailable under the Code.' " *United States v. Pepperman,* 976 F.2d 123, 131 (3d Cir.1992) (quoting *In re Morristown & Erie R.R. Co.,* 885 F.2d 98, 100 (3d Cir.1989)); *see also In re Jamo,* 283 F.3d 392, 403 (1st Cir.2002) (stating that equity may be invoked only if the equitable remedy dispensed by the court "is necessary to preserve an identifiable right conferred elsewhere in the Bankruptcy Code.").

What happens if we adopt the principle inherent in the majority's reasoning, that a court may use its equitable power to confer standing to a party that is explicitly omitted from a statute? The Code contains nearly 40 provisions that authorize only the trustee to act. [3] Could a bankruptcy court broaden standing to act under one provision or narrow standing under a different provision depending on its view of the equities involved? I would say not. If it were otherwise, the Supreme

Official Committee of Unsecured Creditors of Cybergenics..., 330 F.3d 548 (2003)

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

Court might very well have thought it "equitable" to broaden the phrase "the trustee may" in § 506(c) and allow the administrative claimant to recover in *Hartford Underwriters.* It did not. If the language of the Code is not ambiguous, it seems to me simply wrong to use equity to confer derivative standing where the statute specifically names the parties who may act.

**\*586** For other reasons, I do not share the majority's confidence in relying on equity as a basis for expanding § 544(b) to permit creditors' committees to bring avoidance actions derivatively. In an analogous area, shareholder derivative actions, our jurisprudence demonstrates that equity should not be used to enlarge the category of eligible plaintiffs.

In the historical development of shareholder derivative actions, federal courts had attempted to use equity as the basis for enlarging the category of eligible plaintiffs and to permit equitable owners of stock to bring suit. *See, e.g., Arcola Sugar Mills Co. v. Burnham,* 67 F.2d 981, 982 (5th Cir.1933), *cert. denied,* 292 U.S. 630, 54 S.Ct. 640, 78 L.Ed. 1484 (1934) (enlarging the category of plaintiffs to include a pledgee of stock who had the right to protect his interests and prevent the dissipation of corporate assets). However, following the Supreme Court's decision in *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this Court was the first to hold that, for purposes of derivative actions, state substantive law squarely controlled the definition of an eligible plaintiff. *See Gallup v. Caldwell,* 120 F.2d 90, 93 (3d Cir.1941); *see also* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 1826, at 44 n. 10 (1986). Implicit in our decision in *Gallup* is the notion that, for purposes of shareholder derivative actions, federal courts were no longer permitted to broaden the concept of a "shareholder" on the grounds of equity or otherwise. Although there are significant differences between shareholder derivative actions and § 544(b) actions, our experience with the former is relevant in one critical respect: where the text of a statute is unambiguous as to who may bring suit, principles of equity do not provide a basis for enlarging the category of eligible plaintiffs.

### IV. Pre–Code Practice and Policy Concerns

After completing its comprehensive textual analysis in *Hartford Underwriters,* the Supreme Court concluded: "[b]ecause we believe that by far the most natural reading

of § 506(c) is that it extends only to the trustee, petitioner's burden of persuading [the Court] that the section must be read to allow its use by other parties is 'exceptionally heavy.' " 530 U.S. at 9, 120 S.Ct. 1942 (citations omitted). The Supreme Court also explained that, while pre-Code practice informs the interpretation of statutory provisions that have "ambiguity in the text," pre-Code practice may not to be used as "an extratextual supplement." *Id.* at 10, 120 S.Ct. 1942. Based on these principles, the Supreme Court held that the phrase "the trustee may" in § 506, the identical phrase found in § 544(b)(1) and under review here, "leaves no room for clarification by pre-Code practice" and that "[p]re-Code practice cannot transform § 506(c)'s reference to 'the trustee' to 'the trustee and other parties in interest.' " *Id.* at 11, 120 S.Ct. 1942.[4]

I do not believe that the phrase "the trustee may," which the Supreme Court found to be unambiguous in one section of the Code, becomes ambiguous simply because it appears in a different Code provision. The fact that *Hartford Underwriters* involved a Chapter 7 proceeding while the present case involves a Chapter 11 proceeding is of no consequence because, as previously explained, no other Code **\*587** provision under either chapter renders the phrase ambiguous or alters its meaning to allow courts to authorize derivative suits. Because the language of § 544 is clear, a review of pre-Code practice is totally unnecessary. The same is true with regard to the public policy concerns discussed by the majority. In light of the clear import of the language of § 544 and because the result that language commands is not absurd, there is no need to explore the public policy implications of derivative standing.

One final point. At oral argument, the Court and the parties explored other possibilities which may be available to creditors' committees, such as: (1) seeking appointment of a trustee or an examiner to pursue allegedly fraudulent transfers; (2) requesting a bankruptcy court order compelling the debtor in possession to act; or (3) seeking an order lifting the automatic stay to allow a creditors' committee to pursue a fraudulent transfer action in state court on the condition that any assets recovered are brought back to the estate. We are not called upon, in this case, to decide the viability of these or other possibilities. However, the many possibilities raised demonstrate that holding that creditors' committees lack derivative standing to pursue § 544 actions will not necessarily result in forfeiture of potentially valuable causes of action.

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

## V. Conclusion

The Bankruptcy Code does not authorize bankruptcy courts to grant derivative standing to creditors' committees and the Supreme Court has rejected the notion that the federal courts have any policy-making role in construing clear statutory language. If it is a good idea for creditors' committees to have standing, that is a matter for Congress, not the courts, to decide. *Hartford Underwriters,* 530 U.S. at 13–14, 120 S.Ct. 1942. For the foregoing reasons, I would affirm the judgment of the District Court dismissing the Committee's complaint for lack of standing.

## Parallel Citations

41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

## Footnotes

\*      Amended per order dated 11/19/01
            Amended per order dated 3/21/02

\*\*      Judge Becker completed his term as Chief Judge on May 4, 2003.

\*\*\*      Judge Scirica succeeded to the position of Chief Judge on May 4, 2003.

\*\*\*\*      Joining Professor Lipson on the brief are Professors Ralph Brubaker, Daniel J. Bussel, Kenneth N. Klee, Stephen J. Lubben, Walter J. Taggart, Elizabeth Warren, and William J. Woodward.

1      Scott Chinery died on October 24, 2000. Kathleen Chinery, his wife and the executrix of his estate, has been substituted as a defendant in this case.

2      This amount was later reduced to $60 million in settlement of a lawsuit by Lincolnshire against L & S and Chinery alleging fraud, breach of fiduciary duty, and breach of contract relating to the sale.

3      These include conclusions that: (1) the Committee could identify no present creditor, a requirement for maintaining an action to avoid a fraudulent transfer; (2) Cybergenics had no unpaid creditors holding unsecured claims at the time of the alleged fraudulent transfer; (3) the heightened pleading standard of Fed. R. Civ. Proc. 9(b) is applicable to the Committee's complaint, and it failed to plead with sufficient particularity; (4) the Committee was not entitled to amend its complaint under Fed. R. Civ. Proc. 17(a); and (5) the Committee abandoned its claim of equitable subordination.

4      As discussed more fully *infra,* section 1107 gives Chapter 11 debtors-in-possession all powers normally associated with trustees in the usual event that no trustee is appointed.

5      In this regard, the case at bar is the exception to the rule, for after filing under Chapter 11, Cybergenics decided to liquidate rather than reorganize. Critically, however, unlike the debtor in *Hartford Underwriters,* Cybergenics never converted its case from Chapter 11 to Chapter 7. Its bankruptcy therefore remains governed by the Chapter 11 "reorganization" rules.

6      The dissenting opinion suggests that because creditors' committees are typically represented by attorneys, their expenses are properly reimbursed under sections 330(a)(1)(A) and (B), rather than under section 503(b)(3)(B). Those sections provide for "reasonable compensation" as well as "reimbursement for actual, necessary expenses" incurred by a committee's representative, such as an attorney. 11 U.S.C. § 330(a)(1)(A), (B). Also, under this view, section 503 properly addresses only individual creditors, not creditors' committees.

        We do not believe that it would be proper to embark *sua sponte* on a lengthy analysis of Section 330(a)'s role in bankruptcy proceedings—that section was not cited in any brief submitted in this case. Suffice it to say that it is not obvious that section 330(a) displaces section 503(b)(3)(B) in this situation, as the two sections contain key differences. One difference is that section 330(a) does not provide compensation for a committee's expenses that are not incurred *by an attorney,* and such costs may be considerable. Another is that while section 503, section 330(a) contains no language limiting compensation to a creditor "that recovers," thus raising the specter of creditors' committees seeking reimbursement for *failed* attempts at recovery. As for the proposition that section 503 addresses only individual creditors, not creditors' committees, we set forth in the text *infra* our reasons for concluding otherwise.

7      *See Ohio Valley Bank Co. v. Mack,* 163 F. 155, 156 (6th Cir.1906) ("[W]hen the trustee refuses to appeal ... the better practice would be to order the trustee to appeal or to allow the dissatisfied creditor to appeal in his name."); *In re Roadarmour,* 177 F. 379, 381 (6th Cir.1910) ("[W]here the trustee in bankruptcy refuses to appeal... such court may, in its discretion, allow an appeal to be taken by creditors."); *In re Patterson–McDonald Shipbuilding Co.,* 288 F. 546, 548 (9th Cir.1923) (same); *In re Flanders,* 32 F.2d 654, 655 (6th Cir.1929) (same); *Fred Reuping Leather Co. v. Fort Greene National Bank of Brooklyn,* 102 F.2d 372, 373 (3d Cir.1939) (same); *Gochenour v. Cleveland Terminals Bldg. Co.,* 118 F.2d 89, 95 (6th Cir.1941) (if the court deems proper, it can give creditors the right to bring suit in the name of the debtor); *Rooke v. Reliable,* 195 F.2d 667, 668 (4th Cir.1952) (noting the well-established rule that a general creditor has no right to contest another creditor's claim or to appeal from the refusal of the court to disallow it unless,

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 360 of 540

Official Committee of Unsecured Creditors of Cybergenics..., 330 F.3d 548 (2003)
41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

upon application, the trustee has refused to do so and the district court has authorized the creditor to proceed in the trustee's name); *Dallas Cabana, Inc. v. Hyatt Corp.,* 441 F.2d 865, 868 (5th Cir.1971) (if the trustee or debtor-in-possession refuses to bring an action, creditors have the right to ask leave of the court to prosecute the action for and in the name of the trustee or debtor-in-possession); *Casey v. Baker,* 212 F. 247, 254 (N.D.N.Y.1914) (same); *In re Cook's Motors,* 52 F.Supp. 1007, 1009 (D.Mass.1943) (allowing recovery of expenses for any party that "acts in the place of the trustee in bankruptcy and not merely for his individual interest"), *rev'd on other grounds,* 142 F.2d 369 (1st Cir.1944) (granting a creditor compensation under Section 64(a)(1) for justifiably and successfully acting in the place of the trustee in bankruptcy and for the benefit of the estate); *In re Macloskey,* 66 F.Supp. 610, 612 (D.N.J.1946) (after the trustee declines to bring suit, the court can compel the trustee to proceed or allow the creditor to sue if the suit is maintained in the name of the trustee and by the order of the court).

8    Large corporate debtors routinely seek so-called "first-day" orders, in which they ask the bankruptcy court to approve such urgent matters as key-employee retention plans, the payment of pre-petition claims of critical vendors, and, most important, going-forward financing for the case. (Law Professors' Brief at 11.) The parties affected by these orders (*e.g.,* the key employees, critical vendors and lenders) often demand that the debtor waive other claims that it might have against them, such as avoidance actions. Post-petition financing orders in particular can present difficult problems for bankruptcy courts because they are extremely complex, often including provisions that cross-collateralize or "white wash" prepetition security interests. *See* David Kurtz & Rena Samole, *Bankruptcy Law & Practice Update: New Developments in an Uncertain Economy: A Satellite Program, First Day Orders,* at 2 (PLI Commercial Law Practice Course Handbook Series No. A0–00, 2001). Similarly, major vendors will often demand that the debtor release preference or comparable claims as the *quid pro quo* for doing business with the debtor.

A court facing motions for first-day orders has a difficult choice. If it disapproves of the order, it could simply refuse to issue it on the theory that the parties would renegotiate and eliminate any offending provisions. Alternatively, it could table the motion and explore the claim's underlying merits. But either choice is problematic, for first-day orders are by their nature extremely urgent—without an order approving financing for critical vendors, for example, the debtor might collapse before reorganization can occur. The possibility of a derivative suit by a creditors' committee serves Congress's goals when, by granting fist-day orders, bankruptcy courts nevertheless reserve to the creditors' committees the right to investigate and pursue claims that would otherwise be released in those orders. (Law Professors' Brief at 13.)

9    Of course, even a creditors' committee suing derivatively is entitled to recover its costs pursuant to § 503(b)(3)(B), discussed *supra.* But unlike a trustee, a creditors' committee is not entitled to a statutory fee in addition to those expenses.

1    *See, e.g.,* § 110(h)(3) (naming the debtor, the trustee, a creditor, or the United States trustee); § 328(a) (naming the trustee or a committee appointed under § 1102, *i.e.* creditors' and equity security holders' committees); § 330(a)(2) (naming the court, the United States trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest); § 331 (naming a trustee, an examiner, a debtor's attorney, or any professional person employed under §§ 327 or 1103); § 343 (naming creditors, any indenture trustee, any trustee or examiner in the case, or the trustee); § 501(a)-(c) (naming creditors, an indenture trustee, an equity security holder, an entity liable to the debtor's creditor or that has secured such creditor, the debtor, and the trustee); § 503(b)(3)(D) (naming a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under § 1102); § 707(b) (naming the court and the United States trustee, and excluding any party in interest); §§ 727(c)(1) and (d) (naming the trustee, a creditor, or the United States trustee); §§ 1104(a) & 1105 (naming a party in interest or the United States trustee); § 1110(b) (naming the trustee and the secured party, lessor or conditional vendor whose rights are protected under § 1110(a)); § 1112(b) (naming a party in interest and the United States trustee or bankruptcy administrator); § 1121(c) (naming any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee); § 1164 (naming the Surface Transportation Board, the Department of Transportation, and any State or local commission having regulatory jurisdiction over the debtor); § 1224 (naming a party in interest, the trustee, or the United States trustee); § 1229(a) (naming the debtor, the trustee, or the holder of an allowed unsecured claim); § 1307(c) (naming a party in interest or the United States trustee); § 1329(a) (naming the debtor, the trustee, or the holder of an allowed unsecured claim).

2    Congress has extended the rights and powers vested in a trustee to a debtor in possession, but has made no analogous provision for a creditors' committee. *See* 11 U.S.C. § 1107(a).

3    *See, e.g.,* § 108 (extending time for suits brought by the trustee); § 327(b) (allowing a trustee authorized to operate the business of the debtor to retain or replace professional persons employed by the debtor); § 327(e) (allowing the trustee to employ for a special purpose an attorney who has represented the debtor); § 345(a) (allowing a trustee to invest money of the estate); § 363(b)(1) (allowing the trustee to use, sell, or lease property of the estate other than in the ordinary course of business, after notice and a hearing); § 363(c)(1) (allowing the trustee to enter into transactions, "including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing"); § 363(f) (allowing the trustee to sell property free and clear of any interest in such property of an entity other than the estate); § 364 (allowing the trustee to incur secured and unsecured debt); § 365(a) (allowing the trustee to assume or

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 361 of 540

Official Committee of Unsecured Creditors of Cybergenics..., 330 F.3d 548 (2003)
41 Bankr.Ct.Dec. 98, Bankr. L. Rep. P 78,861

reject executory contracts and unexpired leases); § 365(f)(1) (allowing a trustee to assign executory contracts and unexpired leases); § 505(b) (allowing a trustee to request a determination of unpaid tax liabilities of the estate); § 506(c) (allowing a trustee to surcharge property securing an allowed secured claim); § 545 (allowing the trustee to avoid statutory liens); § 547(b) (allowing the trustee to recover preferences); § 548(a)(1) (allowing the trustee to recover fraudulent transfers); § 549 (allowing the trustee to avoid post-petition transfers of estate property); § 550(a) (allowing the trustee to recover value of avoided transfers from initial and mediate transferees); § 554 (allowing the trustee to abandon property of the estate); § 1108 (allowing a trustee to operate the debtor's business); § 1113(a) (allowing the trustee to assume or reject collective bargaining agreements); § 1114(e)(1) (instructing the trustee to pay retiree benefits); § 1146(b) (instructing the trustee to make State or local tax returns of income for the estate of individual debtors).

4    Amicus Brunstad conceded at oral argument that, were we to look to all circuit court decisions decided under the Bankruptcy Act, we would find only four or five that recognize derivative action by creditors' committees. A handful of cases do not suffice to meet appellants' "exceptionally heavy" burden of persuasion.

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 69

501 B.R. 549
United States Bankruptcy Court, S.D. New York.

In re: Residential Capital, LLC, et al., Debtors.
Official Committee of Unsecured Creditors, on
behalf of the estates of the Debtors, Plaintiff,

v.

UMB Bank, N.A., as successor indenture trustee
under that certain Indenture, dated as of June 6,
2008; and Wells Fargo Bank, N.A., third priority
collateral agent and collateral control agent under
that certain Amended and Restated Third Priority
Pledge and Security Agreement and Irrevocable
Proxy, dated as of December 30, 2009, Defendants.
Residential Capital, LLC, et al, Plaintiffs,

v.

UMB BANK, N.A., as successor indenture trustee
under that certain Indenture, dated as of June 6,
2008; and Wells Fargo Bank, N.A., third priority
collateral agent and collateral control agent under
that certain Amended and Restated Third Priority
Pledge and Security Agreement and Irrevocable
Proxy, dated as of December 30, 2009, Defendants.

Case No. 12−12020 (MG) Jointly
Administered    |    Adversary Proceeding
No. 13−01277(MG), Adversary Proceeding
No. 13−01343 (MG)    |    Filed 11/15/2013

## Synopsis

**Background:** Consolidated proceedings were brought for determination as to whether junior secured noteholders' collateral had value exceeding amount of their claims, such that noteholders were entitled to postpetition interest and fees, as well as for determination of noteholders' alleged right to unmatured original issue discount (OID) as addition to their secured claims and to payment on priority basis under debtors' proposed Chapter 11 plan based on alleged failure of adequate protection provided in cash collateral order. Debtors and creditors' committee also asserted claim for avoidance of transfers made to junior noteholders on preference theory.

**Holdings:** The Bankruptcy Court, Martin Glenn, J., held that:

[1] debtors' issuance of new notes to debenture holders as part of prepetition consensual workout, in connection with fair value debt-for-debt exchange, did not give rise to claim disallowable as one for unmatured interest;

[2] junior noteholders failed to satisfy their burden of showing that aggregate value of their collateral had diminished from date that debtors filed for Chapter 11 relief, and were not entitled to adequate protection claim payable on priority basis under plan;

[3] mortgage loans included in property of jointly administered Chapter 11 estates were properly valued, for purpose of determining the undersecured, secured, or oversecured nature of claims collateralized by these loans, using fair market valuation;

[4] paragraph in cash collateral order could not be interpreted as reviving junior secured noteholders' liens in collateral that had been released;

[5] refinancing opportunities associated with mortgage servicing rights that were expressly identified as "excluded" assets could not be separated from servicing rights themselves;

[6] no value could be assigned to goodwill of debtors' residential mortgage loan origination/servicing business as of date their Chapter 11 petitions were filed;

[7] junior secured noteholders did not have perfected liens that were protected from strong-arm avoidance in any deposit accounts

[8] plaintiffs asserting preference claims failed to satisfy burden of showing that challenged transfers enabled junior secured noteholders to receive more than they would have received in hypothetical Chapter 7 liquidation; and

[9] "carve out" provision in cash collateral order had to be interpreted as requiring junior secured noteholders to subordinate their secured claims to payment of carve out only if there were insufficient other unencumbered assets from which carve out could be paid.

So ordered.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

West Headnotes (33)

**[1]    Bankruptcy**
    🔑 Claims or proceedings against estate or debtor; relief from stay

**Bankruptcy**
    🔑 Bankruptcy judges

Bankruptcy court, even as non-Article-III court, had constitutional authority to enter final orders and judgment in proceeding brought for determination of junior secured noteholders' right to postpetition interest and fees as allegedly oversecured creditors, for determination of whether their claims based on original issue discount (OID) should be disallowed as claims for unmatured interest, and for whether they had adequate protection claims, as raising issues that would necessarily be resolved as part of claims-allowance process.

Cases that cite this headnote

**[2]    Bankruptcy**
    🔑 Evidence

Consolidated Financial Data Repository (CFDR) that Chapter 11 debtors maintained in ordinary course of their business as primary means for complying with their collateral tracking and reporting requirements under revolving loan agreement, as a Sarbanes–Oxley (SOX) compliant financial tool that was auditable, verifiable, and subject to heightened level of scrutiny, constituted a reliable and accurate business record which contained contemporaneous record of debtors' business transactions, and evidence of which was admissible under "business records" exception to hearsay rule as proof of what collateral had been released and what collateral was subject to junior secured noteholders' security interest in proceeding for determination of junior secured noteholders' allegedly oversecured status and purported entitlement to postpetition interest and fees. 11 U.S.C.A. § 506(b).

Cases that cite this headnote

**[3]    Bankruptcy**
    🔑 Post-petition interest

While Chapter 11 debtors' issuance of new notes to debenture holders as part of prepetition consensual workout, in connection with fair value debt-for-debt exchange, might result in an original issue discount (OID) for tax purposes, it did not give rise to claim for OID that was disallowable under the Bankruptcy Code as claim for unmatured interest; treating this transaction as giving rise to claim for OID that would be disallowable in bankruptcy would discourage parties from entering into consensual workouts to alleviate financial distress and would result in increased resort to bankruptcy process. 11 U.S.C.A. § 502(b)(2).

Cases that cite this headnote

**[4]    Bankruptcy**
    🔑 Presumptions and burden of proof

In establishing its claim, secured creditor generally bears burden of proving amount and extent of its lien. 11 U.S.C.A. § 506(a).

Cases that cite this headnote

**[5]    Bankruptcy**
    🔑 Adequate protection in general

**Bankruptcy**
    🔑 Order of court and proceedings therefor in general

**Bankruptcy**
    🔑 Lease

Once amount and extent of creditor's secured claim has been established, burden shifts to debtor seeking to use, sell, lease, or otherwise encumber creditor's collateral to prove that secured creditor's interest will be adequately protected. 11 U.S.C.A. §§ 363, 364, 506(a).

Cases that cite this headnote

**[6]    Bankruptcy**
    🔑 Determination of priority

Junior secured noteholders complaining of sufficiency of adequate protection granted

to them in cash collateral order, and asserting priority claim based on this alleged insufficiency, bore burden of proof on issue. 11 U.S.C.A. § 507(b).

Cases that cite this headnote

**[7]    Bankruptcy**
👉 Determination of priority

To establish their entitlement to claim payable on priority basis under debtors' proposed Chapter 11 plan, based on alleged insufficiency of adequate protection granted to them in cash collateral order, junior secured noteholders had to show that aggregate value of their collateral diminished from the petition date to effective date of plan. 11 U.S.C.A. § 507(b).

Cases that cite this headnote

**[8]    Bankruptcy**
👉 Superpriority; extension of credit or failure of adequate protection

**Bankruptcy**
👉 Valuation

In assessing value of junior secured noteholders' collateral on petition date, for purposes of deciding whether aggregate value of collateral had diminished from petition date to effective date of debtors' proposed Chapter 11 plan such that noteholders were entitled to priority claim based on insufficiency of adequate protection granted to them in cash collateral order, bankruptcy court would utilize fair market valuation, rather than valuing collateral based on its liquidation value, where junior secured noteholders had entered into cash collateral stipulation to allow sale of debtors' assets as going concern, and where going concern valuation was consistent with debtors' stated purpose in filing for Chapter 11 relief, which included "preserv[ation of] the debtors' [mortgage loan] servicing business on a going concern basis for sale." 11 U.S.C.A. § 507(b).

1 Cases that cite this headnote

**[9]    Bankruptcy**
👉 Superpriority; extension of credit or failure of adequate protection

Junior secured noteholders failed to satisfy their burden of showing that aggregate value of their collateral had diminished from date that debtors filed for Chapter 11 relief to effective date of debtors' proposed plan, and were not entitled to claim payable on priority basis under plan based on alleged insufficiency of adequate protection granted to them in cash collateral order; while debtors had admittedly spent money that belonged to noteholders, they did so in manner that benefited noteholders, the value of whose collateral on petition date was very substantially impaired by reason of existing defaults that prevented debtors from disposing of collateral at that time, but which debtors, through settlements and consents achieved over many months at great effort and expense, were ultimately able to sell on very favorable terms. 11 U.S.C.A. § 507(b).

Cases that cite this headnote

**[10]    Bankruptcy**
👉 Oversecurity

Determination as to whether junior secured noteholders were oversecured, as required for them to be entitled to postpetition interest and fees in debtors' jointly administered Chapter 11 cases, did not have to be made on debtor-by-debtor basis, but could be made by aggregating their claims against debtor entities, given that no debtor would be required to pay junior secured noteholders more than the value of their collateral; allowing aggregation of claims and collateral more accurately reflected realities of case and of business world at large, given that junior secured noteholders' indenture, like most indentures, allowed debtors to move assets among their subsidiaries, and to create new subsidiaries, as long as noteholders continued to maintain their liens in these assets. 11 U.S.C.A. § 506(b).

Cases that cite this headnote

**[11]    Bankruptcy**
 👈 Transfer and Consolidation of Cases

Absent substantive consolidation, bankruptcy court will not pool assets of multiple debtors to satisfy their liabilities.

Cases that cite this headnote

**[12]    Bankruptcy**
 👈 Transfer and Consolidation of Cases

Substantive consolidation is to be used sparingly, in recognition of dangers of forcing creditors of one debtor to share on parity with creditors of less solvent debtor.

Cases that cite this headnote

**[13]    Bankruptcy**
 👈 Adequacy of price; appraisal

When Chapter 11 debtor's assets are sold in arm's-length transaction, fair market value of assets is conclusively determined by the price paid.

Cases that cite this headnote

**[14]    Bankruptcy**
 👈 Amount secured; partial security
**Bankruptcy**
 👈 Oversecurity

Mortgage loans included in property of jointly administered Chapter 11 estates of debtors that were leading originators and servicers of residential mortgage loans were properly valued, for purpose of determining the undersecured, secured, or oversecured nature of claims collateralized by these loans, using fair market valuation, rather than a recovery analysis that discounted the figures on debtors' balance sheet based on assumed costs of collection, where debtors, in prior cash collateral order, had expressly waived right to surcharge collateral for costs of collection. 11 U.S.C.A. § 506(a-c).

Cases that cite this headnote

**[15]    Bankruptcy**

 👈 Weight and sufficiency

While value of junior secured noteholders' security interests in equity that Chapter 11 debtors enjoyed in their non-debtor subsidiaries might perhaps be reduced based on contingent liabilities that subsidiaries faced in pending litigation, debtors, as parties seeking this reduction for purposes of establishing that junior noteholders were undersecured and not entitled to postpetition interest, had to present evidence of risk-adjusted equity value to account for litigation risk, and could not simply rely upon litigation risk to value equity interests at $0.00. 11 U.S.C.A. § 506(b).

Cases that cite this headnote

**[16]    Bankruptcy**
 👈 Proceedings

Paragraph in cash collateral order could not be interpreted as reviving junior secured noteholders' liens in collateral that had been released to allow Chapter 11 debtors to use it to obtain postpetition financing from another lender, where no party had ever disclosed this purported effect of paragraph in question when cash collateral order was proposed or at any contemporaneous hearing, and where junior noteholders' interpretation of paragraph, as reviving their liens and according them priority even above lien interest of lender from which debtors obtained this postpetition financing, would not have been agreed to by lender, which relied on priority of its lien in making postpetition advances under cash collateral order.

Cases that cite this headnote

**[17]    Bankruptcy**
 👈 Oversecurity

Refinancing opportunities associated with mortgage servicing rights that were expressly identified as "excluded" assets not subject to junior secured noteholders' liens, while not themselves excluded from general intangibles to which junior noteholders' liens attached, could not be separated from servicing rights

themselves, and did not provide any additional security to junior secured noteholders, which bankruptcy court had to consider in assessing whether noteholders were oversecured and entitled to postpetition interest and fees. 11 U.S.C.A. § 506(b).

Cases that cite this headnote

**[18]    Bankruptcy**
   Oversecurity

No value could be assigned to goodwill of debtors' residential mortgage loan origination/servicing business as of date their Chapter 11 petitions were filed, and bankruptcy court did not have to consider this value in assessing whether noteholders were oversecured and entitled to postpetition interest and fees, where value subsequently allocated to goodwill in connection with postpetition sale of debtors' assets was result of settlements and consents that debtors ultimately achieved over many months, at great effort and expense, in order to make assets ready for sale; any goodwill reflected in postpetition sale of debtors' assets was not shown to exist on petition date, when value of debtors' assets was seriously impaired and subject to steep reductions in value to account for litigation risks, potential seizure of certain mortgage servicing rights, and termination of rights and setoff by trustees of residential mortgage-backed securities. 11 U.S.C.A. § 506(b).

Cases that cite this headnote

**[19]    Bankruptcy**
   Particular cases and problems

**Bankruptcy**
   Oversecurity

Any goodwill generated postpetition for Chapter 11 debtors' residential mortgage loan origination/servicing business was not product solely of debtors' use of cash collateral of junior secured noteholders but of settlements that debtors negotiated with government entities and trustees of residential mortgage-backed securities, such that junior secured noteholders' liens did not attach to this postpetition goodwill as product or

offspring of their cash collateral, and bankruptcy court did not have to consider postpetition goodwill in assessing whether junior noteholders were oversecured and entitled to postpetition interest and fees. 11 U.S.C.A. §§ 506(b), 552(b).

Cases that cite this headnote

**[20]    Bankruptcy**
   Oversecurity

**Bankruptcy**
   Evidence

Bankruptcy court could rely on extrinsic evidence, including testimony of employees of debtors and of other parties to ambiguous prepetition security agreement, to find that excluded assets became part of junior secured noteholders' collateral, pursuant to all–asset granting clause in security agreement, once assets ceased to be excluded assets; accordingly, bankruptcy court had to consider such previously excluded assets in assessing whether junior noteholders were oversecured and entitled to postpetition interest and fees. 11 U.S.C.A. § 506(b).

Cases that cite this headnote

**[21]    Secured Transactions**
   After-acquired property

Under New York law, security interest arising by virtue of after-acquired property clause is no less valid than security interest in collateral in which debtor has rights at the time value is given. N.Y. Uniform Commercial Code § 9-204.

Cases that cite this headnote

**[22]    Bankruptcy**
   Particular cases and problems

**Bankruptcy**
   Debtor in possession

**Secured Transactions**
   Filing release

**Secured Transactions**
   Duration of filing; continuation statement

Under New York law, financing statements previously filed by junior secured noteholders continued in effect even after new financing statements were filed following release of portion of collateral securing junior noteholders' claims, and placed third parties on notice of need to investigate noteholders' interest in the released collateral after it was reacquired by Chapter 11 debtors, so as to prevent avoidance of security interest that noteholders possessed in this reacquired collateral pursuant to strong-arm statute. 11 U.S.C.A. § 544; N.Y. Uniform Commercial Code § 9-502.

Cases that cite this headnote

[23]    **Bankruptcy**
        👈 Particular cases and problems
        **Bankruptcy**
        👈 Debtor in possession
        **Bankruptcy**
        👈 Oversecurity

Junior secured noteholders did not have perfected liens that were protected from strong-arm avoidance in any deposit accounts of Chapter 11 debtors for which an executed control agreement could not be produced, and bankruptcy court did not have to consider any such accounts in assessing whether junior noteholders were oversecured and entitled to postpetition interest and fees. 11 U.S.C.A. §§ 506(b), 544; N.Y. Uniform Commercial Code § 9-312(b)(1).

Cases that cite this headnote

[24]    **Secured Transactions**
        👈 Possession by secured party without filing

Under New York law, security interest in deposit account may be perfected only by control of account. N.Y. Uniform Commercial Code § 9-312(b)(1).

Cases that cite this headnote

[25]    **Mortgages**
        👈 Effect in general

Under New York law, in order to perfect lien on real property, secured party must duly record against the title of such property a properly executed mortgage or deed of trust.

Cases that cite this headnote

[26]    **Bankruptcy**
        👈 Mortgages and pledges
        **Bankruptcy**
        👈 Debtor in possession
        **Bankruptcy**
        👈 Oversecurity

In absence of properly executed and duly recorded mortgage or deed of trust, any lien rights that junior secured noteholders possessed in real property of Chapter 11 debtors was avoidable by debtors in exercise of strong-arm powers as debtors-in-possession, and did not have to be considered by bankruptcy court in assessing whether junior noteholders were oversecured and entitled to postpetition interest and fees. 11 U.S.C.A. §§ 506(b), 544.

Cases that cite this headnote

[27]    **Bankruptcy**
        👈 Elements and Exceptions
        **Bankruptcy**
        👈 Preferences

In preference-avoidance proceeding, trustee bears burden of proving each of statutory elements of preference claim, and unless trustee proves each and every one of these elements, transfer is not avoidable as preference. 11 U.S.C.A. § 547(b)(1-5).

Cases that cite this headnote

[28]    **Bankruptcy**
        👈 Preferences

When creditor asserts that it was oversecured at time of its receipt of alleged preferential transfer, such that transfer did not enable it to receive more than it would have received in hypothetical Chapter 7 liquidation, it is plaintiff's burden to refute that assertion. 11 U.S.C.A. § 547(b)(5).

Cases that cite this headnote

Cases that cite this headnote

**[29]    Bankruptcy**

👉 Preferences

Absent evidence regarding value of junior secured noteholders' collateral either at start of preference period or when they received allegedly preferential transfers, such as might permit bankruptcy court to determine that they were not oversecured, parties asserting preference claims failed to satisfy burden of showing that challenged transfers enabled junior secured noteholders to receive more than they would have received in hypothetical Chapter 7 liquidation. 11 U.S.C.A. § 547(b)(5).

Cases that cite this headnote

**[30]    Bankruptcy**

👉 Proceedings

"Carve out" is provision in cash collateral order that allows for some expenditure of administrative and/or professional fees to be paid before secured creditor gets paid on its collateral.

Cases that cite this headnote

**[31]    Bankruptcy**

👉 Proceedings

Unless it conflicts with provisions of the Bankruptcy Code, "carve out" provision in cash collateral order is construed by applying normal contract interpretation principles.

Cases that cite this headnote

**[32]    Bankruptcy**

👉 Proceedings

Usual purpose of "carve out" in cash collateral order is to ensure the payment of specified administrative expenses from secured creditor's collateral in event that bankruptcy case goes badly, use of cash collateral is terminated, and sufficient unencumbered funds are no longer available to administer case.

**[33]    Bankruptcy**

👉 Proceedings

Absent anything in cash collateral order to suggest contrary intent, "carve out" provision in order had to be interpreted in manner consistent with general purpose of "carve out" provisions, as requiring junior secured noteholders to subordinate their secured claims to payment of carve out only if there were insufficient other unencumbered assets from which carve out could be paid.

Cases that cite this headnote

**Attorneys and Law Firms**

Morrison & Foerster LLP, Attorneys for Debtors, 1290 Avenue of the Americas, New York, NY 10104, By: Gary S. Lee, Esq., Jamie A. Levitt, Esq., Stefan W. Engelhardt, Esq.

Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036, Counsel for the Official Creditors' Committee, By: Kenneth H. Eckstein, Esq., Gregory A. Horowitz, Esq.

Pachulski Stang Ziehl & Jones, Conflicts Counsel to Official Creditors' Committee, 780 Third Avenue, 36th Floor, New York, NY 10017, By: Robert J. Feinstein, Esq., John A. Morris, Esq.

White & Case LLP, Attorneys for Ad Hoc Group of Junior Secured Noteholders, 1155 Avenue of the Americas, New York, NY 10036, By: J. Christopher Shore, Esq., Douglas P. Baumstein, Esq., Dwight A. Healy, Esq.

Akin Gump Strauss Hauer & Feld LLP, Special Counsel to UMB Bank, N.A., One Bryant Park, New York, NY 10036, By: David M. Zensky, Esq., Deborah Newman, Esq., Brian T. Carney, Esq.

Reed Smith LLP, Attorneys for Wells Fargo as Collateral Agent, 599 Lexington Avenue, 22nd Floor, New York, NY 10022, By: David M. Schlecker, Esq.

Chapter 11

## MEMORANDUM OPINION, AND FINDINGS OF FACT AND CONCLUSIONS OF LAW, AFTER PHASE I TRIAL

MARTIN GLENN, UNITED STATES BANKRUPTCY JUDGE

ResCap and the Creditors' Committee (the "Plaintiffs") are co-proponents of a reorganization plan that treats the junior secured noteholders ("JSNs") as undersecured, but would pay them the face amount of all principal and prepetition interest ($2.222 billion, less $1.1 billion repaid **\*556** postpetition). The JSNs voted against and oppose confirmation of the plan.

The JSNs contend they are oversecured and entitled to postpetition interest (at the default rate) and fees; they also contend they are entitled to recover an adequate protection claim of $515 million based on alleged diminution in value of their prepetition collateral used during the case under a series of consensual cash collateral orders.[1] They also contend that their collateral should be increased as the result of an "all assets" pledge, which purportedly attaches to the Debtors' assets that (1) were once excluded from the "all assets" pledge but no longer are, (2) were released from the JSNs' liens but were subsequently reacquired by the Debtors, or (3) were never properly released from the JSNs' liens at all.

The Plaintiffs contend that (1) the JSNs are undersecured and, therefore, not entitled to postpetition interest and fees; (2) the JSNs' collateral has not declined in value since the petition date and thus the JSNs cannot assert an adequate protection claim; (3) the JSNs' collateral should be reduced from lien challenges to deposit accounts and real estate owned ("REO") assets; (4) the Debtors' transfers of approximately $270 million of collateral to the undersecured JSNs in the 90 days before bankruptcy are avoidable preferences; and (5) and the principal amount of the JSNs' claim must be reduced by approximately $386 million for unmatured interest arising from original issue discount ("OID") created as part of the Debtors' "fair value" debt-exchange offer in 2008.

The swing between the JSNs' projected recoveries under the proposed plan and their "ask" is at least $350 million, or perhaps more. In other words, the parties are fighting about a lot of money.

The legal issues are framed in two adversary proceedings, one filed by the Debtors and the other by the Creditors' Committee (the "Committee") after it was given standing in an order granting an STN motion. The two adversary proceedings, asserting both claims and counterclaims, were consolidated. In two earlier written decisions, the Court granted in part (sometimes with prejudice and sometimes without prejudice) and denied in part motions to dismiss some of the claims and counterclaims. (See In re Residential Capital, LLC, 495 B.R. 250 (Bankr.S.D.N.Y.2013), ECF Doc. # 74, and In re Residential Capital, LLC, 497 B.R. 403 (Bankr.S.D.N.Y.2013), ECF Doc. # 100.[2]) Familiarity with those decisions is assumed.

The Court established an expedited schedule for discovery and trial. The trial was bifurcated into two phases because some issues involve only the Plaintiffs and Defendants (as defined below) while other issues potentially involve other creditor constituencies in the case. The Phase I trial, conducted between October 15–23 and on November 6, 2013, was limited to disputed issues between the Plaintiffs and Defendants, to simplify the trial and limit the number of parties that felt it necessary to actively participate; the Phase II trial, involving issues potentially affecting the Plaintiffs, Defendants and a broader group **\*557** of parties in interest in the bankruptcy case, will be part of the contested plan confirmation hearing now scheduled to begin on November 19, 2013.

On August 23, 2013, the parties submitted an agreed list of issues for trial. (ECF Doc. # 84.) A Joint Pretrial Conference Order, approved by the Court on October 18, 2013, provides stipulations of fact, the parties' factual and legal contentions, and exhibit and witness lists. (ECF Doc. # 161.) All direct fact and expert sworn witness testimony was filed in advance, with the witnesses in court during the trial for cross and re-direct examination. Motions in limine to preclude some of the proposed expert testimony were granted in part and denied in part. (Oct. 16 Tr. 8:2–15.[3]) Deposition designations and counter-designations were introduced into evidence at trial mostly without objections.[4] Voluminous exhibits were admitted in evidence at trial, mostly without objections. The parties filed post-trial submissions on November 1, 2013, and conducted closing arguments on November 6, 2013.

This Opinion resolves the legal and factual issues in the Phase I trial. The Court completed the Opinion quickly because the outcome of the Phase I trial impacts Phase II and the confirmation hearing. This Opinion contains the Court's

findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52, made applicable to these adversary proceedings by FED. R. BANKR. P. 7052. In making its findings of fact, the Court has resolved credibility issues and the weight appropriately given to conflicting evidence. Where contested or disputed facts or opinions were offered during trial, this Opinion reflects the Court's resolution of those disputes, whether or not the opinion specifically refers to the contrary evidence introduced by the opposing parties.

[1] All of the issues in the Phase I trial are "core," as provided in 28 U.S.C. § 157(b)(2). Because the JSNs (through UMB, the indenture trustee) submitted a proof of claim in this case, seeking to recover all principal, prepetition and postpetition interest and fees, and have asserted an adequate protection claim, all of the issues raised and resolved in these adversary proceedings necessarily must be resolved as part of the claims-allowance process. Therefore, the Court concludes that it has the constitutional authority to enter final orders and judgment in these adversary proceedings. Because issues in these adversary proceedings remain to be resolved following the Phase II trial and confirmation hearing, no final judgment can be entered now. This Opinion does include the Court's final resolution of the issues upon which it now rules.

The results of the Phase I trial can be viewed as a split decision —some issues have been resolved in favor of the Plaintiffs and some in favor of the Defendants. Subject to the outcome of the Phase II **\*558** trial, the Court concludes that the JSNs' claim should not be reduced for unmatured OID; the JSNs have failed to establish that they are entitled to recover an adequate protection claim; the JSNs have liens on certain contested collateral, including certain intangible assets, but the JSNs do not have liens on the full extent of the collateral claimed; the Plaintiffs have failed to establish that the JSNs received avoidable preferences during the preference period (as defined below); and the JSNs are undersecured and not entitled to postpetition interest and fees. As explained below, the Court concludes that (subject to the results of the Phase II trial) the JSNs are undersecured by approximately $318 million.

### I. BACKGROUND

On May 14, 2012 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors in possession. Before filing for bankruptcy, the Debtors were a leading originator of residential mortgage loans and, together with their non-Debtor affiliates, the fifth largest servicer of residential mortgage loans in the United States, servicing approximately $374 billion of domestic residential mortgage loans and working with more than 2.4 million mortgage loans across the United States. (Marano Direct ¶ 23.)

Defendant UMB Bank, N.A. ("UMB") is the successor indenture trustee (in such capacity, the "Notes Trustee") for the 9.625% Junior Secured Guaranteed Notes due 2015 issued by ResCap (the "Junior Secured Notes" or the "Notes"). (PTO ¶ 3.) Wells Fargo Bank, N.A. ("Wells Fargo")— also a defendant—is the third priority collateral agent and collateral control agent for the Junior Secured Notes. (Id. ¶ 4.) Defendant Ad Hoc Group of holders of Junior Secured Notes (the "Ad Hoc Group" or the "JSNs" and, together with the Notes Trustee, the "Defendants" [5] ) comprises entities that hold, or manage entities that hold, Junior Secured Notes. Membership in the Ad Hoc Group changes from time to time, as set forth in the Ad Hoc Group's statements periodically filed with the Court pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure. (Id. ¶ 6.)

The Defendants' claims against the Debtors' estates arise from Junior Secured Notes that ResCap issued pursuant to an Indenture dated June 6, 2008. (PX 1.) Those notes and the collateral securing those notes are discussed in greater detail below. As of the Petition Date, the JSNs held secured claims against ResCap, and certain of its affiliates as guarantors and grantors, in the face amount of $2.222 billion, consisting of $2.120 billion in unpaid principal as of the Petition Date, and $101 million in unpaid prepetition interest. (DX ABF at 3.) The issue whether the face amount of the claim should be reduced by unamortized OID is discussed in section III.A below.

### A. The Adversary Proceedings

#### 1. Complaints and Counterclaims

In or about July 2012, the Committee began investigating what it believed to be security interests improperly asserted by the Defendants. The Committee filed its complaint on February 28, 2013 (ECF Doc. # 1), seeking among other things (1) a declaratory judgment on claims that (a) certain of the Debtors' property is not **\*559** subject to liens or security

interests in favor of the JSNs, and that (b) certain liens or security interests on property of the Debtors are unperfected; (2) an order avoiding the JSNs' allegedly unperfected liens on or security interests in certain property; (3) an order avoiding as preferential certain liens or security interests allegedly granted for the Defendants' benefit within 90 days of the Petition Date; (4) an order characterizing postpetition payments to the Defendants' professionals as payments of principal; [6] (5) an order clarifying the priority of the JSNs' liens; and (6) an order disallowing the JSNs' claims pending final resolution of the Committee's complaint; and (7) an order disallowing a portion of the JSNs' claims as a result of unmatured interest allegedly arising from the 2008 debt-for-debt exchange. (*Id.*)

On May 3, 2013, the Debtors filed a Complaint (ECF 13–01343, Doc. # No. 1), and filed an Amended Complaint on June 19, 2013. (ECF 13–01343 Doc. # 8.) In their amended complaint, the Debtors seek declaratory judgments, including among other things that: (1) the JSNs' lien on general intangibles does not include any lien on the proceeds of, or value attributed to, the sale of assets pursuant to the Ocwen Asset Purchase Agreement dated November 2, 2012 ("Ocwen APA"); (2) the JSNs are not entitled to an adequate protection replacement lien; (3) the JSNs are not entitled to a lien on the assets that secure the Amended and Restated Loan Agreement, dated December 30, 2009 ("AFI LOC"), or any other collateral under the Notes Indenture (defined below) that was released by Wells Fargo; (4) the JSNs are not entitled to a lien on any recoveries of any future avoidance actions brought by or on behalf of the Debtors' estates; (5) the JSNs are undersecured and not entitled to postpetition interest; (6) if the JSNs are found to be entitled to postpetition interest, the interest should be awarded at the contractual nondefault rate of interest; and (7) the JSNs are undersecured because they are not oversecured at any individual Debtor entity.

On June 21, 2013, the Court entered an order consolidating the Committee's action with the Debtors' action. (ECF Doc. # 41.) On June 28, the Defendants filed an Answer, Affirmative Defenses and Counterclaims to the Debtors' Amended Complaint. (ECF 13–01343 Doc. # 14.) On July 29, 2013, the Defendants amended their answer and counterclaims. (ECF 13–01343 Doc. # 29.) Those amended counterclaims seek declaratory relief: (1) establishing the ownership and value of the stipulated and disputed collateral and the assets pledged in support of the JSNs; (2) establishing that the JSNs have a lien on claims against Ally Financial, Inc. ("AFI"); (3) determining the distributable value to be

generated from all intercompany claims and causes of action; (4) allocating the purchase prices of Debtor assets sold in Court-approved sales; (5) establishing that the JSNs have a lien on the purportedly released assets; (6) determining that the use of cash collateral results in diminution in the collateral's value; (7) enforcing the Debtors' section 506(c) waiver; (8) defining the exact quantum of the direct costs of liquidating collateral; (9) determining the amount of the JSNs' adequate **\*560** protection liens; (10) reallocating administrative expenses; (11) establishing that the JSNs are entitled to postpetition interest, default interest, fees, and expenses; (12) determining that the claims asserted by any residential mortgage backed security trust ("RMBS Trust"), monoline insurers, and RMBS certificate-holders must be subordinated; and (13) establishing that the claims against AFI identified by the Examiner [7] appointed in the chapter 11 proceedings and/or the property that is the subject of those claims, constitute the JSNs' collateral.

### *2. Motions to Dismiss*

On April 30, 2013, UMB filed a motion to dismiss with prejudice Counts I, IV, V, VII, XI, XII, XIII and XIV of the Committee's complaint in their entirety, and Counts III and X in part. (ECF Doc. # 20.) UMB later withdrew its motion to dismiss certain of those counts, and on July 26, 2013, the Court heard oral argument on UMB's motion. (ECF. Doc. # 61.) The Court entered an opinion and order granting in part and denying in part UMB's motion. (ECF Doc. # 74.) In that opinion, the Court dismissed Count V and denied without prejudice UMB's motion to dismiss Counts I, IV, and XIII. (*Id.*) *See Residential Capital,* 495 B.R. at 250.

On July 16, 2013, the Defendants filed a Motion to Dismiss Counts 3 and 5 of the Debtors' Amended Complaint. (ECF Doc. # 52.) That same day, the Plaintiffs filed a motion to dismiss fourteen of the Defendants' counterclaims. (ECF Doc. # 53.) The Court heard oral argument on both of those motions to dismiss on August 28, 2013, and subsequently issued a memorandum opinion and order (1) denying the Defendants' motion without prejudice, and (2) granting in part and denying in part the Plaintiffs' motion. (ECF. Doc. # 100.) *See Residential Capital,* 497 B.R. at 403.

### B. The Trial

On August 23, 2013, the parties entered into a Joint Statement of Issues, which the Court so-ordered. (ECF Doc. # 84.) That

statement of issues contemplated a bifurcated adjudication whereby certain issues would be decided in a Phase I trial, and others would be decided in a Phase II trial (if necessary). The Phase I trial issues include (1) "[w]hether and to what extent any unamortized portion of the alleged original issue discount on the Junior Secured Note[holders]' claim should be disallowed as unmatured interest," (2) "valuation of each Debtor's collateral ... securing the JSN claims, on a debtor-by-debtor basis, and the appropriate methodologies for conducting such valuation," [8]  (3) "[w]hether and to what extent the JSNs have liens on various items of disputed collateral ... including issues related to avoidance of preferential transfers, disputed lien releases, asserted equitable liens resulting therefrom, and potential avoidance of any such equitable liens," (4) adequate protection issues, including "[w]hether and to what extent the JSNs' collateral has diminished in value as a result of the Debtors' use of cash collateral; whether the JSNs are entitled to an adequate protection claim for some or all of that value diminution; and, if the Court deems it appropriate to decide during **\*561** Phase I, whether as a matter of law the JSNs might be entitled to adequate protection for any diminution in value associated with the Debtors' entry into the Global Settlement," (5) "the appropriate allocation of proceeds to JSN collateral from the Debtors' asset sales to Ocwen and Walter" (described below), (6) "[w]hether the JSNs have a lien on all or any portion of the AFI Contribution, [9] and/or all or any of causes of action of the Debtors or avoidance claims that the Debtors may bring that are being settled in the Global Settlement," [10] and (7) "[w]hether under section 506 of the Bankruptcy Code, the [Noteholders] may recover postpetition interest and other fees, costs, or charges under the Indenture (a) only to the extent they are oversecured by assets at a single Debtor entity without reference to collateral at other Debtor entities; (b) to the extent they are oversecured with reference to all collateral held by any Debtor, collectively; and/or (c) to the extent that the Debtors collectively have sufficient assets to pay the [Noteholders'] claim in full and/or any particular Debtor is solvent." (*Id.*) [11]

The Court conducted a six-day hearing on Phase I from October 15–17 and October 21– 23, 2013. The parties submitted the written direct testimony of 13 witnesses: Teresa Rae Farley ("Ms. Farley"), John D. Finnerty ("Dr. Finnerty"), James Gadsden ("Gadsden"), Marc E. Landy ("Mr. Landy"), Thomas Marano ("Mr. Marano"), Marc D. Puntus ("Mr. Puntus"), and Mark Renzi ("Mr. Renzi"), for the Plaintiffs; and Michael Fazio ("Mr. Fazio"), Jeffrey M. Levine ("Mr.

Levine"), Ronald J. Mann ("Mr. Mann"), P. Eric Siegert ("Mr. Siegert"), John A. Taylor ("Mr. Taylor"), and Scott Winn ("Mr. Winn"), for the Defendants. Each of these witnesses was subjected to cross-examination and redirect at trial. Neither party called any rebuttal witnesses. The Plaintiffs and the Defendants sent their final exhibit lists to the Court post trial. More than 700 exhibits were admitted in evidence, some for limited purposes. The Parties filed amended consolidated deposition designations on October 29, 2013 (ECF Doc. # 179).

## II. *FINDINGS OF FACT*

### A. The Notes, the Collateral, and the Loan Facilities

#### 1. The AFI Revolver and the Junior Secured Notes

On or about June 4, 2008, Residential Funding Company, LLC ("RFC") and GMAC Mortgage LLC ("GMAC"), as borrowers, ResCap and certain other entities as guarantors, and certain entities as obligors, entered into a revolving loan facility (the "Revolver") as amended from time to time. The Revolver was provided under a Loan Agreement (the "Original Revolver Loan Agreement"), dated June 4, 2008 (and amended from time to time before December 30, 2009), with AFI as initial lender and lender agent. (PTO ¶ 10; PX **\*562** 5.) To secure the obligations under the Revolver, ResCap and certain of its subsidiaries, as grantors, granted a security interest in favor of Wells Fargo, as First Priority Collateral Agent and Collateral Control Agent, pursuant to a First Priority Pledge and Security Agreement and Irrevocable Proxy (the "Original Revolver Security Agreement"), dated June 4, 2008 (and amended from time to time before December 30, 2009). (PTO ¶ 11; PX 7.) ResCap also issued $4.01 billion in face principal amount of Junior Secured Notes (the "Junior Secured Notes") pursuant to an indenture dated as of June 6, 2008 (the "Notes Indenture"). (PX 1 § 1.01.) Interest accrues on the Junior Secured Notes at an annual 9.625% rate. [12] (*Id.* at 8.) ResCap issued those Junior Secured Notes with certain other entities serving as guarantors and obligors, [13] and with U.S. Bank National Association, as the original indenture trustee. (*Id.*) To secure the obligations under the notes, ResCap and the guarantors under the Notes Indenture granted a security interest in favor of Wells Fargo —the Third Priority Collateral Agent—pursuant to the Third Priority Pledge and Security Agreement and Irrevocable Proxy (the "Original JSN Security Agreement"), dated June

6, 2008 (and amended from time to time before December 30, 2009). (PTO ¶ 13; PX 3.)

Pursuant to Original Revolver Security Agreement and the Original JSN Security Agreement, the collateral securing the Revolver was identical to the collateral securing the Junior Secured Notes. (*See* PX 7, PX 3.) [14] On December 30, 2009, the Original Revolver Security Agreement, the Original Revolver Loan Agreement, and Original JSN Security Agreement were amended and restated, giving rise to the "Revolver Loan Agreement," the "Revolver Security Agreement," and the "JSN Security Agreement." Following those amendments, the collateral securing the agreements remained identical. (*See* PX 8, PX 4.) The Plaintiffs contend that certain collateral was later pledged to the Revolver but not to the JSNs, which the Court will address below.

Since the collateral securing the Revolver and the Junior Secured Notes was identical, the creditors entered into an Intercreditor Agreement on June 6, 2008. (PX 2.) That agreement governs the Revolver Collateral Agent's ability to enforce rights associated with collateral. The governing documents expressly authorize the Collateral Agent, at the request of the Debtors, to release liens on the collateral previously securing the Revolver and the JSNs. Any lien releases executed by the Revolver Collateral Agent were binding on the Junior Secured Notes.

### 2. Primary Collateral and Blanket Lien Collateral

The Revolver and Junior Secured Notes were secured by two categories of collateral: **\*563** Primary Collateral and Blanket Lien Collateral. (PTO ¶ 12.) Primary Collateral was specifically delineated on the schedules to the AFI Revolver and served as the borrowing base under the AFI Revolver. Primary Collateral was subject to various operational and reporting requirements. (Farley Direct ¶ 24; Farley Dep. 48:14–21.)

Blanket Lien Collateral encompassed the balance of the collateral pledged as security under the AFI Revolver and not falling within the definition of "Excluded Assets." [15] (Farley Direct ¶ 25.) The Blanket Lien Collateral included assets that were not Primary Collateral, "whether [such assets were] now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced." (PX 3 at 11–12; *see also* PX 4 at 15.) All of the assets that came in to ResCap (except Excluded Assets) after the parties executed

the Original JSN Security Agreement were subject to the JSNs' third priority lien due to the blanket lien. (*See* PX 3 at 11–13; PX 4 at 15–17.)

Between the Primary and Blanket Lien Collateral, the JSNs' collateral included (1) assets and property of ResCap, the Notes Guarantors, and the Additional Notes Grantors (other than Excluded Assets); [16] (2) certain equity interests, certain promissory notes and other debt instruments, certain deposit and security accounts, and certain related assets of the Notes Equity Pledgors; (3) all "Financial Assets" (as defined in Article 8 of the U.C.C.) and certain related assets of the FABS Grantors (as defined in the JSN Security Agreement); and (4) certain deposit accounts and certain related assets of the Additional Account Parties (collectively, the "JSN Collateral"). (PX 4.)

Primary Collateral could only be released if proceeds of that collateral were used to pay down the AFI Revolver or to buy replacement collateral. (*See* PX 1 at 56.) Blanket Lien Collateral, on the other hand, could be released without the same restrictive requirements. (Farley Direct ¶ 25; Oct. 16 Tr. 180:4–8.)

The Notes Indenture and the JSN Security Agreement combined to permit the Debtors to incur future indebtedness secured by liens, to conduct certain asset sales, and to release JSN Collateral so long that release was part of a transaction not prohibited by the Notes Indenture. (PX 1 §§ 1.01, 4.01, 8.04(a)(i); PX 4 § 7.) Additionally, the Intercreditor Agreement allowed the First Priority Collateral Agent to release liens on any collateral in connection with a sale or disposition of the collateral allowed under the Revolver Agreements and the Junior Secured Notes Agreement. (PX 2 § 3.1.) That collateral release would be binding on the JSNs. (*Id.*) The Debtors could only release JSN Collateral pursuant to the JSN Security Agreement, the Notes Indenture, and the Intercreditor Agreement. Additionally, the JSN Indenture allowed the Debtors to move assets among their subsidiaries, and to create new subsidiaries, as long as the JSNs continued to maintain liens on such **\*564** assets. (PX 1 § 4.7 (requiring all "Significant Subsidiaries" to become "Guarantors" and thus also "Grantors" under the JSN Pledge Agreement).)

### 3. The AFI LOC and Released Blanket Collateral

In 2009, the Debtors determined that they needed additional financing to continue operating their businesses. To that

end, on or about December 30, 2009, RFC and GMAC, as borrowers, entered into the AFI LOC, provided under an Amended and Restated Loan Agreement ("LOC Loan Agreement" with AFI as initial lender and lender agent). (PTO ¶ 18; PX 9.) To secure the obligations under the AFI LOC, ResCap and certain other Debtors granted a security interest to AFI pursuant to the Amended and Restated Pledge and Security Agreement and Irrevocable Proxy, dated December 30, 2009 (as amended from time to time, the "LOC Security Agreement") with GMAC Investment Management LLC, as secured party, and AFI, as omnibus agent, lender agent, lender and secured party. (PTO ¶ 19.) Granting that security interest to secure the AFI LOC required the First Priority Collateral Agent and Third Priority Collateral Agent to release their respective liens on certain collateral. (PX 134; Farley Direct ¶¶ 52–61.)

In 2010 and 2011, the Third Priority Collateral Agent released its lien on a variety of assets included in the JSN Collateral so the collateral could be pledged to secure the AFI LOC, including (1) certain mortgage loans, servicing rights and other assets (the "Released Loan Collateral"), and (2) certain Freddie Mac servicing advances (the "Released Advances," and collectively with the Released Loan Collateral, the "Released Blanket Collateral"). (PX 134.) To effectuate the releases, the Third Priority Collateral Agent executed (1) a Partial Release of Collateral, dated May 14, 2010, releasing the security interest in the Released Loan Collateral that previously secured the Junior Secured Notes, and (2) a Partial Release of Collateral, dated May 27, 2011, that released the security interest in the Released Advances that previously secured the Junior Secured Notes (together with the May 14, 2010 release, the "Blanket Releases"). (PX 130 at 1176–1305, PX 134.) The Third Priority Collateral Agent also filed U.C.C.–3 amendments that removed the Released Blanket Collateral from the collateral set forth in the original U.C.C.–1s (as amended) filed by the Third Priority Collateral Agent. (PX 131; PX 133.) Exhibits annexed to these U.C.C.–3s contained descriptions of the Released Blanket Collateral that were identical to those in the Blanket Releases themselves. (*Id.*)

The May 14, 2010 release described various categories of Released Loan Collateral, including any existing or future rights in "Subject Mortgage Loan [s]." The release defined those loans as:

> Any Mortgage Loan (a) which is identified in a Mortgage Schedule delivered under the LOC Loan Agreement, (b) the carrying value of which is included in the calculation of the borrowing base included in a borrowing base report or a monthly collateral report under the LOC Loan Agreement, or (c) which is indicated in a Relevant Party's [17] books and records as having been pledged to the Lender Agent. [18]

(PX 134 at 8.) Thus, a mortgage loan listed as AFI LOC collateral on the Debtors' books and records would qualify as a Subject ***565** Mortgage Loan that was released. The LOC Loan Agreement defines mortgage loans to mean residential mortgage loans and any right to receive payment from the Federal Housing Administration and Department of Veterans Affairs ("FHA/VA") for insurance or guarantees of residential mortgage loans. [19] (PX 9 at 87; PX 10 at 100.)

Other categories of collateral released under the Blanket Loan Release included (1) "Servicing Rights Collateral," defined as all of RFC's and GMAC's rights under existing or future agreements pursuant to which they were obligated to perform collection, enforcement or similar services to maintain and remit funds collected from mortgagees; and (2) all intangible assets and other general intangibles relating to Subject Mortgage Loans and Servicing Rights Collateral. (PX 134 at 6–8.)

The May 27, 2011 release described various categories of Released Advances that were being released from the JSNs' liens. These assets included any existing and future advances relating to mortgage loans and real estate owned property made pursuant to certain contracts with Freddie Mac. (*See* PX 130 at 1181–83.)

**B. The Debtors' Books and Records**

**[2]** To comply with the numerous collateral tracking and reporting requirements of the Revolver Loan Agreement, the Debtors developed and implemented technological systems and operational procedures. (Farley Direct ¶ 29.) Starting in 2008, the Consolidated Financial Data Repository, or "CFDR," became the Debtors' primary record for tracking their assets and was maintained in the ordinary course of the Debtors' business. (Farley Direct ¶¶ 29–30; *see also* PX 139.) The CFDR tracks various categories of assets, including without limitation, held for sale ("HFS") and held for investment ("HFI") mortgage loans, FHA/VA receivables,

servicing advances, lending receivables, service fees and late charges, REO property, trading securities, and mortgage servicing rights. (Farley Direct ¶ 30 n.4.) Each asset is marked in the CFDR to reflect the facility to which it has been pledged. (Oct. 16 Tr. 194:3–10.) Because the collateral pools for the Revolver and the JSN Secured Notes were the same, the CFDR tracked the JSN Collateral by tracking the Revolver collateral. (Farley Direct ¶ 30.)

Assets comprising Primary Collateral under the Revolver Security Agreement are tracked and marked in the CFDR as pledged to the Revolver. (Oct. 16 Tr. 194:3–6.) Assets comprising Blanket Lien Collateral under the Revolver are also tracked, but before the Petition Date, those assets were marked as "Unpledged" in the CFDR because (1) the Debtors were not required, and the CFDR was not used, to report on Blanket Lien Collateral; and (2) Blanket Lien Collateral was not subject to the same constraints relating to use of proceeds as Primary Collateral. (Farley Direct ¶ 35.) Not all unpledged assets constituted Blanket Lien Collateral, though, because Excluded Assets under the Revolver Security Agreement and JSN Security Agreement would also be listed as unpledged. (Farley Direct ¶ 35; Oct. 16 Tr. 194:7–10.)

**\*566** Shortly before the Petition Date, the Debtors updated the CFDR to comply with stricter reporting and cash tracking requirements attendant to the bankruptcy process and recoded assets constituting Blanket Lien Collateral from "Unpledged" to "Blanket Lien Collateral." (Ruhlin Dep. 119:4–9, 155:16–156:2, 156:15–21; Farley Direct ¶ 36; Farley Dep. 115:4–14.) When the Debtors repurposed the CFDR in 2012 and began specifically tracking blanket lien collateral, "what [ResCap] viewed as blanket lien collateral was no longer included as unpledged. It was marked otherwise to be more specific that it related to pledged collateral in some way." (Ruhlin Dep. 119:4–9; *see also* Farley Dep. 138:4–11 ("Shortly before the filing date ... since [ResCap was] going to have to start reporting on all assets which had been subject to the blanket lien at the time of the filing date, there was an effort undertaken to label all of the assets which were in [ResCap's] view ... subject to the blanket lien.").)

During the trial, Ms. Farley testified that the CFDR is a Sarbanes–Oxley ("SOX") compliant financial tool that is auditable, verifiable, and subject to a heightened level of scrutiny and attention by the Debtors'/AFI's SOX teams and the Debtors' external auditors, Deloitte & Touche. (Farley Direct ¶ 43; Oct. 16 Tr. 233:1–6, 234:23–235:25.) Ms. Farley also testified that these controls were rigorous because the

CFDR was a critical financial technology for the Debtors. (Oct. 16 Tr. 235:24–25.) Ms. Farley further detailed the strict controls on the collateral tracking process under the CFDR, including the processes for (1) designating an asset as being pledged to a particular facility; (2) changing an asset's designation; (3) reconciling any inconsistencies between the CFDR data, the general ledger, and source data submitted by various business units; and (4) submitting collateral reports under the Revolver and LOC Facility. (Farley Direct ¶¶ 30 n.4, 33–34, 38–42; Oct. 16 Tr. 194:1–10; *see also* PX 162.)

Following Ms. Farley's testimony, over the Defendants' objection, the Court admitted the CFDR in evidence as a business record maintained by the Debtors in the ordinary course of business. (Oct. 17 Tr. 32:17–33:17, 40:7–41:18.) The Court expressly finds that the CFDR is a reliable and accurate business record containing a contemporaneous record of the Debtors' business transactions concerning the assets tracked in the system. The Court also expressly finds that the Defendants' challenge to the CFDR is unpersuasive.

### 1. The CFDR and the Released Blanket Collateral

The CFDR constituted the Debtors' books and records by which the they tracked collateral pledged to various facilities. Thus, collateral listed as pledged to the AFI LOC in the CFDR would meet the definition of a Subject Mortgage Loan released by the Third Party Collateral Agent (discussed above) as part of the Blanket Releases.

The JSNs claim that they have a lien on $910 million of collateral that was identified in the CFDR as pledged to the AFI LOC on the Petition Date. That collateral is composed of categories of assets that were released under either of the Blanket Releases.[20] (Farley Direct ¶ 62.) The **\*567** JSNs argue that other evidence of the release of this $910 million of JSN Collateral should exist, including schedules of mortgage loans, notices of collateral additions to the LOC Loan Agreement, and electronic templates used to update the CFDR. The Debtors, though, either did not maintain all these documents or did not locate them in their searches during discovery. (*See* ECF 13–01343 Doc. # 117; *see also* Oct. 16 Tr. 237:6–239:14.)

Regardless, there is no dispute that $910 million of collateral is listed in the CFDR as pledged to the AFI LOC; nor is there any dispute that the $910 million comprises categories of assets that were released under the Blanket Releases.

In ruling on the motions to dismiss, the Court held that the description of the collateral covered by the releases satisfied the requirements of the Uniform Commercial Code ("U.C.C.") section 9–108(b). *Residential Capital,* 497 B.R. at 418. Therefore, the Court finds that the $910 million was effectively released, and no further evidence is necessary to support those releases. The absence of the additional records sought by the Defendants is not sufficient to overcome the evidence that was introduced at trial. The Court expressly finds that a preponderance of the evidence supports the finding that the $910 million of collateral was released from the JSNs' lien and pledged to the AFI LOC.

## C. Events Leading Up to the Debtors' Bankruptcy

In August 2011, the Debtors began to contemplate out-of-court restructuring opportunities, a potential chapter 11 filing, financing alternatives and asset sales. To that end, in October 2011, ResCap retained Centerview Partners LLC ("Centerview") to assist in this process. (Puntus Direct ¶¶ 1, 16, 40, 41, 43; Marano Direct ¶ 28.) In December 2011 and January 2012, faced with significant debt maturities coming due in spring 2012, the Debtors and Centerview began evaluating, and launched a process to obtain, a stalking horse bid(s) for a chapter 11 sale of all or a substantial portion of the Debtors' assets. (Puntus Direct ¶¶ 3, 16, 44; Marano Direct ¶ 29.) Contemplating a potential bankruptcy filing, the Debtors wanted to obtain debtor-in-possession ("DIP") financing, secure a stalking horse bid, and continue to work with government-sponsored entities ("GSEs") and regulators to maintain the Debtors' GSE mortgage servicing rights ("MSRs"). (Marano Direct ¶ 3 1.) The Debtors also wanted to resolve potential claims against AFI to obtain AFI's support for the business and resolve litigation threats asserted by RMBS trustees. (*Id.*)

### 1. Stalking Horse Bids

On or about January 23, 2012, Centerview launched a marketing process for the Debtors' assets. (Puntus Direct ¶ 48.) After developing a list of potential bidders, Centerview contacted five potential bidders and negotiated nondisclosure agreements with each one. (*Id.*) Centerview made clear that the Debtors would consider bids for any and all asset combinations, including bids on individual assets. (*Id.*) **\*568** Centerview also opened a data room to facilitate bidder due diligence, and the Debtors held multi-day management presentations with three of the five potential bidders. (*Id.*)

In February 2012, Centerview received three preliminary indications of interest from (a) Nationstar Mortgage LLC ("Nationstar") (PX 27), (b) Ocwen Loan Servicing LLC ("Ocwen") (PX 25), and (c) a certain undisclosed financial bidder (PX 17). The financial bidder's letter of intent ("LOI") included a bid of $1.5 billion for the Debtors' mortgage loan origination and servicing assets (the "Servicing and Origination Assets") and portions of the Debtors' whole loan portfolio (the "Whole Loan Portfolio"). Nationstar also submitted an LOI, which included a bid of $2.6 billion for a substantial portion of the Debtors' assets. (Puntus Direct ¶ 49.) Ocwen's initial LOI was a bid of $1.426 billion to acquire solely the Debtors' private label securitization ("PLS") MSRs and associated advances. (*Id.*) The Debtors and their advisors determined that proceeding with two of the three bidders—Nationstar and the financial bidder—was most prudent. (*Id.* ¶ 50.) Centerview then approached each of the two with a detailed request for supplemental information. (*Id.*) To that end, on February 22, 2012, Centerview sent a letter to Fortress Investment Group LLC ("Fortress")—Nationstar's primary shareholder—requesting additional clarification related to Nationstar's bid. (PX 366.) Centerview asked Nationstar to clarify how it would allocate its bid among the purchased assets, "including but not limited to a separate allocation for each of the financial assets (MSR, advances, whole loan portfolio) as well as the servicing and origination platforms, respectively." [21] (*Id.*) In its response to Centerview's questions about bid allocation, Fortress specified that it would allocate no value to either the consumer lending or servicing platforms. (PX 28 at 2.)

Nationstar submitted a revised LOI on February 28, 2012, increasing the purchase price on assets included in its initial bid by $100 million, and expanding the assets purchased to include GSE and PLS advances. (Puntus Direct ¶ 5 1.) It also increased its total bid for the Debtors' mortgage loan origination and servicing assets and Whole Loan Portfolio to $4.2 billion for the Debtors' mortgage loan origination and servicing assets and Whole Loan Portfolio. (*Id.*) Nationstar's bid on the Whole Loan Portfolio was contingent on AFI providing better-than-market debt financing for such portfolio. (*Id.*) After this bid, the Debtors decided to proceed with Nationstar as the exclusive bidder on the assets. (*Id.* ¶ 52.) In early March 2012, the Debtors and their advisers negotiated the terms of the asset purchase agreement with Nationstar (the "Nationstar APA"), and Nationstar completed its analysis of the Debtors' business. (*Id.* ¶ 55.)

During April and May of 2012, AFI decided not to provide Nationstar debt financing related to the Debtors' Whole Loan Portfolio, and offered its own bid of $1.4 to 1.6 billion to acquire those assets, depending on whether the sale was effectuated through a section 363 sale or chapter 11 plan. (*Id.* ¶ 56.) AFI's decision not to provide financing caused the value of Nationstar's overall bid to decrease. (*See* PX 52 at 6.) The Debtors' professionals determined that AFI's bid to acquire the Whole Loan Portfolio was superior to Nationstar's **\*569** bid for those assets, particularly because AFI was not seeking any stalking horse protections in connection with the sale and had submitted a draft asset purchase agreement with very favorable terms for the Debtors. (Puntus Direct ¶ 56.) Thus, the Debtors and their advisors negotiated the terms of an asset purchase agreement with AFI (the "AFI APA").

The Debtors' Board of Directors approved both APAs. (*Id.* ¶ 57.) On May 13, 2012, both APAs were executed and delivered by the parties. (*Id.*) On the Petition Date, the Debtors filed two stalking horse bids with the Bankruptcy Court: Nationstar's $2.3 billion stalking horse bid for the Debtors' mortgage loan origination and servicing assets (encompassed in the Nationstar APA), and AFI's $1.4 to 1.6 billion bid for the Debtors' Whole Loan Portfolio (encompassed in the AFI APA). (Puntus Direct ¶ 57; Marano Direct ¶ 58.)

### 2. Communications and Settlements with Various Parties

During the prepetition auction process, the Debtors regularly communicated with the GSEs concerning the proposed agreement and plans for maintaining the Debtors' origination and servicing operations as a going concern until closing of the final sale to preserve the value of the MSRs and associated advances. (Marano Direct ¶ 50; Puntus Direct ¶ 45.) Through these regular contacts, the Debtors convinced the GSEs that the Debtors could sell the assets without damaging the MSRs and associated advances. (Puntus Direct ¶ 46.) The stakes were high: if the GSEs had concluded that ResCap could not operate or credibly pursue an orderly sale of the mortgage servicing assets, and that the GSE-related assets might therefore have been subject to liquidation, the GSEs would raise the cost of doing business and seize their assets. (Marano Direct ¶ 51.) By obtaining financing, use of cash, continuity of management through the end of sale, and a stalking horse bidder, the Debtors reassured the GSEs that during the chapter 11 sale process, the Debtors' business would continue to function as usual pending the sale. (*Id.*)

Before the Petition Date, the Debtors negotiated a settlement with the Department of Justice, the Department of Housing and Urban Development, and the attorneys general of 49 states (the "DOJ/AG Settlement") to resolve potential claims arising out of origination and servicing activities and foreclosure matters. (*Id.* ¶ 7.) The DOJ/AG Settlement required that the Debtors pay approximately $110 million in cash and provide various specified forms of borrower relief with a value of at least $200 million and that the Debtors —and any purchaser of the Debtors' assets—implement a remedial program of loan modification and enhanced servicing measures, both subject to ongoing regulatory monitoring and oversight, and imposed increased operational costs. (*Id.* ¶ 53.) Also before the bankruptcy filing, the Debtors entered into a consent order settling an investigation by the Federal Reserve Board (the "FRB Consent Order") arising out of the same general facts as the DOJ/AG Settlement. (*Id.* ¶ 54.) The terms of the FRB Consent Order required ResCap to pay a penalty of $207 million, as well as to enhance various aspects of their origination and servicing business, including their compliance and internal audit programs, internal audit, communications with borrowers, vendor management, employee training, and oversight by the Board of Directors. (*Id.*) The Consent Order required the Debtors—and any purchaser of the Debtors' assets—to maintain **\*570** compliance with the terms of the order.[22] (*Id.*)

### 3. Prepetition Settlements and Plan Support Agreements

Before the Petition Date, the Debtors entered into plan support agreements with AFI and certain other parties in interest—including certain of the current Ad Hoc Group members—whereby the parties committed to support, subject to certain terms and conditions, the Debtors' effort to pursue a chapter 11 plan pursuant to the terms provided in the Plan Term Sheet, dated May 14, 2012 (the "Prepetition Plan Term Sheet"). (PX 432.) The Prepetition Plan Term Sheet contemplated, among other things, that AFI would make a cash contribution in exchange for estate and third party releases. (PTO ¶ 24.) The Debtors and AFI reached a prepetition settlement approved by the ResCap board on May 13, 2012 (the "Original AFI Settlement"). (Marano Direct ¶ 40.) That settlement was memorialized in a Plan Sponsor Agreement. (*Id.*) Under the terms of the Original AFI Settlement, AFI agreed to pay the Debtors $750 million, continue to support the Debtors' origination business in

chapter 11, provide a stalking horse bid for the Whole Loan Portfolio, provide DIP financing, and continue to provide the Debtors the shared services it needed to run its business. (*Id.* ¶ 41.) The Original AFI Settlement and Plan Sponsor Agreement also provided for the automatic termination of the agreements if the Court did not approve a chapter 11 plan on or before October 31, 2012. AFI and the Debtors agreed to monthly waivers of this automatic termination through February 28, 2013. (*Id.* ¶ 41; Puntus Direct ¶ 35.)

Under the plan support agreement entered into with the JSNs (the "JSN PSA"), the JSNs would have waived all rights to postpetition interest through December 31, 2012, so long as no unsecured creditor received postpetition interest, the JSN PSA did not terminate, and the effective date of the plan occurred by December 31, 2012, or (1) the closing of contemplated asset sales occurred by December 31, 2012, and (2) the effective date of the plan occurred by March 31, 2013. (Puntus Direct ¶ 33.) The JSN PSA also would have provided that AFI would subordinate a portion of its liens and claims to the JSNs. (*Id.*)

At the same time that the Debtors were negotiating with AFI, they were also negotiating with the trustees of certain RMBS trusts (the "RMBS Trusts") for which the Debtors acted as sponsor, depositor, or in a similar capacity. (*Id.* ¶ 37.) These negotiations related to resolution of approximately $44 billion of potential liability for representation and warranty and servicing claims arising out of the Debtors' private-label residential mortgage backed securities. (Marano Direct ¶ 43.) The Debtors believed that resolving these private-label securities claims was crucial to enhancing the value of the Debtors' assets for a potential sale. (*Id.*) The overhang of this litigation exposure had impeded the Debtors' sale efforts in the years before the chapter 11 filing and would have diminished the value the Debtors' creditors could have obtained in a chapter 11 sale. (*Id.*) Further, the RMBS Trustees (the "RMBS Trustees") threatened to assert the right to withhold servicing advances owed to the Debtors as an offset against origination and servicing liabilities allegedly owed to them. (*Id.*)

In May 2012, the Debtors reached a proposed settlement with the institutional **\*571** investors holding a substantial stake in the RMBS Trusts (the "RMBS Settlement"). (*Id.* ¶ 44.) ResCap's board of directors approved that agreement on May 13, 2012. (*Id.*)

With the stalking horse bids, proposed settlements, and plan support agreements in place, the Debtors filed their chapter 11 cases on May 14, 2012. Any notion that the Court was being presented with a pre-packaged bankruptcy was short-lived, however, and these cases rapidly descended into warfare threatening the Debtors' ability to continue operating as a going concern.

### *4. Termination of the Initial Plan Support Agreements*

By late September 2012, two events occurred that altered the calculus of the JSNs who supported the prepetition PSA. (Siegert Direct ¶ 12.) First, with the auction still a month away, there was no longer any possibility of an expedited distribution upon a rapid sale closing. (*Id.*) Second, the Committee challenged certain of the JSNs' liens within the challenge period prescribed by the Cash Collateral Order. (*Id.*) The Ad Hoc Group then terminated the prepetition term sheet and inserted an express reservation of rights regarding adequate protection and allocation of expenses in each extension of the Cash Collateral Order. (*Id.*)

### D. The Cash Collateral Order

To keep their business operating as debtors-in-possession, the Debtors sought to obtain postpetition financing and authorization to use the cash collateral encumbered by existing debt facilities. (Marano Direct ¶ 33; Puntus Direct ¶ 17.) The continued funding would allow the Debtors to (1) continue to issue loans and offer loan modifications to thousands of borrowers; (2) continue to service mortgages and make advances associated with such servicing obligations; (3) comply with the Federal Reserve and FDIC consent order; (4) comply with the DOJ/AG Settlement; (5) comply with the agreements that had been entered into with the GSEs mandating the care with which their loans should be serviced and refinanced, and repurchase loans from the GSEs; and (6) maintain hundreds of employees through retention payments so that delinquencies would not increase and thus diminish the value of, and jeopardize the sale of, the Debtors' MSRs and other assets. (Marano Direct ¶ 34.) For example, the Debtors needed to continue funding their servicing advance obligations for the RMBS and other PLS, as well as GSE loans. (*Id.* ¶ 35.) With respect to the GSE loans, the GSEs actually owned the Debtors' servicing rights, so if the Debtors failed to make the requisite advances, the GSEs could have revoked the Debtors' servicing rights, and

re-assigned those rights to another company. (Marano Direct ¶ 35; Puntus Direct ¶ 19.)

The Debtors ultimately obtained DIP financing facilities from Barclays Bank PLC and AFI, as well as consensual use of cash collateral from their prepetition lenders, including the JSNs. (Marano Direct ¶ 37.) On May 14, 2012, the Debtors filed motions seeking authorization to (1) enter the Barclays postpetition financing facility (the "Barclays DIP Facility"); (2) make postpetition draws under the AFI LOC up to $200 million; and (3) use cash collateral securing each of the Revolver, the AFI LOC, and the Junior Secured Notes to fund the cash needs related to operations and assets of each of the respective collateral pools. (Id.; Puntus Direct ¶ 28.) The motions were approved on an interim basis on May 15, 2012, and were approved on a final basis, with the consent of the JSNs and AFI, pursuant to orders entered on **\*572** June 25, 2012 (the "Cash Collateral Order"). (PX 76; Marano Direct ¶ 37.)

Under the Cash Collateral Order, the Debtors were authorized to use cash collateral in accordance with the Forecasts (as defined in the Cash Collateral Order), and the JSNs were protected to the extent of the aggregate diminution in value of the JSN Collateral. (PTO ¶ 29.) Among other things, the JSNs were granted adequate protection liens on all of the collateral securing the AFI Revolver, the AFI LOC, and all of the equity interests of the Barclays DIP Borrowers. (PX 76.)

The parties dispute whether, in determining an adequate protection claim based on diminution in value of collateral, the value of the collateral at the Petition Date should be determined by the foreclosure value of the collateral in the hands of the secured creditor (as argued by the Plaintiffs), or by the going concern value of the collateral in the hands of the Debtors (as argued by the Defendants). The legal issue is discussed below in section III.B.3. The Defendants' expert Mr. Siegert testified that when negotiating the Cash Collateral Order, the parties never discussed that adequate protection and diminution in value of JSN Collateral would be determined using foreclosure value. (Oct. 23 Tr. 195:9–13.) According to Mr. Siegert, that would have been contrary to the spirit of the negotiations, which were aimed at easing the Debtors' bankruptcy filing. (DX AIJ at 7.)

The Forecasts provided for the pro rata allocation of the cash disbursements during the relevant period to various silos of assets securing the Debtors' various secured credit facilities, as well as to unencumbered assets. (Puntus Direct ¶ 26.) The

Debtors delivered updated Forecasts to the JSNs and AFI every four weeks as required by the Cash Collateral Order, and, although the JSNs did not have consent rights, at no point during the case did they object to any Forecast. (Id.) The Cash Collateral Order also obligated the Debtors to deliver to the JSNs a 20–week forecast of anticipated cash receipts and disbursements for the 20–week period. (PX 76 at 22.) The Debtors were only permitted to use cash collateral for the "purposes detailed within the Initial 20–Week Forecast and each subsequent Forecast." (Id. at 23–24.)

The Cash Collateral Order contained a waiver of the Debtors' right to surcharge against prepetition collateral pursuant to Bankruptcy Code section 506(c) (PX 76 at 42–43.) Specifically, the Cash Collateral Order states that: "[N]o expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral and [Cash] Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code...." (Id.) The Cash Collateral Order also expressly waived the "equities of the case" exception contained in section 552(b) of the Code. (Id. at 35.)

The Debtors negotiated several extensions regarding the use of the cash collateral of AFI and the JSNs, including a stipulation entered on June 28, 2013. (ECF 12–12020 Doc. # 4115.) On July 10, 2013, the Court entered the Stipulation and Order in Respect of the Debtors' Motion for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral (ECF 12–12020 Doc. # 3374) (the "Cash Collateral Stipulation") among the Debtors, AFI, and the JSNs, which terminated the use of cash collateral effective as of July 11, 2013, with certain limited exceptions. (PX 85 ¶ 2.)

The Debtors also negotiated a "Carve Out" in the Cash Collateral Order (PX 76 **\*573** at 31– 32.) The Cash Collateral Stipulation served as the Carve Out Notice. No party disputes that a section 506(c) waiver was provided for the benefit of the JSNs. The parties dispute whether the JSNs are entitled to an adequate protection claim for amounts of cash collateral expended by the Debtors consistent with the agreed budget under the Cash Collateral Order. The issue also remains whether the Debtors may use an additional $143 million of the JSNs' cash collateral covered by the Carve Out in the Cash Collateral Order after the termination of the use of cash collateral where sufficient unencumbered cash is

available to make the payments. The issue is addressed below in section III.D.8.

## E. Stipulation of Liens under the Cash Collateral Order

In the Cash Collateral Order, the Debtors stipulated that the JSNs' collateral included, but was not limited to, all categories of assets identified in the "Ally Revolver" and "Blanket" columns on Exhibit A to the Cash Collateral Order. (PTO ¶ 28.) The Debtors further stipulated, pursuant to paragraph 5(g) of the Cash Collateral Order, that security interests granted to the JSNs "are valid, binding, perfected and enforceable priority liens on and security interests in the personal and real property constituting 'Collateral' under and as defined in the Junior Secured Note Documents." (PX 76 at 11–12.) Under the Cash Collateral Order, the "Junior Note Documents" included the JSN Security Agreement, the Notes Indenture, "and all other documents executed in connection therewith." (*Id.* at 4) The Defendants contend that, under paragraph 5(g), the Debtors stipulated that the JSNs' liens extend to all collateral to which a security interest was initially granted, including the AFI LOC Collateral that was previously released by the Third Priority Collateral Agent under the Blanket Release. (PTO JSN Contentions ¶ 18.) The JSNs' witness, Mr. Siegert—the lead engagement partner for Houlihan Lokey Capital, Inc. ("Houlihan")— testified that as of the Petition Date, he had no belief that the Debtors' stipulations in paragraph 5(g) would revive the JSNs' previously released liens. (Oct. 23 Tr. 102:4–6, 102:19–24, 105:3–25, 115:4–8, 125:12–126:15, 126:23–127:21.) Mr. Siegert explained that if counsel for the JSNs had concluded that paragraph 5(g) would revive more than $1 billion of AFI LOC Collateral, that would have been material information for Houlihan and the Ad Hoc Group to know, as well as a material factor in estimating the value of the JSNs' liens. (Oct. 23 Tr. 127:25–128:16.) But Houlihan's May 14, 2012 public presentation (the "May 14 Presentation") that presented an estimation of the JSNs' recovery on their prepetition collateral did not incorporate or disclose the existence of the billion dollars of AFI LOC Collateral. (PX 169; Oct. 23 Tr. 128:17–21; 132:18–133:4.) Mr. Siegert testified that if Houlihan had known that paragraph 5(g) revived $1 billion worth of JSNs' liens, it would have incorporated that fact in the May 14 Presentation. (Oct. 23 Tr. 128:23–133:4.)

Further, in paragraph 5(g), the Debtors stipulated that the JSNs' liens are "subject and subordinate only" to those prepetition liens that were granted under the Revolver. (PX 76 at 11–12.) But this provision does not subordinate the JSNs' purported lien on the AFI LOC Collateral to AFI (i.e.,

the lender). So under the Defendants' proposed interpretation of paragraph 5(g), the JSNs' purported liens on the AFI LOC Collateral would be elevated ahead of the AFI's liens in that same collateral. Additionally, while granting the JSNs a postpetition adequate protection lien on the Revolver Collateral and the **\*574** AFI LOC Collateral, the Cash Collateral Order subordinated those liens to any existing liens on the same collateral. To that end, with respect to the JSNs' adequate protection lien on the Revolver Collateral the Order acknowledges that the lien is junior to the "existing liens granted to the Junior Secured Parties." (*Id.* at 28.) With respect to AFI LOC Collateral, though, the Cash Collateral Order does not mention the JSNs' purported existing lien on that collateral. (*Id.* at 28–29.)

Other documents also indicate that paragraph 5(g) was not intended to revive any previously released JSN liens. For example, in the JSN PSA, the JSNs expressly reserved the right to make a claim for an equitable lien on the AFI LOC Collateral. (PX 252 § 5.6.) That would have been superfluous if the JSNs believed that paragraph 5(g) already granted them a lien on that collateral. Moreover, when the Debtors sought approval of the Barclays DIP Facility, they argued that any asserted equitable JSN lien on the AFI LOC Collateral was invalid and not perfected. (PX 88 at 55.) That position would have been inconsistent with a stipulation granting the JSNs a lien on that collateral in paragraph 5(g). Neither the motion for approval of the use of cash collateral, nor any disclosures to the Court in connection with the interim or final cash collateral orders, disclose that the JSNs believed they were getting a perfected security interest in any previously released collateral.

## F. The Asset Sales

On the Petition Date, the Debtors filed motions to approve stalking horse bids from AFI and Nationstar with respect to the Debtors' Whole Loan Portfolio and Servicing and Origination Assets, respectively. (*See* PX 61.) The Debtors entered into the initial stalking-horse bid with Nationstar to sell the servicing, origination, and capital markets platforms (which included people, software, and IT) of the Debtors. (PX 33.) The Debtors also agreed to sell Nationstar contracts, servicing agreements, MSRs owned by the Debtors, certain Ginnie Mae-guaranteed whole loans, and intellectual property, goodwill, and general intangibles "Related to the Business" for $2.3 billion. (*Id.* at 38–41.)

After the Petition Date, on June 15, 2012, Berkshire Hathaway, Inc. ("Berkshire") submitted competing bids to

become the stalking horse bidder for both sets of assets. (Puntus Direct ¶ 59.) The bids, which were submitted without Berkshire having performed any due diligence, were in the form of executed asset purchase agreements virtually identical to the agreements executed by Nationstar (for the Servicing and Origination Assets) and AFI (for the Whole Loan Portfolio). (*Id.*) Due, at least in part, to Berkshire's bids, a "pre-auction" auction (the "Mini Auction") ensued in advance of and during the sale procedures hearing, with the Court ultimately directing that final proposed stalking horse bids be submitted to the Debtors on June 18, 2012. (*Id.*) In accordance with the Court's direction, both Nationstar and Berkshire submitted revised stalking horse bids. (*Id.*) With the support of the Committee, the Debtors sought and obtained Court approval of the Nationstar and Berkshire stalking horse bids and the bid and sales procedures at a hearing on June 19, 2012. [23] (*Id.* ¶ 60.)

In the lead-up to the Asset Sales, the Debtors maintained the servicing and origination **\*575** platforms as going concerns. (Marano Direct ¶¶ 50–51.) The Debtors considered, but rejected, the possibility of liquidation, because, according to Mr. Marano, the Debtors did not believe that a liquidation was in the best interests of the creditors, and the Debtors did "everything [they] could" to prevent a foreclosure. (Oct. 15 Tr. 164:10–25.)

### 1. The Servicing and Origination Assets Sale

The Court approved the sale and bid procedures with respect to the Servicing and Origination Assets (PX 44), and Centerview approached those institutions that it believed would have an interest in purchasing, and the financial resources and expertise necessary to purchase, the Servicing and Origination Assets, to gauge their respective interest. (Puntus Direct ¶ 61.) Following these initial contacts and an introductory due diligence period for interested parties, the Debtors' management team and Centerview made formal presentations to five prospective purchasers, during which they described in detail the Servicing and Origination Assets being sold and afforded them an opportunity to visit the Debtors' locations and perform detailed on-site due diligence with the Debtors' business units. (*Id.*) The Debtors received responses from three potential purchasers: (1) Berkshire, (2) a consortium of two bidders, and (3) a consortium composed of Ocwen and Walter Investment Management Corporation ("Walter"). (*Id.* ¶ 63.) The Debtors focused their marketing efforts on these three potential purchasers. (*Id.*)

On October 19, 2012, the Debtors received two qualifying bids for the Servicing and Origination Assets: (1) the stalking horse bid previously submitted by Nationstar at a value of $2.357 billion; and (2) a bid from Ocwen and Walter at a value of $2.397 billion. (PX 48; PX 47.) The Debtors determined that the Ocwen bid was the highest and best bid for the Servicing and Origination Assets and decided that they would open the auction with the Ocwen bid. (Puntus Direct ¶ 64; PTO ¶ 34.) On October 23, 2012, the Debtors began the auction for the Servicing and Origination Assets with Ocwen's bid as the opening bid. Two bidders, Nationstar and Ocwen, submitted offers for these assets. Although Ocwen was a bidder of record for these assets, the Ocwen APA provided for the assignment of the Debtors' Fannie Mae assets to Walter. (PX 47; Puntus Direct ¶ 69.)

During the auction, the Debtors negotiated with Nationstar and Ocwen to obtain certain adjustments to their bids and asset purchase agreements. As required by Ginnie Mae, both bidders agreed to remove the Ginnie Mae liability bifurcation condition in the asset purchase agreements. (Puntus Direct ¶ 71.) Consequently, Ginnie Mae would be able to seek satisfaction of all liabilities relating to Ginnie Mae loans, either pre- or post-closing, related to servicing or origination, from the purchaser of the Servicing and Origination Assets. (*Id.*) Also, although both Ocwen's and Nationstar's bid did not contractually obligate them to acquire the servicing and origination platforms, both bidders agreed to include a commitment to acquire the platforms and associated liabilities as part of the bid. (Puntus Direct ¶ 72; Marano Direct ¶ 62.) To induce Ocwen and Nationstar to make this commitment, the Debtors offered the bidders a bid credit in the amount of $108.4 million, which represented the estimated liabilities associated with the platforms. (PX 56 at 37–41; Puntus Direct ¶ 72.) After 28 rounds of bidding, Ocwen made the highest and best offer to purchase the Debtors' Servicing and Origination Assets for itself and Walter, with a winning purchase price of approximately **\*576** $3 billion. (PX 57 at 9–10.) The Court approved the Ocwen Sale on November 19, 2012, and entered an Order approving the asset sales on November 21, 2012. (PX 45; Puntus Direct ¶ 79; PTO ¶ 36.)

The parties effectuated the Ocwen Sale through the Ocwen APA, dated as of November 2, 2012 (and as later amended), among Ocwen, ResCap, and certain other Debtor signatories. (PX 19; PX 20; PX 21; PX 22; PX 23; PX 24; PTO ¶ 37.) The Ocwen APA provided that Ocwen was buying "goodwill and other intangible assets Related to the Business or related to the

Purchased Assets." (DXPT at 41.) In total, over 2,000 ResCap employees, including those associated with call centers and management, were "migrat[ed]" to Ocwen as part of the purchase of ResCap's servicing and origination platform with no significant reduction in personnel. (Ziegenfuse Dep. 63:16–19:6, 65:7–21, 67:17–23.)

In the APA, Ocwen attributed zero value to goodwill and intangibles, but in a subsequent 10–Q filing, the company attributed approximately $210 million to those assets. (DX ZH at 30.) The APA contains a provision that any purchase price allocation in the APA would only bind the parties for tax purposes, and not for any other purpose. (PX 19 at 50.) The parties dispute whether a portion of the purchase price must be allocated to general intangibles and goodwill, as to which the JSNs claim to have a perfected lien.

### 2. The Whole Loan Portfolio Sale

Contemporaneously with the marketing process for the Servicing and Origination Assets, Centerview considered those institutions that it believed would be interested in and financially capable of purchasing the Whole Loan Portfolio. (Puntus Direct ¶ 65.) Centerview approached those potential purchasers to gauge their respective interest. (*Id.*) On October 19, 2012, the bid deadline approved by the Court, the Debtors received two qualifying bids for the Whole Loan Portfolio: (1) the stalking horse bid previously submitted by Berkshire at a value of $1.324 billion; and (2) a bid from a consortium of four financial bidders led by DLJ Mortgage Capital (the "DLJ Consortium") at a value of $1.339 billion. (*Id.* ¶ 66) The Debtors determined that the DLJ Consortium bid was the highest and best bid for the Whole Loan Portfolio and decided that they would open the auction with the DLJ Consortium bid. (*Id.*; PTO ¶ 35.)

On October 25, 2012, ResCap held an auction for its Whole Loan Portfolio. (Puntus Direct ¶ 79.) After 11 rounds of bidding, Berkshire won the auction with the highest and best offer of $1.5 billion, an amount $175 million higher than the original stalking horse bid. (*Id.*; PX 58 at 22–23.) Before the auction, Berkshire had agreed to continue compliance with certain aspects of the FRB Consent Order and the DOJ/AG Settlement. (Puntus Direct ¶ 79.) The Court approved the Berkshire sale on November 19, 2012, and entered an order approving the asset sales on November 21, 2012. (ECF 12–12020 Doc. # 2247; PX 46.)

### G. Facts related to Original Issue Discount

The Junior Secured Notes were issued in connection with a 2008 debt-for-debt exchange offering (the "Exchange"). On May 5, 2008, ResCap issued an Offering Memorandum in which it offered to exchange $9.537 billion face value amount of its then-outstanding unsecured notes maturing from 2010 through 2015 (the "Old Notes") for the Junior Secured Notes. (PTO ¶ 7; PX 175.) Under the Exchange, ResCap offered to exchange $1,000 face principal amount of outstanding unsecured notes for $800 face value of Junior Secured  **\*577** Notes. (PTO ¶ 8.) Pursuant to a modified Dutch Auction, the clearing price was $650 per $1,000 principal amount of Junior Secured Notes, which was the lowest level at which tenders were accepted. (*Id.*) Through the Exchange, ResCap exchanged approximately $6 billion of Old Notes for approximately $4 billion in Junior Secured Notes and $500 million in cash. Approximately 63% of the Old Notes were exchanged in the Exchange. (*Id.* ¶ 9.) The issue price of the Junior Secured Notes was established as $613.75 based on trading activity from the first day of trading. Using this price, AFI calculated the amount of OID for tax purposes as of the Petition Date to be $377,262,728. (*Id.* ¶ 52; PX 189; Finnerty Direct ¶ 55.) As an economic matter the Exchange created OID. (Finnerty Direct ¶ 10.) AFI amortized the OID by compounding it on a semi-annual basis. Amortizing OID on a daily compounding basis results in a slightly larger amount of OID: $386 million. (*Id.* ¶ 60.)

The Plaintiffs argue that the OID should be disallowed in bankruptcy as unmatured interest. The Defendants, on the other hand, argue that the OID should be allowed as part of their claim based on Second Circuit precedent. The Plaintiffs and Defendants each offered expert testimony on issues relating to the bankruptcy treatment of the OID generated in the Exchange. John D. Finnerty, Ph.D., a Managing Director in the Financial Advisory Services Group at AlixPartners, LLP and Professor of Finance at Fordham University's Graduate School of Business Administration, testified on behalf of the Plaintiffs, and Mr. Siegert testified on behalf of the Defendants.

The parties do not dispute that the Exchange was a "fair value" exchange—*i.e.*, that old securities were exchanged for new securities with a reduced principal amount that in theory approximated the market value of the old securities. The Second Circuit's decision in *LTV Corp. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.),* 961 F.2d 378 (2d Cir.1992), addressed the bankruptcy treatment of OID generated in connection with a "face value" exchange

—*i.e.*, one in which the principal amount of the debt is not reduced.[24] (Finnerty Direct ¶ 102; Oct. 21 Tr. 151:11–14.) The experts also agreed that investors in the Notes were sophisticated investors who understood how to analyze risks associated with investing in OID bonds. (Finnerty Direct ¶ 92; Oct. 21 Tr. 184:8–11.)

In addition, Dr. Finnerty calculated that using semi-annual compounding, $377 million in OID remained unamortized as of the Petition Date. (Finnerty Direct, App'x 6A.) Dr. Finnerty, though, believed that daily compounding was the more appropriate method, which he calculated to yield $386 million of unamortized OID as of the Petition Date. (*Id.* at App'x 6B.) Mr. Siegert, on the other hand, testified that he believed that semi-annual compounding **\*578** was the best method. (*See* Oct. 21 Tr. 163:21–25.)

Dr. Finnerty stressed the economic incentives built into the Exchange: yield, security, and seniority. (Finnerty Direct ¶ 62.) In addition, the Exchange allowed ResCap to reduce its overall debt obligations and extend its debt maturities, thereby enhancing the credit strength of the JSNs' obligor, allowing ResCap to avoid bankruptcy for four more years. (*Id.*) In fact, the JSNs will achieve a greater recovery than the noteholders who did not exchange and whose notes remained outstanding on the Petition Date. The Debtors Disclosure Statement (ECF 12–12020 Doc. # 4811) indicates that while the hold-outs have retained a $1,000 par amount unsecured claim, they are projected to recover only 36.3%, or $363.00. (Finnerty Direct ¶ 88.) In contrast, the holders of the JSNs, who received $800 of new secured notes in June 2008, are projected to recover $840. (*Id.*) The Exchange was attractive—and future exchanges would likewise be attractive regardless of the bankruptcy treatment of OID—because of the competitive effective yield of the Junior Secured Notes at issuance, the fact that the Junior Secured Notes, unlike the Old Notes, were secured, and the fact that the Junior Secured Notes were structurally senior to the Old Notes. (*Id.* ¶¶ 62–67, 93.)

Mr. Siegert, in contrast, testified, among other things, that: (1) the disclosures made by ResCap in the Exchange, along with general market evidence, are inconsistent with the conclusion that the Exchange generated disallowable OID for bankruptcy purposes; and (2) disallowing OID in fair value exchanges such as the Exchange would likely cause debt-holders to either reject such exchanges or demand more from distressed companies, thereby discouraging out-of-court workouts and leading to a greater number of bankruptcies. (Siegert Direct

¶ 30.) Mr. Siegert noted that the disclosures did not warn that the Exchange could create OID that would be disallowed in bankruptcy. (*Id.* ¶ 31.) Mr. Siegert also testified that the market did not place much value on the structural enhancements to the Notes that the Exchange created since 63% of noteholders participated in the Exchange, which was a lower participation rate than typical debt-for-debt exchanges. (*Id.* ¶ 32.) ResCap was expecting a significantly higher level of participation in the Exchange; the company and its advisors originally projected a base case participation level of 76%. (*See* Hall Dep. 53:10–21.)

If ResCap had not executed the Exchange, the Company would not have had an ability to meet its debt service obligations as they came due without some third party intervention. (Hall Dep. 43:10–16.) The successful completion of the Exchange enhanced shareholder value by reducing the amount of the Company's outstanding debt. (Hall Dep. 55:14–23; Oct. 21 Tr. 64:5–8; 64:25–65:2.) The successful completion of the Exchange also provided ResCap, its creditors, and other stakeholders with several other valuable benefits, including reducing ResCap's debt service and extending the maturities on ResCap's outstanding debt. (DX BB at 13; Oct. 21 Tr. 18:10–14; 63:6–15; 64:5–8.)

Both experts testified that there is little difference between a face value exchange and a fair value exchange, making disparate treatment for the two exchanges in bankruptcy economically illogical. (Siegert Direct ¶ 37; Oct. 21 Tr. 67:10–69:9.) Mr. Siegert explained that both fair and face value exchanges offer companies the opportunity to restructure out-of-court, avoiding the time and costs—both direct **\*579** and indirect—of a bankruptcy proceeding. (DX AIJ at 7.)

The Second Circuit treats OID created by face value exchanges as allowable in bankruptcy, despite the Code's provision that unmatured interest is disallowed. *See Chateaugay,* 961 F.2d at 384. The *Chateaugay* decision left open the possibility that fair value exchanges could be treated differently, but it did not resolve the issue. Both Dr. Finnerty and Mr. Siegert acknowledged that under *Chateaugay,* there would be no disallowable OID here if the Junior Secured Notes were issued at 100% face value, and all other inducements for participation remained the same. (Oct. 21 Tr. 136:9–20; 214:2–4.) Dr. Finnerty and Mr. Siegert also both acknowledged that if creditors knew that OID created in fair value exchanges would be disallowed, distressed issuers would need to offer greater incentives to participate. (Siegert

Direct ¶ 3 8; DX ABC; Oct. 21 Tr. 101:15–17.) According to Mr. Siegert, this would make distressed debt exchanges more difficult and would likely lead to more bankruptcy filings as opposed to out-of-court workouts. Additionally, bondholders could simply reject fair value exchanges altogether. (Siegert Direct ¶ 3 8.) The experts also both testified that they are unaware of any other creditors whose claim would be determined in bankruptcy based on the trading prices of bonds used to determine the issue price. (DX AIJ 10; Oct. 21 Tr. 23:20–24:2.) Thus, a holder of the Old Notes would not know the amount of OID that would be disallowed in bankruptcy before tendering. (Oct. 21 Tr. 50:24–51:21.) The legal analysis of OID is found in section III.A below.

## H. The Paydowns

On or about June 13, 2013, the Debtors made a payment in the amount of $800 million on account of the outstanding principal of the Junior Secured Notes. (*See* ECF Doc. # 3967.) On or about July 30, 2013, the Debtors made an additional $300 million payment on account of the outstanding principal of the Junior Secured Notes. (*See* ECF Doc. # 4404.) Together these repayments reduced the outstanding principal balance by $1.1 billion.

## I. Expert Valuations of JSN Collateral on Petition Date

The JSNs offered valuation testimony from four proposed experts affiliated with Houlihan: Messers. Fazio, Levine, Taylor, and Siegert. Mr. Fazio offered opinions on the Petition Date value of the Debtors' sold and unsold HFS assets and certain other unsold assets. (Fazio Direct ¶¶ 2–3; Oct. 22 Tr. 122:10–13.) He also offered an opinion on the Petition Date value of a hypothetical entity consisting solely of the Debtors' MSRs, servicing operations, and originations platform. (Fazio Direct ¶¶ 2, 7; Oct. 22 Tr. 122:14–16.) Mr. Levine offered opinions on the Petition Date value of the Debtors' MSRs, refinancing opportunities associated with the MSRs, and Servicing Advances. (Levine Direct ¶ 2.) Mr. Taylor offered an opinion on the allocation of value to certain assets associated with the Ocwen asset sale, including intangible assets, goodwill, and liabilities acquired by Ocwen and Walter. (Taylor Direct ¶¶ 2–3, 7.)

Mr. Siegert offered a single "Global Summary" of these Houlihan opinions suggesting the net fair market value of the JSN Collateral on the Petition Date totaled $2.79 billion. (Siegert Direct ¶¶ 4, 25; Oct. 23 Tr. 134:1–14, 141:14–142:6; DX ABF at 10.) He arrived at this value by first summing (1) the valuations of the Debtors' cash, HFS assets, unsold

servicing advances, FHA/VA loans, equity interests, hedge contracts, and certain other contracts; (2) the valuation of the Debtors' **\*580** sold servicing advances; and (3) his own valuation of the Debtors' intangible assets, derived from his own analysis of Messrs. Fazio, Taylor, and Levine's valuations. (DX ABF at 9–10.) This totaled $4.450 billion. (*Id.* at 10.) Mr. Siegert then subtracted $747 million owed to Ally on the Ally Revolver, and $912 million owed on two facilities,[25] to reach $2.791 billion. (Siegert Direct ¶ 25 & n. 6; DX ABF at 10.)

The Houlihan experts' valuation assumes that the assets could have been sold on the Petition Date by the Debtors. (Oct. 22 Tr. 139:18–142:4; Oct. 23 Tr. 147:23–149:3, 149:18–22.) But when valuing the assets, the Defendants' experts did not look to sales conducted by other distressed entities on the brink of insolvency; rather, the experts treated ResCap as a solvent seller able to capture fair value for its assets.

The Plaintiffs, on the other hand, offered the opinion of Mr. Puntus, Partner and Co-Head of the Restructuring Group at Centerview. Mr. Puntus has been the lead investment banker for the Debtors for over two years. (Puntus Direct ¶ 1, 16; Oct. 16 Tr. 98:9–16.) He was heavily involved in the Debtors' decision to market their assets, the prepetition marketing process and the postpetition sale process, serving as the lead business negotiator for the Debtors on the stalking horse agreements as well as the auction process. (Oct. 16 Tr. 97:23–98:16, 103:6–9.)

Mr. Puntus used the initial Nationstar and AFI stalking horse agreements to determine the benchmark value in his analysis ($1.736 billion), even though these agreements were never consummated. He also endeavored to estimate what the JSNs' Collateral would have been worth upon foreclosure, where the disposition of the assets would have been controlled, in the first instance, by the First Priority Collateral Agent (directed by AFI) or the lenders (*i.e.,* Barclays and AFI for GSAP and BMMZ, respectively).

Mr. Puntus's benchmark did not represent his opinion of the value of the JSNs' Collateral for purposes of adequate protection because the purchase prices reflected in the stalking horse deals were contingent upon the continued operation of the Debtors' business in chapter 11 (Oct. 16 Tr. 103:10–22.) To estimate the value of the JSNs' Collateral as of the Petition Date in the hands of the creditors' agents upon foreclosure, Mr. Puntus therefore made certain downward adjustments from his benchmark valuation. Mr. Puntus based

these adjustments on two alternative scenarios, differing in how long he assumed the creditors would take to dispose of the collateral: "Alternative A" assumed the collateral would be monetized by the collateral agents over a three to four month time period ($1.474 billion), while "Alternative B" assumed a five to six-month period ($1.594 billion). (Puntus Direct, ¶¶ 86–88.) Mr. Puntus further made reductions to account for RMBS and government set off risks, which reduced the "Alternative A" valuation to $1.046 billion, and the "Alternative B" valuation to $1.13 5 billion. (Puntus Direct Ex. 1 at 9.)

Mr. Puntus's methodology was dependent upon his subjective valuations of risks associated with the collateral. At trial, Mr. Puntus conceded that he had never seen a valuation analysis relying on similar methodology before. (Oct. 16 Tr. 36:6–8.) Nor is it likely that Mr. Puntus's valuation methodology could be used in other contexts. **\*581** While Mr. Puntus's methodology is unsupportable, the numbers he reached may well be closer to the actual value of the JSN Collateral on the Petition Date.

## J. Effective Date Value of JSN Collateral

The parties agree to a value of $1.88 billion as the baseline valuation for the JSNs' collateral as of December 15, 2013 (the assumed "Effective Date"), but the Debtors contend that only $1.75 billion of that collateral is properly distributable to the JSNs. The Plaintiffs seek to reduce the JSNs' potential recovery by assessing $143 million of expenses under the Carve Out against the JSN Collateral. The Plaintiffs argue that the Cash Collateral Order expressly made the JSNs' liens subordinate to the Carve Out. The Defendants countered that the Plaintiffs should use unencumbered cash to pay the Carve Out rather than JSN cash collateral.

### 1. Deposit Accounts

Except for the Controlled Accounts (defined below), the Deposit Accounts listed on Schedule 5 to the Committee Action are not subject to an executed control agreement among the relevant Debtor, the Third Priority Collateral Agent, and the bank where such Deposit Accounts are maintained. (PX 126; Landy Direct ¶¶ 3(d), 24(a), 40.) The uncontroverted evidence at trial established that, as of the Petition Date, the Deposit Accounts held funds in the amount of $48,502,829. (Landy Direct ¶ 41.)

Executed control agreements were admitted into evidence for the following Deposit Accounts (collectively, the "Controlled Accounts"): Account Nos. xxxx7570, xxx6190, xxx8567, xxxx7618, xxxx2763, and xxxx0593. (See DX AIU; DX AIV; DX AIW; DX AIX; DX AIY; DX AIZ.) As of the Petition Date, the Controlled Accounts held an aggregate amount of $16,885. (PX 126.) Deposit Account Nos. xxxx2607, xxxx7877, and xxxx1176 (collectively, the "WF Accounts") are maintained at Wells Fargo, which is the Third Priority Collateral Agent. The WF Accounts contained $38,321 as of the Petition Date. (PX 126.)

Deposit Account Nos. xxxx3803 and xxxx6323 (together, the "Ally Accounts") are maintained at Ally Bank, which is an indirect, wholly-owned subsidiary of the AFI, the Revolver Lender. (PTO JSN Contentions ¶ 103.) Ally Bank is not a party to the Junior Notes Documents, the Revolver Documents or the Intercreditor Agreement and is therefore not a "secured party" within the meaning of the U.C.C. for purposes of control and perfection. Further, the Third Priority Secured Parties are not perfected by virtue of the Revolver Lender and Ally Bank being affiliates. First, given that they are not the same entity, the Revolver Lender's lien is not perfected under the U.C.C. through automatic control. Second, even if AFI's lien were perfected through automatic control, that would be the case only with respect to its own security interest (under the Revolver).

Deposit Account No. xxxx2599, which is maintained at J.P. Morgan Chase Bank, N.A. and contained $8,091 as of the Petition Date, contains proceeds of the JSN Collateral (the "Proceeds Account"). (Oct. 17 Tr. 173:4–174:11; PX 6 at 18–19.) The Court finds that the Third Priority Secured Parties have a perfected interest in that account under the U.C.C. because it contains proceeds of JSN Collateral. The Defendants failed to proffer evidence at trial that any of the Deposit Accounts other than the Proceeds Account contain proceeds of the JSN Collateral.

### 2. Real Property

Various Debtors owned the real property and leasehold interests listed on Schedule **\*582** 2 to the Committee Action, and that portion of Schedule 6 to the Committee Action that identifies REO properties (i.e., mortgaged properties acquired through foreclosure or other exercise of remedies under mortgages or deeds of trust that secured the associated mortgage loan instruments) as of the Petition Date. The

property and leasehold interests are not subject to either a mortgage or a deed of trust in favor of the Third Priority Collateral Agent (the "Unencumbered Real Property"). (PX 124; PX 127 at 44–47; Landy Direct ¶¶ 3(b), 24(b), 36; Oct. 17 Tr. 175:1–23.) The uncontroverted evidence at trial established that, as of the Petition Date, the fair market value of the Unencumbered Real Property was $21 million. (Landy Direct ¶ 38.)

The Third Priority Collateral Agent did not know whether it had received any mortgage or deed of trust with respect to the Unencumbered Real Property, nor did it know whether any property owner ever granted or signed a mortgage or deed of trust with respect to the Unencumbered Real Property. (Pinzon Dep. 24:7–11, 29:2–11.) No mortgage or deed of trust for the Unencumbered Real Property was proffered by any party or admitted into evidence during the trial. (Landy Direct ¶ 37.)

The JSNs, therefore, do not have a perfected security interest in or lien on any of the Unencumbered Real Property because that property was not subject to an executed and filed mortgage or deed of trust.

### 3. Executive Trustee Services, LLC and Equity Investment I, LLC Assets

The Plaintiffs argue that the JSNs do not have liens on assets of Executive Trustee Services, LLC ("ETS") and Equity Investment I, LLC ("Equity I"). According to the Plaintiffs, ETS pledged all of its assets to the Revolver in February 2011, but did not pledge any assets to the JSNs. The Plaintiffs also claim that any security interest in Equity I was released on December 29, 2009.

On February 16, 2011, ETS executed a joinder to the Revolver Documents and pledged all of its assets to AFI under the Revolver as a guarantor. Neither the Debtors nor the JSNs have identified a similar joinder agreement whereby ETS became an obligor under any of the Notes Agreements or granted any security interest to the Noteholders. The JSNs have argued that Section 4.17 of the Notes Indenture and Section 2.3(c) of the Intercreditor Agreement dictate that ETS is a guarantor of the Junior Secured Notes. Section 4.17 of the Notes Indenture provides the process by which future guarantors execute supplemental indentures guaranteeing the Junior Secured Notes, and Section 2.3(c) of the Intercreditor Agreement provides that any party pledging assets to the

Revolver must also pledge such assets to the JSNs. (PX 1 at 59–60; PX 2 at 17.) But these provisions are not self-effectuating, and ETS was not a party to the Intercreditor Agreement. Absent an indication that ETS actually did pledge assets to the JSNs, the JSNs cannot establish a lien on any ETS assets.

As for Equity I, that entity was an obligor under the Original Revolver Loan Agreement and the Original JSN Security Agreement, but it was removed as an obligor in the amended versions of those agreements. (PX 3; PX 4; PX 5; PX 6; PX 7; PX 8.) Further, On December 29, 2009, the Third Priority Collateral Agent executed a U.C.C.–3 termination statement terminating the security interest in all assets pledged by Equity I. (PX 131 at 841–45.) The next day, the parties executed the amended JSN Security Agreement that removed Equity I as an obligor. (PX 4.) Also on December 30, 2009, Equity I became a guarantor under the AFI LOC. **\*583** (PX 9.) The JSNs therefore do not have a lien on any Equity I assets.

### 4. Reacquired Mortgage Loans

Count IV of the Committee' complaint alleges that the JSNs do not have perfected security interests in certain mortgage loans that were (1) released from the JSNs' liens and security interests in May 2010 to be sold to certain Citi and Goldman Repurchase Agreement Facilities ("Repo Facilities"), and (2) subsequently repurchased by the Debtors between September 2010 and the Petition Date (the "Reacquired Mortgage Loans"). As of the Petition Date, the Debtors owned the Reacquired Mortgage Loans, which were coded as "Blanket Lien Collateral" in the CFDR. The Debtors repurchased the majority of the Reacquired Mortgage Loans in January 2012. (See DX ABM, Schedule 1.) The Committee's complaint alleges that the Reacquired Mortgage Loans total approximately $14 million at book value and $10 million at fair value. (PX 125; PX 241 at 9.)

Wells Fargo, acting in its capacity as the Third Priority Collateral Agent, filed U.C.C.–3 financing statement amendments in May 2010 terminating the JSNs' security interests in, among other things, loans that later became the Reacquired Mortgage Loans. (See, e.g., PX 133; PX 136.) Those U.C.C.–3 amendments made clear that the assets that were subject to the release were being sold to Repo Facilities by expressly referencing the Repo Facilities and identifying the assets subject to the U.C.C.–3 amendments

as the Mortgage Loans listed on certain Schedules to the Repo Facilities. (*See, e.g.,* PX 133; PX 136.) The loans listed on the U.C.C.–3 amendment were within the scope of and were covered by preexisting U.C.C.–1 financing statements. The U.C.C.–3 amendments provided notice of a collateral change, not a termination of the effectiveness of the identified financing statement. (*See, e.g.,* PX 133; PX 136.)

The U.C.C.–1 financing statements, which remained in effect notwithstanding the filing of the U.C.C.–3 financing statements, continued in force and operated to perfect the JSNs' security interests in the Reacquired Mortgage Loans after the Debtors repurchased those loans. (*See, e.g.,* PX 132; PX 4 § 2.) The U.C.C.–1 financing statements and U.C.C.–3 amendments filed by Wells Fargo provided notice to any potential lender seeking to obtain a security interest in the Reacquired Mortgage Loans of the possibility that the JSNs held a perfected security interest therein. Any potential lender inquiring about the collateral (1) could learn that the Reacquired Mortgage Loans had been reacquired by the Debtors subsequent to the filing of the U.C.C.–3 amendments (by virtue of the fact that they were owned by the Debtors); and (2) would have access to the U.C.C.–1 financing statements providing that the JSNs held a perfected security interest in all assets that the Debtors subsequently acquired. (Oct. 23 Tr. 36:5–37:19.)

Had any actual or potential unsecured creditor inquired of ResCap into the status of the Reacquired Mortgage Loans prepetition, that creditor would have learned that the loans were once again subject to AFI's and the JSNs' Blanket Lien, which was reflected in the CFDR. (*See* Farley Dep. 95:3–14, 110:5–111:14, 115:4–14, 137:21–24, 138:4–11, 176:21–177:3, Oct. 16 Tr. 190:21–192:18; Hall Dep. 117:6–12; Ruhlin Dep. 65:19–22, 66:6–21, 106:8–12, 119:4–9, 155:16–156:2, 156:15–21.)

Therefore, the Court finds that the Reacquired Mortgage Loans are properly treated as collateral for the JSNs at the Petition Date.

**\*584  5. Excluded Assets**

Count I of the Committee's complaint alleges that, pursuant to the JSN Security Agreement, the JSNs do not have perfected security interests in assets that were (1) pledged to a Bilateral Facility (as defined by the JSN Security Agreement) on the date that the Junior Secured Notes were issued by ResCap, (2)

subsequently released from the applicable Bilateral Facility prior to May 14, 2012 (the "Petition Date"), and (3) owned by the Debtors on the Petition Date and coded as "Blanket Lien Collateral" (the "Former Bilateral Facilities Collateral").[26] The Plaintiffs' expert Mr. Landy valued the Former Bilateral Facilities Collateral at $24 million as of the Petition Date using fair market valuation. (*See* PX 241 at 9.)

On June 6, 2008, Wells Fargo, acting in its capacity as the Third Priority Collateral Agent, filed U.C.C.–1 financing statements indicating that the JSNs held a security interest in "[a]ll assets [of each grantor] now owned or hereafter acquired and wherever located." (PX 132.) Section 2 of the JSN Security Agreement (the "All–Assets Granting Clause") reaches all of the Debtors' assets that are legally and practicably available both at the time, and after, the JSN Security Agreement was executed. (PX 4 at 4–17, 18–19 (providing that the pledge includes assets "whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced").)

The JSN Security Agreement carves out from the JSNs' Collateral certain assets (the "Excluded Assets") that could not be pledged to the JSNs for legal or business reasons. (PX 4 at 15–17 ("provided that, notwithstanding the foregoing, the 'Collateral' described in this Section 2 shall not include Excluded Assets.").) "Excluded Assets" are defined under the JSN Security Agreement as "(c) any asset ... to the extent that the grant of a security interest therein would ... provide any party thereto with a right of termination or default with respect ... to any Bilateral Facility to which such asset is subject as of the Issue Date [ (June 6, 2008) ]." (PX 4 at 4–15.) The Excluded Assets category included assets pledged to Bilateral Facilities as of the Issue Date, because the terms of the Bilateral Facilities precluded those assets from being pledged to the AFI Revolver or the JSNs. (Oct. 16 Tr. 184:24–185:3.)

The Court previously ruled that the JSN Security Agreement is ambiguous with respect to "whether an Excluded Asset becomes part of the Secured Parties' collateral pursuant to the All–Asset Granting Clause once it ceases to constitute an Excluded Asset." *Residential Capital,* 495 B.R. at 262. The Court therefore allowed the parties to present extrinsic evidence to determine the parties' intended meaning.

Ms. Farley, the Senior Director of Asset Disposition for ResCap, was involved in negotiating and implementing the Revolver. She testified that she understood that if the Bilateral

Facilities had not precluded the Debtors' assets pledged thereunder from being pledged to AFI and the JSNs, and if those assets otherwise fell within the broad scope of the Blanket Lien, then the Debtors would have included those assets as Revolver and JSN Collateral. (Oct. 16 Tr. 184:24–185:12; Farley Dep. 26:7–18, 58:12–20, 65:13–66:2, 71:5–18.) She also testified that AFI and ResCap understood that the Excluded Assets would change over time. (Oct. 16 Tr. 182:13–21.)

Lara Hall of AFI testified at her deposition that:

> **\*585**  • "AFI's intent was as soon as the assets rolled off the bilateral facility, they would become subject to the blanket lien." (Hall Dep. 123:19–23; *see also id.* 119:7–15);

> • at the time the original AFI Revolver and Revolver Security Agreement were negotiated, in exchange for funding the AFI Revolver, AFI was "trying to secure whatever remained unencumbered that we could, that was legally available to be pledged, not an excluded asset and was operationally feasible for the company, being ResCap." (Hall Dep. 106:2–20; 113:2–13); and

> • "[t]he blanket lien basically suggested that anytime an asset became uncovered, it would be subject to the blanket lien." (Hall Dep. 116:6–14.)

Joseph Ruhlin, the Debtors' former Treasurer, testified that the Debtors understood that the Former Bilateral Facilities Collateral "would be covered by the blanket lien as long as they ... were owned [by the Debtors] and not pledged elsewhere to another bilateral facility," and that the Debtors' "understanding" was that "once an asset was released from a funding facility, depending on the asset, it would become part of the blanket lien." (Ruhlin Dep. 89:14–2, 93:8–14, 165:5–9.)

Ms. Farley, in her capacity as the Debtors' corporate representative, admitted at her deposition that if a loan was initially excluded from the collateral pool because it was pledged to a Bilateral Facility as of the Issue Date, the loan would be transferred into the pool of Blanket Lien Collateral if and when that Bilateral Facility subsequently terminated. (Farley Dep. 105:17–106:21.) At trial, Ms. Farley testified that, with respect to assets that were Excluded Assets as of June 2008 (because they were pledged under a Bilateral Facility), those assets would become part of the revolver and JSN Collateral pools if they fell within the scope of

the security grant when the Bilateral Facility terminated. (Oct. 16 Tr. 186:23–187:9.) Ms. Farley further testified that, in negotiating the terms of the AFI revolver, Ally sought to secure the revolver with as much collateral as possible. (Farley Dep. 45:21–46:4; Farley Direct ¶ 13.)

Additionally, in December 2008, the Debtors' outside counsel sent an email explaining that "if at any point while owned by GMAC [ ] the assets are removed from a Bilateral Facility, the [AFI] Revolver and [JSN] Indenture liens may cover these assets and they will constitute Collateral (if and to the extent Sections 9–406/8 of the U.C.C. are applicable)." (DX ES at 1.)

Given the extrinsic evidence presented at trial about the parties' intent "whether an Excluded Asset becomes part of the Secured Parties' collateral pursuant to the All–Asset Granting Clause once it ceases to constitute an Excluded Asset," the Court is satisfied that the Former Bilateral Facilities Collateral is properly treated as JSN Collateral at the Petition Date.

## III. *CONCLUSIONS OF LAW*

### A. The JSNs Are Entitled to Recover All Original Issue Discount.

 [3]  The Plaintiffs ask the Court to disallow a portion of the JSNs' claim to the extent the claim seeks recovery of unamortized OID. OID is a form of "deferred interest" created when a bond is issued for less than the face value the borrower contracts to pay at maturity. (Finnerty Direct ¶ 10.) Unlike the more common periodic cash interest "coupon" payments made to noteholders, OID interest accretes over the life of the note but is payable only at maturity. (*Id.*) OID is amortized for tax and accounting purposes over the life of the bond. The Exchange Offer, which was a fair value exchange (*see supra* at **\*586** II.F), created $1.549 billion of OID, which amortized over the life of the Junior Secured Notes. (*Id.* at ¶ 11.) As of the Petition Date, unamortized OID on the remaining outstanding Junior Secured Notes was $386 million.[27] (*Id.*)

The JSNs contend that their claim should be allowed in full and should not be reduced by any OID. For the following reasons, the Court agrees that the JSNs' claim should not be reduced by the amount of unamortized OID.

### 1. In re Chateaugay *Controls and Supports Allowing the JSNs' Claim in Full.*

Bankruptcy Code Section 502(b)(2) provides that a creditor's claim should be allowed in full, "except to the extent that ... such claim is for unmatured interest." 11 U.S.C. § 502(b)(2). The Second Circuit ruled in *Chateaugay* that unamortized OID is "unmatured interest" within the meaning of section 502(b)(2). 961 F.2d at 380. Nevertheless, the Second Circuit found that debt-for-debt "face value" exchanges offered as part of a consensual workout do not generate OID that is disallowable as unmatured interest for purposes of section 502(b)(2). *Id.* at 383.

The Second Circuit explained that "application ... of OID to exchange offers ... does not make sense if one takes into account the strong bankruptcy policy in favor of the speedy, inexpensive, negotiated resolution of disputes, that is an out-of-court or common law composition." *Id.* at 382. The Second Circuit explained further:

> If unamortized OID is unallowable in bankruptcy, and if exchanging debt increases the amount of OID, then creditors will be disinclined to cooperate in a consensual workout that might otherwise have rescued a borrower from the precipice of bankruptcy. We must consider the ramifications of a rule that places a creditor in the position of choosing whether to cooperate with a struggling debtor, when such cooperation might make the creditor's claims in the event of bankruptcy smaller than they would have been had the creditor refused to cooperate. The bankruptcy court's ruling [excluding OID recovery] places creditors in just such a position, and unreversed would likely result in fewer out-of-court debt exchanges and more Chapter 11 filings.

> *Id.*

Applying that reasoning, the Second Circuit held "that a face value exchange of debt obligations in a consensual workout does not, for purposes of section 502(b)(2), generate new OID." *Id.* Rather than "chang[ing] the character of the underlying debt," a face value exchange "reaffirms and modifies" the debt. *Id.* But the court specifically left open whether the same rules should apply to a fair value exchange such as the one in this case. The court stated:

> [Disallowing OID recovery] might make sense in the context of a fair market value exchange, where the corporation's overall debt obligations are reduced. In a face value exchange such as LTV's, however, it is unsupportable.

> *Id.*

Here, in ruling on the motions to dismiss, the Court concluded that it would benefit from a fuller evidentiary record before resolving whether as a matter of law the Exchange generated disallowable **\*587** OID. *Residential Capital*, 495 B.R. at 266. Now having the benefit of a full record and argument, the Court concludes that despite the differences between face value and fair value debt-exchanges, the same rule on disallowance of OID should apply in both circumstances. Since *Chateaugay* is the law of the Circuit, and holds that unamortized OID should not be disallowed in the case of a face value exchange, the Court concludes that the unamortized OID generated by the fair value exchange here should not be disallowed from the JSNs' claim.

### 2. *The Legislative History of* Section 502(b)(2)

Section 502(b)(2) was enacted in 1978. The legislative history states that disallowed interest shall include "any portion of prepaid interest that represents an original discounting of the claim [but] would not have been earned on the date of bankruptcy," and gives as an example: "postpetition interest that is not yet due and payable, and any portion of prepaid interest that represents an original discounting of the claim, yet that would not have been earned on the date of the bankruptcy." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 352–54 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6308.

At the time that Congress passed section 502(b)(2), debt-for-debt exchanges did not create OID for tax purposes. (*See* Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, § 101, 92 Stat. 2549 (1978), "The Internal Revenue Code Tax Code") was first amended in 1990 to provide that both distressed face value exchanges and distressed fair

value exchanges create taxable OID. See Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101–508, § 11325, 104 Stat. 1388–466 (1990). Since that time, both the Second and Fifth Circuits have found that face value exchanges do not create disallowable unmatured interest, notwithstanding that they may create OID under the Tax Code. *See Chateaugay*, 961 F.2d at 383 ("The tax treatment of a transaction ... need not determine the bankruptcy treatment.... The tax treatment of debt-for-debt exchanges derives from the tax laws' focus on realization events, and suggests that an exchange offer may represent a sensible time to tax the parties. The same reasoning simply does not apply in the bankruptcy context."); *Texas Commerce Bank, N.A. v. Licht (In re Pengo Indus., Inc.)*, 962 F.2d 543, 550 (5th Cir.1992) ("As bluntly stated by the Second Circuit, the reasoning underlying the tax treatment of debt-for-debt exchanges simply does not apply in the bankruptcy context.") (internal quotation marks omitted).

The parties do not dispute that disallowable OID is created for bankruptcy purposes when a company issues new debt in an original cash issuance for less than its face value. (Finnerty Direct ¶ 76; Oct. 21 Tr. 155:7–15.) Dr. Finnerty testified that "as an economic matter the bond exchange generated OID," but Dr. Finnerty never defines "economic matter" beyond references to taxable OID. (*Id.* at ¶ 10.) Under *Chateaugay*, however, creation of OID for tax purposes is irrelevant in the context of face value exchanges. Because the Court finds no basis for distinguishing OID generated by fair value exchanges from OID generated by face value exchanges, *Chateaugay* controls. Even though the Exchange may have generated OID under the Tax Code, that does not dicatate that it created disallowable unmatured interest.

### 3. There is No Reason to Distinguish OID Generated by Fair Value Exchanges from OID Generated by Face Value Exchanges under the Second Circuit's Reasoning in Chateaugay.

As the Second Circuit observed in *Chateaugay*, an exchange offer made by a **\*588** financially impaired company "can be either a 'fair market value exchange' or a 'face value exchange.'" 961 F.2d at 381 (citations omitted). [28] Because the Second Circuit in *Chateaugay* was presented with a face value exchange, the court did not address whether its decision would extend to a fair value exchange. Instead, the Court explicitly limited its holding to face value exchanges, noting that it "might make sense" to disallow OID in a fair market value exchange. *Id.* The Court concludes, having the benefit

of a full record and argument, that there is no meaningful basis upon which to distinguish between the two types of exchanges.

The Plaintiffs' expert Dr. Finnerty admitted at trial that distinguishing between face value and fair value exchanges is "somewhat arbitrary." (Oct. 21 Tr. 67:10–13.) In fact, Dr. Finnerty acknowledged that nearly all of the features that companies consider in connection with a debt-for-debt exchange can be used in both face value and fair value exchanges: (1) granting of security in the issuer's collateral; (2) interest rate; (3) maturity date; (4) payment priorities; (5) affiliate guarantees; (6) other lending covenants; (7) redemption features; (8) adding or removing a sinking fund or conversion feature; and (9) offering stock with the new debt. (*Id.* at 67:17–69:9.) Other than changing the face value of the bond (which is not possible in face value exchanges), an issuer "could adjust every other factor" available to it. (*Id.* at 69:4–9.) For example, an issuer could provide the exchanging noteholders with security. Both experts testified that there would be no disallowable OID if the Junior Secured Notes were issued at $1,000 face value, even though the new notes were secured while the Old Notes were unsecured, because that exchange would be expressly governed by *Chateaugay*. (*Id.* at 136:9–20; 214:2–4.) Thus, despite the Plaintiffs' contention that the consideration involved in the Exchange—trading the unsecured notes for secured and structurally senior obligations—justifies breaking from the Second Circuit's decision in *Chateaugay*, the evidence presented at trial indicated that the two types of exchanges are virtually identical, and it would be arbitrary for the Court to distinguish between them.

The Court thus concludes that there is no commercial or business reason, or valid theory of corporate finance, to justify treating claims generated by face value and fair value exchanges differently in bankruptcy. First, the market value of the old debt is likely depressed in both a fair value and face value exchange. Second, OID is created for tax purposes in both fair value and face value exchanges. Third, there are concessions and incentives in both fair value and face value exchanges. In addition, both fair and face value exchanges offer companies the opportunity to restructure out-of-court, avoiding the time and costs—both direct and indirect—of a bankruptcy proceeding.

The Plaintiffs argue that the "plain language" of the statute must be enforced unless it leads to an absurd result. They contend that applying the language of section 502(b) to

disallow OID will not lead to absurd results because even if OID is disallowed, the JSNs' recovery exceeds the recovery of the still-outstanding Original Noteholders. But the term "unmatured interest" in section 502(b)(2) is not defined, making application of the plain language rule debatable. And whatever rules are adopted by courts should provide predictability **\*589** to parties in planning transactions. The outcome—whether a transaction results in disallowed OID for bankruptcy purposes—should not hinge on whether, with the benefit of hindsight, noteholders that exchanged their notes did better than those that did not exchange. Determining whether the transaction created disallowable OID should not depend on if the noteholders or the debtors got a "good deal" in bankruptcy. That rule would create confusion in the market and would likely complicate a financially distressed company's attempts to avoid bankruptcy with the cooperation of its creditors. The reasoning of *Chateaugay* supports this conclusion. 961 F.2d at 383.

For the foregoing reasons, the Court concludes that the JSNs' claim should not be reduced by the amount of unamortized OID.

## B. The JSNs Are Not Entitled to an Adequate Protection Claim.

### 1. Generally

The Bankruptcy Code requires a debtor to provide a secured lender with adequate protection against a diminution in value of the secured lender's collateral resulting from: (1) the imposition of the automatic stay under section 362; (2) the use, sale, or lease of the property under section 363; and (3) the granting of a lien under section 364. 11 U.S.C. § 361(1). The Bankruptcy Code does not articulate what constitutes "adequate protection" for purposes of the statute, but section 361 articulates three separate examples of what may constitute adequate protection: (1) periodic cash payments; (2) offering a replacement lien "to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property"; and (3) other relief that will assure the creditor that its position will not be adversely affected by the stay. *Id.*; *see also* 3 COLLIER ON BANKRUPTCY ¶¶ 3 62.07[3][b]–[d] (16th ed. 2011).

A secured creditor is entitled to adequate protection of its interest in the value of its collateral and can obtain adequate protection either after a contested cash collateral hearing, or, as is more often the case, by a consensual cash collateral order. At the commencement of this case, the parties negotiated, and the Court signed, a Cash Collateral Order that, among other things, established the JSNs' right to adequate protection for the use of their collateral and the means by which such adequate protection would be provided. Pursuant to paragraph 16 of the Cash Collateral Order, the JSNs are entitled to

> [A]dequate protection of their interests in Prepetition Collateral, including Cash Collateral, in an amount equal to the aggregate diminution in value of the Prepetition Collateral to the extent of their interests therein, including any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of any Prepetition Collateral, including Cash Collateral, the priming of the AFI Lenders' liens on the AFI LOC Collateral by the Carve Out and AFI DIP Loan, and the automatic stay pursuant to section 362 of the Bankruptcy Code[.]

(PX 76 at 24.) As adequate protection, the JSNs were granted adequate protection liens on all of the collateral securing the AFI Revolver, the AFI LOC, and all of the equity interests of the Barclays DIP Borrowers and, to the extent that such liens were insufficient to provide adequate protection, the right to assert a claim under section 507(b) of the Bankruptcy Code. (*Id.* at 29.) The JSNs now contend they are entitled to recover an adequate protection claim of $515 million based on alleged diminution in value of their prepetition collateral **\*590** used during the case under a series of consensual cash collateral orders. The Plaintiffs disagree, asserting that the JSN Collateral has not declined in value since the Petition Date and that the JSNs therefore cannot assert an adequate protection claim.

The parties agree that the amount of any adequate protection claim is to be measured by the difference in value of the collateral on the Petition Date and the Effective Date.[29] The parties also largely agree about the Effective Date value of the JSN Collateral, subject to adjustments discussed elsewhere in this Opinion. Thus, much of the testimony offered at trial was aimed at establishing the Petition Date value of the JSNs' collateral.

### 2. The JSNs Bear the Burden of Showing Diminution in Value.

 [4]   [5]   The burden of proving valuation falls on different parties at different times. In establishing its claim, a secured creditor generally bears the burden under section 506(a) of proving the amount and extent of its lien. *In re Sneijder,* 407 B.R. 46, 55 (Bankr.S.D.N.Y. 2009); *see also In re Heritage Highgate, Inc.,* 679 F.3d 132, 140 (3d Cir.2012) (holding that "the ultimate burden of persuasion is upon the creditor to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing its claim") (quoting *In re Robertson,* 135 B.R. 350, 352 (Bankr.E.D.Ark.1992)). Once the amount and extent of the secured claim has been set, the burden shifts to a debtor seeking to use, sell, lease, or otherwise encumber the lender's collateral under sections 363 or 364 of the Code to prove that the secured creditor's interest will be adequately protected. *See Wilmington Trust Co. v. AMR Corp. (In re AMR Corp.),* 490 B.R. 470, 477–78 (S.D.N.Y.2013) (holding that the creditor seeking adequate protection "need only establish the validity, [priority, or extent] of its interest in the collateral, while the Debtor bears the initial burden of proof as to the issue of adequate protection") (internal quotation marks and citation omitted); *see also Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.),* 16 F.3d 552, 564 (3d Cir.1994) (holding, in the context of granting a priming lien under section 364(d)(1), that the "debtor has the burden to establish that the holder of the lien to be subordinated has adequate protection") (citation omitted). In contrast, a secured creditor seeking to lift the automatic stay under section 362(d)(1) "for cause, including lack of adequate protection," bears the burden of showing that the debtor lacks equity in the property. 11 U.S.C. §§ 362(d)(1), 362(g)(1); *see also In re Elmira Litho, Inc.,* 174 B.R. 892, 900–03 (Bankr.S.D.N.Y.1994). But in all cases, the creditor bears the burden in the first instance of establishing the amount and extent of its lien under section 506(a).

The JSNs recognize that they must establish their section 507(b) adequate protection claim within the rubric of section 506(a). Further, they concede that the burden of proving the extent of a claim is typically born by the creditor seeking to establish the claim. Nonetheless, the JSNs argue that because their claim seeks adequate protection, the Debtors should have the burden of proving that the JSNs' **\*591** interests were adequately protected. The Court disagrees.

 [6]   The parties established at the outset of this case that the JSNs' interest in their collateral was adequately protected, when they negotiated, and the Court signed, the Cash Collateral Order. [30] As the Court explained in its ruling on the motions to dismiss:

> If the value of the JSNs' collateral actually diminishes, then the JSNs may assert an adequate protection claim.... The Defendants caution against establishing new rules on adequate protection and valuation, but the Court's decision is premised on the terms of the Cash Collateral Order, which the JSNs helped negotiate. That Order provided the JSNs with bargained-for adequate protection.

*Residential Capital,* 497 B.R. at 420. The bargained-for adequate protection included several liens and the right to assert a claim under section 507(b) for any diminution in value not otherwise protected. (PX 76 at 29.) That the JSNs now seek to assert this adequate protection claim based on diminution in value does not shift the initial burden of proving the extent and validity of the claim under section 506(a) to the Debtors. Rather, this burden remains squarely with the secured creditor—the JSNs. [31] *See, e.g., Qmect, Inc. v. Burlingame Capital Partners II, L.P.,* 373 B.R. 682, 690 (N.D.Cal.2007) (affirming bankruptcy court's requirement that secured lenders prove diminution in value of collateral prior to foreclosing on replacement liens, because "the purpose of adequate protection is to protect lenders from diminution in the value of their collateral").

### 3. Fair Market Value in the Hands of the Debtors is the Proper Petition Date Valuation Methodology.

The Plaintiffs argue that for adequate protection purposes, the collateral should be valued at the Petition Date based on the foreclosure **\*592** value of the collateral in the hands of the secured creditor. The Defendants argue that the collateral should be valued based on the fair market value of the collateral in the hands of the Debtors. The Court agrees with the Defendants that fair market value rather than foreclosure value applies, but as explained below, this holding provides little benefit to the Defendants because the Defendants' fair market valuation evidence introduced by their expert witnesses is unreliable, vastly overstates the value

of the collateral on the Petition Date, and is rejected by the Court as a basis to establish an adequate protection claim.

 [7]    [8] To establish their entitlement to an adequate protection claim, the JSNs must show that the aggregate value of their collateral diminished from the Petition Date to the Effective Date. The JSNs will only be entitled to adequate protection, if at all, to the extent of the value of their interest in the collateral as of the Petition Date. 11 U.S.C. § 361. The Supreme Court has explained that the phrase "value of such entity's interest" in section 361 means the same as the phrase "value of such creditor's interest" in section 506(a): the value of the collateral. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 372, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Thus, the question becomes how to value the JSN Collateral as of the Petition Date. To answer this question, the Court looks to valuation principles under section 506(a). *See In re Winthrop Old Farm Nurseries, Inc.,* 50 F.3d 72, 74 (1st Cir.1995) (stating that "a valuation for § 361 [i.e. adequate protection] purposes necessarily looks to § 506(a) for a determination of the amount of a secured claim").

Section 506(a) provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property....*"

11 U.S.C. § 506(a)(1) (emphasis added).

In *Associates Commercial Corp. v. Rash,* the Supreme Court interpreted section 506(a) in the context of a chapter 13 plan, where the chapter 13 debtor sought to cram down a plan over the objection of a secured creditor, keeping the secured lender's collateral. 520 U.S. 953, 955, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). In calculating the value of the lender's secured claim, the Court looked at the first sentence of section 506(a) and observed that the phrase "value of such creditor's interest" did not explain *how* to value the interest. *Id.* at 960–61, 117 S.Ct. 1879. Therefore, the Court looked to the second

sentence of 506(a) and held that "the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question." *Id.* at 962, 117 S.Ct. 1879. Based on the proposed disposition of the property in that case, the Court held that foreclosure value could not be the proper methodology for valuing the secured creditor's claim. *Id.* at 963, 117 S.Ct. 1879. Rather, the Court applied replacement value; the amount a willing buyer would have paid a willing seller for the collateral. *Id.*

Although this case involves the consensual use of collateral in the context of a sale under chapter 11, the reasoning of *Rash* is equally applicable here. *See In re Motors Liquidation Co.,* 482 B.R. 485, 492 (Bankr.S.D.N.Y.2012) (holding that "*Rash*'s underlying thought process is still instructive" in calculating value in a 363 sale and further noting that "[p]ost–*Rash* case law suggests that *Rash* can be applied to the provisions of all three reorganization **\*593** chapters—11, 12, and 13— because these chapters all treat secured claims similarly"); *see also Heritage Highgate,* 679 F.3d at 141 (applying *Rash* in chapter 11 to value secured claim under 506(a)).

The Defendants cite only one case that deals with the exact scenario of this case—diminution of collateral in the context of a consensual use of cash collateral that funded a going concern sale—in which the district court affirmed application of the *Rash* reasoning in the adequate protection context. *See Salyer v. SK Foods, L.P. (In re SK Foods, L.P.),* 487 B.R. 257, 262 n. 11 (E.D.Cal.2013). In *SK Foods,* secured creditors and the chapter 11 trustee had negotiated a settlement on the amount of the creditors' adequate protection claim, conducting their valuation based on the proposed disposition of the collateral on the petition date—a going concern sale. *Id.* at 259–60. The bankruptcy court approved the settlement. *Id.* The appellants objected, asserting that the proper valuation could only be liquidation value, setting the value of the secured creditors' adequate protection claim at "0." *Id.* at 260. The district court rejected that argument, holding that "the Bankruptcy Court properly relied upon the 'liquidation' value for those assets which were to be liquidated, and as required by *Rash,* properly relied upon the 'going-concern' value for those assets which were to be sold as part of the business as a going concern." *Id.* at 263.

None of the other cases that the Defendants cite involve the calculation of an adequate protection claim based on diminution in value due to consensual use of collateral. Instead, the cases cited by the Defendants involve valuations performed for forward-looking determinations of whether

secured creditors' interests would be adequately protected. [32] Nonetheless, **\*594** the Court views the current valuation exercise as similar in nature. That is, the Court is being asked to apply a Petition Date valuation of the JSN Collateral to determine whether the JSNs' interests as of that date were adequately protected. In doing so, the Court agrees with the holdings of *SK Foods* and the other cases cited by the Defendants that the proper valuation methodology must account for the proposed disposition of the collateral.

The Debtors would like this Court to apply a foreclosure standard based on the JSNs' interest in the collateral as of the Petition Date, which, the Debtors contend, was simply to be able to foreclose on the property. Thus, because "the purpose of providing adequate protection is to insure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy," *In re WorldCom, Inc.,* 304 B.R. 611, 618–19 (Bankr.S.D.N.Y.2004), the JSNs should be entitled to foreclosure value of the collateral as of the Petition Date—and no more. In support, the Debtors cite to a line of cases holding that under a section 506(a) analysis, a secured lender's interest is limited to the right to foreclose upon the property. [33]

The Court disagrees, and in light of the Supreme Court's rulings in *Rash* and *Timbers,* the Court finds the cases cited by the Plaintiffs unpersuasive. *See Winthrop,* 50 F.3d at 75–76 (disapproving of cases that "render[ ] the second sentence of § 506(a) virtually meaningless" and holding that "a court remains faithful to the dictates of § 506(a) by valuing the creditor's interest in the collateral in light of the proposed post-bankruptcy reality: no foreclosure sale and economic benefit for the debtor derived from the collateral equal to or greater than its fair market value"). In this case, the parties were not contemplating on the Petition Date that the creditors might conduct a foreclosure sale. The Debtors never had any intention of turning over the JSN Collateral to the collateral **\*595** agent. (Oct. 15 Tr. 164:21–165:2, 249:6–16.) Nor did the JSNs foreclose or attempt to foreclose on the assets. Rather, the JSNs entered into a cash collateral stipulation to allow the sale of assets as a going concern. (DX AIJ at 5.) A going concern valuation is consistent with the Debtors' stated purpose in this case as of the Petition Date, which, among other things was "preserv[ing] the Debtors' servicing business on a going concern basis for sale." (PX 137 at 7.) The testimony at trial confirmed that the parties always intended to market and sell the properties as a going concern. This is also evident by looking at the stalking horse APAs that were in place on the Petition Date. [34] Thus, in determining the value of the JSN Collateral on the Petition Date, the Court must apply that value based on the proposed disposition of the collateral—fair market value in the hands of the Debtors.

### 4. The JSNs Did Not Calculate the Fair Market Value of the Impaired Collateral in the Hands of an Insolvent Company and Have Therefore Failed to Carry Their Burden of Proving a Diminution in Value.

[9] While the Court agrees with the Defendants that the correct methodology for Petition Date valuation is fair market value in the hands of the Debtors, the Court finds that the Defendants have not provided a credible valuation of their collateral as of that date. Therefore, the Defendants have failed to carry their burden of proving a diminution in the value of their collateral, and their adequate protection claim fails. [35]

As detailed above, the JSNs offered valuation testimony from four experts affiliated with Houlihan. The Houlihan opinions of the fair market value of each asset comprising the JSN Collateral was informed, where applicable, by the prices obtained in the auction process, adjusted for cash flows and loan balances back to the Petition Date. (Siegert Direct ¶ 18.) In addition, Houlihan performed a "bottoms-up" fair market valuation as of the Petition Date. Mr. Siegert offered a single "Global Summary" of the Houlihan opinions suggesting the net fair market value of the JSN Collateral on the Petition Date totaled $2.79 billion—nearly $1 billion more than the stipulated Effective Date value of the same collateral. (Siegert Direct ¶¶ 4, 25; Oct. 23 Tr. 134:1–14, 141:14–142:6; DX ABF at 10.) While the Court recognizes that the Houlihan experts used accepted valuation methodologies, the assumptions and inputs they used were seriously flawed. As a result, Houlihan's conclusions regarding value are not credible.

First, the Houlihan experts' valuation assumes that the JSN Collateral could have been sold on the Petition Date by the Debtors. (Oct. 22 Tr. 139:18–142:4; Oct. **\*596** 23 Tr. 147:23–149:3, 149:18–22.) This assumption ignores reality. For example, Mr. Levine's opinion assumes a sale with appropriate representations, warranties, and market indemnifications from the seller; he valued the assets assuming that they could be sold free and clear of certain obstacles to sale. (Oct. 22 Tr. 62:17–21.) But at trial, Mr. Levine conceded that a sale of MSRs would have required the consent of the RMBS Trustees and of the GSEs. (*Id.* at

64:8–65:9.) Mr. Levine did not take into account the costs associated with obtaining the requisite consents, and simply assumed that the transaction would have closed upon the receipt of all required consents. (*Id.* at 63:15–25.) Those costs were considerable, including hundreds of millions of dollars in payments to GSEs to cure alleged liabilities to those entities and obtain their consent to the sale. (*Id.* at 67:1–22; PX 388 ¶ 1.) There was no assurance that the consents could be obtained. In addition, the Debtors agreed to settle billions of dollars of potential RMBS liability to obtain consent of the RMBS Trustees and be able sell the assets free and clear. (Marano Direct ¶ 43.) Mr. Levine's valuation did not account for the potential reduction in funds available to the lender or seller in a sale of those assets nor did his valuation take into account the time and difficulty in obtaining those consents. (*Id.* at 72:7–73:10, 69:10–69:20.)

Second, even assuming that the Debtors could have sold their assets on the Petition Date—an assumption the Court views with considerable skepticism—the Houlihan valuation suffers from another, fatal flaw. When valuing the assets, the Defendants' experts did not look to sales conducted by other distressed entities on the brink of insolvency. The experts instead only considered a solvent company, able to capture fair value for its assets. Thus, even if the Court accepts that the assets were saleable on the Petition Date—before all of the of work conducted during the bankruptcy necessary to make them saleable—the Houlihan experts' valuation cannot be relied upon because it provides a fair market value of the assets in the hands of a solvent company. Most of the assets could not simply be turned over to a buyer who could instantly reap full value as if the assets were commodity products. MSRs require that accurate mortgage security records are provided. The Houlihan valuation ignores the reality of the period leading up to this bankruptcy: ResCap was an insolvent company, over-burdened with debt, owning assets that had to be "fixed" before they could be sold, and facing a real possibility of being shut down. As Mr. Levine testified, the GSEs had the right to terminate ResCap's servicing rights and transfer the rights to another party upon any breach of their servicing agreement. (*Id.* at 96:22–97:7.) Therefore, the Court finds the Houlihan analysis flawed in its premise, and unreliable.

The Court is mindful that the Debtors have spent money that belonged to the JSNs. But while the JSNs' cash collateral has been consumed during the case consistent with the Cash Collateral Forecasts, this does not mean that the JSNs have suffered a diminution in the aggregate value of their

collateral. [36] As already held by the Court, the JSNs are not entitled to an adequate protection claim on a dollar-for- **\*597** dollar basis for cash collateral used during the case. *Residential Capital,* 497 B.R. at 420. Where cash collateral use is permitted according to an approved budget, and the cash collateral order includes a section 506(c) waiver, the two provisions work in tandem. Unless the remaining value of the cash and non-cash collateral at the effective date falls below the value of the collateral on the petition date, the creditor is not entitled to compensation for the amount of cash collateral spent under the approved budget. But the debtor does not get to charge the secured creditor again for any costs of preserving or enhancing the collateral.

Rather, the Defendants have the burden of showing that there has been a diminution in the aggregate value of JSN Collateral. Case law and the Cash Collateral Order both impose this requirement. The Defendants failed to make this required showing. Simply put, the Court cannot accept that the value of the JSN Collateral on the Effective Date does not exceed the value of their collateral on the Petition Date, even after the expenditure of the JSNs' cash collateral. This result was achieved because the value of the collateral at the Petition Date (even valued in the hands of the Debtors on a going concern basis) was very substantially impaired by reason of existing defaults that prevented Debtors from disposing of most of their collateral at that time. Through the settlements and consents achieved over many months, with great effort and expense, the Debtors successfully closed the sales of most of their assets on very favorable terms. The JSNs and all estate creditors will benefit from this accomplishment.

## C. The JSNs Can Establish Whether They Are Oversecured by Aggregating Their Claims against Debtor Entities.

[10] Under section 506(b) of the Bankruptcy Code, a secured creditor is **\*598** entitled to postpetition interest, fees, costs and charges to the extent the value of the property securing the creditor's claim is greater than the amount of the creditor's claim. 11 U.S.C. § 506(b). The Debtors contend that under applicable law, the JSNs must be oversecured at a single Debtor entity—without reference to JSN Collateral held by other Debtor entities—to be entitled to postpetition interest. In contrast, the JSNs argue that a determination of their oversecured status must be made based on the aggregate value of their collateral, across Debtor entities. There is a surprising dearth of case law explicitly addressing the issue of valuing the extent of a creditor's security in multi-debtor cases. The

statute likewise does not provide much guidance. The Court agrees with the JSNs that they are entitled to aggregate their collateral across debtor entities. Any other reading of the statute would lead to inequitable and illogical results.

Section 506(b) permits a secured creditor to collect postpetition interest to the extent that its "allowed secured claim is secured by property the value of which ... is greater than the amount of such claim." 11 U.S.C. § 506(b). Section 506(a), in turn, establishes the rule governing the calculation of secured claims. That section provides that a creditor's claim is secured "to the extent of the value of such creditor's interest in the estate's interest in [the securing] property." 11 U.S.C. § 506(a)(1).

[11] [12] Based on the language of the statute, the Plaintiffs argue that even where a creditor's claim is secured by collateral pledged by other debtors, it is necessary to examine the value of a specific "estate's interest" under section 506(a) to determine whether the secured creditor is entitled to postpetition interest with respect to its claim against that particular debtor under section 506(b). [37] This view seems to follow from the general principle that, absent substantive consolidation, a court will not pool the assets of multiple debtors to satisfy their liabilities. *See Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.),* 860 F.2d 515, 518 (2d Cir.1988). "Because of the dangers in forcing creditors of one debtor to share on a parity with creditors of a less solvent debtor, ... substantive consolidation ... [is] to 'be used sparingly.' " *Id.* (quoting *Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d 845, 847 (2d Cir.1966)) (citation omitted). But aggregating collateral for purposes of determining whether a secured creditor is oversecured and entitled to postpetition interest and fees does not run afoul of this rule. No debtor in a multi-debtor case will be required to pay a secured creditor more than the value of the secured creditor's collateral. The secured creditor by definition has a superior right to the value of the collateral; junior creditors have no right to share on a parity with the secured creditor.

In support of their interpretation of section 506(a), the Plaintiffs cite to *DeNofa v. Nat'l Loan Investors L.P. (In re DeNofa),* 124 Fed.Appx. 729 (3d Cir.2005). In *DeNofa,* the Third Circuit addressed whether a secured creditor, secured by both debtor and non-debtor assets, was entitled to aggregate its collateral to become oversecured. *Id.* at 730–31. The court held that it was not, stating that "the allowed secured claim of [a secured lender to] examine for

purposes of postpetition interest under § 506(b) is limited to the extent of the value of the property of the [debtor's] bankruptcy estate which secures it [under § 506(a) ]." *Id.* at 731. But *DeNofa* dealt with debtor and non-debtor entities; it did not address the situation presented here—multiple debtor obligors may own collateral sufficient, in the aggregate, to render a secured creditor oversecured. While the Plaintiffs contend this is a distinction without a difference, the Court disagrees. There is no scenario where a debtor will ever have to pay on a secured claim more than the value of the collateral securing the debt. However, when all of the secured lender's obligors are in bankruptcy, to the extent that the aggregate value of the collateral exceeds the lender's claim, the estates' unencumbered assets are unaffected by the payment of postpetition interest, and there is nothing inequitable about permitting the secured lender to apply its collateral towards postpetition interest once its prepetition claim has been paid in full. Therefore, *DeNofa 's* analysis is not dispositive of the questions presented **\*599** here. [38]

In another ill-fated attempt to shed light on the issue, the Plaintiffs cite to a Second Circuit case holding that the filing of a joint petition by spouses under section 302 of the Bankruptcy Code "does not automatically consolidate their estates," nor does it "allow the property of one spouse to be used to satisfy the debts of the other spouse." *Wornick v. Gaffney,* 544 F.3d 486, 491 (2d Cir.2008). In *Wornick,* the Second Circuit held that "the trustee may not reach assets in a joint filing that he could not have reached had the spouses filed separately." *Id.* The Plaintiffs assert that the same principle should prevail in the context of section 506(a).

But comparison to *Wornick* ignores the important fact that only collateral securing the debt is at stake here; *Wornick* is easily distinguishable and of little utility to the Court. The interests at question in *Wornick* were the cash surrender values of several life insurance policies. *Id.* at 488. The Second Circuit found that under the applicable state insurance law, had the spouses filed separately, neither spouse's creditors could have claimed an interest in the policies' surrender values. *Id.* at 489–91 (finding that "the beneficiary has no legal or equitable interest in the policy that could be made part of the property of the beneficiary's bankruptcy estate" and that "the trustee would have been powerless to administer the cash surrender value as part of the estate of the owner/insured because [insurance law] provides an express exemption in favor of the beneficiary"). Under those facts, the court held that "[a] joint filing does not vest the trustee with the power to reach a spouse's assets that would have

otherwise been insulated...." *Id.* at 491. The facts in front of this Court are completely different. The JSNs do have a right to assert claims against property held at each of the individual Debtors. Thus, the question presented here does not involve property that does not form part of the secured creditor's collateral; only collateral pledged to the secured creditor will be used to pay postpetition interest. Rather, the question is whether property subject to the JSNs' liens, held across multiple debtors, can be aggregated for the purposes of making the JSNs oversecured.

The Defendants cite two cases explicitly rejecting arguments that a secured creditor had to be oversecured at a single debtor in order to be entitled to postpetition interest.[39] *See* **\*600** *In re SW Hotel Venture, LLC,* 460 B.R. 4, 26 (Bankr.D.Mass.2011),*aff'd in part and rev'd on other grounds sub nom. Prudential Ins. Co. of Am. v. City of Boston (In re SW Boston Hotel Venture, LLC),* 479 B.R. 210 (1st Cir. BAP 2012); *In re Revolution Dairy, LLC,* Case No. 13–20770 (Bankr.D.Utah Apr. 29, 2013) Hr'g Tr. [Docket No. 206] (the "Rev. Dairy Tr."). In *SW Hotel Venture,* the debtors, like the Plaintiffs here, argued that a secured creditor "cannot aggregate the value of all of the Debtors' assets to establish an entitlement to postpetition interest." 460 B.R. at 22. The court "unequivocally reject[ed]" this argument, ruling instead that "the determination of [a secured creditor's] status as an oversecured (or undersecured) creditor must be made aggregating the collateral of all the Debtors...." *Id.* at 33.[40] In Revolution Dairy, the court reached the same conclusion. There, affiliated debtors argued that the collateral held by each debtor should be considered separately for purposes of determining the secured creditors' entitlement to postpetition interest and fees under section 506(b). In rejecting the debtors' position, the court noted that the debtors' failure to "cite ... case authority in support of their argument" was "not surprising," as "[t]he argument is clearly inconsistent with the code and cannot stand modest scrutiny." *Revolution Dairy*, No. 13–20770, Rev. Dairy Tr. at 12:19–13:3.

In this case, given the facts that lead to the creation of the JSNs' liens, the Court believes that the Defendants' interpretation of section 506 best reflects reality and comports with the purpose underlying the Bankruptcy Code. The Plaintiffs argue that adopting the Defendants' suggestion that courts can "cavalierly pool collateral from multiple debtors" runs contrary to the plain text of the statute and the principle of law "deeply ingrained" in American corporate and bankruptcy jurisprudence that corporate separateness must be respected absent extraordinary circumstances. *See,*

*e.g.,United States v. Bestfoods,* 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (refusing to disturb corporate separateness to penalize shareholders of polluting company). According to the Plaintiffs, "arbitrarily merging the assets and liabilities of multiple distinct entities would upset creditors' expectation that the assets of their debtor will be available to satisfy their claim." (Plaintiffs' Post Trial Brief, ECF Doc. # 186 at 66.) *See, e.g., Augie/Restivo,* 860 F.2d at 518–19 ("[C]reditors who make loans on the basis of the financial status of a separate entity expect to be able to look to the assets of their particular borrower for satisfaction of that loan."); *In re Tribune Co.,* 464 B.R. 126, 182 (Bankr.D.Del.2011) ("In the absence of substantive consolidation, entity separateness is fundamental.").

The Plaintiffs woefully mischaracterize the present situation. Only the value of the JSN Collateral would be used to satisfy their claims. They would have this Court ignore the reality of their business arrangement with the JSNs, in favor of a formulaic adherence to fictional corporate separateness. Far from "arbitrarily merging" assets of distinct entities, the Court is giving the JSNs the benefit of their bargain. The JSN Indenture explicitly provides that the JSNs are entitled to collect **\*601** interest until the principal was paid in full. (DX CN at 7; PX 1 at 51.) In the Offering Memorandum, the Debtors represented that the JSNs would be secured by ResCap and its subsidiaries, together, jointly and severally. (PX 175 at 1 ("The new notes will be issued by ResCap and will be secured by substantially all of our existing and after-acquired unencumbered assets remaining available to be pledged as collateral as described below. The notes will also be unconditionally guaranteed by subsidiaries of ResCap."); PX 1. at 79–80.) "Guarantor" is defined in the JSN Indenture as "(i) each of the Subsidiaries of the Company that is a party to this Indenture, and (ii) any other Subsidiary that executes a supplemental indenture in accordance with the provisions of this Indenture." (PX 1 at 14.) The Guarantors provided unconditional guarantees to the JSNs *jointly and severally*. (*Id.* at 79–80.) Additionally, the JSN Indenture required that if the Debtors moved assets to a Significant Subsidiary or created a Significant Subsidiary,[41] such Significant Subsidiary would become a Guarantor, subject to certain exceptions. (*See, e.g.,id.* at 59–60 (Section 4.17 requiring all "Significant Subsidiaries" to become "Guarantors" and thus also "Grantors" under the JSN Pledge Agreement).)

Outside of bankruptcy court the JSNs would have been entitled to levy against the assets of any and all of the Obligors and Guarantors to secure their rights to collect

interest until principal was paid in full. (*Id.* at 79–80.) The JSN Indenture explicitly states that the JSNs are entitled to collect postpetition interest in the event of a bankruptcy proceeding, to the extent allowed by law. (*Id.* at 51.) The JSN Indenture contains no provision conditioning those interest payments on the JSNs being oversecured at any single Debtor entity.

Additionally, the Debtors routinely reported their financial status in consolidated financial statements. (*See, e.g.,* DX GU; DX HQ; DX IT; DX JT.) The Debtors continued to report collateral value in the aggregate after the Petition Date. (*See, e.g.,* Monthly Operating Report for the Period from September 1, 2012 through September 30, 2012, ECF 12–12020 Doc. # 1914; Monthly Operating Report for the Period from August 1, 2013 through August 31, 2013, ECF 12–12020 Doc. # 5209.)

The Defendants' view more accurately reflects the reality of this case. It also reflects the workings of the business world at large. For example, like the JSN Indenture at issue here, most indentures allow debtors to move assets among their subsidiaries, and to create new subsidiaries, as long as the creditors continue to maintain liens in such assets. (See PX 1 § 4.7 (requiring all "Significant Subsidiaries" to become "Guarantors" and thus also "Grantors" under the JSN Pledge Agreement).) This flexibility is beneficial to borrowers, as it enables them to employ varying **\*602** corporate structures in order to avail themselves of tax benefits, limit their liability, and comply with a multiplicity of regulatory requirements (for example, state laws requiring that construction or other permits be obtained by a domestic entity). *See, e.g.,In re Owens Corning,* 419 F.3d 195, 200 (3d Cir.2005) ( "[Parent] and its subsidiaries (which include corporations and limited liability companies) comprise a multinational corporate group. Different entities within the group have different purposes. Some, for example, exist to limit liability concerns (such as those related to asbestos), others to gain tax benefits, and others have regulatory reasons for their formation."). For these Debtors, the use of special purpose subsidiaries was particularly necessary in order to allow the Debtors to obtain financing secured by mortgage loans. (*See* ECF 12–12020 Doc. # 1546 ¶ 49 ("Presumably to avoid the burden and expense of preparing and recording separate mortgages on each parcel of property, the Debtors are permitted to transfer real property to SPVs whose equity were pledged under the Security Agreements.").)

If, to be oversecured, and thus entitled to payment in full of all amounts owing, including postpetition interest, fees, costs, and charges in a bankruptcy case, secured lenders were required to be oversecured at a single entity, credit agreements and indentures might begin to prohibit corporate families from employing the type of complex subsidiary and affiliate structures that are currently commonplace and borrowers will be required to hold all collateral at a single entity. Lenders might also require their approval before collateral could be moved among entities. Absent these precautions, lenders would be less willing to extend credit (especially to borrowers in precarious economic situations, who may be most in need of financing), or would charge higher interest rates to compensate for the possibility that their contractual rights to postpetition interest, fees, costs, and charges will not be honored in bankruptcy.

Moreover, if the Plaintiffs' view is accepted, section 506(b) will effectively be nullified in multi-debtor cases where a secured creditor is not oversecured at any single debtor, even in instances where the creditor is vastly oversecured by the property held by the debtors in the aggregate. An interpretation of section 506(b) that allows for this scenario defies common sense. For all of these reasons, the Court holds that the JSNs must be allowed to aggregate collateral held at each of the Debtors in order to calculate the extent of their security.

### D. Since the Debtors Can Aggregate Collateral, the Court Must Determine What Constitutes JSN Collateral.

The parties agree to a $1.88 billion baseline valuation of the JSN Collateral on the Effective Date, but the Defendants want to add to that figure, and the Plaintiffs want to subtract from it. The analysis below addresses both the Defendants' attempts to add to their collateral along with the Plaintiffs' challenges to certain JSN liens on collateral.

### 1. The JSNs Are Not Entitled to Additional Sale Proceeds for the HFS Collateral.

The Defendants claim that the JSNs' liens attach to an additional $66 million of cash proceeds from the Berkshire sale, based on their expert's allocation of the sale price to the HFS loans. Mr. Fazio conducted an analysis of the value of the HFS loans sold to Berkshire, reaching a value that was $66 million higher than that provided by the Plaintiffs. Mr. Fazio

testified that he did not rely on the pricing **\*603** formula in the Berkshire APA, which broke the HFS loan portfolio into categories based on only one criterion, but instead looked at all the credit quality and credit statistics associated with each of the portfolios to determine value. (Oct. 22 Tr. 167:16–24.) In general, those statistics—including borrower credit rating, interest rate, and delinquency—were better for the JSN loan collateral than for the non-JSN Collateral. (*See* DX ABI at 5–7.)

The Court does not find Mr. Fazio's calculation the best indicator of the value of the HFS loans. In applying his own methodology to allocate the value of the HFS Portfolio between JSN and non-JSN Collateral, Mr. Fazio disregarded the actual purchase prices that Berkshire Hathaway agreed to pay for the collateral pursuant to § 3.1(a) of the Berkshire APA, which was an arm's-length agreement. [42] (PX 31 at 27.) The Berkshire APA classified the loans within the HFS Portfolio into six buckets based on certain characteristics: (1) Performing First Lien; (2) Non–Performing First Lien; (3) Performing Second Lien; (4) Non–Performing Second Lien; (5) Other; and (6) Securitized Advances. (Oct. 22 Tr. 161:20–162:11, 163:7–17; PX 31 at 19.) The Berkshire APA established different purchase prices calculated as percentages to be multiplied by the unpaid principal balance of the loans, for each category (plus any adjustments for the document deficiency multiplier). (Oct. 22 Tr. 162:12–19; 164:8–166:13; 167:25–168:18; PX 31 at 20.) Rejecting these contractual purchase prices, Mr. Fazio reclassified the loans based on characteristics such as origination vintage, product type, or adjustable or fixed rate mortgage, and valued the loans within his classifications based on metrics such as borrower credit scores and interest rates, to derive his bottoms-up valuation. (Oct. 22 Tr. 154:24–158:11, 159:3–9, 164:1–7, 169:2–10; DX ABI at 5, 19–22.)

 [13]  Where, as here, an asset is sold in an arm's-length transaction, the fair market value of such asset is conclusively determined by the price paid. *See Romley v. Sun Nat'l Bank (In re Two "S" Corp.),* 875 F.2d 240, 244 (9th Cir.1989); *see also Covey v. Davlin (In re Hobbick),* No. 97–83543, 2001 WL 34076375, at \*14 (Bankr.C.D.Ill. Sept. 10, 2001). The Berkshire APA was the result of a highly competitive auction process approved by the Court, and the price paid for the whole loans was the result of arm's-length negotiations that established the fair market value of each category of loans. The Court will not rely on Mr. Fazio's reallocation of Berkshire's price calculation. The Court finds that the JSNs

are not entitled to a lien on additional sale proceeds for the HFS loans.

### 2. The JSNs Are Entitled to a $17 Million Increase in FHA/VA Loan Value.

 [14]  The Defendants seek to add an additional $17 million to the baseline collateral, to reflect a net increase to the value of the FHA/VA loans. The difference between the Plaintiffs' and Defendants' valuations of the FHA/VA loans is attributable to their methodologies. The Plaintiffs' expert Mr. Renzi employed a recovery analysis, discounting the figures in the Debtors' April 30, 2013 balance sheet for assumed costs of collection. (Oct. 16 Tr. 139:5–11.) Mr. Renzi assumed a recovery rate of 91.1% of book value, deducting the costs, **\*604** expenses and risks associated with disposing of the assets. (Renzi Direct ¶ 13; Oct. 16 Tr. 144:20–145:2.) The Defendants' expert Mr. Fazio employed a fair market value analysis. Mr. Fazio assumed that the loans would monetize over a 30–36 month period. (DX ABI at 59.) Mr. Fazio discounted the estimated cash flow at 5% over the three year period, taking into consideration the risk of loss and government insurance. (*Id.*) Ultimately, Mr. Fazio valued the FHA/VA loans at 95% of book value. (*Id.*) The Plaintiffs challenge Mr. Fazio's assumption that the loans would be runoff in three years, claiming that the Debtor documents on which he relied actually project a seven-year timetable. (Oct. 22 Tr. 169:15–175:8; DX ABI at 58; *see also* Puntus Direct ¶ 162.) Mr. Fazio stated at trial that while his calculations were based on a 100% monetization by the end of the third year, it is possible that some small "insignificant amount" of the loans would not be monetized until years later. (Oct. 22 Tr. 174:22–175:8.)

The Court believes that fair market value, and not recovery value, was the correct methodology for valuing the FHA/VA loans. Even if there are costs in monetizing the loans, the JSNs should not be charged with these costs when valuing the amount of their secured claim pursuant to section 506(b). Under section 506(b), postpetition interest, fees, costs and charges may only be offset by the amounts chargeable to collateral under section 506(c). 11 U.S.C. §§ 506(b)–(c). Here, there are no such costs under section 506(c) because the Debtors waived their section 506(c) rights in the Cash Collateral Order. (PX 76.) Thus, the premise of the Plaintiffs' recovery analysis—that the assets will continue to generate expenses and cost money to monetize—runs counter to

section 506(b). The Court finds that the JSNs are entitled to a lien on an additional $17 million for the FHA/VA loans.

### 3. The JSNs Are Entitled to Another $40 Million in Liens on Non–Debtor Equity.

[15]  The JSNs claim they have a lien on an additional $40 million of equity interests in non-Debtor subsidiaries. Their argument is based on a report filed by the Debtors, titled *Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Debtors' Estates Hold a Substantial or Controlling Interest* (the "Periodic Report"), which included a summary balance sheet for each of the non-Debtor subsidiaries. (*See* DX ABI at 68–69.) Using the Periodic Report as a guide, Mr. Fazio concluded that the value of the equity pledges in non-Debtor Subsidiaries was approximately $40 million. (*Id.*) Specifically, Mr. Fazio calculated that the value of the equity pledges in the Non–Debtor subsidiaries were $26 million in CAP RE of Vermont, LLC; $3 million in CMH Holdings LLC; $1 million in GMAC–RFC Europe Limited; and $10 million in GMAC–RFC Holdings Limited. (*Id.*)

The Plaintiffs have not offered any evidence regarding these equity interests. At trial, Mr. Renzi testified that Plaintiffs' counsel told him that the non-Debtor subsidiaries had very limited equity value due to contingent liabilities, namely litigation liability. (Oct. 16 Tr. 153:16–154:3.) Plaintiffs' counsel further informed Mr. Renzi that the probability was high that the Debtors would not prevail in the litigation. (*Id.* at 154:4–9.) Instead of presenting a risk-adjusted equity value to account for the litigation risk at the Non–Debtor subsidiaries, based upon his conversations with counsel, Mr. Renzi presented the equity value in those entities as zero. (*Id.* at 153:12–154:15.)

Moreover, the Plaintiffs have not refuted that the JSNs have a lien on equity pledges. The Defendants have carried **\*605** their initial burden of putting forth evidence to show they have an interest in the equity of these non-Debtor subsidiaries, in an amount totaling $40 million. The Plaintiffs' expert did not produce a value for the equity; Mr. Renzi simply valued the equity at "0." The Plaintiffs have therefore failed to put forth sufficient evidence to rebut the Defendants' claim. *See Heritage Highgate,* 679 F.3d at 140 ("It is only fair ... that the party seeking to negate the presumptively valid amount of a secured claim—and thereby affect the rights of a creditor—bear the initial burden.... If the movant

establishes with sufficient evidence that the proof of claim overvalues a creditor's secured claim because the collateral is of insufficient value, the burden shifts."). The Court finds that the JSNs have a lien on $40 million of equity at non-Debtor entities.

### 4. The JSNs Do Not Have a Lien on Any Collateral Pledged to the AFI LOC.

The Defendants offer two arguments for why the JSNs have liens on approximately $910 million in collateral pledged to the AFI LOC. First, the Defendants claim that the collateral was previously pledged to the JSNs and was never properly released from the JSNs' liens, so their liens still attach to the collateral. Second, the Defendants assert that even if their liens on the collateral were released, paragraph 5(g) of the Cash Collateral Order revived those liens. Both arguments fail.

#### a. All JSN Collateral Subsequently Pledged to the AFI LOC Was Properly Released Before Being Pledged to the AFI LOC.

In 2010 and 2011, Wells Fargo, acting as Third Priority Collateral Agent (i.e., the collateral agent for the Junior Secured Notes) consented in writing to the release of a variety of assets from the Notes Collateral that were then pledged to AFI under the LOC Facility. Wells Fargo did this by executing the Blanket Loan Release, which released the JSNs' security interest in the Released Loan Collateral, and the Servicing Advance Release, which released the JSNs' security interest in the Released Advances. Wells Fargo then filed U.C.C.–3 amendments that deleted the Blanket Released Collateral from the collateral provided in the original U.C.C.–1 financing statements (as amended) filed by the Third Priority Collateral Agent.

The Defendants previously contested the effectiveness of those releases. The Court rejected the Defendants' arguments, holding that the releases were effective and entitled to enforcement. *See Residential Capital,* 497 B.R. at 416–17. Specifically reviewing the Blanket Loan Release— which accounts for approximately 97% of the $910 million in dispute—the Court found that the descriptions of the collateral covered by that release satisfied U.C.C. 9–108(b)'s requirement for reasonably identifying the released collateral, and the U.C.C.–3s "are therefore valid." *Id.* at 418.

At trial, the Defendants tried to attack the releases of the collateral pledged to the AFI LOC by arguing that there was an insufficient paper trail documenting the releases. This is not so. The Blanket Loan Release released, among other things, "Servicing Rights Collateral" and "Subject Mortgage Loans." The releases provided three means for determining whether an asset was a Subject Mortgage Loan that had been released from the Revolver and Junior Secured Notes:

- a "Mortgage Schedule delivered under the LOC Loan Agreement";

- in the backup to the monthly borrowing base reports or monthly collateral reports under the LOC Loan Agreement, which reflected the carrying value **\*606** of the assets pledged to the LOC Facility; or

- most broadly, any of the Debtors' "books and records" reflecting that a loan had been pledged to the LOC Facility. This category would include, among other things, the CFDR, which tracked various details concerning the Debtors' loans, including the facility (if any) to which such loans were pledged.

(PX 134.)

Under these terms, if a loan was listed on the CFDR as pledged to the AFI LOC, it was covered by the Blanket Loan Release. There is no dispute that the collateral in question was listed in the CFDR as pledged to the AFI LOC. The Court has already admitted the CFDR as a reliable record that was subject to rigorous audits and controls. Therefore, the releases were effective since the loans appeared in the CFDR as pledged to the AFI LOC. Moreover, a written description of the released collateral was attached as an exhibit to the U.C.C.–3 amendments, which the Third Priority Collateral Agent also filed to delete the Blanket Released Collateral from the collateral set forth in the original U.C.C.–1 financing statements. These written descriptions put all potential creditors on notice that the collateral they covered includes certain servicing rights and mortgage loans (among other assets), and that further diligence may be required to determine to whom they are pledged. As the Court has explained, the U.C.C.–3s are sufficient to satisfy the lenient description standards outlined in U.C.C. § 9–108(b)(6) because the descriptions of the collateral released "reasonably identif[ied]" the collateral released, satisfying the U.C.C. permissive standard. *See Residential Capital*, 497 B.R. at 418.

The Court's conclusion applies with equal force to the Servicing Advance Release. Like the Blanket Loan Release, the Servicing Advance Release contained a description of various categories of Released Advances that were being released from the JSNs' liens, which included, among others, any existing and future advances relating to mortgage loans and REO property, made pursuant to certain contracts with Freddie Mac. Moreover, the Servicing Advance Release described all servicing advances pledged to the AFI LOC.

The Defendants contend that other back-up documentation should exist regarding the release of this $910 million of assets, including schedules of mortgage loans, collateral addition notices to the LOC Facility, and electronic templates used to update the CFDR. But there is no need for this type of additional back-up. The CFDR suffices for the Blanket Loan Release, and the Servicing Advance Release effectively released all advances pledged to the AFI LOC.

### b. Paragraph 5(g) Did Not Revive Any Liens on Collateral Pledged to the AFI LOC or to Any Other Previously Released Collateral.

[16] The Defendants ask the Court to interpret paragraph 5(g) of the Cash Collateral Order to mean that the Debtors agreed that assets released from the JSNs' liens years earlier were revived by the Order. If so, the Defendants would have a lien on the collateral pledged to the AFI LOC, totaling an additional $1.1 billion in value. In ruling on the motions to dismiss, the Court determined that it would benefit from a greater factual record on this issue, and extrinsic evidence could be submitted to establish the meaning of paragraph 5(g). *Residential Capital*, 497 B.R. at 403. Based on the evidence submitted by both sides, the Court concludes that the Defendants' interpretation of paragraph 5(g) fails on multiple grounds.

*First*, the Court notes that no party ever disclosed this purported effect of paragraph **\*607** 5(g) to the Court when the Cash Collateral Order was proposed or at any contemporaneous hearing, despite Local Rule 4001–2(a)(6). That rule requires disclosure of provisions in a cash collateral motion that would secure prepetition debt with liens on assets that the creditor would not otherwise have by virtue of the prepetition security agreement or applicable law. The Court will not countenance the Defendants' attempt to slide a $1.2 billion windfall past the Court and past the Plaintiffs.

*Second*, other portions of the Cash Collateral Order reveal the parties' intent at the time the order was submitted. For instance, the very next stipulation in the Cash Collateral Order provides an overview of the collateral securing the Junior Secured Notes:

> [T]he collateral securing the Junior Secured Notes Obligations includes, among others ... the categories of assets under the columns labeled "Ally Revolver" and "Blanket" set forth on Exhibit A to this Final Order....

(PX 76 at 12.) If, at the time the Cash Collateral Order was negotiated, the JSNs actually believed that they were being granted new liens on the AFI LOC collateral, paragraph 5(h) should have included "AFI LOC" in the categories of assets securing the Junior Secured Notes in Exhibit A to the Cash Collateral Order.

Moreover, the Defendants reading of Paragraph 5(g) is also not supported by the language of the Cash Collateral Order. For example, in Paragraph 5(g), the Debtors acknowledge that the JSNs' liens are "subject and subordinate *only* " to the liens granted under the Revolver. (*Id.* at 11–12 (emphasis added).) This provision does not also subordinate JSNs' purported lien to the LOC Lenders' lien under the LOC Facility. Under the Defendants' proposed interpretation of Paragraph 5(g), the JSNs' purportedly revived lien on the AFI LOC collateral is elevated ahead of the LOC Lenders' (uncontrovertibly senior) lien in that collateral. AFI would not have agreed to such a provision, especially since it relied on the AFI LOC collateral to make the postpetition advances under the Cash Collateral Order.

In addition, in granting the JSNs a postpetition adequate protection lien on the Revolver Collateral and the AFI LOC collateral, the Cash Collateral Order subordinated adequate protection liens to any *existing* liens on the same collateral. To that end, with respect to the JSNs' adequate protection lien on the Revolver Collateral, the order acknowledges that the adequate protection lien is junior to (among other things) the "*existing liens granted to the Junior Secured Parties.*" (*Id.* at 28 (emphasis added).) But the order does not contain similar language with respect to the adequate protection lien in the AFI LOC collateral, indicating that the JSNs did not have an existing lien on that collateral. (*Id.* at 28–29.)

Aside from the terms of the Cash Collateral Order, other documents filed simultaneously in the bankruptcy court

reflect that the stipulations in paragraph 5(g) were not intended to revive previously released liens. For example, the Debtors indicated in their motion seeking approval of the Barclays DIP Facility that any purported equitable lien asserted by the JSNs on the assets securing the AFI LOC was not a valid, perfected, and nonavoidable lien or security interest as of the Petition Date. (PX 88 at 55.) Offering that argument is squarely at odds with a purported stipulation to the validity of a lien on that collateral.

*Third*, the testimony of Mr. Siegert indicates that when the parties were negotiating the Cash Collateral Order, the JSNs did not believe that the Order would revive liens on more than $1 billion in released **\*608** collateral. The JSNs did not include the value of the assets securing the AFI LOC in their own contemporaneous analysis of the collateral securing the Junior Secured Notes. On cross-examination, Mr. Siegert was shown a Houlihan presentation dated May 14, 2012, which was prepared immediately before the Petition Date. (PX 169; Oct. 23 Tr. 110:8–23.) That presentation valued the JSNs' collateral. Mr. Siegert acknowledged that if the counsel for the JSNs had concluded that the Debtors had stipulated to JSN liens on the AFI LOC collateral, that would have been a material fact for Houlihan to consider when presenting estimates of the value of the JSN Collateral. (Oct. 23 Tr. 127:25–128:21.) And further, that would have been a material fact for Houlihan to convey to the JSNs. (*Id.*) But the May 14 Houlihan presentation did not reflect any liens on the AFI LOC collateral. (*Id.*)

It defies the parties' conduct and the terms of the Cash Collateral Order to argue that paragraph 5(g) revived previously leased liens. The JSNs do not have a lien on any AFI LOC collateral by virtue of paragraph 5(g).

### 5. General Intangibles

The Defendants argue that the value of the JSN Collateral on the Effective Date should increase beyond the $1.88 baseline valuation because the baseline valuation does not account for certain JSN liens on intangible assets. Specifically, the Defendants argue that the Debtors sold intangible assets subject to JSN liens during the Ocwen asset sale, but the Debtors did not allocate any portion of the proceeds to intangibles subject to JSN liens. These intangibles include software, certain refinancing opportunities, trademarks, and goodwill. According to the Plaintiffs, Ocwen and Walter did not place any value on these intangibles, so it is not proper

to allocate any proceeds to intangible value. Further, the Plaintiffs argue that to the extent the JSNs had any lien on goodwill, that goodwill was created postpetition and is not subject to any JSN lien. The Defendants respond that they had a lien on assets sold to Ocwen, but have received no benefit of the sale simply because the Ocwen APA assigned no value to the intangibles, even though the Ocwen APA provided that Ocwen and Walter were buying "goodwill and other intangible assets." (PX 19.) According to the Defendants, the Court may still assign value to the intangible assets based on the work of the Defendants' expert Mr. Taylor, who used general accounting principles to value the intangible assets.

#### a. The JSNs Had Liens on Software Sold to Ocwen.

In the JSN Security Agreement, the JSNs were specifically granted a lien on computer software as well as general intangibles. (*See* PX 4.) The Debtors used software in connection with the PLS MSRs and the GSE MSRs. (Oct. 15 Tr. 171:10–12.) The Plaintiffs argue the JSNs' lien on software associated with the PLS MSRs was released under the May 14, 2010 Blanket Release. That release specifically stated that all general intangibles were released "if and to the extent related to the Servicing Rights Collateral" (i.e., the PLS MSRs). (PX 134 at 6.) The Defendants counter, though, that "Servicing Rights Collateral" was defined to specifically exclude computer programs. (*Id.* at 8.) The Court therefore finds that the JSNs' lien on software associated with the PLS MSRs was not released by virtue of the Blanket Release. Any value associated with software sold to Ocwen and Walter would be allocable to the JSNs as JSN Collateral.

The next question is how to value the collateral. The Defendants' expert Mr. Taylor endeavored to value the Debtors' **\*609** software and associated know-how by using an accounting method that considers what a typical market participant would have paid for the asset, regardless of any particular incentives (e.g., synergies) or disincentives that may have existed in the market at the time. The Plaintiffs challenged Mr. Taylor's analysis on several grounds, including that (1) Mr. Taylor's analysis ignores the allocations of assets in the Ocwen APA; (2) the Debtors gave Ocwen and Walter a substantial bid credit (exceeding $100 million) so Ocwen and Walter would buy the Debtors' servicing platform, including the software; (3) Ocwen and Walter later attributed lower values to software, ostensibly using the same accounting principles that Mr. Taylor applied; (4) Mr. Taylor's "avoided cost" analysis assumed that Ocwen

and Walter planned to use the Debtors' software for three years, contrary to Ocwen's and Walter's actual plans; and (5) Mr. Taylor put inordinate weight on certain precedent transactions when applying his "relief from royalty method."

*First*, the Court finds that the allocations in the Ocwen APA do not control here. Section 3.3(b) of that APA provided that the Debtors and Ocwen were bound by the allocations for tax purposes, "*but not for any other purpose.*" (PX 19 at 50 (emphasis in original).) *Second*, the Debtors' bid credit awarded to Ocwen did not render the Debtors' software valueless. Rather, Ocwen and Walter intended to use and did use the Debtors' software associated with the platforms they were buying. Their public filings attributed value to software, whether as a standalone asset or built into the premises and equipment asset category. [43] (*See* DX ZH at 9; DX ST at 3; DX WK at 13.) Therefore, the software had and provided value.

Turning to Mr. Taylor's analysis, the Court is not satisfied with his valuation of the software and associated know-how. The Plaintiffs are correct that Mr. Taylor's avoided cost analysis unreasonably assumes a duration of software use that is contrary to the actual intended use in the Ocwen and Walter sale. As for his "relief from royalty" analysis, the Plaintiffs sufficiently demonstrated flaws in Mr. Taylor's methodology. For example, Mr. Taylor gave no weight to certain transactions between seemingly related parties because those may not have been arm's-length deals. (DX ABH at 135.) But Mr. Taylor then attributed 33.34% of his outcome to a transaction that appears to be between related parties. (*Id.*) Not only is this transaction given greater weight than any other transaction, but it is also a significant outlier in terms of its "point estimate." (*Id.*) Simply removing Mr. Taylor's weight assigned to this transaction would yield a $100 million lower software value. Thus, the Court finds that Mr. Taylor's "relief from royalty" analysis is unreliable.

Rather than relying on Mr. Taylor's analysis, the Court turns to how Ocwen and Walter actually reported the value of the software using a fair value accounting method. Walter's public filings indicate a $17.1 million value for software (DX WK at 13), and Ocwen's filing and its third-party valuation reflect a $1.295 value for software (DX ZH at 9; DX ST at 3.) The Court therefore finds that $18.395 million of the Ocwen sale proceeds should be attributed to JSN liens on software.

### *610  b. The JSNs Have a Lien on the Tradename, Iconography, and Logotype Associated With the Assets Sold to Ocwen and Walter.

The Defendants submitted expert evidence that $10 million of proceeds from the Ocwen and Walter sale was allocable to "tradename/marks, iconography and logotype." (DX ABH at 42–45.) The Plaintiffs did not rebut this analysis at trial. Mr. Taylor notes that the Ocwen APA required the purchasers to rebrand assets within 120 days, but a 10–Q filed by Walter shows that it attributed value to tradename with an estimated eight-year life. (DX ABH at 43.) Thus, there may have been some intangible tradename or logotype value that would not cease to exist after 120 days. The Plaintiffs did not rebut this contention. Nor did the Plaintiffs demonstrate that any tradename value was associated only with the Servicing Rights Collateral or Subject Mortgage Loans and would therefore have been released in the Blanket Release. The Court is satisfied with Mr. Taylor's valuation of the intangible tradename assets associated with the Ocwen sale and finds that a $10 million allocation to the JSNs' liens is appropriate.

### c. The Defendants Do Not Have a Lien on Refinancing Opportunities Associated With GSE MSRs.

[17]  At trial, the Defendants' expert Mr. Levine testified to the value of refinancing opportunities associated with certain GSE MSRs. The JSNs do not have liens on GSE MSRs since those are Excluded Assets, but the Defendants argue that the JSNs have a lien on intangible assets associated with GSE MSRs. Although the Defendants may be correct that the JSNs could have a lien on intangible assets absent a lien on an underlying asset, the value created by refinancing opportunities is inherent to the value of the GSE MSRs. In other words, the opportunities are not a separate intangible asset.

Mr. Levine testified that he regularly values refinancing opportunities separately from servicing rights. (Oct. 22 Tr. 100:9–16.) Even so, the value of the refinancing opportunities are inextricably linked to the MSRs themselves: Mr. Levine conceded that "to the buyer of the servicing, there would not be value to the HARP [refinancing opportunities] without the servicing rights." (Id. at 91:11–23.) In fact, Mr. Levine had never seen an instance where refinancing opportunities were sold separately from servicing rights. (Id. at 101:9–11.) Therefore, the value is properly attributable to the GSE MSRs

themselves. As such, the JSNs do not have a lien on any refinancing opportunities.

### d. The JSNs Did Not Establish the Value of Their Lien on Goodwill as of the Petition Date.

[18]  The JSNs argue that they have a lien on goodwill associated with the Debtors' assets sold to Ocwen. Goodwill is "an intangible asset that represents the ability of a company to generate earnings over and above the operating value of the company's other tangible and intangible assets." In re Prince, 85 F.3d 314, 322 (7th Cir.1996). Goodwill may include "name recognition, consumer brand loyalty, or special relationships with suppliers or customers." Id. To calculate the value of goodwill, generally accepted accounting principles ("GAAP") look to "any excess of [a] purchase price over the fair value of the assets acquired and the liabilities assumed." Fait v. Regions Fin. Corp., 655 F.3d 105, 110 (2d Cir.2011). Although GAAP does not require a company to record internally developed goodwill absent an asset sale, see Sanders v. Jackson, 209 F.3d 998, 1001–02 (7th Cir.2000), the existence of goodwill does not depend on an asset sale. See Prince, 85 F.3d at 323–24  *611 (describing valuation of goodwill in context of assigning value to company stock); see also Ackerman v. Schultz (In re Schultz), 250 B.R. 22, 29 (Bankr.E.D.N.Y.2000) (valuing goodwill outside context of asset sale). So the question becomes whether any goodwill existed on the Petition Date subject to JSN liens.

The Defendants use two methods to calculate goodwill on the Petition Date. First, they look to the Ocwen and Walter asset sale and calculate a present value of the goodwill in that sale as of the Petition Date. Second, the Defendants perform a "top down" analysis of the intangibles associated with the MSRs and servicing and originating platforms, including goodwill. While Houlihan's methodologies may have been textbook, the assumptions and inputs they used were seriously flawed. As a result, Houlihan's conclusions regarding the values of intangibles and goodwill are not credible.

Regarding the first method, the Court cannot conclude that any goodwill derived from the Ocwen and Walter sale existed on the Petition Date. The value of the Debtors' assets on that date was seriously impaired, subject to steep reductions in value by litigation risks, potential seizure of certain MSRs, and termination of rights and setoff by the RMBS Trustees. Ocwen and Walter, the eventual buyers, were not committed

to paying the Debtors anything for their assets on the Petition Date, let alone a price above the fair value of the Debtors' assets and liabilities. The Debtors facilitated the asset sale to Ocwen and Walter by maintaining the value of the assets throughout the bankruptcy, along with decreasing the liabilities associated with those assets. The Debtors worked very hard at substantial expense to achieve settlements and consents that allowed the sales to close. If the Debtors had not taken those actions, Ocwen and Walter may not have bought any assets at all, and likely would not have paid any price above the fair value of the assets and liabilities. To be sure, there may have been name recognition or special market relationships associated with the Debtors' assets on the Petition Date, but that name recognition or those relationships could have been valueless in the eyes of a buyer on the Petition Date. The Court cannot indulge the speculation that the Ocwen and Walter purchase price provides an adequate starting point for the goodwill that would have been generated by an asset sale on the Petition Date. After all, "goodwill often fluctuates widely for innumerable reasons." *Sanders,* 209 F.3d at 1002.

As for the "top down" valuation, the Plaintiffs raised serious problems with the Defendants' market multiple analysis that provided the starting point for the "top down" valuation. *First,* the Defendants' expert Mr. Fazio acknowledged that his market multiple analysis only weighed comparable companies in terms of their equity, rather than their total enterprise value. (Oct. 22 Tr. 198:20–199:6; 199:19–22.) *Second,* Mr. Fazio's analysis failed to account for any value that would be attributable to the Debtors' servicing advances. (Oct. 22 Tr. 200:1–22; DX ABG at 35, 38, 41.) Since those assets were not properly accounted for, and were not properly deduced from Mr. Fazio's valuation, it is possible that what the Defendants concluded was goodwill actually represented value attributable to servicing advances. Thus, the Defendants' second method for determining goodwill is unpersuasive.

Having failed to provide an adequate basis for valuing goodwill on the Petition Date, the JSNs have not met their burden in demonstrating the extent of their lien on goodwill as of the Petition Date.

**\*612  e. The JSNs Do Not Have a Lien on Goodwill Generated after the Petition Date.**

[19]  Although the JSNs have a lien on the proceeds of their prepetition collateral, any goodwill generated in connection with the assets sold to Ocwen and Walter was not the proceeds of that collateral and is not subject to JSN liens. Bankruptcy Code Section 552(b) provides that if a prepetition security agreement extends to proceeds of collateral, then postpetition proceeds would also be subject to that security agreement, unless the court orders otherwise after a hearing based on the equities of the case. 11 U.S.C. § 552(b). The JSN Security Agreement granted the JSNs a lien on "all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on and rights arising out of any of the [collateral described in the JSN Security Agreement]." (PX 4 at 17.) Additionally, the Cash Collateral Order provided that the proceeds of prepetition JSN Collateral are "deemed to be cash collateral of the [JSNs]." (PX 76 at 22.) To establish a lien on the goodwill created by the Ocwen sale, the JSNs would need to demonstrate that the goodwill was the product of their prepetition collateral. They did not meet this burden.

"Section 552(b) is intended to cover after-acquired property that is directly attributable to prepetition collateral, *without addition of estate resources.*" 5 COLLIER ON BANKRUPTCY ¶ 552.02[2][a] (emphasis added). Here, even if JSN Collateral was used to generate goodwill (either by maintaining or improving the value of assets or by diminishing liabilities), Debtor resources were used as well. The Debtors improved the value of the assets sold to Ocwen by negotiating settlements with government entities and RMBS Trustees. That involved time, effort, and expense by the Debtors' estates. The Debtors did not merely take some JSN Collateral and convert it into goodwill without any other resources. That means that the goodwill is not the proceeds of JSN Collateral. *See In re Delco Oil, Inc.,* 365 B.R. 246, 250 (Bankr.M.D.Fla.2007) ("The concept of proceeds is only implicated when one asset is disposed of and another is acquired as its substitute.") (internal quotation marks omitted). Even if a portion of the goodwill was directly attributable to JSN Collateral, without any other additional resources, the JSNs have failed to separate the value of that goodwill. Thus, the JSNs have not met their burden of establishing a lien on goodwill generated postpetition.

*6. Miscellaneous Collateral Categories*

**a. The JSNs Have Liens on the "Contested Assets."**

**[20]**  The JSNs claim to have liens on "Contested Assets," which consist of (1) the Former Bilateral Facilities Collateral and (2) the Reacquired Mortgage Loans. The Court has previously ruled that the JSN Security Agreement is ambiguous with respect to "whether an Excluded Asset becomes part of the Secured Parties' collateral pursuant to the All–Asset Granting Clause once it ceases to constitute an Excluded Asset." *Residential Capital, 495 B.R. at 262.* Where a contract is ambiguous, courts may consider extrinsic evidence in order to determine the parties' intended meaning. *See Bank of New York Trust Co., N.A. v. Franklin Advisers, Inc., 726 F.3d 269, 276 (2d Cir.2013)* (stating that a principle of New York contract law is that, "if contract terms are ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract") (citations omitted). Extrinsic evidence can include testimony of the parties' intent. *See* **\*613** *Webb v. GAF Corp., 936 F.Supp. 1109, 1124 (N.D.N.Y.1996)* ("The court is of the opinion that testimony regarding the understandings of the parties ... was both competent and helpful to the triers of fact....").

Having the benefit of a full evidentiary record, including an examination of both the contractual language and the extrinsic evidence provided by witness testimony, the Court concludes that the JSN Security Agreement grants the JSNs liens on the Contested Assets.

### i. The JSNs Have Liens on the Collateral Released from the Bilateral Facilities.

The Plaintiffs argue that the JSNs do not have a lien on the Former Bilateral Facilities Collateral, which has an alleged fair market value of approximately $24 million.[44] The Plaintiffs argue that the JSNs were never granted liens in the Former Bilateral Facilities Collateral because the underlying loans were originally Excluded Assets. Additionally, the Plaintiffs assert that no "springing lien" exists with respect to the Former Bilateral Facilities Collateral and, even if it did, the JSN Security Agreement is ambiguous whether the Former Bilateral Facilities Collateral automatically reverted to JSN Collateral before the Petition Date when the reason for the exclusion of the Former Bilateral Facilities Collateral no longer existed. The Plaintiffs contend that the testimony presented at trial did not sufficiently establish a course of dealing among the parties. The Defendants argue that even though the Former Bilateral Facilities Collateral consists of assets that were carved out of the JSN Collateral as

"Excluded Assets" at the time the JSN Security Agreement was executed, the collateral was subsequently released from Bilateral Facilities before the Petition Date and treated as AFI and JSN Collateral. The Court finds that the JSNs have liens on the Former Bilateral Facilities Collateral.

The JSN Security Agreement provides that "the 'Collateral' ... shall not include Excluded Assets." (PX 4 § 2.) "Excluded Assets" in turn means, in relevant part:

> (c) any asset ... to the extent that the grant of a security interest therein would violate applicable Requirements of Law, result in the invalidation thereof or provide any party thereto with a right of termination or default with respect thereto or with respect to any Bilateral Facility to which such asset is subject as of the Issue Date....

(*Id.* at 4–15).

The testimony presented at trial revealed that employees for both the Debtors and AFI understood the JSN Security Agreement and the All–Asset Granting Clause to convert the Former Bilateral Facilities Collateral to Notes Collateral when the Bilateral Facilities terminated or when collateral was released from those facilities. The witnesses also testified that once an asset that otherwise fell within the scope Blanket Lien was released from a Bilateral Facility, that asset would become part of the JSN Collateral. Lara Hall testified at her deposition that "AFI's intent was as soon as the assets rolled off the bilateral facility, they would become subject to the blanket lien." (Hall Dep. 123:19–23.) She also said that "[t]he blanket lien basically suggested that anytime an asset became uncovered, it would be subject to the blanket lien." (*Id.* at 116:6–14.) Joseph Ruhlin, the Debtors' former Treasurer, testified in his deposition that the Debtors understood the Former Bilateral Facilities Collateral "would be covered by the blanket lien as long as they ... were owned [by the Debtors] and not **\*614** pledged elsewhere to another bilateral facility," and that the Debtors' "understanding" was that "once an asset was released from a funding facility, depending on the asset, it would become part of the blanket lien." (Ruhlin Dep. 89:14–25; 93:8–14, 165:5–9.) Ms. Farley, the Debtors' appointed 30(b)(6) witness on the assets constituting JSN Collateral, testified that Former Bilateral Facilities Collateral would "absolutely" become JSN Collateral when the Bilateral Facilities terminated, "[t]o

the extent they fell within the security grant." (Oct. 16 Tr. 186:24–187:9.)

Finally, the Debtors were told by their outside counsel via email in December 2008 that "if at any point while owned by GMAC [ ] the assets are removed from a Bilateral Facility, the [AFI] Revolver and [JSN] Indenture liens may cover these assets and they will constitute Collateral (if and to the extent Sections 9–406/8 of the U.C.C. are applicable)." (DX ES at 1.) The extrinsic evidence presented at trial indicates that the parties to the JSN Security Agreement understood and intended that the JSN Collateral would include Former Bilateral Facilities Collateral. The Court therefore finds that the JSNs have liens on the Former Bilateral Facilities Collateral. [45]

### ii. The JSNs Have Liens on the Released and Reacquired Collateral.

The Plaintiffs seek a declaration that the Defendants have not perfected any interest in the Reacquired Mortgage Loans. According to the Plaintiffs, even if the JSNs retained a continuing security interest in the Released Mortgage Loans when those assets were re-acquired by the Debtors, which the Plaintiffs contest, the JSNs never perfected their security interest, and it is avoidable. The Defendants contend that (1) the Reacquired Mortgage Loans are assets that were initially JSN Collateral, subsequently released by the Collateral Agent in May 2010 so that they could be sold to a Repo Facility, and then reacquired by the Debtors between September 2010 and the Petition Date, thereby falling within the scope of the Blanket Lien, and (2) the JSNs' lien on the Reacquired Mortgage Loans is perfected because the original U.C.C. filings perfecting those liens provided adequate notice to potential creditors. The book value of the Reacquired Mortgage Loans is approximately $14.1 million and has an alleged fair market value of approximately $10 million. [46]

The Court finds that the Defendants have perfected liens on the Reacquired Mortgage Loans.

### (a) The Reacquired Mortgage Loans Fall within the Blanket Lien's Grasp.

[21]   The Defendants argue that the loans that were released from the JSNs' liens in May 2010 to be sold to the Citi

and Goldman Repo Facilities and subsequently repurchased by the Debtors between September 2010 and the Petition Date are JSN Collateral due to the Blanket Lien. The Blanket Lien arises from the All–Assets Granting Clause expressly covering all of the Debtors' assets, "whether not or hereafter existing, owned or acquired and wherever located and howsoever created...." (JSN Security Agreement at 13.) "[U]nder the Uniform Commercial Code,  **\*615**  the proper perfection of a security interest may create an enforceable lien in after-acquired property, without regard to an entitlement to an equitable lien under common law." *In re Minor,* 443 B.R. 282, 288 n.3 (Bankr.W.D.N.Y.2011) (citing N.Y. U.C.C. § 9–204 (2001)). A security interest "arising by virtue of an after-acquired property clause is no less valid than a security interest in collateral in which the debtor has rights at the time value is given ... no further action by the secured party—such as a supplemental agreement covering the new collateral—is required." N.Y. U.C.C. § 9–204 cmt. 2 (2013).

No language in the JSN Security Agreement suggests that the Blanket Lien does not apply to  **\*616**  the Reacquired Mortgage Loans. Instead, the Debtors' and AFI's employees testified that they understood that assets sold and repurchased by the Debtors would become JSN Collateral upon their reacquisition. (*See* Oct. 16 Tr. 190:21–191:24 (when an asset that had been released from the JSN Collateral package to be sold to a third party was repurchased by the Debtors, "the blanket lien would pick it up"); Ruhlin Dep. 65:19–22, 66:6–14 ("[A]ssets such as loans that were acquired in the future would be subject to the lien," and those assets could have been "[r]epurchases ... previously owned by ResCap," or "[t]hey ... could be repurchased outside from a third party.").) Thus, under the Blanket Lien, the Reacquired Mortgage Loans became JSN Collateral when the Debtors repurchased them.

### (b) The JSNs' Interest in the Reacquired Mortgage Loans Is Perfected.

[22]   The Plaintiffs argue that the U.C.C.–3 statements filed in May 2010 terminated the U.C.C.–1 financing statements as to these assets, rendering any security interests the JSNs had in the Reacquired Mortgage Loans unperfected. However, because the Court finds that the U.C.C.–1 financing statements continued in effect notwithstanding the filing of the U.C.C.–3 financing statements, the U.C.C.–1 statements operated to perfect the JSNs' security interests.

The U.C.C. employs a notice filing system requiring that a financing statement provide "a simple record providing a limited amount of information" that puts parties on notice to inquire further to ascertain "the complete state of affairs." N.Y. U.C.C. § 9–502 cmt. 2. "UCC Article 9 only requires information sufficient to engage in further inquiry. When the authorization underlying a previously filed termination statement matters to a subsequent lender (as it usually will), the lender can simply include any necessary further inquiry as part of its due diligence." *Official Comm. v. JPMorgan Chase Bank, NA (In re Motors Liquidation Co.),* 486 B.R. 596, 644 (Bankr.S.D.N.Y.2013). In cases where courts have addressed inconsistent financing statements, courts have found that the inconsistency in the statements itself was sufficient to put the creditor on notice. *See In re A.F. Evans Co.,* No. 09–41727(EDJ), 2009 WL 2821510, at *5 (Bankr.N.D.Cal. July 14, 2009) ("Here, CNB's financing statements, as amended by the U.C.C.–3 Amendment statements, each with two conflicting boxes checked [ (a termination box plus a release of collateral box) ], would raise a red flag for any person conducting a search alerting such person of the possibility that a full termination may not have been intended.").

In this case, because the U.C.C.–1s were on file, potential lenders were on notice to investigate the extent of the JSNs' security interest in the Reacquired Mortgage Loans notwithstanding the U.C.C.–3s relating to those assets. After further inquiry, they would have been informed that the Reacquired Mortgage Loans were automatically pledged once again to AFI and the JSNs under the Blanket Lien, and were coded first as unpledged and later as Blanket Lien Collateral in the CFDR. (*See* Farley Dep. 95:3–14, 110:5–111:14, 115:4–14, 137:21–24, 138:4–11, 176:21–177:3; Oct. 16 Tr. 190:21–192:18; Hall Dep. 117:6–12; Ruhlin Dep. 65:19–22, 66:6–21, 106:8–12, 119:4–9, 155:16–156:2, 156:15–21.)

For the foregoing reasons, the Court finds that the JSNs' interest in the Reacquired Mortgage Loans was perfected, and the JSNs are entitled to their lien on the released and reacquired collateral.

### b. The JSNs Have Liens on a Portion of the Deposit Accounts.

 [23]   The Plaintiffs also challenge JSN liens on certain deposit accounts, which the Plaintiffs refer to as "Avoidable Deposit Accounts."[47] The Avoidable Deposit Accounts

hold approximately $48.4 million. The Plaintiffs allege that the JSNs have not perfected their security interests in the Avoidable Deposit Accounts.

 [24]   The Court finds that, except for the Controlled Accounts and the WF Accounts, the JSNs do not have perfected liens on the Avoidable Deposit Accounts. Under the U.C.C., "a security interest in a deposit account may be perfected only by control" of the account. N.Y. U.C.C. § 9–312(b)(1). A secured party has control of a deposit account if: "(1) the secured party is the bank with which the deposit account is maintained; (2) the debtor, secured party, and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor; or (3) the secured party becomes the bank's customer with respect to the deposit account." *Id.* at § 9–104(a)(1)–(3).

The parties requested executed control agreements in discovery. (Landy Direct ¶ 40.) The Defendants offered evidence of control agreements for certain accounts (the "Controlled Accounts"). (*See* DX AIU; DX AIV; DX AIW; DX AIX; DX AIY; DX AIZ.) Given the control agreements, the JSNs have established control over those accounts. Additionally, the Plaintiffs concede that certain accounts the Committee initially challenged are controlled by Wells Fargo, which is the Third Priority Collateral Agent. Since Wells Fargo controls those accounts and is the secured party for the Junior Secured Notes, the JSNs have sufficiently established control over the WF Accounts. The Court finds that the Controlled Accounts and the WF Accounts are the only Deposit Accounts over which the JSNs have established control.

The JSNs claim to have liens on certain Ally Bank accounts by virtue of Ally's corporate relationship with AFI, the Revolver Lender. But Ally and AFI are not the same entity. The JSNs cannot establish control over Ally Bank accounts due to the corporate relationship between Ally and AFI. And even if AFI had control over those accounts by virtue of its relationship with Ally Bank, that would not benefit the JSNs.

Under the U.C.C., the Notes Trustee has the burden of tracing funds to "identifiable cash proceeds" of collateral that would be automatically perfected under U.C.C. § 9–514(c). U.C.C. § 9–315. *See also In re Milton Abeles, LLC,* No. 812–70158–reg, 2013 WL 530414 at *2 (Bankr.E.D.N.Y. Sept. 20, 2013) ("[S]ection 9–315 **\*617** provides that 'proceeds' of a secured

creditor's collateral must be 'identifiable proceeds.' Proceeds that are commingled with other property are 'identifiable' only if 'the secured party identifies the proceeds by a method of tracing.' "); *Matter of Guaranteed Muffler Supply Co., Inc., 1 B.R. 324, 330 (Bankr.N.D.Ga.1979)* ("secured parties bear the burden of identifying, or tracing, the proceeds obtained upon the sale of property in which they have an interest ...."). But for a single account that the Plaintiffs concede contains proceeds of JSN Collateral, the Defendants have failed to provide sufficient evidence that any deposit accounts contain proceeds of JSN Collateral.

After excluding the Controlled Assets, the WF Accounts, and the proceeds account, the amount of funds in the remaining deposit accounts (i.e., the Avoidable Deposit Accounts) as of the Petition Date was $48,439,532. Accordingly, the JSNs do not have a lien on the Avoidable Deposit Accounts pursuant to sections 544(a)(1)–(2) of the Bankruptcy Code. The property or the value of the property represented by the Avoidable Deposit Accounts should be recovered and/or preserved for the benefit of the Debtors' estates pursuant to sections 550(a) and 551 of the Bankruptcy Code.

For the foregoing reasons, the Court finds that the value of the JSNs' collateral should be reduced by $48,439,532, the amount of cash in the Avoidable Deposit Accounts as of the Petition Date.

### c. The JSNs Do Not Have a Lien on the Unencumbered Real Property.

**[25]** **[26]** To perfect a lien on real property, a secured party must execute a mortgage or a deed of trust and duly record it against the title of such real property. *SeeIn re Churchill Mortg. Inv. Corp., 233 B.R. 61, 70 (Bankr.S.D.N.Y.1999)* ("Under the New York Real Property Law § 291, a security interest in real property can be perfected only by filing written notice with the Clerk of the County where the property is located so that the lien may be publicly recorded, giving notice of the encumbrance to potential purchasers or future creditors."). The Court finds that the JSNs do not have a perfected security interest in or lien on any of the Unencumbered Real Property because that property was not subject to an executed and filed mortgage or deed of trust. Accordingly, any JSN lien with respect to the Unencumbered Real Property is avoidable pursuant to sections 544(a)(1) and (2) of the Bankruptcy Code, and the property or the value of the property represented by the Unencumbered Real Property

should be recovered and/or preserved for the benefit of the Debtors' estates pursuant to sections 550(a) and 551 of the Bankruptcy Code.

For the foregoing reasons, the Court finds that the value of the JSNs' collateral should be reduced by $21 million, the fair market value of the Unencumbered Real Property as of the Petition Date.

### 7. The Plaintiffs Failed to Establish Preferential Transfers to the JSNs.

The Plaintiffs seek to avoid $270 million of the JSNs' claim as preferential transfers (the "Alleged Preferential Transfers"). The Alleged Preferential Transfers, listed on Schedule 6 to the Committee's complaint (PX 127), consist of (1) mortgage loan instruments, including HFS Loans and FHA/VA loans, (2) REO property, and (3) government insurance claims arising as a result of expenditures incurred by the Debtors in connection with FHA/VA **\*618** Loans.[48] The Plaintiffs contend that these assets first became JSN Collateral on or after February 29, 2012, during the Modified Preference Period.[49] To prove this contention, the Plaintiffs point to how the collateral was recorded in the CFDR as of February 29, 2012, and as of the Petition Date. As such, the Plaintiffs claim to have met their prima facie burden of proof for a preference claim under Bankruptcy Code sections 547(b)(1)-(5).

The Defendants offer two reasons why the Plaintiffs are not entitled to avoid the Alleged Preferential Transfers: (1) the Plaintiffs failed to make a prima facie case for avoidance, and (2) even if the Plaintiffs could make such a showing, their Preference Claim is barred by the "improvement in position test." Because the Court concludes that the Plaintiffs have failed to make a prima facie case for avoidance of the Alleged Preferential Transfers the Court need not consider the "improvement in position test."

**[27]** Section 547(b) of the Bankruptcy Code "permits a trustee to avoid certain prepetition transfers as 'preferences.' "[50] 5 COLLIER ON BANKRUPTCY ¶ 547.01. Section 547(b) lays out the elements of an avoidable preference as a transfer of an interest in debtor property:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to received more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). Unless the trustee proves each and every one of these elements, a transfer is not avoidable as a preference under section 547(b). *See* 11 U.S.C. § 547(g) ("For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section ...."); *see also Waldschmidt v. Ranier (In re Fulghum Constr. Corp.),* 706 F.2d 171, 172 (6th Cir.1983) ("As is facially evident from this provision, all five enumerated criteria must **\*619** be satisfied before a trustee may avoid any transfer of property as a preference.").

### a. The Plaintiffs Failed to Show that the JSNs Were Undersecured as of February 29, 2012.

 **[28]**   The Defendants argue that the Plaintiffs failed to make a showing that the JSNs were undersecured at the start of the Modified Preference Period, immunizing them "from [a] preference attack because [they] would have been paid in full in a hypothetical Chapter 7 liquidation by virtue of [their] realization on [their] collateral." *Official Comm. v. AAF–McQuay (In re 360networks(USA), Inc.),* 327 B.R. 187, 190 (Bankr.S.D.N.Y.2005); *see also In re Santoro Excavating, Inc.,* 32 B.R. 947, 948 (Bankr.S.D.N.Y.1983) ("[A] payment [during the preference period] to a creditor with an allowed fully secured claim is not a preference.") (collecting cases). Where a creditor asserts that it was oversecured at the time of the alleged preferential transfer, it is the plaintiff's burden to refute that assertion. *See Savage & Assocs., P.C. v. Cnty. of Fairfax (In re Teligent, Inc.),* No. 01–12974(SMB), 2006 WL

1030417 at *3 (Bankr.S.D.N.Y. Apr. 13, 2006) ("Teligent II") ("[W]here the defendant in a preference action asserts that it was oversecured, the plaintiff must prove a negative, to wit that the defendant was not oversecured."), *aff'd sub nom In re Teligent Servs. Inc.,* No. 06 Civ. 03721(KMW), 2009 WL 2152320 (S.D.N.Y. July 17, 2009) ("*Teligent III* "). A defendant's assertion that it was fully secured is not a defense pursuant to section 547(c), but "rather a negation of one of the elements of a preference action, pursuant to section 547(b)." *Teligent III,* 2009 WL 2152320, at *6.

 **[29]**   Throughout this case, the Defendants have maintained that they were oversecured as of the start of the Modified Preference Period, placing the burden squarely on the Plaintiffs to prove that the Defendants were not oversecured. While the Plaintiffs' expert Mr. Puntus provided a proposed valuation of the JSNs' collateral as of the Petition Date, [51] he did not calculate the value as of the start of the Modified Preference Period. In fact, none of the Plaintiffs' experts provided a valuation of the JSN Collateral at the beginning of the Modified Preference Period, or at any time during that period. As a result, the Plaintiffs have failed to satisfy section 547(b)(5) and are not entitled to avoid the portion of the Defendants' liens related to the so-called "Preferential Transfers."

### b. The Plaintiffs Failed to Prove the Identity or Scope of Transfers of Collateral to Defendants During the Modified Preference Period.

Even assuming that the Plaintiffs had shown that the Defendants were undersecured at the beginning of the Modified Preference Period, the Plaintiffs have failed to show the identity or scope of these Alleged Preferential Transfers. The Plaintiffs' only evidence in support of their preference claim, the CFDR, is reliable as a business record to establish when AFI LOC Collateral was properly released, but it is not sufficient to establish the identity or scope of the Alleged Preferential Transfers. The Plaintiffs' expert Mr. Landy identified the Alleged Preferential Transfers by performing a comparison of CFDR extracts as of February 29, 2012, and the Petition Date. (Oct. 17 Tr. 152:16–153:13, 162:12–15.) He concluded that any asset appearing in the CFDR for the first time as JSN Collateral during the Modified **\*620** Preference Period was a preferential transfer, though he "did not attempt to understand the circumstances for why each loan may have appeared on 5/13...." (Oct. 17 Tr. 153:10–22; 155:5–7.) Indeed, the CFDR contains little information

explaining why an asset would appear for the first time or reappear after an absence in the database. (*See* PX 139.) At trial, the Defendants raised a variety of explanations why these assets may have appeared in the CFDR during the Modified Preference Period, tending to negate their status as preferential transfers. For example, the loans may have been modified, repaid in full and then subsequently drawn upon, or they may represent refinancings of old loans that formerly constituted JSN Collateral. (Oct. 22 Tr. 26:23–27:9, 28:3–10, 31:18–32:15, 33:18–34:4, 35:18–21, 42:14–43:3, 56:25.) Under any example, they would not be preferential transfers.

The Defendants' expert Mr. Winn specifically identified a variety of alleged "Preferential Transfers" that should not have been included in Schedule 6. (DX ABN 12 ("[T]he CFDR shows that approximately $18 million of the alleged Preference Assets were owned by the Debtors and served as JSN Collateral as of or prior to 2/29/12 and thus should not be listed as Preference Assets.").) Mr. Landy, who prepared Schedule 6, conceded that certain of these assets were inaccurately included on Schedule 6. (*See* Landy Direct ¶ 56 ("I have determined that I concur with Mr. Winn's observations regarding (a) 18 loans identified as 'FHA/VA Reclassified as Loans HFS' ... with a net book value of approximately $1.95 million, and (b) 2 loans identified as 'REO Reclassified as Loans' ..., with a net book value of $50,478.") ("Mr. Winn identifies approximately $12 million of 'REO' assets that were pre-existing components of the JSN Collateral pool as of February 29, 2012, and were therefore never transferred to or for the benefit of the JSNs during the preference period.").) Specifically, Mr. Landy concurred with Mr. Winn's conclusions that the following do not constitute preferential transfers:

• The FHA/VA assets for which no Loan Funding Date exists within the CFDR and for which the Debtors have provided no information nor conducted any inquiry whether such assets are refinancings (despite the acknowledgment that such assets could be refinancings);

• The approximately $12 million of REO assets which the Committee's expert Marc E. Landy concedes were within the CFDR in the JSN Collateral before the Modified Preference Period. The Committee seeks to avoid these assets "to the extent ... ownership of these REO properties was transferred ... to an REO special purpose vehicle during the preference period," yet offered no evidence that such transfers to special purpose vehicles occurred during the Modified Preference Period;

• The HFS loans appearing for the first time in the CFDR during the Modified Preference Period with Loan Funding Dates before the Modified Preference Period, for which neither the Committee nor the Debtors can offer a reasonable and consistent explanation, the majority of which have "Loan Modification Dates" and a portion of which are coded as HELOCs (suggesting that their appearance is the result of loan modifications or draws on HELOCs); and

• The HFS and FHA/VA loans that appeared in the CFDR before the Modified Preference Period, disappeared from the CFDR and reappeared within the CFDR during the Modified Preference Period.

Given these errors, appearance in the CFDR alone cannot be enough to identify **\*621** a preferential transfer. Too many questions and inconsistencies remain to conclude that the JSNs first acquired an interest in these assets during the Modified Preference Period. Thus, the Plaintiffs have failed to prove the identity and scope of the Alleged Preferential Transfers and are not entitled to avoid this portion of the JSNs' claim.

### *8. The Plaintiffs Are Not Entitled to Charge the JSNs with a $143 Million Carve Out Payment If the Plaintiffs Can Pay Professional Fees and Administrative Expenses with Unencumbered Cash.*

The Plaintiffs seek a declaration permitting them to charge up to an additional $143 million in Carve Out expenses, thereby further reducing the JSNs' secured claim on the Effective Date. The Court holds that the Plaintiffs are not entitled to this declaration if they can pay fees and expenses with unencumbered cash. While this case is not over, it appears that the Debtors have substantial unencumbered cash available to pay administrative expenses.

 **[30]**  A carve out is a provision of a cash collateral order that allows for some expenditure of administrative and/ or professional fees to be paid before a secured creditor gets paid on its collateral. *See In re Blackwood Associates, L.P.,* 153 F.3d 61, 68 (2d Cir.1998) (stating that "absent an agreement to the contrary, a secured creditor's collateral may only be charged for administrative expenses, including attorney's fees, to the extent these expenses directly benefited that secured creditor," but "if a secured party consents to allowing such administrative expenses, that party may be

liable for such expenses even in the absence of conferred benefit"); 3 COLLIER ON BANKRUPTCY ¶ 364.04[2][d] ("A carve-out gives the benefitted claimants a priority in the postpetition lender's collateral ahead of the lender's priority and, if the carve-out is for the benefit of only certain named administrative claimants, above other administrative claimants as well."); Richard B. Levin, *Almost All You Ever Wanted to Know About Carve Out,* 76 AM. BANKR. L.J. 445, 445 (2002) ("As generally used, a carve out is an agreement between a secured lender, on the one hand, and the trustee or debtor in possession ... on the other, providing that a portion of the secured creditor's collateral may be used to pay administrative expenses.").

 [31]  The Bankruptcy Code does not deal with carve out provisions typically included in cash collateral orders. *See In re White Glove, Inc.,* No. 98–12493 DWS, 1998 WL 731611 at *6 (Bankr.E.D.Pa. Oct. 14, 1998) ("The term 'carve out' is one of those uniquely bankruptcy phrases, much like 'cram down,' that appears nowhere in the bankruptcy statute but connotes definite meaning to the parties."); *see also* Levin at 445 ("Unlike 'cram down,' ... which has a relatively well-defined meaning derived from ¶ 1129(b) of the Bankruptcy Code, 'carve out' does not derive its substance from any particular section of the Bankruptcy Code."). Unless it conflicts with provisions of the Bankruptcy Code, a carve out is construed applying normal contract interpretation provisions. *See Blackwood,* 153 F.3d at 67 (applying "the statutory context underlying cash collateral stipulations[ ] and the text of the Stipulation itself" to conclude that a disputed carve out provision did not grant the chapter 11 debtor's counsel payment from cash collateral when the debtor failed to meet the terms of the cash collateral stipulation).

 [32]  The usual purpose of a carve out is to assure the payment of specified administrative expenses from a secured creditor's **\*622** collateral in the event that the case goes badly, use of cash collateral is terminated, and sufficient unencumbered funds are no longer available to administer the case, usually after conversion to chapter 7. *See* Levin at 451 ("The carve out becomes important to the protected administrative claimants *only* when the unencumbered assets in the bankruptcy estate that remain after application of the collateral proceeds to the secured claim are not adequate to pay all administrative claims, so that the administrative claimants will need to look to the carve out as an alternative source for payment.") (emphasis added).

 [33]  Here, the Cash Collateral Order controls the priority of the JSN liens with respect to the Carve Out. The Final Cash Collateral Order creates a Carve Out from the JSNs' cash collateral that subjects and subordinates the JSN liens to the Carve Out amount but does not otherwise affect the validity of the JSN liens on carved out JSN cash collateral:

> the [JSN Liens] are valid, binding, perfected, and enforceable first priority liens on and security interests in the personal and real property constituting "Collateral" under, and as defined in, the Junior Secured Notes Documents ... and (iii) are subject and subordinate only to (A) the liens and security interests granted to the AFI Lender under the AFI Revolver, all subject to the terms and conditions of the Intercreditor Agreement, dated as of June 6, 2008 ..., (B) the Carve Out, and (C) the liens and security interests granted to secure the Adequate Protection Obligations....

(PX 76 at 11–12.) The Carve Out, in turn, is defined as the sum of: (1) court and United States Trustee fees, (2) accrued and unpaid professional fees following a termination event in an aggregate amount not exceeding $25 million (plus all unpaid professional fees allowed by the Court at any time that were incurred on or before the business day following the Carve Out Notice), and (3) unpaid professional fees that were allowed prior to the termination event; provided that,

> (A) the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Adequate Protection Parties, (B) so long as no event of default shall have occurred and be continuing, the Carve Out shall not be reduced by the payment of fees and expenses allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code, and (C) nothing in this Final Order shall impair the right of any party to object to any such fees

or expenses to be paid by the Debtors' estates.

(*Id.* at 31–32.)

The Cash Collateral Order clearly requires the JSNs to subordinate their secured claim to the payment of the Carve Out, but is silent whether the Debtors may use those funds, further reducing the JSNs' secured claim, when other unencumbered funds are available. Absent contractual language requiring that result, the Court concludes that the Cash Collateral Order does not go beyond the ordinary purpose of assuring funds to pay the specified expenses if unencumbered funds are no longer available to do so.

The JSNs' liens remain subordinated to the Carve Out. If during the remainder of the case, unencumbered funds are no longer available to pay the expenses, the JSN Collateral can be used for that purpose. At this stage, however, there is no reason to believe that will occur. The Court holds that the JSNs' Collateral should not be reduced at this time.

**\*623  E. Given the Court's Findings on What Constitutes JSN Collateral, the JSNs are Undersecured.**
Notwithstanding the JSNs' ability to aggregate their collateral across debtors, the Court finds that, as of the conclusion of Phase I, the JSNs are undersecured and not entitled to postpetition interest and fees. [52] As of the Petition Date, the JSNs held secured claims against ResCap, and certain of its affiliates as guarantors and grantors, in the face amount of $2.222 billion, consisting of $2.120 billion in unpaid principal as of the Petition Date, and $101 million in unpaid prepetition interest. (DX ABF at 3.) As the Court discussed in section III.A above, the JSNs' claim will not be reduced by unamortized OID. Assuming an effective date of December 15, 2013, the JSNs will assert a claim for postpetition interest at the default rate, in the amount of $342 million. (JSN Corrected Proposed Findings of Fact, ECF Doc. # 190 § II ¶ 15.) The JSNs are only entitled to receive postpetition interest up to the value of their collateral. 11 U.S.C. § 506(b). Thus, to receive their full claim for postpetition interest, the JSNs have to establish an effective date value of their collateral of at least $2.564 billion. At this point in the case, they fall well shy of the mark.

The parties have largely agreed on $1.888 billion as a baseline estimation of the Effective Date value of the JSN Collateral. (DX AIR at 5.) The Plaintiffs seek to subtract from the

baseline; the Defendants seek to add to it. Based on the Court's rulings, the following amounts will be added to the baseline:

• $40 million in equity held at certain non-Debtors;

• $17 million for a net increase in the value of the FHA/VA Loans;

• $18.395 million for software; and

• $10 million for tradename, iconography, and logotype.

The following amounts will be subtracted from the baseline:

• $48,439,532 in Deposit Accounts (the JSNs retain an interest in $63,297); and

• $20.8 million of unencumbered real property.

Based on the Court's ruling, the following factors will not affect the baseline valuation:

• The Plaintiffs may not charge an additional $143 million of expenses to the JSNs' collateral under the cash collateral carve out at this time.

• The Plaintiffs have not carried their burden in proving any preferential transfers.

• The JSNs do not have a lien on the $1.1 billion of AFI LOC Collateral.

• The JSNs have a lien on $24 million of Former Bilateral Facilities Collateral.

• The JSNs have a lien on $10 million of Reacquired Mortgage Loans.

• The JSNs are not entitled to a $66 million allocation from sale proceeds for net increases in HFS Collateral.

• The JSNs do not have a lien on any other intangibles or goodwill.

Based on the above findings, the JSNs have established that the Effective Date value of their collateral is $1,904,155,468. Because their claim is for the face amount of $2.222 billion, the JSNs are undersecured at the end of Phase I. A final determination of the extent of their security will **\*624**  be deferred until after Phase II of the trial.

### IV. *CONCLUSION*

The Phase I trial presented a large number of complex factual and legal issues requiring extraordinary time and expense for the parties and considerable effort for the Court to reach a result leaving the JSNs substantially undersecured. The JSNs have achieved that result in a case in which the proposed plan would pay the JSNs *all* prepetition principal and interest. The JSNs have pursued from the start a strategy where they contest everything and concede nothing (even when the Court has questioned whether they are acting in good faith). The

JSNs have made clear that they will continue to follow the same strategy in the Phase II trial and contested confirmation hearing beginning on November 19, 2013.

The Court will continue to decide all issues fairly (the JSNs did prevail on some of the important issues in the Phase I trial), but it should not be lost on anyone that the JSNs stand virtually alone in this case in failing to reach a consensual agreement to resolve their issues. The result has been protracted proceedings that have burdened the estate and reduced funds available to satisfy creditor claims. That is unfortunate!

Footnotes

1   The value of the JSNs' purported adequate protection claim will increase or decrease based on the value of the JSNs' Collateral on the Petition Date and on the Effective Date. This Opinion will resolve some issues relating to both values.

2   All docket numbers listed refer to the Adversary Proceeding Docket 13–01277, unless otherwise noted.

3   [Date] Tr. [Citation] refers to transcripts of the Phase I trial. References to [Name] Direct [Citation] refer to direct testimony submitted in writing before the trial began and available on the public docket. Plaintiffs' exhibits are referenced by number (e.g., PX 1), and Defendants' exhibits are referenced by letter (e.g., DX A). All references to page numbers in the Plaintiffs' exhibits refer to the PX page numbers at the bottom of each page (e.g., PX 1 at 51 refers to PX 1 at page 51 of 120.) All references to page numbers in the Defendants' exhibits refer to the DX page numbers at the bottom of the each page. References to [Name] Dep. [Citation] refer to the deposition testimony designated for the Phase I trial. Citations to "PTO ¶ __" are to the stipulated facts contained in the Revised Joint Pretrial Order entered in the consolidated adversary proceedings. (ECF Doc. # 161.)

4   Any remaining objections to deposition designations are overruled.

5   Although Wells Fargo is also a defendant, this opinion refers to UMB and the Ad Hoc Group as the "Defendants" to simplify referring to those parties.

6   Paragraph 16(c)(v) of the Final CashCollateral Order provides that the JSNs are entitled to, as part of adequate protection, prompt payment of reasonable fees and expenses, whether accrued prepetition or postpetition, for certain identified professionals. (PX 76 at 30.) The provision also provides that "nothing shall prejudice the rights of any party to seek to recharacterize any such payments ... as payments of principal under the Junior Secured Notes." (*Id.*) The issue was not addressed by the parties during the Phase I trial.

7   On June 20, 2012, the Court directed that an examiner be appointed (ECF 12–12020 Doc. # 454). On July 30, 2012, the Court approved Arthur J. Gonzalez as the examiner ("Examiner") (ECF 12–12020, Doc. # 674), and on June 26, 2013, the *Report of Arthur J. Gonzalez, as Examiner* was made publicly available (ECF Doc. # 3698).

8   The parties did not present evidence at trial of the value of the JSNs' collateral on a debtor-by-debtor basis, but instead focused on the aggregate value of the JSNs' collateral.

9   The "AFI Contribution" is a $2.1 billion cash contribution AFI agreed to make to the Debtors' estates pursuant to the terms of the settlement among the Debtors, the Committee, AFI, and the Consenting Claimants set forth in Article IV of the Debtors' Joint Chapter 11 Plan.

10  During the trial, the Court determined that issues relating to liens on the AFI Contribution would be tried in Phase II.

11  The issues reserved for Phase II include (1) the value of intercompany balances, (2) the treatment of various claimant classes, (3) allocation of the AFI Contribution, (4) the value of collateral, oversecurity, and interest and fees if not determined in Phase I, and (5) a final calculation of the Defendants' adequate protection claim, if applicable. (*Id.*)

12  The Notes Indenture also provided that "[t]he [Borrower] will pay interest (including postpetition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; it will pay interest (including postpetition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Interest (without regard to any applicable grace period) at the same rate to the extent lawful." (PX 1 § 4.01.)

13    The guarantor entities that are Debtors in these chapter 11 proceedings (the "Guarantor Debtors") guaranteed ResCap's obligations under the Notes Indenture, including the obligation to pay in full all principal, interest, fees, and premiums, if any, with respect to the Junior Secured Notes. (PX 1 § 10.01.)

14    ResCap also issued senior secured notes that were secured by the same collateral, but those notes were satisfied in full before the petition date and are not central to the present dispute.

15    *See infra* II.H.5 for discussion of Excluded Assets.

16    Pursuant to the JSN Security Agreement, the assets included "accounts, chattel paper, commercial tort claims, deposit accounts, financial assets, investment property, intellectual property, and general intangibles" of ResCap and the Notes Guarantors and Additional Grantors. (PX 4.) Although the JSN Security Agreement listed "Commercial Tort Claim described on Schedule V" as collateral, no commercial tort claims were identified or listed on Schedule V. Schedule V was never amended or modified. As a result, the Court previously found that the Defendants do not have a properly perfected lien on any Commercial Tort Claims. (*See* ECF Doc. # 100.)

17    A "Relevant Party" is an obligor under the Revolver Security Agreement or the JSN Security Agreement.

18    AFI was the Lender Agent.

19    FHA/VA loans are repurchased whole loans from Ginnie Mae trusts. (DX ABI at 58.) Since these assets are partially insured, the amounts paid by the Debtors to repurchase these loans are substantially reimbursable. (*Id.*) The Debtors also have the choice of modifying or selling these Ginnie Mae repurchased loans to a Ginnie Mae trust or third party. (*Id.*) The Debtors always intended to sell the FHA/VA loans but ultimately pulled the FHA loans from the auction because they felt the bids received were not high enough. (Puntus Direct ¶ 117.)

20    The $910 million questioned by the Ad Hoc Group is composed of four categories of assets (domestic mortgage loans, FHA/VA receivables, REO properties, and servicing advances) and three of these categories (comprising approximately 97% of the assets at issue) are covered by the Blanket Loan Release. Mortgage loans ($550.4 million) and FHA/VA receivables ($324.7 million) fall within the express definition of "Subject Mortgage Loans." REO properties ($5.9 million) are merely proceeds obtained upon foreclosure of mortgage loans and are therefore covered as well. (*See* DX AHD at 24 (setting forth the values of the various asset classes purportedly lacking evidence of release).) The last category of assets questioned by the Ad Hoc Group—servicing advances ($29.4 million)— is covered by the Servicing Advance Release. The Servicing Advance Release covers Freddie Mac servicing advances (PX 130 at 1181–83), which were the only types of servicing advances pledged as collateral to the AFI LOC on the Petition Date. Farley Direct ¶ 62 & n.7. Therefore, the Servicing Advance Release covered all servicing advances that were pledged as collateral to secure the LOC Facility.

21    The servicing platform related to the MSRs includes, *inter alia,* software servicing contracts, employee contracts and certain other operating expenses relating to the MSRs (Oct. 15 Tr. 171: 8–17), and the origination platform related to the MSRs includes the call center. (Oct. 15 Tr. 172: 1–6.)

22    A significant modification of the FRB Consent Order—effectively reducing the Debtors' costs of compliance—was negotiated during this case and approved by the Court.

23    The Mini Auction resulted in increases in the sales prices by a total of $150 million, as well as a reduction in the proposed break-up fees for the origination and servicing platform.

24    The Second Circuit explained the distinction between the two types of exchanges, writing:

> An exchange offer made by a financially troubled company can be either a "fair market value exchange" or a "face value exchange." In a fair market value exchange, an existing debt instrument is exchanged for a new one with a reduced principal amount, determined by the market value at which the existing debt is trading. By offering a fair market value exchange, an issuer seeks to reduce its overall debt obligations.... A face value exchange, by contrast, involves the substitution of new indebtedness for an existing debenture, modifying terms or conditions but not reducing the principal amount of the debt.

> *Chateaugay,* 961 F.2d at 381–82 (citations omitted).

25    The GMAC Mortgage Services Advance Funding Company Ltd. ("GSAP") Facility and the BMMZ Holding LLC Facility.

26    The "Former Bilateral Facilities Collateral" is referred to as "Released Bilateral Facilities Collateral" in the Committee's complaint and briefings by the Plaintiffs.

27    The parties dispute whether the amount of OID at the Petition Date is $386 million (according to the Plaintiffs) or $377 million (according to the Defendants). Since the Court concludes that the amount of the JSNs' claim should not be reduced by OID, the Court need not resolve this dispute.

28    *See supra* note 24 for the differences between fair market value and face value exchanges.

29    Here, the cash collateral motion was filed as a first day motion, so there is no issue of whether a later date should apply for purposes of an adequate protection claim. *See* 4 COLLIER ON BANKRUPTCY ¶ 506.03[7][a][iv] ("In general, courts typically hold that,

for purposes of adequate protection, the value of the collateral is to be determined either as of the petition date or as of the date on which the request for adequate protection was first made.").

30      There is no question here that the JSNs received adequate protection by a very substantial postpetition lien on collateral (far beyond the property covered by the JSNs' liens on the petition date). Had there been a contested cash collateral hearing the Debtors would have had the burden of establishing adequate protection; that was unnecessary because of the agreement of the parties. The issue now is different: Are the JSNs entitled to recover a claim based on a diminution in the aggregate value of their collateral at the petition date? As explained in the text, on that issue the JSNs have the burden of proof.

31      None of the cases cited by the Defendants support the proposition that in a post-hoc analysis of the sufficiency of adequate protection, the debtor continues to bear the burden of proving adequate protection. Rather, they all involve the well-established rule that, before a debtor may use, sell, lease, or otherwise encumber the lender's collateral, the debtor must show that the creditor's interest will be adequately protected. *See Swedeland,* 16 F.3d at 564 (discussing whether adequate protection existed sufficient to grant a priming lien); *Wilmington Trust Co. v. AMR Corp. (In re AMR Corp.),* 490 B.R. 470, 477–78 (S.D.N.Y.2013) (discussing whether a secured lender was entitled to adequate protection during the pendency of the case); *In re Erewhon, Inc.,* 21 B.R. 79, 84 (Bankr.D.Mass.1982) (stating that a secured creditor worried about diminution in value need only object to use of collateral "since the burden of proving adequate protection is substantially that of the Debtor"); *Hamilton Bank v. Diaconx Corp. (In re Diaconx Corp.),* 69 B.R. 333, 338 (Bankr.E.D.Pa.1987) (denying use of cash collateral because debtor failed to carry burden of showing that secured lender's interest "would be adequately protected"). As the Court already explained, the parties already agreed that the JSNs' interest in their collateral would be adequately protected when they signed the Cash Collateral Order.

32      *See In re Walck,* No. 11–37706(MER), 2012 WL 2918492, at *2 (Bankr.D.Colo. Jul. 17, 2012) (in the context of a motion for relief from stay, construing *section 506(a)* in light of *Rash,* finding that secured creditor was adequately protected based on the fair market value of collateral projected to be earned by sale); *Bank R.I. v. Pawtuxet Valley Prescription & Surgical Ctr.,* 386 B.R. 1, 4 (D.R.I.2008) (holding that going concern/fair market value could be used where secured lender objected to finding that it was adequately protected); *In re Eskim LLC,* No. 08–509, 2008 WL 4093574, at *2–4 (Bankr.N.D.W.Va. Aug. 28, 2008) (in the context of motion for relief from stay, temporarily permitting debtor to use collateral to bridge to a going concern sale, and finding secured creditor might be adequately protected given that "the court's accepted valuation of the property depends on its being sold at a going concern value—not one of foreclosure"); *In re Pelham Enters., Inc.,* 376 B.R. 684, 690–93 (Bankr.N.D.Ill.2007) (in the context of a motion for relief from stay, construing *section 506(a)* in light of *Rash* and rejecting estimated liquidation value of collateral in the hands of creditor given undisputed evidence that the collateral was actually being used as part of debtor's going concern); *In re Deep River Warehouse, Inc.,* No. 04–52749, 2005 WL 1287987, at *7–8 (Bankr.M.D.N.C. Mar. 14, 2005) (construing section 506(a) in the context of a motion for relief from stay, and finding secured creditor to be adequately protected based on real property's going concern value in light of debtor's proposal to retain property as a going concern); *In re Davis,* 215 B.R. 824, 825–26 (Bankr.N.D.Tex.1997) (construing section 506(a) in the adequate protection context in light of *Rash,* and holding that secured creditor in chapter 13 case was adequately protected based on the car's fair market value as of the petition date when debtor intended to retain and use the collateral); *In re Savannah Gardens–Oaktree,* 146 B.R. 306, 308–10 (Bankr.S.D.Ga.1992) (adopting going concern valuation where collateral was to be retained and used under chapter 11 plan, in order to determine amount of secured claim under 506(a) and evaluate whether claim would be adequately protected by value of collateral); *In re Kids Stop of Am., Inc.,* 64 B.R. 397, 401–02 (Bankr.M.D.Fla.1986) (construing section 506(a) in the adequate protection context, and concluding that secured creditor was entitled to continue receiving adequate protection payments because the collateral as of petition date was worth the amount actually realized from asset sales during the case); *Bank Hapoalim B.M. v. E.L.I., Ltd.,* 42 B.R. 376, 379 (N.D.Ill.1984) (in context of motion for relief from stay, affirming bankruptcy court's utilization of an executed sale contract for valuation of sold collateral under *section 506(a)* to determine whether the secured creditor was adequately protected); *First Trust Union Bank v. Automatic Voting Mach. Corp. (In re Automatic Voting Machine Corp.),* 26 B.R. 970, 972 (Bankr.W.D.N.Y.1983) (for purposes of determining whether secured creditor was adequately protected on motion for relief from stay, rejecting evidence of liquidation value and holding that going concern methodology is appropriate when collateral is to be retained and used).

33      *See In re Scotia Dev., LLC,* No. 07–20027, slip op. at 23–24 (Bankr.S.D.Tex. July 7, 2008) ("With non-cash property, the interest that secured creditor has a right to is the right to foreclose. Therefore, the case law suggests that the appropriate value to protect is the foreclosure value of the property and not the fair market value of the property."), *aff'd in part, In re SCOPAC,* 624 F.3d 274, 285–86 (5th Cir.2010); *In re Ralar Distribs., Inc.,* 166 B.R. 3, 7 (Bankr.D.Mass.1994) ("The value relevant for adequate protection purposes, however, is not book value. It is liquidation value realizable by the creditor."),*aff'd,*182 B.R. 81 (D.Mass.1995),*aff'd,*69 F.3d 1200 (1st Cir.1995); *Sharon Steel Corp. v. Citibank, N.A. (In re Sharon Steel Corp.),* 159 B.R. 165, 169 (Bankr.W.D.Pa.1993) (using liquidation value for adequate protection purposes); *United States v. Case (In re Case),* 115 B.R. 666, 670 (9th Cir. BAP 1990) ("If we were attempting to value FmHA's interest in the property for adequate protection purposes, the possibility of forced liquidation would be assumed and a deduction for selling costs would be logical."); *La Jolla Mortg. Fund v. Rancho El Cajon Assocs.,* 18 B.R.

283, 289 (Bankr.S.D.Cal.1982) ("In this regard, we must evaluate the collateral, being the adequate protection, in the hands of the claim holder. It is the creditors' expected costs to liquidate the property that is relevant, not those of the debtor.").

34 The Nationstar APA states clearly that the purchased assets are "Related to the Business." (PX 33 at 38.) Related to the Business is defined in the Nationstar APA as "required for, held for, or used in the conduct of the Business." (*Id.* at 30.) The Business described in the Nationstar APA is, broadly, the Debtors' servicing and origination business. (*Id.* at 13, definition of "Business.") In addition, the Nationstar APA specifically enumerates goodwill as a purchased asset. (*Id.* at 40.) Finally, in a provision requiring the Debtors to effect "Separation Services," the Nationstar APA states that a stand-alone business was part of the bargain, and that "Sellers acknowledge and agree that Separation Services are intended to permit Sellers to deliver at Closing to the Purchaser the Business and Purchased Assets as a stand-alone business...." (*Id.* at 84.)

35 The Court notes that it was equally unimpressed with the testimony presented by Mr. Puntus on behalf of the Plaintiffs. But since the burden of proof lies with the Defendants, the shortcomings of Mr. Puntus's methodology do not alter the result.

36 As Collier explains:

> However, often a secured party will consent to limited use of cash collateral to preserve the value of his interest in other collateral. Payment of expenses of preserving non-cash collateral, payroll expenses to keep the business operating and other immediate cash needs may be as important to a secured party early in the case as it is to the debtor in possession.

3 COLLIER ON BANKRUPTCY ¶ 363.03[4], at 363–34.

37 As a matter of statutory construction, the Defendants argue that while section 506 of the Bankruptcy Code—and indeed, the entire Bankruptcy Code—is written for a single debtor, section 102(7) of the Bankruptcy Code (the "Rules of Construction" section) explicitly provides that "the singular includes the plural." 11 U.S.C. § 102(7). Thus, in multi-debtor cases, courts will treat Bankruptcy Code provisions that refer to a single debtor as referring to all debtors. *See, e.g., In re Vagi,* 351 B.R. 881, 885 (Bankr.N.D.Ohio 2006) (holding that, in a case involving co-debtors, under subsection 102(7), the phrase "acquired for the personal use of the debtor" in subsection 1325(a) "may also be read, 'acquired for the personal use of the debtors' "). The Defendants contend therefore that section 506(a)(1) is properly read as follows: "an allowed claim of a creditor secured by lien[s] on property in which the estate[s] have an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate[s'] interest in such property...." (Defendants' Motion to Dismiss, ECF No. 13–01343 Doc. # 21–1 at 9.) The Court is unconvinced by either party's statutory interpretation argument. Indeed, the statute seems silent on the issue at hand.

38 Another case cited by the Plaintiffs is equally unhelpful because it also deals with non-debtor entities. *See Official Comm. of Unsecured Creditors of Toy King Distribs., Inc. v. Liberty Sav. Bank (In re Toy King Distribs., Inc.),* 256 B.R. 1, 187 (Bankr.M.D.Fla.2000) ("Although the collateral subject to [creditor's] loan includes the property of the individual guarantors and property of the debtor, only the debtor's property is relevant to the court's determination of the secured status of [creditor's] claim against the debtor under Section 506."). The Defendants also argue out that even if *DeNofa's* interpretation of subsection 506(b) is correct, it would not change the outcome here, because pursuant to section 102(7), "the singular includes the plural," and the term "estate" must be interpreted as including all debtor "estates" holding collateral. Therefore, *DeNofa* could still be read to include all debtor estates in the section 506(b) calculation.

39 Other cases cited by the Defendants either involved substantively consolidated debtors or merely assumed, without discussing, that collateral could be aggregated across debtors. *See, e.g., In re Gen. Growth Props., Inc.,* No. 09–11977(ALG), 2011 WL 2974305, *1 n.3 (Bankr.S.D.N.Y. July 20, 2011); *In re Capmark Fin. Grp., Inc.,* 438 B.R. 471, 490, 501 (Bankr.D.Del.2010); *In re Dana Corp.,* 367 B.R. 409, 412 (Bankr.S.D.N.Y.2007); *In re Urban Communicators PCS Ltd. P'ship,* 379 B.R. 232, 244 (Bankr.S.D.N.Y.2007), *aff'd in part and rev'd in part on other grounds,*394 B.R. 325 (S.D.N.Y.2008); *In re Fiberglass Indus., Inc.,* 74 B.R. 738, 740 (Bankr.N.D.N.Y.1987).

40 While the court reached this conclusion in the context of a plan that provided for limited substantive consolidation under section 1123(a)(5)(C), the court seemingly reached its conclusion independently, rejecting the debtor's argument "particularly in view of the provisions of [the] Plan." *SW Hotel Venture,* 460 B.R. at 33.

41 "Subsidiary" is defined in the JSN Indenture as "any corporation, partnership, limited liability company, association or other entity of which at least majority of the outstanding stock or other interest having by its terms ordinary voting power to elect majority of the board of directors, managers or trustees of such corporation, partnership, limited liability company, association or other entity (irrespective of whether or not at the time stock or other interest of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) is at the time owned by the Company, or owned by one or more Subsidiaries, or owned by the Company and one or more Subsidiaries (it being understood that GMAC Bank is not Subsidiary)." (PX 1 at 24.) "Significant Subsidiary" is defined in the JSN Indenture as any Subsidiary that met certain threshold conditions respecting the income or proportionate share of the total assets of the Company and Subsidiaries on a consolidated basis. (*Id.*)

42    Here, the Court distinguishes between allocation and calculation. As the Court already held in connection with the Ocwen APA, any purchase price allocation in the Berkshire APA was for tax purposes only. (PX 31 at 30.) This is distinct from the calculations relied upon here, which set out actual formulas for determining the amount Berkshire would eventually pay for different categories of loans.

43    As explained in Mr. Taylor's report, Ocwen engaged a third-party valuation expert (Applied Economics) to appraise the fair value of certain assets. (DX ABH; DX ST.) Applied Economics considered the ResCap software to be worth $1.295 million (DX ST at 3), and that figure served as a portion of the "premises and equipment" allocation in Ocwen's 10–Q reporting on the ResCap sale.

44    This total does not include the $25 million of BMMZ assets that JSNs claim a lien on and that were subject to an earlier motion to dismiss.

45    The Court already dismissed the Committee's attempt to recharacterize the BMMZ assets as Debtor assets. *Residential Capital,* 495 B.R. at 261. In its opinion, the Court rejected the Committee's contention that the BMMZ collateral was pledged to a bilateral facility as of the Petition Date. In fact, the Debtors did not own the BMMZ collateral on the Petition Date.

46    The Reacquired Mortgage Loans are distinct from the $910 million of loans in the AFI LOC.

47    Account Nos. xxxx7286, xxxx3803, xxxx6323, xxxx9917, xxxx9454, xxxx4806, xxxx2482, xxxx2540, xxxx2565, xxxx2573, xxxx1781, xxxx1799, and xxxx1718. (Plaintiffs' Proposed Findings of Fact ECF Doc. # 187 at ¶ 293.)

48    The "Adjusted Preference Assets" asserted by the Plaintiffs do NOT include the following assets identified on Schedule 6 of the Committee Action: (1) 18 loans identified as "HFS Revolver" or "HFS Blanket," with a net book value of $1,950,188.00, (2) two REO properties identified as "HFS Blanket," with a net book value of $50,478.00, (3) three mortgage loans that were refinanced (the "Refinanced Mortgages"), with a net book value of $1,021,096.00, and (4) certain REO properties that Mr. Landy acknowledges were "never transferred to or for the benefit of the [Noteholders] during the preference period," with a net book value of $12,106,073.00. (Landy ¶ 57; DX ABN at 12; DX AIS at 4; PX 127.)

49    The Committee used a reduced preference period from February 29, 2012 through the Petition Date (75 days instead of 90) (the "Modified Preference Period"). (ECF Doc. # 97.)

50    A preconfirmation debtor-in-possession has the power to initiate and prosecute preference actions. *See* 11 U.S.C. § 1107.

51    The Court reiterates comments made during closing arguments that it has serious problems with the methodology employed by Mr. Puntus in his valuation.

52    This finding is not a final decision whether the JSNs are oversecured or undersecured. Issues relating to certain other alleged JSN collateral were reserved for Phase II of the trial.

---

**End of Document**                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 70

2007 CarswellOnt 6774, 37 C.B.R. (5th) 120, 88 O.R. (3d) 313

c

2007 CarswellOnt 6774, 37 C.B.R. (5th) 120, 88 O.R. (3d) 313

Portus Alternative Asset Management Inc., Re

IN THE MATTER OF THE BANKRUPTCY OF PORTUS ALTERNATIVE ASSET MANAGEMENT INC., AND PORTUS ASSET MANAGEMENT INC., both corporations incorporated pursuant to the Business Corporations Act (Ontario) with their principal place of business in the City of Toronto, in the Province of Ontario (bankrupts)

Ontario Superior Court of Justice

C. Campbell J.

Heard: July 27, 2007
Judgment: October 17, 2007
Docket: 31-OR-207257-T

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: James H. Grout, Larry C. Ellis for Bankrupts, KPMG Inc., in its capacity as Trustee of the Consolidated Estate of Portus Alternative Asset Management Inc., Portus Asset Management Inc.

Jeffrey Leon for Manulife

R. Shayne Kukulowicz, Representative Counsel

C. Smith for Berkshire Hathaway

Subject: Insolvency; Property; Corporate and Commercial

Bankruptcy and insolvency --- Property of bankrupt — Property in hands of bankrupt agent or broker — Stockbrokers

Securities firm received funds from investors for purchase of Canadian securities — Firm instead misappropriated part of funds and used part to buy protected notes — Funds were commingled with other assets of firm — Firm was adjudged bankrupt and all funds declared its property — Trustee applied for order declaring that each customer had claim equal to amount invested through bankrupt less any amounts received prior to bankruptcy — Application granted — Part XII of Bankruptcy and Insolvency Act does not contemplate misappropriation of funds received by securities firm from its customers — Customers had no assets in accounts and could not trace funds to bankrupt's property — Interpretation of s. 253 of Act that their equity was therefore zero would be unjust — Functional gap in Act could be cured by proper exercise of court's jurisdiction.

2007 CarswellOnt 6774, 37 C.B.R. (5th) 120, 88 O.R. (3d) 313

**Cases considered by *C. Campbell J.*:**

*MacMillan Bloedel Ltd. v. Simpson* (1995), [1995] 4 S.C.R. 725, [1996] 2 W.W.R. 1, 14 B.C.L.R. (3d) 122, 44 C.R. (4th) 277, 130 D.L.R. (4th) 385, 103 C.C.C. (3d) 225, 191 N.R. 260, 33 C.R.R. (2d) 123, 68 B.C.A.C. 161, 112 W.A.C. 161, 1995 CarswellBC 974, 1995 CarswellBC 1153 (S.C.C.) — referred to

*Skeena Cellulose Inc., Re* (2003), 2003 CarswellBC 1399, 2003 BCCA 344, 184 B.C.A.C. 54, 302 W.A.C. 54, 43 C.B.R. (4th) 187, 13 B.C.L.R. (4th) 236 (B.C. C.A.) — referred to

*United Used Auto & Truck Parts Ltd., Re* (1999), 12 C.B.R. (4th) 144, 1999 CarswellBC 2673 (B.C. S.C. [In Chambers]) — referred to

*United Used Auto & Truck Parts Ltd., Re* (2000), 2000 BCCA 146, 135 B.C.A.C. 96, 221 W.A.C. 96, 2000 CarswellBC 414, 73 B.C.L.R. (3d) 236, 16 C.B.R. (4th) 141, [2000] 5 W.W.R. 178 (B.C. C.A.) — referred to

**Statutes considered:**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3

    Generally — referred to

    Pt. XII — referred to

    s. 253 — considered

    s. 253 "customer" — referred to

    s. 253 "net equity" — considered

    s. 253 "securities firm" — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36

    Generally — referred to

APPLICATION by trustee of bankrupt for order to assist in administration and distribution of funds.

***C. Campbell J.*:**

1    The Trustee in the above-noted Estate of Portus Alternative Asset Management Inc. ("PAAM") sought an Order that would assist in the administration and distribution of funds to Investors.

2    Approximately twenty six thousand (26,000) parties (the "Investors") retained PAAM as a portfolio manager by entering into an investment management agreement with PAAM (the "Management Agreement.") Pursuant to the Management Agreement, the Investor granted PAAM complete discretion to invest all of the assets that the Investor contributed to its account with PAAM (the "Account") from time to time subject to representations that were made by PAAM regarding the way in which it proposed to exercise the investment discretion granted to it by the Investor.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 6774, 37 C.B.R. (5th) 120, 88 O.R. (3d) 313

3      PAAM represented to the Investors that it would utilize all of the funds received by it from the Investors to purchase Canadian securities listed on the Toronto Stock Exchange (the "Canadian Securities.") Pursuant to a complicated series of forward contracts with offshore counterparties involving the Canadian Securities, the Investors were to receive the indirect economic benefit of principal protected notes issued by a bank to a series of trusts (the "Managed Account Structure.")

4      PAAM received approximately $792 million from the Investors. It did not purchase any Canadian Securities. The Managed Account Structure as it was described to the Investors and the failure of PAAM to implement the Managed Account Structure is fully described in the Consolidated Bankruptcy Report dated May 4, 2007 (the "Consolidated Bankruptcy Report") of KPMG Inc. (the "Receiver") in its capacity as the Receiver of the property, assets and undertaking of PAAM, PAM, BancNote Corp. and certain other related entities and assets (collectively, the "Portus Group.")

5      The Receiver ascertained that all funds contributed by the Investors to their Accounts for investment by PAAM were transferred by PAAM through numerous commingled offshore and domestic bank accounts controlled by PAAM before being used for one of two purposes.

6      First, approximately $110 million of the amount that PAAM received from the Investors was misappropriated by PAAM and used by PAAM to, among other things, fund its operations, repay investors who requested a return of some or all of their investments, fund the redemption of units of a related fund — the Market Neutral Preservation Fund (the "MNPF") and pay referral fees to the financial advisors that had referred the Investors to PAAM.

7      Second, approximately $529 million of the amount that PAAM received from the Investors was used to acquire fifteen (15) principal protected notes (the "Notes") from Société Genérale (Canada.) The Notes were held in a custodial account that was maintained by RBC Dominion Securities Inc. in the name of the MNPF (the "MNPF Account.")

8      On the date the Receiver was appointed, there were numerous bank accounts in the names of various members of the Portus Group containing commingled funds and assets. For example, the Notes, cash received from the Investors and cash subsequently claimed by investors in the MNPF were contained and commingled in the MNPF Account.

9      As a result of the above-described misappropriations and the extensive commingling of the funds received by PAAM from the Investors, the Receiver was of the view that:

     (a) none of the Investors could assert a proprietary claim to the assets in the hands of the Receiver;

     (b) the Receiver should seek an Order declaring that all of the cash, the Notes and any other property of the Portus Group (collectively the "Property") was the property of PAAM; and

     (c) the assets in the hands of the Receiver ought to be realized upon and distributed to the Investors by way of a bankruptcy of PAAM administered under Part XII of the *Bankruptcy and Insolvency* Act (the "BIA").

10      On November 9, 2005, upon the application of the Receiver, this Court made an Order declaring that the Property was the property of PAAM and all claims of the other members of the Portus Group, their creditors and

2007 CarswellOnt 6774, 37 C.B.R. (5th) 120, 88 O.R. (3d) 313

any claimants against them in respect of the Property were vested out (the "Title Declaration Order.")

11       The Title Declaration Order also granted relief in respect of the subsequent bankruptcy of PAAM to be administered under Part XII of the BIA. The Title Declaration Order declared that:

> (a) PAAM is a "securities firm" within the meaning of Part XII of the BIA;

> (b) the Property constituted "cash" and "securities" within the meaning of Part XII of the BIA and were held by or for the account of PAAM as a securities firm, for securities accounts of customers of PAAM or for PAAM's own account as a securities firm all within the meaning of Part XII of the BIA; and

> (c) each Investor is a "customer" of PAAM within the meaning of Part XII of the BIA.

12       On March 24, 2006, upon the application of the Receiver, PAAM was adjudged a bankrupt and KPMG Inc. was appointed as Trustee of the Estate (the "PAAM Estate") pursuant to an Order of this Honourable Court (the "PAAM Bankruptcy Order.")

13       On May 18, 2007, upon the application of the Receiver, PAM was adjudged a bankrupt, KPMG Inc. was named as Trustee of the Estate and the Estate was consolidated with the PAAM Estate on a substantive and procedural basis (the "Consolidated Estate") pursuant to an Order of this Honourable Court (the "Consolidated Bankruptcy Order.")

14       Counsel for the Trustee submitted that the Order sought could be made, given that this Court has the inherent jurisdiction to "fill" a "functional" gap in a statute and/or to give effect to the provisions of the statute itself where the provisions of the statute itself are insufficient to fulfill the purpose of the statute.

15       The Order sought was granted on July 25, 2007 at which time counsel were advised that reasons for the Order may well be given to amplify the basis for the Order.

16       The question of the inherent jurisdiction of the Court has received considerable attention recently, particularly in the context of insolvency and commercial law. When a Court is asked to extend the terms of legislation or to deal with circumstances not provided for, the question arises: on what basis may the Court do so? The basis on which a Court may provide relief in circumstances not specifically covered in legislation requires an analysis of the tools available to the Court to achieve that result.

17       That analysis has now been done in a forthcoming article co-authored by a noted jurist and a noted academic. Justice Georgina R. Jackson of the Saskatchewan Court of Appeal and Dr. Janis P. Sarra of the British Columbia Faculty of Law explore this area in a paper to be published in the forthcoming (2007) Annual Review of Insolvency Law-Thomson-Carswell.[FN1]

18       What the learned authors explore in their paper is an articulation of the basis for exercising the Court's authority to provide appropriate remedies within the context of insolvency statutes.

19       There is wide recognition that a statute such as the *Companies Creditors Arrangements Act*[FN2] ("CCAA") requires the Court to provide practical, effective and often very speedy resolution in what has often been referred to as "real time" litigation. Indeed, it has been said that to achieve the objectives of the legislation, the Court requires a broad, flexible and often urgent exercise of jurisdiction.[FN3]

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 6774, 37 C.B.R. (5th) 120, 88 O.R. (3d) 313

20      The *Bankruptcy & Insolvency Act* [FN4]("BIA"), while often dealing with less urgent issues of priority, does so in a more prescribed context but does allow for the development of the common law and the exercise of some equitable principles.

21      I accept the hierarchical analysis proposed by Justice Jackson and Dr. Sarra. The first step in that process is to have regard to the scheme of the Statute under consideration, its purpose as determined from the Act, its context and the expression intention of Parliament.

22      One aspect of judicial power has been referred to as "gap filling." As the learned authors note, this power has sometimes been referred to as permitting a judge to make explicit what is already implicit in the words of a statute.[FN5] Alternatively, the authors note "gap filling" may be regarded as a judicial tool when the nature of the legislative scheme requires the Court to "make it work."[FN6]

23      I accept the advice of the authors that the first task of the Court is to "interpret the statute before it and exercise authority pursuant to the statute, before reaching for other tools in the judicial toolbox."[FN7] The exercise of statutory interpretation that allows for what is referred to as "gap filling" will frame and in circumstances may limit what has been referred to as "judicial discretion."

24      If the above referred to method of statutory interpretation is accepted, resolution of many issues before the Court may be made before resort to what has increasingly been referred to as the "inherent jurisdiction" of the Court.

25      In this methodology referred to by Justice Jackson and Dr. Sarra[FN8], inherent jurisdiction of the Court may be defined as "being the reserve or fund of powers, a residual source of powers, which the Court may draw upon as necessary whenever it is just or equitable to do so, and in particular to ensure the observation of the due process of law, to prevent improper vexation or oppression..."

26      I considered at the time of granting the Order in July that a simple justification for relief that was not opposed and also made practical sense was available invoking the inherent jurisdiction of the Court. Further reflection and the availability of the paper by Justice Jackson and Dr. Sarra have led me to reconsider the basis for my Order.

27      Part XII of the BIA was added in 1997 to facilitate customer compensation upon the bankruptcy of a securities firm, particularly where there are customer name securities and to expedite claims where those other claims of customers are involved.[FN9] This matter does fall within Part XII of the BIA.

28      A customer of a bankrupt securities firm under Part XII of the BIA has a claim against the bankrupt securities firm for the amount of his or her "net equity". "Net equity" is defined in Section 253 of the BIA as:

> "net equity" means, with respect to the securities account or accounts of a customer, maintained in one capacity, the net dollar value of the account or accounts, equal to the amount that would be owed by a securities firm to the customer as a result of the liquidation by sale or purchase at the close of business of the securities firm on the date of bankruptcy of the securities firm, of all security positions of the customer in each securities account, other than customer name securities reclaimed by the customer, including any amount in respect of a securities transaction not settled on the date of bankruptcy but settled thereafter, less any indebtedness of the customer to the securities firm on the date of bankruptcy including any amount owing in

2007 CarswellOnt 6774, 37 C.B.R. (5th) 120, 88 O.R. (3d) 313

respect of a securities transaction not settled on the date of bankruptcy but settled thereafter, plus any payment of indebtedness made with the consent of the trustee after the date of bankruptcy;

29    Part XII of the BIA presumes that the bankrupt securities firm purchased securities with funds received by it from its customers. The intention of the definition of "net equity" is for the quantum of the claim of each customer to be the market value of the securities purchased and held for him or her by the securities firm as at the date of bankruptcy less any amounts owing by the customer to the securities firm.

30    As a result of:

    (a) the failure of PAAM to purchase Canadian Securities with the funds received by it from the Investors;

    (b) the misappropriation of the funds received by PAAM from the Investors; and

    (c) the extensive co-mingling of the funds received by PAAM from the Investors and the Notes purchased with a portion of those funds on behalf of non-existent trusts;

the Customers have no assets in their Accounts and the Customers are unable to trace their funds to either of the Notes, the cash or the other property in the hands of the Receiver.

31    As a result, according to the definition of "net equity" in Section 253 of the BIA, each Investor's "net equity" would be zero. This result would neither be just nor equitable.

32    Part XII of the BIA contemplates the establishment of securities accounts for the customers of a securities firm and presumes that the securities firm will utilize all funds received from its customers to purchase securities. Part XII of the BIA does not contemplate a misappropriation of funds received by a securities firm from its customers. This is a "functional gap" in the BIA.

33    The rationale of Part XII of the BIA is to provide for recovery by customers of amounts owing to them when their priority is determined. Section 253 of the BIA provides the mechanism for determining the amount of the customer priority.

34    In my view, the statutory purpose of Part XII would be defeated if a fraud by or on behalf of the securities firm operated to defeat an otherwise legitimate entitlement to recovery by a customer.

35    I accept the submission of the Trustee that making the Order being sought in respect of the quantum of the claims of the Investors against PAAM will not conflict with the provisions of Part XII of the BIA-in particular the definition of "net equity" contained in Section 253. Section 253 of the BIA is inapplicable to the facts before this Honourable Court because PAAM failed to purchase any securities whatsoever with the funds it received from the Investors.

36    The "gap" created arises because Part XII does not specifically contemplate a fraud by a securities firm on its own customer prior to the firm's bankruptcy.

37    In such circumstances it is not only just and equitable but within the purpose of Part XII to declare that the net equity of each customer of the Consolidated Estate is in an amount equal to the amount invested by each

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 6774, 37 C.B.R. (5th) 120, 88 O.R. (3d) 313

customer by or through PAAM less any amounts received by each such customer from PAAM prior to March 4, 2005 together with the ancillary relief contained in the draft Order filed.

38      It is to be noted that no other party involved in the PAAM bankruptcy objected or contested the relief sought since it is accepted that making the Order being sought is essential to the administration of the Consolidated Estate because it will ensure that the Investors have the claims against the Estate to which they are entitled.

39      If it were necessary to do so, I would not hesitate to employ the tools of judicial discretion or indeed inherent discretion to provide recovery for Investors. For the reasons set out above, I am satisfied that the Order sought is more than justified on the basis of statutory interpretation and have so ordered.

40      The above approach is in my view consistent with a growing judicial preference for a hierarchy of judicial tools, a discussion that will be accelerated and amplified by the work of Justice Jackson and Dr. Sarra. [FN10]

*Application granted.*

FN1 "Selecting the Judicial Tool to Get The Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters."

FN2 R.S.C. 1985, c. C-36, as amended.

FN3 See *United Used Auto & Truck Parts Ltd., Re* (1999), 12 C.B.R. (4th) 144 (B.C. S.C. [In Chambers]), affirmed [2000] B.C.J. No. 409, 16 C.B.R. (4th) 141 (B.C. C.A.).

FN4 R.S.C. 1985 c. B-3, as amended.

FN5 See references at pp 5-7 to the work of Pierre-André Coté, "The Interpretation of Legislation in Canada" 3 rd ed., (Toronto: Carswell 2000)

FN6 See reference to Professor Sullivan on page 7 of the Article and her work "Sullivan and Dridger on the Construction of Statutes," 4th ed., (Markham: Butterworths, 2002)

FN7 See section C, pp. 10-11.

FN8 See page 27 referring to I.H. Jacob, "The Inherent Jurisdictions of the Court" (1970), 23 Current Legal Problems 23. Also see *MacMillan Bloedel Ltd. v. Simpson,* [1995] 4 S.C.R. 725 (S.C.C.) at paragraph 29-adopting.

FN9 See Houlden & Magrawetz, "Bankruptcy & Insolvency Law of Canada," 3rd ed. (looseleaf), Thomson:Carswell, Vol. 3, p. 7-180.

FN10 See *Skeena Cellulose Inc., Re,* [2003] B.C.J. No. 1335, 43 C.B.R. (4th) 187 (B.C. C.A.) and the conclusion of the authors at pp. 41-42 of their paper.

END OF DOCUMENT

TAB 71

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309



2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

R. v. Gundy

HER MAJESTY THE QUEEN (Respondent) and THUY GUNDY (Appellant)

Ontario Court of Appeal

J. Laskin, M. Rosenberg, H.S. LaForme JJ.A.

Heard: February 1, 2008
Judgment: April 16, 2008
Docket: CA C47370

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: Richard Allman for Appellant

Colleen Hepburn for Respondent

Subject: Criminal; Constitutional; Evidence

Criminal law --- Offences — Driving/care and control with excessive alcohol — Proof by certificate of analysis of bodily substances — Admissibility of certificate — Miscellaneous

Accused was charged with driving with excessive alcohol, contrary to s. 253(b) of Criminal Code, after she failed roadside breath test — Accused did not object to admissibility of certificate of analysis — After one-month adjournment, defence challenged admissibility of Intoxilizer results, claiming that police officer did not have reasonable and probable grounds to make demand because Crown had not proved that device used was "approved screening device" — Trial judge held that approved screening device was used and that there were proper grounds to make demand — Accused was convicted and appealed — Summary conviction appeal court judge ordered new trial — Appeal by accused dismissed — Objection to admissibility of evidence must be made when evidence is tendered — While trial judge has discretion to allow counsel to challenge evidence already received, nothing happened after certificate became exhibit to cast doubt on admissibility of evidence to which no objection was previously taken — Trial judge erred in permitting defence to challenge admissibility of certificate and results of Intoxilizer test at end of trial — Allowing argument at that stage did not serve interests of justice — Crown could have been unfairly prejudiced because of defence's failure to make timely objection — Further, accused did not give required notice of application to exclude evidence under s. 24(2) of Canadian Charter of Rights and Freedoms.

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

Criminal law --- Offences — Driving/care and control with excessive alcohol — Presumption of alcoholic content at time of offence — Reasonable and probable grounds

Accused was charged with driving with excessive alcohol, contrary to s. 253(b) of Criminal Code, after she failed roadside breath test — Arresting officer testified that basis for making Intoxilizer demand was result of roadside screening test — Defence challenged admissibility of Intoxilizer results, claiming that officer did not have reasonable and probable grounds to make demand because Crown had not proved that device used was "approved screening device" — Trial judge held that approved screening device was used and that there were proper grounds to make demand — Accused was convicted and appealed — Summary conviction appeal court judge ordered new trial — Appeal by accused dismissed — Absent constitutional challenge to admissibility of results, Crown need not establish that officer had reasonable and probable grounds to make Intoxilizer demand — Where officer makes Intoxilizer demand based on results of test with approved screening device, Crown must prove that officer reasonably believed he or she was using approved device — Officer's testimony that he or she used approved screening device is sufficient evidence to infer that officer had requisite reasonable belief — As such, officer is entitled to rely on "fail" result to find that there were reasonable and probable grounds to make breath demand — Here, officer stated that she made demand that accused provide sample for analysis by approved screening device — Officer's reference to "Alcotest" did not undermine her direct evidence that she used approved screening device — She therefore had reasonable and probable grounds to make Intoxilizer demand, and there was no violation of s. 8 of Canadian Charter of Rights and Freedoms.

**Cases considered by *M. Rosenberg J.A.*:**

*Carter v. R.* (1985), 31 M.V.R. 1, *(sub nom. R. v. Carter)* 19 C.C.C. (3d) 174, 7 O.A.C. 344, 1985 CarswellOnt 2 (Ont. C.A.) — considered

*R. v. Anderson* (2005), 2005 CarswellOnt 1878 (Ont. C.A.) — referred to

*R. v. Arsenault* (2005), 2005 NBCA 110, 2005 CarswellNB 716, 2005 CarswellNB 717, 204 C.C.C. (3d) 75, 295 N.B.R. (2d) 123, 766 A.P.R. 123, 24 M.V.R. (5th) 168 (N.B. C.A.) — considered

*R. v. Bernshaw* (1994), 8 M.V.R. (3d) 75, 53 B.C.A.C. 1, 87 W.A.C. 1, 26 C.R.R. (2d) 132, 35 C.R. (4th) 201, 176 N.R. 81, [1995] 3 W.W.R. 457, 1994 CarswellBC 3038, 1994 CarswellBC 3039, 95 C.C.C. (3d) 193, [1995] 1 S.C.R. 254 (S.C.C.) — considered

*R. v. Billing* (1995), 1995 CarswellAlta 983, 177 A.R. 8 (Alta. Q.B.) — referred to

*R. v. Bilokrely* (2007), 2007 ONCJ 603, 2007 CarswellOnt 8561 (Ont. C.J.) — referred to

*R. v. Collins* (1987), [1987] 3 W.W.R. 699, [1987] 1 S.C.R. 265, *(sub nom. Collins v. R.)* 38 D.L.R. (4th) 508, 74 N.R. 276, 13 B.C.L.R. (2d) 1, 33 C.C.C. (3d) 1, 56 C.R. (3d) 193, 28 C.R.R. 122, 1987 CarswellBC 94, 1987 CarswellBC 699 (S.C.C.) — considered

*R. v. Dwernychuk* (1992), 42 M.V.R. (2d) 237, 135 A.R. 31, 33 W.A.C. 31, 12 C.R.R. (2d) 175, 77 C.C.C. (3d) 385, 1992 CarswellAlta 263 (Alta. C.A.) — considered

*R. v. Enden* (2007), 2007 SKCA 100, 2007 CarswellSask 527, 52 M.V.R. (5th) 92 (Sask. C.A.) — considered

*R. v. Haas* (2005), 2005 CarswellOnt 3316, 201 O.A.C. 52, 200 C.C.C. (3d) 81, 20 M.V.R. (5th) 32, 76 O.R.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

(3d) 737, 138 C.R.R. (2d) 29 (Ont. C.A.) — considered

*R. v. James* (1995), 1995 CarswellOnt 2608 (Ont. Gen. Div.) — considered

*R. v. Kosa* (1992), 42 M.V.R. (2d) 290, 1992 CarswellOnt 56 (Ont. C.A.) — considered

*R. v. Kutynec* (1992), 12 C.R. (4th) 152, 70 C.C.C. (3d) 289, 7 O.R. (3d) 277, 52 O.A.C. 59, 8 C.R.R. (2d) 300, 1992 CarswellOnt 79 (Ont. C.A.) — considered

*R. v. Latulippe* (2005), 26 M.V.R. (5th) 97, 2005 CarswellOnt 5191 (Ont. S.C.J.) — referred to

*R. v. Lotozky* (2006), 2006 CarswellOnt 3813, 33 M.V.R. (5th) 1, 39 C.R. (6th) 157, 212 O.A.C. 3, 210 C.C.C. (3d) 509, 143 C.R.R. (2d) 297, 81 O.R. (3d) 335 (Ont. C.A.) — referred to

*R. v. Loveman* (1992), 12 C.R. (4th) 167, 71 C.C.C. (3d) 123, 8 C.R.R. (2d) 294, 52 O.A.C. 94, 8 O.R. (3d) 51, 1992 CarswellOnt 80 (Ont. C.A.) — referred to

*R. v. Nelson* (2006), 2006 ABQB 297, 2006 CarswellAlta 519 (Alta. Q.B.) — considered

*R. v. Neziol* (2001), 22 M.V.R. (4th) 299, 2001 CarswellOnt 4027 (Ont. S.C.J.) — referred to

*R. v. Rhyason* (2005), 2005 ABQB 988, 2005 CarswellAlta 1967, 27 M.V.R. (5th) 262 (Alta. Q.B.) — referred to

*R. v. Rilling* (1975), [1976] 2 S.C.R. 183, 24 C.C.C. (2d) 81, 1975 CarswellAlta 81, 1975 CarswellAlta 140, 31 C.R.N.S. 142, [1975] 6 W.W.R. 626, 5 N.R. 327, 60 D.L.R. (3d) 128 (S.C.C.) — considered

*R. v. Saulnier* (2006), 27 M.V.R. (5th) 76, 36 C.R. (6th) 123, 2006 CarswellNB 3, 2006 CarswellNB 4, 2006 NBCA 4, 205 C.C.C. (3d) 245, 296 N.B.R. (2d) 175, 769 A.P.R. 175, 138 C.R.R. (2d) 62 (N.B. C.A.) — considered

*R. v. Searle* (2006), 797 A.P.R. 216, 308 N.B.R. (2d) 216, 215 C.C.C. (3d) 374, 2006 CarswellNB 684, 2006 CarswellNB 685, 2006 NBCA 118, 40 M.V.R. (5th) 207 (N.B. C.A.) — considered

*R. v. Storrey* (1990), 1990 CarswellOnt 78, 1990 CarswellOnt 989, 105 N.R. 81, [1990] 1 S.C.R. 241, 37 O.A.C. 161, 53 C.C.C. (3d) 316, 75 C.R. (3d) 1, 47 C.R.R. 210 (S.C.C.) — considered

*R. v. Tash* (2008), 2008 CarswellOnt 245 (Ont. S.C.J.) — referred to

*R. v. Tran* (2001), 2001 CarswellOnt 2706, 156 C.C.C. (3d) 1, 14 M.V.R. (4th) 1, 55 O.R. (3d) 161, 149 O.A.C. 120, 44 C.R. (5th) 12 (Ont. C.A.) — referred to

*R. v. Wills* (1992), 34 M.V.R. (2d) 296, 9 C.R.R. (2d) 360, 12 C.R. (4th) 58, 7 O.R. (3d) 337, 70 C.C.C. (3d) 529, 52 O.A.C. 321, 1992 CarswellOnt 77 (Ont. C.A.) — considered

*R. v. Woods* (2004), 2004 MBCA 46, 2004 CarswellMan 153, 184 Man. R. (2d) 138, 318 W.A.C. 138, 185 C.C.C. (3d) 70, 118 C.R.R. (2d) 338, 7 M.V.R. (5th) 10 (Man. C.A.) — considered

*R. v. Woods* (2005), 29 C.R. (6th) 240, [2005] 2 S.C.R. 205, 195 Man. R. (2d) 131, 351 W.A.C. 131, 2005

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

SCC 42, 2005 CarswellMan 205, 2005 CarswellMan 206, 254 D.L.R. (4th) 385, 197 C.C.C. (3d) 353, 19 M.V.R. (5th) 1, [2006] 1 W.W.R. 1, 336 N.R. 1, 132 C.R.R. (2d) 168 (S.C.C.) — considered

**Statutes considered:**

*Canadian Charter of Rights and Freedoms*, Part I of the Constitution Act, 1982, being Schedule B to the Canada Act 1982 (U.K.), 1982, c. 11

Generally — referred to

s. 8 — considered

s. 24(2) — considered

*Criminal Code*, R.S.C. 1985, c. C-46

s. 253 — referred to

s. 253(b) — referred to

s. 254(2) — referred to

s. 254(3) — considered

s. 258(1)(c) — considered

s. 258(1)(d.1) [en. 1997, c. 18, s. 10(2)] — referred to

s. 258(1)(g) — considered

s. 657.3 [en. 1997, c. 18, s. 80] — referred to

**Rules considered:**

*Rules of the Ontario Court of Justice in Criminal Proceedings*, SI/97-133

R. 30 — considered

APPEAL by accused from conviction for driving with excessive alcohol.

***M. Rosenberg J.A.:***

1       At the conclusion of oral argument in this case, the court indicated that the appeal was dismissed with reasons to follow. These are the reasons for dismissing the appeal.

2       This appeal in a drinking and driving case involves two issues. First, should the trial judge have entertained a motion to exclude the evidence of the results of an Intoxilizer test in the absence of a timely objection to the admissibility of the evidence? Second, what must the Crown prove to show that the investigating officer made a valid Intoxilizer demand under s. 254(3) of the *Criminal Code* where the officer's grounds for the demand depend upon the results of a test with an approved screening device?

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

## History of the Proceedings

3      The appellant was tried and convicted by Maresca J. on May 31, 2006 of "over 80" contrary to s. 253(b) of the *Criminal Code*. The appellant did not serve any notice prior to trial indicating that she intended to ask for relief under the *Charter of Rights and Freedoms* and did not give notice at the opening of trial of any such application.

4      The appellant appealed her conviction to the Summary Conviction Appeal Court and on January 25, 2007, Herold J. allowed the appeal and ordered a new trial because the trial judge misapprehended evidence relating to the so-called *Carter* defence: see *Carter v. R.* (1985), 19 C.C.C. (3d) 174 (Ont. C.A.).[FN1]

5      The appellant then applied for leave to appeal to this court on the basis that the appeal judge erred in failing to enter an acquittal. The only issues on this appeal concern the submission that the appeal judge should have entered an acquittal. The Crown has not appealed from the order that there be a new trial.

## The Facts

6      It is only necessary to refer to the facts concerning the validity of the Intoxilizer demand. The facts relating to this issue were given by Provincial Constable Twilley. On April 1, 2005, Constable Twilley was stationed at a R.I.D.E. stop in Alton. At 9:15 p.m. she stopped a truck driven by the appellant. The appellant told the officer that she had had two glasses of wine, her eyes were bloodshot, she had difficulty finding her licence and smelled of alcohol. Accordingly, the officer made the following demand to the appellant:

> I demand that you provide forthwith such a sample of your breath as I require for analysis *by the approved screening device* and that you accompany me for this purpose.

> [Emphasis added.]

7      The officer testified that she did a "demo of the Alcotest" to show the appellant how it worked. The appellant blew into the device and registered a fail. The officer arrested the appellant for "over 80" and "read [her] a breath demand for the Intoxilizer". At this point in the officer's evidence an issue arose concerning the admissibility of statements that the appellant made to the officer. The trial judge stated that "even though no *Charter* application has been raised or made up until now, I certainly wouldn't have a problem with one being made at that point in time". Crown counsel then questioned the officer further about her grounds for making the Intoxilizer demand and especially in relation to the results of the approved screening device. The officer testified that as a result of the appellant registering a "fail" she formed an opinion that the appellant was impaired by alcohol. She then briefly described her training with the device, which she described as "the Alcotest".

8      Once back at the police detachment, the appellant spoke to a lawyer and then complied with the Intoxilizer demand. Without objection, Crown counsel filed the Certificate of a Qualified Technician showing the results of the Intoxilizer tests. It was marked as Exhibit 1 and shows the results of tests taken at 10:45 p.m. and 11:06 p.m.

9      Defence counsel cross-examined Constable Twilley on her grounds for making the demand and the officer confirmed that her basis for the Intoxilizer demand depended on the results of the test with the "Alcotest". The officer clarified that she had grounds for believing the appellant had committed the "over 80" offence, not impaired driving.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

10        Following Constable Twilley's evidence, Crown counsel called the Intoxilizer operator. Constable Cormier testified without objection that Constable Twilley told her that she had conducted "a roadside test with the approved screening device which the accused registered a reading of fail on that approved screening device". Constable Cormier also identified Exhibit 1. Defence counsel again raised no objection to the admissibility of the certificate or the officer's references to the results of the test. As well, Crown counsel tendered through Constable Cormier two Subject Test Reports that are produced by the Intoxilizer and show the results of the tests. Defence counsel did not object to the admissibility of these reports, which were marked as Exhibits 2C and 2D.

11        Crown counsel then sought to file an affidavit from a forensic toxicologist to the effect that based on the Intoxilizer results of 217 and 207 milligrams of alcohol in 100 millilitres of blood, the appellant's ability to operate a motor vehicle would have been impaired by alcohol. There was a brief argument about the admissibility of this affidavit that turned on the technical requirements of s. 657.3 of the *Criminal Code*. The trial judge ruled that the affidavit was admissible. Crown counsel then closed her case. The defence offered no objection to the admissibility of the results of the Intoxilizer test.

12        The defence called the appellant, her partner and an expert toxicologist. In the course of the expert's evidence, defence counsel referred him to the results of the Intoxilizer test. At the conclusion of the defence case, the trial judge and counsel discussed an adjournment for argument. At that time, the only issue appeared to be the *Carter* defence.

**Submissions at Trial**

13        The case resumed approximately one month later at which point, for the first time, the appellant's counsel indicated that he was possibly raising a *Charter* argument concerning the admissibility of the Intoxilizer results. Crown counsel stated that she had received no notice of any *Charter* issue and that during the trial the only *Charter* issue that seemed to be raised concerned the admissibility of the appellant's statements because of a possible violation of the appellant's right to counsel. The trial judge ruled as follows:

> [O]nce the evidence comes out if there is no *Charter* issue that arose, as far as defence was concerned, based upon the disclosure but once evidence was given at the trial that raises a *Charter* issue, I think it is only appropriate that the defence be allowed to argue that. Certainly counsel, having heard all of the evidence, *counsel for the Crown having heard all of the evidence as it has come out in the same way the defence has, it is not prejudiced in any way by that argument being raised*, so if there are *Charter* issues I will hear them. [Emphasis added.]

14        Defence counsel then made submissions. First, he argued that the certificate was invalid because while the result of the first test was identified by the full date including the year, the second test did not include the year. Second, he argued that the Crown had failed to prove that the appellant was given a true copy of the certificate. He continued with various other technical arguments.

15        Defence counsel then turned to the issue of "reasonable and probable grounds". His argument here was that the officer did not have grounds to make the Intoxilizer demand because the Crown had not proved that the device used was an approved screening device. Counsel pointed out that Constable Twilley referred to the device as an "Alcotest". Finally, counsel turned to the *Carter* defence issue.

**The Trial Judge's Reasons**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

16      The trial judge gave lengthy reasons addressing all of the issues raised. Her reasons on the issue of reasonable and probable grounds were as follows:

The fourth argument of the defence is that there were no reasonable and probable grounds for making a demand for a sample of Ms. Gundy's breath, as there was no evidence that the roadside screen was conducted properly. The submission is that the evidence did not establish that an approved device was used to administer the screen. The case of *R. v. Brown*, [1998] O.J. 1431 (Ont. Gen. Div.) was cited in support of the proposition that absent reference to an approved screening device, or evidence naming a device which has been approved for use, the evidence of reasonable and probable grounds is not admissible.

In the *Brown* decision, the officer administering the screen testified that it was a "Dragar PA3", which was not an approved device. In the case at bar, Officer Twilley referred to the device she used by name, an Alcotest. She also, in her evidence, indicated that she said to Ms. Gundy, "I demand that you provide forthwith such sample of your breath as I require for analysis by the approved screening device and that you accompany me for this purpose", and that Ms. Gundy then did so. In addition, Officer Cormier testified that she received the grounds for the demand from Officer Twilley based upon Officer Twilley administering a screen with "an approved screening device". Based upon that evidence, I am satisfied that an approved screening device was indeed used, and that there were proper grounds to make the demand for a sample of Ms. Gundy's breath.

**The Appeal Judge's Reasons**

17      As I have indicated, the appellant appealed to the Summary Conviction Appeal Court. The appeal judge pointed out that Crown counsel had not had notice of the *Charter* issue and he said this:

The trial judge quite properly and fairly agreed to have counsel argue it and she dealt with it, but it does contextualize somewhat the type of evidence that may have been given in a more casual manner than might have been anticipated if the *Charter* issue was known to be a live issue.

18      The appeal judge then went on to deal with the Alcotest issue and reasonable and probable grounds. He concluded that the evidence showed that an approved screening device was used and that there were proper grounds to make the Intoxilizer demand. He then dealt with the other ground of appeal and held that because the trial judge had misapprehended some of the defence evidence going to the *Carter* defence, there must be a new trial.

**Analysis**

*(1) Objections to the Admissibility of Evidence*

19      Defence counsel took no objection to the admissibility of the results of the Intoxilizer tests either when the certificate was tendered during the evidence of Constable Twilley or during the testimony of the Intoxilizer operator, Constable Cormier. He also did not object to Constable Cormier's testimony about the results of the tests or the admissibility of the Subject Test Reports that also showed the results of the Intoxilizer tests. Further, no objection was taken to the admissibility of any of this evidence at the close of the Crown's case. Finally, the defence expert referred to this evidence during his testimony. The first inkling that there was any concern about the admissibility of this part of the Crown's case came a month later during submissions. In my view, the objections came too late.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

20      Over fifteen years ago, this court explained in clear terms that objection to the admissibility of evidence should be taken at the time the evidence is tendered. Finlayson J.A. said this in *R. v. Kutynec* (1992), 70 C.C.C. (3d) 289 (Ont. C.A.), at 294-95:

> Prior to the proclamation of the *Charter*, no one conversant with the rules controlling the conduct of criminal trials would have suggested that an objection to the admissibility of evidence tendered by the Crown could routinely be initiated after the case for the Crown was closed. *It is self-evident that objections to admissibility of evidence must be made before or when the evidence is proffered.* This common sense proposition is equally applicable to *Charter* applications to exclude evidence: *R. v. Myers* (1984), 14 C.C.C. (3d) 82 at p. 91, 28 M.V.R. 144 (P.E.I.S.C. App. Div.); Tse, "Charter Remedies: Procedural Issues" (1989), 69 C.R. (3d) 129 at pp. 136-40.

> Litigants, including the Crown, are entitled to know when they tender evidence whether the other side takes objection to the reception of that evidence. The orderly and fair operation of the criminal trial process requires that the Crown know before it completes its case whether the evidence it has tendered will be received and considered in determining the guilt of an accused. The *ex post facto* exclusion of evidence, during the trial, would render the trial process unwieldy at a minimum. In jury trials it could render the process inoperative. [Emphasis added.]

21      More recently, also in the context of a drinking and driving case, the Saskatchewan Court of Appeal held that an objection to the admissibility of breath sample evidence must be taken when the evidence is tendered. Sherstobitoff J.A. said this in *R. v. Enden* (2007), 52 M.V.R. (5th) 92 (Sask. C.A.) at para. 20:

> *It is trite law that an objection to the admissibility of evidence must be made when the evidence is tendered.* See *R. v. Pelletier* (1995), 97 C.C.C. (3d) 139, 128 Sask. R. 214 (Sask. C.A.) and *R. v. Kutynec* (1992), 70 C.C.C. (3d) 289, 7 O.R. (3d) 277 (Ont. C.A.). *To allow the delay [in the taking of breath samples] argument at the final argument stage of the trial would deprive the Crown of the opportunity to lead evidence relevant to the issue.* It is further noted in this respect that the respondent did not cross-examine the Crown witnesses respecting delay, and did not take up the Crown on its offer to put the officer who accompanied the arresting officer on the stand for cross-examination. [Emphasis added.]

22      In *Kutynec* at pp. 296-97, Finlayson J.A. went on to explain that a judge has a discretion to allow counsel to challenge evidence already received and "will do so where the interests of justice so warrant". An example where the judge would exercise that discretion is if other evidence subsequently given puts into doubt the admissibility of evidence to which no objection was previously taken. However, that was not this case. Nothing happened after Constable Twilley identified the technician's certificate and it became an exhibit to cast doubt on the admissibility of the Intoxilizer results. To the contrary, the case for admissibility of the evidence grew stronger during Constable Cormier's evidence when she referred to the grounds upon which Constable Twilley made the demand and then Exhibits 2C and 2D were admitted without objection.

23      In my view, the trial judge erred in permitting the defence to challenge the admissibility of the certificate and the results of the Intoxilizer test at the completion of the trial. Allowing the argument at that stage did not serve the interests of justice. I do not agree that the Crown was not prejudiced by the manner in which the challenge to the evidence unfolded. Had timely objection been taken, Crown counsel would have had the option of calling additional evidence. A month later, the case was closed and presumably the witnesses were gone. As it turned out, the trial judge dismissed the objection, but the Crown could have been unfairly prejudiced because of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

the defence's failure to make a timely objection. These observations do not relate solely to the *Charter* issue but apply to all of the other objections to the admissibility of the Intoxilizer results that were taken by counsel for the first time at the end of the case.

24    There is another problem with the procedure in this case. Rule 30 of the *Rules of the Ontario Court of Justice in Criminal Proceedings*, S.I./97-133, requires an accused to give notice of an application to exclude evidence under s. 24(2) of the *Charter*. That was not done in this case. The courts must be flexible in their application of Rule 30 and a trial judge will consider all the circumstances where an accused seeks to bring a *Charter* application in the middle of the trial: see the reasons of Hill J. in *R. v. Tash*, [2008] O.J. No. 200 (Ont. S.C.J.) for an excellent review of the factors to be considered; see also *R. v. Loveman* (1992), 71 C.C.C. (3d) 123 (Ont. C.A.). Further, there will be different considerations where the accused is unrepresented (see *R. v. Tran* (2001), 156 C.C.C. (3d) 1 (Ont. C.A.)) or unforeseen events occur during the trial. However, the complete disregard of Rule 30 does not serve the interests of justice.

### (2) The Reasonable and Probable Grounds Issue

#### (a) The Statutory Scheme

25    This appellant was charged with the "over 80" offence. She was not charged with refusing to comply with either the approved screening device demand (s. 254(2)) or the Intoxilizer demand (s. 254(3)), and no objection was taken to the grounds for making the approved screening device demand under s. 254(2).

26    The issue is whether the Crown was required to prove as part of its case on the "over 80" charge that Constable Twilley had reasonable and probable grounds to make the Intoxilizer demand. That issue turns on whether reasonable and probable grounds are a pre-requisite to admission of the Intoxilizer results, either by certificate (s. 258(1)(g)) or through *viva voce* evidence, or to the Crown being able to rely on the presumption that evidence of the results of the analysis is proof of the concentration of alcohol in the blood of the accused (s. 258(1)(c)).

27    The argument that admissibility of the certificate requires proof of reasonable and probable grounds turns on the opening words of s. 258(1)(g): "where samples of the breath of the accused have been taken pursuant to a demand made under subsection 254(3)". The argument is that "demand" must mean a valid demand and a valid demand is one made where, in the words of s. 254(3), the peace officer "believes on reasonable and probable grounds that a person is committing, or at any time within the preceding three hours has committed, as a result of the consumption of alcohol, an offence under section 253" of impaired operation or "over 80".

28    However, the pre-*Charter* case of *R. v. Rilling* (1975), 24 C.C.C. (2d) 81 (S.C.C.), stands for the proposition that absence of reasonable and probable grounds does not affect the admissibility of the certificate. Judson J. speaking for the majority of the court held as follows at p. 83:

It is my opinion that this Court should... hold that while absence of reasonable and probable grounds for belief of impairment may afford a defence to a charge of refusal to submit to a breathalyzer test laid under s. 235(2) [now s. 254(5)] of the *Criminal Code*, it does not render inadmissible certificate evidence in the case of a charge under s. 236 [now s. 253(b)] of the *Criminal Code*. The motive which actuates a peace officer in making a demand under s. 235(1) [now s. 254(3)] is not a relevant consideration when the demand has been acceded to.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th)
173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

29      The argument relating to the s. 258(1)(c) presumption runs along similar lines since the opening words
are virtually identical: "where samples of the breath of the accused have been taken pursuant to a demand made
under subsection 254(3)". It would seem to me that *Rilling* is a complete answer to that argument as well: see *R.
v. Anderson*, [2005] O.J. No. 1900 (Ont. C.A.). In fact, in his dissent in *Rilling*, Spence J. drew no distinction
between the admissibility of the certificate or the operation of the presumption, writing that proof of reasonable
and probable grounds was a condition precedent with respect to both. He said this at p. 91:

> I am of the opinion that the requirement in both s. 237(1)(c) [now s. 258(1)(c)] and (f) [now s. 258(1)(g)]
> that the test should have been made pursuant to the demand under s. 235(1) was inserted by Parliament with
> the intention of limiting those cases where the analysis could be proved by a certificate of a qualified techni-
> cian and then that such analysis would provide *prima facie* proof of the proportion of alcohol in the blood of
> the accused only to those cases where the peace officer had, on reasonable and probable grounds, believed
> that the accused was or had been driving while impaired. This was only a proper requirement when the test
> was one which the citizen was required to submit to on penalty of committing an offence if he refused.

*(b) The Impact of the Charter*

30      Logically, the advent of the *Charter of Rights and Freedoms* should have an impact on *Rilling*. Again,
the argument is straightforward. The taking of breath samples is a warrantless seizure. A minimum constitution-
al requirement for a valid seizure within the meaning of s. 8 of the *Charter* is that the seizure was authorized by
law: *R. v. Collins* (1987), 33 C.C.C. (3d) 1 (S.C.C.) at 14. A lawful seizure of breath samples requires that the
officer had reasonable and probable grounds to believe that the motorist committed an offence under s. 253. Ac-
cordingly, if a police officer took breath samples from a motorist in circumstances where the officer did not have
reasonable and probable grounds, the seizure would be unlawful and violate s. 8 of the *Charter* and the evidence
obtained would potentially be inadmissible under s. 24(2). This was the holding of Cory J. in *R. v. Bernshaw*
(1994), 95 C.C.C. (3d) 193 (S.C.C.).

31      The principal issue in *Bernshaw* turned on the validity of the approved screening device demand and
whether the police officer should have waited fifteen minutes before taking the sample to ensure the motorist did
not have any alcohol in his mouth. Three sets of reasons for judgment were delivered but only Cory J., speaking
for himself, Lamer C.J.C. and Iacobucci J. dealt with the *Rilling* issue. He held that *Rilling* is still good law and
that absent a *Charter* challenge to the admissibility of the results, the prosecution need not establish that the of-
ficer had reasonable and probable grounds. He wrote as follows at paras. 40-41:

> The British Columbia Court of Appeal, in this case, held that *Rilling* was no longer good law since it was
> decided prior to the *Charter*.

> In my view, the Court of Appeal erred in taking this position. Certainly, the *Charter* is relevant. An accused
> may be able to establish on the balance of probabilities that the taking of breath samples infringed his
> *Charter* rights. For example, it might be contended that the requisite reasonable and probable grounds for
> making the breathalyzer demand were absent, and that, in the circumstances, the admission of those breath-
> alyzer results would bring the administration of justice into disrepute. In those circumstances, the breath-
> alyzer evidence might well not be accepted. Yet, where an accused complies with the breathalyzer demand,
> the Crown need not prove as part of its case that it had reasonable and probable grounds to make that de-
> mand. Rather, I think, the onus rests upon the accused to establish on the balance of probabilities that there
> has been a *Charter* breach and that, under s. 24(2), the evidence should be excluded. There should not be an

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

automatic exclusion of the breathalyzer test results.

32    Thus, Cory J. concluded that the results could be inadmissible if the accused can establish that the taking of breath samples violated his *Charter* right and their admission would bring the administration of justice into disrepute under s. 24(2).

33    Neither Sopinka J. speaking for four judges nor L'Heureux-Dubé J. speaking for two judges considered the *Rilling* issue. However, Sopinka J. held at para. 51: "The requirement in s. 254(3) that reasonable and probable grounds exist is not only a statutory but a constitutional requirement as a precondition to a lawful search and seizure under s. 8 of the *Canadian Charter of Rights and Freedoms*." L'Heureux-Dubé J. said much the same thing, although she took a slightly different approach to the meaning of reasonable and probable grounds in the breathalyzer context.

34    The next case from the Supreme Court of Canada bearing on this issue is *R. v. Woods* (2005), 197 C.C.C. (3d) 353 (S.C.C.). Like *Bernshaw*, *Woods* was a case engaging the validity of the approved screening device demand as the basis for reasonable and probable grounds to make the breathalyzer demand. The court held that a refusal to comply with the approved screening device demand could not be the basis for reasonable and probable grounds to make a breath demand. The court also held that a fail in response to a demand made over an hour later at the police station could not be the basis for reasonable and probable grounds because such a demand is illegal, not being a demand to provide samples "forthwith" as required by s. 254(2). Unfortunately, the court made no reference to the basis for excluding the breathalyzer results, nor did the court discuss *Rilling* or *Bernshaw* in relation to the reasonable and probable grounds issue. Fish J. speaking for the court said this at para. 47:

    It is common ground that the results of the ASD test and of the subsequent breathalyzer test were inadmissible against the respondent if the initial breath sample provided by him was neither voluntary nor obtained under the statutory authority of s. 254(2) of the *Criminal Code*.

35    I find it difficult to believe that the Supreme Court of Canada intended to overrule *Rilling* without referring to it. In my view, although it is troubling that there is no reference to the *Charter* in the reasons for judgment, the more reasonable explanation is that the court found that the accused's *Charter* rights were infringed and excluded the evidence on that basis albeit without going through the full *Charter* analysis. Also see *R. v. Bilokrely*, [2007] O.J. No. 5131 (Ont. C.J.) at para. 24. I find some support for this view from the reasons of the Manitoba Court of Appeal in *R. v. Woods* reported at (2004), 185 C.C.C. (3d) 70 (Man. C.A.). Speaking for the court, Philp J.A. held at para. 31 that the actions of the police in taking breath samples for the approved screening device test at the police station without consent or statutory authority and the subsequent admission of evidence of the breathalyzer samples "resulted in an unfair trial" and a denial of "fundamental justice". It seems to me that this is *Charter* language and other portions of the reasons show that the case was fought on the basis of a *Charter* challenge to the admissibility of the breathalyzer results.

36    This court and other appellate courts have considered the s. 8 issue in relation to drinking and driving cases. In *R. v. Haas* (2005), 200 C.C.C. (3d) 81 (Ont. C.A.), Goudge J.A. considered *Bernshaw* and *Woods* and held that where the accused challenges the admissibility of breath samples on the basis of a violation of s. 8 because of the lack of reasonable and probable grounds, the burden is on the Crown to establish reasonable and probable grounds. Goudge J.A. reached this conclusion on the basis that a breathalyzer demand results in a warrantless seizure. In accordance with *R. v. Collins* and *R. v. Wills* (1992), 70 C.C.C. (3d) 529 (Ont. C.A.), the burden shifts to the Crown to show that a warrantless seizure is reasonable. I point out that in *Haas*, the accused had

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

clearly brought an application under the *Charter* and it was in that context that the court held the Crown must establish reasonable and probable grounds for the demand. As Goudge J.A. said at para. 36:

> If the Crown is faced with a s. 8 Charter challenge, it is reasonable to require the Crown to call as evidence to resist that challenge the very evidence it would call at trial, particularly if that evidence can be called only once in a proceeding blending the trial and s. 8 *voir dire*. [Emphasis added.]

37      The New Brunswick Court of Appeal has reached a similar conclusion in *R. v. Arsenault* (2005), 204 C.C.C. (3d) 75 (N.B. C.A.)[FN2] and *R. v. Saulnier* (2006), 205 C.C.C. (3d) 245 (N.B. C.A.). For example, in the former at para. 33:

> Considering that the presence of reasonable and probable grounds is both a statutory and constitutional pre-condition for a lawful breathalyzer demand, my view is that *when an accused properly challenges the admissibility of breathalyzer results by reason of the absence of an honest belief to make the breathalyzer demand*, Rilling *loses its significance and, if a violation of a Charter right is found*, the matter must be disposed of on the basis of a s. 24(2) analysis. [Emphasis added.]

38      In *R. v. Dwernychuk* (1992), 77 C.C.C. (3d) 385 (Alta. C.A.) the court held that *Rilling* was still the law even in the face of a *Charter* challenge to the admissibility of the breathalyzer results on the basis of a lack of reasonable and probable grounds. *Dwernychuk* was decided before *Bernshaw* and, in my view, likely cannot stand in the face of the reasons of all members of the Supreme Court of Canada that reasonable and probable grounds is a constitutional requirement and not just a statutory requirement for a breath demand under s. 245(3). This seems to be the view taken by trial courts in Alberta: see e.g. *R. v. Billing* (1995), 177 A.R. 8 (Alta. Q.B.); *R. v. Rhyason* (2005), 27 M.V.R. (5th) 262 (Alta. Q.B.); *R. v. Nelson*, [2006] A.J. No. 467 (Alta. Q.B.). In this last case Watson J. disagreed with *Haas* and held at para. 20 that the burden was on the accused to establish the absence of reasonable and probable grounds.

39      Finally, there is the decision of the New Brunswick Court of Appeal in *R. v. Searle* (2006), 215 C.C.C. (3d) 374 (N.B. C.A.). In *Searle*, the accused did not seek to exclude the breath test results and made no *Charter* argument. Rather, he argued that the Crown could not rely on the presumption in s. 258(1)(c). The accused argued that because the officer did not have reasonable and probable grounds to make the demand, the demand was improper and therefore the presumption was not triggered. Larlee J.A. speaking for the court at para. 25 agreed:

> Since the demand was not made in strict compliance with s. 254(3) of the *Code*, it is unlawful. The Crown cannot rely on the presumption found in s. 258(1)(c) unless the officer had reasonable and probable grounds to make the breathalyzer demand in the first place.

40      The *Searle* issue does not arise in this case. The appellant did not contend here or at trial or at the Summary Conviction Appeal Court that if there were no reasonable and probable grounds the Crown could not rely on the presumption. I should therefore not be taken as having decided that issue. I point out, however, that when the matter is before the court for decision, the effect of *Rilling* will have to be considered.

### (3) Reasonable and Probable Grounds and the Approved Screening Device

41      The leading judgment on the question of reasonable and probable grounds to make an Intoxilizer demand where the officer relies upon the results from an approved screening device is that of Sopinka J. in *Bernshaw*. In

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

that case, Sopinka J. pointed out that while the issue is the officer's belief, that belief has a subjective and objective component. As he said at para. 48: "s. 254(3) of the *Code* requires that the police officer subjectively have an honest belief that the suspect has committed the offence and, objectively, there must exist reasonable grounds for this belief". Sopinka J. held that where the officer is aware that the results of the approved screening device are unreliable because of the circumstances in which the test was administered, then the officer cannot have the requisite subjective belief. However, he also held at para. 80: "Where the particular screening device used has been approved under the statutory scheme, the officer is entitled to rely on its accuracy unless there is credible evidence to the contrary."

42      The focus of Sopinka J.'s reasons is almost entirely on the subjective component of reasonable and probable grounds. The earlier decision in *R. v. Storrey* (1990), 53 C.C.C. (3d) 316 (S.C.C.) dealing with the arrest power assists in understanding the objective component of reasonable and probable grounds. There at p. 324, Cory J. held as follows:

> It is not sufficient for the police officer to personally believe that he or she has reasonable and probable grounds to make an arrest. Rather, *it must be objectively established that those reasonable and probable grounds did in fact exist.* That is to say a reasonable person, standing in the shoes of the police officer, would have believed that reasonable and probable grounds existed to make the arrest [citations omitted].

> [Emphasis added.]

43      Note that it is the reasonable and probable grounds that must be shown to exist. It may turn out that, in fact, the motorist's ability to drive was not impaired or that the motorist's blood alcohol level did not exceed the legal limit. The question is whether a reasonable person with the same information as the officer would have concluded that there were reasonable and probable grounds to believe an offence had been committed. Thus, if the device used by the officer was not in fact an approved screening device, the objective component may or may not be made out; it depends upon whether the officer could reasonably believe that the device he or she was using was an approved device. I turn then to the issue of what kind of evidence is required to show that an *approved* screening device was used.

### *(4) Identification of the Approved Screening Device*

44      In determining whether the particular device was approved, the court must consider all the evidence, including any circumstantial evidence. The court is entitled to draw reasonable inferences from the evidence. Thus, in my view, if the officer in his or her testimony refers to the device as an "approved screening device", the trial judge is entitled to infer that the device was indeed an approved device. As such, the officer is entitled to rely upon the "fail" recorded by the device to find that there were reasonable and probable grounds to make the breath demand.

45      The officer is not required to refer to the device by its particular brand and number such as "Alcotest 7410 GLC". Further, references to a part only of the identification such as "Alcotest" or "Alcotest GLC" do not rebut the reasonable inference from the officer's reference to the device as approved that it is indeed an approved screening device. The addition of the manufacturer's name, for example "Drager Alcotest 7410 GLC", is likewise not fatal: see *R. v. Neziol* (2001), 22 M.V.R. (4th) 299 (Ont. S.C.J.). Further, in my view, the context in which the officer refers to the device as approved is of no particular moment. Thus, if the officer testifies that he or she used an approved screening device, or agrees with the suggestion that it is an approved screening device, such testimony is direct evidence upon which the trial judge can rely: see *e.g. R. v. Latulippe* (2005), 26 M.V.R.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

(5th) 97 (Ont. S.C.J.).

46     Where, as here, the officer states that she made a demand that the motorist provide a sample for analysis by the approved screening device, surely the trier of fact can reasonably infer that the officer used an approved device. That was the holding of the trial judge in this case and I agree with that decision. As Langdon J. said in *R. v. James*, [1995] O.J. No. 190 (Ont. Gen. Div.) at para. 5, "what is the likelihood that the O.P.P. would supply its constables with an unapproved device with which to enforce the R.I.D.E. programme?"

47     In my view, cases holding that the officer did not have reasonable and probable grounds because, although the officer referred to the device as an approved screening device, he or she used a shorthand reference to the device or transposed some of the numbers or letters are wrongly decided. In the absence of some credible evidence to the contrary, it is not reasonable to infer that an officer who says that he or she used an approved screening device actually used an unapproved device. That was the holding of this court in *R. v. Kosa* (1992), 42 M.V.R. (2d) 290 (Ont. C.A.), at 291:

> We are of the view that the manufacturer's model number given by the officer in evidence as Model JA3 rather than Model J3A as set forth in the regulations was no more than an innocent transposition of a number and letter and that *the unchallenged assertion by the officer that it was an approved screening device is sufficient proof thereof*. If such is the case, there is no need to look further to justify the finding of reasonable and probable grounds. [Emphasis added.]

48     Of course the question of whether the officer had reasonable and probable grounds depends on the circumstances of each case. My only point here is that the trial judge is not confined to direct evidence and is entitled to and should draw reasonable inferences from the proven facts.

49     Finally, even if the Crown is unable to establish that the officer had the requisite reasonable and probable grounds and thus the accused has shown a violation of his or her s. 8 rights, exclusion of the results of the Intoxilizer is not automatic. The accused must still establish that admission of the evidence would bring the administration of justice into disrepute under s. 24(2) of the *Charter*: *R. v. Lotozky* (2006), 210 C.C.C. (3d) 509 (Ont. C.A.).

50     To summarize, on a charge of "over 80" or impaired driving, where an issue arises as to the admissibility of the results of the Intoxilizer/Breathalyzer analysis, the trial court should proceed as follows:

**Generally**

1. If the accused does not challenge the admissibility of the results of the Intoxilizer/Breathalyzer analysis on the basis that the accused's rights under the *Charter* were violated, the Crown is not required to establish that the officer had reasonable and probable grounds to make the s. 254(3) demand.

2. Any objection to the admissibility of the results of the analysis should ordinarily be made, at the latest, when the Crown tenders the evidence either through a certificate under s. 258(1)(g) or by way of oral testimony.

3. Where the accused intends to object to the admissibility of the results of the analysis on the basis of a violation of the *Charter*, the accused should comply with Rule 30 of the *Rules of the Ontario Court of Justice in Criminal Proceedings*, although a trial judge has a discretion to dispense with notice in a proper case.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

### *Charter* challenge because of lack of reasonable and probable grounds

4. Where the accused objects to the admissibility of the results of the analysis pursuant to ss. 8 and 24(2) of the *Charter* that the officer lacked reasonable and probable grounds to make the demand, the burden is on the Crown to establish the requisite grounds.

5. Reasonable and probable grounds involve an objective and subjective test. Where the grounds depend upon a "fail" from an approved screening device, the Crown must prove that the officer reasonably believed that he or she was using an approved device.

6. In the absence of credible evidence to the contrary, the officer's testimony that he or she made a demand with an approved screening device is sufficient evidence that the officer had the requisite reasonable belief. The officer is not required to give the particular model number or otherwise identify the device. Obvious errors such as incomplete reference to the model number do not undermine the officer's testimony that the device was an approved screening device.

7. Where the officer did not have the requisite reasonable and probable grounds, the warrantless seizure of breath samples for analysis in an Intoxilizer or breathalyzer is an unreasonable seizure within the meaning of s. 8 and the results may be excluded under s. 24(2) of the *Charter*.

### (5) *Application to this Case*

51      In light of the above, it will be apparent that I agree with the trial judge and the appeal judge that the Crown established that the officer used an approved screening device. The officer's reference to an "Alcotest" did not undermine her direct evidence that she used an approved screening device. She therefore had reasonable and probable grounds to make the Intoxilizer demand and there was no violation of s. 8 of the *Charter*.

### Disposition

52      Accordingly, while I would grant leave to appeal, I would dismiss the appeal.

**J. Laskin J.A.**:

I agree.

**H.S. LaForme J.A.**:

I agree.

*Appeal dismissed.*

FN1 This "defence" is an attempt to rebut the presumption of identity in s. 258(1)(c) and (d.1) of the *Criminal Code* that the blood alcohol level at the time of the tests was the same as at the time of the offence. The accused offers expert evidence to show that based on the amount of alcohol consumed the blood alcohol level would not have exceeded .08.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2008 CarswellOnt 2091, 2008 ONCA 284, 235 O.A.C. 236, 231 C.C.C. (3d) 26, 57 C.R. (6th) 369, 64 M.V.R. (5th) 173, 170 C.R.R. (2d) 51, 77 W.C.B. (2d) 309

FN2 The New Brunswick Court of Appeal went on to hold that the officer did not have reasonable and probable grounds, taking a strict view of the need to identify with some exactitude the device used.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 72

2010 CarswellAlta 2197, 2010 ABQB 701, [2011] A.W.L.D. 197, [2011] A.W.L.D. 196, 73 C.B.R. (5th) 112, 36 Alta. L.R. (5th) 385, [2011] 4 W.W.R. 756, 497 A.R. 146, 194 A.C.W.S. (3d) 724



2010 CarswellAlta 2197, 2010 ABQB 701, [2011] A.W.L.D. 197, [2011] A.W.L.D. 196, 73 C.B.R. (5th) 112, 36 Alta. L.R. (5th) 385, [2011] 4 W.W.R. 756, 497 A.R. 146, 194 A.C.W.S. (3d) 724

Carlson, Re

In the matter of the Bankruptcy and Insolvency Act, R.S.A. 1985, Chapter B-3 as amended

And In the Matter of the bankruptcy of Jack Walter Carlson

Alberta Court of Queen's Bench

C.A. Kent J.

Heard: September 10, 2010
Judgment: November 10, 2010[FN*]
Docket: Calgary BK01 085684

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: Kyle D. Kashuba for Applicant

Gerald N. Kent for Respondent

Subject: Insolvency; Property

Bankruptcy and insolvency --- Avoidance of transactions prior to bankruptcy — Miscellaneous

Applicant bankrupt transferred property in British Columbia (BC) to his brother and cross-applicant sister-in-law and received promissory note and security agreement in exchange — Several years later, applicant began bankruptcy proceedings and swore statement disclosing assets worth significantly less than debts owing — Potential interest in BC property was not disclosed — Applicant later filed suit against sister-in-law claiming beneficial interest in BC property — Applicant was served with motion for summary judgment in BC property action as any interest in property would no longer belong to him, but to his trustee in bankruptcy — Applicant brought application requesting order assigning property proceeding to him in exchange for payment to trustee of full amount owing to creditors, and sister-in-law brought cross-application requesting release regarding interest in property in exchange for her payment to trustee of full amount owing to creditors by applicant — Trustee reappointed to applicant and trustee ordered to provide release to sister-in-law of any claim to BC property in exchange for payment of sum equal to amount owing to applicant's creditors — Applicant failed to disclose property in bankruptcy proceedings and attempted to reap benefits of property subsequent to discharge — Applicant knew about beneficial interest in property and intentionally chose not to disclose it — If there were no consequences for dishonesty, bankruptcy scheme would be compromised.

2010 CarswellAlta 2197, 2010 ABQB 701, [2011] A.W.L.D. 197, [2011] A.W.L.D. 196, 73 C.B.R. (5th) 112, 36 Alta. L.R. (5th) 385, [2011] 4 W.W.R. 756, 497 A.R. 146, 194 A.C.W.S. (3d) 724

Bankruptcy and insolvency --- Property of bankrupt — Miscellaneous

Applicant bankrupt transferred property in British Columbia (BC) to his brother and cross-applicant sister-in-law and received promissory note and security agreement in exchange — Several years later, applicant began bankruptcy proceedings and swore statement disclosing assets worth significantly less than debts owing — Potential interest in BC property was not disclosed — Applicant later filed suit against sister-in-law claiming beneficial interest in BC property — Applicant was served with motion for summary judgment in BC property action as any interest in property would no longer belong to him, but to his trustee in bankruptcy — Applicant brought application requesting order assigning property proceeding to him in exchange for payment to trustee of full amount owing to creditors, and sister-in-law brought cross-application requesting release regarding interest in property in exchange for her payment to trustee of full amount owing to creditors by applicant — Trustee reappointed to applicant and trustee ordered to provide release to sister-in-law of any claim to BC property in exchange for payment of sum equal to amount owing to applicant's creditors — Applicant failed to disclose property in bankruptcy proceedings and attempted to reap benefits of property subsequent to discharge — Applicant knew about beneficial interest in property and intentionally chose not to disclose it — If there were no consequences for dishonesty, bankruptcy scheme would be compromised.

**Cases considered by *C.A. Kent J.*:**

*Allnorth Consultants Ltd. v. Tercon Construction Ltd.* (2010), 66 C.B.R. (5th) 60, 2010 BCSC 451, 2010 CarswellBC 814 (B.C. S.C.) — considered

*Barger v. Georgia (Cartersville City)* (2003), 348 F.3d 1289 (U.S. C.A. 11th Cir.) — referred to

*Burnes v. Pemco Aeroplex Inc.* (2002), 291 F.3d 1282 (U.S. C.A. 11th Cir.) — referred to

*Eastman v. Union Pacific Railroad Co.* (2007), 493 F.3d 1151 (U.S. C.A. 10th Cir.) — referred to

*Gandy v. Gandy* (1885), 30 Ch. D. 57 (Eng. C.A.) — considered

*Hoque, Re* (1996), 38 C.B.R. (3d) 133, *(sub nom. Hoque (Bankrupt), Re)* 429 A.P.R. 142, *(sub nom. Hoque (Bankrupt), Re)* 148 N.S.R. (2d) 142, 1996 CarswellNS 51 (N.S. C.A.) — considered

*Krystal Cadillac-Oldsmobile GMC Truck Inc. v. General Motors Corp.* (2003), 337 F.3d 314 (U.S. C.A. 3rd Cir.) — referred to

*Manley v. O'Brien* (1901), 8 B.C.R. 280, 1901 CarswellBC 78 (B.C. C.A.) — considered

*Moses v. Howard University Hospital* (2010), 606 F.3d 789 (U.S. C.A. D.C.) — referred to

*New Hampshire v. Maine* (2001), 532 U.S. 742, 121 S.Ct. 1808 (U.S. Sup. Ct.) — considered

*Parker v. Wendy International Inc.* (2004), 365 F.3d 1268 (U.S. C.A. 11th Cir.) — referred to

*Payless Wholesale Distributors Inc. v. Alberto Culver (P.R.) Inc.* (1993), 989 F.2d 570 (U.S. C.A. 1st Cir.) — referred to

*Robinson v. Tyson Foods Inc.* (2010), 595 F.3d 1269 (U.S. C.A. 11th Cir.) — referred to

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.* (1996), 81 F.3d 355 (U.S. C.A. 3rd Cir.) — referred

2010 CarswellAlta 2197, 2010 ABQB 701, [2011] A.W.L.D. 197, [2011] A.W.L.D. 196, 73 C.B.R. (5th) 112, 36
Alta. L.R. (5th) 385, [2011] 4 W.W.R. 756, 497 A.R. 146, 194 A.C.W.S. (3d) 724

to

*Saskatoon Credit Union Ltd. v. Central Park Enterprises Ltd.* (1988), 1988 CarswellBC 16, 22 B.C.L.R. (2d) 89, 47 D.L.R. (4th) 431 (B.C. S.C.) — considered

*Substantial Developments Ltd. v. Hitchcox* (January 8, 1973), Addy J. (Ont. H.C.) — considered

*Superior Crewboats Inc., Re* (2004), 374 F.3d 330 (U.S. C.A.) — referred to

*Toronto (City) v. C.U.P.E., Local 79* (2003), 232 D.L.R. (4th) 385, 9 Admin. L.R. (4th) 161, [2003] 3 S.C.R. 77, 17 C.R. (6th) 276, 2003 SCC 63, 2003 CarswellOnt 4328, 2003 CarswellOnt 4329, 311 N.R. 201, 2003 C.L.L.C. 220-071, 179 O.A.C. 291, 120 L.A.C. (4th) 225, 31 C.C.E.L. (3d) 216 (S.C.C.) — considered

*Traci Cannon-Stokes v. Potter* (2006), 453 F.3d 446 (U.S. C.A. 7th Cir.) — referred to

*United States of America v. 49.01 Acres of Land* (1986), 802 F.2d 387 (U.S. C.A. 10th Cir.) — referred to

APPLICATION by bankrupt requesting trustee be reappointed as trustee in bankruptcy and order assigning proceeding for share in real property to bankrupt in exchange for payment to trustee of full amount owing to creditors; CROSS-APPLICATION by defendant in property proceeding requesting trustee be reappointed and provide release to defendant in exchange for payment to trustee of full amount owing to creditors by bankrupt.

*C.A. Kent J.:*

1     On April 11, 2003, Jack Carlson made an Assignment into Bankruptcy. He swore a Statement of Affairs. That Statement of Affairs disclosed that he had approximately $17,000 in assets. On the line where he would identify any house or land, he filled in "nil". The Statement of Affairs did not disclose any interest in a piece of property in British Columbia. He also disclosed $90,000 of debt, all to the Canada Customs and Revenue Agency (CRA"). Mr. Carlson was discharged from bankruptcy on May 2, 2004 and the trustee of his bankruptcy was discharged on March 2, 2005.

2     Around September, 1990, Ernie Carlson, Jack's brother, and Jane Carlson, Ernie's wife, moved onto the B.C. property at issue in this case. On December 24, 1997, Jack Carlson transferred the property to Ernest and Jane Carlson. In January, 2000, Jane Carlson drafted a Promissory Note in favour of Jack Carlson for the sum of $72,000 in relation to the B.C. property. The document was signed by herself and Ernie Carlson. She also drafted a Security Agreement signed 7th January, 2000 stating that the B.C. property was security for the amount of the Promissory Note. Jack Carlson acknowledges receiving the documents in January, 2000. On December 17, 2003, Ernie Carlson died. On March 29, 2004, Jane Carlson became the sole registered owner of the B.C. property. On August 23, 2007, Jack Carlson commenced an action in B.C. claiming a beneficial interest in the B.C. property. On December 5, 2007, Jane Carlson commenced an action in B.C. seeking a declaration that she was the beneficial owner of the B.C. property. In those B.C. proceedings, Jack Carlson was examined for discovery on March 6, 2008. At that time his bankruptcy proceedings referred to above were disclosed.

3     On August 18, 2008, Jack Carlson was served with an application for summary trial in the B.C. action. The basis of that application was that any interest in the B.C. property was the property of the trustee in bankruptcy, not Mr. Carlson so that he had no claim. On December 9, 2008, Mr. Carlson disclosed to his former trustee in bankruptcy his claim to the B.C. property. There were discussions between Mr. Carlson and the trustee

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellAlta 2197, 2010 ABQB 701, [2011] A.W.L.D. 197, [2011] A.W.L.D. 196, 73 C.B.R. (5th) 112, 36 Alta. L.R. (5th) 385, [2011] 4 W.W.R. 756, 497 A.R. 146, 194 A.C.W.S. (3d) 724

such that the trustee agreed that Mr. Carlson could continue with the B.C. litigation subject to the trustee recovering proceeds that would then be paid to Mr. Carlson's creditors under the bankruptcy.

4    On September 25, 2008, Jane Carlson offered to pay $72,000 to the trustee in exchange for a release which would essentially release her from any claims in the B.C. action. Mr. Carlson then offered the trustee approximately $140,000 which would pay off entirely his creditors in the bankruptcy in exchange for the trustee assigning the B.C. claim to Mr. Carlson. In December, 2008, Jane Carlson offered to pay the same amount of money in exchange for a release.

5    This is an application by Jack Carlson requesting that the trustee be reappointed as trustee in bankruptcy of Jack Carlson and an order assigning the BC proceedings to Jack Carlson in exchange for payment by Jack Carlson to the trustee of the full amount owing to Mr. Carlson's creditors. Jane Carlson responds and cross-applies seeking an order that the trustee be reappointed and that in exchange for payment of a sum of money equal to Mr. Carlson's creditors' claim the trustee provide a release. There is a related application by Jane Carlson to strike out certain portions of one of Jack Carlson's Affidavit.

6    The issue before me is whether or not Jack Carlson's apparent failure to disclose his claim to the B.C. property in his Statement of Affairs at the time he made an assignment in bankruptcy prevents him from obtaining the right to continue the claim in B.C.

7    Counsel for Jane Carlson urges me to apply the doctrine of judicial estoppel, a doctrine which has been applied several times in the United States and acknowledged as an appropriate doctrine by the Supreme Court of the United States. Counsel for Jack Carlson says that the doctrine has not been, and should not be adopted in Canada and without such a doctrine, Mr. Carlson ought to receive the right to prosecute the claim.

8    One of the issues before me is whether or not Jack Carlson did disclose the existence of this interest at the time of his bankruptcy. In that regard, Mr. Carlson has given evidence on several occasions. When he was examined for discovery and it was revealed that he had made an assignment in bankruptcy, the following exchange occurred:

  Question: Why did you not list the property described in Exhibit #5 as an asset in the bankruptcy?

  Answer: Never even thought of it.

  Question: At any time did you advise the Trustee in Bankruptcy that you were the owner of that property?

  Answer: Never came up.

9    In an affidavit sworn July 28, 2001, he said the following with respect to this issue:

  6. At the time I made the Assignment into Bankruptcy in 2003, I had a beneficial [sic] in the aforementioned Lands. The beneficial interest was not disclosed on the Claims Register in respect of my bankruptcy.

In an affidavit sworn February12, 2009, Mr. Carlson says the following:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellAlta 2197, 2010 ABQB 701, [2011] A.W.L.D. 197, [2011] A.W.L.D. 196, 73 C.B.R. (5th) 112, 36 Alta. L.R. (5th) 385, [2011] 4 W.W.R. 756, 497 A.R. 146, 194 A.C.W.S. (3d) 724

7. In response to paragraph 14 of Jane Carlson's Affidavit, at the time I made the Assignment into Bankruptcy in 2003, I had a beneficial interest in the Lands. In a conversation with my Trustee, BDO Dunwoody Limited at this time, I believe that I disclosed the interest and the nature of it. I was advised that the beneficial interest need not be disclosed as an asset, and as such, it was not listed on the Claims Register.

8. In late summer of 2008, upon speaking to Mr. Rakochey regarding my entitlement to the Lands in question in the Proceedings, he informed me that my interest in the Lands should have been disclosed to the Trustee and Mr. Rakochey contacted Mr. Edwards at BDO Dunwoody Limited (hereafter the "Discharged Trustee") to give him formal notice of my interest in the property in the B.C. proceedings.

10    It is also significant to note what Mr. Edwards, the trustee, says. He swore an affidavit stating that he was unaware of the claim to the B.C. property and that if he had been aware of the claim, he would have taken steps to realize it. He reviewed the file and found no reference to the beneficial interest in that property. There was an associate at BDO Dunwoody also working on the file. There is no evidence from him on this application.

**Issues**

The issues that I must decide are:

1. Does the doctrine of judicial estoppel apply in Canada?

2. Can I make a determination about Mr. Carlson's failure to report his interest in the B.C. property to the trustee on only the affidavit evidence?

### Does the doctrine of judicial estoppel apply in Canada?

11    The doctrine of judicial estoppel has been developed and accepted widely in the United States in circumstances that are very similar to those in this case. The doctrine has been accepted by the Supreme Court of the United States in the *New Hampshire v. Maine*, 532 U.S. 742 (U.S. Sup. Ct. 2001). That case dealt with the boundary dispute between the states of New Hampshire and Maine. The Court unanimously held that judicial estoppel barred New Hampshire from claiming that the boundary fell as it did, given that New Hampshire had agreed to a different boundary claim in earlier litigation. The Court said:

Although we have not had occasion to discuss the doctrine elaborately, other courts have universally recognized that its purpose is "to protect the integrity of the judicial process," ... by "prohibiting parties from deliberately changing positions according to the exigencies of the moment,"... .

12    In the course of its reasoning it noted that some courts have talked about the doctrine in the context of a litigant "playing fast and loose with the courts", and that it is "an equitable doctrine invoked by a court at its discretion".

13    In the case the court identified at the following factors in determining whether the doctrine should be invoked:

1. Whether the party's current position was "clearly inconsistent" with its previous position;

2. Whether the party had earlier persuaded the court to accept its prior position, such that the acceptance of the inconsistent position would "create the perception that either the first or the second court was

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellAlta 2197, 2010 ABQB 701, [2011] A.W.L.D. 197, [2011] A.W.L.D. 196, 73 C.B.R. (5th) 112, 36
Alta. L.R. (5th) 385, [2011] 4 W.W.R. 756, 497 A.R. 146, 194 A.C.W.S. (3d) 724

misled";

3. Whether the party seeking to assert this latter inconsistent position would derive an unfair advantage
from so doing, or would create an unfair determinant on the opposite party if not estopped.

The Court said that this list was not exhausted.

14        Several circuit courts of appeal have applied the doctrine in bankruptcy cases where a bankrupt has
failed to disclose a claim to an asset which it then later seeks to recover. A review of those cases all of which are
attached as Appendix 1 to this judgment reveal the following principles in addition to those set out in *New
Hampshire*. Those principles are:

1. As a policy consideration, debtors are not to be rewarded by attempting to conceal an asset and only
disclosing the existence of the asset, if caught;

2. Because the doctrine is designed to protect the integrity of the judicial system as opposed to the litig-
ants, detrimental reliance by the party asserting the estoppel is not required;

3. Deliberate omission of an asset can be inferred from the record;

4. The courts are aware that the use of the doctrine may result in a windfall to a defendant asserting it.

15      In the application before me, counsel for Mr. Carlson argued that the development of the principle of es-
toppel in Canada is different than the United States. Specifically he argued that for estoppel to apply, the person
pleading it must show a detrimental reliance. The courts in the United States make it clear that judicial estoppel
is different from other forms of estoppel. It is intended to prevent an abuse against the proper administration of
justice. As a result, there is no privity between the two parties and no need for detrimental reliance to be shown.

16      Counsel were quite forthright in acknowledging that the doctrine of judicial estoppel has not been ap-
plied in Canada. In *Allnorth Consultants Ltd. v. Tercon Construction Ltd.*, 2010 BCSC 451 (B.C. S.C.), the term
was referred to in a costs application. The judge had issued an oral ruling on the substantive issues in the case.
We do not have the benefit of those reasons. He simply said in his decision on cost that in his decision on the
substantive issue:

I heard that having made the claim, Allnorth had asserted that Tercon PV was its debtor and enlisted a legal
process in support of that claim, and that doing so gave rise to a judicial estoppel.

17      In *Substantial Developments Ltd. v. Hitchcox*, [1973] O.J. No. 113 (Ont. H.C.), the court acknowledged
the doctrine of judicial estoppel. The facts are not clear but the court held that by reason of an abuse of process
and the application of the principle of judicial estoppel, one of the parties was estopped from asserting his cur-
rent position.

18      I am satisfied that the principle of judicial estoppel is one that would be available in Canada in the ap-
propriate circumstances. I am not satisfied that estoppel is limited to only those cases where it is an issue
between two parties and one party can show detrimental reliance. I note the following comments from *Saskatoon
Credit Union Ltd. v. Central Park Enterprises Ltd.* (1988), 47 D.L.R. (4th) 431 (B.C. S.C.) at p. 435:

The principle of *res judicata* in its various manifestations has become far too complicated. Lord Denning

2010 CarswellAlta 2197, 2010 ABQB 701, [2011] A.W.L.D. 197, [2011] A.W.L.D. 196, 73 C.B.R. (5th) 112, 36 Alta. L.R. (5th) 385, [2011] 4 W.W.R. 756, 497 A.R. 146, 194 A.C.W.S. (3d) 724

M.R. in *McIlkenny v. Chief Constable*, [1980] [2] W.L.R. 689 (C.A.) at p.700 explains that estoppel comes from the Norman-French language and means simply that someone is stopped from saying something else. Lord Denning M.R. went on to say that from these simple beginnings estoppel has become "... a big house with many rooms." In Coke's time there were only three rooms, estoppel by record, by writing or in pais (conduct). But now we have so many rooms we are likely to become confused. Lord Denning refers to estoppel per rem judicatam, issue estoppel, or estoppel by deed, representation, conduct, acquiescence, election, waiver and negligence, as well as promissory estoppel, proprietary estoppel, and "... goodness knows what else".

19    While accepting the doctrine of judicial estoppel may require the house be renovated, done carefully and thoughtfully it will not damage the beauty of the house.

20    That however does not end the matter. The parties conceptualized this argument as one between Mr. Carlson and Ms. Carlson. Although the trustee has taken a position, the application was to reappoint the trustee and then have the trustee assign the chose of action back to Mr. Carlson. However, that conceptualization is incorrect. When Mr. Carlson made the assignment into bankruptcy, all of his property vested in the trustee. That included the claim in B.C., even though Mr. Carlson did not declare it. That chose in action continues to be in the possession of the trustee. The doctrine of judicial estoppel requires a finding that the person to be estopped is taking an inconsistent position with respect to the matter at issue. While Mr. Carlson is taking an inconsistent position, namely that he now has a claim to B.C. property which in previous bankruptcy proceedings he did not disclose, the trustee has not taken an inconsistent position. I cannot apply the doctrine against the trustee who is the holder of the asset.

21    That said, the doctrine of judicial estoppel is really another way of identifying a remedy where there has been an abuse of process of the court. The concept of abuse of the court's process is a familiar one in Canada. In *Manley v. O'Brien* (1901), 8 B.C.R. 280 (B.C. C.A.), the plaintiff asserted an argument in an action between himself and Mackintosh that was opposite the argument he had made on the same issue in previous litigation with another person. The court said:

> While it is true that in determining the defendant's rights we also determine Mackintosh's, nevertheless that does not entitle the plaintiff to take a different stand today in regard to the defendant's rights from that which he took when he succeeded in inducing the Court to grant him a sweeping, and, if I may say so, novel judgment appropriating this very timber to his own use.

22    The court quotes from *Gandy v. Gandy* (1885), 30 Ch. D. 57 (Eng. C.A.) at p.82, wherein Lord Justice Bowen said the following:

> The husband having got the benefit of our decision on the appeal from the Divorce Court, on the ground that he was acknowledging his continued liability to pay for the maintenance of the two youngest children, now turns and declines to contribute to their maintenance and education. I am not quite sure (and I reserve the point for further consideration) that the decision of the Court on that appeal did not involve a judicial construction of the covenant which, whether it was right or wrong, would be binding upon the parties. I am not certain that this is not *res judicata* within the view which has been taken of *res judicata*, when the same questions arise again between the same parties litigating similar subject-matter. But whether it is *res judicata* or not, it seems to me that there would be monstrous injustice if the husband, having suggested one construction of the deed in the old suit and succeeded on that footing, were allowed to turn round and win

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellAlta 2197, 2010 ABQB 701, [2011] A.W.L.D. 197, [2011] A.W.L.D. 196, 73 C.B.R. (5th) 112, 36 Alta. L.R. (5th) 385, [2011] 4 W.W.R. 756, 497 A.R. 146, 194 A.C.W.S. (3d) 724

the new suit upon a diametrically opposite construction of the same deed. It would be playing fast and loose with justice if the Court allowed that.

23        Judges have an inherent and residual discretion to prevent an abuse of process. In *Toronto (City) v. C.U.P.E., Local 79*, 2003 SCC 63 (S.C.C.), the Court said at para. 37:

> In the context that interests us here, the doctrine of abuse of process engages "the inherent power of the court to prevent the misuse of its procedure, in a way that would ... bring the administration of justice into disrepute" (*Canam Enterprises Inc. v. Coles* (2000), 51 O.R. (3d) 481 (C.A.), at para. 55, per Goudge J.A., dissenting (approved [2002] 3 S.C.R. 307, 2002 SCC 63)). Goudge J.A. expanded on that concept in the following terms at paras. 55-56:

> The doctrine of abuse of process engages in the inherent power of the court to prevent the misuse of its procedure, in a way that would be manifestly unfair to a party to the litigation before it would in some other way bring the administration of justice into disrepute. It is a flexible doctrine unencumbered by the specific requirements of concepts such as issue estoppel. See *House Spring Gardens Ltd. V. Waite* [1990] 3 W.L.R. 347 at p.358, [1990] 2 All E.R. 990 (C.A.)

24        In the context of bankruptcy, ensuring full disclosure of the bankrupt's property is fundamental to maintaining confidence in our bankruptcy scheme. If a bankrupt intentionally fails to disclose assets with the belief that there will be no consequences when the non-disclosure is uncovered, our bankruptcy scheme is compromised. It is the Court's task to ensure that that does not happen.

25        Accordingly while I am satisfied that the doctrine of judicial estoppel could apply in Canada in some circumstances, it does not fit within our bankruptcy scheme. However the principles contained within the doctrine are the same as our notion of abuse of process. The notion of abuse of process permits a judge to take steps which will ensure the proper administration of justice. It avoids the perversion of the judicial machinery which would result if the Court permitted a litigant to take a position in one proceeding which is inconsistent with that taken in a previous piece of litigation. In the context of a bankruptcy, it permits the judge to supervise the activities of a bankrupt who has failed to disclose property in his bankruptcy proceedings and then attempts to reap the benefits of that property subsequent to his discharge.

***Can I make a determination about Mr. Carlson's failure to report his interest in the B.C. property to the trustee on only the affidavit evidence?***

26        Earlier in this judgment I set out the evidence that Mr. Carlson provided with respect to whether or not he told the trustee in bankruptcy about his claim in British Columbia. The evidence he gave at his examination for discovery was different than that in the two affidavits and as between the two affidavits, his evidence is different. All of these inconsistent statements were given under oath. One time he said that the beneficial interest in the property was not disclosed, at an other time he said that the issue of that property never came up and finally he said that he had the told the trustee in bankruptcy who replied that it was not necessary to disclose it. The last of these three pieces of evidence is inconsistent with what the trustee said. Mr. Carlson's evidence is not credible and could not be rehabilitated by a *viva voce* hearing. I am satisfied on the evidence that Mr. Carlson knew about the beneficial interest in the property and intentionally chose not to disclose it.

27        That raises one final issue and that is the position that the trustee in bankruptcy has taken. It is the trustee's position that upon payment of the creditors claims in full, the B.C. proceeding should be assigned to Mr.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellAlta 2197, 2010 ABQB 701, [2011] A.W.L.D. 197, [2011] A.W.L.D. 196, 73 C.B.R. (5th) 112, 36
Alta. L.R. (5th) 385, [2011] 4 W.W.R. 756, 497 A.R. 146, 194 A.C.W.S. (3d) 724

Carlson so that he can litigate the matter to a conclusion. A bankruptcy trustee is an officer of the Court. Ordin-
arily a trustee should be given great deference. As found in *Hoque, Re* (1996), 38 C.B.R. (3d) 133 (N.S. C.A.), a
bankruptcy trustee is required to perform a broad range of duties and the Court is not to interfere in the business
decisions which the trustee make. However, the Court retains a supervisory role and it is the Court that
must ensure the proper administration of justice. In this case, the trustee's role is to ensure the creditor's claim is
paid. I must take a broader view of the behaviour of Mr. Carlson and the impact on the proper administration of
justice if I condone it. What Mr. Carlson did was abuse of this Court's process and he ought not now to be re-
warded by having the B.C. proceedings assigned to him.

28      In conclusion, I will reappoint the trustee as trustee in bankruptcy of Jack Carlson. In exchange for pay-
ment of a sum equal to the amount of Mr. Carlson's creditors, the trustee is to provide a release to Jane Carlson
of any claim to the B.C. property.

*Order accordingly.*

## Appendix 1

1. *New Hampshire v. Maine*, 532 U.S. 742 (U.S. Sup. Ct. 2001)

2. *Payless Wholesale Distributors Inc. v. Alberto Culver (P.R.) Inc.*, 989 F.2d 570 (U.S. C.A. 1st Cir. 1993)

3. *Krystal Cadillac-Oldsmobile GMC Truck Inc. v. General Motors Corp.*, 337 F.3d 314 (U.S. C.A. 3rd Cir. 2003)

4. *Superior Crewboats Inc., Re*, 374 F.3d 330 (U.S. C.A. 2004)

5. *Eastman v. Union Pacific Railroad Co.*, 493 F.3d 1151 (U.S. C.A. 10th Cir. 2007)

6. *Burnes v. Pemco Aeroplex Inc.*, 291 F.3d 1282 (U.S. C.A. 11th Cir. 2002)

7. *Robinson v. Tyson Foods Inc.*, 595 F.3d 1269 (U.S. C.A. 11th Cir. 2010)

8. *Moses v. Howard University Hospital*, 606 F.3d 789 (U.S. C.A. D.C. 2010)

9. *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355 (U.S. C.A. 3rd Cir. 1996)

10. *Parker v. Wendy International Inc.*, 365 F.3d 1268 (U.S. C.A. 11th Cir. 2004)

11. *Traci Cannon-Stokes v. Potter*, 453 F.3d 446 (U.S. C.A. 7th Cir. 2006)

12. *United States of America v. 49.01 Acres of Land*, 802 F.2d 387 (U.S. C.A. 10th Cir. 1986)

13. *Barger v. Georgia (Cartersville City)*, 348 F.3d 1289 (U.S. C.A. 11th Cir. 2003)

FN* A corrigendum issued by the court on November 16, 2010 has been incorporated herein.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2010 CarswellAlta 2197, 2010 ABQB 701, [2011] A.W.L.D. 197, [2011] A.W.L.D. 196, 73 C.B.R. (5th) 112, 36 Alta. L.R. (5th) 385, [2011] 4 W.W.R. 756, 497 A.R. 146, 194 A.C.W.S. (3d) 724

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 73

2012 CarswellAlta 1032, 2012 ABCA 173, 90 C.B.R. (5th) 328, [2012] A.W.L.D. 3122, [2012] A.W.L.D. 3121, [2012] A.W.L.D. 3124, 62 Alta. L.R. (5th) 72, [2012] 9 W.W.R. 43, 219 A.C.W.S. (3d) 501, 533 A.R. 73, 557 W.A.C. 73

**H**

2012 CarswellAlta 1032, 2012 ABCA 173, 90 C.B.R. (5th) 328, [2012] A.W.L.D. 3122, [2012] A.W.L.D. 3121, [2012] A.W.L.D. 3124, 62 Alta. L.R. (5th) 72, [2012] 9 W.W.R. 43, 219 A.C.W.S. (3d) 501, 533 A.R. 73, 557 W.A.C. 73

Carlson, Re

Jack Carlson (Appellant / Applicant / Cross Respondent) and Jane Carlson (Respondent / Respondent / Cross Appellant)

Alberta Court of Appeal

Ronald Berger, Peter Martin, Patricia Rowbotham JJ.A.

Heard: November 10, 2011
Judgment: June 13, 2012
Docket: Calgary Appeal 1101-0092-AC

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: reversing *Carlson, Re* (2010), 36 Alta. L.R. (5th) 385, *(sub nom. Carlson (Bankrupt), Re v.)* 497 A.R. 146, [2011] 4 W.W.R. 756, 2010 ABQB 701, 2010 CarswellAlta 2197, 73 C.B.R. (5th) 112 (Alta. Q.B.)

Counsel: P.R. Leveque for Appellant

G.N. Kent for Respondent

Subject: Insolvency; Property

Bankruptcy and insolvency --- Avoidance of transactions prior to bankruptcy — Miscellaneous

Bankrupt transferred property in British Columbia to brother and sister-in-law and received promissory note and security agreement in exchange — Several years later, bankrupt began bankruptcy proceedings — Potential interest in BC property was not disclosed — Bankrupt was discharged — Bankrupt approached sister-in-law to discuss compensation for BC property — No money was paid — Bankrupt commenced action to enforce alleged written agreement and sister-in-law countersued to enforce alleged oral agreement — Sister-in-law applied for summary judgment arguing that because bankrupt's property had vested in bankruptcy trustee, it was only trustee that could enforce rights attached to BC property — Bankrupt and sister-in-law both applied for order reappointing trustee — Bankrupt sought assignment of right to BC action in exchange for sum equal to full amount owing to his creditors and sister-in-law sought release in exchange for same sum — Chambers judge concluded that bankrupt abused Court's process and denied bankrupt's application, granting relief sought by sister-in-law — Bankrupt appealed — Sister-in-law cross-appealed chambers judge's failure to apply doctrine of judicial estoppel — Appeal allowed and cross-appeal dismissed — Result of refusing to approve bankrupt's application was to

2012 CarswellAlta 1032, 2012 ABCA 173, 90 C.B.R. (5th) 328, [2012] A.W.L.D. 3122, [2012] A.W.L.D. 3121, [2012] A.W.L.D. 3124, 62 Alta. L.R. (5th) 72, [2012] 9 W.W.R. 43, 219 A.C.W.S. (3d) 501, 533 A.R. 73, 557 W.A.C. 73

prevent bankrupt from taking carriage of BC action and that conclusion failed to take into account express provisions of Bankruptcy and Insolvency Act and in particular s. 144 — Upon payment of $139,973.49 bankrupt, subject to approval of court, would be entitled to assignment of cause of action in BC — Order of chambers judge was set aside.

Bankruptcy and insolvency --- Property of bankrupt — Miscellaneous

Bankrupt transferred property in British Columbia to brother and sister-in-law and received promissory note and security agreement in exchange — Several years later, bankrupt began bankruptcy proceedings — Potential interest in BC property was not disclosed — Bankrupt was discharged — Bankrupt approached sister-in-law to discuss compensation for BC property — No money was paid — Bankrupt commenced action to enforce alleged written agreement and sister-in-law countersued to enforce alleged oral agreement — Sister-in-law applied for summary judgment arguing that because bankrupt's property had vested in bankruptcy trustee, it was only trustee that could enforce rights attached to BC property — Bankrupt and sister-in-law both applied for order reappointing trustee — Bankrupt sought assignment of right to BC action in exchange for sum equal to full amount owing to his creditors and sister-in-law sought release in exchange for same sum — Chambers judge concluded that bankrupt abused Court's process and denied bankrupt's application, granting relief sought by sister-in-law — Bankrupt appealed — Sister-in-law cross-appealed chambers judge's failure to apply doctrine of judicial estoppel — Appeal allowed and cross-appeal dismissed — Result of refusing to approve bankrupt's application was to prevent bankrupt from taking carriage of BC action and that conclusion failed to take into account express provisions of Bankruptcy and Insolvency Act and in particular s. 144 — Upon payment of $139,973.49 bankrupt, subject to approval of court, would be entitled to assignment of cause of action in BC — Order of chambers judge was set aside.

Bankruptcy and insolvency --- Discharge of bankrupt — Annulment or rescission of discharge

Bankrupt transferred property in British Columbia to brother and sister-in-law and received promissory note and security agreement in exchange — Several years later, bankrupt began bankruptcy proceedings — Potential interest in BC property was not disclosed — Bankrupt was discharged — Bankrupt approached sister-in-law to discuss compensation for BC property — No money was paid — Bankrupt commenced action to enforce alleged written agreement and sister-in-law countersued to enforce alleged oral agreement — Sister-in-law applied for summary judgment arguing that because bankrupt's property had vested in bankruptcy trustee, it was only trustee that could enforce rights attached to BC property — Bankrupt and sister-in-law both applied for order reappointing trustee — Bankrupt sought assignment of right to BC action in exchange for sum equal to full amount owing to his creditors and sister-in-law sought release in exchange for same sum — Chambers judge concluded that bankrupt abused Court's process and denied bankrupt's application, granting relief sought by sister-in-law — Bankrupt appealed — Appeal allowed — Order of chambers judge was set aside — Test was made out — Bankrupt's intent was that Registrar would act upon bankrupt's false representations and grant discharge, notwithstanding his failure to disclose asset in question — There could be no question that Registrar proceeded under misapprehension to detriment of administration of justice — Order as made pursuant to s. 180(2) of Bankruptcy and Insolvency Act, or in alternative s. 187(5) of Act, that discharge granted to bankrupt be annulled.

   **Cases considered by _Ronald Berger J.A._:**

_Bank of Montreal v. River Rentals Group Ltd._ (2010), 18 Alta. L.R. (5th) 201, 63 C.B.R. (5th) 26, 470 W.A.C. 333, 469 A.R. 333, 2010 ABCA 16, 2010 CarswellAlta 57 (Alta. C.A.) — referred to

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellAlta 1032, 2012 ABCA 173, 90 C.B.R. (5th) 328, [2012] A.W.L.D. 3122, [2012] A.W.L.D. 3121, [2012] A.W.L.D. 3124, 62 Alta. L.R. (5th) 72, [2012] 9 W.W.R. 43, 219 A.C.W.S. (3d) 501, 533 A.R. 73, 557 W.A.C. 73

*D'Alimonte v. Porretta* (2010), 2010 ONSC 2510, 2010 CarswellOnt 10718, 77 C.B.R. (5th) 111 (Ont. S.C.J.) — referred to

*D'Alimonte v. Porretta* (2011), 2011 ONCA 307, 2011 CarswellOnt 2609, 77 C.B.R. (5th) 298 (Ont. C.A.) — referred to

*De Grandpré, Re* (1969), 15 C.B.R. (N.S.) 262, 1969 CarswellQue 37 (Que. S.C.) — considered

*Delaney, Re* (1995), 36 C.B.R. (3d) 27, 13 B.C.L.R. (3d) 50, 1995 CarswellBC 884 (B.C. S.C.) — referred to

*Elias v. Hutchison* (1980), 35 C.B.R. (N.S.) 30, *(sub nom. Catalina Exploration & Development Ltd. v. Hutchison)* 27 A.R. 13, 12 Alta. L.R. (2d) 241, 1980 CarswellAlta 169 (Alta. Q.B.) — referred to

*Fackler v. Patterson* (1948), 14 C.B.R. (N.S.) 152, 1948 CarswellOnt 95 (Ont. Bktcy.) — referred to

*Hoque, Re* (1996), 38 C.B.R. (3d) 133, *(sub nom. Hoque (Bankrupt), Re)* 429 A.P.R. 142, *(sub nom. Hoque (Bankrupt), Re)* 148 N.S.R. (2d) 142, 1996 CarswellNS 51 (N.S. C.A.) — referred to

*Lannigan, Re* (2008), 49 C.B.R. (5th) 183, *(sub nom. Lannigan (Bankrupt), Re)* 271 N.S.R. (2d) 361, *(sub nom. Lannigan (Bankrupt), Re)* 867 A.P.R. 361, 2008 CarswellNS 658, 2008 NSSC 348 (N.S. S.C.) — considered

*LeBlanc, Re* (2007), 2007 NSSC 18, 2007 CarswellNS 27, 27 C.B.R. (5th) 299, 796 A.P.R. 225, 250 N.S.R. (2d) 225 (N.S. S.C.) — considered

*MLA Northern Contracting Ltd. v. LeBrun* (2007), 2007 CarswellOnt 6594, 39 C.B.R. (5th) 95 (Ont. S.C.J.) — considered

*Royal Bank v. Soundair Corp.* (1991), 7 C.B.R. (3d) 1, 83 D.L.R. (4th) 76, 46 O.A.C. 321, 4 O.R. (3d) 1, 1991 CarswellOnt 205 (Ont. C.A.) — referred to

**Statutes considered:**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3

Generally — referred to

s. 40 — referred to

s. 40(1) — considered

s. 40(2) — considered

s. 71 — referred to

s. 144 — considered

s. 158 — considered

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellAlta 1032, 2012 ABCA 173, 90 C.B.R. (5th) 328, [2012] A.W.L.D. 3122, [2012] A.W.L.D. 3121, [2012] A.W.L.D. 3124, 62 Alta. L.R. (5th) 72, [2012] 9 W.W.R. 43, 219 A.C.W.S. (3d) 501, 533 A.R. 73, 557 W.A.C. 73

      s. 158(a) — considered

      s. 158(f) — considered

      s. 158(g) — considered

      s. 180 — considered

      s. 180(2) — considered

      s. 187(5) — considered

      s. 198 — considered

      s. 198(2) — considered

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194

      Generally — referred to

APPEAL by bankrupt from judgment reported at *Carlson, Re* (2010), 36 Alta. L.R. (5th) 385, *(sub nom. Carlson (Bankrupt), Re v.)* 497 A.R. 146, [2011] 4 W.W.R. 756, 2010 ABQB 701, 2010 CarswellAlta 2197, 73 C.B.R. (5th) 112 (Alta. Q.B.).

***Ronald Berger J.A.:***

1     This appeal concerns the ownership of a 44 acre parcel of land located near Elko, British Columbia, valued in excess of $1 million. The Appellant, Jack Carlson, who acquired the property in the early 1980's, maintains that he is the present beneficial owner. The Respondent, Jane Carlson, was married to the Appellant's late brother and became the registered legal owner of the property when her husband passed away on December 17, 2003.

2     Around September 1990, Ernie and Jane Carlson moved onto the property. On December 24, 1997, the Appellant transferred the property to them. The terms of that agreement are disputed. The Appellant claims the property was sold for $1 and that the transfer was designed to give the Respondent and her husband a tax advantage. The Appellant maintains that it was understood that a reverse transfer of land would be executed for use at a later date. That never happened. It is conceded that no money has ever been paid for the property.

3     In June 2000, the Respondent drafted a Promissory Note in the Appellant's favour for the sum of $72,000. At the same time, she drafted a "Security Agreement" signed January 7, 2001 which provided that the BC property was security for the Promissory Note. The Appellant maintains that the Promissory Note was intended to secure an indebtedness for unauthorized logging operations and the resulting revenue the Respondent gleaned. On the other hand, the Respondent says that the $72,000 Promissory Note evidences the agreement made when she and her late husband acquired the legal title in 1997 to purchase the property for $70,000.

4     On April 11, 2003, the Appellant made an assignment in bankruptcy. He claimed assets of $17,000 in his statement of affairs and made no mention of the BC property. He disclosed a debt of $90,000 to the Canada Cus-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellAlta 1032, 2012 ABCA 173, 90 C.B.R. (5th) 328, [2012] A.W.L.D. 3122, [2012] A.W.L.D. 3121, [2012] A.W.L.D. 3124, 62 Alta. L.R. (5th) 72, [2012] 9 W.W.R. 43, 219 A.C.W.S. (3d) 501, 533 A.R. 73, 557 W.A.C. 73

toms and Revenue Agency. The Appellant was discharged on May 2, 2004 and the trustee was discharged on March 2, 2005.

5      The Appellant's failure to disclose his claimed beneficial interest in the property was not the subject of consistent explanation. First he said he had forgotten, and later maintained that he had disclosed the beneficial interest in the property to the trustee who, he asserts, advised him that there was no need to disclose it.

6      In June 2007, the Appellant approached the Respondent to discuss compensation for the BC property. Originally, the Respondent offered to pay $200,000. The parties dispute whether this offer was accepted. In any event, a written agreement was later signed in which the Respondent agreed to pay $600,000 for the property - $200,000 due immediately, and the other $400,000 to be paid at the Respondent's death out of the eventual sale of the property. Again, no monies were paid.

7      On August 23, 2007, the Appellant commenced an action in British Columbia to enforce the alleged $600,000 agreement. On December 5, 2007, the Respondent countersued to enforce the alleged $200,000 oral agreement.

8      In the course of discoveries in these lawsuits, the Appellant's bankruptcy came to light. On August 18, 2008, the Respondent brought an application for summary judgment arguing that because the Appellant's property had vested in the bankruptcy trustee, it was only the trustee that could enforce rights attached to the BC property.

9      After some negotiations between the Appellant and the trustee, it was agreed that, subject to Court approval and provided that the Appellant advance sufficient funds from the litigation to ensure that all creditors would be paid, the Appellant would receive an assignment of the right to pursue the BC claim in exchange for $140,000. On December 8, 2008, the Respondent offered to pay the same amount to the trustee in exchange for a release.

10      Applications were then brought by both the Appellant and the Respondent for an order reappointing the trustee. The Appellant sought an assignment of the right to the BC action in exchange for a sum equal to the full amount owing to his creditors. The Respondent in turn sought a release in exchange for the same sum. The matter came before the chambers judge sitting in bankruptcy. The Respondent argued that the Appellant should not be allowed to have the right to sue assigned to him because of his failure to disclose his claim to the BC property during the bankruptcy proceedings. She argued that the American doctrine of judicial estoppel should be adopted and applied. The Appellant in turn argued that the doctrine should not be adopted in Canada and that he should be allowed to proceed with his claim provided the creditors were made whole.

11      The chambers judge determined that there were two issues before her: first, whether the doctrine of judicial estoppel applied in Canada, and second, whether she could make a decision about the Appellant's failure to disclose his interest in the BC property to the trustee on the basis of affidavit evidence. With regard to the first question, she determined that in certain circumstances the doctrine of judicial estoppel might apply in Canadian law, but it was incompatible with the law of bankruptcy. In particular, she found that because the property of the bankrupt vested in the trustee, and the trustee was not taking an inconsistent position with respect to a previous claim, the doctrine could not apply. She found, however, that she could apply the law relating to abuse of process to achieve the same result. She held, at para. 25 of her reasons:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellAlta 1032, 2012 ABCA 173, 90 C.B.R. (5th) 328, [2012] A.W.L.D. 3122, [2012] A.W.L.D. 3121, [2012] A.W.L.D. 3124, 62 Alta. L.R. (5th) 72, [2012] 9 W.W.R. 43, 219 A.C.W.S. (3d) 501, 533 A.R. 73, 557 W.A.C. 73

> ... The notion of abuse of process permits a judge to take steps which will ensure the proper administration of justice. It avoids the perversion of the judicial machinery which would result if the Court permitted a litigant to take a position in one proceeding which is inconsistent with that taken in a previous piece of litigation. In the context of a bankruptcy, it permits the judge to supervise the activities of a bankrupt who has failed to disclose property in his bankruptcy proceedings and then attempts to reap the benefits of that property subsequent to his discharge.

12      She then turned to the issue of whether she could make a finding that the Appellant's failure to disclose his interest in the BC property was deliberate on the basis of the affidavit evidence before her. She found that the Appellant had given three contradictory statements under oath about the disclosure of his interest. She found that the third statement - that he had told the trustee about his interest, and that the trustee had told him it did not need to be disclosed - was contradicted by the trustee's evidence. She found that there was enough evidence before her without the benefit of a *viva voce* hearing to enable her to make a decision about the Appellant's intentions at the time of the bankruptcy. She went on to conclude that the Appellant knew about his now asserted beneficial interest at the time of the bankruptcy proceedings and deliberately chose not to disclose it.

13      The chambers judge acknowledged the role of the trustee in sanctioning the assignment to the Appellant provided the creditors were paid. While she found that the trustee was an officer of the Court whose opinion was entitled to deference, she also noted that whereas he was appointed to serve the interests of the creditors, the Court had a broader supervisory role in ensuring the proper administration of justice. She concluded that the Appellant abused "[the] Court's process and he ought not now to be rewarded by having the B.C. proceedings assigned to him." (para. 27). She denied the Appellant's application and granted the relief sought by the Respondent. Thus, she reappointed the trustee and ordered him to provide the Respondent with a release upon the payment of a sum equal to the amount owed to the Appellant's creditors.

**Grounds of Appeal**

14      The Appellant advances the following grounds of appeal:

>    1. The chambers judge erred in disregarding the trustee's recommendation.

>    2. The chambers judged erred in finding that the Appellant intentionally failed to disclose his interest in the property to the trustee.

>    3. The chambers judge erred in finding there was an abuse of process.

>    4. The remedy granted by the chambers judge was inappropriate in all of the circumstances.

The Respondent has cross-appealed the chambers judge's failure to apply the doctrine of judicial estoppel.

**Analysis**

15      The main issue on this appeal is whether the chambers judge sitting in bankruptcy properly exercised her discretion to refuse to approve the recommendation of the trustee in bankruptcy to assign the cause of action to the discharged bankrupt, and in ordering the settlement of the claim with the Respondent. (For reasons that will emerge apparent, judicial estoppel need not be considered.)

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellAlta 1032, 2012 ABCA 173, 90 C.B.R. (5th) 328, [2012] A.W.L.D. 3122, [2012] A.W.L.D. 3121, [2012] A.W.L.D. 3124, 62 Alta. L.R. (5th) 72, [2012] 9 W.W.R. 43, 219 A.C.W.S. (3d) 501, 533 A.R. 73, 557 W.A.C. 73

16    The following principles of law apply:

> 1. Upon bankruptcy, all the property of the bankrupt vests in the trustee in bankruptcy and the bankrupt ceases to have any capacity to deal with the property (*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 (the "*Act*"), s. 71)

> 2. The *Act* places a duty on the bankrupt to disclose all property in order to allow the trustee to realize against these assets for the benefit of the bankrupt estate (s. 158 of the *Act*).

> 3. A trustee can be re-appointed to realize against previously undisclosed assets for the benefit of the bankrupt estate.

17    Mindful of the findings of fact of the chambers judge, the relevant inquiry is whether, in the light of the intentional non-disclosure of assets, this Court can properly prevent the bankrupt from benefiting from an assignment of the claim by the trustee. Inspectors were not appointed in respect of this bankruptcy in April 2003 and, accordingly, Court approval of the assignment of the claim is a prerequisite: *Delaney, Re* (1995), 36 C.B.R. (3d) 27 (B.C. S.C.) at para. 26.

18    The trustee has a duty to act with integrity and in a reasonable and competent manner as an officer of the Court: *Hoque, Re* (1996), 148 N.S.R. (2d) 142 (N.S. C.A.) at para. 34. The trustee must exercise reasonable business judgment in realizing the assets of the bankrupt. This responsibility includes not only getting the best possible price for the benefit of the creditors of the estate, but also a duty to defend the integrity of the bankruptcy process (*Hoque, Re* at para. 45, citing with approval an article by Al Lando entitled *Sale of Assets by a Trustee; The Fundamental Pragmatics* (1991), 3 C.B.R. (3d) 179 at 181).

19    The failure to disclose a significant asset without a specific finding of fraud has been held to be sufficient to prevent a discharged bankrupt from reacquiring the asset from the trustee as property not capable of realization under s. 40 of the *Act*. Houlden et al. in *The 2011 Annotated Bankruptcy and Insolvency Act*, (Toronto: Carswell, 2011), explain at p. 121:

> Where a trustee was discharged and the bankrupt had not disclosed an interest in litigation, and the discharged trustee became aware of the civil action, it obtained an order in the bankruptcy action reappointing it as trustee pursuant to s. 41(11) of the *BIA* and subsequently reached a settlement in the civil action. The court dismissed the bankrupt's claim to the proceeds on the basis that the civil action claim existed prior to the bankruptcy, had vested in the trustee, and had never been returned to the bankrupt; hence, the bankrupt had no further right or entitlement to deal with the asset:

> *MLA Northern Contracting Ltd. v. LeBrun* (2007), 2007 CarswellOnt 6594, 39 C.B.R. (5th) 95; additional reasons at (2008), 2008 CarswellOnt 2727, 42 C.B.R. (5th) 238 (Ont. S.C.J.); affirmed (2008), 2008 CarswellOnt 2453, 41 C.B.R. (5th) 168 (Ont. C.A.)

20    Sections 40(1) and (2) of the *Act* read as follows:

> 40(1) Any property of a bankrupt that is listed in the statement of affairs referred to in paragraph 158(d) or otherwise disclosed to the trustee before the bankrupt's discharge and that is found incapable of realization must be returned to the bankrupt before the trustee's application for discharge, but if inspectors have been appointed, the trustee may do so only with their permission.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellAlta 1032, 2012 ABCA 173, 90 C.B.R. (5th) 328, [2012] A.W.L.D. 3122, [2012] A.W.L.D. 3121, [2012] A.W.L.D. 3124, 62 Alta. L.R. (5th) 72, [2012] 9 W.W.R. 43, 219 A.C.W.S. (3d) 501, 533 A.R. 73, 557 W.A.C. 73

> (2) Where a trustee is unable to dispose of any property as provided in this section, the court may make such order as it may consider necessary.

21      In *MLA Northern Contracting Ltd. v. LeBrun* (2007), 39 C.B.R. (5th) 95 (Ont. S.C.J.) at paras. 65 and 67, the Court, mindful of these provisions, added this important qualification:

> 65. A discharged bankrupt has no right or entitlement to deal with his or her prior assets. The discharge of the Trustee and of the bankrupt does not have the automatic effect of reverting proprietary rights to the bankrupt. ... There is no question that the claimed interest in question existed prior to the bankruptcy and that it was not claimed as part of the bankruptcy. ...

> 67 ... It is in the normal course of business for trustees to determine whether an asset is realizable and obviously to do so the trustee must have knowledge of it. This property cannot be determined to be 'property incapable of realization' such as to require it revert to the bankrupt in accordance with s. 40(1) of the *BIA*.

22      The duties of the Court in reviewing a proposed sale or settlement of assets by a receiver that is opposed by other interested parties have been described and applied generally as follows: *Royal Bank v. Soundair Corp.* (1991), 7 C.B.R. (3d) 1, 83 D.L.R. (4th) 76 (Ont. C.A.) at para. 16; *Bank of Montreal v. River Rentals Group Ltd.* (2010), 18 Alta. L.R. (5th) 201, 63 C.B.R. (5th) 26 (Alta. C.A.) at para. 12:

> (i) it should consider whether the receiver has made a sufficient effort to obtain the best price and has not acted improvidently;

> (ii) it should consider the interests of all parties;

> (iii) it should consider the efficacy and integrity of the process by which offers have been obtained; and

> (iv) it should consider whether there has been unfairness in the working out of the process.

23      The Ontario Court of Appeal recently affirmed the decision of a chambers judge to stay the civil claim of a bankrupt plaintiff who had failed to disclose the cause of action in bankruptcy (*D'Alimonte v. Porretta*, 2010 ONSC 2510 (Ont. S.C.J.), aff'd 2011 ONCA 307 (Ont. C.A.)). In *D'Alimonte v. Porretta*, Ms. D'Alimonte brought an action in 2002, one year after her discharge from bankruptcy, alleging a joint venture or equitable trust claim in a dental clinic operated by the defendants. In her Statement of Affairs, she did not disclose any interest in her wholly owned corporate plaintiff, the corporate defendant or the alleged joint venture. Nevertheless, upon becoming aware of the action and concluding that it would likely have been an unrealizable asset of the estate, the trustee consented to allow Ms. D'Alimonte to bring the claim. While the chambers judge noted that deference is generally accorded to the business decisions of the trustee, judicial discretion must also ensure that positions taken by trustees are in accordance with the law (paras. 29-30). In concluding that the civil action was a "nullity" from the outset, the chambers judge explained (at para. 10):

> Ms. D'Alimonte should not be able to benefit from her own wrong. She should not be able to rely upon her false statements to the trustee in bankruptcy to pursue her claim now, with an effective date for commencement of the proceedings back in 2002.

24      In dismissing an appeal by Ms. D'Alimonte, the Ontario Court of Appeal held that even if the claim had not been a "nullity from the outset", the chambers judge properly exercised his discretion under the *Bankruptcy and Insolvency Act* or the Ontario *Rules of Civil Procedure* to refuse to regularize the civil proceedings (para.

2012 CarswellAlta 1032, 2012 ABCA 173, 90 C.B.R. (5th) 328, [2012] A.W.L.D. 3122, [2012] A.W.L.D. 3121, [2012] A.W.L.D. 3124, 62 Alta. L.R. (5th) 72, [2012] 9 W.W.R. 43, 219 A.C.W.S. (3d) 501, 533 A.R. 73, 557 W.A.C. 73

19). Further, the Court held that it was open to the chambers judge to find that Ms. D'Alimonte had knowingly failed to disclose her purported interest in the joint venture, as the largest potential asset of her estate, on the basis of the circumstantial evidence in the case (paras. 20-21).

25      The result of refusing to approve the application of Jack Carlson in the case at bar was to prevent the bankrupt from taking carriage of the BC action (which had been brought by the Appellant before bankruptcy proceedings were initiated and which, accordingly, was not a nullity). That conclusion failed to take account of the express provisions of the *Act* and, in particular, s. 144 which reads as follows:

> The bankrupt, or the legal personal representative or heirs of a deceased bankrupt, is entitled to any surplus remaining after payment in full of the bankrupt's creditors with interest as provided by this Act and of the costs, charges and expenses of the bankruptcy proceedings.

It follows that it was also an error to approve the Respondent's competing bid.

26      The decision of the chambers judge was predicated on her concern that the bankrupt should not be allowed to take the benefit of an asset that was not properly disclosed in the bankruptcy process. In my view, the failure to disclose constitutes an "abuse" of the bankruptcy process and runs afoul of the policy concern that the integrity of bankruptcy proceedings be jealously guarded. A cause of action that had been concealed should not, without more, be assigned to a defalcating bankrupt notwithstanding s. 144.

27      The Appellant submits that the remedy sought and obtained by the Respondent in the Court below results in a windfall to her. However, duplicitous conduct in the course of bankruptcy proceedings must not be condoned. Were the Appellant permitted to reap the benefits of the undisclosed asset beyond the amount required to pay outstanding debts, he would profit from his delict. Preservation of the integrity of the bankruptcy proceedings is the paramount consideration in such circumstances.

28      It follows that in the case at bar, upon payment of the sum of $139,973,49, Jack Carlson, subject to the approval of the Court, would be entitled to an assignment of the cause of action in British Columbia. That said, the Court, in keeping with its duty to maintain the integrity of the bankruptcy process, must be mindful of the duties of a bankrupt as set out in s. 158 of the *Act* and is bound to consider whether the bankrupt has complied with those duties. They include:

> (a) make discovery of and deliver all his property that is under his possession or control to the trustee or to any person authorized by the trustee to take possession of it or any part thereof;

> . . .

> (f) make disclosure to the trustee of all property disposed of within the period beginning on the day that is one year before the date of the initial bankruptcy event or beginning on such other antecedent date as the court may direct, and ending on the date of the bankruptcy, both dates included, and how and to whom and for what consideration any part thereof was disposed of except such part as had been disposed of in the ordinary manner of trade or used for reasonable personal expenses;

> (g) make disclosure to the trustee of all property disposed of by gift or settlement without adequate valuable consideration within the period beginning on the day that is five years before the date of the initial bankruptcy event and ending on the date of the bankruptcy, both dates included;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellAlta 1032, 2012 ABCA 173, 90 C.B.R. (5th) 328, [2012] A.W.L.D. 3122, [2012] A.W.L.D. 3121, [2012] A.W.L.D. 3124, 62 Alta. L.R. (5th) 72, [2012] 9 W.W.R. 43, 219 A.C.W.S. (3d) 501, 533 A.R. 73, 557 W.A.C. 73

29    Indeed, pursuant to s. 198 of the *Act*, any bankrupt who makes a false entry or knowingly makes a material omission in a statement or accounting is guilty of an offence and is liable on summary conviction to a fine not exceeding $5,000 or to imprisonment for a term not exceeding one year, or to both. (If proceeding by indictment the fine and term of imprisonment is greater). Moreover, pursuant to s. 198(2) of the *Act*, a bankrupt who, without reasonable cause, fails to do any of the things required of him under s. 158, is also guilty of an offence and is liable on summary conviction to a fine not exceeding $5,000 or to imprisonment for a term not exceeding one year, or to both. (If proceeding by indictment the fine is greater and the term of imprisonment is greater). There is no indication in the record that any such proceedings have been brought against the Appellant.

30    The Court, however, enjoys the broad discretion and may, in some circumstances, annul the bankrupt's discharge. Cases in which the Registrar has acted to annul a discharge include *LeBlanc, Re* (2007), 27 C.B.R. (5th) 299 (N.S. S.C.) and *Lannigan, Re* (2008), 49 C.B.R. (5th) 183 (N.S. S.C.); and *De Grandpré, Re* (1969), 15 C.B.R. (N.S.) 262 (Que. S.C.).

31    In *De Grandpré, Re*, a bankrupt knowingly and willfully failed to disclose all his assets to the trustee. The Court found that if the Court hearing the application for discharge had been aware of all the facts, a completely differently discharge order would have been made. In such circumstances, the Court held that the conduct of the bankrupt came within s. 180(2) and annulled the discharge.

32    Section 180 of the *Act* reads as follows:

    180(1) Where a bankrupt after his discharge fails to perform the duties imposed on him by this Act, the court may, on application, annul his discharge.

    (2) Where it appears to the court that the discharge of a bankrupt was obtained by fraud, the court may, on application, annul his discharge.

    (3) An order revoking or annulling the discharge of a bankrupt does not prejudice the validity of a sale, disposition of property, payment made or thing duly done before the revocation or annulment of the discharge.

33    Houlden et al. explain that (at p. 800):

    Fraud is usually the result of a fraudulent misrepresentation. A fraudulent misrepresentation is proved when it is shown that a false representation has been made by the bankrupt knowingly, or without belief in its truth, or recklessly, without caring whether it is true or false. ...

34    In the case at bar, that test is made out. Moreover, the Appellant's intent was that the Registrar would act upon Mr. Carlson's false representations and grant a discharge, notwithstanding his failure to disclose the asset in question. There can be no question that the Registrar, in the result, proceeded under a misapprehension to the detriment of the administration of justice.

35    Section 187(5) of the *Act* confers upon the Court an even broader jurisdiction. It reads:

    Every court may review, rescind or vary any order made by it under its bankruptcy jurisdiction.

36    Houlden, et al. explain that the jurisdiction given by s. 187(5) should be sparingly exercised; it must be carefully guarded and invoked only in appropriate circumstances: *Elias v. Hutchison* (1980), 12 Alta. L.R. (2d)

2012 CarswellAlta 1032, 2012 ABCA 173, 90 C.B.R. (5th) 328, [2012] A.W.L.D. 3122, [2012] A.W.L.D. 3121, [2012] A.W.L.D. 3124, 62 Alta. L.R. (5th) 72, [2012] 9 W.W.R. 43, 219 A.C.W.S. (3d) 501, 533 A.R. 73, 557 W.A.C. 73

241 (Alta. Q.B.). See also *Fackler v. Patterson* (1948), 14 C.B.R. (N.S.) 152 (Ont. Bktcy.) confirming the jurisdiction of the Registrar to rescind on the authority of s. 187(5).

37      In the light of the uncontradicted factual underpinnings, mindful of the aforementioned provisions of the *Act*, and the applicable principles set out in this judgment, it seems to me that the order made in the Court below should be set aside. It does not follow, however, that Jack Carlson is entitled, given his malfeasance, to unconditionally benefit were the recommendation of the trustee implemented. Jack Carlson is entitled to an assignment of the action in British Columbia where the competing claim of Jane Carlson will concurrently be considered upon payment to the trustee by Jack Carlson of the sum of $139,973.49, the amount required to make existing creditors whole. The trustee is authorized to pay out existing creditors forthwith upon receipt of those funds.

38      Mindful of the factual underpinnings, it is likely that the British Columbia litigation will be of some duration and complexity and will be quite expensive. Should Jack Carlson be unsuccessful, he may face an award of costs of some magnitude.

39      In my opinion, should that occur, keeping in mind that the disputed asset was not disclosed by Jack Carlson when it should have been, his discharge as a bankrupt should now be annulled and in the event that Mr. Carlson's litigation is unsuccessful and he is subject to an award of costs in British Columbia, the Registrar, upon an application by Mr. Carlson for a discharge, would then properly take account of whether Mr. Carlson had paid those costs.

40      The appeal is allowed. The order of the chambers judge is set aside. In the result, the order of this Court, pursuant to s. 180(2) or, in the alternative, s. 187(5) of the *Act*, is that the discharge granted to Jack Carlson be annulled. An order shall go assigning the British Columbia cause of action to Jack Carlson subject to the conditions set out in paras. 37 and 39 above.

41      In the light of the failure of the Appellant to disclose the disputed asset in the bankruptcy proceedings, the Respondent, whose cross-appeal is also dismissed, shall be entitled to one set of costs to be taxed. The assignment of the British Columbia action shall not be perfected until Jack Carlson has paid those costs.

*Peter Martin J.A.*:

I concur:

*Patricia Rowbotham J.A.*:

I concur:

*Appeal and cross-appeal dismissed.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 74

**NAV Canada, Greater Toronto Airports Authority, Winnipeg Airports Authority Inc., Halifax International Airport Authority, Edmonton Regional Airports Authority, Calgary Airport Authority, Aéroports de Montréal, Ottawa Macdonald-Cartier International Airport Authority, Vancouver International Airport Authority and St. John's International Airport Authority** *Appellants/Respondents on cross-appeals*

*v.*

**International Lease Finance Corporation, Hyr Här I Sverige Kommanditbolag, IAI X, Inc., Triton Aviation International LLC, Sierra Leasing Limited, ACG Acquisition XXV LLC, ILFC International Lease Finance Canada Ltd., U.S. Airways Inc., G.E. Capital Aviation Services Inc., as Agent and Manager for Polaris Holding Company and AFT Trust-Sub I, Pegasus Aviation Inc., PALS I, Inc., Ansett Worldwide Aviation, U.S.A., MSA V, RRPF Engine Leasing Limited, Canadian Imperial Bank of Commerce, Flight Logistics Inc., C.I.T. Leasing Corporation, NBB-Royal Lease Partnership One and GATX/CL Air Leasing Cooperative Association** *Respondents/ Appellants on cross-appeals*

————————

**NAV Canada** *Appellant*

*v.*

**Wilmington Trust Company and Wilmington Trust Corporation** *Respondents*

————————

**NAV Canada, Greater Toronto Airports Authority, Winnipeg Airports Authority Inc., Halifax International Airport Authority, Edmonton Regional Airports Authority, Calgary Airport Authority, Aéroports de Montréal, Ottawa Macdonald-Cartier International Airport Authority, Vancouver International Airport Authority et St. John's International Airport Authority** *Appelantes/intimées aux pourvois incidents*

*c.*

**International Lease Finance Corporation, Hyr Här I Sverige Kommanditbolag, IAI X, Inc., Triton Aviation International LLC, Sierra Leasing Limited, ACG Acquisition XXV LLC, ILFC International Lease Finance Canada Ltd., U.S. Airways Inc., G.E. Capital Aviation Services Inc., en qualité de mandataire et gestionnaire de Polaris Holding Company et AFT Trust-Sub I, Pegasus Aviation Inc., PALS I, Inc., Ansett Worldwide Aviation, U.S.A., MSA V, RRPF Engine Leasing Limited, Banque Canadienne Impériale de Commerce, Flight Logistics Inc., C.I.T. Leasing Corporation, NBB-Royal Lease Partnership One et GATX/CL Air Leasing Cooperative Association** *Intimées/ appelantes aux pourvois incidents*

————————

**NAV Canada** *Appelante*

*c.*

**Wilmington Trust Company et Wilmington Trust Corporation** *Intimées*

————————

RE CANADA 3000 INC.

**NAV Canada**   *Appellant*

*v.*

**G.I.E. Avions de transport régional, ATR Marketing Inc., Heather Leasing Corporation, Renaissance Leasing Corporation, Inter-Canadian (1991) Inc. and Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc.**   *Respondents*

———————

**NAV Canada**   *Appellant*

*v.*

**Inter-Canadian (1991) Inc., Wilmington Trust Company, Wilmington Trust Corporation, Aéroports de Montréal, Greater Toronto Airports Authority, Ottawa Macdonald-Cartier International Airport Authority and Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc.**   *Respondents*

- and -

**Aéroports de Montréal**   *Appellant*

*v.*

**Wilmington Trust Company, Wilmington Trust Corporation, NAV Canada, Greater Toronto Airports Authority, Ottawa Macdonald-Cartier International Airport Authority and Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc.**   *Respondents*

- and -

**Greater Toronto Airports Authority**   *Appellant*

*v.*

**NAV Canada**   *Appelante*

*c.*

**G.I.E. Avions de transport régional, ATR Marketing Inc., Heather Leasing Corporation, Renaissance Leasing Corporation, Inter-Canadien (1991) Inc. et Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc.**   *Intimées*

———————

**NAV Canada**   *Appelante*

*c.*

**Inter-Canadien (1991) Inc., Wilmington Trust Company, Wilmington Trust Corporation, Aéroports de Montréal, Greater Toronto Airports Authority, Ottawa Macdonald-Cartier International Airport Authority et Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc.**   *Intimées*

- et -

**Aéroports de Montréal**   *Appelante*

*c.*

**Wilmington Trust Company, Wilmington Trust Corporation, NAV Canada, Greater Toronto Airports Authority, Ottawa Macdonald-Cartier International Airport Authority et Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc.**   *Intimées*

- et -

**Greater Toronto Airports Authority**   *Appelante*

*c.*

**Ottawa Macdonald-Cartier International Airport Authority, Wilmington Trust Company, Wilmington Trust Corporation, Aéroports de Montréal, NAV Canada, Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc. and Inter-Canadian (1991) Inc.** *Respondents*

- and -

**Ottawa Macdonald-Cartier International Airport Authority** *Appellant*

*v.*

**Wilmington Trust Company, Wilmington Trust Corporation and Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc.** *Respondents*

_____

**NAV Canada** *Appellant*

*v.*

**Inter-Canadian (1991) Inc., Renaissance Leasing Corporation, Heather Leasing Corporation, G.I.E. Avions de transport régional, ATR Marketing Inc., Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc., Aéroports de Montréal, Greater Toronto Airports Authority and Ottawa Macdonald-Cartier International Airport Authority** *Respondents*

- and -

**Aéroports de Montréal** *Appellant*

*v.*

**Renaissance Leasing Corporation, Heather Leasing Corporation, G.I.E. Avions**

**Ottawa Macdonald-Cartier International Airport Authority, Wilmington Trust Company, Wilmington Trust Corporation, Aéroports de Montréal, NAV Canada, Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc. et Inter-Canadien (1991) Inc.** *Intimées*

- et -

**Ottawa Macdonald-Cartier International Airport Authority** *Appelante*

*c.*

**Wilmington Trust Company, Wilmington Trust Corporation et Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc.** *Intimées*

_____

**NAV Canada** *Appelante*

*c.*

**Inter-Canadien (1991) Inc., Renaissance Leasing Corporation, Heather Leasing Corporation, G.I.E. Avions de transport régional, ATR Marketing Inc., Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc., Aéroports de Montréal, Greater Toronto Airports Authority et Ottawa Macdonald-Cartier International Airport Authority** *Intimées*

- et -

**Aéroports de Montréal** *Appelante*

*c.*

**Renaissance Leasing Corporation, Heather Leasing Corporation, G.I.E. Avions de**

RE CANADA 3000 INC.

de transport régional, ATR Marketing Inc., Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc., NAV Canada, Greater Toronto Airports Authority and Ottawa Macdonald-Cartier International Airport Authority   *Respondents*

- and -

**Greater Toronto Airports Authority**   *Appellant*

*v.*

**Ottawa Macdonald-Cartier International Airport Authority, Renaissance Leasing Corporation, Heather Leasing Corporation, G.I.E. Avions de transport régional, ATR Marketing Inc., Aéroports de Montréal, NAV Canada, Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc. and Inter-Canadian (1991) Inc.**   *Respondents*

- and -

**Ottawa Macdonald-Cartier International Airport Authority**   *Appellant*

*v.*

**Renaissance Leasing Corporation, Heather Leasing Corporation, G.I.E. Avions de transport régional, ATR Marketing Inc. and Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc.**   *Respondents*

———————

**Aéroports de Montréal**   *Appellant*

*v.*

transport régional, ATR Marketing Inc., Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc., NAV Canada, Greater Toronto Airports Authority et Ottawa Macdonald-Cartier International Airport Authority   *Intimées*

- et -

**Greater Toronto Airports Authority**   *Appelante*

*c.*

**Ottawa Macdonald-Cartier International Airport Authority, Renaissance Leasing Corporation, Heather Leasing Corporation, G.I.E. Avions de transport régional, ATR Marketing Inc., Aéroports de Montréal, NAV Canada, Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc. et Inter-Canadien (1991) Inc.**   *Intimées*

- et -

**Ottawa Macdonald-Cartier International Airport Authority**   *Appelante*

*c.*

**Renaissance Leasing Corporation, Heather Leasing Corporation, G.I.E. Avions de transport régional, ATR Marketing Inc. et Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc.**   *Intimées*

———————

**Aéroports de Montréal**   *Appelante*

*c.*

RE CANADA 3000 INC.

**Wilmington Trust Company, Wilmington Trust Corporation and Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc.**   *Respondents*

———————

**Aéroports de Montréal**   *Appellant*

*v.*

**Newcourt Credit Group (Alberta) Inc., Canada Life Assurance Company, Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc. and Renaissance Leasing Corporation**   *Respondents*

———————

**Aéroports de Montréal**   *Appellant*

*v.*

**Newcourt Credit Group (Alberta) Inc., Canada Life Assurance Company, CCG Trust Corporation, Greater London International Airport Authority, Greater Toronto Airports Authority, Saint John Airport Inc., St. John's International Airport Authority, Charlottetown Airport Authority Inc., Renaissance Leasing Corporation, Heather Leasing Corporation and Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc.**   *Respondents*

- and -

**St. John's International Airport Authority and Charlottetown Airport Authority Inc.**   *Appellants*

*v.*

**Newcourt Credit Group (Alberta) Inc.,**

**Wilmington Trust Company, Wilmington Trust Corporation et Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc.**   *Intimées*

———————

**Aéroports de Montréal**   *Appelante*

*c.*

**Newcourt Credit Group (Alberta) Inc., Compagnie d'Assurance du Canada sur la Vie, Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc. et Renaissance Leasing Corporation**   *Intimées*

———————

**Aéroports de Montréal**   *Appelante*

*c.*

**Newcourt Credit Group (Alberta) Inc., Compagnie d'Assurance du Canada sur la Vie, CCG Trust Corporation, Greater London International Airport Authority, Greater Toronto Airports Authority, Saint John Airport Inc., St. John's International Airport Authority, Charlottetown Airport Authority Inc., Renaissance Leasing Corporation, Heather Leasing Corporation et Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc.**   *Intimées*

- et -

**St. John's International Airport Authority et Charlottetown Airport Authority Inc.**   *Appelantes*

*c.*

**Newcourt Credit Group (Alberta) Inc.,**

RE CANADA 3000 INC.

**Canada Life Assurance Company, CCG Trust Corporation, Renaissance Leasing Corporation, Heather Leasing Corporation, Canadian Regional Airlines Ltd., Canadian Regional (1998) Ltd. and Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc.** *Respondents*

- and -

**Greater Toronto Airports Authority** *Appellant*

*v.*

**Greater London International Airport Authority, Saint John Airport Inc., St. John's International Airport Authority, Charlottetown Airport Authority Inc., Newcourt Credit Group (Alberta) Inc., Canada Life Assurance Company, CCG Trust Corporation, Aéroports de Montréal, Renaissance Leasing Corporation, Heather Leasing Corporation, Canadian Regional Airlines Ltd., Canadian Regional (1998) Ltd. and Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc.** *Respondents*

———————

**Greater Toronto Airports Authority** *Appellant*

*v.*

**Renaissance Leasing Corporation, Inter-Canadian (1991) Inc. and Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc.** *Respondents*

———————

**Compagnie d'Assurance du Canada sur la Vie, CCG Trust Corporation, Renaissance Leasing Corporation, Heather Leasing Corporation, Lignes aériennes Canadien régional Ltée, Canadian Regional (1998) Ltd. et Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc.** *Intimées*

- et -

**Greater Toronto Airports Authority** *Appelante*

*c.*

**Greater London International Airport Authority, Saint John Airport Inc., St. John's International Airport Authority, Charlottetown Airport Authority Inc., Newcourt Credit Group (Alberta) Inc., Compagnie d'Assurance du Canada sur la Vie, CCG Trust Corporation, Aéroports de Montréal, Renaissance Leasing Corporation, Heather Leasing Corporation, Lignes aériennes Canadien régional Ltée, Canadian Regional (1998) Ltd. et Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc.** *Intimées*

———————

**Greater Toronto Airports Authority** *Appelante*

*c.*

**Renaissance Leasing Corporation, Inter-Canadien (1991) Inc. et Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc.** *Intimées*

———————

**Greater Toronto Airports
Authority**  *Appellant*

*v.*

**Newcourt Credit Group (Alberta) Inc.,
Canada Life Assurance Company, CCG
Trust Corporation, Inter-Canadian (1991)
Inc., Ernst & Young Inc., in its capacity as
trustee for the bankruptcy of Inter-Canadian
(1991) Inc. and Renaissance Leasing
Corporation**  *Respondents*

———————

**Ottawa Macdonald-Cartier International
Airport Authority**  *Appellant*

*v.*

**Wilmington Trust Company and Ernst &
Young Inc., in its capacity as trustee for
the bankruptcy of Inter-Canadian (1991)
Inc.**  *Respondents*

———————

**St. John's International Airport
Authority**  *Appellant*

*v.*

**Newcourt Credit Group (Alberta) Inc.,
Canada Life Assurance Company, CCG
Trust Corporation, Ernst & Young Inc., in
its capacity as trustee for the bankruptcy of
Inter-Canadian (1991) Inc. and Renaissance
Leasing Corporation**  *Respondents*

———————

**Charlottetown Airport Authority
Inc.**  *Appellant*

*v.*

**CCG Trust Corporation and Ernst &
Young Inc., in its capacity as trustee for
the bankruptcy of Inter-Canadian (1991)
Inc.**  *Respondents*

**Greater Toronto Airports
Authority**  *Appelante*

*c.*

**Newcourt Credit Group (Alberta) Inc.,
Compagnie d'Assurance du Canada sur
la Vie, CCG Trust Corporation, Inter-
Canadien (1991) Inc., Ernst & Young Inc.,
en qualité de syndic à la faillite d'Inter-
Canadien (1991) Inc. et Renaissance Leasing
Corporation**  *Intimées*

———————

**Ottawa Macdonald-Cartier International
Airport Authority**  *Appelante*

*c.*

**Wilmington Trust Company et Ernst &
Young Inc., en qualité de syndic à la faillite
d'Inter-Canadien (1991) Inc.**  *Intimées*

———————

**St. John's International Airport
Authority**  *Appelante*

*c.*

**Newcourt Credit Group (Alberta) Inc.,
Compagnie d'Assurance du Canada sur la
Vie, CCG Trust Corporation, Ernst & Young
Inc., en qualité de syndic à la faillite d'Inter-
Canadien (1991) Inc. et Renaissance Leasing
Corporation**  *Intimées*

———————

**Charlottetown Airport Authority
Inc.**  *Appelante*

*c.*

**CCG Trust Corporation et Ernst & Young
Inc., en qualité de syndic à la faillite
d'Inter-Canadien (1991) Inc.**  *Intimées*

**Indexed as: Canada 3000 Inc. (Re); Inter-Canadian (1991) Inc. (Trustee of)**

**Neutral citation: 2006 SCC 24.**

File Nos.: 30214, 30729, 30730, 30731, 30732, 30738, 30740, 30742, 30743, 30745, 30749, 30750, 30751.

2006: January 16, 17; 2006: June 9.

Present: McLachlin C.J. and Bastarache, Binnie, LeBel, Deschamps, Fish and Charron JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

ON APPEAL FROM THE COURT OF APPEAL FOR QUEBEC

*Transportation law — Airports — Seizure and detention of aircraft — Airlines operating fleets of aircraft under leasing agreements with legal titleholders — Airlines, registered owners of aircraft, incurring charges for civil air navigation and airport services — Service providers applying to superior court judge for authorization, pursuant to s. 9 of Airport Transfer (Miscellaneous Matters) Act and s. 56 of Civil Air Navigation Services Commercialization Act, to seize and detain aircraft operated by airlines for unpaid charges incurred prior to airlines' bankruptcies — Whether titleholders' right to repossess leased aircraft should take priority over service providers' seize and detain orders — Whether titleholders liable to service providers for unpaid charges — Whether seize and detain orders can be exercised against security posted by titleholders in substitution for aircraft — Whether lessors of engines attached to detained aircraft entitled to repossess engines — Airport Transfer (Miscellaneous Matters) Act, S.C. 1992, c. 5, s. 9 — Civil Air Navigation Services Commercialization Act, S.C. 1996, c. 20, ss. 55, 56.*

*Legislation — Interpretation — Contextual interpretation — Owner of aircraft — Whether word "owner" in s. 55 of Civil Air Navigation Services Commercialization Act includes legal titleholders of aircraft — Civil Air*

**Répertorié : Canada 3000 Inc. (Re); Inter-Canadien (1991) Inc. (Syndic de)**

**Référence neutre : 2006 CSC 24.**

Nᵒˢ du greffe : 30214, 30729, 30730, 30731, 30732, 30738, 30740, 30742, 30743, 30745, 30749, 30750, 30751.

2006 : 16, 17 janvier; 2006 : 9 juin.

Présents : La juge en chef McLachlin et les juges Bastarache, Binnie, LeBel, Deschamps, Fish et Charron.

EN APPEL DE LA COUR D'APPEL DE L'ONTARIO

EN APPEL DE LA COUR D'APPEL DU QUÉBEC

*Droit des transports — Aéroports — Saisie et rétention d'aéronefs — Transporteurs aériens exploitant leur flotte d'aéronefs en vertu de conventions de bail conclues avec les propriétaires en titre — Redevances pour les services d'aéroports et de navigation aérienne civile imposées aux transporteurs aériens propriétaires enregistrés des aéronefs — Fournisseurs de services demandant à un juge d'une cour supérieure, en vertu de l'art. 9 de la Loi relative aux cessions d'aéroports et de l'art. 56 de la Loi sur la commercialisation des services de navigation aérienne civile, l'autorisation de saisir et de retenir les aéronefs utilisés par les transporteurs aériens pour recouvrer les redevances en souffrance imposées avant la faillite des transporteurs aériens — Le droit des propriétaires en titre de reprendre possession de leurs aéronefs loués a-t-il préséance sur les ordonnances de saisie et de rétention accordées aux fournisseurs de services? — Les propriétaires en titre sont-ils tenus au paiement des redevances dues aux fournisseurs de services? — Les ordonnances de saisie et de rétention peuvent-elles être exécutées sur les sûretés remises par les propriétaires en titre et substituées aux aéronefs? — Les locateurs de moteurs installés dans les aéronefs saisis ont-ils droit de reprendre possession de leurs moteurs? — Loi relative aux cessions d'aéroports, L.C. 1992, ch. 5, art. 9 — Loi sur la commercialisation des services de navigation aérienne civile, L.C. 1996, ch. 20, art. 55, 56.*

*Législation — Interprétation — Interprétation contextuelle — Propriétaire d'aéronefs — Le mot « propriétaire » à l'art. 55 de la Loi sur la commercialisation des services de navigation aérienne civile*

*Navigation Services Commercialization Act, S.C. 1996, c. 20, s. 55.*

An airline in the modern era may consist of little more than a name, with its aircraft leased, its suppliers on week to week contracts and even its reservation and yield management systems outsourced to one of the global service providers such as Sabre or Galileo. Startups are relatively easy, balance sheets are often thin, and failure can be quick and (to outsiders) unexpected. Yet privatized Canadian airports and NAV Canada (the privatized civil air navigation service) are obliged by statute to provide service even to financially troubled airline operators. When an operator collapses leaving unpaid bills for airport charges and air navigation services, the question becomes: who takes the financial loss, the people who ultimately own the leased aircraft or the people who were obliged to (and did) provide the airport and navigation services?

Before going bankrupt, the airline companies Canada 3000 and Inter-Canadian operated their fleets of aircraft under leasing agreements with the respondent legal titleholders and were the registered owners of the aircraft under the *Aeronautics Act*. These airlines incurred approximately $33.75 million in charges for civil air navigation and airport services provided by NAV Canada and the airport authorities pursuant to the *Airport Transfer (Miscellaneous Matters) Act* ("*Airports Act*") and the *Civil Air Navigation Services Commercialization Act* ("*CANSCA*").

### The Collapse of Canada 3000

In November 2001, Canada 3000 applied for protection under the *Companies' Creditors Arrangement Act* ("*CCAA*"). NAV Canada and the airport authorities applied to a judge of the Ontario Superior Court of Justice, under s. 56 of *CANSCA* and s. 9 of the *Airports Act*, for authorization to seize and detain certain aircraft operated by the airline. The judge released the aircraft on the posting of security by the legal titleholders and later dismissed the seizure and detention motions, holding that the provisions in question of *CANSCA* and the *Airports Act* did not give the authorities priority over the rights of the legal titleholders to repossess the aircraft. He also held that the titleholders were not jointly and severally liable for the charges owed to NAV Canada under s. 55 of *CANSCA*, since they were not

*englobe-t-il les propriétaires en titre des aéronefs? — Loi sur la commercialisation des services de navigation aérienne civile, L.C. 1996, ch. 20, art. 55.*

Un transporteur aérien de l'ère moderne peut n'avoir guère plus qu'un nom, avec des aéronefs loués, des contrats d'approvisionnement renouvelés de semaine en semaine et même des systèmes de réservation et de gestion de la recette unitaire confiés à des fournisseurs mondiaux de services comme Sabre ou Galileo. Le démarrage est relativement facile, les bilans sont souvent maigres et l'échec peut survenir abruptement et (vu de l'extérieur) sans avertissement. Mais les aéroports canadiens privatisés et NAV Canada (le service de navigation aérienne civile privatisé) sont légalement tenus de fournir leurs services même à des transporteurs aériens en difficultés financières. L'effondrement d'un transporteur aérien qui laisse impayés des redevances d'aéroport et des services de navigation aérienne soulève la question de savoir qui assume la perte financière, les personnes qui sont en définitive propriétaires des aéronefs loués ou les personnes tenues de fournir les services d'aéroport et de navigation (et qui les ont fournis)?

Avant de faire faillite, les sociétés de transport aérien Canada 3000 et Inter-Canadien exploitaient leurs flottes d'aéronefs en vertu de conventions de bail passées avec les propriétaires en titre intimées et étaient propriétaires enregistrées des aéronefs sous le régime de la *Loi sur l'aéronautique*. Ces transporteurs aériens devaient environ 33,75 millions de dollars en redevances pour des services de navigation aérienne civile et des services aéroportuaires fournis par NAV Canada et les administrations aéroportuaires en vertu de la *Loi relative aux cessions d'aéroports* (« *LCA* ») et de la *Loi sur la commercialisation des services de navigation aérienne civile* (« *LCSNAC* »).

### L'effondrement de Canada 3000

En novembre 2001, Canada 3000 s'est prévalue de la protection de la *Loi sur les arrangements avec les créanciers des compagnies* (« *LACC* »). NAV Canada et les administrations aéroportuaires ont demandé à un juge de la Cour supérieure de justice de l'Ontario, en vertu de l'art. 56 de la *LCSNAC* et de l'art. 9 de la *LCA*, l'autorisation de saisir et de retenir certains aéronefs utilisés par ce transporteur aérien. Le juge a ordonné mainlevée de la saisie des aéronefs contre la remise d'une sûreté par les propriétaires en titre et a plus tard rejeté les requêtes en saisie et en rétention, statuant que les dispositions en question de la *LCSNAC* et de la *LCA* n'accordaient pas aux administrations un droit ayant préséance sur les droits des propriétaires en titre de reprendre possession des aéronefs. Il a aussi conclu

"owners" within the meaning of the Act. The majority of the Court of Appeal upheld the motions judge's decision.

*The Collapse of Inter-Canadian*

In December 1999, the airport authorities and NAV Canada obtained, pursuant to s. 56 of *CANSCA* and s. 9 of the *Airports Act*, an order of the Quebec Superior Court to seize and detain a number of aircraft operated by Inter-Canadian. The airline was subsequently deemed to have made an assignment in bankruptcy. Faced with the legal titleholders' claims that they were entitled to repossess the aircraft, the trustee in bankruptcy applied to the Superior Court for directions. The judge allowed a motion to release the aircraft in exchange for security. He later held that the legal titleholders were jointly and severally liable for the amounts owing. The majority of the Court of Appeal overturned the motions judge's ruling, concluding that the lessors' right to repossession took priority and that the legal titleholders were entitled to the return of their aircraft free and clear of the unpaid charges.

*Held*: The appeals and cross-appeals should be allowed in part.

This case is from first to last an exercise in statutory interpretation, and the issues of interpretation are closely tied to context. Prior to *CANSCA* and the *Airports Act*, civil air navigation and airport services were provided by the federal government. Under the current legislative scheme, the privatized NAV Canada and airport authorities operate as self-funded corporations that provide services on the basis of a cost-based tariff fixed by government regulation. They cannot withhold airport or navigation services even from an obviously failing airline. At the time the measures in question here were enacted, airline insolvencies and bankruptcies had become a fact of life throughout the airline industry. The legislative scheme shows that Parliament fully appreciated that in dealing with aircraft flown in and out of jurisdictions under complex leasing arrangements, the only effective collection scheme would be to render the aircraft themselves available for seizure, and thereafter to let those interested in them resolve their dispute about where the money should come from to pay the debts due to the service providers. [36-39]

que sous le régime de l'art. 55 de la *LCSNAC*, les propriétaires en titre n'étaient pas tenus solidairement au paiement des redevances dues à NAV Canada puisqu'ils n'étaient pas les « propriétaires » au sens de cette Loi. La Cour d'appel à la majorité a maintenu la décision du juge des requêtes.

*L'effondrement d'Inter-Canadien*

En décembre 1999, les administrations aéroportuaires et NAV Canada ont obtenu de la Cour supérieure du Québec, aux termes de l'art. 56 de la *LCSNAC* et de l'art. 9 de la *LCA*, une ordonnance autorisant la saisie et la rétention d'un certain nombre d'aéronefs utilisés par Inter-Canadien. Le transporteur aérien a par la suite été déclaré en faillite. Confronté aux demandes de reprise de possession des aéronefs que lui présentaient les propriétaires en titre, le syndic de faillite s'est adressé à la Cour supérieure pour obtenir des directives. Le juge a accueilli une demande de mainlevée de la saisie des aéronefs contre la remise d'une sûreté. Il a plus tard statué que les propriétaires en titre étaient tenus solidairement au paiement des sommes dues. La Cour d'appel à la majorité a infirmé la décision du juge des requêtes, concluant que le droit des locateurs à la reprise de possession avait préséance et que les propriétaires en titre avaient droit à ce que les aéronefs leur soient remis sans qu'ils aient à payer les redevances dues.

*Arrêt* : Les pourvois et les pourvois incidents sont accueillis en partie.

La présente espèce est de bout en bout un exercice d'interprétation de lois, et les questions d'interprétation sont étroitement liées au contexte. Avant l'entrée en vigueur de la *LCSNAC* et de la *LCA*, c'est le gouvernement fédéral qui assurait les services aéroportuaires et de navigation aérienne civile. Suivant le régime législatif maintenant en vigueur, NAV Canada et les administrations aéroportuaires issues de la privatisation s'autofinancent et offrent leurs services au tarif fixé par règlement et établi en fonction des coûts. Elles ne peuvent refuser leurs services aéroportuaires ou de navigation aérienne même à un transporteur aérien clairement au bord de la déconfiture. Au moment où le législateur a adopté les mesures en cause, les cas de transporteurs aériens insolvables ou en faillite étaient monnaie courante dans l'industrie du transport aérien. Le régime législatif montre que le législateur était pleinement conscient que, s'agissant d'aéronefs dont l'exploitation transcende les frontières et obéit à des baux complexes, le seul mode de perception efficace consistait à rendre les aéronefs eux-mêmes saisissables et à laisser ensuite les divers intéressés résoudre leur différend sur la question de savoir qui devrait payer les sommes dues aux fournisseurs de services. [36-39]

*No Joint and Several Liability for Charges for Air Navigation Services*

The appeals are dismissed with respect to NAV Canada's claim that the legal titleholders are jointly and severally liable for outstanding civil air navigation charges incurred by the registered owners and operators of the failed airlines, since the legal titleholders are not "owners" within the meaning of s. 55 of *CANSCA*. It is clear from the statutory scheme and the legislative record that Parliament intended to create a "user-pay" system for civil air navigation services, and that the only "users" of those services within the contemplation of the Act are the airlines. While in some contexts the meaning of "owner" could include legal titleholders, a purposive interpretation of s. 55 excludes them. The definition of "owner" in s. 55(2) lists only persons in possession or legal custody and control of the aircraft. Section 55(1) should be similarly construed. Interpreting the list in s. 55(2) as exhaustive of ownership for the purposes of s. 55(1) is consistent with the rest of the statutory scheme governing aeronautics, the legislative history, and conforms with common sense. If NAV Canada's interpretation of s. 55 were correct, it would mean that a seizure and detention order issued in respect of Canada 3000's unpaid user charges could in theory attach not only to a legal titleholder's aircraft leased to Canada 3000, but also to any other aircraft to which that lessor holds title, including aircraft leased to other airlines. Moreover, to interpret "owner" as argued by NAV Canada would give preference to the ambiguous English text of s. 55 over the relatively clear French provision. A restrictive interpretation of "owner" is consistent with the policy and practice throughout the federal aeronautics scheme where the term "owner" is used to refer to the person in legal custody and control of the aircraft, not the legal titleholder. In enacting *CANSCA*, Parliament intended not to replace or override the existing regulatory framework but rather to fit cohesively within it. [41-61]

*The Seizure and Detention Remedy*

Although the legal titleholders are not directly liable for the charges due to the service providers, NAV Canada and the airport authorities were entitled to orders seizing and detaining the aircraft pursuant to s. 56 of *CANSCA* and s. 9 of the *Airports Act*, and are

*Les propriétaires en titre ne sont pas tenus solidairement au paiement des redevances pour les services de navigation aérienne*

Les pourvois sont rejetés en ce qui concerne la prétention de NAV Canada suivant laquelle les propriétaires en titre sont solidairement tenus de payer les redevances en souffrance pour les services de navigation aérienne civile imposées aux propriétaires enregistrés et usagers des transporteurs aériens défaillants, puisque ces propriétaires en titre ne sont pas des « propriétaires » au sens de l'art. 55 de la *LCSNAC*. Le régime et l'historique législatifs indiquent clairement que le législateur a voulu instituer un système d'« utilisateur-payeur » en matière de services de navigation aérienne civile, et que les seuls « usagers » de ces services visés par la loi sont les transporteurs aériens. Si, dans certains contextes, le mot « propriétaire » peut inclure le propriétaire en titre, ce dernier est exclu par une interprétation téléologique de l'art. 55. La définition de « propriétaire » au par. 55(2) énumère uniquement les personnes qui ont l'aéronef en leur possession ou qui en ont la garde et la responsabilité légales. Le paragraphe 55(1) devrait s'interpréter de la même manière. Il est conforme au reste du régime législatif en matière d'aéronautique, à l'historique législatif et au bon sens de voir une liste exhaustive dans l'énumération faite au par. 55(2) pour l'application du par. 55(1). Si l'interprétation de l'art. 55 proposée par NAV Canada était correcte, cela signifierait qu'une ordonnance de saisie et de rétention rendue relativement aux redevances d'utilisation dues par Canada 3000 pourrait en théorie s'appliquer non seulement aux aéronefs d'un propriétaire en titre loués à Canada 3000 mais aussi à tout autre appareil appartenant à ce locateur, y compris aux aéronefs loués à d'autres transporteurs aériens. En outre, l'interprétation du mot « propriétaire » que propose NAV Canada privilégierait la version anglaise ambiguë de l'art. 55 à la version française relativement claire. Une interprétation restrictive de « propriétaire » est compatible en principe et en pratique avec tout le régime fédéral en matière d'aéronautique, où ce mot renvoie à la personne qui a la garde et la responsabilité légales de l'aéronef, non au propriétaire en titre. Lorsqu'il a adopté la *LCSNAC*, le législateur ne voulait pas que cette Loi remplace ou écarte le cadre réglementaire en place mais plutôt qu'elle s'y insère de façon cohérente. [41-61]

*Le recours en saisie et en rétention*

Même si les propriétaires en titre ne sont pas directement tenus au paiement des redevances dues aux fournisseurs de services, NAV Canada et les administrations aéroportuaires avaient droit à des ordonnances de saisie et de rétention des aéronefs aux termes de

RE CANADA 3000 INC.

entitled now to have their claims (as assessed by the motions judges) satisfied out of the security posted in substitution for the aircraft. Whereas s. 55 of *CANSCA* identifies a group of persons who are made legally liable for the amounts owing, the detention remedy set out in s. 9 of the *Airports Act* and s. 56 of *CANSCA* has a different focus. This court-granted remedy entitles the authorities to possess the aircraft until the debt is paid or security furnished. It does not confer any interest in the beneficial ownership of the aircraft, and it cannot be circumvented by a leasing arrangement made between an airline and an aircraft lessor. Since ss. 9(1) and 56(1) do not distinguish between the unpaid charges accumulated by specific aircraft operated by a defaulting owner or operator, the amount in respect of which the seizure of each aircraft is made is the entire amount owed by that registered owner or operator. There is no limitation of debts on an aircraft by aircraft basis. [9-10] [62-75] [85-86]

Much of the potential unfairness complained of by the legal titleholders in the operation of the detention remedy can adequately be addressed by the motions judge. The right to seize and detain is not automatic. It requires a prior court authorization which may be subject to such terms as the court considers necessary. The court also has a discretion to limit the duration of the remedy by requiring the applicable authority to release a detained aircraft from detention prior to payment of the amount with respect to which the seizure was made. In any event, an authority that obtains an order is required to release a detained aircraft upon payment of the outstanding charges, or upon the provision of acceptable security therefor. Parliament has thus left the door open for the motions judge to work out an arrangement that is fair and reasonable to all concerned provided that the object and purpose of the remedy (to ensure the unpaid user fees are paid) is fulfilled. [73] [92]

The legal titleholders are sophisticated corporate players and are well versed in the industry in which they have chosen to invest. Since they can select which airlines they are prepared to deal with and negotiate appropriate security arrangements as part of their lease transactions, they are in a better position to protect themselves against this type of loss than are the airport authorities and NAV Canada. [71-72]

The intervention of bankruptcy proceedings in both Quebec and Ontario created procedural complications. In the case of Inter-Canadian, the detention remedies

l'art. 56 de la *LCSNAC* et de l'art. 9 de la *LCA*, et elles ont maintenant droit à ce que les sommes dues (déterminées par les juges des requêtes) leur soient payées sur les sûretés substituées aux aéronefs. Alors que l'art. 55 de la *LCSNAC* indique un groupe de personnes tenues légalement responsables du paiement des redevances dues, le recours en rétention qu'offrent l'art. 9 de la *LCA* et l'art. 56 de la *LCSNAC* vise un autre objet. Ce recours judiciaire donne aux administrations un droit à la prise de possession de l'aéronef jusqu'au paiement de la dette ou au dépôt d'une sûreté. Il ne confère aucun droit de propriété bénéficiaire sur l'aéronef, et les baux entre transporteurs aériens et locateurs d'avions ne peuvent le contourner. Puisque les par. 9(1) et 56(1) ne font pas de distinction en fonction des redevances accumulées à l'égard de chaque aéronef d'un propriétaire enregistré ou utilisateur défaillant, la dette à l'égard de laquelle la saisie est pratiquée est le montant total dû par ce propriétaire enregistré ou utilisateur. Il n'y a pas de fractionnement de la dette aéronef par aéronef. [9-10] [62-75] [85-86]

Le juge des requêtes peut adéquatement examiner bon nombre des possibles effets injustes du recours en rétention dont se plaignent les propriétaires en titre. Le droit de saisie et de rétention n'est pas automatique. Il doit être autorisé par la cour qui peut l'assujettir aux conditions qu'elle estime nécessaires. La cour peut aussi limiter la durée de la saisie en ordonnant à l'autorité en cause de donner mainlevée avant le paiement de la somme pour laquelle l'aéronef avait été saisi. En tout état de cause, une administration qui obtient une ordonnance autorisant la rétention est tenue de donner mainlevée sur paiement des redevances en souffrance ou contre remise d'une garantie satisfaisante. Le législateur a ainsi donné au juge des requêtes la latitude nécessaire pour élaborer des solutions justes et raisonnables pour toutes les parties en cause, dans la mesure où elles sont compatibles avec la réalisation de l'objet et de l'esprit du recours (assurer le paiement des redevances dues). [73] [92]

Les propriétaires en titre sont des entreprises bien informées et bien au fait de l'industrie dans laquelle elles ont choisi d'investir. Puisqu'elles sont en mesure de choisir les transporteurs aériens avec lesquels elles sont disposées à traiter et d'inclure des garanties acceptables dans les baux qu'elles négocient, elles peuvent mieux se protéger contre les pertes de ce genre que les administrations aéroportuaires ou NAV Canada. [71-72]

Les procédures de faillite tant au Québec qu'en Ontario ont engendré des complications procédurales. Dans le cas d'Inter-Canadien, les recours en rétention

were applied for well before the assignment in bankruptcy. In the case of Canada 3000, the detention remedies were applied for while the *CCAA* stay was in effect and Canada 3000 remained the registered owner of the aircraft in question. In neither case did the aircraft become part of the bankrupt estate (because ultimate ownership was in the legal titleholder). The aircraft were legitimate targets of the detention remedies as they were still sitting on a Canadian airport tarmac and were still "owned or operated" (within the meaning of the relevant statutes) by the airlines at the relevant date. Given the authority to charge interest, the interest continues to run to the first of the date of payment, the posting of security or the bankruptcy. [77] [96]

In the proceedings involving Inter-Canadian it was not necessary for the Quebec Superior Court judge to resort to provincial law or, more specifically, to the *Civil Code of Québec*. The *Aeronautics Act*, the *Airports Act*, and *CANSCA* are federal statutes that create a unified aeronautics regime. Parliament endeavoured to create a comprehensive remedy that would be applicable across the country and would not vary from one province to another. This uniformity is especially vital since aircraft are highly mobile and move easily across jurisdictions. [78-79]

Two of the respondents leased to Canada 3000 the engines attached to two of the aircraft which, when seized, were airworthy. For the present purposes, the engines are part of the aircraft in respect of which charges were incurred and that are the subject of the detention. The *Aeronautics Act* does not envisage the dismantling of the aircraft (and thus of its value as security) on the tarmac. [87-89]

## Cases Cited

**Applied:** *Bell ExpressVu Limited Partnership v. Rex*, [2002] 2 S.C.R. 559, 2002 SCC 42; **distinguished:** *Royal Bank of Canada v. Sparrow Electric Corp.*, [1997] 1 S.C.R. 411; **referred to:** *Pan American World Airways Inc. v. The Queen*, [1981] 2 S.C.R. 565; *Heydon's Case* (1584), 3 Co. Rep. 7a, 76 E.R. 637; *Grand Trunk Railway Co. of Canada v. Hepworth Silica Pressed Brick Co.* (1915), 51 S.C.R. 81; *Bristol-Myers Squibb Co. v. Canada (Attorney General)*, [2005] 1 S.C.R. 533, 2005 SCC 26; *Dilworth v. Commissioner of Stamps*, [1899] A.C. 99; *R. v. Loblaw Groceteria Co. (Manitoba) Ltd.*, [1961] S.C.R. 138; *Slaight Communications Inc. v.*

ont été entamés bien avant la cession de faillite. Dans le cas de Canada 3000, les recours en rétention ont été entamés au cours de la période de suspension ordonnée en application de la *LACC* et Canada 3000 est demeurée propriétaire enregistrée des aéronefs en question. Dans les deux cas, les aéronefs n'ont jamais fait partie de l'avoir de la faillie (parce que le titre de propriété appartenait aux propriétaires en titre). Les aéronefs pouvaient légitimement être visés par le recours en rétention puisqu'ils se trouvaient encore sur le tarmac d'un aéroport au Canada et que les transporteurs aériens en étaient encore « propriétaires ou usagers » (au sens des lois en cause) aux dates pertinentes. Vu l'existence du pouvoir d'exiger des intérêts, les intérêts courent jusqu'à la date du paiement des redevances, de la remise d'une sûreté ou de la faillite, selon celui de ces événements qui survient en premier. [77] [96]

Dans les procédures mettant en cause Inter-Canadien, il n'était pas nécessaire que le juge de la Cour supérieure du Québec ait recours au droit provincial ou, plus précisément, au *Code civil du Québec*. La *Loi sur l'aéronautique*, la *LCA* et la *LCSNAC* sont des lois fédérales qui établissent un régime unifié en matière d'aéronautique. Le législateur a voulu constituer un recours exhaustif qui s'appliquerait dans tout le pays de façon uniforme d'une province à l'autre. Cette uniformité est d'autant plus essentielle que l'extrême mobilité des aéronefs leur permet de passer facilement d'un territoire à l'autre. [78-79]

Deux des intimées ont donné à bail à Canada 3000 les moteurs installés dans deux des aéronefs qui, au moment de la saisie, étaient en bon état de vol. Pour les besoins de la présente espèce, les moteurs sont des composantes des aéronefs à l'égard desquels les redevances ont été imposées et qui sont visés par la rétention. La *Loi sur l'aéronautique* n'envisage pas le démontage des appareils sur le tarmac (et, par conséquent, le morcellement de leur valeur en tant que garantie). [87-89]

## Jurisprudence

**Arrêt appliqué :** *Bell ExpressVu Limited Partnership c. Rex*, [2002] 2 R.C.S. 559, 2002 CSC 42; **distinction d'avec l'arrêt :** *Banque Royale du Canada c. Sparrow Electric Corp.*, [1997] 1 R.C.S. 411; **arrêts mentionnés :** *Pan American World Airways Inc. c. La Reine*, [1981] 2 R.C.S. 565; *Heydon's Case* (1584), 3 Co. Rep. 7a, 76 E.R. 637; *Grand Trunk Railway Co. of Canada c. Hepworth Silica Pressed Brick Co.* (1915), 51 R.C.S. 81; *Bristol-Myers Squibb Co. c. Canada (Procureur général)*, [2005] 1 R.C.S. 533, 2005 CSC 26; *Dilworth c. Commissioner of Stamps*, [1899] A.C. 99; *R. c. Loblaw Groceteria Co. (Manitoba) Ltd.*, [1961] R.C.S.

Case 09-10138-MFW    Doc 14410-4    Filed 09/16/14    Page 482 of 540

*Davidson*, [1989] 1 S.C.R. 1038; *Schreiber v. Canada (Attorney General)*, [2002] 3 S.C.R. 269, 2002 SCC 62; *R. v. Dubois*, [1935] S.C.R. 378; *R. v. Ulybel Enterprises Ltd.*, [2001] 2 S.C.R. 867, 2001 SCC 56; *Rizzo & Rizzo Shoes Ltd. (Re)*, [1998] 1 S.C.R. 27; *R. v. Morgentaler*, [1993] 3 S.C.R. 463; *Aetna Financial Services Ltd. v. Feigelman*, [1985] 1 S.C.R. 2; *The Emilie Millon*, [1905] 2 K.B. 817; *Channel Airways Ltd. v. Manchester Corp.*, [1974] 1 Lloyd's Rep. 456; *Peoples Department Stores Inc. (Trustee of) v. Wise*, [2004] 3 S.C.R. 461, 2004 SCC 68; *Firestone Tire & Rubber Co. of Canada v. Industrial Acceptance Corp.*, [1971] S.C.R. 357; *Bank of America Canada v. Mutual Trust Co.*, [2002] 2 S.C.R. 601, 2002 SCC 43.

## Statutes and Regulations Cited

*Aeronautics Act*, R.S.C. 1985, c. A-2, ss. 3(1) "aeronautical product", "registered owner", 4.4(5), 4.5.

*Airport Transfer (Miscellaneous Matters) Act*, S.C. 1992, c. 5, ss. 9, 10.

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, ss. 121, 122.

*Canadian Aviation Regulations*, SOR/96-433, ss. 101.01(1) "operator", "owner", 202.15 to 202.17.

*Civil Air Navigation Services Commercialization Act*, S.C. 1996, c. 20, ss. 2(1) "user", (2), 7, 8, 9, Part III, 32 to 35, 36(3)(a)(i), 37(4), 44, 55, 56, 57(1).

*Civil Code of Québec*, S.Q. 1991, c. 64, arts. 1592, 1593.

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, s. 11.31.

*Interpretation Act*, R.S.C. 1985, c. I-21, ss. 8.1, 8.2, 12.

## Treaties and Other International Instruments

*Air Transport Agreement Between the Government of Canada and the Government of the United States of America* (1995), Annex I, s. 1.

*Convention on International Civil Aviation*, Can. T.S. 1944 No. 36, art. 19.

## Authors Cited

Bunker, Donald H. *Canadian Aviation Finance Legislation*. Montreal: Institute and Centre of Air and Space Law, McGill University, 1989.

Canada. House of Commons. *House of Commons Debates*, vol. IV, 1st Sess., 33rd Parl., June 20, 1985, pp. 6065-66.

138; *Slaight Communications Inc. c. Davidson*, [1989] 1 R.C.S. 1038; *Schreiber c. Canada (Procureur général)*, [2002] 3 R.C.S. 269, 2002 CSC 62; *R. c. Dubois*, [1935] R.C.S. 378; *R. c. Ulybel Enterprises Ltd.*, [2001] 2 R.C.S. 867, 2001 CSC 56; *Rizzo & Rizzo Shoes Ltd. (Re)*, [1998] 1 R.C.S. 27; *R. c. Morgentaler*, [1993] 3 R.C.S. 463; *Aetna Financial Services Ltd. c. Feigelman*, [1985] 1 R.C.S. 2; *The Emilie Millon*, [1905] 2 K.B. 817; *Channel Airways Ltd. c. Manchester Corp.*, [1974] 1 Lloyd's Rep. 456; *Magasins à rayons Peoples inc. (Syndic de) c. Wise*, [2004] 3 R.C.S. 461, 2004 CSC 68; *Firestone Tire & Rubber Co. of Canada c. Industrial Acceptance Corp.*, [1971] R.C.S. 357; *Banque d'Amérique du Canada c. Société de Fiducie Mutuelle*, [2002] 2 R.C.S. 601, 2002 CSC 43.

## Lois et règlements cités

*Code civil du Québec*, L.Q. 1991, ch. 64, art. 1592, 1593.

*Loi d'interprétation*, L.R.C. 1985, ch. I-21, art. 8.1, 8.2, 12.

*Loi relative aux cessions d'aéroports*, L.C. 1992, ch. 5, art. 9, 10.

*Loi sur l'aéronautique*, L.R.C. 1985, ch. A-2, art. 3(1) « produits aéronautiques », « propriétaire enregistré », 4.4(5), 4.5.

*Loi sur la commercialisation des services de navigation aérienne civile*, L.C. 1996, ch. 20, art. 2(1) « usager », (2), 7, 8, 9, partie III, 32 à 35, 36(3), 37(4), 44, 55, 56, 57(1).

*Loi sur la faillite et l'insolvabilité*, L.R.C. 1985, ch. B-3, art. 121, 122.

*Loi sur les arrangements avec les créanciers des compagnies*, L.R.C. 1985, ch. C-36, art. 11.31.

*Règlement de l'aviation canadien*, DORS/96-433, art. 101.01(1), « propriétaire », « utilisateur », 202.15 à 202.17.

## Traités et autres instruments internationaux

*Accord relatif au transport aérien entre le gouvernement du Canada et le gouvernement des États-Unis d'Amérique* (1995), Annexe I, art. 1.

*Convention relative à l'aviation civile internationale*, R.T. Can. 1944 nº 36, art. 19.

## Doctrine citée

Bunker, Donald H. *Canadian Aviation Finance Legislation*. Montreal : Institute and Centre of Air and Space Law, McGill University, 1989.

Canada. Chambre des communes. *Débats de la Chambre des communes*, vol. IV, 1re sess., 33e lég., 20 juin 1985, p. 6065-6066.

Canada. House of Commons. *House of Commons Debates*, vol. 133, 2nd Sess., 35th Parl., March 25, 1996, pp. 1152-54.

Canada. House of Commons. *House of Commons Debates*, vol. 134, 2nd Sess., 35th Parl., May 15, 1996, pp. 2821, 2834, May 29, 1996, p. 3144, June 4, 1996, pp. 3394, 3410.

Canada. Senate. *Debates of the Senate*, vol. 135, 2nd Sess., 35th Parl., June 10, 1996, pp. 588-89.

"Clause by Clause Analysis for the *Civil Air Navigation Services Commercialization Act*", as presented to the Senate Committee on Transport and Communications.

Driedger, Elmer A. *Construction of Statutes*, 2nd ed. Toronto: Butterworths, 1983.

Sullivan, Ruth. *Sullivan and Driedger on the Construction of Statutes*, 4th ed. Toronto: Butterworths, 2002.

Uniform Law Conference of Canada. *Drafting Conventions for the Uniform Law Conference of Canada*, s. 21(4) (online: http://www.ulcc.ca/en/us/index.cfm?sec=5).

APPEALS and CROSS-APPEALS from a judgment of the Ontario Court of Appeal (Abella and Cronk JJ.A. and Juriansz J. (*ad hoc*)) (2004), 69 O.R. (3d) 1, 235 D.L.R. (4th) 618, 183 O.A.C. 201, 3 C.B.R. (5th) 207, [2004] O.J. No. 141 (QL), affirming in part a decision of Ground J. (2002), 33 C.B.R. (4th) 184, 5 P.P.S.A.C. (3d) 272, [2002] O.J. No. 1775 (QL). Appeals and cross-appeals allowed in part.

APPEALS from judgments of the Quebec Court of Appeal (Nuss, Pelletier and Morissette JJ.A.), [2004] R.J.Q. 2966, 247 D.L.R. (4th) 503, [2004] Q.J. No. 11921 (QL), [2004] Q.J. No. 11922 (QL), [2004] Q.J. No. 11923 (QL), [2004] Q.J. No. 11924 (QL), [2004] Q.J. No. 11925 (QL), [2004] Q.J. No. 11926 (QL), [2004] Q.J. No. 11927 (QL), [2004] Q.J. No. 11928 (QL), [2004] Q.J. No. 11930 (QL), [2004] Q.J. No. 11932 (QL), [2004] Q.J. No. 11933 (QL), [2004] Q.J. No. 11961 (QL), reversing, in whole or in part, decisions of Tremblay J., [2000] R.J.Q. 2935, [2000] Q.J. No. 7330 (QL), [2000] Q.J. No. 4959 (QL), [2000] Q.J. No. 4996 (QL), [2000] Q.J. No. 5004 (QL), [2000] Q.J. No. 5005 (QL), [2000] Q.J. No. 5007 (QL), [2000] Q.J. No. 5009 (QL). Appeals allowed in part.

Canada. Chambre des communes. *Débats de la Chambre des communes*, vol. 133, 2e sess., 35e lég., 25 mars 1996, p. 1152-1154.

Canada. Chambre des communes. *Débats de la Chambre des communes*, vol. 134, 2e sess., 35e lég., 15 mai 1996, p. 2821, 2834, 29 mai 1996, p. 3144, 4 juin 1996, p. 3394, 3410.

Canada. Sénat. *Débats du Sénat*, vol. 135, 2e sess., 35e lég., 10 juin 1996, p. 588-589.

« Clause by Clause Analysis for the *Civil Air Navigation Services Commercialization Act* », présentée au Comité permanent des transports et des communications du Sénat.

Conférence pour l'harmonisation des lois au Canada. *Protocole de rédaction de la Conférence pour l'uniformisation des lois au Canada*, par. 21(4) (en ligne : http://www.ulcc.ca/fr/us/index.cfm?sec=5).

Driedger, Elmer A. *Construction of Statutes*, 2nd ed. Toronto : Butterworths, 1983.

Sullivan, Ruth. *Sullivan and Driedger on the Construction of Statutes*, 4th ed. Toronto : Butterworths, 2002.

POURVOIS et POURVOIS INCIDENTS contre un arrêt de la Cour d'appel de l'Ontario (les juges Abella et Cronk et le juge Juriansz (*ad hoc*)) (2004), 69 O.R. (3d) 1, 235 D.L.R. (4th) 618, 183 O.A.C. 201, 3 C.B.R. (5th) 207, [2004] O.J. No. 141 (QL), qui a confirmé en partie un jugement du juge Ground (2002), 33 C.B.R. (4th) 184, 5 P.P.S.A.C. (3d) 272, [2002] O.J. No. 1775 (QL). Pourvois et pourvois incidents accueillis en partie.

POURVOIS contre des arrêts de la Cour d'appel du Québec (les juges Nuss, Pelletier et Morissette), [2004] R.J.Q. 2966, 247 D.L.R. (4th) 503, [2004] J.Q. no 11921 (QL), [2004] J.Q. no 11922 (QL), [2004] J.Q. no 11923 (QL), [2004] J.Q. no 11924 (QL), [2004] J.Q. no 11925 (QL), [2004] J.Q. no 11926 (QL), [2004] J.Q. no 11927 (QL), [2004] J.Q. no 11928 (QL), [2004] J.Q. no 11930 (QL), [2004] J.Q. no 11932 (QL), [2004] J.Q. no 11933 (QL), [2004] J.Q. no 11961 (QL), qui a infirmé, en tout ou en partie, des jugements du juge Tremblay, [2000] R.J.Q. 2935, [2000] J.Q. no 7330 (QL), [2000] J.Q. no 4959 (QL), [2000] J.Q. no 4996 (QL), [2000] J.Q. no 5004 (QL), [2000] J.Q. no 5005 (QL), [2000] J.Q. no 5007 (QL), [2000] J.Q. no 5009 (QL). Pourvois accueillis en partie.

*Clifton P. Prophet* and *Eric Wredenhagen*, for NAV Canada (30214).

*Lyndon A. J. Barnes* and *Jean-Marc Leclerc*, for Greater Toronto Airports Authority (30214).

*John T. Porter* and *Alan B. Merskey*, for Winnipeg Airports Authority Inc., Halifax International Airport Authority, Edmonton Regional Airports Authority, Calgary Airport Authority, Aéroports de Montréal, Ottawa Macdonald-Cartier International Airport Authority, Vancouver International Airport Authority and St. John's International Airport Authority (30214).

*Richard A. Conway*, *David P. Chernos*, *Linda M. Plumpton* and *Jana N. Stettner*, for International Lease Finance Corporation, Hyr Här I Sverige Kommanditbolag, IAI X, Inc., Triton Aviation International LLC, Sierra Leasing Limited, ACG Acquisition XXV LLC, ILFC International Lease Finance Canada Ltd. and U.S. Airways Inc. (30214).

*Christopher W. Besant* and *Joseph J. Bellissimo*, for G.E. Capital Aviation Services Inc., as Agent and Manager for Polaris Holding Company and AFT Trust-Sub I, Pegasus Aviation Inc., and PALS I, Inc. (30214).

*Barbara L. Grossman* and *Christopher D. Woodbury*, for Ansett Worldwide Aviation, U.S.A., and MSA V (30214).

*Kenneth D. Kraft*, for RRPF Engine Leasing Limited and Flight Logistics Inc. (30214).

*Pamela L. J. Huff* and *Jill Lawrie*, for C.I.T. Leasing Corporation and NBB-Royal Lease Partnership One (30214).

Written submissions only by *Craig J. Hill* and *Roger Jaipargas*, for GATX/CL Air Leasing Cooperative Association (30214).

*Michel G. Ménard*, for NAV Canada (30729, 30730, 30731, 30732).

*Richard L. Desgagnés* and *Véronique E. Marquis*, for Ottawa Macdonald-Cartier International Airport Authority, St-John's International Airport

*Clifton P. Prophet* et *Eric Wredenhagen*, pour NAV Canada (30214).

*Lyndon A. J. Barnes* et *Jean-Marc Leclerc*, pour Greater Toronto Airports Authority (30214).

*John T. Porter* et *Alan B. Merskey*, pour Winnipeg Airports Authority Inc., Halifax International Airport Authority, Edmonton Regional Airports Authority, Calgary Airport Authority, Aéroports de Montréal, Ottawa Macdonald-Cartier International Airport Authority, Vancouver International Airport Authority et St. John's International Airport Authority (30214).

*Richard A. Conway*, *David P. Chernos*, *Linda M. Plumpton* et *Jana N. Stettner*, pour International Lease Finance Corporation, Hyr Här I Sverige Kommanditbolag, IAI X, Inc., Triton Aviation International LLC, Sierra Leasing Limited, ACG Acquisition XXV LLC, ILFC International Lease Finance Canada Ltd. et U.S. Airways Inc. (30214).

*Christopher W. Besant* et *Joseph J. Bellissimo*, pour G.E. Capital Aviation Services Inc., en qualité de mandataire et gestionnaire de Polaris Holding Company et AFT Trust-Sub I, Pegasus Aviation Inc., et PALS I, Inc. (30214).

*Barbara L. Grossman* et *Christopher D. Woodbury*, pour Ansett Worldwide Aviation, U.S.A., et MSA V (30214).

*Kenneth D. Kraft*, pour RRPF Engine Leasing Limited et Flight Logistics Inc. (30214).

*Pamela L. J. Huff* et *Jill Lawrie*, pour C.I.T. Leasing Corporation et NBB-Royal Lease Partnership One (30214).

Argumentation écrite seulement par *Craig J. Hill* et *Roger Jaipargas*, pour GATX/CL Air Leasing Cooperative Association (30214).

*Michel G. Ménard*, pour NAV Canada (30729, 30730, 30731, 30732).

*Richard L. Desgagnés* et *Véronique E. Marquis*, pour Ottawa Macdonald-Cartier International Airport Authority, St-John's International Airport

Authority and Charlottetown Airport Authority Inc. (30731, 30732, 30742, 30749, 30750, 30751).

*Gerald N. Apostolatos*, for Aéroports de Montréal (30731, 30732, 30738, 30740, 30742).

*Sandra Abitan*, *David Tardif-Latourelle* and *Allon Pollack*, for Greater Toronto Airports Authority (30731, 30732, 30742, 30743, 30745).

*Bertrand Giroux*, *Markus Koehnen*, *Jeff Gollob*, *Jason Murphy*, *Jean-Yves Fortin* and *Geneviève Bergeron*, for Wilmington Trust Company, Wilmington Trust Corporation, Renaissance Leasing Corporation, Heather Leasing Corporation, G.I.E. Avions de transport régional and ATR Marketing Inc. (30729, 30730, 30731, 30732, 30738, 30740, 30742, 30743, 30745, 30749, 30750).

*Pierre Bourque* and *Eugene Czolij*, for Newcourt Credit Group (Alberta) Inc., Canada Life Assurance Company and CCG Trust Corporation (30740, 30742, 30745, 30750, 30751).

No one appeared for Canadian Imperial Bank of Commerce, Inter-Canadian (1991) Inc., Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc., Greater London International Airport Authority, Saint John Airport Inc., Canadian Regional Airlines Ltd. and Canadian Regional (1998) Ltd.

The judgment of the Court was delivered by

BINNIE J. — When an airline collapses leaving unpaid bills for airport charges and air navigation services, the question becomes who takes the financial loss (or, as it is sometimes said, "the haircut"), the people who ultimately own the aircraft or the people who were obliged to (and did) provide the airport and navigation services?

The question lands before the Court because of the collapse of "Inter-Canadian (1991) Inc. Airline" in 1999 and, in 2001, of Canada 3000 Airlines Ltd. and Royal Aviation Inc. (collectively "Canada

Authority et Charlottetown Airport Authority Inc. (30731, 30732, 30742, 30749, 30750, 30751).

*Gerald N. Apostolatos*, pour Aéroports de Montréal (30731, 30732, 30738, 30740, 30742).

*Sandra Abitan*, *David Tardif-Latourelle* et *Allon Pollack*, pour Greater Toronto Airports Authority (30731, 30732, 30742, 30743, 30745).

*Bertrand Giroux*, *Markus Koehnen*, *Jeff Gollob*, *Jason Murphy*, *Jean-Yves Fortin* et *Geneviève Bergeron*, pour Wilmington Trust Company, Wilmington Trust Corporation, Renaissance Leasing Corporation, Heather Leasing Corporation, G.I.E. Avions de transport régional et ATR Marketing Inc. (30729, 30730, 30731, 30732, 30738, 30740, 30742, 30743, 30745, 30749, 30750).

*Pierre Bourque* et *Eugene Czolij*, pour Newcourt Credit Group (Alberta) Inc., Compagnie d'Assurance du Canada sur la Vie et CCG Trust Corporation (30740, 30742, 30745, 30750, 30751).

Personne n'a comparu pour Banque Canadienne Impériale de Commerce, Inter-Canadien (1991) Inc., Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc., Greater London International Airport Authority, Saint John Airport Inc., Lignes aériennes Canadien régional Ltée et Canadian Regional (1998) Ltd.

Version française du jugement de la Cour rendu par

LE JUGE BINNIE — L'effondrement d'un transporteur aérien qui laisse impayés des redevances d'aéroport et des services de navigation aérienne soulève la question de savoir qui, des personnes qui sont en définitive propriétaires des aéronefs ou des personnes tenues de fournir les services d'aéroport et de navigation (et qui les ont fournis) assument la perte financière (ou, comme on dit parfois, y laissent des plumes). [1]

La Cour est saisie de cette question en raison de l'effondrement d'« Inter-Canadien (1991) Inc. » en 1999 et, en 2001, de Canada 3000 Airlines Ltd. et Royal Aviation Inc. (collectivement « Canada [2]

3000"). The answer depends on the statutory interpretation to be given to provisions of the *Airport Transfer (Miscellaneous Matters) Act*, S.C. 1992, c. 5 ("*Airports Act*"), and the *Civil Air Navigation Services Commercialization Act*, S.C. 1996, c. 20 ("*CANSCA*"). The important context for this interpretation is the unusual nature of the modern airline business.

3    After decades of financial turbulence, an airline in the modern era may consist of little more than a name, with its aircraft leased, its suppliers on week to week contracts and even its reservation and yield management systems outsourced to one of the global service providers such as Sabre or Galileo. Start-ups are relatively easy, balance sheets are often thin, and failure can be quick and (to outsiders) unexpected, as the history of Canada 3000 illustrates. When a financial collapse occurs (and these have been frequent in Canada and elsewhere in the past decade), there is little meat on the corporate bones for unsecured creditors. Doing business with such airline operators carries significant financial risks, yet the appellant Canadian airports operating under government supervision are obliged by statute to allow financially troubled airlines to make use of their services (and sometimes the airport will not know if an airline is in financial trouble or not). Airport costs are largely recovered through landing fees. If these and other fees go unpaid, the airport is out of pocket for the cost of the service it was obliged by law to provide.

4    "NAV Canada", the privatized successor to the former government-run civil air navigation system, is also obliged to offer its services to any aircraft flying through Canadian airspace on a cost-recovery basis. Its business is even riskier than that of the airports because quite often these aircraft do not even land in Canada, as in the case of transatlantic traffic flying the great circle route to and from the eastern seaboard of the United States: *Pan*

3000 »). La réponse tient à l'interprétation qu'il faut donner aux dispositions de la *Loi relative aux cessions d'aéroports*, L.C. 1992, ch. 5 (« *LCA* »), et de la *Loi sur la commercialisation des services de navigation aérienne civile*, L.C. 1996, ch. 20 (« *LCSNAC* »). Dans cette interprétation, le contexte de la nature particulière de l'industrie moderne du transport aérien revêt une grande importance.

Après des décennies de turbulences financières, un transporteur aérien de l'ère moderne peut n'avoir guère plus qu'un nom, avec des aéronefs loués, des contrats d'approvisionnement renouvelés de semaine en semaine et même des systèmes de réservation et de gestion de la recette unitaire confiés à un fournisseur mondial de services comme Sabre ou Galileo. Le démarrage est relativement facile, les bilans sont souvent maigres et l'échec peut survenir abruptement et (vu de l'extérieur) sans avertissement, comme l'illustre l'expérience de Canada 3000. Lorsque survient l'effondrement (et il y en a eu fréquemment au Canada et ailleurs au cours de la dernière décennie), il reste bien peu dans les coffres du transporteur pour satisfaire les créanciers non garantis. Ceux qui commercent avec ces transporteurs aériens courent des risques financiers considérables, mais les aéroports canadiens appelants, sur lesquels s'exerce une supervision gouvernementale, sont quand même légalement tenus de permettre à des transporteurs aériens en difficultés financières de recourir à leurs services (parfois, les aéroports ne savent rien de la santé financière d'un transporteur). C'est en grande partie par les frais d'atterrissage que les aéroports recouvrent leurs coûts. Lorsque ces frais et d'autres redevances ne sont pas payés, ce sont les aéroports qui absorbent le coût des services que la loi les oblige à fournir.

« NAV Canada », qui a pris la relève du gouvernement lorsque le système de navigation aérienne civile a été privatisé, est tenue elle aussi de fournir ses services à tout aéronef circulant dans l'espace aérien canadien, selon le principe de la récupération des coûts. Elle court un risque encore plus grand que les aéroports parce que, bien souvent, les appareils n'atterrissent même pas au Canada, comme c'est le cas de ceux qui empruntent la route

*American World Airways Inc. v. The Queen*, [1981] 2 S.C.R. 565.

When Parliament adopted its policy of privatizing major airports and navigation services in the early 1990s putting such services on a commercial footing, potential investors were expected to insist on some assurance that they would in fact be financially viable serving the chronically unstable aviation business. Thus, Parliament decided to extend to the private operators of airport and navigation services a statutory power to apply to a superior court judge for an order to seize and detain aircraft until outstanding charges are paid, similar to the power Parliament had earlier conferred on the Crown in pre-privatization days under the *Aeronautics Act*, R.S.C. 1985, c. A-2, s. 4.5.

It is worth emphasizing that no power to seize and detain as such is conferred. A superior court judge is interposed between the aircraft sought to be seized and the airports or NAV Canada. As discussed below, the role of the judge is crucial to an understanding of the statutory detention remedy.

The respondents are primarily entities with the ultimate ownership of the aircraft in respect of which the charges in issue were incurred ("the legal titleholders"). Their position is that under the terms of their various leases with the defaulting airlines, they did not operate the aircraft, nor did they make use of the services for which charges were levied, nor did they derive benefit therefrom. They say that they are investors, and that when the lessees failed they were entitled to repossess their aircraft free of the charges which the defaulting airlines — not the legal titleholders — incurred. They consider it unjust that they were required in these cases to post security as a condition of removing "their" aircraft from the airports in question. The appellant airport authorities and NAV Canada, on the other hand, argue that the failure of Canada 3000 and Inter-Canadian reflects the sort of air carrier instability that Parliament rightly anticipated and in light of

orthodromique en partance ou à destination du littoral est des États-Unis : *Pan American World Airways Inc. c. La Reine*, [1981] 2 R.C.S. 565.

Lorsque le Parlement a adopté au début des années 1990 son programme de privatisation des grands aéroports et des services de navigation et leur a donné une vocation commerciale, il s'attendait à ce que les investisseurs potentiels exigent une quelconque assurance qu'il serait financièrement viable de fournir des services à l'industrie du transport aérien, chroniquement instable. C'est pourquoi il a décidé d'accorder aux exploitants privés de ces services le pouvoir légal de demander à un juge de la juridiction supérieure une ordonnance de saisie et de rétention des aéronefs jusqu'à l'acquittement des redevances en souffrance, un pouvoir semblable à celui que le législateur avait déjà accordé à l'État avant la privatisation, sous le régime de la *Loi sur l'aéronautique*, L.R.C. 1985, ch. A-2, par. 4.5.

Il convient de souligner qu'aucun pouvoir de saisie et de rétention en soi n'est accordé. Un juge d'une cour supérieure agit comme intermédiaire entre un aéroport ou NAV Canada et l'aéronef à saisir. Comme on le verra plus loin, le rôle du juge est essentiel pour bien comprendre le recours en rétention prévu par la loi.

Les intimées sont principalement des entités qui sont les véritables propriétaires des aéronefs à l'égard desquels les redevances en cause ont été imposées (les « propriétaires en titre »). Elles prétendent qu'aux termes des divers baux conclus avec les transporteurs aériens défaillants, elles n'ont pas utilisé les aéronefs, pas plus qu'elles n'ont recouru aux services pour lesquels des redevances ont été imposées ou qu'elles n'ont tiré profit de ces services. Elles affirment être des investisseurs et que, lorsque les locataires ont fait défaut, elles avaient le droit de reprendre possession de leurs aéronefs libres de toutes les redevances dues par les transporteurs aériens défaillants, non par les propriétaires en titre. Elles estiment injuste que les propriétaires en titre aient été tenus dans ces cas de remettre une sûreté pour pouvoir retirer « leurs » aéronefs des aéroports en cause. Les appelantes, les administrations aéroportuaires et NAV Canada, soutiennent

5

6

7

which it created the statutory remedies in question. Parliament must be taken to appreciate, they say, that an airline may be only a corporate shell but an aircraft under detention is a good, solid and enduring hostage for payment.

8    I agree with the courts below that the respondent legal titleholders are not subject to personal or corporate liability to pay the unpaid charges under s. 55 of *CANSCA*. But that is not to say that the aircraft are similarly unburdened.

9    In my view, the appellants are entitled to obtain judicially authorized seize and detain orders (hereinafter sometimes collectively referred to as the detention remedy) to be exercised against the security posted in substitution for the aircraft. The matters should be remitted to the motions judges to work out the details of the orders. Considered in the context in which the detention remedy was intended by Parliament to operate, the detention remedy cannot be circumvented as suggested by the respondents by the expedient of leasing arrangements made between the airlines and the aircraft lessors. The detention remedy is purely statutory and Parliament's intention to create an effective collection mechanism against *the aircraft* itself owned or operated by the person liable to pay the amount or charge must be given full effect.

10    On the other hand, the appellants' remedy, if an order is granted, is limited to possession. Simple possession under the statutes does not confer any interest in the beneficial ownership of the aircraft. I do not think the appellants' further claim to the airborne equivalent of a maritime lien is well founded, nor do they have any "implied" power to sell the aircraft once detained. They get what the statute says they get — a right to apply for a judicial order to seize and detain the aircraft until payment — no more, and no less.

pour leur part que l'échec de Canada 3000 et Inter-Canadien illustre le genre d'instabilité des transports aériens que le législateur avait correctement prévue et en raison de laquelle il a créé les recours légaux en question. Selon elles, il faut considérer que le législateur était conscient qu'un transporteur aérien peut n'être qu'une coquille vide, mais qu'un aéronef en rétention constitue un gage solide et permanent de paiement.

Je partage l'opinion des juridictions inférieures que les propriétaires en titre intimés ne sont pas, aux termes de l'art. 55 de la *LCSNAC*, tenus personnellement de payer les redevances dues. Mais cela ne veut pas dire que les aéronefs soient pareillement dégagés.

À mon avis, les appelantes ont droit à des ordonnances judiciaires de saisie et de rétention (appelées parfois ci-après le recours en rétention) pouvant être exécutées sur les sûretés substituées aux aéronefs. Les affaires devraient être renvoyées aux juges des requêtes pour qu'ils précisent la teneur des ordonnances. Compte tenu du contexte dans lequel le législateur a envisagé le recours en rétention, les baux entre transporteurs aériens et locateurs d'avions ne peuvent servir de moyen pour contourner ce recours comme le prétendent les intimées. Le recours en rétention est d'origine purement législative, et il convient de donner pleinement effet à l'intention du législateur de créer un mode de perception efficace visant *l'aéronef* lui-même dont est propriétaire ou utilisateur la personne tenue au paiement des redevances.

Par ailleurs, la seule mesure de redressement offerte aux appelantes, si une ordonnance leur est accordée, se limite à la possession de l'aéronef. La simple possession aux termes de ces lois ne confère aucun droit de propriété bénéficiaire sur l'aéronef. L'autre prétention des appelantes relative à l'équivalent, pour le transport aérien, d'un privilège maritime, n'est pas fondée selon moi, et je ne crois pas non plus qu'elles puissent exercer un pouvoir « implicite » de vendre un aéronef qu'elles retiennent. Elles n'ont que ce que la loi leur accorde — un droit de demander au tribunal une ordonnance les autorisant à saisir et retenir un aéronef jusqu'au paiement de leur créance — ni plus ni moins.

For the reasons that follow, I would allow the appeals and the cross-appeals in part, and return the seizure and detention applications to the respective motions judges to be dealt with in accordance with this judgment.

Pour les motifs ci-après, je suis d'avis d'accueillir en partie les pourvois et les pourvois incidents en partie et de renvoyer les demandes de saisie et de rétention aux juges des requêtes respectifs pour qu'ils statuent sur elles en conformité avec le présent jugement. 11

## I.   Facts

In 1992, the *Airports Act* privatized airports formerly owned and operated by the federal government. In 1996, *CANSCA* implemented the same objective in relation to Canada's civil air navigation services. Thus NAV Canada was incorporated as a non-profit corporation for the purpose of developing, operating and maintaining the civil air navigation system; see *House of Commons Debates*, vol. 133, 2nd Sess., 35th Parl., March 25, 1996, at p. 1153. *CANSCA* implemented the transfer of what was Transport Canada's civil air navigation services to NAV Canada and established the commercial and economic regulatory arrangements for the continued operation of those services; see *House of Commons Debates*, vol. 134, 2nd Sess., 35th Parl., May 15, 1996, at p. 2821.

## I.   Faits

En 1992, la *LCA* a privatisé des aéroports que le gouvernement fédéral possédait et exploitait. En 1996, la *LCSNAC* a fait de même pour les services canadiens de navigation aérienne civile. C'est ainsi que NAV Canada a été constituée en société sans but lucratif ayant pour mandat de développer et d'assurer le fonctionnement et le maintien du système de navigation aérienne civile; voir les *Débats de la Chambre des communes*, vol. 133, 2e sess., 35e lég., 25 mars 1996, p. 1153. La *LCSNAC* a mis en œuvre le transfert à NAV Canada des services de navigation aérienne civile de Transports Canada et a établi les mesures réglementaires commerciales et économiques nécessaires pour assurer la prestation continue de ces services; voir les *Débats de la Chambre des communes*, vol. 134, 2e sess., 35e lég., 15 mai 1996, p. 2821. 12

### A.   *Canada 3000*

On November 8, 2001, Canada 3000 applied for protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). The effect of an initial court order made on the same day stayed all proceedings by creditors pending the filing of a plan of arrangement. Although the stay contemplated the continuation of operations, some five hours later the airlines' management issued a press release declaring that the airlines had ceased operations. The next day, November 9, a further order was issued grounding the fleet and providing for the return of aircraft operated by the airlines to Canada.

### A.   *Canada 3000*

Le 8 novembre 2001, Canada 3000 s'est prévalue de la protection de la *Loi sur les arrangements avec les créanciers des compagnies*, L.R.C. 1985, ch. C-36 (« *LACC* »). Une première ordonnance rendue le même jour a suspendu toutes les procédures intentées par les créanciers jusqu'au dépôt d'un plan d'arrangement. Même si l'ordonnance prévoyait la poursuite de l'exploitation, la direction de l'entreprise a publié environ cinq heures plus tard un communiqué de presse dans lequel elle déclarait qu'elle mettait fin à ses activités. Le lendemain, le 9 novembre, une nouvelle ordonnance interdisait la flotte de vol et prescrivait le retour au Canada des aéronefs utilisés par l'entreprise. 13

On November 9, 2001, NAV Canada applied to the Ontario Superior Court of Justice under s. 56(1) of *CANSCA* for an authorization to seize and detain certain aircraft operated by Canada 3000.

Le 9 novembre 2001, NAV Canada a demandé à la Cour supérieure de justice de l'Ontario aux termes du par. 56(1) de la *LCSNAC* l'autorisation de saisir et de retenir des aéronefs utilisés par Canada 3000. 14

RE CANADA 3000 INC. *Binnie J.*

The Greater Toronto Airport Authority ("GTAA") applied for relief against Canada 3000 but did not at that time seek leave of the court to seize and detain any aircraft.

15    On November 10, 2001, the directors and officers of Canada 3000 resigned. The next day the Canada 3000 companies were put into bankruptcy. At that time, the Canada 3000 companies owed approximately $7.4 million to NAV Canada, $13 million to the GTAA, and $8.35 million to the other Canadian airport authorities. On November 12, the GTAA moved to seize and detain aircraft under s. 9 of the *Airports Act* and on November 23, the other airport authorities applied for similar relief.

16    The detention remedy sought by the authorities was in relation to 38 aircraft operated by the Canada 3000 companies and collectively worth approximately US $1.1 billion. Despite the existence of the legal titleholders, all of the aircraft were registered in the name of Canada 3000 as owner under the *Aeronautics Act*. Canada 3000 held leases with the various respondents in respect of 36 aircraft. The lessors retained legal title to the aircraft. At the time of the *CCAA* application, rental payments under the leases were significantly in arrears.

17    The termination provisions varied somewhat from lease to lease. Under some, the leases came to an end and the lessors became entitled to repossession upon the granting of the *CCAA* order, under others by the cessation of operations, and under the rest by the assignment in bankruptcy. The *CCAA* stay operated, in effect, as an interim bar to repossession (see s. 11.31 *CCAA*). At the time the detention remedy was sought, the aircraft sought to be seized were grounded at the Canadian airports listed in the style of cause of the various proceedings.

18    On December 3, 2001, after the aircraft had been grounded for close to a month, the motions judge

La Greater Toronto Airports Authority (« GTAA ») a exercé un recours contre Canada 3000 mais n'a pas alors demandé l'autorisation de saisir et retenir des aéronefs.

Le 10 novembre 2001, les administrateurs et dirigeants de Canada 3000 ont démissionné. Le lendemain, les sociétés du groupe étaient mises en faillite. À ce moment, les sociétés de Canada 3000 devaient environ 7,4 millions de dollars à NAV Canada, 13 millions de dollars à la GTAA et 8,35 millions de dollars à d'autres administrations aéroportuaires canadiennes. Le 12 novembre, la GTAA a demandé la saisie et la rétention d'aéronefs sous le régime de l'art. 9 de la *LCA* et le 23 novembre, les autres administrations aéroportuaires ont fait de même.

Le recours en rétention exercé par les administrations visait 38 aéronefs d'une valeur globale approximative de 1,1 milliard de dollars US utilisés par les sociétés de Canada 3000. En dépit des propriétaires en titre, tous les aéronefs étaient immatriculés sous le régime de la *Loi sur l'aéronautique* comme appartenant à Canada 3000. Cette dernière avait conclu avec les diverses intimées des conventions de location relativement à 36 aéronefs. Les locateurs conservaient le titre de propriété sur les aéronefs. Au moment de la demande fondée sur la *LACC*, les arriérés de loyer représentaient une somme substantielle.

Les clauses de résiliation étaient quelque peu différentes d'un bail à l'autre. Certains baux prévoyaient la résiliation du bail et le droit du locateur à la reprise de possession lorsqu'une ordonnance était rendue en vertu de la *LACC*, selon d'autres, le bail était résilié à la cessation des activités, et selon d'autres, lors de la cession de faillite. En fait, suspension d'instance aux termes de la *LACC* avait pour effet d'interdire provisoirement la reprise de possession (voir *LACC*, art. 11.31). À la date du recours en rétention, les aéronefs visés étaient frappés d'interdiction de vol dans les divers aéroports canadiens énumérés dans l'intitulé des diverses instances.

Le 3 décembre 2001, presque un mois après l'interdiction de vol des aéronefs, le juge des requêtes

approved the terms of their release on the posting of security for 110 percent of the amounts alleged to be owed. The motions judge then heard the seizure and detention motions through December and into January 2002, and dismissed them on May 7, 2002. The airport authorities and NAV Canada appealed and on January 20, 2004, the Ontario Court of Appeal dismissed their appeal.

### B.  *Inter-Canadian*

Inter-Canadian operated its fleet of aircraft under leasing agreements with the legal titleholders but it too was the registered owner under the *Aeronautics Act*. On November 27, 1999, Inter-Canadian ceased operations and laid off 90 percent of its employees. At that point, it had accumulated unpaid charges totalling approximately $5 million owing to NAV Canada and to the airport authorities.

Through early December 1999 the airport authorities and NAV Canada moved to seize and detain a number of the aircraft. This was authorized by four orders made by the Quebec Superior Court between December 8 and 17. Before the seizure motions were launched, however, one of the respondents, Renaissance Leasing Corporation, had purported to terminate its lease with Inter-Canadian. The aircraft nevertheless remained on the tarmac at Dorval airport.

On January 5, 2000, Inter-Canadian filed a notice of intention to make a proposal to its creditors pursuant to the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3. The airline's creditors rejected its proposal in March and the company was deemed retroactively to have made an assignment in bankruptcy as of January 5. Faced with the legal titleholders' claims that they were entitled to repossession of the aircraft, the trustee in bankruptcy applied to the Superior Court for directions.

On July 7, 2000, the Superior Court allowed a motion to release the aircraft in exchange for security set at 150 percent of the claims of the

a approuvé les termes d'une mainlevée de la saisie contre la remise d'une sûreté équivalant à 110 pour 100 de la créance réclamée. Pendant le mois de décembre et une partie du mois de janvier 2002, il a entendu les requêtes en saisie et rétention, qu'il a rejetées le 7 mai 2002. Les administrations aéroportuaires et NAV Canada ont interjeté appel et le 20 janvier 2004, la Cour d'appel de l'Ontario a rejeté leur appel.

### B.  *Inter-Canadien*

Inter-Canadien exploitait sa flotte d'aéronefs en vertu de conventions de bail passées avec les propriétaires en titre des aéronefs, mais elle aussi était propriétaire enregistrée des appareils sous le régime de la *Loi sur l'aéronautique*. Le 27 novembre 1999, elle a cessé ses activités et a mis à pied 90 pour 100 de son personnel. Sa dette envers NAV Canada et les administrations aéroportuaires pour redevances impayées s'élevait alors à 5 millions de dollars environ. [19]

Au début de décembre 1999, les administrations aéroportuaires et NAV Canada ont demandé la saisie et la rétention d'un certain nombre d'aéronefs. Quatre ordonnances de la Cour supérieure du Québec les ont autorisées entre le 8 et le 17 décembre. Avant les requêtes en saisie toutefois, une des intimées, Renaissance Leasing Corporation, avait prétendu résilier son bail conclu avec Inter-Canadien. Les appareils sont quand même demeurés sur le tarmac à l'aéroport de Dorval. [20]

Le 5 janvier 2000, Inter-Canadien a déposé un avis de son intention de présenter une proposition à ses créanciers sous le régime de la *Loi sur la faillite et l'insolvabilité*, L.R.C. 1985, ch. B-3. Les créanciers ont rejeté la proposition au mois de mars, constituant rétroactivement le transporteur aérien en faillite en date du 5 janvier. Confronté aux demandes de reprise de possession des aéronefs que lui présentaient les propriétaires en titre, le syndic de faillite s'est adressé à la Cour supérieure pour obtenir des directives. [21]

Le 7 juillet 2000, la Cour supérieure a accueilli une demande de mainlevée de la saisie des aéronefs contre la remise d'une sûreté équivalant à 150 pour [22]

airport authorities and NAV Canada. On November 9, 2000, Tremblay J., having heard the application on its merits, confirmed the validity of the detention and also held the legal titleholders liable for the amounts owing. His ruling was overturned by a majority decision of the Quebec Court of Appeal, which held that the lessors' right to repossession took priority and that the legal titleholders were entitled to the return of their aircraft free and clear of the unpaid charges.

## II.  Judicial History

### A.  *Canada 3000*

#### (1)  Ontario Superior Court of Justice (Ground J.)

23    The motions judge concluded that the legal titleholders were not jointly and severally liable for the charges owed to NAV Canada under s. 55 of *CANSCA*. They were not "owners" within the meaning of the Act because none of the aircraft were registered in their name. Nor were any of the titleholders in possession of the aircraft when the charges were incurred. In his view, "the word 'owner' in [*CANSCA*] should not be interpreted to include persons who do not have custody or control of the aircraft, do not operate the aircraft, and do not make use of the air navigation services in respect of which the navigation charges are levied": (2002), 33 C.B.R. (4th) 184, at para. 52.

24    Further, the motions judge concluded that the seizure and detention remedies found in *CANSCA* and the *Airports Act* did not create a lien or security interest that ranked in priority to the ownership or perfected security rights of third parties. He preferred the analogy of a *Mareva* injunction:

I am not persuaded, however, that the legislation granting such detention rights should be interpreted as creating rights against third parties having ownership or perfected security interests in the aircraft such that they, in effect, become liable for the debts of third parties and must extinguish those debts before they can

100 du montant réclamé par les administrations aéroportuaires et NAV Canada. Le 9 novembre 2000, le juge Tremblay, qui avait entendu la requête au fond, a confirmé la validité de la rétention et a statué que les propriétaires en titre étaient tenus au paiement des sommes dues. La Cour d'appel du Québec a infirmé cette décision, les juges majoritaires statuant que le droit des locateurs à la reprise de possession avait préséance et que les propriétaires en titre avaient droit à ce que les aéronefs leur soient remis sans qu'ils aient à payer les redevances dues.

## II.  Les décisions antérieures

### A.  *Canada 3000*

#### (1)  Cour supérieure de justice de l'Ontario (le juge Ground)

Le juge des requêtes a conclu que, sous le régime de l'art. 55 de la *LCSNAC*, les propriétaires en titre n'étaient pas tenus solidairement au paiement des redevances dues à NAV Canada. Ils n'étaient pas les « propriétaire[s] » au sens de cette Loi parce qu'aucun des aéronefs n'était immatriculé à leur nom. Les propriétaires en titre n'avaient pas non plus la possession des aéronefs lorsque les redevances ont été imposées. À son avis, il ne fallait pas donner au [TRADUCTION] « mot "propriétaire" dans la [*LCSNAC*] une interprétation propre à inclure les personnes qui n'ont pas la garde ou la responsabilité des aéronefs, ne les utilisent pas et n'ont pas recours aux services de navigation aérienne pour lesquels les redevances sont imposées » : (2002), 33 C.B.R. (4th) 184, par. 52.

Le juge des requêtes a aussi conclu que les recours à la saisie et la rétention qu'offrent la *LCSNAC* et la *LCA* ne créaient pas un privilège ou une sûreté ayant préséance sur les droits de propriété ou les sûretés parfaites de tiers. Il a privilégié l'analogie à l'injonction *Mareva* :

[TRADUCTION] Je ne suis pas convaincu, toutefois, qu'il faille considérer que les dispositions conférant de tels droits de rétention ont créé des droits ayant pour effet de rendre des tiers jouissant, à l'égard des aéronefs, d'un droit de propriété ou d'une sûreté parfaite, responsables de dettes auxquelles ils sont étrangers et

enforce their contractual rights to repossess the aircraft or enter into possession of the aircraft to realize on their security. [para. 43]

Accordingly, he dismissed the claims of NAV Canada and the airport authorities.

### (2) Ontario Court of Appeal

#### (a) *Cronk J.A., for the Majority*

Cronk J.A. agreed with the motions judge that the titleholders were not jointly and severally liable under s. 55 of *CANSCA*. A restrictive definition of "owner" excluding legal titleholders was consistent with the user-pay model established by *CANSCA*, the broader regulatory system and the relevant legislative history, all of which demonstrated Parliament's intent to limit liability to "persons having legal custody and control and persons otherwise in possession of aircraft": (2004), 69 O.R. (3d) 1, at para. 118.

Cronk J.A. also agreed that the seizure and detention provisions in *CANSCA* and the *Airports Act* do not give the authorities priority over the rights of the titleholders to repossess the aircraft:

I conclude that the remedies under the Detention Provisions, if granted, do not create rights in the Aircraft that rank in priority to the interests in the Aircraft of the Lessors, the legal titleholders to the Aircraft, in the face of a claim for repossession and recovery of the Aircraft by the Lessors. . . . The Detention Provisions are intended to apply to aircraft of persons having legal custody and control or who are otherwise in possession of the aircraft. [para. 190]

In the view of the majority, even if the aircraft had been properly detained, the engines attached to the aircraft and leased to Canada 3000 by two of the respondents could be removed by their respective owners. The appeal of the various authorities was dismissed.

de les obliger à les acquitter pour pouvoir exercer leurs droits contractuels de reprendre possession ou d'entrer en possession des aéronefs en vue de réaliser leur garantie. [par. 43]

Il a donc rejeté les demandes de NAV Canada et des administrations aéroportuaires.                    25

### (2) Cour d'appel de l'Ontario

#### a) *La juge Cronk, pour la majorité*

La juge Cronk a souscrit à l'opinion du juge des     26
requêtes selon laquelle les propriétaires en titre n'étaient pas solidairement responsables en vertu de l'art. 55 de la *LCSNAC*. Elle a estimé qu'une définition restrictive du mot « propriétaire », qui exclut les propriétaires en titre, était conforme au principe de l'utilisateur-payeur établi par la *LCSNAC*, à un cadre réglementaire plus large et à l'historique législatif, qui dans l'ensemble témoignent de l'intention du législateur de limiter la responsabilité aux [TRADUCTION] « personnes qui ont la garde et la responsabilité légales des aéronefs ou aux personnes qui en ont autrement la possession » : (2004), 69 O.R. (3d) 1, par. 118.

La juge Cronk a également souscrit à l'opinion      27
voulant que les dispositions de la *LCSNAC* et la *LCA* relatives à la saisie et la rétention n'attribuent pas aux administrations un droit ayant préséance sur le droit des propriétaires en titre de reprendre possession des aéronefs :

[TRADUCTION] Je conclus qu'en faisant droit aux recours prévus par les dispositions relatives à la rétention, on ne crée pas, sur les aéronefs, de droits ayant préséance sur les droits des locateurs, les propriétaires en titre, en cas de demande de reprise de possession des aéronefs par ces derniers. [. . .] Les dispositions relatives à la rétention sont censées s'appliquer aux aéronefs de personnes qui ont la garde et la responsabilité légales des aéronefs ou qui en ont autrement la possession. [par. 190]

La majorité de la Cour d'appel a considéré que    28
même si les aéronefs avaient été légitimement retenus, les moteurs fixés aux aéronefs et loués à Canada 3000 par deux des intimées pouvaient être enlevés par leurs propriétaires respectifs. L'appel des diverses administrations a été rejeté.

(b) *Juriansz J. (ad hoc), Dissenting in Part*

29      Juriansz J. (*ad hoc*, now J.A.) would have allowed the appeal in respect of the detention remedies. In his view, these remedies focus on the aircraft and not the persons liable to pay. As long as the aircraft is owned or operated by a person liable to pay then it may be the subject of an application to seize and detain it. The fact that other persons may have property interests in the aircraft is of no consequence:

The remedy is "in addition to any other remedy available for the collection" of the outstanding charges. The remedy is not confined to collection of outstanding charges from persons liable for the charges. The remedy is not directed to persons at all, but rather to "aircraft", and permits the Authorities, under court supervision, to seize, to detain and to refuse to release the aircraft until somebody has satisfied the outstanding charges. [para. 255]

Juriansz J. also held that the detention provisions apply to the leased engines since they were affixed to the aircraft that were subject to the detention remedy.

B.  *Inter-Canadian*

(1)  Quebec Superior Court (Tremblay J.)

30      The motions judge held the titleholders to be jointly and severally liable for the unpaid charges due to NAV Canada under s. 55 of *CANSCA*. *CANSCA* and the *Airports Act* provide for a right to retain the aircraft operated by a party that has not paid its charges. The motions judge relied on arts. 1592 and 1593 of the *Civil Code of Québec*, S.Q. 1991, c. 64, and determined that the authorities' right of retention of the aircraft took priority over the lessors' interests: [2000] R.J.Q. 2935.

31      Accordingly, by order dated November 9, 2000, the motions judge confirmed the validity of the

b)  *Le juge Juriansz (ad hoc), dissident en partie*

Le juge Juriansz (*ad hoc*) (maintenant juge à la Cour d'appel) aurait accueilli l'appel relativement aux demandes de saisie et de rétention. Selon lui, ce recours vise les aéronefs et non les personnes tenues au paiement des redevances. Dès lors que l'aéronef appartient à une personne tenue de payer des redevances, ou est utilisé par elle, il peut faire l'objet d'une demande de saisie et de rétention. Le fait que d'autres personnes puissent avoir des droits de propriété sur les aéronefs n'entre pas en ligne de compte :

[TRADUCTION] Le recours s'exerce « en sus de tout autre recours visant [le] recouvrement » des redevances en souffrance. Il n'est pas limité au recouvrement de ces redevances auprès des personnes tenues de les payer. Il ne vise aucunement des personnes, mais plutôt les « aéronefs », et il permet aux administrations de saisir et de retenir un aéronef, sous supervision judiciaire, et de refuser de donner mainlevée tant que les redevances n'ont pas été acquittées. [par. 255]

Le juge Juriansz a aussi conclu que les dispositions relatives à la rétention s'appliquaient aux moteurs loués puisqu'ils étaient fixés aux aéronefs faisant l'objet du recours en rétention.

B.  *Inter-Canadien*

(1)  Cour supérieure du Québec (le juge Tremblay)

Le juge des requêtes a statué que les propriétaires en titre sont solidairement responsables du paiement des redevances dues à NAV Canada aux termes de l'art. 55 de la *LCSNAC*. Selon lui, la *LCSNAC* et la *LCA* prévoient le droit de retenir les aéronefs des utilisateurs en défaut de payer les redevances. Il a appuyé sa décision sur les art. 1592 et 1593 du *Code civil du Québec*, L.Q. 1991, ch. 64, et a statué que le droit des administrations de retenir les aéronefs avait priorité sur les droits des locateurs : [2000] R.J.Q. 2935.

Dans une ordonnance en date du 9 novembre 2000, le juge des requêtes a confirmé la validité des

seizures, and declared the respondents liable to pay the overdue charges.

(2) Quebec Court of Appeal

(a) *Pelletier and Morissette JJ.A., for the Majority*

Pelletier and Morissette JJ.A. reversed the motions judge's decision and absolved the legal titleholders from liability for unpaid service charges to NAV Canada under s. 55 of *CANSCA*. In their view, limiting the definition of "owner" to the enumerated categories in s. 55(2) was the only interpretation consistent with both the English and French versions of the statute and the statutory context. They noted that NAV Canada's interaction is primarily with the user of the aircraft, not the legal titleholders. They concluded, at (2004), 247 D.L.R. (4th) 503, para. 106, that

[TRANSLATION] these aircraft are in no way liable for the debts of Inter-Canadian for the simple reason that they do not belong to this debtor.

Moreover, in their view, neither the airport authorities nor NAV Canada had any right to an order to seize and detain the aircraft in priority to the rights of the legal titleholders. They rejected the motions judge's resort to the *Civil Code*.

(b) *Nuss J.A., Dissenting*

Nuss J.A. concluded that the intention and purpose of the statutory provisions would be defeated if the legal titleholders could obtain release of the aircraft without payment of the charges. However, he limited the liability of a legal titleholder to an obligation to pay the charges incurred in the operation of aircraft of which it is the titleholder:

. . . the titleholder, to obtain release of its seized aircraft must only pay all the charges, in the use of the airport, incurred (and unpaid) by the operator in the operation of any aircraft owned by the <u>same</u> titleholder. [Emphasis added; para. 145.]

saisies et a déclaré que les intimées étaient tenues au paiement des redevances en souffrance.

(2) Cour d'appel du Québec

a) *Les juges Pelletier et Morissette, pour la majorité*

Les juges Pelletier et Morissette ont infirmé la décision du juge des requêtes et ont dégagé les propriétaires en titre de l'obligation de payer les redevances dues à NAV Canada en vertu de l'art. 55 de la *LCSNAC*. Selon eux, la seule interprétation de la définition de « propriétaire » qui était compatible à la fois avec les versions française et anglaise de la Loi et avec le contexte législatif était celle qui en limitait la portée aux catégories énoncées au par. 55(2). Ils ont signalé que l'interlocuteur de prédilection de NAV Canada était l'usager d'un aéronef, non le propriétaire en titre. Ils ont conclu comme suit à [2004] R.J.Q. 2966, par. 106 :

32

. . . ces aéronefs ne sont tenus d'aucune façon aux dettes d'Inter-Canadien pour la simple et bonne raison qu'ils n'appartiennent pas à cette débitrice.

De plus, ils ont estimé que ni les administrations aéroportuaires ni NAV Canada n'avaient droit d'obtenir une ordonnance de saisie et de rétention des aéronefs leur conférant priorité sur les droits des propriétaires en titre. Ils ont jugé non fondé le recours au *Code civil* par le juge des requêtes.

33

b) *Le juge Nuss, dissident*

Le juge Nuss a conclu qu'il n'est conforme ni à l'intention du législateur ni à l'objet des dispositions législatives que les propriétaires en titre puissent obtenir mainlevée de la saisie des aéronefs sans acquitter les redevances. Toutefois, il a limité la responsabilité des propriétaires en titre au paiement des redevances imposées relativement à l'utilisation des aéronefs dont ils sont propriétaires :

34

[TRADUCTION] . . . pour obtenir mainlevée de la saisie de ses aéronefs, le propriétaire en titre n'a qu'à payer les redevances de services aéroportuaires dues par l'utilisateur qui se rapportent à l'utilisation de tout aéronef appartenant au <u>même</u> propriétaire. [Je souligne; par. 145.]

III. Statutory Provisions

35     The statutory provisions are reproduced in the relevant paragraphs of the reasons.

IV. Analysis

36     This case is from first to last an exercise in statutory interpretation, and the issues of interpretation are, as always, closely tied to context. The notion that a statute is to be interpreted in light of the problem it was intended to address is as old at least as the 16th century; see *Heydon's Case* (1584), 3 Co. Rep. 7a, 76 E.R. 637. In a more modern and elaborate formulation, it is said that "the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament" (E. A. Driedger, *Construction of Statutes* (2nd ed. 1983), at p. 87).

37     As this Court noted in 1915, part of the context is "the condition of things existent at the time of the enactment": *Grand Trunk Railway Co. of Canada v. Hepworth Silica Pressed Brick Co.* (1915), 51 S.C.R. 81, at p. 88. At the time the measures in question here were enacted, airline insolvencies and bankruptcies had become a fact of life throughout the airline industry. Many of the planes flown in and out of and across Canada were leased to, and flown by, airlines in, or close to, bankruptcy protection. Under the interpretation offered by the respondents and the majority decisions of the Courts of Appeal, the detention remedy would be opposable to everybody but the titleholder, whose aircraft is often the only asset to survive the financial wreckage. Parliament would be taken to have intended a remedy that is least effective when it is most needed. It is more likely that Parliament fully appreciated that in dealing with aircraft flown in and out of jurisdictions under complex leasing arrangements, the only effective collection scheme is to render the aircraft themselves available for seizure, and thereafter to let those interested in them, including legal titleholders, registered owners, sublessors and operators,

III. Les dispositions législatives

Les dispositions législatives applicables sont reproduites dans les paragraphes pertinents des motifs.

IV. Analyse

La présente espèce est, de bout en bout, un exercice d'interprétation des lois, et les questions d'interprétation sont, comme toujours, étroitement liées au contexte. Le précepte suivant lequel une loi doit être interprétée en fonction du problème auquel elle est censée remédier remonte au seizième siècle au moins; voir *Heydon's Case* (1584), 3 Co. Rep. 7a, 76 E.R. 637. Suivant une formulation plus moderne et plus exhaustive, on dit qu'[TRADUCTION] « il faut lire les termes d'une loi dans leur contexte global et en suivant le sens ordinaire et grammatical qui s'harmonise avec l'esprit de la loi, l'objet de la loi et l'intention du législateur » (E. A. Driedger, *Construction of Statutes* (2e éd. 1983), p. 87).

Comme notre Cour l'a fait remarquer en 1915, le contexte comprend notamment [TRADUCTION] « la situation existant au moment de l'adoption de la loi » : *Grand Trunk Railway Co. of Canada c. Hepworth Silica Pressed Brick Co.* (1915), 51 R.C.S. 81, p. 88. Au moment où le législateur a adopté les mesures en cause, les cas de transporteurs aériens insolvables ou en faillite étaient monnaie courante dans l'industrie du transport aérien. Bon nombre des avions qui survolaient le Canada, y arrivaient ou en partaient, étaient loués et utilisés par des transporteurs près de faire faillite ou en faillite. Suivant l'interprétation proposée par les intimées et retenue dans les décisions des Cours d'appel à la majorité, le recours en rétention serait opposable à tous, sauf aux propriétaires en titre dont les aéronefs constituent souvent les seuls avoirs qui survivent au naufrage financier. Le législateur aurait donc eu l'intention de créer un recours qui perd le plus de son efficacité lorsqu'il est le plus nécessaire. Il est plus probable que le législateur ait été pleinement conscient que, s'agissant d'aéronefs dont l'utilisation transcende les frontières et obéit à des baux complexes, le seul mode de perception efficace consiste à rendre

resolve their dispute about where the money is to come from to pay the debts due to the service providers. I should add that I agree with Juriansz J. that the legal titleholders are not without benefit from the services provided, although the benefit is indirect. Without the day to day flight operations the legal titleholders would have no business. They lease the aircraft intending them to be used in the very activities for which the services are provided. By and large, the legal titleholders are sophisticated corporations. They are knowledgeable about the ways of the industry in which they have chosen to participate.

Part of the important context is the commercial reality of the marketplace where a statute is intended to function. Here the privatized appellants provide services on the basis of a cost-based tariff fixed by regulation. Prior to *CANSCA* and the *Airports Act*, civil air navigation and airport services were provided by the federal government. Central to the statutory scheme is the fact that these service providers are self-funded and intended to be financially viable and independent; see *CANSCA*, ss. 7 and 8; *House of Commons Debates*, March 25, 1996, at pp. 1152-54. The privatized service providers do not possess the financial resources of the Crown. The statutory remedies are clearly intended to promote financial viability within a risky business environment and to make privatization attractive and practicable to potential investors.

Another important commercial fact is that not only are NAV Canada and the airport authorities required to provide services according to a cost-based tariff, but they cannot withhold services from even an obviously failing airline. Pursuant to the lease agreement between Transport Canada and

les aéronefs eux-mêmes saisissables et à laisser ensuite les divers intéressés, dont les propriétaires en titre, les propriétaires enregistrés, les sous-locateurs et les utilisateurs, résoudre leur différend sur la question de savoir qui paiera les sommes dues aux fournisseurs de services. J'ajouterais que je partage l'avis du juge Juriansz selon lequel les propriétaires en titre ne sont pas sans retirer des avantages des services fournis, même si ces avantages sont indirects. Les propriétaires en titre ne pourraient pas exercer leurs activités commerciales sans les opérations aériennes quotidiennes. Ils louent des aéronefs en souhaitant qu'ils servent aux activités mêmes pour lesquelles les services sont fournis. Généralement, les propriétaires en titre sont des sociétés bien informées. Ils sont rompus aux subtilités de l'industrie dans laquelle ils ont décidé de jouer un rôle.

38    La réalité commerciale de l'entreprise privée à laquelle une loi s'applique constitue un élément de ce contexte important. En l'espèce, les appelantes issues de la privatisation fournissent des services suivant un tarif fixé par règlement et établi en fonction des coûts. Avant l'entrée en vigueur de la *LCSNAC* et de la *LCA*, c'est le gouvernement fédéral qui assurait les services aéroportuaires et de navigation aérienne civile. L'autofinancement de ces fournisseurs de service constitue un élément fondamental du régime législatif, de même que la volonté qu'ils soient financièrement autonomes et viables : voir les art. 7 et 8 de la *LCSNAC*; *Débats de la Chambre des communes*, 25 mars 1996, p. 1152-1154. Les fournisseurs de services issus de la privatisation ne disposent pas des ressources financières du gouvernement. Les recours prévus par la loi visent donc clairement à favoriser leur viabilité financière dans un secteur commercial risqué et à faire en sorte que la privatisation attire des investisseurs et leur paraisse faisable.

39    Un autre facteur commercial important est le fait que non seulement NAV Canada et les administrations aéroportuaires sont tenues de fournir leurs services au tarif établi en fonction des coûts, mais elles ne peuvent refuser leurs services même à un transporteur aérien clairement au bord de la

the Airport Authorities, the airports cannot limit the access of aircraft to their facilities except in cases of bad weather or emergency conditions; see *Ottawa Macdonald-Cartier International Airport Ground Lease*, s. 8.10.02. Similarly, NAV Canada is obligated under s. 9 of *CANSCA* to provide all users with its civil air navigation services. This reflects the obligation undertaken by Canada under international agreements; see, e.g., *Air Transport Agreement Between the Government of Canada and the Government of the United States of America*, February 24, 1995 ("*USA-Canada Open-Skies Agreement*"), Annex I, s. 1.

40   With these preliminary comments on context (and in particular the vitally important commercial context in which these statutes were designed to operate), I turn to the two major questions raised by the appeals. Firstly are the *legal titleholders* liable for the debt incurred by the registered owners and operators of the failed airlines to the service providers? Secondly, even if they are not so liable, are *the aircraft* to which they hold title subject on the facts of this case to judicially issued seizure and detention orders to answer for the unpaid user charges incurred by Canada 3000 and Inter-Canadian?

A.   *Are the Legal Titleholders Jointly and Severally Liable to NAV Canada Under Section 55 of CANSCA for Outstanding Civil Air Navigation Charges?*

41   In my view, on a purposeful interpretation of s. 55, the answer is no. I agree with Ground J. and with the unanimous view of both Courts of Appeal that the legal titleholders are not personally liable for the unpaid charges. Section 55 provides:

**55.** (1) [Joint and several liability] The owner and operator of an aircraft are jointly and severally liable

déconfiture. Les baux conclus entre Transports Canada et les administrations aéroportuaires prévoient que les aéroports ne peuvent restreindre l'accès des aéronefs à leurs installations sauf en cas d'intempéries ou d'urgence; voir le *Bail foncier de l'aéroport international Macdonald-Cartier d'Ottawa*, art. 8.10.02. NAV Canada est pareillement tenue, en vertu de l'art. 9 de la *LCSNAC*, de fournir ses services de navigation aérienne civile à tous les usagers. Ces mesures correspondent aux obligations internationales contractées par le Canada; voir p. ex. l'*Accord relatif au transport aérien entre le gouvernement du Canada et le gouvernement des États-Unis d'Amérique*, 24 février 1995 (« *Accord ciels ouverts* »), Annexe I, art. 1.

Ces observations préliminaires sur le contexte (et en particulier sur le contexte commercial d'importance vitale dans lequel ces lois doivent s'appliquer) m'amènent à l'examen des deux principales questions soulevées dans ces pourvois. Premièrement, les *propriétaires en titre* sont-ils tenus aux dettes contractées envers les fournisseurs de services par les propriétaires enregistrés et usagers des transporteurs aériens défaillants? Et deuxièmement, même s'ils ne sont pas tenus à ces dettes, est-ce que *les aéronefs* dont ils sont propriétaires sont assujettis, dans les circonstances en cause, à des ordonnances judiciaires de saisie et de rétention pour garantir le paiement des redevances imposées à Canada 3000 et Inter-Canadien?

A.   *Les propriétaires en titre sont-ils solidairement responsables envers NAV Canada aux termes de l'art. 55 de la LCSNAC relativement aux redevances pour services de navigation aérienne civile en souffrance?*

À mon avis, selon une interprétation téléologique de l'art. 55, la réponse est non. Je souscris à l'opinion du juge Ground et à l'opinion unanime des deux Cours d'appel selon lesquelles les propriétaires en titre n'assument aucune responsabilité personnelle pour les redevances impayées. L'article 55 prévoit ce qui suit :

**55.** (1) [Solidarité] Le propriétaire et l'usager d'un aéronef sont solidaires du paiement des redevances

for the payment of any charge for air navigation services imposed by the Corporation in respect of the aircraft.

(2) [Meaning of "owner"] In subsection (1), "owner", in respect of an aircraft, includes

(*a*) the person in whose name the aircraft is registered;

(*b*) a person in possession of an aircraft as purchaser under a conditional sale or hire-purchase agreement that reserves to the vendor the title to the aircraft until payment of the purchase price or the performance of certain conditions;

(*c*) a person in possession of the aircraft as chattel mortgagor under a chattel mortgage; and

(*d*) a person in possession of the aircraft under a bona fide lease or agreement of hire.

The appellants contend that the word "owner" in s. 55(1) should be given its ordinary meaning to include the legal titleholders. Who, more than they, should be considered an "owner"? The legal titleholders respond that it would be absurd to make them jointly and severally liable for civil air navigation charges related to air operations in which they did not participate, any more than the owner of a rented car should be liable for charges incurred by a renter in using a toll bridge. They point out that the practical effect of NAV Canada's argument would be mischievous. In this case, for example, Canada 3000 leased a number of aircraft from International Lease Finance Corporation ("ILFC") based in California, one of the largest aircraft leasing companies in the world. If NAV Canada's interpretation of s. 55 is correct, it would mean that a seizure and detention order issued in respect of Canada 3000's unpaid user charges could in theory attach not only to the ILFC aircraft leased to Canada 3000, but also to any other aircraft to which ILFC holds title, including aircraft leased to other airlines (e.g. Lufthansa, British Airways or United Airlines). Thus the wreckage created by Canada 3000's collapse could spread disruption widely and

imposées par la société pour les services de navigation aérienne à l'égard de l'aéronef.

(2) [Définition de « propriétaire »] Pour l'application du paragraphe (1), « propriétaire », relativement à un aéronef, s'entend :

*a*) de la personne au nom de laquelle l'aéronef est immatriculé;

*b*) d'une personne qui est en possession de l'aéronef à titre d'acheteur en vertu d'un acte de vente conditionnelle ou d'un acte de location-vente qui laisse au vendeur le titre de propriété de l'aéronef jusqu'au paiement du prix d'achat ou jusqu'à l'accomplissement de certaines conditions;

*c*) d'une personne qui est en possession de l'aéronef à titre de débiteur hypothécaire en vertu d'une hypothèque sur biens meubles;

*d*) d'une personne qui est en possession de l'aéronef en vertu d'un bail ou d'un contrat de louage conclu de bonne foi.

Les appelantes soutiennent que le mot « propriétaire », au par. 55(1), doit être pris dans son sens ordinaire et inclure les propriétaires en titre. Qui plus qu'eux peut-on considérer comme des « propriétaire[s] »? Ces derniers objectent qu'il n'est pas plus logique de les rendre solidairement responsables de redevances imposées pour des services de navigation aérienne civile afférents à des opérations de transport aérien auxquelles ils n'ont pas pris part que de tenir le propriétaire d'une voiture louée responsable des droits que verse le locataire qui emprunte un pont à péage. Ils signalent que l'argument de NAV Canada aurait, en pratique, des conséquences pernicieuses. En l'espèce par exemple, Canada 3000 a pris à bail des aéronefs d'International Lease Finance Corporation (« ILFC ») de Californie, l'une des principales sociétés de location d'aéronefs au monde. Si l'interprétation de l'art. 55 proposée par NAV Canada est correcte, cela signifierait que l'ordonnance de saisie et de rétention rendue relativement aux redevances d'utilisation dues par Canada 3000 pourrait en théorie s'appliquer non seulement aux aéronefs d'ILFC loués à Canada 3000 mais aussi à tout autre appareil dont ILFC est propriétaire, y compris aux aéronefs loués à d'autres transporteurs aériens

42

perhaps unjustifiably trigger a further crisis in other airlines.

43    It seems clear from the statutes and the legislative record that Parliament intended to create a "user-pay" scheme for civil air navigation services, and that the only "users" of the civil air navigation services within the contemplation of the Act are the airlines, not the legal titleholders.

#### (1)    The Meaning of "Owner"

44    If s. 55(1) were read in isolation, the ordinary and grammatical meaning of "owner" would include the legal titleholder. However, this Court held, in *Bell ExpressVu Limited Partnership v. Rex*, [2002] 2 S.C.R. 559, 2002 SCC 42, that

one must consider the "entire context" of a provision <u>before</u> one can determine if it is reasonably capable of multiple interpretations. . . .

. . . It is necessary, in every case, for the court charged with interpreting a provision to undertake the contextual and purposive approach set out by Driedger, and *thereafter* to determine if "the words are ambiguous . . .". [Underlining added; paras. 29-30.]

45    Accordingly, to paraphrase the Court's decision in *Bristol-Myers Squibb Co. v. Canada (Attorney General)*, [2005] 1 S.C.R. 533, 2005 SCC 26, it is necessary to suspend judgment on the precise scope of the word "owner" in s. 55(1) and first to examine the "contextual" elements of the Driedger approach.

#### (2)    Statutory Context of Section 55

46    Understandably, the appellants lay great emphasis on the fact that s. 55(2) is introduced by the words

(p. ex. Lufthansa, British Airways ou United Airlines). Par conséquent, le naufrage causé par l'effondrement de Canada 3000 pourrait se répercuter largement dans l'industrie et, peut-être, déclencher sans raison une autre crise chez d'autres transporteurs aériens.

Les lois et l'historique législatif indiquent clairement que le législateur a voulu instituer un régime d'« utilisateur-payeur » en matière de services de navigation aérienne civile et que les seuls « usager[s] » de ces services visés par la loi sont les transporteurs aériens, non les propriétaires en titre.

#### (1)    Le sens de « propriétaire »

Si l'on considérait isolément le par. 55(1), le mot « propriétaire », dans son sens ordinaire et grammatical, inclurait le propriétaire en titre. Toutefois, notre Cour a déclaré ce qui suit dans l'arrêt *Bell ExpressVu Limited Partnership c. Rex*, [2002] 2 R.C.S. 559, 2002 CSC 42 :

Il [faut] tenir compte du « contexte global » de la disposition <u>pour</u> pouvoir déterminer si elle est raisonnablement susceptible de multiples interprétations. . .

. . . Il est donc nécessaire, dans chaque cas, que le tribunal appelé à interpréter une disposition législative se livre à l'analyse contextuelle et téléologique énoncée par Driedger, *puis* se demande si [TRADUCTION] « le texte est suffisamment ambigu . . . » [Soulignement ajouté; par. 29-30.]

Par conséquent, pour paraphraser un autre arrêt de notre Cour, *Bristol-Myers Squibb Co. c. Canada (Procureur général)*, [2005] 1 R.C.S. 533, 2005 CSC 26, il est nécessaire de réserver notre jugement sur la portée exacte du terme « propriétaire » au par. 55(1) et d'examiner d'abord les éléments « contextuels » de la méthode préconisée par Driedger.

#### (2)    Le contexte législatif de l'art. 55

Naturellement, les appelantes insistent fortement sur le fait que la version anglaise du par. 55(2) commence par les mots

In subsection (1), "owner", in respect of an aircraft, <u>includes</u> . . . .

followed by a list of four subsections. In the French text, on the other hand, the introductory words are

*Pour l'application du paragraphe (1), "propriétaire", relativement à un aéronef, <u>s'entend</u>* . . . .

There was, as might be expected, much argument over the words "includes" and "*s'entend*" in s. 55(2). NAV Canada argues that "includes" expands the definition of owner beyond the enumerated groups and that its ordinary meaning encompasses titleholders. The legal titleholders respond that the sense of "*s'entend*" in the French text is usually conveyed by the English word "means", which generally precedes a definition to be construed as exhaustive, and which would therefore exclude them from personal liability.

The English word "includes" may also, depending on the context, precede a list that exhausts the definition; see, e.g., *Dilworth v. Commissioner of Stamps*, [1899] A.C. 99 (P.C.), at pp. 105-6; *R. v. Loblaw Groceteria Co. (Manitoba) Ltd.*, [1961] S.C.R. 138.

In this case, in my view there are three significant reasons for adopting a restrictive interpretation of the word "includes" in s. 55(2), and thereby excluding the legal titleholders from liability under s. 55(1).

Firstly, it *is* significant that the French version signals a closed list; see Uniform Law Conference of Canada, *Drafting Conventions for the Uniform Law Conference of Canada* (on-line), s. 21(4). The shared meaning is not conclusive to when such an interpretation would be contrary to the purpose and intent of the statute, but it is preferred; see *Slaight Communications Inc. v. Davidson*, [1989] 1 S.C.R. 1038, at pp. 1070-72; *Schreiber v. Canada (Attorney General)*, [2002] 3 S.C.R. 269, 2002 SCC 62, at para. 56; and R. Sullivan, *Sullivan and Driedger on the Construction of Statutes* (4th ed. 2002), at pp. 79-90. Further, where one of the linguistic versions is broader than the other, the common meaning favours the more restricted or limited meaning;

*In subsection (1), "owner", in respect of an aircraft, <u>includes</u>* . . .

suivis de quatre alinéas, alors que la version française est introduite par l'énoncé suivant :

Pour l'application du paragraphe (1), « propriétaire », relativement à un aéronef, <u>s'entend</u> . . .

Comme on peut le penser, l'emploi des mots « *includes* » et « s'entend » au par. 55(2) a suscité un débat considérable. NAV Canada soutient que « *includes* » étend la définition de propriétaire au-delà des catégories énumérées et que son sens ordinaire englobe les propriétaires en titre. Ces derniers répliquent que l'expression française « s'entend » se rend habituellement en anglais par « *means* », qui introduit généralement une définition qu'il faut considérer comme exhaustive et qui écarterait par conséquent leur responsabilité personnelle.

47   Le mot anglais « *includes* » peut également, selon le contexte, introduire une définition exhaustive; voir p. ex. *Dilworth c. Commissioner of Stamps*, [1899] A.C. 99 (C.P.), p. 105-106; *R. c. Loblaw Groceteria Co. (Manitoba) Ltd.*, [1961] R.C.S. 138.

48   À mon avis, trois raisons importantes militent en l'espèce en faveur d'une interprétation restrictive du mot « *includes* » au par. 55(2) et écartent par conséquent la responsabilité des propriétaires en titre en vertu du par. 55(1).

49   Premièrement, le fait que la version française indique une définition fermée *est* significatif; voir Conférence pour l'harmonisation des lois au Canada, *Protocole de rédaction de la Conférence pour l'uniformisation des lois au Canada* (en ligne), par. 21(4). Même si la signification commune n'est pas déterminante lorsqu'elle irait à l'encontre de l'objet de la loi, elle est préférable; voir *Slaight Communications Inc. c. Davidson*, [1989] 1 R.C.S. 1038, p. 1070-1072; *Schreiber c. Canada (Procureur général)*, [2002] 3 R.C.S. 269, 2002 CSC 62, par. 56; R. Sullivan, *Sullivan and Driedger on the Construction of Statutes* (4e éd. 2002), p. 79-90. De plus, lorsque l'une des versions a une portée plus large que l'autre, la signification commune favorise

see *Schreiber*; *R. v. Dubois*, [1935] S.C.R. 378. As the English version is ambiguous, indicating that the list could be exhaustive or expansive depending on the context, the fact that the relatively clear French version signals that "owner" is restricted to the persons listed in s. 55(2) is a factor weighing against NAV Canada's expansive interpretation.

50    Secondly, I conclude (as did the Courts of Appeal) that interpreting the list enumerated in s. 55(2) as exhaustive of ownership for the purposes of s. 55(1) is consistent with the regulatory scheme as a whole and its legislative history, outlined below. In restricting "owner" to those in possession and legal custody and control of the aircraft, s. 55(2) is brought into conformity with the meaning that the word "owner" carries throughout the interlocking statutes that regulate aeronautics. For example, under the *Canadian Aviation Regulations*, SOR/96-433 ("*CARs*"), only a person who has legal custody and control may be a registered owner. Sections 55(2)(*b*) to (*d*) all explicitly state that the "owner" must be in possession of the aircraft. Also of significance is s. 55(2)(*d*), which includes as owner someone "in possession of the aircraft under a bona fide lease". No reference is made therein to the lessor. Parliament put its mind to aircraft leasing agreements and decided that the person in possession of the aircraft is the owner for the purposes of user charges.

51    Thirdly, exclusion of legal titleholders is consistent with Parliament's manifest intent to limit the scope of liability to "users" of NAV Canada's civil air navigation services. Section 32 of *CANSCA* authorizes NAV Canada to impose charges only on a "user", which s. 2(1) of the Act defines as "an aircraft operator." Part III of *CANSCA* lays out detailed mechanisms through which NAV Canada may impose fees. All of its provisions contemplate that it is the user who will be charged. Section 36(3)(*a*)(i) states that notice of changes to existing

le sens le plus restreint ou limité; voir *Schreiber*; *R. c. Dubois*, [1935] R.C.S. 378. Comme la version anglaise est ambiguë puisqu'elle indique que l'énumération pourrait être exhaustive ou ouverte selon le contexte, le fait que la version française relativement claire signale que le mot « propriétaire » se limite aux personnes énumérées au par. 55(2) constitue un facteur militant contre l'interprétation large que fait valoir NAV Canada.

Deuxièmement, je conclus (comme l'ont fait les Cours d'appel) qu'il est conforme à l'ensemble du régime de réglementation et à l'historique de la loi, dont il sera question plus loin, de voir une liste exhaustive dans l'énumération faite au par. 55(2) pour l'application du par. 55(1). En limitant le mot « propriétaire » aux personnes qui sont en possession d'un aéronef et qui en ont la garde et la responsabilité légales, le par. 55(2) s'aligne sur le sens qui est conféré au mot « propriétaire » dans l'ensemble des lois qui régissent l'aéronautique. Par exemple, suivant le *Règlement de l'aviation canadien*, DORS/96-433 (« *RAC* »), seule une personne qui a la garde et la responsabilité légales d'un aéronef peut en être le propriétaire enregistré. Les alinéas 55(2)b) à d) énoncent tous explicitement que le « propriétaire » doit être en possession de l'aéronef. L'alinéa 55(2)d) revêt aussi une importance particulière car il confère qualité de propriétaire à une personne qui est « en possession de l'aéronef en vertu d'un bail ou d'un contrat de louage conclu de bonne foi ». Il n'y est pas fait mention du locateur. Le législateur a pris en considération les accords de location d'aéronefs et il a décidé que la personne en possession d'un aéronef en est le propriétaire pour les besoins des redevances d'utilisation.

Troisièmement, l'exclusion des propriétaires en titre est conforme à l'intention manifeste du législateur de limiter la portée de la responsabilité aux « usagers » des services de navigation aérienne civile de NAV Canada. L'article 32 de la *LCSNAC* autorise NAV Canada à imposer des redevances uniquement à un « usager », défini comme l'« [e]xploitant d'un aéronef » au par. 2(1). La partie III de la *LCSNAC* prévoit des mécanismes précis à cet égard, et il ressort de toutes ses dispositions que c'est à l'usager que les redevances

charges and notice of new charges must be sent to representative user organizations. Section 37(4) states that NAV Canada must advise representative user organizations once a new charge has been approved. Section 44 limits the right to appeal charges to "any user, group of users or representative organization of users".

In contrast, titleholders are not provided with notice of rates or accounts of the charges that their aircraft accumulate. In this case, the respondents in the Canada 3000 case were only notified of the $7.4 million owing to NAV Canada the day before the airline filed for protection under the *CCAA*. Thus Cronk J.A. observed that

the charges scheme of the *CANSCA* does not protect aircraft lessors and secured creditors from the possible imposition by NAV Canada of improper or arbitrary navigation charges precisely because it is not envisaged that such persons will have any liability for such charges. [para. 101]

In summary, in my view, the statutory context supports the exclusion of the legal titleholders from the definition of owner under s. 55 of *CANSCA*.

(3)  The Broader Legislative Framework

As stated, aeronautics in Canada is governed by a complex web of statutes, regulations and international conventions. *CANSCA* and the *Airports Act* are part of this broader legislative framework. In *R. v. Ulybel Enterprises Ltd.*, [2001] 2 S.C.R. 867, 2001 SCC 56, the Court emphasized, at para. 52, "the principle of interpretation that presumes a harmony, coherence, and consistency between statutes dealing with the same subject matter". See also *Bell ExpressVu*, at para. 27.

The policy and practice throughout the federal regulatory scheme is to use the term "owner" to refer to the person in legal custody and control of

sont imposées. Le paragraphe 36(3) énonce que des préavis de révision des redevances existantes ou de nouvelles redevances doivent être envoyés aux organisations représentant les usagers. Aux termes du par. 37(4), NAV Canada doit informer ces organisations lorsqu'une nouvelle redevance a été approuvée. L'article 44 limite le droit d'interjeter appel relativement aux redevances à « l'usager ou l'organisation ou regroupement représentant ses intérêts ».

52 Les propriétaires en titre, par contre, ne reçoivent pas d'avis concernant la tarification ou le montant des redevances dues à l'égard de leurs aéronefs. En l'espèce, les intimées dans l'affaire Canada 3000 n'ont été informées de l'existence de la créance de 7,4 millions de dollars de NAV Canada que la veille du jour où le transporteur aérien s'est prévalu de la protection de la *LACC*. Ainsi, la juge Cronk a fait remarquer ce qui suit :

[TRADUCTION] [L]e régime de redevances de la *LCSNAC* ne protège pas les locateurs d'aéronefs et les créanciers garantis contre la possibilité que NAV Canada impose des redevances irrégulières ou arbitraires précisément parce qu'il n'est pas prévu que ces personnes soient assujetties à ces redevances. [par. 101]

53 En résumé, je suis d'avis que le contexte législatif appuie l'idée que les propriétaires en titre soient exclus de la définition de propriétaire à l'art. 55 de la *LCSNAC*.

(3)  Le cadre législatif plus général

54 Comme je l'ai indiqué, au Canada, l'aéronautique est régie par un ensemble complexe de lois, de règlements et de conventions internationales. La *LCSNAC* et la *LCA* font partie de ce cadre législatif élargi. Dans *R. c. Ulybel Enterprises Ltd.*, [2001] 2 R.C.S. 867, 2001 CSC 56, la Cour a mis l'accent, au par. 52, sur le « principe d'interprétation qui présume l'harmonie, la cohérence et l'uniformité entre les lois traitant du même sujet ». Voir aussi *Bell ExpressVu*, par. 27.

55 Dans tout le régime de réglementation fédéral en cause, le mot « propriétaire » renvoie en principe et en pratique à la personne qui a la garde et

the aircraft, not the legal titleholder. The *CARs*, for example, define owner as "the person who has legal custody and control of the aircraft" (s. 101.01(1)). The *Aeronautics Act* refers only to "registered owners" and, under s. 4.4(5), only the operator or *registered* owner may face liability for charges imposed under that Act. Section 3(1) defines a registered owner as the person to whom a certificate of registration has been issued and the *CARs* make clear that an aircraft may only be registered by an owner who, again, must have legal custody and control of the aircraft; see ss. 202.15 to 202.17. Section 2(2) of *CANSCA* itself states that "[u]nless a contrary intention appears, words and expressions used in this Act have the same meaning as in subsection 3(1) of the *Aeronautics Act*." I appreciate that arguments are available to counter these points but in my view the legal titleholders have the better side of the debate.

56    Internationally, the *Convention on International Civil Aviation*, December 7, 1944, Can. T.S. 1944 No. 36 (the "Chicago Convention"), does not require legal title to correspond with registered ownership. Article 19 states that registration shall be in accordance with the laws of the contracting State. It is common ground that, by virtue of ss. 202.15, 202.16 and 202.17 of the *CARs*, an aircraft may only be registered in the Canadian Civil Aircraft Register by the "owner" of the aircraft as that term is defined under s. 101.01(1) of the *CARs*, and that that person is the entity having legal custody and control of the aircraft. Thus an airline operating aircraft in Canada under a long-term lease is named on the Certificate of Registration as "owner" of the aircraft, notwithstanding that title is actually held by the lessor; see D. H. Bunker, *Canadian Aviation Finance Legislation* (1989), at p. 764. We have been given no reason why the privatization legislation should be held to depart so strikingly from Canadian regulatory practice.

la responsabilité légales de l'aéronef, non au propriétaire en titre. Le *RAC*, par exemple, définit le propriétaire comme étant « [d]ans le cas d'un aéronef, la personne qui en a la garde et la responsabilité légales » (par. 101.01(1)). Dans la *Loi sur l'aéronautique*, il n'est question que des « propriétaires enregistrés », et le par. 4.4(5) énonce que seul l'utilisateur ou le propriétaire *enregistré* peut être tenu responsable du paiement des redevances imposées en vertu de cette Loi. Au paragraphe 3(1), le propriétaire enregistré est défini comme le titulaire d'une marque d'immatriculation d'aéronef, et il ressort clairement du *RAC* qu'un aéronef ne peut être immatriculé que par un propriétaire qui, encore une fois, doit avoir la garde et la responsabilité légales de l'aéronef; voir les art. 202.15 à 202.17. Le paragraphe 2(2) de la *LCSNAC* lui-même énonce que « [à] moins d'indication contraire du contexte, les termes utilisés dans la présente loi s'entendent au sens du paragraphe 3(1) de la *Loi sur l'aéronautique*. » Je suis conscient qu'on peut opposer des arguments à chacun de ces points, mais j'estime que la position des propriétaires en titre est plus défendable.

Au plan international, la *Convention relative à l'aviation civile internationale*, 7 décembre 1944, R.T. Can. 1944 nº 36 (la « Convention de Chicago »), n'exige pas que le titre de propriété corresponde à l'immatriculation. L'article 19 énonce que l'immatriculation dans un État contractant s'effectue conformément à ses lois. Il est bien établi qu'aux termes des art. 202.15, 202.16 et 202.17 du *RAC*, un aéronef ne peut être inscrit au Registre des aéronefs civils canadiens que par son « propriétaire », au sens de la définition énoncée au par. 101.01(1) du *RAC*, et cette personne est l'entité qui en a la garde et la responsabilité légales. Ainsi, un transporteur aérien utilisant un aéronef au Canada en vertu d'un bail à long terme est désigné comme le « propriétaire » de l'aéronef au certificat d'immatriculation, bien que le détenteur réel du titre de propriété soit le locateur; voir D. H. Bunker, *Canadian Aviation Finance Legislation* (1989), p. 764. On n'a évoqué devant nous aucun motif justifiant de considérer que les lois opérant privatisation s'écarteraient de façon aussi marquée du cadre réglementaire canadien.

#### (4)  Legislative History

Though of limited weight, Hansard evidence can assist in determining the background and purpose of legislation; *Rizzo & Rizzo Shoes Ltd. (Re)*, [1998] 1 S.C.R. 27, at para. 35; *R. v. Morgentaler*, [1993] 3 S.C.R. 463, at p. 484. In this case, it confirms Parliament's apparent intent to exclude legal titleholders from personal liability for air navigation charges. The legislative history and the statute itself make it clear that Parliament did not intend *CANSCA* to replace or override the existing regulatory framework but rather to fit cohesively within it. In introducing *CANSCA*, the Minister of Transport stated that the *Aeronautics Act*, which establishes the essential regulatory framework to maintain safety in the aviation industry, "will always take precedence over the commercialization legislation" (*House of Commons Debates*, March 25, 1996, at p. 1154). In the Ontario Court of Appeal, Cronk J.A. highlighted a number of other instances where government spokespersons emphasized to Members of Parliament that *CANSCA* was to fit within the existing regulatory framework which generally favours the narrow meaning of "owner"; see, e.g., *House of Commons Debates*, May 15, 1996, at p. 2834; May 29, 1996, at p. 3144; June 4, 1996, at pp. 3394 and 3410; and *Debates of the Senate*, vol. 135, 2nd Sess., 35th Parl., June 10, 1996, at pp. 588-89.

In 1985, during passage of the *Aeronautics Act*, a concern was raised in Parliament that liability under s. 4.4(5) (that Act's liability provision) could extend to legal titleholders. In response, the Government inserted the term "registered owner". The Parliamentary Secretary to the Minister of Transport specifically stated that the change was made to ensure that liability did not extend to those who had a security or other financial interest in the aircraft; *House of Commons Debates*, vol. IV, 1st Sess., 33rd Parl., June 20, 1985, at pp. 6065-66.

In 1996, the Government considered Bill C-20 (which became *CANSCA*) as it transferred the

#### (4)  L'historique législatif

Bien que sa valeur probante soit restreinte, la transcription des débats parlementaires peut servir à déterminer le contexte et l'objet d'un texte législatif; *Rizzo & Rizzo Shoes Ltd. (Re)*, [1998] 1 R.C.S. 27, par. 35; *R. c. Morgentaler*, [1993] 3 R.C.S. 463, p. 484. En l'espèce, elle confirme l'intention évidente du législateur d'exclure la responsabilité personnelle des propriétaires en titre à l'égard des redevances pour la navigation aérienne. L'historique législatif et la *LCSNAC* elle-même montrent clairement que le législateur ne voulait pas que cette Loi remplace ou écarte le cadre réglementaire en place mais plutôt qu'elle s'y insère de façon cohérente. Lorsqu'il a présenté la *LCSNAC*, le ministre des Transports a déclaré que la *Loi sur l'aéronautique*, qui fournit le cadre réglementaire essentiel pour assurer la sécurité dans l'industrie aéronautique, « aura toujours préséance sur la loi prévoyant la commercialisation » (*Débats de la Chambre des communes*, 25 mars 1996, p. 1154). La juge Cronk de la Cour d'appel de l'Ontario a signalé d'autres interventions de porte-parole du gouvernement assurant les députés que la *LCSNAC* devait s'inscrire dans le cadre réglementaire existant qui retient généralement le sens étroit du mot « propriétaire »; voir p. ex. *Débats de la Chambre des communes*, 15 mai 1996, p. 2834; 29 mai 1996, p. 3144; 4 juin 1996, p. 3394 et 3410, et *Débats du Sénat*, vol. 135, 2e sess., 35e lég., 10 juin 1996, p. 588-589.

En 1985, au cours de l'adoption de la *Loi sur l'aéronautique*, des députés ont craint que la responsabilité imposée par le par. 4.4(5) (la disposition relative à la responsabilité) puisse s'étendre aux propriétaires en titre des aéronefs. C'est pourquoi le gouvernement a ajouté l'expression « propriétaire enregistré ». Le secrétaire parlementaire du ministre des Transports a explicitement précisé que cette modification visait à écarter la possibilité que soit retenue la responsabilité des titulaires d'une sûreté ou d'un autre intérêt financier sur un aéronef; voir *Débats de la Chambre des communes*, vol. IV, 1re sess., 33e lég., 20 juin 1985, p. 6065-6066.

Le projet de loi C-20 (devenu la *LCSNAC*) transférant de Transports Canada à NAV Canada

57

58

59

operation of the civil navigation system from Transport Canada to NAV Canada. The Clause by Clause Analysis brief presented to the Senate Committee explained that s. 55 is based on the wording of the equivalent section of the *Aeronautics Act* which, as stated, restricts "owner" to *registered* owner; see "Clause by Clause Analysis for the *Civil Air Navigation Services Commercialization Act*", as presented to the Senate Committee on Transport and Communications, at pp. 51-52. However, the textual discrepancy noted above was not addressed.

#### (5) Conclusion on the Section 55 Issue

60     A purposive interpretation of s. 55 that takes into account the foregoing considerations compels rejection of the position urged by NAV Canada. Moreover, and importantly, the narrow interpretation of "owner" in s. 55(1) conforms with common sense. It would be a severe disruption to the functioning of the airline industry if, as a result of Canada 3000's failure to pay its charges, NAV Canada could seize and detain an aircraft operated by, for example, Air Canada. There is no reason to think Parliament intended to let the damage caused by a failed airline expand beyond that airline's fleet of aircraft.

61     Accordingly, applying Driedger's contextual approach to s. 55(1) of *CANSCA*, I agree with the Courts of Appeal that the titleholders of the aircraft are *not* jointly and severally liable for the charges due to NAV Canada. They are not "owners" within the meaning of that section.

#### B.  *The Detention Remedy*

62     If the legal titleholders are not directly liable for the charges due to the service providers, they argue that it would be unfair and contradictory to hold their aircraft hostage for the payment. Section 56 of *CANSCA* and s. 9 of the *Airports Act* should be

l'exploitation du système de navigation civile a été examiné en 1996. L'analyse article par article du projet de loi présentée au comité sénatorial expliquait que le libellé de l'art. 55 s'inspirait de celui des dispositions analogues prévues par la *Loi sur l'aéronautique*, lesquelles, comme on l'a indiqué, limitent la notion de « propriétaire » à celle de propriétaire *enregistré*; voir [TRADUCTION] « Analyse article par article de la *Loi sur la commercialisation des services de navigation aérienne civile* », présentée au Comité permanent des transports et des communications du Sénat, p. 51-52. Toutefois, la formulation différente signalée précédemment n'a pas été expliquée.

#### (5) Conclusion pour la question relative à l'art. 55

Une interprétation téléologique de l'art. 55 tenant compte des considérations qui précèdent m'oblige à rejeter la solution que NAV Canada nous presse de retenir. En outre, il importe de signaler qu'une interprétation restrictive du mot « propriétaire » au par. 55(1) relève du bon sens. On perturberait gravement le fonctionnement de l'industrie du transport aérien si, en raison du défaut de Canada 3000 d'acquitter ses redevances, on permettait à NAV Canada de saisir et de retenir un avion utilisé, par exemple, par Air Canada. Rien ne nous autorise à penser que le législateur voulait que l'échec d'un transporteur aérien se répercute au-delà de la flotte de ce transporteur.

L'application, au par. 55(1) de la *LCSNAC*, de la méthode contextuelle préconisée par Driedger m'amène donc à conclure, comme le font les Cours d'appel, que les propriétaires en titre d'aéronefs *ne* sont *pas* solidairement tenus au paiement des redevances dues à NAV Canada. Ils ne sont pas des « propriétaires » au sens de cette disposition.

#### B.  *Le recours en rétention*

Les propriétaires en titre soutiennent que s'ils ne sont pas directement tenus au paiement des redevances dues aux fournisseurs de services, il serait injuste et illogique de prendre leurs aéronefs en gage pour garantir le paiement. Les propriétaires

interpreted consistently with s. 55(1) of *CANSCA*, the legal titleholders argue, and their right to repossess the aircraft on termination of the lease should take priority over the statutory remedy.

On the other hand, Nuss J.A., dissenting in the Quebec Court of Appeal, put the contrary position:

> If the titleholder could obtain release of the seized aircraft without the payment of the outstanding charges or providing security, the intention and purpose of the Detention Provisions enacted by Parliament would be defeated. This is so because the debt is constituted of charges incurred by the operator of the aircraft (who is often, as in this case, the registered owner) and not by the titleholder. Thus, if the contention of [the titleholders] were to prevail, the titleholder, who is neither the operator nor the "owner" within the meaning of the statutes, could always obtain release of the aircraft and the charges would not be paid. The recourse provided by Parliament would, inevitably, be of no avail. [para. 126]

I believe that Nuss J.A. is correct on this point.

The relevant provisions, which authorize applications to a superior court judge of the province in which any aircraft owned or operated by the person liable to pay the charge or amount is situated, are expressed in the two statutes in similar terms.

Section 56 of *CANSCA* provides:

**56.** (1) [Seizure and detention of aircraft] In addition to any other remedy available for the collection of an unpaid and overdue charge imposed by the Corporation for air navigation services, and whether or not a judgment for the collection of the charge has been obtained, the Corporation may apply to the superior court of the province in which any aircraft owned or operated by the person liable to pay the charge is situated for an order, issued on such terms as the court considers appropriate, authorizing the Corporation to seize and detain any such aircraft until the charge is paid or a bond or other security for the unpaid and overdue amount in a form satisfactory to the Corporation is deposited with the Corporation.

(2) [Application may be *ex parte*] An application for an order referred to in subsection (1) may be made

en titre affirment que les art. 56 de la *LCSNAC* et 9 de la *LCA* devraient être interprétés dans le sens du par. 55(1) de la *LCSNAC*, et que leur droit de reprendre possession des aéronefs sur résiliation du bail devrait avoir préséance sur le recours prévu par la Loi.

Le juge Nuss par contre, qui était dissident en Cour d'appel du Québec, soutient le contraire : 63

> [TRADUCTION] Il irait à l'encontre de l'objet des dispositions relatives à la rétention édictées par le législateur que le propriétaire en titre puisse obtenir mainlevée de la saisie sans avoir à payer les redevances dues ou à remettre une sûreté. En effet, la dette se compose de redevances encourues par l'utilisateur des aéronefs (qui en est souvent le propriétaire enregistré, comme en l'espèce) et non par leur propriétaire en titre. Ainsi, si l'argument des propriétaires en titre devait prévaloir le propriétaire en titre, qui n'est ni utilisateur ni « propriétaire » au sens des lois, pourrait toujours obtenir mainlevée, et les redevances ne seraient pas acquittées. Inévitablement, le recours prévu par le législateur ne servirait à rien. [par. 126]

Je pense que le juge Nuss a raison sur ce point.

Les dispositions pertinentes, qui autorisent les demandes à un juge de la juridiction supérieure de la province où se trouve l'aéronef dont le défaillant est propriétaire ou usager, ont un libellé analogue dans les deux lois. 64

L'article 56 de la *LCSNAC* prévoit ce qui suit : 65

**56.** (1) [Saisie et détention] À défaut de paiement ou en cas de retard de paiement des redevances qu'elle impose pour les services de navigation aérienne, la société peut, en sus de tout autre recours visant leur recouvrement et indépendamment d'une décision judiciaire à cet égard, demander à la juridiction supérieure de la province où se trouve l'aéronef dont le défaillant est propriétaire ou usager de rendre, aux conditions que la juridiction estime indiquées, une ordonnance l'autorisant à saisir et à retenir l'aéronef jusqu'au paiement des redevances ou jusqu'au dépôt d'une sûreté — cautionnement ou autre garantie qu'elle juge satisfaisante — équivalente aux sommes dues.

(2) [Demande sans préavis] Dans les mêmes circonstances, la société peut, si elle est fondée à croire

*ex parte* if the Corporation has reason to believe that the person liable to pay the charge is about to leave Canada or take from Canada any aircraft owned or operated by the person.

(3) [Release] <u>The Corporation shall release</u> from detention an aircraft seized under this section if

(*a*)  the amount in respect of which the seizure was made is paid;

(*b*)  a bond or other security in a form satisfactory to the Corporation for the amount in respect of which the seizure was made is deposited with the Corporation; or

(*c*)  <u>an order of a court directs the Corporation to do so</u>.

66    Section 9 of the *Airports Act*, under which the airport authorities bring their seizure and detention applications, is to the same effect.

**9.** (1) [Seizure and detention for fees and charges] Where the amount of any landing fees, general terminal fees or other charges related to the use of an airport, and interest thereon, set by a designated airport authority in respect of an airport operated by the authority has not been paid, the authority may, <u>in addition to any other remedy</u> available for the collection of the amount and <u>whether or not a judgment for the collection of the amount has been obtained</u>, on application to the superior court of the province <u>in which any aircraft owned or operated by the person liable to pay</u> the amount is situated, <u>obtain an order</u> of the court, issued on such terms as the court considers necessary, <u>authorizing the authority to seize and detain aircraft</u>.

(2) [Idem] Where the amount of any fees, charges and interest referred to in subsection (1) has not been paid and the designated airport authority has reason to believe that the person liable to pay the amount is about to leave Canada or take from Canada any aircraft owned or operated by the person, the authority may, in addition to any other remedy available for the collection of the amount and whether or not a judgment for the collection of the amount has been obtained, <u>on *ex parte* application</u> to the superior court of the province in which any aircraft owned or operated by the person is situated, obtain an order of the court, issued on such terms as the court considers necessary, authorizing the authority to seize and detain aircraft.

(3) [Release on payment] Subject to subsection (4), except where otherwise directed by an order of a court,

que le défaillant s'apprête à quitter le Canada ou à en retirer un aéronef dont il est propriétaire ou usager, procéder à la même demande *ex parte*.

(3) [Mainlevée] <u>La société donne mainlevée</u> de la saisie après paiement des sommes dues, contre remise d'une sûreté — cautionnement ou autre garantie qu'elle juge satisfaisante — équivalente aux sommes dues ou <u>si la juridiction lui ordonne de le faire</u>.

L'article 9 de la *LCA*, sur lequel sont fondés les recours en saisie et rétention des administrations aéroportuaires, comporte des dispositions similaires.

**9.** (1) [Saisie] À défaut de paiement des frais fixés par elle — frais généraux d'aérogare ou d'atterrissage ou toute redevance se rapportant à l'utilisation d'un aéroport, ainsi que les intérêts y afférents —, l'administration aéroportuaire désignée peut, <u>en sus de tout autre recours</u> visant leur recouvrement et <u>indépendamment d'une décision judiciaire à cet égard</u>, <u>demander</u> à la juridiction supérieure de la province <u>où se trouve l'aéronef dont le défaillant est propriétaire ou utilisateur</u> de rendre une <u>ordonnance l'autorisant à saisir et à retenir l'aéronef</u>, aux conditions que la juridiction estime nécessaires.

(2) [Demande sans préavis] Dans les mêmes circonstances, l'administration aéroportuaire désignée peut, si elle est en outre fondée à croire que le défaillant s'apprête à quitter le Canada ou à en retirer un aéronef dont il est propriétaire ou utilisateur, procéder à la même <u>demande *ex parte*</u>.

(3) [Mainlevée] Sauf ordonnance contraire de la juridiction, l'administration aéroportuaire désignée

a designated airport authority is not required to release from detention an aircraft seized under subsection (1) or (2) unless the amount in respect of which the seizure was made is paid.

(4)  [Release on security] A designated airport authority shall release from detention an aircraft seized under subsection (1) or (2) if a bond, suretyship or other security in a form satisfactory to the authority for the amount in respect of which the aircraft was seized is deposited with the authority.

(5)  [Same meaning] Words and expressions used in this section and section 10 have the same meaning as in the *Aeronautics Act*.

According to these provisions, the airport authorities or NAV Canada (upon obtaining a court order) may take possession of an aircraft and detain it. The aircraft must be either "owned" or "operated" by a person who is liable to pay. Either is a sufficient basis for an application.

The key difference between the joint and several liability provisions in s. 55 of *CANSCA* and the detention remedy provided for in s. 56 of *CANSCA* and s. 9 of the *Airports Act* is that the seizure and detention remedy lies against the aircraft. Whereas s. 55 identifies a group of *persons* who are made legally liable for the amounts owing, the detention remedy has a different focus. It provides for a right to possess *aircraft* until the debt is paid or security provided.

The legal titleholders argue that the claim of NAV Canada and the airport authorities to detain the aircraft must yield to their right under their respective leases to repossession. They liken the seizure and detention remedies to a *Mareva* injunction, in which the assets are frozen while various parties work out their respective entitlements; see *Aetna Financial Services Ltd. v. Feigelman*, [1985] 1 S.C.R. 2. However, in my view, there is no need to resort to analogies, especially loose analogies (e.g. *Mareva* injunctions are interlocutory, whereas the detention remedy is available whether or not a judgment for the collection of the charge or amount has been obtained. Moreover, *Mareva* injunctions are directed at persons (*Aetna Financial Services*,

n'est pas tenue de donner mainlevée de la saisie tant que les sommes dues n'ont pas été acquittées.

(4) [Sûretés] L'administration aéroportuaire désignée donne cependant mainlevée contre remise d'une sûreté — cautionnement ou autre garantie qu'elle juge satisfaisante — équivalente aux sommes dues.

(5) [Terminologie] Les termes du présent article et de l'article 10 s'entendent au sens de la *Loi sur l'aéronautique*.

Selon ces dispositions, les administrations aéroportuaires ou NAV Canada peuvent (après obtention d'une ordonnance) prendre possession d'un aéronef et le retenir. Le défaillant doit être le « propriétaire » ou l'« utilisateur » de l'aéronef; l'une ou l'autre qualité suffit pour fonder le recours.

La différence fondamentale entre les dispositions relatives à la solidarité à l'art. 55 de la *LCSNAC* et le recours en rétention prévu à l'art. 56 de la même Loi et à l'art. 9 de la *LCA* tient à ce que le recours à la saisie et à la rétention s'exerce sur l'aéronef. Alors que l'art. 55 indique un groupe de *personnes* tenues légalement responsables du paiement des redevances dues, le recours en rétention vise un autre objet. Il donne droit à la prise de possession de l'*aéronef* jusqu'au paiement de la dette ou au dépôt d'une sûreté.

Les propriétaires en titre soutiennent que le droit à la reprise de possession qui leur est conféré par leurs baux respectifs a préséance sur le droit de NAV Canada et des administrations aéroportuaires de retenir les aéronefs. Ils comparent le recours en saisie et en rétention à l'injonction *Mareva* qui a pour effet d'immobiliser les biens pendant que les parties dénouent l'écheveau de leurs droits respectifs; voir *Aetna Financial Services Ltd. c. Feigelman*, [1985] 1 R.C.S. 2. J'estime toutefois qu'il est inutile de recourir à des analogies, et encore moins à des analogies vagues (p. ex. l'injonction *Mareva* est un recours interlocutoire, alors que le recours en rétention est exercé indépendamment d'une décision judiciaire. De plus, l'injonction *Mareva* vise

67

68

69

at pp. 25-26), whereas the seizure and detention remedy targets the aircraft itself).

70 The *CARs*, adopted pursuant to the *Aeronautics Act*, provide that an "operator" in respect of an aircraft "means the person that has possession of the aircraft as owner, lessee or otherwise" (s. 101.01(1)). At the dates of the applications for seizure and detention orders, Canada 3000 and Inter-Canadian were still the *registered* owners of the aircraft. Accordingly, if the Court is to read the words of the detention remedy in the context of the realities of this industry previously discussed, it seems to me that those remedies must be available against the aircraft of Canada 3000 (except any aircraft already repossessed by the titleholder prior to the *CCAA* application on November 8, 2001) and Inter-Canadian. (Once a titleholder reclaims possession, it becomes an operator in possession within s. 55(1) of *CANSCA*. However, as its possession post-dates the charges, no personal liability is incurred on that account.)

71 It is difficult to endorse the indignation of the legal titleholders with respect to detention of their aircraft until payment is made for debts due to the service providers. They are sophisticated corporate players well versed in the industry in which they have chosen to invest. The detention remedies do not affect their ultimate title. Investors who have done their due diligence will recognize that detention remedies have deep roots in the transport business. In *The Emilie Millon*, [1905] 2 K.B. 817 ("*Mersey Docks*"), for example, the English Court of Appeal examined a statute that stipulated that the Mersey Docks and Harbour Board could cause a ship to be detained until all harbour and tonnage payments had been made despite the fact that the ownership of the ship did not correspond to the debtor who had incurred the charges. The ruling in that case reflects the traditional scope of this type of remedy (at p. 821):

des personnes (*Aetna Financial Services*, p. 25-26) alors que le recours en saisie et en rétention vise l'aéronef lui-même).

Le *RAC* pris aux termes de la *Loi sur l'aéronautique* prévoit qu'un « utilisateur », dans le cas d'un aéronef, est « la personne qui a la possession de l'aéronef, notamment à titre de propriétaire ou de locataire » (par. 101.01(1)). Aux dates des demandes de saisie et des ordonnances de rétention, Canada 3000 et Inter-Canadien étaient encore les propriétaires *enregistrés* des aéronefs. Par conséquent, si la Cour doit examiner les termes prévoyant le recours en rétention dans le contexte de cette industrie, tel qu'exposé précédemment, il me semble que ces recours doivent pouvoir être exercés à l'égard des aéronefs de Canada 3000 (exception faite des aéronefs dont le propriétaire en titre avait déjà repris possession avant le 8 novembre 2001, date de la demande fondée sur la *LACC*) et de ceux d'Inter-Canadien. (Dès qu'un propriétaire en titre reprend possession d'un aéronef, il devient un usager qui en a la possession au sens du par. 55(1) de la *LCSNAC*. Cependant, comme sa possession est postérieure à l'imposition des redevances, il n'est pas tenu personnellement au paiement de ces redevances.)

Il est difficile d'accepter que les propriétaires en titre s'indignent que leurs aéronefs soient retenus jusqu'à l'acquittement des créances des fournisseurs de services. Il s'agit d'entreprises bien informées et bien au fait de l'industrie dans laquelle elles ont choisi d'investir. Les recours en rétention ne portent pas atteinte à leur titre de propriété. Les investisseurs ayant fait preuve de diligence raisonnable n'ignoreront pas que les recours en rétention s'exercent depuis longtemps dans l'industrie du transport. Dans l'arrêt *The Emilie Millon*, [1905] 2 K.B. 817 (« *Mersey Docks* »), par exemple, la Cour d'appel anglaise a examiné une loi permettant au Mersey Docks and Harbour Board de retenir un navire jusqu'au paiement des droits de port et de tonnage, bien que le débiteur de ces frais ne fût pas le propriétaire du navire. La décision rendue dans cette affaire rend compte de la portée traditionnelle des recours de ce genre (p. 821) :

The Mersey Docks and Harbour Board have a right by statute to detain the vessel until the dock tonnage rates and harbour rates are paid. That is an express statutory right, and the board have nothing to do with any sale of the vessel to a purchaser. That is a matter which only concerns those who are interested in the vessel. It does not concern the board. <u>The board are entitled to detain the vessel, whoever is the owner, until the rates are paid.</u> The order appealed against deprives them of that right, and without their consent purports to give them an option to try and make some claim to a lien upon or right against the fund in priority to other claimants. The board have no such lien or right. If this vessel had been allowed to leave the dock, the board would have been left to make a futile claim against the fund in court. [Emphasis added.]

This type of provision is not uncommon in the airline business, see, e.g., decisions under a differently worded U.K. Act such as *Channel Airways Ltd. v. Manchester Corp.*, [1974] 1 Lloyd's Rep. 456 (Q.B.), at p. 461, in which it was held that the *Manchester Corporation Act* "mean[t] what it sa[id]", and that the city could detain aircraft in respect of which charges had been incurred until those charges had been paid. The legal titleholders face this problem on the other side of the Atlantic. It is a risk they manage there. No reason was given as to why they cannot manage it here.

The legal titleholders are in a better position to protect themselves against this type of loss than are the airport authorities and NAV Canada. The legal titleholders can select which airlines they are prepared to deal with and negotiate appropriate security arrangements as part of their lease transactions with the airlines. In the case of the aircraft at issue in these appeals, many if not all of the leases provided for substantial security deposits. For example, the total amount posted by Canada 3000 to the ILFC as security deposits for airport fees and charges was approximately $15,305,500. It is unnecessary to catalogue all of the possible security arrangements, but these deposits demonstrate a legal titleholder's ability to negotiate protection at a time when the airline is solvent to cover the amounts in overdue charges that the airline may

[TRADUCTION] Le Mersey Docks and Harbour Board est légalement autorisé à retenir le navire jusqu'à l'acquittement des droits de port et de tonnage. Il s'agit d'un droit expressément conféré par la loi, et le Board n'a rien à voir avec la vente du navire, qui ne concerne que ceux qui détiennent un intérêt sur ce navire. Le Board est étranger à cette mesure. <u>Il a le droit de retenir le navire, quel qu'en soit le propriétaire, jusqu'à ce que les droits soient payés.</u> L'ordonnance portée en appel le prive de ce droit et, sans qu'il y ait consenti, elle lui donne la possibilité de tenter de revendiquer un quelconque privilège ou droit lui permettant d'être payé par préférence aux autres sur le produit consigné de la vente. Le Board ne possède pas de tel privilège ou droit. Si le navire avait été autorisé à quitter le port, il ne serait plus resté au Board qu'à présenter au tribunal une réclamation futile sur le produit consigné de la vente. [Je souligne.]

Une disposition de ce genre n'est pas inhabituelle dans le commerce du transport aérien, voir p. ex. les décisions rendues en application d'une loi du Royaume-Uni formulée différemment telles *Channel Airways Ltd. c. Manchester Corp.*, [1974] 1 Lloyd's Rep. 456 (Q.B.), p. 461, dans laquelle la Cour a déclaré que le *Manchester Corporation Act* [TRADUCTION] « dit ce qu'elle veut dire » et a statué que la ville pouvait retenir un aéronef jusqu'au paiement des redevances imposées à son égard. Les propriétaires en titre sont aux prises avec ce problème de l'autre côté de l'Atlantique. Là-bas, c'est un risque qu'ils gèrent. Ils n'ont pas indiqué pourquoi ils ne peuvent le gérer ici.

Les propriétaires en titre peuvent mieux se protéger contre les pertes de ce genre que les administrations aéroportuaires ou NAV Canada. Ils sont en mesure de choisir les transporteurs aériens avec lesquels ils sont disposés à traiter et d'inclure des garanties acceptables dans les baux qu'ils négocient avec les transporteurs aériens. Dans le cas des aéronefs en cause dans ces appels, bon nombre des baux, sinon la totalité, prévoyaient des dépôts de garantie substantiels. Par exemple, le montant total du dépôt fourni par Canada 3000 pour protéger ILFC contre le non-paiement des redevances aéroportuaires s'élevait à environ 15 305 500 dollars. Il n'est pas nécessaire de dresser l'inventaire de toutes les formules de garantie possibles, mais ces dépôts démontrent que les propriétaires en titre peuvent négocier des mesures de protection avec

72

eventually be required to pay to the statutory service providers.

73    I agree with Cronk J.A. (at para. 133) that the detention remedy under the statutes is subject to several constraints: (i) the remedy is not automatic and requires prior court authorization; (ii) the remedy is discretionary and may be subject to such terms as the court considers necessary; (iii) under s. 9(3) of the *Airports Act* and s. 56(3)(*c*) of *CANSCA*, the court also has a discretion to limit the duration of the remedy by requiring the applicable authority to release a detained aircraft from detention prior to payment of the amount with respect to which the seizure was made; (iv) in any event, an authority that obtains an order under the detention provisions is required to release a detained aircraft upon payment of the outstanding amount or charges in respect of which the seizure was made or upon the provision of acceptable security therefor (ss. 9(3) and 9(4) of the *Airports Act* and ss. 56(1) and 56(3) of *CANSCA*); and (v) an order is not available under the detention provisions if the aircraft in respect of which the order is sought is exempt from seizure and detention under provincial law (s. 10(1) of the *Airports Act* and s. 57(1) of *CANSCA*) or, in the case of the *Airports Act*, under a regulation made by the Governor in Council (s. 10(2)).

74    On the other hand, the conclusion of Juriansz J., dissenting in part, was correct that "the wording of the Detention Provisions makes apparent that aircraft may be seized and detained without regard to the property interests of persons who are neither the registered owners nor the operators of the aircraft under the legislation. As long as the aircraft is owned or operated by a person liable to pay the outstanding charges, it may be the subject of an application to seize and detain it. The fact that there may be other persons, who are not liable to pay the outstanding charges but have property interests in the aircraft, is of no consequence" (para. 239).

les transporteurs aériens lorsque ceux-ci sont solvables afin de couvrir les montants des redevances en souffrance que le transporteur aérien peut éventuellement être requis de payer aux fournisseurs de services prévus par la loi.

Je suis d'accord avec la juge Cronk qui expose (au par. 133) les nombreuses restrictions applicables au recours en rétention prévu par la loi : (i) ce recours n'est pas automatique et doit être autorisé par la cour; (ii) il est discrétionnaire et le tribunal peut l'assujettir aux conditions qu'il estime nécessaires, (iii) aux termes des par. 9(3) de la *LCA* et 56(3) de la *LCSNAC*, le tribunal peut aussi limiter la durée de la saisie en ordonnant à l'administration en cause de donner mainlevée avant le paiement de la somme pour laquelle l'aéronef avait été saisi; (iv) en tout état de cause, une administration qui obtient une ordonnance autorisant la rétention est tenue de donner mainlevée sur paiement des sommes ou des redevances dues pour lesquelles la saisie a été pratiquée, ou contre remise d'une garantie satisfaisante (par. 9(3) et (4) de la *LCA* et 56(1) et (3) de la *LCSNAC*), et (v) une ordonnance de saisie ne peut être accordée si l'aéronef en cause est insaisissable en vertu du droit provincial (par. 10(1) de la *LCA* et 57(1) de la *LCSNAC*) ou, dans le cas de la *LCA*, si un règlement du gouverneur en conseil exempte l'aéronef de la saisie ou de la rétention (par. 10(2)).

Le juge Juriansz, dissident en partie, avait toutefois raison de conclure qu'il [TRADUCTION] « ressort clairement du libellé des dispositions relatives à la saisie et à la rétention qu'un aéronef peut être saisi et retenu sans égard aux droits de propriété des personnes qui ne sont ni propriétaires enregistrés ni utilisateurs de l'aéronef au sens des lois en cause. Tant que le débiteur des redevances en souffrance est propriétaire ou utilisateur de l'aéronef, une demande de saisie et de rétention de l'aéronef peut être présentée. Le fait que d'autres personnes, qui ne sont pas tenues de payer les redevances en souffrance, puissent avoir un droit de propriété sur l'aéronef n'entre pas en ligne de compte » (par. 239).

I turn, then, to a number of additional arguments raised on both sides which, in my view, with respect, unnecessarily complicate a straightforward task of statutory interpretation.

### (1)  Whether or Not a Lien Existed

In the Ontario case, there was considerable debate about whether the detention remedy created a lien. However, as the English Court of Appeal commented in *Mersey Docks*, there was no need for the port authority "to . . . make some claim to a lien" (p. 821). Nor is it necessary here. In this case, as in *Mersey Docks*, the remedy is purely a creature of statute. Whether or not a lien could be said to arise by operation of law is perhaps of theoretical interest but it has no practical bearing on the result in these appeals.

### (2)  Effect of the Bankruptcy Proceedings

The intervention of bankruptcy proceedings in both Quebec and Ontario created procedural complications. For present purposes, it is sufficient to note that the detention remedies in Quebec were applied for well before the assignment in bankruptcy. In Ontario, the detention remedies were applied for while the *CCAA* stay was in effect and Canada 3000 remained the registered owner of the aircraft in question. In neither case did the aircraft become part of the bankrupt estate (because ultimate ownership was in the legal titleholder). The aircraft were nevertheless legitimate targets of the detention remedies as they were still sitting on a Canadian airport tarmac and were still "owned or operated" (within the meaning of the relevant statutes) by the airlines at the relevant date.

### (3)  Resort to the *Civil Code of Québec*

In the Quebec Superior Court, Tremblay J. held that the seizure and detention provisions create a right similar to that found in arts. 1592 and 1593 of

J'aborde maintenant un certain nombre d'arguments soulevés de part et d'autre qui, à mon avis, compliquent inutilement un simple exercice d'interprétation des lois.

### (1)  L'existence d'un privilège

Les parties au litige ontarien ont beaucoup débattu la question de savoir si le recours en rétention créait un privilège. Cependant, comme la Cour d'appel anglaise l'a indiqué dans *Mersey Docks*, l'administration portuaire n'avait pas à [TRADUCTION] « revendiquer un quelconque privilège » (p. 821). Une telle revendication n'est pas nécessaire non plus en l'espèce. Comme dans l'affaire *Mersey Docks*, l'origine du recours en l'espèce est exclusivement législative. Bien que la question de savoir si un privilège a pu naître par l'effet de la loi puisse revêtir un intérêt théorique, elle n'a aucune incidence concrète sur l'issue des présents pourvois.

### (2)  L'effet des procédures de faillite

Les procédures de faillite tant au Québec qu'en Ontario ont engendré des complications procédurales. Pour les besoins de la présente espèce, il suffit de remarquer qu'au Québec, les recours en rétention ont été entamés bien avant la cession de faillite. En Ontario, les recours en rétention ont été entamés au cours de la période de suspension ordonnée en application de la *LACC*, et Canada 3000 est restée propriétaire enregistré des aéronefs en question. Dans ces deux cas, les aéronefs n'ont jamais fait partie de l'avoir de la faillie (parce que le titre de propriété appartenait aux propriétaires en titre). Néanmoins, les aéronefs pouvaient légitimement être visés par le recours en rétention puisqu'ils se trouvaient encore sur le tarmac d'un aéroport au Canada et que les transporteurs aériens en étaient encore « propriétaires ou usagers » (au sens des lois en cause) aux dates pertinentes.

### (3)  Le recours au *Code civil du Québec*

Le juge Tremblay de la Cour supérieure du Québec a statué que les dispositions relatives à la saisie et à la rétention créent un droit analogue à

75

76

77

78

the *Civil Code of Québec*. However, with respect, there is no need to make reference to provincial law or, more specifically, to the *Civil Code*, and to do so here is inappropriate. Section 56 of *CANSCA* and s. 9 of the *Airports Act* specifically state that the remedy is to be "in addition to any other remedy", which includes remedies under provincial law.

79    The *Aeronautics Act*, the *Airports Act* and *CANSCA* are federal statutes that create a unified aeronautics regime. Parliament endeavoured to create a comprehensive code applicable across the country and not to vary from one province to another. This uniformity is especially vital since aircraft are highly mobile and move easily across jurisdictions.

80    NAV Canada also relied on ss. 8.1 and 8.2 of the *Interpretation Act*, R.S.C. 1985, c. I-21, to urge that s. 56 of *CANSCA* provides for a *civiliste* right of retention. However, neither section applies in this case. Section 8.1 states that

if in interpreting an enactment it is necessary to refer to a province's rules, principles or concepts forming part of the law of property and civil rights, reference must be made to the rules, principles and concepts in force in the province at the time the enactment is being applied.

If it were *necessary* to resort to provincial law, then the provincial law to be used is that of the province in which the provision is being applied: *Peoples Department Stores Inc. (Trustee of) v. Wise*, [2004] 3 S.C.R. 461, 2004 SCC 68. Here, for reasons stated, resort to provincial law is not necessary.

81    Section 8.2 of the *Interpretation Act* states that

when an enactment contains both civil law and common law terminology, or terminology that has a different meaning in the civil law and the common law, the civil law terminology or meaning is to be adopted in the Province of Quebec and the common

celui que prévoient les art. 1592 et 1593 du *Code civil du Québec*. À mon avis cependant, il n'est pas nécessaire de recourir au droit provincial ou, plus spécifiquement, au *Code civil*, et il est inopportun d'y recourir en l'espèce. L'article 56 de la *LCSNAC* et l'art. 9 de la *LCA* énoncent expressément que ce recours s'exerce « en sus de tout autre recours », ce qui comprend les recours prévus par le droit provincial.

La *Loi sur l'aéronautique*, la *LCA* et la *LCSNAC* sont des lois fédérales qui établissent un régime unifié en matière d'aéronautique. Le législateur a voulu constituer un code exhaustif qui soit applicable dans tout le pays de façon uniforme d'une province à l'autre. Cette uniformité est d'autant plus essentielle que l'extrême mobilité des aéronefs leur permet de passer facilement d'un territoire à l'autre.

NAV Canada a également invoqué les art. 8.1 et 8.2 de la *Loi d'interprétation*, L.R.C. 1985, ch. I-21, au soutien de l'argument selon lequel l'art. 56 de la *LCSNAC* crée un droit de rétention civiliste. Toutefois, aucun de ces articles ne s'applique en l'espèce. L'article 8.1 prévoit ce qui suit :

. . . s'il est nécessaire de recourir à des règles, principes ou notions appartenant au domaine de la propriété et des droits civils en vue d'assurer l'application d'un texte dans une province, il faut [. . .] avoir recours aux règles, principes et notions en vigueur dans cette province au moment de l'application du texte.

S'il est *nécessaire* d'avoir recours au droit provincial, c'est le droit de la province où la disposition est appliquée qui doit servir : *Magasins à rayons Peoples inc. (Syndic de) c. Wise*, [2004] 3 R.C.S. 461, 2004 CSC 68. En l'espèce, il n'est pas nécessaire, pour les motifs déjà exposés, de recourir au droit provincial.

L'article 8.2 de la *Loi d'interprétation* énonce notamment :

. . . est entendu dans un sens compatible avec le système juridique de la province d'application le texte qui emploie à la fois des termes propres au droit civil de la province de Québec et des termes propres à la common law des autres provinces, ou qui emploie des termes

law terminology or meaning is to be adopted in the other provinces.

The issue here is not one of conflicting terminology. The language used in relation to the detention remedy is perfectly apt to make Parliament's intention clear bilingually and bijuridically. In short, resort to the *Civil Code* was neither necessary nor appropriate.

### (4) Existence of a Power of Sale

The appellants argue that the existence of a seizure and detention implies (in their favour) a power of sale. No such power is contained in *CANSCA* or the *Airports Act*. Nor is it necessarily implied in the creation of a power to seize and detain. The only claim that the authorities have under federal aeronautics law is the claim to possession of the aircraft until their user charges are paid.

### (5) Presumption Against Interference With Private Rights

The Ontario motions judge applied a narrow approach to the Detention Remedy on the basis that it invades what would otherwise be the proprietary rights of the legal titleholders. Reference was made to *Royal Bank of Canada v. Sparrow Electric Corp.*, [1997] 1 S.C.R. 411, where it was held that the legislation at issue in that case did not impose a charge in the nature of a lien because of the absence of clear and unambiguous language. However, only if a provision is ambiguous (in that after full consideration of the context, multiple interpretations of the words arise that are equally consistent with Parliamentary intent), is it permissible to resort to interpretive presumptions such as "strict construction". The applicable principle is not "strict construction" but s. 12 of the *Interpretation Act*, which provides that every enactment "is deemed remedial, and shall be given such fair, large and liberal construction and interpretation as best ensures the attainment of its objects"; see *Bell ExpressVu*, at para. 28:

qui ont un sens différent dans l'un et l'autre de ces systèmes.

Nous ne sommes pas en présence de termes contradictoires en l'espèce. Les termes employés relativement au recours en rétention sont tout à fait propres à exprimer clairement l'intention du législateur dans les deux langues et dans les deux systèmes de droit. Bref, il n'était ni nécessaire ni indiqué de recourir au *Code civil*.

### (4) L'existence d'un pouvoir de faire vendre

Les appelantes soutiennent que la saisie et la rétention emportent (en leur faveur) un pouvoir de faire vendre. Ni la *LCSNAC* ni la *LCA* ne prévoient un tel pouvoir. Il ne découle pas non plus nécessairement de la création du pouvoir de saisir et retenir. Tout ce que les administrations peuvent revendiquer sous le régime du droit aéronautique fédéral, c'est la possession des aéronefs jusqu'à l'acquittement de leurs redevances.

### (5) La présomption de non-atteinte aux droits privés

Le juge des requêtes saisi de l'affaire ontarienne a appliqué une démarche restrictive au recours en rétention parce que ce recours empiète sur ce qui serait autrement des droits de propriété des propriétaires en titre. Il a cité l'arrêt *Banque Royale du Canada c. Sparrow Electric Corp.*, [1997] 1 R.C.S. 411, dans lequel la Cour a statué qu'en raison de l'absence de texte clair et sans équivoque, les dispositions en cause n'imposaient pas un privilège. Toutefois, le recours à des présomptions comme le principe de « l'interprétation stricte » ne se justifie que si une disposition est ambiguë (au sens où, à l'issue d'un examen exhaustif du contexte, le libellé peut donner lieu à diverses interprétations également compatibles avec l'intention du législateur). Ce n'est pas le principe de « l'interprétation stricte » qui s'applique mais l'art. 12 de la *Loi d'interprétation* qui énonce que tout texte « est censé apporter une solution de droit et s'interprète de la manière la plus équitable et la plus large qui soit compatible avec la réalisation de son objet »; voir *Bell ExpressVu*, par. 28 :

82

83

84

Other principles of interpretation — such as the strict construction of penal statutes and the "*Charter* values" presumption — only receive application where there is ambiguity as to the meaning of a provision. (On strict construction, see: *Marcotte v. Deputy Attorney General for Canada*, [1976] 1 S.C.R. 108, at p. 115, *per* Dickson J. (as he then was); *R. v. Goulis* (1981), 33 O.R. (2d) 55 (C.A.), at pp. 59-60; *R. v. Hasselwander*, [1993] 2 S.C.R. 398, at p. 413; *R. v. Russell*, [2001] 2 S.C.R. 804, 2001 SCC 53, at para. 46. . . .)

In my view, there is no ambiguity in the statutory language creating the detention remedy and thus resort to "strict construction" is not called for.

### (6) Limitation of Debts on an Aircraft by Aircraft Basis

85      The titleholders argue that it would be extremely unfair that one titleholder's aircraft, however recently leased, may ultimately be held hostage for all of the unpaid user charges of the airline that flew it. They contend that if (which they deny) the titleholders must pay charges in order to recover an aircraft, they should only be required to pay the charges incurred by the individual aircraft sought to be released, as opposed to the charges outstanding in relation to the whole fleet of the defaulting airline.

86      However, the statute says that an aircraft operated by the person liable to pay the amount can be seized and, absent further court order, need not be released until the entire amount owed by that *operator* has been paid. This point is made clearly by the release provisions in s. 9(3) of the *Airports Act* and s. 56(3) of *CANSCA*. The authorities must only release the aircraft if "the amount in respect of which the seizure was made is paid". Since s. 9(1) and s. 56(1) do not distinguish between the amounts accumulated by specific aircraft operated by a defaulting owner or operator, it seems clear that the amount in respect of which the seizure was made is the entire amount owed by that registered owner or operator.

D'autres principes d'interprétation — telles l'interprétation stricte des lois pénales et la présomption de respect des « valeurs de la *Charte* » — ne s'appliquent que si le sens d'une disposition est ambigu. (Voir, relativement à l'interprétation stricte : *Marcotte c. Sous-procureur général du Canada*, [1976] 1 R.C.S. 108, p. 115, le juge Dickson (plus tard Juge en chef du Canada); *R. c. Goulis* (1981), 33 O.R. (2d) 55 (C.A.), p. 59-60; *R. c. Hasselwander*, [1993] 2 R.C.S. 398, p. 413, et *R. c. Russell*, [2001] 2 R.C.S. 804, 2001 CSC 53, par. 46. . .)

Selon moi, les dispositions créant le recours en rétention ne sont aucunement ambiguës, et il n'y a donc pas lieu de recourir à « l'interprétation stricte ».

### (6) Fractionnement de la dette aéronef par aéronef

Selon les propriétaires en titre, il serait extrêmement injuste qu'un aéronef puisse, quelle que soit la date, même récente, de sa location, être retenu comme gage du paiement de la totalité des redevances dues par le transporteur aérien qui l'a utilisé. Ils prétendent que si les propriétaires en titre doivent acquitter des redevances pour recouvrer un appareil (ce qu'ils contestent), ils ne devraient avoir à payer que les redevances imposées à l'égard de l'appareil pour lequel mainlevée est demandée, et non celles qui se rapportent à la flotte entière du transporteur en défaut.

Les textes de loi prévoient toutefois qu'un aéronef utilisé par le débiteur des redevances impayées peut être saisi et, en l'absence de nouvelle ordonnance judiciaire, peut être retenu jusqu'au paiement du montant total dû par cet *utilisateur*. C'est ce qu'indiquent clairement les dispositions relatives à la mainlevée aux par. 9(3) de la *LCA* et 56(3) de la *LCSNAC*. Les administrations ne sont pas tenues de donner mainlevée de la saisie des aéronefs « tant que les sommes dues n'ont pas été acquittées ». Puisque les par. 9(1) et 56(1) ne font pas de distinction en fonction des redevances accumulées à l'égard de chaque aéronef d'un propriétaire enregistré ou utilisateur défaillant, il semble clair que la dette à l'égard de laquelle la saisie a été pratiquée est le montant total dû par ce propriétaire ou utilisateur.

(7) <u>Limitation of Seizure to Exclude Engines</u>

Two of the respondents, RRPF Engine Leasing Ltd. and Flight Logistics Inc. (the "engine lessors"), leased to Canada 3000 the engines attached to two of the aircraft which, when seized, were airworthy. The engine lessors argue that they should be entitled to repossess their engines because seizure of the aircraft is not seizure of the engines. They cite Laskin J. (as he then was) in *Firestone Tire & Rubber Co. of Canada v. Industrial Acceptance Corp.*, [1971] S.C.R. 357, for the proposition that the doctrine of accession does not apply to a removable and identifiable object such as the engines.

In my view, the engines are part of the aircraft for present purposes. Engines and equipment such as onboard computers fall under the definition of "aeronautical product" in the *Aeronautics Act* (s. 3(1)). If the engines could be removed, third-party lessors could cannibalize any "aircraft propeller or aircraft appliance or part or the component parts of any of those things, including any computer system and software"; see *Aeronautics Act*, s. 3(1).

*Firestone Tire* is not of assistance here. In that case, a truck was repossessed under a conditional sales contract. The vendor in possession of the seized truck sought to retain the tires mounted on the truck as against the claim of the unpaid conditional seller of the tires. Laskin J. was concerned about the windfall one creditor might receive when repossessing the property of another unpaid creditor for which he "has given no value" (p. 359). Here, no beneficial interest is implicated. The engines are attached to the aircraft in respect of which charges were incurred and that are the subject of the detention. The Act does not envisage the dismantling of the aircraft (and thus of its value as a security) on the tarmac.

(7) <u>Exclusion des moteurs</u>

Deux des intimées, RRPF Engine Leasing Ltd. et Flight Logistics Inc. (les « locateurs de moteurs »), ont donné à bail à Canada 3000 les moteurs installés dans deux des aéronefs saisis, lesquels étaient en bon état de vol au moment de la saisie. Elles prétendent avoir droit de reprendre possession de leurs moteurs parce que la saisie d'aéronefs diffère de la saisie de moteurs. S'appuyant sur les motifs du juge Laskin (plus tard Juge en chef) dans *Firestone Tire & Rubber Co. of Canada c. Industrial Acceptance Corp.*, [1971] R.C.S. 357, elles font valoir que la doctrine de l'accession ne s'applique pas à un objet amovible et identifiable comme un moteur. [87]

Selon moi, pour les besoins de la présente espèce, les moteurs sont des composantes des aéronefs. Les moteurs et les pièces d'équipement comme les ordinateurs de bord entrent dans la définition de « produits aéronautiques » énoncée dans la *Loi sur l'aéronautique* (par. 3(1)). Si les moteurs pouvaient être enlevés, les tiers locateurs pourraient aussi enlever « les hélices et appareillages d'aéronefs, ainsi que leurs pièces ou autres éléments constitutifs, y compris les matériels et logiciels informatiques »; voir *Loi sur l'aéronautique*, par. 3(1). [88]

*Firestone Tire* n'est d'aucun secours en l'espèce. Cette affaire portait sur la reprise d'un camion aux termes d'un contrat de vente conditionnelle. Le vendeur en possession du véhicule opposait son droit de conserver les pneus installés sur le camion à la réclamation du vendeur conditionnel de ces pneus. Le juge Laskin a estimé injustifiable l'avantage inattendu dont aurait joui un créancier en prenant possession de choses appartenant à un autre créancier impayé sans avoir « donné [. . .] aucune contrepartie » (p. 359). En l'espèce, aucun intérêt bénéficiaire n'est en cause. Les moteurs sont fixés aux aéronefs à l'égard desquels des redevances ont été imposées et qui sont visés par la rétention. Les dispositions législatives n'envisagent pas le démontage des appareils sur le tarmac (et, par conséquent, le morcellement de leur valeur en tant que garantie). [89]

(8)  Effect of Sub-Leases

90    The respondents Ansett Worldwide Aviation, U.S.A. and MSA V leased three aircraft to Canada 3000, two of which, in turn, had been leased by those respondents from other persons under head leases. These sub-lessors stand in no better position than the legal titleholders, and the aircraft in which they have a leasehold interest were subject to seizure.

C.  *The Important Role of the Motions Judge*

91    The detention remedy does not create any rights unless, and until, a court order is made authorizing the seizure and detention of an aircraft. Instead, the provisions create potential remedies, available at the discretion of the court and subject to such conditions as the court considers necessary, as Cronk J.A. noted, at para. 134.

92    Much of the potential unfairness which the titleholders envisage in the operation of the detention remedy can be addressed by the motions judge. Section 56(3)(*c*) of *CANSCA* states that NAV Canada must release the aircraft "if . . . an order of a court directs the Corporation to do so". Similarly, s. 9(3) of the *Airports Act* states that an airport authority need not release the aircraft until the charges are paid, "except where otherwise directed by an order of a court". Parliament has left the door open for the motions judge to work out an arrangement that is fair and reasonable to all concerned, provided that the object and purpose of the remedy (to ensure the unpaid user fees are paid) is fulfilled. It would be open to a judge on a detention remedy hearing to determine an allocation amongst the titleholders that reflected such factors as the number of seized aircraft, the amount of charges in relation to a particular aircraft or the short duration of an aircraft's life spent in the doomed fleet. The judge need not make each aircraft hostage for the full amount of the unpaid charges, provided the result is that the authority is paid in full. In this way, what may otherwise be portrayed as a draconian

(8)  L'effet de la sous-location à bail

Les intimées Ansett Worldwide Aviation, U.S.A. et MSA V ont loué trois aéronefs à Canada 3000, et elles avaient elles-mêmes loué deux de ces appareils d'autres personnes aux termes de baux principaux. Elles ne sont pas en meilleure position, à titre de sous-locateurs, que les propriétaires en titre, et les aéronefs sur lesquels elles détiennent un intérêt à bail étaient visés par la saisie.

C.  *L'importance du rôle du juge des requêtes*

Le recours en rétention ne crée pas de droits sauf si une ordonnance autorise la saisie et la rétention d'un aéronef, et à compter de cette ordonnance. Les dispositions législatives en cause prévoient plutôt un recours potentiel, soumis au pouvoir discrétionnaire du tribunal et subordonné aux conditions que le tribunal estime nécessaires, comme l'a signalé la juge Cronk au par. 134.

Le juge des requêtes peut examiner bon nombre des possibles effets injustes du recours en rétention qu'ont évoqués les propriétaires en titre. Le paragraphe 56(3) de la *LCSNAC* énonce que NAV Canada doit donner mainlevée de la saisie « si la juridiction lui ordonne de le faire ». De la même façon, le par. 9(3) de la *LCA* prévoit qu'une administration aéroportuaire n'est pas tenue de donner mainlevée de la saisie tant que les sommes dues n'ont pas été acquittées, « [s]auf ordonnance contraire de la juridiction ». Le législateur a donné au juge des requêtes la latitude nécessaire pour élaborer des solutions justes et raisonnables pour toutes les parties en cause, dans la mesure où elles sont compatibles avec la réalisation de l'objet et de l'esprit du recours (assurer le paiement des redevances dues). Il serait loisible au juge qui entend une demande de saisie et de rétention de procéder à une répartition entre propriétaires en titre qui tienne compte de facteurs comme le nombre d'aéronefs saisis, le montant des redevances afférentes à un appareil en particulier ou la courte période pendant laquelle un appareil a fait partie de la flotte du transporteur défaillant. Le juge n'a pas à retenir chaque aéronef en gage du paiement de la totalité des redevances dues pourvu que

remedy can be reduced to a fair and proportionate judicial response to the airline collapse.

D. *Interest*

The *Airports Act* explicitly authorizes the airport authorities to charge interest on the overdue amounts. Section 9(1) defines the amount on account of which the seizure was made as the "amount of any landing fees, general terminal fees or other charges related to the use of an airport, and underline interest thereon". While *CANSCA* makes no explicit mention of interest, ss. 32 to 35 lay out a broad authority for NAV Canada to set and charge its fees. A procedure has been established under s. 35(1)(*a*), whereby the Minister of Transport approves the charges imposed by NAV Canada. The Minister has approved a regulation imposing interest. Notice was provided to airline operators (although not the legal titleholders) and no judicial review of this regulation was sought.

The time value of money is universally accepted in ordinary commercial practice; see *Bank of America Canada v. Mutual Trust Co.*, [2002] 2 S.C.R. 601, 2002 SCC 43. There is no reason for this principle to be excluded in the case of privatized aeronautics services, and it is not surprising that NAV Canada has been permitted to incorporate interest on unpaid charges into its charging scheme.

The question then turns to how long the interest can run. The airport authorities and NAV Canada have possession of the aircraft until the charge or amount in respect of which the seizure was made is paid. It seems to me that this debt must be understood in real terms and must include the time value of money.

Given the authority to charge interest, my view is that interest continues to run to the first of the

l'administration soit entièrement payée. Ainsi, une mesure qu'on pourrait autrement dépeindre comme draconienne peut devenir une réponse juste et mesurée à l'effondrement du transporteur aérien.

D. *Les intérêts*

La *LCA* autorise expressément les administrations aéroportuaires à exiger des intérêts sur les sommes en souffrance. Le paragraphe 9(1) définit la créance fondant la saisie comme les « frais généraux d'aérogare ou d'atterrissage ou toute redevance se rapportant à l'utilisation d'un aéroport, ainsi que les underline intérêts y afférents ». Bien que les intérêts ne soient pas explicitement mentionnés dans la *LCSNAC*, les art. 32 à 35 accordent à NAV Canada un pouvoir étendu de fixer et d'imposer des redevances. Suivant une procédure établie en application de l'al. 35(1)*a*) en vue de l'approbation, par le ministre des Transports, des redevances imposées par NAV Canada, le Ministre a approuvé un règlement imposant des intérêts. Les transporteurs aériens (mais non les propriétaires en titre) ont reçu avis du règlement, lequel n'a fait l'objet d'aucune demande de contrôle judiciaire. 93

En matière commerciale, la valeur temporelle de l'argent est universellement reconnue; voir *Banque d'Amérique du Canada c. Société de Fiducie Mutuelle*, [2002] 2 R.C.S. 601, 2002 CSC 43. Rien ne justifie d'écarter ce principe dans le cas des services aéronautiques privatisés, et il n'est pas surprenant que NAV Canada ait été autorisée à inclure dans sa tarification l'intérêt sur les redevances en souffrance. 94

Il s'agit donc alors de se demander pendant combien de temps les intérêts peuvent courir. Les administrations aéroportuaires et NAV Canada peuvent demeurer en possession des aéronefs tant que les redevances ou les sommes à l'égard desquelles la saisie a été pratiquée n'ont pas été acquittées. Il me semble que cette créance doit être envisagée dans son contexte et doit inclure la valeur temporelle de l'argent. 95

Vu l'existence du pouvoir d'exiger des intérêts, je suis d'avis que les intérêts courent jusqu'à la date 96

date of payment, the posting of security or bankruptcy. If interest were to stop accruing before payment has been made, then the airport authorities and NAV Canada would not recover the full amount owed to them in real terms. Once the owner, operator or titleholder has provided security, the interest stops accruing. The legal titleholder is then incurring the cost of the security and losing the time value of money. It should not have to pay twice. While a *CCAA* filing does not stop the accrual of interest, the unpaid charges remain an unsecured claim provable against the bankrupt airline. The claim does not accrue interest after the bankruptcy: ss. 121 and 122 of the *Bankruptcy and Insolvency Act*.

du paiement des redevances, de la remise d'une sûreté ou de la faillite, selon celui de ces événements qui survient en premier. Si les intérêts cessaient de courir avant le paiement de la créance, les administrations aéroportuaires et NAV Canada ne recouvreraient pas le montant total réel qui leur est dû. La remise d'une sûreté par le propriétaire, l'utilisateur ou le propriétaire en titre met fin à l'accumulation des intérêts. Le propriétaire en titre supporte alors le coût de la sûreté et perd la valeur temporelle de l'argent ainsi engagé. Il ne devrait pas avoir à payer deux fois. Alors que le fait de se prévaloir de la *LACC* ne met pas fin à l'accumulation de l'intérêt, les redevances impayées restent une créance non garantie prouvable à l'égard du transporteur aérien failli. La réclamation n'accumule pas d'intérêts après la faillite : art. 121 et 122 de la *Loi sur la faillite et l'insolvabilité*.

97     A particular issue is raised in the Quebec appeals regarding proper notice of the interest charges. This is an issue to be dealt with by the motions judge when these matters are returned for further consideration and disposition.

Les pourvois québécois soulèvent une question particulière concernant l'avis des frais d'intérêt qui doit être donné. Cette question sera examinée par le juge des requêtes lorsque ces affaires lui seront renvoyées pour qu'il en poursuive l'examen et qu'il rende une décision.

V.   Disposition[*]

V.   Décision[*]

98     For these reasons, I would allow the appeals and cross-appeals in part, as follows:

Pour ces motifs, je suis d'avis d'accueillir en partie les pourvois et les pourvois incidents ainsi qu'il suit :

1.   I would dismiss the appeals of NAV Canada seeking to hold the respondents liable in their personal/corporate capacity;

1.   les pourvois de NAV Canada visant à faire reconnaître la responsabilité personnelle des intimées sont rejetés;

2.   I would allow the appeals of NAV Canada and the airport authorities of the dismissal of their seizure and detention applications and remit those applications to the respective motions judges to be dealt with in accordance with these reasons;

2.   les pourvois formés par NAV Canada et les administrations aéroportuaires contre le rejet de leurs demandes de saisie et de rétention sont accueillis et ces demandes sont renvoyées aux juges des requêtes respectifs pour qu'ils les tranchent conformément aux présents motifs;

3.   I would set aside the orders requiring NAV Canada and the airport authorities to reim-

3.   les ordonnances enjoignant NAV Canada et les administrations aéroportuaires de défrayer les

---

[*]   The amendments to para. 98, issued on August 16, 2006, are included in these reasons.

[*]   Les modifications qui ont été apportées au par. 98 le 16 août 2006 sont incorporées dans les présents motifs.

burse the respondents for the aircraft detention costs;

4.   I would allow the appeals of NAV Canada and the GTAA of the ruling that the engine lessors are entitled to repossess the leased engines;

5.   Interest on overdue charges continues to run to the first of the date of payment, the posting of security or bankruptcy.

In other respects, the appeals and cross-appeals will be dismissed. Aéroports de Montréal, St. John's International Airport Authority Inc. and Charlottetown Airport Authority Inc. are entitled to their costs in the Quebec appeals. All other parties shall bear their own costs.

*Appeals and cross-appeals allowed in part.*

*Solicitors for NAV Canada (30214): Gowling Lafleur Henderson, Toronto.*

*Solicitors for Greater Toronto Airports Authority (30214): Osler Hoskin & Harcourt, Toronto.*

*Solicitors for Winnipeg Airports Authority Inc., Halifax International Airport Authority, Edmonton Regional Airports Authority, Calgary Airport Authority, Aéroports de Montréal, Ottawa Macdonald-Cartier International Airport Authority, Vancouver International Airport Authority and St. John's International Airport Authority (30214): Ogilvy Renault, Toronto.*

*Solicitors for International Lease Finance Corporation, Hyr Här I Sverige Kommanditbolag, IAI X, Inc., Triton Aviation International LLC, Sierra Leasing Limited, ACG Acquisition XXV LLC, ILFC International Lease Finance Canada Ltd. and U.S. Airways Inc. (30214): Torys, Toronto.*

*Solicitors for G.E. Capital Aviation Services Inc., as Agent and Manager for Polaris Holding*

intimées des coûts afférents à la rétention des aéronefs sont annulées;

4.   les pourvois formés par NAV Canada et la GTAA contre la décision portant que les locateurs de moteurs ont le droit de reprendre possession des moteurs loués sont accueillis;

5.   les intérêts sur les sommes en souffrance courent jusqu'à la date du paiement des redevances, de la remise d'une sûreté ou de la faillite, selon celui de ces événements qui survient en premier.

Pour le reste, les pourvois et pourvois incidents seront rejetés. Aéroports de Montréal, St. John's International Airport Authority Inc. et Charlottetown Airport Authority Inc. ont droit à leurs dépens dans les pourvois québécois. Toutes les autres parties supporteront leurs propres dépens.

*Pourvois et pourvois incidents accueillis en partie.*

*Procureurs de NAV Canada (30214) : Gowling Lafleur Henderson, Toronto.*

*Procureurs de Greater Toronto Airports Authority (30214) : Osler Hoskin & Harcourt, Toronto.*

*Procureurs de Winnipeg Airports Authority Inc., Halifax International Airport Authority, Edmonton Regional Airports Authority, Calgary Airport Authority, Aéroports de Montréal, Ottawa Macdonald-Cartier International Airport Authority, Vancouver International Airport Authority et St. John's International Airport Authority (30214) : Ogilvy Renault, Toronto.*

*Procureurs d'International Lease Finance Corporation, Hyr Här I Sverige Kommanditbolag, IAI X, Inc., Triton Aviation International LLC, Sierra Leasing Limited, ACG Acquisition XXV LLC, ILFC International Lease Finance Canada Ltd. et U.S. Airways Inc. (30214) : Torys, Toronto.*

*Procureurs de G.E. Capital Aviation Services Inc., en qualité de mandataire et gestionnaire de*

*Company and AFT Trust-Sub I, Pegasus Aviation Inc., and PALS I, Inc. (30214): Cassels Brock & Blackwell, Toronto.*

*Solicitors for Ansett Worldwide Aviation, U.S.A., and MSA V (30214): Fraser Milner Casgrain, Toronto.*

*Solicitors for RRPF Engine Leasing Limited (30214): Heenan Blaikie, Toronto.*

*Solicitors for Flight Logistics Inc. (30214): Morrison Brown Sosnovitch, Toronto.*

*Solicitors for C.I.T. Leasing Corporation and NBB-Royal Lease Partnership One (30214): Blake Cassels & Graydon, Toronto.*

*Solicitors for GATX/CL Air Leasing Cooperative Association (30214): Borden Ladner Gervais, Toronto.*

*Solicitors for NAV Canada (30729, 30730, 30731, 30732): Lapointe Rosenstein, Montréal.*

*Solicitors for Ottawa Macdonald-Cartier International Airport Authority, St-John's International Airport Authority and Charlottetown Airport Authority Inc. (30731, 30732, 30742, 30749, 30750, 30751): Ogilvy Renault, Montréal.*

*Solicitors for Aéroports de Montréal (30731, 30732, 30738, 30740, 30742): Langlois Kronström Desjardins, Montréal.*

*Solicitors for Greater Toronto Airports Authority (30731, 30732, 30742, 30743, 30745): Osler Hoskin & Harcourt, Montréal.*

*Solicitors for Wilmington Trust Company, Wilmington Trust Corporation, Renaissance Leasing Corporation, Heather Leasing Corporation, G.I.E. Avions de transport régional and ATR Marketing Inc. (30729, 30730, 30731, 30732, 30738, 30740, 30742, 30743, 30745, 30749, 30750): Brouillette Charpentier Fortin, Montréal.*

*Solicitors for Newcourt Credit Group (Alberta) Inc., Canada Life Assurance Company and CCG Trust Corporation (30740, 30742, 30745, 30750,*

*Polaris Holding Company et AFT Trust-Sub I, Pegasus Aviation Inc., et PALS I, Inc. (30214) : Cassels Brock & Blackwell, Toronto.*

*Procureurs d'Ansett Worldwide Aviation, U.S.A., et MSA V (30214) : Fraser Milner Casgrain, Toronto.*

*Procureurs de RRPF Engine Leasing Limited (30214) : Heenan Blaikie, Toronto.*

*Procureurs de Flight Logistics Inc. (30214) : Morrison Brown Sosnovitch, Toronto.*

*Procureurs de C.I.T. Leasing Corporation et NBB-Royal Lease Partnership One (30214) : Blake Cassels & Graydon, Toronto.*

*Procureurs de GATX/CL Air Leasing Cooperative Association (30214) : Borden Ladner Gervais, Toronto.*

*Procureurs de NAV Canada (30729, 30730, 30731, 30732) : Lapointe Rosenstein, Montréal.*

*Procureurs d'Ottawa Macdonald-Cartier International Airport Authority, St-John's International Airport Authority et Charlottetown Airport Authority Inc. (30731, 30732, 30742, 30749, 30750, 30751) : Ogilvy Renault, Montréal.*

*Procureurs d'Aéroports de Montréal (30731, 30732, 30738, 30740, 30742) : Langlois Kronström Desjardins, Montréal.*

*Procureurs de Greater Toronto Airports Authority (30731, 30732, 30742, 30743, 30745) : Osler Hoskin & Harcourt, Montréal.*

*Procureurs de Wilmington Trust Company, Wilmington Trust Corporation, Renaissance Leasing Corporation, Heather Leasing Corporation, G.I.E. Avions de transport régional et ATR Marketing Inc. (30729, 30730, 30731, 30732, 30738, 30740, 30742, 30743, 30745, 30749, 30750) : Brouillette Charpentier Fortin, Montréal.*

*Procureurs de Newcourt Credit Group (Alberta) Inc., Compagnie d'Assurance du Canada sur la Vie et CCG Trust Corporation (30740, 30742,*

*30751): Desjardins Ducharme Stein Monast, Montréal.*

*Solicitors for Canadian Imperial Bank of Commerce (30214): Blake Cassels & Graydon, Toronto.*

*Solicitors for Inter-Canadian (1991) Inc. and Ernst & Young Inc., in its capacity as trustee for the bankruptcy of Inter-Canadian (1991) Inc. (30730, 30731, 30732, 30738, 30740, 30742, 30743, 30745, 30749, 30750, 30751): Kugler Kandestin, Montréal.*

*Solicitors for Greater London International Airport Authority and Saint John Airport Inc. (30742): Ogilvy Renault, Montréal.*

*Solicitors for Canadian Regional Airlines Ltd. and Canadian Regional (1998) Ltd. (30742): Fraser Milner Casgrain, Montréal.*

*30745, 30750, 30751) : Desjardins Ducharme Stein Monast, Montréal.*

*Procureurs de Banque Canadienne Impériale de Commerce (30214) : Blake Cassels & Graydon, Toronto.*

*Procureurs d'Inter-Canadien (1991) Inc. et Ernst & Young Inc., en qualité de syndic à la faillite d'Inter-Canadien (1991) Inc. (30730, 30731, 30732, 30738, 30740, 30742, 30743, 30745, 30749, 30750, 30751) : Kugler Kandestin, Montréal.*

*Procureurs de Greater London International Airport Authority et Saint John Airport Inc. (30742) : Ogilvy Renault, Montréal.*

*Procureurs de Lignes aériennes Canadien régional Ltée et Canadian Regional (1998) Ltd. (30742) : Fraser Milner Casgrain, Montréal.*

# TAB 75

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932



1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

Canadian Red Cross Society/Société canadienne de la Croix-Rouge, Re

In the matter of the Companies' Creditors Arrangement Act, R.S.C. 1985 c. C-36

In the matter of a plan of compromise or arrangement of the Canadian Red Cross Society/La Société canadienne de la Croix-Rouge

Ontario Court of Justice, General Division [Commercial List]

Blair J.

Judgment: August 19, 1998[FN*]
Docket: 98-CL-002970

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: additional reasons at (August 19, 1998), Doc. 98-CL-002970 (Ont. Gen. Div. [Commercial List]); further additional reasons at (August 19, 1998), Doc. 98-CL-002790 (Ont. Gen. Div. [Commercial List])

Counsel: *B. Zarnett, B. Empey* and *J. Latham*, for Canadian Red Cross.

*E.B. Leonard, S.J. Page* and *D.S. Ward*, for Provinces except Que. and for the Canadian Blood Services.

*Jeffrey Carhart*, for Héma - Québec and for the Government of Québec.

*Marlene Thomas* and *John Spencer*, for the Attorney General of Canada.

*Pierre R. Lavigne* and *Frank Bennett*, for Quebec '86-90 Hepatitis C Claimants.

*Pamela Huff* and *Bonnie Tough*, for the 1986-1990 Haemophiliac Hepatitis C Claimants.

*Harvin Pitch* and *Kenneth Arenson*, for the 1986-1990 Hepatitis C Class Action Claimants.

*Aubrey Kaufman* and *David Harvey*, for the Pre 86/Post 90 Hepatitis C Class Action Claimants.

*Bruce Lemer*, for B.C. 1986-90 Class Action.

*Donna Ring*, for HIV Claimants.

*David A. Klein*, for B.C. Pre-86/Post-90 Hepatitis C Claimants.

David Thompson - Agent for Quebec Pre-86/Post 90 Hepatitis C Claimants.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

*Michael Kainer*, for Service Employees International Union.

*I.V.B. Nordheimer*, for Bayer Corporation.

*R.N. Robertson, Q.C.*, and *S.E. Seigel*, for T.D. Bank.

*James H. Smellie*, for the Canadian Blood Agency.

*W.V. Sasso*, for the Province of British Columbia.

*Justin R. Fogarty*, for Raytheon Engineers.

*Nancy Spies*, for Central Hospital et al (Co-D).

*M. Thomson*, for various physicians.

*C. H. Freeman*, for Blood Trac System.


Subject: Intellectual Property; Property; Corporate and Commercial; Civil Practice and Procedure; Insolvency


Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangement Act — Miscellaneous issues

Canadian Red Cross Society sought and obtained insolvency protection and supervision of court under Companies' Creditors Arrangement Act — Society brought motion for approval of sale and transfer of its blood supply assets and operations to two new agencies — Purchase price for assets was to be used to satisfy claims of transfusion claimants — Group of transfusion claimants brought cross-motion for order directing holding of meeting of creditors to consider counter-proposal based on Society's continued operation of blood system — Motion granted and cross-motion dismissed — Assets owned and controlled by Society were important to continued viability of blood supply operations and to seamless transfer of operations in interests of public health and safety — Proposed purchase price for assets was fair and reasonable in circumstances, and as close to maximum as was reasonably likely to be obtained for assets — Counter-proposal did not offer workable or practical alternative solution as neither Society nor claimants had any control over making counter-proposal happen — Counter-proposal was political and social solution which had to be effected by governments and could not be imposed by court in context of restructuring — Sections 4 and 5 of Act do not give creditors right to meeting or right to put forward proposal but right to request court to order meeting — Court had jurisdiction, under s. 11 of Act and inherently, to make order approving sale of assets before plan had been put forward and placed before creditors for approval — There was no realistic alternative to sale and transfer of assets proposed — Circumstances warranted exemption from compliance with provisions of Bulk Sales Act — Sale allowed subject to caveat that final terms and settlement of order to be negotiated and approved by court before order issued — Bulk Sales Act, R.S.O. 1990, c. B.14, s. 3 — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, ss. 4, 5, 11.

Bulk sales --- Requirements for valid sale — Judicial exemption

Canadian Red Cross Society sought and obtained insolvency protection and supervision of court under Companies' Creditors Arrangement Act — Society brought motion for approval of sale and transfer of its blood supply assets and operations to two new agencies — Purchase price for assets was to be used to satisfy claims of trans-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

fusion claimants — Group of transfusion claimants brought cross-motion for order directing holding of meeting of creditors to consider counter-proposal based on Society's continued operation of blood system — Motion granted and cross-motion dismissed — Circumstances warranted exemption from compliance with provisions of Bulk Sales Act — Sale would not impair Society's ability to pay its creditors in full — Claimants did not qualify as "creditors" under Bulk Sales Act — Sale allowed, subject to caveat that final terms and settlement of order to be negotiated and approved by court before order issued — Bulk Sales Act, R.S.O. 1990. c. B.14, s. 3 — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

### Cases considered by *Blair J.*:

*Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106 (Ont. Gen. Div. [Commercial List]) — applied

*Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24, 9 B.L.R. (2d) 275 (Ont. Gen. Div. [Commercial List]) — applied

*Royal Bank v. Soundair Corp.* (1991), 7 C.B.R. (3d) 1, 83 D.L.R. (4th) 76, 46 O.A.C. 321, 4 O.R. (3d) 1 (Ont. C.A.) — considered

**Statutes considered:**

*Bulk Sales Act*, R.S.O. 1990, c. B.14

Generally — referred to

s. 3 — considered

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36

Generally — referred to

s. 4 — considered

s. 5 — considered

s. 11 — considered

MOTION by Society for approval of sale and transfer of its blood supply assets and operations; CROSS-MOTION by transfusion claimants for order directing holding of meeting of creditors to consider counter-proposal based on Society's continued operation of blood system.

*Blair J.*:

### Background and Genesis of the Proceedings

1      The Canadian Red Cross Society/La Société Canadienne de la Croix Rouge has sought and obtained the insolvency protection and supervision of the Court under the *Companies' Creditors Arrangement Act* ("CCAA"). It has done so with a view to putting forward a Plan to compromise its obligations to creditors and also as part of a national process in which responsibility for the Canadian blood supply is to be transferred from the Red Cross to two new agencies which are to form a new national blood authority to take control of the Canadian Blood Program.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

2      The Red Cross finds itself in this predicament primarily as a result of some $8 billion of tort claims being asserted against it (and others, including governments and hospitals) by a large number of people who have suffered tragic harm from diseases contacted as a result of a blood contamination problem that has haunted the Canadian blood system since at least the early 1980's. Following upon the revelations forthcoming from the wide-ranging and seminal Krever Commission Inquiry on the Blood System in Canada, and the concern about the safety of that system  — and indeed alarm — in the general population as a result of those revelations, the federal, provincial and territorial governments decided to transfer responsibility for the Canadian Blood Supply to a new national authority. This new national authority consists of two agencies, the Canadian Blood Service and Héma-Québec.

**The Motions**

3      The primary matters for consideration in these Reasons deal with a Motion by the Red Cross for approval of the sale and transfer of its blood supply assets and operations to the two agencies and a cross-Motion on behalf of one of the Groups of Transfusion Claimants for an order dismissing that Motion and directing the holding of a meeting of creditors to consider a counter-proposal which would see the Red Cross continue to operate the blood system for a period of time and attempt to generate sufficient revenues on a fee-for-blood-service basis to create a compensation fund for victims.

4      There are other Motions as well, dealing with such things as the appointment of additional Representative Counsel and their funding, and with certain procedural matters pertaining generally to the CCAA proceedings. I will return to these less central motions at the end of these Reasons.

**Operation of the Canadian Blood System and Evolution of the Acquisition Agreement**

5      Transfer of responsibility for the operation of the Canadian blood supply system to a new authority will mark the first time that responsibility for a nationally co-ordinated blood system has not been in the hands of the Canadian Red Cross. Its first blood donor clinic was held in January, 1940 - when a national approach to the provision of a blood supply was first developed. Since 1977, the Red Cross has operated the Blood Program furnishing the Canadian health system with a variety of blood and blood products, with funding from the provincial and territorial governments. In 1981, the Canadian Blood Committee, composed of representatives of the governments, was created to oversee the Blood Program on behalf of the Governments. In 1991 this Committee was replaced by the Canadian Blood Agency  — whose members are the Ministers of Health for the provinces and territories — as funder and co-ordinator of the Blood Program. The Canadian Blood Agency, together with the federal government's regulatory agency known as BBR (The Bureau of Biologics and Radiopharmaceuticals) and the Red Cross, are the principal components of the organizational structure of the current Blood Supply System.

6      In the contemplated new regime, The Canadian Blood Service has been designated as the vehicle by which the Governments in Canada will deliver to Canadians (in all provinces and territories except Quebec) a new fully integrated and accountable Blood Supply System. Quebec has established Héma-Québec as its own blood service within its own health care system, but subject to federal standards and regulations. The two agencies have agreed to work together, and are working in a co-ordinated fashion, to ensure all Canadians have access to safe, secure and adequate supplies of blood, blood products and their alternatives. The scheduled date for the transfer of the Canadian blood supply operations from the Red Cross to the new agencies was originally September 1, 1998. Following the adjournment of these proceedings on July 31st to today's date, the closing has

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

been postponed. It is presently contemplated to take place shortly after September 18, 1998 if the transaction is approved by the Court.

7      The assets owned and controlled by the Red Cross are important to the continued viability of the blood supply operations, and to the seamless transfer of those operations in the interests of public health and safety. They also have value. In fact, they are the source of the principal value in the Red Cross's assets which might be available to satisfy the claims of creditors. Their sale was therefore seen by those involved in attempting to structure a resolution to all of these political, social and personal problems, as providing the main opportunity to develop a pool of funds to go towards satisfying the Red Cross's obligations regarding the claims of what are generally referred to in these proceedings as the "Transfusion Claimants". It appears, through, that the Transfusion Claimants did not have much, if any, involvement in the structuring of the proposed resolution.

8      Everyone recognizes, I think, that the projected pool of funds will not be sufficient to satisfy such claims in full, but it is thought  — by the Red Cross and the Governments, in any event — that the proceeds of sale from the transfer of the Society's blood supply assets represent the best hope of maximizing the return on the Society's assets and thus of maximizing the funds available from it to meet its obligations to the Transfusion Claimants.

9      This umbrella approach  — namely, that the blood supply operations must be transferred to a new authority, but that the proceeds generated from that transfer should provide the pool of funds from which the Transfusion Claimants can, and should, be satisfied, so that the Red Cross may avoid bankruptcy and continue its other humanitarian operations — is what led to the marriage of these CCAA proceedings and the transfer of responsibility for the Blood System. The Acquisition Agreement which has been carefully and hotly negotiated over the past 9 months, and the sale from the Red Cross to the new agencies is — at the insistence of the Governments — subject to the approval of the Court, and they are as well conditional upon the Red Cross making an application to restructure pursuant to the CCAA.

10      The Initial Order was made in these proceedings under the CCAA on July 20th.

**The Sale and Transfer Transaction**

11      The Acquisition Agreement provides for the transfer of the operation of the Blood Program from the Red Cross to the Canadian Blood Service and Héma-Québéc, together with employees, donor and patient records and assets relating to the operation of the Program on September 1, 1998. Court approval of the Agreement, together with certain orders to ensure the transfer of clear title to the Purchasers, are conditions of closing.

12       The sale is expected to generate about $169 million in all, before various deductions. That sum is comprised of a purchase price for the blood supply assets of $132.9 million plus an estimated $36 million to be paid for inventory. Significant portions of these funds are to be held in escrow pending the resolution of different issues; but, in the end, after payment of the balance of the outstanding indebtedness to the T-D Bank (which has advanced a secured line of credit to fund the transfer and re-structuring) and the payment of certain creditors, it is anticipated that a pool of funds amounting to between $70 million and $100 million may be available to be applied against the  Transfusion Claims.

13       In substance, the new agencies are to acquire all fixed assets, inventory, equipment, contracts and leases associated with the Red Cross Blood Program, including intellectual property, information systems, data, software, licences, operating procedures and the very important donor and patient records. There is no doubt that the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

sale represents the transfer of the bulk of the significant and valuable assets of the Red Cross.

14      A vesting order is sought as part of the relief to be granted. Such an order, if made, will have the effect of extinguishing realty encumbrances against and security interest in those assets. I am satisfied for these purposes that appropriate notification has been given to registered encumbrancers and other security interest holders to permit such an order to be made. I am also satisfied, for purposes of notification warranting a vesting order, that adequate notification of a direct and public nature has been given to all of those who may have a claim against the assets. The CCAA proceedings themselves, and the general natural of the Plan to be advanced by the Red Cross  — including the prior sale of the blood supply assets — has received wide coverage in the media. Specific notification has been published in principal newspapers across the country. A document room containing relevant information regarding the proposed transaction, and relevant financial information, was set up in Toronto and most, if not all, claimants have taken advantage of access to that room. Richter & Partners were appointed by the Court to provide independent financial advice to the Transfusion Claimants, and they have done so. Accordingly, I am satisfied in terms of notification and service that the proper foundation for the granting of the Order sought has been laid.

15      What is proposed, to satisfy the need to protect encumbrancers and holders of personal security interests is,

   a) that generally speaking, prior registered interests and encumbrances against the Red Cross's lands and buildings will not be affected-i.e., the transfer and sale will take place subject to those interests, or they will be paid off on closing; and,

   b) that registered personal property interests will either be assumed by the Purchasers or paid off from the proceeds of closing in accordance with their legal entitlement.

**Whether the Purchase Price is Fair and Reasonable**

16      The central question for determination on this Motion is whether the proposed Purchase Price for the Red Cross's blood supply related assets is fair and reasonable in the circumstances, and a price that is as close to the maximum as is reasonably likely to be obtained for such assets. If the answer to this question is "Yes", then there can be little quarrel  — it seems to me-with the conversion of those assets into cash and their replacement with that cash as the asset source available to satisfy the claims of creditors, including the Transfusion claimants. It matters not to creditors and Claimants whether the source of their recovery is a pool of cash or a pool of real/personal/intangible assets. Indeed, it may well be advantageous to have the assets already crystallised into a cash fund, readily available and earning interest. What is important is that the value of that recovery pool is as high as possible.

17      On behalf of the 1986-1990 Québec Hepatitis C Claimants Mr. Lavigne and Mr. Bennett argue, however, that the purchase price is *not* high enough. Mr. Lavigne has put forward a counter-proposal which he submits will enhance the value of the Red Cross's blood supply assets by giving greater play to the value of its exclusive licence to be the national supplier of blood, and which will accordingly result in a much greater return for Claimants. This proposal has been referred to as the "Lavigne Proposal" or the "No-Fault Plan of Arrangement". I shall return to it shortly; but first I propose to deal with the submissions of the Red Cross and of those who support its Motion for approval, that the proposed price is fair and reasonable. Those parties include the Governments, the proposed Purchasers — the Canadian Blood Service and Héma-Québec — and several (but not all) of the other Transfusion Claimant Groups.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

18      As I have indicated, the gross purchase price under the Acquisition Agreement is $132.9 million, plus an additional amount to be paid for inventory on closing which will generate a total purchase price of approximately $169 million. Out of that amount, the Bank indebtedness is to be paid and the claims of certain other creditors defrayed. It is estimated that a fund of between $70 million and $100 million will be available to constitute the trust fund to be set aside to satisfy Transfusion Claims.

19      This price is based upon a Valuation prepared jointly by Deloitte & Touche (financial advisor to the Governments) and Ernst & Young (financial advisor to the Red Cross and the present Monitor appointed under the Initial CCAA Order). These two financial advisors retained and relied upon independent appraisal experts to appraise the realty (Royal LePage), the machinery and equipment and intangible assets (American Appraisal Canada Inc.) and the laboratories (Pellemon Inc.). The experience, expertise and qualifications of these various experts to conduct such appraisals cannot be questioned. At the same time, it must be acknowledged that neither Deloitte & Touche nor Ernst & Young are completely "independent" in this exercise, given the source of their retainers. It was at least partly for this reason that the Court was open to the suggestion that Richter & Partners be appointed to advise the 1986-1990 Ontario Class Action Claimants (and through them to provide independent advice and information to the other groups of Transfusion Claimants). The evidence and submissions indicate that Richter & Partners have met with the Monitor and with representatives of Deloitte & Touche, and that all enquiries have been responded to.

20      Richter & Partners were appointed at the instance of the 1986-1990 Ontario Hepatitis C Claimants Richter & Partners, with a mandate to share their information and recommendations with the other Groups of Transfusion Claimants. Mr. Pitch advises on behalf of that Group that as a result of their due diligence enquiries his clients are prepared to agree to the approval of the Acquisition Agreement, and, indeed urge that it be approved quickly. A significant number of the other Transfusion Claimant groups — but by no means all — have taken similar positions, although subject in some cases to certain caveats, none of which pertain to the adequacy of the purchase price. On behalf of the 1986-1990 Hemophiliac Claimants, for instance, Ms. Huff does not oppose the transfer approval, although she raises certain concerns about certain terms of the Acquisition Agreement which may impinge upon the amount of monies that will be available to Claimants on closing, and she would like to see these issues addressed in any Order, if approval is granted. Mr. Lemer, on behalf of the British Columbia 1986-1990 Hepatitis C Class Action Claimants, takes the same position as Ms. Huff, but advises that his clients' further due diligence has satisfied them that the price is fair and reasonable. While Mr. Kaufman, on behalf of Pre 86/Post 90 Hepatitis C Claimants, advances a number of jurisdictional arguments against approval, his clients do not otherwise oppose the transfer (but they would like certain caveats applied) and they do not question the price which has been negotiated for the Red Cross's blood supply assets. Mr. Kainer for the Service Employees Union (which represents approximately 1,000 Red Cross employees) also supports the Red Cross Motion, as does, very eloquently, Ms. Donna Ring who is counsel for Ms. Janet Conners and other secondarily infected spouses and children with HIV.

21      Thus, there is broad support amongst a large segment of the Transfusion Claimants for approval of the sale and transfer of the blood supply assets as proposed.

22      Some of these supporting Claimants, at least, have relied upon the due diligence information received through Richter & Partners, in assessing their rights and determining what position to take. This independent source of due diligence therefore provides some comfort as to the adequacy of the purchase price. It does not necessarily carry the day, however, if the Lavigne Proposal offers a solution that may reasonably practically generate a higher value for the blood supply assets in particular and the Red Cross assets in general. I turn to that Pro-

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

posal now.

**The Lavigne Proposal**

23      Mr. Lavigne is Representative Counsel for the 1986-1990 Québec Hepatitis C Claimants. His cross-motion asks for various types of relief, including for the purposes of the main Motion,

> a) an order dismissing the Red Cross motion for court approval of the sale of the blood supply assets;

> b) an order directing the Monitor to review the feasibility of the Lavigne Proposal's plan of arrangement (the "No-Fault Plan of Arrangement") which has now been filed with the Court of behalf of his group of "creditors"; and,

> c) an order scheduling a meeting of creditors within 6 weeks of the end of this month for the purpose of voting on the No-Fault Plan of Arrangement.

24      This cross-motion is supported by a group of British Columbia Pre 86/Post 90 Hepatitis C Claimants who are formally represented at the moment by Mr. Kaufman but for whom Mr. Klein now seeks to be appointed Representative Counsel. It is also supported by Mr. Lauzon who seeks to be appointed Representative Counsel for a group of Québec Pre 86/Post 90 Hepatitis C Claimants. I shall return to these "Representation" Motions at the end of these Reasons. Suffice it to say at this stage that counsel strongly endorsed the Lavigne Proposal.

25      The Lavigne Proposal can be summarized in essence in the following four principals, namely:

> 1. Court approval of a no-fault plan of compensation for all Transfusion Claimants, known or unknown;

> 2. Immediate termination by the Court of the Master Agreement presently governing the relationship between the Red Cross and the Canadian Blood Agency, and the funding of the former, which Agreement requires a one-year notice period for termination;

> 3. Payment in full of the claims of all creditors of the Red Cross; and,

> 4. No disruption of the Canadian Blood Supply.

26      The key assumptions and premises underlying these notions are,

> • that the Red Cross has a form of monopoly in the sense that it is the only blood supplier licensed by Government in Canada to supply blood to hospitals;

> • that, accordingly, this license has "value", which has not been recognized in the Valuation prepared by Deloitte & Touche and by Ernst & Young, and which can be exploited and enhanced by the Red Cross continuing to operate the Blood Supply and charging hospitals directly on a fully funded cost recovery basis for its blood services;

> • that Government will not remove this monopoly from the Red Cross for fear of disrupting the Blood Supply in Canada;

> • that the Red Cross would be able to charge hospitals sufficient amounts not only to cover its costs of operation (without any public funding such as that now coming from the Canadian Blood Agency under

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

the Master Agreement), but also to pay all of its creditors **_and_** to establish a fund which would allow for compensation over time to all of the Transfusion Claimants; and, finally,

• that the no-fault proposal is simply an introduction of the Krever Commission recommendations for a scheme of no-fault compensation for all transfusion claimants, for the funding of the blood supply program as through direct cost recovery from hospitals, and for the inclusion of a component for a compensation fund in the fee for service delivery charge.

27    In his careful argument in support of his proposal Mr. Lavigne was more inclined to couch his rationale for the No-fault Plan in political terms rather than in terms of the potential value created by the Red Cross monopoly licence and arising from the prospect of utilizing that monopoly licence to raise revenue on a fee-for-blood-service basis, thus leading — arguably — to an enhanced "value" of the blood supply operations and assets. He seemed to me to be suggesting, in essence, that because there are significant Transfusion Claims outstanding against the Red Cross, Government as the indirect purchaser of the assets should recognize this and incorporate into the purchase price an element reflecting the value of those claims. It was submitted that because the Red Cross has (or, at least, will have had) a monopoly licence regarding the supply of blood products in Canada, and because it _could_ charge a fee-for-blood-service to hospitals for those services and products, and because other regimes in other countries employ such a fee for service system and build in an insurance or compensation element for claims, and because the Red Cross _might_ be able to recover such an element in the regime he proposes for it, then the purchase price _must_ reflect the value of those outstanding claims in some fashion. I am not able to understand, in market terms, however, why the value of a debtor's assets is necessarily reflective in any way of the value of the claims against those assets. In fact, it is the stuff of the everyday insolvency world that exactly the opposite is the case. In my view, the argument is more appropriately put — for the purposes of the commercial and restructuring considerations which are what govern the Court's decisions in these types of CCAA proceedings — on the basis of the potential increase in value from the revenue generating capacity of the monopoly licence itself. In fairness, that is the way in which Mr. Lavigne's Proposal is developed and justified in the written materials filed.

28    After careful consideration of it, however, I have concluded that the Lavigne Proposal cannot withstand scrutiny, in the context of these present proceedings.

29    Farley Cohen — a forensic a principal in the expert forensic investigative and accounting firm of Linquist Avery Macdonald Baskerville Company — has testified that in his opinion the Red Cross operating licence "provides the potential opportunity and ability for the Red Cross to satisfy its current and future liabilities as discussed below". Mr. Cohen then proceeds in his affidavit to set out the basis and underlying assumptions for that opinion in the following paragraphs, which I quote in their entirety:

1. In my opinion, if the Red Cross can continue as a sole and exclusive operator of the Blood Supply Program and can amend its funding arrangements to provide for full cost recovery, including the cost of proven claims of Transfusion Claimants, and whereby the Red Cross would charge hospitals directly for the Blood Safety Program, **then there is a substantial value to the Red Cross to satisfy all the claims against it**.

2. **In my opinion, such value to the Red Cross is not reflected in the Joint Valuation Report**.

3. My opinion is based on the following assumptions: (i) the Federal Government, while having the power to issue additional licences to other Blood System operators, would not do so in the interest of

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

public safety; (ii) the Red Cross can terminate the current funding arrangement pursuant to the terms of the Master Agreement; and (iii) the cost of blood charged to the hospitals would not be cost-prohibitive compared to alternative blood suppliers.

(highlighting in original)

30      On his cross-examination, Mr. Cohen acknowledged that he did not know whether his assumptions could come true or not. That difficulty, it seems to me, is an indicia of the central weakness in the Lavigne Proposal. The reality of the present situation is that all 13 Governments in Canada have determined unequivocally that the Red Cross will no longer be responsible for or involved in the operation of the national blood supply in this country. That is the evidentiary bedrock underlying these proceedings. If that is the case, there is simply no real-istic likelihood that any of the assumptions made by Mr. Cohen will occur. His opinion is only as sound as the assumptions on which it is based.

31      Like all counsel  — even those for the Transfusion Claimants who do not support his position — I com-mend Mr. Lavigne for his ingenuity and for his sincerity and perseverance in pursing his clients' general goals in relation to the blood supply program. However, after giving it careful consideration as I have said, I have come to the conclusion that the Lavigne Proposal — whatever commendation it my deserve in other contexts — does not offer a workable or practical alternative solution in the context of these CCAA proceedings. I question whether it can even be said to constitute a "Plan of Compromise and Arrangement" within the meaning of the CCAA, because it is not something which either the debtor (the Red Cross) or the creditors (the Transfusion Claimants amongst them) have control over to make happen. It is, in reality, a political and social solution which must be effected by Governments. It is not something which can be imposed by the Court in the context of a re-structuring. Without deciding that issue, however, I am satisfied that the Proposal is not one which in the cir-cumstances warrants the Court in exercising its discretion under sections 4 and 5 of the CCAA to call a meeting of creditors to vote on it.

32      Mr. Justice Krever recommended that the Red Cross not continue in the operation of the Blood Supply System and, while he did recommend the introduction of a no-fault scheme to compensate all blood victims, it was not a scheme that would be centred around the continued involvement of the Red Cross. It was a govern-ment established statutory no-fault scheme. He said (Final Report, Vol. 3, p. 1045):

The provinces and territories of Canada should devise statutory no-fault schemes that compensate all blood-injured persons promptly and adequately, so they do not suffer impoverishment or illness without treatment. I therefore recommend that, without delay, the provinces and territories devise statutory no-fault schemes for compensating persons who suffer serious adverse consequences as a result of the administration of blood components or blood products.

33      Governments  — which are required to make difficult choices — have chosen, for their own particular reasons, not to go down this particular socio-political road. While this may continue to be a very live issue in the social and political arena, it is not one which, as I have said, is a solution that can be imposed by the Court in proceedings such as these.

34      I am satisfied, as well, that the Lavigne Proposal ought not to impede the present process on the basis that it is unworkable and impractical, in the present circumstances, and given the determined political decision to transfer the blood supply from the Red Cross to the new agencies, might possibly result in a disruption of the supply and raise concerns for the safety of the public if that were the case. The reasons why this is so, from an

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

evidentiary perspective, are well articulated in the affidavit of the Secretary General of the Canadian Red Cross, Pierre Duplessis, in his affidavit sworn on August 17, 1998. I accept that evidence and the reasons articulated therein. In substance Dr. Duplessis states that the assumptions underlying the Lavigne Proposal are "unrealistic, impractical and unachievable for the Red Cross in the current environment" because,

a) the political and factual reality is that Governments have clearly decided — following the recommendation of Mr. Justice Krever — that the Red Cross will not continue to be involved in the National Blood Program, and at least with respect to Québec have indicated that they are prepared to resort to their powers of expropriation if necessary to effect a transfer;

b) the delays and confusion which would result from a postponement to test the Lavigne Proposal could have detrimental effects on the blood system itself and on employees, hospitals, and other health care providers involved in it;

c) the Master Agreement between the Red Cross and the Canadian Blood Agency, under which the Society currently obtains its funding, cannot be cancelled except on one year's notice, and even if it could there would be great risks in denuding the Red Cross of all of its existing funding in exchange for the prospect of replacing that funding with fee for service revenues; and,

d) it is very unlikely that over 900 hospitals across Canada — which have hitherto not paid for their blood supply, which have no budgets contemplating that they will do so, and which are underfunded in event — will be able to pay sufficient sums to enable the Red Cross not only to cover its operating costs and to pay current bills, but also to repay the present Bank indebtedness of approximately $35 million in full, and to repay existing unsecured creditors in full, *and* to generate a compensation fund that will pay existing Transfusion Claimants (it is suggested) in full for their $8 billion in claims.

35    Dr. Duplessis summarizes the risks inherent in further delays in the following passages from paragraph 17 of his affidavit sworn on August 17, 1998:

The Lavigne Proposal that the purchase price could be renegotiated to a higher price because of Red Cross' ability to operate on the terms the Lavigne Proposal envisions is not realistic, because Red Cross does not have the ability to operate on those terms. Accordingly, there is no reason to expect that CBS and H-Q would pay a higher amount than they have already agreed to pay under the Acquisition Agreement. Indeed, there is a serious risk that delays or attempts to renegotiate would result in lower amounts being paid. Delaying approval of the Acquisition Agreement to permit an experiment with the Lavigne Proposal exposes Red Cross and its stakeholders, including all Transfusion Claimants, to the following risks:

(a) continued losses in operating the National Blood Program which will reduce the amounts ultimately available to all stakeholders;

(b) Red Cross' ability to continue to operate its other activities being jeopardized;

(c) the Bank refusing to continue to support even the current level of funding and demanding repayment, thereby jeopardizing Red Cross and all of Red Cross' activities including the National Blood Program;

(d) CBS and H-Q becoming unprepared to complete an acquisition on the same financial terms given,

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

among other things, the costs which they will incur in adjusting for later transfer dates, raising the risks of exproporation or some other, less favourable taking of Red Cross' assets, or the Governments simply proceeding to set up the means to operate the National Blood Program without paying the Red Cross for its assets.

36    These conclusions, and the evidentiary base underlying them, are in my view irrefutable in the context of these proceedings.

37    Those supporting the Lavigne Proposal argued vigorously that approval of the proposed sale transaction in advance of a creditors' vote on the Red Cross Plan of Arrangment (which has not yet been filed) would strip the Lavigne Proposal of its underpinnings and, accordingly, would deprive those "creditor" Transfusion Claimants from their statutory right under the Act to put forward a Plan and to have a vote on their proposed Plan. In my opinion, however, Mr. Zarnett's response to that submission is the correct one in law. Sections 4 and 5 of the CCAA do not give the creditors *a right* to a meeting or a right to put forward a Plan and to insist on that Plan being put to a vote; they have *a right to request the Court to order a meeting*, and the Court will do so if it is in the best interests of the debtor company and the stakeholders to do so. In this case I accept the submission that the Court ought not to order a meeting for consideration of the Lavigne Proposal because the reality is that the Proposal is unworkable and unrealistic in the circumstances and I see nothing to be gained by the creditors being called to consider it. In addition, as I have pointed out earlier in these Reasons, a large number of the creditors and of the Transfusion Claimants oppose such a development. The existence of a statutory provision permitting creditors to apply for an order for the calling of a meeting does not detract from the Court's power to approve a sale of assets, assuming that the Court otherwise has that power in the circumstances.

38    The only alternative to the sale and transfer, on the one hand, and the Lavigne Proposal, on the other hand, is a liquidation scenario for the Red Cross, and a cessation of its operations altogether. This is not in the interests of anyone, if it can reasonably be  avoided. The opinion of the valuation experts is that on a liquidation basis, rather than on a "going concern" basis, as is contemplated in the sale transaction, the value of the Red Cross blood supply operations and assets varies between the mid  — $30 million and about $74 million. This is quite considerable less than the $169 million (+/-) which will be generated by the sale transaction.

39    Having rejected the Lavigne Proposal in this context, it follows from what I have earlier said that I conclude the purchase price under the Acquisition Agreement is fair and reasonable, and a price that is as close to the maximum as is reasonably likely to be obtained for the assets.

**Jurisdiction Issue**

40    The issue of whether the Court has jurisdiction to make an order approving the sale of substantial assets of the debtor company before a Plan has been put forward and placed before the creditors for approval, has been raised by Mr. Bennett. I turn now to a consideration of that question.

41    Mr. Bennett argues that the Court does not have the jurisdiction under the CCAA to make an order approving the sale of substantial assets by the Applicant Company before a Plan has even been filed and the creditors have had an opportunity to consider and vote on it. He submits that section 11 of the Act permits the Court to extend to a debtor the protection of the Court pending a restructuring attempt but only in the form of a stay of proceedings against the debtor or in the form of an order restraining or prohibiting new proceedings. There is no jurisdiction to approve a sale of assets in advance he submits, or otherwise than in the context of the sanctioning

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

of a Plan already approved by the creditors.

42    While Mr. Kaufman does not take the same approach to a jurisdictional argument, he submits nonetheless that although he does not oppose the transfer and approval of the sale, the Court cannot grant its approval at this stage if it involves "sanitizing" the transaction. By this, as I understand it, he means that the Court can "permit" the sale to go through — and presumably the purchase price to be paid — but that it cannot shield the assets conveyed from claims that may subsequently arise-such as fraudulent preference claims or oppression remedy claims in relation to the transaction. Apart from the fact that there is no evidence of the existence of any such claims, it seems to me that the argument is not one of "jurisdiction" but rather one of "appropriateness". The submission is that the assets should not be freed up from further claims until at least the Red Cross has filed its Plan and the creditors have had a chance to vote on it. In other words, the approval of the sale transaction and the transfer of the blood supply assets and operations should have been made a part and parcel of the Plan of Arrangement put forward by the debtor, and the question of whether or not it is appropriate and supportable in that context debated and fought out on the voting floor, and not separately before-the-fact. These sentiments were echoed by Mr. Klein and by Mr. Thompson as well. In my view, however, the assets either have to be sold free and clear of claims against them-for a fair and reasonable price — or not sold. A purchaser cannot be expected to pay the fair and reasonable purchase price but at the same time leave it open for the assets purchased to be later attacked and, perhaps, taken back. In the context of the transfer of the Canadian blood supply operations, the prospect of such a claw back of assets sold, at a later time, has very troubling implications for the integrity and safety of that system. I do not think, firstly, that the argument is a jurisdictional one, and secondly, that it can prevail in any event.

43    I cannot accept the submission that the Court has no jurisdiction to make the order sought. The source of the authority is twofold: it is to be found in the power of the Court to impose terms and conditions on the granting of a stay under section 11; and it may be grounded upon the inherent jurisdiction of the Court, not to make orders which contradict a statute, but to "fill in the gaps in legislation so as to give effect to the objects of the CCAA, including the survival program of a debtor until it can present a plan": *Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106 (Ont. Gen. Div. [Commercial List]), per Farley J., at p. 110.

44    As Mr. Zarnett pointed out, paragraph 20 of the Initial Order granted in these proceedings on July 20, 1998, makes it a condition of the protection and stay given to the Red Cross that it not be permitted to sale or dispose of assets valued at more than $1 million without the approval of the Court. Clearly this is a condition which the Court has the jurisdiction to impose under section 11 of the Act. It is a necessary conjunction to such a condition that the debtor be entitled to come back to the Court and seek approval of a sale of such assets, if it can show it is in the best interests of the Company and its creditors as a whole that such approval be given. That is what it has done.

45    It is very common in CCAA restructurings for the Court to approve the sale and disposition of assets during the process and before the Plan if formally tendered and voted upon. There are many examples where this has occurred, the recent Eaton's restructuring being only one of them. The CCAA is designed to be a flexible instrument, and it is that very flexibility which gives it its efficacy. As Farley J said in *Dylex Ltd.* supra (p. 111), "the history of CCAA law has been an evolution of judicial interpretation". It is not infrequently that judges are told, by those opposing a particular initiative at a particular time, that if they make a particular order that is requested it will be the first time in Canadian jurisprudence (sometimes in global jurisprudence, depending upon the level of the rhetoric) that such an order has made! Nonetheless, the orders are made, if the circumstances are appropriate and the orders can be made within the framework and in the spirit of the CCAA legislation. Mr.

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

Justice Farley has well summarized this approach in the following passage from his decision in *Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]), at p. 31, which I adopt:

> The CCAA is intended to facilitate compromises and arrangements between companies and their creditors as an alternative to bankruptcy and, as such, is remedial legislation entitled to a liberal interpretation. It seems to me that the purpose of the statute is to enable insolvent companies to carry on business in the ordinary course *or otherwise deal with their assets* so as to enable plan of compromise or arrangement to be prepared, filed and considered by their creditors for the proposed compromise or arrangement which will be to the benefit of both the company and its creditors. See the preamble to and sections 4,5,7,8 and 11 of the CCAA (a lengthy list of authorities cited here is omitted).

> The CCAA is intended to provide a structured environment for the negotiation of compromises between a debtor company and its creditors for the benefit of both. Where a debtor company realistically plans to continue operating *or to otherwise deal with its assets* but it requires the protection of the court in order to do so and it is otherwise too early for the court to determine whether the debtor company will succeed, relief should be granted under the CCAA (citations omitted)

> (emphasis added)

46      In the spirit of that approach, and having regard to the circumstances of this case. I am satisfied not only that the Court has the jurisdiction to make the approval and related orders sought, but also that it should do so. There is no realistic alternative to the sale and transfer that is proposed, and the alternative is a liquidation/bankruptcy scenario which, on the evidence would yield an average of about 44% of the purchase price which the two agencies will pay. To fore go that purchase price — supported as it is by reliable expert evidence — would in the circumstances be folly, not only for the ordinary creditors but also for the Transfusion Claimants, in my view.

47      While the authorities as to exactly what considerations a court should have in mind in approving a transaction such as this are scarce, I agree with Mr. Zarnett that an appropriate analogy may be found in cases dealing with the approval of a sale by a court-appointed receiver. In those circumstances, as the Ontario Court of Appeal has indicated in *Royal Bank v. Soundair Corp.* (1991), 7 C.B.R. (3d) 1 (Ont. C.A.), at p. 6, the Court's duties are,

> (i) to consider whether the receiver has made a sufficient effort to get the best price and has not acted improvidently;

> (ii) to consider the interests of the parties;

> (iii) to consider the efficacy and integrity of the process by which offers are obtained; and,

> (iv) to consider whether there has been unfairness in the working out of the process.

48      I am satisfied on all such counts in the circumstances of this case.

49      Some argument was directed towards the matter of an order under the *Bulk Sales Act*. Because of the nature and extent of the Red Cross assets being disposed of, the provisions of that Act must either be complied with, or an exemption from compliance obtained under s. 3 thereof. The circumstances warrant the granting of such an exemption in my view. While there were submissions about whether or not the sale would impair the

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

Society's ability to pay its creditors in full. I do not believe that the sale will *impair* that ability. In fact, it may well enhance it. Even if one accepts the argument that the emphasis should be placed upon the language regarding payment "in full" rather than on "impair", the case qualifies for an exemption. It is conceded that the Transfusion claimants do not qualify as "creditors" as that term is defined under the *Bulk Sales Act*; and if the claims of the Transfusion Claimants are removed from the equation, it seems evident that other creditors could be paid from the proceeds in full.

**Conclusion and Treatment of Other Motions**

50    I conclude that the Red Cross is entitled to the relief it seeks at this stage, and orders will go accordingly. In the end, I come to these conclusions having regard in particular to the public interest imperative which requires a Canadian Blood Supply with integrity and a seamless, effective and relatively early transfer of blood supply operations to the new agencies; having regard to the interests in the Red Cross in being able to put forward a Plan that may enable it to avoid bankruptcy and be able to continue on with its non-blood supply humanitarian efforts; and having regard to the interests of the Transfusion Claimants in seeing the value of the blood supply assets maximized.

51    Accordingly an order is granted  — subject to the caveat following — approving the sale and authorizing and approving the transactions contemplated in the Acquisition Agreement, granting a vesting order, and declaring that the *Bulk Sales Act* does not apply to the sale, together with the other related relief claimed in paragraphs (a) through (g) of the Red Cross's Notice of Motion herein. The caveat is that the final terms and settlement of the Order are to be negotiated and approved by the Court before the Order is issued. If the parties cannot agree on the manner in which the "Agreement Content" issues raised by Ms. Huff and Mr. Kaufman in their joint memorandum of comments submitted in argument yesterday, I will hear submissions to resolve those issues.

***Other Motions***

52    The Motions by Mr. Klein and by Mr. Lauzon to be appointed Representative Counsel for the British Columbia and Québec Pre86/Post 90 Hepatitis C Claimants, respectively, are granted. It is true that Mr. Klein had earlier authorized Mr. Kaufman to accept the appointment on behalf of his British Columbia group of clients, but nonetheless it may be — because of differing settlement proposals emanating to differing groups in differing Provinces — that there are differences in interests between these groups, as well as differences in perspectives in the Canadian way. As I commented earlier, in making the original order appointing Representative Counsel, the Court endeavours to conduct a process which is both fair and *perceived* to be fair. Having regard to the nature of the claims, the circumstances in which the injuries and diseases inflicting the Transfusion Claimants have been sustained, and the place in Canadian Society at the moment for those concerns, it seems to me that those particular claimants, in those particular Provinces, are entitled if they wish to have their views put forward by those counsel who are already and normally representing them in their respective class proceedings.

53    I accept the concerns expressed by Mr. Zarnett on behalf of the Red Cross, and by Mr. Robertson on behalf of the Bank, about the impact of funding on the Society's cash flow and position. In my earlier endorsement dealing with the appointment of Representative Counsel and funding, I alluded to the fact that if additional funding was required to defray these costs those in a position to provide such funding may have to do so. The reference, of course, was to the Governments and the Purchasers. It is the quite legitimate but nonetheless operative concerns of the Governments to ensure the effective and safe transfer of the blood supply operations to the new agencies which are driving much of what is happening here. Since the previous judicial hint was not responded

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, [1998] O.J. No. 3306, 72 O.T.C. 99, 81 A.C.W.S. (3d) 932

to, I propose to make it a specific term and condition of the approval Order that the Purchasers, or the Governments, establish a fund  — not to exceed $2,000,000 at the present time without further order — to pay the professional costs incurred by Representative Counsel and by Richter & Partners.

54      The other Motions which were pending at the outset of yesterday's Hearing are adjourned to another date to be fixed by the Commercial List Registrar.

55      Orders are to go in accordance with the foregoing.

*Motion granted; cross-motion dismissed.*

FN* Additional reasons at (1998), 5 C.B.R. (4th) 319 (Ont. Gen. Div. [Commercial List]); further additional reasons at (1998), 5 C.B.R. (4th) 321 (Ont. Gen. Div. [Commercial List]).

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works