TAB 76

Case 09-10138-MFW   Doc 14410-5   Filed 09/16/14   Page 2 of 314

Stelco Inc., Re, 2005 CarswellOnt 1188

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

2005 CarswellOnt 1188
Ontario Court of Appeal

Stelco Inc., Re

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253
D.L.R. (4th) 109, 2 B.L.R. (4th) 238, 75 O.R. (3d) 5, 9 C.B.R. (5th) 135

# In the Matter of the Companies' Creditors
# Arrangement Act, R.S.C., c. C-36, as amended

And In the Matter of a proposed plan of compromise or arrangement
with respect to Stelco Inc. and the other Applicants listed in Schedule "A"

Application under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended

Goudge, Feldman, Blair JJ.A.

Heard: March 18, 2005
Judgment: March 31, 2005
Docket: CA M32289

Proceedings: reversed *Stelco Inc., Re* ((2005)), 2005 CarswellOnt 742, [2005] O.J. No. 729, 7 C.B.R. (5th) 307 ((Ont. S.C.J. [Commercial List])); reversed *Stelco Inc., Re* ((2005)), 2005 CarswellOnt 743, [2005] O.J. No. 730, 7 C.B.R. (5th) 310 ((Ont. S.C.J. [Commercial List])); additional reasons to *Stelco Inc., Re* ((2005)), 2005 CarswellOnt 742, [2005] O.J. No. 729, 7 C.B.R. (5th) 307 ((Ont. S.C.J. [Commercial List]))

Counsel: Jeffrey S. Leon, Richard B. Swan for Appellants, Michael Woollcombe, Roland Keiper
Kenneth T. Rosenberg, Robert A. Centa for Respondent, United Steelworkers of America
Murray Gold, Andrew J. Hatnay for Respondent, Retired Salaried Beneficiaries of Stelco Inc., CHT Steel Company Inc., Stelpipe Ltd., Stelwire Ltd., Welland Pipe Ltd.
Michael C.P. McCreary, Carrie L. Clynick for USWA Locals 5328, 8782
John R. Varley for Active Salaried Employee Representative
Michael Barrack for Stelco Inc.
Peter Griffin for Board of Directors of Stelco Inc.
K. Mahar for Monitor
David R. Byers (Agent) for CIT Business Credit, DIP Lender

Subject: Corporate and Commercial; Insolvency; Property; Civil Practice and Procedure

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

**Business associations --- Specific corporate organization matters — Directors and officers — Appointment — General principles**

Corporation entered protection under Companies' Creditors Arrangement Act — K and W were involved with companies who made capital proposal regarding corporation — Companies held approximately 20 per cent of corporation's shares — K and W, allegedly with support of over 30 per cent of shareholders, requested to fill two vacant directors' positions of corporation, and be appointed to review committee — K and W claimed that their interest as shareholders would not

Stelco Inc., Re, 2005 CarswellOnt 1188

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 3 of 314

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

be represented in proceedings — K and W appointed directors by board, and made members of review committee — Employees' motion for removal of K and W as directors was granted and appointments were voided — Trial judge found possibility existed that K and W would not have best interests of corporation at heart, and might favour certain shareholders — Trial judge found interference with business judgment of board was appropriate, as issue touched on constitution of corporation — Trial judge found reasonable apprehension of bias existed, although no evidence of actual bias had been shown — K and W appealed — Appeal allowed — K and W reinstated to board — Court's discretion under s. 11 of Act does not give authority to remove directors, which is not part of restructuring process — Trial judge erred in not deferring to corporation's business judgment — Trial judge erred in adopting principle of reasonable apprehension of bias.

### Bankruptcy and insolvency --- Proposal — Companies' Creditors Arrangement Act — Miscellaneous issues

Corporation entered protection under Companies' Creditors Arrangement Act — K and W were involved with companies who made capital proposal regarding corporation — Companies held approximately 20 per cent of corporation's shares — K and W, allegedly with support of over 30 per cent of shareholders, requested to fill two vacant directors' positions of corporation and be appointed to review committee — K and W claimed that their interest as shareholders would not be represented in proceedings — K and W appointed directors by board, and made members of review committee — Employees' motion for removal of K and W as directors was granted and appointments were voided — Trial judge found possibility existed that K and W would not have best interests of corporation at heart, and might favour certain shareholders — Trial judge found interference with business judgment of board was appropriate, as issue touched on constitution of corporation — Trial judge found reasonable apprehension of bias existed, although no evidence of actual bias had been shown — K and W appealed — Appeal allowed — K and W reinstated to board — Court's discretion under s. 11 of Act does not give authority to remove directors, which is not part of restructuring process — Trial judge erred in not deferring to corporation's business judgment — Trial judge erred in adopting principle of reasonable apprehension of bias.

## Table of Authorities

### Cases considered by *Blair J.A.*:

*Alberta-Pacific Terminals Ltd., Re* (1991), 8 C.B.R. (3d) 99, 1991 CarswellBC 494 (B.C. S.C.) — referred to

*Algoma Steel Inc., Re* (2001), 2001 CarswellOnt 1742, 25 C.B.R. (4th) 194, 147 O.A.C. 291 (Ont. C.A.) — considered

*Algoma Steel Inc. v. Union Gas Ltd.* (2003), 2003 CarswellOnt 115, 39 C.B.R. (4th) 5, 169 O.A.C. 89, 63 O.R. (3d) 78 (Ont. C.A.) — referred to

*Babcock & Wilcox Canada Ltd., Re* (2000), 2000 CarswellOnt 704, 5 B.L.R. (3d) 75, 18 C.B.R. (4th) 157 (Ont. S.C.J. [Commercial List]) — referred to

*Baxter Student Housing Ltd. v. College Housing Co-operative Ltd.* (1975), [1976] 2 S.C.R. 475, [1976] 1 W.W.R. 1, 20 C.B.R. (N.S.) 240, 57 D.L.R. (3d) 1, 5 N.R. 515, 1975 CarswellMan 3, 1975 CarswellMan 85 (S.C.C.) — referred to

*Blair v. Consolidated Enfield Corp.* (1995), 128 D.L.R. (4th) 73, 187 N.R. 241, 86 O.A.C. 245, 25 O.R. (3d) 480 (note), 24 B.L.R. (2d) 161, [1995] 4 S.C.R. 5, 1995 CarswellOnt 1393, 1995 CarswellOnt 1179 (S.C.C.) — considered

*Brant Investments Ltd. v. KeepRite Inc.* (1991), 1 B.L.R. (2d) 225, 3 O.R. (3d) 289, 45 O.A.C. 320, 80 D.L.R. (4th) 161, 1991 CarswellOnt 133 (Ont. C.A.) — considered

*Catalyst Fund General Partner I Inc. v. Hollinger Inc.* (2004), 1 B.L.R. (4th) 186, 2004 CarswellOnt 4772 (Ont. S.C.J.) — referred to

Stelco Inc., Re, 2005 CarswellOnt 1188

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 4 of 314

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

*Country Style Food Services Inc., Re* (2002), 2002 CarswellOnt 1038, 158 O.A.C. 30 (Ont. C.A. [In Chambers]) — considered

*Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106, 1995 CarswellOnt 54 (Ont. Gen. Div. [Commercial List]) — referred to

*Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 51 B.C.L.R. (2d) 84, 4 C.B.R. (3d) 311, *(sub nom. Chef Ready Foods Ltd. v. Hongkong Bank of Canada)* [1991] 2 W.W.R. 136, 1990 CarswellBC 394 (B.C. C.A.) — referred to

*Ivaco Inc., Re* (2004), 3 C.B.R. (5th) 33, 2004 CarswellOnt 2397 (Ont. S.C.J. [Commercial List]) — referred to

*Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24, 9 B.L.R. (2d) 275, 1993 CarswellOnt 183 (Ont. Gen. Div. [Commercial List]) — considered

*London Finance Corp. v. Banking Service Corp.* (1922), 23 O.W.N. 138, [1925] 1 D.L.R. 319 (Ont. H.C.) — referred to

*Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 17 C.B.R. (3d) 1, *(sub nom. Olympia & York Developments Ltd., Re)* 12 O.R. (3d) 500, 1993 CarswellOnt 182 (Ont. Gen. Div.) — considered

*People's Department Stores Ltd. (1992) Inc., Re* (2004), *(sub nom. Peoples Department Stores Inc. (Trustee of) v. Wise)* 244 D.L.R. (4th) 564, *(sub nom. Peoples Department Stores Inc. (Bankrupt) v. Wise)* 326 N.R. 267 (Eng.), *(sub nom. Peoples Department Stores Inc. (Bankrupt) v. Wise)* 326 N.R. 267 (Fr.), 4 C.B.R. (5th) 215, 49 B.L.R. (3d) 165, 2004 SCC 68, 2004 CarswellQue 2862, 2004 CarswellQue 2863 (S.C.C.) — considered

*R. v. Sharpe* (2001), 2001 SCC 2, 2001 CarswellBC 82, 2001 CarswellBC 83, 194 D.L.R. (4th) 1, 150 C.C.C. (3d) 321, 39 C.R. (5th) 72, 264 N.R. 201, 146 B.C.A.C. 161, 239 W.A.C. 161, 88 B.C.L.R. (3d) 1, [2001] 6 W.W.R. 1, [2001] 1 S.C.R. 45, 86 C.R.R. (2d) 1 (S.C.C.) — referred to

*Richtree Inc., Re* (2005), 2005 CarswellOnt 255, 7 C.B.R. (5th) 294 (Ont. S.C.J. [Commercial List]) — referred to

*Rizzo & Rizzo Shoes Ltd., Re* (1998), 1998 CarswellOnt 1, 1998 CarswellOnt 2, 154 D.L.R. (4th) 193, 36 O.R. (3d) 418 (headnote only), *(sub nom. Rizzo & Rizzo Shoes Ltd. (Bankrupt), Re)* 221 N.R. 241, *(sub nom. Adrien v. Ontario Ministry of Labour)* 98 C.L.L.C. 210-006, 50 C.B.R. (3d) 163, *(sub nom. Rizzo & Rizzo Shoes Ltd. (Bankrupt), Re)* 106 O.A.C. 1, [1998] 1 S.C.R. 27, 33 C.C.E.L. (2d) 173 (S.C.C.) — referred to

*Royal Oak Mines Inc., Re* (1999), 1999 CarswellOnt 792, 7 C.B.R. (4th) 293 (Ont. Gen. Div. [Commercial List]) — considered

*Sammi Atlas Inc., Re* (1998), 1998 CarswellOnt 1145, 3 C.B.R. (4th) 171 (Ont. Gen. Div. [Commercial List]) — referred to

*Skeena Cellulose Inc., Re* (2003), 43 C.B.R. (4th) 187, 184 B.C.A.C. 54, 302 W.A.C. 54, 2003 BCCA 344, 2003 CarswellBC 1399, 13 B.C.L.R. (4th) 236 (B.C. C.A.) — followed

*Stephenson v. Vokes* (1896), 27 O.R. 691 (Ont. H.C.) — referred to

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

*Westar Mining Ltd., Re* (1992), 70 B.C.L.R. (2d) 6, 14 C.B.R. (3d) 88, [1992] 6 W.W.R. 331, 1992 CarswellBC 508 (B.C. S.C.) — referred to

**Statutes considered:**

*Canada Business Corporations Act*, R.S.C. 1985, c. C-44
    Generally — referred to

    s. 2(1) "affairs" — considered

    s. 102 — referred to

    s. 106(3) — referred to

    s. 109(1) — referred to

    s. 111 — referred to

    s. 122(1) — referred to

    s. 122(1)(a) — referred to

    s. 122(1)(b) — referred to

    s. 145 — referred to

    s. 145(2)(b) — referred to

    s. 241 — referred to

    s. 241(3)(e) — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
    Generally — referred to

    s. 11 — considered

    s. 11(1) — considered

    s. 11(3) — considered

    s. 11(4) — considered

    s. 11(6) — considered

    s. 20 — considered

APPEAL by potential board members from judgments reported at *Stelco Inc., Re* (2005), 2005 CarswellOnt 742, 7 C.B.R. (5th) 307 (Ont. S.C.J. [Commercial List]) and at *Stelco Inc., Re* (2005), 2005 CarswellOnt 743, 7 C.B.R. (5th) 310 (Ont. S.C.J. [Commercial List]), granting motion by employees for removal of certain directors from board of corporation under protection of *Companies Creditors' Arrangement Act*.

*Blair J.A.:*

**WestlawNext**® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

## Part I — Introduction

1    Stelco Inc. and four of its wholly owned subsidiaries obtained protection from their creditors under the *Companies' Creditors Arrangement Act* [1] on January 29, 2004. Since that time, the Stelco Group has been engaged in a high profile, and sometimes controversial, process of economic restructuring. Since October 2004, the restructuring has revolved around a court-approved capital raising process which, by February 2005, had generated a number of competitive bids for the Stelco Group.

2    Farley J., an experienced judge of the Superior Court Commercial List in Toronto, has been supervising the CCAA process from the outset.

3    The appellants, Michael Woollcombe and Roland Keiper, are associated with two companies — Clearwater Capital Management Inc., and Equilibrium Capital Management Inc. — which, respectively, hold approximately 20% of the outstanding publicly traded common shares of Stelco. Most of these shares have been acquired while the CCAA process has been ongoing, and Messrs. Woollcombe and Keiper have made it clear publicly that they believe there is good shareholder value in Stelco in spite of the restructuring. The reason they are able to take this position is that there has been a solid turn around in worldwide steel markets, as a result of which Stelco, although remaining in insolvency protection, is earning annual operating profits.

4    The Stelco board of directors ("the Board") has been depleted as a result of resignations, and in January of this year Messrs. Woollcombe and Keiper expressed an interest in being appointed to the Board. They were supported in this request by other shareholders who, together with Clearwater and Equilibrium, represent about 40% of the Stelco common shareholders. On February 18, 2005, the Board appointed the appellants directors. In announcing the appointments publicly, Stelco said in a press release:

> After careful consideration, and given potential recoveries at the end of the company's restructuring process, the Board responded favourably to the requests by making the appointments announced today.

> Richard Drouin, Chairman of Stelco's Board of Directors, said: "I'm pleased to welcome Roland Keiper and Michael Woollcombe to the Board. Their experience and their perspective will assist the Board as it strives to serve the best interests of all our stakeholders. We look forward to their positive contribution."

5    On the same day, the Board began its consideration of the various competing bids that had been received through the capital raising process.

6    The appointments of the appellants to the Board incensed the employee stakeholders of Stelco ("the Employees"), represented by the respondent Retired Salaried Beneficiaries of Stelco and the respondent United Steelworkers of America ("USWA"). Outstanding pension liabilities to current and retired employees are said to be Stelco's largest long-term liability — exceeding several billion dollars. The Employees perceive they do not have the same, or very much, economic leverage in what has sometimes been referred to as 'the bare knuckled arena' of the restructuring process. At the same time, they are amongst the most financially vulnerable stakeholders in the piece. They see the appointments of Messrs. Woollcombe and Keiper to the Board as a threat to their well being in the restructuring process, because the appointments provide the appellants, and the shareholders they represent, with direct access to sensitive information relating to the competing bids to which other stakeholders (including themselves) are not privy.

7    The Employees fear that the participation of the two major shareholder representatives will tilt the bid process in favour of maximizing shareholder value at the expense of bids that might be more favourable to the interests of the Employees. They sought and obtained an order from Farley J. removing Messrs. Woollcombe and Keiper from their short-lived position of directors, essentially on the basis of that apprehension.

8    The Employees argue that there is a reasonable apprehension the appellants would not be able to act in the best interests of the corporation — as opposed to their own best interests as shareholders — in considering the bids. They say this is so because of prior public statements by the appellants about enhancing shareholder value in Stelco, because of the appellants' linkage

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 7 of 314

Stelco Inc., Re, 2005 CarswellOnt 1188

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

to such a large shareholder group, because of their earlier failed bid in the restructuring, and because of their opposition to a capital proposal made in the proceeding by Deutsche Bank (known as "the Stalking Horse Bid"). They submit further that the appointments have poisoned the atmosphere of the restructuring process, and that the Board made the appointments under threat of facing a potential shareholders' meeting where the members of the Board would be replaced en masse.

9    On the other hand, Messrs. Woollcombe and Keiper seek to set aside the order of Farley J. on the grounds that (a) he did not have the jurisdiction to make the order under the provisions of the CCAA, (b) even if he did have jurisdiction, the reasonable apprehension of bias test applied by the motion judge has no application to the removal of directors, (c) the motion judge erred in interfering with the exercise by the Board of its business judgment in filling the vacancies on the Board, and (d) the facts do not meet any test that would justify the removal of directors by a court in any event.

10    For the reasons that follow, I would grant leave to appeal, allow the appeal, and order the reinstatement of the applicants to the Board.

**Part II — Additional Facts**

11    Before the initial CCAA order on January 29, 2004, the shareholders of Stelco had last met at their annual general meeting on April 29, 2003. At that meeting they elected eleven directors to the Board. By the date of the initial order, three of those directors had resigned, and on November 30, 2004, a fourth did as well, leaving the company with only seven directors.

12    Stelco's articles provide for the Board to be made up of a minimum of ten and a maximum of twenty directors. Consequently, after the last resignation, the company's corporate governance committee began to take steps to search for new directors. They had not succeeded in finding any prior to the approach by the appellants in January 2005.

13    Messrs. Woollcombe and Keiper had been accumulating shares in Stelco and had been participating in the CCAA proceedings for some time before their request to be appointed to the Board, through their companies, Clearwater and Equilibrium. Clearwater and Equilibrium are privately held, Ontario-based, investment management firms. Mr. Keiper is the president of Equilibrium and associated with Clearwater. Mr. Woollcombe is a consultant to Clearwater. The motion judge found that they "come as a package".

14    In October 2004, Stelco sought court approval of its proposed method of raising capital. On October 19, 2004, Farley J. issued what has been referred to as the Initial Capital Process Order. This order set out a process by which Stelco, under the direction of the Board, would solicit bids, discuss the bids with stakeholders, evaluate the bids, and report on the bids to the court.

15    On November 9, 2004, Clearwater and Equilibrium announced they had formed an investor group and had made a capital proposal to Stelco. The proposal involved the raising of $125 million through a rights offering. Mr. Keiper stated at the time that he believed "the value of Stelco's equity would have the opportunity to increase substantially if Stelco emerged from CCAA while minimizing dilution of its shareholders." The Clearwater proposal was not accepted.

16    A few days later, on November 14, 2004, Stelco approved the Stalking Horse Bid. Clearwater and Equilibrium opposed the Deutsche Bank proposal. Mr. Keiper criticized it for not providing sufficient value to existing shareholders. However, on November 29, 2004, Farley J. approved the Stalking Horse Bid and amended the Initial Capital Process Order accordingly. The order set out the various channels of communication between Stelco, the monitor, potential bidders and the stakeholders. It provided that members of the Board were to see the details of the different bids before the Board selected one or more of the offers.

17    Subsequently, over a period of two and a half months, the shareholding position of Clearwater and Equilibrium increased from approximately 5% as at November 19, to 14.9% as at January 25, 2005, and finally to approximately 20% on a fully diluted basis as at January 31, 2005. On January 25, Clearwater and Equilibrium announced that they had reached an understanding jointly to pursue efforts to maximize shareholder value at Stelco. A press release stated:

Stelco Inc., Re, 2005 CarswellOnt 1188

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

Such efforts will include seeking to ensure that the interests of Stelco's equity holders are appropriately protected by its board of directors and, ultimately, that Stelco's equity holders have an appropriate say, by vote or otherwise, in determining the future course of Stelco.

18    On February 1, 2005, Messrs. Keiper and Woollcombe and others representatives of Clearwater and Equilibrium, met with Mr. Drouin and other Board members to discuss their views of Stelco and a fair outcome for all stakeholders in the proceedings. Mr. Keiper made a detailed presentation, as Mr. Drouin testified, "encouraging the Board to examine how Stelco might improve its value through enhanced disclosure and other steps". Mr. Keiper expressed confidence that "there was value to the equity of Stelco", and added that he had backed this view up by investing millions of dollars of his own money in Stelco shares. At that meeting, Clearwater and Equilibrium requested that Messrs. Woollcombe and Keiper be added to the Board and to Stelco's restructuring committee. In this respect, they were supported by other shareholders holding about another 20% of the company's common shares.

19    At paragraphs 17 and 18 of his affidavit, Mr. Drouin, summarized his appraisal of the situation:

17. It was my assessment that each of Mr. Keiper and Mr. Woollcombe had personal qualities which would allow them to make a significant contribution to the Board in terms of their backgrounds and their knowledge of the steel industry generally and Stelco in particular. In addition I was aware that their appointment to the Board was supported by approximately 40% of the shareholders. In the event that these shareholders successfully requisitioned a shareholders meeting they were in a position to determine the composition of the entire Board.

18. I considered it essential that there be continuity of the Board through the CCAA process. I formed the view that the combination of existing Board members and these additional members would provide Stelco with the most appropriate board composition in the circumstances. The other members of the Board also shared my views.

20    In order to ensure that the appellants understood their duties as potential Board members and, particularly that "they would no longer be able to consider only the interests of shareholders alone but would have fiduciary responsibilities as a Board member to the corporation as a whole", Mr. Drouin and others held several further meetings with Mr. Woollcombe and Mr. Keiper. These discussions "included areas of independence, standards, fiduciary duties, the role of the Board Restructuring Committee and confidentiality matters". Mr. Woollcombe and Mr. Keiper gave their assurances that they fully understood the nature and extent of their prospective duties, and would abide by them. In addition, they agreed and confirmed that:

a) Mr. Woollcombe would no longer be an advisor to Clearwater and Equilibrium with respect to Stelco;

b) Clearwater and Equilibrium would no longer be represented by counsel in the CCAA proceedings; and

c) Clearwater and Equilibrium then had no involvement in, and would have no future involvement, in any bid for Stelco.

21    On the basis of the foregoing — and satisfied "that Messrs. Keiper and Woollcombe would make a positive contribution to the various issues before the Board both in [the] restructuring and the ongoing operation of the business" — the Board made the appointments on February 18, 2005.

22    Seven days later, the motion judge found it "appropriate, just, necessary and reasonable to declare" those appointments "to be of no force and effect" and to remove Messrs. Woollcombe and Keiper from the Board. He did so not on the basis of any actual conduct on the part of the appellants as directors of Stelco but because there was some risk of anticipated conduct in the future. The gist of the motion judge's rationale is found in the following passage from his reasons (at para. 23):

In these particular circumstances and aside from the Board feeling coerced into the appointments for the sake of continuing stability, I am not of the view that it would be appropriate to wait and see if there was any explicit action on behalf of K and W while conducting themselves as Board members which would demonstrate that they had not lived up to their obligations to be "neutral". They may well conduct themselves beyond reproach. But if they did not, the fallout would

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

be very detrimental to Stelco and its ability to successfully emerge. What would happen to the bids in such a dogfight? I fear that it would be trying to put Humpty Dumpty back together again. The same situation would prevail even if K and W conducted themselves beyond reproach but with the Board continuing to be concerned that they not do anything seemingly offensive to the bloc. The risk to the process and to Stelco in its emergence is simply too great to risk the wait and see approach.

## Part III — Leave to Appeal

23    Because of the "real time" dynamic of this restructuring project, Laskin J.A. granted an order on March 4, 2005, expediting the appellants' motion for leave to appeal, directing that it be heard orally and, if leave be granted, directing that the appeal be heard at the same time. The leave motion and the appeal were argued together, by order of the panel, on March 18, 2005.

24    This court has said that it will only sparingly grant leave to appeal in the context of a CCAA proceeding and will only do so where there are "serious and arguable grounds that are of real and significant interest to the parties": *Country Style Food Services Inc., Re* (2002), 158 O.A.C. 30, [2002] O.J. No. 1377 (Ont. C.A. [In Chambers]), at para. 15. This criterion is determined in accordance with a four-pronged test, namely,

> a) whether the point on appeal is of significance to the practice;

> b) whether the point is of significance to the action;

> c) whether the appeal is *prima facie* meritorious or frivolous;

> d) whether the appeal will unduly hinder the progress of the action.

25    Counsel agree that (d) above is not relevant to this proceeding, given the expedited nature of the hearing. In my view, the tests set out in (a) - (c) are met in the circumstances, and as such, leave should be granted. The issue of the court's jurisdiction to intervene in corporate governance issues during a CCAA restructuring, and the scope of its discretion in doing so, are questions of considerable importance to the practice and on which there is little appellate jurisprudence. While Messrs. Woollcombe and Keiper are pursuing their remedies in their own right, and the company and its directors did not take an active role in the proceedings in this court, the Board and the company did stand by their decision to appoint the new directors at the hearing before the motion judge and in this court, and the question of who is to be involved in the Board's decision making process continues to be of importance to the CCAA proceedings. From the reasons that follow it will be evident that in my view the appeal has merit.

26    Leave to appeal is therefore granted.

## Part IV — The Appeal

### *The Positions of the Parties*

27    The appellants submit that,

> a) in exercising its discretion under the CCAA, the court is not exercising its "inherent jurisdiction" as a superior court;

> b) there is no jurisdiction under the CCAA to remove duly elected or appointed directors, notwithstanding the broad discretion provided by s. 11 of that Act; and that,

> c) even if there is jurisdiction, the motion judge erred:

>> (i) by relying upon the administrative law test for reasonable apprehension of bias in determining that the directors should be removed;

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Stelco Inc., Re, 2005 CarswellOnt 1188

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 10 of 314

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

(ii) by rejecting the application of the "business judgment" rule to the unanimous decision of the Board to appoint two new directors; and,

(iii) by concluding that Clearwater and Equilibrium, the shareholders with whom the appellants are associated, were focussed solely on a short-term investment horizon, without any evidence to that effect, and therefore concluding that there was a tangible risk that the appellants would not be neutral and act in the best interests of Stelco and all stakeholders in carrying out their duties as directors.

28      The respondents' arguments are rooted in fairness and process. They say, first, that the appointment of the appellants as directors has poisoned the atmosphere of the CCAA proceedings and, secondly, that it threatens to undermine the even-handedness and integrity of the capital raising process, thus jeopardizing the ability of the court at the end of the day to approve any compromise or arrangement emerging from that process. The respondents contend that Farley J. had jurisdiction to ensure the integrity of the CCAA process, including the capital raising process Stelco had asked him to approve, and that this court should not interfere with his decision that it was necessary to remove Messrs. Woollcombe and Keiper from the Board in order to ensure the integrity of that process. A judge exercising a supervisory function during a CCAA proceeding is owed considerable deference: *Algoma Steel Inc., Re* (2001), 25 C.B.R. (4th) 194 (Ont. C.A.), at para. 8.

29      The crux of the respondents' concern is well-articulated in the following excerpt from paragraph 72 of the factum of the Retired Salaried Beneficiaries:

The appointments of Keiper and Woollcombe violated every tenet of fairness in the restructuring process that is supposed to lead to a plan of arrangement. One stakeholder group — particular investment funds that have acquired Stelco shares during the CCAA itself — have been provided with privileged access to the capital raising process, and voting seats on the Corporation's Board of Directors and Restructuring Committee. No other stakeholder has been treated in remotely the same way. To the contrary, the salaried retirees have been completely excluded from the capital raising process and have no say whatsoever in the Corporation's decision-making process.

30      The respondents submit that fairness, and the perception of fairness, underpin the CCAA process, and depend upon effective judicial supervision: see *Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 12 O.R. (3d) 500 (Ont. Gen. Div.); *Ivaco Inc., Re* (2004), 3 C.B.R. (5th) 33 (Ont. S.C.J. [Commercial List]), at para.15-16. The motion judge reasonably decided to remove the appellants as directors in the circumstances, they say, and this court should not interfere.

### Jurisdiction

31      The motion judge concluded that he had the power to rescind the appointments of the two directors on the basis of his "inherent jurisdiction" and "the discretion given to the court pursuant to the *CCAA*". He was not asked to, nor did he attempt to rest his jurisdiction on other statutory powers imported into the CCAA.

32      The CCAA is remedial legislation and is to be given a liberal interpretation to facilitate its objectives: *Babcock & Wilcox Canada Ltd., Re*, [2000] O.J. No. 786 (Ont. S.C.J. [Commercial List]), at para. 11. See also, *Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 4 C.B.R. (3d) 311 (B.C. C.A.), at p. 320; *Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]). Courts have adopted this approach in the past to rely on inherent jurisdiction, or alternatively on the broad jurisdiction under s. 11 of the CCAA, as the source of judicial power in a CCAA proceeding to "fill in the gaps" or to "put flesh on the bones" of that Act: see *Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106 (Ont. Gen. Div. [Commercial List]), *Royal Oak Mines Inc., Re* (1999), 7 C.B.R. (4th) 293 (Ont. Gen. Div. [Commercial List]); and *Westar Mining Ltd., Re* (1992), 70 B.C.L.R. (2d) 6 (B.C. S.C.).

33      It is not necessary, for purposes of this appeal, to determine whether inherent jurisdiction is excluded for all supervisory purposes under the CCAA, by reason of the existence of the statutory discretionary regime provided in that Act. In my opinion, however, the better view is that in carrying out his or her supervisory functions under the legislation, the judge is not exercising

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

inherent jurisdiction but rather the statutory discretion provided by s. 11 of the CCAA and supplemented by other statutory powers that may be imported into the exercise of the s. 11 discretion from other statutes through s. 20 of the CCAA.

*Inherent Jurisdiction*

34    Inherent jurisdiction is a power derived "from the very nature of the court as a superior court of law", permitting the court "to maintain its authority and to prevent its process being obstructed and abused". It embodies the authority of the judiciary to control its own process and the lawyers and other officials connected with the court and its process, in order "to uphold, to protect and to fulfill the judicial function of administering justice according to law in a regular, orderly and effective manner". See I.H. Jacob, "The Inherent Jurisdiction of the Court" (1970) 23 Current Legal Problems 27-28. In Halsbury's Laws of England, 4 th ed. (London: Lexis-Nexis UK, 1973 - ) vol. 37, at para. 14, the concept is described as follows:

> In sum, it may be said that the inherent jurisdiction of the court is a virile and viable doctrine, and has been defined as being the reserve or fund of powers, a residual source of powers, which the court may draw upon as necessary whenever it is just or equitable to do so, in particularly to ensure the observation of the due process of law, to prevent improper vexation or oppression, to do justice between the parties and to secure a fair trial between them.

35    In spite of the expansive nature of this power, inherent jurisdiction does not operate where Parliament or the Legislature has acted. As Farley J. noted in *Royal Oak Mines Inc.*, *supra*, inherent jurisdiction is "not limitless; if the legislative body has not left a functional gap or vacuum, then inherent jurisdiction should not be brought into play" (para. 4). See also, *Baxter Student Housing Ltd. v. College Housing Co-operative Ltd.* (1975), [1976] 2 S.C.R. 475 (S.C.C.) at 480; *Richtree Inc., Re*, [2005] O.J. No. 251 (Ont. S.C.J. [Commercial List]).

36    In the CCAA context, Parliament has provided a statutory framework to extend protection to a company while it holds its creditors at bay and attempts to negotiate a compromised plan of arrangement that will enable it to emerge and continue as a viable economic entity, thus benefiting society and the company in the long run, along with the company's creditors, shareholders, employees and other stakeholders. The s. 11 discretion is the engine that drives this broad and flexible statutory scheme, and that for the most part supplants the need to resort to inherent jurisdiction. In that regard, I agree with the comment of Newbury J.A. in *Skeena Cellulose Inc., Re*, [2003] B.C.J. No. 1335, 43 C.B.R. (4th) 187 (B.C. C.A.) at para. 46, that:

> . . . the court is not exercising a power that arises from its nature as a superior court of law, but is exercising the discretion given to it by the CCAA. . . . This is the discretion, given by s. 11, to stay proceedings against the debtor corporation and the discretion, given by s. 6, to approve a plan which appears to be reasonable and fair, to be in accord with the requirements and objects of the statute, and to make possible the continuation of the corporation as a viable entity. It is these considerations the courts have been concerned with in the cases discussed above, [2] rather than the integrity of their own process.

37    As Jacob observes, in his article "The Inherent Jurisdiction of the Court", *supra*, at p. 25:

> The inherent jurisdiction of the court is a concept which must be distinguished from the exercise of judicial discretion. These two concepts resemble each other, particularly in their operation, and they often appear to overlap, and are therefore sometimes confused the one with the other. There is nevertheless a vital juridical distinction between jurisdiction and discretion, which must always be observed.

38    I do not mean to suggest that inherent jurisdiction can never apply in a CCAA context. The court retains the ability to control its own process, should the need arise. There is a distinction, however — difficult as it may be to draw — between the *court's* process with respect to the restructuring, on the one hand, and the course of action involving the negotiations and corporate actions accompanying them, which are the *company's* process, on the other hand. The court simply supervises the latter process through its ability to stay, restrain or prohibit proceedings against the company during the plan negotiation period "on such terms as it may impose". [3] Hence the better view is that a judge is generally exercising the court's statutory discretion under s. 11 of the Act when supervising a CCAA proceeding. The order in this case could not be founded on inherent jurisdiction because it is designed to supervise the company's process, not the court's process.

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

*The Section 11 Discretion*

39    This appeal involves the scope of a supervisory judge's discretion under s. 11 of the CCAA, in the context of corporate governance decisions made during the course of the plan negotiating and approval process and, in particular, whether that discretion extends to the removal of directors in that environment. In my view, the s. 11 discretion — in spite of its considerable breadth and flexibility — does not permit the exercise of such a power in and of itself. There may be situations where a judge in a CCAA proceeding would be justified in ordering the removal of directors pursuant to the oppression remedy provisions found in s. 241 of the CBCA, and imported into the exercise of the s. 11 discretion through s. 20 of the CCAA. However, this was not argued in the present case, and the facts before the court would not justify the removal of Messrs. Woollcombe and Keiper on oppression remedy grounds.

40    The pertinent portions of s. 11 of the CCAA provide as follows:

**Powers of court**

11. (1) Notwithstanding anything in the *Bankruptcy* and Insolvency Act or the Winding-up Act, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

**Initial application court orders**

(3) A court may, on an initial application in respect of a company, make an order on such terms as it may impose, effective for such period as the court deems necessary not exceeding thirty days.

    (a) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

    (b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

    (c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

**Other than initial application court orders**

(4) A court may, on an application in respect of a company other than an initial application, make an order on such terms as it may impose.

    (a) staying, until otherwise ordered by the court, for such period as the court deems necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

    (b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

    (c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

**Burden of proof on application**

(6) The court shall not make an order under subsection (3) or (4) unless

    (a) the applicant satisfies the court that circumstances exist that make such an order appropriate; and

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 13 of 314

Stelco Inc., Re, 2005 CarswellOnt 1188

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

(b) in the case of an order under subsection (4), the applicant also satisfied the court that the applicant has acted, and is acting, in good faith and with due diligence.

41     The rule of statutory interpretation that has now been accepted by the Supreme Court of Canada, in such cases as *R. v. Sharpe*, [2001] 1 S.C.R. 45 (S.C.C.), at para. 33, and *Rizzo & Rizzo Shoes Ltd., Re*, [1998] 1 S.C.R. 27 (S.C.C.), at para. 21 is articulated in E.A. Driedger, *The Construction of Statutes*, 2 nd ed. (Toronto: Butterworths, 1983) as follows:

Today, there is only one principle or approach, namely, the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament.

See also Ruth Sullivan, *Sullivan and Driedger on the Construction of Statutes*, 4 th ed. (Toronto: Butterworths, 2002) at page 262.

42     The interpretation of s. 11 advanced above is true to these principles. It is consistent with the purpose and scheme of the CCAA, as articulated in para. 38 above, and with the fact that corporate governance matters are dealt with in other statutes. In addition, it honours the historical reluctance of courts to intervene in such matters, or to second-guess the business decisions made by directors and officers in the course of managing the business and affairs of the corporation.

43     Mr. Leon and Mr. Swan argue that matters relating to the removal of directors do not fall within the court's discretion under s. 11 because they fall outside of the parameters of the court's role in the restructuring process, in contrast to the company's role in the restructuring process. The court's role is defined by the "on such terms as may be imposed" jurisdiction under subparagraphs 11(3)(a)-(c) and 11(4)(a)-(c) of the CCAA to stay, or restrain, or prohibit proceedings against the company during the "breathing space" period for negotiations and a plan. I agree.

44     What the court does under s. 11 is to establish the boundaries of the playing field and act as a referee in the process. The company's role in the restructuring, and that of its stakeholders, is to work out a plan or compromise that a sufficient percentage of creditors will accept and the court will approve and sanction. The corporate activities that take place in the course of the workout are governed by the legislation and legal principles that normally apply to such activities. In the course of acting as referee, the court has great leeway, as Farley J. observed in *Lehndorff General Partner Ltd.*, *supra*, at para 5, "to make order[s] so as to effectively maintain the status quo in respect of an insolvent company while it attempts to gain the approval of its creditors for the proposed compromise or arrangement which will be to the benefit of both the company and its creditors". But the s. 11 discretion is not open-ended and unfettered. Its exercise must be guided by the scheme and object of the Act and by the legal principles that govern corporate law issues. Moreover, the court is not entitled to usurp the role of the directors and management in conducting what are in substance *the company's* restructuring efforts.

45     With these principles in mind, I turn to an analysis of the various factors underlying the interpretation of the s. 11 discretion.

46     I start with the proposition that at common law directors could not be removed from office during the term for which they were elected or appointed: *London Finance Corp. v. Banking Service Corp.* (1922), 23 O.W.N. 138 (Ont. H.C.); *Stephenson v. Vokes* (1896), 27 O.R. 691 (Ont. H.C.). The authority to remove must therefore be found in statute law.

47     In Canada, the CBCA and its provincial equivalents govern the election, appointment and removal of directors, as well as providing for their duties and responsibilities. Shareholders elect directors, but the directors may fill vacancies that occur on the board of directors pending a further shareholders meeting: CBCA, ss. 106(3) and 111. [4] The specific power *to remove* directors is vested in the shareholders by s. 109(1) of the CBCA. However, s. 241 empowers the court — where it finds that oppression as therein defined exists — to "make any interim or final order it thinks fit", including (s. 241(3)(e)) "an order appointing directors in place of or in addition to all or any of the directors then in office". This power has been utilized to remove directors, but in very rare cases, and only in circumstances where there has been actual conduct rising to the level of

Case 09-10138-MEW    Doc 14410-5    Filed 09/16/14    Page 14 of 314

Stelco Inc., Re, 2005 CarswellOnt 1188

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

misconduct required to trigger oppression remedy relief: see, for example, *Catalyst Fund General Partner I Inc. v. Hollinger Inc.*, [2004] O.J. No. 4722 (Ont. S.C.J.).

48      There is therefore a statutory scheme under the CBCA (and similar provincial corporate legislation) providing for the election, appointment, *and removal* of directors. Where another applicable statute confers jurisdiction with respect to a matter, a broad and undefined discretion provided in one statute cannot be used to supplant or override the other applicable statute. There is no legislative "gap" to fill. See *Baxter Student Housing Ltd. v. College Housing Co-operative Ltd.*, *supra*, at p. 480; *Royal Oak Mines Inc. (Re)*, *supra*; and *Richtree Inc. (Re)*, *supra*.

49      At paragraph 7 of his reasons, the motion judge said:

> The board is charged with the standard duty of "manage[ing], [*sic*] or supervising the management, of the business and affairs of the corporation": s. 102(1) CBCA. *Ordinarily the Court will not interfere with the composition of the board of directors. However, if there is good and sufficient valid reason to do so, then the Court must not hesitate to do so to correct a problem.* The directors should not be required to constantly look over their shoulders for this would be the sure recipe for board paralysis which would be so detrimental to a restructuring process; thus interested parties should only initiate a motion where it is reasonably obvious that there is a problem, actual or poised to become actual.
>
> [emphasis added]

50      Respectfully, I see no authority in s. 11 of the CCAA for the court to interfere with the composition of a board of directors on such a basis.

51      Court removal of directors is an exceptional remedy, and one that is rarely exercised in corporate law. This reluctance is rooted in the historical unwillingness of courts to interfere with the internal management of corporate affairs and in the court's well-established deference to decisions made by directors and officers in the exercise of their business judgment when managing the business and affairs of the corporation. These factors also bolster the view that where the CCAA is silent on the issue, the court should not read into the s. 11 discretion an extraordinary power — which the courts are disinclined to exercise in any event — except to the extent that that power may be introduced through the application of other legislation, and on the same principles that apply to the application of the provisions of the other legislation.

*The Oppression Remedy Gateway*

52      The fact that s. 11 does not itself provide the authority for a CCAA judge to order the removal of directors does not mean that the supervising judge is powerless to make such an order, however. Section 20 of the CCAA offers a gateway to the oppression remedy and other provisions of the CBCA and similar provincial statutes. Section 20 states:

> The provisions of this Act may be applied together with the provisions of any Act of Parliament or of the legislature of any province that authorizes or makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them.

53      The CBCA is legislation that "makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them". Accordingly, the powers of a judge under s. 11 of the CCAA may be applied together with the provisions of the CBCA, including the oppression remedy provisions of that statute. I do not read s. 20 as limiting the application of outside legislation to the provisions of such legislation dealing specifically with the sanctioning of compromises and arrangements between the company and its shareholders. The grammatical structure of s. 20 mandates a broader interpretation and the oppression remedy is, therefore, available to a supervising judge in appropriate circumstances.

54      I do not accept the respondents' argument that the motion judge had the authority to order the removal of the appellants by virtue of the power contained in s. 145(2)(b) of the CBCA to make an order "declaring the result of the disputed election or appointment" of directors. In my view, s. 145 relates to the procedures underlying disputed elections or appointments, and not to disputes over the composition of the board of directors itself. Here, it is conceded that the appointment of Messrs. Woollcombe

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

and Keiper as directors complied with all relevant statutory requirements. Farley J. quite properly did not seek to base his jurisdiction on any such authority.

*The Level of Conduct Required*

55    Colin Campbell J. recently invoked the oppression remedy to remove directors, without appointing anyone in their place, in *Catalyst Fund General Partner I Inc. v. Hollinger Inc.*, *supra* The bar is high. In reviewing the applicable law, C. Campbell J. said (para. 68):

> Director removal is *an extraordinary remedy* and certainly should be *imposed most sparingly*. As a starting point, I accept the basic proposition set out in Peterson, "Shareholder Remedies in Canada" [5] :

>> SS. 18.172 *Removing and appointing directors to the board is an extreme form of judicial intervention*. The board of directors is elected by the shareholders, vested with the power to manage the corporation, and appoints the officers of the company who undertake to conduct the day-to-day affairs of the company. [Footnote omitted.] It is clear that the board of directors has control over policymaking and management of the corporation. *By tampering with a board, a court directly affects the management of the corporation*. If a reasonable balance between protection of corporate stakeholders and the freedom of management to conduct the affairs of the business in an efficient manner is desired, altering the board of directors should be *a measure of last resort*. The order could be suitable where the continuing presence of the incumbent directors is harmful to both the company and the interests of corporate stakeholders, and where the appointment of a new director or directors would remedy the oppressive conduct without a receiver or receiver-manager.

>> [emphasis added]

56    C. Campbell J. found that the continued involvement of the Ravelston directors in the *Hollinger* situation would "significantly impede" the interests of the public shareholders and that those directors were "motivated by putting their interests first, not those of the company" (paras. 82-83). The evidence in this case is far from reaching any such benchmark, however, and the record would not support a finding of oppression, even if one had been sought.

57    Everyone accepts that there is no evidence the appellants have conducted themselves, as directors — in which capacity they participated over two days in the bid consideration exercise — in anything but a neutral fashion, having regard to the best interests of Stelco and all of the stakeholders. The motion judge acknowledged that the appellants "may well conduct themselves beyond reproach". However, he simply decided there was a risk — a reasonable apprehension — that Messrs. Woollcombe and Keiper would not live up to their obligations to be neutral in the future.

58    The risk or apprehension appears to have been founded essentially on three things: (1) the earlier public statements made by Mr. Keiper about "maximizing shareholder value"; (2) the conduct of Clearwater and Equilibrium in criticizing and opposing the Stalking Horse Bid; and (3) the motion judge's opinion that Clearwater and Equilibrium — the shareholders represented by the appellants on the Board — had a "vision" that "usually does not encompass any significant concern for the long-term competitiveness and viability of an emerging corporation", as a result of which the appellants would approach their directors' duties looking to liquidate their shares on the basis of a "short-term hold" rather than with the best interests of Stelco in mind. The motion judge transposed these concerns into anticipated predisposed conduct on the part of the appellants as directors, despite their apparent understanding of their duties as directors and their assurances that they would act in the best interests of Stelco. He therefore concluded that "the risk to the process and to Stelco in its emergence [was] simply too great to risk the wait and see approach".

59    Directors have obligations under s. 122(1) of the CBCA (a) to act honestly and in good faith with a view to the best interest of the corporation (the "statutory fiduciary duty" obligation), and (b) to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances (the "duty of care" obligation). They are also subject to control under the oppression remedy provisions of s. 241. The general nature of these duties does not change when the company

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

approaches, or finds itself in, insolvency: *People's Department Stores Ltd. (1992) Inc., Re,* [2004] S.C.J. No. 64 (S.C.C.) at paras. 42-49.

60    In *Peoples* the Supreme Court noted that "the interests of the corporation are not to be confused with the interests of the creditors or those of any other stakeholders" (para. 43), but also accepted "as an accurate statement of the law that in determining whether [directors] are acting with a view to the best interests of the corporation it may be legitimate, given all the circumstances of a given case, for the board of directors to consider, *inter alia*, the interests of shareholders, employees, suppliers, creditors, consumers, governments and the environment" (para. 42). Importantly as well — in the context of "the shifting interest and incentives of shareholders and creditors" — the court stated (para. 47):

> In resolving these competing interests, it is incumbent upon the directors to act honestly and in good faith with a view to the best interests of the corporation. In using their skills for the benefit of the corporation when it is in troubled waters financially, the directors must be careful to attempt to act in its best interests by creating a "better" corporation, and not to favour the interests of any one group of stakeholders.

61    In determining whether directors have fallen foul of those obligations, however, more than some risk of anticipated misconduct is required before the court can impose the extraordinary remedy of removing a director from his or her duly elected or appointed office. Although the motion judge concluded that there was a risk of harm to the Stelco process if Messrs Woollcombe and Keiper remained as directors, he did not assess the level of that risk. The record does not support a finding that there was a sufficient risk of sufficient misconduct to warrant a conclusion of oppression. The motion judge was not asked to make such a finding, and he did not do so.

62    The respondents argue that this court should not interfere with the decision of the motion judge on grounds of deference. They point out that the motion judge has been case-managing the restructuring of Stelco under the CCAA for over fourteen months and is intimately familiar with the circumstances of Stelco as it seeks to restructure itself and emerge from court protection.

63    There is no question that the decisions of judges acting in a supervisory role under the CCAA, and particularly those of experienced commercial list judges, are entitled to great deference: see *Algoma Steel Inc. v. Union Gas Ltd.* (2003), 63 O.R. (3d) 78 (Ont. C.A.) at para. 16. The discretion must be exercised judicially and in accordance with the principles governing its operation. Here, respectfully, the motion judge misconstrued his authority, and made an order that he was not empowered to make in the circumstances.

64    The appellants argued that the motion judge made a number of findings without any evidence to support them. Given my decision with respect to jurisdiction, it is not necessary for me to address that issue.

### The Business Judgment Rule

65    The appellants argue as well that the motion judge erred in failing to defer to the unanimous decision of the Stelco directors in deciding to appoint them to the Stelco Board. It is well-established that judges supervising restructuring proceedings — and courts in general — will be very hesitant to second-guess the business decisions of directors and management. As the Supreme Court of Canada said in *Peoples*, *supra*, at para. 67:

> Courts are ill-suited and should be reluctant to second-guess the application of business expertise to the considerations that are involved in corporate decision making . . .

66    In *Brant Investments Ltd. v. KeepRite Inc.* (1991), 3 O.R. (3d) 289 (Ont. C.A.) at 320, this court adopted the following statement by the trial judge, Anderson J.:

> Business decisions, honestly made, should not be subjected to microscopic examination. There should be no interference simply because a decision is unpopular with the minority. [6]

Stelco Inc., Re, 2005 CarswellOnt 1188

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

67    McKinlay J.A then went on to say:

> There can be no doubt that on an application under s. 234 [7] the trial judge is required to consider the nature of the impugned acts and the method in which they were carried out. That does not meant that the trial judge should substitute his own business judgment for that of managers, directors, or a committee such as the one involved in assessing this transaction. Indeed, it would generally be impossible for him to do so, regardless of the amount of evidence before him. He is dealing with the matter at a different time and place; it is unlikely that he will have the background knowledge and expertise of the individuals involved; he could have little or no knowledge of the background and skills of the persons who would be carrying out any proposed plan; and it is unlikely that he would have any knowledge of the specialized market in which the corporation operated. In short, he does not know enough to make the business decision required.

68    Although a judge supervising a CCAA proceeding develops a certain "feel" for the corporate dynamics and a certain sense of direction for the restructuring, this caution is worth keeping in mind. See also *Skeena Cellulose Inc., Re*, *supra*, *Sammi Atlas Inc., Re* (1998), 3 C.B.R. (4th) 171 (Ont. Gen. Div. [Commercial List]); *Olympia & York Developments Ltd. (Re)*, *supra*; *Alberta-Pacific Terminals Ltd., Re* (1991), 8 C.B.R. (3d) 99 (B.C. S.C.). The court is not catapulted into the shoes of the board of directors, or into the seat of the chair of the board, when acting in its supervisory role in the restructuring.

69    Here, the motion judge was alive to the "business judgment" dimension in the situation he faced. He distinguished the application of the rule from the circumstances, however, stating at para. 18 of his reasons:

> With respect I do not see the present situation as involving the "management of the business and affairs of the corporation", but rather as a quasi-constitutional aspect of the corporation entrusted albeit to the Board pursuant to s. 111(1) of the CBCA. I agree that where a board is actually engaged in the business of a judgment situation, the board should be given appropriate deference. However, to the contrary in this situation, I do not see it as a situation calling for (as asserted) more deference, but rather considerably less than that. With regard to this decision of the Board having impact upon the capital raising process, as I conclude it would, then similarly deference ought not to be given.

70    I do not see the distinction between the directors' role in "the management of the business and affairs of the corporation" (CBCA, s. 102) — which describes the directors' overall responsibilities — and their role with respect to a "quasi-constitutional aspect of the corporation" (i.e. in filling out the composition of the board of directors in the event of a vacancy). The "affairs" of the corporation are defined in s. 1 of the CBCA as meaning "the relationships among a corporation, it affiliates and the shareholders, directors and officers of such bodies corporate but does not include the business carried on by such bodies corporate". Corporate governance decisions relate directly to such relationships and are at the heart of the Board's business decision-making role regarding the corporation's business *and* affairs. The dynamics of such decisions, and the intricate balancing of competing interests and other corporate-related factors that goes into making them, are no more within the purview of the court's knowledge and expertise than other business decisions, and they deserve the same deferential approach. Respectfully, the motion judge erred in declining to give effect to the business judgment rule in the circumstances of this case.

71    This is not to say that the conduct of the Board in appointing the appellants as directors may never come under review by the supervising judge. The court must ultimately approve and sanction the plan of compromise or arrangement as finally negotiated and accepted by the company and its creditors and stakeholders. The plan must be found to be fair and reasonable before it can be sanctioned. If the Board's decision to appoint the appellants has somehow so tainted the capital raising process that those criteria are not met, any eventual plan that is put forward will fail.

72    The respondents submit that it makes no sense for the court to have jurisdiction to declare the process flawed only after the process has run its course. Such an approach to the restructuring process would be inefficient and a waste of resources. While there is some merit in this argument, the court cannot grant itself jurisdiction where it does not exist. Moreover, there are a plethora of checks and balances in the negotiating process itself that moderate the risk of the process becoming irretrievably tainted in this fashion — not the least of which is the restraining effect of the prospect of such a consequence. I do not think that this argument can prevail. In addition, the court at all times retains its broad and flexible supervisory jurisdiction — a

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

jurisdiction which feeds the creativity that makes the CCAA work so well — in order to address fairness and process concerns along the way. This case relates only to the court's exceptional power to order the removal of directors.

### *The Reasonable Apprehension of Bias Analogy*

73     In exercising what he saw as his discretion to remove the appellants as directors, the motion judge thought it would be useful to "borrow the concept of reasonable apprehension of bias . . .with suitable adjustments for the nature of the decision making involved" (para. 8). He stressed that "there was absolutely no allegation against [Mr. Woollcombe and Mr. Keiper] of any actual 'bias' or its equivalent" (para. 8). He acknowledged that neither was alleged to have done anything wrong since their appointments as directors, and that at the time of their appointments the appellants had confirmed to the Board that they understood and would abide by their duties and responsibilities as directors, including the responsibility to act in the best interests of the corporation and not in their own interests as shareholders. In the end, however, he concluded that because of their prior public statements that they intended to "pursue efforts to maximize shareholder value at Stelco", and because of the nature of their business and the way in which they had been accumulating their shareholding position during the restructuring, and because of their linkage to 40% of the common shareholders, there was a risk that the appellants would not conduct themselves in a neutral fashion in the best interests of the corporation as directors.

74     In my view, the administrative law notion of apprehension of bias is foreign to the principles that govern the election, appointment and removal of directors, and to corporate governance considerations in general. Apprehension of bias is a concept that ordinarily applies to those who preside over judicial or quasi-judicial decision-making bodies, such as courts, administrative tribunals or arbitration boards. Its application is inapposite in the business decision-making context of corporate law. There is nothing in the CBCA or other corporate legislation that envisages the screening of directors in advance for their ability to act neutrally, in the best interests of the corporation, as a prerequisite for appointment.

75     Instead, the conduct of directors is governed by their common law and statutory obligations to act honestly and in good faith with a view to the best interests of the corporation, and to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances (CBCA, s. 122(1)(a) and (b)). The directors also have fiduciary obligations to the corporation, and they are liable to oppression remedy proceedings in appropriate circumstances. These remedies are available to aggrieved complainants — including the respondents in this case — but they depend for their applicability on the director having engaged in conduct justifying the imposition of a remedy.

76     If the respondents are correct, and reasonable apprehension that directors may not act neutrally because they are aligned with a particular group of shareholders or stakeholders is sufficient for removal, all nominee directors in Canadian corporations, and all management directors, would automatically be disqualified from serving. No one suggests this should be the case. Moreover, as Iacobucci J. noted in *Blair v. Consolidated Enfield Corp.*, [1995] 4 S.C.R. 5 (S.C.C.) at para. 35, "persons are assumed to act in good faith unless proven otherwise". With respect, the motion judge approached the circumstances before him from exactly the opposite direction. It is commonplace in corporate/commercial affairs that there are connections between directors and various stakeholders and that conflicts will exist from time to time. Even where there are conflicts of interest, however, directors are not removed from the board of directors; they are simply obliged to disclose the conflict and, in appropriate cases, to abstain from voting. The issue to be determined is not whether there is a connection between a director and other shareholders or stakeholders, but rather whether there has been some conduct on the part of the director that will justify the imposition of a corrective sanction. An apprehension of bias approach does not fit this sort of analysis.

### Part V — Disposition

77     For the foregoing reasons, then, I am satisfied that the motion judge erred in declaring the appointment of Messrs. Woollcombe and Keiper as directors of Stelco of no force and effect.

78     I would grant leave to appeal, allow the appeal and set aside the order of Farley J. dated February 25, 2005.

79     Counsel have agreed that there shall be no costs of the appeal.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

**Goudge J.A.:**

I agree.

**Feldman J.A.:**

I agree.

*Appeal allowed.*

Footnotes

| | |
|---|---|
| 1 | R.S.C. 1985, c. C-36, as amended. |
| 2 | The reference is to the decisions in *Dyle, Royal Oak Mines, and Westar*, cited above. |
| 3 | See paragraph 43, *infra*, where I elaborate on this distinction. |
| 4 | It is the latter authority that the directors of Stelco exercised when appointing the appellants to the Stelco Board. |
| 5 | Dennis H. Peterson, Shareholder Remedies in Canada (Markham: LexisNexis — Butterworths — Looseleaf Service, 1989) at 18-47. |
| 6 | Or, I would add, unpopular with other stakeholders. |
| 7 | Now s. 241. |

---

**End of Document**  

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 77

1999 CarswellOnt 4112
Ontario Superior Court of Justice [Commercial List]

T. Eaton Co., Re

1999 CarswellOnt 4112, 14 C.B.R. (4th) 298

# In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended

In the Matter of a Plan of Compromise or Arrangement of the T. Eaton Company Limited, Applicant

Farley J.

Judgment: November 17, 1999
Docket: 99-CL-3516

Subject: Insolvency; Corporate and Commercial

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

### Bankruptcy --- Bankruptcy petitions for receiving orders — Grounds for petition — General

Creditor brought cross-motion that if debtor's CCAA plan were defeated, then there should be automatic bankruptcy or, failing that result, CCAA stay should be lifted to allow creditor to file petition in bankruptcy — Cross-motion granted — Creditor's motion was pre-empted by revelation that debtor company's Board of Directors authorized filing of assignment in bankruptcy by monitor if CCAA plan were defeated — CCCA stay was lifted temporarily for sole purpose of allowing creditor to file petition in bankruptcy naming trustee but without prejudice to advancing of proposition by creditor that trustee be replaced — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

### Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangement Act — Miscellaneous issues

Debtor brought motion to approve side deal pursuant to s. 9 of CCAA on contingency that CCAA plan would not receive requisite approval of creditors — Motion dismissed — Section 9 deal was not incorporated into separate plan so that creditors could vote on it; rather, what court was being asked to do was approve prospectively sale of certain assets in advance of voting on plan — Ordinarily, sale would be one that would be considered in event of bankruptcy and under supervision of trustee in bankruptcy — In circumstances, it would be inappropriate to deal with s. 9 deal at time — Bankruptcy regime with roles and responsibilities laid out therein should not be ignored or pre-empted by decision at time — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

**Table of Authorities**

### Cases considered by *Farley J.*:

*British America Nickel Corp. v. M.J. O'Brien Ltd.*, [1927] 1 W.W.R. 869, [1927] A.C. 369, [1927] 1 D.L.R. 1121 (Ontario P.C.) — considered

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re* (1998), 5 C.B.R. (4th) 299 (Ont. Gen. Div. [Commercial List]) — considered

*Confederation Treasury Services Ltd., Re* (1995), 37 C.B.R. (3d) 237 (Ont. Bktcy.) — considered

*Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106 (Ont. Gen. Div. [Commercial List]) — considered

*Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24, 9 B.L.R. (2d) 275 (Ont. Gen. Div. [Commercial List]) — considered

**Statutes considered:**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
    s. 75 — considered

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
    Generally — considered

    s. 9 — considered

MOTION by debtor company for approval of side deal pursuant to s. 9 of *Companies' Creditors Arrangement Act* on contingency that plan would not receive requisite approval of creditors; CROSS-MOTION by creditor that if plan were defeated, then there should be automatic bankruptcy or, failing that result, stay should be lifted to allow creditor to file petition in bankruptcy.

**Endorsement.** *Farley J.*:

1    This endorsement deals with (i) the Eaton's motion to have the Court approve the s.9 Side Deal on the contingency that the Plan will not receive the requisite approval of the creditors on Friday, November 19, 1999 and (ii) the Cadillac Fairview motion that if the Plan is defeated then there should be an automatic bankruptcy, or failing that result, that the stay be lifted to allow CF to file a petition in bankruptcy. This endorsement is being written after extensive argument this morning and given out this afternoon with a view that those voting on the Plan have the maximum possible time in the circumstances to reflect on this decision and to make an informed (at least as to these legal points) decision at the time of voting.

2    The CF motion has been somewhat pre-empted by the revelation that the Eaton's Board on November 15th authorized the filing of an assignment in bankruptcy and that filing material has been given to the Monitor (Richter) to hold in escrow on the condition that if the Plan is defeated on Friday Richter was to file the assignment with the Official Receiver. There then flowed a discussion as to the various merits and disadvantages of the various permutations and combinations involved. It would not be a productive use of limited time to explore these various alternatives. Suffice it to say that with the undertaking given that Eaton's would consent to a Receiving Order if the Plan were not approved by the creditors or sanctioned by the Court, then the simplest and most direct way of dealing with this subject matter is that the CCAA stay is lifted temporarily for the sole purpose of CF filing a petition in bankruptcy naming Richter as trustee, but without prejudice to CF advancing the proposition that Richter be replaced (I would assume by PWC since that was CF's initial choice). However, CF is reminded that such a change would have to be advanced for good and valid reasons in the interests of the bankruptcy estate. I take it that Richter needs no reminding of the necessity to be neutral and objective: see my discussion of this principle in *Re Confederation Treasury Services Ltd.* (1995), 37 C.B.R. (3d) 237 (Ont. Bktcy.).

3    As to the Eaton's motion to have the alternative Side Deal as set out in s.9 approved, it appears to me that this subject has to be examined as to a number of facets: legal, practical and the integrity of the bankruptcy and insolvency system.

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

4    I have no doubt that Blair, J.'s conclusion in *Re Canadian Red Cross Society / Société Canadienne de la Croix-Rouge* (1998), 5 C.B.R. (4th) 299 (Ont. Gen. Div. [Commercial List]) that in a CCAA proceeding, a judge has the authority to approve the sale of assets in essence outside the direct involvement of a plan context. See pp.314-6, where he cited with approval and adoption *Re Lehndorff General Partner Ltd.* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]) at p.31. It should be noted that I said in *Lehndorff General Partner Ltd.* as cited by Blair J.:

> The CCAA is intended to facilitate compromises and arrangements between companies and their creditors <u>as an alternative to bankruptcy</u> and as such is remedial legislation entitled to a liberal interpretation [emphasis added by me now]

See also p.315 where Blair J. cites *Re Dylex Ltd.* (1995), 31 C.B.R. (3d) 106 (Ont. Gen. Div. [Commercial List]):

> ... and it may be grounded upon the inherent jurisdiction of the Court, not to make orders which contradict a statute, but to "fill in the gaps in legislation so as to give effect to the objects of the CCAA, including the survival program of a debtor until it can present a plan.

5    I understand and sympathize with the observation of Eaton's counsel, Mr. Marantz, that Eaton's and those executives left there are suffering from "plan fatigue" and that they sincerely wish to obtain the best possible result for those affected — both as to the Plan — but if the Plan is defeated, then in the condition of bankruptcy. I also appreciate that reasonable people on opposite sides of a table will not always come to the same conclusion. It is in that respect that one must be particularly concerned that there is a legitimate process which will be followed so that no matter what the result that is obtained from that process, the parties affected will, disappointed though they may be with the decision (and uncertain though they may be with the practical result that will obtain from that decision), say that at least the process was fair, reasonable and objective in the circumstances. One must also take into consideration that persons usually act rationally and in their own legitimate best interests (this also holds true for the aspect of voting (keeping in mind the requirements of *British America Nickel Corp. v. M.J. O'Brien Ltd.*, [1927] A.C. 369 (Ontario P.C.)). One would assume that a person would not agree to do something one day and then without intervening reason, not continue to agree to do the same thing. Of course it would not be human nature if one did not take advantage of a condition not being met to see whether one could obtain an advantage. Alternatives, if realistic, may provide some floor. I would also assume that in considering one's best interests, this *would* include a consideration of the impact of one's good "corporate" citizenship and reputation and how that might be impacted by an unfortunate result in the end for those who society may view as vulnerable.

6    Returning, however, to the subject situation, it is the position of Eaton's that it has beaten the bushes high, wide and low and there is no better deal available than the Sears s.9 one in the event that there is a bankruptcy. In that respect, I must take into consideration that there was no formal process established to consider the best offer(s) on the contingency that the Plan was defeated. The s.9 Sears deal was not incorporated into a separate plan so that the creditors could vote on it. Rather what the court is being asked to do is approve prospectively a sale of certain assets (essentially the assets of the Plan minus the tax loss) in advance of the Plan being voted on — when ordinarily this sale would be one which would be considered in the event of a bankruptcy and under the supervision of a trustee in bankruptcy. It is perhaps unusual that what the creditors would be presented with on this Friday's vote, if the s.9 Sears deal were approved, would be a Hobson's choice — vote down the Plan, then the result would automatically be a vote for the s.9 Sears deal.

7    It was suggested that s.75 BIA concepts should apply by analogy. However, it seems to me that this section is truly aimed at those transactions which are not entered into as part of the insolvency/bankruptcy regime. In may be that to apply this concept to the present situation would be a stretch and in effect backdoor the "trustee in waiting" (if there is to be one). In other words, it should not be applied when it is contemplated that there is a substantial likelihood of there being a trustee in bankruptcy in the immediate future.

8    I must be mindful of the fact that what we are talking about here is a deal worth perhaps $40 million, perhaps $10 million, plus the effect on certain of the employees. If there were certainty or a high probability that if the Plan were defeated, the only alternative to the s.9 Sears deal would be zero, then that would raise the anxiety level.

9    Richter did not give any opinion in its Monitor's report dated November 11, 1999 as to the value of the s.9 Sears deal nor did it conclude that it would be the only possible transaction which would be open to a trustee in bankruptcy. It stated:

> Eaton's and Sears have also agreed, subject to Court approval, that in the event that the Plan is not successfully implemented, Sears would purchase the underlying assets in the Sears Agreement (i.e. excluding the benefits of the taxes losses) for up to $40 million Canadian, subject to certain conditions. <u>It is the Monitor's view that creditors should not regard a sale to Sears as a certainty in the event that the Plan fails</u>. [emphasis on original]

10    This is in step with Ms. Jackson's statement as Sears' counsel that there is no assurance that Sears will do this (or any of the deal) if the Plan is not approved and Court approval is not now obtained for the s.9 Sears deal. Richter, through Mr. MacNaughton, responded to Mr. Zarnett's observation on behalf of CF that the Monitor's report did not endorse the s.9 Sears deal by observing that it was implicitly supportive.

11    On the other side of the matter one would also observe that the Court should not be engaged itself in the rough and tumble of negotiations as aptly put by Mr. Arcand. I trust that there has been engagement in that process to date and that before the vote is taken that there will be more - sufficient one would trust for the best possible plan in the circumstances to be put forward and voted upon with the sober second and reflective thought of the likely alternatives.

12    I would wish to confirm that I make absolutely no observation as to the merits or value of the present Plan (and the underpinning Sears deal) nor with respect to the s.9 Sears deal. It would be premature to even touch upon that or any variation.

13    In the end result, I am of the view that, in these circumstances, it would be inappropriate to deal with the s.9 Sears deal at this time. I think it extremely desirable to appreciate that the bankruptcy regime with the roles and responsibilities laid out therein should not be ignored or pre-empted by a decision at this time. It is on this basis that I decline to give the requested order.

14    I, however, am certain that notwithstanding the heat of the moment - from moment to moment - that all interested parties will co-operatively work with one another with a view to obtaining the best possible result in the circumstances.

*Motion dismissed; cross-motion granted.*

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 78

12 Fed.R.Serv.2d 301, 160 U.S.P.Q. 574

290 F.Supp. 725
United States District Court E.D. New York.

RESEARCH FRONTIERS
INCORPORATED, Plaintiff,
v.

MARKS POLARIZED CORPORATION,
Alvin M. Marks and Mortimer M. Marks,
Defendants, and Robert Saxe, Morton Berger
and Robert Thompson, Counter-Defendants.

No. 67 Civ. 1149.    |    Sept. 30, 1968.

Motion to dismiss complaint. The District Court, Judd, J., held that where complaint recited that plaintiff held exclusive licenses from defendants to make, use and sell products and processes embodying inventions covered by certain patents, infringement of licenses was alleged without reference to any specific patents, and additional claims were asserted against defendants, based on their negotiations with named companies for use of same inventions licensed to plaintiff, court applied doctrine of pendent jurisdiction and retained jurisdiction of the entire claim.

Motion denied.

West Headnotes (8)

**[1]**    **Courts**
         Time of making objection

    **Federal Courts**
         Counterclaims, cross-claims, and third-party practice

    That defendants had served an answer and amended answer, asserting defenses and counterclaims, obtained an order adding counter-defendants, and served notices of taking depositions, which had survived motions for protective orders, would not prevent dismissal for lack of jurisdiction, for that question may be raised even after judgment; if jurisdiction existed, however, they were relevant to court's exercise of discretion whether to retain jurisdiction of pendent causes of action.

Cases that cite this headnote

**[2]**    **Federal Courts**
         Infringement

    If complaint stated only claim for breach of patent license agreement, and not an infringement or threatened infringement of patents, jurisdiction would be in the state courts, there being no diversity of citizenship.

Cases that cite this headnote

**[3]**    **Federal Courts**
         Infringement

    **Patents**
         Persons entitled to sue

    An exclusive licensee of a patent may sue for infringement of patent; he may sue his licensor in federal courts under patent laws, even though licensor is owner of patents he is charged with infringing.

1 Cases that cite this headnote

**[4]**    **Patents**
         Construction and Operation of Licenses

    The fact that license is subject to rights previously granted to others does not prevent license agreement from being an "exclusive" license under section of patent laws authorizing patentee to convey an exclusive right under his patent; it is sufficient that license agreement bars licensor from enlarging scope of existing licenses or increasing number of licenses. 35 U.S.C.A. § 261.

3 Cases that cite this headnote

**[5]**    **Patents**
         Allegations in pleadings

    While issues would have been clarified if plaintiff had expressly alleged infringement of "patents" instead of infringement of "exclusive licenses" granted by patentee-defendant, such verbal niceties should not be decisive of sufficiency of pleading, even on allegations of

12 Fed.R.Serv.2d 301, 160 U.S.P.Q. 574

jurisdiction, under present practice of "notice pleading".

3 Cases that cite this headnote

**[6]    Federal Courts**
   ☞ Jurisdiction of Entire Controversy;  Pendent and Supplemental Jurisdiction

Where valid ground of federal jurisdiction exists, court may also consider state claims which derive from common nucleus of operative fact.

1 Cases that cite this headnote

**[7]    Federal Courts**
   ☞ Jurisdiction of Entire Controversy;  Pendent and Supplemental Jurisdiction

Pendent jurisdiction is to be exercised in court's discretion, based on judicial economy, convenience and fairness to litigants.

Cases that cite this headnote

**[8]    Federal Courts**
   ☞ Contract claims

Where complaint recited that plaintiff held exclusive licenses from defendants to make use and sell products and processes embodying inventions covered by certain patents, infringement of licenses was alleged without reference to any specific patents, and additional claims were asserted against defendants, based on their negotiations with named companies for use of same inventions licensed to plaintiff, court applied doctrine of pendent jurisdiction and retained jurisdiction of entire claim.

2 Cases that cite this headnote

**Attorneys and Law Firms**

*726 Feldshuh & Frank, New York City, Sidney Feldshuh, New York City, of counsel, for plaintiff.

Hopgood & Calimafde, New York City, John M. Calimafde, New York City, of counsel, for defendants.

**Opinion**

OPINION AND ORDER

JUDD, District Judge.

A motion to dismiss the complaint raises the question whether plaintiff has stated a claim for infringement of patents of which it is the exclusive licensee, or merely a claim for breach of the license agreements.

The complaint recites that plaintiff holds exclusive licenses from defendants to make, use and sell products and processes embodying inventions covered by certain patents. The agreements name twenty-one United States patents and twenty-five applications for United *727 States patents relating to the polarization of light and other fields apparently related thereto. Certain foreign patents and applications are also covered by the license agreements. Each agreement recites that the defendants have granted plaintiff 'an exclusive license, including the right to grant sub-licenses, to make, use and sell products and processes under the licensed patents and licensed applications.'

Infringement of the licenses is alleged, without reference to any specific patents. It is asserted that defendants manufactured and sold polarized sheets and polarized lenses to others. Additional claims are asserted against defendants, based on their negotiations with named companies for use of the same inventions licensed to plaintiff, thereby frustrating plaintiff's efforts to exploit its licenses. The allegations of improper license negotiations constitute a larger portion of the complaint than the allegations of infringing manufacture and sale.

The complaint seeks an injunction, ordinary and punitive damages, and counsel fees.

Defendants served an answer and amended answer, asserting defenses and counterclaims, obtained an order adding counter-defendants, and served notices of taking depositions, which have survived motions for protective orders. There were already twenty-five entries in this Court's docket before the motion to dismiss was filed.

[1]    The proceedings already taken would not prevent dismissal for lack of jurisdiction, for that question may be raised even after judgment. Smith Separator Corp. v. Dillon, 98 F.2d 521 (10th Cir. 1938). If jurisdiction exists, however, they are relevant to the Court's exercise of discretion whether to retain jurisdiction of pendent causes of action.

**[2]  [3]**  If the complaint stated only a claim for breach of a patent license agreement, and not an infringement or threatened infringement of patents, jurisdiction would be in the state courts, there being no diversity of citizenship. Luckett v. Delpark, Inc., 270 U.S. 496, 510-511, 46 S.Ct. 397, 70 L.Ed. 703 (1926). On the other hand, an exclusive licensee of a patent may sue for infringement of the patent. Wilborn & Sons, Inc. v. Brandex Tilt Sash, Inc., 380 F.2d 44 (7th Cir. 1967). He may sue his licensor in the federal courts under the patent laws, even though the licensor is the owner of the patents he is charged with infringing. Littlefield v. Perry, 88 U.S. 205 (21 Wall. 205) 22 L.Ed. 577 (1874); E.I.S. Mfg. Co., Inc. v. Supco Products Corp., 26 F.Supp. 758 (S.D.N.Y.1938).

**[4]**  The fact that the license is subject to rights previously granted to others, does not prevent the license agreement from being an 'exclusive' license under section 1 of the Patent Law (35 U.S.C § 261). It is sufficient that the license agreement bars the licensor from enlarging the scope of existing licenses or increasing the number of licenses. Mechanical Ice Tray Corp. v. General Motors Corp., 144 F.2d 720, 725 (C.C.A. 2, 1944).

**[5]**  The issues here would have been clarified if plaintiff had expressly alleged infringement of 'patents' instead of infringement of the 'exclusive licenses' granted by the patentee-defendant. Such verbal niceties should not be decisive of the sufficiency of a pleading, even on allegations of jurisdiction, under the present practice of 'notice pleading.' A. T. Brod & Co. v. Perlow, 375 F.2d 393, 398 (2d Cir. 1967); Dioguardi v. Durning,139 F.2d 774 (2d Cir. 1944). An allegation that the patentee-licensor has infringed the exclusive license by 'manufacture, use and sale' of specified products gives notice that infringement of patents is claimed. Particulars concerning which patents are infringed can be obtained through discovery proceedings.

It is assumed for purposes of this motion that the claims based on negotiations between defendants and others are not of themselves subject to federal jurisdiction, in the absence of any allegations that they resulted in the manufacture, **\*728** use or sale of patented products or processes. Half a century ago, it would have been necessary to split the lawsuit, and dismiss these portions of the complaint. Geneva Furniture Mfg. Co. v. S. Karpen & Bros., 238 U.S. 254, 259, 35 S.Ct. 788, 59 L.Ed. 1295 (1915). Intervening changes in the Federal Rules of Civil Procedure and extension of the doctrine of

pendent jurisdiction put in question the continuing viability of the Geneva case.

**[6]  [7]**  Where a valid ground of federal jurisdiction exists, the Court may also consider state claims which derive from 'a common nucleus of operative fact.' The current test has been stated by the Supreme Court as:

'The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole.' United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

Pendent jurisdiction is to be exercised in the Court's discretion, based on 'judicial economy, convenience and fairness to litigants' (id. at 726, 86 S.Ct. at 1139).

Even before the Gibbs case, the Second Circuit Court of Appeals had recognized a widening scope for pendent jurisdiction, where there was an overlap of factual basis between patent or trademark and unfair competition claims. Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 543-544 (2d Cir. 1956); 28 U.S.C. § 1338(b). The same liberal application of the rule has been extended to claims of misappropriation of trade secrets (A. H. Emery Co. v. Marcan Products Corp., 268 F.Supp. 289, 292 (S.D.N.Y.1967)), anti-trust law violations (David & David, Inc. v. Myerson, 277 F.Supp. 973, 979 (E.D.N.Y.1966)), fraudulent transfers (Bartle v. Markson, 357 F.2d 517, 522-523 (2d Cir. 1966)), and foreign patents (Ortman v. Stanray Corp., 371 F.2d 154 (7th Cir. 1967)).

**[8]**  Applying the rule of the Gibbs case to the pleadings before us here, the license agreements and the various United States patents and patent applications provide a 'common nucleus of operative fact.' Defendants' counterclaims, seeking to annul the license agreements, could be pleaded in defense to the patent infringement portions of the complaint (Wilborn & Sons, Inc. v. Brandex Tilt Sash, Inc., 380 F.2d at 47), and pleaded again in the state court if a separate action there were required on the claims based on negotiations between the defendant and others.

Acceptance of pendent jurisdiction is also indicated by the tendency to require a plaintiff to try his whole case in a single action (United Mine Workers v. Gibbs, 383 U.S. at 725 n. 13,

12 Fed.R.Serv.2d 301, 160 U.S.P.Q. 574

86 S.Ct. 1130). A plaintiff with two claims against the same defendants, based on breach of the same agreements, would normally be expected to try both claims in one proceeding, thus bringing its case within the test stated in the Gibbs opinion (383 U.S. at 725, 86 S.Ct. 1130).

The extent of effort already put into this case is a proper factor for consideration. A. H. Emery Co. v. Marcan Products Corp., 268 F.Supp. at 292-293. The burden on the litigants, and on the state courts, if two actions were required, is also relevant. Although the state courts are a separate judicial system, they are partners of the federal courts in the administration of justice. Easing the burden of a federal court by removing part of a case to the state courts, where such a removal is not required, would be unfair treatment of an already over-burdened partner. Leaving the entire case joined in the federal venue promotes judicial economy and the convenience of the parties. American Foresight of Philadelphia, Inc. v. Fine Arts Steling Silver, Inc., 268 F.Supp. 656 (E.D.Pa.1967).

**\*729** 'Judicial economy, convenience and fairness to litigants' all point to the exercise of pendent jurisdiction, and the power exists to exercise it.

The motion to dismiss is denied.

This opinion shall serve as an order.

**Parallel Citations**

12 Fed.R.Serv.2d 301, 160 U.S.P.Q. 574

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 79

1976 CarswellNat 603, 27 C.P.R. (2d) 257

1976 CarswellNat 603
Registrar of Trade Marks

Rite Manufacturing Ltd. v. Ever-Tite Coupling Co.

1976 CarswellNat 603, 27 C.P.R. (2d) 257

# RITE MANUFACTURING LTD. v. EVER-TITE COUPLING CO. INC.

N. M. Thurm

Judgment: January 12, 1976
Docket: None given

Counsel: None given

Subject: Intellectual Property; Property

**Table of Authorities**

**Cases considered by *Thurm*:**

*Cheerio Toys & Games Ltd. v. Dubiner* (1964), [1965] 1 Ex. C.R. 524, 28 Fox Pat. C. 1, 44 C.P.R. 134, 1964 CarswellNat 43 (Can. Ex. Ct.) — referred to

*Cheerio Toys & Games Ltd. v. Dubiner* (1965), [1966] S.C.R. 206, 48 C.P.R. 226, 32 Fox Pat. C. 37, 55 D.L.R. (2d) 313, 1965 CarswellNat 51 (S.C.C.) — referred to

*National Carbonising Co. v. British Coal Distillation Ltd.* (1936), 54 R.P.C. 41, [1936] 2 All E.R. 1012 (Eng. C.A.) — referred to

**Statutes considered:**

*Trade Marks Act*, R.S.C. 1970, c. T-10
Generally — referred to

s. 2 — referred to

s. 49(10) — considered

s. 49(10)(a) — considered

s. 49(10)(b) — considered

s. 49(10)(c) — considered

s. 49(11) — referred to

***Thurm*:**

1976 CarswellNat 603, 27 C.P.R. (2d) 257

1    Rite Manufacturing Ltd. is the registered owner of the trade mark EVER-TITE registered under No. 154,784 on December 22, 1967. On May 9, 1968, Ever-Tite Coupling Co., Inc. was registered as a registered user of such trade mark in respect of the wares in association with which the trade mark was registered. Rite Manufacturing Ltd. has applied for cancellation of Ever-Tite Coupling Co., Inc. as a registered user of its trade mark on the grounds that:

There is no existing or subsisting relationship between the registered owner and the registered user of record and the registered owner is not bound by any agreement between other parties.

2    A registered user agreement was entered into in April, 1968, by R.N.G. Oil Equipment Co. Ltd., the owner of the registered trade mark EVER-TITE, registration 154,784, and Ever-Tite Coupling Co., Inc., the proposed registered user of the mark EVER-TITE, in respect of the wares covered by the registration.

3    The trade mark EVER-TITE was originally registered in the Canadian Trade Marks Office under registration 154,784 by R.N.G. Oil Equipment Co. Ltd. (The letters patent show the correct corporate name to be R.N.G. Oil Equipment Company Limited.) By supplementary letters patent issued on January 5, 1968, the name of R.N.G. Oil Equipment Company Limited was changed to R.N.G. Equipment Ltd.-Equipements R.N.G. Ltée.

4    By an assignment dated November 21, 1972 and registered in the Trade Marks Office November 30, 1972, R.N.G. Equipment Ltd.-Equipements R.N.G. Ltée assigned all its right, title and interest in and to the trade mark EVER-TITE, registered under No. 154,784, to Rite Manufacturing Limited.

5    The position of Rite Manufacturing Limited, the current registered owner of the mark EVER-TITE, is that there is no existing or subsisting relationship between Rite Manufacturing Limited and Ever-Tite Coupling Co. Inc. and that the present registered owner Rite Manufacturing Limited is not bound by the agreement between R.N.G. Oil Equipment Company Limited, its predecessor in title, and Ever-Tite Coupling Co. Inc. the registered user of record.

6    Before a decision is made on the grounds raised for cancellation of the registered user, it must be determined if the Registrar has authority to consider the ground on which the trade mark owner is moving to cancel the registered user agreement, a matter about which there has been doubt for some time.

7    Section 49(10) of the *Trade Marks Act*, R.S.C. 1970, c. T-10, reads as follows:

49(10) The registration of a person as a registered user of a trade mark may be cancelled,

(a) by the Registrar on the application in writing of the registered owner or the registered user of the trade mark;

(b) by the Registrar on his own motion in respect of any wares or services for which the trade mark is no longer registered; or

(c) by the Federal Court of Canada upon the application of any person, of which notice is served upon the registered owner and all registered users, on any of the following grounds:

(i) that the registered user has used the trade mark otherwise than by way of the permitted use, or in such a way as to cause, or to be likely to cause, deception or confusion,

(ii) that the owner or the registered user misrepresented or failed to disclose some fact that if accurately represented or disclosed would have justified the Registrar in refusing the application for registration of the registered user,

(iii) that the circumstances have changed since the date of the registration in such a way that at the date of such application for cancellation they would have justified the Registrar in refusing the application for registration of the registered user, or

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

(iv) that the registration ought not to have been effected having regard to rights vested in the applicant by virtue of a contract in the performance of which he is interested.

8    Under s. 49(10)(*c*), the Federal Court of Canada may consider an application by "any person" to cancel the registration of a person as a registered user of a trade mark. The person applying to cancel the registration of a person as a registered user must serve notice upon the registered owner and all registered users of the grounds upon which that person relies for cancellation.

9    Under s. 49(10)(*a*), the only persons who may apply to the Registrar of Trade Marks for cancellation of a person as a registered user of a trade mark are the registered owner and the registered user.

10    Under s. 49(10)(*b*), the Registrar may on his own motion cancel the registration of a person as a registered user of a trade mark in respect of any wares or services for which the trade mark is no longer registered.

11    The grounds upon which the Registrar may consider the cancellation of the registration of a person as a registered user under s. 49(10)(*a*) were commented on as follows by Noel, J., in the case of *Cheerio Toys & Games Ltd. v. Dubiner* (1964), 44 C.P.R. 134 (Can. Ex. Ct.) at p. 151, (1964), [1965] 1 Ex. C.R. 524, 28 Fox Pat. C. 1 (Can. Ex. Ct.) [affirmed (1965), 48 C.P.R. 226, 55 D.L.R. (2d) 313, [1966] S.C.R. 206 (S.C.C.) ]:

> This subsection, however, is not too clear as the grounds mentioned under s. 49(10(c) would seem to apply to the proceedings before the Exchequer Court only. However, as the Registrar's right of cancellation is discretionary and as s. 49(12) does not permit the Registrar to "exercise any discretionary power under this section adversely to a person without giving each person that will be affected by the exercise of the power an opportunity of being heard personally or by his agent" it would seem that the same grounds as those contained under para. (c) above could be raised at any such hearing.

12    While the grounds upon which the Registrar may consider cancellation upon an application under s. 49(10)(*a*) by the registered owner or registered user include, as stated by Noel, J., the grounds set out in s. 49(10)(*c*) of the *Trade Marks Act*, those are not the only grounds on which the Registrar may cancel under s. 49(10)(*a*). Indeed, s. 49(10)(*a*) places no limitation on the grounds on which the Registrar may cancel an application. Presumably, on a proper application being made to him, the Registrar could cancel a registered user because the owner and user so wished, because one party had died or gone into bankruptcy or for any other reason of substance. Section 49(10)(*c*) appears to have been intended, in part at least, for those cases where the application for cancellation of a registered user is commenced by a person other than either the registered owner or registered user. For example, the application could be made by a person who had been deceived by the registered user's use of the trade mark, perhaps because of receiving goods inferior to those sold by the registered owner under the same mark.

13    The present registered owner of the trade mark, Rite Manufacturing Ltd., filed two affidavits in support of its application for cancellation of the entry of Ever-Tite Coupling Co. Inc. as a registered user. The first affidavit filed was that of Denis Barclay, the general manager and vice-president of Rite Manufacturing Ltd. Attached to the Barclay affidavit was a certified copy of the letters patent issued on April 17, 1961, incorporating Rite Manufacturing Ltd. The company was incorporated in the Province of Quebec. The Barclay affidavit also includes the statement "THAT, Rite Manufacturing Ltd. is not a related company within the meaning, of section 2 of the *Trade Marks Act* ...". Presumably, this is intended to mean that Rite Manufacturing Ltd. is not related within the meaning of s. 2 of the *Trade Marks Act* to any other company. The second affidavit filed was that of the vice-president of R.N.G. Equipment Ltd.-Equipements R.N.G. Ltée, the predecessor in title to Rite Manufacturing Ltd. This affidavit contains the same statement with respect to the Rite Manufacturing Ltd. not being a related company the meaning of s. 2 of the *Trade Marks Act* with any other company. No doubt, these two affidavits are intended to show, in part at least, that the assignment from R.N.G. to Rite was an arm's length transaction.

14    The lists of principal officers of Rite and R.N.G. as given in the two affidavits refer to Gerald R. McIver, of the Town of Mount-Royal, in the Province of Quebec, as the secretary-treasurer of each of the companies. Although I am not prepared to find from the mere fact that Gerald R. McIver is a secretary-treasurer of the current registered owner as well as being secretary-treasurer of the predecessor in title that Rite Manufacturing Ltd. received the assignment of the mark EVER-TITE with full knowledge of the existence on the register of a registered user agreement between Ever-Tite Coupling Co.

Inc. and R.N.G. Equipment Ltd.-Equipements R.N.G. Ltée, there are other circumstances that lead to the conclusion that Rite Manufacturing Ltd. knew of the existing registered user agreement at and before the date of assignment of registration 154,784 to Rite Manufacturing Ltd.

15    McIver is secretary-treasurer of both companies. The knowledge of the secretary-treasurer of a company may fairly be taken to be the knowledge of the company. The affidavit of Benjamin E. Alter filed in these proceedings by Ever-Tite shows clearly that McIver is and has been for many years — knowledgeable about the trade mark matters of R.N.G. and, in particular, that he was aware that Ever-Tite was a registered user of the registered trade mark EVER-TITE. In this respect, attached as an exhibit to Alter's affidavit is a copy of a previous affidavit sworn by Alter in connection with an earlier application by R.N.G. to cancel the registration of Ever-Tite as a registered user of the trade mark EVER-TITE. It appears from Alter's previous affidavit that, when R.N.G. first applied to register the trade mark EVER-TITE in Canada, Ever-Tite contemplated opposing the application on the ground that Ever-Tite, not R.N.G., was the person entitled to registration. The following paragraphs from that affidavit speak for themselves:

> Thereafter, the President of our COMPANY, Mr. John T. Krapp, informed me that he had been prevailed upon by his friend, Mr. Gerry McIver of R.N.G., not to oppose the registration but to accept a licence from R.N.G. as a registered user. Mr. Krapp and I spoke to Mr. McIver on the telephone and had a tri-party conversation. Mr. McIver assured us that the registration was not intended to interfere in any manner with the use by our COMPANY of our trade mark EVER-TITE in Canada or elsewhere; that there was an active movement in Canada to "buy Canadian"; that the registration of the trade mark in the name of R.N.G. would be the boost that his business required; that it would so improve his business that he would increase his orders to our COMPANY for items profitable to our COMPANY; that it would improve his ability to pay bills on time; that he realized he was asking for a great deal from us, but that the long friendship between the principals of the two companies was the compelling force; and again, that we could, of course, use our trade mark anywhere without any restriction whatsoever. Copies of the registered user application were sent to us for signature. We observed that the words "wherever practicable" appeared in paragraph 2(C) of the draft registered user agreement in accordance with Mr. McIver's assurance to us that there would be no restriction with respect to the use of our EVER-TITE trade mark in Canada. Obviously, Mr. McIver had informed his attorney that no impediments were to be placed in the way of our COMPANY. Mr. Krapp, still believing that his friendship for Mr. McIver and his desire to co-operate with a COMPANY distributor justified his action, signed and returned the application. Attached hereto and marked Exhibit "C" to this my affidavit is a copy of a letter dated April 11, 1968 which Mr. Krapp of the COMPANY sent to Mr. McIver.

Exhibit "C" just referred to reads as follows:

> I am most pleased to enclose signed copies of EVER-TITE Registered User Application which you forwarded to me. I presume where you state that the proposed permitted use is without definite period, you mean forever.

> To you my very best regards and cooperation.

16    It is also pertinent to mention that the entry of Ever-Tite as a registered user of the registered trade mark EVER-TITE is a matter of public record in the Trade Marks Office.

17    Contrary to normal practice, the registered user agreement in this case contains no provision for its termination by either the trade mark owner or the registered user. As well, the agreement provides that the registered user "will not at any time contest the owner's exclusive right and property to and in the trade mark in Canada and will not take any action to invalidate the trade mark registration". It appears, if the above clause is valid, that if Ever-Tite's right to use the trade mark EVER-TITE in Canada as a licensee is successfully terminated, Ever-Tite will still be precluded by its contractual obligation from reasserting its claim to ownership of the trade mark EVER-TITE in Canada.

18    The *Trade Marks Act* is silent on the status of a registered user entry when the trade mark is assigned to a new owner. Section 49(11) of the Act provides that a registered user of a trade mark does not have any transferable right to the use of

1976 CarswellNat 603, 27 C.P.R. (2d) 257

the trade mark. There is, however, no provision that provides that the registered user entry or the registered user's right to use terminates when the trade mark itself is assigned to a new owner.

19    It seems to follow, therefore, that the intention of the Act is that, after assignment of a trade mark to a new owner, the registered user entry and the registered user's right to use continue in full force and effect and that the registered user agreement continues to bind the registered user and is binding on the new owner until it is terminated in accordance with its terms or by mutual agreement or the registered user entry is cancelled under s. 49(10).

20    There is jurisprudence which supports this view. In the case of patents, it has been held that the purchaser of a legal interest in a patent takes subject to any pre-existing licence whether or not he had notice of the existence of that licence. In *National Carbonising Co. v. British Coal Distillation Ltd.* (1936), 54 R.P.C. 41 (Eng. C.A.), Romer, L.J., states as follows at pp. 56-7:

> The next thing to be observed is that a patentee is fully entitled to assign his rights under the Letters Patent to another and that this must be deemed to have been known to the parties. Such an assignment could not, of course, defeat the rights of the licensee under the licence. It was indeed suggested in the argument for the Respondents that the licence only conferred some interest in equity and that it would not prevail against the title of a purchaser of the legal interest in the Letters Patent without notice of the licence. No authority was cited that in any way supports this extraordinary proposition and, in my opinion, it is without any foundation. It is said in Hindmarch on Patents that a licence to use an invention comprised in a patent is in fact a grant of a right by the patentee to the licensee and, until the present case, I have never heard any suggestion to the contrary. But though the licence would remain in full force after an assignment of the Patent the licensee would only continue to exercise it upon the terms as to payment of royalties and otherwise that are contained in it. This being so, it would seem plain that, if the patentee is to be regarded as having the power of assigning the Patents and can only assign them subject to the rights of the licensee, he must also be regarded as having the power at the same time to assign the benefits accruing to him under the licence.

21    For some 20 years, the practice of the Registrar has been to treat the registered user entry as continuing even after assignment of the trade mark registration to a new owner. No doubt, trade mark owners and licensees have likewise treated the registered user entry as continuing and protecting the validity of the registered trade mark.

22    For the reasons outlined above, it is my conclusion that the mere fact of an assignment of a registered trade mark to a new owner having notice of an existing registered user agreement does not terminate the registered user entry or the registered user's right to continue to use and that any licence or registered user agreement between the previous registered owner and the registered user is binding on the new owner.

23    In this case, the new owner seeks cancellation of the registered user entry under s. 49(10)(*a*) on the ground that there is no subsisting or existing relationship between the registered owner and the registered user of record and the registered owner is not bound by any agreement between other parties.

24    The present registered owner of the registered trade mark EVER-TITE and the registered user, Ever-Tite Coupling Co. Inc., have not negotiated or entered into a formal agreement with one another concerning the registered trade mark EVER-TITE. Ever-Tite Coupling Co. Inc. remains a registered user of the trade mark by effect of law, the present registered owner as assignee having taken the rights in registration 154,784 "Ever-Tite" subject to the existing rights of the registered user.

25    For the reasons expressed above, I have reached the conclusion that a licence or registered user agreement between an owner of a registered trade mark and a registered user is binding on an assignee of the mark, at least where the assignee takes the mark with notice of the registered user. The application for cancellation of Ever-Tite Coupling Co. Inc. as a registered user of registration 154,784 for the mark EVER-TITE is refused.

---

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 80

2013 CarswellNS 428, 2013 SCC 37, J.E. 2013-1134, 228 A.C.W.S. (3d) 78, 359 D.L.R. (4th) 381, 37 C.P.C. (7th)
225, 22 C.L.R. (4th) 1, 446 N.R. 35, 1052 A.P.R. 1, 332 N.B.R. (2d) 1, [2013] 2 S.C.R. 623

▷☑

2013 CarswellNS 428, 2013 SCC 37, J.E. 2013-1134, 228 A.C.W.S. (3d) 78, 359 D.L.R. (4th) 381, 37 C.P.C.
(7th) 225, 22 C.L.R. (4th) 1, 446 N.R. 35, 1052 A.P.R. 1, 332 N.B.R. (2d) 1, [2013] 2 S.C.R. 623

Sable Offshore Energy Inc. v. Ameron International Corp.

Sable Offshore Energy Inc., as agent for and on behalf of the Working Interest Owners of the Sable Offshore
Energy Project, ExxonMobil Canada Properties, Shell Canada Limited, Imperial Oil Resources, Mosbacher Op-
erating Ltd., Pengrowth Corporation, ExxonMobil Canada Properties, as operator of the Sable Offshore Energy
Project, Appellants and Ameron International Corporation, Ameron B.V., Allcolour Paint Limited, Amercoat
Canada, Rubyco Ltd., Danroh Inc. and Serious Business Inc., Respondents

Supreme Court of Canada

McLachlin C.J.C., LeBel, Abella, Cromwell, Moldaver, Karakatsanis, Wagner JJ.

Heard: March 25, 2013
Judgment: June 21, 2013
Docket: 34678

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights re-
served.

Proceedings: reversing *Sable Offshore Energy Inc. v. Ameron International Corp.* (2011), 12 C.L.R. (4th) 129,
2011 CarswellNS 893, 2011 NSCA 121, 983 A.P.R. 382, 310 N.S.R. (2d) 382, 346 D.L.R. (4th) 68, 26 C.P.C.
(7th) 1 (N.S. C.A.); reversing *Sable Offshore Energy Inc. v. Ameron International Corp.* (2010), 299 N.S.R. (2d)
216, 947 A.P.R. 216, 2010 CarswellNS 907, 2010 NSSC 473 (N.S. S.C.)

Counsel: Robert Belliveau, Q.C., Kevin Gibson, for Appellants

John P. Merrick, Q.C., Darlene Jamieson, Q.C., for Respondents, Ameron International Corporation and Amer-
on B.V.

Terrence L.S. Teed, Q.C., Ronald J. Savoy, for Respondents, Allcolour Paint Limited, Amercoat Canada,
Rubyco Ltd., Danroh Inc. and Serious Business Inc.

Subject: Civil Practice and Procedure; Evidence

Civil practice and procedure --- Disposition without trial — Settlement — Miscellaneous

Privilege with respect to amount of settlement — Plaintiffs were involved in litigation with multiple defendants
— Plaintiffs reached settlement with some defendants ("settling defendants") — Plaintiffs and settling defend-
ants executed Pierringer agreement — Remaining defendants brought unsuccessful application for disclosure of
quantum of settlement under R. 20 of Civil Procedure Rules (1972) — Chambers judge held quantum met relev-

2013 CarswellNS 428, 2013 SCC 37, J.E. 2013-1134, 228 A.C.W.S. (3d) 78, 359 D.L.R. (4th) 381, 37 C.P.C. (7th) 225, 22 C.L.R. (4th) 1, 446 N.R. 35, 1052 A.P.R. 1, 332 N.B.R. (2d) 1, [2013] 2 S.C.R. 623

ancy threshold for disclosure under R. 20, but not until after trial — Chambers judge held disadvantage to remaining defendants of not knowing quantum did not outweigh benefit of encouraging settlement in future multi-party litigation — Chambers judge held that protection of settlement privilege was necessary to encourage remaining parties to settle for reasons of certainty and potential cost savings — Non-settling defendants successfully appealed timing of disclosure of settlement amount — Plaintiffs appealed — Appeal allowed — It was not clear how knowledge of settlement amounts materially affected ability of non-settling defendants to know and present case — Defendants remained fully aware of claims they must defend themselves against and of overall amount that plaintiffs was seeking — It was true that knowing settlement amounts might allow defendants to revise estimate of how much they want to invest in case, but this did not rise to sufficient level of importance to displace public interest in promoting settlements.

Evidence --- Documentary evidence — Privilege as to documents — Miscellaneous

Privilege with respect to amount of settlement — Plaintiffs were involved in litigation with multiple defendants — Plaintiffs reached settlement with some defendants ("settling defendants") — Plaintiffs and settling defendants executed Pierringer agreement — Remaining defendants brought unsuccessful application for disclosure of quantum of settlement under R. 20 of Civil Procedure Rules (1972) — Chambers judge held quantum met relevancy threshold for disclosure under R. 20, but not until after trial — Chambers judge held disadvantage to remaining defendants of not knowing quantum did not outweigh benefit of encouraging settlement in future multi-party litigation — Chambers judge held that protection of settlement privilege was necessary to encourage remaining parties to settle for reasons of certainty and potential cost savings — Non-settling defendants successfully appealed timing of disclosure of settlement amount — Plaintiffs appealed — Appeal allowed — It was not clear how knowledge of settlement amounts materially affected ability of non-settling defendants to know and present case — Defendants remained fully aware of claims they must defend themselves against and of overall amount that plaintiffs was seeking — It was true that knowing settlement amounts might allow defendants to revise estimate of how much they want to invest in case, but this did not rise to sufficient level of importance to displace public interest in promoting settlements.

Procédure civile --- Jugement rendu sans procès — Règlement — Divers

Secret concernant le montant d'une transaction — Demandeurs étaient engagés dans un litige avec de nombreuses défenderesses — Demandeurs ont conclu une transaction avec certaines d'entre elles (les « défenderesses parties à la transaction ») — Demandeurs et les défenderesses parties à la transaction ont exécuté des ententes de type Pierringer — Autres défenderesses ont déposé une demande de divulgation du quantum de la transaction en vertu du R. 20 des Règles de procédure civile de 1972, sans succès — Juge en chambre a estimé que le quantum pouvait être divulgué, en vertu du critère portant sur la pertinence de la divulgation décrit au R. 20, mais pas avant la fin du procès — Juge en chambre a conclu que le désavantage que représentait, pour les autres défenderesses, le fait de ne pas savoir quel était le quantum ne l'emportait pas sur le fait de favoriser les transactions dans les litiges futurs impliquant plusieurs parties — Juge en chambre a statué qu'il était nécessaire de protéger le secret relatif aux transactions afin d'encourager les parties qui ne l'ont pas fait à transiger pour permettre un meilleur contrôle et économiser des frais — Défenderesses non parties à la transaction ont interjeté appel à l'encontre du moment choisi pour la divulgation du montant de la transaction, avec succès — Demandeurs ont formé un pourvoi — Pourvoi accueilli — Il n'était pas évident que la connaissance des sommes convenues aux ententes influait grandement sur l'aptitude des défenderesses non parties à la transaction à connaître et à présenter leurs arguments — Ces défenderesses demeuraient pleinement conscientes des poursuites contre lesquelles elles devaient se défendre ainsi que de la somme globale que réclamaient les de-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2013 CarswellNS 428, 2013 SCC 37, J.E. 2013-1134, 228 A.C.W.S. (3d) 78, 359 D.L.R. (4th) 381, 37 C.P.C. (7th) 225, 22 C.L.R. (4th) 1, 446 N.R. 35, 1052 A.P.R. 1, 332 N.B.R. (2d) 1, [2013] 2 S.C.R. 623

mandeurs — Certes, le fait de connaître les sommes convenues aux ententes pourrait permettre aux défenderesses de revoir leur estimation de la somme qu'elles voulaient investir pour se défendre, mais la connaissance de ces sommes ne semblait pas suffisamment importante pour écarter l'intérêt public à favoriser les transactions.

Preuve --- Preuve documentaire — Confidentialité en ce qui concerne les documents — Divers

Secret concernant le montant d'une transaction — Demandeurs étaient engagés dans un litige avec de nombreuses défenderesses — Demandeurs ont conclu une transaction avec certaines d'entre elles (les « défenderesses parties à la transaction ») — Demandeurs et les défenderesses parties à la transaction ont exécuté des ententes de type Pierringer — Autres défenderesses ont déposé une demande de divulgation du quantum de la transaction en vertu du R. 20 des Règles de procédure civile de 1972, sans succès — Juge en chambre a estimé que le quantum pouvait être divulgué, en vertu du critère portant sur la pertinence de la divulgation décrit au R. 20, mais pas avant la fin du procès — Juge en chambre a conclu que le désavantage que représentait, pour les autres défenderesses, le fait de ne pas savoir quel était le quantum ne l'emportait pas sur le fait de favoriser les transactions dans les litiges futurs impliquant plusieurs parties — Juge en chambre a statué qu'il était nécessaire de protéger le secret relatif aux transactions afin d'encourager les parties qui ne l'ont pas fait à transiger pour permettre un meilleur contrôle et économiser des frais — Défenderesses non parties à la transaction ont interjeté appel à l'encontre du moment choisi pour la divulgation du montant de la transaction, avec succès — Demandeurs ont formé un pourvoi — Pourvoi accueilli — Il n'était pas évident que la connaissance des sommes convenues aux ententes influait grandement sur l'aptitude des défenderesses non parties à la transaction à connaître et à présenter leurs arguments — Ces défenderesses demeuraient pleinement conscientes des poursuites contre lesquelles elles devaient se défendre ainsi que de la somme globale que réclamaient les demandeurs — Certes, le fait de connaître les sommes convenues aux ententes pourrait permettre aux défenderesses de revoir leur estimation de la somme qu'elles voulaient investir pour se défendre, mais la connaissance de ces sommes ne semblait pas suffisamment importante pour écarter l'intérêt public à favoriser les transactions.

The plaintiffs were involved in litigation with multiple defendants. The plaintiffs reached settlement with some defendants. The remaining defendants brought an unsuccessful application for disclosure of the quantum of settlement under R. 20 of Civil Procedure Rules (1972).

The chambers judge held that the quantum met the relevancy threshold for disclosure under R. 20, but not until after the trial. The chambers judge held that the disadvantage to the remaining defendants of not knowing quantum did not outweigh the benefit of encouraging settlement in future multi-party litigation. The chambers judge held that protection of settlement privilege was necessary to encourage remaining parties to settle for reasons of certainty and potential cost savings.

The non-settling defendants successfully appealed the timing of disclosure of the settlement amount.

The plaintiffs appealed.

**Held:** The appeal was allowed.

Per Abella J. (McLachlin C.J.C., LeBel, Cromwell, Moldaver, Karakatsanis, Wagner JJ. concurring): It was not clear how knowledge of the settlement amounts materially affected the ability of the non-settling defendants to know and present their case. The defendants remained fully aware of the claims they must defend themselves

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2013 CarswellNS 428, 2013 SCC 37, J.E. 2013-1134, 228 A.C.W.S. (3d) 78, 359 D.L.R. (4th) 381, 37 C.P.C. (7th) 225, 22 C.L.R. (4th) 1, 446 N.R. 35, 1052 A.P.R. 1, 332 N.B.R. (2d) 1, [2013] 2 S.C.R. 623

against and of the overall amount that the plaintiffs were seeking.

It was true that knowing the settlement amounts might allow the defendants to revise their estimate of how much they wanted to invest in the case, but this did not rise to a sufficient level of importance to displace the public interest in promoting settlements.

Les demandeurs étaient engagés dans un litige avec de nombreuses défenderesses. Les demandeurs ont conclu une transaction avec certaines d'entre elles. Les autres défenderesses ont déposé une demande de divulgation du quantum de la transaction en vertu du R. 20 des Règles de procédure civile de 1972, sans succès.

Le juge en chambre a estimé que le quantum pouvait être divulgué, en vertu du critère portant sur la pertinence de la divulgation décrit au R. 20, mais pas avant la fin du procès. Le juge en chambre a conclu que le désavantage que représentait, pour les autres défenderesses, le fait de ne pas savoir quel était le quantum ne l'emportait pas sur le fait de favoriser les transactions dans les litiges futurs impliquant plusieurs parties. Le juge en chambre a statué qu'il était nécessaire de protéger le secret relatif aux transactions afin d'encourager les parties qui ne l'ont pas fait à transiger pour permettre un meilleur contrôle et économiser des frais.

Les défenderesses non parties à la transaction ont interjeté appel à l'encontre du moment choisi pour la divulgation du montant de la transaction, avec succès.

Les demandeurs ont formé un pourvoi.

**Arrêt:** Le pourvoi a été accueilli.

Abella, J. (McLachlin, J.C.C., LeBel, Cromwell, Moldaver, Karakatsanis, Wagner, JJ., souscrivant à son opinion) : Il n'était pas évident que la connaissance des sommes convenues aux ententes influait grandement sur l'aptitude des défenderesses non parties à la transaction à connaître et à présenter leurs arguments. Ces défenderesses demeuraient pleinement conscientes des poursuites contre lesquelles elles devaient se défendre ainsi que de la somme globale que réclamaient les demandeurs.

Certes, le fait de connaître les sommes convenues aux ententes pourrait permettre aux défenderesses de revoir leur estimation de la somme qu'elles voulaient investir pour se défendre, mais la connaissance de ces sommes ne semblait pas suffisamment importante pour écarter l'intérêt public à favoriser les transactions.

### Cases considered by *Abella J.*:

*Amoco Canada Petroleum Co. v. Propak Systems Ltd.* (2001), [2001] 6 W.W.R. 628, 2001 CarswellAlta 575, 2001 ABCA 110, 281 A.R. 185, 248 W.A.C. 185, 4 C.P.C. (5th) 20, 200 D.L.R. (4th) 667, 91 Alta. L.R. (3d) 13 (Alta. C.A.) — referred to

*Bioriginal Food & Science Corp. v. Gerspacher* (2012), 2012 SKQB 469, 2012 CarswellSask 823 (Sask. Q.B.) — considered

*Brown v. Cape Breton (Regional Municipality)* (2011), 2011 NSCA 32, 2011 CarswellNS 186, 331 D.L.R. (4th) 307, 955 A.P.R. 84, 302 N.S.R. (2d) 84 (N.S. C.A.) — followed

*Cutts v. Head* (1984), [1984] 1 All E.R. 597, [1984] 2 W.L.R. 349, [1984] Ch. 290 (Eng. C.A.) — considered

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2013 CarswellNS 428, 2013 SCC 37, J.E. 2013-1134, 228 A.C.W.S. (3d) 78, 359 D.L.R. (4th) 381, 37 C.P.C. (7th) 225, 22 C.L.R. (4th) 1, 446 N.R. 35, 1052 A.P.R. 1, 332 N.B.R. (2d) 1, [2013] 2 S.C.R. 623

*Dos Santos (Committee of) v. Sun Life Assurance Co. of Canada (2005), 249 D.L.R. (4th) 416, 40 B.C.L.R. (4th) 245, [2005] 7 W.W.R. 1, (sub nom. Dos Santos Estate v. Sun Life Assurance Co. of Canada) 207 B.C.A.C. 54, (sub nom. Dos Santos Estate v. Sun Life Assurance Co. of Canada) 341 W.A.C. 54, 2005 BCCA 4, 2005 CarswellBC 5, 17 C.C.L.I. (4th) 180, 5 C.P.C. (6th) 278* (B.C. C.A.) — referred to

*Hudson Bay Mining & Smelting Co. v. Fluor Daniel Wright (1997), 12 C.P.C. (4th) 94, 1997 CarswellMan 388, (sub nom. Hudson Bay Mining & Smelting Co. v. Wright) 120 Man. R. (2d) 214, [1997] 10 W.W.R. 622* (Man. Q.B.) — referred to

*Loewen, Ondaatje, McCutcheon & Co. c. Sparling (1992), (sub nom. Kelvin Energy Ltd. v. Lee) 97 D.L.R. (4th) 616, (sub nom. Kelvin Energy Ltd. v. Lee) [1992] 3 S.C.R. 235, (sub nom. Kelvin Energy Ltd. v. Lee) 51 Q.A.C. 49, 143 N.R. 191, 1992 CarswellQue 126, 1992 CarswellQue 126F* (S.C.C.) — considered

*Middelkamp v. Fraser Valley Real Estate Board (1992), 1992 CarswellBC 267, 71 B.C.L.R. (2d) 276, 10 C.P.C. (3d) 109, 96 D.L.R. (4th) 227, 17 B.C.A.C. 134, 29 W.A.C. 134, 45 C.P.R. (3d) 213* (B.C. C.A.) — considered

*Pierringer v. Hoger (1963), 124 N.W.2d 106, 21 Wis. 2d 182* (U.S. Wis. S.C.) — considered

*Rush & Tompkins Ltd. v. Greater London Council (1988), [1988] 3 All E.R. 737, 104 N.R. 392, [1989] A.C. 1280, [1988] 3 W.L.R. 939* (U.K. H.L.) — considered

*Sparling v. Southam Inc. (1988), 66 O.R. (2d) 225, 1988 CarswellOnt 121, 41 B.L.R. 22* (Ont. H.C.) — considered

*Underwood v. Cox (1912), 26 O.L.R. 303, 4 D.L.R. 66, 21 O.W.R. 757, 1912 CarswellOnt 200* (Ont. Div. Ct.) — referred to

*Unilever Plc v. Procter & Gamble Co. (1999), [2000] 1 W.L.R. 2436, [2001] 1 All E.R. 783* (Eng. C.A.) — referred to

**Statutes considered:**

*Competition Act*, R.S.C. 1985, c. C-34

Generally — referred to

**Rules considered:**

*Civil Procedure Rules (1972)*, N.S. Civ. Pro. Rules

R. 20.02 — considered

R. 20.06 — considered

### Authorities considered:

Bryant, Alan W., Sidney N. Lederman and Michelle K. Fuerst, *The Law of Evidence in Canada*, 3rd ed. (Markham, Ont.: LexisNexis, 2009) Knapp, Peter B., "Keeping the *Pierringer* Promise: Fair Settlements and

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2013 CarswellNS 428, 2013 SCC 37, J.E. 2013-1134, 228 A.C.W.S. (3d) 78, 359 D.L.R. (4th) 381, 37 C.P.C. (7th) 225, 22 C.L.R. (4th) 1, 446 N.R. 35, 1052 A.P.R. 1, 332 N.B.R. (2d) 1, [2013] 2 S.C.R. 623

Fair Trials" (1994), 20 *Wm. Mitchell L. Rev.* 1Vaver, David, "'Without Prejudice' Communications — Their Admissibility and Effect" (1974), 9 *U.B.C. L. Rev.* 85

APPEAL by plaintiffs from decision reported at *Sable Offshore Energy Inc. v. Ameron International Corp.* (2011), 12 C.L.R. (4th) 129, 2011 CarswellNS 893, 2011 NSCA 121, 983 A.P.R. 382, 310 N.S.R. (2d) 382, 346 D.L.R. (4th) 68, 26 C.P.C. (7th) 1 (N.S. C.A.), which granted non-settling defendants' appeal of timing of disclosure of settlement amount.

POURVOI formé par les demandeurs à l'encontre d'une décision publiée à *Sable Offshore Energy Inc. v. Ameron International Corp.* (2011), 12 C.L.R. (4th) 129, 2011 CarswellNS 893, 2011 NSCA 121, 983 A.P.R. 382, 310 N.S.R. (2d) 382, 346 D.L.R. (4th) 68, 26 C.P.C. (7th) 1 (N.S. C.A.), ayant accueilli l'appel des défenderesses non parties à une transaction à l'encontre du moment choisi pour la divulgation du montant de la transaction.

*Abella J.*:

1       The justice system is on a constant quest for ameliorative strategies that reduce litigation's stubbornly endemic delays, expense and stress. In this evolving mission to confront barriers to access to justice, some strategies for resolving disputes have proven to be more enduringly successful than others. Of these, few can claim the tradition of success rightfully attributed to settlements.

2       The purpose of settlement privilege is to promote settlement. The privilege wraps a protective veil around the efforts parties make to settle their disputes by ensuring that communications made in the course of these negotiations are inadmissible.

3       Sable Offshore Energy Inc. sued a number of defendants. It settled with some of them. The remaining defendants want to know what amounts the parties settled for. The question before us is whether those negotiated amounts should be disclosed or whether they are protected by settlement privilege.

**Background**

4       Sable undertook the Sable Offshore Energy Project, whose purpose was the building of several offshore structures and onshore gas processing facilities in Nova Scotia. Ameron International Corporation and Ameron B.V. (Ameron) and Allcolour Paint Limited, Amercoat Canada, Rubyco Ltd., Danroh Inc. and Serious Business Inc. (collectively Amercoat) supplied Sable with paint for parts of the Sable structures. Sable brought three lawsuits alleging that the paint failed to prevent corrosion.

5       In the lawsuit that is the subject of this appeal, Sable sued Ameron, Amercoat, and 12 other contractors and applicators who were responsible for preparing surfaces and applying the paint coatings. The claims against Ameron and Amercoat were for negligence, negligent misrepresentation and breach of a collateral warranty. The claims against the other defendants were similar.

6       Sable entered into three Pierringer Agreements with some of the defendants. Named for the 1963 Wisconsin case of *Pierringer v. Hoger*, 124 N.W.2d 106 (U.S. Wis. S.C. 1963), a Pierringer Agreement allows one or more defendants in a multi-party proceeding to settle with the plaintiff and withdraw from the litigation, leaving the remaining defendants responsible only for the loss they actually caused. There is no joint liability with the settling defendants, but non-settling defendants may be jointly liable with each other.

7       As part of the terms of the Agreements, Sable agreed to amend its statement of claim against the non-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2013 CarswellNS 428, 2013 SCC 37, J.E. 2013-1134, 228 A.C.W.S. (3d) 78, 359 D.L.R. (4th) 381, 37 C.P.C. (7th)
225, 22 C.L.R. (4th) 1, 446 N.R. 35, 1052 A.P.R. 1, 332 N.B.R. (2d) 1, [2013] 2 S.C.R. 623

settling defendants to pursue them only for their share of liability. In addition, all the relevant evidence in the possession of the settling defendants, would, in accordance with the Agreements, be given to the Plaintiffs and be discoverable by the non-settling defendants.

8      Ameron and Amercoat did not settle. All the terms of the Pierringer Agreements were disclosed to Ameron and Amercoat except the amounts agreed to.

9      These settlement agreements were approved by court order on April 27, 2010. On December 3, 2010, Ameron filed an application pursuant to Rules 20.02 and 20.06 of Nova Scotia's 1972 *Civil Procedure Rules* (which the parties previously agreed would govern the litigation) for disclosure of the settlement amounts paid under the Pierringer Agreements. Sable's position was that the amounts were subject to settlement privilege.

10      Hood J. dismissed the defendants' application for disclosure of the settlement amounts. She concluded that the public interest was best served by preserving settlement privilege and keeping the settlement amounts confidential. The Court of Appeal overturned that decision and ordered the amounts disclosed.

**Analysis**

11      Settlements allow parties to reach a mutually acceptable resolution to their dispute without prolonging the personal and public expense and time involved in litigation. The benefits of settlement were summarized by Callaghan A.C.J.H.C. in *Sparling v. Southam Inc.* (1988), 66 O.R. (2d) 225 (Ont. H.C.):

> [T]he courts consistently favour the settlement of lawsuits in general. To put it another way, there is an overriding public interest in favour of settlement. This policy promotes the interests of litigants generally by saving them the expense of trial of disputed issues, and it reduces the strain upon an already overburdened provincial Court system. [p. 230]

This observation was cited with approval in *Loewen, Ondaatje, McCutcheon & Co. c. Sparling*, [1992] 3 S.C.R. 235 (S.C.C.), at p. 259, where L'Heureux-Dubé J. acknowledged that promoting settlement was "sound judicial policy" that "contributes to the effective administration of justice".

12      Settlement privilege promotes settlements. As the weight of the jurisprudence confirms, it is a class privilege. As with other class privileges, while there is a *prima facie* presumption of inadmissibility, exceptions will be found "when the justice of the case requires it" (*Rush & Tompkins Ltd. v. Greater London Council*, [1988] 3 All E.R. 737 (U.K. H.L.), at p. 740).

13      Settlement negotiations have long been protected by the common law rule that "without prejudice" communications made in the course of such negotiations are inadmissible (see David Vaver, "'Without Prejudice' Communications — Their Admissibility and Effect" (1974), 9 *U.B.C. L. Rev.* 85, at p. 88). The settlement privilege created by the "without prejudice" rule was based on the understanding that parties will be more likely to settle if they have confidence from the outset that their negotiations will not be disclosed. As Oliver L.J. of the English Court of Appeal explained in *Cutts v. Head*, [1984] 1 All E.R. 597 (Eng. C.A.), at p. 605:

> [P]arties should be encouraged so far as possible to settle their disputes without resort to litigation and should not be discouraged by the knowledge that anything that is said in the course of such negotiations ... may be used to their prejudice in the course of the proceedings. They should, as it was expressed by Clauson J in *Scott Paper Co v. Drayton Paper Works Ltd* (1927) 44 RPC 151 at 157, be encouraged freely and

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2013 CarswellNS 428, 2013 SCC 37, J.E. 2013-1134, 228 A.C.W.S. (3d) 78, 359 D.L.R. (4th) 381, 37 C.P.C. (7th) 225, 22 C.L.R. (4th) 1, 446 N.R. 35, 1052 A.P.R. 1, 332 N.B.R. (2d) 1, [2013] 2 S.C.R. 623

frankly to put their cards on the table.

What is said during negotiations, in other words, will be more open, and therefore more fruitful, if the parties know that it cannot be subsequently disclosed.

14      *Rush & Tompkins* confirmed that settlement privilege extends beyond documents and communications expressly designated to be "without prejudice". In that case, a contractor settled its action against one defendant, the Greater London Council (the GLC), while maintaining it against the other defendant, the Carey contractors. The House of Lords considered whether communications made in the process of negotiating the settlement with the GLC should be admissible in the ongoing litigation with the Carey contractors. Lord Griffiths reached two conclusions of significance for this case. First, although the privilege is often referred to as the rule about "without prejudice" communications, those precise words are not required to invoke the privilege. What matters instead is the intent of the parties to settle the action (p. 739). Any negotiations undertaken with this purpose are inadmissible.

15      Lord Griffiths' second relevant conclusion was that although most cases considering the "without preju- dice" rule have dealt with the admissibility of communications once negotiations have failed, the rationale of promoting settlement is no less applicable if an agreement is actually reached. Lord Griffiths explained that a plaintiff in Rush & Tompkins' situation would be discouraged from settling with one defendant if any admis- sions it made during the course of its negotiations were admissible in its claim against the other:

In such circumstances it would, I think, place a serious fetter on negotiations ... if they knew that everything that passed between them would ultimately have to be revealed to the one obdurate litigant. [p. 744]

16      *Middelkamp v. Fraser Valley Real Estate Board* (1992), 71 B.C.L.R. (2d) 276 (B.C. C.A.), subsequently endorsed the view that settlement privilege covers any settlement negotiations. The plaintiff James Middelkamp launched a civil suit against Fraser Valley Real Estate Board claiming that it had engaged in practices that were contrary to the *Competition Act*, R.S.C. 1985, c. C-34, and caused him to suffer damages. He also complained about the Board's conduct to the Director of Investigation and Research under different provisions of the *Act*, resulting in an investigation by the Director and criminal charges against the Board. The Board negotiated a set- tlement with the Department of Justice, leading to the criminal charges being resolved. Middelkamp sought dis- closure of any communications made during the course of negotiations between the Board and the Department of Justice. McEachern C.J.B.C. refused to order disclosure of the communications on the basis of settlement privilege, explaining:

... the public interest in the settlement of disputes generally requires "without prejudice" documents or com- munications created for, or communicated in the course of, settlement negotiations to be privileged. I would classify this as a "blanket, *prima facie*, common law, or 'class'" privilege because it arises from settlement negotiations and protects the class of communications exchanged in the course of that worthwhile endeav- our.

In my judgment this privilege protects documents and communications created for such purposes both from production to other parties to the negotiations and to strangers, and extends as well to admissibility, *and whether or not a settlement is reached*. This is because, as I have said, a party communicating a proposal re- lated to settlement, or responding to one, usually has no control over what the other side may do with such documents. Without such protection, the public interest in encouraging settlements will not be served. [Emphasis added; paras. 19-20.]

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2013 CarswellNS 428, 2013 SCC 37, J.E. 2013-1134, 228 A.C.W.S. (3d) 78, 359 D.L.R. (4th) 381, 37 C.P.C. (7th) 225, 22 C.L.R. (4th) 1, 446 N.R. 35, 1052 A.P.R. 1, 332 N.B.R. (2d) 1, [2013] 2 S.C.R. 623

17    As McEachern C.J.B.C. pointed out, the protection is for settlement negotiations, whether or not a settlement is reached. That means that successful negotiations are entitled to no less protection than ones that yield no settlement. The reasoning in *Brown v. Cape Breton (Regional Municipality)*, 2011 NSCA 32, 302 N.S.R. (2d) 84 (N.S. C.A.), is instructive. A plaintiff brought separate claims against two defendants for unrelated injuries to the same knee. She settled with one defendant and the Court of Appeal had to consider whether the trial judge was right to order disclosure of the amount of the settlement to the remaining defendant. Bryson J.A. found that disclosure should not have been ordered since a principled approach to settlement privilege did not justify a distinction between settlement *negotiations* and what was ultimately negotiated:

> Some of the cases distinguish between extending privilege from negotiations to the concluded agreement itself.... *The distinction ... is arbitrary*. The reasons for protecting settlement communications from disclosure are not usually spent when a deal is made. *Typically parties no more wish to disclose to the world the terms of their agreement than their negotiations in achieving it*.

> [Emphasis added; para. 41.]

Notably, this is the view taken in Alan W. Bryant, Sidney N. Lederman and Michelle K. Fuerst, *The Law Of Evidence in Canada* (3rd ed. 2009), where the authors conclude:

> ... the privilege applies not only to failed negotiations, but also to the *content of successful negotiations*, so long as the existence or interpretation of the agreement itself is not in issue in the subsequent proceedings and none of the exceptions are applicable.

> [Emphasis added; para. 14. 341.]

18    Since the negotiated amount is a key component of the "content of successful negotiations", reflecting the admissions, offers, and compromises made in the course of negotiations, it too is protected by the privilege. I am aware that some earlier jurisprudence did not extend the privilege to the concluded agreement (see *Amoco Canada Petroleum Co. v. Propak Systems Ltd.*, 2001 ABCA 110, 281 A.R. 185 (Alta. C.A.), at para. 40, citing *Hudson Bay Mining & Smelting Co. v. Fluor Daniel Wright* (1997), 120 Man. R. (2d) 214 (Man. Q.B.)), but in my respectful view, it is better to adopt an approach that more robustly promotes settlement by including its content.

19    There are, inevitably, exceptions to the privilege. To come within those exceptions, a defendant must show that, on balance, "a competing public interest outweighs the public interest in encouraging settlement" (*Dos Santos (Committee of) v. Sun Life Assurance Co. of Canada*, 2005 BCCA 4, 207 B.C.A.C. 54 (B.C. C.A.), at para. 20). These countervailing interests have been found to include allegations of misrepresentation, fraud or undue influence (*Unilever Plc v. Procter & Gamble Co.* (1999), [2001] 1 All E.R. 783 (Eng. C.A.), *Underwood v. Cox* (1912), 26 O.L.R. 303 (Ont. Div. Ct.)), and preventing a plaintiff from being overcompensated (*Dos Santos*).

20    The non-settling defendants argue that there should be an exception to the privilege for the amounts of the settlements because they say they need this information to conduct their litigation. I see no tangible prejudice created by withholding the amounts of the settlements which can be said to outweigh the public interest in promoting settlements.

21    The particular settlements negotiated in this case are known as Pierringer Agreements. Pierringer Agree-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2013 CarswellNS 428, 2013 SCC 37, J.E. 2013-1134, 228 A.C.W.S. (3d) 78, 359 D.L.R. (4th) 381, 37 C.P.C. (7th) 225, 22 C.L.R. (4th) 1, 446 N.R. 35, 1052 A.P.R. 1, 332 N.B.R. (2d) 1, [2013] 2 S.C.R. 623

ments were developed in the United States to address the obstacles to settlement that arose in multi-party litigation. Professor Peter B. Knapp summarized the value — and complexity — of trying to settle multi-party litigation as follows:

> Settlement of complicated multi-defendant civil litigation is particularly valuable, because complicated civil trials can consume enormous amounts of a judge's time and can be expensive for the parties. However, settling multi-defendant civil litigation can be especially difficult. Different defendants have different tolerances for risk, and some defendants are simply far less willing to settle than others.

"Keeping the *Pierringer* Promise: Fair Settlements and Fair Trials" (1994), 20 *Wm. Mitchell L. Rev.* 1, at p. 5.

22      Professor Knapp also explained why, prior to Pierringer Agreements, settlements had been difficult to encourage:

> On one hand, a plaintiff contemplating settlement with one of several defendants faced the possibility that release of the one defendant would also extinguish all claims against the nonsettling defendants. On the other hand, in jurisdictions which permitted contribution among joint tortfeasors, a settling defendant faced the possibility of post-settlement contribution claims made by the nonsettling defendants. [pp. 6-7]

23      In the United States, Pierringer Agreements were found to significantly attenuate the obstacles in the way of negotiating settlements in multi-party litigation. Under a Pierringer Agreement, the plaintiff's claim was only "extinguished" against those defendants with whom it settled; the claims against the non-settling defendants continued. The settling defendants, meanwhile, were assured that they could not be subject to a contribution claim from the non-settling defendants, who would be accountable only for their own share of liability at trial.

24      Pierringer Agreements in Canada built on these American foundations and routinely included additional protections for non-settling defendants, such as requiring that non-settling defendants be given access to the settling defendants' evidence. In this case, for example, the court order approving the settlement required that the plaintiffs get production of all relevant evidence from the settling defendants and make this evidence available to the non-settling defendants on discovery. It also ordered that, with respect to factual matters, there be no restrictions on the non-settling defendants' access to experts retained by the settling defendants. In addition, the Agreements in this case specified that their non-financial terms would be disclosed to the court and non-settling defendants "to the extent required by the laws of the Province of Nova Scotia and the rulings and ethical guidelines promulgated by the Nova Scotia Barristers' Society" (A.R., at pp. 142 and 184).

25      The non-settling defendants have in fact received all the non-financial terms of the Pierringer Agreements. They have access to all the relevant documents and other evidence that was in the settling defendants' possession. They also have the assurance that they will not be held liable for more than their share of damages. Moreover, Sable agreed that at the end of the trial, once liability had been determined, it would disclose to the trial judge the amounts it settled for. As a result, should the non-settling defendants establish a right to set-off in this case, their liability for damages will be adjusted downwards if necessary to avoid overcompensating the plaintiff.

26      As for any concern that the non-settling defendants will be required to pay more than their share of damages, it is inherent in Pierringer Agreements that non-settling defendants can only be held liable for their share of the damages and are severally, and not jointly, liable with the settling defendants.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2013 CarswellNS 428, 2013 SCC 37, J.E. 2013-1134, 228 A.C.W.S. (3d) 78, 359 D.L.R. (4th) 381, 37 C.P.C. (7th) 225, 22 C.L.R. (4th) 1, 446 N.R. 35, 1052 A.P.R. 1, 332 N.B.R. (2d) 1, [2013] 2 S.C.R. 623

27    It is therefore not clear to me how knowledge of the settlement amounts materially affects the ability of the non-settling defendants to know and present their case. The defendants remain fully aware of the claims they must defend themselves against and of the overall amount that Sable is seeking. It is true that knowing the settlement amounts might allow the defendants to revise their estimate of how much they want to invest in the case, but this, it seems to me, does not rise to a sufficient level of importance to displace the public interest in promoting settlements.

28    The non-settling defendants also argued that refusing disclosure impedes their own possible settlement initiatives since they are more likely to settle if they know the settlement amounts already negotiated. Perhaps. But they may also, depending on the amounts, arguably come to see them as a disincentive. In any event, theirs is essentially a circular argument that the interest in *subsequent* settlement outweighs the public interest in encouraging the *initial* settlement. But the likelihood of an initial settlement decreases if the amount is disclosable.

29    Someone has to go first, and encouraging that first settlement in multiparty litigation is palpably worthy of more protection than the speculative assumption that others will only follow if they know the amount. The settling defendants, after all, were able to come to a negotiated amount without the benefit of a guiding settlement precedent. The non-settling defendants' position is no worse. As Smith J. noted in protecting the settlement amount from disclosure in *Bioriginal Food & Science Corp. v. Gerspacher*, 2012 SKQB 469 (Sask. Q.B.):

> ... imperfect knowledge is virtually always the case in settlement negotiations. There are always knowns and known unknowns ... [para. 33].

And Bryson J.A. compellingly summarized the competing arguments in *Brown* as follows:

> Some courts have argued that it is necessary to go further and disclose the settlement amount itself.... They hold either that the agreement (unlike negotiations) is not privileged or that the settling parties have an advantage which should be redressed by disclosure. ... If indeed settling parties thereby enjoy an advantage over non-settling parties, it is one for which they have bargained. The court should hesitate to expropriate that advantage by ordering disclosure at the instance of non-settling parties, intransigent or otherwise. The argument that disclosure would facilitate settlement amongst the remaining parties ignores that, but for the privilege, the first settlement would often not occur. [Citations omitted; para. 67.]

30    A proper analysis of a claim for an exception to settlement privilege does not simply ask whether the non-settling defendants derive some tactical advantage from disclosure, but whether the reason for disclosure *outweighs* the policy in favour of promoting settlement. While protecting disclosure of settlement negotiations and their fruits has the demonstrable benefit of promoting settlement, there is little corresponding harm in denying disclosure of the settlement amounts in this case.

31    I would therefore allow the appeal with costs throughout.

*Appeal allowed.*

*Pourvoi accueilli.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 81



## SUPREME COURT OF CANADA

**CITATION:** Sattva Capital Corp. *v.* Creston Moly Corp., 2014 SCC 53      **DATE:** 20140801
**DOCKET:** 35026

**BETWEEN:**

**Sattva Capital Corporation (formerly Sattva Capital Inc.)**
Appellant
and
**Creston Moly Corporation (formerly Georgia Ventures Inc.)**
Respondent
- and -
**Attorney General of British Columbia and BCICAC Foundation**
Interveners

**CORAM:** McLachlin C.J. and LeBel, Abella, Rothstein, Moldaver, Karakatsanis and Wagner JJ.

**REASONS FOR JUDGMENT:**      Rothstein J. (McLachlin C.J. and LeBel, Abella, Moldaver,
(paras. 1 to 125)      Karakatsanis and Wagner JJ. concurring)

**NOTE:** This document is subject to editorial revision before its reproduction in final form in the *Canada Supreme Court Reports*.

———————————————

2014 SCC 53 (CanLII)

SATTVA CAPITAL CORP. *v.* CRESTON MOLY CORP.

**Sattva Capital Corporation (formerly Sattva Capital Inc.)** *Appellant*

*v.*

**Creston Moly Corporation (formerly Georgia Ventures Inc.)** *Respondent*

and

**Attorney General of British Columbia and
BCICAC Foundation** *Interveners*

**Indexed as: Sattva Capital Corp. *v.* Creston Moly Corp.**

**2014 SCC 53**

File No.: 35026.

2013: December 12; 2014: August 1.

Present: McLachlin C.J. and LeBel, Abella, Rothstein, Moldaver, Karakatsanis and Wagner JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

2014 SCC 53 (CanLII)

*Arbitration — Appeals — Commercial arbitration awards — Parties entering into agreement providing for payment of finder's fee in shares — Parties disagreeing as to date on which to price shares for payment of finder's fee and entering into arbitration — Leave to appeal arbitral award sought pursuant to s. 31(2) of the Arbitration Act — Leave to appeal denied but granted on appeal to Court of Appeal — Appeal of award dismissed but dismissal reversed by Court of Appeal — Whether Court of Appeal erred in granting leave to appeal — What is appropriate standard of review to be applied to commercial arbitral decisions made under Arbitration Act — Arbitration Act, R.S.B.C. 1996, c. 55, s. 31(2).*

*Contracts — Interpretation — Parties entering into agreement providing for payment of finder's fee in shares — Parties disagreeing as to date on which to price the shares for payment of finder's fee and entering into arbitration — Whether arbitrator reasonably construed contract as a whole — Whether contractual interpretation is question of law or of mixed fact and law.*

S and C entered into an agreement that required C to pay S a finder's fee in relation to the acquisition of a molybdenum mining property by C. The parties agreed that under this agreement, S was entitled to a finder's fee of US$1.5 million and was entitled to be paid this fee in shares of C. However, they disagreed on which date should be used to price the shares and therefore the number of shares to which S was entitled. S argued that the share price was dictated by the date set out in the Market Price definition in the agreement and therefore that it should receive

2014 SCC 53 (CanLII)

approximately 11,460,000 shares priced at $0.15.   C claimed that the agreement's "maximum amount" proviso prevented S from receiving shares valued at more than US$1.5 million on the date the fee was payable, and therefore that S should receive approximately 2,454,000 shares priced at $0.70.   The parties entered into arbitration pursuant to the B.C. *Arbitration Act* and the arbitrator found in favour of S.   C sought leave to appeal the arbitrator's decision pursuant to s. 31(2) of the *Arbitration Act*, but leave was denied on the basis that the question on appeal was not a question of law. The Court of Appeal reversed the decision and granted C's application for leave to appeal, finding that the arbitrator's failure to address the meaning of the agreement's "maximum amount" proviso raised a question of law.   The superior court judge on appeal dismissed C's appeal, holding that the arbitrator's interpretation of the agreement was correct.   The Court of Appeal allowed C's appeal, finding that the arbitrator reached an absurd result.   S appeals the decisions of the Court of Appeal that granted leave and that allowed the appeal.

*Held*: The appeal should be allowed and the arbitrator's award reinstated.

Appeals from commercial arbitration decisions are narrowly circumscribed under the *Arbitration Act*.   Under s. 31(1), they are limited to questions of law, and leave to appeal is required if the parties do not consent to the appeal. Section 31(2)(*a*) sets out the requirements for leave at issue in the present case:   the court may grant leave if it determines that the result is important to the parties and the determination of the point of law may prevent a miscarriage of justice.

2014 SCC 53 (CanLII)

In the case at bar, the Court of Appeal erred in finding that the construction of the finder's fee agreement constituted a question of law. Such an exercise raises a question of mixed fact and law, and therefore, the Court of Appeal erred in granting leave to appeal.

The historical approach according to which determining the legal rights and obligations of the parties under a written contract was considered a question of law should be abandoned. Contractual interpretation involves issues of mixed fact and law as it is an exercise in which the principles of contractual interpretation are applied to the words of the written contract, considered in light of the factual matrix of the contract.

It may be possible to identify an extricable question of law from within what was initially characterized as a question of mixed fact and law, however, the close relationship between the selection and application of principles of contractual interpretation and the construction ultimately given to the instrument means that the circumstances in which a question of law can be extricated from the interpretation process will be rare. The goal of contractual interpretation, to ascertain the objective intentions of the parties, is inherently fact specific. Accordingly, courts should be cautious in identifying extricable questions of law in disputes over contractual interpretation. Legal errors made in the course of contractual interpretation include the application of an incorrect principle, the failure to consider a required element of a legal test, or the failure to consider a relevant factor. Concluding that C's

application for leave to appeal raised no question of law is sufficient to dispose of this appeal, however the Court found it salutary to continue with its analysis.

In order to rise to the level of a miscarriage of justice for the purposes of s. 31(2)(*a*), an alleged legal error must pertain to a material issue in the dispute which, if decided differently, would affect the result of the case. According to this standard, a determination of a point of law "may prevent a miscarriage of justice" only where the appeal itself has some possibility of succeeding. An appeal with no chance of success will not meet the threshold of "may prevent a miscarriage of justice" because there would be no chance that the outcome of the appeal would cause a change in the final result of the case.

At the leave stage, it is not appropriate to consider the full merits of a case and make a final determination regarding whether an error of law was made. However, some preliminary consideration of the question of law by the leave court is necessary to determine whether the appeal has the potential to succeed and thus to change the result in the case. The appropriate threshold for assessing the legal question at issue under s. 31(2) is whether it has arguable merit, meaning that the issue raised by the applicant cannot be dismissed through a preliminary examination of the question of law.

Assessing whether the issue raised by an application for leave to appeal has arguable merit must be done in light of the standard of review on which the merits of the appeal will be judged. This requires a preliminary assessment of the standard

2014 SCC 53 (CanLII)

of review.  The leave court's assessment of the standard of review is only preliminary and does not bind the court which considers the merits of the appeal.

The words "may grant leave" in s. 31(2) of the *Arbitration Act* confer on the court residual discretion to deny leave even where the requirements of s. 31(2) are met.  Discretionary factors to consider in a leave application under s. 31(2)(*a*) include: conduct of the parties, existence of alternative remedies, undue delay and the urgent need for a final answer.  These considerations could be a sound basis for declining leave to appeal an arbitral award even where the statutory criteria have been met.  However, courts should exercise such discretion with caution.

Appellate review of commercial arbitration awards is different from judicial review of a decision of a statutory tribunal, thus the standard of review framework developed for judicial review in *Dunsmuir v. New Brunswick*, 2008 SCC 9, [2008] 1 S.C.R. 190, and the cases that followed it is not entirely applicable to the commercial arbitration context.  Nevertheless, judicial review of administrative tribunal decisions and appeals of arbitration awards are analogous in some respects.  As a result, aspects of the *Dunsmuir* framework are helpful in determining the appropriate standard of review to apply in the case of commercial arbitration awards.

In the context of commercial arbitration, where appeals are restricted to questions of law, the standard of review will be reasonableness unless the question is one that would attract the correctness standard, such as constitutional questions or questions of law of central importance to the legal system as a whole and outside the

2014 SCC 53 (CanLII)

adjudicator's expertise.   The question at issue here does not fall into one of those categories and thus the standard of review in this case is reasonableness.

In the present case, the arbitrator reasonably construed the contract as a whole in determining that S is entitled to be paid its finder's fee in shares priced at $0.15.   The arbitrator's decision that the shares should be priced according to the Market Price definition gives effect to both that definition and the "maximum amount" proviso and reconciles them in a manner that cannot be said to be unreasonable.    The arbitrator's reasoning meets the reasonableness threshold of justifiability, transparency and intelligibility.

A court considering whether leave should be granted is not adjudicating the merits of the case.   It decides only whether the matter warrants granting leave, not whether the appeal will be successful, even where the determination of whether to grant leave involves a preliminary consideration of the question of law at issue.   For this reason, comments by a leave court regarding the merits cannot bind or limit the powers of the court hearing the actual appeal.

**Cases Cited**

Referred to:  *British Columbia Institute of Technology (Student Assn.) v. British Columbia Institute of Technology*, 2000 BCCA 496, 192 D.L.R. (4th) 122; *King v. Operating Engineers Training Institute of Manitoba Inc.*, 2011 MBCA 80, 270 Man. R. (2d) 63; *Thorner v. Major*, [2009] UKHL 18, [2009] 3 All E.R. 945;

*Prenn v. Simmonds*, [1971] 3 All E.R. 237; *Reardon Smith Line Ltd. v. Hansen-Tangen*, [1976] 3 All E.R. 570; *Jiro Enterprises Ltd. v. Spencer*, 2008 ABCA 87 (CanLII); *QK Investments Inc. v. Crocus Investment Fund*, 2008 MBCA 21, 290 D.L.R. (4th) 84; *Dow Chemical Canada Inc. v. Shell Chemicals Canada Ltd.*, 2010 ABCA 126, 25 Alta. L.R. (5th) 221; *Minister of National Revenue v. Costco Wholesale Canada Ltd.*, 2012 FCA 160, 431 N.R. 78; *WCI Waste Conversion Inc. v. ADI International Inc.*, 2011 PECA 14, 309 Nfld. & P.E.I.R. 1; *269893 Alberta Ltd. v. Otter Bay Developments Ltd.*, 2009 BCCA 37, 266 B.C.A.C. 98; *Hayes Forest Services Ltd. v. Weyerhaeuser Co.*, 2008 BCCA 31, 289 D.L.R. (4th) 230; *Bell Canada v. The Plan Group*, 2009 ONCA 548, 96 O.R. (3d) 81; *Canada (Director of Investigation and Research) v. Southam Inc.*, [1997] 1 S.C.R. 748; *Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 S.C.R. 235; *Jesuit Fathers of Upper Canada v. Guardian Insurance Co. of Canada*, 2006 SCC 21, [2006] 1 S.C.R. 744; *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, 2010 SCC 4, [2010] 1 S.C.R. 69; *Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71, 173 Man. R. (2d) 300; *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 All E.R. 98; *Glaswegian Enterprises Inc. v. B.C. Tel Mobility Cellular Inc.* (1997), 101 B.C.A.C. 62; *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129; *United Brotherhood of Carpenters and Joiners of America, Local 579 v. Bradco Construction Ltd.*, [1993] 2 S.C.R. 316; *Gutierrez v. Tropic International Ltd.* (2002), 63 O.R. (3d) 63; *Domtar Inc. v. Belkin Inc.* (1989), 39 B.C.L.R. (2d) 257; *Quan v. Cusson*, 2009 SCC 62, [2009] 3 S.C.R. 712; *Quick Auto Lease Inc. v. Nordin*, 2014 MBCA 32, 303 Man. R. (2d) 262; *R. v. Fedossenko*, 2013

ABCA 164 (CanLII); *Enns v. Hansey*, 2013 MBCA 23 (CanLII); *R. v. Hubley*, 2009 PECA 21, 289 Nfld. & P.E.I.R. 174; *R. v. Will*, 2013 SKCA 4, 405 Sask. R. 270; *Newfoundland and Labrador Nurses' Union v. Newfoundland and Labrador (Treasury Board)*, 2011 SCC 62, [2011] 3 S.C.R. 708; *Immeubles Port Louis Ltée v. Lafontaine (Village)*, [1991] 1 S.C.R. 326; *MiningWatch Canada v. Canada (Fisheries and Oceans)*, 2010 SCC 2, [2010] 1 S.C.R. 6; *R. v. Bellusci*, 2012 SCC 44, [2012] 2 S.C.R. 509; *R. v. Bjelland*, 2009 SCC 38, [2009] 2 S.C.R. 651; *R. v. Regan*, 2002 SCC 12, [2002] 1 S.C.R. 297; *Homex Realty and Development Co. v. Corporation of the Village of Wyoming*, [1980] 2 S.C.R. 1011; *Dunsmuir v. New Brunswick*, 2008 SCC 9, [2008] 1 S.C.R. 190; *Alberta (Information and Privacy Commissioner) v. Alberta Teachers' Association*, 2011 SCC 61, [2011] 3 S.C.R. 654; *Canadian Western Bank v. Alberta*, 2007 SCC 22, [2007] 2 S.C.R. 3; *Pacifica Mortgage Investment Corp. v. Laus Holdings Ltd.*, 2013 BCCA 95, 333 B.C.A.C. 310, leave to appeal refused, [2013] 3 S.C.R. viii; *Tamil Co-operative Homes Inc. v. Arulappah* (2000), 49 O.R. (3d) 566.

**Statutes and Regulations Cited**

*Administrative Tribunals Act*, S.B.C. 2004, c. 45, ss. 58, 59.
*Arbitration Act*, R.S.B.C. 1996, c. 55 [formerly *Commercial Arbitration Act*], s. 31.
*Civil Code of Québec*.

**Authors Cited**

Brown, Donald J. M., and John M. Evans, with the assistance of Christine E. Deacon. *Judicial Review of Administrative Action in Canada*. Toronto: Canvasback, 1998 (loose-leaf updated May 2014).

Dyzenhaus, David. "The Politics of Deference: Judicial Review and Democracy", in Michael Taggart, ed., *The Province of Administrative Law*. Oxford: Hart, 1997, 279.

Hall, Geoff R. *Canadian Contractual Interpretation Law*, 2nd ed. Markham, Ont.: LexisNexis, 2012.

Lewison, Kim. *The Interpretation of Contracts*, 5th ed. London: Sweet & Maxwell, 2011 & Supp. 2013.

McCamus, John D. *The Law of Contracts*, 2nd ed. Toronto: Irwin Law, 2012.

APPEAL from a judgment of the British Columbia Court of Appeal (Newbury, Low and Levine JJ.A.), 2010 BCCA 239, 7 B.C.L.R. (5th) 227, 319 D.L.R. (4th) 219, [2010] B.C.J. No. 891 (QL), 2010 CarswellBC 1210, setting aside a decision of Greyell J., 2009 BCSC 1079, [2009] B.C.J. No. 1597 (QL), 2009 CarswellBC 2096, and from a subsequent judgment of the British Columbia Court of Appeal (Kirkpatrick, Neilson and Bennett JJ.A.), 2012 BCCA 329, 36 B.C.L.R. (5th) 71, 326 B.C.A.C. 114, 554 W.A.C. 114, 2 B.L.R. (5th) 1, [2012] B.C.J. No. 1631 (QL), 2012 CarswellBC 2327, setting aside a decision of Armstrong J., 2011 BCSC 597, 84 B.L.R. (4th) 102, [2011] B.C.J. No. 861 (QL), 2011 CarswellBC 1124. Appeal allowed.

*Michael A. Feder* and *Tammy Shoranick*, for the appellant.

*Darrell W. Roberts*, *Q.C.*, and *David Mitchell*, for the respondent.

2014 SCC 53 (CanLII)

*Jonathan Eades* and *Micah Weintraub*, for the intervener the Attorney General of British Columbia.

*David Wotherspoon* and *Gavin R. Cameron*, for the intervener the BCICAC Foundation.

The judgment of the Court was delivered by

ROTHSTEIN J. —

# TABLE OF CONTENTS

I.    Facts

II.   Arbitral Award

III.  Judicial History

A.    *British Columbia Supreme Court — Leave to Appeal Decision, 2009 BCSC 1079*

B.    *British Columbia Court of Appeal — Leave to Appeal Decision, 2010 BCCA 239*

C.    *British Columbia Supreme Court — Appeal Decision, 2011 BCSC 597*

D.    *British Columbia Court of Appeal — Appeal Decision, 2012 BCCA 329*

IV.   Issues

V.    Analysis

A.    *The Leave Issue Is Properly Before This Court*

B.    *The CA Leave Court Erred in Granting Leave Under Section 31(2) of the AA*

      (1)   Considerations Relevant to Granting or Denying Leave to Appeal Under the *AA*

      (2)   The Result Is Important to the Parties

2014 SCC 53 (CanLII)

(3)   The Question Under Appeal Is Not a Question of Law

    (a)   *When Is Contractual Interpretation a Question of Law?*

    (b)   *The Role and Nature of the "Surrounding Circumstances"*

    (c)   *Considering the Surrounding Circumstances Does Not Offend the Parol Evidence Rule*

    (d)   *Application to the Present Case*

(4)   May Prevent a Miscarriage of Justice

    (a)   *Miscarriage of Justice for the Purposes of Section 31(2)(a) of the AA*

    (b)   *Application to the Present Case*

(5)   Residual Discretion to Deny Leave

    (a)   *Considerations in Exercising Residual Discretion in a Section 31(2)(a) Leave Application*

    (b)   *Application to the Present Case*

C.   *Standard of Review Under the AA*

D.   *The Arbitrator Reasonably Construed the Agreement as a Whole*

E.   *Appeal Courts Are Not Bound by Comments on the Merits of the Appeal Made by Leave Courts*

VI.   Conclusion

**APPENDIX I**

Relevant Provisions of the Sattva-Creston Finder's Fee Agreement

**APPENDIX II**

Section 3.3 of TSX Venture Exchange Policy 5.1: Loans, Bonuses, Finder's Fees and Commissions

**APPENDIX III**

*Commercial Arbitration Act*, R.S.B.C. 1996, c. 55 (as it read on January 12, 2007) (now the *Arbitration Act*)

[1]      When is contractual interpretation to be treated as a question of mixed fact and law and when should it be treated as a question of law? How is the balance between reviewability and finality of commercial arbitration awards under the

*Commercial Arbitration Act*, R.S.B.C. 1996, c. 55 (now the *Arbitration Act*, hereinafter the "*AA*"), to be determined? Can findings made by a court granting leave to appeal with respect to the merits of an appeal bind the court that ultimately decides the appeal? These are three of the issues that arise in this appeal.

I.    Facts

[2]       The issues in this case arise out of the obligation of Creston Moly Corporation (formerly Georgia Ventures Inc.) to pay a finder's fee to Sattva Capital Corporation (formerly Sattva Capital Inc.). The parties agree that Sattva is entitled to a finder's fee of US$1.5 million and is entitled to be paid this fee in shares of Creston, cash or a combination thereof. They disagree on which date should be used to price the Creston shares and therefore the number of shares to which Sattva is entitled.

[3]       Mr. Hai Van Le, a principal of Sattva, introduced Creston to the opportunity to acquire a molybdenum mining property in Mexico. On January 12, 2007, the parties entered into an agreement (the "Agreement") that required Creston to pay Sattva a finder's fee in relation to the acquisition of this property. The relevant provisions of the Agreement are set out in Appendix I.

[4]       On January 30, 2007, Creston entered into an agreement to purchase the property for US$30 million. On January 31, 2007, at the request of Creston, trading of Creston's shares on the TSX Venture Exchange ("TSXV") was halted to prevent speculation while Creston completed due diligence in relation to the purchase. On

March 26, 2007, Creston announced it intended to complete the purchase and trading resumed the following day.

[5]        The Agreement provides that Sattva was to be paid a finder's fee equal to the maximum amount that could be paid pursuant to s. 3.3 of Policy 5.1 in the TSXV Policy Manual. Section 3.3 of Policy 5.1 is incorporated by reference into the Agreement at s. 3.1 and is set out in Appendix II of these reasons. The maximum amount pursuant to s. 3.3 of Policy 5.1 in this case is US$1.5 million.

[6]        According to the Agreement, by default, the fee would be paid in Creston shares. The fee would only be paid in cash or a combination of shares and cash if Sattva made such an election. Sattva made no such election and was therefore entitled to be paid the fee in shares. The finder's fee was to be paid no later than five working days after the closing of the transaction purchasing the molybdenum mining property.

[7]        The dispute between the parties concerns which date should be used to determine the price of Creston shares and thus the number of shares to which Sattva is entitled. Sattva argues that the share price is dictated by the Market Price definition at s. 2 of the Agreement, i.e. the price of the shares "as calculated on close of business day before the issuance of the press release announcing the Acquisition". The press release announcing the acquisition was released on March 26, 2007. Prior to the halt in trading on January 31, 2007, the last closing price of Creston shares was $0.15. On this interpretation, Sattva would receive approximately 11,460,000 shares (based on the finder's fee of US$1.5 million).

2014 SCC 53 (CanLII)

2014 SCC 53 (CanLII)

[8]        Creston claims that the Agreement's "maximum amount" proviso means that Sattva cannot receive cash or shares valued at more than US$1.5 million on the date the fee is payable. The shares were payable no later than five days after May 17, 2007, the closing date of the transaction. At that time, the shares were priced at $0.70 per share. This valuation is based on the price an investment banking firm valued Creston at as part of underwriting a private placement of shares on April 17, 2007. On this interpretation, Sattva would receive approximately 2,454,000 shares, some 9 million fewer shares than if the shares were priced at $0.15 per share.

[9]        The parties entered into arbitration pursuant to the *AA*. The arbitrator found in favour of Sattva. Creston sought leave to appeal the arbitrator's decision pursuant to s. 31(2) of the *AA*. Leave was denied by the British Columbia Supreme Court (2009 BCSC 1079 (CanLII) ("SC Leave Court")). Creston successfully appealed this decision and was granted leave to appeal the arbitrator's decision by the British Columbia Court of Appeal (2010 BCCA 239, 7 B.C.L.R. (5th) 227 ("CA Leave Court")).

[10]        The British Columbia Supreme Court judge who heard the merits of the appeal (2011 BCSC 597, 84 B.L.R. (4th) 102 ("SC Appeal Court")) upheld the arbitrator's award. Creston appealed that decision to the British Columbia Court of Appeal (2012 BCCA 329, 36 B.C.L.R. (5th) 71 ("CA Appeal Court")). That court overturned the SC Appeal Court and found in favour of Creston.  Sattva appeals the decisions of the CA Leave Court and CA Appeal Court to this Court.

II.   Arbitral Award

[11]      The arbitrator, Leon Getz, Q.C., found in favour of Sattva, holding that it was entitled to receive its US$1.5 million finder's fee in shares priced at $0.15 per share.

[12]      The arbitrator based his decision on the Market Price definition in the Agreement:

> What, then, was the "Market Price" within the meaning of the Agreement? The relevant press release is that issued on March 26 . . . . Although there was no closing price on March 25 (the shares being on that date halted), the "last closing price" within the meaning of the definition was the $0.15 at which the [Creston] shares closed on January 30, the day before trading was halted "pending news" . . . . This conclusion requires no stretching of the words of the contractual definition; on the contrary, it falls literally within those words. [para. 22]

[13]      Both the Agreement and the finder's fee had to be approved by the TSXV. Creston was responsible for securing this approval. The arbitrator found that it was either an implied or an express term of the Agreement that Creston would use its best efforts to secure the TSXV's approval and that Creston did not apply its best efforts to this end.

[14]      As previously noted, by default, the finder's fee would be paid in shares unless Sattva made an election otherwise.The arbitrator found that Sattva never made such an election. Despite this, Creston represented to the TSXV that the finder's fee

2014 SCC 53 (CanLII)

2014 SCC 53 (CanLII)

was to be paid in cash. The TSXV conditionally approved a finder's fee of US$1.5 million to be paid in cash. Sattva first learned that the fee had been approved as a cash payment in early June 2007. When Sattva raised this matter with Creston, Creston responded by saying that Sattva had the choice of taking the finder's fee in cash or in shares priced at $0.70.

[15]     Sattva maintained that it was entitled to have the finder's fee paid in shares priced at $0.15. Creston asked its lawyer to contact the TSXV to clarify the minimum share price it would approve for payment of the finder's fee. The TSXV confirmed on June 7, 2007 over the phone and August 9, 2007 via email that the minimum share price that could be used to pay the finder's fee was $0.70 per share. The arbitrator found that Creston "consistently misrepresented or at the very least failed to disclose fully the nature of the obligation it had undertaken to Sattva" (para. 56(k)) and "that in the absence of an election otherwise, Sattva is entitled under that Agreement to have that fee paid in shares at $0.15" (para. 56(g)). The arbitrator found that the first time Sattva's position was squarely put before the TSXV was in a letter from Sattva's solicitor on October 9, 2007.

[16]     The arbitrator found that had Creston used its best efforts, the TSXV could have approved the payment of the finder's fee in shares priced at $0.15 and such a decision would have been consistent with its policies. He determined that there was "a substantial probability that [TSXV] approval would have been given" (para. 81). He assessed that probability at 85 percent.

[17]     The arbitrator found that Sattva could have sold its Creston shares after a four-month holding period at between $0.40 and $0.44 per share, netting proceeds of between $4,583,914 and $5,156,934. The arbitrator took the average of those two amounts, which came to $4,870,424, and then assessed damages at 85 percent of that number, which came to $4,139,860, and rounded it to $4,140,000 plus costs.

[18]     After this award was made, Creston made a cash payment of US$1.5 million (or the equivalent in Canadian dollars) to Sattva. The balance of the damages awarded by the arbitrator was placed in the trust account of Sattva's solicitors.

III.  Judicial History

A.  *British Columbia Supreme Court — Leave to Appeal Decision, 2009 BCSC 1079*

[19]     The SC Leave Court denied leave to appeal because it found the question on appeal was not a question of law as required under s. 31 of the *AA*. In the judge's view, the issue was one of mixed fact and law because the arbitrator relied on the "factual matrix" in coming to his conclusion. Specifically, determining how the finder's fee was to be paid involved examining "the TSX's policies concerning the maximum amount of the finder's fee payable, as well as the discretionary powers granted to the Exchange in determining that amount" (para. 35).

[20]     The judge found that even had he found a question of law was at issue he would have exercised his discretion against granting leave because of Creston's

conduct in misrepresenting the status of the finder's fee to the TSXV and Sattva, and "on the principle that one of the objectives of the [*AA*] is to foster and preserve the integrity of the arbitration system" (para. 41).

B.   *British Columbia Court of Appeal — Leave to Appeal Decision, 2010 BCCA 239*

[21]      The CA Leave Court reversed the SC Leave Court and granted Creston's application for leave to appeal the arbitral award. It found the SC Leave Court "err[ed] in failing to find that the arbitrator's failure to address the meaning of s. 3.1 of the Agreement (and in particular the 'maximum amount' provision) raised a question of law" (para. 23). The CA Leave Court decided that the construction of s. 3.1 of the Agreement, and in particular the "maximum amount" proviso, was a question of law because it did not involve reference to the facts of what the TSXV was told or what it decided.

[22]      The CA Leave Court acknowledged that Creston was "less than forthcoming in its dealings with Mr. Le and the [TSXV]" but said that "these facts are not directly relevant to the question of law it advances on the appeal" (para. 27). With respect to the SC leave judge's reference to the preservation of the integrity of the arbitration system, the CA Leave Court said that the parties would have known when they chose to enter arbitration under the *AA* that an appeal on a question of law was possible. Additionally, while the finality of arbitration is an important factor in exercising discretion, when "a question of law arises on a matter of importance and a miscarriage of justice might be perpetrated if an appeal were not available, the

integrity of the process requires, at least in the circumstances of this case, that the right of appeal granted by the legislation also be respected" (para. 29).

C.  *British Columbia Supreme Court — Appeal Decision, 2011 BCSC 597*

[23]      Armstrong J. reviewed the arbitrator's decision on a correctness standard. He dismissed the appeal, holding the arbitrator's interpretation of the Agreement was correct.

[24]      Armstrong J. found that the plain and ordinary meaning of the Agreement required that the US$1.5 million fee be paid in shares priced at $0.15. He did not find the meaning to be absurd simply because the price of the shares at the date the fee became payable had increased in relation to the price determined according to the Market Price definition. He was of the view that changes in the price of shares over time are inevitable, and that the parties, as sophisticated business persons, would have reasonably understood a fluctuation in share price to be a reality when providing for a fee payable in shares. According to Armstrong J., it is indeed because of market fluctuations that it is necessary to choose a specific date to price the shares in advance of payment. He found that this was done by defining "Market Price" in the Agreement, and that the fee remained US$1.5 million in $0.15 shares as determined by the Market Price definition regardless of the price of the shares at the date that the fee was payable.

2014 SCC 53 (CanLII)

[25]     According to Armstrong J., that the price of the shares may be more than the Market Price definition price when they became payable was foreseeable as a "natural consequence of the fee agreement" (para. 62).  He was of the view that the risk was borne by Sattva, since the price of the shares could increase, but it could also decrease such that Sattva would have received shares valued at less than the agreed upon fee of US$1.5 million.

[26]     Armstrong J. held that the arbitrator's interpretation which gave effect to both the Market Price definition and the "maximum amount" proviso should be preferred to Creston's interpretation of the agreement which ignored the Market Price definition.

[27]     In response to Creston's argument that the arbitrator did not consider s. 3.1 of the Agreement which contains the "maximum amount" proviso, Armstrong J. noted that the arbitrator explicitly addressed the "maximum amount" proviso at para. 23 of his decision.

D.  *British Columbia Court of Appeal — Appeal Decision, 2012 BCCA 329*

[28]     The CA Appeal Court allowed Creston's appeal, ordering that the payment of US$1.5 million that had been made by Creston to Sattva on account of the arbitrator's award constituted payment in full of the finder's fee. The court reviewed the arbitrator's decision on a standard of correctness.

2014 SCC 53 (CanLII)

[29]      The CA Appeal Court found that both it and the SC Appeal Court were bound by the findings made by the CA Leave Court. There were two findings that were binding: (1) it would be anomalous if the Agreement allowed Sattva to receive US$1.5 million if it received its fee in cash, but shares valued at approximately $8 million if Sattva took its fee in shares; and (2) the arbitrator ignored this anomaly and did not address s. 3.1 of the Agreement.

[30]      The Court of Appeal found that it was an absurd result to find that Sattva is entitled to an $8 million finder's fee in light of the fact that the "maximum amount" proviso in the Agreement limits the finder's fee to US$1.5 million. The court was of the view that the proviso limiting the fee to US$1.5 million "when paid" should be given paramount effect (para. 47). In its opinion, giving effect to the Market Price definition could not have been the intention of the parties, nor could it have been in accordance with good business sense.

IV. <u>Issues</u>

[31]      The following issues arise in this appeal:

      (a) Is the issue of whether the CA Leave Court erred in granting leave under s. 31(2) of the *AA* properly before this Court?

      (b) Did the CA Leave Court err in granting leave under s. 31(2) of the *AA*?

2014 SCC 53 (CanLII)

2014 SCC 53 (CanLII)

(c) If leave was properly granted, what is the appropriate standard of review to be applied to commercial arbitral decisions made under the *AA*?

(d) Did the arbitrator reasonably construe the Agreement as a whole?

(e) Did the CA Appeal Court err in holding that it was bound by comments regarding the merits of the appeal made by the CA Leave Court?

V.   Analysis

A.   *The Leave Issue Is Properly Before This Court*

[32]      Sattva argues, in part, that the CA Leave Court erred in granting leave to appeal from the arbitrator's decision. In Sattva's view, the CA Leave Court did not identify a question of law, a requirement to obtain leave pursuant to s. 31(2) of the *AA*. Creston argues that this issue is not properly before this Court. Creston makes two arguments in support of this point.

[33]      First, Creston argues that this issue was not advanced in Sattva's application for leave to appeal to this Court. This argument must fail. Unless this

Court places restrictions in the order granting leave, the order granting leave is "at large". Accordingly, appellants may raise issues on appeal that were not set out in the leave application. However, the Court may exercise its discretion to refuse to deal with issues that were not addressed in the courts below, if there is prejudice to the respondent, or if for any other reason the Court considers it appropriate not to deal with a question.

[34]    Here, this Court's order granting leave to appeal from both the CA Leave Court decision and the CA Appeal Court decision contained no restrictions (2013 CanLII 11315). The issue — whether the proposed appeal was on a question of law — was expressly argued before, and was dealt with in the judgments of, the SC Leave Court and the CA Leave Court.  There is no reason Sattva should be precluded from raising this issue on appeal despite the fact it was not mentioned in its application for leave to appeal to this Court.

[35]    Second, Creston argues that the issue of whether the CA Leave Court identified a question of law is not properly before this Court because Sattva did not contest this decision before all of the lower courts. Specifically, Creston states that Sattva did not argue that the question on appeal was one of mixed fact and law before the SC Appeal Court and that it conceded the issue on appeal was a question of law before the CA Appeal Court. This argument must also fail. At the SC Appeal Court, it was not open to Sattva to reargue the question of whether leave should have been granted. The SC Appeal Court was bound by the CA Leave Court's finding that leave

2014 SCC 53 (CanLII)

2014 SCC 53 (CanLII)

should have been granted, including the determination that a question of law had been identified. Accordingly, Sattva could hardly be expected to reargue before the SC Appeal Court a question that had been determined by the CA Leave Court. There is nothing in the *AA* to indicate that Sattva could have appealed the leave decision made by a panel of the Court of Appeal to another panel of the same court. The fact that Sattva did not reargue the issue before the SC Appeal Court or CA Appeal Court does not prevent it from raising the issue before this Court, particularly since Sattva was also granted leave to appeal the CA Leave Court decision by this Court.

[36]      While this Court may decline to grant leave where an issue sought to be argued before it was not argued in the courts appealed from, that is not this case. Here, whether leave from the arbitrator's decision had been sought by Creston on a question of law or a question of mixed fact and law had been argued in the lower leave courts.

[37]      Accordingly, the issue of whether the CA Leave Court erred in finding a question of law for the purposes of granting leave to appeal is properly before this Court.

B.  *The CA Leave Court Erred in Granting Leave Under Section 31(2) of the AA*

  (1)  Considerations Relevant to Granting or Denying Leave to Appeal Under the
       *AA*

[38]      Appeals from commercial arbitration decisions are narrowly circumscribed under the *AA*. Under s. 31(1), appeals are limited to either questions of law where the parties consent to the appeal or to questions of law where the parties do not consent but where leave to appeal is granted. Section 31(2) of the *AA*, reproduced in its entirety in Appendix III, sets out the requirements for leave:

> (2) In an application for leave under subsection (1) (b), the court may grant leave if it determines that
>
> (a)  the importance of the result of the arbitration to the parties justifies the intervention of the court and the determination of the point of law may prevent a miscarriage of justice,
>
> (b)  the point of law is of importance to some class or body of persons of which the applicant is a member, or
>
> (c)  the point of law is of general or public importance.

[39]      The B.C. courts have found that the words "may grant leave" in s. 31(2) of the *AA* give the courts judicial discretion to deny leave even where the statutory requirements have been met (*British Columbia Institute of Technology (Student Assn.) v. British Columbia Institute of Technology*, 2000 BCCA 496, 192 D.L.R. (4th) 122 ("*BCIT*"), at paras. 25-26). Appellate review of an arbitrator's award will only occur where the requirements of s. 31(2) are met and where the leave court does not exercise its residual discretion to nonetheless deny leave.

[40]      Although Creston's application to the SC Leave Court sought leave pursuant to s. 31(2)(a), (b) and (c), it appears the arguments before that court and throughout focused on s. 31(2)(a). The SC Leave Court's decision quotes a lengthy

2014 SCC 53 (CanLII)

passage from *BCIT* that focuses on the requirements of s. 31(2)(a). The SC Leave Court judge noted that both parties conceded the first requirement of s. 31(2)(a): that the issue be of importance to the parties. The CA Leave Court decision expressed concern that denying leave might give rise to a miscarriage of justice — a criterion only found in s. 31(2)(a). Finally, neither the lower courts' leave decisions nor the arguments before this Court reflected arguments about the question of law being important to some class or body of persons of which the applicant is a member (s. 31(2)(b)) or being a point of law of general or public importance (s. 31(2)(c)). Accordingly, the following analysis will focus on s. 31(2)(a).

### (2) The Result Is Important to the Parties

[41]      In order for leave to be granted from a commercial arbitral award, a threshold requirement must be met: leave must be sought on a question of law. However, before dealing with that issue, it will be convenient to quickly address another requirement of s. 31(2)(a) on which the parties agree: whether the importance of the result of the arbitration to the parties justifies the intervention of the court. Justice Saunders explained this criterion in *BCIT* as requiring that the result of the arbitration be "sufficiently important", in terms of principle or money, to the parties to justify the expense and time of court proceedings (para. 27). The parties in this case have agreed that the result of the arbitration is of importance to each of them. In view of the relatively large monetary amount in dispute and in light of the fact that the parties have agreed that the result is important to them, I accept that the

2014 SCC 53 (CanLII)

importance of the result of the arbitration to the parties justifies the intervention of the court. This requirement of s. 31(2)(a) is satisfied.

### (3)   The Question Under Appeal Is Not a Question of Law

#### (a)   *When Is Contractual Interpretation a Question of Law?*

[42]        Under s. 31 of the *AA*, the issue upon which leave is sought must be a question of law. For the purpose of identifying the appropriate standard of review or, as is the case here, determining whether the requirements for leave to appeal are met, reviewing courts are regularly required to determine whether an issue decided at first instance is a question of law, fact, or mixed fact and law.

[43]        Historically, determining the legal rights and obligations of the parties under a written contract was considered a question of law (*King v. Operating Engineers Training Institute of Manitoba Inc.*, 2011 MBCA 80, 270 Man. R. (2d) 63, at para. 20, *per* Steel J.A.; K. Lewison, *The Interpretation of Contracts* (5th ed. 2011 & Supp. 2013), at pp. 173-76; and G. R. Hall, *Canadian Contractual Interpretation Law* (2nd ed. 2012), at pp. 125-26). This rule originated in England at a time when there were frequent civil jury trials and widespread illiteracy. Under those circumstances, the interpretation of written documents had to be considered questions of law because only the judge could be assured to be literate and therefore capable of reading the contract (Hall, at p. 126; and Lewison, at pp. 173-74).

[44]      This historical rationale no longer applies. Nevertheless, courts in the United Kingdom continue to treat the interpretation of a written contract as always being a question of law (*Thorner v. Major*, [2009] UKHL 18, [2009] 3 All E.R. 945, at paras. 58 and 82-83; and Lewison, at pp. 173-77). They do this despite the fact that U.K. courts consider the surrounding circumstances, a concept addressed further below, when interpreting a written contract (*Prenn v. Simmonds*, [1971] 3 All E.R. 237 (H.L.); and *Reardon Smith Line Ltd. v. Hansen-Tangen*, [1976] 3 All E.R. 570 (H.L.)).

[45]      In Canada, there remains some support for the historical approach. See for example *Jiro Enterprises Ltd. v. Spencer*, 2008 ABCA 87 (CanLII), at para. 10; *QK Investments Inc. v. Crocus Investment Fund*, 2008 MBCA 21, 290 D.L.R. (4th) 84, at para. 26; *Dow Chemical Canada Inc. v. Shell Chemicals Canada Ltd.*, 2010 ABCA 126, 25 Alta. L.R. (5th) 221, at paras. 11-12; and *Minister of National Revenue v. Costco Wholesale Canada Ltd.*, 2012 FCA 160, 431 N.R. 78, at para. 34. However, some Canadian courts have abandoned the historical approach and now treat the interpretation of written contracts as an exercise involving either a question of law or a question of mixed fact and law. See for example *WCI Waste Conversion Inc. v. ADI International Inc.*, 2011 PECA 14, 309 Nfld. & P.E.I.R. 1, at para. 11; *269893 Alberta Ltd. v. Otter Bay Developments Ltd.*, 2009 BCCA 37, 266 B.C.A.C. 98, at para. 13; *Hayes Forest Services Ltd. v. Weyerhaeuser Co.*, 2008 BCCA 31, 289 D.L.R. (4th) 230, at para. 44; *Bell Canada v. The Plan Group*, 2009 ONCA 548, 96

O.R. (3d) 81, at paras. 22-23 (majority reasons, *per* Blair J.A.) and paras. 133-35 (*per* Gillese J.A. in dissent, but not on this point); and *King*, at paras. 20-23.

[46]     The shift away from the historical approach in Canada appears to be based on two developments. The first is the adoption of an approach to contractual interpretation which directs courts to have regard for the surrounding circumstances of the contract — often referred to as the factual matrix — when interpreting a written contract (Hall, at pp. 13, 21-25 and 127; and J. D. McCamus, *The Law of Contracts* (2nd ed. 2012), at pp. 749-51). The second is the explanation of the difference between questions of law and questions of mixed fact and law provided in *Canada (Director of Investigation and Research) v. Southam Inc.*, [1997] 1 S.C.R. 748, at para. 35, and *Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 S.C.R. 235, at paras. 26 and 31-36.

[47]     Regarding the first development, the interpretation of contracts has evolved towards a practical, common-sense approach not dominated by technical rules of construction. The overriding concern is to determine "the intent of the parties and the scope of their understanding" (*Jesuit Fathers of Upper Canada v. Guardian Insurance Co. of Canada*, 2006 SCC 21, [2006] 1 S.C.R. 744, at para. 27 *per* LeBel J.; see also *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, 2010 SCC 4, [2010] 1 S.C.R. 69, at paras. 64-65 *per* Cromwell J.). To do so, a decision-maker must read the contract as a whole, giving the words used their ordinary and grammatical meaning, consistent with the surrounding circumstances

known to the parties at the time of formation of the contract. Consideration of the surrounding circumstances recognizes that ascertaining contractual intention can be difficult when looking at words on their own, because words alone do not have an immutable or absolute meaning:

> No contracts are made in a vacuum: there is always a setting in which they have to be placed. . . . In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

> (*Reardon Smith Line*, at p. 574, *per* Lord Wilberforce)

[48]    The meaning of words is often derived from a number of contextual factors, including the purpose of the agreement and the nature of the relationship created by the agreement (see *Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71, 173 Man. R. (2d) 300, at para. 15, *per* Hamilton J.A.; see also Hall, at p. 22; and McCamus, at pp. 749-50). As stated by Lord Hoffmann in *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 All E.R. 98 (H.L.):

> The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. [p. 115]

[49]      As to the second development, the historical approach to contractual interpretation does not fit well with the definition of a pure question of law identified in *Housen* and *Southam*. Questions of law "are questions about what the correct legal test is" (*Southam*, at para. 35). Yet in contractual interpretation, the goal of the exercise is to ascertain the objective intent of the parties — a fact-specific goal — through the application of legal principles of interpretation. This appears closer to a question of mixed fact and law, defined in *Housen* as "applying a legal standard to a set of facts" (para. 26; see also *Southam*, at para. 35). However, some courts have questioned whether this definition, which was developed in the context of a negligence action, can be readily applied to questions of contractual interpretation, and suggest that contractual interpretation is primarily a legal affair (see for example *Bell Canada*, at para. 25).

[50]      With respect for the contrary view, I am of the opinion that the historical approach should be abandoned. Contractual interpretation involves issues of mixed fact and law as it is an exercise in which the principles of contractual interpretation are applied to the words of the written contract, considered in light of the factual matrix.

[51]      The purpose of the distinction between questions of law and those of mixed fact and law further supports this conclusion. One central purpose of drawing a distinction between questions of law and those of mixed fact and law is to limit the intervention of appellate courts to cases where the results can be expected to have an

2014 SCC 53 (CanLII)

2014 SCC 53 (CanLII)

impact beyond the parties to the particular dispute. It reflects the role of courts of appeal in ensuring the consistency of the law, rather than in providing a new forum for parties to continue their private litigation. For this reason, *Southam* identified the degree of generality (or "precedential value") as the key difference between a question of law and a question of mixed fact and law. The more narrow the rule, the less useful will be the intervention of the court of appeal:

> If a court were to decide that driving at a certain speed on a certain road under certain conditions was negligent, its decision would not have any great value as a precedent.  In short, as the level of generality of the challenged proposition approaches utter particularity, the matter approaches pure application, and hence draws nigh to being an unqualified question of mixed law and fact.  See R. P. Kerans, *Standards of Review Employed by Appellate Courts* (1994), at pp. 103-108.  Of course, it is not easy to say precisely where the line should be drawn; though in most cases it should be sufficiently clear whether the dispute is over a general proposition that might qualify as a principle of law or over a very particular set of circumstances that is not apt to be of much interest to judges and lawyers in the future. [para. 37]

[52]      Similarly, this Court in *Housen* found that deference to fact-finders promoted the goals of limiting the number, length, and cost of appeals, and of promoting the autonomy and integrity of trial proceedings (paras. 16-17). These principles also weigh in favour of deference to first instance decision-makers on points of contractual interpretation. The legal obligations arising from a contract are, in most cases, limited to the interest of the particular parties. Given that our legal system leaves broad scope to tribunals of first instance to resolve issues of limited application, this supports treating contractual interpretation as a question of mixed fact and law.

[53]        Nonetheless, it may be possible to identify an extricable question of law from within what was initially characterized as a question of mixed fact and law (*Housen*, at paras. 31 and 34-35).   Legal errors made in the course of contractual interpretation include "the application of an incorrect principle, the failure to consider a required element of a legal test, or the failure to consider a relevant factor" (*King*, at para. 21).  Moreover, there is no question that many other issues in contract law do engage substantive rules of law: the requirements for the formation of the contract, the capacity of the parties, the requirement that certain contracts be evidenced in writing, and so on.

[54]        However, courts should be cautious in identifying extricable questions of law in disputes over contractual interpretation. Given the statutory requirement to identify a question of law in a leave application pursuant to s. 31(2) of the *AA*, the applicant for leave and its counsel will seek to frame any alleged errors as questions of law. The legislature has sought to restrict such appeals, however, and courts must be careful to ensure that the proposed ground of appeal has been properly characterized. The warning expressed in *Housen* to exercise caution in attempting to extricate a question of law is relevant here:

>      Appellate courts must be cautious, however, in finding that a trial judge erred in law in his or her determination of negligence, as it is often difficult to extricate the legal questions from the factual. It is for this reason that these matters are referred to as questions of "mixed law and fact". Where the legal principle is not readily extricable, then the matter is one of "mixed law and fact" . . . . [para. 36]

2014 SCC 53 (CanLII)

[55]       Although that caution was expressed in the context of a negligence case, it applies, in my opinion, to contractual interpretation as well. As mentioned above, the goal of contractual interpretation, to ascertain the objective intentions of the parties, is inherently fact specific. The close relationship between the selection and application of principles of contractual interpretation and the construction ultimately given to the instrument means that the circumstances in which a question of law can be extricated from the interpretation process will be rare. In the absence of a legal error of the type described above, no appeal lies under the *AA* from an arbitrator's interpretation of a contract.

(b)   *The Role and Nature of the "Surrounding Circumstances"*

[56]       I now turn to the role of the surrounding circumstances in contractual interpretation and the nature of the evidence that can be considered. The discussion here is limited to the common law approach to contractual interpretation; it does not seek to apply to or alter the law of contractual interpretation governed by the *Civil Code of Québec*.

[57]       While the surrounding circumstances will be considered in interpreting the terms of a contract, they must never be allowed to overwhelm the words of that agreement (*Hayes Forest Services*, at para. 14; and Hall, at p. 30). The goal of examining such evidence is to deepen a decision-maker's understanding of the mutual and objective intentions of the parties as expressed in the words of the contract. The interpretation of a written contractual provision must always be grounded in the text

and read in light of the entire contract (Hall, at pp. 15 and 30-32). While the surrounding circumstances are relied upon in the interpretive process, courts cannot use them to deviate from the text such that the court effectively creates a new agreement (*Glaswegian Enterprises Inc. v. B.C. Tel Mobility Cellular Inc.* (1997), 101 B.C.A.C. 62).

[58]      The nature of the evidence that can be relied upon under the rubric of "surrounding circumstances" will necessarily vary from case to case.   It does, however, have its limits. It should consist only of objective evidence of the background facts at the time of the execution of the contract (*King*, at paras. 66 and 70), that is, knowledge that was or reasonably ought to have been within the knowledge of both parties at or before the date of contracting. Subject to these requirements and the parol evidence rule discussed below, this includes, in the words of Lord Hoffmann, "absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man" (*Investors Compensation Scheme*, at p. 114). Whether something was or reasonably ought to have been within the common knowledge of the parties at the time of execution of the contract is a question of fact.

  (c)  *Considering the Surrounding Circumstances Does Not Offend the Parol Evidence Rule*

[59]      It is necessary to say a word about consideration of the surrounding circumstances and the parol evidence rule.    The parol evidence rule precludes

2014 SCC 53 (CanLII)

admission of evidence outside the words of the written contract that would add to, subtract from, vary, or contradict a contract that has been wholly reduced to writing (*King*, at para. 35; and Hall, at p. 53). To this end, the rule precludes, among other things, evidence of the subjective intentions of the parties (Hall, at pp. 64-65; and *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129, at paras. 54-59, *per* Iacobucci J.). The purpose of the parol evidence rule is primarily to achieve finality and certainty in contractual obligations, and secondarily to hamper a party's ability to use fabricated or unreliable evidence to attack a written contract (*United Brotherhood of Carpenters and Joiners of America, Local 579 v. Bradco Construction Ltd.*, [1993] 2 S.C.R. 316, at pp. 341-42, *per* Sopinka J.).

[60]      The parol evidence rule does not apply to preclude evidence of the surrounding circumstances. Such evidence is consistent with the objectives of finality and certainty because it is used as an interpretive aid for determining the meaning of the written words chosen by the parties, not to change or overrule the meaning of those words. The surrounding circumstances are facts known or facts that reasonably ought to have been known to both parties at or before the date of contracting; therefore, the concern of unreliability does not arise.

[61]      Some authorities and commentators suggest that the parol evidence rule is an anachronism, or, at the very least, of limited application in view of the myriad of exceptions to it (see for example *Gutierrez v. Tropic International Ltd.* (2002), 63 O.R. (3d) 63 (C.A.), at paras. 19-20; and Hall, at pp. 53-64). For the purposes of this

appeal, it is sufficient to say that the parol evidence rule does not apply to preclude evidence of surrounding circumstances when interpreting the words of a written contract.

### (d)  *Application to the Present Case*

[62]      In this case, the CA Leave Court granted leave on the following issue: "Whether the Arbitrator erred in law in failing to construe the whole of the Finder's Fee Agreement . . ." (A.R., vol. 1, at p. 62).

[63]      As will be explained below, while the requirement to construe a contract as a whole is a question of law that could — if extricable — satisfy the threshold requirement under s. 31 of the *AA*, I do not think this question was properly extricated in this case.

[64]      I accept that a fundamental principle of contractual interpretation is that a contract must be construed as a whole (McCamus, at pp. 761-62; and Hall, at p. 15). If the arbitrator did not take the "maximum amount" proviso into account, as alleged by Creston, then he did not construe the Agreement as a whole because he ignored a specific and relevant provision of the Agreement. This is a question of law that would be extricable from a finding of mixed fact and law.

[65]      However, it appears that the arbitrator did consider the "maximum amount" proviso. Indeed, the CA Leave Court acknowledges that the arbitrator had

considered that proviso, since it notes that he turned his mind to the US$1.5 million maximum amount, an amount that can only be calculated by referring to the TSXV policy referenced in the "maximum amount" proviso in s. 3.1 of the Agreement. As I read its reasons, rather than being concerned with whether the arbitrator ignored the maximum amount proviso, which is what Creston alleges in this Court, the CA Leave Court decision focused on how the arbitrator construed s. 3.1 of the Agreement, which included the maximum amount proviso (paras. 25-26). For example, the CA Leave Court expressed concern that the arbitrator did not address the "incongruity" in the fact that the value of the fee would vary "hugely" depending on whether it was taken in cash or shares (para. 25).

[66]     With respect, the CA Leave Court erred in finding that the construction of s. 3.1 of the Agreement constituted a question of law. As explained by Justice Armstrong in the SC Appeal Court decision, construing s. 3.1 and taking account of the proviso required relying on the relevant surrounding circumstances, including the sophistication of the parties, the fluctuation in share prices, and the nature of the risk a party assumes when deciding to accept a fee in shares as opposed to cash. Such an exercise raises a question of mixed fact and law. There being no question of law extricable from the mixed fact and law question of how s. 3.1 and the proviso should be interpreted, the CA Leave Court erred in granting leave to appeal.

[67]     The conclusion that Creston's application for leave to appeal raised no question of law would be sufficient to dispose of this appeal. However, as this Court

rarely has the opportunity to address appeals of arbitral awards, it is, in my view, useful to explain that, even had the CA Leave Court been correct in finding that construction of s. 3.1 of the Agreement constituted a question of law, it should have nonetheless denied leave to appeal as the application also failed the miscarriage of justice and residual discretion stages of the leave analysis set out in s. 31(2)(a) of the *AA*.

### (4)  May Prevent a Miscarriage of Justice

#### (a)  *Miscarriage of Justice for the Purposes of Section 31(2)(a) of the AA*

[68]      Once a question of law has been identified, the court must be satisfied that the determination of that point of law on appeal "may prevent a miscarriage of justice" in order for it to grant leave to appeal pursuant to s. 31(2)(a) of the *AA*. The first step in this analysis is defining miscarriage of justice for the purposes of s. 31(2)(a).

[69]      In *BCIT*, Justice Saunders discussed the miscarriage of justice requirement under s. 31(2)(a). She affirmed the definition set out in *Domtar Inc. v. Belkin Inc.* (1989), 39 B.C.L.R. (2d) 257 (C.A.), which required the error of law in question to be a material issue that, if decided differently, would lead to a different result: ". . . if the point of law were decided differently, the arbitrator would have been led to a different result. In other words, was the alleged error of law material to the decision; does it go to its heart?" (*BCIT*, at para. 28). See also *Quan v. Cusson*,

2014 SCC 53 (CanLII)

2009 SCC 62, [2009] 3 S.C.R. 712, which discusses the test of whether "some substantial wrong or miscarriage of justice has occurred" in the context of a civil jury trial (para. 43).

[70]      Having regard to *BCIT* and *Quan*, I am of the opinion that in order to rise to the level of a miscarriage of justice for the purposes of s. 31(2)(a) of the *AA*, an alleged legal error must pertain to a material issue in the dispute which, if decided differently, would affect the result of the case.

[71]      According to this standard, a determination of a point of law "may prevent a miscarriage of justice" only where the appeal itself has some possibility of succeeding. An appeal with no chance of success will not meet the threshold of "may prevent a miscarriage of justice" because there would be no chance that the outcome of the appeal would cause a change in the final result of the case.

[72]      At the leave stage, it is not appropriate to consider the full merits of a case and make a final determination regarding whether an error of law was made. However, some preliminary consideration of the question of law is necessary to determine whether the appeal has the potential to succeed and thus to change the result in the case.

[73]      *BCIT* sets the threshold for this preliminary assessment of the appeal as "more than an arguable point" (para. 30).   With respect, once an arguable point has been made out, it is not apparent what more is required to meet the "more than an

2014 SCC 53 (CanLII)

arguable point" standard. Presumably, the leave judge would have to delve more deeply into the arguments around the question of law on appeal than would be appropriate at the leave stage to find *more* than an arguable point. Requiring this closer examination of the point of law, in my respectful view, blurs the line between the function of the court considering the leave application and the court hearing the appeal.

[74]    In my opinion, the appropriate threshold for assessing the legal question at issue under s. 31(2) is whether it has arguable merit. The arguable merit standard is often used to assess, on a preliminary basis, the merits of an appeal at the leave stage (see for example *Quick Auto Lease Inc. v. Nordin*, 2014 MBCA 32, 303 Man. R. (2d) 262, at para. 5; and *R. v. Fedossenko*, 2013 ABCA 164 (CanLII), at para. 7). "Arguable merit" is a well-known phrase whose meaning has been expressed in a variety of ways: "a reasonable prospect of success" (*Quick Auto Lease*, at para. 5; and *Enns v. Hansey*, 2013 MBCA 23 (CanLII), at para. 2); "some hope of success" and "sufficient merit" (*R. v. Hubley*, 2009 PECA 21, 289 Nfld. & P.E.I.R. 174, at para. 11); and "credible argument" (*R. v. Will*, 2013 SKCA 4, 405 Sask. R. 270, at para. 8). In my view, the common thread among the various expressions used to describe arguable merit is that the issue raised by the applicant cannot be dismissed through a preliminary examination of the question of law. In order to decide whether the award should be set aside, a more thorough examination is necessary and that examination is appropriately conducted by the court hearing the appeal once leave is granted.

[75]        Assessing whether the issue raised by an application for leave to appeal has arguable merit must be done in light of the standard of review on which the merits of the appeal will be judged. This requires a preliminary assessment of the applicable standard of review. As I will later explain, reasonableness will almost always apply to commercial arbitrations conducted pursuant to the *AA*, except in the rare circumstances where the question is one that would attract a correctness standard, such as a constitutional question or a question of law of central importance to the legal system as a whole and outside the adjudicator's expertise. Therefore, the leave inquiry will ordinarily ask whether there is any arguable merit to the position that the arbitrator's decision on the question at issue is unreasonable, keeping in mind that the decision-maker is not required to refer to all the arguments, provisions or jurisprudence or to make specific findings on each constituent element, for the decision to be reasonable (*Newfoundland and Labrador Nurses' Union v. Newfoundland and Labrador (Treasury Board)*, 2011 SCC 62, [2011] 3 S.C.R. 708, at para. 16). Of course, the leave court's assessment of the standard of review is only preliminary and does not bind the court which considers the merits of the appeal. As such, this should not be taken as an invitation to engage in extensive arguments or analysis about the standard of review at the leave stage.

[76]        In *BCIT*, Saunders J.A. considered the stage of s. 31(2)(a) of the *AA* at which an examination of the merits of the appeal should occur. At the behest of one of the parties, she considered examining the merits under the miscarriage of justice criterion. However, she decided that a consideration of the merits was best done at the

residual discretion stage. Her reasons indicate that this decision was motivated by the desire to take a consistent approach across s. 31(2)(a), (b) and (c):

> Where, then, if anywhere, does consideration of the merits of the appeal belong? Mr. Roberts for the Student Association contends that any consideration of the merits of the appeal belongs in the determination of whether a miscarriage of justice may occur; that is, under the second criterion. I do not agree. In my view, the apparent merit or lack of merit of an appeal is part of the exercise of the residual discretion, and applies equally to all three subsections, (*a*) through (*c*). Just as an appeal woefully lacking in merit should not attract leave under (*b*) (of importance to a class of people including the applicant) or (*c*) (of general or public importance), so too it should not attract leave under (*a*). Consideration of the merits, for consistency in the section as a whole, should be made as part of the exercise of residual discretion. [para. 29]

[77]      I acknowledge the consistency rationale. However, in my respectful opinion, the desire for a consistent approach to s. 31(2)(a), (b) and (c) cannot override the text of the legislation. Unlike s. 31(2)(b) and (c), s. 31(2)(a) requires an assessment to determine whether allowing leave to appeal "may prevent a miscarriage of justice". It is my opinion that a preliminary assessment of the question of law is an implicit component in a determination of whether allowing leave "may prevent a miscarriage of justice".

[78]      However, in an application for leave to appeal pursuant to s. 31(2)(b) or (c), neither of which contain a miscarriage of justice requirement, I agree with Justice Saunders in *BCIT* that a preliminary examination of the merits of the question of law should be assessed at the residual discretion stage of the analysis as considering the

merits of the proposed appeal will always be relevant when deciding whether to grant leave to appeal under s. 31.

[79]      In sum, in order to establish that "the intervention of the court and the determination of the point of law may prevent a miscarriage of justice" for the purposes of s. 31(2)(a) of the *AA*, an applicant must demonstrate that the point of law on appeal is material to the final result and has arguable merit.

(b)  *Application to the Present Case*

[80]      The CA Leave Court found that the arbitrator may have erred in law by not interpreting the Agreement as a whole, specifically in ignoring the "maximum amount" proviso. Accepting that this is a question of law for these purposes only, a determination of the question would be material because it could change the ultimate result arrived at by the arbitrator. The arbitrator awarded $4.14 million in damages on the basis that there was an 85 percent chance the TSXV would approve a finder's fee paid in $0.15 shares. If Creston's argument is correct and the $0.15 share price is foreclosed by the "maximum amount" proviso, damages would be reduced to US$1.5 million, a significant reduction from the arbitrator's award of damages.

[81]      As s. 31(2)(a) of the *AA* is the relevant provision in this case, a preliminary assessment of the question of law will be conducted in order to determine if a miscarriage of justice could have occurred had Creston been denied leave to appeal. Creston argues that the fact that the arbitrator's conclusion results in Sattva

2014 SCC 53 (CanLII)

receiving shares valued at considerably more than the US$1.5 million maximum dictated by the "maximum amount" proviso is evidence of the arbitrator's failure to consider that proviso.

[82]      However, the arbitrator did refer to s. 3.1, the "maximum amount" proviso, at two points in his decision: paras. 18 and 23(a). For example, at para. 23 he stated:

>        In summary, then, as of March 27, 2007 it was clear and beyond argument that under the Agreement:
>
> (a)  Sattva was entitled to a fee equal to the maximum amount payable pursuant to the rules and policies of the TSX Venture Exchange – section 3.1. It is common ground that the quantum of this fee is US$1,500,000.
>
> (b)  The fee was payable in shares based on the Market Price, as defined in the Agreement, unless Sattva elected to take it in cash or a combination of cash and shares.
>
> (c)  The Market Price, as defined in the Agreement, was $0.15.
>      [Emphasis added.]

[83]      Although the arbitrator provided no express indication that he considered how the "maximum amount" proviso interacted with the Market Price definition, such consideration is implicit in his decision. The only place in the contract that specifies that the amount of the fee is calculated as US$1.5 million is the "maximum amount" proviso's reference to s. 3.3 of the TSXV Policy 5.1. The arbitrator acknowledged that the quantum of the fee is US$1.5 million and awarded Sattva US$1.5 million in shares priced at $0.15. Contrary to Creston's argument that the arbitrator failed to

consider the proviso in construing the Agreement, it is apparent on a preliminary examination of the question that the arbitrator did in fact consider the "maximum amount" proviso.

[84]    Accordingly, even had the CA Leave Court properly identified a question of law, leave to appeal should have been denied. The requirement that there be arguable merit that the arbitrator's decision was unreasonable is not met and the miscarriage of justice threshold was not satisfied.

(5)  Residual Discretion to Deny Leave

(a)  *Considerations in Exercising Residual Discretion in a Section 31(2)(a) Leave Application*

[85]    The B.C. courts have found that the words "may grant leave" in s. 31(2) of the *AA* confer on the court residual discretion to deny leave even where the requirements of s. 31(2) are met (*BCIT*, at paras. 9 and 26). In *BCIT*, Saunders J.A. sets out a non-exhaustive list of considerations that would be applicable to the exercise of discretion (para. 31):

1.  "the apparent merits of the appeal";

2.  "the degree of significance of the issue to the parties, to third parties and to the community at large";

3.  "the circumstances surrounding the dispute and adjudication including the urgency of a final answer";

4.  "other temporal considerations including the opportunity for either party to address the result through other avenues";

5.  "the conduct of the parties";

6.  "the stage of the process at which the appealed decision was made";

7.  "respect for the forum of arbitration, chosen by the parties as their means of resolving disputes"; and

8.  "recognition that arbitration is often intended to provide a speedy and final dispute mechanism, tailor-made for the issues which may face the parties to the arbitration agreement".

[86]      I agree with Justice Saunders that it is not appropriate to create what she refers to as an "immutable checklist" of factors to consider in exercising discretion under s. 31(2) (*BCIT*, at para. 32). However, I am unable to agree that all the listed considerations are applicable at this stage of the analysis.

[87]     In exercising its statutorily conferred discretion to deny leave to appeal pursuant to s. 31(2)(a), a court should have regard to the traditional bases for refusing discretionary relief: the parties' conduct, the existence of alternative remedies, and any undue delay (*Immeubles Port Louis Ltée v. Lafontaine (Village)*, [1991] 1 S.C.R. 326, at pp. 364-67). Balance of convenience considerations are also involved in determining whether to deny discretionary relief (*MiningWatch Canada v. Canada (Fisheries and Oceans)*, 2010 SCC 2, [2010] 1 S.C.R. 6, at para. 52). This would include the urgent need for a final answer.

[88]     With respect to the other listed considerations and addressed in turn below, it is my opinion that they have already been considered elsewhere in the s. 31(2)(a) analysis or are more appropriately considered elsewhere under s. 31(2). Once considered, these matters should not be assessed again under the court's residual discretion.

[89]     As discussed above, in s. 31(2)(a), a preliminary assessment of the merits of the question of law at issue in the leave application is to be considered in determining the miscarriage of justice question. The degree of significance of the issue to the parties is covered by the "importance of the result of the arbitration to the parties" criterion in s. 31(2)(a). The degree of significance of the issue to third parties and to the community at large should not be considered under s. 31(2)(a) as the *AA* sets these out as separate grounds for granting leave to appeal under s. 31(2)(b) and (c). Furthermore, respect for the forum of arbitration chosen by the parties is a

consideration that animates the legislation itself and can be seen in the high threshold to obtain leave under s. 31(2)(a). Recognition that arbitration is often chosen as a means to obtain a fast and final resolution tailor-made for the issues is already reflected in the urgent need for a final answer.

[90]     As for the stage of the process at which the decision sought to be appealed was made, it is not a consideration relevant to the exercise of the court's residual discretion to deny leave under s. 31(2)(a). This factor seeks to address the concern that granting leave to appeal an interlocutory decision may be premature and result in unnecessary fragmentation and delay of the legal process (D. J. M. Brown and J. M. Evans, with the assistance of C. E. Deacon, *Judicial Review of Administrative Action in Canada* (loose-leaf), at pp. 3-67 to 3-76). However, any such concern will have been previously addressed by the leave court in its analysis of whether a miscarriage of justice may arise; more specifically, whether the interlocutory issue has the potential to affect the final result. As such, the above-mentioned concerns should not be considered anew.

[91]     In sum, a non-exhaustive list of discretionary factors to consider in a leave application under s. 31(2)(a) of the *AA* would include:

- conduct of the parties;

- existence of alternative remedies;

- undue delay; and

- the urgent need for a final answer.

[92]    These considerations could, where applicable, be a sound basis for declining leave to appeal an arbitral award even where the statutory criteria of s. 31(2)(a) have been met. However, courts should exercise such discretion with caution. Having found an error of law and, at least with respect to s. 31(2)(a), a potential miscarriage of justice, these discretionary factors must be weighed carefully before an otherwise eligible appeal is rejected on discretionary grounds.

(b)  *Application to the Present Case*

[93]    The SC Leave Court judge denied leave on the basis that there was no question of law. Even had he found a question of law, the SC Leave Court judge stated that he would have exercised his residual discretion to deny leave for two reasons: first, because of Creston's conduct in misrepresenting the status of the finder's fee issue to the TSXV and Sattva; and second, "on the principle that one of the objectives of the [*AA*] is to foster and preserve the integrity of the arbitration system" (para. 41). The CA Leave Court overruled the SC Leave Court on both of these discretionary grounds.

[94]    For the reasons discussed above, fostering and preserving the integrity of the arbitral system should not be a discrete discretionary consideration under s. 31(2)(a). While the scheme of s. 31(2) recognizes this objective, the exercise of

2014 SCC 53 (CanLII)

discretion must pertain to the facts and circumstances of a particular case. This general objective is not a discretionary matter for the purposes of denying leave.

[95]    However, conduct of the parties is a valid consideration in the exercise of the court's residual discretion under s. 31(2)(a). A discretionary decision to deny leave is to be reviewed with deference by an appellate court. A discretionary decision should not be interfered with merely because an appellate court would have exercised the discretion differently (*R. v. Bellusci*, 2012 SCC 44, [2012] 2 S.C.R. 509, at paras. 18 and 30). An appellate court is only justified in interfering with a lower court judge's exercise of discretion if that judge misdirected himself or if his decision is so clearly wrong as to amount to an injustice (*R. v. Bjelland*, 2009 SCC 38, [2009] 2 S.C.R. 651, at para. 15; and *R. v. Regan*, 2002 SCC 12, [2002] 1 S.C.R. 297, at para. 117).

[96]    Here, the SC Leave Court relied upon a well-accepted consideration in deciding to deny discretionary relief: the misconduct of Creston. The CA Leave Court overturned this decision on the grounds that Creston's conduct was "not directly relevant to the question of law" advanced on appeal (at para. 27).

[97]    The CA Leave Court did not explain why misconduct need be directly relevant to a question of law for the purpose of denying leave. I see nothing in s. 31(2) of the *AA* that would limit a leave judge's exercise of discretion in the manner suggested by the CA Leave Court. My reading of the jurisprudence does not support

the view that misconduct must be directly relevant to the question to be decided by the court.

[98]      In *Homex Realty and Development Co. v. Corporation of the Village of Wyoming*, [1980] 2 S.C.R. 1011, at pp. 1037-38, misconduct by a party not directly relevant to the question at issue before the court resulted in denial of a remedy. The litigation in *Homex* arose out of a disagreement regarding whether the purchaser of lots in a subdivision, Homex, had assumed the obligations of the vendor under a subdivision agreement to provide "all the requirements, financial and otherwise" for the installation of municipal services on a parcel of land that had been subdivided (pp. 1015-16). This Court determined that Homex had not been accorded procedural fairness when the municipality passed a by-law related to the dispute (p. 1032). Nevertheless, discretionary relief to quash the by-law was denied because, among other things, Homex had sought "throughout all these proceedings to avoid the burden associated with the subdivision of the lands" that it owned (p. 1037), even though the Court held that Homex knew this obligation was its responsibility (pp. 1017-19). This conduct was related to the dispute that gave rise to the litigation, but not to the question of whether the by-law was enacted in a procedurally fair manner. Accordingly, I read *Homex* as authority for the proposition that misconduct related to the dispute that gave rise to the proceedings may justify the exercise of discretion to refuse the relief sought, in this case refusing to grant leave to appeal.

2014 SCC 53 (CanLII)

[99]      Here, the arbitrator found as a fact that Creston misled the TSXV and Sattva regarding "the nature of the obligation it had undertaken to Sattva by representing that the finder's fee was payable in cash" (para. 56(k)). While this conduct is not tied to the question of law found by the CA Leave Court, it is tied to the arbitration proceeding convened to determine which share price should be used to pay Sattva's finder's fee. The SC Leave Court was entitled to rely upon such conduct as a basis for denying leave pursuant to its residual discretion.

[100]      In the result, in my respectful opinion, even if the CA Leave Court had identified a question of law and the miscarriage of justice test had been met, it should have upheld the SC Leave Court's denial of leave to appeal in deference to that court's exercise of judicial discretion.

[101]      Although the CA Leave Court erred in granting leave, these protracted proceedings have nonetheless now reached this Court. In light of the fact that the true concern between the parties is the merits of the appeal — that is how much the Agreement requires Creston to pay Sattva — and that the courts below differed significantly in their interpretation of the Agreement, it would be unsatisfactory not to address the very dispute that has given rise to these proceedings. I will therefore proceed to consider the three remaining questions on appeal as if leave to appeal had been properly granted.

C.   *Standard of Review Under the AA*

2014 SCC 53 (CanLII)

[102]      I now turn to consideration of the decisions of the appeal courts. It is first necessary to determine the standard of review of the arbitrator's decision in respect of the question on which the CA Leave Court granted leave: whether the arbitrator construed the finder's fee provision in light of the Agreement as a whole, particularly, whether the finder's fee provision was interpreted having regard for the "maximum amount" proviso.

[103]      At the outset, it is important to note that the *Administrative Tribunals Act*, S.B.C. 2004, c. 45, which sets out standards of review of the decisions of many statutory tribunals in British Columbia (see ss. 58 and 59), does not apply in the case of arbitrations under the *AA*.

[104]      Appellate review of commercial arbitration awards takes place under a tightly defined regime specifically tailored to the objectives of commercial arbitrations and is different from judicial review of a decision of a statutory tribunal. For example, for the most part, parties engage in arbitration by mutual choice, not by way of a statutory process. Additionally, unlike statutory tribunals, the parties to the arbitration select the number and identity of the arbitrators. These differences mean that the judicial review framework developed in *Dunsmuir v. New Brunswick*, 2008 SCC 9, [2008] 1 S.C.R. 190, and the cases that followed it is not entirely applicable to the commercial arbitration context. For example, the *AA* forbids review of an arbitrator's factual findings. In the context of commercial arbitration, such a provision is absolute. Under the *Dunsmuir* judicial review framework, a privative clause does

2014 SCC 53 (CanLII)

not prevent a court from reviewing a decision, it simply signals deference (*Dunsmuir*, at para. 31).

[105]       Nevertheless, judicial review of administrative tribunal decisions and appeals of arbitration awards are analogous in some respects. Both involve a court reviewing the decision of a non-judicial decision-maker. Additionally, as expertise is a factor in judicial review, it is a factor in commercial arbitrations: where parties choose their own decision-maker, it may be presumed that such decision-makers are chosen either based on their expertise in the area which is the subject of dispute or are otherwise qualified in a manner that is acceptable to the parties. For these reasons, aspects of the *Dunsmuir* framework are helpful in determining the appropriate standard of review to apply in the case of commercial arbitration awards.

[106]       *Dunsmuir* and the post-*Dunsmuir* jurisprudence confirm that it will often be possible to determine the standard of review by focusing on the nature of the question at issue (see for example *Alberta (Information and Privacy Commissioner) v. Alberta Teachers' Association*, 2011 SCC 61, [2011] 3 S.C.R. 654, at para. 44). In the context of commercial arbitration, where appeals are restricted to questions of law, the standard of review will be reasonableness unless the question is one that would attract the correctness standard, such as constitutional questions or questions of law of central importance to the legal system as a whole and outside the adjudicator's expertise (*Alberta Teachers' Association*, at para. 30). The question at issue here, whether the arbitrator interpreted the Agreement as a whole, does not fall into one of

2014 SCC 53 (CanLII)

those categories. The relevant portions of the *Dunsmuir* analysis point to a standard of review of reasonableness in this case.

D.   *The Arbitrator Reasonably Construed the Agreement as a Whole*

[107]     For largely the reasons outlined by Justice Armstrong in paras. 57-75 of the SC Appeal Court decision, in my respectful opinion, in determining that Sattva is entitled to be paid its finder's fee in shares priced at $0.15 per share, the arbitrator reasonably construed the Agreement as a whole. Although Justice Armstrong conducted a correctness review of the arbitrator's decision, his reasons amply demonstrate the reasonableness of that decision. The following analysis is largely based upon his reasoning.

[108]     The question that the arbitrator had to decide was which date should be used to determine the price of the shares used to pay the finder's fee: the date specified in the Market Price definition in the Agreement or the date the finder's fee was to be paid?

[109]     The arbitrator concluded that the price determined by the Market Price definition prevailed, i.e. $0.15 per share. In his view, this conclusion followed from the words of the Agreement and was "clear and beyond argument" (para. 23). Apparently, because he considered this issue clear, he did not offer extensive reasons in support of his conclusion.

[110]     In *Newfoundland and Labrador Nurses' Union*, Abella J. cites Professor David Dyzenhaus to explain that, when conducting a reasonableness review, it is permissible for reviewing courts to supplement the reasons of the original decision-maker as part of the reasonableness analysis:

> "Reasonable" means here that the reasons do in fact or in principle support the conclusion reached. That is, even if the reasons in fact given do not seem wholly adequate to support the decision, the court must first seek to supplement them before it seeks to subvert them. For if it is right that among the reasons for deference are the appointment of the tribunal and not the court as the front line adjudicator, the tribunal's proximity to the dispute, its expertise, etc, then it is also the case that its decision should be presumed to be correct even if its reasons are in some respects defective. [Emphasis added by Abella J.; para. 12.]
>
> (Quotation from D. Dyzenhaus, "The Politics of Deference: Judicial Review and Democracy", in M. Taggart, ed., *The Province of Administrative Law* (1997), 279, at p. 304.)

Accordingly, Justice Armstrong's explanation of the interaction between the Market Price definition and the "maximum amount" proviso can be considered a supplement to the arbitrator's reasons.

[111]     The two provisions at issue here are the Market Price definition and the "maximum amount" proviso:

## 2. DEFINITIONS

"**Market Price**" for companies listed on the TSX Venture Exchange shall have the meaning as set out in the Corporate Finance Manual of the TSX Venture Exchange as calculated on close of business day before the issuance of the press release announcing the Acquisition. For companies listed on the TSX, Market Price means the average closing price of the

2014 SCC 53 (CanLII)

Company's stock on a recognized exchange five trading days immediately preceding the issuance of the press release announcing the Acquisition.

And:

## 3. FINDER'S FEE

3.1        . . . the Company agrees that on the closing of an Acquisition introduced to Company by the Finder, the Company will pay the Finder a finder's fee (the "Finder's Fee") based on Consideration paid to the vendor equal to the maximum amount payable pursuant to the rules and policies of the TSX Venture Exchange. <u>Such finder's fee is to be paid in shares of the Company based on Market Price</u> or, at the option of the Finder, any combination of shares and cash, <u>provided the amount does not exceed the maximum amount as set out in the Exchange Policy 5.1, Section 3.3 Finder's Fee Limitations</u>. [Emphasis added.]

[112]      Section 3.1 entitles Sattva to be paid a finder's fee in shares based on the "Market Price". Section 2 of the Agreement states that Market Price for companies listed on the TSXV should be "calculated on close of business day before the issuance of the press release announcing the Acquisition". In this case, shares priced on the basis of the Market Price definition would be $0.15 per share. The words "provided the amount does not exceed the maximum amount as set out in the Exchange Policy 5.1, Section 3.3 Finder's Fee Limitations" in s. 3.1 of the Agreement constitute the "maximum amount" proviso. This proviso limits the amount of the finder's fee. The maximum finder's fee in this case is US$1.5 million (see s. 3.3 of the TSXV Policy 5.1 in Appendix II).

[113]      While the "maximum amount" proviso limits the amount of the finder's fee, it does not affect the Market Price definition. As Justice Armstrong explained, the Market Price definition acts to fix the date at which one medium of payment (US$) is transferred into another (shares):

> The medium for payment of the finder's fee is clearly established by the fee agreement. The market value of those shares at the time that the parties entered into the fee agreement was unknown. The respondent analogizes between payment of the $1.5 million US finder's fee in shares and a hypothetical agreement permitting payment of $1.5 million US in Canadian dollars. Both agreements would contemplate a fee paid in different currencies. The exchange rate of the US and Canadian dollar would be fixed to a particulate date, as is the value of the shares by way of the Market Price in the fee agreement. That exchange rate would determine the number of Canadian dollars paid in order to satisfy the $1.5 million US fee, as the Market Price does for the number of shares paid in relation to the fee. The Canadian dollar is the form of the fee payment, as are the shares. Whether the Canadian dollar increased or decreased in value after the date on which the exchange rate is based is irrelevant. The amount of the fee paid remains $1.5 million US, payable in the number of Canadian dollars (or shares) equal to the amount of the fee based on the value of that currency on the date that the value is determined.

> (SC Appeal Court decision, at para. 71)

[114]      Justice Armstrong explained that Creston's position requires the Market Price definition to be ignored and for the shares to be priced based on the valuation done in anticipation of a private placement.

[115]      However, nothing in the Agreement expresses or implies that compliance with the "maximum amount" proviso should be reassessed at a date closer to the payment of the finder's fee. Nor is the basis for the new valuation, in this case a private placement, mentioned or implied in the Agreement. To accept Creston's

interpretation would be to ignore the words of the Agreement which provide that the "finder's fee is to be paid in shares of the Company based on Market Price".

[116]     The arbitrator's decision that the shares should be priced according to the Market Price definition gives effect to both the Market Price definition and the "maximum amount" proviso. The arbitrator's interpretation of the Agreement, as explained by Justice Armstrong, achieves this goal by reconciling the Market Price definition and the "maximum amount" proviso in a manner that cannot be said to be unreasonable.

[117]     As Justice Armstrong explained, setting the share price in advance creates a risk that makes selecting payment in shares qualitatively different from choosing payment in cash. There is an inherent risk in accepting a fee paid in shares that is not present when accepting a fee paid in cash. A fee paid in cash has a specific predetermined value. By contrast, when a fee is paid in shares, the price of the shares (or mechanism to determine the price of the shares) is set in advance. However, the price of those shares on the market will change over time. The recipient of a fee paid in shares hopes the share price will rise resulting in shares with a market value greater than the value of the shares at the predetermined price. However, if the share price falls, the recipient will receive shares worth less than the value of the shares at the predetermined price. This risk is well known to those operating in the business sphere and both Creston and Sattva would have been aware of this as sophisticated business parties.

2014 SCC 53 (CanLII)

[118]     By accepting payment in shares, Sattva was accepting that it was subject to the volatility of the market. If Creston's share price had fallen, Sattva would still have been bound by the share price determined according to the Market Price definition resulting in it receiving a fee paid in shares with a market value of less than the maximum amount of US$1.5 million. It would make little sense to accept the risk of the share price decreasing without the possibility of benefitting from the share price increasing. As Justice Armstrong stated:

> It would be inconsistent with sound commercial principles to insulate the appellant from a rise in share prices that benefitted the respondent at the date that the fee became payable, when such a rise was foreseeable and ought to have been addressed by the appellant, just as it would be inconsistent with sound commercial principles, and the terms of the fee agreement, to increase the number of shares allocated to the respondent had their value decreased relative to the Market Price by the date that the fee became payable. Both parties accepted the possibility of a change in the value of the shares after the Market Price was determined when entering into the fee agreement.
>
> (SC Appeal Court decision, at para. 70)

[119]     For these reasons, the arbitrator did not ignore the "maximum amount" proviso. The arbitrator's reasoning, as explained by Justice Armstrong, meets the reasonableness threshold of justifiability, transparency and intelligibility (*Dunsmuir*, at para. 47).

E.    *Appeal Courts Are Not Bound by Comments on the Merits of the Appeal Made by Leave Courts*

2014 SCC 53 (CanLII)

[120]      The CA Appeal Court held that it and the SC Appeal Court were bound by the findings made by the CA Leave Court regarding not simply the decision to grant leave to appeal, but also the merits of the appeal. In other words, it found that the SC Appeal Court erred in law by ignoring the findings of the CA Leave Court regarding the merits of the appeal.

[121]      The CA Appeal Court noted two specific findings regarding the merits of the appeal that it held were binding on it and the SC Appeal Court: (1) it would be anomalous if the Agreement allowed Sattva to receive US$1.5 million if it received its fee in cash, but allowed it to receive shares valued at approximately $8 million if Sattva received its fee in shares; and (2) that the arbitrator ignored this anomaly and did not address s. 3.1 of the Agreement:

> The [SC Appeal Court] judge found the arbitrator had expressly addressed the maximum amount payable under paragraph 3.1 of the Agreement and that he was correct.
>
> This finding is contrary to the remarks of Madam Justice Newbury in the earlier appeal that, if Sattva took its fee in shares valued at $0.15, it would receive a fee having a value at the time the fee became payable of over $8 million. If the fee were taken in cash, the amount payable would be $1.5 million US. Newbury J.A. specifically held that the arbitrator did not note this anomaly and did not address the meaning of paragraph 3.1 of the Agreement.
>
> The [SC Appeal Court] judge was bound to accept those findings. Similarly, absent a five-judge division in this appeal, we must also accept those findings. [paras. 42-44]

[122]      With respect, the CA Appeal Court erred in holding that the CA Leave Court's comments on the merits of the appeal were binding on it and on the SC Appeal Court. A court considering whether leave should be granted is not adjudicating the merits of the case (*Canadian Western Bank v. Alberta*, 2007 SCC 22, [2007] 2 S.C.R. 3, at para. 88). A leave court decides only whether the matter warrants granting leave, not whether the appeal will be successful (*Pacifica Mortgage Investment Corp. v. Laus Holdings Ltd.*, 2013 BCCA 95, 333 B.C.A.C. 310, at para. 27, leave to appeal refused, [2013] 3 S.C.R. viii). This is true even where the determination of whether to grant leave involves, as in this case, a preliminary consideration of the question of law at issue. A grant of leave cannot bind or limit the powers of the court hearing the actual appeal (*Tamil Co-operative Homes Inc. v. Arulappah* (2000), 49 O.R. (3d) 566 (C.A.), at para. 32).

[123]      Creston concedes this point but argues that the CA Appeal Court's finding that it was bound by the CA Leave Court was inconsequential because the CA Appeal Court came to the same conclusion on the merits as the CA Leave Court based on separate and independent reasoning.

[124]      The fact that the CA Appeal Court provided its own reasoning as to why it came to the same conclusion as the CA Leave Court does not vitiate the error. Once the CA Appeal Court treated the CA Leave Court's reasons on the merits as binding, it could hardly have come to any other decision. As counsel for Sattva pointed out, treating the leave decision as binding would render an appeal futile.

2014 SCC 53 (CanLII)

## VI.  Conclusion

[125]    The CA Leave Court erred in granting leave to appeal in this case. In any event, the arbitrator's decision was reasonable. The appeal from the judgments of the Court of Appeal for British Columbia dated May 14, 2010 and August 7, 2012 is allowed with costs throughout and the arbitrator's award is reinstated.

## APPENDIX I

Relevant Provisions of the Sattva-Creston Finder's Fee Agreement

(a) "Market Price" definition:

### 2. DEFINITIONS

> **"Market Price"** for companies listed on the TSX Venture Exchange shall have the meaning as set out in the Corporate Finance Manual of the TSX Venture Exchange as calculated on close of business day before the issuance of the press release announcing the Acquisition. For companies listed on the TSX, Market Price means the average closing price of the Company's stock on a recognized exchange five trading days immediately preceding the issuance of the press release announcing the Acquisition.

(b) Finder's fee provision (which contains the "maximum amount" proviso):

### 3. FINDER'S FEE

> 3.1    . . . the Company agrees that on the closing of an Acquisition introduced to Company by the Finder, the Company will pay the Finder a finder's fee (the "Finder's Fee") based on Consideration paid to the vendor equal to the maximum amount payable pursuant to the rules and policies of the TSX Venture Exchange. Such finder's fee is to be paid in shares of the Company based on Market Price or, at the option of the Finder, any combination of shares and cash, provided the amount does

not exceed the maximum amount as set out in the Exchange Policy 5.1, Section 3.3 Finder's Fee Limitations.

2014 SCC 53 (CanLII)

2014 SCC 53 (CanLII)

## APPENDIX II

Section 3.3 of TSX Venture Exchange Policy 5.1: Loans, Bonuses, Finder's Fees and Commissions

### 3.3    Finder's Fee Limitations

The finder's fee limitations apply if the benefit to the Issuer is an asset purchase or sale, joint venture agreement, or if the benefit to the Issuer is not a specific financing. The consideration should be stated both in dollars and as a percentage of the value of the benefit received. Unless there are unusual circumstances, the finder's fee should not exceed the following percentages:

| Benefit | Finder's Fee |
|---|---|
| On the first $300,000 | Up to 10% |
| From $300,000 to $1,000,000 | Up to 7.5% |
| From $1,000,000 and over | Up to 5% |

As the dollar value of the benefit increases, the fee or commission, as a percentage of that dollar value should generally decrease.

# APPENDIX III

*Commercial Arbitration Act*, R.S.B.C. 1996, c. 55 (as it read on January 12, 2007) (now the *Arbitration Act*)

## Appeal to the court

**31**  (1)  A party to an arbitration may appeal to the court on any question of law arising out of the award if

(a) all of the parties to the arbitration consent, or

(b) the court grants leave to appeal.

(2)  In an application for leave under subsection (1) (b), the court may grant leave if it determines that

(a) the importance of the result of the arbitration to the parties justifies the intervention of the court and the determination of the point of law may prevent a miscarriage of justice,

(b) the point of law is of importance to some class or body of persons of which the applicant is a member, or

(c) the point of law is of general or public importance.

(3)  If the court grants leave to appeal under this section, it may attach conditions to the order granting leave that it considers just.

(4)  On an appeal to the court, the court may

(a) confirm, amend or set aside the award, or

(b) remit the award to the arbitrator together with the court's opinion on the question of law that was the subject of the appeal.

2014 SCC 53 (CanLII)

*Appeal allowed with costs throughout.*

*Solicitors for the appellant:  McCarthy Tétrault, Vancouver.*

*Solicitors for the respondent:  Miller Thomson, Vancouver.*

*Solicitor for the intervener the Attorney General of British Columbia:  Attorney General of British Columbia, Victoria.*

*Solicitors for the intervener the BCICAC Foundation:  Fasken Martineau DuMoulin, Vancouver.*

# TAB 82

713 F.2d 782
United States Court of Appeals,
Federal Circuit.

CARL SCHENCK, A.G., Appellee,

v.

NORTRON CORPORATION, Appellant.

Appeal No. 83–675.    |    July 21, 1983.

The United States District Court for the Middle District of Tennessee, 570 F.Supp. 810, entered judgment finding valid a patent for wheel balancer and finding claims of such patent infringed, and manufacturer of infringing machine appealed. The Court of Appeals, Markey, Chief Judge, held that: (1) structure effectuating elimination of damping would not have been obvious to those skilled in the art, and (2) there was no basis for determination of error in finding of infringement.

Affirmed.

West Headnotes (15)

**[1]      Patents**

 Nature of patent rights

If patentee or licensee enjoys widespread sales, such is but an example of incentive-useful arts promoting element in patent system.

1 Cases that cite this headnote

**[2]      Patents**

 Nature of patent rights

**Patents**

 Nature of license

Patents and licenses are exemplifications of property rights.

1 Cases that cite this headnote

**[3]      Patents**

 Aliens

Participation in United States patent system, as patentees and as licensees, is available to citizens and noncitizens alike.

Cases that cite this headnote

**[4]      Patents**

 Appeal

On appeal from decision in patent infringement action, counsel's argument and interpretations of prior art cannot supplant requirement for presentation of testimony from qualified witnesses and exhibits to trial court; absent showing on appeal that findings were clearly erroneous in light of record made at trial or that conclusions based on such findings were incorrect as matter of law, judgment appealed from must be affirmed.

6 Cases that cite this headnote

**[5]      Patents**

 Invention and Obviousness in General

In patent infringement action, argument seeking to limit focus of inquiry to structural difference from prior art and then to show that such difference alone would have been obvious was not proper under statute requiring that an invention be considered "as a whole;" emphasis on nonobviousness is one of inquiry, not quality. 35 U.S.C.A. § 103.

21 Cases that cite this headnote

**[6]      Patents**

 Automobiles and vehicles

Claims one, two and five of patent No. 3,182,511 relating to machine for sensing vibration resulting from imbalance in wheels and other rotating elements were valid since insight eliminating need for damping was contrary to understanding and expectations of the art and structure effectuating such elimination therefore would not have been obvious to those skilled in the art. 35 U.S.C.A. § 103.

17 Cases that cite this headnote

**[7]      Patents**

 Patents for Machines or Manufactures

Claims one, two, and five of patent No. 3,182,511 relating to machine for sensing vibration resulting from imbalance in wheels and other rotating elements were infringed.

Cases that cite this headnote

**[8]**    **Patents**
    🗝 **Exclusive Nature of Right**

Patent right is but right to exclude others and, under statute, is property. 35 U.S.C.A. § 261.

10 Cases that cite this headnote

**[9]**    **Antitrust and Trade Regulation**
    🗝 **Patents**

That property right represented by patent, like other property rights, may be used in scheme violative of antitrust laws creates no "conflict" between laws establishing any of such property rights and antitrust laws. 35 U.S.C.A. § 261.

3 Cases that cite this headnote

**[10]**    **Patents**
    🗝 **Nature of patent rights**

Valid patent gives public what it did not earlier have.

Cases that cite this headnote

**[11]**    **Patents**
    🗝 **Rejection and Amendment of Claims**

Reference to patent as "the patent monopoly" or description of patent as "exception to the general rule against monopolies" is irrelevant when considering patent questions, including question of file wrapping estoppel.

5 Cases that cite this headnote

**[12]**    **Patents**
    🗝 **Operation and Effect of Claims in General**

Trial judge in patent validity and infringement action properly read claims as would one skilled in the art.

2 Cases that cite this headnote

**[13]**    **Patents**
    🗝 **Construction of language of claims in general**

Modification of disclosure of patent unwarranted by disclosure of reference is improper.

1 Cases that cite this headnote

**[14]**    **Patents**
    🗝 **Original utility**

2,329,654. Cited.

Cases that cite this headnote

**[15]**    **Patents**
    🗝 **Original utility**

3,182,511. Valid and claims one, two, and five infringed.

Cases that cite this headnote

**Attorneys and Law Firms**

***783**    Sheldon W. Witcoff, Chicago, Ill., argued for appellant. With him on the brief was Ronald E. Larson, Chicago, Ill., of counsel.

Robert B. Russell, Boston, Mass., argued for appellee. With him on the brief were David A. Tucker, Boston, Mass., and Thomas H. Peebles, III, Nashville, Tenn., of counsel.

Before MARKEY, Chief Judge, and FRIEDMAN and NIES, Circuit Judges.

**Opinion**

MARKEY, Chief Judge.

Appeal from a judgment of the District Court for the Middle District of Tennessee holding U.S. Patent No. 3,182,511 ('511 patent) valid and finding claims 1, 2, and 5 of that patent infringed by Nortron Corporation (Nortron). We *affirm*.

## BACKGROUND

The inventors are Federn, Geiss, and Seibert, who assigned the '511 patent to Carl Schenck, A.G. (Schenck). As assignee, Schenck sued Nortron, R.H. Scales Co. (Scales), and Myers Tire Supply Co. (Myers). The case has been stayed respecting Scales and Myers. Nortron manufactures the 7402 wheel balancer accused as an infringement.

Nortron was selling a wheel balancer in competition with Schenck as early as 1973. That product did not infringe the '511 patent, which issued in 1965 and expired in 1982. In 1979, Nortron shifted to the model 7402 balancer.

**\*784** **[1]**  **[2]**  **[3]**  Nortron's brief characterizes Schenck as a "German monopolist." That denigration, whether inserted in a vain hope of prejudicing the court or otherwise, has no support in the present record. Disclosure of an invention found to have revolutionized an industry is but a classic example of the ideal working of the patent system. If a patentee or licensee enjoys widespread sales, that too is but an example of the incentive-useful arts promoting element in the patent system. Patents and licenses are exemplifications of property rights. Further, and happily, participation in the U.S. patent system, as patentees and as licensees, is available to citizens and non-citizens alike.

The '511 patent discloses and claims a machine for sensing vibration resulting from an imbalance in what are here called "wheels" (tires, wheels, turbine rotors, and other rotating elements). Claim 1 is representative:

> 1. A vibratory testing machine, comprising a rigidly fixed base structure 13, a vibratory workpiece-holding structure 14 having means for accommodating a workpiece 10 and defining a given measuring direction M, supporting means 15 joining said structures and having a plurality of supporting rod members 15 forming a parallelogram linkage yieldable in said measuring direction M and stiff in planes transverse to said direction M (i.e., in direction A) to limit vibration of said holding structure 14 to said measuring direction M, said vibratory holding structure 14

and said base structure 13 as well as said supporting means 15 forming jointly a single integral and gaplessly continuous piece.

Judge Nixon entered a comprehensive unpublished Memorandum constituting his Findings and Conclusions, accompanied by an Order finding in favor of Schenck and setting a date (now stayed) for hearing on damages. In that Memorandum, Judge Nixon: described the physical phenomena involved in wheel balancing; set forth the long-term employment of soft-bearing balancer machines, their disadvantages, and their replacement by the hard-bearing machines of the invention; noted the belief of practitioners before the invention was made that resonance damping was required in hard-bearing machines, and the present inventor's contrary teaching that damping should be avoided; listed basic principles of patent law; held irrelevant the assertion that the invention had not been used in automotive balancers sold by Schenck in the United States; characterized as passé the defense that making a support structure in one piece "does not rise to the standard of invention", in view of recognition in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), that the standard is nonobviousness; surveyed the evidence supporting nonobviousness, particularly the abandonment of soft-bearing for hard-bearing machines; rejected the defense of no causal relationship between the invention and that industry shift; dismissed the argument that "a consolidation of elements can never rise to the level of patentable invention"; rejected the defense of fraud for failure of the drawing to disclose more than one support structure to the Patent and Trademark Office; rejected as not prior art an earlier patent of Federn; rejected the assertion of no infringement based on model 7402's allowance of axial movement, interpreting the claims as contemplating limited motion in the measuring direction and significantly more limited (i.e., less) motion in the axial direction; stated that he was interpreting the claims in the "manner of those skilled in the art," citing *Autogiro Co. of America v. U.S.,* 384 F.2d 391, 155 U.S.P.Q. 697, (Ct.Cl.1967); quoted the description in a Nortron patent application of the model 7402 machine; found that description persuasive of the similarity of both parties' mechanisms; and rejected Nortron's tests as proof of noninfringement.

## ISSUES

Did Judge Nixon err in: (1) holding the '511 patent valid; or (2) finding claims 1, 2, and 5 infringed by Nortron's model 7402 wheel balancing machine?

## *785  OPINION

[4]    Nortron argues the present appeal on substantially a *de novo* basis. Counsel's arguments and interpretations of prior art cannot, however, supplant the requirement for presentation of testimony from qualified witnesses and exhibits to the trial court. Our review is on the record made at trial. Absent a showing on appeal that findings were clearly erroneous in light of that record, or that conclusions based on those findings were incorrect as a matter of law, the judgment appealed from must be affirmed.

Nortron says it bases the present appeal on three "issues". The first and third "issues" relate to infringement, the second to validity. We consider the latter first.

### A. *Validity*

Nortron points to recognition in the '511 patent of a prior support structure in which legs and cross-pieces are bolted together with notch-and-tooth engaging faces. From that it argues that the present invention was merely the forming of that structure in one piece, a step, Nortron says, that would have been obvious to those skilled in the art at the time the invention was made. [1]

The unchallenged testimony of record establishes that the legs of the notch-and-tooth design are broad leaf springs. Thus, far from eliminating damping (as Nortron asserts) the notch-and-tooth design *introduces* damping, as was pointed out to and accepted by the examiner during prosecution of the application that resulted in the '511 patent.

The uncontested testimony of record further establishes that those skilled in the art believed that damping was required in hard-bearing balancers. Judge Nixon's finding that "many practitioners introduced damping into their measuring devices in order to suppress resonance" is amply supported in the record. That finding is not only not shown on appeal to have been clearly erroneous, it is not mentioned by appellant.

Nortron has pointed to nothing of record that would suggest the replacement of a structure formed of bolted leaf springs and cross bars with a single, unitary, gapless (and thus

rigid) structure. On the contrary, the record reflects that that step would remove the flexibility present and thought to be necessary in the former.

[5]  [6]    In its argument that the invention here is but making integral what had earlier been made in four bolted pieces, Nortron seeks to limit the focus of inquiry to a structural difference from the prior art and then to show that that difference *alone* would have been obvious. That effort is not proper under the statute, which requires that an invention be considered "as a whole", 35 U.S.C. § 103. As Judge Nixon recognized, "the emphasis on nonobviousness is one of inquiry, not quality". *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The inquiry here establishes that the present invention includes the inventor's elimination of the need for damping. Because that insight was contrary to the understanding and expectations of the art, the structure effectuating it would not have been obvious to those skilled in the art. *United States v. Adams,* 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

Indeed, hard-bearing balancers had been known since the early 1920's, but had not been successful because of the art-perceived need for mechanisms to dampen resonance. That the *means* of eliminating the need for damping was the one-piece gapless support structure described in the claims detracts in no manner from the contribution to the art made by the inventor. The present invention was a key to the unlocking of a pre-accepted  *786  barrier and to the resurrection of hard-bearing balancers, which then replaced widely-used soft-bearing balancers. Nortron was and is at liberty to employ, as it once did, a support formed of separate elements bolted together. That it felt impelled to abandon earlier devices and to employ the unitary structure of the invention is evidence of the latter's value.

As Judge Nixon noted, the *only* direct evidence on the obviousness issue was that of Professor Muster, who described the invention and its relation to the notch-and-tooth design as set forth here. Nortron's second "issue" is thus unavailing, for Judge Nixon's conclusion that the inventions set forth in claims 1, 2 and 5 of the '511 patent would have been nonobvious is fully supported in the record and free of error. [2]

### B. *Infringement I*

[7]  [8]  [9]  [10]  [11]  [12]  [13]    Nortron asserts as its first "issue" that there is a file wrapper estoppel, ignored

by Judge Nixon, under which the claims cannot cover a balancer like its model 7402 that permits vibrations in an axial direction of as much as ¼ those in the measuring direction. [3] The assertion rests on the claim language, "supporting means ... yieldable in said measuring direction and stiff in planes transverse to said direction to limit vibration of said holding structure to said measuring direction," and a statement in the patent specification, "It is an object of our invention to devise a vibratory testing machine which more reliably avoids the above-mentioned undesired yieldability in directions transverse to the vibratory mounted workpiece holding or journalling structure."

In Nortron's main brief, it insisted that the claims must be read as though they "necessarily exclude vibration in the axial direction." Reminded by Schenck's brief of the fact established in the record, i.e., that all skilled in the art have always known that exclusion of vibration in the axial direction is impossible, Nortron's reply brief no longer says the claims exclude vibration in the axial direction, but that they do not encompass machines with axial vibrations of more than an "appreciable or measurable extent."

As part of its file wrapper argument concerning axial vibration, Nortron necessarily says Schenck wrote the claims narrowly in respect of the amount of permissible axial vibration to distinguish them from the prior art. Nortron's difficulty is that the claim language it relies on was not inserted to avoid prior art. On the contrary, the prosecution history makes plain that the argument for patentability focused on the support structure clearly present in the accused machine.

Judge Nixon did not ignore the argument surrounding the cited claim language. On the contrary, he discussed that argument thoroughly and properly rejected it. As presented at trial, the argument was the unsupportable one initially stated here, i.e., that the claims envisage total absence of **\*787** axial vibration. Further, the uncontested expert testimony was that the object of the invention was to eliminate signals caused by axial or transverse vibration, not all axial vibration itself. The inventor employs long rods to avoid an influence of axial vibration on the output of his transducers. Nortron employs a bridge circuit to cancel out the influence of axial vibration in the 7402 model. Thus, both machines limit the output of the detection device to the signal from vibration in the measuring direction.

There is simply no basis in the record for the argument based on counsel's claim interpretation and counsel's description of model 7402's operation. The testimony at trial of Schenck's expert Muster, and the description by Nortron's model 7402 designer Curchod, fully support Judge Nixon's interpretation of the claims as permitting "a limited pedestal motion in the measuring direction and a significantly more limited pedestal motion in the axial direction." Judge Nixon properly read the claims as would one skilled in the art, *Autogiro Co., supra,* and Nortron has shown no error in that action on this record. Hence, Nortron's first "issue" reflects no basis for a determination of error in the finding of infringement in this case.

### C. *Infringement II*

Nortron correctly points out that there must be a consistent interpretation of the claims, *Smith v. Hall,* 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049 (1937), then asserts as its third "issue" that Judge Nixon read the "rigidly fixed base structure" language of the claims (in finding infringement) in a manner that makes that limitation readable on the prior art Rouy patent No. 2,329,654 ('654 patent).

The limitation "rigidly fixed base structure" is read by Schenck on a plate of model 7402 to which the bearing support structures are welded. The plate is in turn bolted to a pedestal. In an effort to restrict the claim limitation to a massive base with feet bolted to short foundations, Nortron reads into the claims the description of one other machine shown in the drawings of the '511 patent. The language of the limitation itself is, however, clearly readable on the bolted plate of model 7402. That language is not ambiguous, and nothing in the prior art of record or in the prosecution history requires that it be read only in the light of the specification or restricted to the embodiment shown in the drawings and described in the specification of the '511 patent.

If "rigidly fixed base structure" be read as encompassing its plate, says Nortron, it is equally readable on certain elements of the Rouy '654 prior art patent. That argument, however, turns on a conjectural modification of the disclosure of the '654 patent. Modification unwarranted by the disclosure of a reference is improper. *See In re Imperato,* 486 F.2d 585, 587, 179 USPQ 730, 732 (CCPA 1973); *In re Bergel,* 292 F.2d 955, 130 USPQ 206, (CCPA 1961). In its modification, Nortron labels the outer end portions of what Rouy calls "flexible connections" as "base plates" and adds numerical designations to them. There is no justification for that modification. Rouy did not regard or describe those end

portions as base plates; nor did he describe them in any manner; nor did he disclose their dimension in the direction of his shaft axis. The Rouy '654 patent, disclosing a support structure with gaps and numerous other differences from the structure claimed in the '511 patent, has little if any relevance, as was apparently recognized by the examiner in the Patent and Trademark Office who cited the '654 patent, but did not apply it to the claims.

The interpretation of the present claims by Judge Nixon was consistent throughout his consideration of the validity issue, the prior art, and the infringement issue. There is, accordingly, no basis in Nortron's third "issue" for a determination of error in the finding of infringement in this case.

## CONCLUSION

Nortron having failed to establish error in the record, the judgment appealed from must be affirmed.

AFFIRMED.

### Parallel Citations

218 U.S.P.Q. 698

Footnotes

1    In its main brief, Nortron added as part of the prior art associated with the notch-and-tooth design, the knowledge that damping was undesirable. Schenck in its brief pointed out that that unpublished knowledge was limited to Schenck in Germany and thus could not be "prior art" under 35 U.S.C. § 102(a). In its reply brief, Nortron rewrote its second issue to substitute "axial yieldability" for "damping". The substitution may be made in the text of this opinion without change in the reasoning or result.

2    Nortron asserts error in the finding of commercial success, pointing to testimony that Schenck's *automotive* wheel balancers sold in the United States would not infringe the '511 patent. Nortron ignores the testimony that Schenck's U.S. sales of balancers for other uses would infringe the '511 patent, and that the unitary support structure is employed in Schenck automotive balancers, their noninfringement arising from the absence of other elements in the claims of the '511 patent.

3    Nortron begins its file wrapper estoppel argument with "Patents are an exception to the general rule against monopolies...". A patent, under the statute, is property. 35 U.S.C. § 261. Nowhere in any statute is a patent described as a monopoly. The patent right is but the right to exclude others, the very definition of "property." That the property right represented by a patent, like other property rights, may be *used* in a scheme violative of antitrust laws creates no "conflict" between laws establishing any of those property rights and the antitrust laws. The antitrust laws, enacted long after the original patent laws, deal with appropriation of what should belong to others. A valid patent gives the public what it did not earlier have. Patents are valid or invalid under the statute, 35 U.S.C. It is but an obfuscation to refer to a patent as "the patent monopoly" or to describe a patent as an "exception to the general rule against monopolies." That description, moreover, is irrelevant when considering patent questions, including the question of estoppel predicated on prosecution history.

**End of Document**                                            © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 83

407 B.R. 576
United States District Court,
D. Delaware.

In re NEW CENTURY TRS HOLDINGS,
INC., a Delaware corporation, et al., Debtors.
Gregory J. Schroeder, et al., Appellants,
v.
New Century Liquidating Trust, et al., Appellees.

Bank. No. 07–10416 (KJC).   |   Civ.
No. 08–546–SLR.   |   June 16, 2009.

**Synopsis**

**Background:** Confirmation hearing was held on joint liquidating Chapter 11 plan proposed by debtors, and objections were filed on theory that plan would effect an improper substantive consolidation of debtors' estates, that plan improperly discriminated between creditors in same class, that plan failed to satisfy "best interests of creditors" test, and that compromises included in plan were not fair and equitable. The Bankruptcy Court, Kevin J. Carey, J., 390 B.R. 140, entered order overruling objections, and objectors appealed.

**Holdings:** The District Court, Sue L. Robinson, J., held that:

[1] appeal from unstayed plan confirmation order was not equitably moot;

[2] proposed Chapter 11 plan that aggregated various debtor entities into different debtor classes, and that required creditors with claims against debtors that had been placed within same class to compete against each other for payment of their claims from consolidated pool of assets, effected an improper "substantive consolidation" of debtors and could not be confirmed; and

[3] plan unfairly discriminated in favor of certain creditors without consent of other creditors in class.

Reversed and remanded.

West Headnotes (26)

**[1]** **Bankruptcy**
 Moot Questions

Under doctrine of equitable mootness, bankruptcy appeal should be dismissed as equitably moot if affording appellant the relief he seeks would be inequitable.

Cases that cite this headnote

**[2]** **Bankruptcy**
 Moot Questions

In deciding whether equitable mootness doctrine applies, bankruptcy appellate court must determine whether relief sought by appellant would be inequitable in context of the case before it.

Cases that cite this headnote

**[3]** **Bankruptcy**
Effect of Want of Stay; Conclusiveness of Sale
**Bankruptcy**
Moot Questions

In deciding whether the relief sought on bankruptcy appeal would be inequitable and, thus, whether equitable mootness doctrine applies, bankruptcy appellate courts consider the following factors: (1) whether a reorganization plan has been substantially consummated; (2) whether a stay has been obtained; (3) whether relief requested would affect rights of parties not before court; (4) whether relief requested would affect success of plan; and (5) public policy of affording finality to bankruptcy judgments.

1 Cases that cite this headnote

**[4]** **Bankruptcy**
Moot Questions

Factors that bankruptcy appellate courts consider in deciding whether an appeal is equitably moot

**[5]**    **Bankruptcy**

    Moot Questions

Even assuming that equitable mootness doctrine applies on appeal from order confirming liquidating Chapter 11 plan, factors bearing on whether appeal from plan confirmation order is equitably moot cannot be given same weight in reorganizing and liquidating Chapter 11 cases.

2 Cases that cite this headnote

**[6]**    **Bankruptcy**

    Moot Questions

Two countervailing considerations inform bankruptcy appellate court's exercise of discretion in deciding whether to dismiss appeal from plan confirmation order as equitably moot: the public policy served by encouraging non-adverse third parties to rely on finality of bankruptcy confirmation orders, on the one hand, and need to preserve meaningful right of appeal, on the other.

Cases that cite this headnote

**[7]**    **Bankruptcy**

    Moot Questions

If "equitable mootness" bar is too low, i.e., if equitable mootness factors swing too easily in favor equitable mootness, right of appeal becomes meaningless and instruction to apply equitable mootness doctrine cautiously and on limited scope is contravened.

Cases that cite this headnote

**[8]**    **Bankruptcy**

    Effect of Want of Stay;  Conclusiveness of Sale

    **Bankruptcy**

    Moot Questions

Even assuming that equitable mootness doctrine applied on appeal from order that confirmed liquidating Chapter 11 plan, appeal from bankruptcy court's unstayed plan confirmation order would not be dismissed as "equitably moot," where plan, while substantially consummated, had not proceeded to point where there had been distribution to any creditor class, where plan could be unraveled without much difficulty, and without prejudice to any non-adverse third parties who had detrimentally relied thereon, and where there was nothing in record to suggest that undoing debtors' current liquidation plan would affect debtors' ability to liquidate in future under different plan.

4 Cases that cite this headnote

**[9]**    **Bankruptcy**

    Effect of Want of Stay;  Conclusiveness of Sale

    **Bankruptcy**

    Moot Questions

Mere fact that debtors' liquidating Chapter 11 plan had been substantially consummated, and that reversal of unstayed plan confirmation order would necessitate the unraveling of plan, was not factor weighing in favor of dismissal of appeal from plan confirmation order, as equitably moot; it did not appear that reversal of plan would result in great difficulty or inequity.

1 Cases that cite this headnote

**[10]**    **Bankruptcy**

    Effect of Want of Stay;  Conclusiveness of Sale

    **Bankruptcy**

    Moot Questions

Ordinarily, existence or absence of stay is critical factor for bankruptcy appellate court in deciding whether to dismiss appeal from plan confirmation order as equitably moot.

Cases that cite this headnote

**[11]**    **Bankruptcy**

🔑 Effect of Want of Stay;  Conclusiveness of
Sale

**Bankruptcy**

🔑 Moot Questions

Mere fact that bankruptcy court order confirming
debtors' liquidating Chapter 11 plan had not
been stayed was not factor weighing in favor of
dismissal of appeal from that order as equitably
moot, where plan had not gone freely forward
and it did not appear that any distribution to
creditors had been made, and where those plan
components that had gone forward were not
those on which non-adverse third parties had
detrimentally relied.

Cases that cite this headnote

**[12]   Bankruptcy**

🔑 Moot Questions

Equitable mootness doctrine protects interests
of non-adverse third parties who are not before
bankruptcy appellate court, but who have acted
in reliance on plan as implemented.

Cases that cite this headnote

**[13]   Bankruptcy**

🔑 Moot Questions

Effect of relief requested on plan's success,
as factor bearing on whether appeal from
plan confirmation order is equitably moot, is
concerned with whether requested relief will
affect re-emergence of debtor as revitalized
entity or, in liquidating Chapter 11 case, with
whether requested relief will affect debtor's
ability to liquidate.

Cases that cite this headnote

**[14]   Bankruptcy**

🔑 Moot Questions

Public policy of affording finality to bankruptcy
court judgments is factor weighing in favor
of equitable mootness when non-adverse third
parties have acted in detrimental reliance on
finality of bankruptcy plan confirmation orders
to such a degree that reversing those orders

would discourage future detrimental reliance by
similarly situated parties.

Cases that cite this headnote

**[15]   Bankruptcy**

🔑 Moot Questions

In reorganization context, finality of bankruptcy
judgments is significant factor in deciding
whether appeal from plan confirmation order
is equitably moot, since multiple parties,
including non-adverse third parties, have acted in
detrimental reliance on debtor's emerging from
bankruptcy as contemplated by reorganization
plan; however, when parties have not relied to
their detriment on finality, which is often the case
in liquidation context, this factor does not weigh
in favor of equitable mootness.

Cases that cite this headnote

**[16]   Bankruptcy**

🔑 Conclusions of Law;  De Novo Review

**Bankruptcy**

🔑 Clear Error

On appeal, district court applies "clearly
erroneous" standard to bankruptcy court's
findings of fact and a plenary standard to its legal
conclusions. Fed.Rules Bankr.Proc.Rule 8013,
11 U.S.C.A.

Cases that cite this headnote

**[17]   Bankruptcy**

🔑 Clear Error

Factual finding is "clearly erroneous" when
reviewing court, on entire evidence, is left
with definite and firm conviction that mistake
has been committed. Fed.Rules Bankr.Proc.Rule
8013, 11 U.S.C.A.

Cases that cite this headnote

**[18]   Bankruptcy**

🔑 Conclusions of Law;  De Novo Review

**Bankruptcy**

🔑 Clear Error

With respect to mixed questions of law and fact, district court must accept bankruptcy court's findings of historical or narrative fact unless clearly erroneous, but exercises plenary review of bankruptcy court's choice and interpretation of legal precepts and its application of those precepts to historical facts. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

Cases that cite this headnote

[19]    **Bankruptcy**
   Conclusions of Law;  De Novo Review

On appeal from district court's decisions in its bankruptcy appellate capacity, the Court of Appeals effectively reviews on de novo basis bankruptcy court opinions.

Cases that cite this headnote

[20]    **Bankruptcy**
   Transfer and Consolidation of Cases

**Bankruptcy**
   Equitable Powers and Principles

"Substantive consolidation" is equitable remedy, that is used, essentially, to address harms caused by debtors, and their related entities, disregarding their separateness and/or otherwise entangling their affairs.

Cases that cite this headnote

[21]    **Bankruptcy**
   Transfer and Consolidation of Cases

Substantive consolidation treats separate legal entities as if they were merged into single survivor left with all the cumulative assets and liabilities, save for inter-entity liabilities, which are erased; result is that claims against separate debtors morph into claims against the consolidated survivor.

2 Cases that cite this headnote

[22]    **Bankruptcy**
   Transfer and Consolidation of Cases

Substantive consolidation of bankruptcy estates is extreme and imprecise, works "rough justice," and is to be used sparingly.

1 Cases that cite this headnote

[23]    **Bankruptcy**
   Grounds and Objections;  Factors Considered

Substantive consolidation is appropriate only when parties consent, when entities to be consolidated disregarded their separateness prepetition to such a significant extent that their creditors relied on breakdown of entity borders and treated them as one legal entity, or when their assets and liabilities are so scrambled postpetition that separating them is prohibitive and hurts all creditors.

Cases that cite this headnote

[24]    **Bankruptcy**
   Reorganization Cases

**Bankruptcy**
   Provisions for Satisfaction of Claims;  Relation to Recovery in Liquidation

Proposed Chapter 11 plan that aggregated various debtor entities into different debtor classes, and that required creditors with claims against debtors that had been placed within same class to compete against each other for payment of their claims from consolidated pool of assets, effected an improper "substantive consolidation" of debtors and could not be confirmed, though plan did not provide for erasure of inter-entity liabilities.

2 Cases that cite this headnote

[25]    **Bankruptcy**
   Equality of Treatment Within Classes

Proposed Chapter 11 plan is not confirmable, if claims within same class are not receiving same treatment, and if holders of those claims being treated less favorably have not consented to the discrimination. 11 U.S.C.A. § 1123(a)(4).

Cases that cite this headnote

**[26]    Bankruptcy**

👉 Provisions for Satisfaction of Claims;
Relation to Recovery in Liquidation

**Bankruptcy**

👉 Unsecured Creditors and Equity Holders,
Protection Of

Multi-debtor protocol which Chapter 11 debtors
had negotiated with creditors holding the same
claim against more than one debtor, and which
was included in joint liquidating plan that debtors
had proposed, which required such creditors to
waive the claims that they had to distribution in
one class in exchange for a 130% distribution
on claim that they possessed in other class,
unfairly discriminated in favor of these creditors
and against other creditors in class from which
130% distribution was made without these
other creditors' consent, in violation of plan
confirmation requirement; it did not matter that
overall effect on creditors receiving this 130%
distribution may have been negative, and that
creditors receiving this 130% distribution may
have consented to this "negative" treatment. 11
U.S.C.A. § 1123(a)(4).

Cases that cite this headnote

## Attorneys and Law Firms

**\*579**  Joseph H. Huston, Jr., Esquire, and Maria Aprile
Sawczuk, Esquire, of Stevens & Lee, P.C., Wilmington, DE,
and Robert J. Keach, Esquire, and D. Sam Anderson, Esquire,
of Bernstein, Shur, Sawyer & Nelson, P.A., of Portland, ME,
for Appellants.

Bonnie Glantz Fatell, Esquire, and David W. Carickhoff,
Esquire, of Blank Rome LLP, Wilmington, DE, and Mark
T. Power, Esquire, Mark S. Indelicato, Esquire, Don D.
Grubman, Esquire, and Joseph Orbach, Esquire, of Hahn &
Hessen LLP, New York, NY, for Appellees.

## Opinion

### MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

### I. INTRODUCTION

In April 2007, New Century TRS Holdings, Inc. ("TRS
Holdings") and its affiliates **\*580** (collectively, "debtors" [1] )
filed chapter 11 bankruptcy petitions. In March 2008, debtors
filed a liquidation plan. In July 2008, over objections raised
by the Ad Hoc Committee of Beneficiaries of the New
Century Financial Corporation Deferred Compensation Plan
and/or Supplemental Executive Retirement/Savings Plan
(collectively, along with Gregory J. Schroeder, Michelle
Park, Martin Warren, Steve Holland, and Nabil Bawa,
"appellants"), the bankruptcy court confirmed the liquidation
plan.

Pending before the court are appellants' appeal [2] (D.I.1) of
the plan confirmation and the motion to dismiss filed by New
Century Liquidating Trust and Alan M. Jacobs as Liquidating
Trustee and Plan Administrator for New Century Warehouse
Corporation's (collectively, "appellees") (D.I.13). For the
reasons that follow, appellees' motion to dismiss is denied
and the bankruptcy court issuances that are the subject of the
appeal (Bk.D.I.8254, 8255, 8596, 8626) are reversed.

### II. BACKGROUND

#### A. Debtors' Business and the Events Leading to
Bankruptcy

Debtors were in the business of originating, servicing, and
purchasing mortgage loans (as well as selling mortgage loans)
through whole loan sales and securitizations. (Bk. D.I. 8254
at 3) Founded in 1995, [3] TRS Holdings grew rapidly from
its **\*581** inception. (*Id.* at 8) In 1996, its first year of
operation, TRS Holdings originated $357 million in mortgage
loans. (*Id.*) Ten years later, in 2006, TRS Holdings originated
approximately $60 billion in mortgage loans; between April
2005 and December 2006, TRS Holdings funded more than
$200 million in loans almost every business day. (*Id.*) Prior to
the bankruptcy filings, TRS Holdings had grown to employ
over 7,200 people, had a market capitalization of over $1
billion (as of February 2007), had its equity securities traded
on the New York Stock Exchange, had credit facilities of
$17.4 billion to finance its activities, and was the second

largest originator of subprime residential mortgage loans. (*Id.*)

In February and March 2007, debtors experienced a swift reversal of fortune. On February 7, 2007, TRS Holdings announced that it must restate its loan repurchase losses in its previously-filed financial statements for quarters ended March 31, June 30, and September 30, 2006, and that it expected to post both a fourth quarter loss and a loss for all of 2006; this announcement precipitated multiple securities class action lawsuits against the company. (*Id.* at 6) On March 2, 2007, TRS Holdings announced that it could not file its 2006 Form 10–K without unreasonable effort and expense, which caused the New York Stock Exchange to announce the de-listing of the company's stock on March 13, 2007. (*Id.* at 7) These announcements led warehouse lenders to cut off funding for loans originated by debtors and to replace debtors as the mortgage loan servicer. (*Id.*) Under those circumstances, debtors were able to fund only a portion of their loan originations. (*Id.*) Ultimately, by the end of March 2007, debtors found themselves with obligations in excess of $7 billion and insufficient liquidity to satisfy those obligations. (*Id.* at 7, 9)

### B. Bankruptcy Proceedings and the Plan

On April 2, 2007, debtors filed voluntary chapter 11 bankruptcy petitions.[4] (*Id.* at 1) On April 9, 2007, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee"), which consisted of seven creditors holding claims of various types against different individual debtors. (*Id.* at 10 n. 12) Debtors, the Creditors' Committee, and other creditor groups began negotiating a chapter 11 plan. (*See id.* at 9–10)

On June 20, 2007, appellants filed an adversary proceeding against debtors, Wells Fargo Bank, N.A. as Trustee ("Wells Fargo"), the Compensation Committee of the Board of Directors of New Century Financial Corporation as Plan Administrator (the "Compensation Committee"), and the Creditors' Committee concerning amounts that appellants had contributed under deferred compensation plans while in debtors' employ. (*Id.* at 27) In January 1999, TRS Holdings had created a trust (the "Deferred Compensation Trust"), with Wells Fargo as Trustee, to be used in conjunction with The New Century Financial Corporation Deferred Compensation Plan and/or The New Century Financial Corporation Supplemental Executive Retirement/Savings Plan (the "Deferred **\*582** Compensation Plans").[5] (*Id.*

at 23, 27) Appellants and other eligible employees had contributed funds under the Deferred Compensation Plans. (*Id.*) In the adversary proceeding, appellants have sought a declaration that the Deferred Compensation Plans are not "top hat" plans as defined by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"),[6] and that the Deferred Compensation Trust, therefore, is not an asset of the bankruptcy estates that can be used to satisfy other creditors' claims.[7] (*Id.* at 27–28)

On February 2, 2008, after extensive negotiations (Bk. D.I. 8254 at 9), debtors and the Creditors' Committee filed a joint chapter 11 liquidation plan and corresponding disclosure statement. (Bk. D.I. 4804 and 4805) On March 18, 2008, debtors filed an amended joint liquidation plan ("the first amended plan"). (*See* Bk. D.I. 5405) That same day, the bankruptcy court approved the disclosure statement, established procedures for voting on the first amended plan, and scheduled a hearing on plan confirmation. (*See* Bk. D.I. 5396) On April 18, 2008, appellants filed an objection to plan confirmation. (Bk.D.I.6338)

On April 23, 2008, debtors filed a second amended joint liquidation plan (the "second amended plan" or "plan"). (*See* Bk. D.I. 6412) The plan separates the sixteen debtors into three groups (each, a "Debtor Group") to facilitate the distributions to the unsecured creditors. (*Id.* at 10) The first Debtor Group, the Holding Company Debtors, consists of real estate investment entities that typically held residual interests in securitization trusts, owned stock in the Operating Company Debtors, and provided overall direction and management to the Operating Company Debtors.[8] (*Id.* at 11) The second Debtor Group, the Operating Company Debtors, were generally entities that conducted debtors' business operations, including originating, purchasing, and selling loans and servicing loans for third parties.[9] (*Id.*) The final Debtor Group consists only of New Century Warehouse Corporation ("Access Lending"), which was acquired by TRS Holdings in **\*583** early 2006 and was a subsidiary that provided warehouse financing to independent mortgage companies. (*Id.*)

The plan classifies claims based upon the three Debtor Groups. (*Id.*) Claims against the Holding Company Debtors are placed in classes HC1 through HC13, with appellants assigned to class HC3b along with holders of other unsecured claims against NCFC. (*Id.* at 11–13) Claims against the Operating Company Debtors are placed in classes OP1

through OP12. (*Id.* at 13–14) Claims against Access Lending are placed in classes AL1 through AL3. (*Id.* at 14)

The plan provides for the distribution of the net cash available from the assets of debtors in each Debtor Group to the holders of unsecured claims against debtors in that Debtor Group. (*Id.* at 14–15) Cash available for distribution to unsecured creditors in each Debtor Group is calculated based on the gross proceeds obtained from disposing of that Debtor Group's assets minus amounts for allowed administrative, priority, and secured claims, expenses of administering the Debtors' estates during the chapter 11 proceedings, and expenses of the liquidating trust established by the plan. (*Id.*)

The plan provides for certain protocols that affect the amount of each claimant's distribution, including the Multi–Debtor Claim Protocol, the Intercompany Claim Protocol, and the EPD/Breach Claim Protocol. [10] (*Id.* at 15–19) The Multi–Debtor Claim Protocol adjusts the distribution amount for creditors holding allowed unsecured claims for which more than one debtor is jointly and/or severally liable. (*Id.* at 15) For instance, under the Multi–Debtor Claim Protocol, unsecured creditors with claims for which Holding Company Debtors NCFC and NC Credit are jointly and/or severally liable will receive 130% of the amount of their claims against NCFC and 0% of the amount of their claims against NC Credit. (*Id.* at 15–16) Similarly, unsecured creditors with claims for which NCMC and other Operating Company Debtors are jointly and/or severally liable will receive 130% of the amount of their claim against NCMC and 0% of the amount of their claim against the other Operating Company Debtors. (*Id.* at 16)

The Intercompany Claim Protocol addresses claims held by one debtor against another debtor by adjusting the distribution amount based on the merits of each debtor's intercompany claims. [11] (*Id.*) First, claims against other debtors within the same Debtor Group receive 0% of the claim amount. (*Id.*) Second, in recognition of NC Capital's potential intercompany claims against NCMC, EPD/Breach claimants with claims against NC Capital will receive 50% of the amount of their claims against the Operating Company Debtors. (*Id.* at 17) Finally, NCFC will receive 50% of the amount of its claims against NCMC in recognition that the NCMC's debt owed to NCFC could be recharacterized as equity in NCFC. (*Id.* at 17–18)

The EPD/Breach Claim Protocol is used to calculate the amount of damages for EPD/Breach Claims and is

interrelated with other compromises in the plan. [12]  **\*584** (*Id.* at 18–19) For example, where the EPD/Breach Protocol generates a claim amount that is disputed as too high or too low, the dispute is resolved consistent with the compromise on the allocation of Litigation Proceeds (as defined in the plan) among the EPD/Breach claimants and other classes of creditors. [13] (*Id.* at 19) Pursuant to that compromise, the EPD/Breach claimants with claims against NC Capital receive 45% of the net Litigation Proceeds, the Holding Company Debtors receive 27.5% of the net Litigation Proceeds, and the Operating Company Debtors (excluding those with EPD/Breach Claims against NC Capital) receive 27.5%. (*Id.* at 24–25)

On the date debtors filed their petitions, debtors had approximately $62 million of cash in their operating accounts. (*Id.* at 19) After filing, debtors generated an additional $230.4 million through asset sales; under the plan, those proceeds are assets of the Operating Company Debtors. (*Id.* at 19–20) The plan provides for the transfer of debtors' remaining assets (including capital stock in Access Lending but not Access Landing's assets [14]) into a liquidating trust. (*Id.* at 20) The liquidating trust is for the benefit of holders of unsecured claims against the Holding Company Debtors and holders of unsecured claims against the Operating Company Debtors. (*Id.*)

The plan provides that debtors' assets will be divided between the Holding Company Debtors and the Operating Company Debtors for purposes of distribution. [15] (*Id.*) The Holding Company assets, as asserted on the respective bankruptcy schedules, consist mostly of intercompany receivables, the Carrington Interests, [16] and the Deferred Compensation Trust. [17] (*Id.* at 21–22) The Operating Company assets include proceeds from the sales of debtors' servicing business and mortgage loans not **\*585** subject to repurchase. [18] (*Id.* at 24)

On April 23, 2008, the same day the plan was filed, debtors' claims agent filed a declaration reporting the voting results for the first amended plan. (Bk.D.I.6406) Every class of creditors entitled to vote accepted the first amended plan except class HC3b, which includes appellants. (Bk. D.I. 8254 at 25) Of the 203 votes cast against the first amended plan, 200 were cast by appellants. [19] (*Id.*)

On April 24 and 25, 2008, the bankruptcy court conducted a two-day hearing on plan confirmation. (*Id.* at 2) At the hearing and in post-hearing briefs, appellants raised several arguments against plan confirmation, including that: (i) the plan provides for substantive consolidation of the debtors in violation of *In re Owens Corning*, 419 F.3d 195 (3d Cir.2005); and (ii) the plan does not comply with 11 U.S.C § 1123(a)(4) (as required by § 1129(a)(1)) because, by operation of the Multi–Debtor Claim Protocol, it provides for disparate treatment of claims within the same class. (*Id.;* Bk. D.I. 6645)

On July 2, 2008, the bankruptcy court issued an opinion overruling appellants' objections (the "confirmation opinion") and ordered the plan proponents to draft an order to be entered confirming the plan. (Bk.D.I.8254, 8255) On July 15, 2008, the bankruptcy court entered the plan proponents' confirmation order. (Bk.D.I.8596) On July 23, 2008, to correct a typographical error in that order (*see* Bk. D.I. 8624), the bankruptcy court issued an amended confirmation order. (Bk.D.I.8626) On July 14 and July 24, 2008, appellants timely appealed the confirmation opinion and the related confirmation orders. (Bk.D.I.8563, 8628)

On July 29, 2008, appellants filed a motion to stay the confirmation order pending appeal (the "stay motion"). (Bk.D.I.8673) On August 22, 2008, the bankruptcy court denied the stay motion but imposed on the New Century Liquidating Trust (the "liquidating trust") a duty to provide appellants thirty days written notice of its intent to distribute any funds to classes HC1, HC3a, HC3b, HC5, HC7, HC8, HC10a, HC10b, HC11, and HC13. (Bk.D.I.8847)

### C. Implementation of the Plan

The plan had become effective on August 1, 2008 (the "effective date"). [20] (D.I. 14 at attch. 1, ¶ 5) On the effective date, [21] the liquidating trust was created with Alan M. Jacobs as trustee. (*Id.* at attch. 1, ¶ 6) Also on that date, the Creditors' Committee was dissolved; the Plan Advisory Committee (the "PAC") was formed; debtors' officers and directors ceased serving and were replaced by Jacobs; [22] debtors' assets *586 were distributed to the liquidating trust; and NCFC's outstanding common and preferred stock, as well as all notes, securities, and indentures, were cancelled. [23] (*Id.* at attch. 1, ¶¶ 6–12) Approximately 127,000 parties received notice concerning the effective date. (*Id.* at attch. 1, ¶ 16)

Since the effective date, the liquidating trust has entered into contracts with a temporary legal staffing agency and an information technology contractor and has extended a short-term lease. (*Id.* at attch. 1, ¶ 15) Funds spent pursuant to these contracts total approximately $1.3 million. (*Id.* at attch. 1, ¶ 17) The liquidating trust further spent funds as follows: $142,720 as a premium on a one-year bond covering the liquidating trust's assets; $10,640 as a premium on a one-year bond covering Access Lending's assets; $311,400 as a three-year premium on an Errors and Omissions insurance policy covering the liquidating trust, Jacobs as plan administrator and trustee, and the PAC and its members; and approximately $5.65 million for professionals, including counsel, financial advisors, and accountants. [24] (*Id.*)

Claims have been settled and distributions made after the plan was confirmed, including the following: (1) on July 31, 2008, Credit Suisse First Boston Mortgage Capital LLC reached a settlement with debtors and the Creditors Committee fixing and allowing certain claims and determining its distribution class while waiving other claims; (2) on August 28, 2008, the liquidating trust paid approximately $1.84 million to SPI Litigation Direct LLC ("SPI") in settlement of claims arising out of SPI's work for the debtors; (3) on October 23, 2008, Natixis Real Estate Capital Inc. reached a settlement with the liquidating trust fixing and allowing certain claims and determining its distribution class while waiving other claims; (4) on October 29, 2008, the liquidating trust paid approximately $46,000 to Fidelity National Information Services in settlement of administrative claims; (5) on November 25, 2008, the liquidating trust paid $66,000 to AT & T, Inc., and its affiliated entities in settlement of administrative claims; (6) on December 12, 2008, the liquidating trust paid $120,000 to Wells Fargo in settlement of administrative claims; (7) on December 19, 2008, the liquidating trust paid $181,000 to GMAC Commercial Finance LLC in settlement of administrative claims; and (8) on December 29, 2008, the liquidating trust paid $2.6 million to a group of employees in settlement of WARN Act claims and other claims arising out of their termination. [25] (*Id.* at attch. 1,¶21)

### III. DISCUSSION

### A. Analysis of Equitable Mootness

[1] [2] Under the doctrine of equitable mootness, a bankruptcy appeal should be dismissed as equitably moot if affording the appellant the relief he seeks "would be

inequitable." **\*587** *In re PWS Holding Corp.,* 228 F.3d 224, 236 (3d Cir.2000) (citing *In re Continental Airlines,* 91 F.3d 553, 559 (3d Cir.1996)). Whether the relief sought would be inequitable depends on context. Thus, in deciding whether the doctrine applies, a court must determine whether the relief sought would be inequitable in the context of the case before it.

**[3]** **[4]** In determining whether the relief sought would be inequitable and, hence, whether the doctrine should apply, courts in the Third Circuit are to consider the following factors:

> (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.

*Continental,* 91 F.3d at 560. Courts are to give these factors "varying weight, depending on the circumstances." [26] *PWS Holding,* 228 F.3d at 236.

**[5]** Here, the circumstances are that of a chapter 11 liquidation, and the court must apply the above factors with that liquidation context in mind. [27] This means that the court, in determining whether the relief sought in this case would be inequitable, cannot indiscriminately follow *Continental* and its progeny. [28] This is because the guidance in those decisions concerning how to apply the above factors invokes considerations and employs examples that are relevant to reorganizations but not as much to liquidations. For example, unraveling a substantially consummated reorganization plan can be difficult and inequitable—difficult in that it requires reversing multiple, often complex, future-looking transactions (securing financing, issuing equity, contracting with producers and/or suppliers, etc.) and inequitable in that it shifts the tables on non-adverse third parties **\*588** (such as investors, financiers, etc.) who have acted in reliance on the debtor emerging from bankruptcy in accordance with the particulars of the reorganization plan. *See, e.g., Zenith,* 329 F.3d at 344–46. Thus, in a reorganization context, it makes sense to treat the unraveling of the plan as a significant fact weighing in favor of finding the appeal equitably moot.

*See generally id.* However, it makes less sense to treat the unraveling of the plan with such significance in a liquidation context, since (in that context) the plan transactions tend to be discrete and relatively simple transactions aimed at disposing of the debtor's assets in the short term (sale or disposal of assets, services contracts to sustain the debtor through liquidation, etc.) and the non-adverse third parties transacting with the debtor are not doing so with any particular interest in debtor's future condition, let alone relying on debtor's future condition as contemplated by the particulars of any chapter 11 plan. Accordingly, in light of the foregoing and in keeping with the equitable nature of this inquiry, the court exercises its discretion in assigning weight to the facts of this case.

**[6]** **[7]** **[8]** Two countervailing considerations inform the court's exercise of discretion. On the one hand, public policy is served by encouraging non-adverse third parties to rely on the finality of bankruptcy confirmation orders. *Continental,* 91 F.3d at 565. Since applying the doctrine brings finality, this suggests that there should be a low bar for applying the doctrine and that the court should construe facts accordingly. On the other hand, however, even while encouraging reliance on finality, the court must preserve a meaningful right of appeal. If the equitable mootness bar is too low, that is, if equitable mootness factors swing too easily in favor equitable mootness, the right of appeal becomes meaningless and the instruction to apply the doctrine "cautiously" and on a "limited" scope, *PWS Holding,* 228 F.3d at 236, is contravened.

**1. Substantial consummation**

**[9]** To determine whether the substantial consummation factor weighs in favor of equitable mootness, the court first looks to whether the bankruptcy code's definition of "substantial consummation" has been satisfied. *Zenith,* 329 F.3d at 343–44. The bankruptcy code defines "substantial consummation" as the:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2). If this definition has been satisfied, the court may then look to whether a successful appeal would unravel the plan, *see id.* at 344–45, although, in the liquidation context, that fact has diminished significance. Indeed, where the plan that has been substantially consummated can be "reversed without great difficulty and inequity," this factor does not weigh in favor of equitable mootness. *See Nordhoff,* 258 F.3d at 186.

In this case, the bankruptcy code's definition of substantial consummation has been satisfied: debtors' assets [29] have been **\*589** transferred to the liquidating trust for disposition and distributions have commenced. It is also true that the relief appellants seek would unravel the plan, at least in part, since appellants seek on appeal to undo the plan's debtor groups and protocols.

It does not appear from the record, however, that reversing the plan would result in "great difficulty or inequity." Certain events are the natural and inevitable consequences of a liquidation, *e.g.,* the discharge of employees, cancellation of equity and debts, transfer of assets to the liquidating trustee, and asset sales, to name a few. Indeed, the only aspects of plan implementation that arguably need to be reversed are the relatively few distributions that have occurred, [30] but these are not sufficient to establish "great difficulty and inequity." Accordingly, this factor does not weigh in favor of equitable mootness.

**2. Obtaining a stay**

[10]    Ordinarily, "[t]he existence or absence of a stay is a critical factor in determining whether to dismiss an appeal under the doctrine of equitable mootness." *In re Grand Union Co.,* 200 B.R. 101, 105 (citing *Continental,* 91 F.3d at 561–63). This is so because where no stay has been obtained, the plan goes forward, and it can be difficult to undo the acts of non-adverse third parties proceeding under the plan without prejudicing those non-adverse third parties. *See generally Continental,* 91 F.3d at 561–63; *In re Highway Truck Drivers & Helpers Local Union # 107,* 888 F.2d 293, 297 (3d Cir.1989).

[11]    In this case, however, while no stay has been obtained, the plan has not gone forward freely, at least in part because of the bankruptcy court's imposition of a notice requirement; indeed, it appears from the record that no creditor class has received distributions. Moreover, the plan components that

have gone forward are not those on which non-adverse third parties have detrimentally relied. [31] Under the circumstances here, then, appellants' failure to obtain a stay has not resulted in the advanced implementation with which this factor is typically concerned. Thus, this factor does not weigh in favor of equitable mootness.

**3. Rights of non-adverse third parties**

[12]    Equitable mootness "protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance upon the plan as implemented." *Continental,* 91 F.3d at 562 (quoting *In re Manges,* 29 F.3d 1034, 1039 (5th Cir.1994) (quotation marks omitted)). As has been discussed, the record does not establish that non-adverse parties have relied on the particulars of the current liquidation plan in such a way as to make a reversal of confirmation inequitable. Accordingly, this factor does not weigh in favor of equitable mootness.

**4. Affect on the plan's success**

[13]    As articulated in *Continental* and its progeny, this factor is ultimately concerned with whether an appellant's requested **\*590** relief "would affect the re-emergence of the debtor as a revitalized entity." *Nordhoff,* 258 F.3d at 189 (quotation marks omitted). The analogous concern in the liquidation context would be whether the appellant's requested relief would affect the debtor's ability to liquidate. Because nothing in the record suggests that undoing the current liquidation plan will affect debtors' ability to liquidate in the future under a different plan, this factor does not weigh in favor of equitable mootness.

**5. Public policy of affording finality to bankruptcy judgments**

[14]    [15]    This factor weighs in favor of equitable mootness where non-adverse third parties have acted in detrimental reliance on the finality of bankruptcy confirmation orders to such a degree that reversing those orders would discourage future detrimental reliance by similarly situated parties. *See Continental,* 91 F.3d at 565. In the reorganization context, the finality of bankruptcy judgments is significant because multiple parties, including non-adverse third parties, have acted in detrimental reliance on the debtor emerging from bankruptcy as contemplated by the reorganization plan. *See Continental,* 91 F.3d at 565. Thus, the public policy favoring finality is allowed to trump the countervailing consideration of preserving a meaningful right of appeal from erroneous

plan confirmations. Where parties have not relied to their detriment on finality, which is often the case in the liquidation context, this factor does not weigh in favor of equitable mootness.

In this case, there is no record that any non-adverse third party changed its position in reliance on finality to the degree that reversing the appeal here would discourage similarly situated parties from transacting business with a liquidating debtor. Accordingly, this factor does not weigh in favor of equitable mootness.

Having found that none of the equitable mootness factors weigh in favor of applying the doctrine in this case, the court denies appellees' motion to dismiss.

**B. Analysis of the Appeal on the Merits**

**1. Standard of review on appeal**

 **[16]**  **[17]**  **[18]**  **[19]**  This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact [32] and a plenary standard to that court's legal conclusions. See *Am. Flint Glass Workers Union v. Anchor Resolution Corp.,* 197 F.3d 76, 80 (3d Cir.1999). With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.' " *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 642 (3d Cir.1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101–02 (3d Cir.1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo **\*591** basis bankruptcy court opinions. See *In re Hechinger,* 298 F.3d 219, 224 (3d Cir.2002); *In re Telegroup,* 281 F.3d 133, 136 (3d Cir.2002).

**2. Questions presented**

Appellants present five questions on appeal, two of which the court addresses here: [33] (1) does the plan provide for substantive consolidation inconsistent with *In re Owens Corning,* 419 F.3d 195 (3d Cir.2005); and (2) does the plan discriminate among members of class HC3b in violation of 11 U.S.C. § 1123(a)(4)? The court addresses these in order.

**3. Substantive consolidation**

 **[20]**  **[21]**  **[22]**  **[23]**  Substantive consolidation is an equitable remedy. *In re Owens Corning,* 419 F.3d at 210. It is used, essentially, to address the harms caused by debtors (and their related entities) disregarding their separateness and/or otherwise entangling their affairs. See *id.* In function, substantive consolidation " 'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims against separate debtors morph into claims against the consolidated survivor.' " *Id.* at 205 (quoting *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.),* 402 F.3d 416, 423 (3d Cir.2005)). The pooling of assets in a consolidated survivor, and the resulting increased competition among creditors for a share of those assets, means that certain creditors may recover significantly less in a substantive consolidation scenario. See *id.* Because substantive consolidation is "extreme ... and imprecise," it works " 'rough justice' " and is to be used sparingly. *Id.* at 210. Indeed, in the Third Circuit, substantive consolidation is appropriate only where the parties consent or where the proposed-to-be-consolidated entities "(i) prepetition disregarded separateness so significantly [that] their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Id.*

 **[24]**  The question raised on appeal is whether the plan, by aggregating multiple debtors into debtor groups to resolve claims, effects a substantive consolidation. As the bankruptcy court points out, the plan here does not call for the typical case of substantive consolidation where multiple separate entities are merged into a single entity and inter-entity liabilities are erased; instead of many-into-one, the plan calls for many-into-three, and the inter-entity liabilities are not erased. Typical or not, however, the many-into-three framework still presents the same potential inequities for creditors as would be presented in the many-into-one framework, namely that creditors face increased competition for a consolidated pool of assets and a re-valued claim that is less precise than if the creditors were dealing with debtors individually. This is the "rough justice" against which *Owens Corning* warns and, because it is effected by aggregating multiple debtors into one or more debtor groups, it falls within the definition of substantive consolidation.


It is true that the aggregation in this case was not accompanied by erasure of inter-entity liabilities and was achieved by compromise settlement. These facts, however, are not meaningful grounds for **\*592** differentiating the instant case from the typical substantive consolidation scenario because they do not eliminate the aggregation's potentially deleterious effects on creditors, which is the main concern expressed in *Owens Corning* with respect to substantive consolidation and the reason why *Owens Corning* limits the use of substantive consolidation to only a few scenarios. Thus, these differences are not sufficient to place the aggregation in this case outside the definition of substantive consolidation. The bankruptcy court erred, then, in concluding that the plan did not effect a substantive consolidation and, as the record does not show that substantive consolidation is warranted in this case consistent with *Owens Corning,* the plan confirmation must be reversed.

**4. Disparate treatment of class members in the same class**

[25]    To be confirmable, a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Courts are to enforce this provision according to its plain language. *See Hartford Underwriters Ins. Co. v. Union Planters,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). Accordingly, if claims within the same class are not receiving the same treatment, and the holders of those claims being treated less favorably have not consented to the discrimination, the plan is not confirmable.

[26]    The question raised on appeal is whether the plan, by providing 100% of the determined distribution amount on some claims in class HC3b (the "100% claims") and 130% on other claims in class HC3b whose holders have relinquished claims in class HC10b (the "130% claims"), treats all claims in class HC3b the same or, in the alternative, discriminates with the holders' consent. The bankruptcy court concluded that the plan discriminates with consent, reasoning that the holders of the 130% claims, instead of insisting on receiving 100% of the determined distribution for their HC3b claims and 100% of the determined distribution for their HC10b claims (a total distribution of 200%), consented to less favorable treatment in the form of receiving 0% on their HC10b claims and 130% on their HC3b claims (a total distribution of 130%). The problem, however, is that consent

to less favorable treatment in class HC10b only excuses disparate treatment of claims in that class. It is inapposite to the treatment of claims in class HC3b. The treatment of claims in class HC3b is a separate matter, and it is clear that the plan treats the 100% claims in that class less favorably than the 130% claims without the holders'—or at least appellants'—consent. Thus, the bankruptcy court erred in finding that the plan was in compliance with § 1123(a)(4), and the plan confirmation must be reversed. [34]

**IV. CONCLUSION**

For the aforementioned reasons, the court denies debtors' motion to dismiss (D.I.13), reverses the bankruptcy court's issuances that are the subject of this appeal (Bk.D.I.8254, 8255, 8596, 8626), and remands the case. An appropriate order shall issue.

**ORDER**

At Wilmington this 16th day of June, 2009, having reviewed the appeal filed by **\*593** filed by Gregory J. Schroeder, Michelle Park, Martin Warren, Steve Holland, Nabil Bawa, and the Ad Hoc Committee of Beneficiaries of the New Century Financial Corporation Deferred Compensation Plan and/or Supplemental Executive Retirement/Savings Plan and the motion to dismiss the appeal filed by New Century Liquidating Trust and Alan M. Jacobs as Liquidating Trustee and Plan Administrator for New Century Warehouse Corporation (collectively, "appellees") and the papers filed in connection therewith;

IT IS ORDERED that:

1. Appellees' motion to dismiss (D.I.13) is denied.

2. The bankruptcy court issuances that are the subject of the appeal (Bk.D.8254, 8255, 8596, 8626) are reversed.

3. The case is remanded to the bankruptcy court for further proceedings consistent with the memorandum opinion issued this same day.

**Parallel Citations**

51 Bankr.Ct.Dec. 211

## Footnotes

1     "Debtors" are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; and NCoral, L.P., a Delaware limited liability partnership. (Bk. D.I. 8254 at 1 n. 1) "Debtors" also include New Century Warehouse Corporation (a/k/a Access Lending), a California corporation, which filed its voluntary chapter 11 petition on August 3, 2007. (*Id.*) In total, there are sixteen debtors-in-possession. (*Id.* at 10)

2     Appellants at one time had two appeals pending, but the earlier-filed appeal has been consolidated with the instant appeal by order of the court. (D.I.9)

3     Formed as a Delaware corporation in 1995, the entity formerly known as New Century Financial Corporation ("NCFC") was the parent corporation of the other debtor entities. (Bk. D.I. 8254 at 21) In 2004, in anticipation of NCFC being reorganized into a Maryland real estate investment trust ("REIT") for federal income tax purposes, New Century REIT, Inc. (a Maryland corporation with REIT status) and its wholly-owned subsidiary, NC Merger Sub, Inc. (a Delaware corporation), were established. (*Id.*) On October 1, 2004, to effect the reorganization, NC Merger Sub was merged into NCFC, and NCFC's name was changed to New Century TRS Holdings, Inc. ("TRS Holdings"). (*Id.*) TRS Holdings, the surviving corporation, was now a wholly-owned subsidiary of New Century REIT, Inc., with New Century REIT, Inc., taking the name of "New Century Financial Corporation." (*Id.*) After the merger and reorganization, debtors' general ledger system identified the entity now known as New Century Financial Corporation as "REIT," but continued to identify TRS Holdings as NCFC, its former name. (*Id.*) The court herein refers to the entity formerly known as NCFC and now known as TRS Holdings as TRS Holdings.

4     Measured by the value of pre-petition assets, debtors' bankruptcy filing was the largest chapter 11 filing in 2007 and, as of February 29, 2008, the ninth-largest ever. (Bk. D.I. 8254 at 9 n. 11)

5     As of December 31, 2006, the Deferred Compensation Trust contained more than $43 million. (Bk. D.I. 8254 at 27)

6     ERISA defines a "top hat" plan as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated individuals." 29 U.S.C. § 1051(2)

7     Appellants argue in the adversary proceeding that, if the Deferred Compensation Plans are not top hat plans subject to ERISA, then any employee contributions "never inure[d] to the benefit of any employer and [have been] held for the exclusive purpose of providing benefits to participants in the [compensation] plan and their beneficiaries and defraying reasonable expenses of administering the [compensation] plan." (Bk. D.I. 8254 at 28 n. 23 (quoting 29 U.S.C. § 1103(c)(1))) In the alternative, appellants argue that the terms of the Deferred Compensation Plans and the Deferred Compensation Trust provide that the Deferred Compensation Trust is available only to general creditors of NCFC. (*Id.* at 28)

8     The Holding Company Debtors consist of NCFC, TRS Holdings, New Century Credit Corporation ("NC Credit"), and NC Residual IV Corporation ("NC Residual IV"). (Bk. D.I. 8254 at 11)

9     The Operating Company Debtors consist of New Century Mortgage Corporation ("NCMC"), NC Capital Corporation ("NC Capital"), Home123 Corporation ("Home123"), NC Asset Holding, L.P. ("NC Asset Holding"), NC Deltex, LLC ("NC Deltex"), New Century REO Corp. ("NC REO"), New Century REO II Corporation ("NC REO II"), New Century REO III Corporation ("NC REO III"), NC Residual III Corporation ("NC Residual III"), New Century Mortgage Ventures, LLC ("NCM Ventures"), and NCoral, L.P. ("NCoral"). (Bk. D.I. 8254 at 11)

10     The plan provides that certain provisions may not "be stricken, altered, or invalidated," including provisions related to the Multi–Debtor Claim and Intercompany Protocols and the treatment and classification of claims. (*See* Bk. D.I. 6412 at 105)

11     These claims appear on debtors' books and records, but there are no promissory notes or instruments evidencing the debt. (Bk. D.I. 8254 at 16)

12     The plan defines an "EPD/Breach Claim" as a claim "arising under an agreement between one or more of the Debtors and a loan buyer or securitization party for (i) breach of representation or warrant under such agreement made by one or more of the Debtors

or (ii) a right under such an agreement to resell a loan to one or more of the Debtors based on a payment default by the borrower on such loan." (Bk. D.I. 8254 at 18)

13 Under the plan, "Litigation Proceeds" are the net proceeds generated from any litigation (except those proceeds belonging to Access Lending) and include any net proceeds from avoidance actions and suits arising out of the need to restate 2006 financial statements. (Bk. D.I. 8254 at 24)

14 Access Lending's assets consist primarily of proceeds from the liquidation of its assets in April 2007 and the cash in its operating account as of the petition date. (Bk. D.I. 8254 at 20 n. 18)

15 During plan negotiations, issues arose over which debtors owned which assets. (Bk. D.I. 8254 at 20–21) These issues stemmed primarily, with respect to the Holding Company Debtors especially, from the 2004 reorganization involving NCFC and TRS Holdings discussed *supra* in footnote 3. (*See id.* at 21)

16 The Carrington Interests are two different partnership interests owned by debtors—one is a general partnership interest valued by debtors at approximately $8 million, and the other is a limited partnership interest valued by the debtors at approximately $42.5 million. (Bk. D.I. 8254 at 22) Debtors' accounting records show that the Carrington Interests are owned by TRS Holdings, but other documents after the 2004 reorganization make ownership unclear. (*Id.*) Income from the limited partnership interest is presently being realized by NCFC, but NCMC advanced the money that TRS Holdings used to purchase the interest. (*Id.*) The Creditors' Committee has asserted that NCMC, by virtue of its having funded the purchase, should be entitled to that interest. (*Id.*)

17 The confusion over whether NCFC or TRS Holdings owned the Carrington Interests and the Deferred Compensation Trust led to the decision to aggregate the assets of the Holding Company Debtors for purposes of distribution. (Bk. D.I. 8254 at 22)

18 It was further agreed during plan negotiations that NCMC would receive any potential tax refunds owed to debtors. (Bk. D.I. 8254 at 24)

19 For reasons not made clear in the bankruptcy court's confirmation order or in the parties' briefs on appeal, the bankruptcy court and the parties treat the voting results on the first amended plan as applicable to the second amended plan.

20 On July 28, 2008, in preparation for the plan taking effect, all of Access Lending's stock was transferred to the liquidating trust, which then became the sole shareholder of Access Lending. (D.I. 14 at attach. 1, ¶ 10)

21 As of the effective date, the Holding Company Debtors had no cash with which to pay their share of administrative expenses. (D.I. 14 at attach. 1, ¶ 24) As part of plan compromises, between the effective date and December 31, 2008, the Operating Company Debtors paid $5.6 million to cover the Holding Company Debtors' share. (*Id.*)

22 Debtors also ceased having employees. (D.I. 14 at attach. 1, ¶ 7)

23 Jacobs speculates that these cancellations precipitated significant tax events in 2008 for equity holders and creditors. (D.I. 14 at attach. 1, ¶ 13)

24 Jacobs avers that the liquidating trust has distributed approximately $21.12 million in payment of professional fees and other pre-effective date administrative claims (D.I. 14 at attach. 1, ¶ 20), but he fails to clarify the allocation between professional fees and administrative claims or whether the $5.65 million in post-effective date professional fees is included in the $21.12 million figure.

25 The bankruptcy court approved each of these settlements. (*See* D.I. 14 at attach. 1, ¶ 21) The liquidating trust also entered into settlements not requiring the bankruptcy court's approval, including settlements with Bloomington Associates 2005 LLC, the Ohio Attorney General, and various taxing authorities. (*Id.* at attach. 1, ¶ 22)

26 The *PWS Holding* court goes on to state that "the foremost consideration is whether the reorganization plan has been substantially consummated," *PWS Holding,* 228 F.3d at 236, but, as discussed hereafter, that statement does not necessarily hold true in the liquidation context.

27 It is reasonable to question whether the equitable mootness doctrine, as articulated by the Third Circuit, even applies in the liquidation context. The court in *In re Zenith Electronics Corp.* stated that "[t]he underlying purpose of the doctrine is to 'prevent[ ] a court from unscrambling complex bankruptcy **reorganizations** when the appealing party should have acted before the plan became extremely difficult to retract.' " 329 F.3d 338, 345 (3d Cir.2003) (quoting *Nordhoff Investments, Inc. v. Zenith Electronics Corp.,* 258 F.3d 180, 185 (3d Cir.2001)) (emphasis added). Similarly, the court in *Continental,* in listing factors for determining whether the doctrine should apply, expressly referred to "reorganization." *See Continental,* 91 F.3d at 560. Likewise, the courts in *Nordhoff, PWS Holding,* and *Zenith* discussed the doctrine applying in a reorganization context. *See generally Nordhoff,* 258 F.3d at 185–90; *PWS Holding,* 228 F.3d at 235–37; *Zenith,* 329 F.3d at 343–47.

> That said, the express focus on reorganization in these cases can reasonably be attributed to the fact that reorganization plans were at issue in each. Moreover, the court is not aware of any reason why it should be concerned with inequitable appellate relief in a reorganization context but not in a liquidation context. Accordingly, the court assumes, as have other courts in the Third Circuit, that the equitable mootness doctrine may apply in a liquidation context. *See In re Nellson Nutraceutical, Inc.,* 2008 WL 4532514 (D.Del. Oct.9, 2008); *In re Reading Broadcasting, Inc.,* 2008 WL 3540212 (E.D.Pa. Aug.8, 2008).

28  "*Continental* and its progeny" refers to *Continental* and *PWS Holding*, both cited previously, as well as *Nordhoff Investments, Inc. v. Zenith Electronics Corp., 258 F.3d 180 (3d Cir.2001)*, and *In re Zenith Electronics Corp., 329 F.3d 338 (3d Cir.2003)*.

29  Appellants argue that not all or substantially all of debtors' assets have been transferred to the liquidating trust because it has not yet been determined whether debtors had rights to the amounts contributed under the Deferred Compensation Plans, which is a significant asset. Appellees counter, and the court agrees, that appellants' argument on this point misses the mark. Whatever rights debtors had with respect to those amounts (even if they had no rights) were transferred as of the effective date, thus satisfying the requirement that all or substantially all assets be transferred.

30  For example, distributions to administrative and WARN Act claimants.

31  The cancellation of debt and equity may have had tax implications for non-adverse third parties, as Jacobs speculates. However, the record does not establish that a successful appeal would create such difficulty with respect to tax filings as to render the appeal inequitable. Accordingly, the court gives no weight to this speculation.

32  "A factual finding is clearly erroneous when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *In re CellNet Data Sys., Inc., 327 F.3d 242, 244 (3d Cir.2003)* (citing *United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)*).

33  The court does not address appellants' three additional questions since resolving the two questions listed here is sufficient to instruct the parties and the bankruptcy court on remand as to the strictures governing subsequent iterations of the plan.

34  While the court appreciates the complexity of dealing with the tangle of debtor entities involved at bar, nonetheless, there are limits to what equity alone can accomplish. The Third Circuit has established those limits in *Owens Corning* and, while it is the final arbiter of how those limits apply to any individual fact scenario, this court declines to further expand the scope of equitable powers given a bankruptcy court in these circumstances.

**End of Document**                         © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 84

2009 WL 3245879
Only the Westlaw citation is currently available.
United States District Court,
D. Oregon.

SECURITIES and EXCHANGE
COMMISSION, Plaintiffs,
v.

SUNWEST MANAGEMENT, INC., Canyon
Creek Development, Inc., Canyon Creek
Financial LLC, and Jon M. Harder, Defendants,
and

Darryl E. Fisher, J. Wallace Gutzler, Kristin Harder,
Encore Indemnity Management LLC, Senenet
Leasing Company, Fuse Advertising, Inc., KDA
Construction, Inc., Clyde Hamstreet, and Clyde A.
Hamstreet & Associates, LLC, Relief Defendants.

Civil No. 09–6056–HO.   |   Oct. 2, 2009.

West KeySummary

1    **Securities Regulation**

     Receivership

Court approval of proposed distribution plan
was warranted in action that was brought by
Securities and Exchange Commission (SEC)
regarding violation of federal securities laws and
that sought receivership regarding corporation.
Corporation's procuring and using funds in a
comingled manner, coupled with the inability to
trace funds, warranted a finding that corporation
was conducted as a unitary enterprise and
therefore warranted proposed plan's claim
calculation method and claim distribution
treatment. It would have been inequitable for
a creditor or investor to receive a distribution
based on the value of any specific facility.
Corporation did not respect the separateness
of the receivership entities nor the restricted
purposes of invested funds that were intended to
be limited to use for specific facilities.

Cases that cite this headnote

**Attorneys and Law Firms**

Kashya K. Shei, Marc J. Fagel, Mark P. Fickes, Michael E.
Liftik, Sheila E. O'Callaghan, Susan F. Lamarca, Securities
and Exchange Commission, San Francisco, CA, for Plaintiffs.

Michael E. Haglund, Shay S. Scott, Haglund Kelley Horngren
Jones & Wilder, LLP, Portland, OR, David A. Foraker,
Greene & Markley, PC, Portland, OR, Greg R. Yates, Steptoe
& Johnson, New York, NY, Christopher H. Hart, George H.
Kalikman, Gregory C. Nuti, Kevin W. Coleman, Schnader
Harrison Segal & Lewis LLP, San Francisco, CA, David D.
Vanspeybroeck, Robert B. Miller, Stephen F. English, Laura
Caldera Taylor, Bullivant Houser Bailey, PC, Portland, OR,
Eric T. Smith, Keith E. Whitson, Schnader Harrison Segal &
Lewis LLP, Pittsburgh, PA, for Defendants.

James M. Barrett, Steven K. Blackhurst, Ater Wynne,
LLP, Portland, OR, Robert J. Vanden Bos, Vanden Bos
& Chapman, Portland, OR, Thomas R. Johnson, Stephanie
K. Hines, Perkins Coie, LLP, Portland, OR, for Relief
Defendants.

Opinion

FINDINGS OF FACT AND CONCLUSIONS OF LAW

MICHAEL R. HOGAN, District Judge.

 *1  This matter comes before the court upon the motion to
approve the Proposed Distribution Plan (Dkt. No. 537) (the
"Plan") filed jointly by Michael Grassmueck, court-appointed
Receiver (the "Receiver") and Clyde Hamstreet, Chief
Restructuring Officer ("CRO") for Sunwest Management,
Inc. ("SMI") and several hundred affiliates (as defined in the
Plan, the "Sunwest Enterprise").[1]

At its peak, the Sunwest Enterprise controlled and/or
operated hundreds of assisted living facilities around the
country. The Sunwest Enterprise also controlled and managed
other investments, including real property both related and
unrelated to the assisted living facilities. Over the past several
years, hundreds of millions of dollars in new investments
in the Sunwest Enterprise were solicited, primarily offered
and structured as tenant in common ("TIC") real property
investments, without disclosures to investors of material
information about the Sunwest Enterprise.

This case involves the near financial meltdown of the Sunwest Enterprise. Jon Harder, the founder of the Sunwest Enterprise, and dozens of Receivership Entities have filed voluntary chapter 11 proceedings. The Sunwest Enterprise has critical cash flow problems arising from the over leveraging of properties, lower than industry standard occupancy, and disruption in the capital markets. This has caused the Sunwest Enterprise to be in severe financial distress for the past two years, and has led to hundreds of millions of dollars in investment losses, primarily to individual investors who had intended to restrict their investments to specific facilities.

The Sunwest Enterprise, however, was managed as a unitary enterprise that generally did not respect the separateness of the Receivership Entities nor the restricted purposes of invested funds that were intended to be limited to use for specific facilities. Without the Distribution Plan, the investors have little hope that they will achieve the expected, or perhaps any, return on their investments. Many investors would receive no recovery of their investment without the prompt implementation of a Distribution Plan. The status quo is unsustainable and will cause further losses to all investors and creditors. There is neither an easy nor a perfect solution to the problems created by the historic operations of the Sunwest Enterprise. By approval of the Distribution Plan, as modified by this Court and reflected in the attached redline of the filed Distribution Plan, and as set forth in detail in the following findings of fact and conclusions of law, the Court attempts to ameliorate the harm to the innocent persons and entities who were unknowingly caught up in these events.

### PROCEDURAL HISTORY

1. On March 2, 2009, the United States Securities and Exchange Commission (the "Commission") filed its Complaint against Defendants Sunwest Management, Inc., Canyon Creek Development, Inc., Canyon Creek Financial, LLC, and Jon M. Harder, and Relief Defendants Darryl E. Fisher, J. Wallace Gutzler, Kristin Harder, Encore Indemnity Management, LLC, Senenet Leasing Company, Fuse Advertising, Inc., KDA Construction, Inc., Clyde Hamstreet, and Clyde A. Hamstreet & Associates, LLC, for violation of the federal securities laws, injunctions against future violations and recoveries of restitution and penalties for the violations. The Commission's Complaint alleges that the Sunwest Enterprise control parties operated the Sunwest Enterprise virtually as a "Ponzi" scheme.

**\*2** 2. On the same day, the Commission filed its application for a preliminary injunction and appointment of a receiver. On March 3, 2009, the Court entered a temporary restraining order. On March 10, the Court entered an order that provides for, among other things, the preliminary injunction and appointment of the Receiver (the "Receiver Order").

3. Pursuant to the Receiver Order, the CRO was granted certain authority including the continuing authority over the day-to-day operations of the Sunwest Enterprise and disposition of assets, subject to consultation with the Receiver. Moreover, the Court appointed a Management Committee comprised of two representative Tenant In Common Claimants and two representative Unsecured Creditor Claimants to act as a fiduciary committee for Receivership Entities pursuant to the Receiver Order and that certain Order Approving Rights and Powers of CRO and Management Committee entered by the Court on June 12, 2009, as docket no. 352.

4. Since entering the original Receiver Order, the Court has entered additional Receiver Orders to include additional Receivership Entities that were affiliates of the original Receivership Entities and part of the Sunwest Enterprise that had not been specifically identified as of the date of the original Receiver Order (together with the original Receiver Order, the "Receiver Orders").

5. The Court has entered numerous orders allowing certain parties to intervene in the SEC Enforcement Action, for purposes of appearing in the Federal Receivership Case. Primarily, these parties are Secured Creditors of certain of the Receivership Entities.

6. The Court directed the Receiver and CRO to consult with parties in interest in connection with formulation of the Distribution Plan, including the Management Committee, the TIC Committee and the Unsecured Creditors' Committee formed in the Harder Bankruptcy, certain representative TIC Investors, Secured Creditors, Unsecured Creditors, and the HFG Parties. These consultations led to many Mediation sessions among the various parties in interest, resulting in numerous interim settlements or compromises with respect to the terms of the proposed Distribution Plan. The Court has recorded a number of these settlements or compromises on the record, including on July 15 and August 6, 2009.

7. The Court established a schedule for the filing of the Plan and related pleadings and documents and the hearing on approval of the Distribution Plan and related proceedings.

8. Pursuant to the established schedule, the Receiver and CRO filed the proposed Distribution Plan on August 25, 2009. Also on that date, the Receiver and CRO filed their joint motion for approval of the Distribution Plan and notice of the approval hearing (Dkt. No. 541, the "Hearing Notice") as well as detailed declarations by the CRO, Alvarez and Marsal advisors Matt Marcos and Paul Rundell, the Receiver, and his forensic accountant Greg Gadawaske of Financial Forensics.

**\*3** 9. The Hearing Notice set forth the deadline to file any response to the Distribution Plan as September 9, 2009.

10. Numerous parties, including Certain Coordinating Lenders, filed objections or other responses to the request for approval of the Distribution Plan. On September 18, 2009, the Receiver and CRO filed their Omnibus Reply to Objections to Distribution Plan Proposed By Receiver And Chief Restructuring Officer (the "Omnibus Reply"). A summary of all the timely-filed objections to the Distribution Plan is attached to the Omnibus Reply as Exhibit 1.

11. Several parties filed and served additional objections and declarations after the Omnibus Reply was filed, including Certain Coordinating Lenders who filed a supplement to their original objection and several declarations on the eve of the hearing on the Distribution Plan.

12. The hearing on approval of the Distribution Plan was conducted on September 23, 2009 (the "Approval Hearing"), at which time the court heard testimony, arguments and reviewed documentary evidence in connection with the Distribution Plan. All parties were afforded an opportunity to make an appearance, present evidence, cross-examine the witnesses offered in support of approval of the Distribution Plan, and make arguments in connection with the Court's consideration of approval of the Distribution Plan. Appearances were made as reflected in the Court's record.

13. The Court has considered the Distribution Plan, the circumstances leading up to the commencement of the Federal Receivership Case, the reports the Court has received about the operations of the Sunwest Enterprise during the Federal Receivership Case, the numerous requests for relief filed by many Secured Lenders, investors and others affected by the Federal Receivership Case, the pleadings and

documents filed in support of and objection to the approval of the Distribution Plan; the sworn testimony of the declarants and witnesses; the statements, arguments, and representations of counsel made at the Approval Hearing; and the complete record in this Federal Receivership Case and related Harder Bankruptcy and other bankruptcy proceedings. Based on the foregoing, the Court finds and concludes as follows:

## *FINDINGS OF FACT*

1. The Hearing Notice advised interested persons of the date, time, and place of the hearing on approval of the Distribution Plan and the Claims Process and their right to attend. (Hearing Notice, Dkt. No. 541). In addition, the Hearing Notice informed interested parties of their right to object and comment on proposed Distribution Plan and provided mailing and email addresses to submit objections and comments to the court, the Receiver, and the CRO. (*Id.*)

2. Approximately 81,000 Hearing Notices were mailed to potential Claimants. [Dkt. No. 597.] Copies of the Hearing Notice and Distribution Plan were also posted on the web sites of the Receiver. (*Id.*)

3. The Distribution Plan describes terms that have been agreed to through Mediation among the Receiver and CRO, and the HFG Parties (the "HFG Settlement"). For purposes of the HFG Settlement and the Distribution Plan, the Court has determined that the HFG Settlement will be resolved prior to or in connection with the Reorganization Plan, as set forth in the attached redline of the Distribution Plan.

**\*4** 4. The Court has been asked to approve the Distribution Plan and to make certain findings in connection with the approval of the Distribution Plan. Some of these findings are necessary to the approval and implementation of the Distribution Plan, and some were agreed upon conditions to support the Distribution Plan made in connection with the Distribution Plan mediation settlements that were placed on the record as the Distribution Plan was being negotiated among the various major stakeholders with the assistance of the Court and the Court appointed Mediator. In particular, as discussed in more detail below, certain findings are helpful to Tenant In Common ("TIC") and other investors who have suffered losses of their investments and face the serious additional risk of adverse tax consequences. In determining whether to make the requested findings, the Court is mindful of the unusual and somewhat unique circumstances of this

case, especially with respect to the tax issues and how it may affect investors and creditors as well as the Defendants and Relief Defendants identified in the SEC Enforcement Action.

5. The SEC filed a complaint which contends that the Defendants, who in large part controlled the Receivership Entities pre-receivership, engaged in a massive fraud that led to losses of hundreds of millions of dollars to investors who acquired TIC interests in the real properties and to other investors and creditors as well. The SEC further contends that TIC investors and other investors were told that they were purchasing ownership interests for a specific real property that would generate enough profit to pay a fixed promised annual return, and that Sunwest had a history of never missing a payment. These representations, according to the SEC, were false and concealed the true nature of the investments and the risk to investors from Sunwest's precarious financial position.

6. The SEC further contends that, contrary to representations by Defendants that investors were obtaining an interest in a specific real property which would generate a steady income stream, Defendants ran Sunwest as an integrated unitary enterprise, commingling investor and creditor funds and operational revenue into essentially a single fund, often funneled through the personal bank account of Harder, from which operating expenses and investor returns were paid. Furthermore, the SEC contends that, contrary to Defendants' representations, including written representations and marketing pitches, Sunwest paid some investors and some creditors steady returns on their investments and claims, not from successful management of a particular real property asset, but from cash generated in the operations of other real property assets and from funds obtained by refinancings, from loans from Defendant Harder and certain Harder creditors, and from funds raised through offerings to new investors. The SEC contends that these facts were not disclosed to, or known by, investors and constituted securities fraud.

 **\*5**  7. According to the SEC, by June 2008, the Defendants operated Sunwest virtually as a Ponzi scheme: money raised in the final offerings (represented to be for new real property assets) was used to pay old investors and creditors their promised return and payments and otherwise fund existing operations and other real property assets. The SEC accuses Defendants or Harder of reporting income to investors and creditors that was partially or wholly fictitious. The SEC also contends that, despite Sunwest's dire financial situation, Defendant Harder misappropriated tens of millions of dollars,

and the Relief Defendants were the recipients of substantial ill gotten gains. The SEC contends that as a result of this conduct, as of January 2009, over 100 real properties operated by Sunwest were in jeopardy of foreclosure, and in or headed into Rents and Profits Receiverships or bankruptcy cases.

8. These are serious accusations by the SEC, and according to the SEC, are based on a thorough investigation of Sunwest records and depositions and interviews of various Sunwest insiders, including Defendant Harder, and of investors and others.

9. In response to the filed complaint and allegations of the SEC, the dire financial circumstances facing many of the Receivership Entities, the continuing losses being experienced and threatened to the detriment of investors and creditors, and the support of Defendants, Relief Defendants and Case Fiduciaries, the Court issued an Order Granting Preliminary Injunction and Appointing Receiver ("Order") with respect to numerous entities affiliated with Sunwest. That Order created the Receivership Estate consisting of assets protected by the injunction and under the control of the Receivership Entities, all as described in the Order.

10. As part of that Order, the Receiver was specifically charged with the investigation of the financial condition of the Receivership Entities, the disposition of investor funds, and the extent of commingling of funds among Defendants, Relief Defendants and Receivership Entities and the impact of any commingling on the losses and claims of investors and creditors.

11. The Receiver retained attorneys and accountants to assist with his duties and on April 24, 2009, filed his First Interim Report. The views and opinions of the Receiver and his accountants, as set forth in the First Interim Report, and in the Declarations of the Receiver and his accountants and the CRO filed in support of approval of the Distribution Plan, have been considered and utilized by the Court in connection with the Court's issuance of the Order Approving Distribution Plan and these additional findings. The Receiver and his accountants conducted an independent review of certain books and records of Sunwest, interviewed numerous Sunwest employees and managers and others, and concluded that there is substantial evidence to support a conclusion that investor and creditor funds were utilized for purposes that were not disclosed prior to the investments and for purposes inconsistent with the expectations and documents related to the investments. The CRO and the Receiver have concluded

that in order to treat the investors and creditors fairly, as well as to serve the public purpose of establishing an orderly mechanism to administer the assets of the Receivership Estate and implement an equitable mechanism to reduce the losses experienced by investors and creditors, the Distribution Plan needs to be premised on the Court recognizing that the use of funds by the Sunwest Enterprise was on a unitary enterprise basis, without regard to separate purposes or restrictions, and that it would be inequitable to treat the claims of investors and creditors in any manner other than on a parri passu, pro rata equitable claim calculation basis (modified Money–In less Money–Out) as proposed in the Distribution Plan.

**\*6** 12. The HFG Parties and certain Secured Lenders vigorously deny the contentions of the SEC and dispute many of the conclusions of the Receiver, CRO and other declarants in support of the Distribution Plan. The HFG Parties and certain Secured Lenders acknowledge that funds were often transferred from one Receivership Entity to another, sometimes in contravention of agreements or without the knowledge or consent of creditors and investors. However the HFG Parties and certain Secured Lenders contend that there was no commingling per se because records were kept, and that all transfers were faithfully recorded.

13. The Court is informed that for purposes of settlement with the Commission, Harder will not dispute that on certain occasions when Harder met personally with a potential investor, he encouraged the investor to purchase a TIC interest in a particular facility, and during such conversations, Harder, at times, made representations to potential investors which led them to believe that the potential TIC investment was limited to only the risks and benefits of an investment in only that particular facility. Furthermore, Harder will not dispute that at times, Harder directed money transfers to be made from cash flow positive Sunwest facilities to negative cash flow Sunwest facilities and from negative cash flow Sunwest facilities to cash flow positive Sunwest facilities to ensure the facilities could meet financial obligations to residents, investors, and creditors. And, Harder will not dispute that in conversations with some potential investors, Harder at times omitted material facts necessary to avoid misleading these potential investors into believing that their investment was limited to only that particular facility, and that as a result of the money transfers between facilities, the TIC investments were not always limited to a particular facility, and were at times intertwined with other facilities also managed by Sunwest.

14. After review of all the facts and circumstances currently known to the Court, the Court finds as follows. First, the Court already determined that there was enough probability of success by the SEC on its complaint for the Court to issue a Preliminary Injunction and appoint the Receiver. Second, the independent Receiver charged with investigating these matters as the Court's agent has reached a conclusion that there was extensive and wrongful commingling of funds, both from successful Receivership Entities to less successful Receivership Entities, and from Receivership Entities that were in serious financial distress to solvent and successful Receivership Entities, and that a variety of descriptions for transfers into and out of Receivership entity accounts and into and out of Defendant Harder's account exist in the Sunwest records. The Receiver has concluded that by mid to late 2008, funds were being utilized and paid on almost a pure "availability" and "cash flow needs basis" and without regard to the source or intended or required use of the funds, and without the knowledge or consent of affected investors and creditors. The Receiver has further concluded that the pervasive nature of the commingling has rendered it virtually impossible to trace the ultimate source and use of the funds. In other words, on at least some occasions, new investor funds intended for one facility were used instead to make lease, interest, or other payments to old investors in unrelated facilities.

**\*7** 15. The Court has considered all the evidence presented to it and has determined for purposes of approving the Distribution Plan, and not for any other purpose, that there is substantial evidence of the Sunwest Enterprise procuring and using funds in a commingled manner without the prior knowledge or consent of investors and creditors, and in a manner inconsistent with the representations to investors and creditors. That commingling, coupled with the inability to trace funds, the evidence of recordation of descriptions that were inconsistent, changed after the fact, and/or inaccurate, and the evidence that the Sunwest Enterprise decided how and where to use funds on a "who-needs-the cash now" basis warrants the finding of unitary enterprise, and claim calculation method and claim distribution treatment set forth in the Distribution Plan. In Fact, the evidence is overwhelming that the Sunwest Enterprise has been conducted as a unitary enterprise. The Court believes that, subject to the specific exceptions in the Distribution Plan, it would be inequitable for an investor or creditor to have its claim allowed or receive a distribution based on the existing value of any specific facility given the evidence that funds were taken from one property for use on another regardless

of whether the funding property had positive or negative cash flow or value.

16. The Court reviewed the eve-of-hearing supplemental objection filed by Certain Coordinating Lenders and the declarations filed in support thereof, heard cross-examination of the witnesses submitting such declarations, including testimony of Mr. McFarlane and Professor Rasmussen, offered as expert testimony. The declarations and testimony in court of the witnesses proffered by Certain Coordinating Lenders do not credibly refute the evidence presented throughout this case by the SEC, the Receiver, and the CRO, and the evidence specifically presented in connection with the Approval Hearing, that misrepresentations were made to investors concerning the use of invested funds, that invested funds were commingled among the Receivership Entities, the Defendants, and the Relief Defendants, and that certain investment proceeds were used to make distributions to prior investors.

17. The Court is encouraged by the TIC investors to make a finding that the use of funds in the manner described above caused the TIC investors to be denied the rights, privileges and benefits that would otherwise inure to them as holders of real property interests. That finding is necessary to potentially make applicable Internal Revenue Coder § 1033, which provision may be necessary to insulate TIC investors from adverse tax consequences in addition to the investment losses they have suffered, and is a mediation condition for the support of the Distribution Plan by the TIC Committee. The Court agrees and hereby finds that the control and use of cash inconsistent with the legal restrictions and separateness that were contained in the TIC documents did deprive the TIC investors of the benefits of real property ownership to which they were entitled.

**\*8** 18. The Court concludes that the evidence of commingling is sufficient, the commingling so extensive and pervasive, and the impact of the commingling on the amount owed to investors and creditors so significant that, in order to make an equitable distribution to investors and creditors, as well as to serve the public purpose of establishing an orderly mechanism to administer the assets of the Receivership Estate and implement an equitable mechanism to reduce the losses experienced by investors and creditors, the Receivership Entities are to be considered a unitary enterprise for the purposes set forth in the Distribution Plan, and that a single chapter 11 filing to reorganize the unitary Sunwest enterprise is warranted and appropriate.

19. The Court also recognizes that its decision to approve the Distribution Plan and, thus, to treat the Receivership Entities as a unitary enterprise and to authorize the commencement of a single chapter 11 filing to reorganize that unitary Sunwest enterprise will effect a nonvoluntary taking on the Effective Date of the Reorganization Plan of the real property interests of TIC investors, and the Court determines that such taking is for the public purposes of (I) ensuring the orderly and equitable administration of the Receivership Estate in furtherance of the public purpose underlying the appointment of the Receiver at the behest of the SEC, and (ii) assisting the SEC to protect the investing public redress the wrongs causing the investing public to suffer losses, and therefore, the takings are to be recognized as being for a public purpose.

20. To the extent that any of the foregoing Findings of Fact could also be characterized as Conclusions of Law, they are also deemed to be Conclusions of Law.

## CONCLUSIONS OF LAW

1. The Hearing Notice sufficiently complied with the statutory requirements of Section 3 of the Securities Act of 1933, as amended, 15 U.S.C. § 77c(a)(10). Notice provided was sufficient under the facts and circumstances of this case.

2. A district court administering an equity receivership has the power to fashion any distribution plan that is fair and equitable. *SEC v. Hardy,* 803 F.2d 1034, 1037 (9th Cir.1986); *SEC v. Wang,* 944 F.2d 80, 84–85 (2d Cir.1991); *see also SEC v. Basic Energy & Affiliated Res., Inc.,* 273 F.3d 657, 670–71 (6th Cir.2001); *SEC v. Forex Asset Mgmt. LLC,* 242 F.3d 325, 331 (5th Cir.2001); *SEC v. Elliott,* 953 F.2d 1560, 1566 (11th Cir.1992). There are no set rules or specific plan terms or means of implementation that govern distribution plans in federal equity receiverships. *SEC v. Byers* 2009 WL 2185491, 6 (S.D.N.Y.2009).

3. Federal equity receivership courts are not required to exercise bankruptcy powers and nor to strictly apply bankruptcy law. *CFTC v. Eustace,* 2008 WL 471574, at *6 (E.D.Pa.2008) (citing *CFTC v. Topworth Int'l, Ltd.,* 205 F.3d 1107 (9th Cir.1999); *Forex Asset Management,* 242 F.3d 325; *Elliot,* 953 F.2d 1560). The Court finds no support for the objecting parties' assertion that this Court must follow the priority scheme applied in bankruptcy cases or that equity requires that unsecured claims be favored over the claims of

victimized investors in this case. On the other hand, federal equity receivership case law supports an equitable, pro rata distribution as provided for in the Distribution Plan. *See, e.g., Byers,* 2009 WL 2185491 (summarizing case law).

 **\*9** 4. In approving a plan of distribution in an SEC receivership case, the court must determine the most equitable distribution result for all claimants, including investors. Typically, tracing of invested funds does not yield the most equitable result, because the ability to trace funds is the result of the merely fortuitous fact that certain investor funds were spent before funds of others, where the funds of investors have been shown to be substantially commingled. *See, e.g., United States v. Durham,* 86 F.3d 70 (5th Cir.1996); *Forex Asset Mgmt.,* 242 F.3d at 331. The extent of commingling necessary to justify abandoning a tracing approach is not settled in the applicable case law. Due to the fungibility of money, however, courts have held that any commingling is enough to warrant treating all the funds as tainted. *Byers,* at \*15 (citing *United States v. Garcia,* 37 F.3d 1359, 1365–66 (9th Cir .1994); *SEC v. Better Life Club of Am.,* Inc., 995 F.Supp. 167, 181 (D.D.C.1998); *SEC v. Lauer,* 2009 U.S. Dist. LEXIS 23510, at \*4 (S.D.Fla. Mar. 25, 2009)). Commingling need not necessarily be systematic to justify alternatives to tracing investor funds. *CFTC v. Eustace,* 2008 WL 471574, at \*7 (E.D.Pa.2008).

5. Due to the extensive commingling of funds among the Receivership Entities and the HFG Parties, if all Investors' funds are administered separately, a significant number of Investors who have invested in certain Receivership Entities or related properties or facilities would receive no return on their investment, while others who were fortunate enough to have invested in certain Receivership Entities or related properties or facilities may receive all of their invested capital plus interest. The Court finds and concludes that this result would be inequitable because it would allow greater recovery by certain Investors on the arbitrary basis of the actions of the Sunwest Enterprise control parties. *Durham,* 86 F.3d at 72.

6. Moreover, favoring certain Investors through tracing invested funds is not justified solely because such investments were "legitimate" transactions that otherwise would be recognized and enforced according to their terms by the courts. Because the Sunwest Enterprise relied on commingling funds to support its operations, all of its transactions lost this presumption of legitimacy. It may seem only fair that an Investor who can trace and recover his invested funds should be able to do so. That would be true

as between the Investor and the HFG Parties or the Sunwest Enterprise. But it is not true as among that Investor and either the creditors of or other Investors in the Sunwest Enterprise. As a matter of equity, one Investor should not be permitted to benefit from a fraud at the expense of other Investors merely because he was not himself to blame for the fraud. *Scholes v. Lehmann,* 56 F.3d 750, 757 (7th Cir.1995).

7. Additionally, due to the large number of transactions used to commingle the funds, tracing all funds transferred would be extremely difficult, time consuming and costly to the Receivership Estate. Even if such tracing were performed, most if not all of the funds transferred have already been paid out and are no longer available.

 **\*10** 8. A substantial body of case law concerning distributions through federal equity receiverships supports equitable pooling of the assets of receivership entities in order to enable pro rata distributions to investors in cases like this one. *Eustace,* 2008 WL 471574, at \*6 (citing *CFTC v. Topworth Int'l, Ltd.,* 205 F.3d 1107 (9th Cir.1999); *Forex Asset Management,* 242 F.3d 325; *Elliot,* 953 F.2d 1560. The Court is not bound in this Federal Receivership Case to apply the bankruptcy law concept of substantive consolidation or to follow bankruptcy case law regarding that separate and distinct concept. *Id.*

9. The court has been adequately advised of the terms and conditions of the Distribution Plan and has reviewed it, along with all the declarations and exhibits submitted, the evidence submitted at the hearing, and comments from interested parties made both before and at the evidentiary hearings.

10. The Distribution Plan has been proposed in good faith and not by any means forbidden by law.

11. The court has carefully considered the Distribution Plan and concludes that it represents the most equitable distribution of the value of the Receivership Estate to Claimants. The Distribution Plan presents adequate means for the realization of the highest and best value of the Sunwest Enterprise for the benefit of all stakeholders, including through the recognition of the unitary enterprise and its reorganization through the Reorganization Plan. The Distribution Plan through its treatment of various Claimants, best balances the difficulties resulting from the commingling of funds and the harm caused to Investors with the interests of creditors, the Receivership Entities, and the HFG Parties who wish to satisfy their obligations to their Investors.

The terms and conditions of the Distribution Plan do not discriminate unfairly against any class of Claimants and are fair and equitable in the best interest of all interested parties. Accordingly, the Distribution Plan shall be approved. The final approved form of the Distribution Plan shall be attached to the court's order approving the Distribution Plan (the "Approved Plan").

12. The utilization of Summary Procedures, as referenced in and for the purposes set forth in the Approved Plan, are appropriate. In implementing a plan of distribution, the court's use of summary proceedings to allow, disallow, and subordinate claims has been approved as an appropriate and efficient adjudication mechanism, so long as potential claimants are afforded an opportunity to be heard and present claims. *SEC v. Elliott,* 953 F.2d 1560, 1567 (11th Cir.1992); *McFarland v. Winnebago South, Inc.,* 863 F.Supp. 1025, 1034 (W.D.Mo.1994); *FDIC v. Bernstein,* 786 F.Supp. 170, 177 (E.D.N.Y. Jan.10, 1992); 13 Moore's Federal Practice (3d ed.) § 66.06[4][b]. Indeed, the use of these summary procedures promotes judicial efficiency and reduces litigation costs to the receivership, thereby preserving receivership assets for the benefit of all claimants. *Bernstein,* 786 F.Supp. at 177.

**\*11** 13. The court authorizes and directs the Receiver and the CRO, respectively as set forth in the Approved Plan, to take all actions necessary and appropriate to put the Approved Plan into effect.

14. In particular, but without limitation, the Receiver and the CRO are authorized to reorganize the unitary enterprise recognized by the Approved Plan through the pending chapter 11 case of In re Stayton SW Assisted Living, LLC, Bankruptcy Case No. 08–36637 pending before this court, as set forth in the Approved Plan.

15. The Receiver and CRO have retained necessary and appropriate professionals to assist them in implementing the Approved Plan, and are authorized without further Court order to continue their employment from and after entry of the court's order approving the Approved Plan. Compensation of such professionals shall remain subject to court approval.

16. The Receiver and CRO shall have the ultimate authority in implementing the Approved Plan, subject to the terms of the Approved Plan and supervision of this Court.

17. The Court retains full jurisdiction over all activities of the Receiver and CRO and all persons and entities involved in implementation of the Approved Plan including, without limitation, for the purposes set forth in the Approved Plan.

18. To the extent that any of the above Conclusions of Law are more properly characterized as Findings of Fact, they are hereby deemed to be Findings of Fact.

Footnotes

1    Capitalized terms not defined herein shall have the meaning set forth in the accompanying Proposed Distribution Plan.

**End of Document**                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 85

Case 09-10138-MFW   Doc 14410-5   Filed 09/16/14   Page 152 of 314

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

2013 ONSC 1300

Ontario Superior Court of Justice [Commercial List]

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc.

2013 CarswellOnt 2558, 2013 ONSC 1300, 226 A.C.W.S. (3d) 732

# Stetson Oil & Gas Ltd., Plaintiff and Stifel Nicolaus Canada Inc., Defendant

Newbould J.

Heard: January 9, 2013; January 10, 2013; January 11, 2013; January 16, 2013; January 18, 2013; January 21, 2013; January 22, 2013; January 23, 2013; January 24, 2013; January 28, 2013; February 5, 2013

Judgment: March 1, 2013

Docket: CV-08-7809-00CL

Counsel: William J. Burden, Arthur Hamilton, Lara Jackson, for Plaintiff

Joseph Groia, Kellie Seaman, David Sischy, for Defendant

Subject: Contracts; Civil Practice and Procedure; Corporate and Commercial; Natural Resources; Securities

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

### Contracts --- Performance or breach — Breach — Miscellaneous

Under engagement letter, W agreed to purchase for resale subscription receipts in capital of S at 55 cents per subscription receipt for aggregate gross proceeds of $25 million — W did not close agreement — S made agreement with C for financing which resulted in gross proceeds to S of $12 million for issuance of 60 million units at 20 cents per unit — S brought action for damages for breach of contract against W for different between proceeds it should have received and proceeds received — Action allowed — S was entitled to judgment against W for $16 million and interest — It was not open to W to rely on material adverse change-out clause and disaster out clause — W attempted to rely on clauses for first time at trial — W never attempted to negotiate underwriting agreement before W failed to close transaction as required by engagement letter — There was no agreement containing out clauses that W could rely on in refusing to close — Even if out clauses relied on by W were applicable, there were no facts present that would have entitled W to rely on out clauses.

## Table of Authorities

### Cases considered by *Newbould J.*:

*Baud Corp., N.V. v. Brook* (1978), 1978 CarswellAlta 268, 1978 CarswellAlta 302, *(sub nom. Asamera Oil Corp. v. Sea Oil & General Corp.)* [1979] 1 S.C.R. 633, [1978] 6 W.W.R. 301, *(sub nom. Asamera Oil Corp. v. Sea Oil & General Corp.)* 89 D.L.R. (3d) 1, *(sub nom. Asamera Oil Corp. v. Sea Oil & General Corp.)* 23 N.R. 181, 12 A.R. 271, 5 B.L.R. 225 (S.C.C.) — referred to

*Café La France, Inc. v. Schneider Securities, Inc.* (2003), 281 F.Supp.2d 361 (U.S. D. R.I.) — referred to

*Calvan Consolidated Oil & Gas Co. v. Manning* (1959), [1959] S.C.R. 253, 17 D.L.R. (2d) 1, 1959 CarswellAlta 83 (S.C.C.) — considered

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 153 of 314

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

*Canada Square Corp. v. Versafood Services Ltd.* (1981), 34 O.R. (2d) 250, 15 B.L.R. 89, 130 D.L.R. (3d) 205, 1981 CarswellOnt 124 (Ont. C.A.) — considered

*Health & Community Living, Inc. v. Goldis Financial Group, Inc.* (March 13, 1998), Doc. 96 CV 0459 (U.S. Dist. Ct. E.D. N.Y.) — referred to

*Inmet Mining Corp. v. Homestake Canada Inc.* (2002), 2002 CarswellBC 53, 2002 BCSC 61, 99 B.C.L.R. (3d) 93 (B.C. S.C.) — considered

*Jamal v. Moola Dawood, Sons & Co.* (1915), [1916] 1 A.C. 175 (Lower Burma P.C.) — referred to

*Johnson v. Agnew* (1979), [1979] 1 All E.R. 883, [1980] A.C. 367 (U.K. H.L.) — considered

*Kerr v. Danier Leather Inc.* (2007), 2007 SCC 44, 2007 CarswellOnt 6445, 2007 CarswellOnt 6446, 87 O.R. (3d) 398 (note), 36 B.L.R. (4th) 95, 231 O.A.C. 348, 286 D.L.R. (4th) 601, [2007] 2 S.C.R. 331, 48 C.P.C. (6th) 205, 368 N.R. 204 (S.C.C.) — considered

*Leitch Transport Ltd. v. Neonex International Ltd.* (1979), 27 O.R. (2d) 363, 8 B.L.R. 257, 106 D.L.R. (3d) 315, 1979 CarswellOnt 171 (Ont. C.A.) — considered

*Mull v. Dynacare Inc.* (1998), 44 B.L.R. (2d) 211, 1998 CarswellOnt 3892 (Ont. Gen. Div.) — considered

*R. v. Mohan* (1994), 18 O.R. (3d) 160 (note), 29 C.R. (4th) 243, 71 O.A.C. 241, 166 N.R. 245, 89 C.C.C. (3d) 402, 114 D.L.R. (4th) 419, [1994] 2 S.C.R. 9, 1994 CarswellOnt 1155, 1994 CarswellOnt 66 (S.C.C.) — considered

*Salah v. Timothy's Coffees of the World Inc.* (2010), 2010 CarswellOnt 7643, 2010 ONCA 673, 74 B.L.R. (4th) 161, 268 O.A.C. 279 (Ont. C.A.) — considered

*Semelhago v. Paramadevan* (1996), 1996 CarswellOnt 2737, 1996 CarswellOnt 2738, 197 N.R. 379, 3 R.P.R. (3d) 1, 28 O.R. (3d) 639 (note), 136 D.L.R. (4th) 1, 91 O.A.C. 379, [1996] 2 S.C.R. 415 (S.C.C.) — considered

*Treaty Group Inc. v. Drake International Inc.* (2007), 2007 ONCA 450, 2007 CarswellOnt 4018, 227 O.A.C. 72, *(sub nom. Leather Treaty v. Drake International Inc.)* 2007 C.L.L.C. 210-051, 86 O.R. (3d) 366, 51 C.C.L.T. (3d) 5 (Ont. C.A.) — referred to

*UBS Securities Canada Inc. v. Sands Brothers Canada Ltd.* (2008), 45 B.L.R. (4th) 105, 2008 CarswellOnt 2503 (Ont. S.C.J.) — considered

*UBS Securities Canada Inc. v. Sands Brothers Canada Ltd.* (2009), 95 O.R. (3d) 93, 2009 CarswellOnt 2082, 2009 ONCA 328, 248 O.A.C. 146, 58 B.L.R. (4th) 60 (Ont. C.A.) — referred to

*Von Hatzfeldt-Wildenburg v. Alexander* (1911), [1912] 1 Ch. 284, [1911-13] All E.R. Rep. 148, 81 L.J. Ch. 184 (Eng. Ch. Div.) — considered

**Statutes considered:**

*Securities Act*, R.S.O. 1990, c. S.5

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 154 of 314

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

s. 1(1) "material change" — referred to

ACTION for damages for breach of contract.

*Newbould J.*:

1    The plaintiff Stetson Oil & Gas Ltd. ("Stetson") sues for breach of a "bought deal" underwriting agreement contained in a signed letter agreement (the "engagement letter") under which Thomas Weisel Partners Canada Inc. ("Weisel") [1] agreed to purchase for resale 45,454,600 subscription receipts in the capital of Stetson at a price of 55 cents per subscription receipt for aggregate gross proceeds of approximately $25,000,030. Weisel did not close the agreement. Stetson then made an agreement with Canaccord Capital Corporation for financing which resulted in gross proceeds to Stetson of $12,000,000 for the issuance of 60,000,000 units (each consisting of a share and warrant) at 20 cents per unit. Stetson claims damages for breach of contract against Weisel, being the difference between the proceeds it should have received under the engagement letter and the proceeds raised in the Canaccord financing, plus interim financing costs.

2    For the reasons that follow, the action is allowed and Stetson is entitled to judgment against Weisel for $16,042,669 and interest.

**Pertinent History**

3    Stetson is a junior oil and gas exploration company which trades on the TSX Venture Exchange. [2] Weisel at material times operated as an investment bank and securities dealer specializing in the growth sectors of the economy.

4    In June, 2008 Stetson made a proposal to the Fort Berthold Tribe of North Dakota to lease tribal lands to explore in the Bakken Formation in North Dakota. In 2008 the Bakken was one of the hottest oil and gas plays in the United States, due in part to new horizontal fracturing technology that allows for exploration and development in property that under conventional techniques could not be profitably explored. The Bakken in North Dakota and Saskatchewan has the potential to become a world class producer of oil and gas. Today it produces over 700,000 barrels of oil a day, mostly in North Dakota.

5    Stetson needed to raise funds in order to pursue the Bakken opportunity. Stetson's market capitalization at the time was $15 to $20 million

6    Stetson wanted to raise funds through a bought deal financing because it wanted a guarantee with no financing risk. In a bought deal, the underwriter agrees to purchase the issuer's securities at a fixed price and takes the risk of selling them in the market at a profit. A bought deal in this respect is fundamentally different from an agency or best efforts underwriting in which an underwriter makes best efforts to sell the securities of the issuer but provides no guarantee of the amount or value of the securities that will be sold. The issuer takes the market risk.

7    Stetson began canvassing the underwriting market in June, 2008 in anticipation of acquiring the lease rights in the Bakken. Mr. Stan Bharti, the founder and Chairman of Forbes & Manhattan, a very successful resource merchant bank, had been a director of Stetson since 2006. Forbes & Manhattan and Mr. Bharti had existing investment banking relationships with, among others, Canaccord and Macquarie Capital Markets Inc., but had no relationship with Weisel.

8    Weisel was very interested in doing business with Mr. Bharti as he was viewed as a very successful businessman who had been involved in many successful start-up ventures. When Weisel learned of his involvement in Stetson and Stetson's interest in the Bakken play in North Dakota, Weisel reached out to Mr. Bharti and Stetson. They viewed Mr. Bharti as the key decision maker for Stetson.

9    Mr. Alex Wylie of Calgary acted as the lead banker for Weisel in dealing with Stetson. Mr. Alec Rowlands of Weisel had known Mr. Bharti since 1993 and he and Mr. Wylie agreed to pursue Mr. Bharti and Stetson. Meetings were arranged

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 155 of 314

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...
2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

for the president of Stetson, Mr. Bill Ward, to meet with Mr. Wylie and after that there were a number of meetings between Stetson and Weisel.

10     Weisel had detailed research coverage on the Bakken play. It had extensively analyzed Kodiak Oil & Gas Corp. ("Kodiak"), a successful oil exploration company with lands near the lands that Stetson was pursuing. After his meeting with Mr. Ward, Mr. Wylie sent him several research reports Weisel had done on Kodiak and on another company involved in the Bakken named Tristar Oil & Gas.

11     Weisel promoted its expertise and knowledge of the Bakken formation as something that would be of assistance to Stetson. Messrs. Wylie and Rowlands told Mr. Bharti that they and their analysts knew the Bakken well, and that Weisel wanted to get involved in the deal and to build a relationship with Mr. Bharti and Forbes & Manhattan.

12     Weisel understood from discussions with Mr. Bharti and Mr. Said, another director of Stetson, that Stetson was looking to raise $25 million through a bought deal and that it could be expected that obtaining an underwriting agreement would be a competitive situation. There is no question but that Weisel was very anxious to get the business. An internal Weisel e-mail of July 4, 2008 from Mr. Wylie was indicative of this:

Stetson is a Stan Bhardhi [sic] company with assets in the Bakken...

. . .

They are ging [sic] to want a bought deal...Stan's last deal out here was a few weeks back for Vast...Niko took a big chunk...apparently they had $75MM in orders on a $25MM deal... Stan is going to be the decision maker on this ... they will have a syndicate but you need to put up a deal to get in the game on this one ...

13     Vast Exploration was a company in the Forbes & Manhattan group and the reference to it was to a recent financing for Vast that had received $75 million in orders for a limited $25 million financing.

14     On July 7, shortly after Mr. Ward met with the sales force of Weisel in Toronto, Mr. Wylie said in another internal Stetson e-mail that Stan Bharti was clearly the decision maker and that Mr. Rowlands "has the best relationship with Stan and he needs to start working him over". Mr. Wylie's evidence that all he was indicating was that he wanted Weisel to be prepared in case Stetson won the lands was not convincing. More indicative of Weisel's frame of mind was an e-mail from Mr. Rowlands to Mr. Bharti of July 9 which said "...this is a deal we want to lead, we believe that our coverage of the Bakken and the US players in the area will benefit Stetson, let's talk today, when are u available?" On the same day Mr. Wylie e-mailed Mr. Said of Stetson and said "The firm is very enthusiastic about getting behind the Stetson story and will be putting up a deal to Stetson once you are ready for bids."

15     The lease sought by Stetson required approval by the Tribal Council which was expected in early July. On July 11, 2008 Stetson announced that it had received Tribal Council approval to the lease of 8,570 acres of what were referred to as tribal lands that were adjacent to another 4,500 acres of freehold lands that it was leasing, subject to approval of the Bureau of Indian Affairs.

16     On that day, the Commitment Committee of Weisel met and decided to offer 50 cents a share on a bought deal that would see Stetson receive $25 million less fees to Weisel. Mr. Wylie called Mr. Bharti and Mr. Said and said that Weisel was prepared to deliver a bought deal letter at 50 cents a share. Mr. Bharti said that 50 cents was not enough and proposed 55 cents. The Commitment Committee of Weisel met a second time and agreed to the price of 55 cents a share.

17     At 8:53 p.m. on July 11, 2008, Weisel e-mailed a signed engagement letter from Mr. Wylie to Mr. Bharti and others. In the e-mail, Mr. Wylie outlined the terms of the "bought deal letter", including the following:

Syndicate: 65% TWP [Weisel], 35% Canaccord — the deal is not subject to syndication

18     This arose as a result of discussions between Messrs. Bharti and Mr. Said of Stetson and Messrs. Rowlands and Wylie of Weisel who knew that Forbes & Manhattan had a close relationship with Canaccord and that Canaccord was very interested

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 156 of 314

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

in the financing. Canaccord had been the lead banker for oil and gas deals that Forbes & Manhattan had done. Weisel thought that it would be easier to obtain Mr. Bharti's agreement to use Weisel for the financing if Weisel offered some of the deal to Canaccord. In early discussions Weisel had said to Mr. Bharti that if Stetson wanted syndication they could do that. Syndication means that the underwriter brings in other underwriters to reduce its liability or risk. Weisel told Mr. Bharti that if he felt syndication was important because of his relationships with other bankers, they would be open to it.

19      The engagement letter stated that the deal was not subject to syndication, and all Weisel witnesses confirmed that the deal did not require that Canaccord participate in it and that Weisel was quite prepared to proceed with the deal alone. It is quite clear that the participation of Canaccord was not required, or even asked for, by Weisel. Weisel told Mr. Bharti that their first preference was to go without any syndication. Mr. Bharti told Weisel that if Canaccord agreed, he would like to see Canaccord in the syndicate because of their long-term relationship and over the week-end after the engagement letter was sent by Weisel, he told them that he would like to see Canaccord with 40% rather than 35% but that it would be entirely up to Weisel how they would structure the syndicate.

20      Over the week-end there were communications between Mr. Gleeson, Stetson's in-house counsel, and Mr. Wylie of Weisel regarding terms of the engagement letter. Some terms were changed. On Sunday, July 13, 2008 at 11:11 pm Mr. Gleeson e-mailed to Mr. Wylie a copy of the engagement letter signed by him on behalf of Stetson. The terms had been changed somewhat from the previous version signed and sent by Weisel on July 11, 2008.

21      The engagement letter provided that Weisel, as the Lead Underwriter, would on a bought deal basis purchase by way of private placement for resale 45,454,600 subscription receipts in the capital of Stetson at a price of 55 cents per subscription receipt for aggregate gross proceeds of approximately $25,000,030. Weisel was granted an option to purchase an additional 9,091,000 subscription receipts for 55 cents each. Each subscription receipt was to be automatically exchanged for one common share of Stetson upon approval of the Bureau of Indian Affairs to the lease of the 8,570 acres already approved by the Tribal Council.

22      One of the terms of the engagement letter was that it was subject to reconfirmation by 5 a.m. Calgary time on July 14, 2008. It is apparently quite common if a bought deal is done at night that there must be reconfirmation in the morning. That is done to give a party time to react to something that may happen overnight before the morning. In this case Mr. Wylie of Weisel reconfirmed the deal at 5 a.m. Calgary time in a call to Mr. Said of Stetson.

23      Shortly before 7 a.m. Toronto time Mr. Pocrnic of Weisel telephoned Canaccord to invite Canaccord to participate in a syndicate. He recalls little of the discussion. A few minutes later he got a call back from Canaccord saying they were going to pass on the transaction. Mr. Wylie called Mr. Said who suggested he call Genuity as Genuity had indicated late on Sunday evening that if Canaccord did not participate, which Genuity though highly remote, Genuity would certainly play a syndicate role. Mr. Pocrnic then spoke to the head of institutional sales at Genuity who indicated they would not participate. Mr. Wylie informed Mr. Said of this and said that Weisel was going ahead with the marketing of the deal.

24      At 7:31 a.m. Toronto time, Weisel released a press release announcing on behalf of Stetson that Stetson had entered into an agreement with Weisel as lead underwriter on behalf of a syndicate of underwriters to purchase on a bought deal private placement basis 45,454,600 subscription receipts in the capital of Stetson at a price of 55 cents per subscription receipt for aggregate gross proceeds of approximately $25,000,030. In the parlance of the underwriting market, the deal at that point went "live".

25      On July 13, Weisel advised its sales and trading personnel that it would be going live on a bought deal for Stetson the next morning at 7:30 a.m. Weisel intended and expected to sell the entire bought deal by 9:15 am, within two hours of announcing the deal, and fifteen minutes before the TSX opened at 9:30am. This was consistent with both the timelines for a bought deal in Weisel's Deal Book, the guide used by Weisel to conduct its business. Mr. Wylie testified that once Canaccord backed out, Weisel was not sure that the entire position would sell by the opening of the market that day. I have some trouble with that evidence. Mr. Wylie had said that putting a provision in the engagement letter that the deal was not subject to syndication had

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

been intended to show a sign of strength on the part of Weisel and that Weisel did not need Canaccord in the deal but could do it alone.

26    Weisel was not able to sell any of its position in Stetson on the 13th. Mr. Rowlands, the managing director of institutional equity sales for Weisel, said that at the same time the Stetson press release was issued to announce the bought deal with Weisel, Shell Canada announced it was going to buy Duvernet Oil, an oil and gas play in Alberta, for $6.5 billion dollars. Most of the people Weisel wanted to talk to were shareholders of either Shell or Duvernet and it was very difficult to get them on the telephone as they were pre-occupied with the larger deal. There was no suggestion that the fact that Canaccord was not part of the syndicate was any impediment to the deal. Mr. Rowlands kept Mr. Bharti informed on a daily basis that week and for the first half of the week told Mr. Bharti that they were confident that the deal would be sold.

27    However, by July 17, 2008 Weisel had managed to place only $2 million of its position. Mr. Bharti's evidence, which I accept, was that in his experience involving 30 or 40 bought deals, they can sell out in one hour, sometimes in two or three days and usually are always sold out in the first four or five days. He said it was that it was in no one's interest for a bought deal to be a hung deal, meaning for the underwriters to be holding the stock. The market would understand that the stock could not be sold and it would hurt the price of the stock.

28    Mr. Bharti offered later that month to have Aberdeen, a Forbes & Manhattan fund, buy $2 million of Weisel's position if the rest was sold, and said that Stetson was open to discussions if Weisel wanted to change some terms to help them resell the deal. He testified that he made it clear to Weisel that Stetson needed the money by the end of July or early August to meet their obligations, that Stetson had to be pragmatic, and that if Weisel came back with a proposal that would help them sell the deal, for example with a different price or incentives, Stetson would be open to looking at. Weisel never came back with any new fixed proposal before closing.

29    The engagement letter provided that the deal was to close on July 31, 2008. On that date Stetson was to receive the agreed amount from Weisel. However, on July 28, 2008 Weisel's lawyers wrote to Stetson's lawyers and said that Weisel did not intend to close the deal on July 31, 2008. No reason was provided.

30    By letter of July 31, 2008 e-mailed on August 1, 2008, Stetson's lawyers wrote to Weisel's lawyers and said that Stetson "agrees to allow the extension of the closing past July 31, 2008 to a later date that reasonably coincides with the Corporation's capital expenditure requirements". There had been no request for an extension from Weisel and it cannot be said that the extension was made by agreement with Weisel. Mr. Bharti's evidence, which I accept, was that Stetson had no choice but to state that there was an extension as Weisel had gone silent and had not said why they would not close or provided new terms. He said that Stetson had commitments and that its business was in jeopardy. Because they had had some discussion on terms, he felt an extension would give time to perhaps come to new terms that would allow them to fulfill their commitments. He said he had to be practical and pragmatic and was trying to look for a solution. Mr. Said's evidence, which I also accept, was to the same effect.

31    A press release announcing the extension was made on August 8th. Mr. Bharti's evidence, which I accept, was that they had not heard back from Weisel regarding the extension letter and they had statutory disclose requirements to announce the extension contained in the July 31, 2008 letter e-mailed the following day. Mr. Said testified that Stetson was stuck because of the failure of Weisel to close the transaction and that announcing anything other than that the deal was extended would be terrible for Stetson. He said that there was no agreement with Weisel about the extension. I accept that evidence. I do not accept the evidence of Mr. Wylie that he had discussions with Mr. Bharti and Mr. Said regarding the extension or that Weisel agreed or participated in extended the closing. There was no discussion in the conversation between Stetson and Weisel people on August 1, 2008 about any extension of the closing. Weisel had no interest or intention of closing the deal reached in the engagement letter. It sought a new deal for much less and for terms more favourable to it.

32    Around the time of the extension, Mr. Bharti received a call from Mr. Lionel Conacher, the president and chief operating office of Weisel, who was based in San Francisco at the time. They met in Toronto on August 13, 2008. They differ as to what exactly was said. I viewed Mr. Bharti as having the better recollection, but it is perhaps unimportant. No new agreement was reached. On August 14, 2008 Weisel offered to make a debt investment of $8 million in return for a release of its obligations

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

under the engagement letter. On August 18, 2008 the solicitors for Stetson replied that Stetson would not release Weisel from the terms of the engagement letter and that if Weisel did not fulfill its obligations, it would take action.

33    As early as August 1, 2008 Stetson began to consider alternatives to the Weisel deal. On that day they received a proposal from First Energy that was not acceptable. They went to Canaccord and Macquarie for advice. Canaccord suggested considering a strategic partner and Mr. Said met with Crescent Point at Canaccord's suggestion. However Mr. Said testified that Stetson had no leverage and Crescent Point knew they had a financing problem. No agreement was made. They also met with Tristar and although it looked promising at the outset, Tristar knew that Stetson had no leverage and in Mr. Said's words, were trying to squeeze Stetson. Tristar knew that if Stetson did not get financing, they could go themselves to the Tribal Council and get the lands themselves.

34    Eventually Stetson signed an agreement with Canaccord effective August 28, 2008 pursuant to which Canaccord agreed to provide a $12 million financing on a "best efforts" basis in exchange for 60,000,000 units, each unit consisting of a share and warrant of Stetson, at 20 cents per unit. In addition, Stetson agreed to issue approximately 85 million preferred shares to every existing shareholder of Stetson who would be entitled to "the proceeds of any final judgment or settlement monies paid to and received by the Corporation in connection with its claim against Thomas Weisel...". The preferred shares were the idea of Canaccord as a sweetener to assist the sale of the Stetson shares.

35    Mr. Said testified that Canaccord was doing Stetson, and particular Mr. Bharti, a favour. He testified that Stetson was tainted because of the failed bought deal and that Canaccord were uncertain what they could do. Stetson trusted Canaccord would do its best. I accept this evidence.

36    The Canaccord financing closed on September 17, 2008 for net proceeds to Stetson of $11,215,928.92 after fees paid to Canaccord.

37    Before the closing, Stetson had to obtain two bridge loans from Longford Energy Inc., a public company that is a member of the Forbes & Manhattan group, to make lease payments that had become due. These bridge loans and the associated fees ($100,000) and accrued interest ($33,559) were repaid from the proceeds received on closing of the Canaccord financing.

38    There were not sufficient funds from the Canaccord financing for Stetson to undertake its development in the Bakken. Another $23 or $24 million was needed. Mr. Ward, the president of Stetson, thought a strategic partner was needed and he canvassed potential parties. Eventually a proposal was made in early October 2008 by Red Willow Great Plains, LLC. Red Willow was a business enterprise of the Southern Ute Indian Tribe with sizeable oil and gas production.

39    Under the Red Willow deal, Stetson assigned 50% of its oil and gas mineral rights in the allotment lands and 60% of its rights in the tribal lands to Red Willow. In exchange, Red Willow agreed to pay for Stetson's first $3,500,000 of drilling costs and also to pay for its share of all land, drilling and exploration costs, to provide its considerable technical expertise and to act as the operator of the programme.

40    Eventually only one well was drilled before Red Willow decided not to proceed further, and the project was terminated and the leases lost. During the trial, a ruling was made refusing a motion by Weisel to amend its pleading to rely on the Red Willow transaction and subsequent activity under it, and thus geological evidence regarding the leased lands and their economic potential was not led.

**Was there a binding agreement?**

41    Weisel takes the position that the engagement letter was not a binding agreement, but only an agreement to agree, and that before there could be a binding agreement, there had to be an underwriting agreement signed by the parties prior to closing.

42    The principles to be considered in assessing whether the parties entered into a binding agreement or merely agreed to agree were recently discussed by Pepall J. (as she then was) in *UBS Securities Canada Inc. v. Sands Brothers Canada Ltd.*

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

(2008), 45 B.L.R. (4th) 105 (Ont. S.C.J.) at paras. 40 to 43; aff'd (2009), 95 O.R. (3d) 93 (Ont. C.A.). I take from her discussion the following principles:

(a) The test as to whether there was *consensus ad idem* is an objective one. The parties will be found to have reached a meeting of the minds where it is clear to the objective reasonable bystander, in light of all the material facts, that the parties intended to contract and the essential terms of that contract can be determined within a reasonable degree of certainty.

(b) The investigation to determine whether a reasonable observer would think that two parties intended to contract extends to all the circumstances of the agreement. This has been held to include words and conduct, future actions and representations by both parties and reliance. This determination frequently involves an assessment of the credibility of witnesses

(c) An agreement is not incomplete simply because it calls for some further agreement between the parties or because it provides for the execution of a further formal document. It is a question of construction whether the execution of the further contract is a condition or term of the bargain, or whether it is a mere expression of the desire of the parties as to the manner in which the transaction already agreed to will in fact go through.

43    In *Canada Square Corp. v. Versafood Services Ltd.* (1981), 34 O.R. (2d) 250 (Ont. C.A.), which involved an issue as to whether a letter sufficed to make a binding agreement or required a formal contract, Morden J.A. cited Professor Waddams for the proposition that subsequent conduct of the parties, while not conclusive and to be looked at with caution, may be helpful in showing what meaning the parties attached to the document after its execution, and this in turn may suggest that they took the same view at the earlier date. He also cited Corbin on Contracts for the proposition that the fact that the parties have acted by rendering some substantial performance or by taking other material action in reliance upon their existing expressions of agreement is itself a circumstance bearing upon the question of completeness of their agreement.

44    Morden J.A. also said, quoting Cardozo J., that it is important to consider, as a part of the context of the document, "the genesis and aim of the transaction".

45    There are a number of provisions in the engagement letter that suggest it constitutes a binding agreement. There is also a provision requiring an underwriting agreement to be made prior to closing. Included are the following provisions:

Thomas Weisel Partners Canada Inc. ("Thomas Weisel" or the "Lead Underwriter"), hereby offers, on a "bought deal" basis by way of private placement, to purchase for resale...

**1. Terms of Engagement**

...The Offer shall be open for acceptance by the Company until 10 a.m. (Calgary time) on July 13, 2008 unless otherwise extended...and is subject to reconfirmation prior to 5 a.m. (Calgary time) on July 14, 2008. Upon the reconfirmation of this engagement letter, the Company authorizes Thomas Weisel to disseminate the press release attached in Schedule C...The Company agrees upon reconfirmation of this engagement letter to have the trading of its securities halted, if necessary,...

**3. Underwriting Agreement**

The definitive terms of this agreement will be governed by a formal underwriting agreement to be entered into prior to closing of the purchase by Thomas Weisel (the "Underwriting Agreement") in respect of the Offering. The Underwriting Agreement will be negotiated in good faith between the Company and Thomas Weisel, on behalf of the Underwriters, and will contain representations, warranties, covenants, conditions (including, without limitation, the delivery of certificates of responsible officers of the Company on behalf of the Company, and legal opinions from counsel to the Company regarding relevant corporate and securities matters with respect to the Offering, and the principal subsidiaries and properties of the Company, together with other relevant corporate and securities matters, acceptable to Thomas Weisel and its counsel), indemnity and termination provisions (including without limitation, standard "due diligence-out", "disaster-out", "material

**WestlawNext**® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 160 of 314

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

adverse change-out", and "regulatory-out" rights) customary in agreements of this type and will be consistent in all material respects with this letter agreement, unless otherwise agreed between the parties.

### 5. Indemnification

The Company agrees to indemnity the Underwriters in accordance with Schedule B attached hereto, which Schedule forms part of this agreement and the consideration of which is the entering into this agreement. Such indemnity shall be executed and delivered to Thomas Weisel on the execution of this agreement. The Underwriting Agreement shall contain more comprehensive indemnity provisions consistent with Schedule B. This agreement and the indemnity provisions contained in Schedule B shall enure to the benefit of the respective successors and assigns of the parties hereto and of the indemnified parties, and the obligations and liabilities assumed in the agreement and in the indemnity contained in Schedule B shall be binding upon their respective successors and assigns. ...

### 8. Other matters

(e) Any dispute arising out of this agreement (including any Schedule) will exclusively be submitted to an arbitrator for binding and conclusive resolution.... [3]

### 9. Acceptance

Please confirm that the foregoing is in accordance with the Company's understanding by signing and returning the attached duplicate copy of this letter, which shall thereupon constitute a binding agreement between the Company and Thomas Weisel. (Underlining added)

46     The language of this engagement letter certainly indicates an intention that it be a binding agreement. It states so expressly in paragraph 9 and the expression "this agreement" is referred to many times. The provision in paragraph 3 calling for the negotiation of an underwriting agreement does not state that until there is such an underwriting agreement there is no binding agreement between the parties.

47     The inclusion of an arbitration clause is a clear indication that a binding agreement was made. Otherwise there would be no purpose in an arbitration provision. The same is the case with respect to the indemnity provided in the engagement letter.

48     What is the "genesis and aim" of the transaction? It was a bought deal underwriting transaction that was intended to be acted upon within hours of the signing of the engagement letter. The time for acceptance by Stetson of the offer contained in the engagement letter was very short. The price of 55 cents per share (or subscription receipt) had been settled by Weisel after taking into account the trading price of Stetson's shares late on the afternoon of Friday, July 11, 2008 with the intention that if the engagement letter was signed by Stetson the deal would go "live" before the opening of the markets on Monday morning, and if normal events occurred, would be sold out shortly thereafter.

49     The engagement letter was to be reconfirmed by Weisel by 5 a.m. Calgary time, Monday morning, which it was. There would be no need for a reconfirmation if there were no binding agreement. Weisel intended to thereupon contact Canaccord to offer them part of the Stetson position that it had agreed to underwrite, which it did, and to issue the press release announcing the agreement by the parties to a bought deal, which it did. All of this before the market opened in Toronto at 9:30 a.m. Weisel then met with a number of its institutional clients to try to sell them a position. Weisel could not have taken these steps if it thought that it had no binding agreement with Stetson. It would make no commercial sense to view things differently.

50     The form of the engagement letter was a standard form used by Weisel, and any substantive changes had to be approved by its Commitment Committee. The form of the letter was contained in Weisel's Deal Book, the guide used by Weisel to conduct its business. That Deal Book also contained the following statement about the engagement letter:

The engagement letter specifies the terms of the deal and serves as the primary agreement defining the obligations of the dealer to the issuer and vice versa.

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

51    Mr. Wylie, the lead banker for Weisel on this transaction, agreed on cross-examination that the statement was a correct statement at the time the engagement letter was signed. That is, Weisel itself acted on the basis that the engagement letter was the primary agreement that defined the obligations of Stetson and Weisel. While the test as to whether there was a binding agreement is not a subjective test, this evidence is consistent with what a reasonable observer would consider to have occurred, i.e. that a binding agreement had been made by the parties. The same can be said for the lack of evidence of any Weisel witness that the engagement letter was not a binding agreement. No Weisel witness testified that Weisel acted as it did on the basis that the engagement letter was not a binding agreement or that the engagement letter was viewed by them as not being a binding agreement.

52    There are other indications that Weisel understood that it was making a binding agreement. Mr. Wylie testified that at the first meeting of the Weisel Commitment Committee dealing with Stetson on July 11, 2008, the thrust of the conversation was that Weisel had to be confident in putting up the firm's capital that the deal "would sell" in the market place, i.e. not that they would be committing capital only after they had gone to the market and learned that the deal had sold, but before.

53    After Weisel had gone to the market and had difficulty in selling its position, Mr. Conacher, the president and chief operating officer of Weisel, e-mailed Mr. Pocrnic, the managing director and head of syndication and equity capital markets in Toronto, and others at Weisel on July 19, 2008. He stated:

Nick - I'd like to have a review first thing on Monday of exactly which accounts we've approached on Stetson, which ones are outstanding, which accounts are likely buyers of the deal and for you to review the action plan for the coming week. I think we should include Seth and/Mo in the discussion so that we make sure we are thinking about ALL possible alternatives to get off this liability. This is by far the most important thing we need to do between now and month end and I want to make sure that we are utilizing all of the Firm's resources to manage this situation. Going forward I want a full daily report that includes all of the above. I want a full Court press on this. Nobody goes on vacation until this deal is sold. If people are on vacation, call them back. (Underlining added)

54    This was a clear indication that Weisel was acting on an understanding that it had a liability to Stetson and that it wanted to sell out the position before it was required to close the deal with Stetson on July 31, 2008. No reasonable observer could view it otherwise.

55    Stetson clearly acted on the basis that it had a binding agreement with Weisel and it relied on the agreement being binding. Stetson consented to the press release announcing the bought deal to be released in its name on July 14, 2008 and Stetson personnel attended the meetings set up by Weisel with prospective purchasers in accordance with the terms of the engagement letter. No reasonable observer would expect Stetson to have done these things if there was no binding agreement.

56    This is not a case such as two U.S. cases relied upon by Weisel [4] in which the parties clearly provided that the imposition of legal obligations must be preceded by execution of an underwriting agreement.

57    Weisel contends that its offer was subject to due diligence and the execution of an underwriting agreement, and that was an indication that a formal agreement was necessary, absent which the engagement letter was merely an agreement to agree. However, this is not what the language of the engagement letter says.

58    So far as due diligence is concerned, the engagement letter stated that "completion of the offering was subject to due diligence to be completed prior to the closing", which was to be on July 31, 2008, a little over two weeks after the engagement letter was open for acceptance and long after it was expected that the Stetson position would have been sold by Weisel. Due diligence was not a condition for the offer in the engagement letter and its acceptance to be binding, but a potential reason for Weisel not to close the transaction if there were material matters undisclosed at the time of the acceptance of the engagement letter affecting Stetson's affairs.

59    So far as the requirement for an underwriting agreement is concerned, it was also something to be negotiated prior to closing. The engagement letter did not state that it was a condition of the engagement letter being binding. It is ironic that such

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

reliance is made by Weisel of the need for an underwriting agreement. Weisel made no attempt at all to negotiate one, and a request by Stetson's solicitors on July 24, 2008 to Weisel's solicitors for a draft of the underwriting agreement went unanswered.

60    While the engagement letter contemplated that an underwriting agreement would be made prior to closing, the underwriting agreement, in the language of Parker J. in *Von Hatzfeldt-Wildenburg v. Alexander* [(1911), [1911-13] All E.R. Rep. 148 (Eng. Ch. Div.)] quoted by Judson J. in *Calvan Consolidated Oil & Gas Co. v. Manning*, [1959] S.C.R. 253 (S.C.C.) at page 5, was not a condition of the bargain but rather it was an expression of the desire of the parties as to the manner in which the transaction already agreed to was to go through.

61    Stetson called as an expert witness Mr. Stephen Halperin, a lawyer practising at the Toronto law firm of Goodmans LLP, where he is a partner, member of the firm's executive committee and co-chair of the corporate securities group. Mr. Halperin was called to give evidence as to how a "Reasonable Market Actor" would view the engagement letter in the circumstances of this case. His Reasonable Market Actor was a proxy for how he believed a reasonably sophisticated participant in an underwriting process would have construed the situation. His qualifications as an expert witness were not challenged by Mr. Groia, but surprisingly in light of that concession, the weight to be placed on his evidence is now challenged on the basis that he has little experience in what he testified to.

62    Mr. Halperin was an impressive witness. It is the case that he is a highly regarded lawyer in his field, which no doubt was the reason why he was not challenged as an expert, but it is also the case that he has had business experience in the area and dealings in his career with the issues involved in this case. He has been involved in a variety of significant transactions in the areas of corporate finance and mergers and acquisitions and as acted for both issuers and underwriters. In his capacity as a director, he has participated in probably 6 private placements and has been involved in bought deals. He is currently a member of the OSC's Senior Securities Lawyers Advisory Group and is a past member of the OSC's Securities Advisory Committee. It was evident throughout his testimony that he is very knowledgeable and I accept his views without qualification.

63    Mr. Halperin was clear to say that he was not offering a legal opinion as to whether the engagement letter constituted a binding contract, but an opinion of whether a Reasonable Market Actor would consider the engagement letter to be a binding agreement. I expressed some concern that he was trespassing on the purview of the judge who is to decide this issue, but was reminded that as the case law has developed, particularly in *R. v. Mohan*, [1994] 2 S.C.R. 9 (S.C.C.), the rule which excluded expert evidence on the ultimate issue before a court is no longer of general application, although the concerns underlying it remain.

64    In determining whether expert evidence is a necessity in assisting the trier of fact, what is required is that the opinion be necessary in the sense that it provides information which is likely to be outside the experience and knowledge of a judge or jury. See *R. v. Mohan* at para. 26.

65    It is Mr. Halperin's opinion that a Reasonable Market Actor would view the engagement letter as being a binding obligation of Stetson and Weisel. I appreciate that Mr. Halperin does not purport to opine on the legal meaning of the engagement letter but rather how a Reasonable Market Actor would view it. In that sense, he is looking at it from the perspective of a reasonable man, or put differently, from the perspective of what objectively can be taken from the engagement letter and the surrounding circumstances. That however is not really something that is outside the experience and knowledge of a judge. It is commonplace for judges to consider whether parties have arrived at a meeting of the minds to form a binding contract. The tests for doing so are contained in the jurisprudence, some of which I have referred to.

66    Mr. Levy, who filed an expert report on behalf of Weisel and who testified at the trial, referred in his report to the engagement letter as a letter of intent. He stated in his report that the letter of intent "is an agreement" used within the Canadian securities industry to set the intended terms, conditions and indemnifications of a financing. On cross-examination, Mr. Levy said he agreed with the statement in the Weisel Deal Book that the engagement letter serves as the primary agreement defining the obligations of the dealer and issuer. Thus in that regard his evidence on this point was not inconsistent with Mr. Halperin's opinion.

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

67     In the circumstances I decline to rely on Mr. Halperin's opinion that a Reasonable Market Actor would view the engagement letter as being a binding obligation of Stetson and Weisel. I also decline to rely on Mr. Levy's statement that the engagement letter was an agreement. These are not matters for which evidence is necessary in order for a judge understand and deal with the issue.

## Applicability of the "out clauses"

68     The engagement letter provided in paragraph 5 that the definitive terms of "this" agreement would be governed by a formal underwriting agreement to be entered into prior to closing of the purchase, to be negotiated in good faith between the parties, and that the underwriting agreement would contain certain terms, including standard "due diligence out", "disaster out", "material adverse change-out", and "regulatory out" rights customary in agreements of this type, to be consistent in all material respects with "this" letter agreement.

69     In the first offer from Weisel sent to Stetson, the word "broad" preceded the out clauses. This word was changed in the final signed engagement letter at the request of Mr. Gleeson of Stetson to "standard", so that the clauses were to be standard out clauses customary in agreements of this type.

70     Weisel contends that the inclusion of the out provisions in the underwriting agreement was a fundamental term of its participation in the financing and that it would not have committed to any obligation with respect to the financing unless an agreement explicitly included standard out clauses. Two things can be said to that argument. First, Weisel did commit to the obligation by reason of the language and provisions in the engagement letter that I have already discussed. Second, the engagement letter in paragraph 5 provided that what was to be contained in the underwriting agreement regarding out clauses were to be standard provisions customary in agreements of this type. Presumably Weisel must have been satisfied with this description.

71     Weisel relies on two of the clauses in its closing argument, being the "material adverse change-out" and "disaster out" clauses. In my view, it is not open for Weisel to rely on these clauses.

72     First, Weisel never attempted to negotiate an underwriting agreement before it failed to close the transaction on July 31, 2008 as required by the engagement letter. The Weisel Deal Book checklist for bought deals in which Weisel was the lead underwriter required Weisel to draft an underwriting agreement with legal counsel. Counsel for Stetson's request for Weisel's draft underwriting agreement went unanswered. Therefore there was no agreement containing these out clauses that Weisel could rely on in refusing to close.

73     Second, at no time did Weisel purport to rely on these clauses. They were first raised during this litigation. The form of clauses relied on by Weisel as being the standard clauses were by their language to be available to Weisel to refuse to close the transaction (i) if Weisel came to the opinion that the conditions in them were not met and (ii) written notice to that effect was given prior to the time of closing. When Weisel announced through its lawyers on July 28, 2008 that it did not intend to close on July 31, 2008, no suggestion was made by its lawyers that Weisel had formed the opinion that it had a right to refuse to close because of any out clause nor was anything said by anyone at Weisel to anyone at Stetson that it was relying on any out clause in deciding not to close on July 31, 2008.

74     Mr. Levy, Weisel's expert witness, in discussing the out clauses, stated that if Weisel determined as a result of its ongoing review of the Bakken project that the potential profitability had been materially reduced as a result of an oil price decline (which Weisel relied on at the trial), Weisel could consider termination by use of the due diligence out clause and/or the material change out clause. While I disagree with Mr. Levy's opinion that these clauses could have been relied on by Weisel, it is noteworthy that he said that before considering termination of the agreement, Weisel had to first make a determination after reviewing the Stetson Bakken project that its profitability had been materially reduced. Weisel had made no review of Stetson's Bakken project after signing the engagement letter nor had it made any determination that its profitability had been reduced before it announced that it was not going to close on July 31, 2008 as required by the engagement letter. Thus even according to Weisel's own expert, there was no basis to be purporting to rely on the out clauses.

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

75    Mr. Levy's opinion reflects the two clauses relied on by Weisel. The clauses require that in order to terminate its obligations, the underwriter must form an opinion prior to the time of closing that the conditions in the clause have occurred and must give written notice of its exercise of the rights contained in the clauses. None of that occurred in this case.

76    The standard material adverse change out clause relied on by Weisel provides:

If, after the date hereof and prior to the Time of Closing, there shall occur any material change or change in a material fact which, in the reasonable opinion of the Underwriters (or any of them), would be expected to have a significant adverse effect on the market price or value of the Securities, any Underwriter shall be entitled, at its option, to terminate its obligation under this agreement by written notice to that effect, given to the Company at or prior to the Time of Closing.

77    The standard disaster out clause relied on by Weisel provides:

The obligations of the Underwriter (or any of them) to purchase the Securities under this agreement may be terminated by the Underwriter at its option by written notice to that effect to the Company at any time prior to the Closing if there should develop, occur or come into effect or existence any event, action state, condition or major financial occurrence of national or international consequence or any law or regulation which in the opinion of the Underwriter seriously adversely affects, or involves, or will seriously affect, or involve, the financial markets or the business, operations or affairs of the Company and its subsidiaries taken as a whole.

78    Weisel argues that oil price changes were sufficient to enable it to rely on these clauses. It points to no evidence, and there is none, that prior to July 31, 2008 it formed an opinion required by the material change out clause that oil price changes would be expected to have a significant adverse effect on the market price or value of the Stetson securities. Nor is there any evidence that prior to July 31, 2008 Weisel formed an opinion required by the disaster out clause that because of oil price changes there had developed, occurred or come into effect or existence any event, action state, condition or major financial occurrence of national or international consequence or any law or regulation which seriously adversely affected, or involved, or would seriously affect, or involve, the financial markets or the business, operations or affairs of Stetson.

79    Nor did Weisel give written notice that it was terminating its obligations under the engagement letter because of the out clauses. On August 1, 2008 there was a conference call participated in by Messrs. Bharti and Said and others on behalf of Stetson and by Messrs. Conacher, Wylie, Rowlands and others on behalf of Weisel. During that call there was nothing said by anyone on behalf of Weisel about the price of oil, or the state of the markets or the Stetson share price, and nothing was said about using any out clause to terminate its obligations under the engagement letter.

80    This argument of Weisel that the out clauses entitle it to deny liability to Stetson because of oil price declines is nothing more than a *post facto* attempt to rely on something said to fall within the material adverse change and disaster out clauses. It is supported by no plausible evidence. No Weisel witness testified that Weisel refused to close because of any drop in oil prices.

81    When one looks at the oil prices changes, they can hardly be said to rise to the level that would support any reasonable opinion that the out clauses now relied on by Weisel permitted the termination of the engagement letter.

82    Weisel argues that as at July 14, 2008, the price of oil reached a near-peak price of $145.16 per barrel. As at September 5, 2008, the price of oil had dropped to $106.47 per barrel, representing a 27% drop in less than two months and said to be the first substantive material decline in oil prices since December 2006.

83    However, Stetson was an exploration play and the daily price of oil was of less importance than for an oil producer. Stetson would likely have not been in production for four years. The evidence of Mr. Bharti, which I accept, was that with an exploration play such as Stetson's project, short term price movements were not important when compared to the long term view on oil pricing and that the long term view of oil was bullish with oil prices staying at or above $80 to $85 per barrel. Mr. Said's evidence, which I also accept, was to the same effect. What was of importance to Stetson, and fully recognized by Weisel, was that oil prices would not likely drop below the forecasted oil prices used in their future value models.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 165 of 314

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

84    In its various reports at relevant times, Weisel used conservative oil prices much below market prices in forecasting future values of oil plays. Also, Mr. Wylie, the lead banker for Weisel on this transaction, acknowledged that oil by nature has a high beta, i.e. high volatility and that he would look at pricing over a one or two month period to give him a trend line. It was only two weeks after the deal went live on July 14, 2008 that Weisel through its lawyers said on July 28, 2008 that it would not close on July 31, 2008.

85    On March 12, 2008, Weisel prepared a research report in respect of Kodiak Oil & Gas Corp. Under the heading Unproven Resource Potential, Weisel stated that it estimated Kodiak's unproven Bakken resource potential based on a number of assumptions. The assumption for oil was an average NYMEX oil price of $75 per barrel and an average realized oil price of $65 per barrel. Kodiak was also an exploration play in the Bakken and no drilling had yet occurred. On the day of its report the spot price for WTI oil closed at $109.86.

86    On April 25, 2008, Weisel prepared a research report with respect to another Bakken player, TriStar Oil & Gas Ltd, an oil producer, and used as commodity prices in its valuation a WTI price of $110 per barrel for 2008 and $100 per barrel for 2009. On that day, April 25, 2008, the WTI spot price for oil closed at $132.99.

87    On May 21, 2008, Weisel produced another research report on Kodiak. In its net asset value sensitivity analysis, it used three price point cases — the low case at $75 per barrel, the mid-range case at $85 per barrel, and the high case at $95 per barrel. On May 21, 2008 the WTI spot price for oil closed at $132.99.

88    In an investor presentation dated July 3, 3008 which was provided to Weisel shortly afterwards, Stetson used initial production price assumptions in its two forecasted cases of WTI $90 and $115 per barrel. On that date, the spot price for WTI oil closed at $145.31. After this report was made to the Weisel sales team on July 8, 2008, Mr. Wylie told Stetson that Weisel was very enthusiastic about Stetson and would be putting up a deal to Stetson once it was ready for bids. By July 10, 2008 Weisel had prepared a presentation to be used by its sales team that used the same price assumptions of $90 and $115 that Stetson had used. On July 28, 2008, the date that Weisel's lawyers advised Stetson that it would not close, the spot price for TWI oil closed at $124.72.

89    Throughout July, Weisel's equity sales team used its sales presentation in trying to market the Stetson position. As well, Weisel continued to promote Stetson as being similar to Kodiak. On July 21, 2008 Weisel sent to potential equity investors the two Kodiak reports of March 12 and 21 which contained the price assumptions already referred to. On that date Weisel was valuing the Stetson shares, which it had agreed to purchase for 55 cents, at $1.50. It would hardly be right for Weisel to now take the position that the oil prices had dropped to the point that the material adverse market and disaster out clauses were applicable when at the same time it was marketing its Stetson position with oil price forecast assumptions that were lower than the then current price of oil.

90    What also belies Weisel's argument on oil pricing is how it reacted to oil pricing at relevant times. On July 3, 2008, oil closed at its highest price to date, at $145.31 per barrel. However, in the next two trading days, oil retreated by more than $9 per barrel to close on July 8 at a price of $136.06 per barrel. July 8 was the day Stetson made its presentation to Weisel's sales desk. There is no evidence that anyone within Weisel, whether connected with the sales desk or otherwise, registered any concern about the drop in the price of oil and it was after this presentation that Mr. Wylie stated, in an e-mail to Mr. Said of Stetson that Weisel was very enthusiastic about getting behind the Stetson story and would be putting up a deal to Stetson once Stetson was ready for bids.

91    In light of all of this, it is not surprising that no one from Weisel testified that Weisel refused to close because of any drop in oil prices. To have asserted that would not have been plausible or reasonable.

92    Mr. Rowlands did testify that the markets began to turn around negatively at about the time that oil prices hit their high. Both he and Mr. Conacher testified that the markets were buoyant leading up to the engagement letter but that by the end of July (Mr. Conacher) or third week of July (Mr. Rowlands), they had turned negative. This evidence was given to support a

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

case that it was oil pricing that caused a turn in the markets. I have considerable doubt about the admissibility of this evidence, which is opinion evidence.

93     Mr. Rowlands also asserted that by July 28 the decline in oil pricing from July 14th was a reflection of a growing concern for the debt crisis. I do not think he had any qualifications to make such a statement. He was a trader of stocks, not an economist or someone trained in the analysis of markets and the cause and effect of factors on those markets.

94     In any event, I think the evidence of Mr. Rowlands and Mr. Conacher on these issues is unreliable. Their assertions were made baldly, with no objective evidence given by them to support them. While they testified in chief that the markets were buoyant at the time of the engagement letter, in fact the major indices such as the TSX, the Dow and the S & P 500 were down considerably since their highs earlier in the year. Mr. Conacher could not recall the date of the major economic event that year, the collapse of Lehman Brothers that occurred on September 15, 2008 and he acknowledged that it had an immense impact on the financial markets. The world financial markets, of course, suffered from the debt crisis much earlier than July, 2008, as witness the collapse of the asset backed commercial paper market in 2007. I do not accept the implication of their evidence that the failure of Weisel to sell its position in Stetson was caused by the price of oil starting to drop shortly after the engagement letter was agreed on the evening of July 13, 2008.

95     In my view, and I so find, even if the out clauses relied on by Weisel were applicable, there were no facts present that would have entitled Weisel to rely on them or that entitle Weisel to rely on them in this trial.

### (i) Material adverse change out clause

96     On the premise, however, that the out clauses were a part of the agreement between the parties, I will consider material adverse change out and disaster out clauses as they are the two clauses relied on by Weisel.

97     In this connection the expert opinions of Mr. Halperin and Mr. Levy must be considered. What would be considered to be standard material adverse change or disaster out clauses is something that is not within the knowledge of a judge and is the proper purview of expert evidence. For the reasons that follow, I prefer the evidence of Mr. Halperin rather than Mr. Levy.

98     The engagement letter provided that the underwriting agreement was to contain "a standard material adverse change-out... customary in agreements of this type". I assume, although it is not clear, that "agreements of this type" refers to a bought deal by way of a private placement. A material adverse change out provision is referred to in the jargon of the industry as a "MAC out" provision.

99     The handbook of the Investment Industry Association of Canada (IIAC), which sets out the standard features of an underwriting agreement and the particular wording that "parties in the business have come to expect", contains a "material change out" clause that would be applicable to both a bought deal and an agency best efforts deal. It says that "material change out" clause means a provision substantially in the following form:

> If, after the date hereof and prior to the Time of Closing, there shall occur any <u>material change or change in a material fact</u> which, in the reasonable opinion of the Underwriters (or any of them), <u>would be expected to have a significant adverse effect on the market price or value of the Securities</u>, any Underwriter shall be entitled, at its option, to terminate its obligation under this agreement by written notice to that effect, given to the Company at or prior to the Time of Closing. (Underlining added).

100     There are two other MAC out clauses in the record that apply to agency agreements and not bought deals. I view them as not determinative, although the one in the Weisel Deal Book is some indication of what Weisel would want in a negotiated material adverse change out clause. [5]

101     The IIAC material change out clause does not define what is meant by material change or change in a material fact. These are not loose terms but have particular meaning in the securities industry.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 167 of 314

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

102     Mr. Halperin's opinion is that MAC out clauses in the securities underwriting context (again subject to the specific language of the relevant provision) would typically be expected to be interpreted by reference to the legal definition of "material change" in the *Securities Act* (Ontario) and comparable provisions under other Canadian provincial securities legislation, which define a "material change", in pertinent part, as: "a change in the business, operations or capital of the issuer that would reasonably be expected to have a significant effect on the market price or value of any of the securities of the issuer ...". He went on to say:

> In my experience, "MAC out" provisions in underwriting agreements tend to be based upon the statutory definition of material change (adding the adjective "adverse"). Thus, in the underwriting context, Reasonable Market Actors would expect that a "MAC out" would be available to the underwriter in the event of a change in the business, operations or capital of the issuer of the securities that would rise to the level of a defined material change, with the change "trigger" being the price or value of the issuer's securities, without regard to whether the change is permanent or transformational.

103     Mr. Halperin went on to say that there is some debate and uncertainty as to whether a MAC out in this context only gives rise to an underwriter termination right if the MAC out is specific to the issuer as opposed to being of general application. Mr. Halperin said that the issue is sometimes addressed through specific drafting of the provision in the underwriting agreement. In this case Weisel never attempted to negotiate an underwriting agreement.

104     Mr. Halperin's opinion is that in the absence of drafting specificity, the Reasonable Market Actor would derive some guidance on the issue from two sources, being National Policy 51-201 of the Canadian Securities Administration dealing with disclosure standards for reporting issuers and a decision of the Supreme Court of Canada in *Kerr v. Danier Leather Inc.*, [2007] 2 S.C.R. 331 (S.C.C.) which he said became well known in the business community.

105     National Policy 51-201 states that it is only external developments that have a direct effect on a business not generally experienced by other business in the same industry that require disclose of changes, as follows:

> Companies are not generally required to interpret the impact of external political, economic and social developments on their affairs. However, if an external development will have or has had a direct effect on the business and affairs of a company that is both material and uncharacteristic of the effect generally experienced by other companies engaged in the same business or industry, the company is urged to explain, where practical, the particular impact on them. For example, a change in government policy that affects most companies in a particular industry does not require an announcement, but if it affects only one or a few companies in a material way, such companies should make an announcement.

106     In *Danier*, the trial judge held that a significant change in weather patterns was not a change in the business of *Danier* and thus not a material change within the definition of material change in the Securities Act. The Supreme Court agreed with that finding and pointed out that the distinction between a material fact and a material change was deliberate. Binnie J. stated:

> The distinction between "material change" and "material fact" is deliberate and policy-based, as explained by a former chairman of the O.S.C.:

>> The term "material fact" is necessary when an issuer is publishing a disclosure document, such as a prospectus or a take-over bid circular, where all material information concerning the issuer at a point in time is published in one document which is convenient to the investor. The term "material change" is limited to a change in the business, operations or capital of the issuer. This is an attempt to relieve reporting issuers of the obligation to continually interpret external political, economic and social developments as they affect the affairs of the issuer, unless the external change will result in a change in the business, operations or capital of the issuer, in which case, timely disclosure of the change must be made.

107     Thus the purport of Mr. Halperin's opinion is that absent a specific contractual provision to the contrary, a Reasonable Market Actor would consider that a standard material adverse change out clause would require a change to the business of Stetson and not a change in oil pricing generally in order for Weisel to attempt to rely on the clause.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 168 of 314

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

108    Weisel takes the position that a MAC out clause as contained in the IIAC form of clause is applicable and that any material change in oil prices is not required to have an effect on the business of the issuer, in this case Stetson. This position is somewhat ironic as the form of MAC out clause in Weisel's Deal Book for an agency agreement restricts its applicability to a material change in the business of the issuer, and one would think that in any negotiations that clause would be the starting position for Weisel and accepted by Stetson. The language of the engagement letter was changed between the first draft and the signed letter to change the out clauses to be included in the underwriting agreement from "broad" to "standard" out clauses. [6] No evidence was given as to what that difference would be so far as a material adverse change out clause is concerned, but it suggests that perhaps the clause would have been restricted to changes to the business of Stetson rather than to the industry in general.

109    Weisel says that there is a distinction between materiality in a legislative context and in contractual context, and that the objectives behind legislative provisions to protect the public are different from contractual objectives. It relies on the following passage from *Inmet Mining Corp. v. Homestake Canada Inc.*, 2002 BCSC 61 (B.C. S.C.):

> There is an important distinction to be made between the tests for materiality that the courts have applied in cases of legislated disclosure, such as that found in the Securities Act, Real Estate Act, etc., and the test for materiality in a contract. In the former cases the tests have to be more objective because the legislation is aimed at protection of the general public. It would be impossible to know what would affect the mind of every purchaser. <u>By contrast, the parties to a contract have the opportunity to tailor make their own terms and a purchaser is able to build in its own protections. In a contract the court is bound to use a more subjective standard in determining what was material and adverse to a particular purchaser's decision to buy.</u> (Underlining added)

110    I take the point of the underlined passage relied on by Weisel. However, unlike the situation posited in *Inmet*, there was no material adverse change out clause tailored by Weisel. Another case relied on by Weisel, *Mull v. Dynacare Inc.* (1998), 44 B.L.R. (2d) 211 (Ont. Gen. Div.) makes clear that whether the defendant purchaser could refuse to close because of changes to the business being acquired was to be determined on the wording of the agreement. See Sanderson J. at paras. 113 to 125.

111    In this case, where there was no material adverse change out clause negotiated by the parties, other than a reference in the engagement letter to the parties negotiating in good faith an underwriting agreement that was to contain a standard material change out clause, I accept the opinion of Mr. Halperin that a Reasonable Market Actor would be guided by the provisions that he referred to in thinking that a material adverse change out clause would restrict changes to those that materially affected Stetson rather than just affecting businesses in the industry generally.

112    There is another reason why Mr. Halperin considered this to be so, and it has to do with the difference between a market out clause and a material adverse change out clause.

113    A market out clause allows an underwriter to refuse to close if the securities to be acquired by the underwriter cannot be marketed profitably. A typical clause is contained in the IIAC Handbook as follows:

> If, after the date hereof and prior to the Time of Closing, the state of financial markets in Canada or elsewhere where it is planned to market the Securities is such that, in the reasonable opinion of the Underwriters (or any of them), the Securities cannot be marketed profitably, any Underwriter shall be entitled, at its option, to terminate its obligations under this agreement by notice to that effect given to the Company at or prior to the Time of Closing.

114    All witnesses agreed that a bought deal cannot contain a market out clause. This is because a principal element of a bought deal is that the market risk is transferred to the underwriter on the execution of the agreement. Whether the underwriter will be able to sell the securities for more than it paid to the issuer is entirely the risk of the underwriter. For that reason a market out clause is never contained in a bought deal agreement, and is inconsistent with a bought deal.

115    Mr. Halperin's opinion, which I accept, is that Reasonable Market Actors would understand that, on balance, in the context of a "bought deal" arrangement where there is axiomatically no "market out" in favour of the underwriter, the MAC out clause should not be construed so as to effectively provide the underwriters with a "market out" by another name. Stetson

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 169 of 314

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

contends that is what Weisel is effectively doing in this case by arguing that because it could not sell its Stetson position profitably, it should be relieved of its obligation to purchase the Stetson shares (or subscription receipts). I agree with Stetson on this point. What Weisel says would fall within a MAC out clause would also fall within a market out clause.

116    This notion that a MAC out clause should not be construed so as to effectively provide an underwriter with a market out clause is particularly important in this case in which no specific MAC out clause was negotiated. I would not construe the language of a "standard material adverse change out clause" contained in the engagement letter as to be negotiated by the parties as permitting a market out clause by another name. No reasonable market actor would think otherwise.

117    Finally, even if the form of MAC out clause contended by Weisel should govern, I do not think that it would be of assistance to Weisel. That is because any change would have to be material, and in my view the evidence on this point is against Weisel.

118    First, Weisel knew that the price of oil was very volatile, that it had a high beta. It could not possibly think that when it reached an all-time high that it would stay there. The oil prices during the second half of July, 2008 continued to be above the assumed pricing used by Weisel in its analysis of the share price of Stetson as well as other companies such as Kodiak, and no witness testified that at the time it was thought that the oil pricing would drop below those levels.

119    Second, Weisel did not believe that the oil pricing had materially affected the value of Stetson. On July 21, 2008 Mr. Pocrnic, the managing director and head of syndication and equity capital markets in Toronto, said in an internal engagement letter-mail that based on the Stetson land package and a comparison to the Kodiak Bakken lands "we come to a valuation of approximately $1.50 per share (with $.31 in cash)." When this is compared to the 55 cents per share that Weisel agreed to pay Stetson, it hardly can be said that if there were an adverse change by reason of the oil price movements, it was material to the risk that Weisel had taken on, or that it would be reasonable to conclude that the change would expect to have a significant adverse effect on the market price or value of the Stetson shares.

120    It is significant, in my view, that there is no evidence that the reasons given to Weisel by prospective purchasers of the Stetson position for not wanting to purchase Stetson shares was any concern for oil pricing. Mr. Pocrnic prepared an account tracking document that listed the feedback Weisel sales personnel had received from various accounts concerning the Stetson offering. A significant majority of the feedback from those accounts that had passed on the Stetson offering reported "too small", and Mr. Pocrnic confirmed that this feedback referred to Stetson's market capitalization size or size of the deal. None of the feedback listed in the account tracking maintained by Mr. Pocrnic, and distributed by e-mail on July 23, disclosed any account that expressed concern about the current price of oil.

121    Mr. Levy in his report referred to the WTI spot price of oil on July 11, 2008 of $144.96 and on August 15, 2008 of $113.46, a drop of 21.73%. He then referred to five corporations in the energy sector and compared their share prices on July 11, 2008 and August 15, 2008, which had a drop in trading of between 7.56 % and 58.62%. He then stated that it was his opinion that:

    (i) If Weisel determined as a result of its ongoing review of the Bakken project, that the potential profitability had been materially reduced as a result of the oil price decline, they could consider termination by use of the due diligence out clause and/or the material change out clause.

    (ii) If Weisel's analysis determined as a result of this initial oil price decline that the exploration relating to the Bakken leases was no longer viable, then the material change out clause and/or the disaster out clause could be considered.

122    I have considerable concerns with Mr. Levy's opinions. It was unclear whether Mr. Levy had any or much relevant experience in bought deals, or what that experience was. He acknowledged that he is not an expert in the oil and gas industry. He is now a consultant but when in business was involved in areas of management, compliance and supervision.

123    Of considerable concern are the five corporations he chose for his comparison to oil price declines. It is clear that he knew very little of these corporations and he admitted he did no analysis to determine if the companies were comparable to Stetson. On cross-examination he said he did not say they were true comparables. He acknowledged that many factors affect

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

share prices and that he did not look at the individual companies to consider what other factors might have affected their share prices. His use of the date of August 15, 2008 was not explained other than a reference in his report to negotiations going on between Stetson and Weisel at the time. It was July 31, 2008 that was the date for closing and it was three days earlier on July 28, 2008 that Weisel announced through its lawyers that it was not going to close.

124    Mr. Levy acknowledged that the failure of a bought deal would be viewed as a negative for the Stetson share price. The expectation was that the Stetson position would be closed on the day it went live on July 14, 2008. As time passed and the position had not sold, Mr. Bharti's evidence, which I accept was that the failure was viewed as a negative for Stetson. The Stetson shares closed at 60 cents on Friday, July 11, 2008 when Weisel made its offer at 55 cents, and on July 14, 2008, the date that the deal went live. By July 28, 2008 when Weisel announced it was not going to close on July 31, 2008, the closing price of the Stetson shares had drifted down to 44 cents at the close on light volume. It is possible that the slide was because of the bought deal going awry. It may have been because of falling oil prices, although if that were the case it would mean the market was not valuing the exploration play on a longer term basis, or any other factor that causes share prices to go up or down. Two days later the shares closed on July 30, 2008 at fifty cents.

125    Mr. Levy in my view had no basis to state, as he did, that the price decline in oil from July 11 to August 15, 2008 "had immediate and significant impact on the trading prices of energy related securities, especially junior issuer's securities, many of which suffered material declines in prices." He was not qualified to express such an opinion and his analysis (or lack of analysis) did not support it. Nor did he have a basis to state that Weisel could rely on a market adverse change out clause or a disaster out clause. He did say, which I have previously discussed, that in order for Weisel to rely on such clauses, it would have had to consider the issues referred to in those clauses, which Weisel did not do.

126    Mr. Halperin's opinion was that Reasonable Market Actors would not have an expectation that a bought deal underwriter would be entitled to terminate its commitment by invoking standard disaster out or MAC out provisions solely on the basis of a decline in the price of oil which neither results in or leads to a serious deterioration in financial markets generally, nor affects the issuer in question in a manner disproportionate to its effect upon other entities in the issuer's industry sector. I accept that opinion. I am not prepared to find on the evidence that any decline in oil prices at the relevant times led to a serious deterioration in financial markets generally, nor affected Stetson in a manner disproportionate to its effect upon other entities in Stetson's sector. Weisel has not established those things.

127    In all the circumstances, I find that Weisel may not rely on a material adverse change out clause to contend that it was entitled to terminate its obligations under the engagement letter.

*(ii) Disaster out clause*

128    Weisel relies on a form of disaster out clause contained in the IIAC Handbook:

The obligations of the Underwriter to purchase the Securities under this agreement may be terminated by the Underwriter at its option by written notice to that effect to the Company at any time prior to the Closing if there should develop, occur or come into effect or existence any event, action state, condition or major financial occurrence of national or international consequence or any law or regulation which in the opinion of the Underwriter seriously adversely affects, or involves, or will seriously affect, or involve, the financial markets or the business, operations or affairs of the Company and its subsidiaries taken as a whole.

129    Weisel asserts that the 27% drop in oil price from July 14, 2008 to September 5, 2008 and the 62% drop in the value of Stetson's common shares in the same time period entitled Weisel to terminate any obligations it had under the engagement letter pursuant to the disaster-out clause.

130    Even assuming that Weisel formed the necessary opinion and acted pursuant to a disaster out clause, which I have held it did not, I cannot accept the argument that it had grounds to act under such a clause.

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

131     The relevant date is not September 5, 2008, but July 28 or the latest July 31, 2008. The drop in oil from July 14 to July 31, 2008 was from $145.16 to $124.17, or approximately 14.5% and the price of the shares of Stetson during that period declined from 60 cents to 50 cents, or 16.67%.

132     On what basis can one conclude that the drop in the price of oil of 14.5% was a major financial occurrence of national or international consequence that *seriously adversely affected or involved the financial markets* or the *business, operations or affairs of Stetson*? There was no evidence to support such an assertion. With oil having a high beta, or volatility, one would expect prices to go up or down and even Mr. Wylie said he would want to look at a longer period of over one or two months to see a trend line. I have already disregarded the assertion of Mr. Levy that the price decline in oil from July 11 to August 15, 2008 had immediate and significant impact on the trading prices of energy related securities, especially junior issuer's securities.

133     Mr. Halperin's opinion is that a disaster out clause in the underwriting context is generally understood by Reasonable Market Actors to be somewhat analogous to a *force majeure* provision in other contractual contexts. The clause contemplates termination of an underwriting obligation, and Reasonable Market Actors would expect that it could only be invoked, in the event of a catastrophic "macro" event, circumstance or change in law of national or international general application which is not specific to a particular issuer or (except in the most extraordinary circumstances) industry. That opinion is consistent with the IIAC form of disaster out clause and I accept it.

134     Mr. Halperin further opined that most significantly, in the context of a "bought deal" arrangement which is typified by the absence of a "market out" provision, Reasonable Market Actors would have an expectation that a disaster out clause would not be used by, or interpreted as being available to, underwriters to terminate commitments, in the absence of a "disaster" properly so called, on the basis solely of facts and circumstances that affect the state of the financial markets such that the underwriters have determined that the underwritten securities, in the language of standard "market out" provisions, cannot be marketed profitably. I accept that opinion as well.

135     Without discussing any of the specifics of the disaster out clause contained in the IIAC Handbook, Mr. Levy asserted:

If however, Weisel's analysis determined as a result of this initial oil price decline that the exploration relating to the Bakken leases was no longer viable, then in our opinion, as to CSI practice that termination under the due diligence out clause, the material change out clause and/or the disaster out clause could be considered.

136     Weisel made no analysis or determination that the exploration relating to Stetson's Bakken leases was no longer viable. But even had it done so, Mr. Levy has not explained how the oil price decline reached the level required by the disaster out clause. I do not accept his opinion that the disaster out clause could be considered.

137     In all the circumstances, I find that Weisel may not rely on a disaster out clause to contend that it was entitled to terminate its obligations under the engagement letter.

**Indemnity agreement**

138     Section 5 of the engagement letter provided, in part:

**5. Indemnification**

The Company agrees to indemnity the Underwriters in accordance with Schedule B attached hereto, which Schedule forms part of this agreement and the consideration of which is the entering into this agreement. ...The Underwriting Agreement shall contain more comprehensive indemnity provisions consistent with Schedule B. ...

139     What those more comprehensive indemnity provisions would have been in the underwriting agreement is unknown as there was no underwriting agreement.

140     Schedule B contained an indemnity provision, portions of which are as follows:

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 172 of 314

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

In connection with the engagement (the "Engagement") of Thomas Weisel Partners Canada Inc. ("Thomas Weisel") pursuant to an engagement letter (the "Engagement Letter") between Thomas Weisel and Stetson Oil & gas Ltd. (the "Company") dated July 11, 2008, the Company agrees to indemnify and hold harmless Thomas Weisel and other members of the syndicate formed in connection with the Engagement, and any of their respective affiliates (herein referred to collectively as the "Underwriters") and the Underwriters' respective directors, officers, employees, partners, each other person, if any, controlling any of the Underwriters or any of their respective subsidiaries and each shareholder of the Underwriters (collectively, the "Indemnified Parties" and individually, an Indemnified party"), from and against any and all losses (other than lost profits), claims (including shareholder actions, derivative or otherwise), actions, suits, proceedings, damages, liabilities or expenses of whatever nature or kind, joint or several, including the aggregate amount paid in reasonable settlement of any actions, suits, proceedings, investigation or claims and the reasonable fees, expenses and taxes of their counsel that may be incurred for advising with respect to and/or defending any action, suit, proceedings, investigation or claim that may be made or threatened against any Indemnified Party or in enforcing this indemnity (collectively the "Claims") to which any Indemnified Party may become subject or otherwise involved in any capacity insofar as the Claims relate to, are caused by, result from, arise out of or are based upon, directly or indirectly, the Engagement whether performed before or after the Company's execution of the Engagement Letter and to reimburse each Indemnified Party forthwith, upon demand, for any legal or other expenses reasonably incurred by such Indemnified Party in connection with any Claim. <u>The Company agrees that in no event will any Indemnified Party be liable or obligated in any manner for any damages (including, without limitation, actual, consequential, exemplary or punitive damages or lost profits) in excess of fees actually received by Thomas Weisel pursuant to Section 4 of this Engagement Letter (captioned "Fees"), and the Company agrees not to seek or claim any such damages or profits in any circumstance.</u> (Underlining added)

141     Weisel contends that the underlined words prevent Stetson from suing Weisel for more than the fees actually received by Weisel, which in this case were nothing as Weisel did not close the transaction. Thus, if it is the case that Weisel breached the engagement letter by failing to close, Weisel reads the indemnity provision to prevent Stetson from suing Weisel for breach of contract.

142     The issue therefore is to interpret this contractual provision. The principles of contract interpretation are well known and were recently summarized by Winkler C.J.O. in *Salah v. Timothy's Coffees of the World Inc.* (2010), 74 B.L.R. (4th) 161 (Ont. C.A.) at para. 16 as follows:

16. The basic principles of commercial contractual interpretation may be summarized as follows. When interpreting a contract, the court aims to determine the intentions of the parties in accordance with the language used in the written document and presumes that the parties have intended what they have said. The court construes the contract as a whole, in a manner that gives meaning to all of its terms, and avoids an interpretation that would render one or more of its terms ineffective. In interpreting the contract, the court must have regard to the objective evidence of the "factual matrix" or context underlying the negotiation of the contract, but not the subjective evidence of the intention of the parties. The court should interpret the contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. If the court finds that the contract is ambiguous, it may then resort to extrinsic evidence to clear up the ambiguity. Where a transaction involves the execution of several documents that form parts of a larger composite whole — like a complex commercial transaction — and each agreement is entered into on the faith of the others being executed, then assistance in the interpretation of one agreement may be drawn from the related agreements.

143     I do not read Schedule B as being the only relevant provision. Paragraph 5 of the engagement letter is also part of the agreement, and it provides that Stetson agrees to indemnify the underwriters in accordance with Schedule B. One cannot read paragraph 5 in any way other than that what was intended by the parties was an indemnity.

144     The language of Schedule B is hardly a model of draftsmanship. The portions relied on by Weisel are not all of its contents. Its form is contained in Weisel's Deal Book and was apparently drafted by its outside counsel (not Mr. Groia's firm). The language is prolix, difficult to follow and unclear.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 173 of 314

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

145    The language of Schedule B provides that the indemnified parties include Weisel, any other underwriter who becomes a member of the syndicate and the directors, employees, partners, etc. of Weisel or other syndicate underwriters. It contains many clauses typical of indemnities, including requirements to notify Stetson of a claim made against an indemnified party and the right of Stetson to approve any settlement of a claim. Down to the underlined portion of the quoted part of Schedule B relied on by Weisel, it is relatively clear that the indemnity refers to losses etc. caused to an indemnified party by some third party other than the indemnified party. That is the nature of an indemnity.

146    For ease of reference, the last sentence of the quoted part of Schedule B states:

The Company agrees that in no event will any Indemnified Party be liable or obligated in any manner for any damages (including, without limitation, actual, consequential, exemplary or punitive damages or lost profits) in excess of fees actually received by Thomas Weisel pursuant to Section 4 of this Engagement Letter (captioned "Fees"), and the Company agrees not to seek or claim any such damages or profits in any circumstance.

147    By agreeing that an indemnified party will not be liable or obligated for any damages in excess of fees received by Weisel, the Company, being Stetson, could not literally restrict what a third party could successfully claim against an indemnified party, and that could not have been the purpose of that provision. Stetson argues, and I tend to agree, that in the context of an indemnity given to an indemnified party, the provision means (i) that Stetson must pay to the indemnified party any liability of the indemnified party to a third party in excess of the fees actually received by Weisel and (ii) Stetson may not sue or claim against any such third party any amount in excess of those fees. Thus if Weisel were the indemnified party in any situation, the issuer, in this case Stetson, would have to indemnify Weisel against any liability it had to a third party in excess of the fees received by Weisel and Stetson could not sue the third party for anything in excess of those fees.

148    The reference in the provision limiting liability to the amount of fees actually received by Weisel pursuant to the engagement letter suggests that the provision is intended to apply only if the engagement letter has been closed. Weisel could not have actually received any fees if the engagement letter did not close. Mr. Groia in argument said that if Weisel were found to be in breach of agreement, it would not object to a judgment against it in the amount of the fees that it would have received had the agreement closed. However, that would be providing a result not in accordance with the language of the agreement. The concession, however, was a reflection I believe of the difficulty in arguing that Schedule B means that a breach of agreement by Weisel results in no damages payable to Stetson.

149    There is another provision in Schedule B that lends support to the interpretation of the provision as not applying to a claim by Stetson against Weisel for failure to close the engagement letter. Schedule B contains the following:

The foregoing indemnity shall not apply to the extent that a court of competent jurisdiction in a final judgment that has become non-appealable shall determine that such losses, expenses, claims, actions, damages or liabilities to which the Indemnified Party may be subject were caused by the negligence or wilful misconduct of the Indemnified Party.

150    This provision clearly would mean that if Weisel is the indemnified party, it may not be indemnified for something caused by its negligence or wilful misconduct. Wilful means intentional as opposed to accidental. Misconduct is defined in the Concise Oxford English Dictionary as "unacceptable or improper behaviour". The American Heritage Dictionary includes in its definition of misconduct "Behaviour not conforming to prevailing standards or laws; impropriety". Businessdictionary.com defines wilful misconduct as "Conscious or intentional disregard of the rights or the safety of others; misconduct in which an individual is doing what he or she intends to do".

151    It is hard to think that wilful misconduct could not include intentional breach of contract. Breach of contract is certainly unacceptable and improper in the eyes of the law and it disregards the rights of the other party to the contract. The sense of the provision that the indemnity does not cover damages caused by Weisel's negligence or wilful conduct is clear. If Weisel was involved in such conduct as found by a court, it is not entitled to be indemnified. In this case, Weisel has been involved in intentional breach of contract by not closing the engagement letter on July 31, 2008 and thus the provision relied on by Weisel, even if it did otherwise prevent Stetson from suing Weisel, could not apply.

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

152     Mr. Groia argued that the provision dealing with wilful misconduct does not apply to the provision Weisel relies on regarding damages in excess of the fees actually received by Weisel. This is because, he says, the provision dealing with wilful misconduct begins by stating that the foregoing "indemnity" shall not apply if there is wilful misconduct, whereas the provision regarding damages in excess of fees is not an indemnity. The reason why this latter provision is not an indemnity, he says, is because it refers to "damages", which is to be distinguished from a Claim that is the subject of the indemnification in the lengthy paragraph that precedes the sentence Weisel relies on.

153     This interpretation appears to me to be a completely strained and artificial interpretation, one that might be made by wordsmiths but which lacks any commercial or common sense. Technically it ignores the definition of "Claim" in the indemnity that includes the word "damages". The sentence relied on by Weisel begins with the words "The Company agrees that in no event will any Indemnified Party be liable or obligated in any manner for any "damages"...in excess of fees actually received...". This is a reference obviously to a claim for damages and it is part of the indemnity provisions contained in the paragraph. The provision regarding wilful misconduct begins with the words "The foregoing indemnity shall not apply...". There is no basis to say that "the foregoing indemnity" was anything but the indemnity provision contained earlier in Schedule B, including the sentence dealing with no liability or obligation in excess of fees received by Weisel.

154     There is another reason why the clause should not prevent Stetson from suing Weisel in this case. One of the principles of contract interpretation as summarized by Winkler C.J.O. in *Salah v. Timothy's Coffees of the World Inc.*, *supra*, is that a court should interpret a contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. It would be a commercial absurdity to conclude that the parties intended that Weisel would have a free pass to break the contract by not closing it without any liability. That would make no commercial sense, and any such result would have to be expressly and explicitly stated in the agreement. In my view, the language of the paragraph 5 of the engagement letter and Schedule B is not so explicit.

155      Finally, Stetson points out that the arbitration provision dealing with disputes between Stetson and Weisel provides that the arbitrator will have no power to award consequential (including lost profits), punitive or exemplary damages. Stetson contends that the arbitration provision is the only provision dealing directly with claims between the parties, that it is an indication that the parties directed their minds to what damages the arbitrator could not award, and that there is no limitation of damages against Weisel to its fees received. [7] Weisel contends that the arbitration clause is not the only provision in the agreement dealing with claims between the parties and there is nothing in the arbitration provision that affects, limits or supersedes the indemnity agreement in Schedule B.

156     I think there is force to this argument of Stetson. The parties directed their mind in the arbitration clause to the kinds of damages that could not be awarded. There was no limitation of the damages that could be awarded against Weisel to only the fees received by Weisel. I recognize that it is a general arbitration clause, and if the provision in Schedule B clearly and explicitly provided that Weisel could not be sued by Stetson for its breach of contract when it had not received any fees, that might survive in spite of the language of the arbitration provision. However in my view it does not so explicitly provide.

157     Weisel led evidence from some if its witnesses as to what protection was sought by the indemnity agreement. In my view, this evidence does not affect the issue. While there may have been some ambiguity in the language of Schedule B, any such ambiguity could be resolved without the need to consider extrinsic evidence. In any event, evidence of Weisel's intentions regarding an indemnity would be inadmissible. See Geoff R. Hall, *Canadian Contractual Interpretation*, 2d ed. (LexisNexus) at 2.4.3.

158     In the result, any damages suffered by Stetson are not to be reduced to nil by reason of Weisel not actually receiving any fees.

**Damages**

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 175 of 314

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

159    Stetson claims damages based on the difference between the 55 cents per share that Weisel agreed to pay and the 20 cents per share that Canaccord paid, after taking into account the extra shares that Stetson had to sell to Canaccord, plus expenses incurred in obtaining the interim loans pending the Canaccord underwriting.

160    Losses recoverable for breach of contract are limited to those that will put the injured party in the same position as he or she would have been in had the wrongdoer performed the contract. See *Baud Corp., N.V. v. Brook* (1978), [1979] 1 S.C.R. 633 (S.C.C.) at para. 18. What are the damages that a seller of an asset may be entitled to on a breach by the purchaser to complete the purchase? The authorities make clear that the seller is entitled to the difference between the contract price and the market price subject to the obligation of the seller to take reasonable steps to mitigate the loss by selling on the market. See S.M. Waddams, *The Law of Damages*, Looseleaf, (Canada Law Book, November 2012) at para. 13.110. See also *Jamal v. Moola Dawood, Sons & Co.* (1915), [1916] 1 A.C. 175 (Lower Burma P.C.)

161    Normally the seller has an obligation to mitigate damages by selling on the date of the breach for the best price possible. But that is not always the case if the shares could not be sold on that date. In *Leitch Transport Ltd. v. Neonex International Ltd.*, [1979] O.J. No. 1093 (Ont. C.A.) the defendant Neonex failed to purchase a large block of shares of Maple Leaf Mills Limited, a public company trading on the Toronto Stock Exchange. It was not realistic to sell the shares on the stock exchange on the date of the breach, but rather the block had to be sold to an investment dealer who would make a secondary offer. It was held that the law permits a realistic approach to valuation and does not insist upon an arbitrary sale on the date of the breach. The Court stated:

> Under a contract for the sale of shares in a company upon a breach by the purchaser, the measure of damages is the difference between the contract price and the market price at the date of the breach; the seller has, however, an obligation to mitigate damages by selling the shares for the best price obtainable on that date: *Jamal v. Moolla Dawood & Sons & Co.* [1916] A.C. 175. Since Maple Leaf was a public company whose shares traded on the TSE, the market price would ordinarily be the price at which the shares were trading on the Exchange on the date of the breach. Here, however, because of the limited market for the shares and the large quantity that was being sold under the contract, it was not possible to sell the shares on the Exchange. In these circumstances, the law permits a realistic approach to the valuation of shares and does not insist upon an arbitrary sale on the date of the breach: *Hooper v. Herts* [1906] 1 Ch. 549. We agree with the trial judge that the only realistic way to have disposed of the directly held shares was to sell them to a broker or investment dealer who would have made a secondary offering of them, and that the amount which could have been obtained by such a sale constituted the market price in this case.

162    See also *Treaty Group Inc. v. Drake International Inc.* (2007), 86 O.R. (3d) 366 (Ont. C.A.) and *Johnson v. Agnew* (1979), [1980] A.C. 367 (U.K. H.L.). In the latter case, in a passage adopted in *Semelhago v. Paramadevan*, [1996] 2 S.C.R. 415 (S.C.C.), Lord Wilberforce stated:

> (2) The general principle for the assessment of damages is compensatory, i.e., that the innocent party is to be placed, so far as money can do so, in the same position as if the contract had been performed. Where the contract is one of sale, this principle normally leads to assessment of damages as at the date of the breach — a principle recognised and embodied in section 51 of the Sale of Goods Act 1893. But this is not an absolute rule: if to follow it would give rise to injustice, the court has power to fix such other date as may be appropriate in the circumstances.

163    Weisel contends that the shares of Stetson traded at fifty cents on or about July 31, 2008, five cents less than what Weisel had agreed to pay, and therefore if damages for breach of contract are to be awarded, the damages should be limited to five cents per share on the 45,454,600 shares that Weisel agreed to purchase, for damages of $2,272,730.

164    Apart from the fact that the shares of Stetson traded on July 31, 2008 at a closing price of 45 cents, which on the argument of Weisel would double the damages to approximately $4.5 million, this argument is completely unrealistic. Stetson was a company with a very small market cap. The volume of shares of Stetson that traded that day was 56,000. No one suggests that Stetson could have issued 45,454,600 shares and sold them that day on the TSX. To suggest that such a large block of stock

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

had a market value that day equal to what a minute fraction of those shares traded for defies common sense and no evidence was led to support this value for such a large block of stock.

165    Stetson had to consider how to proceed to raise the money it was supposed to have received from Weisel, including obtaining advice from Canaccord and Macquarie, and negotiating with other companies such as Crescent Point and Tristar. Stetson had been damaged by the failure of the bought deal to close and did not have a lot of leverage. After canvassing the market it was able to conclude an underwriting on a best efforts basis with Canaccord, which was uncertain as to what could be done but was doing Stetson and Mr. Bharti a favour.

166    The steps taken by Stetson to mitigate their damages by entering into the agreement with Canaccord were reasonable. Taking into account the principles discussed in *Leitch Transport Ltd. v. Neonex International Ltd.* and *Johnson v. Agnew*, the appropriate measure of damages in my view is the amount per share that Stetson would have received from Weisel had the engagement letter closed on July 31, 2008 less the amount per share received by Stetson from the Canaccord transaction.

167    Mr. Groia contended at the end of the trial that the Bakken project for Stetson had no prospect of success as after only one well was drilled, Red Willow decided not to proceed further. He contends therefore that had Weisel provided funding under the engagement letter, Stetson would have ended up with nothing, and thus will gain a windfall if successful in this action. This issue has already been the subject of a ruling I made after the first week of trial refusing leave to the defendant to amend its pleading. Evidence regarding the feasibility of the project was not led as a result, and during argument Mr. Groia conceded that as no expert evidence was called, I was in no position to be making a finding that the property had no prospect of success.

168    In any event, the authorities make clear, as discussed, that the damages for failure to purchase shares is the difference between the purchase price and the value of the shares at the time of the breach, subject to an obligation to mitigate and to a discretion as to the appropriate date. What the plaintiff would have done with its money had it been received under the contract, or what it did with the replacement money, is not relevant.

169    In principle as well, I do not think the argument of Weisel is correct. Suppose instead of issuing equity shares, Stetson had agreed to borrow the necessary funds from a lender at say 5% interest but after the lender reneged, Stetson was only able to borrow the money at 10% interest. Suppose Stetson then took all of the borrowed money and drilled nothing but empty wells and ended up with nothing. Stetson still would have suffered damages to the tune of the extra 5% in interest payments it had to pay for the loan. In this case, Stetson had to issue shares at 20 cents instead of 55 cents. It received less for its shares than it would have had Weisel not breached its contract. It has suffered those damages.

170    At the opening of trial Weisel contended that it was not Stetson that would suffer any damages but rather the holders of the preferred shares issued at the time of the Canaccord financing on the advice of Canaccord as a sweetener to entice the market to accept the Stetson shares sold by Canaccord. These holders will be entitled to the proceeds of any final judgment or settlement money paid to Stetson for this action. This argument was not pursued at the conclusion of the case. In any event, there is nothing to it. What Stetson does with its money is its business. Whether it pays the money from the judgment to its bankers, its common shareholders or its preferred shareholders is irrelevant.

171    Stetson acknowledges that there are two possible ways that its damages can be calculated. The first is based on the difference between the 55 cents that Weisel was to pay to purchase the Stetson shares and the 20 cents that Canaccord agreed to pay, which is 35 cents, multiplied by the 45,454,600 shares provided for in the bought deal. This results in an award of $15,909,110. Stetson contends that damages should be calculated on a per share, rather than an aggregate basis so that Weisel does not obtain the benefit of the fact that Stetson was required to sell 14,545,400 more shares for lower proceeds under the Canaccord transaction. Stetson had to sell these additional shares and is entitled to consideration for that fact.

172    The second method is to calculate damages on an aggregate basis, which would simply involve taking the difference between the $25,000,030 contract price that Weisel was to pay Stetson under the engagement letter and the $12 million Stetson received from the Canaccord transaction, which results in an award of $13,000,030.

Case 09-10138-MFW   Doc 14410-5   Filed 09/16/14   Page 177 of 314

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

173    I agree with Stetson that the first method is the appropriate method as it reflects the fact that it had to sell far more shares to Canaccord than it would have to Weisel. It is not in a company's interest to issue more shares than necessary to obtain equity financing. Weisel did not argue otherwise and, as discussed, contended that the damages, if to be awarded, should be on the same basis as the first method chosen by Stetson, albeit by using five cents a share rather than 35 cents.

174    Stetson is also entitled to the expenses it had to incur in borrowing money on an interim basis that it needed to comply with its lease obligations, which borrowing would not have been required had Weisel not breached the engagement letter. The interim loans were repaid from the money received from Canaccord. These expenses were incurred by Stetson to mitigate its loss and totaled $133,559.

175    Stetson is therefore entitled to judgment for $15,909,110 and $133,559, totalling $16,042,669.

176    Stetson is entitled to interest. No argument was made as to what basis interest should be awarded. If interest cannot be agreed, Stetson may make written submissions within 10 days and Weisel will have a further 10 days to make submissions.

177    Stetson is entitled to its costs. If these cannot be agreed, Stetson may make written submissions within 10 days, including a cost outline in accordance with the rules, and Weisel will have a further 10 days to make submissions.

*Action allowed.*

Footnotes

1    At the conclusion of the trial, the name of the defendant was changed from Thomas Weisel Partners Canada Inc. to Stifel Nicolaus Canada Inc. For ease of reference, the defendant will be referred to as Weisel.

2    Statements of fact in these reasons are findings of fact unless stated otherwise.

3    The parties agreed to litigate rather than arbitrate this dispute.

4    *Health & Community Living, Inc. v. Goldis Financial Group, Inc.* [, Doc. 96 CV 0459 (U.S. Dist. Ct. E.D. N.Y. March 13, 1998)], 1998 WL 117928 at *4 (E.D.N.Y March 13, 1998) and *Café La France, Inc. v. Schneider Securities, Inc.*, 281 F.Supp.2d 361 (U.S. D. R.I. 2003).

5    Weisel has a material adverse change out clause in its Deal Book precedent for an agency agreement. The clause applies only to a change in the business of the issuer. In the Canaccord agency agreement made by Stetson with Canaccord, it contains a material adverse change clause that applies to a material adverse change or change to a material fact that could have a material adverse effect on the business of Stetson or the market price of the offered units. The evidence indicates that in an agency agreement less attention is paid to the language of a material change out provision as the underwriter is not obliged to buy the position of the issuer but only make best efforts to sell the position on behalf of the issuer. Mr. Halperin's opinion, which I accept, is that the Canaccord agreement should not be looked at in considering the issues in this case.

6    Schedule A to the engagement letter is an "indicative term sheet", which contains in summary form the terms of the offer. It refers to "broad" rather than "standard" out clauses. No evidence was given why there was this difference between the engagement letter and Schedule A. One can perhaps infer that it was overlooked when the change was made to paragraph 3 of the engagement letter. However, the indicative term sheet was a document intended to be given by Weisel to any underwriter who joined the syndicate, and presumably would have been the subject of negotiations between Weisel and the particular underwriter. It was not argued that the out clauses so far as Stetson and Weisel are concerned should have been "broad" out clauses.

7    This argument was made by correspondence following the conclusion of oral argument. Weisel contends that it was improper for Stetson to make the argument in this manner without giving counsel for Weisel advance notice. It may have been preferable for Mr. Burden to have given advance notice to Mr. Groia, but I fail to see what difference that would have made. It would have been counter-productive to have an oral hearing on this point, and Mr. Groia does not suggest he wanted an oral hearing. He made his reply argument by letter. Mr. Groia also contended that by his letter, Mr. Burden was attempting to file new evidence about the arbitration provision. I do not understand that. It is not a matter of evidence but an argument about the proper interpretation of the agreement, which in this case is a legal rather than an evidentiary matter.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 178 of 314

Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300, 2013...

2013 ONSC 1300, 2013 CarswellOnt 2558, 226 A.C.W.S. (3d) 732

**End of Document**
Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 86

*Indexed as:*

# Substantial Developments Ltd. v. Hitchcox

**Between**
**Substantial Developments Limited, a private company**
**incorporated under the laws of the Province of Ontario,**
**plaintiff (respondent), and**
**William Dudley Hitchcox, Andrew Robert Marr, Charles Keith**
**Stuart and Eileen Stuart, defendants (applicants)**

[1973] O.J. No. 113

Ontario Supreme Court - High Court of Justice
Toronto Weekly Court

**Addy J.**

Heard: January 8, 1973.
Oral judgments: January 8, 1973.

(2 pp.)

**Counsel:**

Alfred Schorr, for the plaintiff.
J.R. Miller, for the defendants, W.D. Hitchcox and A.R. Marr.
No one appearing for the defendants, C.K. Stuart and E. Stuart.

---

**1    ADDY J.** (orally):-- There is no doubt, in my mind, that this action falls squarely within the relief requested by the Defendants Applicants. There might very well be a claim by the trustee in bankruptcy for Selkirk for the breach of some fiduciary relationship as claimed by counsel, but I am dealing only with this particular writ issued on behalf of Substantial Developments Limited.

**2    Having read the material and heard argument of counsel, it is difficult for me to conceive of a clearer case where the action is an abuse of the process in view of such things as the timing and the

fact that the cestui que trust, Substantial Developments Limited, was represented by the solicitor for Mrs. Wooding the trustee on the vendors and purchasers' motion. The matter was dealt with by the Court at that time.

**3**　　The affidavits of the solicitor for Substantial Developments Limited and for Selkirk are quite clear for what they are worth. In any event, it is quite clear, in my view, that the prime mover behind all these companies (three of which are now defunct), Selkirk, is taking a different stand that he and his solicitor took previously. In my view, the matter has been dealt with, and for the above reasons, and by reason of the application of the principle of judicial estoppel (it not being res judicata because Substantial Developments Limited was not an actual party on the vendors and purchasers' application) Selkirk is estopped since he now states that he was the prime mover behind this as well as the cestui que trust and obviously knew everything that was going on.

**4**　　In my view, Substantial Developments Limited is certainly suing and acting for the express purpose of blocking the sale that is presently at the point of being completed without any valid claim to the lands. I hesitated for a few moments as to whether I should go so far as to dismiss the action but, if ever an action should be dismissed on the grounds alleged in paragraph (a), I believe this to be a glaring case and I am, therefore, granting the prayer for relief of the Defendants in this application and I am endorsing the notice of motion as follows:

　　　　　　"Motion granted as to para. (a).


　　　　　　　Action dismissed with costs as against the defendants applicants herein."

ADDY J.

qp/s/mbm/sme

TAB 87

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 183 of 314
Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

2010 SCC 60
Supreme Court of Canada

Ted Leroy Trucking [Century Services] Ltd., Re

2010 CarswellBC 3419, 2010 CarswellBC 3420, 2010 SCC 60, [2010] 3 S.C.R. 379, [2010]
G.S.T.C. 186, [2011] 2 W.W.R. 383, [2011] B.C.W.L.D. 533, [2011] B.C.W.L.D. 534, 12
B.C.L.R. (5th) 1, 196 A.C.W.S. (3d) 27, 2011 D.T.C. 5006 (Eng.), 2011 G.T.C. 2006 (Eng.), 296
B.C.A.C. 1, 326 D.L.R. (4th) 577, 409 N.R. 201, 503 W.A.C. 1, 72 C.B.R. (5th) 170, J.E. 2011-5

## Century Services Inc. (Appellant) and Attorney General of Canada on behalf of Her Majesty The Queen in Right of Canada (Respondent)

Deschamps J., McLachlin C.J.C., Binnie, LeBel, Fish, Abella, Charron, Rothstein, Cromwell JJ.

Heard: May 11, 2010
Judgment: December 16, 2010
Docket: 33239

Proceedings: reversing *Ted Leroy Trucking Ltd., Re* (2009), 2009 CarswellBC 1195, 2009 G.T.C. 2020 (Eng.), 2009 BCCA 205, 270 B.C.A.C. 167, 454 W.A.C. 167, [2009] 12 W.W.R. 684, 98 B.C.L.R. (4th) 242, [2009] G.S.T.C. 79 (B.C. C.A.); reversing *Ted Leroy Trucking Ltd., Re* (2008), 2008 CarswellBC 2895, 2008 BCSC 1805, [2008] G.S.T.C. 221, 2009 G.T.C. 2011 (Eng.) (B.C. S.C. [In Chambers])

Counsel: Mary I.A. Buttery, Owen J. James, Matthew J.G. Curtis for Appellant
Gordon Bourgard, David Jacyk, Michael J. Lema for Respondent

Subject: Estates and Trusts; Goods and Services Tax (GST); Tax — Miscellaneous; Insolvency

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

#### Tax --- Goods and Services Tax — Collection and remittance — GST held in trust

Debtor owed Crown under Excise Tax Act (ETA) for unremitted GST — Debtor sought relief under Companies' Creditors Arrangement Act (CCAA) — Under order of BC Supreme Court, amount of GST debt was placed in trust account and remaining proceeds of sale of assets paid to major secured creditor — Debtor's application for partial lifting of stay of proceedings to assign itself into bankruptcy was granted, while Crown's application for payment of tax debt was dismissed — Crown's appeal to BC Court of Appeal was allowed — Creditor appealed to Supreme Court of Canada — Appeal allowed — Analysis of ETA and CCAA yielded conclusion that CCAA provides that statutory deemed trusts do not apply, and that Parliament did not intend to restore Crown's deemed trust priority in GST claims under CCAA when it amended ETA in 2000 — Parliament had moved away from asserting priority for Crown claims under both CCAA and Bankruptcy and Insolvency Act (BIA), and neither statute provided for preferred treatment of GST claims — Giving Crown priority over GST claims during CCAA proceedings but not in bankruptcy would reduce use of more flexible and responsive CCAA regime — Parliament likely inadvertently succumbed to drafting anomaly — Section 222(3) of ETA could not be seen as having impliedly repealed s. 18.3 of CCAA by its subsequent passage, given recent amendments to CCAA — Court had discretion under CCAA to construct bridge to liquidation under BIA, and partially lift stay of proceedings to allow entry into liquidation — No "gap" should exist when moving from CCAA to BIA — Court order segregating funds did not have certainty that Crown rather than creditor would be beneficiary sufficient to support express trust — Amount

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 184 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

held in respect of GST debt was not subject to deemed trust, priority or express trust in favour of Crown — Excise Tax Act, R.S.C. 1985, c. E-15, ss. 222(1), (1.1).

## Tax --- General principles — Priority of tax claims in bankruptcy proceedings

Debtor owed Crown under Excise Tax Act (ETA) for unremitted GST — Debtor sought relief under Companies' Creditors Arrangement Act (CCAA) — Under order of BC Supreme Court, amount of GST debt was placed in trust account and remaining proceeds of sale of assets paid to major secured creditor — Debtor's application for partial lifting of stay of proceedings to assign itself into bankruptcy was granted, while Crown's application for payment of tax debt was dismissed — Crown's appeal to BC Court of Appeal was allowed — Creditor appealed to Supreme Court of Canada — Appeal allowed — Analysis of ETA and CCAA yielded conclusion that CCAA provides that statutory deemed trusts do not apply, and that Parliament did not intend to restore Crown's deemed trust priority in GST claims under CCAA when it amended ETA in 2000 — Parliament had moved away from asserting priority for Crown claims under both CCAA and Bankruptcy and Insolvency Act (BIA), and neither statute provided for preferred treatment of GST claims — Giving Crown priority over GST claims during CCAA proceedings but not in bankruptcy would reduce use of more flexible and responsive CCAA regime — Parliament likely inadvertently succumbed to drafting anomaly — Section 222(3) of ETA could not be seen as having impliedly repealed s. 18.3 of CCAA by its subsequent passage, given recent amendments to CCAA — Court had discretion under CCAA to construct bridge to liquidation under BIA, and partially lift stay of proceedings to allow entry into liquidation — No "gap" should exist when moving from CCAA to BIA — Court order segregating funds did not have certainty that Crown rather than creditor would be beneficiary sufficient to support express trust — Amount held in respect of GST debt was not subject to deemed trust, priority or express trust in favour of Crown.

## Taxation --- Taxe sur les produits et services — Perception et versement — Montant de TPS détenu en fiducie

Débitrice devait à la Couronne des montants de TPS qu'elle n'avait pas remis, en vertu de la Loi sur la taxe d'accise (LTA) — Débitrice a entamé des procédures judiciaires en vertu de la Loi sur les arrangements avec les créanciers des compagnies (LACC) — En vertu d'une ordonnance du tribunal, le montant de la créance fiscale a été déposé dans un compte en fiducie et la balance du produit de la vente des actifs a servi à payer le créancier garanti principal — Demande de la débitrice visant à obtenir la levée partielle de la suspension de procédures afin qu'elle puisse faire cession de ses biens a été accordée, alors que la demande de la Couronne visant à obtenir le paiement des montants de TPS non remis a été rejetée — Appel interjeté par la Couronne a été accueilli — Créancier a formé un pourvoi — Pourvoi accueilli — Analyse de la LTA et de la LACC conduisait à la conclusion que le législateur ne saurait avoir eu l'intention de redonner la priorité, dans le cadre de la LACC, à la fiducie réputée de la Couronne à l'égard de ses créances relatives à la TPS quand il a modifié la LTA, en 2000 — Législateur avait mis un terme à la priorité accordée aux créances de la Couronne sous les régimes de la LACC et de la Loi sur la faillite et l'insolvabilité (LFI), et ni l'une ni l'autre de ces lois ne prévoyaient que les créances relatives à la TPS bénéficiaient d'un traitement préférentiel — Fait de faire primer la priorité de la Couronne sur les créances découlant de la TPS dans le cadre de procédures fondées sur la LACC mais pas en cas de faillite aurait pour effet de restreindre le recours à la possibilité de se restructurer sous le régime plus souple et mieux adapté de la LACC — Il semblait probable que le législateur avait par inadvertance commis une anomalie rédactionnelle — On ne pourrait pas considérer l'art. 222(3) de la LTA comme ayant implicitement abrogé l'art. 18.3 de la LACC, compte tenu des modifications récemment apportées à la LACC — Sous le régime de la LACC, le tribunal avait discrétion pour établir une passerelle vers une liquidation opérée sous le régime de la LFI et de lever la suspension partielle des procédures afin de permettre à la débitrice de procéder à la transition au régime de liquidation — Il n'y avait aucune certitude, en vertu de l'ordonnance du tribunal, que la Couronne était le bénéficiaire véritable de la fiducie ni de fondement pour donner naissance à une fiducie expresse — Montant perçu au titre de la TPS ne faisait l'objet d'aucune fiducie présumée, priorité ou fiducie expresse en faveur de la Couronne.

## Taxation --- Principes généraux — Priorité des créances fiscales dans le cadre de procédures en faillite

Débitrice devait à la Couronne des montants de TPS qu'elle n'avait pas remis, en vertu de la Loi sur la taxe d'accise (LTA) — Débitrice a entamé des procédures judiciaires en vertu de la Loi sur les arrangements avec les créanciers des compagnies (LACC) — En vertu d'une ordonnance du tribunal, le montant de la créance fiscale a été déposé dans un compte en fiducie et la balance du produit de la vente des actifs a servi à payer le créancier garanti principal — Demande de la débitrice visant

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

à obtenir la levée partielle de la suspension de procédures afin qu'elle puisse faire cession de ses biens a été accordée, alors que la demande de la Couronne visant à obtenir le paiement des montants de TPS non remis a été rejetée — Appel interjeté par la Couronne a été accueilli — Créancier a formé un pourvoi — Pourvoi accueilli — Analyse de la LTA et de la LACC conduisait à la conclusion que le législateur ne saurait avoir eu l'intention de redonner la priorité, dans le cadre de la LACC, à la fiducie réputée de la Couronne à l'égard de ses créances relatives à la TPS quand il a modifié la LTA, en 2000 — Législateur avait mis un terme à la priorité accordée aux créances de la Couronne sous les régimes de la LACC et de la Loi sur la faillite et l'insolvabilité (LFI), et ni l'une ni l'autre de ces lois ne prévoyaient que les créances relatives à la TPS bénéficiaient d'un traitement préférentiel — Fait de faire primer la priorité de la Couronne sur les créances découlant de la TPS dans le cadre de procédures fondées sur la LACC mais pas en cas de faillite aurait pour effet de restreindre le recours à la possibilité de se restructurer sous le régime plus souple et mieux adapté de la LACC — Il semblait probable que le législateur avait par inadvertance commis une anomalie rédactionnelle — On ne pourrait pas considérer l'art. 222(3) de la LTA comme ayant implicitement abrogé l'art. 18.3 de la LACC, compte tenu des modifications récemment apportées à la LACC — Sous le régime de la LACC, le tribunal avait discrétion pour établir une passerelle vers une liquidation opérée sous le régime de la LFI et de lever la suspension partielle des procédures afin de permettre à la débitrice de procéder à la transition au régime de liquidation — Il n'y avait aucune certitude, en vertu de l'ordonnance du tribunal, que la Couronne était le bénéficiaire véritable de la fiducie ni de fondement pour donner naissance à une fiducie expresse — Montant perçu au titre de la TPS ne faisait l'objet d'aucune fiducie présumée, priorité ou fiducie expresse en faveur de la Couronne.

The debtor company owed the Crown under the Excise Tax Act (ETA) for GST that was not remitted. The debtor commenced proceedings under the Companies' Creditors Arrangement Act (CCAA). Under an order by the B.C. Supreme Court, the amount of the tax debt was placed in a trust account, and the remaining proceeds from the sale of the debtor's assets were paid to the major secured creditor. The debtor's application for a partial lifting of the stay of proceedings in order to assign itself into bankruptcy was granted, while the Crown's application for the immediate payment of the unremitted GST was dismissed.

The Crown's appeal to the B.C. Court of Appeal was allowed. The Court of Appeal found that the lower court was bound by the ETA to give the Crown priority once bankruptcy was inevitable. The Court of Appeal ruled that there was a deemed trust under s. 222 of the ETA or that an express trust was created in the Crown's favour by the court order segregating the GST funds in the trust account.

The creditor appealed to the Supreme Court of Canada.

**Held:** The appeal was allowed.

Per Deschamps J. (McLachlin C.J.C., Binnie, LeBel, Charron, Rothstein, Cromwell JJ. concurring): A purposive and contextual analysis of the ETA and CCAA yielded the conclusion that Parliament could not have intended to restore the Crown's deemed trust priority in GST claims under the CCAA when it amended the ETA in 2000. Parliament had moved away from asserting priority for Crown claims in insolvency law under both the CCAA and Bankruptcy and Insolvency Act (BIA). Unlike for source deductions, there was no express statutory basis in the CCAA or BIA for concluding that GST claims enjoyed any preferential treatment. The internal logic of the CCAA also militated against upholding a deemed trust for GST claims.

Giving the Crown priority over GST claims during CCAA proceedings but not in bankruptcy would, in practice, deprive companies of the option to restructure under the more flexible and responsive CCAA regime. It seemed likely that Parliament had inadvertently succumbed to a drafting anomaly, which could be resolved by giving precedence to s. 18.3 of the CCAA. Section 222(3) of the ETA could no longer be seen as having impliedly repealed s. 18.3 of the CCAA by being passed subsequently to the CCAA, given the recent amendments to the CCAA. The legislative context supported the conclusion that s. 222(3) of the ETA was not intended to narrow the scope of s. 18.3 of the CCAA.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

The breadth of the court's discretion under the CCAA was sufficient to construct a bridge to liquidation under the BIA, so there was authority under the CCAA to partially lift the stay of proceedings to allow the debtor's entry into liquidation. There should be no gap between the CCAA and BIA proceedings that would invite a race to the courthouse to assert priorities.

The court order did not have the certainty that the Crown would actually be the beneficiary of the funds sufficient to support an express trust, as the funds were segregated until the dispute between the creditor and the Crown could be resolved. The amount collected in respect of GST but not yet remitted to the Receiver General of Canada was not subject to a deemed trust, priority or express trust in favour of the Crown.

Per Fish J. (concurring): Parliament had declined to amend the provisions at issue after detailed consideration of the insolvency regime, so the apparent conflict between s. 18.3 of the CCAA and s. 222 of the ETA should not be treated as a drafting anomaly. In the insolvency context, a deemed trust would exist only when two complementary elements co-existed: first, a statutory provision creating the trust; and second, a CCAA or BIA provision confirming its effective operation. Parliament had created the Crown's deemed trust in the Income Tax Act, Canada Pension Plan and Employment Insurance Act and then confirmed in clear and unmistakable terms its continued operation under both the CCAA and the BIA regimes. In contrast, the ETA created a deemed trust in favour of the Crown, purportedly notwithstanding any contrary legislation, but Parliament did not expressly provide for its continued operation in either the BIA or the CCAA. The absence of this confirmation reflected Parliament's intention to allow the deemed trust to lapse with the commencement of insolvency proceedings. Parliament's evident intent was to render GST deemed trusts inoperative upon the institution of insolvency proceedings, and so s. 222 of the ETA mentioned the BIA so as to exclude it from its ambit, rather than include it as the other statutes did. As none of these statutes mentioned the CCAA expressly, the specific reference to the BIA had no bearing on the interaction with the CCAA. It was the confirmatory provisions in the insolvency statutes that would determine whether a given deemed trust would subsist during insolvency proceedings.

Per Abella J. (dissenting): The appellate court properly found that s. 222(3) of the ETA gave priority during CCAA proceedings to the Crown's deemed trust in unremitted GST. The failure to exempt the CCAA from the operation of this provision was a reflection of clear legislative intent. Despite the requests of various constituencies and case law confirming that the ETA took precedence over the CCAA, there was no responsive legislative revision and the BIA remained the only exempted statute. There was no policy justification for interfering, through interpretation, with this clarity of legislative intention and, in any event, the application of other principles of interpretation reinforced this conclusion. Contrary to the majority's view, the "later in time" principle did not favour the precedence of the CCAA, as the CCAA was merely re-enacted without significant substantive changes. According to the Interpretation Act, in such circumstances, s. 222(3) of the ETA remained the later provision. The chambers judge was required to respect the priority regime set out in s. 222(3) of the ETA and so did not have the authority to deny the Crown's request for payment of the GST funds during the CCAA proceedings.

La compagnie débitrice devait à la Couronne des montants de TPS qu'elle n'avait pas remis, en vertu de la Loi sur la taxe d'accise (LTA). La débitrice a entamé des procédures judiciaires en vertu de la Loi sur les arrangements avec les créanciers des compagnies (LACC). En vertu d'une ordonnance du tribunal, le montant de la créance fiscale a été déposé dans un compte en fiducie et la balance du produit de la vente des actifs de la débitrice a servi à payer le créancier garanti principal. La demande de la débitrice visant à obtenir la levée partielle de la suspension de procédures afin qu'elle puisse faire cession de ses biens a été accordée, alors que la demande de la Couronne visant à obtenir le paiement immédiat des montants de TPS non remis a été rejetée.

L'appel interjeté par la Couronne a été accueilli. La Cour d'appel a conclu que le tribunal se devait, en vertu de la LTA, de donner priorité à la Couronne une fois la faillite inévitable. La Cour d'appel a estimé que l'art. 222 de la LTA établissait

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14410-5   Filed 09/16/14   Page 187 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

une fiducie présumée ou bien que l'ordonnance du tribunal à l'effet que les montants de TPS soient détenus dans un compte en fiducie créait une fiducie expresse en faveur de la Couronne.

Le créancier a formé un pourvoi.

**Arrêt:** Le pourvoi a été accueilli.

Deschamps, J. (McLachlin, J.C.C., Binnie, LeBel, Charron, Rothstein, Cromwell, JJ., souscrivant à son opinion) : Une analyse téléologique et contextuelle de la LTA et de la LACC conduisait à la conclusion que le législateur ne saurait avoir eu l'intention de redonner la priorité, dans le cadre de la LACC, à la fiducie réputée de la Couronne à l'égard de ses créances relatives à la TPS quand il a modifié la LTA, en 2000. Le législateur avait mis un terme à la priorité accordée aux créances de la Couronne dans le cadre du droit de l'insolvabilité, sous le régime de la LACC et celui de la Loi sur la faillite et l'insolvabilité (LFI). Contrairement aux retenues à la source, aucune disposition législative expresse ne permettait de conclure que les créances relatives à la TPS bénéficiaient d'un traitement préférentiel sous le régime de la LACC ou celui de la LFI. La logique interne de la LACC allait également à l'encontre du maintien de la fiducie réputée à l'égard des créances découlant de la TPS.

Le fait de faire primer la priorité de la Couronne sur les créances découlant de la TPS dans le cadre de procédures fondées sur la LACC mais pas en cas de faillite aurait pour effet, dans les faits, de priver les compagnies de la possibilité de se restructurer sous le régime plus souple et mieux adapté de la LACC. Il semblait probable que le législateur avait par inadvertance commis une anomalie rédactionnelle, laquelle pouvait être corrigée en donnant préséance à l'art. 18.3 de la LACC. On ne pouvait plus considérer l'art. 222(3) de la LTA comme ayant implicitement abrogé l'art. 18.3 de la LACC parce qu'il avait été adopté après la LACC, compte tenu des modifications récemment apportées à la LACC. Le contexte législatif étayait la conclusion suivant laquelle l'art. 222(3) de la LTA n'avait pas pour but de restreindre la portée de l'art. 18.3 de la LACC.

L'ampleur du pouvoir discrétionnaire conféré au tribunal par la LACC était suffisant pour établir une passerelle vers une liquidation opérée sous le régime de la LFI, de sorte qu'il avait, en vertu de la LACC, le pouvoir de lever la suspension partielle des procédures afin de permettre à la débitrice de procéder à la transition au régime de liquidation. Il n'y avait aucune certitude, en vertu de l'ordonnance du tribunal, que la Couronne était le bénéficiaire véritable de la fiducie ni de fondement pour donner naissance à une fiducie expresse, puisque les fonds étaient détenus à part jusqu'à ce que le litige entre le créancier et la Couronne soit résolu. Le montant perçu au titre de la TPS mais non encore versé au receveur général du Canada ne faisait l'objet d'aucune fiducie présumée, priorité ou fiducie expresse en faveur de la Couronne.

Fish, J. (souscrivant aux motifs des juges majoritaires) : Le législateur a refusé de modifier les dispositions en question suivant un examen approfondi du régime d'insolvabilité, de sorte qu'on ne devrait pas qualifier l'apparente contradiction entre l'art. 18.3 de la LACC et l'art. 222 de la LTA d'anomalie rédactionnelle. Dans un contexte d'insolvabilité, on ne pourrait conclure à l'existence d'une fiducie présumée que lorsque deux éléments complémentaires étaient réunis : en premier lieu, une disposition législative qui crée la fiducie et, en second lieu, une disposition de la LACC ou de la LFI qui confirme l'existence de la fiducie. Le législateur a établi une fiducie présumée en faveur de la Couronne dans la Loi de l'impôt sur le revenu, le Régime de pensions du Canada et la Loi sur l'assurance-emploi puis, il a confirmé en termes clairs et explicites sa volonté de voir cette fiducie présumée produire ses effets sous le régime de la LACC et de la LFI. Dans le cas de la LTA, il a établi une fiducie présumée en faveur de la Couronne, sciemment et sans égard pour toute législation à l'effet contraire, mais n'a pas expressément prévu le maintien en vigueur de celle-ci sous le régime de la LFI ou celui de la LACC. L'absence d'une telle confirmation témoignait de l'intention du législateur de laisser la fiducie présumée devenir caduque au moment de l'introduction de la procédure d'insolvabilité. L'intention du législateur était manifestement de rendre inopérantes les fiducies présumées visant la TPS dès l'introduction d'une procédure d'insolvabilité et, par conséquent, l'art. 222 de la LTA mentionnait la LFI de manière à l'exclure de son champ d'application, et non de l'y inclure, comme le faisaient les autres lois. Puisqu'aucune de ces lois ne mentionnait spécifiquement la LACC, la mention

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 188 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

explicite de la LFI n'avait aucune incidence sur l'interaction avec la LACC. C'était les dispositions confirmatoires que l'on trouvait dans les lois sur l'insolvabilité qui déterminaient si une fiducie présumée continuerait d'exister durant une procédure d'insolvabilité.

Abella, J. (dissidente) : La Cour d'appel a conclu à bon droit que l'art. 222(3) de la LTA donnait préséance à la fiducie présumée qui est établie en faveur de la Couronne à l'égard de la TPS non versée. Le fait que la LACC n'ait pas été soustraite à l'application de cette disposition témoignait d'une intention claire du législateur. Malgré les demandes répétées de divers groupes et la jurisprudence ayant confirmé que la LTA l'emportait sur la LACC, le législateur n'est pas intervenu et la LFI est demeurée la seule loi soustraite à l'application de cette disposition. Il n'y avait pas de considération de politique générale qui justifierait d'aller à l'encontre, par voie d'interprétation législative, de l'intention aussi clairement exprimée par le législateur et, de toutes manières, cette conclusion était renforcée par l'application d'autres principes d'interprétation. Contrairement à l'opinion des juges majoritaires, le principe de la préséance de la « loi postérieure » ne militait pas en faveur de la présance de la LACC, celle-ci ayant été simplement adoptée à nouveau sans que l'on ne lui ait apporté de modifications importantes. En vertu de la Loi d'interprétation, dans ces circonstances, l'art. 222(3) de la LTA demeurait la disposition postérieure. Le juge siégeant en son cabinet était tenu de respecter le régime de priorités établi à l'art. 222(3) de la LTA, et il ne pouvait pas refuser la demande présentée par la Couronne en vue de se faire payer la TPS dans le cadre de la procédure introduite en vertu de la LACC.

## Table of Authorities

### Cases considered by *Deschamps J.*:

*Air Canada, Re* (2003), 42 C.B.R. (4th) 173, 2003 CarswellOnt 2464 (Ont. S.C.J. [Commercial List]) — referred to

*Air Canada, Re* (2003), 2003 CarswellOnt 4967 (Ont. S.C.J. [Commercial List]) — referred to

*Alternative granite & marbre inc., Re* (2009), *(sub nom. Dep. Min. Rev. Quebec v. Caisse populaire Desjardins de Montmagny)* 2009 G.T.C. 2036 (Eng.), *(sub nom. Quebec (Revenue) v. Caisse populaire Desjardins de Montmagny)* [2009] 3 S.C.R. 286, 312 D.L.R. (4th) 577, [2009] G.S.T.C. 154, *(sub nom. 9083-4185 Québec Inc. (Bankrupt), Re)* 394 N.R. 368, 60 C.B.R. (5th) 1, 2009 SCC 49, 2009 CarswellQue 10706, 2009 CarswellQue 10707 (S.C.C.) — referred to

*ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.* (2008), 2008 ONCA 587, 2008 CarswellOnt 4811, *(sub nom. Metcalfe & Mansfield Alternative Investments II Corp., Re)* 240 O.A.C. 245, *(sub nom. Metcalfe & Mansfield Alternative Investments II Corp., Re)* 296 D.L.R. (4th) 135, *(sub nom. Metcalfe & Mansfield Alternative Investments II Corp., Re)* 92 O.R. (3d) 513, 45 C.B.R. (5th) 163, 47 B.L.R. (4th) 123 (Ont. C.A.) — considered

*Canadian Airlines Corp., Re* (2000), [2000] 10 W.W.R. 269, 20 C.B.R. (4th) 1, 84 Alta. L.R. (3d) 9, 9 B.L.R. (3d) 41, 2000 CarswellAlta 662, 2000 ABQB 442, 265 A.R. 201 (Alta. Q.B.) — referred to

*Canadian Red Cross Society / Société Canadienne de la Croix Rouge, Re* (2000), 2000 CarswellOnt 3269, 19 C.B.R. (4th) 158 (Ont. S.C.J.) — referred to

*Doré c. Verdun (Municipalité)* (1997), *(sub nom. Doré v. Verdun (City))* [1997] 2 S.C.R. 862, *(sub nom. Doré v. Verdun (Ville))* 215 N.R. 81, *(sub nom. Doré v. Verdun (City))* 150 D.L.R. (4th) 385, 1997 CarswellQue 159, 1997 CarswellQue 850 (S.C.C.) — distinguished

*Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106, 1995 CarswellOnt 54 (Ont. Gen. Div. [Commercial List]) — considered

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 189 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

*First Vancouver Finance v. Minister of National Revenue* (2002), [2002] 3 C.T.C. 285, *(sub nom. Minister of National Revenue v. First Vancouver Finance)* 2002 D.T.C. 6998 (Eng.), *(sub nom. Minister of National Revenue v. First Vancouver Finance)* 2002 D.T.C. 7007 (Fr.), 288 N.R. 347, 212 D.L.R. (4th) 615, [2002] G.S.T.C. 23, [2003] 1 W.W.R. 1, 45 C.B.R. (4th) 213, 2002 SCC 49, 2002 CarswellSask 317, 2002 CarswellSask 318, [2002] 2 S.C.R. 720 (S.C.C.) — considered

*Gauntlet Energy Corp., Re* (2003), 30 Alta. L.R. (4th) 192, 2003 ABQB 894, 2003 CarswellAlta 1735, [2003] G.S.T.C. 193, 49 C.B.R. (4th) 213, [2004] 10 W.W.R. 180, 352 A.R. 28 (Alta. Q.B.) — referred to

*Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 51 B.C.L.R. (2d) 84, 1990 CarswellBC 394, 4 C.B.R. (3d) 311, *(sub nom. Chef Ready Foods Ltd. v. Hongkong Bank of Canada)* [1991] 2 W.W.R. 136 (B.C. C.A.) — referred to

*Ivaco Inc., Re* (2006), 2006 C.E.B. & P.G.R. 8218, 25 C.B.R. (5th) 176, 83 O.R. (3d) 108, 275 D.L.R. (4th) 132, 2006 CarswellOnt 6292, 56 C.C.P.B. 1, 26 B.L.R. (4th) 43 (Ont. C.A.) — referred to

*Komunik Corp., Re* (2010), 2010 CarswellQue 686, 2010 QCCA 183 (Que. C.A.) — referred to

*Komunik Corp., Re* (2009), 2009 QCCS 6332, 2009 CarswellQue 13962 (Que. S.C.) — referred to

*Nova Metal Products Inc. v. Comiskey (Trustee of)* (1990), 1990 CarswellOnt 139, 1 C.B.R. (3d) 101, *(sub nom. Elan Corp. v. Comiskey)* 1 O.R. (3d) 289, *(sub nom. Elan Corp. v. Comiskey)* 41 O.A.C. 282 (Ont. C.A.) — considered

*Ottawa Senators Hockey Club Corp., Re* (2005), 2005 G.T.C. 1327 (Eng.), 6 C.B.R. (5th) 293, 2005 D.T.C. 5233 (Eng.), 2005 CarswellOnt 8, [2005] G.S.T.C. 1, 193 O.A.C. 95, 73 O.R. (3d) 737 (Ont. C.A.) — not followed

*Pacific National Lease Holding Corp., Re* (1992), 72 B.C.L.R. (2d) 368, 19 B.C.A.C. 134, 34 W.A.C. 134, 15 C.B.R. (3d) 265, 1992 CarswellBC 524 (B.C. C.A. [In Chambers]) — referred to

*Philip's Manufacturing Ltd., Re* (1992), 9 C.B.R. (3d) 25, 67 B.C.L.R. (2d) 84, 4 B.L.R. (2d) 142, 1992 CarswellBC 542 (B.C. C.A.) — referred to

*Quebec (Deputy Minister of Revenue) c. Rainville* (1979), *(sub nom. Bourgeault, Re)* 33 C.B.R. (N.S.) 301, *(sub nom. Bourgeault's Estate v. Quebec (Deputy Minister of Revenue))* 30 N.R. 24, *(sub nom. Bourgault, Re)* 105 D.L.R. (3d) 270, 1979 CarswellQue 165, 1979 CarswellQue 266, *(sub nom. Quebec (Deputy Minister of Revenue) v. Bourgeault (Trustee of))* [1980] 1 S.C.R. 35 (S.C.C.) — referred to

*Reference re Companies' Creditors Arrangement Act (Canada)* (1934), [1934] 4 D.L.R. 75, 1934 CarswellNat 1, 16 C.B.R. 1, [1934] S.C.R. 659 (S.C.C.) — referred to

*Royal Bank v. Sparrow Electric Corp.* (1997), 193 A.R. 321, 135 W.A.C. 321, [1997] 2 W.W.R. 457, 208 N.R. 161, 12 P.P.S.A.C. (2d) 68, 1997 CarswellAlta 112, 1997 CarswellAlta 113, 46 Alta. L.R. (3d) 87, *(sub nom. R. v. Royal Bank)* 97 D.T.C. 5089, 143 D.L.R. (4th) 385, 44 C.B.R. (3d) 1, [1997] 1 S.C.R. 411 (S.C.C.) — considered

*Skeena Cellulose Inc., Re* (2003), 2003 CarswellBC 1399, 2003 BCCA 344, 184 B.C.A.C. 54, 302 W.A.C. 54, 43 C.B.R. (4th) 187, 13 B.C.L.R. (4th) 236 (B.C. C.A.) — referred to

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

*Skydome Corp., Re* (1998), 16 C.B.R. (4th) 118, 1998 CarswellOnt 5922 (Ont. Gen. Div. [Commercial List]) — referred to

*Solid Resources Ltd., Re* (2002), [2003] G.S.T.C. 21, 2002 CarswellAlta 1699, 40 C.B.R. (4th) 219 (Alta. Q.B.) — referred to

*Stelco Inc., Re* (2005), 253 D.L.R. (4th) 109, 75 O.R. (3d) 5, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 2005 CarswellOnt 1188, 196 O.A.C. 142 (Ont. C.A.) — referred to

*United Used Auto & Truck Parts Ltd., Re* (1999), 12 C.B.R. (4th) 144, 1999 CarswellBC 2673 (B.C. S.C. [In Chambers]) — referred to

*United Used Auto & Truck Parts Ltd., Re* (2000), 2000 BCCA 146, 135 B.C.A.C. 96, 221 W.A.C. 96, 2000 CarswellBC 414, 73 B.C.L.R. (3d) 236, 16 C.B.R. (4th) 141, [2000] 5 W.W.R. 178 (B.C. C.A.) — referred to

**Cases considered by *Fish J.*:**

*Ottawa Senators Hockey Club Corp., Re* (2005), 2005 G.T.C. 1327 (Eng.), 6 C.B.R. (5th) 293, 2005 D.T.C. 5233 (Eng.), 2005 CarswellOnt 8, [2005] G.S.T.C. 1, 193 O.A.C. 95, 73 O.R. (3d) 737 (Ont. C.A.) — not followed

**Cases considered by *Abella J.* (dissenting):**

*Canada (Attorney General) v. Canada (Public Service Staff Relations Board)* (1977), [1977] 2 F.C. 663, 14 N.R. 257, 74 D.L.R. (3d) 307, 1977 CarswellNat 62, 1977 CarswellNat 62F (Fed. C.A.) — referred to

*Doré c. Verdun (Municipalité)* (1997), (sub nom. *Doré v. Verdun (City)*) [1997] 2 S.C.R. 862, (sub nom. *Doré v. Verdun (Ville)*) 215 N.R. 81, (sub nom. *Doré v. Verdun (City)*) 150 D.L.R. (4th) 385, 1997 CarswellQue 159, 1997 CarswellQue 850 (S.C.C.) — referred to

*Ottawa Senators Hockey Club Corp., Re* (2005), 2005 G.T.C. 1327 (Eng.), 6 C.B.R. (5th) 293, 2005 D.T.C. 5233 (Eng.), 2005 CarswellOnt 8, [2005] G.S.T.C. 1, 193 O.A.C. 95, 73 O.R. (3d) 737 (Ont. C.A.) — considered

*R. v. Tele-Mobile Co.* (2008), 2008 CarswellOnt 1588, 2008 CarswellOnt 1589, 2008 SCC 12, (sub nom. *Tele-Mobile Co. v. Ontario*) 372 N.R. 157, 55 C.R. (6th) 1, (sub nom. *Ontario v. Tele-Mobile Co.*) 229 C.C.C. (3d) 417, (sub nom. *Tele-Mobile Co. v. Ontario*) 235 O.A.C. 369, (sub nom. *Tele-Mobile Co. v. Ontario*) [2008] 1 S.C.R. 305, (sub nom. *R. v. Tele-Mobile Company (Telus Mobility)*) 92 O.R. (3d) 478 (note), (sub nom. *Ontario v. Tele-Mobile Co.*) 291 D.L.R. (4th) 193 (S.C.C.) — considered

**Statutes considered by *Deschamps J.*:**

*Bank Act*, S.C. 1991, c. 46
    Generally — referred to

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
    Generally — referred to

    s. 67(2) — referred to

**WestlawNext**® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW Doc 14410-5 Filed 09/16/14 Page 191 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

s. 67(3) — referred to

s. 81.1 [en. 1992, c. 27, s. 38(1)] — considered

s. 81.2 [en. 1992, c. 27, s. 38(1)] — considered

s. 86(1) — considered

s. 86(3) — referred to

*Bankruptcy Act and to amend the Income Tax Act in consequence thereof, Act to amend the*, S.C. 1992, c. 27
   Generally — referred to

   s. 39 — referred to

*Bankruptcy and Insolvency Act, the Companies' Creditors Arrangement Act and the Income Tax Act, Act to amend the*, S.C. 1997, c. 12
   s. 73 — referred to

   s. 125 — referred to

   s. 126 — referred to

*Canada Pension Plan*, R.S.C. 1985, c. C-8
   Generally — referred to

   s. 23(3) — referred to

   s. 23(4) — referred to

*Cités et villes, Loi sur les*, L.R.Q., c. C-19
   en général — referred to

*Code civil du Québec*, L.Q. 1991, c. 64
   en général — referred to

   art. 2930 — referred to

*Companies' Creditors Arrangement Act, Act to Amend*, S.C. 1952-53, c. 3
   Generally — referred to

*Companies' Creditors Arrangement Act, 1933*, S.C. 1932-33, c. 36
   Generally — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
   Generally — referred to

   s. 11 — considered

   s. 11(1) — considered

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 192 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

s. 11(3) — referred to

s. 11(4) — referred to

s. 11(6) — referred to

s. 11.02 [en. 2005, c. 47, s. 128] — referred to

s. 11.09 [en. 2005, c. 47, s. 128] — considered

s. 11.4 [en. 1997, c. 12, s. 124] — referred to

s. 18.3 [en. 1997, c. 12, s. 125] — considered

s. 18.3(1) [en. 1997, c. 12, s. 125] — considered

s. 18.3(2) [en. 1997, c. 12, s. 125] — considered

s. 18.4 [en. 1997, c. 12, s. 125] — referred to

s. 18.4(1) [en. 1997, c. 12, s. 125] — considered

s. 18.4(3) [en. 1997, c. 12, s. 125] — considered

s. 20 — considered

s. 21 — considered

s. 37 — considered

s. 37(1) — referred to

*Employment Insurance Act*, S.C. 1996, c. 23
    Generally — referred to

s. 86(2) — referred to

s. 86(2.1) [en. 1998, c. 19, s. 266(1)] — referred to

*Excise Tax Act*, R.S.C. 1985, c. E-15
    Generally — referred to

s. 222(1) [en. 1990, c. 45, s. 12(1)] — referred to

s. 222(3) [en. 1990, c. 45, s. 12(1)] — considered

*Fairness for the Self-Employed Act*, S.C. 2009, c. 33
    Generally — referred to

*Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.)
    s. 227(4) — referred to

s. 227(4.1) [en. 1998, c. 19, s. 226(1)] — referred to

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

*Interpretation Act*, R.S.C. 1985, c. I-21
    s. 44(f) — considered

*Personal Property Security Act*, S.A. 1988, c. P-4.05
    Generally — referred to

*Sales Tax and Excise Tax Amendments Act, 1999*, S.C. 2000, c. 30
    Generally — referred to

*Wage Earner Protection Program Act*, S.C. 2005, c. 47, s. 1
    Generally — referred to

    s. 69 — referred to

    s. 128 — referred to

    s. 131 — referred to

**Statutes considered *Fish J.*:**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
    Generally — referred to

    s. 67(2) — considered

    s. 67(3) — considered

*Canada Pension Plan*, R.S.C. 1985, c. C-8
    Generally — referred to

    s. 23 — considered

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
    Generally — referred to

    s. 11 — considered

    s. 18.3(1) [en. 1997, c. 12, s. 125] — considered

    s. 18.3(2) [en. 1997, c. 12, s. 125] — considered

    s. 37(1) — considered

*Employment Insurance Act*, S.C. 1996, c. 23
    Generally — referred to

    s. 86(2) — referred to

    s. 86(2.1) [en. 1998, c. 19, s. 266(1)] — referred to

*Excise Tax Act*, R.S.C. 1985, c. E-15

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

    Generally — referred to

    s. 222 [en. 1990, c. 45, s. 12(1)] — considered

    s. 222(1) [en. 1990, c. 45, s. 12(1)] — considered

    s. 222(3) [en. 1990, c. 45, s. 12(1)] — considered

    s. 222(3)(a) [en. 1990, c. 45, s. 12(1)] — considered

*Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.)
    Generally — referred to

    s. 227(4) — considered

    s. 227(4.1) [en. 1998, c. 19, s. 226(1)] — considered

    s. 227(4.1)(a) [en. 1998, c. 19, s. 226(1)] — considered

**Statutes considered *Abella J.* (dissenting):**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
    Generally — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
    Generally — referred to

    s. 11 — considered

    s. 11(1) — considered

    s. 11(3) — considered

    s. 18.3(1) [en. 1997, c. 12, s. 125] — considered

    s. 37(1) — considered

*Excise Tax Act*, R.S.C. 1985, c. E-15
    Generally — referred to

    s. 222 [en. 1990, c. 45, s. 12(1)] — considered

    s. 222(3) [en. 1990, c. 45, s. 12(1)] — considered

*Interpretation Act*, R.S.C. 1985, c. I-21
    s. 2(1)"enactment" — considered

    s. 44(f) — considered

*Winding-up and Restructuring Act*, R.S.C. 1985, c. W-11
    Generally — referred to

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14410-5   Filed 09/16/14   Page 195 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

APPEAL by creditor from judgment reported at 2009 CarswellBC 1195, 2009 BCCA 205, [2009] G.S.T.C. 79, 98 B.C.L.R. (4th) 242, [2009] 12 W.W.R. 684, 270 B.C.A.C. 167, 454 W.A.C. 167, 2009 G.T.C. 2020 (Eng.) (B.C. C.A.), allowing Crown's appeal from dismissal of application for immediate payment of tax debt.

***Deschamps J.*:**

1     For the first time this Court is called upon to directly interpret the provisions of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). In that respect, two questions are raised. The first requires reconciliation of provisions of the *CCAA* and the *Excise Tax Act*, R.S.C. 1985, c. E-15 ("*ETA*"), which lower courts have held to be in conflict with one another. The second concerns the scope of a court's discretion when supervising reorganization. The relevant statutory provisions are reproduced in the Appendix. On the first question, having considered the evolution of Crown priorities in the context of insolvency and the wording of the various statutes creating Crown priorities, I conclude that it is the *CCAA* and not the *ETA* that provides the rule. On the second question, I conclude that the broad discretionary jurisdiction conferred on the supervising judge must be interpreted having regard to the remedial nature of the *CCAA* and insolvency legislation generally. Consequently, the court had the discretion to partially lift a stay of proceedings to allow the debtor to make an assignment under the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*"). I would allow the appeal.

## 1. Facts and Decisions of the Courts Below

2     Ted LeRoy Trucking Ltd. ("LeRoy Trucking") commenced proceedings under the *CCAA* in the Supreme Court of British Columbia on December 13, 2007, obtaining a stay of proceedings with a view to reorganizing its financial affairs. LeRoy Trucking sold certain redundant assets as authorized by the order.

3     Amongst the debts owed by LeRoy Trucking was an amount for Goods and Services Tax ("GST") collected but unremitted to the Crown. The *ETA* creates a deemed trust in favour of the Crown for amounts collected in respect of GST. The deemed trust extends to any property or proceeds held by the person collecting GST and any property of that person held by a secured creditor, requiring that property to be paid to the Crown in priority to all security interests. The *ETA* provides that the deemed trust operates despite any other enactment of Canada except the *BIA*. However, the *CCAA* also provides that subject to certain exceptions, none of which mentions GST, deemed trusts in favour of the Crown do not operate under the *CCAA*. Accordingly, under the *CCAA* the Crown ranks as an unsecured creditor in respect of GST. Nonetheless, at the time LeRoy Trucking commenced *CCAA* proceedings the leading line of jurisprudence held that the *ETA* took precedence over the *CCAA* such that the Crown enjoyed priority for GST claims under the *CCAA*, even though it would have lost that same priority under the *BIA*. The *CCAA* underwent substantial amendments in 2005 in which some of the provisions at issue in this appeal were renumbered and reformulated (S.C. 2005, c. 47). However, these amendments only came into force on September 18, 2009. I will refer to the amended provisions only where relevant.

4     On April 29, 2008, Brenner C.J.S.C., in the context of the *CCAA* proceedings, approved a payment not exceeding $5 million, the proceeds of redundant asset sales, to Century Services, the debtor's major secured creditor. LeRoy Trucking proposed to hold back an amount equal to the GST monies collected but unremitted to the Crown and place it in the Monitor's trust account until the outcome of the reorganization was known. In order to maintain the *status quo* while the success of the reorganization was uncertain, Brenner C.J.S.C. agreed to the proposal and ordered that an amount of $305,202.30 be held by the Monitor in its trust account.

5     On September 3, 2008, having concluded that reorganization was not possible, LeRoy Trucking sought leave to make an assignment in bankruptcy under the *BIA*. The Crown sought an order that the GST monies held by the Monitor be paid to the Receiver General of Canada. Brenner C.J.S.C. dismissed the latter application. Reasoning that the purpose of segregating the funds with the Monitor was "to facilitate an ultimate payment of the GST monies which were owed pre-filing, but only if a viable plan emerged", the failure of such a reorganization, followed by an assignment in bankruptcy, meant the Crown would lose priority under the *BIA* (2008 BCSC 1805, [2008] G.S.T.C. 221 (B.C. S.C. [In Chambers])).

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

6    The Crown's appeal was allowed by the British Columbia Court of Appeal (2009 BCCA 205, [2009] G.S.T.C. 79, 270 B.C.A.C. 167 (B.C. C.A.)). Tysoe J.A. for a unanimous court found two independent bases for allowing the Crown's appeal.

7    First, the court's authority under s. 11 of the *CCAA* was held not to extend to staying the Crown's application for immediate payment of the GST funds subject to the deemed trust after it was clear that reorganization efforts had failed and that bankruptcy was inevitable. As restructuring was no longer a possibility, staying the Crown's claim to the GST funds no longer served a purpose under the *CCAA* and the court was bound under the priority scheme provided by the *ETA* to allow payment to the Crown. In so holding, Tysoe J.A. adopted the reasoning in *Ottawa Senators Hockey Club Corp. (Re)*, [2005] G.S.T.C. 1, 73 O.R. (3d) 737 (Ont. C.A.), which found that the *ETA* deemed trust for GST established Crown priority over secured creditors under the *CCAA*.

8    Second, Tysoe J.A. concluded that by ordering the GST funds segregated in the Monitor's trust account on April 29, 2008, the judge had created an express trust in favour of the Crown from which the monies in question could not be diverted for any other purposes. The Court of Appeal therefore ordered that the money held by the Monitor in trust be paid to the Receiver General.

## 2. Issues

9    This appeal raises three broad issues which are addressed in turn:

   (1) Did s. 222(3) of the *ETA* displace s. 18.3(1) of the *CCAA* and give priority to the Crown's *ETA* deemed trust during *CCAA* proceedings as held in *Ottawa Senators*?

   (2) Did the court exceed its *CCAA* authority by lifting the stay to allow the debtor to make an assignment in bankruptcy?

   (3) Did the court's order of April 29, 2008 requiring segregation of the Crown's GST claim in the Monitor's trust account create an express trust in favour of the Crown in respect of those funds?

## 3. Analysis

10    The first issue concerns Crown priorities in the context of insolvency. As will be seen, the *ETA* provides for a deemed trust in favour of the Crown in respect of GST owed by a debtor "[d]espite ... any other enactment of Canada (except the *Bankruptcy and Insolvency Act*)" (s. 222(3)), while the *CCAA* stated at the relevant time that "notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be [so] regarded" (s. 18.3(1)). It is difficult to imagine two statutory provisions more apparently in conflict. However, as is often the case, the apparent conflict can be resolved through interpretation.

11    In order to properly interpret the provisions, it is necessary to examine the history of the *CCAA*, its function amidst the body of insolvency legislation enacted by Parliament, and the principles that have been recognized in the jurisprudence. It will be seen that Crown priorities in the insolvency context have been significantly pared down. The resolution of the second issue is also rooted in the context of the *CCAA*, but its purpose and the manner in which it has been interpreted in the case law are also key. After examining the first two issues in this case, I will address Tysoe J.A.'s conclusion that an express trust in favour of the Crown was created by the court's order of April 29, 2008.

### 3.1 Purpose and Scope of Insolvency Law

12    Insolvency is the factual situation that arises when a debtor is unable to pay creditors (see generally, R. J. Wood, *Bankruptcy and Insolvency Law* (2009), at p. 16). Certain legal proceedings become available upon insolvency, which typically allow a debtor to obtain a court order staying its creditors' enforcement actions and attempt to obtain a binding compromise with creditors to adjust the payment conditions to something more realistic. Alternatively, the debtor's assets may be liquidated and debts paid from the proceeds according to statutory priority rules. The former is usually referred to as reorganization or restructuring while the latter is termed liquidation.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 197 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

13    Canadian commercial insolvency law is not codified in one exhaustive statute. Instead, Parliament has enacted multiple insolvency statutes, the main one being the *BIA*. The *BIA* offers a self-contained legal regime providing for both reorganization and liquidation. Although bankruptcy legislation has a long history, the *BIA* itself is a fairly recent statute — it was enacted in 1992. It is characterized by a rules-based approach to proceedings. The *BIA* is available to insolvent debtors owing $1000 or more, regardless of whether they are natural or legal persons. It contains mechanisms for debtors to make proposals to their creditors for the adjustment of debts. If a proposal fails, the *BIA* contains a bridge to bankruptcy whereby the debtor's assets are liquidated and the proceeds paid to creditors in accordance with the statutory scheme of distribution.

14    Access to the *CCAA* is more restrictive. A debtor must be a company with liabilities in excess of $5 million. Unlike the *BIA*, the *CCAA* contains no provisions for liquidation of a debtor's assets if reorganization fails. There are three ways of exiting *CCAA* proceedings. The best outcome is achieved when the stay of proceedings provides the debtor with some breathing space during which solvency is restored and the *CCAA* process terminates without reorganization being needed. The second most desirable outcome occurs when the debtor's compromise or arrangement is accepted by its creditors and the reorganized company emerges from the *CCAA* proceedings as a going concern. Lastly, if the compromise or arrangement fails, either the company or its creditors usually seek to have the debtor's assets liquidated under the applicable provisions of the *BIA* or to place the debtor into receivership. As discussed in greater detail below, the key difference between the reorganization regimes under the *BIA* and the *CCAA* is that the latter offers a more flexible mechanism with greater judicial discretion, making it more responsive to complex reorganizations.

15    As I will discuss at greater length below, the purpose of the *CCAA* — Canada's first reorganization statute — is to permit the debtor to continue to carry on business and, where possible, avoid the social and economic costs of liquidating its assets. Proposals to creditors under the *BIA* serve the same remedial purpose, though this is achieved through a rules-based mechanism that offers less flexibility. Where reorganization is impossible, the *BIA* may be employed to provide an orderly mechanism for the distribution of a debtor's assets to satisfy creditor claims according to predetermined priority rules.

16    Prior to the enactment of the *CCAA* in 1933 (S.C. 1932-33, c. 36), practice under existing commercial insolvency legislation tended heavily towards the liquidation of a debtor company (J. Sarra, *Creditor Rights and the Public Interest: Restructuring Insolvent Corporations* (2003), at p. 12). The battering visited upon Canadian businesses by the Great Depression and the absence of an effective mechanism for reaching a compromise between debtors and creditors to avoid liquidation required a legislative response. The *CCAA* was innovative as it allowed the insolvent debtor to attempt reorganization under judicial supervision outside the existing insolvency legislation which, once engaged, almost invariably resulted in liquidation (*Reference re Companies' Creditors Arrangement Act (Canada)*, [1934] S.C.R. 659 (S.C.C.), at pp. 660-61; Sarra, *Creditor Rights*, at pp. 12-13).

17    Parliament understood when adopting the *CCAA* that liquidation of an insolvent company was harmful for most of those it affected — notably creditors and employees — and that a workout which allowed the company to survive was optimal (Sarra, *Creditor Rights*, at pp. 13-15).

18    Early commentary and jurisprudence also endorsed the *CCAA's* remedial objectives. It recognized that companies retain more value as going concerns while underscoring that intangible losses, such as the evaporation of the companies' goodwill, result from liquidation (S. E. Edwards, "Reorganizations Under the Companies' Creditors Arrangement Act" (1947), 25 *Can. Bar Rev.* 587, at p. 592). Reorganization serves the public interest by facilitating the survival of companies supplying goods or services crucial to the health of the economy or saving large numbers of jobs (*ibid.*, at p. 593). Insolvency could be so widely felt as to impact stakeholders other than creditors and employees. Variants of these views resonate today, with reorganization justified in terms of rehabilitating companies that are key elements in a complex web of interdependent economic relationships in order to avoid the negative consequences of liquidation.

19    The *CCAA* fell into disuse during the next several decades, likely because amendments to the Act in 1953 restricted its use to companies issuing bonds (S.C. 1952-53, c. 3). During the economic downturn of the early 1980s, insolvency lawyers and courts adapting to the resulting wave of insolvencies resurrected the statute and deployed it in response to new economic

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

challenges. Participants in insolvency proceedings grew to recognize and appreciate the statute's distinguishing feature: a grant of broad and flexible authority to the supervising court to make the orders necessary to facilitate the reorganization of the debtor and achieve the *CCAA's* objectives. The manner in which courts have used *CCAA* jurisdiction in increasingly creative and flexible ways is explored in greater detail below.

20    Efforts to evolve insolvency law were not restricted to the courts during this period. In 1970, a government-commissioned panel produced an extensive study recommending sweeping reform but Parliament failed to act (see *Bankruptcy and Insolvency: Report of the Study Committee on Bankruptcy and Insolvency Legislation* (1970)). Another panel of experts produced more limited recommendations in 1986 which eventually resulted in enactment of the *Bankruptcy and Insolvency Act* of 1992 (S.C. 1992, c. 27) (see *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency* (1986)). Broader provisions for reorganizing insolvent debtors were then included in Canada's bankruptcy statute. Although the 1970 and 1986 reports made no specific recommendations with respect to the *CCAA*, the House of Commons committee studying the *BIA*'s predecessor bill, C-22, seemed to accept expert testimony that the *BIA*'s new reorganization scheme would shortly supplant the *CCAA*, which could then be repealed, with commercial insolvency and bankruptcy being governed by a single statute (*Minutes of Proceedings and Evidence of the Standing Committee on Consumer and Corporate Affairs and Government Operations*, Issue No. 15, October 3, 1991, at pp. 15:15-15:16).

21    In retrospect, this conclusion by the House of Commons committee was out of step with reality. It overlooked the renewed vitality the *CCAA* enjoyed in contemporary practice and the advantage that a flexible judicially supervised reorganization process presented in the face of increasingly complex reorganizations, when compared to the stricter rules-based scheme contained in the *BIA*. The "flexibility of the *CCAA* [was seen as] a great benefit, allowing for creative and effective decisions" (Industry Canada, Marketplace Framework Policy Branch, *Report on the Operation and Administration of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act* (2002), at p. 41). Over the past three decades, resurrection of the *CCAA* has thus been the mainspring of a process through which, one author concludes, "the legal setting for Canadian insolvency restructuring has evolved from a rather blunt instrument to one of the most sophisticated systems in the developed world" (R. B. Jones, "The Evolution of Canadian Restructuring: Challenges for the Rule of Law", in J. P. Sarra, ed., *Annual Review of Insolvency Law 2005* (2006), 481, at p. 481).

22    While insolvency proceedings may be governed by different statutory schemes, they share some commonalities. The most prominent of these is the single proceeding model. The nature and purpose of the single proceeding model are described by Professor Wood in *Bankruptcy and Insolvency Law*:

> They all provide a collective proceeding that supersedes the usual civil process available to creditors to enforce their claims. The creditors' remedies are collectivized in order to prevent the free-for-all that would otherwise prevail if creditors were permitted to exercise their remedies. In the absence of a collective process, each creditor is armed with the knowledge that if they do not strike hard and swift to seize the debtor's assets, they will be beat out by other creditors. [pp. 2-3]

The single proceeding model avoids the inefficiency and chaos that would attend insolvency if each creditor initiated proceedings to recover its debt. Grouping all possible actions against the debtor into a single proceeding controlled in a single forum facilitates negotiation with creditors because it places them all on an equal footing, rather than exposing them to the risk that a more aggressive creditor will realize its claims against the debtor's limited assets while the other creditors attempt a compromise. With a view to achieving that purpose, both the *CCAA* and the *BIA* allow a court to order all actions against a debtor to be stayed while a compromise is sought.

23    Another point of convergence of the *CCAA* and the *BIA* relates to priorities. Because the *CCAA* is silent about what happens if reorganization fails, the *BIA* scheme of liquidation and distribution necessarily supplies the backdrop for what will happen if a *CCAA* reorganization is ultimately unsuccessful. In addition, one of the important features of legislative reform of both statutes since the enactment of the *BIA* in 1992 has been a cutback in Crown priorities (S.C. 1992, c. 27, s. 39; S.C. 1997, c. 12, ss. 73 and 125; S.C. 2000, c. 30, s. 148; S.C. 2005, c. 47, ss. 69 and 131; S.C. 2009, c. 33, ss. 25 and 29; see also *Alternative granite & marbre inc., Re*, 2009 SCC 49, [2009] 3 S.C.R. 286, [2009] G.S.T.C. 154 (S.C.C.); *Quebec (Deputy*

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 199 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

*Minister of Revenue) c. Rainville* (1979), [1980] 1 S.C.R. 35 (S.C.C.); *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency* (1986)).

24     With parallel *CCAA* and *BIA* restructuring schemes now an accepted feature of the insolvency law landscape, the contemporary thrust of legislative reform has been towards harmonizing aspects of insolvency law common to the two statutory schemes to the extent possible and encouraging reorganization over liquidation (see *An Act to establish the Wage Earner Protection Program Act, to amend the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act and to make consequential amendments to other Acts*, S.C. 2005, c. 47; *Gauntlet Energy Corp., Re*, 2003 ABQB 894, [2003] G.S.T.C. 193, 30 Alta. L.R. (4th) 192 (Alta. Q.B.), at para. 19).

25     Mindful of the historical background of the *CCAA* and *BIA*, I now turn to the first question at issue.

### 3.2 GST Deemed Trust Under the CCAA

26     The Court of Appeal proceeded on the basis that the *ETA* precluded the court from staying the Crown's enforcement of the GST deemed trust when partially lifting the stay to allow the debtor to enter bankruptcy. In so doing, it adopted the reasoning in a line of cases culminating in *Ottawa Senators*, which held that an *ETA* deemed trust remains enforceable during *CCAA* reorganization despite language in the *CCAA* that suggests otherwise.

27     The Crown relies heavily on the decision of the Ontario Court of Appeal in *Ottawa Senators* and argues that the later in time provision of the *ETA* creating the GST deemed trust trumps the provision of the *CCAA* purporting to nullify most statutory deemed trusts. The Court of Appeal in this case accepted this reasoning but not all provincial courts follow it (see, e.g., *Komunik Corp., Re*, 2009 QCCS 6332 (Que. S.C.), leave to appeal granted, 2010 QCCA 183 (Que. C.A.)). Century Services relied, in its written submissions to this Court, on the argument that the court had authority under the *CCAA* to continue the stay against the Crown's claim for unremitted GST. In oral argument, the question of whether *Ottawa Senators* was correctly decided nonetheless arose. After the hearing, the parties were asked to make further written submissions on this point. As appears evident from the reasons of my colleague Abella J., this issue has become prominent before this Court. In those circumstances, this Court needs to determine the correctness of the reasoning in *Ottawa Senators*.

28     The policy backdrop to this question involves the Crown's priority as a creditor in insolvency situations which, as I mentioned above, has evolved considerably. Prior to the 1990s, Crown claims largely enjoyed priority in insolvency. This was widely seen as unsatisfactory as shown by both the 1970 and 1986 insolvency reform proposals, which recommended that Crown claims receive no preferential treatment. A closely related matter was whether the *CCAA* was binding at all upon the Crown. Amendments to the *CCAA* in 1997 confirmed that it did indeed bind the Crown (see *CCAA*, s. 21, as am. by S.C. 1997, c. 12, s. 126).

29     Claims of priority by the state in insolvency situations receive different treatment across jurisdictions worldwide. For example, in Germany and Australia, the state is given no priority at all, while the state enjoys wide priority in the United States and France (see B. K. Morgan, "Should the Sovereign be Paid First? A Comparative International Analysis of the Priority for Tax Claims in Bankruptcy" (2000), 74 *Am. Bank. L.J.* 461, at p. 500). Canada adopted a middle course through legislative reform of Crown priority initiated in 1992. The Crown retained priority for source deductions of income tax, Employment Insurance ("EI") and Canada Pension Plan ("CPP") premiums, but ranks as an ordinary unsecured creditor for most other claims.

30     Parliament has frequently enacted statutory mechanisms to secure Crown claims and permit their enforcement. The two most common are statutory deemed trusts and powers to garnish funds third parties owe the debtor (see F. L. Lamer, *Priority of Crown Claims in Insolvency* (loose-leaf), at § 2).

31     With respect to GST collected, Parliament has enacted a deemed trust. The *ETA* states that every person who collects an amount on account of GST is deemed to hold that amount in trust for the Crown (s. 222(1)). The deemed trust extends to other property of the person collecting the tax equal in value to the amount deemed to be in trust if that amount has not been remitted in accordance with the *ETA*. The deemed trust also extends to property held by a secured creditor that, but for the security interest, would be property of the person collecting the tax (s. 222(3)).

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 200 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

32      Parliament has created similar deemed trusts using almost identical language in respect of source deductions of income tax, EI premiums and CPP premiums (see s. 227(4) of the *Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.) ("*ITA*"), ss. 86(2) and (2.1) of the *Employment Insurance Act*, S.C. 1996, c. 23, and ss. 23(3) and (4) of the *Canada Pension Plan*, R.S.C. 1985, c. C-8). I will refer to income tax, EI and CPP deductions as "source deductions".

33      In *Royal Bank v. Sparrow Electric Corp.*, [1997] 1 S.C.R. 411 (S.C.C.), this Court addressed a priority dispute between a deemed trust for source deductions under the *ITA* and security interests taken under both the *Bank Act*, S.C. 1991, c. 46, and the Alberta *Personal Property Security Act*, S.A. 1988, c. P-4.05 ("*PPSA*"). As then worded, an *ITA* deemed trust over the debtor's property equivalent to the amount owing in respect of income tax became effective at the time of liquidation, receivership, or assignment in bankruptcy. *Sparrow Electric* held that the *ITA* deemed trust could not prevail over the security interests because, being fixed charges, the latter attached as soon as the debtor acquired rights in the property such that the *ITA* deemed trust had no property on which to attach when it subsequently arose. Later, in *First Vancouver Finance v. Minister of National Revenue*, 2002 SCC 49, [2002] G.S.T.C. 23, [2002] 2 S.C.R. 720 (S.C.C.), this Court observed that Parliament had legislated to strengthen the statutory deemed trust in the *ITA* by deeming it to operate from the moment the deductions were not paid to the Crown as required by the *ITA*, and by granting the Crown priority over all security interests (paras. 27-29) (the "*Sparrow Electric* amendment").

34      The amended text of s. 227(4.1) of the *ITA* and concordant source deductions deemed trusts in the *Canada Pension Plan* and the *Employment Insurance Act* state that the deemed trust operates notwithstanding any other enactment of Canada, except ss. 81.1 and 81.2 of the *BIA*. The *ETA* deemed trust at issue in this case is similarly worded, but it excepts the *BIA* in its entirety. The provision reads as follows:

> **222.** (3) Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed ....

35      The Crown submits that the *Sparrow Electric* amendment, added by Parliament to the *ETA* in 2000, was intended to preserve the Crown's priority over collected GST under the *CCAA* while subordinating the Crown to the status of an unsecured creditor in respect of GST only under the *BIA*. This is because the *ETA* provides that the GST deemed trust is effective "despite" any other enactment except the *BIA*.

36      The language used in the *ETA* for the GST deemed trust creates an apparent conflict with the *CCAA*, which provides that subject to certain exceptions, property deemed by statute to be held in trust for the Crown shall not be so regarded.

37      Through a 1997 amendment to the *CCAA* (S.C. 1997, c. 12, s. 125), Parliament appears to have, subject to specific exceptions, nullified deemed trusts in favour of the Crown once reorganization proceedings are commenced under the Act. The relevant provision reads:

> **18.3** (1) Subject to subsection (2), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

This nullification of deemed trusts was continued in further amendments to the *CCAA* (S.C. 2005, c. 47), where s. 18.3(1) was renumbered and reformulated as s. 37(1):

> **37.** (1) Subject to subsection (2), despite any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

**WestlawNext** CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW  Doc 14410-5  Filed 09/16/14  Page 201 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

38    An analogous provision exists in the *BIA*, which, subject to the same specific exceptions, nullifies statutory deemed trusts and makes property of the bankrupt that would otherwise be subject to a deemed trust part of the debtor's estate and available to creditors (S.C. 1992, c. 27, s. 39; S.C. 1997, c. 12, s. 73; *BIA*, s. 67(2)). It is noteworthy that in both the *CCAA* and the *BIA*, the exceptions concern source deductions (*CCAA*, s. 18.3(2); *BIA*, s. 67(3)). The relevant provision of the *CCAA* reads:

> **18.3** (2) Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act*....

Thus, the Crown's deemed trust and corresponding priority in source deductions remain effective both in reorganization and in bankruptcy.

39    Meanwhile, in both s. 18.4(1) of the *CCAA* and s. 86(1) of the *BIA*, other Crown claims are treated as unsecured. These provisions, establishing the Crown's status as an unsecured creditor, explicitly exempt statutory deemed trusts in source deductions (*CCAA*, s. 18.4(3); *BIA*, s. 86(3)). The *CCAA* provision reads as follows:

> **18.4** (3) Subsection (1) [Crown ranking as unsecured creditor] does not affect the operation of
>
> (a) subsections 224(1.2) and (1.3) of the *Income Tax Act*,
>
> (b) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution ....

Therefore, not only does the *CCAA* provide that Crown claims do not enjoy priority over the claims of other creditors (s. 18.3(1)), but the exceptions to this rule (i.e., that Crown priority is maintained for source deductions) are repeatedly stated in the statute.

40    The apparent conflict in this case is whether the rule in the *CCAA* first enacted as s. 18.3 in 1997, which provides that subject to certain explicit exceptions, statutory deemed trusts are ineffective under the *CCAA*, is overridden by the one in the *ETA* enacted in 2000 stating that GST deemed trusts operate despite any enactment of Canada except the *BIA*. With respect for my colleague Fish J., I do not think the apparent conflict can be resolved by denying it and creating a rule requiring both a statutory provision enacting the deemed trust, and a second statutory provision confirming it. Such a rule is unknown to the law. Courts must recognize conflicts, apparent or real, and resolve them when possible.

41    A line of jurisprudence across Canada has resolved the apparent conflict in favour of the *ETA*, thereby maintaining GST deemed trusts under the *CCAA*. *Ottawa Senators*, the leading case, decided the matter by invoking the doctrine of implied repeal to hold that the later in time provision of the *ETA* should take precedence over the *CCAA* (see also *Solid Resources Ltd., Re* (2002), 40 C.B.R. (4th) 219, [2003] G.S.T.C. 21 (Alta. Q.B.); *Gauntlet*

42    The Ontario Court of Appeal in *Ottawa Senators* rested its conclusion on two considerations. First, it was persuaded that by explicitly mentioning the *BIA* in *ETA* s. 222(3), but not the *CCAA*, Parliament made a deliberate choice. In the words of MacPherson J.A.:

> The *BIA* and the *CCAA* are closely related federal statutes. I cannot conceive that Parliament would specifically identify the *BIA* as an exception, but accidentally fail to consider the *CCAA* as a possible second exception. In my view, the omission of the *CCAA* from s. 222(3) of the *ETA* was almost certainly a considered omission. [para. 43]

43    Second, the Ontario Court of Appeal compared the conflict between the *ETA* and the *CCAA* to that before this Court in *Doré c. Verdun (Municipalité)*, [1997] 2 S.C.R. 862 (S.C.C.), and found them to be "identical" (para. 46). It therefore considered *Doré* binding (para. 49). In *Doré*, a limitations provision in the more general and recently enacted *Civil Code of Québec*, S.Q. 1991, c. 64 ("*C.C.Q.*"), was held to have repealed a more specific provision of the earlier Quebec *Cities and Towns Act*, R.S.Q., c. C-19, with which it conflicted. By analogy, the Ontario Court of Appeal held that the later in time and more general provision, s. 222(3) of the *ETA*, impliedly repealed the more specific and earlier in time provision, s. 18.3(1) of the *CCAA* (paras. 47-49).

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

44    Viewing this issue in its entire context, several considerations lead me to conclude that neither the reasoning nor the result in *Ottawa Senators* can stand. While a conflict may exist at the level of the statutes' wording, a purposive and contextual analysis to determine Parliament's true intent yields the conclusion that Parliament could not have intended to restore the Crown's deemed trust priority in GST claims under the *CCAA* when it amended the *ETA* in 2000 with the *Sparrow Electric* amendment.

45    I begin by recalling that Parliament has shown its willingness to move away from asserting priority for Crown claims in insolvency law. Section 18.3(1) of the *CCAA* (subject to the s. 18.3(2) exceptions) provides that the Crown's deemed trusts have no effect under the *CCAA*. Where Parliament has sought to protect certain Crown claims through statutory deemed trusts and intended that these deemed trusts continue in insolvency, it has legislated so explicitly and elaborately. For example, s. 18.3(2) of the *CCAA* and s. 67(3) of the *BIA* expressly provide that deemed trusts for source deductions remain effective in insolvency. Parliament has, therefore, clearly carved out exceptions from the general rule that deemed trusts are ineffective in insolvency. The *CCAA* and *BIA* are in harmony, preserving deemed trusts and asserting Crown priority only in respect of source deductions. Meanwhile, there is no express statutory basis for concluding that GST claims enjoy a preferred treatment under the *CCAA* or the *BIA*. Unlike source deductions, which are clearly and expressly dealt with under both these insolvency statutes, no such clear and express language exists in those Acts carving out an exception for GST claims.

46    The internal logic of the *CCAA* also militates against upholding the *ETA* deemed trust for GST. The *CCAA* imposes limits on a suspension by the court of the Crown's rights in respect of source deductions but does not mention the *ETA* (s. 11.4). Since source deductions deemed trusts are granted explicit protection under the *CCAA*, it would be inconsistent to afford a better protection to the *ETA* deemed trust absent explicit language in the *CCAA*. Thus, the logic of the *CCAA* appears to subject the *ETA* deemed trust to the waiver by Parliament of its priority (s. 18.4).

47    Moreover, a strange asymmetry would arise if the interpretation giving the *ETA* priority over the *CCAA* urged by the Crown is adopted here: the Crown would retain priority over GST claims during *CCAA* proceedings but not in bankruptcy. As courts have reflected, this can only encourage statute shopping by secured creditors in cases such as this one where the debtor's assets cannot satisfy both the secured creditors' and the Crown's claims (*Gauntlet*, at para. 21). If creditors' claims were better protected by liquidation under the *BIA*, creditors' incentives would lie overwhelmingly with avoiding proceedings under the *CCAA* and not risking a failed reorganization. Giving a key player in any insolvency such skewed incentives against reorganizing under the *CCAA* can only undermine that statute's remedial objectives and risk inviting the very social ills that it was enacted to avert.

48    Arguably, the effect of *Ottawa Senators* is mitigated if restructuring is attempted under the *BIA* instead of the *CCAA*, but it is not cured. If *Ottawa Senators* were to be followed, Crown priority over GST would differ depending on whether restructuring took place under the *CCAA* or the *BIA*. The anomaly of this result is made manifest by the fact that it would deprive companies of the option to restructure under the more flexible and responsive *CCAA* regime, which has been the statute of choice for complex reorganizations.

49    Evidence that Parliament intended different treatments for GST claims in reorganization and bankruptcy is scant, if it exists at all. Section 222(3) of the *ETA* was enacted as part of a wide-ranging budget implementation bill in 2000. The summary accompanying that bill does not indicate that Parliament intended to elevate Crown priority over GST claims under the *CCAA* to the same or a higher level than source deductions claims. Indeed, the summary for deemed trusts states only that amendments to existing provisions are aimed at "ensuring that employment insurance premiums and Canada Pension Plan contributions that are required to be remitted by an employer are fully recoverable by the Crown in the case of the bankruptcy of the employer" (Summary to S.C. 2000, c. 30, at p. 4a). The wording of GST deemed trusts resembles that of statutory deemed trusts for source deductions and incorporates the same overriding language and reference to the *BIA*. However, as noted above, Parliament's express intent is that only source deductions deemed trusts remain operative. An exception for the *BIA* in the statutory language establishing the source deductions deemed trusts accomplishes very little, because the explicit language of the *BIA* itself (and the *CCAA*) carves out these source deductions deemed trusts and maintains their effect. It is however noteworthy that no equivalent language maintaining GST deemed trusts exists under either the *BIA* or the *CCAA*.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 203 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

50     It seems more likely that by adopting the same language for creating GST deemed trusts in the *ETA* as it did for deemed trusts for source deductions, and by overlooking the inclusion of an exception for the *CCAA* alongside the *BIA* in s. 222(3) of the *ETA*, Parliament may have inadvertently succumbed to a drafting anomaly. Because of a statutory lacuna in the *ETA*, the GST deemed trust could be seen as remaining effective in the *CCAA*, while ceasing to have any effect under the *BIA*, thus creating an apparent conflict with the wording of the *CCAA*. However, it should be seen for what it is: a facial conflict only, capable of resolution by looking at the broader approach taken to Crown priorities and by giving precedence to the statutory language of s. 18.3 of the *CCAA* in a manner that does not produce an anomalous outcome.

51     Section 222(3) of the *ETA* evinces no explicit intention of Parliament to repeal *CCAA* s. 18.3. It merely creates an apparent conflict that must be resolved by statutory interpretation. Parliament's intent when it enacted *ETA* s. 222(3) was therefore far from unambiguous. Had it sought to give the Crown a priority for GST claims, it could have done so explicitly as it did for source deductions. Instead, one is left to infer from the language of *ETA* s. 222(3) that the GST deemed trust was intended to be effective under the *CCAA*.

52     I am not persuaded that the reasoning in *Doré* requires the application of the doctrine of implied repeal in the circumstances of this case. The main issue in *Doré* concerned the impact of the adoption of the *C.C.Q.* on the administrative law rules with respect to municipalities. While Gonthier J. concluded in that case that the limitation provision in art. 2930 *C.C.Q.* had repealed by implication a limitation provision in the *Cities and Towns Act*, he did so on the basis of more than a textual analysis. The conclusion in *Doré* was reached after thorough contextual analysis of both pieces of legislation, including an extensive review of the relevant legislative history (paras. 31-41). Consequently, the circumstances before this Court in *Doré* are far from "identical" to those in the present case, in terms of text, context and legislative history. Accordingly, *Doré* cannot be said to require the automatic application of the rule of repeal by implication.

53     A noteworthy indicator of Parliament's overall intent is the fact that in subsequent amendments it has not displaced the rule set out in the *CCAA*. Indeed, as indicated above, the recent amendments to the *CCAA* in 2005 resulted in the rule previously found in s. 18.3 being renumbered and reformulated as s. 37. Thus, to the extent the interpretation allowing the GST deemed trust to remain effective under the *CCAA* depends on *ETA* s. 222(3) having impliedly repealed *CCAA* s. 18.3(1) because it is later in time, we have come full circle. Parliament has renumbered and reformulated the provision of the *CCAA* stating that, subject to exceptions for source deductions, deemed trusts do not survive the *CCAA* proceedings and thus the *CCAA* is now the later in time statute. This confirms that Parliament's intent with respect to GST deemed trusts is to be found in the *CCAA*.

54     I do not agree with my colleague Abella J. that s. 44(*f*) of the *Interpretation Act*, R.S.C. 1985, c. I-21, can be used to interpret the 2005 amendments as having no effect. The new statute can hardly be said to be a mere re-enactment of the former statute. Indeed, the *CCAA* underwent a substantial review in 2005. Notably, acting consistently with its goal of treating both the *BIA* and the *CCAA* as sharing the same approach to insolvency, Parliament made parallel amendments to both statutes with respect to corporate proposals. In addition, new provisions were introduced regarding the treatment of contracts, collective agreements, interim financing and governance agreements. The appointment and role of the Monitor was also clarified. Noteworthy are the limits imposed by *CCAA* s. 11.09 on the court's discretion to make an order staying the Crown's source deductions deemed trusts, which were formerly found in s. 11.4. No mention whatsoever is made of GST deemed trusts (see Summary to S.C. 2005, c. 47). The review went as far as looking at the very expression used to describe the statutory override of deemed trusts. The comments cited by my colleague only emphasize the clear intent of Parliament to maintain its policy that only source deductions deemed trusts survive in *CCAA* proceedings.

55     In the case at bar, the legislative context informs the determination of Parliament's legislative intent and supports the conclusion that *ETA* s. 222(3) was not intended to narrow the scope of the *CCAA's* override provision. Viewed in its entire context, the conflict between the *ETA* and the *CCAA* is more apparent than real. I would therefore not follow the reasoning in *Ottawa Senators* and affirm that *CCAA* s. 18.3 remained effective.

56     My conclusion is reinforced by the purpose of the *CCAA* as part of Canadian remedial insolvency legislation. As this aspect is particularly relevant to the second issue, I will now discuss how courts have interpreted the scope of their discretionary powers

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

in supervising a *CCAA* reorganization and how Parliament has largely endorsed this interpretation. Indeed, the interpretation courts give to the *CCAA* helps in understanding how the *CCAA* grew to occupy such a prominent role in Canadian insolvency law.

### 3.3 Discretionary Power of a Court Supervising a CCAA Reorganization

57      Courts frequently observe that "[t]he *CCAA* is skeletal in nature" and does not "contain a comprehensive code that lays out all that is permitted or barred" (*ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.*, 2008 ONCA 587, 92 O.R. (3d) 513 (Ont. C.A.), at para. 44, *per* Blair J.A.). Accordingly, "[t]he history of CCAA law has been an evolution of judicial interpretation" (*Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106 (Ont. Gen. Div. [Commercial List]), at para. 10, *per* Farley J.).

58      *CCAA* decisions are often based on discretionary grants of jurisdiction. The incremental exercise of judicial discretion in commercial courts under conditions one practitioner aptly describes as "the hothouse of real-time litigation" has been the primary method by which the *CCAA* has been adapted and has evolved to meet contemporary business and social needs (see Jones, at p. 484).

59      Judicial discretion must of course be exercised in furtherance of the *CCAA's* purposes. The remedial purpose I referred to in the historical overview of the Act is recognized over and over again in the jurisprudence. To cite one early example:

    The legislation is remedial in the purest sense in that it provides a means whereby the devastating social and economic effects of bankruptcy or creditor initiated termination of ongoing business operations can be avoided while a court-supervised attempt to reorganize the financial affairs of the debtor company is made.

    (*Nova Metal Products Inc. v. Comiskey (Trustee of)* (1990), 41 O.A.C. 282 (Ont. C.A.), at para. 57, *per* Doherty J.A., dissenting)

60      Judicial decision making under the *CCAA* takes many forms. A court must first of all provide the conditions under which the debtor can attempt to reorganize. This can be achieved by staying enforcement actions by creditors to allow the debtor's business to continue, preserving the *status quo* while the debtor plans the compromise or arrangement to be presented to creditors, and supervising the process and advancing it to the point where it can be determined whether it will succeed (see, e.g., *Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 51 B.C.L.R. (2d) 84 (B.C. C.A.), at pp. 88-89; *Pacific National Lease Holding Corp., Re* (1992), 19 B.C.A.C. 134 (B.C. C.A. [In Chambers]), at para. 27). In doing so, the court must often be cognizant of the various interests at stake in the reorganization, which can extend beyond those of the debtor and creditors to include employees, directors, shareholders, and even other parties doing business with the insolvent company (see, e.g., *Canadian Airlines Corp., Re*, 2000 ABQB 442, 84 Alta. L.R. (3d) 9 (Alta. Q.B.), at para. 144, *per* Paperny J. (as she then was); *Air Canada, Re* (2003), 42 C.B.R. (4th) 173 (Ont. S.C.J. [Commercial List]), at para. 3; *Air Canada, Re* [2003 CarswellOnt 4967 (Ont. S.C.J. [Commercial List])], 2003 CanLII 49366, at para. 13, *per* Farley J.; Sarra, *Creditor Rights*, at pp. 181-92 and 217-26). In addition, courts must recognize that on occasion the broader public interest will be engaged by aspects of the reorganization and may be a factor against which the decision of whether to allow a particular action will be weighed (see, e.g., *Canadian Red Cross Society / Société Canadienne de la Croix Rouge, Re* (2000), 19 C.B.R. (4th) 158 (Ont. S.C.J.), at para. 2, *per* Blair J. (as he then was); Sarra, *Creditor Rights*, at pp. 195-214).

61      When large companies encounter difficulty, reorganizations become increasingly complex. *CCAA* courts have been called upon to innovate accordingly in exercising their jurisdiction beyond merely staying proceedings against the debtor to allow breathing room for reorganization. They have been asked to sanction measures for which there is no explicit authority in the *CCAA*. Without exhaustively cataloguing the various measures taken under the authority of the *CCAA*, it is useful to refer briefly to a few examples to illustrate the flexibility the statute affords supervising courts.

62      Perhaps the most creative use of *CCAA* authority has been the increasing willingness of courts to authorize post-filing security for debtor in possession financing or super-priority charges on the debtor's assets when necessary for the continuation of the debtor's business during the reorganization (see, e.g., *Skydome Corp., Re* (1998), 16 C.B.R. (4th) 118 (Ont. Gen. Div. [Commercial List]); *United Used Auto & Truck Parts Ltd., Re*, 2000 BCCA 146, 135 B.C.A.C. 96 (B.C. C.A.), aff'g (1999),

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

12 C.B.R. (4th) 144 (B.C. S.C. [In Chambers]); and generally, J. P. Sarra, *Rescue! The Companies' Creditors Arrangement Act* (2007), at pp. 93-115). The *CCAA* has also been used to release claims against third parties as part of approving a comprehensive plan of arrangement and compromise, even over the objections of some dissenting creditors (see Metcalfe & Mansfield). As well, the appointment of a Monitor to oversee the reorganization was originally a measure taken pursuant to the *CCAA's* supervisory authority; Parliament responded, making the mechanism mandatory by legislative amendment.

63     Judicial innovation during *CCAA* proceedings has not been without controversy. At least two questions it raises are directly relevant to the case at bar: (1) what are the sources of a court's authority during *CCAA* proceedings? (2) what are the limits of this authority?

64     The first question concerns the boundary between a court's statutory authority under the *CCAA* and a court's residual authority under its inherent and equitable jurisdiction when supervising a reorganization. In authorizing measures during *CCAA* proceedings, courts have on occasion purported to rely upon their equitable jurisdiction to advance the purposes of the Act or their inherent jurisdiction to fill gaps in the statute. Recent appellate decisions have counselled against purporting to rely on inherent jurisdiction, holding that the better view is that courts are in most cases simply construing the authority supplied by the *CCAA* itself (see, e.g., *Skeena Cellulose Inc., Re*, 2003 BCCA 344, 13 B.C.L.R. (4th) 236 (B.C. C.A.), at paras. 45-47, *per* Newbury J.A.; *Stelco Inc. (Re)* (2005), 75 O.R. (3d) 5 (Ont. C.A.), paras. 31-33, *per* Blair J.A.).

65     I agree with Justice Georgina R. Jackson and Professor Janis Sarra that the most appropriate approach is a hierarchical one in which courts rely first on an interpretation of the provisions of the *CCAA* text before turning to inherent or equitable jurisdiction to anchor measures taken in a *CCAA* proceeding (see G. R. Jackson and J. Sarra, "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters", in J. P. Sarra, ed., *Annual Review of Insolvency Law 2007* (2008), 41, at p. 42). The authors conclude that when given an appropriately purposive and liberal interpretation, the *CCAA* will be sufficient in most instances to ground measures necessary to achieve its objectives (p. 94).

66     Having examined the pertinent parts of the *CCAA* and the recent history of the legislation, I accept that in most instances the issuance of an order during *CCAA* proceedings should be considered an exercise in statutory interpretation. Particularly noteworthy in this regard is the expansive interpretation the language of the statute at issue is capable of supporting.

67     The initial grant of authority under the *CCAA* empowered a court "where an application is made under this Act in respect of a company ... on the application of any person interested in the matter ..., subject to this Act, [to] make an order under this section" (*CCAA*, s. 11(1)). The plain language of the statute was very broad.

68     In this regard, though not strictly applicable to the case at bar, I note that Parliament has in recent amendments changed the wording contained in s. 11(1), making explicit the discretionary authority of the court under the *CCAA*. Thus in s. 11 of the *CCAA* as currently enacted, a court may, "subject to the restrictions set out in this Act, ... make any order that it considers appropriate in the circumstances" (S.C. 2005, c. 47, s. 128). Parliament appears to have endorsed the broad reading of *CCAA* authority developed by the jurisprudence.

69     The *CCAA* also explicitly provides for certain orders. Both an order made on an initial application and an order on subsequent applications may stay, restrain, or prohibit existing or new proceedings against the debtor. The burden is on the applicant to satisfy the court that the order is appropriate in the circumstances and that the applicant has been acting in good faith and with due diligence (*CCAA*, ss. 11(3), (4) and (6)).

70     The general language of the *CCAA* should not be read as being restricted by the availability of more specific orders. However, the requirements of appropriateness, good faith, and due diligence are baseline considerations that a court should always bear in mind when exercising *CCAA* authority. Appropriateness under the *CCAA* is assessed by inquiring whether the order sought advances the policy objectives underlying the *CCAA*. The question is whether the order will usefully further efforts to achieve the remedial purpose of the *CCAA* — avoiding the social and economic losses resulting from liquidation of an insolvent company. I would add that appropriateness extends not only to the purpose of the order, but also to the means

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

it employs. Courts should be mindful that chances for successful reorganizations are enhanced where participants achieve common ground and all stakeholders are treated as advantageously and fairly as the circumstances permit.

71      It is well-established that efforts to reorganize under the *CCAA* can be terminated and the stay of proceedings against the debtor lifted if the reorganization is "doomed to failure" (see *Chef Ready*, at p. 88; *Philip's Manufacturing Ltd., Re* (1992), 9 C.B.R. (3d) 25 (B.C. C.A.), at paras. 6-7). However, when an order is sought that does realistically advance the *CCAA's* purposes, the ability to make it is within the discretion of a *CCAA* court.

72      The preceding discussion assists in determining whether the court had authority under the *CCAA* to continue the stay of proceedings against the Crown once it was apparent that reorganization would fail and bankruptcy was the inevitable next step.

73      In the Court of Appeal, Tysoe J.A. held that no authority existed under the *CCAA* to continue staying the Crown's enforcement of the GST deemed trust once efforts at reorganization had come to an end. The appellant submits that in so holding, Tysoe J.A. failed to consider the underlying purpose of the *CCAA* and give the statute an appropriately purposive and liberal interpretation under which the order was permissible. The Crown submits that Tysoe J.A. correctly held that the mandatory language of the *ETA* gave the court no option but to permit enforcement of the GST deemed trust when lifting the *CCAA* stay to permit the debtor to make an assignment under the *BIA*. Whether the *ETA* has a mandatory effect in the context of a *CCAA* proceeding has already been discussed. I will now address the question of whether the order was authorized by the *CCAA*.

74      It is beyond dispute that the *CCAA* imposes no explicit temporal limitations upon proceedings commenced under the Act that would prohibit ordering a continuation of the stay of the Crown's GST claims while lifting the general stay of proceedings temporarily to allow the debtor to make an assignment in bankruptcy.

75      The question remains whether the order advanced the underlying purpose of the *CCAA*. The Court of Appeal held that it did not because the reorganization efforts had come to an end and the *CCAA* was accordingly spent. I disagree.

76      There is no doubt that had reorganization been commenced under the *BIA* instead of the *CCAA*, the Crown's deemed trust priority for the GST funds would have been lost. Similarly, the Crown does not dispute that under the scheme of distribution in bankruptcy under the *BIA*, the deemed trust for GST ceases to have effect. Thus, after reorganization under the *CCAA* failed, creditors would have had a strong incentive to seek immediate bankruptcy and distribution of the debtor's assets under the *BIA*. In order to conclude that the discretion does not extend to partially lifting the stay in order to allow for an assignment in bankruptcy, one would have to assume a gap between the *CCAA* and the *BIA* proceedings. Brenner C.J.S.C.'s order staying Crown enforcement of the GST claim ensured that creditors would not be disadvantaged by the attempted reorganization under the *CCAA*. The effect of his order was to blunt any impulse of creditors to interfere in an orderly liquidation. His order was thus in furtherance of the *CCAA's* objectives to the extent that it allowed a bridge between the *CCAA* and *BIA* proceedings. This interpretation of the tribunal's discretionary power is buttressed by s. 20 of the *CCAA*. That section provides that the *CCAA* "may be applied together with the provisions of any Act of Parliament... that authorizes or makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them", such as the *BIA*. Section 20 clearly indicates the intention of Parliament for the *CCAA* to operate *in tandem* with other insolvency legislation, such as the *BIA*.

77      The *CCAA* creates conditions for preserving the *status quo* while attempts are made to find common ground amongst stakeholders for a reorganization that is fair to all. Because the alternative to reorganization is often bankruptcy, participants will measure the impact of a reorganization against the position they would enjoy in liquidation. In the case at bar, the order fostered a harmonious transition between reorganization and liquidation while meeting the objective of a single collective proceeding that is common to both statutes.

78      Tysoe J.A. therefore erred in my view by treating the *CCAA* and the *BIA* as distinct regimes subject to a temporal gap between the two, rather than as forming part of an integrated body of insolvency law. Parliament's decision to maintain two statutory schemes for reorganization, the *BIA* and the *CCAA*, reflects the reality that reorganizations of differing complexity require different legal mechanisms. By contrast, only one statutory scheme has been found to be needed to liquidate a bankrupt debtor's estate. The transition from the *CCAA* to the *BIA* may require the partial lifting of a stay of proceedings under the *CCAA*

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

to allow commencement of the *BIA* proceedings. However, as Laskin J.A. for the Ontario Court of Appeal noted in a similar competition between secured creditors and the Ontario Superintendent of Financial Services seeking to enforce a deemed trust, "[t]he two statutes are related" and no "gap" exists between the two statutes which would allow the enforcement of property interests at the conclusion of *CCAA* proceedings that would be lost in bankruptcy *Ivaco Inc. (Re)* (2006), 83 O.R. (3d) 108 (Ont. C.A.), at paras. 62-63).

79      The Crown's priority in claims pursuant to source deductions deemed trusts does not undermine this conclusion. Source deductions deemed trusts survive under both the *CCAA* and the *BIA*. Accordingly, creditors' incentives to prefer one Act over another will not be affected. While a court has a broad discretion to stay source deductions deemed trusts in the *CCAA* context, this discretion is nevertheless subject to specific limitations applicable only to source deductions deemed trusts (*CCAA*, s. 11.4). Thus, if *CCAA* reorganization fails (e.g., either the creditors or the court refuse a proposed reorganization), the Crown can immediately assert its claim in unremitted source deductions. But this should not be understood to affect a seamless transition into bankruptcy or create any "gap" between the *CCAA* and the *BIA* for the simple reason that, regardless of what statute the reorganization had been commenced under, creditors' claims in both instances would have been subject to the priority of the Crown's source deductions deemed trust.

80      Source deductions deemed trusts aside, the comprehensive and exhaustive mechanism under the *BIA* must control the distribution of the debtor's assets once liquidation is inevitable. Indeed, an orderly transition to liquidation is mandatory under the *BIA* where a proposal is rejected by creditors. The *CCAA* is silent on the transition into liquidation but the breadth of the court's discretion under the Act is sufficient to construct a bridge to liquidation under the *BIA*. The court must do so in a manner that does not subvert the scheme of distribution under the *BIA*. Transition to liquidation requires partially lifting the *CCAA* stay to commence proceedings under the *BIA*. This necessary partial lifting of the stay should not trigger a race to the courthouse in an effort to obtain priority unavailable under the *BIA*.

81      I therefore conclude that Brenner C.J.S.C. had the authority under the *CCAA* to lift the stay to allow entry into liquidation.

### *3.4 Express Trust*

82      The last issue in this case is whether Brenner C.J.S.C. created an express trust in favour of the Crown when he ordered on April 29, 2008, that proceeds from the sale of LeRoy Trucking's assets equal to the amount of unremitted GST be held back in the Monitor's trust account until the results of the reorganization were known. Tysoe J.A. in the Court of Appeal concluded as an alternative ground for allowing the Crown's appeal that it was the beneficiary of an express trust. I disagree.

83      Creation of an express trust requires the presence of three certainties: intention, subject matter, and object. Express or "true trusts" arise from the acts and intentions of the settlor and are distinguishable from other trusts arising by operation of law (see D. W. M. Waters, M. R. Gillen and L. D. Smith, eds., *Waters' Law of Trusts in Canada* (3rd ed. 2005), at pp. 28-29 especially fn. 42).

84      Here, there is no certainty to the object (i.e. the beneficiary) inferrable from the court's order of April 29, 2008, sufficient to support an express trust.

85      At the time of the order, there was a dispute between Century Services and the Crown over part of the proceeds from the sale of the debtor's assets. The court's solution was to accept LeRoy Trucking's proposal to segregate those monies until that dispute could be resolved. Thus there was no certainty that the Crown would actually be the beneficiary, or object, of the trust.

86      The fact that the location chosen to segregate those monies was the Monitor's trust account has no independent effect such that it would overcome the lack of a clear beneficiary. In any event, under the interpretation of *CCAA* s. 18.3(1) established above, no such priority dispute would even arise because the Crown's deemed trust priority over GST claims would be lost under the *CCAA* and the Crown would rank as an unsecured creditor for this amount. However, Brenner C.J.S.C. may well have been proceeding on the basis that, in accordance with *Ottawa Senators*, the Crown's GST claim would remain effective if reorganization was successful, which would not be the case if transition to the liquidation process of the *BIA* was allowed. An amount equivalent to that claim would accordingly be set aside pending the outcome of reorganization.

**WestlawNext**® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

87      Thus, uncertainty surrounding the outcome of the *CCAA* restructuring eliminates the existence of any certainty to permanently vest in the Crown a beneficial interest in the funds. That much is clear from the oral reasons of Brenner C.J.S.C. on April 29, 2008, when he said: "Given the fact that [*CCAA* proceedings] are known to fail and filings in bankruptcy result, it seems to me that maintaining the status quo in the case at bar supports the proposal to have the monitor hold these funds in trust." Exactly who might take the money in the final result was therefore evidently in doubt. Brenner C.J.S.C.'s subsequent order of September 3, 2008, denying the Crown's application to enforce the trust once it was clear that bankruptcy was inevitable, confirms the absence of a clear beneficiary required to ground an express trust.

**4. Conclusion**

88      I conclude that Brenner C.J.S.C. had the discretion under the *CCAA* to continue the stay of the Crown's claim for enforcement of the GST deemed trust while otherwise lifting it to permit LeRoy Trucking to make an assignment in bankruptcy. My conclusion that s. 18.3(1) of the *CCAA* nullified the GST deemed trust while proceedings under that Act were pending confirms that the discretionary jurisdiction under s. 11 utilized by the court was not limited by the Crown's asserted GST priority, because there is no such priority under the *CCAA*.

89      For these reasons, I would allow the appeal and declare that the $305,202.30 collected by LeRoy Trucking in respect of GST but not yet remitted to the Receiver General of Canada is not subject to deemed trust or priority in favour of the Crown. Nor is this amount subject to an express trust. Costs are awarded for this appeal and the appeal in the court below.

*Fish J. (concurring)*:

I

90      I am in general agreement with the reasons of Justice Deschamps and would dispose of the appeal as she suggests.

91      More particularly, I share my colleague's interpretation of the scope of the judge's discretion under s. 11 of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). And I share my colleague's conclusion that Brenner C.J.S.C. did not create an express trust in favour of the Crown when he segregated GST funds into the Monitor's trust account (2008 BCSC 1805, [2008] G.S.T.C. 221 (B.C. S.C. [In Chambers])).

92      I nonetheless feel bound to add brief reasons of my own regarding the interaction between the *CCAA* and the *Excise Tax Act*, R.S.C. 1985, c. E-15 ("*ETA*").

93      In upholding deemed trusts created by the *ETA* notwithstanding insolvency proceedings, *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737, [2005] G.S.T.C. 1 (Ont. C.A.), and its progeny have been unduly protective of Crown interests which Parliament itself has chosen to subordinate to competing prioritized claims. In my respectful view, a clearly marked departure from that jurisprudential approach is warranted in this case.

94      Justice Deschamps develops important historical and policy reasons in support of this position and I have nothing to add in that regard. I do wish, however, to explain why a comparative analysis of related statutory provisions adds support to our shared conclusion.

95      Parliament has in recent years given detailed consideration to the Canadian insolvency scheme. It has declined to amend the provisions at issue in this case. Ours is not to wonder why, but rather to treat Parliament's preservation of the relevant provisions as a deliberate exercise of the legislative discretion that is Parliament's alone. With respect, I reject any suggestion that we should instead characterize the apparent conflict between s. 18.3(1) (now s. 37(1)) of the *CCAA* and s. 222 of the *ETA* as a drafting anomaly or statutory lacuna properly subject to judicial correction or repair.

II

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

96    In the context of the Canadian insolvency regime, a deemed trust will be found to exist only where two complementary elements co-exist: first, a statutory provision *creating* the trust; and second, a *CCAA* or *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*") provision *confirming* — or explicitly preserving — its effective operation.

97    This interpretation is reflected in three federal statutes. Each contains a deemed trust provision framed in terms strikingly similar to the wording of s. 222 of the *ETA*.

98    The first is the *Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.) ("*ITA*") where s. 227(4) *creates* a deemed trust:

> **227 (4) Trust for moneys deducted** — Every person who deducts or withholds an amount under this Act <u>is deemed</u>, notwithstanding any security interest (as defined in subsection 224(1.3)) in the amount so deducted or withheld, <u>to hold the amount separate and apart</u> from the property of the person and from property held by any secured creditor (as defined in subsection 224(1.3)) of that person that but for the security interest would be property of the person, <u>in trust for Her Majesty and for payment to Her Majesty in the manner and at the time provided under this Act</u>. [Here and below, the emphasis is of course my own.]

99    In the next subsection, Parliament has taken care to make clear that this trust is unaffected by federal or provincial legislation to the contrary:

> **(4.1) Extension of trust** — <u>Notwithstanding</u> any other provision of this Act, <u>the *Bankruptcy and Insolvency Act*</u> (except sections 81.1 and 81.2 of that Act), <u>any other enactment of Canada</u>, any enactment of a province or any other law, <u>where</u> at any time <u>an amount deemed by subsection 227(4) to be held by a person in trust for Her Majesty is not paid to Her Majesty</u> in the manner and at the time provided under this Act, <u>property of the person</u> ... equal in value to the amount so deemed to be held in trust <u>is deemed</u>
>
> > (a) <u>to be held</u>, from the time the amount was deducted or withheld by the person, separate and apart from the property of the person, <u>in trust for Her Majesty</u> whether or not the property is subject to such a security interest, ...
> >
> > ...
>
> ... and the proceeds of such property shall be paid to the Receiver General in priority to all such security interests.

100    The continued operation of this deemed trust is expressly *confirmed* in s. 18.3 of the *CCAA*:

> **18.3** (1) <u>Subject to subsection (2)</u>, notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.
>
> (2) <u>Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*</u>, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act*....

101    The operation of the *ITA* deemed trust is also confirmed in s. 67 of the *BIA*:

> **67** (2) <u>Subject to subsection (3)</u>, notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a bankrupt shall not be regarded as held in trust for Her Majesty for the purpose of paragraph (1)(*a*) unless it would be so regarded in the absence of that statutory provision.
>
> (3) <u>Subsection (2) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*</u>, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act*....

Case 09-10138-MFW Doc 14410-5 Filed 09/16/14 Page 210 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

102    Thus, Parliament has first *created* and then *confirmed the continued operation of* the Crown's *ITA* deemed trust under *both* the *CCAA* and the *BIA* regimes.

103    The second federal statute for which this scheme holds true is the *Canada Pension Plan*, R.S.C. 1985, c. C-8 ("*CPP*"). At s. 23, Parliament creates a deemed trust in favour of the Crown and specifies that it exists despite all contrary provisions in any other Canadian statute. Finally, and in almost identical terms, the *Employment Insurance Act*, S.C. 1996, c. 23 ("*EIA*"), creates a deemed trust in favour of the Crown: see ss. 86(2) and (2.1).

104    As we have seen, the survival of the deemed trusts created under these provisions of the *ITA*, the *CPP* and the *EIA* is confirmed in s. 18.3(2) the *CCAA* and in s. 67(3) the *BIA*. In all three cases, Parliament's intent to enforce the Crown's deemed trust through insolvency proceedings is expressed in clear and unmistakable terms.

105    The same is not true with regard to the deemed trust created under the *ETA*. Although Parliament creates a deemed trust in favour of the Crown to hold unremitted GST monies, and although it purports to maintain this trust notwithstanding any contrary federal or provincial legislation, it does not *confirm* the trust — or expressly provide for its continued operation — in either the *BIA* or the *CCAA*. The second of the two mandatory elements I have mentioned is thus absent reflecting Parliament's intention to allow the deemed trust to lapse with the commencement of insolvency proceedings.

106    The language of the relevant *ETA* provisions is identical in substance to that of the *ITA*, *CPP*, and *EIA* provisions:

**222. (1) [Deemed] Trust for amounts collected** — Subject to subsection (1.1), every person who collects an amount as or on account of tax under Division II <u>is deemed</u>, for all purposes and despite any security interest in the amount, <u>to hold the amount in trust for Her Majesty</u> in right of Canada, <u>separate and apart</u> from the property of the person and from property held by any secured creditor of the person that, but for a security interest, would be property of the person, until the amount is remitted to the Receiver General or withdrawn under subsection (2).

...

**(3) Extension of trust** — <u>Despite</u> any other provision of this Act (except subsection (4)), <u>any other enactment of Canada (except the *Bankruptcy and Insolvency Act*)</u>, any enactment of a province or any other law, <u>if at any time an amount deemed</u> by subsection (1) <u>to be held</u> by a person <u>in trust for Her Majesty is not remitted</u> to the Receiver General or withdrawn in the manner and at the time provided under this Part, <u>property of the person</u> and property held by any secured creditor of the person that, but for a security interest, would be property of the person, <u>equal in value to the amount so deemed to be held in trust, is deemed</u>

(a) <u>to be held</u>, from the time the amount was collected by the person, <u>in trust for Her Majesty,</u> separate and apart from the property of the person, whether or not the property is subject to a security interest, ...

...

... and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

107    Yet no provision of the *CCAA* provides for the continuation of this deemed trust after the *CCAA* is brought into play.

108    In short, Parliament has imposed *two* explicit conditions, or "building blocks", for survival under the *CCAA* of deemed trusts created by the *ITA*, *CPP*, and *EIA*. Had Parliament intended to likewise preserve under the *CCAA* deemed trusts created by the *ETA*, it would have included in the *CCAA* the sort of confirmatory provision that explicitly preserves other deemed trusts.

109    With respect, unlike Tysoe J.A., I do not find it "inconceivable that Parliament would specifically identify the *BIA* as an exception when enacting the current version of s. 222(3) of the *ETA* without considering the *CCAA* as a possible second exception" (2009 BCCA 205, 98 B.C.L.R. (4th) 242, [2009] G.S.T.C. 79 (B.C. C.A.), at para. 37). *All* of the deemed trust provisions excerpted above make explicit reference to the *BIA*. Section 222 of the *ETA* does not break the pattern. Given the

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

near-identical wording of the four deemed trust provisions, it would have been surprising indeed had Parliament not addressed the *BIA* at all in the *ETA*.

110    Parliament's evident intent was to render GST deemed trusts inoperative upon the institution of insolvency proceedings. Accordingly, s. 222 mentions the *BIA* so as to *exclude* it from its ambit — rather than to *include* it, as do the *ITA*, the *CPP*, and the *EIA*.

111    Conversely, I note that *none* of these statutes mentions the *CCAA* expressly. Their specific reference to the *BIA* has no bearing on their interaction with the *CCAA*. Again, it is the confirmatory provisions *in the insolvency statutes* that determine whether a given deemed trust will subsist during insolvency proceedings.

112    Finally, I believe that chambers judges should not segregate GST monies into the Monitor's trust account during *CCAA* proceedings, as was done in this case. The result of Justice Deschamps's reasoning is that GST claims become unsecured under the *CCAA*. Parliament has deliberately chosen to nullify certain Crown super-priorities during insolvency; this is one such instance.

**III**

113    For these reasons, like Justice Deschamps, I would allow the appeal with costs in this Court and in the courts below and order that the $305,202.30 collected by LeRoy Trucking in respect of GST but not yet remitted to the Receiver General of Canada be subject to no deemed trust or priority in favour of the Crown.

*Abella J. (dissenting)*:

114    The central issue in this appeal is whether s. 222 of the *Excise Tax Act*, R.S.C. 1985, c. E-15 ("*EIA*"), and specifically s. 222(3), gives priority during *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"), proceedings to the Crown's deemed trust in unremitted GST. I agree with Tysoe J.A. that it does. It follows, in my respectful view, that a court's discretion under s. 11 of the *CCAA* is circumscribed accordingly.

115    Section 11 [1] of the *CCAA* stated:

**11**. (1) Notwithstanding anything in the *Bankruptcy and Insolvency Act* or the *Winding-up Act*, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

To decide the scope of the court's discretion under s. 11, it is necessary to first determine the priority issue. Section 222(3), the provision of the *ETA* at issue in this case, states:

**222 (3) Extension of trust** — Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed

(a) to be held, from the time the amount was collected by the person, in trust for Her Majesty, separate and apart from the property of the person, whether or not the property is subject to a security interest, and

(b) to form no part of the estate or property of the person from the time the amount was collected, whether or not the property has in fact been kept separate and apart from the estate or property of the person and whether or not the property is subject to a security interest

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 212 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

and is property beneficially owned by Her Majesty in right of Canada despite any security interest in the property or in the proceeds thereof and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

116    Century Services argued that the *CCAA's* general override provision, s. 18.3(1), prevailed, and that the deeming provisions in s. 222 of the *ETA* were, accordingly, inapplicable during *CCAA* proceedings. Section 18.3(1) states:

**18.3** (1) ... [N]otwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

117    As MacPherson J.A. correctly observed in *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737, [2005] G.S.T.C. 1 (Ont. C.A.), s. 222(3) of the *ETA* is in "clear conflict" with s. 18.3(1) of the *CCAA* (para. 31). Resolving the conflict between the two provisions is, essentially, what seems to me to be a relatively uncomplicated exercise in statutory interpretation: does the language reflect a clear legislative intention? In my view it does. The deemed trust provision, s. 222(3) of the *ETA*, has unambiguous language stating that it operates notwithstanding any law except the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*").

118    By expressly excluding only one statute from its legislative grasp, and by unequivocally stating that it applies despite any other law anywhere in Canada *except* the *BIA*, s. 222(3) has defined its boundaries in the clearest possible terms. I am in complete agreement with the following comments of MacPherson J.A. in *Ottawa Senators*:

The legislative intent of s. 222(3) of the *ETA* is clear. If there is a conflict with "any other enactment of Canada (except the *Bankruptcy and Insolvency Act*)", s. 222(3) prevails. In these words Parliament did two things: it decided that s. 222(3) should trump all other federal laws and, importantly, it addressed the topic of exceptions to its trumping decision and identified a single exception, the *Bankruptcy and Insolvency Act* .... The *BIA* and the *CCAA* are closely related federal statutes. I cannot conceive that Parliament would specifically identify the *BIA* as an exception, but accidentally fail to consider the *CCAA* as a possible second exception. In my view, the omission of the *CCAA* from s. 222(3) of the *ETA* was almost certainly a considered omission. [para. 43]

119    MacPherson J.A.'s view that the failure to exempt the *CCAA* from the operation of the *ETA* is a reflection of a clear legislative intention, is borne out by how the *CCAA* was subsequently changed after s. 18.3(1) was enacted in 1997. In 2000, when s. 222(3) of the *ETA* came into force, amendments were also introduced to the *CCAA*. Section 18.3(1) was not amended.

120    The failure to amend s. 18.3(1) is notable because its effect was to protect the legislative *status quo*, notwithstanding repeated requests from various constituencies that s. 18.3(1) be amended to make the priorities in the *CCAA* consistent with those in the *BIA*. In 2002, for example, when Industry Canada conducted a review of the *BIA* and the *CCAA*, the Insolvency Institute of Canada and the Canadian Association of Insolvency and Restructuring Professionals recommended that the priority regime under the *BIA* be extended to the *CCAA* (Joint Task Force on Business Insolvency Law Reform, *Report* (March 15, 2002), Sch. B, proposal 71, at pp. 37-38). The same recommendations were made by the Standing Senate Committee on Banking, Trade and Commerce in its 2003 report, *Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*; by the Legislative Review Task Force (Commercial) of the Insolvency Institute of Canada and the Canadian Association of Insolvency and Restructuring Professionals in its 2005 *Report on the Commercial Provisions of Bill C-55*; and in 2007 by the Insolvency Institute of Canada in a submission to the Standing Senate Committee on Banking, Trade and Commerce commenting on reforms then under consideration.

121    Yet the *BIA* remains the only exempted statute under s. 222(3) of the *ETA*. Even after the 2005 decision in *Ottawa Senators* which confirmed that the *ETA* took precedence over the *CCAA*, there was no responsive legislative revision. I see this lack of response as relevant in this case, as it was in *R. v. Tele-Mobile Co.*, 2008 SCC 12, [2008] 1 S.C.R. 305 (S.C.C.), where this Court stated:

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

While it cannot be said that legislative silence is necessarily determinative of legislative intention, in this case the silence is Parliament's answer to the consistent urging of Telus and other affected businesses and organizations that there be express language in the legislation to ensure that businesses can be reimbursed for the reasonable costs of complying with evidence-gathering orders. I see the legislative history as reflecting Parliament's intention that compensation not be paid for compliance with production orders. [para. 42]

122    All this leads to a clear inference of a deliberate legislative choice to protect the deemed trust in s. 222(3) from the reach of s. 18.3(1) of the *CCAA*.

123    Nor do I see any "policy" justification for interfering, through interpretation, with this clarity of legislative intention. I can do no better by way of explaining why I think the policy argument cannot succeed in this case, than to repeat the words of Tysoe J.A. who said:

I do not dispute that there are valid policy reasons for encouraging insolvent companies to attempt to restructure their affairs so that their business can continue with as little disruption to employees and other stakeholders as possible. It is appropriate for the courts to take such policy considerations into account, but only if it is in connection with a matter that has not been considered by Parliament. Here, Parliament must be taken to have weighed policy considerations when it enacted the amendments to the *CCAA* and *ETA* described above. As Mr. Justice MacPherson observed at para. 43 of *Ottawa Senators*, it is inconceivable that Parliament would specifically identify the *BIA* as an exception when enacting the current version of s. 222(3) of the *ETA* without considering the *CCAA* as a possible second exception. I also make the observation that the 1992 set of amendments to the *BIA* enabled proposals to be binding on secured creditors and, while there is more flexibility under the *CCAA*, it is possible for an insolvent company to attempt to restructure under the auspices of the *BIA*. [para. 37]

124    Despite my view that the clarity of the language in s. 222(3) is dispositive, it is also my view that even the application of other principles of interpretation reinforces this conclusion. In their submissions, the parties raised the following as being particularly relevant: the Crown relied on the principle that the statute which is "later in time" prevails; and Century Services based its argument on the principle that the general provision gives way to the specific (*generalia specialibus non derogani*).

125    The "later in time" principle gives priority to a more recent statute, based on the theory that the legislature is presumed to be aware of the content of existing legislation. If a new enactment is inconsistent with a prior one, therefore, the legislature is presumed to have intended to derogate from the earlier provisions (Ruth Sullivan, *Sullivan on the Construction of Statutes* (5th ed. 2008), at pp. 346-47; Pierre-André Côté, *The Interpretation of Legislation in Canada* (3rd ed. 2000), at p. 358).

126    The exception to this presumptive displacement of pre-existing inconsistent legislation, is the *generalia specialibus non derogant* principle that "[a] more recent, general provision will not be construed as affecting an earlier, special provision" (Côté, at p. 359). Like a Russian Doll, there is also an exception within this exception, namely, that an earlier, specific provision may in fact be "overruled" by a subsequent general statute if the legislature indicates, through its language, an intention that the general provision prevails (*Doré c. Verdun (Municipalité)*, [1997] 2 S.C.R. 862 (S.C.C.)).

127    The primary purpose of these interpretive principles is to assist in the performance of the task of determining the intention of the legislature. This was confirmed by MacPherson J.A. in *Ottawa Senators*, at para. 42:

[T]he overarching rule of statutory interpretation is that statutory provisions should be interpreted to give effect to the intention of the legislature in enacting the law. This primary rule takes precedence over all maxims or canons or aids relating to statutory interpretation, including the maxim that the specific prevails over the general (*generalia specialibus non derogant*). As expressed by Hudson J. in *Canada v. Williams*, [1944] S.C.R. 226, ... at p. 239 ...:

The maxim *generalia specialibus non derogant* is relied on as a rule which should dispose of the question, but the maxim is not a rule of law but a rule of construction and bows to the intention of the legislature, if such intention can reasonably be gathered from all of the relevant legislation.

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

(See also Côté, at p. 358, and Pierre-Andre Côté, with the collaboration of S. Beaulac and M. Devinat, *Interprétation des lois* (4th ed. 2009), at para. 1335.)

128    I accept the Crown's argument that the "later in time" principle is conclusive in this case. Since s. 222(3) of the *ETA* was enacted in 2000 and s. 18.3(1) of the *CCAA* was introduced in 1997, s. 222(3) is, on its face, the later provision. This chronological victory can be displaced, as Century Services argues, if it is shown that the more recent provision, s. 222(3) of the *ETA*, is a general one, in which case the earlier, specific provision, s. 18.3(1), prevails (*generalia specialibus non derogant).* But, as previously explained, the prior specific provision does not take precedence if the subsequent general provision appears to "overrule" it. This, it seems to me, is precisely what s. 222(3) achieves through the use of language stating that it prevails despite any law of Canada, of a province, or "any other law" *other than the BIA*. Section 18.3(1) of the *CCAA*, is thereby rendered inoperative for purposes of s. 222(3).

129    It is true that when the *CCAA* was amended in 2005, [2] s. 18.3(1) was re-enacted as s. 37(1) (S.C. 2005, c. 47, s. 131). Deschamps J. suggests that this makes s. 37(1) the new, "later in time" provision. With respect, her observation is refuted by the operation of s. 44(f) of the *Interpretation Act*, R.S.C. 1985, c. I-21, which expressly deals with the (non) effect of re-enacting, without significant substantive changes, a repealed provision (see *Canada (Attorney General) v. Canada (Public Service Staff Relations Board)*, [1977] 2 F.C. 663 (Fed. C.A.), dealing with the predecessor provision to s. 44(f)). It directs that new enactments not be construed as "new law" unless they differ in substance from the repealed provision:

> **44.** Where an enactment, in this section called the "former enactment", is repealed and another enactment, in this section called the "new enactment", is substituted therefor,
>
> ...
>
> (f) except to the extent that the provisions of the new enactment are not in substance the same as those of the former enactment, the new enactment shall not be held to operate as new law, but shall be construed and have effect as a consolidation and as declaratory of the law as contained in the former enactment;

Section 2 of the *Interpretation Act* defines an enactment as "an Act or regulation or *any portion of an Act or regulation*".

130    Section 37(1) of the current *CCAA* is almost identical to s. 18.3(1). These provisions are set out for ease of comparison, with the differences between them underlined:

> **37.**(1) Subject to subsection (2), <u>despite</u> any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as <u>being</u> held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

> **18.3** (1) Subject to subsection (2), <u>notwithstanding</u> any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

131    The application of s. 44(f) of the *Interpretation Act* simply confirms the government's clearly expressed intent, found in Industry Canada's clause-by-clause review of Bill C-55, where s. 37(1) was identified as "a technical amendment to reorder the provisions of this Act". During second reading, the Hon. Bill Rompkey, then the Deputy Leader of the Government in the Senate, confirmed that s. 37(1) represented only a technical change:

> On a technical note relating to the treatment of deemed trusts for taxes, the bill [*sic*] makes no changes to the underlying policy intent, despite the fact that in the case of a restructuring under the CCAA, sections of the act [*sic*] were repealed and substituted with renumbered versions due to the extensive reworking of the CCAA.

> (*Debates of the Senate*, vol. 142, 1st Sess., 38th Parl., November 23, 2005, at p. 2147)

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 215 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

132    Had the substance of s. 18.3(1) altered in any material way when it was replaced by s. 37(1), I would share Deschamps J.'s view that it should be considered a new provision. But since s. 18.3(1) and s. 37(1) are the same in substance, the transformation of s. 18.3(1) into s. 37(1) has no effect on the interpretive queue, and s. 222(3) of the *ETA* remains the "later in time" provision (Sullivan, at p. 347).

133    This means that the deemed trust provision in s. 222(3) of the *ETA* takes precedence over s. 18.3(1) during *CCAA* proceedings. The question then is how that priority affects the discretion of a court under s. 11 of the *CCAA*.

134    While s. 11 gives a court discretion to make orders notwithstanding the *BIA* and the *Winding-up Act*, R.S.C. 1985, c. W-11, that discretion is not liberated from the operation of any other federal statute. Any exercise of discretion is therefore circumscribed by whatever limits are imposed by statutes *other* than the *BIA* and the *Winding-up Act*. That includes the *ETA*. The chambers judge in this case was, therefore, required to respect the priority regime set out in s. 222(3) of the *ETA*. Neither s. 18.3(1) nor s. 11 of the *CCAA* gave him the authority to ignore it. He could not, as a result, deny the Crown's request for payment of the GST funds during the *CCAA* proceedings.

135    Given this conclusion, it is unnecessary to consider whether there was an express trust.

136    I would dismiss the appeal.

*Appeal allowed.*

*Pourvoi accueilli.*

## Appendix

### *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as at December 13, 2007)

**11. (1) Powers of court** — Notwithstanding anything in the *Bankruptcy and Insolvency Act* or the *Winding-up Act*, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

...

**(3) Initial application court orders** — A court may, on an initial application in respect of a company, make an order on such terms as it may impose, effective for such period as the court deems necessary not exceeding thirty days,

(a) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (i);

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

**(4) Other than initial application court orders** — A court may, on an application in respect of a company other than an initial application, make an order on such terms as it may impose,

(a) staying, until otherwise ordered by the court, for such period as the court deems necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

(c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

...

**(6) Burden of proof on application** — The court shall not make an order under subsection (3) or (4) unless

(a) the applicant satisfies the court that circumstances exist that make such an order appropriate; and

(b) in the case of an order under subsection (4), the applicant also satisfies the court that the applicant has acted, and is acting, in good faith and with due diligence.

**11.4 (1) Her Majesty affected** — An order made under section 11 may provide that

(a) Her Majesty in right of Canada may not exercise rights under subsection 224(1.2) of the *Income Tax Act* or any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, in respect of the company if the company is a tax debtor under that subsection or provision, for such period as the court considers appropriate but ending not later than

(i) the expiration of the order,

(ii) the refusal of a proposed compromise by the creditors or the court,

(iii) six months following the court sanction of a compromise or arrangement,

(iv) the default by the company on any term of a compromise or arrangement, or

(v) the performance of a compromise or arrangement in respect of the company; and\

(b) Her Majesty in right of a province may not exercise rights under any provision of provincial legislation in respect of the company where the company is a debtor under that legislation and the provision has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

for such period as the court considers appropriate but ending not later than the occurrence or time referred to in whichever of subparagraphs (*a*)(i) to (v) may apply.

**(2) When order ceases to be in effect** — An order referred to in subsection (1) ceases to be in effect if

(a) the company defaults on payment of any amount that becomes due to Her Majesty after the order is made and could be subject to a demand under

(i) subsection 224(1.2) of the *Income Tax Act*,

**WestlawNext** CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 217 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

(ii) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii) under any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

    (A) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

    (B) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection; or

(b) any other creditor is or becomes entitled to realize a security on any property that could be claimed by Her Majesty in exercising rights under

(i) subsection 224(1.2) of the *Income Tax Act*,

(ii) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

    (A) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

    (B) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection.

**(3) Operation of similar legislation** — An order made under section 11, other than an order referred to in subsection (1) of this section, does not affect the operation of

(a) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(b) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(c) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 218 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

**18.3 (1) Deemed trusts** — Subject to subsection (2), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

**(2) Exceptions** — Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "federal provision") nor in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province where

(a) that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

(b) the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, notwithstanding any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

**18.4 (1) Status of Crown claims** — In relation to a proceeding under this Act, all claims, including secured claims, of Her Majesty in right of Canada or a province or any body under an enactment respecting workers' compensation, in this section and in section 18.5 called a "workers' compensation body", rank as unsecured claims.

...

**(3) Operation of similar legislation** — Subsection (1) does not affect the operation of

(a) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(b) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

(c) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

...

**20. [Act to be applied conjointly with other Acts]** — The provisions of this Act may be applied together with the provisions of any Act of Parliament or of the legislature of any province, that authorizes or makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them.

**Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as at September 18, 2009)**

**11. General power of court** — Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

...

**11.02 (1) Stays, etc. — initial application** — A court may, on an initial application in respect of a debtor company, make an order on any terms that it may impose, effective for the period that the court considers necessary, which period may not be more than 30 days,

(a) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*;

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c) prohibiting, until otherwise ordered by the court, the commencement of any action, suit or proceeding against the company.

**(2) Stays, etc. — other than initial application** — A court may, on an application in respect of a debtor company other than an initial application, make an order, on any terms that it may impose,

(a) staying, until otherwise ordered by the court, for any period that the court considers necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in paragraph (1)(*a*);

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

(c) prohibiting, until otherwise ordered by the court, the commencement of any action, suit or proceeding against the company.

**(3) Burden of proof on application** — The court shall not make the order unless

(a) the applicant satisfies the court that circumstances exist that make the order appropriate; and

(b) in the case of an order under subsection (2), the applicant also satisfies the court that the applicant has acted, and is acting, in good faith and with due diligence.

...

**11.09 (1) Stay — Her Majesty** — An order made under section 11.02 may provide that

(a) Her Majesty in right of Canada may not exercise rights under subsection 224(1.2) of the *Income Tax Act* or any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, in respect of the company if the company is a tax debtor under that subsection or provision, for the period that the court considers appropriate but ending not later than

(i) the expiry of the order,

(ii) the refusal of a proposed compromise by the creditors or the court,

(iii) six months following the court sanction of a compromise or an arrangement,

(iv) the default by the company on any term of a compromise or an arrangement, or

(v) the performance of a compromise or an arrangement in respect of the company; and

(b) Her Majesty in right of a province may not exercise rights under any provision of provincial legislation in respect of the company if the company is a debtor under that legislation and the provision has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

for the period that the court considers appropriate but ending not later than the occurrence or time referred to in whichever of subparagraphs (*a*)(i) to (v) that may apply.

**(2) When order ceases to be in effect** — The portions of an order made under section 11.02 that affect the exercise of rights of Her Majesty referred to in paragraph (1)(*a*) or (*b*) cease to be in effect if

(a) the company defaults on the payment of any amount that becomes due to Her Majesty after the order is made and could be subject to a demand under

(i) subsection 224(1.2) of the *Income Tax Act*,

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 221 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

(ii) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii) any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

(A) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(B) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection; or

(b) any other creditor is or becomes entitled to realize a security on any property that could be claimed by Her Majesty in exercising rights under

(i) subsection 224(1.2) of the *Income Tax Act*,

(ii) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii) any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

(A) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(B) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection.

**(3) Operation of similar legislation** — An order made under section 11.02, other than the portions of that order that affect the exercise of rights of Her Majesty referred to in paragraph (1)(*a*) or (*b*), does not affect the operation of

(a) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(b) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(c) any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 222 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

**37. (1) Deemed trusts** — Subject to subsection (2), despite any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

**(2) Exceptions** — Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "federal provision"), nor does it apply in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province if

(a) that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

(b) the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

*Excise Tax Act*, **R.S.C. 1985, c. E-15 (as at December 13, 2007)**

**222. (1) [Deemed] Trust for amounts collected** — Subject to subsection (1.1), every person who collects an amount as or on account of tax under Division II is deemed, for all purposes and despite any security interest in the amount, to hold the amount in trust for Her Majesty in right of Canada, separate and apart from the property of the person and from property held by any secured creditor of the person that, but for a security interest, would be property of the person, until the amount is remitted to the Receiver General or withdrawn under subsection (2).

**(1.1) Amounts collected before bankruptcy** — Subsection (1) does not apply, at or after the time a person becomes a bankrupt (within the meaning of the *Bankruptcy and Insolvency Act*), to any amounts that, before that time, were collected or became collectible by the person as or on account of tax under Division II.

...

**(3) Extension of trust** — Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn

**WestlawNext** CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed

(a) to be held, from the time the amount was collected by the person, in trust for Her Majesty, separate and apart from the property of the person, whether or not the property is subject to a security interest, and

(b) to form no part of the estate or property of the person from the time the amount was collected, whether or not the property has in fact been kept separate and apart from the estate or property of the person and whether or not the property is subject to a security interest

and is property beneficially owned by Her Majesty in right of Canada despite any security interest in the property or in the proceeds thereof and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

***Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 (as at December 13, 2007)**

**67. (1) Property of bankrupt** — The property of a bankrupt divisible among his creditors shall not comprise

(a) property held by the bankrupt in trust for any other person,

(b) any property that as against the bankrupt is exempt from execution or seizure under any laws applicable in the province within which the property is situated and within which the bankrupt resides, or

(b.1) such goods and services tax credit payments and prescribed payments relating to the essential needs of an individual as are made in prescribed circumstances and are not property referred to in paragraph (*a*) or (*b*),

but it shall comprise

(c) all property wherever situated of the bankrupt at the date of his bankruptcy or that may be acquired by or devolve on him before his discharge, and

(d) such powers in or over or in respect of the property as might have been exercised by the bankrupt for his own benefit.

**(2) Deemed trusts** — Subject to subsection (3), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a bankrupt shall not be regarded as held in trust for Her Majesty for the purpose of paragraph (1)(*a*) unless it would be so regarded in the absence of that statutory provision.

**(3) Exceptions** — Subsection (2) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "federal provision") nor in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province where

(a) that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

(b) the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14410-5    Filed 09/16/14    Page 224 of 314

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, notwithstanding any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

**86. (1) Status of Crown claims** — In relation to a bankruptcy or proposal, all provable claims, including secured claims, of Her Majesty in right of Canada or a province or of any body under an Act respecting workers' compensation, in this section and in section 87 called a "workers' compensation body", rank as unsecured claims.

...

**(3) Exceptions** — Subsection (1) does not affect the operation of

(a) subsections 224(1.2) and (1.3) of the *Income Tax Act*;

(b) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts; or

(c) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

---

Footnotes

1    Section 11 was amended, effective September 18, 2009, and now states:

**11.** Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

2    The amendments did not come into force until September 18, 2009.

---

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 88

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

**H**

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne

In the Matter of the Primo Poloniato Grandchildren's Trust

The Canada Trust Company Trustee of the Primo Poloniato Grandchildren's Trust, Applicant (Respondent) and Russell Browne, John Mori Jr., Andrea L. Mori-Mickus, Laura Lee, Marla L. Ashmore, Teresa O'Neil, Michael Poloniato, Kristen Wiley, Brandon Ashmore, and The Children's Lawyer on behalf of the minors, Rachel Browne, Hailey Browne, Michelle Wiley, Jessica Ashmore, Julia Mickus, Robert Mickus, Olivia Mickus, John Mickus, Marissa Lee, Erica Lee and on behalf of the unborn and unascertained beneficiaries of the Primo Poloniato Grandchildren's Trust, Respondents (Appellant/Respondents)

Ontario Court of Appeal

K. Feldman, Janet Simmons, E.A. Cronk JJ.A.

Heard: April 11, 2012
Judgment: December 7, 2012[FN*]
Docket: CA C53262

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: affirming *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne* (2011), 2011 ONSC 731, 65 E.T.R. (3d) 113, 2011 CarswellOnt 29 (Ont. S.C.J.)

Counsel: Earl A. Cherniak, Q.C., Cynthia B. Kuehl, for Appellant

Archie J. Rabinowitz, David Lobl, Jeremy C. Millard, for Respondent, Canada Trust Company

Mark Abradjian, Christopher R. Durdan, Brad Wiseman, for Respondents, John Mori Jr., Marla L. Ashmore and Teresa O'Neil

Subject: Estates and Trusts; Civil Practice and Procedure

Estates and trusts --- Trusts — Express trust — Interpretation

P established trust for grandchildren, income beneficiaries (IBs) and great-grandchildren and their issue, capital beneficiaries (CBs) — Income was to accumulate in trust for 21 years or death of first IB when trust would be split equally into sub-trusts for each IB or their issue — Thereafter, income from sub-trusts was to be paid to each IB during lifetime and, on death, capital would be payable to CBs — After drop in trust income, IBs varied

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

trust with IBs' consent and court's approval to create percentage trust which provided, among other things, that IBs' income was never to fall below prior years' income — Trustee had to sell assets to top up payments to comply with variation and reported suggested capital could be expended in 18 to 20 years — Court interpreted varied trust as giving trustee power to manage investments of trusts, including distributions primary trust asset of trust to generate sufficient income to meet minimum payments to IBs — Office of Children's Lawyer (OCL) appealed on behalf of IBs — Appeal dismissed with costs on full indemnity basis for all parties from estate — Application judge interpreted trust in accord with proper trust principles and as trust was understood and intended by parties and court at time — OCL agreed to and court approved variation based on expert evidence supporting variations' potential to benefit CBs and increase portfolio's value — Appeal was from application to interpret, not approve, trust — Nothing in ruling contradicted or changed factual matrix as described when court approved variation — Variation was percentage trust, which was new financial approach to investment and disbursement of trust funds which allowed trustee to maximize overall value of trust assets for all beneficiaries' benefit — It was not variation's intent to benefit IBs at CBs' expense — Application judge did not fail to consider objective of variation to ensure some growth to CBs — Trust was internally consistent in providing mandatory percentage distribution scheme to IBs — Use of capital assets to satisfy percentage distribution was function of balanced investment strategy used in percentage trust to achieve growth — In percentage trust, trustee's duty was not to obtain large income yield while preserving capital but to increase size of entire trust for benefit of all — Trust as varied required trustee to cause holding company to sell assets, if necessary, to meet obligation to IBs, despite effect on trust corpus.

Estates and trusts --- Trustees — Powers and duties of trustees — Supervision by court — Review of discretionary powers

P established trust for grandchildren, income beneficiaries (IBs) and great-grandchildren and their issue, capital beneficiaries (CBs) — Income was to accumulate in trust for 21 years or death of first IB when trust would be split equally into sub-trusts for each IB or their issue — Thereafter, income from sub-trusts was to be paid to each IB during lifetime and, on death, capital would be payable to CBs — After drop in trust income, IBs varied trust with IBs' consent and court's approval to create percentage trust which provided, among other things, that IBs' income was never to fall below prior years' income — Trustee had to sell assets to top up payments to comply with variation and reported suggested capital could be expended in 18 to 20 years — Court interpreted varied trust as giving trustee power to manage investments of trusts, including distributions primary trust asset of trust to generate sufficient income to meet minimum payments to IBs — Office of Children's Lawyer (OCL) appealed on behalf of IBs — Appeal dismissed with costs on full indemnity basis for all parties from estate — Application judge interpreted trust in accord with proper trust principles and as trust was understood and intended by parties and court at time — OCL agreed to and court approved variation based on expert evidence supporting variations' potential to benefit CBs and increase portfolio's value — Appeal was from application to interpret, not approve, trust — Nothing in ruling contradicted or changed factual matrix as described when court approved variation — Variation was percentage trust, which was new financial approach to investment and disbursement of trust funds which allowed trustee to maximize overall value of trust assets for all beneficiaries' benefit — It was not variation's intent to benefit IBs at CBs' expense — Application judge did not fail to consider objective of variation to ensure some growth to CBs — Trust was internally consistent in providing mandatory percentage distribution scheme to IBs — Use of capital assets to satisfy percentage distribution was function of balanced investment strategy used in percentage trust to achieve growth — In percentage trust, trustee's duty was not to obtain large income yield while preserving capital but to increase size of entire trust for benefit of all — Trust as varied required trustee to cause holding company to sell assets, if necessary, to meet obligation to IBs, despite

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

effect on trust corpus.

Estates and trusts --- Trustees — Powers and duties of trustees — Duties to life tenant and remainderman — Evenhandedness

P established trust for grandchildren, income beneficiaries (IBs) and great-grandchildren and their issue, capital beneficiaries (CBs) — Income was to accumulate in trust for 21 years or death of first IB when trust would be split equally into sub-trusts for each IB or their issue — Thereafter, income from sub-trusts was to be paid to each IB during lifetime and, on death, capital would be payable to CBs — After drop in trust income, IBs varied trust with IBs' consent and court's approval to create percentage trust which provided, among other things, that IBs' income was never to fall below prior years' income — Trustee had to sell assets to top up payments to comply with variation and reported suggested capital could be expended in 18 to 20 years — Court interpreted varied trust as giving trustee power to manage investments of trusts, including distributions primary trust asset of trust to generate sufficient income to meet minimum payments to IBs — Office of Children's Lawyer (OCL) appealed on behalf of IBs — Appeal dismissed with costs on full indemnity basis for all parties from estate — Application judge interpreted trust in accord with proper trust principles and as trust was understood and intended by parties and court at time — OCL agreed to and court approved variation based on expert evidence supporting variations' potential to benefit CBs and increase portfolio's value — Appeal was from application to interpret, not approve, trust — Nothing in ruling contradicted or changed factual matrix as described when court approved variation — Variation was percentage trust, which was new financial approach to investment and disbursement of trust funds which allowed trustee to maximize overall value of trust assets for all beneficiaries' benefit — It was not variation's intent to benefit IBs at CBs' expense — Application judge did not fail to consider objective of variation to ensure some growth to CBs — Trust was internally consistent in providing mandatory percentage distribution scheme to IBs — Use of capital assets to satisfy percentage distribution was function of balanced investment strategy used in percentage trust to achieve growth — In percentage trust, trustee's duty was not to obtain large income yield while preserving capital but to increase size of entire trust for benefit of all — Trust as varied required trustee to cause holding company to sell assets, if necessary, to meet obligation to IBs, despite effect on trust corpus.

Estates and trusts --- Trustees — Powers and duties of trustees — Duties to life tenant and remainderman — Encroaching on capital — Implied right

P established trust for grandchildren, income beneficiaries (IBs) and great-grandchildren and their issue, capital beneficiaries (CBs) — Income was to accumulate in trust for 21 years or death of first IB when trust would be split equally into sub-trusts for each IB or their issue — Thereafter, income from sub-trusts was to be paid to each IB during lifetime and, on death, capital would be payable to CBs — After drop in trust income, IBs varied trust with IBs' consent and court's approval to create percentage trust which provided, among other things, that IBs' income was never to fall below prior years' income — Trustee had to sell assets to top up payments to comply with variation and reported suggested capital could be expended in 18 to 20 years — Court interpreted varied trust as giving trustee power to manage investments of trusts, including distributions primary trust asset of trust to generate sufficient income to meet minimum payments to IBs — Office of Children's Lawyer (OCL) appealed on behalf of IBs — Appeal dismissed with costs on full indemnity basis for all parties from estate — Application judge interpreted trust in accord with proper trust principles and as trust was understood and intended by parties and court at time — OCL agreed to and court approved variation based on expert evidence supporting variations' potential to benefit CBs and increase portfolio's value — Appeal was from application to interpret, not approve, trust — Nothing in ruling contradicted or changed factual matrix as described when court approved

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

variation — Variation was percentage trust, which was new financial approach to investment and disbursement of trust funds which allowed trustee to maximize overall value of trust assets for all beneficiaries' benefit — It was not variation's intent to benefit IBs at CBs' expense — Application judge did not fail to consider objective of variation to ensure some growth to CBs — Trust was internally consistent in providing mandatory percentage distribution scheme to IBs — Use of capital assets to satisfy percentage distribution was function of balanced investment strategy used in percentage trust to achieve growth — In percentage trust, trustee's duty was not to obtain large income yield while preserving capital but to increase size of entire trust for benefit of all — Trust as varied required trustee to cause holding company to sell assets, if necessary, to meet obligation to IBs, despite effect on trust corpus.

### Cases considered by *K. Feldman J.A.*:

*Armstrong, Re* (1924), 55 O.L.R. 639 (Ont. Div. Ct.) — considered

*Dumbrell v. Regional Group of Cos.* (2007), 55 C.C.E.L. (3d) 155, 220 O.A.C. 64, 85 O.R. (3d) 616, 2007 CarswellOnt 407, 25 B.L.R. (4th) 171, 279 D.L.R. (4th) 201, 2007 ONCA 59 (Ont. C.A.) — followed

*Finnell v. Schumacher Estate* (1990), 37 E.T.R. 170, 74 O.R. (2d) 583, 38 O.A.C. 258, 1990 CarswellOnt 479 (Ont. C.A.) — referred to

*Glaswegian Enterprises Inc. v. BC Tel Mobility Cellular Inc.* (1997), 49 B.C.L.R. (3d) 317, 101 B.C.A.C. 62, 164 W.A.C. 62, 1997 CarswellBC 2836 (B.C. C.A.) — considered

*Hi-Tech Group Inc. v. Sears Canada Inc.* (2001), 52 O.R. (3d) 97, 4 C.P.C. (5th) 35, 2001 CarswellOnt 9, 11 B.L.R. (3d) 197 (Ont. C.A.) — followed

*Irving, Re* (1975), 66 D.L.R. (3d) 387, 11 O.R. (2d) 443, 1975 CarswellOnt 581 (Ont. H.C.) — considered

*Russ v. British Columbia (Public Trustee)* (1994), 1994 CarswellBC 131, 89 B.C.L.R. (2d) 35, 3 E.T.R. (2d) 170, 43 B.C.A.C. 209, 69 W.A.C. 209 (B.C. C.A.) — referred to

*Teichman v. Teichman Estate* (1996), 134 D.L.R. (4th) 155, *(sub nom. Teichman Estate, Re)* 110 Man. R. (2d) 114, *(sub nom. Teichman Estate, Re)* 118 W.A.C. 114, 1996 CarswellMan 158 (Man. C.A.) — referred to

**Statutes considered:**

*Trustee Act*, R.S.O. 1990, c. T.23

Generally — referred to

*Variation of Trusts Act*, R.S.O. 1990, c. V.1

s. 1(2) — considered

APPEAL from judgment reported at *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne* (2011), 2011 ONSC 731, 65 E.T.R. (3d) 113, 2011 CarswellOnt 29 (Ont. S.C.J.).

**K. Feldman J.A.:**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

## Introduction

1    The Children's Lawyer brings this appeal on behalf of the minor, unborn and unascertained beneficiaries of the Primo Poloniato Grandchildren's Trust (the "Trust"). The Trust was settled in October 1980 by Primo Poloniato, the founder of Primo Foods Ltd., in favour of his grandchildren (the income beneficiaries) and their issue, his great-grandchildren (the capital beneficiaries). The Trust's principal asset is shares in 679312 Alberta Ltd. (the "Holding Company"), a private investment company controlled by the Trust. While the value of the Trust has fluctuated over the years, at its peak it was worth in excess of $130 million.

2    Since its inception, the Trust has been varied with court approval twice — in December 1988 and again by a deed of arrangement, dated December 1997, which was approved in March 1998. Both variations were made based on the agreement and consent of all parties, including the Children's Lawyer (in 1988, the Official Guardian) on behalf of minor, unborn and unascertained beneficiaries.

3    The application that gives rise to this appeal was brought by Canada Trust, the Trust's current trustee, for the court's advice and direction to clarify the trustee's obligations under the Trust agreement as varied by the 1997 trust deed (the "Trust Deed as Varied"). That variation changed the nature of the Trust to a "percentage trust" or a "unitrust". It allowed the trustee to have a freer hand to make investments within the Holding Company in order to maximize the value of the Trust for the benefit of all beneficiaries, without concern as to whether those investments were income-producing or growth-oriented.

4    The Trust Deed as Varied provides that the income beneficiaries receive a fixed percentage of the net fair market value of a defined percentage of the Trust's assets as their distribution each year. This provides the income beneficiaries with a guaranteed annual income, allowing them to be able to plan their spending priorities and obligations with confidence. As a percentage trust, if the income-producing investments chosen by the trustee do not produce sufficient income to make the distributions, the trustee may sell equities or other capital investments held by the Holding Company in order to generate sufficient funds to make the percentage payments to the income beneficiaries.

5    For the residuary capital beneficiaries, the benefit of the 1997 variation is that the trustee may invest in equities and other appreciating assets, which will ultimately be available for the capital beneficiaries, rather than being constrained by the obligation to earn income and preserve capital.

6    The 1997 variation application was based on accounting projections of the future value of the Trust that were prepared by Ernst & Young based on past market performance. Those projections saw the value of the Trust continue to increase over time.

7    Unfortunately, because economic conditions since 2001 have resulted in lower than expected investment returns, the trustee has had to continue to sell a significant portion of the underlying assets owned by the Holding Company in order to make the annual percentage distributions to the income beneficiaries, resulting in an ongoing depletion of the value of the Trust as a whole.

8    The application judge interpreted the Trust Deed as Varied to require the trustee to make the percentage distributions to the income beneficiaries in spite of the downturn in the market and its effect on the capital value of the Trust.

9    The Children's Lawyer appeals from the application judge's decision, arguing that the application judge

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

ignored trust principles and failed to take into account the proper factual matrix in interpreting the terms of the Trust Deed as Varied. Counsel submits that the effect of the decision is to erode the interests of the capital beneficiaries to the point of elimination, which could not have been what was intended when the 1997 variation received court approval.

10    For the reasons that follow, I would dismiss the appeal. In my view, the application judge interpreted the Trust Deed as Varied in accordance with proper trust principles and in the way it was understood and intended by all the consenting parties and by the approving court at the time.

**Facts**

11    Mr. Poloniato, who died in 1984, had seven grandchildren. All are now of full age and capacity. At the time of the application there were 12 great-grandchildren, six of full age and capacity and six minors.

12    The Trust was settled as part of an estate freeze. Initially, the Trust held the growth shares of Primo Foods through an Ontario numbered company. Upon Mr. Poloniato's death, the shares were sold and the proceeds were invested in securities and near cash equivalents, which are now held by the Holding Company.

13    Under the original terms of the Trust, income from the Trust would be accumulated until the earlier of the expiration of 21 years from the settling of the Trust, or the death of the settlor's first grandchild (the latter defined as the "Time of Division"). At the Time of Division, the Trust would be split equally into sub-trusts for each grandchild then living or who had issue living. Subsequent to the Time of Division, the income from each sub-trust would be paid to each grandchild during his or her lifetime and, on the death of the grandchild, the capital of each sub-trust would be payable to one or more of the grandchild's issue as designated by him or her pursuant to a power of appointment. The trustee was given no specific power to encroach on capital.

14    By the mid-1980s, the value of the Trust had grown significantly. The grandchildren, who were the income beneficiaries, sought earlier access to some of the income from the Trust to assist them in addressing their immediate financial needs and to prepare them for the anticipated receipt of a large sum of money beginning in October 2001 (the expiration of 21 years from the settlement of the Trust).

15    In December 1988, the court approved a trust variation that accelerated payment of income to the income beneficiaries beginning in 1988 and continuing to 2001. The variation sought by the trustee was consented to by all the adult beneficiaries and the Official Guardian.

16    The main elements of the 1988 variation (also referred to as the Settlement) were the following:

• The income beneficiaries became entitled to receive 1/7 of the "gross annual income" of the Trust in 1988 and an increasing percentage each year up to 1/3 of the gross annual income for the years 1998, 1999 and 2000; the distributable income was to be paid to those grandchildren alive in each of those years, divided in equal shares *per capita*.

• From January 1, 2001 onwards on an annual basis, all the net income from the Trust fund was to be divided in equal shares *per capita* among the grandchildren.

• The trustee was permitted to encroach on capital to a maximum of $200,000 for each family unit for the benefit of the great-grandchildren.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

• The income beneficiaries released their power of appointment in respect of their capital interests under the Trust so that every one of their issue (all the great-grandchildren) would be equal capital beneficiaries.

17     Some problems arose following the 1988 variation, including uncertainty about the meaning of the term "gross annual income". Also, the grandchildren (the income beneficiaries) wanted to receive a predictable annual amount of money so that they could plan and live knowing what amount would be available each year. Finally, because by 1997 the equity markets were performing very well while interest rates were in decline, it was felt that both classes of beneficiaries were losing out on overall returns because of the investment restrictions on the trustee regarding the need for income-producing assets. The trustee was not able to maximize the value of the Trust at a time when there were significant growth opportunities in the market for those with a more unconstrained investment mandate.

18     According to an affidavit on the motion to approve the 1997 variation sworn by Mike Ruf, a trust officer of the then trustee, National Trust Company, the second variation in 1997 was meant to resolve the interpretive issue, to give the trustee more discretion as to the management of the investments, and to make distributions to income beneficiaries more predictable.

19     Among other things, the 1997 variation was designed as a percentage trust or a unitrust, a new type of trust that had been recommended by the Ontario Law Reform Commission's *Report on the Law of Trusts* (Ministry of the Attorney General, 1984). The percentage trust or unitrust would allow the trustee to use a balanced portfolio strategy of investing. Paragraph 26 of the Ruf affidavit explains:

> The principal advantage of the revised method of distribution is that it will enable the Trustee to adopt a balanced portfolio strategy which most likely in the longer term will provide the greatest asset base for the capital beneficiaries, being the minor children and unborn issue of the Grandchildren.

20     As counsel for the trustee at the time of the 1997 variation, Mr. Martin Rochwerg explained in his evidence on this application that the advantage of a percentage trust is that it allows the trustee to invest for maximum returns, regardless of whether they result in capital gains or income. The total growth is then split between the income and capital beneficiaries on a specified percentage basis. He explained further that the interests of the income and capital beneficiaries would therefore be "in tandem", because they would "either both benefit or they both lose." The effect of the conversion to a percentage trust was that the income beneficiaries were no longer entitled to receive income from the Trust; instead they would receive a fixed amount of money from the Trust each year, based on a percentage formula that included mandatory minimum and maximum limits.

21     Prior to the approval of the 1997 variation, a "no-tax" ruling was sought and obtained from Revenue Canada (now the Canada Revenue Agency or "CRA"). By letter of June 1997 addressed to Revenue Canada, Mr. Rochwerg enclosed a memorandum that explained the reasons for the proposed variation and that addressed the issue whether the proposed variation would result in a disposition of a capital interest for tax purposes.

22     One of the points covered in the memorandum was the legal requirement that the arrangement be for the benefit of minors and unborn and unascertained beneficiaries, who, in this case, were the capital beneficiaries. The memorandum opined that the court would not approve the proposed arrangement on behalf of those beneficiaries if the result was that their interest would be diminished. In this case, the benefit to the capital beneficiaries was said to come "primarily from the Trustee being freed from restrictions on investing so that the Trustee [could] adopt an investment policy which will further enhance the value of the Trust."

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

23      After some back and forth between the CRA and the Trust's advisors, the CRA granted an advance tax ruling based on the facts as set out in the ruling letter, which included the following paragraph:

> 10. In no event will the annual distribution [to the Income Beneficiaries] be less than the previous year's distribution. Where it is determined that the amount to be distributed based on the formula is less than the previous year's distribution, the current year's distribution will be adjusted to the amount of the prior year's distribution. The new system will also provide that the current year's distribution cannot exceed 115% of the previous year's distribution. *The Deed of Arrangement will also limit income distributions in any one year to the amount of cash dividends the Trust receives from [the] Holding Company in that year, ensuring there will be no encroachment on capital of the Trust on behalf of the Income Beneficiaries.* These provisions will have the effect of providing the Income Beneficiaries with a stable annual income, and ensuring some growth to the Capital Beneficiaries. In determining the appropriate Distribution Percentage (70%) for the years 2001 and onward, various asset mixes were tested and compared with the results using a rigid asset mix. Rates of return for the last 10 years were used in these projections. Provided these rates of return are a reasonable indication of future rates of return, the new formula will provide an after-tax increase for the Capital Beneficiaries and should also provide a slightly greater after-tax return for the Income Beneficiaries over the longer term.

> [Emphasis added.]

24      The basis for selecting 70 per cent in setting the Yearly Income to be distributed to income beneficiaries starting in 2002, which was the amount recommended and accepted as part of the arrangement, was explained in the Ruf affidavit at para. 23. The distribution percentages of 25 per cent for 1997 and 33-1/3 per cent for 1998-2000 were the same as in the Trust deed as varied in 1988, which he refers to as the Settlement. He then states: "In all years thereafter the Distribution Percentage represents a reduction of 30% from that set out in the Settlement." This was because the Settlement provided that, beginning in 2001, the trustee was to administer the Trust Fund's annual income by dividing 100 per cent of the net income among the grandchildren on a *per capita* basis. Therefore, a 70 per cent distribution represented a 30 per cent reduction from what they would have received under the Settlement.

25      The CRA ruling required that income distributions be in the form of cash dividends paid by the Holding Company to the Trust in any year in order to ensure that there would be no encroachment on the capital of the Trust (the shares of the Holding Company). On that basis, the CRA was prepared to give the ruling that "[t]here will not be a disposition of any income or capital interest in the Trust as a result of the proposed transactions". This ruling was needed in order to implement the proposed 1997 variation without adverse tax consequences.

26      The Children's Lawyer consented to the 1997 variation on behalf of the capital beneficiaries who were unable to consent, namely those who were minor, unborn or unascertained persons.

27      Ernst & Young had prepared a number of calculations for the purpose of advising on the proposed variation, including a comparison of the projected capital using the then existing portfolio mix of 70 per cent debt and 30 per cent equities, and comparing that to an asset mix of 70 per cent equities and 30 per cent debt. Those calculations, which were provided to the Children's Lawyer, showed an expected benefit to the capital beneficiaries of approximately $2 million after five years and $12 million after ten years.

28      In a 1996 letter to the Children's Lawyer explaining the background to the proposal, Mr. Rochwerg summarized five benefits of the proposed variation for the capital beneficiaries. It would: 1) increase growth from

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

better investment performance; 2) reduce costs of administration; 3) address the issue of 21-year planning to reduce imminent tax liability; 4) impose a cap on the income entitlement that would leave more growth for the capital beneficiaries; and 5) accelerate the use of significant tax-free and refundable tax amounts.

29      This letter also explained the concept of the percentage trust that had been endorsed in 1984 by Ontario's Law Reform Commission in its *Report on the Law of Trusts*. The percentage trust allows the trustee to invest to increase the overall value of the trust and to allocate funds to the income or capital beneficiaries without regard to whether those funds themselves are income or capital of the trust. In that regard, the *Report* recommended that the percentage payment to the income beneficiaries come first from the annual income, and if insufficient, then from capital: p. 303.

30      Justice Donna Haley, a Superior Court judge with significant expertise in wills and trusts, approved the 1997 variation. In her endorsement, she found that the proposed variation was in the best interests of the great-grandchildren as they would benefit "both directly as capital beneficiaries and by the certainty of income provided by the variation to their parents who are all grandchildren under the trust".

31      Commenting on the context in which the 1997 variation application was made, the application judge below observed that at the time, interest rates were declining and capital markets were heating up. "It was anticipated by all parties", he noted, "that the rates of return which had been historically achieved on the assets of the Holding Company would be equalled or exceeded in the future."

32      However, a few years after the 1997 variation was approved, it transpired that investment returns were not consistently as strong as predicted, which has had a significant effect on the Trust and its value.

33      The application judge further observed:

[A] decrease in market performance of the Trust's assets has resulted in the calculation of Yearly Income in each year being less than the Yearly Income which was paid to the income beneficiaries in 2002. Because the definition of "Yearly Income" in clause 0.1(g) of the Trust Deed as Varied provides that the Yearly Income cannot be less than the prior year's Yearly Income, the result has been that the amount the Trust has distributed to the income beneficiaries for each year after 2002 has been the 2002 amount.

In order to be able to pay the Yearly Income to the income beneficiaries as required, the trustee was obliged to cause the Holding Company to sell assets.

34      In 2003, the trustee commissioned a report on the expected life of the Trust, assuming distributions were maintained at then current levels. The report indicated that, depending on investment returns, the capital of the Trust would be expended in 18 to 20 years.

35      The respondent income beneficiaries rely on a more recent report obtained by the trustee in 2007 that estimates that the projected value of the Trust in 2022 could be about $90 million depending on investment returns.

36      Because of the concerns of the trustee, the Children's Lawyer and other beneficiaries that the minimum annual percentage distributions to the income beneficiaries were depleting the Trust capital, the trustee applied to the court for direction on the extent of the trustee's discretion not to make the minimum percentage distributions to the income beneficiaries in order to preserve the value of the Trust corpus for the capital beneficiaries.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

37      In particular, the trustee wanted to know whether it retained a duty to maintain an even hand between the income and capital beneficiaries in managing Trust distributions, and therefore a discretion to stop making the prescribed percentage payments to the income beneficiaries that were eroding the value of the Trust.

**Application Judge's Decision and Reasons**

38      The application judge provided detailed reasons explaining his interpretation of the Trust Deed as Varied. The relevant provisions of the Trust deed are set out in the Appendix to these reasons.

39      He found the provisions of the Trust Deed as Varied to be clear and unequivocal and thus all that needed to be considered apart from the agreement was the factual matrix. In his view, the Ruf affidavit best summarized the circumstances at the time of the 1997 variation. He concluded that the evidence of the discussions leading up to the agreement and subsequent approval of the 1997 variation, communications with the CRA, the parties' understandings as to what was intended by the 1997 variation or what was communicated to them subsequently, and any legal opinions as to what the 1997 variation means, constituted extrinsic evidence that was inadmissible for the purposes of interpreting the Trust Deed as Varied.

40      In bringing the application, the trustee set out two questions to be answered by the application judge. The first question was: does the trustee have the discretion to cause the Holding Company that is controlled by the Trust to distribute sufficient income to the Trust to meet the minimum annual distribution requirements to the income beneficiaries? In order to answer that question, the application judge was required to consider the meaning of the following provisions of the Trust Deed as Varied: the definitions of "Yearly Income", "Applicable Percentage", "Net Income", and paras. 1(a), 1(c) and 5(vi).

41      The application judge first found that clause 1(a) together with the definition of "Yearly Income" in clause 0.1(g)(vi) are clear and unambiguous. He concluded that the requirement in clause 1(a) to pay the Yearly Income and associated taxes to the income beneficiaries was mandatory. Those provisions read:

"Yearly Income" for a calendar year shall mean the amount equal to:

. . .

(vi) in 2002, and in each year thereafter, 70% of the Applicable Percentage for the year of the Net Fair Market Value of the trust's assets valued as of the first business day of the calendar year, provided further that the Yearly Income *shall not be less than the Yearly Income of the previous calendar year, nor greater than 115% of the Yearly Income of the previous calendar year....*

1. The Trustee shall keep invested the Trust Fund until the date of the death of the first of the grandchildren of Primo Poloniato alive at the date of this agreement (hereinafter collectively referred to as the "Grandchildren" and individually as a "Grandchild") to die (hereinafter referred to as the "time of division") and until the time of division, the Trustee shall deal with the Trust Fund as follows:

(a) *the Trustee shall pay the Yearly Income* to or for the benefit of the Grandchildren in equal shares in each calendar year.... The Trustee shall also from time to time as determined by the Trustee but at least annually pay amounts out of the income of the trust to a Grandchild to compensate him or her for any taxes payable by such Grandchild or withheld by the Trustees from such Grandchild pursuant to the Income Tax Act in respect of the Yearly Income from the trust. The Trustee

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

shall also have the discretion to additionally compensate a Grandchild, who is a non-resident of Canada for purposes of the *Income Tax Act*, for any foreign taxes or similar amounts paid or payable by the Grandchild on account of the receipt by the Grandchild of a distribution hereunder ... Any income of the trust for a calendar year in excess of the Yearly Income ... shall be added to the capital;

[Emphasis added.]

42    He observed that the mandatory duty created in clause 1(a) is qualified by clause 1(c), which ensures that the mandatory payments are made from the Net Income of the Trust, which means cash dividends paid by the Holding Company (or income from other assets of the trust) and not from a sale or other disposition of the shares of the Holding Company, which would constitute a disposition of the capital of the trust. Paragraph 1(c) provides:

(c) notwithstanding the foregoing subparagraphs of this paragraph 1, the total of all amounts on account of Yearly Income and any additional payments to a Grandchild paid in a year, shall not exceed the Net Income of the trust.

43    The application judge then turned to clause 5(vi) which reads:

5. The Trustee in addition to all other powers available to it by law or otherwise, shall have the following powers, authorities and discretions:

. . .

(vi) to determine whether any payments made by the Trustee in the due administration of the Trust Fund shall be charged against the capital of the Trust Fund or against the income therefrom or partly against capital and partly against the income and such determination shall be final and binding upon all persons concerned and *to manage the investments of the trust, including any distributions from any corporations controlled by the Trustee in order that the Net Income, of any trust hereunder shall be no less than the amount required to be distributed to a Grandchild during a calendar year*;

[Emphasis added.]

44    He concluded that this clause grants powers to the trustee, including the power to manage the investments and pay the distributions, in a manner that will achieve the objective of creating sufficient net income to pay the minimum annual amounts to the income beneficiaries. The highlighted portion of clause 5(vi) did not create a duty or obligation on the trustee, but an objective or purpose to guide the trustee.

45    The application judge found that the power to manage investments in clause 5(vi) carried with it a discretion in the trustee to determine the way in which the investments would be managed. It followed that the power to manage distributions, which by the wording of clause 5(vi) was included in the power to manage investments, must also give rise to discretion in the trustee to determine how distributions were managed.

46    Moreover, clause 5(vi) made clear that the trustee's discretion to manage investments, including distributions from the Holding Company of cash dividends, was guided by the investment objective to ensure that the Net Income "shall be no less than the amount required to be distributed to a Grandchild during a calendar year".

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

47     Based on this analysis, the application judge concluded in answer to the first question that, under the Trust Deed as Varied, the trustee does have a discretion regarding both the investment and distribution of the Trust assets.

48     The second question put to the application judge was: if the answer to the first question is "yes", is the trustee still subject to the duty to maintain an even hand between the income beneficiaries and the capital beneficiaries when exercising the discretion to manage distributions?

49     Citing *Waters' Law of Trusts in Canada*, the application judge noted that the duty to maintain an even hand could be excluded by the terms of the trust deed. The duty can be ousted either by express words or by implication. In every case it is a matter of construction: Donovan W.M. Waters, Mark R. Gillen & Lionel D. Smith, *Waters' Law of Trusts in Canada*, 3d ed. (Toronto: Thomson Carswell, 2005) at pp. 966 - 969.

50     In this case, the application judge considered whether the even hand principle continued to apply in two contexts — the investment of the Trust assets and their distribution to the beneficiaries.

51     Dealing first with the trustee's duty with respect to the investment of the Trust assets, the application judge found it was clear that, when read together, the terms of the Trust Deed as Varied ousted the duty on the trustee to maintain an even hand. Because the income beneficiaries were now entitled to receive their percentage share from the total return on investment, whether by income or capital appreciation, there was no longer any necessity to maintain a distinction between interest and capital for investment purposes. Instead, the trustee could invest in a balanced portfolio for the benefit of all. He noted that this finding was consistent with the intentions of the parties as reflected in the Trust Deed as Varied.

52     The application judge came to a similar conclusion regarding the trustee's obligation to maintain an even hand in managing distributions. He found that, too, had been ousted by the terms of the Trust Deed as Varied and the way it was designed to operate with a prescribed minimum payment to the income beneficiaries each year.

53     The power to manage distributions in clause 5(vi) was included in the power to manage investments. He reasoned that if the duty to maintain an even hand did not apply to the power to manage the investments of the Trust, it could not apply to the included power to manage distributions.

54     The application judge found that the wording of the Trust Deed as Varied clearly required that capital assets held by the Holding Company would be sold, if necessary, to fund the obligations to the income beneficiaries. For the trustee to meet the obligation to pay the Yearly Income to the income beneficiaries, it must require the Holding Company to pay sufficient cash dividends to the Trust and those dividends must be sourced from the Holding Company's returns on its investments, which included both income and capital appreciation. To the extent that the obligations of the Trust could not be met from the income earned on investments, it was intended that they would be met from the sale of assets in the Holding Company sufficient to generate the required cash dividends.

55     The application judge also found that to interpret the Trust deed to require the trustee to maintain an even hand between income and capital in respect of the distribution of monies from the Holding Company, so that the trustee could distribute only income from the Holding Company to the Trust to fund the obligations to the income beneficiaries, would render the clear language of clause 1(a) and the definition of "Yearly Income" in clause 0.1(g) completely ineffective.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

56      He further concluded that that interpretation would also fly in the face of the stated objective of the parties to the 1997 variation — to permit the income beneficiaries to share (with the capital beneficiaries) in the overall appreciation of the Trust's assets on an annual basis, while still providing them with a degree of certainty in respect of the annual amount they would receive.

57      The application judge rejected the submission that the settlor's original intent, as discerned from the original Trust deed, was relevant to the interpretation of the Trust Deed as Varied. He also rejected the relevance of the court approval of the 1997 variation by Haley J. He said that it had no bearing on the issue before the court on the application, as the issue before the court was whether the 1997 variation was in the best interests of the capital beneficiaries and the material before the court at that time "clearly confirmed that it was".

58      Finally, he did not agree that the 1997 variation would "obliterate" the interests of the capital beneficiaries. There was an indirect benefit to the capital beneficiaries — who were all children of the income beneficiaries — and, as well, a return to previously projected rates of return would "no doubt go a long way to maintaining and perhaps increasing the capital." The negative projections were all based on the assumption that current low rates would continue.

59      To conclude, in answer to the second question, the application judge found that the duty to maintain an even hand was ousted by the terms and necessary operation of the Trust Deed as Varied.

**Issue on Appeal**

60      The issue on appeal is whether the application judge made a fundamental error in his interpretation of the Trust Deed as Varied by finding that minimum percentage payments to the income beneficiaries were mandatory and that the even hand rule had been ousted with respect to the management of Trust distributions, leaving open the potential for depletion of the capital of the Trust to the detriment of the capital beneficiaries.

61      The appellant takes the position that the application judge erred in the following specific ways:

1) He erred in law by applying only contractual as opposed to trust interpretation principles to the interpretation of the Trust Deed as Varied and in particular:

   a) He narrowly construed the factual matrix so as to exclude any consideration of the role of the court and its jurisdiction in approving the 1997 variation.

   b) He excluded other evidence relevant to the factual matrix, specifically the CRA ruling.

   c) He ignored the intention of the settlor in the interpretive exercise.

   d) He made inconsistent interpretive findings concerning the trustee's ability to encroach.

   e) He failed to consider the objective of the 1997 variation that there be capital growth.

   f) He failed to consider whether his interpretation was consistent with the language of the Trust agreement when read as a whole.

2) He erred in law by finding, contrary to trust principles and the language of the Trust Deed as Varied, when read as a whole, that the obligation of the trustee to maintain an even hand with respect to the man-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

agement of Trust distributions was ousted.

62    Three of the income beneficiaries participated in this appeal. They take the position that the appellant is essentially asking the court to find that the trustee may pay less than the stipulated Yearly Income in the years in which the investment portfolio does not create sufficient returns in the form of income to fund the Yearly Income. They say that there is nothing in the wording of the Trust Deed as Varied or the factual matrix to support this interpretation.

63    The current trustee says it takes a "neutral" position on this appeal.

**Analysis**

*Principles of Interpretation*

64    The appellant argues that the application judge erred by interpreting the Trust Deed as Varied only as a contract, and that he failed to apply trust principles as part of the interpretive process. When the court is interpreting a trust that has been varied on consent of the beneficiaries, contractual interpretation principles are applied to determine the objective intent of the parties. However, because the agreement is a trust, trust principles must also inform that interpretation.

65    Before he embarked on the interpretation of the Trust Deed as Varied, the application judge acknowledged that "regard must also be had to the fact that the document under review is a trust deed and not strictly a commercial instrument." The appellant's specific concerns will be addressed individually in the course of the following analysis.

*Issue 1 - Factual Matrix — General Principles*

66    Before addressing the appellant's specific arguments, it is important to review what is meant by the factual matrix of an agreement.

67    It is well established that in interpreting a contract, the court may consider the "factual matrix" surrounding the contract, even where there is no ambiguity. "Indeed, because words always take their meaning from their context, evidence of the circumstances surrounding the making of a contract has been regarded as admissible in every case": *Hi-Tech Group Inc. v. Sears Canada Inc.* (2001), 52 O.R. (3d) 97 (Ont. C.A.), at para. 23.

68    In *Dumbrell v. Regional Group of Cos.* (2007), 85 O.R. (3d) 616 (Ont. C.A.), at para. 53, this court affirmed the relevance of the factual matrix to contractual interpretation:

    [53] The text of the written agreement must be read as a whole and in the context of the circumstances as they existed when the agreement was created. The circumstances include facts that were known or reasonably capable of being known by the parties when they entered into the written agreement ...

69    This court noted in *Dumbrell*, at para. 55, that while there is some debate about the outer limits of the scope of factual matrix, it clearly encompasses "the genesis of the agreement, its purpose, and the commercial context in which the agreement was made".

70    In *Glaswegian Enterprises Inc. v. BC Tel Mobility Cellular Inc.* (1997), 49 B.C.L.R. (3d) 317 (B.C. C.A.), at para. 18, the British Columbia Court of Appeal described the factual matrix as the "background" of the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R.
(3d) 287

contract:

> The factual matrix is the background of relevant facts, that the parties must clearly have been taken to have
> known and to have had in mind when they composed the written text of their agreement. It can throw light
> on what the parties must have meant by the words they chose to express their intention....

> The factual matrix is the background which may deepen an understanding of what the parties meant by the
> language they used, but the Court cannot make a new agreement.

71      While the scope of the factual matrix is broad, it excludes evidence of negotiations, except perhaps in the
most general terms, and evidence of a contracting party's subjective intentions: Geoff R. Hall, *Canadian Con-
tractual Interpretation Law*, 2d ed. (Markham: LexisNexis, 2012), at p. 27. As the cases above suggest, the fac-
tual matrix includes only objective facts known to the parties at or before the date of the agreement, and what is
common to both parties: Hall, p. 30. Hall goes on to state that while the factual matrix can "be used to clarify the
parties' intentions as expressed in a written agreement, it cannot be used to contradict that intention, create an
ambiguity which otherwise does not exist in the written document, or have the effect of making a new agree-
ment": p. 31 (footnotes omitted). Ultimately, the words of the agreement are paramount.

### Issue 1(a) - Court Approval of the 1997 Variation

72      The appellant's position is that if the interpretation of the 1997 variation is not one that could have been
approved by the court, then it could not have been what the parties intended or the court understood or approved
at that time. The appellant submits that the application judge erred in finding that the approval of the variation
"has no bearing on the issue before the Court in this application". To the contrary, the basis for the court's ap-
proval must form part of the factual matrix.

73      Under s. 2 of the *Variation of Trusts Act*, R.S.O. 1990, c. V.1, the court must be assured that any vari-
ation approved constitutes a benefit for those whose interests it has a duty to protect. It cannot ever have been
intended, argues the appellant, that the interests of the capital beneficiaries would be diminished or defeated en-
tirely. Had that been the intention or considered a reasonable consequence of the proposed variation, it would
not have been approved by the court, nor could the Children's Lawyer have consented to it.

74      The problem with the appellant's submission is that the variation application was brought on a record
that explained how the variation would be beneficial to the capital beneficiaries, primarily by increasing the
value of the capital through investment in equities with growth potential as part of a balanced portfolio. The ex-
pert evidence suggested that, based on past performance, such a portfolio would increase in value in the future.
The Children's Lawyer agreed to the variation on that basis and the court approved it on that basis.

75      The application from which this appeal is brought is not a variation application, nor is it a late appeal
from that application. Rather, it is an application to the court to interpret the Trust Deed as Varied.

76      The appellant's submission is that the approving court would not have found the variation to be for the
benefit of the minor, unborn and unascertained capital beneficiaries had it known that markets would fall and
not continue to perform as they did through the late 1990's. Therefore this court should interpret the words of the
variation in a manner that would allow the trustee to disregard the mandatory provisions of the Trust Deed as
Varied. Instead, the court should read the deed as implicitly giving the trustee a discretion to reduce the pay-
ments to the income beneficiaries in order to preserve the capital of the Trust for the capital beneficiaries, on the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

basis that the even hand principle remains in effect under the Trust Deed as Varied.

77      Stated another way, the appellant submits in para. 47 of its factum that: "if [the application judge's] interpretation of the 1997 Variation is not one that could have been approved by the court, then of necessity, it could not have been what the parties intended or the court understood or approved at that time."

78      The appellant's first argument to support this submission is that the application judge erred by stating that the variation approval and its basis were irrelevant to his interpretation of the Trust Deed as Varied. The appellant says the factual matrix includes the court approval and the record that formed the basis of the approval application and that the application judge was required to consider those factors as part of the factual matrix.

79      I agree with the appellant's submission that the court approval of the 1997 variation and the material that supported it are an important part of the factual matrix that informs the interpretation of the Trust Deed as Varied. And I agree that it would have been an error for the application judge to ignore the court approval of the 1997 variation in his analysis. However, it is clear that that is not what occurred.

80      As the basis for the factual matrix he considered, the application judge relied on the affidavit of Mr. Ruf that was used to support the court approval variation application. The application judge explicated in detail how the variation had to benefit the capital beneficiaries before it could be approved and that the court found, and the material stated, that it did so.

81      What the application judge stated near the end of his reasons is that, on the application before him, the court was not performing an approval function but an interpretation function. In other words, on this application — as distinct from the 1997 variation application — the court was not deciding what was in the best interests of the capital beneficiaries.

82      That said, the application judge also went on to dispute the position of the appellant that the effect of the 1997 variation would necessarily be to "obliterate" the interests of the capital beneficiaries. The value of the Trust did increase for a few years following 1997. Although markets later took a downturn, the appellant's pessimistic forecasts are based on a continuation of that downturn. The application judge observed that a return to previously projected rates of return "would go a long way to maintaining and possibly even increasing the capital". Obviously no one knows the future. However, it was open to the application judge to make this observation based on the evidence in the record before him, including the 2007 projection report.

### Issue 1(b) - CRA Tax Ruling

83      The second aspect of the factual matrix that the appellant says the application judge failed to consider was the CRA tax ruling and related correspondence. In the appellant's submission, the CRA ruling made explicit that the definition of "Net Income" was included to ensure that there would be no disposition of the capital assets of the Trust for the benefit of the income beneficiaries. Moreover, the CRA stated that the purpose of the 1997 variation was to ensure growth of the capital assets for the benefit of the capital beneficiaries and trustee's counsel confirmed in correspondence to the CRA that capital assets would not be diminished as a result of the 1997 variation.

84      Contrary to this submission, it is clear that the application judge considered, as part of the factual matrix, the CRA ruling that was appended to the Ruf affidavit, as important relevant background.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

85      To the extent that the application judge did not consider the correspondence to the CRA and from the tax authorities, I agree with the appellant that this correspondence is helpful in understanding the full factual context of the 1997 variation and I have included some references to it in the statement of facts in these reasons. However, the appellant has not pointed to anything in the ruling or in that correspondence that contradicts or changes the factual matrix as described by the application judge or the basis on which the court approval was obtained in 1998.

86      The appellant also argues that the CRA inserted clause 1(c) and the definition of "Net Income" as cash dividends from the Holding Company into the Trust Deed as Varied to ensure that the trustee would not encroach on capital to the detriment of the capital beneficiaries.

87      I would not accede to this argument. This interpretation is not supported by anything in the correspondence from the CRA. That correspondence was directed to ensuring that cash dividends would be paid from the Holding Company to the Trust. It was the form of those dividends as income to the Trust that would govern their tax treatment, which was the sole concern of the CRA. This is consistent with the "form rule", used in the administration of trusts, which says that for trust accounting purposes, the form of a distribution determines its characterization as income or capital: *Report on the Law of Trusts*, p. 292. In its submission to the CRA dated November 26, 1997, Ernst & Young stated:

> The Deed of Arrangement will also limit income distributions in any one year to the amount of cash dividends the Trust receives from Holding Company in that year, ensuring there will be no encroachment on capital of the Trust on behalf of Income Beneficiaries.

88      The "capital of the Trust" being referred to is the shares of the Holding Company. Their disposal would amount to a capital disposition that would be taxable as such. Clause 1(c) ensures that income distributions will only come from cash dividends paid by the Holding Company, taking the form of income.

### *Other Correspondence that is Part of the Factual Matrix*

89      In my view, the correspondence by the trustee's lawyer and by the income beneficiaries' lawyer with the Children's Lawyer that explained the purpose of the variation and its intended effect and benefits also forms part of the factual matrix. In that correspondence, reference was made to the fact that the variation was to be a percentage trust, a new financial approach to the investment and disbursement of trust funds by trustees that was approved by the Ontario Law Reform Commission in its 1984 *Report on the Law of Trusts*.

90      In *Waters' Law of Trusts in Canada*, the authors explain that a percentage trust allows the trustee to maximize the overall value of the trust assets for the benefit of all beneficiaries. It dispenses with the distinction between income and capital, instead guaranteeing the "income beneficiary" "a regular return of a fixed percentage on the value of the trust property": p.1059. If, in a particular year, the traditional income from investments exceeds the percentage to be paid to the income beneficiaries, the excess "remains part of the trust property". However, "if the income is less, the percentage is made up out of the trust property": p. 1059.

### *Issue 1(c) - Intention of the Settlor*

91      The appellant next submits that the application judge erred in finding the intention of the settlor was irrelevant in interpreting the Trust Deed as Varied. Relying on *Irving, Re* (1975), 11 O.R. (2d) 443 (Ont. H.C.), the appellant argues that before a trust can be varied, one of the issues is whether the variation keeps intact the

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

settlor's basic intention. Here the basic intention of the settlor was to benefit two generations of the Poloniato family through the creation of income and capital beneficiaries. Yet the interpretation of the 1997 variation by the application judge, the appellant argues, permits unlimited capital encroachment, thus possibly destroying any benefit of the Trust for the second generation.

92      In my view, there are three responses to this submission. The first is one already referred to — that this was not an application for a variation, but an application to interpret a Trust Deed as Varied. Therefore, if the varying court approved a variation that did not take the settlor's intent into account, and its meaning is clear, it is not the role of the interpreting court to distort the meaning of the deed as varied.

93      Second, the case law both in Ontario since *Irving, Re*, as well as in other provinces, suggests that the original intention of the settlor need not be considered when the court approves a variation as long as the necessary criteria are met: See *Russ v. British Columbia (Public Trustee)* (1994), 89 B.C.L.R. (2d) 35 (B.C. C.A.); *Teichman v. Teichman Estate* (1996), 134 D.L.R. (4th) 155 (Man. C.A.); *Finnell v. Schumacher Estate* (1990), 74 O.R. (2d) 583 (Ont. C.A.). However, because of my first and third responses to the appellant's submission, it is not necessary in this case to finally decide this issue.

94      The third response is that I do not agree with the appellant's suggestion that the intent and effect of the 1997 variation was to benefit only the income beneficiaries at the expense of the capital beneficiaries. That was clearly not the intent of the approving court, which was obliged to approve the variation only if it was for the benefit of the capital beneficiaries on whose behalf the approval was given. As the application judge was entitled to find, if the economy improves, the value of the trust should also see improvement. Moreover, the capital beneficiaries have had the indirect benefit, referred to by Haley J., of a consistent income flowing to their parents since the date of the variation.

### Issue 1(d) - Inconsistent Findings

95      The appellant contends that the application judge erred in making an inconsistent finding. On the one hand, he found the parties intended that the trustee would have the power to encroach on capital assets of the Trust by selling the assets of the Holding Company. That finding is inconsistent, says the appellant, with his earlier finding, at para. 50 of his reasons, that the purpose of the definition of "Net Income" was to ensure that there would be no encroachment on the capital of the Trust.

96      As discussed above, the premise of this submission is incorrect. This submission has been answered in the section dealing with the factual matrix surrounding the CRA ruling.

### Issue 1(e) - Objective of 1997 Variation

97      In the appellant's view, the application judge erred in failing to take into account an important objective of the 1997 variation: to ensure some growth to the capital beneficiaries. There is no merit in this submission. The application judge did not fail to take this objective into account: see, for example, paras. 37-39 of his reasons. For economic reasons, the trustee has been unable, at least up until the application, to continue to achieve the hoped for growth of the Trust corpus, despite the clear objective of the Trust and of the trustee to do so.

### Issue 1(f) - Interpretation of the Trust Deed as Varied, Read as a Whole

98      In the appellant's submission, the application judge erred in failing to consider whether his interpretation

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

was consistent with the language of the Trust Deed as Varied, when read as a whole. For instance, counsel points to the fact that the 1988 variation gave the trustee an express power of encroachment on capital to a limited amount for the purpose of benefitting capital beneficiaries. It is argued that when the parties intended to permit encroachment on the capital of the Trust, they did so in clear and unequivocal terms.

99      In my view, this submission fails. In his analysis, which is set out in detailed and comprehensive reasons, the application judge takes into account the agreement as a whole. The appellant has provided no suggestion as to how to read the Trust Deed as Varied without giving full effect to the mandatory language to which it objects.

100      The Trust document is internally consistent in providing the mandatory percentage distribution scheme to the income beneficiaries. As already explained, to the extent that satisfaction of the percentage distribution may require using capital assets, this is a function of the balanced investment strategy employed in a percentage trust to achieve overall growth of the trust corpus. It is not an encroachment on capital in the traditional sense, which is a discretionary exercise by a trustee to benefit a specific beneficiary for specific or general needs, over and above that beneficiary's regular entitlement under the trust.

### Issue 2 - Even Hand Rule

101      The appellant submits that the application judge erred in his interpretation of the Trust Deed as Varied by failing to recognize and give effect to the duty of the trustee to maintain an even hand between the interests of the income and capital beneficiaries. The obligation of a trustee to treat different classes of beneficiaries fairly and impartially can only be displaced, contends the appellant, by an express intention to the contrary in the trust deed. In the appellant's submission, the 1997 variation did not displace the duty to maintain an even hand in managing distributions.

102      It is trite law that executors and trustees have a duty to maintain an even hand between the interests of the income and the capital beneficiaries, unless that duty is ousted explicitly or implicitly by the words of the instrument. Justice Middleton described this duty in the following way in *Armstrong, Re* (1924), 55 O.L.R. 639 (Ont. Div. Ct.), at p. 8:

> [I]t must be borne in mind by trustees that they are trustees not for the remaindermen alone in disregard of the rights of the life-tenant, nor for the life-tenant disregarding the interests of the remaindermen. Trustees must preserve an even hand as between these two conflicting interests. The duty towards the capital is to preserve it intact. The duty towards the tenant for life is to obtain as large a yield as is consistent with safety and the observance of the law under the instrument of trust as to the class of investment made; and, furthermore, so to adjust the investments that the life-tenant will receive annually his due proportion.

103      However, in a percentage trust, the trustee's duty is not to obtain a large income yield while preserving the capital but, instead, to increase the size of the entire trust for the benefit of both classes of beneficiaries. This includes increasing the capital rather than preserving it, and therefore involves an investment strategy that may include more risk. Because in a percentage trust the trustee is investing to increase the entire value of the trust to benefit all, the issue is not whether the trustee's even hand duty is ousted in respect of the management of the trust's investments. What is disputed is whether the duty has been ousted in respect of the obligation of the trustee to make distributions to the beneficiaries.

104      The role of the even hand duty in the administration of a percentage trust was addressed in the Law Reform Commission's *Report on the Law of Trusts*. That *Report* recommends that when trustees administer a per-

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

centage trust, they continue to maintain an even hand in the periodic valuation of the trust and when making the distributions. Specifically, the *Report* states at p. 303:

> We therefore recommend that the revised [Trustee] Act should contain a provision to the effect that, where trustees are expressly directed by the trust instrument to hold trust assets "on percentage trusts", they shall value the assets periodically and, instead of any income arising from the assets, pay to the person who would otherwise be the income beneficiary a percentage of that valuation in each year of the valuation period. *In so doing, trustees should be required to maintain an even hand between income and capital beneficiaries.*

> [Emphasis added.][FN1]

105    There is no clear explanation as to what the Commission means when it says that the trustees should maintain an even hand when valuing the assets and making the annual percentage payment to the income beneficiaries. My interpretation is that the Commission contemplates a periodic review and, if necessary, a re-set of the percentage payable to income beneficiaries, based on the value of the trust assets and on the even hand rule.

106    The problem here is that in the Trust Deed as Varied, the percentage payable to the income beneficiaries is based on a fixed formula for determining the "Applicable Percentage" and the amount to be paid can never go below the highest amount previously paid in a year. That is why the trustee continues to be obliged to cause the Holding Company to sell assets, if necessary, to meet the obligation to the income beneficiaries, despite the effect on the Trust corpus.

107    To the extent the Trust Deed as Varied sets forth a minimum annual payment to the income beneficiaries, the even hand duty on the trustee has been ousted, implicitly, by the words and intended operation of the Trust Deed as Varied. The application judge made no error in making that finding.

*Conclusion*

108    The experience of this Trust has reinforced the need for percentage trusts to be drafted with specific safeguard mechanisms in place that will allow the trustee to review and revise the annual percentage payable to the income beneficiaries based on the changing value of the trust to ensure that one set of beneficiaries is not favoured over the other. Commentators on the percentage trust concept have recommended including a "force majeure" clause to protect against unforeseen anomalies: see for example, Anne Werker, "The Percentage Trust — Uniting the Objectives of the Life Tenant and Remainderperson in Total Return Investing by Trustees" (Paper delivered at the Law Society of Upper Canada's 8th Annual Estates and Trusts Summit, November 30, 2005), p. 251.

109    Two options would be to include a clause providing for a periodic reset by the trustee of the percentage payable to income beneficiaries, or an option for the trustee to apply to the court for advice and directions on such a reset.

110    It is also clear that the material provided to the court in support of a variation application seeking to convert a trust into a percentage trust must include not only upside projections but also potential downside projections that take into account a possible future market downturn. This will give the approving court the basis to include the appropriate safeguards that will ensure, to the extent possible, that the variation will in fact continue to be for the benefit of the future capital beneficiaries.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

111      However, there are no such provisions in this Trust Deed as Varied. The trustee is obliged to continue to make the minimum percentage distributions provided by its terms.

**Disposition of the Appeal**

112      For these reasons, I would dismiss the appeal. In the circumstances of this case, I would award full indemnity costs in accordance with their Bills of Costs to each of the parties, payable out of the estate. To the Children's Lawyer, $116,855.13; to the trustee, $145,061.32; to the respondents on the appeal, $122,473.29, all inclusive of disbursements and H.S.T.

**_Janet Simmons J.A._:**

I agree

**_E.A. Cronk J.A._:**

I agree

_Appeal dismissed._

## Appendix

0.1 In this Trust Deed ... the following terms shall have the following meanings:

 . . .

(a) "**Applicable Percentage**" for a calendar year shall mean the average Rate of Return of the trust over the previous three calendar years.

 . . .

(d) "**Net Fair Market Value**" shall mean the fair market value of the trust's assets at the particular time, provided that where the trust owns shares in a private corporation, the fair market value of such shares shall be deemed to be equal to the fair market value of the assets of the corporation less all the corporation's liabilities, including an amount equal to the current tax liabilities of the corporation with respect to unrealized capital gains on its assets, less:

(i) liabilities of the trust;

(ii) an amount equal to the current tax liabilities of the trust with respect to unrealized capital gains on its assets other than shares in a private corporation; and

(iii) the value of any outstanding interest-free loans to Grandchildren;

(e) "**Net Income**" of the trust for a calendar year shall mean the cash dividends received by the trust in the calendar year from 679312 Alberta Limited ... and any income that is earned on the other assets of the trust,

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

net of expenses incurred and taxes paid by the Trustee in the calendar year on account of the income of the trust;

(f) "**Rate of Return**" for a calendar year shall mean the resulting percentage when [sic] the difference determined when

(A) the Fair Market Value of the trust calculated on the first business day of the next calendar year is added to the Yearly Income Distribution and other permissible distributions to beneficiaries in respect of the calendar year, and is reduced by receipts during the calendar year for life insurance proceeds

is then reduced by

(B) the Fair Market Value if the trust calculated on the first business day of the calendar year,

is then divided by

(C) the Fair Market Value of the trust on the first business day of the calendar year;

(g) "**Yearly Income**" for a calendar year shall mean the amount equal to:

. . .

(vi) in 2002, and in each year thereafter, 70% of the Applicable Percentage for the year of the Net Fair Market Value of the trust's assets valued as of the first business day of the calendar year, provided further that the Yearly Income shall not be less than the Yearly Income of the previous calendar year, nor greater than 115% of the Yearly Income of the previous calendar year.

1. The Trustee shall keep invested the Trust Fund until the date of the death of the first of the grandchildren of Primo Poloniato alive at the date of this agreement (hereinafter collectively referred to as the "Grandchildren" and individually as a "Grandchild") to die (hereinafter referred to as the "time of division") and until the time of division, the Trustee shall deal with the Trust Fund as follows:

(a) the Trustee shall pay the Yearly Income to or for the benefit of the Grandchildren in equal shares in each calendar year.... The Trustee shall also from time to time as determined by the Trustee but at least annually pay amounts out of the income of the trust to a Grandchild to compensate him or her for any taxes payable by such Grandchild or withheld by the Trustees from such Grandchild pursuant to the *Income Tax Act* in respect of distributions of the Yearly Income from the trust. The Trustee shall also have the discretion to additionally compensate a Grandchild, who is a non-resident of Canada for purposes of the *Income Tax Act*, for any foreign taxes or similar amounts paid or payable by the Grandchild on account of the receipt by the Grandchild of a distribution hereunder ... Any income of the trust for a calendar year in excess of the Yearly Income ... shall be added to the capital;

. . .

(c) notwithstanding the foregoing subparagraphs of this paragraph 1, the total of all amounts on account of Yearly Income and any additional payments to a Grandchild paid in a year, shall not exceed the Net Income of the trust.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15402, 2012 ONCA 862, 82 E.T.R. (3d) 165, 225 A.C.W.S. (3d) 281, 300 O.A.C. 71, 115 O.R. (3d) 287

5. The Trustee in addition to all other powers available to it by law or otherwise, shall have the following powers, authorities and discretions: ...

(vi) to determine whether any payments made by the Trustee in the due administration of the Trust Fund shall be charged against the capital of the Trust Fund or against the income therefrom or partly against capital and partly against the income and such determination shall be final and binding upon all persons concerned and to manage the investments of the trust, including any distributions from any corporations controlled by the Trustee in order that the Net Income, of any trust hereunder shall be no less than the amount required to be distributed to a Grandchild during a calendar year;

FN* A corrigendum issued by the court on December 14, 2012 has been incorporated herein.

FN1 This recommendation has not been incorporated into the *Trustee Act*, R.S.O. 1990, c. T.23.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 89

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457



2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

Transamerica Life Canada Inc. v. ING Canada Inc.

TRANSAMERICA LIFE CANADA INC. and AEGON CANADA INC. (Plaintiffs/Respondents) and ING
CANADA INC. (Defendant/Appellant)

Ontario Court of Appeal

O'Connor A.C.J.O., Laskin, Sharpe JJ.A.

Heard: June 17, 2003
Judgment: December 3, 2003
Docket: CA C39314

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights re-
served.

Proceedings: reversing in part (2002), 2002 CarswellOnt 4114, 30 B.L.R. (3d) 254 (Ont. S.C.J.)

Counsel: Gerald L.R. Ranking for Appellant

Mary Jane Stitt, Colleen E. Robertshaw for Respondents

Subject: Contracts; Civil Practice and Procedure; Corporate and Commercial

Contracts --- Construction and interpretation — Implied terms — Miscellaneous issues

Parties entered share purchase agreement for all shares of insurance company — Purchaser had access to insur-
ance company's documents, accounting system and other systems for interim period between signing and closing
of agreement — Following closing, purchaser alleged that there were serious problems in accounting system
which should have been disclosed — Purchaser brought action for damages and indemnity arising from vendor's
alleged misrepresentations and breaches of warranties and covenants — Purchaser's motion to strike out para-
graphs of statement of defence referring to implied duties of good faith and fair dealing was granted — Vendor
appealed — Appeal allowed in part — Motion judge erred by striking vendor's plea that purchaser owed vendor
implied duty of good faith during due diligence period — Implication of duty of good faith has not gone so far
as to create new, unbargained-for rights and obligations, nor to alter express terms of agreement — Determining
implication of duty of good faith, and whether it was consistent with parties' intentions and with commercially
reasonable standards of conduct, required detailed analysis best performed by trial judge — Motion judge erred
by striking vendor's plea that agreement should have been construed in accordance with parties' intentions and
expectations — Many of representations and warranties relied upon by purchaser were qualified by requirement
of materiality — Issue of the parties' intentions and expectations was relevant to determination of relevant and
admissible evidence as to materiality — Motion judge erred by striking pleas asserting certain facts — Facts

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

pleaded supported vendor's assertion that purchaser breached implied duty of good faith — Since existence of implied duty was left to trial judge, facts relevant to vendor's plea should not be struck on pleadings motion.

Civil practice and procedure --- Pleadings — Statement of defence — Reasonable defence to be disclosed

Parties entered share purchase agreement for all shares of insurance company — Purchaser had access to insurance company's documents, accounting system and other systems for interim period between signing and closing of agreement — Following closing, purchaser alleged that there were serious problems in accounting system which should have been disclosed — Purchaser brought action for damages and indemnity arising from vendor's alleged misrepresentations and breaches of warranties and covenants — Purchaser's motion to strike out paragraphs of statement of defence referring to implied duties of good faith and fair dealing was granted — Vendor appealed — Appeal allowed in part — Motion judge erred by striking vendor's plea that purchaser owed vendor implied duty of good faith during due diligence period — Implication of duty of good faith has not gone so far as to create new, unbargained-for rights and obligations, nor to alter express terms of agreement — Determining implication of duty of good faith, and whether it was consistent with parties' intentions and with commercially reasonable standards of conduct, required detailed analysis best performed by trial judge — Motion judge erred by striking vendor's plea that agreement should have been construed in accordance with parties' intentions and expectations — Many of representations and warranties relied upon by purchaser were qualified by requirement of materiality — Issue of the parties' intentions and expectations was relevant to determination of relevant and admissible evidence as to materiality — Motion judge erred by striking pleas asserting certain facts — Facts pleaded supported vendor's assertion that purchaser breached implied duty of good faith — Since existence of implied duty was left to trial judge, facts relevant to vendor's plea should not be struck on pleadings motion.

The purchaser corporation bought all shares of an insurance company from the vendor corporation. During the interim period between the signing of the share purchase agreement and the closing, the vendor granted the purchaser access to the insurance company's documents, accounting system and other systems. The vendor addressed issues raised by the purchaser during the due diligence period. The purchaser raised no concerns about the insurance company during the due diligence period or the interim period, and did not seek a price adjustment which was provided for in the agreement. After the agreement closed, the purchaser claimed that the vendor failed to disclose serious issues in the accounting systems. The purchaser brought an action for damages and indemnity arising from the vendor's misrepresentations and breaches of warranties and covenants.

The vendor denied that the problems existed. Alternatively the vendor claimed that the alleged problems were not material, and that no misrepresentation or breach of warranties or covenants were perpetrated. The vendor claimed the purchaser breached implied duties of good faith and fair dealing and was precluded from asserting indemnity claims. The purchaser's motion to strike out paragraphs in the statement of defence referring to implied duties of good faith and fair dealing was granted. The motion judge found that claim by the vendor that the purchaser owed it an implied duty of good faith was not tenable in law. The motion judge found that a duty to bargain in good faith was not recognized in a commercial setting absent a special relationship. The motion judge struck as irrelevant all references to the parties' intentions and to the purchaser's failure to express concerns during the due diligence period. The vendor appealed.

**Held:** The appeal was allowed in part.

Per O'Connor A.C.J.O. (Sharpe J.A. concurring): The motion judge erred by striking the vendor's plea that the purchaser owed the vendor an implied duty of good faith to notify the vendor of problems, and to consult the

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

vendor with regard to remedial actions, before the agreement closed. By advancing a claim for breach of good faith the vendor sought to imply a duty of good faith in the agreement. Courts have proceeded cautiously in recognizing duties of good faith in performance and enforcement contracts. The implication of a duty of good faith has not gone so far as to create new, unbargained-for rights and obligations, nor to alter the express terms of a contract. Given the unsettled state of the applicable law, the vendor's claim should not be struck on a pleadings motion. Determining the implication of the duty of good faith pleaded, and whether it was consistent with the intentions of the parties and with commercially reasonable standards of conduct, required a detailed analysis best performed by the trial judge.

The motion judge erred by striking the vendor's plea that the agreement should have been construed in accordance with the parties' intentions and expectations. Many of the representations and warranties relied upon by the purchaser were qualified by a requirement of materiality. Materiality, which was not defined in the agreement, would become an important issue at trial. The trial judge would be charged with determining relevant and admissible evidence as to materiality. The issue of the parties' intentions and expectations was relevant to this determination, and properly left to the trial judge.

The motion judge erred by striking pleas asserting certain facts. The facts pleaded supported the vendor's assertion that the purchaser breached an implied duty of good faith. Since the existence of such an implied duty was left to the trial judge, facts relevant to the vendor's plea should not be struck on a pleadings motion. Pleadings that the purchaser was wilfully blind to the problems prior to the closing, and the purchaser's failure to seek a price adjustment, went to the issue of materiality, and were improperly struck. The appeal should be allowed, and the order below varied.

Per Laskin J.A. (dissenting): The motion judge correctly determined that it was plain and obvious that the vendor's defence of duty of good faith and fair dealing during the interim period could not succeed. The purchaser owed the vendor a good faith obligation to provide prompt notice of errors at, or after, closing. The vendor sought to use the good faith pleading to add to the contractual obligations that the purchaser had expressly agreed to. The vendor acknowledged that it sought to maintain a pleading of good faith during the interim period, but not during the due diligence period.

The relationship between the parties did not require an implied duty of good faith. The parties were large, powerful corporations, and neither was vulnerable to the bargaining strength of the other. Both parties were represented by legal counsel, and had together negotiated a sophisticated share purchase agreement. The agreement did not include an obligation by the purchaser to disclose any errors discovered during the interim period.

The terms of the agreement precluded implying a duty of good faith. The agreement stipulated that the vendor alone had a disclosure obligation during the interim period. Presuming that the parties agreed not to impose the same obligation on the purchaser, it was not for the court to rewrite the agreement under the rubric of good faith. The parties also specified the contractual obligations which were to be carried out in good faith. An entire agreement clause existed which stated that neither party was to be burdened by an obligation not expressly set out in the agreement, unless agreed to in writing. The parties stopped short of imposing a duty on the purchaser to disclose errors discovered.

None of the conditions required to imply a term in the agreement were met. Even if the presumed intention of the parties could be put forward to satisfy the requirements, the vendor did not assert that an implied term was required to give business efficacy to the agreement, or that one party had clearly assumed the term existed. The

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

implied term pleaded by the vendor was neither obvious nor necessary. The pleaded implied term was inconsistent with the agreement, including the "entire agreement". The vendor's pleading of implied duty of good faith were properly struck. The appeal should be allowed in part.

### Cases considered by *O'Connor A.C.J.O.*:

*Falloncrest Financial Corp. v. Ontario* (1995), *(sub nom. Nash v. Ontario)* 27 O.R. (3d) 1, 1995 CarswellOnt 910 (Ont. C.A.) — considered

*Gateway Realty Ltd. v. Arton Holdings Ltd.* (1992), *(sub nom. Gateway Realty Ltd. v. Arton Holdings Ltd. (No. 3))* 112 N.S.R. (2d) 180, *(sub nom. Gateway Realty Ltd. v. Arton Holdings Ltd. (No. 3))* 307 A.P.R. 180, 1992 CarswellNS 518 (N.S. C.A.) — referred to

*Gateway Realty Ltd. v. Arton Holdings Ltd. (No. 3)* (1991), 106 N.S.R. (2d) 180, 288 A.P.R. 180, 1991 CarswellNS 320 (N.S. T.D.) — considered

*GATX Corp. v. Hawker Siddeley Canada Inc.* (1996), 1 O.T.C. 322, 27 B.L.R. (2d) 251, 1996 CarswellOnt 1434 (Ont. Gen. Div. [Commercial List]) — considered

*Greenberg v. Meffert* (1985), 50 O.R. (2d) 755, 18 D.L.R. (4th) 548, *(sub nom. Greenberg v. Montreal Trust Co.)* 9 O.A.C. 69, 7 C.C.E.L. 152, 37 R.P.R. 74, 1985 CarswellOnt 727 (Ont. C.A.) — considered

*Hunt v. T & N plc* (1990), 4 C.C.L.T. (2d) 1, 43 C.P.C. (2d) 105, 117 N.R. 321, 4 C.O.H.S.C. 173 (headnote only), *(sub nom. Hunt v. Carey Canada Inc.)* [1990] 6 W.W.R. 385, 49 B.C.L.R. (2d) 273, *(sub nom. Hunt v. Carey Canada Inc.)* 74 D.L.R. (4th) 321, [1990] 2 S.C.R. 959, 1990 CarswellBC 759, 1990 CarswellBC 216 (S.C.C.) — followed

*LeMesurier v. Andrus* (1986), 38 R.P.R. 183, 54 O.R. (2d) 1, 25 D.L.R. (4th) 424, 12 O.A.C. 299, 1986 CarswellOnt 670 (Ont. C.A.) — referred to

*MacDonald v. Ontario Hydro* (1994), 19 O.R. (3d) 529, 6 C.C.P.B. 305, C.E.B. & P.G.R. 8196, 38 C.P.C. (3d) 378, 1994 CarswellOnt 1073 (Ont. Gen. Div.) — followed

*Marshall v. Bernard Place Corp.* (2002), 2002 CarswellOnt 404, 47 R.P.R. (3d) 1, 58 O.R. (3d) 97, 156 O.A.C. 377, 26 B.L.R. (3d) 9 (Ont. C.A.) — referred to

*MDS Health Group Ltd. v. King Street Medical Arts Centre Ltd.* (1994), 12 B.L.R. (2d) 209, 55 C.P.R. (3d) 360, 1994 CarswellOnt 229 (Ont. Gen. Div. [Commercial List]) — referred to

*Peel Condominium Corp. No. 505 v. Cam-Valley Homes Ltd.* (2001), 2001 CarswellOnt 579, *(sub nom. Peel Condominium Corp. v. Cam-Valley Homes Ltd.)* 196 D.L.R. (4th) 621, 53 O.R. (3d) 1, 7 C.L.R. (3d) 184, 142 O.A.C. 251, 41 R.P.R. (3d) 231, 14 B.L.R. (3d) 169 (Ont. C.A.) — referred to

*978011 Ontario Ltd. v. Cornell Engineering Co.* (2001), 2001 CarswellOnt 1290, 8 C.C.E.L. (3d) 169, 12 B.L.R. (3d) 240, 198 D.L.R. (4th) 615, 144 O.A.C. 262, 53 O.R. (3d) 783 (Ont. C.A.) — referred to

*978011 Ontario Ltd. v. Cornell Engineering Co.* (2001), 2001 CarswellOnt 3809, 2001 CarswellOnt 3810, 284 N.R. 199 (note), 158 O.A.C. 195 (note) (S.C.C.) — referred to

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

**Cases considered by** *Laskin J.A.***:**

*M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.* (1999), 170 D.L.R. (4th) 577, 237 N.R. 334, 44 C.L.R. (2d) 163, 232 A.R. 360, 195 W.A.C. 360, 1999 CarswellAlta 301, 1999 CarswellAlta 302, [1999] 1 S.C.R. 619, [1999] 7 W.W.R. 681, 69 Alta. L.R. (3d) 341, 3 M.P.L.R. (3d) 165, 49 B.L.R. (2d) 1, 15 Const. L.J. 455, 2 T.C.L.R. 235 (S.C.C.) — considered

*Shelanu Inc. v. Print Three Franchising Corp.* (2003), 64 O.R. (3d) 533, 2003 CarswellOnt 2038, 226 D.L.R. (4th) 577, 172 O.A.C. 78 (Ont. C.A.) — referred to

*978011 Ontario Ltd. v. Cornell Engineering Co.* (2001), 2001 CarswellOnt 1290, 8 C.C.E.L. (3d) 169, 12 B.L.R. (3d) 240, 198 D.L.R. (4th) 615, 144 O.A.C. 262, 53 O.R. (3d) 783 (Ont. C.A.) — referred to

**Rules considered by** *O'Connor A.C.J.O.***:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194

R. 21 — referred to

R. 21.01 — considered

R. 21.01(1) — considered

R. 21.01(1)(b) — considered

R. 25 — referred to

R. 25.11 — considered

**Rules considered by** *Laskin J.A.***:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194

R. 21 — referred to

APPEAL by vendor from judgment reported at (2002), 2002 CarswellOnt 4114, 30 B.L.R. (3d) 254 (Ont. S.C.J.), striking pleadings from vendor's statement of defence.

***O'Connor A.C.J.O.:***

1        The defendant, ING Canada Inc., ("ING") appeals from a decision of Macdonald J. (the motion judge) dated November 27, 2002 granting a motion pursuant to Rule 21 of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194 to strike certain portions of ING's amended statement of defence.

2        The action involves a claim by Transamerica Life Canada Inc. and Aegon Canada Inc. (collectively "Transamerica") to recover substantial damages for misrepresentation and breach of warranties and covenants contained in a share purchase agreement (the "agreement") pursuant to which Transamerica purchased all of the shares of NN Life Insurance Company of Canada ("NN Life") from ING. Transamerica's complaints relate to alleged problems with the business, operations and systems of NN Life and to NN Life's failure to administer in-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

surance policies and investment products in accordance with the policies' terms. Transamerica claims indemnity for the amounts required to rectify the problems and to compensate policy and unit holders who suffered prejudice as a result of the problems.

3     ING denies that the problems existed and alternatively pleads that if such problems did exist, they were not material and that therefore there was no misrepresentation or breach of any warranty or covenant. In the further alternative, ING pleads that Transamerica breached certain implied duties of good faith and fair dealing ("duties of good faith") and is, therefore, precluded from asserting its indemnity claims.

4     The portions of the amended statement of defence that were struck can be divided into three categories.

5     First, the motion judge struck pleas alleging that Transamerica had implied duties of good faith requiring it to notify ING before closing if it became aware of the problems that it alleges in its claim and to consult with ING about the remedial actions it took after closing. I have concluded that the motion judge erred in striking those pleas.

6     In addition, the motion judge struck a plea that the agreement should be construed in accordance with the intentions and expectations of the parties. In my view, the motion judge also erred in striking that plea. The intentions and expectations of the parties may be relevant to the interpretation of some provisions in the agreement, including the determination of whether the representations and warranties in issue should be considered "material", as per the agreement.

7     Finally, the motion judge struck pleas of certain factual matters. ING alleges that, before the closing of the sale of NN Life, Transamerica knew of, or was wilfully blind to, the problems upon which it now relies and it failed to disclose its knowledge of these problems to ING. ING also pleads that after the closing, Transamerica did not consult with or involve ING in its remedial actions. In my view, the motion judge erred in striking the factual pleas from the amended statement of defence. The facts alleged may be relevant to both the pleas that Transamerica owed duties of good faith to ING and to other defences raised by ING in its amended statement of defence.

## THE FACTS

8     The following outline of facts is based on the pleadings and the agreement which is referred to extensively in the pleadings.

### (a) The transaction

9     In the fall of 1999, ING put NN Life up for sale. Transamerica, a sophisticated and experienced life insurance company, investigated the possible acquisition of NN Life. Transamerica had the expertise to thoroughly examine the business and operations of NN Life.

10     Commencing in the fall of 1999, Transamerica performed due diligence on all aspects of the business and operations of NN Life. During the course of the due diligence, Transamerica reviewed, or had the opportunity to review, hundreds of documents and had access to the accounting and other systems of NN Life.

11     During the due diligence, Transamerica raised a number of issues that ING considered and addressed. Transamerica and ING entered into the agreement by which Transamerica acquired all of the issued and outstanding shares of NN Life. The parties signed the agreement on January 7, 2000 and the sale closed on April

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

12, 2000. It was agreed that information would be exchanged during the period from January 7, 2000 to April 12, 2000 (the "interim period").

12      During the interim period, ING granted Transamerica wide-ranging access to NN Life, its properties, its books, and its records. Transamerica was also involved in the operation of NN Life. In particular, the agreement provided that during the interim period:

> a) all material operating decisions in relation to the operation of NN Life were to be made by ING and Transamerica acting jointly;

> b) any profit or loss realized by NN Life after January 1, 2000 was to be for the account of Transamerica;

> c) ING and Transamerica were obliged to use all commercially reasonable and diligent efforts to maintain the value and goodwill of NN Life;

> d) the parties were to agree to a final purchase price; and

> e) ING was obligated to co-operate with Transamerica in arranging meetings and communications with NN Life's agents and distributors with a view to assisting Transamerica to maintain NN Life's goodwill.

13      Throughout the interim period, Transamerica attended the offices of NN Life, met with NN Life employees, questioned them as to practices and procedures of NN Life, and gained a hands-on appreciation for all aspects of the business, operations, and systems of the company. ING co-operated in providing access to the operations of NN Life and in disclosing information.

14      At no time during the due diligence period or the interim period did Transamerica raise concerns about the business, operations, or systems of NN Life which went unaddressed by ING. Nor did Transamerica seek an adjustment of the final price based on the problems it raises in its statement of claim.

### (b) Statement of claim

15      In its statement of claim, Transamerica claims contractual damages and indemnity from ING for ING's misrepresentations and breaches of warranties and covenants in the agreement. The damages and the resulting indemnity claims arise primarily out of errors and deficiencies in: a) the investment management and accounting systems used by NN Life to perform its investment accounting and valuation functions for the NN Life's family of segregated funds (the "PAM System") and b) a second accounting system used by NN Life to record policy holder transactions ("CAPS-I-L System"). ING also alleges that NN Life failed to administer its insurance policies in accordance with the policies' terms, failed to file required tax returns, and failed to disclose certain liabilities in the financial statements and records of NN Life.

16      Transamerica alleges that the errors and deficiencies existed in both accounting systems prior to closing, with the result that virtually all of the segregated funds held by NN Life policy holders were incorrectly priced both before and after the closing. It also alleges that NN Life's failure to administer policies in accordance with the policies' terms created substantial contingent liabilities to NN Life policy holders.

17      Transamerica pleads that the circumstances described in the statement of claim constitute several misrep-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

resentations and breaches of warranties and covenants made by ING in the agreement, relating to matters such as the accuracy of the books, records, and financial statements of NN Life and the absence of undisclosed liabilities, changes, and unusual transactions. Many of the alleged misrepresentations and breached warranties and covenants are qualified by a requirement of materiality.

18      In the agreement, ING agreed to indemnify Transamerica on an after-tax basis from any loss suffered as a result of any misrepresentation or breach of warranty made by ING in any closing document. On closing, ING represented in writing that all of the representations and warranties in the agreement were true in all material respects. Subsequent to the closing Transamerica merged NN Life's business with its own.

19      Transamerica pleads that it suffered substantial damages as a result of ING's misrepresentations and breached warranties and covenants, and that it is entitled to be indemnified for those damages. Transamerica includes in its damage claim certain payments it made to unit and policyholders which it alleges were necessary because of the errors and deficiencies in NN Life's systems.

### (c) The amended statement of defence

20      In its amended statement of defence, ING denies that the errors or deficiencies in NN Life's accounting systems or its books and records existed at the closing date. Alternatively, ING pleads that if such errors did exist, they were not material and did not constitute a misrepresentation or a breach of any warranty in the agreement giving rise to a loss for which ING is contractually liable to indemnify Transamerica.

21      As a further alternative, ING pleads that Transamerica had the opportunity to conduct due diligence during the period prior to the execution of the agreement and to investigate and review all aspects of the business and operations of NN Life. Following the signing of the agreement, Transamerica continued its review of NN Life during the interim period.

22      ING pleads that during the due diligence period and the interim period, Transamerica was aware of or was wilfully blind to the errors now alleged in the statement of claim and that it did not reveal to ING information within its knowledge with respect to the alleged errors. Transamerica first raised the concerns now alleged in the statement of claim sixteen months after closing.

23      ING further alleges that Transamerica failed to consult with ING on the appropriate remedial steps for the alleged errors and, in particular, did not consult ING before making gratuitous payments to certain unit holders in an attempt to address the errors.

24      ING pleads that Transamerica's failures, set out in the previous two paragraphs, preclude Transamerica from relying upon the errors referred to in the statement of claim as a basis for indemnity for two reasons.

25      First, relying upon the combined effect of clauses 5.9 and 5.10 of the agreement, ING pleads that Transamerica had an obligation to give timely notice of its indemnity claim. Transamerica's failure to do so materially prejudiced and caused damage to ING. ING pleads that as a result Transamerica is disentitled to the relief claimed.

26      ING also pleads that Transamerica's failure to disclose the errors before closing and failure to consult with ING about remedial steps after closing, breached implied duties of good faith, thereby disentitling Transamerica to rely on those matters in support of its claim.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

27      In addition, ING pleads that the agreement and, in particular, the representations and warranties contained therein, must be construed in accordance with the intentions and expectations of the parties.

## THE DECISION BELOW

28      Transamerica moved to strike the amended statement of defence under Rules 21 and 25 of the Rules of Civil Procedure, *supra*. The motion judge made an order striking portions of the defence under rule 21.01. Although it is not entirely clear from the reasons, it appears that the motion judge made the order under paragraph (b) of rule 21.01 on the basis that the portions struck did not disclose a reasonable defence.

29      In all, the motion judge struck all or a portion of thirteen paragraphs in the amended statement of defence. The portions that were struck fall into four categories: reliance by ING on implied duties of good faith, references in the pleading to the parties intentions and expectations, pleas of the factual matters referred to in paragraphs 22 and 23 above, and pleas suggesting that Transamerica owed ING a duty of care during the interim period (these were struck from paragraphs 20 and 27 of the amended statement of defence and are not in issue in this appeal).

30      The motion judge concluded that ING's pleas that Transamerica owed it implied duties of good faith were not tenable at law. She held that a duty to bargain in good faith is not recognized in Canada in commercial settings like that found in the present case and that absent a "special relationship" the parties' obligations are governed solely by the express terms of the agreement.

31      The motion judge concluded that the implication of a duty of good faith would have the effect of adding to the obligations contained in the agreement. She attached importance to the "Entire Agreement" and the "No Rights In Addition" clauses in the agreement, respectively clauses 1.5 and 5.15.

32      The motion judge also struck several references to the parties' intentions and expectations on the basis that parol evidence of this nature would not be admissible to construe the agreement. She said that there is no suggestion of ambiguity in the terms of the agreement, that the agreement is clear, and that its provisions are "not reasonably susceptible of more than one meaning." The motion judge concluded that the pleas regarding the intentions and expectations of the parties are not sustainable in law.

33      Finally, the motion judge held that factual references to the failure of Transamerica to express concerns about the accounting systems of NN Life during the due diligence period are irrelevant and should be struck.

## ISSUES

34      ING submits that the motion judge erred in striking:

a) the pleas referring to implied duties of good faith;

b) references to the parties' intentions and expectations; and

c) the factual pleas referred to in paragraphs 22 and 23 above.

## ANALYSIS

### (a) Motions under rule 21.01

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

35     The relevant parts of rule 21.01 read as follows:

> 21.01(1) A party may move before a judge,
>
>> (a) for the determination, before trial, of a question of law raised by a pleading in an action where the determination of the question may dispose of all or part of the action, substantially shorten the trial or result in a substantial saving of costs; or
>>
>> (b) to strike out a pleading on the ground that it discloses no reasonable cause of action or defence.
>>  . . .

36     The test on a motion to strike a pleading is well-settled. When the motion is brought under rule 21.01(1)(b), the essential question is whether it is plain and obvious that the pleadings disclose no reasonable cause of action or defence: *Hunt v. T & N plc*, [1990] 2 S.C.R. 959 (S.C.C.).

37     The "plain and obvious" test is also applicable to motions brought under rule 21.01(1)(a): *MacDonald v. Ontario Hydro* (1994), 19 O.R. (3d) 529 (Ont. Gen. Div.).

38     On a motion to strike a pleading, the court must take the facts alleged in the challenged pleading as true unless they are patently ridiculous or incapable of proof. The court should read the pleading generously, making allowances for drafting deficiencies: *Hunt*, *supra*; *Falloncrest Financial Corp. v. Ontario* (1995), 27 O.R. (3d) 1 (Ont. C.A.) at 6.

39     On a pleadings motion, a court should not dispose of matters of law that are not settled in the jurisprudence. Where the law in a particular area can be described as "muddy", the court will not strike that part of the pleading, nor hold that the claim or defence must fail: *Falloncrest Financial Corp.*, *supra*.

40     ING concedes that the motion judge correctly articulated the law regarding motions to strike pleadings. It argues, however, that she erred in the manner in which she applied the law to those portions of the amended statement of defence discussed in the next three sections of these reasons.

### (b) Issue # 1: The Duty of Good Faith

41     ING argues that the motion judge erred in concluding that its pleas regarding Transamerica's implied duties of good faith are not tenable at law.

42     The primary duty of good faith pleaded by ING is found in paragraphs 10(b), 11, 17, and 18 of the amended statement of defence. ING pleads that Transamerica had a duty to disclose facts which came to its attention during the due diligence and interim periods that might adversely affect or prejudice ING's position. In oral argument, counsel for ING narrowed this pleas to a duty to disclose only during the Interim Period.

43     ING pleads that, before closing, Transamerica knew of, or was wilfully blind to, the facts that it now alleges constitute misrepresentations and breached warranties. Despite this knowledge, it closed the purchase without seeking a final price adjustment as it could have done under clauses 2.4 and 2.5 of the agreement.

44     ING argues that Transamerica should not now be permitted to recover damages for matters that could have given rise to a price adjustment, thereby by-passing the price adjustment scheme set in the agreement.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

Hence, the court should imply into the agreement a duty of good faith which required Transamerica to disclose the complaints on which it now relies, prior to closing so as to prevent Transamerica from defeating one of the objectives of the agreement.

45      ING points out that obligations of good faith in the performance and enforcement of contracts have been recognized in a number of cases in Canada, including *GATX Corp. v. Hawker Siddeley Canada Inc. (1996), 27 B.L.R. (2d) 251* (Ont. Gen. Div. [Commercial List]); *Greenberg v. Meffert (1985), 50 O.R. (2d) 755* (Ont. C.A.); *LeMesurier v. Andrus (1986), 54 O.R. (2d) 1* (Ont. C.A.); *MDS Health Group Ltd. v. King Street Medical Arts Centre Ltd. (1994), 12 B.L.R. (2d) 209* (Ont. Gen. Div. [Commercial List]); *Gateway Realty Ltd. v. Arton Holdings Ltd. (No. 3) (1991), 106 N.S.R. (2d) 180* (N.S. T.D.)), aff'd *(1992), 112 N.S.R. (2d) 180* (N.S. C.A.). ING submits that the existence of a doctrine of implied duties of good faith is settled and that the only uncertainty concerns the ambit of the principles that apply to the duty. That being the case, ING says the jurisprudence is at a minimum "muddy" and as a result, the pleas in the amended statement of defence that rely on a duty of good faith should not have been struck on a pleadings motion.

46      In response, Transamerica says that under the law of Ontario there is no generalized overarching duty of good faith to be implied into all contracts. Rather, Transamerica submits that the requirement to exercise contractual rights of good faith is recognized only in certain categories of relationships, none of which apply here. Those categories of relationships are found in agreements relating to employment and franchises, agreements containing rights of first refusal, agreements that empower a party to act in its "sole discretion" and to use its "best efforts", and in contractual arrangements where there is a power imbalance or a disparity of information between the parties, such as insurance or condominium purchase transactions: *Peel Condominium Corp. No. 505 v. Cam-Valley Homes Ltd. (2001), 53 O.R. (3d) 1* (Ont. C.A.) at 30-34; *978011 Ontario Ltd. v. Cornell Engineering Co. (2001), 53 O.R. (3d) 783* (Ont. C.A.) at 793-795, leave to appeal to S.C.C. refused, (S.C.C.); *Marshall v. Bernard Place Corp. (2002), 58 O.R. (3d) 97* (Ont. C.A.) at 101. Thus, Transamerica says that the motion judge correctly struck references to a duty of good faith in the amended statement of defence.

47      Transamerica also argues the Canadian courts have not recognized a stand-alone duty of good faith that is independent from the expressed terms in a contract. The duty that ING pleads is not a duty that applies to the performance or the enforcement of the agreement. Rather, it is a duty that is in addition to the specific terms of the agreement and a duty that conflicts with the "Entire Agreement" and the "No Rights In Addition" clauses in the agreement.

48      Transamerica submits that the jurisprudence is settled and that the motion judge properly found that the duty of good faith pleaded is not tenable at law.

49      In my view, the motion judge erred in striking the pleas set out in paragraphs 10(b), 11, 17, and 18 of the amended statement of defence.

50      The comments that follow are intended to apply only to the implication of duties of good faith into commercial contracts, and not to contracts involving other areas of the law.

51      It is fair to say that Canadian courts have proceeded cautiously in recognizing duties of good faith in the performance and enforcement of contracts. Interestingly, when Canadian courts have referred to duties of good faith, they have done so in circumstances where the result of the case has been determined by the application of other, more established, legal principles. In a helpful article, Professor John McCamus describes the somewhat tenuous judicial underpinnings of the doctrine of good faith duties in Canadian jurisprudence and the cautious

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

approach adopted by Canadian courts to the implication of duties of good faith as a separate doctrine in contract law. See John D. McCamus, "The Duty of Good Faith Contractual Performance at Common Law" (Paper presented to the N.J.I.: Civil Law Seminar, Contract Law: From Form to Remedies, Osgoode Hall Law School, 17 May 2000) [unpublished].

52    Unlike the situation in the United States where the duty of good faith in the performance of enforcement of commercial contracts has been broadly recognized, Canadian courts have not developed a comprehensive and principled approach to the implication of duties of good faith in commercial contracts. As Professor McCamus points out, many questions about the nature and scope of such duties have yet to be resolved. Indeed, it remains an open question whether implied duties of good faith add anything to the other available common law doctrines that apply to contracts.

53    I agree with Transamerica that Canadian courts have not recognized a stand-alone duty of good faith that is independent from the terms expressed in a contract or from the objectives that emerge from those provisions. The implication of a duty of good faith has not gone so far as to create new, unbargained-for, rights and obligations. Nor has it been used to alter the express terms of the contract reached by the parties. Rather, courts have implied a duty of good faith with a view to securing the performance and enforcement of the contract made by the parties, or as it is sometimes put, to ensure that parties do not act in a way that eviscerates or defeats the objectives of the agreement that they have entered into: see *GATX, supra; Greenberg, supra; Gateway Realty, supra*.

54    That said, it must be kept in mind that this issue comes before the court on a pleadings motion. As such, the facts pleaded must be taken as established and a decision to strike the pleading must only be made when the applicable law is settled in the jurisprudence.

55    The duty of good faith pleaded by ING in paragraphs 10(b), 11, 17, and 18 asserts that Transamerica had a duty to disclose facts, which it learned before closing, that might adversely affect or prejudice ING. ING's position is that it is necessary to imply such a duty in order to prevent Transamerica from ignoring the price adjustment procedure set out in the agreement, opting instead to recover the damages claimed in this action. Accepting the facts as pleaded, it is at least arguable that if Transamerica is permitted to recover the damages now claimed, one of the objectives of the agreement — namely that the parties would use the price adjustment mechanism in the agreement to address claims of the kind now asserted — would be defeated. Such a duty, if implied, would not be independent of or unconnected to the bargained for agreement but rather would be directed at preventing Transamerica from defeating one of the objectives of its agreement with ING.

56    I hasten to add that as a matter of law the implication of the duty of good faith pleaded in paragraphs 10(b), 11, 17, and 18, is far from certain. Transamerica makes several arguments that point away from the implication of such a duty, not the least of which is the inclusion by the parties of the "Entire Agreement" and the "No Additional Rights" clauses in the agreement. Those clauses may well prove to be a complete answer to ING's plea that a court should imply a duty of good faith into the agreement. However, I am not persuaded that, in this case, the pleading stage is the appropriate stage in which to finally determine that the duty of good faith pleaded is unavailable. Two matters lead me to conclude that the resolution of this issue should await the trial.

57    First, ING has pleaded that the duty of good faith alleged is consistent with the intentions and expectations of the parties and with commercially reasonable standards of conduct. Not surprisingly, Transamerica argues that evidence regarding these matters is inadmissible and should play no role in either construing or inter-

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

preting the provisions of the agreement or in determining whether the agreement should include terms other than those expressly set out by the parties. However, given the complex and sophisticated nature of the agreement and the extensive dealings between the parties before the closing of the transaction, the issue of the admissibility of this type of evidence is better left to the trial. At the pleadings stage, it is premature to determine what evidence may or may not be admissible at trial and, if admissible, for what purpose. If evidence relating to the intentions and expectations of the parties and the commercially reasonable practices were to be admitted, it could have a bearing on a court's decision whether to imply the duty of good faith as pleaded in paragraphs 10(b), 11, 17, and 18 of the amended statement of defence.

58    Second, striking the duty of good faith pleaded in paragraphs 10(b), 11, 17, and 18 at this point would require, at a minimum, a very detailed review of the agreement and the objectives of its contractual scheme. It would also require analysis as to how those objectives may be affected by the duty of good faith that ING seeks to have implied into the agreement. I recognize that the agreement was referred to in the pleadings and that a court can, therefore, have regard to its terms on a pleadings motion. However, it is my view that, in this case, the detailed analysis required to finally determine the issue of whether to imply a good faith duty is better left for a trial.

59     Accordingly, I am of the view that the motion judge should not have struck the pleas of a duty of good faith in paragraphs 10(b), 11, 17, and 18 of the amended statement of defence.

60    The second duty of good faith pleaded by ING is found in paragraph 29 of the amended statement of defence, which reads as follows:

> 29. Further, if errors or deficiencies existed as at or after the date of Closing, which is denied, Transamerica owed ING a duty of good faith and fair dealing under the Share Purchase Agreement, to give ING due and prompt notice of the alleged errors, and to consult ING on appropriate remedial steps. . . .

61    Although not entirely clear, it appears that the duty pleaded in paragraph 29 is tied to the performance of the agreement. Under clause 5.9 of the agreement, the party making a claim for indemnity for misrepresentation or breach of any warranty or covenant is required to give written notice no later than thirty days after the party becomes aware of the claim. The party receiving notice is given thirty days in which to respond.

62    Under clause 5.10, failure to give timely notice does not affect the party's right to indemnity unless, *inter alia*, the party entitled to notice was "materially prejudiced or damaged as a result of such failure."

63    The plea of duty of good faith in paragraph 29 may relate to the performance of clauses 5.9 and 5.10 and as such should not be struck in a pleadings motion.

64     Finally, in paragraph 10(a) of the amended statement of defence, ING pleads a general duty that Transamerica would act fairly in all its dealings with ING throughout the interim period and beyond. The amended statement of defence gives no specifics about what is entailed in the general duty referred to in paragraph 10(a). The plea is vague and is not tied to the performance or enforcement of the provisions in the agreement. Nor is it linked to any alleged actions by Transamerica that would defeat any of the contractual objectives. Indeed, ING does not allege a breach of the general duty of good faith in paragraph 10(a). In my view, the motion judge properly struck that plea.

*(c) Issue #2: Intentions and Expectations*

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

65      ING alleges that the motion judge erred in striking references in the amended statement of defence to the intentions and expectations of the parties. The first reference is in paragraph 9 which reads as follows:

> Furthermore, the Share Purchase Agreement, and the representations and warranties contained therein, must be construed in accordance with the intentions and expectations of the parties that were understood and shared by ING and Transamerica at the time the Share Purchase Agreement was executed.

66      In my view, the motion judge erred in striking paragraph 9. Many of the representations and warranties relied upon by Transamerica in asserting its claim were qualified by a requirement for materiality. The issue of what is material and what is not will likely be an important issue at trial.

67      Materiality is not defined in the agreement. It will be for the trial judge to determine what evidence, if any, is relevant and admissible in order to determine what is material. The question of whether the intentions and expectations of the parties are relevant to this determination is properly left to the trial judge and should not be determined on a pleadings motion.

68      In addition, it may be necessary for the trial judge to determine whether the failure to give notice under clause 5.9 "materially prejudiced or damaged" ING within the meaning of clause 5.10. Again, in determining this issue, the trial judge may consider it appropriate to look to the intentions and expectations of the parties.

69      In paragraphs 10(b), 11, and 17 of the amended statement of defence, ING refers to the intentions and expectations of the parties in support of its pleas that there should be an implied duty of good faith in the performance of the agreement. Given my conclusion that some of the pleas of duties of good faith should be permitted to stand, I do not consider that the references to the parties' intentions and expectations in paragraphs 10(b), 11, and 17 should have been struck.

70      Finally, there is a reference to the intentions and expectations of the parties in paragraph 13 of the amended statement of defence relating to the establishment of a steering committee during the interim period. The creation of the steering committee is part of the narrative or background that gives context to the events at issue. The reference to the intentions and expectations of the parties is innocuous and I see no reason to strike this reference.

### (d) Issue #3: Factual Pleas

71      ING argues that the motion judge erred in striking a number of pleas asserting facts. Under rule 25.11, a court may strike pleas of facts that are clearly not relevant to the issues raised in the pleadings. Rule 25.11 reads as follows:

> The court may strike out or expunge all or part of a pleading or other document, with or without leave to amend, on the ground that the pleading or other document,
>
> (a) may prejudice or delay the fair trial of the action;
>
> (b) is scandalous, frivolous or vexatious; or
>
> (c) is an abuse of the process of the court.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

72      The impugned facts are asserted in a support of a plea that Transamerica breached an implied duty of good faith. Since I conclude that it is open to ING to plead the duty of good faith, the facts relevant to that plea should not be struck.

73      The first factual plea struck by the motion judge is found in paragraph 17 of the amended statement of defence. In that paragraph, ING pleads as a fact that Transamerica was aware of or was wilfully blind to the errors now relied on and that it did not reveal the existence of such errors to ING before closing.

74      The impugned facts in paragraph 17 may also be relevant to the plea that the errors alleged by Transamerica were not material and, therefore, did not amount to a breach of representation or warranty. ING may argue that Transamerica's knowledge of the errors before closing and failure to seek a price adjustment are evidence that Transamerica considered such errors to be immaterial.

75      In addition, the facts pleaded in paragraph 17 may be relevant to ING's plea that Transamerica breached the obligation to give timely notice of its claim under clause 5.9 of the agreement and that such failures materially prejudiced and caused damage to ING within clause 5.10.

76      Transamerica argues that the reference to wilful blindness in paragraph 17 was properly struck because it suggests that Transamerica owed ING a duty of care, prior to closing, to discover the problems now relied upon; a duty which ING says is not tenable since it did not appear in the agreement. I do not accept this argument.

77      The reference to wilful blindness is a factual plea, nothing more. It is a plea that Transamerica had constructive knowledge of the problems before closing. It is not a plea that Transamerica owed a duty of care to ING to discover those problems. It is premature at the pleading stage to determine what significance, if any, a finding that Transamerica was wilfully blind during the due diligence or interim periods may have on the issues raised by the amended statement of defence.

78      For the same reasons that apply to the facts asserted in paragraph 17 of the amended statement of defence, I am satisfied that the factual allegations contained in paragraphs 24 and 25 — that Transamerica did not express concerns about the PAM or the CAPS-I-L systems until 16 months after closing — should not have been struck.

79      The motion judge also struck a factual allegation in paragraph 30 of the amended statement of defence. In that paragraph, ING pleads that Transamerica did not consult ING before making certain gratuitous payments to unit holders, thereby incurring unnecessary losses. Those facts may be relevant to the plea of the duty of good faith found in paragraph 29 of the amended statement of defence.

80      In addition, the factual assertion that Transamerica failed to consult may be relevant to ING's plea that Transamerica failed to mitigate its damages. Accordingly, the factual assertion in paragraph 30 should not have been struck.

## DISPOSITION

81      ING did not argue that the motion judge erred in striking the portions of paragraphs 20 and 27 or the amended statement of defence, which are referred to in subparagraphs 1(g) and 1(j) of her order.

82      In summary, I would allow the appeal and vary the order of the court below by deleting all of the sub-paragraphs of paragraph 1 of that order other than:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

• Subparagraph 1(b) as it relates to paragraph 10(a) of the statement of defence

• Subparagraph 1(g)

• Subparagraph 1(j)

83      As ING has been largely successful on the appeal I would direct Transamerica pay to ING its costs of this appeal and the costs of the motion below on a partial indemnity scale. I would fix the costs of this appeal in the amount of $15,000 inclusive of G.S.T. and disbursements.

**Sharpe J.A.**:

I agree.

**Laskin J.A. (Dissenting in part)**:

84      I have had the benefit of reading the draft reasons of O'Connor A.C.J.O. I agree with him that the following parts of ING's amended statement of defence should be permitted to stand:

      i) ING's pleading about the parties' intentions and expectations in paragraphs 9 and 13. As O'Connor A.C.J.O. said, this pleading may bear on the meaning of materiality;

      ii) ING's plea of "wilful blindness" in paragraph 17 and its "factual pleas" in paragraphs 24, 25 and 30;

      iii) ING's pleading in paragraph 29.

85      I take a different view, however, on the main issue in this appeal: whether ING should be permitted to maintain its pleading that Transamerica owed it an implied duty of good faith and fair dealing during the Interim Period. In my opinion, the motions judge correctly concluded it was "plain and obvious" that this defence could not succeed.

86      The way that ING seeks to use its pleading of an implied duty of good faith is critical for me. Had ING meant only that Transamerica was obliged to carry out its contractual obligations in good faith, on the plain and obvious test I would have allowed its pleading to stand. This is why, like O'Connor A.C.J.O., I would not strike ING's pleading in paragraph 29 that Transamerica owed a good faith obligation to give prompt notice of any errors at or after closing.

87      Although I doubt paragraph 29 has much merit or adds anything to ING's defence in the light of other provisions in the agreement (which I will discuss), I would not strike it on a pleadings motion. I would not do so because in a variety of settings, this court and other courts have used the doctrine of good faith to police the bargain the parties have already made and to supervise performance of their contractual obligations. Even where good faith is not pleaded, in many contexts courts have held that one contracting party owes the other an implied duty to carry out its obligations or to exercise any discretion given by the contract in good faith. See for example *978011 Ontario Ltd. v. Cornell Engineering Co.* (2001), 53 O.R. (3d) 783 (Ont. C.A.). The pleading of good faith in paragraph 29 relates to the performance of Transamerica's timely notice obligation under Articles 5.9 and 5.10 of the share purchase agreement. It is therefore supportable.

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

88    But ING also seeks to use good faith for an entirely difference purpose and it is this other purpose I find objectionable. ING asserts an implied duty of good faith not just to police performance of an existing obligation but also to add a substantive term to the parties' express bargain. It seeks to use good faith to add to the contractual obligations expressly agreed to by Transamerica. This can be seen most clearly by ING's pleading in paragraphs 10(b) and 17 of its amended statement of defence:

> 10. The intentions and expectations of the parties were as follows:
>
>> a) that Transamerica and its Advisors would act in good faith, and would act fairly in all of their dealings with ING throughout the Interim Period and beyond; and
>>
>> b) that Transamerica would disclose to ING all facts that came to its attention, or the attention of its Advisors, during the Due Diligence period and the Interim Period which might adversely affect or prejudice ING's position.
>
> . . .
>
> 17. In the further alternative, if errors existed, and if such errors were material, which is denied, ING pleads that Transamerica was aware, or was wilfully blind to such errors and that it owed ING an implied duty of good faith and fair dealing under the Share Purchase Agreement, to give due and prompt notice of the alleged errors. This duty included an obligation to, amongst other things, disclose to ING all errors that came to its attention during the Due Diligence period and Interim Period that might adversely affect or prejudice ING's position. ING pleads that Transamerica did not reveal the information within its knowledge or the knowledge of its Advisors with respect to the alleged errors. The failure of Transamerica to provide prompt notice of the alleged errors was contrary to the reasonable intentions and expectations of the parties and contrary to commercially reasonable standards of conduct [emphasis added].

In oral argument counsel for ING acknowledged that he sought to maintain the pleading of an implied duty of good faith during the Interim Period only, not during the Due Diligence Period.

89    Still, the parties did not stipulate that Transamerica had an obligation to "disclose to ING all facts that came to its attention . . . during the . . . Interim Period that might adversely affect or prejudice ING's position." ING seeks to add this obligation to the list of obligations Transamerica expressly undertook by pleading an implied duty of good faith. This it cannot do.

90    I have reached this conclusion for three reasons:

**1. The relationship between the parties does not call for implying a duty of good faith.**

91    This is not a contract between unequals where one party is vulnerable to the bargaining strength of the other. Both ING and Transamerica are large, powerful insurers. Both were represented on the transaction by major Toronto law firms. And together they negotiated a sophisticated share purchase agreement, which sets out each party's rights and obligations in excruciating detail. Yet nowhere in their single spaced 69-page agreement is Transamerica under an obligation to disclose to ING errors it may discover during the Interim Period, though as a practical matter one may ask why it would opt not to do so and instead "lie in the bushes" until after closing.

**2. The terms of the share purchase agreement preclude implying a duty of good faith.**

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

### a) Express disclosure obligation only on ING

92    This is not a contract where the parties overlooked the question of disclosure. Instead, they specifically addressed what disclosure obligations would be imposed during the Interim Period. Article 4 of the agreement details each party's covenants before closing. Article 4.5 is headed "Disclosure" and provides:

> Prior to the Closing Date, the Seller shall immediately disclose in writing to the Buyer any matter inconsistent in any respect with any of the Seller's representations or warranties contained herein.

ING, not Transamerica, had a disclosure obligation during the Interim Period. The parties could have struck a different bargain, a bargain that would impose a disclosure obligation on Transamerica. Presumably they chose not to do so. It is not for the courts, under the rubric of good faith, to rewrite their bargain for them. Further, the absence of any disclosure obligation on Transamerica may be contrasted with its duty — in Article 2.5 of the agreement — to speak out (give notice) if it wished to dispute any of the various net worth calculations before closing.

### b) Express good faith obligations

93    Moreover, this is not even a contract where the parties were silent about good faith obligations. In three places in the contract the parties expressly agreed that specific contractual obligations were to be carried out in good faith.

94    In Article 2.5 the parties agreed "in good faith" to negotiate a resolution of any dispute over the calculation of net worth. In Article 4.13 the parties agreed — significantly, before closing — to "work together in good faith to find a commercially reasonable solution" to any problem caused by ING's failure to obtain certain third party consents and waivers. In Article 8.4 the parties undertook to "use all reasonable efforts, acting in good faith" to agree on the text of any required pre-closing public announcement. Because of these specific contractual good faith provisions, I am dubious whether there is any room to plead an implied duty of good faith, even the one pleaded in paragraph 29 of the defence, let alone the implied duty asserted in paragraphs 10(b) and 17.

### c) Entire agreement, amendment and waiver clauses

95    As is typical with major agreements of purchase and sale, the parties included an entire agreement clause, an amendment clause and a waiver of rights clause in their share purchase agreement. These clauses unambiguously signal that neither party is to be burdened with an obligation not expressly set out in the contract unless that additional obligation is agreed to in writing. The relevant provisions state as follows:

**1.5 Entire Agreement**

This agreement constitutes the entire agreement between the Parties pertaining to the subject matter hereof and supersedes and replaces all prior agreements, negotiations, discussions and understandings, written or oral, between the Parties including, from and after Closing, the Confidentiality Agreement. There are no representations, warranties, conditions or other agreements or acknowledgements, whether direct or collateral, express or implied, that form part of or affect this Agreement, or which induced any Party to enter into this Agreement or on which reliance is placed by any Party, except as specifically set forth in this Agreement or in any other Closing Documents.

**1.6 Amendment**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

This Agreement may be amended, modified or supplemented only by a written agreement signed by each Party.

**1.7 Waiver of Rights**

Any waiver of, or consent to depart from, the requirements of any provision of this Agreement shall be effective only if it is in writing and signed by the Party giving it, and only in the specific instance and for the specific purpose for which it has been given. No failure on the part of any Party to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver of such right. No single or partial exercise of any such right shall preclude any other or further exercise of such right or the exercise of any other right.

Implied obligations, such as the one contended for by ING in paragraphs 10(b) and 17, are expressly excluded by the deal the parties made.

96    To be sure, courts have not always given effect to entire agreement clauses. See for example P.M. Perell, "A Riddle Inside an Enigma: The Entire Agreement Clause" (May 1998) 20 Advocates' Q. 287; *Shelanu Inc. v. Print Three Franchising Corp.* (2003), 64 O.R. (3d) 533 (Ont. C.A.). But they have not done so where, for example, after signing a written contract, parties have entered into an oral agreement and by their conduct have shown that they did not intend to be bound by their previous written contract. ING has not pleaded an oral agreement or any other facts that would make the entire agreement and related clauses inapplicable.

*d) Cooperation during the interim period*

97    ING contends that if Transamerica knew of errors or deficiencies before closing, it had an obligation to disclose them before claiming damages to permit ING to "remedy such errors in a timely and cost-effective manner." My colleague makes the related point that the pleading of an implied duty of good faith in paragraphs 10(b) and 17 of the defence may be needed to give effect to the price adjustment mechanism in Article 2.4 of the share purchase agreement.

98    It seems to me, however, that the agreement the parties wrote crystallizes Transamerica's obligations in the Interim Period. Its obligation was to cooperate to maintain the value of the Company and to permit the closing to take place. Therefore, under Article 4.4 Transamerica (together with ING) was required to "use all commercially reasonable and diligent efforts" to maintain the value and goodwill of the company and to facilitate the closing. Under Article 4.6 it was obliged to use "reasonable commercial efforts" to satisfy the conditions of closing. In short, the parties addressed Transamerica's obligations in the Interim Period and stopped short of imposing a duty to disclose errors. Significantly, ING does not plead that Transamerica breached its obligation to cooperate in Articles 4.4 and 4.6.

**3. The conditions for implying a term have not been met.**

99    In Canada we have well-established rules for when courts can imply a term in a contract. Terms may be implied in a contract in three situations:

1.) based on custom or usage;

2.) as the legal incidents of a particular class or kind of contract; or

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

3.) based on the presumed intention of the parties where the implied term must be necessary "to give business efficacy to a contract or as otherwise meeting the 'officious bystander' test as a term which the parties would say, if questioned, that they had obviously assumed".

See *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619 (S.C.C.) at para. 27.

100     Only the last situation — the presumed intention of the parties — could support ING's pleading of an implied duty of good faith, which, as I have said, in reality is a pleading that Transamerica owed an implied duty of disclosure during the Interim Period. But ING has not asserted that such an implied term is necessary to give business efficacy to the contract or that this term is one the parties would say they had obviously assumed.

101     Nor could ING realistically maintain such an assertion. *M.J.B. Enterprises Ltd.* is instructive. There the court considered whether terms could be implied in a tender document. Writing for the court, Iacobucci J. commented that a "degree of obviousness" is needed to imply a term and that it is important to look at the express terms of the contract:

A court, when dealing with terms implied in fact, must be careful not to slide into determining the intentions of reasonable parties. This is why the implication of the term must have a certain degree of obviousness to it, and why, if there is evidence of a contrary intention, on the part of either party, an implied term may not be found on this basis. As G.H.L. Fridman states in The Law of Contract in Canada (3rd ed. 1994), at p. 476:

In determining the intention of the parties, attention must be paid to the express terms of the contract in order to see whether the suggested implication is necessary and fits in with what has clearly been agreed upon, and the precise nature of what, if anything, should be implied.

102     Applying this passage here, I see nothing obvious or necessary about the implied term pleaded by ING. Rather than fitting in with the written agreement of the parties, it is quite inconsistent with that agreement. It is inconsistent with the "entire agreement" and "amendment" clauses, with the express disclosure obligation during the Interim Period imposed solely on ING, and with the explicit references to good faith elsewhere in the agreement. On the existing jurisprudence, I am not persuaded a court can imply a term that Transamerica had a disclosure obligation during the Interim Period. By couching its pleading in the language of good faith ING is attempting to do indirectly what the case law precludes it from doing directly.

103     I recognize that Rule 21 motions are not meant to defeat novel causes of action or defences. Perhaps, in the appropriate case, a court may consider using good faith as a tool to imply terms more readily than under the existing rules laid down by the Supreme Court of Canada. For all the reasons I have already discussed I do not consider this to be the appropriate case to do so. See E.A. Farnsworth, "Good Faith in Contract Performance" in J. Beatson and in D. Friedman, eds., *Good Faith and Fault in Contract Law* (Oxford: Clarendon Press, 1995).

104     I would allow the appeal to the limited extent set out in these reasons. However, I would dismiss the appeal on paragraphs 10, 11, 17 (other than the plea of "wilful blindness") and 18 of the amended statement of defence. Because success was divided, I would order no costs of the appeal.

*Appeal allowed in part.*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2003 CarswellOnt 4834, [2004] I.L.R. I-4258, 234 D.L.R. (4th) 367, 41 B.L.R. (3d) 1, 68 O.R. (3d) 457

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 90

TransCore, LP v. Electronic Transaction Consultants Corp., 563 F.3d 1271 (2009)

90 U.S.P.Q.2d 1372

563 F.3d 1271
United States Court of Appeals,
Federal Circuit.

TRANSCORE, LP and TC License,
Ltd., Plaintiffs–Appellants,

v.

ELECTRONIC TRANSACTION CONSULTANTS
CORPORATION, Defendant–Appellee.

No. 2008–1430.    |    April 8,
2009.    |    Rehearing and Rehearing
En Banc Denied June 5, 2009.

### Synopsis

**Background:** Holder of patents relating to automated toll collection systems brought infringement action against toll collection service provider. The United States District Court for the Northern District of Texas, James Edgar Kinkeade, J., 2008 WL 2152027, entered summary judgment in provider's favor, and holder appealed.

**Holdings:** The Court of Appeals, Gajarsa, Circuit Judge, held that:

[1] doctrine of patent exhaustion barred holder's patent infringement claims against provider;

[2] parol evidence of parties' intent not to provide downstream rights to customers was irrelevant; and

[3] holder's rights to patent that had not yet issued, and was thus not identified in settlement agreement, were exhausted.

Affirmed.

West Headnotes (8)

[1]    **Patents**
     Rights and powers of patentees as to making, use, or sale of invention

Toll collection service provider's sales of toll collection systems were authorized by settlement agreement between patent holder and provider's

supplier, and thus doctrine of patent exhaustion barred holder's patent infringement claims against provider, where holder had agreed not to bring any suit for future infringement, but did not place any restriction on sales.

7 Cases that cite this headnote

[2]    **Patents**
     Rights and powers of patentees as to making, use, or sale of invention

Doctrine of patent exhaustion provides that initial authorized sale of patented item terminates all patent rights to that item.

8 Cases that cite this headnote

[3]    **Patents**
     Construction and Operation of Licenses

Patentee, by license or otherwise, cannot convey affirmative right to practice patented invention by way of making, using, selling, etc.; patentee can only convey freedom from suit. 35 U.S.C.A. § 154(a)(1).

16 Cases that cite this headnote

[4]    **Courts**
     Particular questions or subject matter

Evidentiary rulings, which are procedural in nature, are reviewed by Court of Appeals for Federal Circuit according to regional circuit's law.

2 Cases that cite this headnote

[5]    **Federal Courts**
     Taking case or question from jury; judgment as a matter of law
**Federal Courts**
     Admission of Evidence
**Federal Courts**
     Exclusion of Evidence

Under Fifth Circuit law, unless trial court has abused its discretion and substantial right of defendant has been affected, Court of Appeals

will not reverse on basis of evidentiary ruling in question.

1 Cases that cite this headnote

[6]   **Patents**

👉 Rights and powers of patentees as to making, use, or sale of invention

Only issue relevant to patent exhaustion is whether sales of patented items were authorized, not whether patent holder and seller intended, expressly or impliedly, for covenant to extend to seller's customers, and thus parol evidence of parties' intent not to provide downstream rights to customers was irrelevant in patent infringement action against customers.

9 Cases that cite this headnote

[7]   **Patents**

👉 Rights and powers of patentees as to making, use, or sale of invention

Patent holder's rights to patent that had not yet issued, and was thus not identified in its settlement agreement with competitor, were exhausted by competitor's authorized sales under implied license to practice that patent by virtue of legal estoppel, where later-issued patent was broader than, and necessary to practice, patent that was included in settlement agreement.

10 Cases that cite this headnote

[8]   **Patents**

👉 Original utility

4,303,904, 5,086,389, 5,144,553, 5,253,162, 5,289,183, 5,347,274, 5,351,187, 5,406,275, 5,751,973, 5,805,082, 6,653,946. Cited.

Cases that cite this headnote

**Attorneys and Law Firms**

*1272 William J. Robinson, Foley & Lardner LLP, of Los Angeles, CA, argued for plaintiffs-appellants. With him on the brief was Grant E. Kinsel.

John R. Emerson, Haynes and Boone, LLP, of Dallas, TX, argued for defendant-appellee. With him on the brief were Phillip B. Philbin, Jacob G. Hodges, and William D. White.

Before GAJARSA, DYK, and MOORE, Circuit Judges.

**Opinion**

GAJARSA, Circuit Judge.

TransCore, LP and TC License, Ltd. (collectively "TransCore") appeal from a final judgment of the U.S. District Court for the Northern District of Texas that was entered upon the district court's grant *1273 of summary judgment. *See Transcore, LP v. Electronic Transaction Consultants Corp.,* No. 3:05–CV–2316–K, 2008 WL 2152027 (N.D.Tex. May 22, 2008). Specifically, the District Court found that TransCore's patent infringement claims against Electronic Transaction Consultants Corp. ("ETC") were barred by patent exhaustion, implied license and legal estoppel, in view of a settlement agreement between TransCore and the supplier of the products ETC installed, Mark IV. Because we agree with the district court and find that Mark IV's sales were authorized and exhausted TransCore's patent rights, thus barring TransCore's claims against ETC, we affirm.

**BACKGROUND**

TransCore is engaged in the manufacture, sale and installation of automated toll collection systems—the tags and readers that communicate as a vehicle passes through an automated toll plaza (e.g., E–ZPass). TransCore is the assignee of several patents to related technologies.

In 2000, TransCore sued a competitor, Mark IV Industries, for infringement of several TransCore patents. That action was resolved by a settlement agreement, in which Mark IV agreed to pay $4.5M in exchange for an unconditional covenant not to sue and a release of all existing claims. The covenant and release, which are central to the dispute here, read:

3. In exchange for the payment set forth in paragraph 1, TCI hereby agrees and covenants not to bring any demand, claim, lawsuit, or action against Mark IV for future infringement of any of United States Patent Nos. 5,805,082; 5,289,183; 5,406,275; 5,144,553; 5,086,389; 5,751,973; 5,347,274; 5,351,187; 5,253,162; and 4,303,904, or any foreign counterparts of the aforesaid

90 U.S.P.Q.2d 1372

United States Patents, for the entire remainder of the terms of the respective United States Patents and their foreign counterparts. This Covenant Not To Sue shall not apply to any other patents issued as of the effective date of this Agreement or to be issued in the future.

* * *

8. TCI, TII and GRAVELLE, for themselves and their respective predecessors, successors, heirs and assigns, fully and forever release, discharge and dismiss all claims, demands, actions, causes of action, liens and rights, in law or in equity (known, unknown, contingent, accrued, inchoate or otherwise), existing as of June 26, 2001, that they have against MARK IV, and its officers, directors, employees, representatives and attorneys of MARK IV, but excluding any claims for breach of this Agreement. No express or implied license or future release whatsoever is granted to MARK IV or to any third party by this Release.

Several years later, ETC, a firm engaged in consulting and systems integration related to toll-collection systems, won a bid with the Illinois State Toll Highway Authority (ISTHA) to install and test a new open-road tolling system. As part of the contract, ETC agreed to set up and test toll-collection systems purchased by the ISTHA from Mark IV.

TransCore sued ETC for infringement of three patents that had previously been in suit against Mark IV (U.S. Patent Nos. 5,805,082; 5,289,183; and 5,406,275 (the #082, #183, and #275 patents)) as well as U.S. Patent No. 6,653,946 (the #946 patent), a related patent that was pending **1274** before the Patent and Trademark Office but had not yet issued at the time of the TransCore—Mark IV settlement. During a hearing, the district court questioned the legal impact of the TransCore—Mark IV settlement agreement on the TransCore—ETC lawsuit and ordered the parties to brief the issue. ETC responded by filing a motion for summary judgment with the district court, asserting that its activities were permitted by the TransCore—Mark IV settlement agreement under the related doctrines of patent exhaustion, implied license and legal estoppel.

On May 22, 2008, the district court granted ETC's motion, dismissed TransCore's claims with prejudice and directed the entry of final judgment. TransCore timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a) (1).

## DISCUSSION

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We review the district court's grant of summary judgment without deference, reapplying the same standard as the district court. *Micro Chem., Inc. v. Lextron, Inc.,* 318 F.3d 1119, 1121 (Fed.Cir.2003). "In deciding whether summary judgment was appropriate, we view the evidence in a light most favorable to the party opposing the motion with doubts resolved in favor of the opponent...." *Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.,* 149 F.3d 1309, 1315 (Fed.Cir.1998).

## I.

**[1]**   The district court found that Mark IV's sales of the toll collection systems installed by ETC were authorized by the TransCore—Mark IV settlement agreement, such that TransCore's patent rights were exhausted as to those systems. We agree. [1]

## A.

**[2]**   Recently, in *Quanta Computer, Inc. v. LG Electronics, Inc.,* 553 U.S. 617, 128 S.Ct. 2109, 170 L.Ed.2d 996 (2008), the Supreme Court reiterated unequivocally that "[t]he longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item," *id.* at 2115, and that "[e]xhaustion is triggered only by a sale authorized by the patent holder," *id.* at 2121. The question for this court is whether an unconditional covenant not to sue authorizes sales by the covenantee for purposes of patent exhaustion. We hold that it does.

TransCore asserts that sales under a covenant not to sue are not "authorized," relying heavily on *Jacobs v. Nintendo of America, Inc.,* 370 F.3d 1097 (Fed.Cir.2004). In *Jacobs,* a panel of this court addressed the respective roles of a license term and a covenant not to sue in a settlement agreement. Explicitly considering downstream customer liability, the panel explained:

If all that [the patent holder] intended to do through the settlement agreement **\*1275** was to free [the infringing manufacturer] of its liability for infringement, paragraph 5 of the agreement (the covenant not to sue) would have been fully sufficient to serve that purpose. Paragraph 3 [the license provision], however, goes much further by granting [the infringing manufacturer] an affirmative right to engage in the manufacture and sale of accelerometers to be used in tilt-sensitive control boxes. That grant comes without restriction of any kind.

*Id.* at 1101. The court in *Jacobs* was differentiating between settlement terms for the express purpose of determining the contracting parties' intent in the context of an implied license analysis. As the Supreme Court explained in *Quanta,* however, the parties' intent with respect to downstream customers is of no moment in a patent exhaustion analysis. *See Quanta,* 128 S.Ct. at 2122 ("But the question whether third parties received implied licenses is irrelevant because [the downstream customer] asserts its right to practice the patents based not on implied license but on exhaustion. And exhaustion turns only on [licensee's] own license to sell products practicing the [licensor's] Patents."). The analysis in *Jacobs,* therefore, does not apply here.

[3]    Rather, our analysis begins with the premise that one cannot convey what one does not own. This principle is particularly important in patent licensing, as the grant of a patent does not provide the patentee with an affirmative right to practice the patent but merely the right to exclude. *See* 35 U.S.C. § 154(a)(1) ("Every patent shall contain ... a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States ...."); *see also* *Leatherman Tool Group Inc. v. Cooper Indus., Inc.,* 131 F.3d 1011, 1015 (Fed.Cir.1997) ("In fact, the federal patent laws do not create any affirmative right to make, use, or sell anything.... [T]he Supreme Court made clear that the patent laws provide a limited right to exclude others from making, using, or selling a claimed invention for a limited period of time, but afford no affirmative right to make, use, and sell a patented invention." (citing *Bloomer v. McQuewan,*

55 U.S. (14 How.) 539, 548, 14 L.Ed. 532 (1852) ("The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent."))). It follows, therefore, that a patentee, by license or otherwise, cannot convey an affirmative right to practice a patented invention by way of making, using, selling, etc.; the patentee can only convey a freedom from suit.

For this reason, the Supreme Court in *De Forest Radio Telephone & Telegraph Co. v. United States,* reiterated: "As a license passes no interest in the monopoly, it has been described as a mere waiver of the right to sue by the patentee." 273 U.S. 236, 242, 47 S.Ct. 366, 71 L.Ed. 625 (1927) (treating a covenant not to enjoin infringing acts as a license). To like effect, this court and its predecessors have on numerous occasions explained that a non-exclusive patent license is equivalent to a covenant not to sue:

As a threshold matter, a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee. Even if couched in terms of "[l]icensee is given the right to make, use, or sell X," the agreement cannot **\*1276** convey that absolute right because not even the patentee of X is given that right. His right is merely one to exclude others from making, using or selling X. Indeed, the patentee of X and his licensee, when making, using, or selling X, can be subject to suit under other patents. In any event, patent license agreements can be written to convey different scopes of promises not to sue, e.g., a promise not to sue under a specific patent or, more broadly, a promise not to sue under any patent the licensor now has or may acquire in the future.

*Spindelfabrik Suessen–Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft,* 829 F.2d 1075, 1081 (Fed.Cir.1987) (citations omitted); *see also* *U.S. Philips Corp. v. Int'l Trade Comm'n,* 424 F.3d 1179, 1189 (Fed.Cir.2005) ("A nonexclusive patent license is simply a promise not to sue for infringement."); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings,* 370 F.3d 1354, 1369 (Fed.Cir.2004) ( "This license is, in essence, a licensor's covenant not to sue the licensee."); *Hilgraeve Corp. v. Symantec Corp.,* 265 F.3d 1336, 1346 (Fed.Cir.2001) ("This court has stated that 'licenses are considered as nothing more than a promise by the licensor not to sue the licensee.' " (quoting *Jim Arnold Corp. v. Hydrotech Sys., Inc.,* 109 F.3d 1567, 1577 (Fed.Cir.1997))); *Intell. Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.,* 248 F.3d 1333, 1345 (Fed.Cir.2001)

TransCore, LP v. Electronic Transaction Consultants Corp., 563 F.3d 1271 (2009)

90 U.S.P.Q.2d 1372

(defining "a nonexclusive license or 'bare' license" as "a covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention and under which the patent owner reserves the right to grant similar licenses to other entities"); *Ortho Pharm. Corp. v. Genetics Inst., Inc.,* 52 F.3d 1026, 1031 (Fed.Cir.1995) ("A license may amount to no more than a covenant by the patentee not to sue the licensee for making, using or selling the patented invention, the patentee reserving the right to grant others the same right."); *W. Elec. Co. v. Pacent Reproducer Corp.,* 42 F.2d 116, 118 (2d Cir.1930) ("In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent. Such a license grants to the licensee merely a privilege that protects him from a claim of infringement by the owner of the patent monopoly."). The real question, then, is not whether an agreement is framed in terms of a "covenant not to sue" or a "license." That difference is only one of form, not substance—both are properly viewed as "authorizations." Rather, the pertinent question here is not whether but what the TransCore—Mark IV settlement agreement authorizes. More specifically, does the TransCore—Mark IV settlement agreement authorize *sales*? We conclude that it does.

The language of the TransCore—Mark IV settlement agreement is unambiguous: "[TransCore] agrees and covenants not to bring any demand, claim, lawsuit, or action against Mark IV for future infringement...." This term, without apparent restriction or limitation, thus authorizes all acts that would otherwise be infringements: making, using, offering for sale, selling, or importing. TransCore did not, as it could have, limit this authorization to, for example, "making" or "using." And indeed, at oral argument, TransCore conceded that the TransCore—Mark IV settlement agreement does not include a restriction on sales. *See* Audio Recording of Oral Arg. at 40:54–42:25, *TransCore, LP v. Elec. Transaction Consultants Corp.*, No. 2008–1430 (Fed.Cir. Feb. 5, 2009), *available at* http://oralarguments.cafc.uscourts.gov/mp 3/2008–1430.mp3; *cf.* **\*1277** *Quanta,* 128 S.Ct. at 2121 (applying patent exhaustion where "[n]othing in the License Agreement restricts [licensee's] right to sell its microprocessors and chipsets to purchasers who intend to combine them with non-Intel parts. It broadly permits Intel to 'make, use, [or] sell' products free of [licensor's] patent claims." (internal quotation marks omitted)). As a result, the district court correctly found that Mark IV's sales to ISTHA were authorized and that TransCore's patent rights are exhausted. The inclusion of the language "No express or implied license

or future release whatsoever is granted to MARK IV or to any third party by this Release" refers only to the effect of the Release provision and thus does not require a different result.

### B.

As a subordinate issue to the proper interpretation of the covenant not to sue, TransCore argues that the district court abused its discretion by excluding parol evidence of TransCore's and Mark IV's intent at the time they entered into the settlement agreement. We disagree.

**[4]    [5]**    Evidentiary rulings, which are procedural in nature, are reviewed by this court according to the law of the regional circuit. *See Sulzer Textil A.G. v. Picanol N.V.,* 358 F.3d 1356, 1363 (Fed.Cir.2004). Applying Fifth Circuit law, "unless the trial court has abused its discretion and a substantial right of the defendant has been affected, we will not reverse on the basis of [an] evidentiary ruling in question." *United States v. Saldana,* 427 F.3d 298, 306 (5th Cir.2005).

**[6]**    The district court's decision to exclude TransCore's parol evidence has not affected any substantial right of TransCore. On this point *Quanta* is clear. The only issue relevant to patent exhaustion is whether Mark IV's sales were authorized, not whether TransCore and Mark IV intended, expressly or impliedly, for the covenant to extend to Mark IV's customers. *See Quanta,* 128 S.Ct. at 2122. TransCore's proffered evidence of the parties' intent not to provide downstream rights to Mark IV's customers is, therefore, irrelevant and could not impact the outcome reached by the district court and affirmed here.

Moreover, California law, which governs the TransCore—Mark IV settlement agreement, prohibits the admission of parol evidence: (i) to insert an additional term into a written contract, if the contract is a complete and exclusive statement of the terms of the agreement, Cal.Civ.Proc.Code § 1856(b), (d); and/or (ii) to influence the meaning of contract terms where no ambiguity exists, *id.* § 1856(g); *see also Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641, 644–45 (Cal.1968).[2] The district court correctly concluded that the settlement agreement is a final, complete and exclusive agreement, and that the settlement agreement is unambiguous. We, therefore, find no error in the district court's decision not to admit TransCore's parol evidence.

**\*1278 C.**

TransCore further argues that several material facts remain in dispute: (1) which Mark IV entity actually sold the products to ISTHA for installation by ETC; (2) whether the sale from Mark IV to ISTHA occurred within the United States; and (3) assuming Mark IV U.S. (referred to by the parties, at times, as "IVHS") is found to have actually sold the products to ISTHA, whether Mark IV U.S. was included within the terms of the TransCore—Mark IV settlement agreement, which extended coverage to "sister" companies of Mark IV Canada. Based on the record before the district court, as viewed in the light most favorable to TransCore (the non-movant), we disagree.

Although the parties do not agree about which Mark IV entity actually sold the toll collection products—the irrevocable offer was made by Mark IV US, but the purchase order was placed with (and the order was ultimately filled by) Mark IV Canada—there is no dispute that a Mark IV entity was responsible for the sale.

Moreover, there is no dispute that the toll collection products were sold and shipped to ISTHA. Even if we accept TransCore's assertions that the products were shipped from Canada, this does not alter the essential fact that the transaction as a whole ultimately occurred "to" the United States. *See Lightcubes, LLC v. N. Light Prods., Inc.,* 523 F.3d 1353, 1369–71 (Fed.Cir.2008) (finding that a sale "to" the United States is sufficient to support infringement liability).

Finally, as to the third "disputed" fact—whether Mark IV U.S. is covered by the terms of the TransCore—Mark IV settlement agreement—the parties do not dispute that both Mark IV U.S. and Mark IV Canada are wholly-owned subsidiaries of Mark IV Industries. Because the term "sister company" is commonly used and generally understood to refer to a subsidiary company that shares common ownership (i.e., a common "parent") with another subsidiary company, *see generally, e.g., Poly–America, L.P. v. GSE Lining Tech., Inc.,* 383 F.3d 1303 (Fed.Cir.2004) (referring to two corporations that share a common parent as "sister corporations"); *Humana Inc. v. Comm'r,* 881 F.2d 247 (6th Cir.1989) (referring to *all* subsidiaries of Humana, Inc. as "brother-sister" corporations), we find it to be beyond dispute that Mark IV U.S. is a "sister" company of Mark IV Canada and thus has the same express authority under the TransCore—Mark IV settlement agreement as any other "sister" company.

## II.

**[7]**    The district court further found that TransCore's rights to the # 946 patent—which had not yet issued and was thus not identified in the TransCore—Mark IV settlement agreement—were exhausted by Mark IV's authorized sales under an implied license to practice that patent by virtue of legal estoppel. Again, we agree with the district court.

As explained by our predecessor court in *AMP Inc. v. United States,* 182 Ct.Cl. 86, 389 F.2d 448 (1968):

> [W]hen a person sells a patent which employs an invention which infringes a prior patent, the person selling is estopped from bringing an action against his grantee for that infringement, even though the earlier patent is acquired after the sale of the later patent. The same principle applies to the grant of a patent right by license as well as assignment.

**\*1279** *Id.* at 451 (citation omitted). Although TransCore argues that this form of legal estoppel only applies to "prior" or "earlier" patents, we see no reason for so fine a distinction—the timing of patent issuance is no more relevant to this inquiry than the timing of acquisition. Indeed, the court in *AMP* explained the policy rationale underlying the legal estoppel doctrine in the following manner:

> The essence of legal estoppel that can be found in the estoppel of the implied license doctrine involves the fact that the licensor (or assignor) has licensed (or assigned) a definable property right for valuable consideration, and then has attempted to derogate or detract from that right. The grantor is estopped from taking back in any extent that for which he has already received consideration.

*Id.* at 452. The basic principle is, therefore, quite simple: "Legal estoppel refers to a narrow[ ] category of conduct encompassing scenarios where a patentee has licensed or

assigned a right, received consideration, and then sought to derogate from the right granted." *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.,* 103 F.3d 1571, 1581 (Fed.Cir.1997).

On summary judgment, ETC asserted, and TransCore did not dispute, [3] that TransCore's later-issued #946 patent was broader than, and necessary to practice, at least the #082 patent that was included in the TransCore—Mark IV settlement agreement. Indeed, during discovery TransCore adopted its # 082 patent infringement contentions as its contentions related to the # 946 patent. [4] Absent argument to the contrary, the district court properly concluded that in order for Mark IV to obtain the benefit of its bargain with TransCore, it must be permitted to practice the #946 patent to the same extent it may practice the #183, #275 and #082 patents. TransCore is, therefore, legally estopped from asserting the #946 patent against Mark IV in derogation of the authorizations granted to Mark IV under the #183, #275 and #082 patents. And Mark IV is, in turn, an implied licensee of the # 946 patent. The language of the TransCore—Mark IV settlement agreement, which states that "[t]his Covenant Not To Sue shall not apply to any other patents ... to be issued in the future," is not to the contrary. This language may protect TransCore against broad claims that future patents generally are impliedly licensed, but it does not permit TransCore to derogate from the rights it has expressly granted and thus does not preclude a finding of estoppel.

Mark IV's rights under its implied license to the #946 patent are necessarily coextensive with the rights it received in **\*1280** the TransCore—Mark IV license agreement. Mark IV's sales to ISTHA were thus authorized and, accordingly, exhausted TransCore's patent rights in the products sold.

## CONCLUSION

The district court's decision, granting summary judgment and thus dismissing TransCore's claims, is affirmed.

*AFFIRMED*

## COSTS

No costs.

### Parallel Citations

90 U.S.P.Q.2d 1372

---

Footnotes

1    Because we agree with the district court that TransCore's claims are barred by the doctrine of patent exhaustion, we need not address the district court's decision on the related doctrine of implied license by no non-infringing use.

2    We note that, under California law, the district court may *receive* and *consider* extrinsic evidence to determine whether one or more terms of a contract is reasonably susceptible to multiple meanings, *see Dore v. Arnold Worldwide, Inc.,* 39 Cal.4th 384, 46 Cal.Rptr.3d 668, 139 P.3d 56, 60 (2006), but once the district court determines that no ambiguity exists, as it did here, extrinsic evidence is properly not *admitted, see Pac. Gas,* 69 Cal.Rptr. 561, 442 P.2d at 644–45.

3    On appeal, TransCore claims that it is possible to practice the #183, #275 and #082 patents without infringing the #946 patent. TransCore did not, however, raise this argument to the district court. We, therefore, deem it waived. *See Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1426 (Fed.Cir.1997) ("If a litigant seeks to show error in a trial court's overlooking an argument, it must first present that argument to the trial court. In short, this court does not 'review' that which was not presented to the district court.").

4    At oral argument, TransCore argued that "a contention of infringement ... is not enough for an implied license." Oral Arg. at 39:31– 39:35. This argument misses the mark. TransCore's contentions did not create the implied license; they merely serve as evidence that TransCore sought to enforce the #946 patent in derogation of the rights it granted under the TransCore—Mark IV settlement agreement. That attempted derogation is prevented by legal estoppel, which gives rise to the implied license.

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 91

Date of Printing: Aug 02, 2014

**KEYCITE**

**H Unique Broadband Systems, Inc., Re,** 2014 CarswellOnt 9327, 2014 ONCA 538, 13 C.B.R. (6th) 278 (Ont. C.A., Jul 10, 2014)

**History**

**Direct History**

▶ 1 Unique Broadband Systems Inc., Re, 2013 CarswellOnt 6926, 228 A.C.W.S. (3d) 621, 2013 ONSC 2953, 5 C.B.R. (6th) 1 (Ont. S.C.J. [Commercial] May 21, 2013)

*Additional reasons in*

▶ 2 Unique Broadband Systems Inc., Re, 2013 CarswellOnt 11112, 230 A.C.W.S. (3d) 976, 2013 ONSC 5121, 5 C.B.R. (6th) 241 (Ont. S.C.J. [Commercial] Aug 06, 2013)

*AND Reversed by*

=> 3 **Unique Broadband Systems, Inc., Re,** 2014 CarswellOnt 9327, 2014 ONCA 538, 13 C.B.R. (6th) 278 (Ont. C.A. Jul 10, 2014)

© 2014 Thomson Reuters. All rights reserved.

# TAB 92

918 A.2d 339 (Table)
Unpublished Disposition
(The decision of the Court is referenced
in the Atlantic Reporter in a 'Table of
Decisions Without Published Opinions.')
Supreme Court of Delaware.

U.S. BANK NATIONAL f/k/a First Bank National
Association TR U/A dated June 1, 1997, solely
in its capacity as Trustee for EQCC Home
Equity Trust 1997-2, Assignee of Equi Credit
Corporation of America, Assignee of Equi Credit
Corporation of DE, Plaintiff Below, Appellant,

v.

Posie H. SWANSON, Defendant Below, Appellee.

No. 268, 2006.    |    Submitted: Oct.
25, 2006.    |    Decided: Dec. 27, 2006.

**Synopsis**

**Background:** Mortgagee brought foreclosure action against mortgagor, and purchaser of mortgagor's property filed motion to satisfy judgment. The Superior Court, New Castle County, denied the motion, but subsequently dismissed the case. Mortgagee filed motion to vacate the judgment, which was granted. The Superior Court then granted the motion to satisfy. Mortgagee appealed.

**Holding:** The Supreme Court, Myron T. Steele, C.J., held that purchaser of mortgaged property reasonably relied on payoff notice from mortgagee's assignor such that equitable estoppel applied to preclude mortgagee from recovering additional payoff costs.

Affirmed.

West Headnotes (1)

**[1]    Mortgages**
    👈 Payment of Debt

Purchaser of mortgaged property reasonably relied on a notice from mortgagee's assignor that $50,433.01 plus per diem would pay

off mortgage, and therefore, the doctrine of equitable estoppel applied to preclude mortgagee from recovering any additional payoff costs, even though it contained a disclaimer that the notice "was not to be construed as a payoff statement;" the notice was provided pursuant to the Fair Debt Collection Act, appeared on its face to be unequivocal despite the disclaimer, and assignor's law firm sent the notice, inviting reliance. Fair Debt Collection Practices Act, § 802, 15 U.S.C.A. § 1692.

Cases that cite this headnote

Court Below: Superior Court of the State of Delaware in and for New Castle County, C.A. No. 03L-09-142.

Before STEELE, Chief Justice, HOLLAND and RIDGELY, Justices.

***ORDER***

MYRON T. STEELE, Chief Justice.

**\*1** This 27th day of December, 2006, upon consideration of the briefs of the parties and the record in this case, it appears to the Court that:

(1) U.S. Bank National appeals the Superior Court's judgment that $54,656.16 satisfied the mortgage of record of 140 Winder Road, New Castle, Delaware. U.S. Bank argues that the trial judge incorrectly applied the doctrine of estoppel in this case. Because the trial judge's finding that the property buyer reasonably relied on the conduct of U.S. Bank when he purchased the property is supported by the record, we affirm the Superior Court's judgment.

(2) Appellee, Posie Swanson, purchased 140 Winder Road, New Castle, Delaware in 1979. On March 21, 1997, Swanson refinanced this property with EquiCredit. EquiCredit later assigned the debt and mortgage to U.S. Bank. On September 26, 2003, Swanson sold the property to Meyer & Meyer (Meyer). Earlier that same day, Meyer's attorney requested a mortgage payoff quote and the law firm of Draper & Goldberg faxed him a Validation of Debt Notice Pursuant to 15 U.S.C. § 1692 from the EquiCredit mortgage department. The Notice indicated that the amount of debt was $50,433.01, as of September 17, 2003. The Notice also stated that the

amount should "not be construed as a payoff statement as the debt continues to accrue interest, fees and costs on a daily basis." EquiCredit stated that the per diem interest charge was $12.81. In response to the Notice, Meyer deposited $50,676.40 in escrow that day.

(3) Without Meyer's knowledge, EquiCredit filed a foreclosure action on September 30, 2003. At the time of their September 26th communications, the EquiCredit mortgage department did not know that EquiCredit had filed the action. The amount EquiCredit demanded in the foreclosure action was inconsistent with the amount their own mortgage department cited in the "Notice." On October 6, 2003, EquiCredit faxed Meyer a payoff of $59,787.97. Confused by the discrepancies between the "Notice" and the faxed "payoff," Meyer's attorney requested that EquiCredit clarify the additional charges. EquiCredit, however, did not respond.

(4) On November 17, 2003, Meyer requested a revised payoff quote. Again, EquiCredit did not respond. On December 3, Meyer filed a report with the Department of Financial Services for the State of Florida, alleging that EquiCredit had failed to respond to his repeated requests for information in a timely manner. On that same day, EquiCredit sent a payoff quote of $68,147.74 to Swanson, but not to Meyer. On December 30, Meyer sent EquiCredit a check for $54,656.16 based on the numbers in the "Notice" the mortgage department provided on September 26. EquiCredit returned the check to Meyer with a letter dated January 8, 2004.

(5) On February 19, 2004, Meyer filed a motion to satisfy the judgment in the Superior Court and requested that the court declare $54,615.16 to be a sufficient payment to satisfy the mortgage. A Superior Court judge held a hearing on March 5, 2004. The judge denied the motion to satisfy without prejudice and ordered that U.S. Bank, EquiCredit's assignee, file a payoff amount with the court by March 22, 2004. U.S. Bank did not file the payoff quote until May 24, 2004, and stated that the quote that it did file was not "the final breakdown." U.S. Bank never filed "the final breakdown" with the Superior Court.

*2 (6) On September 24, 2004, the Superior Court notified U.S. Bank that the foreclosure action would be dismissed pursuant to Superior Court Rule 41(e) because of six months of inactivity. When U.S. Bank did not respond, a judge dismissed the case on November 16, 2004. On November 8,

2005, nearly a year after the Superior Court dismissed the case, U.S. Bank filed a motion to vacate the judgment. A judge granted the motion to vacate and allowed the parties to provide supplemental memorandums on the motion to satisfy the mortgage. On May 1, 2006, a judge granted Meyer's motion to satisfy based on the doctrine of equitable estoppel.

(7) U.S. Bank argues that the trial judge erred when he found that Meyer met the reliance requirement of equitable estoppel because the disclaimer language contained in the September 26, 2003, Notice provided that the Notice should "not be construed as a payoff statement as the debt continues to accrue interest, fees and costs on a daily basis" thus rendering Meyer's reliance on the Notice unreasonable.

(8) The doctrine of equitable estoppel entails mixed questions of law and fact. [1] We review legal questions de novo. [2] We will not disturb the trial judge's factual findings if they are supported by the record and are not clearly wrong. [3] Because U.S. Bank disputes the trial judge's finding that the evidence satisfies the elements of estoppel, we review the matter to determine if the record adequately supports this finding.

(9) Equitable estoppel applies "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." [4] "To establish estoppel, it must be shown that the party claiming estoppel lacked knowledge of the truth of the facts in question; relied on the conduct of the party against whom estoppel is claimed; and suffered a prejudicial change of position as a result of his reliance." [5] Furthermore, the "reliance upon the conduct ... must be reasonable and justified under the circumstances." [6] U.S. Bank challenges only the reasonableness of Meyer's reliance.

(10) The record shows that Meyer reasonably relied on the $50,433.01 Notice plus per diem that would pay off the mortgage. On September 26, 2003, when Meyer requested a payoff quote from EquiCredit, EquiCredit's agent, the law firm of Draper & Goldberg, faxed Meyer a Notice pursuant to the Fair Debt Collection Act, 15 U.S.C. § 1692, citing a payoff of $50,676.40. The Notice was provided pursuant to the Fair Debt Collection Act, which prohibits giving "the false representation of the character, amount, or legal status of any debt." [7] The Notice appeared on its face to be unequivocal, despite the disclaimer, and the title of the Notice and the fact that EquiCredit's law firm sent the Notice would invite reliance. EquiCredit stated that the per diem interest charge

was $12.81 and provided no other payoff figure before the September 26, 2003, real estate closing. EquiCredit provided two additional payoff statements in October and December, but when Meyer requested clarification for the discrepancy, neither EquiCredit, its agent, nor U.S. Bank responded. For these reasons, the trial judge properly found that U.S. Bank is estopped from recovering any additional payoff costs on the mortgage.

**\*3** (11) We are satisfied that the record supports the trial judge's finding that Meyer's reliance upon U.S. Bank's conduct was reasonable.

NOW, THEREFORE, IT IS ORDERED that the Superior Court's judgment is **AFFIRMED.**

### Parallel Citations

2006 WL 3952032 (Del.Supr.)

Footnotes

1    *Am. Family Mortgage Corp. v. Acierno,* 640 A.2d 655, 1994 WL 144591, at \*4 (Del.1994).
2    *Id.*
3    *McAllister v. State,* 807 A.2d 1119, 1123 (Del.2002).
4    *Dep't of Natural Res. and Envtl. Control v. Front St. Prop.,* 808 A.2d 1204, 2002 WL 31432384, at \*5 (Del.2002).
5    *Id.*
6    *Id.*
7    15 U.S.C. § 1692e(2)(A) (2000).

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.                3

TAB 93

242 F.3d 325
United States Court of Appeals,
Fifth Circuit.

SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

FOREX ASSET MANAGEMENT
LLC, etc.; et al., Defendants.
Michael Whitbeck; Donna
Whitbeck, Movants–Appellants,

v.

Dan R. Waller, Receiver, Appellee.

No. 00–10224.    |    Feb. 26, 2001.

Following complaint against investment company by the Securities and Exchange Commission (SEC) alleging securities fraud, resulting in freeze of the company's assets and appointment of receiver, receiver sought approval of plan to distribute company's assets. The United States District Court for the Northern District of Texas, Jorge A. Solis, J., approved plan. Investors appealed. The Court of Appeals, Emilio M. Garza, Circuit Judge, held that: (1) investors had standing to appeal; (2) order approving distribution plan was appealable under the collateral order doctrine; and (3) approval of plan was not abuse of discretion.

Affirmed.

West Headnotes (10)

[1]    **Federal Courts**
 Persons Entitled to Seek Review or Assert Arguments; Parties; Standing
Only parties to a federal lawsuit, or those that properly become parties, may appeal an adverse judgment.

2 Cases that cite this headnote

[2]    **Federal Courts**
 Asserting claims of others
Fifth Circuit applies a three-part test when deciding whether a non-party may appeal an

adverse decision; court asks whether the non-party actually participated in the proceedings below, whether the equities weigh in favor of hearing the appeal, and whether the non-party has a personal stake in the outcome.

9 Cases that cite this headnote

[3]    **Federal Courts**
 Asserting claims of others
Investors had standing to appeal district court's approval of receivership distribution plan for investment company, resulting from securities fraud action against company by the Securities and Exchange Commission (SEC), though investors were not parties to SEC action and did not seek to intervene; investors participated in action by, inter alia, filing a notice that they were an interested party, and method of distribution directly affected amount allocated to investors.

13 Cases that cite this headnote

[4]    **Federal Courts**
 Remedial Matters
District court's order approving receiver's plan to distribute investment company's assets, after assets were frozen as result of securities fraud action against company by the Securities and Exchange Commission (SEC), was not a "final order" for purposes of investors' appeal; order was only part of overall litigation by the SEC. 28 U.S.C.A. § 1291.

4 Cases that cite this headnote

[5]    **Federal Courts**
 Interlocutory and Collateral Orders
An order is appealable by virtue of the "collateral order doctrine" if it falls into that small class of decisions which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.

3 Cases that cite this headnote

**[6]**    Federal Courts
     🔑 Interlocutory and Collateral Orders

In order to determine whether an order may be appealed under the "collateral order doctrine," order must meet each of the following three requirements: it must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment.

3 Cases that cite this headnote

**[7]**    Federal Courts
     🔑 Remedial Matters

District court's order approving receiver's plan to distribute investment company's assets, after assets were frozen as result of securities fraud action against company by the Securities and Exchange Commission (SEC), was appealable under the collateral order doctrine; order conclusively determined manner in which receivership assets should be distributed, issue of distribution was separate from merits of SEC action, and order was unreviewable on appeal of the SEC action.

12 Cases that cite this headnote

**[8]**    Federal Courts
     🔑 Equity and equitable relief in general

     Federal Courts
     🔑 Securities regulation

Court of Appeals analyzed district court's decision to approve a receiver's distribution plan for investment company, resulting from fraud action against company by Securities and Exchange Commission (SEC) and freezing of company's assets, for an abuse of discretion; district court was acting pursuant to its inherent equitable powers when it approved the plan.

8 Cases that cite this headnote

**[9]**    Federal Civil Procedure
     🔑 Nature and extent of relief in general

     Federal Courts

     🔑 Equity and equitable relief in general

In shaping equity decrees, the district court is vested with broad discretionary power, and appellate review of such decrees is correspondingly narrow.

6 Cases that cite this headnote

**[10]**    Securities Regulation
     🔑 Distribution and allocation of assets and funds; priority

District court did not abuse its discretion in approving receivership distribution plan for investment company subject to securities fraud action by the Securities and Exchange Commission (SEC), which plan provided for pro rata distribution of assets to all investors, though funds of one investor pair were segregated from those of other investors.

43 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*327** Kenneth Arthur Hill, Michael J. Quilling, Quilling, Selander, Cummiskey & Lownds, Dallas, TX, for Movants–Appellants.

David Brian Dyer, Secore & Waller, Dallas, TX, for Appellee.

Appeal from the United States District Court for the Northern District of Texas.

Before WIENER, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

**Opinion**

EMILIO M. GARZA, Circuit Judge:

Michael and Donna Whitbeck ("the Whitbecks") appeal the district court's order approving of the decision by Dan R. Waller ("Receiver"), the receiver appointed to oversee the assets connected with Forex Asset Management, L.L.C. ("Forex"), to distribute the assets of Forex on a pro rata basis. We affirm.

## I

The Whitbecks learned of a foreign currency investment opportunity with Forex through a radio infomercial given by Kosova, the individual who allegedly controls Forex. Thereafter, the Whitbecks attended a seminar regarding investment opportunities with Forex, and wrote a check to Forex for $100,000. Several months later, after receiving statements reflecting a profitable return on their $100,000 investment, the Whitbecks attended another seminar. After the seminar, the Whitbecks decided to invest additional money, and they took out a loan of $800,000 in order to do so. The Whitbecks then wrote a check to Forex for $800,000, which they gave to Kosova. Kosova informed the Whitbecks that their funds would be placed in a separate account in order to invest the money more aggressively.

Kosova deposited the Whitbecks' $800,000 check in an account held by FAM Preferred Trading Corporation ("FAM Preferred") at NationsBank.[1] The records documenting the FAM Preferred account's transactions show only one deposit, specifically the Whitbecks' $800,000 check.

In addition to the account at NationsBank, FAM Preferred also maintained a brokerage account with Rosenthal Collins Group, L.P. ("Rosenthal"). After depositing the $800,000 into the FAM Preferred account, Kosova transferred $750,000 into the Rosenthal account. The $750,000 deposited into the Rosenthal account was the only deposit made into that account. The Whitbecks assert that the only other withdrawals from the NationsBank account were to cover the cost of the wire transfer fees, and an $8,500 check to themselves.

After the Whitbecks invested $900,000 with Forex, the Securities and Exchange Commission ("SEC") filed a complaint against Kosova and Forex for allegedly engaging in a scheme to defraud investors. As a consequence of the SEC complaint, the assets of Forex, Kosova and the entities **\*328** owned and controlled by Kosova were frozen, and a receiver was appointed.[2] The Whitbecks were not named as parties to the suit between the SEC, Forex and Kosova, nor did they move to intervene in accordance with Federal Rule of Civil Procedure 24.

The Receiver appointed to manage the Forex–Kosova assets determined that the Forex program had accumulated approximately $2.5 million of indebtedness, and retained approximately $1,150,000 worth of assets.[3] After analyzing the debts owed and calculating the amount of the remaining assets, the Receiver determined that the assets should be distributed on a pro rata basis in order to treat the creditors equally because none of the creditors had a "secured claim ... [or] legal preference." According to the plan, each investor "would share in the distribution based upon the percentage of their loss as measured against the losses of all of the unpaid claimants."

Prior to approving the Receiver's distribution plan, the district court sought objections to the plan, for which it received two, one of which was from the Whitbecks. Pursuant to the receivership plan, the Whitbecks' $800,000 investment was to be treated identically to the other Forex investment funds. This was because the Receiver determined that the $800,000, while placed in a separate account, was simply another investment in the Forex foreign currency program, and therefore should be analyzed similarly to the other investors' contributions. To support its position, the Receiver noted that the Whitbecks wrote both their $800,000 and $100,000 checks to Forex. Therefore, the Whitbecks' investment with Forex was calculated at $900,000, of which they were owed $878,000.[4] Because they were owed $878,000, under a pro rata distribution they would receive 33.09 percent of the remaining assets.

The Whitbecks, however, argued that because their $800,000 check was placed in a segregated account they should receive all of the funds that remained in the FAM Preferred and Rosenthal accounts. The Whitbecks did not, however, assert that something other than a pro rata distribution should be performed with regard to their initial $100,000 investment, as these funds were commingled with other Forex investors' funds.

After considering the Whitbecks' objections, the district court affirmed the plan because it determined that the "Receiver's Plan provide[d] the most equitable means of addressing all of the victim's harms[,] ... [and] the Whitbecks [did] not present[] any facts that would elevate their claims above those of the other investors." The court further noted that it was afforded "wide discretion in the supervision of an equity receivership ... [and that it could] approve a plan as long as it [was] fair and equitable."

## II

**[1]** The Whitbecks appeal the district court's order approving the Receiver's distribution plan. Prior to reviewing the merits of the Whitbecks' appeal, there are two threshold issues that require our attention. First, we must determine whether the Whitbecks have standing to bring this appeal. Although the parties have not raised this issue, we may raise it *sua sponte. See Lang v. French,* 154 F.3d 217, 222 n. 28 (5th Cir.1998) (reaffirming the principle that questions regarding standing may be "raised by an appellate court *sua sponte*"). Our concern regarding the Whitbecks' standing stems from the fact **\*329** that the Whitbecks were not named as parties in the SEC's complaint, nor did they seek to intervene in accordance with Rule 24. As the Supreme Court stated in *Marino v. Ortiz,* 484 U.S. 301, 304, 108 S.Ct. 586, 588, 98 L.Ed.2d 629 (1988), "[t]he rule that only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment is well settled."

While there is a general rule that non-parties to a suit do not have standing to appeal, we have previously stated that exceptions exist. For instance, in *Castillo v. Cameron County, Tex.,* 238 F.3d 339 (5th Cir.2001), where we were asked to determine whether Texas had standing to seek review of a series of injunctions after it was dismissed from the underlying suit, we reaffirmed the principle that " '[i]f the decree affects [a third party's] interests, he is often allowed to appeal.' " *Id.* at 349, citing *United States v. Chagra,* 701 F.2d 354, 358–59 (5th Cir.1983); *see also In re Beef Indus. Antitrust Litig.,* 589 F.2d 786, 788 (5th Cir.1979) (stating that "[t]he Fifth Circuit has been lenient in hearing the appeals of non-parties").

**[2]** Additionally, in *Castillo* we emphasized that this Circuit applies a three-part test when deciding whether a non-party may appeal. We inquire " 'whether "the non-part[y] actually participated in the proceedings below, the equities weigh in favor of hearing the appeal, and the non-part[y] ha[s] a personal stake in the outcome." ' " *Id.* (citations omitted). Moreover, we favorably cited a case by our sister circuit, *Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.,* 205 F.3d 1107, 1113 (9th Cir.1999), in which the court found that a non-party creditor who objected to a proposed receivership distribution plan had standing because he had a legitimate interest in the proceedings, and had participated adequately in the proceedings by timely filing his claim, filing objections, and attending the hearing on the claim. Furthermore, in *Castillo* we reaffirmed the statement that we made in *Chagra* that "[n]on-party creditors who assert rights

in receivership proceedings may appeal orders affecting their legitimate interests." *Id.*, citing *Chagra,* 701 F.2d at 358–59.

**[3]** To determine whether the Whitbecks' appeal is proper, we apply our three-part test. First, in accordance with the first prong of the test, we find that the Whitbecks participated in the proceedings in the district court to the extent their interests were involved. The Whitbecks' participation is demonstrated by three actions: (1) their filing a notice that they were an interested party; (2) their moving for a turnover of the assets in the FAM Preferred account and replying to the Receiver's response to their turnover request; and (3) their filing an objection to the Receiver's proposed distribution plan.

Second, the equities weigh in favor of hearing the appeal because the distribution order substantially affects the Whitbecks' interests and the district court solicited objections to the distribution order. Moreover, unlike other cases in which standing has been found not to exist, hearing the Whitbecks' appeal will not frustrate another legal principle. *See Searcy v. Philips Electronics North America Corp.,* 117 F.3d 154, 156 (5th Cir.1997) (noting that we have more strictly enforced the rule that non-parties may not appeal in the class action context because to do otherwise "could frustrate the Rule 23 mechanism"), citing *Walker v. City of Mesquite,* 858 F.2d 1071, 1074 (5th Cir.1988) (stating that nonnamed class members should seek to intervene if they desire to appeal a decision regarding the class because to hear an appeal by a nonnamed party who has not intervened "would result in the frustration of the purpose behind class litigation").

Third, we find that the Whitbecks have a personal stake in the outcome of the distribution plan because the method by which the funds are distributed, specifically whether the funds placed in the FAM **\*330** Preferred account are distributed pro rata or given exclusively to the Whitbecks, will substantially alter the amount allocated to the Whitbecks under the distribution plan.

Accordingly, while the Whitbecks were not parties to the suit nor did they seek to intervene, we find that they have standing to appeal because they meet our three-part test for non-party standing. We caution, however, that this decision does not indicate that parties will be given a free pass to avoid complying with the rules of intervention. [5]

The second threshold issue with which we are presented is whether we may properly exercise jurisdiction over this

appeal because it is either a " 'final decision under 28 U.S.C. § 1291, [an] interlocutory decision under 28 U.S.C. § 1292, [a] nonfinal judgment certified as final under []FED.R.CIV.P. 54(b), or some other nonfinal order or judgment to which an exception applies'." *See Briargrove Shopping Ctr. Joint Venture v. Pilgrim Enter., Inc.,* 170 F.3d 536, 538 (5th Cir.1999).

**[4]**    The Whitbecks assert that this is an appeal from a final order, and therefore we have jurisdiction under 28 U.S.C. § 1291. We disagree with the Whitbecks that the district court's order is a final order because it does not " 'end the litigation on the merits [ ] leav[ing] nothing for the court to do but execute the judgment.' " *See id.* at 538–39. Instead, the decision is only one part of the overall litigation by the SEC. Consequently, we must determine whether there is another source of jurisdiction to hear the appeal.

**[5]**    We believe that the collateral order doctrine provides the authority to review the order on appeal.[6] An order is appealable by virtue of the collateral order doctrine if it "fall[s] [into] that small class [of decisions] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949).

**[6]**    In order to determine whether an order falls within the class of decisions discussed in *Cohen,* the order must meet each of the following three requirements: " '[it must] conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment.' " *Dardar v. Lafourche Realty Co., Inc.,* 849 F.2d 955, 957 (5th Cir.1988), *citing Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978).

**[7]**    The decision by the district court to approve the Receiver's distribution plan fits within the confines of the collateral order doctrine. First, it conclusively determines the manner in which the receivership assets should be distributed. Second, it resolves an important issue regarding distribution of the assets, which is separate from the merits of the SEC's complaint against Forex and Kosova. Third, it is effectively unreviewable on appeal because the assets from the receivership will be distributed, and likely unrecoverable,

long before the action brought by the SEC is subject to appellate review. Therefore, because this case meets the **\*331** requirements of the collateral order doctrine, we retain jurisdiction to hear the Whitbecks' appeal.

**[8]**    **[9]**    Turning to the merits of the Whitbecks' appeal, we analyze the district court's decision to approve the Receiver's distribution plan for an abuse of discretion because the district court was "acting pursuant to its inherent equitable powers" when it approved the plan. *United States v. Durham,* 86 F.3d 70, 72 (5th Cir.1996) (noting that the abuse of discretion standard applies when a district court is "impos[ing] an equitable remedy"). Furthermore, " '[i]n shaping equity decrees the trial court is vested with broad discretionary power[,] [and] appellate review is correspondingly narrow.' " *Quenzer v. United States,* 19 F.3d 163, 165 (5th Cir.1993).

Both the district court and the Receiver rely on *Durham* for the proposition that a pro rata distribution was a permissible equitable remedy in the present case. In *Durham,* the defendants were engaged in a "scheme to defraud [investors] through an advance fee loan financing business." *Durham,* 86 F.3d at 71. Although the majority of the investors' funds were dissipated by the time the defendants' assets were frozen, approximately $83,000 was available for distribution. Of this amount, all but approximately $8,800 was traceable to seven of the thirteen investors. One of the investors, Claremont, traced to itself approximately $70,000 of the $83,000. Despite the uncontroverted evidence that $70,000 of the $83,000 was traceable to Claremont, the district court determined that equity required that the money be distributed pro rata. On appeal, we upheld the district court's decision noting that "[i]n entering a restitution order, adherence to specific equitable principles, including rules concerning tracing are 'subject to the equitable discretion of the court.' " *Id.* at 72 (citations omitted). Although we acknowledged that "tracing would have been permissible," we upheld the decision of the district court because the court considered the positions of the various investors and, applying its discretion, determined that allowing Claremont to trace its funds would prove inequitable. *Id.* at 72–73.

**[10]**    Applying the principles enunciated in *Durham,* the district court in this case did not abuse its discretion in rejecting the Whitbecks' claim, and determining that it was more equitable to distribute the remaining Forex assets pro rata. The district court carefully considered the Whitbecks' arguments and the position of the other fraud victims. Further, the district court determined that the facts did not support a

remedy that would elevate the Whitbecks' claim above the other victims, and accordingly determined that a pro rata distribution would provide a fair and equitable remedy. Thus, the district court "used its discretion in a logical way to divide the money," and, therefore, did not abuse its discretion in approving the plan. *Id.* at 73.

The Whitbecks, however, argue that the remaining balance in the FAM Preferred accounts, namely $777,372, should not be distributed pro rata because the only deposit made into those accounts was the proceeds from their $800,000 investment. The Whitbecks proffer arguments under federal receivership law, Texas common law regarding constructive trusts, and analogous bankruptcy law to support their position.

First, the Whitbecks claim that *Durham* is inapplicable because it involved tracing, whereas the present case does not involve tracing because the funds were not commingled; this is a distinction without a difference. In both *Durham* and the present case we were asked to review a district court's decision granting one form of equitable relief over another. While it may have been permissible in *Durham* for the district court to have traced the funds, and while it may have been permissible in the present case for the district court to have allocated all of the segregated funds to the Whitbecks, in neither case was the district court required to choose the equitable **\*332** remedy requested by Claremont or the Whitbecks. Rather, in both cases the district court, acting as a court of equity, was afforded the discretion to determine the most equitable remedy. We will not disturb a district court's permissible exercise of discretion on appeal.

Despite the *Durham* decision, the Whitbecks urge that the apposite analysis for the present case is found in the Fourth Circuit's decision in *Anderson v. Stephens,* 875 F.2d 76 (4th Cir.1989). In *Anderson,* the Fourth Circuit decided "the narrow issue of whether it was proper for the district court to rule that checks deposited in [an] account ... after entry of [a] [ ] freeze order were to be included in the general account and distributed pro rata." *Id.* at 78. The Fourth Circuit held that the funds were not to be distributed pro rata, but rather were to be returned to the original investors, because "the purpose of the freeze order was to stop all activity of the [ ] account," and, therefore, nothing could have been added to the account after it was frozen. *Id.* at 80. Although the Whitbecks argue that *Anderson* stands for the proposition that segregated funds should not be subject to a pro rata distribution, we find the court's narrow holding in *Anderson* to pivot on the status of the accounts as frozen, rather than the segregated nature of

the funds. Therefore, the reasoning applied in *Anderson* is inapplicable to the present case.

The Whitbecks also claim that they are entitled to the FAM Preferred funds because FAM Preferred is a separate legal entity, and, "when a fraudulent investment scheme involves more than one investment program, the investors in each program are entitled to priority in the assets of their particular program." The Whitbecks, however, did not raise this argument in the district court when they objected to the distribution plan, and therefore this argument is forfeited. *See Governor & Co. of Bank of Scotland v. MARIA S.J. MV,* 211 F.3d 261, 265 n. 3 (5th Cir.2000) (noting that when a "claim [i]s not presented in district court, the [movants] must show the existence of a plain error that affected their substantial rights, and also must persuade us to exercise our discretion to correct it") (citations omitted).

Additionally, the Whitbecks argue that they are entitled to a constructive trust over the money in the FAM Preferred accounts under Texas common law. In *Durham,* however, this Court stated that even where it is permissible to impose a constructive trust the district court does so "only 'where equity and justice demand.' " *Durham,* 86 F.3d at 73, *quoting Rosenberg v. Collins,* 624 F.2d 659, 663 (5th Cir.1980). The Whitbecks have not shown that the district court abused its discretion in determining that equity and justice called for a different remedy in this case.

The Whitbecks further contend that analogous bankruptcy law dictates that they are entitled to all of the remaining assets in the FAM Preferred accounts. Inasmuch as this case may be resolved by application of *Durham,* which involved a similar type of distribution as the one presented in this case, we need not rely on bankruptcy law for this non-bankruptcy case.

Finally, the Whitbecks contend that the district court erred in approving the plan of distribution to the extent that it proposes to deduct any expenses of the receivership from their funds in the FAM Preferred accounts, since they did not benefit from the receivership. The Whitbecks cite no authority for this argument, and have made no showing that the district court abused its discretion in approving a plan that would deduct the Receiver's fees and expenses from the total assets prior to distribution. Accordingly, this argument likewise fails.

**III**

Because we find that the district court did not abuse its discretion when it approved the Receiver's plan, we AFFIRM.

Footnotes

1    FAM Preferred is a separate corporation from Forex.

2    At the time the accounts were frozen there was $27, 372 in the NationsBank account and $750,000 in the Rosenthal account.

3    Although the Receiver identified 87 investors, who had invested over four million dollars, forty-five of the investors previously had their investments returned to them.

4    The Receiver found that $22,000 of the $800,000 was returned to the Whitbecks shortly after their deposit.

5    We note that granting the parties standing in the present case is at variance with the decisions of the Third and Seventh Circuits. *See* *S.E.C. v. Black,* 163 F.3d 188, 196 (3d Cir.1998) (stating that "*Marino* only requires that a court deny an appeal from non-parties who have not obtained or sought intervenor status."); *see* *S.E.C. v. Wozniak,* 33 F.3d 13, 14 (7th Cir.1994) (stating that a non-party who did not intervene may not appeal). However, this case only emphasizes the circuit split that previously existed based on our analysis of the rule of non-party standing in *Castillo* and our previous cases.

6    Because we find that we have jurisdiction under the collateral order doctrine, we do not consider whether § 1292(a)(2) also provides jurisdiction.

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 94

226 Fed.Appx. 217
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also Third Circuit
LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,
Third Circuit.

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION
v.
The INFINITY GROUP COMPANY; Geoffrey
P. Benson; Geoffrey J. O'Connor; Futures
Holding Company; SLB Charitable Trust;
Susan L. Benson; JGS Trust; Lindsay
Springer; Bondage Breaker Ministries
Lindsay Springer; Bondage Breaker
Ministries, Third-Party Plaintiffs
v.
The Union States of the Constitution, i.e., Alaska;
Alabama; Arkansas; Arizona; California; Colorado;
Connecticut; Delaware; Florida; Georgia; Hawaii;
Iowa; Illinois; Indiana; Kansas; Kentucky;
Louisiana; Massachusetts; Maryland; Maine;
Michigan; Minnesota; Missouri; Mississippi;
Montana; North Carolina; North Dakota;
Nebraska; New Hampshire; New Jersey; New
Mexico; Nevada; New York; Ohio; Oklahoma;
Oregon; Pennsylvania; Rhode Island; South
Carolina; South Dakota; Tennessee; Texas;
Utah; Virginia; Vermont; Wisconsin; West
Virginia; Wyoming; Washington; Federal State
District of Columbia, Third-Party Defendants
Edward W. Roberts, Appellant.

No. 06-4158.    |    Submitted Pursuant
to Third Circuit    LAR 34.1(a) March
6, 2007.    |    Filed: April 5, 2007.

Synopsis
**Background:** Receiver for entity engaged in Ponzi scheme
determined to distribute its assets on a pro rata basis to each
defrauded investor. Recent investor whose funds could still

be traced objected to this form of distribution. The United
States District Court for the Eastern District of Pennsylvania,
Stewart Dalzell, J., overruled the objection and approved the
distribution. Investor appealed.

**Holding:** The Court of Appeals held that pro rata distribution
was proper even if investor's particular assets could be traced.

Affirmed.

See also, 2004 WL 1126275.

West Headnotes (1)

[1]     **Securities Regulation**
        🔑 Insiders' Profits, Recovery of

        Pro rata distribution of assets of entity engaged
        in Ponzi scheme to each defrauded investor was
        proper, even if recent investor's particular assets
        could be traced because his cashier's check was
        under a three-day hold when the district court
        froze the entity's account, since this investor did
        not have an equitable priority over earlier victims
        of the fraud.

        13 Cases that cite this headnote

**\*217**  On Appeal from the United States District Court for
the Eastern District of Pennsylvania, D.C. Civil Action No.
97-cv-5458, (Honorable Stewart Dalzell).

**Attorneys and Law Firms**

**\*218**  Securities & Exchange Commission, Washington, DC,
for United States Securities and Exchange Commission.

Edward W. Roberts, St. George, UT, pro se.

Before: SCIRICA, Chief Judge, FUENTES and SMITH,
Circuit Judges.

Opinion

## OPINION OF THE COURT

PER CURIAM.

Edward W. Roberts invested $30,000 in an entity called the Infinity Group Company Trust ("TIGC"), which turned out to be a "Ponzi" scheme that brought in some $26.6 million from over 10,000 investors. [1] The SEC obtained an order freezing TIGC's assets, and the District Court appointed a receiver to marshal those assets and hold them in trust for distribution to the defrauded investors. Over 4,800 investors, including Roberts, filed claims. The receiver ultimately recovered and distributed funds sufficient to cover 55 percent of each claimant's investment, which means that Roberts has recouped $16,500.

The receiver decided that the only fair and practicable way of distributing TIGC's assets was on a *pro rata* basis to each investor. Roberts objected to this form of distribution for the reason discussed below, but the District Court approved it and overruled Roberts's objection in 2000. Roberts filed an appeal, but we dismissed it for lack of jurisdiction because the District Court had not yet entered a final order. The District Court has now entered a final order terminating the receiver's trusteeship and again overruling Roberts's (oft-renewed) objection, and Roberts appeals *pro se* from that order. For the reasons that follow, we will affirm. [2]

District Courts have wide equitable discretion in fashioning distribution plans in receivership proceedings, and we review the District Court's order only for abuse of that discretion. *See Black,* 163 F.3d at 199; *SEC v. Fischbach,* 133 F.3d 170, 175 (2d Cir.1997). We do not believe that the District Court abused its discretion here. In the original Ponzi scheme case, *Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), the Supreme Court held that "tracing" fictions should not be used to pursue individual recoveries when a fraud ensnares multiple victims whose funds are commingled. *See id.* at 12-13, 44 S.Ct. 424. Instead, the Court held that all innocent victims should share equally in the recovered funds because equity demands equal treatment. *See id.*

Since then, the Courts of Appeals repeatedly have recognized that *pro rata* distribution of a defrauder's assets to multiple victims of the fraud is appropriate and that District Courts act within their discretion in approving such distributions.

*See, e.g., SEC v. Credit Bancorp, Ltd.,* 290 F.3d 80, 89 (2d Cir.2002) (explaining that "the use of a *pro rata* distribution has been deemed especially appropriate for fraud victims of a 'Ponzi' scheme" and collecting cases); *United States v. 13328 and 13324 State Highway North,* 89 F.3d 551, 553-54 (9th Cir.1996) (collecting cases). This is so even when circumstances that do not provide any equitable basis to distinguish between investors make it possible to trace particular investors' assets. *See, e.g., Credit Bancorp,* 290 F.3d at 89 (affirming *pro* rata distribution **\*219** where tracing possible as a result of "merely fortuitous" events); *United States v. Durham,* 86 F.3d 70, 73 (5th Cir.1996) (same); *SEC v. Forex Asset Mgmt. LLC,* 242 F.3d 325, 331-32 (5th Cir.2001) (affirming *pro rata* distribution where objecting investors' funds were segregated in a separate account and never commingled).

Roberts, however, argues that he is entitled to the return of his full $30,000 investment because TIGC never actually had access to his money and $30,000 of the funds remaining in its account when it was frozen can thus be traced directly to him. Roberts invested his money by means of a $30,000 cashier's check, which shows that TIGC deposited it on August 25, 1997. According to Roberts, TIGC's bank had a policy of placing a three-day "hold" on cashier's check funds and the actual funds thus would not have become available to TIGC until August 28, 1997. On August 27, 1997, however, the District Court entered two temporary restraining orders freezing TIGC's account. Thus, Roberts argues, his $30,000 never became available to TIGC and necessarily remained in its account when the District Court froze it on August 27.

We will assume for present purposes the truth of Roberts's allegations. [3] Those allegations, however, establish merely that it would have been possible to trace his $30,000 to money remaining in the TIGC account, not that equity demanded he receive it all back. According to Roberts, the bank policy on which he relies wound up depriving TIGC of access to his funds solely by reason of the date on which TIGC deposited his check. The mere fact that it did so just two days before its account was frozen does not give Roberts equitable priority over the thousands of other victims of TIGC's fraud. Accordingly, the District Court determined that there is no equitable basis to distinguish between early investors and those, like Roberts, who invested shortly before TIGC's account was frozen, and that all investors should thus be treated the same. (June 9, 2000 Order at 1; Aug. 28, 2006 Order at 2 n. 1.) We cannot say that the District Court abused its wide equitable discretion in so concluding. *See, e.g., Credit*

U.S. S.E.C. v. Infinity Group Co., 226 Fed.Appx. 217 (2007)

Fed. Sec. L. Rep. P 94,196

*Bancorp,* 290 F.3d at 89; *Forex Asset Mgmt.,* 242 F.3d at 331-32. [4]

The District Court's order will be affirmed.

**Parallel Citations**

2007 WL 1034793 (C.A.3 (Pa.)), Fed. Sec. L. Rep. P 94,196

Footnotes

1    The parties are familiar with the background of this case. All others are referred to *SEC v. Infinity Group Co.,* 212 F.3d 180 (3d Cir.2000), which sets forth the nature and history of the scheme in some detail.

2    We have jurisdiction pursuant to 28 U.S.C. § 1291.

3    For this reason, we need not address Robert's argument that he was denied "equal protection" by the receiver's or District Court's alleged failure to investigate and establish these allegations.

4    Roberts has not cited any legal authority. We have located one appellate decision that potentially supports his position, but it is distinguishable. In *Anderson v. Stephens,* 875 F.2d 76 (4th Cir.1989), a defrauder deposited certain of his victims' checks in an account one day after it had been frozen by court order, and the bank accepted the deposit despite the freeze. Reasoning that the effect of the freeze was to prevent the defrauder from transacting business of any kind with the account, the Fourth Circuit held that the post-freeze deposit was invalid and that the funds in question should have been returned in full to the individual investors, not combined with the defrauder's assets for *pro rata* distribution. *See id.* at 79-80. Here, by contrast, TIGC deposited Roberts's cashier's check two days *before* the District Court froze its account, so that deposit was perfectly valid. Even if we were to find *Anderson* persuasive, that distinction is dispositive. We further note that nothing in the District Court's temporary restraining orders prevented TIGC's bank from crediting already-deposited funds to TIGC's account after the freeze.

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 95

785 F.2d 1
United States Court of Appeals,
First Circuit.

UNITED STATES of America, Appellee,

v.

Assada ABOU–SAADA, Defendant, Appellant.
UNITED STATES of America, Appellee,

v.

Milad K. EL–DEBEIB, Defendant, Appellant.
UNITED STATES of America, Appellee,

v.

Antonious TANNOUS, Defendant, Appellant.
UNITED STATES of America, Appellee,

v.

Yacoub FAYAD, Defendant, Appellant.

Nos. 85–1101 to 85–1104.   |   Argued Nov.
12, 1985.   |   Decided Feb. 27, 1986.   |   As
Amended on Denial of Rehearing March 21, 1986.

Defendants were convicted before the United States District
Court for the District of Massachusetts, Andrew A.
Caffrey, Chief Judge, of conspiracy to possess heroin with
intent to distribute and of a related "interstate commerce"
charge, and they appealed. The Court of Appeals, Breyer,
Circuit Judge, held that: (1) posttrial affidavit attesting
to willingness of previously unavailable witness to testify
that Government had promised defendant immunity in
return for his cooperation warranted evidentiary hearing to
decide whether or not Government made such a promise;
(2) evidence of defendant's past and present association
with other conspirators in drug possession and distribution
scheme, of other conspirators' reluctance to deal with those
they did not trust, of defendant's presence with one of
conconspirators on public square at time alleged transaction
was to take place, of his conduct at that time, and of
a false exculpatory statement was sufficient to sustain
convictions; and (3) affidavit of drug enforcement agent
was sufficient to support finding that normal investigative
procedures reasonably appeared to be unlikely to succeed,
thus warranting issuance of wiretap order.

Affirmed in part and remanded in part.

West Headnotes (12)

[1]    **Criminal Law**
       ⚖ Hearing and rehearing in general

Posttrial affidavit attesting to willingness of
previously unavailable witness to testify that
Government had promised defendant immunity
in return for his cooperation warranted
evidentiary hearing to decide whether or not
Government made such a promise; testimony
became available before final sentence was
passed, hearing would not involve jury, factual
question involved was important, affidavit was
not inherently incredible, trial judge had had
no opportunity to assess witness' credibility at
trial, Government did not submit affidavits from
agents denying factual assertions in witness'
affidavit, and there was no reason to doubt that
defendant had tried to obtain witness' testimony
earlier or that her failure to testify was not
defendant's fault.

6 Cases that cite this headnote

[2]    **Criminal Law**
       ⚖ Hearing and rehearing in general

Disputed matters of fact arising from posttrial
motions do not always require evidentiary
hearings; such issues may often be properly
decided on basis of affidavits.

7 Cases that cite this headnote

[3]    **Conspiracy**
       ⚖ Admissibility in general

In absence of any evidence of a government
promise not to prosecute defendant if he
went ahead with a "controlled delivery" of
narcotics, or evidence of any justified reliance
on such a promise, facts of "controlled delivery"
were admissible in prosecution on charge
of conspiracy to possess heroin with intent
to distribute and related interstate commerce
charge. Comprehensive Drug Abuse Prevention
and Control Act of 1970, §§ 403(b), 406, 21
U.S.C.A. §§ 843(b), 846.

2 Cases that cite this headnote

**[4]    Criminal Law**

🔑 Exceptions to hearsay rule, and non-hearsay distinguished in general

Third-party conduct, including meeting of the four conspirators, fact that a conversation took place between defendant and a taxi driver in public square where conspirators were meeting, action of defendant and taxi driver in traveling from public square to a local motel, and fact that taxi driver fled when drug enforcement agents appeared, was not hearsay, and thus was admissible in prosecution on charge of conspiracy to possess heroin with intent to distribute and on related interstate commerce charge. Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 403(b), 406, 21 U.S.C.A. §§ 843(b), 846; Fed.Rules Evid.Rules 801, 801 note, 28 U.S.C.A.

Cases that cite this headnote

**[5]    Criminal Law**

🔑 Particular cases

Defendant's act of pointing to another alleged participant in drug possession and distribution scheme, while clearly assertive, was a party admission, rather than inadmissible hearsay. Fed.Rules Evid.Rule 801(d)(2)(A), 28 U.S.C.A.

3 Cases that cite this headnote

**[6]    Criminal Law**

🔑 Effect of Failure to Object or Except

Failure of defense counsel to separately object to that part of coconspirator hearsay introduced against defendant that no other defendant could have raised, or to indicate special ground for objection that defendant had withdrawn from conspiracy, would result in waiver of objection.

5 Cases that cite this headnote

**[7]    Commerce**

🔑 Federal Offenses and Prosecutions

**Conspiracy**

🔑 Narcotics and dangerous drugs

Evidence of defendant's past and present association with other conspirators in drug possession and distribution scheme, of other conspirators' reluctance to deal with those they did not trust, of defendant's presence with one of conspirators on public square at time alleged transaction was to take place, of his conduct at that time, and of a false exculpatory statement upon arrest was sufficient to sustain conviction of charge of conspiracy to possess heroin with intent to distribute and of a related "interstate commerce" charge. Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 403(b), 406, 21 U.S.C.A. §§ 843(b), 846.

1 Cases that cite this headnote

**[8]    Criminal Law**

🔑 Waiver of rights

Evidence supported district court's findings that defendant, who, while undeniably a foreigner, had lived in United States for 16 years and sometimes answered questions in English before they were translated by court-provided interpreter, understood English and his *Miranda* warnings sufficiently to knowingly waive his rights.

10 Cases that cite this headnote

**[9]    Commerce**

🔑 Federal Offenses and Prosecutions

**Conspiracy**

🔑 Sentence and Punishment

Sentence of six years imprisonment upon conviction of conspiracy to possess heroin with intent to distribute and of related "interstate commerce" charge, which was well within statutory 20-year maximum, was not excessive. Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 401(b)(1)(A)(i), 403(b), 406, 21 U.S.C.A. §§ 841(b)(1)(A)(i), 843(b), 846.

Cases that cite this headnote

**[10]    Telecommunications**

👉 *Necessity; inadequacy of other procedures*

Issuance of wiretapping warrant requires that district court satisfy itself that government has used normal techniques but has encountered difficulties in penetrating a criminal enterprise or in gathering evidence to the point where, even given statutory preference for less intrusive techniques, wiretapping becomes reasonable. 18 U.S.C.A. § 2518(3)(c).

26 Cases that cite this headnote

**[11]** **Telecommunications**

👉 *Necessity; inadequacy of other procedures*

Affidavit of drug enforcement agent setting out history of detailed investigation of drug possession and distribution conspiracy, efforts to use other less intrusive investigatory techniques, failure to obtain identities of or evidence against all the conspirators, and various statements suggesting reluctance of conspirators to meet with unknown persons was sufficient to support finding that normal investigative procedures reasonably appeared to be unlikely to succeed, thus warranting issuance of wiretap order. 18 U.S.C.A. § 2518(3)(c).

23 Cases that cite this headnote

**[12]** **Telecommunications**

👉 *Application or Affidavit*

Fact that Government lacked sufficient evidence to convict key source of supply in drug possession and distribution scheme justified seeking wiretaps to obtain evidence against all key conspirators, only some of whom were known at time of application for warrant, even though there may have been sufficient evidence without the wiretaps to convict certain of the conspirators. Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 403(b), 406, 21 U.S.C.A. §§ 843(b), 846; 18 U.S.C.A. § 2518(3)(c).

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*3** Nicholas A. Abraham, with whom Abraham-Hanna, P.C., was on brief, for defendant, appellant Tannous.

Charles Rankin, for defendant, appellant El-Debeib.

Andrew Good, with whom Silverglate, Gertner, Baker, Fine & Good, was on brief, for defendant, appellant Fayad.

E. Sydney Hanlon, Asst. U.S. Atty., with whom William F. Weld, U.S. Atty., was on brief, for appellee.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and WYZANSKI, [*] Senior District Judge.

**Opinion**

BREYER, Circuit Judge.

The government charged the four defendants in this case with being part of an international heroin importing conspiracy. The jury convicted them of conspiracy to possess (with intent to distribute) fifteen pounds of heroin, 21 U.S.C. § 846, and of a related "interstate commerce" charge, 21 U.S.C. § 843(b). All four (Assada Abou-Saada, Milad El-Debeib, Antonious Tannous and Yacoub Fayad) appeal raising various arguments. With one exception, we find these arguments legally inadequate; hence, we affirm the convictions of Abou-Saada, Tannous, and Fayad. We remand El-Debeib's case for further proceedings.

**I**

We first set forth several of the key facts in this case, primarily for what they tell us about Abou-Saada's role. This role will become important in respect to one of appellant Tannous' arguments which we will discuss at pp. 9–10 *infra.* In setting forth the facts, we read the record in a light most favorable to the government. *United States v. Quejada-Zurique,* 708 F.2d 857, 859 (1st Cir.), *cert. denied,* 464 U.S. 855, 104 S.Ct. 173, 78 L.Ed.2d 156 (1983).

**A**

*The Canadian Investigation*

On March 9, 1984, in Toronto, Canada, an undercover agent of the Royal Canadian Mounted Police (RCMP), Corporal Gerald Froud, bought 100 grams of heroin from Remonda Bassett. Froud wanted to catch Bassett's suppliers. When he met with her again on March 13, he complained about the quality of the 100 grams received. He insisted on meeting with her suppliers, and he discussed buying an additional four kilograms of heroin. After placing wiretaps on Bassett's phone, the RCMP heard her relay the four kilogram order to Elias and Marie Njeim in Montreal. The RCMP then began to tap the Njeims' phone as well.

Froud went with Bassett to Montreal on March 19. He met with the Njeims, he paid them $30,000 for the 100 grams, he discussed an interim purchase of 250 grams, and he agreed to buy the additional four kilograms for $600,000. During the trip, Froud heard Bassett say that the Njeims were "dealing with the main person in Boston," who received drugs from an overseas supplier whom she (Bassett) knew.

Froud met with Bassett again in Toronto on March 30. Bassett offered to sell him yet an additional 200 grams. Later that day, the RCMP heard Bassett's husband call Assad Abou-Saada in Lebanon and ask for four kilograms of heroin. After bargaining over the price, Abou-Saada agreed to deliver the four kilograms of drugs to the United States for $150,000.

On April 1, Bassett received a call from Yacoub Fayad in Boston. During the conversation, **\*4** Fayad made clear that he was the Njeims' regular heroin supplier, that he would supply the extra 200 grams destined for Froud, and that he did not want to meet her customers. He said, "No, no, no, if they are not from our people I won't meet with them. I will meet with you, me and you...." Subsequently, the RCMP overheard several conversations among Bassett, Fayad and the Njeims discussing the quality and price of the 200 grams, in which it became apparent that Marie Njeim and Fayad were attempting to doublecross both each other and Bassett.

On April 5, Froud returned to Montreal with Bassett. He paid for, and received, the 200 grams. Froud then travelled with Bassett to Massachusetts, where Bassett met alone with Fayad at the Harvard Street Garage in Medford (which Fayad owned). Afterwards Bassett told Froud that "everything was in place" for the four kilogram shipment.

**B**

**Boston: Pre-Delivery**

The RCMP kept the United States Drug Enforcement Agency informed about these events. Consequently, the DEA began to watch Fayad's Harvard Street Garage. On May 3 (after Bassett's meeting with Fayad in Boston), the DEA obtained a warrant allowing it to tap the phones at the garage and at Fayad's residence. Two days later, the DEA overheard Abou-Saada call Fayad from Lebanon and tell Fayad that he would soon arrive in Boston. They arranged to meet. On May 10 the DEA overheard Abou-Saada tell Fayad that he had arrived in Boston and was staying at the Charles River Motel. The DEA began to watch Abou-Saada who communicated frequently with Fayad from that point on.

On Tuesday, May 15, Abou-Saada told Fayad that the "shipment" would arrive Thursday. In fact, the next day (Wednesday), two crates arrived at Logan Airport in Boston addressed to a fictitious address near Fayad's garage. They contained china and fifteen pounds of heroin packed between the cardboard dividers separating the dishes.

During the next few days Abou-Saada told Fayad that he believed government agents were watching him; Marie Njeim told Froud that the four kilograms of heroin had arrived; Fayad told Bassett that the drugs had arrived but could not be delivered; and Marie Njeim then told Froud that there was a delay and he should call again in fifteen days to a month.

**C**

**The Delivery**

On May 30, a skycap at Logan Airport told federal agents that two women had tried to bribe him to smuggle two packages (the ones just described) past customs. The agents seized the packages and found the heroin inside. They arrested the women, Sara Green and Judith Limentani (defendant El-Debeib's ex-wife). They informed the women of their *Miranda* rights. *See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).* They then asked the women to help make a "controlled delivery," *i.e.,* to deliver the packages as if nothing had happened while the DEA watched. The women agreed.

The two women took the packages (the DEA had removed most of the heroin) and they tried to deliver them to Abou-Saada at a Boston motel. Abou-Saada, however, did not keep his appointment with the women. The RCMP overheard Abou-Saada tell Marie Njeim that El-Debeib had told him to pick up the drugs, but that someone else had told him that agents were watching the motel.

The DEA decided to try again. They took the packages and put them in a locker in Boston's Back Bay bus terminal. They gave the key to Limentani, and told her to await Abou-Saada's further delivery instructions. In the meantime, the DEA began to watch Limentani's ex-husband, El-Debeib. They noticed El-Debeib talk to a gasoline station attendant (defendant Tannous) on two occasions. And, they also **\*5** continued to watch the Harvard Street Garage.

The next day (May 31), the DEA noticed that El-Debeib was driving his taxi near the bus terminal. Believing that he had come to pick up the packages, they stopped him; and, they found that he had the key to the locker with the packages. The DEA did not arrest El-Debeib, but they read him *Miranda* warnings; and, they asked him to cooperate by continuing with a "controlled" delivery. El-Debeib agreed. The DEA agents then placed the packages in El-Debeib's taxi.

The DEA agents watched El-Debeib drive to Harvard Square in Cambridge, Massachusetts, get out of his taxi, and talk to another taxi driver whom he met there. He and the other taxi driver then each returned to their taxis and drove off to the parking lot of a nearby Holiday Inn. The agents also saw Abou-Saada and Tannous sitting in a white Pontiac parked in the Square. They noticed that when El-Debeib arrived, Tannous (who was sitting in the driver's seat) pointed to El-Debeib, apparently for Abou-Saada's benefit.

The two men (Tannous and Abou-Saada) watched while El-Debeib and the other taxi driver spoke. When El-Debeib and the second taxi driver drove to the Holiday Inn, Tannous and Abou-Saada drove off in the opposite direction. The DEA agents then arrested El-Debeib and the other driver (who fled when the DEA appeared) at the Holiday Inn. Other DEA agents stopped Tannous and Abou-Saada on Memorial Drive in Cambridge and arrested them.

Although the government presented additional incriminating evidence against some of the defendants, this outline of the facts is sufficient for the purposes of these appeals.

## II

### *El-Debeib*

#### A

[1] El-Debeib notes that, after the trial, he told the district court that a previously unavailable witness, Judith Limentani, was then willing to testify that the government had promised El-Debeib immunity in return for his cooperation. He argues that that district judge, after reading her affidavit, should have granted him a new trial, or, at least, held an evidentiary hearing to decide whether or not the government made such a promise. We agree that the court ought to have held the hearing.

The relevant background is as follows: On December 17, 1984, the tenth day of trial, El-Debeib filed a written motion asking the court to dismiss the indictment, in part because the government did not tell the grand jury that "federal law enforcement agents" assured Judith Limentani that "if she used Milad El-Debeib to complete the controlled delivery, ... [he would] not be charged ... which assurances she conveyed" to El-Debeib. The district court denied the motion the same day.

The district court had previously heard defense attorneys question the government agents involved outside the presence of the jury (apparently as part of a voir dire looking towards an entrapment defense). The court had also heard counsel *try* to present Ms. Limentani's testimony. But, Limentani invoked the Fifth Amendment, refusing to testify because she had not yet been sentenced in a related proceeding before another judge. Thus, the district court, when it denied El-Debeib's motion, had before it only the agents' testimony which made no reference to any such promise.

After Limentani was sentenced, El-Debeib asked the court to hear her testimony. His (post-trial) request for an evidentiary hearing was accompanied by an affidavit from Limentani, in which, she says,

> I indicated to [DEA Special] agent [John] Costanzo that I would be willing to ask Milad El-Debeib to try to locate [Abou-Saada] only if the Federal authorities agreed not

to prosecute Milad El-Debeib. Agent Costanzo agreed that if Milad El-Debeib were used, he would not be arrested or prosecuted.... That morning [May 31, 1984], because of my condition [heroin withdrawal] and my inability to **6** effect a controlled delivery of the package to [Abou-Saada], I told Milad El-Debeib the events of the previous day and asked him to complete my part of the controlled delivery of the two packages to [Abou-Saada]. I assured Milad El-Debeib that he would not be arrested or prosecuted and indicated to him that John Costanzo of the DEA had assured me that Milad El-Debeib would not be arrested or prosecuted.... During Milad El-Debeib's absence I called DEA agent Pat Meahl. Ms. Meahl indicated to me that I should give the key to the locker to Milad and have him complete the controlled delivery. I was concerned about Milad El-Debeib being arrested and asked DEA agent Pat Meahl if he would be arrested and prosecuted. She indicated to me that he would not be. I then asked for her supervisor's assurances of the same. DEA agent John Costanzo spoke to me over the telephone and indicated that Milad El-Debeib would not be arrested or prosecuted if he effected a controlled delivery of the package.

In our view, the district court should have granted El-Debeib's request that it hear from Ms. Limentani before deciding whether her allegations were true or false, even though the request was made after El-Debeib's trial was over.

First, the trial was *just* over. The district court would have heard from Limentani had she been willing to testify on December 17. Her testimony became available only three weeks later—and before final sentence was passed. The hearing would not involve the jury. Second, the factual question—whether or not the agents made the promise—is important. If the agents made such a promise, the district court would, in all likelihood, wish to reopen the case, either to

dismiss the indictment or to fashion other appropriate relief. *United States v. Carrillo,* 709 F.2d 35, 37 (9th Cir.1983); *In re Snoonian,* 502 F.2d 110, 112 (1st Cir.1974); *see also Santobello v. New York,* 404 U.S. 257, 263, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971); *United States v. Garcia,* 698 F.2d 31, 37 (1st Cir.1983); *cf. United States v. Hamilton,* 559 F.2d 1370, 1373 (5th Cir.1977). Third, Limentani's affidavit is not *inherently* incredible, *cf. United States v. Crooker,* 729 F.2d 889, 890–91 (1st Cir.1984). In fact, the agents agree they made certain promises to Limentani, though not necessarily the promises she asserts. Fourth, the trial judge had no opportunity to assess Limentani's credibility at trial. *Cf. United States v. Ward,* 544 F.2d 975, 976 (8th Cir.1976) (per curiam) (necessity for a hearing diminished where trial judge earlier saw and heard witness). Fifth, the government did not submit affidavits from the agents denying Limentani's factual assertions. *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954) (per curiam). The earlier testimony of the agents contains no specific outright denial. Sixth, we have no reason to doubt that El-Debeib tried to obtain Limentani's testimony earlier and her failure to testify was not his fault.

 **[2]** District courts need not always hold hearings on disputed matters of fact arising from post-trial motions; *see, e.g., United States v. Nace,* 561 F.2d 763, 772 (9th Cir.1977) (trial court has discretion to decide factual issue raised after trial on affidavits); *United States v. Kearney,* 682 F.2d 214, 219 (D.C.Cir.1982) (same). Such issues are often properly decided on the basis of affidavits. *See United States v. Wright,* 625 F.2d 1017, 1018–19 (1st Cir.1980); *United States v. Martorano,* 663 F.2d 1113, 1119 (1st Cir.1981), *cert. denied,* 460 U.S. 1011, 103 S.Ct. 1249, 1250, 75 L.Ed.2d 479 (1983). But, given the combination of six circumstances we have outlined, we believe a hearing before the judge—giving him an opportunity to assess credibility—is appropriate here. *See Remmer v. United States,* 347 U.S. at 229–30, 74 S.Ct. at 451; *United States v. Mitchell,* 602 F.2d 636, 639 (4th Cir.1979); *Lyles v. United States,* 272 F.2d 910, 912 (5th Cir.1959). *Compare United States v. Crooker,* 729 F.2d 889 (1st Cir.1984) *with United States v. Fournier,* 594 F.2d 276 (1st Cir.1979). Should the court decide the factual **7** question in the government's favor, the matter is at an end. Should it decide against the government, it can then determine appropriate relief in light of the factual circumstances revealed. *Compare Government of Virgin Islands v. Scotland,* 614 F.2d 360, 365 (3d Cir.1980) (protecting reliance interest of defendant only). *See Santobello v. New York,* 404 U.S. at

263, 92 S.Ct. at 499; *see also Mabry v. Johnson,* 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984).

## B

 **[3]**   El-Debeib argues that the district court should have suppressed the facts of the "controlled delivery," which the government introduced into evidence against him. El-Debeib says that it is 'fundamentally unfair,' and, therefore, a violation of the Due Process Clause of the Fifth Amendment, for the government to use against him what the government had learned only as a result of his voluntary cooperation. He cites as support *Rochin v. California,* 342 U.S. 165, 72 S.Ct 205, 96 L.Ed 183 (1952) (due process prevents state's forcible extraction of contents of defendant's stomach to gather evidence), and also *United States v. Romano,* 583 F.2d 1, 7 (1st Cir.1978). On the facts of this case, however, we can find no such basic unfairness.

Before obtaining El-Debeib's cooperation, government agents told El-Debeib he was a suspect. They read El-Debeib a standard statement of his constitutional rights. El-Debeib understands English and said he understood those rights; he shows no compulsion. Had he confessed, his confession would have been admissible. *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). We find no other circumstance suggesting that the government took unfair advantage of him. *Cf. Tague v. Louisiana,* 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980) (per curiam). With one possible exception, treated separately in part IIA above (see pp. 5–7, *supra*), the record contains no evidence of a government promise not to prosecute El-Debeib, nor evidence of any justified reliance on such a promise. This absence of reliance on broken government promises distinguishes the cases El-Debeib cites. *Cf. Rowe v. Griffin,* 676 F.2d 524, 528 (11th Cir.1982) ("[O]nce the defendant's good faith compliance with the terms of the [immunity] agreement is established, the state must perform on its side and any attempt by the state to breach the agreement is *per se* a bad faith prosecution"); *Mobley ex rel. Ross v. Meek,* 531 F.2d 924 (8th Cir.), *rev'd sub nom. Hutto v. Ross,* 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976) (admissions, made after plea bargain later disavowed by state, suppressed by Court of Appeals). In fact, this record suggests that El-Debeib's decision to cooperate simply reflected his hope for favorable treatment by prosecutor and judge. And, the trial court gave El-Debeib a lighter sentence than his co-defendants. Unless defendant shows the promise described in Section IIA was made, then given this record, the defendant will not have shown that introduction of evidence obtained through his cooperation was "fundamentally unfair."

## C

El-Debeib also complains about the admission of certain evidence which he says is hearsay. He adds that the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), is not available, for he had withdrawn from the conspiracy (and was cooperating with the government) when the hearsay statements were made. *United States v. Smith,* 623 F.2d 627, 631 (9th Cir.1980); *United States v. Mardian,* 546 F.2d 973, 978 n. 5 (D.C.Cir.1976) (citing cases). He makes three separate claims.

 **[4]**   First, El-Debeib attacks the admission of evidence of conduct by third parties. This conduct includes a) the act of the four conspirators meeting in Harvard Square; b) the fact that a conversation took place between El-Debeib and the second taxi driver in Harvard Square; c) the action of El-Debeib and the other taxi driver travelling to the Holiday Inn; and d) the fact  **\*8**  that the second taxi driver fled when the DEA agents appeared. The Federal Rules of Evidence do not consider third party conduct hearsay, however, unless it was intended as a statement—a rather unlikely circumstance that would presuppose an elaborate charade intended to "frame" El-Debeib. *See* Fed.R.Evid. 801 & advisory committee note (a). *United States v. Hensel,* 699 F.2d 18, 31 (1st Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983); *cf. United States v. Brock,* 667 F.2d 1311, 1315 n. 2 (9th Cir.1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1271, 75 L.Ed.2d 493 (1983). Defendant does not argue that this is the case.

 **[5]**   Second, El-Debeib objects to the introduction against him of his own pointing to the second taxi driver. This conduct, while clearly assertive, is a party admission. Hence, it is not hearsay. Fed.R.Evid. 801(d)(2)(A).

 **[6]**   Third, El-Debeib complains of the act of Antonious Tannous pointing to him as he arrived in Harvard Square. DEA agent Albert Reilly testified as follows:

> Q. After you entered the Harvard Square area, you saw Tannous's car parked with the lights flashing. What was the next thing you saw? ...

A. ... So as El-Debeib came abreast to Tannous's car, I observed Tannous's left hand was on the wheel, he leaned over, got close to Abou-Saada and appeared to say something, and he pointed to the cab; and I then observed El-Debeib look at Tannous's vehicle.

We agree with El-Debeib that Tannous' pointing amounts to hearsay, for it is conduct intended as an assertion. *See* Fed.R.Evid. 801 advisory committee note (a); *United States v. Ross,* 321 F.2d 61, 69 (2d Cir.), *cert. denied,* 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963). We also agree that the pointing would ordinarily not be admissible against El-Debeib as a conspirator, for he had previously withdrawn from the conspiracy. *United States v. Mardian,* 546 F.2d at 978 n. 5 (citing cases). Nonetheless, the government claims that the pointing is admissible in this instance because El-Debeib's counsel did not properly object to its admission into evidence; and the objection was therefore waived. *Reagan v. Brock,* 628 F.2d 721, 723 (1st Cir.1980).

El-Debeib replies that he did object properly. He says that the trial judge told counsel to save all objections to co-conspirator hearsay until he made the findings required by *United States v. Petrozziello,* 548 F.2d 20, 23 (1st Cir.1977)—findings that the government had produced enough evidence of a conspiracy to warrant submitting the issue and evidence to a jury. He says that he then objected.

We have examined this late objection, however, and we find it inadequate. The recorded exchange at the time of the *Petrozziello* findings consists of the following:

The Court: This is the time for me to make the *Petrozziello* findings.... I find on the basis of what I remember of the non-hearsay evidence the government has proved by a preponderance of the evidence that there was a conspiracy formed and in existence at about the time charged in the indictment, that the conspiracy was of the type charged and that each of these defendants was a member thereof....

Mr. DiMento [counsel to Fayad]: Note my objection.

Mr. Nessralla [counsel to Abou-Saada]: Mine.

Mr. Prince [counsel to Rawwad]: Mine.

Mr. Boyajian [counsel to El-Debeib]: Mine.

Mr. Abraham [counsel to Tannous]: Mine....

This exchange indicates a general objection to the adequacy of the *Petrozziello* finding. It does not suggest that El-Debeib had a separate objection to one part of the coconspirator hearsay that no other defendant could have raised. It neither identifies the particular testimony to which El-Debeib (now) objects, nor does it indicate the special **\*9** ground for objection. It is, therefore, inadequate. *See* 1 J. Weinstein & M. Berger, *Weinstein's Evidence,* ¶ 103[02] at 103–22 ("If a general objection is overruled when a specific objection should have been made, the party objecting to the evidence is precluded from asserting the proper objection on appeal."); Fed.R.Crim.P. 51; *Harney v. United States,* 306 F.2d 523, 534 (1st Cir.), *cert. denied,* 371 U.S. 911, 83 S.Ct. 254, 9 L.Ed.2d 171 (1962).

El-Debeib also says that he later made another objection. Counsel said:

I would ask that that evidence insofar as El-Debeib is concerned be stricken for consideration in evidence because it has clearly been shown by the government witnesses they put it there, that he was a cooperating individual, and to now have those boxes go to the jury for consideration as adverse evidence against him I think is highly prejudicial....

This objection mentions the relevant ground, namely, withdrawal from the conspiracy,—but it does not mention the evidence to which El-Debeib now objects, namely, the pointing. Rather, the "evidence" to which it refers consisted of packages containing heroin. Thus, it does not help El-Debeib.

In sum, El-Debeib's "hearsay" objections fail on appeal, either because the evidence to which he points is not hearsay or because he did not properly object at trial.

## III

### *Tannous*

#### A

Antonious Tannous claims that the evidence the government produced against him was insufficient as a matter of law.

He says that no reasonable juror could have found it showed guilt beyond a reasonable doubt. *United States v. Quejada-Zurique,* 708 F.2d at 859; *United States v. Smith,* 680 F.2d 255, 259 (1st Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983). We do not agree.

[7]    The government introduced evidence showing that Tannous worked at an Exxon station in Chestnut Hill where he had spoken to El-Debeib near the time of the heroin delivery. A DEA agent's testimony (quoted at p. 8, *supra*) places Tannous next to Abou-Saada, pointing out El-Debeib, at the very time El-Debeib was in Harvard Square with the "heroin" packages, speaking to the second taxi driver. The jury had considerable evidence that Abou-Saada was a ringleader, that El-Debeib was a courier, that El-Debeib was to deliver the heroin to the other taxi driver whom he met in Harvard Square, and that Abou-Saada was worried about DEA surveillance. It might reasonably have inferred that Abou-Saada had Tannous drive him to the Square so that he could assure himself that the delivery was taking place as planned and that Tannous helped Abou-Saada by pointing out El-Debeib. A juror might thus have seen Tannous as a kind of lookout or as a kind of "getaway" driver for Abou-Saada.

The one difficult question is whether the jury could have concluded that Tannous had the requisite state of mind at the time. Did Tannous know about Abou-Saada's criminal activities, or had Abou-Saada told Tannous a false but 'innocent' story about what was happening? The evidence favoring the former interpretation included 1) Tannous' past association with the other conspirators; 2) the nature of Tannous' activities in Harvard Square; 3) the other conspirators' reluctance to deal with those they did not trust; and 4) testimony by DEA agent James Connolly that Tannous, when stopped, said he had been "looking for someone" and he "didn't meet them"—a statement inconsistent with Tannous' previously observed actions. A juror faced with this evidence may have viewed Tannous' statement to the DEA agent as an effort at evasion, and may also have thought the likelihood that Abou-Saada had used an "unknowing" person very small. We cannot say such a juror would be unreasonable in concluding guilt proved beyond a reasonable doubt—particularly in the absence of any evidence (in the government's case) that Abou-Saada, in fact, gave **\*10** Tannous a false explanation of what was happening. *Compare United States v. Guerrero-Guerrero,* 776 F.2d 1071, 1074 (1st Cir.1985) *with United States v. Glasgow,* 658 F.2d 1036, 1040–42 (5th Cir. Unit B 1981) (no

false exculpatory statement; no prior association with other conspirators).

Of course, if one looks beyond the government's case, to the defense, one finds additional evidence supporting Tannous. Tannous testified that Abou-Saada gave him an innocent explanation of why he wished a ride to Harvard Square. Yet, the jury may well have thought Tannous evasive on the witness stand and taken a negative view of his credibility. In addition, the government presented in rebuttal, testimony that Tannous said during police questioning that Abou-Saada had given him $2500 which he, in turn, gave to El-Debeib (a fact that Tannous had denied on the witness stand). Given the additional evidence, along with the jury's right to assess credibility, to include defense and rebuttal evidence in deciding the "sufficiency" of the evidence hurts Tannous more than it helps him.

In sum, we find sufficient evidence to support Tannous' conviction whether we restrict our review to the evidence presented in the government's case in chief, *see Cephus v. United States,* 324 F.2d 893, 897 (D.C.Cir.1963), or whether, as is more often appropriate in this circuit, we look to all the evidence. *United States v. Notarantonio,* 758 F.2d 777, 788 (1st Cir.1985) (court must consider all the evidence in weighing 'sufficiency' if it reserves judgment on motion for acquittal made at close of government's case until the close of all the evidence); *see also Colella v. United States,* 360 F.2d 792, 802 (1st Cir.), *cert. denied,* 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966); *cf. United States v. Fusaro,* 708 F.2d 17, 23–24 (1st Cir.), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983) (limited exception to this rule where codefendant's case impels defendant's presentation of evidence).

## B

Tannous next argues that the district court should have suppressed statements he made to government agents because he did not knowingly waive his *Miranda* rights. Essentially, he claims that his English was too poor, and his education, background, and intelligence too limited for him to understand the *Miranda* warnings the agents read him before asking him questions. The district court, after an extensive hearing, found the contrary, and that finding has adequate record support.

 **[8]** Tannous argues that the very fact the government provided him with an interpreter indicates a lack of knowledge of English. He adds that the transcript of his testimony reveals poor English. He is undeniably a foreigner. And, he testified to a limited educational background having permanently left school at age 16. On the other hand, Tannous has lived in the United States for 16 years. The DEA agents who initially questioned him said he could answer their questions perfectly well in English, to the point of describing the medical details of a complicated neck injury he had suffered. And, his interpreter said he would sometimes answer questions in English before they were translated. Additionally, the suppression hearing transcript offers considerable support for the district court's conclusion that Tannous was evasive and inconsistent. His claims, for example, that he understood nothing at all, not even the Arabic translations of the *Miranda* warnings (because of the interpreter's "Egyptian accent") might reasonably be taken as showing the opposite. After reading the hearing record, we cannot say that the district court's findings (that Tannous understood English, and that he understood the *Miranda* warnings) was "clearly erroneous." *United States v. Jobin,* 535 F.2d 154, 156 (1st Cir.1976) (clearly erroneous standard appropriate in reviewing district court's findings of fact at suppression hearing); *United States v. Cox,* 752 F.2d 741, 747 (1st Cir.1985) (same). And, given this factual support, the district court's conclusion that Tannous had knowingly  **\*11** waived his rights has adequate support. *United States v. Payton,* 615 F.2d 922, 923 (1st Cir.), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 830 (1980).

## C

 **[9]** Tannous argues that his sentence of six years imprisonment was too long given his minor role in the conspiracy, his age, his background, his previous behavior, his medical history, the sentences given to the more important conspirators, and so forth. The sentence, however, is well within the statutory twenty-year maximum, 21 U.S.C. §§ 846, 841(b)(1)(A)(i), and the appropriate weight to be given to the factors Tannous mentions is, as a matter of law, up to the district court. *United States v. Kimball,* 741 F.2d 471, 475 (1st Cir.1984) (citing *United States v. Tucker,* 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972) for the proposition that a sentence within statutory limits is not generally subject to review); *United States v. Tracey,* 675 F.2d 433, 441 (1st Cir.1982).

## IV

### *Fayad and Abou-Saada*

Fayad and Abou-Saada argue that the district court should have suppressed the evidence the government obtained by wiretapping Fayad's garage. They say the warrant authorizing the wiretaps was legally defective in that the affidavit supporting the government's request for the warrant failed to satisfy the statutory requirement that it show that "normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c).

As the Supreme Court has written, "[t]his language, however, is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974), and that the section safeguards against wiretapping "procedures [being] ... routinely employed as the initial step in criminal investigation." *United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).

 **[10]** We have held that courts are to read an affidavit showing compliance with this requirement in a "practical and commonsense manner." *United States v. Scibelli,* 549 F.2d 222, 226 (1st Cir.), *cert. denied,* 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977); and, that the government does not need to exhaust all other investigative procedures before resorting to wiretapping. *United States v. Southard,* 700 F.2d 1, 28 (1st Cir.), *cert. denied,* 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983) (citing cases). Nor must ordinary techniques be shown to have been wholly unsuccessful. *United States v. Scully,* 546 F.2d 255, 260–61 (9th Cir.1976), *vacated on other grounds sub nom. United States v. Cabral,* 430 U.S. 902, 97 S.Ct. 1168, 51 L.Ed.2d 578 (1977). Rather, the district court must satisfy itself that the government has used normal techniques but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence —to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable. *United States v. Scafidi,* 564 F.2d 633, 641 (2d Cir.), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 401 (1977); *United States v. Pacheco,* 489 F.2d 554, 565 (5th Cir.), *cert. denied,* 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1974).

[11]  In this case, the government attached to its warrant request a highly detailed, thirty-five page factual account of the government investigation to date—in the form of an affidavit of DEA agent James Connolly. The affidavit contains facts designed to show, among other things, that:

1. DEA agents could not identify certain unknown key co-conspirators or obtain necessary evidence simply by watching those previously identified;

2. The DEA could not obtain search warrants and seize the contraband because  *12  it did not know where the conspirators had stored it;

3. The DEA knew of no informants who would help apprehend the conspirators;

4. The DEA had twice tried to introduce undercover agents to the conspirators so that they could pretend to buy drugs and then arrest the sellers; but these efforts failed to uncover key conspirators because of the conspirators' reluctance to deal with non-Lebanese;

5. The DEA did not wish to use "grants of immunity" because all the presently identified members of the conspiracy seemed to play important roles; in any event it seemed unlikely any of them would testify against the others;

6. The RCMP's wiretaps had not identified all key members of the conspiracy or yet produced sufficient evidence to convict them all;

7. The DEA could not identify important unidentified members of the conspiracy or gather sufficient evidence through examination of telephone toll records.

The appellants accept most of the facts recited in the affidavit as sufficiently supporting these seven assertions which, in turn, are more than sufficient to satisfy the requirement of § 2518(3)(c). Compare United States v. Southard, 700 F.2d at 28; United States v. Scibelli, 549 F.2d at 227. Appellants aim their attack at point 4—the DEA's efforts to introduce undercover agents. They say that the affidavit's statement that "unsuccessful" attempts to introduce "an undercover agent to Fayad" is overstated, that it is not borne out by the facts the affidavit recites; and in any event, those facts are shown untrue by a wiretap recording introduced at trial. And, they conclude that these defects require a finding that the government has not met its burden under § 2518(1)(c).

In our view, even as to point 4 the affidavit was adequate. It indicates a 'reasonable likelihood' that efforts to use undercover agents would fail to find and to catch all the key conspirators. 18 U.S.C. § 2518(3)(c). For one thing, the affidavit recounts lengthy government investigations that did not wholly succeed. It adds that Fayad, in statements recorded by the RCMP, "insisted he was unwilling to meet anyone he didn't know." It says that Bassett told RCMP Corporal Froud that "Fayad will not deal with anyone whom he doesn't know, and that he specifically refuses to deal with anyone who is American or Canadian (and not Lebanese)." It also reproduces a taped conversation from an investigation of Yacoub Fayad one year earlier (in 1983), in which an undercover agent (John Costanzo) who had just arranged to buy some heroin, seems to be making an effort to meet Fayad, but Fayad is reluctant to meet him. Finally, it recounts Froud's trip with Bassett to Boston in 1984 (see p. 4, supra ). It says that "Bassett suggested that Fayad meet the undercover officer, but Fayad said that "he ... would not [do so] under any circumstances." It adds that Fayad told Bassett "to come alone ... and that he was frightened she might be followed."

Appellants' argument basically concerns the details of these two last mentioned incidents, namely Costanzo's undercover efforts in 1983 and Froud's trip with Bassett. They say that Costanzo's 1983 efforts to meet Fayad failed, not because of Fayad but because of the government. They note that Costanzo at the time had said to Fayad "We're gonna have to sit down after, me and you, huh" and Fayad said, "Okay." This single sentence in a transcript of a taped conversation, about a hypothetical future meeting, is not sufficient, however, to overcome other evidence of Fayad's reluctance to meet with outsiders—even in 1983, for Fayad took considerable precautions not to be present when Costanzo bought the drugs. If appellants mean to fault the government for failing to follow up on this 1983 "invitation," after Costanzo's "purchase," we can find no fault, for the government could not easily follow up after it arrested the conspirators who appeared at the sale.

Appellants also argue that the affidavit's account of the Froud trip is in error. Bassett,  *13  they say, did not suggest that she bring Froud to meet Fayad in Boston; rather, Bassett wanted to bring her husband. It is difficult to see why this makes a difference, for, if Fayad was reluctant to meet Bassett's husband, he was likely to be reluctant to meet Froud. Regardless, we must take the facts as stated in the affidavit, for the validity of a warrant depends upon the sufficiency of

the affidavit on its face, where, as here, there is no allegation that the affiant deliberately lied. *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978); *Krohn v. United States,* 742 F.2d 24, 26–27 (1st Cir.1984).

In essence, appellants have aimed their arguments at peripheral matters. The basic point is that the affidavit sets out a history of 1) a detailed investigation, 2) efforts to use other less intrusive investigatory techniques, 3) failure to obtain the identities of or evidence against all the conspirators and 4) various statements suggesting reluctance to meet with unknown persons. The district court could reasonably conclude that normal investigative procedures "reasonably appear to be unlikely to succeed."

 **[12]**    Appellants make a final point. They argue that the government had enough evidence to convict the conspirators, so it did not need the wiretaps. Whether or not this was

true in respect to Fayad, however, it is untrue in respect to Abou-Saada, the key source of supply. Thus, it was reasonable to seek wiretaps to obtain evidence against *all* the key conspirators, only some of whom were known at the time of the application for the warrant. *See United States v. Messersmith,* 692 F.2d 1315, 1317–18 (11th Cir.1982).

*The judgments of the district court as to defendants Assada Abou-Saada, Antonious Tannous, and Yacoub Fayad are affirmed. While we retain appellate jurisdiction, the cause of Milad K. El-Debeib is remanded to the district court for further proceedings in accordance with this opinion. The district court is to advise this court when a decision has been rendered.*

**Parallel Citations**

19 Fed. R. Evid. Serv. 1481

---

Footnotes

*    Of the District of Massachusetts, sitting by designation.

---

**End of Document**                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 96

86 F.3d 70
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of America, Plaintiff,
and

Claremont Properties, Inc.,
Intervenor/Plaintiff–Appellant,

v.

Jannette E. DURHAM, et al., Defendants–Appellees.

No. 95–10470.    |    June 24, 1996.

Appeal was taken from order of the United States District Court for the Northern District of Texas, Robert B. Maloney, J., distributing seized assets that were involved in fraudulent loan brokerage scheme. The Court of Appeals, Reynaldo G. Garza, Circuit Judge, held that distributing funds that were involved in fraudulent scheme pro rata to victims, rather than imposing constructive trust on funds that could be traced to individual victim, was not abuse of discretion.

Affirmed.

West Headnotes (7)

**[1]    Sentencing and Punishment**
    Power to award
**Trusts**
    Equity jurisdiction in general
When fashioning restitution order or imposing constructive trust, district court is acting pursuant to its inherent equitable powers.

3 Cases that cite this headnote

**[2]    Sentencing and Punishment**
    Discretion of court
In entering restitution order, adherence to specific equitable principles, including rules concerning tracing analysis, are subject to equitable discretion of court.

7 Cases that cite this headnote

**[3]    Criminal Law**
    Sentencing
District court's decision to distribute pro rata funds seized from defendants involved in fraudulent scheme, rather than tracing funds to individual claimants, was imposition of equitable remedy subject to review for abuse of discretion.

30 Cases that cite this headnote

**[4]    Trusts**
    Nature of constructive trust
When party that is victim of fraudulent scheme can trace its assets, that party is entitled to seek constructive trust or equitable lien on its portion of those funds that remain. Restatement of Restitution § 211(1).

3 Cases that cite this headnote

**[5]    Trusts**
    Nature of constructive trust
Constructive trust may be created regardless of intention of parties where equity and justice demand.

Cases that cite this headnote

**[6]    Criminal Law**
    Civil liabilities to persons injured; reparation
When tracing of assets taken as result of fraudulent scheme is impossible, claimant has merely personal claim against wrongdoer and funds are distributed ratably. Restatement of Restitution § 213 comment.

8 Cases that cite this headnote

**[7]    Criminal Law**
    Civil liabilities to persons injured; reparation
**Trusts**
    Nature of constructive trust

Distributing funds that were involved in fraudulent scheme pro rata to victims, rather than imposing constructive trust on funds that could be traced to individual victim, was not abuse of discretion; district court determined it would be inequitable to allow individual victim to benefit merely because defendants spent other victims' funds first.

17 Cases that cite this headnote

**Attorneys and Law Firms**

**\*71** Katherine Savers McGovern, Assistant U.S. Attorney, Paul E. Coggins, U.S. Attorney's Office, Dallas, TX, for U.S.

Leila A. D'Aquin, Haynes & Boone, Dallas, TX, Marcus Montalvo, Baker & McKenzie, Dallas, TX, for Claremont Properties, Inc., intervenor/plaintiff-appellant.

Jannette E. Durham, Mesquite, TX, pro se.

Raymond R. Kramer, El Reno, OK, pro se.

Marc L. Ellison, Schlanger, Mills, Mayer and Grossberg, Houston, TX, Michael Scott Bernstein, Dallas, TX, for Sheila Suess Kennedy, claimant.

Joel D. Johnson, Warner and Smith, Fort Smith, AR, for John Putnam and Charles McRay dba Airport Properties, claimants.

Paige B. Bayoud, Dallas, TX, pro se.

Robert Robert Jersky, Washington, DC, pro se.

L.P. Mazel Realty, Brooklyn, NY, pro se.

Brandon McVey, Poplar Bluff, MO, pro se.

Fred G. Schaller, Sarasota, FL, pro se.

Frank Belgiovine, Hackensack, NJ, pro se.

San Antonio Motel Ltd., Gulf Breeze, FL, pro se.

Robert Raymond Ansiaux, Dallas, TX, for Public Storage Properties XVIII Ltd., movant.

Mark Christopher Niles, Department of Justice, Washington, DC, Robert S. Greenspan, U.S. Department of Justice, Civil Division, Washington, DC, for U.S. as amicus curiae.

Appeals from the United States District Court for the Northern District of Texas.

Before REYNALDO G. GARZA, JONES and DENNIS, Circuit Judges.

**Opinion**

REYNALDO G. GARZA, Circuit Judge:

**Background**

Intervenor/Plaintiff–Appellant, Claremont Properties, Inc. ("Claremont"), challenges the district court's method of distributing assets seized by the United States from Defendants–Appellees, Jannette E. Durham, et al.[1] The Defendants perpetrated a "scheme to defraud consumers through an advance fee loan financing business." They created various front corporations purportedly operating a legitimate loan brokerage business in order to obtain money from consumers by falsely representing their ability to obtain financing for large projects, or to directly finance those projects.

These grifters were successful in their venture until apprehended by the FBI. A total of $806,750 was defrauded from thirteen entities or individuals. Upon Defendants' arrest, roughly $83,495.52 of the money was left. The Defendants were indicted for wire fraud, money laundering, and conducting financial transactions with money derived from unlawful activity. *See* 18 U.S.C. §§ 1343, 1956(a)(1)(A)(i), 1956(a)(1)(B)(ii), 1957 and 2. Defendants plead guilty to a single count of 18 U.S.C. §§ 1343 and 2. Upon motion from the United States, the district court permanently enjoined the Defendants from further fraudulent action and froze their assets.[2] The next order of business was to divide the **\*72** seized $83,495.52 among the thirteen claimants.

The charlatans used multiple accounts and company names to implement their scheme. However, by the end, they had only one account (Cypress, Ltd.) with assets (the $83,495.42) at one bank, Pavilion National. It is uncontested by court or party that all but $8,803.99 of the money in the Pavilion accounts could be traced to seven claimants, one of which was Claremont Properties. Only four of these seven filed

claims. The Defendants had deposited and withdrawn almost all the money defrauded from the other claimants. A few days after Claremont funds were deposited, the Defendants were arrested.

Over Claremont's objection, the district court elected in the interest of equity, to distribute the $83,000 pro rata rather than giving the bulk of it to Claremont and the other three victims whose funds had been traced. The court added the total claims, $806,750, and allocated the $83,000 by percentage against the total claim. Claremont's total claim was $161,750 —20% of the total claims. Therefore it would receive only $16,740,83. Uncontroverted evidence from the FBI showed that, if tracing were applied, Claremont was due $70,970.13 of the $83,000. [3]

The district court rejected Claremont's bid that the court trace the funds. The court justified its decision to distribute pro rata stating,

> In determining a plan for distribution, the Court must act to determine the most equitable result. In the instant action, all claimants stand equal in terms of being victimized by the defendant defrauders. The ability to trace the seized funds to Claremont and Northernaire is the result of the merely fortuitous fact that the defrauders spent the money of the other victims first. Allowing Claremont and Northernaire to recover from the funds seized to the exclusion of the other victims under the tracing principle would be to elevate the position of those two victims on the basis of the actions of the defrauders. The Court sees no justification in equity for this result. [4]

Order Overruling Objections of Claremont, p. 3.

The district court granted Claremont's motion to intervene in the government's action for injunctive relief, allowing Claremont to make this timely appeal. For the reasons stated herein, we affirm.

**Discussion**

**A. Standard of Review**

[1]    [2]    [3]    Claremont contends that the district court was required by law to impose a constructive trust for the traced portions of the assets. Appellant thus argues that this court reviews the district court's restitution order de novo. However, when fashioning a restitution order or imposing a constructive trust, the district court is acting pursuant to its inherent equitable powers. *See United States v. Brown, 988 F.2d 658, 661 (6th Cir.1993); United States v. Cen– Card Agency/C.C.A.C., 724 F.Supp. 313, 318 (D.N.J.1989).* In entering a restitution order, adherence to specific equitable principles, including rules concerning tracing analysis are "subject to the equitable discretion of the court." *In re Intermountain Porta Storage, Inc., 74 B.R. 1011, 1016 (D.C.Colo.1987).* Accordingly, we will review the lower court's imposition of an equitable remedy for abuse of discretion. *S.E.C. v. AMX, International, Inc., 7 F.3d 71, 73 (5th Cir.1993).*

**B. Distribution of Funds**

[4]    [5]    [6]    The Court is offered this question to decide: did the district court abuse its discretion in distributing the assets pro rata? Typically, when a party can trace its assets, that party is entitled to seek a constructive trust or equitable lien on its portion of those funds that remain. Restatement (First) of Restitution § 211(1) (1937); **\*73** *Cunningham v. Brown,* 265 U.S. 1, 11, 44 S.Ct. 424, 426, 68 L.Ed. 873 (1924) (discussing the infamous Ponzi scheme). A constructive trust may be created regardless of the intentions of the parties "where equity and justice demand." *Rosenberg v. Collins,* 624 F.2d 659, 663 (5th Cir.1980). When tracing is impossible, a claimant has merely a personal claim against the wrongdoer and the funds are distributed ratably. *Cunningham,* 265 U.S. at 11, 44 S.Ct. at 426; Restatement (First) of Restitution § 213 cmt. c., illus. 3–6 (1937).

[7]    No one can dispute that tracing would have been permissible under the circumstances of this case. *Cunningham,* 265 U.S. at 11, 44 S.Ct. at 426. Claremont identified its funds and had a right *to seek* imposition of a constructive trust on the traced funds. The government in fact suggested that Claremont receive the traced funds. However, the court, in exercising its discretionary authority in equity, was not obliged to apply tracing. See *S.E.C. v. Elliott,* 953 F.2d 1560 (11th Cir.1993) (district court's decision to

disallow tracing was well within broad equitable powers); *United States v. Vanguard Inv. Co.,* 6 F.3d 222, 227 (4th Cir.1993) ("a district court in its discretionary supervision of an equitable receivership may deny remedies like rescission and restitution where the equities of the situation suggest such a denial would be appropriate."). As noted above, the court imposes a constructive trust only "*where equity and justice demand.*" *Rosenberg,* 624 F.2d at 663.

The lower court in this case chose not to impose a constructive trust in Claremont's favor because it seemed inequitable to allow Claremont to benefit merely because the defendants spent the other victims' funds first. Claremont would obtain a preferred claim over funds if the court were to impose the constructive trust. To the district court, all the fraud victims were in equal positions and should be treated as such. We cannot say that the district court's assessment of the facts and the resulting order were an abuse of discretion.

Sitting in equity, the district court is a "court of conscience." *Wilson v. Wall,* 73 U.S. (6 Wall.) 83, 90, 18 L.Ed. 727 (1867). Acting on that conscience, the lower court in the instant case rationally considered the positions of the victims and held that following the tracing principle would be inequitable. Claremont's frustration with the lower court's ruling is understandable but the court was not required to impose a constructive trust in Claremont's favor. Because the court used its discretion in a logical way to divide the money, the court committed no error requiring our intervention. For us to hold otherwise would be to chain the hands of the court in Equity to do what is right under the circumstances. We will not rob the lower court of the discretion essential to its function. The restitution order is AFFIRMED.

## Footnotes

1  Appellees, Jannette E. Durham, et al., have taken no part in this appeal and do not challenge the arguments or actions of Appellant. The United States participates in this appeal only as amicus curiae.

2  Under 18 U.S.C. § 1345, the district court has power to enjoin the violation of federal fraud statutes and may "take other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought." Under § 1345 and inherent equitable power, a district court may distribute seized funds to fraud victims.

3  An FBI Special Agent traced $70,000 of Claremont's payments that were deposited and never withdrawn.

4  The United States initially was able to trace funds for only two of the claimants, Claremont and Northernaire.

---

**End of Document**                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.