# TAB 97

739 F.2d 838
United States Court of Appeals,
Third Circuit.

UNITED STATES of America
v.
GIBBS, Stephen a/k/a "Jake," Appellant.

No. 82-1096.    |    Argued Sept. 14, 1982.    |
Panel Opinion Filed March 22, 1983.    |    Vacated
and Rehearing En Banc    Granted May 19, 1983.
|    Reargued In Banc Nov. 21, 1983.    |    Decided
June 15, 1984.    |    As Amended June 19, 1984.

Defendant was convicted in the United States District Court
for the Eastern District of Pennsylvania, John B. Hannum, J.,
of conspiracy to distribute marijuana, and he appealed. The
Court of Appeals, Garth, Circuit Judge, held that: (1) District
Court properly determined that out-of-court statements were
admissible under coconspirator exception to the hearsay rule,
in view of independent evidence of conspiracy and fact that
statements were made in furtherance of conspiracy, and (2)
defendant failed to preserve for appeal confrontation clause
issue, i.e., that Government did not carry its burden of proof
as to unavailability of declarant and reliability of evidence.

Affirmed.

Rosenn, Senior Circuit Judge, dissented and filed opinion, in
which Aldisert and Gibbons, Circuit Judges, joined.

Seitz, Chief Judge, dissented and filed opinion.

West Headnotes (7)

[1]    **Criminal Law**
       👈 Furtherance or Execution of Common
       Purpose
       **Criminal Law**
       👈 Necessity in General

       Before an out-of-court statement can be admitted
       into evidence under coconspirator exception to
       the hearsay rule, there must be independent
       evidence establishing that the person against
       whom the statement is offered participated
       in conspiracy, statement must have been in

furtherance of conspiracy, and coconspirator's
statement must have been made during the life
of the conspiracy. Fed.Rules Evid.Rule 801(d)
(2)(E), 28 U.S.C.A.

10 Cases that cite this headnote

[2]    **Criminal Law**
       👈 Necessity in General
       **Criminal Law**
       👈 Weight and Sufficiency

       To admit evidence under coconspirator's
       exception to the hearsay rule, prosecution
       must lay a foundation for the admission of
       coconspirator testimony by establishing the
       existence of a conspiracy including the defendant
       by a fair preponderance of independent evidence;
       this preponderance standard simply requires
       prosecution to present sufficient proof so that
       the trial judge may find that the existence of
       the contested fact is more probable than its
       nonexistence.

       6 Cases that cite this headnote

[3]    **Criminal Law**
       👈 Weight and Sufficiency

       Trial court properly found that certain out-of-
       court statements were admissible in prosecution
       for conspiracy to distribute marijuana against
       defendant as coconspirator admissions, in that
       evidence permitted a reasonable inference of
       defendant's complicity in enterprise, there was
       sufficient independent evidence from which
       district court reasonably could have inferred
       that defendant was still involved in conspiracy
       at time statements were made, and there was
       a reasonable basis for trial court to find
       that statements were made in furtherance of
       conspiracy. Fed.Rules Evid.Rule 801(d)(2)(E),
       28 U.S.C.A.

       7 Cases that cite this headnote

[4]    **Criminal Law**
       👈 Furtherance or Execution of Common
       Purpose

Statements made to those who were not involved in a conspiracy are not in furtherance of it for purposes of coconspirator exception of the hearsay rule, just as casual conversation between coconspirators that is not intended to induce continued involvement, or other actions that would not advance the conspiracy, are not in furtherance of a conspiracy. Fed.Rules Evid.Rule 801(d)(2)(E), 28 U.S.C.A.

7 Cases that cite this headnote

**[5]** **Criminal Law**
👉 Character of Acts or Declarations

Statements made by one conspirator to keep other conspirators informed about progress of the scheme satisfies the "in furtherance" requirement of the coconspirator exception to the hearsay rule. Fed.Rules Evid.Rule 801(d)(2)(E), 28 U.S.C.A.

5 Cases that cite this headnote

**[6]** **Criminal Law**
👉 Hearsay

Since defendant never specifically raised during trial confrontation clause issue, i.e., the Government did not carry its burden of proving unavailability of declarant and reliability of certain hearsay statements of declarant, issue had not been preserved for appeal and could not serve as basis to reverse defendant's conviction. Fed.Rules Evid.Rule 801(d)(2)(E), 28 U.S.C.A.

17 Cases that cite this headnote

**[7]** **Criminal Law**
👉 Time of Objection

Even if defendant's confrontation clause objection to certain hearsay testimony had been specifically made, and even if it had addressed issues of burden of proof and unavailability of declarant, which it did not, objection was untimely and insufficient to preserve a confrontation clause issue for appeal, where, even assuming that objection was sufficiently specific, defendant made his constitutional objection not when the evidence

was offered, but during motion to strike made after the Government rested. Fed.Rules Evid.Rules 103(a)(1), 801(d)(2)(E), 28 U.S.C.A.

27 Cases that cite this headnote

**Attorneys and Law Firms**

**\*839** Martin G. Weinberg (argued), Lillian A. Wilmore, Oteri, Weinberg & Lawson, Boston, Mass., Thomas A. Bergstrom, Philadelphia, Pa., for appellant.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Robert L. Hickok (argued), Sp. Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before SEITZ, Chief Judge, ALDISERT, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER, BECKER, Circuit Judges, and ROSENN, Senior Circuit Judge.

**OPINION OF THE COURT**

GARTH, Circuit Judge.

Defendant Stephen Gibbs was convicted after a jury trial in the United States District Court for the Eastern District of Pennsylvania of conspiracy to distribute marijuana in violation of 21 U.S.C. § 846 (1976). The conviction was based primarily on statements made by a co-conspirator, Joseph Quintiliano, that were admitted into evidence against Gibbs under Fed.R.Evid. 801(d)(2)(E), which creates a category of non-hearsay for co-conspirators' admissions.

On appeal to a panel of this court, Gibbs argued that (1) the prerequisites for the admission into evidence of co-conspirator testimony were not satisfied, and that (2) the introduction of that evidence violated his sixth amendment right to confront and cross-examine the witnesses against him. We hold that the challenged testimony was **\*840** properly admitted under Fed.R.Evid. 801(d)(2)(E) and we also hold that Gibbs' sixth amendment confrontation issue was not adequately preserved for appeal. Thus, we affirm the judgment of conviction entered below.

**I.**

Stephen Gibbs was one of six persons indicted for conspiracy to violate federal narcotics laws. [1] At his trial, Gibbs did not dispute that in 1980 Joseph Quintiliano and several others participated in a conspiracy to import marijuana into the United States with the intent to distribute it for sale. Rather, Gibbs' defense was that there was insufficient evidence of his own participation in the conspiracy.

The existence of the conspiracy was firmly established at trial. The evidence showed that early in 1980, Quintiliano began to make plans to import marijuana into Pennsylvania from Colombia, South America. In late March, he purchased a Beechcraft twin-engine airplane for $40,000. According to the testimony of two unindicted co-conspirators, Charles Bilella and David White, [2] Quintiliano stated on several occasions in late March and early April that he intended to use the airplane to transport marijuana from Colombia into Pennsylvania. From April to September 1980, Quintiliano and the other conspirators made efforts to repair and equip the plane for smuggling. In late September, after several test flights, pilot Prentiss Breland [3] flew the plane from Pennsylvania to Homestead, Florida. On October 4, Breland flew the plane from Florida to Colombia. Upon his return trip to Pennsylvania in the early morning hours of October 5, Breland missed a planned refueling stop in the Bahamas and was forced to land at Boca Raton, Florida, to refuel. A few hours later Breland was arrested at the Florida airport and the plane, containing marijuana worth over $400,000, was seized. [4]

The Government prosecuted Gibbs on the theory that he participated in the conspiracy as the intended purchaser of the marijuana. The evidence linking Gibbs to the conspiracy fell into three categories. First, the Government established that on April 7, 1980, Gibbs traveled from his home in Massachusetts to Quakertown, Pennsylvania, for a meeting with Quintiliano. Gibbs flew to Philadelphia and was met there by David White, who then flew him to meet Quintiliano at Wings Airfield in Montgomery County, Pennsylvania. Surveillance officers testified that Quintiliano greeted Gibbs at Wings Airfield and drove him to the Perkins Pancake House, the site of other conspiracy meetings, where they conversed privately. Quintiliano and Gibbs then proceeded to Quakertown Airport where the Beechcraft was located, and together they inspected the airplane for several minutes. Upon leaving the airport, they were followed by Pennsylvania state **841 troopers who observed that the people in the vehicle (Quintiliano and Gibbs) were looking around to see

if someone was following them and that Quintiliano engaged in several driving maneuvers that the officers testified were designed to evade surveillance, i.e., a brief pull-off into a hotel area, followed by a resumption of travel in the same direction, and then, after further "looks" by the driver and passenger, a U-turn to proceed in the direction from which they had come.

The second category of evidence upon which the Government relied, and in fact the principal evidence offered against Gibbs, was derived from statements made by Quintiliano that implicated Gibbs in the conspiracy. Bilella and White testified that in the spring of 1980, around the time Quintiliano purchased the Beechcraft and began to repair it, Quintiliano stated that he planned to sell the marijuana to a customer named "Jake" with whom he had dealt before. On April 6, 1980, the day before Gibbs' visit to the Quakertown airport, Quintiliano told White that "Jake" was growing impatient with the slow progress of the planning, and that Quintiliano had invited "Jake" to come for a visit the next day (i.e., April 7, 1980) to see firsthand the preparations for the Colombia trip. White volunteered to meet "Jake" at the Philadelphia airport and to take him to Wings Airfield to meet with Quintiliano. White testified that the following day he went to Philadelphia and met defendant Gibbs, who identified himself as "Jake" and matched the description of "Jake" given by Quintiliano. Gibbs told White that he had been informed of the arrangements for White to meet him in Philadelphia.

Bilella also testified to an out-of-court statement by Quintiliano. According to Bilella, sometime during the first week in October, Quintiliano told him that he had made arrangements to sell the marijuana to some people from Florida who had offered more money than "Jake." (Gibbs argues that this testimony indicates that he, Gibbs, had dropped out of the conspiracy.)

White and Bilella also testified to a series of events that took place at Quintiliano's home on the evening of October 4, 1980, including statements by Quintiliano concerning telephone conversations that incriminated Gibbs in the conspiracy. Bilella testified that while he was in Quintiliano's home early that evening, he heard Rizo and Quintiliano discussing financial arrangements for the sale of the marijuana to the people from Florida, who were staying nearby. Quintiliano apparently became dissatisfied with these terms because the prospective buyers were unable to pay cash in advance. Quintiliano stated that he had telephoned "Jake" to see if he would buy the marijuana, and that "Jake" had agreed to "try to make the necessary arrangements." [5]

White testified that while at his own home that evening, he received a telephone call from Quintiliano asking him to come to Quintiliano's residence. When White arrived about 10:45 p.m., Quintiliano apprised him of the developments earlier in the evening. Quintiliano described to White three telephone conversations he had had with his Miami bosses, who had instructed Quintiliano not to distribute the marijuana without receiving full payment. [6] White also testified regarding Quintiliano's account of a telephone call to "Jake" in which "Jake" reportedly had agreed to buy the marijuana but needed time to obtain the necessary **\*842** funds. [7] These conversations between White and Quintiliano took place in Rizo's presence. White further testified that he heard Quintiliano instruct his brother Jerry to call "Jake" from a pay phone. Quintiliano asked White for permission to store the marijuana temporarily in his shop until "Jake" could get the money, and at about 12:30 a.m. on October 5, 1980, White, Quintiliano, and other conspirators met at White's shop to clear storage space for the marijuana.

The third category of evidence by which the Government sought to link Gibbs to the conspiracy and to corroborate the co-conspirator testimony consisted of telephone records showing long distance calls made from the Quintiliano residence in Pennsylvania. At least six telephone calls were made from Quintiliano's residence to the Gibbs residence in Massachusetts between March and May 1980. [8] Four such calls were made during September 1980, three of which occurred on September 26-27, about the time Breland flew the plane to Florida. Another call was made on October 3, 1980, the day before the plane left for Colombia. In addition, two calls were made from the Quintiliano residence to the Gibbs residence in the early morning hours of October 5, at the time the plane was due in Quakertown. The second such call, made at 3:39 a.m., followed a call from Quintiliano to David White, who was waiting at Quakertown Airport, in which Quintiliano told White that something had gone wrong with Breland's flight home.

There also was evidence of telephone calls on October 4, 1980, from Quintiliano's residence to the Ram Broadcast Co. (Ram), an electronic beeper service located near Gibbs' home in Massachusetts. [9] Although there was no direct evidence that the defendant was a client of Ram, the Government did demonstrate that one of Ram's customers was a "Gibbs Oil Co." and that Gibbs himself had claimed to be involved in the

oil business. There was no evidence that these calls to Ram were returned.

On appeal, Gibbs contends that the district court erred in allowing the jury to consider the statements made by Quintiliano to White and Bilella as evidence against Gibbs. He maintains that Quintiliano's out-of-court statements were hearsay declarations that should have been excluded from admission under the Federal Rules of Evidence and under the Confrontation Clause of the sixth amendment to the Constitution.

## II.

Under the Federal Rules of Evidence, the out-of-court statements of a party to the case or of his agent are considered "admissions"-non-hearsay [10] -and may be used as substantive evidence. *See* Fed.R.Evid. 801(d)(2). Rule 801(d)(2)(E) provides that statements offered against a party that are made "by a co-conspirator of a party during the course and in furtherance of the conspiracy" are not hearsay and are admissible. In this case, the district court found **\*843** that Quintiliano's out-of-court statements were admissible against Gibbs as co-conspirator admissions.

**[1]**  Before an out-of-court statement can be admitted into evidence under Fed.R.Evid. 801(d)(2)(E), three requirements must be satisfied. *United States v. Ammar,* 714 F.2d 238, 245 (3d cir.), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). First, there must be independent evidence establishing that the person against whom the statement is offered participated in the conspiracy. Second, the statement must have been in furtherance of the conspiracy. Third, the co-conspirator's statement must have been made during the life of the conspiracy. Gibbs contends that the first and second prerequisites are not met in this case.

### A. *Independent Evidence of Conspiracy*

**[2]**  According to the rule of *United States v. Trotter,* 529 F.2d 806 (3d Cir.1976), the prosecution must lay a foundation for the admission of co-conspirator testimony by establishing the existence of a conspiracy including the defendant by "a fair preponderance of independent evidence." *Id.* at 811-13. *See Ammar,* 714 F.2d at 246 & n. 3.; *Government of the Virgin Islands v. Dowling,* 633 F.2d 660, 665 (3d Cir.), *cert. denied,* 449 U.S. 960, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980); *United States v. Continental Group, Inc.,* 603 F.2d 444, 457

(3d Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). [11] This preponderance standard simply requires the prosecution to present sufficient proof so that the trial judge may find "that the existence of the contested fact is more probable than its nonexistence." *Trotter, supra,* 529 F.2d at 812 n. 8 (quoting McCormick, *Evidence* 794 (2d ed. 1972)). [12] In reviewing the district court's determination that a preponderance of independent evidence established Gibbs' participation in the conspiracy, this court's inquiry is limited to whether the trial judge had "reasonable grounds" to make his finding. *Ammar,* 714 F.2d at 249; *Continental Group,* 603 F.2d at 460; *United States v. Bey,* 437 F.2d 188, 196 (3d Cir.1971).

[3] In holding that the district court did not err in finding that the conspiracy existed and that Gibbs participated in the conspiracy we do not consider the alleged telephone conversations between Quintiliano and Gibbs to which White and Bilella testified. [13] The existence of a conspiracy in this case is clear and uncontested. As for Gibbs' participation in the conspiracy, the independent evidence (*i.e.,* evidence apart from the testimony of White and Bilella) offered by the Government to prove that Gibbs was a member of the conspiracy, while not weighty, was nevertheless sufficient. The Government relied heavily on Gibbs' visit to Pennsylvania in April 1980 and on telephone records showing calls made from Quintiliano's residence to Gibbs' residence or Ram Broadcast Co. around the time of the unsuccessful smuggling operation.

**\*844** The circumstances surrounding Gibbs' April 7, 1980, visit to see Quintiliano, the principal conspirator, provides some evidence that Gibbs was involved in Quintiliano's scheme at that time. The meeting took place only nine days after Quintiliano bought an airplane to be used for smuggling marijuana into the United States, and it took Gibbs a considerable distance from home to the place of the conspiratorial planning. Gibbs and Quintiliano had obviously had some communication prior to the visit. Although the plane was located at Quakertown Airport, White was instructed by Quintiliano to take Gibbs to Wings Airfield, [14] from which the Government suggests an inference can be drawn that Gibbs and Quintiliano wanted to hide their connection with the smuggling plane located at Quakertown Airport. [15] Gibbs and Quintiliano conferred at the Perkins Pancake House, the site of previous conversations between Quintiliano and White and Bilella concerning the conspiracy. The defendant and Quintiliano then proceeded

to Quakertown Airport, where they inspected the plane to be used in the smuggling operation. Finally, evidence of Quintiliano's evasive driving after leaving Quakertown Airport accompanied by his passenger Gibbs, and the frequent glances by both Quintiliano and Gibbs for the apparent purpose of detecting surveillance allows the further inference of unlawful activity. *See United States v. D'Amato,* 493 F.2d 359, 364-65 (2d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 50 (1974) (counter-surveillance driving indicative of conspiracy).

We recognize that at that point in the trial the evidence of Gibbs' contacts with Quintiliano may have fallen short of establishing Gibbs' involvement in the conspiracy beyond a reasonable doubt. But that is not the appropriate standard to be applied at that stage. The evidence, as recounted above, permits a reasonable inference of Gibbs' complicity in the enterprise then under way. We cannot say that the district court lacked reasonable grounds to infer that Gibbs was participating in the conspiracy at the time of his visit. [16]

Because most of the co-conspirator declarations offered by the Government were made six months after Gibbs' April 7, 1980, visit to Pennsylvania, we must consider whether there was sufficient independent evidence from which the district court reasonably could have inferred that Gibbs was still involved in the conspiracy in October 1980. The Government, in seeking to demonstrate the necessary predicate for admission of Quintiliano's co-conspirator declarations, relied on a presumption that Gibbs' membership in the conspiracy continued until October 1980. [17]

**\*845** This court has held that once the Government establishes a defendant's involvement in an ongoing conspiracy, the burden shifts to the defendant to prove by affirmative acts inconsistent with the object of the conspiracy that he withdrew. [18] *Ammar,* 714 F.2d at 254; *United States v. Steele,* 685 F.2d 793, 803-04 (3d Cir.1982), *cert. denied,* 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1983); *United States v. Gillen,* 599 F.2d 541, 548 (3d Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979). [19] Because there is no evidence that Gibbs withdrew from the conspiracy after April, his involvement may be deemed to have continued until October, [20] making him a conspirator at the time of Quintiliano's incriminating statements to White and Bilella on October 4 and 5, 1980. Therefore, we conclude that the district court did not err in its determination that the Government met its burden of establishing by a preponderance of independent

evidence that Gibbs was involved in the conspiracy at the time of Quintiliano's statements.

## B. "In Furtherance" of the Conspiracy

Gibbs argues that the Government did not satisfy the requirement of Fed.R.Evid. 801(d)(2)(E) that the statements be made *in furtherance* of the conspiracy. Gibbs claims that Quintiliano's statements to White and Bilella were mere "narratives of past fact" and not made to induce conduct that would further the goals of the conspiracy, and that White and Bilella were mere "errand runners."

[4]  [5]  Gibbs' argument is meritless. The "in furtherance" requirement is usually given a broad interpretation. *See United States v. Trotter, supra,* 529 F.2d at 813. It is true that statements made to those who are not involved in the conspiracy are not "in furtherance" of it, *United States v. Provenzano,* 620 F.2d 985, 1000-01 (3d Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980), just as casual conversation between co-conspirators that is not intended to induce continued involvement, or other actions that would not advance the conspiracy, are not "in furtherance" of a conspiracy. *See, e.g., United States v. Lieberman,* 637 F.2d 95, 103 (2d Cir.1980); *United States v. Eubanks,* 591 F.2d 513, 520-21 (9th Cir.1979). But statements made by one conspirator to keep other conspirators informed about the progress of the scheme do satisfy the "in furtherance" requirement. *See, e.g., Ammar,* 714 F.2d at 252; *United States v. Pool,* 660 F.2d 547, 562 (5th Cir.1981); **\*846** *United States v. Mason,* 658 F.2d 1263, 1270 (9th Cir.1981).

In the present case, there was a reasonable basis for the trial court to find that Quintiliano's statements to Bilella and White were made in furtherance of the conspiracy. As participants in the scheme, it was important for White and Bilella to be kept abreast of developments to induce their continued participation and allay any fear they might have had. Although neither White nor Bilella had any decision-making role or any real interest in the identity of the buyer, they both had been closely involved in the planning and implementation of the conspiracy. White had picked up Gibbs at the Philadelphia Airport and brought him to the conference rendezvous with Quintiliano in April, and had also agreed to help unload the marijuana when the plane arrived. Quintiliano, who specifically had asked White to come to his home for a talk, may have foreseen that he would be requesting White's cooperation in storing the marijuana temporarily. Although Bilella at that time had no specific

duties with respect to the conspiracy, he had repeatedly rendered assistance to Quintiliano; he had at Quintiliano's request found the Beechcraft plane for purchase and had introduced him to White, an experienced pilot. Quintiliano also may have felt that he would need Bilella's help in the future. Under these circumstances, Quintiliano's reports to White and Bilella did further the conspratorial scheme.

This case is distinguishable from *United States v. Provenzano, supra,* where the co-conspirator's statements were held not to be in furtherance of the conspiracy. Contrary to the circumstances of the instant case where all the statements were made to co-conspirators, in *Provenzano,* the statements were made to persons *not* part of the conspiracy who had no reason to know about the matters disclosed to them.

We conclude that the Government satisfied its burden of laying the necessary foundation for admission of Quintiliano's co-conspirator statements against Gibbs under Fed.R.Evid. 801(d)(2)(E). It remains for us to consider Gibbs' contention that his constitutional rights under the sixth amendment Confrontation Clause were violated.

## III.

The sixth amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." Gibbs contends on appeal that the admission of out-of-court statements made by Quintiliano on October 4 and 5, 1980, had the effect of denying Gibbs his constitutional right to confront and cross-examine his accuser. Gibbs argues that under the rule of *Ohio v. Roberts,* 448 U.S. 56, 65-66, 100 S.Ct. 2531, 2538-39, 65 L.Ed.2d 597 (1980), which examined the bounds of the sixth amendment, the Government was required to prove that the declarant, Quintiliano, was unavailable, and that the co-conspirator evidence was reliable, [21] before any such testimony could be admitted into evidence. **\*847** We recognize that no exact equation exists between Fed.R.Evid. 801 and the Confrontation Clause, *see Dutton v. Evans,* 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970); *Ammar,* 714 F.2d at 254-55, thereby raising the possibility that evidence that satisfies Fed.R.Evid. 801(d)(2)(E) could still be deemed inadmissible under the constitutional test. Gibbs has argued that unavailability must be demonstrated and that the Government has the burden of establishing unavailability. However, we have no occasion to discuss or

to reach the merits of that issue in this case, *i.e.,* whether unavailability must be shown to satisfy the Confrontation Clause where a co-conspirator statement is sought to be admitted. Even if we were to assume that unavailability had to be demonstrated, Gibbs did not preserve that question for appeal.

[6]    The Confrontation Clause issue now raised by Gibbs-*i.e.,* that the Government did not carry its burden of proof as to unavailability and reliability of the evidence (*see* note 21 *supra* )-was never raised by Gibbs during trial. Had Gibbs, by a specific objection, timely made, alerted the Government and the district court to the fact that no proof of unavailability had been presented by the Government, that deficiency could have been cured. But because Gibbs did not preserve that issue for appeal, it cannot serve now as a basis to reverse Gibbs' conviction.

### A.

The evidence against Gibbs, the ostensible purchaser in a conspiracy to import and distribute a large quantity of marijuana, consisted in significant part of the testimony of Bilella and White, two unindicted co-conspirators, who testified to a number of hearsay declarations by Quintiliano (the alleged chief conspirator, who did not testify at trial) to the effect that Quintiliano planned to sell the marijuana to a customer named "Jake" (Gibbs).

At no time during the Government's case-in-chief, however, did Gibbs object to any of Quintiliano's hearsay declarations on Confrontation Clause grounds. Rather, Gibbs' counsel asserted that under the co-conspirator rule, Fed.R.Evid. 801(d)(2)(E), Quintiliano's out-of-court declarations were inadmissible because the Government had not established, by independent evidence, either the existence of a conspiracy or Gibbs' involvement in the conspiracy. During White's testimony, for example, the following exchange transpired:

Q. Mr. White, did Joseph Quintiliano ever mention to you potential buyers for the marijuana?

MR. BERGSTROM: Objection.

It is hearsay, Your Honor, and there is no proof aliunde of a conspiracy at this point in the case.

THE COURT: Well, that we do not find persuasive.

We will permit the question.

App. at 43a. Counsel later obtained a standing objection to White's repetition of Quintiliano's out-of-court declarations. *Id.* at 55a.

Similarly, during Bilella's testimony the following exchange took place:

Q. Now, you mentioned someone by the name of "Jake."

Who was it that told you about "Jake"?

A. Well, Joe had mentioned a fellow named-

MR. BERGSTROM: Objection-it is hearsay, Your Honor, for the record, sir.

THE COURT: Your response, Mr. Huyett.

MR. HUYETT: Yes, sir.

It is a co-conspirator statement.

THE COURT: Yes.

The witness may [answer] the question if he understands it.

App. 248a.

At this juncture, Gibbs did not question, and consequently the Government had no obligation to answer, whether the introduction of Quintiliano's declarations would violate the Confrontation Clause-much less that the Confrontation Clause would require a showing of unavailability. Thus, it is not surprising that the question of who bore the burden of establishing Quintiliano's **\*848** unavailability, and the concomitant factual question as to whether Quintiliano was unavailable, never arose. Certainly Gibbs never raised any such issue. And because Rule 801 [22] -unlike Fed.R.Evid. 804 [23] -does not require a showing of unavailability, the subject of Quintiliano's availability never became an issue, and thus never became part of the record.

On November 27, 1981, the Government rested. App. 442a. Gibbs then moved, pursuant to Fed.R.Crim.P. 29(a), for a judgment of acquittal. At the same time, counsel for Gibbs stated that "it would probably be necessary for me also to make a motion to the Court to ... strike all of the hearsay co-conspirator declarations from the record." App. 448a. Gibbs renewed at this stage the argument, raised

in his Memorandum of Law and by his trial objections referring to Fed.R.Evid. 801, that the Government failed to establish "a conspiracy by a clear preponderance of the evidence independent of the co-conspirator statement and the participation of the defendant, Gibbs, in that conspiracy ...." *Id.*

In addition, for the first time Gibbs observed "yet another problem." App. 452a. "Aside from [Rule] 801(d)(2)(E)," Gibbs argued, "there is a clear Sixth Amendment problem in this case." *Id.* Noting that the co-conspirator hearsay rule "does not subsume and take the place of the Sixth Amendment right to confrontation," Gibbs asserted that the "Sixth Amendment right and Rule 801(d)(2) are going to come smashing head on into one another ... in this case." *Id.* at 452a-53a. The essence of Gibbs' sixth amendment objection is captured by the following passage:

> The [men] who should have been on that witness stand and whom I should have been able to cross-examine [were] Joe Quintiliano [and his brother] Jerry Quintiliano, the declarant[s] of the hearsay statement[s], and I have been denied through this case the right to confront and cross-examin[e] [those] who really are the ultimate accusers in this case ... -that being Joseph and Jerry Quintiliano.

App. 453a.

At no time during these remarks, however, did Gibbs assert that Quintiliano was in fact available, or that the Government had the burden of showing unavailability and had not carried this burden. As a consequence, neither the Government nor the district court was alerted to the nature of the issue upon which Gibbs now seeks to have his conviction reversed.

Had anyone mentioned the word "availability," of course, it would have been a relatively simple matter for the Government to address that question and produce proofs as to Quintiliano's availability or unavailability. Presumably the Government could have called Quintiliano, and if Quintiliano had asserted the fifth amendment privilege against self-incrimination, he then would have been deemed unavailable. *See United States v. Pelton*, 578 F.2d 701, 709-10 (8th Cir.1978). Hence, it is solely by reason of Gibbs' failure to raise the issue of Quintiliano's availability before the district

court, that the record is barren of any evidence of Quintiliano's unavailability.

The district court denied Gibbs' motion to strike and motion for judgment of acquittal without comment on Gibbs' general constitutional objection. The court found only that "the Government has established the existence of an alleged conspiracy and the connection of each defendant with it by a clear preponderance of the evidence independent of the hearsay declarations." App. at 480a. The defense rested immediately **\*849** thereafter. Gibbs' conviction followed.

**B.**

[7] There are compelling reasons why Gibbs' Confrontation Clause objection-even if it had been specifically made, and even if it had addressed the issues of burden of proof and unavailability, which it did not-should be regarded as untimely.

First, Fed.R.Evid. 103(a)(1) requires that a timely objection or motion to strike must "stat[e] the specific ground of objection, if the specific ground was not apparent from the context." Gibbs can hardly argue that the issue of the Government's failure to establish Quintiliano's unavailability-an argument that eluded the Government and the district court-was "apparent from the context." It follows that Gibbs was obliged to satisfy the specificity requirement of Rule 103.

The Advisory Committee Notes to Rule 103 indicate that the purpose of the specificity requirement is to call the nature of the error "to the attention of the judge, so as to alert him to the proper course of action and enable opposing counsel to take proper corrective measures." Rule 103(a) Advisory Comm. Note. Gibbs' objection is the model of an objection that fails the Advisory Committee's test. At no time was the district court ever apprised that the nub of Gibbs' complaint was that the Government had not proved Quintiliano's unavailability. As a consequence, the Government was deprived of the opportunity to take corrective measures-including the possibility of calling Quintiliano in order to establish that he would assert the fifth amendment privilege.

Second, even assuming that Gibbs' objection was sufficiently specific, Gibbs made his constitutional objection *not* when the evidence was offered, but during a motion to strike made *after* the Government rested. As a consequence, the many co-

conspirator declarations related by White and Bilella over the course of a three-day trial were already in evidence.

As Professors Wright and Graham note, the appropriate time for raising an objection is as soon as the ground for objection is known, or could reasonably have been known to the objector-unless some special reason makes its postponement desirable and not unfair to the opposition. 21 C. Wright & K. Graham, Federal Practice and Procedure § 5037, at 188 (1977). Nothing prevented Gibbs' counsel from raising an objection when White first testified. Gibbs could have objected to the following effect: "Your Honor, although Rule 801 does not require that the declarant be unavailable, the Confrontation Clause does. Because there is no evidence that Quintiliano is unavailable, the evidence is inadmissible."

This simple objection, if made when the Government sought to introduce the testimony of White and Bilella, would have warned the Government of the need to call Quintiliano, or to prove his unavailability in other ways. No special reasons made a postponement of this objection desirable, and a good many reasons made its postponement unfair. Not the least of these reasons is that the Government would have been obliged to reopen its case in order to establish Quintiliano's unavailability-a matter which, from his silence at trial, we can only assume Gibbs had taken for granted.

If Quintiliano ultimately proved to be unavailable, a delay of several days might have resulted until the Government produced him-a delay that could have been obviated had Gibbs' constitutional objection been made during the trial, when it would have been timely, rather than after the evidence had closed. Even at that late date, an issue raised as to unavailability could still have been met by the Government. If, however, Quintiliano had proved to be "available"-perhaps because he would choose not to assert his fifth amendment privilege-Gibbs' motion to strike, if granted, would almost certainly have been followed by a motion for mistrial on the ground that no jurors could be expected to expunge from their minds the many hearsay declarations adduced throughout three days of prior testimony.

**\*850** This court has frequently held that it will not entertain arguments on appeal based on objections not timely raised below. See Halderman v. Pennhurst State School & Hospital, 673 F.2d 628, 639 (3d Cir.1982) (in banc), reversed on other grounds, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); Caisson Corp. v. Ingersoll-Rand Co., 622 F.2d 672, 680 (3d Cir.1980). To do so here would constitute an

unacceptable interference with the administration of justice and the district court's management of the trial. We reverse the trial judge's determination of timeliness only for an abuse of discretion. [24] The circumstances here do not rise to that level. For these reasons, we hold Gibbs' objection untimely [25] and insufficient to preserve a Confrontation Clause "unavailability" issue for appeal.

## V.

As we have discussed, we are satisfied that there was sufficient evidence to withstand Gibbs' 801(d)(2)(E) objection, which had been properly taken. Gibbs, however, did not preserve in timely fashion the Confrontation Clause issue which he has raised on appeal. His failure to alert the Government or the court to the issue of Quintiliano's unavailability precludes our consideration of Gibbs' argument which involves, among other things, the Government's failure to carry its sixth amendment burden of proof. Having failed to preserve this issue at the threshold, there is no need for us to address the merits of his sixth amendment argument.

We will affirm Gibbs' conviction.

ROSENN, Senior Circuit Judge, with whom ALDISERT and GIBBONS, Circuit Judges, join, dissenting.
Beginning with the defendant's brief and only appearance in Quakertown, Pennsylvania, the Government's case against him is built upon speculative inferences, legal fiction, and double hearsay. These are joined by the fragile tissue of a judicial presumption that, once a defendant has been found to have participated in a conspiracy, he is presumed to continue to participate in it despite the lapse of considerable time, unless he produces affirmative evidence that he has withdrawn.

The Government's case is grounded on meager testimony-barely sufficient under the preponderance of evidence rule of this circuit-offered as independent evidence of defendant's participation in the marijuana conspiracy [1] as a potential buyer. On the **\*851** basis of this slight, inferential, and dubious evidence the Government introduced the out-of-court hearsay declarations. To accomplish this objective the Government leaned heavily on the coconspirator rule, which is based on the legal fiction that each conspirator is the agent of the other. It has neither produced the declarant for cross-examination nor has it shown that he is unavailable. Also

absent is not only direct or circumstantial evidence of guilt, but the procedural opportunity for fairness and the discovery of truth. The accused has been denied the fundamental right to cross-examine the out-of-court declarant. A society that values the good name and liberty of every person should not condemn anyone on such a naked amalgam of double hearsay, legal fiction, and judicial presumption. I therefore dissent.

# I.

No one disputes the existence of the 1980 conspiracy among the two Quintiliano brothers and others to smuggle marijuana into Pennsylvania from Colombia, South America, and to distribute it. As the majority correctly observes, op. at 840, the Government prosecuted Gibbs on the theory that he too participated in the conspiracy as the potential purchaser. To prove his participation, the Government established that on April 7, 1980, Gibbs flew to Wings Air Field in Montgomery County, Pennsylvania, where Joseph Quintiliano [2] met him. They then traveled to the Quakertown Airport, where they inspected for several minutes the Beechcraft airplane purchased several weeks previously by Quintiliano to smuggle the marijuana from Colombia.

At this point, there may have been several legitimate reasons why Gibbs was in Quakertown. State police officers, however, gave it a criminal conspiratorial flavor by testifying that they observed Quintiliano, upon leaving the Quakertown Airport, engage in what they considered evasive driving to avoid surveillance.

Based upon this tenuous evidence of Gibbs's complicity in the conspiracy, the Government introduced out-of-court statements allegedly made by Quintiliano to Bilella and White, unindicted coconspirators, of what Gibbs allegedly told Quintiliano. [3] These out-of-court statements, which the majority acknowledges were the principal evidence offered against Gibbs, op. at 841, became the fulcrum of the Government's case and were essential to convict Gibbs. The Government never called Quintiliano, but instead produced Bilella and White, who testified that about the time Quintiliano purchased the Beechcraft airplane he told them that he planned to sell the imported marijuana to a customer named "Jake." White testified that Gibbs, whom he had met when Gibbs came to inspect the plane at Quakertown, matched Quintiliano's description of "Jake" and had identified himself to White under that name.

The crux of the Government's case depends upon the out-of-court statements made on the evening of October 4, 1980, at Quintiliano's home. These statements allegedly (op. at 841-842) made by Gibbs alluded to Quintiliano's reopening of negotiations with him in early October 1980 after Quintiliano had rejected some Florida prospects for the purchase. They were introduced in evidence through Bilella's and White's testimony. Quintiliano told them that he had telephoned "Jake" when he rejected the prospective Florida purchasers and that "Jake" told him that he would "try to make the necessary arrangements" for the purchase.

In an effort to give some credence to the hearsay testimony, the Government introduced evidence of certain telephone records. They showed that long distance calls were made early in October 1980 from **\*852** Quintiliano's residence in Pennsylvania to the Gibbs residence or to the Ram Broadcast Company in Massachusetts. There is no evidence, however, of any conversation with Gibbs. The Government suggests that from this series of telephone calls it can be inferred that Gibbs and Quintiliano were discussing arrangements for the sale of the marijuana in furtherance of whatever plans they had made at their April meeting. There are several major problems with the Government's argument, however. One obvious difficulty is the absence of evidence directly linking Gibbs with Ram or proof that any of Quintiliano's calls to Ram were returned. Moreover, except for Quintiliano's out-of-court hearsay, there is nothing to indicate the substance of the conversations or that they actually conversed.

# II.

Although I am inclined to agree with the majority that there may be sufficient evidence to permit a reasonable inference of Gibbs's initial complicity in the enterprise, I strongly believe that the admission of the double hearsay statements constitutes serious and therefore reversible error because it deprived Gibbs of his sixth amendment right to confrontation. Because the independent evidence upon which the Government relied for introduction of the out-of-court statements was so tenuous, [4] it was highly important that any out-of-court statements be unequivocal and that the declarant be subject to searching cross-examination.

In *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), the Supreme Court recognized that the confrontation clause and the hearsay rule "stem from the same roots," but stated that "the Court has never equated

the two, and we decline to do so...." *Id.* at 86, 91 S.Ct. at 218. The confrontation clause issue and the evidentiary question therefore must be separately analyzed, and the sixth amendment may require the exclusion of evidence even though admissible under Fed.R.Evid. 801(d)(2)(E). *See United States v. Perez,* 658 F.2d 654, 660 & n. 5 (9th Cir.1981). *See also United States v. Palumbo,* 639 F.2d 123, 131 (3d Cir.) (Adams, J., concurring), *cert. denied,* 454 U.S. 819, 102 S.Ct. 100, 70 L.Ed.2d 90 (1981); *United States v. Puco,* 476 F.2d 1099, 1102 (2d Cir.), *cert. denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973).

In *Ohio v. Roberts,* 448 U.S. 56, 65-66, 100 S.Ct. 2531, 2538-39, 65 L.Ed.2d 597 (1980), the Supreme Court identified two restrictions that the confrontation clause places on the use of hearsay evidence in criminal trials. First, the prosecution generally must establish that the hearsay evidence is necessary because the declarant is unavailable. Second, the hearsay statement must be reliable. "Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.' " *Id.* at 65, 100 S.Ct. at 2538 (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 107, 54 S.Ct. 330, 332-33, 78 L.Ed. 674 (1934)). In the instant case, the necessity aspect of this test has not been met. Therefore, there is **\*853** no need to reach the question whether the reliability prong has been satisfied.

Although the literal language of the sixth amendment guarantees to any accused "the right ... to be confronted with the witnesses against him," the Supreme Court has recognized the necessity that extrajudicial statements sometimes must be used because of the declarant's unavailability. Gibbs maintains that Quintiliano was not legally unavailable to testify and that therefore there was no need for introduction of his out-of-court statements. The Government contends that a showing of unavailability is not required.

The Supreme Court discussed the unavailability component of the confrontation clause in *Ohio v. Roberts, supra:*

> [I]n conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case ... the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.

448 U.S. at 65, 100 S.Ct. at 2538. A witness may be deemed "unavailable" only if the prosecution has made "a *good faith effort* to obtain his presence at trial." *Id.* at 74, 100 S.Ct. at 2543 (emphasis in original) (quoting *Barber v. Page,* 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968)). And, under the foregoing language in *Ohio v. Roberts,* it is *the prosecution* that must produce or demonstrate the unavailability of the declarants. The Court did not impose any burden on the *accused* to show that the declarant is available.

Quintiliano was a codefendant in the Government's prosecution who had pleaded guilty to two of the three counts in the indictment and was still awaiting sentencing at the time of Gibbs's trial. There is no evidence in the trial record that bears on Quintiliano's availability. Although Quintiliano was faced with an impending sentencing proceeding and might not have been willing to waive his fifth amendment right and testify against Gibbs, there is a possibility that he would have because he had already pleaded guilty. Because there is nothing in the record to indicate that the Government ever established that Quintiliano would refuse to testify against Gibbs, the Government failed to carry its burden under *Ohio v. Roberts,* 448 U.S. at 74-75, 100 S.Ct. at 2543-44, to demonstrate the declarant's legal unavailability.

In a footnote, the *Roberts* Court suggested that "[a] demonstration of unavailability, however, is not always required," *id.* at 65 n. 7, 100 S.Ct. at 2538 n. 7. To support this proposition, the Court cited *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), in which it had permitted the admission of cocconspirator hearsay in circumstances where a seemingly available declarant was not called to testify. The *Roberts* Court described *Dutton* as a case where the requirement of unavailability could be dispensed with because "the utility of trial confrontation" would have been "remote." *See* 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7; *United States v. Perez,* 658 F.2d at 661. Here, Quintiliano's statements do not fall within the *Dutton* exception to the unavailability requirement because they are crucial to conviction, and not "of peripheral significance at most," as in *Dutton, 400 U.S.* at 87, 91 S.Ct. at 219. Moreover, in *Dutton,* the Court pointed out that the accused there had full opportunity to cross-examine the declarant as to whether he actually heard the person make the statement offered in evidence.

The instant case is also distinguishable from *Dutton* because the Government has not carried its burden of showing that Quintiliano's hearsay statements were "marked with such trustworthiness," *Ohio v. Roberts,* 448 U.S. at 65, 100 S.Ct. at 2538, to justify disregarding the unavailability requirement. I can conceive of possible motives Quintiliano might have had to misrepresent Gibbs's involvement in the crime. [5] For example, Quintiliano may have **\*854** misrepresented Gibbs's involvement to reassure his coconspirators that plans for the sale of the contraband were proceeding smoothly. In addition, it is plausible that the statements were contrived as part of Quintiliano's bargaining strategy. Quintiliano may have seen a chance of pressuring the Florida buyers to offer better terms by giving the impression that he had another buyer waiting in the wings. Under these circumstances, the cross-examination of the testifying witnesses (White and Bilella) could not adequately test the truthfulness of Quintiliano's statements.

Most important, I believe that the instant case falls outside the *Dutton* exception to the unavailability requirement because I do not believe Quintiliano's hearsay statements were only "of peripheral significance," *see* 400 U.S. at 87, 91 S.Ct. at 219, in the prosecution's case. The challenged statements provide direct incriminating evidence, in the form of Quintiliano's declaration that Gibbs had agreed to buy the marijuana. Admittedly, there is some other evidence linking Gibbs to the conspiracy. However, unlike *Dutton,* where the disputed evidence consisted of a single sentence reported by one of twenty witnesses, the coconspirator hearsay presented in Gibbs's trial was the core of the Government's case. [6]

The opportunity to cross-examine an accuser or a critical witness is a powerful tool in the search for truth and in the assessment of guilt or innocence. The confrontation clause, in the words of the Supreme Court, contemplates

> "a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

*Ohio v. Roberts,* 448 U.S. at 63-64, 100 S.Ct. at 2537-38 (quoting *Mattox v. United States,* 156 U.S. 237, 242-43, 15 S.Ct. 337 at 399, 39 L.Ed. 409 (1895) ). Because the right of confrontation is so important in our adversarial system, it may only be denied in exceptional situations. The Government has not met its burden to show that the instant case is such an exceptional situation. The prosecution has failed to establish either that the declarant cannot be produced for trial or that the hearsay is sufficiently reliable and insignificant to justify dispensing with a showing of unavailability.

The admission of Quintiliano's statements without giving the defendant the opportunity to cross-examine the declarant sharply tipped the scales of justice against the defendant. The historic safeguard guaranteeing the accused the right to be confronted with the witnesses against him may not be disregarded.

## III.

The majority, however, does not reach the merits of the sixth amendment issue because it asserts that "Gibbs did not preserve **\*855** that issue for appeal [and therefore] it cannot serve now as a basis to reverse Gibbs's conviction." Op. at 847. But the issue was raised in the trial court, perhaps not as specifically or as timely as it might have been, but it was raised sufficiently to be preserved and heard. [7]

First, the defendant repeatedly objected during the Government's case in chief to the admission of Quintiliano's statements on the ground that they failed to satisfy Fed.R.Evid. 801(d)(2)(E). Although these objections did not specifically refer to the sixth amendment issue, they should have sufficed to put the trial judge on notice that intertwined with them was a constitutional issue. *See State v. Poole,* 31 Or.App. 925, 572 P.2d 320 (1977) (objection only on the ground of hearsay was so closely related to the incompetency of the witness as to preserve for appeal the challenge based on the incompetency of the witness). Second, if there was any doubt concerning notice to the Government and the court, it was resolved when the Government rested without calling Quintiliano or producing proof of his unavailability. Only at that point could Gibbs have been certain that he would be denied his constitutional right to confront his accuser. He therefore moved, while the court, jury, and counsel were still present, to strike the hearsay, stating:

[A]side from the co-conspirator exception to the hearsay rule, there is a clear sixth amendment problem in this case, and the co-conspirator hearsay rule which permits the introduction of co-conspirator hearsay does not subsume and take place of the sixth amendment right to confrontation ... [and] the other cases have recognized that there is still, notwithstanding the existence of 801(d)(2)(E) ... a sixth amendment right of a defendant to confront and cross-examine his accusers. [8]

(452a-453a) If the Government desired to cure the defect, it could have done so readily at that time. It did not.

The majority asserts that if the defendant had objected when the Government sought to introduce the testimony of White and Bilella that "would have warned the Government of the need to call Quintiliano or to prove his unavailability in other ways." Op. at 849. As a matter of trial management, it would, of course, have been desirable for the defense to have specifically objected at the time on the sixth amendment ground, but not because the Government had to be warned of the need to call Quintiliano or prove his unavailability. The Government should have known that under *Ohio v. Roberts,* "in the usual case ... the prosecution must either produce, or demonstrate unavailability of, the declarant whose statement it wishes to use against the defendant." *See supra* at 853. Calling Quintiliano or proving his unavailability was, as the majority recognizes, "a relatively simple matter for the Government." Op. at 848. Taking such action when the motion to strike was tendered may have been an inconvenience for the Government, but an inconvenience so trivial should not be used to nullify an important constitutional safeguard.

Finally, the majority assumes that the district court overruled the defendant's sixth amendment objection on the ground that it was untimely. It therefore declares that "the trial judge's determination of timeliness" can only be reversed for an abuse of discretion. Op. at 850. The record, however, does not support this assumption. The trial judge heard and considered **\*856** the defendant's sixth amendment motion to strike *before* the defense opened its case; he did not reject the motion as "untimely." In fact, he made no ruling at all with respect to

this constitutional issue. After hearing arguments of defense counsel and the prosecution when the Government rested, the trial judge either ignored the sixth amendment motion or impliedly equated it with the coconspirator exception. He only ruled: "We find that the Government has established the existence of an alleged conspiracy and the connection of each defendant with it by a clear preponderance of the evidence independent of the hearsay declarations." (480a) This was the substance of the district court's ruling on the defense arguments with respect to the coconspirator statements and the sixth amendment motion to strike the testimony. Thus, as this record stands, the court did not reject the sixth amendment motion on the ground of untimeliness. The prosecution raised no objection to the motion on the ground of untimeliness. The untimeliness question was raised for the first time by Judge Garth *sua sponte* in his dissent from the panel opinion. (Panel slip op. at 30).

In any event, the confrontation issue is significant to the fact-finding process and to the ultimate determination of guilt or innocence. If the objection was not timely raised, this court may nonetheless take notice of the issue under the plain error rule. [9] The denial of the right to cross-examine the declarant of the hearsay statements, especially under the circumstances we have here, violated a fundamental right of the accused and constituted serious prejudicial error. *United States v. McKinney,* 707 F.2d 381 (9th Cir.1983); *United States v. Provencio,* 554 F.2d 361 (9th Cir.1977); *People v. Marine,* 48 Ill.App.3d 271, 6 Ill.Dec. 25, 362 N.E.2d 454 (1977). "In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice error to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Silber v. United States,* 370 U.S. 717, 718, 82 S.Ct. 1287, 1288, 8 L.Ed.2d 798 (1962) (per curiam) (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).

Courts have found no difficulty in reviewing a sixth amendment issue under the plain error rule for the waiver of fundamental constitutional rights "is not lightly to be found." *United States v. Provencio, 554 F.2d at 363.* In *United States v. McKinney,* 707 F.2d 381 (9th Cir.1983), the defendant, as in this case, was convicted on Government testimony that constituted double hearsay. Although the sixth amendment issue was neither raised in the district court nor briefed or argued on appeal, the circuit court *sua sponte* considered the issue under the plain error rule and reversed. In *United*

*States v. Provencio,* the court held that the introduction of depositions without any proof that the deposed witnesses were unavailable was such an obvious violation of the accused's rights to confrontation that "it is unnecessary for us to decide whether the error in admitting the evidence without objection was plain error." 554 F.2d at 362. The court refused to infer a waiver of a fundamental right from the failure of the defense counsel to object at the time of trial. *Id.* at 363. [10]

**\*857** In *People v. Marine,* 48 Ill.App.3d 271, 6 Ill.Dec. 25, 362 N.E.2d 454 (1977), the appellate court reviewed a confrontation issue although the defendant had objected at trial only on the ground of hearsay. In rejecting the state's argument that the defendant had waived the confrontation issue by only objecting on the ground of inadmissible hearsay, the court stated: "Even if we were to find a waiver of this issue for purposes of appeal, we regard the right to confrontation to be of such significance as to involve the application of the plain error rule." *Id.* at 276, 6 Ill.Dec. at 29, 362 N.E.2d at 458 (citations omitted).

## IV.

In summary, I believe that the sixth amendment issue was timely raised, even if the objection came at the close of the Government's case. Had it not been timely, this court should review the issue under the plain error rule both because fundamental rights are involved and because the Government's case rests largely on untested, devastating hearsay. Because the defendant has been denied the right of confrontation and cross-examination, "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal," *Barber v. Page,* 390 U.S. 719, 721, 88 S.Ct. 1318, 1320, 20 L.Ed.2d 255 (1967) (quoting *Pointer v. Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965), the judgment of conviction should be reversed and the case remanded for a new trial.

SEITZ, Chief Judge, dissenting.

I am in agreement with all the basic conclusions reached in Judge Rosenn's dissent. [1] I write separately because Judge Rosenn would order a new trial while I would vacate and remand to afford the government an opportunity to discharge its burden of showing that Quintiliano was unavailable at the time of the trial. *See* 28 U.S.C. § 2106.

The only issue dividing the court concerns a possible violation of the Confrontation Clause. I agree with Judge Rosenn that there was a violation of the Confrontation Clause if Quintiliano was available at the time of the trial. On the other hand, if the government can present clear and convincing evidence at a hearing that it made a "good faith" effort to obtain Quintiliano's presence at trial, *see Ohio v. Roberts,* 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980), or that such an effort would have been clearly unavailing, then I believe the government will have satisfied the unavailability requirement of the Confrontation Clause. [2] This would correct the erroneous ruling of the district judge at the trial. I can think of no legitimate societal purpose to be served by ordering a new trial, unless such a hearing would debase the values inherent in the Confrontation Clause.

**\*858** I assume that the objection to a later hearing on the unavailability issue would be based on the problems inherent in reconstructing the situation that existed at the time of the trial. It seems to me that the heavy burden on the government at such a hearing, together with the requirement that the district court make a reasoned determination, subject to appellate review, provides meaningful assurance that a defendant will not be impermissibly deprived of his Confrontation rights.

I recognize the concern expressed by the then Chief Judge Bazelon in his dissent in *Henderson v. United States,* 349 F.2d 712 (D.C.Cir.1965), that a remand places what amounts to a psychological burden on the defendant because of the court's awareness of the conviction. However, I believe the safeguards afforded, including appellate review, sufficiently protect a defendant's Confrontation rights. Indeed, the nunc pro tunc hearing approach to the suppression of evidence which was approved in *Waller v. Georgia,* 52 U.S.L.W. 4618, 4620-21 (May 22, 1984) and *Jackson v. Denno,* 378 U.S. 368, 394, 84 S.Ct. 1774, 1790, 12 L.Ed.2d 908 (1964), certainly implicated defense interests every bit as important as that here implicated. *Compare Government of the Virgin Islands v. Smith,* 615 F.2d 964 (3rd Cir.1980).

Thus, while I join the basic conclusions in Judge Rosenn's dissent, I would vacate and remand for an evidentiary hearing on the unavailability issue and, if pertinent, the trustworthiness issue.

I therefore dissent.

U.S. v. Gibbs, 739 F.2d 838 (1984)

15 Fed. R. Evid. Serv. 929

**Parallel Citations**

15 Fed. R. Evid. Serv. 929

Footnotes

1    Also named in the indictment were Joseph Quintiliano (an alleged co-conspirator), Jerry Quintiliano (Joseph's brother), Prentiss Breland, Michael O'Looney, and Alejandro Rizo. All six defendants were charged in Count I of the indictment with conspiracy to distribute and to possess with the intent to distribute marijuana, in violation of 21 U.S.C. § 846. All of the defendants except Gibbs were also charged with conspiracy to import marijuana unlawfully, in violation of 21 U.S.C. § 963 (Count II) and with the substantive offense of illegal importation of marijuana in violation of 21 U.S.C. § 952 (Count III). Gibbs was tried jointly with codefendant Rizo, who was convicted on two counts of the indictment. The trial of Prentiss Breland was severed, and the other three defendants pleaded guilty to the indictment.

2    Bilella was an aviation insurance broker and Quintiliano's cousin. White, an experienced pilot, was introduced to Quintiliano by Bilella. Throughout the conspiracy, White acted as an informant for the Federal Drug Enforcement Administration (DEA).

3    Prentiss Breland was convicted of violating 21 U.S.C. § 846 (conspiracy to possess with intent to distribute marijuana) and 21 U.S.C. § 963 (conspiracy to import marijuana) and he was sentenced to fifteen years imprisonment on the § 846 count and five years probation on the § 963 count. This court affirmed that judgment and conviction. *United States v. Breland,* 709 F.2d 1490 (3d Cir.1982).

4    DEA Agents were notified by David White, who called from Pennsylvania to alert them that Breland had landed in Florida with drugs.

5    Q: What did he [Quintiliano] say about "Jake" to you that evening?

     A: He said he had called. He went to another room and said he had called up "Jake" and asked him if he could perhaps make arrangements to have someone come down and pick up this load.

     Q: Did he tell you whether he had reached "Jake" to speak to him?

     A: He had spoken to him, yes.

     Q: And did he tell you what "Jake's" response to him was?

     A: That he would try to make the necessary arrangements, yes.

     App. 273a (Bilella on Direct Examination).

6    The telephone records show that Quintiliano made one call to Florida at 10:52 p.m.

7    Q: Were other telephone calls made that evening?

     A: Joe made a call to a-gentleman named "Jake" in-in the Boston or Massachusetts area to see if he would buy the-marijuana.

     Q: And after that telephone call, what did Joe say about the call?

     A: Joe told me that "Jake" would buy the marijuana. He only could-could that night-he only had a hundred thousand dollars cash on hand. We-he would be able to get the rest of the money in a day or when the banks opened.

     App. 109a (White on Direct Examination).

8    The evidence documents five calls in March and one in May 1980. The Government offered no records for the month of April.

9    The first such telephone call was made early in the morning of October 4. A call was also made that night at 8:52 p.m., and at 10:21 p.m., a call to Ram was placed from a pay telephone near Quintiliano's home and charged to the Quintiliano residence.

10   Technically, the federal rules exclude admissions from the definition of hearsay rather than treating them as exceptions to the rule against hearsay. *See United States v. Ammar,* 714 F.2d 238, 255 (3d Cir.), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). For simplicity, we will refer to the "co-conspirator exception."

11   Other courts have also adopted this rule. *See, e.g., United States v. Andrews,* 585 F.2d 961 (10th Cir.1978); *United States v. Santiago,* 582 F.2d 1128 (7th Cir.1978); *United States v. Enright,* 579 F.2d 980 (6th Cir.1978); *United States v. Bell,* 573 F.2d 1040 (8th Cir.1978); *United States v. Stanchich,* 550 F.2d 1294 (2d Cir.1977); *United States v. Jones,* 542 F.2d 186 (4th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375, 376 (1976). *But see United States v. Bulman,* 667 F.2d 1374, 1377-79 (11th Cir.), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982) (adopting Fifth Circuit precedent of "substantial independent evidence" test); *United States v. Slade,* 627 F.2d 293, 307 (D.C.Cir.1980) (same test); *United States v. James,* 590 F.2d 575 (5th Cir.) (en banc) (same test), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

12   In *Trotter,* this court refused to accept the Government's suggestion that a less rigorous standard requiring only "prima facie proof" was appropriate in light of *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

13   Once Gibbs was held to have participated in the conspiracy the telephone conversations referred to in text were properly admissible against Gibbs under Fed.R.Evid. 801(d)(2)(E). *See Ammar,* 714 F.2d at 245.

14    White testified on direct examination that he "volunteered to go down and pick up 'Jake' with my-with an airplane, and Joe accepted the-the offer, ... and the next day I went down to the airport and met-met 'Jake'." App. 61a. This testimony would be admissible against Gibbs to link him to the conspiracy without running afoul of the hearsay rules.

15    The defendant argued before this court, based on the record, that Gibbs was taken to Wings Airfield because it was convenient to Quintiliano's residence. Accepting that as true does not alter the fact that a reasonable inference such as the Government suggests could be drawn from the circumstances described. At this point in time, the Government is entitled to the benefit of any reasonable inferences that may be drawn from the record. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1941).

16    It is true that mere association with those who have conspired cannot by itself support a conviction for conspiracy. *See Ammar, 714 F.2d at 250; United States v. Torres,* 519 F.2d 723, 726 (2d Cir.), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975). In the instant case, however, inferences are capable of being drawn which suggest that Gibbs' meeting with Quintiliano was "intended to advance the ends of the conspiracy." *See United States v. Mancillas,* 580 F.2d 1301, 1308 (7th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). In addition, it must be remembered that the Government's burden here was only to establish the existence of a conspiracy by a preponderance of the evidence.

17    Direct evidence of Gibbs' relationship to Quintiliano in October 1980 consists of telephone records showing calls from the Quintiliano residence to the Gibbs residence or to Ram Broadcast Co. at around that time. The Government suggests that from this series of telephone calls it can be inferred that Gibbs and Quintiliano were discussing arrangements for the sale of the marijuana in furtherance of whatever plans they had made at their April meeting. Gibbs argues otherwise. He claims that one obvious difficulty is the absence of evidence directly linking Gibbs with Ram or showing that any of Quintiliano's calls were returned. Moreover, Gibbs asserts that except for Quintiliano's hearsay, there is nothing to indicate the substance of the conversations, and the bare bone telephone toll records have little probative value.

18    Defendants can also show "that the conspiracy terminated, such as by demonstrating that its ends had been so frustrated or its means so impaired that its continuation was no longer plausible." *Ammar, 714 F.2d at 254.* There is no doubt in this case but that the drug smuggling conspiracy itself had not been terminated and was ongoing in October 1980.

19    Gibbs claims the presumption of continuing involvement under *Gillen* is unconstitutional, citing *United States v. Read,* 658 F.2d 1225 (7th Cir.1981). *Read,* however, concerns the prosecution's burden to prove every element of the offense beyond a reasonable doubt as a basis for a conviction and thus is not relevant to the lesser showing that must be made to permit the introduction of co-conspirator statements. Moreover, *Read* did impose on the defendant the burden of presenting *some* evidence of withdrawal. *Id.* at 1239. Here none was presented.

20    Although Gibbs challenged the admissibility of Quintiliano's out-of-court statements and at the conclusion of the trial moved "to strike all of the hearsay coconspirator's declarations," on appeal Gibbs argues in support of his claim (that he had withdrawn from the conspiracy) that an alleged statement by Quintiliano to Bilella early in October 1980-to the effect that Quintiliano had another potential buyer from Florida for the marijuana-is evidence that Gibbs had withdrawn from the conspiracy as early as April. This testimony, however, is a portion of the very evidence to which Gibbs objects.

21    The only argument made by Gibbs challenging the reliability of the evidence is that Quintiliano had reason to, and did, fabricate Gibbs' involvement in the conspiracy. In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court held that "the Confrontation Clause restricts the range of admissible hearsay by imposing a two-prong requirement: first, the government must normally show that the declarant is unavailable and that the hearsay testimony is thus necessary; and second, the statement must bear sufficient 'indicia of reliability' to demonstrate its trustworthiness." *United States v. Ammar,* 714 F.2d 238, 255 (3d Cir.), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983), citing *Roberts,* 448 U.S. at 65-66, 100 S.Ct. at 2538-39. Some members of the majority believe that the reliability component of the *Roberts* test should be addressed in this opinion, while others do not. *See United States v. Ammar,* 714 F.2d 238, 254-57 (3d Cir.1983) (decided after Gibbs' trial). Regardless of that philosophical disagreement, all the members of the majority are in agreement that the *Roberts* reliability requirement, if preserved for appeal, was satisfied in this case. *See Ammar,* 714 F.2d at 256 ("[I]n many, if not most, instances a coconspirator statement which is admissible under Rule 801(d)(2)(E) will also be sufficiently reliable to satisfy the Confrontation Clause."). In short, we are not persuaded by Gibbs' reliability argument.

22    Rule 801(d)(2)(E) states only that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

23    Rule 804(b) lists five hearsay exceptions which "are not excluded by the hearsay rule if the declarant is unavailable as a witness," using the definition of "unavailable" found in Rule 804(a) (listing five categories of when a witness is to be deemed unavailable).

24    In *Belmont Industries, Inc. v. Bethlehem Steel Corp.,* 512 F.2d 434 (3d Cir.1975), testimony had been received without objection "at widely scattered times over [a] ten-day trial." *Id.* at 437. Belmont moved after the close of Bethlehem's case to strike considerable portions of testimony on hearsay and best-evidence grounds. In addition, like Gibbs, Belmont's motion did not specify which of the items of testimony were to be stricken. *Id.* This court held:

We cannot say that the trial judge abused his discretion in determining that the possibilities of confusion to the jury, prejudice to the opposing party, and undue delay of a case about to be submitted to the jury outweighed the detriment suffered by Belmont resulting from the reception of this allegedly hearsay and secondary evidence.

*Id.* (footnote omitted).

The circumstances in *Belmont Industries* apply with equal force here. Certainly the prospects of confusion to the jury, prejudice to the Government, and undue delay are very real in this case, particularly since here Gibbs at no time made known the specific constitutional ground on which he now relies.

25    Although we may entertain on appeal objections not timely raised below if the district court committed plain error, *see* Fed.R.Crim.Proc. 52(b); *Halderman, supra,* 673 F.2d at 639-40, we are satisfied that in this instance the district court did not commit plain error.

1    Judge Aldisert and Judge Gibbons believe that there was insufficient evidence of conspiracy measured by the "fair preponderance of independent evidence" test of *United States v. Trotter,* 529 F.2d 806, 811-12 (3d Cir.1976). *See also Edward J. Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 115-17 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

Several other circuits have adopted a more stringent test than the preponderance of evidence rule for the admission of coconspirator statements. They require "substantial evidence," independent of the statements, showing the defendant's participation in the conspiracy. *United States v. Bulman,* 667 F.2d 1374, 1379 (11th Cir.), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982); *United States v. Jackson,* 627 F.2d 1198, 1219 (D.C.Cir.1980); *United States v. Grassi,* 616 F.2d 1295, 1300-01 (5th Cir.1980); *United States v. Petersen,* 611 F.2d 1313, 1330-31 (10th Cir.1979).

2    All references hereinafter to Quintiliano are to Joseph Quintiliano.

3    This constituted the "double hearsay" referred to in this dissent-Gibbs to Quintiliano and Quintiliano to Bilella and White.

4    I do not mean to suggest that there is anything improper in relying on a presumption to show the continuation of a person's participation in a conspiracy, but imposing such a presumption upon slight independent evidence implicating the defendant in the conspiracy only highlights the utter absence of flesh and blood in the Government's case upon which to rest the hearsay statements of a non-testifying conspirator.

The crucial portion of the alleged coconspirator statements was made approximately six months after Gibbs's April 7 meeting in Quakertown. To accomplish the admission, the Government relied upon a presumption that once it established Gibbs's participation in the conspiracy, membership continued thereafter until October 1980 unless Gibbs proved, by affirmative acts inconsistent with the object of the conspiracy, that he had withdrawn. There is no evidence in this record that Gibbs withdrew from the conspiracy after April.

5    It is true, of course, that Quintiliano's statements were against his penal interest because they disclosed his own complicity in the conspiracy. But this fact is hardly conclusive of the statements' reliability, particularly because the critical portions of Quintiliano's statements-his references to Gibbs-were not against his penal interest. *See* Davenport, *The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis,* 85 Harv.L.Rev. 1378, 1395 (1972).

6    The instant case is distinguishable from *United States v. Weber,* 437 F.2d 327, 337-40 (3d Cir.1970), *cert. denied,* 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971). In *Weber,* this court upheld against a constitutional attack the use of a coconspirator's out-of-court statement against the accused. Three factors distinguish *Weber* from the instant case. First, the hearsay evidence in *Weber* presented the "traditional hallmarks of reliability, because they were uttered spontaneously and they were against [the declarant's] penal interest." *Id.* at 340. Here, there are significant doubts about the reliability of Quintiliano's statements. Second, the coconspirator statements in *Weber* were not crucial to the case, as they are here. Third, there was an absolute necessity for admission in *Weber* because the declarant had died before trial.

7    The majority asserts that the issue was never raised by Gibbs during trial. "Had Gibbs by a specific objection, timely made, alerted the Government and the district court to the fact that no proof of unavailability had been presented by the Government, that deficiency could have been cured." Op. at 847.

8    Defense counsel further stated in support of his sixth amendment objection: "The men who should have been on that witness stand and ... whom I should have been able to cross-examine [were] Joe Quintiliano [and his brother] Jerry Quintiliano, the declarant[s] of the hearsay statement [s], and I have been denied through this case the right to confront and cross-examine ... the ultimate accusers in this case ... Joseph and Jerry Quintiliano." (453a)

9    Fed.R.Crim.P. 52(b) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error has been defined as "serious and manifest" or "seriously prejudicial error" or "grave errors which seriously affect substantial rights of the accused." *United States v. Morales,* 477 F.2d 1309, 1315 n. 17 (5th Cir.1973). *See United States v. Nobel,* 696 F.2d 231, 237 (3d Cir.1982).

10    Other federal courts that have on appeal reviewed a confrontation argument, although the issue was not specifically raised at trial, include: *United States v. Escobar,* 674 F.2d 469 (5th Cir.1982) (admission of officer's testimony constituted plain error affecting

substantial rights that court will review even absent timely objection at trial); *Naples v. United States,* 344 F.2d 508 (D.C.Cir.1964) (reception of double hearsay reviewed as plain error although not raised below); *United States v. Dunn,* 299 F.2d 548 (6th Cir.1962) (receipt of inadmissible hearsay that was the only evidence sufficient to make prosecution's case reviewed by appellate court on its own motion).

In this court, we have often applied the plain error rule, sometimes in cases that did not even involve fundamental rights of the accused. *See, e.g., United States v. Logan,* 717 F.2d 84 (3d Cir.1983) (failure to preserve issue of trial court's failure to instruct on character witness reviewable as plain error); *Government of the Virgin Islands v. Joseph,* 685 F.2d 857 (3d Cir.1982) (submission to jury of defendant's confession and minister's letter when not admitted of record reviewable as plain error); *Government of the Virgin Islands v. Brown,* 685 F.2d 834, 839 (3d Cir.1982) ("[t]he omission of an essential element of an offense in the charge to the jury ordinarily constitutes plain error, even in the absence of objection"); *United States v. DiPasquale,* 677 F.2d 355, 359 n. 10 (3d Cir.1982) (submission of case to jury despite failure to renew motion for judgment of acquittal at close of all the evidence reviewable under plain error rule); *Beardshall v. Minuteman Press Int'l, Inc.,* 664 F.2d 23 (3d Cir.1981) (erroneous instruction on burden of proof in civil case reviewable under plain error rule despite counsel's failure to object).

1  I do not find it necessary to join Judge Rosenn's plain error discussion.

2  It would be for the district court to consider the "trustworthiness" issue if it determined that Quintiliano was unavailable.

---

                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 98

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

976 F.2d 123
United States Court of Appeals,
Third Circuit.

UNITED STATES of America, Appellant,

v.

Lewis PEPPERMAN, Trustee for Keith T. Sorensen,

Keith T. Sorensen, Debtor,

US Trustee, Trustee.

No. 91-6000.    |    Argued July
9, 1992.    |    Decided Sept. 3, 1992.

Trustee for individual Chapter 7 debtor filed motion to have individual debtor's tax liability for corporate trust fund taxes reduced by amount of corporate Chapter 7 debtor's partial tax payment to the Internal Revenue Service (IRS). The Bankruptcy Court granted that motion, and the IRS appealed. The United States District Court for the District of New Jersey, Anne E. Thompson, J., affirmed, and the IRS appealed. The Court of Appeals, Sloviter, Chief Judge, held that: (1) payments made to IRS out of Chapter 7 debtor's estate were involuntary, as trustee was not free to withhold payment for taxes, and accordingly, trustee did not have authority to designate application of corporate Chapter 7 debtor's partial tax payment to trust fund taxes for which individual debtor was also liable instead of to nontrust fund taxes; (2) bankruptcy court presiding over individual Chapter 7 debtor's case had power to determine that debtor's individual tax liability, including allocation of corporate Chapter 7 debtor's partial tax payment to the IRS; but (3) showing had not been made that crediting of corporate Chapter 7 debtor's partial tax payment to IRS to trust fund taxes was necessary or appropriate to carry out provisions of the Bankruptcy Code so as to justify such order by bankruptcy court in individual debtor's Chapter 7 case.

Reversed with directions to remand.

Rosenn, J., disagreed in part.

West Headnotes (5)

[1]    **Internal Revenue**
👉 Period and Taxes Covered by Payments;
Application of Payments

Payments made to Internal Revenue Service (IRS) out of Chapter 7 debtor's estate were involuntary, as trustee was not free to withhold payment for taxes, and accordingly, trustee did not have authority to designate application of corporate Chapter 7 debtor's partial tax payment to trust fund taxes for which individual debtor was also liable instead of to nontrust fund taxes.

19 Cases that cite this headnote

[2]    **Internal Revenue**
👉 Period and Taxes Covered by Payments;
Application of Payments

Bankruptcy court presiding over individual Chapter 7 debtor's case had power to determine that debtor's individual tax liability, including allocation of corporate Chapter 7 debtor's partial tax payment to the Internal Revenue Service (IRS) to trust fund taxes for which individual debtor was also liable instead of to nontrust fund taxes, pursuant to statute authorizing court to determine amount of tax. Bankr.Code, 11 U.S.C.A. § 505; 26 U.S.C.A. § 6672.

14 Cases that cite this headnote

[3]    **Internal Revenue**
👉 Period and Taxes Covered by Payments;
Application of Payments

Showing had not been made that crediting of corporate Chapter 7 debtor's partial tax payment to Internal Revenue Service (IRS) to trust fund taxes for which individual Chapter 7 debtor was also liable, rather than to nontrust fund taxes was necessary or appropriate to carry out provisions of the Bankruptcy Code so as to justify such order by bankruptcy court in individual debtor's Chapter 7 case, although individual debtor's creditors could be benefited by reduction in IRS's tax claim against that debtor. Bankr.Code, 11 U.S.C.A. § 105; 26 U.S.C.A. § 6672.

20 Cases that cite this headnote

[4]    **Bankruptcy**
👉 Carrying Out Provisions of Code

**Internal Revenue**

U.S. v. Pepperman, 976 F.2d 123 (1992)    Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 22 of 204

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

🔑 Period and Taxes Covered by Payments;
Application of Payments

Absent showing of need for reorganization or similar purpose, bankruptcy court is not free to, under aegis of statute authorizing order necessary or appropriate to carry out provisions of the Bankruptcy Code, direct allocation of tax payments in contravention of policy behind tax statute and long-standing Internal Revenue Service (IRS) procedure. Bankr.Code, 11 U.S.C.A. § 105; 26 U.S.C.A. § 6672.

31 Cases that cite this headnote

[5]   Internal Revenue
🔑 Period and Taxes Covered by Payments;
Application of Payments

Internal Revenue Service (IRS) would not be equitably estopped from denying alleged agreement to credit corporate Chapter 7 debtor's partial payment of taxes to trust fund taxes for which individual Chapter 7 debtor was also liable rather than to nontrust fund taxes; letter upon which estoppel argument was based was at most ambiguous as to what taxes payment would be applied to, further explanation was immediately sent once IRS learned of trustee's erroneous interpretation of letter, and trustee had not established affirmative misconduct or rare and extreme circumstances necessary to allow estoppel claim to run against government. 26 U.S.C.A. § 6672.

20 Cases that cite this headnote

**Attorneys and Law Firms**

*124 Gary R. Allen, Joel A. Rabinovitz (argued), Kenneth L. Greene, U.S. Dept. of Justice, Washington, D.C., for appellant.

Elizabeth W. Kreger (argued), Stark & Stark, Princeton, N.J., for appellee.

Before: SLOVITER, Chief Judge, STAPLETON and ROSENN, Circuit Judges.

**OPINION OF THE COURT**

SLOVITER, Chief Judge.

The question presented is whether the bankruptcy court erred as a matter of law in crediting a corporate debtor's partial tax payment made in a Chapter 7 proceeding against the trust fund liability of the individual debtor, who was a "responsible person" under the Internal Revenue Code.

**I.**

*Factual History and Procedural Posture*

Keith T. Sorensen (Sorensen) was an officer and director of Sorensen Industries, Inc. Sorensen Industries failed to pay both the social security and income taxes it withheld from its employees' pay checks (together commonly referred to as "trust fund" taxes) for the third and fourth quarters of 1984, all of 1985, and the first quarter of 1986. Sorensen Industries also did not pay its own social security taxes to the government (commonly referred to as "non-trust fund" taxes). The IRS determined, and Sorensen does not challenge, that he was a "responsible person" of Sorensen Industries, and that therefore, under section 6672 of the Internal Revenue Code,[1] *125 Sorensen was liable for a penalty equal to the total amount of the tax not paid over. On August 25, 1986, the IRS assessed against Sorensen the amount equal to Sorensen Industries' unpaid trust fund taxes, $54,364.08, and on December 29, 1986, it filed against him its notice of federal tax lien in that amount, plus interest.

Sorensen filed a petition for liquidation in the bankruptcy court under Chapter 7 of the Bankruptcy Code on May 12, 1988. Sometime prior to this filing, Sorensen Industries had also filed a Chapter 7 bankruptcy petition for liquidation. Lewis J. Pepperman was appointed trustee in both bankruptcy cases. On August 30, 1988, the IRS filed its proof of claim against Sorensen for the taxes due under section 6672 in the amount of $64,184.71. On June 6, 1989, the bankruptcy court entered a consent order setting the amount of the government's tax lien at $58,742.64 and directed that

the real property belonging to the debtor known as Block 29, Lot 2, 127 Pension Road, Manalapan, New Jersey, be sold *free and clear of the*

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 23 of 204

U.S. v. Pepperman, 976 F.2d 123 (1992)

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

*liens of the United States of America,*
*Internal Revenue Service,* with said
liens to attach to the proceeds of sale in
the respective order of priority, subject
to the reasonable costs of sale and
administration.

App. at 31 (emphasis added).

Apparently in response to a query by Pepperman regarding
the effect that Sorensen Industries' payment of taxes would
have on Sorensen's personal tax liability under section 6672,
Special Assistant United States Attorney Patricia H. Delzotti
sent a letter dated February 28, 1990, stating:

any payment that is made to the
Internal Revenue Service on behalf
of Sorensen Industries, Inc. for
withholding/FICA taxes due for the
taxable periods ending September
30, 1984 through March 31, 1986,
inclusive, will also reduce the
Service's claim against Keith Sorensen
individually by the same amount.

App. at 32.

On October 25, 1990, Pepperman, as trustee in the
Sorensen Industries' bankruptcy proceeding, mailed a check
for $33,922.16 to the IRS on the corporation's behalf
"representing the pro rata payment of first and final dividends
paid to creditors in the Sorensen Industries, Inc. matter."
App. at 42. Pepperman also included a proposed consent
order reducing the government's tax lien against Sorensen's
individual liability by the amount of that check. The consent
order was apparently based on Pepperman's interpretation of
Delzotti's February 28 letter that all payments made
by Sorensen Industries would necessarily reduce Sorensen's
individual section 6672 liability in an equal amount.

On November 14, 1990, Delzotti responded to Pepperman,
explaining that he had misunderstood her prior letter; that
Sorensen's individual liability would be reduced only to the
extent that the payment from Sorensen Industries reduced its
trust fund liabilities, *i.e.* its liabilities for "withholding/FICA
taxes"; that the IRS would not apply Sorensen Industries'
payment of approximately $34,000 to its trust fund liabilities
because its non-trust fund liabilities would not be satisfied;
and that "[i]t is the government's position that the [IRS] is

entitled to apply payments received in a Chapter 7 proceeding
in its best interest." App. at 36.

On December 27, 1990, Pepperman, as trustee of Sorensen's
bankruptcy estate, filed a motion, styled as a consent order,
to have the bankruptcy court presiding over Sorensen's
bankruptcy reduce Sorensen's individual tax liability by the
amount of Sorensen Industries' payment on the ground that
the February 28 letter from Delzotti was a contract between
the United States and the trustee to that effect. The IRS
argued that it had not entered into any contract with the trustee,
and that since **\*126** the payment was made pursuant to
a bankruptcy proceeding, it was necessarily an involuntary
payment which the IRS could allocate to the corporation's
non-trust fund liability.

After a hearing, the bankruptcy court granted the trustee's
motion. The court held that under *United States v. Energy
Resources Co.,* 495 U.S. 545, 110 S.Ct. 2139, 109 L.Ed.2d
580 (1990), the trustee has the power to designate whether
the $34,000 payment, which the court characterized as
"voluntary," should be applied to reduce Sorensen Industries'
trust fund liability. The bankruptcy court explained, "a debtor
has a certain degree of leverage, and that leverage includes
the ability to make the designation as a voluntary payment
as opposed to just simply letting the lien ride." App. at
12. The court rejected the government's argument that by
its plain language and reasoning *Energy Resources* applies
only to Chapter 11 reorganizations and not to liquidations,
concluding that the general principle of that case indicated
to it that the bankruptcy court's equitable power applied in
all instances. The court did not address the trustee's estoppel
arguments.

The IRS appealed to the district court, which rejected the
government's contention that the holding in *Energy Resources*
does not apply in a Chapter 7 liquidation proceeding. The
district court agreed with the bankruptcy court that the
decision in *Energy Resources* rested on the equitable powers
of the bankruptcy court, including those set forth in section
105 of the Bankruptcy Code. The district court then reasoned
that under these general equitable powers, the bankruptcy
court had the authority to designate the application of the tax
payment made by Sorensen Industries. Like the bankruptcy
court, the district court did not reach the trustee's estoppel
arguments.

We have jurisdiction over this appeal under 28 U.S.C. §§
158(d) and 1291, *see In re Technical Knockout Graphics,*

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

*Inc.,* 833 F.2d 797, 800–01 (9th Cir.1987), and review *de novo* the legal question whether the bankruptcy court had the power to designate the payment at issue so as to reduce Sorensen's section 6672 liability.

## II.

### *Discussion*

### A.

#### *General Legal Principles*

[1] As the Supreme Court has recognized, the trust fund taxes that employers are required to collect from their employees' wages and pay over to the government "can be a tempting source of ready cash to a failing corporation beleaguered by creditors." *Slodov v. United States,* 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978). The loss to the U.S. Treasury when a corporate employer fails to pay over its trust fund taxes can be substantial because the employees are credited with the amounts withheld even if the taxes were not paid over to the government. *See* 26 U.S.C. § 31(a) (1988).

Because of this concern, *see United States v. Sotelo,* 436 U.S. 268, 277 n. 10, 98 S.Ct. 1795, 1801 n. 10, 56 L.Ed.2d 275 (1978), Congress, through section 6672 of the Internal Revenue Code, enacted the stringent measure of imposing personal liability on those individuals whose control over the financial affairs of a business entity requires them to collect and pay over taxes withheld from the employees. *See Slodov,* 436 U.S. at 244–45, 98 S.Ct. at 1784; *Quattrone Accountants, Inc. v. IRS,* 895 F.2d 921, 927 (3d Cir.1990). The provision making a responsible person liable for an amount equal to the trust fund taxes that were not paid over to the government establishes an alternative source of collection for the government to make the public fisc whole. *Slodov,* 436 U.S. at 243–45, 98 S.Ct. at 1783-84. To ensure further that the government will, in fact, be paid, liability under section 6672 is not dischargeable in bankruptcy. *See* 11 U.S.C. §§ 523(a)(1)(A), 507(a)(7)(C) (1988).

Although denominated a "penalty" in the statute, the liability imposed under section 6672 is not penal in nature, but rather is a means of ensuring that withholding taxes are paid. **\*127** *Sotelo,* 436 U.S. at 275, 98 S.Ct. at 1800; *In re Ribs-R-Us,* 828 F.2d 199, 200–01 (3d Cir.1987). The IRS need not attempt to collect the withholding taxes from the employer before seeking to collect from the responsible person. *Ribs-R-Us,* 828 F.2d at 201; *United States v. Pomponio,* 635 F.2d 293, 298 (4th Cir.1980). However, under long-standing IRS policy, the government will realize only one satisfaction of the unpaid trust fund taxes, whether collected in part from each responsible person and the corporate employer, or entirely from one source. *See* Policy Statement P-5-60 (approved May 30, 1984), *reprinted in* Policies of the Internal Revenue Service Handbook, 1 CCH Administration, Internal Revenue Manual at 1305-14; *see also Sotelo,* 436 U.S. at 279-80 n. 12, 98 S.Ct. at 1802 n. 12. Thus, each responsible person will be relieved of separate liability to the extent that the corporation pays its trust fund taxes.

Under another long-standing IRS policy, taxpayers may designate the application of tax payments that are voluntarily made, but may not designate the application of involuntary payments. Rev.Rul. 79-284, 1979-2 C.B. 83; Rev.Rul. 73-304, 1973-2 C.B. 42; *Ribs-R-Us,* 828 F.2d at 201. This policy stems from the common law rule generally recognized between creditors and debtors that the debtor may indicate which debt it intends to pay when it voluntarily submits a payment to a creditor, but may not dictate the application of funds that the creditor involuntarily collects from it. *See O'Dell v. United States,* 326 F.2d 451, 456 (10th Cir.1964); *In re R.L. Inge Dev. Corp.,* 78 B.R. 793, 794 (Bankr.E.D.Va.1987).

An involuntary payment traditionally has been defined as "any payment received by agents of the United States as a result of distraint or levy *or from a legal proceeding* in which the Government is seeking to collect its delinquent taxes or file a claim therefor." *Amos v. Commissioner,* 47 T.C. 65, 69 (1966) (emphasis added). Most courts that have considered the issue have concluded that payments made in the bankruptcy context are involuntary. *See In re Frank Meador Buick, Inc.,* 946 F.2d 885 (Table), 1991 WL 209824, at *3, 1991 U.S.App. LEXIS 24802, at *8 (4th Cir. Oct. 21, 1991) (memorandum opinion) (per curiam) (Chapter 7 liquidation); *In re Optics of Kansas, Inc.,* 132 B.R. 446, 448 (Bankr.D.Kan.1991) (same); *In re F.A. Dellastatious, Inc.,* 121 B.R. 487, 492 (Bankr.E.D.Va.1990) (same); *In re Clements Elec., Inc.,* 102 B.R. 101, 102 (Bankr.S.D.Tex.1988) (same); *In re Jehan-Das, Inc.,* 925 F.2d 237, 238 (8th Cir.) (Chapter 11 liquidation), *cert. denied,* 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991); *see also Ribs-R-Us,* 828 F.2d at 203 (Chapter 11 reorganization); *In*

U.S. v. Pepperman, 976 F.2d 123 (1992)

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 25 of 204

re Energy Resources Co., 871 F.2d 223, 230 (1st Cir.1989) (same), aff'd on other grounds, 495 U.S. 545, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990); In re DuCharmes & Co., 852 F.2d 194, 196 (6th Cir.1988) (per curiam) (same); Technical Knockout Graphics, 833 F.2d at 802 (same). But see In re Lifescape, Inc., 54 B.R. 526 (Bankr.D.Colo.1985) (payment in Chapter 11 reorganization voluntary); In re Tom LeDuc Enters., 47 B.R. 900, 902 (W.D.Mo.1984) (payment in Chapter 11 reorganization pursuant to agreement with IRS voluntary). The Supreme Court left this issue open in Energy Resources, 495 U.S. at 548-49, 110 S.Ct. at 2141-42 (bankruptcy court in Chapter 11 proceeding can direct designation "whether or not the payments ... are rightfully considered to be involuntary").

In this case, the bankruptcy court characterized the payment of taxes as a "voluntary payment." App. at 14. It is unclear whether, and to what extent, that may have influenced its holding that the trustee could designate the payment to be applied to the corporate debtor's trust fund liability. In any event, we conclude in line with the overwhelming authority that payments made to the IRS out of a Chapter 7 debtor's estate are involuntary. As counsel for the trustee conceded at the argument before us, the trustee was not free to withhold payment for taxes. Energy Resources is not to the contrary since the issue in that case was whether the bankruptcy court (as distinguished from the debtor or trustee) had the authority to direct the IRS to allocate the tax payments *128 as trust fund payments. We turn to that issue.

## B.

### Jurisdiction

[2]    We must consider preliminarily the IRS's argument that the bankruptcy court that entered the order lacked jurisdiction. The tax payment at issue was made by Pepperman as trustee for Sorensen Industries pursuant to the order of the bankruptcy court supervising its liquidation, which is now complete. However, Pepperman filed the motion with respect to the designation of that payment in the bankruptcy court in Sorensen's separate and distinct liquidation proceeding, presided over by a different bankruptcy judge. It happens that they were both in the district of New Jersey, but they need not have been. Thus, the IRS contends that only the bankruptcy court in charge of Sorensen Industries' case could have made the order directing the manner in which the IRS should allocate the payment.

Certainly that court would have had jurisdiction in that respect. However, the action taken by the bankruptcy court in this case was somewhat different. It did not order the IRS to allocate the Sorensen Industries' tax payment in any particular manner, but rather made what amounted to a determination of Sorensen's section 6672 tax liability as permitted by section 505(a)(1) of the Bankruptcy Code. [2] We need not decide which bankruptcy court would have had jurisdiction had the same issue been brought before both of them. It wasn't, and Sorensen Industries' liquidation proceeding is now closed. Thus, we conclude that the bankruptcy court presiding over Sorensen's liquidation proceeding did have the power to determine his individual tax liability. See, e.g., In re Brooks, 129 B.R. 484, 485-86 (Bankr.N.D.Ohio 1991) (ruling in chapter 13 proceeding on motion of debtors under section 505 for determination of their section 6672 tax liability following liquidation of former corporate employer); cf. In re Grant, 90-2 U.S. Tax Cas. (CCH) ¶ 50,504 (Bankr.W.D.Pa.1990) (denying merits of Chapter 13 debtor's section 505 motion that he was not responsible person for section 6672 liability purposes), aff'd, 91-2 U.S. Tax Cas. (CCH) ¶ 50,324 (W.D.Pa.1991), aff'd mem., 958 F.2d 363 (3d Cir.1992). [3]

## C.

### The Scope of Energy Resources

[3]    The district court based its affirmance of the bankruptcy court's order reducing the amount of the IRS's tax lien on its interpretation of the Supreme Court's decision in Energy Resources, an interpretation the IRS contends is erroneous. In Energy Resources the Supreme Court resolved a conflict between the First Circuit, which held that although payments made pursuant to a chapter 11 reorganization plan were involuntary, the bankruptcy court had the authority to direct the IRS to allocate a corporate debtor's tax payments *129 to its trust fund liability prior to its non-trust fund liability, see Energy Resources Co., 871 F.2d at 230, and this court, which held that because tax payments in a Chapter 11 reorganization were involuntary, the IRS, and not the bankruptcy court, was entitled to allocate tax payments in any manner it saw fit. See Ribs-R-Us, 828 F.2d at 204. The Supreme Court affirmed the judgment of the First Circuit, holding that "whether or not the payments at issue are rightfully considered to be involuntary, a bankruptcy court has the authority to order the IRS to apply

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

the payments to trust fund liabilities if the bankruptcy court determines that this designation is necessary to the success of a reorganization plan." *Energy Resources,* 495 U.S. at 548-49, 110 S.Ct. at 2141-42. [4]

The Court noted that various provisions of the Bankruptcy Code "are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." *Id.* (citing 11 U.S.C. §§ 1123(b)(5), 1129, 105). It was this language, as well as the Supreme Court's reference to section 105, [5] on which the district court relied in this case. *See* App. at 5-7.

The IRS argues that the Supreme Court's holding should not be expanded beyond the Chapter 11 reorganization context because it was conditioned on a finding by the bankruptcy court that such action would aid the reorganization. The trustee responds that the broad powers available to the bankruptcy court under section 105 to oversee the administration of the bankruptcy estate are not limited to either Chapter 11 or to ensuring the success of a reorganization under Chapter 11. He notes that both sections 507(a)(7) and 523(a)(1)(A) (establishing the priority and nondischargeability of specified tax claims), which the Court in *Energy Resources* concluded did not preclude the allocation orders in that case, apply in Chapter 7 liquidations as well as Chapter 11 reorganizations. Thus, according to Pepperman, the bankruptcy court in this case had the authority under section 105 to credit Sorensen Industries' tax payments against Sorensen's section 6672 liability.

The vast majority of courts that have addressed the issue of the scope of the *Energy Resources* decision have declined to extend its application beyond the Chapter 11 reorganization context. *See In re Kare Kemical, Inc.,* 935 F.2d 243, 244 (11th Cir.1991) (Chapter 11 liquidation); *Jehan-Das,* 925 F.2d at 238 (same); *In re Equipment Fabricators,* 127 B.R. 854, 858 (D.Ariz.1991) (same); *In re Visiting Nurse Ass'n,* 128 B.R. 835, 837 (Bankr.M.D.Fla.1991) (same); *Frank Meador Buick,* 1991 WL 209824, at *3, 1991 U.S.App. LEXIS 24802, at *8 (Chapter 7 liquidation); *In re Gregory Engine & Mach. Servs.,* 135 B.R. 807, 810 (Bankr.E.D.Tex.1992) (same); *Optics of Kansas,* 132 B.R. at 449 (same); *Brooks,* 129 B.R. at 486-87 (same); *Dellastatious,* 121 B.R. at 493 & n. 3 (same); **130** *In re Arie Enters.,* 116 B.R. 641, 643 (Bankr.S.D.Ill.1990) (same); *cf. In re T.M. Prods. Co.,* No. 90-6734, 1992 U.S.Dist. LEXIS 9404, at *7 (S.D.Fla. June 4, 1992) ("payments made after reorganization attempts ceased should not be subject to the Debtor's choice of designation").

*But see In re Deer Park, Inc.,* 136 B.R. 815, 818 (9th Cir.BAP 1992) (*Energy Resources* does apply to Chapter 11 liquidation plans).

The IRS offers forceful arguments to support its position that absent reorganization, a bankruptcy court lacks the authority to order the IRS to credit a corporate debtor's tax payments against an individual debtor's section 6672 liability. Indeed, the Court in *Energy Resources* consistently linked its holding with the fact of reorganization and the debtor's need for rehabilitation. *See Energy Resources,* 495 U.S. at 546, 549, 551, 110 S.Ct. at 2140, 2142, 2143. In resolving the tension between the revenue protection goals of IRS policy and the preference for debtor rehabilitation favored by Chapter 11 of the Bankruptcy Code, the Court noted that where a debtor is being reorganized, the tax debt must be paid off within six years, *see* 11 U.S.C. § 1129(a)(9)(C), and "therefore ... the IRS, in all likelihood, will collect the tax debt owed." *Energy Resources,* 495 U.S. at 549, 110 S.Ct. at 2142. The Court further noted that while the IRS was correct

> that, if it can apply a debtor corporation's tax payments to non-trust-fund liability before trust fund liability, it stands a better chance of debt discharge because the debt that is not guaranteed [i.e., the non-trust fund liability] will be paid off before the guaranteed debt.... [T]his result ... is an added protection not specified in the Code itself.

*Id.* at 550, 110 S.Ct. at 2142. According to the Court, if a bankruptcy court concludes that an allocation of a tax payment is necessary to the success of a reorganization, *see id.* at 549, 110 S.Ct. at 2142 (citing 11 U.S.C. § 1129(a)(11)), the appropriate balance between the goals of revenue protection and debtor rehabilitation must be struck in favor of rehabilitation.

Such considerations have no application where Chapter 7 liquidation is involved because designation of tax payments cannot aid the debtor's reorganization efforts. *Cf. T.M. Prods. Co.,* No. 90-6734, 1992 U.S.Dist. LEXIS 9404, at *4 (observing that in "involuntary liquidation, after which the debtor will not exist, there is no policy reason for allowing the debtor to designate payments"). In addition, although trust fund taxes technically are nondischargeable in bankruptcy, *see* 11 U.S.C. § 523(a)(1)(A), corporate dissolution has the practical effect of discharging the corporate debtor from

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 28 of 204

U.S. v. Pepperman, 976 F.2d 123 (1992)
70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

The apparent misunderstanding between Pepperman and Delzotti cannot be said to have imperiled the "interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Heckler v. Community Health Servs.,* 467 U.S. 51, 61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). Because Pepperman has not established the affirmative misconduct or rare and extreme circumstances necessary to allow an estoppel claim to run against the government we need not consider whether he proffered adequate evidence of the other elements of estoppel.

*132  III.

### Conclusion

For the foregoing reasons, we will reverse the order of the district court with directions to remand to the bankruptcy court for further proceedings not inconsistent with this opinion.

### Parallel Citations

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734, Bankr. L. Rep. P 74,925, Unempl.Ins.Rep. (CCH) P 16858A

Footnotes

1    This provision states in pertinent part:

(a) General Rule.-Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C.A. § 6672 (West Supp.1992).

2    Section 505 states in pertinent part:

(a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

(2) The court may not so determine-

(A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title.

11 U.S.C. § 505 (1988).

The government does not contend, and the record does not indicate, that Sorensen's section 6672 tax liability was determined "by a judicial or administrative tribunal of competent jurisdiction" before the institution of his Chapter 7 case.

3    Judge Rosenn believes that the bankruptcy court's jurisdiction under 11 U.S.C. § 505 is questionable. *See In re Vermont Fiberglass, Inc.,* 88 B.R. 41, 44-45 (Bankr.D.Vt.1988). He would base jurisdiction solely upon 28 U.S.C. § 157(b)(2)(K) under which the bankruptcy court properly exercised jurisdiction to determine the extent of the IRS lien on Sorensen's property. Because there is no disagreement by the panel with the exercise of jurisdiction under this section, he would not reach the question of jurisdiction under section 505.

4    As one recent commentator has recognized:

The successful reorganization of a company depends in large part on the existing management's cooperation, effort and, in certain cases, capital infusion. A financially distressed company often does not have the time and resources to expend on the search for and installation of new management. New management would not only have to confront the difficult task of becoming intimately familiar with the company's operations, but also would have to direct the company through a turbulent period. Therefore, unless existing management has been grossly negligent or incompetent, their retention can be crucial to the successful restructuring of a company.

Comment, *Responsible Officers Get Green Light at the Intersection of the Tax and Bankruptcy Codes; Bankruptcy Code Section 105 Can Be Used to Order the IRS to Apply Debtor Tax Payments to Trust Fund Taxes,* 21 Seton Hall L.Rev. 868, 869 (1991) (footnotes omitted); *see also* David G. Jaeger, *The Allocation of Tax Payments in Bankruptcy: In* Energy Resources Co., Inc., *the Supreme Court Resolves Conflict Among the Circuits,* 6-91 Tax Adviser 383 (June 1991) (responsible persons may be more willing to advance funds to rehabilitate corporation if corporate tax payments are allocated to trust fund liability before non-trust fund liability).

**U.S. v. Pepperman, 976 F.2d 123 (1992)**
70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

5    Under this section, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105 (1988).

End of Document                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 99

803 F.2d 123
United States Court of Appeals,
Third Circuit.

The UNITED STATES

v.

Hilmer Burdette SANDINI, Ernest G. Rockwell,
George White Kost, Ronald Paul Urban, Carol Ann
Hineman Sandini, Sandra Jean Sandini, Michael
Frawley, David Thompson, George Strickler,
Sherman John Glunt, Santos Ruiz, Robert Kotula,
Eugene Anthony Gesuale, Robert Maker, Vincent
Ciraolo, Richard Moody, Edward Mills, Rex
Foster, Kenneth Hill, Harry Jessup, Rose Jessup.
Appeal of Richard MOODY.

No. 86-3283.    |    Submitted Under
Third Circuit Rule 12(6)    Sept. 30, 1986.
|    Decided Oct. 16, 1986.    |    Rehearing
and Rehearing En Banc Denied Nov. 10, 1986.

Defendant was convicted by jury in the United States District
Court for the Western District of Pennsylvania, Gerald J.
Weber, J., of conspiracy to import marijuana, conspiracy
to possess marijuana with intent to distribute, importation
of marijuana, and possession of marijuana with intent to
distribute, and he appealed. The Court of Appeals, James
Hunter, III, Circuit Judge, held that: (1) defendant had failed
to preserve error regarding admission of evidence relating to
his association with cocaine conspirator, and (2) defendant
had not waived right to object to venue, but venue was
proper in district that was actual, as opposed to intended, final
destination of marijuana.

Affirmed.

West Headnotes (6)

[1]    **Criminal Law**
        👉 Necessity of Specific Objection

        General evidentiary objections, such as
        characterization of offending evidence as
        irrelevant, will not satisfy evidentiary rule
        restricting appellate review of evidentiary errors
        to errors for which specific ground of objection

has been stated. Fed.Rules Evid.Rule 103(a)(1),
28 U.S.C.A.

3 Cases that cite this headnote

[2]    **Criminal Law**
        👉 Necessity of Specific Objection

        Defendant charged with various counts relating
        to marijuana conspiracy had failed to preserve
        trial error regarding admission of evidence of
        his association with cocaine conspirator through
        specific trial objection; defense counsel had
        failed to specifically invoke either of federal
        evidentiary rules being relied on as basis for
        objection during his colloquy with United States
        Attorney and trial judge, and substance of
        colloquy was not of such character as to put
        trial judge on notice of basis for objection, as
        defense counsel had simply repeated three times
        that information was "irrelevant." Fed.Rules
        Evid.Rules 103(a)(1), 403, 404(b), 28 U.S.C.A.

        15 Cases that cite this headnote

[3]    **Criminal Law**
        👉 Objections and Exceptions

        Where there is proper allegation of venue in
        indictment, but government fails to prove that
        allegation at trial, challenge to venue in motion
        for acquittal is timely.

        8 Cases that cite this headnote

[4]    **Criminal Law**
        👉 Objections and Exceptions

        Defendant has no notice that facially proper
        allegation of venue is in fact defective until
        government rests its case and therefore cannot
        waive right to object to venue until that time.

        9 Cases that cite this headnote

[5]    **Criminal Law**
        👉 Objections and Exceptions

        Defendant charged with conspiracy to import
        marijuana and importation of marijuana had not
        waived right to object to venue, where relevant
        counts of indictment had properly alleged venue

in district to which marijuana had been imported.
18 U.S.C.A. § 3237(a).

7 Cases that cite this headnote

[6]    **Criminal Law**
   👉 Offenses Against United States
   Venue in prosecution for conspiracy to import
   marijuana and importation of marijuana was
   proper in district that was actual, as opposed to
   intended, final destination of that marijuana.

5 Cases that cite this headnote


**Attorneys and Law Firms**

 **\*124**  Jon A. Sale, Ira N. Loewy, Bierman, Sonnett, Shohat
& Sale, P.A., Miami, Fla., for appellant.

J. Alan Johnson, U.S. Atty., Constance M. Bowden, Asst.
U.S. Atty., Pittsburgh, Pa., for appellee.

Before WEIS, MANSMANN, and HUNTER, Circuit Judges.


**OPINION OF THE COURT**

JAMES HUNTER, III, Circuit Judge:

On June 27, 1985, in the United States District Court for the
Western District of Pennsylvania, appellant Richard Moody
was charged in four counts of a 23 count indictment with
conspiracy to import marijuana in violation of 21 U.S.C. §
963, conspiracy to possess marijuana with intent to distribute
in violation of 21 U.S.C. § 846, importation of marijuana in
violation of 21 U.S.C. § 952(a), and possession of marijuana
with intent to distribute in violation of 21 U.S.C. § 841(a)
(1). The same indictment charged a number of defendants,
including Hilmer Sandini, one of Moody's conconspirators,
in a large-scale cocaine trafficking conspiracy. Prior to
trial, Moody filed a Motion for Severance and Relief from
Prejudicial Joinder, arguing that the marijuana conspiracy
was entirely separate from the cocaine conspiracy, and that
joinder could not be justified by the mere fact that Moody's
coconspirator Sandini was alleged to be a participant in both
conspiracies. **\*125**  Moody also argued that joinder was
prejudicial as to him because the introduction of evidence
concerning the cocaine conspiracy at his trial would deprive
him of a fair opportunity to have the jury determine his guilt

or innocence on the marijuana charges. The trial court agreed,
and on August 27, 1985, entered an Order of Severance.
Moody's trial commenced on December 18, 1985, and the jury
returned verdicts of guilty on all four counts on December 20,
1985. On April 24, 1986, Moody was sentenced to concurrent
terms of imprisonment of 360 days on each count, to be
followed by a special parole term of two years. He was also
fined on all four counts a total of $16,000. This appeal,
in which Moody challenges (a) the admission of allegedly
prejudicial evidence at trial and (b) improper venue, followed.

According to the testimony, Moody was a member
of a marijuana trafficking conspiracy led by indicted
coconspirator Ed Mills. Moody supplied the airplane, a
Cessna 401, used in the group's importation of marijuana
into the United States, and provided partial financing for the
purchase of the marijuana. The Mills group started business in
1981. They planned to purchase marijuana in Jamaica, fly the
marijuana from there to the Bahamas, and ship it from there
by boat to Florida. This trip was attempted for the first time in
1982. Moody's plane was used to move the contraband from
Jamaica to the Bahamas. The load was then lost because Mills
failed to arrange for boats to carry the drugs from the Bahamas
to Florida. Shortly thereafter, a second trip was planned, for
which Moody supplied $15,000 for the drug purchase as well
as his airplane. This mission also failed. Moody again agreed
to supply $15,000 and the use of this airplane for a third
importation effort, and this time his partners promised him
$60,000 for the use of the plane and # of the balance of all
profits to compensate him for his previous investments.

Around the same time that the Mills group was planning
its third marijuana run from Jamaica, the members of the
conspiracy met with Hilmer Sandini and his associate Dan
Mitrione at the Clock Restaurant in Florida. The meeting's
participants discussed the marijuana importation scheme; a
proposal by Sandini that members of the Mills group become
involved in his cocaine importation scheme; the possible use
by Sandini of Moody's Cessna 401; and the possible use by
Mills of Sandini's Cessna 411. Moody, though present, may
not have actively participated in any of these conversations.
After several more meetings with the Mills group, Sandini
learned that neither Moody nor any of his coconspirators was
interested in the cocaine venture. Sandini was also rebuffed
in his offer to broker the marijuana haul once it arrived in
Florida.

Sandini finally became involved in the marijuana importation
scheme when the Mills group used his plane instead of

Moody's to make the third run from Jamaica. Sandini rented the plane to the Mills group for $30,000, demanding that $15,000 be paid when the plane took off from Boca Raton Airport, and $15,000 when it returned. Moody brought the first $15,000, in cash, to the Boca Raton Airport and delivered it to one of his coconspirators, who later passed it on to Sandini.

The third trip from Jamaica was a success. Sandini was fully paid for the use of his airplane upon the marijuana's arrival into the United States. The Mills group immediately sold $50,000 worth of the marijuana to Ronald Todd, whom they had met through Dan Richitelli, the individual chosen to broker the marijuana. Todd brought the marijuana he had purchased into the Western District of Pennsylvania.

Moody testified on his own behalf at trial. Moody testified that, in 1982, he decided that he wanted to sell his airplane. In March or April of 1982, he entered into a lease-purchase agreement with Ed Mills. Moody only received one payment on this lease-purchase agreement, which consisted of $15,000 in cash. Because Moody did not believe that this much cash could be kept safely, he returned it to Mills several days later, at the Boca Raton Airport. Moody **\*126** also testified that his meetings with Sandini concerned Sandini's interest in purchasing various pieces of Moody's property, including his Cessna 401. No sale ever came of any of these discussions. At none of the meetings between Moody and Sandini, insists Moody, were drugs ever discussed.

Appellant Moody's first point of appeal is based on Federal Rules of Evidence 404(b) and 403. Moody argues that the admission at trial of evidence regarding the meetings between the Mills group and Hilmer Sandini was irrelevant and prejudicial, because the proffered testimony concerned a cocaine conspiracy in which Moody was not involved. The prosecution's purpose in introducing this testimony, Moody argues, was the "prejudicial and improper [one] of showing that Moody had been associating with some bad people." Brief for Appellant at 16. Moody argues that no evidence of these meetings should have been admitted at trial, or, short of that, that any reference to the cocaine conspiracy should have been excluded. The government argued successfully at trial that the evidence of the Sandini meetings was essential to its case because, without it, "[n]othing would make any sense." Appendix at 245. On appeal, the government argues that the Sandini meetings were needed to show that, contrary to Moody's testimony, Moody was fully aware of how his airplane was being used by Mills.

**[1]** Before reaching the merits of Moody's claims under Rules 404(b) and 403 we must determine whether appellant is barred from raising these claims by Federal Rule of Evidence 103(a)(1). Rule 103(a)(1) restricts appellate review of evidentiary errors to those in which the complaining party has "stat[ed] the specific ground of objection, if the specific ground was not apparent from the context...." Although the degree of specificity required by the Rule is not clear, it has been established that general objections, such as the characterization of the offending evidence as irrelevant, will not suffice. *See, e.g., United States v. Blackshear,* 568 F.2d 1120, 1121 (5th Cir.1978).

**[2]** Appellant Moody's principal ground for objecting to the admission of the evidence of the Sandini meetings is that these meetings constituted "other acts" that were relied upon by the prosecution to suggest that Moody had a propensity for drug-related crime or a generally bad character as demonstrated by his association with Sandini. Such tactics are prohibited by Rule 404(b), which provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to show that [the defendant] acted in conformity therewith." Appellant Moody also argues that the testimony about the Sandini meetings should have been excluded under Rule 403, which directs the trial judge to exclude any relevant evidence that is "substantially outweighed by the danger of unfair prejudice." Appellant did not properly preserve either of these grounds of objection for appeal. At no point during the colloquy between defense counsel, the United States Attorney and the trial judge did defense counsel specifically invoke either Rule 404(b) [1] or Rule 403, as required by Rule 103(a)(1) and our precedents. *See Carter v. Hewitt,* 617 F.2d 961, 966 n. 4 (3d Cir.1980); *United States v. Long,* 574 F.2d 761, 766 (3d Cir.), *cert. denied,* 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). Nor was defense counsel's reliance on either of these Rules "apparent from the context." *See United States v. Gibbs,* 739 F.2d 838, 849 (3d Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985). The substance of the colloquy was not of such a character to put the trial judge on notice that an objection based on Rule 404(b) or Rule 403 was at issue. Instead, defense counsel simply repeated three times that the information was "irrelevant." The trial judge's determination that the evidence was admissible will not **\*127** be disturbed. *See Kane v. Ford Motor Co.,* 450 F.2d 315, 316 (3d Cir.1971). Therefore, appellant Moody's appeal must fail as far as it relies on Rule 404(b) and Rule 403 because those grounds for objection were not properly preserved for appellate review.

Appellant Moody's second point of appeal is that the trial court erred in denying his motion for judgment of acquittal on Counts II and IV of the indictment (the conspiracy to import and substantive importation counts) based on the prosecution's failure to prove venue in the Western District of Pennsylvania. The Constitution of the United States restricts the government's choice of venue in criminal cases. In Article III, the Constitution requires that "the trial of all crimes ... shall be held in the State where said crimes shall have been committed...." U.S. Const. art. III, § 2, cl. 3. The Sixth Amendment further provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and District wherein the crime shall have been committed...." U.S. Const. amend. VI. Appellant Moody claims that the alleged crime of importation ended in Florida, and that the prosecution of his case in the Western District of Pennsylvania thus violated the U.S. Constitution.

[3] [4] [5] The United States contends that Moody has waived his right to object to venue in the Western District of Pennsylvania. The government correctly asserts that objections to venue are waived if not raised in a timely manner, i.e., "at least prior to the close of the government's case ... and perhaps before the trial begins." *United States v. Polin,* 323 F.2d 549, 577 (3d Cir.1963). However, all circuits reaching this question have mitigated the harshness of this rule by holding that venue objections are waived only "when the indictment ... clearly reveals [the venue] defect but the defendant fails to object." *United States v. Price,* 447 F.2d 23, 27 (2d Cir.), *cert. denied,* 404 U.S. 912, 92 S.Ct. 232, 30 L.Ed.2d 186 (1971). Consequently, where there is a proper allegation of venue in the indictment, but the government fails to prove that allegation at trial, a challenge to venue in a motion for acquittal is timely. *See* 2 C. Wright, *Federal Practice and Procedure: Criminal* § 306, p. 600, n. 9 and cases cited therein (2d ed. 1982 & Supp. 1986). Until the government rests its case, the defendant has no notice that a facially proper allegation of venue is in fact defective, and thus there can be no waiver until the close of the government's case. *United States v. Black Cloud,* 590 F.2d 270, 272 (8th Cir.1979); *United States v. Bohle,* 445 F.2d 54, 58 (7th Cir.1971). Moody has not waived his right to object to venue, because venue in the Western District of Pennsylvania was properly alleged in Counts II and IV of the indictment, which charged Moody with conspiracy to import and importation of marijuana into the Western District of Pennsylvania. *See United States v. Netz,* 758 F.2d 1308,

1311-12 (8th Cir.1985) (no waiver of objection to venue in the Western District of Missouri where indictment charged defendant with importation of cocaine into the Western District of Missouri).

Federal venue in narcotics importation cases is controlled by 18 U.S.C. § 3237(a), which provides that

**§ 3237. Offenses begun in one district and completed in another**

(a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Any offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or *into which such* commerce, mail matter, or *imported object* or person moves.

**\*128** 18 U.S.C. § 3237(a) (1982) (emphasis added). Under the plain meaning of the statutory language, venue is proper in the Western District of Pennsylvania because the "imported object," *i.e.,* the marijuana, "move[d]" into the Western District of Pennsylvania.

Appellant Moody argues that 18 U.S.C. § 3237(a) is inapplicable to him because the statute was not enacted until after the commission of the crime. The government responds that the statute was enacted not to alter but to clarify prior law in this area. The resolution of this debate is inconsequential. Appellant Moody asks this court to apply the teachings of a line of cases holding that venue is properly laid in the district of the marijuana's "final destination." *See, e.g., United States v. Godwin,* 546 F.2d 145 (5th Cir.1977); *United States v. Jackson,* 482 F.2d 1167 (10th Cir.1973), *cert. denied,* 414 U.S. 1159, 94 S.Ct. 918, 39 L.Ed.2d 111 (1974). It is this same line of cases that the government believes underlies the amendment of 18 U.S.C. § 3237(a). Therefore, we will apply the teachings of the final destination cases to this appeal.

[6] Appellant Moody relies on five cases in which narcotics were destined for one destination, seized at a port of entry, *i.e.,* California or Florida, and then sent on to the destination originally intended to be the final destination by

U.S. v. Sandini, 803 F.2d 123 (1986)

21 Fed. R. Evid. Serv. 1253

the defendant. *See United States v. Netz,* 758 F.2d 1308 (8th Cir.1985); *United States v. Lowry,* 675 F.2d 593 (4th Cir.1982); *United States v. Gray,* 626 F.2d 494 (5th Cir.1980), *cert. denied,* 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820 (1981); *United States v. Godwin,* 546 F.2d 145 (5th Cir.1977); *United States v. Jackson,* 482 F.2d 1167 (10th Cir.1973), *cert. denied,* 414 U.S. 1159, 94 S.Ct. 918, 39 L.Ed.2d 111 (1974). In each of these cases, the appellate court concluded that the proper venue for the prosecution was the final destination of the contraband rather than the port at which the narcotics entered the country. Appellant Moody argues that the critical point in these cases is that the courts held that proper venue was in the district that the defendant *intended* to be the final point of destination for the contraband. Although the facts of the cases support this contention, there is no language in any of the opinions to support it. These courts were concerned not with the well-laid plans of defendants, but with the artificiality of assigning venue to the district of the port of entry. They were anxious to reject an earlier precedent from the Eastern District of Virginia asserting that the port of entry was the proper venue *per se* in marijuana importation cases. *See United States v. Lember,* 319 F.Supp. 249 (E.D.Va.1970). Thus, these courts held not that the proper venue for a violation of 21 U.S.C. § 952(a) is the destination intended by the defendant, but that

> importation of a controlled substance in
> violation of 21 U.S.C. § 952(a) is a
> "continuous crime" that is not complete
> until the controlled substance reaches its
> final destination point, and that venue is
> proper in any district along the way.

*Gray,* 626 F.2d at 498 (citing *Jackson,* 482 F.2d at 1178); *accord, Godwin,* 546 F.2d at 146-47.

It is unrealistic to assume that the "final destination" of all Florida-based drug smugglers is Florida. Florida is merely the conduit through which many controlled substances imported into this country must pass before reaching destinations outside of that state. Appellant argues that it would be unjust and irrational to lay venue in any jurisdiction where a small amount of contraband imported into Florida happened to find its way. That is not what happened in this case. This case involves the transportation of $50,000 worth of marijuana purchased almost immediately after the drug's arrival in this country by an individual contacted by the coconspirators' own specially-selected marijuana broker. Although the Western District of Pennsylvania may not have been the final destination intended by the appellant, it was nevertheless the final destination of a considerable amount of the marijuana he conspired to import into this country. To adopt appellant Moody's argument and hold that Florida was the "final destination" for this **\*129** contraband would be to reinstate *Lember* 's irrational port of entry rule rejected by the very authorities appellant cites. Venue was properly laid in the Western District of Pennsylvania.

The appellant's conviction will be affirmed.

**Parallel Citations**

21 Fed. R. Evid. Serv. 1253

---

Footnotes

1     The United States Attorney, however, did remark that "[i]f nothing else, it would certainly be 404 anyway because they are discussing at the same time multiple acts." Appendix at 246.

---

**End of Document**                                                            © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 100

944 F.2d 870
United States Court of Appeals,
Federal Circuit.

VAUPEL TEXTILMASCHINEN KG and
Vaupel North America, Plaintiffs–Appellants,

v.

MECCANICA EURO ITALIA S.P.A. and American
Trim Products, Inc., Defendants/Cross–Appellants.

Nos. 90–1397, 90–1422.  |  Sept. 13, 1991.

Licensee filed action for alleged infringement of a patent for a weaving method and machine. The United States District Court for the Western District of North Carolina, Woodrow Wilson Jones, J., found infringement, but also found that laches and estoppel barred the action. Appeal and cross appeal were taken. The Court of Appeals, Lourie, Circuit Judge, held that: (1) the patent licensing agreement transferred sufficient rights to the licensee so that it could be treated as an assignee and had standing; (2) delay during reissue proceedings was not to be considered in deciding whether the action was barred by laches or estoppel; and (3) the district court did not clearly err in finding that the patent had been infringed.

Affirmed in part and reversed in part.

West Headnotes (15)

**[1]**  **Patents**
  Construction and Operation of Licenses
**Patents**
  Persons entitled to sue
Patent licensing agreement transferred all substantial rights under patent, giving licensee status of assignee that had standing to bring infringement action; although inventor retained right to veto sublicensing, and agreement as limited in scope to United States, agreement transferred right to sue for all infringements, past, present, and future. 35 U.S.C.A. § 261; Fed.Rules Civ.Proc.Rules 19, 19(a), 28 U.S.C.A.

178 Cases that cite this headnote

**[2]**  **Patents**
  Laches
Laches and estoppel are equitable defenses in patent infringement action and are within district court's discretion.

Cases that cite this headnote

**[3]**  **Patents**
  Laches
Key factor in finding laches is length of patentee's delay in bringing suit from time he knew, or in exercise of reasonable diligence should have known, of alleged infringement.

3 Cases that cite this headnote

**[4]**  **Patents**
  Effect of prior or pending litigation
Patent owner may avoid consequences of what would otherwise be unreasonable delay in filing infringement action by establishing that he or she was engaged in "other litigation" such as reissue proceedings.

11 Cases that cite this headnote

**[5]**  **Patents**
  Effect of prior or pending litigation
For other litigation to excuse patent holder's delay in bringing infringement action, accused infringer must have adequate notice of existing proceedings.

17 Cases that cite this headnote

**[6]**  **Patents**
  Effect of prior or pending litigation
For "other litigation" to excuse patentee's delay in bringing infringement action until conclusion of another lawsuit, alleged infringer must have had proper notice of existing suit so as to permit alleged infringer to change his activities to avoid liability or to bring declaratory judgment action if delay would be burdensome.

31 Cases that cite this headnote

**[7]** **Patents**

 Effect of prior or pending litigation

Alleged infringer had sufficient notice of patentee's ongoing reissue proceeding and of patentee's intent to sue and, therefore, delay consumed by reissue proceeding could be excused in deciding whether infringement action was barred by laches; not only was alleged infringer aware of reissue proceeding, but it actively participated and it would have been superfluous to tell alleged infringer of intent to sue after conclusion of reissue proceeding.

8 Cases that cite this headnote

**[8]** **Patents**

 Effect of prior or pending litigation

Delay caused by patentee's reissue proceeding could be excused in deciding whether laches barred infringement action, despite infringer's alleged knowledge that reissue proceeding would affirm original patent allowance; patentability issues were not resolved until nearly three and one-half years later and, without valid and enforceable patent, there could be no obligation to sue in order to avoid laches.

7 Cases that cite this headnote

**[9]** **Patents**

 Specific period

Delay of three and one-half years after conclusion of reissue proceeding and commencement of patent infringement action did not result in laches where licensee did not have knowledge to whom alleged infringer had sold infringing devices.

39 Cases that cite this headnote

**[10]** **Patents**

 Defenses

Continuing conflict between licensee and alleged infringer barred determination that infringement action had been barred by estoppel; alleged

infringer could not reasonably have drawn inference of abandonment, it did not rely on any purported abandonment, and alleged infringer repeatedly asserted its right to sell allegedly infringing devices.

11 Cases that cite this headnote

**[11]** **Patents**

 Comparison with claims of patent

Liability for patent infringement requires that accused device contain every limitation of claim or its substantial equivalent.

9 Cases that cite this headnote

**[12]** **Patents**

 Claims

Preamble language in patent for weaving method and machine did not involve structural limitation of claims and, thus, absence of specified loom parts from accused device did not preclude liability for patent infringement; loom "parts" were not illustrated in any figures of patent or otherwise described in specification.

15 Cases that cite this headnote

**[13]** **Patents**

 Particular patents

District court did not clearly err in finding that accused device literally infringed claim of patent for weaving method and machine by guiding fabric through use of spreader bar, take-up roll, pressure rollers, guide rollers, and drive cloth roll, all of which kept tension on fabric and produced tensile stresses.

11 Cases that cite this headnote

**[14]** **Patents**

 Rejection and Amendment of Claims

Evidence did not show that threaded temple bar limitation had been added to apparatus claim for guiding station, cutting station, and thermostabilizing station of weaving method and machine merely to avoid obviousness rejection

and, therefore, prosecution history estoppel did not bar enforcement of claim.

11 Cases that cite this headnote

[15] **Patents**
&#9758; Original utility

3,961,650. Infringed.

Cases that cite this headnote

**Attorneys and Law Firms**

*871 Melvin M. Goldenberg, Christensen, O'Connor, Johnson & Kindness, Seattle, Wash., argued, for plaintiffs-appellants. With him on the brief, were Michael W. Bocianowski and Jeffrey W. Reis. Also on the brief, was Charles W. Helzer, Arnold, Md.

Gregory B. Wood, Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst, Los Angeles, Cal., and Susan Lerner, Los Angeles, Cal., argued, for defendants/cross-appellants.

Before NEWMAN, LOURIE and RADER, Circuit Judges.

**Opinion**

LOURIE, Circuit Judge.

This appeal and cross-appeal are from the June 1, 1990, judgment of the United States District Court for the Western District of North Carolina, ST–C–88–127. The court, in a suit brought by Vaupel Textilmaschinen KG (Vaupel KG) and Vaupel North America (Vaupel NA) (collectively Vaupel), found that Meccanica Euro Italia, S.P.A. and American Trim Products (collectively MEI) infringed U.S. Patent 3,961,650 ('650 patent), but that Vaupel was barred from maintaining its infringement action by laches and estoppel. Vaupel appeals the court's conclusion that its infringement action is barred. MEI cross-appeals, alleging *872 that Vaupel, as a mere licensee, has no standing to bring suit and that the district court clearly erred in finding infringement. We reverse that part of the judgment relating to laches and estoppel and affirm the judgment in all other respects.

**BACKGROUND**

The '650 patent, entitled "Weaving Method and Machine" and issued to Ruthard Marowsky, discloses a method for use on what is commonly called a "broad weaving loom," which produces cut strips of woven labels for garments. For many years prior to the invention of the '650 patent, labels were woven on narrow loom machines. Because of the physical constraints of narrow looms, any label manufacturer who wanted to offer a wide variety of label widths had to maintain a number of narrow looms of different sizes.

Marowsky's invention took advantage of the faster weaving ability of the modern broad loom to make a woven label. The prior art had taught that the materials used to make labels could be cut by heat and that such fibers could be severed by using electrically heated blades which would also melt and fuse together the weft threads of the fiber. Marowsky envisioned that the cutting means could be made adjustable across the width of the fabric, so that adjustment of the cutters would permit labels in a variety of widths to be woven on a single machine. He improved upon this art and found a way to not only cut the fibers into the desired width, but also to melt and fuse the ends of the weft threads and thereby form a solid edge or "selvage" so there would be no loose ends. He also knew that it was important that the finished label not be lopsided, so he envisioned the use of a guiding station extending across the weft yarns in a rectilinear position. In addition, he used heat to thermostabilize the labels after they were cut to provide a smooth finish of the product.

On January 22, 1974, Marowsky filed a patent application in the United States Patent and Trademark Office (PTO). The application issued as the '650 patent on June 8, 1976. Only Claims 1 and 2 are at issue in this appeal.

Claim 1 is directed to a process involving weaving and cutting fabric in such a way as to avoid weft arching, *i.e.,* to ensure that the warp and weft threads are at right angles to each other. The broad woven fabric is then transformed into individual strips whose edges are simultaneously cut and welded by heated blades. The strips are then thermostabilized by heating at a temperature lower than the cutting and welding temperature before being removed from the loom. Claim 1 reads as follows:

> 1. A method of forming a plurality of patterned strips of fabric woven from threads of synthetic material using a broad weaving machine having a sley and a breast beam, which method comprises:

weaving on the broad weaving machine a unitary broad fabric with said strips to be formed extending in parallel relation along the warp direction of said fabric;

conveying said fabric from the position where the sley of said machine beats up the fabric at a sufficiently low warp tension that a boxing condition occurs to obviate weft arching;

guiding the woven fabric leaving the position where the sley beats up the fabric to allow movement towards the breast beam of said machine, but not in the opposite direction;

cutting the guided woven fabric in the warp direction with a heated cutting blade means maintained at a first temperature of at least about 300°C to form strips whereby the edges are welded by the heat and thereby avoids ripping;

separating said strips;

and thereafter further heating the entire body of said separated strips at a second temperature lower than said cutting temperature to relieve varying tensile stress therein by thermostabilization.

Claim 2 is an apparatus claim:

2. In a broad fabric weaving machine having a sley and a breast plate for forming a plurality of strips of fabric from threads of synthetic fiber, the improvement comprising:

  **\*873**  a fabric guiding station extending across the width of said machine at the output from the machine where the sley beats up the fabric and ahead of the breast plate, said fabric guiding station comprising a slot and a rounded guide bar there-behind to define a re-entrant part-annular path for passage of woven fabric into said slot, round said bar and back out of said slot;

said guide bar being formed with a left-hand fabric guided thread over the right-hand half of its length in the direction towards a cutting station, and a right-hand guiding thread over its left-hand half;

a heating and cutting station downstream from said guiding station in the fabric path to said breast plate, which station includes a plurality of electrically heated cutting wires successively spaced across the width of said machine in the direction of the weft and extending into the path of the

fabric for heating and cutting said woven fabric into desired width separated strips parallel to the warp of the fabric and for heating the cut edges of said strips to weld the same;

and a second heating station comprising an elongated heating member to heat said separated strips extending across the width of said machine downstream from said hot wire cutting and cut edge heating station towards said breast beam for heating the strips at a temperature lower than said cutting temperature to effect thermostabilization of said strips.

Before trial, MEI moved to dismiss under Fed.R.Civ.P. 19(b) on the ground that Vaupel KG and Vaupel NA were mere licensees of the '650 patent and as such could not maintain an infringement action without the joinder of Marowsky. The district court concluded that by virtue of a series of agreements, the Vaupel companies were assignees of the patent and had the right to bring suit without joining Marowsky.

At trial the issues were narrowed to include only infringement and the defenses of laches and estoppel. The district court held that MEI had directly infringed, contributorily infringed, and induced infringement of the '650 patent. It further held, however, that Vaupel was barred from maintaining the action and from any relief because of laches and estoppel. These appeals followed.

## DISCUSSION

### A. License v. Assignment

[1]  MEI contends in its cross appeal that this suit must be dismissed because Vaupel KG and Vaupel NA were mere licensees under the '650 patent and could not maintain an infringement action without the joinder of Marowsky. As mentioned above, MEI first raised this issue in a pretrial motion, and the district court concluded that by virtue of a series of agreements, Vaupel KG and Vaupel NA were the assignees of the '650 patent and therefore had the right to bring this action without the joinder of Marowsky. MEI again raised this issue at trial and the district court again concluded that Vaupel had standing.

MEI's contention requires us to decide as a matter of law whether the district court was correct in concluding that Vaupel KG and Vaupel NA were assignees of the '650

patent, or, in any event, could maintain suit without joining Marowsky as an indispensable party.

The Patent Act provides that "patents shall have the attributes of personal property ... [;] any interest therein, shall be assignable in law by an instrument in writing." 35 U.S.C. § 261. The right to sue under a patent was discussed by the Supreme Court one hundred years ago:

> The patentee or his assigns may, by instrument in writing, assign, grant and convey, either, 1st, the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or, 2d, an undivided part or share of that exclusive right; or, 3d, the exclusive right under the patent within and throughout a specified part of the United States. A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the **\*874** patent itself, with a right to sue infringers; in the second case, jointly with the assignor; in the first and third cases, in the name of the assignee alone. Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent and no right to sue at law in his own name for an infringement.

*Waterman v. Mackenzie,* 138 U.S. 252, 255, 11 S.Ct. 334, 335, 34 L.Ed. 923 (1891) (citations omitted).

To determine whether a provision in an agreement constitutes an assignment or a license, one must ascertain the intention of the parties and examine the substance of what was granted. "An assignment of an interest in an invention secured by letters-patent, is a contract, and like all other contracts is to be construed so as to carry out the intention of the parties to it." *Nicolson Pavement Co. v. Jenkins,* 81 U.S. (14 Wall.) 452, 456, 20 L.Ed. 777 (1871). One of our predecessor courts has also made this point:

> Whether a transfer constitutes a sale or license is determined by the *substance of the transaction* and a transfer will suffice as a sale if it appears

from the agreement and surrounding circumstances that the *parties intended* that the patentee surrender all his substantial rights to the invention.

*Bell Intercontinental Corp. v. United States,* 381 F.2d 1004, 1011, 180 Ct.Cl. 1071, 152 USPQ 182, 184 (1967) (emphasis added). We must therefore examine whether the agreements transferred all substantial rights to the '650 patent and whether the surrounding circumstances indicated an intent to do so.

In 1973, Marowsky entered into an agreement with Theobald Vaupel oHG, the predecessor to Vaupel KG, wherein Marowsky granted "the exclusive right, to solely use [the label weaving machine and process embodied in the '650 patent]." The agreement provided further that "[a] sublicensing agreement given by Vaupel needs a written consent"; that "Marowsky has the right ... to register patents in all countries of his choice in reference to the invention which forms the basis of this contract"; and that "the contract is cancelled automatically on the same day on which Vaupel files for bankruptcy or stops production of [the machine]." It also provided that:

> A possibly necessary litigation to sue for violation of the patent registrations which are the basis of this contract will have to be dealt with among the parties, case by case. In principle, both parties will work together towards prohibiting third parties of making use of the object of this contract.

In January, 1977, the agreement was modified to include Vaupel KG, and provided that "VAUPEL KG will handle the production and distribution of the contractual product as of January 1, 1975 according to all the rights and responsibilities of the contract."

On March 21, 1988, Marowsky and Vaupel KG entered into another agreement which provided in pertinent part:

> 1. MAROWSKY hereby grants to VAUPEL an exclusive license under United States Patent 3,961,650 to make, have made, use, sell, lease, rebuild and maintain in the United States and its territories weaving machines which practice the inventive method and apparatus covered by the claims of patent 3,961,650, and with the prior written consent of MAROWSKY, to grant sublicenses to others under the patent.

2. MAROWSKY hereby grants to VAUPEL the rights to sue for past, present and future infringements of patent 3,961,650 (if any) including the right to seek injunctions and/or money damages, in any effort by VAUPEL to protect the invention covered by the patent against encroachment by third parties; provided, however, that VAUPEL first notifies MAROWSKY in writing of its intention to sue for enforcement of the patent against a particular party. The final decision, whether or not a particular party is to be sued lies, however, solely with VAUPEL. All costs arising in connection with any infringement are carried by VAUPEL.

**\*875** The agreement further provided that Vaupel agrees "to pay to MAROWSKY any money damages obtained from third parties based on infringement of [the '650 patent]" up to a maximum of five percent of third party sales.

Finally on August 2, 1988, Marowsky entered into another agreement nearly identical to the March 1988 agreement except that Vaupel NA was joined with Vaupel KG as a grantee. The 1988 agreements thus purported to grant to Vaupel the exclusive right to make, use, and sell in the United States weaving machines and practice the method covered by the claims of the '650 patent. As we shall discuss, Marowsky retained certain other rights.

It is well settled that "[w]hether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions." *Waterman,* 138 U.S. at 256, 11 S.Ct. at 335. Therefore, the use of the term "exclusive license" in the 1988 agreements is not dispositive; what the documents in fact recite is dispositive. However, the term "assignment" has a particular meaning in patent law, implying formal transfer of title. We conclude that the subject agreements here, although not constituting a formal assignment of the U.S. patent, were a grant of all substantial rights and, in accordance with Rule 19, permitted Vaupel to sue without joining Marowsky.

A patent provides its owner with the right to exclude others from making, using, and selling the claimed invention. 35 U.S.C. § 154 (1988); *Bloomer v. McQuewan,* 55 U.S. (14 How.) 539, 549, 14 L.Ed. 532 (1852). It is, in effect, a bundle of rights which may be divided and assigned, or retained in whole or part. In determining whether a grant of *all* substantial rights was intended, it is helpful to look at what rights have been retained by the grantor, not only what was

granted. The agreements show that Marowsky retained 1) a veto right on sublicensing by Vaupel; 2) the right to obtain patents on the invention in other countries; 3) a reversionary right to the patent in the event of bankruptcy or termination of production by Vaupel; and 4) a right to receive infringement damages. However, as the district court properly held, none of these reserved rights was so substantial as to reduce the transfer to a mere license or indicate an intent not to transfer all substantial rights.

The sublicensing veto was a minor derogation from the grant of rights. It did not substantially interfere with the full use by Vaupel of the exclusive rights under the patent, and it has been held not to bar capital gains treatment. *Bell,* 381 F.2d at 1017, 152 USPQ at 189 (citing *Rollman v. Commissioner,* 244 F.2d 634, 639–40 (4th Cir.1957)). Nor did the right to obtain patents in other countries affect Vaupel's rights arising from the '650 patent, which are limited to the United States. Further, the termination provisions in the agreements were entirely consistent with an assignment. An assignment of a patent "may be either absolute, or by way of mortgage and liable to be defeated by non-performance of a condition subsequent...." *Waterman,* 138 U.S. at 256, 11 S.Ct. at 336. Finally, the right to receive infringement damages was merely a means of compensation under the agreement; this was not inconsistent with an assignment. *See Rude v. Westcott,* 130 U.S. 152, 162–63, 9 S.Ct. 463, 467, 32 L.Ed. 888 (1889) (retention of portion of "sales, royalties, or settlements, or other sources" does not limit the assignment of patent).

The agreements also transferred the right to sue for infringement of the '650 patent, subject only to the obligation to inform Marowsky. This grant is particularly dispositive here because the ultimate question confronting us is whether Vaupel can bring suit on its own or whether Marowsky must be joined as a party. The policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer. *Crown Die & Tool Co. v. Nye Tool & Mach. Works,* 261 U.S. 24, 38, 43 S.Ct. 254, 257, 67 L.Ed. 516 (1923) (citing *Gayler v. Wilder,* 51 U.S. (10 How.) 477, 13 L.Ed. 504 (1850)). This policy is not undercut **\*876** here because the right to sue rested solely with Vaupel.

Under Rule 19, a court must undertake a two-step analysis to determine whether a person in question should be joined. Fed.R.Civ.P. 19(a). A person is necessary if "complete relief cannot be accorded among those already parties," or if the disposition of an action may leave "persons already

parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations." *Id.* The district court's decision, and our affirmance thereof, assure that the provisions of this rule have not been transgressed: complete relief can be afforded among those already parties and there is no substantial risk of a party incurring double obligations. [1]

Based on the above, we hold that the district court was correct in concluding that Vaupel KG and Vaupel NA had standing to sue for infringement without joinder of Marowsky. The contractual documents constituted a transfer of all substantial rights under the patent, thereby permitting Vaupel to sue; the agreements expressly granted Vaupel the sole right to sue for all infringements, past, present, and future as well.

### B. Laches and Estoppel

[2]    Laches and estoppel are both equitable defenses, matters within the trial court's discretion; they depend on the particular factual circumstances of a case. *Jamesbury Corp. v. Litton Indus. Prods.,* 839 F.2d 1544, 1551, 5 USPQ2d 1779, 1785 (Fed.Cir.), *cert. denied,* 488 U.S. 828, 109 S.Ct. 80, 102 L.Ed.2d 57 (1988); *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.,* 616 F.2d 1315, 1325, 206 USPQ 577, 586 (5th Cir.), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). We review the trial court's exercise of discretion to determine whether (1) the decision was clearly unreasonable, arbitrary, or fanciful; (2) the decision was based on an erroneous conclusion of law; (3) the court's findings were clearly erroneous; or (4) the record contains no evidence upon which the court rationally could have based its decision. *Western Elec. Co. v. Piezo Technology,* 860 F.2d 428, 430–31, 8 USPQ2d 1853, 1855 (Fed.Cir.1988).

[3]    A finding of laches can occur when an accused infringer shows unreasonable and unexcused delay in filing suit and material prejudice or injury as a result of the delay. *See Leinoff v. Louis Milona & Sons,* 726 F.2d 734, 741, 220 USPQ 845, 850 (Fed.Cir.1984). A key factor in considering this question is the length of the patentee's delay in bringing suit from "the time the patentee knew, or in the exercise of reasonable diligence should have known, of the alleged infringing activity." *Jamesbury,* 839 F.2d at 1552, 5 USPQ2d at 1785 (footnote omitted).

In this case, the parties dispute whether Vaupel's period of delay began in 1980, when MEI first displayed and sold the accused infringing machines in the United States, or

sometime after early 1985, when reissue proceedings on the '650 patent were terminated. Since Vaupel brought the instant suit August 26, 1988, Vaupel's unexcused delay was either zero to 3 ½ years or approximately 8 years. Vaupel argues that its delay was excused by the reissue proceedings in the PTO, and thereafter because it neither knew nor should have known of MEI's alleged infringing activity until late 1987. Relying on a presumption of laches after a delay of longer than six years, the district court found that Vaupel did not show evidence sufficient "to excuse their failure to institute this action within six years of the time they knew or should have known of the infringement" by MEI. In so finding, the district court erred.

[4]    A patent owner may avoid the consequences of what would otherwise be an unreasonable delay in filing suit by establishing  *877  that he or she was engaged in "other litigation." *Watkins v. Northwestern Ohio Tractor Pullers Ass'n,* 630 F.2d 1155, 1162, 208 USPQ 545, 551 (6th Cir.1980). Although here we are dealing with a reissue proceeding, such proceedings should be treated similarly to infringement litigation for purposes of laches. There is no demonstrable distinction for this purpose between judicial proceedings raising the issue of patent validity and a PTO proceeding involving patentability.

[5]    For other litigation to excuse a delay in bringing suit, there must be adequate notice of the proceedings to the accused infringer. *Hottel Corp. v. Seaman Corp.,* 833 F.2d 1570, 1573, 4 USPQ2d 1939, 1940–41 (Fed.Cir.1987). The notice must also inform the alleged infringer of the patentee's intention to enforce its patent upon completion of that proceeding. *Id.* (citing *Watkins,* 630 F.2d at 1162–63, 208 USPQ at 551–52).

[6]    The "other litigation" excuse normally applies when a patentee defers suit against an alleged infringer until the conclusion of another lawsuit. If the party is ultimately sued and had received proper notice, the time delay consumed by the original proceeding may be excused in evaluating whether laches occurred.

Notice is important for several reasons. It informs the accused infringer of the existence of the suit and that a subsequent suit will be filed against him. He can then change his activities to avoid liability. He can also bring a declaratory judgment action if the delay in waiting for a judicial determination would be a burden upon his proposed activities. To establish whether such notice was given, the district court must look

not at the actions of the patentee, but also at evidence showing whether the alleged infringer was *in fact* on notice of an existing lawsuit.

[7]   In this case, on December 14, 1979, Marowsky filed a reissue application pursuant to the then-existing "no-fault" reissue practice.[2]  One month later, Marowsky notified MEI that the reissue application had been filed and that MEI was invited to participate if it desired. During the reissue proceeding, MEI (through a related company, Nastroficio Eurotessile S.R.I. (NE))[3] actively and continuously opposed maintenance of the patent claims. Based on these protests, the PTO issued an order stating that the Office would review not only the patentability of Marowsky's claims, but also any possible inequitable conduct in procuring the '650 patent. The issues of patentability and enforceability were finally resolved in favor of the '650 patent, and the PTO effectively confirmed the patent as originally issued and terminated the proceedings in February 1985.

During the reissue proceeding, from October 18 to October 25, 1980, MEI exhibited its accused machine at a textile machinery show in South Carolina. Representatives from Vaupel inspected the machine and determined that it infringed the '650 patent. Two of the allegedly infringing machines were then sold to Universal Label Company. Vaupel sent Universal a letter warning that the purchased machines infringed the '650 patent. The parties settled the dispute when Universal purchased parts from Vaupel to replace MEI parts.

MEI, apparently concerned about the loss of Universal's business, demanded that Vaupel withdraw its warning letter. It asserted that the accused devices were manufactured according to one of its own patents and noted that the validity and enforceability of the '650 patent remained subject to the reissue proceedings. MEI also threatened Vaupel with litigation, as evidenced from its April 20, 1982 letter:

It is evident that we can no longer delay the initiation of court proceedings.

**878**  We intend to have our rights protected and to obtain compensation for the enormous damages that we have suffered.

We are, therefore, compelled to inform you in all clarity that we are going to initiate court proceedings if we do not receive a conclusive and satisfactory response from you within fifteen days from today (April 20, 1982[) ].

Rather than filing suit, MEI continued with its opposition in the PTO.

MEI argues that our decision in *Hottel* requires that to excuse the delay during the period the '650 patent was in reissue proceedings, notice must not only have informed MEI of the reissue proceeding, but also have stated Vaupel's intention of enforcing its patent upon completion of the reissue proceeding. Both parties agree that Vaupel did not explicitly inform MEI that Vaupel would sue after the reissue proceedings. However, Vaupel argues that its actions clearly satisfied the notice requirement for such an excuse, that all the communications showed that Vaupel intended to enforce its rights, and that MEI knew of those intentions. We agree.

Our decision in *Hottel* does not require that notice of other litigation *and* of a patentee's intent to sue after that other litigation is terminated be expressly stated in writing. What is important is whether MEI had reason to believe it was likely to be sued. A review of the extensive communications between MEI and Vaupel leaves no doubt that MEI was concerned about being sued by Vaupel. Among these communications was a July 1982 letter from NE to the Commissioner wherein MEI stated that there were "continued threats of infringement by applicant's attorney against prospective purchasers of the apparatus manufactured and sold by the protester." A May 1982 letter from Vaupel KG to MEI stated that "[w]e will protect our patent No. 3,961,650 and look after our rights.... [and] highly recommend an elucidating discussion before plunging into court proceedings...." Also, as previously mentioned, in an April 1982 letter to Vaupel, MEI threatened a declaratory judgment action. These are but a sampling of the communications indicating that MEI believed during the years in question that it was threatened. Where there is explicit notice of a reissue proceeding in which an alleged infringer actively participated, and the evidence as a whole shows that the accused infringer was in fear of suit, there is no further requirement to notify the alleged infringer of an intent to sue after the reissue proceeding has been concluded in order to avoid a holding of laches. Such a notification would be superfluous, telling the accused infringer what he already knew.

In the instant case, MEI was deeply involved in protesting the reissue proceeding and acknowledged a continuing conflict between it and Vaupel. The present lawsuit is part of that conflict. We therefore hold that the district court erred in concluding that MEI lacked notice concerning Vaupel's

intention to sue and that Vaupel's delay in filing suit during the proceeding was not excused.

[8]  The district court also found that the period the '650 patent was in reissue could not be excused because Vaupel "knew in 1980 or 1981 that the reissue proceeding would affirm the original patent allowance." The record shows that patentability issues were resolved in September 1981. However, the record also shows that enforceability was not resolved until early 1985. Without a valid and enforceable patent, Vaupel could not reasonably be held to an obligation to sue in order to avoid a laches holding. MEI itself stated, as a protestor in the PTO proceedings, that "[a] final decision on this [enforceability] issue is vital to the resolution of the ongoing conflict between protestor and applicant." Patentees should be encouraged to avoid litigation when their patents are being reevaluated in the PTO rather than being forced into premature litigation on penalty of being held to have been guilty of laches.

[9]  We next examine the circumstances existing during the 3 ½ year period between the end of the reissue proceeding and the filing of the instant suit. Between April 25 and May 3, 1985, after the reissue proceeding was terminated, MEI again displayed **879** its accused infringing machine at a trade show in South Carolina. Vaupel representatives attended the show, inspected MEI's machine, and explained to MEI representatives how its machine infringed the '650 patent. None of the alleged infringing machines was sold as a result of the trade show; consequently, Vaupel took no further action to protect its patent rights.

In October 1987, MEI again displayed its accused infringing machine, this time at a trade show in Paris, France. After Vaupel warned MEI that shipment of its accused machine to the United States would constitute infringement, MEI responded that it was protected by its own patents and that MEI had already shipped accused infringing machines to the United States. After discovering the identity of the buyer of the alleged infringing machines, as well as observing other subsequent sales, Vaupel filed suit on August 26, 1988. Vaupel thus took prompt action to protect its rights once it learned of renewed infringing activity. Given the undisputed facts, it would have been an abuse of discretion for the district court to have held that these circumstances resulted in laches.

We therefore conclude that Vaupel was not guilty of laches. Because of this disposition, we need not address the district

court's finding and the parties' arguments relating to MEI's alleged material prejudice or injury.

[10]  With respect to estoppel, the district court found that "the delay from 1981–1982 until 1988 is an extended period of non-enforcement and constitutes affirmative conduct from which [MEI] could infer the claims against them had been abandoned." In light of our determination regarding laches and the extensive communications evidencing a continuing conflict between the parties and the fear of imminent suit, the district court erred in holding that Vaupel's suit was barred by estoppel.

"Estoppel requires representations or conduct by the patentee from which the alleged infringer could reasonably infer that the patentee had abandoned his claim." Jamesbury, 839 F.2d at 1554, 5 USPQ2d at 1787. In this case, MEI could reasonably have drawn no such inference. MEI did not rely on any purported abandonment by Vaupel of its patent rights or any intentionally misleading silence to suggest abandonment, but relied on the existence of MEI's own patents. In MEI's communications with Vaupel and its customers, it repeatedly stated that because its own patent covered its loom, not Vaupel's '650 patent, it had the right to sell its allegedly infringing looms in the United States. [4] Vaupel's actions did not constitute affirmative conduct from which defendants could reasonably have inferred that the claims of infringement against them had been abandoned.

## C. Infringement

[11]  In order to determine a question of patent infringement, a district court must (1) determine as a matter of law the scope and meaning of the claims at issue and (2) determine as a factual matter whether the properly construed claims encompass or "read on" the accused device. ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1578, 6 USPQ2d 1557, 1559 (Fed.Cir.1988). Liability for infringement requires that an accused device contain every limitation of a claim or its substantial equivalent. Lemelson v. United States, 752 F.2d 1538, 1551, 224 USPQ 526, 533 (Fed.Cir.1985). We review an issue of claim interpretation de novo, ZMI, 844 F.2d at 1578, 6 USPQ2d at 1559, and the factual application of a properly interpreted claim to an accused structure under the clearly erroneous standard. SRI Int'l v. Matsushita Elec. Corp. of America, 775 F.2d 1107, 1118, 227 USPQ 577, 583 (Fed.Cir.1985) (in banc).

[12]   MEI argues that the preamble language "breast beam" and "breast plate" of Claims 1 and 2, respectively, requires a specific loom part which is absent from its **\*880** accused device, and that the district court erred in concluding that the terms were used "only to fix the direction of movement of the woven fabric on the loom" and not to constitute claim limitations. After reviewing the claims, the specification and drawings, the prosecution history, and the expert testimony, we conclude that the district court was correct. "Breast beam" and "breast plate" are not structural limitations of Claims 1 and 2; as used in Claims 1 and 2, they indicate a reference point to fix the direction of movement of the woven fabric from the loom. Such alleged loom "parts" are not illustrated in any of the figures of the '650 patent or otherwise described in the specification.

[13]   The district court interpreted Claim 1 and concluded that the claim does not require that "the steps of cutting and thermostabilizing be carried out in the specific manner contained in the preferred embodiment of the invention appearing in the patent description and drawings...." It also interpreted Claim 2 as not requiring that "the heating and cutting station and the thermostabilizing station be located before the take-up roll, breast beam or breast plate." We agree. The plain language of the claims supports the district court's construction. Even MEI recognized, when it was advantageous to do so, that the order of steps in Claim 1's method was not specifically set forth. In its July 31, 1980 protest, NE argued that Claim 1, as written, did not require that the cutting step take place before the take-off roll or breast plate:

> There is no specific language, nor any intimation whatsoever in Marowsky's

claim 1 that the cutting step takes place *before* the take-off roll or breast plate.

(Emphasis in original). In its March 18, 1982 protest, NE argued that Claims 1 and 2, as written, do not limit the steps or stations to any particular location or sequence:

> It is quite clear, even from a cursory reading of the Marowsky patent and the instant reissue application, that the location of Marowsky's invention relative to the breast beam or breast plate is not specifically set forth in the claims[.]

The Examiner rejected NE's arguments, allowed the claims, and reemphasized that the location of the cutter between the breast beam and the sley was not the "critical factor" for patentability, that the applicant was entitled to claim the "broadest concept" of his invention.

We also agree that the step of heating to relieve "varying tensile stresses" does not require that the heating be done between the guide bar and the take-up roll of the loom. The claims do not require the limitations MEI suggests.

At trial the parties stipulated that MEI's off-loom machines did not infringe the '650 patent, and that MEI's accused device was represented by the following drawings:

**\*881**



MEI argues that the district court clearly erred in finding that Claim 1 was literally infringed, because the MEI device does not perform the step of "cutting the guided woven fabric" and because MEI's heated setting bar does not "relieve varying tensile stresses." However the court found, relying on expert testimony, that the MEI machine guides the fabric using the spreader bar, take-up roll, pressure rollers, guide rollers, and the drive cloth roll, and that these various rolls keep a tension on the fabric and produce tensile stresses. Because the guiding of the woven fabric in the MEI device extends through and beyond a cutting step, and varying tensile stresses also continue up to the cloth roll, the district court properly found Claim 1 to be infringed.

MEI has not shown the district court's findings relating to guiding to be clearly erroneous, and it offers no factual support for its argument that somehow the tensile stresses in its machine are relaxed downstream of the take-up roll. Given this complete lack of proof, we cannot say that the district court clearly erred. The district court first properly interpreted Claim 1, and then properly found that the MEI machine performed each and every step of Claim 1. Therefore, the district court was correct in finding that MEI's purchaser, ATP, directly infringed method Claim 1 and MEI contributorily infringed and induced infringement of Claim 1.

[14] MEI next argues that the district court clearly erred in holding that apparatus Claim 2 was infringed under the doctrine of equivalents. The apparatus in Claim 2 comprises a "guiding station," a "cutting station," and a "thermostabilizing station." The district court found each of these three elements to have equivalent structure in the MEI machine. MEI argues that the district court failed to properly apply the doctrine of prosecution history estoppel when it found the spreader bar to be equivalent to the "guiding station" in Claim 2. It specifically argues that the threaded temple bar limitation was added "to avoid an obviousness rejection." We disagree.

There is no indication in the file history as to why the threads were added to the guide bar. The threaded guide bar limitation was already present in original Claim 6, which seems to have been combined with original Claim 5 to become Claim 2 of **882** the '650 patent. The doctrine of prosecution history estoppel bars "a patentee from enforcing its claims against otherwise legally equivalent structures if those structures were excluded by claim limitations added in order to avoid prior art." *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.,* 793 F.2d 1279, 1284, 230 USPQ 45, 48 (Fed.Cir.1986) (citations omitted). In determining whether prosecution history estoppel applies because of a change in claim language during prosecution, the court must consider not only what was changed, but the *reason* for such change. *See Sun Studs, Inc. v. ATA*

*Equip. Leasing,* 872 F.2d 978, 987, 10 USPQ2d 1338, 1345 (Fed.Cir.1989).

Here, because the record does not indicate that the threaded guide bar limitation was added to avoid prior art, it does not support overturning the district court's finding that there is no estoppel against the combination of the smooth temple bar and the threaded spreader bar in the MEI machine being held to be the equivalent of the threaded guide bar limitation of Claim 2.

MEI also argues that the district court erred in finding equivalence of the "cutting station" and the "thermostabilizing station" in its accused device. MEI's argument must fail here too, because it hinges on its prior argument that the cutting and thermostabilizing stations are location-specific. We have already determined that the district court did not clearly err in finding that the claims did not require a specific sequence of the various stations.

The district court did not clearly err in finding that Claim 2 of the '650 patent was infringed under the doctrine of equivalents. Every limitation of Claim 2 has an equivalent in the MEI machine.

We have considered all the other arguments and conclude that they lack merit.

## COSTS

Costs to Vaupel.

## CONCLUSION

The judgment as it relates to laches and estoppel is reversed; in all other respects it is affirmed.

AFFIRMED–IN–PART, REVERSED–IN–PART.

### Parallel Citations

20 U.S.P.Q.2d 1045

---

Footnotes

1   Only if a person is deemed necessary under Rule 19(a) must a court undertake the second step of the analysis. In other words, if a party is deemed necessary under Rule 19(a), but cannot be joined because it is not subject to process, then the court must consider in equity and good conscience whether the party is indispensable and dismissal appropriate. Fed.R.Civ.P. 19(b). In this case, the district court correctly held that Marowsky was not a necessary party under Rule 19(a) and thus analysis under Rule 19(b) was unnecessary.

2   This discontinued practice allowed an applicant to have his patent reexamined to allow the PTO to determine the effect of newly discovered prior art not previously before the examiner. *See* 37 C.F.R. § 1.175(a)(4) (1981).

3   The district court found that NE was related to MEI and treated NE as the equivalent of MEI throughout the trial. MEI has not disputed this; therefore, we impute knowledge to MEI of all actions taken in the PTO and communications received by NE.

4   MEI's statements are evidence of its fear of suit, even though it is well-established that the existence of one's own patent does not constitute a defense to infringement of someone else's patent. It is elementary that a patent grants only the right *to exclude others* and confers no right on its holder to make, use, or sell. *See* 35 U.S.C. § 154 (1988).

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 101

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183



2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust

Ventas, Inc., 2124678 Ontario Inc., and 2124680 Ontario Inc. (Applicants) and Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust, Sunrise REIT GP, Inc., Sunrise Senior Living Inc., and Health Care Property Investors, Inc. (Respondents)

Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust, and Sunrise REIT GP, Inc. (Applicants) and Ventas SSL Ontario II, Inc. (Formerly 2124678 Ontario Inc.) Ventas SSL Ontario I, Inc. (Formerly 2124680 Ontario Inc.) Ventas, Inc., Sunrise Senior Living, Inc. and Health Care Property Investors Inc. (Respondents)

Sunrise Senior Living, Inc. (Applicant) and Ventas SSL Ontario II, Inc. (Formerly 2124678 Ontario Inc.), Ventas SSL Ontario I, Inc. (Formerly 2124680 Ontario Inc.), Ventas, Inc., Health Care Property Investors, Inc. Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust and Sunrise REIT GP, Inc. (Respondents)

Ontario Superior Court of Justice

Pepall J.

Judgment: March 6, 2007[FN*]
Docket: 07-CL-6893

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: affirmed *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 2007 CarswellOnt 1705, B.L.R. 29 (4th) 312 (Ont. C.A.)

Counsel: Mark A. Gelowitz, Laura K. Fric for Applicants, Ventas Inc., 2124678 Ontario Inc., 2124680 Ontario Inc.

Mark A. Gelowitz, Laura K. Fric for Respondents, Ventas SSL Ontario II, Inc. (Formerly 2124678 Ontario Inc.), Ventas SSL Ontario I., Inc. (Formerly 2124680 Ontario Inc.) and Ventas, Inc.

Peter F.C. Howard, Eliot Kolers, Ellen Snow for Respondents / Applicants, Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust, Sunrise REIT GP Inc.

Luis Sarabia, Cynthia Spry for Respondent / Applicant, Sunrise Senior Living, Inc.

Robert W. Staley, Derek J. Bell, Lisa Millman for Respondent, Health Care Property Investors Inc.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

Subject: Corporate and Commercial; Contracts; Property; Public

Business associations --- Powers, rights and liabilities — Contracts by corporations — Miscellaneous issues

Real estate trust was publicly traded entity — Board established special committee to explore possibility of sale of trust units or assets through confidential sale process — All parties interested in purchase of trust assets were required to enter into confidentiality agreement with trust — Trust entered into confidentiality agreements with American-based corporation and third party — Confidentiality agreements contained standstill terms prohibiting contact between either potential purchaser and trust's subsidiary — Corporation entered into agreement with trust to purchase assets — Third party learned of agreement and sent last-ditch proposal to trust — Trust told third party to enter discussions with representatives from subsidiary — Corporation refused to waive standstill terms of agreement — Corporation brought application for declaration that trust was obligated to enforce standstill terms in confidentiality agreement — Application granted — Trust expressly and unambiguously agreed that it would not amend, waive or fail to enforce any of standstill terms or other conditions included in confidentiality agreements without waiver of corporation — Third party was in clear breach of standstill terms and trust was obligated to enforce such breach — Parties to transaction were experienced and sophisticated with financial advisors and legal representation from prominent firms — Role of courts was not to rewrite contracts entered into by sophisticated commercial parties.

### Cases considered by *Pepall J.*:

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority* (1993), 1993 CarswellBC 1254, [1993] 2 W.W.R. 321, [1993] 1 S.C.R. 12, 147 N.R. 81, 75 B.C.L.R. (2d) 145, 99 D.L.R. (4th) 577, 20 B.C.A.C. 241, 35 W.A.C. 241, 14 C.C.L.T. (2d) 233, 5 C.L.R. (2d) 173, 1993 CarswellBC 10 (S.C.C.) — considered

*Eli Lilly & Co. v. Novopharm Ltd.* (1998), 227 N.R. 201, 152 F.T.R. 160 (note), 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 80 C.P.R. (3d) 321 (S.C.C.) — followed

*Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 1998 CarswellOnt 4170, 41 B.L.R. (2d) 42, 114 O.A.C. 357 (Ont. C.A.) — followed

*Lee v. Canada (Minister of Citizenship & Immigration)* (1997), 37 Imm. L.R. (2d) 278, 1997 CarswellNat 338, 126 F.T.R. 229 (Fed. T.D.) — referred to

*Scanlon v. Castlepoint Development Corp.* (1992), 29 R.P.R. (2d) 60, 59 O.A.C. 191, 11 O.R. (3d) 744, 99 D.L.R. (4th) 153, 1992 CarswellOnt 633 (Ont. C.A.) — considered

*Solosky v. Canada* (1979), 1979 CarswellNat 4, *(sub nom. Solosky v. R.)* [1980] 1 S.C.R. 821, 105 D.L.R. (3d) 745, 16 C.R. (3d) 294, 30 N.R. 380, 50 C.C.C. (2d) 495, 1979 CarswellNat 630 (S.C.C.) — referred to

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 1998 CarswellOnt 2565, 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]) — followed

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1999), 45 O.R. (3d) 417, *(sub nom. Toronto-Dominion Bank v. Leigh Instruments Ltd. (Bankrupt))* 124 O.A.C. 87, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, 1999 CarswellOnt 2812 (Ont. C.A.) — referred to

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

*Venture Capital USA Inc. v. Yorkton Securities Inc.* (2005), 2005 CarswellOnt 1875, 197 O.A.C. 264, 75 O.R. (3d) 325, 4 B.L.R. (4th) 324 (Ont. C.A.) — followed

APPLICATION by corporation for declaration that trust was obligated to enforce confidentiality agreement.

*Pepall J.*:

**Introduction**

1      This case involves the interpretation of a purchase agreement entered into following an auction. The issue to be considered is whether the vendor has an obligation under that agreement to enforce a standstill agreement signed by an unsuccessful auction participant.

**Facts**

2      Sunrise Senior Living Real Estate Investment Trust ("Sunrise REIT") is a Canadian public real estate investment trust whose units are listed on the Toronto Stock Exchange. It owns and invests in income producing and newly developed senior living communities in major metropolitan markets and surrounding suburban areas in Canada and the United States. It owns 74 senior living communities all of which are managed by Sunrise Senior Living, Inc. ("SSL"). SSL is one of the largest providers of such management services in North America. It is an American public company whose shares are listed on the New York Stock Exchange.

3      In September, 2006, the Board of Trustees of Sunrise REIT determined that a strategic sale process of the investment trust would likely be beneficial for unitholders. The Board decided to explore the possibility of a sale of either the Sunrise REIT units or assets of Sunrise REIT through a confidential sale process. It established a special committee to examine alternative transactions and the committee in turn engaged TD Securities as its financial advisor. Mr. Warren, the chairman of the Board of Sunrise REIT, testified that he sought to move the REIT towards value maximization through the process of an auction and that he retained TD Securities to assist in creating an auction designed to encourage bidders to make their best offer. Sunrise REIT initiated a strategic review process. As part of the first round of this process, TD Securities approached a select number of prospective purchasers regarding their interest in purchasing all of the Sunrise REIT units or all of Sunrise REIT's assets.

4      Interested parties were each required to enter into a confidentiality agreement. Sunrise REIT entered into seven confidentiality agreements, three of which were with parties to these applications, namely SSL, Ventas Inc. ("Ventas") and Health Care Property Investors, Inc. ("HCP"). Ventas is an American public company whose shares are listed on the New York Stock Exchange. It is a leading health care real estate investment trust which owns a number of properties including independent and assisted living facilities, skilled nursing facilities, hospitals and medical office buildings. HCP is also an American public company whose shares are also listed on the New York Stock Exchange. It is a self-administered investment trust that invests directly or through joint ventures in health care facilities. Ventas and Sunrise REIT executed a confidentiality agreement dated November 7, 2006, HCP and Sunrise REIT entered into a confidentiality agreement on November 8, 2006 and on November 10, 2006, Sunrise REIT and SSL also executed a confidentiality agreement.

5      With one exception, the confidentiality agreements of HCP and Ventas were substantially similar. The agreements imposed restrictions on the use and disclosure of confidential non-public proprietary information provided by Sunrise REIT to the potential purchaser and contained further terms prohibiting communications between the potential purchaser and SSL without the prior written consent of Sunrise REIT. The agreements also

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

prevented a potential purchaser from visiting any facility managed by SSL regardless of whether it was owned by Sunrise REIT. The agreements provided for access by the potential purchaser to a detailed online data room containing additional confidential information of Sunrise REIT. The confidentiality agreements provided that to facilitate discussion relating to a potential negotiated transaction, Sunrise REIT expected to make certain non-public information available. Specifically, the parties to the confidentiality agreements agreed that,

> Moreover, without the prior written consent of Sunrise REIT, the Interested Party[FN1] will not, and will direct its Representatives not to, directly or indirectly (a) disclose to Sunrise Senior Living, Inc. ("Sunrise") that it has entered into this agreement or entered into discussions with Sunrise REIT relating to the Transaction, (b) approach or contact or discuss with Sunrise to discuss any terms or other facts with respect to the Transaction, the Evaluation Material or any information regarding the business, financial condition, operations, assets, properties, liabilities, or prospects of Sunrise REIT, including any information regarding any properties managed by Sunrise, or (c) visit any property or facility managed by Sunrise, whether owned by Sunrise REIT or otherwise.

The confidentiality agreements addressed waiver as follows,

> No provision of this agreement can be waived except by means of a written instrument that is validly executed on behalf of the party hereto granting the waiver and that refers specifically to the particular provision or provisions being waived. No failure or delay by a party hereto in exercising any right hereunder or any partial exercise thereof will operate as a waiver thereof or preclude any other or further exercise of any right hereunder.

Both HCP and Ventas had standstill provisions in their confidentiality agreements but their language differed. Amongst other things, HCP agreed that for a period of 18 months it would not make a proposal to acquire any securities or assets of Sunrise REIT unless it had Sunrise REIT's prior written consent. More precisely, the HCP confidentiality agreement provided that,

> In consideration of the Evaluation Material being furnished to the Interested Party [HCP], the Interested Party agrees that from the date hereof until the date that is 18 months from the date hereof (the "Standstill Period"), without the prior written consent of Sunrise REIT, the Interested Party shall not and shall cause its affiliates not to: (a) in any manner acquire, agree to acquire or make any proposal to acquire, directly or indirectly, by means of purchase, merger, business combination or in any other manner, beneficial ownership of any securities or all or any assets of Sunrise REIT or any of its subsidiaries, (b) make, or in any way participate, directly or indirectly, in any solicitation of proxies to vote, or seek to advise or influence any person with respect to the voting of, any voting securities of Sunrise REIT, (c) form, join or in any way participate in a "group" (within the meaning of Section 13(d)(3) of the *United States Securities Exchange Act* of 1934) or act jointly or in concert with any other person with respect to any voting securities of Sunrise REIT, (d) otherwise act, alone or in concert with others, to seek to control, advise, change or influence the management, board of trustees, or governing instruments of Sunrise REIT, (e) make any public disclosure of any intention in connection with the foregoing, (f) make any public disclosure, or take any action that could require Sunrise REIT to make any public disclosure, with respect to any of the matters set forth in this agreement, (g) disclose any intention, plan or arrangement inconsistent with the foregoing, or (h) advise, assist or encourage any other persons in connection with any of the foregoing. The Interested Party also agrees during such period not to request Sunrise REIT or any of its Representatives, directly or indirectly, to amend or waive any provision of this paragraph (including this sentence).(emphasis added)

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

For ease of reference, this provision is referred to in these reasons as the Standstill Agreement.

6     The Ventas confidentiality agreement contained a similar standstill provision but it ceased to apply if, amongst other things, Sunrise REIT entered into an agreement to sell more than 20% of its units or assets to a third party. Items (a) through and including (h) and following were identical to the provisions of HCP's agreement but the definition of Ventas' Standstill Period differed from that of HCP as follows:

> In consideration of the mutual agreements contained herein and the provisions of the Evaluation Material to the Interested party [Ventas], the parties hereto agree that until the earlier of (i) the expiration of 18 months from the date hereof, (ii) such date, if any, that Sunrise REIT or any of its affiliates has entered into or publicly disclosed its intent to enter into a definitive agreement with the Interested Party or any of its affiliates or any third party with respect to any sale of Sunrise REIT, a sale or other divestiture in a single or series of related transactions of more than 20% of Sunrise REIT's equity securities, assets or operations, or any other transaction that would reasonably be expected to result in a change of control of Sunrise REIT, or (iii) such date, if any, that is fifteen business days following the date any third party has formally commenced an unsolicited take-over bid, tender offer or exchange offer for any of Sunrise REIT's securities which has not been publicly rejected by Sunrise REIT's board (such period described in the preceding clauses (i) through (iii), the "Standstill Period").

Ventas was unaware of the terms of the HCP confidentiality agreement until February 18, 2007.

7     Having executed confidentiality agreements, potential purchasers were then invited to make a preliminary non-binding written proposal. Following a review of the preliminary proposals submitted in December, 2006, the Sunrise REIT special committee invited a number of interested bidders to go to round two, in effect to undertake further due diligence and to submit a final bid in January, 2007.

8     By early December 2006, it became clear to the special committee that SSL was not an interested purchaser and therefore, there was no longer any need to maintain the prohibition on discussions with SSL as set forth in the confidentiality agreements. Sunrise REIT therefore authorized TD Securities to contact HCP and Ventas and to arrange for them to have direct contact with SSL which they did.

9     Ventas and HCP were the only participants invited to the second stage of the auction. Both were asked to submit a final binding proposal for the acquisition of Sunrise REIT by January 8, 2007. In the correspondence sent to HCP, it was told, "You should not assume that you will be given an opportunity to rebid, renegotiate, or improve the terms of your proposal." Ventas submitted its proposal but HCP withdrew from the process and declined to submit a final binding proposal on the basis that it was unable to successfully negotiate an agreement with SSL. The special committee endorsed the Ventas proposal and the Board subsequently met and voted to approve the Ventas transaction and to recommend it to the Sunrise REIT unitholders.

10     Following the Board approval, Ventas and Sunrise REIT entered into a purchase agreement (the "Purchase Agreement") on January 14, 2007. Concurrently, Ventas also entered into an agreement with SSL. The next day Sunrise REIT publicly announced the Ventas transaction.

11     Under the terms of the Purchase Agreement, through two wholly owned subsidiaries, 2124678 Ontario Inc. and 2124680 Ontario Inc., Ventas was to acquire substantially all of Sunrise REIT's assets as well as assume substantially all of its liabilities for a cash consideration of $15 per Sunrise REIT unit. According to Sunrise REIT's press release of January 15, 2007, this represented a 35.7% premium over the closing price of the units on

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

January 12, 2007. The Ventas transaction must be approved by Sunrise REIT unitholders at a special meeting of all unitholders. The meeting is to take place before March 31, 2007. If the unitholders reject the offer, the Purchase Agreement may be terminated by Sunrise REIT.

12    The Purchase Agreement contained an entire agreement provision which states,

This Agreement, the agreements and other documents herein referred to and the Confidentiality Agreement constitute the entire agreement between the parties pertaining hereto and supersede all other prior agreements, understandings, negotiations and discussions, whether oral or written, between the parties hereto. Except as expressly represented and warranted herein, neither party shall be considered to have given any other express or implied representations or warranties, including without limitation as a result of oral or written statements.

The purchase price was stated to be equal to the amount of $1,137,712,410 plus assumed liabilities. In Section 2.5 of the Purchase Agreement, Sunrise REIT waived the standstill provisions contained in the Ventas confidentiality agreement and stated that in all other respects, the provisions of the Ventas confidentiality agreement continued to apply.

13    Article 4 of the Purchase Agreement addressed covenants and 4.4 was entitled "Covenants Regarding Non-Solicitation". Given their significance to this dispute, these provisions are reproduced in their entirety as follows:

4.4 (1) Following the date hereof, Sunrise REIT shall not, directly or indirectly, through any trustee, officer, director, agent or Representative of Sunrise REIT or any of its Subsidiaries, and shall not permit any such Person to,

(i) solicit, initiate, encourage or otherwise facilitate (including by way of furnishing information or entering into any form of agreement, arrangement or understanding or providing any other form of assistance) the initiation of any inquiries or proposals regarding, or other action that constitutes, or may reasonably be expected to lead to, an actual or potential Acquisition Proposal,

(ii) participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual or potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligations to Sunrise REIT or any of its Subsidiaries, (emphasis added)

(iii) approve, recommend or remain neutral with respect to, or propose publicly to approve, recommend or remain neutral with respect to, any Acquisition Proposal,

(iv) accept or enter into any agreement, arrangement or understanding related to any Acquisition Proposal (other than a confidentiality agreement contemplated in Section 4.4(2)), or

(v) withdraw, modify or qualify, or publicly propose to withdraw, modify or qualify, in any manner adverse to the Purchasers, the approval or recommendation of the Board (including any committee thereof) of this Agreement or the transactions contemplated hereby.

(2) Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from complying with Sunrise REIT's disclosure obligations under applicable Laws with re-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

gard to a bona fide written, unsolicited Acquisition Proposal or, following the receipt of any such Acquisition Proposal from a third party (that did not result from a breach of this Section 4.4), from furnishing or disclosing non-public information to such Person if and only to the extent that:

(i) the Board believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal if consummated could reasonably be expected to result in a Superior Proposal; and

(ii) such third party has entered into a confidentiality agreement containing terms in the aggregate no more favourable to such third party than those in the Confidentiality Agreement as are then in effect in accordance with its terms.

(3) Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from withdrawing or modifying, or proposing publicly to withdraw or modify its approval and recommendation of the transactions contemplated by this Agreement, or accepting, approving or recommending or entering into any agreement, understanding or arrangement providing for a bona fide written, unsolicited Acquisition Proposal (that did not result from a breach of this Section 4.4) ("Proposed Agreement") if and only to the extent that:

(i) it has provided the Purchasers with a copy of all of the documents relating to the Acquisition Proposal,

(ii) the Board, believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal constitutes a Superior Proposal and has promptly notified the Purchasers of such determination,

(iii) a period of at least five Business Days (the "Matching Period") has elapsed following the later of (x) the date the Purchasers received written notice advising the Purchasers that the Board has resolved, subject to compliance with this Section 4.4(3), to withdraw, modify its approval and recommendation of the transactions contemplated by this Agreement or accept, approve or recommend or enter into a Proposed Agreement in respect of such Superior Proposal and (y) the date the Purchasers received a copy of the documentation related to such Superior Proposal pursuant to Section 4.4(3)(i),

(iv) if the Purchasers have proposed to amend the transactions contemplated under this Agreement in accordance with Section 4.4(6), the Board has again made the determination in Section 4.4(3)(ii) taking into account such proposed amendments; and

(v) if Sunrise REIT proposes to enter into a Proposed Agreement (other than a confidentiality agreement referred to in Section 4.4(2)) after complying with this Section 4.4(3), Sunrise REIT shall have complied with Section 5.2 and 5.3. For the purposes of this Section 4.4(3) the preparation and delivery of a directors' circular pursuant to Section 99 of the *Securities Act* relating to an Acquisition Proposal shall be deemed to be a qualification, withdrawal or modification, of the Board's recommendation of the transactions contemplated hereby unless the Board expressly, and without qualification, reaffirms its recommendation of the transactions contemplated hereby in such disclosure.

(4) If the expiry of the Matching Period referred to in Section 4.4(3)(iii) falls on a date which is less than five Business Days prior to the Unitholder Meeting, Sunrise REIT shall, at the request of the Purchasers, ad-

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

journ the Unitholder Meeting to a date that is not more than 10 Business Days following such expiry date.

(5) Sunrise REIT acknowledges and agrees that each successive amendment to any Acquisition Proposal shall constitute a new Acquisition Proposal for purposes of Section 4.4.

(6) During the Matching Period, the Purchasers shall have the right, but not the obligation, to propose to amend the terms of this Agreement. The Trustees will review any proposal by the Purchasers to amend the terms of this Agreement in good faith in order to determine (after consultation with their financial advisor and legal counsel) whether the transactions contemplated by this Agreement, taking into account the Purchasers' proposed amendments would, if consummated in accordance with its terms, result in the Superior Proposal ceasing to be a Superior Proposal. If the Trustees so determine, Sunrise REIT will enter into an amending agreement with the Purchasers reflecting such proposed amendment.

(7) Sunrise REIT shall, as promptly as practicable, notify the Purchasers of any relevant details relating to any Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or any amendments to any Acquisition Proposal (including the identity of the parties and all material terms thereof), or any request for non-public information relating to Sunrise REIT or any of its Subsidiaries in connection with an Acquisition Proposal or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or for access to the properties, books or records of Sunrise REIT or any of its Subsidiaries by any Person that informs Sunrise REIT or such Subsidiary that it is considering making, or has made, an Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, in each case which any of Sunrise REIT, any of its Subsidiaries or any officer, trustee, director, employee or Representative may receive after the date hereof relating to an Acquisition Proposal. Sunrise REIT shall promptly and fully keep the Purchasers informed of the status on a current basis, including any change to any of the terms, of any such Acquisition Proposal.

(8) Sunrise REIT shall

(i) ensure that its officers and Trustees and its Subsidiaries and their respective officers and directors and any Representatives retained by it or its Subsidiaries in connection herewith are aware of the provisions of this Section 4.4, and Sunrise REIT shall be responsible for any breach of this Section 4.4 by its and its Subsidiaries' officers, directors, trustees or representatives;

(ii) immediately cease and cause to be terminated any existing activities, discussions or negotiations with any parties conducted heretofore with respect to any Acquisition Proposal;

(iii) require all Persons other than the Purchasers who have been furnished with confidential information regarding Sunrise REIT or its Subsidiaries in connection with the solicitation of or discussion regarding any Acquisition Proposal within 12 months prior to the date hereof promptly to return or destroy such information, in accordance with and subject to the terms of the confidentiality agreement entered into with such Persons;

(iv) terminate access for all Persons (other than the Purchasers and its Representatives) of the electronic dataroom accessible through Merrill Datasite's website; and

(v) not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties. (emphasis added)

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

14      The Purchase Agreement defines Acquisition Proposal and Superior Proposal as follows:

"Acquisition Proposal" means any proposal or offer made by any Person other than the Purchasers (or any affiliate of the Purchasers or any Person acting jointly and/or in concert with the Purchasers or any affiliate of the Purchasers) with respect to the acquisition, directly or indirectly, of assets, securities or ownership interests of or in Sunrise REIT or any of its Subsidiaries representing 20% or more of the consolidated assets of Sunrise REIT and its Subsidiaries taken as a whole, in a single transaction or a series of transactions, or of equity interests representing a 20% or greater economic interest in Sunrise REIT or such Subsidiaries taken as a whole, in a single transaction or a series of transactions pursuant to any merger, amalgamation, tender offer, share exchange, business combination, liquidation, dissolution, recapitalization, take-over or nonexempt issuer bid, amendment to the Declaration of Trust, redemption of units, extraordinary distribution, sale, lease, exchange, mortgage, pledge, transfer, purchase, or issuance as consideration or similar transaction or series of transactions involving Sunrise REIT or any of such Subsidiaries or any other transaction the consummation of which would reasonably expected to impede, interfere with, prevent or materially delay the transactions contemplated hereby.

"Superior Proposal" means any unsolicited bona fide written Acquisition Proposal made by a third party that in the good faith determination of the Trustees, after consultation with its financial advisors and with outside counsel:

(a) is reasonably capable of being completed without undue delay having regard to financial, legal, regulatory and other matters;

(b) in respect of which adequate arrangements have been made to ensure that the required funds will be available to effect payment in full of the consideration; and

(c) would, if consummated in accordance with its terms, result in a transaction more favourable to Unitholders from a financial point of view (including financing terms, any termination fee or expenses reimbursement payable under this Agreement, any conditions to the consummation thereof) than the transactions contemplated by this Agreement; provided, however, that for purposes of this definition the references in the definition of Acquisition Proposal to "20%" shall be deemed to be references to "100%".

15      In the event that a Superior Proposal emerges, the Purchase Agreement provides Ventas with both a "right to match" and in the event that it chooses not to match the proposal, subject to certain tax considerations, it receives a break fee of $39,800,000 if it terminates the Purchase Agreement.

16      On January 17, 2007, Sunrise REIT's solicitor wrote to HCP advising that Sunrise REIT had entered into an agreement with Ventas. Sunrise REIT's solicitor requested HCP to promptly return certain documents "pursuant to the terms of the Confidentiality Agreement between you and Sunrise REIT dated November 8, 2006 (the "Agreement")" and went on to write, "You are reminded that the terms of the Agreement, including those with respect to the continued confidentiality and use of the Evaluation Material (including any oral Evaluation Material), continue in force in accordance with its terms." HCP responded by returning confidential materials to Sunrise REIT's solicitor.

17      On February 14, 2007, HCP wrote to Sunrise REIT to submit a proposal on behalf of HCP to acquire

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

Sunrise REIT. Sunrise REIT described the proposal as being "otherwise identical" to that contained in the Purchase Agreement with Ventas but for cash consideration of $18 per unit. This represented a 20% premium over the price offered by Ventas. HCP stated in its letter that its proposal was a Superior Proposal as defined in Ventas' Purchase Agreement and it trusted that Sunrise REIT's chairman and other trustees, in the proper exercise of their fiduciary duties to unitholders, would respond immediately and positively to its proposal. HCP also publicly announced its intention to make a bid to acquire Sunrise REIT.

18      Sunrise REIT concluded that it was not in a position to consider or make any determination as to whether HCP was a Superior Proposal as HCP's letter of February 14, 2007 suggested that the terms of the offer were conditional on HCP reaching an agreement with SSL. Sunrise REIT issued a press release to this effect on February 15, 2007.

19      On February 15, 2007, Ventas wrote to the president and CEO of Sunrise REIT advising that it had become aware that HCP had been in contact with two of Sunrise REIT's trustees, Messrs. Klassen and Newell, who are also the most senior executives of SSL. Ventas took the position that this contact could constitute a violation of HCP's confidentiality agreement of November, 2006 which Ventas asserted prohibited contact between HCP and SSL. Ventas stated that it understood that HCP's confidentiality agreement was the same as that of Ventas. Ventas also wrote to SSL.

20      On February 16, 2007, Sunrise REIT wrote to Ventas and stated that the term of the confidentiality agreements prohibiting contact as between HCP and Ventas on the one side and SSL on the other, had been waived and asked Ventas to confirm that it agreed that Sunrise REIT would not be in breach of the Purchase Agreement if discussions occurred as between HCP and SSL. This confirmation was not forthcoming from Ventas. On February 18 and 20, 2007, HCP wrote to Sunrise REIT with further proposals. HCP offered to enter an agreement with SSL that was identical in material respects to that entered into by Ventas and HCP stated that this therefore eliminated the need for SSL to engage in discussions with HCP. When Ventas discovered that HCP was still bound by the Standstill Agreement in its confidentiality agreement, Ventas wrote to Sunrise REIT requesting that it comply with the covenants in the Purchase Agreement and enforce its rights under the HCP confidentiality agreement. On February 19, 2007, Sunrise REIT commenced court proceedings as did Ventas on February 21, 2007 and SSL on February 21, 2007.

**Relief Requested**

21      Sunrise REIT applies for a declaration that the term in the confidentiality agreements between Sunrise REIT and Ventas, Sunrise REIT and HCP, and Sunrise REIT and SSL restricting SSL from having discussions or communications with either of HCP or Ventas with respect to Sunrise REIT has been waived by Sunrise REIT and that that waiver remains in effect. It also requests a declaration that Sunrise REIT is not and will not be in breach of the Ventas Purchase Agreement by reason of a discussion as between HCP and SSL as to its management of Sunrise REIT properties with a view towards ascertaining whether HCP and SSL can agree on management terms in the event that HCP succeeds in a bid for the assets of Sunrise REIT. It also requests a declaration that, in particular, section 4.4 of the Ventas Purchase Agreement does not apply to require Sunrise REIT to enforce terms of confidentiality agreements executed by Sunrise REIT which were waived prior to the execution of the Ventas Purchase Agreement.

22      Ventas applies for a declaration that Sunrise REIT, Sunrise REIT Trust and Sunrise REIT GP, Inc. are obligated pursuant to the Ventas Purchase Agreement to enforce the standstill terms and other conditions in the

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

HCP confidentiality agreement. It also requests a declaration that the standstill terms set out in the HCP confidentiality agreement are in effect and remain in effect until May 8, 2008.

23      SSL applies for a declaration that the agreement set forth in a letter dated January 14, 2007 does not prohibit or in any way restrict SSL from engaging in discussions with HCP concerning SSL's management of Sunrise REIT properties with a view to ascertaining whether HCP and SSL can agree on management terms and changes to the various agreements currently in place between SSL and Sunrise REIT in the event that HCP succeeds in a bid for the assets of Sunrise REIT or other business combination with Sunrise REIT. SSL also requests a declaration that SSL is not and will not be in a breach of the confidentiality agreement between it and Sunrise REIT by reason of any discussions between SSL and HCP regarding SSL management of the Sunrise REIT properties and changes to the aforesaid various agreements in connection with HCP's bid to acquire Sunrise REIT.

24      Given the urgency of the matter, these applications proceeded in a very truncated time frame. I propose to address Ventas' application first.

**Positions of the Parties**

25      In brief, these are the parties' positions with respect to the Ventas application. Ventas submits that sophisticated commercial parties should be held to their contracts to ensure commercial certainty and to avoid commercial chaos. The auction process, which was designed to cause bidders to put their best foot forward, involved a set of "rules of engagement". It is Ventas' position that as part of the auction process, a confidentiality agreement that included the Standstill Agreement was entered into by HCP and Sunrise REIT. Ventas played by the rules and won the auction. The benefits of winning the auction included a binding obligation on Sunrise REIT to enforce the HCP Standstill Agreement. It argues that the covenants in section 4.4 of the Ventas Purchase Agreement are clear. In the context of the auction process that led to the Purchase Agreement, the only objectively reasonable interpretation of Section 4.4(8)(v) is that any third parties bound by standstill terms with Sunrise REIT would continue to be bound by them and Sunrise REIT would enforce them. Any interpretation or argument that this obligation falls away in the face of an Acquisition Proposal made by a third party in breach of its standstill terms would deprive section 4.4(8)(v) of any meaning and would render it nugatory. In addition, Ventas argues that the HCP proposals do not satisfy the criteria that would permit 4.4(2) and 4.4(3) to oust the provisions of 4.4(1) in that they were not unsolicited or bona fide and they result from a breach of section 4.4. It is Ventas' position that Sunrise REIT and HCP should be held to their bargains. The rationale for deal protection devices such as the Standstill Agreement between Sunrise REIT and HCP is that, in a contested bidding situation, they encourage bidders to make their best bids. In any event, as set forth in the Purchase Agreement, Ventas states that ultimately it should be for the unitholders to decide which course to take.

26      Sunrise REIT does not take the position that the Purchase Agreement is ambiguous. Rather, it submits that Sunrise REIT contracted for a "fiduciary out" mechanism in the Purchase Agreement and these provisions were a fundamental aspect of the commercial context of the process that was designed to maximize value for the unitholders. It agreed with Ventas not to solicit further bids but was permitted to consider an unsolicited Acquisition Proposal made by any Person as those terms were defined in the Purchase Agreement. Ventas received significant benefits from being the winner "at the end of the first stage of the auction" as it had the right to match another proposal or walk away with a $39,800,000 break fee. If Ventas had wanted to exclude a person who had been involved in the auction, it could have used express language to do so. Counsel submits that sections 4.4(2) and 4.4(3) of the Purchase Agreement are engaged when Sunrise REIT receives an unsolicited Acquisition Pro-

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

posal and these sections expressly supercede section 4.4(1). Furthermore, from a reading of 4.4(2) and 4.4(3), nothing, including section 4.4(8), should override Sunrise REIT's ability to consider unsolicited Acquisition Proposals and Superior Proposals. Sunrise REIT should be able to determine whether an Acquisition Proposal could be a Superior Proposal without being required to enforce a standstill provision. Counsel submits that Ventas' treatment of section 4.4(8) renders the obligation in 4.4(1) redundant and also ignores the word "nothing" in sections 4.4(2) and 4.4(3). Counsel argues that subsection 4.4(8) applies in circumstances other than those involving Acquisition Proposals. Furthermore, that section of the Purchase Agreement must be read in the context of the "fiduciary out" provisions in the manner advanced by Sunrise REIT. It is also more practical to proceed in the manner it describes given that the Ventas Purchase Agreement is subject to a vote of the unitholders before it can proceed. In its factum, Sunrise REIT acknowledged that the HCP Standstill Agreement continues to be outstanding and that it has not consented to the HCP proposal.

27       HCP makes substantially similar arguments to those of Sunrise REIT with respect to the interpretation to be given to the Purchase Agreement. HCP's counsel submits that the Purchase Agreement expressly permits HCP's Acquisition Proposal. The term Acquisition Proposal does not exclude proposals made by first round participants. Nothing could prevent Sunrise REIT from entering into a bona fide written unsolicited Acquisition Proposal as it had an obligation to its unitholders to design a process that would maximize unitholder value. The Ventas Purchase Agreement contemplates that any third party can make a subsequent unsolicited bid and if the bid is financially superior to the Ventas transaction, Sunrise REIT could accept the bid and terminate the Purchase Agreement with Ventas. This is clear from the wording of sections 4.4(2) and 4.4(3). The introductory words of those sections, "notwithstanding anything contained in section 4.4(1)" are not words of limitation but are for greater certainty. Unlike section 4.4(1), section 4.4(8) has no application to future discussions or negotiations with respect to a future unsolicited Acquisition Proposal. It does not apply to subsequent unsolicited bona fide Acquisition Proposals. In this regard, section 4.4(3) "occupies the field." HCP also submits that its proposal did not result from a breach of section 4.4; it was unsolicited, and bona fide. Subsequent conduct also supports the argument that section 4.4(3) applies to HCP's proposal.

28       In any event, HCP states that it received Sunrise REIT's prior written consent to make binding bids on December 29, 2006. The consent was not limited to any specified duration or in any other way. The consent was never revoked and the Standstill Agreement was never reinstated. HCP also submits that the benefits of the Standstill Agreement may not be assigned without its consent.

**Discussion**

*(a) The Purchase Agreement*

29       At its heart, this case involves issues of contractual interpretation. Therefore, I will start by addressing the appropriate principles of law that I should consider in interpreting the Purchase Agreement.

30       Firstly, as affirmed by the Court of Appeal in *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)*,[FN2]

> The aim of the court, in construing a written agreement, is to determine the intentions of the parties to the agreement, and in this regard, the cardinal presumption is that the parties have intended what they have said. Their words must be construed as they stand.

Similar principles were expressed more recently in the Ontario Court of Appeal decision of *Venture Capital*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

*USA Inc. v. Yorkton Securities Inc.*[FN3]

The cardinal rule of contract interpretation "is that the court should give effect to the intention of the parties as expressed in their written agreement", and where the intention of the parties "is plainly expressed in the language of the agreement, the court should not stray beyond the four corners of the agreement": *KPMG Inc. v. Canadian Imperial Bank of Commerce* [1998] O.J. No.4746 (C.A.), at para. 5, leave to appeal refused, [1999] S.C.C.A. No. 36, [1999] 2 S.C.R. vi; *Indian Molybdenum Ltd. v. R..*, [1951] 3 D.L.R. 497 (S.C.C.), at p. 502; , [1998] 2 S.C.R. 129, [1998] S.C.J. No. 59, at pp. 166-68 S.C.R.

31     Secondly, I am to consider the Purchase Agreement as a whole.

It is a cardinal rule of the construction of contracts that the various parts of the contract are to be interpreted in the context of the intentions of the parties as evident from the contract as a whole.:

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority*[FN4] The court should also strive to give meaning to the agreement and "reject an interpretation that would render one of its terms ineffective": *Scanlon v. Castlepoint Development Corp.*[FN5]

32     As to surrounding circumstances, subjective intent and extrinsic evidence, Iacobucci J. stated in *Eli Lilly & Co. v. Novopharm Ltd.*,[FN6]

The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination.

Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. In the words of Lord Atkinson in *Lampson v. City of Quebec* (1920), 54 D.L.R. 344 (P.C.):

... the intention by which the deed is to be construed is that of the parties as revealed by the language they have chosen to use in the deed itself ... [I]f the meaning of the deed, reading its words in their ordinary sense, be plain and unambiguous it is not permissible for the parties to it, while it stands unreformed, to come into a Court of justice and say: Our intention was wholly different from that which the language of our deed expresses...

When there is no ambiguity in the wording of the document, the notion in *Consolidated Bathurst* that the interpretation which produces a "fair result" or "sensible commercial result" should be adopted is not determinative. Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the goal is to ascertain their true contractual intent. However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if it is presumed that the parties intended the legal consequences of their words.[FN7]

33     The Court of Appeal addressed the issue of surrounding circumstances or the "factual matrix" in *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*[FN8] as follows:

While the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its "factual matrix" will also provide the court with useful assistance. In the famous passage in *Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen*, [1976] 1 W.L.R. 989 at 995-96 (H.L.) Lord Wilberforce said this:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

The scope of the surrounding circumstances to be considered will vary from case to case but generally will encompass those factors which assist the court "... to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of the entry into the contract." *Consolidated Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888 at 901.

Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity. [*City of Toronto v. W.H. Hotel Ltd.* (1966), 56 D.L.R. (2d) 539 at 548 (S.C.C.)]. Rather, the document should be construed in accordance with sound commercial principles and good business sense. [*Scanlon v. Castlepoint Development Corporation et al.* (1992), 11 O.R. (3d) 744 at 770 (Ont.C.A.)]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

34      With these broad principles of interpretation in mind, I turn to the construction to be given to section 4.4 of the Purchase Agreement. Properly construed, does it impose an obligation on Sunrise REIT to enforce the Standstill Agreement in the confidentiality agreement entered into by HCP and Sunrise REIT? In my view, it does for the following reasons.

35      Sunrise REIT expressly and unambiguously agreed that it would not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties. The standstill enforcement obligations are found in sections 4.4(1) and 4.4(8) of the Purchase Agreement.

36      Sections 4.4(2) and 4.4(3) address Sunrise REIT's obligations with regard to "a bona fide written, unsolicited Acquisition Proposal (that did not result from a breach of this section 4.4)." Sections 4.4(2) and 4.4(3) are prefaced with the words "notwithstanding anything contained in section 4.4(1)." Sections 4.4(2) and (3) do not say "notwithstanding anything contained in section 4.4(1) or 4.4(8)." If it had been the parties' contractual intention to exempt the circumstances described in sections 4.4(2) and (3) from the operation of section 4.4(8), they could have so provided but they did not. Similarly, unlike sections 4.7 and 4.8 which commence with the words "notwithstanding any other term of the Agreement", sections 4.4(2) and 4.4(3) do not use this language.

37      It also should be observed that 4.4(2) and 4.4(3) contemplate a bona fide Acquisition Proposal. Bona fide means acting or done in good faith; sincere, genuine.[FN9] I agree with the submission of counsel for Ventas that a proposal made in breach of a contractual obligation not to make such a proposal cannot be considered to be bona fide. Sections 4.4(2) and 4.4(3) are not designed to address Acquisition Proposals that are not bona fide. So, for instance in this case, HCP is in breach of its Standstill Agreement and therefore HCP's proposals would not be encompassed by sections 4.4(2) and 4.4(3) because they could not be considered to be bona fide. Furthermore, sections 4.4(2) and 4.4(3) also contemplate an Acquisition Proposal from a third party that did not result

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

from a breach of section 4.4. An Acquisition Proposal submitted in breach of a standstill agreement, to the extent it is considered by Sunrise REIT, would result from a breach of section 4.4. Again, in this case, sections 4.4(2) and 4.4(3) would be inapplicable on this ground as well.

38    It seems to me that the clear scheme of this Purchase Agreement was ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

39    Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal.[FN10] It simply precludes a proposal from anyone who is in breach of its standstill agreement. While creative, I view Sunrise REIT's and HCP's interpretation arguments to be strained. They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole.

40    Lastly, in reaching this determination, it is unnecessary to have regard to any of the evidence of Ms. Cafaro of Ventas of which Sunrise REIT and HCP take exception.

41    In conclusion, I am of the view that the Purchase Agreement requires Sunrise REIT to enforce the HCP Standstill Agreement contained in the HCP confidentiality agreement.

*(b) Prior Written Consent*

42    The next issue to address is HCP's argument that, as required by the provisions of the Standstill Agreement, it received Sunrise REIT's prior written consent to submit its proposal. On December 29, 2006, Sunrise REIT invited Ventas and HCP to make binding bids in the second round of the auction process. HCP submits that these invitations constituted Sunrise REIT's prior written consent to both HCP and Ventas and that this consent was not limited to any specified duration or in any other way.[FN11]

43    In my view, this position is not borne out by the evidence. The December 29, 2006 letter from TD Securities invites HCP "to submit *a* detailed *final* binding proposal (a "Proposal") for the acquisition of the REIT" (emphasis added) and goes on to state "You should not assume that you will be given an opportunity to rebid, renegotiate, or improve the terms of your Proposal." This letter cannot possibly be construed as constituting Sunrise REIT's prior written consent as that term is used in the Standstill Agreement. Furthermore, on January 17, 2007, Sunrise REIT's solicitor reminded HCP that the terms of the confidentiality agreement continued in force. The confidentiality agreement of course contained the Standstill Agreement. In addition, the proposal most recently provided by HCP to Sunrise REIT provides that "Sunrise REIT hereby waives the standstill provisions." If consent had already been provided, this language would be unnecessary. Lastly, Sunrise REIT also takes the position that the Standstill Agreement continues to bind HCP and that it has not provided consent. In my view, the facts are inconsistent with a conclusion that Sunrise REIT provided its consent pursuant to the provisions of the Standstill Agreement so as to obviate the need for HCP to comply with the Standstill Agreement and for Sunrise REIT to be relieved of its obligation to enforce it.

*(c) Assignment*

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

44    There is also no merit in HCP's argument that the benefit of the HCP Standstill Agreement was assigned to Ventas without HCP's consent. Neither the Standstill Agreement nor its benefit has been assigned. Ventas only requests that Sunrise REIT comply with its obligation to enforce the Standstill Agreement.

*(d) Remaining Applications*

45    I am of the view that having found in favour of Ventas with respect to its application, the subject matter of the other two applications is moot. The question whether HCP can have discussions with SSL about Sunrise REIT is of no practical significance as they would be discussions absent a proposal that could not be made or considered. Furthermore, on February 20, 2007, HCP wrote to Sunrise REIT stating that the need to engage in discussions with SSL was eliminated.

> ... our offer to enter into an agreement with [SSL] identical in material respects to that entered into by Ventas eliminates the need for [SSL] to engage in any discussion or communications with HCP and therefore can be accepted irrespective of any such concerns.

A court should not grant declaratory relief where the issue has become academic and therefore declaratory relief would serve no useful purpose: *Solosky v. Canada*[FN12] and *Lee v. Canada (Minister of Citizenship & Immigration).*[FN13]

**Conclusion**

46    In conclusion, I note that the parties to this transaction were experienced and sophisticated. They had financial advisors and legal representation from prominent law firms. Absent an established legal principle such as rectification, it is not the role of the courts to rewrite contracts entered into by sophisticated commercial parties. The relief set forth in paragraph (a) of the notice of application of Ventas is granted as is the request for a declaration that the standstill terms in the HCP confidentiality agreement are in effect. I am not granting Ventas' request for a declaration that the standstill terms remain in effect until May 8, 2008 as, as noted by Ventas in its factum, if the unitholders reject Ventas' offer, the Purchase Agreement may be terminated by Sunrise REIT thereby relieving Sunrise REIT of its obligations under the Agreement, including the standstill enforcement obligation at issue in this case. The applications of Sunrise REIT and SSL are dismissed. If the parties are unable to agree on costs, they are to make brief written submissions.

*Application granted.*

FN* Judgment affirmed at *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 56 R.P.R. (4th) 163, 2007 CarswellOnt 1705, 222 O.A.C. 102, 2007 ONCA 205, 29 B.L.R. (4th) 312 (Ont. C.A.).

FN1 Eg. HCP or Ventas.

FN2 (1998), 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]) at para. 403, affirmed (1999), 45 O.R. (3d) 417 (Ont. C.A.).

FN3 (2005), 75 O.R. (3d) 325 (Ont. C.A.), at 333.

FN4 [1993] 1 S.C.R. 12 (S.C.C.) at p. 23.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1704, 29 B.L.R. (4th) 292, 56 R.P.R. (4th) 183

FN5 (1992), 11 O.R. (3d) 744 (Ont. C.A.), at 770.

FN6 [1998] 2 S.C.R. 129 (S.C.C.).

FN7 P. 166.

FN8 (Ont. C.A.) at para.25-27.

FN9 Oxford English Dictionary, Oxford University Press, 2007.

FN10 As for example, Ventas.

FN11 See para. 20 of the HCP factum.

FN12 (1979), [1980] 1 S.C.R. 821 (S.C.C.), at 832.

FN13 (1997), 126 F.T.R. 229 (Fed. T.D.), at 233.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 102

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

2007 ONCA 205
Ontario Court of Appeal

Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust

2007 CarswellOnt 1705, 2007 ONCA 205, [2007] O.J. No. 1083, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R.
(4th) 163, 85 O.R. (3d) 254

# VENTAS, INC., 2124678 ONTARIO INC., and 2124680 ONTARIO INC. (Applicants / Respondents in Appeal) and SUNRISE SENIOR LIVING REAL ESTATE INVESTMENT TRUST, SUNRISE REIT TRUST, SUNRISE REIT GP, INC., SUNRISE SENIOR LIVING INC., and HEALTH CARE PROPERTY INVESTORS, INC. (Respondents / Appellants in Appeal)

SUNRISE SENIOR LIVING REAL ESTATE INVESTMENT TRUST, SUNRISE REIT TRUST, and SUNRISE REIT GP, INC. (Applicants / Appellants in Appeal) and VENTAS SSL ONTARIO II, INC. (FORMERLY 2124678 ONTARIO INC.), VENTAS SSL ONTARIO I, INC. (FORMERLY 2124680 ONTARIO INC.), VENTAS INC., SUNRISE SENIOR LIVING, INC., and HEALTH CARE PROPERTY INVESTORS, INC. (Respondents / Respondents in Appeal / Ventas Inc. and numbered companies) (Appellant by Cross-Appeal / Health Care Property Investors, Inc.)

R.A. Blair, J. MacFarland, H.S. LaForme JJ.A.

Heard: March 20, 2007
Judgment: March 23, 2007
Docket: CA C46790, C46791

Proceedings: affirming *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 2007 CarswellOnt 1704, 29 B.L.R. (4th) 292 (Ont. S.C.J.)

Counsel: Peter F.C. Howard, Eliot Kolers for Appellants, Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust, Sunrise REIT GP Inc.
Jeffrey S. Leon, Derek J. Bell for Appellants, Health Care Property Investors Inc.
Mark A. Gelowitz, Laura K. Fric for Respondents, Ventas Inc., Numbered Companies
Luis G. Sarabia, Cynthia Spry for Respondent, Sunrise Senior Living Inc.

Subject: Corporate and Commercial; Contracts; Property; Public

## Headnote

### Business associations --- Powers, rights and liabilities — Contracts by corporations — Miscellaneous issues

Real estate investment trust was publicly traded entity — Board of trustees decided to sell assets and developed two-stage auction process to maximize value of units — Parties interested in purchasing were required to enter into confidentiality agreements with trust — Confidentiality agreements contained standstill terms prohibiting contact between either potential purchaser and trust's subsidiary — Corporation entered into agreement with trust to purchase assets — Third party learned of agreement and sent last-ditch proposal to trust — Trust told third party to enter discussions with representatives from its subsidiary — Corporation refused to waive standstill terms of agreement —

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.          1

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

Corporation's application for declaration that trust was obliged to enforce standstill terms in confidentiality agreement was granted — Trust appealed — Third party cross-appealed for declaration that communications between it and subsidiary of trust were permitted — Appeal dismissed; cross-appeal dismissed — Trust was obliged to enforce standstill terms — Judge correctly outlined and applied principles of contract interpretation — Judge was correct that important purpose of s. 4.4 of purchase agreement was to ensure enforcement of standstill agreements entered into by previous players in auction process — Fiduciary out clause did not apply where unsolicited proposal was tendered in breach of non-solicitation provisions of purchase agreement — Fiduciary out clause did not allow trust to resile from terms of its standstill agreements with earlier bidders — Judge was sensitive to fiduciary out provisions that permitted other bona fide written unsolicited acquisition proposals — Judge found this was balanced by requirement that trust ensure enforcement of standstill agreements signed as part of auction process in order to protect successful bidder — This interpretation made commercial sense — Judge did not err in her assessment and use of term "bona fide" — Issue on cross-appeal was moot since ruling precluded third party proposal from being pursued.

## Table of Authorities

**Cases considered by _R.A. Blair J.A._:**

_ACE Ltd. v. Capital Re Corp._ (1999), 747 A.2d 95 (U.S. Del. Ch.) — referred to

_BG Checo International Ltd. v. British Columbia Hydro & Power Authority_ (1993), 1993 CarswellBC 1254, [1993] 2 W.W.R. 321, [1993] 1 S.C.R. 12, 147 N.R. 81, 75 B.C.L.R. (2d) 145, 99 D.L.R. (4th) 577, 20 B.C.A.C. 241, 35 W.A.C. 241, 14 C.C.L.T. (2d) 233, 5 C.L.R. (2d) 173, 1993 CarswellBC 10 (S.C.C.) — referred to

_Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co._ (1979), _(sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)_ [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 1979 CarswellQue 157, 1979 CarswellQue 157F, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — referred to

_CW Shareholdings Inc. v. WIC Western International Communications Ltd._ (1998), 39 O.R. (3d) 755, 160 D.L.R. (4th) 131, 1998 CarswellOnt 1891, 38 B.L.R. (2d) 196 (Ont. Gen. Div. [Commercial List]) — referred to

_Eli Lilly & Co. v. Novopharm Ltd._ (1998), 227 N.R. 201, 152 F.T.R. 160 (note), 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 80 C.P.R. (3d) 321 (S.C.C.) — referred to

_Kentucky Fried Chicken Canada v. Scott's Food Services Inc._ (1998), 1998 CarswellOnt 4170, 41 B.L.R. (2d) 42, 114 O.A.C. 357 (Ont. C.A.) — considered

_Paramount Communcations Inc. v. QVC Network Inc._ (1994), 637 A.2d 34, 62 U.S.L.W. 2530, Fed. Sec. L. Rep. P 98,063 (U.S. Del. Super.) — referred to

_Pente Investment Management Ltd. v. Schneider Corp._ (1998), 113 O.A.C. 253, _(sub nom. Maple Leaf Foods Inc. v. Schneider Corp.)_ 42 O.R. (3d) 177, 1998 CarswellOnt 4035, 44 B.L.R. (2d) 115 (Ont. C.A.) — considered

_Scanlon v. Castlepoint Development Corp._ (1992), 29 R.P.R. (2d) 60, 59 O.A.C. 191, 11 O.R. (3d) 744, 99 D.L.R. (4th) 153, 1992 CarswellOnt 633 (Ont. C.A.) — referred to

_Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)_ (1998), 1998 CarswellOnt 2565, 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]) — referred to

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

>   *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1999), 45 O.R. (3d) 417, *(sub nom. Toronto-Dominion Bank v. Leigh Instruments Ltd. (Bankrupt))* 124 O.A.C. 87, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, 1999 CarswellOnt 2812 (Ont. C.A.) — referred to

>   *Venture Capital USA Inc. v. Yorkton Securities Inc.* (2005), 2005 CarswellOnt 1875, 197 O.A.C. 264, 75 O.R. (3d) 325, 4 B.L.R. (4th) 324 (Ont. C.A.) — referred to

APPEAL by public real estate trust from decision reported at *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 56 R.P.R. (4th) 184, 2007 CarswellOnt 1704, 29 B.L.R. (4th) 292 (Ont. S.C.J.), granting application by corporation for declaration that trust was obligated to enforce confidentiality agreement; CROSS-APPEAL by third party for declaration that communications between it and subsidiary of trust were permitted.

*R.A. Blair J.A.*:

**Overview**

1    Sunrise REIT is a Canadian public real estate investment trust whose units are traded on the Toronto Stock Exchange. It owns and invests in senior living communities in Canada and the United States. In September 2006, Sunrise's board of trustees determined that a strategic sale process of its assets would be beneficial to its unitholders, thus effectively putting Sunrise "in play" on the public markets.

2    To carry out this plan, the Trustees developed a two-stage auction process with a view to maximizing the value of Sunrise's units. Ventas, Inc. ("Ventas") and Health Care Property Investors, Inc. ("HCPI") were two of seven initially interested prospective purchasers in the auction process. They emerged from the preliminary round as the only two potential bidders asked to participate in the final round.

3    Ventas submitted a successful bid to acquire all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15 per unit), subject to unitholder approval. HCPI withdrew from the auction process and did not bid at that time. Instead, it put forward a post-auction bid — after it knew what Ventas had offered — "topping up" the Ventas offer by twenty per cent to $18 per unit. This increased offer represents an additional $227.5 million for the unitholders, who are to meet on March 30, 2007, to consider the Ventas proposal.

4    Hence the urgency of this appeal.

5    The appeal turns on the interpretation of the terms of the purchase agreement executed by Sunrise and Ventas following acceptance of the Ventas bid. The issue is whether Sunrise is obliged to enforce the terms of a prior standstill agreement entered into between it and HCPI in the course of the auction process and which prohibits HCPI from making an offer for the Sunrise assets without Sunrise's consent. If the answer to that question is "Yes", Sunrise will be precluded from considering or accepting the richer HCPI offer pending the unitholders' meeting.

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

6    Following an urgent application, determined on March 6, 2007, Justice Pepall answered the foregoing question in the affirmative. Sunrise and HCPI appeal from that decision. Ventas supports it.

7    For the reasons that follow, I would dismiss the appeal and uphold the decision of the application judge.

## Facts

8    As mentioned above, Sunrise owns and invests in senior living communities in Canada and the United States. The properties are managed by Sunrise Senior Living, Inc. ("SSL"), a U.S. public company whose shares are traded on the New York Stock Exchange.

9    HCPI is a self-administered real estate investment trust that also invests in healthcare facilities. Ventas is a U.S.-based health care real estate investment trust whose shares are listed on the New York Stock Exchange.

10    In September 2006, after Sunrise's board of trustees determined that a strategic sale process of the Trust's assets would be beneficial to its unitholders, it began an auction process with a view to maximizing unitholder value.

11    Parties who were interested in acquiring Sunrise (including HCPI and Ventas) were required to enter into a confidentiality agreement with it in order to prevent non-public information exchanged by the parties from being publicly disclosed (the "Confidentiality Agreements"). The Confidentiality Agreements contained restrictions preventing each prospective acquiring party from attempting a hostile (unsolicited) takeover bid (the "Standstill Agreements").

12    Although the parties' Confidentiality Agreements were largely similar, Ventas's Standstill Agreement was worded differently from HCPI's in that the Ventas standstill ceased to apply if, among other things, Sunrise entered into an agreement to sell more than twenty per cent of its assets to a third party. Notably, HCPI's Standstill Agreement did not contain a similar termination clause.

13    On November 21, 2006, Sunrise invited potential bidders to submit bids in the non-binding preliminary round of an auction. After the first round of bids, Sunrise invited HCPI and Ventas to engage in further negotiations and on December 29, 2006, it invited them to submit final binding bids in the second round of the auction by January 8, 2007. Sunrise waived the Standstill Agreements with those bidders for that purpose, and HCPI and Ventas were expressly told not to assume that the "winning" bid was assured of actually acquiring Sunrise at the price agreed upon or that they would be given an opportunity to rebid, renegotiate, or improve the terms of their proposal.

14    Ventas submitted a second bid on January 8, but HCPI withdrew from the auction and did not.

15    On January 14, 2007, Ventas and Sunrise signed an agreement contemplating the purchase by Ventas of all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15.00 per Unit), subject to Unitholder

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

approval (the "Purchase Agreement"). This price represented a 35.8% premium over the closing price of the units on January 12, 2007. The Purchase Agreement contemplated subsequent third-party unsolicited bids and allowed Sunrise to accept such a bid if it was financially superior to Ventas's bid.

16      On January 17, 2007, Sunrise notified HCPI of the agreement with Ventas and asked for the return of Sunrise's confidential materials. In the letter, Sunrise's solicitor reminded HCPI of the terms of the Confidentiality Agreement it signed in November 2006.

17      On February 14, 2007, HCPI submitted a proposal to acquire all of Sunrise's assets for $18.00 per unit (the "HCPI Proposal"), conditional on HCPI's ability to reach a management agreement with SSL. Sunrise treated the HCPI Proposal as an unsolicited third-party bid, but it concluded that it was not in a position to determine whether the bid was a superior bid because of the SSL condition.

18      The Confidentiality Agreements entered into in the course of the auction process contained a provision prohibiting prospective purchasers from communicating with SSL. This was because SSL was viewed as a possible bidder. Following the preliminary round of the auction, in late November 2006, and after realizing that SSL was not an interested purchaser, Sunrise had authorized its financial advisors to arrange to allow HCPI and Ventas to contact SSL for purposes of the second round of bidding. On February 15, 2007, however — after learning of the HCPI Proposal — Ventas advised Sunrise that, if it permitted communications between SSL and HCPI, Sunrise would be in breach of the Purchase Agreement. It did not assert that HCPI would be in breach of its Standstill Agreement because it apparently assumed that HCPI's Standstill Agreement was worded similarly to the Ventas Standstill Agreement, which meant that the restraint on an unsolicited bid was no longer enforceable since Sunrise had entered into an agreement with a third party.

19      On February 18, 2007, Sunrise served application materials upon Ventas, HCPI and SSL indicating its intention to seek the court's interpretation of the Purchase Agreement, specifically on the issue of communications between HCPI and SSL. It is at this point that Ventas learned of the specific terms of HCPI's Confidentiality Agreement and realized that HCPI's Standstill Agreement did not contain the same termination clause as Ventas's Standstill Agreement. On February 21, 2007, Ventas brought the within Application seeking a declaration that Sunrise was required to enforce its Standstill Agreement with HCPI, thereby preventing it from considering the HCPI Proposal.

20      The application judge found that Sunrise had agreed with Ventas that it would enforce existing Standstill Agreements and that any bid made in breach of an existing Standstill Agreement would not be *bona fide*. She then concluded that Sunrise was required to enforce the Standstill Agreement with HCPI and that HCPI did not have prior written consent to submit its bid. She dismissed Sunrise's application on the grounds that the issue was moot in light of her earlier conclusion.

**The Provisions of the Agreement**

21      Section 4 of the Purchase Agreement deals generally with the covenants of the parties. Section 4.4 deals with Sunrise's "Covenants Regarding Non-Solicitation". Because of their importance, I reproduce the provisions of section 4.4 in their entirety (the underlining is mine):

    4.4(1) <u>Following the date hereof, Sunrise REIT shall not</u>, directly or indirectly, through any trustee, officer, director,

WestlawNext© CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

agent or Representative of Sunrise REIT or any of its Subsidiaries, and shall not permit any such Person to,

(i) <u>solicit</u>, initiate, encourage or otherwise facilitate (including by way of furnishing information or entering into any form of agreement, arrangement or understanding or providing any other form of assistance) the initiation of any inquiries or <u>proposals</u> regarding, or other action that constitutes, or may reasonably be <u>expected to lead to, an actual or potential Acquisition Proposal</u>,

(ii) <u>participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligations to Sunrise REIT or any of its Subsidiaries,</u>

(iii) approve, recommend or remain neutral with respect to, or propose publicly to approve, recommend or remain neutral with respect to, any Acquisition Proposal,

(iv) accept or enter into any agreement, arrangement or understanding, related to any Acquisition Proposal (other than a confidentiality agreement contemplated in Section 4.4(2)), or

(v) withdraw, modify or qualify, or publicly propose to withdraw, modify or qualify, in any manner adverse to the Purchasers, the approval or recommendation of the Board (including any committee thereof) of this Agreement or the transactions contemplated hereby.

(2) Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from complying with Sunrise REIT's disclosure obligations under applicable Laws with regard to a bona fide written, unsolicited Acquisition Proposal or, following the receipt of any such Acquisition Proposal from a third party (<u>that did not result from a breach of this Section 4.4</u>), from furnishing or disclosing non-public information to such Person if and only to the extent that:

(i) the Board believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal if consummated could reasonably be expected to result in a Superior Proposal; and

(ii) such third party has entered into a confidentiality agreement containing terms in the aggregate no more favourable to such third party than those in the Confidentiality Agreement as are then in effect in accordance with its terms.

(3) Notwithstanding anything, contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from withdrawing or modifying, or proposing publicly to withdraw or modify its approval and recommendation of the transactions contemplated by this Agreement, or accepting, approving or recommending or entering into any agreement, understanding or arrangement providing for a bona fide written, unsolicited Acquisition Proposal (<u>that did not result from a breach of this Section 4.4</u>) ("Proposed Agreement") if and only to the extent that:

(i) it has provided the Purchasers with a copy of all of the documents relating to the Acquisition Proposal,

(ii) the Board, believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal constitutes a Superior Proposal and has promptly notified the Purchasers of such determination,

(iii) a period of at least five Business Days (the "Matching Period") has elapsed following the later of (x) the date the Purchasers received written notice advising the Purchasers that the Board has resolved, subject to compliance with this Section 4.4(3), to withdraw, modify its approval and recommendation of the transactions contemplated by this Agreement or accept, approve or recommend or enter into a Proposed Agreement in respect of such Superior Proposal and (y) the date the Purchasers received a copy of the documentation related to such Superior Proposal pursuant to Section 4.4(3)(i),

(iv) if the Purchasers have proposed to amend the transactions contemplated under this Agreement in accordance

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

with Section 4.4(6), the Board has again made the determination in Section 4.4(3)(ii) taking into account such proposed amendments; and

(v) if Sunrise REIT proposes to enter into a Proposed Agreement (other than a confidentiality agreement referred to in Section 4.4(2)) after complying with this Section 4.4(3), Sunrise REIT shall have complied with Section 5.2 and 5.3. For the purposes of this Section 4.4(3) the preparation and delivery of a directors' circular pursuant to Section 99 of the *Securities Act* relating to an Acquisition Proposal shall be deemed to be a qualification, withdrawal or modification, of the Board's recommendation of the transactions contemplated hereby unless the Board expressly, and without qualification, reaffirms its recommendation of the transactions contemplated hereby in such disclosure.

(4) If the expiry of the Matching Period referred to in Section 4.4(3)(iii) falls on a date which is less than five Business Days prior to the Unitholder Meeting, Sunrise REIT shall, at the request of the Purchasers, adjourn the Unitholder Meeting to a date that is not more than 10 Business Days following such expiry date.

(5) Sunrise REIT acknowledges and agrees that each successive amendment to any Acquisition Proposal shall constitute a new Acquisition Proposal for purposes of section 4.4.

(6) During the Matching Period, the Purchasers shall have the right, but not the obligation, to propose to amend the terms of this Agreement. The Trustees will review any proposal by the Purchasers to amend the terms of this Agreement in good faith in order to determine (after consultation with their financial advisor and legal counsel) whether the transactions contemplated by this Agreement, taking into account the Purchasers' proposed amendments would, if consummated in accordance with its terms, result in the Superior Proposal ceasing to be a Superior Proposal. If the Trustees so determine, Sunrise REIT will enter into an amending agreement with the Purchasers reflecting such proposed amendment.

(7) Sunrise REIT shall, as promptly as practicable, notify the Purchasers of any relevant details relating to any Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or any amendments to any Acquisition Proposal (including the identity of the parties and all material terms thereof), or any request for non-public information relating to Sunrise REIT or any of its Subsidiaries in connection with an Acquisition Proposal or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or for access to the properties, books or records of Sunrise REIT or any of its Subsidiaries by any Person that informs Sunrise REIT or such Subsidiary that it is considering making, or has made, an Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, in each case which any of Sunrise REIT, any of its Subsidiaries or any officer, trustee, director, employee or Representative may receive after the date hereof relating to an Acquisition Proposal. Sunrise REIT shall promptly and fully keep the Purchasers informed of the status on a current basis, including any change to any of the terms, of any such Acquisition Proposal.

(8) Sunrise REIT shall

(i) ensure that its officers and Trustees and its Subsidiaries and their respective officers and directors and any Representatives retained by it or its Subsidiaries in connection herewith are aware of the provisions of this Section 4.4, and Sunrise REIT shall be responsible for any breach of this Section 4.4 by its and its Subsidiaries' officers, directors, trustees or representatives;

(ii) immediately cease and cause to be terminated any existing activities, discussions or negotiations with any parties conducted heretofore with respect to any Acquisition Proposal;

(iii) require all Persons other than the Purchasers who have been furnished with confidential information regarding Sunrise REIT or its Subsidiaries in connection with the solicitation of or discussion regarding any Acquisition Proposal within 12 months prior to the date hereof promptly to return or destroy such information, in accordance with and subject to the terms of the confidentiality agreement entered into with such Persons;

(iv) terminate access for all Persons (other than the Purchasers and its Representatives) of the electronic dataroom accessible through Merrill Datasite's website; and

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

(v) not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties.

22      The Purchase Agreement defines "Acquisition Proposal" and "Superior Proposal" as follows:

"Acquisition Proposal" means any proposal or offer made by any Person other than the Purchasers (or any affiliate of the Purchasers or any Person acting jointly and/or in concert with the Purchasers or any affiliate of the Purchasers) with respect to the acquisition, directly or indirectly, of assets, securities or ownership interests of or in Sunrise REIT or any of its Subsidiaries representing 20% or more of the consolidated assets of Sunrise REIT and its Subsidiaries taken as a whole, in a single transaction or a series of transactions, or, of equity interests representing a 20% or greater economic interest in Sunrise REIT or such Subsidiaries taken as a whole, in a single transaction or a series of transactions pursuant to any merger, amalgamation, tender offer, share exchange, business combination, liquidation, dissolution, recapitalization, take-over or non-exempt issuer bid, amendment to the Declaration of Trust, redemption of units, extraordinary distribution, sale, lease, exchange, mortgage, pledge, transfer, purchase, or issuance as consideration or similar transaction or series of transactions involving Sunrise REIT or any of such Subsidiaries or any other transaction the consummation of which would reasonably expected to impede, interfere with, prevent or materially delay the transactions contemplated hereby.

"Superior Proposal" means any unsolicited bona fide written Acquisition Proposal made by a third party that in the good faith determination of the Trustees, after consultation with its financial advisors and with outside counsel:

(a) is reasonably capable of being completed without undue delay having regard to financial, legal, regulatory and other matters;

(b) in respect of which adequate arrangements have been made to ensure that the required funds will be available to effect payment in full of the consideration; and

(c) would, if consummated in accordance with its terms, result in a transaction more favourable to Unitholders from a financial point of view (including financing terms, any termination fee or expenses reimbursement payable under this Agreement, any conditions to the consummation thereof) than the transactions contemplated by this Agreement; provided, however, that for purposes of this definition the references in the definition of Acquisition Proposal to "20%" shall be deemed to be references to "100%".

**Analysis**

23      The central issue on this appeal, as it was before the application judge, is whether the provisions of section 4.4 of the Purchase Agreement impose an obligation on Sunrise to enforce the Standstill Agreement between it and HCPI, thus precluding it from considering the Acquisition Proposal submitted by HCPI following the close of the auction and after the Ventas bid had been accepted. In my view, they do.

24      Counsel accept that the application judge correctly outlined the principles of contractual interpretation applicable in the circumstances of this case. I agree. Broadly stated — without reproducing in full the relevant passages from her reasons (paras. 29-34) in full — she held that a commercial contract is to be interpreted:

(a) as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;[1]

(b) by determining the intention of the parties in accordance with the language they have used in the written

WESTLAW NEXT® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

document and based upon the "cardinal presumption" that they have intended what they have said;[2]

(c) with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties;[3] and (to the extent there is any ambiguity in the contract),

(d) in a fashion that accords with sound commercial principles and good business sense, and that avoid a commercial absurdity.[4]

25    The appellants assert, however, that the application judge misapplied the principles of contractual interpretation that she had properly enunciated. They say she did so essentially,

a) by misapprehending the interplay between sections 4.4(1), 4.4(2), 4.4(3) and 4.4(8)(v) of the Purchase Agreement and, in particular by failing to appreciate, and to reconcile, the differences between the wording of sections 4.4(1) and 4.4(8), and more generally,

b) by failing to understand the "architecture" of section 4.4 of the Purchase Agreement and to consider it against the background of the factual matrix in which the Agreement was negotiated.

26    I do not agree.

***The Application Judge's Reasoning***

27    The thrust of the application judge's reasoning in this regard is found at paragraphs 35, 36, 38 and 39 of her reasons:

35 Sunrise REIT expressly and unambiguously agreed that it would not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties. The standstill enforcement obligations are found in sections 4.4(1) and 4.4(8) of the Purchase Agreement.

36 Sections 4.4(2) and 4.4(3) address Sunrise REIT's obligations with regard to "a bona fide written, unsolicited Acquisition Proposal (that did not result from a breach of this section 4.4)." Sections 4.4(2) and 4.4(3) are prefaced with the words "notwithstanding anything contained in section 4.4(1)." Sections 4.4(2) and (3) do not say "notwithstanding anything contained in section 4.4(1) or 4.4(8)." If it had been the parties' contractual intention to exempt the circumstances described in sections 4.4(2) and (3) from the operation of section 4.4(8), they could have so provided but they did not. Similarly, unlike sections 4.7 and 4.8 which commence with the words "notwithstanding any other term of the Agreement", sections 4.4(2) and 4.4(3) do not use this language.

38 It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

39 Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal. It simply precludes a proposal from anyone who is in breach of its standstill agreement. While creative, I view Sunrise REIT's and HCP's interpretation arguments to be strained. They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

[Footnote omitted.]

*The Scheme and Interpretation of Section 4.4*

28      I agree with the application judge that an important purpose of this part of the Purchase Agreement is to ensure the enforcement of standstill agreements entered into by previous players in the auction process. The negotiating context demonstrates that Ventas has been skilful in protecting its own position with respect to competition and standstills — unlike the HCPI Standstill, the Ventas/Sunrise Standstill Agreement expired at the conclusion of the auction — and it is objectively reasonable, given this background, that it would seek protection against competition from those who were unsuccessful in the auction, particularly its principle competitor.

29      From Sunrise's perspective, the safety valve lies in the unitholders' meeting. If the unitholders believe that there is a more favourable offer available — one worth the risk of rejecting the Ventas proposal — they may well vote to reject the Ventas proposal at their meeting on March 30.

30      The language used by the parties in the Purchase Agreement supports this interpretation.

31      Viewed contextually, sections 4.4(1), 4.4(2), 4.4(3) and 4.4(8) form part of a section of the Purchase Agreement that deals with the general covenant of Sunrise not to shop for other offers pending unitholder consideration of the Ventas bid. Viewed in light of the factual matrix in which the Agreement was negotiated, the provisions provide deal protection for Ventas, as the successful bidder in the auction, subject to Sunrise REIT's fiduciary out obligations.

32      As I read section 4.4 of the Agreement, it has four major components. First, it contains the overriding obligation of Sunrise not to solicit other bids, buttressed by the commitment of Sunrise to enforce existing standstill agreements that may be in place with bidders who have already engaged in the auction process (section 4.4(1)). Secondly, it contains the "fiduciary out" protection for the Sunrise Trustees (and unitholders), permitting the Trustees to consider *bona fide* unsolicited Acquisition Proposals from third parties (*that are not in breach of the provisions of section 4.4*) (sections 4.4(2) and 4.4(3)). Thirdly, it contains a series of provisions dealing with how the parties are to address a situation where a permitted Acquisition Proposal is received (sections 4.4(3)-4.4(7)).[5] Lastly, section 4.4(8)(v) returns to the general non-solicitation obligation, reinforcing it by ensuring that Sunrise will (i) ensure all of its officers, Trustees and agents are aware of the non-solicitation provisions, (ii) immediately stop negotiating with anyone previously involved in the bidding process, (iii) require those bidders to return any confidential documentation and information they may have received during the process, (iv) terminate access to the data room by anyone other than Ventas and its representatives, and finally (a reiteration of the requirement set out in section 4.4(1)):

> (v) not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties ...

33      Contrary to the appellants' submissions, however, it is not *any* Acquisition Proposal that the Trustees are free to consider as part of the fiduciary out scenario; it is only an Acquisition Proposal from a third party *that is not in breach of section 4.4 of the Agreement*.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

34      Properly understood in this fashion, then, a reading of section 4.4 demonstrates that there is no *conflict* between the provisions of sections 4.4(1)(ii), 4.4(2), 4.4(3) and 4.4(8)(v). The repeated standstill enforcement terms *complement* one another. As the application judge pointed out, the opening phrases of sections 4.4(2) and 4.4(3) — "notwithstanding anything contained in Section 4.4(1)" — do not have the words "or Section 4.4(8)(v)" added to them. This reinforces the interpretation that section 4.4(8)(v) is there to clarify that Sunrise's obligation to enforce its Standstill Agreements with third parties is not negated by the fiduciary out clause. An unsolicited proposal by a prior bidder bound by a Standstill Agreement is a proposal that is otherwise in breach of section 4.4, because it violates section 4.4(8)(v), and therefore is not immunized by the fiduciary out provisions.

35      In that sense, contrary to the appellants' submissions, the application judge's reading of the Purchase Agreement does not reduce section 4.4(8)(v) to simply the functional equivalent of section 4.4(1)(ii). Nor is it a case of section 4.4(8)(v) continuing to require the enforcement of a Standstill Agreement even when the fiduciary out clause is otherwise applicable. The fiduciary out clause does not apply where the unsolicited proposal is tendered in breach of the non-solicitation provisions of the Purchase Agreement, i.e., in breach of a Standstill Agreement that Sunrise is obliged to enforce. The fiduciary out formula is an important feature of the non-solicitation format, but it does not allow Sunrise to resile from the terms of its Standstill Agreements with earlier bidders, in my opinion.

### The Difference in Wording between Sections 4.4(1)(ii) and 4.4(8)(v)

36      Mr. Howard emphasized what he argued was a difference in wording between those two provisions. He points out that section 4.4(1)(ii) expressly refers to situations involving "an actual or potential Acquisition Proposal" whereas section 4.4(8)(v) contains no such reference, and further, that other subsections of section 4.4(8) — namely, sections 4.4(8)(ii) and (iii) — refer to Acquisition Proposals as well, although not in the context of standstill agreements (4.4(8)(ii) and 4.4(8)(iii)). Because section 4.4(8)(v) does not refer to "Acquisition Proposals", Mr. Howard submits it does not apply in the context of such a proposal and therefore does not apply in the context of the HCPI Acquisition Proposal.

37      There are several problems with this argument. First, it misapprehends the fact that *any* proposal to acquire more than twenty percent of the assets of Sunrise — whether made before or after the close of the auction — constitutes an "Acquisition Proposal" as defined in the Agreement. Consequently, section 4.4(8)(v) can only apply in the context of an Acquisition Proposal of some sort, regardless of its wording.

38      Secondly, the argument appears to be founded on the unarticulated premise that an Acquisition Proposal, as referenced in sections 4.4(1)(ii), 4.4(2) and 4.4(3), is the equivalent of a Superior Proposal. The appellants' theory of the Agreement is that the Trustees are entitled to consider any Acquisition Proposal received after the close of the auction, and that the commitment in section 4.4(8)(v) to enforce standstill agreements only applies in the event that a subsequent Acquisition Proposal received by the Trustees does not make the grade as a Superior Proposal. The function of section 4.4(8)(v), they say, is to permit the Trustees in such circumstances to prevent a bidder in such a case — whether a prior bidder or not — from continuing to participate in the bidding process.

39      It is not the case, however, that an Acquisition Proposal and a Superior Proposal are the same thing. The latter is a narrower concept than the former. While an Acquisition Proposal is essentially an offer by anyone to acquire more than twenty percent of the assets of Sunrise, a Superior Proposal is an Acquisition Proposal[6] that is more favourable to the unitholders from a financial point of view than the Ventas bid. Sunrise submits, at paragraph 43 of its factum, that section 4.4(8)(v) "is part of the filtering protection for both Ventas and Sunrise REIT that allows and obliges Sunrise REIT to deal summarily with offers that do not meet the Acquisition Proposal threshold." Sunrise does not mean the "Acquisition Proposal

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

threshold" in this statement, however; it means the "Superior Proposal threshold." To support the appellants' argument, the reference to "Acquisition Proposal" in section 4.4(1)(ii) would have to be read as "Superior Proposal". That is not what it says.

40      Moreover, and in any event, a careful reading of section 4.4(1)(ii) does not bear out the nexus between the reference to "Acquisition Proposal" and the commitment to enforce the standstill agreements. For ease of reference I repeat the wording of section 4.4(1)(ii) here:

> 4.4(1) Following the date hereof, Sunrise REIT shall not ...

>> (ii) participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual or potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligation to Sunrise REIT or any of its Subsidiaries.

41      Section 4.4(1)(ii) in reality contains two prohibitions, not one. The language does not work otherwise. Sunrise agrees not to participate in discussions or negotiations regarding actual or potential Acquisition Proposals. It also agrees not to release anyone from, or fail to enforce, existing Standstill Agreements. The drafters could well have divided section 4.4(1) into six general prohibitions rather than five. The commitment to enforce the Standstill Agreements is not, therefore, tied to "Acquisition Proposals" in a way that section 4.4(8)(v) is not.

42      Accordingly, I agree with the application judge's observation that while the appellants' interpretation arguments are creative, they are strained. As she said, "They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole."

*An Interpretation that Reflects the "Factual Matrix", is "Commercially Sensible", and Accords with the Fiduciary Obligations of the Sunrise Trustees*

43      Nor do I accept the submission that the application judge failed to consider the factual matrix underlying the negotiation of the Purchase Agreement, or that she failed to give effect to the "commercial sense" component of contract interpretation.

44      In a blended argument, the appellants submit that the application judge's interpretation of the Purchase Agreement ignores the factual matrix in which the Agreement was negotiated, defies commercial sense and reasonableness, and eviscerates the fiduciary out mechanism that was central to the parties' agreement. Respectfully, I do not read the application judge's reasons in this fashion.

*The Factual Matrix*

45      Contracts are not made in a vacuum, and there is no dispute that the surrounding circumstances in which a contract is negotiated are relevant considerations in interpreting contracts. As this court noted in *Kentucky Fried Chicken*, *supra*, at para. 25, "[w]hile the task of interpretation must begin with the words of the document and their ordinary meaning, the general

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

context that gave birth to the document or its 'factual matrix' will also provide the court with useful assistance."

46    Sunrise points to a number of surrounding circumstances which it says the application judge ignored in arriving at her decision. These include that:

> a) the Purchase Agreement was entered into at the conclusion of the second stage of a private sale auction process where it was clear that the overall objective of Sunrise was to maximize value for it unitholders;

> b) the expectations of the bidders, objectively determined, could not have been that the "winner" of the auction was assured of acquiring the Sunrise assets, because everyone was aware that there would be a fiduciary out clause and that superior proposals could displace the winning bid;

> c) Ventas's own standstill terms ceased to apply in the event that Sunrise entered into a sales transaction with a third party, and Ventas could not know whether the other Standstill Agreements rested on the same footing (and did not know that HCPI's did not);

> d) Ventas never told Sunrise it believed the participants in the auction would be excluded from the operation of the fiduciary out provision; and

> e) Ventas had bargained for, and achieved, considerable deal protection, in the form of the "no shop" provision, the right to match any Superior Proposal, and the right to receive a $39.8 million break fee if it chose not to match such an offer.

47    Matters involving the factual matrix underlying a contract are matters of fact, or at least matters of mixed fact and law. A judge is owed considerable deference in her assessment of such matters. Here, the experienced Commercial List judge was exercising a function common to that role — the interpretation of a commercial contract — and, while she may not have dealt with the foregoing themes expressly as the appellants would like, her reasons, read as a whole, indicate that she was alive to most, if not all, of them. She was certainly aware of the facts contained in points (a), (b), (c) and (e) above, as she dealt with them at one time or another in the reasons. The factor mentioned in (d) is not dispositive of anything.

48    At the conclusion of her consideration of the interpretation issue, as noted earlier, the application judge said (at paras. 38 and 39):

> 38 It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

> 39 Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal. It simply precludes a proposal from anyone else who is in breach of its standstill agreement. [Emphasis added, footnote omitted.]

49    I can find no basis for concluding the applications judge was not attuned to the need to keep the factual matrix in mind when conducting her interpretative exercise.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

50    Nor do I accept that she either ignored the need to interpret the contract in a way that reflected sound commercial sense, or that she failed to give it such an interpretation. It is apparent from her recitation of the principles of contract interpretation that she was aware of the relevance of the "sound commercial sense" theme. She cited the following passage from this Court's decision in *Kentucky Fried Chicken*, *supra*, at para. 27:

> Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity: [*City of Toronto v. W.H. Hotel Ltd.* (1966), 56 D.L.R. (2d) 539 at 548 (S.C.C.)]. Rather, the document should be construed in accordance with sound commercial principles and good business sense: [*Scanlon v. Castlepoint Development Corporation et al.* (1992), 11 O.R. (3d) 744 at 770 (Ont.C.A.)]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

51    The appellants' argument that the application judge failed to interpret the Purchase Agreement in a fashion that accords with sound commercial sense is grounded in the belief that she overlooked the importance of the "maximizing value" principle and the centrality of the Trustees' fiduciary obligations in that regard, in cases of this nature. She did neither, in my view.

52    As noted above, the application judge was sensitive to the fiduciary out provisions that permitted other *bona fide* written unsolicited Acquisition Proposals. In her view, however, this was balanced, objectively and reasonably, by the requirement that Sunrise ensure enforcement of Standstill Agreements that had been signed as part of the auction process in order to protect the successful bidder. This interpretation makes commercial sense, in my view.

53    On behalf of HCPI, Mr. Leon placed great emphasis on the sanctity of the fiduciary out mechanism in acquisition agreements of this nature. There is no doubt that the directors of a corporation that is the target of a takeover bid — or, in this case, the Trustees — have a fiduciary obligation to take steps to maximize shareholder (or unitholder) value in the process: see *CW Shareholdings Inc. v. WIC Western International Communications Ltd.* (1998), 39 O.R. (3d) 755 (Ont. Gen. Div. [Commercial List]), at 768 and 774. That is the genesis of the "fiduciary out" clauses in situations such as the case at hand. They enable directors or trustees to comply with their fiduciary obligations by ensuring that they are not precluded from considering other *bona fide* offers that are more favourable financially to the shareholders or unitholders than the bid in hand.

54    It is not necessary — nor would it be wise, in my view — to go as far as HCPI suggests this court might go, and adopt the principle gleaned from some American authorities, that the target vendor can place no limits on the directors' right to consider superior offers and that any provision to the contrary is invalid and unenforceable: see *Paramount Communcations Inc. v. QVC Network Inc.*, 637 A.2d 34 (U.S. Del. Super. 1994), and *ACE Ltd. v. Capital Re Corp.*, 747 A.2d 95 (U.S. Del. Ch. 1999) at 105. That is not what happened in this case.

55    The Trustees did not contract away their fiduciary obligations. Rather, they complied with them by setting up an auction process, in consultation with their professional advisers, that was designed to maximize the unit price obtained for Sunrise's assets, in a fashion resembling a "shotgun" clause, by requiring bidders to come up with their best price in the second round, subject to a fiduciary out clause that allowed them to consider superior offers from anyone save only those who had bound themselves by a Standstill Agreement in the auction process not to make such a bid. In this case, that turned out to be only HCPI.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

56    An auction process is well-accepted as being one — although only one — "appropriate mechanism to ensure that the board of a target company acts in a neutral manner to achieve the best value reasonably available to shareholders in the circumstances": *Pente Investment Management Ltd. v. Schneider Corp.* (1998), 42 O.R. (3d) 177 (Ont. C.A.) at 200. Here, the trustees, acting reasonably and on professional advice, formed the view that an auction process was the best way to maximize value, and conducted such an auction to the point where they attracted a successful bidder. This is not a case where the Trustees were unable to judge the adequacy of the bid (*Schneider*, at 200). They had dealt with seven prospective purchasers in the course of the two auction rounds, and had received preliminary proposals. Ventas's $15.00-per-unit price represented a 35.8% increase over the market price of the Units on the date the auction closed. I do not think the Trustees can be said to have failed in the exercise of their fiduciary obligations to their unitholders in these circumstances simply by agreeing in the Purchase Agreement to preclude earlier bidders, who had bound themselves under Standstill Agreements not to do so, from coming in after the auction was concluded and the "successful" bidder had showed its cards and attempting to "top up" that bid.

57    It is well accepted that "where an agreement admits of two possible constructions, one of which renders the agreement lawful and the other of which renders it unlawful, courts will give preference to the former interpretation": John D. McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2005) at 729. Advancing this principle, the appellants argue that we should be loathe to adopt an interpretation of the Purchase Agreement that is inconsistent with overarching fiduciary obligations. While I accept the principle put forward, however, I do not think it applies in the context of this case for the reasons outlined above. The interpretation given to the Purchase Agreement by the application judge is not inconsistent with the Trustee's fiduciary obligation to maximize unitholder value. Indeed, it is consistent with that obligation.

58    Finally, Mr. Leon emphasizes the importance of the word "nothing" in the opening language of sections 4.4(2) and 4.4(3) of the Purchase Agreement. Both provisions open with the words "Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, *nothing* shall prevent the Board from ..." [emphasis added]. Mr. Leon submits that "nothing" means what it says, and must be given the full scope of that meaning, in order to ensure that "nothing" in the Purchase Agreement or otherwise is permitted to stand in the way of the Trustees performing their duty to maximize shareholder value. This point involves parsing the Purchase Agreement in a microscopic fashion that is a little too fine, in my view. The use of the word "nothing" in sections 4.4(2) and 4.4(3) is nothing more than a different way of saying "Notwithstanding anything contained in Section 4.4(1) ... *the Board is not prevented from* ...". I would not ascribe to it the expanded role that HCPI proposes.

### *The Meaning of "Bona Fide"*

59    The appellants also attack the conclusion of the application judge that the HCPI Acquisition Proposal was not a "*bona fide*" offer. She accepted the Ventas submission that "a proposal made in breach of a contractual obligation not to make such a proposal cannot be considered to be *bona fide*," noting that sections 4.4(2) and 4.4(3) of the Purchase Agreement contemplate an Acquisition Proposal from a third party "that did not result from a breach of ... Section 4.4".

60    There was much debate about the meaning of "*bona fide*". The application judge viewed it as meaning acting "in good faith; sincere, genuine", relying upon *The Oxford English Dictionary*.[7] She found that the HCPI Acquisition Proposal was not *bona fide* because it was made in breach of the HCPI Standstill Agreement, which Sunrise was obliged by s. 4.4 to enforce. The appellants agree that *bona fide* means "genuine" or "made in good faith" but submit that a *bona fide* Acquisition Proposal, as contemplated by the Purchase Agreement, is one that is "genuine" or "authentic" in the sense that it is not a sham and is reasonably capable of becoming a Superior Proposal, and that this decision must be made in the context of the

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

entire situation.

61    In the end, there is not much difference between the parties as to the meaning of the term "*bona fide*". As with the principles of contract interpretation, they differ on the application of the term in the circumstances of this case. Given the language of the Purchase Agreement, and the context in which it was negotiated — particularly the language "that did not result from a breach of this Section 4.4" in sections 4.4(2) and 4.4(3) — I do not think the application judge erred in her assessment and use of the term "*bona fide*" here.

## Miscellaneous

62    Two additional points were made by the appellants, but need not be dealt with at length.

63    First, HCPI argued that Sunrise had given its prior consent to HCPI to make its subsequent Acquisition Proposal following completion of the auction process and the execution of the Purchase Agreement. This consent is said to derive from the waiver Sunrise gave to both HCPI and Ventas as part of the invitation to bid in the second round. The application judge made a specific finding against this position, however, concluding that the December 29, 2006 letter "cannot possibly be construed as constituting Sunrise REIT's prior written consent as that term is used in the Standstill Agreement." There is no basis for interfering with this finding.

64    Secondly, HCPI submitted that the position of Ventas on these applications was tantamount to saying that the benefit of the HCPI Standstill Agreement had been assigned to it. The application judge correctly found that there was no merit in this argument. I agree with her that neither the Standstill Agreement nor its benefits had been assigned to anyone, and no one was taking the position that they had.

## The HCPI Cross-Appeal

65    HCPI applied for a declaration that communications between it and SSL regarding Sunrise were permitted. The application judge declined to deal with this request, given her ruling which effectively precluded the HCPI Acquisition Proposal from being pursued. She concluded the application was moot.

66    I agree and for the same reason find it unnecessary to deal with the cross-appeal for the same relief.

## Conclusion

67    For the foregoing reasons, then, I would dismiss both the appeal and the cross-appeal.

68    If the parties are unable to agree as to costs, they may make brief written submissions in that regard, not to exceed five pages in length.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

69      In closing, I would like to thank all counsel for their able presentations and assistance.


**J. MacFarland J.A.:**


I agree.


**H.S. LaForme J.A.:**


I agree.


*Appeal dismissed; cross-appeal dismissed.*

Footnotes

1       *BG Checo International Ltd. v. British Columbia Hydro & Power Authority,* [1993] 1 S.C.R. 12 (S.C.C.) at 23-24; *Scanlon v. Castlepoint Development Corp.* (1992), 11 O.R. (3d) 744 (Ont. C.A.) at 770.

2       *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]) at para. 403, aff'd (1999), 45 O.R. (3d) 417 (Ont. C.A.); *Venture Capital USA Inc. v. Yorkton Securities Inc.* (2005), 75 O.R. (3d) 325 (Ont. C.A.) at para. 26; *Eli Lilly & Co. v. Novopharm Ltd.,* [1998] 2 S.C.R. 129 (S.C.C.) at 166-68 [*Eli Lilly*].

3       *Eli Lilly, ibid.* at 166; *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 (Ont. C.A.) at paras. 25-27 [*Kentucky Fried Chicken*].

4       *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at 901; *Kentucky Fried Chicken, ibid.*

5       The Proposal has to be a Superior Proposal; Sunrise has to notify Ventas of the Proposal and provide it with all relevant documentation; Ventas had the right to match the Proposal within five days (as defined) and, if it chooses not to, to terminate the Agreement and receive the break fee (see also, section 5.3 and Schedule "B" (definition of "Termination Payment")).

6       That meets the section 4.4(2) requirements of being *bona fide* and unsolicited.

7       2d ed., *s.v.* "bona fide".

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

---

# TAB 103

122 S.Ct. 1036, 152 L.Ed.2d 79, 89 A.F.T.R.2d 2002-1258, 70 USLW 4178...

122 S.Ct. 1036
Supreme Court of the United States

Cornelius P. YOUNG, et ux., Petitioners,

v.

UNITED STATES.

No. 00–1567.   |   Argued Jan. 9,
2002.   |   Decided March 4, 2002.

Internal Revenue Service (IRS) sought unpaid balance of
debtors' taxes. The bankruptcy court, Mark W. Vaughn,
Chief Judge, determined that tax debt was not dischargeable,
and debtors appealed. The United States District Court for
the District of New Hampshire, Steven J. McAuliffe, J.,
affirmed, and debtors appealed. The Court of Appeals, 233
F.3d 56, Boudin, Circuit Judge, affirmed. Certiorari was
granted. The Supreme Court, Justice Scalia, held that three-
year lookback period allowing IRS to collect taxes against a
debtor was tolled during pendency of debtors' earlier Chapter
13 proceeding.

Affirmed.

West Headnotes (3)

[1]   **Bankruptcy**
        👉 Limitations and Time to Sue;  Computation

Three-year lookback period allowing Internal
Revenue Service (IRS) to collect taxes against
a debtor was tolled during pendency of debtors'
earlier Chapter 13 proceeding, while automatic
stay prevented IRS from taking collection action;
three-year lookback period was a limitations
period subject to traditional principles of
equitable tolling. Bankr.Code, 11 U.S.C.A. §§
362(a), 507(a)(8)(A)(i).

145 Cases that cite this headnote

[2]   **Limitation of Actions**
        👉 Suspension or Stay in General;  Equitable
        Tolling

Limitations periods are customarily subject
to equitable tolling, unless tolling would be
inconsistent with the text of the relevant statute.

150 Cases that cite this headnote

[3]   **Bankruptcy**
        👉 Equitable Powers and Principles

      **Bankruptcy**
        👉 Limitations and Time to Sue;  Computation

      **Limitation of Actions**
        👉 Suspension or Stay in General;  Equitable
        Tolling

Congress must be presumed to draft limitations
periods in light of the background principle of
equitable tolling, especially when it is enacting
limitations periods to be applied by bankruptcy
courts, which are courts of equity and apply the
principles and rules of equity jurisprudence.

125 Cases that cite this headnote

**1037   *43   *Syllabus* [*]

If the Internal Revenue Service (IRS) has a claim for certain
taxes for which the return was due within three years before
the individual taxpayer files a bankruptcy petition, its claim
enjoys eighth priority under 11 U.S.C. § 507(a)(8)(A)(i), and
is nondischargeable in bankruptcy under § 523(a)(1)(A). The
IRS assessed a tax liability against petitioners for their failure
to include payment with their 1992 income tax return filed
on October 15, 1993. On May 1, 1996, petitioners filed a
Chapter 13 bankruptcy petition, which they moved to dismiss
before a reorganization plan was approved. On March 12,
1997, the day before the Bankruptcy Court dismissed the
Chapter 13 petition, petitioners filed a Chapter 7 petition. A
discharge was granted, and the case was closed. When the IRS
subsequently demanded that they pay the tax debt, petitioners
asked the Bankruptcy Court to reopen the Chapter 7 case and
declare the debt discharged under § 523(a)(1)(A), claiming
that it fell outside § 507(a)(8)(A)(i)'s "three-year lookback
period" because it pertained to a tax return due more than
three years before their Chapter 7 filing. The court reopened
the case, but sided with the IRS. Petitioners' tax return was
due more than three years before their Chapter 7 filing but
less than three years before their Chapter 13 filing. Holding
that the "lookback period" is tolled during the pendency of a
prior bankruptcy petition, the court concluded that the 1992
debt had not been discharged when petitioners were granted

Young v. U.S., 535 U.S. 43 (2002)

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 87 of 204

122 S.Ct. 1036, 152 L.Ed.2d 79, 89 A.F.T.R.2d 2002-1258, 70 USLW 4178...

a discharge under Chapter 7. The District Court and the First Circuit agreed.

*Held:* Section 507(a)(8)(A)(i)'s lookback period is tolled during the pendency of a prior bankruptcy petition. Pp. 1038–1043.

(a) The lookback period is a limitations period subject to traditional equitable tolling principles. It prescribes a period in which certain rights may be enforced, encouraging the IRS to protect its rights before three years have elapsed. Thus, it serves the same basic policies furthered by all limitations periods: "repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Rotella v. Wood,* 528 U.S. 549, 555, 120 S.Ct. 1075, 145 L.Ed.2d 1047. The fact that the lookback commences on a date that may precede the date when the IRS discovers its claim does not make it a substantive component of the Bankruptcy Code as petitioners claim. Pp. 1038–1040.

**\*44** b) Congress is presumed to draft limitations periods in light of the principle that such periods are customarily subject to equitable tolling unless tolling would be inconsistent with statutory text. Tolling is appropriate here. Petitioners' Chapter 13 petition erected an automatic stay under § 362(a), which prevented the IRS from taking steps to collect the unpaid taxes. When petitioners later filed their Chapter 7 petition, the three-year lookback period therefore excluded time during which their Chapter 13 petition was pending. Because their 1992 tax return was due within that three-year period, the lower courts properly held that the tax debt was not discharged. Tolling is appropriate regardless of whether petitioners filed their Chapter 13 petition in good faith or solely to run down the lookback period. In either case, the IRS was disabled from protecting its claim. Pp. 1040–1041.

(c) The statutory provisions invoked by petitioners—§§ 523(b), 108(c), and **\*1038** 507(a)(8)(A)(ii)—do not display an intent to preclude tolling here. Pp. 1041–1043.

233 F.3d 56, affirmed.

SCALIA, J., delivered the opinion for a unanimous Court.

**Attorneys and Law Firms**

Grenville Clark, III, Manchester, NH, for petitioners.

Patricia A. Millett, Washington, DC, for respondent.

**Opinion**

Justice SCALIA delivered the opinion of the Court.

A discharge under the Bankruptcy Code does not extinguish certain tax liabilities for which a return was due within three years before the filing of an individual debtor's petition. 11 U.S.C. §§ 523(a)(1)(A), 507(a)(8)(A)(i). We must decide whether this "three-year lookback period" is tolled during the pendency of a prior bankruptcy petition.

# I

Petitioners Cornelius and Suzanne Young failed to include payment with their 1992 income tax return, due and filed on **\*45** October 15, 1993 (petitioners had obtained an extension of the April 15 deadline). About $15,000 was owing. The Internal Service (IRS) assessed the tax liability on January 3, 1994, and petitioners made modest monthly payments ($40 to $300) from April 1994 until November 1995. On May 1, 1996, they sought protection under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Hampshire. The bulk of their tax liability (about $13,000, including accrued interest) remained due. Before a reorganization plan was confirmed, however, the Youngs moved on October 23, 1996, to dismiss their Chapter 13 petition, pursuant to 11 U.S.C. § 1307(b). On March 12, 1997, one day before the Bankruptcy Court dismissed their Chapter 13 petition, the Youngs filed a new petition, this time under Chapter 7. This was a "no asset" petition, meaning that the Youngs had no assets available to satisfy unsecured creditors, including the IRS. A discharge was granted June 17, 1997; the case was closed September 22, 1997.

The IRS subsequently demanded payment of the 1992 tax debt. The Youngs refused and petitioned the Bankruptcy Court to reopen their Chapter 7 case and declare the debt discharged. In their view, the debt fell outside the Bankruptcy Code's "three-year lookback period," §§ 523(a)(1)(A), 507(a)(8)(A)(i), and had therefore been discharged, because it pertained to a tax return due on October 15, 1993, more than three years before their Chapter 7 filing on March 12, 1997. The Bankruptcy Court reopened the case but sided with the IRS. Although the Youngs' 1992 income tax return was due more than three years before they filed their Chapter 7 petition, it was due less than three years before they filed their Chapter 13 petition on May 1, 1996. Holding that the

"three-year lookback period" is tolled during the pendency of a prior bankruptcy petition, the Bankruptcy Court concluded that the 1992 tax debt had not been discharged. The District Court for the District of New Hampshire and Court **\*46** of Appeals for the First Circuit agreed. 233 F.3d 56 (2000). We granted certiorari. 533 U.S. 976, 122 S.Ct. 22, 150 L.Ed.2d 804 (2001).

## II

Section 523(a) of the Bankruptcy Code excepts certain individual debts from discharge, including any tax "of the kind and for the periods specified in section ... 507(a)(8) of this title, whether or not a claim for such tax was filed or allowed." § 523(a)(1)(A). Section 507(a), in turn, describes the priority of certain claims in the distribution of the debtor's assets. Sub **\*\*1039** section 507(a)(8)(A)(i) gives eighth priority to "allowed unsecured claims of governmental units, only to the extent that such claims are for—... a tax on or measured by income or gross receipts—... *for a taxable year ending on or before the date of the filing of the petition for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition ... .*" (Emphasis added.) This is commonly known as the "three-year lookback period." If the IRS has a claim for taxes for which the return was due within three years before the bankruptcy petition was filed, the claim enjoys eighth priority under § 507(a)(8)(A)(i) and is nondischargeable in bankruptcy under § 523(a)(1)(A).

[1] The terms of the lookback period appear to create a loophole: Since the Code does not prohibit back-to-back Chapter 13 and Chapter 7 filings (as long as the debtor did not receive a discharge under Chapter 13, see §§ 727(a)(8), (9)), a debtor can render a tax debt dischargeable by first filing a Chapter 13 petition, then voluntarily dismissing the petition when the lookback period for the debt has lapsed, and finally refiling under Chapter 7. During the pendency of the Chapter 13 petition, the automatic stay of § 362(a) will prevent the IRS from taking steps to collect the unpaid taxes, and if the Chapter 7 petition is filed after the lookback period has expired, the taxes remaining due will be dischargeable. Petitioners **\*47** took advantage of this loophole, which, they believe, is permitted by the Bankruptcy Code.

We disagree. The three-year lookback period is a limitations period subject to traditional principles of equitable tolling. Since nothing in the Bankruptcy Code precludes equitable

tolling of the lookback period, we believe the courts below properly excluded from the three-year limitation the period during which the Youngs' Chapter 13 petition was pending.

## A

The lookback period is a limitations period because it prescribes a period within which certain rights (namely, priority and nondischargeability in bankruptcy) may be enforced. 1 H. Wood, Limitations of Actions § 1, p. 1 (4th D. Moore ed.1916). Old tax claims—those pertaining to returns due more than three years before the debtor filed the bankruptcy petition—become dischargeable, so that a bankruptcy decree will relieve the debtor of the obligation to pay. The period thus encourages the IRS to protect its rights—by, say, collecting the debt, 26 U.S.C. §§ 6501, 6502 (1994 ed. and Supp. V), or perfecting a tax lien, §§ 6322, 6323(a), (f) (1994 ed.)—before three years have elapsed. If the IRS sleeps on its rights, its claim loses priority and the debt becomes dischargeable. Thus, as petitioners concede, the lookback period serves the same "basic policies [furthered by] all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Rotella v. Wood,* 528 U.S. 549, 555, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). It is true that, unlike most statutes of limitations, the lookback period bars only *some,* and not *all,* legal remedies [1] for enforcing the claim (viz., priority and **\*48** nondischargeability in bankruptcy); that makes it a more limited statute of limitations, but a statute of limitations nonetheless.

Petitioners argue that the lookback period is a substantive component of the Bankruptcy Code, not a procedural limitations **\*\*1040** period. The lookback period commences on the date the return for the tax debt "is last due," § 507(a)(8)(A)(i), not on the date the IRS discovers or assesses the unpaid tax. Thus, the IRS may have less than three years to protect itself against the risk that a debt will become dischargeable in bankruptcy.

To illustrate, petitioners offer the following variation on this case: Suppose the Youngs filed their 1992 tax return on October 15, 1993, but had not received (as they received here) an extension of the April 15, 1993, due date. Assume the remaining facts of the case are unchanged: The IRS assessed the tax on January 3, 1994; petitioners filed a Chapter 13 petition on May 1, 1996; that petition was voluntarily

Young v. U.S., 535 U.S. 43 (2002)

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 89 of 204

122 S.Ct. 1036, 152 L.Ed.2d 79, 89 A.F.T.R.2d 2002-1258, 70 USLW 4178...

dismissed and the Youngs filed a new petition under Chapter 7 on March 12, 1997. In this hypothetical, petitioners argue, their tax debt would have been dischargeable in the *first* petition under Chapter 13. Over three years would have elapsed between the due date of their return (April 15, 1993) and their Chapter 13 petition (May 1, 1996). But the IRS —which may not have discovered the debt until petitioners filed a return on October 15, 1993—would have enjoyed less than three years to collect the debt or prevent the debt from becoming dischargeable in bankruptcy (by perfecting a tax lien). The Code even contemplates this possibility, petitioners believe. Section 523(a)(1)(B)(ii) renders a tax debt nondischargeable if it arises from an untimely return filed within *two years* before a bankruptcy petition. Thus, if petitioners had filed their return on April 30, 1994 (more than two years before their Chapter 13 petition), and if the IRS had been **\*49** unaware of the debt until the return was filed, the IRS would have had only *two years* to act before the debt became dischargeable in bankruptcy. For these reasons, petitioners believe the lookback period is not a limitations period, but rather a *definition* of dischargeable taxes.

We disagree. In the sense in which petitioners use the term, *all* limitations periods are "substantive": They *define* a subset of claims eligible for certain remedies. And the lookback is not distinctively "substantive" merely because it commences on a date that may precede the date when the IRS discovers its claim. There is nothing unusual about a statute of limitations that commences when the claimant has a complete and present cause of action, whether or not he is aware of it. See 1 C. Corman, Limitation of Actions § 6.1, pp. 370, 378 (1991); 2 Wood, *supra,* § 276c(1), at 1411. As for petitioners' reliance on § 523(a)(1)(B)(ii), that section proves, at most, that Congress put different limitations periods on different kinds of tax debts. All tax debts falling within the terms of the three-year lookback period are nondischargeable in bankruptcy. §§ 523(a)(1)(A), 507(a)(8)(A)(i). Even if a tax debt falls outside the terms of the lookback period, it is nonetheless nondischargeable if it pertains to an untimely return filed within two years before the bankruptcy petition. § 523(a)(1)(B)(ii). These provisions are complementary; they do not suggest that the lookback period is something other than a limitations period.

**B**

[2]    [3]    It is hornbook law that limitations periods are "customarily subject to 'equitable tolling,' " *Irwin v.*

*Department of Veterans Affairs,* 498 U.S. 89, 95, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), unless tolling would be "inconsistent with the text of the relevant statute," *United States v. Beggerly,* 524 U.S. 38, 48, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998). See also *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 558–559, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946); *Bailey v. Glover,* 21 Wall. 342, 349–350, 22 L.Ed. 636 (1875). Congress must be presumed to draft limitations periods in light of this background **\*50** principle. Cf. *National Private Truck Council, Inc. v. Oklahoma Tax Comm'n,* 515 U.S. 582, 589–590, 115 S.Ct. 2351, 132 L.Ed.2d 509 (1995); **\*\*1041** *United States v. Shabani,* 513 U.S. 10, 13, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994). That is doubly true when it is enacting limitations periods to be applied by bankruptcy courts, which are courts of equity and "appl[y] the principles and rules of equity jurisprudence." *Pepper v. Litton,* 308 U.S. 295, 304, 60 S.Ct. 238, 84 L.Ed. 281 (1939); see also *United States v. Energy Resources Co.,* 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990).

This Court has permitted equitable tolling in situations "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin, supra,* at 96, 111 S.Ct. 453 (footnotes omitted). We have acknowledged, however, that tolling might be appropriate in other cases, see, *e.g., Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 151, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) *(per curiam),* and this, we believe, is one. Cf. *Amy v. Watertown (No. 2),* 130 U.S. 320, 325–326, 9 S.Ct. 537, 32 L.Ed. 953 (1889); 3 J. Story, Equity Jurisprudence § 1974, pp. 558–559 (14th W. Lyon ed.1918). The Youngs' Chapter 13 petition erected an automatic stay under § 362, which prevented the IRS from taking steps to protect its claim. When the Youngs filed a petition under Chapter 7, the three-year lookback period therefore excluded time during which their Chapter 13 petition was pending. The Youngs' 1992 tax return was due within that three-year period. Hence the lower courts properly held that the tax debt was not discharged when the Youngs were granted a discharge under Chapter 7.

Tolling is in our view appropriate regardless of petitioners' intentions when filing back-to-back Chapter 13 and Chapter 7 petitions—whether the Chapter 13 petition was filed in good faith or solely to run down the lookback period. In either

Young v. U.S., 535 U.S. 43 (2002)
Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 90 of 204

122 S.Ct. 1036, 152 L.Ed.2d 79, 89 A.F.T.R.2d 2002-1258, 70 USLW 4178...

case, the IRS was disabled from protecting its claim during the pendency of the Chapter 13 petition, and this period **\*51** of disability tolled the three-year lookback period when the Youngs filed their Chapter 7 petition.

## C

Petitioners invoke several statutory provisions which they claim display an intent to preclude tolling here. First they point to § 523(b), which, they believe, explicitly permits discharge in a Chapter 7 proceeding of certain debts that were nondischargeable (as this tax debt was) in a prior Chapter 13 proceeding. Petitioners misread the provision. Section 523(b) declares that

> "a debt that was *excepted from discharge* under subsection (a)(1), (a)(3), or (a)(8) of this section ... in a prior case concerning the debtor ... is dischargeable in a case under this title unless, by the terms of subsection (a) of this section, such debt is not dischargeable in the case under this title." (Emphasis added.)

The phrase "excepted from discharge" in this provision is not synonymous (as petitioners would have it) with "nondischargeable." It envisions a prior bankruptcy proceeding that progressed *to the discharge stage,* from which discharge a particular debt was actually "excepted." It thus has no application to the present case; and even if it did, the very same arguments in favor of tolling that we have found persuasive with regard to § 507 would apply to § 523 as well. One might perhaps have expected an explicit tolling provision in § 523(b) if that subsection applied *only* to those debts "excepted from discharge" in the earlier proceeding that were subject to the three-year lookback—but in fact it also applies to excepted debts (see § 523(a)(3)) that were subject to no limitations period. And even the need for tolling as to debts that *were* subject to the three-year lookback is minimal, since a separate provision of the Code, § 727(a)(9), constrains successive discharges under Chapters 13 and 7: Generally speaking, **\*\*1042** six years must elapse between filing of the **\*52** two bankruptcy petitions, which would make the need for tolling of the three-year limitation nonexistent. The absence of an explicit tolling provision in § 523 therefore suggests nothing.

Petitioners point to two provisions of the Code, which, in their view, do contain a tolling provision. Its presence there, and its absence in § 507, they argue, displays an intent

to preclude equitable tolling of the lookback period. We disagree. Petitioners point first to § 108(c), which reads:

> "Except as provided in section 524 of this title, if applicable nonbankruptcy law ... fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor ..., and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of—(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (2) 30 days after notice of the termination or expiration of the stay ... with respect to such claim."

Petitioners believe § 108(c)(1) contains a tolling provision. The lower courts have split over this issue, compare, *e.g., Rogers v. Corrosion Products, Inc.,* 42 F.3d 292, 297 (C.A.5), cert. denied, 515 U.S. 1160, 115 S.Ct. 2614, 132 L.Ed.2d 857 (1995), with *Garbe Iron Works, Inc. v. Priester,* 99 Ill.2d 84, 75 Ill.Dec. 428, 457 N.E.2d 422 (1983); we need not resolve it here. Even assuming petitioners are correct, we would draw no negative inference from the presence of an express tolling provision in § 108(c)(1) and the absence of one in § 507. It would be quite reasonable for Congress to instruct *nonbankruptcy* courts (including state courts) to toll *nonbankruptcy* limitations periods (including state-law limitations periods) while, at the same time, assuming that bankruptcy courts will use their inherent equitable powers to toll the federal limitations periods within the Code.

**\*53** Finally, petitioners point to a tolling provision in § 507(a)(8)(A), the same subsection that sets forth the three-year lookback period. Subsection 507(a)(8)(A) grants eighth priority to tax claims pertaining to returns that were *due* within the three-year lookback period, § 507(a)(8)(A)(i), and to claims that were *assessed* within 240 days before the debtor's bankruptcy petition, § 507(a)(8)(A)(ii). Whereas the three-year lookback period contains no express tolling provision, the 240–day lookback period is tolled "any time plus 30 days during which an offer in compromise with respect to such tax that was made within 240 days after such assessment was pending." § 507(a)(8)(A)(ii). Petitioners believe this express tolling provision, appearing in the same

Young v. U.S., 535 U.S. 43 (2002)

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 91 of 204

122 S.Ct. 1036, 152 L.Ed.2d 79, 89 A.F.T.R.2d 2002-1258, 70 USLW 4178...

subsection as the three-year lookback period, demonstrates a statutory intent *not* to toll the three-year lookback period.

If anything, § 507(a)(8)(A)(ii) demonstrates that the Bankruptcy Code *incorporates* traditional equitable principles. An "offer in compromise" is a settlement offer submitted by a debtor. When § 507(a)(8)(A)(ii) was enacted, it was IRS practice—though no statutory provision required it—to stay collection efforts (if the Government's interests would not be jeopardized) during the pendency of an "offer in compromise," 26 CFR § 301.7122–1(d)(2) (1978); M. Saltzman, IRS Practice and Procedure ¶ 15.07[1], p. 15–47 (1981). [2] Thus, a court would not have equitably tolled the 240–day lookback period during the pendency of an "offer in compromise," since tolling is inappropriate when a claimant has voluntarily chosen not to protect his rights within the limitations period. See, *e.g., Irwin,* 498 U.S., at 96, 111 S.Ct. 453. Hence the tolling provision in § 507(a)(8)(A)(ii) *supplements* rather **1043** than displaces principles of equitable tolling.

*54 * * *

We conclude that the lookback period of 11 U.S.C. § 507(a)(8)(A)(i) is tolled during the pendency of a prior bankruptcy petition. The judgment of the Court of Appeals for the First Circuit is affirmed.

*It is so ordered.*

### Parallel Citations

122 S.Ct. 1036, 152 L.Ed.2d 79, 89 A.F.T.R.2d 2002-1258, 70 USLW 4178, 2002-1 USTC P 50,257, 47 Collier Bankr.Cas.2d 211, 39 Bankr.Ct.Dec. 45, Bankr. L. Rep. P 78,601, 2002-1 C.B. 954, 02 Cal. Daily Op. Serv. 2013, 2002 Daily Journal D.A.R. 2455, 15 Fla. L. Weekly Fed. S 142

Footnotes

*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1    Equitable remedies may still be available. Traditionally, for example, a mortgagee could sue in equity to foreclose mortgaged property even though the underlying debt was time barred. *Hardin v. Boyd,* 113 U.S. 756, 765–766, 5 S.Ct. 771, 28 L.Ed. 1141 (1885); 2 G. Glenn, Mortgages §§ 141–142, pp. 812–818 (1943); see also *Beach v.Ocwen Fed. Bank,* 523 U.S. 410, 415–416, 118 S.Ct. 1408, 140 L.Ed.2d 566 (1998) (recoupment is available after a limitations period has lapsed); *United States v. Dalm,* 494 U.S. 596, 611, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990) (same).

2    The Code was amended in 1998 to prohibit collection efforts during the pendency of an offer in compromise. See 26 U.S.C. § 6331(k) (1994 ed., Supp. V).

---

**End of Document**             © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 104

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 93 of 204

§ 1:12 Waiving objections—Inviting error, opening the door, 1 Federal Evidence § 1:12...

1 Federal Evidence § 1:12 (4th ed.)

Federal Evidence
Database updated May 2014
Christopher B. Mueller [a0] , Laird C. Kirkpatrick [a1]
Chapter 1. General Provisions: Rules 101 to 106
Rule 103. Rulings on Evidence

§ 1:12 Waiving objections—Inviting error, opening the door

Affirmative trial strategies, like introducing or relying on evidence, raising points in argument, or eliciting answers by questioning witnesses, bear importantly on evidence issues. In effect, a litigant is limited in the objections he can make (and challenges he can bring against a final judgment) by these and similar affirmative strategies he pursues at trial. This result is hardly surprising in an adversary system stressing party responsibility for presenting evidence. Thus he may lose the right to exclude evidence by introducing, eliciting, using, or relying on it. Since affirmative strategies bear on what evidence another party can introduce, and on the questions she may ask and arguments she may advance, a litigant may lose the right to object to strategies pursued by other parties by way of countermoves.

In net effect, these consequences of affirmative strategies come from notions of waiver and are similar to what happens when parties fail to object or make offers of proof, so the subject at hand connects with the concerns underlying Rule 103, which is often cited as Fed. R. Evid. 103. Those concerns include giving the parties adequate opportunities to try their cases, but not endless ones, and making the parties responsible for the strategies they pursue at trial. In describing the consequences of affirmative strategies, courts speak of "invited error" and "opening the door."

*Invited error.* Typically the term "invited error" describes what happens when a party puts a question to a witness and gets a fair and responsive answer: If the answer injects something the questioner might otherwise exclude, such as reporting out-of-court statements or mentioning unrelated criminal acts, the questioner is usually saddled with the response. Usually the situation suggests accident or miscalculation. The questioner was expecting or looking for some other kind of response, but he is stuck with the answer because he "invited" it by the question he asked, and the answer is allowed to stand.

In this situation, the trial court *might* strike the answer if it seems that the questioner was trying to get at something else. But a questioner is only entitled to strike nonresponsive answers, and not to strike answers that are responsive, even if unexpected. [1]

If the answer truly *is* nonresponsive, the questioner might get not only an instruction to disregard, but even a mistrial or an argument on appeal that the instruction did not suffice, so the case must be retried, but of course these more extreme outcomes happen rarely.

*Opening the door.* The phrase "opening the door" describes what happens when one party introduces evidence and another introduces counterproof to refute or contradict the initial evidence. Usually the first party's strategy is deliberate rather than accidental, but it provokes a response that might not have been expected or that proves more threatening or successful than anticipated. If the first party objects to the counterproof, or loses the case and claims error in admitting it, typically the objection or claim of error is rejected because he "opened the door."

In these door-opening cases, usually the counterproof would be excludable if it were not for the opening gambit. Often the counterproof violates a doctrine relating to character evidence by showing an act by a party, or would be excluded as prejudicial or irrelevant but for the fact that it refutes the initial evidence. Often the initial evidence was excludable too, and it got in simply because no objection was raised. Hence it is sometimes tempting to see the open door doctrine as a kind of tit-for-tat rule: The first party broke a rule, so others can too. [2]

This account, however, is not helpful: It smacks too much of the gaming table, and courts that consider the propriety of admitting counterproof seldom address the question whether the initial evidence was itself excludable.

The real concern of the open door doctrine is that evidence that might affect the outcome should not be immune from challenge. If counterproof is available, the very fact that the initial proof was admitted counts strongly in favor of admitting counterproof. Even if the initial evidence was proper, admitting it may open the door to counterproof that would otherwise be excludable under various doctrines, particularly those governing character evidence and the general rule against unfairly

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 94 of 204

§ 1:12Waiving objections—Inviting error, opening the door, 1 Federal Evidence § 1:12...

prejudicial evidence. Typically an opening gambit does not pave the way for counterproof that would violate the hearsay doctrine. The doctrines that are most often overcome by the party offering counterproof are those limits on relevancy in Rule 403 to 415 and sometimes restrictions on impeaching witnesses in Rule 608 to 609. [3]

*Even broader.* In practice, the doctrines of invited error and opening the door are even broader than these descriptions suggest. At the heart of each is the notion that a party who broaches a subject in almost any way—by argument, by relying on evidence, by putting questions to witnesses called by others, by calling witnesses and adducing their testimony—is limited by these strategic choices. He can neither object to his own folly nor complain about reasonable countermoves by others, and usually cannot succeed on appeal in predicating claims of error on such points. In practice, the two doctrines overlap and converge and even the terms themselves are sometimes used interchangeably.

Affirmative trial strategies also raise questions of relevancy, trial sequence, and scope of cross-examination, which are discussed elsewhere. [4]  Similarly, questioning and argument that come as countermoves—responses by one party to another's affirmative strategies—are also viewed in terms of impeachment by contradiction. That mechanism raises many concerns at once, including the purpose and proper scope of rules of exclusion, the impact of party strategy, the balance between probative worth and risk of prejudice (or confusion and waste of time), and what is usually termed the "collateral matter" bar. These aspects of the subject are also examined elsewhere too. [5]

*Immediate effects of introducing evidence ("invited error").* One effect of introducing evidence is immediate and obvious. By doing so, a party loses any right to exclude it or claim that admitting it was error. Occasionally courts call it error but find it harmless because invited by the complaining party.

In a sense, this immediate consequence is but another way of saying that ours is an adversary system. Letting parties introduce evidence and examine witnesses while relieving them from the consequences of their strategic choices would be burdensome and wasteful, and even worse if continuous litigation proved more attractive to a resourceful party than reaching a final judgment. Hence courts are on solid ground in generally refusing to let parties complain about evidence they themselves introduce. [6]  While the plain error doctrine provides an anchor to windward, courts often say in such cases that any error that appears was invited by the party who put the questions. [7]

For much the same reasons, a party who introduces evidence tending to prove some point should be at least limited in the objections he can raise to competent evidence offered by another party in support of the same point. [8]  Extending the logic one more step, it seems that relying on evidence offered by another party should affect the propriety of objecting to such proof, although attempts to minimize the effect of evidence or turn it to one's own advantage by suggesting alternative interpretations should not undercut properly raised objections. [9]

As noted further below, objections based on notions of unfair prejudice, hearsay or various restrictions on character evidence (particularly proof of other bad acts) still have merit, in all these situations. But the initial proof, or the party strategy, has the effect of opening the case to various kinds of responsive proof, and the further effect of lessening the strength of such objections.

*Further effect of introducing evidence ("opening the door").* Introducing evidence (or sometimes just making arguments or relying on evidence) also has more far-reaching effects. These strategies pave the way for other parties to introduce evidence, question witnesses, and offer argument on the same subject in attempts to rebut or confine the initial evidence. In the customary phrase, the party who offers evidence on a point is said to have "opened the door," meaning that doing so legitimates countermoves seeking to answer or rebut the initial evidence. Using another metaphor associated with Charles McCormick, it is said that litigants may "fight fire with fire." [10]

Usually reviewing courts conclude that allowing reasonable countermoves is not error at all, although sometimes they say any error was "invited" by the party who offered the initial evidence (or made the arguments or relied on other evidence).

Let us suppose now that a party deliberately introduces evidence that advances his case, undercuts his opponent's case, appeals to sympathy, or arouses prejudice. Suppose further that another party offers counterproof tending squarely to contradict or undercut the initial evidence, without injecting new elements of sympathy or prejudice or aggravating whatever might be objectionable in the initial evidence. In short, there is a good "fit" between initial proof and rebuttal evidence. In such settings the open door doctrine is useful and routinely invoked. Although it sometimes takes a trial into uncharted, and in a sense

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 95 of 204

§ 1:12Waiving objections—Inviting error, opening the door, 1 Federal Evidence § 1:12...

unnecessary territory, nevertheless it often seems preferable to let parties rebut whatever might be false in the initial evidence, to provide perspective, and to increase the chance of a proper understanding of events and the people involved in them. [11]

Usually the affirmative strategies that have a door-opening effect are those pursued on direct examination by the party who called the witness. In fact, however, most of what happens at trial is a strategy of some sort, and affirmative strategies having a door-opening effect can be those that are pursued during cross-examination of witnesses called by others, as happens when cross goes beyond the scope of direct and explores new subjects. Indeed, whenever new facts or ideas are raised on cross by answers that are responsive to and essentially encompassed or contained by the questions asked, it seems fair to conclude that the questioner has opened an area to further inquiry. [12]

Unfortunately the "fit" between initial proof and later response is not always there. Unfortunately too, the open door doctrine is so vague that it sheds little real light on what should happen, and the idea of waiver and party responsibility seems inadequate. Suppose, for instance, that the rebuttal evidence is covered by some exclusionary principle found in rules, statute, Constitution, or common-law doctrine. Suppose further that the initial evidence is itself objectionable under such a doctrine, and that the initial proof seems marginal or bland but the counterproof is dramatic or explosive, or that the counterproof does not squarely meet the initial evidence, but tends only in some indirect or incomplete way to shed light on the subject. In settings such as these, admitting rebuttal evidence may diminish or undercut the purposes of exclusionary doctrines or inject prejudice or confusion. The question whether to admit such evidence turns not only on the strategies of the parties, but on the nature of the evidence and counterproof, the terms and purposes of relevant exclusionary doctrines, the degree of "fit" between initial proof and counterproof, the importance of the issue at stake, and the balance of probative worth and prejudicial effect, and these questions are examined in the sections on contradiction. [13]

More generally, the effect of an affirmative strategy in justifying countermeasures is a matter of degree and proportion, and concerns of prejudice, distraction, and confusion of issues justify careful limits on countermoves. [14]

Context is important, and many decisions have only the most general bearing on other cases. The open door doctrine is supposed to prevent prejudice (not to introduce or exacerbate it), [15] and it is often wise to limit or block attempts to offer rebuttal evidence. [16]

*Same category.* The open door doctrine does not pave the way for responsive evidence just because it fits in the same general category as evidence already admitted. [17] For example, admitting hearsay for one side does not mean the other side can offer hearsay, and admitting one letter does not mean another letter should be admitted, and admitting proof of one deed does not mean others should be provable too. The question in each case is not whether initial proof shares some common quality with proof offered in response. Rather, it is whether the latter answers the former, and whether it does so in a reasonable way without sacrifice of other important values.

*Surprise and nonresponsive answers.* Putting a question to a witness does not mean that a party opens the door to whatever subject the answer touches. Unresponsive answers, or those that are responsive but broader than the question, are not the responsibility of the questioner. In this setting, the examining lawyer may ask that the answer be stricken, and putting the question was not a waiver of objection, [18] although prompt action is necessary to give credibility to the claim that the answer was not expected and was not a reasonable response. [19]

Answers of this sort are most likely to crop up during cross-examination or direct questioning of hostile witnesses, where questioner and witness are less attuned to each other and sometimes work at cross-purposes, although the same thing may happen in other situations.

In such settings, carelessly applying the open door doctrine would unfairly saddle a party with responsibility for what happens. It is one thing to hold the examiner to the intended and foreseeable consequences of his strategy, quite another to make him responsible for whatever his questions produce. [20]

Sometimes it is appropriate to let a party who elicits a surprise or unresponsive answer introduce rebuttal evidence, although it may be hard to sort things out if such evidence would otherwise be excluded. Obviously a party should not be allowed to get around an exclusionary rule by deliberately (even carelessly) asking questions that produce predictable responses, then claiming that the rule should not apply because rebuttal is appropriate. Suppose, for example, that the prosecutor questions the defendant in a way that invites (or tends to force) a broad claim of innocence, then offers proof of specific instances to

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 96 of 204

§ 1:12Waiving objections—Inviting error, opening the door, 1 Federal Evidence § 1:12...

contradict this response. If the instances would not otherwise be provable, rewarding the prosecutor for this strategy invites abuse. A party should not be allowed to bootstrap himself into an advantageous position in this way. [21]

*Anticipatory damage control.* A party who makes and loses a pretrial motion to exclude or suppress evidence faces a serious strategic dilemma. On the one hand, she can object again at trial and hope the court changes its mind and excludes. [22] Its refusal to grant the motion might, after all, reflect only a preference to rule when the issue is more clearly presented at trial, so a timely objection might still succeed. On the other hand, the party might "bite the bullet" by going into the subject herself, since doing so gives her the advantage of choosing time and manner and she may be able to minimize damage in this way and drain out the rhetorical advantage the opposition would otherwise have.

Obviously renewing the objection preserves claims of error. The question is whether the other strategy loses those claims? To mix the metaphors for a moment, one might ask whether biting the bullet also opens the door? Occasionally courts have said no, at least where the court's ruling on the pretrial motion clearly indicates that the evidence is admissible, on the theory that making the motion demonstrates a determination to keep it out, so the objecting party should be allowed to rely on what the court did and minimize damage without waiving the claim that the evidence should have been excluded. [23]

Arguably, however, the better answer is yes—biting the bullet does open the door. The party who tries but fails to exclude evidence is not absolved of responsibility for later introducing it. After all, the party who bites-the-bullet in anticipation of damage deprives the opponent of the choice whether to go into the matter, and there is usually no way to know whether the evidence would have been offered at all. This issue reached the Supreme Court in the *Ohler* case, which presented the question whether a defendant who made and lost a pretrial motion to bar cross-examination on prior convictions would waive the right to review the ruling by testifying and bringing out the convictions first. The Court held in *Ohler* that indeed this strategy waives review. [24]

It is also worth noting that the usual rule is that a court has no obligation to rule in advance, nor to stick with whatever pretrial ruling it makes, so refusing to rule in advance is not a clear or certain sign that the evidence will be welcome if offered. In somewhat different settings, pretrial resolutions of evidence issues cannot generate claims of error on appeal, and these cases imply that reliance on such rulings in laying the groundwork to attack judgments is misplaced, which suggests in turn that the bite-the-bullet strategy described here should be viewed as a strategic choice and treated in the same way as door-opening strategies. [25]

*Who waives what—muddled theory.* Hidden behind the open door doctrine is a confusing question that sometimes surfaces in the cases. It arises because often the strategy thought to open the door could be blocked at the outset by timely and appropriate objection. Hence there is at least some force in the argument that failing to object should not only foreclose claims of error in admitting evidence that might have been excluded, but should also block the adverse party from pursuing a counterstrategy, particularly if it would otherwise be improper. After all, failing to object might itself be a deliberate ploy to pave the way for counterproof (or questioning or argument) that would otherwise be forbidden.

An early Supreme Court decision actually took this approach, holding that a party who failed to object could not rebut what he might have excluded. [26] A few modern federal cases concur, [27] but most ignore this possibility and a few openly reject the approach. [28]

This approach is deficient for a number of reasons:

First is the practical difficulty of assessing the motivation of a party who does not object when he might. There is an onus associated with objecting because jurors want to know what happened and see objections as attempts to hide information, so lawyers routinely forgo even objections they might hope to win. The proponent should not be allowed to put the adversary in the position of having to object on pain of conceding the point in issue altogether. Moreover, lawyers may be unsure whether they can win an objection, and may resolve doubts by not objecting rather than running the risk of a negative impression. Lawyers know that an objection may be counterproductive because it strengthens the adversary by suggesting ways to reframe questions and alternative methods toward the same evidential goal. In short, lawyers may forgo objecting for reasons having nothing to do with offering counterproof later.

Second, limiting a party to the remedy of objecting seems crude—it is an either/or approach to a problem that obviously admits of other solutions. It seems necessary to reject a claim for a new trial on the basis of error in admitting evidence that the appellant might have excluded by objecting, but efficiency concerns do not similarly justify a rule against counterproof rebutting such evidence. From the standpoint of accurate factfinding, it is preferable to admit counterproof than to leave

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 97 of 204

§ 1:12Waiving objections—Inviting error, opening the door, 1 Federal Evidence § 1:12...

unanswered all the evidence that got in even though it could have been excluded. Admitting counterproof seems a necessary concession to the imperfections of the trial process, in which lawyers are destined to overlook some objections they might win and courts are destined to make mistakes in deciding what proof might have been excluded if appropriate objection had been made.

Third, admitting counterproof as a remedy even when initial evidence might have been excluded seems consistent with the philosophy that the parties themselves are in charge of their cases. If one party introduces evidence on a point not raised by the pleadings or the pretrial order, others may introduce evidence in rebuttal, and the philosophy of alternative dispute resolution similarly favors party autonomy in matters of proof.

If a party properly objects or moves to strike and the court overrules the objection or denies the motion, there is no question of waiver. [29] Having done what he could to exclude the evidence, he may now invoke the open door doctrine as the basis for rebuttal evidence, and urge on appeal that the court erred in admitting the initial evidence. [30]

Here, of course, the error in admitting the initial evidence may well have been cured by admitting the rebuttal evidence, which is the main reason for the open door doctrine to begin with.

Westlaw. © 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

| | |
|---|---|
| a0 | Henry S. Lindsley Professor of Law, University of Colorado School of Law. |
| a1 | Louis Harkey Mayo Research Professor of Law, George Washington University Law School. |
| 1 | Motions to strike are discussed in § 1:7, supra. |
| 2 | See McCormick on Evidence § 57 (6th ed. 2006) (open door doctrine assumes that initial evidence is inadmissible, and means that one who persuades court to pursue inquiry that is incompetent or irrelevant cannot complain if the adversary takes advantage of the opening). McCormick's overall account, however, focuses on the real concerns, which are whether the initial proof might affect the case and whether the rebuttal fairly meets the initial proof. |
| 3 | *Colorado:* Itin v. Ungar, 17 P.3d 129, 132 n4 (Colo. 2000) (open door doctrine "usually describes the waiver of an objection to the admission of evidence," which "often occurs when one party introduces evidence that causes another party to introduce counterproof that would otherwise be inadmissible but for the first party's introduction of the subject matter") (citing this Treatise). |
| 4 | On trial sequence, see discussion of Rule 611 in § 6:61. On scope of cross, see discussion of Rule 611 in §§ 6:69 to 6:74. |
| 5 | On contradiction and the "collateral matter" limit, see discussion of Rule 611 in §§ 6:85 to 6:90. See also discussion of Rule 403 in § 4:16, infra. |
| 6 | *First Circuit:* U.S. v. One Star Class Sloop Sailboat, 546 F.3d 26, 39 (1st Cir. 2008) (defendant did not object to court's mention of his lowest settlement demand, and in fact "brought it up and referred repeatedly to it," which waived objection he might otherwise have raised). |
| | *Fifth Circuit:* U.S. v. Allen, 76 F.3d 1348, 1366 (5th Cir. 1996) (defendant proved prior act, so government could argue it showed bribe and indicated that promise to repay was part of cover story; defendant cannot prove prior acts and "then cry foul when the prosecution turns that evidence against him, so long as the government's interpretation is not otherwise misleading"). |
| | *Eighth Circuit:* Chism v. CNH America LLC, 638 F.3d 637, 640–641 (8th Cir. 2011) (in product suit against maker of hay baler, plaintiff argued in opening that defendant knew of two prior accidents and "did nothing" to correct problems; advancing this argument violated court's pretrial warning and increased probative value of verdicts returned in favor of defendant in those two cases; court properly admitted proof of these verdicts). |
| | Hoselton v. Metz Baking Co., 48 F.3d 1056, 1062 (8th Cir. 1995) (where plaintiffs did not object, and insisted on whole deposition, any error was invited). |
| | *Ninth Circuit:* U.S. v. Miller, 771 F.2d 1219, 1234 (9th Cir. 1985) (M complains of double hearsay elicited on cross by counsel for LJ after he pled nolo contendere and LS after he was dismissed, but cross continued by agreement of defense counsel; one cannot seek reversal on basis of one's own errors). |
| | *Tenth Circuit:* U.S. v. Chavez, 229 F.3d 946, 951 (10th Cir. 2000) (in opening statement, defense referred to content of statements and later "elicited more details," thus invited any error in government use statements on direct examination of agent; defense opened door). |
| | *Court of Federal Claims:* A.A.B. Joint Venture v. U.S., 77 Fed. Cl. 702, 704 (2007) (by offering evidence, one "opens the door" and thus waives right to object, and the "immediate effect" is "loss of the right to exclude the evidence or to claim that admitting the evidence was other than harmless error," and courts are "generally on solid ground" in "refusing to let parties complain about evidence they themselves introduce") (citing this Treatise). |

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 98 of 204

§ 1:12Waiving objections—Inviting error, opening the door, 1 Federal Evidence § 1:12...

7    See discussion of harmless and reversible error in §§ 1:17 to 1:20, infra, and discussion of plain error in §§ 1:21 to 1:22, infra.

8    *First Circuit:* U.S. v. Reed, 977 F.2d 14, 17 (1st Cir. 1992) (defendant claimed entrapment and testified about prior conviction, claiming that being on probation made him reluctant to deal drugs; court could admit "material details" of prior offense, such as amount of cocaine, to clarify "the extent to which the prior conviction might or might not" prove disposition).

Willco Kuwait (Trading) S.A.K. v. deSavary, 843 F.2d 618, 624 (1st Cir. 1988) (objection is waived if evidence is "first elicited by the party now objecting," and here plaintiff elicited "similar testimony").

*Fifth Circuit:* Bender v. Brumley, 1 F.3d 271, 275 (5th Cir. 1993) (in suit alleging police beating when plaintiff surrendered in connection with shooting death of officer, plaintiff testified about a murder for which he had been convicted, but objected when defense offered other testimony; plaintiff "opened the door to evidence regarding his underlying murder conviction").

U.S. v. Hall, 845 F.2d 1281, 1283 (5th Cir. 1988) (after defense adduced testimony by S that O saw defendant with check, prosecutor went over ground on redirect; jury could credit testimony of S; defendant "opened this door" as a matter of strategy to elicit information about O).

*Sixth Circuit:* U.S. v. Glover, 21 F.3d 133, 136 (6th Cir. 1994) (rejecting claim of error in admitting testimony describing travel documents, men's clothing, watch, and ring found at certain address; defense "introduced these matters to the jury during his opening statement," and raised the question whether he lived there).

*Seventh Circuit:* U.S. v. Bursey, 85 F.3d 293, 295 (7th Cir. 1996) (in attacking testimony by officer that defendant threw down white package containing drugs in street encounter, defense asked whether officer considered defendant "street smart," in effort to show that officer was mistaken in suggesting that defendant would resort to such obvious ploy; this tactic opened the door to questions on redirect about prior incidents that officer observed; questions served "distinct and legitimate purpose" in establishing basis for conclusion).

*Eighth Circuit:* Gee v. Pride, 992 F.2d 159, 161 (8th Cir. 1993) (on direct, plaintiff mentioned appealing from robbery convictions and mentioned concealed weapons conviction, thus opened door to development of those subjects and use of certified copies of convictions).

*Ninth Circuit:* U.S. v. Kerr, 981 F.2d 1050, 1052 (9th Cir. 1992) (defense said in opening statement that defendant possessed cocaine at time of arrest, and offered testimony; if defendant introduces similar acts, government may step through door).

9    *Second Circuit:* U.S. v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) (defendant was not prejudiced by evidence of criminal activities before he joined gang; he "actually welcomed" the evidence, trying to convince jury that he did not exhibit violence and brutality while portraying gang "in the most brutal terms" and now seeks to evade consequences of unsuccessful tactic).

*Sixth Circuit:* U.S. v. Cowart, 90 F.3d 154, 156 (6th Cir. 1996) (defense did not object to drug conviction based on nolo plea, and testified that he admitted his guilt; he used incident "to argue that he admits when he is guilty," and now cannot evade strategy's failure) (he "affirmatively compounded" any error by testifying).

*Seventh Circuit:* U.S. v. Silvers, 374 F.2d 828, 831 (7th Cir. 1967) (defendant objected to testimony about prior convictions but relied on prison experiences to support insanity defense; using the evidence cured or waived error).

10    This apt phrase comes from McCormick on Evidence § 57 (6th ed. 2006)

11    *D.C. Circuit:* U.S. v. Lewis, 701 F.2d 972, 974 (D.C. Cir. 1983) (defendant described arrest for running caution light, saying officers handcuffed him even though he had valid license and credentials, reiterating these points on cross; government could ask about outstanding arrest warrant; otherwise jury might think he was arrested for trivial reasons).

*First Circuit:* U.S. v. Marin, 523 F.3d 24, 28–30 (1st Cir. 2008) (defense brought out that defendant never admitted to agent that he possessed gun in bedroom because he was dealing drugs; prosecutor could bring out that agent never asked why he had gun because it "was obvious" in light of the drugs; defense opened door, and government could "clarify the context" of the conversation to prevent a misleading impression).

Fitzgerald v. Expressway Sewerage Const., Inc., 177 F.3d 71, 74 (1st Cir. 1999) (in suit against operator of parade float for injuries to 6-year-old child, mother testified on direct that medical bills caused "strain both emotionally and financially," so defense could prove insurance payments; collateral source rule would normally bar such proof, but plaintiffs opened the door and could not complain that defendants "passed through the portal").

*Second Circuit:* U.S. v. Carter, 801 F.2d 78, 83 (2d Cir. 1986) (in trial for firearms conspiracy, admitting evidence that weapons were stolen; defendant opened door in opening argument that rural residents often had guns; proof that guns were stolen, serial numbers obliterated, and price list was found, made it more likely that he was not ordinary rural resident).

*Fifth Circuit:* U.S. v. Lowenberg, 853 F.2d 295, 299 (5th Cir. 1988) (defense asked government witness what he lost that cost $50,000, and he said suitcase; on redirect, prosecutor showed suitcase belonged to defendant and witness thought it contained drugs; cross opened door to follow-up).

Case 09-10138-MFW   Doc 14410-6   Filed 09/16/14   Page 99 of 204

§ 1:12 Waiving objections—Inviting error, opening the door, 1 Federal Evidence § 1:12...

*Sixth Circuit:* U.S. v. Harvey, 653 F.3d 388, 394–395 (6th Cir. 2012) (admitting recorded interview involving defendant and government agents; by cross-examining agent about what defendant said, he "opened the door to the previously excluded portions" of recording).

*Seventh Circuit:* U.S. v. Martinez, 988 F.2d 685, 702 (7th Cir. 1993) (quoting this Treatise).

*Eighth Circuit:* Cummings v. Malone, 995 F.2d 817, 824 (8th Cir. 1993) (in suit by inmate alleging that officials beat him, plaintiff testified that he was not told why he was taken to investigator's office; court should have let defense show that he testified in deposition and wrote in pro se complaint that officers told him he was being questioned about sexual assault against woman employee; plaintiff injected issue, thus "opened the door") (reversing).

*Ninth Circuit:* U.S. v. Mendoza-Prado, 314 F.3d 1099, 1105 (9th Cir. 2002) (defendant testified that he was "a family man" and lacked time, inclination, and courage to deal cocaine, and had significant legitimate income; witness testified that he "worked long hours in construction and took no significant time off," implying that he was law-abiding and hard-working; counsel argued that "devotion to family and hard work" showed good character; door was thus opened to proof that he bragged about crimes, like making phone calls worth about $5000 while working as janitor for government, and stealing $30,000 and harassing American tourists and extorting money while working as police officer; when defendant opens door, government "may introduce otherwise inadmissible evidence") (evidence of general good character opened door to prove "bad acts to demonstrate bad character").

*Tenth Circuit:* McEwen v. City of Norman, 926 F.2d 1539, 1546 (10th Cir. 1991) (in suit arising out of pursuit of motorcyclist leading to fatal crash, plaintiff's witness testified on direct that he gave false name because officer was "out to get him" so defense could show he had outstanding DUI bench warrant; plaintiff opened door).

*Rhode Island:* State v. Carvalho, 892 A.2d 140, 145 (R.I. 2006) (in trial for assaulting officer, defense won motion in limine to exclude evidence of intoxication; he testified to his activities, and state could question him "to convince the jury of the incredible nature of the fragmented chronology" he presented; jury should hear that despite claim of walking streets for hours, he exhibited "signs of intoxication").

12    *Second Circuit:* U.S. v. Vasquez, 267 F.3d 79, 83 (2d Cir. 2001) (in racketeering trial, S testified that defendant V came knocking on door at 3 a.m., that S and A retrieved weapons before opening, and V began shooting through door; on cross, defense suggested that S never saw weapon in V's hand, and S and A fired when nobody else had; government could elicit from S that V had reputation for killing people; V opened door by suggesting that S was the aggressor; redirect served "merely to clarify" S's purpose in getting out weapon).

*Fifth Circuit:* U.S. v. Lowenberg, 853 F.2d 295, 299 (5th Cir. 1988) (approving government follow-up questions eliciting damaging responses because defense cross opened the door).

*Sixth Circuit:* Birns v. Perini, 426 F.2d 1288, 1291 (6th Cir. 1970) (defendant cross-examined witness about evidence seized in illegal raid, and prosecutor "quickly stepped through the open door") (prosecutor could rebut "that which was brought out on cross-examination").

*Eighth Circuit:* U.S. v. Eagle, 515 F.3d 794, 801 (8th Cir. 2008) (in sex abuse trial, defense asked mother whether victim "told you that this had happened over 20 times to him," opening door to "further evidence" of conversation).

13    See the discussion in §§ 6:85 to 6:90.

14    *Second Circuit:* U.S. v. Beno, 324 F.2d 582, 588 (2d Cir. 1963) (charged with solicitation, IRS agent testified to honest behavior in auditing returns; court erred in admitting proof that he was dishonest in handling others; false testimony on direct may be refuted by other witnesses, and character witnesses may be asked about rumors, but one who offers irrelevant evidence of specific acts does not invite prosecutor "to explore without restraint and at great length any specific occurrence which might tend to create an abhorrent image") ("a small advantage improperly obtained does not compel the exaction of a gross disadvantage in penalty").

*Seventh Circuit:* U.S. v. Martinez, 988 F.2d 685, 702 (7th Cir. 1993) (in trial of inmates for killing one and assaulting another, guard testified that he had no "previous problems" with victims; court could exclude evidence that victims held racist views and committed violent acts against minority prisoners; open door doctrine "does not give an opponent unbridled license to introduce otherwise inadmissible evidence," which may be admitted "only to the extent necessary to remove" unfair prejudice brought by original evidence; where rebuttal "does not directly contradict" or goes beyond necessity of removing prejudice, can exclude) (citing this Treatise).

*Ninth Circuit:* U.S. v. Sine, 493 F.3d 1021, 1037–1028 (9th Cir. 2007) (defendant made "passing reference" in testimony to finding in which judge "wrote up some bad things about me," which was "insufficient to open the door to the government's otherwise impermissible references to the order, as [defendant] did not introduce an inaccurate portrait" or use opinion to "appeal to the professional authority of the judge") (harmless).

U.S. v. Tory, 52 F.3d 207, 210 (9th Cir. 1995) (court suppressed holster and gunbelt found in defendant's garage; defense did not open door evidence by asking government agent on cross whether he found gun in searching residence) (not an assertion that defendant never owned gun).

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 100 of 204

§ 1:12Waiving objections—Inviting error, opening the door, 1 Federal Evidence § 1:12...

15    *D.C. Circuit:* U.S. v. Brawner, 471 F.2d 969, 1003 (D.C. Cir. 1972) (curative admissibility means removing prejudice in interest of fairness).

*Sixth Circuit:* U.S. v. Dunn, 805 F.2d 1275, 1280 (6th Cir. 1986) (in trial of chicken farmer for burning buildings to collect insurance, error to admit evidence that he stole eggs from company that supplied chickens and it canceled contract to avoid doing business with thief, offered in rebuttal of claim that contract was canceled because company was losing money; reason for cancellation was irrelevant; egg stealing was irrelevant and prejudicial) (reversing).

*Seventh Circuit:* U.S. v. Johnson, 502 F.2d 1373, 1376 (7th Cir. 1974) (curative admissibility should "only be used to prevent prejudice," not "subverted into a rule for injection of prejudice").

16    *Fifth Circuit:* California Ins. Co. v. Allen, 235 F.2d 178, 180 (5th Cir. 1956) (insurance carrier claimed plaintiff arson, and on direct he referred to lie detector test; this matter could be considered only to extent necessary to rebut unfair inference; test results did not become "admissible for all purposes," but "only to the extent necessary to remove any unfair prejudice").

*Ninth Circuit:* U.S. v. Collicott, 92 F.3d 973, 979 (9th Cir. 1996) (in drug trial, Z testified that defendant put money on bed in motel room, that L came as Z was cooking and smoking cocaine, and that later L left and money was gone, and in its place a paper bag of cocaine; defense asked Z whether she remembered telling officer K that L arrived between midnight and 1 a.m., but Z said she did not remember; defense called K, who testified that Z did say that; error to admit K's testimony about Z's further statements describing meeting with L; question was whether statements from Z's conversation with K clarify or provide context to inconsistency that defense raised, and they did not) (reversing).

*Tenth Circuit:* See Wilson v. Muckala, 303 F.3d 1207, 1217 (10th Cir. 2002) (in sexual harassment suit against doctor, excluding testimony that defendant had extramarital affairs, offered to impeach doctor's deposition statements that he never solicited or had adulterous relationship while employed at hospital; evidence was wholly collateral).

17    *D.C. Circuit:* U.S. v. Childs, 598 F.2d 169, 174 (D.C. Cir. 1979) (defendant sold undercover agents a check that was misaddressed and misdelivered; cross showed that agent loaned money to defendant; court should not have let prosecutor show that defendant returned to repay money and sell other items; open door doctrine "provides no basis for legitimatizing" unrelated proof that defendant tried to arrange sale of contraband).

*Second Circuit:* U.S. v. Benedetto, 571 F.2d 1246, 1250 (2d Cir. 1978) (fact that defendant introduced improper evidence of specific instances of his own good conduct did not justify government testimony about his other bad acts) (they were admissible, however, to contradict his direct testimony).

*Third Circuit:* U.S. v. Cook, 538 F.2d 1000, 1004 (3d Cir. 1976) (defendant was arrested with cash and pistol matching one used in robbery; on cross, he elicited testimony that it is not a federal crime to cross state lines with unregistered gun, although carrying concealed weapon is state crime; court erred in letting prosecutor bring out that defendant was convicted of sodomy, making it federal crime for him to possess gun; where evidence is "only vaguely favorable" to defendant and irrelevant to issues and does not harm government's case, need to refute it does not outweigh risk of prejudice).

*Fifth Circuit:* U.S. v. Fleetwood, 528 F.2d 528, 535 (5th Cir. 1976) (in trial of grain inspector for soliciting bribes, two witnesses testified that they bribed him and four inspectors testified that they pled guilty to taking bribes; after defense brought out that first witness was involved in other bribes, error to admit testimony by the four inspectors that they took bribes; defense opened door on involvement by first witness in bribes, but "repeated, methodical, and essentially unnecessary questioning" of grain inspectors "far overreached proper bounds") (reversing).

*Sixth Circuit:* U.S. v. Pritchett, 699 F.2d 317, 318 (6th Cir. 1983) (defendant claimed social involvement, saying "he knew nothing about drugs" before meeting codefendant; government cross seeking to connect defendant with drug dealer presented innuendo evidence inviting improper inference of guilt by association, and impeachment by "associational insinuations").

*Seventh Circuit:* U.S. v. Martinez, 988 F.2d 685, 702 (7th Cir. 1993) (in trial of inmates for killing one inmate and assaulting another in incident, guard testified that he had no "previous problems" with victims; court could exclude evidence that victims held racist views and committed violent acts against minority prisoners; open door doctrine does not justify admitting rebuttal evidence "merely because it is in the same category of excludable evidence as the evidence previously offered") (citing this Treatise).

*Eighth Circuit:* U.S. v. Crawford, 438 F.2d 441, 444 (8th Cir. 1971) (on direct, defendant described acquaintance with certain persons and said he did not sell them drugs, which did not open door to cross on association with "unsavory characters," including convicted drug users and sellers; cross must clarify point or impeach; here it "merely threw a shroud of suspicion" over defendant).

*Tenth Circuit:* U.S. v. Hoffner, 777 F.2d 1423, 1425 (10th Cir. 1985) (in trial of doctor for distributing controlled substances, excluding testimony by lay witnesses on question whether defendant had legitimate medical purpose; fact that experts testified did not give defendant "carte blanche to introduce any and all lay testimony" in rebuttal; different standards apply to lay and expert opinion) (defense witnesses lacked rational basis for their opinions).

*Kentucky:* Com. v. Stone, 291 S.W.3d 696 (Ky. 2009) (in manslaughter trial, defendant brought out, on cross-examination of detective, that defendant had said that victim "came at" him; prosecutor could offer that statement, but it was hearsay when defendant offered

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 101 of 204

§ 1:12Waiving objections—Inviting error, opening the door, 1 Federal Evidence § 1:12...

it, but prosecutor neither objected nor requested an instruction, and instead sought to meet statement by bringing out a "previously redacted" part of H's statement that victim was "backing away" at the time; prosecutor was entitled to offer "countervailing proof" that victim was backing away, but was not "free to disregard the hearsay rule in so doing") (quoting this Treatise for proposition that open door doctrine does not pave the way for responsive evidence just because it fits same general category, and admitting hearsay offered by one side does not invite counterproof that is also hearsay).

*Texas:* Schutz v. State, 957 S.W.2d 52, 72 (Tex. Crim. App. 1997) (in trial of father for sexual abuse of his child, reversible error to admit expert testimony that child's accusations were not result of fantasizing; testimony by mother that child was truthful does not open door for expert testimony pointing toward opposite conclusion) (careful and lengthy discussion of this point).

18    *Ninth Circuit:* U.S. v. Schneiderman, 106 F. Supp. 892, 905 (S.D. Cal. 1952) (refusing to let lawyer strike nonresponsive answers would make direct examination "infinitely more difficult" and cross-examination "virtually useless").

19    *First Circuit:* Saville v. U.S., 400 F.2d 397, 400 (1st Cir. 1968) (defendant neither objected nor moved to strike answer given on defense cross, nor sought mistrial until later; too late to urge error on account of answer).

      *Seventh Circuit:* U.S. v. Jansen, 475 F.2d 312, 315 (7th Cir. 1973) (refusing to strike answer by defendant to question by his own lawyer that asked too broadly about prior convictions when intent was only to ask about prior felonies; motion not made until following day).

20    *Fifth Circuit:* U.S. v. Taylor, 508 F.2d 761, 763 (5th Cir. 1975) (in trial of H and T for bank robbery, government agreed not to introduce H's pretrial statement incriminating T, but his lawyer brought out part of statement while cross-examining; invited error doctrine did not apply because attorney "had no way to know" his question would disclose statement).

21    *Supreme Court:* Walder v. U.S., 347 U.S. 62, 66 (1954) (prosecutor may rebut overbroad claim by defendant on direct that he never sold or possessed drugs; situation should be "sharply contrasted" with case where government tries "to smuggle it in" on cross by asking defendant whether he ever saw drugs, eliciting expected denial, and attempting to discredit by proof that drugs were unlawfully seized from defendant's home).

      *D.C. Circuit:* U.S. v. Simpson, 992 F.2d 1224, 1228 (D.C. Cir. 1993) (government asked on cross about prior possession and whether defendant knew it was common to package dilaudid in yellow pills; he said he "wouldn't know that much" about it; plain error to let government show he had been arrested for possessing dilaudid; question was improper, since it only supported propensity inference; denial of knowledge did not pave way to prove the contrary) (reversing).

      *Second Circuit:* U.S. v. Mariani, 539 F.2d 915, 923 (2d Cir. 1976) (on direct, defendant did not say whether he owned gun, carried one in car, or had bullets; prosecutor elicited denials on these points; court erred in admitting bullets illegally seized from car; government may not rebut, by "evidence inadmissible in its case-in-chief," the testimony extracted from the defendant only on cross-examination").

      *Third Circuit:* U.S. v. Pantone, 609 F.2d 675, 682 (3d Cir. 1979) (trial of magistrates and justices of peace for making referrals to, and taking kickbacks from, bail bondsmen; on direct, defendant denied taking bribes from one bondsman, but on cross testified more generally that he never took bribes; error to let prosecutor prove he took bribes from another; government "may not cross-examine on collateral matters not testified to on direct in order to establish a ground for the admission of otherwise inadmissible evidence") (reversing).

      *Fifth Circuit:* U.S. v. Herzberg, 558 F.2d 1219, 1223 (5th Cir. 1977) (where frauds involving defendant came out on cross rather than direct, proof of these amounted to improper impeachment by extrinsic evidence on collateral matter).

      *Seventh Circuit:* U.S. v. Lambert, 463 F.2d 552, 556 (7th Cir. 1972) (witness may not be impeached by contradiction on "collateral or irrelevant matters elicited on cross-examination").

      *Ninth Circuit:* U.S. v. Whitson, 587 F.2d 948, 951 (9th Cir. 1978) (error to let prosecutor prove Miranda-barred statement to contradict testimony elicited from accused on cross; if defendant presents case without raising issues open to impeachment and government elicits statements on cross, government cannot "impeach its own induced statements with inadmissible evidence") (reversing).

      *Tenth Circuit:* U.S. v. Warledo, 557 F.2d 721, 726 (10th Cir. 1977) (reversible error to let prosecutor prove defendant owned gun after he denied it on cross; cannot "impeach a witness on a collateral or irrelevant matter" elicited on cross).

22    On motions in limine and trial objections, see §§ 1:10 to 1:11, supra.

23    *Fifth Circuit:* Moorhead v. Mitsubishi Aircraft Intern., Inc., 828 F.2d 278, 287 (5th Cir. 1987) (estate showed decedent's "good conduct as a pilot," but did not put subject in issue; court had ruled that other side could offer evidence that decedent got low marks in handling emergencies, which was error; ruling left estate little choice but to go into it) (case tried to bench; reversal not required).

      *Eleventh Circuit:* Judd v. Rodman, 105 F.3d 1339, 1342 (11th Cir. 1997) (in suit against basketball player for damages from genital herpes, plaintiff objected to proof of her sexual conduct; objection was overruled and she testified about it, which was "valid trial strategy," so objection preserved issue) (it was admissible on cause).

      *Hawaii*: Kobashigawa v. Silva, 300 P.3d 579, 599 (Hawaii 2013) (after court denied plaintiff's pretrial motion to exclude evidence, plaintiffs introduced the testimony themselves, "aiming to minimize the prejudice that would result," and this tactic did not waive their objection) (approving award of new trial).

Case 09-10138-MFW   Doc 14410-6   Filed 09/16/14   Page 102 of 204

§ 1:12Waiving objections—Inviting error, opening the door, 1 Federal Evidence § 1:12...

24    *Supreme Court:* Ohler v. U.S., 529 U.S. 753 (2000), discussed in § 6:51.

      *Seventh Circuit:* Clarett v. Roberts, 657 F.3d 664, 670 (7th Cir. 2011) (applying *Ohler* doctrine in civil suit; introducing conviction waived objection that it was inadmissible under Rule 609).

25    See generally the discussion in § 1:11, supra.

      *Seventh Circuit:* U.S. v. DePriest, 6 F.3d 1201, 1208 (7th Cir. 1993) (judge declined to rule on motion to exclude report that defendant tested positive for marijuana; he revealed point on direct, denying use of marijuana; court finally ruled in favor of admitting report; defendant should have requested final ruling before testifying, and failing to do so means no error occurred; even if court had ruled before, there would be no error; defense strategy seeking to ameliorate anticipated effect deprives court and government of chance to reconsider positions).

      *Eighth Circuit:* U.S. v. Einfeldt, 138 F.3d 373, 376 (8th Cir. 1998) (defense lost pretrial motion to block impeachment with bank robbery conviction, then admitted it on direct; this tactic "precludes review of the issue on appeal").

26    *Supreme Court:* Stringer v. Young's Lessee, 28 U.S. 320, 337 (1830) (rejecting claim that appellants had right to introduce irrelevant testimony to rebut other side's irrelevant testimony; had they objected or sought instruction, original testimony could not be admitted, but appellants did not do so and sought instead to rebut by their own inadmissible evidence) (Marshall opinion indicates that if instructions would be ineffective, otherwise inadmissible testimony may be admitted in rebuttal, but this question need not be reached here).

27    *Eighth Circuit:* U.S. v. Kristiansen, 901 F.2d 1463, 1466 (8th Cir. 1990) (expert should not have testified that defendant was sociopath, but defense did not object and should have; defense could not then introduce expert testimony on mental state).

      *California:* People v. Gambos, 84 Cal. Rptr. 908, 911 (Cal. App. 1970) (defendant introduced statement against penal interest without showing unavailability of declarant, and prosecutor waived objection; error to admit rebuttal evidence; no door was opened, for "allowing objectionable evidence to go in without objection" does not give silent party a right to introduce related or additional testimony otherwise inadmissible) (open door doctrine is a "popular fallacy").

28    *First Circuit:* U.S. v. Vachon, 869 F.2d 653, 658 (1st Cir. 1989) (while prosecutor did not object to opinion by defense psychiatrist and defendant did object to counterproof, invited error doctrine lets courts prevent unfair trials by disregarding "legal formalities" when fairness and need to correct one-sided impressions require other evidence).

      *Fifth Circuit:* U.S. v. Meneses-Davila, 580 F.2d 888, 895 (5th Cir. 1978) (defense did not object to use of defendant's postwarning silence, but pursued the matter in questioning that suggested that no opportunity was given to explain away the charges; defense strategy did not excuse government's conduct under invited error doctrine; government "made the initial reference to defendant's silence").

29    Wigmore argued that objecting adequately protects the appellant, hence that there still is no reason to admit rebuttal evidence. See 1 Wigmore, Evidence § 15 (3d ed. 1940), but this suggestion has not been followed.

30    *Third Circuit:* U.S. v. DeCarlo, 458 F.2d 358, 372 n1 (3d Cir. 1972) (when objection is overruled, objecting party can treat ruling as law of case and "explain or rebut, if he can," evidence that came in over his protest; one does not waive objection if he meets evidence to which he objected with other evidence that under theory of objection would be incompetent).

      *Seventh Circuit:* U.S. v. Konovsky, 202 F.2d 721, 727 (7th Cir. 1953) (in trial for depriving black citizens of rights, prosecutor introduced injunction directing defendants and others not to prevent black citizen from living in apartment; defendants tried to meet the erroneous evidence, which was not waiver).

      *Eighth Circuit:* U.S. v. Millard, 139 F.3d 1200, 1204 (8th Cir. 1998) (government mentioned convictions and plea bargaining statements in opening statement; defense went into these subjects, but that did not make defense guilty of invited error; defense could claim error on appeal) (reversing).

      Salt Lake City v. Smith, 104 F. 457, 470 (8th Cir. 1900) (city that objected to hearsay did not waive objection by offering its own hearsay to refute other hearsay; one who objects does not waive or lose objection by "subsequent introduction of the same class of evidence").

      *Ninth Circuit:* Sheehy v. Southern Pac. Transp. Co., 631 F.2d 649, 651 99 (9th Cir. 1980) (over plaintiff's objection, court ruled that proof of collateral benefits bore on malingering; on cross, defendant brought out that plaintiff was getting $800 a month, and on redirect plaintiff brought out source, including testimony that he contributed to retirement program and would lose benefits if he began working, which did *not* open the door) (reversing).

---

**End of Document**                                                © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

TAB 105

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 104 of 204

§ 19:6.Distribution of rights embraced in a..., 5 Pat. L....

5 Pat. L. Fundamentals § 19:6 (2d ed.)

Patent Law Fundamentals
Database updated August 2014
John Gladstone Mills III, Donald Cress Reiley III, Robert Clare Highley and Peter D. Rosenberg
Part VI. Exploiting Patent Rights
Chapter 19. Licensing and Assignment: The Sharing and Transfer of Patent Rights

References Correlation Table

§ 19:6. Distribution of rights embraced in a patent—Assignment vs. license—Assignment vs. Exclusive License

A nonexclusive license may more accurately be characterized as a sharing of patent rights than as a transfer thereof, whereas both assignments and exclusive licenses do involve a transfer of rights.

The line of distinction between an assignment and an exclusive license is, in many instances, a hazy one, since by an exclusive license the licensee acquires exclusivity, with the licensor retain ing, for the duration of the license, the right to enforce that exclusivity by resort to the courts, the right to enforcement being at least as much for the licensee's benefit as for the licensor's. The grant of an exclusive license under a patent entitles the exclusive licensee to maintain an action for the infringement of such patent in the name of the exclusive licensee. See § 18:71, infra.

A patent owner may transfer all substantial rights in the patents-in-suit, in which case the transfer is tantamount to an assignment of those patents to the exclusive licensee, conferring standing to sue solely on the licensee.[0.10] To determine whether an exclusive license is tantamount to an assignment, we "must ascertain the intention of the parties [to the license agreement] and examine the substance of what was granted."[0.20]

When an exclusive license transfers less than "all substantial rights" in the patents to the exclusive licensee, the exclusive licensee may still be permitted to bring suit against infringers, but the patent owner is an indispensable party who must be joined.[0.30] Either the licensor did not transfer "all substantial rights" to the exclusive licensee, in which case the licensor remains the owner of the patent and retains the right to sue for infringement, or the licensor did transfer "all substantial rights" to the exclusive licensee, in which case the licensee becomes the owner of the patent for standing purposes and gains the right to sue on its own. In either case, the question is whether the license agreement transferred sufficient rights to the exclusive licensee to make the licensee the owner of the patents in question. If so, the licensee may sue but the licensor may not. If not, the licensor may sue, but the licensee alone may not. When there is an exclusive license agreement, as opposed to a nonexclusive license agreement, but the exclusive license does not transfer enough rights to make the licensee the patent owner, either the licensee or the licensor may sue, but both of them generally must be joined as parties to the litigation.[0.40]

The Federal Circuit has held that a invention development company that granted exclusive licenses for its patents to for-profit companies to build medical devices retained a right to sue and had standing to sue third party infringers.[0.50] The invention development company retained a secondary right to sue infringers if the licensee declined to exercise its right to sue. The court reasoned that "where the licensor retains a right to sue accused infringers, that right often precludes a finding that all substantial rights were transferred to the licensee."[0.60] The court further determined that the agreement between development company and manufacturing company was an exclusive license agreement, it was not a virtual assignment of the patents-in-suit, and accordingly, the development company retained standing to sue accused infringers.[0.70] The Federal Circuit has overturned a district court ruling that a licensee did not have standing to sue because it was not an exclusive licensee since six other parties also held rights to sublicense patents to signal transmission and data encoding.[0.75] The Federal Circuit found that the license was exclusive and that the "the key question … is not…. whether [the plaintiff has shown that it has the right to exclude all others…. The question is whether [the plaintiff] has shown that it has the right under the patents to exclude the Defendants."[0.80]

§ 19:6.Distribution of rights embraced in a..., 5 Pat. L....

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 105 of 204

The Federal Circuit has also upheld a decision by a Massachusetts district court dismissing a declaratory judgment suit because the patent owner university had granted only a field of use license. [0.85] This field of use license did not transfer all substantial rights and thus the patent owner was an indispensible party. However, the patent owner university could not be joined as a defendant in Massachusetts court because it did not waive its Eleventh Amendment immunity. [0.90]

Although "royalties" are generally associated with licenses, retention of royalty rights has been deemed not inconsistent with an assignment. [1] At least one court has suggested that the right to receive royalties is inconsistent with an assignment. [2] Prospective periodic payments are not necessarily royalties. They may merely be a financing arrangement for the payment of an assignment or license. [3] Of course, the right to receive royalties or, indeed, any prospective payment, may be assigned. [4] A contract which used the term "assigns" but provided that the person doing the assigning retained the right to royalties and performance of other services, in default of which the patent would immediately revert back to the assignor was held to be indistinguishable from an exclusive and revocable patent license. [5]

What purports by its caption to be a license, may in fact, by its operative terms, constitute an assignment, and vice versa. The particular name given to the instrument does not control its construction as a license or assignment. [6] Reference to the parties as "licensor/licensee" is not controlling. [7] Exclusivity, the right to transfer, and the right to sue infringers are the hallmarks which distinguish an assignment from a license, the right to sue infringers being indispensible to an assignment. [8] Thus, on one hand, an agreement, though labeled an assignment, which granted the transferor a noncancellable, royalty-free license and the right to grant sublicenses and which did not grant the transferee the right to assign his interest in the patent, was deemed to constitute a license. [9] On the other hand, an agreement, though labeled a license, which granted the transferee the right to make, use, and sell the invention, as well as the right to sue infringers, was deemed to constitute an assignment. [10] A bundle of rights which included the right to grant sublicenses and, in effect, the right to sue and recover damages as coplaintiff, was deemed an assignment rather than a nonexclusive license, as it was labelled. [11]

A license that did not grant the licensee either the right to make or use the invention but only the right to sublicense subject to the licensor's approval coupled with an obligation to sue alleged patent infringers was held to run afoul of New York State's champerty statute. [12] An "exclusive license agreement" that gave the "licensee" the sole and exclusive, irrevocable, worldwide right and license to make, have made, use, and sell the invention covered by the claims of the patent and the exclusive right to defend and enforce the patent and to prevent its infringement was deemed an assignment rather than an exclusive license. [13] Reservation by the grantor of the right to cancel the agreement for certain enumerated defaults (such as a failure on the part of the grantee to use its best efforts or failure to pay royalties) made the transaction a license rather than an assignment. [14]

A license may be exclusive with respect to less than all the rights embraced in a patent, i.e., it may be exclusive only with respect to the right to make. Where a licensee under a copyright was granted only some of the bundle of rights embraced by the copyright, it was held that such licensee had no right to share in an infringement settlement where none of the licensee's exclusive rights was involved. [15]

Courts are inclined to conclude that if the patentee retains any rights in the patent or if the "exclusive licensee" remains under any obligation to the patentee and the agreement states that it is an exclusive license, the court will not hold otherwise. Without expressly stating whether what purported to be an exclusive license is in fact an assignment, a court held that though by the terms of the agreement the "exclusive licensee" acquired the right to sue infringers and to sublicense, the "licensor" was a necessary party to an infringement suit instituted by the "exclusive licensee." [16] The Federal Circuit has held that a licensor that grants patent licenses of varying scope to two different licensees may put itself "in the position of having to aid two licensees" in litigation against each other. The Court held that the primary licensee did not have standing to sue the secondary licensee without the participation of the licensor because the licensor did not "convey all substantial rights" in the patent. [16.50]

An agreement that provided that patent owner does "sell, assign and transfer … an undivided one-third interest in the whole right, title and interest in [the patent] …to [be] held and enjoyed … as fully and entirely as the same would have been held and enjoyed by [the patent owner] had this assignment and sale not been made …" was held to be an assignment rather than

a license, even though the patent owner reserved certain rights, including the right to reassignment if the obligation to the patent owner were not paid. [17] The right to the return of intellectual property upon the happening of a condition subsequent does not vitiate the effectiveness of the transaction as an assignment. [18]

While the line of distinction between an assignment and an exclusive license may in most contexts be elusive, the difference is not entirely without legal consequences. For example, reten tion of title carries with it control of the right to disclaim under 35 U.S.C.A. § 253 or seek reissue. Conceivably, an unscrupulous assignee that no longer wishes to pay royalties under an assignment agreement providing for payment thereof could disclaim one or more claims or dedicate the entire patent to the public and then take the position that there is no longer an obligation to pay royalties under the patent! Accordingly, if the patent owner has sufficient bargaining power he should endeavor to retain title to obviate such possibility.

Westlaw. © 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

| | |
|---|---|
| 0.10 | Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870, 873–74, 20 U.S.P.Q.2d 1045 (Fed. Cir. 1991). |
| 0.20 | Mentor H/S, Inc. v. Medical Device Alliance, Inc., 240 F.3d 1016, 1017, 57 U.S.P.Q.2d 1819 (Fed. Cir. 2001). |
| 0.30 | Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1377, 55 U.S.P.Q.2d 1742 (Fed. Cir. 2000). |
| 0.40 | Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336, 1344, 77 U.S.P.Q.2d 1456 (Fed. Cir. 2006), citing Independent Wireless Telegraph Co. v. Radio Corporation of America, 269 U.S. 459, 466, 46 S. Ct. 166 (1926). |
| 0.50 | Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 1362, 95 U.S.P.Q.2d 1321, 1326 (Fed. Cir. 2010). |
| 0.60 | Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 1362, 95 U.S.P.Q.2d 1321, 1326 (Fed. Cir. 2010). |
| 0.70 | Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 1362, 95 U.S.P.Q.2d 1321, 1326 (Fed. Cir. 2010). |
| 0.75 | WiAV Solutions LLC v. Motorola, Inc., 97 U.S.P.Q.2d 1484, 2010 WL 5256801 (Fed. Cir. 2010). |
| 0.80 | WiAV Solutions LLC v. Motorola, Inc., 97 U.S.P.Q.2d 1484, 2010 WL 5256801, *8 (Fed. Cir. 2010). |
| 0.85 | A123 Systems, Inc. v. Hydro-Quebec, 626 F.3d 1213, 1217, 97 U.S.P.Q.2d 1257, 1259 (Fed. Cir. 2010). |
| 0.90 | A123 Systems, Inc. v. Hydro-Quebec, 626 F.3d 1213, 1220, 97 U.S.P.Q.2d 1257, 1262 (Fed. Cir. 2010). |
| 1 | TWM Mfg. Co. v. Dura Corp., 189 U.S.P.Q. (BNA) 518, 526, 1975 WL 21197 (E.D. Mich. 1975). |
| 2 | Roberts v. Sears, Roebuck and Co., 697 F.2d 796, 217 U.S.P.Q. (BNA) 675 (7th Cir. 1983), reh'g granted and opinion vacated on other grounds, (Mar. 14, 1983) and on reh'g, 723 F.2d 1324, 221 U.S.P.Q. (BNA) 504 (7th Cir. 1983). |
| 3 | Such periodic payments do not constitute post-expiration royalties, although they extend beyond the life of the patent. (See § 19:17, infra). Nor do such periodic payments preclude long-term capital gains treatment. (See § 19:33, infra). |
| 4 | See, for example, Gould v. Lumonics Research Ltd., 495 F. Supp. 294, 210 U.S.P.Q. (BNA) 454 (N.D. Ill. 1980). |
| 5 | Hanes Corp. v. Millard, 531 F.2d 585, 593, 189 U.S.P.Q. (BNA) 331, 336-37 (D.C. Cir. 1976). |
| 6 | REFAC Intern., Ltd. v. VISA USA, Inc., 16 U.S.P.Q.2d (BNA) 2024, 2027, 1990 WL 130032 (N.D. Cal. 1990); Afros S.p.A. v. Krauss-Maffei Corp., 671 F. Supp. 1402, 1444, 5 U.S.P.Q.2d (BNA) 1145, 1179 (D. Del. 1987), judgment aff'd, 848 F.2d 1244 (Fed. Cir. 1988), aff'd, 848 F.2d 1244 (Fed. Cir. 1988). |
| 7 | Allen v. Werner, 190 F.2d 840, 842, 90 U.S.P.Q. (BNA) 133, 135, 51-2 U.S. Tax Cas. (CCH) ¶9398, 40 A.F.T.R. (P-H) ¶1182 (5th Cir. 1951). |
| 8 | Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24, 38-39, 43 S. Ct. 254, 67 L. Ed. 516 (1923). See §§ 19:3 to 19:6, supra. |
| 9 | Raber v. Pittway Corp., 23 U.S.P.Q.2d (BNA) 1313, 1992 WL 219016 (N.D. Cal. 1992), aff'd, 996 F.2d 318 (Fed. Cir. 1993), aff'd, 996 F.2d 318 (Fed. Cir. 1993). |
| 10 | Sybron Transition Corp. v. Nixon, Hargrave, Devans & Doyle, 770 F. Supp. 803, 808, 21 U.S.P.Q.2d (BNA) 1515, 1518-19 (W.D. N.Y. 1991). |
| 11 | Schneider (Europe) AG v. Scimed Life Systems, Inc., 28 U.S.P.Q.2d (BNA) 1225, 1230-31, 1993 WL 463204 (D. Minn. 1993). |
| 12 | Refac Intern., Ltd. v. Lotus Development Corp., 131 F.R.D. 56, 15 U.S.P.Q.2d (BNA) 1747 (S.D. N.Y. 1990). |
| 13 | Dreamlite Holdings Ltd. v. Kraser, 705 F. Supp. 98, 101, 9 U.S.P.Q.2d (BNA) 1401, 1403 (E.D. N.Y. 1988), aff'd, 878 F.2d 1446, 12 U.S.P.Q.2d (BNA) 1574 (Fed. Cir. 1989), aff'd, 878 F.2d 1446, 12 U.S.P.Q.2d 1574 (Fed. Cir. 1989). |

14      Contico Intern., Inc. v. CSS Holding Corp., 16 U.S.P.Q.2d (BNA) 1159, 1160, 1990 WL 171080 (W.D. Mo. 1990).

15      Original Appalachian Artworks, Inc. v. S. Diamond Associates, Inc., 44 F.3d 925, 930, 33 U.S.P.Q.2d (BNA) 1606, 1610
        (11th Cir. 1995). See § § 17:7 to 17:12, infra.

16      Rainville Co., Inc. v. Consupak, Inc., 407 F. Supp. 221, 193 U.S.P.Q. (BNA) 31, 22 Fed. R. Serv. 2d 627 (D.N.J. 1976).

16.50   AsymmetRx, Inc. v. Biocare Med., LLC., 582 F.3d 1314, 1321, 92 U.S.P.Q.2d 1113, 1118 (Fed. Cir. 2009).

17      Willingham v. Star Cutter Co., 555 F.2d 1340, 1343, 194 U.S.P.Q. (BNA) 249, 251 (6th Cir. 1977).

18      Model Rectifier Corp. v. Takachiho Intern. Inc., 220 U.S.P.Q. (BNA) 508, 511, 1982 WL 52132 (C.D. Cal. 1982), aff'd, 709
        F.2d 1517, 221 U.S.P.Q. (BNA) 502 (9th Cir. 1983), aff'd, 709 F.2d 1517, 221 U.S.P.Q. 502 (9th Cir. 1983) (trademark).

---

**End of Document**                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 106

Case 09-10138-MFW   Doc 14410-6   Filed 09/16/14   Page 109 of 204

§ 5036.1 Objections; Specificity—Elements of Specificity, 21 Fed. Prac. & Proc. Evid. §...

21 Fed. Prac. & Proc. Evid. § 5036.1 (2d ed.)

Federal Practice & Procedure

Federal Rules Of Evidence

Database updated April 2014

The Late Charles Alan Wright [a384], Kenneth W. Graham, Jr. [a385], Victor James Gold [a386], Michael H. Graham [a387]

Chapter 2. Administration of Rules of Evidence

Kenneth W. Graham, Jr. [a457]

Rule 103. Rulings On Evidence

**Link to Monthly Supplemental Service**

§ 5036.1 Objections; Specificity—Elements of Specificity

**Primary Authority**

**Fed. R. Evid. 103**

Rule 103 tell us cryptically that a proper objection must state "the specific ground of objection." [1] This might suggest that all that is required to preserve error in admitting evidence is to specify the "legal ground" that justifies exclusion. [2] Writers, however, understand that this does not suffice; at a bare minimum, the objector must tell the trial judge "both what is objected to and why." [3] More expansively, a proper objection must be specific as to "grounds, parts, parties, and purposes." [4] We shall refer to these four as the "elements of specificity", though taking them up in different order—and perhaps with different meaning—than that used by their originators. [5]

**Purpose**

At the very least, what comes out of the lawyer's mouth must make it clear to the trial judge that what she is hearing is an objection; i.e., that the lawyer wants the judge to do something and is not just whining or playing games with opposing counsel. [6] As one writer puts it, an objection should be "positive, direct and correct" [7] A Texas court once said, the objector must "let the trial judge know what he wants and why he thinks himself entitled to it." [8] This does not mean that the lawyer must utter the magic word "objection"; it is enough that the trial judge understands that an objection is being made. [9]

But simply letting the judge know that one is objecting will not suffice. [10] The objection must make clear that the remedy sought is exclusion of the evidence, not some other form of relief. [11] For example, sometimes what a party wants is not to have the evidence excluded but to have the judge give an instruction to the jury limiting the purposes for which the evidence can be used; e.g., an out-of-court statement that is admitted for some nonhearsay purpose. [12] The party must make clear to the judge she is invoking Rule 105, not Rule 103. [13] Whether or not Rule 103 applies to cases of multiple admissibility or not, a request for relief under Rule 105 necessarily requires something more than just an objection. [14]

**Grounds**

When Rule 103 requires that the "ground" be specific, we generally understand that the referent is the "legal reason for excluding" the evidence. [15] As the North Carolina version of Rule 103 puts it: "No particular form is required in order to preserve the right to assert the alleged error upon appeal if the motion or objection clearly presented the alleged error to the trial court." [16] As we shall see, the specificity of an objection can range from one that states no grounds at all to one that is highly precise; reasonable people can differ as to where on this spectrum of specificity an objection must fall in order to "clearly present" the grounds to the trial court. [17]

In assessing the degree of specificity required, courts should recur to the policy of Rule 103. [18] The objection should be specific enough to alert the trial judge to the proper course of action and to enable the opponent to obviate the objection, if

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 110 of 204

§ 5036.1 Objections; Specificity—Elements of Specificity, 21 Fed. Prac. & Proc. Evid. §...

possible. [19]  Appellate courts understandably hesitate to condemn the trial judge for erring where the counsel claiming error did not specify his objection with sufficient clarity to allow the judge to see the error. [20]  But fairness and efficiency also caution against reversal for a new trial to cure the error when the opponent could have done this in the first trial had she understood then what the appellate court now understands the appellant's complaint to have been. [21]

What constitutes a "specific ground" varies with the situation. [22]  Normally an objection suffices without any citation of authority, though as a practical matter rattling a rule or precedent at the trial judge may improve the objector's chances of getting the evidence excluded and thus eliminate any need to preserve error for appeal. [23]  Yet in a situation where the lawyer wants to object to the admission in a joint trial of a codefendant's admission that inculpates his client, we may doubt that an objection under the Confrontation Clause that did not include some mention of the Bruton decision would always suffice to preserve the issue. [24]

Sometimes clearly stating "the reasons for the objection" will require more than a simple statement of authority. [25]  To preserve the error, Rule 103 may require the lawyer to state his "theory" as to why the rule applies; for example, a judge will be understandably puzzled by a hearsay objection to testimony that after talking to the people who witnessed an assault, the police arrested the defendant. [26]  Similarly, if in response to a hearsay objection, the opponent invokes a hearsay exception, the objector will probably have to explain to the judge why the exception does not apply in order to preserve the error for appeal. [27]

Finally, in some cases the objection will depend upon facts about the evidence that the proponent of the evidence has no motive to introduce; e.g., that the statements about to be offered in evidence were uttered in settlement negotiations. [28]  Rule 104 requires that the party objecting prove the factual basis for the objection. [29]  If the judge will not allow this to be done by the use of hearsay, counsel may have to take the witness on voir dire examination to elicit the fact needed to make the basis of the objection clear to the trial judge. [30]

**Targeting the object of the objection**

To be "specific", an objection must do more than state the ground of the objection; it must also "specify the evidence to which the objection is directed." [31]  Placing the burden on the objector to identify the target of her objection furthers the policy of efficiency; she is the person most likely to know what needs to be excluded. [32]  Forcing the objector to specify the target also furthers the policy of party autonomy via separation of functions; as it is usually said, "it is not the job of the judge to sort out admissible from inadmissible evidence." [33]

The target of the objection will usually be readily apparent because the objection will immediately follow the attempt to offer the objectionable evidence. [34]  Rule 103 will require more precise targeting in two situations. [35]  The first arises when despite a close temporal relationship between the objection and the offending evidence, the target remains unclear because the evidence consists of a number of distinct items of evidence; for example, a police report that contains the statements of a number of witnesses, not all of which can be excluded as hearsay. [36]  The second disconnect arises when there is not a close temporal relationship between the objection and its target; e.g., when the objector moves to strike the testimony of a witness on a ground that did not become apparent until cross-examination or when the objector wants to make an objection to an entire line of testimony being offered. [37]  In such cases, context will determine whether specificity requires only the objector identify the "the particular testimony being challenged" [38]  or whether she must target the exact "word, phrase, or question." [39]

**Parties**

Writers who use this category apparently refer to a pair of intertwined problems. [40]  First, in multiparty cases, evidence may be admissible against one party but not against the other under Rule 105; hence, an objection must specify the party against whom the evidence is claimed to be inadmissible. Second, in multiparty cases it would be inefficient to require that all parties object to evidence that is inadmissible against all; but allowing the objection of one party to suffice for all the others may confuse things when the evidence is admissible against some but not all of the parties.

**Rule 103 and invocations of discretion**

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 111 of 204

§ 5036.1 Objections; Specificity—Elements of Specificity, 21 Fed. Prac. & Proc. Evid. §...

Rule 403 explicitly confers discretion on the trial judge to exclude otherwise admissible evidence when the balance between its probative worth and specified countervailing complications tips in favor of the latter.[41] As we have previously seen, despite the differences between Rule 403 and rules that mandate exclusion, courts have generally held that Rule 103 applies both to "true objections" under the other rules and "invocations of discretion" under Rule 403.[42]

Despite their nominal equivalence under Rule 103, we believe it is worthwhile to preserve the distinction between "true objections" and "invocations of discretion."[43] A proper invocation of discretion must, as a practical matter, contain far more than Rule 103 requires for a "true objection."[44] Since under the "abuse of discretion" standard applicable to Rule 403, appellate reversals are rare, the lawyer invoking the court's discretion under Rule 403 should do what it takes to convince the trial judge to rule in her favor.[45] For example, in a civil rights action against police officers for brutalizing the relatives of suspect, Rule 103 might be satisfied by a mere claim that evidence of the gruesome details of the crime the defendants were investigating was "prejudicial."[46] But to convince the trial judge, the lawyer must argue that the probative worth of the evidence on the issue of the defendants' fear for their own safety was outweighed by the danger that the jury might suppose that by admitting the evidence, the court wants them to infer that "the end justifies the means."[47] By fleshing out the logic of the "invocation", the lawyer not only makes a more convincing case for the trial judge but also enhances his admittedly slim chances for an appellate remedy.[48]

Though they sometimes observe it in practice, courts generally fail to distinguish formally between "objections" and "invocations of discretion."[49]

**Rule 103 and objections to form**

The power of the court to control "the mode and order of interrogating witnesses and presenting evidence" under Rule 611(a) resembles Rule 403 in two ways.[50] First, in both cases one can doubt that Rule 103 applies to "objections" under the Rules.[51] Second, in both cases the Rule grants the trial judge a limited discretion but one subject to only limited appellate control.[52] To that extent, what we have said about Rule 403 may be equally applicable to Rule 611.[53]

But Rule 611 has one feature that distinguishes it from Rule 403; at common law the court's discretion had congealed into categories that are frequently taken for "true objections"—"asked and and answered", "argumentative", "compound", "assumes a fact not in evidence", etc.[54] These "objections" to the form of questions are as varied and localized as the "ground rules" in baseball.[55] Obviously it takes more than an Act of Congress to stamp out these ancient and exotic "objections."[56] These spurious "objections" probably do little harm since the opponent can usually surmount them at the trial level with guile or persistence.[57] But it would be a mistake for appellate courts to substitute these labels for analysis of the trial court's exercise of discretion as some of them occasionally do.[58]

Westlaw. © 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

---

Footnotes

| | |
|---|---|
| a384 | Charles Alan Wright Chair in Federal Courts, The University of Texas. |
| a385 | Professor Of Law Emeritus, University of California, Los Angeles. |
| a386 | Professor and William M. Rains Fellow, Loyola Marymount University Law School. |
| a387 | Professor of Law, University of Miami. |
| a457 | Professor Of Law Emeritus, University of California, Los Angeles. |
| 1 | **Cryptically**<br>This seems to condense the language of U.R.Ev. 4: "so stated as to make clear the specific ground of objection." See § 5031, text at notecall 65. |
| 2 | **"Legal ground"**<br>Butts, Gamble & Imwinkelried, Alabama Evidentiary Foundations, 1999, p. 17. |
| 3 | **"What and why"** |

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 112 of 204

§ 5036.1Objections; Specificity—Elements of Specificity, 21 Fed. Prac. & Proc. Evid. §...

Butts, Gamble & Imwinkelreid, Alabama Evidentiary Foundations, 1999, p. 17.

**See also**

7 Adams & Weeg, Iowa Practice: Evidence, 1998, p. 23.

4

**"Parts, parties, purposes"**

1 Cleckley, Handbook on Evidence for West Virginia Lawyers, 3d ed.1994, p. 71; 1 Goode, Wellborn & Sharlot, Guide to The Texas Rules of Evidence: Civil & Criminal, 2d ed. 1993, p. 15.

5

**"Elements"**

These are not be confused with the four elements of a good objection. See 7 Blinka, Wisconsin Practice: Wisconsin Evidence, 2001, p. 11. That is, one must have an "objection" that is "timely", "specific", and "of record." See § 5036, above.

6

**Playing games**

See, e.g., McElhaney, Speaking Objections, 1985, 11 Litigation 39.

Olden v. Commonwealth, Ky. 2006, 203 S.W.3d 672, 675 (merely expressing an intention to object in the future does not preserve error when promised objection fails to materialize at the proper time).

**See also**

People v. Satchell, 1978, 146 Cal.Rptr. 307, 81 Cal.App.3d 347 (statement of counsel that he "would have preferred that the officer testify anew" was a mere "grumbling acquiescence" and not an adequate objection to the use of officer's preliminary hearing testimony).

7

**"Positive, direct"**

1 Cleckley, Handbook on Evidence for West Virginia Lawyers, 3d ed.1994, p. 71.

8

**"Entitled to it"**

Lankston v. State, Tex.Crim.1992, 827 S.W.2d 907, 909, quoted in 1 Goode, Wellborn & Sharlot, Guide to The Texas Rules of Evidence: Civil & Criminal, 2d ed. 1993, p. 17.

9

**Judge understands**

Pestey v. Cushman, 2002, 788 A.2d 496, 510, 259 Conn. 345 (error preserved despite absence of word "objection" where transcript shows trial court knew an objection was being made).

10

**Not suffice**

See, e.g., Sawyer v. State, 1984, 678 S.W.2d 367, 369, 284 Ark. 26 (error not preserved where objection was made but no grounds were stated).

11

**Exclusion sought**

7 Blinka, Wisconsin Practice: Wisconsin Evidence, 2001, p. 11.

12

**Limiting instruction**

See § 5066, below.

13

**Invoking 105**

1 Cleckley, Handbook on Evidence for West Virginia Lawyers, 3d ed.1994, p. 71; 1 Goode, Wellborn & Sharlot, Guide to The Texas Rules of Evidence: Civil & Criminal, 2d ed. 1993, p. 15.

14

**Requires more**

See § 5065. On whether Rule 103 applies, see § 5034.4, above.

**See also**

U.S. v. Demopoulos, C.A.7th, 1974, 506 F.2d 1171, 1176–77 (defendant contended that a portion of the grand jury transcript which was only relevant on the issue of the materiality of his allegedly perjured testimony should not have been submitted to the jury but only considered by the judge; issue was not preserved for appeal by an objection which went to admissibility and conceded the propriety of the ruling now alleged as error); Castro v. State, Fla.App.2000, 791 So.2d 1114, 1115 (when trial

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 113 of 204

§ 5036.1Objections; Specificity—Elements of Specificity, 21 Fed. Prac. & Proc. Evid. §...

court admits other crimes evidence to corroborate, objector must state the argument he wishes to make on appeal; namely, that self-corroboration does not suffice).

**15**

**"Legal reason"**

See, e.g., Ehrhardt, Florida Evidence, 2002, p. 19.

Motorola Inc. v. J.B. Rogers Mechanical Contractors, C.A.9th, 2006, 177 Fed.Appx. 754 (party fails to preserve error not only by failing to make a specific objection, but also by making the wrong specific objection").

**State cases**

Woods v. State, 13 So. 3d 1, 19 (Ala. Crim. App. 2007) (review barred by failure to state grounds of objection below); Ainsworth v. KLI, Inc., 967 So. 2d 296, 301 (Fla. Dist. Ct. App. 4th Dist. 2007); McWilliams v. Courtney, La.App. 2006, 945 So.2d 242, 244 (objecting party must state both the specific ground for objection to evidence as well as reasons that support objection); DeLeon v. State, 407 Md. 16, 962 A.2d 383, 387 (2008) (under appellate rule, grounds for objection need not be stated, unless the trial court requests it); State v. Muse, 2006, 721 N.W.2d 661, 672, 15 Neb.App. 13 (litigant must make timely objection that specifies the ground for exclusion); State v. Lopez, 2007-NMSC-037, 142 N.M. 138, 164 P.3d 19, 24 (2007) (objections during and prior to trial and motion to sever made clear that the defense was objecting on *Bruton* grounds); State v. Biggs, Tenn.Crim.App. 2006, 218 S.W.3d 643, 667 (Rule 103 requires objector to place on the record the reasons for an objection); State v. Prineas, 316 Wis. 2d 414, 2009 WI App 28, 766 N.W.2d 206, 211 (Ct. App. 2009) (specific ground of objection).

**16**

**"No particular form"**

N.C.R.Ev. 103(a)(1), quoted in § 5031, note 100.

**See also**

U.S. v. Hogan, C.A.5th, 1985, 763 F.2d 697, 701 (while objections were not paradigms, they were sufficient to bring issue to attention of trial court).

Reyna v. State, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005) (must state with sufficient specificity to make trial court aware of the complaint).

Safari v. State, Tex.App.1997, 961 S.W.2d 437, 442 (no technical form of words required so long as objection sufficiently apprised the court and opposing counsel of the nature of the complaint).

**17**

**People differ**

For an interesting exchange on the required degree of specificity, see the majority and dissenting opinions in U.S. v. Arteaga-Limones, C.A.5th, 1976, 529 F.2d 1183.

State v. Robbins, 979 So. 2d 630, 641 (La. Ct. App. 2d Cir. 2008) (objection to lab certificate as hearsay does not preserve claim that state erred in failing to give notice of intent to use the certificate so defense could not subpoena the declarant for cross-examination); State v. Muse, 2006, 721 N.W.2d 661, 672, 15 Neb.App. 13 (objection that evidence was cumulative and prejudicial does not preserve objection to relevance of the evidence).

**18**

**Policy of Rule**

See § 5032, above.

State v. Kirkman, 2007, 155 P.3d 125, 130, 159 Wash.2d 918 (by requiring a specific objection to preserve issue, Rule 103 gives the trial judge the opportunity to prevent or cure error by striking testimony or giving curative instruction).

**19**

**Alert and obviate**

State v. Sosnowicz, 229 Ariz. 90, 270 P.3d 917, 922 n.5 (Ct. App. Div. 1 2012) ("that's a legal opinion" suffices to alert trial judge and opponent to nature of the objection).

Carter v. Wiese Corp., Iowa App.1984, 360 N.W.2d 122, 132 (purpose of objections is to alert trial judge to question raised and to enable opposing counsel to take steps to cure the alleged defect).

Washington v. State, 179 Md. App. 32, 943 A.2d 704, 710 (2008), judgment rev'd, 2008 WL 5191475 (Md. 2008) (objection to authenticity of surveillance videotape sufficed to alert the court to possibility of editing when coupled with his remarks during argument about the need for someone familiar with the manner of copying tape to CD-ROM).

State v. Applewhite, 660 S.E.2d 240, 243 (N.C. Ct. App. 2008) (general objection to opinion did not preserve error in failure to qualify witness as an expert).

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 114 of 204

§ 5036.1Objections; Specificity—Elements of Specificity, 21 Fed. Prac. & Proc. Evid. §...

State v. Merced, 933 A.2d 172, 174 (R.I. 2007) (failure to object on ground of improper bolstering bars appeal as trial court's attention was never directed to this issue).

20

**Allow to see**

"The trial court must be apprised of the basis for the objection with sufficient particularity to allow an informed decision to be made on the legal issue involved." U.S. v. Greenfield, C.A.5th, 1977, 554 F.2d 179, 186.

**See also**

1 Mueller & Kirkpatrick, Federal Evidence, 2d ed.1994, p. 77.

21

**Understood then**

U.S. v. Gibbs, C.A.3d, 1984, 739 F.2d 838, 849 (failure to specify ground of objection under Confrontation Clause deprived the prosecution of opportunity to take corrective measures); People v. Smith, 1986, 225 Cal.Rptr. 348, 351, 180 Cal.App.3d 72 (reason for requiring objection in trial court is that if opponent had been faced with a proper objection there, evidence obviating the objection might have been adduced).

**See also**

7 Adams & Weeg, Iowa Practice: Evidence, 1998, p. 17.

22

**"Specific ground"**

12 Miller, Indiana Practice: Indiana Evidence, 2d ed.1995, p. 38.

Jennings v. State, 965 So. 2d 1112, 1122 (Ala. Crim. App. 2006) (statement of specific grounds of objection "waives" all other objections not specified).

**Compare**

U.S. v. Hicks, 393 Fed. Appx. 201, 203 (5th Cir. 2010) (denying review where appellate review does not cite Evidence Rules or relevant caselaw).

23

**Authority**

Cohen, Sheppeard & Paine, Tennessee Law of Evidence, 3d ed.1995, p. 17.

Ford v. State, 305 S.W.3d 530, 533 (Tex. Crim. App. 2009) (but need not "spout magic words" or recite a specific statute); Rivas v. State, 275 S.W.3d 880, 887 (Tex. Crim. App. 2009) (reference to Rule may save an obscure objection but an objection is not defective merely because it does not cite a Rule of Evidence).

**But see**

People v. Curl, 46 Cal. 4th 339, 93 Cal. Rptr. 3d 537, 554 n. 14, 207 P.3d 2 (2009), as modified, (July 8, 2009) (failure to cite specific Evidence Code provision not required if substance, purpose, and relevance of the excluded evidence were made clear); Raess v. Doescher, 883 N.E.2d 790, 797 (Ind. 2008) (finding objection insufficient to raise objection to reliability of expert's proposed testimony where did not cite Rule 702).

24

**Bruton decision**

See § 5064, below.

25

**"Reasons for objection"**

Cohen, Sheppeard & Paine, Tennessee Law of Evidence, 3d ed.1995, p. 16.

**See also**

State v. Isom, 313 Or. 391, 837 P.2d 491, 500 (1992) (objection on theory that prosecutor was commenting on prior counsel's strategy does not preserve objection on theory that it was improper to refer to a prior trial of defendant as equally important to present case).

26

**Arrested defendant**

Readers of this footnote presumably were as mystified by the objection as the hypothetical judge. In the real case on which this was based, the only relevance of the evidence was as circumstantial evidence that the witnesses had told the police that the defendant was the person who struck the victim from behind with a beer bottle as the victim testified that he did not see who struck him. Had the lawyer not explained his theory to the trial judge and first raised it on appeal, we think it highly

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 115 of 204

§ 5036.1 Objections; Specificity—Elements of Specificity, 21 Fed. Prac. & Proc. Evid. §...

unlikely that the appellate court would feel compelled to address the question of whether the hearsay rule bars circumstantial as well as direct evidence of hearsay.

27

**Why does not apply**

Dykes v. Raymark Industries, Inc., C.A.6th, 1986, 801 F.2d 810, 817 (incumbent on party objecting to former testimony to explain precisely why persons in former trial did not have motive or opportunity to develop cross-examination present party would have used).

**See also**

11 Thompson, Minnesota Practice: Evidence, 3d ed.2001, p. 41 (similar).

**But see**

State v. Biggs, Tenn.Crim.App. 2006, 218 S.W.3d 643, 667 (when objecting on hearsay grounds, objector must negate application of hearsay objection—apparently even when opponent does not raise that exception to justify admission).

28

**Settlement**
See Rule 408.

29

**Prove factual basis**
See § 5053, below.

30

**Take on voir dire**
5 Tegland, Washington Practice: Evidence, 4th ed.1999, p. 51.

31

**"Objection is directed"**
5 Tegland, Washington Practice: Evidence, 4th ed.1999, p. 50.
U.S. v. Rodriguez, 525 F.3d 85, 98 (1st Cir. 2008) (objection to violation of Rule 703 does not preserve error where defense never specified the underlying data supposedly revealed to the jury).

32

**Likely to know**
If the objector does not know the target, he should not object; if he is too stupid or careless to know his own ignorance, then overruling the objection for failure to specify may be the most efficient way to teach him to shut up.

33

**"Not judge's job"**
7 Adams & Weeg, Iowa Practice: Evidence, 1998, p. 23.

34

**Readily apparent**
7 Adams & Weeg, Iowa Practice: Evidence, 1998, p. 23.

35

**More precise targeting**
1 Mueller & Kirkpatrick, Federal Evidence, 2d ed.1994, p. 36.

36

**Number of items**
We shall say more about this problem in § 5036.3, below.

**See also**
Konopasek v. State, 946 N.E.2d 23, 27 n.3 (Ind. 2011) (judge's reference to "opening the door" does not suffice to show he understood a 404(b) objection was intended).

37

**Temporal specificity**
Since this problem blurs the distinction between specificity and timeliness of the objection, we will need to consider it in two places. See § 5036.4 and 5037., below.

38

**"Particular testimony"**
Cohen, Sheppeard & Paine, Tennessee Law of Evidence, 3d ed.1995, p. 17.

39

**"Phrase or question"**
Butts, Gamble & Imwinkelreid, Alabama Evidentiary Foundations, 1999, p. 17.

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 116 of 204

§ 5036.1Objections; Specificity—Elements of Specificity, 21 Fed. Prac. & Proc. Evid. §...

**40**

**Use category**

1 Cleckley, Handbook on Evidence for West Virginia Lawyers, 3d ed.1994, p. 71; 1 Goode, Wellborn & Sharlot, Guide to The Texas Rules of Evidence: Civil & Criminal, 2d ed. 1993, p. 15.

**41**

**Tips balance**

See vol. 22, § 5214.

**42**

**Applies to both**

See § 5034.4, above.

**43**

**Preserve distinction**

We persist in the (unrealistic?) hope that appellate courts will eventually return to their senses and stop acting as if every one of the Evidence Rules was a gift of discretion to the trial judge. See § 5035, above. Under the present system, the distinction has far less salience than it would under a proper interpretation of the Rules.

**44**

**Contain more**

Under most circumstances, a true objection preserves error simply by specifying the ground and the target; e.g., "objection—hearsay." If they were truly equivalent, "objection—Rule 403!" would suffice to preserve error in discretionary exclusion. American Family Mut. Ins. Co. v. DeWitt, 218 P.3d 318, 325 (Colo. 2009) (relevance objection does not preserve claim of undue prejudice under Rule 403).

**45**

**"Abuse of discretion"**

See vol. 22, § 5224, note 37.

**46**

**"Prejudicial"**

Compare Llaguno v. Mingey, C.A.7th, 1985, 763 F.2d 1560, 1569.

**47**

**"Ends justifies means"**

For an explanation of why "prejudice" usually involves an appeal to an improper inference as well as an appeal to the emotions, see vol. 22, § 5215.

**48**

**Enhances chances**

An appellate court might find the argument in the text appealing, yet be reluctant to find the trial judge abused her discretion in rejecting an argument that was never made to her. See § 5032, above.

**49**

**Fail to distinguish**

See, e.g., State v. Jenkins, 1998, 512 S.E.2d 860, 864, 204 W.Va. 347 (objection on ground of "surprise" not sufficient to preserve objection under Rule 403); State v. Neri, R.I.1991, 593 A.2d 953, 956 ("objection" under Rule 403 does not suffice to preserve claim that evidence was totally irrelevant).

**See also**

For a more comprehensive collection of cases, see vol. 22, § 5224, notes 4–7.

**50**

**"Mode and order"**

See generally, vol. 28, § 6164.

State v. Jose G., 290 Conn. 331, 963 A.2d 42, 50 (2009) (an objection that a question is "leading" is a procedural objection does not preserve objection that question called for improper impeachment).

**51**

**Doubt Rule 103 applies**

In the case of Rule 611, the question is whether a ruling as to the proper mode of questioning a witness is one that "admits or excludes evidence" within the meaning of Rule 103. See § 5034.4, above.

**52**

**Grants discretion**

See vol. 28, § 6162.

**53**

**Said about Rule 403**

See above, text at notecall 40.

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 117 of 204

§ 5036.1 Objections; Specificity—Elements of Specificity, 21 Fed. Prac. & Proc. Evid. §...

54

**Congealed categories**

A popular evidence manual in use in California at the time that the California Evidence Code was adopted devoted a chapter to each of the following objections: is ambiguous or unintelligible, compound, too general, calls for narrative answer, has been asked and answered, misquotes a witness, is leading, is argumentative, assumes fact not in evidence, calls for speculation. Heafey, California Trial Objections, 1967, pp. 47–79.

**Compare**

The list in the text with the one found in Maxwell, I Object!, 46 So.Dak.L.Rev. 203, 204–205.

55

**"Ground rules"**

The present writer once heard a trial judge sustain an objection to a line of questioning on the ground that it was "tedious." Whether or not the ruling would have pleased an appellate court, it delighted the jury.

For those unfamiliar with the former "National Pastime" we should explain that because baseball stadia lack any uniformity, each ballpark has a set of unique rules that deal with problems peculiar to that locale. For example, in stadia with low outfield fences that allow balls to bounce out of play, the hitter is generally restricted in how far she can advance. Hence, the expression "a ground rule double" for the case where the batter bounces the ball into the stands but is only allowed to advance to second base.

56

**Stamp out**

In California, a quasi-official benchbook for state trial judge still lists 20 such "objections" despite scathing criticism by a local smart alec. Graham, California's "Restatement" of Evidence: Some Reflections on Appellate Repair of the Codification Fiasco, 1971, 4 Loy.(L.A.) L.Rev.279, 280–281.

57

**Surmount at trial**

We do not mean to discount the pervasiveness of these "objections." The writer, as a byproduct of a massive empirical study of Los Angeles Courts, collected statistics on the number and nature of the objections made by lawyers. Objections to the form of the question outnumbered all the substantive objections combined. It would be nice to see similar statistics from other locales, but, alas, the path to tenure seems to lie through writing the umpteenth article on Daubert.

58

**Substitute labels**

See, e.g., 1 M. Graham, Handbook of Federal Evidence, 5th ed.2001, §§ 611.14 to 611.23.

---

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 107

# Black's Law Dictionary

## Tenth Edition

**Bryan A. Garner**
Editor in Chief



THOMSON REUTERS

LIBRARY OF

JUL  9 2014

Mat # 41372510
Mat # 41513461—deluxe

REF.
DICT
KF
156
.B52
2014
c. 2

## Disclaimer

Although this publication was created to provide you with accurate and authoritative information about legal terminology, it was not necessarily prepared by persons licensed to practice law in a particular jurisdiction. The publisher is not engaged in rendering legal or other professional advice, and this publication is not a substitute for an attorney's advice. If you require legal or other expert advice, you should seek the services of a competent attorney or other professional.

## Copyright Clearence Center

For authorization to photocopy, please contact the Copyright Clearance Center at 222 Rosewood Drive, Danvers, MA 01923, USA (978) 750-8400; fax (978) 646-8600 or West's Copyright Services at 610 Opperman Drive, Eagan, MN 55123, fax (651) 687-7551. Please outline the specific material involved, the number of copies you wish to distribute, and the purpose or format of the use.

## Copyright information

"BLACK'S LAW DICTIONARY" is a registered trademark of Thomson Reuters.

Registered in U.S. Patent and Trademark Office
COPYRIGHT © 1891, 1910, 1933, 1951, 1957, 1968, 1979, 1990 West Publishing Co.
© West, a Thomson business, 1999, 2004
© 2009, 2014 Thomson Reuters
                610 Opperman Drive
                St. Paul, MN 55123
                1-800-313-9378
Printed in the United States of America

ISBN: 978-0-314-61300-4
ISBN: 978-0-314-62130-6 (deluxe)

that has been colonized. — Also termed *native title*.
2. INDIAN TITLE.

▶ **absolute title.** (17c) An exclusive title to land; a title that excludes all others not compatible with it. See *fee simple absolute* under FEE SIMPLE.

▶ **adverse title.** (18c) A title acquired by adverse possession. See ADVERSE POSSESSION.

▶ **after-acquired title.** (1810) Title held by a person who bought property from a seller who acquired title only after purporting to sell the property to the buyer. See AFTER-ACQUIRED-TITLE DOCTRINE. Cf. *title by estoppel*.

▶ **allodial title.** Real-property ownership without a duty of service to, control by, or acknowledgment of any superior landlord. — Also termed *radical title*.

▶ **apparent title.** See COLOR OF TITLE.

▶ **bad title.** 1. See *defective title*. 2. See *unmarketable title*.

▶ **clear title.** (17c) 1. A title free from any encumbrances, burdens, or other limitations. 2. See *marketable title*. — Also termed *good title*.

▶ **defeasible title.** (17c) A title voidable on the occurrence of a contingency, but not void on its face.

▶ **defective title.** (17c) A title that cannot legally convey the property to which it applies, usu. because of some conflicting claim to that property. — Also termed *bad title*.

▶ **derivative title.** (17c) 1. A title that results when an already existing right is transferred to a new owner. . 2. The general principle that a transferee of property acquires only the rights held by the transferor and no more.

▶ **dormant title.** (17c) A title in real property held in abeyance.

▶ **doubtful title.** (17c) A title that exposes the party holding it to the risk of litigation with an adverse claimant. See *unmarketable title*.

> "Doubtful titles are those which turn upon some question of law or fact which the court considers so doubtful that the purchaser will not be compelled to accept the title and incur the risk of a lawsuit by adverse claimants." Chapman W. Maupin, *Marketable Title to Real Estate* 2 (2d ed. 1907).

▶ **equitable title.** (17c) A title that indicates a beneficial interest in property and that gives the holder the right to acquire formal legal title. ● Before the Statute of Uses (1536), an equitable title was enforceable only in a court of chancery, not of law. Cf. *legal title*.

▶ **good title.** (16c) 1. A title that is legally valid or effective. 2. See *clear title* (1). 3. See *marketable title*.

> "A good title consists in the rightful ownership of the property and in the rightful possession thereof, together with the appropriate legal evidence of rightful ownership. The rightful owner of an estate may be in the rightful possession thereof, but unless he is supplied with the documentary evidence of title, where he holds by purchase, or can prove his right by the testimony of witnesses or other instruments of evidence, where he holds as heir, that is, by descent, his title cannot be said to be good. Sir William Blackstone declares that a perfect title consists in the union of the possession, the right of the possession and the right of property in one and the same person. This is true in a general sense, but the definition scarcely embraces all the elements of a good title, as that term is employed between vendor and purchaser. A purchaser in possession who has paid the whole purchase money, but who has not received a conveyance, may be said to have the possession,

the right of possession and the right of property, but not having received a deed, the indispensable evidence of legal title in such a case, his title cannot be said to be good." Chapman W. Maupin, *Marketable Title to Real Estate* 1–2 (2d ed. 1907).

▶ **imperfect title.** (18c) A title that requires a further exercise of the granting power to pass land in fee, or that does not convey full and absolute dominion.

▶ **Indian title.** See INDIAN TITLE.

▶ **just title.** *Civil law.* In a case of prescription, a title that the possessor received from someone whom the possessor honestly believed to be the real owner, the title having been intended to transfer ownership of the property. La. Civ. Code art. 3483. — Also termed *justus titulus*.

▶ **legal title.** (17c) A title that evidences apparent ownership but does not necessarily signify full and complete title or a beneficial interest. ● Before the Statute of Uses (1536), a legal title was enforceable only in a court of law, not chancery. Cf. *equitable title*.

▶ **lucrative title.** (17c) *Civil law.* A title acquired without giving anything in exchange for the property; title by which a person acquires anything that comes as a clear gain, as by gift, descent, or devise. ● Because lucrative title is usu. acquired by gift or inheritance, it is treated as the separate property of a married person. Cf. *onerous title*.

▶ **marketable title.** (18c) A title that a reasonable buyer would accept because it appears to lack any defect and to cover the entire property that the seller has purported to sell; a title that enables a purchaser to hold property in peace during the period of ownership and to have it accepted by a later purchaser who employs the same standards of acceptability. — Also termed *good title*; *merchantable title*; *clear title*.

> "One definition of a marketable title which has been put forward repeatedly is one free from all reasonable doubt. Stated another way, a marketable title is one which does not contain any manner of defect or outstanding interest or claim which may conceivably operate to defeat or impair the interest which is bargained for and is intended to be conveyed. This negative concept of marketability has become an implied invitation for courts to declare titles unmarketable if an examiner has entertained any doubt whatever with respect to them. The digests attest the painful truth that claims of a bygone era cling like barnacles to land titles and encumber them long after they should have been scraped clean. . . . We need to replace this negative approach by a positive one which will make the marketability of titles depend solely upon their state during some recent interval of time rather than upon their entire history." Paul E. Basye, *Clearing Land Titles* § 371, at 539 (1953).

▶ **native title.** See *aboriginal title* (1).

▶ **nonmerchantable title.** See *unmarketable title*.

▶ **onerous title** (on-ər-əs). (17c) 1. *Civil law.* A title acquired by giving valuable consideration for the property, as by paying money or performing services. 2. A title to property that is acquired during marriage through a spouse's skill or labor and is therefore treated as community property. Cf. *lucrative title*.

▶ **original title.** A title that creates a right for the first time.

> "The catching of fish is an original title of the right of ownership, whereas the purchase of them is a derivative title. The right acquired by the fisherman is newly created; it

# TAB 108

# Canadian Contractual Interpretation Law

SECOND EDITION

## Geoff R. Hall

B.A. (McGill), M.A., LL.B. (Toronto), LL.M. (Harvard)

Partner, McCarthy Tétrault LLP

 LexisNexis·

finally the <u>purpose</u> sought by the parties in using these terms ... .[39] [Underlining in original.]

A contract's purpose is generally not a significant element of the interpretive process under the common law, although it was considered along with text and context in *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*.[40]

## 2.2    A CONTRACT IS TO BE CONSTRUED AS A WHOLE WITH MEANING GIVEN TO ALL OF ITS PROVISIONS

### 2.2.1    The principle

It is a fundamental precept that contractual interpretation requires an examination of a contract as a whole, not just a consideration of the specific words in dispute.[41] Individual words and phrases must be read in the context of the entire document. "The key principle of contractual interpretation here is that the words of one provision must not be read in isolation but should be considered in harmony with the rest of the contract and in light of its purposes and commercial context."[42] The rule is so basic that it has aptly been described as a "well-known" principle of contract interpretation.[43]

The corollary of this principle is the precept that meaning must be given to all of the words in a contract:

> To the extent that it is possible to do so, [a contract] should be construed as a whole and effect should be given to all of its provisions. The provisions should be read, not as standing alone, but in light of the agreement as a whole and the other provisions thereof: *Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57 at p. 66, 25 D.L.R. (4th) 649 at p. 655. The court should strive to give meaning to the agreement and "reject an interpretation that would render

---

[39]    *Frenette v. Metropolitan Life Insurance Co.*, [1992] S.C.J. No. 24, [1992] 1 S.C.R. 647 at 667 (S.C.C.).

[40]    [2010] S.C.J. No. 4, [2010] 1 S.C.R. 69 at paras. 64-66 (S.C.C.), *per* Cromwell J.

[41]    The first edition of this book was cited with approval on this point in *Hnatiuk v. Court*, [2010] M.J. No. 52, 251 Man.R. (2d) 178 at para. 43 (Man. C.A.).

[42]    *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, [2010] S.C.J. No. 4, [2010] 1 S.C.R. 69 at para. 64 (S.C.C.), *per* Cromwell J. See also *Canadian Newspapers Co. v. Kansa General Insurance Co.*, [1996] O.J. No. 3054, 30 O.R. (3d) 257 at 270 (Ont. C.A.), leave to appeal to S.C.C. refused [1996] S.C.C.A. No. 553 (S.C.C.); *Toronto-Dominion Bank v. Leigh Instruments Ltd. (Trustee of)*, [1999] O.J. No. 3290, 45 O.R. (3d) 417 at para. 9 (Ont. C.A.); and *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, [2007] O.J. No. 1083, 85 O.R. (3d) 254 at para. 24 (Ont. C.A.), which are to a similar effect.

[43]    *Geoffrey L. Moore Realty Inc. v. Manitoba Motor League (c.o.b. CAA Manitoba)*, [2003] M.J. No. 191, [2003] 9 W.W.R. 385 at para. 12 (Man. C.A.), citing *National Trust Co. v. Mead*

### 6.1.6    The power to correct errors in recording written agreements in Québec

The Québec Court of Appeal has recently recognized that the courts have a power, not dissimilar to the common law concept of rectification, to correct "material errors" or a "material slip of the pen" in recording written agreements. Consistent with the subjective theory of contract that prevails in Québec, the logic is that where the writing does not conform to the intentions of the parties — which constitutes the true contract[23] — the intentions of the parties must prevail. Thus to the extent of an inconsistency between the parties' intentions and the document, a court may intervene to correct the error in the document.[24]

The Québec Court of Appeal has emphasized that the process in Québec is not an importation of the common law concept of rectification, noting that Québec law has sufficient tools to give effect to the true intentions of the parties even where the contract does not correctly reflect that intention.[25]

Given Québec's subjective theory of contractual interpretation, it is unsurprising that the power to correct errors has only recently emerged in Québec law: looking to subjective intent will often obviate the need to correct a written document. Similarly it is unsurprising that the Québec Court of Appeal has held it unnecessary to import the common law doctrine into Québec. In many respects, the doctrine of rectification is only made necessary by the common law's objective approach to interpretation, and the doctrine would fit uneasily into a regime of subjective intention.

## 6.2    ESTOPPEL BY CONVENTION

### 6.2.1    The principle

Estoppel by convention is another doctrine arguably not forming part of the law of contractual interpretation proper, but which can nevertheless affect the meaning ascribed to a contract. Applied in the context of contractual meaning, estoppel by convention provides that if the parties to a contract have based their dealings on a shared assumption as to the proper interpretation of their contract and one party has relied upon that interpretation to its detriment, the other party

---

[23] As Pigeon J. stated in *Guardian Insurance Co. of Canada v. Victoria Tire Sales Ltd.*, [1979] S.C.J. No. 74, [1979] 2 S.C.R. 849 at 869 (S.C.C.), "Under the civil law embodied in the *Civil Code of Québec* a contract is not to be identified with the document in which its terms are set forth. The contract is the agreement between the parties, the document is only evidence of it."

[24] Nicolas W. Vermeys, "Le poids des virgules — Étude sur l'impact des erreurs matérielles en droit des contrats" (2006) 66 R. du B. 291; *Sobeys Québec inc. v. Coopérative des consommateurs de Sainte-Foy*, [2005] J.Q. no 17876, [2006] R.J.Q. 100 (Qué. C.A.); and *Riopel v. Agence du revenu du Canada*, [2011] J.Q. no 5720 at para. 15 (Qué. C.A.), leave to appeal to S.C.C. granted [2011] S.C.C.A. No. 356 (S.C.C.).

[25] *Québec (Sous-ministre du Revenu) v. Services environnementaux AES inc.*, [2011] J.Q. no 1911 at para. 13 (Qué. C.A.), leave to appeal to S.C.C. granted [2011] S.C.C.A. No. 198 (S.C.C.) and *Riopel v. Agence du revenu du Canada, ibid.*, at para. 16.

---

*(right column, partially cut off)*

will not be allowed to resile from t
of another meaning of the contract.

In *Ryan v. Moore*,[26] the Suprem
review of the law of estoppel by
convention requires three elements
detriment:

(1) The parties' dealings must ha
or law: estoppel requires mar
creating a mutual assumptio
silence (impliedly).

(2) A party must have conducted
assumption, its actions resulti

(3) It must also be unjust or un
depart from the common as
estoppel therefore has to prov
party is allowed to resile fro
change from the presumed pos

Estoppel by convention can ar
determining the meaning to be asc
Canada. There are likely several re
requirements, making it difficult to i
both a common understanding and d
a mere possibility. Second, a party ca
achieve the same result as would be
convention by staying within the
interpretation and invoking the pa
interpretation. In this regard, the on
convention is that it, unlike the u
contractual interpretation, does no
contract.[28] This likely goes a lor
prominence of estoppel by conventio
generally not admissible as an ai
ambiguity.[29]

The situation in Québec is the c
convention has no exact Québec equi
(always permissible as an interpretive
estoppel by convention.[30]

Although not truly a doctrine c
estoppel by convention fits easily v

---

[26] [2005] S.C.J. No. 38, [2005] 2 S.C.R. 53 (S

[27] *Ibid.*, at para. 59.

[28] *Adtronics Signs Ltd. v. Sicon Group Inc.*
proceeded with an analysis of estoppel by
question was unambiguous.

[29] See section 3.2.

[30] See section 3.2.4.

will not be allowed to resile from the common assumption and seek enforcement of another meaning of the contract.

In *Ryan v. Moore*,[26] the Supreme Court of Canada undertook a comprehensive review of the law of estoppel by convention. It concluded that estoppel by convention requires three elements, namely a common assumption, reliance and detriment:

(1) The parties' dealings must have been based on a shared assumption of fact or law: estoppel requires manifest representation by statement or conduct creating a mutual assumption. Nevertheless, estoppel can arise out of <u>silence</u> (impliedly).

(2) A party must have conducted itself, i.e. acted, in reliance on such shared assumption, its actions resulting in a change of its legal position.

(3) It must also be unjust or unfair to allow one of the parties to resile or depart from the common assumption. The party seeking to establish estoppel therefore has to prove that detriment will be suffered if the other party is allowed to resile from the assumption since there has been a change from the presumed position.[27]

Estoppel by convention can arise in several contexts. In the context of determining the meaning to be ascribed to a contract, it is rarely invoked in Canada. There are likely several reasons for this. First, the doctrine has strict requirements, making it difficult to invoke. The courts require clear evidence of both a common understanding and detrimental reliance that is not speculative or a mere possibility. Second, a party can usually avoid most of these strictures and achieve the same result as would be achieved under the doctrine of estoppel by convention by staying within the strict confines of the law of contractual interpretation and invoking the parties' subsequent conduct as an aid to interpretation. In this regard, the only real advantage of invoking estoppel by convention is that it, unlike the use of subsequent conduct as an aid to contractual interpretation, does not require an ambiguity in the written contract.[28] This likely goes a long way towards explaining the greater prominence of estoppel by convention in England, where subsequent conduct is generally not admissible as an aid to interpretation even to resolve an ambiguity.[29]

The situation in Québec is the converse of that of England. Estoppel by convention has no exact Québec equivalent, but the use of subsequent conduct (always permissible as an interpretive tool) yields essentially the same results as estoppel by convention.[30]

Although not truly a doctrine of the law of contractual interpretation, estoppel by convention fits easily with that law. Contractual interpretation

---

[26] [2005] S.C.J. No. 38, [2005] 2 S.C.R. 53 (S.C.C.).

[27] *Ibid.*, at para. 59.

[28] *Adtronics Signs Ltd. v. Sicon Group Inc.*, [2004] B.C.J. No. 1885 at para. 145 (B.C.S.C.) proceeded with an analysis of estoppel by convention on the assumption that the contract in question was unambiguous.

[29] See section 3.2.

[30] See section 3.2.4.

TAB 109

# CIVIL
# EVIDENCE
# HANDBOOK

**Gordon D. Cudmore**
B.A., LL.B., LL.M. (Cambridge) of the Ontario Bar

## Volume 1

# CARSWELL®

© 1994 Thomson Reuters Canada Limited

NOTICE AND DISCLAIMER: All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without the prior written consent of the publisher (Carswell).

Carswell and all persons involved in the preparation and sale of this publication disclaim any warranty as to accuracy or currency of the publication. This publication is provided on the understanding and basis that none of Carswell, the author/s or other persons involved in the creation of this publication shall be responsible for the accuracy or currency of the contents, or for the results of any action taken on the basis of the information contained in this publication, or for any errors or omissions contained herein.

No one involved in this publication is attempting herein to render legal, accounting or other professional advice. If legal advice or other expert assistance is required, the services of a competent professional should be sought. The analysis contained herein should in no way be construed as being either official or unofficial policy of any governmental body.

**A cataloguing record for this publication is available from Library and Archives Canada**

ISBN 0-459-30401-1

The paper used in this publication meets the minimum requirements of the American National Standard for Information Sciences — Permanence of Paper for Printed Library Materials, ANSI X39.48-1984.

**TELL US HOW WE'RE DOING**
Scan the QR code to the right with your smartphone to send your comments regarding our products and services.
Free QR Code Readers are available from your mobile device app store.
You can also email us at carswell.feedback@thomsonreuters.com




THOMSON REUTERS

CARSWELL, A DIVISION OF THOMSON REUTERS CANADA LIMITED

| | **Customer Relations** |
|---|---|
| One Corporate Plaza | |
| 2075 Kennedy Road | Toronto 1-416-609-3800 |
| Toronto, Ontario | Elsewhere in Canada/U.S. 1-800-387-5164 |
| M1T 3V4 | Fax 1-416-298-5082 |
| | www.carswell.com |
| | E-mail www.carswell.com/email |

1.6      ADMISSIBILITY

existed at time of action's commencement, evidence of such grounds which became subsequently available admissible).

*R. v. Swaby* (1998), 110 B.C.A.C. 200, 178 W.A.C. 200 (B.C. C.A.) (accused's appeal of convictions on basis that trial judge erred in admitting impugned evidence because it was not relevant and tended to establish his bad character was dismissed where defence counsel did not object at trial to introduction of evidence; trial judge gave strong and specific directions regarding use that could be made of evidence).

As to s. 13 of the *Charter of Rights and Freedoms.*

*See:*
*Scott v. Yukon Territory (Commissioner)* (May 27, 1991), Doc. C.A. 1154.88, YU00140 (Y.T. C.A.). (where a correctional officer gives evidence at an inquest which is completely exculpatory of him or her, the mere fact that the evidence is not believed does not render it "incriminating").

As to the application of the right against self-incrimination to civil cases.

*See:*
*Davison v. Insurance Corp. of British Columbia* (1993), [1994] I.L.R. 1-3049 (B.C. S.C.) (incriminating breathalyzer evidence admissible against insured in action for recovery under motor vehicle policy; evidence admissible despite no reasonable and probable grounds for making demand; fact that there was significant evidence of impairment, police officer complied with s. 10(b) of *Charter* and no relationship between police and insurer reduced weight of *Charter* violation; admission of breathalyzer evidence would not bring administration of justice into disrepute pursuant to s. 24).

Counsel should specify the basis upon which evidence is objectionable.

"[T]he ground of objection must be clearly stated, and beyond the ground of objection thus stated, the Court is not at all bound to look".

*Bain v. Whitehaven & Furness Ry. Co.* (1850), 3 H.L. Cas. 1 at 16, 10 E.R. 1 (H.L.).

*See also:*
*Bank of N.S. v. Fish* (1895), 24 S.C.R. 709 (S.C.C.).

1-12.28

TAB 110

# Falconbridge on Mortgages

## *Fifth Edition*

**Walter M. Traub, B.A., LL.B., LL.M.**
**Editor-in-Chief**

## CANADA LAW BOOK.

April 2014

© 2014 Thomson Reuters Canada Limited

NOTICE AND DISCLAIMER: All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written consent of the publisher (Canada Law Book).

Canada Law Book and all persons involved in the preparation and sale of this publication disclaim any warranty as to accuracy or currency of the publication. This publication is provided on the understanding and basis that none of Canada Law Book, the author/s or other persons involved in the creation of this publication shall be responsible for the accuracy or currency of the contents, or for the results of any action taken on the basis of the information contained in this publication, or for any errors or omissions contained herein.

No one involved in this publication is attempting herein to render legal, accounting, or other professional advice. If legal advice or other expert assistance is required, the services of a competent professional should be sought. The analysis contained herein should in no way be construed as being either official or unofficial policy of any governmental body.

**A cataloguing record for this publication is available from Library and Archives Canada**

**ISBN 0-88804-367-8**

Printed in Canada by Thomson Reuters

**TELL US HOW WE'RE DOING**
Scan the QR code to the right with your smartphone to send your comments
regarding our products and services.
Free QR Code Readers are available from your mobile device app store.
You can also email us at carswell.feedback@thomsonreuters.com



 **THOMSON REUTERS**

CANADA LAW BOOK, A DIVISION OF THOMSON REUTERS CANADA LIMITED

| | |
|---|---|
| One Corporate Plaza | Customer Relations |
| 2075 Kennedy Road | Toronto 1-416-609-3800 |
| Toronto, ON | Elsewhere in Canada/U.S. 1-800-387-5164 |
| M1T 3V4 | Fax 1-416-298-5082 |
| | www.carswell.com |
| | E-mail www.carswell.com/email |

# PART VI

# MORTGAGE ACTIONS

# Chapter 22

# ACTION FOR POSSESSION[*]

§22:10    History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-1
§22:20    Proviso for Quiet Possession Until Default. . . . . . . . . . . . . . . . . . . . 22-3
§22:30    Rights of Mortgagor in Possession . . . . . . . . . . . . . . . . . . . . . . . 22-4
§22:40    Elements of Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-6
§22:50    Action During Prohibited Period in Section 42 . . . . . . . . . . . . . . . . 22-10
§22:60    Obtaining Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-11
§22:70    Possible Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-13
    §22:70.10       Mortgagor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-13
    §22:70.20       Spouses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-13
    §22:70.30       Tenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-14
§22:80    Mortgagee's Rights Against Third Parties . . . . . . . . . . . . . . . . . . . 22-14
§22:90    General — Other Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-15

## §22:10   History

Historically, at common law a mortgage was a contract whereby the owner of real property transferred the legal title to the property to the mortgagee as security for a debt. The transfer was a deed of conveyance similar to any other deed of conveyance and contained the usual covenants. Essentially, the mortgagee became the legal owner of the property subject to one important qualification. The mortgage contract contained a proviso for redemption in favour of the mortgagor. The proviso for redemption effectively stated that if the mortgage debt were paid in full, strictly in accordance with the mortgage contract, the conveyance of the legal title to the property to the mortgagee would be null and void. In effect, the deed of conveyance to the mortgagee was conditional and would be found to be void once the mortgage debt was repaid in full. The common law courts interpreted the proviso for redemption strictly and required the mortgage debt to be repaid in accordance with the terms of the contract. If on the date for redemption the mortgage moneys were not paid, the mortgagor lost the legal right to redeem the property. Accordingly, at law, if the mortgagor tendered the mortgage proceeds on the day following the maturity date, the mortgagee could refuse the funds and retain the property. The amount owing on the mortgage debt the day after the contractual date of redemption was irrelevant and the mortgagee could retain ownership of the property even if virtually all of the debt had been repaid. The proviso for redemption

---

[*] This chapter has been prepared with the assistance of Eric C. Haslett whose contribution is hereby gratefully acknowledged. We also acknowledge with thanks the assistance of Craig Carter in revising and updating the within chapter.

or the ability of the mortgagor to essentially cause the deed of conveyance to be null and void was therefore lost.

The courts of equity concluded this to be immensely unfair and created an equitable right of redemption. This equitable right of redemption could be exercised by the mortgagor at any time up until the rights of the mortgagor were foreclosed by an equitable action for foreclosure. However, the equitable right of the mortgagee to foreclose could be affected by whether the mortgagee had itself acted fairly and come to court with "clean hands".

Essentially, a mortgage at common law was the conveyance to the mortgagee of legal title to the property with an equitable right of the mortgagor to redeem. While this fiction of the conveyance of legal title with an equitable right of redemption was abolished in 1984 pursuant to s. 6(1) of the *Land Registration Reform Act, 1984*, S.O. 1984, c. 32 [now *Land Registration Reform Act*, R.S.O. 1990, c. L.4] (the "LRRA"), all rights and remedies of the mortgagor and all rights and remedies of the mortgagee were preserved pursuant to s. 6(3) of the LRRA. Section 6 of the LRRA provides as follows:

> 6(1) A charge does not operate as a transfer of the legal estate in the land to the chargee.
>
> . . . . .
>
> (3) Despite subsection (1), a chargor and chargee are entitled to all the legal and equitable rights and remedies that would be available to them if the chargor had transferred the land to the chargee by way of mortgage, subject to a proviso for redemption.

Due to the fact that at common law a mortgage was the conveyance to the mortgagee of the legal title to the property and because exclusive possession of property is one of the indices of ownership, the mortgagee at common law was entitled to possession of the mortgaged property. The right is paramount.[1] By contract, however, the mortgagee permits the mortgagor to be in possession until default. The mortgagee's right to possession arises because the legal title to the property is conveyed to the mortgagee. It is not a contractual right. It is inherent in a mortgage being a conveyance.

Possession is one of the rights preserved by s. 6(3) of the LRRA. For the purpose of determining the mortgagee's right to possession, s. 6(3) effectively deems the charge to be a conveyance of the legal title. As such, the mortgagee under a charge has the right to possession even if not expressly set out in the charge.

Section 7(a)(iv) of the *Mortgages Act*, R.S.O. 1990, c. M.40, states that a mortgage is deemed to include a covenant by the mortgagor that "on default, the mortgagee shall have quiet possession of the land, free from all encumbrances". This deemed covenant does not apply to mortgages of land situate in a part of Ontario that has been designated under Part I of the LRRA, where the mortgage is executed after the designation. The entire province has been so designated since April 1, 1985. Accordingly, the deemed covenant in the *Mortgages Act* does not apply to Ontario mortgages executed after April 1, 1985.

---

[1] See *Goodyear Canada Inc. v. Burnhamthorpe Square Inc.* (1997), 32 O.R. (3d) 657 (Gen. Div.), vard 41 O.R. (3d) 321 (C.A.), leave to appeal to S.C.C. refused 173 D.L.R. (4th) vi, for the effect of the mortgagee's paramount right to possession as against a subsequent tenant.

Section 7(1) of the LRRA states that a mortgage in the prescribed form shall be deemed to include a number of covenants by the chargor unless the deemed covenants are specifically excluded or varied in a schedule to the charge. Section 7(1), para. 1(v) states that the "chargee on default of payment for the number of days specified in the charge or in the *Mortgages Act,* whichever is longer, may on giving the notice specified in the charge or required by that Act, whichever is longer, enter on and take possession of, receive the rents and profits of, lease or sell the land".

This deemed covenant requires a period of default and notice before the mortgagee is entitled to take possession. Since the *Mortgages Act* does not provide any default period or notice period for a mortgagee to take possession, the terms of the mortgage will dictate. Most mortgages also do not require any default period or notice period before taking possession. It should be noted, however, that it is still open to the courts to find that the default and notice provisions in s. 7(1) of the LRRA refer to the sale notice provisions in the *Mortgages Act.*

### §22:20   Proviso for Quiet Possession Until Default

In the absence of any provision in the mortgage reserving the right to possession to the mortgagor, or of any agreement express or implied to the same effect, a legal mortgagee is entitled, after the making of the mortgage and by virtue of the conveyance to it of the legal estate, to take possession of the mortgaged lands at any time.[2] Notwithstanding that the mortgagee is entitled by law to possession, it is usual in Ontario to insert in a mortgage a proviso that the mortgagor until default shall have quiet possession of the lands, and in any case, until the mortgagee demands possession, the mortgagor's possession is lawful. In light of s. 7(1) of the LRRA, the mortgagee would have to expressly exclude the mortgagor's covenant for possession.

The mortgagor in possession is in effect a tenant at will or a tenant at sufferance. In *Noyes v. Pollock,*[3] the court states: "When . . . the mortgagor has been left in occupation of the estate by the mortgagee, the mortgagor is either tenant at will or tenant by sufferance to the mortgagee". It is not clear whether categorizing the mortgagee as a tenant at will or a tenant at sufferance is strictly necessary. The covenant in the mortgage to give the mortgagor exclusive possession until default certainly looks like a form of lease. However, the mortgage is a special document and the mortgagor has or should have greater rights than a mere tenant because of the mortgagor's equity of redemption. The courts should be open to discard any rights or obligations of a tenant at will or a tenant at sufferance if those rights do not accord with the mortgagor being in a favoured position. Despite the legal fiction, equity treats the mortgagor as the real owner of the property.

If a mortgagee is entitled to possession as between itself and the mortgagor, and the land is in the occupation of the mortgagor or of any other person whose title is not superior to that of the mortgagee,[4] the mortgagee may enter on the land, if the

---

[2] *Four-Maids Ltd. v. Dudley Marshall (Properties) Ltd.,* [1957] Ch. 317.
[3] (1886), 32 Ch. D. 53 (C.A.), at p. 64.
[4] For example, a tenant under a lease made by a prospective purchaser (mortgagor) before he or she had any title or possession of the property. See *Hughes v. Waite,* [1957] W.L.R. 713 (Ch. D.). Another

mortgagee can do so peaceably,[5] or may bring an action for possession. The mortgagee's right is paramount and he or she can even dispossess subsequent tenants who leased the property with knowledge of the mortgage, even if rent has been paid to the mortgagor.[6] If the land is occupied by a tenant under a lease which is binding on the mortgagee, the mortgagee may take possession by requiring the tenant to pay rent to the mortgagee.[7] In either case, after obtaining possession, the mortgagee becomes liable to account to the mortgagor as a mortgagee in possession for any rents received.

If a mortgage contains a proviso for quiet possession by the mortgagor until default, the mortgagee will be liable in damages if he or she enters prior to default.[8] The proviso operates as a redemise to the mortgagor, but on default the mortgagee may be entitled to enter without previous notice or demand subject to other terms in the mortgage.[9]

If by an attornment clause the mortgagor expressly becomes a tenant of the mortgagee, either at will or from year to year, at a rent, then the mortgagor will have the ordinary right to possession of any such tenant, except insofar as such right may be qualified by the mortgage itself in giving a right to entry without notice on default in payment or non-observance of covenants.[10]

Unless the mortgage provides otherwise, any default under the mortgage no matter how slight gives the mortgagee the right to take possession. If the mortgagor rectifies the default pursuant to s. 22 of the *Mortgages Act*, the mortgagee loses the right to possession.

### §22:30   Rights of Mortgagor in Possession

The position of a mortgagor who remains in possession after the making of the mortgage, if the mortgage does not reserve to him or her the right to possession, or if the mortgagor remains in possession after default, if the mortgage provides that he or she may retain possession until default, is anomalous. In either case, the mortgagee is entitled to take possession at any time, but until the mortgagee demands or takes possession, the mortgagor's continuing possession is still rightful and not by wrong, and the mortgagor is entitled to the rents and profits of the land without account to the mortgagee.[11] The mortgagor is not a trespasser. The mortgagor's right of possession is paramount to everyone except the mortgagee.

It is provided in Ontario by s. 5 of the *Mortgages Act*:

---

example could be a tenant under a lease made after the mortgage but without the authority of the mortgagee.

[5] *Doe d. Fisher v. Giles* (1829), 5 Bing. 421, 130 E.R. 1123. In order to gain entrance the mortgagee may break open an outer door of a house which is unoccupied or has been vacated: *Lows v. Telford* (1876), 1 App. Cas. 414 (H.L.); *Doe d. Bryant v. Cunard* (1843), 2 Kerr 193, 4 N.B.R. 193.

[6] See Chapter 15, and *Goodyear Canada Inc. v. Burnhamthorpe Square Inc., supra*, footnote 1.

[7] The lease would be binding if prior in registration, if the mortgagee consented to the lease or if the tenant and the mortgagor have an attornment agreement.

[8] *Moore v. Shelley* (1883), 8 App. Cas. 285 (P.C.).

[9] *Doe d. Garrod v. Olley* (1840), 12 Ad. & E. 481, 113 E.R. 894; *Brethour v. Brooke* (1893), 21 O.A.R. 144, affg 23 O.R. 658 (Ch. D.).

[10] E.D. Armour, *A Treatise on the Law of Real Property*, 2nd ed. (Toronto: Canada Law Book, 1916), p. 186.

[11] *Heath v. Pugh* (1881), 6 Q.B.D. 345, at p. 359 (C.A.), affd 7 App. Cas. 235 (H.L.).

> 5. A mortgagor entitled for the time being to the possession or receipt of the rents and profits of any land, as to which no notice of intention to take possession or to enter into receipt of the rents and profits thereof has been given by the mortgagee, may sue for such possession, or sue or distrain for the recovery of such rents or profits, or to prevent or recover damages in respect of any trespass or other wrong relative thereto, in the mortgagor's own name only, unless the cause of action arises upon a lease or other contract made by the mortgagor jointly with any other person, and in that case the mortgagor may sue or distrain jointly with such other person.

Formerly, if a mortgagor was entitled to possession against the mortgagee under a provision in the mortgage giving him or her the right to possession until default, the mortgagor could before default, but not after default, maintain against a third party an action of ejectment or for possession of the land.[12]

On the other hand, a mortgagor in possession, whether before or after default, could formerly, and can still, maintain an action against a third party for trespass or for injury to the mortgaged property, the mortgagor's right to sue depending not upon ownership or right to possession, but upon actual possession, and the third party not being entitled to set up the mortgagee's title or the mortgagor's want of title as a defence.[13]

A mortgagor may maintain an action for possession, even after default, if no notice has been given by the mortgagee of the intention to take possession, but after the giving of such notice the mortgagor's right of action ceases.

Section 7(1), para. 1(v) and (vi) of the LRRA provides a statutory right to possession in favour of the mortgagor until default as follows:

> 7(1) A charge in the prescribed form shall be deemed to include the following covenants by the chargor, for the chargor and the chargor's successors, with the chargee and the chargee's successors and assigns:
>
> 1.   In a charge of freehold or leasehold land by the beneficial owner:
>
>           . . . . .
>
> v.   That the chargee on default of payment for the number of days specified in the charge or in the *Mortgages Act*, whichever is longer, may on giving the notice specified in the charge or required by that Act, whichever is longer, enter on and take possession of, receive the rents and profits of, lease or sell the land.
> vi.   That where the chargee enters on and takes possession of the land on default as described in subparagraph v, the chargee shall have quiet enjoyment of the land.

These provisions replace the old rights to possession contained in the *Short Forms of Mortgages Act*, R.S.O. 1980, c. 474 [not consolidated and not repealed].

Note that this provision incorporates a contractual term into every charge unless expressly excluded. By implication it gives the mortgagor possession until default. It is also more restricted than the mortgagee's common law right to possession since it requires the mortgagee to give notice.

---

[12] *Rogers v. Dickson* (1861), 10 U.C.C.P. 481; *Ford v. Jones* (1862), 12 U.C.C.P. 358.
[13] *Selleck v. Smith* (1826), 3 Bing. 603, at pp. 606-607, 130 E.R. 646; *Mann v. English* (1876), 38 U.C.Q.B. 240, at p. 249.

### §22:40  Elements of Possession

A significant issue that arises in mortgage remedy situations is whether a mortgagee exercising remedies against property will be considered a mortgagee in possession. In some situations the mortgagee wants to be in possession. However, in many instances the mortgagee does not want to be so defined.

A mortgagee may want to take possession of property on default for a number of reasons, some of which are as follows:

1.  *Capture income stream from property* — Where the property is income generating, the mortgagee will generally want to intercept the income. The income is an important asset to the mortgagee and will often be what supported the original lending decision. Accordingly, the lender generally wants to capture the income, first to reduce its exposure, secondly to provide cash flow to offset realization expenses, thirdly to pay tax arrears which are a prior lien and fourthly to prevent the borrower from using the funds for other purposes, such as paying subsequent encumbrancers or maintaining other assets.

2.  *Prevent deterioration of the security* — In some cases the mortgagee may be concerned that the borrower, faced with negative cash flow, is neglecting the property. Besides devaluing the security, this may erode the income from the property if tenants leave or if the property cannot attract tenants due to its condition. While the mortgage usually contains provisions requiring the mortgagor to keep the property in good repair, the mortgagee may deem it necessary to step in and take possession to ensure repairs and maintenance of the property are completed in order to enhance or maintain the value of the security. The risk of losing tenants may be the factor which precipitates the mortgagee to take possession.

3.  *Assist in realization* — There are many possible reasons why the mortgagee would want to take possession of the real property in order to assist in the realization process. The mortgagee has certain remedies under the mortgage document and at law which permit the mortgagee to sell, liquidate or acquire the real property asset. However, for those remedies to be meaningful, the mortgagee in most cases will require possession of the property. Possession by the mortgagee will assist in performing appraisals, marketing and refurbishing the property and to provide vacant possession on closing if required.

4.  *Remove poor management* — The mortgagee may want possession of the real property in order to remove the borrower or its property manager if the mortgagee is of the opinion that the management of the property is inadequate. Inadequate management can taint the property in the market for realization purposes and can also cause the income from the property to deteriorate. In these circumstances, the mortgagee may, if it cannot replace the management of the property co-operatively with the borrower, require possession in order to do so.

5.  *Attract new tenants* — In order to enhance the marketability of the property or the income from the property, the mortgagee may wish to actively seek out tenants, renew existing tenants or provide leasehold improvements and

allowances to new tenants. In order to do this, the mortgagee will require possession of the property.

6. *Pressuring the borrower* — In some circumstances the mortgagee wants to deprive the borrower of possession to maximize the pressure on the borrower. The threat of taking possession may be sufficient to bring the borrower to the table. This factor may be especially relevant in a residential context or an owner-occupied commercial context.

A mortgagee may not want to take possession of property on default for a number of reasons, some of which are as follows:

1. *Obligation to act prudently* — The mortgagee will be held to be strictly accountable to all persons with an interest in the property. The mortgagee's obligation to account is significant.[14]

2. *Environmental damage* — A mortgagee in possession has care, control and management of real property. As such the mortgagee is liable for any past environmental damage. This is an unlimited exposure unless the mortgagee, before taking possession, negotiates an agreement with the Ministry of the Environment limiting liability.

3. *Improvident realization* — A mortgagee on taking possession of real property is obligated to sell the property as soon as possible. This obligation is akin to an obligation to mitigate. The mortgagee will not be entitled to collect any increase in its debt or costs if it fails to realize providently.

4. *Subsequent tenants* — By taking possession the mortgagee gives subsequent tenants which have not executed an attornment agreement with the mortgagee the right to terminate their long-term leases.[15]

5. *Marketplace stigma* — By taking possession, the mortgagee signals to the marketplace that the real estate is distressed. This may lead to a lower recovery on a sale by the mortgagee.

6. *Stuck with possession* — Once in possession, a mortgagee cannot go out of possession unless another party takes possession from the mortgagee or agrees to do so.

7. *Liability for realty taxes* — Once in possession a mortgagee has a personal liability for realty taxes. The amount unpaid is not limited to a lien on the land.

The mortgagee has the right under the mortgage contract to take possession of the property and deprive the mortgagor of possession under certain conditions. The issue becomes whether the mortgagee has done enough to be considered to be in possession of the property. In many situations the mortgagee wants to have some control over the property yet not be characterized as a mortgagee in possession. The question becomes: Has the mortgagee gone so far by its actions as to be found to be a mortgagee in possession?

The test of what constitutes a mortgagee in possession is whether the mortgagee has deprived the mortgagor of control and management of the mortgaged premises. In *Noyes v. Pollock*[16] the court sets out the test for a mortgagee in possession:

---

[14] See Chapter 32.
[15] See *Goodyear Canada Inc. v. Burnhamthorpe Square Inc.* (1997), 32 O.R. (3d) 657 (Gen. Div.), vard 41 O.R. (3d) 321 (C.A.), leave to appeal to S.C.C. refused 173 D.L.R. (4th) vi.
[16] (1886), 32 Ch. D. 53 (C.A.), at p. 64.

> But in the case where an estate is let to tenants, of course the mortgagee does not enter upon actual occupation of the demised premises. He may fall under the principle as a person who enters and takes possession of the rents and profits; but only, as it seems to me, if he does something which goes beyond the mere receipt of sums of money to which the rents and profits may amount, and reaches a point at which he displaces, for the purpose of realizing the security, the mortgagor from the control and dominion of the reversion of the estate which is demised . . . He may take the rents; that is not enough unless he takes the rent in such a way as to take upon himself, and out of the hands of the mortgagor, the business and the duty of collecting and being diligent in that respect.

The court also stated:[17]

> . . . and [the mortgagee] is looked upon as if he had taken upon himself the control and management of the estate as between those in actual occupation and the mortgagor, so as to put an end to any right which the mortgagor has of dealing with the estate in the way of management, including letting and making allowances to tenants, and getting the best rent from them he can.

The court then goes on to find the mortgagee must intercept the power of the mortgagor to manage the estate and the mortgagee must manage and receive the rents as part of the management of the estate. For a mortgagee to be found in possession, it must take on the management functions that the mortgagor would be expected to fulfil as the owner of the property. The mortgagor must be deprived of the rights and benefits of a mortgagor in possession of the property. Clearly if a mortgagee changes the locks to the property, hires a property manager, collects the rents, assumes the obligations under the leases as would the owner of property, then the mortgagee will be in possession of the mortgaged security.

In *Modern Realty Co. v. Shantz*[18] it was held that there must be actual re-entry where the mortgaged property is not abandoned and the mortgage contains a provision stating that on default the mortgagee shall have quiet possession of the mortgaged property. In *National Trust Co. v. Carleton Condominium Corp. No. 489*[19] the court found that a mortgagee attorning rents in its own name and not through the mortgagor was a mortgagee in possession. In *Beckstead v. Ball*[20] the mortgagee was not found to be a mortgagee in possession because the mortgagee was collecting rents as agent for the mortgagor and not for its own account.

As discussed, a mortgagee will be found to be in possession of the property where the mortgagee assumes control and management of the property. In *Unican Development Corp. Ltd. v. Settlers Savings and Mortgage Corp.*[21] the court found that the mortgagee was in possession based on the following actions taken by the mortgagee:

    (a)    employing a resident caretaker;
    (b)    making mortgage payments on the senior mortgage;
    (c)    paying utility and other accounts;
    (d)    assuming responsibility for leasing portions of the property and terminating leases;
    (e)    contracting for the supply of services to the building;

[17] *Supra*, at p. 61.
[18] [1928] S.C.R. 213.
[19] (1993), 33 R.P.R. (2d) 304 (Ont. Ct. (Gen. Div.)).
[20] [1961] O.R. 127 (H.C.J.).
[21] (1984), 30 Alta. L.R. (2d) 66 (Q.B.).

    (f)    looking after tenant requirements as they arose;

    (g)    performing minor repairs;

    (h)    installing replacement locks;

    (i)    refusing to keep the mortgagor advised about the operation of the building; and

    (j)    attorning and collecting rents under the mortgagee's security.

In *Carter v. Bell*[22] it was held that acts performed by the mortgagee which cannot be distinguished from the acts which would normally be performed by the mortgagor will indicate that the mortgagee is in possession of the property.

In *Abdool v. Somerset Place Developments of Georgetown Ltd.*[23] it was held that a mortgagee appointing a receiver pursuant to a mortgage which stated that any such receiver is the agent of the mortgagor will not by itself cause the mortgagee to be in possession of the property. In *Ontario (Attorney General) v. Tyre King Tyre Recycling Ltd.*[24] it was held that a mortgage providing a contractual right for the mortgagee to enter and repair the property and to accelerate payment of the mortgage debt if the property was not kept in good repair did not cause a mortgagee to be a mortgagee in possession in the absence of the exercise of such powers, management or control of the property. A mortgagee will not be found to be in possession merely due to there being an attornment provision in the mortgage.[25]

In *National Trust Co. v. Saks*[26] the court held that wrongful entry into the property by a mortgagee constitutes a trespass exposing the mortgagee to damages for trespass and conversion.

The obligations of a mortgagee in possession are onerous and the mortgagee may go to significant effort not to be categorized as a mortgagee in possession. As discussed earlier, one risk is that a mortgage in possession may be fully liable for environmental contamination and its clean-up. The mortgagor and subsequent encumbrancers may try to categorize the mortgagee as a mortgagee in possession in order to obtain the right to an accounting and to claim damages for neglect of the property. In order to obtain concessions from the mortgagee or delay the exercising of remedies by the mortgagee, the mortgagor may threaten the mortgagee with becoming a mortgagee in possession if the mortgagee takes certain steps. This is particularly true in the case of the attornment of rents on commercial property. Attornment of rents is often the quickest way to pressure the mortgagor and is very difficult for a mortgagor to defend against. Accordingly, a mortgagor concerned about the mortgagee threatening to attorn could threaten the mortgagee with all the potential liability of being a mortgagee in possession to discourage the mortgagee from taking such action.

Where rents are directed to the mortgagee and the mortgagee is merely the recipient thereof, the mortgagee is not in possession of the property. Where, however, the mortgagee takes active steps to collect the rent and diverts the rent from the mortgagor then the mortgagee may be found to be in possession of the property.

---

[22] (1915), 21 D.L.R. 243 (B.C.C.A.).
[23] (1992), 10 O.R. (3d) 120 (C.A.), leave to appeal to S.C.C. refused 101 D.L.R. (4th) vii.
[24] (1992), 9 O.R. (3d) 318 (Gen. Div.).
[25] *Stanley v. Grundy* (1883), 22 Ch. D. 478.
[26] (1994), 51 A.C.W.S. (3d) 539 (Ont. Ct. (Gen. Div.)),

In order to determine whether a mortgagee is in possession of real property, the courts may consider the nature of the property itself. The test for determining whether a mortgagee is in possession of vacant land will be a different test than in the case of a residential apartment building or an office building. In the case of vacant land it may be sufficient to merely post a sign or install a lock on a gate. In the case of a building occupied by tenants it may be necessary to lock out the property manager, change the locks to the property manager's office, seize the rental files and attorn the rents. The test may also be different where the property is a family dwelling or where the property is industrial or retail premises. In all cases the courts will first examine the indices of possession and ownership that the mortgagor asserts with respect to the particular property and determine whether the mortgagee has usurped any of these.

The intention of the mortgagee in the particular circumstances may also be a relevant factor. Certainly, if the mortgagee intends to take possession of the property, the courts will be more likely to find that whatever steps were taken by the mortgagee were sufficient to cause the mortgagee to go into possession. However, if the mortgagee does not intend to become a mortgagee in possession but effectively deprives the mortgagor of the control or management of the property, the mortgagee will likely be found to be a mortgagee in possession despite its intention.

The intention of the mortgagor may also be relevant. Where the mortgagee and the mortgagor enter into arrangements dealing with the operation of the property and the mortgagor intends to maintain control of the property, then the intention of the mortgagor may be a significant factor. For example, if the mortgagor directs rents from the property to the mortgagee, the intention of the mortgagor is to retain control but to divert funds to the mortgagee. This could well be an important factor in determining that the mortgagee is not in possession of the property.

### §22:50   Action During Prohibited Period in Section 42

If the mortgagee has made a demand for payment or served a notice of sale, judgment should not be signed during either notice period unless the mortgagee has obtained an order pursuant to s. 42(1) of the *Mortgages Act*. Section 42(1) states:

> 42(1) Where, pursuant to any condition or proviso contained in a mortgage, there has been made or given a demand or notice either requiring payment of the money secured by the mortgage, or any part thereof, or declaring an intention to proceed under and exercise the power of sale therein contained, no further proceeding and no action either to enforce the mortgage, or with respect to any clause, covenant or provision therein contained, or to the mortgaged property or any part thereof, shall, until after the lapse of the time at or after which, according to such demand or notice, payment of the money is to be made or the power of sale is to be exercised or proceeded under, be commenced or taken until an order permitting the same has been obtained from a judge of the Superior Court of Justice.

The mortgage will almost always give the mortgagee the right to possession of the property on default and the mortgagee may choose or require the use of the courts to obtain possession of the property. While the mortgagee may use self-help measures to take possession, these are limited to their agreement. The mortgagee cannot take

possession by force. If the mortgagee takes possession without a court order and it is found that the mortgagee did not have the right to do so (*i.e.*, no default), then the mortgagee is liable in trespass. Accordingly, the mortgagee may commence an action for possession of the property. The action can be commenced on its own or together with a claim on the covenant for repayment of the debt and/or together with a claim for foreclosure or judicial sale of the property.[27] In all cases, the statement of claim merely provides that the mortgagee is seeking an order granting the mortgagee possession of the property as against the mortgagor and refers to the applicable provisions in the mortgage which give the mortgagee the right to possession of the property after default by the mortgagor. The statement of claim for possession must be served personally on the mortgagor and other defendants pursuant to the Ontario *Rules of Civil Procedure*.

Once the defendants have been served with the statement of claim, the defendants have 20 days within which to file a statement of defence or a notice of intent to defend. If a notice of intent to defend is filed, the defendants have an additional 10 days to file their statement of defence. If the action is not defended the mortgagee will obtain a default judgment for possession.

If a defence has been filed, the matter either proceeds on an application for summary judgment or proceeds to discoveries and then possibly to trial. In the case of a summary judgment application the mortgagee must show that there are no triable issues between the mortgagor and the mortgagee. The opportunities for the mortgagor to delay, hinder or frustrate the mortgagee taking possession are significant, particularly in circumstances where the mortgagor claims a set-off or that the mortgage is not in default. The mortgagor must merely raise genuine issues to be tried between the parties and the process could possibly be delayed for quite some time.

Once the mortgagee obtains a judgment, by default, summary or after trial, the mortgagee must then obtain a writ of possession to enforce the judgment. The writ of possession is a court directive to the appropriate sheriff to deliver possession of the property to the mortgagee.

## §22:60  Obtaining Possession

Once a mortgagee obtains judgment for possession, whether or not that action was combined with a sale or foreclosure judgment, it may be enforced by a writ of possession pursuant to rule 60.03 of the *Rules of Civil Procedure*. The mortgagee may obtain leave to issue a writ of possession by application pursuant to rule 60.10. Leave may be obtained on motion without notice or at the time the judgment for possession is made. The court must be satisfied that all persons in actual possession of the property have received proper notice of the proceedings in which the order for possession was obtained to have allowed them to apply for relief or to bring a motion to set aside the judgment. *Jamort Investments Ltd. v. FitzGerald*[28] refers to the type of evidence which must be brought to satisfy the court that proper notice has been given. An affidavit must be provided which identifies all parties in possession of the

---

[27] *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, Rule 64.
[28] [1968] 1 O.R. 541 (Master).

mortgaged property, the nature and tenure of their possession, information relating to the relationship between those in occupation and the mortgagee to allow the court to determine priorities, and evidence that notice of the intended eviction has been given to the person who will be evicted with proof of service. It should also state that the property is not a residential rental property. The mortgagee may not be entitled to possession against the following persons:

    (a)   prior tenants;
    (b)   subsequent tenants if
        (i)   consented to, or
        (ii)   there is a non-disturbance agreement.

Once the judgment for possession is obtained written notice must be given to all persons in possession of the property in order to obtain a writ of possession.

A writ of possession remains in force for one year from the date of the order authorizing its issue. Renewals of one-year terms may be obtained pursuant to rule 60.10(3). The mortgagee may have to send an agent or attend on the property to determine who is in actual possession of the property. If there are tenants and the mortgagee intends to take the property with the tenants in possession of the property, the mortgagee need not serve the tenants with the judgment.

Once the order is issued and entered the mortgagee may prepare a writ of possession and deliver it to the sheriff in the district where the land is located. The sheriff will attend on the premises and provide a notice to the occupants that they are to leave the premises within a stated period of time. If the occupants fail to leave the premises within that time period, the sheriff will re-attend on the premises and arrange for the locks to the property to be changed and remove the persons in occupation of the property. The sheriff is entitled to use force to do so.

The mortgagee can take possession of the property without the aid of the courts and without the borrower's consent. Where the property is vacant land, the mortgagee merely attends at the property and asserts its possession over the property. This may involve installing a gate, posting signs on the property, changing the locks on an existing gate or in some other way asserting possession of the property. Where the property contains an income-generating building where the mortgagor is not physically in possession of the building, the mortgagee may take possession of the building by appointing a property manager to take over and change the locks to the property management office, by changing the locks to the main doors to the premises and informing tenants that the mortgagee has taken possession of the premises and by attorning rents. Where the property is occupied by the borrower, the mortgagee cannot oust the borrower from the property or use physical force to obtain possession of the property. Where, however, the mortgagor has abandoned the property, the mortgagee may merely move in and change the locks. The mortgagee is permitted by law to use a moderate amount of force to take possession, such as breaking locks or breaking doors or windows where the property is vacant.

The mortgagee also has the right under most mortgage contracts to appoint a private receiver to take possession of the property. Before appointing a private receiver the mortgagee must pay particular attention that proper notice is provided.

In most cases the mortgagee must allow the mortgagor reasonable notice to repay the indebtedness before appointing a receiver.

The mortgagee generally has the right to apply to the courts for a court-appointed receiver. A court-appointed receiver would be authorized to take possession of the property from the mortgagor. A court-appointed receiver is the agent of the court and is basically appointed to oversee the liquidation of the property on behalf of all creditors. Even if the mortgage does not permit a receiver to be appointed, the court has jurisdiction to appoint a receiver where there is a concern about deterioration of the property.

Depending on the situation, a mortgagee may petition the mortgagor into bankruptcy and the trustee in bankruptcy may then take possession of the real property. This method is often used where there are environmental concerns.

### §22:70  Possible Defendants

Depending on the nature of the property and the purpose for which it is used, there may be a number of possible defendants to an action for possession.

### §22:70.10  Mortgagor

A mortgagor is entitled to possession provided the mortgagor is not in default of the mortgage. As such, the mortgagor must be named as a defendant in an action for possession. In *Kinross Mortgage Corp. v. Balfour*[29] it was held that, if there are numerous mortgagors, all must be named as defendants.

### §22:70.20  Spouses

Section 19(1) of the *Family Law Act*, R.S.O. 1990, c. F.3, provides that a non-titled spouse has a right to possession of a matrimonial home. As such, a spouse is entitled to receive the same notice of possession proceedings as the spouse who is the mortgagor. If notice of possession proceedings is not given to the spouse, the mortgagee may not obtain a writ of possession. Therefore, it is important that the mortgagee determine if the mortgagor has a spouse and whether or not the property is considered a "matrimonial home as defined in s. 18(1) of the *Family Law Act*.

Sections 18(1) and 19 provide as follows:

> 18(1) Every property in which a person has an interest and that is or, if the spouses have separated, was at the time of separation ordinarily occupied by the person and his or her spouse as their family residence is their matrimonial home.
>
> . . . . .
>
> 19(1) Both spouses have an equal right to possession of a matrimonial home.
> (2) When only one of the spouses has an interest in a matrimonial home, the other spouse's right of possession,
>> (a)  is personal as against the first spouse; and
>> (b)  ends when they cease to be spouses, unless a separation agreement or court order provides otherwise.

---

[29] (1981), 33 O.R. (2d) 213 (H.C.J.).

Section 22(1) of the *Family Law Act* provides that a spouse is entitled to the same notice as the spouse on title to the property:

> 22(1) When a person proceeds to realize upon a lien, encumbrance or execution or exercises a forfeiture against property that is a matrimonial home, the spouse who has a right of possession under section 19 has the same right of redemption or relief against forfeiture as the other spouse and is entitled to the same notice respecting the claim and its enforcement or realization.

### §22:70.30   Tenants

A tenant in possession of the mortgaged property, whose interest is subsequent to that of the mortgagee and who does not have a landlord and tenant relationship with the mortgagee, is not a necessary party to an action for possession. The tenant will be given notice however to an application for a writ of possession. Rule 60.10(2) states that where the mortgagee seeks a judgment for possession as against the mortgagor rather than the mortgagor's tenant, then the tenant is entitled to receive notice of the proceeding. In order for a tenant to maintain priority over a mortgagee, the tenant must provide evidence that either the mortgagee had actual notice of the tenant's interest or that notice of the lease was registered prior to the registration of the mortgagee's interest.[30]

## §22:80   Mortgagee's Rights Against Third Parties

As discussed earlier, if a mortgagee becomes entitled to possession, it may commence an action for possession against the mortgagor. If there is a tenant under a lease made subsequent to the mortgage without the authority of the mortgagee, the mortgagee may commence an action for possession against the tenant.

If the mortgagor or some one claiming under the mortgagor is in actual possession, the mortgagee cannot commence an action for trespass against a third party.[31] If the property has been left vacant by the mortgagor before a title by possession has been acquired by anyone, and the mortgagee has a right of entry, the constructive possession is in the mortgagee and it is entitled to bring an action for trespass.[32]

After entry by a mortgagee its right of possession relates back to the time at which the mortgagee's legal right to enter accrued so as to enable it to support an action against a wrongdoer for a trespass committed at a time prior to the entry,[33] at least in a case in which the mortgagor himself or herself, while in possession, had the right to sue.[34]

It has been held that a mortgagee is entitled to maintain an action against a stranger for damages for removal of part of the mortgaged premises, without proving that the defendant's act has rendered the security insufficient,[35] and it

[30] *Goldale Investments Ltd. v. Ringlord Holdings Ltd. (No. 2)* (1980), 6 A.C.W.S. (2d) 61 (Master).
[31] *Wheeler v. Montefiore* (1841), 2 Q.B. 133, 114 E.R. 53.
[32] *Delaney v. C.P.R. Co.* (1891), 21 O.R. 11 (Q.B.D.); *Mann v. English* (1876), 38 U.C.Q.B. 240.
[33] *Ocean Accident and Guarantee Corp. Ltd. v. Ilford Gas Co.*, [1905] 2 K.B. 493 (C.A.), approving and applying *Barnett v. Earl of Guildford* (1855), 11 Ex. 19, 156 E.R. 728.
[34] *Reid v. Galbraith*, [1927] 2 D.L.R. 857 (B.C.C.A.).

would appear that the right to maintain the action exists notwithstanding that there has been no default under the mortgage and that the mortgagee is not entitled to possession as against the mortgagor.[36]

## §22:90   General — Other Issues

Generally, before the mortgagee has the right to recover possession of the mortgaged property there must be a default under the mortgage. After default and the expiration of any required notice periods, the mortgagee may enter and take possession of the mortgaged property to the exclusion of other parties with subordinate claims against the property. Default may include such things as failure to make a payment, failure to insure, non-payment of realty taxes or non-payment of condominium expenses. Section 88(1)(b) of the *Condominium Act, 1998*, S.O. 1998, c. 19, deems non-payment of condominium expenses to be an event of default.

The mortgagee may not always have the right to take immediate possession of the property. For example, a court order must first be obtained to allow an equitable mortgagee to take possession of property.[37]

In some cases the mortgagee may be required to give the mortgagor notice of default prior to steps being taken to recover possession. This will occur when default is other than non-payment of the mortgage as required by the mortgage or where the mortgage does not have the proper default provision. If there is no stated notice period requirement the test of "reasonableness" may be applicable.

Section 42 of the *Mortgages Act* prevents any further "proceeding or action during the redemption period following the issuing of a notice of sale. A "proceeding or action includes taking possession either by self-help or court process. Section 42 provides:

> 42(1) Where, pursuant to any condition or proviso contained in a mortgage, there has been made or given a demand or notice either requiring payment of the money secured by the mortgage, or any part thereof, or declaring an intention to proceed under and exercise the power of sale therein contained, *no further proceeding and no action either to enforce the mortgage, or with respect to any clause, covenant or provision therein contained,* or to the mortgaged property or any part thereof, shall, until after the lapse of the time at or after which, according to such demand or notice, payment of the money is to be made or the power of sale is to be exercised or proceeded under, be commenced or taken until an order permitting the same has been obtained from a judge of the Superior Court of Justice.
>
> (2) The order may be obtained without notice or upon such notice as the judge may direct upon such proof as satisfies the judge that it is reasonable and equitable that the proposed action or proceeding should be permitted.
>
> (3) This section does not apply to proceedings to stay waste or other injury to the mortgaged property.

(Emphasis added.)

In *Lee v. Guettler*[38] the mortgagee issued a claim for possession and obtained default judgment for possession during the redemption period set out in a notice of

[35]   *Holland Canada Mtge Co. v. Fraser*, [1926] 4 D.L.R. 993 (Sask. C.A.).
[36]   *Gooding v. Shea* (1869), 103 Mass. 360. cited in *Holland Canada Mtge Co. v. Fraser, supra.*
[37]   *Barclays Bank Ltd. v. Bird*, [1954] Ch. 274; *Royal Bank of Canada v. Nicholson* (1980), 28 O.R. (2d) 377 (H.C.J.).

sale. The Court of Appeal concluded that the action was a nullity and set aside the default judgment. The court stated that the right to possession was being exercised pursuant to a provision in the mortgage and was a prohibited proceeding or action.

In *Storm v. Double D. Developments Ltd.*[39] a claim for possession was issued before the notice of sale but the claim was served during the notice period. The court held that service of the claim for possession was a "further proceeding and was therefore a nullity. The claim had to be served again.

In *Jones v. Torgis*[40] the court concluded that a claim for possession served on the same day that the notice of sale was issued was a nullity even if the claim was served before the notice of sale was mailed. On the particular facts, the notice of sale was mailed at 4:30 p.m. and the claim was served at 8:00 p.m. The *Mortgages Act* deems the notice of sale to be received on the day it is mailed.

If a receiver has been appointed by the court as a result of action taken by a subsequent mortgagee and the order prohibits other creditors from exercising their rights without prior court approval, a prior mortgagee will not be permitted to recover possession without obtaining court approval.

Section 2 of the *Mortgages Act* allows a redeeming mortgagor or subsequent encumbrancer to require the mortgagee to assign its mortgage security to the redeeming party or as they may direct rather than discharge the mortgage. This is not available if the mortgagee has taken possession. Section 2(1) and (3) provides as follows:

> 2(1) Despite any stipulation to the contrary, where a mortgagor is entitled to redeem the mortgagor may require the mortgagee, instead of giving a certificate of payment or reconveying and on the terms on which the mortgagee would be bound to reconvey, to assign the mortgage debt and convey the mortgaged property to any third person as the mortgagor directs, and the mortgagee is bound to assign and convey accordingly.
>
> . . . . .
>
> (3) This section does not apply if the mortgagee is or has been in possession.

The purpose of s. 2(3) is that, once the mortgagee is in possession, it is liable thereafter for the management of the property and may continue to be liable even if it transfers possession to a subsequent encumbrancer.

A mortgagee contemplating taking possession of the mortgaged security must review the mortgage documentation in order to determine if there are any conditions or limitations on the mortgagee's right to possession.

Not all events of default will necessarily give the mortgagee a right to possession. Some mortgage documentation may only give a right to possession in the event of a monetary default under the mortgage. This is the case with the implied covenants under s. 7(1), para. 1(v) of the LRRA which states: "That the chargee on default of payment . . . may . . . enter on and take possession of . . . the land."

If there is a non-monetary default under the mortgage such as the failure to insure, the failure to keep the property in a good state of repair, the failure to provide for financial statements, the failure to pay realty taxes or the failure to keep prior encumbrances in good standing, these may not in themselves give rise to a right to

---

[38] (1975), 10 O.R. (2d) 257 (C.A.).
[39] (1977), 16 O.R. (2d) 717 (S.C.).
[40] (1978), 22 O.R. (2d) 123 (S.C.).

possession. However, most mortgages will permit the mortgagee to accelerate the debt for a non-monetary default and on acceleration the right to possession will almost certainly be triggered because the accelerated principal and interest are immediately due and if unpaid default occurs.

Notice provisions may be required before possession can be taken. For instance, notice of acceleration for a non-monetary default may have to be provided before the right to possession can be exercised. Most mortgages provide that on default the mortgagee has an immediate right of possession and that no notice is required before possession can be taken. However, some mortgages may provide that a demand for possession must be made before it may be exercised or that the default must continue for a period of time before possession can be taken.

Consideration must be given to whether possession is under the mortgage or under collateral security such as an assignment of rents. The choice of the document may ultimately impact on the procedure for taking possession and the results and obligations which flow from taking possession. For instance, taking possession under the mortgage may give the tenants the right to terminate their leases whereas if possession is taken pursuant to an assignment of leases, the tenants may not have the right to terminate their leases.

TAB 111

# THE PRACTITIONER'S EVIDENCE LAW SOURCEBOOK

FIRST EDITION

**Kevin P. McGuinness**

**Linda S. Abrams**



**The Practitioner's Evidence Law Sourcebook, First Edition**
© LexisNexis Canada Inc. 2011
December 2011

All rights reserved. No part of this publication may be reproduced or stored in any material form (including photocopying or storing it in any medium by electronic means and whether or not transiently or incidentally to some other use of this publication) without the written permission of the copyright holder except in accordance with the provisions of the *Copyright Act*. Applications for the copyright holder's written permission to reproduce any part of this publication should be addressed to the publisher.

Warning: The doing of an unauthorized act in relation to a copyrighted work may result in both a civil claim for damages and criminal prosecution.

**Library and Archives Canada Cataloguing in Publication**

McGuinness, Kevin Patrick
    The practitioner's evidence law sourcebook / Kevin P. McGuinness and Linda S. Abrams.

Includes bibliographical references and index.
ISBN 978-0-433-46129-6

    1. Evidence (Law)—Canada.   2. Evidence (Law)—Canada—Cases.   I. Abrams, Linda S.
II. Title.

KE8440.M35 2011      343.71'06      C2011-906275-5
KF8935.ZA2M35 2011

---

**Published by LexisNexis Canada, a member of the LexisNexis Group**
LexisNexis Canada Inc.
123 Commerce Valley Dr. E., Suite 700
Markham, Ontario
L3T 7W8

**Customer Service**
Telephone: (905) 479-2665  •  Fax: (905) 479-2826
Toll-Free Phone: 1-800-668-6481  •  Toll-Free Fax: 1-800-461-3275
Email: customerservice@lexisnexis.ca
Web Site: www.lexisnexis.ca

Printed and bound in Canada.

presented to it is almost always based upon a non-statistical estimate of the relative probability of truth of the different narratives that have been presented before the court. The persons who present those narratives are the witnesses who testify in court. It is generally assumed by the courts that the epistemological methodologies that they employ in their fact-finding minimize the risk of an unjust result. However, the basis for this belief is unclear.

**§2.112**  We make this point not because we have identified some superior method of judicial inquiry that would permit a more exacting resolution of issues of fact than has hitherto been the case. Sadly, we have not. Rather, the point of the foregoing paragraph is that the judicial approach to fact determination is that a degree of healthy scepticism ought to be exercised by the courts, both with respect to the evidence that is presented, and with respect to the possibility of embarking upon new methods of inquiry than have not previously been accepted by the courts as reliable.

**§2.113**  In essence, a law of evidence defines the types of factual information and opinion on which a legal decision-maker is entitled to rely when making a decision. It incorporates the rules governing the assembly and disclosure of that information before any trial or hearing begins, and the procedure for introducing that evidence at a trial or hearing. It will set out the factors that may be taken into account in weighing the relative value of evidence, and establishing the credibility of evidence.

**§2.114**  Ultimately, the aim of the law of evidence is to specify how disputed issues of fact can be resolved in legal proceedings, both civil and criminal. Conceptually, the law of evidence is part of that body of law described by Bentham as adjective law; meaning that it sets out rules about rules, and in so doing governs the means by which the substantive law may be enforced.

---

*R. v. Corbett*, [1988] S.C.J. No. 40, [1988] 1 S.C.R. 670 at 697 (S.C.C.), *per* Dickson C.J.C.:

> ... basic principles of the law of evidence embody an inclusionary policy which would permit into evidence everything logically probative of some fact in issue, subject to the recognized rules of exclusion and exceptions thereto. Thereafter the question is one of weight. The evidence may carry much weight, little weight or no weight at all. If error is to be made it should be on the side of inclusion rather than exclusion and our efforts in my opinion, consistent with the ever-increasing openness of our society, should be toward admissibility unless a very clear ground of policy or law dictates exclusion.

## (b)  Objections to Admissibility

**§2.115**  A lawyer who wishes to object to the admission of evidence by the court should object to that evidence before it is admitted. Evidence should not be admitted subject to objection. A failure to raise a timely objection may be construed as consent to admission. The normal procedure when objecting is for the lawyer to stand and state the nature of objection to the court, as in "I object, your Honour, this is hearsay." Ideally, the lawyer should be prepared to back up the objection with relevant authority, although this is not usually necessary. It is permissible for both the court and for opposing counsel to require the lawyer who seeks to present evidence to disclose the purpose of the evidence.

---

*Stirland v. Director of Public Prosecutions*, [1944] A.C. 315 at 327-28 (H.L.), *per* Viscount Simon L.C.:

> [There is no universal rule] that a conviction cannot be quashed on the ground of the improper admission of evidence prejudicial to the prisoner unless an application is made at the time by counsel for the prisoner for the trial to begin again before another jury. ... It has been said more than once that a judge when trying a case should not wait for objection to be taken to the admissibility of the evidence but should stop such questions himself ... If that be the judge's duty it can hardly be fatal to an appeal founded on the admission of an improper question that counsel failed at the time to raise the matter. No doubt ... the Court must be careful in allowing an appeal on the ground of reception of inadmissible evidence when no objection has been made at the trial by the prisoner's counsel. The failure of counsel to object may have a bearing on the question whether the accused

# TAB 112

1 McCormick On Evid. § 52 (7th ed.)

McCormick on Evidence
Database updated March 2013
Kenneth S. Broun [a0]
Title 3. Admission and Exclusion
Chapter 6. The Procedure of Admitting and Excluding Evidence

§ 52. Objections [1]

If the administration of the exclusionary rules of evidence is to be fair and workable, the judge must be informed promptly of any contention that evidence should be rejected, and the reasons supporting the contention. This burden is placed on the party opponent, not the judge. Accordingly, the general approach is that a failure to make a specific objection at the time the evidence is proffered, is a waiver on appeal of any ground of complaint against its admission. However, this general approach is modified by the doctrine of plain error, discussed at the end of this section.

*Time of Making: Motions to Strike*

The opponent may not gamble on the possibility of a favorable answer. [2] Rather, the opponent must object to the admission of evidence as soon as the ground for objection becomes apparent. [3] Usually, during a witness's testimony, an objection is apparent as soon as the question is asked, since the wording of the question is likely to indicate that it calls for inadmissible evidence. If there is an opportunity, counsel must then state her objection before the witness answers. [4] But sometimes an objection before an answer is infeasible. An eager witness may answer so quickly that counsel does not have enough time and a fair chance to object. [5] In that event, the counsel may move to strike the answer for the purpose of interposing an objection to the question; if the judge thinks that the witness "jumped the gun" and grants the motion, the counsel then states her objection to the question. Or a question which is unobjectionable may be followed by a partially or completely nonresponsive answer. [6] In this situation, the questioner [7] has the right to have the nonresponsive material stricken. Or after the evidence is received, a ground of objection to the evidence may later surface for the first time. [8] For example, although on direct examination the witness purported to testify from personal knowledge, it might become evident for the first time on cross that in reality, the witness is relying on inadmissible hearsay. In all these cases, an "after-objection" may be stated as soon as the ground appears. The proper technique is to move to strike the objectionable evidence and request a curative instruction to the jury to disregard the evidence. Ideally, counsel should use the term of art "motion to strike," but any phraseology directing the judge's attention to the grounds as soon as they appear suffices. [9]

Suppose that the evidence is a transcript of an earlier deposition. The time when objections must be made to deposition questions varies, depending on the type of objection. [10] Usually objections going to the "manner and form" of the questions or answers, such as challenges to leading questions or nonresponsive answers—sometimes opinions and secondary evidence are put in this class—must be made during the deposition hearing. [11] The rationale is that in these cases, if the opponent had objected on the spot, the proponent could have cured the problem. For instance, the proponent might have rephrased the question or established an excuse for the non-production of the original writing. In contrast, objections going to the "substance," such as relevancy and hearsay, may ordinarily be urged for the first time when the deposition is offered at trial. [12] Assume that there was a prior trial rather than a prior deposition hearing. Suppose further that evidence was introduced at the earlier trial of the case, and an available objection was not made then. In those circumstances, may the opponent object for the first time when the same evidence is tendered at a second trial? The trial and deposition settings differ markedly. As previously stated, the opponent can forego most types of objections at a deposition hearing while, at a trial, the opponent must generally urge the objections. § 259 addresses this issue.

*Pretrial Motions in Limine*

A motion for an advance ruling on the admissibility of evidence is a relatively modern device for obtaining rulings on evidence even before the evidence is proffered at trial. [13] The proponent of evidence can file an in limine motion to obtain an advance ruling that an item of evidence is admissible. However, in the vast majority of cases, the opponent files the motion to obtain an advance ruling that a particular item of evidence is inadmissible. The purpose of such motions may be to shield the jury from exposure to prejudicial inadmissible evidence or to afford a basis for strategic decisions. [14] For instance, an advance ruling might help the counsel decide whether to mention an item of evidence during opening statement [15] or advise her client whether to take the stand. [16] Advance rulings on objections can be sought before or during trial prior to the presentation of the evidence. [17] Although there is some old authority forbidding advance rulings, [18] today the prevailing rule is that the judge has considerable discretion [19] to make or refuse to make advance rulings, [20] Unless the resolution of the motion requires a prediction of the state of the evidence at the later trial, and as long as the matter is left primarily within the trial judge's discretion, a pretrial ruling on a motion in limine should be encouraged. [21] In the pretrial setting, the judge has more time to carefully think through the evidentiary issue; there are no jurors impatiently waiting for the sidebar conference to end. In addition, an in limine motion may prevent the jurors' exposure to prejudicial information and thereby avoid a mistrial.

When a party files an in limine motion, the judge can make three different types of rulings. First, the judge can refuse to entertain the motion and defer the issue until trial. In most but not all cases, [22] the judge has discretion whether to rule on the issue before trial. Secondly, the judge can make a preliminary or tentative ruling on the motion. By way of example, suppose that the opponent moves to exclude an item of evidence as unduly prejudicial under Rule 403. Although the judge agrees that the evidence might prejudice the jury, the judge can conceive of a state of the record in which the proponent's need for the evidence would be so great that the need would trump the risk of prejudice. If so, the judge might tentatively exclude the evidence. However, the judge would also inform the proponent that the ruling is not final; if at any point during trial, the proponent thought that the state of the record had sharpened the need for the evidence, the proponent could approach sidebar and request permission to introduce the evidence. Thirdly, the judge could make a definitive or final ruling on the merits of the motion.

Suppose that a party moves in limine to exclude certain evidence but the judge denies the motion. To preserve the issue for appeal, must the party repeat the objection at trial when the opposing party offers the evidence? There is a split of authority over this question. [23] At common law the traditional, prevailing view was that if she loses a pretrial in limine motion, the opponent must renew the objection at trial in order to preserve the issue for appeal. [24] Of course, that view robs the in limine motion of much of its utility. One of the foremost advantages of an in limine motion is that the opponent makes the motion outside the jury's hearing, and there is no risk that the jury will form the impression that the opponent is objecting to hide the truth. If the opponent must renew the motion in the jury's presence, that risk rears its ugly head again.

However, even at common law some appellate courts dispensed with a requirement for renewal when the trial judge's ruling is explicit [25] and purportedly definitive. [26] In 2000, Federal Rule of Evidence 103 was amended to codify that approach, and restyled Federal Rule of Evidence 103(a)(2) provides that "(o)nce the court rules definitively on the record–either before or at trial–a party need not renew an objection or offer of proof to preserve a claim of error for appeal." The Advisory Committee Note accompanying the 2000 amendment adds that the opponent has an "obligation … to clarify whether an in limine or other evidentiary ruling is definitive when there is doubt on that point." [27]

An in limine motion is distinguishable from a motion to suppress. [28] Suppression motions typically rest on constitutional grounds such as the Fourth Amendment exclusionary rule rather than statutory and common law evidence rules. Moreover, in most jurisdictions, the party must make suppression motions before trial under pain of waiver. [29] Further, if the suppression motion is timely, the judge ordinarily must dispose of it before trial. As previously stated, in the case of in limine motions, the judge usually [30] has discretion whether to rule on the merits of the motion before trial.

*General and Specific Objections* [31]

To help the judge make an intelligent ruling on the merits, the opponent should make a specific objection. Specificity has three aspects: specificity as to grounds, part, and party.

*Specificity as to grounds.* Objections have to be accompanied by a definite statement of the grounds; [32] in other words, objections must reasonably indicate the appropriate rules of evidence relied on as reasons for the objections. [33] These objections are labeled "specific" objections in contrast to so-called general objections. The specificity requirement serves two important purposes at the trial level. First, the requirement helps to ensure that the trial judge understands the objection raised and that the adversary has a fair opportunity to remedy the defect, if possible. [34] However, the requirement for a specific objection does not *per se* ban the use of general trial objections (objections which state no distinct grounds). [35] When the evidence is objectionable on some ground, the judge has discretion to entertain and sustain a general objection. However, as we shall soon see, the requirement is enforced to a certain extent on appeal. The second purpose of the requirement is to make a proper record for the reviewing court in the event of an appeal.

If the judge *overrules* a general objection, on appeal the objecting party ordinarily may not attack the ruling by urging a ground not mentioned when the objection was made at trial. [36] Yet, there are three exceptional situations in which the appellate court will disregard this requirement and consider a meritorious objection that was not voiced to the trial judge. First, if the ground for exclusion should have been obvious to judge and the proponent, the lack of specification of the ground is immaterial for purpose of appealing the judge's action overruling the general objection. [37] This exception is simple good sense. Second, some courts hold that if the evidence is inadmissible for any purpose, a general objection suffices to secure appellate review of the judge's overruling the objection. [38] This exception makes little sense if the ground is not apparent; when the ground is not evident, there is still a need for specification. [39] If the opponent had put the proponent on notice of the dispute over the admissibility of the evidence, the proponent might have substituted alternative proof to establish the fact. Third, it has been suggested that if the omitted ground could not have been obviated, a general objection permits appellate consideration of an unstated, specific objection. [40] The case for this exception overlooks an important consideration. Assume arguendo that the objection to the particular evidence could not have been obviated. Nevertheless, if the objection had been stated and the proponent realized the validity of the objection, again the proponent might have withdrawn the inadmissible evidence and substituted other evidence to fill the gap. [41] Fortunately, Federal Rule of Evidence 103(a)(1) does not codify the third exception. [42]

The cumulative impact of the above rules is that the appellate court typically upholds a trial judge's action in overruling a general objection. If the trial judge *sustains* a general objection, the appellate court is again charitable to the trial judge's ruling. "When evidence is *excluded* upon a mere general objection, the ruling will be upheld, if any ground in fact existed for the exclusion. It will be assumed, in the absence of any request by the opposing party or the court to make the objection definite, that it was understood, and that the ruling was placed upon the right ground." [43]

Examples of general objections are "I object;" [44] objections on the ground that the evidence is "inadmissible," [45] "illegal," [46] "incompetent," [47] "foundation," [48] is not "proper" testimony, [49] or an objection "on all the grounds ever known or heard of." [50] One of the most overworked objections is the formula that the evidence is "incompetent, irrelevant and immaterial." Its rhythm and alliteration seduce some lawyers to employ it as a routine ritual. Courts frequently treat this formula as merely equivalent to the general objection, [51] "I object." As applied to evidence, the word "incompetent" means no more than inadmissible and thus does not state a ground of objection. However, although somewhat general in wording, the expression "irrelevant and immaterial" states a distinct, substantive ground for exclusion. [52] A requirement that the objector state specifically the reason why the evidence is irrelevant or immaterial, as some courts demand, can be unduly burdensome; it requires the opponent to prove a negative. It is more practical to consider the irrelevancy objection in this form as a specific objection with one qualification. The qualification is that if the judge has any doubt as to relevancy, before ruling she may ask the proponent to explain the purpose of the proof. [53]

To make a sufficiently specific objection, the opponent should name the generic evidentiary rule being violated: "calls for information protected by the attorney-client privilege," "lack of authentication," "not the best evidence," or "hearsay"— the level of specificity found in the phrasing of the titles of the various articles in the Federal Rules of Evidence. Under the prevailing view, it is unnecessary to be any more specific. From a tactical perspective, it is usually [54] undesirable to be more specific. If the opponent names the specific deficiency in the foundation, the opponent has in effect educated the

proponent, and the proponent now knows exactly how to cure the defect in the foundation. However, a minority view requires the opponent to specify the missing foundational element. [55] This view has the advantage of forcing the opponent to get right to the point and thereby saving trial time. In the pretrial setting when the judge is ruling on an in limine motion, the judge is more likely to follow the minority view. [56] At trial, an objection can surface unexpectedly; and it is often impractical to insist that the opponent specify the precise deficiency in the proffered testimony. In contrast, when the context is pretrial, the opponent typically has more time to formulate a specific objection. Understandably, the judge demands more precise objections in the latter context.

While an "irrelevancy" objection has occasionally been held sufficient to preserve a claim of prejudice in the sense of arousing personal animus against the party, [57] that holding is questionable; that phrasing does not explicitly raise the policy concerns listed in Federal Rule 403. [58] Those concerns can easily be raised specifically, and a reference to one of those concerns does not require the opponent to establish a negative. [59] The judge should demand that the opponent cite Rule 403 or identify a probative danger mentioned in Rule 403. By the same token, many courts hold that a "hearsay" objection is insufficient to raise a Sixth Amendment Confrontation Clause objection. [60]

In the above cases, the judge pressures the objecting party to be more specific. In other cases, though, the objector faces exactly the opposite problem: the judge might make it difficult for the attorney to verbalize a sufficiently specific objection to make the record for appeal. As we shall see, the trial judge has a right to preclude "speaking" objections, in which under the guise of objecting the objector endeavors to make a speech to the jury. In an effort to prevent a speaking objection, the trial judge sometimes unduly interferes with the attorney's ability to articulate a complete objection satisfactory to the appellate court. When the record shows that the trial judge is responsible for the generality of the objection stated in the court below, the appellate courts are more liberal in deciding whether the objection was sufficiently specific with respect to ground.

A variation of the problem of specificity as to ground arises when an evidentiary rule limits the purposes for which an item of evidence may be admitted. Assume that evidence offered is properly admissible on a particular issue but not upon some other issue, or is admissible against one party but not against another. [61] Here, although she assigns grounds, an objector who simply asks that this evidence be excluded cannot complain on appeal if her objection is overruled. Instead, she should request that the admission of the evidence be limited to the particular purpose or party. [62]

*Specificity as to part.* Objections ought to be specific not only with regard to the ground, but also with respect to the particular part of an offer. Suppose that evidence sought to be introduced consists of several statements or items tendered as a unit in a deposition, letter, conversation, or trial transcript. Assume that the opponent objects to the whole of the evidence when some parts are subject to the objection made but other parts are not. In this situation, the judge does not err by overruling the objection. [63] It is not the judge's responsibility to sever the bad parts if some are good. [64] That is the opponent's burden. Obviously this rule should not be administered rigidly by the appellate courts; rather, the courts ought to apply the rule realistically with a sensitivity to the realities of the particular trial situation.

*Specificity as to party.* When the counsel represents only one party at trial, she is obviously claiming that the evidence is inadmissible against her client. However, when counsel appears on behalf of multiple clients at the same trial, the evidence might be admissible as against one but inadmissible as against the other. In this situation, counsel runs the risk of waiving the objection if she does not identify the client whom the evidence is inadmissible against.

Assume that the opponent makes an objection that lacks specificity with respect to ground, part, or party. On appeal, the court will uphold the *overruling* of an untenable specific objection even if there was a tenable ground for exclusion which was not urged in the trial court. [65] In an adversary system of litigation, it is the opponent's responsibility to specifically articulate a justifiable basis for excluding the proponent's evidence.

When an untenable specific objection is *sustained,* there is authority that the appellate court will uphold the ruling if there is any other ground for doing so, even though the ground was not cited below. [66] There is no point in ordering a retrial if the evidence would have to be excluded on the proper ground. However, some qualifications are necessary. When the correct objection, had it been made, could have been obviated, [67] or admissible evidence could have been substituted, a retrial is appropriate. If a ruling on the proper objection at the second trial would involve the judge's discretion, again a new trial is

appropriate unless the judge determines that on remand her discretion would be exercised in favor of exclusion. [68] A similar result should follow where findings of fact are required as a preliminary to determining admissibility. [69]

*Repetition of Objections*

A offers one witness's testimony which his adversary, B, thinks is inadmissible. B objects, and the objection is *sustained*. In that event, when A offers similar testimony by the same or another witness, B must repeat her objection if she is to complain about the later evidence. [70] Suppose, however, the first objection is *overruled*. Must B repeat her objection when other similarly objectionable evidence is offered? A few decisions intimate that she must [71]—a requirement which wastes time and casts B in the unenviable role of an obstructionist in the jurors' eyes. However, most courts sensibly hold that B is entitled to assume that the judge will continue to make the same ruling and she need not repeat the objection. [72] The logical consequences of this view are that the first objection is not waived by the objector's subsequent conduct and that in addition, the reach of this objection extends to all subsequent, similar evidence vulnerable to the same objection. In any jurisdiction where the law on this point is at all unsettled, it is a wise precaution for objecting counsel to ask the judge to have the record reflect a "running" or "continuing" objection, going to all other like evidence. [73]

*The Exception* [74]

Closely associated with the objection but distinct from it was the classic common law exception; [75] if the objector disagreed with the judge's overruling of the objection, the objector had to "except" to the ruling on the record to preserve the issue for purpose of appeal. The federal rules and the practice in most states dispense with exceptions, and provide that for all purposes, "it is sufficient to 'inform[ ] the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection.'" [76] Nevertheless, for motivations such as a desire to impress a jury, some attorneys persist in announcing that they "except" to rulings at jury trials even in jurisdictions where exceptions are unnecessary. These attorneys do so at the risk of irritating the trial judge–and having the trial judge admonish them in the jury's hearing.

*The Tactics of Objecting*

Jurors want to know the facts. They may resent objections as attempts to hide the facts, and view sustained objections as the successful suppression of the truth. [77] If this description of the jury's attitude is accurate, certain conclusions as to desirable tactics follow.

Even when a question is technically objectionable, the opponent should not object unless making the objection will do more good than harm. Conduct a cost/benefit analysis. In some situations, an objection can be counterproductive. Objections to leading questions or opinion evidence frequently result in strengthening the examiner's case by requiring her to elicit the testimony in more concrete, convincing form. [78] In a given case, an authentication, best evidence, or hearsay objection can have the same result and backfire. Further, if an objection has little chance of being sustained at trial or on appeal, it usually should not be made. An unsuccessful objection may succeed only in magnifying the importance of unfavorable evidence; the jurors might think that the opponent must have thought that the evidence was damning because he went to the length of trying to exclude it. Objections ought to be few in number, and they should target only evidence which will do substantial harm to the objector's theory of the case. [79]

Finally, when objections are made in the jury's presence, the objector's demeanor and the phrasing of the objection are important. An objection ought to be phrased to prevent the objection from sounding as if it rests exclusively on some technical rule. [80] Thus, an objection to a copy under the best evidence rule should not be stated solely in terms of "secondary evidence" but should also mention the unreliability of an incomplete copy. Likewise, the objection "hearsay" ought to be expanded to mention the need to produce the declarant so that the jury can see him and evaluate his credibility. The art of making effective objections at a jury trial consists in adding a short adjective, adverb, or phrase which signals the jury that the ground of the objection relates to substantive justice. However, most judges do not tolerate lengthy "speaking" objections. If a counsel is foolish enough to attempt such an objection, the judge might admonish counsel in the jury's hearing.

*Withdrawal of Evidence*

The Federal and Uniform Rules of Evidence do not deal explicitly with the subject of withdrawal of evidence. However, reasonably construed, Rule 611(a) permits withdrawal as an aspect of the court's discretionary control over the presentation

of evidence. The discretion could be exercised in accordance with the principles historically recognized in the case law. The cases sometimes imply that if a party has introduced evidence which is not objected to and which turns out to be favorable to the adversary, the offering party may withdraw the evidence as of right. [81] The accepted rule, however, is that withdrawal is not of right. Rather, the adversary is entitled to have the benefit of the testimony, [82] unless exceptional facts make it fair for the judge in her discretion to allow withdrawal. [83] However, if the evidence is admitted over the adversary's objection, and the proponent later decides to yield to the objection and asks to withdraw the evidence, the court may revoke its ruling and permit the withdrawal. [84]

*Plain Error Rule*

Many of the criteria for so-called "plain error" and "harmful error" (as opposed to harmless error) are similar. Yet, the two concepts should be distinguished. Like Uniform Rule of Evidence 103(a), restyled Federal Rule Evidence 103(a) codifies the "harmless error" concept with the statement, "A party may claim error only if the error affects a substantial right of the party …." Thus, only harmful errors warrant relief. Plain error is defined in restyled Rule 103(e): "A court may take notice of a plain error even if the claim of error was not properly preserved." In contrast to harmful error, harmless error denotes a ruling which is incorrect but which is not cause for reversal. Plain error denotes a harmful error that is sufficiently serious to justify considering it on appeal despite the opponent's failure to observe the usual procedures for preserving error for review. [85]

There are several key distinctions between plain and harmful error. To begin with, there is a difference in degree between harmful and plain error. For error to be harmful, the error must be prejudicial to the appellant; but for plain error, the error must have *very* prejudicial effects. [86] To qualify as plain error, the error must be a "blockbuster." [87] Harmful error is the genus, and plain error is the species. Moreover, to trigger the plain error doctrine, the error must create a risk of a miscarriage of substantive justice. [88] Some exclusionary rules of evidence bar the admission of relevant, reliable evidence in order to promote an extrinsic social policy. While those rules are certainly legitimate, it may be difficult to persuade an appellate court that a ruling admitting relevant, trustworthy evidence was likely to cause justice to miscarry. Despite the fundamental theoretical distinctions between the two concepts, surprisingly little difference can be found in the way the harmful and plain error concepts are applied in the published opinions. [89]

The published opinions clearly demonstrate the appellate courts' hesitancy to overturn the trial judge's evidentiary decisions. [90] There are many reasons for that hesitancy. The appellate courts are loathe to second guess the trial judge who usually has a better feel for the case. [91] Moreover, appellants frequently fail to marshal facts demonstrating that the alleged error was prejudicial. [92] This judicial reluctance is evident even in criminal cases. [93] However, a holding of plain error is far more likely in cases involving the constitutional rights of criminal defendants. [94] Reversals on the basis of plain error are much less common in civil suits than in criminal cases, in part because liberty and life are not at stake in a civil action. [95]

The application of the plain error doctrine depends upon a fact intensive, case specific analysis. [96] Findings of plain error are not only rarities; they also have very limited precedential value.

Westlaw. © 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

[a0]    General Editor, Henry Brandis Professor of Law Emeritus, University of North Carolina.
         Contributing Authors: George E. Dix, Edward J. Imwinkelried, David H. Kaye, Robert P. Mosteller, E.F. Roberts, Eleanor Swift.

[1]     1 Wigmore, Evidence § 18 (3d ed. 1940); 1 Weinstein's Federal Evidence §§ 103.10–.14 (rev. 2011); West's Key Number Digest, Trial 🔑73 to 97; Aprile, How to Be a Conscientious Objector, 27 Crim. Just., Fall 2011, at 40 (the article discusses in detail the various facets of a good objection: the hail to the judge, the objection itself, the statement of grounds, a description of prejudice, constitutionalization, and the request for relief).

[2]     Unif. R. Evid. 103(a)(1) and former Fed. R. Evid. 103(a)(1) embody the principles set forth in this paragraph of the text:

         (a) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits
         or excludes evidence unless a substantial right of the party is affected, and

(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; … .

Effective December 1, 2011, restyled Fed. R. Evid. 103(1)(1) reads:

Preserving a Claim of Error. A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and:

(1) if the ruling admits evidence, a party, on the record:

(A) timely objects or moves to strike; and

(B) states the specific ground, unless it was apparent from the context ….

*See* Reagan v. Brock, 628 F.2d 721 (1st Cir. 1980); U.S. v. Armedo–Sarmiento, 545 F.2d 785 (2d Cir. 1976). *See also* Hastings v. Serleto, 61 Cal. App. 2d 672, 143 P.2d 956 (2d Dist. 1943); Kuiken v. Garrett, 243 Iowa 785, 51 N.W.2d 149 (1952).

3    *See* Fed. R. Evid. 103(a)(1) and Unif. R. Evid. 103(a)(1). *See also* People v. Dykes, 46 Cal. 4th 731, 95 Cal. Rptr. 3d 78, 209 P.3d 1, 29 (2009) (the requirement for a timely objection applies in capital as well as non-capital cases); Cheffer v. Eagle Discount Stamp Co., 348 Mo. 1023, 156 S.W.2d 591 (1941). *But see* U.S. v. Meserve, 271 F.3d 314, 324 (1st Cir. 2001) (it became obvious later that the conviction in question was a 20-year-old misdemeanor; "[t]he general principle that an objection should be made after a question has been asked but before an answer has been given … is flexible in deference to the 'heat of a hotly contested criminal trial' …. Meserve's objection, although delayed, was sufficiently contemporaneous ….").

4    See federal cases cited in note 31 supra. *See also* Stark's Adm'x v. Herndon's Adm'r, 292 Ky. 469, 166 S.W.2d 828 (1942) (question asked by juror); Lineberry v. Robinett, 446 S.W.2d 481 (Mo. Ct. App. 1969).

5    A motion to strike should then be made. Wightman v. Campbell, 217 N.Y. 479, 112 N.E. 184 (1916) (but in the particular situation an objection sufficed); Sorenson v. Smith, 65 Or. 78, 129 P. 757 (1913). These rules are undoubtedly effective under Fed. R. Evid. 103(a)(1).

6    Brown v. Parker, 375 S.W.2d 594 (Mo. Ct. App. 1964) (dictum); Wallace v. American Toll Bridge Co., 124 Or. 179, 264 P. 351 (1928) (when the is question is proper but the answer is improper. the approved practice is to move to strike the answer).

The mere fact that the answer is unresponsive is not an objection available to the opponent. Hester v. Goldsbury, 64 Ill. App. 2d 66, 212 N.E.2d 316 (1st Dist. 1965) and cases cited therein; Isham v. Birkel, 184 Neb. 800, 172 N.W.2d 92 (1969) (exclusion by trial judge on opponent's objection held reversible error under particular circumstances). The objection is available to only the questioner, who may move to strike. Davidson v. State, 211 Ala. 471, 100 So. 641 (1924).

Again, these principles are applicable under Fed. R. Evid. 103(a)(1).

7    If the only vice in the answer is that it is nonresponsive to the question, it would seem that the only aggrieved party is the questioner. If the answer is otherwise admissible, the other party arguably lacks standing to move to strike the nonresponsive material. However, many trial judges permit both parties to move to strike on the ground of nonresponsiveness; and in pertinent part, Cal. Evid. Code § 766 provides that "answers that are not responsive shall be stricken on motion of any party." According to the Cal. Evid. Code § 11, " 'Shall' is mandatory…."

8    *See* Young v. Dueringer, 401 S.W.2d 165 (Mo. Ct. App. 1966).

9    Mere labels should not make a difference under Fed. R. Evid. 103(a)(1). *See also* Hackenson v. City of Waterbury, 124 Conn. 679, 2 A.2d 215 (1938) (plaintiff-witness "jumped the gun" and answered a question before defendant objected, and court sustained the objection; the court held that the objection was sufficient to preserve the issue even though there was no formal motion to strike); Wightman v. Campbell, 217 N.Y. 479, 112 N.E. 184 (1916) (when the first question in series proving the making of a land survey was answered before objection and objection was then made "to all that proof," the trial judge overruled the objection; the appellate court held that the objector had sufficiently raised the issue even without a motion to strike).

As to the adequacy of instructions to disregard, see § 58 at note 17 and § 59 infra.

10    *See* Fed. R. Civ. P. 32(b) and (d), adopted in many states and Fed. R. Crim. P. 15 and 16.

11    Fed. R. Civ. P. 32(b) and (d) to cite; 1 Wigmore, Evidence § 18, nn. 7–14 (3d ed. 1940).

If the opponent raises an objection to a question during the deposition and further instructs the deponent not to answer, before trial the proponent may file a motion to compel the deponent to answer the question. The proponent may need to know the answer in order to properly prepare for trial.

A fair rule of thumb is to include in this category objections which probably could have been obviated by the examiner if raised at the time. The rationale is that in all these cases, if the opponent had made an objection on the spot, the proponent could have cured the problem by, for instance, rephrasing the question or establishing an excuse for the non-production of the original writing. *But see* Fed. R. Crim. P. 16.

12    See references, note 10 supra.

13    Carlson, Successful Techniques for Civil Trials Ch. 1 (2d ed. 1992); Hazel, The Motion in Limine: A Texas Proposal, 21 Hous. L. Rev. 919 (1984); Gamble, The Motion *In Limine*: A Pretrial Procedure That Has Come of Age, 33 Ala. L. Rev. 1 (1981); Miller, To Argue Is Human, to Exclude Divine: The Role of Motions in Limine and the Importance of Preserving the Record on Appeal, 32 Am. J. Trial Adv. 541 (2009); Rothblatt & Leroy, The Motion in Limine in Criminal Trials, 60 Ky. L.J. 611 (1972); Comments, 29 Ark. L. Rev. 247 (1975), 27 U. Fla. L. Rev. 531 (1975), 9 Gonzaga L. Rev. 780 (1974), 35 Mont. L. Rev. 362 (1974); Modern status of rules as to use of motion in limine or similar preliminary motion to secure exclusion of prejudicial evidence or reference to prejudicial matters, 63 A.L.R.3d 311.

14    Luce v. U.S., 469 U.S. 38, 40 n.2, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984) (" '*In limine*' has been defined as: '[o]n or at the threshold; at the very beginning; preliminarily.' Black's Law Dictionary 708 (5th ed. 1979). We use the term in a broad sense to refer to any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered.").

15    If during opening counsel mentions prejudicial evidence which is later ruled inadmissible, the opponent might be entitled to a mistrial.

16    Suppose, for example, that the accused has a prior conviction but the judge rules the conviction inadmissible for impeachment purposes. It is then safer for the counsel to advise the client to testify.

17    Motions at the trial may be untimely if an intolerable, extensive interruption at the trial is required. U.S. v. Murray, 492 F.2d 178 (9th Cir. 1973).

18    *E.g.*, State v. Flett, 234 Or. 124, 380 P.2d 634 (1963); Modern status of rules as to use of motion in limine or similar preliminary motion to secure exclusion of prejudicial evidence or reference to prejudicial matters, 63 A.L.R.3d 311.

19    *But see* Ponder v. Conway, 748 F. Supp. 2d 183, 193 (W.D. N.Y. 2010) (under New York law, "a defendant is entitled to an in limine ruling setting forth the extent to which the prosecution may cross-examine him regarding prior crimes and acts bearing on his credibility … should he choose to testify"); People v. Mullins, 242 Ill. 2d 1, 350 Ill. Dec. 819, 949 N.E.2d 611 (2011); People v. Patrick, 233 Ill. 2d 62, 330 Ill. Dec. 149, 908 N.E.2d 1 (2009) (citing Settles v. State, 584 So. 2d 1260 (Miss. 1991), State v. McClure, 298 Or. 336, 692 P.2d 579 (1984), and State v. Ritchie, 144 Vt. 121, 473 A.2d 1164 (1984), the court noted that several jurisdictions recognize a general rule that a trial judge should not defer ruling on a defense motion challenging the admissibility of a defendant's conviction offered for purposes of impeachment; in order to make an intelligent decision whether to testify, the defendant needs to know whether the conviction will be admissible; in the instant case, the trial judge erred in deferring the ruling).

20    U.S. v. Oakes, 565 F.2d 170 (1st Cir. 1977); U.S. v. Kahn, 472 F.2d 272 (2d Cir. 1973); U.S. v. Evanchik, 413 F.2d 950 (2d Cir. 1969); People v. Owen, 299 Ill. App. 3d 818, 233 Ill. Dec. 900, 701 N.E.2d 1174 (4th Dist. 1998). These cases involve an advance motion to exclude alleged prejudicial, inadmissible evidence on cross-examination of a defendant if he takes the stand. *See also* U.S. v. Palumbo, 401 F.2d 270 (2d Cir. 1968). Compare People v. Lytal, 415 Mich. 603, 329 N.W.2d 738 (1982) (defendant is entitled to know before he takes the stand whether a prior conviction can be used to impeach).

Authority under the Federal and Revised Uniform Rules Evid. may be found in Rules 103(c), 104(c), and 611(a), the rules on pretrial conference and other pretrial proceedings, and the court's general power to control proceedings before them.

Like other interlocutory orders, rulings on these matters ordinarily remain subject to reconsideration by the judge at any time during the trial. However, when strategy has been developed in reliance on the ruling, as when an accused takes the stand in reliance on a ruling excluding impeachment by prior convictions, a trial judge's subsequent reversal of his ruling may well be an abuse of discretion.

21    U.S. v. Oakes, 565 F.2d 170 (1st Cir. 1977) (it is within the trial judge's discretion whether to make advance ruling on admissibility of prior convictions to impeach accused if he takes the stand, but practice is strongly encouraged).

22    See note 19 infra.

23    1 Weinstein's Federal Evidence § 103.11[2][b][iii] (rev. 2011); 1 Graham, Handbook of Federal Evidence § 103:8 (7th ed. 2012); Brosnahan, Using Motions in Limine in the Federal Courts, The Practical Litigator, Sep. 1997, at 13 (collecting cases on both sides of the split of authority). In state court, where a motion in limine is made and ruled upon, the point raised is sometimes treated as preserved for appeal despite the lack of an offer of proof or trial objection. *See* Palmerin v. City of Riverside, 794 F.2d 1409, 1412 n.3 (9th Cir. 1986) ("State courts are split on whether a contemporaneous objection during trial is required to preserve a right to appeal on an evidentiary matter admitted over a detailed motion in limine. *Compare* Reeve v. McBrearety, 660 P.2d 75, 77 (Kan. App. 1983); State v. Harper, 340 N.W.2d 391, 393 (Neb. 1983); Kaiser v. State, 673 P.2d 160, 161–62 (Okla. Crim. 1983); State v. Lesley, 672 P.2d 79, 82 (Utah 1983); Gamble, The Motion *in Limine*: A Pretrial Procedure That Has Come of Age, 33 Ala. L. Rev. 1, 16 (1981) (objection during trial required); with State v. Sisneros, 670 P.2d 721, 723 (Ariz. 1983); Harley–Davidson Motor Co. v. Daniel, 260 S.E.2d 20, 22 (Ga. 1979) (*in limine* motion preserves objection for appeal).").

With respect to the interlocutory or final nature of a ruling on a motion in limine, see Euroholdings Capital & Inv. Corp. v. Harris Trust & Sav. Bank, 602 F. Supp. 2d 928, 935 (N.D. Ill. 2009) ("'[T]he [in limine] ruling is subject to change when the case unfolds …. 'Indeed, even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to

alter a previous in limine ruling'"); Saltzburg, Impeachment of Witnesses and the Federal Rules of Evidence, 22 Crim. L. Bull. 101, 115 (1986) ("Trial judges in many cases have rendered final rulings for litigants prior to a trial event so that the litigants may prepare. Despite the language of *Luce*, it would be unfortunate if trial judges could not assist the parties in their preparation with some definitive rulings. This is not to say that the trial judge must or should rule finally prior to trial or prior to a part of a trial. It is only to acknowledge that some rulings can be made once and for all early in a case, and that trial judges should have the authority to make them.") (reprinted with permission from Criminal Law Bulletin, March/April 1986, vol. 22, No. 2. Copyright © 1986, Warren, Gorham & Lamont, Inc., 210 South Street, Boston, MA. 02111). All Rights Reserved. There is considerable support for the notion that if the motion in limine is fully briefed and a definitive ruling made, it is *not* necessary for the opposing party to object at trial to preserve error for appeal with respect to evidence held admissible on the motion in limine. *E.g.*, Freeman v. Package Machinery Co., 865 F.2d 1331 (1st Cir. 1988); Palmerin v. City of Riverside, 794 F.2d 1409 (9th Cir. 1986).

Evidence offered in violation of an order in limine must be objected to at trial. U.S. Aviation Underwriters, Inc. v. Olympia Wings, Inc., 896 F.2d 949 (5th Cir. 1990).

24    Gill v. Thomas, 83 F.3d 537 (1st Cir. 1996); U.S. v. Wiman, 77 F.3d 981 (7th Cir. 1996); U.S. v. Blum, 65 F.3d 1436 (8th Cir. 1995); U.S. v. Birbal, 62 F.3d 456 (2d Cir. 1995).

25    Rosenfeld v. Basquiat, 78 F.3d 84 (2d Cir. 1996).

26    U.S. v. Collier, 527 F.3d 695, 699 (8th Cir. 2008) (the trial judge made a definitive ruling); U.S. v. McVeigh, 153 F.3d 1166, 1200 (10th Cir. 1998) ("A motion in limine will not preserve an objection if it is not renewed at the time the evidence is introduced unless 'the issue (1) is fairly presented to the district court, (2) is the type of issue that can be fairly decided in pretrial hearing, and (3) is ruled upon without equivocation by the trial judge' "); Pandit v. American Honda Motor Co., Inc., 82 F.3d 376 (10th Cir. 1996). See also Bradford & Wyrsch, Making the Record in the Trial Court, 64 J. Mo. Bar 284, 286 (Nov.-Dec. 2008) ("Trial counsel has the obligation to clarify whether an in limine ruling … is 'definitive'"). *But see* U.S. v. Lillie, 669 F. Supp. 2d 903, 906 (N.D. Ill. 2009); Euroholdings Capital & Inv. Corp. v. Harris Trust & Sav. Bank, 602 F. Supp. 2d 928, 935 (N.D. Ill. 2009) ("[T]he [in limine] ruling is subject to change when the case unfolds …. 'Indeed, even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling.").

27    U.S. v. Hargrove, 625 F.3d 170, 177 (4th Cir. 2010), cert. denied, 132 S. Ct. 292, 181 L. Ed. 2d 177 (2011); U.S. v. Parish, 606 F.3d 480, 485 (8th Cir. 2010); Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387 (Fed. Cir. 2003) ("Here, the district court made definitive rulings either before or at trial on all of the defendant's objections to Fiorito's testimony").

28    See § 180 infra.

29    See § 55 infra.

30    *But see* U.S. v. Lubell, 301 F. Supp. 2d 88 (D. Mass. 2004) (in a limited class of cases, the judge is required to rule on the pretrial motion; a pretrial ruling is necessary only when the evidence needed to decide the motion is entirely segregable from questions of guilt or innocence; when the evidence is not completely segregable such as in cases where the evidence overlaps, the judge may postpone the ruling until trial unless the overlap is de minimis); People v. Patrick, 233 Ill. 2d 62, 330 Ill. Dec. 149, 908 N.E.2d 1 (2009) (citing Settles v. State, 584 So. 2d 1260 (Miss. 1991), State v. McClure, 298 Or. 336, 692 P.2d 579 (1984), and State v. Ritchie, 144 Vt. 121, 473 A.2d 1164 (1984), the court notes that several jurisdictions recognize a general rule that a trial judge should not defer ruling on a defense motion challenging the admissibility of a defendant's conviction offered for purposes of impeachment; in order to make an intelligent decision whether to testify, the defendant needs to know whether the conviction will be admissible; in the instant case, the trial judge erred in deferring the ruling).

31    1 Wigmore, Evidence § 18(c)(1)(2) (3d ed. 1940); 1 Weinstein's Federal Evidence § 103.12 (rev. 2011); West's Key Number Digest, Trial ⟜81 to 84.

32    *See* Fed. and Unif. R. Evid. 103(a)(1). *See also, e.g.*, Craig v. Citizens Trust Co., 217 Ind. 434, 26 N.E.2d 1006 (1940).

33    Ferguson v. Secretary for Dept. of Corrections, 580 F.3d 1183, 1212 (11th Cir. 2009) ("Though 'magic words are not needed to make a proper objection,' counsel must articulate his reason with sufficient specificity 'to inform the trial judge of the alleged error'").

34    City of Yuma v. Evans, 85 Ariz. 229, 336 P.2d 135 (1959).

35    Fed. R. Evid. 103(a)(1) does not ban the use of general objections at trial because the rule governs treatment of rulings on appeal and motions for new trial. *See also* Graham, Preserving Error for Appeal: Objections and Offers of Proof, 44 Crim. L. Bull. 609, 614–15 (July-Aug. 2008).

36    Fed. R. Evid. 103(a)(1) embodies this general rule. For case law, see, *e.g.*, Reed v. Trainor, 142 Ind. App. 192, 233 N.E.2d 685 (1968).

37    Restyled Fed. R. Evid. 103(a)(1) (error may not be predicated on a ruling admitting evidence absent a specific, timely objection "unless the [objection] was apparent from the context"); former Fed. and Unif. R. Evid. 103(a)(1) (error may not be predicated upon a ruling admitting evidence unless a timely specific objection was made "if the specific ground was not apparent from the context"). Case law is to the same effect. Styblo v. McNeil, 317 Ill. App. 316, 45 N.E.2d 1011 (1st Dist. 1943) ("An objection, except where it is obvious, should be stated in such a manner as to inform the court of the point being urged."); Johnson v. Jackson, 43 Ill. App. 2d

251, 193 N.E.2d 485 (1st Dist. 1963) ("it is difficult to show that a particular defect cannot be cured or that the ground for objection is obvious;" held not obvious in this case); Floy v. Hibbard, 227 Iowa 149, 287 N.W. 829 (1939) (general objection sufficient "where the grounds of the objection are discernible").

On appeal, however, reliance on this doctrine may indicate oversight in failing to "protect the record" or ignorance of a supposedly apparent specific objection.

38   Granberry v. Gilbert, 276 Ala. 486, 163 So. 2d 641 (1964) (if illegal for any purpose and incurable by other evidence or by reframing question); Scally v. Flannery, 292 Ill. App. 349, 11 N.E.2d 123 (4th Dist. 1937); State ex rel. State Highway Commission v. Rauscher Chevrolet Co., 291 S.W.2d 89 (Mo. 1956).

39   The qualification arises from the fact that some courts treat the objection "I object" as raising a relevancy objection. See note 51 infra.

40   Floy v. Hibbard, 227 Iowa 149, 287 N.W. 829 (1939); Smith v. Fine, 351 Mo. 1179, 175 S.W.2d 761 (1943).

41   See Campbell v. Paschall, 132 Tex. 226, 121 S.W.2d 593 (Comm'n App. 1938).

42   Fed. and Unif. R. Evid. 103(a)(1). See U.S. v. Ashton, 555 F.3d 1015, 1019 (D.C. Cir. 2009) ("when the party offering evidence does not request that the court clarify its decision to exclude that evidence, a reviewing court will sustain the exclusion on any ground that the district court could have invoked").

43   Tooley v. Bacon, 70 N.Y. 34, 37, 1877 WL 12006 (1877). See 1 Wigmore, Evidence § 18. If the offering counsel requests a statement of the specific grounds for excluding the evidence, the trial judge is obligated either to furnish it himself or to require objecting counsel to furnish it. Colburn v. Chicago, St. P., M. & O.R. Co., 109 Wis. 377, 85 N.W. 354 (1901). See also U.S. v. Dwyer, 539 F.2d 924 (2d Cir. 1976); U.S. v. Hibler, 463 F.2d 455 (9th Cir. 1972). If in doubt, offering counsel should follow this procedure. While in terms, Federal Rule 103(a) strictly applies only to saving error for review, its principal purpose is to promote precision and clarity of evidence rulings at trial. 1 Saltzburg, Martin & Capra, Federal Rules of Evidence Manual 103-5 (10th ed. 2011). The suggested procedure is available under the Federal Rules.

Once the general objection has been converted into a specific one, the later treatment of the objection should follow the rules prescribed for specific objections.

44   See language in Bandera v. City of Quincy, 344 F.3d 47 (1st Cir. 2003) ("objection") and U.S. v. Hutcher, 622 F.2d 1083 (2d Cir. 1980). The wordings at notes 45-50 are clearly not specific objections for the purposes of Fed. R. Evid. 103(a)(1). See also notes 31 to 41 supra. Gerald v. Caterers, Inc., 382 S.W.2d 740 (Mo. Ct. App. 1964).

45   Fowler v. Wallace, 131 Ind. 347, 31 N.E. 53 (1892).

46   Johnston v. Johnston, 174 Ala. 220, 57 So. 450 (1912).

47   Minchen v. Hart, 72 F. 294 (C.C.A. 8th Cir. 1896).

48   U.S. v. Barker, 27 F.3d 1287, 1292 (7th Cir. 1994).

49   Itasca Lumber Co. v. Martin, 230 F. 584 (C.C.A. 8th Cir. 1916).

50   Johnston v. Clements, 25 Kan. 376, 1881 WL 834 (1881) (possibly a world's record).

51   Vogel v. Sylvester, 148 Conn. 666, 174 A.2d 122 (1961) (objection on basis of irrelevancy); Goldfoot v. Lofgren, 135 Or. 533, 296 P. 843 (1931); West's Key Number Digest, Trial ⚓83(2).

52   See 1 Graham, Handbook of Federal Evidence § 103:2 (7th ed. 2012). As to relevancy and materiality generally, see Ch. 16 infra.

53   Ample authority for this approach is found in Fed. R. Civ. P. 46 and Fed. R. Crim. P. 51, supra § 51, note 23. At this stage, each party desires the court to act in her favor and is obliged to state her grounds.

54   There are exceptions to that proposition. In most cases, after the judge sustains the objection, the proponent may rephrase. If the proponent does so, a prejudicial line of questioning can potentially continue. If the opponent wants to cut off the line of questioning, the opponent might: (1) make a very specific objection, identifying the deficiency in the proponent's foundation; and (2) assert that the deficiency is incurable. In this situation, the opponent sometimes asks for permission to approach sidebar and presents her argument outside the jury's hearing.

55   U.S. v. Fendley, 522 F.2d 181 (5th Cir. 1975) (it is insufficient to object that evidence is inadmissible hearsay; the opponent must specify that the evidence is inadmissible as a business entry because there is no evidence that it was the regular practice of the business to prepare this type of record); People v. Wright, 48 Cal. 3d 168, 255 Cal. Rptr. 853, 768 P.2d 72 (1989) ("although defendant made a general best-evidence-rule objection, he failed to object on foundational grounds to the prosecution's failure to establish the original writing was lost or destroyed"); People v. Dorsey, 43 Cal. App. 3d 953, 118 Cal. Rptr. 362 (5th Dist. 1974).

56   Imwinkelried, The Pretrial Importance and Adaptation of the "Trial" Evidence Rules, 25 Loy. L.A. L. Rev. 965, 983–84 (1992).

57   E.g., Hungate v. Hudson, 353 Mo. 944, 185 S.W.2d 646 (1945).

58   Grounds for objection available under Rule 403 include "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." See U.S. v. Eagle, 515 F.3d 794, 803 (8th Cir. 2008); U.S. v. Adkins, 196 F.3d 1112, 1116 n.3 (10th Cir. 1999) (a "relevance" objection did not raise a Rule 403 issue); § 185 infra.

59  Of the objections listed in Rule 403, note 58 supra, only the first three are likely candidates for success on review.

60  U.S. v. Cabrera-Beltran, 660 F.3d 742, 751 (4th Cir. 2011), cert. denied, 132 S. Ct. 1935, 182 L. Ed. 2d 775 (2012); U.S. v. Meises, 645 F.3d 5 (1st Cir. 2011). See also Saltzburg, The Right Objection, 25 Crim.Just., Wint. 2011, at 54 (discussing the relationship between the hearsay and lack of personal knowledge objections).

61  Issues. Finley v. Smith, 240 Ark. 323, 399 S.W.2d 271 (1966); Curtin v. Benjamin, 305 Mass. 489, 26 N.E.2d 354 (1940); West's Key Number Digest, Trial ⚷86.

   Parties. Solomon v. Dabrowski, 295 Mass. 358, 3 N.E.2d 744 (1936); West's Key Number Digest, Trial ⚷87.

   If such a limitation is not requested, the objection lacks the specificity mandated by Rule 103(a)(1).

62  Finley v. Smith, note 61 supra; Walls v. Clark, 252 Or. 414, 449 P.2d 141 (1969) (parties).

63  U.S. v. McGrath, 622 F.2d 36 (2d Cir. 1980); Clayton v. Prudential Ins. Co. of America, 4 N.C. App. 43, 165 S.E.2d 763 (1969) (an objection to letter as a whole was insufficient although part was inadmissible on hearsay and opinion grounds); Jacobson v. Bryan, 244 Wis. 359, 12 N.W.2d 789 (1944) (part of a traffic officer's report of accident was based on personal knowledge, but another part was not; an objection to whole report was insufficient); West's Key Number Digest, Trial ⚷85.

64  An objection which fails to separate out the objectionable part as the target of the objection lacks the specificity mandated by Rule 103(a)(1). See United States v. McGrath, note 63 supra; Wright and Miller's Federal Practice and Procedure, Evidence § 5036. See also Mucci v. LeMonte, 157 Conn. 566, 254 A.2d 879 (1969). The judge may sustain the objection without error, since he has no duty to separate the good from the bad. See § 51 supra.

65  This is the result both at common law and under Fed. and Unif. R. Evid. 103(a)(1). An untenable specific objection is the same as no objection at all. Gray v. Lucas, 677 F.2d 1086, 1099 n.13 (5th Cir. 1982) (hearsay claim not considered on appeal because not raised below); U.S. v. Brady, 595 F.2d 359 (6th Cir. 1979); U.S. v. Ruffin, 575 F.2d 346, 355 (2d Cir. 1978) (objection below of irrelevancy did not support an appellate claim of hearsay); People ex rel. Blackmon v. Brent, 97 Ill. App. 2d 438, 240 N.E.2d 255 (1st Dist. 1968); State v. Dietz, 115 N.W.2d 1 (N.D. 1962).

66  See 1 Wigmore, Evidence § 18 at 345 (3d ed. 1940).

67  See Morgan, Basic Problems in Evidence 54 (1962).

68  See Saltzburg, Another Ground for Decision—Harmless Trial Court Errors, 47 Temple L.Q. 193 (1974). This reasoning would apply if, at the hearing on a new trial motion after the first hearing, the judge realized that there is a tenable specific objection to the evidence.

69  Saltzburg, Another Ground for Decision–Harmless Trial Court Errors, 47 Temple L.Q. 193 (1974).

70  Frost v. Goddard, 25 Me. 414, 1845 WL 1274 (1845); Wagner v. Jones, 77 N.Y. 590, 1879 WL 12215 (1879). The instant rule is embodied in Fed. R. Evid. 103(a)(1) and Unif. R. Evid. 103(a)(1).

71  Shelton v. Southern Ry. Co., 193 N.C. 670, 139 S.E. 232 (1927).

72  Tucker v. Reil, 51 Ariz. 357, 77 P.2d 203 (1938); West–Nesbitt, Inc. v. Randall, 126 Vt. 481, 236 A.2d 676 (1967); West's Key Number Digest, Trial ⚷79; Ladd, Common Mistakes in the Technique of Trial, 22 Iowa L. Rev. 609, 612–17 (1937).

   The "continuing objection" is not specifically mentioned by Fed. and Unif. R. Evid. 103(a)(1). The federal Advisory Committee's Note indicates it is authorized by its reference to California Code § 353. See Wright and Miller's Federal Practice and Procedure, Evidence § 5037. Accord U.S. v. Lynn, 608 F.2d 132 (5th Cir. 1979); Squyres v. Hilliary, 599 F.2d 918 (10th Cir. 1979).

73  U.S. v. Roach, 164 F.3d 403, 410 (8th Cir. 1998) ("A standing objection may be appropriate to cover the same recurring issue, but it cannot protect a party where there are distinct foundation questions involved"); U.S. v. Fortenberry, 919 F.2d 923 (5th Cir. 1990); State v. Guloy, 104 Wash. 2d 412, 705 P.2d 1182 (1985) (counsel requested continuing objection). Reliance on a continuing objection can be risky. See U.S. v. McVeigh, 153 F.3d 1166 (10th Cir. 1998) (continuing objections are generally considered inappropriate for Rule 403 challenges, since the probativity/prejudice balance can vary from question to question); Hall v. State, 119 Md. App. 377, 705 A.2d 50 (1998) (a continuing objection "is effective only as to questions clearly within its scope").

74  1 Wigmore, Evidence § 20 (3d ed. 1940); West's Key Number Digest, Trial ⚷99 to 104, 105.

75  The function and procedure of bills of exception are described in Green, Basic Civil Procedure 254–55 (2d ed. 1979):

   … [T]he only function of the appellate court was to review alleged errors of law, and in so doing it was confined to the common law record which consisted of the writ (summons), the return, pleadings, verdict and judgment. The court could not review the facts since they were the sole province of the jury, and furthermore no record of the testimony was kept. Consequently the scope of review was very narrow, at least until the year 1285 when Parliament passed the famous Statute of Westminster II which, among other things, provided for Bills of Exceptions.

   The purpose of a Bill of Exceptions was to bring before the appellate court for review matters which otherwise would not appear on the common law record due to the fact that there were no court reporters to record the

testimony and the proceedings at the trial. This was before the days of shorthand and recording devices. After the Statute of Westminster II if a litigant believed the court had erred in a ruling, he could make it a matter of record by "saving his exception." For example, if counsel had objected to a question asked of a witness and the court had overruled the objection and counsel thought the ruling was erroneous, he could say, "If the court please, I desire to save an exception to your honor's ruling." The judge was then obliged to stop the trial and call the scrivener who, with his quill pen, would make a record on parchment which would read something like the following: (after giving the caption of the case) "Elmer Zilch, a witness sworn in the above entitled case, was asked the following question, 'Have you stopped beating your wife?' to which counsel for the defendant objected on the ground the question was improper because an answer either way would incriminate him; whereupon, after argument the court overruled the objection, to which ruling the defendant duly saved his exception." When this document was completed, it would be signed by the judge. During the course of the trial numerous exceptions might be "saved." At the conclusion of the trial they would be bound together and certified by the trial judge as the Bill of Exceptions in the case, and they would be attached to and become a part of the record on appeal. Today, with modern methods of court reporting, this antiquated method of preserving a record has become obsolete and court rules make "exceptions" unnecessary. (Footnotes omitted).

76    Fed. R. Crim. P. 51(b). The analogous provision in the Federal Rules of Civil Procedure, Rule 46, refers to "the action that it wants the court to take or objects to, along with the ground for the request or objection."

77    See general discussion in Keeton, Trial Tactics and Methods 166–90 (2d ed. 1973); Mauet, Trial Techniques § 10.3, at 449-50 (8th ed. 2010); Carlson & Imwinkelried, Dynamics of Trial Practice § 6.3, at 170–71 (4th ed. 2010). The National Law Journal and LEXIS funded a large survey of juror attitudes. The researchers reported:

> When a lawyer made an objection, 46 percent of the jurors thought the lawyer was trying to hide something the jurors felt would have been helpful to know…. Young jurors were particularly suspicious of objections—59% of those in the 18–34 age group thought that lawyers had something to hide.

Panelists Give Tip to Lawyers, Nat'l L.J., Feb. 22, 1993.

78    Ladd, Common Mistakes in the Technique of Trial, 22 Iowa L. Rev. 609, 617 (1937).

79    Lane, Goldstein Trial Technique § 13:8 (3d ed.).

80    See examples of objections in Busch, Law and Tactics in Jury Trials §§ 488, 492 (1949); Keeton, Trial Tactics and Methods 210–15 (2d ed. 1973); Mauet, Trial Techniques Ch. 10 (8th ed. 2010); Bright, Carlson & Imwinkelried, Objections at Trial (5th ed. 2008); Imwinkelried, Evidentiary Foundations § 2.03[3], at 17-18 (8th ed. 2012).

81    See Young v. U.S., 97 F.2d 200, 205 (C.C.A. 5th Cir. 1938), and Note, 17 Tex. L. Rev. 373, 374 (1939).

82    Page v. Payne, 293 Mo. 600, 240 S.W. 156 (1922) (defendant had no right to withdraw parts of documents introduced by him); Looman Realty Corp. v. Broad St. Nat. Bank of Trenton, 74 N.J. Super. 71, 180 A.2d 524 (App. Div. 1962) (no withdrawal unless evidence irrelevant or immaterial); 1 Wigmore, Evidence § 17c (3d ed. 1940); West's Key Number Digest, Trial ⟜58.

83    Maas v. Laursen, 219 Minn. 461, 18 N.W.2d 233, 235 (1945) (withdrawal is discretionary; it may be allowed if evidence irrelevant or if favorable only to withdrawing party; court here did not err in denying withdrawal).

84    Alabama Great Southern R. Co. v. Hardy, 131 Ga. 238, 62 S.E. 71, 72 (1908); McCarty v. Bishop, 231 Mo. App. 604, 102 S.W.2d 126 (1937) (evidence may be withdrawn in the court's discretion despite a protest by the opposing party).

85    See 1 Weinstein's Federal Evidence § 103.42 (rev. 2011) (exclusion without a proper offer of proof may be plain error); Adv.Com. Note, Fed. R. Evid. 103(d).

86    E.g., U. S. v. Frady, 456 U.S. 152, 163, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982) ("particularly egregious errors"); U.S. v. Atkinson, 297 U.S. 157, 160, 56 S. Ct. 391, 80 L. Ed. 555 (1936) ("seriously affect the fairness, integrity or public reputation of judicial proceedings"); U.S. v. Douglas, 818 F.2d 1317, 1320 (7th Cir. 1987) ("such a great magnitude that it probably changed the outcome of the trial").

87    U.S. v. Olivo-Infante, 938 F.2d 1406 (1st Cir. 1991).

88    U.S. v. Shorty, 159 F.3d 312, 313 (7th Cir. 1998); U.S. v. Yamin, 868 F.2d 130 (5th Cir. 1989); U.S. v. Solomon, 856 F.2d 1572 (11th Cir. 1988).

89    Wright and Miller's Federal Practice and Procedure, Criminal § 856 ("Indeed the cases have given the distinct impression that 'plain error' is a concept appellate courts find impossible to define, save that they know it when they see it.").

90    Berger, When, If Ever, Does Evidentiary Error Constitute Reversible Error?, 25 Loy. L.A. L. Rev. 893 (1992); Swift, The Hearsay Rule at Work: Has It Been Abolished De Facto by Judicial Decision?, 76 Minn. L. Rev. 473 (1992).

91    Of course, the trial judge may object or suggest objections to the attorney. See § 55 infra.

92    1 Weinstein's Federal Evidence § 103.42 (rev. 2011), quoting Sykes v. U.S., 373 F.2d 607 (5th Cir. 1966); Graham, Preliminary Questions of Admissibility, Fed. R. Evid. 103 and 104; Motions in Limine, 44 Crim. L. Bull. 108 (Jan.-Feb. 2008).

93    See cases cited in Wright and Miller's Federal Practice and Procedure, Evidence § 5036; Berger, When, If Ever, Does Evidentiary Error Constitute Reversible Error?, 25 Loy. L.A. L. Rev. 893 (1990). But there are many cases in which plain error was cause for reversal. See sources cited in note 114 supra.

94    Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) indicates that "before a federal constitutional error can be harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt … "

95    In civil cases, reversal for plain error is rare. 1 Mueller & Kirkpatrick, Federal Evidence § 1:22 (3d ed. 2007). The Federal Rules of Criminal Procedure contain a plain error rule, Fed. R. Crim. P. 52(b), but the Federal Rules of Civil Procedure do not.

96    E.g., 1 Weinstein's Federal Evidence § 103.42 (rev. 2011).

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 113

§ 55. Waiver of objection, 1 McCormick On Evid. § 55 (7th ed.)

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 171 of 204

1 McCormick On Evid. § 55 (7th ed.)

McCormick on Evidence
Database updated March 2013
Kenneth S. Broun [a0]
Title 3. Admission and Exclusion
Chapter 6. The Procedure of Admitting and Excluding Evidence

§ 55. Waiver of objection

As a general proposition, the party's failure to assert an objection promptly and specifically effects a waiver. [1] What other conduct constitutes a waiver?

*A Failure to Testify After the Loss of a Motion in Limine*

When a party has unsuccessfully [2] moved in limine motion to exclude credibility evidence, some authorities require the party to testify to preserve the issue for appeal. When the testimony is logically relevant only to credibility, the party can preclude the admission of the testimony by foregoing the witness's testimony. Thus, the cost of a ruling admitting the evidence can be the loss of the witness's testimony. The argument runs that the appellate court cannot intelligently gauge that cost unless the court has the benefit of the testimony; the appellate courts reason that without the benefit of the witness's actual testimony, they cannot properly evaluate the trial judge's ruling denying the in limine motion.

However, the holdings in those authorities are limited in scope; many [3] of these authorities relate to evidence logically relevant only on a credibility theory. Moreover, in some jurisdictions, a voir dire of the witness outside the jury's presence obviates the need for the witness to testify at trial to preserve the issue for purposes of appeal. [4] Finally, some jurisdictions flatly reject the view that the party must call the witness in order to preserve the issue. [5]

*Demand for Inspection of a Writing*

Federal Rule of Civil Procedure 34 authorizes a litigant to demand that the opponent produce writings and objects for pretrial inspection. Suppose that one party, D, gives notice to his opponent, O, to produce a document, and O produces it. Then D asks to inspect it and is allowed to do so. Assume that under some evidentiary doctrine the document, if offered by O, would be inadmissible except for the facts of notice, production, and inspection. Do these facts preclude D from objecting when O offers the document into evidence? Old precedents in England, Massachusetts, and a few other states said yes: D is precluded from objecting. [6] This result was originally rationalized on the notion that it would be unconscionable to permit the demanding party to examine the producing party's private papers without incurring some corresponding risk. [7] A later case, however, attempted to justify the result on another theory; according to that case, at least when the demand is made in open court, the jury may suspect the party who is called on to produce the writing of evasion or concealment unless he can introduce the writing. [8] That argument has limited validity, though; that risk is present only when, under local procedure, the demand must be made in the jury's hearing. Modernly, the demand is ordinarily made out of court before trial.

The modern cases recognize that the old policy against compelled disclosure of relevant writings in a party's possession is outmoded. [9] The contemporary policy is just the opposite, that of pressuring full disclosure except for privileged matter. [10] Accordingly, today the overwhelming majority of states reject the old rule [11] and permit D to assert any pertinent objection if O later offers the writing. This rule is consistent with Federal and Uniform Rule of Evidence 103(a)(1). The older view is at odds with the liberal pretrial discovery policy of the federal civil rules, which have been adopted widely in the states. [12] In this fact situation, it is silly to infer that the party requesting production has waived all evidentiary objections to the introduction of the writing; the party cannot forecast the potential objections until she has had an opportunity to review the contents of the writing.

*Failure to Object to Earlier Similar Evidence*

A party has introduced evidence of particular facts without objection. Later he offers additional evidence, perhaps by other witnesses or writings, of the same facts. May the adversary now object, or has he waived his right by his earlier quiescence?

§ 55. Waiver of objection, 1 McCormick On Evid. § 55 (7th ed.)

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 172 of 204

Some opinions summarily state that he may not object. [13] However, in the more carefully reasoned opinions, courts usually conclude that standing alone, the earlier failure to object to other like evidence is not a waiver of objection to the new inadmissible evidence. [14] This conclusion should be reached under the Federal and Revised Uniform Rules of Evidence. [15] (Of course, overruling the new objection will sometimes be harmless error, since the earlier evidence could render the error harmless; but that is a different question.) [16] As § 52 points out, even when evidence is technically objectionable, experienced trial attorneys do not object unless the evidence is clearly damaging. Their practice is in the interest of judicial economy and encouraged by the nonwaiver rule. The conventional wisdom is that an attorney should not assert every technically available objection; to avoid alienating the jury, the attorney ought to object only when the objection is both legally meritorious and tactically sound—such as when the evidence in question would do major damage to the attorney's theory of the case. It might have been tactically inadvisable to object to the earlier evidence; although the testimony was technically objectionable under evidence law, its contents might have been innocuous or positively helpful. It would be wrong-minded to infer a waiver from the earlier failure to object.

However, when the evidence of the fact, admitted without objection, is extensive, [17] and the evidence though inadmissible has some probative value, the trial judge should have discretion to find that the objector's conduct amounted to a waiver. Again, this approach can be followed under the Federal and Revised Uniform Rules of Evidence.

*The Offering of Like Evidence by the Objector*

If a party who has objected to evidence of a certain fact himself later produces affirmative evidence of the same fact from his own witness, he has waived his earlier objection. [18] This result should obtain under the Federal and Revised Uniform Rules of Evidence. [19] However, when his objection is made and overruled, he is entitled to treat this ruling as the "law of the trial" and to negatively rebut or explain, if he can, the evidence admitted over his protest. Consequently, as a general rule there is no waiver if he cross-examines the adversary's witness about the matter. [20] There is no waiver even though the cross-examiner repeats the fact, [21] or even meets the testimony with other evidence which, under the theory of his objection, would be inadmissible. [22] Here too the courts can reach the same result under the Federal and Revised Uniform Rules of Evidence. [23] However, some courts have carved out an exception to the above general rule. Suppose that the defense counsel believes that the prosecutor will attempt to use an inadmissible conviction to impeach the defendant but unsuccessfully moves in limine to bar the use of the conviction. Assume further that to blunt the impact of the expected impeachment, during the defendant's direct examination the defense counsel has the defendant acknowledge the conviction. In 2000 in *Ohler v. United States*, [24] the Court held that by mentioning her conviction on direct, the defendant waived any error in the in limine ruling. The Court's syllabus states:

> A defendant who preemptively introduces evidence of a prior conviction on direct examination may not challenge the admission of such evidence on appeal. Ohler attempts to avoid the well-established commonsense principle that a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted by invoking the Federal Rules of Evidence 103 and 609. However, neither Rule addresses the question at issue here. She also argues that applying such a waiver rule in this situation would compel a defendant to forgo the tactical advantage of preemptively introducing the conviction in order to appeal the in limine ruling. But both the Government and the defendant in a criminal trial must make choices as the trial progresses.

The Court's holding has been sharply criticized. [25] The essence of the criticism is that it is an accepted trial tactic to blunt anticipated damaging evidence and that the cost of resorting to such a legitimate tactic should not include forfeiting the right to challenge an erroneous trial court ruling. Since the decision is non-constitutional in character, the states are free to adopt a contrary view. Several have done so. [26]

*Exclusion by Judge on Her Own Motion Absent an Objection*

A party's failure to object usually waives the objection and forecloses that party from complaining if the evidence is admitted. [27] But the party's failure does not preclude the trial judge from excluding the evidence on her own motion if the

§ 55. Waiver of objection, 1 McCormick On Evid. § 55 (7th ed.)

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 173 of 204

prospective witness is incompetent or the evidence is inadmissible, and the judge believes the interests of justice require the exclusion of the testimony.[28] The judge is especially likely to intervene in criminal cases to bar inadmissible evidence that might severely prejudice the defendant. The judge can step in both to protect the accused's rights and to decrease the risk that any conviction will be vulnerable to collateral attack on the ground of ineffective representation of counsel. The Federal and Revised Uniform Rules of Evidence grant the judge sufficiently broad power to intervene *sua sponte* in such circumstances.[29]

However, many types of evidence such as reliable affidavits or copies of writings, albeit technically inadmissible, are probative and trustworthy. In that case, absent an objection, the trial judge would be unjustified in excluding the evidence. The judge should exercise her discretionary power to intervene only when the evidence is irrelevant, unreliable, misleading, or prejudicial as well as technically inadmissible.

However, privileged evidence, such as confidential communications between husband and wife, ought to be treated differently. The privileges protect the holder's outside interests, not the parties' interest in securing justice in the present litigation. Accordingly, when a question calls for privileged matter and the holder is present, if necessary the judge may explain the privilege to the holder; but the judge should not assert it on her own motion if the holder decides against claiming the privilege. In contrast, when the holder is absent, the judge in some jurisdictions has a discretionary power to assert it on the holder's behalf.[30]

Westlaw. © 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

## Footnotes

a0    General Editor, Henry Brandis Professor of Law Emeritus, University of North Carolina.

   Contributing Authors: George E. Dix, Edward J. Imwinkelried, David H. Kaye, Robert P. Mosteller, E.F. Roberts, Eleanor Swift.

1    See § 52 supra. The use of a term, "waiver," in the situations discussed generally in this section has been strongly criticized. Wright and Miller's Federal Practice and Procedure, Evidence § 5039. Many courts have apparently not used the term in its strictly technical sense, but as a convenient label for various doctrines of preclusion. Many of the original case citations in the instant section indicate no confusion with the strictly orthodox terms, "waiver" and "estoppel," as used in other areas of the law.

   Some courts recognize vicarious objections; "[w]hen one co-party objects [to an evidentiary issue] and thereby brings the matter to the attention of the court, further objections by other co-parties are unnecessary." U.S. v. Irving, 665 F.3d 1184, 1206–1207 (10th Cir. 2011), cert. denied, 132 S. Ct. 1873, 182 L. Ed. 2d 656 (2012). Moreover, a failure to object can be excused when the trial judge's prior rulings make it futile to object. State v. Barajas, 247 Or. App. 247, 268 P.3d 732 (2011). See further § 137 infra.

2    *See generally* Luce v. U.S., 469 U.S. 38, 41–42, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984) ("Any possible harm flowing from a district court's *in limine* ruling permitting impeachment by a prior conviction is wholly speculative. The ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling."). Thus, in federal courts, the defendant must testify to preserve error for review with respect to a claim of improper impeachment with a prior conviction. Luce v. United States, id.; U.S. v. Gunter, 551 F.3d 472, 483–84 (6th Cir. 2009); U.S. v. Fallon, 348 F.3d 248, 253–54 (7th Cir. 2003) (by failing to testify, the defendant waived the right to challenge the impeachment use of convictions outside the normal ten-year period); Government of Virgin Islands v. Fonseca, 44 V.I. 336, 274 F.3d 760, 765 (3d Cir. 2001) (collecting cases applying *Luce*); U.S. v. Kozeny, 643 F. Supp. 2d 415, 417 (S.D. N.Y. 2009) ("a court's ruling regarding a motion in limine 'is subject to case when the case unfolds' …. [E]ven if nothing unexpected happens at trial the district court is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling"); Brumfield v. Stinson, 297 F. Supp. 2d 607, 619–20 (W.D. N.Y. 2003). Although *Luce* involved Rule 609 impeachment with a conviction, some jurisdictions have extended the scope of the case's holding beyond that context. U.S. v. Ferrer, 441 Fed. Appx. 867 (3d Cir. 2011) ("our sister circuits have extended *Luce* beyond the Rule 609(a) context"); State v. Romar, 221 Ariz. 342, 212 P.3d 34 (Ct. App. Div. 1 2009) (the defense waived its objection to the cross-examination of character witnesses; after the judge's ruling, the defense elected not to call the witnesses; the appellate court refused to rule "based on purely hypothetical testimony"); State v. Smyers, 207 Ariz. 314, 86 P.3d 370 (2004). The same is true with respect to impeachment by prior acts of misconduct not leading to a conviction. U.S. v. Weichert, 783 F.2d 23 (2d Cir. 1986). The rule has also been applied to post-arrest silence offered for impeachment purposes. People v. Boyd, 470 Mich. 363, 682 N.W.2d 459 (2004).

3    There is an argument that the *Luce* reasoning applies only when the challenged evidence is logically relevant only on a credibility theory. Under *Luce*, the trial judge must consider the probative value of the testimony the party contemplates giving. The ruling can

deter the party from testifying precisely because the party can preclude the introduction of credibility evidence by not testifying. If the party does not testify, his or her credibility does not become an issue; and evidence bearing only on the party's credibility is irrelevant and consequently inadmissible under Federal Rule 401. The *Luce* reasoning does not apply when the evidence can be admitted even if the party does not testify. For example, in many instances, evidence of a defendant's uncharged misconduct can be admitted under Federal Rule 404(b) even if the defendant decides against testifying. Rule 404(b) evidence is ordinarily relevant to the historical merits rather than credibility. Nevertheless, some courts assume that a defendant must testify in order to preserve a Rule 404(b) ruling for appeal. 2 Imwinkelried, Uncharged Misconduct Evidence § 9:15, at 9-96-99 (rev. 2009) (collecting authorities).

4    "[T]he First Circuit has indicated that a voir dire of the defendant out of the presence of the jury may be sufficient to preserve the issue for appellate review …." May & Cohen, Staying Luce, 27 The Champion 30, 32 (Nov. 2003) (citing U.S. v. Griffin, 818 F.2d 97, 105 (1st Cir. 1987) and U.S. v. Nivica, 887 F.2d 1110, 1116 (1st Cir. 1989)).

5    Warren v. State, 121 Nev. 886, 124 P.3d 522 (2005); Graham, Motions in Limine: Anticipatory Disclosure of Prior Conviction, 41 Crim. L. Bull. 539, 549 (Sep.-Oct. 2005) ("Tennessee law provides that a defendant need not testify to preserve error for appeal … State v. Galmore, 994 S.W.2d 120, 122-25 (Tenn. 1999)").

6    Wharam v. Routledge, 1805 WL 1043 (U.K. Assizes 1805); Calvert v. Flower, 1836 WL 3607 (K.B.); Clark v. Fletcher, 83 Mass. 53, 1 Allen 53, 1861 WL 4380 (1861) (leading case); Leonard v. Taylor, 315 Mass. 580, 53 N.E.2d 705 (1944); and cases cited in Production, in response to call therefor by adverse party, of document otherwise inadmissible in evidence, as making it admissible, 151 A.L.R. 1006. However, as remarked in Zimmerman v. Zimmerman, 12 N.J. Super. 61, 79 A.2d 59 (App. Div. 1950), the spirit of the federal discovery rules adopted in New Jersey "seems to run counter" to the older practice. This *Zimmerman* viewpoint should apply in states which have adopted in substance the federal discovery rules. See also West's Key Number Digest, Evidence 🗝368(14).

But the rule does not apply in any event when the writing is used by one party to refresh his witness's memory: the other party is entitled to inspect the writing without being penalized by being required to permit its introduction in evidence. Clearly the supposed reason of the rule does not apply. Nussenbaum v. Chambers & Chambers, 322 Mass. 419, 77 N.E.2d 780 (1948). See § 9 supra.

7    Clark v. Fletcher, 83 Mass. 53, 1 Allen 53, 57, 1861 WL 4380 (1861), quoted in Production, in response to call therefor by adverse party, of document otherwise inadmissible in evidence, as making it admissible, 151 A.L.R. 1006, 1013.

8    Leonard v. Taylor, 315 Mass. 580, 53 N.E.2d 705 (1944) This shifting of ground, however tenuous the new justification may seem, at least implies that the rule should be restricted to the limits of the new reason, namely, to jury trials where request for inspection is made in the jury's presence.

9    See the vigorous criticism of the rule in 7 Wigmore, Evidence § 2125 (Chadbourn rev. 1978).

10   Fed. R. Civ. P. 26.

11   Scully v. Morrison Hotel Corp., 118 Ill. App. 2d 254, 254 N.E.2d 852 (1st Dist. 1969) (rejecting "English" rule in Illinois); Morgan v. Paine, 312 A.2d 178 (Me. 1973) (overruling prior cases); Smith v. Rentz, 131 N.Y. 169, 30 N.E. 54, 56 (1892) ("The party who has in his possession books or papers which may be material to the case of his opponent has no moral right to conceal them from his adversary. … The party calling for books and papers would be subjected to great hazard if an inspection merely, without more, would make them evidence in the case. That rule tends rather to the suppression than the ascertainment of truth, and the opposite rule is, as it seems to us, better calculated to promote the ends of justice."); Merlino v. Mutual Service Cas. Ins. Co., 23 Wis. 2d 571, 127 N.W.2d 741 (1964).

12   *See* Zimmerman v. Zimmerman, 12 N.J. Super. 61, 79 A.2d 59 (App. Div. 1950); Oakley & Coon, The Federal Rules in State Courts: A Survey of State Court Systems of Civil Procedure, 61 Wash. L. Rev. 1367 (1986).

13   Star Realty v. Strahl, 261 Iowa 362, 154 N.W.2d 143 (1967); State v. Tranchell, 243 Or. 215, 412 P.2d 520 (1966) (matter is in court's discretion); Rash v. Waterhouse, 124 Vt. 476, 207 A.2d 130 (1965).

But no court would hold that because earlier evidence was subject to an objection under a particular exclusionary rule, e.g., hearsay, and was received without objection, the prior lack of objection precludes the adversary from asserting this ground of objection against new evidence. *E.g.*, New York Life Ins. Co. v. Neasham, 250 F. 787 (C.C.A. 9th Cir. 1918) (consent to use transcript of one witness's testimony at coroner's hearing, did not waive the right to object to transcript of another witness's testimony at same hearing).

14   Lowery v. Jones, 219 Ala. 201, 121 So. 704 (1929) ("If these [later] objections had been sustained, the force of the former testimony would probably have been weakened in the mind of the jury"); Slocinski v. Radwan, 83 N.H. 501, 144 A. 787 (1929); Bobereski v. Insurance Co. of Pennsylvania, 105 Pa. Super. 585, 161 A. 412, 415 (1932) (" … the fact that incompetent, irrelevant, and immaterial evidence may be introduced on a trial by one party, without objection from the other party, because he may deem it of no importance and harmless, does not prevent the latter from objecting to the further introduction and elaboration of such evidence when he is of opinion that it is both important and harmful. The principle of estoppel does not apply in such case."); McLane v. Paschal, 74 Tex. 20, 11 S.W. 837, 839 (1889).

15   This position is also taken in Wright and Miller's Federal Practice and Procedure, Evidence § 5039.

16   As pointed out by Phillips, C.J. in Slayden v. Palmo, 108 Tex. 413, 194 S.W. 1103, 1104 (1917).

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 175 of 204

§ 55. Waiver of objection, 1 McCormick On Evid. § 55 (7th ed.)

17    Of course, evidence and counterevidence may make the fact material, though not pleaded. *E.g.*, Swezey v. Valley Transport, 6 Wash. 2d 324, 107 P.2d 567 (1940), and see § 54 note 3 supra.

18    U.S. v. Silvers, 374 F.2d 828, 832 (7th Cir. 1967) (defense counsel objected to testimony of prior convictions but relied on defendant's long prison experiences in presenting insanity defense; "a defendant's reference to or use of an erroneously admitted line of evidence cures or waives the error."); Trouser Corp. of America v. Goodman & Theise, Inc., 153 F.2d 284 (C.C.A. 3d Cir. 1946) (the court recognized the general principle, but in this case it was unclear whether the testimony was elicited in effort to rebut); In re Forsythe's Estate, 221 Minn. 303, 22 N.W.2d 19 (1946) (other letter from same person giving similar but more prejudicial facts, a waiver); Inter–City Trucking Co. v. Mason & Dixon Lines, 38 Tenn. App. 450, 276 S.W.2d 488 (1954); City of Houston v. McFadden, 420 S.W.2d 811 (Tex. Civ. App. Houston 14th Dist. 1967, error refused n.r.e.); and cases in 1 Wigmore, Evidence § 18 n. 35 (3d ed. 1940). *See also* Russin v. Lipet, 103 R.I. 461, 238 A.2d 369 (1968) (the party elicited the same testimony from the same witness).

19    The party should not be permitted "to blow hot and cold" in this way. Perhaps the result can be viewed as a simple lack of objection under Fed. R. Evid. 103(a).

20    Chester v. Shockley, 304 S.W.2d 831 (Mo. 1957); Sayner v. Sholer, 77 N.M. 579, 425 P.2d 743 (1967); Haase v. Ryan, 100 Ohio App. 285, 60 Ohio Op. 251, 136 N.E.2d 406, 410 (6th Dist. Lucas County 1955). There are some holdings to the contrary. *See, e.g.*, Grain Dealers Mut. Ins. Co. v. Julian, 247 S.C. 89, 145 S.E.2d 685 (1965) (previous objection must be reserved).

Similarly, when the evidence objected to is elicited on cross-examination, the objector may seek to explain or refute on redirect without a waiver. Tucker v. Reil, 51 Ariz. 357, 77 P.2d 203 (1938).

21    While calling for a repetition is a permissible part of a testing, as a matter of tactics exploratory cross-examination and repetition should be held to a minimum.

22    Salt Lake City v. Smith, 104 F. 457, 470 (C.C.A. 8th Cir. 1900); State v. Tiedemann, 139 Mont. 237, 362 P.2d 529 (1961); Glennon v. Great Atlantic & Pacific Tea Co., 87 R.I. 454, 143 A.2d 282 (1958). *See generally* U.S. v. DeCarlo, 458 F.2d 358, 372 n.1 (3d Cir. 1972) ("It has long been the rule that when a party's objection is made and overruled, he is entitled to treat that ruling as the 'law of the case' and to explain or rebut, if he can, the evidence which has come in over his protest. Consequently, a party does not waive his objection if he meets the evidence to which he objected with other evidence which under the theory of the objection would be incompetent.").

23    See general agreement in Wright and Miller's Federal Practice and Procedure, Evidence § 5039; 1 Mueller & Kirkpatrick, Federal Evidence § 1:12, at 79–82 (3d ed. 2007); U.S. v. DeCarlo, 458 F.2d 358, 372 n.1 (3d Cir. 1972).

24    Ohler v. U.S., 529 U.S. 753, 120 S. Ct. 1851, 146 L. Ed. 2d 826 (2000). *See also* Clarett v. Roberts, 657 F.3d 664 (7th Cir. 2011); U.S. v. McConnel, 464 F.3d 1152, 1160–1162 (10th Cir. 2006) (as a matter of trial strategy, the defendant admitted the conviction on direct examination); U.S. v. Watler, 461 F.3d 1005 (8th Cir. 2006) (the defendant waived the issue, even though the defendant had already lost a motion in limine to exclude the evidence and the defendant mentioned the evidence on direct only to limit the damage that might be inflicted on cross-examination); U.S. v. Decoud, 456 F.3d 996, 1011 (9th Cir. 2006).

25    Perrin, Pricking Boils, Preserving Error: On the Horns of a Dilemma After Ohler v. United States, 34 U.C. Davis L. Rev. 615 (2000).

26    State v. Daly, 623 N.W.2d 799 (Iowa 2001); State v. Thang, 145 Wash. 2d 630, 41 P.3d 1159 (2002).

27    See § 52 supra.

28    Bodholdt v. Garrett, 122 Cal. App. 566, 10 P.2d 533 (1st Dist. 1932) (the trial judge excluded a truck driver's unexcited statement that broken spring was cause of collision; the judge did not err; "The court on its own motion in the interest of justice may exclude. … " Query, whether the ruling was in the interest of justice.); South Atlantic S. S. Co. of Del. v. Munkacsy, 37 Del. 580, 187 A. 600 (1936) (in a suit by seaman for injury, the trial judge excluded a boatswain's opinion as to safe character of work; there was no error; "the trial judge is something more than a mere umpire;" careful exposition of judge's authority); King v. Baker, 109 Ga. App. 235, 136 S.E.2d 8 (1964) (judge excluded answer which was nonresponsive but otherwise admissible); City of Detroit v. Porath, 271 Mich. 42, 260 N.W. 114 (1935) (irrelevant picture); Wisniewski v. Weinstock, 130 N.J.L. 58, 31 A.2d 401 (N.J. Sup. Ct. 1943) (a truck driver's testimony as to speed from tire-tracks was excluded for lack of qualification); Best v. Tavenner, 189 Or. 46, 218 P.2d 471 (1950) (where witness died from stroke after direct testimony was partly completed, judge had discretion to withdraw testimony from jury on own motion or declare mistrial); Barber v. State Highway Commission, 80 Wyo. 340, 342 P.2d 723 (1959). Cases are collected at West's Key Number Digest, Trial ⟜105(6).

It is even sometimes said that the judge at the close of the case may of his own motion withdraw incompetent evidence from the jury though not objected to when received. *E.g.*, American Workmen v. Ledden, 196 Ark. 902, 120 S.W.2d 346 (1938). But an opposite result is advocated "to prevent unfairness, in that, if the counsel offering the testimony were made aware of the objection to the testimony at the time, he would have had an opportunity to cure it." Electric Park Amusement Co. v. Psichos, 83 N.J.L. 262, 83 A. 766, 768 (N.J. Sup. Ct. 1912).

29    The judge has broad power to control the presentation of evidence to make the interrogation and presentation "effective for determining the truth," under Fed. and Unif. R. Evid. 611(a). Coupled with the plain error provisions of Rule 103(d), those powers

afford a base for the principle in the text. *See* U.S. v. Wright, 542 F.2d 975 (7th Cir. 1976) (trial judge could on own initiative bar line of questioning as irrelevant).

30    People v. Atkinson, 40 Cal. 284, 1870 WL 908 (1870) (where witness, an attorney, on examination was unable to say whether communications from client were public or private, over the defendant-client's objection the trial judge admitted the evidence, the appellate court held that the trial judge had erred; and by way of dictum the appellate court added that the trial court should have excluded on its own motion); Hodges v. Mullikin, 1 Bland Ch. 503, 509 (Md. Ch. 1831) ("if the client be no party … the lips of his attorney must remain closed and the Court cannot allow him to speak … "). Cal. Evid. Code § 916 requires the judge to exclude privileged information if no person authorized to claim the privilege is present.

---

**End of Document**                                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 114

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 178 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

Modern Licensing Law § 5:33

Modern Licensing Law
Database updated September 2013
Raymond T. Nimmer and Jeff C. Dodd
Chapter 5. Exclusive Licenses
III. Licensee Obligations and Rights

References

§ 5:33. Exclusive licensee: standing to sue for property-based claims—Exclusive patent licenses

**West's Key Number Digest**
**West's Key Number Digest, Patents ⚷ 206**
**Additional References**
**Dratler Jr., Licensing of Intellectual Property § 8.06**

Most of the case law relating to exclusive licensee standing to sue for infringement involves patent licensees. The language of the Patent Act provides the basic framework. The Patent Act states: "patentee shall have remedy by civil action for infringement of his patent." [1] This grants the right to sue for infringement only to the patent owner and to those who become owners by assignment. [2] However, over time, the courts have engrafted a series of doctrines on this statute to create a sliding scale of patent standing.

The Federal Circuit generally divides licenses into three types, each of which we will describe more fully in this Section below:

• Non-Exclusive Licensees: non-exclusive licensees have no Article III standing to bring, or even to be parties to, enforcement of the licensed patents. [3]

• Exclusive licensees lacking "all substantial rights": such licensees have been granted sufficient rights to exclude others from one of the statutory patent rights, [4] but do not have all "substantial rights." These exclusive licensees would generally have Article III standing to sue, but do not have prudential standing to sue on their own account in most cases, and so they must usually join the patent owner.

• Exclusive licensees having "all substantial rights"; such licensees may sue to enforce the licensed patents without joining the patent owner.

The plaintiff has the burden to establish that it has standing to sue at the outset of the lawsuit. [5] The question of the sufficiency of a licensee's standing can be brought up at any stage of the proceedings, or even by the appellate court itself. [6] This is an issue with respect to assignments, no less than for exclusive licenses. In both, the granting clauses defining the rights conveyed must be sufficient to the task of conveying the rights or interests being enforced by the time the enforcement commenced. In Abraxis BioSience, Inc. v. Navinta LLC, [7] this issue came up in an interesting way. It continued a line of cases determining whether language in a granting clause would be sufficient to transfer inventions in the future automatically without any further action—an issue that would also be relevant to exclusive licenses. [8] As fate would have it, that determination would also resolve a jurisdictional issue. For Article III jurisdiction would exist only if the plaintiff had standing on the date it filed suit for patent infringement purposes, and if standing did not exist on the date of filing, the plaintiff could not cure the defect by assignment or retroactive agreement. [9] The issue came down to the language in the granting clause:

If the contract expressly conveys rights in future inventions, no further act is required once an invention comes into being, and the transfer of title occurs by operation of law…. For example, in *Speedplay,*

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 179 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

an employment agreement providing that all inventions made during the term of employment "shall belong" to Speedplay and that the employee "hereby conveys, transfers and assigns … all right, title and interest in and to Inventions" operated as an automatic assignment once the invention was created…. In contrast, contracts that obligate the owner to grant rights in the future do not vest legal title to the patents in the assignee…. Thus, contract language stating that a party "agrees to assign" reflects a mere promise to assign rights in the future, not an immediate transfer of expectant interests.[10]

Under these tests, the language in the agreements did not automatically transfer rights as to future inventions.[11] Note also, parties may convey rights to sue for past infringements. "A party may sue for past infringement transpiring before it acquired legal title if a written assignment expressly grants the party a right to do so."[12] However, in such a case, the patent owner would need to be joined.[13]

*Nonexclusive licensees*

Courts routinely hold that nonexclusive licensees cannot enforce the patent through a claim of infringement, while a patent assignee (the new owner) can pursue an infringement claim against third parties.[14] Indeed, the Federal Circuit has made it clear that it believes this rule to be based on the requirements of Article III of the United States Constitution: "a nonexclusive license or 'bare' license—a covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention and under which the patent owner reserves the right to grant similar licenses to other entities—confers no constitutional standing on the licensee under the Patent Act to bring suit or even to join a suit with the patentee because a nonexclusive (or 'bare') licensee suffers no legal injury from infringement."[15]

In addition to reading the statutory language strictly, courts have articulated policy reasons for limiting standing. They note that, in many infringement actions, the alleged infringer claims patent invalidity as a primary defense; allowing any mere licensee to bring an action could result in a decision invalidating a patent that could bind the patent owner even though it was not in control of the action and even though the licensee's interests in the patent were narrow and not conducive to vigorous defense.[16] If, on the other hand, the action were not binding on the patent owner, the potential of inconsistent rulings on the same crucial issue of validity looms large.[17] Moreover, to allow the infringer to be sued by multiple "bare licensees" as well as the owner herself would be to allow multiple suits for the purposes of harassment alone.[18]

*Exclusive licensees without all substantial rights to the patent*

Yet, early on, courts recognized that in some cases it would be inequitable to preclude certain exclusive licensees from defending the value of the subject matter for which it bargained to obtain exclusive rights. Especially if the exclusive license is comprehensive in its coverage of the patent rights, precludes further licensing by the licensor, and expressly vests substantial controls over patent litigation in the licensee, the licensee is the party with the greatest economic stake in preventing infringement directly affecting the value of the rights it obtained.[19] For in such circumstances, the incentive of the licensor in protecting the rights has been reduced substantially; it may even be nonexistent.[20] When the circumstances fit this configuration of interests, it becomes important to enable the licensee to act to protect its interest.

Recognizing this, the Supreme Court long ago found that *certain* exclusive licensees had standing to bring an action in the name of the patent owner; either the contract contains an express grant of the right to do so or, in the absence of express terms, a court will imply that such right exists as a matter of equity.[21] Thus, the ability of the exclusive licensee to bring the lawsuit does not depend on express permission by the licensor[22] and the label used by the parties to describe the agreement does not control.[23]

Indeed, a licensee that holds rights under a license granting the exclusive right to make, use, and sell inventions covered by a patent has constitutional standing merely by virtue of its "exclusive" rights.[24] Thus in Intellectual Property Development v. TCI Cablevision of Ca., Inc.,[25] the Federal Circuit noted that Article III constitutional standing required only that: "(1) the plaintiff have suffered an 'injury in fact' … which is: (a) concrete and particularized and that (b) actual or imminent not conjectural or hypothetical"; (2) there be "a causal connection between injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be 'redressed by a favorable decision.'"[26] Even though the exclusive licensee did not have all substantial rights in the patent in this case, as an exclusive licensee, it was

Case 09-10138-MFW Doc 14410-6 Filed 09/16/14 Page 180 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

a party that had the right "to exclude others from making, using and selling the invention" and would be constitutionally injured by another entity that exercised any of those rights. Hence it had Article III standing as a "co-plaintiff," [27] as long as it held "some of the proprietary sticks from the bundle of patent rights, albeit a lesser share of rights in the patent than for an assignment and standing to sue alone." [28] This means, in essence, that the license must grant exclusivity as to at least some of the proprietary rights under the patent—i.e. "the rights to exclude others from making, using, or selling this invention in the United States." [29] Moreover, the exclusivity must relate to "the entire invention, at least within a specific geographical area or for a specific purpose." [30] Hence, the license terms are crucial. [31]

In one of the more interesting cases concerning standing of exclusive licensees, the Federal Circuit found that even where the patent rights have been licensed and allocated among many owners or licensees Article III standing may still be present. [32] The case was WiAV Solutions LLC v. Motorola, Inc. [33] WiAV owned two patents, the '205 and '920 patents, and claimed an exclusive licensee as to seven Mindspeed patents in a specified field. When it brought suit to enforce the patents, the district court dismissed the claims on the Mindspeed patents, holding that WiAV did not have "constitutional standing to assert the Mindspeed Patents against the Defendants because several third parties have a limited right to license the patents in WiAV's alleged exclusive field of use." [34] Skyworks granted WiAV the exclusive license as to "'all of Skyworks' right, title, and interest, in and to the [Mindspeed Patents] in the Wireless Handset field of use'" with rights to assign and sublicense and to bring infringement claims within that field." [35] The problem was that before Skyworks had granted Mindspeed this exclusive license, through various transactions the rights associated with the patents had been allocated, transferred, reserved, reallocated and fractured into various fields and in favor of various parties. Indeed, in this case, holders of the patents had carved out various rights for themselves and for others with respect to the patents in issue, including the right to grant new licenses and to continue to practice the inventions in specified fields. [36]

Even so, the Federal Circuit found that WiAV had Article III standing. The Federal Circuit emphasized that an exclusive licensee may not have all substantial rights but still have Article III standing. "For a party to establish constitutional standing, it must 'show that the conduct of which [it] complains has caused [it] to suffer an 'injury in fact' that a favorable judgment will redress.'" [37] According to the WiAV Solutions court because "the legally protected interests in a patent are the exclusionary rights created by the Patent Act, a party holding one or more of those exclusionary rights-such as an exclusive licensee-suffers a legally cognizable injury when an unauthorized party encroaches upon those rights and therefore has standing to sue." [38] Thus, the "the touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury." [39]

This is quite different from the "all substantial rights" inquiry made to determine whether an exclusive licensee could sue in her own name without joining the patent owner. An exclusive licensee would have Article III standing if it were granted the right to exclude others with respect to one of the statutory rights, but that alone would not confer the right to sue it her own name without joinder. [40] Yet, what did the right to exclude others mean if other licensees could exercise the same rights with impunity? Note that in this case holders of the patents had carved out various rights for themselves and for others with respect to the patents in issue, including the right to grant new licenses. This, according to the WiAV court, was of no moment. The WiAV court adopted a novel relativity approach to exclusive license standing:

> This court…. holds that an exclusive licensee does not lack constitutional standing to assert its rights under the licensed patent merely because its license is subject not only to rights in existence at the time of the license but also to future licenses that may be granted only to parties other than the accused. If the accused neither possesses nor can obtain such a license, the exclusive licensee's exclusionary rights with respect to that accused party are violated by any acts of infringement that such party is alleged to have committed, and the injury predicate to constitutional standing is met. [41]

Note how the court focused on the rights of the licensee in relation to the specific defendants in the case. Even though others could license or practice the patents within the field granted to the licensee, that, in this court's view, was irrelevant. That others could be licensed in the future in the same field is also irrelevant. The only issue was whether the defendants could

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 181 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

obtain *a license* from others. [42]   Indeed, the court did not require the licensee to have the right to prevent the defendants from being able to use inventions covered by the patents, for the defendants could acquire handsets, and thereby have an implied license, [43] from one of the several entities that had reserved rights or had licensed in the tangled chain of title. The sole issue is whether the particular defendants that the putative licensee sues could obtain a license from others to practice the invention. This relativistic approach to standing is quite a departure from precedent. In theory, the most promiscuous licensing or reservation of rights, even within the putative exclusive licensee's field, would not affect the licensee's standing to bring suit and to compel the "patent owner" to join in the suit. [44]   No matter how many others could exercise the same rights within the licensee's fields, no matter how many could sell or distribute inventions coming within those fields, as long as the defendants could not obtain a license without the granting party breaching an agreement, the licensee would be an exclusive licensee. [45] What, then, really distinguishes an exclusive licensee from a non-exclusive licensee is that relative to the exclusive licensee at least one person would not be able to obtain a license to practice the patent within the field covered by the exclusive license —at least according to the *WiAV* court's doctrine. Other cases, including two cases that the Federal Circuit distinguished on narrow factual grounds, were far more preoccupied with the scope of the "proprietary" bundle of rights conferred on the licensee generally, not with whether the particular defendant in the suit could obtain a license. [46]   The rights and powers conferred on the licensee generally, not the specific right vis-à-vis the particular defendant, was important. [47]   In particular, the courts trained their attention on whether others in the chain could grant licenses, but not because they were concerned with whether the defendant could obtain a license and thus end the suit. Rather, that others had the power to allow third parties to practice in the field undercut the notion that the licensee had, in fact, been given sufficient proprietary rights from the bundle of patent interests to warrant finding Article III standing. [48]   The quantum of rights conveyed and retained and that could be exercised by others generally was the focus of the inquiry. In the final analysis we wonder whether the concept of "exclusive" license loses its meaning if claims to rights under a patent become so fragmented, the fields separating "interest holders" become so thin, so diaphanous, that the granular, case by case, defendant by defendant approach unveiled in WiAV defeats the core concept that an exclusive licensee actually holds "some of the proprietary sticks from the bundle of patent rights, albeit a lesser share of rights in the patent than for an assignment and standing to sue alone." [49]   Thus, as Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp. [50] stated:

> … a patent may not have multiple separate owners for purposes of determining standing to sue…. Of course, the patent may be owned by a group, as when a patent with multiple named inventors first issues. But, at least for purposes of determining standing to sue for infringement, there may not be multiple groups or unaffiliated individuals who claim ownership of the patent; one of these groups or individuals must be determined to be the owner, and that owner is the only party with standing to sue on its own…. [V]arious rights available under the patent … may, as a result of licensing agreements and assignments, become separated and be held by multiple individuals. When a sufficiently large portion of this bundle of rights is held by one individual, we refer to that individual as the owner of the patent, and that individual is permitted to sue for infringement in his own name. When a plaintiff lacking a sufficiently large portion of rights brings suit, that plaintiff does not have standing to sue on his own, and the suit must be dismissed, *or additional holders of rights under the patent must be joined* as parties to the suit, as appropriate given the plaintiff's status as either an exclusive or a nonexclusive licensee. [51]

But even if an exclusive licensor has sufficient Article III standing that only means that it may bring suit as a co-plaintiff with the patent owner and may join that owner, voluntarily or involuntarily (assuming other jurisdictional and procedural requirements are met). [52]   Prudential standing requires that, as a general rule "suit … be brought in [the name of the patent owner], and never in the name of the licensee alone, unless that is necessary to prevent an absolute failure of justice, as when the patentee is the infringer and cannot sue itself." [53]   Thus, in Prima Tek II, L.L.C. v. A-Roo Co., [54] the Federal Circuit emphasized that, even though an exclusive licensee might have standing to participate in a patent infringement suit, joinder of the patent owner was still generally required. A concern that multiple actions could be brought underlies this rule: "the owner of the patent as a party is indispensable, not only to give jurisdiction under the patent laws, but also in most cases to

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 182 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

enable the alleged infringer to respond in one action to all claims of infringement for his act, and thus either to defeat all claims in the one action, or by satisfying one adverse decree to bar all subsequent actions." [55]

As the Supreme Court has noted, to cure standing, the exclusive license can join the patent owner(assuming that it can establish who is the owner). [56] "If the owner of a patent, being within the jurisdiction, refuses or is unable to join an exclusive licensee as co-plaintiff, the licensee may make him a party defendant by process, and he will be lined up by the court in the party character which he should assume." [57]

*Exclusive license granting "all substantial rights"*

The Prima Tek II, L.L.C. v. A-Roo Co. [58] court did not stop there. It went on to observe that:

> As a general rule … a patentee should be joined, either voluntarily or involuntarily, in any infringement suit brought by an exclusive licensee … However, this general rule—which we recognize as being prudential rather than constitutional in nature—is subject to an exception. The exception is that, where the patentee makes an assignment of all substantial rights under the patent, the assignee may be deemed to be the effective "patentee" under 35 U.S.C.A. § 281 and thus may have standing to maintain an infringement suit in its own name. [59]

The Federal Circuit has held that its "all substantial rights" rule is a matter of prudential standing. As we mentioned above, a license granting the exclusive rights to make, use, and sell inventions covered by a patent has constitutional standing merely by virtue of its "exclusive" rights. However, in the words of Intellectual Property Development v. TCI Cablevision of Ca., Inc., [60] "As a prudential principle, an exclusive licensee having fewer than all substantial rights possesses standing under the Patent Act as long as it sues in the name of, and jointly with, the patent owner." [61] By adopting this prudential standard that requires a complainant that has "all substantial rights" the Federal Circuit has attempted to bridge the gap that would otherwise be created by making a distinction between an assignment (transfer of ownership) and a license (no ownership transfer). It recognizes that, in some cases, the bundle of rights conveyed to an exclusive licensee may be so broad as to be a transfer of ownership in commercial effect. That is the crucial point: the "all substantial rights" test has been developed to determine whether the exclusive patent licensee can bring a suit in her name, without joinder of the patent owner. [62] The determination that an exclusive license conveys "all substantial rights" is tantamount to saying that the exclusive licensee is functionally the patentee. [63] As the Federal Circuit stated in AsymmetRx, Inc. v. Biocare Medical, LLC, "the critical determination regarding a party's ability to sue in its own name is whether an agreement transferring patent rights to that party is, in effect, an assignment or a mere license. To determine whether an assignment of patent rights was made, we must 'examine whether the agreement transferred all substantial rights' to the patents and 'whether the surrounding circumstances indicated an intent to do so.'" [64]

Predictably, there has been substantial litigation about whether particular exclusive licenses meet the "all substantial rights" test. [65] Certainly, the test does not turn on the labels the parties use to describe their arrangement. [66] Rather, the terms describing the rights conferred and retained must be parsed with care. [67]

At a minimum, an *exclusive* license must be granted [68] and the exclusivity must relate to the underlying patent rights. [69] Thus, Rite-Hite Corp. v. Kelley Co., Inc. [70] held that independent sales organizations that distributed products were not exclusive patent licensees and could not bring an infringement action against a third party. In order to be an "exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention in a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention" within the territory. [71]

Beyond imposing this rudimentary requirement that the exclusivity relate to underlying patent rights, the cases have not set on one single approach to determine whether an exclusive license meets this standard of having conveyed substantially all of the rights under a patent. [72] Some courts tally up the rights conveyed by the licensor and those that it retained. Thus, in Vaupel Textilmaschinen v. Meccania Euro Italia, [73] the Court of Appeals for the Federal Circuit stated: "A patent provides its owner with the right to exclude others from the making, using and selling the claimed invention…. It is, in effect, a bundle of rights which may be divided and assigned, or retained in whole or part. In determining whether a grant of all substantial

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 183 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

rights was intended, if it's helpful to look at what rights have been retained by the grantor, not only what was granted." [74] One can view this as a negative test; transfer all "substantial rights." Thus, the exclusive license is tested by what it does not confer rather than by what it does.

If the licensor has retained very few rights with respect to the patent, a court might conclude that the "licensee" in fact received an assignment of the patent and no ownership remains in the licensor. [75] However, the retention of certain rights, especially any right to make, use, or sell within the field and territory covered by the license, can undermine a claim that all substantial rights had passed. [76]

One major factor is whether the license affirmatively grants the licensee the right to sue infringers. While such a right is not alone sufficient, [77] it is very important, [78] and even dispositive in some cases. [79] Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp. [80] emphasized just how important the power to bring suit is in this calculus. The question was whether the patent owner had granted so many rights to its exclusive licensee that it could not bring suit without joining the licensee. [81] AMF had exclusively licensed certain patents to AB, which had elected not to pursue litigation against an alleged infringer. So AMF exercised its secondary right and sued Cochlear for infringement. Cochlear challenged AMF's standing to do so, arguing that AMF had transferred all "substantial rights" as to the patents to AB. While AB had the first right to sue for infringement and to settle on terms of its choosing, the power to sublicense and many other rights, [82] the Federal Circuit found that AMF was the owner of the patents-in-suit because it retained substantial rights. It noted that while courts should weigh various factors to determine whether substantial rights had passed or retained, the most important factor is "the nature and scope of the exclusive licensee's purported right to bring suit, together with the nature and scope of any right to sue purportedly retained by the licensor." [83] Specifically, if "the licensor retains a right to sue accused infringers, that right often precludes a finding that all substantial rights were transferred to the licensee. It does not, however, preclude such a finding if the licensor's right to sue is rendered illusory by the licensee's ability to settle licensor-initiated litigation by granting royalty-free sublicenses to the accused infringers." [84] Here AB could sublicense to defendants sued by AMF, but the right to sublicense did not render AMF's rights to sue illusory because "ABs right to sublicense is … fettered: any sublicense AB grants must include specified pass-through royalties." [85]

Then the Federal Circuit moved to the real question: "But if AMF's right to sue suspected infringers is not illusory, is it still substantial enough to find that AMF remains the owner of the patents-in-suit? We think it is. While AMF's right to choose to sue an infringer does not vest until AB chooses not to sue that infringer, it is otherwise unfettered. Once its right to sue an infringer activates, AMF can decide whether or not to bring suit, when to bring suit, where to bring suit, what claims to assert, what damages to seek, whether to seek injunctive relief, whether to settle the litigation, and the terms on which the litigation will be settled. AMF is required to inform AB of the status of the litigation while it is ongoing, but AMF has complete discretion to decide what trial strategy and tactics to employ…. Such a broad right to decide whether to bring suit and to control litigation is thoroughly inconsistent with an assignment of the patents-in-suit to AB." [86] So even though the license with exclusive, it was not "a virtual assignment of the patents-in-suit," providing AMF with standing to sue accused infringers. [87] Indeed, and perhaps most importantly, the Federal Circuit announced a "conversation of ownership" principle: "a patent may not have multiple separate owners for purposes of determining standing to sue…. But, at least for purposes of determining standing to sue for infringement, there may not be multiple groups or unaffiliated individuals who claim ownership of the patent; one of these groups or individuals must be determined to be the owner, and that owner is the only party with standing to sue on its own." [88]

Another factor relates to other license grants. Thus, some courts consider whether the exclusive licensee's rights are cabined in by prior licenses. Thus, in Refac International, Inc. v. Mastercharge International [89] a district court held that there was insufficient exclusivity where the patent owner had made two prior nonexclusive licenses with respect to a patented system and the plaintiff-licensee had expressly taken its license subject to the rights of the earlier licensees. [90] Other courts focus on whether the license entirely precludes the licensor from further licensing of the respective patent rights. If it does, this creates a shift of incentives and thus the equitable basis for establishing the licensee's right to sue. [91] The transaction must be one in which the licensor relinquishes further rights to license within the territory covered by the exclusive license—even

to affiliated and related parties. [92]  This element, rather than the existence of prior licenses, seems more appropriate to the question of who has the right to enforce the patent.

In Aspex Eyewear Inc. v. Miracle Optics, Inc., [93]  Contour granted Chic an exclusive license with respect to specified patents. Later, Aspex, not Chic, filed an infringement suit against Contour. Shortly later Chic granted a sublicense to Aspex. The Federal Circuit noted that standing is determined as of the filing of the suit. Aspex alone could not bring suit because it did not have substantially all rights. The license vested the power to bring suit but contained a hard termination date before the expiry date of the patent. This undercut the other elements that pointed to ownership of all substantial rights. The panel held that a licensee could not be deemed to own all substantial rights if the term of the license did not potentially extend to the expiration date of the patents. It contrasted this to provisions allowing termination or cancellation upon the occurrence of certain events, which were not inconsistent with the possibility of the license lasting until the patents ended.

Often, the analysis concerns several variables at one time. In Intellectual Property Development, the court held that there was not a transfer of all substantial rights. The exclusive license granted the licensee the exclusive right "to make, use, and sell the inventions." [94]  However, the licensor retained the right to assign its rights and obligations and the right to prevent the licensee from assigning its rights without the licensor's consent. Even more importantly, the licensor retained the right, when it was a necessary party, to require the licensee to obtain the licensor's consent to proceed with litigation (and the licensor could withdraw that consent at any time). It also retained the rights, when it was not a necessary party, to be informed and to be consulted, to consent to settlements and to receive 50% of profits realized from litigation. The rights to control litigation and to prevent assignment were an important part of the court's analysis. It held that the licensee did not receive all substantial rights and, thus, lacked standing. [95]

Can the parties cure a standing problem by a retroactive assignment?

In Mars, Inc. v. Coin Acceptors, Inc., [96]  the Federal Circuit confronted this issue. Mars owned a 137 patent and 719 patent relating to technology used in vending machines to authenticate coins. Mars did not make the machines itself. Rather, Mars's subsidiary—Mars Electronics International, Inc. (MEI)—manufactured the coin changers equipped with the capability to recognize and authenticate coins electronically. In 1990, however, Mars sued Coinco for infringement of the 137 patent and the '719 patent. In 1992, the 137 patent expired. Also, in 1996, Mars entered into the "1996 Agreements" with MEI and subsidiary, MEI-UK, which was designed to address the UK's taxing authority's treatment of the intercompany royalty payments. To resolve that dispute, Mars transferred "its entire interest in the Covered Intellectual Property"—including the patents—to MEI pursuant to the 1996 Agreements and MEI-UK continued to have a nonexclusive license to practice the patents in return for royalties at diminishing rates, beginning at 5% in 1996, and gradually declining to 2% in 2004. [97]  Then in 2003, the '719 patent expired. [98]  Sometime during the 18 year course of the litigation, a final judgment of infringement was entered—after intervening appeal and return to the lower court, of course. The issue was whether Mars had standing to recover the damages that it took 18 years to obtain. Construing the patent assignment in the 1996 Agreements under the law chosen by the parties to those agreements, the Federal Circuit found that the 1996 agreements assigned all of Mars's interest in the '719 patent to MEI, which gave MEI standing at that point. [99]  However, in 2006, Mars and MEI entered into a "Confirmation Agreement" that, prior to the entry of the final judgment in the infringement case, purported to transfer back to Mars the title to patents so that, under the Federal Circuit's decision in Schreiber Foods, Inc. v. Beatrice Cheese, Inc., [100]  Mars reacquired title to the patents "to correct the jurisdictional defect that arises when the plaintiff loses title to the patent during the litigation." [101]  Interpreting the Confirmation Agreement under the state law chosen by the agreement itself, the Federal Circuit noted that while

> paragraph A of the recitals as the portion of the agreement effecting a transfer
> of rights, paragraph A contains nothing but a general description of the subject
> matter of the purchase agreement. Paragraph 1 appears to be the paragraph that
> most closely resembles a transfer of title. It states:

> Mars and the Buyer [MEI] do hereby *acknowledge* that Mars owns and retains the right to sue for past
> infringement of the Litigation Patents. To the extent that MEI may have or claim *any rights in or to any*

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 185 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

*past infringement of the Litigation Patents or any recovery therefor*, upon the terms and subject to the conditions of the Purchase Agreement, MEI hereby does irrevocably *assign* all such rights to Mars. [102]

The acknowledgement of a transfer in the first sentence was ineffective to confer title or standing: the "first sentence of paragraph 1 describes an acknowledgement—i.e., a recognition-of rights that the contracting parties believed had already been transferred. … It did not purport to be a transfer itself." [103] While the second sentence described a transfer, the transfer was merely an assignment of a right to sue for past infringement, not title itself, which was insufficient to confer standing. [104]

*If the plaintiff does not have all substantial rights, should its suit be dismissed with prejudice?*

If a licensee (or co-owner) does not have all substantial rights and fails to join the owner (or other co-owners) of a patent, the courts generally respond by dismissing the suit without prejudice. [105] While that is true as a general rule, a court may make in the rare case dismiss with prejudice where the plaintiff will not be able to cure the standing defect or has had a shot at curing the defect and did not do so. [106] Ultimately, the decision whether to dismiss with prejudice lies within the discretion of the trial court, subject to appellate review under an "abuse of discretion standard." [107]

Westlaw. © 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

1    35 U.S.C.A. § 281. *See generally* Independent Wireless Telegraph Co. v. Radio Corporation of America, 269 U.S. 459, 46 S. Ct. 166, 70 L. Ed. 357 (1926); Waterman v. Mackenzie, 138 U.S. 252, 11 S. Ct. 334, 34 L. Ed. 923 (1891).

2    In Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac Solutions, P.C., 482 F.3d 1347, 82 U.S.P.Q.2d 1293 (Fed. Cir. 2007), the court discussed the effect of a failure to comply with the Bayh-Dole Act, 35 U.S.C.A. §§ 200 to 212, on standing. The case related to a '515 patent covering an invention developed based on research funded by a grant by the National Institutes of Health. The United States thus had certain rights, including the rights "to be notified of the invention, …, to obtain patents in foreign countries where the inventor does not pursue patent applications, … a royalty-free nonexclusive license, … and the ability under certain circumstances to 'march-in' and compel the patentee to grant a license to a third party…." Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac Solutions, P.C., 482 F.3d 1347, 1351, 82 U.S.P.Q.2d 1293 (Fed. Cir. 2007). The inventor obtained NIH's waiver with respect to patent rights on the condition that "the inventor shall grant to the Government of the United States a nonexclusive, irrevocable, royalty-free license to use the invention for governmental purposes…." Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac Solutions, P.C., 482 F.3d 1347, 1351, 82 U.S.P.Q.2d 1293 (Fed. Cir. 2007). The inventor, however, never executed that license. While the Federal Circuit noted that a Bayh-Dole violation allowed the United States the discretion to strip title to a patent away, that only made title voidable. "However, it is not void: title remains with the named inventors or their assignees. Nothing in the statute, regulations, or our case law indicates that title is automatically forfeited…. However, NIH has shown no interest in pursuing the matter. Absent any action by NIH, Dr. Buckberg retains title to the patent and his exclusive license to CAPS is valid." Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac Solutions, P.C., 482 F.3d 1347, 1352–53, 82 U.S.P.Q.2d 1293 (Fed. Cir. 2007).

3    Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 1345, 58 U.S.P.Q.2d 1681 (Fed. Cir. 2001) ("a nonexclusive license or 'bare' license-a covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention and under which the patent owner reserves the right to grant similar licenses to other entities-confers no constitutional standing on the licensee under the Patent Act to bring suit or even to join a suit with the patentee because a nonexclusive (or "bare") licensee suffers no legal injury from infringement").

4    "To demonstrate entitlement to join as a *co-plaintiff* GUCLT must have the right to exclude others from making, using, or selling the invention in the United States." Morrow v. Microsoft Corp., 499 F.3d 1332, 1342, 48 Bankr. Ct. Dec. (CRR) 243, 84 U.S.P.Q.2d 1377 (Fed. Cir. 2007). *See, e.g.,* Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 1031-32, 34 U.S.P.Q.2d 1444 (Fed. Cir. 1995). The *Morrow* court went further: "Here, we are faced with the question of whether GUCLT holds the exclusionary rights and suffers constitutional injury in fact…. If GUCLT holds all substantial rights, it can sue in its name alone. If GUCLT holds less than all substantial rights but sufficient exclusionary rights that it suffers injury in fact, it can sue as a co-party with the legal title holder AHLT. If it lacks injury in fact, GUCLT lacks standing to be a party to this case…. Only when a party holds the exclusionary rights to the patent but lacks all substantial rights may the party join the legal title owner in a suit to enforce patent rights. Joining the legal title holder only satisfies prudential standing requirements. It cannot cure constitutional standing deficiencies." Morrow v. Microsoft Corp., 499 F.3d 1332, 1341, 1344, 48 Bankr. Ct. Dec. (CRR) 243, 84 U.S.P.Q.2d 1377 (Fed. Cir. 2007).

Case 09-10138-MFW   Doc 14410-6   Filed 09/16/14   Page 186 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

5   See Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc., 587 F.3d 1375, 1378, 92 U.S.P.Q.2d 1940 (Fed. Cir. 2009) ("A plaintiff generally has the burden of proving standing to sue … '[T]o assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title at the inception of the lawsuit.'" … If standing and jurisdiction of a trial court are lacking, an appellate court may vacate a decision that was rendered on the merits at the trial level or, in rare instances, order joinder of a necessary party at the appellate level."); Fieldturf, Inc. v. Southwest Recreational Industries, Inc., 357 F.3d 1266, 1268, 69 U.S.P.Q.2d 1795 (Fed. Cir. 2004) ("Fieldturf asserts that it has standing to enforce the … patent against third parties not because it is the patentee or a successor in title to the patentee, but rather because it is an exclusive licensee. Consequently, it has the burden to provide evidence endowing it with all substantial rights in the patent."); Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1250, 53 U.S.P.Q.2d 1984 (Fed. Cir. 2000).

6   See, e.g., AsymmetRx, Inc. v. Biocare Medical, LLC, 582 F.3d 1314, 1318, 92 U.S.P.Q.2d 1113 (Fed. Cir. 2009) ("The issue of AsymmetRx's standing to bring suit without Harvard joining as a plaintiff was not raised by either party or by the district court. However, an appellate court must satisfy itself that it has standing and jurisdiction whether or not the parties have raised them….").

7   Abraxis Bioscience, Inc. v. Navinta LLC, 625 F.3d 1359, 96 U.S.P.Q.2d 1977 (Fed. Cir. 2010), cert. denied, 132 S. Ct. 115, 181 L. Ed. 2d 39 (2011).

8   Also, consider the unusual case of SiRF Technology, Inc. v. International Trade Com'n, 601 F.3d 1319, 94 U.S.P.Q.2d 1607 (Fed. Cir. 2010). Abraham and Fuchs were co-owners and the patent named Global Locate as the assignee. However, Abraham had been an employee of Magellan when he conceived of the invention and Abraham has signed an employee invention agreement with Ashtech, Magellan's predecessor that merged with Magellan. That agreement assigned "all inventions … which are related to or useful in the business of the Employer … and which were … conceived … during the period of the Employee's employment, whether or not in the course of the Employee's employment." SiRF Technology, Inc. v. International Trade Com'n, 601 F.3d 1319, 1326, 94 U.S.P.Q.2d 1607 (Fed. Cir. 2010). Abraham left Magellan in February 2000 for Global Locate. Fifteen months or so later Abraham and his co-inventor applied for the '346 patent, which they assigned to Global Locate, their employer. Was, however, Magellen the co-owner since Abraham was its employee when he conceived of the invention? Here the agreement did provide for "automatic assignment" because it provided "that '[t]he Employee assigns all of his or her right, interest, or title in any Invention to the Employer to the extent allowed by law' … By using the language "Employee assigns," the employee assignment agreement expressly grants rights with no further action needed on the part of the employee." SiRF Technology, Inc. v. International Trade Com'n, 601 F.3d 1319, 1326, 94 U.S.P.Q.2d 1607 (Fed. Cir. 2010) (citing DDB Techs., L.L.C. v. MLB Advanced Media, L.P., 517 F.3d 1284, 1289 (Fed.Cir.2008) the found "automatic assignment where the agreement used 'the present, automatic' language 'agrees to and does hereby grant and assign'"). So, if the patents in question were covered by the agreement, they would be automatically assigned. Note at that point the employee would be working at another employer on similar technology. Suppose at that point the second employer did not even know of the prior assignment and thought that it had all inventions under a patent assignment. Is it sound policy to have inventions by an employee during the employ at Employer 2 to spring back automatically to Employer 1? Fortunately, the Federal Circuit did not have to weigh this issue, for it found that the assignment clause limited the springing inventions to those that were "related to or useful in the business of the Employer," which, on the facts, the Federal Circuit found the inventions in question not to be so related. SiRF Technology, Inc. v. International Trade Com'n, 601 F.3d 1319, 1328, 94 U.S.P.Q.2d 1607 (Fed. Cir. 2010).

9   This cannot be cured after the suit is filed—that is plaintiff cannot retroactively cure its standing by having an assignment after the suit is filed. Abraxis Bioscience, Inc. v. Navinta LLC, 625 F.3d 1359, 1364, 96 U.S.P.Q.2d 1977 (Fed. Cir. 2010), cert. denied, 132 S. Ct. 115, 181 L. Ed. 2d 39 (2011) ("the plaintiff must demonstrate that it held enforceable title to the patent at the inception of the suit to assert standing") (quoting Paradise Creations, Inc. v. UV Sales, Inc., 315 F.3d 1304, 1309-1310, 65 U.S.P.Q.2d 1293 (Fed. Cir. 2003).

10  Abraxis Bioscience, Inc. v. Navinta LLC, 625 F.3d 1359, 1364-1365, 96 U.S.P.Q.2d 1977 (Fed. Cir. 2010), cert. denied, 132 S. Ct. 115, 181 L. Ed. 2d 39 (2011) (citing for the last point, IpVenture, Inc. v. Prostar Computer, Inc., 503 F.3d 1324, 1327, 84 U.S.P.Q.2d 1853 (Fed. Cir. 2007); Arachnid, Inc. v. Merit Industries, Inc., 939 F.2d 1574, 1580-81, 19 U.S.P.Q.2d 1513 (Fed. Cir. 1991).

11  As the court parsed through the language in the relevant documents, it noted that the asset purchase agreement indicated that the transfer of patents would be occurring in the future. The asset purchase agreement stated that AZ-UK "shall or shall cause one or more of its affiliates to" transfer the patents in question. The transfer itself was to occur by a separate "IP Assignment Agreement" that would be in a mutually agreed upon form. Interestingly, such an IP Assignment Agreement did occur. The problem was that at the time AZ-UK could not assign the patents because it did not have the title to them; legal title did not come to AZ-UK until later. Abraxis Bioscience, Inc. v. Navinta LLC, 625 F.3d 1359, 1365-1366, 96 U.S.P.Q.2d 1977 (Fed. Cir. 2010), cert. denied, 132 S. Ct. 115, 181 L. Ed. 2d 39 (2011). As the court explained, even if the agreements could be considered to be retroactive, title to those patents did not automatically vest because the 2006 IP assignment did not "result in an immediate transfer of expected interests to Abraxis … for the title to vest in Abraxis, a further assignment by AZ-UK was required by the "Further Assurances" provision of the June 28, 2006 IP Assignment Agreement. Whether AZ-AB and AZ-UK are part of the same corporate structure and are not complete strangers, therefore, is irrelevant because there was no valid written assignment to Abraxis … common corporate structure

Case 09-10138-MFW   Doc 14410-6   Filed 09/16/14   Page 187 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

does not overcome the requirement that even between a parent and its subsidiary, an appropriate written assignment is necessary to transfer legal title from one to the other." *Id.* at 1366.

12 Abraxis Bioscience, Inc. v. Navinta LLC, 625 F.3d 1359, 1367, 96 U.S.P.Q.2d 1977 (Fed. Cir. 2010), cert. denied, 132 S. Ct. 115, 181 L. Ed. 2d 39 (2011) (citing Moore v. Marsh, 74 U.S. 515, 522, 19 L. Ed. 37, 1868 WL 11114 (1868) and Arachnid, Inc. v. Merit Industries, Inc., 939 F.2d 1574, 1579 n.7, 1580-81, 19 U.S.P.Q.2d 1513 (Fed. Cir. 1991)).

13 *See,* Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24, 39-40, 43 S. Ct. 254, 67 L. Ed. 516 (1923) (assignment of right to sue for past patent infringement; "The remaining question is whether the instrument relied on by the plaintiff below gave it the right to sue in its own name in this case for damages for past infringements. We think not…. The plaintiff below could not bring such a suit for past infringements without joining with it the owner of the patent when the infringements were committed"). *Cf.* Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1372, 87 U.S.P.Q.2d 1076 (Fed. Cir. 2008) ("Finally, we reject Mars's argument that because the right to sue for past infringement is the "only remaining right[ ]" in an expired patent, a transfer of the right to sue is effectively the same as a transfer of title…. Title to a patent-even an expired patent-includes more than merely the right to recover damages for past infringement. Moreover, the transfer of the right to sue for past infringement divorced from title creates a risk of unnecessary third-party litigation, whether or not the patent has expired").

14 *See, e.g.,* Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 53 U.S.P.Q.2d 1984 (Fed. Cir. 2000) (all substantial rights had been transferred so licensee could bring infringement action); Monsanto Co. v. Aventis Cropscience SA, 226 F. Supp. 2d 531, 538–39 (D. Del. 2002).

15 Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 1345, 58 U.S.P.Q.2d 1681 (Fed. Cir. 2001); Immersion Corp. v. Sony Computer Entertainment America, Inc., 2004 WL 3088662 (N.D. Cal. 2004), aff'd on other grounds, 239 Fed. Appx. 578 (Fed. Cir. 2007). The Intellectual Property court cited Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 34 U.S.P.Q.2d 1444 (Fed. Cir. 1995), which explained why a nonexclusive licensee had "no legal injury" under the Patent Act if a third party infringed the patent rights covered by the nonexclusive license:

> A license may amount to no more than a covenant by the patentee not to sue the licensee
> for making, using or selling the patented invention, the patentee reserving the right to
> grant others the same right. A holder of such a nonexclusive license suffers no legal
> injury from infringement and, thus, has no standing to bring suit or even join in a suit
> with the patentee…. He has no property interest in the monopoly of the patent, nor any
> contract with the patent owner that others shall not practice the invention. Hence the
> patent owner may freely license others, or may tolerate infringers. In either case no
> right of the patent licensee is violated. Practice of the invention by others may indeed
> cause him pecuniary loss, but it does him no legal injury.

52 F.3d at 1031. Constitutional standing may be lost if the plaintiff becomes a nonexclusive licensee. *See* Schreiber Foods, Inc. v. Beatrice Cheese, Inc., 402 F.3d 1198, 74 U.S.P.Q.2d 1204, 61 Fed. R. Serv. 3d 174 (Fed. Cir. 2005) ("The test of standing must be met at two times, at the time of filing and the time that the judgment is entered. In the case, while the case was pending Schreiber assigned its patent and all claims thereunder to its subsidiary.") When the lawsuit was brought Schreiber had standing. When it assigned the patent it became a nonexclusive licensee and lost its standing to sue. However, Schreiber regained its stake in the litigation when it reacquired the '860 patent before the entry of judgment. While the general rule was that "a plaintiff must have initial standing and continue to have a 'personal stake' in the outcome of the lawsuit," the rule was not absolute in patent cases. Acknowledging that it had previously held that "if the original plaintiff lacked Article III initial standing, the suit must be dismissed, and the jurisdictional defect cannot be cured by the addition of a party with standing, … nor by the subsequent purchase of an interest in the patent in suit." Schreiber Foods, Inc. v. Beatrice Cheese, Inc., 402 F.3d 1198, 74 U.S.P.Q.2d 1204, 61 Fed. R. Serv. 3d 174 (Fed. Cir. 2005) (*citing* Paradise Creations, Inc. v. UV Sales, Inc., 315 F.3d 1304, 1309, 65 U.S.P.Q.2d 1293 (Fed. Cir. 2003) and Gaia Technologies, Inc. v. Reconversion Technologies, Inc., 93 F.3d 774, 780, 39 U.S.P.Q.2d 1826 (Fed. Cir. 1996), amended on reh'g in part by, 104 F.3d 1296, 41 U.S.P.Q.2d 1134 (Fed. Cir. 1996). It held that Schreiber's reacquisition of "the § 860 patent (and causes of action thereunder) before the entry of judgment" cured the jurisdictional defect "and thus the judgment was not void."

16 *Cf.* Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S. Ct. 1434, 28 L. Ed. 2d 788, 169 U.S.P.Q. 513, 1971 Trade Cas. (CCH) ¶ 73565 (1971) (patentee is estopped from litigating the validity of a patent once it has been judicially found to be invalid unless the patentee has not had a "full and fair chance" to litigate validity in the earlier case).

17 *See* Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 58 U.S.P.Q.2d 1681 (Fed. Cir. 2001). Textile Productions, Inc. v. Mead Corp., 134 F.3d 1481, 45 U.S.P.Q.2d 1633 (Fed. Cir. 1998).

18 In A.L. Smith Iron Co. v. Dickson, 141 F.2d 3, 60 U.S.P.Q. 475 (C.C.A. 2d Cir. 1944), Judge Learned Hand articulated the rationale as follows:

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 188 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

The ordinary case of a suit by a licensee against an infringer is in no sense the same. It is indeed true that a mere licensee may have an interest at stake in such a suit; his license may be worth much more to him than the royalties which he has agreed to pay, and its value will ordinarily depend on his ability to suppress the competition of his rivals. The reason why he is not permitted to sue is not because he has nothing to protect. But against that interest is the interest of the infringer to be immune from a second suit by the owner of the patent; and also the interest of the patent owner to be free to choose his forum, the same interest which exists here. Indeed, the owner may have granted a number of licenses, and it would be exceedingly oppressive to subject him to the will of all his licensees.

A.L. Smith Iron Co. v. Dickson, 141 F.2d 3, 6, 60 U.S.P.Q. 475 (C.C.A. 2d Cir. 1944). *Cf.* Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1381, 55 U.S.P.Q.2d 1742 (Fed. Cir. 2000) ("A patentee may not give a right to sue to a party who has no proprietary interest in the patent…. Just as a 'right to sue' clause cannot confer standing on a bare licensee, neither can a patent owner's agreement to be bound by judgments against a licensee circumvent the rule of Independent Wireless that the patent owner must ordinarily join, in any infringement action, an exclusive licensee who possesses less than all substantial rights in the patent. To hold otherwise would be to allow a patent owner to effectively grant a 'hunting license,' solely for the purpose of litigation, in the form of a pro forma exclusive license, e.g., covering only a minuscule territory.").

19    Hence, the exclusive licensee is entitled to recover the lost profits damages with respect to infringements while it is the exclusive licensee. DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 469 F.3d 1005, 1025–26, 80 U.S.P.Q.2d 1865 (Fed. Cir. 2006).

20    *See* Chisum, Patents § 21.03[2] (1996).

21    Independent Wireless Telegraph Co. v. Radio Corporation of America, 269 U.S. 459, 46 S. Ct. 166, 70 L. Ed. 357 (1926).

22    *See, generally,* Philadelphia Brief Case Co. v. Specialty Leather Products Co., 145 F. Supp. 425, 111 U.S.P.Q. 180 (D.N.J. 1956), judgment aff'd, 242 F.2d 511, 113 U.S.P.Q. 100 (3d Cir. 1957); Calgon Corp. v. Nalco Chemical Co., 726 F. Supp. 983, 13 U.S.P.Q.2d 1529 (D. Del. 1989).

23    *See, e.g.,* Textile Productions, Inc. v. Mead Corp., 134 F.3d 1481, 45 U.S.P.Q.2d 1633 (Fed. Cir. 1998).

24    DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 469 F.3d 1005, 1025–26, 80 U.S.P.Q.2d 1865 (Fed. Cir. 2006) ("Determining whether a licensee is an exclusive licensee or a bare licensee is a question of ascertaining the intent of the parties to the license as manifested by the terms of their agreement and examining the substance of the grant. The use of the word 'exclusive' is not controlling; what matters is the substance of the arrangement. Because patent rights are rights to 'exclude others,' a licensee is an exclusive licensee only if the patentee has promised, expressly or impliedly, that 'others shall be excluded from practicing the invention' within the field covered by the license. Put another way, an exclusive license is 'a license to practice the invention accompanied by the patent owner's promise that others shall be excluded from practicing it within the field of use wherein the licensee is given leave.'") (*quoting* Textile Productions, Inc. v. Mead Corp., 134 F.3d 1481, 1484, 45 U.S.P.Q.2d 1633 (Fed. Cir. 1998) (internal citations omitted).

25    Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 1342, 58 U.S.P.Q.2d 1681 (Fed. Cir. 2001). The losing infringement defendant in Intellectual Property Development case argued that a licensee lacking all substantial rights did not have Article III standing because the Patent Act created the sole remedy for infringement, and only patentees and assignees would have the remedy for patent infringement. Thus, if an exclusive licensee did not have the equivalent rights to an assignee, the licensee would not have Article III standing, and if the patentees were not joined at filing, the standing problem could not be cured by joinder by the court. The holding in Intellectual Property Development put that argument to permanent rest.

26    Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351, 34 Env't. Rep. Cas. (BNA) 1785, 22 Envtl. L. Rep. 20913 (1992).

27    *See* Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 1030, 34 U.S.P.Q.2d 1444 (Fed. Cir. 1995).

28    Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 1031, 34 U.S.P.Q.2d 1444 (Fed. Cir. 1995).

29    Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 1032, 34 U.S.P.Q.2d 1444 (Fed. Cir. 1995) ("The proprietary rights granted by any patent are the rights to exclude others from making, using or selling the invention in the United States. A patent license may have the effect between the parties to the license of transferring some of those proprietary rights from the patentee to its licensee. Such license then does more than provide a covenant not to sue, *i.e.,* a 'bare' license. In addition, the license makes the licensee a beneficial owner of some identifiable part of the patentee's bundle of rights to exclude others. Thus, a licensee with proprietary rights in the patent is generally called an 'exclusive' licensee. But it is the licensee's beneficial ownership of a right to prevent others from making, using or selling the patented technology that provides the foundation for co-plaintiff standing, not simply that the word 'exclusive' may or may not appear in the license…. The consequence of recognizing co-plaintiff standing is that the licensee has a right to bring suit on the patent, albeit in the name of the licensor, whether or not the license so provides and regardless

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 189 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

of the patentee's cooperation. Further, the patentee/licensor suffers the legal consequences of litigation brought in its name."). *See also* Morrow v. Microsoft Corp., 499 F.3d 1332, 1344, 48 Bankr. Ct. Dec. (CRR) 243, 84 U.S.P.Q.2d 1377 (Fed. Cir. 2007) ("Only when a party holds the exclusionary rights to the patent but lacks all substantial rights may the party join the legal title owner in a suit to enforce patent rights. Joining the legal title holder only satisfies prudential standing requirements. It cannot cure constitutional standing deficiencies."); Philadelphia Brief Case Co. v. Specialty Leather Products Co., 145 F. Supp. 425, 428, 111 U.S.P.Q. 180 (D.N.J. 1956), judgment aff'd, 242 F.2d 511, 113 U.S.P.Q. 100 (3d Cir. 1957).

30    Immersion Corp. v. Sony Computer Entertainment America, Inc., 2004 WL 3088662 (N.D. Cal. 2004), aff'd on other grounds, 239 Fed. Appx. 578 (Fed. Cir. 2007) (no standing even as exclusive licensee with less than the substantial rights; the exclusivity only related only to part of the invention).

31    *See* Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 58 U.S.P.Q.2d 1681 (Fed. Cir. 2001); Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 34 U.S.P.Q.2d 1444 (Fed. Cir. 1995).

32    The authors note that Andrews Kurth LLP now represents one of the defendants in the ongoing litigation in this case, but did not do so at the time of or in connection with the appeal or the district court proceedings giving rise to the appeal.

33    WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 97 U.S.P.Q.2d 1484 (Fed. Cir. 2010).

34    WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 97 U.S.P.Q.2d 1484, 1486 (Fed. Cir. 2010).

35    WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 97 U.S.P.Q.2d 1484, 1487 (Fed. Cir. 2010).

36    The rights were as follows:

• Rockwell International was the original owner of the Mindspeed Patents, but assigned them to Conexant as part of a corporate spin-off. Conexant granted Rockwell Science Center, a subsidiary of Rockwell International, "a limited, non-exclusive license to use the Mindspeed Patents in connection with its business. Conexant also permitted Rockwell Science Center to: (1) sublicense Rockwell International and its 'Affiliates,' i.e., any entity that 'controls, is controlled by, or is under common control with' Rockwell International; and (2) transfer the license in connection with the sale by either Rockwell International or its Affiliates of all or part of their respective businesses 'to which such intellectual property rights relate.'"

• Conexant later spun-off part of its business to Skyworks, during the course of which Conexant granted Skyworks an "exclusive license in the field of 'Wireless Handsets' to commercialize products covered by the Mindspeed Patents…. The agreement also provides Skyworks the exclusive right to license the patents to Qualcomm in all fields, as well as the right to assert infringement claims under the patents against Qualcomm in all fields, but prohibits Skyworks from assigning these rights without the prior written consent of Conexant." Conexant retained the rights to "'make, have made, use, offer to sell, export, and import Conexant Products in the field of Wireless Handsets' and could 'license this right' in connection with "'a divesture, sale, or spin-off of any Conexant business unit … and/or … to any third party that works under a joint development agreement with Conexant' to develop a Conexant Product." It reserved the power to sublicense Mindspeed, its subsidiary, with respect to "Mindspeed Products" and a limited power to "allow Mindspeed to assign and license its rights in the Mindspeed Patents."

• Conexant assigned the Mindspeed Patents in connection with the spin-off of Mindspeed and provided Mindspeed rights similar to the rights it had reserved when it spun off Skyworks, granting Mindspeed "a non-exclusive license to, among other things, produce and market Mindspeed Products" and permitting "Mindspeed to assign and sublicense its rights" to defined categories of persons. Conexant also reserved the ability to "practice, assign, and license the patents with respect to Conexant Products." Skyworks exercised its right to license Qualcomm by granting Qualcomm "a non-exclusive license to make, import, and sell components for a particular type of wireless communication device," along with the power to extend the license rights to Qualcomm "'Affiliates,' i.e., 'any present or future Parent … or … Subsidiary' of Qualcomm."

• Mindspeed granted Sipro "the right to offer a limited license to two of the Mindspeed Patents as part of a patent pool for the G.729.1 speech coding standard" to permit "licensees to manufacture and sell 'Licensed Products' for the sole purpose of encoding and decoding data in accordance with the speech coding standard."

• Skyworks, however, retained the right to license and sue Qualcomm in all fields of use, as Skyworks could not assign those rights without written consent.

WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 97 U.S.P.Q.2d 1484, 1486-88 (Fed. Cir. 2010). The agreement defined a "'Wireless Handset' as a device (or a component of a device) that 'is capable of wireless communication of real-time voice' and 'communicates directly to a Wireless WAN Infrastructure.'…. The agreement defines 'Conexant Products' as products in which 'the specifications and designs … are developed or owned by, or exclusively licensed to, Conexant or a Subsidiary of Conexant.'…. [And "Mindspeed Products" were] … products having 'specifications and designs … developed or owned by, or exclusively licensed to

Case 09-10138-MFW   Doc 14410-6   Filed 09/16/14   Page 190 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

Mindspeed or a Mindspeed Subsidiary.'" WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 97 U.S.P.Q.2d 1484, 1486-87 (Fed. Cir. 2010).

37    WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 97 U.S.P.Q.2d 1484, 1489 (Fed. Cir. 2010) (citing Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 11, 124 S. Ct. 2301, 159 L. Ed. 2d 98, 188 Ed. Law Rep. 17 (2004)).

38    WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 97 U.S.P.Q.2d 1484, 1490 (Fed. Cir. 2010).

39    WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 97 U.S.P.Q.2d 1484, 1490 (Fed. Cir. 2010).

40    See, e.g., Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 58 U.S.P.Q.2d 1681 (Fed. Cir. 2001) ("As discussed above, IPD is an exclusive licensee having fewer than all substantial rights in the '202 patent…. A party such as IPD that has the right to exclude others from making, using, and selling an invention described in the claims of a patent is constitutionally injured by another entity that makes, uses, or sells the invention…. Indeed, the Supreme Court has stated that a patent owner that grants 'the exclusive right to make, use, or vend [a patented invention], which does not constitute a statutory assignment … must allow the use of his name as plaintiff in any action brought by the licensee … to obtain damages for the *injury to his exclusive right.*'").

41    WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 97 U.S.P.Q.2d 1484, 1491 (Fed. Cir. 2010). In fairness we note that Skyworks had promised not to grant further licenses within the field except to Qualcomm. However, we also note that this would be of no significance under the WiAV test, for an exclusive license is no less exclusive because it is subject to "future licenses that may be granted" as long as the defendants are not within the group that could obtain the license. WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 97 U.S.P.Q.2d 1484, 1491 (Fed. Cir. 2010).

42    WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 97 U.S.P.Q.2d 1484, 1491 (Fed. Cir. 2010) ("Because an exclusive licensee derives its standing from the exclusionary rights it holds, it follows that its standing will ordinarily be coterminous with those rights. Depending on the scope of its exclusionary rights, an exclusive licensee may have standing to sue some parties and not others. For example, an exclusive licensee lacks standing to sue a party for infringement if that party holds a preexisting license under the patent to engage in the allegedly infringing activity. Similarly, an exclusive licensee lacks standing to sue a party who has the ability to obtain such a license from another party with the right to grant it. In both of these scenarios, the exclusive licensee does not have an exclusionary right with respect to the alleged infringer and thus is not injured by that alleged infringer. But if an exclusive licensee has the right to exclude others from practicing a patent, and a party accused of infringement does not possess, and is incapable of obtaining, a license of those rights from any other party, the exclusive licensee's exclusionary right is violated.").

43    In Chapter 10, we discuss implied licenses and patent exhaustion upon sales.

44    Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 1346-47, 58 U.S.P.Q.2d 1681 (Fed. Cir. 2001) ("Indeed, the Supreme Court has stated that a patent owner that grants 'the exclusive right to make, use, or vend [a patented invention], which does not constitute a statutory assignment … must allow the use of his name as plaintiff in any action brought by the licensee … to obtain damages for the *injury to his exclusive right.*' Independent Wireless, 269 U.S. at 469, 46 S.Ct. 166") (emphasis added by court).

45    WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 97 U.S.P.Q.2d 1484, 1491 (Fed. Cir. 2010) ("With these principles in mind, the key question in determining whether WiAV has standing to assert the Mindspeed Patents against the Defendants is not, as the Defendants would have it, whether WiAV has established that it has the right to exclude *all* others from practicing the patent. The question is whether WiAV has shown that it has the right under the patents to exclude *the Defendants* from engaging in the alleged infringing activity and therefore is injured by the Defendants' conduct.").

46    Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 1031-1032, 34 U.S.P.Q.2d 1444 (Fed. Cir. 1995) ("Thus economic injury alone does not provide standing to sue under the patent statute. To have co-plaintiff standing in an infringement suit, a licensee must hold some of the proprietary sticks from the bundle of patent rights, albeit a lesser share of rights in the patent than for an assignment and standing to sue alone…. The proprietary rights granted by any patent are the rights to exclude others from making, using, or selling the invention in the United States. A patent license may have the effect between the parties to the license of transferring some of those proprietary rights from the patentee to its licensee…. In addition, the license makes the licensee a beneficial owner of some identifiable part of the patentee's bundle of rights to exclude others…. But it is the licensee's beneficial ownership of a right to prevent others from making, using or selling the patented technology that provides the foundation for co-plaintiff standing, not simply that the word "exclusive" may or may not appear in the license.").

47    In addition to the cases cited in the next footnote, *see, e.g., cf.* Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1368, 87 U.S.P.Q.2d 1076 (Fed. Cir. 2008) ("'To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well.' … By the same token, if the patentee *allows* others to practice the patent in the licensee's territory, then the licensee is *not* an exclusive licensee."); Evident Corp. v. Church & Dwight Co., Inc., 399 F.3d 1310, 1313-14, 73 U.S.P.Q.2d 1910 (Fed. Cir. 2005) ("Here, there can be no dispute that Evident had constitutional standing to bring its suit. Evident

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 191 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

had certain significant rights to the patent, in particular, the right to make, use, and sell the patented dentifrice composition for human oral use, as well as the right to grant sublicenses. Thus, it would be injured by any party that made, used, or sold that patented composition."); Textile Productions, Inc. v. Mead Corp., 134 F.3d 1481, 1484-85, 45 U.S.P.Q.2d 1633 (Fed. Cir. 1998) ("To qualify as an exclusive license, an agreement must clearly manifest the patentee's promise to refrain from granting to anyone else a license in the area of exclusivity…. Mead did not promise that all others (beyond Textile) 'shall be excluded from [making the invention].' … Mead retained the right to license third parties to manufacture the harness for their own use or for sale to others. In sum, Mead did not grant Textile the rights of an exclusive licensee, but retained for itself important rights to license the invention to others."). The WiAV court distinguished Textile Productions and Mars on factual grounds.

48    Morrow v. Microsoft Corp., 499 F.3d 1332, 1341-42, 48 Bankr. Ct. Dec. (CRR) 243, 84 U.S.P.Q.2d 1377 (Fed. Cir. 2007) (Here, we are faced with the question of whether GUCLT holds the exclusionary rights and suffers constitutional injury in fact…. While GUCLT has been granted the right to sue infringers that are not controlling shareholders, AHLT is the patent title holder, holds the right to sell the patent, grant exclusive and nonexclusive licenses, grant the right to sublicense, or transfer any of the rights that AHLT holds to another party. The only limitations on AHLT's ability to control and transfer its patent rights is GUCLT's and BHLT's consent…. Nor does this consent requirement transfer to GUCLT any exclusionary rights to the patent. Moreover, there is no indication that AHLT is restricted as to the parties to whom it could transfer any of the exclusionary rights that it holds under the … patent…. The problem for GUCLT and AHLT is that the exclusionary rights have been separated from the right to sue for infringement…. The importance of AHLT's right to license third parties to our constitutional standing analysis is underscored by Textile Productions. This court determined that the transfer of the right to sue in that case did not provide standing to even participate in the suit because the agreement did not clearly manifest that the owner would *refrain from granting a license to anyone else in the particular area of exclusivity … We stated that the right to license third parties is an important patent right because implicit in the right to exclude is the right to waive that right; that is, to license activities that would otherwise be excluded.*") (emphasis added); Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 1031-1033, 34 U.S.P.Q.2d 1444 (Fed. Cir. 1995) ("Thus economic injury alone does not provide standing to sue under the patent statute. To have co-plaintiff standing in an infringement suit, a licensee must hold some of the proprietary sticks from the bundle of patent rights, albeit a lesser share of rights in the patent than for an assignment and standing to sue alone…. The proprietary rights granted by any patent are the rights to exclude others from making, using or selling the invention in the United States. A patent license may have the effect between the parties to the license of transferring some of those proprietary rights from the patentee to its licensee…. In addition, the license makes the licensee a beneficial owner of some identifiable part of the patentee's bundle of rights to exclude others…. But it is the licensee's beneficial ownership of a right to prevent others from making, using or selling the patented technology that provides the foundation for co-plaintiff standing, not simply that the word 'exclusive' may or may not appear in the license"; licensee's right to use was limited to one location and "was nonexclusive inasmuch as Amgen had the right to license others to do the same," so it did not have Article III standing).

49    Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 1031, 34 U.S.P.Q.2d 1444 (Fed. Cir. 1995). Indeed, the Seventh Circuit found that an exclusive copyright licensee did not have standing to sue an alleged infringer because there was not a "clearly delineated exclusivity over at least one strand of the bundle of rights" where the licensor retained a right to use the licensed software, to license others for testing and development for the licensor, and to renegotiate a previously granted sub license. HyperQuest, Inc. v. N'Site Solutions, Inc., 632 F.3d 377, 97 U.S.P.Q.2d 1492, 1496-1498 (7th Cir. 2011). We understand that copyright standing and patent standing may well be different things. The point here is that even where divisibility and fragmentation of rights is part of the very fabric of the property regime—as it is with copyrights—even a slight burden from prior licenses and very limited reservations or rights the courts question the power of suit. At some point, who really is the owner of the patent for standing purposes if multiple rights have been carved out and granted, or a subject to being granted, with respect to one field? Must all the rights holders be joined? Cf. Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321, 1327 (Fed. Cir. 2010) (district court had to consider whether exclusive licensee should be joined as an indispensible party when the patent owner had retained secondary rights to sue).

50    Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321 (Fed. Cir. 2010).

51    Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321, 1324, 1325 n.2 (Fed. Cir. 2010).

52    See, Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 1032, 34 U.S.P.Q.2d 1444 (Fed. Cir. 1995) ("The consequence of recognizing co-plaintiff standing is that the licensee has a right to bring suit on the patent, albeit in the name of the licensor, whether or not the license so provides and regardless of the patentee's cooperation…. In the case at hand, the patentee has refused to let its licensee join in its suit against an infringer. However, co-plaintiff standing is determined by whether or not the licensee acquired proprietary rights in the patent under the contract with the patentee. The patentee's later second thoughts are irrelevant, either to confer standing or, as here, to deny standing."). Indeed, when WiAV sued on the patents that it owned and that it licensed from Skyworks, its also named "Mindspeed as the 'defendant patent owner' of the Mindspeed Patents" to "satisfy prudential

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 192 of 204

standing." WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 97 U.S.P.Q.2d 1484, 1488 (Fed. Cir. 2010). Query: could an exclusive licensee of a patent or copyright bring a lawsuit to enforce the contractual obligations of the license even if they could not bring an infringement suit? What of contractual claims as to exceeding scope? Would scope claims, though limited to breach of contract, be preempted? Would the federal courts have exclusive jurisdiction over such contractual scope claims?

53   Waterman v. Mackenzie, 138 U.S. 252, 255, 11 S. Ct. 334, 34 L. Ed. 923 (1891). See also, Evident Corp. v. Church & Dwight Co., Inc., 399 F.3d 1310, 1313-14, 73 U.S.P.Q.2d 1910 (Fed. Cir. 2005) ("'The doctrine of standing limits federal judicial power and has both constitutional and prudential components.' … Constitutional standing requires only that a plaintiff must have suffered an injury in fact, that there be a causal connection between the injury and a defendant's conduct, and that the injury be redressable by a favorable court decision.… We have held that 'a patentee should be joined, either voluntarily or involuntarily, in any infringement suit brought by an exclusive licensee,' a general rule that is 'prudential rather than constitutional in nature.'"). In Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336, 77 U.S.P.Q.2d 1456 (Fed. Cir. 2006), the Federal Circuit stated, "For the same policy reasons that a patentee must be joined in any lawsuit involving his or her patent, there must be joinder of any exclusive licensee." Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336, 1344, 77 U.S.P.Q.2d 1456 (Fed. Cir. 2006). However, in Amgen, Inc. v. F. Hoffman-LaRoche Ltd., 456 F. Supp. 2d 267, 66 Fed. R. Serv. 3d 573 (D. Mass. 2006), the district court questioned whether the rule was as expansive as stated by the Federal Circuit. In Amgen, the exclusive licensee without all substantial rights sought to intervene in a suit brought by the patent owner. The district court observed that the policy of requiring patent owners being joined if a licensee did not have all substantial rights—namely, "the potentially pernicious effects of two or more (possibly inconsistent) lawsuits involving the same patent"—did support a blanket requirement of joining exclusive licensees without all substantial rights, for such licensees could not sue alone and so "there usually is no similar risk of multiple suits if such licensee is not joined in an action by the patent owner." Amgen, Inc. v. F. Hoffman-LaRoche Ltd., 456 F. Supp. 2d 267, 281-82, 66 Fed. R. Serv. 3d 573 (D. Mass. 2006). However, the district court was bound by Aspex, so "the Court rules that an exclusive licensee must be joined in an infringement suit brought by the patent owner." It reached "…. this conclusion with some hesitation. The Federal Circuit in Aspex did not give any indication that it was making such a significant statement regarding the law of patent standing. Patent owners can divide their bundle of rights not only into separate exclusive licenses to make, sell, and use the patented item, but also divide each of those licenses into exclusive licenses of infinite geographical or temporal scope. Requiring all exclusive licensees to join patent infringement actions could complicate litigation exponentially." Amgen, Inc. v. F. Hoffman-LaRoche Ltd., 456 F. Supp. 2d 267, 281-82, 66 Fed. R. Serv. 3d 573 (D. Mass. 2006). For these reasons, the court recognized an exception to the Aspex rule: the parties, by contract, could "preclude … exclusive licensees from being deemed necessary parties to any patent infringement actions" the licensor brought. Amgen, Inc. v. F. Hoffman-LaRoche Ltd., 456 F. Supp. 2d 267, 281-82, 66 Fed. R. Serv. 3d 573 (D. Mass. 2006).

54   Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 55 U.S.P.Q.2d 1742 (Fed. Cir. 2000).

55   Independent Wireless Telegraph Co. v. Radio Corporation of America, 269 U.S. 459, 46 S. Ct. 166, 70 L. Ed. 357 (1926). For similar reasons AsymmetRx, Inc. v. Biocare Medical, LLC, 582 F.3d 1314, 92 U.S.P.Q.2d 1113 (Fed. Cir. 2009) pointed to the policies supporting Fed. R. Civ. P. 19 as supporting joinder in that case:

> Rule 19(a) provides that a person who can be joined as a party should be joined if (1) the person's absence would make it impossible to grant complete relief to the parties, or (2) the person claims an interest in the subject matter of the action and is so situated that the disposition of the action in his absence could impede his ability to protect that interest or leave any of the parties subject to a substantial risk of incurring multiple inconsistent obligations. Harvard obviously retains an interest in the patents, and the disposition of AsymmetRx's suit against Biocare could either prejudice Harvard's interests or expose Biocare to the risk of multiple litigations. This is especially true because the Biocare License provides that, upon reasonable notice by Biocare, Harvard is obligated to help Biocare defend against any infringement suit by a third party. Harvard, by granting licenses to two parties involving the same subject matter, has potentially put itself in the conflicting position of having to aid two licensees opposed to each other. Complicating matters is the fact that Harvard is continuing to accept royalty payments from Biocare resulting from sales in the commercial diagnostic market that AsymmetRx asserts are infringing its patent rights. If anything, this added complication indicates that the purpose of Rule 19 to avoid multiple suits or incomplete relief arising from the same subject matter is best served by joinder of Harvard, which would permit the relationships between AsymmetRx, Biocare, and Harvard to all be resolved at the same time as well as solve the standing problem.

AsymmetRx, Inc. v. Biocare Medical, LLC, 582 F.3d 1314, 1321-22, 92 U.S.P.Q.2d 1113 (Fed. Cir. 2009).

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 193 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

56    Fieldturf, Inc. v. Southwest Recreational Industries, Inc., 357 F.3d 1266, 69 U.S.P.Q.2d 1795 (Fed. Cir. 2004). We note again that this avenue is not open to a "bare licensee." See, e.g., Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 87 U.S.P.Q.2d 1076 (Fed. Cir. 2008) (only "a patent owner or an exclusive licensee can have constitutional standing to bring an infringement suit" and, as to bare licensees, this "standing deficiency cannot be cured by adding the patent title owner to the suit").

57    See Independent Wireless Telegraph Co. v. Radio Corporation of America, 269 U.S. 459, 468, 46 S. Ct. 166, 70 L. Ed. 357 (1926).

58    Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 55 U.S.P.Q.2d 1742 (Fed. Cir. 2000).

59    222 F.3d at 1377.

60    Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 1342, 58 U.S.P.Q.2d 1681 (Fed. Cir. 2001).

61    Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 1348, 58 U.S.P.Q.2d 1681 (Fed. Cir. 2001). In Evident Corp. v. Church & Dwight Co., Inc., 399 F.3d 1310, 73 U.S.P.Q.2d 1910 (Fed. Cir. 2005), the court underscored the prudential underpinnings of this rule. In that case, a partnership holding rights to a patent licensed that patent to a company (Evident) formed by three of the partners. The license reserved a right of first refusal for the partnership to bring suit against any infringing parties. Evident sued Church for infringement and Church joined Peroxydent as a third-party defendant. The court denied a challenge to Evident's constitutional standing, noting that "constitutional standing requires only that a plaintiff must have suffered an injury in fact, that there be a causal connection between the injury and a defendant's conduct, and that the injury be redressable by a favorable court decision." All of these were present because Evident had "the right to make, use, and sell the patented dentifrice composition for human oral use, as well as the right to grant sublicenses. Thus, it would be injured by any party that made, used, or sold that patented composition. Clearly, Evident, as exclusive licensee to the '782 patent, had constitutional standing …" Evident Corp. v. Church & Dwight Co., Inc., 399 F.3d 1310, 73 U.S.P.Q.2d 1910 (Fed. Cir. 2005). Moreover, prudential standing requirements were satisfied because the general rule requiring an exclusive licensee to join the patentee was based on two interrelated policy concerns: "principally, from the standpoint of an accused infringer, avoidance of multiple lawsuits and liabilities, and, from the standpoint of the patentee, ensuring that its patent is not invalidated or held unenforceable without its participation …" Evident Corp. v. Church & Dwight Co., Inc., 399 F.3d 1310, 73 U.S.P.Q.2d 1910 (Fed. Cir. 2005). These concerns were addressed when Peroxydent was joined as a third-party defendant, though not at the instance of the licensee.

62    As the Federal Circuit stated the consequences of an all substantial rights determination:

> a patent owner may grant an exclusive license to his patents under such terms that the license is tantamount to an assignment of the patents to the exclusive licensee. This happens when the exclusive license transfers "all substantial rights" in the patents…. When this happens, the exclusive licensee has sole standing to sue those suspected of infringing the patents' claims…. In addition, we have held that, where an exclusive license transfers less than "all substantial rights" in the patents to the exclusive licensee, the exclusive licensee may still be permitted to bring suit against infringers, but the patent owner is an indispensable party who must be joined….

> Either the licensor did not transfer "all substantial rights" to the exclusive licensee, in which case the licensor remains the owner of the patent and retains the right to sue for infringement, or the licensor did transfer "all substantial rights" to the exclusive licensee, in which case the licensee becomes the owner of the patent for standing purposes and gains the right to sue on its own. In either case, the question is whether the license agreement transferred sufficient rights to the exclusive licensee to make the licensee the owner of the patents in question. If so, the licensee may sue but the licensor may not. If not, the licensor may sue, but the licensee alone may not. When there is an exclusive license agreement, as opposed to a nonexclusive license agreement, but the exclusive license does not transfer enough rights to make the licensee the patent owner, either the licensee or the licensor may sue, but both of them generally must be joined as parties to the litigation….

Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321, 1324 (Fed. Cir. 2010).

63    See, e.g., Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870, 875, 20 U.S.P.Q.2d 1045 (Fed. Cir. 1991) (transfer of substantially all rights treated as assignment); Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 1030, 34 U.S.P.Q.2d 1444 (Fed. Cir. 1995). If the license is not an exclusive license, the statutory provisions for damages do not encompass lost profits by that entity even if the two work closely together on products and even though they are subsidiaries of the same parent. See Poly-America, L.P. v. GSE Lining Technology, Inc., 04-1022 (Fed. Cir. September 14, 2004) (Slip. Op) ("We have held that a

Case 09-10138-MFW   Doc 14410-6   Filed 09/16/14   Page 194 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

licensee generally may not sue for damages unless it has exclusive rights under a patent, including the right to sue … Poly-Flex does not have exclusive rights. It is clearly identified in the license agreement as a nonexclusive licensee, and as such, it received only a 'bare license' and has no entitlement under the patent statutes to itself collect lost profits damages for any losses it incurred due to infringement…. Although parties to a lawsuit may allocate the disposition of infringement damages between themselves, as they appear to have done here, they cannot create lost profits for a patentee if there are none.").

64    AsymmetRx, Inc. v. Biocare Medical, LLC, 582 F.3d 1314, 92 U.S.P.Q.2d 1113 (Fed. Cir. 2009), (quoting Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870, 874, 20 U.S.P.Q.2d 1045 (Fed. Cir. 1991)); Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321 (Fed. Cir. 2010) helpfully catalogued some of the rights that it had weighed in its calculus of substantiality:

   • "Of course, transfer of the exclusive right to make, use, and sell products or services under the patent is vitally important to an assignment"

   • "the scope of the licensee's right to sublicense"

   • "the nature of license provisions regarding the reversion of rights to the licensor following breaches of the license agreement"

   • "the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee"

   • "the duration of the license rights granted to the licensee"

   • "the ability of the licensor to supervise and control the licensee's activities"

   • "the obligation of the licensor to continue paying patent maintenance fees"

   • "the nature of any limits on the licensee's right to assign its interests in the patent."

   Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321, 1325 (Fed. Cir. 2010).

65    Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321, 1325 (Fed. Cir. 2010) ("prior decisions have never purported to establish a complete list of the rights whose holders must be examined to determine whether a licensor has transferred away sufficient rights to render an exclusive licensee the owner of a patent").

66    Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 1343, 58 U.S.P.Q.2d 1681 (Fed. Cir. 2001) ("The title of the agreement at issue, which uses the term 'license' rather than the term 'assignment,' is not determinative of the nature of the rights transferred under the agreement; actual consideration of the rights transferred is the linchpin of such a determination."). See Sky Technologies LLC v. SAP AG, 576 F.3d 1374, 1378, 91 U.S.P.Q.2d 1854, 70 U.C.C. Rep. Serv. 2d 664 (Fed. Cir. 2009), cert. denied, 130 S. Ct. 2343, 176 L. Ed. 2d 561 (2010) ("Thus, it is the 'substance of what was granted' that determines the rights in the patent, not the form."); Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 53 U.S.P.Q.2d 1984 (Fed. Cir. 2000) ("A party that has been granted all substantial rights under the patent is considered the owner regardless of how the parties characterize the transaction that conveyed those rights.").

67    Minding language is, indeed, a virtue. In Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc., 587 F.3d 1375, 92 U.S.P.Q.2d 1940 (Fed. Cir. 2009), though it involved a putative complete transfer of rights, as opposed to a license, the language in issue could cause the same mischief in an exclusive license. The language reads as follows:

            a) Subject to the terms and conditions of this Agreement, USSC hereby assigns, transfers, and delivers to the Partnership … all of the assets, properties, and business (excepting only the "Excluded Assets," as defined in Section 1.2 of this Agreement) of every kind and description; wherever located; real, personal, or mixed; tangible or intangible; owned or held; or used primarily in the conduct of the Business as the same shall exist on the Contribution Date (collectively, the "Assets"), and including, without limitation, all right, title, and interest of USSC in, to, and under: … *(iii) Those patents … and other intangible property … and any applications for the same, used primarily in the Business* … (collectively, the "Intangible Property")….

      1.2 Excluded Assets.
      (a) [USSC] expressly understands and agrees that there shall be excluded from the Assets any assets not used in connection with the Business and the following assets and properties of USSC which are used in connection with the Business: … (ix) *Any and all patents and patent applications relating to any pending litigation involving USSC….*

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 195 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

*Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc.*, 587 F.3d 1375, 1381, 92 U.S.P.Q.2d 1940 (Fed. Cir. 2009) (quoted in the dissent) (emphasis added). The Federal Circuit found that while the general description of the assets transferred included all patents and patent applications used primarily in the "Business"—which would, without more have captured the patents in question—the Excluded Assets definition trumped the more general description. Since the plaintiff had the burden of proving that it had standing, in the majority's view, that meant that the plaintiff had to show that the patents in question were not related to any litigation involving USSC when the agreement became effective.

68      See, e.g., *Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 95 U.S.P.Q.2d 1321, 1324 (Fed. Cir. 2010) ("The first step is to determine whether the license is exclusive or nonexclusive, because AB, as the licensee, would have no right to sue, even by joining AMF, under a nonexclusive license agreement.... A finding that the license was exclusive is necessary, but not in itself sufficient, to find that the licensee has standing to sue.").

69      *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 55 U.S.P.Q 1742 (Fed. Cir. 2000). ("Standing to sue for infringement depends entirely on the putative plaintiff's proprietary interest in the patent, not on any contractual arrangements among the parties regarding who may sue and who will be bound by judgments."). In addition the exclusivity must comprehend the entire invention covered by the patent—at least for some period or purpose. *Immersion Corp. v. Sony Computer Entertainment America, Inc.*, 2004 WL 3088662 (N.D. Cal. 2004), aff'd on other grounds, 239 Fed. Appx. 578 (Fed. Cir. 2007) ("Without an exclusive right to practice the entire inventions at least within a specific geographical area or for a specific purpose, International Symposium on Chinese Languages and Linguistics (ISCLL) does not have a proprietary interest in the '213 and 333 patents.").

70      *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 35 U.S.P.Q.2d 1065 (Fed. Cir. 1995).

71      *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1552, 35 U.S.P.Q.2d 1065 (Fed. Cir. 1995).

72      The Federal Circuit has held that the license must be in writing in order to convey all substantial rights. See *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 45 U.S.P.Q.2d 1368 (Fed. Cir. 1998). However, the Federal Circuit has held that while an oral exclusive license could not be an effective transfer of "all substantial rights" so as to allow the licensee to have standing to sue in her own name, such a license may nonetheless be an effective exclusive license to confer standing to sue as long as the owner were joined in the action. See *Waymark Corp. v. Porta Systems Corp.*, 334 F.3d 1358, 67 U.S.P.Q.2d 1303 (Fed. Cir. 2003) ("Only assignments need be in writing under 35 U.S.C. § 261. Licenses may be oral."); *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 288 Fed. Appx. 697, 705–706 (Fed. Cir. 2008) ("We have concluded that both assignments and 'virtual assignments' (i.e., exclusive license agreements that convey all substantial rights) must be in writing for a party to have standing to sue in its own name."). We wonder, however, how a writing requirement really addresses the policies underlying the "all substantial rights" doctrine for standing purposes. That does not mean we disagree with imposing a writing requirement, but it strikes that the question of whether the substance of the license conveys all substantial rights so as to avoid multiple suits is not directly affected by the presence or absence of a writing—all rights may be covered by the scope of a grant, regardless of the medium. Certainly allowing oral exclusive licenses may give rise to convenient or fraudulent claims. See, e.g., *Visioneer, Inc. v. KeyScan, Inc.*, 626 F. Supp. 2d 1018, 1025–26 (N.D. Cal. 2009), dismissed, 370 Fed. Appx. 87 (Fed. Cir. 2009) ("On oral argument, Visioneer attested that it received the exclusive oral license in exchange for bringing suit against KeyScan. Yet, as Visioneer also stated, prior to bringing this suit, it thought it was the assignee of the '108 patent, having neglected to contact higher management and verify such ownership. It stretches the bounds of credibility too far to accept that Visioneer, thinking it had the necessary rights to the '108 patent, approached Soque prior to filing this action to acquire an exclusive license to the patent to which it already believed it had exclusive rights."). However, we would ask whether that concern should be addressed by applying statute of frauds under relevant state law, since the Federal Circuit has held the most directly relevant statute of frauds, Section 261 of the Patent Act, applies solely to true assignments. In this regard, consider *Sky Technologies LLC v. SAP AG*, 576 F.3d 1374, 91 U.S.P.Q.2d 1854, 70 U.C.C. Rep. Serv. 2d 664 (Fed. Cir. 2009), cert. denied, 130 S. Ct. 2343, 176 L. Ed. 2d 561 (2010). (While Section 261 requires that "assignments" be in writing to be effective, not all transfers of ownership were assignments and such other transfers of ownership did not need to be in writing; applying that premise to a foreclosure sale under state law.)

73      *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 20 U.S.P.Q.2d 1045 (Fed. Cir. 1991).

74      *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875, 20 U.S.P.Q.2d 1045 (Fed. Cir. 1991). *See also Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1342, 58 U.S.P.Q.2d 1681 (Fed. Cir. 2001) (To determine "whether a patent transfer agreement conveys all substantial rights under a patent to a transferee or fewer than all of those rights, a court must assess the substance of the rights transferred and the intention of the parties involved.... In making such a determination it is helpful to consider rights retained by the grantor in addition to rights transferred to the grantee."). *See also Sicom Systems, Ltd. v. Agilent Technologies, Inc.*, 427 F.3d 971, 979, 76 U.S.P.Q.2d 1933 (Fed. Cir. 2005) ("We find unpersuasive Sicom's response that it is not suing Appellees' customers, nor suing for non-commercial infringement, and that this court should not consider risks that are outside the scope of the facts in this case. Sicom's focus on the parties in suit is misplaced where this court has established that the intention of the parties to the Agreement and the substance of what was granted are relevant factors in determining whether all substantial rights in a patent were conveyed.").

75    *See* discussion in Textile Productions, Inc. v. Mead Corp., 134 F.3d 1481, 45 U.S.P.Q.2d 1633 (Fed. Cir. 1998).

76    See, e.g., Fieldturf, Inc. v. Southwest Recreational Industries, Inc., 357 F.3d 1266, 1269, 69 U.S.P.Q.2d 1795 (Fed. Cir. 2004) ("First, without granting STC the right to enforce the patent, either explicitly or impliedly, the document conveys no more than a bare license. … Second, the licensor's retention of a limited right to develop and market the patented invention indicates that the licensee failed to acquire all substantial rights. … Because the 1998 agreement is silent with respect to these important considerations, it is nothing more than an exclusive licensing agreement that fails to convey all substantial interest in the '283 patent."); Abbott Laboratories v. Diamedix Corp., 47 F.3d 1128, 1132, 33 U.S.P.Q.2d 1771, 31 Fed. R. Serv. 3d 392 (Fed. Cir. 1995) ("Diamedix retained the right to make and use, for its own benefit, products embodying the inventions claimed in the patents, as well as the right to sell such products to end users, to parties with whom Diamedix had pre-existing contracts, and to pre-existing licensees. Abbott's exclusive license was also made subject to prior licenses granted by Diamedix."); Visioneer, Inc. v. KeyScan, Inc., 626 F. Supp. 2d 1018, 1026–27 (N.D. Cal. 2009), dismissed, 370 Fed. Appx. 87 (Fed. Cir. 2009) (retention by the original owner of nonexclusive perpetual right to use; "regardless of Visioneer's assertions of an 'oral exclusive license,' the existence of a perpetual, non-exclusive, world-wide license to Primax means that Visioneer is a non-exclusive licensee…. A non-exclusive licensee does not have the exclusive right to exclude, and therefore lacks the necessary injury in fact to support Article III standing.")

77    Morrow v. Microsoft Corp., 499 F.3d 1332, 1341-42, 48 Bankr. Ct. Dec. (CRR) 243, 84 U.S.P.Q.2d 1377 (Fed. Cir. 2007) ("Moreover, GUCLT's control with respect to infringement litigation does not lead to the conclusion that GUCLT suffers injury in fact from infringement. In Sicom, we held that Sicom lacked all substantial rights (it was not a category one plaintiff) because it did not have the right to settle litigation it initiated without prior written consent of the licensor, even though it had the right to sue and an exclusive license to the patent."); Propat Intern. Corp. v. Rpost, Inc., 473 F.3d 1187, 1192, 81 U.S.P.Q.2d 1350 (Fed. Cir. 2007) ("The rights allocated to Propat under the agreement are not sufficiently substantial to make Propat in effect the assignee of the patent. It has long been held that a 'right to sue' clause in a contract, unaccompanied by the transfer of other incidents of ownership, does not constitute an assignment of the patent rights that entitles the transferee to sue in its own name.")

78    *See, e.g.,* Fieldturf, Inc. v. Southwest Recreational Industries, Inc., 357 F.3d 1266, 1269, 69 U.S.P.Q.2d 1795 (Fed. Cir. 2004) ("without granting STC the right to enforce the patent, either explicitly or impliedly, the document conveys no more than a bare license"); Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870, 875-76, 20 U.S.P.Q.2d 1045 (Fed. Cir. 1991) ("The agreements also transferred the right to sue for infringement of [the patent], subject only to the obligation to inform Marowsky. This grant is particularly dispositive here because the ultimate question confronting us is whether Vaupel can bring suit on its own or whether Marowsky must be joined as a party. The policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer…. This policy is not undercut here because the right to sue rested solely with Vaupel."); Sicom Systems, Ltd. v. Agilent Technologies, Inc., 427 F.3d 971, 76 U.S.P.Q.2d 1933 (Fed. Cir. 2005) ("We find unpersuasive Sicom's response that it is not suing Appellees' customers, nor suing for non-commercial infringement, and that this court should not consider risks that are outside the scope of the facts in this case. Sicom's focus on the parties in suit is misplaced where this court has established that the intention of the parties to the Agreement and the substance of what was granted are relevant factors in determining whether all substantial rights in a patent were conveyed."; however, even though the license granted Sicom the power to bring actions against commercial infringements, it did not convey all substantial rights).

79    AsymmetRx, Inc. v. Biocare Medical, LLC, 582 F.3d 1314, 1319, 92 U.S.P.Q.2d 1113 (Fed. Cir. 2009) ("[w]e have stated that the exclusive right to sue is 'particularly dispositive' in cases where, as here, we are deciding whether a patent owner must be joined as a party"; licensor's retention of rights with respect to patent infringement litigation was most important factor in decision not to find all substantial rights passed).

80    Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321 (Fed. Cir. 2010).

81    Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321, 1322 (Fed. Cir. 2010). As the Federal Circuit noted, this case did not present the typical fact situation. "Typically, we are confronted with cases in which an exclusive licensee sues an accused infringer, and we must decide whether the licensee has been granted rights sufficient to confer standing. This case presents a converse scenario in which the patent owner seeks to bring suit, requiring us to determine whether the patent owner transferred away sufficient rights to divest it of any right to sue." *Id.* at 1324. Though not typical, this fact situation was not unheard of. *See, e.g.,* Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336, 77 U.S.P.Q.2d 1456 (Fed. Cir. 2006).

82    The Federal Circuit listed the rights granted to AB as exclusive licensee and the rights retained by AMF as follow:

   • To AB

      • "The exclusive, worldwide right to make, have made, use, lease, offer to lease, sell, offer to sell, and otherwise commercially exploit the '616 and '691 patents for the full term of those patents."

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 197 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

• "The first right to sue to enforce the patents when either AMF or AB learns of any alleged, actual, suspected, potential, or threatened infringement, misappropriation, or unauthorized use. This right to choose whether to sue includes the right to control any litigation commenced by AB, including the right to choose counsel and the right to make unilateral decisions about litigation and settlement strategy and tactics."

• "The right to settle any AB-controlled litigation on any terms (with or without payment of money) without any prior authorization by AMF. Exercise of this right does require first consulting with AMF."

• "The right to grant sublicenses, as long as the sublicenses include specified confidentiality requirements; particular reporting, inspection, and audit rights; provisions terminating the sublicense if the license is terminated; and the payment of specified pass- through royalties to AMF."

• Retained by AMF

• "The secondary right to sue to enforce the patents when either AMF or AB finds out about any alleged, actual, suspected, potential, or threatened infringement … and when AB declines to exercise its right to sue, described above. This secondary right to sue includes the right to control any litigation commenced by AMF, including the right to choose counsel and the right to make unilateral decisions about litigation and settlement strategy and tactics."

• "The apparent obligation to pay maintenance fees on the patents-in-suit."

• "The right to some significant portion of the recovery in infringement suits, whether initiated by AB or by AMF."

• "The apparent right to grant licenses to settle litigation initiated by AMF."

• "The right to prevent AB from assigning its rights to anyone else except under certain specified conditions. AMF's consent to AB's assignment of its rights cannot be unreasonably withheld."

• "The right to terminate the license agreement and any sublicenses if AB misses payments to AMF."

Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321, 1322-23 (Fed. Cir. 2010).

83    Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321, 1325 (Fed. Cir. 2010) (Citing AsymmetRx, Inc. v. Biocare Medical, LLC, 582 F.3d 1314, 1320-21, 92 U.S.P.Q.2d 1113 (Fed. Cir. 2009); Sicom Systems, Ltd. v. Agilent Technologies, Inc., 427 F.3d 971, 979-80, 76 U.S.P.Q.2d 1933 (Fed. Cir. 2005); Abbott Laboratories v. Diamedix Corp., 47 F.3d 1128, 1132, 33 U.S.P.Q.2d 1771, 31 Fed. R. Serv. 3d 392 (Fed. Cir. 1995)). For good measure, the Federal Circuit repeated the point in a slightly different way: "Under the prior decisions of this court, the nature and scope of the licensor's retained right to sue accused infringers is the most important factor in determining whether an exclusive license transfers sufficient rights to render the licensee the owner of the patent." Id.

84    Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321, 1325 (Fed. Cir. 2010).

85    "By contrast, in Speedplay, we held that a licensee's right to grant royalty-free sublicenses to defendants sued by the licensor rendered illusory the licensor's right to sue…. We expressly distinguished an earlier case in which the licensor's right to sue was not illusory because any sublicenses the licensee might grant included the requirement to pay royalties." Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321, 1326 (Fed. Cir. 2010) (citing Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1251, 53 U.S.P.Q.2d 1984 (Fed. Cir. 2000)). Nor did the failure to specify a time frame during which AB had to make a decision to sue disturb the Federal Circuit: "Under California law, '[i]f no time is specified for the performance of an act required to be performed, a reasonable time is allowed.' Cal. Civ. Code § 1657. Thus, AB has only a reasonable amount of time before it must decide whether or not to sue an infringer, depriving AB of the right to indulge infringements indefinitely. Because AB cannot indulge infringements for an unlimited time, under Abbott Laboratories, AB holds substantially less than the complete right to sue." Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321, 1327 (Fed. Cir. 2010).

86    Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321, 1326 (Fed. Cir. 2010).

87    Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321, 1326 (Fed. Cir. 2010).

88    Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 95 U.S.P.Q.2d 1321, 1324 n.2 (Fed. Cir. 2010).

89    Refac Intern., Ltd. v. Mastercard Intern., 758 F. Supp. 152, 18 U.S.P.Q.2d 1632 (S.D. N.Y. 1991).

90    Refac Intern., Ltd. v. Mastercard Intern., 758 F. Supp. 152, 156, 18 U.S.P.Q.2d 1632 (S.D. N.Y. 1991). See also Devlin v. Ingrum, 928 F.2d 1084 (11th Cir. 1991) (transfer of some rights not an assignment but sufficient nonetheless to enable recipient of transfer to grant exclusive license in underlying patent for particular use); Visioneer, Inc. v. KeyScan, Inc., 626 F. Supp. 2d 1018, 1026–27

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 198 of 204

(N.D. Cal. 2009), dismissed, 370 Fed. Appx. 87 (Fed. Cir. 2009) (retention by the original owner of nonexclusive perpetual right to use; "regardless of Visionere's assertions of an 'oral exclusive license,' the existence of a perpetual, non-exclusive, world-wide license to Primax means that Visionere is a non-exclusive licensee…. A non-exclusive licensee does not have the exclusive right to exclude, and therefore lacks the necessary injury in fact to support Article III standing.").

91    *See* Donald Chisum, Patents § 21.03[2] (1996). *See also* Western Electric Co. v. Pacent Reproducer Corporation, 42 F.2d 116, 119, 5 U.S.P.Q. 105 (C.C.A. 2d Cir. 1930) ("A bare license might be outstanding in one when the patent owner grants a license to another accompanied by the promise that the grantor will give no further license. In such a case, the second licensee needs the protections of the right of joinder in a suit against infringers as much as though he were a sole license."); Textile Productions, Inc. v. Mead Corp., 134 F.3d 1481, 45 U.S.P.Q.2d 1633 (Fed. Cir. 1998); Solarex Corp. v. Arco Solar, Inc., 805 F. Supp. 252 (D. Del. 1992).

92    In Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 87 U.S.P.Q.2d 1076 (Fed. Cir. 2008), the Federal Circuit considered an intercorporate licensing arrangement. In 1996 Agreements, Mars and its subsidiary MEI acknowledged that Mars was the owner of the patents in question and that MEI-UK "a separate corporate entity from either Mars or MEI-previously had and would continue to have a [non-exclusive] license to practice the patents-in-suit … 'in any country of the world' (including the United States), in exchange for a royalty payment." Since its corporate sister could practice patents in the United States, MEI was not an exclusive licensee before 1996: "'To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well.' … By the same token, if the patentee *allows* others to practice the patent in the licensee's territory, then the licensee is *not* an exclusive licensee." Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1368, 87 U.S.P.Q.2d 1076 (Fed. Cir. 2008). See Textile Productions, Inc. v. Mead Corp., 134 F.3d 1481, 1484–85, 45 U.S.P.Q.2d 1633 (Fed. Cir. 1998) (License not exclusive where it was silent on the licensor's right to make its own use of the technology; agreements were "silent about Mead's ability to grant licenses to suppliers for nonMead customers or to those who wish to make the invention for their own use." Evidently because the agreements were silent, Mead in fact retained the power to license.)

93    Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336, 77 U.S.P.Q.2d 1456 (Fed. Cir. 2006).

94    Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 1336, 58 U.S.P.Q.2d 1681 (Fed. Cir. 2001).

95    *See also* Abbott Laboratories v. Diamedix Corp., 47 F.3d 1128, 33 U.S.P.Q.2d 1771, 31 Fed. R. Serv. 3d 392 (Fed. Cir. 1995) (court held that "all substantial patent rights" had not transferred because licensor retained the right to bring infringement actions (though the licensee had the right of first refusal to do so), the licensee could not permit infringement (i.e., it could not refrain from suing), licensee could not assign its rights other than to a successor without licensor's or consent, and the licensor had the right to participate in lawsuit); Mentor H/S, Inc. v. Medical Device Alliance, Inc., 240 F.3d 1016, 57 U.S.P.Q.2d 1819 (Fed. Cir. 2001) (No transfer of all substantial rights. The licensor could develop and manufacture products, and supervise and control product development by the licensee; was obligated to pay maintenance fees for the patent; and had the first obligation to sue parties for infringement. The licensee could only sue for infringement if the licensor failed to do so). *Compare* Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 53 U.S.P.Q.2d 1984 (Fed. Cir. 2000) (All substantial rights had been transferred even though licensor retained the right to initiate action against an infringer in its own name if licensee failed to bring a suit within three months. However, the license did not allow the licensor to participate in actions that the licensee brought or to limit the licensee's management of litigation. Also the licensee could render the licensor's right to sue illusory by granting the infringer a royalty free sublicense. Further, while the licensee could not assign its interest without consent, the licensor's consent could not be unreasonably withheld).

96    Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 87 U.S.P.Q.2d 1076 (Fed. Cir. 2008).

97    In the 1996 Agreements, Mars and MEI acknowledged that Mars was the owner of the patents in question and that MEI-UK "a separate corporate entity from either Mars or MEI-previously had and would continue to have a [non-exclusive] license to practice the patents-in-suit … 'in any country of the world' (including the United States), in exchange for a royalty payment." Since its corporate sister could practice patents in the United States, MEI was not an exclusive licensee before 1996: "'To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well.' …. By the same token, if the patentee *allows* others to practice the patent in the licensee's territory, then the licensee is *not* an exclusive licensee." Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1369, 87 U.S.P.Q.2d 1076 (Fed. Cir. 2008).

98    Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1363, 87 U.S.P.Q.2d 1076 (Fed. Cir. 2008).

99    Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1370, 87 U.S.P.Q.2d 1076 (Fed. Cir. 2008) ("The relevant language of the 1996 Agreements is: '[Mars] Incorporated hereby transfers to MEI-US its entire interest in the Covered Intellectual Property that relates to the business of the Parties.' We see nothing ambiguous about this language. A transfer of the 'entire interest' of a patentee in a patent is well known to mean a full assignment of the patent-i.e., transfer of title…. Thus, giving the ordinary and usual meaning to the terms of this clause of the 1996 Agreements, we find that intent of the parties was to transfer title to the '719 patent from Mars to MEI.").

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 199 of 204

100    Schreiber Foods, Inc. v. Beatrice Cheese, Inc., 402 F.3d 1198, 74 U.S.P.Q.2d 1204, 61 Fed. R. Serv. 3d 174 (Fed. Cir. 2005). In that case, the Federal Circuit considered whether a temporary loss of standing would render an infringement judgment void. Noting that the "initial standing of the original plaintiff is assessed at the time of the original complaint, even if the complaint is later amended," 402 F.3d 1198 at note 5, the Federal Circuit observed that at the outset of the suit, Schreiber owned the '860 patent. "However, once the assignment to Schreiber Technologies was completed, there was no question that Schreiber lost its 'personal stake in the outcome.' Though an assignment of a patent does not ordinarily include the right to sue for past infringement, …, the assignment to Schreiber Technologies explicitly included an assignment of all causes of action. … [W]hen Schreiber transferred the '860 patent and became a mere non-exclusive licensee, Schreiber lost standing to sue for infringement and the case became moot. However, the mootness in this case was only temporary. Schreiber regained its stake in the litigation when it reacquired the '860 patent before the entry of judgment. The issue before us is therefore whether a judgment is void when there is a temporary transfer of the patent in suit to a non-party, which temporarily deprives the court of jurisdiction, even though the plaintiff owned the patent at the commencement of the suit and at the time of judgment? We hold that the judgment is not void in such circumstances. … The general rule in federal cases is that a plaintiff must have initial standing and "continue to have a 'personal stake in the outcome' of the lawsuit."…. But, as will be seen, this rule is not absolute. … In the area of patent infringement, this court has held that if the original plaintiff lacked Article III initial standing, the suit must be dismissed, and the jurisdictional defect cannot be cured by the addition of a party with standing, Paradise Creations, Inc. v. UV Sales, Inc., 315 F.3d 1304, 1309, 65 U.S.P.Q.2d 1293 (Fed. Cir. 2003), nor by the subsequent purchase of an interest in the patent in suit. Gaia Technologies, Inc. v. Reconversion Technologies, Inc., 93 F.3d 774, 780, 39 U.S.P.Q.2d 1826 (Fed. Cir. 1996), amended on reh'g in part by, 104 F.3d 1296, 41 U.S.P.Q.2d 1134 (Fed. Cir. 1996). In this case, Schreiber had constitutional standing at the time the suit was commenced. Importantly, after assigning the '860 patent, Schreiber reacquired it before the entry of judgment. … This court has also held that the temporary loss of standing during patent litigation can be cured before judgment. … Here Schreiber reacquired its stake in the litigation by reacquiring the '860 patent (and causes of action thereunder) before the entry of judgment. The jurisdictional defect that had existed was cured before the entry of judgment and thus the judgment was not void. 402 F.3d at 1203–04.

101    Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1370, 87 U.S.P.Q.2d 1076 (Fed. Cir. 2008).

102    Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1371, 87 U.S.P.Q.2d 1076 (Fed. Cir. 2008) (emphasis added by court).

103    Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1371, 87 U.S.P.Q.2d 1076 (Fed. Cir. 2008). In footnote 3 the court noted that "[i]n fact, the title of the Confirmation Agreement-'COINCO CONFIRMATION AGREEMENT'-itself suggests that the agreement was meant primarily to acknowledge an understanding of an earlier agreement, rather than to transfer ownership of property. J.A. 3177. See, e.g., 3 Oxford English Dictionary 710 (2d ed.1989) (defining 'confirmation' as '1. The action of making firm or sure … 2. The action of confirming or ratifying by some additional legal form'); 129 S. Ct. at 709 (defining 'confirm' as '2. To make valid by formal authoritative assent (a thing already instituted or ordered); to ratify, sanction')." 129 S. Ct. at note 3.

104    Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1371, 87 U.S.P.Q.2d 1076 (Fed. Cir. 2008) ("The second sentence of paragraph 1 does describe an actual transfer—'MEI hereby does irrevocably assign all such rights to Mars.' J.A. 3178. But the antecedent of 'such rights' is 'any rights in or to any past infringement of the Litigation Patents or any recovery therefor.' … This is an assignment of the right to sue for past infringement, not an assignment of title. The 1996 Agreements make clear that MEI and Mars knew how to transfer title when they intended to do so. We see no provision in the Confirmation Agreement that transfers title to the '719 patent back to Mars.") The court also rejected "Mars's argument that because the right to sue for past infringement is the 'only remaining right [ ]' in an expired patent, a transfer of the right to sue is effectively the same as a transfer of title. … Title to a patent-even an expired patent-includes more than merely the right to recover damages for past infringement. Moreover, the transfer of the right to sue for past infringement divorced from title creates a risk of unnecessary third-party litigation, whether or not the patent has expired." 527 F.3d at 1372.

105    See, e.g., Fieldturf, Inc. v. Southwest Recreational Industries, Inc., 357 F.3d 1266, 1269, 69 U.S.P.Q.2d 1795 (Fed. Cir. 2004) ("Ordinarily, dismissal for lack of standing is without prejudice."). See also University of Pittsburgh v. Varian Medical Systems, Inc., 569 F.3d 1328, 91 U.S.P.Q.2d 1251 (Fed. Cir. 2009) ("As this court has explained, if a co-owner of a patent wishes to sue for infringement, he must join the other co-owners in the action in order to avoid a dismissal for lack of standing…. [It] is clear that a dismissal for failure to join a party is not an adjudication on the merits, and thus, should not have preclusive effect—i.e. such a dismissal should be without prejudice…. Even if we ignore the party joinder issue and view the district court's action as a simple dismissal for lack of standing, we still conclude that the district court abused its discretion. A dismissal for lack of standing is jurisdictional and is not an adjudication on the merits…. The [court] have repeatedly emphasized that a dismissal for lack of standing should generally be without prejudice, particularly when the defect is curable.");

106    Sicom Systems, Ltd. v. Agilent Technologies, Inc., 427 F.3d 971, 980, 76 U.S.P.Q.2d 1933 (Fed. Cir. 2005) ("We conclude that the district court did not abuse its discretion by dismissing this case with prejudice. First, as the district court noted, this action was Sicom's second suit that was dismissed for lack of standing. Second, as the district court noted, 'Sicom has not contested Defendants'

Case 09-10138-MFW    Doc 14410-6    Filed 09/16/14    Page 200 of 204

§ 5:33.Exclusive licensee: standing to sue for..., Modern Licensing Law...

assertion that any dismissal by the Court of this action should be with prejudice, because Sicom has twice attempted and twice failed to establish standing.' … Although Sicom correctly argues that dismissal with prejudice is generally inappropriate where the standing defect can be cured, Sicom already had a chance to cure the defect and failed.").

107    See, e.g., Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc., 587 F.3d 1375, 92 U.S.P.Q.2d 1940 (Fed. Cir. 2009) ("Turning to the nature of the dismissal, Ethicon feels aggrieved because it had asked the district court to dismiss the case with prejudice. 'A dismissal with prejudice bars a subsequent action between the same parties or their privies on the same claim, but a dismissal without prejudice, although it constitutes a final termination of the first action, does not bar a second suit. We have explained that" [o]rdinarily, dismissal for lack of standing is without prejudice." … On occasion, however, a dismissal with prejudice is appropriate, especially where it is plainly unlikely that the plaintiff will be able to cure the standing problem.' … Within the sound discretion of the district court is the decision of whether dismissal is with or without prejudice … Ethicon has not shown that Judge Arterton abused her discretion. As best we can tell, Tyco Healthcare may become able to show that it owned the asserted patents. Alternatively, Tyco Healthcare may be able to obtain ownership of the patents. Further, given that the ownership issue was not identified to the court as an issue to be litigated during trial and was first explicitly raised by Ethicon during Mr. Amelio's cross-examination, we do not perceive any undue prejudice to Ethicon. Should Tyco Healthcare be able to cure the ownership deficiency, most if not all the evidence, testimony, and rulings developed during trial should be applicable to a subsequent proceeding between the parties.").

**End of Document**                                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 115

# CANADIAN PATENT LAW

## Second Edition

Stephen J. Perry and T. Andrew Currier

Introduction by the Honourable Roger T. Hughes

 LexisNexis

**Canadian Patent Law, Second Edition**
© LexisNexis Canada Inc. 2014
April 2014

All rights reserved. No part of this publication may be reproduced, stored in any material form (including photocopying or storing it in any medium by electronic means and whether or not transiently or incidentally to some other use of this publication) without the written permission of the copyright holder except in accordance with the provisions of the *Copyright Act*. Applications for the copyright holder's written permission to reproduce any part of this publication should be addressed to the publisher.

Warning: The doing of an unauthorized act in relation to a copyrighted work may result in both a civil claim for damages and criminal prosecution.

The publisher, (Author(s)/General Editor(s)) and every person involved in the creation of this publication shall not be liable for any loss, injury, claim, liability or damage of any kind resulting from the use of or reliance on any information or material contained in this publication. While every effort has been made to ensure the accuracy of the contents of this publication, it is intended for information purposes only. When creating this publication, none of the publisher, the (Author(s)/General Editor(s)) or contributors were engaged in rendering legal or other professional advice. This publication should not be considered or relied upon as if it were providing such advice. If legal advice or expert assistance is required, the services of a competent professional should be sought and retained. The publisher and every person involved in the creation of this publication disclaim all liability in respect of the results of any actions taken in reliance upon information contained in this publication and for any errors or omissions in the work. They expressly disclaim liability to any user of the work.

**Library and Archives Canada Cataloguing in Publication**

Perry, Stephen J.
    Canadian patent law / Stephen J. Perry and T. Andrew Currier.

Includes bibliographical references and index.
ISBN 978-0-433-47657-3 (Second Edition)

    1. Patent laws and legislation—Canada.
I. Currier, T. Andrew  II. Title.

KE2919.P47 2011          346.7104'86          C2011-907448-6
KF3120.P47 2011

**Published by LexisNexis Canada, a member of the LexisNexis Group**
LexisNexis Canada Inc.
123 Commerce Valley Dr. E., Suite 700
Markham, Ontario
L3T 7W8

**Customer Service**
Telephone: (905) 479-2665 • Fax: (905) 479-2826
Toll-Free Phone: 1-800-668-6481 • Toll-Free Fax: 1-800-461-3275
Email: customerservice@lexisnexis.ca
Web Site: www.lexisnexis.ca

Printed and bound in Canada.

1934 when Duff C.J. of the Supreme Court of Canada referred with approval
to the following words of Lord Halsbury in *Tubes Ltd. v. Perfecta Seamless
Steel Tube Co.*:[25]

> ... if one has to look at first principles and see what the meaning of the
> specification is ... why is a specification necessary? It is a bargain
> between the State and the inventor: the State says, "If you will tell what
> your invention is and if you will publish that invention in such a form
> and in such a way as to enable the public to get the benefit of it, you
> shall have a monopoly of that invention for a period of fourteen years."
> That is the bargain.[26]

**§3.19** In *Consolboard Inc. v. MacMillan Bloedel (Saskatchewan) Ltd.*,[27]
the Supreme Court made reference to the description of the patent bargain
provided by H.G. Fox, above, and noted that the statutory requirement for
disclosure "... lies at the heart of the whole patent system" in that "[t]he
description of the invention ... is the quid pro quo for which the inventor is
given a monopoly for a limited term of years on the invention."[28]

**§3.20** More recently, in *Free World Trust v. Électro Santé Inc.*,[29] the
Supreme Court concluded that: "Patent protection rests on the concept of a
bargain between the inventor and the public. In return for disclosure of the
invention to the public, the inventor acquires for a limited time the exclusive
right to exploit it. It was ever thus."[30]

## III. PATENTS AS PROPERTY

**§3.21** Legal and contractual rights of all kinds qualify as property rights.
Patent rights are no different. The exclusive right granted by a patent has
historically been treated as a property right and,[31] more specifically, as a
*chose in action*, which is a right to exclude others from the property defined
by the patent.

**§3.22** Lord Herschell elaborated on the nature of the patent right in *Steers
v. Rogers*:

> What is the right which a patentee has or patentees have? It has been
> spoken of as though a patent right were a chattel, or analogous to a
> chattel. The truth is that letters patent do not give the patentee any right

*Électro Santé Inc.*, [2000] S.C.J. No. 67, [2000] 2 S.C.R. 1024 (S.C.C.); *Hershkovitz v. Tyco
Safety Products Canada Ltd.*, [2010] F.C.J. No. 947 at paras. 6-7, 2010 FCA 190 (F.C.A.).

25  (1902), 20 R.P.C. 77 at 95-96 (H.L.).

26  *Western Electric Co. v. Baldwin International Radio Co. of Canada*, [1934] S.C.J. No. 39,
[1934] S.C.R. 570 at 571 (S.C.C.).

27  [1981] S.C.J. No. 44, [1981] 1 S.C.R. 504 (S.C.C.).

28  *Ibid.*, at para. 22.

29  [2000] S.C.J. No. 67, [2000] 2 S.C.R. 1024 (S.C.C.).

30  *Ibid.*, at para. 13.

31  *Torkington v. Magee*, [1902] 2 K.B. 427 at 430, *per* Channell J., revd [1903] 1 K.B. 644 (C.A.).