**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>NORTEL NETWORKS INC., *et al.*,<br><br><br>                              Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br><br>(Jointly Administered) |

- and -

Court File No.: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**JOINT ADMINISTRATORS' POST-HEARING REPLY SUBMISSION REGARDING
ALLOCATION OF THE PROCEEDS OF THE NORTEL ASSET SALES**

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Rodney Square
1000 North King Street
Wilmington, Delaware 19801

Edwin J. Harron (No. 3396)
John T. Dorsey (No. 2988)
Jaime Luton Chapman (No. 4936)

Tel.:   302-571-6600
Fax:   302-571-1253

LAX O'SULLIVAN SCOTT LISUS LLP

Suite 2750
145 King Street West
Toronto, ON M5H 1J8

Matthew P. Gottlieb (LSUC#: 32268B)
mgottlieb@counsel-toronto.com

Tel.:   416-598-1744
Fax:   416-598-3730

HUGHES HUBBARD & REED LLP

One Battery Park Plaza
New York, New York 10004

William R. Maguire (admitted *pro hac vice*)
Derek J.T. Adler (admitted *pro hac vice*)
Neil J. Oxford (admitted *pro hac vice*)

Tel.:   212-837-6000
Fax:   212-422-4726

DAVIES WARD PHILLIPS & VINEBERG LLP

155 Wellington Street West
Toronto, Ontario M5V 3J7

James W.E. Doris (LSUC#:  33236P)
jdoris@dwpv.com
Matthew Milne-Smith (LSUC#: 44266P)
mmilne-smith@dwpv.com

Tel.:   416-863-0900
Fax:   416-863-0871

*Counsel for the Joint Administrators*

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ...................................................................................1

II.     THE SOURCE OF THE PARTIES' RIGHTS .....................................................8

     A.     The Canadian Debtors Expand the MRDA Beyond Its Express Scope..................8

         1.     The MRDA Is Not the Source of the RPEs' Rights, But Merely Confirms the RPEs' Beneficial Ownership of IP, Which Pre-Dates the MRDA.................................................................................................8

         2.     The RPEs' Joint Beneficial Ownership Arises from Invention, Not from the MRDA, So the RPEs' Conduct Is Direct Evidence of Joint Beneficial Ownership........................................................................9

         3.     The MRDA Served Important Operational, Administrative, and Tax Purposes...............................................................................................13

         4.     The Granting of Licenses Is Not Evidence that NNL Alone Owned Nortel's IP Because a Holder of Legal Title Can Grant Licenses .............15

     B.     Beneficial Ownership Under the MRDA Was Based on Contribution and Was Not Equivalent to the Licenses ....................................................................16

         1.     The MRDA Does Not Equate Ownership With Licenses ........................18

         2.     The RPS Methodology Reflects Ownership Based on Contribution, Not Licenses............................................................................................19

         3.     Beneficial Ownership Does Not Have Special Meaning for Tax Purposes ................................................................................................21

     C.     The RPEs' History of Dividing Ownership Based on Historical R&D Spending Is Not Parol Evidence Regarding the Terms of the MRDA .................22

         1.     The Evidence Relied on by the EMEA Debtors Is Direct Evidence of Ownership, Not Parol Evidence ..........................................................23

         2.     The Evidence of the RPEs' Joint Beneficial Ownership Is Also Admissible as Part of the Factual Matrix of the MRDA ..........................24

III.     THE MRDA CONFIRMED THE RPES' BENEFICIAL OWNERSHIP OF NORTEL IP ...........................................................................................................25

     A.     The MRDA Must Be Interpreted in Light of its Factual Matrix...........................25

i

**Table of Contents**
(continued)

1.    Consideration of the Factual Matrix Is Mandatory ................................... 26

2.    The Canadian Debtors' View of the Factual Matrix of the MRDA Is Narrow and Self-Serving ..................................................... 26

3.    The Canadian Debtors Rely on Factual Matrix and Extrinsic Evidence, Albeit Only When They Think It Supports Their Position ............................................................................... 28

4.    The Canadian Debtors Distort Key Factual Matrix Evidence ................. 29

    (a)    The History of IP Development at Nortel ..................................... 29

    (b)    Transfer Pricing Arrangements ....................................... 32

    (c)    The Arm's Length Principle ............................................. 34

    (d)    Amendments to the MRDA ......................................... 36

B.    Interpretation of the MRDA ............................................................... 37

1.    The MRDA and Its Addenda Recognize the Beneficial Ownership of the EMEA and U.S. Debtors ......................................... 37

    (a)    The Canadian Debtors' Argument that "Legal Title" Means "Ownership" Is Incorrect ............................................. 37

    (b)    The MRDA Repeatedly Confirmed that Beneficial Ownership Was Held Jointly by All RPEs ..................................... 44

2.    Article 3 Does Not Provide that RPS Payments Are the Only Compensation for R&D Spending ........................................... 46

3.    Article 4(e) Confers on the EMEA and U.S. Debtors a Broad Right of Enforcement that Is Coextensive with the License Right ..................... 48

4.    Article 5(a) Does Not Confer a Limited Make-Use License ................... 50

5.    The Canadian Debtors' Interpretation of the MRDA Is Absurd in All Conceivable Circumstances ............................................ 54

IV.    ALLOCATING THE RPES' BENEFICIAL OWNERSHIP OF NORTEL IP ................ 55

A.    The Criticisms of R&D Spending as a Measurement of Contribution Are Without Merit ............................................................................... 56

**Table of Contents**
(continued)

| | | |
|---|---|---|
| 1. | The EMEA Debtors Do Not Use R&D Spending to Value IP | 56 |
| 2. | The R&D Performed by the EMEA Debtors Was as Valuable as the R&D Performed by NNL | 57 |
| 3. | The Inventorship Approach Is Inappropriate for Nortel | 59 |

B. The Courts Should Allocate the RPEs' Contributions Based on All Relevant R&D Spending .......... 61

    1. The Evidence Proves that the Useful Life of the IP Sold Was Far Longer than Five Years .......... 61

    2. The Lookback Period in the MRDA is Expressly Inapplicable and Wrong .......... 63

    3. The 2010 RPS Percentages Are Particularly Inappropriate .......... 68

    4. The Courts Should Not Adjust the Contribution Approach to Include Funding .......... 70

C. The License Approach Suggested by the U.S. Debtors .......... 71

D. The Licenses Should Be Valued Based on Their Highest and Best Use .......... 75

    1. The Licenses Were Effectively Transferable Because All RPEs Consented to the Sales .......... 75

    2. The Licenses Should Be Valued in "Safe Hands" .......... 77

    3. Mr. Britven's Reliance on the 2008 Annual Impairment Test Was Improper .......... 79

V. ALLOCATING CUSTOMER-RELATED ASSETS AND GOODWILL .......... 82

A. Only the EMEA Debtors Properly Allocate Customer-Related Assets .......... 82

    1. The Canadian Debtors' Treatment of Customer-Related Assets and IP As One Asset Class Is Wrong .......... 82

    2. The EMEA Debtors' Separate Valuations of Customer-Related Assets and IP Are Accurate .......... 87

        (a) The EMEA Debtors Correctly Concluded that the Most Valuable Assets Transferred in the Business Sales Were Customer-Related Assets and Goodwill .......... 87

**Table of Contents**
**(continued)**

(b)    Mr. Malackowski Never Claimed that the Value of the IP Sold Could Be $10.4 Billion..........................................................90

(c)    The CCC's Approach Confirms the EMEA Debtors' Analysis...........................................................................91

3.    The U.S. and Canadian Debtors' Improper Treatment of the Customer-Related Assets Disproportionately Impacts the LREs ..............92

B.    The Canadian Debtors Have No Principled Basis for Ignoring Significant Goodwill Value......................................................................94

VI.    THE EMEA DEBTORS' APPROACH IS DICTATED BY THE LAW AND THE FACTS ......................................................................96

VII.    CONCLUSION............................................................................100

APPENDIX A ..................................................................... A-1

## I.    PRELIMINARY STATEMENT

1.    Ownership of IP arises from invention.[1]  The inventive work of the RPEs' engineers vested beneficial ownership of Nortel IP in the RPEs by operation of law,[2] and a decade of uniform conduct confirms two fundamental facts:  beneficial ownership was never transferred to NNL, and the parties consistently measured their beneficial ownership by relative spending on the R&D that created Nortel's IP.[3]

2.    The MRDA recognized the parties' pre-existing beneficial ownership of Nortel IP, but it was not the source of that ownership.  Rather, the MRDA was an operating agreement under which NNL held legal title to the IP, the EMEA and U.S. Debtors held exclusive and nonexclusive territorial licenses, and all of the RPEs had joint beneficial ownership.  The MRDA implemented one aspect of the RPEs' return on this ownership – sharing the taxable profits and losses that would accrue from the exploitation of Nortel's IP while Nortel was a going concern.

3.    Of the closing briefs submitted in this case, only that of the EMEA Debtors adequately addresses these central points.  By contrast, the briefs of the Canadian and U.S. Debtors misstate

---

[1]    *See* Joint Administrators' Post-Hearing Submission Regarding Allocation of the Proceeds of the Nortel Asset Sales ¶ 353, Aug. 7, 2014 [hereinafter "EMEA Debtors' Closing Brief"].  Defined terms in this submission (the "EMEA Debtors' Reply Brief") have the same meaning as used in the EMEA Debtors' Closing Brief.

[2]    *See* EMEA Debtors' Closing Brief ¶¶ 354–357.

[3]    *See* EMEA Debtors' Closing Brief ¶¶ 94–119, 124–165, 376–467.

the role and importance of legal title and the licenses.  The Canadian Debtors' legal title theory, which denies any form of beneficial ownership of IP, is particularly flawed.[4]

4.      While assuming the guise of contractual purists, the Canadian Debtors ignore and distort the plain language of the MRDA, which acknowledges the RPEs' joint ownership rights. Schedule A of the MRDA, the reason the agreement was entered into, confirms that all RPEs, not just NNL, "bear the full entrepreneurial risk of the Nortel business, such as the risks attendant with the substantial and continuous development and ownership of the NN Technology."[5]  The parties reaffirmed their joint ownership of IP every time they amended the MRDA by retaining or even reiterating these words.  The Second Addendum confirms that "each Participant holds and enjoys equitable and beneficial ownership of NN Technology as defined in the prior Agreement."[6]  The parties' Memorandum of Understanding expressly refers to the RPEs' "respective ownership interests in the NN Technology."[7]  Schedule A  to the MRDA was amended twice, and both times reiterated the RPEs' "ownership of NN Technology."[8]  These words cannot be ignored.

---

[4]      *See* Initial Post-Trial Brief (Allocation) of the Monitor & Canadian Debtors ¶¶ 268, 365–367, Aug. 7, 2014 (revised Aug. 18, 2014) [hereinafter "Canadian Debtors' Closing Brief"].  The CCC "adopts and relies upon" the Canadian Debtors' arguments.  *See* Closing Brief of the Canadian Creditors' Committee ("CCC") ¶¶ 36, 37, 110, Aug. 7, 2014 (revised Aug. 18, 2014) [hereinafter "CCC's Closing Brief"].  Accordingly, criticisms of the Canadian Debtors' allocation position discussed herein apply equally to the CCC's position.

[5]      TR21003, Third Addendum sched. A (Jan. 2009), at NNC-NNL06001514/48 (amending Schedule A to the original MRDA (TR21003, MRDA sched. A (Dec. 22, 2004), at NNC-NNL06001514/18)) (emphasis added).

[6]      TR21003, Second Addendum at 1 (Dec. 14, 2007), at NNC-NNL06001514/27 (first recital) (emphasis added).

[7]      TR11393, Memorandum of Understanding ¶ 6 (Dec. 31, 2008) (emphasis added).

[8]      *See* TR21003, Second Addendum sched. A (Dec. 14, 2007), at NNC-NNL06001514/30 (emphasis added); TR21003, Third Addendum sched. A (Jan. 2009), at NNC-NNL06001514/48 (emphasis added).

5.      The Canadian Debtors have no answer to these contractual statements of joint ownership in the MRDA and its progeny.  Far from protecting the sanctity of the words of the MRDA, the Canadian Debtors effectively ask the Courts to read various offending words out of the contract.

6.      At the same time, the Canadian Debtors would imply new words into the MRDA by claiming that it governs the allocation of sale proceeds – that the MRDA is the "sole source" of the EMEA and U.S. Debtors' rights in that regard[9] – even though by its own terms the MRDA only addresses the "operating arrangements" of the parties.[10]   Indeed, the Third Addendum explicitly excluded gain or loss on sale of a business from the RPS methodology.[11]

7.      The MRDA has many other provisions that are highly inconvenient for the Canadian Debtors' arguments, and they tie themselves in knots trying to explain them away.  A sample of their inconsistencies includes the following:

- The Canadian Debtors claim that the repeated recognition of the RPEs' "ownership" in the MRDA and its addenda merely refer to licenses, which, in the same breath, they argue cannot constitute ownership because licenses give rise only to contractual rights;[12]

- The Canadian Debtors argue that Article 3(a) limits the EMEA and U.S. Debtors to an allocation based on the RPS methodology because Article 3(a) provides that "the sole compensation for carrying out R&D is the right to receive operating profit-sharing payments pursuant to the RPSM."[13]   This argument fails to recognize that by

---

[9]     Canadian Debtors' Closing Brief ¶ 278.

[10]    TR21003, First Addendum § I (June 2006), at NNCC-06001514/21 (amending opening paragraph of the original MRDA (TR21003, MRDA at 1 (Dec. 22, 2004) at NNC-NNL00601514/1)).

[11]    TR21003, Third Addendum sched. A (Jan. 2009), at NNC-NNL06001514/49.

[12]    *See* Canadian Debtors' Closing Brief ¶¶ 371–372, 378–381.

[13]    Canadian Debtors' Closing Brief ¶ 397.

its plain language, Article 3(a) applies equally to NNL because it prescribes the R&D Allocation for "Participants," not just "Licensed Participants."[14]   The Canadian Debtors would have the Courts rewrite Article 3(a) by inserting the limiting word "Licensed";

- The MRDA is trumpeted as the complete and final statement of the EMEA and U.S. Debtors' ownership rights,[15] but when the Canadian Debtors attempt to justify a vanishingly narrow interpretation of the licenses, the MRDA is temporarily reduced to a mere operating agreement;[16] and

- In arguing that Article 14(a), which precludes assignment of the MRDA without consent, restricts the transfer of the EMEA and U.S. Debtors' licenses,[17] the Canadian Debtors ignore the plain words of the contract, which say that Article 14(a) applies to all "Participants," making any restriction equally applicable to NNL's legal title.[18]

8.      In short, the MRDA undermines the Canadian Debtors' position.  The Canadian Debtors nonetheless rely almost exclusively on it because the surrounding evidence is even more damning for their case.  The Canadian Debtors ask the Courts to ignore the overwhelming body of evidence about (i) how the parties jointly undertook to create and own Nortel IP, (ii) what they said internally, to their auditors, and to their governments about what they were doing, (iii) what they actually did when they shared annual profits and losses, the proceeds of the Alcatel sale, and licensing revenues, and (iv) how they contemplated sharing the proceeds of other sales of Nortel IP, including the sales that are the subject of these proceedings.  In each case, the parties hewed to the general principle of contribution, not the Canadian Debtors' legal title theory; and in each case, the Canadian Debtors now ask the Courts to ignore what the parties said and did.

---

[14]    TR21003, MRDA art. 3(a) (Dec. 22, 2004), at NNC-NNL06001514/5.

[15]    Canadian Debtors' Closing Brief ¶ 278.

[16]    Canadian Debtors' Closing Brief ¶ 326.

[17]    *See, e.g.*, Canadian Debtors' Closing Brief ¶ 329.

[18]    *See* TR21003, MRDA art. 14(a) (Dec. 22, 2004), at NNC-NNL06001514/12.

9.      To assert that this large body of evidence supports their legal title theory, the Canadian Debtors apply their familiar "one rule for us, another rule for everybody else" approach.  For example, they claim that:

- NNL's pre-existing rights (such as pre-MRDA patent assignments to NNL) are directly relevant, but the pre-existing rights of the other RPEs, as shown in patent infringement proceedings, tax submissions, and elsewhere, are not;[19]

- The Courts should rely on a single statement by the Joint Administrators concerning the ownership of IP, made prior to the confirmation of their appointment, but ignore NNL's postpetition transfer pricing report, prepared by the Monitor's firm, which confirmed that Nortel IP was jointly owned by all of the RPEs;[20]

- The MRDA was a good deal for the EMEA and U.S. Debtors because they gained access to a larger pool of technology than they otherwise could have afforded, even though the EMEA and U.S. Debtors contributed the majority of the R&D spending to create IP that would be owned solely by NNL;[21] and

- When attempting to justify their claim of sole ownership, the Canadian Debtors emphasize the very long useful life of Nortel technology created in the 1960s and 1970s; by contrast, when valuing the EMEA and U.S. Debtors' interests in IP that the uncontroverted evidence confirms was created between 1991 and 2008, they claim that Nortel technology suddenly has a very short useful life – just five years.[22]

10.     It should perhaps then be no surprise that the Canadian Debtors did not call a single witness who could explain why NNL's decade-long history of recognizing and implementing the parties' joint ownership rights is – as acknowledged by NNL's own postpetition CFO, John Doolittle[23] – so radically inconsistent with the Canadian Debtors' view of those rights in

---

[19]    Canadian Debtors' Closing Brief ¶¶ 215, 298.

[20]    *See* Canadian Debtors' Closing Brief ¶ 623; *see also* CCC's Closing Brief ¶¶ 9, 11.

[21]    Canadian Debtors' Closing Brief ¶ 49.

[22]    *See* Canadian Debtors' Closing Brief ¶¶ 29–33, 460.

[23]    J. Doolittle Dep. Tr. 149:24–150:14, Dec. 5, 2013.

litigation today.  Instead, recognizing that the record is so heavily against them, the Canadian Debtors urge the Courts to ignore the evidence and exclude the words of the MRDA that contradict their legal title theory.

11.     The Canadian Debtors' allocation proposal rests exclusively on NNL's legal title to Nortel IP, but legal title bears no relation to which entities beneficially owned Nortel IP.  Legal title was held in one entity for important administrative and operational purposes, but never had any bearing on which entities bore the economic risks and benefits associated with ownership. Holding legal title did not entitle NNL to a greater share of operating profits or sale proceeds than the other RPEs.  The Canadian Debtors are asking the Courts to ignore how the Nortel Group operated and how the RPEs owned the IP.  This the Courts should not do.

12.     Although much of the trial focused on the appropriate allocation of proceeds attributable to IP, the Courts should adopt an approach that allocates value to the debtors in respect of each asset class they owned, including Customer-Related Assets and Goodwill, which comprised 29% of the total value of the sale proceeds, approximately $2 billion.[24]  In this respect, the Canadian Debtors' treatment of Customer-Related Assets is obviously and transparently flawed.  They acknowledge that Customer-Related Assets exist, but they argue that those assets are inseparably intertwined with IP.  Thus, the argument goes, the selling debtors are only entitled to value for the customer relationships, distribution networks, and customer contracts they sold to the extent they also sold IP.  This approach ignores standard valuation practice and the overwhelming evidence in the record that Customer-Related Assets constitute an independent, valuable asset

---

[24]     *See* DEM00010, Huffard Slides at 5.

class that is distinct from IP, was owned separately from IP, and was sold by other Nortel entities in addition to the RPEs.  Nortel, Alcatel, and the purchasers of the Lines of Business all say that the Canadian Debtors' approach here is entirely wrong.

13.     The motivation for advancing this flimsy argument is not hard to see.  In global terms, Canada was a relatively small market, which is reflected in the Canadian Debtors' share of Customer-Related Assets.[25]  By intertwining those valuable Customer-Related Assets with IP, including $409 million of Customer-Related Assets and Goodwill attributable to the EMEA Debtors,[26] the Canadian Debtors seek to allocate to themselves an outsized share of Customer-Related Assets as well.  The windfall sought by the Canadian Debtors would come in part from the EMEA LREs, to whom the Canadian Debtors would allocate nothing.  The LREs did not conduct R&D and did not own IP, but nonetheless sold valuable Customer-Related Assets and are entitled to an allocation in respect of assets they conveyed to the Business Sales purchasers, regardless of how the IP assets are distributed.

---

[25]     The Canadian Debtors owned 10% of the Customer-Related Assets and Goodwill sold in the Business Sales, whereas the EMEA and U.S. Debtors owned 21% and 69%, respectively.  *See* DEM00010, Huffard Slides at 19.

[26]     *See* TR00030, Expert Report of Paul P. Huffard ¶ 119 (Apr. 11, 2014) [hereinafter "Huffard Report"].

## II.    THE SOURCE OF THE PARTIES' RIGHTS

### A.    The Canadian Debtors Expand the MRDA Beyond Its Express Scope

*1.    The MRDA Is Not the Source of the RPEs' Rights, But Merely Confirms the RPEs' Beneficial Ownership of IP, Which Pre-Dates the MRDA*

14.    The fundamental mistake that underlies the Canadian Debtors' position is their claim that "[t]he sole source of the U.S. and EMEA Debtors' rights under the Nortel IP is the MRDA itself."[27]   The MRDA, on any fair reading, merely confirms the parties' pre-existing joint beneficial ownership, along with setting out various operational and administrative details. Relying on the MRDA as the sole source of the EMEA and U.S. Debtors' rights overlooks both the entire history of how IP was invented at Nortel[28] and the legal principles that vested beneficial ownership of that IP in the RPEs as a result of their inventive work.[29]

15.    It is also a startling assertion in the context of this litigation, which involved very broad discovery, including the disclosure of some 2.8 million documents, 131 depositions, 27 fact witness affidavits, and 33 expert reports, and concluded with a 21-day trial.   The Canadian Debtors understood the necessity for this discovery in determining the parties' legal rights.   They themselves served 973 separate document requests and 155 interrogatories.   But the Canadian Debtors now claim that all of this was a complete waste of time and money, and that some

---

[27]   Canadian Debtors' Closing Brief ¶ 278.

[28]   EMEA Debtors' Closing Brief ¶¶ 52−79.

[29]   EMEA Debtors' Closing Brief ¶¶ 353−360.

selected parts of one short document contain the complete answer; every other piece of evidence is, in the words of counsel to the Canadian Debtors, just so much "Hamburger Helper."[30]

16.    In fact, even the Canadian Debtors concede that the MRDA was not the sole source of the parties' rights in IP.  The Canadian Debtors state that the MRDA merely "confirms NNL's Legal Title to the IP," not that the MRDA granted it.[31]  Similarly, the CCC notes that NNL's interest in "the IP was not part of the contractual 'benefits' that form part of the Agreement, but pre-existed it."[32]  The MRDA itself states that the parties' intent is that the EMEA and U.S. Debtors "continue . . . to hold and enjoy" the "equitable and beneficial ownership" that they had previously enjoyed.[33]  The Canadian Debtors are trying to have it both ways, but the plain language of the MRDA belies their argument – rather than merely confirming NNL's pre-existing interest, the MRDA acknowledges all of the RPEs' independent joint ownership rights.

> 2.    *The RPEs' Joint Beneficial Ownership Arises from Invention, Not from the MRDA, So the RPEs' Conduct Is Direct Evidence of Joint Beneficial Ownership*

17.    The reason the MRDA repeatedly confirmed that it was not the "sole source" of the RPEs' rights in Nortel IP is that, as explained in the EMEA Debtors' Closing Brief, ownership arises from invention.[34]  The inventive work of the RPEs' engineers vested beneficial ownership

---

[30]    Trial Day 2 Tr. 438:13–439:6, May 13, 2014 (B. Zarnett Opening).

[31]    Canadian Debtors' Closing Brief 61 (Part IV(b) heading).

[32]    CCC's Closing Brief ¶ 85 n.83.

[33]    *See* TR21003, MRDA at 2 (Dec. 22, 2004), at NNC-NNL06001514/2 (second recital).

[34]    *See* EMEA Debtors' Closing Brief ¶ 353.

in the RPEs by operation of law.[35]  This beneficial ownership was never transferred to NNL.[36]

The parties' conduct throughout Nortel's history confirmed that the RPEs at all times held joint

beneficial ownership of the IP.[37]  Put differently, the EMEA Debtors do not rely on the MRDA

as a source of rights – they simply point out that rather than extinguishing or altering pre-existing

ownership rights, the MRDA acknowledges, affirms, and reinforces the RPEs' beneficial

ownership, and did so each time it was amended.

18.    The extensive record – including but by no means limited to the MRDA – confirms that

the RPEs held and continued to hold joint beneficial ownership as a result of their contributions

to joint R&D efforts.  This evidence, discussed in detail in the EMEA Debtors' Closing Brief,[38]

includes:

> (a) The 2002 APA Q&A Document, reflecting Nortel's understanding in 2002 that it
> would split the proceeds of a sale of jointly created IP according to relative historical
> contributions to the R&D that created the IP.[39]  The U.S. Debtors attempt to minimize
> the impact of this document, claiming that "[n]o witness offered evidence that this
> question or its answer was ever considered by Nortel personnel or its tax or transfer
> pricing advisors during their preparation for the APA kick off meeting."[40]  This is
> false.  In fact, MaryAnne Pahapill, NNL's regional head of tax for Canada, did
> exactly that, and numerous documents confirmed that Deloitte, KPMG, Horst Frisch,

---

[35]    *See* EMEA Debtors' Closing Brief ¶¶ 354–357.

[36]    *See* EMEA Debtors' Closing Brief ¶¶ 376–467.

[37]    *See* EMEA Debtors' Closing Brief ¶¶ 94–119, 124–165.

[38]    *See* EMEA Debtors' Closing Brief ¶¶ 94–119, 124–165.

[39]    *See* TR22020, APA Kick Off Meeting: Potential Questions and Sample Answers, at 39 (June 17, 2002).

[40]    Proposed Findings of Fact and Conclusions of Law of the U.S. Interests at 102 ¶ 314, Aug. 7, 2014 (revised
Aug. 14, 2014) [hereinafter "U.S. Debtors' Findings of Fact and Conclusions of Law"].

and Sutherland, in addition to senior Nortel tax personnel, were all involved in preparing and reviewing the Q&A Document.[41]

(b) The 2002 memorandum from James Gatley, NNL's transfer pricing leader, to Scott Wilkie, a transfer pricing lawyer at NNL's external tax counsel, Osler, Hoskin & Harcourt LLP, confirming that "the effect of the RPS model is that the future intangibles developed are beneficially owned" by the RPEs.[42]

(c) The 2003 Joint APA Response submitted by NNL, NNI, and NNUK to their respective tax authorities, referring to all of the RPEs as "owners of the intangible property."[43]

(d) The 2003 IP Migration Analysis in which NNL personnel assumed that NNUK and NNSA owned Nortel IP and would have to be compensated for any proposed transfer of IP to NNL.[44]

(e) The 2004 Functional Analysis prepared by Ernst & Young (Canada) (*i.e.*, the Monitor's firm) which stated that the RPEs collectively were "responsible for ongoing entrepreneurship and risk-taking functions with respect to the IP arising from their collective R&D efforts," and that therefore "[t]he allocation of the Company's profit or loss should be commensurate with its risks associated with the company's R&D."[45]

(f) The 2004 allocation of the Foundry settlement proceeds, which allocated the proceeds based on relative historical contributions to R&D, including to the EMEA Debtors, even though they were not a party to the litigation and even though a number of the patents involved were not used in any Nortel "Products."[46]    According to the

---

[41]    *See* EMEA Debtors' Closing Brief ¶¶ 97–104.

[42]    TR21382, Memorandum from James Gatley, NNL, to Scott Wilkie, Oslers, at 1 (Nov. 14, 2002).

[43]    TR11169, APA Responses to Questions Posed by IR, IRS, and CRA, at 25 (Sept. 2003).

[44]    TR21526, Email from Jason Swales, NNL, to Karina O, NNL, *et al.* (Oct. 1, 2003, 9:44 p.m.), attaching IP Migration: IP Sale Analysis, at slide 4.

[45]    TR21407, Nortel Networks Functional Analysis for the Years Ended Dec. 31, 2000–2004, at 7, 48 (Nov. 30, 2004) [hereinafter "Functional Analysis"].

[46]    *See* TR41278, Foundry Journal Entry (Dec. 8, 2004) (showing that the proceeds were shared among all of the RPEs); TR22084, Complaint, *Nortel Networks Inc. v. Foundry Networks, Inc.*, No. 01-10442DPW (D. Mass. Mar. 14, 2001) (showing that only NNI and NNL were plaintiffs); DEM00011, Malackowski Slides at 33 (showing that three of the Foundry patents were designated "not used").

Canadian Debtors, patents that were not used in Nortel "Products" were not subject to the licenses, and so NNL should receive all proceeds attributable to this IP.[47]

(g) The 2007 allocation of the proceeds of the sale of IP to Alcatel in accordance not with legal title, nor with revenue, but with historical R&D spending.[48] The ownership structure recognized in the Alcatel sale was accepted and approved by Nortel's internal management and external auditors, reflecting a conscious acknowledgment and demonstration of the RPEs' ownership rights as measured by R&D contribution.[49] In a memorandum prepared for Nortel's auditors by NNI's Michael Orlando and EMEA's Kerry Stephens and approved by NNL's Peter Look, Nortel explained, "While NNL generally is the legal owner of the technology, the [MRDA] determines the economic ownership of it and thus allocation of the consideration by proportionate R&D Capital Stock is appropriate."[50]

(h) The Canadian Debtors' 2009 PPA, which allocated, albeit preliminarily, the postpetition IP sale proceeds based on historical R&D spending.[51] John Doolittle, the former NNL head of tax and the Canadian Debtors' postpetition CFO, testified that this allocation decision was made after consulting with, among others, NNL's auditors and the Monitor.[52]

(i) Statements in 2008 and 2009 by NNL's head of tax, Peter Look, that all of the RPEs beneficially owned the IP.[53]

---

[47] *See* Canadian Debtors' Closing Brief ¶¶ 196(d), 204, 212, 484–486.

[48] TR21165, Memorandum from the Nortel Global Initiatives Group to the Project Osiris Files, at 2–3 (Feb. 15, 2007), at NNC-NNL06121235/2–3.

[49] *See* EMEA Debtors' Closing Brief ¶¶ 146–149.

[50] TR21165, Memorandum from the Nortel Global Initiatives Group to the Project Osiris Files, at 2 (Feb. 15, 2007), at NNC-NNL06121235/2.

[51] TR11264, Email from Michael Orlando, NNI, to David Chapman, *et al.* (Sept. 28, 2010, 12:55 p.m.), attaching draft purchase price allocation estimates for several of the Business Sales for financial reporting purposes only; TR45156.02, Nortel Networks IP Sale High Level Estimate of Purchase Price Allocation (July 14, 2011).

[52] J. Doolittle Dep. Tr. 201:8–202:7, Dec. 5, 2013.

[53] *See* TR22139, Email from Peter Look, NNL, to Michael Orlando, NNI, *et al.* (Dec. 19, 2008, 11:47 p.m.), at NNC-NNL07112812/6; TR21537, Email from Peter Look, NNL, to Karina O, NNL, *et al.* (Jan. 7, 2009, 12:56 p.m.); TR21020, Email from Peter Look, NNL, to Jim Sullivan, Herbert Smith, *et al.* (Mar. 1, 2009, 5:40 p.m.); *see also* P. Look Dep. Tr. 229:6–14, Nov. 12, 2013 (confirming that "there were valuable IP rights outside of Canada" because "there were economic rights that were allocated out to the various RPS participants").

19.    This evidence stands independent of the MRDA and directly confirms the EMEA Debtors' position that ownership arose from invention, not from the MRDA.   The RPEs' engineers performed the inventive work, the RPEs shared beneficial ownership of the IP that was created, and Nortel consistently operated accordingly.

### 3.    The MRDA Served Important Operational, Administrative, and Tax Purposes

20.    In 2001, after consulting with the tax authorities about the most appropriate transfer pricing strategy for their multinational-enterprise tax issues, the Nortel Group switched from sharing costs to sharing profits via the RPS methodology.[54]   The RPEs did so without entering a written agreement and were content to operate without such an agreement for more than three years.[55]   Nortel only determined that a written agreement was needed in 2004, in part to respond to a transfer pricing audit by the French tax authorities, and to facilitate the conclusion of its APA with the U.S. and Canadian tax authorities.[56]   Therefore, Nortel undertook to prepare an agreement – the MRDA – to set out the transfer pricing principles that would be followed in dividing taxable operating profits among the five RPEs.   The MRDA was never considered or intended to be an agreement creating or transferring the parties' ownership rights in Nortel IP. The MRDA is not an IP ownership agreement.

---

[54]    *See* EMEA Debtors' Closing Brief ¶¶ 86–87.

[55]    *See* EMEA Debtors' Closing Brief ¶ 94.

[56]    *See* EMEA Debtors' Closing Brief ¶¶ 125–126, 132–133.

21.     The "operating arrangements" of the RPEs, which were reflected in the MRDA, included a number of important provisions designed to ensure that Nortel operated in a sensible, globally tax-efficient, and legally compliant manner.  Legal title continued to be vested in NNL, as had been the case under the preceding R&D CSA regime, allowing the Nortel Group to centralize IP registration, enforcement, and licensing in one entity.[57]   But the costs and benefits of these activities were shared among the RPEs.

22.     The exclusive territorial licenses that the MRDA granted to the EMEA and U.S. Debtors were necessary for the Group's dealings with third parties, both friend and foe.  First, licenses ensured that third parties could rely on each RPE's right to exploit the Nortel IP in its exclusive territory without having to look behind the RPE to the registered holder of legal title.  Although the EMEA and U.S. Debtors were beneficial owners, they needed licenses to exploit Nortel IP in their assigned territories because they were not the registered legal title holders of the IP.  Second, the licenses assisted the EMEA and U.S. Debtors in protecting Nortel's IP from third parties.  The licenses conferred standing in IP litigation, specifically to sue for lost profits, a claim of damages unavailable to NNL.[58]

---

[57]   *See, e.g.*, TR33067, Research and Development Cost Sharing Agreement between Northern Telecom Limited and Nortel Limited art. 4 (Jan. 1, 1995); TR00016, Declaration of Walter T. Henderson, Jr. ¶¶ 23, 55, Apr. 11, 2014 [hereinafter "Henderson Decl."]; EMEA Debtors' Closing Brief ¶¶ 76–77.

[58]   *See, e.g.*, TR22084, Complaint, *Nortel Networks Inc. v. Foundry Networks, Inc.*, No. 01-10442DPW (D. Mass. Mar. 14, 2001).

23.     The MRDA also addressed numerous other administrative and operational needs of the

Group, including enforcement, confidentiality, admission of new Participants,[59] and rights of the

Participants on termination.[60]

> 4.     *The Granting of Licenses Is Not Evidence that NNL Alone Owned*
> *Nortel's IP Because a Holder of Legal Title Can Grant Licenses*

24.     The Canadian Debtors claim that NNL must be the sole owner of the Nortel IP because

NNL "granted license rights to that IP."[61]  This is incorrect as a matter of law because a holder of

only legal title can license, encumber, or otherwise dispose of property.   For example, the

Ontario Court of Appeal recently confirmed in *Di Michele v. Di Michele* that an estate trustee

could mortgage trust property.[62]   The trustee in that case was one of three beneficiaries of the

estate and was therefore beneficially entitled to only a third of it, much like how NNL shared

beneficial ownership with the other RPEs.[63]   He was nonetheless held to have validly mortgaged

the entire property because he held legal title to the property in his capacity as estate trustee.

25.     There are in fact many circumstances in which a legal title holder may grant a right to use

property despite not being the beneficial owner of that property.   For example, an estate trustee

---

[59]   All of the RPEs, including NNL, were defined as Participants under the MRDA.  TR21003, MRDA at 1–2
(Dec. 22, 2004), at NNC-NNL06001514/1–2.

[60]   *See* TR21003, MRDA arts. 4(e), 6, 10, 11 (Dec. 22, 2004), at NNC-NNL06001514/6–10; *see also* TR21003,
Second Addendum § V (Dec. 14, 2007), at NNC-NNL06001514/28–29 (amending Article 11 of the original
MRDA); TR21003, Third Addendum § IV (Jan. 2009), at NNC-NNL06001514/41 (amending Article 4(e) of
the original MRDA).

[61]   Canadian Debtors' Closing Brief ¶ 295.

[62]   *Di Michele v. Di Michele*, 2014 ONCA 261 at para. 58.

[63]   *See Di Michele v. Di Michele*, 2014 ONCA 261 at para. 45.

need not be the beneficial owner of a home that forms part of the estate, but may grant the right to use that property (just as the trustee in *Di Michele* could mortgage it).  The bottom line is that legal title is effective as against the rest of the world.  Beneficial ownership means entitlement to the economic benefits of property, but a beneficial owner may still need a license or other form of permission to use the property in order to protect its own rights and satisfy third parties.  That is what Article 5(a) of the MRDA provided.

26.    Notably, the Canadian Debtors cite no authority for the proposition that the holder of only legal title to property lacks the capacity to grant rights to use that property.  The only authority provided (*Eli Lilly* citing Harold Fox) merely states that an owner <u>can</u> grant a license.[64]  Further, the passage cited is concerned with the nature of a license, not the source of the licensor's authority to grant a license.[65]  As such, it cannot be taken to stand for the proposition that a legal title holder must have full ownership of property in order to grant a license.

      **B.**    **Beneficial Ownership Under the MRDA Was Based on Contribution and Was Not Equivalent to the Licenses**

27.    The argument that the MRDA is the sole source of the EMEA and U.S. Debtors' IP rights rests at least in part on a misapprehension of the MRDA's references to beneficial ownership.

28.    The Canadian Debtors and CCC try to explain away the references to "beneficial ownership" throughout the MRDA and elsewhere as references to exclusive territorial licenses.

---

[64]    *Eli Lilly & Co. v. Novopharm*, [1998] 2 S.C.R. 129 at para. 49 (citing Harold G. Fox, *Canadian Law and Practice Relating to Letters Patent for Inventions*, 4th ed. (Toronto: Carswell, 1969) at 285).

[65]    *See Eli Lilly & Co. v. Novopharm*, [1998] 2 S.C.R. 129 at para. 49.

For example, the CCC asserts that the "equitable and beneficial ownership of certain exclusive rights under NT Technology for a Specified Territory" is "clearly just a reference to the exclusive territorial licenses granted to the Licensed Participants by the CSAs."[66]  The Canadian Debtors likewise claim that "beneficial ownership" merely "is a transfer pricing term, which refers to a party's right to benefit from some or all of an operating profit stream attributable to a defined undertaking or activity."[67]  Thus, the Canadian Debtors claim, "describing the U.S. and EMEA Debtors' rights as 'beneficial ownership' in the transfer pricing context merely indicates that they held exclusive licenses."[68]

29.     Even leaving to one side the inconsistency inherent in the Canadian Debtors' argument that repeated references in the MRDA and its addenda to all of the Participants holding "ownership" are references to the very licenses that the Canadian Debtors simultaneously argue are not ownership,[69] there are numerous problems with this approach:  (i) it seeks to change the words of the contract and cannot explain away the references to ownership in the MRDA and the Memorandum of Understanding[70] that are unrelated to territorial licenses, (ii) it is inconsistent with the RPS methodology, which is the backbone of the MRDA, and (iii) it relies on a spurious and wholly unsupported suggestion that the EMEA and U.S. Debtors could have "beneficial ownership for tax purposes" but not have beneficial ownership for all purposes.   Since the

---

[66]   CCC's Closing Brief ¶ 52 (emphasis omitted).

[67]   Canadian Debtors' Closing Brief ¶ 377.

[68]   Canadian Debtors' Closing Brief ¶ 379.

[69]   *See* Canadian Debtors' Closing Brief ¶ 219; *see also* CCC's Closing Brief ¶ 53.

[70]   TR11393, Memorandum of Understanding ¶¶ 3, 6 (Dec. 31, 2008).

references to the RPEs' ownership in the MRDA cannot be to licenses, they can only be references to the RPEs' independently existing joint beneficial ownership of the Nortel IP.

### 1.    The MRDA Does Not Equate Ownership With Licenses

30.    The first problem with the "ownership means license" theory is that it ignores the actual words of the MRDA.  The only place where the MRDA implicitly links beneficial ownership to licenses is the second recital, cited by the CCC, which refers to "beneficial ownership of certain exclusive rights under NT Technology for a Specified Territory" under the CSAs.[71]   This provision recognizes that the licenses under the CSAs continued under the MRDA.

31.    The other references to ownership in the MRDA confirm that "ownership" is beneficial ownership of the IP measured by R&D contribution and not merely territorial licenses.  Most crucially, the RPS methodology set out in Schedule A – implementation of which was the very purpose of the MRDA – states that the methodology reflects the entrepreneurial risks attendant with the RPEs' "ownership of the NN Technology."[72]  The RPS methodology in Schedule A, which divided one incident of the RPEs' ownership – operating profit and loss – among the RPEs, was repeatedly amended.   However, this language, in which ownership of "NN Technology" by "the Participants" is measured by R&D contribution rather than licenses, always remained the same.[73]   The Canadian Debtors' only response is to pretend that the word

---

[71]    TR21003, MRDA at 2 (Dec. 22, 2004), at NNC-NNL06001514/2 (second recital); *see* CCC's Closing Brief ¶ 52.

[72]    TR21003, MRDA sched. A (Dec. 22, 2004), at NNC-NNL06001514/18.

[73]    *See* TR21003, Second Addendum sched. A (Dec. 14, 2007), at NNC-NNL06001514/30; TR21003, Third Addendum sched. A (Jan. 2009), at NNC-NNL06001514/48.

"Participants" is not used in Schedule A, and then wrongly claim that Schedule A says nothing about who owns the NN Technology.[74]   There is no justification for departing from the express words of the contract, nor is one even offered.

### 2.    The RPS Methodology Reflects Ownership Based on Contribution, Not Licenses

32.    The second problem with the Canadian Debtors' theory is that it ignores the operation of the RPS methodology, which is the *raison d'être* of the MRDA.  If the EMEA and U.S. Debtors' beneficial ownership were nothing more than a territorial license, then their economic returns should have been tied to territorial revenue, as they were under the CSA regime that ended in 2000.  In fact, under the MRDA, territorial revenue and residual profits or losses were unrelated.

33.    That the division of benefits under the RPS methodology superseded the territorial licenses is demonstrated by the fact that individual RPEs routinely had to turn over a large portion of their profits because of losses sustained elsewhere in the Group.   The RPS methodology could even transform an RPE's operating profit into a substantial loss, and vice versa.  In 2004, NNSA, which had an operating profit of $102.2 million, ended up with a $97.6 million operating loss after the application of the RPS methodology.[75]  Conversely, in 2003, the RPS methodology converted NNL's initial operating loss of $228 million into an operating profit of $110.6 million.[76]  In short, the licenses and legal title did not determine the profit or loss that

---

[74]    *See* Canadian Debtors' Closing Brief ¶ 370.

[75]    TR49194, 2004 RPS Model, at tabs Profit split profit, Comparison to status quo (U.S. GAAP starting operating profit/loss).

[76]    TR49188, 2003 RPS Model, at tabs RONA, Comparison to status quo (U.S. GAAP starting operating profit/loss).

an individual RPE retained under the MRDA; beneficial ownership, measured by R&D spending, did.

34.    Consistent with the operation of the RPS methodology, the MRDA recitals confirmed that beneficial ownership was tied to R&D contribution, not territorial licenses or revenue:

> WHEREAS each Participant believes that it is appropriate that each Participant should benefit from its contribution to R&D activity commensurate with the value of its contribution to that R&D activity in the context of the manner in which the Nortel Networks business is conducted and that the residual profit split methodology (RPSM) is the best arm's length measure, in the circumstances of NNL and the Participants, of such contributions with reference to such benefits;[77]

35.    In other words, beneficial ownership of Nortel IP (as reflected in the manner of sharing profits and losses) was measured by contribution.  The licenses had no bearing on the economic returns of ownership; indeed, they were addressed in the very next recital, which does not refer to revenue, profit sharing, or any other benefits of ownership:

> WHEREAS this Agreement reflects the Participants' intent and agreement since January 1, 2001 to enter a license arrangement with the Licensed Participants, and the Participants have operated from January 1, 2001 in accordance with the terms set forth herein;[78]

36.    Thus, the entire structure and text of the MRDA – not to mention Nortel's own representations and conduct, as will be addressed below – consistently recognizes that the benefits of ownership flow from R&D contribution, rather than territorial revenue.

---

[77]    TR21003, MRDA at 2 (Dec. 22, 2004), at NNC-NNL06001514/2 (sixth recital) (emphasis added).

[78]    TR21003, MRDA at 2 (Dec. 22, 2004), at NNC-NNL06001514/2 (seventh recital).

### 3.   Beneficial Ownership Does Not Have Special Meaning for Tax Purposes

37.     The third problem is with the Canadian Debtors' suggestion that "beneficial ownership" is an arcane transfer pricing term that means something much less than it means in all other circumstances.  The Canadian Debtors cite no authority for this obviously incorrect proposition, because none exists.

38.     As explained in the EMEA Debtors' Closing Brief, "beneficial ownership" cannot mean one thing for tax purposes and something different for other purposes.[79]  One cannot be an "owner" – beneficial or otherwise – only for tax purposes.[80]  "Beneficial ownership" is a well-known equitable term used in countless areas of the law, which denotes the right to enjoy the economic benefits of property even if the beneficial owner is not the registered owner or legal titleholder.[81]  For example, in *Csak v. Aumon*, the parties had co-founded a company together.[82]

---

[79]   EMEA Debtors' Closing Brief ¶¶ 25, 110, 416–420.

[80]   *Gelber v. Canada (Minister of National Revenue)*, [1991] 2 C.T.C. 2319 (T.C.C.).

[81]   EMEA Debtors' Closing Brief ¶¶ 348–352; *see also MacKeen Estate v. Nova Scotia*, [1978] C.T.C. 557 at para. 22 (C.A.) ("a person is 'beneficially entitled' to property if he is the real or beneficial owner of it, even though it is in someone else's name as nominal owner"); *Covert v. Nova Scotia (Minister of Finance)*, [1980] 2 S.C.R. 774 (applies the decision in *MacKeen Estate* on similar facts); *C.I. Covington Fund Inc. v. White*, [2000] O.J. No. 4589 at paras. 38–39 (S.C.J. (Commercial List)), *aff'd* [2001] O.J. No. 3918 (Div. Ct.) (employer of inventor is entitled to beneficial ownership of IP); *Csak v. Aumon*, [1990] O.J. No. 534 at paras. 9–10 (O.S.C.-H.C.J) (co-founders of company were "beneficial owners" of shares based on their contributions even though shares never issued to them); *Bledin v. Landsburg*, 2013 N.S.J. No. 688 at paras. 31–34 (N.S.S.C) (same); *Andrews v. Canada*, [2007] T.C.J. No. 195 at para. 7 (T.C.C.) (taxpayer acquired beneficial ownership of an automobile when the vehicle was acquired as his mother had simply financed the purchase and held title as security for this debt); *QEW 427 Dodge Chrysler (1991) Inc. v. Ontario (Minister of Revenue)*, [2000] O.J. No. 2582 at para. 37 (S.C.J.), *aff'd* [2002] O.J. No. 1639 (Div. Ct.) (purchase of a vehicle under a conditional sales agreement resulted in beneficial ownership); *Inland Kenworth Ltd. v. Fowler*, [1988] B.C.J. No. 241 at para. 10 (C.A.) (party with legal title to truck under a conditional sales agreement was not entitled to take the proceeds of sale because it did not have beneficial ownership of the truck); *St. Onge v. Willowbay Investments Inc.*, [2010] O.J. No. 2480 at para. 22 (S.C.J.) (after the plaintiffs entered into an Agreement of Purchase and Sale, they became the beneficial owners of the property, even though the title to that property was in the name

(Footnote continued on next page)

21

The respondent, Aumon, was to manage the business while the applicants, Csak and Boon, provided financing, technical advice, and other assistance.  Each party was to receive a one-third interest in the company, but all the shares were registered in Aumon's name.  In response to a motion to dismiss an action brought by Csak and Boon, the court held that Csak and Boon were "beneficial owners" entitled to bring an action even though they did not hold legal title to any shares.[83]

39.     Having chosen to structure their affairs for tax purposes, a party cannot disavow that choice when it becomes convenient for other purposes.  The Canadian Debtors, who claim to be bound by the MRDA, provide no authority for changing the meaning of the words of the contract that directly contradict their denial of the RPEs' joint beneficial ownership of Nortel IP.

### C.     The RPEs' History of Dividing Ownership Based on Historical R&D Spending Is Not Parol Evidence Regarding the Terms of the MRDA

40.     A common criticism leveled at the EMEA Debtors by the Canadian Debtors and the CCC is that the EMEA Debtors "introduce certain types of evidence in an attempt to contradict,

---

(Footnote continued from previous page)

of another); *Paxton v. Canada*, [1996] F.C.J. No. 1634 at paras. 38–41 (F.C.A.) (shares were beneficially owned by beneficiaries of a trust); *Mount Royal/Walsh Inc. v. Jensen Star*, [1989] F.C.J. No. 450 at para. 13 (F.C.A.) (a beneficial owner is one who "stands behind the registered owner in situations where the latter functions merely as an intermediary, like a trustee, a legal representative or an agent"); *Sistem Muhendislik Insaat Sanayi Ve Ticaret Anonim Sirketi v. Kyrgyz Republic*, [2014] O.J. No. 1815 at para. 63 (S.C.J. (Commercial List)) ("one party may have a beneficial interest even where another party also has an interest in the property" in context of beneficial ownership of shares); Daphne A. Dukelow, *The Dictionary of Canadian Law*, 4th ed. (Toronto: Thomson Reuters, 2011) at 114 (defines "beneficial owner" as the "real owner of property even though it is in someone else's name").

[82]     *Csak v. Aumon*, [1990] O.J. No. 534 (O.S.C.).

[83]     *Csak v. Aumon*, [1990] O.J. No. 534 at para. 10 (O.S.C.).

modify or vary the terms of the MRDA,"[84] or that the EMEA Debtors try to "unwind the contribution regime that the parties actually bargained for and codified in the MRDA for themselves."[85]   The CCC submits that such evidence "should be rejected out of hand as inadmissible."[86]   This objection to any evidence beyond the MRDA is the flipside of the Canadian Debtors' insistence that the MRDA is the "sole source" of the EMEA and U.S. Debtors' rights in IP.

41.      These arguments are wrong on many levels.  First and foremost, the EMEA Debtors do not try to contradict, modify, or vary the terms of the MRDA.  If anything, it is the Canadian Debtors that do.  Moreover, the evidence that the Canadian Debtors seek to exclude is admissible to demonstrate that joint beneficial ownership of Nortel IP existed prior to, after, and independent of the MRDA.  This evidence does not vary the terms of the MRDA.  Finally, for the reasons explained in Section III.A below, this same evidence is admissible as part of the factual matrix for the MRDA and its addenda.

> 1.    *The Evidence Relied on by the EMEA Debtors Is Direct Evidence of Ownership, Not Parol Evidence*

42.      As explained above, the MRDA is not the sole source of the RPEs' rights in IP.  It is merely an important piece of evidence confirming the parties' pre-existing joint beneficial ownership.  The Canadian Debtors' and the CCC's complaints regarding evidence confirming

---

[84]    Canadian Debtors' Closing Brief ¶ 247.

[85]    CCC's Closing Brief ¶ 18.

[86]    CCC's Closing Brief ¶ 11.

joint beneficial ownership – that "[n]one of these so-called precedents is admissible to interpret the MRDA"[87] – misses the point and is wrong as a matter of law.  The primary relevance of the evidence is not to interpret, much less alter, the terms of the MRDA, but rather as powerful independent evidence confirming that all of the RPEs enjoyed joint beneficial ownership of the Nortel IP in proportion to historical R&D spending.  This is relevant to addressing a matter that is expressly excluded from the scope of the MRDA, *i.e.*, how to allocate the proceeds from a sale of Nortel IP.

43.    Perhaps equally powerful is the paucity of evidence supporting the Canadian Debtors' claim that the MRDA gave NNL sole ownership of Nortel's IP.  It is telling that in the decade leading up to insolvency, before the MRDA was adopted and then continuing through its various amendments, NNL never once mentioned, much less asserted or applied, these extraordinarily broad ownership rights the Canadian Debtors now allege it held all along.  The only possible explanation for this one-way record is that NNL never held sole ownership of Nortel's IP.

## 2. The Evidence of the RPEs' Joint Beneficial Ownership Is Also Admissible as Part of the Factual Matrix of the MRDA

44.    The fact that much of this evidence also forms part of the MRDA's factual matrix is secondary, but still important.  As discussed in Section III below, when the MRDA is read – as it must be – in light of this factual matrix, the only reasonable interpretation is that it confirms that

---

[87]    CCC's Closing Brief ¶ 144; *see also* Canadian Debtors' Closing Brief ¶ 263 (arguing that the Alcatel sale "is of no assistance and should be disregarded").

the EMEA Debtors held joint beneficial ownership with the other RPEs in proportion to historical R&D spending.[88]

45.     With respect to events that occurred after insolvency, such as Nortel's internal PPAs, the statements of NNL's head of tax, and NNL's 2010 transfer pricing report, these are not part of the factual matrix of the MRDA.  They are independent evidence of the RPEs' joint beneficial ownership.[89]

### III.    THE MRDA CONFIRMED THE RPES' BENEFICIAL OWNERSHIP OF NORTEL IP

#### A.     The MRDA Must Be Interpreted in Light of its Factual Matrix

46.     The Canadian Debtors claim that the MRDA is the "sole source" of the EMEA and U.S. Debtors' rights.[90]  In addition to being independent evidence of joint beneficial ownership, evidence of Nortel's conduct and representations also form part of the factual matrix of the MRDA.  Consideration of the factual matrix of a contract is not optional; it is mandatory.  If one wants to understand the rights that the parties received under the MRDA, one must first understand what rights they brought into it.[91]  It is precisely this evidence of the factual matrix that the Canadian Debtors are so insistent the Courts not review or consider, contrary to the direction of the Supreme Court of Canada.

---

[88]     *See also* EMEA Debtors' Closing Brief ¶¶ 439–447.

[89]     As explained at paragraphs 391 to 393 of the EMEA Debtors' Closing Brief, such evidence also is admissible extrinsic evidence regarding the interpretation of the MRDA in the event of ambiguity.

[90]     Canadian Debtors' Closing Brief ¶ 278.

[91]     *See* EMEA Debtors' Closing Brief ¶¶ 443–444.

### 1.    Consideration of the Factual Matrix Is Mandatory

47.    The principles of contractual interpretation are well-established and, for the most part, not in dispute.  The one point of disagreement is that the Canadian Debtors concede only that the factual matrix "may" be considered.[92]  As explained in the EMEA Debtors' Closing Brief, the Supreme Court of Canada and the Ontario Court of Appeal have both confirmed that a court <u>must</u> consider the factual matrix when construing a contract.[93]  This exercise is mandatory, regardless of ambiguity, and it is very broad.

### 2.    The Canadian Debtors' View of the Factual Matrix of the MRDA Is Narrow and Self-Serving

48.    More importantly, the Canadian Debtors and the CCC fundamentally misconstrue what falls within the factual matrix.  In effect, the Canadian Debtors claim that any evidence supporting the EMEA or U.S. Debtors' positions is inadmissible, including such obvious factual matrix evidence as "patent infringement proceedings that predated the MRDA,"[94] the allocation of proceeds of IP sold to Alcatel,[95] and the 2002 APA Q&A Document.[96]  According to the Canadian Debtors, the only relevant factual matrix evidence worth discussing is the fact that Nortel engineers assigned their rights in IP to NNL, and that NNL was named the patentee on

---

[92]    Canadian Debtors' Closing Brief ¶ 252.

[93]    *See* EMEA Debtors' Closing Brief ¶¶ 440–444.

[94]    Canadian Debtors' Closing Brief ¶ 215; *see* CCC's Closing Brief ¶ 144(d).

[95]    Canadian Debtors' Closing Brief ¶ 263 (arguing that the Alcatel sale "is of no assistance and should be disregarded").

[96]    CCC's Closing Brief ¶ 144(b).

virtually all patents.[97]  These facts do not support the Canadian Debtors' position.[98]  Regardless, the factual matrix includes all of the evidence known to the parties, not just self-serving evidence relied upon by one of them.

49.     Indeed, the Supreme Court of Canada confirmed in *Sattva Capital Corp. v. Creston Moly Corp.* that – provided it was "knowledge that was or reasonably ought to have been within the knowledge of both parties at or before the date of contracting" – the factual matrix includes "absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man."[99]  As the Ontario Court of Appeal explained in *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, this means that the factual matrix includes the "genesis of the transaction, the background, the context, [and] the market in which the parties are operating."[100]

50.     The genesis of the MRDA necessarily includes the rights that <u>all</u> of the RPEs brought into the contract.  The MRDA repeatedly refers to pre-existing rights, and so it is essential to know what the parties' rights were and to examine contemporaneous documents that addressed those rights.  The patent assignments and registrations relied on by the Canadian Debtors are unquestionably relevant, but the EMEA Debtors do not run from them as the Canadian Debtors

---

[97]   Canadian Debtors' Closing Brief ¶ 298.

[98]   The evidence regarding patent assignment and registration, which the Canadian Debtors rely on, is perfectly consistent with a structure in which one corporate entity holds legal title to IP.

[99]   *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 58 (quoting *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 All E.R. 98 at 114).

[100]  *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 at para. 26.

do from all of the evidence they find inconvenient.  As explained in the EMEA Debtors' Closing

Brief, the patent assignments and registrations are consistent with NNL's holding legal title, but

not sole beneficial ownership of Nortel IP.[101]   The Courts must review all background facts,

extending through the addenda to the MRDA executed in late 2008 and early 2009, and not only,

as the Canadian Debtors urge, that vanishingly thin slice of the evidence that is, they erroneously

believe, consistent with their current litigation position.

> 3.      *The Canadian Debtors Rely on Factual Matrix and Extrinsic*
> *Evidence, Albeit Only When They Think It Supports Their Position*

51.      It is also noteworthy that the Canadian Debtors and CCC rely on factual matrix, and even

extrinsic evidence, when they believe it can support their current litigation position.  In reality,

none of this evidence actually does.  For example, the Canadian Debtors quote testimony from

both Michael Orlando, a member of international tax and transfer pricing at NNI and a trial

witness for the U.S. Debtors, and Kerry Stephens, a member of the EMEA tax department and

trial witness for the EMEA Debtors, agreeing that the MRDA was the only written contract that

addressed the parties' IP rights.[102]  This is both undisputed and irrelevant.  The evidence that sets

out and explains the parties' rights in the IP is not limited to formal written contracts,[103] but also

consists of, for example, transactions, representations to tax authorities, and internal Nortel

documentation.  Mr. Stephens – a non-lawyer – appropriately declined to comment on whether

---

[101]   *See* EMEA Debtors' Closing Brief ¶¶ 464–467.

[102]   Canadian Debtors' Closing Brief ¶¶ 281–282.

[103]   As explained in the EMEA Debtors' Closing Brief at paragraphs 361 to 364, as an alternative argument there
may be an unwritten contract confirming the same ownership interests that arise by operation of law from
inventorship.

the MRDA was the only source of NNUK's IP rights, limiting his answer to confirming that the MRDA was the only <u>formal agreement</u> he was aware of that addressed such rights.[104]

52.     Finally, the CCC even relies on extrinsic evidence of the Joint Administrators' comments regarding the ownership of Nortel IP, which were made prior to the confirmation of their appointment as administrators in the United Kingdom.[105]  It is remarkable, and another striking example of the Canadian Debtors' and the CCC's "one rule for us, another rule for everybody else" approach, that the CCC would rely on an isolated statement that the Joint Administrators made prior to their confirmation after very limited opportunity for investigation.  At the same time, the CCC would have the Courts ignore years of representations by Nortel itself,[106] not to mention an NNL transfer pricing report, approved by the Monitor's firm, which explicitly recognized the RPEs' joint beneficial ownership of Nortel IP, more than a year after the Monitor's own appointment.[107]

### 4.     The Canadian Debtors Distort Key Factual Matrix Evidence

### (a)     The History of IP Development at Nortel

53.     The Canadian Debtors and the CCC provide a very partial (in both senses of the word) history of the Nortel Group.  They begin by pointing out that "[b]efore the 1980s, all of Nortel's

---

[104]   Trial Day 8 Tr. 1779:22–1780:3, May 27, 2014 (K. Stephens Cross).

[105]   CCC's Closing Brief ¶ 9.

[106]   *See* CCC's Closing Brief ¶ 11.

[107]   *See* TR48622.01, Email from Karen Salsbury, Ernst & Young LLP, to Michael Orlando, NNI, *et al.* (Oct. 29, 2010, 7:51 p.m.), attaching TR48622.02, NNL Transfer Pricing Report for the Taxation Year Ended Dec. 31, 2009, at 1 (Oct. 29, 2010); TR00019, Declaration of Michael Orlando ¶ 14, Apr. 28, 2014 [hereinafter "<u>Orlando Decl.</u>"].

R&D was performed in Ottawa."[108]  NNL's predecessor may have been behind digital switching

technology that was one important part of Nortel's business, but to the extent older IP mattered

as a form of intellectual "seed capital," some of it was provided by NNUK's predecessor, STC

plc.  In fact, Nobel Prize–winning research of Charles Kao and other researchers at STC plc in

the 1960s formed the basis for the entire field of fiber-optic communications, which was an

important part of Nortel's business up until filing, along with other valuable technologies that

were brought to Nortel by STC plc.[109]  Bay Networks similarly brought a significant patent

portfolio when it was acquired by Nortel.[110]

54.    The history of Nortel's R&D prior to the 1990s is, however, of limited or no relevance

because none of the IP sold postpetition dated back to the 1980s, 1970s, or 1960s.[111]  What

---

[108]  Canadian Debtors' Closing Brief ¶ 30; *see also* CCC's Closing Brief ¶ 47.

[109]  Trial Day 3 Tr. 681:21–682:16, May 14, 2014 (B. McFadden Cross); *see also* TR00025, Affidavit of Andrew Jeffries ¶¶ 30–31, 35, Mar. 25, 2014 (explaining that "STC's knowledge of wireless systems and radio engineering was much broader and deeper than Nortel's" and that "inventions that Nortel exploited in the late 1990s (such as OFDM and smart antenna techniques) were based upon know-how acquired from STC's work in the mid-1980s"); TR00024, Affidavit of Peter Newcombe ¶¶ 17, 19, Apr. 11, 2014 (explaining that STC "gave Nortel access to a particular set of valuable products and technologies which formed the basis for a number of technologies developed by the Nortel Group after the 1990s which continued to drive sales into the 2000s" and that "some of the technologies that Nortel was selling at the time of the insolvency could be tracked back to founding patents and technologies acquired from STC and developed by Harlow and Maidenhead engineers in the 1990s. In many cases, the utility of these underlying technologies, developed by Nortel's engineers in EMEA, continued into the next decade and stretched over multiple product lifecycles.").

[110]  *See* TR49724, Nortel Networks 1998 Annual Report at 3, 6, 10, 16 (Feb. 25, 1999); *see also* Canadian Debtors' Closing Brief ¶ 32.  The Canadian Debtors imply that Bay Networks' patent contributions should be attributed to NNL because the acquisition was made with shares in the Canadian Debtors.  *See* Canadian Debtors' Closing Brief ¶ 32.  In fact, Bay Networks was acquired with NNC shares.  *See* Canadian Debtors' Closing Brief ¶ 32.  NNC was not an RPE; it was the publicly traded parent company of all Nortel subsidiaries. The value of its shares comprised the combined value of all Nortel entities, not just NNL.

[111]  Before the 1960s, Nortel's predecessor was a subsidiary of Western Electric and had no material R&D function.  *See* Proposed Findings of Fact and Conclusions of Law of the Canadian Creditors' Committee ("CCC") ¶ 5, Aug. 7, 2014 (revised Aug. 18, 2014) [hereinafter "CCC's Findings of Fact and Conclusions of Law"].

matters in this allocation proceeding is which entities created the Nortel IP that was sold for $5.3 billion in the Business Sales and the Residual Patent Sale. The oldest such IP dated back only to 1990.[112]

55. By the 1990s, when the IP sold in the postpetition sales was actually created, hundreds of millions of dollars in R&D were being spent to support labs in the United States, the United Kingdom, Ireland, and France.[113] The Canadian Debtors claim that the licenses granted under the MRDA "permitted the subsidiaries to have access to a much greater pool of technology on an exclusive basis in their territories than they could ever have afforded otherwise."[114] But the same point applies equally to NNL, which accounted for only about two-fifths of Nortel's total R&D spending from at least 1990 (the earliest year R&D spending by entity is available) through 2006.[115]

56. In addition to the actual R&D conducted abroad, the Nortel Group's international operations provided NNL with access to billions in revenues earned abroad and transferred to NNL under transfer pricing arrangements.[116] As the Canadian Debtors' trial witness Clive Allen

---

[112]   TR00033, Expert Report of James E. Malackowski 48 (Mar. 24, 2014) [hereinafter "Malackowski Report"] (noting that the oldest priority date of a non-expired patent in the Enterprise Solutions portfolio was 1990).

[113]   *See* TR11383, Malackowski Report Ex. R.2.2. During this time period, substantially all of Nortel's R&D was carried out through Bell-Northern Research Ltd., which was the research subsidiary jointly owned by Bell Canada and Nortel. *See* TR40248, Northern Telecom Limited Annual Report for the Fiscal Year Ended Dec. 31, 1990 (Form 10-K), at 10 (Mar. 27, 1991); *see also* TR00030, Huffard Report app. 4 ¶¶ 8–9.

[114]   Canadian Debtors' Closing Brief ¶ 49.

[115]   TR11383, Malackowski Report Ex. R.2.1 (noting that 39.4% of the Nortel Group's R&D spending was attributable to Canada between 1991 and 2006). R&D spending by region before 1990 is not available.

[116]   *See* TR00019, Orlando Decl. ¶ 9; TR00016, Henderson Decl. ¶¶ 42–43.

conceded in 1999, without access to markets beyond Canada, NNL would have "died because [it] could not afford the R&D to be competitive."[117]

57.    In short, the U.S. and EMEA Debtors were not only making substantial contributions to R&D from the time the oldest IP transferred in the postpetition sales was invented, they were actually conducting the majority of the R&D.  From 1991 to 1999, the U.S. and EMEA Debtors contributed 46.9% and 17.2%, respectively, of the Nortel Group's R&D spending.[118]  During that same time, the U.S. and EMEA Debtors were not dependent on NNL for their viability, inasmuch as they were generating the majority of the Group's revenues.  For example, from 1991 to 1997, the U.S. and EMEA Debtors represented 60.0% and 23.5%, respectively, of the Nortel Group's customer revenues.[119]

(b)    Transfer Pricing Arrangements

58.    The growing role of the RPEs was reflected in the evolving transfer pricing arrangements of the parties.  Once again, the Canadian Debtors present a distorted portrait.  First, they state that the various iterations of the R&D CSAs "each built on and intended to continue the rights granted in the prior agreements."[120]  Second, they state that the "primary change between the

---

[117]    TR21101, *Discussion Following the Remarks of Mr. Allen*, 25 Can.-U.S. L.J. 415, 416 (1999).

[118]    *See* TR11383, Malackowski Report Ex. R.2.2.

[119]    *See* TR40251, Northern Telecom Limited Annual Report for the Fiscal Year Ended Dec. 31, 1993 (Form 10-K), at F-21 (Mar. 11, 1994); TR40255, Northern Telecom Limited Annual Report for the Fiscal Year Ended Dec. 31, 1996 (Form 10-K), at F-23 (Mar. 10, 1997); TR40256, Northern Telecom Limited Annual Report for the Fiscal Year Ended Dec. 31, 1997 (Form 10-K), at F-26 (Mar. 6, 1998).  These figures exclude revenue generated by Nortel entities outside of Canada, the United States, and EMEA.  Entity-specific data is not available for 1998 and 1999.

[120]    Canadian Debtors' Closing Brief ¶ 56.

1985 and 1992 versions was in the defined terms."[121]   Third, they jump back in time to quote

from the 1978 R&D CSA (recognizing Nortel IP as "property of [NNL]"), purportedly to

demonstrate the vesting of "legal title" in NNL.[122]

59.     This potted history is highly misleading because it omits the fact that NNL's rights were

significantly altered between the 1978 and 1985 R&D CSAs, which not coincidentally was

around the time that the U.S. and EMEA Debtors assumed a much larger role in conducting

R&D and generating revenue for the Group.  Whereas the 1978 R&D CSA stated that all Nortel

patents developed under the CSA "are and shall continue to be the property of [NNL],"[123] the

1985 R&D CSA provided that only "legal title to all Intangible Technological Property . . . shall

be vested in [NNL]."[124]   Far from "continu[ing] the rights granted in the prior agreements,"[125]

this change significantly reduced NNL's interests in Nortel IP.  This is direct evidence from

actual agreements among the RPEs.   Vesting "legal title" is very different from vesting

"ownership."[126]  Legal title is subject always to the rights and collective economic entitlements

of the parties, including NNL, that jointly hold beneficial ownership.

---

[121]   Canadian Debtors' Closing Brief ¶ 58.

[122]   Canadian Debtors' Closing Brief ¶ 59.

[123]   TR46882, Research and Development Cost Sharing Agreement between Northern Telecom Limited and Northern Telecom, Inc. art. 4 (Jan. 1, 1978) (emphasis added).

[124]   TR45741, Amended Research and Development Cost Sharing Agreement between Northern Telecom Limited and Northern Telecom Inc. art. 4 (Jan. 1, 1985) (emphasis added).

[125]   Canadian Debtors' Closing Brief ¶ 56.

[126]   See EMEA Debtors' Closing Brief ¶¶ 77–78, 386–396.

60.    The critical change in the R&D CSAs from "property" to "legal title" was echoed almost twenty years later, when it was proposed that the MRDA refer to NNL holding "legal ownership" of Nortel IP, as opposed to "legal title."  Scott Wilkie, a transfer pricing lawyer with Oslers, NNL's external tax counsel, cautioned against such a change on the basis that it would misrepresent NNL as the "real owner" of the Nortel IP:

> The philosophical concern that I have . . . is a <u>stronger implication that NNL is the "real owner" of the IP and that the Participants derive their rights from NNL, as licensees, rather than as a consequence of having earned them in their own right as participants in the R&D program</u>.  Among other things this colours the royalty free license differently than under the "former" arrangements.[127]

(c)    The Arm's Length Principle

61.    The Canadian Debtors are at pains to point out that the arm's length principle "does not restrict the form of the parties' dealings,"[128] but this argument attacks a straw man.  The EMEA Debtors do not allege that transfer pricing principles restrained or rewrote the parties' bargain. Instead, transfer pricing obligations, such as the arm's length principle, are part of the factual matrix of the MRDA and greatly inform the proper interpretation of the MRDA.  This is particularly so where the factual record demonstrates that Nortel's internal and external transfer pricing experts were acutely aware of these obligations and took great pains to comply with them.[129]  Indeed, the MRDA states that the RPS methodology "is the best arm's length measure"

---

[127]    TR11349, Email from Scott Wilkie, Oslers, to Mark Weisz, NNI, *et al.* (Oct. 18, 2004, 4:13 p.m.), at NOR000221/1 (emphasis added); *see also* TR11349, Draft MRDA art. 4 (Oct. 18, 2004), at NOR000222/7.

[128]    Canadian Debtors' Closing Brief ¶ 54.

[129]    *See, e.g.*, TR00019, Orlando Decl. ¶ 9; J. Doolittle Dep. Tr. 166:3–9, Dec. 5, 2013; J. Gatley Dep. Tr. 50:11–12, Nov. 7, 2013; M. Weisz Dep. Tr. 33:3–8, 99:8–18, Nov. 25, 2014; G. Sparagna Dep. Tr. 63:11–64:19, Dec.

(Footnote continued on next page)

of the parties' contributions and explicitly acknowledges that the MRDA is subject to amendment following review by the tax authorities for compliance with the arm's length principle.[130]

62.    The transfer pricing guidelines that form a key part of the factual matrix of the MRDA make two points very clear.  First, holding legal title to IP and administering and registering patents may support a routine return, but can never support entitlement to a share of residual profits or losses on the IP.[131]  To earn a residual return (whether by way of annual profits or gain on sale) from an intangible such as IP, an entity must contribute to the creation of the IP.  NNL is entitled to a return on Nortel IP because, and only to the extent that, it created Nortel IP by performing R&D.  The same applies, of course, to the other RPEs.[132]  The Canadian Debtors, by contrast, claim that under the MRDA – which expressly adopts the arm's length standard – NNL is entitled not just to a return on Nortel's IP, but to the lion's share of sale proceeds, for performing routine functions associated with holding legal title.

---

(Footnote continued from previous page)

10, 2013; TR22123, Horst Frisch Inc., Economic Analysis of Nortel Networks' Intercompany Transactions 14–15, 41–42, 45–46 (Mar. 14, 2002).

[130]    TR21003, MRDA at 2 (Dec. 22, 2004), at NNC-NNL06001514/2 (sixth and eighth recitals).

[131]    *See* EMEA Debtors' Closing Brief ¶ 461 (citing TR50471, OECD, Revised Discussion Draft On Transfer Pricing Aspects Of Intangibles ¶¶ 73, 74 (July 30, 2013)).

[132]    *See* EMEA Debtors' Closing Brief ¶ 460.

63.     Second, transactions between parties under common control must be consistent with the terms to which two unrelated parties would agree under the same facts and circumstances.[133] The Canadian Debtors, however, in an effort to paint their claim to 90% of IP proceeds as reasonable, argue that controlled entities can enter into lopsided, uncommercial transactions.[134] That may be true for parties under common control in the same country, but the factual matrix for a contract like the MRDA includes the arm's length principle.   The whole point of the transfer pricing regulations is to prevent the very mischief that the Canadian Debtors are now claiming those regulations permit.

(d)     Amendments to the MRDA

64.     The MRDA continued to be amended right up to the eve of insolvency, and these amendments included continued representations about ownership of Nortel IP.   Schedule A to the Third Addendum to the MRDA, signed in January 2009, confirms that "the Participants bear the full entrepreneurial risk of the Nortel business, such as the risks attendant with the substantial and continuous development and ownership of the NN Technology."[135]   Two very important points flow from this fact.   First, each subsequent version of the MRDA is independent evidence of ownership.   Second, because the factual matrix includes events up to the effective date of each

---

[133]   EMEA Debtors' Closing Brief ¶ 90.

[134]   *See* Canadian Debtors' Closing Brief ¶¶ 52–54, 73, 81–82, 377–385; *see also* EMEA Debtors' Closing Brief ¶¶ 457–459.

[135]   TR21003, Third Addendum sched. A (Jan. 2009), at NNC-NNL06001514/48.

addendum,[136] events that occurred up through insolvency – such as the Alcatel allocation in 2007 – are important factual matrix evidence for subsequent iterations of the MRDA.

## B.    Interpretation of the MRDA

65.    As discussed in the EMEA Debtors' Closing Brief, the MRDA does not control the allocation of sale proceeds and is but one (admittedly important) piece of evidence demonstrating the RPEs' joint beneficial ownership interests in Nortel IP.[137]   On its face, and consistent with the factual matrix, the MRDA and its addenda state that NNL holds legal title, the EMEA and U.S. Debtors have territorial licenses (both exclusive and nonexclusive), and all of the RPEs share beneficial ownership.

### 1.    *The MRDA and Its Addenda Recognize the Beneficial Ownership of the EMEA and U.S. Debtors*

#### (a)    The Canadian Debtors' Argument that "Legal Title" Means "Ownership" Is Incorrect

66.    The Canadian Debtors claim that according to *Black's Law Dictionary*, "'[t]itle' and 'ownership' are legally equivalent concepts."[138]   That is entirely irrelevant because the MRDA refers not to "title," but to "legal title."[139]   The Canadian Debtors avoid any reference to the definition of "<u>legal</u> title" in *Black's Law Dictionary*, no doubt because, as the decision in

---

[136]    *Bramalea Ltd. v. Vancouver School Board No. 39*, [1992] B.C.J. No. 811 at para 19 (BCCA).

[137]    *See* EMEA Debtors' Closing Brief ¶¶ 143, 344, 434.

[138]    Canadian Debtors' Closing Brief ¶ 197; *see* EMEA Debtors' Closing Brief ¶ 388.

[139]    *See* TR21003, Third Addendum § IV (Jan. 2009), at NNC-NNL06001514/41 (amending Article 4(a) of the original MRDA (TR21003, MRDA art. 4(a) (Dec. 22, 2004), at NNC-NNL06001514/6)).

*Francey v. Wawanesa Mutual Insurance Company* makes clear, this definition flatly contradicts the Canadian Debtors' claim that they own the IP:

> One cognizable or enforceable in a court of law, or one which is complete and perfect so far as regards the apparent right of ownership and possession, <u>but which carries no beneficial interest in the property, another person being equitably entitled thereto</u> . . . .[140]

67.   The Canadian Debtors, conspicuously, do not cite that definition in their closing brief, notwithstanding that it is a legal term of art with a well-understood meaning that the RPEs specifically chose, based on legal advice, to describe NNL's interest.[141]

68.   Instead of confronting the actual language of the MRDA and the caselaw regarding its proper interpretation, the Canadian Debtors baldly assert that "the word 'legal', when used to modify 'title', is not a term of limitation."[142]   No authority is given for this remarkable proposition because there is none.   Indeed, it is contradicted not only by the definition of "legal title," but also by the contemporaneous admonitions of NNL's own external tax counsel from Oslers, Scott Wilkie, quoted above, who warned that the words "legal ownership" would create a

---

[140]   *Francey v. Wawanesa Mutual Insurance Company*, 1990 CarswellAlta 133 at para. 74 (Q.B.), *aff'd* (1991), 117 AR 318 (C.A.) (ellipsis in original) (emphasis added) (quoting the *Black's Law Dictionary* definition of "legal title" and concluding that "legal title" does not mean full ownership); *see also* EMEA Debtors' Closing Brief ¶¶ 348–351 (discussing *MacKeen Estate v. Nova Scotia*, [1978] C.T.C. 557 (N.S.S.C.A.D.)).

[141]   *See* Canadian Debtors' Closing Brief ¶¶ 197–200 (defining only "title" and "own"); *see* TR11349, Email from Scott Wilkie, Oslers, to Mark Weisz, NNI, *et al.* (Oct. 18, 2004, 4:13 p.m.), at NOR000221/1 (advising that the parties use the term "legal title" to more accurately reflect NNI's interests in the IP); *see also* TR11349, Draft MRDA art. 4(a) (Oct. 18, 2004), at NOR000222/7.

[142]   Canadian Debtors' Closing Brief ¶ 293.

"stronger implication that NNL is the 'real owner' of the IP" than would the words "legal title."[143]

69.     In effect, what the Canadian Debtors would have the Courts do is strike the inconvenient word "legal" from the MRDA so that the MRDA refers to NNL holding "title."  This the Courts cannot do; they must respect the words explicitly chosen by the parties, read in their proper context, and give meaning to each of them.  Doing so confirms that NNL held only legal title, while sharing beneficial ownership with the other RPEs.

70.     The Canadian Debtors' submissions also overlook the ruling in *MacKeen Estate v. Nova Scotia* – applied by the Supreme Court of Canada in *Covert v. Nova Scotia (Minister of Finance)*[144] – which states that the person beneficially entitled to property is "the real or beneficial owner," while the holder of legal title is merely the "nominal owner."[145] Acknowledging that NNL shared beneficial interest with the other RPEs is the only interpretation consistent with the factual matrix in this case and with the distinction that the parties used in the MRDA between the different terms "legal title" and "beneficial ownership." If "legal title" meant the entire bundle of ownership, there would have been no reason to give the EMEA and U.S. Debtors an allocation of proceeds from the Foundry litigation settlement or the Alcatel sale.  It is critical to note that the Canadian Debtors did not present any evidence or even

---

[143]    *See* TR11349, Email from Scott Wilkie, Oslers, to Mark Weisz, NNI, *et al.* (Oct. 18, 2004, 4:13 p.m.), at NOR000221/1; *see also* TR11349, Draft MRDA art. 4(a) (Oct. 18, 2004), at NOR000222/7.

[144]    *Covert v. Nova Scotia (Minister of Finance)*, [1980] 2 S.C.R. 774.

[145]    *MacKeen Estate v. Nova Scotia*, [1978] 28 N.S.R. (2d) 3 at para. 22 (N.S.S.C.A.D.).

attempt to explain on what basis, other than beneficial ownership, the EMEA and U.S. Debtors

were allocated proceeds from these transactions.  That is because there is no other basis.

71.    Typical of the Canadian Debtors' and the CCC's improper interpretation of the phrase

"legal title" is the following from the CCC's Closing Brief:

> As the Supreme Court of Canada has noted, "the ordinary and
> grammatical meaning of 'owner' would include the legal
> titleholder". Therefore, the reference to "legal" title in Article 4(a)
> reflects a transfer of ownership.[146]

72.    The CCC misrepresents the cited case in two ways.  First, looking just at the words

excerpted by the CCC, the case does not say that the ordinary meaning of "legal titleholder" is

"owner."  The case states only that the word "'owner' would <u>include</u> the legal titleholder."[147]

There is no dispute that NNL was <u>an</u> owner.  That does not mean it is the <u>only</u> owner.

73.    Second, the CCC has taken the quoted passage out of context.  The passage quoted from

the Supreme Court of Canada comes from *Re Canada 3000 Inc.*, a 2006 decision concerning the

collapse of two airlines.[148]   The airlines in question leased their aircraft fleets from legal

titleholders.  When the airlines entered insolvency, their creditors tried to recover amounts due

by seizing planes held by the legal titleholders on the basis that these legal titleholders were

"owners" under the Civil Air Navigation Services Commercialization Act.  The Supreme Court

---

[146]    CCC's Closing Brief ¶ 42 (footnote omitted).

[147]    *Re Canada 3000 Inc.*, [2006] 1 S.C.R. 865 at para. 44 (emphasis added).

[148]    *Re Canada 3000 Inc.*, [2006] 1 S.C.R. 865.

rejected their claim, holding that the legal titleholders were <u>not</u> the real owners.[149]   The entire

passage from which the quote in the CCC's Closing Brief is extracted states that "<u>[i]f s. 55(1)</u>

<u>were read in isolation</u>, the ordinary and grammatical meaning of 'owner' would include the legal

titleholder."[150]   The Supreme Court of Canada then considered the "entire context" of the

provision and rejected precisely the argument now advanced by the Canadian Debtors and the

CCC:

> A purposive interpretation of s. 55 that takes into account the
> foregoing considerations compels rejection of the position urged
> by NAV Canada.   Moreover, and importantly, the narrow
> interpretation of "owner" in s. 55(1) conforms with common sense.
> It would be a severe disruption to the functioning of the airline
> industry if, as a result of Canada 3000's failure to pay its charges,
> NAV Canada could seize and detain an aircraft operated by, for
> example, Air Canada.   There is no reason to think Parliament
> intended to let the damage caused by a failed airline expand
> beyond that airline's fleet of aircraft.
>
> Accordingly, applying Driedger's contextual approach to s. 55(1)
> of *CANSCA*, I agree with the Courts of Appeal that the <u>titleholders</u>
> <u>of the aircraft are not jointly and severally liable for the charges</u>
> <u>due to NAV Canada.   They are not "owners" within the meaning</u>
> <u>of that section.</u>[151]

74.     While *Re Canada 3000 Inc.* concerns statutory rather than contractual interpretation, the

principles are analogous.[152]   The context in which the MRDA was adopted, the substance of the

---

[149]   *Re Canada 3000 Inc.*, [2006] 1 S.C.R. 865 at para. 41.

[150]   *Re Canada 3000 Inc.*, [2006] 1 S.C.R. 865 at para. 44 (emphasis added).

[151]   *Re Canada 3000 Inc.*, [2006] 1 S.C.R. 865 at paras. 60–61 (emphasis added).

[152]   *See Shelanu v. Print Three Franchising Corp.*, [2003] O.J. No. 1919 at para. 45 (ONCA); *Manulife Bank of Canada v. Conlin*, [1996] 3 S.C.R. 415 at para. 40 (*per* L'Heureux-Dubé J., dissenting on another issue).

agreement, and common sense all compel the conclusion that "legal title" was used in a manner that intentionally distinguished it from ownership.

75.     The CCC also attempts to overcome the language of the MRDA by relying on section 5(3) of the *Conveyancing and Law of Property Act* (the "<u>CLPA</u>"), which states that "[w]here no words of limitation are used, the conveyance passes all the estate, right, title, interest, claim and demand that the conveying parties have in, to, or on the property conveyed."[153]  The CCC claims that because "nothing in Article 4(a) suggests an intention to limit NNL's ownership," the MRDA conveyed to NNL all rights the EMEA and U.S. Debtors had in the IP, including beneficial ownership.[154]

76.     This argument fails for several reasons.  First, section 5(3) of the CLPA only applies "[w]here no words of limitation are used."  As the discussion above makes clear, the word "legal" is a word of limitation that qualifies the type of "title" vested in NNL under Article 4(a) of the MRDA.

77.     Second, the CCC conveniently ignores section 5(4) of the CLPA, which states that section 5(3) applies "only if and as far as a contrary intention does not appear from the conveyance."[155]  Thus, section 5(3) does not apply here because the MRDA clearly evinces an intention not to pass all rights in Nortel IP to NNL.  Not only does the word "legal" precede

---

[153]    R.S.O. 1990, c. C.34 (emphasis added).

[154]    *See* CCC's Closing Brief ¶ 43.

[155]    R.S.O. 1990, c. C.34, s. 5(4).

"title" in Article 4(a), but each version of Schedule A provides that "the <u>Participants</u> bear . . . the risks attendant with the substantial and continuous development and <u>ownership of the NN Technology</u>."[156]

78.    Third, as discussed above, the clear direction from the Supreme Court of Canada is that courts must consider the factual matrix when interpreting contracts, including contracts that convey property.  This requirement is not preempted by section 5(3) of the Act, and the CCC has cited no authority otherwise.  In fact, courts have refused to apply the CLPA in the manner urged by the CCC where, as here, the surrounding circumstances, but not the conveyance, indicated an opposite intention.[157]  In short, the CCC cannot rely on the CLPA to transform a vesting of "legal title" into a passing of all of the EMEA and U.S. Debtors' rights in IP to NNL.

79.    Finally, the Canadian Debtors claim that the EMEA Debtors try to insert words like "bare" or "for administrative convenience" into the MRDA's references to "legal title."[158]  The EMEA Debtors' Closing Brief makes clear that is not the case.  The discussion above confirms that the words "legal title" speak for themselves as a term of art, which is well-defined, well-known, and set out concisely in law dictionaries, not merely a product of arcane authorities that may not be known to the drafter.  Moreover, the Canadian Debtors cite a host of reasons they

---

[156]    *See* TR21003, MRDA sched. A (Dec. 22, 2004), at NNC-NNL06001514/18 (emphasis added); TR21003, Second Addendum sched. A (Dec. 14, 2007), at NNC-NNL06001514/30 (emphasis added); TR21003, Third Addendum sched. A (Jan. 2009), at NNC-NNL06001514/48 (emphasis added).

[157]    *First Place, Hamilton v. Hamilton (City)* (1979), 12 R.P.R. 121 at para. 30 (H.C.J.).

[158]    Canadian Debtors' Closing Brief ¶¶ 304–306.

claim explain why it was good corporate policy for NNL to have sole ownership of the IP.[159]  In fact, these reasons are all variants of administrative simplicity and are reasons why it made sense for one entity – possibly, but not necessarily, NNL – to hold legal title.

(b)      The MRDA Repeatedly Confirmed that Beneficial
Ownership Was Held Jointly by All RPEs

80.      Even if the word "legal" were struck from "legal title," this would not solve the Canadian Debtors' problems with the words of the MRDA because it would not explain the repeated references to the RPEs jointly sharing "ownership" or "beneficial ownership."  For example, the Canadian Debtors claim that Schedule A's reference to the "Participants bearing risks such as those 'attendant with the substantial and continuous development and ownership of the NN Technology,'" somehow, "says nothing about who owns the NN Technology."[160]  The only way to read this passage in the manner suggested by the Canadian Debtors is to suggest that the Participants had to bear the risks associated with ownership, but NNL got to enjoy the benefits. This conclusion – which is commercially absurd on its face – is impossible to reconcile with the preceding paragraph in Schedule A, which says that the RPS methodology is "the most appropriate method for determining the arm's length compensation due to each Participant for its respective R&D Activity provided pursuant to the Agreement."[161]  It cannot be an arm's length

---

[159]    Canadian Debtors' Closing Brief ¶ 315.

[160]    Canadian Debtors' Closing Brief ¶ 370 (emphasis added).

[161]    TR21003, Third Addendum sched. A (Jan. 2009), at NNC-NNL06001514/48 (amending Schedule A to the original MRDA (TR21003, MRDA sched. A (Dec. 22, 2004), at NNC-NNL06001514/18)).

bargain for the RPEs to share the risks, but for NNL to exclusively enjoy the benefits whenever IP is sold.

81.    The Second Addendum to the MRDA is also inconsistent with the Canadian Debtors' position because it states explicitly that "each Participant holds and enjoys <u>equitable and beneficial ownership</u> of NN Technology as defined in the [MRDA]."[162]  The Canadian Debtors' first argument is that this passage can be ignored because it appears in a recital.[163]  It is correct that a recital "does not purport to (and, indeed, cannot) grant substantive rights,"[164] and the EMEA Debtors do not argue otherwise.  The substantive right – ownership – arises from inventive work.  The MRDA and its addenda merely recognize this ownership and confirm that it is held jointly by the RPEs.

82.    Recitals can and must be considered in interpreting an agreement as a whole.[165]  Recitals are included in agreements because they record the context of the parties' intentions and rights as at the date of entering into the contract.[166]  The Canadian Debtors invite the Courts not only to ignore the effect of the recitals, but also to ignore the fact that the term "equitable and beneficial

---

[162]    TR21003, Second Addendum at 1 (Dec. 14, 2007), at NNC-NNL06001514/27 (first recital) (emphasis added).

[163]    Canadian Debtors' Closing Brief ¶ 372.

[164]    *See* Canadian Debtors' Closing Brief ¶ 372.

[165]    *Sistem v. Kyrgyz Republic*, 2012 ONSC 4983 (Newbould, J.) at paras. 25–26; *Canadian Faces Inc. v. Cosmetic Manufacturing Inc.*, 2011 ONSC 6171, para. 39; *Oceanic Exploration Co. v. Denison Mines Ltd. (1999)*, 127 O.A.C. 224 (C.A.), paras. 16, 30–31; *Denison Mines Ltd. v. Ontario Hydro (2002)*, 58 O.R. (3d) 26 (C.A.), para. 9.

[166]    *Canadian Faces Inc. v. Cosmetic Manufacturing Inc.* 2011 ONSC 6171, para. 39; *see also Oceanic Exploration Co. v. Denison Mines Ltd.* (1999), 127 O.A.C. 224 (C.A.), paras. 30–31.

ownership" was used in the recitals to the Second Addendum alongside earlier and later references to "legal title."

83.    The Canadian Debtors' only other argument regarding the Second Addendum's reference to joint beneficial ownership is that the phrase "as defined in the [MRDA]" means that the parties "did not intend in any way to change the rights set out in the MRDA."[167]  This is true, and as explained above, the MRDA recognizes and in fact is premised on the RPEs' joint beneficial ownership.

> 2.    *Article 3 Does Not Provide that RPS Payments Are the Only Compensation for R&D Spending*

84.    The Canadian Debtors claim that, pursuant to Article 3(a) of the MRDA, "the sole compensation for carrying out R&D is the right to receive operating profit-sharing payments pursuant to the RPSM."[168]  As a result, the Canadian Debtors argue, the EMEA Debtors are not entitled to proceeds attributable to the sale of IP on the basis of their R&D spending.  This argument fails for several reasons.

85.    First, Article 3 applies equally to NNL as it does to the EMEA and U.S. Debtors.  It does not distinguish between Participants (*i.e.*, all RPEs) and Licensed Participants (*i.e.*, the EMEA and U.S. Debtors).  It states that "each Participant shall be entitled to receive a payment . . . as the measure of the benefit to which it is entitled commensurate with its performance of, and

---

[167]    Canadian Debtors' Closing Brief ¶ 372 (brackets in original).

[168]    Canadian Debtors' Closing Brief ¶ 397.

contribution to, R&D Activity."[169]  The Canadian Debtors' argument that the EMEA and U.S. Debtors are limited to RPS payments, while NNL receives RPS payments and sale proceeds, would have the effect of inserting the word "Licensed" in front of "Participants."  The Canadian Debtors cannot point to their legal title as justification for a further entitlement because Nortel never, at any point during its existence, assigned any value to holding legal title.[170]  Nor could it under the arm's length principle, as described above.

86.      Second, as is clear from the very first words of the contract, and confirmed again on the eve of bankruptcy in the Third Addendum, the MRDA applies only to the operating arrangements of Nortel and does not govern the sale of IP.[171]  Thus, even if Article 3 could be read to apply only to the EMEA and U.S. Debtors, which it cannot, that provision still would not provide that the RPS payments to the EMEA and U.S. Debtors are the only compensation to which they are entitled for their billions of dollars of R&D.  Their beneficial ownership arises independent of the MRDA, which by its terms does not cover anything more than "operating arrangements."[172]

---

[169]  TR21003, MRDA art. 3(a) (Dec. 22, 2004), at NNC-NNL06001514/5 (emphasis added).

[170]  NNL's administrative tasks, including the holding of legal title, were already compensated by routine payments.  *See* Trial Day 11 Tr. 2669:2–2671:6, May 30, 2014 (R. Cooper Direct); TR22078, NNL & NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007–2011 (with rollback to 2006), at 44–48, 51 (Oct. 31, 2008) [hereinafter "NNL-NNI Joint APA Request"].

[171]  *See* TR21003, MRDA at 1 (Dec. 22, 2004), at NNC-NNL06001514/1; TR21003, Third Addendum sched. A (Jan. 2009), at NNC-NNL06001514/49.

[172]  *See* TR21003, First Addendum § I (June 2006), at NNC-NNL06001514/21 (amending the opening paragraph of the original MRDA (TR21003, MRDA at 1 (Dec. 22, 2004), at NNC-NNL06001514/1)).

### 3. *Article 4(e) Confers on the EMEA and U.S. Debtors a Broad Right of Enforcement that Is Coextensive with the License Right*

87.    Article 4(e) provides that the EMEA and U.S. Debtors "have the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others."[173]   The CCC claims that this provision "does not confer standing on any party to assert an action or recover damages or other remedies in any Court."[174]   As a result, the CCC claims that the EMEA and U.S. Debtors "had no enforcement rights at all regarding the 59-66% of the patents in the Residual IP portfolio that were Not Used."[175]

88.    This position begs the question of just what falls within the licenses granted under Article 5(a).   In answering that question, the Courts should read the two provisions harmoniously.[176] Article 4(e) squarely contradicts the cramped interpretation of Article 5(a) advanced by the Canadian Debtors.   The right granted in Article 4(e) is to sue for infringement of <u>any</u> NN Technology.   No words of limitation are used.   The Canadian Debtors seek to import limiting words by swapping the word "license" for "NN Technology" and adopting their narrow, and incorrect, interpretation of the scope of the licenses.

---

[173]   TR21003, Third Addendum § IV (Jan. 2009), at NNC-NNL06001514/41 (amending Article 4(e) of the original MRDA (TR21003, MRDA art. 4(e) (Dec. 22, 2004), at NNC-NNL06001514/6)).

[174]   CCC's Findings of Fact and Conclusions of Law ¶ 116.

[175]   CCC's Findings of Fact and Conclusions of Law ¶ 117.

[176]   *Atco Electric Ltd. v. Alberta (Energy & Utilities Board)* 2004 ABCA 215, para. 71 ("One cannot simply pick and choose clauses — or parts of clauses — without considering the contract as a whole."); *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)*, [1998] O.J. No. 2637 at para. 409, *aff'd* [1999] O.J. No. 3290 (C.A.), leave to appeal refused 139 O.A.C. 399 (note) (S.C.C.) (The contract "should be looked at as a whole, with each contractual term considered in the context of the entire document.").

89.     The Canadian Debtors' reading of Article 4(e) is also irreconcilable with the factual matrix.  For example, in 2004, prior to the MRDA, Nortel named NNI as a plaintiff in the lawsuit against Foundry for infringement of certain Nortel patents, thereby acknowledging that NNI had a right to sue for enforcement of those patents.[177]  One-quarter of the patents that Nortel – both NNL and NNI – sued Foundry for infringing were later classified as "Not Used" by Nortel and sold to Rockstar in the Residual Patent Sale.[178]  If the Canadian Debtors' current position is correct, then NNI was a party to an infringement suit regarding patents to which, according to the Canadian Debtors, it had absolutely no rights.  To the contrary, the only reasonable conclusion is the one reached by the Canadian Debtors' own experts, who admitted that the RPEs could enforce their IP rights to all NN Technology, not just the IP used in Products, in their territories under Article 4(e).[179]

90.     Indeed, the Foundry litigation is also a reminder that the entire "Not Used" designation was invented by John Veschi to support the postpetition sale process and had never been used by Nortel prior to insolvency.[180]  When Nortel actually operated as a going concern, as with Foundry, it drew no such distinctions and rewarded all RPEs in respect of all benefits of all Nortel IP.  The Canadian Debtors would propose to retroactively dispossess the U.S. and EMEA

---

[177]   *See* TR22084, Complaint, *Nortel Networks Inc. v. Foundry Networks, Inc.*, No. 01-10442DPW (D. Mass. Mar. 14, 2001).

[178]   *See* DEM00011, Malackowski Slides at 33.

[179]   *See* Trial Day 15 Tr. 3720:14–3721:18, June 16, 2014 (M. Berenblut Cross); Trial Day 13 Tr. 3185:9–25, June 5, 2014 (P. Green Cross).

[180]   *See* EMEA Debtors' Closing Brief ¶¶ 253–257.

Debtors of any interest in the residual patent portfolio based on a designation that did not even exist until 2009.  This is insupportable.

### 4.    Article 5(a) Does Not Confer a Limited Make-Use License

91.    The EMEA Debtors' primary position is that the interpretation of Article 5(a) does not matter to this allocation dispute because, for reasons explained above, the RPEs' economic entitlements flow from beneficial ownership rather than the territorial licenses.  However, in the event the Courts decide that the MRDA, and Article 5(a) in particular, is in fact the sole source of the EMEA and U.S. Debtors' rights, the EMEA Debtors adopt the submissions of the U.S. Debtors in their closing brief in respect of the interpretation of Article 5(a), and make the following submissions in reply to the Canadian Debtors' arguments.

92.    The exclusive license grant in Article 5(a) of the MRDA, as amended, is as follows:

> (a)    To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:  (i) continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, [1] rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and [2] all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License");[181]

---

[181]    TR21003, Third Addendum § V (Jan. 2009), at NNC-NNL06001514/41–42 (amending Article 5(a) of the original MRDA (TR21003, MRDA art. 5(a) (Dec. 22, 2004), at NNC-NNL06001514/6–7)) (numbering of the two "arms" of the license grant added in brackets).

93.     The Canadian Debtors agree with the U.S. and EMEA Debtors that the Article 5(a) license grant consists of the two "arms" numbered in brackets above.[182]  However, the Canadian Debtors would interpret those two arms as follows, in a manner inconsistent with the actual words of Article 5(a):

(a) "a right is [*sic*] to make, use or sell products, software or services that used or embodied Nortel IP and that were made or sold (or proposed to be made or sold) by, or for, any of the parties to the MRDA;"[183] and

(b) a right to "use certain Nortel IP as necessary or appropriate in connection with the making, using or selling of 'Products.'"[184]

94.     Put more simply, the Canadian Debtors' interpretation is that the first arm is to make, use, or sell Products embodying Nortel IP; the second arm is to use Nortel IP to make, use, or sell Products.  The only difference between these two formulations is syntax.  The Canadian Debtors would render the second arm of the license grant completely superfluous.

95.     In reality, the second arm supplements the first.  It clarifies the very point at issue between the U.S. and Canadian Debtors; the license grant is not limited to making Products, as the Canadian Debtors argue.  It also broadly encompasses "<u>all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith</u>."[185]  The definition of "NN Technology," which appears

---

[182]  *See* Canadian Debtors' Closing Brief ¶¶ 323–325; CCC's Closing Brief ¶¶ 73–74; EMEA Debtors' Closing Brief ¶ 475; Post-Trial Brief of the U.S. Interests 28–29, Aug. 7, 2014 (revised Aug. 14, 2014) [hereinafter "<u>U.S. Debtors' Closing Brief</u>"].

[183]  Canadian Debtors' Closing Brief ¶ 323; *see also* CCC's Closing Brief ¶ 74.

[184]  Canadian Debtors' Closing Brief ¶ 324; *see also* CCC's Closing Brief ¶ 74.

[185]  TR21003, Third Addendum § V (Jan. 2009), at NNC-NNL06001514/42 (amending Article 5(a) of the original MRDA (TR21003, MRDA art. 5(a) (Dec. 22, 2004), at NNC-NNL06001514/7)) (emphasis added).

in the first arm, already incorporates "patents, industrial designs and copyrights" in respect of "Products"; therefore, if the second arm of Article 5(a) were also limited to "Products" like the first arm, then references to "patents, industrial designs and copyrights" would be completely superfluous. That the draftsperson could have been more parsimonious with his or her words and achieved the same effect matters not; the fact is the words actually chosen are extremely broad.

96.    The Canadian Debtors' interpretation of Article 5(a) as granting a limited make-use license would also render the entire sublicense and enforcement powers superfluous. On the Canadian Debtors' theory, under Article 5(a) the EMEA and U.S. Debtors can only sublicense third parties to make Nortel Products.[186]    However, a license or sublicense is not required to engage in contract manufacturing. As the Supreme Court of Canada observed in *Eli Lilly*, a "licensed party was entitled to have the licensed products made by an agent" without the need for a sublicense.[187]

97.    The Canadian Debtors claim, however, that redundancy in a contract is normal and indeed expected.[188]    While it is one thing to expect a degree of redundancy in a contract, it is another to render entire provisions – such as the second arm of Article 5(a), the entire right to sublicense, and the Article 4(e) enforcement right – a nullity.

---

[186]    *See* Canadian Debtors' Closing Brief ¶¶ 325–327.

[187]    *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 75 (discussing *Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381 (Fed. Cir. 1996)); *see also* U.S. Debtors' Findings of Fact and Conclusions of Law at 174 ¶ 45.

[188]    Canadian Debtors' Closing Brief ¶¶ 210, 344–346.

98.     In support of their redundancy argument, the Canadian Debtors cite two cases, neither of which provides a basis to ignore the second arm of Article 5(a).  In *Long v. Delta Catalytic Industrial Services*, the Alberta Court of Queen's Bench interpreted an ambiguous employment termination provision in favor of the employee, despite resulting redundancy in the contract.[189] The court in that case noted that it was constrained by "a complex set of legal and evidentiary principles to ensure that employees are treated fairly," which "elevate[d] the contractual standards" and created presumptions that the employer was not able to overcome.[190]

99.     In *Beaufort Developments v. Gilbert-Ash N.I.*, on the other hand, the House of Lords interpreted a standard form contract that was "the result of interaction between the draftsmen and the courts."[191]  In those circumstances, Lord Hoffman noted that in the face of redundancies it was necessary to make a "careful examination of the contract as a whole."[192]  Examining the MRDA as a whole, the second arm of Article 5(a) must supplement the first arm in order to avoid an interpretation that renders the license largely meaningless.  If the contribution theory were not adopted, the licenses would be the only source of value attributable to IP for the EMEA and U.S. Debtors, and principles of contract interpretation militate against reading the licenses in a way that would render them largely ineffective and unnecessary.  Therefore, the Canadian Debtors' argument that the second arm is a redundant nullity cannot be adopted.

---

[189]  *Long v. Delta Catalytic Industrial Services Inc.*, [1998] A.J. No 131 (Q.B.).

[190]  *Long v. Delta Catalytic Industrial Services Inc.*, [1998] A.J. No 131 at para 15 (Q.B.).

[191]  *Beaufort Developments (N.I.) Ltd. v. Gilbert-Ash N.I. Ltd.*, [1999] 1 A.C. 226 at 274 (H.L.).

[192]  *Beaufort Developments (N.I.) Ltd. v. Gilbert-Ash N.I. Ltd.*, [1999] 1 A.C. 226 at 274 (H.L.).

5.    *The Canadian Debtors' Interpretation of the MRDA Is Absurd in*
      *All Conceivable Circumstances*

100.    The Canadian Debtors claim that their interpretation of the MRDA would not produce a commercial absurdity; instead, it is merely "a contract that in some situations works advantageously to one party and disadvantageously to the other party."[193]   This is simply not true.  Under the Canadian Debtors' interpretation, the MRDA – from the moment it was adopted and in all conceivable circumstances – impermissibly advantages the Canadian Debtors and disadvantages all other parties, by creating results that are commercially absurd and contrary to the arm's length principle.  The Canadian Debtors' attempt to paint their version of the deal as merely improvident for the other parties, or as a deal that just happened to give NNL more than 90% of the sale proceeds attributable to IP, as things turned out, is pure fiction.  On the Canadian Debtors' view, the only possible winner from the MRDA – by a huge margin – was NNL due to a massive, one-way appropriation of value.  That is *ipso facto* absurd.

101.    The EMEA and U.S. Debtors, like the Canadian Debtors, had to incur the enormous, multibillion-dollar costs associated with R&D.  All five of the RPEs had to bear any losses that Nortel suffered, while sharing any residual profits.   According to the Canadian Debtors, however, on sale, NNL alone is entitled to capture (i) the entire value of IP above the value of limited "make-use" licenses for IP actually used in Nortel Products, and (ii) 100% of the value of IP not currently used in Nortel Products, regardless of how little NNL contributed to the creation of that IP.  Moreover, NNL is supposedly entitled to unilaterally decide when to sell any IP, and if that IP is not currently used in any "Products," it need not even worry about obtaining license

---

[193]    Canadian Debtors' Closing Brief ¶ 194.

assignments or terminations from the EMEA and U.S. Debtors.  As the Canadian Debtors'

expert, Mr. Burshtein, conceded at his deposition, this means NNUK could spend half a billion

dollars on R&D to create a new technology, see NNL sell it for $1 billion, and receive not a

penny.[194]  Conversely, NNL could stop conducting R&D entirely, and while it would no longer

receive RPS payments, it would (on the Canadian Debtors' theory) receive 100% of sale

proceeds for "Not Used" patents because it held legal title to Nortel IP.  Not only is that not

arm's length, as required by transfer pricing principles, it is commercially absurd.

102.    The Canadian Debtors have not so much as suggested a scenario in which the EMEA and

U.S. Debtors would be advantaged, and the Canadian Debtors disadvantaged, by the Canadian

Debtors' interpretation of the MRDA.  No such plausible scenario exists.  A contract that can

only privilege one party, in circumstances where transfer pricing obligations demand an arm's

length return, is absurd.[195]

## IV.    ALLOCATING THE RPES' BENEFICIAL OWNERSHIP OF NORTEL IP

103.    Having established that the RPEs' beneficial ownership of Nortel IP is based on their

contributions to R&D, the next step is to allocate the IP sale proceeds in proportion to those

contributions.  The only reliable approach, based on the record in this case, is to measure the

RPEs' relative R&D spending over the period during which the IP sold was actually created.

The other parties, principally the Canadian Debtors, offer two types of objections to this, both

---

[194]    *See* S. Burshtein Dep. Tr. 243:23–246:8, June 11, 2014.

[195]    *Corporate Properties Ltd. v. Manufacturers Life Insurance Co.*, [1989] O.J. No. 2278 (C.A.) at paras. 18–19; *see also Downey v. Ecore International Inc.*, [2012] O.J. No. 3086 at para. 54 (C.A.); *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 at para. 27; *Campeau v. Desjardins Financial Security Life Assurance Co.*, 2005 MBCA 148 at para. 38.

easily dismissed.  First, they object to any use of R&D spending as a measure of contribution. Second, they object to measuring the R&D spending that actually created the IP sold.

### A.    The Criticisms of R&D Spending as a Measurement of Contribution Are Without Merit

#### 1.    The EMEA Debtors Do Not Use R&D Spending to Value IP

104.    The other parties criticize the contribution approach by arguing that R&D spending is no way to value IP.  The EMEA Debtors could not agree more.  Their position has been clear all along, but given the continued, perhaps disingenuous, mischaracterization,[196] the point bears repeating once more:  the EMEA Debtors do not look to R&D spending to value IP.  Mr. Malackowski, the EMEA Debtors' expert, calculated the value of the IP that was sold using the widely accepted valuation principles of relief from royalty and discounted cash flow.[197]  R&D spending played no part in Mr. Malackowski's valuation exercise.

105.    R&D spending is relevant not to valuation but to allocation, because relative levels of R&D spending provide the best available proxy (and only reliable basis in this case)[198] for measuring the RPEs' relative contributions to the creation of Nortel IP.  That is why the RPEs themselves used R&D spending as the allocation key to measure their beneficial ownership of Nortel IP.

---

[196]    *See, e.g.*, U.S. Debtors' Closing Brief 121–123; CCC's Closing Brief ¶¶ 139–140.

[197]    *See* TR00033, Malackowski Report 20–38.

[198]    *See* DEM00011, Malackowski Slides at 61; Trial Day 10 Tr. 2354:2–2355:23, May 29, 2014 (J. Malackowski Cross); Trial Day 10 Tr. 2336:13–2337:20, May 29, 2014 (J. Malackowski Direct).

106.    The EMEA Debtors' approach is consistent with what Canadian courts will do in resulting trust circumstances.  When faced with property created through the joint contributions of more than one party, courts will reward beneficial ownership in proportion to the parties' relative contributions.[199]

> ## 2.    The R&D Performed by the EMEA Debtors Was as Valuable as the R&D Performed by NNL

107.    The Canadian Debtors suggest that R&D spending is not an appropriate measure of contribution because the R&D work done by the EMEA and U.S. Debtors was somehow less valuable than R&D performed by NNL, which they say was responsible for most of the Nortel Group's advanced research.[200]   This claim, supported only by the most conclusory and self-serving statements, is wholly inconsistent with the record.

108.    First, for the reasons addressed in the EMEA Debtors' Closing Brief, the interrelated nature of R&D at Nortel means that it is impossible to link the R&D spending of any particular

---

[199]   *Rascal Trucking Ltd. v. Nishi*, 2013 SCC 33 at para. 1; *see also Sistem Muhendislik Insaat Sanayi Ve Ticaret Anonim Sirketi v. Kyrgyz Republic*, [2014] O.J. No. 1815 at para. 50; *Hamilton v. Hamilton*, [1996] O.J. No. 2634 at para. 37 (C.A.); *Fillion v. Fillion*, [2011] B.C.J. No. 2230 at paras. 139 and 141 (B.C.S.C.); Donovan Waters, *Waters' Law of Trusts in Canada*, 4th ed. (US: Thomson Reuters, 2012) at 405 ("Where, however, both parties contribute to the purchase money, and title is taken in the name of one party, the other party is entitled to a resulting trust order in his favour proportionate to the amount he contributed.").

[200]   *See, e.g.*, Canadian Debtors' Closing Brief ¶ 39 ("'localization' of technology developed elsewhere to a particular market's needs" was "a common focus of the NNUK laboratories with respect to technology developed in Ottawa"); *see also* Canadian Debtors' Closing Brief ¶ 37.

RPE to discrete technologies or patents, including those sold in the postpetition sales.[201]    Nortel itself confirmed this fact time and again in its representations to multiple tax authorities.[202]

109.    Second, there simply is no evidence that the EMEA RPEs performed R&D that was any "less productive" or "less valuable" than NNL.    On the contrary, the transfer pricing methodology reflected in the MRDA was expressly premised on a finding that each dollar of R&D spending by each RPE had equal value.    The Canadian Debtors' attempt to rebut this rests heavily on the evidence of Brian McFadden,[203] NNL's former chief technology officer, but Mr. McFadden admitted in cross-examination that the EMEA Debtors made vital contributions to Nortel's advanced research late into Nortel's existence.[204]    In addition, numerous NNUK engineers and other employees gave unrebutted evidence that the EMEA Debtors were responsible for substantial advanced research.[205]    The record demonstrates that the R&D performed by the EMEA RPEs was sophisticated, wide-ranging, and valuable.

---

[201]    *See* EMEA Debtors' Closing Brief ¶¶ 55–64.

[202]    *See, e.g.*, TR21407, Functional Analysis at 30.

[203]    *See* Canadian Debtors' Closing Brief ¶¶ 31, 37.

[204]    *See* Trial Day 3 Tr. 720:16–721:13, May 14, 2014 (B. McFadden Cross) (noting that NNUK's facility at Harlow had a history of working on smart antennas, which were related to LTE technology, based on the lab's expertise).

[205]    *See, e.g.*, Trial Day 3 Tr. 681:12–682:16, May 14, 2014 (B. McFadden Cross) (Harlow was a worldwide leader in modern fiber-optic communication, which contributed to Nortel's growth in the 1990s.); Trial Day 7 Tr. 1568:21–1569:10, 1569:15–1570:2, May 22, 2014 (S. Brueckheimer Direct) (Harlow filed five fundamental patents associated with voice on packet technology, one of which "embodies some fundamental principles necessary for controlling the whole network."); Trial Day 7 Tr. 1607:1–14, May 22, 2014 (P. Newcombe Direct) (EMEA worked  on coherent detection systems for the MEN portfolio ultimately sold to Ciena, and MIMO technology, wireless antenna technology for LTE.); Trial Day 7 Tr. 1663:24–1664:19, May 22, 2014 (A. Jeffries Direct) (Mr. Jeffries' team in Harlow developed the MIMO algorithms, which Ottawa put into

(Footnote continued on next page)

110.    Third, to the extent it is possible to conduct such an inventorship analysis – as Mr. Malackowski did to provide a sense-check of his allocation conclusions – it serves only to defeat the Canadian Debtors' suggestion that the EMEA Debtors conducted "less valuable" R&D.  Mr. Malackowski's analysis shows that the EMEA Debtors accounted for the creation of 17.7% of total patents sold in the Residual Patent Sale, and 18.7% of the high-interest patents sold in the Residual Patent Sale.[206]  Not only did no party challenge Mr. Malackowski's analysis regarding the EMEA Debtors' inventive output, but the CCC's own expert, Mr. Britven, and the UKPC's expert, Dr. Bazelon, confirmed that the EMEA Debtors made significant contributions to the creation of Nortel IP – not only in dollars, but in actual patents.[207]

### 3.    The Inventorship Approach Is Inappropriate for Nortel

111.    The CCC argues that Mr. Malackowski failed to "undertake the kind of detailed tracing exercise that would be required to determine which IP innovators contributed what to Nortel's

---

(Footnote continued from previous page)

existing equipment for over-the-air demonstration.); G. Mumford Dep. Tr. 79:6–16, Oct. 24, 2014 (Harlow worked on advanced research for optical.).

[206]    TR00034, Rebuttal Report of James E. Malackowski 41 (Mar. 24, 2014) [hereinafter "Malackowski Rebuttal"]; *see also* DEM00011, Malackowski Slides at 36.

[207]    TR00046, Thomas Britven, Allocation of Sales Proceeds to the Nortel Debtor Groups, Rebuttal to Reports of Messrs. Kinrich, Zenkich, Malackowski, Huffard, Bazelon, Green, and Berenblut and Cox § 6.17 tbl. 4 (Feb. 28, 2014) [hereinafter "Britven Rebuttal"]; TR00039, Expert Report of Coleman Bazelon 18–20 (Jan. 24, 2014).

success,"[208] and that the inventorship analysis is "at least as accurate a measure of contribution as R&D spend."[209]

112.    First, Mr. Malackowski explained that such an exercise is impossible in this case,[210] and no party, not even the CCC, suggests otherwise.  The perfect cannot be the enemy of the good, particularly where all parties agree that "the perfect" is unattainable, while "the good" was used by Nortel to measure IP ownership for many years.

113.    Second, it is quite incorrect that an inventorship analysis is at least as accurate a measure of contribution as R&D spending.  Nortel itself disclaimed such an approach in the Functional Analysis it submitted to the tax authorities, which emphasized that research often built on earlier contributions carried out in other jurisdictions, that this would not necessarily be recognized in a patent filing, and that using the names of inventors on patents to measure the RPEs' respective contributions to R&D would be misleading.[211]    That is why Nortel historically recognized ownership based on contribution measured by R&D spending, a measurement never subject to criticism by any tax authority.  The CCC's preference for inventorship is driven by the fact that it favors the Canadian Debtors over the U.S. Debtors, but it is undermined by the CCC's own

---

[208]    CCC's Closing Brief ¶ 21.

[209]    CCC's Closing Brief ¶ 141.

[210]    *See* TR00033, Malackowski Report 39; Trial Day 10 Tr. 2336:13–2337:7, May 29, 2014 (J. Malackowski Direct); Trial Day 10 Tr. 2346:23–2348:1, May 29, 2014 (J. Malackowski Cross).

[211]    *See* TR21407, Functional Analysis at 30.

arguments in support of the *pro rata* theory – namely, that R&D contributions cannot be disentangled in this manner.[212]

114.    An inventorship approach would also funnel more money to the EMEA Debtors.  But the EMEA Debtors rejected such an approach in favor of contribution because relative R&D spending is the best available metric for allocating relative ownership interests in Nortel IP,[213] and it is consistent with the way Nortel recognized that ownership prior to insolvency.

> **B.    The Courts Should Allocate the RPEs' Contributions Based on All Relevant R&D Spending**
>
> > *1.    The Evidence Proves that the Useful Life of the IP Sold Was Far Longer than Five Years*

115.    The Canadian Debtors argue that the 30% amortization and the five-year "lookback," which were used at various points to calculate the RPEs' relative shares of profit and loss under the RPS methodology, represented "an average economic life of R&D expense," and so the Canadian Debtors use the 2010 RPS percentages (incorporating R&D spending from 2005 to 2009) in their valuation.[214]   The Canadian Debtors also assert that using all relevant R&D spending, in order to capture contributions to the creation of IP made prior to 2005, "would greatly overvalue the expenditures that generated no IP or IP that could not be put to use."[215] These arguments are entirely beside the point.   First, the task before the Courts is not to

---

[212]    *See* CCC's Closing Brief ¶ 161.

[213]    *See* DEM00011, Malackowski Slides at 61; Trial Day 10 Tr. 2354:2–2355:23, May 29, 2014 (J. Malackowski Cross); Trial Day 10 Tr. 2336:13–2337:20, May 29, 2014 (J. Malackowski Direct).

[214]    *See* Canadian Debtors' Closing Brief ¶ 70.

[215]    Canadian Debtors' Closing Brief ¶ 72; *see also* Canadian Debtors' Closing Brief ¶ 562.

determine the average economic life of IP; the task is to determine what the RPEs contributed to the creation of the Nortel IP that was actually sold. Second, capturing all R&D in any given year does not overvalue expenditures that generated IP of lesser value (or no IP at all) because, once again, this is an exercise in allocation, not valuation.[216]

116.    As established in the EMEA Debtors' Closing Brief, all of the IP that was sold in the Business Sales and the Residual Patent Sale is *ipso facto* within its useful life because a third-party purchaser was willing to pay for it.[217] In order to include all of the RPEs' contributions to the creation of the IP sold, it is essential to look at all R&D spending that occurred during the period in which the IP sold was created. As Mr. Malackowski demonstrated at trial, much of the valuable IP that was sold in the Business Sales and the Residual Patent Sale was quite old.[218]

117.    Indeed, it should be no surprise that research done in the 1990s was responsible for the majority of the patents sold with the Lines of Business and the high-interest residual patents that were purchased by Rockstar.[219] For the best inventions, the useful life could be unlimited and the only limit on economic life would be the patent term. To use an extreme example, one of

---

[216]    The Canadian Debtors' claim that NNL's R&D spending was more valuable is addressed above in Section IV.A.2.

[217]    *See* EMEA Debtors' Closing Brief ¶¶ 179–202.

[218]    *See, e.g.,* DEM00011, Malackowski Slides at 19, 22; Trial Day 10 Tr. 2277:16–2278:7, May 29, 2014 (J. Malackowski Direct). Had Mr. Malackowski actually wanted to "cherry-pick" data to achieve the most favorable outcome for the EMEA Debtors, he could have adopted a five-year lookback from 2001 to 2006 (*i.e.*, a five-year period leading up to the invention of the last high-interest patent sold to Rockstar), an inventorship analysis, or even the license approach explained in his report. All would have resulted in a higher recovery for the EMEA Debtors. *See* DEM00011, Malackowski Slides at 61; TR11383, Malackowski Report Ex. R.2.1.

[219]    *See* DEM00011, Malackowski Slides at 19, 22.

civilization's greatest inventions was the wheel.  Had a perpetual patent been granted for this invention, it would be earning royalties today.  During the 1990s, the various RPEs invented a series of telecommunications "wheels" that were highly valued by the purchasers of Nortel's businesses and residual patent portfolio – $5.3 billion was paid for Nortel IP across the postpetition sales.  But the Canadian Debtors' five-year lookback period would have the Courts ignore nearly all of the R&D spending that actually led to the creation of this IP.

   2.   *The Lookback Period in the MRDA is Expressly Inapplicable and Wrong*

118.   In support of a five-year lookback period, the Canadian Debtors assert that if R&D spending were used to allocate sale proceeds, the best guide would be to use the period specified in the prepetition amendments to the MRDA.[220]  That is incorrect for a number of reasons.

119.   First, it is contrary to the plain language of the MRDA, which by its terms applies to operating profit and loss, not sale proceeds.[221]  The question before the Courts is not whether Schedule A to the MRDA was an acceptable allocation method for distributing operating profit and loss when Nortel was a going concern.

120.   Second, as the EMEA Debtors' transfer pricing expert, Dr. Cooper, explained in his testimony, the five-year lookback period (or 30% amortization rate) that applied under the MRDA was put in place to provide certainty for accounting purposes.  It was designed to

---

[220]   *See* Canadian Debtors' Closing Brief ¶¶ 557–564.

[221]   *See* TR21003, Third Addendum sched. A (Jan. 2009), at NNC-NNL06001514/49.

distribute current income, and therefore had a relatively short-term focus.[222]   In distributing

operating income it was also appropriate to focus more on short-lived R&D that produced

marketable, revenue-generating products – as opposed to the entire useful life of a patent

transferred in a sale.  Indeed, Dr. Cooper testified that in a sale like this, the tax authorities would

require a more rigorous analysis of the parties' contributions than what was used in the MRDA

to apportion operating profit and loss.[223]   This is reflected in the parties' agreement in the Third

Addendum to the MRDA that Schedule A would not be used to allocate sale proceeds.[224]

121.    Third, Nortel had specific operational and tax goals in adopting, first, the 30%

amortization rate, and then the five-year lookback period, which applied to Schedule A to the

MRDA.  In particular, Nortel used a shorter lookback period because it would shift more revenue

to Canada, a lower tax jurisdiction that was desperate for funds.  Following the dot-com bust in

2000, Nortel gradually shifted R&D spending away from the EMEA and U.S. Debtors, and

toward NNL.  This trend accelerated between 2005 and 2009.[225]   The shorter the lookback

period, the more revenue could be shifted to Canada.

122.    In preparation for APA negotiations with the tax authorities, Gilles Fortier, NNL's

taxation manager for transfer pricing, circulated a document among Nortel tax executives

summarizing the "key drivers" for Nortel, on the one hand, and the tax authorities, on the other,

---

[222]   *See* Trial Day 11 Tr. 2661:16–2665:9, May 30, 2014 (R. Cooper Direct).

[223]   Trial Day 11 Tr. 2663:18–2665:20, May 30, 2014 (R. Cooper Direct).

[224]   *See* TR21003, Third Addendum sched. A (Jan. 2009), at NNC-NNL06001514/49.

[225]   *See* TR11383, Malackowski Report Ex. R.2.2.

with regard to the APA.[226]   Mr. Fortier highlighted that "Nortel wants to move as much to C[a]nada" as possible and that a "longer life increase[s] the profit in NNI [and] we do not want that."[227]   Accordingly, Mr. Fortier advised that Nortel should "suggest 4 – 7 yrs." to the tax authorities, even though he acknowledged that the life of Nortel IP was "7 – 10 yrs. or more."[228] Using this shorter period would result in approximately $1 billion in cash tax savings to Nortel over the APA period.[229]

123.    Moreover, Nortel also suggested a shorter useful life to the tax authorities for strategic reasons, anticipating that the tax authorities would push Nortel to adopt a longer useful life. Both NNL and NNI personnel testified that Nortel's proposal would be subject to change through the course of the APA negotiations.[230]   For example, Walter Henderson, a senior tax attorney at NNI, gave evidence that the 30% amortization rate proposed for the RPS

---

[226]   TR22128, Email from Gilles Fortier, NNL, to MaryAnne Pahapill, NNL, *et al.* (May 10, 2002, 2:42 p.m.), attaching Purpose Behind the Advance Pricing Agreement Between Nortel Networks and the Three Tax Authorities (CCRA, IRS and Inland Revenues).

[227]   TR22128, Purpose Behind the Advance Pricing Agreement Between Nortel Networks and the Three Tax Authorities (CCRA, IRS and Inland Revenues).

[228]   TR22128, Purpose Behind the Advance Pricing Agreement Between Nortel Networks and the Three Tax Authorities (CCRA, IRS and Inland Revenues).

[229]   *See* TR22128, Purpose Behind the Advance Pricing Agreement Between Nortel Networks and the Three Tax Authorities (CCRA, IRS and Inland Revenues).

[230]   *See* K. O Dep. Tr. 163:21–166:7, Nov. 9, 2013 (Nortel modeled various options for the R&D amortization period and then negotiated with the tax authorities regarding the appropriate period); Trial Day 5 Tr. 1202:15–22, May 20, 2014 (W. Henderson Recross); TR00016, Henderson Decl. ¶ 53 ("However, we recognized that this 30 percent figure might not ultimately be accepted or agreed to by the IRS and the other tax authorities.").

methodology during the 2001 to 2005 period was "certainly" subject to change and would be "subject to a long negotiation."[231]

124.    Fourth, as it happened, the Canadian and U.S. tax authorities never accepted Schedule A to the MRDA.[232]  No reason was given for the $2 billion adjustment from NNL to NNI that was ordered with respect to the 2001 to 2005 period.  However, in light of this massive adjustment it simply cannot be assumed that the formula set forth in Schedule A to the MRDA represented an accurate, arm's length measure of the relationship between the RPEs even for operational purposes.  The MRDA explicitly stated that "the calculation of the RPSM as set forth in Schedule A may be amended" based on review by the tax authorities.[233]  No amendment was made because the Nortel Group was insolvent by the time the $2 billion adjustment was agreed, but it nonetheless highlights the fact that the figures used in Schedule A were not infallible. Indeed, Nortel itself changed the applicable period from a 30% amortization to a five-year lookback.[234]

125.    Fifth, while for reasons of convenience Nortel ultimately chose to use RPS percentages in allocating IP proceeds from the Alcatel sale, senior executives who were responsible for

---

[231]    Trial Day 5 Tr. 1202:15–22, May 20, 2014 (W. Henderson Recross).

[232]    *See* TR40594, Thirty-Fifth Report of the Monitor ¶¶ 39–41 (Jan. 18, 2010); DEM00003, U.S. Opening Slides at 199.

[233]    TR21003, MRDA at 2 (Dec. 22, 2004), at NNC-NNL06001514/2 (eighth recital).

[234]    Despite this, the Canadian Debtors accuse the EMEA Debtors of demonstrating insufficient fidelity to the RPS percentages in the EMEA Debtors' implementation of the contribution approach.  Of course, as described at length in this brief and the EMEA Debtors' Closing Brief, the EMEA Debtors are the only party that demonstrates any fidelity to the way the Nortel Group actually allocated the fruits of IP ownership.

determining that allocation were not bound to do so.[235]  Instead, Nortel considered the rights held

by the parties and specifically chose to allocate the value of the IP sold in accordance with the

RPEs' underlying joint ownership of all Nortel IP, as Nortel represented to its auditors.[236]

Moreover, although the allocation of IP sale proceeds used the 30% amortization – the five-year

lookback was only adopted on the eve of insolvency in the Third Addendum – this produced an

allocation of 40% to NNL, 42% to NNI, and 17% to EMEA[237] because relative R&D spending

had been more or less stable in the lead-up to the Alcatel sale.  The Alcatel allocation figures

were therefore far more consistent with historical spending than the 2005 to 2009 lookback

period on which the Canadian Debtors now rely.[238]

126.    In light of the foregoing, there can be no question that the lookback in the MRDA must

not be applied here.  The parties agreed it would not apply, and the Courts now have clear and

uncontroverted evidence regarding the period during which the relevant Nortel IP was created

and the relative R&D spending during that period.  The sale process and the expert analysis of

what created the value in the sales prove without question that Schedule A would be a wildly

---

[235]  M. Weisz Dep. Tr. 139:23–140:24, Nov. 25, 2013; TR00027, Affidavit of Aylwin Kersey Stephens ¶ 48, Apr. 11, 2014; TR21165, Memorandum from the Nortel Global Initiatives Group to the Project Osiris Files (Feb. 15, 2007), at NNC-NNL06121235/1.  TR21165, the Alcatel Memorandum, was drafted by NNI's Michael Orlando and NNUK's Kerry Stephens and was approved by NNL's Peter Look.  Trial Day 6 Tr. 1305:2–16, May 21, 2014 (M. Orlando Cross).

[236]  *See* TR21160, Email from Louis Farr, NNI, to Timothy Pickering, Deloitte, *et al.* (Jan. 29, 2007, 2:25 p.m.); TR21165, Memorandum from the Nortel Global Initiatives Group to the Project Osiris Files, at 2 (Feb. 15, 2007), at NNC-NNL06121235/2; Trial Day 6 Tr. 1305:2–1306:4, May 21, 2014 (M. Orlando Cross).

[237]  *See* TR00030, Huffard Report app. 10 ¶ 10.

[238]  *See* Canadian Debtors' Closing Brief ¶ 564 (showing that the 2010 RPS percentages result in an allocation of 50% to NNL, 39% to NNI, and 12% to EMEA, whereas the allocation under the EMEA Debtors' contribution approach is 43% to NNL, 39% to NNI, and 18% to EMEA).

inaccurate measure of the RPEs' contribution to the IP conveyed in the postpetition sales.  The trial record thus provides the Courts with much more accurate information than those Schedule A estimates.  It would be an error to ignore this relevant, unrebutted evidence.  Seeking to maximize their allocation, the Canadian Debtors invite the Courts to reach factual findings that are contradicted by the clear evidence in the record.[239]

### 3.    The 2010 RPS Percentages Are Particularly Inappropriate

127.    For the reasons discussed above, the use of any five-year lookback to measure contribution to the IP sold postpetition is necessarily wrong.  However, if a five-year lookback period were adopted by the Courts, there are two additional reasons why the Canadian Debtors' proposed 2005 to 2009 lookback period is particularly inappropriate.

128.    First, this lookback period includes postpetition R&D spending that occurred during 2009.[240]  The Canadian Debtors concede that postpetition R&D spending was not intended to create new IP, but rather "to preserve the enterprise value of the business lines for either ongoing business or sale."[241]  As a result, very little new IP was created, as reflected in a precipitous drop in 2010 patent filings when the RPEs' R&D spending from 2009 could be expected to bear

---

[239]    *See Mitchell v. Minister of National Revenue* 2001 SCC 33 at para. 51; *R. v. Roy* 2012 SCC 26 at paras. 44–46; *Dynamic Fuel Systems Inc. v. Synergic Distribution Inc.* 2013 ONSC 4081 at paras. 17, 27–29 (Div. Ct.); *Upper Freehold Reg'l Bd. of Educ. v. T. W.*, 496 F. App'x 238, 243–44 (3d Cir. 2012) (vacating and remanding after determining that the trial court had drawn factual conclusions that contradicted the evidence in the record); *FTC v. Lane Labs-USA, Inc.*, 624 F.3d 575, 584, 587 (3d Cir. 2010) (same); *PNC Bank, N.A. v. Varsity Sodding Serv. (In re Varsity Sodding Serv.)*, 139 F.3d 154, 158 (3d Cir. 1998) (reversing under same circumstances); *see also Caracci v. Comm'r*, 456 F.3d 444, 462 (5th Cir. 2006) (noting that "[i]n the process of arriving at and applying [its selected valuation] method, and in struggling to make that method make sense, the Tax Court made a number of clearly erroneous factual findings" that required reversal).

[240]    *See* Canadian Debtors' Closing Brief ¶ 564.

[241]    Canadian Debtors' Closing Brief ¶ 107.

fruit.[242]   Since the goal is to measure the RPEs' contributions to the creation of IP that was actually sold, postpetition spending should be excluded.

129.    Second, using a five-year lookback from 2005 to 2009 excludes R&D spending from 2004.  In contrast to 2009, R&D spending in 2004 supported significant R&D that was actually being conducted and led to the creation of the IP that was sold.  High-interest patents, which drove the $4.5 billion purchase price paid by Rockstar, were being invented in 2004, not in 2009.[243]   Because the EMEA Debtors' R&D spending was greater during the period when Nortel was actually creating saleable IP, their allocation is materially reduced by applying a lookback period from 2005 to 2009 versus a lookback period from 2004 to 2008.[244]   There is no principled basis to favor the former over the latter in measuring the RPEs' contributions to R&D, and it would be patently wrong to do so.

---

[242]    *See* TR00033, Malackowski Report 41 fig. 1; *see also* DEM00011, Malackowski Slides at 20, 22.

[243]    *See* DEM00011, Malackowski Slides at 22.

[244]    As discussed below, the EMEA Debtors are entitled to an allocation of $409 million in respect of Customer-Related Assets and Goodwill.  *See* TR00030, Huffard Report ¶ 119.  Adding this figure to the EMEA Debtors' allocation in respect of IP, calculated using a lookback period from 2004 to 2008, results in a total allocation to the EMEA Debtors of $1,105 million (15.0%).  *See* TR11383, Malackowski Report Ex. B.1.7.1.  Adopting a lookback period from 2005 to 2009, instead of 2004 to 2008, would not only be wholly unwarranted, it would result in the allocation of an additional $100 million to the Canadian Debtors, almost entirely at the expense of the EMEA Debtors.  *See* TR11383, Malackowski Report Ex. B.1.7.1.

4.      *The Courts Should Not Adjust the Contribution Approach to Include Funding*

130.   The U.S. Debtors argue that for the CSA period, prior to 2001, a contribution approach should take into account transfer pricing adjustments made pursuant to the CSAs.[245]   Such adjustments are unwarranted.   As explained in detail in the EMEA Debtors' Closing Brief, the adjustments proposed by the U.S. Debtors' expert, Ms. Ryan, are inaccurate and misleading and fraught with methodological errors and baseless assumptions.[246]   Her approach is therefore unreliable and should not be adopted.   More fundamentally, her adjustments have nothing to do with the purpose of the contribution approach.   The goal in measuring the RPEs' contributions to the creation of IP is to get as close as possible to the inventive process.[247]   Absent a tracing exercise involving laboratory notebooks and interviews of each engineer, which all parties accept is impossible here, the closest proxy is actual R&D spending.[248]   Ms. Ryan's skewed focus on the funding of R&D is far removed from the inventive process.[249]   Indeed, Ms. Ryan herself conceded at trial that funding R&D is not the same as conducting R&D.[250]   The Courts should apply Mr. Malackowski's unadjusted R&D spending figures, which accurately reflect the RPEs'

---

[245]   U.S. Debtors' Closing Brief 125–128.  Notably, the U.S. Debtors appear to have abandoned the argument, presented in Ms. Ryan's report and again at trial, that transfer pricing adjustments from the MRDA period should also be included in R&D spending. This approach is properly rejected because it errs in equating funding with ownership and because it would override the parties' own choice to value their ownership interests based on direct R&D spending.  *See* Trial Day 18 Tr. 4566:4–23, June 19, 2014 (L. Ryan Cross).

[246]   *See* EMEA Debtors' Closing Brief ¶¶ 227–231.

[247]   *See* EMEA Debtors' Closing Brief ¶ 223.

[248]   *See* Trial Day 10 Tr. 2336:13–2337:20, May 29, 2014 (J. Malackowski Direct).

[249]   *See* EMEA Debtors' Closing Brief ¶¶ 223–226.

[250]   *See* Trial Day 18 Tr. 4549:3–7, June 19, 2014 (L. Ryan Cross).

contributions to the creation of the Nortel IP that was sold, rather than Ms. Ryan's flawed funding adjustments.

### C.    The License Approach Suggested by the U.S. Debtors

131.    The EMEA Debtors' primary position is that neither the licenses nor legal title is determinative in this proceeding because the right to an allocation of sale proceeds attributable to IP lies in the RPEs' beneficial ownership.   The EMEA Debtors urge the Courts to accept the contribution approach not only because it is the approach that is grounded in the law, but also because it is by some margin the approach that most closely reflects the way Nortel recognized, valued, and allocated rights in IP for the last decade of its operations, including in the MRDA, which allocated value exclusively according to R&D contribution.

132.    If the Courts were to determine that the contribution approach is not the best method for allocating sale proceeds, the EMEA Debtors submit that a license approach, based on the value of the revenue streams relinquished by the RPEs, is a viable alternative method for allocating the value of sale proceeds attributable to IP.   A license approach that includes the full value of the EMEA and U.S. Debtors' exclusive and nonexclusive licenses can properly recognize their significant role in generating revenue for the Nortel Group.

133.    In implementing a license approach, the Courts should adopt Mr. Malackowski's methodology.[251]   Mr. Malackowski's alternative license approach has much in common with the approach of the U.S. Debtors' expert, Mr. Kinrich, including, importantly, that the value of the

---

[251]    EMEA Debtors' Closing Brief ¶¶ 270–281.

nonexclusive licenses to the rest of the world, held by each of the five RPEs, should be split equally (one-fifth each) because together the nonexclusive rights are the equivalent of one exclusive license.[252]  Nortel itself determined that in 2007 the RPEs generated more than a billion dollars in revenue outside of their exclusive territories, yet the Canadian Debtors simply ignore the nonexclusive licenses.[253]

134.    Mr. Malackowski's approach is, however, superior for a number of reasons, principally that Mr. Kinrich's approach greatly understates the value of Nortel's IP in the nonexclusive jurisdictions.  Mr. Kinrich assumes little revenue in China and absolutely no revenue in the rest of the world, including major technology economies such as Japan and South Korea, which have highly developed patent enforcement regimes and in which Nortel's top patents were registered.[254]  Mr. Malackowski, by contrast, fully accounts for all such revenues because he calculated the projected income for each of Nortel's franchises in each global market based on reliable third party data.[255]

135.    If the Courts were to adopt Mr. Kinrich's approach notwithstanding his undervaluing of the nonexclusive licenses, it would still be necessary first to correct for one critical error:  Mr.

---

[252]    *See* EMEA Debtors' Closing Brief ¶¶ 278–279; Trial Day 17 Tr. 4119:9–4120:3, June 18, 2014 (J. Kinrich Direct).

[253]    *See* TR11268, Email from Michael Orlando, NNI, to Peter Look, NNL, *et al.* (Jan. 5, 2009, 10:47 p.m.) (attaching Intercompany Sales Analysis with Mark-up Data spreadsheet, which reports each RPE's sales outside of their territories in 2007, totaling over a billion dollars).

[254]    *See* Trial Day 10 Tr. 2320:20–2321:4, 2332:8–2334:7, May 29, 2014 (J. Malackowski Direct); Trial Day 11 Tr. 2578:4–12, May 30, 2014 (J. Malackowski Cross); Trial Day 17 Tr. 4241:23–4254:21, June 18, 2014 (J. Kinrich Cross).

[255]    *See* TR00033, Malackowski Report 31–38, 49–52.

Kinrich allocates sale proceeds according to relative revenues of the license holders in 2009, which is an inherently unreliable starting point.  Mr. Kinrich claims that 2009 data is the most current available.[256]    That may be technically true, but it misses the much larger and more important point:  2009 was not a typical or representative year for Nortel.  In fact, it would be hard to find a less representative year.  The reasons for that include:

- The Nortel Group's creditor protection filings occurred in the middle of January 2009,[257] which undoubtedly impacted revenues during the year.

- In 2009, Nortel concluded definitive agreements to sell all but one of its eight Lines of Business, and in fact closed four of those eight sales.[258]

- As a result, full-year financial data for half of the Lines of Business sold was not even available for 2009, so Mr. Kinrich's conclusions are based on incomplete data.[259]

- As Mr. Kinrich's own charts demonstrate, the EMEA Debtors' share of the Line of Business revenues was 12.8% in 2001 and increased steadily every single year through 2008, when the EMEA Debtors' share accounted for 22.7% of Nortel's global revenues.[260]  The only year in which the EMEA Debtors' share dropped was 2009, the year Mr. Kinrich selected as "representative."[261]  Mr. Kinrich himself cited telecommunications projections showing an increasing EMEA revenue share through at least 2013.[262]

---

[256]    Trial Day 17 Tr. 4183:21–4184:9, June 18, 2014 (J. Kinrich Direct).

[257]    Trial Day 17 Tr. 4209:1–16, June 18, 2014 (J. Kinrich Cross).

[258]    Trial Day 17 Tr. 4209:17–4213:16, June 18, 2014 (J. Kinrich Cross); DEM00007, Ray Slides at 1–12; DEM00019, Kinrich Slides at 25.

[259]    Trial Day 17 Tr. 4214:1–4216:14, June 18, 2014 (J. Kinrich Cross).

[260]    Trial Day 17 Tr. 4220:24–4221:21, June 18, 2014 (J. Kinrich Cross); TR00051, Kinrich Report Ex. 6.

[261]    Trial Day 17 Tr. 4221:15–21, June 18, 2014 (J. Kinrich Cross).

[262]    *See* DEM00019, Kinrich Slides at 33.

136.    Mr. Kinrich nonetheless refused to consider 2009 revenues "anomalous,"[263] claiming during trial that these revenues may have affected overall revenues of the Group but did not affect relative levels of revenue across the RPEs.[264]  That is simply not true.  The EMEA revenue share, when compared between 2008 and 2009, shows a material drop postpetition – from 22.7% in 2008 to 18.4% in 2009.  When applied to the Business Sales proceeds, this 4.3% difference means that the EMEA Debtors' allocation falls from $647 million using 2008 revenue to $524 million using 2009 revenue, thus shifting more than $100 million away from the EMEA Debtors.[265]

137.    Given Nortel's creditor protection filings, the agreed-to and completed divestitures of its Lines of Business, and the historical Nortel trends in revenue, Mr. Kinrich's conclusion that 2009 is not "anomalous" is a clear error.  Accordingly, an application of Mr. Kinrich's license approach to valuation and allocation should apply revenue shares from the year 2008, the most current year (as Mr. Kinrich prefers) that would provide reliable data from Nortel as it operated in its normal course.

138.    Finally, any license theory that is adopted by the Courts cannot be subject to the RPS methodology, as in the Canadian Debtors' allocation approach.  Again, the task before the Courts is to allocate the proceeds of assets sales, not distribute operating profit and loss.  The assets sold in the Business Sales and Residual Patent Sale were purchased free and clear of the RPS

---

[263]    *E.g.*, Trial Day 17 Tr. 4221:22–25, June 18, 2014 (J. Kinrich Cross) ("Q.  And yet it is your testimony to these Courts that 2007 and 2008 revenue figures are anomalous and 2009 is not?  A.  Yes.").

[264]    *See* Trial Day 17 Tr. 4218:21–4219:8, June 18, 2014 (J. Kinrich Cross).

[265]    Trial Day 17 Tr. 4218:10–4219:8, June 18, 2014 (J. Kinrich Cross).

methodology because the existing licenses were terminated.   Thus, the price paid by the purchasers for the unencumbered IP has no relationship to the RPS methodology.   It represents what purchasers were willing to pay for the RPEs to terminate their licenses and focuses on fair market value, not projected revenues in the hands of Nortel.   Regardless, as noted above, all parties agree that the RPS methodology does not apply to the allocation of sale proceeds.

### D.    The Licenses Should Be Valued Based on Their Highest and Best Use

139.    The Canadian Debtors place undue restrictions on the EMEA and U.S. Debtors' license rights in an attempt to depress their value, thereby increasing the surplus IP value that the Canadian Debtors allocate to NNL.   These restrictions are unsupportable and should be rejected.

#### 1.    *The Licenses Were Effectively Transferable Because All RPEs Consented to the Sales*

140.    The Canadian Debtors' first argument is that the licenses can only be valued in the hands of Nortel because the licenses were not transferable.[266]   Article 14(a) of the MRDA is the only place in the record to which the Canadian Debtors have ever been able to point for support, but the plain language of Article 14(a) does not restrict the transferability of the licenses:   "This Agreement shall not be assigned by any Participant except with the written consent of each of the other Participants."[267]

141.    Article 14(a) says nothing about the licenses.   It says only that the Agreement – the MRDA itself – may not be assigned without consent.   Critically, Article 14(a)'s restriction on the

---

[266]    Canadian Debtors' Closing Brief ¶ 329.

[267]    TR21003, MRDA art. 14(a) (Dec. 22, 2004), at NNC-NNL06001514/12.

assignment of the MRDA applies equally to all Participants, not just the EMEA and U.S. Debtors.  Thus, even if Article 14(a) did mean that the Participants' interests must be valued in the hands of Nortel, then each Participant's interest – whether in the form of a license or legal title – would have to be valued in the hands of Nortel.  In other words, if the Canadian Debtors' interpretation of Article 14(a) were correct, then NNL would also be prohibited from transferring legal title to Nortel IP.  The Canadian Debtors simply are not entitled to claim the difference between the value of the licenses in the hands of Nortel and the actual purchase price of the sales as a surplus for NNL.

142.    The other answer, as pointed out by the U.S. Debtors, is that the parties all consented to the sales and so there is no reason to value their interests "in the hands of Nortel."[268]  Had the Canadian Debtors disclosed their contention that NNL is the sole owner of Nortel IP and that the Canadian Debtors are therefore entitled to all of the Residual Patent Sale proceeds, the EMEA and U.S. Debtors would not have consented and that sale would not have occurred.[269]

143.    The CCC claims that Article 14(a) does not apply to legal title because NNL's ownership of Nortel IP was not part of the contractual benefit provided in the MRDA, but rather pre-existed it.[270]  This ignores the plain language of Article 4(a) that legal title is granted "in consideration [for]" the license grants, and effectively argues that NNL received ownership in return for

---

[268]    *See* U.S. Debtors' Closing Brief 108–10.

[269]    *See* Trial Day 6 Tr. 1374:17–1375:10, May 21, 2014 (J. Ray Direct); A. Bloom Dep. Tr. 95:12–96:16, Dec. 5, 2013.

[270]    CCC's Closing Brief ¶ 85 n.83.

nothing.[271]   In reality, legal title and the licenses were two sides of the same coin.   They represented the most tax-efficient and operationally sound way for Nortel to structure nominal ownership of the IP, but neither controlled beneficial ownership.

144.     The Canadian Debtors' approach is driven by their need to limit the IP allocation to the EMEA and U.S. Debtors.   They determine the value of the licenses "in the hands of Nortel" – based on nonexistent transfer restrictions – and then calculate the license values based on R&D spending from 2005 to 2009.[272]   This creates a substantial surplus above the artificially depressed value of the EMEA and U.S. Debtors' licenses, which the Canadian Debtors take for themselves. There is no foundation for allocating this residual surplus to the Canadian Debtors based on nonexistent restrictions.

### 2.      *The Licenses Should Be Valued in "Safe Hands"*

145.     The Canadian Debtors also assert that the licenses "were restricted to activities 'by or for the Participants,'"[273] an argument discredited above in Section III.B.4.   As a result, they claim, "[n]o additional value can be hypothesized if those restricted license rights were put in the hands of another person."[274]   Accordingly, each of the Canadian Debtors' experts adopted a "value in

---

[271]   TR21003, Third Addendum § IV (Jan. 2009), at NNC-NNL06001514/41 (amending Article 4(a) of the original MRDA (TR21003, MRDA art. 4(a) (Dec. 22, 2004), at NNC-NNL06001514/6)).

[272]   As noted above, applying this lookback period to R&D spending is wrong because (i) a five-year lookback period fails to account for the useful life of all of the IP that was actually sold, and (ii) a lookback period that includes 2009 incorporates postpetition R&D spending that was aimed at maintaining the value of Nortel's IP portfolio, rather than creating new, high-interest patents.

[273]   Canadian Debtors' Closing Brief ¶ 464.

[274]   Canadian Debtors' Closing Brief ¶ 464.

the hands of Nortel" approach to valuing the EMEA and U.S. Debtors' licenses.[275]   Not surprisingly, given that Nortel was a bankrupt company, this attributed negligible value to the licenses, leaving the lion's share of the IP proceeds to NNL.

146.    First, as noted above, Article 14(a) explicitly states that the MRDA can only be assigned by NNL and the other RPEs – all Participants – with consent.   Therefore, the value available to each of the RPEs would be the safe hands value that could be obtained from a sale done with the consent of all of the RPEs.   Second, as also explained above, the licenses were not limited and the EMEA and U.S. Debtors were not restricted to using Nortel IP only to make Nortel "Products."   Therefore, the entire premise of determining the value of the licenses "in the hands of Nortel," instead of in the safe hands of a financially secure purchaser, is an error.

147.    In valuing the licenses, the approach of Mr. Malackowski or the approach of Mr. Kinrich – both of whom conducted valuations based on fair market value – should be followed, since their approaches are consistent with the scope of the license rights and the actual value relinquished by the EMEA and U.S. Debtors.   Considering that the IP was actually sold to purchasers willing to acquire the IP based on anticipated benefits, it is completely without merit to suggest that the IP should be valued as if it continued to remain in Nortel's hands.

---

[275]   *See* TR00042, Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities 15–16 (Feb. 28, 2014) [hereinafter "Green Report"]; TR00047, Report of Mark L. Berenblut and Alan J. Cox ¶ 65 (Jan. 24, 2014).

### 3. Mr. Britven's Reliance on the 2008 Annual Impairment Test Was Improper

148.    The CCC's implementation of the legal title theory is no less flawed than the approach presented by the Canadian Debtors' experts because Mr. Britven adopted the same flawed assumptions as the Canadian Debtors' experts.[276]   While the Canadian Debtors' expert, Mr. Green, valued the licenses based on projected cash flows, Mr. Britven determined the value of the EMEA and U.S. Debtors' interests in IP transferred in the Business Sales using a 2008 annual impairment test ("AIT"), which estimated the total value of the Nortel business "in the hands of Nortel" to be $988 million.  Mr. Britven then estimated the portion of that $988 million attributable to IP using relative percentages that appeared in PPAs prepared by three Business Sales purchasers, and he derived the EMEA and U.S. Debtors' shares of that value using the RPEs' relative R&D spending over a lookback period from 2005 to 2009.[277]

149.    There are a host of problems with Mr. Britven's analysis.  First, his starting point is an unaudited and wholly unreliable valuation of the entire Nortel business, including the residual patent portfolio, which values the entire global enterprise at less than $1 billion when it sold for $7.5 billion.  Second, as noted above, there is no basis for Mr. Britven's decision to value the business "in the hands of Nortel."  Third, as noted above, there is no basis to treat NNL differently from the other Participants.

---

[276]    *See, e.g.*, TR00045, Thomas Britven, Nortel Networks Expert Report on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups ¶¶ 4.0–4.3 (Jan. 24, 2014) [hereinafter "Britven Report"].

[277]    *See* TR00045, Britven Report § 6.40 tbl. 6.

150.    Remarkably, the CCC claims that the $988 million valuation of the global Nortel business, on which Mr. Britven relies, was in Nortel's "financial statements in 2008, which were subject to audit and involved two major independent accounting firms."[278]   In reality, the $988 million figure appears nowhere in Nortel's financial statements; it does not even appear in a fourth quarter 2008 "triggering memo," which Mr. Britven cited in support of the $988 million figure under cross-examination by the U.S. Debtors.[279]

151.    In the approximately 2.8 million documents produced in this case, Mr. Britven could only locate that $988 million valuation on page 56 of a 69-page draft spreadsheet that he characterizes as the 2008 AIT.[280]   Indeed, despite the fact that $988 million was the starting point for Mr. Britven's entire valuation of the IP transferred in the Business Sales, Mr. Britven testified at his deposition that he simply had no idea of the provenance of this figure.[281]   At trial, after the opportunity for further investigation, Mr. Britven still was unable to determine the origin of this document, vaguely offering only that it came from Nortel's "accounting department."[282]

152.    Regarding the purported review of this document by "independent accounting firms," Mr. Britven's only testimony that anyone else, including any accounting firm, had reviewed this

---

[278]   CCC's Closing Brief ¶ 100.

[279]   Trial Day 14 Tr. 3421:15–3422:11, 3543:3–3544:1, June 6, 2014 (T. Britven Cross).

[280]   *See* Trial Day 14 Tr. 3447:20–3448:16, June 6, 2014 (T. Britven Cross); TR00045, Britven Report ¶ 6.38; TR21645, Nortel Government Solutions Unaudited Net Assets for Evaluation of Goodwill Carrying Value.

[281]   Trial Day 14 Tr. 3436:12–25, June 6, 2014 (T. Britven Cross).

[282]   Trial Day 14 Tr. 3435:17–3436:25, June 6, 2014 (T. Britven Cross).

document was his assumption that "[i]t is what they do in accounting departments,"[283] and "[t]hat's the way the AIT works."[284]  These are just Mr. Britven's guesses for which there is no evidentiary support.  Nor is there any evidence that the $988 million figure was ever audited, either by Nortel or an outside accounting firm.

153.    If the starting point for Mr. Britven's valuation of IP, this $988 million figure, changes – and it must because it is demonstrably incorrect – then all of his conclusions change as well.  In fact, if one were to use the actual $7.5 billion generated by the postpetition sales as the value of the global Nortel enterprise, then, applying Mr. Britven's approach, NNL would receive nothing for the IP.[285]  As Mr. Britven himself testified, "when you get to unreasonable results, we obviously have to step back and say, what is transpiring here."[286]  Since Mr. Britven bases his valuation on a $988 million figure that is demonstrably unreliable, his valuation of the EMEA and U.S. Debtors' licenses must be disregarded.

154.    The CCC's attacks on the EMEA Debtors' experts are also easily dismissed.  The CCC's Closing Brief includes an appendix that criticizes the assumptions and conclusions of Mr.

---

[283]   Trial Day 14 Tr. 3437:1–11, June 6, 2014 (T. Britven Cross).

[284]   Trial Day 14 Tr. 3439:18–23, June 6, 2014 (T. Britven Cross).

[285]   This is because the value attributable to the EMEA and U.S. Debtors' licenses would exceed $1.1 billion, which Mr. Britven calculated to be the total value of IP transferred in the Business Sales based on the purchaser PPAs.  *See* Trial Day 14 Tr. 3535:13–3537:22, June 6, 2014 (T. Britven Cross).

        Adding to the absurdity of Mr. Britven's analysis is that he uses this $988 million figure as the total value for the entire Nortel business – including the residual patent portfolio.  *See* Trial Day 14 Tr. 3421:8–14, 3518:7–13, June 6, 2014 (T. Britven Cross).  By then comparing this total value to the $1.1 billion value of IP transferred in the Business Sales, Mr. Britven is comparing apples and oranges.

[286]   Trial Day 14 Tr. 3538:14–23, June 6, 2014 (T. Britven Cross).

Malackowski and Mr. Huffard, the EMEA Debtors' allocation experts.  The EMEA Debtors analyzed these criticisms and submit responses in Appendix A attached to this submission.  In summary, the CCC's criticisms fail for numerous reasons, including that (i) they are at odds with fundamental valuation concepts, (ii) they contradict information that Mr. Britven relies upon, (iii) they criticize Mr. Malackowski and Mr. Huffard solely for being inconsistent with the CCC's theory, and (iv) they promote a results-driven allocation methodology to achieve the CCC's desired outcome.

## V.    ALLOCATING CUSTOMER-RELATED ASSETS AND GOODWILL

155.    The dispute over allocation of the sale proceeds attributable to IP is no doubt the most significant dispute in this case.  That does not mean, however, that other assets – worth about $2 billion – can be ignored.  In addition to IP, Nortel transferred valuable Customer-Related Assets, Goodwill, and Net Tangible Assets to the purchasers in the Business Sales.  The Canadian and U.S. Debtors improperly value and allocate these non-IP asset classes, and their approaches should not be adopted.

### A.    Only the EMEA Debtors Properly Allocate Customer-Related Assets

#### 1.    The Canadian Debtors' Treatment of Customer-Related Assets and IP As One Asset Class Is Wrong

156.    The Canadian Debtors assert that there should not be a separate category for Customer-Related Assets because "the value of the license rights includes within it the value of customer-related intangibles such as customer relationships and distribution agreements."[287]  They are

---

[287]    Canadian Debtors' Closing Brief ¶ 471; *see also* Canadian Debtors' Closing Brief ¶¶ 134–37.

eager to blur the distinction between IP and Customer-Related Assets because their legal title argument – which claims more than 90% of the proceeds attributable to IP – only directly applies to IP.  Merging the Customer-Related Assets, of which the Canadian Debtors own very little (Canada was, after all, a smaller market for Nortel), with IP shifts to the Canadian Debtors $409 million of Customer-Related Assets and Goodwill that is attributable to the EMEA Debtors.[288] The Canadian Debtors' approach is wrong under valuation principles, wrong under the evidence in the record, and wrong under the MRDA.  It should be rejected for those reasons, and for its blatant attempt to allocate a disproportionate amount of sale proceeds to the Canadian Debtors for assets that were owned by other entities.

157.    First, valuation principles dictate that separately identifiable assets should be valued separately.  There is no doubt that Customer-Related Assets and IP at Nortel were related – without cutting-edge, valuable IP, Nortel would not have been able to generate strong customer relationships, and without lasting and reliable customer relationships, Nortel would not have been able to generate revenue to sustain its R&D and create and sell new technology.  The fact that these two assets were "entangled," as Dr. Bazelon testified,[289] however, does not mean that no effort should be made to value them separately.  Indeed, as experts for both the EMEA Debtors and CCC explained, under standard valuation principles, when assets can be separately

---

[288]    *See* TR00030, Huffard Report ¶ 119.

[289]    Trial Day 12 Tr. 2985:14–21, June 2, 2014 (C. Bazelon Cross).

valued, they must be.[290]  Applying these principles, both the EMEA Debtors and CCC were able

to separately value and allocate Customer-Related Assets and IP.[291]  There is no basis for the

Canadian Debtors to ignore these same principles.

158.    Second, the evidence in the record confirms the separate nature of Customer-Related

Assets and IP.  As explained in detail in the EMEA Debtors' Closing Brief, Customer-Related

Assets were recognized as valuable by Nortel executives prepetition,[292] both Alcatel and Nortel

valued and allocated a separate class of Customer-Related Assets in the Alcatel sale,[293] Nortel

pitched the value of its Customer-Related Assets to potential purchasers of its Lines of

Business,[294] and the Business Sales purchasers separately valued and publicly reported the value

of the Customer-Related Assets they received from Nortel.[295]  The Canadian Debtors' approach

contradicts the substantial evidence in the record that Customer-Related Assets can and should

be separated from IP.

159.    Third, contrary to a brand-new argument that the Canadian Debtors assert in their closing

brief, the MRDA cannot be read to govern Customer-Related Assets.  In their attempt to shoe-

---

[290]  *See* Trial Day 9 Tr. 1972:18–1974:11, May 28, 2014 (P. Huffard Direct); Trial Day 14 Tr. 3473:6–10, June 6, 2014 (T. Britven Cross); Trial Day 14 Tr. 3379:15–19, June 6, 2014 (T. Britven Direct); TR0045, Britven Report ¶ 6.7.

[291]  Trial Day 9 Tr. 1972:18–1974:11, May 28, 2014 (P. Huffard Direct); TR00030, Huffard Report app. 20; Trial Day 14 Tr. 3379:15–19, June 6, 2014 (T. Britven Direct); TR00045, Britven Report ¶ 6.7.

[292]  EMEA Debtors' Closing Brief ¶¶ 288–294.

[293]  EMEA Debtors' Closing Brief ¶¶ 295–300.

[294]  EMEA Debtors' Closing Brief ¶¶ 301–310.

[295]  EMEA Debtors' Closing Brief ¶¶ 311–317.

horn Customer-Related Assets into their legal title argument, the Canadian Debtors rely on the MRDA's definition of NN Technology:

> [A]ny and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill.[296]

The Canadian Debtors argue that "any and all intangible assets" must be read to include Customer-Related Assets.[297]  This argument fails for several reasons.

160.    Fundamentally, the MRDA is a contract between the RPEs – it in no way affects the other entities (including AREs, LREs, and CPEs) that are independently entitled to an allocation on account of the Customer-Related Assets that they transferred in the Business Sales.  The Canadian Debtors' argument, at best, can only apply to Customer-Related Assets sold by the RPEs.  However, the plain language of the MRDA makes clear that the Canadian Debtors' new argument has absolutely no merit.

161.    First, the definition of NN Technology, and indeed every reference to NN Technology in the MRDA, speaks only to IP-related intangibles, not to Customer-Related Assets (and also specifically excludes Goodwill).  For example, Customer-Related Assets cannot be said to be "produced or conceived as a result of research and development," as all NN Technology must be.  Second, principles of contract interpretation lead to the same conclusion:  according to the

---

[296]    TR21003, MRDA art. 1(f) (Dec. 22, 2004), at NNC-NNL06001514/3.

[297]    *See* Canadian Debtors' Closing Brief ¶¶ 471–472.

*ejusdem generis* canon of construction, the phrase "any and all intangible assets" cannot be read to expand the nature of NN Technology from technology to Customer-Related Assets or Goodwill.[298]   Third, if NN Technology meant Customer-Related Assets, then under the Canadian Debtors' analysis, NNL would perversely be vested with "legal title" to all of the EMEA and U.S. Debtors' Customer-Related Assets.[299]   That is clearly not the case.  Indeed, the Canadian Debtors' expert acknowledged that each entity in the Nortel Group individually created, cultivated, and maintained customer relationships in its jurisdiction, and each entity owned those Customer-Related Assets.[300]

162.    There is no fair reading of the plain terms of the MRDA – a document that so clearly relates only to R&D and IP – that would encompass rights or obligations related to Customer-Related Assets.  Indeed, Nortel executives at the time of the Alcatel sale specifically concluded and represented to their auditors that Customer-Related Assets "are not considered technology and are thus outside the Master R&D Agreement."[301]   The Canadian Debtors' attempts to rewrite the MRDA to include Customer-Related Assets and thereby allocate more value to themselves should be rejected.

---

[298]    *National Bank of Greece (Canada) v. Katsikonouris*, [1990] 2 S.C.R. 1029 at para 12.

[299]    *See* TR21003, Third Addendum § IV (Jan. 2009), at NNC-NNL06001514/41 (amending Article 4(a) of the original MRDA (TR21003, MRDA art. 4(a) (Dec. 22, 2004), at NNC-NNL06001514/6)) ("Except as otherwise specifically agreed, legal title to any and all NN Technology, whether now in existence or hereafter acquired, or developed pursuant to the terms of this Agreement, shall be vested in NNL.").

[300]    *See, e.g.*, TR00042, Green Report 3, 56 ("The U.S. and EMEA Entities owned tangible assets and intangible assets – primarily workforce and customer relationships. . . . [T]he Debtors owned the contract rights related to the businesses sold.").

[301]    TR21165, Memorandum from the Nortel Global Initiatives Group to Project Osiris Files, at 3 (Feb. 15, 2007), at NNC-NNL06121235/3.

2. *The EMEA Debtors' Separate Valuations of Customer-Related Assets and IP Are Accurate*

   (a)    The EMEA Debtors Correctly Concluded that the Most Valuable Assets Transferred in the Business Sales Were Customer-Related Assets and Goodwill

163.    The Canadian Debtors repeatedly argue that the EMEA Debtors have inflated the value of Customer-Related Assets and Goodwill at the expense of IP.[302]   This criticism is unfounded and arises because the Canadian Debtors artificially divorce the IP sold in the Business Sales from the IP sold in the Residual Patent Sale.   Looking only at the value of the IP transferred in the Business Sales, the Canadian Debtors complain that under the EMEA Debtors' approach, Business Sales IP "account[s] for barely a quarter of their sale proceeds."[303]   Specifically, the EMEA Debtors conclude that the Business Sales IP represents 25% of the total value of the Business Sales, whereas the total value of IP across all of the postpetition sales represents 69% of the total proceeds.[304]

164.    Considering the context of Nortel's asset sales, however, this conclusion is not a surprise. The Business Sales occurred after the majority of Nortel's IP, including the most valuable IP, had been stripped out of the Lines of Business.   The residual patent portfolio – which on its own sold for $4.5 billion – was worth 60% more than all of the assets of all of the Lines of Business combined.   This was because IP that was useful to more than one business was not sold with any business, but rather was retained by Nortel and merely licensed on a nonexclusive basis.

---

[302]   *See, e.g.*, Canadian Debtors' Closing Brief ¶¶ 586–587.

[303]   Canadian Debtors' Closing Brief ¶ 573; *see also* CCC's Closing Brief ¶ 133.

[304]   DEM00010, Huffard Slides at 20, 21.

Advanced research that had not yet been incorporated into a product was also not transferred – by sale, license, or otherwise – in the Business Sales.  Nor was IP that had been patented for defensive purposes to cover competitors' technology included.  Once all this valuable IP had been stripped out of the Lines of Business, it should be no surprise that what was left was a subset of less valuable IP and a core of valuable Customer-Related Assets and Goodwill.

165.    To give but one example, the largest Business Sale was CDMA/LTE.  The CDMA portion of the business was a legacy technology, for which the purchaser, Ericsson, already had a piece of the market outside the United States.  Although LTE was an emerging technology, Ericsson was already a much larger player in the LTE space than Nortel.  Thus, what the sale offered to Ericsson was access to Nortel's major Carrier Networks customers in the United States, such as Verizon, Sprint, and AT&T.[305]  It should therefore be no surprise that IP did not make up the majority of the value of the sale.

166.    Although the Canadian Debtors accuse the EMEA Debtors of adopting a self-serving allocation approach by claiming that "each additional dollar that is allocated to the residual category increases the ultimate allocation to the EMEA Debtors,"[306] this claim is not true for every Business Sale.  Looking again to the largest sale, CDMA/LTE, the EMEA Debtors did not transfer any Customer-Related Assets and Goodwill because a decision had been made to sell

---

[305]    *See* Trial Day 7 Tr. 1622:11–23, May 22, 2014 (P. Newcombe Direct); TR40195, LM Ericsson Telephone Co., Annual Report for the Fiscal Year Ended Dec. 31, 2009 (Form 20-F), at 27 (Apr. 21, 2010); DEM00010, Huffard Slides at 14; Trial Day 10 Tr. 2146:11–2151:4, May 29, 2014 (P. Huffard Redirect).

[306]    Canadian Debtors' Closing Brief ¶ 587.

only the North American business.  Reaching a low value for CDMA/LTE IP therefore <u>hurt</u> the EMEA Debtors.[307]  The evidence simply dictated it.

167.    That Ericsson's PPA ascribed a higher value to CDMA/LTE IP than the EMEA Debtors' allocation shows only that reasonable valuators can differ, and one cannot speculate as to why without an examination of their methodologies.  The purchaser PPAs were generated for the specific purposes of the purchasers, which have little to do with the allocation exercise before the Courts.[308]  This is precisely why the parties agreed not to rely on the purchaser PPAs[309] – something which the CCC has chosen to ignore.  The parties did so for eminently sensible reasons; the purchasers were not parties to this proceeding, the various Nortel debtor estates have no insight into how the purchasers arrived at their PPAs, and – most importantly – if the numbers used by the purchasers in their PPAs were to hold sway in this proceeding, the parties would have had to litigate this very dispute eight more times, with eight purchasers.  Despite this, the CCC criticizes Mr. Huffard for "depart[ing] from the way in which the purchasers of the Lines of Business allocated the assets they acquired."[310]  Mr. Huffard did not refer to the asset valuations in the PPAs for one very simple reason:  he was instructed not to do so.  The EMEA Debtors abided by the restriction to which all parties, including the Canadian Debtors, agreed.  It is remarkable that they are criticized for doing so by a party that did not.

---

[307]  *See* Trial Day 9 Tr. 1985:11–1986:6, May 28, 2014 (P. Huffard Direct); Trial Day 10 Tr. 2254:12–25, May 29, 2014 (J. Malackowski Direct); Trial Day 11 Tr. 2484:1–2486:16, May 30, 2014 (J. Malackowski Cross).

[308]  *See* TR00031, Expert Report of Paul P. Huffard in Rebuttal to Canadian and U.S. Expert Reports ¶ 45 (Feb. 28, 2014) [hereinafter "<u>Huffard Rebuttal</u>"].

[309]  *See* TR00031, Huffard Rebuttal ¶ 45 & n.73.

[310]  CCC's Closing Brief ¶ 132.

(b)      Mr. Malackowski Never Claimed that the Value of
the IP Sold Could Be $10.4 Billion

168.    The Canadian Debtors further attempt to argue that the EMEA Debtors overvalued the

Customer-Related Assets and Goodwill and undervalued the IP in the Business Sales by

claiming that Mr. Malackowski opined that "the total value of all of the Nortel IP . . . could be

$10.4 billion."[311]   Mr. Malackowski of course gave no such opinion, and the Canadian Debtors

know that.   The $10.4 billion figure demonstrates that the methodology used by the Canadian

Debtors' expert, Mr. Green, was incorrect because it produced absurd results.   Mr. Malackowski

was explicit on this point:

> I have used Green's methodology to allocate the value of the IP
> sold in each of the businesses sold by Nortel, including its
> licensing business.  I do not do so as a means of offering a viable
> allocation approach.  Instead, I do so to demonstrate the inherent
> problems with a residual-based approach that does not attribute
> any value to Nortel's pre-existing licensing business.[312]

169.    Mr. Green had ignored the value of Nortel's nascent licensing business in calculating the

value of the EMEA and U.S. Debtors' licenses over all Nortel IP, and Mr. Malackowski simply

applied Mr. Green's methodology (which he explicitly rejected), after correcting that error, to

demonstrate that methodology's absurdity.[313]   By making this correction, Mr. Malackowski not

only showed that Mr. Green's valuation methodology must be incorrect for producing the absurd

result that the IP could have been worth $10.4 billion, but also that (i) Mr. Green inappropriately

ignored the value of the licensing business in the hands of the EMEA and U.S. Debtors, which

---

[311]   Canadian Debtors' Closing Brief ¶ 574.

[312]   TR00034, Malackowski Rebuttal 19 (emphasis added).

[313]   *See* TR00034, Malackowski Rebuttal 19–21.

reduced their allocations by over 80% and 70%, respectively, and that (ii) by treating NNL's interest as a residual, Mr. Green allocated the Canadian Debtors a windfall for assets they did not own.[314]

(c)    The CCC's Approach Confirms the EMEA
Debtors' Analysis

170.    The propriety of the EMEA Debtors' analysis is further confirmed by the CCC, which not only recognized similar asset classes as the EMEA Debtors, but also allocated comparable value to those asset classes.  Considering only the Business Sales, the CCC determined that Customer-Related Assets and Goodwill represented more value than IP, just as the EMEA Debtors do.  Specifically, the CCC concluded that Customer-Related Assets and Goodwill comprised 54% of the value of the Business Sales, and IP was only 40%.[315]  Considering all of the IP across all of the asset sales, the CCC's approach produces remarkably similar results to the EMEA Debtors:  the CCC allocated 77% of the total sale proceeds to IP, as compared to the EMEA Debtors' allocation of 69%.[316]  These relatively minor differences confirm that the EMEA Debtors do not in any way suppress the value of the IP; rather, they appropriately recognize the value of separately identifiable asset classes.

---

[314]    *See* TR00034, Malackowski Rebuttal 19–22.

[315]    *See* CCC's Closing Brief ¶ 37.

[316]    *See* CCC's Closing Brief ¶ 37; EMEA Debtors' Closing Brief ¶ 341.

3.      *The U.S. and Canadian Debtors' Improper Treatment of the*
        *Customer-Related Assets Disproportionately Impacts the LREs*

171.    While the Canadian Debtors lump Customer-Related Assets with IP in their analysis, the U.S. Debtors do not even distinguish among the various asset classes, instead choosing to allocate all sale proceeds according to 2009 revenues.  By combining separable asset classes and valuing and allocating those merged groups, the U.S. and Canadian Debtors fail to account for the fact that different assets have different, identifiable owners.  Assets should be categorized and allocated based on ownership.  Each owner must be allocated the value of the assets it held and should not be awarded the value of assets owned by other entities.

172.    One clear example of the inaccurate and unjust results of ignoring the separate nature of the various asset classes, particularly Customer-Related Assets and IP, emerges when considering Nortel's LREs.  These entities did not own any IP.  They had limited tangible assets (which, in the case of the EMEA LREs, had negative value due to the liabilities they also carried).  The lion's share of the value they relinquished lay in customer relationships that they had developed and fostered over the previous decades.  They incurred liabilities in building these relationships – employee salaries, pensions, trade debts, etc. – that remain outstanding.  The LREs were explicitly designated as selling debtors in the Business Sales, after careful consideration, because they had valuable assets to transfer, they bore transactional costs, and they actively participated in the sale process.[317]  They relinquished their customer relationships as part of the Business Sales, and they are entitled to be compensated for them so that their

---

[317]   *See* TR00030, Huffard Report apps. 11–18.

creditors can be paid.  For example, the EMEA LREs – which constitute sixteen of the twenty-three EMEA Debtors presently before the Courts – sold the following assets[318]:

| EMEA LRE ALLOCATIONS – NET TANGIBLE ASSETS, CUSTOMER-RELATED ASSETS, AND GOODWILL | | | | | | | | | | | $ in millions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | CDMA | Enterprise | MEN | CVAS | GSM | MSS | Layer 4-7 | Next Gen | Residual IP | Total Allocation | Total Value |
| **EMEA** | 0.0% | 7.5% | 9.2% | 5.1% | 3.4% | 12.7% | 0.3% | 0.0% | 0.0% | 1.8% | $ 135 |
| | | | | | | | | | | | |
| **Entities** | | | | | | | | | | | |
| Nortel (Austria) GmbH | – | 0.4% | 0.4% | 0.1% | 0.7% | 0.0% | 0.0% | – | – | 0.1% | 6 |
| Nortel N.V. | – | 0.5% | 1.3% | 0.7% | 0.8% | 1.2% | 0.1% | – | – | 0.2% | 15 |
| Nortel Czech Republic | – | 0.1% | 0.0% | 0.0% | 0.1% | 0.2% | 0.1% | – | – | 0.0% | 1 |
| Nortel Oy | – | – | – | – | – | 0.0% | – | – | – | 0.0% | 0 |
| Nortel Hungary | – | 0.1% | – | – | – | – | – | – | – | 0.0% | 1 |
| Nortel S.p.A. | – | 1.1% | 0.5% | 1.9% | 0.1% | 1.0% | 0.0% | – | – | 0.2% | 15 |
| Nortel B.V. | – | 1.1% | 3.7% | 0.6% | 0.2% | 1.5% | 0.1% | – | – | 0.5% | 33 |
| Nortel Networks AS | – | 0.6% | – | – | – | 0.6% | – | – | – | 0.1% | 5 |
| Nortel Polska Sp. z.o.o. | – | 0.1% | 0.2% | 0.0% | 0.8% | – | 0.0% | – | – | 0.0% | 3 |
| Nortel Portugal S.A. | – | 0.2% | 0.0% | 0.1% | – | 0.5% | 0.0% | – | – | 0.0% | 2 |
| Nortel Romania SRL | – | 0.2% | – | 0.0% | 0.2% | 1.9% | 0.0% | – | – | 0.0% | 3 |
| Nortel Slovensko, s.r.o. | – | 0.0% | – | 0.0% | 0.4% | 0.2% | – | – | – | 0.0% | 1 |
| Nortel Hispania, S.A. | – | 0.6% | 1.2% | 1.0% | – | 4.7% | – | – | – | 0.2% | 17 |
| Nortel AB | – | 0.7% | 1.1% | – | – | 0.6% | – | – | – | 0.2% | 12 |
| Nortel AG | – | 1.1% | 0.8% | 0.7% | 0.1% | 0.3% | 0.0% | – | – | 0.2% | 15 |
| Nortel South Africa Ltd | – | 0.7% | – | – | – | – | – | – | – | 0.1% | 6 |
| **Total** | 0.0% | 7.5% | 9.2% | 5.1% | 3.4% | 12.7% | 0.3% | 0.0% | 0.0% | 1.8% | $ 135 |

173.    The amounts in question are relatively small – 1.8% of the Business Sales proceeds for all of the EMEA LREs combined – but they are significant to the various entities (and their creditors) that NNL chose to establish and operate across Europe, the Middle East, and Africa and should be allocated to the LREs regardless of which approach is adopted for allocating IP assets.[319]  By lumping the value of Customer-Related Assets with IP, the Canadian and U.S.

---

[318]    *See* TR00030, Huffard Report app. 23, chart 23.1 (removing the EMEA RPEs and AREs, which owned IP, as well as two entities that have settled their allocation entitlements).  Nortel Networks Oy transferred a small amount of assets in the Business Sales, which round to zero for the purposes of this chart.  *See* TR00030, Huffard Report app. 15 ¶ 7, app. 18 ¶ 6 (listing Nortel Networks Oy as a party to the asset sale agreements governing the Enterprise and MMS Business Sales).

[319]    It is worth noting that the *pro rata* approach advocated by the UKPC and the CCC would also have the likely effect of giving a number of EMEA Debtors no allocation for their contributions to the lockbox.  In cases

(Footnote continued on next page)

Debtors impermissibly attribute value from the LREs' Customer-Related Assets – which was generated without any relationship to or ownership stake in IP – to the IP owned by other entities in the Nortel Group.  Such disregard for the contributions of the LREs and the assets they owned should not be countenanced.

**B.    The Canadian Debtors Have No Principled Basis for Ignoring Significant Goodwill Value**

174.    The Canadian Debtors claim that no amount should be attributed to Goodwill because "all of Nortel's goodwill was written-off in 2008."[320]  This argument confuses two instances of goodwill relevant to this case and is simply wrong.

175.    Goodwill arises when a business is sold.  By definition, Goodwill is "a residual value, [which] reflects all other future cash flows that a buyer attributes to an asset that cannot be directly identified."[321]  In other words, in a business sale, once all separately identifiable assets (*i.e.*, tangible assets, IP, and customer-related assets) have been accounted for, the unallocated portion of the purchase price represents (and is carried on the books of the purchaser as)

---

(Footnote continued from previous page)

where treasury cash on hand for a given entity is sufficient to exceed the fixed distribution percentage, that entity would receive a lower percentage allocation, and possibly nothing, from the lockbox under a *pro rata* approach.  *See* T. Britven Dep. Tr. 63:8–65:6, Apr. 2, 2014.

[320]    Canadian Debtors' Closing Brief ¶ 449.

[321]    TR00030, Huffard Report ¶ 115.

Goodwill.[322]    This residual Goodwill category includes assets which are difficult to value separately, such as in-place workforce, trademarks, product names, and business synergies.[323]

176.    The goodwill that Nortel carried on its books until it was written off in 2008 was goodwill arising from various past acquisitions of other businesses by Nortel.[324]  As recognized by experts for both the EMEA Debtors and the CCC, it is distinct from the Goodwill acquired by the Business Sales purchasers.[325]  Indeed, the CCC relies on purchaser PPAs that disclose a total Goodwill value of $853 million,[326] which proves that Nortel's write-off of goodwill associated with past acquisitions has nothing to do with the valuable Goodwill in the Nortel Lines of Business when they were acquired by the various purchasers.

177.    Additionally, the Canadian Debtors' allocation of value in respect of Nortel's in-place workforce directly contradicts their argument that no Goodwill was transferred in the Business Sales.  Mr. Green admitted that in-place workforce should not be separated from Goodwill according to generally accepted accounting principles.[327]  Despite acknowledging this standard

---

[322]    *See* TR00030, Huffard Report ¶ 76.

[323]    Trial Day 9 Tr. 1969:10–1972:17, May 28, 2014 (P. Huffard Direct).

[324]    *See* TR00030, Huffard Report ¶ 76 n.81.

[325]    *See* TR00045, Britven Report ¶ 6.45 (contrasting the goodwill Nortel wrote off in 2008 with the Goodwill recognized by the purchasers in the Business Sales); TR00031, Huffard Rebuttal ¶ 39 ("[T]he prior Goodwill Nortel carried on its own balance sheet has no bearing on any new Goodwill created in the Asset Sales in circumstances where the buyers paid more than the book value of the assets acquired in the Asset Sales.").

[326]    *See* TR00045, Britven Report ¶ 6.48 tbl. 8, sched. 2.1.

[327]    *See, e.g.*, TR00042, Green Report 52 n.204 ("'Because the assembled workforce is not an identifiable asset to be recognized separately from goodwill, any value attributed to it is subsumed into goodwill.'" (quoting Financial Accounting Standard 141R)); Trial Day 13 Tr. 3291:11–24, June 5, 2014 (P. Green Cross) ("Q.  And

(Footnote continued on next page)

valuation tenet, Mr. Green completely ignored it, justifying his deviation from established rules on the sole basis that Nortel's in-place workforce had value that should be recognized.[328]  While Mr. Green claimed that there was no Goodwill in Nortel at the time of the Business Sales (and therefore no Goodwill value transferred to the purchasers), he simultaneously admitted that he "had actually valued a piece of goodwill by doing a separate valuation of the in-place workforce."[329]  Mr. Green and the Canadian Debtors therefore did actually recognize "a piece" of the Goodwill value that transferred to the purchasers.  As the Canadian Debtors admit that Nortel transferred Goodwill, there is no basis for them to ignore the value of Goodwill beyond the negligible figure they assign to in-place workforce.

## VI.    THE EMEA DEBTORS' APPROACH IS DICTATED BY THE LAW AND THE FACTS

178.    The Canadian Debtors claim that "the contribution approach is based merely on some vague notion of what a fair allocation would be."[330]  In fact, the EMEA Debtors' approach to allocation is driven by the specific property rights that the RPEs held in the assets sold in the

---

(Footnote continued from previous page)

goodwill includes such things . . . like a workforce?  A.  To the extent that you're not going to separately value it, like I did, yes.  Q.  And in a business combination under generally accepted accounting principles, you're not really allowed to recognize the value of a workforce as an intangible value apart from goodwill; right?  A.  That's what accounting principles provide, yes.").

[328]    *See* TR00042, Green Report 52, app. I at 1.

[329]    Trial Day 13 Tr. 3113:4–6, June 5, 2014 (P. Green Direct); *see also* Trial Day 13 Tr. 3291:25–3292:9, June 5, 2014 (P. Green Cross) ("Q.  Now, here it's your view that there was no goodwill; but you, nonetheless, did recognize there obviously was a value in the Nortel workforce?  A.  That's right.  Q.  So at least with respect to that, you did recognize some value for goodwill at Nortel?  A.  That's right.  Or what would normally be included in goodwill.").

[330]    Canadian Debtors' Closing Brief ¶ 547.

Business Sales and the Residual Patent Sale.   With respect to IP, those rights arose from inventorship and were consistently and repeatedly confirmed by the RPEs in their words and deeds.   All three debtor groups made material contributions to Nortel, so it stands to reason that all three debtors groups would receive a material allocation in this proceeding – a result achieved only by the EMEA Debtors' allocation approach.   That respecting property rights produces an eminently fair result should come as no surprise – the law is supposed to be fair and comport with common sense.   Far from being a reason to reject the EMEA Debtors' approach, this confirms that it is the correct one.   It would be much less fair for owners of property to be deprived of proceeds from the sale of that property.

179.    Ironically, it is parties affiliated with the Canadian Debtors that do in fact mount vague "fairness" arguments.   For example, the CCC was at pains throughout trial to demonstrate for the Courts what percentage recovery the various parties' allocation methods would generate for various creditor groups,[331] and in its closing brief the CCC boasts that its methodology "produce[s] fair and comparable allocation results."[332]   By contrast, it alleges, the EMEA and U.S. Debtors' approaches "grossly overcompensate certain Debtor Estates and Creditors to the detriment of those individuals, including the Canadian pensioners, who dedicated their working lives to Nortel."[333]   Even Wilmington Trust, the indenture trustee for NNL-only bonds, claims

---

[331]    TR00046, Britven Rebuttal § 10.0; Trial Day 14 Tr. 3408:14–3409:15, June 6, 2014 (T. Britven Direct) (discussing DEM00016, Britven Slides at 35).

[332]    CCC's Closing Brief ¶ 3.

[333]    CCC's Closing Brief ¶ 3.

that the Canadian Debtors' allocation "provides the most equitable distribution amongst the creditors of the various Debtors."[334]   These arguments are both inaccurate and irrelevant.

180.    They are inaccurate because it is impossible at this stage to determine the distributions that will result from each allocation methodology.   For example, in calculating projected recoveries, Mr. Britven made a series of assumptions that maximized estimated recovery percentages for the creditors of the EMEA and U.S. Debtors, while minimizing them for creditors of the Canadian Debtors.   Among other things, Mr. Britven:

> (a) gave no effect to priority claims;

> (b) excluded Financial Support Direction claims by the UKPC against various EMEA Debtors;

> (c) attributed $500 million to the EMEA Debtors' non-pension claims against the Canadian Debtors (which settled for $125 million);

> (d) overlooked the fact that there has been no claims bar date in the U.K. proceedings, and thus claims in the EMEA estate could grow; and

> (e) overlooked the fact that undistributed cash from NNI, NNSA, and NN Ireland goes to the Canadian Debtors.[335]

Changing any of these assumptions would increase the estimated recovery percentages for creditors of the Canadian Debtors and decrease them for creditors of the EMEA and U.S. Debtors, dramatically changing the perceived "fairness" of the hypothetical distributions on which the CCC relies.   Fairness is not a reason to adopt the EMEA Debtors' methodology; the

---

[334]   Post-Trial Brief of Wilmington Trust, National Association, As Successor Indenture Trustee ¶ 2, Aug. 7, 2014.

[335]   Trial Day 14 Tr. 3495:6–3503:5, June 6, 2014 (T. Britven Cross); *see also* TR00045, Britven Report § 4.0.

law and the facts are.   However, fairness would be a terrible reason to adopt the Canadian Debtors' approach because there is nothing fair about it.

181.    More importantly, none of these points is even relevant.  The task before the Courts is not to give effect to some inchoate notion of "fairness" based on finger-in-the-air guesses about what distribution percentages might look like following estate administrations that in some jurisdictions have barely even begun.  The task before the Courts is to allocate sale proceeds, and that allocation must be based on the rights of the parties.

182.    Finally, it is noteworthy that the parties advocating for an "equitable" or "fair" allocation are at the same time advocating for an allocation that gives the Canadian Debtors almost everything.  Nortel was a multinational organization to which the EMEA and U.S. Debtors made important contributions.   Whether one looks at revenue generated, R&D spending, or inventorship of high-interest patents, the EMEA Debtors contributed close to 20%.[336]   The Canadian Debtors' theory would disregard that history and allocate the EMEA Debtors barely 4% of the sale proceeds.[337]

183.    The only function to which the Canadian Debtors can point that was not also carried out by the EMEA Debtors was NNL's performance of administrative functions in its capacity as the

---

[336]    *See* TR00051, Expert Report of Jeffrey H. Kinrich Ex. 6 (Jan. 24, 2014); TR11383, Malackowski Report Ex. R.2.2; DEM00011, Malackowski Slides at 36.

[337]    *See* TR00043, Rebuttal Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities 2 (Feb. 28, 2014).

RPEs' operating parent company.[338]   Of course, NNL was already compensated for its administrative costs via routine returns under the MRDA,[339] and it is impossible to understand why it deserves any further credit, to the detriment of its subsidiaries' creditors, for masterminding the reverse alchemy of turning an investment of some $35 billion in R&D spending into a bankrupt company that owned barely $5 billion of IP.[340]

## VII.   CONCLUSION

184.   The EMEA Debtors respectfully request that the Courts enter an order applying the contribution approach and allocating the sale proceeds attributable to IP, Customer-Related Assets, Goodwill, and Net Tangible Assets among the EMEA, U.S., and Canadian Debtors in accordance with the relative percentages set forth in the table below:

---

[338]   *See* Canadian Debtors' Closing Brief ¶ 19; CCC's Closing Brief ¶¶ 47, 161.

[339]   *See* Trial Day 11 Tr. 2669:2–2671:6, May 30, 2014 (R. Cooper Direct) (describing how NNL was compensated for its role as the administrator of the Group's IP through the RPS methodology); TR22078, NNL-NNI Joint APA Request at 44–48, 51 (discussing how NNL would have received a routine return for the administrative functions it performed for the benefit of the Group).

[340]   *See* DEM00011, Malackowski Slides at 17, 26; TR11383, Malackowski Report Ex. R.2.1.

| CONTRIBUTION APPROACH | | | | $ in millions |
|---|---|---|---|---|
| **Total Allocation by Contribution Approach:  Business Sale IP (Sale Specific) / Residual IP (1991-2006)** | | | | |
| | **Canada** | **US** | **EMEA** | **Total** |
| CDMA | 15.8% | 80.4% | 3.8% | 100.0% |
| Enterprise | 20.2% | 50.9% | 29.0% | 100.0% |
| MEN | 23.7% | 47.1% | 29.2% | 100.0% |
| CVAS | 29.2% | 41.9% | 28.8% | 100.0% |
| GSM | 23.6% | 66.3% | 10.1% | 100.0% |
| MSS | 13.1% | 42.6% | 44.3% | 100.0% |
| Layer 4-7 | 27.5% | 50.7% | 21.8% | 100.0% |
| Next Gen | 33.0% | 53.6% | 13.4% | 100.0% |
| Residual IP | 39.5% | 42.9% | 17.6% | 100.0% |
| **Total Allocation** | **31.9%** | **49.9%** | **18.2%** | **100.0%** |
| **Total Value** | **$ 2,320** | **$ 3,636** | **$ 1,325** | **$ 7,280** |

185.     In the alternative, the EMEA Debtors respectfully request that the Courts enter an order applying the license approach and allocating the sale proceeds among the EMEA, U.S., and Canadian Debtors in accordance with the following table:

| LICENSE APPROACH | | | | $ in millions |
|---|---|---|---|---|
| **Total Allocation by License Approach** | | | | |
| | **Canada** | **US** | **EMEA** | **Total** |
| CDMA | 9.9% | 79.1% | 11.0% | 100.0% |
| Enterprise | 11.3% | 52.3% | 36.5% | 100.0% |
| MEN | 18.4% | 48.0% | 33.5% | 100.0% |
| CVAS | 12.1% | 47.4% | 40.5% | 100.0% |
| GSM | 9.9% | 55.7% | 34.4% | 100.0% |
| MSS | 10.5% | 40.6% | 48.9% | 100.0% |
| Layer 4-7 | 4.8% | 81.8% | 13.4% | 100.0% |
| Next Gen | 12.2% | 49.1% | 38.7% | 100.0% |
| Residual IP | 11.0% | 55.4% | 33.6% | 100.0% |
| **Total Allocation** | **11.5%** | **57.7%** | **30.9%** | **100.0%** |
| **Total Value** | **$ 836** | **$ 4,198** | **$ 2,247** | **$ 7,280** |

Dated:    Wilmington, Delaware       Respectfully submitted,
          September 10, 2014

                                     YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                     _____/s/ Jaime Luton Chapman_____

                                     Edwin J. Harron (No. 3396)
                                     John T. Dorsey (No. 2988)
                                     Jaime Luton Chapman (No. 4936)

                                     Rodney Square
                                     1000 North King Street
                                     Wilmington, Delaware 19801
                                     Tel.:  302-571-6600
                                     Fax:  302-571-1253

                                     – and –

                                     HUGHES HUBBARD & REED LLP

                                     William R. Maguire (admitted *pro hac vice*)
                                     Derek J.T. Adler (admitted *pro hac vice*)
                                     Neil J. Oxford (admitted *pro hac vice*)

                                     One Battery Park Plaza
                                     New York, New York 10004
                                     Tel.:  212-837-6000
                                     Fax:  212-422-4726

                                     *Counsel for the Joint Administrators*

**APPENDIX A**

**EMEA DEBTORS' RESPONSES TO**
**THE CCC'S APPENDIX D CRITICISMS OF MR. MALACKOWSKI'S AND MR. HUFFARD'S ASSUMPTIONS[1]**

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| | | | **PURPOSE OF REPORT** | | | |
| | M4 | 3 | Objective is to determine:<br>1.  the portion of business sale proceeds attributable to IP included in the transactions;<br>2.  which allocation and valuation methodologies are appropriate on the facts of this case in light of valuation theory and economic principles related to IP; and,<br>3.  the portion of the proceeds attributable to IP that should be allocated to the Canadian, U.S. and EMEA Debtors under each of the contribution and license theories. | | | |
| | | | **VALUATION PRINCIPLES/METHODOLOGY** | | | |
| | H2<br>M5 | 4<br>1 | The Proceeds of the Sales should be allocated to the various legal entities according to the value of the interests transferred or rights relinquished by each relevant party ("Value"). | | | |
| 1 | | | Implied | Breaking out by entity is the appropriate or best approach | True only to the extent that this can be done with reasonable accuracy, having due regard to the amounts at issue and the impact on creditors. Thus, where the court accepts the interpretation accorded to the MRDA by the CCC and the Canadian Debtors, the exercise of allocating value to legal entities is relatively straight forward and the impact of inaccuracies are tolerable. Conversely, competing interpretations of the MRDA posited by the other Core Parties put considerably more value at issue, with the result that the impact of inaccuracy on creditors is much more significant and alternative approaches focused on creditor recoveries become appropriate. | **The CCC disagrees with this proposition because it is inconsistent with the CCC's own assumptions.**<br><br>The CCC is arguing that if the Courts agree with its assumptions about the MRDA and therefore allocate the vast majority of sale proceeds to Canada, then and only then is it appropriate to allocate according to the value of the rights relinquished by each party. If, however, the rights relinquished by the Canadian Debtors are not valued at more than 80% of the total proceeds, then the methodology is unreliable.<br><br>**The CCC proposes a results-driven allocation methodology to achieve its desired outcome.**<br><br>The proper allocation methodology should be selected by the Courts not based on desired returns to a debtor or creditor group, but instead based on the facts of the case, the terms of the parties' arrangements, precedential allocation approaches, and statements made by Nortel. |

---

[1]  This Appendix responds to the criticisms of Mr. Malackowski and Mr. Huffard included in the chart at Appendix D of the Closing Brief of the Canadian Creditors' Committee ("CCC"). The columns with gray headings are taken directly from the CCC's chart. The columns with blue headings have been added by the EMEA Debtors.

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| | | | **LINE OF BUSINESS SALES** | | | |
| | H3 | 6 | The interests transferred or rights relinquished by each relevant party consist of the following categories: 1. Net Tangible Assets (monetary assets, inventory, and fixed assets net of assumed liabilities); 2. Intellectual Property; 3. Customer Related Assets; and 4. Goodwill Not Otherwise related to IP | | | |
| 2 | H3 | 6 | Express | Nortel relinquished goodwill. | This assumption erroneously equates what was relinquished with what was paid for; these are not the same. | **The CCC's comments are at odds with fundamental valuation concepts.** Goodwill is composed of the residual intangible assets that generate earnings in excess of a normal return on all other tangible and intangible assets. The CCC appears to assume, mistakenly, that since the seller does not carry the book value of these goodwill intangibles prior to sale, these intangible assets did not actually exist in the hands of the seller. |
| 3 | H33 | 72 | Express | Customer Related Assets had significant value and purchasers paid something for them in each business sale where they were transferred. | Although Customer Related Assets do have value, Huffard errs in his approach, as indicated further below, by simply combining them with goodwill and treating them as a residual category. He does not actually independently value these two distinct asset categories. | **The CCC's comments are at odds with fundamental valuation concepts.** Reliable information regarding Customer-Related Assets was universally unavailable to the experts (*e.g.*, access to Nortel's management, customer invoices, etc.). Therefore, according to commonly accepted valuation standards, the value of these assets must be included as a portion of the residual Customer-Related Assets and Goodwill category. Treating Customer-Related Assets, which the CCC admits were owned by LREs, as IP and giving 90% of the value of those assets to the Canadian Debtors is not supportable by any rational valuation or allocation methodology. |

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| | | | **Treatment of Tangible Assets in the Line of Business Sales** | | | |
| | H3 | 7 | Tangible Assets are assumed to have Book Value and are allocated in accordance with each entity's Balance Sheets | | | |
| 4 | | | Implied | Accounting depreciation reflects loss of value in the Market. | This is an inaccurate simplifying assumption that is justified on the basis that the value of the tangible assets is negligible. | **The CCC's comments are at odds with fundamental valuation concepts.** There were no tangible asset appraisals completed at the time of sale; as such, there is a need to determine what the assets are worth in accordance with the FASB and fair value measurement requirements usually completed in a PPA. Not only was Mr. Huffard's approach acceptable and appropriate, but also the results were detrimental to the EMEA Debtors' allocation (*i.e.*, the net value was negative due to assumed liabilities). |
| | | | **Treatment of Intellectual Property in the Line of Business Sales** | | | |
| | | | **Valuation of IP in LOB Sales** | | | |
| | M10 M20 M22 M24 | 3 2 1-6 4-7 | The value of Nortel's IP in a given business sale ("Value") depends on the future stream of revenue that it could generate, as per the following formula:<br><br>1. Value = Defensive Value + Synergistic Value<br>2. Defensive Value = Price that Nortel would pay to License its own IP<br>= Discount Rate 1 x Royalty Rate 1 x Revenue that Nortel would earn from Products/IP<br>3. Synergistic Value = Value of IP to a hypothetical market participant<br>= Discount Rate 2 x Royalty Rate 2 x Revenue that a market participant would earn from Products/IP | | | |
| 5 | M22 | 1, 2 | Express | The duration and timing of the cashflow stream = the statutory or legal life of the IP. | Malackowski's contribution method does not distinguish the value of R&D based on "age"—this has the effect of overstating value of older R&D to the benefit of the US and EMEA Debtors, and the prejudice of the Canadian Debtors. See Britven Rebuttal Report at p. 28. | **The CCC disagrees with this proposition because it is inconsistent with the CCC's own assumptions.** All of the evidence indicates that older R&D was substantially more productive and led to the creation of virtually all of the valuable patents sold. Mr. Malackowski ran multiple tests on the economic life of Nortel's IP, all of which indicate that older patents are more valuable. Had R&D spending been weighted more heavily in years with greater high-interest patent output, the resulting allocation would have been even more favorable to the EMEA Debtors. |
| 6 | M22 | 5 | Express | Revenue Base = the expected revenues to be generated through the life of the IP. | Although this is a valid assumption and definition for the purposes of Malackowski's methodology, the application relies on a series of assumptions that conflict with the approach taken by Britven. See Britven Rebuttal Report at p. 26. | **The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.** |

A-3

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| 7 | M22 | 6 | Express | Revenue base may be determined by projecting future revenue according to market research. | Malackowski does no work to confirm that the IP would in fact be royalty bearing. | **The CCC's comments are at odds with fundamental valuation concepts.**<br><br>IP is potentially royalty-bearing when it is patented and used commercially. In regard to defensive value, all relief-from-royalty ("RfR") analyses value IP based on the royalties avoided by owning the IP used in the business. For the synergistic value, it was assumed that some portion of the acquired IP will cover the buyer's products/services, and Mr. Malackowski accounted for this assumption by using a larger discount rate and lower royalty rate. Mr. Malackowski's assumptions are also consistent with those of Global IP, and of Rockstar, which paid $4.5 billion for IP on the assumption that it would bear royalties. |
| 8 | M25 | 1 | Express | Nortel Revenue Base derived from:<br>1.  forecasted financial information in Nortel deal books;<br>2.  forecast growth rates for each business as published by International Data Corporation (IDC), Infonetics, and Nortel Deal Memo CAGRs, and industry CAGRs. | Malackowski's choices for forecasts and "notional" buyer are flawed. See Britven Rebuttal Report at p. 26. | **The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.**<br><br>Although it is unclear where, if at all, this particular point is addressed in the Britven Rebuttal Report, to the extent the CCC is referring to Mr. Britven's reliance on buyer PPAs, Mr. Malackowski ignored them based on the parties' agreement. |
| 9 | M25 | 1 | Implied | Assumes accuracy of Nortel financial forecasts. | The forecasts are inherently speculative and therefore form an inadequate basis to allocate material portions of the Sale Proceeds. | **The CCC's comments are at odds with fundamental valuation concepts.**<br><br>A valuation determines the present value of expected future benefits that the owner will obtain.  To determine future benefits, all valuations use forecasts.<br><br>**The CCC's argument contradicts information that its expert, Mr. Britven, relies upon.**<br><br>Mr. Britven relies heavily on Nortel forecasts for his analysis.  His business values are taken from the Q4 2008 annual impairment test ("AIT"), which required the use of Nortel's financial forecasts to predict how the businesses would do in the future. |

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| 10 | M25 | 1 | Implied | Assumes accuracy of IDC, Infonetics, Nortel CAGRs and Industry CAGRs relied upon. | These private analyst reports are inherently speculative. Malackowski does not provide access to these information sources, and he fails to disclose the historical accuracy of the forecasts. They may or may not reflect the best available information, but their speculative nature makes them an inadequate basis to allocate the Sale Proceeds. Indeed, note Huffard's critique (at H41-42) of the use of "theoretical" valuation methodologies requiring "subjective assumptions" such as the expected churn rate for customer relationships and the cost of capital associated with different tangible and intangible assets employed by a company. | **The CCC's comments are at odds with fundamental valuation concepts.**<br><br>See response to item 9 for comments on forecasts.<br><br>Valuation professionals typically rely on these types of data.[2]<br><br>**The CCC's argument contradicts information that its expert, Mr. Britven, relies upon.**<br><br>Mr. Britven states in his report at paragraph 6.23 (TR00045) that to "determine the fair market value of the assets owned by the Nortel Debtors . . . we would typically consider, amongst other items: <u>forecasts for the Lines of Business</u>, details of customer orders and relationship history, <u>projections of revenues for each customer</u> . . . ." Such forecasts and projections are determined using data from analyst reports. |
| 11 | M27 M28 | 2, 3 1-3 | Express | Market Participant Revenue Base is derived from:<br>1.  the weighted average revenue for the market, determined by reference to IDC and Infonetics data for the top four competitors in an industry; and,<br>2.  CAGRs for each business as published by IDC and Infonetics. | Based almost entirely on the accuracy of the choice of market participant and the data provided by IDC/Infonetics. The royalty rates used by Malackowski are inconsistent with his "defensive" and "synergistic" positions and the IP being valued. See Britven Rebuttal Report, at p. 26. | **The CCC's comments are at odds with fundamental valuation concepts.**<br><br>See response to item 9 for comments on forecasts.<br><br>**The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.** |
| 12 | M27 M28 | 2, 3 1-3 | Implied | Accuracy of:<br>•  selection of market comparables;<br>•  IDC/Infonetics revenue forecasts; and,<br>•  IDC/Infonetics CAGR forecasts | The validity (or lack thereof) for the selection of market comparables, revenue forecasts and CAGR forecasts is propagated throughout Malackowski's analysis. If the selections are invalid (as Britven contends that they are), then Malackowski's conclusions are equally flawed. See Britven Rebuttal Report at p. 26-27. | **The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.** |

---

[2]    *See* TR00033, Expert Report of James E. Malackowski 25 n.85 (Mar. 24, 2014) [hereinafter "<u>Malackowski Report</u>"].

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| 13 | M22 | 5 | Express | Royalty Rate is a percentage applied to net revenues derived from products or services infringing the IP. | Although the definition is technically correct, the application and basis for using the license approach are disputed by Britven. See Britven Rebuttal Report, at p. 29. | **The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.** |
| 14 | M22 | 6 | Express | Royalty Rate may be determined by examining actual transactions between willing licensees and licensors. | This is but one factor in a royalty rate analysis and is not dispositive. Some other factors include: 1. Royalties patentee receives for licensing the patent in suit; 2. Nature and scope of license in terms of exclusivity and territory / customer restrictions; 3. Licensor's established policy and marketing program to maintain patent monopoly by not licensing others to use the invention; 4. Commercial relationship between licensor and licensee, such as whether they are competitors or inventor and promoter; 5. Effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales; 6. Duration of patent and term of license; 7. Established profitability of the products made under the patent, its commercial success and its current popularity; 8. Utility and advantages of patent property over old modes and devices; 9. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefit of those who have used the invention; 10. The extent to which the infringer has made use of the invention and the value of such use; 11. The portion of profit or selling price customarily allowed for the use of the invention; 12. The portion of realizable profit attributable to the invention as distinguished from non-patented elements, significant features / improvements added by the infringer, the manufacturing process or business risks. Source: *Georgia-Pacific Corp.* v. *United States Plywood Corp.*, 318 F. Supp. 1116, 1119-20 (S.D.N.Y. 1970), modified and aff'd, 446 F.2d 295 (2d Cir.); *Uniplay, S.A.* v. *American Electronic Sign Co., Inc.*, 69 F.3d 512, 517 n.7 (Fed. Cir. 1995). | **The CCC's comments are at odds with fundamental valuation concepts.** Many of the listed Georgia-Pacific (G-P) factors were considered by Mr. Malackowski when examining actual transactions between willing licensees and licensors, including at least factors 1, 2, 4, 6, and 9. There are additional G-P factors, which the CCC has not listed, but which were also involved in Mr. Malackowski's selection of an appropriate royalty rate (*e.g.*, the opinion testimony of qualified experts, etc.). |
| 15 | M24 M25 | 6 6 | Express | Royalty Rate 1 = rate derived by Lazard / Global IP. | The Lazard/Global IP rates may or may not reflect the best available information. However, they are inherently speculative and therefore form an inadequate basis to allocate material portions of the Sale Proceeds. Further, the Lazard/Global IP rates are used to derive the "synergistic" and "defensive" value of IP, but the resulting rates are inconsistent with the IP being valued. See Britven Rebuttal Report at 26. | **The CCC's comments are at odds with fundamental valuation concepts.** All RfR analyses require the selection of a royalty rate after analyzing comparable transactions. Those comparable transactions almost never involve the exact same IP. The CCC's doubts about the selected rates in the RfR analysis are a difference of opinion; they do not constitute an error. |

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| 16 | M24 M25 | 6 6 | Implied | Assumes accuracy of Lazard/Global IP forecasts. | The Lazard/Global IP forecasts may or may not reflect the best available information. However, they are inherently speculative and therefore form an inadequate basis to allocate material portions of the Sale Proceeds. Further, the Lazard/Global IP forecasts are not consistent with what the Licensed Participants would have received on the valuation date. See Britven Rebuttal Report at 26. | **The CCC's comments are at odds with fundamental valuation concepts.**<br><br>See response to item 9 for comments on forecasts. |
| 17 | M26 | 2 | Implied | Assumes comparability of franchises | There is no basis to assess this. | **The CCC's comments are at odds with fundamental valuation concepts.**<br><br>All RfR analyses require the selection of comparable transactions. Those comparables are almost never based on the exact same IP. The basis for assessing comparability comes from the fact that all of the technology was Nortel technology and that the technologies in the Business Sales were similar to the technologies in the selected franchises. |
| 18 | M24 M28 | 6 4 | Express | Royalty Rate 2=implied rates paid by Rockstar Consortium members Apple, RIM and Ericsson, as determined by reference to: 1. each member's contribution to the purchase price of the Residual Patent Portfolio; and, 2. the present value of the consortium members addressable projected revenue | There is no basis to assess this; further, these rates are inconsistent with the "safe hands" approach and do not reflect what the licensed participants would have been able to command as a royalty rate for the same IP. | **The CCC disagrees with this proposition because it is inconsistent with the CCC's own assumptions.**<br><br>The implied royalty rates pertain only to the synergistic value of the IP. The CCC's comments demonstrate a misunderstanding of the definition of synergistic value. The synergistic royalty rate is not intended to represent the rate which the "licensed participants would have been able to command" from others. Synergistic value, by definition, applies only to the pre-existing products and services of the buyer. |
| 19 | M26 | 4 | Express | Discount Rate 1 equal to "Industry" Weighted Average Cost of Capital. | The Rockstar business model would not be an active manufacturer in the communications industry—it would only be a licensing entity—so the choice of "industry" represents a material error. Kinrich makes the same error. See Britven Rebuttal Report at p. 21. | **The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.**<br><br>The CCC appears to be confused on this point since the Business Sales discount rate selection had absolutely nothing to do with Rockstar. |
| 20 | M26 | 4 | Express | Industry determined by Standard Industrial Classification (SIC) code applicable to each business sale. | As per above, the actual resulting Rockstar licensing business model would not reflect the SIC code used by Malackowski for his rates. | **The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.**<br><br>See response to item 19. |

A-7

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| 21 | M29 | 1 | Express | Discount Rate 2 equal to Discount Rate 1 plus a risk premium; | The selection of the discount rate is inherently speculative and therefore forms an inadequate basis to allocate material portions of the Sale Proceeds. Malackowski essentially admits this, stating that the selection of the discount rate "requires substantial judgment". | **The CCC's comments are at odds with fundamental valuation concepts.** <br><br>All valuations require the calculation and/or selection of a discount rate, which requires judgment on the part of the valuator. If no judgment were required, there would be no need for expert valuators. The CCC's identified error is, once again, simply a general objection to any valuation. Moreover, they offer no affirmative argument for a different discount rate. |
| 22 | M29 | 1 | Express | Risk Premium justified by: <br> 1. greater risk associated with the ability of acquired IP to cover buyer's current products and services; <br> 2. negotiation risk; <br> 3. business risk re: commercialization of the IP. | Although these are valid factors for consideration, the selection of the discount rate is inherently speculative and therefore forms an inadequate basis to allocate material portions of the Sale Proceeds. | **The CCC's comments are at odds with fundamental valuation concepts.** <br><br>See response to item 21. |
| 23 | M29 | 2 | Express | Assumes risk premium is 15%, by reference to standard Risk Adjusted Hurdle Rates (discount rates commonly used in IP valuation) | The selection of the risk premium is inherently speculative and therefore forms an inadequate basis to allocate material portions of the Sale Proceeds. | **The CCC's comments are at odds with fundamental valuation concepts.** <br><br>See response to item 21. |
| 24 | M29 | 2 | Implied | Assumes accuracy and relevance of RAHRs. | The selection of the discount rate is inherently speculative and therefore forms an inadequate basis to allocate material portions of the Sale Proceeds. | **The CCC's comments are at odds with fundamental valuation concepts.** <br><br>See response to item 21. |

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| Allocation of IP in LOB Sales | | | | | | |
| | H3 | 8 | Intellectual Property Value is to be allocated pursuant to two different approaches: a "Contribution Approach" and a "License Approach" | | | |
| 25 | H3 | 8 | Implied | The allocation methodologies are limited to those proposed by the Joint Administrators in their pleadings. | There are alternate preferable approaches to the allocation of the Sale Proceeds. Britven disagrees with the use of the Contribution and License approaches as allocation methodologies. See Britven Rebuttal Report at pp. 26-29. | **The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.** |
| Option 1: Contribution Approach | | | | | | |
| | M5 | 1 | Value payable to a Selling Debtor corresponds to the Selling Debtors' relative contribution to the creation of IP (the "Contribution Approach") | | | |
| 26 | M5 | 1 | Implied | The Selling Debtors retained some residual proprietary interest in the IP. <br><br> --OR-- <br><br> Alternatively, the value of the contractual rights of Selling Debtors depends upon the contribution to creation of IP. | Inconsistent with the MRDA, and no basis for residual or constructive trust. <br><br> Logically the value of a license to IP in the context of a sale to a third party has nothing to do with historical contributions to the creation of IP (however measured). <br><br> R&D spending, in particular, is only a measure of value in the context of a negotiated formula for compensation (i.e., the MRDA/RPSM. In that context: <br><br> • it is not open to the courts to write or rewrite the bargain between the parties; <br><br> • in any event, it is speculative and illogical to suggest that a licensee should receive a better return on its surrender of license rights through a liquidating sale than it would in the ordinary course through the exercise of its license rights in the context of the RPSM (that would re-write the bargain to the prejudice of the owner of the IP). | **The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.** <br><br> The EMEA Debtors' position does not turn on a "residual or constructive trust." Their position is simply that each party should be compensated for what it relinquished. <br><br> The EMEA Debtors agree that the <u>value</u> is not determined by historical contributions to the creation of IP. Mr. Malackowski uses the historical contributions to the creation of IP to <u>allocate</u> value. <br><br> The RPSM was a negotiated formula to distribute <u>operating profits</u>. Mr. Malackowski used an appropriate contribution theory to allocate <u>sales proceeds</u> based on Nortel's historical statements and practice of allocating profits according to contributions to R&D. The EMEA Debtors do not request that the Courts "rewrite the bargain between the parties"; the parties' bargain, as encapsulated in the MRDA and RPS methodology, was not designed for, nor does it apply to, the allocation of sale proceeds. <br><br> Comments regarding license rights are irrelevant since the contribution approach is independent of any interpretation of the scope of the license rights. |

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| | M39 | 3 | | | It is not possible to accurately determine contributions of the Selling Debtors to the creation of the IP due to the size of Nortel's IP portfolio, time limits and limited access to information. | |
| 27 | M39 | 3 | Implied | Patent rights are not specific to the inventors shown on the patents. | A patent is a statutory right conferred on a specific inventor in recognition of that inventor's unique idea. The location of the inventors is thus at least as good a proxy for measuring relative contributions as the various and sundry R&D expenses incurred by the Debtors. As Nortel's former CTO Brian McFadden testified: Q.    -- it's really hard to say exactly what was the research that led to the patent application? A.    The authors would probably beg to differ with you. (McFadden Trial Testimony, May 14, 2014, 688:12-688:16) See also Britven Rebuttal Report pp. 28-29. | **The stated assumption was not in fact made by Mr. Malackowski.** The inventorship approach was not used as the formal measure of contribution because it does not reflect all of the R&D activity that led to the development of technology.  In fact, the inventorship approach was specifically considered by Nortel and rejected because it would be misleading.[3]  This is supported by numerous Nortel statements indicating that Nortel's R&D was commingled.[4]  Further, when Mr. Malackowski ran the inventorship analysis as a sense check, the EMEA Debtors actually did better using an inventorship approach. |
| | M39 | 4 | | | Inventorship is not a reasonable proxy for a Selling Debtor's contribution towards the creation of IP because: 1.    the research effort at Nortel was a commingled and cooperative one; 2.    basic research and development can often lead to foundational discoveries that may not be patentable but which would still represent valuable contributions to the development of Nortel's IP as a whole. | |
| 28 | M39 | 4 | Implied | Patent rights encompass contributions beyond those of the inventor. | A patent is a statutory right conferred on a specific inventor in recognition of that inventor's unique idea. The location of the inventors is thus at least as good a proxy for measuring relative contributions as the various and sundry R&D expenses incurred by the Debtors. Britven Rebuttal Report pp. 28-29. | **The stated assumption was not in fact made by Mr. Malackowski.** The stated assumption is absolutely not an assumption that Mr. Malackowski makes, implied or otherwise.  The inventorship approach is not as good a proxy for measuring contributions to creation of IP.  See response to item 27. |
| 29 | M39 | 4 | Implied | The RPEs have not been fully compensated for these contributions through the MRDA and RPSM. | The RPEs have received full value for their R&D contributions through the exchange of consideration reflected in the MRDA, including the grant of licenses to use all Nortel IP creating an opportunity to generate revenue, and through the transfer pricing methodology set out in the MRDA. | **The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.** The RPSM is designed to split operating profits, not sales proceeds from a liquidation. Compensating the EMEA and U.S. Debtors for their R&D with only a share of trading profits (much less the losses they actually shared) while rewarding NNL with full ownership of the resulting, valuable IP is a commercially absurd deal to which no arm's length parties would ever agree. |

---

[3]    *See* TR21407, Nortel Networks Functional Analysis for the Years Ended Dec. 31, 2000–2004, at 30 (Nov. 30, 2004).

[4]    *See, e.g.*, TR11169, Advance Pricing Arrangement Responses to Questions Posed by Inland Revenue, Internal Revenue Service, Canada Customs Revenue Agency, at 34 (Sept. 2003).

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| | M6 M40 | 2 | | | R&D spending is a reasonable proxy for a Selling Debtor's contribution towards the creation of IP for the benefit of the entire Nortel group. | |
| 30 | M6 M40 | 2 | Implied | The various Nortel Debtors had co-extensive beneficial interests in the Nortel IP | NNL was the owner of the majority of the IP; other Nortel entities held licenses. | **The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.** The fact that NNL held legal title to the majority of the IP is not contested and is in no way inconsistent with the fact that all of the RPEs shared beneficial ownership of Nortel's IP. |
| 31 | M6 M40 | 2 | Implied | R&D spend captures other activities that contributed to the creation of IP. | R&D spending is only a proxy for contribution in the context of a negotiated formula for compensation (i.e., the MRDA/RPSM—there were many contributions made to the Nortel enterprise (debt financing, strategic oversight, administration, etc.), and the MRDA/RPSM bargain used R&D spending as a benchmark in a formula to compensate the various Nortel entities for those various contributions. See Britven Rebuttal Report at pp. 27-28. | **The CCC disagrees with this proposition because it is inconsistent with the CCC's own assumptions.** Mr. Malackowski agrees that R&D spending is only a proxy for contribution to R&D activities and explicitly stated this in his initial report. Debt financing, strategic oversight, and administration, however, are not direct or indirect measures of R&D activities and should not be considered as such. Additionally, these factors were never used by Nortel as measures of R&D activity and were never accepted by tax authorities. |
| 32 | M6 M40 | 2 | Implied | Every R&D dollar had roughly equal IP generating capacity. | If this were true then, statistically, over a large sample size, we would expect the distribution of patents among the RPE labs to correspond to the RPE's R&D spend—in fact, we can see from the inventors on the patents that this was plainly not the case. See Britven Rebuttal Report, Table 4 at p. 29. In fact we know from the evidence that the different labs did different kinds of research: the U.S. labs in particular were focused on development work which tended to support the creation of their operating revenue, whereas the Canadian labs had a greater emphasis on advanced technology, which created patents that increased their capital base (McFadden Reply Affidavit, April 25, 2014, para. 3; McFadden Testimony, May 14, 2014, pp. 636:16-637:5, 638:5-639:13). See Britven Rebuttal Report at pp. 27-28. | **The CCC disagrees with this proposition because it is inconsistent with the CCC's own assumptions.** Due to the commingled nature of the R&D, inventorship should only be considered as a sense check for the conclusions. As indicated in Table 4 of Mr. Britven's rebuttal report (TR00046), the EMEA Debtors' contribution results are much closer to the inventorship analysis results than is the Canadian Debtors' conclusion that NNL is entitled to more than 90% of the IP proceeds. The EMEA Debtors do not assume that every R&D dollar had roughly equal IP-generating capacity, but given the commingled and collaborative nature of IP creation at Nortel, the point is irrelevant. In any event, there is no evidence that EMEA did proportionally less valuable R&D. Indeed, the evidence is to the contrary.[5] While the inventorship analysis does not match up exactly with the contribution analysis (for example, the EMEA Debtors would receive an even greater share under an inventorship analysis), it does demonstrate the reasonableness of Mr. Malackowski's approach. |

---

[5]    *See, e.g.,* TR00034, Rebuttal Report of James E. Malackowski 40 tbl. 12 (Mar. 24, 2014) [hereinafter "Malackowski Rebuttal"].

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| | M44 | 3 | The Look Back Period: It is appropriate to determine contribution to the creation of IP in the Line of Business Sales by measuring R&D spending starting the year before the filing of the earliest unexpired patent in each portfolio. | | | |
| 33 | M42 | 3 | Express | Older patents may be more valuable because of the time it takes for the market to adopt the technology. | This "see saw" routine regarding the relative value of 'older' vs. 'newer' patents serves to demonstrate the arbitrariness of the selection of the contribution period (and related weighting of spending (or lack thereof)). | **The CCC disagrees with this proposition because it is inconsistent with the CCC's own assumptions.** |
| 34 | M44 | 1 | Express | Older patents may be more valuable because they may be part of industry standard technology. | The assumptions also ignore the type of IP. Treats LTE, Carrier Networks and "dead" technologies equally on the basis that they were created within the same window of time. Malackowski uses one analysis of the life of a patent to make an extremely broad generalization across all business lines of Nortel. | This is not a "see saw" routine.  What the CCC has listed and referred to as "assumptions" are the factors that must be considered when determining the economic life of IP.  It should come as no surprise that not all factors point in the same direction.  To ignore some of these factors would lead to a completely arbitrary conclusion regarding the economic life of IP. |
| 35 | M43 | 1 | Express | Older patents may be more valuable because competitors move into the space occupied by the patent. | Moreover, no explanation is offered to justify the selected time period, and no explanation is given for the manner in which the proposed formula accounts for contributions to the creation of R&D aside from R&D spending. As noted above: R&D spending is only a measure of value in the context of a negotiated formula for compensation (i.e., the MRDA/RPSM). | Mr. Malackowski does not conduct one analysis of the economic life of the IP – he conducts at least four.  He analyzed the market adoption of three representative technologies, the patent portfolio age (indicating maintenance fees paid), the correlation between high-interest ratings and patent age, and the priority year of patents asserted in litigation by Rockstar.[6] |
| 36 | M44 | 2 | Express | New patents may have more value because there is a longer term remaining in the life of the patent. | | The statement that "no explanation is offered to justify the selected time period" is completely unfounded. |
| 37 | M44 | 2 | Express | New patents may have more value because the technology to which they relate is less likely to become obsolete. | | "Dead" technologies were not included in the patent portfolio because of Nortel's rigorous culling process to avoid unnecessary maintenance payments. |
| | M44 | 6 | The End Date: The appropriate end date for measuring R&D contribution for the purpose of the LOB sales is the end of 2008 | | | |
| 38 | M44 | 6 | Express | "Know How" was continuously being developed up to the termination of the ordinary course operations on January 14, 2009. | "Know how" was being developed right through to the closing of the sale. | **The CCC's argument contradicts information that its expert, Mr. Britven, relies upon.**

The CCC's comment is unfounded and is inconsistent with the Canadian Debtors' own description of the type of R&D taking place post-insolvency.[7] |

---

[6]    *See* TR00033, Malackowski Report 41–44; TR00034, Malackowski Rebuttal 27–32.

[7]    *See, e.g.*, TR00010A, Reply Affidavit of Sharon Hamilton ¶ 8, Apr. 25, 2014; TR48622.02, NNL Transfer Pricing Report for the Taxation Year Ended Dec. 31, 2009, at 34, 43 (Oct. 29, 2010).

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| | M45 | 3 | | | Nortel's calculation of RPS percentages for transfer pricing purposes is not an accurate way to measure each RPE's relative contributions to the creation of Nortel IP. | |
| 39 | M45 | 4, 5 | Express | It is problematic that the RPS lookback period is shorter than the useful life of the patents sold: "Since the vast majority of high-value patents in Nortel's portfolio are derived from R&D spending that occurred more than five years before the relevant dates, I am aware of no justification for such a restricted approach". | The RPS look-back period makes sense when one considers: <br><br> (a) the RPE percentages were the same for all parties (i.e., they affected NNL, NNI, etc. the same way); <br><br> (b) that the RPEs' bargain compensates for more than just the R&D done by the various entities—it necessarily takes account of the entire relationship between the RPEs in its historical context (e.g., NNL kick-started the global enterprise through the contribution of its IP; NNL provided strategic oversight; NNL financed borrowing; etc.) <br><br> (c) the context of the bargain viewed as a whole: the RPEs other than NNL are surrendering their individual ownership of IP and thereby assuming a disproportionate risk of insolvency, in exchange for a perpetual license that affords them the significant benefit of participating in the Nortel enterprise and making profits in any given year, firstly through operations, and only secondarily through the residual profit split or cost-sharing formula. | **The CCC disagrees with this proposition because it is inconsistent with the CCC's own assumptions.** <br><br> (a) The RPS lookback period could only make sense if R&D spending remained constant over time, which it did not. The percentages are therefore not even remotely the same and do not affect each party the same way. For example, NNL does substantially better when the period of time during which the most valuable assets were created – *i.e.*, 1991 to 2000 – is ignored. <br><br> (b) Once again, the "RPEs' bargain" (*i.e.*, the RPS methodology) was designed for allocating operating profits and explicitly does not apply to sale proceeds. Additionally, the CCC appears to be arguing for other factors to be considered as contributions to R&D activity; however, it is unclear what the consideration of additional factors has to do with either R&D or the period of time over which contributions are measured (*i.e.*, the lookback period). <br><br> (c) As stated above, the RPS methodology was designed for allocating the profits of an operating business. It explicitly does not apply to proceeds from the sale of business units or assets. |
| | | | **Option 2: License Approach** | | | |
| | M49 | 3 | | | Value payable to a Selling Debtor is equal to the value of the Selling Debtor's license to IP. | |
| | M50 | | | | The value of the IP license surrendered by an RPE is equal to the revenue generated by an LOB in the RPE's territory, plus an equal share of the revenue generated in unassigned territories | |
| 40 | M50 | 1 | Express | Assumes accuracy of third-party market research data from IDC, Infonetics, Boston Analytics, and Frost & Sullivan for the purpose of geographic revenue projections. | These private analyst reports are inherently speculative . Malackowski does not provide these information sources, and he fails to disclose the historical accuracy of the forecasts. They may or may not reflect the best available information, but their speculative nature makes them an inadequate basis to allocate the Sale Proceeds. Indeed, note Huffard's critique (at H41-42) of the use of "theoretical" valuation methodologies requiring "subjective assumptions" such as the expected churn rate for customer relationships and the cost of capital associated with different tangible and intangible assets employed by a company. | **The CCC's comments are at odds with fundamental valuation concepts.** <br><br> See response to item 9 for comments on forecasts. <br><br> Also, Mr. Britven states in his report that to "determine the fair market value of the assets owned by the Nortel Debtors . . . we would typically consider, amongst other items: <u>forecasts for the Lines of Business</u>, details of customer orders and relationship history, <u>projections of revenues for each customer</u> . . . ." Such forecasts and projections are determined using data from analyst reports. |
| 41 | M50 | 1 | Implied | Assumes that an IE is beneficially entitled to all of the Revenue initially booked by it. | Inconsistent with the CCC interpretation of the MRDA and RPSM, which require a reallocation of revenue at year end to account for R&D spending and other untracked support provided by various entities conducting R&D. | **The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.** |

A-13

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| 42 | M51 | 4 | Express | Assumes that subsidiaries were free to compete with NNL in ROW. | Inconsistent with the CCC interpretation of MRDA and scope of license rights. See Britven Rebuttal Report at pp. 13-15. | The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error. |
| 43 | M51 | 5 | Express | Assumes that an IE would have been entitled to hold up a sale by asserting its license rights. | Ignores reality that IEs decided that they were better off not to hold up a sale, and ability of the courts to force a sale. | The CCC disagrees with this proposition because it is inconsistent with the CCC's own assumptions.<br><br>To look only at the choice that was ultimately made by the RPEs and to deny the fact that the RPEs could have held up the sale if they thought the Canadian Debtors planned to keep all of the proceeds is to completely ignore the facts. The RPEs decided not to hold up the sale based on the understanding that they would receive a fair allocation of the sale proceeds.[8] |
| | | | **Treatment of Customer Related Assets and Goodwill in LOB Sales** | | | |
| | H35 | 78 | Customer Related Assets and Goodwill are treated together as a residual balance, after determination and allocation of Net Tangible Assets and Intellectual Property | | | |
| 44 | H41 | 94 | Express | Theoretical methodologies to value customer related assets are unreliable | All theoretical valuation methodologies are subject to uncertainty—the question is whether they are too unreliable for the intended purpose. It is ironic that Huffard concludes that the methods for valuing customer related assets are too unreliable, when he relies so heavily on the speculative valuation work that Malackowski undertakes for the purpose of valuing and allocating the vast majority of the Sale Proceeds. | The CCC's comments are at odds with fundamental valuation concepts.<br><br>See response to item 3. |
| 45 | H42 H51 | 94 114 | Express | In the absence of a reliable valuation methodology treat Customer Related Assets and Goodwill as a residual category. | This assumption reflects a self-serving approach that, ironically, relies on the accuracy of theoretical methodologies used by Malackowski to value IP rights. In a nutshell: use the theoretical methodologies that are beneficial to the EMEA Debtors, and disregard others on the basis that they are "unreliable". This approach departs from the way in which the purchasers of the LOBs allocated the assets they acquired and the Alcatel "precedent". | The CCC's comments are at odds with fundamental valuation concepts.<br><br>See response to item 3. |
| 46 | H51 | 114 | Express | Allocate to the Selling Debtors proportionate to their 2008 revenue in each LOB. | Assumes that each country "owns" its revenue when in fact there are many inter-company contributions to revenue that need to be taken into account through the RPSM payments. | The CCC is confusing the fact that Mr. Huffard disagrees with Mr. Britven's assumptions with committing some kind of error.<br><br>The RPS methodology does not apply to proceeds from the sale of Customer-Related Assets, or any assets for that matter. Additionally, the 2008 revenue is used as a proxy for determining which entities owned the Customer-Related Assets, not the Line-of-Business revenues. |

---

[8]  *See* TR21638, IFSA § 11(a) (June 9, 2009) (Under the IFSA, the U.S. and EMEA Debtors agreed that they would execute appropriate license termination agreements "in consideration of a right to an allocation . . . of portions of the sale proceeds." (emphasis added)).

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| 47 | H52 | 116 | Express | Transfer pricing mechanisms are designed for tax efficiency and so revenue provides a better proxy for the value generated by the residual assets. | Some transfer pricing is operationally justified—can't ignore inter-company support. | **The CCC is confusing the fact that Mr. Huffard disagrees with Mr. Britven's assumptions with committing some kind of error.**<br><br>As Mr. Huffard states at paragraph 116 of his initial report (TR0030), intercompany "arrangements are often designed to ensure that profits are generated across entities in a tax-efficient manner, which may not accurately reflect where economic value is created." This demonstrates that Mr. Huffard considered intercompany support but appropriately chose not to rely upon it. |
| | **RESIDUAL PATENT PORTFOLIO SALE** | | | | | |
| | | **Valuation of Patents** | | | | |
| | M20 | 3 | Actual Value is determined by the residual patent sale | | | |
| | | **Allocation of Value** | | | | |
| | | **Option 1: Contribution Approach** | | | | |
| | Same series of assumption as allocation of IP Value in LOB sales (see pg. 8-13, supra.) | | | | | |
| | | **Option 2: License Approach** | | | | |
| | M49 | 3 | Value payable to a Selling Debtor is equal to the value of the Selling Debtor's license to the Residual IP. | | | |
| | M50-51 | | The value of a Selling Debtor's license to the Residual IP is equal to the revenue generated through the license of Residual Patents in the Selling Debtor's territory, plus an equal share of the revenue generated in unassigned territories. | | | |
| 48 | M50-51 | | Implied | It is possible to model the income generating potential of the Residual Patents with reasonable accuracy. | The forecasts are inherently speculative. For example: taking the most optimistic cash flows from the IP Co. model, and the lowest discount rate used by Nortel and its advisors, and a litigation success rate of 100%, the DCF value of IP Co. is only $2.7 billion; Malackowski's model generates a value of $3.5 billion; and, Rockstar valued the residual IP portfolio at $4.5 billion. These are huge swings in value premised on a series of competing assumptions and agendas. | **The CCC's comments are at odds with fundamental valuation concepts.**<br><br>See response to item 9 for comments on forecasts.<br><br>Additionally, Mr. Malackowski performed two valuations: one which assumed royalties only in countries with at least one high-interest patent (valued at about $3.5 billion) and one which assumed worldwide royalties (valued at about $5.3 billion). Although Mr. Malackowski ultimately selected the former, more conservative model, the latter model would have given even more value to the EMEA Debtors and less to the Canadian Debtors. The mid-point between these two sets of assumptions is almost exactly the amount paid by Rockstar. |

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| | M31 | 1 | | | Revenue in a Selling Debtor's territory is equal to the sum of the license fees that could be recovered for each franchise in which a patent is used in the given territory. | |
| | M32 | 6 | | | The recoverable license fees for a franchise = Discount Rate x Royalty Rate x Royalty Base (Revenue) in that Territory | |
| 49 | M31 | 3 | Express | Nortel's IP Portfolio should be analyzed according to the following eight franchises: | Although the franchise framework is not unreasonable, Malackowski ultimately misapplies the analysis incorporating this assumption. | **The CCC's comments are at odds with fundamental valuation concepts.**<br><br>The CCC provides no support for this comment. |
| 50 | M33 | 3 | Express | Allocation of patents to each franchise | The allocation of patents to a particular franchise is unsubstantiated and speculative. Malackowski's allocation is derived almost entirely from these franchises and related royalty rates (below), but there is no basis in fact for believing that these would apply from 2008 onward. Use of technology inevitably evolves over time as new uses are found. This material assumption lacks real world validity. | **The CCC's comments are at odds with fundamental valuation concepts.**<br><br>The allocation of patents is not speculative and is substantiated by the analysis performed by Global IP in collaboration with Nortel. The royalty rates applied to the analysis were derived by Lazard and Global IP with direct participation from Nortel on a forward-looking basis in 2010 onward.<br><br>Also, finding new uses for IP does not mean that the IP would apply to an entirely different industry segment. There is absolutely nothing in the record to suggest that, for example, Nortel's optical networking patents would typically become smartphone patents as time goes on.  The CCC's speculation that technologies would typically evolve in this manner is entirely unsupported. |
| 51 | M32 | 1 | Express | Nortel's Residual Patent Portfolio was broad and diverse enough to apply to most if not all of the revenue in the eight franchises. | This assertion is unsubstantiated, and subject to change as the technologies develop. | **The CCC disagrees with this proposition because it is inconsistent with the CCC's own assumptions.**<br><br>Nortel's portfolio was determined to be broad and diverse enough to apply to most if not all of the revenue in the eight franchises by independent technical, legal, and financial experts from Nortel, Global IP, and Lazard. Additionally, technology development is accounted for in the forecasts that Mr. Malackowski obtained from industry reports provided by highly reputable independent sources (*e.g.*, Infonetics, IDC, etc.). |

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| 52 | M32 | 3 | Express | For the purposes of the royalty base calculation, revenue is limited to those geographic regions with at least one high interest patent in a given franchise. | There is only limited real-world data to support any conclusion that the "high-value" patents identified by Lazard from a subset of the Rockstar portfolio truly are more valuable than the rest of the portfolio. There is no evidence showing how much more valuable Nortel believed that these patents were. Furthermore, this approach emphasizes the importance of the patent allocation exercise and ignores the possibility of future patent registrations. | **The CCC disagrees with this proposition because it is inconsistent with the CCC's own assumptions.**<br><br>Global IP examined every single independent claim of over 3,500 issued U.S. patents. This is a remarkable level of diligence conducted by an independent third party. Mr. Malackowski then conducted multiple tests to confirm the reasonableness of these ratings.[9]<br><br>It is not clear what is meant by "future patent registrations." If the CCC means that continuations and foreign counterparts can be filed, Mr. Malackowski accounted for that by matching ratings between issued U.S. patents and their foreign counterparts and pending applications. If the CCC is referring to patent applications that may be registered in the future, these were considered and included by Global IP when it performed its analysis. |
| 53 | M32 | 2, 4 | Express | The inherently territorial nature of patents justifies ignoring the potential for earning royalties outside of the jurisdiction of registration. | As Malackowski admits, (M32, para. 2-3), a licensor should be able to leverage royalties for use outside of the jurisdiction of registration as a condition of settlement (i.e. focus on global revenue as opposed to territorial revenue). It is possible to license bundles of patents that apply to multiple jurisdictions for one consolidated rate. | **The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.**<br><br>Mr. Malackowski performed two valuations: one which assumed royalties only in countries with at least one high-interest patent (valued at about $3.5 billion) and one which assumed worldwide royalties (valued at about $5.3 billion). Although Mr. Malackowski ultimately selected the former, more conservative model, the latter model would have given even more value to the EMEA Debtors and less to the Canadian Debtors. |

---

[9]   *See* DEM00011, Malackowski Slides at 32.

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| 54 | M34-35 | | Express | For each of the franchises, Revenue will be as predicted by selected private market research firms, and further as determined by the linear application of growth rates, as selected by Malackowski.<br><br>For example:<br><br>1) S▇▇▇▇<br>  a) 2011-15: Per Infonetics forecasts;<br>  b) 2016-2020: 6% growth as per Infonetics 2015; and,<br>  c) 2021 onwards: 3%<br><br>2) ▇▇▇▇▇▇▇<br><br>  a) 2011-15 as per Boston Analytics;<br>  b) 2016-2020: 10% growth per Boston Analytics estimate of 13.8% for 2015; and,<br>  c) 2021 onwards: 3% growth;<br><br>3) ▇▇▇▇▇▇▇<br>  a) 2011-215 as per Siemens Enterprise Communication; and<br>  b) 2016 onwards: revenue at 2015 levels based on Siemens 0% growth estimates for 2014 and 2015. | The basis for these forecasts, and their historical accuracy are not disclosed. They are inherently speculative, as demonstrated by Malackowski's own unexplained guesswork in cases where analyst forecasts were unavailable. This may or may not be the best information available, but it is not a reliable basis upon which to allocate material Sale Proceeds. Moreover, Malackowski misapplies these assumptions as he ignores the terms of the MRDA addressing ownership rights and the scope of license grants. | **The CCC's comments are at odds with fundamental valuation concepts.**<br><br>Historical accuracy of forecasts based on hindsight is not relevant since the valuation must be as of the date of sale and cannot incorporate additional information that was unknowable at the time of sale.<br><br>Analyst growth rates were used whenever available (see response to item 9 for comments on the use of forecasts in valuations) and growth rates no greater than inflation were used for later years. Additionally, the rates used for these later years have no material impact on allocation.<br><br>**The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.** |

| Item No. | Page No. | Para. | Proposition | | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|---|
| | | | Express vs. Implied | | | | |
| 55 | M34-35 | | Implied | | Assumes accuracy of forecasts | Forecasts are inherently speculative, and therefore not a reliable basis upon which to allocate material Sale Proceeds. | **The CCC's comments are at odds with fundamental valuation concepts.** <br><br> See response to item 9 for comments on forecasts. |
| 56 | M32 | 6 | Express | | Assumptions as to royalty rates, licensing expenses, tax rates, and discount rates. | These factors are inherently speculative, and therefore not a reliable basis upon which to allocate material sale proceeds. | **The CCC's comments are at odds with fundamental valuation concepts.** <br><br> Licensing expenses, tax rates, and discount rates do not have any impact on allocation. As Mr. Malackowski states on pages 32 to 33 of his initial report (TR00033): "It is worth noting that decisions regarding licensing expenses and tax rates do not ultimately affect the allocation among regions; they only affect the estimate of value of each franchise for purposes of cross-checking against the actual $4.5 billion sale price paid." <br><br> See response to item 15 for comments on royalty rates and response to item 21 for comments on discount rates. |
| 57 | M36 | 2 | Express | | Royalty Rate is based upon "Litigation Light" model constructed by Nortel/Lazard/Global IP: <br> 1. ████████ 0.45%; <br> 2. ████████ 1.85%; <br> 3. ████████ 1.25%; <br> 4. ████████ 1.85%; <br> 5. ████████ 0.30%; <br> 6. ████████ 1.25%; <br> 7. ████████ 1.25%; and <br> 8. ████████ 1.25% | These royalty rates are inherently speculative, and therefore not a reliable basis upon which to allocate material Sale Proceeds. | **The CCC's comments are at odds with fundamental valuation concepts.** <br><br> See response to item 15 for comments on royalty rates. |
| 58 | M36 | 2 | Implied | | Assumes accuracy of the IPCo model | The Lazard/Global IP forecasts may or may not reflect the best available information. However, they are inherently speculative and therefore form an inadequate basis to allocate material portions of the Sale Proceeds. For example: taking the most optimistic cash flows from the IP Co. model, and the lowest discount rate used by Nortel and its advisors, and a litigation success rate of 100%, the DCF value of IP Co. is only $2.7 billion; Malackowski's model generates a value of $3.5 billion; and, Rockstar valued the residual IP portfolio at $4.5 billion. These are huge swings in value premised on a series of competing assumptions and agendas. <br><br> Further, the Lazard/Global IP forecasts are not consistent with what the licensed participants would have received on the valuation date. <br><br> See Britven Rebuttal Report at 21-22. | **The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.** <br><br> Mr. Malackowski and the EMEA Debtors do not assume the IP Co. model was accurate. If Mr. Malackowski did, he would not have built his own model with different assumptions. He only adopted elements of the IP Co. model where, in his independent judgment, it was appropriate to do so. |

| Item No. | Page No. | Para. | Proposition Express vs. Implied | Related Assumptions | Description of Errors in the Assumption | EMEA Debtors' Response |
|---|---|---|---|---|---|---|
| 59 | M37 | 2 | Express | Licensing and Litigation Expensed will by 20% of royalty revenue | Completely speculative | **The CCC's comments are at odds with fundamental valuation concepts.**<br><br>See response to item 56. |
| 60 | M37 M38 | 4 | Express | Assumes Discount Rate of 30% across all franchises, reflecting a moderate to high risk enterprise. | Completely speculative. Appendix U to Malackowski's Report, refers to a range of Risk Adjusted Hurdle Rates of 10% to 70%, and purports to create an air of legitimacy and reliability by attaching empty words to meaningless numbers. | **The CCC's comments are at odds with fundamental valuation concepts.**<br><br>The Risk Adjusted Hurdle Rates, which the CCC refers to as "empty words" and "meaningless numbers," were obtained directly from *Valuation and Dealmaking of Technology-Based Intellectual Property: Principles, Methods, and Tools*, written by Dr. Richard Razgaitis in 2009 (see Appendix U to Mr. Malackowski's initial report (TR11383)). Dr. Razgaitis is the author of four books on valuation and negotiation/dealmaking (published by John Wiley and Sons).<br><br>It is also important to note that altering discount rates up or down across the board does not impact allocation. |
| 61 | M50 | | Express | Forecast license returns can be allocated based on where the revenue is earned, with the ROW revenue being split equally between the 5 RPEs. | This is in essence a revenue-based allocation that assumes that the proceeds of sale are independent from any duty to account for the support provided for those sales, NNL's exclusive rights to enforce in non-exclusive territories and NNL's unique position as the owner of the Residual Patents. See Britven Rebuttal Report at pp. 29-30. | **The CCC disagrees with this proposition because it is inconsistent with the CCC's own assumptions.**<br><br>As discussed at page 51 of Mr. Malackowski's initial report (TR00033), NNL's "exclusive rights to enforce in non-exclusive territories" is an economic liability when there are numerous parties who can all grant nonexclusive licenses. |
| 62 | M50 | | Implied | Assumes that an RPE is beneficially entitled to all of the Revenue initially booked by it. | Contrary to the CCC interpretation of the MRDA and RPSM, which require a reallocation of revenue at year end to account for R&D spending and other untracked support provided by various entities conducting R&D. | **The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.**<br><br>There is no assumption that each RPE was entitled to all of the revenue initially booked by it. Further, the CCC is again confusing the contribution approach with the RPS methodology, which is specific to operating profits. |
| 63 | M51 | 4 | Express | Assumes that subsidiaries were free to compete with NNL in ROW | Inconsistent with CCC interpretation of MRDA and scope of license rights. See Britven Rebuttal Report at pp. 13-15. | **The CCC is confusing the fact that Mr. Malackowski disagrees with Mr. Britven's assumptions with committing some kind of error.** |
| 64 | M51 | 5 | Express | Assumes that an RPE would have been entitled to hold up a sale by asserting its license rights | Ignores reality that RPEs decided that they were better off not to hold up a sale, and ability of the courts to force a sale. See Britven Rebuttal Report at p. 30. | **The CCC disagrees with this proposition because it is inconsistent with the CCC's own assumptions.**<br><br>See response to item 43. |