Court File No.: 09-CL-7950

## ONTARIO
## SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

- and -

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS, INC., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

**ALLOCATION POST-TRIAL REPLY BRIEF OF NORTEL NETWORKS UK PENSION TRUST LIMITED AND THE BOARD OF THE PENSION PROTECTION FUND**

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

September 10, 2014

**THORNTON GROUT FINNIGAN LLP**
Barristers and Solicitors
100 Wellington Street West, Suite 3200
Toronto, Ontario
M5K 1K7

**Michael E. Barrack** (LSUC# 21941W)
**John Finnigan** (LSUC # 24040L)
**D. J. Miller** (LSUC# 34393P)
**Andrea McEwan** (LSUC# 53781P)
**Michael S. Shakra** (LSUC# 64604K)

Tel:    416-304-1616
Fax:    416-304-1313

*Canadian Counsel to Nortel Networks UK
Pension Trust Limited and the Board of the
Pension Protection Fund*

**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, N.Y. 10019-6099, U.S.A

**Brian E. O'Connor**
**Eugene L. Chang**
**Sameer Advani**
**Heather M. Schneider**
**Robert Kofsky**
**Andrew Hanrahan**
Tel:    212-728-8000
Fax:    212-728-8111

**BAYARD, P.A.**
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899

**Charlene D. Davis** (No. 2336)
**Justin Alberto** (No. 5126)
Tel: 302-655-5000
Fax: 302-658-6395

*US Counsel to Nortel Networks UK Pension
Trust Limited and the Board of the Pension
Protection Fund*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. ii

TABLE OF AUTHORITIES ............................................................................ v

INTRODUCTION ........................................................................................... 1

PRELIMINARY STATEMENT ...................................................................... 1

ARGUMENT .................................................................................................. 4

I.    THE LEGAL AND ECONOMIC FLAWS IN THE OTHER PARTIES'
      POSITIONS CONFIRM THAT THE PRO RATA DISTRIBUTION
      MODEL IS THE MOST APPROPRIATE ALLOCATION APPROACH ................. 4

      A.    The Key Facts Supporting the Pro Rata Distribution Model Are Not in
            Dispute. ........................................................................................ 5

      B.    The Canadian Debtors' Legal Title Approach Is Economically Irrational
            and Depends on Flawed Assumptions. ............................................... 8

            (1)    The Legal Title Approach Ignores Undisputed Facts
                   Demonstrating that the Company Operated as "One Nortel." ......... 9

            (2)    The Legal Title Approach Treats the RPEs as Economically
                   Irrational Actors. .................................................................. 13

            (3)    The Legal Title Approach Undervalues the RPE License Rights
                   That Were Surrendered For the Line of Business and Residual
                   Patent Sales. ......................................................................... 15

            (4)    The Legal Title Approach Is Wholly Dependent on Flawed
                   Assumptions. ........................................................................ 17

      C.    The US Debtors' Income Approach Relies On A Selective Interpretation
            of the MRDA and Suffers from Serious Flaws in Implementation. ............ 23

            (1)    The Income Approach Ignores Any Obligation to Share Revenues
                   After Expenses Across the Nortel Group. .................................. 24

            (2)    The Income Approach Misconstrues the Nature of the RPEs'
                   Beneficial Ownership Interests. ............................................... 28

            (3)    The Income Approach Would Result in Unjust Enrichment. ......... 30

            (4)    Even If Accepted, the Income Approach Suffers From Significant
                   Implementation Errors That Must Be Corrected. ......................... 31

D.    If the Courts Do Not Adopt the Pro Rata Distribution Model, the EMEA Contribution Model Is Consistent With How Nortel Operated and Is Economically Rational. ..........................................................................44

II.    **THE ARGUMENTS ADVANCED BY THE PARTIES IN OPPOSITION TO PRO RATA ARE WITHOUT MERIT AND SHOULD BE REJECTED. ..........46**

A.    Responding Overview ...........................................................................46

B.    The IFSA and Other Orders and Statements by the Courts Do Not Preclude the Courts from Ordering a Pro Rata Allocation. ...................49

C.    The Pro Rata Distribution Model Is Not "Global Substantive Consolidation." ......................................................................................52

    (2)    US Case Law Addressing Substantive Consolidation ...............59

    (3)    Canadian Case Law Addressing Substantive Consolidation ....66

D.    The Pro Rata Distribution Model Is Not a Sub Rosa Plan. ...................73

E.    The Extensive Factual Record Supports a Pro Rata Allocation. ...........74

F.    The CCC and Wilmington Trust Support a Pro Rata Allocation. ..........75

G.    The US$2 Billion Intercompany Claim and Previously Settled Claims Are Not Impediments to Pro Rata Allocation. ...............................................77

H.    Outstanding Claims and Estate Issues Do Not Preclude Implementation. ............80

I.    The Pro Rata Distribution Model Best Reflects Creditor Expectations. ..............81

    (1)    The Bondholders have Presented No Evidence of Creditor Expectations. ...........................................................................81

    (2)    The Evidence of Creditor Expectations that Has Been Presented to the Courts Supports the Pro Rata Distribution Model. ..............84

    (3)    A Pro Rata Allocation Will Have No Impact on the Capital Markets Generally. ..................................................................90

J.    Pro Rata Allocation Does Not Render the Guarantees Worthless. ........93

K.    Creditor Recoveries Are Relevant to the Task Before the Courts .........98

L.    Implementing the Pro Rata Distribution Model Does Not Require the Courts to First Confirm a Plan. ...........................................................101

    (1)    The Bondholders Mischaracterize the Pro Rata Distribution Model. ......101

(2)     There Is No Need for Further Plan Negotiations in Canada or the
US. .........................................................................................................101

M.     The US Debtors' Motion to Strike the Pro Rata Reports Is Without Merit.........105

**CONCLUSION** ...............................................................................................................**107**

# TABLE OF AUTHORITIES

**Reference**                                                                              **Page(s)**

## US LAW

*In re 1438 Meridian Place, N.W., Inc.*,
    15 B.R. 89 (Bankr. D.D.C. 1981) ...................................................................64

*Alexander v. Compton (In re Bonham)*,
    229 F.3d 750  (9th Cir. 2000) ......................................................................64

*In re Brentwood Golf Club, LLC*,
    329 B.R. 802 (Bankr. E.D. Mich. 2005) ....................................................64

*Counihan v. Allstate Ins. Co.*,
    194 F.3d 357 (2d Cir. 1999).........................................................................30

*In re Crabtree*,
    39 B.R. 718 (Bankr. E.D. Tenn. 1984) .......................................................64

*FDIC v. Colonial Realty Co.*,
    966 F.2d 57 (2d Cir. 1992)...........................................................................60

*In re Faser Paper Inc.*
    No. 09-12123 (KJC) (Bankr. D. Del. Feb. 11, 2011) ................................104

*In re LLS America, LLC*,
    2012 WL 2042503 (9th Cir. B.A.P. June 5, 2012) ......................................64

*In re Manzey Land & Cattle Co.*,
    17 B.R. 332 (Bankr. D.S.D. 1982).............................................................97

*Munford, Inc. v. Toc Retail, Inc. (In re Munford, Inc.)*,
    115 B.R. 390 (Bankr. N.D. Ga. 1990) ........................................................64

*In re Nortel Networks, Inc.*,
    669 F.3d 128 (3rd Cir. 2011) .....................................................................100

*In re Owens Corning*,
    419 F.3d 195 (3d Cir. 2005)..........................................60–63, 66, 69, 74, 83, 91, 95, 97–98

*In re Quebecor World (USA) Inc.*,
    No. 08-10152 (JMP) (Bankr. S.D.N.Y.) ...............................................63–64

*Sampsell v. Imperial Paper & Color Corp.*,
    313 U.S. 215 (1941)....................................................................................60

| Reference | Page(s) |
|---|---|

*Shubert v. Jeter (In re Jeter),*
171 B.R. 1015 (Bankr. W.D. Mo. 1994)............................................................97

## CANADIAN LAW

*Re AbitibiBowater,* 2009 QCCS 6461 ...............................................................103, 105

*Re Atlantic Yarns Inc.*, 2008 CarswellNB 195 (N.B. C.Q.B.) ................................68–69

*Century Services Inc. v Canada (Attorney General),* 2010 SCC 60.....................66, 103

*In re Everfresh Beverages, Inc.*, No. 32-077978 (Ont. Gen. Div.) ................................66

*Re Fairview Industries Ltd.*, 1991 CarswellNS 35 (N.S.S.C.)....................................67

*Re Fraser Paper Inc.* (Feb. 11, 2011) Court File No. CV-09- CV-09-8241-00CL...............63, 104

*Re Huffy Corp*, 2005 CarswellOnt 10571 (Ont. S.C.J)....................................................68

*Kerr v. Baranow*, 2011 CarswellBC 240, 2011 SCC 10 ...............................................30

*Re Lehndorff General Partner Ltd.,*1993 CarswellOnt 183 (Ont. C.J. Gen. Div.)......................67

*Re Livent Inc.*, (Nov., 21 2003) Court File No. 98-CL-3162........................................66

*Re Nortel Networks Corp.*, 2009 CarswellOnt 146 (Ont. S.C.J) ................................72

*Re Nortel Networks Corp.*, 2010 ONSC 1708 ...............................................................79

*Re Nortel Networks Corp.*, 2011 ONSC 4012 ...............................................................99

*Re Nortel Networks Corp.*, 2013 ONCA 427 ...............................................................49

*Re Nortel Networks Corp.*, 2013 ONSC 1757 ...............................................................49

*Re Nortel Networks Corporation et al*, 2014 ONSC 4777 .........................................102–103, 105

*Re Northland Properties Ltd.,*1988 CarswellBC 531 (B.C.S.C.) ............................66–67

**Reference**                                                                 **Page(s)**

*Re PSINet Ltd.,* 2002 CarswellOnt 1261 (Ont. S.C.J) .....................................................68

*Re Timmico Limited,* 2014 ONSC 6461 ..................................................................103


## US STATUTES

11 U.S.C. § 105...............................................................................................................60


## CANADIAN STATUES

Income Tax Act, RSC 1985, c 1 (5th Supp) .....................................................................45


## OTHER AUTHORITIES

*Facilitating the cross-border insolvency of multinational enterprise groups:*
      *Note by the Secretariat,*  United National Comm. on Int'l Trade Law,
      45th sess, A/CN.9/WG.V/WP.120 (2014) ...........................................................96

*In re HIH Casualty Insurance and General Insurance Ltd.*, [2008] UKHL 21 ...........................56

M. MacNaughton, *Classification, Consolidation and Context:*
      *A Canadian Approach to Substantive Consolidation,*
       Banking & Finance Law Review 17 (September, 2009) ..................................66

M. MacNaughton and M. Azoumanidis, Substantive Consolidation in the Insolvency of
      Corporate Groups: A Comparative Analysis, Annual Review of Insolvency Law,
      2007, J. Sarra, ed. (Carswell: 2008)...................................................................66

Irit Mevorach, Insolvency within Multinational Enterprise Groups
      (Oxford U Press 2009) ...............................................................57–59, 71, 92

John A.E. Pottow, *A New Role for Secondary Proceedings in International Bankruptcies*,
      46 Tex. Int'l L.J. 579, 584–586 (2011)...............................................................97

M. Rotsztain and N. DeCicco *Substantive Consolidation in CCAA Restructurings:*
      *A Critical Analysis*, Annual Review of Insolvency Law,
      2004, J. Sarra, ed. (Carswell: 2005)..............................................................66–67

Jay L. Westbrook, *Priority Conflicts as a Barrier to Cooperation in Multinational*
      *Insolvencies*, 27 Penn St. Int'l L. Rev. 869 (2009)............................................56

**Reference**                                                                                          **Page(s)**

Jay L. Westbrook, *Multinational Financial Distress: The Last Hurrah of Territorialism*,
    41 Tex. Int'l L.J. 321 (2006)................................................................................56

William H, Widen, *Corporate Form and Substantive Consolidation*,
    75 Geo. Wash. L. Rev. 237 (2006) ...........................................52, 69, 91, 95, 94

William H. Widen, *Report to the American Bankruptcy Institute: Prevalence of Substantive
    Consolidation in Large Public Company Bankruptcies from 2000 to 2005*,
    16 Am. Bankr. Inst. L. Rev. 1 (2008) ..............................................................61

## INTRODUCTION

1.      This Post-Trial Allocation Reply Brief is submitted on behalf of the Nortel

Networks UK Pension Trust Limited and the Board of the UK Pension Protection Fund (the "**UK**

**Pension Claimants**" or "**UKPC**"), which represent over 36,000 remaining pension creditors of

Nortel Networks Corporation and its global subsidiaries (collectively, "**Nortel,**" the "**Nortel**

**Group,**" or the "**Group**").[2]  As outlined in their Opening Post-Trial Brief,[3] the UK Pension

Claimants respectfully request that the Courts adopt the pro rata distribution model to allocate

the Lockbox Funds among the Estates of the Selling Debtors so that Nortel's worldwide creditors

as a whole are treated equitably.

## PRELIMINARY STATEMENT

2.      As outlined in the UK Pension Claimants' Opening Post Trial Brief, the pro rata

distribution model is the most appropriate method of allocation because:

- Prior to the insolvency of Nortel, there was no agreement between the various Nortel entities as to how the proceeds of asset sales in a liquidating insolvency would be allocated as between the entities;

- The allocation method suggested by the Canadian Debtors, the legal-title approach, and the US Debtors' revenue approach, each are based on the fundamentally flawed premise that the MRDA represents an *ex ante* agreement among the Nortel entities as to how the proceeds of asset sales in a liquidating insolvency would be allocated;

- In the absence of an *ex ante* agreement, the governing core insolvency principle is the *pro rata pari passu* treatment of unsecured creditors;

- This core insolvency principle has been recognized both in the applicable domestic insolvency law and in international insolvency law through the codification of the "Hotchpot Rule," which is applicable in this case due to the

---

[2]      Unless otherwise indicated, all capitalized terms shall have the same meaning ascribed to them in the Allocation Pre-Trial Brief of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund, dated May 2, 2014 [D.I. 13451].

[3]      ("**UK Pension Claimants' Br.**")

asset integration and one undifferentiated pool of proceeds contained in the Lockbox; and

- Given the absence of *ex ante* agreement on the method of allocation there are a number of domestic legal bases applicable to the division of a single pool of commingled assets that support the application by these Courts of the pro rata distribution model on the unique facts of this case.  These include:

  o Joint venture law;

  o The law relating to the imposition of a constructive trust based upon unjust enrichment;

  o Equitable receivership principles applied within the context of the relevant insolvency statutes applicable to these proceedings; and

  o The law relating to substantive consolidation.

3.      As also pointed out in the UK Pension Claimants' Opening Post-Trial Brief, the legal bases that justify the pro rata distribution model are supported by the virtually undisputed trial evidence regarding Nortel's operations prior to insolvency:

- Nortel's business operated as one highly integrated global enterprise with geographically diverse residual profit entities ("**RPEs**") that:

  o Collaborated on development of technology;

  o Collaborated on sales to customers;

  o Shared intellectual property ("**IP**");

  o Shared revenues after paying operating expenses, including certain pension costs; and

  o Was operated and managed without regard to individual entities;

- Cash was treated as a fungible commodity to be used for the benefit of the global enterprise rather than any individual entity;

- The development of patents, the most valuable assets of Nortel, were the result of a collaborative process that all Parties agree was so entangled that no Party has attempted to attribute individual patents to individual Nortel entities; and

- The MRDA was a transfer pricing document addressing operating profit and loss that explicitly did not apply to asset sales.

4.      Similarly the legal support for the pro rata distribution model is overwhelmingly supported by the conduct of the Nortel insolvency:

- The initial filings advised the Courts of the highly integrated nature of Nortel's operations.

- The Cross-Border Insolvency Protocol specifically contemplated that a motion could be brought to substantively consolidate the Canadian and US Debtors.

- Pursuant to the Interim Funding and Settlement Agreement (the "**IFSA**"), the Canadian, US and EMEA Debtors agreed to cooperate in selling the Nortel Group's assets, while deferring the issue of how the sale proceeds would be allocated.

- None of the RPEs or other entities was capable of operating independently outside of the Group.

- The lines of business were sold—as they had to be—in cooperative, multi-jurisdictional sales that recognized, "these were not Canadian businesses or American businesses or English businesses; they were worldwide businesses."[4]

- The residual patent portfolio was sold in the Rockstar transaction on a collaborative worldwide basis to take advantage of the fact that the global coverage of the patent portfolio was perceived as a source of value.[5]

- The very existence of the Lockbox, a commingled fund representing the principal proceeds of the Group's business, is further powerful testimony to the operation integration that preceded the insolvency.

- Subsequent to the sales, the Debtors have been engaged in a costly, intractable litigation for several years while the creditors, the true parties in interest, have lost over US$1 billion in value through fees and expenses paid largely to support no-holds-barred litigation in which highly territorial positions have been steadfastly held.

5.      In this Reply Brief, the UK Pension Claimants will provide the Courts with comments on the flaws contained in the principal allocation methods outlined in the primary briefs of the other Core Parties.  In addition, the UK Pension Claimants will address a number of the issues raised by other Core Parties in opposition to the pro rata distribution model.

---

[4]      Trial Trans. Day 4, 1001:4–8 (Hamilton).

[5]      Veschi Dep. 73:3–24.

6.      The vastly divergent interpretations of the MRDA, which are the foundation of each of the Canadian and US allocation methodologies, serve to emphasize the fact that not only was this explicitly **_not_** a document that addressed the issue before the Courts, but there has never been any subsequent agreement among the Nortel entities on an allocation method for asset sale proceeds.   Those entities now have no economic interest in allocating sale proceeds, as the only economic interest belongs to the creditors.

7.      Parochial theories advanced by advisors to defunct corporations should be dismissed in favour of the only allocation method that is legally supportable and reflects the true nature of the process these Courts are undertaking—allocation of the hopelessly entangled assets of a single multi-national enterprise that conducted its business on profoundly integrated, worldwide basis.

## ARGUMENT

## I.      THE LEGAL AND ECONOMIC FLAWS IN THE OTHER PARTIES' POSITIONS CONFIRM THAT THE PRO RATA DISTRIBUTION MODEL IS THE MOST APPROPRIATE ALLOCATION APPROACH.

8.      The post-trial briefs submitted by the Monitor, the Canadian, US, and EMEA Debtors, the CCC, Wilmington Trust, the Bondholders, Law Debenture Trust Company, and BNY Mellon as Indenture Trustee (hereinafter, the "**Core Parties**" or "**Parties**") serve only to confirm that the pro rata distribution model is the most fair, equitable, economically rational, and appropriate method for allocating the Lockbox Funds.  In fact, two of the other Parties (the CCC and Wilmington Trust) specifically endorse the pro rata distribution model as an equitable way to allocate the Lockbox Funds.

9.      With the exception of the EMEA Debtors' contribution theory, the other Parties' approaches largely rely on parochial interpretations of selective provisions of the MRDA that

lead to a wide disparity among proposed recovery rates for the different geographic groupings of creditors.  It is not coincidental, of course, that each of the US Debtors and the Canadian Debtors proposes an allocation methodology that produces the highest recovery for their own particular geography or Estate.  This disparity in outcomes makes clear the moral hazard in allowing parties to pursue economically irrational allocation theories that are favourable to particular geographic debtor groups while the creditors as a whole bear the substantial associated litigation costs through the reduction in total funds available for distribution.  The disparate geographic treatment of creditors under the US and Canadian allocation theories is inconsistent with the "One Nortel" that existed prior to bankruptcy.

10.     Therefore, for the reasons presented in the UK Pension Claimants' Opening Post-Trial Brief and the reasons discussed below, the Courts should conclude that the pro rata distribution model is the most appropriate and economically rational allocation methodology for these cases.  If, however, the Courts decide not to adopt the pro rata distribution model, the EMEA contribution model is (as discussed in Part D below) the next best allocation approach that reflects the manner in which Nortel operated, the nature of the assets sold, and the economic rationality of the RPEs, and the UK Pension Claimants would ask the Courts to adopt that allocation model.

### A.     The Key Facts Supporting the Pro Rata Distribution Model Are Not in Dispute.

11.     The UK Pension Claimants submitted to these Courts before trial that the factual evidence concerning Nortel's operations would be remarkably consistent.[6]  The trial and the Parties' initial post-trial briefs have borne that out.  Nineteen days of live testimony and

---

[6]     *See* UK Pension Claimants' Br. Part I (Summary Statement of Facts); *id.* at Appx. A (Proposed Findings of Fact) Parts I, II.A–B, V, and VI.

thousands of pages of evidence have eroded many of the factual contentions that the Parties once

asserted, and the facts that lie at the core of the allocation dispute are free from virtually any

material disagreement.  These facts cannot reasonably be disputed and, indeed, have not been

disputed by the Parties:

> (a)   Nortel operated pursuant to a vertically and horizontally integrated matrix structure, where legal entities and geographic boundaries were cast aside in favour of business lines.[7]
>
> (b)   The entities were so intertwined and interdependent that no single Nortel entity or region was able to provide the full line of Nortel products and services.[8]
>
> (c)   Nortel's most valuable assets were its IP assets.[9]
>
> (d)   Nortel's IP assets were jointly financed, developed through a cross-border, collaborative R&D process, and utilized by all RPEs.[10]
>
> (e)   In contrast to other large technology companies, Nortel's R&D was distributed among many sites associated with different RPEs.[11]
>
> (f)   Nonetheless, Nortel R&D sites worked with each other, across geographic boundaries, to develop technologies collaboratively, for the use and benefit of Nortel globally.[12]

---

[7]   Initial Post-Trial Brief (Allocation) of the Monitor and Canadian Debtors ("**Canadian Debtors**" and "**Canadian Br.**") ¶¶ 22–24; ("The matrix structure was designed to enable Nortel to function more efficiently, drawing on employees from different functional disciplines worldwide, allowing them to work together to develop products and attract and provide service to customers, fulfilling their demands globally."); Proposed Findings of Fact and Conclusions of Law of the US Interests (hereinafter referred to as the "**US Debtors**" and the "**US Finds. of Fact**") ¶ 26; Joint Administrators' Post-Hearing Submission Regarding Allocation of the Proceeds of the Nortel Asset Sales  (hereinafter referred to as the "**EMEA Debtors**" and the "**EMEA Br.**") ¶ 41.

[8]   *E.g.*, Canadian Br. ¶ 24.

[9]   Canadian Br. ¶ 27 ("R&D was the primary driver of Nortel's value and profit."); US. Finds. of Fact ¶ 106 ("In a high-tech firm whose lifeblood is R&D, such as Nortel . . . .") (quoting TR00056); EMEA Br. ¶ 53 ("The primary driver of the Nortel Group's business success was its ability to create and exploit advanced telecommunications technology.")

[10]   EMEA Br. ¶ 9; Canadian Br. ¶ 66; US FoF ¶ 18–20.

[11]   TR11352 (Letter, Apr. 6, 2006) at NNI_01534867; TR21188 (Global R&D Investment Strategy) pp. 9–10; Trial Trans. Day 3, 709:14–710:19 (McFadden).

[12]   *E.g.*, TR00023 (Brueckheimer Aff.) ¶5.

(g)     The overlapping and intersecting contributions of the RPEs to R&D coalesced into the Nortel IP such that it is impossible to reliably identify which RPEs developed, or contributed to the development of, patents or assets sold in the bankruptcy sales.[13]

(h)     Individual Nortel employees often did not differentiate between different corporate entities in performing their duties, and generally sought to advance the interests of Nortel as a whole.[14]

(i)     The Nortel Group used a shared cash management system to transfer cash among entities and otherwise manage the cash needs of the enterprise as a whole.[15]

(j)     Under Nortel's residual profit split methodology ("**RPSM**"), various operating expenses were deducted from revenues before the resulting residual profits or losses were shared among the RPEs.[16]

(k)     To effect a sale of Nortel's IP assets from its highly integrated businesses, purchasers required that all of the RPEs relinquish their rights to those assets.[17]

(l)     Such was the level of integration across the businesses, even dividing Nortel's patent portfolio by business line—the primary dimension by which Nortel was organized—for purposes of the asset sales required an iterative, year-long process involving IP specialists and technical experts from all of Nortel's businesses.[18]

(m)     There was no *ex ante* agreement as to how the proceeds from the sale of those joint assets should be allocated among the Nortel entities.  The MRDA did not contemplate—nor does it apply to—either the global cessation of operations or the sale of the IP in an insolvency proceeding.[19]

---

[13]    EMEA Br. ¶¶ 63–64 ("Any attempt to survey Nortel's IP portfolio and attribute the creation of individual patents to the work of individual inventors or RPEs would be 'doomed to failure.'"); Canadian Br. ¶ 45.

[14]    Proposed Findings of Fact and Conclusions of Law of the CCC ¶18; UK Pension Claimants Br. Appx. A ¶¶ 32–43.

[15]    *E.g.*, TR21540 (Doolittle Decl.) ¶64.

[16]    Trial Trans. Day 8, 1747:3–18 (Stephens); Day 9, 1881:24–1882:8 (Weisz); Day 14, 3341:3–5 (Green).

[17]    US FoF ¶¶ 291–292; Canadian Br. ¶ 620.

[18]    *E.g.*, McColgan Dep. 128:7–22; 129:12–25.

[19]    EMEA Br. ¶ 24; Canadian Br. ¶ 73 ("It is undisputed that the RPSM and MRDA did not contemplate and did not dictate a particular result in the event of insolvency of all parties."); Post-Trial Brief of the US

12.     It is also beyond reasonable dispute that, having completed the liquidation of the Nortel assets, the role of the US Debtors, the Canadian Debtors, and the EMEA Debtors (collectively, the "**Estates**") has shifted to one of administrative necessity.  The Estates lack any financial interest in the litigation, and are only vehicles for the corporations that are subject to the bankruptcy proceedings.  The sole purpose of those corporations, is to facilitate an equitable distribution to their creditors.  Given the complexity of Nortel's operations and the demonstrable difficulty in disentangling the Group's assets in advance of their sale, the pro rata distribution model is the only allocation mechanism that will ensure that result.

### B.    The Canadian Debtors' Legal Title Approach Is Economically Irrational and Depends on Flawed Assumptions.

13.     The Canadian Debtors' allocation position results in a very extreme allocation of the Lockbox Funds in favour of the Canadian Estate, although in reality it relates to only one Debtor, NNL.  Basically, the Canadian Debtors argue that they should get the bulk of the proceeds from the business sales—and ***all*** of the proceeds from the residual patent sale— because, they contend, full ownership and value of Nortel's patents had been transferred to NNL.  However, it would have been economically irrational for the non-Canadian RPEs to incur significant expenses on R&D and transfer their rights in the fruits of that R&D to NNL, but receive nothing in return if that IP were sold (whether that sale occurred when Nortel was solvent or not).  For example, under the Canadian Debtors' theory, NNL could have sold any Nortel IP immediately after title was transferred to NNL and kept the entirety of the proceeds for itself, leaving all of the development costs with the RPEs.  That is not how Nortel operated.  Rather, the RPEs engaged in a common endeavor in which there was no *ex ante* compensation of

---

Interests (hereinafter referred to as the "**US Debtors**" and the "**US Br.**"), 32 (calling the MRDA's insolvency and termination provisions "most closely analogous," but not directly applicable.).

equivalent market value for the legal title transferred to NNL and, thus, any allocation position that construes that transfer of legal title as a transfer of full value and ownership is misconceived, inequitable, and economically irrational.

### (1)    The Legal Title Approach Ignores Undisputed Facts Demonstrating that the Company Operated as "One Nortel."

14.    The Canadian Debtors take the position that "allocation should be based on the rights of the Parties."[20]  The Canadian Debtors then spend the next 64 pages of their brief engaging in a tortuous exegesis to parse out and justify what those rights were.[21]  Arguing that the most important right (bare legal title) belonged to NNL, they allocate the bulk of the business sales and the entire residual patent sale to the Canadian Estate.

15.    Although there is a superficial attractiveness to framing the allocation question as requiring determination of the pre-existing ownership of assets sold, the undisputed evidence is that the various Nortel entities had no pre-existing delineation of entitlement to proceeds from the sale of the entire enterprise in bankruptcy.  Any allocation approach that gives the bulk of the proceeds from the entangled IP to one Estate (Canada) based on the alleged position of one RPE (NNL) would result in unjust enrichment.[22]  After-the-fact attempts to disentangle and segregate ownership of the essential IP assets among the entities for purposes of allocation in a liquidating bankruptcy, in a way never contemplated during Nortel's operation, are by necessity wholly contrived.

16.    As explained in the UK Pension Claimants' Opening Post-Trial Brief, the Nortel RPEs operated as a common endeavor akin to a joint venture and, thus, the Lockbox Funds

---

[20]    Canadian Br. Part V; *id.* at ¶ 240 (advocating an allocation methodology "based upon the value of the *property rights* transferred or surrendered by each Debtor Estate in connection with the various sales").

[21]    Canadian Br. Part VI, ¶¶ 245–433.

[22]    UK Pension Claimants' Br. ¶¶ 69–72.

should be distributed to the RPEs' creditors on a broadly equal basis.[23]  It is inconsistent with the

RPEs' common activities and expectations to bestow a windfall on Canada simply because NNL,

as the parent company, held legal title to Nortel's IP.

17.    Moreover, the trial evidence was clear and undisputed:  Nortel's IP was both

technologically and geographically entangled.[24]  Given the strong evidence of IP asset

entanglement, any effort now to disentangle their sale proceeds to support an allocation by

geography (or entity-by-entity) is a wholly artificial and imprecise exercise replete with

implementation issues likely to spawn appellate issues for years to come.

18.    The UK Pension Claimants submit that the proceeds of the bankruptcy sales

should be treated in the same manner as the creation of the patents and the operation of Nortel:

on the basis that all RPEs contributed to a single world-wide enterprise, with all sharing the risks

and benefits of that endeavor.

19.    The Canadian Debtors' opening brief concedes key facts that undermine their

position and support the UK Pension Claimants' pro rata distribution model:

- "R&D was the primary driver of Nortel's value and profit";[25]

- "As a result of Nortel's matrix structure, no single Nortel entity or region . . . was able to provide the full line of Nortel products and services, including R&D capabilities, on a stand-alone basis";[26]

- "[I]t is impossible to trace which R&D expenses produced which IP";[27]

---

[23]    *Id.* at *¶¶ 61–68.*

[24]    *See generally id.* at ¶¶ 25–27.

[25]    Canadian Br. ¶ 27.

[26]    *Id.* at  ¶ 24.

[27]    *Id.* at  ¶ 45.

- "Transfer pricing addresses the allocation of operating income within a multinational group as a going concern and does not address the allocation of assets on insolvency",[28] and

- "It is undisputed that the RPSM and MRDA did not contemplate and did not dictate a particular result in the event of insolvency of all parties."[29]

20.     As shown above, the Canadian Debtors admit that R&D was the driver of Nortel's value, that no one entity did create, or could have created, that value alone, and that it is impossible to trace which entity produced which IP.  The Canadian Debtors further admit that the Nortel Group's transfer pricing policy did not govern the allocation of proceeds upon global insolvency.  As the UK Pension Claimants explained, the allocation of proceeds from such a commingled pool of assets should be effected on a pro rata basis as it would in the context of an equitable receivership.[30]

21.     Contrary to these admissions and their logical impact on allocation, the Canadian Debtors purport to define the rights of the Parties based on their construction of the MRDA, the very transfer pricing document that they admit was never intended to, and does not, apply in a global insolvency.[31]  They base their allocation approach specifically on Article 4 of the MRDA, which vests legal title to Nortel's patent IP in NNL.  The Canadian Debtors contend that other RPEs enjoyed only limited licenses, and were only entitled to the value of their transferred or surrendered license rights as capped by their shares of the ongoing operating profits attributable to Nortel IP embedded in products—an amount they calculate to be very small in relation to the overall value of Nortel's IP portfolio.  Accordingly, the Canadian Debtors assert that NNL is

---

[28]     *Id.* at  ¶ 52(d).

[29]     *Id.* at  ¶ 73.

[30]     UK Pension Claimants' Br. ¶ 73–77.

[31]     *See* Canadian Br. ¶ 73.

entitled to the bulk of the IP-related proceeds from the line of business sales and the entire

US$4.5 billion of the Rockstar sale proceeds.[32]  Notably, the Canadian Debtors, in their Post-

Trial Brief, do not assert that their position is economically rational.  In fact, that term appears

nowhere in their brief.

22.     This division of rights presupposed by the Canadian Debtors' legal title theory is

unsupported by the record.  Rather, the trial evidence demonstrates that the RPEs that were

engaged in R&D for the benefit of Nortel were recognized to be beneficial owners of Nortel's IP,

and thereby entitled to share in the economic upsides and downsides, from such IP.[33]  The RPEs'

agreement to transfer legal title to NNL was in return for a share of economic ownership in the

entirety of Nortel's patent portfolio—each RPE was entitled to receive a share of revenue

generated in all the Nortel territories worldwide, after operating expenses had been paid.  In

other words, the Nortel RPEs agreed to pool their patent portfolio for the good of the Nortel

Group, with each RPE understanding that revenues after all costs, particularly R&D costs, were

paid would be shared.  Nortel's RPSM was justified to the tax authorities on this basis.[34]

23.     The Canadian Debtors have provided no satisfactory explanation for why this

entitlement would terminate on a Group insolvency and would not apply to IP sales.  Beneficial

interests are relevant in bankruptcy as they are in the pre-bankruptcy period.  The Canadian

Debtors do not explain why substantially all proceeds from the IP sales should go to NNL alone

while expenses, including pension costs, should remain with the other RPEs that incurred them.

Such an outcome is inconsistent with the manner in which the RPEs operated as part of a

---

[32]     *See* Canadian Br. ¶ 13.

[33]     TR45100.03 (Request for Bilateral APA) pp. 11, 13; *see, e.g.*, US Br. 41 ("[E]very witness who testified at
trial about the MRDA confirmed that the factual context in which the MRDA was created led the parties to
grant each Participant equitable and beneficial ownership of that technology.").

[34]     TR45100.03 (Request for Bilateral APA) pp. 11, 13.

common endeavor while Nortel was a going concern, paying at least most operating expenses and only then sharing residual profits and losses rather than one entity alone benefitting from any upside.

24.     Fundamentally, the distribution in bankruptcy of the proceeds of sale from jointly-created and jointly-used assets should reflect the fact that the RPEs operated in such a way that the revenues from the ongoing exploitation of such assets had to be applied first to meet the costs of the global business, including certain pension costs, irrespective of the jurisdictions in which revenues were generated.  When Nortel was a going concern, none of the RPEs was entitled to retain all of the benefit of revenues from third-party sales in its respective territory.  Instead, each RPE was subject to an obligation to share profits and losses with each other as part of their common entrepreneurial activity.  That was the purpose for which the RPEs assigned legal title in the IP they created to NNL.  Because that purpose was no longer (upon bankruptcy) capable of being fulfilled, NNL plainly cannot be permitted to keep the Group's assets free and clear for its own benefit.

### (2)     The Legal Title Approach Treats the RPEs as Economically Irrational Actors.

25.     The Canadian Debtors' position also treats the RPEs as irrational economic actors.  If the non-Canadian RPEs had understood the implications of the MRDA, as _**now**_ interpreted by the Canadian Debtors, they would have had no incentive to create value for the overall Group.  Indeed, it may have created director liability to have permitted the RPEs' resources to be "given away" while long-term liabilities—such as the huge UK pension deficit— were increasing if there would have been no recovery from assets to satisfy these liabilities in the event of an insolvency or other asset disposal.  Clearly, it would not have been in any of the other RPEs' best interests to pursue research that would eventually lead to the development of

-13-

commercially exploitable IP if they would not share in the value realized when the IP was sold. It is difficult to find any justification, economic or otherwise, for such an arrangement from the non-Canadian RPEs' point of view.

26.     The Canadian Debtors argue that, based upon a reading of the MRDA, the **_only_** consideration to which the RPEs were entitled in return for performing R&D was their right to share in any ongoing operating profits under the RPSM.[35]  The Canadian Debtors assert that non-Canadian RPEs would have accepted such an arrangement simply to receive this periodic income.  However, they have provided no basis to suggest that any RPE would rationally have entered into such a hypothetical bargain.  Such a one-sided bargain would also be inconsistent with the role of all RPEs as risk-taking entrepreneurs having economic interests in the proceeds from their R&D efforts, whatever the form those proceeds might take.

27.     But even if that were a rational framework for **_ongoing_** operations, it would not have been rational for the non-Canadian RPEs to agree to receive **_no_** consideration in the event of a sale of **_all_** IP assets (in a Group insolvency or otherwise).  If the MRDA were to support this conclusion, it would have been wholly irrational for the non-Canadian RPEs to accept the terms and conditions of the RPSM and associated MRDA, much less to have agreed to continue under the same terms on the eve of the Group's insolvency[36] or to have entered into the IFSA.  The Canadian Debtors' theory suggests that RPEs would have been happy to cover deferred liabilities such as pensions on their own, even though they had no separate resources, and allow any upside realized in the insolvency sales to inure to NNL and its creditors alone.  Such an imbalance would have been entirely irrational for the non-Canadian RPEs to have accepted.

---

[35]     *See* Canadian Br. ¶¶ 401, 397–400.

[36]     *See* TR21003 (MRDA) p. 59 (Fourth Addendum effective Dec. 31, 2008 and executed in early Jan. 2009).

28.     The Canadian Debtors additionally argue that the leadership by Canada gave the other RPEs access to R&D that would not have been economically viable for a standalone company.[37]  But NNL also received access to R&D under the MRDA, such as the extensive and groundbreaking work done by NNUK,[38] that it would not have had access to as a standalone company either.

> ### (3)    The Legal Title Approach Undervalues the RPE License Rights That Were Surrendered For the Line of Business and Residual Patent Sales.

29.     Under the legal title allocation approach, the Canadian Debtors assert that the Canadian Estates should receive virtually all of the Lockbox Funds except with respect to a small number of tangible assets located in each Estate, and the value of the MRDA licenses relinquished by the US and EMEA RPEs if Nortel had continued as a going concern.  The experts for the Canadian Debtors estimated that these relinquished licenses were of low value, thereby entitling the Canadian Debtors to 80 percent or more of the Lockbox Funds.[39]

30.     Such a low valuation contradicts the importance that was placed on the RPEs' relinquishment of licenses to effectuate the sales of the lines of business and residual patents. These sales were facilitated by the voluntary relinquishments of the RPE licenses.  If the non-Canadian RPEs had been informed of the low value that the Canadian Debtors now place on their licenses, it would have been more rational for them to demand a higher percentage of the proceeds than to willingly relinquish their assets in order to facilitate Nortel's line of business

---

[37]     Canadian Br. ¶ 33.

[38]     *See* UK Pension Claimants' Br. Appx. A (Proposed Findings of Fact) Part III.

[39]     Canadian Br. ¶ 13, Table (seeking 82.2 percent of Total Allocation for Canada).

sales.  It would have been completely irrational for the RPEs to surrender their licenses in exchange for virtually nothing in return.

31.     With respect to the IFSA, the Canadian Debtors repeatedly argue that the Parties wanted to avoid a dispute at the time of bankruptcy, maximize sale proceeds, and promptly dispose of Nortel's assets before they depreciated.  As they repeatedly assert, "[a]ll parties recognized that fighting over allocation would have prevented the sales of the assets, resulting in a smaller pot of proceeds to allocate between the Debtors."[40]  That certainly is logical.  But implicit in that statement is the assumption that the other Parties would receive a fair share of that pot.  Indeed, why would the other Parties have cared about maximizing the size of the Rockstar proceeds if they believed they would receive absolutely no part of those proceeds?

32.     The Canadian Debtors also spill a significant amount of ink arguing that the Parties were not required to make their allocation positions known at the time of the IFSA.  They even include an 18-page section arguing that they can make their legal-title based argument now and are not estopped from doing so.[41]  The UK Pension Claimants do not contend that the Canadian Debtors are estopped from making their legal-title submissions.  Nonetheless, the behavior of the Canadian Debtors and other Parties in entering into the IFSA, along with the representations to the Courts at the time of the approval of the IFSA and the bankruptcy sales, were entirely inconsistent with the legal title theory now being advanced.[42]

---

[40]     Canadian Br. ¶ 110.

[41]     Canadian Br. Part X, ¶¶ 593–648.

[42]     *See* Trial Trans. Day 6, 1374:17–1375:10 (Ray) ("I certainly wouldn't have proceeded in the face of someone telling me that I had absolutely no asset to sell.  In fact, when we did the transaction, I came here to this court and I told this Court that the transaction was in the best interests of the US Estate.  I couldn't have done that if that was the position that the Monitor had taken."); *see also* TR49885 (Sixty-Third Report of the Monitor) ¶15 (reporting that "a sale of the Residual IP was the best method of monetizing the Residual IP for the benefit of [Nortel] Stakeholders").

### (4)    The Legal Title Approach Is Wholly Dependent on Flawed Assumptions.

33.    In addition to the conceptual flaws discussed above, the Canadian Debtors' legal title approach is further undermined by reliance on unfounded assumptions. These problems highlight and confirm the unsound bases underlying the Canadian Debtors' theory, and provide yet another reason why the Courts should reject their proposed allocation.

### (a)    The Canadian Debtors' Experts Rely on Assumptions Not Borne Out by the Record.

34.    The Canadian Debtors' legal title approach is premised on an assumption that the MRDA alone governs allocation, and upon a particular construction of the MRDA. The approach depends entirely on the Courts concluding that the non-Canadian RPEs held effectively no rights of value in Nortel's IP. The Canadian Debtors' expert, Philip Green, testified that his entire valuation is based on his understanding of the US and EMEA Debtors' rights under the MRDA, as advised by counsel for the Canadian Debtors.[43] Green testified that if the Courts conclude that the non-Canadian RPEs had a greater interest in Nortel's IP than he ascribed to them based on the Canadian Debtors' construction of the MRDA, his primary approach, which is the basis for the Canadian Debtors' proposed allocation, would undervalue those interests.[44]

35.    Green's analysis also depends in part on the flawed premise that patents in the residual portfolio categorized as "not used" in Nortel's businesses were never used by any of the

---

[43]    Trial Trans. Day 13, 3110:12–18 (Green)  ("Q. [I]n your approach to valuation, why does Canada get what it gets?  A. It really gets what it gets because it owns it, based on my understanding of the MRDA."); see also Trial Trans. Day 13, 3118:8–3120:19 (Green).

[44]    Trial Trans. Day 14, 3352:4–11 (Green).  The UK Pension Claimants disagree with the Canadian Debtors' interpretation of the MRDA and their criticisms of the expert report of Bruce Stratton.  *See generally* Canadian Br. ¶¶ 418–433.  For example, the Canadian Debtors improperly assert that Stratton relies on extrinsic evidence, although they admit that the factual matrix can be considered when interpreting contracts under Canadian law.  *Compare* Canadian Br. ¶ 423 *id.* at ¶ 179.  Stratton's interpretation is consistent with Canadian law and the factual matrix and the Canadian Debtors' criticisms are unfounded.

businesses, giving the US and EMEA Debtors no rights to them under the Canadian Debtors'
construction of the MRDA.[45]  That is factually incorrect.  Patents could be designated "not used"
if they related to products and services that Nortel had discontinued,[46] or covered products that
Nortel was selling but sourcing from a third party—including (a) components Nortel purchased
from a supplier for use within a Nortel product, such as an integrated circuit; or (b) equipment
Nortel purchased from a supplier and then rebranded and sold as its own.[47]  Green conceded that
if he was wrong that the US and EMEA RPEs had no rights to these "not used" patents, then his
valuation analysis was wrong as well.[48]

36.     Similarly, Dr. Reichert's position depends on assumptions that, if not adopted by
the Courts, render his opinions baseless.  Dr. Reichert testified at trial that, if the Courts
determine that the RPEs were engaged in a common endeavor, and retained a beneficial interest
in the IP, then it would have been economically irrational for them to enter into an arrangement
in which all residual value went to NNL, as the Canadian Debtors now argue.[49]  Thus, even if the
Courts were to determine that the interest of the parties can be separately valued for purposes of
determining an allocation, the Canadian Debtors' legal title approach would remain fatally
inconsistent with the trial evidence.

---

[45]     *See* Trial Trans. Day 13, 3125:8–14 (Green); Canadian Br. ¶¶ 467, 479-86.

[46]     McColgan Dep. 125:22–127:9; 130:21–131:7, 132:8–16.

[47]     McColgan Dep. 132:17–133:10.

[48]     Trial Trans. Day 13, 3183:13–3184:5 (Green).

[49]     Trial Trans. Day 16, Trial Trans. 4051:12–25 (Reichert) ("[I]n your hypothetical, it's a joint venture going
in, walking in the door, they have all the residual interests. Of course it would be irrational for them to give
those residual interests away without payment.  Of course.").

> **(b)** **The Canadian Debtors Fail to Value the IP Rights of the Canadian Debtors In The Same Manner as the Rights of Other RPEs.**

37.     The largest asset category included in Green's analysis of Nortel's line of business sales is IP rights and customer relationships, which is the residual category after allocating the business sales proceeds to tangible assets, in-place workforce, and wholly-owned subsidiaries.[50]  For the IP component, Green:  (1) valued the IP licenses and customer relationships surrendered by the US and EMEA Debtors (based on his flawed "value-in-use" standard), and (2) then assigned the remainder of the value to the Canadian Estate, on the grounds that NNL was the legal title holder and licensor under the MRDA.[51]  Thus, Green did not seek to value NNL's interest in the IP according to the same methodology he used to value the interests of the US and EMEA Debtors.  The fact that NNL was a licensor, whereas other RPEs were licensees, neither explains nor justifies Green's deviation from his own chosen valuation approach.

38.     Green calculated the residual value, which he attributed entirely to NNL, to be US$1.38 billion.  However, Green testified that had he gone through the same steps of valuing NNL's interests as he did for the other RPEs, and not engaged in this shortcut, the value attributed to NNL would actually have been around US$400 million.[52]  This inconsistency has a very significant impact on the allocation of business sale proceeds under the Canadian Debtors' approach.

---

[50]     DEM00015 (Green Dems.) p. 10.

[51]     Trial Trans. Day 13, 3108:11–3111:15, 3126:17–3127:3 (Green) (describing "value-in-use" approach).

[52]     Trial Trans. Day 13, 3229:1–3230:17 (Green).

### (c)    The Canadian Debtors Mistakenly Rely on Value In Use.

39.    Another way in which Green attributes an unreasonably low value to the US and EMEA license rights is by valuing their licenses on a "value-in-use" basis.[53]  Green's premise appears to be that, with the rights afforded by their licenses under the MRDA and RPSM (as construed by the Canadian Debtors), the US and EMEA RPEs could only have earned a limited set of cash flows from the continuation of Nortel's businesses as going concerns.  That, according to Green, was the totality of the interests the US and EMEA Debtors relinquished.

40.    "Value in use" is an inappropriate and unreasonable valuation basis in the context of allocating proceeds from the ***actual*** market transactions that occurred.  Licensees surrendered not merely the rights they had actually exercised in the past as part of Nortel operations, but the entirety of their license right in Nortel's IP, which would be of greater value to potential bidders than the licensee's own "value in use."  Thus, the value of these rights to third parties bidding for Nortel's businesses, and what those businesses would be worth to bidders had the US and EMEA Debtors ***not*** relinquished their rights prior to sale, are more appropriate measures of value.[54]  Indeed, had the Debtors negotiated for an allocation prior to the business sales taking place, the US and EMEA Debtors would not rationally have settled for merely their "value in use."

41.    The distorting effect of the "value-in-use" methodology employed by Green and the Canadian Debtors' other experts is drawn into sharp relief when their disparate valuations of NNUK are considered.  Their expert, Dr. Mark Berenblut, submitted a report both in this

---

[53]    *See* Trial Trans. Day 13, 3125:15–3127:3 (Green).

[54]    The Canadian Debtors assert that the RPEs' licenses were essentially worthless to third parties because the licenses come with concomitant obligations, such as the obligation to share profits. Canadian Br. ¶ 464-65. This argument ignores that NNL was bound by those obligations as well.  Dr. Cox admitted at deposition that a buyer would have paid less for the residual patents if the US and EMEA had not relinquished their licenses.  Canadian Br. ¶ 497.  The Canadian Debtors' efforts to explain away his testimony are unavailing, as his testimony is clear and the licenses do have value.

allocation proceeding and in the claims proceeding before the Canadian Court expressing opinions on the value of EMEA's and NNUK's assets, respectively.  In the allocation proceeding, Berenblut opined that the appropriate means of valuing the interest of the EMEA Debtors was to determine their value in use,[55] which Green subsequently calculated to be approximately US$236 million for all of EMEA.[56]  Yet, in the claims proceeding, Berenblut opined that the net book value of NNUK's assets was, conservatively, approximately US$2.2 billion as of June 30, 2008, and that their fair value was likely to be in excess of $3 billion.[57] Berenblut testified that in a hypothetical sale of NNUK's assets, a buyer would actually have paid at least this net book value as of that date.[58]  The "value-in-use" calculations underlying the Canadian Debtors' proposed allocation cannot be reconciled with their own position on market value, infecting their entire approach with error.

---

[55]     *See* Trial Trans. Day 15, 3756:16–21 (Berenblut).

[56]     *See* Trial Trans. Day 15, 3758:24–3759:24 (Berenblut).

[57]     *See* Trial Trans. Day 15, 3764:21–3765:24 (Berenblut) (referencing TR00047 (Berenblut claims report) ¶ 24.)

[58]     Trial Trans. Day 15, 3766:15–21 (Berenblut).

**(d)** **The Canadian Debtors Assume That RPEs Would Have Undertaken R&D Even If They Expected a Net Return of Zero.**

42. The Canadian Debtors maintain that non-Canadian RPEs would have agreed to engage in R&D pursuant to the MRDA (as they construe it) simply in exchange for receiving periodic income under the RPSM.[59]   At trial, the Canadian Debtors' expert, Dr. Timothy Reichert, elaborated that the non-Canadian RPEs would have viewed the net present value ("**NPV**") of their investment in R&D to be at least zero on the basis of periodic income, without regard for receipt of any portion of the sale proceeds.[60]

43. However, the RPEs were risk-taking entities.  Thus, in a hypothetical bargain for a share of proceeds, they would have demanded more than their break-even value necessary to justify their R&D activity.[61]  As the UK Pension Claimants' expert, Dr. Coleman Bazelon, testified, "[i]nvestors want to maximize the NPV of their investments, not simply meet the threshold of not losing money on an investment."[62]  Reichert agreed that a net present value of zero was simply the lower boundary of the range of bargaining outcomes.[63]  Nonetheless, the Canadian Debtors do not seek to determine what the actual result of bargaining would have been.  Thus, even if it were correct that the RPEs all expected to at least break even on account of their shared operations revenue—a point not established by the record—it would not demonstrate that the RPEs (other than NNL) would not have also expected to share in the proceeds of an IP sale.

---

[59]    *See* Canadian Br. ¶ 401.

[60]    *See* DEM00018 (Reichert Dems.) p. 15.

[61]    TR00040 (Bazelon Rebuttal Report) p. 24.

[62]    Trial Trans. Day 12, 2965:23–2966:6 (Bazelon).

[63]    Trial Trans. Day 16, 4032:2–18 (Reichert).

44.    More fundamentally, there is absolutely no evidence that, prior to entering into the MRDA, RPEs did undertake, or could have undertaken, any analysis of the economics of recouping their individual investment in R&D through RPSM payments alone.  All of the evidence points to the economic justification for the MRDA, from the standpoint of the RPEs, being that what was good for the entire enterprise was good for the individual entities, recognizing that the economic fortunes of all members of the Nortel Group were inescapably intertwined.[64]  Reichert conceded that his NPV analysis was concerned with Nortel as a whole, and extended to individual RPEs because all expected to share in overall returns of the global enterprise.[65]  Thus, the very notion that the MRDA includes an *ex ante* agreement among the RPEs governing the allocation of IP sales proceeds is flawed.[66]  It is entirely implausible to suggest that had this issue actually been considered and negotiated, the Parties would have agreed on the outcome argued *ex post* by the Canadian Debtors.

45.    In conclusion, for the reasons stated above, the Canadian Debtors' legal title approach is a misconceived and inappropriate allocation mechanism, and should be rejected.

**C.    The US Debtors' Income Approach Relies On A Selective Interpretation of the MRDA and Suffers from Serious Flaws in Implementation.**

46.    The income or revenue-based approach proposed by the US Debtors would allocate the Lockbox Funds in proportion to projected income attributable to the territories associated with each debtor group.  This approach is premised on a selective reading of the MRDA that only gives effect to its patent license provisions.  It ignores the fact that while Nortel

---

[64]    *See, e.g.*, Trial Trans. Day 8, 1751:20–1752:2 (Stephens) (Nortel's tax planning activities were aimed at minimizing joint revenue of the global enterprise).

[65]    *See* Trial Trans. Day 16 4044:25–4045:15 (Reichert).

[66]    Elsewhere, the Canadian Debtors appear to concede as much:  "It is undisputed that the RPSM and MRDA did not contemplate and did not dictate a particular result in the event of insolvency of all parties."  Canadian Br. ¶ 73.

was an ongoing enterprise, Nortel's RPEs shared the profits or losses (revenue after paying operating expenses) derived from the exploitation of their jointly developed IP without regard for which territory generated those revenues and expenses. The result is a windfall for the US Debtors, who would collect a large share of Nortel's global revenue on behalf of the Group by virtue of its geography alone, but would bear disproportionately little of the direct expense required to produce the assets to generate that revenues. The Canadian and EMEA RPEs, who were net exporters of technology to the US, never agreed to such a windfall, nor would it have been economically rational for them to have done so.

**(1)     The Income Approach Ignores Any Obligation to Share Revenues After Expenses Across the Nortel Group.**

47.     As applied to the patent sale proceeds, the US Debtors' revenue approach begins and ends with the licenses memorialized in the MRDA: the RPEs' exclusive licenses to exploit Nortel's patents in their territories, and the RPEs' co-equal, non-exclusive rights in the remaining territories covered by any Nortel patents. This approach ignores the related obligations to share revenues ***after*** paying expenses, and ignores how Nortel operated in practice.

48.     The trial evidence overwhelmingly supports the conclusion that the MRDA memorialized practices relating to transfer pricing[67] adopted to operate the Group's global business in a tax-efficient manner but was not intended to address allocation of proceeds in the event of a global insolvency.[68] There is no dispute that the RPSM embodied in the MRDA was intended to share the Group's residual profits—revenue net of operating expenses—not to

---

[67]     Trial Trans. Day 9, 1847:24–1848:20 (Weisz) (The MRDA "contractualize[d] the arrangements that the participants had and had been ongoing for quite some time since 2001.").

[68]     Trial Trans. Day 16, 4030:4–8 (Reichert); Trial Trans. Day 8, 1785:2–10, 1787:9–24 (Stephens); Trial Trans. Day 5, 1124:17–24, 1143:19–1144:8 (Henderson); Trial Trans. Day 6, 1325:4–7 (Orlando); Trial Trans. Day 9, 1877:18–1878:1 (Weisz).

allocate asset sale proceeds in an insolvency.[69]  Even the Monitor and the Canadian Debtors

accept this is the case:  "It is undisputed that the RPSM and the MRDA did not contemplate and

did not dictate a particular result in the event of insolvency of all parties.  Not only is transfer

pricing limited to the tax context, there is consensus among the transfer pricing experts that

transfer pricing principles have not, to their knowledge and in all their years of experience, ever

been applied to allocate assets in the case of insolvency proceedings."[70]

49.    The MRDA recognizes that the RPEs were the beneficial owners of the Nortel

IP[71] and were, therefore, entitled to share in the proceeds from exploitation of that IP by other

RPEs.  Nortel's RPSM was justified to the tax authorities on this basis.[72]  The MRDA's

description of the RPEs' licenses was merely one aspect of the arrangement pursuant to which

the RPEs jointly developed and exploited the Nortel Group's IP, of which they were all

beneficial owners.  As befitting this joint beneficial ownership interest in Nortel's IP and

attendant right to share in the entrepreneurial risks and benefits of their R&D activity,[73] each

integrated entity was entitled to share in the profits resulting from Nortel's Group-wide revenue,

regardless of the territory in which it originated, after most operating expenses and routine

returns were paid.[74]  One can only ascertain profits and losses after liabilities to creditors,

---

[69]    Trial Trans. Day 12, 2852:20–2853:14 (Felgran) (Transfer pricing is "about the year-in/year-out operating income"); Trial Trans. Day 21, 5077:3–11 (Eden) ("[T]he transfer pricing rules were developed with the idea of ongoing . . . entities for purposes of determining their corporate income tax.").

[70]    Canadian Br. ¶ 73.

[71]    TR45100.03 (Request for Bilateral APA) pp. 11, 13; *see, e.g.*, US Br. 41 ("[E]very witness who testified at trial about the MRDA confirmed that the factual context in which the MRDA was created led the parties to grant each Participant equitable and beneficial ownership of that technology.").

[72]    TR45100.03 (Request for Bilateral APA) pp. 11, 13.

[73]    TR21003 (MRDA) p. 2.

[74]    *Id. at*  pp. 48–49.

including to the pensioners who created the technology generating the revenue, have been satisfied.

50.     There is no dispute that at least some pension costs were an "above the line" expense in calculating residual profit under the RPSM[75] (the failure to include all relevant costs "above the line" being a separate point of criticism made by the UK Pension Claimants in the context of their claims against NNL).  Accordingly, the allocation methodology proposed by the US Debtors is misconceived in that it does not take into account the unpaid pension costs (and indeed other associated costs) across the Nortel Group that must be deducted before any profits said to derive from the asset sale can be shared (if, contrary to the UK Pension Claimants' submissions, the MRDA were even applicable).

51.     Yet, for purposes of this allocation, the US Debtors ignore the RPEs' arrangement to share revenues, net of expenses, despite it being part and parcel of the common enterprise in which the Nortel RPEs were engaged.  Under their approach, revenue from IP is attributed solely to the geographies in which it is projected to be earned (mostly in the US) without sharing, and leaving the costs incurred in generating that IP where they lay—disproportionately with the Canadian and EMEA Debtors.  As the trial evidence has shown beyond any doubt, the location of a sale bore no direct relation to the effort required to generate that sale.

52.     The US Debtors' income approach is wholly irrational from the standpoint of the Canadian and EMEA Debtors.  In the decade leading up to Nortel's insolvency, NNL and NNUK in particular undertook a far greater share of Nortel's R&D on a cost basis than their share of revenue and, accordingly, were net recipients of transfer pricing payments.[76]  As pointed

---

[75]     Trial Trans. Day 8, 1747:3–18 (Stephens); Day 9, 1881:24–1882:8 (Weisz); Day 14, 3341:3–5 (Green).

[76]     *See* US Finds. of Fact p. 71 & Table 2 (compiling transfer pricing payment data).

out above, there was no *ex ante* bargaining between the RPEs regarding the allocation of proceeds in the event of a liquidating insolvency, nor any other negotiation for the fair market value of the IP rights contributed by the RPEs for the benefit of the Nortel Group.  Had such negotiations taken place, NNL and NNUK would rationally have demanded, at a minimum, to recover their full costs associated with performing R&D, such as pension costs of researchers and other employees, plus an appropriate rate of return.[77]

53.     The economic irrationality of the income approach becomes more obvious when Nortel's policies for filing patents are considered.  Regardless of where an invention originated, it was Nortel's policy to file patent applications on substantially all Group inventions meeting threshold criteria for inventiveness and technological and commercial value in the United States.[78]  A much smaller percentage—only roughly the top 25 percent of inventions—were the subject of a patent filing anywhere else.[79]  The US was the overwhelming focus of Nortel's patenting activities, and it received a tremendous portion of the Group's global patent budget.[80]

54.     This made sense in the context of Nortel's global enterprise, in which the only objective was to maximize total Group profits in a tax-efficient manner.  The US was Nortel's single largest commercial market, offered a cost-efficient patent law regime, and was strategically important for the global enterprise.[81]  Moreover, because profits were shared, it did not matter (apart from any tax consequences) that revenue was being earned in the US rather

---

[77]     *See* TR00040 (Bazelon Rebuttal Report) 3.  Dr. Reichert's explained that a NPV of zero was the minimum that a party would rationally accept in order to undertake an investment.  Trial Trans. Day 16, 4032:2–18 (Reichert).

[78]     Trial Trans. Day 10, 2173:24–2176:9, 2180:11–2181:2 (Anderson).

[79]     Trial Trans. Day 3, 765:7–766:10 (DeWilton); Day 10, 2181:3–15 (Anderson).

[80]     *See* Trial Trans. Day 3, 767:6–17 (DeWilton); Day 10, 2182:14–2183: 24 (Anderson).

[81]     Trial Trans. Day 10, 2180:11–2181:2 (Anderson).

than in another country.  It was therefore beneficial for the Group as a whole to concentrate on

US patents, often to the exclusion of other jurisdictions.

55.     However, these patent filing policies would have made no sense if non-US RPEs

were not entitled to any of the benefits from the use or sale of Nortel's US patents going forward,

but were limited to income from patents in their own exclusive territories and a share of income

in the non-exclusive territories.  Not only were relevant markets in Canada, individual European

jurisdictions, and the rest of the world generally much smaller than in the US, but Nortel did not

file patents on most of its inventions in any jurisdiction other than the US.  Applying the income

approach, the Canadian and EMEA Debtors would be deemed effectively to have transferred

valuable patent rights to the US Debtors without compensation or even some assurance that their

costs would be covered.

### (2)     The Income Approach Misconstrues the Nature of the RPEs' Beneficial Ownership Interests.

56.     In an effort to square their territorial income approach with the manner in which

the RPEs actually operated as part of a common global endeavor, the US Debtors repeatedly

suggest that each RPE was only the beneficial owner of the IP registered in its exclusive

territory, and a joint owner of IP in any non-exclusive territories.[82]  In this way, the US Debtors

seek to equate each RPE's beneficial ownership with the exclusive and non-exclusive licenses

memorialized in the MRDA.  The implication of this theory is that it would accord NNI

beneficial, and exclusive, ownership of all IP rights of value relating to the US territory.[83]  This

is incorrect for two reasons.

---

[82]     *E.g.*, US Br. 9 (The MRDA and its addenda "expressly and repeatedly . . . recite the parties' overarching intent to have each Licensed Participant hold 'equitable and beneficial ownership of NN Technology' ***in its Exclusive Territory***.") (emphasis added).

[83]     *E.g.*, *id.* at 21 (contending that "the MRDA . . . clearly grants NNI very broad license rights amounting to equitable and beneficial ownership of Nortel's intellectual property in the US.").

57.     First, this theory places the cart before the horse.  The economic activity of RPEs, which gave rise to their beneficial ownership interests, determines and informs the transfer pricing arrangements and agreements—not the other way around.[84]  RPEs enjoyed beneficial ownership of Nortel's IP because they undertook the entrepreneurial risk of paying for it and developing it through their cooperative R&D efforts.[85]  The trial evidence is clear that each RPE worked collaboratively on technologies to be used by Nortel and patented anywhere in the world, and did not engage only in R&D relevant to its individual territory.[86]

58.     The licenses memorialized in the MRDA (or its predecessor Cost Sharing Agreements) are not the source of this beneficial ownership.  These agreements were intended to reflect, not establish or alter, the economic reality of Nortel's ongoing business.[87]  Thus, the territorial scope of these licenses does nothing to undermine the fact that the RPEs, through their worldwide R&D efforts, were joint beneficial owners of the results of Nortel's IP on a worldwide basis.

59.     Second, in order for an RPE such as NNI to enjoy ***exclusive*** beneficial ownership of Nortel's IP within its territory, it would need to acquire the beneficial ownership interests residing with the other RPEs who contributed to that IP's creation.  Ownership in Nortel's IP resided initially with its creators, who worked collaboratively and were situated across the globe

---

[84]     Trial Trans. Day 12, 2828:24–2829:10 (Cooper) ("It [the beneficial ownership interest] comes from the concept underlying the RPS.  The MRDA simply tries to memorialize that, but it does not come from the MRDA itself.").

[85]     Trial Trans. Day 11, 2667:2–8 (Cooper); TR45100.03 (Request for Bilateral APA) pp. 11.

[86]     *E.g.*, Trial Trans. Day 7, 1567:4–25, 1573:4–12 (Brueckheimer); TR00023 (Brueckheimer Aff.) ¶ 5; McFadden Dep. 53:6–22.

[87]     Trial Trans. Day 6, 1319:12–18 (Orlando).

due to Nortel's unusual geographic distribution of R&D.[88]  Yet, nearly every one of Nortel's

patented inventions was patented in the US, and many only in the US.[89]  Under the US Debtors'

interpretation, only NNI would have a valuable ownership interest in these US patents, because

NNI had an exclusive license to the US patents.  The US Debtors make no attempt to show—and

there are no contemporaneous documents submitted to tax authorities, or otherwise,

showing—that all beneficial rights in the US were transferred to NNI, other than through their

selective reading of the MRDA to bestow that windfall on NNI.

(3)    <b>The Income Approach Would Result in Unjust Enrichment.</b>

60.    As discussed in the UK Pension Claimants' Post-Trial Brief,[90] application of the

income approach would result in the US Debtors' unjust enrichment.[91]  On that reading, NNI

was uniquely enriched by the work of other RPEs to create inventions that became the subject of

patents registered in the US, to which NNI held exclusive license rights within that jurisdiction.

In return, other RPEs were to receive a share of profits, reflecting revenue generated in the US

and elsewhere, through the RPSM.  NNUK in particular incurred significant pension expense

employing thousands of researchers and other personnel to create inventions that were patented

in the US.  Much of this expense was deferred and has never been paid.  The revenue approach

would allow the US Debtors and their creditors to reap all of the revenue from the sale of patents

registered in the US—revenue NNI was not allowed to keep for itself pre-insolvency—while

---

[88]    TR45100.03 (Request for Bilateral APA) pp. 11.

[89]    Trial Trans. Day 3, 765:7–766:10 (DeWilton); Trial Trans. Day 10, 2180:11–2182:16 (Anderson); TR00032 (Anderson Aff.) Exh. A.

[90]    UK Pension Claimants' Br. Part II.A(2).

[91]    *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999); *Kerr v. Baranow*, 2011 CarswellBC 240, 2011 SCC 10.

saddling NNUK and the remaining non-US debtors with all of the costs incurred in creating those patents.

### (4)    Even If Accepted, the Income Approach Suffers From Significant Implementation Errors That Must Be Corrected.

61.    If the Courts were ultimately to determine that the Lockbox Funds can and should be allocated in accordance with the US Debtors' revenue approach—and, for all of the reasons set forth above, the UK Pension Claimants contend they should not—there would remain the need to correct significant errors in the US Debtors' proposed implementation of that approach. The US Debtors err most significantly in allocating proceeds from the residual patent sale by discounting projected revenues from patents in China and by allocating proceeds from the business sales based on anomalous 2009 revenue figures for their business income projections.

### (a)    The US Debtors Incorrectly Discount Chinese Revenue Projections, Misallocating Hundreds Of Millions Of Dollars To NNI.

62.    Although the US Debtors' income approach essentially adopts Nortel's IPCo Model in its entirety, the US Debtors self-servingly discount royalty income projected in the IPCo Model for the Chinese market.  The effect of this error alone dramatically reduces the proportion of revenue attributed to territories outside the US, and correspondingly increases the proportion of revenue attributed to the US, thereby increasing the allocation to NNI by about US$330 million at the expense of EMEA and Canada.[92]  This departure from the IPCo Model is unwarranted, and should the Courts adopt the US Debtors' income approach, the IPCo Model revenue projections for China should be given full credit.

---

[92]    *See* DEM00019 (Kinrich Dem.) p. 22 ("IPCO Model with China").  The alternative "license" approach advanced by the EMEA debtors is analogous to the US Debtors' revenue approach but fully accounts for Chinese revenue, among other corrections, and in this respect is preferable to the US Debtors' revenue approach.

63.     The IPCo Model was frequently reviewed, scrutinized, and revised by interested Parties,[93] and as a result evolved and became more refined during the first two years of Nortel's insolvency.  Initial versions of the IPCo Model included projections for only six territories: those of the five RPEs, plus Germany.[94]

64.     Beginning in early 2010 with version 2.0, the IPCo Model projected revenues for China as well.  No doubt in recognition of the rapid ascendency of China's telecommunications market and patent regime, the assumptions on which the IPCo Model's China revenue projections were based were very conservative.  The projections were limited to just three markets—"handsets, wireless infrastructure, and PCs" (personal computers).[95]  The model conservatively assumed that revenue would not be generated until five years later, in 2015, and would end in 2020.  Additionally, the IPCo Model discounted the projections to just two-thirds of the otherwise relevant market.[96]

65.     As a further limiting assumption, developers of the IPCo Model recognized that, if Nortel's wireless patents were sold off and removed from the model, the remaining patent coverage in China would not be sufficiently extensive to assure profitable licensing.  In these circumstances, China was to be taken out of the addressable market altogether.[97]  The possibility that Nortel's various patent franchises—wireless included—might be separately sold was

---

[93]     US Finds. of Fact  ¶¶ 400–402.

[94]     *See* EX00051 (Kinrich Report) ¶ 96; DEM00011 (Malackowski Dem.) p. 49 (countries in green).

[95]     TR50643(IP Co. Model 2.2 Update) p. 9; *accord* Trial Trans. Day 17, 4272:25–4273:14 (Kinrich).

[96]     TR50643(IP Co. Model 2.2 Update) p. 9; *accord* Trial Trans. Day 17, 4273:20–4274:1 (Kinrich).

[97]     TR48697.01 (IP Co. Model 4.0 Update) p. 3.

considered early in the process,[98] and by March 2010, Nortel had identified potential buyers having specific interest in the wireless portfolio.[99]  To no one's surprise, when China was contemporaneously added to the IPCo model,[100] it included, among many inputs, an option to exclude all revenue from Chinese markets.[101]  This never came to pass, and Nortel's wireless and non-wireless patents (including Chinese patents) were sold collectively to Rockstar.

66.     Nonetheless, the US Debtors contend that the IPCo Model's conservative revenue projections from China should be further discounted—a revision that materially affects the allocation outcome.  Excluding the Chinese market, which is shared equally among RPEs under the US Debtors' income approach, completely from the calculation has the effect of increasing the US Debtors' allocation from the patent sale proceeds by US$440 million—a 9.8 percent increase—at the expense of the EMEA and Canadian Debtors.[102]  The allocation proposed by the US Debtors in their post-trial brief reflects a somewhat less-than-total exclusion of China, increasing the US Debtors' share of the proceeds instead by US$330 million (or 7.4 percent).[103]

---

[98]     TR50572.02 (Project Iceberg Work Plan for Plan A & B) p. 4 (referring to sale of all or logical patent groups as "Plan A"); p. 7 (identifying wireless as a sale grouping).

[99]     *Id.* at p. 23.

[100]    TR50643(IP Co. Model 2.2 Update) pp. 4, 9.

[101]    TR40105 (Project Copperhead IPR Model 2.0) "Drivers_Sensitivity" Tab (Wireless patents included in model as part of "Case C," and  "China In" set to "IN").

[102]    DEM00019 (Kinrich Dem.) p. 22.

[103]    *Compare* US Br. 2 *with* DEM00019 (Kinrich Dem.) p. 22.  The implied discount rate when Chinese revenue is fully excluded is 12.2 percent.  When China is fully included, the implied discount rate is 15.7 percent.  Trial Trans. Day 17, 4139:24–4141:3 (Kinrich).

67.     The US Debtors adopt, and urge the Courts to accept, essentially all of the myriad other default inputs and assumptions of the IPCo Model.[104]  However, with respect to China, and China only, the US Debtors argue that certain projections should be further discounted significantly, thereby shifting hundreds of millions of dollars to the US.  To support their proposed deviation from the IPCo Model and drastic discounting of Chinese revenue, the US Debtors rely on the opinions of two experts:  Jeffrey Kinrich, an accountant and business valuator, and Raymond Zenkich, a patent broker.  However, this drastic discount is inappropriate in light of the IPCo Model's already conservative assumptions, Kinrich's and Zenkich's lack of relevant experience to render their opinions, and the trial evidence concerning how Nortel valued the particular Nortel Chinese patents at issue.

> **(i)      The IPCo Model's revenue projections for China were already conservative.**

68.     As stated, the IPCo Model **_already_** incorporated a 33 percent discount, on top of conservative assumptions relating to the technology areas in China that could be addressed through licensing, the timeframe in which licensing would be viable in China, and the extent of the Chinese market that could be captured through licensing.[105]  Rather than accept these conservative projections or recognize that they had been discounted in the IPCo Model, Kinrich

---

[104]     For example, the model includes a range of options to adjust wireless penetration rates, select different start dates for various licensing programs, exclude a key licensee, or change the applicable tax rate.  *See* TR40105 (Project Copperhead IPR Model 2.0) "Drivers_Sensitivity" Tab.

[105]     TR50643 (IP Co. Model 2.2 Update) p. 9.

began his analysis of Chinese revenues by taking the average between including and excluding the projections—effectively, a further 50 percent discount.[106]

69.     Compounding his error, Kinrich made a further downward adjustment based upon his views about the enforceability of patents in China.[107]  This further deviation from the conservative assumptions of the IPCo Model yields a value "closer to the without-China line" that the US Debtors adopt in their post-trial brief for the purposes of their allocation.[108]  In short, the US allocation results in ***tripling*** the downward adjustments in the IPCo Model.

**(ii)     Kinrich and Zenkich lack expertise on matters of Chinese patent law.**

70.     The Courts should decline to further discount Chinese revenue projections for the additional reason that that it is premised solely on unreliable opinion evidence from Kinrich and Zenkich that is well outside their knowledge and expertise.

71.     Kinrich, an accountant and business valuator, acknowledged that he is not an expert on matters of Chinese patent law.[109]  Yet, Kinrich undertook to determine whether it was "appropriate and reliable to include projected revenues from China"[110] by conducting an independent comparative analysis of international patent enforcement regimes.[111]  Kinrich did

---

[106]     Trial Trans. Day 17, 4161:15–18 (Kinrich) ("Because IPCo provides for China in and China out, I started essentially with the middle, giving equal weight."); *id.* at 4162:4–6.  Although the IPCo Model includes many options  to include or exclude market segments or licensees, to adjust royalty rates, and manipulate costs, this appears to be the only time that Kinrich suggests taking the "midpoint" between any two extreme values, or making other substantive deviations from default values.  *See generally* TR40105 (Project Copperhead IPR Model 2.0) "Drivers_Sensitivity" Tab.

[107]     Trial Trans. Day 17, 4161:18–4162:17, 4162:6–12 (Kinrich).

[108]     Trial Trans. Day 17, 4162:13–17 (Kinrich); *Compare* US Br. 2 *with* DEM00019 (Kinrich Dem.) p. 22.

[109]     Trial Trans. Day 17, 4277:14–19 (Kinrich).

[110]     TR00051 (Kinrich Report) ¶ 104.

[111]     *Id.*

not investigate whether the publications he relied upon were considered reputable or reliable by actual experts in the field.[112]  Indeed, certain information that Kinrich relied on in assessing China's patent enforcement regime, which related to rankings of various countries' IP regimes, was not specific to patents at all, but concerned copyright or other matters.[113]

72.    Acknowledging that he lacked expertise in the area of how the market perceived the value of Chinese patents, Kinrich sought to "fill that hole" by relying on Zenkich.[114] However, Zenkich's limited expertise does little to plug the gap.

73.    Zenkich's patent broker experience[115] does not provide a reliable basis for rendering opinions on Chinese patent law:  namely, that Chinese patents were "prohibitively" costly to enforce and at risk of being found invalid.[116]  Zenkich candidly disclaimed any legal or IP enforcement expertise,[117] and could not recall any experience with enforcement of Chinese patents.[118]  He admitted having no knowledge of the frequency with which Chinese patents were found invalid, having examined no data on the subject, and that he had not identified any instance in which a Chinese patent was held invalid but a counterpart patent in another jurisdiction was not.[119]  Zenkich also testified that his knowledge of the cost to bring a patent

---

[112]    Trial Trans. Day 17, 4282:7–14, 4282:24–4283:6 (Kinrich); Kinrich Dep. 200:11–14, 17–25, 201:4–13, 16, 23–25, 202:2–3, 6–24.

[113]    Kinrich Dep. 211:7–17, 19–25, 212:2.

[114]    Kinrich Dep. 183:20–184:9 ("[T]o the extent I felt some shortcomings in any expertise I had, that is why I asked counsel to essentially procure the opinion to Mr. Zenkich. . . .  [T]he request was there were certain areas where I did not feel I have the expertise and if there is some other way to address those and Mr. Zenkich became the solution to some of those."); Trial Trans. Day 17, 4279:5–19 (Kinrich).

[115]    Trial Trans. Day 18, 4426:2–7 (Zenkich).

[116]    TR00054 (Zenkich Report) ¶¶ 22, 32.

[117]    Trial Trans. Day 18, 4426:2–7 (Zenkich).

[118]    Trial Trans. Day 18, 4413:9–4414:3; 4414:21–4415:11 (Zenkich).

enforcement action in China was "pretty limited.  It is not zero, but it is pretty limited; I would agree."[120]  Thus, the uninformed opinions of Kinrich and Zenkich on the subject can provide little aid to the Courts, and should be given correspondingly little, if any, weight.

> **(iii)    The record does not support discounting China patent revenues.**

74.    In addition to a disabling scarcity of relevant expertise, Kinrich and Zenkich also ignored the trial evidence that Nortel itself placed substantial value on the Nortel Chinese patents at issue.  Although Zenkich agreed that the approach for valuing patents considered most effective, and preferred in his industry, involves a patent-by-patent analysis of the portfolio in question[121]—an approach he employed for purposes of rendering his other opinions[122]—Zenkich did not look to ___any___ Nortel patents or documents to inform his opinions on the value of Nortel's Chinese patents. [123]  Instead, his opinion was arrived at "completely independently from Nortel."[124]  Kinrich's analysis was similarly rooted in nothing other than generalizations.[125]

75.    The trial evidence demonstrates that Nortel considered its Chinese patents to be a significant and worthwhile addition to its portfolio, procuring them in spite of budgetary constraints that severely limited the number of patents that could be filed and maintained. [126]  For

---

[119]    Trial Trans. Day 18, 4417:5–15; 4419:10–4421:4 (Zenkich).

[120]    Trial Trans. Day 18, 4434:25–4435:4 (Zenkich).

[121]    Trial Trans. Day 18, 4427:22–4428:25; 4443:25–4444:22 (Zenkich).

[122]    *See*, e.g., TR00054 (Zenkich Report) ¶¶ 35–42; Trial Trans. Day 18, 4427:22–4428:25, 4444:23–4445:6, 4446:16–4447:6 (Zenkich).

[123]    Trial Trans. Day 18, 4432:10–4433:10 (Zenkich).

[124]    Zenkich Dep. 107:8–13, 15–16.

[125]    *See, e.g.*, TR00051 (Kinrich Report) ¶ 104.

[126]    Trial Trans. Day 3, 767:6–12 (DeWilton); Day 10, 2173:24–2176:9; 2182:14–2183:20 (Anderson).

Chinese and indeed other non-US patents, the thresholds for filing were especially high, and

Nortel filed patents in China for only roughly the top three percent of inventions.[127]  Once filed,

patents were routinely culled if they were no longer deemed worthwhile to maintain.[128]  As a

result, Nortel's patent portfolio contained an exceptionally high density of quality patents.[129]  It

follows that the Chinese patents that remained in Nortel's portfolio at the time of the sale were

considered at one time to be among the 'best of the best'—not relatively valueless, as Kinrich

and Zenkich contend.

76.     Zenkich's opinion that Chinese patents are often of lower quality generally,[130] and

thus more likely to be found invalid,[131] also does not apply to Nortel's patents.  As Zenkich

noted, all but three of the patent families that Nortel filed in China were also filed in the US.[132]

There is simply no basis to conclude that, among its patents for the same invention, Nortel's

Chinese patents were of lower quality than its US patents.

77.     Moreover, Zenkich's opinion that generally Chinese patents were perceived in the

market to have little or no value is not borne out by the trial evidence.  In the years leading up to

the portfolio sale, China experienced an explosion of patent applications and grants, both by

domestic (Chinese) and foreign (non-Chinese) filers.  By 2010, fully 25 percent of Chinese

invention patent applications (or 98,111) and 41 percent of Chinese granted invention patents (or

---

[127]     Trial Trans. Day 10, 2181:16–2182:13 (Anderson); TR00032 (Anderson Aff.) Exh. A.

[128]     Trial Trans. Day 10, 2184:18–2186:16 (Anderson).

[129]     Veschi Dep. 90:17–91:2.

[130]     TR00054 (Zenkich Report) ¶ 32 (quoting concerns about "junk patents").

[131]     *Id.* at ¶ 22.

[132]     *Id.* at ¶ 48 Fig. 1.

55,343) were attributable to foreigners.[133]  Foreign parties suing Chinese parties for IP

infringement in Chinese courts were reportedly experiencing win rates of around 60 percent.[134]

Sources cited and relied upon by Zenkich confirm, rather than rebut, that interest in Chinese

patents was increasing.[135]  They also confirm that courts in major Chinese cities were

"considered as a reliable forum for patent infringement actions."[136]

78.      For all of these reasons, the further discounting of Chinese revenue projections

under the US Debtors' income approach is at odds with the trial evidence and inappropriate.

Accordingly, if the Courts adopt the US Debtors' income approach, they should not discount

Chinese revenues but should include the full IPCo Model projections.

(b)      **The US Debtors Inappropriately Rely On 2009 Revenues As The Key For Allocating Business Sale Proceeds.**

79.      If the Courts were to determine that the US Debtors' revenue approach is a

plausible and correct way to allocate proceeds from Nortel's business sales, adjustments would

have to be made to correct errors of the US Debtors and their valuation expert, Jeffrey Kinrich,

in implementing this approach.

80.      Because the revenue approach allocates proceeds in proportion to revenue,

selecting the appropriate revenue numbers has a significant impact on the outcome.  Kinrich

---

[133]    TR00040 (Bazelon Rebuttal Report) 41 (citing China's State Intellectual Property statistics.  In China, an invention patent is analogous to a US utility patent.

[134]    TR00040 (Bazelon Rebuttal Report) 41 (citing Yang, Patent Enforcement in China, 2011, available at http://www.americanbar.org).

[135]    *See, e.g.*, TR11382 (Bailey, China's Emerging Patent Trading Markets) p. 79 (noting "universal agreement among experts that strategic logic will drive a much more active demand for patent portfolios by Chinese companies;" stating that technology exchanges were "brokering ever larger private [patent] deals;" and identifying Chinese-specific patent auctions).

[136]    TR50244 (EU-China IPR2 Roadmap) p. 2; *see id.* at p. 3 (noting similarities to German patent systems); *id.* at p. 11 (describing procedures for obtaining preliminary relief that parallel standards and practices in the US).

relied on 2009 revenue figures.  However, 2009 was an anomalous year for Nortel for several notable reasons.

81.     Nortel filed for insolvency protection in January 2009.  From then on, Nortel was operating under the supervision of courts in Canada, the US, the UK, and elsewhere.[137] Throughout 2009, Nortel was actively engaged in selling its businesses, signing seven out of eight of its sale agreements in that year.[138]  Four of the business sales were concluded before the year's end.[139]  Indeed, because of these dispositions, complete financials for 2009 were not even available for certain businesses, and revenues had to be estimated based upon performance prior to the sale closing date.[140]

82.     Because of the uncertainty stemming from Nortel's insolvency, major customers threatened to stop purchases unless and until Nortel's businesses were safely in the hands of other stable companies.  Verizon, the largest customer of Nortel's CDMA business, advised Nortel that it would not award wireless contracts to Nortel unless the business was sold.[141] AT&T and Comcast expressed similar concerns.[142]  All of this contributed to Nortel's inability to generate revenues in the short term.

---

[137]     *See* Trial Trans. Day 17, 4209:1–10 (Kinrich).

[138]     *See* DEM00007 (Demonstrative Timeline) p. 7; Trial Trans. Day 17, 4209:19–4212:1 (Kinrich).

[139]     *See* DEM00019 (Kinrich Dem.) p. 25.

[140]     Trial Trans. Day 17, 4215:6–14 (Kinrich).

[141]     Trial Trans. Day 5, 1083:20–1084:20 (Binning); *cf.* Trial Trans. Day 13, 3134:10–3135:1 (Green); *see generally* Riedel Dep. 144:7–9, 12–24.

[142]     Trial Trans. Day 5, 1085:1–11 (Binning).

83.    Thus, compared with financial figures from earlier years, 2009 revenues were an outlier, including from the standpoint of each debtor's proportional share of revenues, which is the measure selected by the US Debtors for purposes of their proposed allocation.

84.    Using 2009 revenues instead of revenues from 2008, the fiscal year that immediately preceded the insolvency, increases the US Debtors' allocation by US$100 million, or roughly 4 percent of all business sale proceeds.[143]

---

[143]    Trial Trans. Day 17, 4219:17–25 (Kinrich).



Figure 9.  Market Share by Debtors [44]

85.    As shown in Figure 9 from Dr. Bazelon's rebuttal report, reproduced above, NNI's share of Nortel's global revenue plateaued at approximately 65 percent, while the revenue share of each of the remaining RPEs similarly stabilized at approximately 23 percent.  The 2009 insolvency disrupted this trend.  As calculated, NNI's revenue share increased sharply by roughly 4 percent, and the share of NNL, NNUK, NN France, and NN Ireland collectively

---

[144]    TR00040 (Bazelon Rebuttal Report) p. 38  & Fig. 9.

decreased accordingly.  Kinrich's assertion that 2009 revenues should be used as the allocation key because they resemble the weighted average over all years between 2001 to 2008[145] ignores this trend, as well as all of the exceptional circumstances created by Nortel's bankruptcy.

86.     Dr. Bazelon presented a revised revenue model correcting Kinrich's implementation errors as they relate to the allocation of business sale proceeds.  In particular, Dr. Bazelon recalculated the results of Kinrich's model, in which more-representative 2008 revenue figures are used in place of 2009 figures.  Dr. Bazelon corrects a further error by dividing Rest-of-World ("**RoW**") income attributable to IP equally among RPEs to reflect their co-equal rights in those territories.[146]  These results are repeated in the rightmost columns below, and should be adopted in lieu of either alternative proposed by Kinrich in the event the Courts were to accept the US Debtors' allocation metric.[147]

**Table 11.  Correction to Kinrich's Business Sales Allocation – RoW and FY2008 Adjustments**

|  | Kinrich Approach 1 | | Kinrich Approach 2 | | Revised Approach - 2008 Revenue/RoW | |
|---|---|---|---|---|---|---|
|  | US$, mil | % | US$, mil | % | US$, mil | % |
| Canadian Debtors | 316 | 11% | 362 | 13% | 383 | 13% |
| EMEA Debtors | 541 | 19% | 487 | 17% | 768 | 27% |
| U.S. Debtors | 1,989 | 70% | 1,999 | 70% | 1,652 | 58% |
| RoW | 0 | 0% | 0 | 0% | 45 | 2% |
| Total | 2,846 | 100% | 2,848 | 100% | 2,848 | 100% |

---

[145]     *See* TR00052 (Kinrich Report) ¶ 54.

[146]     TR00040 (Bazelon Rebuttal Report) pp. 35–38.

[147]     *Id.* at 38 & Table 11.

**D.      If the Courts Do Not Adopt the Pro Rata Distribution Model, the EMEA Contribution Model Is Consistent With How Nortel Operated and Is Economically Rational.**

87.      The UK Pension Claimants maintain that the pro rata distribution model is the allocation methodology that is consistent with the facts of this case and the Courts' equitable powers.  However, if the Courts were to decline to adopt the pro rata distribution model, the EMEA contribution model is the next best allocation approach reflective of the manner in which Nortel operated, the nature of the assets sold, and the economic rationality of the RPEs.

88.      The R&D contribution approach proposed by the EMEA Debtors would allocate proceeds based on R&D spending as a proxy for R&D contribution.[148]  The EMEA contribution approach recognizes the collaborative way in which the Nortel RPEs developed and shared technology, and attempts to evaluate the contribution of each Nortel RPE to the assets that were sold in bankruptcy.  The model is economically rational as it recognizes the beneficial ownership of each RPE in the technology it created and contributed, and does not provide unintended and non-negotiated windfalls to any debtor estate.[149]  The contribution approach also recognizes undisputed facts regarding the IP in the Nortel residual patent portfolio, including the fact that the technology and associated patents remained valuable for far more than five years.[150]

89.      The EMEA Debtors properly recognize that the MRDA is just one piece of evidence reflecting the IP rights that the RPEs held in the IP they jointly created.  By contrast, the concepts of property interests in the MRDA relied on by the Canadian Debtors (legal title governs the result) contradict the commercial context of the document.  Specifically, in order to

---

[148]      EMEA Br. Finds. of Fact Part II.A.

[149]      *Id.* at Cncls. of L. Part II.

[150]      *See* Trial Trans. Day 10, 2183:12–13 (Anderson) (patents have a term of 20 years); DEM00011 (Malackowski Dem.) p.22 (vast majority of high-interest patents in the residual portfolio filed prior to 2006); Trial Trans. Day 10, 2281: 2-12 (Malackowski) (same).

use a residual profit-split methodology, each of the RPEs had to be an owner of the intellectual property.[151]  In fact, the text Valuing Intangible Assets, one of the treatises relied on by Green, explains that ownership of IP is a precondition for using an RPSM:

> This is one reason why the regulations allow taxpayers to apply a profit-split methodology: ***if, and only if, each controlled party owns valuable non-routine internally developed intangible assets***. . . .
>
> In the second step, since ***a profit split method can only be used in cases where each taxpayer owns valuable nonroutine intangible assets***, there will be residual profits left to be allocated after assigning each related party a return to its routine economic activities.[152]

90.     The requirement for ownership of the IP by each of the RPEs is a condition precedent to the use of an RPSM.  This undermines any suggestion by the Canadian Debtors that the vesting of legal title trumps the ownership interests of the other RPEs.

91.     As the EMEA Debtors point out, this is also what Nortel consistently represented to the tax authorities prior to bankruptcy:

---

[151]    See section 247 of the Income Tax Act, RSC 1985, c 1 (5th Supp) and TR50295 (Information Circular (IC) 87-2R, CCRA (Feb. 27, 1987))  §§ 120–121.  Pursuant to section 247 of the Income Tax Act, the MRDA is a Qualifying Cost Contribution Arrangement ("**QCCA**").  Paragraphs 120–121 of IC87-2R note that:

120. . . .  In general terms, a QCCA is an arrangement whereby two or more parties share the costs and risks of producing, developing, or acquiring any property, or acquiring or performing any services, in proportion to the benefits which each participant is reasonably expected to derive from the property or services as a result of the arrangement.

121. Each participant's expected benefit from a QCCA, for the purposes of apportioning the costs, consists of the benefits that the participant will derive from exploiting the results of the QCCA, and not from the actual activities of the QCCA. If the QCCA develops property such as an intangible, each participant in a QCCA is not required to be a legal owner of the property, but each participant must enjoy substantially similar rights, benefits, and privileges as a legal owner (effective or beneficial ownership).

[152]    See TR00044 (Valuing Intangible Assets—a text which is cited by Canadian allocation expert Philip Green) p. 465 (emphasis added).  The Canadian Debtors assert that there is no distinction between legal title and beneficial ownership.  Canadian Br. ¶ 293.  However, Giovanna Sparagna, who served as Nortel's outside tax counsel, confirmed that, for tax purposes, there is a distinction between legal title and beneficial or economic ownership.  Sparagna Dep. 80:5–22; see id. at 240:13–241:17; 245:22–246:6.  See generally TR50295 (IC 87-2R, CCRA (Feb. 27, 1987)) § 121 ("[E]ach participant in a [qualifying cost contribution arrangement] is not required to be a legal owner of the property, but each participant must enjoy substantially similar rights, benefits, and privileges as a legal owner (effective or beneficial ownership).").

-45-

(a)    each integrated entity subsidiary that conducted R&D "could be considered to own the [Nortel] technology as it related to its specific region";

(b)    the RPEs were "owners of the intangible property";

(c)    although all Nortel IP is registered by NNL[,] [e]ach IE "maintains an economic ownership in the IP"; and

(d)    the RPEs were "the primary owners of intangibles developed by the Nortel Group" and that they "bear the risk of [that] development."[153]

92.    Given the collaborative nature of R&D at Nortel and the entangled nature of Nortel's IP, it is the UK Pension Claimants' position that R&D spending is not a fully accurate proxy for measuring R&D value creation and contribution.  For example, the evidence shows that NNUK consistently "punched above its weight" by contributing significantly more patentable inventions than R&D spending alone would indicate.[154]  However, should the Courts decide to use R&D as a proxy for each Nortel RPE's contribution to the Group's IP, the EMEA contribution approach would be a reasonable alternative.

## II.    THE ARGUMENTS ADVANCED BY THE PARTIES IN OPPOSITION TO PRO RATA ARE WITHOUT MERIT AND SHOULD BE REJECTED.

### A.    Responding Overview

93.    Notwithstanding the:  (i) overwhelming evidence at trial supporting the uniquely integrated nature of the Nortel Group's global enterprise; (ii) profoundly integrated nature of the intellectual property assets giving rise to the proceeds of sale in the Lockbox; and (iii) manner in

---

[153]    In its 2002 application for an APA with the IRS, CRA, and Inland Revenue, NNL, NNI and NNUK represented that each integrated entity subsidiary that conducted R&D "could be considered to 'own' the [Nortel] technology as it related to its specific region."  *See* TR11055 p. 10.  Likewise, in 2003, faced with questions posed by the IRS and CRA in connection with Nortel's APA applications, Nortel responded that the IEs were "owners of the intangible property."  *See* TR21080 at p. 25; see also TR22078 at Appx. A p. 4, where NNL and NNI represented to the CRA and IRS that, although all Nortel IP "is registered by NNL[,] [e]ach IE maintains an economic ownership in the IP."

[154]    Between 15 and 20 percent of Nortel's new patent disclosures were based on invention disclosures from UK labs, while NNUK's share of R&D was only around 5.5 percent.  *Compare* Trial Trans. Day 3, 778:12–779:6 (DeWilton) *and* TR00023 (Brueckheimer Aff.) Exh. E. *with* TR00033 (Malackowski Report) p. 53 Table 24.

which the global enterprise was operated and viewed by those dealing with it internally and

externally, the US Debtors and Bondholders oppose a pro rata allocation of the Lockbox Funds.

The principal reason for their opposition is that the Bondholders—having the largest claim in the

global insolvency proceedings in the principal amount of US$4.092 billion—want to ensure that

they have three ***separate*** "pots" available for recovery on their claims:

> (a)    from the Canadian Estate as the obligor on the bonds;
>
> (b)    from the US Estate in respect of the guarantee on the bonds; and
>
> (c)    as the largest creditor in the US Estate and therefore the overwhelming
> beneficiary of distributions flowing from NNI's $2 billion intercompany
> claim against NNL.

94.     The granting of guarantees by NNI to support bond issuances by NNC and NNL

created a form of contractual substantive consolidation of the Canadian and US operating

companies (NNL and NNI) and ultimate parent (NNC) from the Bondholders' perspective.

Consistent with that reality, the Bondholders agreed, as evidenced by their support of the IFSA,

to place the proceeds of the sale of the Nortel Group's assets in one consolidated pool to be

allocated post-sale either by agreement or litigation.  To untangle proceeds in one consolidated

pool generated by the sale of fully integrated, jointly-developed, and jointly-owned assets of the

global enterprise for the sole purpose of artificially creating separate "pots" of recovery arising

from these contractual arrangements, would elevate form well beyond the substance of the

underlying transactions.

95.     The Courts are engaged in an unprecedented joint trial that creates a tremendous

opportunity and a corresponding challenge.  When Nortel commenced insolvency proceedings in

January 2009, the Monitor, the Canadian Debtors and the US Debtors made a strategic decision

not to seek recognition or involvement of the UK Court overseeing the third main estate

(EMEA), or include the UK Court as a party to the Cross-Border Insolvency Protocol.  Having

made the decision to not seek recognition of the CCAA and Chapter 11 proceedings in the UK,[155] the Canadian and US Debtors made clear their intention to have Nortel's global insolvency proceedings and realization of the worldwide assets conducted under the supervision of Courts in Canada and the US alone.

96.    At that time the Canadian and US Debtors took another unprecedented step: they presented to the Courts and obtained approval of a Cross-Border Insolvency Protocol that included specific reference to the potential for substantive consolidation of the Canadian and US Debtors.[156]  From the outset, the parties recognized the profound degree of integration that existed within the Nortel Group, as reflected in the pre-filing Report of the Monitor, the Affidavit of John Doolittle, and corresponding Declaration filed in the Chapter 11 proceedings. It was only later, when the aggregate proceeds of the global enterprise turned out to be significantly larger than expected, that the parties, armed with funding from the estates, turned to scorched-earth adversarial tactics to obtain as much of the pie as possible on a territorial basis.

97.    Insolvency practitioners, academics, international bodies, and others have watched as Nortel's early success in maximizing the value of its global assets through cooperation has disintegrated into value-erosive adversarial and territorial litigation.  That erosion of value will continue as long as the Estates' proposed solutions to the Allocation Litigation remain mired in parochial territoriality.  Instead, the unprecedented opportunity and challenge facing the Courts can only be met by a decision that subordinates territorial wrangling in favour of a global solution.  Where the parties have failed, the Courts can succeed in bringing finality to enable distributions to creditors to be made.  The undisputed trial evidence presented

---

[155]    Another party, such as the Joint Administrators of EMEA or the UK Pension Claimants cannot "force" a foreign representative or debtors to seek recognition in another jurisdiction.

[156]    *See* section 15(viii) of the Cross-Border Insolvency Protocol.

to the Courts requires a solution that reflects, and is consistent with, the profoundly integrated nature of Nortel's global enterprise.

98.     Finally, the US Debtors, the Canadian Debtors and the EMEA Debtors are purely administrative vehicles for the corporations that are subject to bankruptcy proceedings.  The legal entities or "Selling Debtors" have no actual interest in the Lockbox Funds beyond the interests of their creditors, to whom distributions of the Lockbox Funds will ultimately be made.  Arguments advanced by the Bondholders that the Allocation Litigation should be divorced from any consideration of distributions to creditors is misguided, as set out in Section K below.[157]  Distribution of the Lockbox Funds to creditors is the ***ultimate and sole purpose*** of the Allocation Litigation.

## B.    The IFSA and Other Orders and Statements by the Courts Do Not Preclude the Courts from Ordering a Pro Rata Allocation.

99.     Each of the Estates is a party, and agreed, to the terms of the IFSA, and the Bondholders actively supported approval of the IFSA by the Courts.  Each of the Courts has held that, by executing the IFSA, each of the three Estates confirmed that the Courts had jurisdiction to determine the appropriate allocation of the Lockbox Funds in the absence of agreement of the Parties.[158]

100.     Nothing in the IFSA mandates that the Courts determine the issue of allocation by reference to a specific metric, such as "the fair market value of the assets and rights [the selling debtors] sold or relinquished in connection with the sale of Nortel's businesses and residual

---

[157]     *Cf.* Post-Trial Brief of the *Ad Hoc* Group of Bondholders ("**Bonds Br.**") ¶¶ 22–27.

[158]     The Ontario Court of Appeals affirmed.  See *Re Nortel Networks Corp.*, 2013 ONSC 1757 at ¶¶ 34–39 and *Re Nortel Networks Corp.*, 2013 ONCA 427 at ¶¶ 5–10, where the Ontario Superior Court of Justice and the Ontario Court of Appeal respectively determined that the Courts have jurisdiction to determine the Allocation Litigation.

patent portfolio," as argued by the US Debtors.[159]  The IFSA was entered into in June, 2009,[160] before the Estates on behalf of the Selling Debtors (as defined in the IFSA) had each developed and disclosed the diametrically polar views as to their respective rights to the proceeds of the sale of the lines of business and residual patent portfolio.  No party knew at the time that the Monitor and the Canadian Debtors would take the position, for example, that all of the value for residual patents belonged solely to NNL and no other entity.  Moreover, no party could have imagined that the Estates' disagreement with respect to the allocation of the Lockbox Funds would be accompanied by scorched-earth litigation strategies that continue to be pursued by certain Parties and Estates some five and a half years after Nortel filed for insolvency protection.

101.    Both the terms of the IFSA and the factual matrix surrounding it demonstrate that the Estates never intended to limit the way in which the Lockbox Funds could be distributed. The terms of the IFSA are clear.  Subsection 12(f) provides:

> Nothing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to seek its entitlement to Sale Proceeds from any Sale Transaction.

102.    The IFSA expressly preserves the right of every party to seek entitlement to sale proceeds from any sale transaction on any basis.   Nothing in the IFSA purports to limit the Courts' authority to merely tracing the value of assets contributed by each Selling Debtor to its source within Nortel.  Such an exercise has proven to be cost prohibitive to date, and is in fact impossible to complete with any degree of reliability.

103.    Moreover, in her Affidavit sworn April 25, 2014, Sharon Hamilton noted that the Estates were scrupulous in their dealings to ensure that all rights and positions with respect to the

---

[159]    *See* US Br. 1 fn. 2.

[160]    The UK Pension Claimants and CCC are not parties to the IFSA.

allocation dispute were reserved, so that the parties could present "any arguments, methodologies, legal or factual theories in support of a proposed allocation of the proceeds of any sale transaction or IP transaction."[161]  In addition, the Allocation Protocol approved by both Courts makes it clear that the Core Parties were free to argue any theory with respect to Allocation.[162]

104.    The Courts have granted Core Party status to each of the UK Pension Claimants and the CCC and, in doing so, did not impose restrictions on the allocation positions that could be advanced by either party or how those allocation positions could be effected by the Courts in distributing the Lockbox Funds.  Thus, if a pro rata allocation is determined by the Courts to be the most appropriate manner of effecting an allocation of the Lockbox Funds, it would not be inconsistent with the provisions of the IFSA approved by the Courts.

105.    Although the US Debtors and the Bondholders insist that the IFSA requires an allocation among the Selling Debtors, the allocation position they have advanced is actually premised on the basis of an allocation among the three Estates—in other words, based on crude geography.[163]  Despite their professed opposition to a pro rata distribution for all creditors, the US Debtors and the Bondholders have not explained how money would be moved from NNI to the other fifteen US entities to satisfy claims ***other than*** through substantive consolidation. Indeed, the Canadian Debtors are expected to substantively consolidate the Canadian Debtors

---

[161]    TR00010A (Reply Affidavit of Sharon Hamilton) ¶ 45.

[162]    *See* TR50025 (Allocation Protocol and related Canadian Order).

[163]    *See, e.g.*, Bonds Br. ¶ 2 ("The trial conducted by the Courts . . . was intended to determine how to allocate the more than $7 billion of Sale Proceeds to the estates.  As each of the U.S., Canadian, and EMEA Debtors' estates . . . and the Courts have recognized, the task therefore is to determine the value attributable to each estate based on what it relinquished in those sales."); *see also id.* at ¶ 5 ("[T]he Courts should . . . allocate the Sale Proceeds among the Nortel Debtors' estates according to the fair market value of the assets and rights relinquished by each estate.").

such that all creditors of any of the five Canadian Debtors receive the same pro rata recovery.[164]

Inasmuch as substantive consolidation is possible or even likely within the Estates, there is no

principled basis to argue that the Courts cannot or should not adopt the pro rata distribution

model as the proper allocation mechanism for the Lockbox Funds.

### C.    The Pro Rata Distribution Model Is Not "Global Substantive Consolidation."

106.    The US Debtors and the Bondholders mischaracterize the pro rata distribution

model as "global substantive consolidation,"[165] suggesting (incorrectly and optimistically) that

"if that label attaches to [the UK Pension Claimants'] theory, they have lost the argument."[166]

These statements ring hollow for several reasons.  First, the allocation methodology requested by

the UK Pension Claimants is not substantive consolidation, globally or otherwise.  However, as

demonstrated in the sections below, even if the legal requirements for substantive consolidation

were applicable, the UK Pension Claimants submit that the unique extraordinary circumstances

present here make this is a paradigm case for granting such relief based on the legal standard

under Canadian and US law.[167]

107.    Moreover, any attempts to apply "labels" are merely a distraction from the

Courts' task of determining the appropriate result for this multi-jurisdictional litigation.   There is

no precedent for any determination that will be made by the Courts following the Allocation

---

[164]    Trial Trans. Day 4, 998:3–11 (Hamilton). Although the allocation position of the Monitor and Canadian Debtors provides for 100 percent of any allocation of Lockbox Funds to be made to NNL (one of the five Canadian Debtors) based on its bare legal title, more than 50 percent of the Canadian employees at the time the CCAA proceeding was commenced were employed by NNTC, a Canadian entity that according to the affidavit filed in support of the Initial Order, "does not produce any third party revenue and relies on NNL for all of its funding."  TR40135 (Doolittle Aff.) ¶21(c).

[165]    *See, e.g.,* US Br. 129–30;Bonds Br. ¶¶ 33–39.

[166]    Bonds Br. ¶ 29.

[167]    There are strong policy reasons for considering substantive consolidation in this context.  *See generally* William H. Widen, *Corporate Form and Substantive Consolidation*, 75 Geo. Wash. L. Rev. 237, 245 (2006).

Litigation—on any allocation position advanced by any Core Party—and the pro rata distribution model is no different in that regard. However, facts such as the presence of commingled assets, common ownership, highly integrated operations and pooled funds often provide the factual bases in support of substantive consolidation, and accordingly a review of those principles may be helpful to the Courts in considering the appropriate result in this case.

108.     That said, a pro rata allocation of the Lockbox Funds does ***not*** equate to a global substantive consolidation of the Estates. In a global substantive consolidation:

(a)     all of the entities would thereafter be administered by a single insolvency administrator in one jurisdiction;

(b)     all of the global entities would be treated as one entity;

(c)     all claims against any of the global entities would be determined within the one insolvency proceeding under the supervision of one insolvency administrator;

(d)     one Plan of Arrangement or Plan of Reorganization would be effected for all global entities; and

(e)     creditors would, as a result of the above, receive a common dividend on a pro rata, *pari passu* basis from the single insolvency.

109.     In this case, the Parties agreed by contract in the IFSA, approved by the Courts, that the proceeds of the sale of their jointly-created assets would be placed in a common pool—the Lockbox Funds—for allocation after the sale, by way of agreement or litigation. Thus, the proceeds of the sale of the jointly-created worldwide assets have already been "consolidated" on an undifferentiated basis in the Lockbox. The only issue before the Courts is whether, and if so, how the Lockbox Funds should be disentangled and made available for distribution to satisfy creditor claims. Allocation of the Lockbox Funds by reference to the claims of global creditors of the "One Nortel" common endeavour is simply one allocation method available to the Courts

to resolve this complex question.  The pro rata distribution model proposed by the UK Pension

Claimants is simply a metric used to allocate the Lockbox Funds and does **_not_** involve:

(a)  a merging of any corporate entities;

(b)   one Plan of Arrangement or Confirmation Plan for all legal entities;

(c)  a proposal that all claims be administered and determined in a single jurisdiction;

(d)  a proposal that the Estates be administered together in a single jurisdiction under the supervision of a single insolvency administrator; or

(e)  any change to the existing administration of the Estates in each of the three jurisdictions.

110.    Unlike the "global substantive consolidation" mischaracterization by the US

Debtors and Bondholders, the pro rata distribution model advanced by the UK Pension

Claimants, and supported by the CCC and Wilmington Trust, proposes simply to allocate

Lockbox Funds to produce a pro rata distribution to unsecured creditors, regardless of the

jurisdiction in which they reside.   The pro rata distribution model recognizes that separate

Estates exist, will continue to exist, and will ultimately be utilized to make distributions to

creditors through whatever means is determined by the Courts following the Allocation

Litigation, including on a pro rata basis.[168]

111.    It is palpably absurd for the Bondholders to claim that "there is no evidence

suggesting that Nortel's assets and liabilities are entangled, much less 'hopelessly entangled.'"[169]

The trial evidence on the integration and entanglement of this particular multinational enterprise

is clear and uncontroverted.

---

[168]    Westbrook Dep. 24:10–25:8; 25:2–8;  26:11–27:3.

[169]    Bonds Br. ¶ 68.

112.    The profound integration of Nortel's IP is demonstrated by the below figure, which illustrates the extensive inter-relatedness of technology areas (horizontal axis) and major R&D sites (vertical axis) as revealed through a citation analysis of Nortel's residual patent portfolio.



Figure 7. Interconnectedness of Nortel's Rockstar Patents by Franchise and Inventor Country

Notes: The Figure is based on the 2,684 U.S. granted Rockstar patents (EMEAPROD2214888, tab "Assets") and on publicly available data on patent citations and inventor locations from the USPTO. The ten categories from left to right represent Data (1), Enterprise Voice (2), Carrier Voice (3), Service Provider (4), Wireless Infrastructure (5), Wireless Handset (6), Other (7), Optical (8), PC (9) and Internet (10).

113.    Issues as to ownership and other rights to Nortel's remaining assets continue to be raised by the parties and litigated before the Courts on separate motions, outside of the Allocation Litigation.[170]

114.    The Bondholders' assertion that international insolvency experts Clark and Westbrook advocate for the "imposition of cross-border substantive consolidation as the *default rule in a case involving a global enterprise*"[171] is without evidentiary support.  Clark and Westbrook do not advocate for substantive consolidation, nor is substantive consolidation referenced in their expert report.  By reference to the various efforts that have been made on the bench, in academia and in law reform organizations, Clark and Westbrook summarize the development of those efforts as reflecting "the idea that international insolvency cases should be managed as much as possible towards the ideal of a single worldwide proceeding, within the limits established by a pragmatic realization that the ideal is not the actual and that jurisdictions committed to the ideal must advance toward it step by thoughtful step."[172]  That statement underlies modified universalism and the Model Law and is supported in numerous articles authored by scholars and accepted in international insolvency organizations.[173]

115.    In referring to the realization of assets of "an integrated global enterprise operating under a single brand," Clark and Westbrook state that "the same logic that points to

---

[170]    *See* Monitor's motion returnable September 9, 2014 for court approval of the sale of internet addresses. There is an ongoing dispute between the Canadian Debtors and the US Debtors as to the respective rights in those internet addresses.

[171]    *See* Bonds Br. ¶ 44 (emphasis original).

[172]    Clark and Westbrook Report ¶ 5.

[173]    *See, e.g.,* Jay L. Westbrook, *Priority Conflicts as a Barrier to Cooperation in Multinational Insolvencies,* 27 Penn St. Int'l L. Rev 869 (2009); *see generally* Jay L. Westbrook, *Multinational Financial Distress: The Last Hurrah of Territorialism,* 41 Tex. Int'l L.J. 321 (2006); *In re HIH Casualty Insurance and General Insurance Ltd.,* [2008] UKHL 21 ¶¶ 6–7, 30.

maximization of value through a global, nonterritorial realization of assets leads to a strong

presumption against both territorial and entity-based distributions of that realization, with narrow

exceptions where appropriate."[174]   The emphasis, as confirmed through deposition testimony,[175]

on *__highly integrated__* global enterprises operating under a single brand places Nortel in the

special category of multinational enterprises that other leading authorities, such as Dr. Irit

Mevorach of The World Bank,[176] describe as candidates for global solutions on realization and

distributions:

> [An] important aspect is the level of integration and inter-dependence among the
> members constituting the MEG (or the degree of 'group unity' or otherwise
> 'affiliates' independence').[177]
>
> [T]he question of the degree of 'group unity' is crucial for our purposes.  That is,
> to what extent the group actually operated as a single entity or rather its
> components were truly (not only legally, but economically) independent
> entities.[178]
>
> Other factors are focused on the degree of interdependence.  Thus, where group
> members significantly rely on other affiliates in the group for vital functions (such
> as legal, accounting, tax, insurance and so forth) the companies become
> considerably intertwined and their resemblance to independent corporations
> diminishes.  Simply, interdependence may result from 'group financing', such as
> loans resting on cross guarantees of the group members.  In many groups,

---

[174]    Clark and Westbrook Report at ¶ 7.

[175]    *See* Westbrook Dep. 47:9–20 ("There's a spectrum, I would think, of integration of global groups.  There are some global groups at the opposite end of the spectrum from Nortel who—you have a passive holding company in some friendly jurisdiction, and it owns wholly separate businesses in several countries and so forth, and then you move along the spectrum to a very highly-integrated company, which, as far as I can tell [is] what Nortel was.  And my impression is it's on the highly-integrated end of that spectrum.").

[176]    Dr. Irit Mevorach is an international insolvency scholar and an associate professor at the University of Nottingham.  In addition, she is Senior Counsel and co-head of the World Bank's Insolvency and Creditor/Debtor Regimes Initiative.  Dr. Mevorach is the author of Insolvency within Multinational Enterprise Groups, a leading text on international insolvency issues affecting multinational enterprise groups. *See* Irit Mevorach, Insolvency within Multinational Enterprise Groups (Oxford University Press: 2009).

[177]    "MEG" refers to multinational enterprise groups. *Id.* at 128.

[178]    The trial evidence is uncontroverted that none of the Nortel entities was capable of operating as a stand-alone business. *See* Trial Trans. Day 4, 1001:19–1002:11 (Hamilton).

-57-

executive personnel are rotated by the parent to successive assignments in different affiliated companies, and various programmes for employees are devised on a group basis resulting in the employees being identified with the group as a whole.  Another relevant factor in ascertaining the degree of group unity is how the group represented itself to the public, and to what extent it was perceived as a single entity.[179]

Furthermore, it is also important to identify the special case in which there was actually a greater degree of integration/ inter-dependence in a way that resulted in a substantial mix between the entities comprising the group.  This may suggest more interventionist tools to be applied in the course of insolvency, in terms of interfering with the corporate form and the location of the entities in different jurisdictions.  ***It is therefore suggested to classify the integration/interdependence factors into three classes: the 'weak (or no) integration' cases, the 'business integration' cases, and the 'asset integration' scenarios of MEGs.***[180]

[I]n "asset integration" scenarios, substantive consolidation should typically be the solution.[181]

116.    The Bondholders also imply that Clark and Westbrook are lone voices against a chorus of those who recognize the tension between strict adherence to the traditional corporate form on an individual entity basis, and accepted enterprise principles when dealing with a multinational enterprise.  That is simply incorrect.  This tension is described by Dr. Irit Mevorach as follows:

Entity law represents the traditional thinking, deeming the separate company as the main player, respecting the distinct corporate personality of the corporation and the limited liability of its shareholders.  The corporation is an artificial person which comes into life via the process of incorporation, and is then recognized as a legal person by a sovereign power.  This arguably corresponded fully with the economic realities of the nineteenth century where the single corporation was the

---

[179]    *See Re Nortel Networks Corp.*, 2009 CarswellOnt 146 (Ont. S.C.J) at ¶¶ 3,6 ( Morawetz J.) ( "[T]he name Nortel [referring to the global enterprise as a whole] is known throughout the world for leadership in the networking . . . .").

[180]    Mevorach, Insolvency within Multinational Enterprise Groups at 130–131 (emphasis added).

[181]    *Id.* at 316.

norm. Namely, separate legal identity for the corporation and its shareholders matched the separation between single companies and their investors.[182]

The concept of 'enterprise entity' suggests that in certain circumstances the enterprise may be regarded as the relevant entity or effect will be given to the relationship among group members.  Here a 'new' entity is recognized, based on economic facts rather than on legal incorporation. That is, when the corporate personality does not correspond to the actual enterprise, but merely to a fragment of it.  Such an 'enterprise approach' has been referred to as 'a product of modern age', 'a pragmatic response of the legal and political system to changing political, social and economic realities'.  Enterprise principles will be thus concerned with matching rights and responsibilities to the collective economic activity (the business), i.e. to the enterprise comprised of separate but related companies.  Arguably this would better reflect current economic realities where enterprises operate as groups.  It has also been observed in this regard, that the application of limited liability in a group context may not be justified.[183]

Commentators in the US have identified a shift in US courts' approach, as well as in legal rules in other jurisdictions, from strict adherence to the entity doctrine to applying enterprise principles.[184]

117.    The adoption of the pro rata distribution model does not seek to impose liability outside the single multinational enterprise that held itself out both internally and externally as One Nortel.  There is no attempt to visit liability on the non-Nortel shareholders who remain, for purposes of each insolvency proceeding, beyond the reach of Nortel's creditors.

118.    It is against this legal and economic framework that the allocation method sought by the UK Pension Claimants, mischaracterized by the Bondholders and US Debtors as global substantive consolidation, should be considered.

### (2)    US Case Law Addressing Substantive Consolidation

119.    Although global substantive consolidation is not requested by the UK Pension Claimants, and is not required in order to effect a pro rata allocation of the Lockbox Funds, the

---

[182]    *Id.* at 38.

[183]    *Id.* at 39 (internal citations omitted).

[184]    *Id.* at 40.

underlying legal principles that support substantive consolidation in Canadian and US case law may be useful by reference or analogy, as certain factors are common in determining whether substantive consolidation or a pro rata allocation in bankruptcy is appropriate.

120.    Under US law, a court's power to effectuate substantive consolidation is not specifically provided for in the Bankruptcy Code, but arises out of the court's general powers of equity and federal common law.[185]  In *Owens Corning*, the Third Circuit held that entities may be substantively consolidated where: "(i) pre-petition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity; *or* (ii) post-petition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. "[186]  The rationale for the latter test "is at bottom one of practicality when the entities' assets and liabilities have been 'hopelessly commingled,'" in contrast to the rationale for the former test, which is meant to protect the prepetition expectations of creditors.[187]  Regardless of which test is applied to the special facts of Nortel, the trial evidence demonstrates that the "One Nortel" global enterprise is a paradigm example which would satisfy either test if the UK Pension Claimants were requesting substantive consolidation, which to be clear, they are not.

121.    The UK Pension Claimants propose a pro rata allocation in this uniquely complex case, in which the realization of assets from a multi-national enterprise group insolvency results

---

[185]    *See* 11 U.S.C. § 105; *see, e.g., Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219 (1941); *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005), *cert. denied*, 126 S. Ct. 1910 (2006) ("Substantive consolidation, a construct of federal common law, emanates from equity."); *FDIC v. Colonial Realty Co.*, 966 F.2d 57, 59 (2d Cir. 1992).

[186]    419 F.3d at 211.

[187]    *Id.* at 211 fns. 19–20.

in "a ***single undifferentiated*** fund."[188]  Thus, although the pro rata distribution model derives

from international insolvency principles (as opposed to domestic substantive consolidation law),

and does not propose the actual substantive consolidation of the various Estates, it does address

the pragmatic challenges arising from the allocation of undifferentiated assets among closely

related entities, just as substantive consolidation does.

122.    Although the Third Circuit has stated that use of "this 'rough justice' remedy (i.e.,

substantive consolidation) should be rare[189] and, in any event, one of last resort after considering

and rejecting other remedies (for example, the possibility of more precise remedies conferred by

the Bankruptcy Code),"[190] the UK Pension Claimants submit that even if those substantive

consolidation standards were applicable here, the present case qualifies as a clear case where

equitable relief of this nature would be justified.

123.    Moreover, unlike in *Owens Corning*, Nortel is not a situation where the assets and

liabilities of entities are artificially consolidated for voting or distribution purposes while each of

those same entities continues operating as separate entities with distinct ownership of their own

assets.  There are no future operations in store for any of the Nortel entities.  In addition, NNL's

---

[188]    Clark and Westbrook Report ¶ 34(a) (emphasis added).

[189]    In a report prepared for the American Bankruptcy Institute, a comprehensive empirical analysis by Professor Widen revealed that use of the remedy of substantive consolidation was not uncommon in large US bankruptcy proceedings.  William H. Widen, *Report to the American Bankruptcy Institute: Prevalence of Substantive Consolidation in Large Public Company Bankruptcies from 2000 to 2005*, 16 Am. Bankr. Inst. L. Rev. 1 (2008).   In this article, Professor Widen noted:

The most basic practical lesson from this report is that creditors who rely simply on legal entities to match assets with liabilities are deluding themselves.  ***The prevalence of substantive consolidation in large public bankruptcies reveals that the simple asset partition created by a legal entity is a particularly unreliable method of matching assets with liabilities. This much is clear.***

*Id.* at 28–29 (emphasis added).  The UK Pension Claimants submit that this supports the conclusion that the economic realities of complex organizations often do not reflect their corporate form.

[190]    *Owens Corning*, 419 F.3d at 211.

main operating subsidiaries (NNI and NNUK) cannot be said to have had the same degree of autonomy that existed in *Owens Corning*.

124.    The Allocation Litigation has been a lengthy, costly, and ultimately futile exercise to "unscramble the egg."  The Selling Debtors sold their jointly-created assets that gave rise to the Lockbox Funds by agreeing to ignore the issue of legal or beneficial ownership of the assets being sold or entitlement to the proceeds of their sale and, instead, placed them in a common fund to be allocated thereafter by agreement or litigation.  They did that in order to maximize value for creditors.  First, by selling the assets jointly, the Estates could realize more, based on going concern value, synergies, and other reasons, than they could have if each Selling Debtor had liquidated its respective assets separately.  Furthermore, the creation of the assets and the use and ownership of the assets, both before and after bankruptcy, were so profoundly scrambled that the prohibitive costs of attempting to unscramble the assets before their sale would have hurt all creditors.  This continues to be the case post-sale, reflected in the extraordinary professional fees that continue to be incurred in this proceeding.

125.    If the Courts and the parties had known at the outset that it would take five years and over US$1 billion in professional fees to unscramble the egg, it would have been difficult for any party to argue in good faith that substantive consolidation was not appropriate.  And yet, the Courts and parties are now faced with potentially years of additional litigation before allocation issues are finally resolved and creditors receive distributions.  It is false logic to suggest that because such vast costs have already been incurred that there is no reason to stem such costs now by refusing to give credence to adversarial, territorial positions.

126.    The comments made by the Third Circuit in *Owens Corning* to the effect that consolidation is appropriate where separating the assets and liabilities of the entities will reduce

the recovery of all creditors, must be considered in context.  As all parties have acknowledged,

the Allocation Litigation is a zero sum game.  In any insolvency proceeding with limited funds

for distribution, a smoothing of distributions among various creditor groups (or "wealth transfer"

as some authors refer to it)[191] will, by definition, mean that certain creditors receive more and

others receive less.  It is mathematically impossible for there to be any other result.  Accordingly,

the analysis outlined by the Third Circuit in *Owens Corning* does not require that consolidation

must result in a net benefit for every creditor in every case.  Rather, the net benefit for all

creditors is that estate assets are not further depleted by ongoing litigation to disentangle and

account for the assets and liabilities on an entity-by-entity basis.  Furthermore, even if it did, it is

beyond dispute that all creditors will receive a net benefit from the consolidation of the assets.

By selling the assets on a consolidated and joint basis, creditors will receive higher recoveries

even on a substantively consolidated basis than they would have received if such assets had been

liquidated separately by each Selling Debtor on an entity-by-entity basis.

127.    The Canadian and US Courts have, on a number of occasions, issued orders

approving substantively consolidated plans among multiple entities in both jurisdictions.[192]  For

example, in *In re Quebecor World (USA) Inc.*,[193] a US plan of reorganization and a Canadian

plan of reorganization and compromise pursuant to the CCAA and CBCA were concurrently

---

[191]    *See id.* at 274.

[192]    In addition to *Quebecor* see, for example, *In re Everfresh Beverages, Inc.*, No. 32-077978 (Ont. Gen. Div); Nos. 95-B-45405-06 (Bankr. S.D.N.Y. 1995).  See also CCAA Sanction Order in *Re Livent Inc.* (November 21, 2003) Court File No. 98-CL-3162; CCAA Sanction Order in *Re Fraser Papers Inc.* (February 10, 2011) Court File No. CV-09-8241-00CL and Judge Carey's companion Chapter 15 Order Recognizing Order of the Canadian Court and Approving the Debtors' Amended Consolidated Plan of Compromise and Arrangement and Transaction Agreement in *In re Fraser Paper Inc.* (February 11, 2011) Case No. 09-12123 (KJC). At p.3 subparagraph (f) of Judge Carey's Chapter 15 Order, he noted that "[t]he relief . . . granted [was] necessary and appropriate [and was] in the interests of the public and international comity, consistent with the public policy of the United States [and was] warranted pursuant to sections 1520 and 1521 of the Bankruptcy Code.

[193]    *In re Quebecor World (USA) Inc.*, No. 08-10152 (JMP) (Bankr. S.D.N.Y.).

approved for the US and Canadian estates respectively which, among other things, provided for: (i) voting, confirmation and distributions to be effected as if the estates were consolidated for such purposes; (ii) claims against one debtor being treated as if they were a single claim against all of the US and Canadian Debtors; (iii) claims receiving the same pro rata recovery regardless of whether such claims had been asserted against the Canadian or the US estates; and (iv) claims asserted against multiple debtors in respect of guarantees by one debtor of the obligations of any other debtor, or in respect of any joint and several liability of that debtor with another debtor, receiving a single recovery in respect of such claims.[194]

128.    In addition, the scope of a US court's substantive consolidation authority has been interpreted broadly enough to permit the substantive consolidation of a debtor with a non-debtor, particularly where parties were on notice of the request for such relief.[195]

129.    Accordingly, the same jurisdiction that permits each of the Courts to grant orders effecting a substantive consolidation of multiple entities in more than one jurisdiction, provides authority for a pro rata allocation in this case.  To the extent the Courts have jurisdiction over the

---

[194]    Findings of Fact, Conclusions of Law and Order Confirming Third Amended Joint Plan of Reorganization of Quebecor World (USA), Inc. and Certain Affiliated Debtors and Debtors-in-Possession, slip op. [D.I. 1802] at ¶ 15 (July 2, 2009); Third Amended Joint Plan of Reorganization of Quebecor World (USA), Inc. and Certain Affiliated Debtors and Debtors-in-Possession (attached as Exhibit A to confirmation order)  at Introduction, Article 6.2.; and Third Amended Joint Plan of Reorganization, at 2, *Quebecor*, No. 08-10152 (JMP) (Bankr. S.D.N.Y.).

[195]    *See Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 770  (9th Cir. 2000) (ordering substantive consolidation of individual debtor and two corporate non-debtors where all named parties were on notice of the requested relief); *Munford, Inc. v. Toc Retail, Inc. (In re Munford, Inc.)*, 115 B.R. 390, 398 (Bankr. N.D. Ga. 1990)  (use of substantive consolidation under Section 105(a) of the Bankruptcy Code as a means to bring non-debtor's assets into a debtor's estate not precluded by ability to file involuntary petition under section 303 against non-debtor); *cf. In re LLS America, LLC*, 2012 WL 2042503 (9th Cir. B.A.P. June 5, 2012) (affirming bankruptcy court order substantively consolidating estates of debtors with numerous non-debtor entities); *In re Brentwood Golf Club, LLC*, 329 B.R. 802 (Bankr. E.D. Mich. 2005) (ordering substantive consolidation of debtor and non-debtor limited liability companies); *In re Crabtree*, 39 B.R. 718, 722 (Bankr. E.D. Tenn. 1984) (permitting amendment of caption to include non-debtor, as alter-ego of debtor); *In re 1438 Meridian Place, N.W., Inc.*, 15 B.R. 89, 95 (Bankr. D.D.C. 1981) (jurisdiction over subsidiary supported jurisdiction over parent and no deprivation of substantive rights existed because all named parties were on notice or requested relief).

Allocation Litigation—which each Court has concluded it does—that jurisdiction is not limited to results for which each party might consent or provide approval. Indeed, the Cross-Border Insolvency Protocol that has been in place since January 14, 2009 and was approved by the Canadian and US Courts specifically provides for any motion to substantively consolidate the Canadian and US Estates to be hears at a joint hearing.[196] Clearly, the US Debtors and the Canadian Debtors would not have included that provision in the Cross-Border Protocol if the Courts lacked the jurisdiction to hear and grant such a motion. The UK Pension Claimants, as the overwhelming creditor of NNUK and the entire EMEA Estate, are expressly requesting that the Courts determine the Allocation Litigation using the pro rata distribution model. The extent to which the pro rata distribution model would lead to a similar result as substantive consolidation is, therefore, not a valid argument against the Courts' jurisdiction to order this relief.

130.    Regardless of whether Canadian or US Courts have ordered the non-consensual consolidation of debtor estates across legal jurisdictions previously or not, it is within the Courts' inherent equitable authority to effect such a pro rata allocation remedy here, in the context of the joint allocation trial. The US and Canadian Courts are on no less sound jurisdictional footing to authorize a pro rata allocation amongst the US, Canadian, and EMEA Estates than they are to authorize allocation of the Lockbox Funds on any of the other theories proposed by the Parties. All parties have been on notice that the UK Pension Claimants and CCC have proposed such relief and such parties have had, and will have, the opportunity to be heard on the matter.

---

[196]    *See* Cross-Border Insolvency Protocol § 15(viii).

### (3)    Canadian Case Law Addressing Substantive Consolidation

131.    For decades Canadian Courts have used their inherent jurisdiction and

discretionary powers to grant orders consolidating the assets and liabilities of separate legal

entities,[197] despite the absence of an express provision in the CCAA addressing substantive

consolidation.  This has included cross-border cases involving multiple entities.[198]  By contrast,

the more restrictive test for granting substantive consolidation as set out in *Owens Corning* has

never been endorsed or followed in Canada.[199]  The Supreme Court of Canada has recognized

that:

> (a)    the CCAA is skeletal and flexible in nature and does not expressly lay out
> everything that is permitted; and
>
> (b)    the incremental exercise of judicial discretion with respect to the CCAA
> has been adapted and has evolved to meet contemporary business and
> social needs.[200]

132.    The Court's discretion in CCAA matters applies to numerous types of relief

affecting the substantive rights of parties.  A reflection of this judicial innovation is a hallmark of

the CCAA and described by the Supreme Court of Canada as follows:

> When large companies encounter difficulty, reorganizations become increasingly
> complex.  **_CCAA courts have been called upon to innovate accordingly_** in
> exercising their jurisdiction beyond merely staying proceedings against the debtor

---

[197]    *See* M. MacNaughton and M. Azoumanidis, Substantive Consolidation in the Insolvency of Corporate
Groups: A Comparative Analysis, Annual Review of Insolvency Law, 2007, J. Sarra, ed. (Carswell: 2008);
*Re Northland Properties Ltd.,* 1988 CarswellBC 531 at ¶ 47 (B.C.S.C.); *See* M. Rotsztain and N. DeCicco
*Substantive Consolidation in CCAA Restructurings: A Critical Analysis*, Annual *Review of Insolvency Law*,
2004, J. Sarra, ed. (Carswell: 2005).

[198]    *See, e.g., In re Everfresh Beverages, Inc.,* No. 32-077978 (Ont. Gen. Div.); Nos. 95-B-45405 -06 (Bankr.
S.D.N.Y. 1995); *see also* CCAA Sanction Order in *Re Livent Inc.*, (Nov., 21 2003) Court File No. 98-CL-
3162.

[199]    M. MacNaughton, *Classification, Consolidation and Context: A Canadian Approach to Substantive
Consolidation,* Banking & Finance Law Review 17 (September, 2009).

[200]    *Century Services Inc. v Canada (Attorney General)*,  2010 SCC 60 at ¶¶ 57–61.

to allow breathing room for reorganization.  ***They have been asked to sanction measures for which there is no explicit authority in the CCAA.***[201]

133.    The US Debtors' and Bondholders' mischaracterization of substantive consolidation as "an extraordinary equitable remedy," is misleading. Although Canadian Courts have been judicious in applying the doctrine of substantive consolidation, CCAA plans involving substantive consolidation are not unusual.[202]

134.    A number of Canadian cases have enunciated principles for consideration in determining whether substantive consolidation is appropriate.  In *Re Northland Properties*, Justice Trainor cited seven factors to be considered from the earlier US case of *In re Vecco Construction Industries, Inc*:

<blockquote>

(a)    difficulty in segregating assets;

(b)    presence of consolidated financial statements;

(c)    profitability of consolidation at a single location;

(d)    commingling of assets and business functions;

(e)    unity of interests in ownership;

(f)    existence of inter-corporate loan guarantees; and

(g)    transfer of assets without observance of corporate formalities.[203]

</blockquote>

135.    In *Re Fairview Industries Ltd.,* the court held that the CCAA allowed for the consolidation of companies in appropriate circumstances and highlighted the fact that the financial affairs of the debtor companies were interlocked.[204]

---

[201]    *Id.* at ¶ 61 (emphasis added).

[202]    *Rotsztain and DeCicco*, *supra* fn. 197 at 8.

[203]    *Re Northland Properties Ltd.*, 1988 CarswellBC 531 (B.C.S.C) at ¶¶ 49–57.

[204]    *Re Fairview Industries Ltd.*, 1991 CarswellNS 35  (N.S.S.C.) at ¶¶ 22, 70–76.

136.    In *Re Lehndorff General Partner Ltd.*, Justice Farley held that a consolidated plan was appropriate, noting that there was significant intertwining of the debtor companies, including multiple instances of inter-company debt, cross-default provisions and guarantees and the existence and operation of a centralized cash-management system.[205]

137.    In *Re PSINet Ltd.*, Justice Farley noted that a plan of arrangement based on substantive consolidation avoided the "complex and likely litigious issues" that could result from the allocation of the proceeds of the sale of substantially all of the debtor companies' assets. Justice Farley also noted that the consolidated plan reflected the intertwined nature of the debtors and their operation.[206]

138.    In *Re Huffy Corp.*, substantive consolidation was approved by Justice Hoy where the debtors had:

(a)    integrated and interdependent operations;

(b)    substantial intercompany guarantees;

(c)    common officers and directors;

(d)    common control and decisions making;

(e)    relied on a consolidated cash management system; and

(f)    disseminated principally consolidated financial information to third parties.[207]

139.    In *Re Atlantic Yarns Inc.*, substantive consolidation of multiple debtors was found to be appropriate, fair and reasonable in light of the fact that, although the debtors were distinct legal entities, they were wholly-owned subsidiaries of the same parent corporation, and there was

---

[205]    *Re Lehndorff General Partner Ltd.,* 1993 CarswellOnt 183 (Ont. C.J. Gen. Div.) at ¶ 4.

[206]    *Re PSINet Ltd.,* 2002 CarswellOnt 1261 (Ont. S.C.J) at ¶¶ 2 and 11.

[207]    *Re Huffy Corp*, 2005 CarswellOnt 10571 (Ont. S.C.J) at 15–16.

a commingling of business functions between the debtors.  Further one of the debtors had

guaranteed another's indebtedness and one of the debtor's largest creditors had treated the

debtors as intertwined by virtue of the cross-default provisions contained in the security granted

by one of the debtors.[208]

140.    The decision in *Atlantic Yarns* yields three principles to be applied in determining

whether to approve substantive consolidation: (i) consolidation must be appropriate in the

circumstances; (ii) there must be a balancing of interests, such that the benefits of consolidation

will outweigh any prejudice; and (iii) it is appropriate to look at the *overall* effect of

consolidation.[209]

141.    Under Canadian case law, the presence of substantial intercompany guarantees is

a factor that weighs ***in favour*** of the granting of an order for substantive consolidation.  Prior to

the specific factual findings on creditor reliance in *Owens Corning*—which were largely based

on the evidentiary record before the Court—this was also the case under US law.[210]  The same

factors that have led courts, in both the US and Canada, to employ substantive consolidation in

past cases are overwhelmingly present in this case.

142.    The uncontroverted trial evidence clearly establishes that the Nortel Group:

(a)    had profoundly integrated and interdependent operations;

(b)    had intercompany guarantees for its primary indebtedness (creating
"substantive consolidation by contract");

(c)    operated a consolidated treasury system;

(d)    disseminated consolidated financial information throughout its entire
history, save for the year before its bankruptcy;

---

[208]    *Re Atlantic Yarns Inc.*, 2008 CarswellNB 195 (N.B. C.Q.B.) at ¶¶ 31–36.

[209]    *Id.*

[210]    Widen, *Corporate Form and Substantive Consolidation*, 75 Geo. Wash. L. Rev. at 264–265.

      (e)     created IP through integrated R&D activates that were global in scope; and

      (f)     had significant difficulty in determining the ownership of its principle assets—namely, the lines of business and the residual patent portfolio.

143.    The US Debtors and the Bondholders argue that because the following existed within Nortel, the domestic standard for substantive consolidation cannot be met:

      (a)     All Nortel entities maintained separate financial books and records;

      (b)     Each entity's cash was kept separate, and there was no intermingling of one entity's cash with any other entity's cash;

      (c)     Intercompany loans were created, tracked, and documented according to specific corporate procedures.  When necessary, the relevant entities boards reviewed and approved the transactions;

      (d)     All Nortel entities prepared their own, entity-specific financial statements, which were audited by local auditors and reviewed and approved by their respective boards of directors; and

      (e)     All Nortel entities filed and paid taxes in their respective home jurisdictions in accordance with local law.[211]

144.    These facts are entirely unremarkable, however, and would exist for **_any_** company that was operating legally, as opposed to one that ignored statutory, regulatory and legal requirements in the countries in which it operated.  The standard for determining the degree of integration and entanglement of assets in applying substantive consolidation principles is not based on whether a company was operating illegally.

145.    Further, although cash may have been kept separate for bookkeeping and banking purposes, it was at no time ring-fenced for use by one entity alone.  As Peter Currie testified, cash was fungible, and it was deployed throughout the global enterprise wherever and whenever

---

[211]      Bonds Br. ¶ 69.

it was needed.[212]  Cash generated by one entity was not used solely to pay the expenses of that

one entity—it was utilized by Nortel as a whole for the benefit of the Group.

146.    The Bondholders cite a portion of Leif Clark's deposition as support for the

proposition that if the factors listed in paragraph 138 above were present, it may not be a

particularly strong case in which to apply a single pool distribution model.[213]  They ignore,

however, the balance of his testimony, in which he states that a review of cash and intercompany

accounts represents only one part of the analysis.  The other more significant aspect involves the

degree to which assets are intermingled among the entities, and in that regard Nortel "is an easy

case."[214]  That position is consistent with the prototypes of multinational enterprise groups

studied by Dr. Irit Mevorach wherein those with asset integration are those in which "substantive

consolidation should typically be the solution."[215]

147.    The Bondholders also refer to deposition testimony from the Monitor to suggest

that the books and records and reconciliation of intercompany transactions within the Nortel

Group were by then "largely done" (five years after filing!) and "reasonably clear," such that

there is no question as to who is owed money by which entity.[216]  In fact, the Summary of

Claims periodically filed by the Monitor with its Reports to the Canadian Court[217] demonstrates

the degree to which claims of creditors were filed against multiple Canadian Debtors, suggesting

---

[212]    Currie Dep. 183:3–23.

[213]    Bonds Br. ¶ 70.

[214]    Clark Dep. 99:6–25.

[215]    Mevorach, *supra* fn. 176, at 316.

[216]    Bonds Br. ¶ 73.

[217]    *See, e.g.*, TR00012 (104th Report of the Monitor dated March 14, 2014) ¶ 27 (referring to "duplicative claims filed against multiple Applicants"); *id.* at Appx. D p. 81 (CCAA Applicants' Overall Claims Status).

that there was at the time of filing and remains a real issue as to which entity may be liable for various obligations.  Irrespective of the claims issues, the impossibility of determining on any reliable basis the ***assets*** of the various entities makes the fact of intermingling and the task of unwinding those assets a paradigm case for the "hopelessly entangled" test.

148.    It is also not the case, as the Bondholders suggest, that "there are three principal Nortel Debtor estates and, thus, six possible inter-estate claims that could be asserted among them,"[218] which they assert are largely resolved, such that there is no entanglement requiring any unwinding.  To suggest that it is only ***inter-estate*** claims (on a geographic basis) that would be relevant to review and reconcile in the absence of a pro rata allocation is to miss the point entirely.  As Jay Westbrook testified at his deposition, a disentanglement exercise would require an analysis on an entity-by-entity basis—not simply on an inter-estate basis.[219]  There are five Canadian Debtors, sixteen US Debtors, and nineteen EMEA Debtors—not simply the "six possible claims" as suggested by the Bondholders.  In this case, it is the impossibility of separating the assets on an entity-by-entity basis (or even on a geographic estate basis) that lends itself so clearly to the pro rata allocation result.

149.    Clear evidence of the profound integration of the Nortel Group and the hopeless entanglement of the global assets is contained in the pre-filing report of the Monitor, the affidavit of John Doolittle sworn January 14, 2009 in support of the Initial Order in the CCAA proceeding and the Declaration of John Doolittle filed by the US Debtors in support of Court approval of the IFSA in June, 2009, as well as the pre-filing documents filed by Nortel with legal and regulatory

---

[218]    Bonds Br. ¶ 74.

[219]    Westbrook Dep. 139:3–13.

authorities under penalty of perjury. [220]  Evidence as to the profound integration of the Nortel entities was presented by the Canadian and US Debtors and filed at a time when the legal arguments now advanced and the litigation consuming several years and more than US$1 billion in fees were not yet contemplated.[221]

150.    A pro rata allocation is appropriate given the factual context; it balances the interests of Nortel's worldwide creditors in a fair and equitable manner.

### D.    The Pro Rata Distribution Model Is Not a Sub Rosa Plan.

151.    The US Debtors erroneously contend that a pro rata allocation would violate the Bankruptcy Code and the CCAA as a *sub rosa* plan because it would require the Courts to dictate creditor recoveries. That is simply not the case.  Pursuant to the pro rata distribution model, Lockbox Funds are allocated to each Estate, leaving it for each Estate to confirm a plan or otherwise distribute the proceeds according to the requirements of their local jurisdiction.  It remains for each Court to decide, if and when a plan is confirmed, whether any adjustments to a pro rata approach should be made at that time.  Each Estate will have a set amount of cash to distribute, by reference to the aggregate unsecured claims in each Estate.

152.    Moreover, the pro rata allocation theory is no more a *sub rosa* plan than is any other allocation theory.  Like the pro rata allocation theory, all of the other allocation theories dictate how the funds, once allocated  to the respective jurisdictions, should be available to the various debtors.  The Monitor's theory (based on NNL's ownership) would push nearly all of the

---

[220]    Such evidence of integration was, for example, specifically cited in Chief Justice Morawetz's approval of Nortel's application for CCAA protection.  *Re Nortel Networks Corp.*, 2009 CarswellOnt 146 (Ont. S.C.J) at ¶¶ 3, 6–16, & 42.

[221]    For consolidated evidence produced in the course of the Allocation Litigation, see Appx. E to the Clark and Westbrook Report (Statement of Assumed Facts) ¶¶ 34–40, 50—51, 57(a), 65–67, 72, 74 & 75.

value to NNL, the legal owner of the IP.  The US Debtors' and Bondholders' theory would give all of the value to NNI, one of the sixteen US Debtors.

153.    The US Debtors' objection that the pro rata allocation theory constitutes a *sub rosa* plan is misplaced because a *sub rosa* plan objection is only relevant in the context where the Court is approving a transaction, such as a sale, settlement or operational agreement between the debtor and a third party.  For example, each of the cases cited by the US Debtors relates to approval of a **_transaction_**, not the judicial determination of parties' rights.[222]

154.    It is absurd to suggest, as the US Debtors do, that the Courts cannot decide issues—particularly, issues such as the rights of creditors or the validity of claims—that could affect how a later plan is structured: these are merely determinations of the parties' rights.  Were that the case, substantive consolidation could only be proposed in connection with a Chapter 11 plan.  That is clearly not the case, however, as it is often sought by motion in advance of a plan.[223]

### E.    The Extensive Factual Record Supports a Pro Rata Allocation.

155.    The US Debtors argue that the factual record in this case does not support a pro rata allocation because the domestic tests for substantive consolidation are not met.[224]  Even a cursory review of the trial evidence, however ,would lead any reasonable observer to precisely the opposite conclusion.

---

[222]    *See* US Br. 131 ("In the US, a settlement or transaction which effectively mandates the terms of a plan must meet the requirements of plan confirmation under Section 1129 of the US Bankruptcy Code.").

[223]    *See, e.g. In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005) (debtors sought substantive consolidation via motion ahead of chapter 11 plan; lower court's order approving substantive consolidation in anticipation of chapter 11 plan to be filed in case was a final order from which appeal could be taken even though order would only be implemented when a plan was confirmed).  See also section 15(viii) of the Cross-border Insolvency Protocol which contemplates a motion to substantively consolidate the Canadian Debtors and the US Debtors.

[224]    *See* US Br. 132–36.

156.     The UK Pension Claimants set forth an extensive summary of the trial evidence in their Proposed Finding of Fact and Conclusions of Law supporting a pro rata allocation of the Lockbox Funds.[225]  The evidence establishes that—were the standard for substantive consolidation applicable—each of the two alternate domestic tests would be satisfied and, thus, neither poses any impediment to a pro rata allocation of the Lockbox Funds.

## F.     The CCC and Wilmington Trust Support a Pro Rata Allocation.

157.     Two other Parties—the CCC and Wilmington Trust—agree that the pro rata distribution model is an appropriate allocation mechanism:

- ". . .[ O]nly the Pro Rata Theory looks to how Nortel actually operated to determine an equitable allocation of the proceeds from the lockbox";[226]

- "[A] Pro Rata Allocation achieves an equitable outcome that is rational and fair;"[227] and

- "[A] Pro Rata Allocation is appropriate where, as here, the evidence is undisputed that Nortel was a highly integrated company that was often referred to as 'one Nortel.'"[228]

158.     Those Parties argue in the alternative for the Canadian legal-title approach. Although this seems seem counterintuitive, it may be consistent with their interpretation of the Canadian position.  The CCC seems to argue that the Canadian approach could result in an essentially equitable distribution once the claims process is resolved.  That is, it might be that the CCC contends that, if all of the proceeds are given to "Canada" as the parent company during

---

[225]     *See* UK Pension Claimants' Br. Part I (Summary Statement of Facts); *id.* at Appx. A (Proposed Findings of Fact) Parts I, II.A–B, V, and VI.

[226]     Post-Trial Brief of Wilmington Trust, National Association, as Successor Indenture Trustee ¶ 38.

[227]     Closing Brief of the Canadian Creditors' Committee ("**CCC Br.**") ¶ 25.

[228]     CCC Br. ¶ 161.

allocation, the proceeds will then effectively be shared with other entities and their creditors during the claims process.[229]

159.    However, even within Canada, the CCC's apparent position depends on the legal-title approach being implemented by distributing the proceeds on a pro rata basis to the various entities that make up the so-called "Canadian Estate," even though NNL was the only entity that held legal title to the Group's IP.[230]  Without some type of intra-estate substantive consolidation, a strict application of the Canadian legal-title approach would leave Canadian entities that are not RPEs, such as Nortel Networks Technology Corporation ("**NNTC**"), without any significant ability to meet the claims against them including, for example, employee claims.  NNTC was the employer of most of the Canadian R&D employees who contributed to the jointly created IP.[231] Not surprisingly, Sharon Hamilton testified at trial that the Monitor would consider substantive consolidation of the entities within the Canadian Estate.[232]  There is no other evidence in the record regarding how money would be distributed to NNTC if not through such substantive consolidation of the Canadian Debtors.

160.    If the Canadian Debtors implement substantive consolidation, the legal title approach would lead to an absurd result.  Each of NNTC and NNUK are direct, wholly-owned subsidiaries of NNL, although NNUK is an RPE under the MRDA and NNTC is not.  Each had significant numbers of employees who undertook R&D functions on behalf of the Nortel Group as a whole.  Neither can claim legal title to the NN Technology, although NNUK has an

---

[229]    CCC Br. ¶ 24.  However, this view runs counter to the vigorous and unjustified attempts by the Monitor to resist each and every element of the UK Pension Claimants' claims against NNL.

[230]    Trial Trans. Day 14, 3563:8–3564:6, 3564:23–3565:21 (Britven).

[231]    Trial Trans. Day 4, 990:11–20 (Hamilton).

[232]    Trial Trans. Day 4, 998:3–11 (Hamilton).

equitable and beneficial interest in the IP.[233]  But under the Canadian legal-title theory, pensioners and creditors of NNTC would share in the windfall to NNL purely by virtue of having the good fortune to be located in Canada.  NNUK pensioners and creditors would not.  In sharp contrast, the pro rata distribution model puts pensioners in the UK and Canada who performed the R&D that generated the Lockbox Funds on equal footing.

161.    Rather than adopt the Canadian legal-title approach that runs counter to the pro rata distribution model—but then relies on some type of substantive consolidation to distribute the allocated proceeds among the Canadian Debtors arising from any windfall—the Courts should simply adopt the pro rata distribution model for the entire allocation of the Lockbox Funds.

G.    **The US$2 Billion Intercompany Claim and Previously Settled Claims Are Not Impediments to Pro Rata Allocation.**

162.    The Bondholders assert that the existence of the court-approved US$2 billion claim of NNI against NNL is inconsistent with the implementation of a pro rata allocation, and that implementing such an allocation model would require unwinding prior Court orders.  That is not correct, as articulated through the expert evidence submitted by the UK Pension Claimants, and addressed in paragraphs 83 to 88 of the UK Pension Claimants' Opening Post-Trial Brief.  However, based on a question from the Court during opening submissions,[234] the UK Pension Claimants elaborate further on this point below.

163.    The US$2 billion claim is an intercompany claim—in other words, a claim by one Nortel entity against another Nortel entity.  It is not a third-party creditor claim.  As the trial evidence has established, Nortel operated as one highly integrated global organization with little

---

[233]    *See* TR21003 (MRDA) p. 2, third recital.

[234]    Trial Trans. Day 1, 158:24-159:3 (Opening Statement of the UK Pension Claimants).

or no regard for territorial concerns or geographic boundaries, other than for the purpose of meeting minimum legal, statutory and regulatory requirements.  If, in recognition of these facts, the Courts implement a "pure" pro rata solution to the Allocation Litigation, all intercompany claims would be rendered unnecessary—the logic of "One Nortel" renders it meaningless to focus on claims between Nortel entities.

164.    In practice, the US$2 billion claim between NNI and NNL could be recognized in any pro rata allocation in one of two ways.  First, under a "pure" approach, which most closely parallels the "One Nortel" in operation, the claim would be treated as one of the unsecured liabilities of NNL, ranking *pari passu* with all other unsecured claims, and the dividend on that claim to be received  by NNI would be treated as part of NNI's assets for purposes of the pro rata calculations.  As such, the effect of the intercompany claim "washes out"—although recognized as one of NNL's liabilities, the amount received by NNI directly from the Lockbox Funds would be less because NNI's assets would include its dividend on that very claim for purposes of calculating NNI's pro rata entitlement to the Lockbox Funds.

165.    Alternatively, the Courts could recognize the US$2 billion intercompany claim as a liability of NNL as part of the pro rata calculations, but could decline to include the dividend on that claim as an asset of NNI when calculating NNI's pro rata entitlement to the Lockbox Funds.  In this scenario, the dividend on the intercompany claim would enure purely to the benefit of creditors having claims against NNI, who would then receive a higher ultimate dividend than unsecured creditors of other entities.

166.    The same principles that apply to the US$ 2 billion claim by NNI against NNL would, of course, apply to the admitted claim of NNUK and Nortel Networks SpA against NNL

pursuant to the Agreement Settling EMEA Canadian Claims and Related Claims dated July 9,

2014.

167.    Likewise, the model can also accommodate payments already received:

(a)    regarding the US$37.5 million already paid by the US Debtors in settlement of the EMEA Debtors' US claims, such amounts would plainly be treated as part of the existing assets of the relevant EMEA Debtors and so would be taken into account in any pro rata calculations; and

(b)    in principle and subject to the precise consideration of each claim, to the extent that a creditor has already received part-payment but continues to have an outstanding unsecured claim, the amount of its claim for the purposes of the pro rata calculations would be reduced by any payment actually received to date.[235]  This simply reflects that creditors must account for any payments received to date for distribution purposes.

Accordingly, contrary to the suggestion made by the Bondholders, a pro rata allocation of the

Lockbox Funds can be effected without "unwinding any prior settled claims."[236]

168.    Mischaracterizations as to the status of the claims process in Canada[237] or as to

the result of claims that the UK Pension Claimants might otherwise have against EMEA

---

[235]    This would apply to the amounts received by the Canadian pension plans by way of current service payments and special payments in accordance with the specific direction of Morawetz. J.  *See Re Nortel Networks Corp.*, 2010 ONSC 1708 at ¶ 99.  This would also apply to the US$37.5 million received by the UK Pension Claimants from the US Debtors as a settlement of its claim against the US Debtors (notwithstanding that the US$37.5 million is actually an accepted administrative expense and, therefore, is not an unsecured claim).  It would also apply to any other payments received by unsecured creditors who continue to have an outstanding claim in Nortel's insolvency proceedings.

[236]    *See* Bonds Br. ¶¶ 40-41; US Br. 138–139.

[237]    For example, the reference to outstanding claims against the Canadian Debtors having a claim value of "CAD24.2 billion" in paragraph 18 of the Bondholder Brief ignores the reference to duplicate claims having been filed against multiple Applicants in the Canadian Proceeding, as reflected on the Claims Summary.

entities[238] should not serve to distract the Courts from the fact that claims in each of the estates

represent no bar to implementation of the pro rata distribution model.

### H.    Outstanding Claims and Estate Issues Do Not Preclude Implementation.

169.    The Bondholders' assertion that pro rata distributions cannot be effectuated

because the claims determination processes have not been completed overstates the impact of the

estate process on allocation.  In reality, this attempt to throw additional hurdles into an already

difficult task for the Courts is nothing more than a distraction, and presents no real bar to

implementation.

170.    First, the Courts could direct the parties, and the court officers managing each of

the Estates, to take any steps necessary to effect a pro rata distribution to creditors.

171.    Further, more than five years have passed since the Nortel entities commenced

insolvency proceedings.  It is beyond belief that representatives for each of the Estates do not

have a very detailed understanding of the approximate range of claims that are likely to be

allowed with respect to each estate.  All significant claims are known, and there are no surprises

in the form of large unknown creditor claims in any of the estates that will have the effect of

changing the range of outcomes in any material way based on the aggregate global claims to

date.

172.    Furthermore, to the extent precise claim figures are not available, as explained in

the UK Pension Claimant's Allocation Post Trial Brief, the pro rata distribution model can be

---

[238]    The Bondholder Brief, at ¶ 18, refers to the resolution of FSD claims asserted by the UK Pension Claimants "against 25 separate Nortel entities in the EMEA region."  The suggestion that the UK Pension Claimants advocate "for an allocation method that spreads cash in as many estates as possible," US Br. 139,  is absurd.  The UK Pension Claimants have advanced a single allocation theory, based on the One Nortel that existed.  The pure pro rata distribution model is based on one claim per creditor, which would result in the UK Pension Claimants recovering on exactly the same basis as all other global unsecured creditors, notwithstanding any alternate sources that may be available to it, whether through multiple entities in EMEA or by contract including guarantees from NNL.

effected by allowing interim distributions to be made to each estate based on claims that have been determined and reserving such amounts as necessary to meet potential claims[239] (only a fraction of any undetermined claim amounts would need to be held back in the course of making interim distributions).[240]  These types of mechanisms are already familiar to, and routinely employed by, the Courts.  Thus, the fact that not all claims have been fully determined is no barrier to implementing the pro rata distribution model.

### I.     The Pro Rata Distribution Model Best Reflects Creditor Expectations.

#### (1)     The Bondholders have Presented No Evidence of Creditor Expectations.

173.     Contrary to the US Debtors' and the Bondholders' suggestion,[241] a pro rata allocation would not disregard creditor expectations.  The UK Pension Claimants and the Bondholders are in agreement that the only relevant time that creditor expectations should be measured is prior to Nortel's insolvency filing.[242]

174.     The US Debtors and the Bondholders have failed to identify any creditor expectations that would militate against a pro rata allocation of the Lockbox Funds. There is no trial evidence from _**any**_ Nortel bondholder concerning—much less establishing—a pre-filing reliance on the corporate separateness of the various entities that comprise the Nortel Group.  In fact, no bondholder testified at trial, and no bondholder was deposed in the Allocation Litigation.

---

[239]     UK Pension Claimants' Br. ¶ 88.

[240]     *Id.*

[241]     *See* US Br. 138–40; Bonds Br. ¶¶ 40–41.

[242]     *See* Trial Trans. Day 2, 369:20–24 (Opening Statement on behalf of *Ad Hoc* Group of Bondholders).

175.    Robert Kilimnik[243] (an expert originally proffered by the US Debtors and the Bondholders) and Professor John McConnell (an expert proffered by the UCC), purported to opine on creditor expectations in advocating against a pro rata allocation of the Lockbox Funds. At their depositions, Kilimnik and McConnell admitted that they had never spoken to any of Nortel's bondholders in forming their opinions with respect to creditor expectations:

### *Kilimnik Deposition Testimony*

Q. Sir, other than speaking to the lawyers who instructed you, and I don't want you to tell me about those conversations, did you meet or participate in any telephone calls  with any holders of Nortel bonds?

A. I did not.

Q. Okay. Did you speak with anyone, other than the lawyers that instructed you about this case, about the case to prepare your report?

A. I did not.[244]

### *McConnell Deposition Testimony*

Q. So I take it you've specifically not met with any Nortel bondholders?

A. To my knowledge that is correct.[245]

. . .

Q. I just want to make sure I'm clear on something. Did you have any conversations or discussions with any of the current bondholders of the Nortel debt?

A. Not to my knowledge.[246]

---

[243]    The Expert Report of Robert Kilimnik was ultimately withdrawn by the US Debtors and the *Ad Hoc* Group of Bondholders.

[244]    Kilimnik Dep. 15:7–17.

[245]    McConnell Dep. 27:6–8.

[246]    McConnell Dep. 186:22–187:2.

176.    At trial, McConnell once again confirmed that he has never spoken to any Nortel bondholders:

*__McConnell Trial Testimony__*

Q. You did not meet with or speak with any Bondholders in the preparation of your report?

A. That is also correct.

Q. You only met with lawyers and individuals working with Navigant to help you prepare the report?

A. That is fair.[247]

177.    During opening submissions, counsel for the Bondholders promised the Courts that they would hear evidence of creditor expectations and the purported importance of guarantees to bondholders.[248]  That proved to be an empty promise.  The Bondholders submitted no factual evidence to support that contention.  Further, on July 22, 2014, one day before the Bondholders' *__only__* expert was scheduled to testify at the Allocation Trial, the Bondholders withdrew the Expert Report of Robert Kilimnik.  The UK Pension Claimants invite the Courts to draw a negative inference from the Bondholders' decision to withdraw Kilimnik's report on the eve of his scheduled trial testimony.  The withdrawal of Kilimnik's report leaves the Courts with *__no evidence__*, expert or fact, from the Bondholders in respect of creditor expectations.

178.    In *Owens Corning*, the Court specifically referred to the evidence filed by the parties opposing substantive consolidation in demonstrating the degree of reliance required to overcome the arguments in favour of the remedy.  The Bondholders knew the allocation position in favour of a pro rata allocation that was being presented and chose not to file any evidence on which they could be exposed to cross-examination.

---

[247]    Trial Trans. Day 20, 4804:23–4805:5 (McConnell).

[248]    Trial Trans. Day 2, 367:4–15 (Opening Statement on behalf of *Ad Hoc* Group of Bondholders).

179.    The US Debtors' and Bondholders' speculation and conjecture are insufficient to establish vested creditor expectations.  The Courts should, therefore, draw a negative inference from the complete lack of any evidence presented by the Bondholders.

>    **(2)**    **The Evidence of Creditor Expectations that Has Been Presented to the Courts Supports the Pro Rata Distribution Model.**

180.    The preponderance of the trial evidence of creditor expectations supports a pro rata allocation of the Lockbox Funds.

181.    First, creditors such as the Trustee of the UK Pension Plan were told that they should rely on the credit of the Global Group in support of the obligation owed to them.[249]

182.    Second, ___no fewer than nine___ credit rating agency reports confirmed the trial evidence that the market ___did not distinguish___ between Nortel's bonds that were guaranteed by NNI and those that were not.[250]  The Bondholders own expert, Kilimnik, confirmed that if guarantees were a true risk differentiator in respect of a bond issuance, one would expect that Nortel's guaranteed bonds would have been rated more favourably than Nortel's non-guaranteed bonds.[251]  It is well established that credit rating agency reports are routinely considered by bond purchasers and play a significant role in informing their decisions as creditors.[252]

---

[249]    *See* TR21368 (Email from Mark Cooper (Global head of employment law) to David Drinkwater (Chief Legal Officer) and Pavi Binning) p. EMEAPRIV0293648 ("[W]e have always said that the Trustees should look at the strength of the Nortel group rather than NNUK in isolation. The Trustees will be looking more at the strength of the global covenant . . . ."); *see also* the UK Pension Claimants Br. ¶¶ 228–29.

[250]    *See* TR12036 (Moody's Rating Action, June 16, 2006) p. 2; TR12037 (DBRS Credit Rating Report, July 16, 2006) pp. 1–2; TR12038 (Moody's Rating Action, Mar. 22, 2007) p. 1; TR12039 (DBRS Rating Report, Nov. 9, 2007) pp. 1–2; TR12040 (Moody's Rating Action, May 21, 2008) p. 1; TR12041 (DBRS Report, July 14, 2008) p. 2; TR12042 (Moody's Rating Action, Dec. 15, 2008) p. 1; TR12045 (Moody's Credit Opinion, Dec. 16, 2009) p. 3; and TR12045 (Moody's Credit Opinion, Dec. 16, 2009) p. 3.

[251]    Kilimnik Dep. 41:20–42:4.

[252]    See Trial Trans. Day 5 1106:10–1107:18 (Binning), where Paviter Binning noted that among other things, bondholders look at the credit rating of a company in determining whether to invest in a particular bond issuance.  See also McConnell Dep. 75:18–23, where Professor McConnell confirmed that credit rating agency reports were one of the factors that he used to form his opinion in respect of creditor expectations.

183.    Third, pre-insolvency spread data in respect of Nortel bonds confirms that the market did not view Nortel bonds that carried an NNI guarantee as being less risky than Nortel bonds that did not carry an NNI guarantee:



TR00058

# Nortel Bond Spreads to U.S. Government Yield Curve (Basis Points)

| | Issue Amount | Issuer/Guarantor(s) | Jun 29, 2006 | Feb 22, 2007 | Mar 22, 2007 | Apr 20, 2007 | Jan 31, 2008 | Mar 31, 2008 | May 21, 2008 |
|---|---|---|---|---|---|---|---|---|---|
| **5-year L+425 due Jul 2011** | 1 Billion | NNL/NNI & NNC | | 276 bps | 326 bps | 277 bps | 718 bps | 1,072 bps | 675 bps |
| **7-year 10.125% due Jul 2013** | 550 Million | NNL/NNI & NNC | 492 bps | | | | 737 bps | 997 bps | 731 bps |
| **10-year 10.75% due Jul 2016** | 450 Million (650 add-on in May 08) | NNL/NNI & NNC | 553 bps | 351 bps | 380 bps | 354 bps | 753 bps | 926 bps | 785 bps |
| **6.875% due Sep 2023** | 200 Million | NNL/ No Guarantee | 387 bps | 281 bps | 279 bps | 265 bps | 617 bps | 852 bps | 702 bps |
| **7.875% due Jun 2026** | 150 Million | NNCC/NNL | 464 bps | 323 bps | 339 bps | 301 bps | 666 bps | 879 bps | 760 bps |

184.    The chart above[253] clearly demonstrates that Nortel bonds that carried an NNI guarantee traded at higher or equal spreads to Nortel bonds that did not carry an NNI guarantee. Kilimnik (whose report the Bondholders subsequently withdrew) confirmed that: (i) bonds with a lower spread are considered less risky in the marketplace; and that (ii) if guarantees were recognized by creditors as reducing the risk of issuances by the same company, he would expect to see that expectation reflected in spread comparisons:

### *Kilimnik Deposition Transcript*

Q. Okay. Let's—when bonds are priced, generally, amongst bond traders, they talk about spreads over government bonds, correct?

A. Correct.

Q. And spreads over government bonds of a similar term?

A. Yes.

Q. And that allows—the reason they do that is that allows for the isolation of the risk associated with the bonds?

A. That's correct.

Q. And the lower the spread, the less risky the bond? The higher the bond, the more risky, correct?

A. Yes.

Q. And that's why, if we go to—stay with page two, and we look at your point one, that's why you say the spread will reflect the risk associated with a particular issuance.

A. Correct.

Q. Now, if guarantees reduce the risk of the bond, then we would expect that they would reduce the spread at the time of issue relative to bonds without a guarantee?

---

[253]    *See* TR00058.  The figures listed in the TR00058 are derived from  and were agreed to in the Stipulation entered into between the UK Pension Claimants and the UCC on May 7, 2014, see TR50888 (Stipulation), and the related yield and spread data TR12044B (Schedule 1 to the Stipulation).

A. If we are the same corporation or the same borrowing entity, yes.[254]

185.    As the spread data indicates, the marketplace did not view Nortel bonds guaranteed by NNI as being less risky than those that were not guaranteed by NNI.  The market viewed the bonds relative to the credit risk of the entire Nortel enterprise as a whole.  Accordingly, contrary to what the Bondholders claim, pre-insolvency creditor expectations do not support the contention that Nortel's guaranteed bonds would enjoy a greater percentage recover upon insolvency or should otherwise entitle them to a higher recovery than Nortel's other unsecured creditors.

186.    Fourth, contrary to what the Bondholders claim, the documents evidencing the issuance of the bonds (i.e., the offering memoranda and indentures) ***do not provide*** a basis for any Bondholders to have reasonably relied on the separateness of various Nortel entities or, more importantly, any partitioning of assets among the individual entities.  To the contrary, even a cursory review of the offering memoranda and indentures for the bonds guaranteed by NNI reveals that prospective investors could not have reasonably formed the expectation that distinct pools of assets would be available to investors upon the insolvency of Nortel.

187.    For example, the guarantees did not restrict NNC or its subsidiaries from lending cash to, or making investments in, affiliates, or from incurring substantial amounts of additional indebtedness.[255]  Investors were specifically warned of the possibility of consolidation,[256] and

---

[254]    Kilimnik Dep. 18:12–19:14.

[255]    See June 29, 2006 Offering Memoranda for NNL NoteSenior Notes due 2011, 2013, and 2016 (TR40117) at pp. 29–30 (CCC0004630–CCC0004631).  See also the May 21, 2008 Offering Memorandum for Nortel's Senior Notes due 2016 (TR48723.01) at 22 (NNI_01410294) which contains identical risk factors and warnings; Trial Trans. Day 5, 1112:3–1114:21 (Binning).

[256]    TR40117at p. 34.

that under applicable law principal and interest might not be paid. [257]  Thus, the Bondholders'
allegations of reliance on the outcome they now advocate are unfounded.

188.    In addition, the June 29, 2006 Offering Memorandum for NNL's Senior Notes
due 2011, 2013, and 2016,[258] the related Indenture dated July 5, 2006[259] and the related
Prospectus dated December 21, 2007[260] (and all documents incorporated by reference therein)
only contained consolidated financial information for the Nortel Group.  Similarly, the March 22,
2007 Offering Memorandum for NNC's Convertible Senior Notes due 2012 and 2014,[261] the
related Indenture dated March 28, 2007[262] and the related Prospectus dated December 21,
2007[263] (and all documents incorporated by reference therein) only contained consolidated
financial information for the Nortel Group.  Accordingly, based on the documents underlying
Nortel's bond issuances, no bondholder could have formed the reasonable expectation that on
insolvency, a guarantee would have entitled bondholders to access distinct pools of assets that
may or may not have been held by the entity that guaranteed the bonds.

189.    Finally, the pro rata distribution model allows for equal treatment of all of
Nortel's unsecured creditors.  None of Nortel's major creditors—including the Bondholders—
had a security interest in any of Nortel's assets.  Yet, the Bondholders are seeking 100 percent

---

[257]    Trial Trans. Day 4, 828:7–21 (McCorkle).

[258]    TR40117.

[259]    TR40041(Proof of Claim for 2006 Indenture and Indenture appended).

[260]    TR40182 (Prospectus - Offers to Exchange Notes due 2011, 2013, 2016 dated Dec 21, 2007).

[261]    TR44615.

[262]    TR40042 (Proof of Claim for 2007 Indenture and Indenture appended).

[263]    TR40180 (Prospectus for NNC Convertible Notes due 2012 and 2014 dated December 21, 2007).

principal recovery (plus post-petition interest at the contract rate) as though they were a secured creditor.

### (3)    A Pro Rata Allocation Will Have No Impact on the Capital Markets Generally.

190.    The Bondholders also assert that a pro rata allocation of the Lockbox Funds will have a negative impact on the capital markets.  However, rather than presenting factual evidence in support of this assertion, the Bondholders rely exclusively on the report of Professor John McConnell (an expert proffered by the UCC).

191.    Yet, Professor McConnell's opinion is of little assistance to the Courts with respect to any alleged impact that pro rata may have on the capital markets.  McConnell's report provides no quantitative analysis in support of his claim that a pro rata allocation would alter the price of existing securities and other debt instruments.  Although he opined that the impact of pro rata would be far-reaching and lead to wealth transfers, McConnell admitted that he "did not attempt to quantify the wealth transfers that in [his] opinion would occur."[264]  At trial, when pressed on whether he tried to quantify the alleged capital market effects described in his report, McConnell again confirmed that had undertaken no analysis whatsoever:

### *McConnell Trial Testimony*

Q. You did not try to quantify the capital market effects described in your report?

A. That is absolutely correct.[265]

192.    Clearly, as with much of the evidence relied upon by the Bondholders, McConnell's opinion is mere unsubstantiated conjecture.  Having failed to introduce evidence at trial as to the purported quantification of the "wealth transfer" that would be experienced by the

---

[264]    McConnell Dep. 46:5–23.

[265]    Trial Trans. Day 20, 4804:20–22 (McConnell).

Bondholders if a pro rata distribution model were accepted by the Courts, the Bondholders attempt to bolster the record by argument in their post-closing submission.[266] They argue that a "wealth transfer" or allocation that distributes proceeds evenly among all unsecured creditors is a bar to imposition of a remedy—whether substantive consolidation or otherwise—such as pro rata. Argument is no substitute for evidence. Even if it were, the result would not change, as the argument is incorrect.

193.    As explained by one commentator:

Substantive consolidation does not produce a 'wrong' simply because the consolidation produces a wealth transfer . . . The facts underlying the Third Circuit's *Owens Corning* decision strongly support this proposition. ***In Owens Corning, if the presence of a wealth transfer were sufficient to defeat substantive consolidation, the estimated $1 billion wealth transfer from the syndicated lenders to the unsecured noteholders and other parent creditors would have created a simple bar to use of the doctrine. Rather than relying on the mere fact of a wealth transfer to support its decision, the Third Circuit instead believed it needed to find separate creditor reliance on the individual guarantors.*** Without this reliance, apparently the Third Circuit would have viewed the lower court's imposition of substantive consolidation proper despite the wealth transfer.[267]

The Third Circuit clearly identified the *Owens Corning* case as a wealth transfer scenario, while the District judge found substantive consolidation 'a virtual necessity' to effect the reorganization. Both courts might be correct. Indeed we have seen how a case of necessity can overlap with a case of pure wealth transfer. . . .

The Third Circuit decision might be seen to foreclose a substantive consolidation that results in a pure wealth transfer (particularly a significant wealth transfer). The better view is instead that the Third Circuit decision simply rejects the District judge's finding of necessity. The latter reading is strongly preferred because, in the face of a wealth transfer, the court went on to consider whether substantive consolidation conflicted with the lending syndicate's reliance interest.[268]

---

[266]    *See* Bonds Br. ¶ 78 (alleging that Bondholders would be harmed by at least US$ 1.182 billion).

[267]    William H, Widen, *Corporate Form and Substantive Consolidation*, 75 Geo. Wash. L. Rev. 237, 274 (2006).

[268]    *Id.* at 291.

194.    In addition, McConnell's opinion on the alleged impact of pro rata on the markets

is faulty because it provides a one-sided and biased view of the issue.  McConnell admitted on

cross-examination that pro rata could have positive effects for some creditors,[269] yet he failed to

provide any analysis of what those effects might be and if those effects may engender greater

efficiency—a clearly positive effect with which he agreed—in the marketplace.  In response to

whether he was aware of any positive effects that modified universalism might have on the

capital markets, McConnell stated that "[he had not] thought through all of the possibilities" and

that he was "only here responding to Mr. Clark and Westbrook's report."[270]  Finally, when

pressed on whether he had carried out an investigation or study in respect of the positive effects

of modified universalism on the capital markets, McConnell admitted that he had done

absolutely nothing beyond what he listed in his report.[271]

195.    In contrast to the lack of any research undertaken by the expert retained by the US

Debtors, a renowned expert on multinational enterprise groups who has studied the issue

extensively expresses the following view:

> [T]he contention that limited liability promotes capital market efficiency as there
> is no need to monitor the wealth of fellow stockholders as well as the financial
> condition of the enterprise (and for the same reason provides incentives for
> managers to act efficiently) is weaker in the case of corporate groups, where the
> parent company may be the sole shareholder.[272]

196.    Finally, explicit risk factors outlined in the offering memoranda for a number of

Nortel's bond issuances reveals that Nortel's guaranteed bonds were distinctive, highly

speculative and risky investments that were unlike other bond issuances in the capital markets:

---

[269]    McConnell Dep. 49:18–24.

[270]    McConnell Dep. 55:9–15.

[271]    McConnell Dep. 55:16–20.

[272]    Mevorach, *supra fn.* 176, at 42.

**_June 29, 2006 Offering Memoranda for NNL Senior Notes due 2011, 2013 and 2016_**

The covenants in the indenture will contain significant exceptions and "carve-outs" which may provide less protection to holders of **Notes** than **Indentures** governing securities of comparably rated companies . . .

The covenants in the indenture governing the Notes and Guarantees contain significant exceptions and "carve-outs" in order to provide significant operating flexibility for NNC and its subsidiaries. These exceptions may provide less protection to holders of Notes than indentures governing securities of non-investment grade related companies. In particular, you should be aware that the indentures governing the Notes and the Guarantees. . . .[273]

197.    The distinctiveness of Nortel's guaranteed bonds—as compared to other non-investment grade issuances issued by comparably rated issuers—militates against the Bondholders' suggestion that a pro rata allocation of the Lockbox Funds will have general, broad-sweeping effects on the capital markets.  The capital markets have the ability to distinguish between Nortel's guaranteed bonds and other issuances that are highly dissimilar to Nortel's bonds. Any suggestion to the contrary is inaccurate and is not supported by the trial evidence.

### J.    Pro Rata Allocation Does Not Render the Guarantees Worthless.

198.    In an attempt to discredit the Clark and Westbrook Report and the Bazelon Reports (collectively, the "**Pro Rata Reports**") as "untenable," the US Debtors also mischaracterize the opinions expressed by the experts retained by the UK Pension Claimants on the effect of guarantees granted to particular parties, namely, the Bondholders.  Despite repeated attempts by the US Debtors at depositions seeking to have the UK Pension Claimants' experts agree that the guarantees would be "worthless" if a pro rata allocation were effected, they did not

---

[273]    See June 29, 2006 Offering Memoranda for NNL Senior Notes due 2011, 2013 and 2016 (TR40117) at pp. 29–30 (CCC0004630–CCC0004631).  See also the May 21, 2008 Offering Memorandum for Nortel's Senior Notes due 2016 (TR48723.01) at p. 22 (NNI_01410294), which contains identical risk factors and warnings.

do so.  As Clark and Westbrook consistently testified, effecting a pro rata allocation from a single pool of funds actually provides the Bondholders with access to a greater pool of assets than that for which they originally bargained.  Whereas their contractual entitlements were limited to only specific entities' assets, they would now be given access to the entire worldwide pool of the Nortel Group's assets in the form of the Lockbox Funds.  A pro rata distribution model that permits all unsecured creditors to look to those same assets for recovery does not defeat any pre-filing rights held by the Bondholders.

199.    A creditor holding a guarantee has a right to assert a claim against more than one entity, with recovery on that claim dependent on the assets available to satisfy the claim relative to the claims asserted by other creditors.  The guarantees provided to the Bondholders (which were entirely unsecured) only granted the holder the right to recover against the assets of more than one Nortel entity.  They did not restrict the number of creditors, either before or after insolvency, who might also have claims against the assets of those entities—whether directly or through guarantees obtained at any point in time.

200.    The Lockbox Funds represent the proceeds of sale of all of the assets of all of the entities under the IFSA.  Creditors holding guarantees have access under the pro rata approach to not only the assets of the principal obligor and guarantor corporations, but the proceeds of sale of all the assets of the Selling Debtors in the Lockbox.  This is greater access than that for which the holder of a guarantee bargained.

201.    The equality of treatment (compared to non-guaranteed creditors) occurs not because it ignores the strength of the guarantees, but because it illustrates their weaknesses.

202.    Flaws in the arguments advanced by the Bondholders are exposed by the following summary of the role of guarantees in the context of a multinational enterprise financing, which:

typically employs a web of intercompany guarantees defensively rather than offensively.  A defensive use of intercompany guarantees ensures that no subsidiary creditor has structural seniority over the syndicate's loans.  This protection allows the syndicate to rely confidently upon consolidated financial statements and consolidated financial tests to monitor the corporate group as a single economic unit.[274]

[A lender's] claim of reliance on fragile and unprotected asset partitions inside bankruptcy [is] implausible when those very partitions might have been eliminated without penalty outside bankruptcy.[275]

When a priority based on corporate form is intended to be relied upon, lending syndicates do not rely on naked guarantees.[276]

Before the Third Circuit's decision in *Owens Corning* . . . no sophisticated lending syndicate ever relied on a mere covenant prohibiting merger, consolidation, or dissolution to create priority when the syndicate itself employed a web of guarantees.  The reason for non-reliance on such covenants is simple: the market believed that the presence of intercompany guarantees virtually assured that imposition of substantive consolidation would be proper for any companies forming part of an intercompany guarantee web (and no competent counsel would have opined otherwise).  In *Owens Corning*, rather than a *bona fide* case of reliance on asset partitions, we have a case of simple good fortune for the lenders, the asset partitions and guarantees happened to remain in place until the bankruptcy filing, and the continued presence of the guarantees' structure afforded them a priority.[277]

---

[274]    Widen, *Corporate Form and Substantive Consolidation,* 75 Geo. Wash. L. Rev. at 274, 277.

[275]    *Id.* at 277.

[276]    *Id.* at 279.

[277]    *Id.*

This is entirely consistent with the trial testimony of Paviter Binning, Nortel's former Chief Financial Officer, that regardless of guarantees, bond investors were looking to the overall quality of the company to inform their decision to invest.[278]

203.    Deposition testimony of each of Clark and Westbrook on the Pro Rata Reports confirms the following:

(a)    The expectations of creditors who hold a guarantee are satisfied by virtue of their having access to the entire worldwide assets, rather than only those entities from whom they have a contractual obligation.[279]

(b)    A guarantee claim only represents a right of recovery against another entity.  The guarantee is a remedy in respect of the same debt.  Where the assets of all entities are already consolidated in a single pot [the Lockbox], there is no longer a need for a separate remedy.[280]

(c)    Like all other unsecured creditor claims, insolvency has a way of cutting into contractual rights.  However, in terms of honouring the basic claim for the amount loaned, that expectation continues to be honoured.[281]

(d)    The pro rata allocation and an application of the synthetic distribution mechanism gives effect to the guarantees negotiated by creditors.[282]

(e)    The synthetic distribution model [elicited during deposition][283] is nothing more than a single pool concept, a pro rata allocation and a mechanism to achieve it.[284]

---

[278]    Trial Trans. Day 5, 1106:5–1107:18.

[279]    Clark Dep. 54:2–5; Westbrook Dep. 23:18–21; 24:14–19.

[280]    Clark Dep. 59:21–60:12.

[281]    Clark Dep. 89:10–17.

[282]    Clark Dep. 96:21–97:6.

[283]    For the original source of the "synthetic distribution" referenced by Clark, see *Facilitating the cross-border insolvency of multinational enterprise groups: Note by the Secretariat*, United National Commission on International Trade Law, 45th sess, A/CN.9/WG.V/WP.120 (2014).

(f)     Where parties holding guarantees have not contracted for security to support the guarantees, they have no more than a claim against two entities.  If the assets of those entities form a single pool, the claim is the same and there is no need for the remedy represented by the guarantee.[285]

204.    Moreover, if the Courts so conclude, guarantees may still be treated as claims against the assets of a separate estate for purposes of implementing a pro rata allocation.[286]

205.    The ultimate treatment of intercompany claims and guarantees will be a matter for the Courts as part of the Allocation Litigation.  Although a pro rata approach involving a single pool distribution would normally recognize one claim against one pool of assets, it is always within the Courts' discretion to determine whether alternate treatment of particular claims is warranted and the factual and evidentiary analysis that might be relevant in determining whether to craft such a solution.  The approach set out in the Pro Rata Reports can accommodate any decision that the Courts may make in that regard.[287]

---

See also *id.* at fn. 14 for particular reference to the Nortel case. The concept of "synthetic" models in international insolvency cases also finds reflection in discussions regarding secondary proceedings. Professor John Pottow refers to the "synthetic" secondary proceedings in *Collins and Aikman* as a means of addressing an otherwise thorny distribution issue as between two jurisdictions**.**  See  John A.E. Pottow, *A New Role for Secondary Proceedings in International Bankruptcies*, 46 Tex. Int'l L.J. 579, 584–586 (2011).

[284]     Clark Dep. 158:23–159:3.

[285]     Westbrook Dep. 50:15–24.

[286]     Bazelon Dep. 88:25–89:23.

[287]     Generally, if substantive consolidation is granted, a creditor holding a guaranty claim against an entity that is substantively consolidated with the primary obligor on the guaranteed debt likely would lose the guaranty claim in favour of a single claim against the consolidated entity.  *See, e.g., In re Manzey Land & Cattle Co.,* 17 B.R. 332, 338 (Bankr. D.S.D. 1982) (unsecured creditors' claim against individual guarantors would be single unsecured claim against consolidated estate of individuals and corporation). However, substantive consolidation is rooted in the court's equitable authority which permits the court to craft a remedy appropriate to the circumstances.  Thus, while substantive consolidation may be ordered even if a creditor asserts that it relied on the separate existence and credit of one or more of the entities, courts have tailored the substantive consolidation remedy to protect the interests of such creditors where appropriate.  *See, e.g., Shubert v. Jeter (In re Jeter)*, 171 B.R. 1015, 1020 (Bankr. W.D. Mo. 1994) (in connection with substantive consolidation order, court directed that "innocent creditors' that did business with the corporation "in good faith and without notice of irregularity" be paid from the corporations assets before other creditors).  Indeed, in *Owens Corning*, the Third Circuit specifically left open the issue

206.    The UK Pension Claimants' flexibility in allowing for any decision that the Courts might make on the guarantees (or the US$2 billion inter-company claim) does not equate to "[throwing] these enormous complexities back at the Courts" for resolution.[288]  It properly reflects the fact that they are issues the Courts are entitled to consider and determine in light of both the trial evidence and the absence of trial evidence that could have been presented by the Bondholders in response to the pro rata distribution proposed by the UK Pension Claimants and the CCC.

**K.    Creditor Recoveries Are Relevant to the Task Before the Courts**

207.    The Bondholders suggest that the Courts should have no regard for creditor recoveries in determining the Allocation Litigation.  The UK Pension Claimants submit that that is simply incorrect.  A distribution to creditors is the sole purpose for the Allocation Litigation.  It is not, despite its five-year history, an academic exercise fueled by paid professionals to prove who is "right" in a geographic tug of war.  The outcome determines the money available to creditors such as pensioners, whose futures continue to be drastically affected by ongoing legal wrangling.

208.    The essential task of the Courts is to allocate the Lockbox Funds according to the correct legal and equitable principles.  In essence, the Canadian and US Debtors suggest that this is simply a process of determining pre-existing ownership of the assets or interests that were sold (based on the false premise that there are separate identifiable interests) and allocating value accordingly.  The fallacy of this approach is demonstrated by the law relating to the imposition of a constructive trust based upon unjust enrichment.  The foundational cases recognizing this

---

whether "partial substantive consolidation that did not impair the rights of an objecting creditor that relied on the entities' separateness would be appropriate."  419 F.3d at 210, fn. 16.

[288]    *See* US Br. 137 & fn. 483.

cause of action acknowledge that the person upon whom a constructive trust was imposed had clear legal title to the property in question. Retention of that legal title, unfettered by a recognition of the efforts of another party in creating the value of that property, would inequitably ignore the fact that the legal title holder obtained its interest through not only his own efforts but the uncompensated contribution of another.

209.    The outcome of the Allocation Litigation, designed to facilitate a distribution to creditors throughout the world, must also be capable of finality in order to accomplish that purpose. A pro rata allocation of the Lockbox Funds with clear findings of fact by the Courts to support such an outcome, will best accomplish that objective.

210.    Bankruptcy Courts are guided by overriding considerations of equity and fairness, both procedural and substantive. The Courts in both jurisdictions have previously expressed concern that the litigation focus of professionals in this proceeding distracts from the real task at hand—providing a ***distribution to creditors***. As articulated by Justice Morawetz:

> Many of these former employees are pensioners and this group have unsecured claims for both pension and medical benefits.
>
> For many of these individuals, the delay in receiving a meaningful distribution can be significant. It is not just a question of calculating the time value of money. For this group of creditors, time is not on their side.
>
> In making these comments, I do not mean to suggest that the claims of other creditor groups are not of equal significance. The reality is however that the timing of receipt of a distribution may be less critical for a financial player as opposed to an individual.[289]

211.    This was repeated by (former) Chief Justice of Ontario Warren Winkler at the commencement of the third court-ordered mediation wherein he stated:

> At the heart of the Nortel insolvency is the distribution of the assets of the Nortel Companies. The sales of Nortel's global business lines and residual intellectual

---

[289]    *Re Nortel Networks Corp.*, 2011 ONSC 4012.

property have produced over USD$7 billion in cash now held in escrow awaiting distribution.  Funds available for distribution to Nortel's creditors total almost USD$9 billion.[290]

212.    And as articulated by Judge Sloviter of the Third Circuit Court of Appeals:

We are concerned that the attorneys representing the respective sparring parties may be focusing on some of the technical differences governing bankruptcy in the various jurisdictions without considering that there are real live individuals who will ultimately be affected by the decisions being made in the courtrooms.  It appears that the largest claimants are pension funds in the U.K. and the United States, representing pensioners who are undoubtedly dependent, or who will become dependent, on their pensions.  They are the Pawns in the moves being made by the Knights and the Rooks.[291]

213.    Approximately 5,000 of the UK Pension Claimants have died since this proceeding began over five-and-a-half years ago.[292]  Unlike Bondholders, the majority of who purchased bonds after the filing date in the hope that they would recover a return on their investment, involuntary creditors like pension claimants have no such option.  They are not capable of "trading out" of their position.  The UK Pension Claimants depend upon a fair and equitable outcome in an unprecedented global proceeding under the supervision of two Judges in Courts of two foreign jurisdictions.  That is a factor that the Courts can, and should, consider in determining an appropriate allocation of the Lockbox Funds.

214.    The Bondholders cite *Re Ivaco* as support for the proposition that creditor recoveries are not relevant to the Allocation Litigation, in referring to the weight to be given to claims of various creditors.[293]  However, that case specifically dealt with issues of priority among various types of creditor claims (secured, preferred, unsecured), and that the Court cannot

---

[290]    Archived copy available at https://web.archive.org/web/20130120054435/http://www.nortelmediation.com /li/pdf/Nortel_Mediation_Opening_Remarks_of_the_Mediator_April_24_2012.pdf.

[291]    *In re Nortel Networks, Inc.,* 669 F.3d 128, 143 (3rd Cir. 2011).

[292]    5,042 as at the commencement of the Allocation Litigation trial.

[293]    *See Bonds Br.* ¶10.

override Parliament where priority has been established by statute.  The portions of the case cited by the Bondholders stand for the unremarkable proposition that courts cannot override clear statutory priorities afforded to various types of claims.  That is an entirely different issue from one where the Courts can consider the actual recoveries to be received by creditors having the same unsecured status.

**L.      Implementing the Pro Rata Distribution Model Does Not Require the Courts to First Confirm a Plan.**

**(1)      The Bondholders Mischaracterize the Pro Rata Distribution Model.**

215.      The Bondholders assert that the pro rata distribution model must be rejected because "[a]ttempting to fix creditor recoveries under a hypothetical future plan is . . . impossible," as no plans have been confirmed.[294]   This argument mischaracterizes the UK Pension Claimants' position.  The pro rata distribution model proposes the allocation of the Lockbox Funds to each Estate based on the ***claims*** of each Estate, not the ***distributions*** that such creditors would ultimately receive.  Any distributions to creditors will be effectuated by each Estate separately in accordance with the requirements of their local jurisdictions.

**(2)      There Is No Need for Further Plan Negotiations in Canada or the US.**

216.      The Bondholders' insistence that the Lockbox Funds cannot be distributed in the absence of a Plan of Arrangement is simply incorrect.[295]   The Bondholders' motivation in insisting upon a Plan mechanism is driven by the reality that they hold a veto in any vote, thereby creating leverage for any special terms they may require for their sole benefit.

217.      More than five and a half years into this proceeding, with all assets sold and no ongoing or future operations and after three unsuccessful mediations, there are no terms to

---

[294]      *See id.* at ¶20.

[295]      *See id.*

"negotiate" in connection with any hypothetical Plan of Arrangement in Nortel's CCAA or a

Plan of Reorganization in Nortel's Chapter 11 proceedings.  Following the Allocation Litigation,

and regardless of the allocation methodology adopted by the Courts, there will be a limited (and

ever eroding) amount of cash to distribute, based upon legal priorities and ordinary pro rata *pari*

*passu* principles of distribution applicable to unsecured creditors.

218.    With respect to the US proceedings, this is demonstrated by the fact that the US

Debtors have, since 2010 had their Joint Chapter 11 Plan and related Disclosure Statement on

file,[296] which they have not withdrawn at any time since.  The Joint Chapter 11 Plan is a

straightforward liquidating plan, which the US Debtors represented they "believe . . . will satisfy

all of the requirements for confirmation,"[297] including, among other things, section 1129's

requirements that the plan and the proponents comply with the applicable provisions of the

Bankruptcy Code.

219.    As to the Canadian proceedings, the fact that there are no terms left to negotiate in

Nortel's insolvency proceeding was contemplated by Newbould J. less than one month ago in his

Endorsement regarding the Bondholders' entitlement to post-filing interest in Canada:

> One may ask what is left over in this case to negotiate. The assets have long been
> sold and what is left is to determine the claims against the Canadian estate and,
> once the amount of the assets in the Canadian estate are known, distribute the
> assets on a *pari passu* basis. This is not a case in which equity is exchanged for
> debt in a reorganization…[298]

220.    Pursuant to section 11(1) of the CCAA, the Canadian Court has wide jurisdiction

to make any order it deems appropriate—including doing what is just in the circumstances and

---

[296]    Chapter 11 Plan of Reorganization (Joint) of Nortel Networks Inc. and Its Affiliated Debtors [D.I. 3580];
Disclosure Statement [Proposed] for the Joint Chapter 11 Plan of Nortel Networks Inc. and its Affiliated
Debtors [D.I. 3874].

[297]    *See* Disclosure Statement, at p. 87.

[298]    *Re Nortel Networks Corporation et al*, 2014 ONSC 4777 at ¶ 49 ("**Nortel Interest Decision**").

ordering a distribution to creditors in the absence of a Plan of Arrangement.  Amendments to Section 11 that came into force after Nortel's filing merely codified the jurisdiction which had previously existed under the common law.[299]

221.    The CCAA does not contain any express provision which governs the process by which funds are distributed to creditors.[300]  As the UK Pension Claimants have previously argued and the CCAA Court has recently confirmed, payments to creditors in the absence of a Plan of Arrangement can and often do occur.[301]

222.    In *Re Timmico Limited,* Morawetz J. confirmed that a distribution had been made to secured creditors without a Plan of Arrangement in place and where there was no intention to propose a Plan.[302]  Similarly, in *Re AbitibiBowater*,[303] despite objections made by a group of bondholders, Gascon J.C.S. (as he then was) approved a large interim distribution from funds generated by the sale of assets in a CCAA process to senior secured noteholders:

> the Bondholders conclude that the proposed distribution should not be considered until after the creditors have had an opportunity to negotiate a plan of arrangement or a compromise.

> Despite what the Bondholders argue, it is neither unusual nor unheard of to proceed with an interim distribution of net proceeds in the context of a sale of assets in a CCAA reorganization. Nothing in the CCAA prevents similar interim distribution of monies. There are several examples of such distributions having been authorized by Courts in Canada.[304]

---

[299]    *Century Services*, *supra* fn. 200 at ¶¶ 65–68; *see also Nortel Interest Decision*, *supra* note 298 at ¶ 54.

[300]    *Id.* at ¶ 53.

[301]    *Id.* at ¶ 55.

[302]    2014 ONSC 6461 at ¶ 38.

[303]    2009 QCCS 6461.

[304]    *Id.* at ¶¶ 58 and 71.

223.    In *Fraser Papers*, a liquidating CCAA and Chapter 15 proceeding involving both Canadian and US entities,[305] an Order was issued outside of a Plan (and without reference to any future Plan) that provided for:

(a)    a sale of substantially all of the assets of the Canadian and US entities;

(b)    the creation of trusts as vehicles to hold proceeds of sale for the benefit of various unsecured creditor groups;[306]

(c)    representation on the purchaser's board of directors to be nominated by unsecured creditors;

(d)    extensive releases including third party releases;

(e)    approval of various payments to creditors, including CAD$6 million to one particular group of unsecured creditors and a mechanism to deliver the balance of the proceeds of sale;

(f)    the wind-up of pension plans effective upon the closing of the transaction; and

(g)    relief that would normally be embodied in a Plan but was effected by court Order.

The Order granting this relief was also approved by the Delaware Court overseeing the Chapter 15 proceeding.[307]

224.    Despite arguments to the contrary, the circumstances under which a distribution is sought are immaterial in determining whether the Court has jurisdiction to order distributions in the absence of a Plan of Arrangement:

---

[305]    See CCAA Sanction Order in *Re Fraser Papers Inc.* (February 10, 2011) Court File No. CV-09-8241-00CL.

[306]    The proceeds of sale were common shares representing a 49 percent interest in the Purchaser, and Promissory Notes. The common shares could not be held by unsecured creditors directly without contravening securities laws for a closely-held corporation, and neither shares nor a Promissory Note were assets that could be held directly by a registered pension plan.

[307]    See Judge Carey's companion Chapter 15 Order Recognizing Order of the Canadian Court and Approving the Debtors' Amended Consolidated Plan of Compromise and Arrangement and Transaction Agreement in *In re Fraser Paper Inc.*, No. 09-12123 (KJC) (February 11, 2011).

I see no difference between an interim distribution, as in the case of *AbitibiBowater*, or a final distribution, as in the case of *Timminco*, or a distribution to an unsecured or secured creditor, so far as a jurisdiction to make the order is concerned without any plan of arrangement.[308]

225.    In addition, the IFSA provides that the Lockbox Funds can be paid out upon either an agreement among the parties *or by Court Order*.[309]  Ultimately, the absence of a Plan of Arrangement is no impediment to implementation of the pro rata distribution model proposed by the UK Pension Claimants.

**M.    The US Debtors' Motion to Strike the Pro Rata Reports Is Without Merit.**

226.    At footnotes 477 and 478 of their Post-Trial Brief, the US Debtors request a renewal of their unmeritorious Motion to Strike (the "**Motion to Strike**") the Pro Rata Reports. Through mischaracterization, incomplete transcript references, and a fundamental misunderstanding of the expert opinions offered, the US Debtors seek to strike the Pro Rata Reports and distract the Courts from the inherent flaws in the US Debtors' attack on the pro rata distribution model and the path forward that such methodology offers in this protracted dispute.

227.    The UK Pension Claimants re-state in its entirety and rely on their Memorandum Opposing the US Debtors' Motion to Strike the Pro Rata Expert Reports, dated April 28, 2014.[310]

228.    In addition, the UK Pension Claimants respond to certain statements made by the US Debtors and the UCC in their Post-Trial Briefs as it relates to the Pro Rata Reports, and the evidence actually presented at trial.

229.    Despite their claim, the US Debtors and the Bondholders have failed to establish that Bazelon, Clark and Westbrook are unreliable on any basis.  The absurdity of the US

---

[308]    *Nortel Interest Decision*, *supra* fn. 298 at ¶ 58.

[309]    *See* TR40015 (IFSA) § 12(b).

[310]    *See* TR50981.

Debtors' attack on the Statement of Assumed Facts provided to Clark and Westbrook[311] is

apparent when one considers that ***no expert in this case*** has reviewed the approximately three

million documents produced in this case.  All of the experts in this case, including those

produced by the US Debtors, were provided with a limited set of documents and facts which

informed the experts' opinion.

230.    All of the statements in the Statement of Assumed Facts are sourced to documents

produced by the Nortel Estates or other Core Parties.[312]  They are not "untested, unverifiable and

incomplete facts provided by counsel" as suggested by the US Debtors.[313]  Although the US

Debtors suggested in Opening Submissions that the Statement of Assumed Facts is deficient, no

Core Party—including the US Debtors—has established in the trial that the facts in the Statement

of Assumed Facts are inaccurate or incomplete.

231.    Remarkably, most of the source documents that form the basis of the Statement of

Assumed Facts have been cited by and relied upon by the US Debtors and Bondholders in

support of their own allocation theory.  To the extent that the Statement of Assumed Facts

suffers from any alleged deficiencies—which the UK Pension Claimants dispute—the reports

proffered by other experts in the Allocation Litigation suffer from the same alleged deficiencies.

232.    Through depositions and at trial, the US Debtors have been given the opportunity

to test the factual assumptions and analyses that form the basis of the Pro Rata Reports.  The fact

that the US Debtors have not provided any additional evidence as to why the Pro Rata Reports

should be struck since their original Motion to Strike was filed in April 2014 demonstrates that

---

[311]    *See* TR11436 (Clark and Westbrook Report) Appx. E.

[312]    Notably, the US Debtors dropped all of their outstanding objections to documents used by all Core Parties in the Allocation Litigation.

[313]    *Cf.* US Br.136 fn. 477.

the US Debtors have been unsuccessful in their attempts to undermine the factual assumptions

and analysis contained in the Pro Rata Reports.  The trial evidence overwhelmingly supports the

facts contained in the Statement of Assumed Facts.

233.    Finally, there is no basis for the US Debtors' suggestion that Westbrook's

opinions should be given reduced consideration by the courts merely because he did not testify at

trial.  As reflected in the recitals to the Stipulation entered by the Canadian and US Courts,

unlike Clark who had been designated as a testifying expert and was always prepared to be

deposed and testify at trial, Westbrook "was not designated, identified or retained as a testifying

expert."[314]  Notwithstanding the opportunity to cross-examine Clark at trial, including on any

"differences" alleged to exist between Clark and Westbrook on any point, the US Debtors and

the Bondholders refused to permit him to testify, thereby depriving the Courts of such evidence.

## CONCLUSION

234.    For all of the reasons above, and as set forth in their Opening Post-Trial Brief, the

UK Pension Claimants respectfully request that the Courts adopt the pro rata distribution model

for allocating the Lockbox Funds.

---

[314]    Stipulation Regarding the Expert Report and Testimony of Jay Westbrook and Leif M. Clark dated May. 26, 2014[D.I. 13803].

ALL OF WHICH IS RESPECTFULLY SUBMITTED this 10th day of September 2014.


September 10, 2014 _/s/ Michael E. Barrack_

**Thornton Grout Finnigan LLP**
Barristers and Solicitors
100 Wellington Street West, Suite 3200
Toronto, Ontario, M5K 1K7

**Michael E. Barrack** (LSUC# 21941W)
**John Finnigan** (LSUC # 24040L)
**D. J. Miller** (LSUC# 34393P)
**Andrea McEwan** (LSUC# 53781P)
**Michael S. Shakra** (LSUC# 64604K)

Tel:    416-304-1616
Fax:    416-304-1313

_/s/ Brian E. O'Connor_

**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, N.Y. 10019-6099, U.S.A

**Brian E. O'Connor**
**Eugene L. Chang**
**Sameer Advani**
**Heather M. Schneider**
**Robert Kofsky**
**Andrew Hanrahan**

Tel:    212-728-8000
Fax:    212-728-8111

_/s/ Justin R. Alberto_

**Bayard, P.A.**
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899

**Charlene D. Davis** (No. 2336)
**Justin Alberto** (No. 5126)
Tel: 302-655-5000
Fax: 302-658-6395
cdavis@bayardlaw.com
jalberto@bayardlaw.com