Court File No. 09-CL-7950

ONTARIO

SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)


IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

- and -


UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., et al., | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |


**REPLY CLOSING BRIEF OF THE
CANADIAN CREDITORS' COMMITTEE ("CCC")**


**Public Version**

## TABLE OF CONTENTS

**PART I — OVERVIEW** ..................................................................................................**1**

   **A. Ownership Allocation** ...................................................................................**1**

   **B. Pro Rata Allocation**.....................................................................................**3**

**PART II — OWNERSHIP ALLOCATION** .................................................................**3**

   **A. Construction of the MRDA** .........................................................................**3**

      1. It is an Error to Disregard the Language of the Agreement.........................4

      2. U.S. and EMEA Debtors Misuse the Factual Matrix.....................................5

   **B. Misuse of Post-Contractual Evidence** .......................................................**11**

      1. Post-Contractual Evidence Not Admissible.................................................12

      2. Post-Contractual Evidence Cannot Establish an Estoppel...........................14

   **C. The Parties' Interests with Respect to NN Technology** ...........................**17**

      1. Licensed Participants Held No Ownership Interest in the NN Technology ...............17

      2. EMEA Beneficial Ownership Theory Should be Rejected...........................19

      3. There is No Resulting Trust.........................................................................24

   **D. Limits of the Licensed Participants' Licence Rights** ...............................**25**

      1. The Second Arm of the License....................................................................25

      2. The Word "Including" in Article 5(a).........................................................26

      3. The Business Contemplated in the IP Co. Model Was Not a "Service".....................28

      4. The "Have Made" Right .............................................................................30

**PART III — CCC PRO RATA ALLOCATION** ..........................................................**31**

   **A. CCC Pro Rata Allocation is an Allocation Theory** ...................................**31**

   **B. CCC Pro Rata Allocation is Proposed for a Legitimate and Sustainable Purpose** ...**32**

   **C. CCC Pro Rata Allocation Does Not Constitute an Improper *Sub Rosa* Plan** ...........**33**

   **D. CCC Pro Rata Allocation Does Not Effect Substantive Consolidation** .....................**34**

   **E. The Bondholders Have Offered No Evidence Of Creditor Expectations** ..................**35**

**PART IV — CCC'S ALLOCATION THEORIES ARE FAIR TO ALL NORTEL
          CREDITORS** ....................................................................................**38**

# TABLE OF AUTHORITIES

| CASES | TAB NO. |
|---|---|
| *32262 B.C. Ltd. v. Companions Restaurants Inc.*, [1995] B.C.J. No. 342 (S.C.) | 1 |
| *690981 Ontario Ltd. v. Look Communications Inc.*, 2011 ONSC 2494 | 2 |
| *3163083 Canada Ltd. v. St. John's*, 2004 NLCA 42 | 3 |
| *4345142 Ont. Inc. v. Access Self Storage Inc.*, [2008] O.J. No. 2752 (S.C.J.) | 4 |
| *Agribrands Purina Canada Inc. v. Kasamekas*, 2011 ONCA 460 | 5 |
| *Alberta Gas Trunk Line Co. v. Amoco Canada Petroleum Co.*, [1980] A.J. No. 715 (C.A.), *affirmed* [1981] 2 S.C.R. 437 | 6 |
| *American Cyanamid  Co. v. Novopharm Ltd.*, [1972] F.C.J. No. 61 (C.A.) | 7 |
| *Apotex Inc. v. Sanofi-Aventis*, 2011 FC 1486, *reversed on other grounds*, 2013 FCA 186 | 8 |
| *Arthur Andersen Inc. v. Toronto-Dominion Bank*, [1994] O.J. No. 427  (C.A.), *leave to appeal refused* [1994] S.C.C.A. No. 189 | 9 |
| *Banks v. Unisys Corp.*, 228 F. 3d 1357 at p. 1359 (Fed. Cir. 2000) | 10 |
| *Barton v. Toronto Argonaut Football Club Ltd.*, [1978] O.J. No. 2721 (H.C.J.), *affirmed* (1979), 27 O.R. (2d) 734 (C.A.), *affirmed* [1982] 1 S.C.R. 666 | 11 |
| *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832 (Fed.Cir.2009), *affirmed* 131 S.Ct. 2188 (2011) | 12 |
| *BG Checo Internat'l Ltd. v. B.C. Hydro and Power Authority*, [1993] 1 S.C.R. 12 | 13 |
| *C.I. Covington Fund Inc. v. White*, [2000] O.J. No. 4589 (S.C.J.), *affirmed*, [2001] O.J. No. 3918 (Div. Ct.) | 14 |
| *Canacemal Investment Inc. v. PCI Realty Corp.*, [1999] B.C.J. No. 2029 (S.C.) | 15 |
| *Canadian National Railways v. Canadian Pacific Ltd.*, [1978] B.C.J. No. 1298 (C.A.), *affirmed* [1979] 2 S.C.R. 668 | 16 |
| *Canadian Superior Oil Ltd. v. Murdoch*, [1969] A.J. No. 74 (C.A.), *affirmed* (1969), 6 D.L.R. (3d) 464 (S.C.C.) | 17 |
| *Capital Estate Planning Corp. v. Lynch*, 2004 ABQB 727 | 18 |

| CASES | TAB NO. |
|---|---|
| *Chippewas of Mnjikaning First Nation v. Ontario*, 2010 ONCA 47, *leave to appeal refused*, [2010] S.C.C.A. No. 91 | 19 |
| *Clarke's-Gamble of Canada Ltd. v. Grant Park Plaza Ltd.*, [1967] S.C.R. 614 | 20 |
| *Collier v. Moncton Kinsmen House Inc.*, 2002 NBQB 96 | 21 |
| *Commissioners of Excise v. Savoy Hotel Ltd.*, [1966] 1 W.L.R. 948 | 22 |
| *Comstock Canada v. Electec Ltd.*, [1991] F.C.J. No. 987 | 23 |
| *Confederation Treasury Services Ltd. v. Hees Internat'l Bancorp Inc.* [1997] O.J. No. 351 (Gen. Div.), *affirmed*, [1998] O.J. No. 4734 (C.A.). | 24 |
| *Country Meadow Estates (No. 2) Inc. v. Citibank Canada,* [1994] O.J. No. 1835 (Gen. Div.) | 25 |
| *Coventree Inc. v. Lloyd's Syndicate 1221 (Millennium Syndicate)*, 2012 ONCA 341*, leave to appeal refused*, [2013] S.C.C.A. No. 276 | 26 |
| *Dimson v. KTI Kanatek Technologies Inc.*, 2013 ONCA 454 | 27 |
| *Domco Industries Ltd. v. Armstrong Cork Canada Ltd.*, [1982] 1 S.C.R. 907 | 28 |
| *Drosophilinks Consulting Inc. v. Canadian National Rwy Co.,* 2010 ONSC 3576 *leave to appeal refused,* 2010 ONSC 5156 (Div. Ct.) | 29 |
| *Dubiner v. Cheerio Toys & Games Ltd.*, [1965] 1 Ex.C.R. 524, *affirmed on other grounds*, [1966] S.C.R. 206 | 30 |
| *Dunlop Pneumatic Tyre Company, Ltd. v. North British Rubber Company, Ltd.* (1904), 21 R.P.C. 161 at 169 (Ch. Div.), *affirmed* (1904), 21 R.P.C. 161 at 181 (C.A.). | 31 |
| *EdperBrascan Corp. v. 117373 Canada Ltd.*, [2000] O.J. No. 4012 (S.C.J.) *affirmed*, [2002] O.J. No. 759 (C.A.), *appeal abandoned*, [2002] S.C.C.A. No. 184. | 32 |
| *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 | 33 |
| *Famous Players Canadian Corp. v. J.J. Turner and Sons Ltd.*, [1948] O.J. No. 69 (H.C.J.) | 34 |
| *Francklyn v. Guilford Packing Co.,* 695 F.2d 1158 at pp. 1162-1163 (9th Cir. 1983) | 35 |
| *Friends of Lansdowne Inc. v. Ottawa*, 2012 ONCA 273 | 36 |

| CASES | TAB NO. |
|---|---|
| *G.D. Searle & Co. v. Novopharm Ltd.*, 2007 FCA 173, *leave to appeal refused*, [2007] S.C.C.A. No. 340. | 37 |
| *Gellman v. Telular Corp.*, 449 F. App'x 941, 944 (Fed. Cir. 2011) | 38 |
| *Gilroy v. H.W.S. Holdings Ltd.*, [1995] O.J. No. 2103 (Gen. Div.) | 39 |
| *Halagan v. Reifel*, 2001 BCCA 434, *quoting with approval from the judgment below*, [1998] B.C.J. No. 2301 (S.C.), *leave to appeal refused*, [2001] S.C.C.A. No. 469 | 40 |
| *Hamilton v. Hamilton*, [1996] O.J. No. 2634 (C.A.) | 41 |
| *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 340-41 (3d Cir. 2006) | 42 |
| *In re SLM Int'l, Inc.*, 248 B.R. 240 (D. Del. 2000) | 43 |
| *Indian Molybdenum Ltd. v. The King,* [1951] 3 D.L.R. 497 (S.C.C.) | 44 |
| *Insituform Technical Services v. Inliner UK*, [1992] R.P.C. 83 (Ch. D.) | 45 |
| *Jencan Ltd. v. Canada (M.N.R.)*, [1998] F.C.J. No. 876 (C.A.) | 46 |
| *Kerr v. Baranow*, 2011 SCC 10 | 47 |
| *Lamarche v. Lamarche*, [2001] O.J. No. 3251 (S.C.J.) | 48 |
| *London Loan & Savings Co. of Canada v. Osborn*, [1928] S.C.R. 451 | 49 |
| *McLean v. McLean*, 2013 ONCA 788 | 50 |
| *Merck & Co. v. Apotex Inc.*, 2010 FC 1265, *affirmed* 2011 FCA 363, *leave to appeal refused*, [2012] S.C.C.A. No. 82 | 51 |
| *MHR Board Game Design Inc. v. Canadian Broadcasting Corp.*, 2013 ONCA 728, *leave to appeal refused* [2014] S.C.C.A. No. 105 | 52 |
| *Millennium Veterinary Hospital Corp. v. SR & R Bay Ridges Ltd.*, [2007] O.J. No. 2848 (S.C.J.), *affirmed* 2008 ONCA 264 | 53 |
| *Molson Canada 2005 v. Miller Brewing Co.*, 2013 ONSC 2758 | 54 |
| *Montreal Trust Co. v. Birmingham Lodge Ltd.*,[1995] O.J. No. 1609 (C.A.) | 55 |
| *Newcorp Properties Ltd. v. West Vancouver*, [1989] B.C.J. No. 642 (S.C.) | 56 |

| CASES | TAB NO. |
|---|---|
| *Oceanic Exploration Co. v. Denison Mines Ltd.*, [1999] O.J. No. 4813 (C.A.) | 57 |
| *Pecore v. Pecore*, 2007 SCC 17 | 58 |
| *Powerline Plus Ltd. v. Ontario Energy Board*, 2013 ONSC 6720 | 59 |
| *Primo Poloniato Grandchildren's Trust v. Browne*, 2012 ONCA 862, *leave to appeal refused*, [2013] S.C.C.A. No. 68 | 60 |
| *Re T. Eaton Co.*, [1999] O.J. No. 4216 (S.C.J.) | 61 |
| *Reddin v. Mills*, [1995] B.C.J. No. 352 (S.C.) | 62 |
| *Royal Bank of Canada v. Body Blue Inc.*, [2008] O.J. No. 1628 (S.C.J.) | 63 |
| *Ryan v. Moore*, 2003 NLCA 19, *reversed on other grounds*, [2005] 2 S.C.R. 53 | 64 |
| *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 | 65 |
| *Scotsburn Co-op. Services Ltd. v. WT Goodwin Ltd.*, [1985] 1 S.C.R. 54 | 66 |
| *Scottish & Newcastle Plc v Lancashire Mortgage Corp. Ltd* [2007] EWCA Civ 684 | 67 |
| *Seanix Technology Inc. v. Ircha*, [1998] B.C.J. No. 179 (S.C.) | 68 |
| *Shelanu Inc. v. Print Three Franchising Corp.*, [2003] O.J. No. 1919 (C.A.) | 69 |
| *Spotwave Wireless Inc. v. Bongfeldt,* [2005] O.J. No. 4530 (C.A.) | 70 |
| *Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc.*, 2013 ONSC 1300 | 71 |
| *Techform Products Ltd. v. Wolda*, [2000] O.J. No. 5676  (S.C.J.), *varied on other grounds* [2001] O.J. No. 3822 (C.A.), *leave to appeal refused*, [2001] S.C.C.A. No. 603 | 72 |
| *Thomas Cook Canada Inc. v. Skyservice Airlines Inc.*, 2011 ONSC 5756 | 73 |
| *Tomko v. Wawanesa Mutual Insurance Co.*, 2007 MBCA 8 | 74 |
| *Transamerica Life Canada Inc. v. ING Canada Inc.*, (2003), 68 O.R. (3d) 457 (C.A.) | 75 |
| *United States v. Dubilier Condenser Corp.*, 289 U.S. 178 (1933) | 76 |
| *Vancouver City Savings Credit Union v. Norenger Development (Canada) Inc.*, 2002 BCSC 934 | 77 |

| CASES | TAB NO. |
|---|---|
| *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 | 78 |
| *Wade v. Ukeni*, 2014 ONCA 99 | 79 |
| *White v. Halifax Pension Committee*, 2007 NSCA 22 | 80 |
| *Winnipeg Police Assn. v. Winnipeg*, [1980] M.J. No. 147 (C.A.) | 81 |
| *Wong v. Wong-Koroluk*, [2009] B.C.J. No. 817 (S.C.) | 82 |
| *Woolcock v. Bushert*, [2004] O.J. No. 4498  (C.A.) | 83 |
| *York University v. Markicevic*, 2013 ONSC 378 | 84 |

| SECONDARY SOURCES | TAB |
|---|---|
| *Halsbury's Laws of England*, 5th ed. (London: LexisNexis, 2008/2014), Vol, 79 ("Patents and Registered Designs") | 85 |
| Spencer-Bower and Turner, *Estoppel by Representation* | 86 |
| *Terrell on the Law of Patents,* 17th ed. (London: Sweet & Maxwell, 2011) | 87 |

# PART I — OVERVIEW

## A.    Ownership Allocation

1.    As the CCC has consistently argued, the central issue before the Courts is the interpretation and application of the MRDA,[1] which governs the ownership interests held by the parties in Nortel's IP.

2.    The parties appear to agree on the basic principles of Ontario law that govern the interpretation of the MRDA.  However, the U.S. Interests and the EMEA Debtors either ignore those principles or apply them incorrectly.[2]

3.    The Supreme Court of Canada has recently reaffirmed that "[t]he interpretation of a written contractual provision must always be grounded in the text and read in light of the entire contract."[3]  The U.S. Interests acknowledge this, yet devote very little of their submissions to the actual text of the MRDA.  Their submissions refer extensively to inadmissible extrinsic evidence.  The U.S. Interests rely on witnesses' subjective "understandings" of the MRDA's purpose and its terms, drafting changes, statements made to tax authorities, Nortel's "business practices," and a legal opinion from an IP lawyer dressed up as "custom and practice".  This evidence does not form part of the factual matrix.  It is not part of the background of the MRDA, its genesis or its purpose.  It should not be considered by these Courts.

4.    Even if admissible, the evidence relied upon by the U.S. Interests does not support their position.  Most of the evidence simply consists of characterizations of the parties' legal rights

---

[1] Defined terms herein have the same meaning as the terms set out in Appendix A to the CCC's Closing Brief. All figures are in U.S. dollars unless otherwise indicated.

[2] For avoidance of doubt, except as expressly admitted in its Pre-Trial Brief, Closing Brief or this Closing Reply Brief, the CCC disputes all factual allegations of the U.S. Interests and EMEA Debtors. The CCC also adopts the response of the Monitor and Canadian Debtors' to the Proposed Findings of Fact of the U.S. Interests and EMEA Debtors.

[3] *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 57.

under the MRDA, made by various people, in various contexts, for various purposes, all during ordinary course operations. The evidence does not assist in determining the key issue of contractual interpretation that governs the valuation of the Licenses after Nortel filed for creditor protection and ceased operating as a going concern.

5.      The EMEA Debtors raise, for the first time, a new argument in an attempt to establish their claim to beneficial ownership of the IP. This late-breaking theory is a desperate attempt to claim a property interest to which the EMEA Debtors are not entitled. The notion that the Licensed Participants retained beneficial ownership of inventions in their Exclusive Territories by operation of law is illogical. It is inconsistent with the EMEA Debtors' joint ownership hypothesis, the clear terms of the MRDA and Nortel's invariable practice of requiring inventors to assign all right, title and interest to inventions to NNL, the Canadian parent corporation.

6.      Both the U.S. Interests and EMEA Debtors raise a number of technical arguments in an attempt to prevent the Monitor from asserting NNL's ownership interest in the IP. These estoppel arguments are unsustainable at law and in any event do not bind the CCC.

7.      In the end, none of the arguments raised by the U.S. Interests or the EMEA Debtors alter the rights of the parties as defined in the MRDA. The inescapable conclusion is that NNL owned the IP. The Licenses held by the Licensed Participants, while valuable in the context of Nortel's business during ordinary course operations, had little to no value at the point when they were terminated by the Licensed Participants. The allocation decision that these Courts must make should reflect that reality.

## B.    Pro Rata Allocation

8.    The efforts of the U.S. Interests and Bondholder Group to dismiss the CCC's alternative pro rata allocation proposal (hereinafter "CCC Pro Rata Allocation") are unfounded. Their objections bear no relation to the CCC's theory, mischaracterize it, and ignore the purpose for which it has been proposed. The relevant authority from both jurisdictions and the undisputed evidence in the trial record establish that CCC Pro Rata Allocation is sustainable in all respects, can be implemented in a practical and expedient manner, and would result in a fair and equitable outcome for all Creditors. The objectors cite no authority or record evidence to the contrary, and present no alternative that would lead to anything other than an extreme result favouring the U.S. Interests and, in particular, the cross-over bondholders.

# PART II — OWNERSHIP ALLOCATION

9.    The MRDA lies at the heart of the allocation of the Sale Proceeds. It governs the parties' respective ownership rights in the NN Technology. For the following reasons, the arguments raised by the U.S. Interests and the EMEA Debtors should be rejected.

## A.    Construction of the MRDA

10.    The U.S. Interests and the EMEA Debtors agree with the CCC's statement of the governing principles of contractual interpretation under Ontario law.[4] While acknowledging these principles,[5] the U.S. Interests and the EMEA Debtors in fact ignore them.

---

[4] Under these rules, the MRDA is to be interpreted: "(a) as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective; (b) by determining the intention of the parties in accordance with the language they have used in the written document and based upon the 'cardinal presumption' that they have intended what they have said; (c) with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties; and (to the extent there is any ambiguity in the contract), (d) in a fashion that accords with sound commercial principles and good business sense, and that avoid a commercial absurdity" (see *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24).

- 4 -

### 1.   It is an Error to Disregard the Language of the Agreement

11.   Under Ontario law, the first rule of interpretation is to have regard to the specific language used by the parties in drafting their agreement.[6]  The actual language used in the contract drives the interpretive process.[7]  As the Supreme Court of Canada recently stated: "[t]he interpretation of a written contractual provision must always be grounded in the text and read in light of the entire contract… While the surrounding circumstances are relied upon in the interpretive process, courts cannot use them to deviate from the text such that the court effectively creates a new agreement."[8]

12.   The U.S. Interests and the EMEA Debtors pay lip service to this principle,[9] but do not apply it.  There are two particularly noteworthy examples where the U.S. Interests and EMEA Debtors deviate from the text of the MRDA.

13.   *First*, the U.S. Interests and the EMEA Debtors rely heavily upon the reference to "equitable and beneficial ownership" in the MRDA's second recital.[10]  However, they ignore the remaining words of the recital, which make clear that the only ownership interests held by the Licensed Participants relate to "*certain exclusive rights under* NT Technology *for a Specified*

---

[5] EMEA Debtors' Post-Hearing Submission, paras. 379, 381, 387 & 448; U.S. Interests' Post-Trial Brief, pp. 7-12, 21-24 & 37-38; and U.S. Interests' Proposed Findings and Conclusions, paras. 18-26, 47 & 183-195 (Law).

[6] *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at paras. 57.

[7] For the same reason, any assessment of the parties' *implied duties of good faith* likewise depends first and foremost on the language used in the agreement.  The U.S. Interests attempt to use this common law doctrine as a means of constraining NNL's rights under the MRDA without acknowledging this limitation (see U.S. Interests' Proposed Findings and Conclusions (at para. 129 (Law)).  See *Transamerica Life Canada Inc. v. ING Canada Inc.*, (2003), 68 O.R. (3d) 457 (C.A.) at para. 53; *MHR Board Game Design Inc. v. Canadian Broadcasting Corp.*, 2013 ONCA 728 at para. 5, *leave to appeal refused*  [2014] S.C.C.A. No. 105; and *Agribrands Purina Canada Inc. v. Kasamekas*, 2011 ONCA 460 at para. 51.

[8] *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at paras. 57.

[9] EMEA Debtors' Post-Hearing Submission, paras. 379, 380 & 387; U.S. Interests' Post-Trial Brief, pp. 7-9, 22 & 37-39; and U.S. Interests' Proposed Findings and Conclusions, paras. 20-21, 47 & 103 (Law).

[10] EMEA Debtors' Post-Hearing Submissions, paras. 23, 398-399, 410, 417 & 420; U.S. Interests' Post-Trial Brief, pp. 9, 10, 21, 24, 25, 26, 27, 39, 41, 47 & 122; and U.S. Interests' Proposed Findings and Conclusions, para. 290 (Fact) and paras. 61, 114 & 122 (Law).

*Territory*".[11]   The italicized words confirm that the recital refers merely to the exclusive territorial licenses granted to the Licensed Participants pursuant to the CSAs, which were continued in the MRDA.[12]

14.    *Second*, the U.S. Interests and the EMEA Debtors put forward strained interpretations of Article 5(a)(i) of the MRDA.  Illustrative of this approach is the U.S. Interests' distortion of the structure and phrasing of Article 5(a)(i) of the MRDA.  The U.S. Interests reverse the original order of the first and second arms of the licence grant.[13]  This represents a misreading (and, in effect, a re-drafting) of Article 5(a)(i).  The second arm of the License is not a discrete grant of rights, totally disconnected from the first arm, as the paraphrase offered by the U.S. Interests suggests.  By re-writing Article 5(a)(i), the U.S. Interests also misrepresent the role played by the key phrase "in connection with," as used by the drafters at the end of the second arm.[14]

### 2.    U.S. and EMEA Debtors Misuse the Factual Matrix

15.    The CCC agrees that an assessment of the factual matrix surrounding the creation of the MRDA is relevant to the interpretation of the agreement.[15]  However, there are important limits

---

[11] Emphasis added.

[12] It is significant that the second recital used the preposition "under" rather than stating that the Licensed Participants held "rights *in* the NN Technology."  This further confirms that the recital referred solely to the Licensed Participants' licence rights. See CCC's Closing Brief, para. 52 and the citation to *Insituform Technical Services v. Inliner UK*, [1992] R.P.C. 83 (Ch. D.) at 105 ("I do not agree that a licence is a right *in* a patent; it is a right *under* a patent") [emphasis added].

[13] See U.S. Interests' Post-Trial Brief, at pp. 28-29 [emphasis added]:

> "NNI's right to exploit was thus broad, *including* 'all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how as necessary or appropriate in connection therewith' *in addition to* 'rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for' the US."

This summary -- which misleadingly suggests that the second arm of the licence grant *precedes* the first arm -- self-servingly ignores the drafters' chosen structure.

[14] For a complete discussion of these issues, see Section D(1) below.

[15] See the CCC's Closing Brief, paras. 11 & 55-60.

to the *types* of evidence that qualify as evidence of the factual matrix, and restrictions on *how* such evidence can be used.[16]

16.     Evidence of subjective intention cannot form part of the factual matrix.[17]  For example, parties are not permitted to establish such "evidence" by relying on statements made during the negotiation and drafting process, nor by asking the court to draw conclusions from changes made to successive draft versions of the final agreement.[18]

17.     The U.S. Interests and EMEA Debtors acknowledge the prohibition on subjective intention evidence,[19] but then proceed to rely on it throughout their submissions.[20]  Several examples are noteworthy.

18.     *First*, the U.S. Interests and the EMEA Debtors rely on drafting changes allegedly introduced into the unfinished MRDA at the behest of Nortel tax counsel.[21]  Courts have consistently confirmed that evidence of this sort is inadmissible.[22]

---

[16] *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at paras. 57 & 58.

[17] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at paras. 54 & 59 ("[T]he…evidence..*sheds no light at all on the surrounding circumstances.*  It consisted only of *the subjective intentions* of the parties") [emphasis added]; *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 59; and *McLean v. McLean*, 2013 ONCA 788 at para. 54.

[18] *690981 Ontario Ltd. v. Look Communications Inc.*, 2011 ONSC 2494 at para. 29 ("The law *excludes from the admissible background circumstances, previous negotiations* of the parties *and their declarations of subjective intent*….") [emphasis added]; *York University v. Markicevic*, 2013 ONSC 378 at para. 57; and *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71.

[19] EMEA Debtors' Post-Hearing Submission, para. 379; U.S. Interests' Post-Trial Brief, p. 38; and U.S. Interests' Proposed Findings and Conclusions, para. 82 (Law).

[20] EMEA Debtors' Post-Hearing Submission, paras. 107, 124-134 (esp. 130-131), 383 & 393-396; U.S. Interests' Post-Trial Brief, pp. 38 & 43-46; and U.S. Interests' Proposed Findings and Conclusions, paras. 233-234, 247, 251 & 252-263 (Fact). Undermining their own position in this regard, the EMEA Debtors acknowledge *both* (i) that direct evidence of the parties' negotiations is *only* considered if the contract is found to be "ambiguous," and (ii) that the MRDA is *not* ambiguous (see EMEA Debtors' Post-Hearing Submission, paras. 383, 391 & 394.)

[21] EMEA Debtors' Post-Hearing Submission, paras. 130-131; U.S. Interests' Post-Trial Brief, pp. 45-46; and U.S. Interests' Proposed Findings and Conclusions, para. 263 (Fact).

[22] *York University v. Markicevic*, 2013 ONSC 378 at para. 50 ("The *circumstances surrounding* the making of the [contract] *do not include either party's own reasons for wanting a particular clause or form of words used in a document* or any particular subject addressed by it, *nor does it include evidence of what may have been said in negotiations or draft agreements*….") [emphasis added]; and *Indian Molybdenum Ltd. v. The King*, [1951] 3 D.L.R. 497 (S.C.C.) at 502.

19.    *Second*, the U.S. Interests rely heavily on witnesses' subjective understandings of the meaning of the MRDA's terms and the purpose of the agreement.  For instance, the U.S. Interests rely on the evidence of Mark Weisz, John Doolittle, Michael Orlando, and Kerry Stephens regarding what they "understood" terms of the MRDA to mean, including the nature of the interests held by the Licensed Participants and the scope of the Licenses.[23]  In one striking example, the U.S. Interests quote Mr. Weisz's statements about what he thought the parties intended and what he understood the agreement to mean: "[f]rom an economic perspective, the MRDA parties intended that each… would exclusively own the rights to fully exploit technology in their exclusive territories"; "I did not understand the scope of the exclusive licenses… to be limited in any way other than with respect to the geographic territory."[24]  The U.S. Interests also rely on Mr. Weisz's characterization of the purpose of the MRDA, which, according to Mr. Weisz was to "contractualize" the parties' pre-existing arrangement "that all the Participants had full economic rights and benefits to exploit Nortel technology in the[ir] country of incorporation."[25]

20.    Courts have consistently confirmed that this sort of evidence is inadmissible.[26]  As Justice Newbould commented during the trial on several occasions, witnesses' subjective understandings of the MRDA are not helpful: "most of what the witnesses' views of what this

---

[23] U.S. Interests' Proposed Findings and Conclusions, paras. 252-263 (Fact).

[24] Declaration of Mark Weisz sworn April 11, 2014, paras. 3, 10, 12, 14 (TR00028), cited in U.S. Interests' Proposed Findings and Conclusions, para. 252 (Fact).

[25] Trial Testimony of Mark Weisz, May 28, 2014, 1848:3-1849:2 and Declaration of Mark Weisz, paras. 3, 10, 12-14 (TR00028), cited in the U.S. Interests' Proposed Findings and Conclusions, para. 258 (Fact).

[26] *Drosophilinks Consulting Inc. v. Canadian National Railway Co.,* 2010 ONSC 3576  at para. 33 ("CN also relies on *the evidence of Mr. Longo who negotiated and signed the agreement on behalf of CN* as to what he believed the clause to mean, but *this evidence of subjective intent is not admissible*"), *leave to appeal refused,* 2010 ONSC 5156 (Div. Ct.); *4345142 Ont. Inc. v. Access Self Storage Inc.,* [2008] O.J. No. 2752 (S.C.J.) at para. 31 ("[Counsel] has objected to statements *made by an officer of the Purchaser*, purporting to give *evidence of the intention of the parties*. I have given *no consideration* to this evidence"); and *EdperBrascan Corp. v. 117373 Canada Ltd.*, [2000] O.J. No. 4012 (S.C.J.) at para. 20, *affirmed,* [2002] O.J. No. 759 (C.A.), *appeal abandoned,* [2002] S.C.C.A. No. 184 [emphasis added].

agreement means or doesn't mean, I have expressed it before, is not very helpful"[27] and "[w]e all know the value of an affidavit that says 'my understanding is'."[28]

21.      *Third*, statements made by Nortel representatives to various tax authorities before, during and after the execution of the MRDA are similarly inadmissible and do not form part of the factual matrix.  The statements relied upon by the U.S. Interests and the EMEA Debtors[29] are nothing more than representations made by various individuals about the proposed contract, and do not provide objective evidence concerning the "negotiation and execution" of the MRDA.[30] In any event, the tax authorities ultimately received the MRDA, once it was executed, and therefore had recourse (as do these Courts) to the actual language of the agreement.

22.      The U.S. Interests are only able to cite a single authority supporting the admission of such evidence, *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*,[31] and it is entirely distinguishable.  *Primo* involved the 2012 interpretation of a 1988 trust deed which had been judicially varied in 1997/1998.  The variation had received judicial approval only after the parties seeking the variation had first received a favourable ruling from the Canadian tax authorities regarding the ramifications of that variation.  Thus, in contrast to this case, the Court of Appeal in *Primo* was considering (i) the interpretation of *a trust deed* and not a commercial contract, as well as (ii) the interpretation of a historical amendment which itself had been the subject of *judicial supervision and approval*, (iii) both of which occurred in circumstances where

---

[27] Trial Testimony of Aylwyn Kersey Stephens, May 27, 2014, 1792:10-1793:6.

[28] Trial Testimony of Philippe Albert-Lebrun, May 21, 2014, 1514:4-1514:23. See also: Trial Testimony of Sharon Hamilton, May 15, 2014, 888:2-891:12, 967:23-968:7 and 983:13-986:14; Trial Testimony of Michael Orlando, May 21, 2014, 1275:18-1276:21; Trial Testimony of Angela Anderson, May 29, 2014, 2210:11-2211:23; Trial Testimony of Mark Berenblut, June 16, 2014, 3676:13-3680:3 and 3720:7-3723:15.

[29] EMEA Debtors' Post-Hearing Submission, paras. 445-446; U.S. Interests' Post-Trial Brief, pp. 23-24 & 49-56; and U.S. Interests' Proposed Findings and Conclusions, paras. 264-274 (Fact) and paras. 84, 92, 93 & 115 (Law).

[30] Furthermore, to the extent that such evidence *post-dates* the execution of the MRDA, it is not properly introduced as evidence of the factual matrix.  See the discussion of this issue at Section B, below.

[31] 2012 ONCA 862.

the amendment itself had been *predicated on a favourable ruling of the CRA*.  On these facts, the Court of Appeal viewed the 1997 CRA ruling and related correspondence as part of the "factual matrix" which provided *objective* evidence of the circumstances surrounding the judicially approved variation.   In contrast, the U.S. Interests and the EMEA Debtors seek to use correspondence with the tax authorities as evidence of the parties' *subjective* intent regarding the meaning of the MRDA.

23.     *Fourth*, the so-called "custom and usage" evidence of Daniel Bereskin, an expert for the U.S. Debtors not called at trial, is not part of the factual matrix.[32]  Mr. Bereskin is a full-time intellectual property lawyer whose mandate was to address how a "sophisticated business person" would understand the scope of the Licenses.[33]  Even if Mr. Bereskin were qualified to give that evidence (which he is not),[34] it is inadmissible.  The meaning of the MRDA is a question for the Courts and Mr. Bereskin's understanding (whether as a lawyer, an associate of business persons or otherwise) is of no assistance.

24.     *Fifth*, the evidence of Nortel's "business practices," such as litigation and licensing, is not part of the factual matrix.[35]  The evidence does not form part of the background of the MRDA, its genesis or its purpose.

---

[32] U.S. Interests' Post-Trial Brief, pp.  62-63; and U.S. Interests' Proposed Findings and Conclusions, paras. 287-293 (Fact) and paras. 85-86 (Law).

[33] This proposed use of Mr. Bereskin's "expert" evidence closely resembles the proposed use which was rejected by Newbould J. in *Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc.*, 2013 ONSC 1300 at para. 67.

[34] The only opinion Mr. Bereskin is capable of giving is that of a lawyer whose sole occupation for the last 50 years has been the practice of law in the area of intellectual property. Mr. Bereskin conceded throughout his deposition that he could not distinguish between his opinion as a lawyer and his opinion as a "sophisticated business person" reading the MRDA: see Deposition Testimony of Daniel Bereskin, March 27, 2014, 18:19-19:9, 20:6-20:19, 59:22-60:11, 60:16-61:13, 63:12-65:10, 66:7-66:11; 100:8-101:21. It is clear from his report and deposition that Mr. Bereskin based his opinion on a legal interpretation and not on any customs and practices unique to the intellectual property community: see Deposition Testimony of Daniel Bereskin, March 27, 2014, 17:19-58:9. Indeed, by his own admission, Mr. Bereskin did not set out the relevant "customs and practices" in his report, but simply "looked at the MRDA and… expressed what [he] believe[d] an experienced business person would take from that": see Deposition Testimony of Daniel Bereskin, March 27, 2014, 24:18-24:23.

[35] U.S. Interests' Proposed Findings and Conclusions, para. 275-286 (Fact).

- 10 -

25.     Even if the evidence relied upon by the U.S. Interests and the EMEA Debtors was admissible as part of the factual matrix (which it is not), it does not support their proposed interpretations of the MRDA.

26.     For instance, witnesses such as Messrs. Weisz, Doolittle, Orlando and Stephens all testified about their "understanding" of the rights held by the Licensed Participants in the context of Nortel operating as a going concern (i.e., while the Participants were making and exploiting Products).  Their understandings have no relevance to the allocation questions before these Court regarding the value of the Licenses surrendered in connection with the Sales after Nortel filed for insolvency and ceased operating as a going concern.

27.     Nor is the Horst Frisch Report, the transfer pricing functional analyses or indirect evidence regarding such analyses of assistance to these Courts.  These reports simply contain references to the terms of the CSAs and the MRDA, which are the governing legal documents that the Courts must interpret.  The manner in which the authors of these reports described the parties' contractual arrangements should not influence the legal interpretation of the parties' written agreement.  In any event, the reports characterize the parties' arrangement *from an economic standpoint* in the context in which Nortel was operating, while the Licensed Participants were making and exploiting Products.[36]  They offer no assistance to the Courts in determining the proper scope of legal rights in the context of insolvency.

28.     Similarly, the evidence regarding Nortel's patent litigation and licensing relied upon by the U.S. Interests is equivocal at best and does not support the U.S. Interests' reading of the

---

[36] For instance, the Horst Frisch Report states, in reference to the CSAs, that "[u]nder the arrangement, each cost sharing participant had the *right to use* the intangible property developed pursuant to the R&D cost sharing arrangement in its respective market. *From an economic standpoint*, each R&D cost sharing participant could be considered to *'own'* the NT technology as it related to its specific region" [emphasis added]. See Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch dated March 14, 2002, p. 10 (TR11055B).

MRDA.  NNL and NNI were almost invariably named as co-plaintiffs in U.S. patent litigation. NNL was stated to be the owner of the U.S. patents in question and together with NNI, was alleged to have suffered damages.  This is inconsistent with the U.S. Interests' position.[37] Similarly, the licensors in the third-party license agreements on which the U.S. Interests rely were either (i) *NNL* and NNI (in which case NNL was stated to be the "owner" of the licensed U.S. patents)[38] or (ii) *NNL* on its own behalf and on behalf of its Subsidiaries.[39]  If NNI had ownership or "all substantial rights" to all Nortel U.S. patents, as the U.S. Interests contend, there would have been no need for NNL to be party to the license agreements.  Further, there is at least one license agreement[40] in which NNL granted a world-wide intellectual property license to a third party, which cannot be reconciled with the U.S. Interests' position.

## B.    Misuse of Post-Contractual Evidence

29.    The U.S. Interests and the EMEA Debtors rely on various statements, conduct and events *subsequent* to the execution of the MRDA in 2004 in an attempt to broaden the rights prescribed by the language of the agreement.[41]  This "post-contractual evidence" is inadmissible, irrelevant and, in any event, does not support their positions.[42]

---

[37] See Monitor and Canadian Debtors' Initial Post Trial Brief (Allocation), paras. 359-364.

[38] See ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (TR48848); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (TR48927);  and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (TR48849), all cited in U.S. Interests' Proposed Findings and Conclusions, para. 284 (Fact).

[39] See ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (TR48885); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (TR48840) and ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (TR48865).

[40] See Patent License Agreement with ADC Telecommunications, Inc. dated June 14, 2000 (TR21621).

[41] EMEA Debtors' Post-Hearing Submission, paras. 135-157, 158-164, 383, 393 & 412-413; U.S. Interests' Post-Trial Brief, pp. 26, 46-47, 52-56, 61- 62 & 66-68; and U.S. Interests' Proposed Findings and Conclusions, paras, 226-230, 248, 266-274, 275-286 & 300-314 (Fact) and paras. 65-66, 94 & 114 (Law).

[42] See the CCC's Closing Brief, paras. 11 & 55-60.

- 12 -

## 1.   Post-Contractual Evidence Not Admissible

30.     In the absence of ambiguity in the contract, post-contractual evidence is *not* admissible,[43] a fact acknowledged by the EMEA Debtors.[44]

31.     The MRDA is not ambiguous for the reasons set out in the CCC's Closing Brief and Findings of Fact and Conclusions of Law.  The threshold for a finding of true "ambiguity" is a stringent one,[45] and the necessary prerequisites are not satisfied here.

32.     Nor is the post-contractual evidence part of the factual matrix.  Factual matrix evidence must, by definition, *pre-date* the execution of the relevant agreement.  As the Ontario Court of Appeal has stated, "[t]he court's search for the intention of the parties may be aided by reference to the surrounding circumstances or factual matrix *at the time of the negotiation and execution of the contract*…"[46]

33.     To paraphrase Justice Newbould in *Thomas Cook Canada Inc. v. Skyservice Airlines Inc.*, in the absence of an ambiguity, any evidence relating to "what happened after the [MRDA] took place cannot be considered part of the factual matrix…"[47]

---

[43] *Arthur Andersen Inc. v. Toronto-Dominion Bank*, [1994] O.J. No. 427  (C.A.), *leave to appeal refused* [1994] S.C.C.A. No. 189, at para. 18 ("*First*, the words of the contract must be analyzed 'in its factual matrix', and a conclusion arrived at that there are two possible interpretations of the contract. *Then, and only then, may the trial judge look at* other facts, including… *evidence of subsequent conduct of the parties* to the agreement") [emphasis added]; and *Oceanic Exploration Co. v. Denison Mines Ltd*., [1999] O.J. No. 4813 (C.A.) at para. 45.

[44] EMEA Debtors' Post-Hearing Submission, paras. 364, 383 & 391-393.

[45] The mere fact that the parties themselves "place different interpretations on the contract…does not render it ambiguous" (see *Barton v. Toronto Argonaut Football Club Ltd.*, [1978] O.J. No. 2721 (H.C.J.) at para. 35, *affirmed* (1979), 27 O.R. (2d) 734 (C.A.), *affirmed* [1982] 1 S.C.R. 666).  Ambiguity will *only* be found to exist if -- after all textual and contextual evidence has been fully assessed -- "there remain two reasonable alternative interpretations."   (See *Montreal Trust Co of Canada. v. Birmingham Lodge Ltd.*,[1995] O.J. No. 1609 (C.A.) at para. 22, quoting *Canadian National Railways v. Canadian Pacific Ltd.*, [1978] B.C.J. No. 1298 (C.A.) at para. 82, *affirmed* [1979] 2 S.C.R. 668; and *Chippewas of Mnjikaning First Nation v. Ontario (Minister of Native Affairs)*, 2010 ONCA 47, *leave to appeal refused*, [2010] S.C.C.A. No. 91, at para. 162.)

[46] *Coventree Inc. v. Lloyd's Syndicate 1221 (Millennium Syndicate)*, 2012 ONCA 341 at para. 17, *leave to appeal refused*, [2012] S.C.C.A. No. 276 [emphasis added].  See also *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 58.

[47] *Thomas Cook Canada Inc. v. Skyservice Airlines Inc.*, 2011 ONSC 5756 at para. 24 ("*What happened after* the Amalgamation Agreement took place *cannot be considered part of the factual matrix* and *would only be admissible if there were an ambiguity*") [emphasis added].

34.     In an attempt to circumvent this rule, the U.S. Interests assert that, because the MRDA was amended several times between 2004 and 2008, *all* extrinsic evidence arising during this *entire* period is part of the factual matrix, and, as such, may be considered when construing *every* provision of the agreement.[48]  This is wrong in law.  In construing the *original* language of the MRDA, the Courts may consider factual matrix evidence pre-dating the execution of the agreement in 2004.  In construing the meaning of a given *amendment*, the Courts may consider factual matrix evidence surrounding the introduction of *that particular amendment*.[49]  The fact that certain provisions of the MRDA were amended during the 2004-2008 period does not sweep in, under the guise of "the factual matrix," evidence having nothing to do with the negotiation, drafting or execution of the original contract.

35.     Even if the evidence were admissible (which it is not), it does not advance the positions of the U.S. Interests and the EMEA Debtors.  For instance, the December 2008 Memorandum of Understanding expressly states that it "creates no liability or obligations or rights among the parties thereto" and in no way displaces the operative terms of the MRDA, which govern.[50]  Similarly, transfer pricing reports that post-date the MRDA simply characterize the nature of the interests held by the Licensed Participants from a tax and economic perspective during ordinary-course operations.[51]  They neither modify nor override the terms of the MRDA, which must be construed according to the actual language used by the parties.

---

[48] U.S. Interests' Proposed Findings and Conclusions, para. 88 (Law).

[49] *690981 Ontario Ltd. v. Look Communications Inc.*, 2011 ONSC 2494 at paras. 5-6; and *Molson Canada 2005 v. Miller Brewing Co.*, 2013 ONSC 2758 at paras. 62, 66, 70, 73, 116 & 120.

[50] Memorandum of Understanding dated December 31, 2008 (TR11393).

[51] See *e.g.* evidence referred to in U.S. Interests' Proposed Findings and Conclusions, para. 266 (Fact).

### 2.    Post-Contractual Evidence Cannot Establish an Estoppel

36.    The U.S. Interests and the EMEA Debtors argue that, regardless of the parties' agreement in the MRDA, post-contractual evidence estops the Monitor from asserting its position.[52]  These arguments, whether predicated on estoppel by convention or estoppel by representation, should be rejected.  The CCC adopts the position of the Monitor on this issue and adds the following.[53]

37.    *First*, it is significant that these forms of estoppel were not set out in the Core Parties' Allocation Positions or Responding Allocation Positions.[54]  "The law is now clear that estoppel must be pleaded if it is to be relied upon... and the facts relied upon as establishing it must be specifically alleged."[55]

38.    *Second*, the U.S. Interests and the EMEA Debtors rely on statements allegedly made to third parties, not to themselves.[56]  This is fatal to their position.  Statements to third parties do not ground estoppel by representation[57] or estoppel by convention.[58]

39.    *Third*, contrary to the EMEA Debtors' position, no estoppel is created by "statements in the MRDA."[59]  Estoppel by convention cannot be founded "upon operative words in a contract",

---

[52] U.S. Interests' Post-Trial Brief, pp. 73-74; U.S. Interests' Proposed Findings and Conclusions, paras. 96-100 (Law); and EMEA Debtors' Post-Hearing Submission, paras. 365-370.

[53] See the CCC's Closing Brief, paras. 91-92.

[54] The EMEA Debtors made passing allusion to *proprietary estoppel* (see Allocation Position, paras. 67-68), which the U.S. Interests properly noted was "without merit" (see Allocation Response, p. 27).  The U.S. Interests also made reference (albeit not by name) to *judicial estoppel*, which they argued precluded the Monitor from disavowing "prior representations [made] to these Courts" (see U.S. Interests' Pre-Trial Brief, p. 10).

[55] *Collier v. Moncton Kinsmen House Inc.*, 2002 NBQB 96 at para. 23 (and para. 24), quoting Williston & Rolls, *The Law of Civil Procedure* at pp. 703-704.  See also *Famous Players Canadian Corp. v. J.J. Turner and Sons Ltd.*, [1948] O.J. No. 69 (H.C.J.) at para. 8; and *Confederation Treasury Services Ltd. v. Hees International Bancorp Inc.* [1997] O.J. No. 351 (Gen. Div.) at para. 63, *affirmed*, [1998] O.J. No. 4734 (C.A.).

[56] See, for example, references made to "Nortel's representations to tax authorities" (EMEA Debtors' Post-Hearing Submission, para. 368); reference to the testimony of "a lead lawyer for the Canadian Debtors... before the House of Commons" (U.S. Interests' Proposed Findings and Conclusions, para. 97 (Law)); and references to the "18 separate reports" filed with the Courts by the Monitor (U.S. Interests' Proposed Findings and Conclusions, para. 97 (Law)).

[57] *Scotsburn Co-op. Services Ltd. v. WT Goodwin Ltd.*, [1985] 1 S.C.R. 54 at p. 66 [emphasis added].

[58] *Ryan v. Moore*, [2005] 2 S.C.R. 53 at para. 62.

[59] EMEA Debtors' Post-Hearing Submission, para 368.

which words "bind the parties, if they bind them at all, by creating or evidencing contractual obligations."[60]

40.    *Fourth*, there is no evidence of a "clear and unequivocal" representation that could be said to ground estoppel by representation,[61] and no evidence of a common assumption possessing both "clarity and certainty" that could be said to ground estoppel by convention.[62]    Many of the alleged statements relied upon are too ambiguous to be reliable.[63]    Other alleged representations are contradicted by other evidence.    For example, there exist numerous post-MRDA filings that identified NNL as the "owner" of the NN Technology, including the U.S. Debtors' own representation to the Courts (*i.e.*, "[w]ithin the Nortel Group, *NNL is the owner* of the vast majority of Nortel's intellectual property assets.")[64]    Similarly, the IFSA relied on by the U.S. Interests to support their estoppel argument[65] stated that the agreement would not impact the Nortel Debtors' ownership rights, nor "serve as the basis for any claim… in respect of… allocation of any sale proceeds."[66]

41.    *Fifth*, the representations and agreements relied upon by the U.S. Interests and the EMEA Debtors, even if made, did not involve representations or assumptions of *existing fact or law*. The law is clear that representations or common assumptions regarding *in futuro* events or

---

[60] *Ryan v. Moore*, 2003 NLCA 19 at para. 70, *reversed on other grounds*, [2005] 2 S.C.R. 53, *citing* Spencer Bower & Turner, *The Law Relating to Estoppel by Representation*, 3rd ed.  See also *Canadian Superior Oil Ltd. v. Murdoch*, [1969] A.J. No. 74 (C.A.) at para. 15, *affirmed* (1969), 6 D.L.R. (3d) 464 (S.C.C.).

[61] *Jencan Ltd. v. Canada (M.N.R.)*, [1997] F.C.J. No. 876 (C.A.) at para. 47; and *White v. Halifax Pension Committee*, 2007 NSCA 22 at para. 79.

[62] *Ryan v. Moore*, [2005] 2 S.C.R. 53 at paras. 61 & 63.

[63] For example, the EMEA Debtors refer vaguely to "the division of the fruits of ownership in various transactions" as a basis for imposing an estoppel (see EMEA Debtors' Post-Hearing Submission, para. 368); and the U.S. Interests complain that "the Monitor never informed either the U.S. Debtors or the EMEA Debtors that Nortel's patents were not subject to licenses" (see U.S. Interests' Proposed Findings and Conclusions, para. 97 (Law)).

[64] CCC's Closing Brief, paras. 9 & 60 [emphasis added].

[65] U.S. Interests' Proposed Findings and Conclusions, para. 97 (Law).

[66] Likewise, the LTAs on which the U.S. Interests also rely expressly terminated (rather than transferred) the Licensed Participants' Licences, despite transferring *other* types of contracts to the purchasers (see CCC's Closing Brief, para. 91, 96-97 & 108).

arrangements – *e.g.,* the right of the Licensed Participants to participate as "owners" in the proceeds of any hypothetical *future sale* of the NN Technology[67] – are incapable of grounding either estoppel by representation[68] or estoppel by convention.[69]

42.      *Sixth*, the U.S. Interests and the EMEA Debtors have not suffered any "detriment" through their reliance on the alleged representations and assumptions.[70]  Neither (i) the R&D spending made by the Licensed Participants as members of the Nortel group, for which they received compensation in the form of RPSM payments,[71] nor (ii) the decision to pursue the Sales rather than the IP Co. model,[72] is capable of grounding an estoppel claim.[73]

43.      *Seventh*, even if these estoppel arguments are valid (which is denied), they cannot be used to restrict the positions asserted by the CCC in the current proceedings.  The CCC was not a party to the conduct or the representations allegedly relied on by the U.S. Interests and the EMEA Debtors.[74]  "[E]stoppel can have no application to a stranger.  There is a maxim that

---

[67] For example, the EMEA Debtors identify – as an alleged representation or common understanding – the proposition that "the RPEs would share in the proceeds from any sale of the jointly created IP" (see Post-Hearing Submission, para. 368).   In contrast, while the U.S. Interests do not identify the common assumption which they assert gave rise to estoppel by convention, their position would appear to be the same (see U.S. Interests' Post-Trial Brief, pp. 73-74; and U.S. Interests' Proposed Findings and Conclusions, paras. 96-100 (Law)).

[68] *Clarke's-Gamble of Canada Ltd. v. Grant Park Plaza Ltd.*, [1967] S.C.R. 614 at pp. 626-627; and *Country Meadow Estates (No. 2) Inc. v. Citibank Canada,* [1994] O.J. No. 1835 (Gen. Div.) at para. 32.

[69] *Vancouver City Savings Credit Union v. Norenger Development (Canada) Inc.*, 2002 BCSC 934 at para. 75; *3163083 Canada Ltd. v. St. John's*, 2004 NLCA 42 at para. 32; and *Scottish & Newcastle Plc v Lancashire Mortgage Corp. Ltd* [2007] EWCA Civ 684 at paras. 62-64.

[70] For estoppel by representation, see *Scotsburn Co-operative Services Ltd. v. WT Goodwin Ltd.*, [1985] 1 S.C.R. 54 at p. 66; and for estoppel by convention, see *Ryan v. Moore*, [2005] 2 S.C.R. 53 at para. 59.

[71] EMEA Debtors' Post-Hearing Submission, para. 369.  This is not a valid example of detrimental reliance, as the Licensed Participants were, in any event, required to incur these R&D investment expenses under the MRDA.  There is no evidence that they could have entered into any *other* form of contractual arrangement with NNL which would have granted them rights relating to the NN Technology. Furthermore, and in any event, the Licensed Participants were compensated for their R&D spending through royalty-free licenses from NNL and the RPSM, as discussed below.

[72] U.S. Interests' Proposed Findings and Conclusions, paras. 449 & 535 (Facts) and para. 98 (Law).  Again, this is not a valid example of detrimental reliance, as the IP Co. proposal did not progress to the point where the allocation of the revenues from it was discussed in any detail.  Furthermore, the evidence is that the Licensed Participants would have received *fewer proceeds* from IP Co. than from the Sales (see CCC's Closing Brief, paras. 126-128).

[73] *32262 B.C. Ltd. v. Companions Restaurants Inc.*, [1995] B.C.J. No. 342 (S.C.) at paras. 22-27; and *Canacemal Investment Inc. v. PCI Realty Corp.*, [1999] B.C.J. No. 2029 (S.C.) at paras. 33-34 & 38-42.

[74] U.S. Interests' Proposed Findings and Conclusions, para. 97 (Law); and EMEA Debtors' Post-Hearing Submission, para. 368.

'estoppels ought to be mutual,' and ancillary to that maxim is the concept that a stranger can neither take advantage of nor be bound by [such estoppels]."[75]

## C.    The Parties' Interests with Respect to NN Technology

44.    The Licensed Participants *never* possessed beneficial or equitable ownership of the NN Technology.[76]  Their interests consisted of contractual Licences "under" the NN Technology owned by NNL.[77]  Those Licences, granted by NNL, were at all times limited by the terms of the MRDA, including the Field of Use specified in Article 5(a).

### 1.    Licensed Participants Held No Ownership Interest in the NN Technology

45.    Contrary to the U.S. Interests' position,[78] a licensee's rights (whether described as "equitable," "beneficial" or otherwise) do *not* include any proprietary interest in the underlying property.  This point is confirmed by the language of the MRDA itself.[79]

46.    The U.S. Interests' rely – at three separate junctures[80] – on a passage from a (dissenting) judgment of a former Chief Justice of the Canadian Federal Court of Appeal.  In that passage,

---

[75] *Winnipeg Police Assn. v. Winnipeg (City),* [1980] M.J. No. 147 (C.A.) at para. 38 (and para. 39).  See also *London Loan & Savings Co. of Canada v. Osborn*, [1928] S.C.R. 451 at p. 456; and *Ryan v. Moore*, [2005] 2 S.C.R. 53 at para. 59.

[76] In the alternative, to the extent that the Licensed Participants ever received beneficial ownership interests in the NN Technology in their capacity as employers of individual inventors (which is *not* conceded), those rights immediately thereafter were transferred from the Licensed Participants to NNL pursuant to Article 4(a) of the MRDA, as discussed below.

[77] See the CCC's Closing Brief, paras. 40-48, 51-54, 63-76 & 85.

[78] See U.S. Interests' Post-Trial Brief, pp. 9, 21, 24-32, 37, 43-47, 61-63 & 122; and U.S. Interests' Proposed Findings and Conclusions, paras. 147, 185-186, 236, 254, 257, 260 & 290 (Fact) and paras. 61-67 (Law).  See also EMEA Debtors' Post-Hearing Submission, paras 77-78, 380, 397-398, 413 & 415-416.

[79] As discussed above, the language of the second recital – referring to the Licensed Participants' "equitable and beneficial ownership *of certain exclusive rights* under NN Technology *for a Specified Territory*" – clearly refers to the Licensed Participants' "ownership" of contractual rights in the Licences, and not to any genuinely proprietary rights in the NN Technology itself [emphasis added].

[80] U.S. Interests' Proposed Findings and Conclusions, paras. 33, 49 & 120 (Law).

Chief Justice Jackett states that an exclusive licensee has "an exclusive right in the property (carved out of the patentee's full ownership rights)."[81]

47.     Justice Jackett's *dicta* does not stand for the proposition that an exclusive licensee enjoys a proprietary interest in the underlying intellectual property.   His reference to an exclusive licensee's right "in the property" must be understood as a reference to the exclusive licensee's contractual rights to *use* the property (under the licence).[82]

48.     The proposition that an exclusive licensee holds a proprietary interest *in* the licensed property has been definitively and repeatedly *rejected* by the Supreme Court of Canada, both before and after Chief Justice Jackett's *dicta* in *American Cyanamid Co. v. Novopharm Ltd*.   As the Supreme Court of Canada stated in *Domco Industries v. Armstrong Cork*:

> Armstrong sought to *distinguish an exclusive licence from a non-exclusive licence on the basis that the former was a grant of a part of the monopoly and that such a licensee was practically an assignee of the patent for the term of the licence with all the beneficial rights of the patentee*. It is *difficult to reconcile this reasoning* with what was said in *Heap v. Hartley* [(1889), 42 Ch.D. 461 (U.K.C.A.)] (applied by this Court in [*Electric Chain Co. of Canada v. Art Metal Works Inc.*, [1933] S.C.R. 581]) in the passage which I have already quoted. *I repeat from that passage the following portion which is apt in relation to Armstrong's submission*:
>
> > Now he puts his case in a two-fold manner. He says: 'In the first place, *as exclusive licensee, I am in the position of an assign of the letters patent for that district and for that term, and as an assign of letters patent, I have a right to restrain any person who is infringing within the district*.' That argument appears to be based on *an entire error with regard to the nature of a license*. *An exclusive license is only* a license in one sense; that is to say, the true nature of an exclusive license is this. It is *a leave to do a thing*, and a contract not to give leave to anybody else to do the same thing. *But it confers like any other license, no interest or property in the thing*.[83]

---

[81] See *American Cyanamid Co. v. Novopharm Ltd.*, [1972] F.C.J. No. 61 (C.A.) at para. 21, where Jackett C.J. (in dissent) was purporting to distinguish between the rights of exclusive licensees and non-exclusive licensees.  That the Chief Justice was *dissenting* from the other members of the panel in this passage was subsequently confirmed by the Supreme Court of Canada in *Domco Industries Ltd. v. Armstrong Cork Canada Ltd.*, [1982] 1 S.C.R. 907 at p. 915.

[82] Alternatively, this dissenting *dicta* represents a misstatement of the law, as confirmed by the subsequent and more authoritative ruling in *Domco Industries Ltd. v. Armstrong Cork Canada Ltd.*, [1982] 1 S.C.R. 907, discussed immediately *infra*.

[83] *Domco Industries Ltd. v. Armstrong Cork Canada Ltd.*, [1982] 1 S.C.R. 907 at p. 918 [emphasis added].

49.     In a recent bankruptcy proceeding, addressing the rights of an exclusive licensee of intellectual property, Justice Morawetz observed:

> At best, Herbal Care had *an exclusive licence to use the PF Free technology*.  However, even if established, *a licence agreement only creates a contractual agreement* as between the parties.  Even if the grant to Herbal Care to market and sell were construed as a traditional licence, *it is not the case that Herbal Care acquired a property interest in such a right*. …[84]

50.     Accordingly, the Licensed Participants' held no proprietary interest ("equitable", "beneficial" or otherwise) in the NN Technology, which was owned by NNL.

### 2.     EMEA Beneficial Ownership Theory Should be Rejected

51.     In their Post-Hearing Submission, the EMEA Debtors raise, for the first time, a new argument in an attempt to establish that beneficial ownership of the NN Technology rested with the Licensed Participants.  Previously, they had argued that, pursuant to the MRDA and/or the doctrines of constructive or resulting trust, each Licensed Participant beneficially owned the patents invented by its employees, and that NNL was merely a nominal legal owner of the NN Technology.

52.     Now, after the trial is complete, the EMEA Debtors attempt to change their position entirely.  They argue that, under Canadian common law principles, the Licensed Participants received beneficial title (and only beneficial title) to the NN Technology, as a result of their status as employers of the individual inventors.  They contend that Nortel inventors were only capable of assigning to NNL legal title to their inventions because the beneficial title rested at all times with the Licensed Participants and was never transferred to NNL.[85]

---

[84] *Royal Bank of Canada v. Body Blue Inc.*, [2008] O.J. No. 1628 (S.C.J.) at para. 15 [emphasis added].  See also *Re T. Eaton Co.*, [1999] O.J. No. 4216 (S.C.J.) at para. 12 ("The true nature of *an (exclusive) licence … confers no interest or property in the thing*") [emphasis added]; *Merck & Co. v. Apotex Inc.*, 2010 FC 1265 at para. 49, *affirmed* 2011 FCA 363, *leave to appeal dismissed*, [2012] S.C.C.A. No. 82; and *Apotex Inc. v. Sanofi-Aventis*, 2011 FC 1486 at para. 35, *reversed on other grounds*, 2013 FCA 186.

[85] EMEA Debtors' Post-Hearing Submission, paras. 8, 71, 74-75, 344, 353-360, 376-396 & 464-467.

53.     The EMEA Debtors' position should be rejected.  Not only was this argument never pleaded or advanced at trial, but it is internally incoherent and cannot be supported in law or fact.[86]

54.     *First*, the EMEA Debtors' new theory ignores the fact that Article 4(a) of the MRDA transferred to NNL *all* relevant ownership relating to the NN Technology created by any of the Participants.  To the extent that the Licensed Participants possessed an "equitable or beneficial ownership" *in* the NN Technology (which is not admitted), those rights passed in their entirety from the Licensed Participants to NNL under the terms of the MRDA.[87]  As the EMEA Debtors conceded in their application for administration in the U.K., "*all* intellectual property ('IP') *rights belong to NNL*, the Canadian company, *irrespective of which Group company originally carried out the research and development* activity that generated the IP."[88]

55.     *Second*, the EMEA Debtors rely exclusively on Canadian common law principles in support of their claim that beneficial ownership resided with the Licensed Participants, with only passing reference to the equivalent U.K. doctrine.[89]  This approach fails for several reasons:

(a)     Contrary to the EMEA Debtors' assertions, ownership of a given invention created by a particular employee is governed by the law which governed the employment relationship.[90]  The EMEA Debtors have not pleaded, let alone

---

[86] See the CCC's Closing Brief, para. 44.

[87] CCC's Closing Brief, paras. 7 & 40-48; and Monitor and Canadian Debtors' Initial Post-Trial Brief (Allocation), paras. 196-207, 267-270 & 287-317.

[88] Nortel Networks EMEA Companies' Report of Alan Robert Bloom et al. dated January 14, 2009, p. 6, para. 3.3 (TR31622) [emphasis added].

[89] The EMEA Debtors make bald reference to U.K. common law principles and to s. 39 of the U.K. *Patents Act, 1977*, but without meaningful discussion (see EMEA Debtors' Post-Hearing Submission, para. 356, footnote 500).

[90] The EMEA Debtors argue, without justification, that "ownership" arises "from invention, not from contract," and that, as a result, Ontario law should govern as Ontario was the "center of coordination and administration of the Nortel Group."  They also argue that "[b]ecause no party adduced evidence of foreign law…, the Canadian Court may presume that foreign law is consistent with Ontario law" (see EMEA Debtors' Post-Hearing Submission, paras. 345-347).  These submissions ignore the fundamental significance of each inventor's employment contract (as discussed below), and/or the applicable legislation (in the case of U.K.-based employees).  They further ignore the fact that, in the present hybrid proceeding, U.S. law is *not* properly characterized as "foreign law."  Further, in the U.S,. the question of whether contractual language in an employment agreement effects a present assignment of patent rights is resolved by U.S. Federal Circuit law. *Bd. of Trustees of the Leland Stanford Junior Univ. v. Roche*

proven, the substantive law of *each* jurisdiction where employees were employed or where they invented. It is noteworthy that the law of the two common law jurisdictions most closely resembling Canada – *i.e.*, the United States[91] and the United Kingdom[92] – have distinct principles governing the legal and/or beneficial ownership of employee inventions. The EMEA Debtors have failed to meet their onus of proving that a beneficial ownership interest (or only a beneficial ownership interest) in the NN Technology passed to the Licensed Participants by virtue of their employment relationship with individual employees. This is reason enough to reject the EMEA Debtors' new theory.

(b)    In any event, the EMEA Debtors' focus on "common law" principles is misguided, particularly in relation to the ownership rights of employees in the U.S.,[93] where a presumption of ownership are displaced by the terms of an express contractual arrangement (*e.g.*, an employment agreement).[94] Nortel's standard practice was to require employees to sign agreements assigning all of

---

*Molecular Sys., Inc.*, 583 F.3d 832, 841 (Fed.Cir.2009) aff'd, 131 S.Ct. 2188 (2011). Moreover, since this argument was raised, for the first time, by the EMEA Debtors themselves in their Post-Trial Submission, the onus of establishing applicable foreign law rests solely on *them*.

[91] The governing U.S. principles are both similar to, and different than, those applicable in Canada. As in Canada, employees will own their own employees, *unless* (1) their employment agreement provides otherwise, or (2) the individual is employed specifically to invent on behalf of the employer. *Unlike* in Canada, an employment agreement – which grants or assigns ownership of employees' inventions to an employer – transfers *both legal and beneficial title* to the employer. See *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S.Ct. 2188, 2195, 2196 (2011); *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 189 (1933); *Banks v. Unisys Corp.*, 228 F. 3d 1357, 1359 (Fed. Cir. 2000); and *Gellman v. Telular Corp.*, 449 F. App'x 941, 944 (Fed. Cir. 2011).

[92] Under U.K. law, the key doctrine emerges *neither* from the common law nor from the parties' agreement, but rather from ss. 39-43 of the *Patents Act, 1977*. Under this statutory regime, *both beneficial and legal title* of any employee invention will pass to the employer if the invention falls under s. 39 – *i.e.*, the invention must have arisen from the employee's normal duties or from the specific duties assigned to the employee, or in circumstances where the employee had a special obligation to further the employer's interests. Unlike in Canada (or the U.S.), this statutory regime *trumps* any inconsistent provisions in an employment contract. (See *Terrell on the Law of Patents*, 17th ed. (London: Sweet & Maxwell, 2011) at paras. 4-13 to 4-16; and *Halsbury's Laws of England*, 5th ed. (London: LexisNexis, 2008/2014), Vol, 79 ("Patents and Registered Designs"), at paras. 369-377).

[93] *Bd. of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 841–42 (Fed.Cir.2009) aff'd, 131 S.Ct. 2188, 2195, 2196 (2011); and *Banks v. Unisys Corp.*, 228 F. 3d 1357, 1359 (Fed. Cir. 2000). In Canada the common law rules are also displaced by an agreement in writing. See, *Comstock Canada v. Electec Ltd.*, [1991] F.C.J. No. 987 at p. 17 (QL) ("In Canada, *the law first looks, of course, to discover if the parties have concluded an objectively provable or reasonably inferred agreement* about inventions…."); and *Techform Products Ltd. v. Wolda*, [2000] O.J. No. 5676 (S.C.J.) at para. 13, *varied on other grounds* [2001] O.J. No. 3822 (C.A.), *leave to appeal refused*, [2001] S.C.C.A. No. 603 [emphasis added]. Agreements requiring an employee to assign patent rights are routinely enforced (see, *e.g.*, *Spotwave Wireless Inc. v. Bongfeldt,* [2005] O.J. No. 4530 (C.A.) at para. 2). This proposition is confirmed by the very authority relied upon by the EMEA Debtors (see *C.I. Covington Fund Inc. v. White*, [2000] O.J. No. 4589 at para. 38, *affirmed*, [2001] O.J. No. 3918 (Div. Ct.)).

[94] As noted above, under U.K. law, the governing principles emerge from the *Patents Act, 1977*, rather than from common law or from contract. See the authorities at footnote 92.

- 22 -

their rights in any inventions to one or more Nortel entities.[95]  The effect of these agreements in the U.S. was to transfer all of the rights in patents, not merely any beneficial interests.[96]  The EMEA Debtors not only rely erroneously on the common law, but they fail to address the governing contractual arrangements that *actually* dictated ownership in several key jurisdictions.[97]  This failure of the EMEA Debtors to factually support their sweeping assertions is fatal to their argument.

56.    *Fourth,* regardless of the legal effect of the relevant contractual or statutory provisions applicable in a given jurisdiction and applicable to a particular employment relationship, Nortel employees invariably assigned all right, title and interest in their inventions to NNL. To the extent that any interest passed from employees to a Licensed Participant, that interest was assigned to NNL under Article 4(a) of the MRDA.   The individual assignment agreements completed and/or confirmed the transfer process.

57.    *Fifth,* the EMEA Debtors' new argument cannot be accepted in light of its inconsistency with their primary position.  The EMEA Debtors rely on the cooperative and commingled nature of R&D at Nortel and assert that the Participants *shared* ownership of the "indivisible pool" of NN Technology *jointly,* by virtue of their R&D efforts.   However, they also allege that this

---

[95] This fact is explicitly acknowledged by the EMEA Debtors' Post-Hearing Submission, paras. 71 & 74.

[96] *Gellman v. Telular Corp.*, 449 F. App'x 941, 944 (Fed. Cir. 2011); *Bd. of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 841–42 (Fed.Cir.2009) aff'd, 131 S.Ct. 2188.

[97] Even had the EMEA Debtors fulfilled their obligation to these Courts – by attempting to substantiate their newly hatched arguments – the governing contracts do not support their assertions. Under many Nortel employment agreements, the employees assigned all of their rights in inventions to the "Employer" (which was defined in the agreement to include "any *affiliates* of the Employer *including without limitation Nortel Networks*"). This reference to "affiliates" -- as the identified assignee of the employee's rights -- clearly extended to NNL.  Thus, the employee fulfilled or confirmed this contractual obligation through his or her subsequent assignment to NNL. See, *inter alia,* Employment Agreement of Curtis Aaron Reilly, dated June 11, 2006 (TR48820); Employment Agreement of Srikanth Keesara, dated June 28, 2003 (TR48821); Employment Agreement of Matthew Chan, dated June 20, 2005 (TR48823); Employment Agreement of Quan Sizu Ta, dated November 10, 2003 (TR48824); Employment Agreement of Richard L. Olinde, dated May 8, 2008 (TR48825); and Employment Agreement of Paul E. Unbehagen Jr., dated August 23, 2006 (TR48826). Any assignment of rights to a Licensed Participant would be owned by NNL pursuant to Article 4(a) of the MRDA.

ownership interest arose from individual employment relationships and individual inventions.[98] Either the Participant who employs an inventor beneficially owns the technology or all Participants beneficially own Nortel's technology jointly. The EMEA Debtors cannot have it both ways. That it would be difficult or impossible to trace the inventorship process on this record as alleged by the EMEA Debtors is not an answer.

58.    *Sixth,* other factors are inconsistent with the EMEA Debtors' late-blooming claim that the Licensed Participants always possessed beneficial ownership of the NN Technology:

> (a)    NNL could only have granted the Licenses if NNL had full ownership of the NN Technology to begin with. The overwhelming evidence at trial was that the MRDA was the only source of NNL's rights to the intellectual property which NNL in turn licensed to the Licensed Participants on the terms set forth in Article 5(a).[99] The EMEA Debtors themselves argue that, under the CSAs, which formed the basis for the ownership and licensing provisions continued in the MRDA, each subsidiary obtained from NNL an "exclusive license to *all of Nortel's IP* in its operating territory".[100] Such a grant would be impossible without full ownership.

> (b)    If the EMEA Debtors' new theory were correct, there would be no need for a license from NNL on the terms set out in Article 5(a).[101] The Licensed Participants would already possess the necessary economic rights to exploit the NN Technology in their Exclusive Territories.[102]

> (c)    If the EMEA Debtors' new theory were correct, the Licensed Participants would have had to enter into cross-licenses, absent which each Participant could only

---

[98] EMEA Debtors' Post-Hearing Submission, paras. 344, 358-360 & 376-378. On this point, see: Expert Reply of Sheldon Burshtein, March 24, 2014, para. 106.

[99] See Trial Testimony of Michael Orlando, May 21, 2014, 1327:20-1328:4, 1328:14-19; Trial Testimony of Kerry Stephens, May 27, 2014, 1779:11-1780:3; Trial Testimony of Mark Weisz, May 28, 2014, 1890:19-1891:13; Trial Testimony of Philippe Albert-Lebrun, May 21, 2014, 1509:3-11, 1510:9-21, 1511:8-1512:5

[100] EMEA Debtors' Post-Hearing Submission, para. 84.

[101] Expert Reply of Sheldon Burshtein, March 24, 2014, para. 107.

[102] *Id.*

- 24 -

exploit the IP that it had invented. For instance, the EMEA Debtors' new theory does not explain how NNI could exploit *all* NN Technology in the U.S. market, including IP developed by inventors in the EMEA region or in Canada. Clearly, no cross-licenses were required because it was NNL that was the source of all rights in a given jurisdiction.

### 3.    There is No Resulting Trust

59.    Contrary to the EMEA Debtors' alternative position, NNL did not hold the NN Technology for the benefit of the Licensed Participants under a resulting trust.[103]

60.    It is correct that a wholly "gratuitous" transaction – *i.e.*, a transfer of property effected for "no consideration" or for "no value" – may raise a presumption of resulting trust.[104]  However, the EMEA Debtors are wrong in law when they argue that, in order to rebut an allegation of resulting trust, it is necessary to "establis[h] that *adequate consideration* was provided for the contribution."[105]  All that is required is that the transaction not have been "gratuitous" or made for merely "nominal" consideration. Beyond that, "[i]t is *not* the role of the court to weigh *the value of the consideration*, *only* to determine *if it exists*."[106]  As confirmed by the Ontario Superior Court:

> …The consideration *is not nominal*. … In my view, the transfer of the contested property and the matrimonial home property together on June 18, 1986, *was not gratuitous*. The transfer *was made for valuable consideration*. That being so, *the court need not enquire into the adequacy of the consideration* in relation to the value of the property.[107]

---

[103] See the CCC's Closing Brief, para. 90.

[104] *Pecore v. Pecore*, 2007 SCC 17 at paras. 20 & 24; *Kerr v. Baranow*, 2011 SCC 10 at para. 17;  *Wade v. Ukeni*, 2014 ONCA 99 at para. 4 ("[T]here was *no resulting trust, given…that there was consideration* provided for the transfer of the…property"); and *Hamilton v. Hamilton*, [1996] O.J. No. 2634 (C.A.) at para. 34 ("The presumption of a resulting trust is…rebuttable on a showing that the transfer to the titled party *was not gratuitous*") [emphasis added].

[105] EMEA Debtors' Post-Hearing Submission, para. 374 [emphasis added].  In support of this proposition, the EMEA Debtors cite two decisions which stand for a *different proposition* -- namely, that, in certain transactions, "consideration [may be] *so nominal* that in equity it should not stand in the way of the presumption of resulting trust" (see *Reddin v. Mills*, [1995] B.C.J. No. 352 (S.C.) at para. 109 and *Wong v. Wong-Koroluk*, [2009] B.C.J. No. 817 (S.C.) at para. 112 [emphasis added]).

[106] *Halagan v. Reifel*, 2001 BCCA 434 at para. 53, *quoting with approval* (see paras. 53, 60, 61 & 64) *from the judgment below*, [1998] B.C.J. No. 2301 (S.C.) at para. 217, *leave to appeal refused*, [2001] S.C.C.A. No. 469 [emphasis added].

[107] *Lamarche v. Lamarche*, [2001] O.J. No. 3251 (S.C.J.) at para. 30 [emphasis added].

61.     Accordingly, in order to succeed in demonstrating a resulting trust, the EMEA Debtors must establish that the consideration received by the Licensed Participants under the MRDA was either nominal or non-existent.  It was not.  Under the MRDA, each of the Licensed Participants received valuable consideration – in the form of royalty-free exclusive and non-exclusive Licenses to make and exploit Nortel Products using NN Technology owned by NNL, the right to RPSM participation and significant administrative, strategic and head-office support which was disproportionately borne by NNL.[108]   Where, as here, there is an exchange of intellectual property rights in return for the grant of a licence and other benefits, there is no resulting trust.[109]

## D.     Limits of the Licensed Participants' Licence Rights

62.     Each of the U.S. Interests and the EMEA Debtors have asserted interpretive arguments designed to support the broadest possible reading of the rights granted to the Licensed Participants by Article 5(a)(i) of the MRDA.  These arguments should be rejected.[110]

### 1.     The Second Arm of the License

63.     Contrary to the arguments of the U.S. Interests[111] and the EMEA Debtors,[112] the two "arms" of the License embodied in Article 5(a)(i) are not *separate* grants of rights, and the limiting concept of "Products" (as defined in Article 1 of the MRDA) is not applicable *only* to the *first* arm.  Interpreting the words "in connection therewith" as a reference back to the first arm does not render the second arm meaningless.

---

[108] MRDA, Sixth Recital, Articles 1(n), 2(c), 3(a), 4(a) and Schedule A (TR21003).

[109] *Dubiner v. Cheerio Toys & Games Ltd.*, [1965] 1 Ex.C.R. 524 at para. 99 (QL), *affirmed on other grounds*, [1966] S.C.R. 206.

[110] The following submissions are supplemental to the CCC's Closing Brief, paras. 7, 63-75 & 76-82.

[111] U.S. Interests' Post-Trial Brief, pp. 28-29 & 106-107; and U.S. Interests' Proposed Findings and Conclusions, paras. 102-113 (Law).

[112] EMEA Debtors' Post-Hearing Submissions, paras. 475-480.

64.     As the CCC explained in its Closing Brief, the two arms served unique and distinct purposes:

(a)     The *first* arm granted to the Licensed Participants the right to make, use, sell (*etc.*) "Products," with the restriction that such Products must "us[e] or embod[y] NN Technology."   The phrase "using or embodying NN Technology" are merely words of limitation in the licence grant.  What the first arm *did not do*, however, was to grant to the Licensed Participants any *direct* rights in or under the NN Technology itself.

(b)     In contrast, the *second* arm *did* grant direct rights under the NN Technology. More specifically, it granted to the Licensed Participants such contractual rights to use the NN Technology as were "necessary or appropriate in connection" with the Licensed Participants' *related rights* to make, use, sell (*etc.*) the "Products" (under the first arm).

### 2.     The Word "Including" in Article 5(a)

65.     The U.S. Interests argue that the use of the word "including" means that the Licences' Field of Use is effectively unlimited, because every word and phrase that follows "including" is part of a *non-exhaustive* enumeration of the Licensed Participants' rights.[113]  This is incorrect.

66.     "[T]he word 'including' has a *number of meanings* and the appropriate meaning in any particular case *must be determined from the context* in which it is used."[114]   The word "including" can be used (i) to *expand* the meaning of the word which precedes it, (ii) to *illustrate*

---

[113] U.S. Interests' Post-Trial Brief, p. 35; and U.S. Interests' Proposed Findings and Conclusions, paras. 40 & 104 (Law).

[114] *Alberta Gas Trunk Line Co. v. Amoco Canada Petroleum Co.*, [1980] A.J. No. 715 (C.A.) at para. 69 (concurring reasons), *affirmed* [1981] 2 S.C.R. 437 [emphasis added].

the meaning of that word, (iii) to *exhaustively* define the meaning of that word, or (iv) simply to *confirm* the meaning of that word, all by reference to the word or words which follow.[115]

67.    The context of Article 5(a)(i) makes clear that the word "including" modifies the word which precedes it ("licence") by reference to the words which follow ("the right to sublicense"). The drafters used the phrase "including the right to sublicense" to confirm that, *in addition to* receiving the enumerated *licence* rights, the Licensed Participants *also* received a separate, coterminous right to grant *sublicenses* to third parties of the specific rights described in the two arms of the licence grant.[116]  This confirmation was necessary because (in its absence) no right to sublicense would have been found.[117]

68.    This is further confirmed when considering the inclusion and the placement of the next phrase in Article 5(a)(i) -- *viz.,* "which except as hereinafter provided shall be in perpetuity". This latter phrase was inserted by the drafters *following* the word "including" rather than before. This confirms that the phrase "licence, *including* the right to sublicense" is intended to be read as a *single* concept -- *i.e.*, *both* licences and sublicences are presumptively perpetual, and *both* encompass the specific rights enumerated in the *remainder* of Article 5(a)(i).[118]

---

[115] *Newcorp Properties Ltd. v. West Vancouver (District),* [1989] B.C.J. No. 642 (S.C.) at p. 4 ("[I]ncluding" ... in relation to the words that follow it may be found to have been used simply *to enlarge,* *to limit, to define exhaustively* or for the avoidance of doubt *to repeat* the preceding word or phrase"), quoting with approval from *Commissioners of Excise v. Savoy Hotel Ltd.*, [1966] 2 ALL ER 299 at p. 301; and *Capital Estate Planning Corp. v. Lynch*, 2004 ABQB 727 at para. 71 ("[T]he word "including" can be read as *enlarging* the meaning of the [word that precedes it],' as *illustrative* of that [word], or as *exhaustive* [of the meaning of that word]") [emphasis added].

[116] *Powerline Plus Ltd. v. Ontario Energy Board*, 2013 ONSC 6720 at paras. 7 & 38 ("…I am of the opinion that the specific activities referred to in paragraph 6 are included for the purpose of clarification or greater certainty that is, *to ensure that activities that might not otherwise be considered to fall within the general descriptive language in paragraph 6 are included*") [emphasis added].

[117] *Eli Lilly and Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 50.

[118] Had the word "including" been intended to introduce a non-exhaustive list of licence rights (of which *one* was the right to sublicense), the structure of the provision would have been different -- *i.e.*, Article 5(a) would have referred to "an exclusive, royalty-free license, *which except as hereinafter provided shall be in perpetuity*, including the right to sublicense, rights to make, have made, use, lease, license, offer to sell and sell…"

69.     It would be absurd to read the word "including" as creating a non-exhaustive list of rights.  Such an interpretation would render it impossible for either the licensor or the licensee to identify or understand the true scope of their respective rights and obligations.[119]

### 3.     The Business Contemplated in the IP Co. Model Was Not a "Service"

70.     Contrary to the U.S. Interests' contention, the litigation and licensing business contemplated in the IP Co. model was not a proposed "service" within the definition of "Products" in Article 1 of the MRDA.  The U.S. Interests' argument ignores the fundamental principle of contractual interpretation that words take their meaning from their context.[120]  The word "services" must be read in light of the accompanying enumerated concepts of "products" and "software."  The linking of these words confirms that they shared common elements and fell within the same class: "[t]he entire series of words is to be considered together. … The maxim *noscitur a sociis* applies -- a word is known by its companions."[121]  This alone defeats the U.S. Interests' argument that, in offering a "service," IP Co. would have offered a "Product."[122]

71.     This is confirmed when the word "services" is assessed in light of the entirety of the definition of "Products," and within the MRDA as a whole:

---

[119] A contractual interpretation will lead to an "absurdity" in circumstances where, *inter alia,* the interpretation is "unworkable" or where it lacks "a reasonable degree of certainty" (see *Millenium Veterinary Hospital Corp. v. SR & R Bay Ridges Ltd.*, [2007] O.J. No. 2848 (S.C.J.) at para. 26, *affirmed* 2008 ONCA 264; and *Gilroy v. H.W.S. Holdings Ltd.*, [1995] O.J. No. 2103 (Gen. Div.) at para. 7).

[120] *BG Checo Internat'l Ltd. v. B.C. Hydro and Power Authority*, [1993] 1 S.C.R. 12 at pp. 23-24; *Dimson v. KTI Kanatek Technologies Inc.*, 2012 ONSC 6556 at para. 23, *affirmed*, 2013 ONCA 454; *Woolcock v. Bushert*, [2004] O.J. No. 4498  (C.A.) at para. 24; and *Friends of Lansdowne Inc. v. Ottawa*, 2012 ONCA 273 at para. 28.

[121] *Tomko v. Wawanesa Mutual Insurance Co.*, 2007 MBCA 8 at para. 17; and *Shelanu Inc. v. Print Three Franchising Corp.*, [2003] O.J. No. 1919 (C.A.) at paras. 44 & 45 ("It is a well-known principle of statutory interpretation that the meaning of questionable words or phrases in a statute may be ascertained by reference to the meaning of the words or phrases associated with them…The principles which govern the interpretation of contracts are essentially the same as for statutory interpretation…").

[122] Considered in context, it is clear that all three words were intended to mean *technological* products, *technological* software and *technological* services -- *i.e.*, the services in question would include installation, support, maintenance, integration, consulting, *etc*.  In contrast, the legal IP licensing services proposed to be offered by IP Co. would *not* be "services," as used in Article 1, and therefore would *not* be "Products."

(a)     The other concepts contained within the definition of "Products" make sense when applied to *technological* services, but *not* when applied to the legal/licensing services contemplated by the IP Co. model.[123]

(b)     Likewise, the specific *verbs* used in the definition of "Products" are not consistent with the type of litigation and licensing services contemplated in the IP Co. model.[124]

(c)     Similarly, the specific categories of licence right granted in Article 5(a) make sense in the context of *technological* "services," but *not* when applied to the licensing "services" considered in the IP Co. model.[125]

(d)     The legal services which IP Co. would have provided did not "embody" the NN Technology (and it is not clear that such services would have "used" the NN Technology"), as is required under the first arm of Article 5(a).[126]

(e)     Lastly, the second arm of Article 5(a) would not have applied to IP Co.'s provision of "services" *qua* "Products" in the manner intended by the drafters.[127]

---

[123] See, in particular, the reference to "components, parts, sub-assemblies, features, software associated with or incorporated in" -- and the further reference to "improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in" -- all of which must be linked to "products, software and services."

[124] Under the definition of "Products," each of the encompassed "products," "software," and "services" must have been "designed, developed, manufactured or marketed." While *technological* services may be designed, developed and marketed (and perhaps even manufactured), the natural meaning of these words excludes the IP Co. concept of "services." If the intention was to capture the "licensing" services to be made available by IP Co., this concept would have been used explicitly in the definition of "Product."

[125] Article 5(a)(i) of the MRDA (TR21003) licensed the right to exploit "Products" (including "services") by granting "the right to sublicense" *services*, the right to "make" *services*, the right to "have made" *services*, the right to "use" *services*, the right to "lease" *services*, the right to "license" *services*, the right to "offer to sell" *services*, and the right to "sell" *services*. The licensing services which might have been offered by IP Co. were not, themselves, capable of being "licensed," "sublicensed" or "leased," and were not "made" or "used." They might, *perhaps*, have been "sold," but only by doing violence to principles of linguistic usage (*i.e.*, one does *not* speak of "selling" licensing services, but of "licensing").

[126] Recall that the first arm granted the right to exploit "Products" which "us[e] or embod[y] the NN Technology." This cannot be readily reconciled with the provision of licensing services, where the "service" itself is the "Product."

[127] Recall that, while the first arm granted the right to "sublicense,...make, have made, use, lease, licence, offer to sell and sell Products," the second arm granted subsidiary rights to "all rights to patents, industrial designs...or copyrights…and technical know-how, as necessary or appropriate in connection with" the first arm of the grant. IP Co.'s services might have involved an exercise of rights to "patents, industrial designs...or copyrights…and technical know-how," but these rights would not have been exercised "in connection with" the first arm of the grant.

### 4.    The "Have Made" Right

72.    The U.S. Interests are correct that a sublicence is *distinct* from a right to "have made."[128] The former permits the licensee to authorize a third party to exercise, on its *own* behalf and for its *own* benefit, rights originally granted to the licensee under its licence.  In contrast, the latter allows the licensee to authorize a third party to exercise, on behalf of and for the benefit of the *licensee itself*, rights which were granted to the licensee under its licence.[129]

73.    Under Article 5(a)(i), both of these rights were granted to the Licensed Participants, and both were subject to the same Field of Use:

(a)    As such, a Licensed Participant was authorized to "have made" by a third party any "Product" (*i.e.*, any "products, software [or] services designed, developed, manufactured or marketed, at any time, *by or for, any of the Participants*," as well as components, parts, upgrades, *etc*., relating thereto).  Once "made" by this third party, such "Products" could then be used, leased, licensed, offered for sale or sold by the Licensed Participant on its own behalf.

(b)    Alternatively, a Licensed Participant was authorized to grant to a sublicensee the right to make, have made, use, lease, license, offer to sell, and sell any "Products" (*i.e.*, any "products, software [or] services designed, developed, manufactured or marketed, at any time, *by or for, any of the Participants*," as well as components, parts, upgrades, *etc*., relating thereto).  Such "Products" – whether made by the sublicensee itself or by a third party under the sublicensee's own "have made" right – could then be used, leased, licensed, offered for sale or sold by the sublicensee.

---

[128] U.S. Interests' Post-Trial Brief, p. 30; and U.S. Interests' Proposed Findings and Conclusions, paras. 45-47 (Law).

[129] *Eli Lilly & Co. v. Novopharm*, [1998] 2 S.C.R. 129 at paras. 48, 73 & 75; and *Dunlop Pneumatic Tyre Company, Ltd. v. North British Rubber Company, Ltd.* (1904), 21 R.P.C. 161 at 169 (Ch. Div.) at pp. 173 & 174, *affirmed* (1904), 21 R.P.C. 161 at 181 (C.A.) at p 183.

74.     For example, a Licensed Participant was authorized to contract with a third-party manufacturer to manufacture a phone falling within the claims of a licensed patent owned by NNL, for sale by the Licensed Participant's under the Licensed Participant's name ("have made" under Article 5(a)(i)).  A Licensed Participant was also authorized to grant a sublicense to the same third-party manufacturer, permitting the manufacturer to make the same phone for sale by the manufacturer under the Licensed Participant's label (sublicense under Article 5(a)(i)).

75.     Thus, contrary to the position apparently taken by the U.S. Interests, the two separate rights coexisted without conflict, and both were constrained by the Field of Use imposed by Article 5(a)(i).

76.     Accordingly, none of the arguments raised by the U.S. Interests or the EMEA Debtors alter the rights of the parties under the MRDA or affect the valuation of the assets sold by each Nortel Debtor.

## PART III — CCC PRO RATA ALLOCATION

77.     In their post-trial submissions, the U.S. Interests and Bondholder Group assert a series of misleading objections which bear no relation to the CCC's Pro Rata Allocation theory, purpose or methodology.  Each is addressed below.

### A.     CCC Pro Rata Allocation is an Allocation Theory

78.     CCC Pro Rata Allocation is not, as the objectors proclaim, a distribution theory.[130]  Nor does it allocate the Sale Proceeds to the Estates solely as "conduits" "to evade the 'substantive consolidation' label," as the objectors charge.[131]    CCC Pro Rata Allocation is a valid and

---

[130] Post-Trial Brief of the *Ad Hoc* Group of Bondholders, p. 10; U.S. Interests' Post-Trial Brief, p. 128.
[131] Post-Trial Brief of the *Ad Hoc* Group of Bondholders, pp. 13, 15.

sustainable *allocation* theory that equitably allocates the Sale Proceeds to the Nortel Estates, which thereafter determine and make distributions to their creditors according to the laws and processes of their respective jurisdictions under the supervision of their courts. CCC Pro Rata Allocation does not in any manner dictate these distributions or how they are to be determined, or require all Nortel Estates to pay the same percentage recovery to their creditors,[132] any more than do the allocation theories proposed by other parties.

79.     Recognizing these facts, the objectors confusingly also argue that CCC Pro Rata Allocation is not sustainable because all Nortel Creditors ultimately may not receive the same percentage recovery.[133]  Both this allegation and the "conduit" charge mischaracterize the *pro rata* component of the CCC Pro Rata Allocation theory and ignore its purpose.

## B.     CCC Pro Rata Allocation is Proposed for a Legitimate and Sustainable Purpose

80.     The allocation theories proposed by the EMEA Debtors and U.S. Interests are legally and factually unsupportable.[134]  The purpose of CCC Pro Rata Allocation is to provide the Courts a fair and equitable mechanism that simply allocates the Sale Proceeds among the Nortel Estates in a manner that respects how Nortel operated, as "One Nortel," should the Courts find that they are unable to effect allocation based on ownership of the assets sold.  It is not, as the objectors allege, a "reverse engineered theory" and "back door methodology" designed to provide a specific distribution to Canadian Creditors.[135]

---

[132] CCC's Closing Brief, pp. 72-75.

[133] Post-Trial Brief of the *Ad Hoc* Group of Bondholders, pp. 8-10; U.S. Interests' Post-Trial Brief, pp. 136-38.

[134] CCC's Closing Brief, pp. 110-155.

[135] Post-Trial Brief of the *Ad Hoc* Group of Bondholders, p. 5.

81.      CCC Pro Rata Allocation is sustainable on the undisputed evidentiary record regarding how Nortel operated.[136]   The legitimate purpose and effect of the CCC's common pro rata dividend process is to calculate the equitable allocation of the Sale Proceeds among the Nortel Estates in concert with the realities and facts of Nortel's integrated, interdependent structure and operation in an equitable manner that accounts for the collective contribution to what was sold. *None* of the predicate facts supporting CCC Pro Rata Allocation has been disputed by evidence proffered by any party to this litigation.

**C.      CCC Pro Rata Allocation Does Not Constitute an Improper *Sub Rosa* Plan**

82.      Contrary to the assertions of the U.S. Interests and the Bondholder Group, CCC Pro Rata Allocation does not constitute or effect a *sub rosa* or *de facto* plan of arrangement, let alone a plan that fails to comply with applicable statutory requirements.

83.      The U.S. Interests and Bondholder Group define a *sub rosa* plan under U.S. law as "a settlement or transaction that effectively mandates the terms of a plan."[137]   They define a *de facto* plan under Canadian law as "an agreement or transaction which deprives creditors of their rights, including rights to sue for and enforce judgments."[138]   CCC Pro Rata Allocation is neither of these things.   It does not mandate the terms of any plan for any Nortel Estate, effectively or otherwise. Nor does it provide for or require the Courts to adjudicate any Nortel Estate's claims, impair or determine the enforceability of rights of any Nortel Estate's creditors, or dictate or approve recoveries of any Nortel Estate's creditors.   It is simply a means by which the Sale Proceeds are allocated to the Nortel Estates.   Once the Sale Proceeds have been allocated, each

---

[136] CCC's Closing Brief, pp. 59-60.
[137] U.S. Interests' Post-Trial Brief, p. 131.
[138] U.S. Interests' Post-Trial Brief, p. 131.

Nortel Estate, acting under the supervision of its presiding court, will administer claims in the ordinary course, pursuant to applicable law.

**D.    CCC Pro Rata Allocation Does Not Effect Substantive Consolidation**

84.    No matter what the objecting parties call it and how fervently they distort it, CCC Pro Rata Allocation is not "global substantive consolidation".  As fully explained in the CCC's Closing Brief,[139] CCC Pro Rata Allocation does not require, provide for, or result in any of the badges of substantive consolidation as alleged by the U.S. Interests and Bondholder Group.

85.    Under CCC Pro Rata Allocation:

    (i)    there is no actual or constructive consolidation of any of the Nortel Debtors or their assets;

    (ii)    the corporate separateness of the Nortel Estates is maintained;

    (iii)    no valid inter-entity claims or justifiable creditor rights are eliminated or impaired;

    (iv)    no settlements or valid and approved claims are impacted; and

    (v)    no creditor or debtor groups are treated unequally or inequitably.

86.    Under CCC Pro Rata Allocation, the Courts:

    (i)    do not exceed their jurisdiction;

    (ii)    do not dictate the Nortel Estates' distribution of assets to their creditors;

    (iii)    do not fix creditor recoveries;

    (iv)    do not mandate the terms of any estate plan or process; and

---

[139] CCC's Closing Brief, pp. 63-65.

(v)      do not exercise any powers outside their purview.

87.      Nothing the objecting parties argue or cite to refutes or changes these realities.[140]

88.      Despite this, the objectors spill considerable ink arguing why CCC Pro Rata Allocation is an unsustainable "substantive consolidation" under the Third Circuit's *Owens Corning* decision, including a focus on the alleged harm to the expectations of the cross-over bondholders (which – even if relevant – are entirely unproven, as discussed more fully in the section below).  As CCC Pro Rata Allocation is not "substantive consolidation" of the Nortel Debtors, the objectors' parsing of *Owens Corning* is irrelevant and should be disregarded.[141]

## E.      The Bondholders Have Offered No Evidence Of Creditor Expectations

89.      Even if bondholder creditor expectations are relevant, no party has provided any evidence of any bondholder expectations prior to or during the allocation trial.  Nor has any party proffered support for the alleged "fatal effect" of such bondholder expectations to CCC Pro Rata Allocation and the Courts' adoption of it.[142]  The assertions in the U.S. Interests' and Bondholder Group's respective post-trial briefs do nothing to cure this failure of proof.

90.      During its opening statement, the Bondholder Group promised to deliver evidence of "creditor expectations," including an expert witness (paid for by the U.S. Debtors) who would personally appear at trial to "tell the Courts" about "creditor expectations."[143]  The Bondholder Group never delivered on that promise.  The Bondholder Group refused to provide a bondholder or other fact witness to sit for a deposition.  No bondholder testified at trial.  The promised expert

---

[140] The UKPT's witnesses do not speak for the CCC and their testimony is not relevant to the CCC's Pro Rata Allocation theory or method.

[141] Moreover, the objectors misapply the *Owens Corning* decision to the facts of this case.  *See* CCC's Closing Brief, pp. 63-65.

[142] U.S. Interests' Post-Trial Brief, pp. 138-39; Post-Trial Brief of the *Ad Hoc* Group of Bondholders, p. 17.

[143] Opening Statement of the Bondholder Group, May 13, 2014, 367:4-11.

witness, Mr. Robert Kilimnik, was withdrawn on the eve of his scheduled testimony when the Bondholder Group informed the parties by email that the "US Interests have decided not to call Robert Kilimnik as an expert witness."[144]

91.      The eleventh-hour decision not to call Mr. Kilimnik to the stand was unsurprising, as he had admitted in his deposition that he had not communicated with any bondholder,[145] that he was not provided with any information having any probative value on creditor expectations, such as investment guidelines[146] or risk tolerances, and could not testify as to any real-world considerations of Bondholder Group member firms or any other Nortel bondholder.[147]   The UCC's expert, Professor John McConnell, did testify at trial but failed to deal with the issues set out above.  He too did not speak to any Nortel bondholders,[148] did not know when or generally at what price the Nortel bondholders purchased their bonds,[149] did not review any bondholder's investment guidelines,[150] and could not testify as to any real-world considerations of Bondholder Group member firms or any other Nortel bondholder.[151]

92.      The U.S. Interests and Bondholder Group now come to the Courts with cherry-picked language from bond offering documents and claim that this is sufficient evidence of the alleged creditor expectations.[152]   The Bondholder Group and U.S. Interests have produced no evidence that any creditor actually relied on the language they cite.  They have also failed to refute – or even acknowledge – the language from the same offering documents establishing that the sub-

---

[144] E-mail from Samir Vora to Counsel to Core Parties, dated June 22, 2014, 5:59 P.M. (ET).

[145] Deposition Testimony of Robert Kilimnik, March 27, 2014, 15:7-23, 56:8-12.

[146] *Id.* at 34:19-23, 56:20-23.

[147] *Id.* at 56:24-57:5, 63:12-16.

[148] Trial Testimony of John McConnell, June 23, 2014, 4804:23-4805:1.

[149] *Id.* at 4876:6-4877:1.

[150] *Id.* at 4877:10-14.

[151] *Id.* at 4877:19-4878:12.

[152] U.S. Interests' Post-Trial Brief, p. 139; U.S. Interests' Proposed Findings of Fact, para. 41-42; Post-Trial Brief of the *Ad Hoc* Group of Bondholders, para. 63.

investment grade bonds were risky and weakly protected and that the guarantees may not be valid or enforceable in the event of insolvency.[153]

93.      The Bondholder Group and U.S. Interests also fail to account for the different expectations held by post-petition purchasers of the bonds.   Notably, every member of the Bondholder Group is a post-petition purchaser.   These creditors hold at least a majority of outstanding guaranteed bond principal, and Professor McConnell has agreed that the expectations of these creditors vary greatly from those who bought bonds at the time of issue.[154]

94.      The expectations of the creditors who purchased in the post-petition distressed market constantly shift according to changing market events, including the decisions of these and other courts, as Professor McConnell admitted.[155]  These creditors have purchased and sold bonds with full knowledge of the risks attendant to trading in the bonds of insolvent entities, and their decisions to transact were based on new information that flowed into the market – information that was obviously not available at the time the bonds were issued.  These creditors have even continued to trade when bond prices rose above par, betting that the Courts will adopt the U.S. Interests' Revenue Theory and request for post-petition interest and thereby provide them a windfall recovery.  In sum, these creditors' "expectations" – whatever they are – are informed by a wholly different set of circumstances than may have been contemplated in the several offerings and are thus a long way from the expectations of earlier investors in Nortel bonds.  Many of these "expectations" are based on litigation outcomes favourable to the bond investors and should not inform any decision by the Courts.

---

[153] CCC's Trial Brief, paras. 316-17 and CCC's Closing Brief, paras. 185-90.
[154] Trial Testimony of John McConnell, June 23, 2014, 4797:21-4798:25; 4800:8-4801:1.
[155] *Id.* at 4910:22-4911:5; CCC's Pre-Trial Brief, paras. 313-315 and CCC's Closing Brief, paras. 195-196.

95.     To be sure, as the CCC established in its Closing Brief,[156] there is no proof that these creditors will suffer undue harm if CCC Pro Rata Allocation is adopted.

## PART IV — CCC'S ALLOCATION THEORIES ARE FAIR TO ALL NORTEL CREDITORS

96.     From the outset of this proceeding, the U.S. Interests have complained that the Canadian Ownership Allocation is unfair to the other estates because it allocates nearly all of the lockbox proceeds to the Canadian Estate.  They simultaneously ask the Courts to ignore[157] that creditors of the U.S. Estate, including the cross-over bondholders, will receive the vast majority of any recovery to the Canadian Estate under *any* allocation theory, and that the U.S. Estate would receive more than 70% of the lockbox proceeds under the U.S. Interests' allocation theory – all of which get distributed to U.S. Estate stakeholders.  The U.S. Interests' assertion of unfairness is misplaced.

97.     John Ray, the principal officer of NNI, testified that the U.S. Debtors have an approved $2 billion tax claim into the Canadian Estate.[158]  Moreover, the cross-over bondholders have asserted a $4.2 billion claim into Canada.  The CCC's expert, Thomas Britven, explained that when these claims are considered, under the CCC's Ownership Allocation the U.S. Estate would still recover the majority of the lockbox proceeds, with the cross-over bondholders ultimately receiving 100% recovery on their pre-petition claims.  The alternative CCC Pro Rata Allocation method effectively reaches the same result.  If the Courts find it legally sustainable, the cross-over bondholders may at the appropriate time receive a recovery from both the U.S. and Canadian Estates of up to 100% of their pre-petition claims.

---

[156] CCC's Closing Brief, paras. 180-96.
[157] U.S. Interests' Post-Trial Brief, pp. 2, 128-40.
[158] Trial Testimony of John Ray, May 21, 2014, 1440:16-1441:22.

98.    The chart below illustrates the various allocation theory outcomes and puts the lie to the U.S. Interests' assertion that the Canadian theories are unfair or extreme.[159]

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| | CCC Ownership | Canadian Debtors and Monitor | US Interests | EMEA Debtors | | UK Pension | CCC Alternative Pro Rata |
| | | | | License Approach | Contribution Approach | | |
| Key Creditor Group | Britven | Green | Kinrich | Malackowski/Huffard | | Bazelon | Britven |
| Guaranteed Bondholders | 100% | 100% | 100% | 100% | 100% | 71.2% | 71% |
| US Creditors | 95% | 100% | 100% | 100% | 100% | 71.2% | 71% |
| Canadian Creditors | 59% | 61% | 11% | 11% | 25% | 71.2% | 71% |
| EMEA Creditors | 27% | 19% | 48% | 77% | 50% | 71.2% | 71% |
| UK Pension Trust | 44% | 37% | 51% | 79% | 58% | 71.2% | 71% |
| Undistributed Cash in NNI | $0 | $111m | $1,304m | $248m | $536m | $0 | $0 |

*(Britven Rebuttal Report dated February 28, 2014, p. 5, Table 1 and Schedule 1)

99.    As shown above, the lion's share of any recovery to Canada under any allocation theory, including Canadian Ownership Allocation, ends up in the pockets of the U.S. Estate and its creditors, including the cross-over bondholders.  The Canadian theories lead to *equitable*, not "extreme," results.

100.    In contrast, the U.S. Interests' Revenue Theory would leave the Canadian Estate with inadequate amounts to distribute to its creditors, including to the pensioners and other former employees who built Nortel, while the cross-over bondholders claim post-filing interest.  This is the very definition of an extreme and unfair result.

---

[159] U.S. Interests' Post-Trial Brief, pp. 138-140.

101.    The extreme results caused by the U.S. Interests' allocation theory presumably are why they and the Bondholder Group insist that the Courts cannot consider claims and the ultimate outcomes to creditors when deciding how to allocate the lockbox proceeds.[160]  But these parties provide no authority that would prohibit the Courts from considering the outcomes of each allocation theory, including each theory's impact on creditors.  The U.S. Interests' citations to agreements of the parties and decisions by the Courts that the determination of claims will not be part of the allocation trial have no relationship or relevance to the Courts' consideration of the real-world effect of each allocation theory.  Indeed, the Third Circuit has held that "[t]he great principles of equity are aimed at securing complete justice for the parties before a court.  Thus, the bankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates."[161]

102.    Moreover, the same parties have themselves placed outcomes at issue by asserting that the CCC's theories are unfair and extreme, that creditor expectations of recovery somehow require the Courts to reject CCC Pro Rata Allocation, and by putting forward an allocation theory that is itself driven by results and outcomes.  The U.S. Interests' Revenue Theory, not coincidentally, renders the U.S. Estate solvent, therefore conceivably enabling the cross-over bondholders to recover the principal amount of their bonds plus interest until the Filing Date, plus post-petition interest and other enhancements they allege to be recoverable under their Indentures, if the U.S. Court determines they are so entitled.

---

[160] *Id.*; and Post-Trial Brief of the *Ad Hoc* Group of Bondholders, pp. 10-12.

[161] *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 340-41 (3d Cir. 2006) (rejecting appellant's suggested approach to reorganization in part because result would have been inequitable).  *See also In re SLM Int'l, Inc.*, 248 B.R. 240 (D. Del. 2000) (citation omitted) (vacating and remanding decision of bankruptcy court for consideration of equities of the case because "courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity.")

103.    As such, the Courts should not decide allocation in a vacuum.  Rather, the Courts can, and should, consider the nature and scope of the likely outcomes and their impact on creditors. In the context of those likely outcomes, it is clear that the only fair and just theories for all estates and their respective creditors are the theories proposed by the Monitor and CCC, and that it is the U.S. Interests and Bondholder Group who propose unfair results.

104.    Further to this point, the recent "settlement" between the Bondholder Group and the U.S. Interests demonstrates that the U.S. Interests are not interested in an equitable allocation of the proceeds of the Nortel asset sales.  The so-called arms-length agreement between the Bondholder Group and U.S. Interests purports to "cap" at approximately $1 billion the amount of post-petition interest the guaranteed bondholders can recover from the U.S. Estate.[162]    The Bondholder Group claims that the settlement thereby represents a discount of over $600 million against the bondholders' $1.6 billion claim for post-petition interest, accrued at the contract rate.[163]

105.    The facts show that this is not a "settlement" at all but rather an end-run around a decision on the merits.  After accounting for substantial estimated cash burn in the U.S. Estate during the allocation trial and an estimated $100 million post-filing priority tax claim, the U.S. Estate would have approximately $1 billion in undistributed cash if the Courts adopt the U.S. Interests' revenue theory.[164]    Thus, the "settlement" agreement delivers to the cross-over bondholders a windfall equal to the maximum amount of cash that would be available to the guaranteed bondholders *if,* and *only* if, the Courts were to adopt in full the U.S. Interests'

---

[162] *See* Agreement Settling the NNI Post-Petition Interest Dispute and Related Matters, dated July 24, 2014 [U.S. Docket No. 14076-2], para. 2.2.

[163] *See* Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement by and Among Nortel Networks Inc., the Supporting Bondholders, and the Bank of New York Mellon with Respect to the NNI Post-Petition Interest Dispute and Related Issues, dated July 24, 2014 [U.S. Docket No. 14076], p. 17.

[164] *See id;* Britven Rebuttal Report dated February 28, 2013, p. 5, Table 1 and Schedule 1 (TR00046).

revenue theory and *if,* and *only* if, the U.S. Court were to then award post-petition interest to the bondholders at the contract rate.  The purported recovery "cap" is a mirage.

## PART V - ORDERS SOUGHT

106.    For the reasons set out, the CCC seeks the following relief:

    (a)    an Order allocating, administering and effecting the distribution of the Sale Proceeds to the Nortel Debtors by ownership of the assets sold; or

    (b)    in the alternative, an Order allocating the Sale Proceeds pursuant to CCC Pro Rata Allocation.

107.    The CCC reserves the right to seek costs against any Core Party.


    ALL OF WHICH IS RESPECTFULLY SUBMITTED, THIS 10th DAY OF SEPTEMBER, 2014

_____

For All Counsel for the CCC


TO:    THE SERVICE LIST APPENDED

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-35, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, et. al. APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

Court File No: 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)
Proceeding commenced at TORONTO

**REPLY CLOSING BRIEF OF THE CANADIAN CREDITORS' COMMITTEE ("CCC") PUBLIC VERSION**

**KOSKIE MINSKY LLP**
20 Queen St. W., Suite 900
Toronto, ON M5H 3R3
Mark Zigler / Ari Kaplan / Jeff Van Bakel
Tel. 416.595.2090 / Fax 416.204.2877
Lawyers for the Canadian Former Employees and Disabled Employees through their court appointed Representative

**McCARTHY TÉTRAULT LLP**
TD Bank Tower, Suite 5300
66 Wellington Street West
Toronto, ON M5K 1E6
R. Paul Steep / Elder C. Marques / Byron Shaw
Tel. 416.601.7998 / Fax 416.868.0673
Lawyers for Morneau Shepell Ltd., as administrator of the Nortel Canada registered pension plans

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
155 Wellington St. W., 35th Floor
Toronto, ON M5V 3H1
Ken Rosenberg / Lily Harmer / Massimo Starnino
Tel. 416.646.4300 / Fax 416.646.4301
Lawyers for the Superintendent of Financial Services as Administrator of the Pension Benefits Guarantee Fund