ONTARIO

SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

— and —

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE
------------------------------------------------------------------------ x
In re:                                                                  :   Chapter 11

Nortel Networks, Inc., et al.                                           :   Case No. 09-10138 (KG)

                    Debtors.                                            :   (Jointly Administered)

------------------------------------------------------------------------ x

**POST-TRIAL RESPONSE BRIEF OF WILMINGTON TRUST,
<u>NATIONAL ASSOCIATION, AS SUCCESSOR INDENTURE TRUSTEE</u>**

# TABLE OF CONTENTS

[PRELIMINARY STATEMENT](#) ............................................................................................... 1

[ARGUMENT](#) ............................................................................................................................. 4

    [A.](#)    [The Canadian Monitor's Position is the Most Consistent with the MRDA's Description of the Parties' Legal Rights.](#) ........................................................................... 4

    [B.](#)    [The US Interests Methodology for Determining "Fair Market Value" is Wrong and is Designed to Siphon Value from NNL.](#) ............................................................... 10

    [C.](#)    [The EMEA Debtors' Distribution Theory Improperly Dismisses the MRDA; However, Even if the MRDA is Disregarded, Title to Nortel IP was Vested in NNL.](#) ............................................................................................................................. 12

    [D.](#)    [The US Interests and Bondholder Group Conflate the Pro Rata Theory with Substantive Consolidation, Which is Not at Issue.](#) .......................................................... 13

    [E.](#)    [Joinder](#) ................................................................................................................ 14

[CONCLUSION](#) ............................................................................................................................. 14

Wilmington Trust, National Association, exclusively in its capacity as indenture trustee for the Notes (in such capacity, "Wilmington Trust" or the "Trustee"), by and through its undersigned attorneys, submits this post-trial response brief in support of the Post-Trial Brief of Wilmington Trust, with respect to the allocation of certain lockbox proceeds from the sale of Nortel's intellectual property assets (the "Nortel IP"), and in furtherance thereof, respectfully submits as follows:

## PRELIMINARY STATEMENT

1. There can be no legitimate dispute that the ownership of the Nortel IP is vested solely in NNL, and that the MRDA provides the only rights held by the Licensed Participants in that IP. As the legal title holder, and the only entity entitled to license or sell the Nortel IP, it follows that NNL is entitled to the majority of proceeds from the Rockstar Sale.

2. The Licensed Participants' rights to the Nortel IP are restricted to their right to sublicense and make/use Products within their respective territories, pursuant to express *license* rights in the MRDA. Although the US Interests engage in convoluted language construction to interpret the MRDA and the EMEA eschews the MRDA altogether to construct a course of conduct argument to exhibit some greater "ownership" interest, such efforts fail upon a plain and straightforward reading of the language of the MRDA itself and recognition that the MRDA is the source of the legal rights of the parties.

3. The Monitor's interpretation of the MRDA as conveying only limited license rights to the Licensed Participants, with NNL retaining ownership, is correct, and its allocation methodologies lead to the result most consistent with the actual ownership interests of the respective Estates. Not only is the Monitor's interpretation more accurate and logical than that offered by the US Interests or the EMEA, it is entirely commercially reasonable, despite repeated self-serving and post hoc protestations to the contrary. It is typical commercial practice that a

1

parent company, such as NNL, will retain ownership of assets that enabled the creation and operation of subsidiaries, in addition to and independent of its equity interests in those subsidiaries.  As the owner of Nortel's IP assets prior to the creation of the subsidiaries now known as the Licensed Participants, it is therefore standard that NNL retained ownership of the IP which gave rise to the multi-national Nortel enterprise.  The Licensed Participants conveniently ignore that they initially received the IP they needed to start and grow their once successful businesses, and were permitted by NNL to maintain operations, without paying any up-front costs or royalties for the extremely lucrative licenses that they were given. (Affidavit of Clive Allen (Ex. TR00002), ¶ 36).

4. Rather, as the Licensed Participants agreed, they obtained the right to make and use Nortel technology, and sell Products related to that technology – obtaining substantial revenue as a result – at no cost for exclusive licenses, and without respect to whether a particular Participant's own R&D was responsible for the technology supporting the Products sold by that Participant.  Thus, while the Licensed Participants made significant contributions to research and development, they were compensated through the RPSM for those contributions to the operating enterprise on an ongoing basis.  In their post-trial briefs, the US Interests and the EMEA choose to ignore, or minimize, the valuable consideration discussed above.  Yet it cannot be disputed that the consideration described above was clearly sufficient to induce them, at the relevant times, to enter into the MRDA, and its predecessor, the CSA.  The US Interests and the EMEA cannot now rewrite the MRDA to give their constituents a share in liquidation proceeds which they never bargained for in their written agreements.

5. The arguments advanced by the US Interests in support of their Allocation Position have more rhetorical strength than actual, and are designed to distract the Courts from

the simple language of the MRDA.  The US Debtors' repeated refrain that "equity takes last" is a flimsy attempt to cast NNL in the subordinate role of equity holder in a claims proceeding, instead of the cardinal role of owner of liquidated assets in this Allocation Proceeding.  The US Interests' rhetoric is thus inapplicable to the determination of allocation of the Line of Business and Rockstar sale proceeds:  NNL's rights to the proceeds come from its ownership of the underlying assets themselves, not its ownership of equity in NNI.

6.      Likewise, the US Interests' further attempts to distract the Courts by leveling allegations of impropriety against the Canadian Monitor are belied by the facts and are merely a disingenuous effort to mask the weakness of the US Interests' arguments for rewriting the MRDA.  The Monitor's disclosure of its belief that ownership of the Nortel IP was vested in NNL was clear from its Pre-Filing Report dated January 14, 2009.  (Ex. TR21278, ¶ 42.)  The Monitor's reservation of its Allocation Position until allocation positions were due was both appropriate and consistent with the parties' agreement under the IFSA.  Moreover, and contrary to the rhetoric of the US Interests, the Monitor's position not only appropriately allocates value based on ownership of the assets sold, it leads to a distribution of value to the US Estate that is not merely substantial, but will ensure a recovery by US Creditors at or near par.

**ARGUMENT**

**A.    The Canadian Monitor's Position is the Most Consistent with the MRDA's Description of the Parties' Legal Rights.**

7.      As the only legally cognizable agreement setting forth the rights of Licensed Participants in the Nortel IP, an accurate understanding of the MRDA's language is the key to properly allocating the proceeds of the sales of Nortel's Lines of Business and Residual IP.  The allocation proposed by the Canadian Monitor best assesses the respective value between NNL's

ownership of the Nortel IP, and the actual license rights of the Licensed Participants. It is also the best proposal for ensuring that the value produced by the Line of Business and Rockstar sales will be allocated equitably among the estates in accordance with the ownership rights of the respective Estates. Allocation, according to the Monitor's theory, would flow largely, in the first instance, to the Canadian estate. Such a distribution would not only comport with Canadian Law, as NNL was the title holder to the sold assets, it will also still permit a meaningful recovery to the US Interests. Suggesting that the US Interests get "nothing" under NNL's allocation proceeding is misleading and disingenuous.

### 1. Fair Market Value is Best Reflected by a Discounted Cash Flow Analysis, as Utilized by the Canadian Valuation Experts.

8.   The key driver of the allocation of the sale proceeds is the value of the Nortel IP, and the value of the licenses held by the Licensed Participants in those assets. As defined by Mr. Kinrich, an expert testifying for the U.S. Debtor, "the value of a license is driven by the profits a licensee could obtain by using the patented technology." (Expert Report of J. Kinrich, January 24, 2014 (Ex. TR00051), ¶ 69). The methodology to determine those profits which a licensee could obtain is known as a "Discounted Cash Flow" and is the best methodology for valuing the Nortel IP.

9.   The Canadian experts began their Discounted Cash Flow analysis by considering exactly what rights the Licensed Participants had under the MRDA, in order to understand what profits the Licensees could obtain by exploiting those rights. This methodology both reflects the reality of rights owned by the respective Participants to the MRDA and is consistent with past practice under the CSA. To the extent the MRDA's licenses were limited, as they must be "limited to, and qualified by, the express terms of the license," so too the value of those license rights are limited. *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at paras. 49 (S.C.C.).

4

10. The dispute among the parties about the delineation of those limited rights can be clearly resolved by reference to the language of the MRDA itself. As detailed in the chart below, while the Canadian Interests' interpretation of the MRDA accords with the plain meaning of its provisions, the interpretation advocated by the US Interests requires the twisting and/or omission of key phrases.

| MRDA Provision | US Interests | Canadian Interests |
|---|---|---|
| Recital 2: "WHEREAS each Licensed Participant held and enjoyed equitable and *beneficial ownership* of certain exclusive *rights* under NN Technology for a Specified Territory . . ., and it is the intent of NNL and the Licensed Participants that the Licensed Participants continue . . . to hold and enjoy such rights;" | All Licensed Participants hold equitable and beneficial ownership *of NN Technology* (US at 24). | • Licensed Participants have "beneficial ownership" of *rights, pursuant to the licenses*, not of the IP itself (CCC ¶ 52), which "beneficial ownership" must be "in accordance with the terms of the [MRDA]" (Monitor ¶ 371 (citing Agreement with Respect to Certain NN Technology)).<br>• "Beneficial ownership" is a term of art used with taxing authorities (Trustee ¶ 19). |
| Art. 4(a): "Except as otherwise specifically agreed, *legal title* to any and all NN Technology whether now in existence or acquired of developed pursuant to the terms of this Agreement *shall be vested in NNL*." | NNL holds legal title of Nortel IP (US at 26). | Same (Monitor ¶¶ 220, 294; CCC ¶¶ 40, 45; Trustee ¶ 14). |
| Art. 4(e): "Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Territories for infringement or misappropriation of NN Technology by others." | Art. 4(e) does not explicitly limit NNI's exclusion right, so such right must be unlimited (US at 27). | The MRDA does not need to explicitly limit NNI's exclusion right; NNI would only have standing to enforce its License subject to the limitations imposed upon it by the MRDA (CCC ¶ 80 & n.77). |
| Article 5(a): "To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:<br>(i) continues to grant to each Licensed Participant an exclusive, royalty-free license, *including* the *right to sublicense*, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell *Products* using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, | • "Including" is expansive, not limiting (US at 35).<br><br>• The sublicensing right is not explicitly limited in the MRDA, so such right must be unlimited (US at 30).<br><br>• "In connection therewith" refers to "technical know-how" in connection with the exercise of the "rights to patents" (US at 34). | • The US Interests' interpretation of "including" would cause all language before such word to be a complete grant on their own, even though a licensee's rights are limited to the express terms of the license by law. If that were the case, then the "Exclusive Territory" limitation within Art. 5(a) would be rendered meaningless, despite the US Interests' concession of such limitation. (Monitor ¶¶ 333-337.)<br><br>• By definition, a sublicense cannot extend beyond the scope |

| MRDA Provision | US Interests | Canadian Interests |
|---|---|---|
| and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate *in connection therewith* ("Exclusive License"); and<br><br>(ii) grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, *including* the *right to sublicense*, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell *Products* using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate *in connection therewith* ("Non-Exclusive License")." | | of the license itself (Monitor ¶ 327).<br><br>• "In connection therewith" refers to the making, using and selling of Products (Monitor ¶¶ 212, 220). To interpret this clause otherwise would render it meaningless; such an interpretation would result in no connection between "rights to patents" and NN Technology (Monitor ¶¶ 340-342). |
| Art. 1(g): "'**Products**' shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time *by, or for, any of the Participants*, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing." | "[T]he MRDA provided NNI with *all* valuable rights to NN Technology in the US." (US at 33). | US Interests' interpretation ignores "by, or for, any of the Participants" language. "Products" must have been created or marketed by or for a Nortel entity in order to exploit Nortel IP; i.e., "Products" could not entail any products of a third party (CCC ¶¶ 66-67). |
| Schedule A: "the Participants bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and *ownership* of the NN Technology." | "Ownership" refers to all Participants (US at 26). | This provision never speaks on who specifically owns NN Technology; nor does this provision purport to change any ownership rights granted within the MRDA to which this is a schedule (Monitor ¶ 370; Trustee ¶ 14 n.8). |

11.      As can be seen from the chart above, or a reading of the MRDA itself, the relevant language of the MRDA does not grant the Licensed Participants the right to transfer the licenses that they enjoyed, but only the right to sublicense.  The MRDA does not grant the Licensed Participants the right to exploit the licenses for any purpose, but only the right to exploit the licenses for the purpose of making/using ***Nortel Products***.  And last, but most important, the licenses granted by the MRDA are limited to the territories of the Licensed Participants.  All of these limits sharply constrain the Licensed Participants' ability to monetize their license rights outside of the operation of the Nortel business.  Aside from the value derived from the licenses actually used in the Lines of Business, the Licensed Participants could expect to receive no value for the Nortel IP in the operation of their businesses.

> **2.      Contrary to the US Interests' Disingenuous Suggestions, the Canadian Monitor's Proposal Will Provide them with Significant Value from Both the Rockstar and Line of Business Sales.**

12.      The US Interests' feigned outrage over the Canadian Interests' proposed allocation not only improperly conflates the amount of proceeds allocated to the US Debtors (approximately $1 billion) with the value that the US Interests will ultimately recover (likely over $5 billion), it also falsely depends on the incorrect notion that, under the Monitor's theory, the Licensed Participants will receive no value for their licenses in the Nortel IP at all.

13.      It is undisputed that, even under the Monitor's theory of allocation, the US Creditors will likely receive a recovery at or near par.  The US Debtor would receive over $1 billion in consideration for the tangible assets, wholly-owned subsidiaries, and intangible assets (i.e., the US Debtor's license rights in the Nortel IP) it sold in the Line of Business Sales.  However, the value that the US Debtor will receive from the Line of Business and Rockstar sales is not limited to the proceeds which are allocated to it, contrary to the US Interests' rhetoric on the topic.  Mr. Ray, a principal officer of NNI, in fact testified that, as a result of the $2 billion

tax claim that NNI holds against NNL "not subject to setoff or counterclaim," and the $4 billion in claims on NNL held by US Bondholders (J. Ray, Trial Tr. 1441:9-1442:6), the total value of the recovery of the US Interests (under the Monitor's theory) will be billions of dollars higher than the proceeds that the US Estate is allocated.

14. Moreover, while the Monitor's experts do not allocate proceeds of the Rockstar Sale to the US Debtor or EMEA, that is because the value of the Licensed Participants' rights in that IP are included in their valuation of the Licensees' rights in the Line of Business Sales. The Discounted Cash Flow Analysis (described *supra*) conducted by the Canadian experts accounted for the rights relinquished by the Licensed Participants in the Nortel IP that was actively in use by the Lines of Business in the Lines of Business analysis. The residual IP that was sold in the Rockstar Sale was either not subject to any license or was subject to the license rights that were transferred pursuant to the Line of Business Sales, for which the US Debtor and EMEA are already being awarded the value of the ownership interests in those licenses that they relinquished.

### 3. The Monitor's Interpretation of the MRDA is Commercially Reasonable and was Properly Disclosed.

15. As discussed above, the plain language of the MRDA vests the ownership of the Nortel IP, and thus the majority of the value of proceeds from sale of that IP, in NNL. This arrangement was commercially reasonable at the inception of the Nortel subsidiary arrangement, as memorialized in the CSA (the precursor to the MRDA), and continues to be commercially reasonable at the liquidation of the Nortel business.

16. Prior to Nortel's expansion into the global market in the 1970s, the Canadian company, and its predecessors, spent almost a century creating and utilizing telecommunications IP. (Affidavit of Clive Allen (Ex. TR00002), ¶ 29.) The Nortel subsidiaries were set up by NNL

8

in order to exploit foreign markets, and had no IP of their own upon inception. (C. Allen, Trial Tr. 613:4-7.) Not only did the Nortel subsidiaries have no IP to offer NNL in exchange for access to NNL's extensive patent portfolio, they also paid no upfront consideration to obtain ownership rights in NNL's IP. In fact, the subsidiaries entered into the CSA so that they might "benefit[] initially by being able to commence operations without substantial up-front costs for Technology and thereafter by having access to a much greater pool of Technology than they could ever afford…." (Affidavit of Clive Allen (Ex. TR00002), ¶ 36.)

17. As Dr. Reichert explains, the Licensees were compensated for their contribution to R&D through the MRDA from the split of the profits and losses and through their entitlement to compensation for the value of the only ownership interests that they would surrender in such a sale—their ownership of their license rights. (*See* Dr. Reichert, Trial Tr. 3851:7-17.) It follows that, as NNL held title and all rights at the inception of the Participant's corporate creation, so they hold it at dissolution.

18. The Monitor's interpretation of the MRDA is not only commercially reasonable, it was also appropriately reserved for the Allocation Trial in accordance with the IFSA, just as the US Interests' allocation theory was reserved. Pursuant to the IFSA, all parties reserved their rights to argue for any allocation position at the Allocation Trial. It is therefore not surprising that the theories of the US and Canadian Interests, which were previously unaired, parallel each other in allocating a small percentage of the sale proceeds to their fellow estates. Just as it was perfectly reasonable, even if legally incorrect, for the US Interests to argue for an 11% allocation to NNL, so is it reasonable for the Canadian Interests to argue that it is entitled to the overwhelming majority of the proceeds from the Rockstar Sale due to its ownership of all of the intellectual property that was sold in that sale. The difference between the two allocation

theories is that, while the Canadian Interests contemplate a recovery by the US Creditors of at or near par, the theory advocated by the US Interests only permits a recovery by Canadian Creditors of around ten cents on the dollar.  (*See* Rebuttal Expert Report of Thomas Britven (Ex. TR00046) at p. 35, Table 1.)

B.     **The US Interests Methodology for Determining "Fair Market Value" is Wrong and is Designed to Siphon Value from NNL.**

19.    The US Interests' employment of an "income-based valuation method" (*see* US Interests' Post-Trial Brief, p. 82) is both incapable of accurately valuing the Nortel IP assets, and deliberately chosen to drastically reduce the value attributable to NNL.  As admitted by the US Debtor's expert, Mr. Kinrich, a Discounted Cash Flow analysis is the best valuation methodology for IP assets (*see* J. Kinrich Trial Tr. 4328:13-20); however, Mr. Kinrich incorporated into his analysis the incorrect assumption that "there is no scope of use restriction on the licenses." (Rebuttal Report of Jeffrey Kinrich (Ex. TR00052), ¶ 22.)  Additionally, to reach his ultimate conclusions on allocation, instead of applying a Cash Flow analysis (revenues less costs) for his valuation of the Line of Business sales, Mr. Kinrich applies a "Revenue Multiple-Based Income Approach" (*see* further discussion in Monitor's Post-Trial Brief, ¶¶ 508-514).  Not only must Mr. Kinrich's approach fail based on his faulty assumptions, it must also fail for omitting NNI's substantial costs from his final calculation, allocating value to the parties based only on their respective revenues, without any persuasive justification for this departure from his previous support for Cash Flow analyses (*see* further discussion in Monitor's Post-Trial Brief, ¶¶ 516-530).

20.    The US Debtor's rebuttal expert, Ms. Ryan, employs a likewise unfounded and methodologically flawed approach in adjusting the "Contribution" valuation of the EMEA (which is itself baseless).  Without opining on the appropriateness of the Contribution approach,

Ms. Ryan credits back to NNI the transfer pricing adjustments it was obligated to pay under the RPSM for no other apparent reason than to increase NNI's share of the allocation (*see* further discussion in Monitor's Post-Trial Brief, ¶ 568). While Ms. Ryan reverses the credit owed by NNI to other entities, she fails to perform the same reversal on behalf of NNL's credit to NNI, thus stripping NNL of $2 billion in value, and double-counting those $2 billion in favor of NNI (*see* further discussion in Monitor's Post-Trial Brief, ¶ 570; EMEA's Post-Trial Brief, ¶ 227). Not only is Ms. Ryan's method wildly inconsistent in NNI's favor, it also ignores that very purpose of the RPSM, which was to adjust for costs among the entities.

21.     The common thread between the US Interests' various valuation methodologies is a series of faulty assumptions leading to an inflation of the Licensed Participant's rights in order to subsume those of the title owner, NNL, and a resultant diminution of NNL's share in the allocation of proceeds on account of assets that it owned. Beyond the incorrect assumptions, the expert opinions proffered by the US Debtors are mired in methodological errors that serve to increase NNI's allocation beyond that which even their erroneous assumptions could justify. (*See generally*, Monitor's Post-Trial Brief, ¶¶ 504-592.)

**C.     The EMEA Debtors' Distribution Theory Improperly Dismisses the MRDA; However, Even if the MRDA is Disregarded, Title to Nortel IP was Vested in NNL.**

22.     The EMEA Debtors go to great lengths in their post-trial brief to argue that the MRDA is inapplicable to Allocation. The evidence and legal theory provided by the EMEA is fundamentally flawed, as it relies on supposed relationships and conduct of parties outside of their written agreements and ignores that the CSA and the MRDA memorialized the respective rights of the parties and superseded any non-written agreements.

23.     While the EMEA is correct in stating that the MRDA does not govern allocation, and was not drafted to govern allocation in a bankruptcy proceeding, that does not mean that the

11

MRDA is not the source of the legal rights of the parties in the underlying assets as made clear by the document itself, as well as the testimony and evidence presented at trial. In fact, all the evidence presented at trial supports the conclusion that the MRDA is the *sole* source of rights for any of the Participants. (*See, e.g.,* Monitor Post-Trial Brief, ¶¶ 278-283 (citing the MRDA and witness testimony), ¶¶ 389-412 (rebutting the EMEA's "Joint Ownership" theory); US Interests' Post-Trial Brief at 42 ("Upon cross-examination by the Monitor, each of these witnesses testified that *the MRDA was the sole legal document that reflected the Participants' rights* . . . .") (emphasis in original).)

24. Nevertheless, even if the MRDA were disregarded, any rights to IP would necessarily have to be determined solely by title. And it was, indisputably, Nortel's policy to ultimately assign title and ownership of all IP to NNL. EMEA's own witness, Angela Anderson, who served as director of patents for NNUK and head of IP in Europe for Nortel (A. Anderson, Trial Tr. 2171:12-24), noted that doing so "is the best practice" and "is very common." (A. Anderson, Trial Tr. 2178:19-2179:4.) Her testimony was in accord with that of NNL's witness, Clive Allen, who was "significantly involved in the conception, drafting and implementation" of the CSA, the predecessor to the MRDA. (*See* Affidavit of Clive Allen (Ex. TR00002), ¶¶ 28, 35.)

25. Due to this policy, an EMEA Debtor's employee would assign title to IP he or she invented to his or her respective EMEA Debtor, just as the EMEA Debtor would assign that title to NNL. For example, in NNUK, which followed UK statutory law that vested patent application rights in the employer and not the employee who invented the object being patented, for "[e]very application that [NNUK] filed, [NNUK] prepared/executed a patent assignment for the United States, a patent application, *which put the rights in the name of NNL*." (A. Anderson,

Trial Tr. 2178:10-14.)  Thus, even if the MRDA is found to be wholly inapplicable to Allocation, NNL remains the sole owner of IP pursuant to Nortel corporate policies.

**D.    The US Interests and Bondholder Group Conflate the Pro Rata Theory with Substantive Consolidation, Which is Not at Issue.**

26.    Despite the continued mischaracterizations by the US Interests (*see, e.g.,* US Interests Pre-Trial Brief at 129; Bondholders Post-Trial Brief, ¶¶ 29-32; US Interests Post-Trial Brief at 17), the Pro Rata Theory cannot be conflated with substantive consolidation.  The US Interests set substantive consolidation up as a strawman, and it is that strawman, rather than the Pro Rata Theory, which they repeatedly attack.  Their argument, however, results in a fallacy of relevance, as, quite simply, the Pro Rata Theory *is not* substantive consolidation.

27.    As the CCC makes clear, the Third Circuit has noted that "substantive consolidation '*treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities, (save for inter-entity liabilities which are erased).  The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor.*'"  (CCC Post-Trial Brief, ¶ 173 (quoting *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005)).)  That is not the case with the Pro Rata Theory.  Under the Pro Rata Theory, the Nortel Group will *not* be "merged into a single survivor," any inter-company claims will *not* be erased, and creditors of one Debtor will *not* receive distributions from other Debtors.  The Pro Rata Theory instead is simply the only **allocation** based in equity that would be consistent with how Nortel's business was run.

**E.    Joinder**

28.    The Trustee hereby joins, adopts, and incorporates by reference, as if fully set forth herein, the statements and arguments set forth in the Initial Post-Trial Brief (Allocation) of

the Monitor and Canadian Debtors, including their proposed Findings of Fact and Conclusions of Law therein.

## **CONCLUSION**

29. For the forgoing reasons, the Trustee hereby requests that the Courts employ the methodology found in the expert submissions of the CCC and the Monitor for the determination of the proper allocation of the sale proceeds.

30. If the evidence presented during the Allocation Proceeding does not permit the Courts to determine the ownership of the Nortel IP assets that were sold, then for the reasons set forth above and in the Trustee's Post-Trial Brief, the Trustee requests that the Courts employ the most equitable and appropriate method for allocation, a pro rata distribution to all of the creditors of Nortel.

Dated: September 18, 2014  
       Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

      */s/ Ann M. Kashishian*  
Scott D. Cousins (No. 3079)  
Mark D. Olivere (No. 4291)  
Ann M. Kashishian (No. 5622)  
1007 North Orange Street, Suite 1110  
Wilmington, Delaware 19801  
Telephone:   (302) 295-0191  
Facsimile:    (302) 295-0199  
Email:       cousins@chipmanbrown.com  
               olivere@chipmanbrown.com  
               kashishian@chipmanbrown.com

– and –

Craig A. Barbarosh
David A. Crichlow
Karen B. Dine
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022-2585
Telephone: (212) 940-8800
Facsimile: (212) 940-8776
Email: craig.barbarosh@kattenlaw.com
   david.crichlow@kattenlaw.com
   karen.dine@kattenlaw.com

– and –

Kenneth Kraft
John Salmas
DENTONS CANADA LLP
77 King Street West, Suite 400
Toronto, Ontario M5K 0A1
Canada
Telephone: (416) 863-4511
Facsimile: (416) 863-4592
Email: kenneth.kraft@dentons.com
   john.salmas@dentons.com

*Attorneys for Wilmington Trust, National Association, solely in its capacity as Successor Indenture Trustee and not in its individual capacity*