Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Nortel Networks Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

**REBUTTAL POST-TRIAL BRIEF (ALLOCATION)**
**OF THE MONITOR AND CANADIAN DEBTORS**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Benjamin Zarnett**  LSUC#: 17247M
bzarnett@goodmans.ca
**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Peter Ruby**  LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello** LSUC#: 38390C
jpasquariello@goodmans.ca
Tel:    (416) 979-2211
Fax:    (416) 979-1234
*Lawyers for the Monitor*

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canada Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

**Derrick Tay**  LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam**  LSUC#: 46735J
jennifer.stam@gowlings.com
Tel:    (416) 862-5691
Fax:    (416) 862-7661

*Lawyers for the Canadian Debtors*

September 10, 2014

**BUCHANAN INGERSOLL & ROONEY PC**
919 North Market Street, Suite 1500
Wilmington, Delaware 19801

**Mary F. Caloway** (No. 3059)
mary.caloway@bipc.com
**Kathleen A. Murphy** (No. 5215)
kathleen.murphy@bipc.com
Tel:    (302) 552-4200
Fax:    (302) 552-4295

*Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian
Debtor*

**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, NY 10020

**Jacob S. Pultman**
jacob.pultman@allenovery.com
**Paul B. Keller**
paul.keller@allenovery.com
**Laura R. Hall**
laura.hall@allenovery.com
**Ken Coleman**
ken.coleman@allenovery.com
**Daniel Guyder**
daniel.guyder@allenovery.com
Tel:    (212) 610-6300
Fax:    (212) 610-6399

*Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian
Debtor*

**TO:    THE CORE PARTIES SERVICE LIST**

------------------------

[1]    The US Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9630), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226)

# TABLE OF CONTENTS

Page

PART I – OVERVIEW.................................................................................................................1

PART II – REBUTTAL TO PROPOSED FINDINGS OF FACT .................................................2

PART III – REBUTTAL ARGUMENTS.......................................................................................3

A.     Rebuttal to the US Interests' Attempt to Conflate the Rights of the Licensed
Participants with Ownership of Nortel IP....................................................................3

     (a)     The US Interests' Contentions as to the Meaning of the Words of the MRDA ......4

          (i)     Response to the US Interests' Argument that IP Co. was a "service"
and Therefore a Licensed "Product" Under the MRDA............................5

          (ii)    Response to the US Interests' (and EMEA Debtors) Argument that
Separation of Legal and Beneficial Title Is Possible Even in the
Absence of a Trust ...................................................................................10

     (b)     Principles of Contract Interpretation Revisited....................................................17

          (i)     The Search for the Intent of the Parties Does Not Permit Evidence of
Subjective Intent .....................................................................................18

          (ii)    Factual Matrix Evidence Does Not Include "Absolutely Everything" ......19

     (c)     The Factual Matrix of the MRDA – The Approach Adopted by the US
Interests Requires Impermissible Use of Extrinsic Evidence that they
Masquerade as "Factual Matrix" .........................................................................23

          (i)     The Principal Purpose of the MRDA was not to Memorialize the
"Economic Ownership" of Nortel IP .......................................................24

          (ii)    Extrinsic Evidence Is Equally Impermissible To Interpret The CSAs
(Which also Do Not Serve To Expand The MRDA License Rights)........30

          (iii)   Nortel's Representations to the Tax Authorities about "economic
ownership" were Consistent with the MRDA Distinction Between
Ownership and License Rights ................................................................39

          (iv)   Nortel's Court Filings, Representations to the Tax Authorities and
Internal Assessments Do Not support the Allocation Position of the
US Interests.............................................................................................42

          (v)    The Tax Authorities Cannot (and Did Not) Re-write the MRDA .............44

          (vi)   Custom and Practice does not Arise under the MRDA ............................45

B.     Rebuttal to the Technical Arguments the US Interests Resort to in order to Suppress
the Courts' Consideration of the Merits of the Monitor's Allocation Position .................50

     (a)     Post-Petition Conduct of the Parties ....................................................................50

          (i)     There Are no Inconsistencies in Prior Statements ...................................54

          (ii)    The Monitor's Litigation Position was Disclosed in a Timely Fashion ....56

          (iii)   Estoppel By Convention Does Not Arise .................................................61

     (b)     Procedural Matters – Trial Witnesses and Objections...........................................65

          (i)     No Need to Call Murray McDonald, Whose Deposition Testimony
was Extensive and Consistent..................................................................65

          (ii)    No Need to Call Kruger to "explain" Tax Filings that Express
Consistent Positions ................................................................................68

|   |   | (iii) | No Need to Call Additional Witnesses to Testify about the Provisions of the MRDA ...........................................................................................70 |
|---|---|---|---|
|   |   | (iv) | Monitor's Objections to Attempts by Others to Rely on Subjective Intentions/Understandings Should be Sustained.............................72 |
| C. |   |   | Rebuttal to Other Assertions Made in Support of the US Interests' Allocation Theory ...75 |
|   | (a) |   | The US Interests' Assertion That "Equity-Takes-Last" is a Red-Herring............75 |
|   | (b) |   | The US Interests' Assertion that NNI was the "most valuable" Nortel Entity is Myopic .......................................................................................................77 |
|   |   | (i) | NNC/NNL were Instrumental to NNI's Conception, Growth and Operations ........................................................................................78 |
|   |   | (ii) | NNI's R&D Supported Legacy Businesses From Acquisitions ...............80 |
|   |   | (iii) | NNI's Customers were Nortel Customers Who Depended on Nortel Technology ...................................................................................84 |
|   |   | (iv) | NNI's Revenue was Subject to the RPSM...............................................85 |
|   |   | (v) | The Importance of NNI's Credit Support is Exaggerated .........................86 |
|   |   | (vi) | NNC/NNL Oversaw and Supported NNI's Administrative Functions......88 |
| D. |   |   | Rebuttal to Attempts by the EMEA debtors to Identify Rights IN Nortel IP Beyond Those Granted to the Licensed Participants Under the MRDA.........................................90 |
|   | (a) |   | The Joint Ownership Theory Underlying the Allocation Position of the EMEA Debtors is Flawed .....................................................................................90 |
|   |   | (i) | The Legal Theories of the US Interests and EMEA Debtors Undermine Each Other ....................................................................90 |
|   |   | (ii) | The Joint Ownership Theory is Flawed ....................................................92 |
|   | (b) |   | EMEA Debtors Alternative Resulting Trust Theory is Also Flawed .................102 |
|   |   | (i) | Resulting Trusts Serve a Restitutionary Purpose in Specific Circumstances .................................................................................102 |
|   |   | (ii) | Presumption of Resulting Trust Only Applies to Gratuitous Transfers...103 |
|   | (c) |   | EMEA Debtors' Attempt to Import the Arm's Length Principle into the Construction of the MRDA is Flawed .................................................................106 |
|   |   | (i) | There is No Legal Basis Requiring the MRDA "be" Arm's Length .......107 |
|   |   | (ii) | Transfer Pricing Principles Require Respect for the Formal Structure (Legal Arrangement) Adopted by the Parties .........................................108 |
|   |   | (iii) | Nortel's Licensing Arrangement was Commercially Rational ...............112 |
| E. |   |   | Rebuttal to Attacks on the Monitor's Valuation Approach ...........................................116 |
|   | (a) |   | The Central Arguments of the US Interests and the EMEA Debtors Against the Monitor's Valuation Position is About Legal Premises, Not Valuation Methodology ...........................................................................................116 |
|   | (b) |   | Green Valued What Was Sold to Rockstar: Ownership of NNL's IP ...............119 |
|   | (c) |   | Green Properly Used Forecasts with Respect to the Business Sales ...................119 |
|   | (d) |   | Green Properly Did Not Include a Terminal Value .............................................120 |
|   | (e) |   | Green Properly used the Q1 2010 RPS Capital Stock Percentages ....................121 |
|   | (f) |   | Green Properly Valued Customer Related Assets and Goodwill ......................122 |
|   | (g) |   | The RPSM Capital Stock Period for Allocation Should be the Same Five Years Used by Nortel ...........................................................................125 |
|   | (h) |   | Green Addressed the Patents not Owned by NNL..............................................134 |
|   | (i) |   | Green Used the Terms "Shared" and "Not Used" Appropriately......................135 |

(j)     The Outcome of the Foundry Litigation is Not Inconsistent with Green's Valuation ..............................................................................................136

(k)     Misplaced Criticisms of Green's Alternative Valuations ....................................138

    (i)     Rockstar Transaction ...........................................................................138

    (ii)    Business Sales......................................................................................142

F.     IP Co. Was Not A Viable Option For Nortel..................................................................143

**PART I – OVERVIEW**

1.      Central to the determination of the allocation of proceeds is a legal question about the interests the Selling Debtors[1] had in the most important asset sold, namely, the IP.  The Initial Post-Trial Submissions of the other parties validate the Monitor's position that the key issue for the Courts to decide is who owned the IP.[2]

2.      The Monitor and the US Interests agree that the answer must be found in the Courts' interpretation of the MRDA.  Curiously, the US Interests devote very little of their submissions to what the MRDA actually says, beyond references to fragments of the recitals and some implausible and unsustainable arguments that rely on select words out of context. A good part of their submissions instead focuses upon inadmissible extrinsic evidence in an attempt to impose a different meaning on the unambiguous words of the contract, technical and procedural contortions to make the inadmissible admissible, and various arguments designed to avoid the Courts giving effect to the Monitor's position on its merits. The extrinsic evidence does not mean what the US Interests contend, it is inadmissible, and there are no procedural devices available to the US Interests that would justify ignoring the rules of contractual interpretation, nor is there any reason why the important issues in this case, and the rights of those affected, should be determined on any basis other than the merits.

---

[1] All capitalized terms used herein which are not defined are as defined in the Post-Trial Brief (Allocation) of the Monitor and Canadian Debtors dated August 7, 2014 (the "Monitor's Initial Post-Trial Brief"), except for the term "US Interests", which is as defined in the Post-Trial Brief (Allocation) of the US Interests dated August 7, 2014 (the "US Interests' Initial Post-Trial Brief") – to include the US Debtors and the Official Committee of Unsecured Creditors.

[2] Reference to the Monitor in this rebuttal brief includes the Canadian Debtors except where the context relates specifically to Ernst & Young Inc. (Canada) in Part III. B hereof.

- 2 -

3.      The EMEA Debtors  would have the Courts essentially ignore the MRDA and its provisions about title and licenses and find "joint ownership" of the IP from other sources.  This theory of "ownership" is fatally flawed. It is conclusively answered by the MRDA – the entire agreement on such subjects – and is also subject to multiple other insurmountable problems.

4.      The Monitor's rebuttal focusses on addressing the misplaced attempts by other parties to narrowly construe NNL's rights as owner of the IP that was sold in the Business Sales and Rockstar Transaction and to expand the rights of the US Debtors and EMEA Debtors.

5.      The Monitor also addresses herein the criticisms made by the other Estates of its valuation approach.  It is apparent that the different allocations proposed by the experts for the each of the three Estates rests on their different understanding of the rights and obligations set out in the MRDA and the criticism of the valuation of Philip Green is largely based on the other Estates' misinterpretation of those rights and obligations. Ultimately, they cannot avoid the fact that the valuation done by Green is the only valuation that gives effect to a proper understanding of the MRDA and provides an allocation reflecting the value of the property interests actually transferred or surrendered by each of the Nortel entities in the Business Sales and Rockstar Transaction.

**PART II** – **REBUTTAL TO PROPOSED FINDINGS OF FACT**

6.      The proposed finding of fact of the US Interests, EMEA Debtors and UKPC are in many respects materially incomplete or inaccurate.

7.      The Monitor has prepared a separate consolidated document (titled Supplemental Consolidated Proposed Findings of Facts) that includes all of its proposed findings from the Monitor's Initial Post-Trial Brief, together with additional facts (denoted by bold text) now made

relevant by, responsive to, or necessary to correct certain aspects of the proposed findings of fact

and arguments advanced by the US Interests, the EMEA Debtors and UKPC in their Initial Post-

Trial Briefs[3] (including facts referred to in this Rebuttal Brief).

## PART III– REBUTTAL ARGUMENTS

8.      Although at times the arguments advanced by the US Interests and EMEA Debtors

overlap, they advance different theories.  How different their theories are is discussed below (see

paragraphs 197 to 202 below).

9.      In this Rebuttal Brief, the position of the US Interests is addressed first, and to the extent

the EMEA Debtors' arguments overlap with an argument of the US Interests, that is generally

noted.  The EMEA Debtors' main theory is then addressed.  Finally, the valuation evidence is

addressed.

10.      The Monitor has not attempted to deal with every point made in the US Interests' and

EMEA Debtors' (or other parties') Initial Post-Trial Briefs.  Silence with respect to any

argument made by other parties does not suggest acceptance by the Monitor of that argument.

## A.      REBUTTAL TO THE US INTERESTS' ATTEMPT TO CONFLATE THE RIGHTS OF THE LICENSED PARTICIPANTS WITH OWNERSHIP OF NORTEL IP

11.      The MRDA deals with both the ownership of NN Technology and the license rights

enjoyed by the Licensed Participants in and to the NN Technology.  The Monitor's approach to

the interpretation of the MRDA (as detailed at paragraphs 287 to 433 of the Monitor's Initial

---

[3] The  Monitor's Supplemental Consolidated Proposed Findings of Fact attempts to deal with the most egregious inaccuracies and omissions from the other parties' proposed findings of fact but does not deal with everything asserted in them. Just because an item asserted as a fact by another party is not addressed does not mean it is admitted.

- 4 -

Post-Trial Brief) gives meaning and effect to both of these legally distinct types of interests, and to the words of the contract itself.  In contrast, the US Interests' approach to the interpretation of the MRDA seeks to change NNL's ownership rights from those provided for in the MRDA (and which are independently confirmed by the assignments from inventors to NNL and the patent registrations themselves) and seeks to misstate and over-state the breadth of NNI's rights so as to equate them with ownership. Essentially, the US Interests seek to do so in three different ways: (i) by advancing increasingly convoluted constructions on the words of the MRDA; (ii) by trying to change the meaning of the MRDA with impermissible extrinsic evidence of subjective understandings; and (iii) with circular and technical arguments by which they hope to persuade the Courts not to give effect to the Monitor's positions even though valid.  The Monitor's rebuttal to (i) and (ii) are in this Part III. A and the Monitor's rebuttal to (iii) is in Part III. B and C.

**(a)       The US Interests' Contentions as to the Meaning of the Words of the MRDA**

12.       It is telling that the US Interests' argument spends relatively little time on what the MRDA actually says.  The US Interests attempt, instead, to place reliance on fragments of recitals to the MRDA, such as the reference to the "full entrepreneurial risks and benefits" enjoyed by each of the Participants,[4] and "the intent of [the parties] that the Licensed Participants" hold and enjoy "equitable and beneficial ownership of certain exclusive rights".[5] But as demonstrated in the Monitor's Initial Post-Trial Brief, when one considers all of the words of the MRDA, the conclusions the US Interests seek are untenable.

---

[4] The capitalized terms "Participants", "RPEs" and "IEs" are used interchangeably in this rebuttal brief and have the same meaning

[5] US Interests' Initial Post-Trial Brief, p. 24 and  US Interests' Proposed Findings of Fact and Conclusions of Law, August 7, 2014 ("US Interests' PFOFCL"), p. 29 (para. 111), 178 (para. 61) and 198 (para. 114)

- 5 -

13.     The Monitor's Initial Post-Trial Brief, for example, outlines the Monitor's position

concerning how the relevant provisions of the MRDA should be properly read, including the

relevance of the recitals and subsequent amendments (and the MOU) that are referred to in the

US Interests' Initial Post-Trial Brief.  Those submissions (Monitor's Initial Post-Trial Brief,

paragraphs 245 to 433) will not be repeated herein.  The Monitor's approach takes into account

the consequences of NNL's legal title to, and ownership of, the IP, the restricted license rights

granted to the Licensed Participants (including the "exclusive" license rights and the attendant

rights to exclude, exploit, enforce and sub-license) and demonstrates that the MRDA maintains

the distinction between the owner and the licensees of the NN Technology while at the same

time defining the extent of the rights of licensees (which are not unlimited).

14.     In addition to relying on the extensive analysis in its Initial Post-Trial Brief of the terms

of the MRDA, read in accordance with the Ontario law concerning contract interpretation, the

Monitor sets out in the following subsections of this Rebuttal Brief submissions with respect to

additional flawed interpretive arguments made by the US Interests.

      **(i)**      **Response to the US Interests' Argument that IP Co. was a "service" and Therefore a Licensed "Product" Under the MRDA**

15.     The US Interests try to develop in their Initial Post-Trial Brief another interpretation of

the MRDA license in their quest to make it unlimited.  Although they criticize others for what

they characterize as "litigation positions", in their evolving attempts to expand NNI's license,

they now assert a position not based on anything said prior to this litigation:

> IP Co., as a licensing service business that the Participants proposed to be
> developed and indeed were actively developing, and which indisputably
> embodied the entirety of the Patent Portfolio sold to Rockstar, fits

> comfortably within the plain meaning of a "service" and thus the definition of "Products".[6]

This argument must be rejected.

16.     The term "service" is not defined in the MRDA.  The word "services" appears in the definition of "Products".  The MRDA defined Products as:

> "**Products**" shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing.[7]

17.     The term "Products" is used in the grant of the license by NNL to the Licensed Participants.  Article 5(a)(i) of the MRDA, by which NNL grants the exclusive license rights to the Licensed Participants, provides as follows:

> To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:
>
> (i)     continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell *Products* using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License"); [emphasis added]

---

[6] US Interests' Initial Post-Trial Brief, p. 36 and 106; see also US Interests' PFOFCL, p. 26 (paras. 102-103)

[7] TR21003 (MRDA), Art. 1(g)

18.     Thus, in the search for the plain meaning of the word "service" as the US Interests

purport to do, one must recognize that it is a part of a defined term and that the importance of the

word "Products" is that the first arm of NNI's license was to "…make, have made, use, lease,

license, offer to sell and sell…Products using or embodying NN Technology…".  And as the

definition of Products makes clear, they must be "by, or for, any of the Participants".

19.     The proposed business of IP Co. was to use threatened or actual litigation against

technology companies making their own products which arguably used or embodied NN

Technology, in an attempt to encourage them to take (and pay for) a license to NN Technology.[8]

The US Interests argue that this conduct is encompassed by the term "service" under their

license.  That is unsupportable.  Giving someone else (i.e. not any of the Participants) the right to

use or embody NN Technology in their own products are not "services" within the Products

definition under the MRDA.

20.     Since the word "services" does not appear in isolation in the MRDA, it must be read both

as part of a phrase in the Products definition that refers to "products, software and services"[9], and

---

[8] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 69, 73

[9] Meaning services relating to Nortel's products and software.  Peter Newcombe, a witness for
the EMEA Debtors who worked in both engineering and sales for Nortel for almost two decades,
testified that regarding his work selling optical and carrier network technologies he participated
in selling "Nortel hardware", "Nortel software" and "related Nortel services": Peter Newcombe
Trial Testimony, Day 7, May 22, 2014, p. 1630:1-20.  The Horst Frisch transfer pricing
economic analysis on which the MRDA was based spoke of Nortel customers choosing "Nortel
products and services" and that "Nortel is committed to using its R&D resources in providing
full pro-active service and support to its customers", making clear that the "services" were part-
and-parcel of the products and software that Nortel was providing to customers: TR11055B
(Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14,
2002) p. 4.  As documented in a Nortel PowerPoint presentation from February 2006, 15% of
Nortel's patent portfolio as of the end of 2005 related to "Services & Cross-Network
Technologies": TR21455 (IP Benchmarking Presentation, February 14, 2006) slide 5.  Services
were an integral and integrated aspect of Nortel's business.  As the functional analysis conducted
in 2004 explained that services were an integral and integrated aspect of Nortel's business:

as a phrase that (through the use of the defined term) is incorporated in the license grant as something that uses or embodies NN Technology.  A product can use or embody NN Technology.  Software can use or embody NN Technology.  Services in the form of, for example, upgrade services, can use or embody NN Technology.  But a licensing business does not use or embody NN Technology in the sense of these provisions.  The US Interests' argument simply does not comport with the contractual language.

21.     Nor does it comport with common sense.  On the US Interests' reading, the word "services" in the definition of Products would overwhelm the rest of the language of the license and render it meaningless and give to the Licensed Participants a right to do and permit others to do anything with the NN Technology, all under the rubric of this being a service.  Thus, this reading suffers from the same flaws as the other attempts by the US Interests to expand the scope of NNI's license beyond its terms, to illogical results.  For example, on the US Interests' reading of the word "services" in the MRDA, NNI could have provided a "service" to competitors of Nortel by permitting them to use in the U.S. the entirety of Nortel's patent pool to make their own products to compete with Nortel.  The plain reading of the MRDA and common sense are contrary to this interpretation.

22.     The US Interests purport to rely on an alleged "admission" from Sheldon Burshtein (the Ontario lawyer whose evidence was tendered to rebut that of Daniel Bereskin on matters of Ontario law) about the meaning of "services".[9]  First, evidence, even from experts, about the

---

"Nortel's networking solutions generally bring together diverse networking products from its various product families, and related services, to create either a customized or "off the shelf" solution for customers.  Nortel's business consists of the design, development, manufacture, assembly, marketing, sale, licensing, servicing and support of these networking solutions": TR11084 (2004 Functional Analysis) p. 3.  See also p. 7.

[10] US Interests' Initial Post-Trial Brief, p. 36 (footnote 83)

meaning of this word as used in the MRDA is unnecessary.[11]  Second, even if evidence from experts on this topic were admissible, it is noteworthy that neither Bereskin nor Bruce Stratton, respectively lawyer witnesses retained by the US and EMEA Debtors, said anything about "services" that supports the US Interests' interpretation.  Third, the response the US Interests claim to be an "admission" by Burshtein was not given in the context of questions about the meaning of "services" in the MRDA definition of Products, or even with respect to IP Co.  Burshtein was handed a summary of trademark registrations made by his firm for IP licensing services, and he commented that licensing IP could be a service within the meaning of the *Trade-marks Act* if there is a benefit to others and not merely to the registrant.  His specific evidence about what the term "service" means in the context of the license that was given to NNI under the MRDA was quite different and does not help the US Interests' position.  Burshtein said:

> …In the context of the definition of products, you have to read services – or in the definition of products, you have to read services in the context of that definition.  In other words, services relate to products and software and components and parts and subassemblies and features an things like that.  In my view, the nature of the services contemplated by this definition are services that are tied in some way, maintenance services, installation services, upgrade services.  When you read that provision as a whole, that's what I think services refers to.[12]

---

[11] See US Interests' Initial Post-Trial Brief, p. 103 (footnote 362) in which they contend that experts may not interpret contracts.

[12] Sheldon Burshtein Deposition, June 11, 2014, p. 184:6-19. Also see Sheldon Burshtein Deposition, June 11, 2014, p. 187:7-23 and 185:10-19. Burshtein's interpretation of the word "services" in the MRDA is supported by the 2004 Functional Analysis, which described the types of services Nortel provided its customers, including installation services (such as "network implementation"), operations and maintenance support, software services, technical services and support, and upgrade services, such as migration and integration to update hardware and software changes.  TR11084 (2004 Functional Analysis), p. 49 and 60-62.

(ii)    **Response to the US Interests' (and EMEA Debtors) Argument that Separation of Legal and Beneficial Title Is Possible Even in the Absence of a Trust**

23.    As discussed in the Monitor's Initial Post-Trial Brief (at paragraphs 205, 207 and 293, as well as in the Pre-Trial Brief of the Monitor and the Canadian Debtors, May 2, 2014 at paragraphs 97-99) any argument by the US Interests or EMEA Debtors that NNL's legal title as described in the MRDA implied that beneficial ownership was held elsewhere, or that NNL's interest was limited to "bare legal title" – i.e. something akin to the interest held by a trustee – while the Licensed Participants held "beneficial ownership" of the Nortel IP is directly contradicted by, among other things, the MRDA's express disclaimer of any fiduciary relationship between the parties.[13]

24.    The US Interests now acknowledge that there was no fiduciary relationship between the parties, but assert they can maintain their position even in the absence of a fiduciary relationship:

> [T]here are examples in law where legal title is separated from equitable and beneficial ownership without a fiduciary relationship.[14]

25.    The EMEA Debtors make a similar concession and argument. In an effort to avoid the fatal effect on their position of the MRDA's explicit exclusion of the existence of a fiduciary relationship, they argue that the absence of a fiduciary relationship is not inconsistent with their assertion of divided legal and beneficial ownership:

> [A] division between legal title and beneficial ownership does not necessarily signify a fiduciary relationship.[15]

---

[13] TR21003 (MRDA and addenda) Article 13

[14] US Interests' Initial Post-Trial Brief, p. 37 (footnote 86); see also US Interests' PFOFCL p.198 (para. 114) (footnote 46)

- 11 -

26.     The argument of the US Interests and EMEA Debtors ignores the strong Ontario

authority against their assertion that a division between legal and beneficial ownership can exist

in the absence of a trust (a quintessential fiduciary relationship).  As the Divisional Court stated

in *Gioris v. Ontario*:

> *[A] trust arises where there is a split between legal and equitable title*.  In
> this case, as we have noted, the Appellant had legal title but he did not
> have sole equitable title.  If the money was not used to purchase the
> apartment, the Appellant was obliged to return it to his brother.  Therefore,
> it cannot be said that the Appellant had sole or complete beneficial title.
> Thus, there was a trust.[16] [emphasis added]

27.     Ignoring this authority against their assertions, the US Interests and EMEA Debtors

attempt to rely primarily on two sources, *Falconbridge on Mortgages* and a decision of the

House of Lords in *Westdeutsche Landesbank v. Islington LBC*.  Neither supports their position.

28.     The US Interests cite *Falconbridge* as authority for the proposition that a "legal

mortgage" is an example of legal title being separated from equitable and beneficial ownership

without a fiduciary relationship.  However, the US Interests' assertion is incorrect.  The very

passage upon which they rely makes it clear that a mortgage is not an example of legal title being

separated from beneficial ownership.

29.     Specifically, *Falconbridge* explains that, at common law, prior to the 1984 enactment of

the *Land Registration Reform Act*, a mortgage effected a conveyance to the mortgagee of legal

title to the property.  By acquiring legal title, the mortgagee acquired all of the rights of

ownership:

---

[15] Joint Administrators' Post-Hearing Submission Regarding Allocation of the Proceeds of the
Nortel Asset Sales (the "EMEA Initial Post-Trial Brief"), para. 426, see generally paras. 426-430

[16] *Gioris v. Ontario (Director of Income Maintenance, Ministry of Community & Social
Services)*, 1999 CarswellOnt 3716 at para 5 (Div. Ct.)

> Due to the fact at common law a mortgage was the conveyance to the mortgagee of the legal title to the property and because exclusive possession of property is one of the indices of ownership, the mortgagee at common law was entitled to possession of the mortgaged property. The right is paramount.[17]

30.     The transfer of legal title did not leave beneficial ownership of the property with the mortgagor. Rather, the source of the mortgagor's right to remain in possession of the property, notwithstanding the mortgagee's legal title, was the contract between the two parties. As *Falconbridge* explains:

> By contract, however, the mortgagee permits the mortgagor to be in possession until default.[18]

31.     *Falconbridge* emphasizes that the mortgagee's legal title meant ownership and the full rights of ownership, including the right of possession, subject only to the terms of the mortgage agreement:

> The mortgagee's right to possession arises because the legal title to the property is conveyed to the mortgagee. It is not a contractual right. It is inherent in a mortgage being a conveyance.[19]

32.     Thus, a mortgage did not create any division between legal and beneficial ownership. Rather, a mortgage involved the conveyance of ownership of the property to the mortgagee, including all of the customary rights of ownership, subject to the terms of the mortgage contract. The only equitable right that was applicable was the mortgagor's equitable right of redemption.

---

[17] Walter M. Traub, *Falconbridge on Mortgages*, 5th ed. looseleaf (Aurora: Canada Law Book, 2003) at para. 22.10

[18] Walter M. Traub, *Falconbridge on Mortgages*, 5th ed. looseleaf (Aurora: Canada Law Book, 2003) at para. 22.10

[19] Walter M. Traub, *Falconbridge on Mortgages*, 5th ed. looseleaf (Aurora: Canada Law Book, 2003) at para. 22.10

This equitable right did not constitute "beneficial ownership" of the property.  It gave the mortgagor a right of redemption in certain circumstances where the strict contractual preconditions for redemption had not been met.  With respect to the contractual right of a mortgagor to redeem, *Falconbridge* states:

> The mortgage contract contained a proviso for redemption in favour of the mortgagor.  The proviso for redemption effectively stated that if the mortgage debt were paid in full, strictly in accordance with the mortgage contract, the conveyance of the legal title to the property to the mortgagee would be null and void.[20]

33.    With respect to the strict preconditions that governed the mortgagor's redemption right at common law, *Falconbridge* states:

> If on the date for redemption the mortgage moneys were not paid, the mortgagor lost the legal right to redeem the property.[21]

34.    However, the courts of equity granted relief from such contractual strictures which the common law enforced.  *Falconbridge* states:

> The courts of equity concluded this [i.e. the strict approach taken by the common law to the right to redeem] to be immensely unfair and created an equitable right of redemption.  This equitable right of redemption could be exercised by the mortgagor at any time up until the rights of the mortgagor were foreclosed by an equitable action for foreclosure.[22]

35.    Thus, far from supporting any arguments advanced by the US Interests and EMEA Debtors, *Falconbridge* actually undermines their argument, because it furnishes another instance

---

[20] Walter M. Traub, *Falconbridge on Mortgages*, 5th ed. looseleaf (Aurora: Canada Law Book, 2003) at para 22.10

[21] Walter M. Traub, *Falconbridge on Mortgages*, 5th ed. looseleaf (Aurora: Canada Law Book, 2003) at para 22.10

[22] Walter M. Traub, *Falconbridge on Mortgages*, 5th ed. looseleaf (Aurora: Canada Law Book, 2003) at para 22.10

- 14 -

where the law equates legal title to full ownership and there is no parallel between a mortgagor's

equitable right of redemption (which is in any event not beneficial ownership) and the rights

which the US Interests and EMEA Debtors claim in Nortel's IP.

36.     The US Interests and EMEA Debtors' reliance on the decision of the House of Lords in

*Westdeutsche Landesbank Girozentrale v. Islington LBC* is also misplaced.  The issue before the

House of Lords in that case involved whether the plaintiff bank, which had established a claim in

restitution for money had and received pursuant to a contract that was declared void *ab initio*,

was entitled to compound interest, or whether its recovery should be limited to simple interest.[23]

37.     The bank based its claim for compound interest upon assertions that:

(a)     when the bank paid the money over to the defendant, it transferred its legal title
        to, but not its equitable ownership of, the money;

(b)     this separation of legal title from equitable title gave rise to a trust, rendering the
        receiving party a trustee; and

(c)     the jurisprudence supported the awarding of compound interest against a trustee.[24]

38.     However, the bank's argument failed at the first hurdle.  The House of Lords rejected the

contention that the bank had retained any equitable interest in the money following payment to

the defendant.  In direct contradiction to the US Interests' and EMEA Debtors' positions, in

rejecting the bank's argument, the House of Lords emphasized that legal title carries with it ***all***

***rights*** of ownership, unless there has been a specific separation of legal and equitable ownership.

Lord Browne-Wilkinson said:

---

[23] *Westdeutsche Landesbank Girozentrale v. Islington LBC*, [1996] A.C. 669 at 700 (HL)

[24] *Westdeutsche Landesbank Girozentrale v. Islington LBC*, [1996] A.C. 669 at 702 (HL)

- 15 -

> I think this argument is fallacious.  A person solely entitled to the full
> beneficial ownership of money or property, both at law and in equity, does
> not enjoy an equitable interest in that property.  The legal title carries with
> it all rights.  Unless and until there is a separation of the legal and
> equitable estates, there is no separate equitable title.  Therefore, to talk
> about the bank "retaining" its equitable interest is meaningless.[25]

39.    Lord Browne-Wilkinson went on to say that the question of whether there was a

separation of the legal and equitable estates depended upon whether the circumstances were such

as to impose a trust:

> The only question is whether the circumstances under which the money
> was paid were such as, in equity, to impose a trust on the local authority.
> If so, an equitable interest arose for the first time under that trust.[26]

40.    On the facts of the case, no trust was found to exist, because the requirements for a trust

were not met:

> There was . . . never a time at which both (a) there was defined trust
> property and (b) the conscience of the [defendant] in relation to such
> defined property was affected.  The basic requirements of a trust were
> never satisfied.[27]

41.    Against this backdrop – i.e. his findings that there was no separation of legal and

equitable title because there was no trust (a finding fatal to the US Interests' and EMEA Debtors'

position) – Lord Browne-Wilkinson went on to consider whether, where one party holds legal

title and another has any form of an equitable interest or claim, a trust is necessarily created.  The

US Interests and EMEA Debtors mistakenly rely on this passage as addressing a question it does

not.  It is clear from his discussion that Lord Browne-Wilkinson was not considering the

---

[25] *Westdeutsche Landesbank Girozentrale v. Islington LBC*, [1996] A.C. 669 at 706 (HL)

[26] *Westdeutsche Landesbank Girozentrale v. Islington LBC*, [1996] A.C. 669 at 706 (HL)

[27] *Westdeutsche Landesbank Girozentrale v. Islington LBC*, [1996] A.C. 669 at 706 (HL)

proposition whether a separation of legal and equitable **ownership** denotes a trust. He had already considered that. Rather, in *obiter*, Lord Browne-Wilkinson was considering a point he summarized as follows:

> The bank's submission, at its widest, is that if the legal title is in A but the equitable interest in B, A holds as trustee for B.[28]

42.     He rejected the bank's argument and said:

> There are many cases where B enjoys rights which, in equity, are enforceable against the legal owner, A, without A being a trustee, e.g. an equitable right to redeem a mortgage, equitable easements, restrictive covenants, the right to rectification, an insurer's right to subrogation to receive damages subsequently recovered by the assured.[29]

43.     Thus, Lord Browne-Wilkinson addresses a point that is quite different than the one that the US Interests and EMEA Debtors have put before the Courts. The examples that he uses for illustration are not situations where legal and equitable ownership are divided. He was considering whether the existence of every kind of equitable claim or interest denotes a trust. For example, he refers to the example of a mortgagee/mortgagor relationship. As discussed above, that relationship does not involve the separation of legal and equitable title. It involves one party holding all of the rights of ownership, subject to the other party's contractual right to redeem, in aid of which equity will step in to prevent forfeiture.

44.     Lord Browne-Wilkinson's other examples make this point clearly – an easement, rectification, a restrictive covenant, an insurer's right to subrogation – also do not involve any separation of beneficial and legal ownership. They simply involve instances where legal title is

---

[28] *Westdeutsche Landesbank Girozentrale v. Islington LBC*, [1996] A.C. 669 at 706 (HL)

[29] *Westdeutsche Landesbank Girozentrale v. Islington LBC*, [1996] A.C. 669 at 706-707 (HL)

- 17 -

held by one person while another has certain rights that are equitable – i.e. that are enforced by courts of equity but are not (like the right to an easement) ownership of the property.

45.     None of this assists the US Interests and EMEA Debtors.  They do not have (and do not purport to have) the types of rights to which Lord Browne-Wilkinson referred, none of which in any event constitute beneficial or equitable ownership of property.  Their rights were contractual – license rights – which were neither more nor less than as specifically defined in the MRDA.

**(b)     Principles of Contract Interpretation Revisited**

46.     In order to advance their position, and unable to ground it in what the MRDA actually says, the US Interests repeatedly ignore the basic principles of contractual interpretation of Ontario, even though they say they are following them.  Foremost among their departures from the established principles is their purported portrayal of the factual matrix.  For example, they repeatedly attempt to use, as factual matrix evidence, matters that are not limited to those which existed at the time the contract was entered into.[30]  Furthermore, the US Interests seek to sweep into factual matrix all sorts of matters that are expressly excluded from its ambit, through their mis-construction of the Supreme Court of Canada decisions in *Consolidated-Bathurst Export*

---

[30] See for example: US Interests' Initial Post-Trial Brief, p. 51-56 and 113; and US Interests' PFOFCL, p. 86-87 (paras. 264-266) and 190-191 (para. 92).  Similar departures from established contract interpretation principles exist in the evidence relied on in the EMEA Initial Post-Trial Brief, for example, Mr. Philippe Albert-Lebrun's testimony (referred to at paras. 93 to 116) concerning NNSA's economic or beneficial ownership of Nortel's IP, which he admitted on cross-examination was a function of drafting and interpreting of the MRDA that was "not [his] core competency" (Philippe Albert-Lebrun Deposition, November 21, 2013, p. 214:7-13), and was predicated on information given to him by others – understandings that were not only second hand or hearsay but also not established to have arisen in the context of the formation of the contract itself (Albert-Lebrun having himself been at least one step removed) (see Philippe Albert-Lebrun Trial Testimony, May 21, 2014, p. 1497:17-1499:8, 1505:10-1508:10 and 1503:23-1504:21).

*Ltd. v. Mutual Boiler & Machinery Insurance Co.* and *Sattva Capital Corp. v. Creston Moly Corp.*

> **(i)** **The Search for the Intent of the Parties Does Not Permit Evidence of Subjective Intent**

47.     The US Interests repeatedly refer[31] to the following quote from the 1980 decision in *Consolidated Bathurst Export Ltd. v. Mutual Boiler*:

> [T]he normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract.[32]

48.     The US Interests seek to use this quote to support their introduction of evidence of subjective intentions and understandings, but these attempts are misguided.  It is a misreading of *Consolidated-Bathurst* to allege that it offers any support for the admissibility of evidence of subjective intention.  This was explained by the Supreme Court of Canada in *Eli Lilly v. Novopharm*, where the Court clarified that the reference in *Consolidated-Bathurst* to the "true intent of the parties" does not permit extrinsic evidence of the parties' actual subjective intent:

> The trial judge appeared to take *Consolidated-Bathurst* to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. In my view, this approach is not quite accurate.  The contractual intent of the parties is to be determined by reference to the words they used in

---

[31] US Interests' Initial Post-Trial Brief, p. 22; US Interests' PFOFCL, p. 165, 167 and 183

[32] *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.*, [1980] 1 S.C.R. 888 at para. 26

drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time.[33]

49.     Recently the Supreme Court of Canada in the *Creston Moly Corp. v. Sattva Capital Corp.* case clearly reaffirmed this approach.  The Supreme Court of Canada explained, once again, that the "goal of the [contractual interpretation] exercise is to ascertain the objective intent of the parties",[34] and that, accordingly, evidence of the parties' subjective intentions is inadmissible:

> The parol evidence rule precludes admission of evidence outside the words of the written contract that would add to, subtract from, vary, or contradict a contract that has been wholly reduced to writing.  To this end, the rule precludes, among other things, evidence of the subjective intentions of the parties.[35]

### (ii)    Factual Matrix Evidence Does Not Include "Absolutely Everything"

50.     Although the US Interests assert that the factual matrix extends to "any factors which assist the court in discerning the parties' intent",[36] this is simply incorrect.  Contrary to the arguments advanced by the US Interests (and also by the EMEA Debtors), the scope of what is admissible as factual matrix is not limitless.

51.     Rather, as is discussed in the Monitor's Initial Post-Trial Brief at, *inter alia*, paragraphs 184-189, there are clear limits on the type of evidence that is admissible under the rubric of

---

[33] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 54

[34] *Creston Moly Corp. v. Sattva Capital Corp.*, 2014 SCC 53 at para. 49

[35] *Creston Moly Corp. v. Sattva Capital Corp.*, 2014 SCC 53 at para. 59

[36] US Interests' Initial Post-Trial Brief, p. 23. The EMEA Debtors similarly assert that "[e]vidence of any rights and entitlements that the RPEs already had before entering into the MRDA falls squarely within the factual matrix" (see EMEA Initial Post-Trial Brief, para. 443), ignoring that the EMEA Debtors would have to prove—which they cannot—the existence of the purported pre-MRDA "rights and entitlements" without any recourse to evidence of the subjective intentions of the parties' regarding their previous agreements.

- 20 -

factual matrix, and there are limits to the uses to which such evidence may be put.  Those limits are as follows:

(a)    the factual matrix includes only evidence of background facts that were known to the parties at or before the date of the written agreement;[37]

(b)    the factual matrix does not include evidence of any party's actual, subjective intent or understanding;[38]

(c)    evidence of the factual matrix cannot be used to add to, vary, or contradict the terms of the written agreement;[39]

(d)    evidence of the factual matrix cannot be used to create an ambiguity which otherwise does not exist in a written agreement;[40] and

(e)    evidence of the factual matrix cannot be used to effectively make a new agreement between the parties.[41]

52.    Nothing in *Sattva Capital* suggests that these limitations do not apply.  Rather, it reconfirms they do.  The Court set out the clear limits to the scope of factual matrix evidence:

> The nature of the evidence that can be relied upon under the rubric of "surrounding circumstances" will necessarily vary from case to case.  It does, however, have its limits.  It should consist only of objective

---

[37] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71; *Creston Moly Corp. v. Sattva Capital Corp.*, 2014 SCC 53 at para. 58

[38] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71; *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24; *Zaccardelli v. Kraus*, 2003 CarswellAlta 490 at paras. 29-30

[39] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71; *Creston Moly Corp. v. Sattva Capital Corp.*, 2014 SCC 53 at para. 58

[40] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71

[41] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71; *Creston Moly Corp. v. Sattva Capital Corp.*, 2014 SCC 53 at para. 57

> evidence of the background facts at the time of the execution of the
> contract, that is, knowledge that was or reasonably ought to have been
> within the knowledge of both parties at or before the date of contracting.[42]

53.      And the Court reiterated that, while factual matrix evidence of surrounding circumstances

can be considered, the words of the contract remain paramount:

> While the surrounding circumstances will be considered in interpreting the
> terms of a contract, they must never be allowed to overwhelm the words of
> that agreement. . . . While the surrounding circumstances are relied upon
> in the interpretive process, courts cannot use them to deviate from the text
> such that the court effectively creates a new agreement.[43]

54.      Any statement about the breadth of matters that can be considered factual matrix in

*Sattva* must be read in light of these clear limitations.  The Court expressly so stated:

> **Subject to these requirements and the parol evidence rule discussed
> below,** this includes, in the words of Lord Hoffman, "absolutely anything
> which would have affected the way in which the language of the document
> would have been understood by a reasonable man".[44] [emphasis added]

55.      The US Interests, in an attempt to argue that the factual matrix knows no limits quote

only part of the foregoing sentence in their Initial Post-Trial Brief and proposed conclusions of

law.[45]  And in their Proposed Findings of Fact and Conclusions of Law, the US Interests state as

follows:

> [F]actual matrix evidence may not include the subjective intent of the
> parties, but subject to that restriction can include "absolutely anything

---

[42] *Creston Moly Corp. v. Sattva Capital Corp.*, 2014 SCC 53 at para. 58

[43] *Creston Moly Corp. v. Sattva Capital Corp.*, 2014 SCC 53 at para. 57

[44] *Creston Moly Corp. v. Sattva Capital Corp.*, 2014 SCC 53 at para. 58

[45] US Interests' Initial Post-Trial Brief, p. 38

which would have affected the way in which the language of the document would have been understood by a reasonable man".[46]

56.     They omit the introductory phrase of the sentence (bolded above) and neglect to mention that Lord Hoffman's comment about the factual matrix including "absolutely everything" does not stand on its own and is not limited only by the exclusion of subjective intention evidence. The Supreme Court of Canada made this comment expressly "subject to" the requirements discussed above (that the evidence must not deviate from the text of the agreement and is limited to objective background facts at the time of the signing of the contract) and "subject to" the parol evidence rule and the exclusion of all subjective intention evidence.

57.     The fallacy of the US Interests' assertions that rely on Lord Hoffman's words, out of context and as part of an incomplete quotation is exposed when the complete quotation is examined.

58.     The US Interests deal with what they assert is "factual matrix" evidence in section "C" of Point II of their Initial Post-Trial Brief and the rebuttal of the Monitor to those specific points will be addressed in the corresponding section (c) below.  However, the US Interests' misunderstanding of what the factual matrix doctrine means:

(a)     much, if not all, of the evidence they wish to rely on, and the uses to which they seek to put it, are impermissible, even if the evidence said what they assert it does (which it does not); and

(b)     in their attempt to rely on this evidence they tacitly concede that the actual words of the MRDA – the paramount consideration – do not assist them.  Why else

_____

[46] US Interests' PFOFCL, p. 185 (para. 82)

would the US Interests attempt to impermissibly overwhelm the words and

deviate from the text with inappropriate evidence?

**(c)     The Factual Matrix of the MRDA – The Approach Adopted by the US Interests Requires Impermissible Use of Extrinsic Evidence that they Masquerade as "Factual Matrix"**

59.     The proper legal framework for factual matrix evidence is discussed immediately above

and the evidence must be assessed by that standard and not by the framework that the US

Interests and EMEA Debtors suggest. The US Interests' Initial Post-Trial Brief is replete with

examples of improper extrinsic evidence.

60.     The US Interests also contend that the Courts may not exclude their inadmissible

extrinsic evidence.[47]  Their position that all remaining objected-to evidence aside from the 46

deposition designations that were highlighted by the Monitor at the outset of trial is admissible as

factual matrix evidence, begs the question: "The failure to object does not render inadmissible

evidence admissible".[48]

61.     The Monitor's objections to the US Interests' reliance on this improper evidence is also

discussed further at paragraphs 160 to 167 of this rebuttal brief.  Notwithstanding its

inadmissibility, the immediately following sections deal with why the so-called "factual matrix"

evidence relied on by the US Interests does not support their position.

---

[47] See US Interests' Initial Post-Trial Brief, p. 38 (footnote 89).

[48] *Doherty v. Home Insurance Co.,* 1986 CarswellOnt 741 at para. 22, citing *Adam v. Campbell*, [1950] S.C.J. No. 51 at para. 36

- 24 -

**(i)      The Principal Purpose of the MRDA was not to Memorialize the "Economic Ownership" of Nortel IP**

62.      The US Interests contend that the principal purpose of the MRDA was to memorialize the Licensed Participants' economic ownership of Nortel IP through Exclusive Territories,[49] but the evidence cited does not support this contention.  The testimony cited to is selective and misleading through omission, and is not objective evidence of the purpose of the MRDA but rather inadmissible evidence of particular witnesses' subjective understandings and interpretations/intentions.  This includes[50]:

(a)      Mark Weisz's subjective understanding of the "purpose" of the MRDA;[51]

(b)      Michael Orlando's subjective understanding of what were the responsibilities of the Licensed Participants;[52]

(c)      Kerry Stephens' subjective views of the meaning of ownership of IP under the MRDA,[53] which views he himself indicated on deposition and on cross examination should not be relied upon;[54]

(d)      John Doolittle's subjective understanding of the purposes and effect of the MRDA;[55] and

---

[49] US Interests' Initial Post-Trial Brief, p. 40-47 and US Interests' PFOFCL, p. 74-98

[50] There are other examples of ex-post facto evidence from 2005 onwards, after the MRDA was signed, which is not properly characterized as factual matrix evidence – e.g. at the US Interests' Initial Post-Trial Brief, p. 46-47 (footnotes 128-131)

[51] US Interests' Initial Post-Trial Brief, p. 41-42 (footnote 100)

[52] US Interests' Initial Post-Trial Brief, p. 42 (footnote 101)

[53] US Interests' Initial Post-Trial Brief, p. 42 (footnote 102)

[54] At his deposition, when Stephens was asked to explain an email he wrote addressing the sale of Nortel's technology and the resulting rights of parties, he commented: "This is a dangerous note. I should-- I should not be commenting on legal matters": Kerry Stephens Deposition, November 7, 2013, p. 288:19-20; see also Kerry Stephens Trial Testimony, Day 8, May 27, 2014, p. 1779:11-1780:3

- 25 -

(e)      evidence of the lawyers (Giovanna Sparagna and Scott Wilkie) involved in

drafting the MRDA concerning the intent and effect of the MRDA license

provisions[56] and concerning the evolution of the draft language.[57]

63.      The uncontroverted meaning of the MRDA is that its purpose was to fully record the

rights and obligations of the parties as an entire agreement.[58]  To the extent one were to refer to

evidence of purpose regarding the question of ownership of IP, Clive Allen was the most senior

Nortel executive to testify through the period of the CSAs and he said that NNL owned the IP

and the subsidiaries were always and only licensees with permission to use technology owned by

NNL and sell Nortel products.  His evidence was that:  Contrary to the US Interests' suggestion

that the purpose was to record the Licensed Participants as owners, "no ownership interest in the

Technology was ever transferred to any subsidiaries and there was no intention to do so"[59] as

demonstrated by comparing the 1992 R&D CSA and the MRDA – there is no change to material

license provisions.  For the US Interests to be right that the purpose was to record the Licensed

---

[55] US Interests' Initial Post-Trial Brief, p. 42 (footnotes 104-105)

[56] US Interests' Initial Post-Trial Brief, p. 43-44 (footnotes 108-113 and 116)

[57] US Interests' Initial Post-Trial Brief, p. 45-46 (footnotes 123-127). Reliance on drafts of the MRDA is impermissible, not only because this is clearly being proffered for the purpose of establishing the subjective intention of the draftspersons, but also because it is well settled in Ontario law that draft agreements are not part of the surrounding circumstances that can be taken into account in the interpretation of a contract. See Geoff R. Hall, *Canadian Contractual Interpretation Law*, 2d ed. (Markham, Ontario: LexisNexis, 2012) at p. 81.  Also, the US Interests have incorrectly listed Sparagna and Wilkie as having been witnesses "for" the Canadian Estate, when in fact they were produced under subpoena from the EMEA Debtors and US Interests, respectively, and were not among the identified deposition witnesses who were "associated" with particular Estates:  See TR50058 (Order (Allocation Protocol – Litigation Timetable and Discovery Plan of the Canadian Court, May 15, 2013) Schedule A (p. 5-7).

[58] TR21003 (MRDA), Art. 14(d).

[59] TR00003 (Exh. 3, Reply Affidavit of Clive Allen, April 23, 2014) para. 5; and TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) paras. 25, 28 and 29; see also TR21528 (Email from John Doolittle in July 2004 re: drafting MRDA)

Participants as owners, a change would have been required.  Accordingly, the "purpose" the US Interests posit is wrong.  In any event, it is clearly an attempt to deviate from the words of the MRDA and make a new and different agreement.

64.     The very witnesses upon whom the US Interests and the EMEA Debtors rely say all of the Licensed Participants' rights to Nortel IP can be found in the licenses granted under the MRDA and nowhere else.[60]  Thus, there can be no doubt the parties' purpose was to have the MRDA as their entire agreement, and the law requires the intentions to be judged by the words of their contract.  It is improper to attempt to introduce, under the rubric of purpose, witnesses' understandings of what the words of the MRDA mean.

65.     Similarly, the Courts should disregard the evidence that the US Interests, EMEA Debtors and other parties sought to elicit about what various individuals think "equitable and beneficial ownership" means.  The policy of the law is not to enter into that enquiry.  The "rabbit hole of different views expressed in different contexts at different times by different people" that was referred to in the Monitor's opening statement[61] is what the law seeks to avoid, by forbidding the enquiry in the first place.  It is not dependent on first finding there are different subjective views before ignoring them, as the US Interests seem to suggest.

---

[60] See Monitor's Initial Post-Trial Brief, paras. 280-283; see also US Interests' Initial Post-Trial Brief, p. 42-43 (footnotes 103 and 111) – quoting Sparagna:  "The [L]icensed [P]articipants held equitable and beneficial ownership in NN Technology ***through their perpetual license***" [emphasis added] Giovanna Sparagna Deposition, December 10, 2013, p.163:21-164:5, 180:12-17; see also evidence cited at US Interests' Initial Post-Trial Brief, p. 44 (footnote 116) (Giovanna Sparagna Deposition, December 10, 2013, p.190:17-22, 190:24-191:2, 191:6-16). Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1326:15-1329:6; Mark Weisz Trial Testimony, Day 9, May 28, 2014, p. 1850:5-18, 1884:8-10 and 1890:19-1891:13

[61] Trial Transcript, Day 2, May 13, 2014, p. 456:14-19 *per* Benjamin Zarnett on behalf of the Monitor and Canadian Debtors; also referred to at the US Interests' Initial Post-Trial Brief, p. 44 (footnote 114)

66.     Contrary to what the US Interests suggest, the "rabbit hole" is present here.  When a witness (like Orlando or Weisz) says he understood that all of the parties' rights are recorded in the MRDA, acknowledges that he is not a lawyer and cannot speak to legal meanings, and then offers understandings of what the words say that are different from what they actually do say, one is confronted with different views in different contexts.[62]  When a witness, like Orlando, says he was in charge of amendments, and never suggested that the words "administrative convenience" be used in the contract to describe NNL's ownership, yet now says he understood that NNL's ownership was for administrative convenience, the Courts are faced with different views in different contexts.[63]  And when witnesses such as Angela de Wilton and Angela Anderson resolutely say NNL's ownership was not merely for administrative convenience, further differing views from Orlando's subjective ones are introduced.[64]

67.     The rights of NNI and the relevant EMEA Debtors are embodied in the licenses granted under the MRDA.  The assertion by the US Interests based on extrinsic evidence of subjective intent that "equitable and beneficial ownership" means that "from any perspective, the Licensed Participants had full ownership of all valuable rights to the NN Technology in the Exclusive Territories" for all purposes regardless of what the licenses say violates all the rules about factual matrix evidence.[65]  Tellingly, this point is asserted without support by the US Interests.  It is for the Courts to interpret the MRDA and determine the scope of and effect of the licenses and associated rights.

---

[62] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1326:15-1329:6; Mark Weisz Trial Testimony, Day 9, May 28, 2014, p. 1850:5-18, 1884:8-10 and 1890:19-1891:13

[63] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1333:17-1334:4

[64] Angela Anderson Trial Testimony, Day 10, May 29, 2014, p. 2195:20-2196:13; Angela De Wilton Trial Testimony, Day 3, May 14, 2014, p. 761:24-762:24

[65] US Interests' Initial Post-Trial Brief, p. 44

68.     The US Interests say that there is no evidence of a "different view" as to the meaning of "beneficial ownership" than the one they propound – and they say the Monitor did not call any witness at trial to express a different view.[66]  That position is wrong on a number of levels.  First, the Monitor's position has been consistent throughout that the views of witnesses as to the meaning of these words is not admissible or relevant on this point.  It does not have to call evidence of different subjective views to maintain that position.  Second, the EMEA Debtors' position of joint beneficial ownership by all Participants in all Nortel IP wherever located is a profoundly different (and equally wrong) view from the one the US Interests assert to be non-controversial.  Third, it is not correct to say that there is no evidence in the record of "different views" – the "rabbit hole", examples of which are outlined above, is readily apparent from a review of the trial and deposition testimony which the US Interests have selectively ignored.

69.     Further, the US Interests ignore the unequivocal testimony of Pavi Binning, Peter Currie and Clive Allen, the three most senior Nortel executives to testify, that NNL owned the IP:

(a)     Binning's evidence that Nortel's structure of ownership of IP at the parent level, with licenses granted to subsidiaries, was similar to that of other global companies and, having specifically inquired about this when he joined Nortel (including of people who would have been knowledgeable of the ownership structure, like Doolittle), no one suggested that the Nortel subsidiaries had "beneficial ownership" in the IP.[67]  (Various other fact witnesses also confirmed that

---

[66] US Interests' Initial Post-Trial Brief, p. 58-60

[67] See TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 10; Paviter Binning Trial Testimony, Day 5, May 20, p. 1061:6-16, 1063:19-24

Nortel's structure was consistent with industry practice where the parent company owns the intellectual property.[68]);

(b)     Currie's testimony at trial that there was nothing to disclose to the reader of Nortel's financial statements concerning the asset value of IP at the individual entity level because it was all held at the parent company and that NNI was no different than Nortel Poland; [69] and

(c)     Although the US Interests do not precisely say when NNI's beneficial ownership came into being, they seem to have it predate 2000 so that Allen's evidence about NNL ownership also contradicts the view the US Interests put forward.[70]

70.     Moreover, even those witnesses whose evidence is cited by the US Interests testified contrary to the so-called uniform view the US Interests assert.  For example, Stephens testified at trial of his understanding that NNL was the owner of the intellectual property while the RPS entities held economic rights.[71]  Stephens also admitted in deposition that "[w]ithout NNL in particular NNUK has no business. NNL has – if nothing else, it has the legal right to the IP, and as part of its business NNUK needs to license that IP". [72]

---

[68] Nick DeRoma Deposition, October 16, 2013, p. 163:24-164:7; Eric Jensen Deposition, October 8, 2013, p. 120:13-121:4; Angela Anderson Trial Testimony, Day 10, May 29, 2014, October 31, 2013, p. 2178:15-2179:4

[69] Peter Currie Trial Testimony, Day 3, May 14, 2014, p. 591:9-18, 601:17-22

[70] Clive Allen Trial Testimony, Day 3, May 14, 2014, p. 606:7-607:14; TR00003 (Exh. 3, Reply Affidavit of Clive Allen, April 11, 2014) paras. 5-6

[71] Kerry Stephens Trial Testimony, Day 8, May 27, 2014, p. 1789:4-1790:7. Under transfer pricing principles, an "economic right" is the right to a defined income stream as a result of a defined undertaking or activity.  See Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3829:18-3832:22

[72] Kerry Stephens Deposition, November 8, 2013, p. 355:11-15

71.     The evidence of Doolittle is a perfect illustration of the problem with the approach of the US Interests and EMEA Debtors.  Doolittle testified in answering a question as to whether anyone had suggested that all the value associated with the economic and beneficial ownership of Nortel's IP should be attributable to NNL by saying "yes", people did say that NNL should retain all of the IP sale proceeds because of its legal ownership of the IP, and then went on to venture his view that this was not consistent with how the company operated.[73]  The US Interests ignore the first part of the answer which directly contradicts the US Interests' position.[74]

    (ii)    **Extrinsic Evidence Is Equally Impermissible To Interpret The CSAs (Which also Do Not Serve To Expand The MRDA License Rights)**

72.     The same rules of interpretation apply to the 1992 R&D CSA as apply to the MRDA. Walter Henderson's subjective understanding and intention of what those pre-existing rights embodied,[75] whether held before and after he copied them from prior agreements into the 1992 R&D CSA,[76] is inadmissible and irrelevant to the interpretive exercise, for the reasons previously discussed and the US Interests' reliance on his evidence is especially misplaced.

---

[73] John Doolittle Deposition, December 5, 2013, p. 149:17-150:12, 150:25-151:24 and 152:8-16

[74] Doolittle's addition that the view expressed by others (that legal ownership determines entitlement to IP sales proceeds) was inconsistent with operations is unhelpful to the US Interests (and to the EMEA Debtors).  The RPSM expressly governed operations, but not sale proceeds, so a difference of approach to the two does not say much, if anything.  Doolittle did not say the proceeds should be divided on the US Interests' revenue theory or on the EMEA Debtors' contribution theory (both of which are also not consistent with the way Nortel operated).

[75] Upon which the US Interests rely e.g. as referred to at US Interests' Initial Post-Trial Brief, p. 48-49 (footnotes 137, 138 and 141

[76] The US Interests have presented Henderson as the primary draftsperson of the 1992 R&D CSA (see TR00016 (Exh. 16, Declaration of Walter Henderson, April 11, 2014) para. 15; and US Interests' Initial Post-Trial Brief, p. 48), but he conceded on cross-examination at trial (Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1153:19-1155:3) that all he had done was copy the substantive provisions from prior agreements.  Henderson acknowledged that the only change between the 1992 R&D CSA and the prior version was in certain defined terms (Walter Henderson Trial Transcript, Day 5, May 20, 2014, 1152:15-1153:5).  However, a close read of

- 31 -

73.     The US Interests' description of Henderson (who was a third year associate trained under Georgia law) as the "primary draftsperson" of the 1992 R&D CSA (a contract governed by Ontario law in which he had no knowledge or training) is specious.[77]  In cross-examination, Henderson was forced to concede that he had copied, essentially without change, every provision of the 1992 R&D CSA bearing on ownership, license rights or how the agreement was to be interpreted, from prior agreements made before he was a lawyer and with which he had no involvement at all.[78]  He also agreed that the 1992 R&D CSA does not include any operative terms indicating that the RPEs held economic and beneficial ownership in Nortel IP.[79]

74.     Beyond their impermissible and misplaced reliance on Henderson, the US Interests and EMEA Debtors mischaracterize and misconstrue the terms of the CSAs in an attempt to retroactively expand the rights they received under those agreements, and thus argue that those incorrectly interpreted rights were what were continued into the MRDA.[80]  This is wrong.  The pre-existing rights were license rights only – they are what were continued under the MRDA.

75.     The US Interests contend that "the structure of the CSAs changed dramatically from the 1970s to the 1990s"[81] – an allegation that is simply not borne out by those agreements. The fundamental nature of those agreements never changed.  NNL (or, as it was formerly known,

---

the 1996 APA which predicated the 1992 R&D CSA (the 1992 R&D CSA was signed in 1996, with an effective date in 1992), demonstrates that all defined terms that were included in the APA were adopted into the R&D CSA substantially verbatim.  Compare TR21002 (1992 R&D CSA) and TR46875 (APA between Nortel and CRA for 1992-1999).

[77] US Interests' Initial Post-Trial Brief, p. 48

[78] Walter Henderson Trial Transcript, Day 5, May 20, 2014, 1145:13-1155:18

[79] Walter Henderson Trial Transcript, Day 5, May 20, 2014, 1156:4-11

[80] See generally the US Interests' Initial Post-Trial Brief, p. 47-51; US Interests' PFOFCL, p. 50-53 (paras. 162-166) and 53-58 (paras. 171-186); and EMEA Initial Post-Trial Brief, paras. 84-85

[81] US Interests' PFOFCL, p. 50 (para. 162)

NTL) always owned the intellectual property and NNL always provided a license to subsidiaries

to use IP developed pursuant to the agreement to make, use, or sell the Products embodying the

IP within the licensee's defined geographical jurisdiction.[82]  NNI, NNUK, and NNSA were

"born as licensees,"[83] and never held any interest other than that of a licensee.  Any alterations to

the language of the agreements as they increased in specificity never changed these fundamental

elements, even through to the MRDA.

76.     The 1978 and 1983 R&D CSAs stated that the technical information and patents, now

possessed or to be developed "are and shall continue to be the property of Northern Telecom

[NNL]."[84] The 1985 Agreement specified that "legal title" "shall be vested in" NNL.[85]  The 1992

R&D CSA[86] retained this same language and referred to NNL as legal owner.[87]

77.     Similarly, the license the various participants received from NNL remained the same in

kind as that originating in the 1970's through the execution of the MRDA as amended.

---

[82] TR46882 (1978 R&D Cost Sharing Agreement, January 1, 1978); TR45048 (1983 R&D Cost Sharing Agreement, January 1, 1983); TR45741 (1985 R&D Cost Sharing Agreement, January 1, 1985); TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992); TR11411 (1995 R&D CSA between NNL and Nortel Limited (U.K.), January 1, 1995); TR46945 (2000 R&D CSA between NNL and NNSA, January 1, 2000)

[83] Dr. Reichert Trial Transcript, Day 16, June 17, 2014, p. 4020:13-4021:2

[84] TR46882 (1978 R&D Cost Sharing Agreement, January 1, 1978) Article 4; TR45048 (1983 R&D Cost Sharing Agreement, January 1, 1983) Article 4

[85] TR45741 (1985 R&D Cost Sharing Agreement, January 1, 1985) Article 4

[86] TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) Articles 4 and 6

[87] The US Interests seek, through the inadmissible evidence of a lawyer involved in the discussions surrounding the evolution of the draft language of the MRDA, to place reliance on the fact that Article 4 of the MRDA refers to the vesting in NNL of legal title to any and all NN Technology rather than referring to legal ownership (US Interests' Initial Post-Trial Brief, p. 45-46 (footnotes 123-127)). It is noteworthy that they rely (without the benefit of any context or explanation) on email the lawyer wrote, but they did not ask him about it after they subpoenaed him to attend a deposition and elected to ask him only a very few questions.  This is a textbook example of why evidence of drafts and negotiations is simply impermissible.

Fundamentally, NNL was always the licensor granting a license to the other participants.  While slight changes were made to the scope of that license, it never ceased to be anything other than a license.  The license never conveyed legal ownership to the licensees and did not create any rights other than those that conveyed with the license.  The license was always limited in terms of the rights stated, being rights to use Products embodying Nortel technology and was always limited to a defined geographical jurisdiction.  In the 1978 R&D CSA, NNL granted NNI's predecessor entity "a non-exclusive right to use the Technical Information and the Northern Telecom Patents . . . for the manufacture, use, lease and sale of the Products within the United States of America . . . and such other place or places as Northern Telecom may from time to time determine" for a five-year period.[88] The 1983 R&D CSA was identical in this regard.[89]  In the 1985 R&D CSA, NNL granted NNI an "exclusive royalty-free license, including the right to sublicense, which…shall be in perpetuity to make, have made, use, lease and sell Products embodying Intangible Technological Property in and for the United States..."[90]  The 1992 R&D CSA contained an identical license right.[91] NNUK and NNSA received identical licenses in 1995 and 2000, respectively.[92] The MRDA continued these identical license rights from the 1985 R&D CSA.[93]

---

[88] TR46882 (1978 R&D Cost Sharing Agreement, January 1, 1978) Article 4

[89] TR45048 (1983 R&D Cost Sharing Agreement, January 1, 1983) Article 4

[90] TR45741 (1985 R&D Cost Sharing Agreement, January 1, 1985) Article 5

[91] TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) Article 5

[92] TR11411 (1995 R&D CSA between NNL and Nortel Limited (U.K.), January 1, 1995) Article 5; TR46945 (2000 R&D CSA between NNL and NNSA, January 1, 2000) Article 5. With the exception that the NNSA license was not granted in perpetuity, but "for the duration of legal protection of the applicable intellectual property rights to make, have made, use, lease and sell Products embodying NT Technology…."; TR46945 (2000 R&D CSA between NNL and NNSA, January 1, 2000) Article 5

[93] TR21003 (MRDA and addenda) Article 5(a)

78.     The US Interests suggest that the grant of an "exclusive" license in the 1985 and 1992 R&D CSA's was a substantial expansion of the prior R&D license, which had previously been "non-exclusive."[94]  As noted in the Monitor's Initial Post-Trial Brief, the Supreme Court of Canada has described an exclusive license as contractual and as being limited to the terms of the license and, thus, not co-extensive with the patentees' rights.[95]  Although the 1985 license was titled an "exclusive" license, on its face, the terms of the license were limited.  Besides being limited to Products, there were other limits.  For example, upon NNL's request, NNI was required to grant a non-exclusive license to NNL in and for the United States to enable NNL to enter into cross-licensing agreements with third parties.[96]  The fact that the "exclusive" license contained a mandatory provision by which certain of those rights reverted to the licensor show it was not in all circumstances truly "exclusive" even within its scope.  In addition, the "exclusive" license granted by NNL was tempered with limitations that prohibited NNI from exercising certain exclusive rights as against other members of the Nortel Group.  NNI could not exercise its exclusive rights to prohibit (i) the import into the U.S. of products manufactured by licensees of NNL and its subsidiaries outside the U.S. and Canada; (ii) the exercise of the right to make or have made in the U.S. items required by a third party in connection with manufacturing by such party pursuant to a license agreement with NNL and its subsidiaries; or (iii) the procurement by NNL and its subsidiaries of components, assemblies, sub-assemblies, supplies, facilities, services

---

[94] US Interests' PFOFCL, p. 51-53 (para. 165-166)

[95] Monitor's Initial Post-Trial Brief, paras. 217-219 and 382-384

[96] TR45741 (1985 R&D Cost Sharing Agreement, January 1, 1985) Article 5; TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) Article 5

and products as may be required by NNL and its subsidiaries in its business outside the U.S. or in support of NNI and its subsidiaries' business in the U.S.[97]

79.    The US Interests' suggestion[98] that changes to the 1985 R&D CSA were made on account of NNI's increased participation in R&D and revenue and therefore that some underlying change in the meaning of their rights beyond what the words say should be implied, is not legally supportable.  Even if extrinsic evidence were permissible, this assertion is not supported by any evidence.  Just as contracts cannot be interpreted based on evidence of subjective understandings,[99] they cannot be interpreted by assertions of such understandings unsupported by evidence.  The cost sharing agreements NNI had with NNL were "substantially identical" to those with the British and French entities.[100] If NNI's enhanced market share were important that would not explain why NNI's agreement was "substantially identical" to that of the EMEA Debtors' cost sharing participants, whose market share and R&D spend was significantly smaller.

80.    Despite the US Interests' contention that a change occurred in the 1985 R&D CSA the fundamental nature of the license arrangement never changed – NNL was always the owner and licensor of the intellectual property and NNI received only a license to certain enumerated uses.

81.    Thus, the US Interests and EMEA Debtors claim that ownership rights in the IP dates back into the R&D CSA is left without any mooring (it finds none in the language of the

---

[97] TR45741 (1985 R&D Cost Sharing Agreement, January 1, 1985) Article 5; TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) Article 5

[98] US Interests' PFOFCL, p. 51 (para. 165)

[99] Such as the inadmissible evidence canvassed at US Interests' Initial Post-Trial Brief, p. 47-51 and contained in the Albert-Lebrun and Stephens' affidavits relied on by the EMEA Debtors, for example in the EMEA Initial Post-Trial Brief, paras. 93-116

[100] This is acknowledged at US Interests' Initial Post-Trial Brief, p. 132

agreements themselves).  Yet both the US Interests and EMEA Debtors rely on a single sentence

from the Horst Frisch Report to argue their conclusion that under the R&D CSAs, the RPEs were

either "economic owners" of Nortel's intellectual property within the United States, or had "joint

ownership of all IP"[101], not any language of the R&D CSA themselves.  The single sentence

from the Horst Frisch Report – written a decade after the last R&D CSA became effective – is

not evidence, let alone conclusive evidence, of legal rights under those agreements.  The authors

of the Horst Frisch Report themselves expressly state they are speaking in economic terms (not

legal) and make it plain that the rights of the parties they are considering are derived from the

R&D CSA "which dates back to the mid-1970's (with several amendments)".  Under this cost

sharing arrangement, it is the parties' "right to use the intangible property developed … in its

respective market"[102] that Horst Frisch go on to state "From an economic standpoint, each R&D

cost sharing participant could be considered to 'own' the NT Technology as it related to its

specific region."[103]

82.    The US Interests' and EMEA Debtors' expansive interpretation of a single sentence in

the 344-page Horst Frisch Report is thus belied by the remainder of the Report, which makes

clear that what was involved was a legal arrangement and the right a licensee received under it

was the right to use intangible property to make, have made, use, lease and sell products

embodying NT Technology in its market:

---

[101] US Interests' PFOFCL, p. 53 (para. 171); EMEA Initial Post-Trial Brief, paras. 84-85

[102] TR11055B (Horst Frisch Report) p. 10, see also example at TR11055B (Horst Frisch Report) p. 30

[103] TR11055B (Horst Frisch Report) p. 10, see also example at TR11055B (Horst Frisch Report) p. 30

(a)     "Under the (CSA) arrangement, each cost sharing participant ("CSP") had the

right to use the intangible property developed pursuant to the R&D cost sharing

arrangement (i.e., the NT Technology") in its respective market."

(b)     "Upon expiration of the R&D CSA, participants are deemed to have acquired a

fully paid up license permitting them to continue to exercise the rights granted to

them under the R&D CSA.  These rights include the exclusive, royalty-free

license, including the right to sublicense, in perpetuity to make, have made, use,

lease and sell products embodying NT Technology in their specific territory."[104]

83.    This "economic" perspective on intellectual property ownership described in the Horst

Frisch Report does not describe the type of beneficial ownership for legal purposes that the US

Interests contend.  Rather, it is consistent with the notions of ownership of intangible property in

transfer pricing, which in that context includes license rights as a type of intangible such that one

party may own the intellectual property, while another "owns" a license to use it. The OECD

Guidelines and transfer pricing regulations in the U.S. and Canada all define intangible property

to include licenses or rights to use assets.[105]

---

[104] See TR11055B (Horst Frisch Report) p. 10, 12, 30-31

[105] The 2010 OECD Guidelines state: "[T]he term 'intangible property' includes rights to use
industrial assets such as patents, trademarks, trade names, designs or models. It also includes
literary and artistic property rights, and intellectual property such as know-how and trade
secrets." TR11391 (2010 OECD Guidelines), § 6.2.
The IRS regulations state (26 C.F.R., §1.482-4(b)):
"[A]n intangible is an asset that comprises any of the following items and has substantial value
independent of the services of any individual –
(1) patents, inventions, formulae, processes, designs, patterns, or know-how;
(2) copyrights and literary, musical or artistic compositions;
(3) trademarks, trade names, or brand names;
(4) franchises, licenses, or contracts;

84.    The OECD's recent draft chapter on intangibles explains that "for transfer pricing

purposes," a licensor and licensee may each "own" different intangibles, i.e., the licensor owns

the intangible and the licensee owns the intangible commensurate with the scope of its license.[106]

The OECD explains that a category of intangibles, includes "licenses and similar limited rights

in intangibles" stating: "Limited rights in intangibles are commonly transferred by means of a

license or other similar contractual arrangement, whether written, oral or implied.  Such licensed

rights may be limited as to field of use, term of use, geography or in other ways.  Such limited

rights in intangibles are themselves intangibles . . . ."[107].

85.    That the Horst Frisch Report was referring to ownership of license rights is further

supported by the testimony of Henderson, who the US Interests attempt to rely upon for his

interpretation of the MRDA.  When asked about this isolated sentence in the Horst Frisch

Report, Henderson, who also claimed to have been involved in drafting the Horst Frisch Report,

explained at trial that this sentence and its use of the word "own" was directly tied to the

---

(5) Methods, programs, systems, procedures, campaigns, surveys, studies, forecasts, estimates, customer lists or technical data; and

(6) Other similar items."

TR50295 (CRA Information Circular 87-2R) provides guidance on the application of Canada's transfer pricing rules to intangibles and defines intangible property broadly to include:

• **rights** to use assets such as patents, trademarks, trade names, designs or models; and

• **intellectual property** such as know-how and trade secrets. (emphasis in original). (TR50295 (CRA Circular 87-2R), p.2).

[106] TR50295 (CRA Information Circular 87-2R) p. 2. In 2013, the OECD produced a draft chapter on intangibles, which is expected to be finalized by September 2014 (Dr. Richard L.V. Cooper Trial Testimony, Day 11, May 30, 2014, p. 2668:4-2668:11). Although the chapter is in draft form, they reflect the concepts that appeared in the 1995 and 2010 OECD Guidelines – "it's just a crisper way of saying what more or less appears in both the '95 and 2010 guidelines"; (Dr. Richard L.V. Cooper Trial Testimony, Day 11, May 30, 2014, p. 2668:4-2668:11); TR21600 (OECD, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles, July 30, 2013) para. 72

[107] TR21600 (2013 OECD Chapter on Intangibles), para. 59.

ownership of the license, consistent with the view of economics and transfer pricing principles, as explained above.[108]

86.    Thus, to the extent the Horst Frisch Report (or other Nortel documents) referred to NNI or the EMEA RPEs as "owners" of Nortel technology, the references were to an ownership of a limited license, in economic terms, and in the context of transfer pricing.[109]  But the economic ownership – the economists' or other transfer pricing advisors' way of referring to the license rights – does not do what the US Interests try to suggest.  Even if the Courts could rely on the Horst Frisch Report to interpret the meaning of MRDA (even though the Horst Frisch Report precedes the MRDA), owning a license simply means the Courts must look to the terms of the license and then determine the value of the license.  The Horst Frisch Report and other Nortel documents referring to economic ownership cannot alter the contract between the parties or who owned the IP – NNL – and nor can they enhance the terms of the licenses.

**(iii)    Nortel's Representations to the Tax Authorities about "economic ownership" were Consistent with the MRDA Distinction Between Ownership and License Rights**

87.    Statements to the tax authorities in the operational context[110] cannot change the meaning of the MRDA.  The MRDA itself was given to the tax authorities as the fundamental

---

[108] Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1165:18-1165:22.  See also Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1158:1-23

[109] This is also consistent with the words of the MRDA preamble which states that: "each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT Technology for a Specified Territory…and it is the intent of [the parties] that the Licensed Participants continue…to hold and enjoy such rights."  In other words, the Licensed Participants owned their licenses and would continue to do so under the MRDA.

[110] Such as those referred to at US Interests' Initial Post-Trial Brief, p. 48-56.  The US Interests rely on *The Canada Trust Co. v. Russell Browne et al*, 2012 ONCA 862 at paras. 21-23 and 83-88 (referred to herein in this Rebuttal Brief as *Primo Poloniato Grandchildren's Trust (Trustee of) v Browne*) to support their assertion of the relevance and importance of communications with

representation to them of the nature and extent of the parties' rights.[111]  Any analysis of communications to the tax authorities must take into account the full context of those communications.  And since Nortel told the tax authorities "here is our agreement with respect to ownership", the US Interests attempt to pick and choose among other statements is necessarily doomed to failure.  In any event, Nortel's communications to the tax authorities were consistent with the rights in the MRDA, including the rights of the Licensed Participants to exclusive licenses in each Licensed Participant's territory.[112]  Indeed, the US Interests' transfer pricing experts agrees that "economic ownership" is a transfer pricing concept – and references to "economic ownership" must be considered in transfer pricing terms.[113]

88.     The Intellectual Property "Economic Ownership" which the US Interests repeatedly refer to in the functional activity chart contained in various filings with the tax authorities[114] must be read in this context.  The Monitor has consistently maintained that "economic ownership" is a transfer pricing concept and does not agree with the suggestion by the US Interests[115] that it is taking a different position in this litigation about the meaning and effect of that concept from

---

tax authorities when interpreting the MRDA. It should be noted that this case deals with communications prior to the entry into the amending agreement that was at issue and should not be taken as support for any evidence that the US Interests seek to point to in this case that arises after the MRDA was signed.  The relevance and weight of these types of communications prior to the signing of the MRDA must be considered in the transfer pricing context of what "economic ownership is" and what it is not (the Monitor's position being that it is distinguishable from legal ownership).

[111] Mark Weisz Trial Testimony, Day 9, May 28, 2014, p. 1896:3-16

[112] The US Interests now also emphasize that the exclusive licenses were important to avoid tax liability of NNL in foreign jurisdictions (see US Interests' Initial Post-Trial Brief, p. 56-58) – that the MRDA licenses were consistent with good tax planning to minimize overall taxes (and in some cases avoid double taxation) is not disputed.

[113] Monitor's Initial Post-Trial Brief, paras. 377-381

[114] US Interests' Initial Post-Trial Brief, p. 53-54

[115] US Interests' Initial Post-Trial Brief, p. 55

positions taken previously by Nortel with the tax authorities. The example of Nortel's 2002 APA application[116] in which it was stated that each participant "could be considered to own" illustrates this distinction.  As already noted above, the statement is clearly derived from the Horst Frisch Report which, as discussed above, itself made it clear that it was referring to the license rights of the Licensed Participants to use IP, and not to any legal sense of ownership.

89.    The assertion by the US Interests that documents prepared for transfer pricing purposes (including post-filing documents) revealed that the Monitor was saying something to the tax department that is inconsistent with its allocation position,[117] is simply unfounded for the reasons outlined above.

90.    Furthermore, for the US Interests to suggest that NNL is now saying something to the Courts about allocation of sale proceeds different than what tax authorities were told is a proposition that the US Interests simply cannot advance.  By the US Interests' witness' own admission (consistent with NNI's own positions and conduct), the tax authorities were told nothing about how sale proceeds would be allocated.  Their own witness, Orlando, testified that nothing was said to the tax authorities, one way or the other, about how proceeds of sale would be allocated, [118] and therefore they were told nothing inconsistent with any party's allocation position.

---

[116] US Interests' Initial Post-Trial Brief, p. 53

[117] These alleged "inconsistences" are discussed in more detail in Part III. B(a)(i) of this Rebuttal Brief. The further assertion by the US Interests at US Interests' Initial Post-Trial Brief, p. 55 (footnote 170) concerning the involvement of Mr. Sean Kruger in certain post-filing transfer pricing reports and the fact that no party sought to call him as a trial witness is addressed in a later section of this Rebuttal Brief.

[118] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1347:25-1348:6; TR47221.02 (NNI Transfer Pricing Report for the year ended December 31, 2009, dated September 14, 2010)

- 42 -

(iv)    **Nortel's Court Filings, Representations to the Tax Authorities and Internal Assessments Do Not support the Allocation Position of the US Interests**

91.    The assertion that documents prepared for transfer pricing purposes (including post-filing documents) revealed that the Monitor is saying something to the tax department that is inconsistent with its allocation position is also a strange position coming from the US Interests. This is so for several reasons:

(a)    NNI's own court filings before this allocation litigation referred to NNL as owner of the IP and to NNI as licensee.  NNI did NOT say then that NNI was a beneficial owner, as the US Interests now do, but rather that "NNL is the owner of the vast majority of Nortel's intellectual property assets [and] licenses its intellectual property". ;[119]

(b)    in NNI's 2009 Transfer Pricing Report by NNI, prepared after the Business Sales had taken place, NNI, after disclosing that sales proceeds were in escrow and would be allocated by what was ultimately this proceeding, told the IRS that it could not say what, if any part of those proceedings would become the property of NNI and that it had "no right to any identifiable portion" of the proceeds.[120]  It did not say *all* the economic value of what was sold in the U.S. belonged to it, it did not say there was any relation between economic ownership for transfer pricing purposes and entitlement to the sale proceeds, and it did not say the proceeds would or should be divided by 2009 or any other year's revenue; and

---

[119] TR11366 (Motion of the U.S. Debtors for an Order (A) Approving the Interim Funding and Settlement Agreement and (B) Granting Related Relief, June 9, 2009), para. 14

[120] TR47221.02 (NNI Transfer Pricing Report for the year ended December 31, 2009, dated September 14, 2010), p. 21 (p. 24 of PDF)

- 43 -

(c)      as discussed above, Orlando admitted on cross-examination, after being taken to a

report dated September 2009 prepared by Nortel for the tax authorities, that

Nortel never said anything, one way or the other, to tax authorities about how

proceeds of a sale would be allocated.[121]

92.      In other words, NNI did not say a word to the Courts or the IRS which is consistent with

the allocation position of the US Interests.  The US Interests contend that Nortel represented to

the tax authorities that each Licensed Participant owned NN Technology in its exclusive territory

(they rely on parts only of the evidence of Orlando, Look and Doolittle [122]). They say this

supports, and leads to, their allocation theory and their revenue approach to it.   In addition to the

obvious difficulties with this that arise from the matters noted above, the US Interests' allocation

position is also inconsistent with a draft non-public NNL accounting spreadsheet approved by

Orlando himself. [123]   The US Interests' proposal of an allocation to NNL of the proceeds of the

Business Sales of only 11.9% [124] is much lower than the post-insolvency internal financial

allocations of the company for the four Business Sales covered by that spreadsheet (37.4% to

48.5%). This significant disparity indicates that the U.S. Interests' allocation position cannot be

correctly termed as something consistent with or that flows from what the U.S. Interests contend

---

[121] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1347:25-1348:6; TR47221.02
(NNI Transfer Pricing Report for the year ended December 31, 2009, dated September 14, 2010)

[122] US Interests' Initial Post-Trial Brief, p. 51- 56.  Orlando reported to Look and later Doolittle
(Micheal Orlando Depostion, November 5, 2013, p. 26:12-27:4).

[123] TR11264 (E-mails re: NNA Fiscal Year 2008 and 2009 Annual Compliance Review
Documents attaching draft financial statement allocations, September 28, 2010), p. 1, 9, 16, 24
and 35 of PDF

[124] US Interests' Initial Post-Trial Brief, p. 2; TR11432 (Expert Report of Jeffrey Kinrich,
January 24, 2014) at paras. 41 and 65 (Table 5),  and Exhibit 9 and Exhibit 14 (averaged);

- 44 -

those witnesses had in their minds about IP ownership including in any comments to the tax authorities, even if evidence of that was otherwise admissible.

### (v)    The Tax Authorities Cannot (and Did Not) Re-write the MRDA

93.    The US Interests allege that tax authorities will disregard legal agreements governing intercompany transactions where form differs from substance. This is both wrong and not supported by the evidence the US Interests provide in support of that statement.[125]  Transfer pricing guidance and regulation proceed from a presumption in favor of respecting the parties' legal arrangements, which may be disregarded only in exceptional circumstances because "[multinational entities] are free to organise their business operations as they see fit.  Tax administrations do not have the right to dictate to [a multinational entity] how to design its structure…"[126]  The arm's length principle applies only to the pricing of transactions for tax purposes and does not restrict the form of the parties' dealings – entities in multinational groups may enter into contracts or arrangements relating to the group's resources in ways that uncontrolled entities would not.[127]  The "bedrock principle" in transfer pricing is a presumption in favor of the legal agreements entered into between the parties.[128]  Paragraphs 236 to 258 below respond to the EMEA Debtors' more elaborate argument seeking to improperly use the arm's length principle to interpret and read new terms into the MRDA.

---

[125] US Interests' PFOFCL, p. 45-46 (para. 147) (citing to Eden Report stating that tax authorities may impute a legal agreement where "there is no contemporaneous written legal contract.")

[126] TR11391 (OECD Transfer Pricing Guidelines, July 2010) p. 290 (para. 9.163); see also Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3829:13-17, 3832:23-3834:11 and 3864:13-3881:16

[127] Monitor's Initial Post-Trial Brief, para. 54; Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3830:17-3831:4; Dr. Richard L.V. Cooper Trial Testimony, Day 11, May 30, 2014, p. 2633:24-2634:17

[128] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3832:25-3833:25

94.     The OECD Guidelines provide that because controlled entities may have similar interests, it is also "important to examine whether the conduct of the parties conforms to the terms of the contract or whether the parties' conduct indicates that the contractual terms have not been followed or are a sham.  In such cases, further analysis is required to determine the true terms of the transaction."[129]  The evaluation of conduct in transfer pricing analysis does not allow the tax authority to disregard the contract where the conduct is consistent with its terms,[130] let alone to rewrite it for any other purpose.

### (vi)     Custom and Practice does not Arise under the MRDA

95.     The US Interests suggest the evidence of Bereskin, who is alleged to have "reviewed the MRDA from an intellectual property custom and practice perspective" is somehow helpful to the Courts.[131] The US Interests go on to assert that this evidence as to "custom and practice" is admissible as part of the factual matrix.  The US Interests' Initial Post-Trial Brief states:

> Daniel Bereskin . . . reviewed the MRDA from an intellectual property custom and practice perspective.  Among other evidence, Bereskin stated that the "fundamental custom and practice of licensing [is] that the scope of a licensee's enforcement rights is coextensive with the scope of its license."[132]

96.     The position is without foundation.  The US Interests rely on a number of cases, none of which support their argument.

---

[129] TR11391 (2010 OECD Guidelines), para. 1.53

[130] Particularly with respect to licensing intangibles, the OECD Guidelines state that it is "critical" to assess "the key contractual terms" of those licenses. TR11391 (OECD Transfer Pricing Guidelines, July 2010) p. 48 (para. 1.54)

[131] US Interests' Initial Post-Trial Brief, p. 62-63

[132] US Interests' Initial Post-Trial Brief, p. 62-63

- 46 -

97.      First, the US Interests rely upon the decision in *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*  In that case, the Court of Appeal considered whether it should reject a proffered contractual interpretation on the grounds that the interpretation in question would be "contrary to the generally accepted practice in the franchise industry".[133]  The Court's actual determination is critical.  It determined that any evidence as to "generally accepted practice in the franchise industry" would be "of little use in interpreting this particular license agreement", since the relationship between the contracting parties – although clearly an arm's length relationship – was "very unusual" and not typical of the industry:

> [I]t was said that reading paragraph 16.1 as I do would be contrary to the generally accepted practice in the franchise industry.  The fallacy in this reasoning is that, as the trial judge recognized, this was a very unusual franchising relationship.[134]

98.      Similar considerations apply in the present case.  Although Bereskin had some experience in reviewing and advising on IP licensing agreements, at no time did he suggest there was any industry standard, nor one that applied to related parties nor with which he had any experience with respect to licensing agreements between related parties.  In fact, he acknowledged that many license agreements are "one-off" and that there is no "one size fits all" – "every deal is different".[135]  Accordingly, just as the evidence tendered in the *Kentucky Fried*

---

[133] *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, 1998 CarswellOnt 4170 at para. 39 (C.A.).

[134] *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, 1998 CarswellOnt 4170 at para. 39 (C.A.).

[135] Daniel R. Bereskin Deposition, March 27, 2014, p. 44:24-25 and 54:7-14

*Chicken* case was not used, Bereskin's evidence should not be either. Burshtein's evidence, on which he was not challenged, was that there was no custom and practice that was standard.[136]

99.    The other cases relied upon by the US Interests are also unhelpful to them.  Two of the cases, *Georgia Construction* and *Stetson Oil & Gas*, deal with expert testimony being tendered to interpret a particular word or phrase in the contract, which was said to have a particular, specialized meaning in the industry in question.

100.    For example, in *Stetson Oil & Gas*, the court heard expert evidence as to what the phrase "standard material adverse change-out" meant and what was customary for these types of clauses.  The evidence was ruled admissible, as the contract itself indicated that the clause was to be interpreted in accordance with the custom in the industry:

> The engagement letter provided that the underwriting agreement was to contain a "standard material adverse change-out . . . ***customary in agreements of this type***". [emphasis added][137]

101.    Here, the MRDA does not contain any words of specialized meaning nor does it reference what is "customary" or "standard".

102.    More apposite is the holding in *Stetson Oil & Gas* that even the evidence of an experienced lawyer about what a contract means is inadmissible.[138]

103.    The US Interests also rely upon the 1929 decision in *Georgia Construction Co. v. Pacific Great Eastern Railway Co.* in which the parties both tendered evidence as to the custom and practice in the industry in order to elucidate the meaning of the words "extra haul".  In that case,

---

[136] TR11445 (Expert Report of Sheldon Burshtein, March 24, 2014) paras. 94, 111 and 113

[137] *Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc.*, 2013 ONSC 1300 at para. 98

[138] *Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc.*, 2013 ONSC 1300 at paras. 65-67

- 48 -

the Supreme Court of Canada held that such evidence is only of assistance where "the alleged

usage is…so all pervading and so reasonable and so well known that everybody doing

business…must be assumed to know it, and to contract subject to it"[139] and found that the

evidence did not establish that the alleged customary usage was sufficiently "all pervasive" as to

warrant a conclusion that the parties intended to bind themselves to such an interpretation:

> I am not satisfied by the evidence that there is any practice of measuring
> distance for computing overhaul in the manner contended for, so well
> recognized, so well known among persons engaged in railway
> construction, and so widely prevailing as to justify a presumption that
> everybody who enters into a contract for such work does so with the
> intention of being bound by that usage.[140]

104.    So too here, there can be no serious suggestion of an alleged "custom and practice" that is

"so well known" or "so widely prevailing" as to justify a presumption that "everybody" who

enters into a licensing contract must be presumed to agree to be bound by such terms.  Bereskin

identified none and Burshtein's evidence said there was no custom.

105.    *Toronto-Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* also does not assist the US

Interests.  There, the dispute before the Ontario Court related to whether or not a "comfort letter"

given by the corporate parent of a debtor constituted an enforceable guarantee obligation.

Among other things, the bank argued that the comfort letter should be interpreted so as to

constitute a binding guarantee, because otherwise the comfort letter would serve no purpose.

The bank further argued that, compared to other comfort letters, the comfort letter in question

used very "strong" language, such as would impose a binding contractual obligation.  To counter

that argument, the defendant called expert testimony "related to banking practices generally and

---

[139] *Georgia Construction Co. v. Pacific Great Eastern Railway Co.*, [1929] S.C.R. 630 at para. 8

[140] *Georgia Construction Co. v. Pacific Great Eastern Railway Co.*, [1929] S.C.R. 630 at para. 11

the use of comfort letters during the period of time material to this action".[141]  The Court

admitted the expert testimony only with respect to "the commercial context in which the comfort

letters were exchanged" but went so far as to say that the expert's testimony "was not essential to

any findings".  Moreover, the trial judge emphasized that he gave no weight to any testimony by

the expert that purported to opine on whether the comfort letter in question was, in fact, binding:

> Where his evidence overlapped with issues which were to be decided by
> this Court, it was given no weight.[142]

106.    By contrast, Bereskin's evidence does not speak to the "commercial context" in which

license agreements such as the one at issue were entered into.  Indeed, as noted above, he does

not purport to have any experience at all with respect to license agreements between related

corporations.  Bereskin summarizes his opinion as follows:

> It is my opinion that based on custom and practice a sophisticated business
> person would understand the MRDA License to give each Licensed
> Participant in its respective Territory equitable and beneficial ownership
> of the NN Technology[143]

107.    Rather, his evidence consists of an opinion as to the proper interpretation of the particular

license agreement that is before the Courts and completely overlaps with the issues to be decided

by them.

---

[141] *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)*, 1998 CarswellOnt 2565 at
paras. 390-391

[142] *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)*, 1998 CarswellOnt 2565 at
para. 391

[143] Expert Rebuttal Report of Daniel R. Bereskin, February 28, 2014, at para. 34

108.    Such evidence would appear to have little if anything in common with the type of evidence that the court considered in *Toronto-Dominion*.  The holding in that case supports the view that Bereskin's evidence is to be given no weight.

**B.    REBUTTAL TO THE TECHNICAL ARGUMENTS THE US INTERESTS RESORT TO IN ORDER TO SUPPRESS THE COURTS' CONSIDERATION OF THE MERITS OF THE MONITOR'S ALLOCATION POSITION**

109.    The US Interests attempt to distract the Courts from consideration of the merits through manufactured outrage based on their own misrepresentations about what the Monitor has previously said and what the Monitor's allocation position is.  When both are considered accurately and in context, the consistency and appropriateness of the Monitor's conduct is plain.

**(a)    Post-Petition Conduct of the Parties**

110.    Post-petition conduct cannot form any part of the "factual matrix" as that, by definition, must exist at the time of formation of the MRDA.

111.    The Monitor's participation in the monetization of Nortel IP and the strict and extensive reservations of rights by all the parties as to their possible and actual allocation positions (under court approved agreements) have already been extensively addressed in the Monitor's Initial Post-Trial Brief at paragraphs 109-116 and 598-611.

112.    The US Interests' Initial Post-Trial Brief and Proposed Findings of Fact and Conclusions of Law make allegations about the conduct of the Monitor's personnel in two other principal areas.[144]

---

[144] See US Interests' Initial Post-Trial Brief, Point II, Part D.2 (p. 68-75); and US Interests' PFOFCL, Part IV, E and F (p. 148-157)

- 51 -

113.    First, they contend that the transfer pricing reports NNL and NNI prepared post-petition, with assistance from EY Canada's Sean Kruger, are inconsistent with the Monitor's allocation position because of references to NNI and the other RPEs as having "Intellectual Property Ownership" and they complain that the Monitor failed to make Kruger available for deposition or call him as a witness at trial.[145]  They also contend that the Monitor repeatedly filed reports that stated that the Nortel IP was subject to exclusive and non-exclusive licenses granted to Nortel subsidiaries, which is also purportedly inconsistent with the Monitor's allocation position.[146]

114.    Second, the US Interests contend that the Monitor should be estopped from pursuing its allocation position as it is alleged to be a "litigation contrivance" that was not disclosed in

---

[145] The assertions relating to Kruger's alleged "failure" to testify are addressed in paragraphs 151 to 153 below of this Rebuttal Brief.  In connection with this assertion, the US Interests also attribute pre-petition transfer pricing documentation with which EY US and EY Canada were involved to "the Monitor."  This purposeful blurring of the distinct roles of EY entities goes so far as to refer to the Joint Administrators as the Monitor's EY partners. The Monitor, Ernst & Young Inc. (Canada) is assisted in carrying out its duties by personnel of Ernst & Young LLP (Canada) and Ernst & Young LP (Canada) (TR49893 (Affidavit of Sean Kruger, April 7, 2014) para. 1).  Prior to the petition date, EY Canada and EY US were retained by Nortel in connection with transfer pricing—following the petition date, personnel working on behalf of the Monitor, including Kruger, assumed responsibility for assisting in NNL's transfer pricing documentation (TR50862 (Motion Record of the Monitor and Canadian Debtors, Motion to Quash Kruger Summons) Tab 2 (One-Hundred and First Report of the Monitor) (para. 17) and Appendix E (Affidavit of Elizabeth Wolfe, September 17, 2013) para. 6; TR11084 (Nortel Networks' Functional Analysis for the years ended December 31, 2000-2004) at EMEAPROD2287001 (copying EY Canada and EY US)).  EY US has been retained by the US Interests in connection with tax issues (Jeffrey Wood Deposition, November 1, 2013, p. 30:24 – 31:4, 43:9 – 44:4). Contrary to the US Interests' suggestion in US Interests' PFOFCL, p. 139 (para. 462), there is no reporting relationship among the Joint Administrators of the EMEA Debtors, who are partners in Ernst & Young (UK), and the separate legal entities of EY Canada and EY US (Murray McDonald Deposition, November 26, 2013, p. 55:20 56:17).

[146] The US Interests also attack the Monitor for not calling Murray McDonald "to appear as a witness at trial to explain how it is that he only came upon the Monitor's litigation position after making numerous representations to the Courts and creditors that NNL's legal title was subject to the Exclusive Licenses." (US Interests' Initial Post-Trial Brief, p.12).

connection with the US Court's approval of the Rockstar Sale (addressed in the Monitors Initial

Post-Trial Brief at paragraphs 634 to 648). The US Interests specifically attack the testimony of

Sharon Hamilton and Murray McDonald with respect to when the allocation position was

formulated, whether it was communicated to any other party prior to May 2013 and whether

failure to disclose it was in violation of a duty specifically owed by the Monitor to the US

Court.[147]

115.    The US Interests' personal attacks on the Monitor's professionals speak volumes about

the weakness of their case – they seek to avoid the Courts' consideration of the merits of the

parties' legal positions by making arguments that are foreclosed by the parties' agreements and

the Courts' orders.  The irony of the US Interests' position is that it could be applicable only if

the Monitor's position is otherwise correct.  It is thus clearly asserted as an instrument of

injustice – to deprive the stakeholders in the Canadian Estate the allocation to which they are

rightfully entitled.

116.    The US Interests' assertions are also based on a number of flawed positions.  First, the

Monitor's allocation position is not somehow inconsistent with its previous statements that NNL

held legal title and that the title was subject to the exclusive licenses.  The Monitor maintains that

NNL had legal title and that one must value the exclusive licenses in light of their terms.  The

Monitor never said anything inconsistent with this proposition.  It has always said allocation

(which, as all parties concede, is to be based on valuation of interests) would be dealt with in the

allocation phase.

---

[147] The evidence of McDonald and Hamilton is discussed at paragraphs 130, 146 and 147 below.

117.    As discussed above at paragraphs 87 to 90, the Monitor's allocation position is also not inconsistent with anything said to tax authorities.

118.    Second, it is baseless that any of the parties could, in the face of their express agreement to preserve their allocation positions, be taken to have waived them by virtue of anything they did after they entered into the IFSA  (or by anything they did while they put the judicial resolution of their allocation entitlements on hold to try to achieve a mediated outcome).

119.    Moreover, the US Interests' assertion that what they term the "litigation position" of the Monitor is something that needed to be disclosed before May 2013, when they themselves never disclosed their present allocation (litigation) position to tax authorities or to the Courts until after December 2013, and their key witness, John Ray swore under oath he was unable to do so when asked if he could or would in December 2013,[148] only accentuates how off base the US Interests' position is.  The US Interests proceed on the erroneous assumption that they need not have behaved according to the very standards they assert.

120.    What is clear is that the Monitor disclosed its litigation position precisely when the Courts directed that all parties do so, the Courts having approved an allocation protocol (and before that, the IFSA) that confirmed all parties could assert allocation positions without restriction.[149]  The US Interests, in disregard of those orders, continue to ignore both their timing and content – they continue to beseech the Courts to say the Monitor was under some restriction in what position it could put forward when the Courts were clear they were under none, and when the US Interests have behaved as though no restriction applies to them.

---

[148] This evidence was previously noted in the Monitor's Initial Post-Trial Brief, para. 607

[149] TR50027 (Amended and Restated Order (Allocation Protocol)), Schedule A, para. 4(a); TR50102 (US Allocation Protocol Order), Exh. 1, para. 4(a)

121.    Thus, no estoppel can arise as a result of the Monitor conducting itself in accordance with the agreement of the parties and the orders of both the US and the Canadian courts.

### (i)    There Are no Inconsistencies in Prior Statements

122.    The US Interests' complaint that Kruger was not called to testify about what was said in various tax reports is based on the erroneous supposition that there is somehow an inconsistency between statements in Nortel's transfer pricing documentation referring to "economic ownership" and the Monitor's allocation position.  There is no such inconsistency.[150] Thus, the participation of Kruger, an advisor to the Monitor, in preparing transfer pricing documentation confirming the existence of such economic ownership is hardly surprising, and also irrelevant to the Courts' interpretation of MRDA and to the allocation decision.

123.    Economic ownership is properly equated with the Licensed Participants' agreement (in the MRDA) for them to share in operating profits and losses.  That sharing of economic ownership of certain revenue streams derived from the exploitation of Nortel IP does not conflict with the Monitor's allocation position based on NNL's  legal ownership of the Nortel IP.  (See Monitor's Initial Post-Trial Brief at paras. 365 to 385.)

124.    The US Interests also misrepresent the parties' positions in contending that "prior to the Patent Portfolio Sale, the Monitor never informed either the US Debtors or the EMEA Debtors that Nortel's patents were not subject to licenses."[151] There was no, and has never been any, reason for the Monitor to ever make any such statement, as that is not the Monitor's position, and its consistent disclosure about the existence of the licenses was appropriate.  What the Monitor

---

[150] Described in more detail above, where it is also pointed out that there is no <u>consistency</u> between the US Interests' allocation positon, and what they said to the IRS.

[151] US Interests' Initial Post-Trial Brief, p. 71

did say – that all parties had reserved their rights and there was no agreement about allocation (and therefore about the value of the respective interests including licenses) - is conveniently ignored by the US Interests.[152] They also ignore that they did not previously take issue with the Monitor's characterization of NNL as legal title holder or owner, and NNI as licensee, nor contend, prior to their allocation position, that NNL had only "bare" legal title or legal title for administrative convenience, yet the US Interests now feel free to assert all of these positions.[153]

125.    That the US Interests do not agree with the Monitor on the legal question of the scope and terms of their licenses, or their value, does not make statements of the Monitor that licenses existed and allocation (and thus value of the licenses) would be dealt with later inconsistent with the Monitor's position.

126.    It is the US Interests that have been inconsistent, telling the Courts in the motion for approval of the IFSA, that "NNL is the owner of the vast majority of Nortel's intellectual property assets [and] licenses its intellectual property"[154] to the other RPEs and that the IFSA

---

[152] The statements made in the Monitor's Reports are summarized at the Monitor's Initial Post-Trial Brief, Schedule C. As Schedule C demonstrates, these statements were consistently used in many reports, and the US Interests' suggestion (US Interests' Initial Post-Trial Brief, p. 70 (footnote 241)) that their inclusion in any particular report means the Monitor was acknowledging that the licenses had value is meritless.

[153] The US Debtors having themselves stated in their motion for an Order Approving the IFSA that NNL was the owner of IP that was licensed to the RPE's without asserting these qualifications and their counsel having affirmed to the court at the hearing that they believed the statements made in the motion papers to be true, while at the same time recognizing that all parties had reserved their rights (the Joint Administrators having questioned the statements about IP ownership contained therein): TR50281 (Transcript of Debtor's Motion for Entry of an Order Authorizing Debtor to Make Certain Transfers and Provide Financial Support to their Nondebtor Subsidiaries, June 29, 2009) p. 52-53; TR11366 (Motion of the U.S. Debtors for an Order (A) Approving the Interim Funding and Settlement Agreement and (B) Granting Related Relief, June 9, 2009) para. 14.

[154] TR11366 (Motion of the U.S. Debtors for an Order (A) Approving the Interim Funding and Settlement Agreement and (B) Granting Related Relief, June 9, 2009) para. 14

would secure NNI's license for "use of intellectual property owned by NNL that is crucial to the US Debtors' business"[155] but now asserting that NNL held bare legal title, it was unimportant and valueless, and that NNI held beneficial ownership of the IP registered in the US.

### (ii)    The Monitor's Litigation Position was Disclosed in a Timely Fashion

127.    The US Interests unpersuasively try to read into the IFSA a *prima facie* guarantee of their right to receive an allocation from the Rockstar Sale.[156]  They also appear to contend that it was the Monitor's affirmative obligation to ignore the IFSA (and all the other agreements in which the parties had been at pains to carefully record that allocation claims and issues were all reserved and would be dealt with at another time) and instead to remind the US Interests of the possibility that the Monitor might take an allocation position at some point in the future that the US Interests might disagree with.[157]  This makes nonsense of the reservations of rights.  They attempt to morph their complaint into one of the Monitor being required to remind the US Interests that although the Canadian Interests were free to take any allocation position, "any" does not include the position the Monitor takes.[158]  This is unsupportable.

---

[155] TR11366 (Motion of the U.S. Debtors for an Order (A) Approving the Interim Funding and Settlement Agreement and (B) Granting Related Relief, June 9, 2009) para. 31

[156] US Interests' Initial Post-Trial Brief, p. 67, where they also seek to impermissibly "imply" a similar guarantee (contrary to the IFSA) arising from the license termination/surrender agreements, neither of which can be sustained in the face of the express reservations of rights.

[157] Bizarrely, the US Interests appear to contend that throughout the bankruptcy process, all parties had ostensibly already agreed with the present formulation of the US Interests' allocation position (that the parties are entitled to the value of Nortel IP registered in their jurisdictions) and accuse the Monitor of shocking everyone by departing from that view in its allocation position. See US Interests' PFOFCL, p. 138-139 (paras. 461-462) and 156-157 (para. 534).  But the US Interests point to nothing that supports that contention and ignore that the EMEA Debtors (and the UKPC and CCC) also disagree with their allocation position—whether this too was a shock to the US Interests is not stated.

[158] John Ray Deposition, December 13, 2013, p. 102:10-104:23

128.    The US Interests are at pains to avoid discussing the IFSA, which is central to understanding the context in which the Rockstar Sale occurred.  As the US Interests themselves tacitly admit, the value achieved in the Rockstar Sale was not achievable through any other means.[159]  As the US Court rightly noted, not closing the Rockstar Sale would have been a $4.5 billion mistake for all parties.[160]

129.    Once the parties and the Courts agreed that the allocation question could be tabled, no party had any obligation to form definitive views on allocation, let alone argue about them.  The US Interests' attempt to construct such an obligation for the Monitor alone out of selective quotes from the testimony of Hamilton confirming her understanding of the Monitor's duty not to mislead the US Court (the same duty of all litigants) is misconceived.[161]

130.    The testimony of McDonald and Hamilton is that the Monitor in fact did not form definitive views at that time (though they did previously disclose to the US Interests the possibility they could seek allocation on the basis of ownership[162]) or indeed until the failure of the third mediation rendered resort to a litigated resolution of the allocation question necessary. Prior to May 2013, the only obligation the Monitor had with respect to allocation of the sale proceeds was to negotiate in good faith to attempt to reach a consensual resolution.[163]  The US

---

[159] See US Interests' PFOFCL, p. 134 (para. 441) (arguing for disregard of discount rates used by Lazard in evaluating IP Co. as "not appropriate here because those rates were for Nortel to operate the business, not a sale of the Portfolio, which is what occurred here.")

[160] TR21509 (July 2011 hearing transcript) p. 110:5-111:11

[161] See US Interests' Initial Post-Trial Brief, p. 68 and US Interests' PFOFCL, p. 154 (para. 528)

[162] Murray McDonald Deposition, November 26, 2014, p. 99:22-101:10; TR00010A (Exh.10, Reply Affidavit of Sharon Hamilton, April 11, 2014) paras. 42-44

[163] TR43794 (Interim Funding and Settlement Agreement, June 9, 2009) para. 12(d).  The IFSA is governed exclusively by the laws of the state of New York.  The US Interests seek to extend para. 12(d) by asserting that "the parties were obligated to negotiate in good faith and thus

Interests would turn this obligation on its head, suggesting that only formulating and disclosing a

legal position, rather than negotiating on a without-prejudice basis for a compromise, could

suffice.  The US Interests cite no authority for such an interpretation, and there is none.  In any

event, as enshrined in the orders of the Canadian and US Courts: "there shall be no restriction on

the ability of any Core Party to advance or oppose any theory of allocation".[164]  Consistent with

the parties' prior agreement, these orders specifically recognized that all parties remained at

liberty to pursue any allocation theory. In this context, in May 2013, the Monitor disclosed the

allocation that it believed flowed from the proper interpretation of the MRDA and the parties'

rights thereunder. The US Interests' suggestion that the Monitor's allocation position would have

been relevant to the US Court in the context of the Rockstar Sale Transaction[165] could only be

tenable if extended to *all* parties' allocation positions – not just the Monitor's – which would

have been equally relevant to both of the Courts in the context of both sale approval motions.

But because the parties had agreed, with the Courts' approval, that these positions were reserved,

no parties put their allocation positions before either Court at that time.  To the extent the US

---

evaluate and disclose their positions" (US Interests' PFOFCL, p. 154 (para. 530)).  This has no
basis in law and is contrary to the reservation of rights in para. 12(f) of the IFSA.  Under New
York law, the duty to negotiate in good faith is a duty to seek compromise within the contours of
the parties' prior agreements – it is breached by the proposal of terms inconsistent with existing,
enforceable contracts (*CanWest Global Commc'ns Corp. v. Mirkaei Tikshoret Ltd.*, 804
N.Y.S.2d 549, 570 (Supr. Ct., N.Y. Cnty. 2005)). It is not breached by the proposal of terms less
beneficial than what a party could be entitled to in a court of law.  To the contrary, the New York
Appellate Division has held that a party's refusal to consider any payment other than the
maximum amount payable under the contract constitutes a failure to negotiate in good faith
(*Young & Rubicam L.P. v. Gramercy Court Associates*, 190 A.D.2d 518, 520, 593 N.Y.S.2d 20
(1st Dep't 1993); *Marquette Co. v. Norcem, Inc.*, 114 A.D.2d 738, 739, 494 N.Y.S.2d 511 (3d
Dep't 1985)). In the context of para. 12(d) IFSA settlement negotiations, no party could
reasonably expected that the Monitor's settlement position would be the same as its litigation
position or that its litigation position had even been finally determined.

[164] TR50027 (Amended and Restated Order (Allocation Protocol), April 3, 2013) Schedule A
(para. 4(a)); TR50102 (Order Entering Allocation Protocol of the U.S. Court, May 17, 2013)
Exhibit 1 (para. 4(a))

[165] See US Interests' Initial Post-Trial Brief, p. 70

- 59 -

Court did not have such information before it so too the Canadian Court did not have information

regarding the US Interests' and EMEA Debtors' allocation positions before it.  This was to be

expected as it flowed from the prior agreement of the parties sanctioned by the Courts.[166]

131.     It is plain that the US Interests themselves did not finalize their allocation position until

well after May 2013.  In December 2013, Ray was unable to state whether the Canadian Debtors

would have any recovery under the US allocation position (which also belies his suggestion that

a party could not take the position that another party would receive nothing).[167]  Ray's testimony

also demonstrates the hypocrisy of the US Interests' suggestion that their participation in the IP

sale process somehow estops the Monitor from putting forward its allocation position because

the IFSA gave the US Interests a contractual right to an allocation – the US Interests themselves

advocate for certain participants in the IP sale to receive nothing from it.[168]

132.     The reason for entering into the IFSA is clear – the parties' publicly asserting and then

disagreeing over allocation positions risked derailing the sale processes and jeopardizing the

ability to make any recovery from Nortel's assets.  Having struck this bargain, without any party

having a guarantee as to ultimate allocation or even allocation positions others would take it

---

[166] Ray testified on deposition that he did not believe that the U.S. Debtors were obligated to make any disclosure of their allocation position before May 2013, or to advise the Courts of their position that NNL would only receive 11 percent of the total allocation (John Ray Trial Testimony, Day 6, May 21, 2014, p. 1453:10-1454:17).

[167] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1447:25-1448:5

[168] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1429:15-1430:13 and 1433:10-1440:1. The testimony of Mr. Tay before a Canadian parliamentary committee referenced in the US Interests' Initial Post-Trial Brief at p. 67-68 (TR12004 at p. 21) that the existence of such licenses obligated the Canadian Debtors to include the subsidiaries' in the sale process is likewise correct.  Mr. Tay correctly noted that the licenses to NNL's subsidiaries remained assets of the other estates, even if they had little or no value, and therefore the Monitor and Canadian Debtors were required to have regard for the insolvency processes in the US and UK in obtaining terminations of those licenses in order to avoid embroiling purchasers in this allocation litigation.

- 60 -

cannot be the Monitor's duty (and only the Monitor's duty) to air its allocation position.  To the

contrary, the Monitor's obligation was to cooperate with the other parties to achieve the best

possible return on the assets sold and leave for another day the question of to which estate the

proceeds of sale belonged.[169]  In furtherance of this duty, the Monitor disclosed that it was the

joint conclusion of the parties that the sale represented the best way to monetize the patent

portfolio[170] and noted the success the parties were able to achieve by putting aside the

contentious topic of allocation.[171]  The Monitor made no representation as to the value it

believed each party would receive upon allocation and appropriately disclosed that no agreement

or allocation existed and all rights about it were reserved.[172]  The Courts recognized that the sale

proceeds represented the highest and best value for the assets sold, and therefore properly

---

[169] TR43794 (Interim Funding and Settlement Agreement, June 9, 2009) paras. 12(c), (d) and (f)

[170] TR49885 (Sixty-Third Report of the Monitor, April 14, 2011) para. 15; TR50174 (Monitor's Motion for Recognition of Order Approving Bidding Procedures and Side Agreement Relating to Sale of Patent Portfolio, May 19, 2011) para. 5

[171] "So I think outwardly, the bottom line of what we've seen here is that this is, I think a shining example, and one of many examples that you've seen in this case, of the amazing things we can get done when the estates work together. Unfortunately, we've also seen the disruption in value when the estates fight amongst each other, but fortunately, this is not before us today." TR21509 (July 2011 hearing transcript) p. 56:10-16 (submission by Derrick Tay)

[172] That not all parties might recover equally (or at all) was contemplated by the parties in agreeing that Global IP's fees and other Rockstar transactions costs were to be borne (and in fact were borne) in proportion to the allocation to be received as they were paid or reimbursed from the Rockstar sale proceeds (Sharon Hamilton Deposition, October 30, 2013, p. 101:15-102:8; TR44243 (Supplement IP Transaction Side Agreement re Certain Transaction Costs and Related Matters, July 27, 2011) para. 8 (p. 4 of PDF); TR46858 (IP Transaction Side Agreement, April 4, 2011) para. 2(f), and the US Interests themselves advocate for certain selling debtors to receive nothing. (John Ray Trial Testimony, Day 6, May 21, 2013, p. 1439:3-1440:1; TR11432 (Expert Report of Jeffrey H. Kinrich, January 24, 2014) at Exhibit 33.

concluded that it was in the best interests of each estate to approve the sale, whomever might ultimately be the recipient of the proceeds.[173]

### (iii)    Estoppel By Convention Does Not Arise

133.    The Monitor has already addressed in its Initial Post-Trial Brief the assertions of the US Interests about equitable estoppel and judicial estoppel – neither applies to prevent the Monitor from asserting its allocation position.  Those arguments will not be repeated herein.[174]

134.    The US Interests and the EMEA Debtors have now each in their Initial Post-Trial Briefs made an additional estoppel argument, namely that the Monitor cannot assert its allocation position because of the doctrine of estoppel by convention.[175]  The US Interests vaguely reference a "shared assumption about the proper interpretation of the [MRDA]" that the exclusive licenses had value, which they allege was communicated post-filing.[176]  In contrast, the EMEA Debtors allege that the shared assumption about the MRDA (and apparently its predecessor agreements) was communicated in the decades before filing when the RPEs began conducting R&D when "NNL represented to the other RPEs that if they invested billions of

---

[173] Justice Morawetz's oral endorsement stated that "All parties are of the view that the purchase price represents fair consideration to the assets included in the sale agreement and the circumstances of this case. That statement could be considered to be somewhat understated. I am satisfied that the consideration provided by Rockstar pursuant to the sale agreement constitutes fair value and fair consideration to the assets in question." TR21509 (Transcript of Proceedings, June 11, 2011) p. 106:17-24.  Judge Gross likewise concluded that "the terms are the highest and best available under the circumstances" without commenting on which party might receive the resulting value. TR21509 (Transcript of Proceedings, June 11, 2011) p. 110:22-23

[174] Monitor's Initial Post-Trial Brief, paras. 233-239

[175] US Interests' Initial Post-Trial Brief, p. 73-75; US Interests' PFOFCL, p. 192-194 (paras. 96-99); EMEA Initial Post-Trial Brief, paras. 365-370

[176] US Interests' Initial Post-Trial Brief, p. 74; US Interests' PFOFCL, p. 193 (para. 97)

dollars in a coordinated program of IP they would be beneficial owners of the resulting IP".[177]

These arguments are without merit.

135.    The US Interests and EMEA Debtors have raised the legal issue of estoppel by convention for the first time in their post-trial briefs.  They did not plead estoppel by convention in their May 2013 allocation response pleadings,[178] nor did they reference it in their pre-trial briefs in May 2014.  That in and of itself speaks volumes about the credibility of the assertion of shared assumptions or representations that underlie their new "litigation position".

136.    Neither the US Interests nor the EMEA Debtors can establish the strict criteria for an estoppel by convention, as laid down by the Supreme Court of Canada.  Each of the following must be proven to establish estoppel by convention:

> 1)  The parties' dealings must have been based on a shared assumption of fact or law: estoppel requires manifest representation by statement or conduct creating a mutual assumption. Nevertheless, estoppel can arise out of silence (impliedly).
>
> 2)  A party must have conducted itself, i.e. acted, in reliance on such shared assumption, its actions resulting in a change of its legal position.
>
> 3)  It must also be unjust or unfair to allow one of the parties to resile or depart from the common assumption. The party seeking to establish estoppel therefore has to prove that detriment will be suffered if the other party is allowed to resile from the assumption since there has been a change from the presumed position.[179]

None of those requirements are present in the case at bar.

---

[177] EMEA Initial Post-Trial Brief, para. 365

[178] Trial Transcript, Day 2, May 13, 2014, p. 410:5-19 per Ken Coleman on behalf of the Monitor and Canadian Debtors

[179] *Ryan v. Moore*, 2005 SCC 38 at para. 59 [emphasis in original]

- 63 -

137.     The first requirement demands that at a particular time the parties must be of "a like

mind" regarding a specific assumption that "must be shared in the sense that each is aware of the

assumption of the other".[180]  Vague allegations of a shared interpretation of the MRDA do not

suffice and, indeed, the US Interests and the EMEA Debtors now claim two different

assumptions (*per* the US Interests, that post-filing the parties assumed the exclusive licenses had

value so that the US Interests would be guaranteed a specific allocation, and *per* the EMEA

Debtors, that pre-filing all the RPEs were joint beneficial owners of the IP and would split its

value when sold).  There is not even a shared assumption between these two groups of debtors,

let alone one that was shared by all including the Canadian Debtors.

138.     Contrary to the position of the EMEA Debtors, there is no evidence that, pre-filing, the

parties had a shared mutual assumption about joint beneficial ownership of the IP and how any

allocation of IP sale proceeds would take place.  The pre-filing evidence shows there was no

shared view that the RPSM would operate to allocate IP assets if they were all sold upon Nortel's

insolvency.[181]  As the Supreme Court of Canada has held, mutual ignorance about an issue

cannot give rise to estoppel by convention.[182]  As for the assertion that R&D investment would

result in ownership, this so-called shared assumption is belied by the MRDA itself.

139.     As for the US Interests' assertion that, post-filing, the Monitor agreed and communicated

an assumption that the Licensed Participants' licenses in the MRDA had value in a way that

---

[180] *Ryan v. Moore*, 2005 SCC 38 at paras. 61-62: "Thus, it is not enough that each of the two
parties acts on an assumption not communicated to the other. Further, the estopped party must
have, at the very least, communicated to the other that he or she is indeed sharing the other
party's (ex *hypothesi*) mistaken assumption" (citations removed).

[181] See Kerry Stephens Trial Testimony, Day 8, May 27, 2014, p. 1791:3-1792:9 and 1794:6-16;
Mark David Weisz Trial Testimony, Day 9, May 28, 2014, p. 1872:1-11; Michael Orlando Trial
Testimony, Day 6, May 21, 2014, p. 1288:14-16 and 1289:1-1290:7

[182] *Ryan v. Moore*, 2005 SCC 38 at para. 63

could affect their legal entitlements to allocation of IP sales proceeds, the agreed to reservations

of rights regarding the allocation issue, in contracts to which the US Interests were parties, and in

the Court orders in this litigation which provide that there would be no restrictions on any party's

allocation position, are fatal to the US Interests' position.[183]

140.    Further, there is also no evidence that the US Interests or EMEA Debtors changed their

course of conduct in reliance on the alleged assumptions, which again is fatal to their claims of

estoppel by convention.[184]

141.    Finally, the US Interests and EMEA Debtors have cited nothing that would permit their

alleged mutual assumptions to trump the MRDA's own terms and its entire agreement clause.

The case law establishes that the MRDA's entire agreement clause is a full answer to an attempt

to alter the MRDA's terms and prevent these Courts from properly interpreting it because of an

alleged estoppel by convention.[185]   Indeed, the arguments about estoppel by convention are

simply another thinly veiled attempt by the US Interests and EMEA Debtors to introduce parol

evidence of subjective intentions and interpretations, evidence which is irrelevant and

inadmissible.[186]   Where there is an entire agreement clause evidence of witnesses' subjective

---

[183] See for example, TR43794 (Interim Funding and Settlement Agreement, June 9, 2009) para. 12(f); TR50027 (Amended and Restated Order (Allocation Protocol), April 3, 2013) Schedule A (para. 4(a)): "There shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation."

[184] *Ryan v. Moore*, 2005 SCC 38 at para. 69: "Detrimental reliance encompasses two distinct, but interrelated, concepts: reliance and detriment. The former requires a finding that the party seeking to establish the estoppel changed his or her course of conduct by acting or abstaining from acting in reliance upon the assumption, thereby altering his or her legal position." [emphasis added]

[185] *1230995 Ontario Inc. v. Badger Daylighting Inc.*, 2010 ONSC 1587 at para. 159 (S.C.J.), affirmed 2011 ONCA 442 at paras. 1(2), 6-8

[186] *Paddon-Hughes Development Co. v. Pancontinental Oil Ltd.*, 1998 ABCA 333 at paras. 43-44, leave to appeal to S.C.C. refused, [1998] 1 S.C.C.A No. 600 ("There is an affinity between

understanding of the agreement is also irrelevant to estoppel by convention.[187]  The doctrine can,

therefore, not be used as a back-door route to the introduction of such testimony.

**(b)    Procedural Matters – Trial Witnesses and Objections**

**(i)    No Need to Call Murray McDonald, Whose Deposition Testimony was
Extensive and Consistent**

142.    It is asserted by the US Interests that: "Notably, McDonald, who is the Monitor's

principal representative and decision-maker, was not called to appear as a witness to explain how

it is that he only came upon the Monitor's litigation position after making numerous

representations to the Courts and creditors that NNL's legal title was subject to the Exclusive

Licenses."[188]

143.    The US Interests[189] (i) misrepresent what McDonald said by improperly conflating the

time line for the development and formalization of the Monitor's litigation position and (ii)

display a lack of understanding of the Monitor's position which has consistently acknowledged

the existence of the exclusive licenses granted under the MRDA – and in particular fails to

distinguish between the existence of those licenses and their value at any given point in time

(discussed in the previous section of this Rebuttal Brief).  The US Interests also suggest a

procedural expectation of witnesses to appear at trial that is inconsistent with the agreed upon

Trial Protocol.  When all the facts are taken into account there is nothing that has been left

unsaid by the Monitor or that the Courts would be assisted in hearing further from McDonald.

so-called "entire agreement" clauses and the parol evidence rule…The parallel between an entire
agreement provision like Clause 23 and the more general parol evidence rule is clear.")

[187] *1230995 Ontario Inc. v. Badger Daylighting Inc.*, 2011 ONCA 442 at paras. 1(2), 6-8

[188] US Interests' Initial Post-Trial Brief, p. 11-12

[189] US Interests' Initial Post-Trial Brief, p. 11-12, 70-71 and 73

144.    The US Interests rely on the following McDonald deposition evidence about when the

Monitor determined its litigation position on the meaning of the MRDA:

> "Q.   And at some point in time you reached the conclusion that's reflected
> in your allocation position that those intercompany licences had no value
> at the time of the Rockstar sale, correct?
>
> A.   Correct.
>
> Q.   When did you first reach that conclusion?
>
> A.   Probably after the unsuccessful third mediation."[190]

145.    As discussed at paragraphs 165-172 of the Monitor's Initial Post-Trial Brief and in this

Rebuttal Brief, the Courts directed that all parties' litigation positions were not to be formalized

until May 2013, consistent with the parties' agreement reflected, among other places, in the

IFSA, that any disagreements about how to allocate any sale proceeds would be deferred for later

determination under a complete reservation of rights.

146.    The US Interests thus take McDonald's statements out of context. What McDonald was

referring to was that it was only in early 2013 that the Monitor formed a *definitive* view about the

allocation position it was going to take.[191] Prior to that time, the Monitor was focused on

ensuring the consummation of the sale transactions and maximizing the value of the assets sold,

and attempting to negotiate a resolution to the issues now before the Courts.[192]

---

[190] Murray McDonald Deposition, November 26, 2014, p. 145:17-146:2, cited at US Interests'
Initial Post-Trial Brief, p.71

[191] Murray McDonald Deposition, November 26, 2014, p. 121:22-123:4

[192] Murray McDonald Deposition, November 26, 2014, p. 118:19-121:2. At US Interests' Initial
Post-Trial Brief, p. 70-71, it is suggested that contrary to McDonald's evidence, Hamilton
intimated that at the time of the Rockstar Sale Transaction, the Monitor had determined its
position regarding the value of the licenses. This deduction cannot be gleaned from any
reasonable reading of Hamilton's evidence, in fact, Hamilton expressly testified that at that time

- 67 -

147.    Nonetheless, as McDonald explained elsewhere on deposition, the US Interests were in fact aware, since at least May 2010, that the Monitor could take the position that NNL owned all of Nortel's IP and should therefore get all the proceeds from its sale.[193] This, together with the evidence cited at paragraph 176 (footnote 206) of the Monitor's Initial Post-Trial Brief that its position that NNL was the sole owner of Nortel's IP was disclosed in these proceedings before the parties' allocation positions were required to be shared, rebuts the US Interests' suggestion that the Monitor's allocation position was just an "after-the-fact litigation contrivance".[194] This is further supported by the evidence from Doolittle who confirmed on deposition that there were several discussions among employees within Nortel in the post-petition time frame where the view was expressed that since legal ownership of the IP rested with NNL, NNL should be entitled to all the proceeds from the sales of the IP.[195]

---

"the Monitor did not have – had not concluded on any definitive position at that point in time, and so it was – it couldn't be said [to the Court] at that point in time and shouldn't be said at that point in time." (Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 970:18-22).

[193] Murray McDonald Deposition, November 26, 2014, p. 100:2-101:10, 102:15-103:14, 104:19-25, 120:20-123:25 and 147:5-148:7. Also see TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 42-44. While the US Interests attempt to diminish the impact of this evidence from two representatives of the Monitor with the sole evidence of Ray (see US Interests' Initial Post-Trial Brief, p. 71(footnote 243)) Ray's evidence does not address the other evidence from Hamilton that the US Interests were advised during the course of the Residual IP sale Process of the Monitor's position that the Residual IP was an NNL asset  (TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 39-41; Sharon Hamilton Deposition, October 30, 2013, p. 105:8-108:20). Nor does Ray's evidence address the statements by counsel for the US Debtors at the IFSA Approval Hearing which made it clear that all parties had reserved their rights relating to allocation and the ownership of IP as early as the IFSA approval hearing in July of 2009, which leaves little doubt that everyone was aware to the significance of differing positions about  IP ownership in the context of later determinations of allocation entitlements.  Ray's evidence should not be preferred over that of the Monitor's representatives about the irrefutable fact that it was understood by all that the Monitor's allocation position could be predicated on NNL's IP ownership.

[194] US Interests' Initial Post-Trial Brief, p. 11

[195] John Doolittle Deposition, December 5, 2013, p. 149:24-150:14,150:25-151:24 and 152:8-153:9

148.    As a procedural matter, there was no onus or obligation for McDonald to appear at trial

and the Trial Protocol was designed to specifically minimize the number of witnesses appearing

at trial. It is not open to the US Interests to argue for or suggest any sort of adverse inference

arising from the failure of McDonald (or any other witness) to appear at trial.

149.    McDonald was deposed by the US Interests (counsel for the US Debtors and the UCC)

for 9 hours on November 26, 2013.  All parties are free to rely upon the testimony that he

provided during his deposition, all of which was designated for purposes of trial in accordance

with the Trial Protocol and forms part of the trial record (see Trial Protocol Part I B 1. and 2.).

150.    In any event, the US Interests never asked that McDonald attend to testify at trial.

**(ii)    No Need to Call Kruger to "explain" Tax Filings that Express Consistent
          Positions**

151.    The US Interests also seek to rely on assertions made about NNI's ownership of NN

Technology  (to the effect that each of the Participants held "Intellectual Property Economic

Ownership" in its respective jurisdiction) in transfer pricing reports prepared post the 2009

filings with assistance from Kruger, who works with the Monitor, and then suggest that the

Monitor refused to produce Kruger[196] for deposition and criticize the Monitor for failing to call

him as a witness at trial to testify on these matters.[197]

152.    It is misleading for the US Interests to say that the Monitor refused to produce Kruger to

be deposed in response to their demand for his deposition.  The US Interests (or any other party)

---

[196] This assertion arises from the attempt by the US Debtors to subpoena Kruger to a deposition
outside of the agreed upon deposition protocol to which the Monitor objected. See TR50862
(Motion Record of the Monitor and Canadian Debtors, Motion to Quash Kruger Summons).

[197] US Interests' Initial Post-Trial Brief, p. 11, 54-55 and footnote 170.

- 69 -

did not list Kruger among the individuals whose depositions it sought on or before the July 30,

2013 deadline set by the Litigation Timetable and Discovery Plan, despite having listed other

representatives of the Monitor at that time - Hamilton and McDonald - both of whom appeared

voluntarily for deposition.[198]  The US Interests failed to advise the members of the Court-ordered

Scheduling Committee (comprised of representatives of the three estates) of their intention to

depose Kruger and failed to seek to negotiate a date for his deposition.[199]  The US Interests did

not seek leave from the Courts to designate him as an additional fact witness to be examined,

which the Litigation Timetable and Discovery Plan permitted upon a showing of good cause.[200]

153.    While it is true that the Monitor did not call Kruger to appear as a witness at trial, it is

also equally true that the US Interests never asked that he appear at trial. The US Interests'

suggestion that Kruger should have been called as a witness at trial (after they failed to seek his

deposition under the procedures set forth in the Litigation Timetable and Discovery Plan) is

nonsensical: Kruger's evidence would not be relevant as he had no involvement in EY Canada's

pre-filing transfer pricing advisory mandate for the Canadian Debtors and has only been engaged

with respect to Nortel matters as an advisor to the Monitor in the post-filing period,[201] which

---

[198] TR50862 (Motion Record of the Monitor and Canadian Debtors, Motion to Quash Kruger Summons) Appendix D (Clearly Gottlieb Letter, July 30, 2013), p. 153-156 of PDF

[199] TR50862 (Motion Record of the Monitor and Canadian Debtors, Motion to Quash Kruger Summons) Tab 2 (One-Hundred and First Report of the Monitor) para. 20; Order approving allocation protocol-litigation timetable and discovery plan dated May 15, 2013, Schedule A "Discovery Plan", page 9; Order approving deposition protocol dated August 27, 2013, Exhibit 1 (Deposition Protocol), Section D

[200] TR50862 (Motion Record of the Monitor and Canadian Debtors, Motion to Quash Kruger Summons) Tab 2 (One-Hundred and First Report of the Monitor) para. 19 (p. 57 of PDF); see also Appendix A (Litigation Timetable), para. 6 (p. 86 of PDF) and Appendix B (Deposition Protocol) (p. 118-122 of PDF)

[201] TR50862 (Motion Record of the Monitor and Canadian Debtors, Motion to Quash Kruger Summons) Tab 2 (One-Hundred and First Report of the Monitor), para. 17 (p. 56-57 of PDF); Appendix E (Affidavit of Elizabeth Wolfe, September 17, 2013), para. 6 (p. 159-161 of PDF).

renders anything he might say inadmissible extrinsic evidence with regard to the interpretation of the MRDA.

### (iii) No Need to Call Additional Witnesses to Testify about the Provisions of the MRDA

154.    Similar unjustified criticisms are levied by the US Interests for the Monitor's alleged failure to call other witnesses who were deposed about their subjective intentions, views and understandings of the MRDA, in particular Doolittle, Ms. Karina O and Look.[202]

155.    It is not clear what inference the US Interests are suggesting ought to be drawn from the Monitor not having these witnesses come to trial given that they were deposed, and the subject of the evidence as described by the US Interests would be irrelevant and inadmissible.

156.    Furthermore, while the US Interests point to the Trial Protocol requiring any fact witness testifying at trial to submit an affidavit,[203] they have not suggested that they attempted, but were unable, to get affidavit testimony from these witnesses. Once they were advised of who the Canadian Allocation Group's trial witnesses would be and that these witnesses were not among them – if they thought they had relevant, helpful and/or admissible testimony to provide to the Courts that was not already otherwise available through their depositions[204] the US Interests could have sought to obtain affidavit evidence from these individuals.

157.    The trial witnesses identified by the US Interests as the "relevant witnesses" (Weisz, Orlando, Henderson, Stephens and Albert-Lebrun) called to testify by NNI and the EMEA

---

[202] US Interests' Initial Post-Trial Brief, p. 58-59

[203] US Interests' Initial Post-Trial Brief, p. 58-59 (footnote 183)

[204] The Monitor considers much of the designated testimony that was elicited by other parties from these witnesses on deposition to be equally irrelevant, unhelpful and/or inadmissible, the effect of which is discussed below.

Debtors about their contention that the "broad license rights amount to equitable and beneficial ownership of NN Technology in each Licensed Participant's Exclusive Territory"[205] all agreed that in advancing these subjective views what they mean to do is describe rights in fact embodied in the MRDA.[206]  Since the relevant rights and concepts are those in the MRDA, evidence of individuals with their views about what they mean is inadmissible – the calling by the US Interests of such witnesses does not require others to meet irrelevant and inadmissible evidence with more of the same.

158.    Accordingly, the suggestion by the US Interests that:  "Even after receiving initial witness statements from Weisz, Orlando, Henderson and Stephens, the Monitor tellingly failed to call any witness at trial with knowledge of the MRDA or the facts and circumstances surrounding its creation"[207] is both inaccurate and misguided.  Inaccurate because the Monitor was entitled to and does rely on the trial and deposition testimony of witnesses who can provide any admissible and relevant evidence of surrounding circumstances or of background facts known at the time of execution of the MRDA that sheds light on the objective intention of the parties at the time of entry into the MRDA; misguided because the testimony of the witnesses called by NNI and the EMEA Debtors is evidence of subjective intention and inadmissible.  The only thing that is telling from the Monitor's failure to call witnesses after receiving the other parties' trial affidavits is that the Monitor has been consistent in its position throughout that their evidence is not relevant or admissible.

---

[205] See US Interests' Initial Post-Trial Brief, p. 9-10

[206] See Monitor's Initial Post-Trial Brief, paras. 280-283 and the US Interests' Initial Post-Trial Brief, p. 42 (footnote 103). See also Mark David Weisz Trial Testimony, Day 9, May 28, 2014, p. 1899:3-6, Kerry Stephens Trial Testimony, Day 8, May 27, 2014, p. 1780:25-1781:11.

[207] US Interests' Initial Post-Trial Brief, p. 9-10

159.    What is also "telling" is how the US Interests themselves describe the supposed factual

matrix testimony that they rely upon – in an attempt to demonstrate that there is no rabbit hole of

different views expressed in different contexts at different times by different people – they assert

that:  "There is no evidence that any party with knowledge of the MRDA ever expressed a

"different view" as  to the meaning of "beneficial ownership" as the Monitor contends; all agreed

that from any perspective, the Licensed Participants had full ownership of all valuable rights to

NN Technology in the Exclusive Territories".[208]  This is a tacit acknowledgement that the

evidence they rely on (and that they say the Monitor has allegedly failed to rebut) is

quintessentially evidence of subjective understanding, interpretation and intention.  It is also

inaccurate since there is contradictory evidence, as discussed above.  No inference or finding can

be made from the Monitor's decision not to call irrelevant and inadmissible evidence.  The

Monitor's rebuttal to the attempts by the US Interests to characterize this evidence as factual

matrix is discussed above at paragraphs 50 to 61.

>    **(iv)    Monitor's Objections to Attempts by Others to Rely on Subjective
>             Intentions/Understandings Should be Sustained**

160.    The US Interests suggest that something further is required from the Monitor in order to

advance the 48 objections to designated exhibits and deposition testimony of subjective

understanding, interpretation, and intention that it preserved at the outset of trial.[209]  Those

objections were made in accordance with the timeline that was provided for in the Trial Protocol

and were preserved at the outset of trial, with both Courts having directed that they be addressed

in closing argument.  A schedule of those remaining objections was provided to all parties on

Day 4 of the Allocation Trial and is attached hereto as Schedule B for the Courts' reference –

---

[208] US Interests' Initial Post-Trial Brief, p. 44
[209] US Interests' Initial Post-Trial Brief, p. 38 (footnote 89)

with the specific deposition testimony that was objected to now having been excerpted and cross referenced to the 14 instances in the other parties' opening and closing (pre-trial and post-trial) briefs where they seek to rely upon that evidence.[210]  Furthermore, nothing in the parties' arrangements about objections to testimony detracts from the Courts' ability (in fact obligation) to disregard inadmissible testimony, nor from the Courts' discretion to give unhelpful evidence of this nature little or no weight.

161.    The Monitor has made it clear in the stated grounds as originally filed that it considers the 48 preserved objections to be about evidence of subjective intention and/or interpretation and that it does not agree with the assertion by the US Interests that this constitutes "factual matrix" evidence.[211]

162.    Having made these objections, there is nothing further to be said about them; they are for the Courts to rule upon now that it is clear from the Post-Trial Briefs (and Schedule B hereto) that the other parties still seek to use some of this evidence in an impermissible manner.

163.    That no weight should be given to statements of subjective intention or parole evidence is axiomatic. The Courts repeated throughout the trial that such evidence was unhelpful and they did not need to be reminded by counsel of it at each point where it arises.  The US Interests expressly concede that factual matrix evidence may not include the subjective intent of the parties.[212]

---

[210] The Monitor having now seen the manner and extent to which other parties seek to rely on this objected to testimony.

[211] See for example, US Interests' Initial Post-Trial Brief, p. 38 (footnote 89), among other places in the brief.

[212] US Interests' Initial Post-Trial Brief, p. 38

164.     The fact that the Monitor did not, with the benefit of the guidance from the Courts, make objections to each sentence in the trial affidavits and to each instance of trial testimony that offended these rules of evidence is an indication of nothing more than the Monitor's acceptance of the Courts' directives that they will properly consider the inadmissibility of this testimony of subjective intention in their deliberations (not a tacit acknowledgment of the relevance or admissibility of that evidence as the US Interests suggest).[213]

165.     Nonetheless, so as to provide the foundation upon which the Courts can make their assessments, the Monitor did make some objections as examples during the trial testimony of certain witnesses and cross-examined upon examples of statements of this nature contained in trial affidavits in order to establish that the witnesses were simply being asked about or speaking of their own subjective interpretations and views about what the words in the MRDA mean, or providing their interpretations of the MRDA – equally impermissible testimony.[214]

166.     The Monitor's objections to extrinsic evidence in the form of trial exhibits, deposition testimony and trial testimony were more than sufficient to preserve the issue for resolution now, as the Courts directed (and in any event, "[t]he failure to object does not render inadmissible evidence admissible").[215]   To invite the Courts to consider such evidence in construing the MRDA is to invite error.  In the analogous context of interpreting contracts under state laws excluding parol evidence where a contract is unambiguous, in a US bench trial the court may

---

[213] US Interests' Initial Post-Trial Brief, p. 38 (footnote 89)

[214] See for example Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 869:16- 71:19; Philippe Albert-Lebrun Trial Testimony, Day 6, May 21, 2014, p. 1504:5 1508:10 and 1514:8 1515:2; Kerry Stephens Trial Testimony, Day 8, May 27, 2014, p. 1792:10-1793:6; Walter Henderson Trial Transcript, Day 5, May 20, 2014, p. 1155:4-17

[215] *Doherty v. Home Insurance Co.,* 1986 CarswellOnt 741 at para. 22, citing *Adam v. Campbell* [1950] S.C.J. No. 51 at para. 36

receive evidence subject to a subsequent determination that it is irrelevant and therefore inadmissible.[216]  Thus, the Courts' permitting the parties to present such evidence should not be construed as the admission of such evidence in the absence of any affirmative ruling.

167.    The Monitor has not gained any tactical advantage since all parties have had adequate notice of the Monitor's position concerning these objections.

## C.    REBUTTAL TO OTHER ASSERTIONS MADE IN SUPPORT OF THE US INTERESTS' ALLOCATION THEORY

### (a)    The US Interests' Assertion That "Equity-Takes-Last" is a Red-Herring

168.    The US Interests have argued that the principle of "equity takes last" supports their allocation theory or, at least, supports the position that the Monitor's allocation theory should not prevail.[217]  The theory appears to be based on the following premises:

(a)    NNI had the exclusive right to carry on business in the U.S., had the right to all revenues generated from the U.S. and owned all of the assets and rights including IP rights that were associated with the U.S.  In her opening statement, Ms. Block

---

[216] See, e.g., *Institute For Disabilities Research and Training, Inc. v. Wal-Mart Stores, Inc.,* No. 5 Civ. 176 (D. Del. 2007) at p. 3 ("Because the court finds the contract term 'Phases' unambiguous, it need not make findings of fact with respect to the extrinsic evidence adduced at trial regarding the meaning of or parties' intentions as to that term."); *Thorn EMI North America, Inc. v. Hyundai Electronics Industries Co., Ltd.*, No. Civ. 332 (D. Del. 1996) at p. 10 and 11 ("The parties contend, and the court agrees, that the language of the IBM/INMOS agreement is unambiguous. Therefore, the court may not consider extrinsic evidence," including "the extrinsic evidence of the negotiations between IBM and INMOS produced at trial".).

[217] US Interests' Initial Post-Trial Brief, p. 18

stated "Once in insolvency, NNL's only access to the value owned by NNI was as its shareholder and in insolvency, equity takes last".[218]

(b)     NNL, as a shareholder, had given NNI those rights and assets in the U.S. in exchange for shares and had no other interest in those rights. The US Interests argue that NNI was NNL's most valuable asset.[219]  Specifically,

(i)     Mr. Bromley said "... in 1985 and for every year after that NNL, continued to own the intellectual property in the United States only through its ownership of NNI".[220]

(ii)     Mr. Leblanc went so far as to say that the Canadian parent's "only assets are the equity that it holds in the subsidiaries."[221]

169.    The US Interests' argument based on an "equity-takes-last" theory is wholly irrelevant to the determination of the arguments relating to allocation.  It erroneously assumes that:

(a)     the US Interests have won their allocation theory – in other words that the "rights" that NNI was given were ownership rights in all of the value comprised of assets, technology, intellectual property and business in the U.S.;

(b)     NNL's only interest in these assets was an equity interest in NNI; and

(c)     the entirety of the relationship between NNL and NNI was by virtue of the shareholder interest that NNL has in NNI.

---

[218] Trial Transcript, Day 1, May 12, 2014, p. 164:22-165:5 and 174:1-3 *per* Sheila Block on behalf of the US Debtors

[219] US Interests' Initial Post-Trial Brief, p. 2 and 75

[220] Trial Transcript, Day 1, May 12, 2014, p. 203:9-23 *per* James Bromley on behalf of the US Debtors

[221] Trial Transcript, Day 2, May 13, 2014, p. 376:16-21 *per* Andrew M. LeBlanc on behalf of the Bondholders

170.    The first two assumptions are, in fact, the very issues that the Courts must decide in the context of this trial. The last assumption is plainly wrong.  If NNI does not have the ownership rights it claims, its creditors do not have an entitlement to proceeds derived from ownership. NNL's ownership of the IP is not dependent upon its equity interest in NNI.

171.    Further, the relationship between NNL and NNI is not just that of a shareholder and subsidiary but is also governed by the various contractual arrangements entered into by those entities.  Most importantly, it is governed by the terms of the MRDA.  The rights that each entity had to Nortel's value, and importantly, the patents that were sold to Rockstar, are derived from rights provided for in that document and not by the shareholder interest that NNL had in NNI.

172.    Ultimately, the issue of equity taking over debt  becomes relevant only after the issue of entitlement to allocation is determined, when NNI is proposing a distribution to its stakeholders of the proceeds that are properly allocated to it. It is only at that point that the principle of equity comes last would apply.

**(b)     The US Interests' Assertion that NNI was the "most valuable" Nortel Entity is Myopic**

173.    The US Interests argue that allocating the largest share of the sale proceeds to NNI is consistent with the fact that NNI was the most "valuable" entity in the Nortel Group.  In support of their theory, they argue that each of the integrated entities (or IEs, also referred to as RPEs) were fully functioning, independent entities capable of conducting business on their own.[222]  The theory is factually unsupported, selective and circular.

---

[222] US Interests' PFOFCL, p. 9 (para. 33)

- 78 -

174.   In support of their argument that NNI was the most valuable Nortel entity, the US

Interests have presented a partial picture of the Nortel structure. They assert the following:

(a)   NNI conducted significant and important R&D;[223]

(b)   NNI had the most important customer relationships;[224]

(c)   NNI earned the most revenue;[225]

(d)   NNI provided support and credit to the Nortel Group;[226] and

(e)   NNI provided the administrative and operational functions needed within the
Nortel Group.[227]

175.   These assertions must be considered in the broader context of the Nortel Group.

(i)   **NNC/NNL were Instrumental to NNI's Conception, Growth and Operations**

176.   The US Interests are correct that NNI was incorporated in 1971.[228]  However, it is

important to note how the U.S. business became what it was at the time of filing, because it is

very clear from the evidence that NNI was not operating a separate business and could not have

(in any timely manner) gone on to do so.

177.   As Allen testified, prior to NNC (or its predecessor) giving NNI access (by a license) to

Nortel technology, it had nothing on its own.[229]  Not only did the Canadian parent continue such

---

[223] US Interests' PFOFCL, p. 14-16 (paras. 51-57)

[224] US Interests' PFOFCL, p. 16-17 (paras. 58-65)

[225] US Interests' PFOFCL, p. 18-20 (paras. 66-71)

[226] US Interests' PFOFCL, p. 20-24 (paras. 72-91)

[227] US Interests' PFOFCL, p. 24-25 (paras. 92-97)

[228] See US Interests' PFOFCL, p. 13 (para. 48)

[229] Clive Allen Trial Testimony, Day 3, May 14, 2014, p. 612:21-614:16 and 622:21-25

licensed access, but, between 1998 and 2000, NNC (or its predecessor) made over $25 billion in acquisitions within the U.S. alone of business that became part of NNI.[230]

178.    The US Interests acknowledge the significance of acquisitions made in the U.S. by NNC as it related to the growth of NNI (or its predecessor).  Specifically as it related to the acquisition of Bay Networks, the largest U.S. acquisition in that time period, counsel for the US Debtors conceded that the acquisition of Bay Networks was a "huge change".[231]

179.    At no time was NNI operating a separate business from the rest of the Nortel operations, nor did it have the capability to do so.  Of particular note:

(a)     NNI did not have the R&D capability to operate a separate stand-alone business.[232]  It was not conducting much or any LTE (next generation) or advanced technology research.[233]

(b)     Any attempts to re-organize around a smaller region-specific entity would have been time consuming and expensive.[234]  Further, it is clear that customers like

---

[230] TR40259 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2000) p. F-15 and F-16; TR40261 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2001) p. F-14; TR40262 (Nortel Networks Limited Form 10-K for fiscal year ended December 31, 2001) p. F-14; TR40263 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2002) p. 121 of PDF.

[231] Trial Transcript, Day 1, May 12, 2014, p. 184:20-24 *per* James Bromley on behalf of the US Debtors

[232] TR00005 (Exh. 5, Reply Affidavit of Brian McFadden, April 24, 2014) para. 3; TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 7; Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 638:5-14

[233] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 8; Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 636:16-637:18 and 645:1-3

[234] TR00015 (Exh 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 8

Verizon were not willing to go with a "smaller" Nortel, so a standalone NNI could not have kept such customers.[235]

(c)     The Nortel Group itself operated as one integrated whole[236] – although NNI did have certain administrative and logistical capabilities, all reporting was to executive management in Canada[237] and NNI itself did not have many functions such as treasury or financial reporting sufficient to run on its own.[238]

(d)     When asked during opening whether NNI ever considered recapitalizing as a stand-alone directly, counsel for the US Debtors did not provide a positive response[239], and no evidence of such consideration was presented.

**(ii)     NNI's R&D Supported Legacy Businesses From Acquisitions**

180.     The US Interests emphasis on the R&D that was being conducted in the U.S., particularly as it related to CDMA and Enterprise, does not at all make their case.  The following points are relevant in response.

181.     Although R&D grew in the U.S. over time, its growth was largely due to acquisitions made using NNC (or predecessor) stock.

---

[235] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 47; TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) paras. 9-12; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 23

[236] TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 6; TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 5; TR00013 (Exh. 13, Affidavit of Gordon Davies, April 11, 2014) para. 39

[237] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 32-35

[238] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 63; TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) Appendix E, p. 7; TR31443 (Witness Statement of Sharon Lynette Rolston, January 14, 2009) paras. 15(i) and 85

[239] Trial Transcript, Day 2, May 13, 2014, p. 323:13-324:11 *per* James Bromley on behalf of the US Debtors

- 81 -

182.    At all times, the majority of R&D was done in Canada.[240] Specifically:

(a)    Nortel's R&D headquarters were located at the Canadian Carling Campus in Ottawa which was its largest R&D facility;[241]

(b)    The CTO resided at Carling;[242]

(c)    Significant amounts of Nortel's R&D took place in Canada including almost all of the R&D for MEN/Optical and LTE as well as Enterprise Voice;[243]

(d)    Most of the advanced technology research was directed and conducted out of Carling;[244]

(e)    When Nortel wanted to impress customers, they typically brought them to Carling because of its size and impressive nature.  Important customers were brought for tours and discussed future products based on advanced technology;[245] and

(f)    The majority of R&D employees worked in Canada.[246]

---

[240] This point was conceded by the US Debtors in their opening statement at trial (Trial Transcript, Day 1, May 12, 2014, p. 188:17-19); TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) paras. 7-8; TR00005 (Exh. 5, Reply Affidavit of Brian McFadden, April 24, 2014) para. 4

[241] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para 117; TR21539 (Affidavit of John Doolittle, January 14, 2009) para. 31; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 15-16; Darryl Edwards Deposition, October 31, 2013, p. 60:4-61:18

[242] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 114; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 10-12 and 17; Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 636:16-637:18

[243] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) paras. 7-8; TR00005 (Exh. 5, Reply Affidavit of Brian McFadden, April 25, 2014) para. 4

[244] Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 636:16-637:18 and 645:1-3; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 15

[245] Darryl Edwards Deposition, October 31, 2013, p. 60:4-61:18; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 29; Pascal Debon Deposition, November 25, 2013: 41:14-42:3, 74:4-14, 79:3-10, 79:19-80:6, 93:5-24; 173:20-174:5

183.    In the years leading up to the insolvency filings, Canada's share of overall Nortel R&D spending was more than that of the U.S., growing between 2001 and 2008 from 43% to 56%, while the U.S. fell from 39.4% to 36.2%.[247]

184.    Even the R&D that was conducted in the U.S. (for CDMA and Enterprise) was not the most valuable for the following reasons:

(a)    Although CDMA was the largest revenue generating business, it was a legacy business that was going to be replaced. Nortel was already having difficulty retaining its largest CDMA customers (such as Verizon) in transitioning to 4G (LTE) technology (see below);[248]

(b)    Enterprise was a money losing business for many years prior to the insolvency filings;[249]

(c)    A significant amount of the CDMA R&D was conducted in Canada (as well as the U.S. and China);[250]

(d)    Almost all of the "next generation" or LTE R&D was conducted in Canada;[251]

(e)    Nearly all of the MEN R&D was also conducted in Canada;[252]

---

[246] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 15; TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 7; Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1061:21-25

[247] TR45171 (Historical R&D Spend by Year as of Q2 2010)

[248] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 8

[249] TR00009 (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 14

[250] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 8

[251] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 8; TR00005 (Exh. 5, Reply Affidavit of Brian McFadden April 10, 2014) paras. 3 and 4

[252] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 7

- 83 -

(f)     Much of the R&D being conducted in the U.S. was "development" phase R&D. In other words, the work that was done in the U.S. was development of products for customers whereas the "research" was done in Canada;[253]

(g)     As set out above, the advanced technology research and the advanced technology programs were run out of Ottawa through the CTO's office. The advanced technology produced the greatest impact in terms of innovation and patent filings.[254] Although advanced technology research did not take place exclusively in Canada, even without considering any other factors, the relative paucity of advanced technology research in the U.S. alone would have prevented the US from operating a stand-alone business without undergoing a time consuming and expensive transition process.[255]

185.    Accordingly, R&D specialization to support customers transitioning to next generation technologies could not have been supported by the U.S. The required R&D specialization could not be obtained or created overnight but would have been time consuming and expensive to acquire.[256]

186.    Approximately 50% of all patents and patent applications in NNL's portfolio had primary inventors who worked in a Canadian entity's research lab.[257]

---

[253] Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 649:15-650:18

[254] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 22

[255] TR00005 (Exh. 5, Reply Affidavit of Brian McFadden April 10, 2014) para. 3; TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 8

[256] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 8

[257] TR00006 (Exh. 6, Affidavit of Angela DeWilton, April 11, 2014) para. 14

- 84 -

(iii)    **NNI's Customers were Nortel Customers Who Depended on Nortel Technology**

187.    There were many large customers in the U.S., but the US Interests overlook the fact that R&D, and the IP it generated, were the key drivers of Nortel profit.[258]  The ownership of the IP was therefore the key value consideration and essential to there being customers.   Moreover:

(a)     The U.S. was not the only jurisdiction with "blue chip" customers – the evidence shows that there were such customers in Canada and EMEA also.[259]

(b)     Large customers were not supported by NNI alone – for large customers, there were global support teams put in place to support such customers.[260]

188.    Customers tended to see Nortel as a "group" and not look to the regional entity[261] – instead, they wanted to know they had the support of Nortel as a whole. Importantly, customers would seek attention from executive management, located in Canada.[262]

189.    By the time Nortel filed for bankruptcy protection, it was starting to lose valuable customers.  Verizon (who accounted for approximately 27% of NNI's total revenue in 2008[263]) had advised that it did not intend to continue with Nortel for its next generation technology and,

---

[258] TR21003 (MRDA) at Schedule A; TR11055 (Horst Frisch Report) at 39-40.

[259] Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 694:5-23

[260] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 31

[261] Clive Allen Trial Testimony, Day 3, May 14, 2014, p. 712:7-11

[262] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 12

[263] TR45494 (2008 Customer Revenue Report)

instead, that Nortel needed to get that technology into "safe hands".[264]  Other customers such as

AT&T and Comcast (both U.S. based customers) had expressed similar concerns.[265]

190.    Other than possibly MEN (in Canada), no single Nortel entity had the R&D capability to

sustain a line of business on its own.[266]

### (iv)    NNI's Revenue was Subject to the RPSM

191.    The US Interests' position is at its most circular on the point of revenue.  First, it is clear

that revenue could be earned only as a result of R&D spending.  Canada's disproportionate R&D

spending enabled revenue to be generated in the U.S.  Moreover, revenue did not equate to value

at Nortel, because the MRDA did not permit NNI to keep revenue generated in the U.S., but

obligated it to share in accordance with the RPSM.  The prime determinant of RPSM sharing

was R&D spending, and since Canada spent the most on R&D, its entitlements were the highest

(and in some years, these entitlements provided NNL a greater share of the losses).  The US

Interests' approach of saying NNI was the most valuable because it had the most revenue

requires both R&D spending and RPSM sharing to be improperly ignored, just as their expert

Jeffrey Kinrich does.  Thus, their proposition that it is no surprise that Kinrich allocates the most

value to NNI because it was the most valuable entity, is a meaningless tautology.

---

[264] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 47; TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) paras. 9-12; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 23

[265] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 47; Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1085:1-11

[266] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) paras. 4(b) and 7

### (v)    The Importance of NNI's Credit Support is Exaggerated

192.    In the US Interests' opening statement at trial, their counsel stated:  "so as of today, since 2000, total cash and liability support provided by NNI to NNL totaled $11 billion."[267]  The "support" allegedly consisted of (a) transfer pricing payments; (b) intercompany loans, and (c) guarantees.

193.    First, transfer pricing payments are not "support".  They are contractually mandated payments under the MRDA.  The US Interests had no entitlement to retain any portion of the profit that was in excess of the allocation to it under the MRDA.  NNI did receive returns on its routine activities under the RPSM, which it also ignores.

194.    The US Interests next point to additional "support" provided through loans from NNI to NNL.  However:

(a)    the 2006 Credit Facility was a bridge facility that was paid off by NNL through its 2006 bond issuance[268] and is not evidence of NNI providing support to NNL.

(b)    NNI points to the $2 billion revolving credit facility (the "NNI Revolver") with NNL as source of support so that NNL could meet "its working capital requirements pending receipt of transfer pricing payments"[269] – however:

(i)    most of the transfer pricing payments owed to NNL were due from NNI and the NNI Revolver therefore simply accelerated NNL's receipt of moneys it was owed;[270]

---

[267] Trial Transcript, Day 2, May 13, 2014, p. 321:7-9

[268] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 91; Trial Transcript, Day 2, May 13, 2014, p. 319:14-320:8

[269] US Interests' PFOFCL, p. 23 (para. 89)

- 87 -

    (ii)    the revolving credit facility was subsequently reduced to $1 billion because NNI did not have the funds to provide up to $2 billion credit to NNL[271] and at the time of filing, the balance owing was less than $300 million;[272] and

(c)    According to the Functional Analysis conducted in 2004, NNL was the most credit worthy Nortel entity.  NNL was the primary borrower of credit on the open market or guarantor to another North American issuer and used that money to fund operations globally.[273]

195.    Third, the US Interests exaggerate the importance of an NNI guarantee:

(a)    The evidence shows not that Nortel's public debt issuance would only be achieved with a NNI guarantee but, rather, that absent such a guarantee, pricing and covenant terms would have been impacted.[274]  Further, the evidence shows that bondholders trading the bonds in the market did not give much value to the

---

[270] TR49192 (2001 Transfer Pricing Calculation) at "RONA" Tab; TR49187 (2002 Transfer Pricing Calculation) at "RONA" Tab; TR49188 (2003 Transfer Pricing Calculation) at "RONA" Tab; TR49194 (2004 Transfer Pricing Calculation) at "Profit Split Profit" Tab; TR49190 (2005 Transfer Pricing Calculation) at "Profit Split Profit" Tab; TR49191 (2006 Transfer Pricing Calculation) at "RPS Calculation" Tab; TR49193 (2007 Transfer Pricing Calculation) at " RPS Calculation" Tab; TR49189 (2008 Transfer Pricing Calculation) at "FY RPS Calc" Tab

[271] TR50773 (Revolving Loan Agreement between Nortel Networks Inc. and Nortel Networks Limited, March 22, 2006) p. NNI_00904896-9

[272] TR21539 (Affidavit of John Doolittle, January 14, 2009) para. 98

[273] TR11084 (2004 Functional Analysis), p. 81.

[274] Peter Currie Trial Testimony, Day 3, May 14, 2014, p. 548:15-549:23; Michael McCorkle Trial Testimony, Day 4, May 15, 2014 p. 820:24-821:15; Peter Currie Deposition, October 15, 2013, p. 262:14-263:21; TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 90

NNI guarantee based on the trading prices of the guaranteed vs non-guaranteed bonds.[275]

(b)     NNI ignores the benefits to the Nortel Group (including NNI) of the funds borrowed, which, of course, were borrowed by NNC and NNL as the principal obligors.  There can be no doubt that NNL provided extensive support to the Nortel Group.  NNL provided letters of credit, lease guarantees including with respect to the US Debtors' facilities in Boston, Research Triangle Park and Richardson the EMEA Debtors' facilities in Maidenhead, Harlow, Chateaufort and Magny-les-Hameaux and the UK pension guarantee.[276]  Often these guarantees were provided on a no-fee basis.[277]  NNL also incurred the majority of the head office costs for managing the Nortel group as well as the largest share of the R&D costs.[278]

**(vi)     NNC/NNL Oversaw and Supported NNI's Administrative Functions**

196.     The US Interests also highlight the administrative and service function role NNI played for what appear to be two reasons:  first, to demonstrate the value of the NNI to the group and second, to support the theory that NNI could have operated as a stand-alone entity.  The facts they cite are not persuasive for the following reasons:

---

[275] Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1105:5-16 and 1106:5-1107:18

[276] TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras 21-24. There is a dispute about whether the obligations under the Funding Guarantee have been triggered and, if so, the extent of the obligations guaranteed which is to be determined by the Canadian Court in the pension claims trial.

[277] Mary Anne Pahapill (Poland) Deposition, October 3, 2013, p. 298:2-16

[278] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) paras. 26 and 36; TR00001 (Exh. 1, Affidavit of Peter Currie, April 10, 2014) paras. 32 and 34-35; Paviter Binning Deposition, October 24, 2013, p. 67:17-68:4; see also TR45171 (Historical R&D Spend by Year as of Q2 2010)

- 89 -

(a)     Providing global and logistical services would not have resulted in NNI being

able to operate as a stand-alone entity.  Logistical service capabilities would have

been meaningless without the underlying R&D and technology (which led to

sales).  The evidence overwhelmingly shows that NNI did not, on its own, have

the R&D capability to sustain existing customers and nor attract new ones.[279]

(b)     Even the most senior managers in NNI reported up to executive management

located in Canada.[280]

(c)     By NNI's own admission, large portions of these functions were performed

outside of the US, mostly in Canada.  Notably:

(i)      As of December 31, 2007, 27% of the global operations team was located

in Canada[281]; and

(ii)     NBS services were provided primarily out of North America with a

significant amount of service being provided out of Canada – specifically,

42% of the transitional services general management team was located in

Canada, the finance team was led by Allan Bifield, a Canadian employee,

21% of the supply chain services team was located in Canada, 44% of the

IT team was located in Canada and the human resources team was led by

Elena King, a Canadian employee.[282]    Overall, over 500 Canadian

---

[279] TR00005 (Exh. 5, Reply Affidavit of Brian McFadden, April 24, 2014) para. 3; TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 7; Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 638:5-14

[280] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 32-35

[281] TR00018 (Declaration of Christopher Ricaurte, April 11, 2014) para. 7

[282] TR00018 (Declaration of Christopher Ricaurte, April 11, 2014) para. 37

employees were engaged in providing services through NBS.[283] Further,
NNI has already been compensated by the business line purchasers for the
NBS services that it provided.[284]

## D. REBUTTAL TO ATTEMPTS BY THE EMEA DEBTORS TO IDENTIFY RIGHTS IN NORTEL IP BEYOND THOSE GRANTED TO THE LICENSED PARTICIPANTS UNDER THE MRDA

### (a) The Joint Ownership Theory Underlying the Allocation Position of the EMEA Debtors is Flawed

197.    The EMEA Debtors theory concerning IP ownership is profoundly different from that of
the US Interests although also deeply flawed.

### (i) The Legal Theories of the US Interests and EMEA Debtors Undermine Each Other

198.    Unlike the US Interests, who base their claimed IP ownership interests in the MRDA, the
EMEA Debtors do not argue that their rights to the Nortel IP were established by the MRDA.
Instead, they argue that their rights to the entire body of Nortel IP – which rights they
characterize as "joint ownership" – arose outside the MRDA "as a matter of law".[285]  The joint
ownership theory of the EMEA Debtors is the alleged legal foundation for their contribution
approach to valuation – the contribution approach, which values interests based on a Nortel
entity's contribution to R&D, requires as a premise that the contributing entity have a matching
ownership interest in the assets to which they contribute, which is something the MRDA does
not give them.

---

[283] TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) para. 19

[284]  TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) para. 29-30

[285] EMEA Initial Post-Trial Brief, para. 5

199.    Moreover, although both the US Interests and EMEA Debtors use the term beneficial

ownership, they use it to describe a very different set of rights.  The US Interests claim that each

RPE had beneficial ownership of the Nortel IP in its Exclusive Territory.  Thus, they claim that

only NNI had ownership of Nortel IP in the U.S.  The EMEA Debtors on the other hand argue

for "joint ownership" of all Nortel IP everywhere – they say they were a joint owner of Nortel

IP, for example in the U.S.:

> [E]ach party beneficially owned not the IP created in its jurisdiction . . .
> but rather a share of the indivisible pool of the Group's IP.[286]
>
> …
>
> Each of the RPEs obtained a beneficial ownership interest in the Entire
> Nortel IP portfolio.[287]

200.    The vastly different theories of the US Interests and EMEA Debtors undermine each

other.  If the EMEA Debtors are correct the US Interests cannot have the exclusive rights in the

U.S. that they claim and if the US Interests are correct the EMEA Debtors cannot have the

worldwide rights they claim.  And neither can credibly argue that any aspect of the other's

approach is supportive of their own, since they are fundamentally opposed.

201.    The EMEA Debtors' theory of joint beneficial ownership, which is the premise for their

contribution approach to valuation, also undermines the US Interests' allocation theory in other

respects.  If the EMEA Debtors' contribution approach was appropriate (i.e. joint contribution to

R&D yields joint ownership), then the logical extension of it would be that joint contributions to

customer relationships should also result in joint ownership of those customer relationships,

irrespective of where the sales occurred.  Many witnesses testified that customers were supported

---

[286] EMEA Initial Post-Trial Brief, para. 10

[287] EMEA Initial Post-Trial Brief, p. 145

by Nortel employees working for subsidiaries in multiple jurisdictions, including customers in the U.S. being supported by Nortel employees outside of the U.S.  For example, wireless customers such as Verizon were supported by global sales teams and global product support teams located in countries around the world[288] and AT&T was supported in Canada, the U.S. and the U.K.[289]  Joint ownership of customers relationship is, of course, inconsistent with the US Interests' revenue allocation approach because they claim 100% of the revenues from U.S. customers belong to the US Debtors.  As noted in paragraph 182 (e) above, customers from around the world were typically brought to the Carling facility in Ottawa to impress them.

202.    Notably, the EMEA Debtors do not claim joint ownership of customer relationships or seek an allocation in this regard based on their contribution to those relationships and instead seek to switch allocation models to one based on each EMEA Debtors' "relative percentage of global historic revenue for the 2008 fiscal year".[290]  There is no logical basis for this divergence from the "contribution" theory offered (as none exists) and this further exposes the implausibility of the EMEA Debtors' joint ownership theory as well as its inconsistency with the US Interests' approach.

(ii)    **The Joint Ownership Theory is Flawed**

203.    The EMEA Debtors' joint ownership theory is fundamentally flawed.

---

[288] Pascal Debon Deposition, November 25, 2013, p. 41:14-42:3, 74:4-14, 79:3-10, 79:19-80:6, 93:5-24 and 173:20-174:5

[289] Simon Daniel Bruckheimer Trial Testimony, Day 7, May 22, 2014, p. 1572:1-1573:25

[290] EMEA Initial Post-Trial Brief, para. 333

204.    The EMEA Debtors assert that "Ontario law applies to determining issues related to ownership of Nortel group's IP".[291]  But their own theory fails under Ontario law.[292]

205.    The EMEA Debtors allege that where an inventor is an employee and where his or her job responsibilities include inventive work, any patentable invention will, by operation of law, be owned by the employer.  The EMEA Debtors' Initial Post-Trial Brief states:

> While the inventor is generally the first owner of the invention and any associated patents and patent applications, the situation is different where the inventor was hired to invent.  In such circumstances, beneficial ownership of the invention, patents, and patent applications automatically vests in the employer as a matter of law.[293]

206.    Whether or not this statement is correct[294], the argument takes the EMEA Debtors nowhere, because the inventions and any associated patents and patent applications were assigned from the inventor and/or his or her employer to NNL.  And this is true whether one looks at the situation:

---

[291] EMEA Initial Post-Trial Brief, para. 345

[292] Even if the law of the country in which the patent was granted governs its existence (as the US Interests contend on pages 27-28 of their Initial Post-Trial Brief), the EMEA Debtors' theory is still fatally flawed; see footnote 294 below regarding the law of the U.S. which does not support the EMEA Debtors' contention of employer ownership of inventions.

[293] EMEA Initial Post-Trial Brief, para. 354

[294] While "generally" this statement may be correct in some jurisdictions, it is not correct with respect to patented inventions in the U.S., which undermines the EMEA Debtors' joint ownership theory.  Under U.S. law, absent an enforceable agreement to the contrary, it is the inventor (not the employer) who is the owner of his or her invention until he or she assigns it: *Board of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 98 USPQ (2d) 1761 (2011) at p. 2195-2196, quoting *United States v. Dubilier Condenser Corp.*, 289 U.S. 178 (1933) at p. 189.  This means that, by operation of U.S. law, the EMEA Debtors have no claim to any ownership interest in the US patents.  (Notably the EMEA Debtors are silent in their Initial Post-Trial Brief about the U.S. law in this area and, just baldly assert at paragraph 345 of their Initial Post-Trial Brief, that "Ontario law applies to determining issues related to ownership of Nortel group's IP".).  Thus, there is a "missing link" in the chain of title to the EMEA Debtors of joint ownership among all of the RPE entities of all Nortel IP.

(a)     before the MRDA;

(b)     after the MRDA; or

(c)     outside of the MRDA.

207.    Although the EMEA Debtors argue that many of their inventions and resulting patents and patent applications pre-date the MRDA, that does not assist them.  Before the MRDA, the CSAs that EMEA Debtors entered into with NNL had a similarly broad definition of NN (or NTL) Technology to that in the MRDA, one that addressed inventions, patents and patent applications.[295]  The CSAs placed legal title of the NTL Technology in NNL (which was referred to as the legal owner), and gave the relevant EMEA Debtors a license only.[296]  Each R&D CSA was expressed to be the entire agreement on that subject matter.[297]

208.    Moreover, there was no gap in time within which employees of the EMEA Debtors could have created an invention not subject to a MRDA/CSA assignment of ownership to NNL. NNUK became an R&D participant in 1995 and a CSA was in effect from January 1, 1995 to January 1, 2001.[298] Similarly, NNSA became an R&D participant in 2000, with a CSA in effect

---

[295] TR11411 (1995 R&D CSA between NNL and Nortel Limited (U.K.), January 1, 1995) Article 1(k); TR46945 (2000 R&D CSA between NNL and NNSA, January 1, 2000) Article 1(k).  The last R&D CSA entered into with NNI mirrored the same definition of NT Technology. TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) Article 1(k).

[296] TR11411 (1995 R&D CSA between NNL and Nortel Limited (U.K.), January 1, 1995) Articles 4 and 6; TR46945 (2000 R&D CSA between NNL and NNSA, January 1, 2000) Articles 4 and 6; TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) Articles 4 and 6

[297] TR11411 (1995 R&D CSA between NNL and Nortel Limited (U.K.), January 1, 1995) Article 13; TR46945 (2000 R&D CSA between NNL and NNSA, January 1, 2000)  Article 13; TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) Article 13

[298] TR11411 (1995 R&D CSA between NNL and Nortel Limited (U.K.), January 1, 1995); TR31016 (Termination of Research and Development Cost Sharing Agreement between NNL and NNUK, January 1, 2001)

from January 1, 2000, through January 1, 2001.[299] The MRDA was effective from January 1,

2001, the date the CSAs were terminated.[300]  In short, there is no period of time when an R&D

agreement, stated to be the entire agreement between the parties and fundamentally inconsistent

with the EMEA Debtors position, was not in effect.

209.    Nor does it help the EMEA Debtors to argue that their rights are found outside the

MRDA (and presumably outside the predecessor agreements).  First, such a proposition is barred

by the entire agreement clause in each agreement.[301]  Second, when one looks outside the

MRDA and its predecessors, one finds uncontroverted evidence that each patent and patent

application in the name of NNL was in its name due to an assignment to NNL of all right, title

and interest thereto.[302]

210.    The next facet of the EMEA Debtors' joint ownership construct requires them to move

from the untenable position of some retained beneficial ownership by them of inventions in their

---

[299] TR46945 (2000 R&D CSA between NNL and NNSA, January 1, 2000); TR32240 (Termination of Research and Development Cost Sharing Agreement between NNL and NNSA)

[300] TR21003 (MRDA and addenda)

[301] See Monitor's Initial Post-Trial Brief, para. 195. TR21003 (MRDA and addenda) Article 14(d) states that: "In respect of the subject matter hereof, this Agreement sets forth the entire agreement and understanding of the Participants".  TR11411 (Research and Development Cost Sharing Agreement between NTL and Nortel Limited, January 1, 1995) Article 13; TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) Article 13; TR46945 (NNSA CSA) Article 13; The MRDA (and its predecessors) necessarily deals with the subject matter of NNL's ownership of the Nortel IP and license rights that only it, as owner, could and did grant to the Licensed Participants in and to the Nortel IP.  This clause forecloses the attempts by the EMEA Debtors to introduce extrinsic evidence about the ownership of the Nortel IP – nor do they suggest or attempt to prove the existence of a collateral agreement about this.

[302] TR0006 (Exh. 6, Affidavit of Angela DeWilton, April 11, 2014) paras. 9 and 12; TR45735 (NNL Patent Application Assignment)

- 96 -

jurisdiction[303] to the concept of joint ownership by all the RPEs of all of the patents (regardless

of the location of invention or of registration of the patent).  Without this step they could not

extend their ownership claim to the vast majority of the patents invented in Canada and the U.S.

One way they do this is to allege all of Nortel's IP was jointly invented.[304]

_____

[303] For example, at EMEA Initial Post-Trial Brief, para. 93 (footnote 132), the EMEA Debtors purport to rely on inadmissible testimony from Albert-Lebrun that "NNSA was an economic owner of Nortel's intellectual property" to reach its conclusion that "the RPEs all jointly held beneficial ownership."  Albert-Lebrun's post-hoc assertions are not only inadmissible (for the same reasons discussed above at paragraphs 47 to 58) but are also belied by the contemporaneous statements that he made to others at Nortel and that NNSA made to the tax authorities at the time.  In 2005, he wrote: "The inspectors don't like the fact that we are financing the R&D but that we don't have the legal ownership of it (Canada does and therefore Canada are the only ones legally entitled to license the technology if my understanding is correct) nor the economic ownership of it as royalties are excluded from the RPS calculation."  TR47214 (December 2005 email chain between Albert-Lebrun, Orlando, Weisz, and Simon Schofield (NNUK tax employee), p. 2.  At trial, Albert-Lebrun confirmed that at that time, the tax authorities were concerned with "the fact that NNSA was not owning the – you know, legally owning the intellectual property that it was creating."  Albert-Lebrun Trial Transcript, Day 6, May 21, 2014, 1483:7-9.  That was the reality that NNSA was contending with at the time, and it did not answer these concerns with the "joint ownership" theory that it now asserts.  Later at EMEA Initial Post-Trial Brief, para. 136 (footnote 200), reliance is again placed on Albert-Lebrun's affidavit testimony about a decision in 2006 not to write down the value of NNSA due to its "…ownership share of a significant IP asset".  This is an example of selective reliance on words from an email chain to support the conclusion that the EMEA Debtors seek to draw namely that NNSA determined that the write down was not necessary because NNSA "owns a share of the IP".  In fact, the complete email chain (principally among others) includes a discussion about Canadian GAAP requirements concerning the write down (TR43091 (E-mail thread between Tony McArdle, Adeel Ahmad, Mark Hamilton, Greg Boone and Tony Grewal re: Investment Impairment, September, 2006); TR43090 (E-mail thread between Tony McArdle, Simon Freemantle, Phillipe Albert-Lebrun, et. al Greg re: Impairment Review on NNSA, September, 2006); TR11206 (E-Mail from Tony Mcardle re: NNIFH Impairment Review on NNSA, September 20, 2006) and the deposition testimony of one of the authors (who Albert-Lebrun was prepared to defer to at trial; Philippe Albert-Lebrun Trial Testimony, Day 6, May 21, 2014, p.1489:1-3 and 1498:25-1499:8).  Testimony is conveniently ignored by the EMEA Debtors, in which Mr. Ryan Smith explained that  this email chain was referring to economic rights as opposed to ownership, which he distinguished (Ryan Smith Deposition, October 22, 2013, p. 322:3-323:24.  Albert-Lebrun himself acknowledged in his trial testimony that entrepreneurship/economic ownership only means that the RPE –licensees were entitled to a share of residual profits/losses from the sale of products or TPA's/R&D Activity Payments under the MRDA; Albert-Lebrun Trial Transcript, Day 6, May 21, 2014, 1508:19-1510:6, 1529:2-12).

[304] EMEA Initial Post-Trial Brief, para. 358

- 97 -

211.    Joint invention occurs when more than one person was responsible for the inventive concept, when more than one person conceived of the new and useful art, process, machine, manufacture or composition of matter.  The Supreme Court of Canada has explained that, in order to identify the inventors, one must answer the question, "Who was responsible for the inventive concept?"[305]

212.    The Supreme Court of Canada has also emphasized that, in order to qualify as an "inventor" within the meaning of the *Patent Act*, one must do more than simply "have a good idea" and must also do more than merely assist in the verification of the invention:

> It is therefore not enough to have a good idea (or, as was said in *Christiani* "for a man to say that an idea floated through his brain"); the ingenious idea must be "reduced to a definite and practical shape".  Of course, in the steps leading from conception to patentability, the inventor(s) may utilize the services of others, who may be highly skilled, but those others will not be co-inventors unless they participated in the conception as opposed to its verification.[306]

213.    This crucial point – i.e. that only those who actually conceive of the invention itself qualify as inventors – was emphasized by the Federal Court in *Weatherford Canada Ltd. v. Corlac Inc.*:

> It is important on this issue, as explained in *Apotex* . . . that the "inventor" is not just a person who comes up with a general idea or thesis.  The inventor must have reduced the idea or thesis to a definite and practical shape by building it as described or by fully describing how it will be practised – showing that there is utility in the claimed invention.[307]

---

[305] *Apotex Inc. v. Wellcome Foundation Ltd.*, [2002] S.C.J. No. 78 at para. 98

[306] *Apotex Inc. v. Wellcome Foundation Ltd.*, [2002] S.C.J. No. 78 at para. 97

[307] *Weatherford Canada Ltd. v. Corlac Inc.*, 2010 FC 602 at para. 239

214.    It is against this backdrop that one must consider the EMEA Debtors' rather startling

contention that the inventions claimed in each Nortel patent were conceived of not by the named

inventors, but rather by all of the R&D personnel employed by all of the Participants and thus the

Participants, as the employers of the R&D personnel, jointly owned the Nortel IP.  The EMEA

Debtors' Initial Post-Trial Brief states:

> [T]he Nortel IP . . . was the product of the inventive work of engineers
> employed by the various RPEs for the specific purpose of inventing.  As a
> matter of law, each of the RPEs therefore always beneficially owned
> Nortel's IP.  As a matter of fact, and as the evidence summarized above
> demonstrates, Nortel's IP was created jointly through the cooperative
> efforts of all the RPEs. . . . The RPEs therefore shared joint beneficial
> ownership of all of Nortel's indivisible pool of IP that was created through
> their joint efforts.[308]

215.    The evidence upon which the EMEA Debtors rely is set out in a dozen paragraphs of

their Initial Post-Trial Brief.[309]  That evidence merely establishes that the various Participants

collaborated on R&D projects.  For example, the EMEA Debtors' Initial Post-Trial Brief states:

> The Nortel Group's R&D was centrally coordinated and carried out with a
> high degree of collaboration among the companies in the Group.[310]

216.    And similarly:

> In addition to collaborating on a project, engineers from one RPE might be
> seconded to another in order to contribute their specific expertise to a
> particular issue or set of issues.[311]

---

[308] EMEA Initial Post-Trial Brief, para. 359

[309] EMEA Initial Post-Trial Brief, paras. 53-64

[310] EMEA Initial Post-Trial Brief, para. 54

[311] EMEA Initial Post-Trial Brief, para. 58

217.    Such evidence of collaboration among the various Participants does not even come close to establishing that employees from each and every Participant were the inventors of each and every Nortel patent.

218.    Accordingly, there is simply no basis for the EMEA Debtors' assertion that the inventors of the Nortel patents were not the inventors named on the patent applications and on the issued patents, but rather, for each patent, an undifferentiated mass of dozens, hundreds or more (the EMEA Debtors do not specify) were the inventors, whose precise contribution to the inventive concepts the EMEA Debtors do not even attempt to identify.

219.    Beyond these problems, even if all Participants were joint owners, the EMEA Debtors' argument still founders on the assignments to NNL and registrations of the patents in the name of NNL, something in which all Participants participated.  And it founders on the terms of the MRDA (and its predecessors) to which all of the alleged joint owners are parties (as described in the Monitor's Initial Post-Trial Brief at paragraphs 278 to 303).  The "joint ownership" theory simply cannot be reconciled with the MRDA.  For example,

(a)    If the EMEA Debtors were joint owners, why would they need a license under the MRDA?

(b)    If they were joint owners, and licenses were required, why were they not grantors of licenses?

(c)    If the EMEA Debtors were joint owners of all of the Nortel IP by virtue of some arrangement outside of the MRDA, why did they agree that the MRDA was the entire agreement?

220.     The clear inconsistency between their joint ownership theory and the fact that, under the

MRDA, NNL grants licenses to the Nortel IP to the Licensed Participants is not met by the

EMEA Debtors' argument that the licenses were intended in case any third parties needed to be

persuaded that they (who, on their theory, were actually joint owners) had the right to use the

very Nortel IP they claim to have owned:

> The EMEA and U.S. RPEs held exclusive licenses in their respective
> territories so that they could demonstrate their rights to use the IP to third
> parties, including in litigation.[312]

221.     The problems with this proposition are overwhelming.

222.     First, contracts are binding when they are entered into with an intention to create legal

relations.[313]  The intention that the EMEA Debtors and the US Debtors would receive licenses so

that they could demonstrate to third parties in a legal forum that they had rights to use IP, is a

quintessential intention to create a legal relationship.  Accordingly, if showing others what rights

they had was the reason for the MRDA licenses and others included Courts, this demonstrates

that the rights they had were those licenses.

223.     Second, if the EMEA Debtors were joint owners as they assert, that would be sufficient

to show their right to use IP – so the EMEA Debtors' "explanation" for why it would be

necessary for the MRDA to say they had a license to use the IP falls flat.

224.     Third, the EMEA Debtors' argument is tantamount to an assertion that the MRDA was a

sham but one they intended to use against third parties, with the tax authorities and in court.  As

---

[312] EMEA Initial Post-Trial Brief, para. 12

[313] *Massey-Ferguson Ltd. v. R.,* [1977] 1 F.C. 760 at para. 12 (Fed. C.A)

the Supreme Court of Canada stated in *Continental Bank Leasing Corp. v. Canada,* [1998]

S.C.J. no. 63 at paragraph 20:

> The sham doctrine will not be applied unless there is an element of deceit in the
> way a transaction was either constructed or conducted.  This requirement was
> outlined by Estey J. as follows in *Stubart Investments Ltd. v. The Queen,* [1984] 1
> S.C.R. 536, at pp. 545-46:
>
>> A sham transaction: This expression comes to us from decisions in the
>> United Kingdom, and it has been generally taken to mean (but not
>> without ambiguity) a transaction conducted with an element of deceit
>> so as to create an illusion calculated to lead the tax collector away
>> from the taxpayer or the true nature of the transaction; or, simple
>> deception whereby the taxpayer creates a facade of reality quite
>> different from the disguised reality.

There is no foundation for making such an assertion and no allegation of deceit or fraud by or

against any of the parties to the MRDA.

225.    Finally, the last step of the EMEA Debtors' joint ownership theory – their attempt to

convert it to a contribution theory of allocation, does not follow.  They assert that, because

employees of all of the Participants were the inventors of all of the Nortel patents, joint

ownership of all patents resulted.  But they also assert that the Participants' relative ownership

shares are in proportion to the RPEs relative spending on R&D:

> Because it would not be possible to distinguish the EMEA Debtors'
> inventive work from the work of the other RPEs, the only way to value
> that work would still be on the basis of relative R&D spending.[314]

226.    This requires a massive jump from joint ownership to valuation based on relative R&D

spending.  There is no necessary reason for joint inventors of a patent to divide ownership based

upon some metric of relative financial contribution to R&D as a whole.  Joint owners could have

---

[314] EMEA Initial Post-Trial Brief, para. 360

divided their interests equally, based on who first came up with the concept for the patented invention, who had the more significant idea or any other basis.[315] As discussed in the Monitor's Initial Post-Trial Brief at paragraphs 64-68 and 400-401, under the MRDA, R&D spending is given a specific consequence, which is not ownership, but instead a carefully defined sharing of operating income only.[316] Accordingly, the EMEA Debtors' contribution theory does not follow from its own legal premises.

**(b)    EMEA Debtors Alternative Resulting Trust Theory is Also Flawed**

227.    The EMEA Debtors alternatively submit based on Canadian jurisprudence that a resulting trust arises in their favour as parties that contributed to the creation of an asset without taking legal title.  Essentially, they submit that the RPEs: (i) contributed the inventive work of their employees, (ii) contributed financially to R&D to create the NN Technology at issue in the litigation, and (iii) should have a resulting trust claim to the proceeds.  They also submit that NNL has the onus to rebut a presumption of resulting trust. [317]

228.    The EMEA Debtors' alternative position has no foundation. A resulting trust does not arise in these circumstances and there is no presumption of resulting trust for NNL to rebut.

**(i)    Resulting Trusts Serve a Restitutionary Purpose in Specific Circumstances**

229.    A resulting trust is a trust that causes a property interest to "jump back" from where it came.  As an equitable remedy, a resulting trust serves a restitutionary purpose in two specific

---

[315] Interestingly no party to this proceeding suggests an equal division of the allocation proceeds, the most obvious allocation if the Participants were joint owners, which suggests that no one believes that the Participants were joint owners.

[316] TR21003 (MRDA and addenda) Article 3

[317] EMEA Initial Post-Trial Brief, para. 374 and 375

circumstances: (i) where an express trust has failed (ie., to allow the property to "jump back" from the trustee to the settlor when, for example, the intended beneficiary disclaims the trust), and (ii) where there is a *gratuitous* transfer because equity presumes bargains rather than gifts.[318] Circumstance (i) clearly does not apply.  Nor does circumstance (ii) since no gratuitous transfer occurred.  It is only in these circumstances that a resulting trust would arise that sends the beneficial interest back to the transferor by impressing the asset in the transferee's hands with a resulting trust.[319]

### (ii)     Presumption of Resulting Trust Only Applies to Gratuitous Transfers

230.     A resulting trust arises when title to property is in one party's name, but that party, because he or she is a fiduciary or gave no value for the property, is under an obligation to return it to the original title owner.[320] Clearly, there was no fiduciary relationship between NNL and the RPEs since the MRDA expressly disclaims a fiduciary relationship.[321]  A presumption of resulting trust, therefore, could only arise in Nortel's situation if no value was given to the RPEs for their contribution to the creation or acquisition of NN Technology; that is, if legal title to the NN Technology was "gratuitously" vested in NNL under the MRDA.

231.     The vesting of legal title in NNL was irrefutably not gratuitous.  The MRDA was a negotiated bargain among the RPEs which expressly recites that the EMEA Debtors were

---

[318]  Mitchell McInnes, *The Canadian Law of Unjust Enrichment and Restitution* (LexisNexis Canada Inc. 2014) at p. 1354-1355

[319]  This is the case whether the property moved directly between the parties (i.e., a gratuitous transfer resulting trust) or one party purchased property in the other's name (i.e., a purchase money resulting trust).  See Mitchell McInnes, *The Canadian Law of Unjust Enrichment and Restitution* (LexisNexis Canada Inc. 2014) at p. 1355

[320]  *Pecore v. Pecore* 2007 SCC 17 at para. 20, citing D.W.M. Waters, M.R. Gillen and LD. Smith, *Waters' Law of Trusts in Canada*, 3rd ed (Toronto: Thomson/Carswell, 2005) at p. 362

[321]  TR21003 (MRDA and addenda) Article 13

granted royalty-free exclusive licenses to use the NN Technology beyond that developed by the

EMEA Debtors in consideration for the NNL having legal title. [322]  It also provided that profit-

sharing entitlements under the RPSM were consideration for performing R&D.[323]

232.    Tellingly, the EMEA Debtors do not assert a resulting trust based on a gratuitous transfer,

but instead a transfer for inadequate consideration.  Even if this was factually correct, which it is

not,[324] a bargain which one side in retrospect finds to have been inadequate cannot be the basis

of a resulting trust.

---

[322]  TR21003 (MRDA and addenda) Article 4(a)

[323]  TR21003 (MRDA) Article 3; The MRDA permitted each Participant to share in the operating
profits of the entire Nortel enterprise and not just its local operating profits.  This potential
advantage is illustrated by NNSA, one of the EMEA Debtors, which operated in France – a
relatively small market in the global market.  (Philippe Albert-Lebrun Deposition, November 21,
2013, p. 48:10-48:15).  Under the RPSM, NNSA stood to receive a share of the enterprises'
global profits, as opposed to only the profits in its own small domestic market, as it had under the
CSA.  Stephens described NNUK as an "unintended beneficiary" of the MRDA and RPSM
(receiving benefits beyond even those profit and loss sharing entitlements it bargained for).
Kerry Stephens Trial Testimony, Day 8, May 27, 2014, p. 1766:20-1769:22; see also TR43387
(E-mail from Kerry Stephens to Alay Patel re: RPS Issues, August 21, 2009).

[324]  The attempt now by the EMEA Debtors to suggest that the consideration received is
inadequate if it is limited to what the MRDA provides (namely the right to share in the profits
and losses of the group without any potential future upside in the IP – EMEA Initial Post-Trial
Brief, para. 116) is not only inconsistent with their written agreement, but the evidence  of
Albert-Lebrun.  For example, the presentations to the French tax authorities in 2005 which
review the benefits of the MRDA for NNSA refer only to the R&D Activity Payments provided
for under the MRDA as potential benefits that NNSA would receive under the RPSM (TR21095
(NNSA Presentation on Residual Profit Split, Transfer Pricing for Meeting with French Tax
Authorities, May 31, 2005) p. 56-63 of PDF). Albert-Lebrun confirmed on his deposition and at
trial that the intention was to put their best foot forward to the tax authorities in this and other
presentations of this type (Philippe Albert-Lebrun Deposition, November 21-22, 2013, p.
195:22-196:9; Philippe Albert-Lebrun Trial Testimony, Day 6, May 21, 2014, p. 1512:21-
1513:5) so the absence of any reference to greater benefits of "joint ownership" that the EMEA
Debtors now claim they were intended to enjoy in respect of Nortel IP is not accidental.

233.    Further, it is questionable whether the presumption of resulting trust applies to related parties, such as the Debtors, at all.  In *Nishi v. Rascal Trucking Ltd.,* cited by the EMEA Debtors in support of their position, the Supreme Court of Canada stated:

> A purchase money resulting trust arises when a person advances funds to contribute to the purchase price of property, but does not take legal title to that property.  Where the person advancing the funds is ***unrelated*** to the person taking title, the law presumes that the parties intended for the person who advanced the funds to hold a beneficial interest in the property in proportion to that person's contribution.  This is called the presumption of resulting trust.[325]  [Emphasis added.]

234.    In *Nishi* the  Supreme Court of Canada found that the presumption of resulting trust applied in the case before it because: (i) the contribution to the purchase of property was made ***without consideration***, and (ii) the parties in question were ***not related***[326] because "***in such circumstances*** equity presumes bargains rather than gifts" [emphasis added].[327]  The situation in Nishi is clearly distinguishable from the facts in this proceeding and that case is of no assistance to the EMEA Debtors.[328]

235.    Finally, the EMEA Debtors' argument in favour of a resulting trust fails because they do not actually seek to get their own property back, but to get a share in property contributed by others – that is, they seek ownership or the proceeds of ownership in all the IP.  Resulting trust does not apply in this circumstance:

> The underlying principles of resulting trust law also make it hard to accommodate situations in which ***the contribution made by the claimant***

---

[325]  *Nishi v. Rascal Trucking Ltd.*, 2013 SCC 33 at para. 1

[326]  *Nishi v. Rascal Trucking Ltd.*, 2013 SCC 33 at para. 29, citing *Pecore v. Pecore*, 2007 SCC 17 at paras. 24 and 27

[327]  *Pecore v. Pecore*, 2007 SCC 17 at para. 24  [Emphasis added.]

[328]  *Pecore v. Pecore*, 2007 SCC 17 at para. 24  [Emphasis added.]

*was not in the form of property or closely linked to its acquisition*.  The point of the resulting trust is that the claimant is asking for his or her own property back, or for the recognition of his or her proportionate interest in the asset which the other has acquired with that property.  This thinking *extends artificially to claims that are based on contributions not clearly associated with the acquisition of an interest in property*; in such cases there is not, in any meaningful sense, a "resulting" back of the transferred property. [emphasis added][329]

**(c)     EMEA Debtors' Attempt to Import the Arm's Length Principle into the Construction of the MRDA is Flawed**

236.    The EMEA Debtors' argument[330] with respect to the MRDA is based upon a fabricated legal premise that the arm's length principle (a limited concept that applies to the transfer pricing world) can dictate or inform the construction of parties' legal agreements.[331]  The law does not invoke the arm's length principle to assist in the interpretation of contracts, let alone to rewrite contracts to import arm's length terms.  Transfer pricing's arm's length principle, relevant to tax authorities, has no place within the law of contract.

237.    Moreover, even if the Courts were to look to the arm's length principle in determining the proper construction of the MRDA, properly understood and applied it supports the Monitor's – and only the Monitor's – interpretation.  NNL's retention – as licensor – of the right to the proceeds from the sale of the IP does not violate the arm's length standard in any respect.  As provided by the MRDA, the Licensed Participants contracted for a share of Nortel's residual operating profit, which the parties determined at the time was the best measure of an arm's length compensation for their R&D investment.  The Licensed Participants did not contract for any rights to the residual interest in the IP, and indeed expressly agreed that residual profit would

---

[329] *Kerr v. Baranow*, 2011 SCC 10 at para. 25

[330] EMEA Initial Post-Trial Brief, paras. 452-463

[331] Addressed in the Monitor's Initial Post-Trial Brief, paras 52-54

not cover sales.[332]  Far from something that the Courts should consider parties would never agree to, investing in R&D without a right to share in profits that might be earned through a sale of resulting IP[333] is exactly what the parties did agree to because they received something else of value (a license and the right to share in Nortel's residual operating profit).  For reasons already stated and further detailed below, the EMEA Debtors' argument is ill-founded.

### (i)    There is No Legal Basis Requiring the MRDA "be" Arm's Length

238.    The EMEA Debtors' argument is based on the fabricated legal premise that the parties' agreement, the MRDA, must "be" arm's length and the contract should be interpreted accordingly.  That is, of course, something quite different from a commercial absurdity, which courts strive (but do not guarantee) to avoid.  The EMEA Debtors ask the Courts, with hindsight, to simply rewrite contracts to what they say arm's length parties "would" agree to.  The EMEA Debtors do not point to any authority that would require parties' contracts to contain such terms, and it is clear that doing so would fundamentally alter contract law, which does not allow courts to excuse parties from the terms of their bargains, even if improvident.[334]  To the contrary, there is no legal basis to import such a requirement and any argument constructed in favour of doing so runs wholly contrary to parties' freedom to contract - a cornerstone principle of contract law.  In fact, taking the EMEA Debtors' argument to its logical conclusion would serve to abrogate contract law entirely.

239.    In any event, by its own terms, there is no requirement the MRDA "be" arm's length. The MRDA provides the parties' own best estimate of arm's length pricing.  As expressly set

---

[332] Monitor's Initial Post-Trial Brief, para. 65.

[333] Argued in EMEA Initial Post-Trial Brief, paras. 457-462; and US Interests' Initial Post-Trial Brief, p. 63-64 to be something independent commercial parties would never agree to.

[334] *Jedfro Investments (U.S.A.) Ltd. v. Jacyk Estates*, 2007 SCC 55 at para. 34

forth in the MRDA, the Licensed Participants each contracted to perform R&D Activity (a defined term) in exchange for an exclusive (and thereafter a further non-exclusive), royalty-free license and a percentage of residual operating profit.  The parties expressly agreed that the formula stipulated in Schedule A was the appropriate arm's length measure in the circumstances for calculating that compensation.[335]  There is no other requirement in the MRDA that it, or its terms, "be" arm's length in any other sense.

240.    The application of the arm's length principle is limited to tax purposes.  The arm's length principle is the international standard OECD member countries have agreed should be used by controlled parties and tax administrations for determining intercompany transfer prices for tax purposes.[336]  By its own terms, the principle is self-limiting.

    (ii)    **Transfer Pricing Principles Require Respect for the Formal Structure (Legal Arrangement) Adopted by the Parties**

241.    As discussed above in the rebuttal of the US Interests' contention that the taxation authorities (and therefore the Courts) can and should ignore the parties' contractual arrangements, transfer pricing rules and regulations expressly direct the examination of a controlled transaction be based on the transaction actually undertaken by the parties.  There exists, in fact, a presumption in favour of the formal structure adopted by the controlled parties,

---

[335] See TR21003 (MRDA and addenda) p. 2 (6th recital), Article 1(i) (definition of "RPSM") and Schedule A, p. 15-16 (3rd recital of Schedule A)

[336] Monitor's Initial Post-Trial Brief, at para. 53; TR11391 (OECD Transfer Pricing Guidelines, July 2010) p.23 (Glossary, "arm's length principle") (p. 25 of PDF)

and only in the rarest of cases will the legal arrangements of the parties be disregarded in favour of another.[337]

242.    As stated, it is only in exceptional circumstances that the actual form of arrangement adopted by the parties can be disregarded by taxation authorities.  The "non-recognition"[338] of the actual transaction or arrangement is limited to those rare or unusual cases where either (i) the economic substance and the form of the parties' arrangement do not cohere or (ii) where such substance and form give rise to an arrangement that is economically irrational.[339]  These are high thresholds to meet.

243.    In performing his analysis, Reichert expressly considered the form and substance of Nortel's transaction as well as the economic rationality of the exchange.  His expert testimony on the matter was clear: Nortel's licensing arrangements reflect the economic substance of the relationship and fully accord with transfer pricing principles and the arm's length standard.[340]

244.    Having regard to the economic substance of the arrangement (the first prong of the analysis), there is no evidence to suggest that anyone ever questioned that the form of the arrangement was fully in accordance with the substance of what the parties were actually doing.

---

[337] TR11391 (OECD Transfer Pricing Guidelines, July 2010) p. 51 (para. 1.64) (p. 53 of PDF); IRS Reg. 26 C.F.R., §1.482-1(f)(2)(ii)(A); Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3833:15-3834:11, 3865:1-3867:24; 3882:4-3883:16

[338] TR11391 (OECD Transfer Pricing Guidelines, July 2010) p. 292 (para. 9.168) (p. 294 of PDF)

[339] TR11391 (OECD Transfer Pricing Guidelines, July 2010) p. 51-53 (paras. 1.64-1.69) (p. 53-55 of PDF) and 292 (para. 9.168) (p. 294 of PDF); Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3833:15-3834:11 and 3865:1-3867:24

[340] TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 40-41

As Reichert confirmed, the economic form and substance cohere[341] – the substance of the transaction mirrored the form.

245.    With respect to the second prong of the analysis, what Reichert referred to as the "Commercial Rationality Threshold", there are in fact two criteria that must be met to overcome this branch: the transaction must be shown to be both commercially irrational and one that practically impedes the tax authority's ability to determine an arm's length price.[342]

246.    Starting with the second of the two criteria, there is no dispute the tax authorities (who in fact requested the RPSM as Nortel's transfer pricing method) accepted the RPSM as an appropriate method for Nortel's transfer pricing.[343]  Moreover, through the course of the APA negotiations, there was great transparency and open flow of information to the tax authorities.[344]

---

[341] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3834:1-4; TR00050 (Exh. 50, Expert Rebuttal Report of Dr. Timothy Reichert, February 28, 2014) p. 67 (p. 74 of PDF)

[342] TR11391 (OECD Transfer Pricing Guidelines, July 2010) p. 51-52 (para. 1.65) (p. 53-54 of 375 PDF); Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3871:4-11

[343] TR21003 (MRDA and addenda) Schedule A (p. 18 of PDF).  Additionally, licensing is a legal arrangement (transaction type) well-accepted by tax authorities, and the RPSM as a transfer pricing methodology is particularly apt in structuring compensation in a licensing arrangement involving IP.  Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3831:9-3832:22; TR21600 (OECD, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles, July 30, 2013) p. 40 (para. 163)

[344] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3879:18-3880:8; see also, for example, TR22122 (Letter regarding Nortel Networks' Request to UK Inland Revenue to Enter APA, March 27, 2002); TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002); TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and CCRA, September 2003); TR21031 (Letter regarding Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004); TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008)

The tax authorities were clearly not impeded in their ability to determine an arm's length price.[345]

247.    Turning to the requirement for proof of economic irrationality: "where reliable data show that comparable uncontrolled transactions exist, it cannot be argued that such transactions between associated enterprises would lack commercial rationality".[346] Contrary to the arguments advanced by the US Interests and EMEA Debtors[347] (and as wholly ignored by their transfer pricing experts), uncontrolled transactions between independent enterprises do occur where a licensor retains full rights to enhancements of the licensed intangible developed during the term of the license; this is expressly recognized by the OECD.[348] As Reichert testified, he was able to find examples of such a relationship in the open market.[349] This, quite simply, ends the inquiry. In any event, even if the test for the taxation authorities disregarding legal formalities was met (which it was not), the tax authorities would merely change their assessment of the taxes owing – not alter the contractual terms to which the parties had agreed.

248.    The testimony of Dr. Richard Cooper, who testified on behalf of the EMEA Debtors, that in his view the rights of the parties arose not from the MRDA but rather from the fact the

--------

[345] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3871:18-3872:5

[346] TR11391 (OECD Transfer Pricing Guidelines, July 2010) p. 293-294 (para. 9.172) (p. 295-296 of PDF)

[347] EMEA Initial Post-Trial Brief, paras. 457-462; and US Interests' Initial Post-Trial Brief, p. 63-64

[348] TR21600 (OECD, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles, July 30, 2013) p. 29-30 (para. 108); Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3876:18-3879:8

[349] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3869:25-3870:13, 3959:8-13, and 4013:25-4014:25; TR00050 (Exh. 50, Expert Rebuttal Report of Dr. Timothy Reichert, February 28, 2014) p. 68-72 (p. 75-79 of PDF) and Appendix B (p. 258 of PDF)

- 112 -

Licensed Participants spent money on R&D,[350] cannot assist them.  Cooper's legal opinion is irrelevant and inadmissible.  Cooper's transfer pricing opinion reflects wholesale disrespect for the parties' legal arrangements, contrary to fundamental transfer pricing principles, and cannot assist in the EMEA Debtors' interpretation.

### (iii)    Nortel's Licensing Arrangement was Commercially Rational

249.    The EMEA Debtors' bald assertions – echoed by the US Interests – that independent commercial parties would never agree to invest billions in R&D without a right to share in profits that might be earned through the sale of resulting IP as 'proof' that the Monitor's interpretation of the MRDA is incorrect[351] is wholly unavailing.

250.    The very premise of these assertions is incorrect.  It simply cannot be argued that such arrangements are irrational or would otherwise result in a commercial absurdity;  arrangements of this very nature exist in the open market.  In fact, as noted above, the OECD itself expressly recognizes that transactions between independent enterprises do occur where a licensor retains full rights to enhancements of the licensed intangible developed during the term of the license.[352] None of the other transfer pricing experts even considered and applied the direction proffered by the OECD[353] with respect to the licensing of intangibles in their work.

---

[350] Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2756:6-18

[351] EMEA Initial Post-Trial Brief, para. 457-458; and US Interests' Initial Post-Trial Brief, p. 63-64

[352] TR21600 (OECD, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles, July 30, 2013) p. 29-30 (para. 108); Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3869:25-3870:13 and 3876:18-3879:8; TR00050 (Exh. 50, Expert Rebuttal Report of Dr. Timothy Reichert, February 28, 2014) p. 69-72 (p. 75-78 of PDF) and Appendix B (p. 257 of PDF)

[353] TR21600 (OECD, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles, July 30, 2013)

251.    For example, Lorraine Eden admitted that she did not do any empirical work studying what arm's length participants actually would do in Nortel's situation; she didn't see it as "necessary".[354]  Similarly, that Steven Felgran "can't see" [355] and Cooper "can't imagine"[356] any arm's length arrangement in which one party could control and receive the entirety of the proceeds from the sale of jointly-developed IP is similarly uninstructive and of no assistance to the Courts.

252.    In its argument the EMEA Debtors continue to rely on Felgran's misrepresentation of Reichert's opinion, citing his view that Reichert posits a "hypothetical and non-commercial scenario in which the RPEs' economic ownership under the MRDA lapses and legal title alone becomes the determining factor."[357]  Reichert, as he testified at trial, made no such statement.[358] Nor is Felgran's mischaracterization helpful, being rooted – as it seems to be –  in a notion of economic ownership that is not what the MRDA provides for.  As Reichert was clear to point out, in the tax or transfer pricing context "economic ownership" refers to a party's right to benefit from an income stream attributable to a defined undertaking or activity,[359] in Nortel's case R&D.  Transfer pricing's concept of "economic ownership" was addressed above at paragraphs 81 to 86.

---

[354] TR00062 (Exh. 62, Expert Report of Dr. Lorraine Eden, January 24, 2014) para. 7; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 5050:1-8, 5051:2-14 and 5059:23-5060:6

[355] Dr. Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2860:10-23

[356] Dr. Richard Cooper Trial Testimony, Day 11, May 30, 2014, p. 2689:25-2690:18

[357] EMEA Initial Post-Trial Brief, para. 459, citing TR00038 (Exh. 38, Expert Rebuttal Report of Dr. Steven Felgran, February 28, 2014) para. 12

[358] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3862:21-3864:12

[359] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3830:4-8; TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 4

253.    In continuing their attack on the rationality of the Monitor's interpretation of the MRDA, the EMEA Debtors, repeating the fact that ultimately the RPEs ended up sharing losses instead of profits, claims that having done so it defies commercial logic for the Licensed Participants to receive only a small share of the sale proceeds[360] (the value attributable to their surrendered license rights).

254.    In transfer pricing, as in contractual interpretation, economic rationality or commercial absurdity must be judged as at the time the parties enter into the transaction.  At the time the RPSM was designed it was always contemplated that Nortel would return to profitability and it was never contemplated the Nortel enterprise would cease operations.[361]

255.    The Participants expected to make operating profits at the time they developed their RPSM, and the rationality of that arrangement should be measured as of that time.  Transfer pricing rules do not permit parties or tax authorities to re-price or otherwise restructure their arrangements after the fact and based on hindsight.[362] Contract interpretation rules do not do so at all.

256.    Unlike the other experts, Reichert considered the economics of the transaction actually undertaken by Nortel – *ex ante*.  As already outlined, Nortel's arrangement was one whereby, NNL, as licensor and the entity with vested legal title to all of the IP, granted Licensed Participants an exclusive, royalty-free license to make and sell products and a limited right to the

---

[360] EMEA Initial Post-Trial Brief, para. 458

[361] TR00016 (Exh. 16, Declaration of Walter Henderson, April 11, 2014) para. 39

[362] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3890:2-5; TR00050 (Exh. 50, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 21-22 (p. 28-29 of PDF); TR11391 (OECD Transfer Pricing Guidelines, July 2010) p. 47-48 (p. 49-50 of PDF) (para. 1.52), p. 51-53 (p. 53-55 of PDF) (para. 1.64-1.69), p. 290 (p. 292 of PDF) (para. 9.162); Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p.5059:18-22

residual profits of the group in exchange for the performance of R&D.[363]  This was no small

thing and was entirely consistent with commercial rationality.

257.    The US Interests and EMEA Debtors also overlook the value provided to the Licensed

Participants under the licenses that granted them, on a royalty free basis, access to a much greater

pool of technology than they could have afforded without substantial upfront costs to create or

license that technology in the open market.[364]  The sharing of operating profits in exchange for

R&D investment must be judged in that scenario.  It was a better deal than the Licensed

Participants could have received in the open market.[365]

258.    Finally, the EMEA Debtors' argument that any allocation that is found not to meet the

arm's length standard could have serious tax consequences for the debtors' estates is neither

instructive nor relevant to the allocation question before the Courts.  It begs the question.  The

Courts will determine what each party is entitled to.  That there may be tax consequences as a

result of the Courts' decisions does not, and cannot, determine the decisions.  Nor is there

reliable evidence of what the tax authorities' views would be, and NNI was at pains not to tell

the IRS anything about how proceeds should be allocated in advance of the Courts' decisions,

even after sales had been effected.[366]

---

[363] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3880:10-3881:16 and 3940:11-24; TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 37 (p. 41 of PDF)

[364] Monitor's Initial Post-Trial Brief, para. 49, citing TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) para. 36; Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1157:21-1159:2

[365] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3943:1-22; TR00050 (Exh. 50, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 21 (p. 28 of PDF)

[366] TR47221.02 (NNI Transfer Pricing Report for the year ended December 31, 2009, dated September 14, 2010) p. 20- 21 (p. 23-24 of PDF). That adjustments may be required depending

- 116 -

E.      **REBUTTAL TO ATTACKS ON THE MONITOR'S VALUATION APPROACH**

(a)      **The Central Arguments of the US Interests and the EMEA Debtors Against the Monitor's Valuation Position is About Legal Premises, Not Valuation Methodology**

259.    The crux of the argument of the US Debtors against the valuation methodology proposed by Philip Green, Mark Berenblut and Alan Cox, and the comprehensive valuation of Green, is that:

> Green's testimony and reports are based on three false premises: that the MRDA only granted very circumscribed rights of limited to no value to the Licensed Participants; that NNL's bare legal title to NN Technology carried with it special, residual value; and that the Licensed Participants' license rights were non-transferable. For the reasons described herein and as shown at trial, each of these premises is wrong and, accordingly, the Monitor's valuation theories all fail.[367]

260.    The US Debtors levy these same criticisms at Green's alternative valuations.[368]

261.    The EMEA Debtors make similar arguments that Green, Berenblut and Cox founded their opinions based on their wrong understanding of the rights of NNL as IP owner and the Licensed Participants as IP licensees.[369]

262.    However, it is the US Interests' and EMEA Debtors' legal analyses which are wrong – which necessarily entails that their main critique of Green's valuation is wrong.

---

on the final determination of allocation was expressly provided for in the notes to Nortel's financial statements, see for example TR21541 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2010) p. 74 (p. 79 of PDF); John Doolittle Deposition, December 5, 2013, p. 298:14-300:21.

[367] US Interests' Initial Post-Trial Brief, p. 100

[368] US Interests' Initial Post-Trial Brief, p. 101-102

[369] EMEA Initial Post-Trial Brief, paras. 232-241 and 250-251

263.    It is clear that the key factor differentiating the allocations proposed by the three estates are the legal foundations on which rest the "valuation" opinions of their respective experts.  All rely heavily on their interpretations of ownership and rights to IP, so much so that the allocation of sale proceeds turns on the interpretation of those concepts.  The Monitor submits that if the Courts accept the interpretation of the MRDA set out in the Monitor's Initial Post-Trial Brief and herein, they should make the allocation calculated by Green, whose opinion is the only valuation based on that interpretation.

264.    Nor would it matter whether Green, Berenblut and Cox arrived at their understanding of the relevant rights based on their own reading of the words of the MRDA, assumptions provided by counsel or both.  What matters is that they based their valuation methodology on the correct understanding of ownership and of the scope of the licenses of the Licensed Participants.

265.    The source and scope of NNL's IP ownership rights, and the scope of the rights of Licensed Participants is set out in detail at paragraphs 287-433 and 544-565 of the Monitor's Initial Post-Trial Brief, and above at paragraphs 11 to 45.

266.    As for the alleged error of Green concerning the non-transferability of Licensed Participants licenses, this was no error at all (see paragraph 464 of the Monitor's Initial Post-Trial Brief).  The approach to transferability taken by Green, Berenblut and Cox was more nuanced than credited by the US Interests, and their conclusion that no additional value can be hypothesized if the license rights of the US Debtors and EMEA Debtors were hypothetically put in the hands of (i.e. transferred to) another person, such as a purchaser in the Business Sales or Rockstar, is the correct approach grounded in the MRDA.  The fact that the MRDA restricted the license to Products, which are products, software and services only "by or for the Participants", meant that even if the Participants consented to the assignment of the licenses of the Licensed

Participants to others, those others would be subject to the same Nortel "Participant" restriction. What others would pay, if anything, for such a license, would have to take into account that restriction.[370] This is determinative on the point with respect to value yet is ignored in the Initial Post-Trial Briefs of the US Interests and EMEA Debtors.

267.    In the context of the arguments about the transferability of the MRDA licenses, the US Interests make several unfounded assertions.  First, the US Interests suggest that the parties consented to the transfer of the MRDA under s. 14(a) of the MRDA in the context of the Rockstar Transaction.[371]  This is incorrect.  Nowhere in the sales transaction documentation was the MRDA assigned.  What was assigned to Rockstar were IP rights,[372] rights which were owned by NNL as evidenced by (i) Article 4 of the MRDA,[373] (ii) the assignments to NNL of "all their right, title and interest worldwide in and to the invention…",[374] and(iii)  the nearly complete set of patents registered showing NNL as owner.[375]  Second, the US Interests suggested that the IFSA deemed the agreement of the Licensed Participants to terminate their licenses to be a sale.[376]  However, the evidence cited by the US Interests in support of their argument in this regard[377] does not support this contention.  To the contrary, these documents show that the

---

[370] Thomas Britven Trial Testimony, Day 14, June 6, 2014, p. 3389:20-3391:1

[371] US Interests' Initial Post-Trial Brief, p. 15 and 109

[372] See TR22085 (Asset Sale Agreement among Nortel Networks Limited and Rockstar Bidco, LP, et al., June 30, 2011) para. 2.1.1

[373] TR21003 (MRDA and addenda), Art. 4

[374] TR0006 (Exh. 6, Affidavit of Angela DeWilton, April 11, 2014) paras. 9 and 12; TR45735 (NNL Patent Application Assignment)

[375] See TR40197 (List of Transferred Patents in Rockstar Transaction) Tab "AllActive20110728" ("Assignee/Owner (sic)" Column) and TR47338 (Patent Excel File, January 7, 2009 Tab "All" ("App Assignee" Column")

[376] US Interests' Initial Post-Trial Brief, p. 109

[377] US Interests' Initial Post-Trial Brief, p. 109 (footnote 384)

parties were aware of the difference between selling assets to a purchaser and terminating

licenses, with completely different provisions to address the sale of IP and the termination of

existing licenses.[378]  Although the proceeds from an asset sale that involves a license termination

are deemed sale proceeds to be allocated, that does not mean a license that was terminated was

sold or dictate how to determine the value of the license that was terminated.

268.    In addition to these central arguments, the US Interests and EMEA Debtors make more

tangential arguments addressed below.

**(b)    Green Valued What Was Sold to Rockstar:  Ownership of NNL's IP**

269.    The US Interests criticize Green for not valuing their rights with respect to the

exploitation of NN Technology in the US, "although this is clearly what NNI owned and sold to

Rockstar".[379]  This argument is unfounded in at least two respects.  First, NNI did not own or sell

any IP to Rockstar – NNL sold IP, which it owned, while NNI merely terminated its licenses.

Second, Green did do a valuation with respect to the proceeds from the Rockstar transaction,

including valuing the US Debtors' license rights, which valuation is summarized at paragraphs

479-486 of the Monitor's Initial Post-Trial Brief.

**(c)    Green Properly Used Forecasts with Respect to the Business Sales**

270.    The US Interests argue that Green selectively and improperly used forecasts, which had

the effect of reducing the projected cash flow of certain of the business units.[380]  Presumably the

---

[378] TR12032 (Interim Funding and Settlement Agreement, June 9, 2009) (IFSA) para. 11(d);
TR22085 (Asset Sale Agreement among Nortel Networks Limited and Rockstar Bidco, LP, et
al., June 30, 2011) s. 2.1.1 and 5.13(b)

[379] US Interests' Initial Post-Trial Brief, p. 103

[380] US Interests' Initial Post-Trial Brief, p. 116 (footnote 401)

US Interests are suggesting that the manner in which Green dealt with the cash flows reduced the value of the licenses of the Licensed Participants and, consequently, their proposed allocations with respect to the Business Sales.

271.    Green addressed his selection and use of forecasts in his valuation.[381]  In summary, Green used in virtually all of his analyses the "continued-use-by-Nortel projections" because

> Well, I'm trying to evaluate the license rights that were surrendered by the U.S. and EMEA Debtors.  The value of those license rights is necessarily constrained, if you will, to what the U.S. and EMEA Debtors could have done with these operating businesses.[382]

272.    This approach is entirely consistent with the correct interpretation of the MRDA which limited the licenses of the U.S. Debtors and EMEA Debtors to products, software and services "by or for the Participants."

273.    Also, Green explained that where he did not use Nortel projections as-is, his adjustments to those forecasts was generally to the benefit of the US Debtors and EMEA Debtors because it increased their license values.[383]  Effectively, the US Interests criticize Green for making adjustments that favour them.

**(d)      Green Properly Did Not Include a Terminal Value**

274.    The US Interests allege Green's valuation was defective because he did not include in his valuation a terminal value for the businesses in which they exercised their license rights.[384]  The

---

[381] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, revised February 28, 2014), p. 57-60

[382] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3127:4-3132:6 (quote at 3131:16-21)

[383] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3135:9-18

[384] US Interests' Initial Post-Trial Brief, p. 116 (footnote 401)

US Interests implicitly suggest that the businesses (and thus the licenses) still had some value at the end of the nine years of projected cash flows (i.e. terminal value) for which Green did not account.  Green had a simple explanation for this concern when asked about it at his deposition: When he assessed the *present value* of the terminal value there might be at year nine, the terminal value "would be virtually of no value in a present value computation".[385]  This is a mathematical consequence of applying the discount rate to a possible value over nine years in the future.  There is no evidence of a terminal value in year nine of a magnitude such that its present value would be material.

**(e)        Green Properly used the Q1 2010 RPS Capital Stock Percentages**

275.    The EMEA Debtors suggest that Green should not have used the Q1 2010 RPS capital stock percentages.[386]  However, as discussed at paragraph 460 of the Monitor's Initial Post-Trial Brief, Green chose that set of percentages because (i) it was the most recent information available, which was appropriate because it was being applied to projections of future revenue and (ii) his valuation was done essentially as of December 31, 2009 and therefore the 2010 percentage matched the date by which most of the business sales had closed or were the subject of binding sale agreements.[387]  Similarly, the Q1 2010 RPS capital stock percentages were used in a settlement in September 2011 about transfer pricing matters, which was approved by the Courts, matching the RPS percentage date with the date of the event.[388]

---

[385] Philip Green Deposition, March 31, 2014, p. 335:25-336:15

[386] EMEA Initial Post-Trial Brief, para. 249

[387] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3139:22-3140:16

[388] TR44194 (Q1 2010 Transfer Pricing Settlement Agreement), in particular, Annex C; TR49887 (Monitor's 72nd Report) at paras. 14, 21 and 22; Order re: Certain Inter-Estate Matters dated August 23, 2011 at paras. 10 – 12; TR45645 (2010 Transfer Pricing Calculations) Tab "Q1 Summary"

- 122 -

**(f)      Green Properly Valued Customer Related Assets and Goodwill**

276.    The EMEA Debtors summarized their view of how what they call customer-related assets

and goodwill should be allocated: [389]

> Because Nortel saved its most valuable IP for the Residual Patent Sale,
> much of the value of the Business Sales was not IP but rather Nortel's
> customer contracts, support infrastructure, and related personnel
> ("Customer-Related Assets"), which (along with residual "Goodwill")
> account for more than $2 billion of the Business Sale proceeds. The
> parties' rights to those Customer-Related Assets and Goodwill differ from
> their rights to the IP, so the separate customer and goodwill asset classes
> must be valued and allocated differently than the IP. [390]

277.    Moreover, they criticize Green for allocating what he calls customer relationships in the

same manner as IP.[391]

278.    The evidence referenced by the EMEA Debtors about the importance of customers to

Nortel is beside the point. The correct question is whether any value attributable to customer-

related assets is separable from IP and should be calculated and allocated on a different metric

than the IP.  There are strong reasons, ignored by the EMEA Debtors, for Green's approach of

treating IP and customer relationships in the same manner as set forth in the Monitor's Initial

Post-Trial Brief at paragraphs 449, 471, 472 and 583-592:

---

[389] EMEA Initial Post-Trial Brief, para. 3

[390] Contrary to the first sentence of this paragraph, there is no evidence that Nortel purposefully
retained valuable IP for the Residual IP sale; rather, the evidence establishes that the patent
segmentation process was completed on a principled, objective basis to identify which patents
were related to a particular product line or business, which were shared by products in multiple
business lines and which had no application to Nortel's products, as described below at
paragraphs 301 to 304. The segmentation process included significant negotiations with the
business purchasers and an internal Nortel technical review involving "…the best minds in
Nortel who had the deepest understanding of the products…" (Trial Tr. 1005:3-18 (Hamilton);
Hamilton Aff. at para. 60; Dadyburjor Dep. Tr 27:10 – 31:16; McColgan Dep. Tr. 128:7 –
130:20; 140:12 – 141:17.)

[391] EMEA Initial Post-Trial Brief, para. 245

- 123 -

(a)     customer related assets do not generate different cash flows than IP;

(b)     cash flows were shared under the RPSM while Nortel operated without attempting any distinction between cash flows generated by customer relations and those from IP.  The EMEA Debtors who claim to rely on practice and precedent, completely ignore this;

(c)     Nortel explained to tax authorities that IP, not customers, drove value;

(d)     the MRDA defines all intangible assets as being owned by NNL, and customer related assets are an intangible asset; and

(e)     revenue (which the EMEA Debtors use for this category) is an inappropriate measure of value, and if applied must be subject to RPSM sharing in calculating value, which the EMEA Debtors fail to do.

279.    Indeed, in the Alcatel transaction, heavily relied on by the EMEA Debtors[392], Nortel pointed out that it had no customer category of asset and only allocated to such a category because the purchasers' categories were in that case binding on it.[393]

280.    There is no basis to say the EMEA Debtors had a valuable interest in customers separate from the value of the IP.  The very witness relied upon extensively by the EMEA Debtors about the importance of sales to customers, Peter Newcombe, testified on cross-examination about the crossover between R&D (which was not conducted solely, or even predominantly by the EMEA Debtors) and sales efforts:

---

[392] See for example, EMEA Initial Post-Trial Brief, para. 295

[393] TR21161 (E-mail Regarding Alcatel Allocation, February 13, 2007) p. 2

Q.  I take it that customers in the field in which you worked needed to be comfortable that Nortel was developing the next generation of technology?

A.  Yes.

Q.  It was important to your sales efforts to not only have great current products but able to show future great products were coming?

A.  That's correct.

Q.  And it was also important to show customers that even beyond products, that basic research was being done in fields of interest to the customers; correct?

A.  It varied by portfolio; but in general terms, yes."[394]

281.    Also, the reliance on the purchasers' Purchase Price Allocations ("PPAs") to support the EMEA Debtors customer and goodwill allocation is specious. The allocations of the purchasers are materially different than those the EMEA Debtors propose.  For example, in the Enterprise, CDMA/LTE and MEN Business Sales (the three deals with information disclosed by the purchasers) the purchasers allocated 40% of the aggregated transaction values to IP.[395]  In contrast, the expert called by the EMEA Debtors, Huffard, allocated only 22% to IP.[396]  The EMEA Debtors have cherry picked the aspects of the purchasers' PPAs they liked, and ignored the aspects problematic for their approach.

282.    The EMEA Debtors also argue that their members that were not Licensed Participants should receive an allocation "for what they gave up in the sales".[397]  This is without substance since these debtors transferred or surrendered no property interests in the Business Sales or

---

[394] Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p. 1631:20-1632:9

[395] TR00045 (Exh. 45, Initial Report of Thomas Britven, January 24, 2014), Schedule 4

[396] TR00030 (Exh. 30, Initial Expert Report of Paul Huffard, January 24, 2014) para. 95

[397] EMEA Initial Post-Trial Brief, para. 490

Rockstar Transaction (other than certain tangible assets for which the Monitor proposes they receive an allocation).  They held no IP licenses.  They owned no IP.  They merely lost the right to sell the products of an insolvent organization.  The non-RPEs transferred or surrendered no property interests and are due no allocation.

**(g)**     **The RPSM Capital Stock Period for Allocation Should be the Same Five Years Used by Nortel**

283.     The EMEA Debtors criticize Green for using the MRDA look-back period in his valuation.[398]  Instead, through James Malackowski, they propose a period at least three times as long as the RPSM method at the time of the relevant sales (5 years) and twice as long as the longest RPS capital stock period Nortel ever used.[399]  Although he suggested that his contribution theory is rooted in consistency with Nortel practice, Malackowski nonetheless contends that the Courts should depart from the RPSM capital stock period (or look-back period) provided for by the MRDA, and the one in fact, used (or proposed be) by Nortel in each of the "precedents" he purports to rely upon.

284.     The EMEA Debtors argue that the choice of a five-year period was motivated by tax considerations, but the evidence they cite does not support this argument or suggest that five years was inappropriate under transfer pricing guidance or otherwise.[400]  In fact, on cross-examination Cooper, the transfer pricing expert produced by the EMEA Debtors, suggested the RPSM used by Nortel (and which included the five year period) was appropriate:

> Q.  We know that you all agree that the RPSM was not just appropriate but was the best method for Nortel's circumstances; correct?

---

[398] EMEA Initial Post-Trial Brief, para. 213

[399] TR00033 (Exh. 33, Expert Report of James Malackowski, January 24, 2014) p. 41-44 and 48

[400] EMEA Initial Post-Trial Brief, para. 207-208

A.  I certainly believe that, given what we know.[401]

…

Q.  And I just want to see if you can help with one other aspect of Dr. Eden's building blocks in her work.· And that's, sir, I take it you are aware that her initial report characterizes the Nortel RPSM as being intentionally skewed in favor of NNL for tax avoidance reasons; correct?

A.  I recall that.

Q.  And that's certainly not a conclusion you drew in any of your work; correct?

A.  That is correct.[402]

…

Q.  And the IRS regulations, or Regulation 482, I believe it is -- I guess that's a Treasury regulation, I apologize -- it is very explicit about that; right?

A.  That is correct.

Q.  And it means, sir, the method that, in the given facts and circumstances, provides the most reliable measure of an arm's-length result; correct?

A.  Yes.

Q.  And obviously, sir, it certainly doesn't mean the method that avoids the most amount of tax for the taxpayer; right?

A.  That is correct.

Q.  And it obviously does not mean the method that intentionally skews income to a low-tax jurisdiction; correct?

A.  That is correct.[403]

285.    The EMEA Debtors also claim that the difference between the look-back period they propose and that used by Nortel is attributable to that fact that when "the Nortel Group estimated

---

[401] Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2761:10-14

[402] Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2762:23-2163:7

[403] Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2767:14-2768:6

useful life in the context of adopting the RPS methodology, it was focused on the useful life of

its products, rather than its patents".[404]  The EMEA Debtors fail to follow the logic of their own

propositions.

286.    First, a document the EMEA Debtors rely heavily upon despite the lack of any evidence

it or its contents were ever used[405], a draft of "Potential Questions and Sample Answers" for the

2002 APA kick-off meeting with the APA tax authorities,[406] states that upon a sale involving IP,

the proceeds would be allocated on the basis of the RPEs' respective shares of total R&D capital

stock in the year of the sale, which would have included the RPSM mandated look-back period

---

[404] EMEA Initial Post-Trial Brief, para. 204

[405] Paul Huffard Trial Testimony, Day 10, May 29, 2014, p. 2155:14-21 where counsel for the EMEA Debtors stated that "I think counsel is absolutely correct that there is nothing in the record that shows that that document was provided to the authorities or, indeed, that that specific answer was given or that question was asked at the tripartite meeting. I don't believe there is anything in the record that shows that that actually happened."

[406] The cover memo for this KPMG document noted "… I also believe some of these questions may need to be further researched and analyzed to ensure that the brief answers make sense and are the most defensible/best answers from Nortel's perspective in the long run" (TR22016). There is no evidence that the answer cited by the EMEA Debtors was ever edited, approved or adopted by Nortel personnel.  The role of the author of the document, Mr. O'Connor of KPMG, with respect to the kick-off meeting with the tax authorities and transfer pricing more broadly appears to have been minimal; MaryAnne Pahapill (who presented on behalf of Nortel at the meeting) did not recall him or Deloitte (then Nortel's auditor) being involved in the APA and O'Connor was not included on communications following the meeting.  The post-meeting communications reveal that the tax authorities never asked how proceeds from the sale of IP would be shared (Mary Anne (Pahapill) Poland Deposition, October 3, 2013, p. 133:24-134:13, 135:20-136:20, 138:25-139:4; TR43679 (Summary of APA Meeting, June 19, 2002); TR44934 (E-Mail from Joelle Hall re: Tax Authorities' Questions from APA Meeting, June 28, 2002); TR44935 (Executive Summary, Tax Authorities' Questions, June 28, 2002); TR44936 (E-Mail from Tom Horst to Joelle Hall re: Suggested Answers to Tax Authorities' Questions, July 1, 2002); TR44937 (Certain Responses to Certain Questions Raised by CCRA, Inland Revenue and IRS, July 1, 2002).  Orlando admitted that Nortel never said anything one way or another to tax authorities about how proceeds of a sale of IP would be allocated (Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1347:25-1348:6).

and not the much longer period proposed by the EMEA Debtors. [407]  Similarly, in the draft non-public NNL accounting spreadsheet that the EMEA Debtors also rely upon (despite a caveat on the face of the spreadsheet that the "[a]ctual proceeds allocation is subject to negotiations among estates") the allocations of proceeds from the Business Sales were recorded on the basis of the RPSM look-back period used by Nortel and not a longer period.[408]  The allocations of the Business Sale proceeds to NNL in this spreadsheet are profoundly higher that those proposed by the EMEA Debtors:[409]

| NNL Allocation | | |
|---|---|---|
| Business Sale | Draft Non-Public Accounting Spreadsheet | EMEA Debtors |
| Radware (Layer 4-7) | 48.5% | 27.5% |
| Hitachi (Next Gen) | 37.4% | 33.0% |
| CDMA | 45.3% | 15.8% |
| Enterprise | 38.9% | 20.2% |

The actual financial statements of the public company, NNC, disclosed that all of the sale proceeds were recorded on the books of NNL, with the caveat that "[s]ubstantially all proceeds received in connection with the completed sales of businesses and assets are being held in

[407] TR22020 (Draft Potential Questions and Sample Answers for APA Kick-off Meeting, Prepared by Deloitte & Touche) p. 39

[408] TR11264 (E-mails re: NNA Fiscal Year 2008 and 2009 Annual Compliance Review Documents attaching draft financial statement allocations, September 28, 2010), p. 1, 9, 16, 24 and 35 of PDF

[409] TR00030 (Exh. 30 Initial Expert Report of Paul Huffard, January 24, 2014) p. 57 (para. 125)

escrow and have been recorded by NNL until the final allocation of these proceeds as between various Nortel legal entities is ultimately determined."[410]

287.    The EMEA Debtors cannot have it both ways.  They cannot assert that Nortel turned its mind to IP sale proceeds sharing and used or proposed to use relative R&D spending to allocate proceeds, and at the same time assert that it did not turn its mind to how the relative spending was to be calculated.  If the EMEA Debtors are right that Nortel "precedents" rise to the level of something relevant to current legal rights to an allocation of proceeds, they cannot say Nortel was only looking in those precedents at the useful life of products when, according to the EMEA Debtors, they were using a look back period to calculate and allocate the proceeds of the sale of patents, not products.

288.    In any event, Nortel calculated its look back period, before contractually enshrining it, by focussing on the useful life of its R&D spending.  This was the approach agreed upon by the parties with respect to useful life.  If one is using relative R&D spending, it is the useful life of that spending which must be used.

289.    Malackowski purports to use all the R&D spending of Nortel over what he considers the life of a patent, whether that R&D resulted in patents or not.  But this is not the correct approach.  As noted by Reichert in cross-examination:

> But the life in question for purposes of the residual profit split method is the time horizon over which all of the R&D, not just the patents, gives rise to residual profit, the thing being split.· Two different questions, again.[411]

---

[410] TR40190 (10K of NNC for 2011), p. 2, para. 4

[411] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 4009:22-4010:1

290.    Reichert, at pages 72 to 83 of his initial report, extensively reviewed the economic life of

Nortel technology  As he explained, the correct amortization (whether 30% per year, a five year

period or something else) is tied to the economic life of the asset in question:

> The economic life of an asset is the period over which the asset is used as capital in the production of a firm's products and/or services. In economic terms, economic life is the period of time over which an input is included in a firm's "production function," and therefore it is the period over which the input's value is reflected in a firm's revenue. In the case of technology, the economic life of technology is the period of time over which an investment in R&D (i.e., investment in a given set of processes, know-how, patents, etc.) is reflected in the firm's residual profit. [It goes without saying that if technology is reflected in a firm's revenue, it is reflected in its operating and residual profit (which may be negative).]

> The concept of an "amortization rate" is closely related to the concept of economic life. The amortization rate of an asset is the rate at which its value, or contribution to revenue, erodes during its economic life.[412]

291.    The Malackowski look-back approach does not account for the economic life of the asset

in question and that led him to err.  Reichert went on to explain "if the question on the table is

what are the various R&D contributions to IP actually sold in a transaction, it would be

necessary to exclude from that calculation any R&D investment that doesn't, in fact, contribute

to that IP."[413]  Malackowski made no attempt to do so despite the evidence at trial demonstrated

that Nortel R&D did not always result in patents:

> *Peter Newcombe*

> Q.  And sometimes on other occasions the research and development never bore fruit at all in terms of a product; right?

> A.  That's correct.

---

[412] TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert) p. 72-73

[413] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3891:11-16

Q.  And sometimes the research and development got used only for a handful of years?

A.  That's correct.[414]

*Simon Brueckheimer*

Q.      Would you agree that some of the research you did didn't go anywhere?

A.      Yes.

Q.      And sometimes you can spend a lot of time and money and not result in a patentable idea?

A. Patents are not the reason for doing research.  Patents are potentially the outcome of doing research.  So yes, I would say that some research doesn't yield any patents.[415]

292.    The EMEA Debtors' proposed look-back ignores the fact that not every dollar spent on R&D actually results in a patent or that past R&D reduces in value over time as newer technology is developed.  By failing to amortize the R&D spend, the EMEA Debtors' argument treats an R&D dollar spent in 1991 the same as a dollar spent in 2007.  Thus, the EMEA Debtors' approach is doubly flawed – it does not amortize the R&D expenditures and does not remove R&D spending that did not result in patents or commercially viable products.

293.    Nortel explained to the tax authorities, due to the fact that "the majority of Nortel's R&D results in earlier generation technology being rendered obsolete by subsequent technology . . . the product useful life for all practical purposes resembles the technology useful life."[416]  In fact,

---

[414] Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p.1637:21-1638:2

[415] Simon Brueckheimer Trial Testimony, Day 7, May 22, 2014, p. 1595:3-12

[416] TR21031 (Letter regarding Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004) p. 12

the useful life of Nortel's telecommunications products was about 2-3 years,[417] so the original

30% amortization rate and the later five-year look-back were both much longer than the product

useful life.

294.    This evidence is consistent with what  Nortel explained to the tax authorities when it

adopted the 30% amortization rate, it was a "conservative yet reasonable" rate, which

accommodated the true nature of Nortel's R&D spending – that: (i) telecommunications R&D

has a short useful life; (ii) only 70% of the Nortel Group's approved R&D projects result in a

commercially viable product that is released to end consumers; (iii) significant R&D expense

consists of determining the appropriate strategy for future R&D efforts and considering emerging

technology, rather than building specific technology or products; and (iv) a substantial portion of

R&D expenditures at Nortel do not result in the successful commercial launch of any product.[418]

295.    In 2005, the IRS specifically asked NNI whether it was possible "to track R&D that did

not result in any revenue (for example, R&D projects that were aborted prior to completion)?"[419]

Nortel provided multiple reasons why this was not possible, including that there is "some R&D

that is never commercially exploited;" "some R&D that is aborted, and then restarted in a

subsequent year…;" "some R&D that results in an increase in knowledge in one R&D group or

line of business that is used by numerous other R&D groups, but cannot be tracked to a specific

---

[417] TR21031 (Letter regarding Nortel Networks Multilateral APA Responses to IRS Information
and Document Request, April 26, 2004) p. 12

[418] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and
CCRA, September 2003) p. 10

[419] TR21033 (Email attaching Nortel Multilateral APA Responses to IRS Information and
Document Request, May 6, 2005) p. 10

revenue stream."[420]  Also, the R&D spending in the year the patent was filed (or the year prior)

does not necessarily correlate to the R&D spent to develop that patent.  Given the difficulty in

tracking a particular spend to the creation of a particular patent or revenue stream and the fact

that one patent may be the result of various years of R&D efforts, there is no accurate measure of

which particular R&D spend created any particular patent or high-value patent.

296.    Thus, Reichert's opinion and how Nortel itself calculated useful life and discussed that

useful life with tax authorities are consistent.  The EMEA Debtors' approach is the outlier.

297.    Although NNI defended Nortel's amortization rate to the tax authorities, the US Interests

now claim that the initial amortization rate in the RPSM of 30% was an "aggressive amortization

rate . . . that presumed a very short lifespan of Nortel Group technology."[421] However, at the

time, NNI (along with NNL and NNUK) informed the tax authorities that "Nortel's analyses

indicated that a 30% amortization was conservative yet reasonable."[422]  In fact, NNI explained

that "[i]n some cases, it could be suggested that a 30% amortization rate is, in fact, too low."[423]

298.    In the submission to the tax authorities for the revised RPSM for 2006-2008, Nortel

adopted a five-year look-back period with a one-year lag.[424]  In its analysis, Nortel found that the

---

[420] TR21033 (Email attaching Nortel Multilateral APA Responses to IRS Information and Document Request, May 6, 2005) p. 10

[421] US Interests' PFOFCL, p. 69 (para. 217)

[422] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and CCRA, September 2003) p. 10

[423] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and CCRA, September 2003) p. 12

[424] TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 49-50

average useful life of Nortel's technology was 4.4 years.[425]  Nortel found that from the time of

making an R&D investment to the time when revenue can be generated from that investment

ranged from six to eighteen months.[426]  In addition, Nortel noted that in the economic lifespan of

telecommunications technologies, there had been an evolution from longer to shorter cycles.[427]

To rely on the parties' R&D spend to determine their contribution to those patents, which is

crucial to Malackowski's approach, one cannot mix and match fragments of history with an

unprincipled historical approach.

299.    The errors of this approach are amplified by its failure to include R&D spending in 2009

– a year in which NNL spent substantial sums not accounted for anywhere in Malackowski's

calculations.[428]

**(h)    Green Addressed the Patents not Owned by NNL**

300.    The EMEA Debtors suggest that Green erroneously did not allocate value to certain

Nortel entities that were not parties to the MRDA but owned patents.[429]  However, as Green

explained in his report and under cross-examination, the allocated patent values carried on the

books of Nortel (such as from acquired patents) were allocated to the patent owner, while any

---

[425] TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) Appendix B, p. 28

[426] TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 50

[427] TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 50

[428] TR00033 (Exh. 33, Expert Report of James Malackowski, January 24, 2014) Exhibit B.1.7.1: of the $1.076 billion in 2009 R&D spending, Canada spent $564 million (52.406).

[429] EMEA Initial Post-Trial Brief, para. 247

remaining patents owned by non-RPE entities were of "minimal value".[430]  Indeed, as

Malackowski's own report showed, the patents of non-RPEs with the largest book value were in

the name of NNC and not any EMEA Debtor.[431]

**(i)      Green Used the Terms "Shared" and "Not Used" Appropriately**

301.    The EMEA Debtors make an argument about the use by Green of the terms "shared" and

"not used" IP, suggesting that he was not sensitive to what two witnesses who did not appear at

trial, Gillian McCollgan and John Veschi, called "predominant use" IP.[432]  However, not only is

Green's terminology not inconsistent with what was sold in the Business Sales and the Rockstar

transaction, it is not at all apparent what flows from the semantic differences the EMEA Debtors

raise.

302.    Clearly, there were three categories of IP.  First, there was IP that was used in a business

line, and that was transferred to the purchaser of that business line.[433]  It is immaterial whether

that is called predominantly used, exclusively used, or anything else.  The point is those patents

and patent applications were sold in the Business Sales, the value for them was realized in those

sales, and no interest in them was retained by any Nortel entity after those sales.

---

[430] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 12 (footnote 35) and Appendix H (p. 278 of PDF); Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3304:15-3316:20

[431] TR00033 (Exh. 33, Expert Report of James Malackowski, January 24, 2014) p. 45-46

[432] EMEA Initial Post-Trial Brief, paras. 253-257

[433] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) at para. 60; TR11150 (IP Aspects of Residual Co. dated July 8, 2009) at Slide 3; Gillian McColgan Deposition, November 8, 2013, p. 124:17-20. See also, for example, TR44138 (CDMA Asset Sale Agreement) section 2.1.1(g); TR44163 (Enterprise Amended and Restated Asset and Share Sale Agreement), section 2.1.1(f) and TR44172 (MEN Amended and Restated Asset Sale Agreement), section 2.1.1(e).

- 136 -

303.     Second, there was IP that was used in more than one line of business.[434]  It is immaterial whether that IP is called "shared" or anything else.  The point is that that IP was licensed, in the Business Sales, to purchasers allowing them to pursue activities in connection with those Businesses that the Nortel entity would or might have pursued if the business were not sold.[435] The value attributed to that was thus realized in the Business Sales.  The interest in that IP, post Business Sales, was subject to the licenses the purchasers had, and any value for them in the Rockstar Transaction (in which they were sold subject to the purchasers' licenses) was not for rights the Licensed Participants could have exploited.

304.     Third, there was IP not used by any business line.[436]  Moreover the fact that they were not transferred or licensed to purchasers in the Business Sales who wanted what they needed to run those businesses, is important confirmation of their "not used" status.  The "not used" status has important implications for the value of the Licensed Participant's licenses in respect of such IP, as Green explained in his evidence.

**(j)      The Outcome of the Foundry Litigation is Not Inconsistent with Green's Valuation**

305.     The EMEA Debtors make reference to the litigation by NNL and NNI for patent infringement against a company called Foundry Networks, Inc.  As they note, that litigation was settled with license fees paid to Nortel and shared in accordance with the RPSM.[437]

---

[434] Gillian McColgan Deposition, November 8, 2013, p. 124:4 – 21; 140-19 – 141:11; 183:6-189:1; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014)  at para. 61

[435] See, for example, TR44142 (CDMA Intellectual Property License Agreement); TR44151 (Enterprise Intellectual Property License Agreement); TR44185 (MEN Intellectual Property License Agreement)

[436] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) at paras. 66-67; Gillian McColgan Deposition, November 8, 2013 125:24 – 126:4

[437] EMEA Initial Post-Trial Brief, para. 117

306.    Certainly sharing license fees in accordance with the RPSM is inconsistent with the position of the US Interests.  If Kinrich's allocation approach were applied to the Foundry license fees they would have to be allocated entirely to the US Debtors, which is not what Nortel did.

307.    The sharing of license fees under Nortel's RPSM is also inconsistent with the allocation approach of the EMEA Debtors.  This is another example of a misplaced attempt by the EMEA Debtors to use a historical Nortel transaction as precedent for its contribution theory despite the fact that the license fees were shared in accordance with Nortel look back period and not the two or three times longer look back period now proposed by the EMEA Debtors.  Nortel's isolated treatment of a relatively small quantity of operating license fees is not meaningful evidence to rely upon in the allocation of the sales proceeds in this proceeding.

308.    Nortel as an operating entity, accounting for license fees as part of operating profits as an adjunct to Nortel's regular business activities, cannot be equated with the situation of the sale, after insolvency, of IP in the Business Sales and Rockstar Transaction (gains from sales were excluded from the RPSM) or even with a notional IP Co.

309.    Notably, only Green's alternative valuation (discussed at Appendix P to his Rebuttal Report and in detail immediately below) is consistent with the valuation theory of RPSM sharing among Participants of license fees and litigation outcomes (similar to the sharing of the Foundry proceeds and fees).

Case 09-10138-MFW    Doc 14432    Filed 09/19/14    Page 143 of 168

- 138 -

**(k)      Misplaced Criticisms of Green's Alternative Valuations**

**(i)      Rockstar Transaction**

310.    At Appendix P to his February 28, 2014 Report, Green provided an alternative allocation for the Residual IP sale proceeds.

311.    Appendix P still takes into account the rights of the MRDA Participants, as does Green's main valuation, except that under his alternative approach Green assumes that the MRDA allowed the US Debtors and EMEA Debtors to participate in the profits from an IP Co., and assumes one could viably operate.[438]  Like his main valuation, in this alternative, Green values the licenses of the Licensed Participants based on what they could have earned in an IP Co., and properly subjects those amounts to RPSM sharing, allocating the balance of the proceeds of the Residual IP to the owner of the IP, NNL.

312.    This is not the "miscalculation" alleged by the US Interests.[439]  If the US Debtors and EMEA Debtors could have participated in an IP Co, then when they terminated their licenses they gave up that potential benefit which was subject to RPSM sharing.  That constrained benefit was reflected in the value of the licenses they surrendered.  Any additional value from the sale which actually took place would be the value to the owner.

313.    The US Interests argue that Rockstar could have exclusively licensed all of the Residual IP from NNI and this demonstrates that NNL had no ownership interest exceeding the license

---

[438] This alternative approach is also based on the assumptions that Nortel could have successfully operated IP Co., that the cash flows that would have been generated by IP Co. can be measured from the IP Co. models which were never accepted or acted on, and that the profits would have been shared under the RPSM; Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3163:3-3164:18

[439] US Interests' Initial Post-Trial Brief, p. 108

interests.[440]  This is clearly not the case, based on the terms of the NNI license.  All Rockstar

could have taken from NNI was a sublicense which would have been restricted in exactly the

same way as NNI's license.  Rockstar did not want such an arrangement and would not have paid

for limited sub-licenses, as is evident from the fact that it was never contemplated in all of the

Residual IP monetization strategies that value could be obtained by Rockstar sublicensing NNI's

rights, and that it was not actually done.  Nor is it correct to contend that Green accepted that this

was the case. As noted in the very testimony cited by the US Interests, while Rockstar could

have offered to license the IP in a manner that gave them the same economic benefit as they

purchased in the Rockstar Transaction, Green pointed out that there might be legal or bankruptcy

reasons why such an arrangement would not be effective.[441]  In fact, there was such a reason

effectively preventing NNI from transferring to Rockstar by means of a license the entire

economic value of the Rockstar Transaction – namely the terms of NNI's limited license under

the MRDA (see paragraphs 327 to 350 of the Monitor's Initial Post-Trial Brief).

314.    The US Interests go on to argue that the IP Co. discount rates used by Green in his

alternative calculation were too high.[442]  This is also incorrect.  Green used the very range of

discount rates considered by Global IP and Lazard in developing the IP Co. projections (Kinrich

used those very same projections, but applied his own unreasonable discount rates – which do

not at all suggest those used by Green were inappropriate).  Green, and Malackowski, both found

the rates used by Global IP and Lazard to be reasonable in the circumstances[443]:

---

[440] US Interests' Initial Post-Trial Brief, p. 110-111

[441] Philip Green Deposition, March 31, 2014, p. 257:22-259:16

[442] US Interests' Initial Post-Trial Brief, p. 111

[443] TR00043 (Exh. 43, Rebuttal Report of Philip Green, February 28, 2014) p. 17-18; TR00034 (Exh. 34, Rebuttal Report of James Malackowski, February 28, 2014) p. 38-39

> First, the Kinrich Report asserts that a 12.2% to 15.7% discount rate is
> appropriate to apply to the projected IP Co. cash flows. I disagree and
> find these discount rates to be too low to appropriately reflect the risks
> associated with the IP Co. business model. In 2010, Lazard prepared a
> sequence of valuations of IP Co. and were prepared using discount rates of
> 25%, 35%, or 45% in their valuations. These discount rates are consistent
> with those used by venture capitalists in evaluating investments in early
> stage companies. Additionally in the Expert Report of James
> Malackowski prepared on behalf of the EMEA Debtors, a 30% discount
> rate is used to value potential licensing revenue from the Residual IP
> portfolio. In my view, the discount rates applied in the IP Co. model and
> by Malackowski are more realistic than the much lower rate used in the
> Kinrich Report because the IP Co. Model would be close to a start- up
> business model (this is a business in which Nortel had virtually no
> experience) which would typically carry a venture capital discount rate.
> [footnotes omitted]

315.    Notably, Kinrich did not suggest that the discount rates he implied with respect to the IP

Co. model, 12.2% and 15.7%, were consistent with the risks of such a business. To the contrary,

they were simply the result of a numerical calculation to reconcile what Rockstar paid to the IP

Co. model cash flows – even though they were not reflective of Rockstar's projected cash flows,

about which Kinrich admitted at trial he knew nothing.[444]

316.    The US Interests argue that Green improperly applied the RPSM to the proceeds received

from the sale of the Rockstar Transaction.[445]  This is incorrect.  Consistent with his valuation

methodology that the value of the licenses is the net present value of the future cash flows, Green

applied the RPSM to the projected cash flows from the IP Co. model used by Kinrich (i.e. the

projected operating profits that would have been earned by IP Co. if the IP Co. model was viable

and if the Licensed Participants' licenses allow them to participate).  These operating profits are

---

[444] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4127:4-12 and 4139:20-4142:10

[445] US Interests' Initial Post-Trial Brief, p. 112

subject to the RPSM (as Kinrich admitted they would be pre-bankruptcy)[446] – they are not sale proceeds.

317.    The US Interests also argue that Green's application of the RPSM to his Appendix P is flawed because it assumes that Nortel's RPSM transfer pricing policy and allocation key would have remained exactly the same going forward.[447]  However, the US Interests rely on the MRDA license to found their rights in NNL's IP, and when they relate it to IP Co. cash flow forecasts into the future they assume those license rights, and thus the MRDA/RPSM, would continue. Continuing rights and obligations under the MRDA cannot be cherry picked and discarded. Green gives effect to the MRDA as a whole, supported by the fact that immediately prior to filing for creditor protection, the Participants amended the MRDA so that it would continue in place even in the event of insolvency.[448]  Moreover, if one forecasts the trend of RPSM capital stock percentages over time based on history, the trend was that NNL's share of R&D spend was increasing[449] – yielding a higher allocation for Canada.  In this sense, using the 2009 capital stock percentages as remaining the same (not increasing) in the future was a conservative approach by Green.  As well, if one assumed that NNI's R&D spending would cease under the MRDA, NNI would cease to have its license rights and thus any benefits from its license (including in an IP Co.) in a relatively short period of time.[450]

---

[446] TR00052 (Exh. 52, Rebuttal Report of Jeffrey Kinrich, February 28, 2014) para. 27

[447] US Interests' Initial Post-Trial Brief, p.112-113

[448] TR21003 (MRDA and addenda) Fourth Addendum (p. 59 of PDF)

[449] TR45171 (Historical R&D spend by year as of Q2 2010)

[450] TR21003 (MRDA and addenda), Article 11

- 142 -

(ii)    **Business Sales**

318.    The US Interests also argue that Green improperly applied the RPSM to the proceeds received from the sale of the Business Sales.[451]  This is incorrect. For the same reasons expressed above at paragraphs 316 and 317, and in the Monitor's Initial Post-Trial Brief at paragraphs 452 to 461, applying the RPSM in calculating forecasted cash flows is appropriate to determine the value of what Licensed Participants gave up by surrendering their licenses as it is necessary to deduct costs in a cash flow determination of value.[452]

319.    The US Interests also argue that Green's alternative valuation with respect to the Business Sales relies on the incorrect simplifying assumption that routine returns would be in approximately the same relative proportion as RPS percentages.[453] As addressed at paragraph 478 of the Monitor's Initial Post-Trial Brief, on cross-examination, Green explained that the information required to properly forecast routine returns was not available – a valuator would require the cash flow projections used by the buyers.[454] Accordingly, his simplifying assumption is appropriate.  Also, Kinrich's criticism that in Q1 2010 the routine returns were different than the RPS percentages does not disprove this assumption for the forecast period.[455]

320.    Finally, the US Interests refer yet again to a fragment only of an answer given by Cox on his deposition.[456]  The answer related to the amount that a fictional buyer would have paid to

[451] US Interests' Initial Post-Trial Brief, p. 116

[452] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 62-63

[453] US Interests' Initial Post-Trial Brief, p. 116-117

[454] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 62; Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3239:20-3240:7

[455] TR00052 (Exh. 52, Rebuttal Report of Jeffrey Kinrich, February 28, 2014) para. 66

[456] US Interests' Initial Post-Trial Brief, p. 83

NNL for its rights in the Residual IP, had NNI and the EMEA Debtors not surrendered their

licenses.  This is simply a case of the US Interests hearing their own echo.  As noted in the

Monitor's Initial Post-Trial Brief at paragraphs 497 to 498, the US Interests reproduce part of a

dialogue omitting the assumption that Cox was asked to make in the course of it.  Essentially,

having been asked by the US Debtor's counsel to assume that the Courts would not require NNI

and the EMEA Debtors to transfer their licenses (in other words, having been asked to assume

that the Courts had ruled that the licenses had value in respect of the Residual IP and that they

need not be surrendered – both at present counter-factual assumptions),  Cox expressed the view

that, in that hypothetical circumstance, a fictional buyer of the Residual IP would have paid a lot

less than what Rockstar actually paid.[457]  This does not help the US Interests, as this case has to

be decided based on what the scope of the licenses was and therefore what value they had – not

on the basis that one already assumes that the positon of the US Interests regarding the scope of

the licenses is right.


## F.    IP CO. WAS NOT A VIABLE OPTION FOR NORTEL

321.    Green's alternative proposed allocation of the Rockstar Transaction proceeds took into

account cash flows projected in the IP Co. models, despite his opinion that they were too

speculative to properly form part of a valuation.  In contrast, the US Interests argue that IP Co.

was a "viable" option for the Estates (and particularly the US Debtors) to pursue.[458] They do this

(i) in support of the US Interests' contention that had they known of the Monitor's position with

respect to the allocation of the Rockstar sale proceeds they could have elected to pursue IP Co.

---

[457] Alan Cox Deposition, March 26, 2014, p. 156:17-157:17

[458] US Interests' Initial Post-Trial Brief, p. 66-67 and US Interests' PFOFCL, p. 135-137 (paras.
449-454)

instead of the Rockstar sale; and (ii) to buttress the use by Kinrich of the IP Co. model to project

cash flows as a basis for his proposed allocation of the Rockstar sale proceeds.

322.    As for the first contention, it is undisputed that the Estates did not pursue an IP Co., but

rather jointly agreed to proceed with a sale of the Residual IP and did so when the amount

apparently realizable from a sale was far less than what Rockstar ultimately paid. It is also

undisputed that the Estates never agreed (or even discussed) how any of the shares or benefits of

an IP Co. would be allocated if IP Co. were pursued. Had they further pursued consideration of

an IP Co. business, the ultimate result for the US Debtors would be the same as with a sale of the

Residual IP: the value the US Debtors would be entitled to would be the value of their license

rights, taking into account the terms and scope of those rights.  Thus, the US Interests'

contention that they would have been better off with an IP Co. than the Residual IP Sale is a false

premise.  The question in both cases is whether their license rights were of value in connection

with the Residual IP, regardless of whether it was sold (as it actually was), or whether it was or

could be utilized in an IP Co.  Put another way, the manner in which the Residual IP was

monetized does not have any impact on the US Debtors' resulting relative entitlements (if any) to

the proceeds of the Residual IP.

323.    The proper question, therefore, is about whether the license rights had value and how that

value should be treated in the valuation evidence of Kinrich and others.  The alleged viability of

IP Co. is relevant to the value of what the US Debtors gave up only if the scope of their rights

would have entitled them to run or participate in an IP Co.  For the reasons discussed above at

paragraphs 15 to 22 (that a licensing business is not, within the meaning of the "Products"

definition, a product, software or service using or embodying NN Technology) they did not.

Regardless of whether a hypothetical IP Co. was an "ice cube factory in Florida" (which Ray

appears to regard as a risky business venture) or a viable business capable of generating significant revenues, the Estate's ultimate entitlement to an interest in IP Co. or the profits generated thereby turns entirely on their respective rights to the Residual IP that would have been at the core of an IP Co.  Only the Canadian Estate had such valuable rights.

324.    However, if the Courts conclude that the Licensed Participants license rights would have allowed them to participate in a Nortel run IP Co., its viability, in the hands of Nortel, is relevant to the value of those rights. The actions of the parties during the actual IP monetization progress establishes that IP Co. was not a truly viable alternative, and certainly one that bears no relationship to the $4.5 billion proceeds of the sale of Residual IP actually achieved. In other words, if what the Licensed Participants gave up when the Residential IP was sold was a right to participate in an IP Co., they gave up a right to be part of a business with a value far less than $4.5 billion, and their allocation must be determined accordingly. As discussed above at paragraphs 310 to 317, in his Appendix P Green valued the Licensed Participants in such a situation.

325.    The trial record establishes that Nortel's IP Co. model was speculative and, therefore, should not have been relied upon by Kinrich.  For example, the evidence of Binning, Nortel's CFO and Chief Restructuring Officer, demonstrates that Nortel in fact did not operate an IP licensing business and that when he left in March 2010, consideration of IP Co. was in its "[v]ery early stages. It was just an option." [459]  This conclusion is buttressed by the fact that Veshi had only been hired in July 2008 (just six months prior to the insolvency filings), and he had been

---

[459] Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1055:24-1056:6 and 1073:2-22; see also TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 40; TR00013 (Exh. 13, Affidavit of Gordon Davies, April 11, 2014) para. 39

hired to look at options for licensing Nortel's IP.[460]  While over the course of 2009 and into early 2010, Veschi did work on versions of an IP Co. business model and the Estates and their creditors did consider it, nothing was approved or finalized.[461]

326.    Thus, as Green concluded, IP Co.'s ultimate utility for valuation and allocation purposes does not bear scrutiny.[462]  His reasons for this valuation conclusion included that Nortel had no experience operating a licensing business and that there were no good comparisons in the market to estimate the cash flows an IP Co. could have generated.[463]  Indeed, IP Co. was so speculative in nature that Lazard, Nortel's financial advisor who advised on each and every post-filing sale transaction, used discount rates of 25% to 45% – the same discount rates used in valuing venture capital investments – to value the hypothetical future cash flows an IP Co. might generate.[464] Consistent with this, Lazard also described IP Co. as being best considered as a venture capital or start up investment.[465]

327.    In addition to the uncertainty and the riskiness of returns that a hypothetical IP Co. might produce there was also a substantial barrier to Nortel ever establishing IP Co.: funding its start-up. While the Estates disagree on the ultimate sum that would have been required, five conclusions can be drawn from the evidence:

---

[460] John Veschi Deposition, November 7, 2013, p. 45:4-7, 47:13-25

[461] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 75-76; Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 900:10-901:1 and 917:17-917:22

[462] TR00043 (Exh. 43, Rebuttal Report of Philip Green, February 28, 2014) Appendix P, p. 1 (p. 248 of PDF)

[463] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 78

[464] TR00043 (Exh. 43, Rebuttal Report of Philip Green, February 28, 2014) p. 17-18

[465] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 78. See also TR50640 (E-mails between Atulan Navaratnam, David Berten and John Veschi re: creditors, February 3-4, 2010).

(a)     At a minimum, it was estimated at least $82 million would have been needed to fund the start-up of IP Co. in its most "refined" version, and as much as $417 million would have been required if a "litigation heavy" strategy were to be pursued. It is notable that in his reply declaration and testimony Ray appears to have adopted start-up costs for IP Co. of at least $269 million, while the US Interests have pointed to the lower figure of $82 million in their Propose Findings of Fact.[466]

(b)     In addition to the required start-up capital, Riedel, Nortel's Chief Strategy Officer and the employee with the ultimate responsibility for overseeing the monetization of the Residual IP, believed that IP Co. would need $100 - $200 million of "dry powder" on its balance sheet to be viewed as a credible litigation threat by the technology giants – such as Apple and Google – that it would be pursuing for license revenues.[467]

(c)     It would take at least two years and as many as five years for an IP Co. to begin generating positive cash flow, and from two to six years to generate a positive return on investment.[468]

(d)     The Canadian Estate indicated it was not in a position to fund the start of IP Co. and that the other Estates would need to purchase the Residual IP from NNL if they wished to pursue it, which no other Estate offered to do.[469]

_____

[466] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 79; TR44758 (Strategic and IP Update, Board of Directors, May 12, 2010) slide 14; TR00021 (Exh. 21, Reply Declaration of John Ray, April 25, 2014) para. 9; and John Ray Trial Testimony, Day 6, May 21, 2014, p. 1416:19-1417:6; US Interests' PFOFCL, p. 136 (para 450).

[467] George Riedel Deposition, October 10, 2013, p. 130:18-131:11

[468] TR44758 (Strategic and IP Update, Board of Directors, May 12, 2010) Slide 14

- 148 -

(e)  No Estate or creditor ever proposed a plan for funding or otherwise pursuing IP

Co., let alone actually took steps to pursue it. As Riedel stated (when being led at

his deposition by counsel to the US Debtors), there was never a conclusion as to a

source of funding for IP Co.[470]

328.  Further, it is undisputed that the Estates consensually agreed to and in fact did proceed

with a sale of the Residual IP – not IP Co.[471]  Ray's contention that the US Debtors might have

opted to pursue IP Co. had he "known" of the Canadian Estate's allocation position must be

measured against the record establishing IP Co. as a risky venture capital type investment as well

as his own testimony (and those of others) acknowledging that a sale of the Residual IP was in

fact the best means to maximize the value of the Residual IP (and therefore generated the most

proceeds for the US Interests to assert their allocation position against regardless of what the

other Estates, who had all reserved rights, might claim)[472]. The US Debtors agreed to the

Rockstar transaction on the same basis as every other transaction under the IFSA: complete the

sale now with a view to maximizing value, while at the same time reserving rights to assert (or

contest), as the other Estates did, any allocation position at a later date.

329.  As noted, the evidence clearly establishes, and the US Interests acknowledge, that a sale

of the Residual IP was in fact viewed as the best option by the Estates. The evidence also

---

[469] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 80 and 84; Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 923:21-24

[470] George Riedel Deposition, October 10, 2013, p. 130:18 – 131:11

[471] John Ray Trial Testimony, Day 6, May 21, 2014, p.1370:1-8

[472] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 43; TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 43-46; John Ray Deposition, December 13, 2013, p. 96:23-98:4 and 103:13-104:23; Alan Bloom Deposition, December 5, 2013, p. 219:8-220:3

establishes that this view was formed well prior to the Estates actually entering into the stalking

horse sale agreement with Google to sell the Residual IP. As described by Riedel, there was

actually an assumption relatively early on in considering monetization strategies for the Residual

IP that a sale would generate more money than an IP Co. and from May 2010 onwards the IP

monetization process and the Estates' efforts were focused on a sale rather than IP Co.[473]  While

IP Co. was maintained as an option, its true purpose was to ensure tension in the unfolding sale

process.[474]

330.    The sale process for the Residual IP resulted in the Google stalking horse agreement and

a binding agreement to sell the Residual IP for $900 million, together with a binding agreement

that the Nortel sellers would not pursue an "Asset Retention Transaction" (defined as a

transaction, such as IP Co., whereby any material portion of the Residual IP would be retained

under a standalone plan of reorganization, plan of liquidation or plan of arrangement). While Ray

professed his confidence that an auction was going to result in a higher price,[475] it is indisputable

---

[473] George Riedel Deposition, October 10, 2013, p. 124:7-18; TR00009A (Exh. 9, Affidavit of
Sharon Hamilton, April 11, 2014) para. 69; TR00010A (Exh. 10, Reply Affidavit of Sharon
Hamilton, April 25, 2014) para. 34; Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p.
922:4-924:18

[474] George Riedel Deposition, October 10, 2013, p. 131:12-134:10. See also TR00009A (Exh. 9,
Affidavit of Sharon Hamilton, April 11, 2014) para. 81

[475] Ray's based his claimed optimism in his blatant overstatement of the success of Nortel's
Business Sales: "And the history of the Nortel Business Sale auction process, as we've all come
to know, is that the ultimate value of the asset was **tripled or quadrupled in all of the sales**. And
so the stalking horse was just that. It was not effectively – it wasn't really our first offer, and it
certainly wasn't our last."; John Ray Trial Testimony, Day 6, May 21, 2014, p. 1367:19-25.
However, the reality is that of the five business unit sale processes that were conducted via
stalking horse, only four went to auction and the increase of the final purchase price in those
auctions relative to the stalking horse agreement **ranged from a low of 48% to a maximum of
89%** (TR21280 ("Seventeenth Report of the Monitor"), p. 8 of pdf, para. 30; TR45589
("Twentieth Report of the Monitor"), p. 9 of pdf, para. 30; TR45595 ("Twenty-Fourth Report of
the Monitor"), p. 10 of PDF, para. 33 and footnote 1; TR45604 ("Twenty-Eighth Report of the
Monitor"), p. 9 of PDF, para. 30; TR45581 ("Thirty-Fourth Report of the Monitor"), p. 12 of

that Nortel was obligated to sell the Residual IP for $900 million subject to receipt of a higher or

better offer at auction. There was no guarantee Nortel would receive such an offer and the

Estates – and their creditors – faced the possibility of closing a sale of the Residual IP for

$900 million. Indeed, in contrast to Ray's professed optimism at the time, the evidence of Riedel

was that the final Rockstar sale price "substantially exceeded" expectations. Similarly, Hamilton

noted that the Rockstar proceeds "…were well in excess of the Estates' and their financial

advisors' estimates." [476]  Riedel and Hamilton's views are consistent with the spike in the trading

price of Nortel bonds once the sale to Rockstar was announced.[477] Clearly the bond market

agreed that the Rockstar proceeds substantially exceeded expectations.

331.    Although Ray acknowledges that Nortel's agreement with Google not to pursue an

"Asset Retention Transaction" prohibited the Estates from thereafter pursuing IP Co. on their

own (an option they gave up when a sale of $900 million was all that was assured when they

entered into the stalking-horse agreement), he points to a carve-out that permitted the possibility

of an "Alternative Transaction" with a third party as preserving the ability to pursue an IP Co.[478]

Ray's interpretation of the relevant provisions is questionable as a disposition of the Residual IP

pdf, para. 32; TR45568 ("Fortieth Report of the Monitor"), p. 5 of PDF, para 18; TR45566 ("Fifty-Fourth Report of the Monitor"), p. 8 of PDF, para. 32.), a far cry from tripling or quadrupling value in each case. In contrast, the Rockstar sale price exceeded the stalking horse price by 500%, which could not have been anticipated based on the prior auctions.

[476] Riedel testified that the ultimate sale of the Residual IP for $4.5 billion "substantially exceeded" expectations.  Hamilton testified that the "…ultimate proceeds of the Rockstar transaction were well in excess of the Estates' and their financial advisors' estimates." (George Riedel Deposition, October 10, 2013, p. 71:10-18 and 72:7-16; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 86

[477] TR00057 (Exh. 57, Expert Report of John J. McConnell), Exh. 3 at p. 16.

[478] TR50184 (Debtor's Motion for Order Authorizing Entry into the Stalking Horse Asset Sale Agreement, April 4, 2011) Exhibit A, para. 5.5(d) (p. 107 of PDF) and para 1.1 ("Alternative Transaction" at p. 67 of PDF and "Asset Retention Transaction" at p. 68 of PDF). See also TR00021 (Exh. 21, Reply Declaration of John Ray, April 25, 2014) para. 19.

to a third party (rather than retention of the Residual IP by NNL) would still be required. In any event, the true viability (and value) of IP Co. is once again disclosed through an incontrovertible fact: no bidder in the auction tendered a bid to pursue an IP Co.  In fact, the presumed "third party" Ray is referring to – the Bondholder group – did not take any step to qualify itself as a bidder in the auction let alone submit a qualified bid in pursuit of establishing an IP Co.[479]  The conclusion that must be drawn is that the Estates and their creditor constituents viewed a sale of the Residual IP for at least $900 million as preferable to the possibility of an IP Co.

---

[479] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1428:14-1429:1

## SCHEDULE A
## LIST OF AUTHORITIES

| CASES | |
|---|---|
| 1. | *1124980 Ontario Inc. v. Liberty Mutual Insurance Co.*, [2003] O.J. No. 1468 (S.C.J., Commercial List) [Initial Brief] |
| 2. | *1230995 Ontario Inc. v. Badger Daylighting Inc.*, 2010 ONSC 1587 (S.C.J.) [Rebuttal Brief] |
| 3. | *1230995 Ontario Inc. v. Badger Daylighting Inc.*, 2011 ONCA 442 [Rebuttal Brief] |
| 4. | *Adam v. Campbell* [1950] S.C.J. No. 51 [Rebuttal Brief] |
| 5. | *Alberta v. Elder Advocates of Alberta*, 2011 SCC 24 [Initial Brief] |
| 6. | *Apotex Inc. v. Wellcome Foundation Ltd.*, [2002] S.C.J. No. 78 [Rebuttal Brief] |
| 7. | *Armstrong Cork Canada Limited v. Domco Industries Limited*, [1982] 1 S.C.R. 907 [Initial Brief] |
| 8. | *Bauer v. Bank of Montreal*, [1980] 2 S.C.R. 102 [Initial Brief] |
| 9. | *Beaufort Developments (NI) Ltd. v. Gilbert-Ash NI Ltd.*, [1999] A.C. 266 [Initial Brief] |
| 10. | *Berckeley Inv. Group, Ltd. V. Colkitt*, 455 F.3d 195 (3rd Cir. 2006) [Initial Brief] |
| 11. | *Board of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 98 USPQ (2d) 1761 (2011) [Rebuttal Brief] |
| 12. | *Bodum USA, Inc. v. La Cafetiere, Inc.*, 621 F.3d 624 (7th Cir. 2010) [Initial Brief] |
| 13. | *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351 (N.Y. 1978) [Initial Brief] |
| 14. | *Canadian National Railway Company v. Volker Stevin Contracting Ltd.*, 1991 CarswellAlta 8 (C.A.) [Initial Brief] |
| 15. | *CanWest Global Commc'ns Corp. v. Mirkaei Tikshoret Ltd.*, 804 N.Y.S.2d 549 (Supr. Ct., N.Y. Cnty. 2005) [Rebuttal Brief] |
| 16. | *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.*, [1980] 1 S.C.R. 888 [Rebuttal Brief] |
| 17. | *Continental Bank Leasing Corp. v. Canada,* [1998] S.C.J. No. 63 [Rebuttal Brief] |
| 18. | *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) [Initial Brief] |

- 2 -

| 19. | *Dinney v. Great-West Life Assurance Co.*, [2009] S.C.C.A. 257 [Initial Brief] |
|---|---|
| 20. | *Dinney v. Great-West Life Assurance Co.*, 2009 MBCA 29 [Initial Brief] |
| 21. | *Doherty v. Home Insurance Co.,* 1986 CarswellOnt 741 (Ont. Div. Ct.) [Rebuttal Brief] |
| 22. | *Dumbrell v. The Regional Group of Companies Inc.*, 2007 ONCA 59 [Initial Brief] |
| 23. | *Electric Chain Company of Canada Limited v. Art Metal Works Inc.*, [1933] S.C.R. 581 [Initial Brief] |
| 24. | *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 [Initial and Rebuttal Brief] |
| 25. | *Geoffrey L. Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71 [Initial Brief] |
| 26. | *Georgia Construction Co. v. Pacific Great Eastern Railway Co.*, [1929] S.C.R. 630 [Rebuttal Brief] |
| 27. | *Gilchrist v. Western Star Trucks Inc.*, 2000 BCCA 70 [Initial Brief] |
| 28. | *Gioris v. Ontario (Director of Income Maintenance, Ministry of Community & Social Services)*, 1999 CarswellOnt 3716 (Div. Ct.) [Rebuttal Brief] |
| 29. | *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562 (N.Y. 2002) [Initial Brief] |
| 30. | *Hawrish v. Bank of Montreal*, [1969] S.C.R. 515 [Initial Brief] |
| 31. | *Heap v Hartley*, (1889) 42 Ch.D. 461 (UK Ch) [Initial Brief] |
| 32. | *Hilgraeve Corp v Symantec Corp.* 265 F.3d 1336 (Fed. Cir. 2001) [Initial Brief] |
| 33. | *Hodge v. Bluebeard's Castle, Inc.*, 392 Fed. Appx. 965 (3d Cir. 2010) [Initial Brief] |
| 34. | *In re Gravure paper & Board Corp.*, 234 F.2d 928 (3d Cir. 1956) [Initial Brief] |
| 35. | *In re Kane*, 628 F.3d 631 (3d Cir. 2010) [Initial Brief] |
| 36. | *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d Cir. 2003) [Initial Brief] |
| 37. | *In re RFE Industries, Inc.*, 283 F.3d 159 (3d Cir. 2002) [Initial Brief] |
| 38. | *Institute For Disabilities Research and Training, Inc. v. Wal-Mart Stores, Inc.,* No. 5 Civ. 176 (D. Del. 2007) [Rebuttal Brief] |
| 39. | *Jedfro Investments (U.S.A.) Ltd. v. Jacyk*, 2007 SCC 55 [Initial and Rebuttal Brief] |
| 40. | *Keefer Laundry Ltd. v. Pellerin Milnor Corp.*, 2009 BCCA 273 [Initial Brief] |

| 41. | *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, 1998 CarswellOnt 4170 (C.A.) [Rebuttal Brief] |
|---|---|
| 42. | *Kerr* v. *Baranow* 2011 SCC 10 [Rebuttal Brief] |
| 43. | *Kraft Canada Inc. v. Euro Excellence Inc.*, 2007 SCC 37 [Initial Brief] |
| 44. | *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, (3d Cir. 2003) [Initial Brief] |
| 45. | *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] S.C.J. No. 83 [Initial Brief] |
| 46. | *Lease Corp. of Am., Inc. v. Resnick*, 288 A.D.2d 533, 732 N.Y.S.2d 266 (N.Y. App. Div. 3rd Dep't 2001) [Initial Brief] |
| 47. | *Long v Delta Catalytic Industrial Services Inc.*, [1998] 6 W.W.R. 792 (ABQB) [Initial Brief] |
| 48. | *Marquete Co. v. Norcem, Inc.,*  114 A.D.2d 738, 494 N.Y.S.2d 511 (3d Dep't 1985) [Rebuttal Brief] |
| 49. | *Massey-Ferguson Ltd. v. R.,* [1976] F.C.J. No. 196 (C.A.) [Rebuttal Brief] |
| 50. | *Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 (FC) [Initial Brief] |
| 51. | *Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773 (3d Cir. 2001) [Initial Brief] |
| 52. | *Nishi v. Rascal Trucking Ltd.* 2013 SCC 33 [Rebuttal Brief] |
| 53. | *Nortel Networks Corp., Re*, 2011 ONSC 3805 (S.C.J.) [Initial Brief] |
| 54. | *Nortel Networks Corp., Re*, 2011 ONSC 4012 (S.C.J.) [Initial Brief] |
| 55. | *Nortel Networks Corporation (Re)*, 2013 ONSC 1757 (S.C.J.) [Initial Brief] |
| 56. | *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir. 1988) [Initial Brief] |
| 57. | *Pacific National Investments Ltd. v. Victoria (City)*, 2004 SCC 75 [Initial Brief] |
| 58. | *Paddon Hughes Development Co. v. Pancontinental Oil Ltd.*, 1998 ABCA 333 [Initial and Rebuttal Brief] |
| 59. | *Paddon-Hughes Development Co. v. Pancontinental Oil Ltd.*, [1998] S.C.C.A No. 600 [Rebuttal Brief] |
| 60. | *Pecore v. Pecore* 2007 SCC 17 [Rebuttal Brief] |

| 61. | *Pfizer Inc. v. Elan Pharm. Research Corp.*, 812 F. Supp. 1352 (D. Del. 1993) [Initial Brief] |
| 62. | *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 [Initial and Rebuttal Brief] |
| 63. | *PUC Distribution Inc. v. Brascan Energy Marketing Inc.*, 2008 ONCA 176 [Initial Brief] |
| 64. | *R. v. Mohan*, [1994] S.C.R. 9 [Initial Brief] |
| 65. | *Re Elliott Estate*, [1962] O.J. No. 164 (C.A.) [Initial Brief] |
| 66. | *Re: Axelrod*, [1994] O.J. No. 2277 (C.A.) [Initial Brief] |
| 67. | *Ryan v. Moore*, 2005 SCC 38 [Rebuttal Brief] |
| 68. | *Sable Offshore Energy Inc. v. Ameron International Corp.*, 2013 SCC 37 [Initial Brief] |
| 69. | *Safeway, Inc. v. Sugarload Partnership, LLC*, 423 F. Supp. 2d 531 (D. Md. 2006) [Initial Brief] |
| 70. | *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 [Initial and Rebuttal Brief] |
| 71. | *Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc.*, 2013 ONSC 1300 (S.C.J.) [Initial and Rebuttal Brief] |
| 72. | *Toronto-Dominion Bank v. Leigh Instruments Ltd. (Trustee of)*, 1998 CarswellOnt 2565 (Gen. Div. – Commercial List) [Rebuttal Brief] |
| 73. | *Thorn EMI North America, Inc. v. Hyundai Electronics Industries Co., Ltd.*, No. Civ. 332 (D. Del. 1996) [Rebuttal Brief] |
| 74. | *U.S. v. Bennett*, 161 F.3d 171 (3rd Cir. 1998) [Initial Brief] |
| 75. | *United Rentals, Inc. v. RAM Holdings, Inc.*, 2007 Del. Ch. LEXIS 179 (Del. Ch. December 13,2007) [Initial Brief] |
| 76. | *United States v. Dubilier Condenser Corp.*, 289 U.S. 178 (1933) [Rebuttal Brief] |
| 77. | *Vasquez v. Delcan Corp.* (1998), 38 C.C.E.L. (2d) 230 (Ont. S.C., Gen. Div.) [Initial Brief] |
| 78. | *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 [Initial and Rebuttal Brief] |
| 79. | *Weatherford Canada Ltd. v. Corlac Inc.*, 2010 FC 602 [Rebuttal Brief] |

- 5 -

| 80. | *Westdeutsche Landesbank Girozentrale v. Islington LBC*, [1996] A.C. 669 (H.L.) [Rebuttal Brief] |
|---|---|
| 81. | *Yetter v. Wise Power Systems, Inc.*, 929 F.Supp.2d 329 (D. Del. 2013) [Initial Brief] |
| 82. | *York Bremner Development Ltd. v. FHR Properties Inc.*, [2007] O.J. No. 3484 (S.C.J.) [Initial Brief] |
| 83. | *Young & Rubicam L.P. v. Gramercy Court Associates,* 190 A.D.2d 518, 593 N.Y.S.2d 20 (1st Dep't 1993) [Rebuttal Brief] |
| 84. | *Zaccardelli v. Kraus*, [2003] A.J. No. 442 (Q.B.) [Initial and Rebuttal Brief] |
| **OTHER** | |
| 85. | Alan W. Bryant, Sidney N. Lederman & Michelle K. Fuerst, *Sopinka, Lederman & Bryant: The Law of Evidence in Canada,* 3rd ed. (Markham, Ontario: LexisNexis Canada, 2009) [Initial Brief] |
| 86. | Bruce Ziff, *Principles of Property Law*, 5th ed.(Toronto: Thomson Reuters Canada, 2010) [Initial Brief] |
| 87. | Bryan A. Garner, ed., *Black's Law Dictionary*, 10th ed. (St. Paul: Thomson West, 2014) [Initial Brief] |
| 88. | D.W.M. Waters, M.R. Gillen and LD. Smith, eds. *Waters' Law of Trusts in Canada*, 3rd ed. (Toronto: Thomson/Carswell, 2005) [Rebuttal Brief] |
| 89. | David Vaver, *Intellectual Property Law* (Toronto: Irwin Law, 2011) [Initial Brief] |
| 90. | Donovan Waters, Mark Gillen and Lionel Smith, eds., *Waters' Law of Trusts in Canada*, 4th ed. (Toronto: Thomson Reuters Canada, 2012) [Initial Brief] |
| 91. | U.S. Federal Rules of Evidence 408(a) [Initial Brief] |
| 92. | Geoff R. Hall, *Canadian Contractual Interpretation Law*, 2d ed. (Markham, Ontario:  LexisNexis, 2012) [Initial and Rebuttal Brief] |
| 93. | Harold G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions*, 4th ed. (1969) [Initial Brief] |
| 94. | *Internal Revenue Services*, 26 C.F.R. §1.482-4(f)(2)(ii)(A), 4(b) (2013) [Rebuttal Brief] |

- 6 -

| 95. | Janet Walker, *Canadian Conflicts of Laws, Vol. 2*, 6th ed. loose-leaf (Markham: LexisNexis, 2005) [Initial Brief] |
| 96. | Walter M. Traub, *Falconbridge on Mortgages*, 5th ed. looseleaf (Aurora: Canada Law Book, 2003) [Rebuttal Brief] |

## SCHEDULE B
## CANADIAN ALLOCATION GROUP - TRANSCRIPT AND EXHIBIT OBJECTIONS

**TRANSCRIPT OBJECTIONS**

| | Deponent | Beginning | End | Objecting Party | Designating Party | Objections | Brief Cited / Oral Opening Submissions | Summary of Reference |
|---|---|---|---|---|---|---|---|---|
| 1 | Cianciolo, Christopher | 154 : 6 | 155 : 7 | Canada | US, EMEA | Improper opinion (legal interpretation) | | |
| 2 | Doolittle, John | 94:17 | 95:3 | Canada | US, EMEA, UKPC | Subjective intent | Pre-Trial Brief of the US Interests (P. 42 – footnote 146), (P. 102 – footnote 355); Post-Trial Brief of the US Interests (P. 43 - footnote 106); Proposed Findings of Fact and Conclusions of Law of the US Interests (P. 82 - para 254) | Doolittle was quoted as testifying that the purpose of the MRDA was to "provide each of the RPS participants beneficial ownership but not legal ownership to the technology," and that such beneficial ownership constituted the right "to exploit the Nortel technology in its territory." |
| 3 | Doolittle, John | 95:23 | 96:6 | Canada | US, UKPC | Improper opinion (legal interpretation) | | |
| 4 | Doolittle, John | 110:4 | 110:9 | Canada | US, EMEA | Improper opinion (legal interpretation) | Pre-Trial Brief of the US Interests (P. 42 - footnote 147), (P. 102 - footnote 356); Post-Trial Brief of the US Interests (P. 43 - footnote 107); Proposed Findings of Fact and Conclusions of Law of the US Interests (P. 82 - para 255) | Doolittle was quoted as testifying that there were no "exceptions to the exclusive right of the [IEs] to the economic and beneficial ownership of Nortel technologies within their respective territories." |
| 5 | Doolittle, John | 166:17 | 167:12 | Canada | EMEA, UKPC | Improper opinion (legal interpretation) | | |
| 6 | Henderson, Walter | 289:21 | 290:22 | Canada | UKPC | Improper opinion (legal interpretation) | Joint Administrators' Post-Hearing Submission Regarding Allocation of the Proceeds of the Nortel Asset Sales (P. 34 - footnote 104); Day 1 Trial Transcript (EMEA Opening Submissions) (47:5-48:5) | Henderson was quoted as testifying that "Legal title is meant to be who is the owner of property in the sense of a registered name. That's been my experience. And can be things like patent, any kind of registered IP, or even land or anything else that has a legal title. Beneficial ownership refers to who has the benefits and burdens of the property and the right to use the property and often goes to who paid the cost to develop the property, or acquire the property." |
| 7 | Henderson, Walter | 291:7 | 291:10 | Canada | US | Improper opinion (legal interpretation) | | |
| 8 | Henderson, Walter | 311:3 | 311:10 | Canada | UKPC | Improper opinion (legal interpretation) | | |

| | Deponent | Beginning | End | Objecting Party | Designating Party | Objections | Brief Cited / Oral Opening Submissions | Summary of Reference |
|---|---|---|---|---|---|---|---|---|
| 9 | Krebs, Laurie | 86:16 | 86:21 | Canada | US | Improper opinion (legal interpretation) | | |
| 10 | Lee, Michelle | 129:2 | 130:23 | Canada | US | Improper opinion (legal interpretation) | | |
| 11 | Lee, Michelle | 131:21 | 132:22 | Canada | US | Improper opinion (legal interpretation) | | |
| 12 | Lee, Michelle | 134:13 | 135:12 | Canada | US | Improper opinion (legal interpretation) | | |
| 13 | Lee, Michelle | 141:15 | 142:24 | Canada | US | Improper opinion (legal interpretation) | | |
| 14 | Lee, Michelle | 143:10 | 144:5 | Canada | US | Improper opinion (legal interpretation) | | |
| 15 | Lee, Michelle | 145:16 | 146:9 | Canada | US, UKPC | Improper opinion (legal interpretation) | | |
| 16 | Lee, Michelle | 146 : 20 | 148 : 19 | Canada | US, UKPC | Improper opinion (legal interpretation) | | |
| 17 | Lee, Michelle | 148 : 24 | 149:19 | Canada | US | Improper opinion (legal interpretation) | | |
| 18 | Lee, Michelle | 149:23 | 150:19 | Canada | US | Improper opinion (legal interpretation) | | |
| 19 | O, Karina | 257:13 | 257:25 | Canada | US | Improper opinion (legal interpretation) | | |
| 20 | O, Karina | 259:18 | 261:11 | Canada | US | Improper opinion (legal interpretation) | | |
| 21 | Rogeau, Cosme | 55:5 | 55:13 | Canada | US, EMEA | Subjective intent | Pre-Trial Brief of the *Ad Hoc* Group of Bondholders (P. 17, footnote 41 and P.20, footnote 50) | Rogeau testified that NNSA agreed to terminate its licenses with the understanding that NNSA was guaranteed a portion of the sale proceeds from the Rockstar transaction, even though the amount that NNSA would receive would be decided later. This testimony was used by the *Ad Hoc* Group of Bondholders to support, in part, the following statements: 1) "Ultimately, after receiving acceptable bids at the auction, the US Debtors and the Bondholder Group embraced results of the Patent Sale instead of the IP Co. business model. They did so, however, with the clear understanding that |

| | Deponent | Beginning | End | Objecting Party | Designating Party | Objections | Brief Cited / Oral Opening Submissions | Summary of Reference |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | all of the Nortel Debtors' estates would be allocated a share of the Patent Sale proceeds, in accordance with the IFSA and the Canadian Debtors' other representations."; 2) "Representatives from the US and EMEA Debtor estates have testified emphatically that they would not have supported the Patent Sale had it been determined that the Canadian Debtors would be entitled to all of the resulting proceeds." |
| 22 | Sparagna, Giovanna | 82:13 | 83:5 | Canada | US, EMEA, UKPC | Improper opinion (legal interpretation) | | |
| 23 | Sparagna, Giovanna | 83:13 | 84:22 | Canada | US, EMEA | Improper opinion (legal interpretation) | Pre-Trial Brief of the US Interests (P. 102 - footnote 359); Post-Trial Brief of the US Interests (P. 43 - footnote 108); Proposed Findings of Fact and Conclusions of Law of the US Interests (P. 83 - para 256) | Sparagna was quoted as testifying that the Licensed Participants were the "entrepreneurs" of Nortel who bore "the upside risk and downside risk" of their R&D investment, and that the Licensed Participants were the "beneficial owners" of Nortel's IP in their Exclusive Territories. |
| 24 | Sparagna, Giovanna | 84 : 25 | 85:7 | Canada | US | Improper opinion (legal interpretation) | Pre-Trial Brief of the US Interests (P. 102 - footnote 359); Post-Trial Brief of the US Interests (P. 43 - footnote 108); Proposed Findings of Fact and Conclusions of Law of the US Interests (P. 83 - para 256) | Sparagna was quoted as testifying that the Licensed Participants were the "entrepreneurs" of Nortel who bore "the upside risk and downside risk" of their R&D investment, and that the Licensed Participants were the "beneficial owners" of Nortel's IP in their Exclusive Territories. |
| 25 | Sparagna, Giovanna | 88:22 | 89:3 | Canada | US, EMEA, UKPC | Improper opinion (legal interpretation) | | |
| 26 | Sparagna, Giovanna | 89 : 5 | 89 : 17 | Canada | US | Improper opinion (legal interpretation) | | |
| 27 | Sparagna, Giovanna | 89 : 18 | 90 : 16 | Canada | US | Improper opinion (legal interpretation) | | |
| 28 | Sparagna, Giovanna | 92:25 | 93:20 | Canada | US | Improper Opinion | | |
| 29 | Sparagna, Giovanna | 96:5 | 96:10 | Canada | US | Improper opinion (legal interpretation) | | |
| 30 | Sparagna, Giovanna | 96 : 13 | 96 : 20 | Canada | US | Improper opinion (legal interpretation) | | |
| 31 | Sparagna, Giovanna | 102:24 | 103:12 | Canada | US, EMEA, UKPC | Improper opinion (legal interpretation) | | |

| | Deponent | Beginning | End | Objecting Party | Designating Party | Objections | Brief Cited / Oral Opening Submissions | Summary of Reference |
|---|---|---|---|---|---|---|---|---|
| 32 | Sparagna, Giovanna | 164:2 | 164:5 | Canada | US, UKPC, EMEA | Improper opinion (legal interpretation) | Pre-Trial Brief of the US Interests (P. 42 - footnote 149), (P. 103 - footnote 362); Post-Trial Brief of the US Interests (P. 43 - footnote 111), (P. 43 - footnote 108); Proposed Findings of Fact and Conclusions of Law of the US Interests (P. 83 - para 256) | Sparagna was quoted as testifying that, under the MRDA, "the [L]icensed [P]articipants held equitable and beneficial ownership in NN technology". |
| 33 | Sparagna, Giovanna | 180:8 | 181:18 | Canada | US, UKPC | Improper opinion (legal interpretation) | Pre-Trial Brief of the US Interests (P. 103 - footnote 362); Proposed Findings of Fact and Conclusions of Law of the US Interests (P. 83 - para 256) | Sparagna was quoted as testifying that the Licensed Participants held beneficial ownership in the NN Technology through their grant to a "perpetual license". |
| 34 | Stephens, Kerry | 56:6 | 56:16 | Canada | US, EMEA, UKPC | Improper opinion (legal interpretation) | Pre-Trial Brief of the US Interests (P. 43 - footnote 154); Joint Administrators' Prehearing Brief Regarding Allocation of the Proceeds of the Nortel Asset Sales (P. 47 - footnote 153), (P. 48 - footnote 154); Post-Trial Brief of the US Interests (P. 42 - footnote 102); Proposed Findings of Fact and Conclusions of Law of the US Interests (P. 84 - para 260); Joint Administrators' Post-Hearing Submission Regarding Allocation of the Proceeds of the Nortel Asset Sales (P. 61 - footnote 216) | Stephens was quoted as testifying that his view of ownership of IP under the MRDA "was that it was economically owned, for which one might read beneficially owned, by the RPSM participants." In addition, his testimony was used in part to support the following statement: "Numerous Nortel employees who were substantially involved in the Alcatel transaction, including Rosanne Culina, NNL's leader of Canadian tax, Peter Look, NNL's global head of tax, Louis Farr, a tax lawyer at NNI, Michael Orlando, a member of international tax and transfer pricing at NNI and a trial witness for the U.S. Debtors, and Mr. Stephens, all agreed that allocating the Alcatel proceeds attributable to IP based on the RPEs' contribution to R&D was the appropriate approach due to the RPEs' shared ownership of the IP." |
| 35 | Stephens, Kerry | 56:17 | 57:21 | Canada | EMEA | Improper opinion (legal interpretation) | Joint Administrators' Prehearing Brief Regarding Allocation of the Proceeds of the Nortel Asset Sales (P. 48 - footnote 154) | Stephens was quoted as testifying that the participants' ownership interest arose because "they share the profits on a basis and therefore that must represent some element of ownership, and they contribute to the creation of the asset and share in the fruits of it." |

| | Deponent | Beginning | End | Objecting Party | Designating Party | Objections | Brief Cited / Oral Opening Submissions | Summary of Reference |
|---|---|---|---|---|---|---|---|---|
| 36 | Stephens, Kerry | 248 : 22 | 249 : 9 | Canada | US | Improper opinion (legal interpretation) | | |
| 37 | Weisz, Mark | 112:4 | 112:10 | Canada | EMEA | Improper opinion (legal interpretation) | | |
| 38 | Weisz, Mark | 112:11 | 112:16 | Canada | EMEA | Subjective intent | | |
| 39 | Weisz, Mark | 112:17 | 113:2 | Canada | EMEA | Subjective Intent | | |
| 40 | Weisz, Mark | 113:7 | 113:13 | Canada | EMEA | Improper opinion (legal interpretation) | Joint Administrators' Post-Hearing Submission Regarding Allocation of the Proceeds of the Nortel Asset Sales (P. 48 - footnote 164); Day 1 Trial Transcript (EMEA Oral Opening Submissions) (51:10-51:15) | Weisz tetsified that the MRDA provided that the residual-profit participants should benefit from their contribution to research and development, commensurate with that contribution. Weisz' testimony was used, in part, to support the following statement: "Mr. Weisz, who was integrally involved in preparing the Functional Analysis, confirmed at his deposition that the RPEs were the risk takers in the Nortel Group who had economic rights to exploit the Group's IP and would expect to share in the proceeds of sale of that IP." |
| 41 | Weisz, Mark | 118:10 | 118:15 | Canada | EMEA, UKPC | Improper opinion (legal interpretation) | Joint Administrators' Prehearing Brief Regarding Allocation of the Proceeds of the Nortel Asset Sales (P. 46 - footnote 149); Joint Administrators' Post-Hearing Submission Regarding Allocation of the Proceeds of the Nortel Asset Sales (P. 51 - footnote 177); | Weisz' testimony was used, in part, to support the following statement: "NNL did not receive any increased share of residual profits under the RPS methodology because it held legal title to and administered the Nortel Group's IP". Weisz was also quoted as testifying that under the MRDA, "legal IP ownership was irrelevant". |
| 42 | Weisz, Mark | 118:16 | 118:24 | Canada | EMEA, UKPC | Subjective intent | Joint Administrators' Prehearing Brief Regarding Allocation of the Proceeds of the Nortel Asset Sales (P. 46 - footnote 149); Joint Administrators' Post-Hearing Submission Regarding Allocation of the Proceeds of the Nortel Asset Sales (P. 51 - footnote 177); | Weisz' testimony was used, in part, to support the following statement: "NNL did not receive any increased share of residual profits under the RPS methodology because it held legal title to and administered the Nortel Group's IP". Weisz was also quoted as testifying that under the MRDA, "legal IP ownership was irrelevant". |
| 43 | Weisz, Mark | 118:25 | 119:5 | Canada | EMEA, UKPC | Improper opinion (legal interpretation) | Joint Administrators' Prehearing Brief Regarding Allocation of the Proceeds of the Nortel Asset Sales (P. 46 - footnote 149); Joint Administrators' Post-Hearing | Weisz' testimony was used, in part, to support the following statement: "NNL did not receive any increased share of residual profits under the RPS methodology because it held legal title to and administered the |

| | Deponent | Beginning | End | Objecting Party | Designating Party | Objections | Brief Cited / Oral Opening Submissions | Summary of Reference |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Submission Regarding Allocation of the Proceeds of the Nortel Asset Sales (P. 51 - footnote 177); | Nortel Group's IP". Weisz was also quoted as testifying that under the MRDA, "legal IP ownership was irrelevant". |
| 44 | Weisz, Mark | 249:12 | 249:15 | Canada | EMEA | Subjective intent | | |
| 45 | Weisz, Mark | 269:17 | 270:12 | Canada | EMEA | Subjective intent | | |
| 46 | Wood, Jeffrey | 153:10 | 154:4 | Canada | EMEA | Improper opinion (legal interpretation) | | |

**EXHIBIT OBJECTIONS**

| | Trial Exhibit # | Objecting Party | Designating Party | Objection | Brief Cited | Summary of Reference | | |
|---|---|---|---|---|---|---|---|---|
| 47 | TR50591 | Canada | US | Improper opinion (legal interpretation) | | | | |
| 48 | TR21145 | Canada | US | Improper opinion (legal interpretation) | | | | |