Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

**SUPPLEMENTAL CONSOLIDATED PROPOSED FINDINGS OF FACT**
**OF THE MONITOR AND CANADIAN DEBTORS**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Benjamin Zarnett**  LSUC#: 17247M
bzarnett@goodmans.ca
**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Peter Ruby**  LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello** LSUC#: 38390C
jpasquariello@goodmans.ca
Tel:    (416) 979-2211
Fax:    (416) 979-1234
*Lawyers for the Monitor*

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canada Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

**Derrick Tay**  LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam**  LSUC#: 46735J
jennifer.stam@gowlings.com
Tel:    (416) 862-5691
Fax:    (416) 862-7661

*Lawyers for the Canadian Debtors*

September 10, 2014

**BUCHANAN INGERSOLL & ROONEY PC**
919 North Market Street, Suite 1500
Wilmington, Delaware  19801

**Mary F. Caloway**  (No. 3059)
mary.caloway@bipc.com
**Kathleen A. Murphy**  (No. 5215)
kathleen.murphy@bipc.com
Tel:    (302) 552-4200
Fax:    (302) 552-4295

*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtor*

**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, NY  10020

**Jacob S. Pultman**
jacob.pultman@allenovery.com
**Paul B. Keller**
paul.keller@allenovery.com
**Laura R. Hall**
laura.hall@allenovery.com
**Ken Coleman**
ken.coleman@allenovery.com
**Daniel Guyder**
daniel.guyder@allenovery.com
Tel:    (212) 610-6300
Fax:    (212) 610-6399

*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtor*

**TO:    THE CORE PARTIES SERVICE LIST**

---

[1]    The US Debtors in these chapter 11cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9630), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226)

# TABLE OF CONTENTS

A.    Pre-Petition ....................................................................................................2

    (a)    Nortel's Corporate Structure and Organization ....................................2
        (i)    Overview ...................................................................................2
        (ii)    Nortel's Lines of Business ........................................................4
        (iii)    Nortel's Corporate and Reporting Structure .............................6
            1.    The Role of NNC/NNL within the Nortel Group ...........6
            2.    The Role of Nortel Subsidiaries.....................................7
        (iv)    Nortel's Operations were Integrated ........................................8
            1.    Global Sales Teams.........................................................9
            2.    Global Administrative Functions....................................9
        (v)    Finance Functions ..................................................................11
            1.    Cash Management..........................................................11
            2.    Access to Capital Markets .............................................11
            3.    Other Intercompany Support..........................................13

    (b)    Research & Development .....................................................................16
        (i)    The Importance of R&D to Nortel...........................................16
        (ii)    Canada's Role in R&D and the Importance of Ottawa.............17
            1.    Nortel's R&D Headquarters ..........................................18
            2.    Canada Conducted the Most Substantive and Substantial
                Amount of Nortel's R&D ...............................................18
            3.    Canada's R&D Employees .............................................19
        (iii)    Nortel R&D Outside Canada—Organic and by Acquisition....19
            1.    Acquisitions of R&D Labs Globally...............................20
            2.    The Nature of NNI's R&D .............................................21
        (iv)    R&D Decision-Making.............................................................22
        (v)    R&D Spend and Patents by Geography.....................................25

    (c)    Intellectual Property............................................................................26
        (i)    Not All R&D Was Yielded Nortel IP .......................................26
        (ii)    IP Ownership and Licenses......................................................28
            1.    NNL's Rights Under the MRDA.....................................29
            2.    The Patents Were Registered in NNL's Name ...............31
            3.    NNL Made Patent-Related Decisions.............................33
            4.    NNL was the Licensor in Patent License Agreements .................35

    (d)    Transfer Pricing Arrangements including CSAs and the MRDA.........35

    (e)    The Cost Sharing Agreements .............................................................38
        (i)    CSA History.............................................................................38
        (ii)    IP Ownership Under the CSAs .................................................43
        (iii)    Licenses Under the CSAs ........................................................44
        (iv)    CSA Tax Guidance ..................................................................46

    (f)    The RPSM and MRDA.........................................................................48
        (i)    Background to the RPSM .........................................................48
        (ii)    Execution of the MRDA ..........................................................51
        (iii)    MRDA Amendments and Related Agreements.........................52

|  |  | (iv) | Intangibles and the MRDA | 55 |
|  |  | (v) | The RPSM Allocation Key | 58 |
|  |  | (vi) | RPSM Involved Sharing Both Profits and Losses | 58 |
|  |  | (vii) | RPSM Does Not Apply to Asset Sales Proceeds | 59 |
|  |  | (viii) | Ad Hoc Application of RPSM to Royalties or Other Proceeds | 60 |
|  |  | (ix) | RPSM Amortization and "Look Back" Period | 62 |
|  |  | (x) | RPE Revenue and Profit/Loss Sharing | 66 |

(g)    The APA Process and Representations to Tax Authorities ........68
    (i)   Background ........68
    (ii)   Choice of RPSM ........69
    (iii)   Approval of RPSM ........72
    (iv)   Preparation for APA "Kick-Off" Meeting ........73
    (v)   Correspondence with Tax Authorities in Support of First RPSM APA Applications ........75
    (vi)   "Beneficial" and/or "Economic Ownership" ........79
    (vii)   Tax Authorities' Responses to First RPSM APA Applications ........82
    (viii)   Second RPSM APA Applications ........82
    (ix)   Resolution of APA Applications ........84

B.   Post-Petition ........87

   (a)   Commencement of Proceedings ........87

   (b)   Post-Petition Transfer Pricing Documentation ........90

   (c)   Decision to Liquidate ........91
    (i)   Nortel's Restructuring Options ........91
    (ii)   Verizon Chooses Another LTE Provider ........92
    (iii)   Nortel Decides to Liquidate ........93
    (iv)   NNI Did Not Pursue a Stand-Alone Restructuring ........93

   (d)   IFSA ........96
    (i)   Background to the IFSA ........96
    (ii)   IFSA Provisions ........98
    (iii)   Reservation of Rights, Deferral of Allocation and Completion of Sale Transactions Under the IFSA ........100
    (iv)   The IFSA Approval Motion ........103
    (v)   Risk in Reservation of Rights ........104

   (e)   The FCFSA ........105

   (f)   Business Sales ........106
    (ii)   The Business Sales Were a Joint Effort of the Three Estates ........108
    (iii)   The LOB Carve-Out Processes ........109
    (iv)   PPAs Were Prepared for Financial Reporting Purposes ........118

   (g)   Residual Patent Portfolio ........120
    (i)   After the Business Sales ........120
    (ii)   IP Steering Committee ........121
    (iii)   IP Co. Models ........124
    (iv)   The "Idea" of IP Co. Was Never Accepted or Implemented ........128
    (v)   Residual IP Sale Stalking Horse Agreement ........130

(vi)    The Rockstar Transaction .......................................................................134

(h)    IP Sold..........................................................................................................137

(i)    Expansion of Monitor's Powers....................................................................138

(j)    Allocation Litigation .....................................................................................140

(i)    Monitor Representatives ........................................................................144

The Monitor and Canadian Debtors set forth herein a consolidated set of proposed findings of fact, consisting of the proposed findings of fact proffered in the Initial Post-Trial Brief of the Monitor and Canadian Debtors (which were all the facts necessary to establish the Monitor and Canadian Debtors' allocation position as an affirmative case), supplemented with facts responsive to or necessary for context for the findings of fact proposed by other parties. For ease of reference, headings have been added and revised, paragraph numbers from the Initial Post-Trial Brief are included in brackets and new proposed findings of fact are indicated by bold text.   These Supplemental Consolidated Proposed Findings of Fact attempt to address the most egregious inaccuracies and omissions from the findings of facts proposed by other parties, but the inclusion of any matter as supplementation is not an admission of relevance and the failure to address any particular factual assertion is not an admission of accuracy or relevance.   In particular, the expert testimony adduced in reports and at trial is not fully canvassed herein.

As well, for convenience, Schedule A hereto is a glossary of terms used in this document and Schedule C hereto is a copy of the table "Summary of Monitor's Reports" previously attached to the Initial Post-Trial Brief of the Monitor and Canadian Debtors.

- 2 -

## A.    Pre-Petition

### (a)    Nortel's Corporate Structure and Organization

#### (i)    Overview

1.      [17.] As of January 14, 2009, Nortel Networks Corporation ("NNC"), a publicly-traded Canadian company, was the indirect parent of more than 130 subsidiaries, located in more than 100 countries, collectively known as the "Nortel Group" or "Nortel".[1]

2.      [18.] NNC was the successor of a long line of technology companies, always headquartered in Canada, dating back to the founding of Bell Telephone Company of Canada in 1883.[2]

3.      [19.] NNC's principal, direct operating subsidiary, also a Canadian company, was Nortel Networks Limited ("NNL"), which in turn was the direct or indirect parent of operating companies located around the world.[3]

4.      [20.] Together with NNL, the principal companies that performed research and development ("R&D") were Nortel Networks Inc. ("NNI", a U.S. company), Nortel Networks (UK) Ltd. ("NNUK", a United Kingdom company), Nortel Networks S.A. ("NNSA", a French company) and Nortel Networks Ireland ("NN Ireland", an Irish company).   These were known

---

[1] TR43999 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2008) p. 1, Exhibit 21.  A corporate chart showing the relevant corporate entities and the Debtor Estate to which each belongs is attached as Schedule "B".

[2] TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) para. 12

[3] TR43999 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2008) p. 1; TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 32, 36

as Residual Profit Entities ("RPEs") due to their participation from 2001 in a residual profit pool in connection with Nortel's transfer pricing arrangements.[4]

5.      [21.] Other operating companies performed sales and distribution functions and were known as Limited Risk Distributors or Entities ("LRDs").[5]  LRDs were incorporated in most of the countries where Nortel products were sold, including in the Europe, Middle East and Africa ("EMEA") region.[6]

6.      [22.] The Nortel Group was organized on a matrix basis, where each entity was integrated into regional and product line management structures to share information and perform R&D, sales and other common functions across geographic boundaries and across legal entities.  The matrix structure was designed to enable Nortel to function more efficiently, drawing on employees from different functional disciplines worldwide, allowing them to work together to develop products and attract and provide service to customers, fulfilling their demands globally.[7]

---

[4] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 1-3; TR21003 (MRDA and addenda)

[5] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 1-3.  The term LRDs here include other Cost-Plus Entities that performed work for other members of the Nortel Group on a "cost-plus" basis, as well as entities that were created as joint ventures and subsequently became wholly owned by the Nortel Group, which also had different transfer pricing arrangements.

[6] See e.g., TR40150 (2001 Distribution Agreement between NNL and NN Austria, effective January 1, 2001); TR40151 (2001 Distribution Agreement between NNL and NN Portugal, effective January 1, 2001); TR40155 (2001 Distribution Agreement between NNL and NN Spain, effective January 1, 2001); TR40122 (2001 Distribution Agreement between NNL and NN Asia, effective January 1, 2001)

[7] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 22-28; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 31-38

7.      [23.] The matrix structure was reflected in the Nortel Group's R&D, sales organization, distribution channels and transfer pricing arrangements.[8]

8.      [24.] As a result of Nortel's matrix structure, no single Nortel entity or region – not NNUK or any of the other EMEA Debtors[9] in Europe, not NNI or any of the other U.S. Debtors[10] in the United States, and not even NNL or any of the other Canadian Debtors[11] in Canada – was able to provide the full line of Nortel products and services, including R&D capabilities, on a stand-alone basis.[12]

### (ii)    *Nortel's Lines of Business*

9.      [25.] As of January 2009, Nortel's lines of business ("LOBs") were:

        (a)     Carrier Networks – wireless networking solutions for providers of mobile voice, data and multimedia communications services over technologies including:

---

[8] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 22-28; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 45-52

[9] The EMEA Debtors are the 23 Nortel entities that, on January 15, 2009, were granted administration orders in the U.K. under the *Insolvency Act, 1986* and whose registered offices were in England, Europe, the Middle East and Africa, including NNUK, NNSA and NN Ireland.

[10] The U.S. Debtors are the U.S. Nortel companies that, on January 14, 2009, filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware for protection under Chapter 11 or Title 11 of the U.S. *Code*, being NNI and several of its U.S. affiliates.

[11] The Canadian Debtors are the Canadian Nortel companies that, on January 14, 2009, filed for and obtained protection under the *Companies' Creditors Arrangement Act* from the Ontario Superior Court of Justice being, NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation.

[12] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 7; TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 23-28; TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 8-13, Appendix B (p. 8-13, 72 of 209 of PDF)

      (i)        Global System for Mobile Communications ("GSM");

      (ii)       Code Division Multiple Access ("CDMA");

      (iii)     Carrier Voice Over Internet Protocol Applications Solutions ("CVAS"); and

      (iv)     the development of long-term evolution ("LTE") wireless technology;

(b)     Enterprise Solutions – enterprise communications solutions addressing the headquarters, branch and home office needs of large and small businesses; and

(c)     Metro Ethernet Networks – optical networking and carrier grade ethernet data networking solutions, including:

      (i)        Carrier Ethernet switching products;

      (ii)       optical networking products; and

      (iii)     multi-service switching products.[13]

10.     [26.] At the time the EMEA, U.S. and Canadian Debtors (collectively, the "Debtors") filed for creditor protection in January 2009, only the GSM and CDMA lines of business were

---

[13] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 9-13 (*but note*, at para. 9, that "[a] fourth business segment, Global Services (essentially Nortel's support and services arm), was a separate reportable segment until December 31, 2008, before being integrated into the other LOBs.")

profitable.[14]  Overall, Nortel was losing vast sums of money, its customers were, in large part, no longer supporting it, and NNC had, in the fall of 2008, written off all of its goodwill.[15]

### (iii)    Nortel's Corporate and Reporting Structure

11.    **The corporate separateness of each Nortel subsidiary was respected at all times, and each was governed in accordance with local law by a board of directors aware of and compliant with their fiduciary duties to the subsidiary.[16]**

1.    The Role of NNC/NNL within the Nortel Group

12.    **As with any multinational corporation, executive management functions were carried out by the parent corporations (NNC and NNL) in Canada.[17]  As Nortel told the IRS and CRA,**

> **NNL performs management/administrative functions that benefit the other residual participants.  These functions include, Senior management roles/team (e.g. CEO, CFO, CTO); Finance (Tax, Treasury, Investor Relations, Customer financing, Internal Audit); Legal Services; Marketing and Advertising; Human Resources; Information Services; and, Logistic and transportation.  To various degrees, the other residual participants also perform many or all of**

---

[14] TR00042 (Exh. 42, Expert Report of Philip Green, Reissued February 28, 2014) Appendices A-E Carve-out statements

[15] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) paras. 21, 47; TR46789 (Verizon Press Release regarding Global LTE Ecosystem, February 17, 2009); TR43999 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2008)

[16] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 39; TR00013 (Exh. 13, Affidavit of Gordon Davies Affidavit, April 11, 2014) paras. 18-23

[17] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 5; TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) Appendix A p. 11 & Appendix E p. 7

the above functions.  However, there is no duplication of services by NNL.[18]

13.    **Within the Nortel Group, the executive officers, including the President and CEO, CFO, Controller and Treasurer, were officers of NNC and/or NNL, even those who were employed by NNI because they lived in the U.S. (though many, including George Riedel, commuted to Canada during the week).[19]**

14.    **The heads of the product lines and the regional senior management all reported to the CEO and group executive management in Canada.[20]**

            2.    The Role of Nortel Subsidiaries

15.    **NNL's subsidiaries, including the RPEs, existed primarily as legal entities and were not "free-standing entities" with their own "strategic process" for carrying out geographically independent businesses—rather Nortel's business was a global one.[21]**

---

[18] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and CCRA, September 2003) at 43-44

[19] TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) Appendix A p. 11 & Appendix E p. 7; George Reidel Deposition, October 10, 2014, p. 31:3-7 ("I still lived in Boston, but commuted to Toronto where my office was."; TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) n. 16

[20] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 10-12, 17, 22-23; TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 114; John Roese Deposition, November 12, 2013, p. 284:7-9

[21] Peter Currie Trial Testimony, Day 3, May 14, 2014, p. 539:20-540:11, 598:15-24; TR00013 (Exh. 13, Affidavit of Gordon Davies, April 11, 2014) para. 39 ("[Products] were conceived, developed, paid for, manufactured, marketed and sold as part of a cohesive global effort, using the resources of Nortel entities worldwide."); TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 36 ("Because Nortel's business was global in scope, NNL incorporated subsidiaries in a number of locations around the world.  With the exception of certain joint

16.    **With respect to the functions all RPEs (also called Integrated Entities ("IEs") and "Participants" in the MRDA) performed to some degree, the RPEs "perform[ed] the functions of R&D, manufacturing support, distribution and extraterritorial services to *varying degrees* in a very united and *reliant* manner."[22]**

17.    **In particular, the RPEs other than NNL depended on NNL for the performance of centralized global functions and the senior management of the Nortel Group.[23]**

18.    **The non-NNL RPEs ("Licensed Participants" in the MRDA), including NNI, lacked sufficient treasury and financial reporting capabilities to operate on their own.[24]**

*(iv)    Nortel's Operations were Integrated*

19.    **As set out above, Nortel's matrix structure meant that operations and most functions were integrated globally.  Key areas of integration included global sales teams, administrative functions, tax and treasury, global operations, IT and research and development (R&D is discussed below in "Research & Development").**

---

ventures, these subsidiaries were all directly or indirectly wholly-owned by NNL, which was in turn wholly owned by NNC.")

[22] TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) at 6 (emphases added); see also TR00013 (Exh. 13, Affidavit of Gordon Davies Affidavit, April 11, 2014) para. 39 ("The various entities within Nortel also operated with a high degree of integration and interdependence")

[23] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 5

[24] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 63; TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) at Appendix E, p. 7; TR31443 (Witness Statement of Sharon Lynette Rolston, January 14, 2009) paras. 15(i), 85; TR00015 (Exh. 15, Affidavit of Paviter Binning, April 24, 2014) para. 5

1.    Global Sales Teams

20.    **Nortel had sales teams located in regions around the world to serve customers located in those regions.  However, global support teams were assembled to serve Nortel's largest customers.[25]**

2.    Global Administrative Functions

21.    **Nortel's Global Operations performed global administrative services for the Nortel Group.  NNL contributed to the global operations including as follows:**

(a)    **As of December 31, 2007, NNL employed 972 Global Operations employees, representing 38% of North American Global Operations employees;[26] and**

(b)    **Extensive logistical and operational functions, such as all purchasing for CDMA, MEN and Enterprise products ordered by U.S. customers, were performed by NNL.[27]**

22.    **The leader of Global Operations reported to CFO Pavi Binning, who was located in Canada.[28]**

23.    **In the post-filing period, global operations transition into what became known as "Nortel Business Services" or "NBS".  NBS was not a legal entity, but rather referred to a**

---

[25] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 31; Pascal Debon Deposition, November 25, 2013, p. 74:4-14, 79:7-10, 79:19-80:6, 93:5-24, 173:20-174:5

[26] TR00018 (Exh. 18, Declaration of Christopher Ricaurte, April 11, 2014) para. 7

[27] TR21539 (Affidavit of John Doolittle, January 14, 2009) para. 88

[28] TR00018 (Exh. 18, Declaration of Christopher Ricaurte, April 11, 2014) para. 30

group comprised of employees of the parties that were obligated to provide services under the Transition Services Agreements.[29]

24.    **Canadian participation in NBS was even greater than in Global Operations and included:**

(a)    **Over 500 Canadian employees were engaged in providing services through NBS,[30] comprising 47% of the general management team, including Allan Bifield, the leader of the finance team, and Elena King, the leader of the human resources team, 44% of the IT team and 21% of the supply chain services team;[31] and**

(b)    **The largest portion of the billings generated by NBS resulted from the provision of IT services, a function to which the Canadian Debtors contributed more employees than the U.S. Debtors.[32]**

25.    **The employers of NBS personnel have already been compensated for their services by the business line purchasers.[33]**

---

[29] Christopher Ricaurte Trial Testimony, Day 5, May 20, 2014, p. 1223:2-1224: 21; 1226:19-1227: 23

[30] TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) para. 19

[31] TR00018 (Exh. 18, Declaration of Christopher Ricaurte, April 11, 2014) para. 30

[32] TR00009A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) para. 19

[33] TR00009A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) para. 29; TR44141 (CDMA Transition Services Agreement, November 13, 2009) s. 5(f); TR47543 (Enterprise Transition Services Agreement, December 18, 2009) s. 5(e); TR48119 (MEN Transition Services Agreement, March 19, 2010) ss. 4(a)(iii), 4(e)(ii)

*(v)    Finance Functions*

1.    Cash Management

26.    **Because of the way cash was managed in the group, large amounts of cash would be held by a single entity for use by various entities (including itself) as needed. NNUK functioned as one such a "cash-hub". This meant that when there was surplus cash in EMEA, NNUK could deploy that cash to its best uses.[34]**

27.    **NNUK, like other Nortel subsidiaries, with the approval of its directors on advice of outside counsel, transferred surplus cash to other entities, including NNL, through intercompany loans.[35]**

28.    **NNUK's directors had (and exercised) the right to refuse a request to transfer surplus cash.[36]**

2.    Access to Capital Markets

29.    **The Corporate Treasury Team was located in Canada and was responsible for long-term funding of Nortel including raising equity and public debt, performance bonding and interfacing with ratings agencies.[37]**

---

[34] TR00007A (Affidavit of Michael McCorkle, April 11, 2014) para. 54(f); TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) paras. 32-34

[35] Sharon Rolston Deposition, November 20, 2013, p. 229:15-230:3; TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 75; TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 32-35; TR00007A (Affidavit of Michael McCorkle, April 11, 2014) paras. 17-21

[36] Sharon Rolston Deposition, November 20, 2013, p. 229:15-230:3; TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 38; TR00007A (Affidavit of Michael McCorkle, April 11, 2014) paras. 20-21

- 12 -

30.    **Prior to 2006, Nortel's public debt was issued by Nortel Canada without any guarantees.[38]**

31.    **While NNI borrowed money in 2006 ("2006 Credit Facility") to assist NNL in repaying maturing bonds, the 2006 Credit Facility was a bridge facility until NNL secured further financing, which it did in June 2006 with a further NNL bond issuance.[39]  At that time, NNL repaid the 2006 Credit Facility with the proceeds from the June 2006 bond issuance.[40]**

32.    **The 2006 bond issuance was unconditionally guaranteed by NNC and conditionally guaranteed by NNI.[41] The terms of the NNI guarantee were such that it would cease to exist if NNL's credit rating improved.[42]**

33.    **The guarantee was seen as a value largely because of the tangible assets that NNI carried on its balance sheet and the fact that NNI was domiciled in the same place where the lenders were (i.e. the United States).[43]**

---

[37] TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) Appendix E, p. 7; John Williams Deposition, October 8, 2013, p. 23:16-24:9; TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 63

[38] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 90

[39] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 91

[40] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 91

[41] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 90

[42] *See*, *e.g.*, TR40180 (NNC Prospectus, $1.15 billion convertible senior notes) at 10 (pg. 17 of PDF) ("Should the ratings on the notes increase to investment grade, NNI's guarantee will be released."); see also John Williams Deposition, October 8, 2013, pp. 197:22-199:16 ("[This] was a structural feature that we added in the event that Nortel would go all the way from single B back to investment grade, then the guarantee would fall away.")

34.    **Based on the trading prices of the guaranteed versus non-guaranteed bonds, bondholders trading the bonds in the market appear not to have given much value to the NNI guarantee.**[44]

35.    **NNL bonds issued in 2007 and 2008 also were unconditionally guaranteed by NNC and conditionally guaranteed by NNI.**[45]

36.    **There is no evidence that NNL could not have successfully issued bonds in 2006, 2007 and 2008 without NNI's guarantee, though the guarantee helped NNL obtain better terms.**[46]

      3.    <u>Other Intercompany Support</u>

37.    **The $2 billion revolving credit facility (the "NNI Revolver") between NNI and NNL was source of support so that NNL could meet "its working capital requirements pending receipt of transfer pricing payments",**[47] **which were due primarily to NNL from NNI.**[48]

---

[43] TR00001 (Exh. 1, Affidavit of Peter Currie April 11, 2014) para. 90

[44] Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1105:5-16, 1106:5-1107:18

[45] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 90

[46] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 90

[47] U.S. Interests' PFOFCOL, p. 23, para. 89

[48] TR49192 (2001 Transfer Pricing Calculation) at "RONA" Tab; TR49187 (2002 Transfer Pricing Calculation) at "RONA" Tab; TR49188 (2003 Transfer Pricing Calculation) at "RONA" Tab; TR49194 (2004 Transfer Pricing Calculation) at "Profit Split Profit" Tab; TR49190 (2005 Transfer Pricing Calculation) at "Profit Split Profit" Tab; TR49191 (2006 Transfer Pricing Calculation)  at "RPS Calculation" Tab; TR49193 (2007 Transfer Pricing Calculation) at "RPS Calculation" Tab; TR49189 (2008 Transfer Pricing Calculation) at "FY RPS Calc" Tab

**Thus, the NNI Revolver ensured efficient use of surplus funds held by NNI but not required for its operations[49] and accelerated NNL's receipt of moneys it was owed.**

38.    **The revolving credit facility was subsequently reduced to $1 billion because NNI did not have the funds to provide up to $2 billion credit to NNL[50] and at the time of filing, the balance owing was less than $300 million.[51]**

39.    **When Nortel Networks Capital Corporation ("NNCC", a subsidiary of NNI and U.S. Debtor[52]) issued bonds, an unconditional NNL guarantee was required.[53]**

40.    **NNL would sometimes provide lease, bonding and other guarantees to support its subsidiaries.[54]**

---

[49] TR00007A (Exh. 7, Affidavit of Michael McCorkle, April 11, 2014) para. 33

[50] TR50773 (Revolving Loan Agreement dated March 22, 2006) at NNI_00904896-7

[51] TR21539 (Affidavit of John Doolittle, January 14, 2009) para. 98

[52] *In re Nortel Networks Capital Corp.*, No. 09-10139 (Bankr. D. Del.)

[53] TR43999 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2008) p. 168

[54] *See, e.g.*, TR49714 (2011 Nortel Networks Corporation Form 10-K) at Note 14; TR49562 (Guarantee dated December 21, 2007 by Nortel networks Limited for Nortel Networks UK Pension Trust Limited); TR21143 (Guarantee dated November 21, 2006 by Nortel Networks Limited for Nortel Networks UK Pension Trust Limited)

41.     **NNL also recapitalized its subsidiaries when the "dot com" bust of 2001 threatened their solvency:**

(a)     **In December 2001, NNL recapitalized NNUK by purchasing of 700 million shares for £1 each,[55];[56]**

(b)     **In 2002, NNL made equity injections (directly and through its subsidiary Nortel Networks International Finance and Holdings B.V.) into NNSA of over €200 million in cash and over €280 million in intercompany notes payable;[57] and**

(c)     **In December 2002, NNL extended a €200 million loan to NNSA, of which €150 million of the loan subsequently was converted to equity in December 2003.[58]**

42.     **NNL provided guarantees in respect of certain NNUK pension funding obligations. The UK Pension Trustee understood that, other than NNL's guarantees, NNUK alone was responsible for funding obligations with respect to the UK Pension Scheme.[59]**

---

[55] TR44458 (NNUK Report and Financial Statements dated December 31, 2001) p. 1; TR33042 (Feb. 28, 2002 Email from T. Mcardle)

[56] [omitted]

[57] TR31574 (NNSA Financial Statements for the year ended December 31, 2003) p. 31

[58] TR32085 (NNSA Loan Agreement, September 9, 2002); TR31574 (NNSA Financial Statements for the year ended December 31, 2003) p. 30

43.     **Other NNL guarantees included lease guarantees for NNI's research facilities in Billerica, Massachusetts; Research Triangle Park, North Carolina; and Richardson, Texas, NNUK's research facilities at Maidenhead and Harlow and NNSA's research facilities at Chateaufort and Magny-Les-Hameaux.[60]**

44.     **NNL and NNC often provided comfort letters to assist subsidiaries in establishing credit facilities and, from time to time, guaranteed such facilities on a no-fee basis.[61]**

(b)     **Research & Development**

        (i)     *The Importance of R&D to Nortel*

45.     [27.] R&D was the primary driver of Nortel's value and profit.[62]  All of the RPEs accepted this in the MRDA, which explicitly stated that the transfer pricing methodology it adopted "acknowledges the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property."[63]  Indeed, even the U.S. Debtors' expert, Jeffrey Kinrich, admitted on cross-examination that in 2009, Nortel's past

---

[59] Hitesh Mehta Deposition Transcript, November 7, 2013, 48:17-48:22; David Davies Deposition Transcript, October 23, 2013, 53:9-25. There is a dispute about whether the obligations under the Funding Guarantee have been triggered and, if so, the extent of the obligations guaranteed which is to be determined by the Canadian Court in the pension claims trial.

[60] TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 24, 2014) para. 23

[61] Mary Anne (Pahapill) Poland Deposition, October 3, 2013, p. 298:2-16

[62] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 28; TR11084 (Nortel Networks Functional Analysis for the years ended December 31, 2000-2004) p. 3 (p. 17 of 192 of PDF), *see also* p. 6, 17-18, 29, 91, 94; TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 11 (p. 11 of 209 of PDF), Appendix C (p. 2) (p. 104 of 209 of PDF)

[63] TR21003 (MRDA and addenda) Schedule A

R&D was the "single most important fact that drove Nortel's ability to generate its 2009 revenues".[64]  As a result, Nortel spent significant amounts on R&D; in 2004, for example, Nortel spent more on R&D as a percentage of revenue than its competitors.[65]

46.     [28.] In addition to developing new and improved products and services, R&D played a critical role in the sales process of each business line.[66]  For example, prospective customers were given tours of the Ottawa R&D facility because of the "shock and awe" of its scale and magnitude of facilities and demonstrated R&D capability, and sales presentations were often made jointly by both sales teams and R&D teams.[67]

>          (ii)     *Canada's Role in R&D and the Importance of Ottawa*

47.     [29.] The Canadian Debtors were massive contributors to R&D, although by no means the only important contributor.

---

[64] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4308:20-4309:10

[65] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 28, citing TR44900 (Email regarding Competitor Comparisons, February 19, 2004)

[66] Gregory Mumford Deposition, October 24, 2013, p. 202:19-204:15, regarding TR21226 (Email discussing Harlow Input, October 28, 2003)

[67] Darryl Edwards Deposition, October 31, 2013, p. 60:4-61:18; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 28-30

- 18 -

1.      Nortel's R&D Headquarters

48.    **Nortel's R&D headquarters were located at the Canadian Carling Campus in Ottawa which was its largest R&D facility.[68]  The CTO was based at Carling.[69]**

49.    **When Nortel wanted to impress customers, they typically were brought to Carling because of its size and impressive nature.  Important customers were brought for tours and discussed future products based on advanced technology.[70]**

2.      Canada Conducted the Most Substantive and Substantial Amount of Nortel's R&D

50.    **Significant amounts of Nortel's R&D took place in Canada (including a substantial portion of the CDMA R&D) and almost all of the R&D for MEN/Optical and LTE as well as Enterprise Voice.[71]**

51.    [37.] The Ottawa facilities performed most of the advanced research, as well as R&D for all of the LOBs; other facilities typically focused on a narrower range of technologies.[72]

---

[68] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 117; TR21539 (Affidavit of John Doolittle, January 14, 2009) para. 31; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 15-16; Darryl Edwards Deposition, October 31, 2013, p. 60:4-61:18

[69] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 114; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 10-12, 17; Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 636:16-637:19

[70] Darryl Edwards Deposition, October 31, 2013, p. 60:4-61:18; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 29

[71] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) paras. 7-8; TR00005 (Exh. 5, Reply Affidavit of Brian McFadden, April 25, 2014) para. 4; TR43850 ("Enterprise Solutions Project Equinox" Presentation, March 2009) p. 45; Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p. 1649:14-1651:14 (At the time of MEN Business Sale, there were 981 MEN R&D employees in Canada (and only 15 in the U.K.) who were necessary to run the business.)

52.     **The U.S. Debtors concede that the majority of Nortel's R&D was performed in Canada.**[73]

3.     Canada's R&D Employees

53.     **The majority of R&D employees worked in Canada.**[74] **Even as of January 14, 2009, Canada had 3,319 R&D employees, the U.S. 1,848, the U.K. 113, France 261 and Ireland 157.**[75]

54.     [42.] Approximately 50 percent of all patents and patent applications in NNL's portfolio had primary inventors who worked in a Canadian entity's research laboratory.[76]

(iii)     *Nortel R&D Outside Canada—Organic and by Acquisition*

55.     [30.] Before the 1980s, all of Nortel's R&D was performed in Ottawa – R&D which led to revolutionary telecommunications products that established Nortel's reputation.[77]

56.     **Prior to NNC (or its predecessor) giving NNI access (by a license) to Nortel technology, it had none of its own.**[78]

---

[72] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 15; TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 8; TR11279 (Welcome to Ottawa PowerPoint, May 2, 2007) Slide 3 (p. 4); TR21188 (PowerPoint regarding Global R&D Investment Strategy and Recommendations for Nortel Networks) Slide 4 (p. 4)

[73] U.S. Debtors' Opening Statement, Day 1, May 12, 2014, p. 188:17-19

[74] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 15; TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 7; Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1061:21-25

[75] TR44075 (2009 NNL Transfer Pricing Report) p. 6

[76] TR00006 (Exh. 6, Affidavit of Angela de Wilton, April 11, 2014) para. 14

[77] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 16

- 20 -

1.    Acquisitions of R&D Labs Globally

57.    [31.] Subsequently, Nortel opened R&D facilities in other jurisdictions, seeding their

work with the foundational R&D performed and resulting intellectual property ("IP") created in

Ottawa, which remained the largest Nortel R&D center through 2009.[79]  NNL's Ottawa campus

was home to the largest concentration of Nortel's R&D employees, nearly all of whom were

employed by the Canadian Debtors.[80]

58.    [32.] Nortel also acquired numerous technology companies during the 1990s and early

2000s (often paying for those corporate acquisitions with NNC shares), and merged their R&D

organizations into those of the Nortel subsidiaries operating in their jurisdictions, such as the

acquisition in the United States of Bay Networks in June 1998 for $9.06 billion, which added a

substantial business and R&D facilities to NNI.[81]

---

[78] Clive Allen Trial Testimony, Day 3, May 14, 2014, p. 612:4-7; 622:21-25

[79] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 16; TR21188 (PowerPoint regarding Global R&D Investment Strategy and Recommendations for Nortel Networks) Slide 4 (p.4), showing R&D locations for employees as of 2002; TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) paras. 7-8; TR44077 (PowerPoint for Nortel Pre-Filing Conference with CRA, October 2, 2007) Slide 5 (p. 5); Gregory Mumford Deposition, October 24, 2013, p. 101:9-14; Paul Karr Deposition, November 14, 2013, p. 118:3-9; TR11279 (Welcome to Ottawa PowerPoint, May 2, 2007) Slide 3 (p. 4)

[80] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 15; TR44794 (Email regarding Draft Note to CIOs, November 11, 2005)

[81] TR40259 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2000) p. F14-F16

59.     The acquisitions by NNC within the U.S. alone (which became part of NNI) totaled over $25 billion.[82]  The acquisition of Bay Networks marked a "huge change" for NNI.[83]

2.     The Nature of NNI's R&D

60.     NNI's labs principally performed R&D for the CDMA and part of the Enterprise businesses.[84]

61.     NNI did not have the R&D capability to operate a separate stand-alone business.[85] It was not conducting much or any LTE (next generation) or advanced technology research.[86]

62.     Although CDMA was the largest revenue-generating business, it was a legacy business that was going to be replaced.  Nortel was already having difficulty retaining its

---

[82] TR40259 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2000) p. F-15 & F-16; TR40261 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2001) p. F-14; TR40262 (Nortel Networks Limited Form 10-K for fiscal year ended December 31, 2001) p. F-14; TR40263 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2002) p. F-33

[83] U.S. Debtors' Opening Statement, Day 1, May 12, 2014, p. 184:20-24

[84] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 21; TR21188 ("Global R&D Investment Strategy and Recommendations for Nortel Networks" presentation) p. 7

[85] TR00005 (Exh. 5, Reply Affidavit of Brian McFadden, April 24, 2014) para. 3; TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 7; Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 638:5-14

[86] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 8; Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 636:16-637:19, 645:1-3

largest CDMA customers (such as Verizon) in transitioning to 4G (LTE) technology (see below).[87]

63.    **The MEN, Enterprise and CVAS LOBs were incurring operating losses from 2007 through 2009.[88]**

64.    **Much of the R&D being conducted in the U.S. was "development" phase R&D. In other words, the work that was done in the U.S. was development of products for customers whereas the "research" was done in Canada.[89]**

65.    **NNI lacked "sufficient R&D resources to support its existing product base and fulfill future customer technology needs . . . for all lines of business and Advanced Technology Programs" independently.[90]**

     *(iv)    R&D Decision-Making*

66.    [33.] The leadership from Canada enabled subsidiaries to commence their operations and produce "state of the art" products which allowed them to become important, and frequently

---

[87] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 8

[88] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 21; TR21188 ("Global R&D Investment Strategy and Recommendations for Nortel Networks" presentation) p. 7; TR50666 ("Enterprise: Credit Committee Advisor Presentation", February 4, 2009) p. 4; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 14; TR44018 (Enterprise Carve-Out Income Statements for 2007-2009)

[89] Brian McFadden Trial Testimony, Day 3, May 14, 2014, pp. 649:15-650:18

[90] TR00005 (Exh. 5, Reply Affidavit of Brian McFadden, April 25, 2014) para. 3; see also Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 638:5-14

dominant, players in their markets, as well as access the results of R&D which would not have been economically viable for a stand-alone company.[91]

67.    [34.] Nortel's R&D organization changed somewhat over time, but in general R&D was coordinated through two different management structures, depending on the type of work being performed, but R&D was never managed by the legal entities that were party to the MRDA.[92]

68.    [35.] On the one hand, decisions about the majority of R&D funding were made by the LOBs to create, develop and improve technology for products within their particular technology areas.[93]

69.    [36.] On the other hand, advanced technology research, which was intended to develop novel, cutting edge technologies with a longer time horizon to product creation (if successful) was coordinated by Nortel's Chief Technology Officer ("CTO") and allocated funding through a central budget.[94]  Of all Nortel R&D programs, the advanced technology research produced the greatest impact in terms of innovation and patent filings.[95]

---

[91] TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) paras. 38-39

[92] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 19-21; TR00023 (Exh. 23, Affidavit of Simon Brueckheimer, April 9, 2014) para. 10

[93] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 19-21; TR00023 (Exh. 23, Affidavit of Simon Brueckheimer, April 9, 2014) para. 10

[94] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 12, 17, 20, 22-23; Simon Brueckheimer Deposition, October 1, 2013, p. 165:6-166:19; Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p. 1608:10-22

[95] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 22

70.     **These programs focused on forward-looking research for the next-generation of technology to meet customer needs.  Advanced technology research was speculative and would only potentially lead to future product development, if successful.**[96]

71.     **As former CTO Brian McFadden testified at trial,**

> **Advanced technology programs are programs designed to research the capabilities of new technologies that are not being used in our products currently.  They would be various techniques and new components and software, it could be -- it could be a multitude of things that you would investigate to see if they would be applicable to be used in products in the future.**[97]

72.     [38.] No major decision regarding R&D direction or funding was taken without approval from Ottawa.[98]

73.     **R&D funds were centrally allocated by product line management and the CTO, who was responsible for managing global R&D efforts.**[99]

74.     [39.] The geographic location in which R&D for a given LOB or CTO project was carried out was selected based on criteria such as the particular skills available, the need for

---

[96] Simon Brueckheimer Deposition, October 1, 2013, p. 165:15-166:19 ("I would say the best way to understand advanced technology is there is no pressing need to meet something under customer contract in terms of a tangible deliverable or the delivery of a product."); Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p. 1607:20-1608:22; TR00004 (Exh. 4, Affidavit of Brian McFadden sworn April 10, 2014) paras. 12, 15-17, 20, 22-23; Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 635:1-637:18; John Roese Deposition, November 11, 2013, p. 35:20-25 ("Okay. Generally speaking, if you are asking long-term meaning more than the current timing horizon of our existing products, that's speculative.")

[97] Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 635:9-16

[98] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 15

[99] Geoffrey Hall Trial Testimony, Day 9, May 28, 2014, p. 1922:21-1923:20; TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 114

"localization" of technology developed elsewhere to a particular market's needs (a common

focus of the NNUK laboratories with respect to technology developed in Ottawa) and cost.[100]

### (v)    *R&D Spend and Patents by Geography*

75.    [40.] Between R&D performed in Canadian facilities and contract R&D performed on

NNL's behalf in low-cost jurisdictions, NNL accounted for nearly half of all Nortel R&D spend

for the years 2000 to 2009.  As reported to the tax authorities in 2004 **(before restatements)**,

NNL's R&D spend for the years 2000 to 2003 in comparison to the other RPEs was as

follows:[101]

| R&D Spend | NNL | NNI | EMEA |
|-----------|-----|-----|------|
| 2000 | 42% | 42% | 16% |
| 2001 | 43% | 39% | 18% |
| 2002 | 39% | 41% | 20% |
| 2003 | 42% | 38% | 20% |

76.    [41.] Similarly, for the years 2005 to 2009 NNL accounted for 49.8 percent of Nortel's

R&D spend, while NNI accounted for 38.5 percent and the EMEA RPEs the remaining 11.7

percent.[102]

---

[100] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 21

[101] TR11084 (2004 Functional Analysis, November 30, 2004) p. 23

[102] TR45645 (Spreadsheet of 2010 Transfer Pricing Adjustments, July 7, 2010) Tab "R&D Asset Table (new)" (which is based on Tab "IP owner R&D")

77.    **Incorporating all restatements, RPS Entities' R&D spend by year from 2001-2009 (in U.S.$ millions) with percentage of group R&D spend in italics:**[103]

| RPS Entity | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|
| **Canada** | 1,339 | 764 | 703 | 719 | 689 | 782 | 842 | 817 | 597 |
| | *42.9%* | *39.9%* | *41.0%* | *42.2%* | *43.0%* | *48.3%* | *51.0%* | *52.8%* | *56.2%* |
| **US** | 1,230 | 756 | 679 | 656 | 617 | 588 | 678 | 615 | 384 |
| | *39.4%* | *39.5%* | *39.6%* | *38.5%* | *38.5%* | *36.3%* | *41.1%* | *39.7%* | *36.2%* |
| **UK** | 322 | 160 | 82 | 82 | 57 | 38 | 39 | 37 | 18 |
| | *10.3%* | *8.4%* | *4.8%* | *4.8%* | *3.6%* | *2.3%* | *2.4%* | *2.4%* | *1.7%* |
| **France** | 204 | 213 | 228 | 228 | 220 | 193 | 67 | 55 | 37 |
| | *6.5%* | *11.1%* | *13.3%* | *13.4%* | *13.7%* | *11.9%* | *4.1%* | *3.6%* | *3.5%* |
| **Ireland** | 11 | 13 | 15 | 15 | 15 | 17 | 25 | 24 | 26 |
| | *0.4%* | *0.7%* | *0.9%* | *0.9%* | *0.9%* | *1.1%* | *1.5%* | *1.6%* | *2.4%* |
| **Australia** | 12 | 9 | 9 | 5 | 4 | - | - | - | - |
| | *0.4%* | *0.5%* | *0.5%* | *0.3%* | *0.2%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* |
| **Total** | **3,118** | **1,915** | **1,716** | **1,705** | **1,602** | **1,618** | **1,651** | **1,548** | **1,062** |

78.    **The figure of 1 in 5 Nortel patents originating from NNUK's Harlow lab was shown to be marketing puffery, not backed by any analysis.**[104]

(c)    **Intellectual Property**

    (i)    *Not All R&D Was Yielded Nortel IP*

79.    [43.] Some Nortel R&D yielded intellectual property, including patents.  However, not all R&D was successful.  R&D expenditure could fail to generate innovations that could be protected as IP, and IP could fail to be incorporated into Nortel products.[105]

---

[103] TR45171 (Historical R&D Spend by Year as of Q2'10)

[104] Simon Brueckheimer Trial Testimony, Day 7, May 22, 2014, p. 1600:2-1602:2

80.    [44.] This fact was represented to the tax authorities.  For example, Ryan Stark, Nortel's

Senior VP of technology, explained to the tax authorities in a submission in 2003 that "a

substantial portion of Nortel's efforts are invested in determining which R&D projects to

undertake and which emerging technologies should be explored further" and that a return on

Nortel's R&D investment was not certain even for approved R&D projects as "[g]enerally, only

70% of all approved R&D projects result in a commercially viable product being released."[106]

Nortel further explained to the tax authorities: "As discussed previously, a considerable amount

of R&D efforts are expended in endeavors that do not result in a product being offered for

sale."[107]  Nortel also explained to the tax authorities in 2005 that "the risk of R&D failure is a

normal business risk shared by all the RPS participants".[108]

81.    [45.] Thus, only a fraction of Nortel's billions in R&D expenditures over the decades

preceding January 2009 generated the IP, but it is impossible to trace which R&D expenses

produced which IP.[109]

---

[105] Simon Brueckheimer Trial Testimony, Day 7, May 22, 2014, p. 1595:3-12; Peter Newcombe
Trial Testimony, Day 7, May 22, 2014, p. 1637:21-24, 1641:25-1642:6

[106] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and
CCRA, September 2003) p. 10 (Footnote 8)

[107] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and
CCRA, September 2003) p. 11

[108] TR21033 (Email attaching Nortel Multilateral APA Responses to IRS Information and
Document Request, May 6, 2005) p. 10 (Response to Question 14)

[109] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1315:21-1316:1; TR11084 (2004
Functional Analysis, November 30, 2004) p. 28-29; TR22078 (Joint Request for US-Canada
BAPA 2007-2011 (with rollback to 2006), October 31, 2008) p. 50, Appendix B

*(ii)*    ***IP Ownership and Licenses***

82.    [50.] Nortel's IP ownership structure, whereby its patent applications were filed as a general rule in the name of NNL and whereby IP was owned by the parent operating company and licensed to subsidiaries, was typical of multinational companies.[110]

83.    **This arrangement was reflected in the MRDA in Articles 4 (legal title) and 5 (licence).[111]**

84.    **NNL's ownership of Nortel IP was confirmed by the three most senior Nortel executives to testify,[112] as well as the trial and deposition testimony of the EMEA Debtors' witness Kerry Stephens.[113]**

85.    **Witnesses for the U.S. Interests and EMEA Debtors consistently testified that all of the rights NNI, NNUK, NNSA and NN Ireland held in Nortel IP arose from the licenses in the MRDA and nowhere else.[114]**

---

[110] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 10; Angela Anderson Trial Testimony, Day 10, May 29, 2014, p. 2171:4-9, 2178:15-2179:4, 2194:7-11, 2195:20-2196:13; see also the testimony of Nicholas DeRoma who worked at Nortel and at IBM for 25 years that at IBM, IP ownership was held by the parent company, Nicholas DeRoma Deposition, October 16, 2013, p. 163:24-164:7; see also TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) para. 27

[111] TR21003 (MRDA and addenda) Articles 4 & 5

[112] *See* TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para 10; Paviter Binning Trial Testimony, Day 5, May 20, p. 1061:6-16, 1063:19-24; Peter Currie Trial Transcript, Day 3, May 14, 2014, p. 591:9-18, 601:17-22; Clive Allen Trial Testimony, Day 3, May 14, 2014, p. 606:7-607:14; TR00003 (Exh. 3, Reply Affidavit of Clive Allen, April 11, 2014) paras. 5-6

[113] Kerry Stephens Trial Testimony, Day 8, May 27, 2014, p. 1789:24-1790:7 (confirming understandings that "NNL is the owner of the IP"); Kerry Stephens Deposition, November 8, 2013, p. 355:11-15 ("NNL has -- if nothing else, it has the legal right to the IP, and as part of its business NN UK needs to license that IP.").

1.    NNL's Rights Under the MRDA

86.    **NNL held rights under the MRDA that differed from those granted to the Licensed Participants, including:**

(a)    **The definition of "Non-Exclusive Territory", as amended, provides that NNL "retains its exclusive rights" with respect to the NN Technology for Canada rather than acquiring any rights by way of a license;**

(b)    **Article 3(d) provides that NNL is the "administrator" of the MRDA;**

(c)    **Article 4(b) provides that "[e]ach Licensed Participant shall execute or cause to be executed such documents reasonably requested by NNL as may be necessary or desirable" to vest legal title to the NN Technology in NNL;**

(d)    **Articles 6(a), 6(b) and 7(b) provide that NNL is owed confidentiality and indemnity obligations from the Licensed Participants regarding the NN Technology, while NNL does not owe the Licensed Participants reciprocal confidentiality and indemnity obligations;**

(e)    **Article 9(c) provides that the provisions of Article 4 (Legal Title to NN Technology), including the requirement of the Licensed Participants to execute documents to perfect NNL's legal title in the NN Technology, survive notwithstanding expiry or termination of the agreement;**

---

[114] Mark Weisz Trial Testimony, Day 9, May 28, 2014, p. 1890:19-1891:13; Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1327:25-1328:19; Kerry Stephens Trial Testimony, Day 8, May 27, 2014, p. 1779:11-1780:3; Philippe Albert-Lebrun Trial Testimony, Day 6, May 21, 2014, p. 1511:8-1512:9; see also Giovanna Sparagna Deposition, December 10, 2013, p. 191:8-24; Jeffrey Wood Deposition, November 1, 2013, p. 149:19-150:17; Karina O Deposition, November 9, 2013, p. 221:16-21

(f)     **Article 10(b) permits NNL to grant Licenses to new MRDA Participants;**

(g)     **Article 11(e) provides that the obligations of a retiring Participant under Article 4 (Legal Title to NN Technology), including the requirement of the Licensed Participants to execute documents to perfect NNL's legal title in the NN Technology, continue notwithstanding the retirement of a Participant; and**

(h)     **Article 13 expressly disclaims a partnership or joint venture relationship: "[t]he relationship of the Participants under this Agreement shall not constitute a partnership or joint venture for any purpose . . . ."[115]**

87.     **The U.S. Interests' witnesses agreed that the MRDA does not characterize NNL's title to NN Technology as "bare", nor as instituted for "administrative convenience".[116]**

88.     **While certain provisions of the MRDA relating to transfer pricing adjustments state that they may be amended by the parties if required by the tax authorities to do so, the MRDA provisions relating to ownership and licensing of NN Technology do not contain such statements and NNL's ownership survives the termination of the MRDA under all circumstances.[117]**

---

[115] TR21003 (MRDA and addenda) Articles 1, 3(d), 4(b), 6(a)-(b), 7(b), 9(c), 10(b), 11(e) & 13

[116] TR00016 (Exh. 16, Declaration of Walter Henderson, April 11, 2014) paras. 23, 55; Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1142:21-24, 1155:19-1156:3, 1159:19-24; TR00028 (Exh. 28, Declaration of Mark Weisz, April 11, 2014) para. 12; Mark Weisz Trial Testimony, Day 9, May 28, 2014, p. 1895:17-22

[117] *Compare* TR21003 (MRDA and addenda) final recital, Article 3(c) & Schedule A with, *e.g.*, *id.* first recital, seventh recital, Article 4(a) & 5(a); *id.* Article 9(c). The Licensed Participants' licenses under the MRDA also survive the termination of the agreement, unless the termination

### 2.    The Patents Were Registered in NNL's Name

89.    [46.] As at January 14, 2009, NNL held legal title to nearly all IP created or acquired by the Nortel Group, and licensed IP to the other Nortel subsidiaries, pursuant to the terms of the MRDA.[118]  The interpretation of the MRDA is described in detail below at Part VI, including the MRDA's role with respect to both intellectual property and transfer pricing.

90.    [47.] As of January 2009, and as discussed in Angela de Wilton's evidence, NNL held approximately 8,800 worldwide patents and applications.[119]

91.    **Angela de Wilton expressly denied that NNL's ownership was "merely a matter of convenience" and Angela Anderson likewise insisted it was not "just for administrative convenience".[120]**

---

occurs for one of several specified reasons, including failure to perform R&D, ceasing to be an "Affiliate" of NNL, or failing to make payments required under the RPSM. TR21003 (MRDA and addenda) Articles 5(a) & 11(b)-(d); TR00042 (Exh. 42, Primary Report of Philip Green dated January 24, 2014) p. 25; TR00043 (Exh. 43, Rebuttal Report of Philip Green dated February 28, 2014) p. 8. These provisions were triggered with respect to NN Australia when it ceased to perform R&D several years prior to the petition date. TR21003 (MRDA and addenda) Second Addendum

[118] TR21003 (MRDA and addenda) Articles 4-5.  Due to acquisitions and joint ventures, certain Nortel IP was held in the names of non-operating acquired companies such as NNC, Nortel Networks SAS (a French subsidiary of NNSA) and Nortel Networks GmbH (a German subsidiary) (see, TR40197 (List of Transferred Patents in Rockstar Transaction) Tab "AllActive20110728" ("Assignee/Owener (sic)" Column) and TR47338 (Patent Excel File, January 7, 2009) Tab "All" ("App Assignee" Column))

[119] TR00006 (Exh. 6, Affidavit of Angela de Wilton, April 11, 2014) para. 12, citing TR47338 (Patent Excel File, January 7, 2009); see also TR11151 (Nortel's IP Team and Patent Portfolio PowerPoint, August 2010) Slide 11 (p. 11)

[120] Angela de Wilton Trial Testimony, Day 3, May 14, 2014, p. 761:24-762:24; Angela Anderson Trial Testimony, Day 10, May 29, 2014, p. 2195:20-2196:13

92.    [48.] The overwhelming majority of all rights, title and interest in inventions by Nortel

employees worldwide were assigned directly or indirectly to NNL.[121]  As a result, virtually all of

the patents and applications were assigned to Canadian entities; with respect to the

approximately 7000 patents and applications in the portfolio sold in the "Rockstar Transaction"

(further described below), as discussed in Ms de Wilton's evidence, at least 98 percent had been

assigned to NNL.[122]

93.    **The registered assignments conveyed "all right, title and interest" in the inventions**

**to NNL[123] and the filings with each country's patent registrars always indicated that NNL**

**was the sole owner of the patents and applications.[124]**

94.    [49.] NNL's IP licenses to its subsidiaries, which were embodied pre-January 1, 2001 in

cost sharing agreements and post-January 1, 2001 in the MRDA[125], were premised on NNL's

---

[121] TR00006 (Exh. 6, Affidavit of Angela de Wilton, April 11, 2014) paras. 8-12; Timothy
Collins Deposition, November 15, 2013, p. 40:10-41:20

[122] TR00006 (Exh. 6, Affidavit of Angela de Wilton, April 11, 2014) paras. 8-12; TR40197 (List
of Transferred Patents in Rockstar Transaction); TR47338 (Patent Excel File, January 7, 2009)

[123] Angela de Wilton Trial Testimony, Day 3, May 14, 2014, p. 746:20-747:1 ("Oh, no, excuse
me, you've mischaracterized that.  The execution of an employment agreement with assignment
of IP rights is not sufficient in and of itself once a patent application is filed.  An assignment
document has to be recorded in the patent office, for example the US Patent and Trademark
office, to perfect that assignment.  So we would not rely on the employee agreement per se.
There would be a specific form of patent assignment except in exceptional cases if the inventor
was not available, for example."); *see also* TR00006 (Exh. 6, Affidavit of Angela de Wilton,
April 11, 2014) para. 8; Angela de Wilton Trial Testimony, Day 3, May 14, 2014, p. 736:21-
737:10, 743:9-15; Angela Anderson Trial Testimony, Day 10, May 29, 2014, p. 2178:8-14,
2195:8-19; Eric Jensen Deposition, October 8, 2013, p. 120:13-121:4, 145:15-22; Gillian
McColgan Deposition, November 8, 2013, p. 175:10-14; Timothy Collins Deposition, November
15, 2013, p. 40:10-41:20

[124] Angela Anderson Trial Testimony, Day 10, May 29, 2014, p. 2195:14-2195:19

ownership of all rights in the licensed IP and permitted the subsidiaries to have access to a much greater pool of technology on an exclusive basis in their territories than they could ever have afforded otherwise, without substantial up-front costs to either create or license the technology.[126]

95.     **The relative handful of patents registered in the name of former joint venture entities or acquired companies, rather than in the name of NNL, was of minimal value.[127]**

3.     NNL Made Patent-Related Decisions

96.     **Nortel's policies relating to patenting were centrally determined by the IP Law Group, which was "responsible for all Intellectual Property matters . . . on a worldwide basis" and reported to the Chief Legal Officer in Canada.[128]  Implementation of these policies was entrusted to regional IP groups and LOB personnel.[129]**

---

[125] TR21003 (MRDA and addenda) Articles 4-5; TR21002 (1992 R&D CSA, January 1, 1992) Articles 4-6, 10-11, 13; *see also* TR45741 (1985 Amended R&D CSA between NNL and NNI, January 1, 1985); TR44284 (R&D CSA between NNL and NN Ireland, January 1, 1985); TR45742 (1988 R&D Agreement between NNL and NT Communications (French), January 2, 1988); TR11411 (1995 R&D CSA between NNL and Nortel Limited (U.K.), January 1, 1995); TR46945 (2000 R&D CSA between NNL and NNSA, January 1, 2000)

[126] TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) para. 36; Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1157:21-1159:2

[127] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 12 (footnote 35) and Appendix H (p. 278 of PDF); Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3304:15-3316:20

[128] TR40127 (Corporate Procedure No. 501.02, "Intellectual Property," February 9, 2004) para. 5.1; Nicholas DeRoma Deposition, October 16, 2013, p. 25:12-21

[129] Angela Anderson Trial Testimony, Day 10, May 29, 2014, p. 2172:8-23, 2189:23-2190:24

97.     **Under the terms of the MRDA, NNL had the exclusive right to decide where to file patent applications and only NNL had the right to file patent applications, in any country in the world.**[130]

98.     **NNL therefore also had the exclusive right to determine whether or not to continue prosecuting patent applications or maintain issued patents.  The decision of which patents to maintain was constrained by budgets, but assessed based on multiple business considerations and all available information.**[131]

99.     **So too NNL alone could select patent applications to pursue for the purposes of "defensive patenting".**[132]

100.    **Decisions about whether to bring IP enforcement actions were also, as a matter of corporate policy, made by the Global IP Law group, which was responsible for "all Intellectual Property matters […] on a worldwide basis", including recommending and advising enforcement actions.**[133]  **NNL's subsidiaries did not make such decisions independently.**

---

[130] TR21003 (MRDA and addenda) Article 4(d)

[131] Angela de Wilton Deposition, November 20, 2013, p. 154:14-155:4 ("Q.   And is the decision in which patents to keep based on their value to certain Nortel priority business areas?  A.   The decision is made on the overall value based on many different criterias, or criteria.  It could be the value to Nortel's business; it could be the potential value to competitors; it could be many other business considerations that are taken into account in assessing the value of a patent. Q.  You would evaluate each of those business considerations?  A.   Information would be gathered to help us make that, those decisions, based on available information.")

[132] TR21003 (MRDA and addenda) Article 4(d)

[133] TR40127 (Corporate Procedure No. 501.02, "Intellectual Property," February 9, 2004)

4.    <u>NNL was the Licensor in Patent License Agreements</u>

101.    **In the third-party patent licenses in evidence to which NNI was a party, NNL (or NNC) is consistently described as the owner of the licensed patents, while NNI is described in these licenses as a licensee of only "certain rights".  Both NNL and NNI are grantors of the license "to the extent of their legal rights to do so."[134]**

102.    **NNL also granted third party patent licenses to U.S., European and Canadian patents unilaterally.[135]**

(d)    **Transfer Pricing Arrangements including CSAs and the MRDA**

103.    [51.] Like nearly all multinational groups, the Nortel Group had transfer pricing arrangements that governed how it reported income in each of the jurisdictions in which it did business.[136]

---

[134] TR48848 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛; TR48927 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛) recitals & para. 2.1; TR48849 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛) recitals & 2.1

[135] TR48832 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛) preamble & s. 3.A; TR48650 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛) recitals & para. 1.3

[136] TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 16;

104.    [52.] The transfer pricing experts largely agreed on the following basic principles:

(a)    The "purpose" of transfer pricing from a multinational enterprise or group's perspective is compliance with tax laws in the jurisdictions in which it operates, and the avoidance of double taxation.[137]

(b)    The arm's length standard is the fundamental principle of transfer pricing, as codified in the OECD guidelines and the tax laws of most jurisdictions.[138]

(c)    Transfer pricing guidance recognizes that there are a range of arm's length results and any point within the range may be considered an arm's length price.[139]

(d)    Transfer pricing addresses the allocation of operating income within a multinational group as a going concern and does not address the allocation of assets on insolvency.[140]

---

[137] TR00037 (Exh. 37, Expert Report of Steven Felgran, January 24, 2014) p. 7; Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2873:13-20; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 4992:5-12, 5022:6-5025:2; Dr. Richard Cooper Trial Testimony, Day 11, May 30, 2014, p. 2632:4-14; TR00062 (Exh. 62, Expert Report of Dr. Lorraine Eden, January 24, 2014) p. 7-11; TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 16

[138] TR00037 (Exh. 37, Expert Report of Steven Felgran, January 24, 2014) p. 7; Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2872:5-11; Dr. Richard Cooper Trial Testimony, Day 11, May 30, 2014, p. 2636:11-25, 2675:24-2676:1; TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 3; TR00062 (Exh. 62, Expert Report of Dr. Lorraine Eden, January 24, 2014) p. 11

[139] Dr. Richard Cooper Trial Testimony, Day 11, May 30, 2014, p. 2637:7-15; TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 18; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 4986:10-4987:9, 4992:18-4993:13, 5056:16-5057:13; Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2863:21-2864:7

105.    [53.] Transfer pricing's "arm's length principle" is, by the OECD guidelines' definition, limited to the tax context: "[t]he international standard that OECD member countries have agreed should be used for determining transfer prices *for tax purposes*".[141]  In this regard, transfer pricing focusses on the *ex ante* expectations of the parties, rather than the *ex post* results.[142]

106.    [54.] The arm's length principle does not purport to dictate legal or property interests either in a going concern or in an insolvency.[143]  Transfer pricing guidance and regulation proceeds from a presumption in favor of respecting the parties' legal arrangements, which may be disregarded only in exceptional circumstances because "[multinational entities] are free to organise their business operations as they see fit.  Tax administrations do not have the right to dictate to an [multinational entity] how to design its structure…"[144]  The arm's length principle applies only to the pricing of transactions for tax purposes and does not restrict the form of the

---

[140] TR00037 (Exh. 37, Expert Report of Steven Felgran, January 24, 2014) p. 25; Steven Felgran Deposition, March 25, 2014, p. 55:11-18; Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2853:6-14, 2873:1-6; Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2725:10-21; 2772:22-2773:6; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 4982:16-4983:2, 4983:22-4984:7, 5044:23-5045:8, 5077:3-11, 5085:1-10; Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3834:12-3835:5, 4031:20-4032:1, 4058:14-4059:4

[141] TR11391 (OECD Transfer Pricing Guidelines, July 2010) p. 23 (Glossary, p. 25 of 375 of PDF) (emphasis added)

[142] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3889:15-3890:5; TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 18-19 (p. 22-23 of 601 of PDF)

[143] TR00062 (Exh. 62, Expert Report of Dr. Lorraine Eden, January 24, 2014) p. 60; Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3834:12-3835:5

[144] TR11391 (OECD Transfer Pricing Guidelines, July 2010) para. 9.163; *see also* Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3829:13-17; 3832:23-3834:11; 3864:13-3881:16

parties' dealings—entities in multinational groups may enter into contracts or arrangements relating to the group's resources in ways that uncontrolled entities would not.[145]

107.    **The arm's length principle is, therefore, unconcerned with the substantive "fairness" of the parties' dealings with each other.[146]**

108.    **The "bedrock principle" in transfer pricing is a presumption in favor of respecting the legal agreements entered into by the parties.[147]  As the OECD guidelines explain, the legal agreements between the parties are to be disregarded only in the exceptional case where either the economic substance of the parties' arrangement differs from the form; or the parties' arrangement is not economically rational and impedes the tax authorities ability to determine the appropriate transfer price.[148]**

(e)    **The Cost Sharing Agreements**

  (i)    *CSA History*

109.    [55.] Prior to 2001, the RPEs (and Nortel Networks Japan and NN Australia) were each party to several Cost Sharing Agreements ("CSA") with NNL which covered tangible property,

---

[145] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3830:17-3831:4; Dr. Richard Cooper Trial Testimony, Day 11, May 30, 2014, p. 2633:24-2634:17

[146] TR11391 (OECD Transfer Pricing Guidelines, July 2010) paras. 1.2-1.4

[147] Dr. Timothy Reichert Trial Testimony, Day 17, June 18, 2014, p. 3832:25-3833:25

[148] TR11391 (2010 OECD Guidelines, July 2010) paras. 1.64-1.65, 9.165

R&D and headquarters costs.[149]  These CSAs were, in part designed to embody Nortel's transfer

pricing arrangements at the time.  They also dealt with the ownership and licensing of IP.

110.    **The R&D CSAs apportioned the collective R&D costs of the participants *pro rata***
**based upon anticipated profit levels through the use of three allocation keys: royalty**
**income, customer sales and operating earnings.[150]**

111.    **The fundamental nature of the R&D CSAs never changed – NNL (or its**
**predecessor, NTL) always owned the intellectual property and NNL always provided a**
**license to the licensees to use R&D developed pursuant to the agreement to manufacture or**
**make, use, lease and sale of the Products within the licensee's defined geographical**
**jurisdiction.   NNI, NNUK, and NNSA were "born as licensees" and never held any interest**
**other than that of a licensee.[151]**

112.    [56.] Nortel had several "generations" of R&D CSAs, each built on and intended to

continue the rights granted in the prior agreements.[152]

113.    **Clive Allen, Chief Legal Officer of NNL at the time the CSAs were drafted, testified**

**that in the 1970s NNL "entered into a series of agreements with a variety of  subsidiaries in**

---

[149] TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) paras. 25-28

[150] TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 26;
TR11055B (Horst Frisch Report regarding Economic Analysis of Nortel Networks'
Intercompany Transactions by Horst Frisch, March 14, 2002) p. 10

[151] Dr. Timothy Reichert Trial Testimony, Day 17, June 18, 2014, p. 4020:13-4021:2

[152] Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1150:2-6

order to, in effect, set them up in business, because they had nothing beforehand"—NNI was incorporated in 1971 with "zero in the way of technology".[153]

114.    In subsequent R&D CSAs, Allen's subordinates were instructed to follow the model from the 1970s and bring any proposed alternatives to his attention for approval.[154]

115.    Allen testified that he would not have countenanced any "fundamental changes in principle"--"no ownership interest in the Technology was ever transferred to any subsidiaries and there was no intention to do so".[155]

116.    The 1978 and 1983 R&D CSAs state that the technical information and patents, now possessed or to be developed, "are and shall continue to be the property of Northern Telecom [NNL]."[156]

117.    The language became more specific in the 1985 R&D CSA, changing from "the property of" to specify that "legal title" "shall be vested in" NNL, and further providing in that NNI "acknowledges that [NNL] is the legal owner" of the Nortel IP.[157]

118.    The "exclusive license" provided to NNI in the 1985 R&D CSA was subject to certain limits as well, including barring NNI from exercising its license rights to prohibit (i)

---

[153] Clive Allen Trial Testimony, Day 3, May 14, 2014, p. 612:21-613:7, 622:21-25

[154] Clive Allen Trial Testimony, Day 3, May 14, 2014, p. 611:14-612:9

[155] Clive Allen Trial Testimony, Day 3, May 14, 2014, p. 612:2-9; TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) paras. 25, 28 and 29; and TR00003 (Exh. 3, Reply Affidavit of Clive Allen, April 23, 2014) para. 5

[156] TR46882 (1978 R&D Cost Sharing Agreement, January 1, 1978) Article 4; TR45048 (1983 R&D Cost Sharing Agreement, January 1, 1983) Article 4

[157] TR45741 (1985 R&D Cost Sharing Agreement, January 1, 1985) Articles 4 & 6

**the import into the U.S. of products manufactured by licensees of NNL outside the U.S. and**

**Canada; (ii) the exercise of the right to make or have made in the U.S. items required by a**

**third party in connection with manufacturing by such party pursuant to a license**

**agreement NNL; or (iii) the procurement by NNL of components, assemblies, sub-**

**assemblies, supplies, facilities, services and products as may be required by NNL in its**

**business outside the U.S. or in support of the Participant's business in the U.S., and**

**requiring NNI to grant to NNL, upon NNL's request, a non-exclusive license to permit**

**NNL to enter into cross-licensing transactions with third parties.[158]**

119.    [57.] Specifically, nearly all of the operative terms regarding the license were the same

between the 1985 R&D CSA and the 1992 version because the parties intended to keep in place

the pre-existing license.[159]

120.    **The license granted by NNL under the 1992 R&D CSA was tempered with similar**

**limitations as were in the 1985 R&D CSA that prohibited NNI from exercising certain**

**exclusive rights as to other members of the Nortel Group.[160]**

121.    [58.] The primary change between the 1985 and 1992 versions was in the defined terms,

which broadened the categories of Nortel IP that were licensed.[161]

-----

[158] TR45741 (1985 R&D Cost Sharing Agreement, January 1, 1985) Articles 5 & 6

[159] Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1153:19-1154:9

[160] TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) Article 5

[161] TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992); TR45741 (1985 R&D Cost Sharing Agreement, January 1, 1985); TR46880 (1983 Amending Agreement, January 1, 1983);

- 42 -

122.    **Many of the defined terms in the 1992 R&D CSA were imported directly from the APA entered into between NNL and the CRA.**[162]

123.    **As was Nortel's practice, it waited until the design and implementation of its transfer pricing methodology was approved under APAs with the IRS and CRA before drawing up the formal contract among the participants, which was made effective as of the beginning of the APA period.**[163]

124.    **The only changes from the 1985 CSA (other than to implement the pricing approved in the APA) made by Walter Henderson, the purported "drafter" of the 1992 R&D CSA, appear to be dates and names.**[164]

125.    **There is no evidence tying any of the changes in the wording of the successive R&D CSAs to any changes in Nortel's operating model or the parties' respective R&D efforts.**

---

TR46881 (1980 R&D Cost Sharing Agreement, January 1, 1980); TR46882 (1978 R&D Cost Sharing Agreement, January 1, 1978).

[162] *Compare* TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) and TR46875 (1992 NNL-NNI R&D CSA) with respect to definitions of "Compensating Adjustment," "Cost of Goods Sold," "Cost Sharing Participant," "GAAP," "Intercompany Purchases," "Intercompany Sales," "Net Customer Sales," "NT Technology," "NTL Consolidated Financial Statements," "NTL Group," "Operating Income," "R&D Expenses," "Residual," and "Royalty Income."

[163] TR46875 (1996 NNL-CRA APA) s. 13 (Definitions) (requiring that the Cost Sharing Agreement between NNL and NNI be entered into within 90 days of the execution of the APA between NNL and CRA)

[164] *Compare* TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) and TR45741 (1985 R&D Cost Sharing Agreement, January 1, 1985); *see also* Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1145:13-1154:24

126.    **Henderson admitted that the 1992 R&D CSA does not include any operative terms indicating that the RPEs held economic and beneficial ownership in Nortel IP.[165]**

    *(ii)    IP Ownership Under the CSAs*

127.    **The 1992 R&D CSA was explicit that "legal title to all NT Technology whether now in existence or developed pursuant to the terms of this Cost Sharing Agreement" "shall be vested in" NNL.  Moreover, NNL had the "exclusive right but not the obligation" to file and prosecute patents or copyright protection in every country of the world.[166]**

128.    [59.] Under the R&D CSAs, legal title to the Nortel Group's technology vested in NNL (then Northern Telecom Limited).  This vesting began with the 1978 R&D CSA between NNL and NNI (then Northern Telecom, Inc.), which stated:

> The parties hereto acknowledge that all Northern Telecom Technical Information and patents (except patents currently owned by [NNI]) relating to the Products now possessed or issued or to be developed, or in the case of patents to be issued, during the term of this Agreement, are and shall continue to be the property of [NNL].
>
> …[NNL], in consideration of [NNI]'s sharing of costs of Research and Development activities…agrees to make the Technical Information and Nortel Telecom Patents available to [NNI], and grants to [NNI] a non-exclusive right to use the Technical Information and the Northern Telecom Patents developed pursuant to this Agreement…for the manufacture, use, lease and sale of the products within the United States of America (including the Commonwealth of Puerto Rico) and such other place or places as [NNL] may from time to time determine.[167]

---

[165] Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1156:4-11

[166] TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) Article 5

[167] TR46882 (1978 R&D Cost Sharing Agreement, January 1, 1978) Article 4

- 44 -

### (iii)    *Licenses Under the CSAs*

129.    [60.] Thereafter, as ultimately recorded in the 1992 Amended Research and Development Cost Sharing Agreement referenced in the MRDA's recital (the "1992 CSA"), "in consideration of [NNI and certain subsidiaries] sharing the costs of Research and Development" NNL granted the licensees "an exclusive royalty-free license, including the right to sublicense, which, except as hereinafter provided, shall be in perpetuity to make, have made, use, lease and sell Products embodying NT Technology in and for the United States, and to all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith."[168]

130.    **None of the R&D CSAs reference "beneficial ownership" or "economic ownership" or purport to do more than grant NNL's counterparties a license.**[169]

---

[168] TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) Article 5

[169] TR46882 (1978 R&D Cost Sharing Agreement, January 1, 1978); TR46881 (1980 R&D Cost Sharing Agreement, January 1, 1980);  TR45048 (1983 R&D Cost Sharing Agreement, January 1, 1983); TR45741 (1985 R&D Cost Sharing Agreement, January 1, 1985); TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992); TR11411 (1995 R&D CSA between NNL and Nortel Limited (U.K.), January 1, 1995); TR46945 (2000 R&D CSA between NNL and NNSA, January 1, 2000)

131.    [61.] In communications to the tax authorities and internal communications, Nortel consistently described the license under the R&D CSA as a limited license that included the right to use Nortel IP to sell products embodying such technology to end customers in the participant's designated jurisdiction:

    (a)    "The R&D CSA gave the UK group formal rights to sell product on an exclusive basis and with clear rights to exploit current and future NN Canada technology, which it did not previously have.  That and the accompanying agreements also gave the UK group an underwritten return on its manufacturing activities in supplying product to other participants in the R&D CSA."[170]

    (b)    "[A] CSA participant obtained a royalty-free license to use the technology developed under the CSA."[171]

132.    [62.] Horst Frisch was retained by Nortel in connection with the CSAs and also described the scope of the license under the R&D CSA as a right to make and use NT Technology, stating:

    (a)    "Under the arrangement, each cost sharing participant ("CSP") had the right to use the intangible property developed pursuant to the R&D cost sharing arrangement (*i.e.*, the NT Technology") in its respective market."[172]

---

[170] TR33041 (NNUK Paper regarding Acquisition of STC, Post STC UK Business and R&D) p. NNI_00713065-00713066

[171] TR21031 (Letter regarding Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004) p. 5

[172] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 10

(b)     The license provided under the R&D CSA was "to make, have made, use, less and sell products embodying NT Technology in their specific territory."[173]

### *(iv)    CSA Tax Guidance*

**133.    Not all cost sharing agreements constitute "qualified cost contribution agreements" ("QCCAs") as described in CRA Information Circular 87-2R ("CRA Circular").[174]**

**134.    The CRA Circular's provisions with respect to "ownership" of intangible property include ownership of a right to use intangible property, such as a license.[175]**

**135.    The CRA Circular states**

> **The application of the arm's length principle would take into account, among other things, the contractual terms and economic circumstances particular to the QCCA.**

**136.    The guidance provided in the CRA Circular does not permit using hindsight to determine a transfer price for intangibles.[176]**

**137.    The narrow scope of the R&D CSA is confirmed in the 1996 NNI-IRS APA:**

> **This APA addresses only the allocation of R&D Expenses between [NNL] and [NNI] pursuant to the rule set forth in the TPM . . . .  This APA does not address, nor in any way determine the arm's length**

---

[173] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 12

[174] TR50295 (CRA Information Circular 87-2R); Dr. Timothy Reichert Trial Testimony, Day 17, June 18, 2014, p. 3907:23-3908:14

[175] TR50295 (CRA Information Circular 87-2R) p. 2 (Definitions)

[176] TR50295 (CRA Information Circular 87-2R) para. 149 (emphasis added)

nature of any other item affecting the computation of [NNI's] tax liabilities, including but not limited to the following items . . . .[177]

138.    **The 1996 APA between NNL and the CRA states:**

This APA is based on the following understandings . . . all benefit derived from the R&D Expenses is recognized either in the selling of a finished product to an unrelated customer or from the licensing of the technology from the R&D Expenses (the "Benefit") within a defined geographical market by a Cost Sharing Participant ("CSP"). . . . [T]he Benefit is based primarily on the profits from the sales and partially on the sales themselves, and, in the case of royalties, the Benefit is the royalty received pursuant to the licensing agreements…[178]

139.    **The 1996 APA between NNI and the IRS also states:**

A Cost Sharing Participant is deemed to derive a benefit ("Benefit") from R&D Expenses as it makes Net Customer Sales, earns Operating Income pursuant to such Sales, or licenses NT Technology in return for Royalty Income. . . .  R&D Expenses and the corresponding Benefits are respectively incurred and received in the same taxation year. . . .  The Benefit is based primarily on the Modified Operating Income from Net Customer Sales and partially on the Net Customer Sales themselves, and, in the case of royalties, the Benefit is the Royalty Income resulting from licensing agreements.[179]

140.    **The same APA defines the term "Benefit" to exclude buy-in and buy-out payments.[180]**

---

[177] TR50829 (1996 NNI-IRS APA) p. 10-11

[178] TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992); TR46875 (1996 NNL-CRA APA) §13 (Definitions) (defining the NTL/NTI Cost Sharing Agreement as a "research and development cost sharing agreement that, within ninety (90) days of the execution of this APA, is in effect between NTL and NTI and that corresponds to the CSM.")

[179] TR50829 (1996 NNI-IRS APA) p. 11

[180] TR50829 (1996 NNI-IRS APA) p. 12

141. [63.] As the tax authorities reviewed the cost sharing methodology in connection with the CSA APA and audits in the 1990's, the authorities raised concerns with the application of the method and none of the major tax authorities (the IRS, CRA, or Inland Revenue) wanted to renew the cost sharing method in a new APA for years subsequent to 1999.[181]

**(f)      The RPSM and MRDA**

   *(i)      Background to the RPSM*

142. [64.] By 2001, it was recognized that the cost sharing methodology was no longer the best method to address Nortel's transfer pricing issues; the best method was the residual profit split method (the "RPSM").[182]  The RPSM is one component of the MRDA, which was entered into effective in 2001.

143. **The R&D, headquarters and tangible property CSAs were terminated effective on or around January 1, 2001.[183]**

144. **After the termination of the R&D CSAs, each of NNI and the EMEA participants had nothing more than the right "to continue to exercise the rights it obtained under the CSA."  The former participants were compensated for the "fully paid up license" through**

---

[181] TR11058 (Email regarding Overview of Objectives for Meeting to Discuss RPSM, December 3, 2001) p. 4

[182] Walter Henderson Trial Testimony, Day 8, May 20, 2014, p. 1174:19-1175:16, 1176:15-1177:13, 1181:3-22; TR21026 (Horst Frisch Report regarding Economic Analysis of Nortel Networks' Intercompany Transactions, March 14, 2002) p. 3; TR11068 (Email regarding Filing of the IRS APA Submission, March 17, 2002)

[183] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 1; TR21031 (Letter regarding Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004) p. 4

the "application of the capitalized R&D factor to attribute residual intangible profits," which included pre-2001 R&D expense in the calculation of the R&D capital stock used to allocate profits under the RPSM.[184]

145.    **As summarized in a December 2, 2001 document, replacement of the R&D CSAs was necessitated by:**

(a)    **The expiration of the APA covering the R&D CSA (which was effective until 12/31/1999);**

(b)    **The fact that neither of the major tax authorities (the [CRA], the IRS or the Inland Revenue) wants to renew the R&D CSA APA for years subsequent to 1999; and**

(c)    **The fact that the R&D CSA does not effectively allocate R&D expenses among participants during 2001 due to the large operating losses.[185]**

146.    **The document goes on to say:**

> **Furthermore, changes in Nortel's business operations (e.g., gradual outsourcing of contract manufacturing) have necessitated a re-examination of our methods for determining intercompany transfer pricing. In an effort to minimize Nortel's long-term effective tax rate, to make the transfer pricing administrative processes more efficient,**

---

[184] TR21002 (1992 NNL-NNI R&D CSA) Article 10 ("…upon the expiry or termination of this Cost Sharing Agreement, Participant shall be deemed to have acquired a fully paid up license permitting Participant to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5 [Participant's Exclusive Royalty-Free License to NT Technology]"); TR21031 (Letter regarding Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004) p. 5

[185] TR11058 (Email regarding Overview of Objectives for Meeting to Discuss RPSM, December 3, 2001) (attachment) p. 1

**and to, over time, improve the global allocation of profits among
Nortel affiliates, the Global Tax Practice ("Tax") has been
investigating alternatives to the R&D CSA.**[186]

147.    **In a December 2001 presentation on the proposed RPSM, the benefits of the new
method were identified as:**

- **Buy-in issues addressed through capitalization and amortization
  of existing R&D "capital stock" -- excessive market
  capitalizations existing at the time of the acquisitions should be of
  diminished importance.**

- **Residual profits will be shifted from country where customers are
  located/customer sales are booked to regions where R&D is
  performed/funded.**

- **Enables profits attributable to property developed   pursuant to
  R&D expenses to follow the movement of R&D expenses.**[187]

148.    [65.] The RPSM applied only to operating income, and not to the proceeds of sales of
assets or businesses.[188]  There is no evidence that Nortel told tax authorities how allocation of
proceeds from the future sale of a business or assets would be made.[189]

---

[186] TR11058 (Email regarding Overview of Objectives for Meeting to Discuss RPSM, December
3, 2001) (attachment) p. 1

[187] TR11053 (Overview of Transfer Pricing APA and Recommendation, December 12, 2001) p.
11

[188] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 4029:18-4031:5, 4031:15-
4031:19; TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by
Horst Frisch, March 14, 2002) p. 37; TR21003 (MRDA and addenda) Schedule A (Step 3(ii))
("The resulting operating earnings/loss is then further adjusted to deduct the following items not
related to Nortel's operations […] gain/loss on the sale of business")

[189] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1344:11-1348:5

149.    [66.] Under the MRDA, the parties did not retain the revenue generated in their respective territory; rather, profits or losses from global operating revenues were shared amongst all of the RPEs.[190]

(ii)    *Execution of the MRDA*

150.    **Prior to execution, each of the MRDA Participants reviewed and approved the MRDA.[191]**

151.    **The MRDA was entered into on December 22, 2004 among NNL, NNI, NNUK, NNSA, NN Australia and NN Ireland with an effective date of January 1, 2001.[192]**

152.    **The MRDA formalized the manner in which the parties had been operating since January 1, 2001.[193]**

---

[190] Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2719:19-2720:1

[191] TR33048 (Dec. 22, 2004 Email from M. Weisz to I. Widdowson and G. Pugh); TR31601 (NNSA Board minutes, June 8, 2005) (approving NNSA entering into the original MRDA) p. 5; Pascal Debon Deposition, November 25, 2013, p. 59:22-60:23 (testifying that the NNSA Board considered and discussed the MRDA and concluded that it was in the best interests of NNSA); Gareth Pugh Deposition, October 8, 2013, p.39:24-40:6 (testifying that the NNUK Board and employees were involved in the process to generate the MRDA and the Board received briefings during the drafting of the MRDA); Sharon Rolston Deposition, November 20, 2013, p.187:4-196:2 (testifying that in connection with the third and fourth addenda, NNUK and NN Ireland received external advice from Ernst & Young, Herbert Smith, and independent counsel for the directors in their personal capacity; she executed the addenda believing they were in the best interests of NNUK and nobody compelled her to sign them); *see also* TR32090 (Dec. 3, 2012 Email from K. Stephens to D. Quane summarizing execution of MRDA) p. 2 ("[T]here were presentations to management at the of [the MRDA's] gestation and I believe that the audience included senior personnel outside Nortel America . . . .")

[192] TR21003 (MRDA and addenda) Preamble

[193] TR21003 (MRDA and addenda) Preamble; TR33048 (Dec. 22, 2004 Email from M. Weisz to I. Widdowson and G. Pugh) ("[T]he agreement does reflect how we have conducted business

153.     It was executed by John Doolittle on behalf of NNL, Mary Cross on behalf of NNI, Gareth Pugh on behalf of NNUK, Alain Biston on behalf of NNSA, and Liam Bluett on behalf of NN Ireland.[194]

  (iii) *MRDA Amendments and Related Agreements*

154.     The First Addendum to the MRDA, which was signed between October 2005 and June 2006, corrected certain typographical issues, including the corporate name of NN Australia.[195]

155.     The MRDA Participants executed an Agreement with Respect to Certain NN Technology effective as of December 30, 2006 to permit the sale of the UMTS Access business to Alcatel.[196]

156.     The Second Addendum to the MRDA, dated December 14, 2007 and effective from January 1, 2006, addressed the retirement of NN Australia from the RPSM due to its cessation of R&D and amended Schedule A's calculation of R&D Activity Payments.[197]

---

over the past few years."); TR21096 (Jan. 14, 2005 Email from Simon Schofield to Jacques Plaine re France Tax Audit; Final Master R&D) (requesting review and authorized signatory of NNSA for the MRDA which "formalises the transfer pricing arrangements that have been in place since 1st January 2001…")

[194] John Doolittle Deposition, December 5, 2013, p.107:22-108:11 (testifying that he reviewed and signed the MRDA on behalf of NNL); Gareth Pugh Deposition, October 8, 2013, p.39:24-40:6 (testifying that he signed the MRDA); TR31098 (Jan. 17, 2006 Email from Simon Schofield to Fidal International [French tax advisor]) (attaching MRDA signed by Alain Biston on behalf of NNSA); TR11070 (Jan. 14, 2005 Email from L. Krebs attaching MRDA signed by M. Cross); *see also* TR32090 (Dec. 3, 2012 Email from K. Stephens to D. Quane summarizing execution of MRDA)

[195] TR21003 (MRDA and addenda) First Addendum

[196] TR44056 (Agreement with Respect to Certain NN Technology, December 30, 2006)

157.    **Shortly before the filings in January 2009, the MRDA Participants (with the benefit of U.S., U.K. and Canadian counsel) negotiated and executed the Third and Fourth Addenda to the MRDA, a Memorandum of Understanding and a Release.**[198]

158.    **The Third Addendum to the MRDA was executed between December 19, 2008 and January 9, 2009, and was effective from January 1, 2006 (except with respect to the grant of non-exclusive licenses, which was from January 1, 2009). It granted to the Licensed Participants non-exclusive licenses in all territories other than those in which an MRDA Participant had an exclusive license. It also amended Schedule A's calculation of R&D Activity Payments to reflect the changes to the RPSM incorporated in Nortel's APA requests for the 2007-2011 tax years (with rollback to 2006).**[199]

159.    **In connection with the execution of the Third Addendum, NNL granted a release to the Licensed Participants for their use of NN Technology outside of their exclusive**

---

[197] TR21003 (MRDA and addenda) Second Addendum

[198] TR21003 (MRDA and addenda) Third & Fourth Addenda, Release; TR11393 (MOU); TR31657 (Dec. 22, 2008, NNSA Board Minutes) p. 3 (authorizing the Chairman to sign the Third Amendment to the MRDA and the MOU); Sharon Rolston Deposition, November 20, 2013, p. 188:7-20 ("[W]e were in the early stages of having had conversations with Herbert Smith and Ernst & Young around potential filings for our NNUK, among other UK entities, and, therefore, I was cautious" with respect to ensuring third and fourth addenda "were in the best interests of NNUK and Ireland".), 192:6-9 ("In connection with the third and the fourth addenda . . . Herbert Smith was providing counsel to NNUK and its Board".), 194:4-21 (approval of Third and Fourth Addenda was given in reliance on advice from prospective Joint Administrators from EY UK and from Herbert Smith) *see also* TR32090 (Dec. 3, 2012 Email from K. Stephens to D. Quane summarizing execution of MRDA) p. 2 ("There was an internal debate within EMEA about the 3rd and 4th Addenda, but in reality with the prospect of the Filings it was in their interests to sign. The 3rd Addendum was necessary because it removed breaches where EMEA entities had made sales outside their territory, although the component modifications arguably put more risk into the entities in the FX area . . . .")

[199] TR21003 (MRDA and addenda) Third Addendum

territories prior to January 1, 2009.  The Licensed Parties counter-signed the release to indicate their acceptance.[200]

160.    The Fourth Addendum to the MRDA was executed in January 2009, effective as of December 31, 2008.  In the Fourth Addendum, the Participants agreed that the anticipated CCAA, Chapter 11 and administration filings would not cause automatic termination of participation in the MRDA.[201]

161.    The Memorandum of Understanding entered into by the MRDA Participants on December 31, 2008 "provide[s] a record of certain operating arrangements and understandings" relating to transfer pricing, but "creates no liability or obligation or rights among the parties".[202]

---

[200] TR21003 (MRDA and addenda) Release

[201] TR21003 (MRDA and addenda) Fourth Addendum; *see also* TR32090 (Dec. 3, 2012 Email from K. Stephens to D. Quane summarizing execution of MRDA) p. 2 ("[T]he 4th Addendum was an essential in anticipation of Filing to prevent a complete cessation of business post Filing, because absent the agreement no one would have been able to continue to exploit the IP or more importantly grant/renew/update licenses to customers post Filing without this agreement (any entity entering insolvency proceedings was automatically excluded from its rights and obligations under the MRDA).")

[202] TR11393 (MOU) Preamble

(iv)     *Intangibles and the MRDA*

162.    **Under the OECD guidelines and IRS and CRA regulations, a right to use an intangible (for example, a license to practice a patent) is itself an intangible whose ownership is relevant to the transfer pricing analysis.**[203]

163.    **The right to share in residual profits was a significant intangible asset of each RPE, and the estimated value of that right was included in analyses of certain RPEs' enterprise value.**[204]

164.    **At times, this revenue sharing right was referred to as an IP right, in recognition of the Nortel parties' determination that IP generated the revenues being shared.**[205]

---

[203] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1335:15-1338:23 (discussing TR22078 (Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement 2007-2011 (with rollback to 2006), October 31, 2008)) and regulations cited at pages 39-40 therein)

[204] TR11206 (September 20, 2006 Email from R. Smith regarding "NNIFH Impairment Review on NN SA") p. 2 ("The calculation of this IP or goodwill asset is per the Residual Profit Share (or RPS) model. NN SA is party to the RPS agreement long with Nortel's other R&D participants globally. The overall effect of the RPS mechanism is for RPS participants to share the 'residual' profits of Nortel globally, that is the profits remaining once all the distributor entities have taken their margin through the transfer pricing agreements. The IP or goodwill asset is calculated based upon R&D spend across earlier years less a factor for depreciation."). Ryan Smith explained that these discussions (also found in TR43091 (September 2006 Email Chain Among T. Mcardle, A. Ahmad, M. Hamilton, G, Boone and T. Grewal re: Investment Impairment), TR43090 (September 2006 Email Chain among T. Mcardle, S. Freemantle, P. Albert-Lebrun, et. al re: Impairment Review on NNSA) and TR11206 (September 20, 2006 Email from T. Mcardle re: NNIFH Impairment Review on NNSA)) refer to economic rights as opposed to ownership. Ryan Smith Deposition, October 22, 2013, p. 322:3-323:24.  Albert-Lebrun, who testified that he would defer to Smith's views, acknowledged in his trial testimony that entrepreneurship or economic ownership only means that the RPE–licensees were entitled to a share of residual profits/losses from the sale of products through Activity Payments under the MRDA.  Philippe Albert-Lebrun Trial Transcript, Day 6, May 21, 2014, 1489:1-3, 1498:25-1499:8, 1508:19-1510:6, 1529:2-12

165.    **The parties using that term, however, generally understood that they were discussing "economic ownership", the right to share in the revenue stream, and not legal ownership of the IP.[206]**

166.    **That understanding was not perfect.  For example, Peter Look, a Vice President of Tax had to be corrected by Louis Farr, a Nortel tax lawyer, with respect to NNL's ownership of Nortel IP—Look, as a tax practitioner, was concerned with only NNL's economic rights (the share in revenues under the RPSM), whereas Farr explained the necessity of accounting for NNL's legal ownership if it were to sell patents to NNI.[207]**

167.    **Farr's explanation is consistent with the OECD guidelines, which instruct that characterization of transactions for transfer pricing purposes (for example, as "economic ownership") "do not provide any guidance as to a country's ability to characterise transactions differently under other aspects of its domestic law."[208]**

---

[205] *See, e.g.*, TR21526 (October 10, 2003 Email from J. Swales attaching "IP Migration sale analysis" Presentation) at slide 4 (calculating the value of Nortel IP and attributing a portion of that value to NNUK and NNSA on the basis of their RPSM percentages when Nortel was considering removing them from the RPSM by selling their RPSM contractual rights to NNL, which ultimately did not occur)

[206] *See, e.g.*, Ryan Smith Deposition, October 22, 2013, p. 322:3-323:24 (regarding TR11205, "I distinguish economics rights versus actual ownership."); Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1328:20-1329:6

[207] TR11254 (October 29-30, 2008 Email Chain among P. Look, L. Farr, M. Orlando and others)

[208] TR11391 (2010 OECD Guidelines, July 2010) para. 9.162

168.    **The license to exploit Nortel IP in their territories and the right to share in residual profits in proportion with R&D expenditure compensated the Licensed Participants for their R&D Activity.[209]**

169.    **The Nortel Group's practices regarding exploitation of NN Technology by the Licensed Participants outside of their Exclusive Territories were somewhat lax and therefore the Third Addendum modified the MRDA to grant, on a prospective basis, non-exclusive licenses to the Licensed Participants in the territories other than the Exclusive Territories.[210]**

170.    **In a December 31, 2008 Memorandum of Understanding (in connection with which NNI was represented by present counsel to the U.S. Debtors), NNI and the other Nortel RPEs confirmed their shared understanding that no party had a proprietary interest in the funds transferred to other parties as a result of the RPSM:**

> **Payments to or from any of [the Participants] under the [RPSM] represent the fulfillment of the [RPSM] allocation rather than a commercial transaction, as 'true up' payments whereby a Participant that holds profits from its own sales and distribution activity in excess of its attributable share under the RPSM formula, pays amounts to parties that hold profit in an amount less than their attributable share.[211]**

---

[209] TR21003 (MRDA and addenda) Articles 3(a) & 4(a)

[210] TR21003 (MRDA and addenda) Third Addendum; TR43376 (December 29, 2008 Email from K. Stephens) (referring to the changes as "modifications," rather than "corrections," designed to address the parties' practice of selling products incorporating NN Technology outside of their Exclusive Territories)

[211] TR11393 (MOU) para. 11

*(v)*        ***The RPSM Allocation Key***

171.    [68.] The RPSM allocation key selected by Nortel, with the assistance of its professional

advisors including Horst Frisch, was R&D expenditure, which was used as a proxy for

contributions to the development of the intellectual property that drove the sales of Nortel

products.[212]

*(vi)*        ***RPSM Involved Sharing Both Profits and Losses***

172.    [67.] The residual profit split methodology first rewarded routine activities with routine

returns (determined by reference to comparable activities performed by comparable companies),

then allocates the remaining profit or loss among participants in accordance with an "allocation

key" tied to the intangibles that generated the profit or loss.[213]

173.    **The parties never agreed to any "target level of profits". Rather, the RPEs were**

**entitled to an R&D Allocation (as defined in the MRDA). To the extent there was a**

---

[212] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 4, 39**;** *see also id.* **p. 40 ("Nortel has concluded that its intangible values are attributable to its R&D efforts."); TR11084 (Nortel Networks Functional Analysis for the years ended December 31, 2000-2004) cover letter p. 2 & functional analysis p. 6;** Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2874:23-2875:5; Dr. Richard Cooper Trial Testimony, Day 11, May 30, 2014, p. 2652:10-22; Dr. Timothy Reichert Deposition, March 20, 2014, p. 191:20-192:17, 198:25-199:21; Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3967:20-3968:10; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 4989:7-4990:22**; Walter Henderson Deposition, October 4, 2013, p. 213:7-214:15; Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1138:13-1138:24 ("The RPSM was intended to reflect Nortel's business operations – the economic reality of the business operations.")**

[213] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3972:13-3973:8; TR21003 (MRDA and addenda) Schedule A; TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 34-48; TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 41-55 (p. 41-55 of 209 of PDF)

difference between an entity's entitlement to an R&D Allocation and its actual income, a

transfer pricing adjustment was required.[214]

174.    **Although the transfer pricing method adopted by Nortel, the residual *profit* split**

**methodology, contemplates the sharing of profits, because Nortel as a group was loss-**

**making from 2001, the RPSM was used to share losses in proportion to R&D expenditure**

**and NNL therefore bore the greatest losses of any Participant.[215]**

    *(vii)    RPSM Does Not Apply to Asset Sales Proceeds*

175.    [73.] It is undisputed that the RPSM and MRDA did not contemplate and did not dictate a

particular result in the event of insolvency of all parties.[216]  Not only is transfer pricing limited to

the tax context, there is consensus among the transfer pricing experts that transfer pricing

principles have not, to their knowledge and in all their years of experience, ever been applied to

allocate assets in the case of insolvency proceedings.[217]

---

[214] TR21003 (MRDA and addenda) Article 3 & Schedule A; TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 55-56

[215] TR00050 (Exh. 50, Rebuttal Report of Dr. Timothy Reichert, February 28, 2014) p. 149

[216] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 4030:4-8; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 4982:1-4985:25; Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2852:12-2853:14, 2853:21-2854:11; Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2717:20-2717:24 ("the purpose of the MRDA was to allow the participants to share in the profit or loss from an ongoing common endeavor"), p. 2853:21–2854:11; Mark Weisz Trial Testimony, Day 9, May 28, 2014, p. 1877:18-1878:1; Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1324:19-1325:3; Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1143:15-1144:2

[217] Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2772:22-2773:5; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 5078:16-22; Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2853:15-2854:6; Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3834:12-3838:8

176.    **The testimony of fact witnesses confirmed that there was no view at Nortel that the RPSM would be the basis for allocation of proceeds from the sale of Nortel IP in bankruptcy.**[218]

       *(viii)    Ad Hoc Application of RPSM to Royalties or Other Proceeds*

177.    **On at least one occasion, with respect to the proceeds from settling an infringement suit against Foundry Networks, Inc., royalties arising from a third-party license were distributed to the RPEs in accordance with their RPSM percentages.**[219]

178.    **In the context of Nortel as an operating entity, it incorporated the relatively modest settlement amount from Foundry into its operating revenues earned from its regular business activities.**[220]

179.    **Notably, proceeds from the settlement, which concerned only U.S. patents, were not channeled exclusively to NNI, nor was a longer look-back period (based on the age of the licensed patents) used to calculate the allocation percentages.**

180.    **So too in other infringement proceedings brought on U.S. Nortel patents, NNL was alleged to have suffered injury due to the infringement, which is inconsistent with the U.S.**

---

[218] Kerry Stephens Trial Testimony, Day 8, May 27, 2014, p. 1791:3-1792:9, 1794:6-16; Weisz Trial Testimony, Day 9, May 28, 2014, p. 1872:1-11; Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1288:14-16, 1289:1-1290:7.

[219] TR41278 (Journal Entry Spreadsheet for Foundry Settlement Payment, December 8, 2004)

[220] TR41278 (Journal Entry Spreadsheet for Foundry Settlement Payment, December 8, 2004)

Interests' contention that NNI alone was entitled to all revenues earned from NN Technology in the U.S.. [221]

181.    When Nortel sold the optical components business, it informed the tax authorities that "[t]he income from the sale of the Optical business is excluded from the Residual Profit Split methodology."[222]

182.    In connection with sale of UMTS assets to the Alcatel under an agreement that Alcatel could select the categories and determine the proceeds attributable to each, Nortel chose to share the proceeds attributed by Alcatel to IP among the RPEs in accordance with their then-current RPSM percentages, without adjusting R&D capital stock to account for the age of the patents sold, but this allocation was not required by the RPSM or MRDA.[223]

183.    One of the asset categories selected by Alcatel was customer-related; Nortel had no practice of using such a category, but allocated the proceeds Alcatel attributed to that category because the purchaser's chosen categories were binding on it.[224]

---

[221] TR22084 (Complaint for Patent Infringement, March 14, 2001) paras. 11, 17, 23, 29, 35 and 41; TR40777 (Complaint for Patent Infringement, March 14, 2001) paras. 11, 17, 23, 29, 35 and 41; TR40788 (Amended Complaint for Patent Infringement, March 15, 2002) para. 15.  In the first two cases, NNL and NNI were collectively defined as "Nortel", and Nortel was alleged to have suffered damages.  In the third case, NNL was specifically alleged to have suffered damages.

[222] TR21003 (May 6, 2005 Responses to IRS Information and Document Request) p. 6

[223] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1289:1-8

[224] TR21161 (February 13, 2007 Email from K. Stephens to M. Orlando, R. Smith, M. Weisz and R. Culina) p. 2

184.    **From a total sale price of approximately $320 million, Alcatel attributed to the tangible assets their net book value in Nortel's books and the remainder to intangibles: $162 million to "Intellectual Property" (over 50% of total purchase price), $52 million to "Customer Contracts" and $10.6 million to "Goodwill".[225]**

185.    **Michael Orlando, who participated in the decision to allocate the UMTS sale proceeds in this way, testified without contradiction that there was no obligation to share the proceeds in this way—"There were a number of ways that it could have been done.  We just happened to choose this one in this particular instance."[226]**

### (ix)    *RPSM Amortization and "Look Back" Period*

186.    [69.] In the 2001-2005 period, R&D expenditure (initially including expenditure during the period preceding the implementation of the RPSM) was calculated as R&D capital stock, amortized at a rate of 30%.[227]  For the period starting in 2006, Nortel changed the RPSM to reduce the R&D capital stock period to a 5-year rolling average.[228]

---

[225] TR40332 ("Sale of UMTS Access Business" summary)

[226] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1290:1-7

[227] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 34-40; *see also* TR21003 (MRDA and addenda) Schedule A; TR11393 (Memorandum of Understanding, December 31, 2008) para. 6 (By "grand-fathering" in the past R&D efforts with compensation through the R&D Activity Payments, the parties agreed "their respective ownership interests in NN Technology and their respective R&D Activity have been … adequately and fairly compensated…")

[228] TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 49 (p. 49 of 209 of PDF)

187.    **A 30% amortization rate results in R&D capital stock being reduced to approximately ten percent of their original value in seven years and five percent of their original value in nine years.**[229]

188.    **Before adopting the 30% amortization rate, Nortel considered alternatives, such as a 3, 5 or 7 year look-back or a straight line or declining balance amortization method, or a 25% amortization with a half-year rule, all of analyses were performed in conjunction with Horst Frisch.**[230]

189.    **In 2003, NNI (along with NNL and NNUK) informed the tax authorities that "Nortel's analyses indicated that a 30% amortization was conservative yet reasonable."[231] In fact, they explained that "[i]n some cases, it could be suggested that a 30% amortization rate is, in fact, too low."[232]**

190.    **This choice of rate was based on considerations including that:  (1) telecommunications R&D has a short useful life; (2) only 70% of the Nortel Group's approved R&D projects result in a commercially viable product that is released to end consumers; (3) significant R&D expense consists of determining the appropriate strategy**

---

[229] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and CCRA, September 2003) p. 10; TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 40

[230] TR33069 (August 21, 2001 email from J. Watt attaching APA Action Register 8-14-2001) p. 2

[231] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and CCRA, September 2003) p. 10

[232] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and CCRA, September 2003) p. 12

for future R&D efforts and considering emerging technology, rather than building specific technology or products; and (4) a substantial portion of R&D expenditures at Nortel do not result in the successful commercial launch of any product.[233]

191.    **The choice of a 30% amortization rate was "a group decision" based on the result of internal surveys of R&D personnel, general experience of independent economists, and the literature for the telecommunications industry.[234]**

192.    **Horst Frisch's economic analysis incorporated the 30% amortization rate.[235]**

193.    [70.] The 30% amortization applicable to R&D capital stock between 2001-2005 and the 5-year rolling average (with 1-year lag) applicable to 2006-2009, represents an average economic life of R&D expense, as distinct from the economic or legal life of the IP that such expense may (or may not) generate.[236]

194.    **Nortel, together with its advisors, proposed the change to the 5-year rolling average (with 1-year lag) in the APA applications for the 2007-2011 tax years (with rollback to 2006) in recognition of accelerating turnover in telecommunications technology due to the**

---

[233] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and CCRA, September 2003) p. 10

[234] Walter Henderson Deposition, October 4, 2013, p. 142:18-143:7

[235] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 40

[236] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and CCRA, September 2003) p. 10 (Footnote 8); TR21031 (Letter regarding Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004) p. 9-12; TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 49-50, Appendix B (p. 49-50, 72-102 of 209 of PDF)

**rapid pace of development and entry of new competitors, leading to shorter commercial**

**and economic life span of technologies.[237]**

195.    **Evidence supporting this conclusion was drawn from interviews with Nortel**

**personnel with in-depth knowledge of intangibles, including the Chief Technology Officer,**

**as well as Nortel R&D and product support policies.[238]**

196.    **The 5-year rolling average (with 1-year lag) was phased in over two years to**

**continue to give value to the RPEs' accumulated R&D capital stock as at December 31,**

**2005.[239]**

197.    [71.] The economic life of the R&D expense is the period over which an investment in

R&D is reflected in the company's residual profit.[240]

198.    [72.] Because R&D may not result in IP, and IP may or may not be incorporated in

products or otherwise generate value, application of a patent life period to R&D expense would

greatly overvalue the expenditures that generated no IP or IP that could not be put to use.[241]

199.    **No evidence was adduced suggesting that 30% amortization rate, and subsequently**

**the 5 year rolling average with 1 year lag, did not accurately capture the average economic**

---

[237] TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 50

[238] TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 50

[239] TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 49

[240] TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 72-73

[241] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3891:4-16

life of Nortel R&D expenditure, as opposed to the economic life of particular Nortel patents.

    *(x)*    ***RPE Revenue and Profit/Loss Sharing***

200.    **Historical revenue before transfer pricing adjustments for the Nortel group from 2001-2009 (as restated)[242]:**

Revenue in $M

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| NNI | (10,105) | (5,267) | (4,828) | (4,433) | (4,787) | (4,609) | (4,636) | (4,154) | (3,097) | (45,916) |
| NNL | (1,752) | (948) | (768) | (780) | (835) | (892) | (1,015) | (790) | (550) | (8,331) |
| France | (270) | (183) | (270) | (399) | (456) | (371) | (357) | (235) | (182) | (2,723) |
| Ireland | (247) | (199) | (278) | (327) | (366) | (486) | (589) | (591) | (278) | (3,361) |
| UK | (1,230) | (678) | (482) | (450) | (532) | (685) | (684) | (631) | (363) | (5,735) |
| Other | (5,295) | (3,732) | (3,306) | (3,088) | (3,534) | (4,375) | (3,666) | (4,021) | (2,442) | (33,460) |
| Total | (18,900) | (11,008) | (9,932) | (9,478) | (10,509) | (11,418) | (10,948) | (10,421) | (6,912) | (99,526) |

% of Global Revenue

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| NNI | 53% | 48% | 49% | 47% | 46% | 40% | 42% | 40% | 45% | 46% |
| NNL | 9% | 9% | 8% | 8% | 8% | 8% | 9% | 8% | 8% | 8% |
| France | 1% | 2% | 3% | 4% | 4% | 3% | 3% | 2% | 3% | 3% |
| Ireland | 1% | 2% | 3% | 3% | 3% | 4% | 5% | 6% | 4% | 3% |
| UK | 7% | 6% | 5% | 5% | 5% | 6% | 6% | 6% | 5% | 6% |
| Other | 28% | 34% | 33% | 33% | 34% | 38% | 33% | 39% | 35% | 34% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

---

[242] TR40623 (2003 Nortel Networks Corporation Form 10-K (Restated)) p. F-2 and F-5; TR40265 (2004 Nortel Networks Corporation Form 10-K) at F-2 and F-5; TR11003 (2005 Nortel Networks Corporation Form 10-K (Restated)) at F-2 and F-5; TR40267 (2006 Nortel Networks Corporation Form 10-K) p. 90 and 93; TR40269 (2008 Nortel Networks Corporation Form 10-K) at 110 and 113; TR49389 (Spreadsheet of Transfer Pricing Adjustments) Tabs "Q4 2009 SAP Con" and "RPS Participants"; TR49192 (2001 Transfer Pricing Calculation) Tabs "RONA" and "New reconciliation"; TR49187 (2002 Transfer Pricing Calculation) Tabs "RONA" and "New reconciliation"; TR49188 (2003 Transfer Pricing Calculation) Tabs "RONA" and "New reconciliation"; TR49194 (2004 Transfer Pricing Calculation) Tabs "Profit Split Profit" and "New reconciliation"; TR49190 (2005 Transfer Pricing Calculation) Tabs "Profit Split Profit" and "New reconciliation"; TR49191 (2006 Transfer Pricing Calculation) Tabs "RPS Calculation" and "A-100 Reconciliation"; TR49193 (2007 Transfer Pricing Calculation) Tab "RPS Calculation", "RPS Participants" and "Q4 2007 SAP Con"; TR49189 (2008 Transfer Pricing Calculation) Tab "FY RPS Calc", "FY RPS Calculation" and "RPS Participants"

201.    **These revenue percentages should be compared with each RPE's share of R&D expenditure, set forth in paragraphs 75-77.**

202.    **Because NNI, NNUK, NNSA and NN Ireland were obligated under the MRDA to share revenues as a condition of the license to exploit NN Technology (which would terminate if a party failed to make such payments),[243] a fair presentation of each RPE's financial results, and therefore the value of the license, is the operating profit/loss after transfer pricing adjustments (which was the basis of presentation for their separate financial statements and tax returns[244]).**

203.    **NNI's operating profit/loss after transfer pricing adjustments for the years 2001-2008 were (in U.S.$ millions):**

| Period | NNI Results After APA Adjustment[245] |
|---|---|
| **2001**[246] | **(1,849)** |
| **2002**[247] | **(122)** |
| **2003**[248] | **509** |

[243] TR21003 (MRDA and addenda) Article 11(c)(iii) & 11(d)

[244] Michel Clement Deposition, December 10, 2013, p. 121:7-122:2; TR33006 (NNUK Management Representation Letter, October 24, 2005)

[245] TR11239 (███████████████████████████)

[246] TR49192 (Spreadsheet of 2001 R&D CSA Participants Operating Earnings) "RONA" Tab

[247] TR49187 (Spreadsheet of 2002 R&D CSA Participants Operating Earnings) "RONA" Tab

[248] TR49188 (Spreadsheet of 2003 R&D CSA Participants Operating Earnings) "RONA" Tab

| | |
|---|---|
| **2004[249]** | **373** |
| **2005[250]** | **490** |
| **2006[251]** | **(31)** |
| **2007[252]** | **74** |
| **2008[253]** | **57** |
| **Total** | **(499)** |

**(g)      The APA Process and Representations to Tax Authorities**

     *(i)      Background*

204.    [74.] Some countries have adopted Advanced Pricing Agreement ("APA") processes, which allow a taxpayer to voluntarily approach a tax authority and receive approval of the taxpayer's transfer pricing approach outside of the audit context.[254]

205.    **The level of transparency required by a taxpayer in connection with an APA submission is inconsistent with a goal of tax avoidance.[255]**

---

[249] TR49194 (Spreadsheet of 2004 R&D CSA Participants Operating Earnings) "Profit Split Profit" Tab

[250] TR49190 (Spreadsheet of 2005 R&D CSA Participants Operating Earnings) "Profit Split Profit" Tab

[251] TR49191 (Spreadsheet of Parameters used in Post 2005 TPM, Applied to FYE 2006) "RPS Calculation" Tab

[252] TR49193 (Spreadsheet of RPS Participants Q4 2007 TP Calculation) "RPS Calculation" Tab

[253] TR49189 (Spreadsheet of Final 2008 Q4 Transfer Pricing Adjustments) "FY RPS Calc" Tab

[254] TR11053 (Overview of Transfer Pricing APA and Recommendation, December 12, 2001) p. 3

*(ii)    Choice of RPSM*

206.    [75.] At the request of the IRS and CRA when the APAs covering the CSAs were

expiring, Nortel prepared an APA request based on a residual profit split methodology, which

was ultimately codified in the MRDA.[256]

207.    **Nortel's preparation of its APA submission began by June 2001.[257]**

208.    **Marlene Gilbert, a Canadian Tax employee responsible for Nortel's transfer**

**pricing, led the "APA Team" Nortel assembled to prepare the APA request.[258]**

209.    **An APA Team email from August 2001 indicates that the team included, in addition**

**to Gilbert, Ron Horn (engineer in the Canadian Tax group who assisted in obtaining R&D**

**credits[259]), Carol-Ann Lane, Gilles Fortier (member of the Canadian Tax group, who**

**became responsible for maintaining the transfer pricing model and calculating transfer**

**pricing adjustments[260]), Donna Panton (NNUK employee responsible for transfer**

**pricing[261]), Walter Henderson, Alice Mitchell (responsible for tax issues related to IP**

---

[255] TR00050 (Exh. 50, Rebuttal Report of Dr. Timothy Reichert, February 28, 2014) p. 148

[256] TR21031 (Letter regarding Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004) p. 5

[257] TR33069 (August 21, 2001 email from J. Watt attaching APA Action Register 8-14-2001)

[258] TR33069 (August 21, 2001 email from J. Watt attaching APA Action Register 8-14-2001) ("Marlene has asked that we continue to work away at each of our action items"); Giles Fortier Deposition, October 10, 2013, p. 24:9-12; Walter Henderson Deposition, October 4, 2013, p. 118:24-119:7

[259] Ron Horn Deposition, September 24, 2013, p. 12:24-15:16

[260] Giles Fortier Deposition, October 10, 2013, p. 24:5-25:4, 116:5-14

[261] Kerry Stephens Deposition, 8, 2013, p. 349:3-13; Walter Henderson Deposition, October 4, 2013, p. 170:11-171:2

licensing[262]), Sandi Carroll, Kishor Badiani (NNUK employee and head of EMEA Tax[263]) and Jeffrey Watt (member of the Canadian Tax group).[264]

210.    In considering the methodology and later in preparing its APA requests, the Nortel Group relied upon external advisors including from Sutherland Asbill & Brennan (a law firm based in Washington, DC), Baker McKenzie (a law firm), Horst Frisch (an economics firm based in Washington, DC), Deloitte & Touche, Arthur Anderson (Terry Awan and Richard Coombes, in the U.K.), Price Waterhouse Coopers (Kerry Stephens, in the U.K.), and KPMG.  In addition, EMEA Tax personnel in NNUK consulted with local tax advisors in France and Ireland regarding the acceptability of the residual profit split methodology. Nortel's consultants obtained information from the Nortel Group's senior Tax, Finance, and Operations personnel.  In addition, the advisors had considerable experience with the Nortel Group based on their years of experience supporting and defending the Nortel Group's transfer prior pricing policies as well as APAs in Canada, the U.S., U.K., and around the world.[265]

---

[262] TR22082 (Memorandum on "Tax Guidelines for Patent and Technology License Agreements", August 31, 2001) p. 5

[263] Kishor Badiani Deposition, November 22, 2013, p. 36:2-37:4, 179:2-4

[264] TR33069 (August 21, 2001 Email from J. Watt attaching APA Action Register 8-14-2001)

[265] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and CCRA, September 2003) p. 39; TR22122 (Letter regarding Nortel Networks' Request to U.K. Inland Revenue to Enter APA, March 27, 2002); TR33071 (July 25, 2001 Email from P. Howe); TR33070 (August 7, 2001 Memorandum from M. Gilbert regarding Acceptability of the Residual Profit Split Method); TR33074 (December 26, 2001 Email from K. Bush attaching Presentation "Overview of Transfer Pricing APA and Recommendation"); TR33069 (August 21, 2001 email from J. Watt attaching APA Action Register 8-14-2001)

211.    **During this period, Nortel hired Peter Hutton, an expert in global transfer pricing issues, away from Arthur Andersen to assist in the APA process.**[266]

212.    **NNL also had the benefit of independent outside Canadian tax counsel—Scott Willkie of the Oslers firm.**[267]

213.    **Horst Frisch's mandate was "to review the transfer pricing methodologies of Nortel's prior Advanced Pricing Agreements ('APAs'), and to recommend the best methodology for a new, comprehensive and more administrable APA."**[268]

214.    **The APA team considered and rejected more tax efficient alternatives to the RPSM, such as moving the IP offshore.**[269]

215.    **While Canada offered R&D tax credits that could lower NNL's effective tax rate, they could not be used if NNL was unprofitable.**[270]

216.    **At this time, Nortel expected to return to profitability—no one contemplated that the Nortel Group would cease operations.**[271]

---

[266] Kriss Bush Deposition, November 11, 2013, p. 42:7-45:12

[267] Giovanna Sparagna Deposition, December 10, 2013, p. 77:17-78:11; Mark Weisz Deposition, November 25, 2013, p. 35:15-36:12

[268] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 1

[269] TR33069 (August 21, 2001 email from J. Watt attaching APA Action Register 8-14-2001)

[270] Mark Weisz Deposition, November 25, 2013, p. 100:6-25; John Doolittle Deposition, December 5, 2013, p. 51:10-12 (Canada "wasn't a tax haven when we were losing billions of dollars.")

[271] TR00016 (Ex. 16, Declaration of Walter T. Henderson Jr., April 25, 2014) para. 39

217.    **As Mark Weisz testified at his deposition, "the driving force behind our transfer pricing was choosing an economic model that reflected what the participants should earn in an arm's length transaction."[272]**

218.    **Walter Henderson likewise testified that his "objectives were that we have a methodology that was compliant with the tax systems of each of the jurisdictions involved, and that we had one with solid economic underpinning so that when we presented it to the tax authorities there was a logical and rational basis for it to be approved,"[273] and that "[t]he RPSM was intended to reflect Nortel's business operations – the economic reality of the business operations."[274]   On that basis, it was appropriate for money to move to Canada following adoption of the RPSM because it matched the distribution of R&D capital stock and the switch to the RPSM was based on the theory that R&D was the primary contributor to Nortel's success.[275]**

   *(iii)    Approval of RPSM*

219.    **The APA Team presented the proposed RPSM to Nortel's Legal Department, which did not identify "any significant legal issues or impediments" to its proposed implementation."[276]**

---

[272] Mark Weisz Deposition, November 25, 2013, p. 99:3-100:20

[273] Walter Henderson Deposition, October 4, 2013, p. 214:2-15

[274] Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1138:13-24

[275] Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1185:11-19, 1179:24-1180:21

[276] TR11065 (December 12, 2001 Email from T. Collins attaching Presentation "Residual Profit Split Arrangement (RPSA) Proposal – Legal Issues"))

220.    **The proposal was also widely circulated to internal IP, Tax, Legal, Finance, and Control personnel throughout Canada, the U.S. and EMEA.**[277]

221.    **In approving and executing the MRDA, the Participants ratified the RPSM.**

        *(iv)    Preparation for APA "Kick-Off" Meeting*

222.    **In preparing to present APA requests to the tax authorities of the U.K., U.S. and Canada, Nortel's external advisors Deloitte, KPMG and Horst Frisch contributed their views on potential questions that might arise and potential answers that Nortel could give—these were compiled into a single document, which has been introduced by the EMEA Debtors as TR22020.**[278]

223.    **The questions and answers compiled in TR22020 include contributions from Joelle Hall of KPMG, Rob O'Connor of Deloitte and Bill Morgan of Horst Frisch.**[279]

---

[277] TR11058 (Email regarding Overview of Objectives for Meeting to Discuss RPSM, December 3, 2001); TR11067 (December 10, 2001 Email from G. Fortier attaching Presentation "Overview of Transfer Pricing APA and Recommendation")

[278] TR22045 (June 7, 2002 Email from J. Hall attaching "Potential Questions at APA Kick Off Meeting.doc"); TR22016 (June 13, 2002 Email from R. O'Connor attaching "Nortel Questions oconnor.doc"); TR22017 (Memorandum from R. O'Connor regarding Potential APA Questions, June 12, 2002); TR50977.01 (June 14, 2002 Email from B. Morgan attaching "questions0614.doc") & TR50977.02 (Memorandum regarding "APA Q's & A's", June 14, 2002); TR22020 ("APA Kick Off Meeting: Potential Questions and Sample Answers")

[279] TR22045 (June 7, 2002 Email from J. Hall attaching "Potential Questions at APA Kick Off Meeting.doc"); TR22016 (June 13, 2002 Email from R. O'Connor attaching "Nortel Questions oconnor.doc"); TR22017 (Memorandum from R. O'Connor regarding Potential APA Questions, June 12, 2002); TR50977.01 (June 14, 2002 Email from B. Morgan attaching "questions0614.doc") & TR50977.02 (Memorandum regarding "APA Q's & A's", June 14, 2002)

- 74 -

224.    **O'Connor's memo included the question "How does Nortel propose to account for any future sale of intellectual property developed prior to or during the term of the APA? Which entities are considered the legal owner of IP and which are considered the economic owners?" and proposed as a response "Proceeds from the sale of IP will be allocated to residual profit split participants on the basis of their economic ownership of the IP - that is, on the basis of their share of total R&D capital stock in the year of sale."[280]**

225.    **O'Connor's cover email for this memo states**

> **"As you requested on Monday I have been considering further potential questions that may arise during the meeting on June 19th. I have prepared the attached memo listing some such questions and have included brief answers that I believe are supportive of the proposed APA. However, as noted in the memo, *I also believe some of these questions may need to be further researched and analyzed* to ensure that the brief answers make sense and are the most defensible/best answers from Nortel's perspective in the long run."[281]**

226.    **Although this question was included in the compilation at TR22020, there is no evidence that the question was ever edited, approved or adopted by Nortel personnel.**

227.    **O'Connor's role with respect to the kick-off meeting with the tax authorities and transfer pricing more broadly appears to have been minimal—MaryAnne Pahapill (who presented on behalf of Nortel at the meeting) did not recall him or Deloitte (then Nortel's**

---

[280] TR22017 (Memorandum from R. O'Connor regarding Potential APA Questions, June 12, 2002) p. 2-3

[281] TR22016 (June 13, 2002 Email from R. O'Connor attaching "Nortel Questions oconnor.doc") (emphasis added)

auditor) being involved in the APA and O'Connor was not included on communications
following the meeting.[282]

228.    **The post-meeting communications reveal that the tax authorities never asked how
proceeds from the sale of IP would be shared and thus neither O'Connor's proposed
response, nor any other statement regarding the issue, was made.[283]**

229.    **Orlando confirmed that Nortel never said anything one way or another to tax
authorities about how proceeds of a sale of IP would be allocated.[284]**

    *(v)    Correspondence with Tax Authorities in Support of First RPSM APA
        Applications*

230.    [76.] In March 2002, APA submissions were made by NNL, NNI and NNUK in their
respective jurisdictions requesting that the authorities approve the proposed residual profit split
methodology for tax years 2000-2004.[285]

---

[282] Mary Anne (Pahapill) Poland Deposition, October 3, 2013, p. 133:24-134:13, 135:20-136:20,
138:25-139:4; TR43679 (Minutes of June 19, 2002 APA Conference); TR44934 (June 28, 2002
Email from J. Hall attaching "Actual Questions from APA Kick Off Meeting and IRS.doc") &
TR44935 ("Actual Questions from APA Kick Off Meeting and IRS.doc"); TR44935 (Notes of
Questions Posed by Tax Authorities at June 19, 2002 APA Meeting); TR44936 (July 1, 2002
Email from T. Horst attaching "SUGGESTED RESPONSES TO CERTAIN QUESTIONS.doc")
& TR44937 ("SUGGESTED RESPONSES TO CERTAIN QUESTIONS.doc")

[283] TR43679 (Minutes of June 19, 2002 APA Conference); TR44934 (June 28, 2002 Email from
J. Hall attaching "Actual Questions from APA Kick Off Meeting and IRS.doc") & TR44935
("Actual Questions from APA Kick Off Meeting and IRS.doc"); TR44935 (Notes of Questions
Posed by Tax Authorities at June 19, 2002 APA Meeting); TR44936 (July 1, 2002 Email from T.
Horst attaching "SUGGESTED RESPONSES TO CERTAIN QUESTIONS.doc") & TR44937
("SUGGESTED RESPONSES TO CERTAIN QUESTIONS.doc")

[284] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1347:25-1348:6

231.    **In late 2003, Ernst & Young LLP (Canada) was hired to assist Nortel in the preparation of a functional analysis requested by the IRS.**[286]  **The lead partner from Ernst & Young LLP (Canada) was Robert Turner.**[287]

232.    **Ernst & Young LLP (Canada) retained Ernst & Young LLP (U.S.) as a subcontractor to conduct the functional analysis and assist in dealing with the U.S. tax authorities.**[288] **The lead partner from Ernst & Young LLP (U.S.) was Robert Ackerman, assisted by David Canale.**[289]

233.    **Ernst & Young LLP (Canada) and Ernst & Young LLP (U.S.) were assisted in conducting the functional analysis by Mark Weisz and Kerry Stephens, among other Nortel personnel who participated in the "global project".**[290]

234.    [77.] In 2004, at the request of the IRS, Nortel filed a functional analysis evidencing the key roles and risks of the APA applications in support of the use of the RPSM.[291]

---

[285] TR22122 (Letter regarding Nortel Networks' Request to UK Inland Revenue to Enter APA, March 27, 2002)

[286] Mark Weisz Deposition, November 25, 2013, p. 91:5-92:10; TR50862 (One Hundred and First Report of the Monitor, November 29, 2013) App. E (Affidavit of Elizabeth Wolfe, September 17, 2013) para. 6(b)

[287] TR50862 (One Hundred and First Report of the Monitor, November 29, 2013) App. E (Affidavit of Elizabeth Wolfe, September 17, 2013) para. 6(a)

[288] TR50862 (One Hundred and First Report of the Monitor, November 29, 2013) App. E (Affidavit of Elizabeth Wolfe, September 17, 2013) para. 6(c)

[289] James Gatley Deposition, November 7, 2013, p. 237:7-238:10

[290] Mark Weisz Deposition, November 25, 2013, p. 91:10-13, 96:2-18

[291] TR11084 (Nortel Networks: Functional Analysis for the years ended December 31, 2000-2004) p. 2

235.    **The 2004 Functional Analysis was submitted to the IRS (and copied to the CRA and Inland Revenue) under a cover letter from Canale of Ernst & Young LLP (U.S.); both Ernst & Young LLP (U.S.) and Ernst & Young LLP (Canada) were involved in its preparation.**[292]

236.    **Canale's cover letter emphasizes Nortel's focus on the use of IP in its products:**

> Though each R&D cost sharing participant continued with its rights to the legacy technology, without the commitment to new and innovative ideas, legacy technology would become obsolete in a very short period of time.  Only the constant pursuit of cutting edge technology allows for continued success.  This commitment to cutting edge technology comes with great risk should the participants not be able to introduce any new and commercially significant products into the market place.[293]

237.    **The attached Functional Analysis states that "In each country in which Nortel files patent applications, Nortel Networks Ltd. is designated as being the *assignee*, with few exceptions."**[294]

238.    **In 2004, with the APA request still pending, Nortel broke from its prior practice of executing transfer pricing agreements only upon conclusion of an APA and drafted and executed the MRDA.  The reasons for formalizing the MRDA at that time included the**

---

[292] TR11084 (Nortel Networks: Functional Analysis for the years ended December 31, 2000-2004)

[293] TR11084 (D. Canale letter attaching Nortel Networks: Functional Analysis for the years ended December 31, 2000-2004) at 2

[294] TR11084 (Nortel Networks: Functional Analysis for the years ended December 31, 2000-2004) p.  29 (emphasis added)

need for a written agreement covering ownership of Nortel IP in connection with licensing and litigation, as well as responding to transfer pricing audits.[295]

239.    The importance of confirming the ownership and licensing of Nortel IP rights is reflected in the numerous references to those issues in the recitals to the MRDA and the naming of the document: Master *Research &Development* Agreement.[296]

240.    The MRDA, showing that NNL had legal ownership of the Nortel IP, was provided to the tax authorities in the U.S., U.K. and Canada.[297]

241.    When the taxing authorities asked who the owner of Nortel IP was, they were told it was NNL.[298]

---

[295] TR11106 (April 12, 2004 email from Nortel IP counsel E. Jensen to M. Weisz) ("[O]ur problem is IP rights, not how the companies share profits/losses - while I understand that the two are intertwined, the impetus for doing this now (and not many years from now as was tax's initial proposal) is because our IP rights are no longer defined and we need to understand who owns what within Nortel. Consequently, I need to understand how you plan on approaching IP rights in the document."); TR11108 (May 27, 2014 email from E. Jensen to M. Weisz) ("I await a response to my email below seeking a timeframe for getting a draft agreement and confirmation as to what the draft agreement will cover from an IP standpoint. …After the Cost Sharing Agreement (CSA) was terminated effective 1/1/2001, our IP-ownership (primarily patents and software/copyrights) became uncertain. According to the CSA, all IP ownership vested in NNL, and in return NNL licensed the various CSA participants. After the CSA was terminated, it is not explicitly clear how the subsidiaries obtain rights to NNL's patents and which entity has IPR ownership for IP purposes. This comes into play in two primary areas, licensing IPR and lawsuits."); Mark Weisz Trial Testimony, Day 9, May 28, 2014, p. 1848:3-20

[296] TR21003 (MRDA and addenda)

[297] Mark Weisz Trial Testimony, Day 9, May 28, 2014, p. 1896:3-11

[298] Mark Weisz Trial Testimony, Day 9, May 28, 2014, p. 1898:8-11; *see also* TR11304 (Sept. 29, 2004 Email from M. Weisz to B. Morgan RE: IP Agreement)

(vi)     *"Beneficial" and/or "Economic Ownership"*

242.    **The second recital of the MRDA refers to the Licensed Participants' "equitable and beneficial ownership of certain exclusive rights under [NN] Technology", but the MRDA nowhere references "economic ownership" or "beneficial ownership" of the NN Technology (including patents).[299]**

243.    **Nortel employees' discussions relating to the transition from the CSAs to the MRDA likewise consistently speak of ownership of *rights*.[300]**

244.    **The evidence also indicates, however, that Nortel IP professionals, who urged the formalization of the MRDA to address IP ownership and licensing, had a different view of the scope of the rights granted under the CSAs and MRDA than did the Nortel tax**

---

[299] TR21003 (MRDA and addenda)

[300] *See, e.g.*, TR11114 (November 7, 2001 Email from T. Collins) at 2 ("I believe the transition will also require a valuation of the current intellectual property *rights* enjoyed by the participants . . . ") (emphasis added); TR11304 (Sept. 29, 2004 Email from M. Weisz to B. Morgan RE: IP Agreement) at 1 ("When we spoke last week there was discussion about buy in/buy out. I feel that this may not be necessary as the old R&D CS participants have the same *rights* as the new RPS participants.") (emphasis added); TR21031 (April 26, 2004 Nortel Networks Multilateral APA Responses to IRS Information and Document Request) at 5 ("Under the R&D CSA, each participant obtained certain *rights* with respect to its share of the intangibles developed under the CSA...With the CSA termination, such former participants are deemed to have acquired a fully paid up license permitting the former participant to continue to exercise the *rights* it obtained under the CSA. As such, no buy-out payment is necessary because each former CSA participant continues to own the *rights* it acquired during the CSA upon CSA termination.") (emphases added); *see also* Giovanna Sparagna Deposition, December 10, 2013, p. 164:15-25 ("Is it your understanding that if NNUK was a [participant] in the CSA, then it was considered to own the NT technology as it related to its specific region?  A.  I think one might say that if NNUK was part of the CSA and that, under the CSA, they would likely have owned intangibles as a result of its participation in the CSA. Q.  Those intangibles include IP *rights*? A. I can't be specific on that, but I would assume so.") (emphasis added)

professionals relied upon by the U.S. and EMEA Debtors.  For example, Timothy Collins,

former Nortel IP counsel, testified at deposition to his

> understanding of the R&D cost-sharing agreement is that it allocates
> to the participants an exclusive licence to make, use, or sell capital "P"
> products to the participants, and capital "P" products are Nortel
> products, so it's basically a distribution type of agreement that's
> giving them exclusive distribution rights in particular geographic
> locations.  It doesn't give them the exclusive licence to the patent, full
> stop.[301]

245.    Collins went on to say that he had no understanding of the use of the term

"beneficial ownership" by non-IP attorneys commenting on the MRDA.[302]

246.    Neither Collins nor any other witness identified any term in the MRDA that was

customary in IP licensing, and the U.S. Interests' supposed "custom and practice" expert

acknowledged that many license agreements are "one-off".[303]

247.    Certain of Nortel's submissions to tax authorities use the phrase "economic

ownership" or "beneficial ownership".  These are terms of art in transfer pricing that

---

[301] Timothy Collins Deposition, November 15, 2013, p. 191:20-192:5

[302] Timothy Collins Deposition, November 15, 2013, p. 200:14-201:2 ("Q.  What did you
understand Mr. Doolittle to mean when he wrote "beneficial rights"?  A.  I have no idea.  Q.
When you read it, did you have no idea?  A.  I had no idea.  This came to me out of the blue, and
I have no idea what John Doolittle would be talking about Canada's IP beneficial rights.  He's not
an IP attorney, so I wouldn't have thought much of it other than he's talking about selling
Canada's IP rights to the U.S.")

[303] Daniel Bereskin Deposition, March 27, 2014, p. 54:7-14

indicate that the parties' arrangement satisfies the requirements for particular tax treatment.[304]

248.    **Specifically, the terms "economic ownership" and "beneficial ownership" as used in the OECD guidelines for transfer pricing mean that a party has "the right to benefit from some or all of an income stream as a result of a defined undertaking or activity."[305]**

249.    **For their part, Nortel's tax professionals consistently emphasized that their use of the terms "beneficial ownership" and "economic ownership" was solely in the tax context and did not bear on the allocation question before the Courts:**

>    Q.    **And there's a distinction between legal title and beneficial or economic ownership; is that right?**
>
>    A.    ***For tax purposes***, **yes.**
>
>    Q.    **And could you describe that to me?**
>
>    A.    ***For tax purposes***, **bare legal title does not necessarily mean economic title, that you're entitled to the returns or the losses attributable to that property.[306]**

250.    **As Mark Weisz noted in an email regarding the drafting of the MRDA,**

>    **With regard to the contract needed between the RPS parties *we (in tax) believe* that the beneficial ownership of the IP has been determined based on the RPS and how the mechanics of the model work.  The issue of IP ownership perhaps goes beyond the scope of what the *tax department needs* at this time.  *From a tax perspective* we**

---

[304] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3834:24-3835:5

[305] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3830:4-8; *see also* TR11391 (2010 OECD Guidelines, July 2010) para. 6.3

[306] Giovanna Sparagna Deposition, December 10, 2013, p. 80:5-13 (emphases added)

will document and contractualize the relationship between the RPS companies.[307]

*(vii)    Tax Authorities' Responses to First RPSM APA Applications*

251.    **In addition to making various requests for information and documentation, the tax authorities met and discussed their positions regarding Nortel's APA application at various times, and t**████████████████████████████████████████████████████████████████████████████████████████████████████. **While the tax authorities took various positions with respect to certain aspects of Nortel's RPSM (none of which aspects are challenged by the parties in this case), there was no disagreement that the residual profit split method was the most appropriate transfer pricing method for Nortel.[308]**

*(viii)    Second RPSM APA Applications*

252.    **In 2007, Nortel presented its request (in various forms) for new APAs to the relevant tax authorities (the CRA, IRS, HMRC and the Direction Génèrale des Impôts**

---

[307] TR11106 (April 12, 2004 email from Nortel IP counsel E. Jensen to M. Weisz) (emphases added)

[308] TR31026 (December 23, 2005 Letter from Inland Revenue to J. Doolittle) (reflecting agreement with CRA on key points relating to APA request); TR49112.02 (February 13, 2006 Fax from T. Ralph of the IRS to D. Canale enclosing memorandum on IRS negotiating position); TR49248 (February 17, 2006 Email from D. Canale to T. Ralph enclosing Nortel's comments on IRS memorandum); TR11237 (March 22, 2006 IRS APA Program Position Paper); TR11352 (April 6, 2006 Memorandum from Nortel to IRS responding to March 2006 Position Paper (copied to CRA and Inland Revenue)); ████████████████████████; TR49279 (July 25, 2006 Fax from IRS's T. Ralph enclosing proposed "Agreed Material Facts"). The three tax authorities met on September 27, 2006, and again on October 27, 2006, to discuss the Nortel APA requests; TR49272 (October 27, 2006 Email from D. Canale re: "Call from Tom Ralph"). In September 2008, the CRA issued a supplementary position paper. ████████████
████████████████████████████████████████████████

**("FTA")).  In October 2007, Nortel made pre filing presentations to the CRA and IRS.[309]**

**Thereafter, in December 2007, NNL and NNSA submitted an application to CRA and the**

**FTA for a bilateral APA between France and Canada for the tax years January 1, 2007 to**

**December 31, 2011;[310] and by this time, Nortel had also presented an outline of the new**

**model to HMRC.[311]**

253.    **Ernst & Young LLP (Canada), led by Robert Turner and Tony Wark, and Ernst &**

**Young LLP (U.S.), led by Bob Ackerman, David Canale and Lonnie Brist, assisted Nortel**

**in preparing its APA applications for the 2007-2011 years.[312]**

254.    [78.] Thereafter, in 2008, Nortel submitted a further request to the IRS and CRA for a

U.S.–Canada bilateral APA in respect of a proposed revised RPSM (as ultimately codified in the

MRDA) for the tax years 2007-2011 (with a rollback to 2006).[313]  Prior to the insolvency filing,

---

[309]  TR11256 ("Nortel Pre-filing Conference with CRA" Presentation, October 2, 2007); TR11257 ("Nortel Pre-filing Conference with IRS" Presentation, October 23, 2007)

[310]  TR31210 (Request for France-Canada Bilateral Advance Pricing Arrangement, December 20, 2007)

[311]  TR43327 (Dec. 3, 2007 Email from K. Stephens to R. Smith and S. Freemantle) ("On the new model I said this had been presented to HMRC in outline . . . .")

[312]  TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) at 21; *see also* TR50862 (One Hundred and First Report of the Monitor, November 29, 2013) para. 17 & App. E (Affidavit of Elizabeth Wolfe, September 17, 2013) para. 6

[313]  TR45100.01 (Letter to IRS regarding NNI and NNL Joint Request for US-Canada Bilateral APA, October 31, 2008); TR45100.02 (Letter to CRA regarding NNI and NNL Joint Request for US-Canada Bilateral APA, November 5, 2008); TR22078 (Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement 2007-2011 (with rollback to 2006), October 31, 2008)

Nortel had planned to submit a similar request to Inland Revenue and the French Tax Authority.[314]

### (ix)    Resolution of APA Applications

255.    [79.] The APA for the 2001-2005 tax years ultimately was resolved by the IRS and CRA. In 2009, following the Nortel bankruptcy, NNL and NNI were advised that the agreement between the tax authorities sought a reallocation of income from NNL to NNI in the amount of U.S. $2 billion for the tax years ending 2001 to 2005.[315]  The $2 billion settlement was presented to NNL and NNI as being a numerical settlement that needed to be accepted "as is" without an explanation as to the technical positions underlying the adjustment[316] and the tax authorities did not specify on what basis the $2 billion figure was calculated.[317]

---

[314] Ultimately, as a result of the restructuring, Nortel was unable to complete its filings and withdrew those applications that had been filed: TR50574.02 (Letter to IRS regarding Withdrawal of Bilateral APA Request with Canada, March 9, 2010); TR48633 (Letter to CRA regarding Withdrawal of Bilateral APA Request with United States, March 25, 2010); TR47109 (Letter to CRA regarding Withdrawal of Bilateral APA Request with France, April 1, 2010)

[315] TR48634 (Settlement Stipulation between Nortel Networks and IRS, December 23, 2009)

[316] TR21285 (Letter to CRA regarding CCAA Proceedings and APA) p. 5; Vincent Raimondo Deposition, October 4, 2013, p. 57:6-58:6; Jeffrey Wood Deposition, November 1, 2013, p. 79:7-80:8, 86:12-86:16; John Doolittle Deposition, December 5, 2013, p. 236:8-236:10

[317] Walter Henderson Trial Testimony, Day 6, May 21, 2014, p. 1320:25-1321:7**; TR21285 (Letter to CRA regarding CCAA Proceedings and APA, November 10, 2009) p. 5; Vincent Raimondo Deposition, October 4, 2013, p. 57:5-9**

- 85 -

256.     **did not suggest that Nortel's RPSM was an inappropriate method or that another method should have been applied.**[318]

257.    [80.] The APAs were approved by the U.S. and Canadian Courts on January 21 and 22, 2010.[319]

258.    **NNI has an allowed claim against NNL's estate for $2 billion.**[320]

259.    [81.] The transfer pricing experts agreed that the $2 billion settlement does not provide any specific criticism of Nortel's transfer pricing system and settlements among tax authorities frequently have little to do with the taxpayer.[321]

260.    **As is typical in bilateral APA processes, the taxpayers (NNI and NNL) were not included in the negotiations between the tax authorities or informed of the reasons why the**

---

[318] TR21285 (Letter to CRA regarding CCAA Proceedings and APA) p. 5

[319] TR21543 (Document containing Order of Canadian Court, January 21, 2010) Appendix B (paras. 8-10, being pg. 54 of 92 of PDF); NNI_00207809 (Order of U.S. Court Approving the Settlement Stipulation Between NNI and the IRS, Entry Into the APA and Related Relief, January 21, 2010) paras. 2-4

[320] TR40594 (Thirty-Fifth Report of the Monitor, January 18, 2010) p. 17

[321] Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2881:22-2883:7; Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2768:16-2769:17; Dr. Timothy Reichert Deposition, March 20, 2014, p. 233:8-235:19; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 5038:19-5039:11

**adjustment** ███████████████████████████████████████████

████████████████████████████ **to $2 billion.**[322]

261.    **The CRA requested the withdrawal of the pending APA request with respect to 2006 onward due to,** *inter alia,* **the uncertainties associated with Nortel's business structure for the foreseeable future, including Nortel's January 14, 2009 announcement that it would pursue creditor protection in Canada and similar creditor protection measures in other jurisdictions.**[323]

262.    **In 2009, the IRS filed three proofs of claim against NNI in 2009, with respect to all taxable years up to and including the year ending December 31, 2008)** (*i.e.*, **the entire pre-filing tax period),  totalling approximately $3 billion.  In 2010, the U.S. Court approved NNI's settlement with the IRS for an agreed claim of $37.5 million.**[324]

─────────────────────────

[322] James Gatley Deposition, November 7, 2013, p. 52:18-56:19; Mark Weisz Deposition, November 25, 2014, p. 83:13-84:5; Vincent Raimondo Deposition, October 4, 2013, p. 57:6-58:6; Jeffrey Wood Deposition, November 1, 2013, p. 79:7-80:8; 86:12-86:16; John Doolittle Deposition, December 5, 2013, p. 236:8-236:10; TR11053 (Overview of Transfer Pricing APA and Recommendation, December 12, 2001); TR22126 (June 19, 2002 Email from K. Bush) **TR21285 (Letter to CRA regarding CCAA Proceedings and APA, November 10, 2009)**

[323] TR43792 (June 30, 2009 letter from CRA requesting withdrawal of 2006-2011 APA request); TR50574.02 (Mar. 9, 2010 NNI letter to IRS withdrawing APA request); TR48633 (Mar. 25, 2010 NNL letter to CRA withdrawing APA request)

[324] TR50986 (Notice of Motion for an Order Approving the Settlement Stipulation Between Nortel Networks Inc. and the IRS, attaching the Motion to Approve an Order Approving the Settlement Stipulation Between Nortel Networks Inc. and the IRS) para. 27 and p. 39

263.    [82.] No party to this litigation contends that Nortel should have used a different transfer

pricing methodology for the 2001-2009 period; to the contrary, there is agreement that the RPSM

was the most appropriate method for Nortel, in light of the facts and circumstances.[325]

## B.    Post-Petition

### (a)    Commencement of Proceedings

264.    [83.] On January 14, 2009, NNC, NNL, Nortel Networks Technology Corporation,

Nortel Networks International Corporation and Nortel Networks Global Corporation (namely,

the Canadian Debtors) filed for and obtained protection from the Court under the *Companies'*

*Creditors Arrangement Act* and Ernst & Young Inc. was appointed as Monitor.[326]

265.    **The Monitor is authorized to engage advisors and is assisted in carrying out its**

**duties by personnel of Ernst & Young LLP of Canada and Ernst & Young LP of**

**Canada.[327]**

266.    [84.] On that same day, NNI and certain of its U.S. subsidiaries and affiliates

concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy *Code* in the

---

[325] Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2851:13-2852:11, 2889:1-9; TR00038 (Exh. 38, Rebuttal Report of Steven Felgran, February 28, 2014) p. 1, 3-4; Dr. Richard Cooper Trial Testimony, Day 11, May 30, 2014, p. 2641:25-2646:17, 2671:7-2672:10; Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2762:8-14, 2766:8-2768:15; TR00035 (Exh. 35, Expert Report of Dr. Richard Cooper, January 24, 2014) p. 22; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 5028:6-5029:3, 5037:4-5038:10; Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3967:8-19; TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 28

[326] NNC-NNL07160800 (Initial Order, January 14, 2009)

[327] TR49893 (Affidavit of Sean Kruger, April 7, 2014) para. 1; NNC-NNL07160800 (Initial Order, January 14, 2009) para. 25.(i)

United States Bankruptcy Court for the District of Delaware.[328]  As required by U.S. law, an official committee of unsecured creditors (the "UCC") was established in January 2009.

267. **NNI has retained Ernst & Young (U.S.) to perform tax functions previously performed by NNI employees.[329]**

268. [85.] Nortel Networks (CALA) Inc. ("NN CALA" together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009 comprise the U.S. Debtors) also filed a voluntary petition under Chapter 11 of the U.S. Bankruptcy *Code* in the U.S. Court on July 14, 2009.

269. [86.] An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these U.S. and Canadian court proceedings (the "Bondholder Group") along with Law Debenture Trust Company of New York, as Trustee, and The Bank of New York Mellon, as Trustee, which are trustees under indentures covering cross-over bonds, which trustees have advanced claims against one or more of the Canadian Debtors and one or more of the U.S. Debtors.  Wilmington Trust, National Association as Successor Trustee is a trustee under an indenture issued by NNL and has advanced claims against only NNL and is also participating in these proceedings.

270. [87.] In addition, pursuant to orders of the Canadian Court, representative counsel was appointed on behalf of the former employees of the Canadian Debtors, the continuing employees of the Canadian Debtors and the LTD Beneficiaries (together with certain other Canadian

---

[328] TR40664 (NNI Voluntary Petition, January 14, 2009)

[329] Jeffrey Wood Deposition, November 1, 2013, p. 30:24-31:4, 43:9-22

creditors, the "Canadian Creditors' Committee" or the "CCC") and representative counsel was also appointed on behalf of the former officers and directors of the Canadian Debtors (the "D&O") and each of these groups is participating in these proceedings.

271.    [88.] Furthermore, the Board of the UK Pension Protection Fund and Nortel Networks UK Pension Trust Limited (together, "UKPC") are also participating in these proceedings.

272.    [89.] On January 14, 2009, NNUK, NNSA, NN Ireland and certain of NNUK's European subsidiaries (namely, the EMEA Debtors) were granted administration orders (the "UK Administration Proceedings") in the U.K. under the *Insolvency Act, 1986* and Alan Bloom, Christopher Hill, Alan Hudson and Stephen Harris of Ernst & Young LLP were appointed as Joint Administrators of the EMEA Debtors (except for NN Ireland, whose Joint Administrators are Alan Bloom and David Hughes).[330]

273.    **Ernst & Young LLP (U.K.), in which the EMEA Joint Administrators are partners, is a separate legal entity from Ernst & Young Inc. (Canada), which serves as Monitor, and the other Canadian Ernst & Young entities that provide services to the Monitor. [331]**

274.    [90.] Subsequent to the filing date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France.

---

[330] TR31625 (Witness Statement of Alan Bloom, July 23, 2010) para. 2

[331] TR31625 (Third Witness Statement of Alan Bloom, July 23, 2010) p. 1-2

275.    [91.] The CCAA proceedings and the UK Administration Proceedings of NNUK and the

other EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under

Chapter 15 of the Code.

276.    [92.] Subsequent to the filing date, certain other Nortel subsidiaries have filed for creditor

protection or bankruptcy proceedings in the local jurisdiction in which they are located.

277.    [93.] Certain solvent indirect subsidiaries of NNUK are not in administration, but are

represented in these proceedings by the Joint Administrators with respect to the allocation

issues.[332]

**(b)    Post-Petition Transfer Pricing Documentation**

278.    **Following the petition date, personnel working on behalf of the Monitor, including**

**Sean Kruger, assumed responsibility for assisting in NNL's transfer pricing**

**documentation, together with Michael Orlando and other Nortel transfer pricing personnel**

**employed by NNI.[333]**

---

[332] Allocation Position of the Joint Administrators Regarding the Allocation Entitlement of the EMEA Debtors, May 16, 2013, Schedule 1

[333] TR50862 (One Hundred and First Report of the Monitor, November 29, 2013) para. 17 & App. E (Affidavit of Elizabeth Wolfe, September 17, 2013) para. 6. Kruger had no involvement in Ernst & Young (Canada)'s pre-petition transfer pricing advisory mandate for the Canadian Debtors and has only been engaged with respect to Nortel matters as an advisor to the Monitor in the post-filing period.

279.    **The 2009 NNI Transfer Pricing Report and the 2009 NNL Transfer Pricing Report were prepared with the assistance of the Monitor, but were neither representations by the Monitor nor in fact submitted to the IRS or CRA.**[334]

280.    **The 2009 NNI Transfer Pricing Report states, with respect to the proceeds of the Business Sales that had occurred as of the date of its preparation, that "[t]he ultimate determination of the final allocation of such proceeds among the various Nortel entities has not yet occurred" and, "[c]urrently, NNI has no right to any identifiable portion of the sale proceeds . . . ." because "[t]he courts allowed for the disposition of the business to be completed without an allocation."** [335]

(c)    **Decision to Liquidate**

(i)    *Nortel's Restructuring Options*

281.    [94.] Following the insolvency filings, the focus was on "right-sizing" Nortel and two main restructuring options were considered.[336]

282.    [95.] The first option considered was a restructured Nortel focused on the legacy CDMA wireless business and a potential business based on LTE wireless technology with all other Nortel business lines being sold.[337]

---

[334] TR47221.02 (2009 NNI Transfer Pricing Report) at 1 ("Nortel Networks, Inc. ('NNI') has prepared a US transfer pricing report . . . "); TR48622.02 (2009 NNL Transfer Pricing Report) at 1 (same regarding NNL)

[335] TR47221.02 (2009 NNI Transfer Pricing Report) at 21

[336] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 42

[337] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 43

283.    [96.] At the time, the CDMA business, which was based on an aging technology, was

profitable but its business was mature, and its revenue was forecast to decline over the coming

years as customers transitioned to the next generation LTE technology.[338]

284.    [97.] The second restructuring option considered was the sale of all of Nortel's business

lines and other assets, *i.e.* a liquidating insolvency.[339]

### *(ii)    Verizon Chooses Another LTE Provider*

285.    [98.] The primary reason why the first option was not pursued was that in February 2009,

Verizon Communications, a major CDMA customer and a prospective customer for Nortel's

LTE technology, advised Nortel that it had not been selected as an LTE provider to Verizon.[340]

286.     [99.] Verizon further advised Nortel that it preferred that the CDMA business be moved

into "safe hands" (*i.e.*, to another telecommunications provider with a strong balance sheet),

failing which Verizon would direct a significant amount of its CDMA purchases to its other

CDMA supplier on a going-forward business.[341]

287.    [100.] As a result of Verizon's lack of support, the prospective business model for Nortel

continuing to operate the CDMA and LTE business was seriously undermined.[342]

---

[338] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) paras. 44-45

[339] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 43

[340] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 47; TR46789 (Verizon Press Release regarding Global LTE Ecosystem, February 17, 2009)

[341] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) paras. 9-12

[342] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 23

288.    [101.] In addition to Verizon, other customers such as AT&T and Comcast also had concerns about awarding contracts to Nortel on a going-forward basis.[343]

### (iii)    *Nortel Decides to Liquidate*

289.    [102.] Ultimately, following significant review by NNC's senior management and board of directors, and following consultation with Lazard Freres & Co (which was Nortel's financial advisor), as well as consultation with all other stakeholders, a decision was made relatively early in the restructuring process that the best means to realize value for creditors would be to sell all of the business lines along with any other assets.[344]

290.    [103.] No party suggested that it was a viable option to restructure along geographic lines or for a country-specific entity to independently continue in Nortel's business.[345]

### (iv)    *NNI Did Not Pursue a Stand-Alone Restructuring*

291.    [104.] Eleven months into insolvency proceedings, and well after the decision not only to liquidate but also to sell Nortel's significant lines of business, John Ray was engaged as Principal Officer of NNI to oversee the winding up of the businesses of the U.S. Debtors.[346]

292.    [105.] By the date of Mr. Ray's engagement in December 2009, Nortel's largest LOBs had already been divested and its remaining significant LOBs were under contract to be sold (for

---

[343] Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1085:1-11

[344] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) paras. 49-50

[345] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) paras. 4-11

[346] TR11358 (John Ray Employment Agreement, December 7, 2009); John Ray Trial Testimony, Day 6, May 21, 2014, p. 1398:21-23

a combined value of $3.218 billion).  After he was hired, the remaining business lines were divested for only $67 million.[347]

293.    **There is no evidence that Verizon, AT&T or Comcast (all significant customers of NNI) would have been willing to award contracts to NNI as a standalone entity without the support of the R&D efforts in Canada and EMEA, given that they were unwilling to proceed with Nortel as a whole.[348] Obtaining sufficient R&D functions to support a stand-alone business would have been time-consuming and expensive.**

294.    **Verizon had accounted for approximately 27% of NNI's total revenue in 2008.[349]**

295.    **At no time was NNI operating a separate business from the rest of the Nortel operations, nor did it have the capability to do so:**

    (a)    **NNI did not have the R&D capability to operate a separate stand-alone business.[350]  It was not conducting much or any LTE (next generation) or advanced technology research.[351]**

------

[347] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1404:9-1413:9; TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 6-8; DEM00007 (Demonstrative for Ray Trial Cross-Examination Testimony)

[348] TR00005 (Exh. 5, Reply Affidavit of Brian McFadden, April 25, 2014) para. 3; Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 638:5-639:12; Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1085:1-11

[349] TR45494 (Revenue by Customer-Portfolio-Region-Entity-Market_2008.xls)

[350] TR00005 (Exh. 5, Reply Affidavit of Brian McFadden, April 24, 2014) para. 3; TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 7; Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 638:5-14

[351]  TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 8; Brian McFadden Trial Testimony, Day 3, May 14, 2014, p. 636:16-637:19, 645:1-3

(b)     **Any attempts to re-organize around a smaller region specific entity would have been time consuming and expensive.[352]  Further, it is clear that customers like Verizon were not willing to go with a "smaller" Nortel and an NNI stand alone could not have kept such customers.[353]**

(c)     **The Nortel Group itself operated as one integrated whole[354] – although NNI did have certain administrative and logistical capabilities, all reporting was to executive management in Canada[355] and NNI itself did not have many functions such as treasury or financial reporting sufficient to run on its own.[356]**

(d)     **When asked during opening whether NNI ever considered recapitalizing as a stand-alone directly, counsel for the U.S. Debtors did not provide a positive response,[357] and no evidence of such consideration was presented.**

---

[352]  TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 8

[353]  TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 47; TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) paras. 9-12; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 23

[354]  TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) at 6 ("Each IE performs the functions of R&D, manufacturing support, distribution and extraterritorial services to varying degrees in a very united and reliant manner."); TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 5; TR00013 (Exh. 13, Affidavit of Gordon Davies, April 11, 2014) para. 39

[355]  TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 32-35

[356]  TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) para. 63; TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) at Appendix E, p. 7; TR31443 (Witness Statement of Sharon Lynette Rolston, January 14, 2009) paras. 15(i), 85; TR00015 (Exh. 15, Affidavit of Paviter Binning, April 24, 2014) para. 5

[357]  U.S. Debtors' Opening Statements, Day 2, May 13, 2014, pp. 323:21-324:11

(d)    **IFSA**

    (i)    ***Background to the IFSA***

296.    **On January 14, 2009, with the approval of the U.S. and Canadian Courts, NNI loaned to NNL $75 million under a new secured revolving loan agreement (the "Intercompany DIP Loan"), which was repaid later by NNL with proceeds from the sale of Nortel's Carling facility.[358]**

297.    **Also in January 2009, a transfer pricing adjustment from NNI to NNL, in the amount of approximately $30 million, was made.[359]**

298.    [106.] Since January 2009, as a result of the insolvency proceedings, NNL had not received any payments from its subsidiaries pursuant to the RPSM provisions of the MRDA.[360]

299.    [107.] NNL had continued to incur significant R&D costs to preserve the enterprise value of the business lines for either ongoing business or sale; for example, in 2009, the Canadian Debtors spent $180 million in R&D on the CDMA and LTE business (as compared to $120 million spent by the U.S. Debtors).[361]

---

[358] TR50194 (U.S. D.I. 58 Order Approving Continued Use of Cash Management) para. 8; NNC-NNL07160800 (Initial Order, January 14, 2009) para. 40; TR50003 (Nov. 8, 2010 Endorsement re NNI Loan Agreement and Certain Matters Involving Allocation) para. 3

[359] TR43794 (Interim Funding and Settlement Agreement, June 9, 2009) p. 2

[360] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 28 (NNL had received one $30 million payment from NNI in January 2009)

[361] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) p. 17, Exhibit 7; Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4314:9-4316:24

300.    [108.] NNL was also incurring significant expenses in respect of corporate overhead, as it worked to coordinate the global restructuring efforts for the benefit of Nortel's global stakeholders.  The resulting negative cash flow was projected to continue unabated over the next few months.[362]

301.    [109.] The parties also appreciated that if determining the allocation of proceeds from Nortel's assets were a precondition to their sale, sales would be substantially delayed, and the value of the assets would depreciate, resulting in less money for all creditors.  Avoiding a dispute during the sale processes about how to allocate the proceeds allowed the parties to obtain the highest monetary value for the assets being sold.[363]

302.    [110.] All parties recognized that fighting over allocation would have prevented the sale of the assets, resulting in a smaller pot of proceeds to allocate between the Debtors.[364]

---

[362] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 29

[363] Trial Transcript, Day 1, May 12, 2014, p. 169:10-25 *per* Sheila Block on behalf of the U.S. Debtors ("[T]he parties cooperated to obtain the highest amount of money, and the aim of the process for each estate was to maximize the recovery."); TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 18 ("The estates and creditors ultimately decided that, to maximize value, the pursuit of the sale of the Residual Patent Portfolio was the best option. This decision proved incredibly successful.")

[364] TR50886 (Transcript of Proceedings, June 7, 2011) p. 36, 43-44 *per* Mr. Bromley on behalf of the U.S. Debtors; *see also* TR21509 (Transcript of Proceedings, **July** 11, 2011) p. 51-52 *per* Mr. Botter on behalf of the Official Committee ("I think all parties agree that the IFSA contemplated cooperation amongst the selling parties in the sales efforts to maximize value without reference to any allocation disputes of which we heard so much about the last time. Your Honor, I think that the efforts of all of the selling parties ought to be applauded here.  We truly did maximize value."); TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 16 ("[T]he sale process would not succeed if a selling party could hold up a sale pending agreement on the allocation of the sale proceeds.")

*(ii)*     ***IFSA Provisions***

303.    [111.] Accordingly, on June 9, 2009, NNL, NNI, NNUK and the Joint Administrators (among other parties) entered into the Interim Funding and Settlement Agreement (the "IFSA"), which addressed these funding issues for an interim period.[365]

304.    [112.] More specifically, under the IFSA, which is governed by New York law, the Estates agreed:

    (a)    that their execution of sale documentation or the closing of a sale transaction would not be conditioned upon reaching agreement either on allocation of the sale proceeds or on a binding procedure for determining the allocation question;

    (b)    that the sale proceeds would be deposited into escrow, and that there would be no distribution out of escrow without either the agreement of all of the selling debtors or the determination of any dispute relating thereto by the relevant dispute resolver;

    (c)    that the agreement would not have any impact on the allocation of proceeds to any Debtor from any asset sale and would not prejudice a party's rights to seek its entitlement to the proceeds from any sale; and

    (d)    that, in order to facilitate the Business Sales, the U.S. and EMEA Debtors would enter into appropriate license termination agreements which would provide for the termination of the license rights granted by NNL under the MRDA.[366]

---

[365] TR43794 (Interim Funding and Settlement Agreement, June 9, 2009)

305.    [113.] The certainty that this structure allowed in the context of going-concern sales in a real-time, worldwide, insolvency proceeding was central to maximizing the sale proceeds received from the LOB sales with all the Estates cooperating.[367]

306.    **The IFSA requires that any agreement or determination by either the U.S. Debtors or Canadian Debtors related to license termination agreements and the allocation of Sale Proceeds required the prior consent of the Bondholder Group, acting in good faith.  The U.S. Debtors had to obtain similar consent from the UCC and the Canadian Debtors had to obtain similar consent from the Monitor.[368]**

307.    [114.] The parties also agreed that a Debtor would not be required to enter into a sale transaction, if it reasonably determined in good faith that the transaction was not in the best economic interest of its creditors.[369]

308.    **No Debtor ever sought to exercise that right and the Business Sales and Rockstar Sale were completed consensually without any agreement or guarantee of allocation.[370]**

---

[366] TR43794 (Interim Funding and Settlement Agreement, June 9, 2009) s. 10(a), 11, 12(a), 12(b), 12(f), 16(a)

[367] Murray McDonald Deposition, November 26, 2013, p. 137:12-139:4; Cosme Rogeau Deposition, December 12, 2013, p. 141:21-144:3; Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 925:16-926:9; Alan Bloom Deposition, December 5, 2013, p. 217:18-220:3, referring to TR31625 (Witness Statement of Alan Bloom, July 23, 2010) para. 34; TR50886 (Transcript of Proceedings, June 7, 2011) p. 36:16-24, 43:18-44:1 *per* Mr. Bromley; Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1054:13-1055:13

[368] TR43794 (Interim Funding and Settlement Agreement, June 9, 2009) s. 12(g)

[369] TR43794 (Interim Funding and Settlement Agreement, June 9, 2009) s. 12(e); TR00009 (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 44

[370] TR00009 (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 44

(iii)    *Reservation of Rights, Deferral of Allocation and Completion of Sale Transactions Under the IFSA*

309.    [115.] Indeed, the Debtor Estates understood that allocation was deferred until after the asset sale.  Alan Bloom, one of the Joint Administrators of the EMEA Debtors, explicitly confirmed this central outcome of the IFSA on his deposition:

> Q.      And you'll agree with me that the parties did collaborate on the asset sales?
>
> A.      Yes.
>
> Q.      And they were doing so pursuant to the IFSA.  Correct?
>
> A.      Yes.
>
> Q.      And that the issue of allocation was deferred until after the asset sales?
>
> A.      Yes.
>
> Q.      And that was to allow the parties a latitude to cooperate in order to maximise the amounts of the asset sales?
>
> A.      Yes.  That was the objective of the exercise.
>
> Q.       And purposely done to allow the asset sales to happen first and allocation to go second?
>
> A.      Yes.[371]

310.    [116.] It was under this framework that Nortel proceeded with the liquidation of its assets, and ultimately, the prosecution of this trial whereby the parties' positions on allocation were required to be disclosed after all of Nortel's assets were sold.

-----

[371] Alan Bloom Deposition, December 5, 2013, p. 219:8-220:3 (Objections not pursued removed); *see also* John Ray Deposition, December 13, 2013, p. 96:23-98:4

311.    [117.] Although section 11(a) of the IFSA does state that the U.S. Debtors and EMEA

Debtors agree to enter into license termination agreements "in consideration of a right to an

allocation", even the evidence of Mr. Ray of the U.S. Debtors makes clear this does not act as a

guarantee to a specific allocation or that such an allocation would not be zero.[372]  Indeed, Section

12 of the IP Transaction Side Agreement, signed by the parties in conjunction with the Rockstar

Sale, states that termination of the license rights have no effect on the allocation dispute and

reserved rights to "present any arguments, methodologies, legal or factual theories in support of a

proposed allocation of the IP Sale Proceeds or the proceeds of any other transaction", and that all

parties' rights continue to be preserved.[373]

312.    [118.] NNI agreed in the IFSA to pay $157 million to the Canadian Debtors in

satisfaction of any claims by NNL for corporate overhead and R&D costs incurred by NNL for

the benefit of the U.S. Debtors for the period from the filing date to September 30, 2009.[374]

313.    [119.] The IFSA also provided a framework for the Debtor Estates to complete the

contemplated sale transactions of Nortel's assets without reference to allocation.[375]  This was

---

[372] John Ray Deposition, December 13, 2013, p. 108:25-111:2

[373] TR46858 (IP Transaction Side Agreement, April 4, 2011) s. 12 (note it is governed by New York law, s. 17); TR00009B (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 98-100; TR00010C (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 45-47

[374] TR00009B (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 30

[375] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 38, 43

purposefully done to avoid the detrimental infighting that would have taken place if the

allocation dispute had taken place prior to the assets being sold.[376]

314.    [120.] The U.S. Debtors have admitted that the Canadian Debtors' ownership of any

rights, property or other assets were not "altered in any way" by the IFSA.[377]

315.    [121.] Based on the explicit understanding – including by NNI – that every party had

reserved their rights to make any argument on allocation later on, each Debtor that entered into a

sale transaction and, in the case of the U.S. and EMEA Debtors, terminated their license rights

under the MRDA, did so without any guarantee of the allocation it would receive.[378]

---

[376] TR50523 (Opinion of the U.S. Court, April 3, 2013) p. 4 ("The IFSA provided the necessary mechanism to allow the planned sales of the Nortel Parties' businesses and assets to proceed without dispute among the Nortel Parties. The IFSA, inter alia, provided that the parties to the IFSA would not condition the execution of any sale agreement with a third party upon allocation or even a binding procedure for allocation of the sale proceeds.")

[377] TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 16-17

[378] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 43; Alan Bloom Deposition, December 5, 2013, p. 219:8-220:3; John Ray Trial Testimony, Day 6, May 21, 2014, p. 1443:13-1444:24 ("Q. And I'm correct, am I not, that you believed that the parties had reserved all rights to make any and all arguments a party could muster in its favor under these reservations of rights? Isn't that right?  A. Yes."); John Ray Deposition, December 13, 2013, p. 96:23-98:4, 108:18-109:8; TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 16, citing TR43794 (IFSA, June 9, 2009) paras. 12(a)-(b); TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 17 ("[N]othing in the IFSA altered in any way the parties' rights vis-à-vis each other regarding the ownership of any rights, property or other assets beyond an agreement to sell or relinquish those rights, property or other assets together to or for the benefit of the buyers.")

- 103 -

316.    [122.] The reservation of "allocation arguments" was made in the agreements to each

subsequent sale both directly and by reference to the IFSA, were repeatedly reiterated to the

Courts, and were acknowledged in orders of the Courts.[379]

### (iv)    The IFSA Approval Motion

317.    **In the U.S. Debtors' motion to the U.S. Court seeking approval of the IFSA, counsel**

**for the U.S. Debtors stated that "NNL is the owner of the vast majority of Nortel's**

**intellectual property assets [and] licenses its intellectual property", that under the IFSA the**

**U.S. Debtors would continue to receive "use of intellectual property owned by NNL that is**

---

[379] TR40835 (Supplemental Submission of the U.S. Debtors and Official Committee of Unsecured Creditors on Allocation Protocol Issues, March 7, 2012) p. 1 (pg. 31 of 53 of PDF) ("[The U.S., Canadian and EMEA Debtors] also recognized that the sale process would not succeed if a selling party could hold up an asset sale pending agreement on the allocation of the Sale Proceeds. The three failed mediations over the past years demonstrate the wisdom of the parties' agreement in the IFSA not to condition the joint sale of Nortel's assets on a prior agreement regarding allocation."); TR50114 (Order of the U.S. Court, July 28, 2009) para. 38 ("[N]othing herein (a) shall, or be deemed to, determine ratify, or adopt, or have any impact whatsoever on, the allocation or distribution of Sale Proceeds"); TR21510 (Order of the U.S. Court, June 11, 2011) para. 45 ("In accordance with this Court's order approving and authorizing the transactions contemplated by the IFSA, the proceeds in the Escrow Account shall not be distributed in advance of either (a) agreement of all the Selling Debtors . . . as to the distribution of such proceeds . . . or (b) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol . . . which  . . . shall be approved by the Court."); TR50214 (Order (A) Approving the [IFSA], and (b) Granting Related Relief, June 29, 2009) s. 8 ("Nothing in this Order or in the [IFSA] shall determine the allocation of proceeds from a Sale Transaction among the Selling Debtors or shall constitute a Protocol for determining the allocation of proceeds from a Sale Transaction among the Selling Debtors."); TR50057 (Order (Interim Funding Agreement), June 29, 2009) s. 3 (Section 3 approved the IFSA "including without limitation, all of the settlements and reservations of rights provided for therein")

crucial to the U.S. Debtors' business" and that the liquidity pressure facing NNL (for the reasons set forth in paragraphs (i)298-(i)300) put the entire Nortel group at risk.[380]

318.    At the joint approval hearing for the IFSA, counsel for the EMEA Debtors noted their reservation of rights regarding IP ownership, prompting the U.S. Court to ask "Mr. Bromley, did you wish to make any final comments? I take it that the reservation of rights relating to Mr. Harron's concerns about the allocation and ownership of intellectual property do not impact the settlement?" Bromley, counsel for the U.S. Debtors, replied

> No, Your Honor.  The agreement itself actually has a very specific provision that deals with the treatment of intellectual property and licenses thereto.  The -- I think it's fair to say that the statements that have been made, both in the motion papers here and in Mr. Doolittle's affidavit or declaration are statements of the company's position with respect to those. . . .  We believe they are the correct position.  But we recognize that all parties have reserved their rights on that, and certainly there's nothing intended by this application or the orders to compromise any rights in that regard.[381]

*(v)    Risk in Reservation of Rights*

319.    The parties recognized that, in cooperating to achieve the highest and best value for the residual patent portfolio and business sales, each risked spending more than it would receive in allocation.[382]

---

[380] TR11366 (Motion of the U.S. Debtors for an Order (A) Approving the IFSA and (B) Granting Related Relief, June 9, 2009) paras. 14, 15 & 31

[381] TR50281 (Transcript of June 29, 2009 IFSA Approval Hearing) p. 52:11-53:24

[382] Murray McDonald Deposition, November 26, 2013, p. 143:7-144:5 ("Nobody had a guarantee that they were going to be net positive after costs on any asset sale, including the U.S., with respect to Rockstar, or Canada with respect to any other line of business.")

320.    **The parties partially mitigated this risk by agreeing that certain costs would be either deducted from the sales proceeds and/or shared in proportion to the allocation from each sale.[383] Under the FCFSA, in fact, the U.S. Debtors and Canadian Debtors agreed to cooperate in the reimbursement of various M&A costs from the sale proceeds including the fees and expenses of Lazard, the costs of having the carve-out financial statements prepared and the salaries of the Nortel M&A team.[384] Further, with respect to the residual patent portfolio sale, the parties entered into multiple side agreements which addressed the proportionality of various fees and expenses.[385]**

(e)    **The FCFSA**

321.    [123.] The Final Canadian Funding and Settlement Agreement (**"FCFSA"**), signed in December 2009, also reserved the rights of NNL to make any argument regarding allocation of sale proceeds.[386]

322.    **In the FCFSA, NNI agreed to pay NNL $190.8 million in full and final settlement of any and all claims for corporate overhead or R&D costs incurred by any Canadian Debtor**

---

[383] Sharon Hamilton Deposition, October 30, 2013, p. 101:15-102:8; TR46910 (Final Canadian Funding and Settlement Agreement, December 23, 2009) s. 8

[384] TR46910 (Final Canadian Funding and Settlement Agreement, December 23, 2009) s. 8

[385] *See*, *e.g.*, TR11371 (IP Transaction Side Agreement) s. 2; TR44243 (Supplemental IP Transaction Side Agreement re Certain Transaction Costs and Related Matters) para. 8; TR48581 (Second Amended and Restated IP Transaction Side Agreement re Certain Transaction Costs and Related Matters) para. 2(h)

[386] TR46910 (Final Canadian Funding and Settlement Agreement, December 23, 2009) s. 23 ("Nothing in this Agreement shall bar, prohibit or in any way hinder the rights of the Parties to this Agreement to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the proceeds of any Sale Transaction or IP Transaction")

for the benefit of the U.S. Debtors through the conclusion of the Canadian Debtors'

proceedings or the wind-down of the Canadian Debtors' estates.[387]

323.    **The FCFSA also memorialized NNI and NNL's agreement to enter into APAs with**

**the IRS and CRA respectively.  Pursuant to the FCFSA, NNL also granted NNI an allowed**

**claim of $2.06 billion (not subject to offset or reduction).[388]**

324.    **NNL and NNI also agreed in the FCFSA not to exercise any rights of termination**

**under the MRDA without the prior written consent of the other parties to the FCFSA, the**

**UCC and the Bondholder Group.[389]**

325.    **NNL separately agreed that it would not terminate participation in the MRDA of**

**any Participant that had filed for U.K. administration until the earlier of (i) such**

**Participant ceasing to be in administration and (ii) such Participant ceasing to trade.[390]**

**(f)     Business Sales**

326.    [124.] With the IFSA framework in place, the Debtor Estates embarked on a process that

resulted in a series of sales of the various business lines (the "Business Sales"), which occurred

from mid-2009 through late 2010, with the last transaction closing in March 2011.  The

following chart summarizes the Business Sales:

---

[387] TR46910 (Final Canadian Funding and Settlement Agreement, December 23, 2009) s. 1

[388] TR46910 (Final Canadian Funding and Settlement Agreement, December 23, 2009) s. 9-11

[389] TR46910 (Final Canadian Funding and Settlement Agreement, December 23, 2009) s. 28

[390] TR48613 (Letter Agreement Between NNL and NNUK, NNSA, and Nortel Networks
(Ireland) Limited, January 14, 2009)

| Business Sale | Purchaser | Signing Date | Closing Date | Sale Price |
|---|---|---|---|---|
| Layer 4-7[391] | Radware | 2/19/2009 | 3/31/2009 | $17.7 million |
| CDMA/LTE[392] | Ericsson | 7/24/2009 | 11/13/2009 | $1.13 billion |
| Enterprise[393] | Avaya | 9/14/2009 | 12/18/2009 | $900 million |
| Next Generation Packet Core[394] | Hitachi | 10/25/2009 | 12/8/2009 | $10 million |
| Metro Ethernet Networks[395] | Ciena | 11/24/2009 | 3/19/2010 | $775 million |
| GSM/GSM-R[396] | Ericsson & Kapsch CarrierCom | 11/24/2009 | 3/31/2010 | $103 million |
| CVAS[397] | GENBAND | 12/22/2009 | 5/28/2010 | $282.6 million |

---

[391] TR49810 (Asset Purchase Agreement among Nortel Networks Limited and Radware Ltd., et al., February 19, 2009)

[392] TR44138 (Asset Purchase Agreement among Nortel Networks Limited and Telefonaktiebolaget L M Ericsson (publ), et al., July 24, 2009)

[393] TR44163 (Amended and Restated Asset and Share Sale Agreement among Nortel Networks Limited and Avaya Inc., et al., September 14, 2009)

[394] TR45015 (Transaction Agreement among Nortel Networks Limited and Hitachi, Ltd., et al., October 25, 2009)

[395] TR44172 (Amended and Restated Asset Sale Agreement among Nortel Networks Limited and Ciena Corporation, et al., November 24, 2009)

[396] TR44245 (Asset Sale Agreement among Nortel Networks Limited and Telefonaktiebolaget L M Ericsson (publ), et al., November 24, 2009)

| Business Sale | Purchaser | Signing Date | Closing Date | Sale Price |
|---|---|---|---|---|
| GSM Retained Contracts[398] | Ericsson | 5/11/2010 | 6/4/2010 | $2 million |
| Multi Service Switch[399] | Ericsson | 9/25/2010 | 3/11/2011 | $65 million |
| Patent Portfolio[400] | Rockstar Bidco | 6/30/2011 | 7/29/2011 | $4.5 billion |

*(ii)*     ***The Business Sales Were a Joint Effort of the Three Estates***

327.    **Leaving aside the assertions of John Ray, who was hired after most of the sales had occurred,[401] there is no evidence that the U.S. Debtors bore a disproportionate share of the time and effort required to conduct the sales.  Each of the U.S., EMEA and Canadian Debtors invested significant time and effort—"[e]ach of the sale processes involved counsel and other professional advisors to the Canadian Debtors participating in crafting and implementing the sales processes and transactions."[402]**

---

[397] TR44113 (Asset Sale Agreement among Nortel Networks Limited and GENBAND, Inc., et al., December 22, 2009)

[398] TR45006 (Asset Sale Agreement among Nortel Networks Limited and Telefonaktiebolaget L M Ericsson (publ), et al., May 11, 2010)

[399] TR44200 (Asset Sale Agreement among Nortel Networks Limited and Telefonaktiebolaget L M Ericsson (publ), et al., September 24, 2010)

[400] TR44220 (Asset Sale Agreement among Nortel Networks Limited and Rockstar Bidco, LP, et al., June 30, 2011)

[401] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1404:9-1413:9; TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 6-8; DEM00007 (Demonstrative for Ray Trial Cross-Examination Testimony)

[402] TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) para. 27

328.    **Counsel to the U.S. Debtors hosted the auctions in their offices at their insistence that they were legally required to hold the auctions in the United States, and any additional expense borne by them on that account was offset by the cost to the Canadian Debtors from their professionals' travel and accommodation expenses.**[403]

329.    **In addition, counsel to the U.S. Debtors was also serving as U.S. counsel to the Canadian Debtors at the time of the Business Sales and not expending its efforts for NNI alone.**[404]

### (iii)    *The LOB Carve-Out Processes*

330.    [125.] In order to sell the lines of businesses separately, Nortel engaged in a "carve-out process" to identify the bundle of assets, rights and obligations that would have to be conveyed in each sale to enable the lines of business to function on a stand-alone basis.[405]

331.    [126.] A key aspect of the carve-out process was the identification of which IP rights – principally patent rights – needed to be conveyed; each prospective purchaser wished to obtain as many patents as possible as part of each sale transaction and, conversely, the Nortel sellers

_____

[403] TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) para. 27

[404] U.S.D.I. 24 (NNI Motion to Retain Cleary Gottlieb Steen & Hamilton LLP, January 14, 2009) para. 20 ("Because the [U.S.] Debtors' and their Canadian parents' interests are united in their integrated, co-dependent business relationship, the [U.S.] Debtors' ability to successfully reorganize is dependent on the reorganization of the jointly operated Nortel businesses in Canada and in the U.S. in a strategic transaction, on a stand alone basis, and /or through the sale of one or more Nortel business segments that are located in both Canada and the U.S. Therefore, [the U.S.] Debtors and their Canadian parents desire to have the [Cleary Gottlieb] Firm continue to provide advice to the Canadian Debtors regarding issues that affect their joint interests and their respective reorganization efforts in order to facilitate a joint and harmonious approach to the debtors' restructuring in both jurisdictions.")

[405] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 51

wanted to ensure that the only patents transferred were those incorporated exclusively or principally in the business line in question so as to retain value within Nortel and not to jeopardize the ability to sell the other business lines that might require rights to the same patents.[406]

**332.    Purchasers and potential purchasers were extremely concerned to ensure they were acquiring the appropriate bundle of IP rights, particularly patent rights, necessary to operate the business in question, as well as to achieve whatever synergies or expansion of its business that might be achieved by integrating the business and underlying technology into its own existing business.  As such, aside from purchase price, the IP (and particularly the patents) to be transferred in a Business Sale was often the most significantly negotiated aspect of a transaction.[407]**

333.    [127.] Ultimately, those patents that were predominantly used in any given LOB were transferred to the purchaser of that LOB as part of the transaction.[408]

**334.    The tension between the interests of Nortel and potential purchasers ensured that "predominant use" was a rigorously negotiated standard.[409]**

---

[406] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 59-60; John Veschi Deposition, November 7, 2013, p. 128:11-25

[407] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 60; Khush Dadyburjor Deposition, October 3, 2013, p. 27:10-31:16

[408] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 61; John Veschi Deposition, November 7, 2013, p. 122:6-127:10

[409] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 60; Khush Dadyburjor Deposition, October 3, 2013, p. 27:10-31:16

335.    **The determination of which patents were predominantly used in each LOB developed into a regimented process, with Gillian McColgan leading review sessions to determine where the patents were predominantly used.[410]**

336.    **One piece of evidence relating to the segmentation process is a McColgan email attaching a spreadsheet of the patents identified as "shared" and "not used" and stating "Here is the spreadsheet with the requested information.  It covers *all the residual portfolio patents remaining* in the Nortel Estate."[411]**

337.    **When a patent met the standard for predominant use, it was assigned.  For those that did not meet the standard of predominant use, the spreadsheet tracked the reasons for retention of a particular patent.  The reasons for retention were: (i) the patent was shared across products being used in multiple business lines; or (ii) the patent was "not used".[412]**

338.    **The "shared" designation was applied to a patent only after all of the relevant people from the lines of business had been able to put their case forward and the IP group had, if necessary, mediated their various demands.  McColgan was confident that an objective standard was used in arriving at a "shared" designation: "[T]he best minds in Nortel who had the deepest understanding of the products in their business units, the**

---

[410] Gillian McColgan Deposition, November 8, 2013, p. 130:8-20

[411] TR22107 (January 10, 2010 Email from G. McColgan attaching "RetainedPriorityIssueDates.xls")

[412] TR22107 (January 10, 2010 Email from G. McColgan attaching "RetainedPriorityIssueDates.xls")

**revenues attached to the products, and it was their consensus and view at the end of the day that these were shared."[413]**

339.    **McColgan was unsure whether this particular spreadsheet continued to be used after January 2010, but affirmed that there was a spreadsheet of all the patents retained for sale or use in IP Co. and that all shared and non-used patents would have gone into that spreadsheet.[414]**

340.    **There is no evidence that Nortel purposefully retained valuable IP for the Residual IP sale; rather, the evidence establishes that the patent segmentation process was completed on a principled, objective basis to identify which patents were related to a particular product line or business, which were shared by products in multiple business lines and which had no application to Nortel's products.[415]**

341.    [128.] In the end, 2,700 patents were transferred as part of the Business Sales.[416]

342.    [129.] For all other patents that were used in that LOB, a license was granted to the purchaser for use of the patents in the operations of the particular business line being purchased.[417]

---

[413] Gillian McColgan Deposition, November 8, 2013, p. 140:12-141:11

[414] Gillian McColgan Deposition, November 8, 2013, p. 137:4-15; 140:2-10; 141:12-24

[415] Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 1005:3-18; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 60; Khush Dadyburjor Deposition, October 3, 2013, p. 27:10-31:16; Gillian McColgan Deposition, November 8, 2013, p. 128:7-130:20, 140:12-141:17

[416] TR11151 (Nortel's IP Team and Patent Portfolio PowerPoint, August 2010) Slide 11 (p. 11)

343.    **These licenses were typically nonexclusive, but were in some cases exclusive, including in the**  **sales where exclusive licenses were granted with respect to particular products and (in the** ███████ **sale) time periods.  The** ███████ **sale exclusive license was with respect to all licensed IP except any "Predominantly Non-** ███████ **IP" and any IP owned by a third party and was for a period of 5 years from closing.** [418]

344.    [130.] NNL retained ownership of the patents licensed to the business sale purchasers.[419]

345.    **Patents not used in any sold business were retained and were not licensed to the business sale purchasers.**[420]

346.    [131.] The sales agreements provided for the transfer of all of the sellers' "right, title and interest in and to" the enumerated IP "subject to any and all licenses" (referring to third party licenses and not to licenses under the MRDA, which were terminated).[421]

---

[417] John Veschi Deposition, November 7, 2013, p. 128:11-25

[418] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 61; TR48099 (Intellectual Property License Agreement with ███████████ at 10; TR50611 (Intellectual Property License Agreement among NNL, NNI, the EMEA Sellers, the Joint Administrators, ██████████████) at 9

[419] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 65

[420] Gillian McColgan Deposition, November 8, 2013, p. 141:12-24; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 65-67; TR11151 (Nortel's IP Team and Patent Portfolio PowerPoint, August 2010) p. 11 ("~6,100 patent assets remain, covering wide variety of technologies […] Strict limits on licenses granted (narrow fields of use/product-line limitations")

[421] *See, e.g.,* TR44138 (ASA regarding CDMA/LTE Assets, July 24, 2009) Articles 2.1.1, 2.1.1(g)

347.    [132.] Through the carve-out process, it was agreed that the sale of each significant business line would generally include the following conveyances of assets, rights and obligations, which would be reflected in the purchase price:

(a)    the transfer of those patents that were "predominantly used" in the particular business line;

(b)    a non-exclusive license for any other patent that was used in that particular business line;

(c)    the transfer or license of other forms of IP, such as trademarks or software, used in the business line;

(d)    the transfer of tangible assets (such as inventory, R&D equipment, computer equipment) used in the business line;

(e)    the transfer of unbilled or in-process receivables and prepaid expenses related to the business line;

(f)    the transfer of a significant portion of the workforce employed in connection with the business line, including management, R&D personnel, and sales and supply chain personnel;

(g)    the assignment of contracts (or portions thereof) related to the business line, including customer contracts, supply contracts, and license agreements with third parties, and including any warranty rights;

(h)    the sale, lease or sub-lease of real property related to the business line; and

(i)    the assumption of certain liabilities related to the business line, particularly warranty obligations to customers and all liabilities of the business line arising after the closing of the transaction.[422]

348.    [133.] Thousands of R&D personnel, principally in Canada but also in the other RPE jurisdictions, were transferred to the purchasers of the lines of business.[423]  The transfer of the valuable assembled workforce, including R&D personnel, enabled the purchasers to continue to operate the businesses without interruption.

349.    [134.] Peter Newcombe, a witness for the EMEA Debtors at trial, testified in this regard about Nortel's MEN business and its sale to Ciena.[424]  Newcombe confirmed that to continue in the MEN business required R&D, and that of the R&D employees that were marketed to be sold with the business, 15 were in the United Kingdom, 3 were in the U.S. and 981 were in Canada.[425]  The U.S. Debtors could not have run the MEN business without the Canadian R&D employees.[426]

350.    [135.] Coleman Bazelon, who was an expert for the UKPC, testified at trial and in his expert report that most of the assets sold by Nortel were IP.[427]  In Mr. Bazelon's expert opinion,

_____

[422] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 52

[423] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 52(f)

[424] Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p. 1633:11-1634:10

[425] Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p. 1649:11-1650:19; TR48945 (MEN Management PowerPoint, October 2009) Slide 54

[426] Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p. 1651:3-14

[427] Coleman Bazelon Trial Testimony, Day 12, June 2, 2014, p. 2984:5-8; TR00040 (Exh. 40, Rebuttal Report of Coleman Bazelon, February 28, 2014) p. 10-11 (Footnote 20)

any value in the sales to goodwill and customer relationships was entangled with IP and took their value in "large part" from the IP.[428]

**351.    Newcombe confirmed the primary importance of IP to Nortel's business notwithstanding his own background as a "sales guy" who would be expected to have a high opinion of the importance of sales personnel and customer relationships.[429]**

**352.    The publically available purchase price allocations among various asset classes performed by the purchasers in the Enterprise, CDMA/LTE and MEN Business Sales allocate 40% of aggregate transaction value to IP.[430]**

353.    [136.] IP also generated the value of IP-related asset categories, such as customer relationships and goodwill.[431]

354.    [137.] Although certain purchasers of Nortel's lines of business wanted to move the Nortel customers to the purchasers' products and platforms[432] there is no doubt that the central reason those customers were with Nortel in the first place was because of Nortel's IP and the products created from that IP.[433]

_____

[428] Coleman Bazelon Trial Testimony, Day 12, June 2, 2014, p. 2985:14-21

[429] Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p. 1627:23-1628:18

[430] TR00045 (Exh. 45, Expert Report of Thomas Britven, January 24, 2014) Schedule 4

[431] Coleman Bazelon Trial Testimony, Day 12, June 2, 2014, p. 2984:5-8; TR00040 (Exh. 40, Rebuttal Report of Coleman Bazelon, February 28, 2014, p. 10-11 (Footnote 20); Coleman Bazelon Trial Testimony, Day 12, June 2, 2014, p. 2985:14-21

[432] Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1119:8-11

[433] Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1118:9-13; _see_ Philippe Albert-Lebrun Trial Testimony, Day 6, May 21, 2014, p. 1485:25-1486:9, in making the same point that

355.    [138.] Any purchaser that wanted to keep Nortel's customers would need to have technology relevant to that customer.[434]

356.    **The Next Generation Packet Core and GSM Retained Contracts sales and the LTE line of business sold in the CDMA/LTE sale did not have any customers associated with them.**[435]

357.    **The other business lines were purchased by established telecommunications companies (Ericsson, Avaya, Ciena, Kapsch and Genband) that had pre-existing commercial relationships with many of Nortel's customers.  The purchase of Nortel's competing line of business (and associated IP) allowed these companies to expand their offerings to those customers.**[436]

358.    **The potential purchasers of certain business lines also sought to avoid the assignment of unprofitable customer contracts.**[437]

---

R&D and products were more important than Nortel's salesforce in the success of Nortel, which contradicted his own affidavit which emphasized customer relationships as critical to NNSA's success, with no mention of R&D and products; TR00022 (Exh. 22, Affidavit of Philippe Albert-Lebrun, May 9, 2014) para. 37

[434] Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1118:14-18

[435] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 11, 53 ("The GSM Retained Contracts transaction involved the transfer of 'stranded' GSM customer contracts in the CALA (Caribbean/Latin American) region which had not been transferred to either of the purchasers in the GSM/GSM-R transaction.")

[436] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 63

[437] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 64

359.    [139.] The licenses granted under the MRDA to NNI, NNUK, NNSA and NN Ireland were not among the assets sold to the purchasers of the LOBs or Residual IP, but were instead terminated.  The MRDA was not assigned under the Business Sales and Residual IP Sale.  Where license termination agreements formed part of the sales, in accordance with the IFSA the Licensed Participants executed license termination agreements with respect to the IP being transferred.[438]

### (iv)    PPAs Were Prepared for Financial Reporting Purposes

360.    **In 2010, NNL and NNI personnel prepared draft purchase price allocations ("PPAs") for certain of the Business Sales for the purposes of completing annual tax returns.[439]**

361.    **Each draft PPA states. "High Level Estimate of Purchase Price Allocation; FOR FINANCIAL REPORTING PURPOSES ONLY; Actual proceeds allocation is subject to negotiation amongst estates".[440]**

---

[438] TR00009B (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 54; John Ray Trial Testimony, Day 6, May 21, 2014, p. 1431:25-1433:9; TR44149 (CDMA/LTE Sale License Termination Agreement) Articles 2.01, 2.06, 2.08; TR44186 (MEN Sale License Termination Agreement) Articles 2.01, 2.06, 2.08; TR45019 (NGPC Sale License Termination Agreement) Articles 2.01, 2.06, 2.08; TR43642.03 (GSM Retained Contracts Sale License Termination Agreement) Articles 2.01, 2.06, 2.08; TR31671 (MSS Sale License Termination Agreement) Articles 2.02, 2.04, 2.01; TR44186 (MEN Sale License Termination Agreement) Articles 2.01, 2.06, 2.08; TR21508 (Rockstar Transaction IP License Termination Agreement) Articles 2.01, 2.02, 2.04

[439] Michael Orlando Deposition, November 5, 2013, p. 179:2-17

[440] TR11264 (September 28, 2010 Email from M. Orlando attaching draft PPAs for certain Business Sales)

362.    **The method of allocation used in the draft PPAs was, in general, allocation to owners of transferred tangible property on the basis of net book value and allocation of the remainder of the purchase price on the basis of then-current RPS percentages.[441]  In certain of the PPAs, a small portion of the purchase price was attributed to the distribution function.[442]**

363.    **Michael Orlando, who created the draft PPAs, testified on deposition that he selected this allocation methodology as "the easiest, quickest and most efficient" way to generate a "placeholder in the tax returns."[443]**

364.    **Orlando's contemporaneous correspondence notes that Nortel was incentivized to "report a conservative allocation of proceeds to avoid overpaying tax" and, indeed, with respect to the allocation of proceeds from each sale, each party's allocation theory contends for a greater allocation to it than is allocated to it in the draft PPAs.[444]**

365.    **No party's allocation position uses the methodology employed by Orlando in creating the draft PPAs.**

---

[441] TR11264 (September 28, 2010 Email from M. Orlando attaching draft PPAs for certain Business Sales); Michael Orlando Deposition, November 5, 2013, p. 184:8-14, 184:22-185:7

[442] TR11264 (September 28, 2010 Email from M. Orlando attaching draft PPAs for certain Business Sales) CDMA/LTE PPA (NNI_01439204) (5% of proceeds allocated to distribution intangible) & Enterprise PPA (NNI_01439205) (5% of proceeds allocated to distribution intangible)

[443] Michael Orlando Deposition, November 5, 2013, p. 182:21-183:4

[444] TR11264 (September 28, 2010 Email from M. Orlando attaching draft PPAs for certain Business Sales)

**(g)    Residual Patent Portfolio**

*(i)    After the Business Sales*

366.    [140.] By the time that all of the Business Sales were completed in March 2011, Nortel had no remaining operating businesses.  What it did retain was a residual patent portfolio, consisting of approximately 7000 patents and patent applications.[445]

367.    [141.] These were principally patents and applications that were not used in any of the lines of business and therefore were not subject to licenses to the Business Sale purchasers.[446]  In addition, the residual IP portfolio included patents used by multiple LOBs and licensed to the purchasers of those LOBs.

368.    [142.] Even before the conclusion of the Business Sales, representatives of the Debtor Estates began to consider how best to maximize the value of what was expected to be a sizable residual patent portfolio.  Two options were considered:

(a)    the sale of the residual patents through a competitive sale process, such as was followed for the sale of the business lines; or

(b)    the creation of a new licensing/litigation business, which would seek to license the residual patents to various technology companies who were believed to be

_____

[445] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 56, 67

[446] Gillian McColgan Deposition, November 8, 2013, p. 141:12-24; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 65-67; TR11151 (Nortel's IP Team and Patent Portfolio PowerPoint, August 2010) Slide 11 (p. 11) ( "~6,100 patent assets remain, covering wide variety of technologies […] Strict limits on licenses granted (narrow fields of use/product-line limitations")

infringing one or more patents.  This potential new licensing business was referred to as "IP Co."[447]

369.    [143.] Both of these options were considered in parallel from mid-2009 through early 2011.  At no point did any Debtor Estate or any major creditor group propose any other means of monetizing the patent portfolio.[448]

### (ii)    IP Steering Committee

370.    [144.] In January 2009, the Nortel Group was in the technology and telecommunications business, developing new technologies and selling products incorporating that technology to customers along with related services.  Nortel had no material business licensing its technology (i.e., its IP) or monetizing its technology by suing others, either before or after filing for protection from creditors in early 2009.[449]

371.    **A committee of representatives of the Estates and their advisors (the "IP Steering Committee") was formed in January 2010 and led the evaluation process for considering the monetization of the patent portfolio.[450]**

---

[447] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 68-69

[448] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 69

[449] Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1055:24-1056:6, 1073:23-1077:8; TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 40

[450] TR50634.02 (January 22, 2010 Draft PowerPoint Presentation) p. 2; TR00020 (Exh. 20, Declaration of John Ray, April 11, 2014) paras. 51-52; George Riedel Deposition, October 10, 2013, p. 117:20-118:4, 118:6-13; *see also* Colloquy by Counsel for U.S. Debtors, Day 4, May 15, 2014, p. 908:15-22

372.    **Although the Monitor's representative on the steering committee was officially Murray McDonald, McDonald delegated that responsibility to Sharon Hamilton, who was leading the Monitor's efforts in connection with the monetization of assets.[451]**

373.    **Lazard was engaged by NNC (a Canadian Debtors) and its controlled subsidiaries, including without limitation NNI.[452]**

374.    **Lazard was involved evaluating monetization strategies for the patent portfolio, including a potential IP Co., but most significantly a sale.[453]**

375.    **The U.S. Court subsequently entered an order amending the terms of Lazard's compensation in various different ways, including to allow for an "IP Transaction Fee" if Nortel consummated "a restructuring and reorganization around all or substantially all of the Company's intellectual property assets".[454]**

376.    **Global IP was retained by the Estates jointly and, pursuant to the Master Consulting Agreement ("MCA"), the RPEs and all of their Subsidiaries and Affiliates (as defined in the MCA) jointly owned all "[d]eliverables, including Intellectual Property rights in the Deliverables" created by Global IP.  Deliverables means all work (including,**

---

[451] Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 911:16-912:9

[452] TR50182 (U.S. D.I. 507 Order Authorizing Retention and Employment of Lazard Freres) (attaching engagement letter)

[453] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 60, 80; George Riedel Deposition, October 10, 2013, p. 131:21-132:23; TR00020 (Exh. 20, Declaration of John Ray, April 11, 2014) para. 66; TR47025 (Lazard Project Iceberg Teaser, May 2010)

[454] U.S. D.1. 2561 Order Approving An Amendment to the Terms of Compensation of Lazard Frères

but not limited to, any work for hire created and/or performed by Global IP or any

employee, agent, contractor or subcontractor of Global IP that performs services)

delivered to Nortel under the MCA, except to the extent any such work is Global IP

property pursuant to the MCA.[455]

377.    **Global IP's mandate was to evaluate the residual patent portfolio for potential**

**monetization through a Nortel-led IP Co., a spun-off IP Co. or the sale of the patents.[456]**

378.    **Contrary to the suggestion of the U.S. Interests, there is no evidence of consideration**

**of a joint venture between Nortel and a third-party simply because Veschi met with an**

**acquaintance running a licensing business.[457]**

379.    **The degree of focus by the IP Steering Committee and its advisors on IP Co. versus**

**a sale varied over time.  From May 2010 onwards, the Estates' efforts in the IP**

**monetization process were focused on a sale rather than IP Co.[458]**

380.    **Between September 2009 and September 2010, the Estates were not only exploring**

**IP monetization strategies through the IP Steering Committee—they also were focused on**

**consummating the Business Sales, the last of which closed on September 2010.[459]**

---

[455] TR48716 (MCA) paras. 1(e), 1(l), 6(a)

[456] Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 905:15-907:15

[457] *Cf.* TR50821 (February 5, 2010 Email from J. Veschi titled "Notes from Mosaid Meeting") (reflecting information gathering for Nortel's "potential creation of similar business") *contra* the interpretation proffered by the U.S. Debtors' Proposed Finding of Fact 448

[458] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 69; TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) para. 34; Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p.  922:4-924:18; George Riedel Deposition, October 10, 2013, p. 131:12-134:10

381.    **A patent monetization update from January 2010 shows the status of all options, noting that the Estates intended in February 2010 to "continue licensing discussions, simultaneous with sale discussions phase."[460]**

382.    [145.] John Veschi had been hired in July 2008 to take responsibility for Nortel's IP group and to look at options for licensing its IP.[461]  Six months later, most Nortel entities filed for creditor protection, and the focus quickly became selling Nortel's assets – not retaining them.[462]

### (iii)    IP Co. Models

383.    [146.] Consideration, study and development of the "IP Co." option was led by John Veschi, which started after filing.  The premise of IP Co. was that the residual patents would be monetized by attempting to license them to various technology companies, in exchange for the payment of royalties.  The licensing attempts would be backed by the threat of patent infringement litigation and, if necessary, actual infringement proceedings.  It was considered important that IP Co. not carry on any telecommunications or other technology business, because, if it did, it would be vulnerable to counterclaims for alleged infringement being brought

---

[459] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 81

[460] TR50634.02 (January 22, 2010 Draft PowerPoint Presentation) p. 5

[461] Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1073:2-22; John Veschi Deposition, November 7, 2013, p. 38:6-39:10

[462] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1394:1-1395:13, 1398:18-1399:7, 1404:9-1412:14; TR11358 (John Ray Employment Agreement, December 7, 2009); TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 6-8, 11

by the targets of its infringement litigation, which would undercut its revenue generating ability.[463]

384.    [147.] Over the course of 2009 and 2010, Mr. Veschi and his team, assisted by Lazard and Global IP (a law firm specializing in patent sales), prepared several versions of a preliminary financial model, in an attempt to forecast the operating profit that could be earned by IP Co. so that the potential economic benefits could be weighed against value expected to be received on a sale of the portfolio.[464]

385.    [148.] The various versions of the preliminary financial model had three sub-models, with differing assumptions relating to how much litigation IP Co. would pursue.  The scenarios were dubbed "Harvest" (assuming very little litigation), "Litigation Light" and "Litigation Heavy"—more litigation resulted in greater forecast revenues, at greater forecast cost.[465]

386.    **Although many projections were prepared, they were all fundamentally based on the same single model.[466]**

387.    **The median royalty rates, between 0.30% and 5.00%, for Litigation Light and Litigation Heavy strategies used in the IP Co. model are consistent with those observed in the market.[467]  Including the high and low rates for Litigation Light and Litigation Heavy**

---

[463] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 73

[464] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 74

[465] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 74

[466] Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 915:19-916:9

[467] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4133:14-20; TR50817.02 (March 2010 IP Co. Update for Leadership Teams) p. 14 ("Support items for Royalty Rate selection"

**brings the range to 0.2-7.5%, and further including the rates for the Harvest strategy widens the range to 0.06-7.5%.[468]**

388.    [149.] The projected cash flows for IP Co. were largely guesswork, given that Nortel had little experience in licensing and there were no good precedents about the estimated cash flow.[469] Even Mr. Ray admitted at trial that there was no certainty in the recoveries projected for IP Co. in the models that were prepared.[470]

389.    **There were no good precedents in the market to estimate the cash flows that IP Co. could generate.[471]**

390.    **Two possibilities for the structure of IP Co. were discussed at a high level: transferring the residual IP to a new company or NNL retaining the residual IP. One potential benefit of the latter structure was the possibility of utilizing NNL's tax losses in connection with a licensing business, but that possibility was never studied in detail.[472]**

---

include research, discussions with various licensing companies, feedback from licensors in the industry, and Nortel's own licensing experience); TR40169 (IP Co. Model v3.1); TR50814.04 (Supporting items for Royalty Rate Selection and Summary of Licensing Rate Assumptions) p. 20-21

[468] TR40169 (IP Co. Model v3.1); TR50814.04 (Supporting items for Royalty Rate Selection and Summary of Licensing Rate Assumptions) p. 20-21

[469] Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 908:8-12, 911:16-912:9, 915:19-919:13; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 78; TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 34-35

[470] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1420:12-20

[471] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 78

[472] TR48685.02 (PowerPoint Presentation titled "IP Monetization – Structure Alternatives") p. 3, 6-7 and 10; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 72

391.    [150.] The costs to capitalize an IP Co. concept were estimated to have been between $269 million and $417 million.[473]

392.    **In addition, Chief Strategy Officer George Riedel (who led IP monetization efforts), estimated IP Co. would need an additional $100 million to $200 million on the balance sheet as "dry powder" to be seen as a credible litigation threat.[474]**

393.    **The discount rates developed by Lazard for evaluating the net present value of the IP Co. opportunity to Nortel were 25-45%, comparable to discount rates used to value speculative venture capital investments, and Lazard in fact described IP Co. as a venture capital or "start up" investment.[475]**

394.    **IP Co. was expected to take at least two years and up to four years to generate positive cash flow, and from three to six years to generate a positive return on investment.[476]**

---

[473] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 79-80; John Ray Trial Testimony, Day 6, May 21, 2014, p. 1416:19-1420:12

[474] George Riedel Deposition, October 10, 2013, p. 130:18-131:11

[475] TR43860 (IP Co. – Preliminary Summary Valuation, April 27, 2010) p.3; TR43714 (IP Co. – Preliminary Summary Valuation Version 2.2, May 6, 2010) p.3; TR43715 (Model 3.0 Preliminary Valuations); TR43716 (Model 3.0 Preliminary Valuations); TR00043 (Exh. 43, Rebuttal Report of Philip Green, February 28, 2014) p. 17-18; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 78; *see also* TR50640 (February 4, 2010 Emails among A. Navaratnam, D. Berten and J. Veschi) (per Navaratnam, "[IP Co.] calls creditors (including pension and funds and employee groups) and bond holders to turn into speculative investors. I can't recall who, but someone [Dave Descoteaux of Lazard] kept repeating the "venture capital" moniker, to describe [IP Co.] – which also points to where some folks' minds are already at.")

[476] TR44758 (Strategic and IP Update, Board of Directors, May 12, 2010) p. 14

- 128 -

395.    **Veschi had a personal interest in the IP Co. model being pursued (as opposed to the sale of the patent portfolio) because he expected to lead it as CEO. His attention to personnel retention and hiring plans included developing an incentivized compensation structure for his future role, but these materials received little attention from the IP Steering Committee.**[477]

396.    **Although Veschi had a strong desire to move the IP Co. idea forward, the idea was never accepted or implemented by Nortel senior management or any of the Estates, and on a number of occasions Nortel senior management had to reign Veschi's activities in.**[478]

397.    **For example, Veschi sent notice letters to potential licensing targets (including Nortel customers and potential purchasers of Nortel's businesses) without any significant consultation with Nortel senior management, the Monitor or the legal and financial advisors to the Estates. Veschi therefore was instructed that, going forward, "everything [he] did had to be coordinated with [CDMA president] Richard Lowe").**[479]

398.    **On another occasion, during the period the Estates were focussed almost exclusively on the CDMA/LTE and Enterprise sale processes (the first and largest LOB transactions), Veschi arranged a meeting with the financial advisors to the Committee and the**

---

[477] Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 914:20-915:18

[478] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 60

[479] John Veschi Deposition, November 7, 2013, p. 156:6-157:3; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 60; TR00021 (Reply Declaration of John Ray, April 25, 2014) para. 11

Bondholder Group to provide a preliminary IP Co. presentation.  This presentation had yet to be vetted by Nortel senior management, the Monitor or the Estates' respective advisors.  At the request of the Monitor, Pavi Binning (Nortel's CRO), agreed to have Veschi postpone the meeting.[480]

399.    **In order to give stakeholders the ability to weigh a sale of the patents or some sort of partnership or joint venture against a "teaser" for the sale of the patent portfolio was circulated to 105 potential buyers of the patent portfolio in May 2010.[481]  In a cover email to Nortel's IP group, Veschi wrote, "We are about to enter a period of time where [a sale of the patents or some sort of partnership or joint venture] are fully explored with the market in order to give the stakeholders the information they need to choose between either of these and [IP Co.] […] We have spent much time working on various [IP Co.] scenarios, and the stakeholders have all the information they need to make an informed decision."[482]**

400.    [151.] Ultimately, the Canadian Debtors and the Monitor advised the representatives of the other estates and the other stakeholders that the Canadian Debtors would not provide any funding to establish IP Co.[483]

401.    **No other source of funding for IP Co. was ever identified.[484]**

---

[480] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 60

[481] TR22099 (Project Iceberg Executive Summary, June 2010)

[482] TR22099 (May 3, 2010 Email from J. Veschi attaching Project Iceberg Executive Summary, June 2010)

[483] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 78-80

402.    **The parties never discussed how revenues from an IP Co. would be shared, nor whether and on what terms IP Co. would need to acquire the Nortel patents from NNL.**[485]

403.    **Global IP's presentation January 29, 2010 presentation noted the existence of the MRDA and specifically disclaimed any "opinion regarding territorial split of patents or patent-related revenue."**[486]

404.    [152.] If any Estate or other interested party wished to pursue IP Co., they would need to purchase the residual patents from NNL.[487]  No Estate or other interested party ever sought to effect such a purchase.  Instead, all of the Estates agreed to pursue a sale process for the residual patents and to terminate consideration of the IP Co. option.

### (v)    *Residual IP Sale Stalking Horse Agreement*

405.    [153.] During discussions concerning the structuring of the sale of the residual patent portfolio, the Monitor suggested to the U.S. Debtors that the transaction should be structured with NNL being the only seller and asserted, including in a conversation between Sharon Hamilton and counsel for the U.S. Debtors, that the residual IP was solely a Canadian asset.[488]

---

[484] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 80; TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 34-35

[485] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 72, 76; Sharon Hamilton Deposition, October 30, 2013, p. 190:13-21

[486] TR43655 (January 29, 2010 PowerPoint Presentation titled "Patent Portfolio Analysis Phase One: Board of Directors Presentation") p. 25

[487] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 80

[488] TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 39-41, which notes that the Canadian Debtors and Monitor agreed to work with NNI together on the

406.    **From the fall of 2010, the Estates pursued a sale of the patent portfolio and progressed through two rounds of bidding and negotiations with potential parties.  Google put in a bid of $900 million late in 2010, and the decision was taken in late 2010 or early 2011 to progress that offer to a stalking horse agreement.[489]**

407.    [154.] The sale process leading to the Rockstar Sale was similar to that followed for the Business Sales.  On April 4, 2011, after significant negotiations with two prospective purchasers, certain Nortel entities (including NNC, NNL, NNI and NNUK) entered into a stalking horse asset sale agreement with a wholly owned subsidiary of Google Inc.[490]

408.    **The valuation models for IP Co. ultimately represented a lower bound on the amount of a stalking horse bid for the portfolio as an alternative to the sale process.[491]**

409.    [155.] The stalking horse agreement with Google placed a value of $900 million on the residual patent portfolio, a value that all of the Debtor Estates agreed exceeded the expected value of the IP Co. model, particularly in view of the certainty the Google sale provided versus the risks of IP Co.[492]

---

Residual IP sales to avoid time consuming litigation that could disrupt the sale process; Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 899:2-19

[489] George Riedel Deposition, October 10, 2013, p. 131:12-134:10; *see also* TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 81

[490] TR45578 (Sixty-Third Report of the Monitor, Google Stalking Horse ASA, April 4, 2011) para. 19, Appendix A

[491] (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 81-82

[492] TR00009 (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 82-85

410.    [156.] As part of the stalking horse agreement, the U.S., Canadian and EMEA Debtors agreed to forego the ability to pursue the IP Co. model, though the bondholders retained the ability to become qualified bidders.[493]

411.    [157.] Ultimately, no bondholder became a qualified bidder or put in a bid to run the IP Co. within Nortel or in any other way.[494]

412.    **The Google stalking horse agreement also required, as a condition of the sale, that all licenses, including the MRDA licenses and all other intercompany licenses, be terminated with the exception of the licenses granted to the Business Sale purchasers.[495]**

413.    **By this time, the existence of the allocation dispute among the Estates had been well publicized and was clearly known to Google,[496] and Google's counsel advised their primary rationale for this request was a concern that there be no "back door" way for a Nortel entity to attempt to grant a sub-license to the Residual IP to another party.**

---

[493] TR45578 (Sixty-Third Report of the Monitor, Google Stalking Horse ASA, April 4, 2011) Appendix A (s. 5.5(d)); John Ray Trial Testimony, Day 6, May 21, 2014, p. 1421:5-1423:20

[494] TR00021 (Exh. 21, Reply Declaration of John Ray, April 25, 2014) para. 19; TR45578 (Sixty-Third Report of the Monitor, Google Stalking Horse ASA, April 4, 2011) Appendix A (s. 5.5(d))

[495] TR45578 (Sixty-Third Report of the Monitor, Google Stalking Horse ASA, April 4, 2011) paras. 22, 38, 49-51

[496] TR00009 (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 99; *see also* Sharon Hamilton Deposition, October 30, 2013, p. 148:16-149:24, 196:20-197:7

414.    **The stalking horse agreement required the Estates to sell the patent portfolio to Google for $900 million in the event no other qualified bids were received.**[497]

415.    **In connection with the motion for approval of the stalking horse agreement, the Monitor submitted its 63rd Report, seeking approval on the basis of the consensus of the parties with respect to the process followed to sell the IP:**

> *Nortel* **ultimately concluded that a sale of the Residual IP was the best method of monetizing the Residual IP for the benefit of its stakeholders.**[498]

416.    **The Monitor stated in its 63rd Report, as it had in numerous prior reports, that legal title to the Nortel Group's intellectual property was held by NNL, "which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases on a non-exclusive basis", and further advised that Legal title to substantially all [the Residual IP] is held by and registered in the name of NNL."**[499]

417.    **The Monitor's 63rd Report also provided a summary description of the IFSA and indicated that no agreement had been reached on allocation.**[500]

---

[497] TR45578 (Sixty-Third Report of the Monitor, Google Stalking Horse ASA, April 4, 2011); George Riedel Deposition, October 10, 2013, p. 71:10-18; 72:7-16

[498] TR45578 (Sixty-Third Report of the Monitor, Google Stalking Horse ASA, April 4, 2011) para. 15 (emphasis added)

[499] TR45578 (Sixty-Third Report of the Monitor, Google Stalking Horse ASA, April 4, 2011) paras. 14, 82; *see also* Schedule C hereto

[500] TR45578 (Sixty-Third Report of the Monitor, Google Stalking Horse ASA, April 4, 2011) paras. 82-84

### (vi)    The Rockstar Transaction

418.    [158.] An auction was held at the end of June 2011, with the residual patents ultimately being sold to Rockstar, a single purpose entity backed by a consortium of major technology companies (Apple, Microsoft, Ericsson, Blackberry, Sony and EMC), for $4.5 billion.[501]

419.    **This sale price was well in excess of the estimates of the Estates and their financial advisors, and trading prices of Nortel bonds spiked after the announcement of the sale price.[502]**

420.    [159.] In connection with the Rockstar Sale and pursuant to the IFSA, the MRDA license rights of the Licensed Participants were not transferred.[503]

421.    [160.] Instead, NNI, NNUK, NNSA and NN Ireland, among others, executed a License Termination Agreement with respect to any MRDA license rights that they may have had in relation to the patents and applications in the residual portfolio.[504]

422.    [161.] Section 2.02 of the License Termination Agreement signed in connection with the Rockstar Sale states: "This Agreement shall not affect the ownership rights that each Seller may have to any intellectual property."[505]

---

[501] TR00009 (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 96; TR44220 (Rockstar Transaction ASA, June 23, 2011)

[502] George Riedel Deposition, October 10, 2013, p. 71:10-18, 72:7-16; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 86; TR00057 (Exh. 57, Expert Report of John McConnell) Exh. 3 p. 16

[503] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1431:25-1433:9; TR21508 (Rockstar Transaction IP License Termination Agreement) Article 2.01

[504] TR21508 (Rockstar Transaction IP License Termination Agreement)

423.    [162.] The same License Termination Agreement reserved each party's rights to "seek its entitlement" to an allocation of the sale proceeds, consistent with the IFSA.[506]

424.    **It is unknown whether Rockstar's business model, and the projections on which its winning bid was based, bear any resemblance to this IP Co. model.[507]**

425.    **The Monitor's 71st Report, recommending approval of the Rockstar Sale, states that NNL held legal title to the Patent Portfolio "subject to . . . intercompany licensing agreements with other Nortel legal entities around the world . . . in some cases on an exclusive basis," and reiterated that no agreement had been reached on allocation.[508]**

426.    **Because of the stay of allocation issues provided by the IFSA, no submissions were made by any party about the ownership of the assets sold or the value each Estate would receive.[509]**

427.    **A statement made at that hearing by counsel for the Canadian Debtors, Derrick Tay, underlined the benefit to the parties of postponing the allocation dispute and avoiding addressing allocation positions at that time:**

---

[505] TR21508 (Rockstar Transaction IP License Termination Agreement) Article 2.02.  Indeed, s. 2.04 of the License Termination Agreement repeats that each Seller "shall have a right to an allocation" of the sale proceeds that is "to be determined in accordance with the provisions of the IFSA."

[506] TR21508 (Rockstar Transaction IP License Termination Agreement) Article 2.04; TR43794 (Interim Funding and Settlement Agreement, June 9, 2009) s. 12(f)

[507] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4353:11-20

[508] TR21282 (Seventy-First Report of the Monitor, July 6, 2011) paras. 49-51

[509] TR00009 (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 48; TR21509 (Transcript of Proceedings, July 11, 2011)

> So I think outwardly, the bottom line of what we've seen here is that this is, I think a shining example, and one of many examples that you've seen in this case, of the amazing things we can get done when the estates work together.  Unfortunately, we've also seen the disruption in value when the estates fight amongst each other, but fortunately, this is not before us today.[510]

428.    **The benefit of postponing allocation discussions was also noted at that hearing by counsel for the UCC:**

> I think all parties agree that the IFSA contemplated cooperation amongst the selling parties in the sales efforts to maximize value without reference to any allocation disputes of which we heard so much about the last time.[511]

429.    **Ray, who attended the sale hearing, testified that he understood, as a result of NNI's allowed claim against NNL and the crossover bonds' claims against both NNI and NNL, that even if NNI received no allocation directly from the proceeds of the Rockstar sale, NNI and its creditors would benefit.[512]**

430.    **Justice Morawetz's oral endorsement approving the sale stated**

> All parties are of the view that the purchase price represents fair consideration to the assets included in the sale agreement and the circumstances of this case.  That statement could be considered to be somewhat understated.  I am satisfied that the consideration provided

_____

[510] TR21509 (Transcript of Proceedings, July 11, 2011) p. 56:10-16; *see also id.* p. 49:2-22 (submission of counsel for U.S. Debtors that subsequent allocation would not be impacted by deal structure)

[511] TR21509 (Transcript of Proceedings, July 11, 2011) p. 51:6-10

[512] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1441:9-1442:9, 1455:5-1456:4, 1456:25-1457:5 ("Q. So when you told this Court that the Rockstar transaction was in the best interests of the U.S. estates, you knew that there would be a meaningful or significant recovery to the U.S. creditors from the Rockstar transaction; correct? A. Yes.")

        **by Rockstar pursuant to the sale agreement constitutes fair value and fair consideration to the assets in question.**[513]

431.    **Judge Gross likewise noted during the hearing that "the terms are the highest and best available under the circumstances."**[514]

432.    **Thus, the U.S. and Canadian Courts approved the Rockstar Sale as representing the highest and best value achievable for the assets sold without ruling upon (nor were they asked to rule upon) the owners of those assets.**[515]

(h)    **IP Sold**

433.    **The IP sold in the Business Sales and Rockstar Sale falls into three categories:  (1) IP used in *one* of the sold business lines (whether described as "predominant" use, "exclusive" use or otherwise);** [516] **(2) IP used in more than one line of business ("shared");**[517] **and (3) IP not used in any line of business.**[518]

---

[513] TR21509 (Transcript of Proceedings, July 11, 2011) p. 106:17-24

[514] TR21509 (Transcript of Proceedings, July 11, 2011) p. 110:22-23

[515] TR50034 (July 11, 2011 Canadian Approval and Vesting Order (Certain Patents and Other Assets)); TR50196 (U.S. D.I. 5935 Order Authorizing and Approving Sale)

[516] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 60; TR11150 (IP Aspects of Residual Co. dated July 8, 2009) p. 3; Gillian McColgan Deposition, November 8, 2013, p. 124:17-20; See also, for example, TR44138 (CDMA Asset Sale Agreement) s. 2.1.1(g); TR44163 (Enterprise Amended and Restated Asset and Share Sale Agreement) s. 2.1.1(f) and TR44172 (MEN Amended and Restated Asset Sale Agreement) s. 2.1.1(e)

[517] Gillian McColgan Deposition, November 8, 2013, p. 124:4-21, 140:19-141:11, 183:6-189:1; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 61

[518] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 66-67; Gillian McColgan Deposition, November 8, 2013 125:24-126:4

434.    **The terminology used to identify each of these categories is irrelevant to determining when value was received or to which Estate proceeds from that category should be allocated.**

435.    **With respect to the first category, the value of the IP was realized in the applicable Business Sale because the IP was transferred to the purchaser.**

436.    **The second category's value was also realized in the Business Sales because the purchasers paid for and received licenses entitling them to exploit the IP in the same way that Nortel would have if the line of business had not been sold, and though the patents were subsequently sold to Rockstar, the value to Rockstar related to the ability to impose licenses through litigation, far different from the Nortel business model in which the IP had been used by the MRDA Participants.[519]**

437.    **As for the third category, at the time of the Business Sales and Rockstar Sale, and likely for some years before, none of the Licensed Participants were realizing value from the exploitation of those patents as they were not incorporated in any Nortel products.**

**(i)      Expansion of Monitor's Powers**

438.    [163.] In addition to the powers and duties set out in the CCAA Initial Order dated January 14, 2009, the Monitor's powers were expanded by order dated August 14, 2009 ("the

––––––––––––––––––––––––

[519] *See, e.g.*, TR44142 (███████ Intellectual Property License Agreement); TR44151 (███████ Intellectual Property License Agreement); TR44185 (█████Intellectual Property License Agreement)

First Expansion of Monitor Powers Order").[520]  As noted in the Monitor's Nineteenth Report

dated August 11, 2009, the Canadian Debtors indicated that the Board of Directors of NNC and

NNL and the Chief Executive Officer believed that Nortel had reached an appropriate transition

point for its governance structure.[521]  By that time, the business operations were stabilized,

progress had been made with respect to the sale of the various business units, organizational

changes had been made towards stand-alone business units and a business unit was established to

provide transitional services with respect to the sale of the business.[522]  Furthermore, Nortel had

announced that effective August 10, 2009 its CEO was stepping down and the number of Board

members was being reduced from 9 to 3.[523]  The First Expansion of Monitor Powers Order

provides, among other things, the Monitor with the authority to cause the Canadian Debtors to

take various actions in connection with the sale of the business units and to conduct, supervise

and direct any procedure regarding the allocation and/or distribution of proceeds of any sale.[524]

439.    [164.] In its Eighty-Eighth Report dated September 26, 2012, following the sale of the

business units and the Residual IP, the Monitor reported that, in light of the cessation of public

reporting obligations, the directors and officers of the Canadian Debtors indicated they would

resign their positions.[525]  The Monitor indicated, at that point in the restructuring, it was not

practical or necessary to replace the directors and officers of the Canadian

---

[520] TR50631 (Order of the Ontario Superior Court of Justice, August 14, 2009)

[521] TR21505 (Nineteenth Report of the Monitor, August 11, 2009) para. 27

[522] TR21505 (Nineteenth Report of the Monitor, August 11, 2009) para. 27

[523] TR21505 (Nineteenth Report of the Monitor, August 11, 2009) para. 28

[524] TR50631 (Order of the Ontario Superior Court of Justice, August 14, 2009) para 3.

[525] NNC-NNL11755843 (Eighty-Eighth Report of the Monitor, September 26, 2012) para. 36

Debtors.[526]  Therefore, the Monitor sought and obtained an order expanding its powers again in the event that prior orders were not all encompassing in this regard.  By order dated October 3, 2012 (the "Second Expansion of Monitor Powers Order"), the Court added to the powers of the Monitor by, among other  things,  authorizing and  empowering, but not obligating, the Monitor to exercise any powers which may be properly exercised by a board of directors of any of the Canadian Debtors.[527]  The Second Expansion of Monitor Powers Order in no way limited the powers and protections provided to the Monitor under prior orders of the Court, the CCAA or applicable law.[528]

**(j)    Allocation Litigation**

440.    [165.] Under the IFSA (as explicitly confirmed in the scheduling orders subsequently entered in 2013 with respect to the allocation litigation), the parties were not required to assert allocation positions until sometime after all of the coordinated asset sales had occurred.[529]

---

[526] NNC-NNL11755843 (Eighty-Eighth Report of the Monitor, September 26, 2012) para. 36

[527] Order (Monitor's Expansion of Power Order # 2) of the Ontario Superior Court of Justice, October 3, 2012, para. 3

[528] Order (Monitor's Expansion of Power Order # 2) of the Ontario Superior Court of Justice, October 3, 2012, para. 3

[529] TR43794 (Interim Funding and Settlement Agreement, June 9, 2009) s. 12(a); TR50027 (Amended and Restated Order (Allocation Protocol), April 3, 2013) Schedule A (s. 4(a)) ("There shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation."); TR50102 (Order Entering Allocation Protocol of the U.S. Court, May 17, 2013) Exhibit 1 (s. 4(a)); TR50058 (Order (Allocation Protocol – Litigation Timetable and Discovery Plan of the Canadian Court, May 15, 2013) Schedule A; Order Entering Litigation Timetable and Discovery Plan of the U.S. Court, May 17, 2013, Exhibit 1

441.    [166.] On June 7, 2011, the Canadian Debtors brought a motion requesting approval of an allocation protocol.  A similar motion was brought at the same time by the U.S. Debtors and a joint hearing was held.[530]

442.    [167.] Pending a ruling on the motion, the Courts directed the parties to engage in mediation.[531]

443.    [168.] The Canadian Court's order and endorsement regarding the mediation explicitly mandated that the parties' positions were inadmissible in this court proceeding.[532]

444.    [169.] Mediation, unfortunately, proved unsuccessful.[533]

445.    [170.] As the parties were unable to reach agreement on the allocation of the sale proceeds, in April and May 2013, the Courts approved an Allocation Protocol to govern the litigation of the allocation issues.[534]  Section 4(a) of that Allocation Protocol provided for the

---

[530] *Nortel Networks Corp., Re*, 2011 ONSC 3805 at paras. 1-3 (S.C.J.).

[531] *Nortel Networks Corp., Re*, 2011 ONSC 3805 at paras. 14-15 (S.C.J.); *Nortel Networks Corp., Re*, 2011 ONSC 4012 at para. 18 (S.C.J.).

[532] TR50050 (Order of the Honourable Justice Morawetz regarding Mediation, June 29, 2011) para. 4(c) ("All offers, promises, conduct and statements, whether written or oral, made in the course of the mediation proceedings, are inadmissible in any arbitration or court proceeding."); *Nortel Networks Corp., Re*, 2011 ONSC 4012 at para. 24 (S.C.J.) ("The parties shall recognize that mediation proceedings are settlement negotiations, and that all offers, promises, conduct and statements, whether written or oral, made in the course of the proceedings, are inadmissible in any arbitration or court proceeding, to the extent allowed by law.")

[533] *Nortel Networks Corporation (Re)*, 2013 ONSC 1757 at para. 3 (S.C.J.).

[534] TR50027 (Amended and Restated Order (Allocation Protocol) of the Canadian Court, April 3, 2013); TR50102 (Order Entering Allocation Protocol of the U.S. Court, May 17, 2013)

- 142 -

exchange of pleadings and that "[t]here shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation."[535]

446.    [171.] Pursuant to the Allocation Protocol, a Litigation Timeline and Discovery Plan was approved by the Courts on May 15 and 17, 2013, which required delivery of opening allocation positions or pleadings by May 16, 2013.[536]

447.    [172.] None of the Canadian, U.S. or EMEA Debtors (or any other Core Party) were required to disclose its litigation position prior to that date.

448.    [173.] Unsurprisingly, the Monitor and Canadian Debtors along with the other parties acted pursuant to the ordered schedule of disclosure of litigation allocation positions, and did not disclose their litigation allocation position prior to that date.

449.    [174.] For example, the U.S. Debtors did not disclose prior to May 16, 2013 that their litigation allocation position was that the Canadian Debtors should receive only 11 percent of the total proceeds from the Business Sales and Rockstar Sales.[537]

---

[535] TR50027 (Amended and Restated Order (Allocation Protocol), April 3, 2013) Schedule A (s. 4(a)); TR50102 (Order Entering Allocation Protocol of the U.S. Court, May 17, 2013) Exhibit 1 (s. 4(a))

[536] TR50058 (Order (Allocation Protocol – Litigation Timetable and Discovery Plan of the Canadian Court, May 15, 2013) Schedule A; Order Entering Litigation Timetable and Discovery Plan of the U.S. Court, May 17, 2013, Exhibit 1 ("Any Core Party who wishes to participate in the Allocation dispute shall serve a pleading or opening submission…which will set out with reasonable particularity the relief sought with respect to allocation, the material facts relied upon and legal bases for the allocation position being advanced by that Core Party")

[537] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1453:10-1454:17

450.    [175.] Even after May 16, 2013, the U.S. Debtors refused to state the amounts (if any)

that they contended should be allocated to the Canadian Debtors until the January 24, 2014

report of their valuation expert was delivered.[538]

451.    [176.] Various elements of the Monitor and Canadian Debtors' allocation position,

however, had been disclosed earlier than the schedule required.  For example, the Monitor and

Canadian Debtors' position that NNL was the sole owner of Nortel's IP was widely recognized

and disclosed in these proceedings before the parties' allocation positions were required to be

shared.[539]  In a meeting in May 2010 attended by Sharon Hamilton and others, Murray

McDonald on behalf of the Monitor said to Mr. Ray that the Monitor could take the position that

NNL owned all of Nortel's IP and should therefore get all the proceeds from its sale.[540]

---

[538] John Ray Deposition, December 13, 2013, p. 106:6-108:2; John Ray Trial Testimony, Day 6, May 21, 2014, p. 1446:24-1448:5; TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) para. 15, p. 17 (Table 2), Exhibits 7, 9

[539] *See* Schedule "C" for excerpts of Monitor's Reports; TR11366 (Motion of the U.S. Debtors for an Order (A) Approving the Interim Funding and Settlement Agreement and (B) Granting Related Relief, June 9, 2009) paras. 14, 16, 31 (*see also* paras. 27, 30) ("NNL is the owner of the vast majority of Nortel's intellectual property assets" and under the IFSA the U.S. Debtors would continue to receive "use of intellectual property owned by NNL that is crucial to the US Debtors' business".); TR31622 (Report of Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris, David Hughes and Christopher John Wilkinson Hill of Ernst & Young LLP, January 14, 2009) s. 3.3; John Doolittle Deposition, December 5, 2013, p. 149:17-150:12, 150:25-151:24, 152:8-16

[540] Murray McDonald Deposition, November 26, 2013, p. 100:2-101:10, 102:15-103:14, 104:19-25, 120:20-123:25, 147:5-148:7; TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 42-44

452.     **John Doolittle also testified on deposition that the position that "the legal ownership of the IP rested with NNL and NNL should retain all of the value from the proceeds of those sales" was taken by people involved in the IP Co. discussions.[541]**

453.     **Each of the U.S., EMEA and Canadian Debtors' allocation positions is premised on a different interpretation of the parties' rights in Nortel's IP.**

454.     **The U.S. Interests' allocation position gives no value from the Rockstar Sale to certain EMEA Debtors (NNSAS and NN GmbH) that held patents in their own names despite being "Selling Debtors" under the IFSA with respect to that sale.[542]**

*(i)     Monitor Representatives*

455.     **The Litigation Timetable and Discovery Plan required the parties to negotiate the scheduling of depositions and the parties therefore established a Scheduling Committee (comprised of representatives of the U.S., EMEA and Canadian Debtors).[543]**

456.     **The Litigation Timetable and Discovery Plan also required the identification of witnesses whom each party wished to depose by July 30, 2013.[544]**

---

[541] John Doolittle Deposition, December 5, 2013, p. 149:24-150:14

[542] John Ray Trial Testimony, Day 6, May 21, 2013, p. 1439:3-1440:1; TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) Exhibit 33

[543] TR50058 (Order (Allocation Protocol – Litigation Timetable and Discovery Plan) of the Canadian Court, May 15, 2013) Schedule A; Order Entering Litigation Timetable and Discovery Plan of the U.S. Court, May 17, 2013, Exhibit 1 (Discovery Plan) p. 10

[544] TR50058 (Order (Allocation Protocol – Litigation Timetable and Discovery Plan) of the Canadian Court, May 15, 2013) Schedule A; Order Entering Litigation Timetable and Discovery Plan of the U.S. Court, May 17, 2013, Exhibit 1

457.    **The U.S. Debtors identified two representatives of the Monitor at that time—Murray McDonald and Sharon Hamilton.**[545]

458.    **The U.S. Debtors first sought the deposition of a third representative of the Monitor, Sean Kruger, by handing Kruger a summons at the conclusion of the November 13, 2013 deposition of Peter Look, which Kruger attended as a representative of the Monitor.**[546]

459.    **The U.S. Debtors had not previously notified the Scheduling Committee of their interest in examining Kruger, nor sought to negotiate a date for such examination.**[547]

460.    **The U.S. Debtors did not seek leave from the Canadian Court to issue or serve the summons, nor did they seek leave from the Courts to designate him as an additional fact witness to be examined, which the Litigation Timetable and Discovery Plan permitted upon a showing of good cause.**[548]

461.    **Following the filing of a motion to quash, the U.S. Debtors withdrew the summons and Kruger was not deposed.**

462.    **The U.S. Debtors never sought to examine Kruger or McDonald at trial.**

---

[545] TR50862 (One Hundred and First Report of the Monitor, November 29, 2013) (Appendix D)

[546] TR50862 (One Hundred and First Report of the Monitor, November 29, 2013) para. 18

[547] TR50862 (One Hundred and First Report of the Monitor, November 29, 2013) para. 20

[548] TR50862 (One Hundred and First Report of the Monitor, November 29, 2013) para. 19; TR50058 (Order (Allocation Protocol – Litigation Timetable and Discovery Plan of the Canadian Court, May 15, 2013) Schedule A; Order Entering Litigation Timetable and Discovery Plan of the U.S. Court, May 17, 2013, Exhibit 1

- 146 -

\

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Benjamin Zarnett**  LSUC#: 17247M
bzarnett@goodmans.ca
**Peter Ruby**  LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello**  LSUC #: 38390C
jpasquariello@goodmans.ca
Tel:     (416) 979-2211
Fax:     (416) 979-1234
*Lawyers for the Monitor*

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay**  LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam**  LSUC#: 46735J
jennifer.stam@gowlings.com
Tel:     (416) 862-5697
Fax:     (416) 862-7661
*Lawyers for the Canadian Debtors*

**BUCHANAN INGERSOLL & ROONEY PC**
919 North Market Street, Suite 1500
Wilmington, Delaware 19801

Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtors*

**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, NY  10020

Jacob S. Pultman
Paul B. Keller
Laura R. Hall
Ken Coleman
Daniel Guyder
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
jacob.pultman@allenovery.com
paul.keller@allenovery.com
laura.hall@allenovery.com
ken.coleman@allenovery.com
daniel.guyder@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtors*

## SCHEDULE "A"

## Glossary of Terms

| | |
|---|---|
| Business Sales | The post-filing sales in 2009 to 2011 involving tangible and intangible assets of, for the most part, operating Nortel businesses. |
| Canadian Court | The Ontario Superior Court of Justice. |
| Canadian Debtors | The Canadian Nortel companies that, on January 14, 2009, filed for and obtained protection under the *Companies' Creditors Arrangement Act* from the Ontario Superior Court of Justice being, Nortel Networks Corporation (NNC), Nortel Networks Limited (NNL), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation. |
| Canadian Estate | Collectively, the entities that make up the Canadian Debtors. |
| CCC | The Canadian Creditors Committee, which represents the interests of Canadian pensioners and other pension interests, long-term disabled and other employees and former employees of Nortel who have claims against the Canadian Debtors. |
| Courts | The U.S. Court and the Canadian Court. |
| Debtor(s) | The companies or entities comprising the Canadian Debtors, the U.S. Debtors and the EMEA Debtors, either individually or collectively. |
| Debtor Estates | Collectively, the Canadian Debtors, the U.S. Debtors and the EMEA Debtors (equivalent to Estates). |
| EMEA Debtors | The 23 Nortel entities that, on January 15, 2009, were granted administration orders in the U.K. under the *Insolvency Act, 1986* and whose registered offices were in England, Europe, the Middle East and Africa, including Nortel Networks UK Limited (NNUK), Nortel Networks S.A. (NNSA) and Nortel Networks (Ireland) Limited (NN Ireland). |
| EMEA Estate | Collectively, the entities that make up the EMEA Debtors. |
| Estates | Collectively, the Canadian Debtors, the U.S. Debtors and the EMEA Debtors (equivalent to Debtor Estates). |
| IFSA | Interim Funding and Settlement Agreement, June 9, 2009 (TR43794) |
| IP | Intellectual Property. |

| | |
|---|---|
| Licensed Participant(s) | As defined in Article 1(e) of the MRDA, a Participant (or all Participants) other than NNL. |
| LOBs | Lines of business |
| LRDs | Limited Risk Distributors which were incorporated in most of the countries where Nortel products were sold, including in the EMEA region |
| Monitor | Ernst & Young Inc. in its capacity as monitor of the Canadian Debtors appointed in the Initial Order granted January 14, 2009.  By various orders, the Ontario Superior Court of Justice expanded the Monitor's powers and authorized it to exercise the powers of the boards of directors of the Canadian Debtors. |
| MRDA | Master R&D Agreement dated December 22, 2004 but with an effective date of January 1, 2001, between NNL, NNI, NNUK, NNSA, NN Australia and NN Ireland, as amended at least four times (TR21003). |
| NNC | Nortel Networks Corporation, being a corporation incorporated under the laws of Canada, which was the publicly traded, parent holding company of NNL and its subsidiaries. |
| NNI | Nortel Networks Inc., being a corporation incorporated under the laws of the State of Delaware, the main U.S. operating entity and a direct subsidiary of NNL. |
| NNL | Nortel Networks Ltd., being a corporation incorporated under the laws of Canada, and the main Canadian operating entity. |
| NNSA | Nortel Networks, S.A., being an entity duly formed under the laws of France, one of the EMEA Debtors, and a direct subsidiary of NNL. |
| NNUK | Nortel Networks UK Limited, being an entity formed under the laws of the United Kingdom, one of the EMEA Debtors, and a direct subsidiary of NNL. |
| NN Ireland | Nortel Networks Ireland, being an entity formed under the laws of the Republic of Ireland, one of the EMEA Debtors, and a direct subsidiary of NNL. |
| NN Australia | Nortel Networks Australia Pty Limited, being an entity formed under the laws of Australia.   NN Australia was one of the signatures to the MRDA but retired from the MRDA effective December 31, 2007. |
| NN Technology | As defined in Article 1(f) of the MRDA, NN Technology "shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, |

| | technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill." |
|---|---|
| Nortel | Collectively, NNC and all of its direct and indirect subsidiaries, including the businesses they operated. |
| Nortel Entity(ies) | Any of the companies or entities, either individually or collectively, within the Nortel Group. |
| Nortel Group | Equivalent to "Nortel". |
| Nortel Products | Equivalent to "Products", as defined below. |
| Participant(s) | As defined in the MRDA, any of the parties to the MRDA, namely NNL, NNI, NNUK NNSA, NN Australia, NN Ireland |
| Products | As defined in Article 1(g) of the MRDA, Products "shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing" (equivalent to "Nortel Products"). |
| R&D | Research and Development |
| RPEs | Residual Profit Entities (NNL, NNI, NNUK, NNSA and NN Ireland) |
| Rockstar Transaction | The sale to Rockstar Bidco, LP in 2011 of the residual patent and patent-related assets owned by NNL (equivalent to "Rockstar Sale"). |
| RPSM | Residual profit split methodology – the transfer pricing methodology used by Nortel from 2001. |
| U.S. Court | The United States Bankruptcy Court for the District of Delaware. |
| U.S. Debtors | The U.S. Nortel companies that, on January 14, 2009, filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware for protection under Chapter 11 or Title 11 of the U.S. *Code*, being Nortel Networks Inc. ("NNI") and several of its U.S. affiliates, namely Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel |

|  | Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc. |
| --- | --- |
| U.S. Estate | Collectively, the entities that make up the U.S. Debtors. |
| UKPC | Collectively, the Nortel Networks UK Pension Trust Limited and the Board of Directors of the Pension Protection Fund. |

# SCHEDULE "C"

## Summary of Monitor's Reports

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| TR21278<br><br>Pre-Filing Report of the Monitor<br><br>January 14, 2009 | Para. 42:<br><br>"Nortel's intellectual property ("IP") is principally owned by NNL." | |
| TR40141<br><br>Second Report of the Monitor<br><br>(Layer 4-7 Stalking Horse)<br><br>February 25, 2009 | Para. 20:<br><br>"The Applicants have an interest in the intellectual property upon which the Layer 4-7 Business products are based. Generally speaking the owner of intellectual property in the Nortel group licenses the intellectual property in question to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis." | |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | Para. 66:<br><br>"As previously indicated, the Layer 4-7 Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the Layer 4-7 Business which, in turn, is subject to various intercompany licensing agreements. Therefore, the task of allocating the sale proceeds stemming from the Purchase Agreement amongst the various Nortel entities in the various jurisdictions is complex. As a result, the proceeds of sale stemming from the Purchase Agreement will be held in escrow with a party acceptable to the Sellers until such time as an allocation is agreed upon." | |
| TR45565 | Para. 14: | Para 18: |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| Fifth Report of the Monitor<br><br>(Layer 4-7 Final)<br><br>March 26, 2009 | "As noted in the Second Report, the Layer 4-7 Business is not operated through a dedicated legal entity or stand-alone division. For example, the Applicants have an interest in intellectual property of the Layer 4-7 Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the Purchase Agreement amongst the various Nortel entities in the various jurisdictions is complex. As a result, the Sellers have agreed that the proceeds of sale stemming from the Purchase Agreement will be held in escrow until such time | "The Monitor is also of the view that the allocation of proceeds amongst the Sellers is complex and requires a significant amount of further analysis before any determination can be made. Accordingly, the Monitor supports the Applicants' request for approval of this Honourable Court to place the proceeds from the closing of the Radware transaction in escrow. This will allow the Sellers time to complete a detailed analysis and engage in discussions with respect to the appropriate method of allocation. Once this process has been completed, the Monitor expects that the Applicants will return before this Honourable Court to seek approval of the allocation and release of the funds from escrow." |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | as an allocation is agreed upon." | |
| TR45571<br><br>Fourteenth Report of the Monitor<br><br>(CDMA/LTE Stalking Horse)<br><br>June 23, 2009 | Para. 18:<br><br>"The Applicants also have an interest in the intellectual property upon which the CDMA products are based. Generally speaking, the owner of intellectual property in the Nortel group, <u>which in most cases is NNL</u>, licenses the intellectual property in question for sale to customers in the other geographies, to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis."<br><br>[Emphasis added] | Para. 69:<br><br>"As previously indicated, the Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the Business which, in turn, is subject to various intercompany licensing agreements. NNL, NNI and certain of their affiliates have interests in various customer contracts, receivables and other assets. Therefore, the task of allocating the sale proceeds stemming from the Sale Agreement amongst the various Nortel entities in the various jurisdictions is complex. As a result, the net proceeds of sale stemming from the Sale Agreement will be held in escrow with a party acceptable to the Sellers until such |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | time as an allocation is agreed upon." |
| TR49809<br><br>Fifteenth Report of the Monitor re: Interim Funding<br><br>June 25, 2009 | | Para. 46(e):<br><br>"The IFSA represents the successful culmination of a lengthy and complicated set of  negotiations between the Applicants, U.S. Debtors, EMEA Debtors, Monitor, U.K. Administrators, UCC and *Ad Hoc* Bondholders' Committee in addressing certain issues, including: […]<br><br> (e) to further facilitate potential asset sales, by agreeing that the execution of definitive documentation with a purchaser by each of the Debtors shall not be conditioned upon the Debtors reaching an agreement with respect to the allocation of the proceeds from such a sale." |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | Para. 47(l) – (n): "The significant terms of the agreement include the following: […] l) Each of the Canadian Debtors, U.S. Debtors, and EMEA Debtors agree their execution of definitive documentation with a purchaser of material assets of any of the Debtors (a "Selling Debtor") shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds; m) In the absence of an agreement regarding the allocation of any sales proceeds, the Debtors agree that the proceeds shall be deposited in an escrow account, and any distribution from the escrow account shall be |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | contingent upon (i) the agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers pursuant to the dispute resolution protocol referred to in paragraph 47 (n) below; n) The Debtors shall negotiate in good faith and attempt to reach an agreement on a sample form of agreement to effectuate the termination of IP licenses as contemplated in paragraph 47 (k) above, and an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | agreement regarding such allocation; […]" |
| TR21280<br><br>Seventeenth Report of the Monitor<br><br>(CDMA/LTE Final)<br><br>July 27, 2009 | Para. 37:<br><br>"As noted in the Fourteenth Report, the CDMA Business and the LTE Business are not operated through a dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the CDMA Business and the LTE Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the Successful Bid amongst the various Nortel entities in the various jurisdictions is | Para. 38:<br><br>"As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through their U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | complex." | agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation." |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | Para. 39:<br><br>"As of the current date, no agreement has been reached regarding the allocation of any sales proceeds. Accordingly, the Selling Debtors have determined that the proceeds shall be deposited in an escrow account. The Applicants and the U.S. Debtors are currently in discussions with a major financial institution with respect to having this institution act as escrow agent." |
| | | Para. 40:<br><br>"In addition, the terms of a protocol with respect to the resolution of disputes in connection with the allocation of proceeds are still under discussion between the Applicants, the U.S. Debtors, the U.K. Administrators, the Monitor, the UCC and the Bondholder Group. Accordingly, the Monitor expects |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | that the Company will return before this Honourable Court prior to closing of the transaction contemplated by the Successful Bid to seek approval of the escrow agreement and a protocol for resolving disputes regarding the allocation of sale proceeds." |
| TR45585<br><br>Eighteenth Report of the Monitor<br><br>(Enterprise Stalking Horse)<br><br>July 31, 2009 | Para. 19:<br><br>"In addition, the Applicants have an interest in the intellectual property upon which the products of the Business are based. Generally speaking, the owner of the intellectual property in the Nortel group, which in most cases is NNL, licenses the intellectual property in question to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. These | Para. 86:<br><br>"As set out in the Fifteenth Report, the Applicants, the U.S. Debtors, and certain of the EMEA Debtors, through their U.K. Administrators, entered into the Interim Funding and Settlement Agreement dated June 9, 2009 (the "IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | Nortel entities in turn license the intellectual property related to the Business to customers in their respective geographic regions." [Emphasis added] | any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers under the terms of a sales protocol. The parties also agreed to negotiate in good faith and attempt to reach an agreement on a sales protocol for resolving disputes |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation." |
| | Para. 85:<br><br>"As previously indicated, the Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the Business which, in turn, is subject to various intercompany licensing agreements. Therefore, the task of allocating the sale proceeds stemming from a sale agreement amongst the various Nortel entities in the various jurisdictions is complex." | Para. 87:<br><br>"As of the current date, no agreement has been reached regarding the allocation of any sales proceeds. In addition, the terms of a sales protocol with respect to the resolution of disputes in connection with the allocation of proceeds are still under discussion between the Applicants, the U.S. Debtors, the U.K. Administrators, the Monitor, the UCC and the Bondholders' Committee. However, the Monitor expects that Nortel will return before this Honourable Court prior to |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | closing of the transaction contemplated by the Avaya Agreement or any Alternative Transaction to seek approval of these matters including terms of an escrow arrangement and the sales protocol." |
| TR45589<br><br>Twentieth Report of the Monitor<br><br>(Enterprise Final)<br><br>September 15, 2009 | Para. 33:<br><br>"As noted in the Eighteenth Report, the Business is not operated through a dedicated legal entity or stand-alone division. Amongst other things, the Applicants have an interest in intellectual property related to the Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds | Para. 34:<br><br>"As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
|  | stemming from the Successful Bid amongst the various Nortel entities in the various jurisdictions is complex." | agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties to the IFSA agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds  where |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | the Selling Debtors have been unable to reach an agreement regarding such allocation." |
| | | Para. 35:<br><br>"As of the current date, no agreement has been reached regarding the allocation of any sales proceeds and the terms of a protocol with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion.  Accordingly, the Selling Debtors have determined that the proceeds shall be deposited in an escrow account.  The Applicants and the U.S. Debtors are currently in discussions with a major financial institution with respect to having this institution act as escrow agent." |
| TR45582<br><br>Twenty-First Report of | Para. 14:<br><br>"As with other Nortel | |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| the Monitor<br><br>(NGPC Sale Process)<br><br>September 24, 2009 | technologies, the underlying intellectual property associated with the NG-PC Assets is owned by NNL and is subject to various inter-company licensing agreements. NNI owns the fixed assets associated with the NG-PC operations."<br><br>[Emphasis added] | |
| TR45584<br><br>Twenty-Third Report of the Monitor<br><br>(GSM/GSM-R Sale Process)<br><br>October 8, 2009 | Para. 17:<br><br>As with other Nortel technologies, the underlying intellectual property associated with the GSM Business is owned by NNL and is subject to various inter-company licensing agreements. Nortel has made considerable R&D investments in its GSM product offerings<br><br>[Emphasis added] | |
| TR45595 | Para. 20: | Para. 88: |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| Twenty-Fourth Report of the Monitor (MEN Stalking Horse) October 13, 2009 | "In addition, the Applicants have an interest in the intellectual property upon which the products of the MEN Business are based. Generally speaking, the owner of the intellectual property in the Nortel group, <u>which in most cases is NNL</u>, licenses the intellectual property in question to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. These Nortel entities in turn license the intellectual property related to the MEN Business to customers in their respective geographic regions." [Emphasis added] | "As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties to the IFSA agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation." |
| | Para. 87:<br><br>"As previously indicated, the MEN Business is not operated through a dedicated legal entity or stand- | Para. 89:<br><br>"As of the current date, no agreement has been reached regarding the allocation of any sales |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | alone division. The Applicants have an interest in intellectual property of the MEN Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from a sale agreement amongst the various Nortel entities in the various jurisdictions is complex." | proceeds and the terms of a protocol with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion." |
| TR45583 Twenty-Sixth Report of the Monitor (NGPC Final) October 26, 2009 | Para. 14: "As with other Nortel technologies, the underlying intellectual property associated with the NG-PC Business is owned by NNL and is subject to various inter-company licensing | Para. 44: "As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the UK Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | agreements. NNI owns the fixed assets associated with the NG-PC Business."<br><br>[Emphasis added] | which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | agreement, a determination of the allocation by the relevant dispute resolvers. The parties agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation." |
| | Para. 43:<br><br>"The NG-PC Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the NG-PC Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the | Para. 45:<br><br>"As of the current date, no agreement has been reached regarding the allocation of any sales proceeds relating to the NG-PC Business. Accordingly, the Monitor understands that the Applicants and the U.S. Debtors have agreed that the sale proceeds shall be deposited in an escrow account and are currently |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | world, in some cases on an exclusive basis and in  other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the sale of the NG-PC Business as between the various Nortel entities is complex." | in discussions with a major financial institution with respect to having this institution act as escrow agent. Accordingly, the Monitor expects that the Applicants will return before this Honourable Court prior to closing of the transaction contemplated by the Transaction Agreement to seek approval of the escrow agreement." |
| TR45604 Twenty-Eighth Report of the Monitor (MEN Final) November 27, 2009 | Para. 37: "As noted in the Twenty-Fourth Report, the MEN Business is not operated through a dedicated legal entity or stand-alone division. Amongst other things, the Applicants have an interest in intellectual property related to the MEN Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the | Para. 38: "As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the UK Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the Successful Bid amongst the various Nortel entities in the various jurisdictions is complex." | execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties to the IFSA agreed to negotiate in good faith and attempt to reach an agreement on a |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation." |
| | | Para. 39: "As of the current date, no agreement has been reached regarding the allocation of any sales proceeds and the terms of a protocol with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion. Accordingly, the Selling Debtors have determined that the proceeds shall be deposited in an escrow account. Once the terms of the escrow arrangements are finalized, the Applicants will bring a |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | motion before this Honourable Court seeking approval of the escrow agreement." |
| TR45609 Twenty-Ninth Report of the Monitor (GSM/GSM-R Final) November 27, 2009 | Para. 68: "As noted in the Twenty-Third Report, the GSM Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the GSM Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the Successful Bid amongst the various Nortel entities in the various jurisdictions is complex." | Para. 69: "As set out in the Fifteenth Report, the Applicants, the U.S. Debtors, and certain of the EMEA entities, through the UK Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sale proceeds, including binding procedures for the allocation of sale proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation." |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | Para. 70:<br><br>"The Monitor notes that the aggregate purchase price payable in connection with the Successful Bid was negotiated by the Sellers and the UK Administrators and Ericsson and Kapsch on a global basis. The allocation of the overall $103 million purchase price as between the amount payable by Ericsson pursuant to the Ericsson Agreement and Kapsch pursuant to the Kapsch Agreement was determined solely by Ericsson and Kapsch and not discussed with the Sellers. Accordingly, the Selling Debtors have agreed that the allocation as set forth in the two transaction agreements is not determinative or reflective of any allocation amongst the Selling Debtors." |
| | | Para. 71: |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
| --- | --- | --- |
| | | "As of the current date, no agreement has been reached regarding the allocation of any sale proceeds. Accordingly, the Selling Debtors have determined that the proceeds from both transactions shall be deposited in an escrow account. In addition, the terms of a protocol with respect to the resolution of disputes in connection with the allocation of proceeds are still under discussion between the Applicants, the U.S. Debtors, the UK Administrators, the Monitor, the UCC and the Bondholder Group. Accordingly, the Monitor expects that the Company will return before this Honourable Court prior to closing of the transactions contemplated by the Successful Bid to seek approval of the escrow agreement and a protocol for resolving disputes regarding the |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | allocation of sale proceeds." |
| Thirtieth Report of the Monitor (ARA) November 27, 2009 | | Para. 23(e): "The Monitor has participated extensively in the analysis and negotiations of the APAC Agreement. The APAC Agreement addresses a number of critical issues facing the Applicants and the APAC Entities, including: (e) ensuring that the execution of definitive documentation with a purchaser by Nortel shall not be conditioned upon reaching an agreement with respect to the allocation of the proceeds from such a sale." |
| | | Para 25(c): "A summary of the significant terms of the APAC Agreement is provided in the paragraphs that follow. Reference should be made directly to |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | the APAC Agreement for a complete understanding of its terms. (c)The APAC Entities have agreed to participate in current and future global business and asset sale transactions including entering into agreements to terminate intellectual property licences, and such participation shall not be conditioned on reaching an agreement with the APAC Entities on the allocation of the sales proceeds." |
| TR45581 Thirty-Fourth Report of the Monitor (CVAS Stalking Horse) January 3, 2010 | Para. 21: "In addition, the Applicants have an interest in the intellectual property upon which the products of the CVAS Business are based. Generally speaking, the owner of the intellectual property in the Nortel group, which in most cases is NNL, licenses the intellectual property in question to various | Para. 94: "As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the UK Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. These Nortel entities in turn license the intellectual property related to the CVAS Business to customers in their respective geographic regions." [Emphasis added] | Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties to the IFSA |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation." |
| | Para. 93: "As previously indicated, the CVAS Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have, amongst other things, an interest in intellectual property of the CVAS Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some | Para. 95: "As of the current date, no agreement has been reached regarding the allocation of any sale proceeds and the terms of a protocol with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion. Accordingly, the Monitor presently expects that the sale proceeds derived from the sale of the CVAS Business will be paid |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from a sale agreement amongst the various Nortel entities in the various jurisdictions is complex." | into an escrow account pursuant to the terms of an escrow agreement which the Applicants will seek approval of at a later date." |
| TR45580 Thirty-Fifth Report of the Monitor January 18, 2010 | Para. 33: "The continued viability of the Applicants is necessary to the Nortel group of companies as NNL provides corporate administrative and management support to its affiliates on a global basis, is contractually obligated to provide transition services to the various purchasers of Nortel's global assets and NNL is the legal owner of substantially all of Nortel's intellectual property, which is licensed to its affiliates. In | |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | addition, a significant portion of Nortel's R&D activity, which is necessary to support the on-going business of Nortel, continues to be conducted by the Applicants." | |
| TR45568<br><br>Fortieth Report of the Monitor<br><br>February 26, 2010 | Para. 24:<br><br>"As noted in the Thirty-Fourth Report, the CVAS Business is not operated through a dedicated legal entity or stand-alone division. Amongst other things, the Applicants have an interest in intellectual property related to the CVAS Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds, stemming from | Para. 25:<br><br>"As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | the GENBAND Agreement amongst the various Nortel entities in the various jurisdictions is complex." | of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties to the IFSA agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | to reach an agreement regarding such allocation." |
| | | Para. 26:<br><br>"As of the current date, no agreement has been reached regarding the allocation of any sales proceeds and the terms of a protocol with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion. Accordingly, the Selling Debtors (as defined in the IFSA) have determined that the proceeds shall be deposited in an escrow account. Once the terms of the escrow arrangements are finalized, the Applicants will bring a motion before this Honourable Court seeking approval of the escrow agreement." |
| TR45569 | | Para. 41: |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| Forty-Fifth Report of the Monitor (CVAS Final) May 14, 2010 | | "The Applicants and the U.S. Debtors have agreed that the sale proceeds related to the sale of the Business will be placed in an escrow account to be established and governed by an escrow agreement that, among other things, shall provide that the sale proceeds may only be released from the escrow account upon either (a) written instruction delivered by all of the Sellers as to the distribution of such proceeds (subject to the prior consent of the Monitor, the Committee and the Bondholder Group acting in good faith) or (b) upon order of this Honourable Court and the U.S. Court after notice and a joint hearing." |
| | | Para. 42: "As of the current date, no agreement has been reached |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | regarding the allocation of any sale proceeds in relation to the Business." |
| TR45567<br><br>Fifty-Second Report of the Monitor<br><br>(MSS Stalking Horse)<br><br>August 30, 2010 | Para. 17:<br><br>"In addition, the Applicants have an interest in the intellectual property upon which the products of the MSS Business are based. <u>Generally speaking, the owner of the intellectual property in the Nortel group, which in most cases is NNL, licenses the intellectual property in question to various other Nortel legal entities around the world</u>, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. These Nortel entities in turn license the intellectual property related to the MSS Business to customers in their respective geographic regions." | Para. 86:<br><br>"As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | [Emphasis added] | agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers" |
| | Para. 85:<br><br>"As previously indicated, the MSS Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have, amongst other things, an interest in intellectual property of the MSS Business which, in turn, is subject to various intercompany | Para. 87:<br><br>"As of the current date, no agreement has been reached regarding the allocation of any sales proceeds. Accordingly, the Monitor expects that the sale proceeds derived from the sale of the MSS Business will be paid into an escrow account pursuant to the terms of an |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from a sale agreement amongst the various Nortel entities in the various jurisdictions is complex." | escrow agreement which the Applicants will seek approval of at a later date." |
| TR45566 Fifty-Fourth Report of the Monitor (MSS Final) September 28, 2010 | Para. 40: "As noted in the Fifty-Second Report, the MSS Business is not operated through a dedicated legal entity or stand-alone division. Amongst other things, the Applicants have an interest in intellectual property related to the MSS Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the | |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the Successful Bid amongst the various Nortel entities in the various jurisdictions is complex. Accordingly, as with the proceeds of other sale transactions where certain of the Applicants, the U.S. Debtors and EMEA Debtors were sellers, the proceeds of the sale of the MSS Business will be placed into an escrow account pending agreement of all of the relevant Selling Debtors (as defined in the Interim Funding and Settlement Agreement approved by this Honourable Court on June 29, 2009) as to an appropriate allocation of such proceeds. Once the terms of the escrow | |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | arrangements are finalized, the Applicants will bring a motion before this Honourable Court seeking approval of the escrow agreement." | |
| TR21281<br><br>Sixty-Third Report of the Monitor<br><br>(Residual IP Stalking Horse)<br><br>April 14, 2011 | Para. 14:<br><br>"In connection with its previous post-filing business unit divestitures, Nortel sold certain patents and intellectual property assets related to such businesses; however, Nortel retained significant Residual IP, including approximately 6,000 Canadian, U.S. and foreign patents and patent applications spanning wireless, wireless 4G, data networking, optical, voice, internet, service provider, semiconductors and other patent portfolios. <u>Legal title to substantially all such patents is held by and registered in the name</u> | Para. 83:<br><br>"As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the Joint Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | of NNL." <br><br> [Emphasis added] | of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers." |
| | Para. 82: <br><br> "NNL holds legal title to the Residual IP which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the | Para. 84: <br><br> "As of the current date, no agreement has been reached regarding the allocation of the Residual IP sale proceeds. Accordingly, the Monitor expects |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | world, in some cases on an exclusive basis and in other cases on a non-exclusive basis." [Emphasis added] | that such proceeds will be paid into an escrow account pursuant to the terms of an escrow agreement which the Applicants will seek approval of at a later date." |
| TR40718 Sixty-Seventh Report of the Monitor June 2, 2011 | Para. 14: "As this Honourable Court well knows, over the course of the past two years, the Canadian Debtors, along with the U.S. Debtors, the EMEA Debtors and certain other Nortel entities, have divested themselves of Nortel's various global operating businesses. The necessity of having various Nortel entities as "sellers" under those transactions resulted from the fact that the businesses divested were not operated through a dedicated legal entity, but rather on a worldwide basis across various Nortel legal entities. Amongst | Para. 42: "With the exception of the IP transaction, the auction for which will commence on June 20, 2011, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors and their affiliates have now divested substantially all of Nortel's material worldwide assets. The proceeds of these divestitures - some $3 billion currently with a minimum of a further $900 million expected to be added upon consummation of the patent portfolio and related assets transaction - now sit in escrow awaiting the resolution of allocation." |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | other things, the Canadian Debtors held (or hold) legal title to the intellectual property which underpinned Nortel's global businesses, which intellectual property was and is licensed to its affiliates, in some cases on an exclusive basis and in other cases on a non-exclusive basis." | Para. 43:<br><br>"This issue, together with the resolution of the EMEA Claims and the U.K. Pension Claims, lays at the heart not only of these CCAA proceedings, but also the Chapter 11 Proceedings and the U.K. Proceedings. Simply put, they are matters that must be resolved before any creditor of an Applicant (and likely any other Nortel debtor) can expect to receive a meaningful distribution on account of amounts that have now been outstanding in most cases since January 2009." |
| TR45574<br><br>Seventy-First Report of the Monitor<br><br>(Residual IP Final)<br><br>July 6, 2011 | Para. 49:<br><br>"As noted in the Sixty-Third Report, NNL holds legal title to the Residual IP which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the | Para. 50:<br><br>"As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA Debtors, through the Joint Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis." <br><br> [Emphasis added] | which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the relevant Selling Debtors (as defined in the IFSA), or (ii) in the case where the Selling Debtors fail |

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| | | to reach an agreement, a determination of the allocation by the relevant dispute resolvers." |
| | | Para. 51:<br><br>"As no agreement has been reached regarding the allocation of the Residual IP sale proceeds, they will be placed into a distribution escrow account upon Closing. Once the terms of the distribution escrow agreement are finalized, the Applicants will bring a motion before this Honourable Court seeking approval of the distribution escrow agreement." |