**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------- x
                              :

*In re*                                :           Chapter 11

                                :

Nortel Networks Inc., *et al.*,          :           Case No. 09-10138 (KG)

                                :

                     Debtors.        :           (Jointly Administered)

                                :

-------------------------------------------------------- x

- and the -

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, C. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**POST-TRIAL REPLY BRIEF OF THE *AD HOC* GROUP OF BONDHOLDERS**

## TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ........................................................................1

II.     COURTS CANNOT FAVOR ONE CREDITOR GROUP OVER ANOTHER................4

      A.      The Global Sub Con Proponents Overstate the Equitable Powers of the Courts...................................................................................................4

      B.      The Identities of the Members of the Bondholder Group and the History of Their Bond Purchases Are Irrelevant to Allocation.................................6

III.    THE PRO RATA APPROACH IS UNPRECEDENTED, IRRELEVANT AND NOT SUPPORTED BY THE EVIDENCE INTRODUCED AT TRIAL ...........................9

      A.      The Global Sub Con Proponents' Request for a "Deemed" Consolidation Must Be Rejected ................................................................................10

      B.      Evidence that Nortel Employed a Matrix Operational Structure Does Not Support a Pro Rata Distribution..............................................................11

            i.      The Pro Rata Approach Would Result in a Default Rule of Substantive Consolidation in Insolvencies of Multinational Enterprise Groups ......................................................................11

            ii.     Nortel's Utilization of a Matrix Organizational Structure Does Not Mean that its Assets and Liabilities are "Hopelessly Entangled"..............13

      C.      Clear Evidence of Bondholder Expectations Was Presented at Trial....................15

      D.      The Third Circuit's Decision in *Owens Corning* Does Not Support the Pro Rata Distribution Theory ..................................................................17

IV.     THE PRO RATA APPROACH CANNOT BE PRACTICALLY IMPLEMENTED ...........................................................................................20

      A.      The Global Sub Con Proponents' Dependence on Estimated Claims Undermines the Pro Rata Distribution Approach ...................................20

      B.      The Pro Rata Approach Fails to Account for Intercompany Claims, Creditor Settlements, and Guarantee Claims ........................................22

V.      THE LEGAL AND EQUITABLE THEORIES THAT THE CCC AND UKPC USE TO SUPPORT THEIR PRO RATA THEORY ARE FLAWED.............................24

      A.      The Pro Rata Approach is Contrary to International Insolvency Principles..........24

i

B.    The Hotchpot Rule is Irrelevant to These Cases......................................................26

C.    The UKPC's Joint Venture Analogy Fails...............................................................29

    i.    The Nortel Entities Were Not Engaged in a Joint Venture........................29

    ii.    In Any Event, Joint Venture Principles Do Not Support a Pro Rata Distribution of Lockbox Proceeds to Nortel Creditors.............................31

D.    The UKPC's Equitable Receivership Theory is Irrelevant to Allocation.............32

E.    The Doctrine of Unjust Enrichment Provides No Support for the Pro Rata Distribution Theory.................................................................................................35

VI.    CONCLUSION..............................................................................................................36

DOCS_DE:195250.1

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re 785 Partners, LLC,*
    470 B.R. 126 (Bankr. S.D.N.Y. 2012) ...............................................................................6, 7

*Atlantic Yarns Inc. (Re),* 2008 NBQB 144 ...............................................................................13

*In re Bd. of Dirs. of Telecom Argentina, S.A.,*
    528 F.3d 162 (2d Cir. 2008)....................................................................................................25

*Blackburn Developments Ltd. (Re),* 2011 BCSC 1671 ...............................................................7

*Blue Line Hockey Acquisition Co. v. Orca Bay Hockey Ltd. Partnership,*
    2008 BCSC 27 .........................................................................................................................30

*Canada (Minister of Indian Affairs & Northern Development) v. Curragh Inc.,*
    1994 CarswellOnt 3851 (Ct. J.) ................................................................................................8

*Central Mortgage & Housing Corp. v. Graham*
    (1973), 43 D.L.R. (3d) 686 (N.S. S.C.)...................................................................................30

*Century Services Inc. v. Canada (Attorney General),*
    2010 SCC 60 ..........................................................................................................................5, 6

*CFTC v. Eustace,*
    Civ. No. 05-2973, 2008 Dist. LEXIS 11810 (E.D. Pa. Feb. 19, 2008)...................................33

*In re Chi., Milwaukee, St. Paul & Pac. R. Co.,*
    791 F.2d 524 (7th Cir. 1986) ....................................................................................................5

*In re Coffee Assocs.,*
    1993 Del. Ch. LEXIS 263 (Del. Ch. Dec. 3, 1993) ...............................................................30

*In re Combustion Engineering, Inc.,*
    391 F.3d 190 (3d Cir. 2004).......................................................................................................4

*Credit Suisse First Boston v. Owens Corning (In re Owens Corning),*
    419 F.3d 195 (3d Cir. 2005)........................................................................................... *passim*

*Cummings Estate v. Peopledge HR Services Inc.,*
    2013 ONSC 2781 ....................................................................................................................34

*Cunningham v. Brown,*
    265 U.S. 1 (1924)....................................................................................................................32

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics
    Corp. v. Chinery*,
    330 F.3d 548 (3d Cir. 2003) ................................................................................5, 31

*Dundes v. Fuersich*,
    791 N.Y.S.2d 893 (N.Y. Sup. Ct. 2004) ........................................................29

*Ex Parte Wilson, In re Douglas*
    (1872) L.R. 7 Ch.App. 490 (Eng.) ..................................................................28

*Gov't Guar. Fund of the Republic of Fin. v. Hyatt Corp.*,
    95 F.3d 291 (3d Cir. 1996) ..............................................................................30

*Invex Holdings, N.V. v. Equitable Life Ins.*,
    179 B.R. 111 (N.D. Ind 1993) ..........................................................................5

*Itel Containers Int'l. Corp. v. Atlanttrafik Express Serv. Ltd.*,
    909 F.2d 698 (2d Cir. 1990) .............................................................................29

*In re Metcalfe & Mansfield Alt. Invs.*,
    421 B.R. 685 (Bankr. S.D.N.Y. 2010) .............................................................25

*Northland Properties Ltd.*, *(Re)* (1988), 29 B.C.L.R. (2d) 257 (S.C.) ....................................13, 14

*In re Pollman*,
    156 F. 221 (S.D.N.Y. 1907) ............................................................................28

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    453 F. Supp. 2d 633 (S.D.N.Y. 2014) .............................................................30

*In re Robert QTIP Marital Trust*,
    332 S.W.3d 248 (Mo. Ct. App. 2010) ..............................................................28

*SEC v. Sunwest Mgmt.*,
    Civ. No. 09-6056-HO, 2009 Dist. LEXIS 93181 (D. Or. Oct. 2, 2009) ............................33, 34

*In re Snider Bros., Inc.*,
    18 B.R. 230 (Bankr. D. Mass. 1982) ...............................................................13

*Solow v. Kalikow* (*In re Kalikow*),
    602 F.3d 82 (2d Cir. 2010) ..............................................................................33

*Stelco Inc., Re* (2005), 75 O.R. (3d) 5 (C.A.) ......................................................................5

*In re Tucson Yellow Cab Co.*,
    789 F.2d 701 (9th Cir. 1986) .............................................................................4

*United States v. USX Corp.*,
    68 F.3d 811 (3d Cir. 1995) ..............................................................................29

iv

**Statutes**

11 U.S.C. § 105(a) ...........................................................................................4, 33

11 U.S.C. § 1532 ....................................................................................................27

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s.11.................5

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s.60..........................27

Del. Code Ann. tit. 6, § 1304 (2014) ...........................................................17

Del. Code Ann. tit. 6, § 1307 (2014) ...........................................................17

N.Y. Debt. & Cred. Law § 273 (McKinney 2014) ........................................17

N.Y. Debt. & Cred. Law § 278 (McKinney 2014) ........................................17

**Other Authorities**

3 Kenneth M. Lapine *et al.*, *Banking Law* § 62.03 (2014) ...........................28

A. Hamilton, *First Report on Public Credit* (January 9, 1790) .....................7

8 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 1532.01 (16th ed. 2012) ........................................................................................27

Rev. Rul. 87-59, 1987-2 C.B. 59 ...................................................................28

UNCITRAL Legislative Guide on Insolvency Law, Pt. III: Treatment of Enterprise Groups in Insolvency (2010) ..................................................13, 24, 25

TO THE HONORABLE KEVIN GROSS, UNITED STATES BANKRUPTCY JUDGE AND
THE HONORABLE JUSTICE F.J.C. NEWBOULD OF THE ONTARIO SUPERIOR COURT
OF JUSTICE:

The *ad hoc* group of bondholders (the "Bondholder Group")[1] hereby delivers to

the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") and the

Ontario Superior Court of Justice (Commercial List) (the "Canadian Court" and, together with

the U.S. Court, the "Courts") its response to the post-trial briefs of (i) the CCC and (ii) the

UKPC.[2]  The Bondholder Group also joins in the Post-Trial Reply Brief of the U.S. Interests.

## I.    **PRELIMINARY STATEMENT**

1.      The pro rata distribution theories advanced by the CCC and UKPC (together, the

"Global Sub Con Proponents") in this Allocation Trial have never been grounded in any legal

principle recognized in either the U.S. or Canada.  In their post-trial briefs, these parties, and

particularly the CCC, finally disclose what they want these Courts to do:  ignore legal principles

and rights and instead rule based on the CCC's proposed moral calculus.  The CCC describes the

case as "a contest between Creditors:  on the one hand, pensioners, disabled workers and other

former employees of the Nortel Group who have suffered significant losses and, on the other

hand, Nortel's note-holder interests" who "are 'voluntary creditors,' most of whom purchased

their notes after the Filing Date at a discount to par and stand to reap windfall profits under any

allocation theory . . . ."  (Closing Brief of the Canadian Creditors Committee [D.I. 14259] (the

"CCC Post-Trial Brief") ¶¶ 33-34.)  Within this "contest," the CCC asks the Courts to reach a

---

[1]     The Bondholder Group consists of entities ("Bondholders") that hold bonds ("Bonds") issued or guaranteed by Nortel Networks Corporation ("NNC" and together with its affiliates worldwide, "Nortel"), Nortel Networks Limited "NNL" and together with NNC and certain of their subsidiaries, the "Canadian Debtors"), Nortel Networks Inc. ("NNI"), and Nortel Networks Capital Corporation ("NNCC" and together with NNI and certain of its subsidiaries, the "U.S. Debtors").

[2]     Terms used but not defined herein have the meanings ascribed to them in the Post-Trial Brief of the *Ad Hoc* Group of Bondholders [D.I. 14258] (the "Bondholder Group's Post-Trial Brief"), the Allocation Protocol [D.I. 10565-1], the Post-Trial Brief of the U.S. Interests [D.I. 14263], or the Proposed Findings of Fact and Conclusions of Law of the U.S. Interests [D.I. 14264] (the "U.S. Proposed FOF"), as applicable.

result, necessarily unhinged from any legal authority, that "err[s] on the side of an allocation that will reasonably protect the expectations of pensioners." (*Id.* at ¶ 34.)

2.      The Courts must not be persuaded by this blatant request to ignore the impartiality they are obligated to apply.  If the Courts were to decide otherwise and reach an allocation result that favors one creditor group—Nortel pensioners—at the expense of another—the Bondholders—because of who those creditors are, as opposed to what rights they have, the Courts would exceed the scope of their authority and set a dangerous precedent for future cases. Indeed, the law in both the U.S. and Canada is clear that any equitable powers possessed by these Courts to effect a pro rata distribution are limited by legal principles, including those that must respect the Bondholders' express contractual rights.

3.      The CCC and UKPC search far and wide for *some* legal support to form the basis for their pro rata theories.  They first contend that the Courts' equitable powers alone provide them with the authority to effect a cross-border pro rata distribution.  It is well settled, however, that insolvency courts cannot use their equitable powers to contravene the explicit provisions of the Bankruptcy Code or CCAA, or the express terms of a contractual agreement between the parties.  Moreover, the CCC and UKPC fail to cite any legal precedent in which an insolvency court relied upon its equitable powers to support a cross-border pro rata distribution.

4.      Next, the Global Sub Con Proponents take great pains to assure the Courts that they are *not* seeking a global substantive consolidation and that their pro rata theories need not meet the factual and legal requirements for substantive consolidation, but then proceed to contend, apparently in the alternative, that their pro rata theory is actually *supported* by principles of substantive consolidation.  Contrary to the Global Sub Con Proponents' arguments, the fact that the Nortel entities adopted a matrix structure and operated in an integrated manner

2

does not support substantive consolidation where, as here, the entities observed corporate

formalities and are not hopelessly entangled.  Moreover, asking the Courts to combine Nortel's

assets and liabilities into a single pool for distribution would amount to a "deemed" substantive

consolidation that is expressly prohibited in the Third Circuit.  None of the evidence presented

by the Global Sub Con Proponents allows them to escape the Third Circuit's decision in *Owens*

*Corning*, which compels that any request for substantive consolidation in this case—however

framed—be denied.  Similarly, there is no legal support under Canadian law for the imposition

of global substantive consolidation, particularly over the objections of significant creditors.  In

fact, no court, anywhere, under any circumstances, has ever ordered a global substantive

consolidation of a multi-national enterprise group on a non-consensual basis.

5.      Next, even if legal support existed for the pro rata theory, it could not reasonably

be implemented in this case.  The primary problem with the pro rata approach is that it depends

entirely on the amount of allowed creditor claims at each estate, which may not be known for

several years, and in many estates is outside the control of these Courts.  This could drastically

impact creditor recoveries.  The CCC and UKPC suggest that Courts could use interim

distributions to sidestep this problem, but any proposal for making such distributions is legally

flawed and logistically impractical.

6.      Finally, the UKPC sets forth a host of novel legal theories as purported

"foundational support" for its pro rata theory, hoping that something will stick.  The UKPC

references, among other things, the so-called "Hotchpot Rule" and principles underlying joint

ventures, equitable receivership, and unjust enrichment.  But none of these theories applies to the

facts of this case and none supports a pro rata distribution approach to allocation.

7.      For all of these reasons, and those referenced in the post-trial briefings of the U.S.

Interests and the Bondholder Group, the Courts should reject the pro rata distribution theory and instead adopt the allocation approach advanced by the U.S. Interests.

## II.     COURTS CANNOT FAVOR ONE CREDITOR GROUP OVER ANOTHER

8.     Through their pro rata distribution theories, the Global Sub Con Proponents ask the Courts to ignore contractual rights and disavow fundamental legal principles to reach a result that favors Nortel's pensioners over other creditor groups, in particular, the Bondholder Group. The Global Sub Con Proponents appeal to the Courts' equitable powers to justify their self-serving pro rata theories, but they fail to address the limitations on those powers that render those theories indefensible as a matter of law.  They further ask the Courts to consider irrelevant information such as the identities of the Bondholders and the circumstances surrounding the acquisitions of their holdings.

### A.     The Global Sub Con Proponents Overstate the Equitable Powers of the Courts

9.     Neither the U.S. Court nor the Canadian Court is empowered to favor one creditor group over another based on subjective notions of fairness or equity.  The cases cited by the CCC support this conclusion.

10.     The CCC cites to *In re Combustion Engineering, Inc.* for the proposition that the bankruptcy courts have "'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings."  391 F.3d 190, 236 (3d Cir. 2004).  The next sentence of the decision, however, states that "[n]evertheless, the equitable powers authorized by [Bankruptcy Code] § 105(a) are not without limitation, and courts have cautioned that this section 'does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.'"  *Id.*

11.     Other cases cited by the CCC similarly discuss the limitations on the Courts' equitable authority.  *See In re Tucson Yellow Cab Co.*, 789 F.2d 701, 704 (9th Cir. 1986)

4

("Nonetheless, the principles of equity may not be invoked in freewheeling fashion. They must be directed to the care and preservation of the estate. They also necessarily operate within the boundaries set by statute.") (citation omitted); *In re Chi., Milwaukee, St. Paul & Pac. R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986) ("The fact that a proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be. . . . Hence ***if the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights*** . . . .") (emphasis added); *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc) (noting that courts have equitable remedies available to them in limited circumstances such as when the "intended system [breaks] down" and the "trustee is delinquent"); *Invex Holdings, N.V. v. Equitable Life Ins.*, 179 B.R. 111, 116 (N.D. Ind. 1993) ("[a]bsent unconscionability or punitive nature of the terms, the terms agreed to between Debtor and Equitable, as the holder of the senior lien, should not be set aside.").

12.     Similarly, section 11 of the CCAA, and corresponding case law, does not provide the Canadian Court with unfettered inherent jurisdiction.  *Stelco Inc., Re* (2005), 75 O.R. (3d) 5 (C.A.) ¶¶ 38, 44.  A court's inherent jurisdiction under the CCAA "does not operate where Parliament or the Legislature has acted" and therefore "if the legislative body has not left a functional gap or vacuum, then inherent jurisdiction should not be brought into play." *Id.* at ¶ 35.  Moreover, as the *Century Services* case, cited by the CCC, makes clear, any relief granted by a court in the exercise of its inherent jurisdiction must be based upon the provisions of the CCAA.  *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60 ¶ 65 (recognizing that "the most appropriate approach is a hierarchical one in which courts rely first on an

5

interpretation of the provisions of the *CCAA* text before turning to inherent or equitable jurisdiction to anchor measures taken in a *CCAA* proceeding.")

13.     In this case, there is no provision in the CCAA that provides the Canadian Court with the authority to reach an "equitable" decision that disavows established legal principles—and that ignores the parties' contractual rights—for the purpose of advantaging one creditor group over another.  Indeed, the Ontario Court of Appeal has recognized that the CCAA "does not accord the claims of 'sympathetic' creditors more weight than the claims of 'unsympathetic' ones." *Ivaco Inc., Re* (2006), 83 O.R. (3d) 108 (C.A.) ¶ 75.  Although there may be compelling policy reasons to protect certain rights or claims in an insolvency, "it is for Parliament, not the courts, to do so."[3] *Id.*

14.     Accordingly, contrary to the CCC's arguments, the Courts' equitable powers are not unlimited.  Simply put, they do not allow the Courts to order a distribution that disregards legal and contractual rights to favor creditors that are argued to be "more deserving" than others.

**B.     The Identities of the Members of the Bondholder Group and the History of Their Bond Purchases Are Irrelevant to Allocation**

15.     The Global Sub Con Proponents ask the Courts to consider the identities of the Bondholder Group's members, their purchase history, and the prices they paid for the Bonds when evaluating the U.S. Interests' allocation theory.  This line of argument is flawed:  when and at what prices the members of the Bondholder Group acquired their Bonds is irrelevant to this litigation.

16.     In the U.S., the purchaser of a debt instrument on the secondary market is entitled to the exact same rights as the original purchaser of that instrument.  *See In re 785 Partners,*

---

[3]     Commercial and insolvency courts in both jurisdictions have time and again asserted the need for certainty in the financial markets so that parties to transactions know where they stand and can act accordingly. That commercial certainty is an important component of the efficiency of financial markets, and is an important policy objective to which courts must always have reference.

DOCS_DE:195250.1

*LLC*, 470 B.R. 126, 133 (Bankr. S.D.N.Y. 2012) (if a creditor is the assignee of the original

lenders, then that creditor "stands in the shoes of the assignor, and takes neither more nor less

than the assignor had").[4]  Thus, in a bankruptcy case of the issuer, the secondary purchaser "can

assert the same rights subject to the same limitations that the Original Lenders could have

asserted if they still owned the Loans."  *Id.*

17.    Moreover, the price paid by a secondary purchaser has no impact on its

substantive rights.  In *785 Partners*, the court found that although "the Debtor's existing default

may have been factored into the price that [the creditor] paid to the Original Lenders," this was

"a matter between those parties."  *785 Partners*, 470 B.R. at 133.  The court further commented

that the debtor, in arguing for a contrary result, had "focus[ed] improperly on what [the creditor]

paid for the Loans . . ., the risks that it faced and the time and effort it has expended in enforcing

the Loans."[5]  *Id.*

18.    Similarly, Canadian courts have recognized that creditors who purchased debt at a

discount are not to be treated different in insolvency proceedings; "it is the role of Parliament

and not the courts to address what limits, if any, should be placed" on such creditors.  *Blackburn*

---

[4]    As Alexander Hamilton recognized soon after the United States' founding:

> [t]he nature of the contract, in its origin, is that the public will pay the sum expressed in the security, to the first holder or his assignee.  The intent in making the security assignable, is, that the proprietor may be able to make use of his property, by selling it for as much as it may be worth in the market, and that the buyer may be safe in the purchase. ***Every buyer, therefore, stands exactly in the place of the seller; has the same right with him to the identical sum expressed in the security; and, having acquired that right, by fair purchase, and in conformity to the original agreement and intention of the Government, his claim cannot be disputed, without manifest injustice***.

A. Hamilton, *First Report on Public Credit* (January 9, 1790) (emphasis added).

[5]    Moreover, the *785 Partners* court raised significant concerns about the slippery slope of "[m]aking equitable determinations of claim allowance based on what an assignee knew about and paid for a claim," which "would require a court to examine the circumstances **of every assignment** to determine the allowed amount of the claim in the hands of the assignee."  *785 Partners*, 470 B.R. at 133 (emphasis added).

*Developments Ltd. (Re)*, 2011 BCSC 1671 ¶ 40.[6]

19.     The UKPC's expert witness, Professor Westbrook, agrees. Although he refused to testify at trial, Westbrook testified at his deposition that "parties that purchase in the secondary market perform a useful economic function" and there is nothing improper about noteholders acquiring notes at a discount. (Westbrook Dep. Tr. 147:15-23.)  He added that there is nothing about the Nortel case that makes the prices at which claims may have traded on the secondary market relevant to his analysis. (*Id.* at 148:11-15.)

20.     Because the purchase price is not relevant, the CCC did not seek an order from the Courts requiring the Bondholder Group to produce in discovery information sufficient to determine the price at which members of the Bondholder Group purchased their holdings.[7] Undeterred by its lack of information, the CCC nonetheless presents a fundamentally flawed analysis of the profits it contends, without any support, have been earned by selected members of the Bondholder Group to suggest that Bondholders stand to obtain a windfall from Nortel's insolvency proceedings.  (CCC Post-Trial Brief ¶ 194.)  In addition to being wholly irrelevant, this analysis is rank speculation.

21.     For example, the CCC singles out Monarch Alternative Capital as a bondholder that has allegedly made "a significant profit" by trading in Bonds on various dates.  To make this argument, the CCC points to mere snapshots of the Bondholder Group's holdings at nine points

---

[6]     *See also Canada (Minister of Indian Affairs & Northern Development) v. Curragh Inc.*, 1994 CarswellOnt 3851 (Ct. J.) ¶ 4.

[7]     Although the Bondholder Group objected to all discovery requests relating to its members' Bond purchases as irrelevant to allocation, in the interests of compromise it agreed to produce information showing its members' holdings as of the following six dates:  January 13, 2009; May 5, 2009; July 31, 2009; July 18, 2011; February 8, 2013; and November 18, 2013.  (*See* The Ad Hoc Group of Bondholders' Responses and Objections to the Written Questions and Contention Interrogatories Served by the Canadian Creditors Committee, dated February 25, 2014 (TR49177).)  The Bondholder Group also filed statements pursuant to Bankruptcy Rule 2019 disclosing its members' holdings as of August 17, 2012, June 26, 2013, and March 11, 2014.  The CCC did not pursue its request for information that would actually show the trading dates and prices after the Bondholder Group's objection.

8

in time from the Petition Date through March 11, 2014, without even disclosing that it has no evidence of when Monarch actually traded and at what prices.  If this factual argument were legally relevant, one would expect that the CCC would have actually pursued information sufficient to make it.  The CCC did not, instead resorting to pure conjecture.

### III.    THE PRO RATA APPROACH IS UNPRECEDENTED, IRRELEVANT AND NOT SUPPORTED BY THE EVIDENCE INTRODUCED AT TRIAL

22.    After yet another round of briefing, the Global Sub Con Proponents still have not pointed to any case law, statute, or other legal principle that supports their pro rata distribution theories.  To the contrary, it remains undisputed that *no court has ever, under any circumstances*, ordered what they have requested, which amounts to the global substantive consolidation of a multinational enterprise on a non-consensual basis.  The Courts should decline the Global Sub Con Proponents' invitation to break new and unprecedented ground that is contrary to existing law.

23.    Although no precedent exists for the pro rata distribution theories, the most analogous legal principles are those that govern domestic substantive consolidation in the U.S. and Canada.  But even under these principles, the arguments of the Global Sub Con Proponents must be rejected.  *First*, the Global Sub Con Proponents seek a "deemed" substantive consolidation that is prohibited in the Third Circuit.  *Second*, contrary to the arguments of the Global Sub Con Proponents, the fact that Nortel operated in an integrated manner and adopted a "matrix" structure does not support substantive consolidation in either jurisdiction.  *Third*, the trial record clearly shows that Bondholders and other creditors relied on the separateness of Nortel entities.  *Fourth*, contrary to the suggestion of the CCC, the Third Circuit's decision in *Owen's Corning* does not support substantive consolidation in this case.

9

A.    **The Global Sub Con Proponents' Request for a "Deemed" Consolidation Must Be Rejected**

24.    The Global Sub Con Proponents argue that their pro rata distribution theories are not substantive consolidation because the individual Nortel entities will remain intact and the estates will not be merged.[8]  This assertion, however, does not allow the Global Sub Con Proponents to dodge the requirements of *Owens Corning* for imposing such a drastic remedy. Indeed, *Owens Corning* explicitly held that the remedy sought by the Global Sub Con Proponents here is an improper "deemed" consolidation.

25.    A deemed consolidation treats "assets and liabilities of separate entities [as if they] were merged" for claim and distribution purposes, but in fact keeps them separate, "with the twist that [guarantee claims]" are eliminated.  *Credit Suisse First Boston v. Owens Corning* (*In re Owens Corning*), 419 F.3d 195, 199 (3d Cir. 2005).  In *Owens Corning*, the Third Circuit held that such an arrangement is inappropriate because it "cuts against the grain of all the principles" that provide the rationale for substantive consolidation.  *Id.* at 212.  In the Third Circuit's view, if a debtor group's corporate and financial structure was such a sham prepetition, then it makes no sense for that structure to remain intact for purposes of creditor distributions. *See id.* at 216.

26.    By requesting a deemed consolidation in this case, the Global Sub Con Proponents "seek to remake substantive consolidation not as a remedy, but rather a stratagem." *Id.*  Their effort seeks to use substantive consolidation to funnel lockbox funds to their

---

[8]    Specifically, the CCC states that its pro rata distribution theory would maintain "the corporate separateness of each Nortel Debtor and does not interfere with its rights to crystallize the asserted Claims against it and distribute recoveries in respect of valid Claims pursuant to the governing laws and practices in each jurisdiction."  (CCC Post-Trial Brief ¶ 160.)  Similarly, the UKPC states the Nortel Debtors' estates will serve as "merely pass-through entities that remain in existence for the sole purpose of channeling distributions to their creditors."  (Allocation Post-Trial Brief of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund [D.I. 14269] (the "UKPC Post-Trial Brief") ¶ 66; *see also id.* at ¶ 56.)

DOCS_DE:195250.1

constituencies, strip Bondholders and other creditors of their rights under the Bankruptcy Code, and trump possible plan objections by impacted parties. As the Third Circuit held, "[s]uch 'deemed' schemes" are improper and must be rejected.[9] *Id.*

**B.    Evidence that Nortel Employed a Matrix Operational Structure Does Not Support a Pro Rata Distribution**

27.    In the alternative, the Global Sub Con Proponents argue that global substantive consolidation is warranted here because "Nortel was a highly integrated company that was often referred to as 'one Nortel.'" (CCC Post-Trial Brief ¶ 161; *see also* UKPC Post-Trial Brief ¶ 58.) This argument fails for at least two reasons. *First*, the imposition of substantive consolidation in this case would lead to a default rule of substantive consolidation for all complex corporate enterprises that operate in an integrated manner. This would directly contradict the principles set forth in *Owens Corning* and relevant Canadian case law and cause chaos in the marketplace. *Second*, although Nortel operated in an integrated manner, the Global Sub Con Proponents have not advanced any credible evidence that Nortel's assets and liabilities are "hopelessly entangled," as required under *Owens Corning*, or so intertwined as to make them indistinguishable from one another, a key factor under Canadian case law.

i.    The Pro Rata Approach Would Result in a Default Rule of Substantive Consolidation in Insolvencies of Multinational Enterprise Groups

28.    It is undisputed that Nortel employed a "matrix" structure organized around Business Lines functioning across entities in multiple jurisdictions. (U.S. Proposed FOF ¶ 26.) Contrary to the Global Sub Con Proponents' arguments, however, this single fact does not mean that the substantive consolidation of the Nortel estates is warranted under either international or domestic legal standards.

---

[9]    Notably, none of the Nortel Debtors' estates support the Global Sub Con Proponents' pro rata theories, instead arguing for the allocation of Sale Proceeds based on legal principles separate from creditor recoveries.

29.     The use of a matrix structure like the one employed by Nortel is common among large multinational corporations.  In fact, Nortel modeled its structure on companies such as GE, Cisco Systems, and IBM.  (U.S. Proposed FOF ¶¶ 27, 28.)  As Professor Westbrook recognized, "many multinational enterprises operate on a highly integrated basis."  (Westbrook Dep. Tr. 48:8-15.)  In Nortel's case, the matrix structure enabled it "to provide its full line of products and services to its customers globally."  (U.S. Proposed FOF ¶ 26.)

30.     But Nortel, like many other multinational corporations, was "comprised of legal entities organized in various countries around the world, each of which observed necessary corporate formalities."  (*See* UKPC Post-Trial Brief ¶ 12.)  The evidence introduced at trial is unequivocal that Nortel recognized and observed the separate legal existence of each corporate entity.  Nortel kept entity-level financial records, tracked and documented intercompany transactions, segregated entities' cash reserves, and entered into lending transactions premised on the separateness of its entities.  (U.S. Proposed FOF ¶¶ 30-40.)

31.     Under these circumstances, substantive consolidation would undermine the legal separateness of the various Nortel entities in the same way that it would for any corporate family. The Third Circuit has explicitly stated that it is "loathe to entertain the argument that complex corporate families should have an expanded substantive consolidation option in bankruptcy." *Owens Corning*, 419 F.3d at 215.  In a similar vein, UNICTRAL has warned that expansive use of substantive consolidation could reduce the important flexibility that companies have in choosing their corporate structure:

> [a] principal concern is that consolidation overturns the principle of the separate legal identity of each group member, which is often used to structure an enterprise group to respond to various business considerations, serving different purposes and having important implications with respect to, for example, taxation law, corporate law and corporate governance rules. ***If the courts routinely agreed to substantive***

12

*consolidation, many of the benefits to be derived from the flexibility of enterprise structure could be undermined*.

(UNCITRAL Legislative Guide on Insolvency Law, Pt. III: Treatment of Enterprise Groups in Insolvency (2010) at 59-60 ("UNCITRAL Legislative Guide") (emphasis added) (TR11438).)

32.     Because Nortel is organized in a manner typical of other large multinational enterprise groups, an order granting substantive consolidation in this case could lead to a default rule that all such enterprise groups are subject to substantive consolidation.  Westbrook expressly supported the adoption of such a rule, arguing that a single pool distribution should apply routinely to multinational enterprises that operate on a highly integrated basis.  (Westbrook Dep. Tr. 19:18-22, 48:18-24.)  Such a default rule, however, was not supported by Judge Clark,[10] Westbrook's co-author, and finds no support in existing law.  *See, e.g.*, *Owens Corning*, 419 F.3d at 216.  If adopted, such a rule could cause chaos in the marketplace, triggering arbitrary wealth transfers from senior creditors to more junior creditors.  (McConnell Report ¶ 67.)  The Courts should avoid this result.

      ii.      <u>Nortel's Utilization of a Matrix Organizational Structure Does Not Mean that its Assets and Liabilities are "Hopelessly Entangled"</u>

33.     The UKPC argues that because Nortel's IP was developed through collaborative and cross-geographical R&D efforts, untangling the assets and liabilities of the various Nortel entities would be challenging.  This argument should be rejected because it contradicts the evidence introduced at trial and fails to meet the standards set forth in *Owens Corning* and relevant Canadian case law.[11]

34.     The UKPC improperly conflates the purported prepetition interconnectedness of

---

[10]      Clark Dep. Tr. 97:19-21, 114:11-23, 127:13-129:4.

[11]      *Owens Corning*, 419 F.3d at 211, 214; *Northland Properties Ltd., (Re)* (1988), 29 B.C.L.R. (2d) 257 (S.C.) ¶¶ 58-59 (citing *In re Snider Bros., Inc.*, 18 B.R. 230 (Bankr. D. Mass. 1982); *Atlantic Yarns Inc. (Re)*, 2008 NBQB 144 ¶¶ 31-36.

Nortel's IP with the ability to separate and account for that IP in the post-petition period.  The

latter is the focus of the *Owens Corning* analysis.  *See Owens Corning*, 419 F3d. at 212, 214.  By

the UKPC's own admission, however, the ownership of Nortel's IP is capable of being

determined post-petition.  (*See* UKPC Post-Trial Brief, Argument Section III.)[12]  Moreover,

Bazelon's "forward citation analysis" of Nortel patents further undercuts the UKPC's position.

(*See* Bazelon Report at 22 (TR00039).)  By reviewing all 2,684 U.S.-granted Rockstar patents,

Bazelon purported to identify where each patent originated and the market segment to which it

was assigned.  (*Id.* at 14, 21, 22.)

35.    Even if a measure of disentanglement is still needed to separate and account for

Nortel's IP, the effort required to do so is not sufficient to warrant substantive consolidation

under *Owens Corning*.[13]  The UKPC alleges only that it would be "***very difficult*** to disentangle

the IP to allocate value across geographies or legal entities."  (UKPC Post-Trial Brief ¶ 28

(emphasis added).)  But the Third Circuit has expressly warned that "[n]either the impossibility

of perfection in untangling the affairs of the entities nor the likelihood of some inaccuracies in

efforts to do so is sufficient to justify consolidation."[14]  *Owens Corning*, 419 F.3d at 214.  "***Very***

***difficult***" is simply not enough to warrant substantive consolidation.  Because the UKPC has not

even alleged, let alone proven, that the entities are hopelessly entangled, the Courts should reject

the pro rata distribution theories.

---

[12]    For example, the UKPC purports to identify NNUK's (i) share of Group-wide R&D, (ii) share of Nortel's new patent applications, (iii) contribution to the Rockstar patent portfolio, and (iv) R&D employment figures.  (UKPC Post-Trial Brief ¶¶ 29-31.)

[13]    Canadian courts have often referenced U.S. case law when considering whether the extraordinary relief of substantive consolidation should be granted, and the elements considered are similar.  *See Northland Properties Ltd. (Re)*, (1988), 29 B.C.L.R. (2d) 257 (S.C.); *Atlantic Yarns Inc. (Re)*, 2008 NBQB 144.

[14]    There is no doubt that the Courts "could properly order and oversee" the process, "dealing with inaccuracies and difficulties as they arise and not in hypothetical abstractions."  *Owens Corning*, 419 F.3d at 215.

C.    **Clear Evidence of Bondholder Expectations Was Presented at Trial**

36.    The Global Sub Con Proponents allege that no evidence of bondholder expectations was introduced at trial to rebut their pro rata theory.[15]  In fact, the unrebutted evidence at trial was that Bondholders relied on their guarantee claims.  The Global Sub Con Proponents, who bear the burden of proof, offered no evidence to support their theory that Bondholders did ***not*** rely on the material guarantee provisions of their indentures.[16]

37.    For example, the Global Sub Con Proponents ignore the testimony of three former chief financial officers of the Nortel Group who testified that the guarantees were crucial for Nortel to obtain the financing that it needed.  When discussing NNI's guarantee of the $2 billion and $1.15 billion high yield bonds issued by NNL in 2006 and 2007, respectively, former CFO, Peter Currie, stated that the NNI guarantees were necessary because "NNI's involvement would be favourable to the outcome."  (Trial Tr. 549:8-23, May 14, 2014 (P. Currie).)  He explained that, had NNI not been the guarantor for the financing, Nortel may not have been able to secure the same principal amount and the rate would have been higher.  (*Id.* at 548:15-549:23.)

38.    Former Executive Vice President and CFO, Paviter Binning, echoed this point, testifying that creditors requested NNI guarantees because they wanted the assets of NNI to support the NNL issuance.  (Trial Tr. 1057:12-25, May 20, 2014 (P. Binning).)  Former CFO Douglas Beatty also testified that when negotiating financing, a parent company guarantee lowered the rate a bank would charge to extend financing to a Nortel entity, which ultimately benefitted that entity.  (Beatty Dep. Tr. 55:5-55:21)  Thus, the evidence presented at trial was

---

[15]        *See* CCC Post-Trial Brief ¶¶ 181-184; UKPC Post-Trial Brief ¶¶ 100, 102.

[16]        The argument by the CCC and UKPC that the Bondholder Group has not offered evidence sufficient to prove that Bondholders relied on their guarantee claims not only misreads the evidence, but also improperly shifts the burden of proof away from the Global Sub Con Proponents.  U.S. law and international legal principles concerning the substantive consolidation of domestic enterprise groups are clear:  ***the proponent of substantive consolidation bears the burden*** of proving facts sufficient to justify such a drastic remedy.  *Owens Corning*, 419 F.3d at 212; UNCITRAL Legislative Guide at 71-72.

unchallenged: without the guarantees, the Bonds could not have been issued on the same terms and at the same rates.

39.    In addition to the testimony of three former Nortel CFOs, other Nortel officers testified to the importance of NNI guarantees in securing Nortel financing. Former Director of Corporate Finance, John Williams, and Assistant Treasurer, Michael McCorkle, testified that NNI-specific guarantees were a critical term of the Nortel bonds. (Williams Dep. Tr. 197:22-200:2; Trial Tr. 820:24-821:15, May 15, 2014 (M. McCorkle).) Williams testified that this bond financing was essential to Nortel's ability to operate and would not have been possible without the NNI guarantees. (Williams Dep. 197:22-200:2; *see also* Trial Tr. 546:13-550:2, May 14, 2014 (P. Currie).)

40.    The Global Sub Con Proponents further ignore the expert report submitted by John McConnell on behalf of the U.S. Interests. (McConnell Report at Ex. 3.) McConnell included in his report a graph clearly showing that the bonds guaranteed by NNI traded at prices well above the prices of the non-guaranteed bonds. (*Id.* at ¶ 55.) This alone serves as irrefutable evidence that Bondholders and market participants valued and relied on the guarantees.[17]

41.    Finally, the terms of the bond indentures themselves provide unrebutted evidence of Bondholder expectations. Most importantly, the guarantees are ***clear and unequivocal*** in providing that NNI would guarantee NNL's obligations on the Bonds.[18] The Global Sub Con Proponents do not contend otherwise. Instead, they allege that Bondholders could not

---

[17]    The CCC argues that McConnell's report and testimony should be discounted because he did not speak directly with any members of the Bondholder Group about their expectations. As is evident from McConnell's report, however, he did not need to have such discussions. Rather, his conclusions are drawn from, and supported by, empirical pricing data as well as historic and indisputable bond market behavior.

[18]    *See, e.g.*, TR40050 at BNY-00570, BNY-00589 (BNY Proof of Claim and attached Indenture, dated July 5, 2006) (NNI "hereby unconditionally and irrevocably guarantees, jointly and severally to the Holder of the Debt Security upon which this Guarantee is endorsed and to the Trustee on behalf of each such Holder the due and punctual payment of the principal of, premium, if any, interest and Additional Amounts, if any, on such Debt Security . . . .")

reasonably rely on these guarantees due to the allegedly weak covenant structure of the Bonds, including the lack of a provision preventing NNL and NNI from assuming all of the debts of their affiliates, thereby negating the effect of the guarantees.  (CCC Post-Trial Brief ¶¶ 188, 189; UKPC Post-Trial Brief; *see also* UKPC Post-Trial Brief ¶ 98.)

42.     This argument fails.  *First*, there is no rational business reason why NNL or NNI would gratuitously assume obligations of another Nortel affiliate.  Not surprisingly, such a gratuitous assumption of liabilities did not happen, rendering this speculation superfluous. *Second*, if either NNL or NNI had irrationally assumed the obligations of its affiliates, and thereby rendered itself insolvent, the Bondholder Group could have potentially avoided the transaction using fraudulent transfer laws.  *See, e.g.*, N.Y. Debt. & Cred. Law §§ 273, 278 (McKinney 2014) (allowing creditors to set aside obligations incurred by debtor that render debtor insolvent); Del. Code Ann. tit. 6, §§ 1304, 1307 (2014) (same).

43.     Pursuant to the guarantee obligations, Bondholders—unlike a creditor without a guarantee—ensured that they were creditors of both NNL and NNI in order to protect their rights.  Accordingly, and contrary to the arguments of the Global Sub Con Proponents, the clear terms of the indentures provide evidence of Bondholders' expectations that the guarantees would in fact have value.

## D.    The Third Circuit's Decision in *Owens Corning* Does Not Support the Pro Rata Distribution Theory

44.     Remarkably, the CCC alone argues that the Third Circuit's decision in *Owens Corning*—which severely restricts the application of substantive consolidation—actually supports its position.  (CCC Post-Trial Brief ¶¶ 174-179.)[19]  Contrary to the CCC's suggestion,

---

[19]     Incredibly, the UKPC's post-trial brief does not include a single reference or citation to the *Owens Corning* decision, which is both controlling precedent in the Third Circuit and a seminal case on domestic substantive consolidation.

*Owens Corning* in no way supports the pro rata distribution theory and, in fact, compels the Courts to reject it.

45.     The CCC ignores the legal principles set forth in *Owens Corning*, referring only to vague "guiding principles of equity designed to achieve an equitable result." (CCC Post-Trial Brief ¶ 174.)  In particular, the CCC fails to mention that in ***denying*** a request for substantive consolidation, the *Owens Corning* court emphasized that substantive consolidation is a remedy that "should be ***rare*** and, in any event, ***one of last resort*** after considering and rejecting other remedies."  *Id.* at 211 (emphasis added).  Nortel is not the rare circumstance meriting this remedy of last resort.

46.     The facts of *Owens Corning* do not "drastically differ from the Nortel facts," as the CCC claims.  (CCC Post-Trial Brief ¶ 176.)  They are nearly identical.  With respect to the "creditor reliance" prong of the substantive consolidation analysis, the Third Circuit found "no evidence of the prepetition disregard of the . . . entities' separateness."  *Owens Corning*, 419 F.3d at 212.  In reaching this conclusion, the court relied on two key facts:  (i) the lending transaction carried out by Owens Corning was "premised on the separateness of all [Owens Corning] affiliates," including the provision of "guarantees of separate entities, made separate by [Owens Corning]'s choice of how to structure the affairs of its affiliate group of companies"; and (ii) evidence indicating that the value of the guarantees was "partially derived from the separateness of the entities."  *Id.* at 212-13.

47.     Both of these facts are present in the Nortel case.  The guarantees provided by NNI enabled the issuers of the Bonds to raise critical funds in the capital markets at prices and on terms (which included the guarantees) that were acceptable to both the issuers and the

underwriters.[20]  Nortel personnel viewed the guaranteed Bonds as "structurally better" than Bonds without such a guarantee.  (Bondholder Group's Post-Trial Brief ¶ 65.)  Moreover, the guarantees were valuable to investors because NNI served as a source of significant revenue and a repository of significant hard assets distinct from NNL.  (*Id.* at ¶ 66.)  Thus, as in *Owens Corning*, there is no evidence that creditors disregarded the separateness of Nortel entities.

48.      The facts of *Owens Corning* are also analogous with respect to the "hopeless entanglement" prong of the analysis.  In *Owens Corning*, the Third Circuit rejected the argument that "because intercompany interest and royalty payments were not perfectly accounted for, untangling the finances of those entities [was] a hopeless endeavor."  *Owens Corning*, 419 F.3d at 215.  The Courts must reject the argument here as well.  The assets and liabilities of the Nortel entities are not hopelessly entangled simply because Nortel operated in an integrated manner and some untangling may need to be done to determine which entities own certain assets.[21]  Indeed, every single intercompany claim between the three major Nortel Debtors' estates has been settled or adjudicated, definitely resolving any purported entanglement.  (Bondholder Group's Post-Trial Brief ¶¶ 74-76.)

49.      For these reasons, the CCC's attempt to distinguish *Owens Corning* fails and the result of that case—the rejection of substantive consolidation—is equally appropriate here.

---

[20]    U.S. Proposed FOF Section II.C.4(a); *see also* Currie Aff. ¶¶ 90, 92; Beatty Dep. Tr. 55:5-21; Currie Dep. Tr. 263:13-264:4.

[21]    In an attempt to distinguish the *Owens Corning* decision, the CCC argues that, unlike the Owens Corning entities, the Nortel Debtors shared "business purposes, logos and trade names, and other features," which prevents the straightforward separation of their assets and liabilities.  (CCC Post-Trial Brief ¶ 177.)  This argument improperly conflates the creditor reliance inquiry with the hopeless entanglement inquiry.  It also ignores evidence definitively showing that the Nortel entities were not hopelessly entangled, including evidence that all Nortel entities maintained separate books and records and cash, prepared entity-specific financial statements and tax returns, and tracked and documented intercompany loans.  (U.S. Proposed FOF ¶¶ 30, 31, 34; Bondholder Group's Post-Trial Brief ¶ 69.)

## IV.    THE PRO RATA APPROACH CANNOT BE PRACTICALLY IMPLEMENTED

50.    The CCC and UKPC have both devoted portions of their post-trial briefs to explaining how their proffered pro rata approaches would be implemented by the Courts and arguing that to do so would be "straightforward" and "efficient."  (CCC Post-Trial Brief, Section IV.F; UKPC Post-Trial Brief, Argument Section III.)  In reality, the pro rata distribution method's reliance on estimated claims data, and its failure to account for intercompany claims, creditor settlements, and subsidiary guarantees, highlights the impracticability of the Global Sub Con Proponents' theories.  An interim distribution process does not cure these defects as it would only lead to uncertainty, expense, and delay.  Because the pro rata distribution approach cannot be practically implemented, it should be rejected by the Courts.

### A.    The Global Sub Con Proponents' Dependence on Estimated Claims Undermines the Pro Rata Distribution Approach

51.    The CCC and UKPC acknowledge that their pro rata distribution approaches cannot be implemented "until all the worldwide claims are determined in each jurisdiction." (UKPC Post-Trial Brief ¶ 88; *see also* CCC Post-Trial Brief ¶ 206.)[22]  Both the CCC and UKPC suggest that this fundamental shortcoming can somehow be overcome through "interim distributions," with the CCC advocating for the creation of a "liquidation trust or similar mechanism managed by an independent fiduciary appointed by the Courts."  (*Id.* at ¶ 208; *see also* UKPC Post-Trial Brief ¶ 88.)  As is the case with nearly all aspects of the pro rata distribution theories proffered by the CCC and the UKPC, interim distributions will create additional problems for the parties and Courts to solve and raise additional questions that must be, but have not been, answered.  Such an approach must therefore be rejected.

---

[22]    Indeed, the formulae proffered by the Global Sub Con Proponents rely on estimates of the worldwide claim amounts.  (CCC Post-Trial Brief ¶ 201.)

52.     *First*, interim distributions will not facilitate the final distribution of lockbox funds to creditors, but instead will cloud these proceedings with additional uncertainty.  At a minimum, the Core Parties and the Courts would be required to vet and select an independent fiduciary, negotiate and implement a distribution process, monitor the collection and verification of assets and claims data, and potentially litigate disagreements among creditors, Core Parties, and the independent fiduciary.  (*See* CCC Post-Trial Brief ¶ 208.)  Far from resulting in a quick resolution of the various claims-related issues yet to be determined in the three main Nortel Debtors' estates, an interim distribution process would only open up a new front for litigation, adding expense and delay.

53.     *Second*, an interim distribution process would be ripe for abuse because it depends, in part, on how claims are adjudicated and allowed in jurisdictions over which these Courts, the independent fiduciary to be appointed, and the Core Parties have no control.  For example, under the pro rata formula proffered by the UKPC, the total funds allocated to the EMEA Debtors' estates will increase if the UKPC's claim against the EMEA Debtors increases. The Joint Administrator, however, has very little incentive to challenge the UKPC's claim because doing so would simply reduce the allocation to the EMEA Debtors' estates.  Thus, if the Joint Administrator does not object to the UKPC's claim, thereby allowing it in the claimed amount (or even higher, because a bar date has not yet been established in the EMEA proceedings), more of the lockbox funds would flow to EMEA.  Such a situation would be beyond the reach of the Courts and would make a mockery of what was a fair and open Allocation Trial.

54.     The CCC's proposed independent fiduciary would not counter this potential abuse.  Indeed, the CCC suggests that an independent fiduciary should usurp the Courts'

jurisdiction and "determine interim and final allocation distributions to the Estates." (CCC Post-Trial Brief ¶ 208.) This fundamental alteration of parties' rights—not to mention the jurisdiction of the various courts around the globe involved in the resolution of claims for each Nortel estate—would create incurable due process and procedural concerns with no clear mechanism to resolve the myriad issues that may arise.

55.    *Finally*, the UKPC does not offer a more reasonable or principled alternative to that proffered by the CCC. Instead, the UKPC calls for the holding back of sufficient funds "to account for any uncertainty over the validity of the claims in each Estate, such that there would be no need to claw back any funds distributed." (UKPC Post-Trial Brief ¶ 88.) According to the UKPC, this requires simply holding back a pro rata percentage of the amount of "uncertain claims" to "cover the worst case scenario." (*Id.*) In the U.K. proceedings, however, a formal claims process has not yet even commenced. Moreover, the value of outstanding claims against the Canadian Debtors' estates is so unpredictable that practically no funds could safely be made available for interim distribution. (One Hundred and Fourth Report of the Monitor ¶ 29 (March 14, 2014) (indicating that there are 143 unresolved claims against the Canadian Debtors' estates which, in total, "represent[] a claim value of approximately CAD $24.2 billion.").) For these reasons, the interim distributions process is unworkable and should be rejected as a mechanism to fix the impossibility of implementing the pro rata approach.

**B.      The Pro Rata Approach Fails to Account for Intercompany Claims, Creditor Settlements, and Guarantee Claims**

56.    The pro rata approach also improperly ignores intercompany claims that have already been approved by the Courts. The CCC and UKPC contend that this is not true, asserting that intercompany claims are recognized under the pro rata approach because they are part of the asset base of the affected Nortel Debtors' estates. (CCC Post-Trial Brief ¶ 203;

UKPC Post-Trial Brief ¶ 86.)  These assertions are hollow.  In reality, the pro rata formula treats already-allowed intercompany claims as both an asset and liability of the Debtors' estates, purposely washing them out of the pro rata model and eliminating entirely their economic effect. (UKPC Post-Trial Brief ¶ 86; Trial Tr. 3060:17-3061:2, June 5, 2014 (C. Bazelon).)[23]

57.    The pro rata approach also requires the Courts to unwind the effect of cash settlements approved by the Courts and received by creditors.  (Trial Tr. 3039:21-3042:22, June 5, 2014 (C. Bazelon).)  The Global Sub Con Proponents, however, do not explain how the Courts could claw back money already paid out to creditors, in reliance on the Courts' orders, such as the $37.5 million cash settlement paid by the U.S. Debtors to the UKPC.  In reality, the pro rata formula is designed to provide the UKPC with the benefit of this settlement *plus* a pro rata distribution from the EMEA Debtors' estate.  (*Id.* at 3042:12-22.)

58.    Finally, the pro rata approach fails to give effect to the guarantee claims of the Bondholders and other creditors.  The Global Sub Con Proponents suggest that the Courts could both adopt the pro rata approach and recognize guarantee claims, but they offer no guidance for how the Courts would achieve this result or what the value of the guarantee claims would be.[24] Moreover, even if the pro rata approach could recognize guarantee claims, it could not do so in a manner consistent with Bondholders' expectations.  When the Bondholders purchased their Bonds, they assumed that the Nortel entities were legally separate and that the guarantees would provide access to separate pools of assets.  (U.S. Proposed FOF ¶¶ 41-44.)  The pro rata approach, however, undercuts these expectations by forcing the Bondholders "to share *pari passu* with creditors of a less solvent group member."  (*See* Westbrook Dep. Tr. 21:16-22:3;

---

[23]    The CCC has not offered any argument to the contrary.

[24]    The CCC does not offer a principled solution with respect to guarantees, stating only that it is "up to the statutory and equitable discretion of the Canadian and U.S. Courts to determine whether there is value in the bondholders' contractual guarantees that should be recognized."  (CCC Post-Trial Brief ¶ 204.)

UNCITRAL Legislative Guide at 61.)[25]

## V.    THE LEGAL AND EQUITABLE THEORIES THAT THE CCC AND UKPC USE TO SUPPORT THEIR PRO RATA THEORY ARE FLAWED

59.    The Global Sub Con Proponents also present a number of inapplicable legal and equitable theories as "foundational support" for their claims.  These new arguments do nothing to remedy the failures of the pro rata approach.

### A.    The Pro Rata Approach is Contrary to International Insolvency Principles

60.    The UKPC claims that its pro rata distribution approach is consistent with "certain 'foundational' principles of bankruptcy and insolvency law which are accepted in common law jurisdictions throughout the world."  (UKPC Post-Trial Brief ¶ 108.)  In support of this statement, they cite to the adoption of modified universalism in the U.S. and Canada which, according to the UKPC, "recognizes that the rules applicable in an international insolvency context may take precedence over the domestic law of a particular jurisdiction."  (*Id.* at ¶¶ 110, 121.)[26]  But the UKPC fails to identify a single rule "applicable in an international insolvency context" that supports the imposition of a global substantive consolidation of the Nortel Debtors' estates.  Indeed, no such rule exists in either international law or in the domestic law of any jurisdiction.

61.    The Legislative Guide on Insolvency Law published by UNCITRAL—a group that has made proposals for changes to domestic laws, and whose work the UKPC cites to favorably—does not even ***address*** substantive consolidation of multinational enterprise groups.

---

[25]    *See also Owens Corning*, 419 F.3d at 216 ("'Communizing' assets of affiliated companies to one survivor to feed all creditors of all companies may to some be equal (and hence equitable).  But it is hardly so for those creditors who lawfully bargained prepetition for unequal treatment by obtaining guarantees of separate entities.") (citation omitted).

[26]    This raises the question: what if the domestic law of both jurisdictions fails to support the requested relief?  The UKPC does not answer this question, but there is no precedent in the U.S. or Canada for a global substantive consolidation.  (Bondholder Group's Post-Trial Brief ¶¶ 34-36; Westbrook Dep. Tr. 170:22-171:18.)  On that basis alone, the pro rata theory must be rejected.

Nor does it propose changes to legislation that would be consistent with the theories advanced by the Global Sub Con Proponents. Instead, UNCITRAL's recommendations address topics such as "[p]romoting cross-border *cooperation* in enterprise group insolvencies," "[f]orms of *cooperation* involving courts," "[f]orms of *cooperation* involving insolvency representatives," and "[u]se of cross-border insolvency agreements." (UNCITRAL Legislative Guide at Section III (emphasis added).) This is precisely what the parties and the Courts have done here in conducting a joint trial after years of joint proceedings. (*See* UKPC Post-Trial Brief ¶ 121.)

62.    It does not follow that such cooperation—even if adopted as law in the U.S. and Canada—would lead to any alteration of parties' rights. The UKPC relies on *Telecom Argentina* and *Metcalfe & Mansfield* in support of its claim that modified universalism is "not limited to the procedural aspects of the law." (UKPC Post-Trial Brief ¶ 122.) *Metcalfe & Mansfield* and *Telecom Argentina* are readily distinguished, however, because in both cases: (i) the U.S. court proceeding was ancillary to a foreign plenary proceedings; (ii) the plan (or, in the case of *Telecom Argentina*, the *acuerdo preventive extrajudicial* ("APE")) at issue did not call for a substantive consolidation; and (iii) the plan and APE received near-unanimous creditor support. *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 687, 690-91 (Bankr. S.D.N.Y. 2010); *In re Bd. of Dirs. of Telecom Argentina, S.A.*, 528 F.3d 162, 164, 166-67 (2d Cir. 2008). Here, the U.S. and Canadian cases are both plenary proceedings and the pro rata distribution theories require the imposition of a deemed consolidation of the Nortel Debtors' estates which is outside of the plan process and without the requisite creditor support.

63.    Even if the Courts were to consider UNCITRAL's legislative recommendations with respect to substantive consolidation of *domestic* enterprise groups, they do not support a court-imposed pro rata distribution in the Nortel context. According to UNICTRAL, substantive

consolidation should be available "only in the following limited circumstances":

> (a)      Where the court is satisfied that the assets or liabilities of the enterprise group members are intermingled to such an extent that the ownership of assets and responsibility for liabilities cannot be identified without disproportionate expense or delay; or
>
> (b)      Where the court is satisfied that the enterprise group members are engaged in a fraudulent scheme or activity with no legitimate business purpose and that substantive consolidation is essential to rectify that scheme or activity.

(UNCITRAL Legislative Guide at 71-72.)

64.      These circumstances are not present here.  *First*, as discussed *supra*, the Nortel Debtors' estates are not "hopelessly entangled," and to the extent the parties must "disentangle" them, it would not be disproportionately expensive to do so.  *Second*, no fraud has been alleged and none is present.  (*See* Clark & Westbrook Report ¶ 42; Clark Dep. Tr. 82:10-83:15.)

65.      Moreover, the UKPC's appeal to the "universally recognized" principle of *pari passu* distribution falls flat.  (*See* UKPC Post-Trial Brief ¶ 108.)  According to the UKPC, that principle demands "that creditors of equal rank or priority are to receive distributions on a pro rata *pari passu* basis from all available proceeds, relative to the amount of their claim."  (*Id.*)  The UKPC conveniently fails to mention that this rule applies to creditors *of the same debtor*. Indeed, UNCITRAL has noted that one of the principal concerns with the availability of an order for substantive consolidation, in the domestic context, is "the potential unfairness caused to one creditor group when forced to share *pari passu* with creditors *of a less solvent group member*." (UNCITRAL Legislative Guide at 61 (emphasis added).)  For these reasons, international insolvency principles neither address nor support the pro rata distribution theory.

## B.      The Hotchpot Rule is Irrelevant to These Cases

66.      The UKPC argues, for the first time in any of its allocation briefing, that the Courts should look to the "Hotchpot Rule" as support for a pro rata distribution.  The Hotchpot

Rule by its very terms,[27] however, applies **only** where there are concurrent insolvency proceedings in multiple jurisdictions **for the same debtor**.  It does not apply where, as here, there are separate plenary proceedings for multiple debtors.

67.     The Hotchpot Rule codifies the common sense principle that when there are concurrent proceedings in multiple jurisdictions **for the same debtor**, a creditor can only collect once for its claims, such that amounts that a creditor collects in country A on a claim are offset against amounts it can collect in country B on that same claim.  The Hotchpot Rule thus guards against the possibility that a creditor with access to multiple proceedings for a single debtor will recover proportionately more than a similarly-situated creditor of that same debtor who has access to only a single proceeding in which to recover.[28]

68.     By its own terms, the Hotchpot Rule has no application where there is a single plenary proceeding for each estate and a creditor will collect against each debtor only once in that debtor's jurisdiction.  The rule also has no application where a single creditor has claims against multiple debtors—like the UKPC purports to have as a result of its guarantee claims.  This limitation on the Hotchpot Rule makes sense.  Allowing creditor A to recover on its claim against a debtor through the administration of that debtor's insolvency proceeding does not alter

---

[27]     Section 1532 of chapter 15 of the Bankruptcy Code, based on Article 32 of the Model Law, adopts the Hotchpot Rule, stating that:

> a creditor who has received payment with respect to its claim in a foreign proceeding pursuant to a law relating to insolvency may not receive a payment **for the same claim** in a case under any other chapter of this title **regarding the debtor**, so long as the payment to other creditors of the same class is proportionately less than the payment the creditor has already received.

(emphasis added).  Similarly, section 60 of the CCAA codifies the Hotchpot Rule in Canadian law and provides in relevant part that "[i]n making a compromise or an arrangement of **a debtor company** . . . the amount that a creditor receives or is entitled to receive outside Canada . . . **in respect of the company**" shall be taken into account in the distribution to the company's creditors.  (emphasis added).

[28]     *See* 8 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 1532.01 (16th ed. 2012) ("The purpose of [Section 1532 of the Bankruptcy Code] is to prevent a creditor from obtaining more favorable treatment than other creditors of the same class by obtaining payment of the same claim in insolvency proceedings in different jurisdictions.")

27

the substantive rights of creditors—including creditor A—to collect on separate claims, against a separate debtor, through a separate insolvency proceeding.

69.     Recognizing this limitation on the Hotchpot Rule, the UKPC admits that such concerns are not implicated under the present circumstances.[29]  Nevertheless, the UKPC resorts to misstating the Hotchpot Rule, claiming that it applies "in cases involving highly integrated debtors where the underlying assets available to satisfy creditor claims are in fact from one source, and represent joint assets prior to bankruptcy or assets in which multiple debtors have an interest."  (UKPC Post-Trial Brief ¶ 129.)

70.     The UKPC provides no support for this proposition.[30]  To the Bondholder Group's knowledge, no court has ever applied the Hotchpot Rule to effect a pro rata distribution that ignores creditors' claims against *separate debtors*.[31]  Doing so would provide an improper end-run around the principles of substantive consolidation in the Third Circuit, in Canada, and in other jurisdictions.  Thus, the Court should reject the UKPC's argument that the Hotchpot Rule,

---

[29]     *See* UKPC PPI Brief ¶¶ 23, 24; UKPC Post-Trial Brief ¶ 127.

[30]     The UKPC relies on two cases that are well over a century old in making its Hotchpot Rule argument, neither of which involves more than one debtor nor are otherwise applicable.  *See In re Pollman*, 156 F. 221, 221-22 (S.D.N.Y. 1907) (finding that foreign attachment of debtor's property constituted a fraudulent transfer where attachment would entitle creditor to receive a greater share of debtor's property than would otherwise be obtainable through bankruptcy); *Ex Parte Wilson, In re Douglas* (1872) L.R. 7 Ch.App. 490 at 490-91 (Eng.) (finding that creditors were not entitled to receive a distribution in the English proceeding before creditors had received the same distribution in the Brazilian proceeding because, contrary to the appellant's claims, the case did not involve two debtor estates but *one debtor estate* being administered concurrently in England and Brazil.)

[31]     As is suggested by the paucity of case law cited by the UKPC, the Hotchpot Rule is rarely used in the insolvency context.  The rule has historically been used in the trusts and estates context as a means of equalizing distributions to beneficiaries of a decedent's estate or a trust.  *See, e.g.*, *In re Robert QTIP Marital Trust*, 332 S.W.3d 248, 253 (Mo. Ct. App. 2010).  The Hotchpot Rule is also used in the tax context as a means of combining a taxpayer's gains and losses from sales or exchange of property used in trade or business, and gains and losses from the compulsory or involuntary conversion of property used in a trade or business.  3 Kenneth M. Lapine *et al.*, *Banking Law* § 62.03[1] (2014); *see also* Rev. Rul. 87-59, 1987-2 C.B. 59 ("Under section 1231(a) of the [Tax] Code, gains or losses from the sale, exchange, or conversion of qualifying property are netted together in a 'hotchpot' computation.")

DOCS_DE:195250.1

even if properly stated, is at all relevant to these cases.[32]

## C.     The UKPC's Joint Venture Analogy Fails

71.    The UKPC also contends that the Courts should analogize Nortel to a joint venture and provide for substantive consolidation as a result.  The UKPC's attempt to justify a pro rata distribution on this basis misses the mark for at least two reasons.  *First*, the Nortel entities did not intend to form a joint venture for any purpose, as they expressly acknowledged in the MRDA.  This fact alone is sufficient to reject the UKPC's joint venture theory.  *Second*, even if the Courts were to treat the Nortel entities as partners in a hypothetical joint venture, the resulting sale proceeds would be distributable to the Nortel entities themselves (as the putative joint venturers) in proportion to their ownership interests in the joint venture, not, as the UKPC argues, to the Nortel entities' creditors on a pro rata basis.

### i.     The Nortel Entities Were Not Engaged in a Joint Venture

72.    The UKPC fails to make the requisite showing that the Nortel entities intended to form a joint venture.  In order to form a joint venture in the U.S., two or more persons must, among other things, (i) "enter into a specific agreement to carry on an enterprise for profit"; and (ii) "evidence their intent to be joint venturers."  *Itel Containers Int'l. Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 701 (2d Cir. 1990); *see also Dundes v. Fuersich*, 791 N.Y.S.2d 893, 895 (N.Y. Sup. Ct. 2004) ("[t]he indicia of the existence of a joint venture are . . . acts manifesting the intent of the parties to be associated as joint venturers . . . ."); *United States v. USX  Corp.*, 68 F.3d 811, 816 (3d Cir. 1995) (noting that "[t]he *sine qua non"* of a joint venture

---

[32]    The UKPC also concedes that "[t]he Hotchpot Rule will not be uniformly available in all cases involving separate legal entities with direct and guarantee claims asserted by the same parties, such as for example where the assets of those entities are, in fact, separate and identifiable as belonging to a particular entity." (UKPC Post-Trial Brief ¶ 129.)  Thus, even assuming that the Hotchpot Rule is at all relevant in the present circumstances, it is inapplicable here because the assets of the Nortel Debtors' estates are separate and identifiable.  (*See* Bondholder Group's Post-Trial Brief ¶¶ 69-79.)

is an agreement to create a joint venture); *In re Coffee Assocs.*, 1993 Del. Ch. LEXIS 263 (Del. Ch. Dec. 3, 1993) ("[a]n essential element of a joint venture is an agreement, express or implied, evidencing the parties' intent to engage in a business enterprise of that kind.")  The law in Canada is the same, as the contractual basis and underpinning for a joint venture is key and the parties must manifest an intention to be legally bound.  *Central Mortgage & Housing Corp. v. Graham* (1973), 43 D.L.R. (3d) 686 (N.S. S.C.) ¶ 68; *Blue Line Hockey Acquisition Co. v. Orca Bay Hockey Ltd. Partnership,* 2008 BCSC 27 ¶¶ 57-62, *aff'd* 2009 BCCA 34.

73.       Far from agreeing to a joint venture, as the UKPC acknowledges, the Nortel entities expressly agreed to the opposite, memorializing within the MRDA that they "***shall not constitute a partnership or joint venture for any purpose***."  (UKPC Post-Trial Brief ¶ 61, n.112; TR21003 (MRDA) at § 13 (emphasis added).)  The UKPC cites no authority that would allow the Courts to disregard the Debtors' clearly-expressed contractual intent.  The language of the MRDA must be given controlling effect, and the UKPC's joint venture analogy should be dismissed.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 685-86 (S.D.N.Y. 2014) (finding that there was no joint venture as a matter of law where the alleged joint venturers' agreement specifically stated that they did not intend for their relationship to constitute a partnership or joint venture); *see also Gov't Guar. Fund of the Republic of Fin. v. Hyatt Corp.*, 95 F.3d 291, 304 (3d Cir. 1996) (finding no joint venture relationship where the parties' agreement stated, "[n]othing in this Agreement . . . shall . . . constitute . . . a . . . joint venture").[33]

---

[33]       The testimony that the UKPC cites in an attempt to show that an NNUK employee and the EMEA Debtor's transfer pricing expert believed the Nortel entities' relationship could be characterized as a joint venture is superseded by the expressed intent of the debtors memorialized in the MRDA.  *See Presbyterian Church of Sudan*, 453 F. Supp. 2d at 686 (noting that although the parties may have viewed their relationship as a joint venture or described it informally as such is insufficient to establish a joint venture where there is no

ii.    In Any Event, Joint Venture Principles Do Not Support a Pro Rata Distribution of Lockbox Proceeds to Nortel Creditors

74.    Even if the Nortel entities' relationship could be analogized to a joint venture for the purposes of allocating the Sale Proceeds, such an analogy would not support the pro rata allocation the UKPC proposes.

75.    The UKPC asserts that the profits of a joint venture should be split equally among *the partners* in a joint venture, absent an agreement or circumstances from which it may be inferred that the parties intended to divide the profits in unequal portions.  (*See* UKPC Post-Trial Brief ¶¶ 64-67.)  But the UKPC does not advocate for such an allocation.  Rather, the UKPC argues, without support, that the Sale Proceeds should be split equally among the Nortel entities' combined *creditors*.

76.    The UKPC suggests that because "the Group has been liquidated, it is the Nortel Debtors' estates' creditors who should be viewed as the 'joint venturers' entitled to the presumption of equality of treatment upon dissolution of the common endeavor they funded."  (*Id*. at ¶ 67.)  Adopting this view would require the Courts to disregard the separate corporate forms of the various Nortel entities, skip allocation, and go straight to claims recovery without any justification or authority.  It would also lead to a plainly absurd result:  whichever Nortel entity had the most unsecured debt at insolvency would receive the greatest share of the joint venture's assets.  The UKPC is forcing an analogy that does not support the result they ultimately seek.

77.    Moreover, contrary to the UKPC's arguments, an equal distribution of profits among the partners to a joint venture is only presumed where there is no agreement or facts

---

agreement evidencing the parties' intent to establish a joint venture and specific language in the agreement forecloses such a relationship).

31

indicating that the parties intended an unequal split.  Here, the Nortel entities evidenced such an intent by both expressly rejecting a joint venture or partnership relationship in the MRDA and by assigning specific rights, *i.e.* the  Exclusive Licenses, in the assets sold to individual Nortel entities.  Notably, none of the cases cited by the UKPC involve a distribution of assets where the joint venturers had independent legal rights to the assets sold.

78.     For these reasons, the UKPC's characterization of the Nortel entities' relationship as a joint venture and its request for a pro rata distribution on these grounds should be rejected.

**D.     The UKPC's Equitable Receivership Theory is Irrelevant to Allocation**

79.     The UKPC contends that the Courts may look to "the equitable common law jurisprudence relating to the pro rata distribution of funds pursuant to an equitable receivership." (*See* UKPC Post-Trial Brief ¶ 73.)  The cases cited by the UKPC, however, support the opposite proposition:  insolvency courts in both the U.S. and Canada are bound by the strict requirements of their respective governing insolvency statutes in exercising their ability to effect a pro rata distribution.  The Courts cannot simply follow what the UKPC contends is equitable.

80.     Nearly every U.S. case cited by the UKPC involves funds collected as part of a fraud investigation or prosecution—a situation in which courts maintain extremely broad discretion to oversee the equitable distribution of the recovered funds to equally-innocent victims.[34]  In fact, the U.S. cases cited by the UKPC draw a sharp distinction between courts presiding over an equitable receivership proceeding and courts exercising bankruptcy powers.

---

[34]     The only case cited by the UKPC that deviates from the fraud investigation fact pattern was decided ninety years ago and does not stand for the proposition, as the UKPC contends, that a pro rata distribution is favored in equitable receivership proceedings, even where funds can be traced.  (*See* UKPC Post-Trial Brief ¶ 74, n.122 (citing to *Cunningham v. Brown*, 265 U.S. 1 (1924).)  In fact, *Cunningham* has nothing to do with equitable receivership proceedings.  The Court there held that certain investors could not keep funds they hurriedly withdrew from a fraudster's accounts pre-petition, finding that the withdrawals constituted illegal preferential payments and must be returned to the estate because the investors had reason to believe the fraudster was insolvent at the time of the withdrawals.  *Cunningham*, 265 U.S. at 11 ("Thus they came into the teeth of the Bankruptcy Act and their preferences in payment are avoided by it.").

*See SEC v. Sunwest Mgmt.*, Civ. No. 09-6056-HO, 2009 Dist. LEXIS 93181, at *32 (D. Or. Oct. 2, 2009) ("Federal equity receivership courts are not required to exercise bankruptcy powers . . . nor to strictly apply bankruptcy law.").  In particular, the equitable receivership courts specifically note that they are not constrained by the law regarding substantive consolidation and opinions such as *Owens Corning* when overseeing equitable receiver proceedings.  *Id*. at *36 ("[t]he Court is not bound in this Federal Receivership Case to apply the bankruptcy law concept of substantive consolidation or to follow bankruptcy case law regarding that separate and distinct concept."); *see also CFTC v. Eustace*, Civ. No. 05-2973, 2008 Dist. LEXIS 11810, at *17 (E.D. Pa. Feb. 19, 2008) ("*Owens Corning* applies to bankruptcy proceedings, and this Court does not exercise bankruptcy powers").

81.    Here, the Courts ***are*** exercising bankruptcy powers and are ***required*** to apply bankruptcy law.  *See Solow v. Kalikow* (*In re Kalikow*), 602 F.3d 82, 97 (2d Cir. 2010) (the equitable power conferred by Section 105 is to carry out the provisions of the Bankruptcy Code, not to empower the court "to do the right thing").  Therefore, unlike the equitable receivership cases cited by UKPC, the concept of substantive consolidation and the heavy burden set forth in *Owens Corning* are directly applicable in this case.  *See Eustace*, Civ. No. 05-2973, 2008 Dist. LEXIS 11810, at *17.  The difference between these situations is clearly identified in the very cases the UKPC cites.[35]

---

[35]    For example, in *Eustace*, the district court noted several differences between a bankruptcy proceeding and an equitable receivership proceeding when rejecting the applicability of *Owens Corning* and the concept of substantive consolidation.  *Eustace*, Civ. No. 05-2973, 2008 Dist. LEXIS 11810, at *17.  First, the Court noted that the role of the court-appointed equitable receiver was very relevant.  *Id*. at *18.  Such an equitable receiver is appointed by the court to represent the interests of all the receivership funds and the proposed distribution represents the plan the receiver deemed to be the most fair to all victims of the defendants' fraudulent activity.  *Id*.  Based on this, the court concluded that the receiver's position on this issue should be given some weight by the court.  *Id*. at *17.  The court contrasted this with the advocates of a pro rata distribution in *Owens Corning*.  Those creditors were "engaged in a ploy to deprive one group of creditors of their rights while providing a windfall to other creditors."  *Id*. at *18 (quoting *Owens Corning*, 419 F.3d at 200) (internal quotations omitted).

82.     The decision in *Cummings Estate v. Peopledge HR Services Inc.*, which the UKPC relies upon to support its pro rata theory under Canadian law, is also clearly distinguishable.  The *Cummings Estate* decision involved funds that were either subject to an express trust or were impressed with a Quistclose trust.  The case law guiding the decision to make a pro rata distribution from these funds was described by Justice Newbould as "dealing with the method to be used in distributing money that was to be held in trust but co-mingled into an account from which money was improperly taken and not used for the purposes for which the money was advanced by claimants."  *Cummings Estate v. Peopledge HR Services Inc.*, 2013 ONSC 2781 ¶ 24.  Indeed, Justice Newbould's decision was based on his findings, *inter alia*, that although the claimants intended for their funds to be held by the debtor in a segregated trust account, the funds were instead co-mingled, possibly in breach of trust and/or contract, and no claimant would be able to trace his or her funds in the debtor's accounts.  *Id.*  Unlike in *Cummings Estate*, Nortel's cash reserves were segregated by entity and, in the post-petition period, the Sale Proceeds are being held in escrow pursuant to the parties' agreement.  (U.S. Proposed FOF ¶¶ 30, 33, 320.)

83.     Because these cases are insolvency proceedings and there is no equitable receiver proposing a pro rata distribution, the Courts are constrained by Bankruptcy Code and CCAA requirements and the strict standards governing substantive consolidation.  The UKPC's request that the Courts look to the law regarding equitable receivership proceedings simply reflects a group of creditors attempting to maximize their own recoveries to the detriment of other creditors, and therefore should be rejected.[36]

---

[36]     Even if the Courts were to look to the equitable receivership jurisprudence cited by UKPC, which they should not, a pro rata distribution would still be inappropriate because it would not be the most equitable result for all parties, including the Bondholders, which would lose their contractual rights.  *See Sunwest Mgmt.*, Civ. No. 09-6056-HO, 2009 Dist. LEXIS 93181, at *34 (pro rata distribution is not mandated in

**E.    The Doctrine of Unjust Enrichment Provides No Support for the Pro Rata Distribution Theory**

84.    The UKPC additionally contends that principles of unjust enrichment support its pro rata theory, but this argument also fails as a matter of both fact and law.

85.    The factual record is clear that NNI has not been unjustly enriched in any respect. As described by the UKPC, unjust enrichment occurs where a party obtains a benefit that would be inequitable for it to retain.  All benefits that NNI stands to obtain under any allocation theory are benefits that it earned and is entitled to retain on account of, *inter alia*, the historical revenues it generated and the contributions it made to the success of Nortel.  Indeed, as discussed in the post-trial brief of the U.S. Interests, over the last 15 years, NNI consistently generated more than 65% of Nortel's global revenue,[37] which it then shared with the other Nortel estates in accordance with the terms of the CSA and the RPSM.[38]  NNI also provided critical financing support for NNL and its other affiliates throughout its lifetime.[39]  Thus, whatever portion of the Sale Proceeds that NNI receives as a result of this litigation does not constitute unjust enrichment.

86.    Moreover, as with its other misplaced equitable theories, the UKPC fails to provide any meaningful link between the doctrine of unjust enrichment and its pro rata theory. The UKPC states in its brief that the "size of each Estate's creditor claims pool provides a good proxy for the value of the 'benefit/enrichment' conferred by the RPEs on NNL and NNI,"[40] but it

---

equitable receivership cases; rather, the trial court must use its discretion to "determine the most equitable distribution result for all claimants, including investors").

[37]    *See* U.S. Interests Brief at 4; *see also* U.S. Proposed FOF ¶¶ 66-68.

[38]    ██████████████████████████████████████████████████████████████

[39]    *Id.* ¶¶ 72-91.

[40]    UKPC Post-Trial Brief ¶ 72.

provides no support for this assertion.  This lack of support is not surprising because, logically, the amount of claims existing at a particular estate has no relationship to the benefits generated by that estate.  For example, if NNI had had sufficient liquidity to pay off all of its debts before the petition date, leaving it with a claims pool of zero dollars, it would get zero dollars in the allocation.  It is impossible to reconcile such an outcome with any concept of equity.

87.     For all of these reasons, contrary to the argument of the UKPC, the doctrine of unjust enrichment provides no support for the pro rata theory.

## VI.     <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, the Bondholder Group requests that the U.S. and Canadian Courts (i) allocate the Sale Proceeds among the Nortel Debtors' estates by determining the fair market value of each Debtor's share of the assets and rights relinquished in the various sale transactions, as set forth by the U.S. Interests in their post-trial brief; and (ii) grant such other and further relief as the Courts deem just and proper.

DOCS_DE:195250.1

Dated: September 10, 2014

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Peter J. Keane*
Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

-and-

**MILBANK, TWEED, HADLEY & M**<sup>c</sup>**CLOY LLP**
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Atara Miller
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4463
Facsimile: (213) 629-5063

-and-

**BENNETT JONES LLP**
Richard B. Swan
Gavin H. Finlayson
3400 One First Canadian Place, P.O. Box 130
Toronto, Ontario, M5X 1A4
Telephone:  (416) 777-5762
Facsimile:  (416) 863-1716

*Attorneys for Ad Hoc Group of Bondholders*