# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                        :
In re                                   :       Chapter 11
                                        :
Nortel Networks Inc., et al.,¹          :       Case No. 09-10138(KG)
                                        :       Jointly Administered
                    Debtors.            :
                                        :
                                        :       Hearing Date: Nov. 4, 2014 at 10:00 a.m.
                                        :       Objections Due: Oct. 14, 2014 at 4:00 p.m.
------------------------------------------------------------x
```

## DEBTORS' MOTION FOR (A) AN ORDER ENFORCING AND/OR EXTENDING THE AUTOMATIC STAY, (B) AN ORDER ENFORCING THE COURT'S PRIOR ORDERS, (C) A PROTECTIVE ORDER, AND (D) RELATED RELIEF UNDER SECTION 105(a)

Nortel Networks Inc. ("NNI") and certain of its affiliates (collectively, the "Debtors")

hereby move this Court, pursuant to Sections 105(a), 107(b), 362(a), and 541 of the Bankruptcy

Code and Bankruptcy Rule 9018, for the entry of an order, substantially in the form attached

hereto as Exhibit A, (a) enforcing and/or extending the automatic stay to third-party subpoenas

seeking production of documents and testimony relating to a patent portfolio sold by Debtors and

other Nortel entities to Rockstar Bidco, LP ("Rockstar"), (b) enforcing, in the context of these

third-party subpoenas, provisions in the Court's previous sale orders, protective orders, and

confidentiality orders that protect confidential and privileged information of Debtors and other

Nortel entities, (c) entering a protective order, (d) granting related relief under Section 105(a) of

---

¹ Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Contact information for the U.S. Debtors and their petitions are available at http://dm.epiq11.com/nortel.

the Bankruptcy Code, and (e) granting such other and further relief as the Court deems just and proper.  In support of this Motion, Debtors (i) submit the Declaration of Timothy C. Ross attached hereto as <u>Exhibit B</u> (the "<u>Ross Decl.</u>"), (ii) request that the Court take judicial notice pursuant to Fed. R. Evid. 201 of the facts and matters appearing in the Court's docket as more particularly referenced herein, including docket items in Case Nos. 09-10138, 09-10164, and 09-11972, and (iii) respectfully represent as follows:

## INTRODUCTION

1.      During these Chapter 11 cases, Debtors, along with other Nortel entities, sold a large patent portfolio to Rockstar.  In connection therewith, the sellers transferred to Rockstar a large quantity of documents and other information related to the patents in the portfolio. Rockstar or its assignees are now engaged in at least six pending patent infringement lawsuits around the country and, given the size of the patent portfolio, more suits may be filed in the future.  Debtors are not parties to those patent lawsuits.

2.      A number of Rockstar's opponents in those suits have served NNI, former Nortel employees, and various estate professionals with broad third-party subpoenas.  Indeed, several of the 18 pending subpoenas contain more than 115 separate document requests, which are not limited in time.  A large percentage of the documents being sought by the subpoenas – "patent documents," relating not only to the particular patents being asserted in the respective litigations, but also more broadly to Nortel's entire portfolio of thousands of patents, most but not all of which were sold to Rockstar – are in the possession of others (primarily Rockstar, a party to those lawsuits).  The other main type of documents sought by the subpoenas – "valuation documents," relating to Nortel's assessment of the potential value of its patents and business lines before it offered those assets for sale, and documents relating to the sales themselves,

including documents submitted to Nortel by both the successful and unsuccessful bidders – focus in large part on, and include, documents collected and retained for purposes of the Allocation Litigation (defined below) among the various Nortel estates.  These valuation documents are subject to this Court's protective and case management orders, designed to protect a variety of significant privilege and confidentiality interests.  Most of these valuation documents are expected to be protected by the attorney-client privilege, the work-product rule, and previous confidentiality orders entered by this Court.  Thus, litigants seeking NNI's documents likely would not receive many documents, but rather only a small number of documents, culled at great burden and expense, and an extensive privilege log.

3.      Given the number and breadth of the document requests contained in the current subpoenas, Debtors' lack of staff, and technical and practical limitations on Debtors' ability to search electronic records of the documents remaining in their possession, just searching for the documents would impose significant burdens that Debtors in fairness should not have to bear. Instead, that burden is more appropriately borne by Rockstar and others that are parties to the patent lawsuits.

4.      But searching for the documents is hardly the only way these subpoenas would burden Debtors.  Debtors would also have to expend significant effort and costs to prepare voluminous privilege logs to protect their privileges and work-product rights.  Further, Debtors would have to undertake efforts to carefully assess and preserve confidentiality of a large number of documents, particularly given objections to the subpoenas served by Rockstar indicating that it will seek to hold liable anyone who reveals its confidential and/or privileged information without authorization.  Finally, because the source of the documents remaining in Debtors' possession is not always clear, Debtors would want to coordinate with affiliated debtors in Canada and the

EMEA (Europe, Middle East, and Africa) region and potentially other third parties – bringing into consideration the duties and burdens of those debtors and international comity concerns.

5.       Debtors have tried to work out issues related to the pending subpoenas with the issuing parties, but so far those efforts have not been successful.  As a result, Debtors face the prospect of litigating subpoena enforcement proceedings in various federal courts throughout the country.  Apart from the burden of litigating in multiple jurisdictions at the same time, Debtors face a risk of inconsistent determinations being made by those other federal courts concerning the scope of the automatic stay, the reasonableness of the burdens the subpoenas impose on Debtors (particularly to the extent Debtors must respond to multiple simultaneous requests), and what compliance may be required and on what schedule.  Rather than litigate these issues on a piecemeal basis across the country, Debtors believe that the bankruptcy policy of centralizing litigation against debtors and protecting debtors and their estates in appropriate circumstances requires that this Court enter the order proposed by the Debtors.

6.       Under Debtors' proposed approach: (a) Debtors would produce redacted deposition designations from the Allocation Litigation and public versions of the approximately 2,200 Allocation Trial exhibits, which can be done without incurring excessive additional burdens; and (b) the Court would regulate further discovery sought from the Debtors by (i) directing third-party litigants to first exhaust and document all attempts to obtain documents from Rockstar and (ii) extending the automatic stay to protect all parties in possession of Debtors' documents from subpoenas and other discovery requests, subject to the rights of third-party litigants to meet and confer with Debtors and ultimately seek relief from the stay from this Court.

7.     This approach closely follows the process adopted by the Bankruptcy Court for the Southern District of New York in *Residential Capital*, where the debtors also faced burdensome third-party discovery requests.[2]  The *Residential Capital* court held that Section 105 of the Bankruptcy Code allows a bankruptcy court to extend the stay to protect the debtor from third-party discovery in litigation in which the debtor is not a defendant.  The court also found that the order extending the stay to discovery relates to administration of the bankruptcy case and does not require the filing of an adversary proceeding.[3]  The court carefully analyzed a variety of principles in determining what conditions and limitations to place on discovery.  The court also looked to case law on extending the automatic stay to non-debtor parties and the provisions of the Federal Rules of Civil Procedure governing discovery and subpoenas.  The court fashioned a six-factor test (discussed in greater detail below) for determining whether to limit or permit third-party discovery and, if so, on what conditions.[4]

8.     Ultimately, the *Residential Capital* court afforded its debtors a respite, not an exemption, from discovery.  Debtors seek similar relief with this Motion.

9.     As described below, Debtors are not asking this Court to quash the subpoenas, nor are Debtors seeking an injunction barring third-party discovery from Nortel for all time.  Rather, Debtors are requesting certain protections under this Court's jurisdiction and case management authority as part of a reasonable, measured approach.  Specifically, Debtors are asking the Court to require the litigants who issued the subpoenas to first attempt to obtain the "patent documents" from Rockstar and other parties who not only are more likely to have them but who, because

---

[2]     *In re Residential Capital, LLC*, 480 B.R. 529 (Bankr. S.D.N.Y.  2012) (extending the automatic stay to anyone seeking discovery from the debtor, absent further order of the bankruptcy court).

[3]     *Id.* at 539.

[4]     *Id.* at 539-43.  The six factors are scope of requested discovery, context, need, timing, burden, and expense.

they are parties to the patent suits, are more appropriately required to bear the expense and burden of searching for and producing the documents.  Once such efforts have been exhausted, parties who seek to pursue follow-on discovery from Debtors would be able to seek lift-stay relief from this Court, which can then evaluate whether the proposed discovery is appropriate in terms of the burdens that would be imposed on Debtors, given the circumstances of Debtors' bankruptcy.

10.     For the reasons stated herein, Debtors respectfully request that the Court grant this Motion and enter the proposed order attached as Exhibit A.

## JURISDICTION

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the February 29, 2012 Amended Standing Order of Reference from the U.S. District Court for the District of Delaware (the "District Court").  Moreover, this Court has exclusive jurisdiction pursuant to 28 U.S.C. § 1334(e) over Debtors' property and property of the estate, including Debtors' books and records.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The statutory bases for the relief requested herein are Sections 105(a), 107(b), 362(a), and 541 of the Bankruptcy Code and Bankruptcy Rule 9018.

## FACTUAL BACKGROUND

### A.     Procedural Background

13.     On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel

Networks (CALA) Inc. ("NN CALA"),[5] filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court.  The cases (the "Chapter 11 Cases") are consolidated for procedural purposes only.  Debtors continue to operate as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

14.     The U.S. Trustee has appointed an Official Committee of Unsecured Creditors (the "Committee") for Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

15.     On the Petition Date, Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[6] commenced proceedings seeking relief from their creditors (collectively, the "Canadian Proceedings") in the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada).  The Canadian Court appointed Ernst & Young Inc. as a monitor (the "Monitor").  Also on the Petition Date, the High Court of Justice in England and Wales (the "English Court") placed nineteen of Nortel's European affiliates, including Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in Europe, the Middle East, and Africa (collectively, the "EMEA Debtors"),[7] into administration (the "UK Proceedings") under the

---

[5]     NN CALA filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' Chapter 11 cases for procedural purposes [D.I. 1098].

[6]     The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation.

[7]     The EMEA Debtors include the following entities:  NNUK, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks

control of court-appointed administrators and foreign representatives (the "Joint Administrators").  Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency, and dissolution proceedings around the world (collectively, with the Chapter 11 Cases, the Canadian Proceedings, and the UK Proceedings, the "Insolvency Proceedings").

16.     On February 27, 2009, in response to the Monitor's petition for recognition of the Canadian Proceedings, this Court entered an Order Granting Recognition and Related Relief [Case No. 09-10164, D.I. 40].  In doing so, the Court gave full force and effect in the United States to the Canadian Court's First Amended and Restated Initial Order, which stays all proceedings against the Canadian Debtors, the Monitor, or the Canadian Debtors' business and property.[8]  On June 26, 2009, this Court similarly recognized the foreign proceedings of the EMEA Debtors and gave full force and effect to the initial order of the English Court, which also contained a broad stay.[9]

**B.     Sales Of Certain Nortel Businesses And Assets**

17.     Soon after commencement of the Insolvency Proceedings, the various companies comprising the Nortel group pursued an orderly and coordinated sale of Nortel's business lines

---

(Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

[8]     *See* Affidavit of Ken Coleman In Support of Petitions for Recognition of Foreign Proceedings [09-10164, D.I. 6], Exhibit C (Canadian Court's Initial Order), ¶¶ 14-15.  The Canadian Court has extended the "Stay Period" several times and the current stay period runs to October 4, 2014.  The Monitor may seek a further extension of the Stay Period.

[9]     *See* Order Granting Recognition and Relief in Aid of Foreign Main Proceedings [09-11972, D.I. 36]; Verified Petition for Recognition of Foreign Proceedings Pursuant to Chapter 15 of the United States Bankruptcy Code [09-11972, D.I. 2] Exhibit A (Initial Order), p. 6 ("No legal process (including legal proceedings, execution, distress and diligence) may be instituted or continued against the Company or the property of the Company, except with the consent of the Joint Administrators or the permission of the English Court").

and assets.  In furtherance of those efforts, Debtors, the Canadian Debtors, and certain of the

EMEA Debtors entered into an Interim Funding and Settlement Agreement, dated as of June 9,

2009 (the "IFSA").[10]  Following a joint hearing on June 29, 2009, the IFSA was approved by this

Court[11] and the Canadian Court.  Among other things, the parties to the IFSA agreed to not

condition the sale of Nortel's businesses and assets on a prior agreement among the selling

parties regarding the allocation of the ultimate sales proceeds from the relevant sale transactions

and to hold all such sale proceeds (with accrued interest, the "Sale Proceeds") in escrow accounts

until an allocation methodology was agreed upon or resolved pursuant to the IFSA.[12]

18.    With this framework in place, from 2009 to 2011 Nortel conducted an extensive

series of court-approved sale transactions generating more than $7.3 billion in net Sale Proceeds.

Specifically, eight business lines and Nortel's considerable patent portfolio were sold with the

Court's approval.  In each Sale Order, the Court retained jurisdiction of matters relating to the

enforcement and implementation of the orders.[13]

---

[10]    *See* Motion Pursuant to 11 U.S.C. § 105(a), § 363, § 503 and Fed. R. Bankr. P. 9019 for an Order (A) Approving the Interim Funding and Settlement Agreement, and (B) Granting Related Relief [D.I. 874], Exhibit B.

[11]    D.I. 993.

[12]    *See* IFSA, ¶¶ 12(a), (b).

[13]    The nine "Sale Orders" are:  (i) Order Authorizing and Approving (A) Sale of Certain Non-Core Assets Free and Clear of All Liens, Claims and Encumbrances and (B) Assumption and Assignment of Certain Contracts, ¶ 25, entered 3/26/09 [D.I. 539]; (ii) Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' CDMA and LTE Business Free and Clear of All Liens, Claims and Encumbrances, (B) the Assumption and Assignment of Contracts and (C) the Assumption and Sublease of Certain Leases ("CDMA/LTE Sale Order"), ¶ 45, entered 7/28/09 [D.I. 1205]; (iii) Order Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interests in, Debtors' Enterprise Solutions Business, (B) the Assumption and Assignment of Certain Contracts and Leases and (C) the Assumption and Sublease of Certain Leases ("Enterprise Sale Order"), ¶ 18, entered 9/16/09 [D.I. 1514]; (iv) Order Authorizing and Approving Sale of Debtors' Next Generation Packet Core Network Components Free and Clear of All Liens, Claims and Interests, ¶ 22, entered 10/28/09 [D.I. 1760]; (v) Order Authorizing and Approving Sale of Debtors' GSM/GSM-R Free and Clear of All Liens, Claims and Encumbrances, ¶36, entered 12/3/09 [D.I. 2065]; (vi) Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Communications Solutions Business Free and Clear of All Liens, Claims and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts

### C.    Sale Of Nortel's Patent Portfolio

19.    The Nortel group also created an "IP Steering Committee," which undertook

significant analysis of how best to monetize Nortel's considerable patent portfolio.[14]  The IP

Steering Committee was assisted by Global IP Law Group and Lazard Fréres & Co. LLC.  The

documents and information created and shared among IP Steering Committee members,

including IPCo Business documents and information, are extremely sensitive, confidential, and

subject to attorney-client privilege and/or work product immunity.

20.    In connection with the potential sale of the patents, an electronic data room

containing both public and confidential diligence materials regarding the patents was created and

40 companies that executed confidentiality agreements were given access to the electronic data

room.  In light of their confidential and privileged nature, IPCo Business documents and

information were not included in the electronic data room diligence materials.

21.    On April 4, 2011, Debtors filed a sale motion [D.I. 5202] in which Ranger Inc.

was put forward as the stalking horse and Google Inc. was the guarantor for a potential sale

---

("CVAS Sale Order"), ¶ 32, entered 3/4/10 [D.I. 2632]; (vii) Order (I) Authorizing the Sale of Certain
Assets of Debtors' GSM/GSM-R Business Free and Clear of All Liens, Claims and Encumbrances; (II)
Authorizing and Approving the Asset Sale Agreement; (III) Authorizing and Approving the Assumption
and Assignment of Certain Executory Contracts; and (IV) Authorizing the Filing of Certain Documents
Under Seal, ¶ 33, entered 5/24/10 [D.I. 3048]; (viii) Order Authorizing and Approving (A) the Sale of
Certain Assets of Debtors' Multi-Service Switch (Formerly Known As "Passport") Business Free and
Clear of All Liens, Claims and Encumbrances and (B) the Assumption and Assignment of Certain
Executory Contracts, ¶ 34, entered 9/30/10 [D.I. 4054]; and (ix) Order Authorizing and Approving (A)
the Sale of Certain Patent and Related Assets Free and Clear of All Claims and Interests, (B) the
Assumption and Assignment of Certain Executory Contracts, (C) the Rejection of Certain Patent Licenses
and (D) the License Non-Assignment and Non-Renewal Protections ("Patent Sale Order"), ¶ 39, entered
7/11/11 [D.I. 5935].

[14]    *See* Declaration of John J. Ray III [D.I. 13601] pp. 14-20 (describing the IP Steering Committee's
considerations regarding options for monetizing the patent portfolio, including a patent sale, the sale of or
obtaining investment in Nortel's patent licensing and enforcement business, and the creation of a
licensing service to derive licensing revenue from the patent portfolio (the so-called "IPCo Business")).

transaction, subject to higher and better bids.  An auction was held on June 27-30, 2011, during which Rockstar's bid was selected as the winning bid.

22.     On July 11, 2011, the Court held a sale hearing and approved the sale of patents to Rockstar by entering the Patent Sale Order.

23.     On July 29, 2011, the sale of the patent portfolio closed.  In connection with the closing, Patent Related Information (as defined in the Asset Sale Agreement with Rockstar) was delivered to Rockstar.  This included the documents in the electronic data room for the patent sale process, which were placed on CDs and delivered to Rockstar.  The Patent Related Information given to Rockstar did not include any confidential and privileged IPCo Business documents and information.

**D.     Nortel's Sales Protected Confidential And Privileged Information**

24.     In connection with each of the nine sales, Debtors and other Nortel entities maintained electronic data rooms with confidential diligence materials.  As each data room was created, NNI and the other Debtors searched for, collected, and included in the electronic data rooms relevant documents and information for each respective sale process.  Access to the confidential diligence materials and the data rooms was limited to persons covered by confidentiality and non-disclosure agreements.[15]

25.     At the conclusion of each sale, Debtors delivered to each purchaser the confidential commercial and other proprietary information contained in the respective electronic data room and other sensitive documents and information otherwise required to be delivered under the respective transactional documents.[16]

---

[15]     Ross Decl., ¶ 16.

[16]     Ross Decl., ¶¶ 16.a., d.

26.     Under the various purchase and sale agreements, Debtors have ongoing confidentiality obligations to the purchasers.  For example, the Asset Sale Agreement with Rockstar restricts the sellers from disclosing any "Purchaser Confidential Information," which is defined to include competitively sensitive, proprietary, or confidential information pertaining to the assets sold.[17]

27.     Also, in some instances, purchasers may have succeeded to, or share a common interest in, a Nortel entity's rights to have certain information protected by the attorney-client privilege and/or work product immunity.  For example, in connection with the sale of patents to Rockstar, the Nortel sellers entered into Common Interest Agreements, dated July 29, 2011, with each of Rockstar and Rockstar Consortium Inc.  Those agreements provide for "the common interest privilege to attach, to the maximum extent permitted by applicable Law, to any privileged Patent Related Documents or other privileged documents to be acquired by [Rockstar] pursuant to the [Asset Sale Agreement] or any other Transaction Document. . . ."[18]

28.     Under the Common Interest Agreements, the Nortel sellers are obligated to not disclose Common Interest Information and not waive any privilege applicable to any Common Interest Information.  The parties also agreed that Common Interest Information shall be "Purchaser Confidential Information" under the Asset Sale Agreement and, therefore, subject to the ongoing confidentiality obligations under the Asset Sale Agreement.[19]

---

[17]      *See* Patent Sale Order [D.I. 5935], Exhibit A (Asset Sale Agreement § 5.11)  *See also* CDMA/LTE Sale Order [D.I. 1205], Exhibit A (Asset Sale Agreement § 5.11); Enterprise Sale Order [D.I. 1514], Exhibit A (Amended and Restated Asset and Share Sale Agreement § 5.11); and CVAS Sale Order [D.I. 2632], Exhibit A (Asset Sale Agreement § 5.11).

[18]      *See* Patent Sale Order [D.I. 5935], Exhibit A (Asset Sale Agreement, p. 7 (defining "Common Interest Agreement").

[19]      Ross Decl., ¶ 21.b.

### E.   Confidential And Privileged Information Has Also Been Protected In The Allocation Litigation

29.   Over the last several years, Debtors, the Canadian Debtors, the Monitor, the EMEA Debtors, the Joint Administrators, the Committee, the Bondholder Group, and other key constituencies, including the so-called "UK Pension Parties" (collectively, the "Core Parties") have engaged in comprehensive settlement discussions with respect to the allocation of the Sale Proceeds and the potential resolution of claims filed by the EMEA Debtors and the UK Pension Parties.  These comprehensive settlement discussions included three formal rounds of mediation, none of which were successful.

30.   After the third mediation ended in January, 2013 without a settlement, certain of the Core Parties sought relief from this Court and the Canadian Court to approve litigation procedures to govern the allocation disputes and the claims filed by the EMEA Debtors and the UK Pension Parties against Debtors and the Canadian Debtors.  On April 3, 2013, the Court (a) granted Debtors' motion for approval of binding procedures and an expedited schedule for the cross-border resolution of the dispute concerning the allocation of the Sale Proceeds (the "Allocation Dispute"), (b) denied the Joint Administrators' cross-motion to compel arbitration, and (c) directed the Core Parties to continue negotiation of an allocation protocol.[20] Additionally, the Court scheduled joint hearings to determine the allocation of the Sale Proceeds (the "Allocation Trial" and, collectively with the Allocation Dispute and related proceedings, the "Allocation Litigation"), the claims of the EMEA Debtors, and the claims of the UK Pension

---

[20]   D.I.s 9946, 9947.

Parties.  The Canadian Court issued a parallel order and endorsement on March 8, 2013 and

April 3, 2013 respectively.[21]

31.     On June 11, 2013, the Court issued a protective order governing discovery in the

Allocation Litigation.[22]

32.     As a result of a complex process, each estate and the other parties to the

Allocation Dispute and related proceedings produced approximately 3 million documents.  The

original source of each of these 3 million documents is not readily identifiable or easily

obtainable at this time.[23]

33.     On May 8, 2014, this Court and the Canadian Court (collectively, the "Courts")

held a joint hearing in advance of the Allocation Trial on motions regarding expert reports and

confidentiality of documents.  Several non-litigant parties appeared at the hearing, including

counsel for Rockstar, Ericsson, and Microsoft (in its capacity as a party to a pre-petition license

agreement), to voice their concerns about the need to protect confidential and propriety

documents and information.[24]   For example, the lawyer representing both Ericsson and Rockstar

stated:

> [A]s the Court correctly observed, in combination [Rockstar] and Ericsson are
> responsible for five and three-quarter billion of the proceeds that are to be divided up
> in the allocation trial.  That price is reflective of the value of the assets that we
> acquired, but it's also reflective of the ancillary protections we acquired under our
> purchase agreements because we not only bought those patents and those assets and
> the technology, but we also bought a lot of other information that is vital to

---

[21]     *See* Notice of Filing of Items Designated for Record on Appeal, Exhibits C and D (May 1, 2013)
[D.I. 10414].

[22]     D.I. 10805-2.

[23]     Ross Decl., ¶ 17.

[24]     Several non-litigants, including Microsoft and Tellabs, also filed their own motions, or joinders in
others' motions, seeking protection of certain confidential and sensitive materials, as explained in detail in
supporting declarations. *See, e.g.*, D.I.s  13500 (Exhibit A (Declaration of Horacio E. Gutiérrez), 13509,
13515, 13516, 13519, 13520 (Declaration of Donald Powers).

maintaining the value of those assets in the marketplace free from competitors and free from litigants as we go forward with those assets. So we have a vital interest in the outcome of this and in the outcome of the treatment of the confidentiality of documents. We have really two concerns. The first is substance, and that's protecting what is really confidential and really valuable to our business. We're mindful of the process that is about to unfold. We have no interest in being obstructionist or delaying it. We don't envision that we're actively participating in this in any fashion. We have no skin in this game other than protecting what we purchased.[25]

34.    During that hearing, Debtors also expressed their desire to proceed carefully to "avoid exposing any of the estates to any potential liability or complaint by a purchaser or by a counter-party to a confidential document."[26]

35.    Following that hearing, the Court on May 12, 2014 entered an Order Providing Directions and Establishing Procedures for Sealing Trial Exhibits, Redacting Pretrial Submissions, and Protecting Confidential Information From Public Disclosure During the Trial.[27] The Court entered a supplementary order on May 30, 2014, which principally addressed confidentiality concerns of the Canadian Revenue Authority (the "CRA").[28]

36.    Also on May 12, 2014, the parties commenced the Allocation Trial before the Courts. The evidentiary portion of the Allocation Trial concluded on June 24, 2014. Post-trial briefs have been submitted and final argument in the Allocation Trial is scheduled to begin on September 22, 2014.

37.    The parties are in the process of reviewing and redacting for confidentiality and privilege approximately 2,200 Allocation Trial exhibits and deposition designations.[29] The review process involves Debtors, the Canadian Debtors, the EMEA Debtors, the other Core

---

[25]    Tr. of May 8, 2012 Hearing at 57: 4-24 [D.I. 13555].

[26]    *Id*. at 62:15-18.

[27]    D.I. 13554.

[28]    D.I. 13729.

[29]    Ross Decl., ¶ 17.

Parties, certain purchasers of the Nortel assets, and other interested parties such as licensees and

the CRA.  At the conclusion of this review and redaction process, public versions of the

Allocation Trial exhibits and deposition designations will be available.

     **F.**    **Patent Infringement Suits Involving Rockstar And Subsequent Third-Party Subpoenas To NNI, Former Nortel Employees, And Professionals Retained By Nortel**

    38.    Beginning in 2013, Rockstar and its affiliates or assignees initiated patent

infringement litigation against several entities, including Google, Samsung, Time Warner, and

Verizon.

    39.    In the past few months, NNI has been served with third-party subpoenas seeking

production of a broad range of documents in connection with the following lawsuits involving

patents that NNI and the other Nortel entities sold to Rockstar:

    a.   *Constellation Techs. LLC v. Time Warner Cable, Inc., et al.*, No. 2:13-cv-01079-RSP (E.D. Tex.) (the " '1079 Litigation"), with the subpoena having been served by Time Warner Cable Inc. on June 9, 2014;

    b.   *Google Inc. v. Rockstar Consortium US LP, et al.*, No. 4:13-cv-05933-CW (N.D. Cal.) (the " '5933 Litigation"), with the subpoena having been served by Google on July 17, 2014;

    c.   *Rockstar Consortium US LP, et al. v. Google Inc.*, No. 2:13-cv-00893-JRG (E.D. Tex.) (the " '893 Litigation"), with the subpoena having been served by Google, Inc. on July 18, 2014;

    d.   *Rockstar Consortium US LP, et al. v. ASUSTek Computer, Inc., et al.*, No. 2:13-cv-00894-JRG (E.D. Tex.) (the " '894 Litigation"), with the subpoena having been served jointly by Google and Samsung Electronics Co., Ltd. on August 11, 2014; and

    e.   *Spherix Inc. v. Verizon Services Corp. et al.*, No. 1:14-cv-721-GBL (E.D. Va.), with the subpoena having been served jointly by numerous Verizon entities on or around September 5, 2014.[30]

---

[30]    Ross Decl., ¶ 2, App. Tabs 1-5 (copies of subpoenas).

40.    The subpoenas served on NNI are remarkable in terms of both the number and breadth of the document requests to which NNI must respond.  The three Google subpoenas, for example, each contain more than 115 separate document requests, the vast majority of which are not limited in time and seek documents that have little or no direct relationship to the small number of patents at issue in those cases.  More particularly, the subpoenas seek production of virtually every document in NNI's possession, custody, or control relating to the valuation and sale of Nortel's patent portfolio and business lines in connection with these bankruptcy proceedings, including documents protected from disclosure by the attorney-client privilege and attorney work-product immunity as well as documents subject to confidentiality obligations to numerous other parties.[31]

41.    In connection with the '893 Litigation, Google has also issued subpoenas to the following former Nortel employees[32] seeking documents and, in at least one case, deposition testimony:

    a.    Christopher C. Cianciolo, former IP Counsel for Nortel who later became Chief IP Counsel for Rockstar;

    b.    Art Fisher, former Vice President, IP Law for Nortel;

    c.    Peter A. Fortman, a former Nortel engineer who is the named inventor on an alleged prior art patent;

    d.    Raj Krishnan, former IP Counsel for Nortel who later became an Assertion Attorney for Rockstar; and

    e.    Richard Weiss, former Deputy IP Counsel for Nortel.[33]

---

[31]    Ross Decl., ¶ 3.

[32]    Upon information and belief, Time Warner also has issued subpoenas to former Nortel employees.  Time Warner has not provided NNI with a full list of the names of such former employees or with copies of any of the subpoenas.

[33]    Ross Decl., ¶ 4, App. Tabs 6-10 (copies of subpoenas).

42.    Upon information and belief, notwithstanding Nortel having timely reminded the former employees of their obligations under their respective employment agreements to return and deliver all writings, documents, materials, and other property owned or leased by or relating to Debtors, certain of these former Nortel employees may be in possession of NNI documents.[34]

43.    Several of these individuals have requested that NNI represent them or otherwise assist them in responding to Google's subpoenas.  Thus far, NNI has agreed to provide counsel for Mr. Cianciolo and Mr. Fortman in order to help protect NNI's privilege and confidentiality interests.  The document requests in those subpoenas are very extensive, again seeking not only documents specifically related to the patents at issue in the '893 Litigation, but also virtually any and all documents relating to Nortel's past patent licensing and enforcement practices, as well as the auction and eventual sale of its patent portfolio and business lines.[35]

44.    Google has served subpoenas in connection with the pending litigations on at least two of Nortel's legal and business advisors, Global IP and Lazard, as well as three former Lazard employees.  Again, the document requests in these subpoenas are wide-ranging, seeking virtually any and all documents relating to Nortel's auction and eventual sale of its patent portfolio and business lines.  Both Global IP and Lazard have asked NNI to assist them with responding to these subpoenas.[36]

45.    Rockstar also is a defendant in *Charter Communications, Inc., et al. v. Rockstar Consortium US LP, et al.*, No. 14-055-SLR (D. Del.), in which Charter Communications has sought leave to serve subpoenas on various Nortel debtors, allegedly to preserve evidence. Charter's motion is pending.

---

[34]    Ross Decl., ¶ 5.

[35]    Ross Decl., ¶ 6.

[36]    Ross Decl., ¶ 7, App. Tabs 11-18 (copies of subpoenas).

### G.    NNI's Reasonable Response To The Subpoenas

46.    In response to the first subpoenas served by Time Warner and Google, NNI attempted to negotiate reasonable limitations on the scope of its response to the document requests.  Specifically, NNI directed the requesting parties to Rockstar for production of documents relating to the particular patents at issue in the respective cases and any other patents acquired by Rockstar.

47.    In light of the serious privilege and confidentiality issues and the burdens associated with searching for, redacting, and logging documents, NNI has sought to limit its response to the subpoenas to producing redacted deposition designations from the Allocation Litigation and public versions of the Allocation Trial exhibits.

48.    It appears unlikely that NNI's proposal will be accepted by Time Warner or Google.  Although no motions to compel have been filed yet, Time Warner recently threatened to seek such relief against NNI in North Carolina.

49.    Given that Rockstar acquired more than 7,000 patents and patent applications from Nortel, NNI anticipates that there may be a significant number of additional Rockstar patent infringement suits filed and attendant third-party subpoenas issued to NNI and its professionals and former employees in the future.

### H.    NNI Has Extremely Limited Resources To Respond To Third-Party Discovery

50.    In addition to having sold the majority of its patent portfolio to Rockstar, NNI has divested all of its various business operations.  NNI's limited present operations exist only to facilitate resolution of the ongoing bankruptcy proceedings.[37]

---

[37]    Ross Decl., ¶ 8.

51.     NNI has only one remaining facility, located in North Carolina, and no remaining employees.  The company's ongoing administrative operations are being handled by a group of seven former Nortel employees working on a contract basis, including declarant Timothy C. Ross and U.S. principal officer John Ray.  None of these individuals ever held a technical or legal position in the company that related in any relevant way to the subject matter of the various patent infringement suits in connection with which NNI has been subpoenaed.[38]

### I.     NNI's Remaining Document Stores Are Difficult to Search

52.     In part due to standard disaster recovery procedures in place when NNI was actively operating its businesses and in part due to litigation-related holds, including in the context of the ongoing Insolvency Proceedings, NNI has retained vast stores of paper and electronic records.  Due to the nature of how those records have been maintained, however, it is extremely difficult, and in many cases essentially impossible, to determine whether any particular category of documents exists or where such documents may be located.[39]

53.     NNI has control over more than a decade's worth of digital media archives, comprising more than 142,000 physical items (mostly magnetic tapes), that are presently maintained by Iron Mountain at approximately six different locations around the country.  Iron Mountain maintains a high-level online catalog of these digital media archives, but that catalog does not contain any information regarding the contents of the particular media stored.  In at least some cases, it may be possible with a substantial degree of effort to trace portions of the archives back to the Nortel organization that provided them to Iron Mountain, but that would only enable identification of the system or server to which a backup tape corresponds.  In order

---

[38]     Ross Decl., ¶ 9.
[39]     Ross Decl., ¶ 10.

to view the contents of any given tape, it would be necessary to load the tape onto whichever system/server it came from, if it still exists, and use the corresponding computer application to review the contents.  Of course, this assumes that the magnetic tape is still readable, which is by no means a given due to the physical degradation that magnetic tape undergoes over time.[40]

54.    Iron Mountain is also holding more than 171,000 boxes of documents and other physical items (*e.g.*, laptops, computer hard drives, books, etc.) at more than fifteen warehouses across the country.  Some of this material comprises records put in off-site storage for safekeeping in the ordinary course of Nortel's business operations, but much of it was sent to Iron Mountain as Nortel was shutting down its operations in the course of the Insolvency Proceedings.  As with the digital media archives discussed above, Iron Mountain maintains a high-level online catalog for these physical items, but that catalog provides little or no information regarding the contents of the items stored.  Again, in at least some cases, it may be possible with a substantial degree of effort to trace a particular collection of boxes back to the Nortel organization that provided them to a particular Iron Mountain facility, but in order to determine the contents of any individual box it would be necessary to retrieve the box from Iron Mountain and physically inspect the contents.[41]

55.    Any effort to locate particular documents, or even broad categories of documents, within the physical and electronic stores under NNI's control is made all the more complicated by the fact that the personnel remaining at NNI have little or no personal knowledge of the relevant business and/or legal operations of the company.  Accordingly, even a seemingly simple request such as "find all of John Smith's documents" requires a laborious effort that begins with

---

[40]    Ross Decl., ¶ 11.

[41]    Ross Decl., ¶ 12.

searching human resource records to determine who "John Smith" was, which organization he worked for and in which facility, scouring any accessible paper and/or computer records for that organization to try to determine whether and where it may have archived its documents, calling back from Iron Mountain potentially thousands of boxes of documents associated with that organization, and then physically inspecting each box to determine whether any of them contain "John Smith's" documents.  To say that this is like looking for the proverbial needle in a haystack would be to dramatically understate the difficulty of the task.[42]

56.     In addition to the above-described archives, NNI has kept a small number of its computer systems operational in order to assist with the administrative aspects of the company's wind-down.  These include a human resources/personnel system, certain financial systems, and the "LiveLink" document management system.[43]

57.     The LiveLink system was available to the various Nortel business organizations to use, on a largely voluntary basis, as a document repository that could be accessed by the members of the organization regardless of where they were physically working.  However, there is no standard method by which documents and information were posted to or organized on LiveLink.  Furthermore, at one time, there was a physical instance of the LiveLink system residing on each of several Nortel servers located around the world, and these various instances were logically connected so that users could access documents seamlessly regardless of where the documents were physically stored.  Today, however, as a result of the divestitures, NNI has possession of, and access to, only the U.S.-based instance of the LiveLink system.[44]

---

[42]     Ross Decl., ¶ 13.

[43]     Ross Decl., ¶ 14.

[44]     Ross Decl., ¶ 14.a.

58.     The LiveLink system to which NNI has access has not been actively maintained for at least three years, but it does provide some rudimentary searching capabilities.  The system supports a relatively crude (by today's standards) Boolean search syntax that enables AND/OR/NOT type searches on specified text strings (*e.g.*, "patent AND infring* AND NOT trademark"), but it does not support proximity searches (*e.g.*, "patent w/5 infring*").  Consequently, it is often not possible to structure a search in a way that returns a manageable number of potentially relevant "hits."[45]

59.     When a search is run in the LiveLink system, the hits can be viewed online in various formats, including in a preview mode that will highlight search terms in the document.  However, the system does not include any facility for efficiently downloading documents returned in a search.  Rather, it is necessary to open each individual document desired to be downloaded and save that document to a storage location (*e.g.*, a Windows folder resident on the computer on which the search was run or a portable drive).  This is an extremely tedious and time-consuming task if any substantial number of documents needs to be downloaded, as it typically takes at least 15-20 seconds to access and download each individual document.[46]

60.     The documents maintained in LiveLink include some basic metadata fields, including the date a document was created and the name of the individual who first stored the document in the system.  The metadata does not identify the business unit with which that individual was associated, nor does it associate the document with any particular Nortel entity.  Accordingly, in order to determine whether any particular document "belongs to" NNI or one of the other Nortel estates (*i.e.*, for purposes of assessing NNI's confidentiality obligations and/or

---

[45]     Ross Decl., ¶ 14.b.

[46]     Ross Decl., ¶ 14.c.

who owns any privilege), it would be necessary to trace the individual who stored the document in LiveLink back to the Nortel entity by whom he or she was employed using the available human resources records.[47]

**J.      Most Of The Documents Sought By The Subpoenas Were Previously Searched For, Collected, And Transferred To Others**

61.     The various third-party subpoenas that have been served on NNI and related third-parties to date seek documents falling into two broad categories:  (i) "patent documents," including documents relating not only to the particular patents being asserted in the respective litigations, but also documents relating more broadly to Nortel's entire portfolio of thousands of patents, most of which were sold to Rockstar; and (ii) "valuation documents," including (a) documents relating to Nortel's effort to assess the potential value of its patents and business lines prior to putting those assets up for sale (*e.g.*, certain IPCo Business documents) and (b) documents relating to the sales themselves, including documents submitted to Nortel by both the successful and unsuccessful bidders.  As discussed further below, the vast majority of responsive "patent documents" should now be in Rockstar's possession, custody, or control; and the vast majority of the "valuation documents" were collected for purposes of the Allocation Litigation among the various Nortel estates.[48]

62.     In connection with the various asset sales made during the Chapter 11 Cases, NNI transferred to the purchasers a large percentage of the paper and electronic documents relating to its former business operations.[49]

---

[47]     Ross Decl., ¶ 14.d.

[48]     Ross Decl., ¶ 15.

[49]     Ross Decl., ¶ 16.

63.     For example, in connection with the sale of more than 7,000 patents and patent applications to Rockstar, NNI transferred to Rockstar a vast collection of records designated "Patent Related Documentation" under the Asset Sale Agreement, including:  (i) all of the physical and electronic patent prosecution files relating to the transferred patents; (ii) documents relating to licensing of the transferred patents, including copies of all license agreements and all statements to standards-setting organizations regarding licensing; (iii) all litigation files relating to assertions of the transferred patents; (iv) all infringement charts relating to the transferred patents; (v) all books, records, files, ledgers, and similar documents stored in Nortel's document management systems used to track, organize, or maintain the patents; (vi) all documents at any time contained in the electronic data room that was made available to Rockstar and other bidders in connection with the auction of Nortel's patent portfolio; (vii) copies of acquisition agreements for any transferred patents that had previously been purchased by Nortel; and (viii) all assignment agreements relating to the transferred patents. [50]

64.     In addition, approximately 26 former Nortel employees, most of whom worked in Nortel's IP Legal Department, transitioned to Rockstar in connection with the transaction, and those employees were authorized and instructed to transfer to Rockstar any paper or electronic documents in their possession that related to the transferred patents.  Rockstar also took possession of approximately 26 desktop and laptop computers previously used by Nortel personnel, again for the purpose of transferring any electronic documents on those computers related to the transferred patents. [51]

---

[50]      Ross Decl., ¶ 16.a.

[51]      Ross Decl., ¶ 16.b.

65.     Accordingly, Rockstar should have at least a copy, and in many if not most instances the original, of virtually every document previously in NNI's possession, custody, or control relating to the patents transferred to Rockstar, including all of the patents now being asserted in the above-identified litigations. [52]

66.     In addition to the sale of patents to Rockstar, Nortel sold eight specific business lines to separate purchasers, including Avaya, Ciena, Ericsson, Genband, Hitachi, Kapsch, and Radware.  Similar to the Nortel/Rockstar Asset Sale Agreement, the asset transfer agreements for these business line sales included provisions for transferring to the purchasers Nortel's paper and electronic documents relating to the transferred business lines.[53]

### K.     Many Of The Subpoenaed Documents Still In NNI's Possession Are Privileged And/Or Confidential

67.     To the extent NNI still has in its possession, custody, or control certain of the "patent documents" and "valuation documents" described above, the vast majority of those documents are subject to confidentiality obligations and/or claims of attorney-client privilege and work-product immunity, rendering any effort to review such documents for possible production in response to the discovery requests extremely burdensome.[54]  The likely result of Nortel undertaking that burden would not be the production of a large number of documents, but rather the production of a small number of documents and a very extensive privilege log.

68.     In addition, the asset purchase agreements between Nortel and the purchasers include extensive confidentiality restrictions that obligate NNI to take all reasonably appropriate steps to preserve the confidentiality and privileged status of documents related to the assets that

---

[52]     Ross Decl., ¶ 16.c.

[53]     Ross Decl., ¶ 16.d.

[54]     Ross Decl., ¶ 18.

were sold.[55]

69.     NNI also has confidentiality and privilege obligations with respect to each of the other Nortel estates and the other Core Parties, as a result of the Allocation Litigation and the protective and confidentiality orders entered therein.[56]

70.     In view of these various obligations, it would be extremely burdensome, time-consuming, and costly for NNI to review, designate, and produce documents sought by the subpoenas.  For instance, in order to avoid breaching its contractual obligations, NNI must have its counsel review each document to identify both attorney-client privileged information and confidential information.  As to each category of protected information, NNI must then determine whether that information relates to assets sold to Rockstar or one of the business line purchasers.  Once the interested third parties are identified, NNI is required to give them notice and an opportunity to object before any such documents are disclosed to others.  In addition, the information in the requested valuation documents that were collected for the Allocation Litigation are subject to protective orders issued by this Court and, therefore, NNI would have to consult extensively with the other Nortel estates and Core Parties to ensure that any production it makes complies with the requirements of those protective orders.[57]

71.     Moreover, the documents sought include highly technical business information, and neither outside counsel nor contractors hired to assist with any document review may be able to identify readily which buyers or other third parties may have an interest therein.[58]  Debtors should not be put in a position where they could subject themselves to liability to any third

---

[55]     Ross Decl., ¶ 18.a.

[56]     Ross Decl., ¶ 18.b.

[57]     Ross Decl., ¶ 19.

[58]     Ross Decl., ¶ 19.

parties by being forced to comply with these complex subpoenas.[59]

72.     In the end, litigants seeking production of such documents likely will not receive many documents, but rather only a small number of documents culled at great expense and an extensive privilege log.

### L.     The Majority Of The Subpoenaed Documents Can Be Obtained More Efficiently From Rockstar And Other Non-NNI Sources

73.     Based on the scope of the document requests that have been served on NNI to date, as well as the identification, availability, and accessibility of the documents remaining in NNI's possession, custody, or control, it is apparent that the documents being sought can be obtained in a far more efficient, more cost-effective, and less burdensome manner from sources other than NNI.[60]

74.     Substantially all of the requested patent documents should be in Rockstar's possession.  Accordingly, Rockstar is in a far better position than NNI to search for, review, and produce such documents.  Moreover, Rockstar is by far the more appropriate entity to be making determinations as to the confidential and/or privileged status of those documents.  Also, because Rockstar is the party that owns the patents in issue and because it is the one that initiated the litigations giving rise to the subpoenas, it is more equitable for Rockstar rather than NNI and Debtors' estates to bear the cost of responding to the document requests.

75.     In connection with the Allocation Litigation, each of the Nortel estates was tasked with searching for and collecting broad categories of documents potentially relevant to the Allocation Dispute, including documents concerning valuation of the patents and other business assets that were sold.  Those documents were collected not only from each of the Nortel estates,

---

[59]     Ross Decl., ¶ 19.
[60]     Ross Decl., ¶ 20.

but also from Nortel's legal and business advisers, including Global IP and Lazard.  That effort

yielded approximately 3 million documents, all of which were loaded into a database accessible

by the Nortel estates and their counsel.  Many of these documents were cited in submissions or

used during the Allocation Trial proceedings, resulting in approximately 2,200 trial exhibits.  A

large number of those exhibits include highly confidential information, and many of them

include attorney-client privileged information.[61]  As required by the Court, and consistent with

the protective orders entered by the Court, the trial exhibits are now being reviewed for

confidentiality and privilege by counsel for the respective Nortel estates, in consultation with

purchasers and other interested parties, in order to prepare public versions.  On information and

belief, the trial exhibits are likely to contain most of the valuation-related documents that are

potentially relevant to issues in the pending patent litigations.  NNI intends to produce all of the

public versions of the trial exhibits to the parties who have issued subpoenas to NNI.

> **M.    Rockstar Has Expressed Serious Concerns Regarding Any Disclosure Of Rockstar Confidential And Privileged Information In Response To The Subpoenas**

76.     Shortly after it was served with the Time Warner subpoena, NNI notified

Rockstar and the business line purchasers of that subpoena.  NNI has also communicated with

the Canadian and EMEA estates concerning these matters.

77.     Rockstar then warned NNI not to disclose any of Rockstar's confidential and/or

privileged information in response to the Time Warner subpoena.  Indeed, Rockstar indicated

that it would seek damages from NNI in connection with any allegedly unauthorized disclosure

of Rockstar's confidential and/or privileged information, suggesting that protection of such

information by NNI was a material term of the Asset Sale Agreement between Rockstar and

---

[61]      Ross Decl., ¶ 17.

Nortel.[62]

78.      Although Rockstar has not yet made similar statements concerning the other

subpoenas served on NNI, former NNI employees, or NNI professionals, Rockstar clearly has

raised the risk of potential post-petition liability for NNI's estate should NNI fail, even

inadvertently, to shield from disclosure information that Rockstar considers confidential and/or

privileged.

### N.      Rockstar Retained Certain NNI Documents And Information

79.      In connection with the closing of the sale of patents to Rockstar, three Nortel

entities – NNI, NNC, and NNL – entered into an Amended and Restated Employee Transfer Side

Agreement and a Transition Services Agreement, both dated as of July 29, 2011, with Rockstar

Consortium Inc.  Those agreements governed certain transition services related to the assets and

transferred employees for the patent sale transaction.[63]

80.      Given the short period of time available to segregate documents and information

held by a Nortel entity that was not related to the patents Rockstar purchased (the "Unrelated

Information"), Rockstar agreed in the Transition Services Agreement to ensure that former

Nortel employees who transitioned to Rockstar did not deliberately access any Unrelated

Information and that any unintentionally disclosed Unrelated Information would not be used or

further disclosed.[64]

81.      Most of the Unrelated Information and other non-transferred items resided on

certain personal computers and workstations ("PCs") of the transferred employees, which

---

[62]      Ross Decl., ¶ 21.a.

[63]      Ross Decl., ¶ 23.

[64]      Ross Decl., ¶ 24.

Rockstar purchased.  Under the Transition Services Agreement, Rockstar agreed to delete all non-transferred items from any PCs.[65]

82.     Rockstar has advised NNI that it has not deleted non-transferred items from the PCs of former Nortel employees, including those of former in-house counsel.[66]  Rockstar reportedly maintains the PCs in storage in Texas and Canada.

83.     As a result, Rockstar has in its possession, custody, or control a potentially significant number of confidential and/or privileged Nortel documents and possibly also private/personal documents and information of former employees, which may be subject to data privacy protections under the laws of the United States, Canada, or other jurisdictions.

84.     Google has asked Rockstar to run searches on the PCs for periods of time that pre-date Rockstar's ownership of the patents and which would capture non-transferred items.  Forensic images of the PCs' hard drives have been taken by Rockstar and forwarded to its e-discovery vendor.

85.     NNI is attempting to work with Rockstar to protect the non-transferred items from disclosure (particularly those with confidentiality, privilege, and/or data privacy issues).  However, to avoid any further use of the non-transferred items and/or any potential arguments about waiver, on September 12, 2014 Debtors filed a motion for a protective order in the U.S. District Court for the Eastern District of Texas, which motion was joined by the Canadian Debtors.  The motion requests an order directing Rockstar to not review, access, or otherwise use the non-transferred items.  The outcome of that motion is uncertain.

---

[65]     Ross Decl., ¶ 25.

[66]     Ross Decl., ¶ 26.  Rockstar asserts that its failure to delete the non-transferred items was due to litigation-related document preservation concerns.

**RELIEF REQUESTED**

86.     By this Motion, Debtors seek the entry of an order, pursuant to Sections 105(a),

107(b), 362(a), and 541 of the Bankruptcy Code and Bankruptcy Rule 9018, (a) enforcing and/or

extending the automatic stay to third-party subpoenas seeking production of documents and

testimony relating to the patent portfolio sold to Rockstar, (b) enforcing, in the context of these

third-party subpoenas, provisions in the Court's previous sale orders, protective orders, and

confidentiality orders that protect confidential and privileged information of the Debtors and

other Nortel entities, (c) entering a protective order, (d) granting related relief under Section

105(a) of the Bankruptcy Code, and (e) granting such other and further relief as the Court deems

just and proper.

**BASIS FOR RELIEF**

**A.     This Court Has Jurisdiction To Grant The Relief Requested.**

87.     This Court, through automatic reference by the District Court, has "exclusive

jurisdiction of all of the property, wherever located, of [NNI] as of the commencement of [the]

case, and of property of the estate. . . ."[67]

88.     The Bankruptcy Code broadly defines "property of the estate" to include all legal

or equitable interests of NNI in property as of the commencement of the case, all proceeds,

product, or offspring of or from property of the estate, and any interest in property that the

bankruptcy estate acquires after the commencement of the case, wherever located and by

---

[67]     28 U.S.C. § 1334(e)(1).  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) (the court has original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11").

whomever held.[68]  As explained below, NNI's books and records fall within the definition of "property of the estate."

89.      In addition to its exclusive jurisdiction over NNI's documents, this Court has jurisdiction and inherent authority to enforce its own orders, particularly orders entered in "core proceedings" such as orders approving sales and orders entered in the Allocation Litigation and other matters concerning the administration of the estate.[69]

**B.      The Court Should Enforce And/Or Extend The Automatic Stay To Protect NNI's Property, Including Documents In NNI's Possession Or Control.**

90.      Section 362 of the Bankruptcy Code automatically and immediately stays all actions against a debtor and its property.  As one of the fundamental debtor protections provided by bankruptcy law, the scope of the automatic stay is broad.[70]

91.      Specifically, Section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[71] Mere possession or control of documents by NNI is sufficient to invoke the protection of the automatic stay.[72]

92.      NNI's books and records are "property of the estate" and are protected by Section 362(a)(3).[73]

---

[68]      11 U.S.C. § 541(a).

[69]      *See, e.g., Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009) (holding that "the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders").

[70]      *Midatlantic Nat'l Bank v. N.J. Dept of Envtl. Protection*, 474 U.S. 494 (1986) (acknowledging the broad scope of the automatic stay under the 1978 Bankruptcy Code).

[71]      11 U.S.C. § 362(a)(3.

[72]      *See, e.g., In re Zartun*, 30 B.R. 543, 545 (B.A.P. 9th Cir. 1983) (citing legislative history in support of a ruling that Section 362(a)(3) protects "property over which the estate has control or possession").

[73]      *See, e.g., In re Integrated Resources, Inc.*, 1992 WL 8335 (S.D.N.Y.  Jan. 14, 1992) (affirming a bankruptcy court's decision that a debtor's books and records are property of the estate and denying a motion for relief from the automatic stay); *In re Greenlife, Inc.*, 1990 WL 10091748, at *3 (Bankr. E.D.

93.     Because "property of the estate" includes NNI's documents "wherever located and by whomever held,"[74] the automatic stay of Section 362(a)(3) extends to NNI documents in the possession of Rockstar and NNI's professionals and former employees.  Thus, all of the pending third-party subpoenas violate the automatic stay.[75]

94.     In connection with the first-day motions, the Court has already entered an Order Enforcing Section 362 of the Bankruptcy Code [D.I. 52].  The Court also enforced the automatic stay with respect to certain UK pension proceedings [D.I. 2576].  Debtors respectfully submit that a further order is warranted here, to ensure that the protections afforded by the automatic stay are applied to the existing subpoenas as well as any similar future subpoenas.

**C.     The Court Should Enforce Its Prior Orders, Including The Sale Orders And The Confidentiality Orders Entered In Connection With The Allocation Trial.**

95.     This Court has jurisdiction to enforce its own orders.[76]

96.     This Court has entered several relevant orders in "core proceedings" in these Chapter 11 Cases that should be enforced as to the pending  subpoenas and any similar future subpoenas.  For example, in the Sale Orders, the Court approved the various sale transaction documents and authorized Debtors to enter into, perform, and comply with their covenants and undertakings in the transaction documents, which include the ongoing confidentiality

---

Va. July 16, 1990) (acknowledging that a debtor's books and records are protected by the automatic stay and stating that "the party seeking issuance or enforcement of a subpoena would be precluded from taking further action in the absence of relief from the stay").

[74]     11 U.S.C. § 541(a).

[75]     *See Raymark Indus. Inc. v. Lai*, 973 F.2d 1125, 1131 (3d Cir. 1992), and *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1206 (3d Cir. 1991) (both holding that actions taken in violation of the stay are void *ab initio*).

[76]     *See, e.g.*, *In re FormTech Indus., LLC*, 439 B.R. 352, 358 (Bankr. D. Del. 2010) (interpretation and enforcement of a sale order is a core proceeding); *In re CD Liquidation Co., LLC*, 2012 Bankr. LEXIS 5924 (Bankr. D. Del.  Dec. 28, 2012) (Gross, J.) (upholding and enforcing provisions of a settlement order and a confirmation order).

obligations.[77]  The order requested by this Motion is in furtherance of the Sale Orders and the

Court-approved, ongoing confidentiality obligations of Debtors.

97.     In addition, the Court has entered orders in connection with the Allocation

Litigation that protect confidential, privileged, and other sensitive documents and information

from public disclosure.[78]  The Court's orders balance the need for a public trial with the acute

sensitivities relating to third-party proprietary and other interests.  With this Motion, Debtors

seek to maintain the integrity of, and respect for, the Court's prior orders.[79]

98.     The Court also has entered other relevant orders, including (i) an order enforcing

Section 362 of the Bankruptcy Code by declaring that Debtors are afforded the protections of the

automatic stay and (ii) an order approving a cross-border protocol designed to promote respect

for comity among the Courts, which recognized the validity of the stay in the Canadian

Proceedings.[80]  An order enforcing and/or extending the automatic stay would be in furtherance

of those orders and the various cross-border stays that are in effect.

---

[77]     *See, e.g.*, CDMA/LTE Sale Order [D.I. 1205], ¶¶ 3, 47; Enterprise Sale Order [D.I. 1514], ¶ 3;
CVAS Sale Order [D.I. 2632], ¶ 3; Patent Sale Order [D.I. 5935], ¶ 3.

[78]     *See, e.g.*, Order Entering A Protective Order [D.I. 10805-2], ¶¶ 1(b), 7 (governing the handling of
all discovery material in the Allocation Litigation and prohibiting confidential material from being made
public); Order Providing Directions and Establishing Procedures for Sealing Trial Exhibits, Redacting
Pretrial Submissions, and Protecting Confidential Information From Public Disclosure During the Trial
[D.I. 13554], ¶¶ 5, 7 (establishing review procedures for the Core Parties to redact, remove, or otherwise
protect from public disclosure Allocation Trial documents); Supplementary Order Providing Directions
and Establishing Procedures for Sealing Trial Exhibits, Redacting Pretrial Submissions, and Protecting
Confidential Information From Public Disclosure During the Trial [D.I. 13729], ¶¶ 3, 6 (sealing certain
documents and prohibiting the use of other information or testimony adduced at the Allocation Trial).

[79]     In similar circumstances, the Second Circuit has affirmed lower court decisions that kept in place
protective orders that sealed documents in connection with a post-bankruptcy license transaction.  *See
Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24 (2d Cir.
1994) (affirming the denial of a motion to unseal confidential commercial information).

[80]     *See* Order Enforcing Section 362 of the Bankruptcy Code [D.I. 52], ¶ 2; Order Approving
Stipulation of the Debtors and the Official Committee of Unsecured Creditors of Nortel Networks Inc. et
al., Amending the Cross-Border Court-to-Court Protocol [D.I. 990], ¶¶ 6, 17.

99.     In each of these orders, this Court retained jurisdiction of matters relating to the implementation and/or enforcement of its orders.

100.    Given the extensive history and extraordinary complexity of the Nortel Insolvency Proceedings and the extent to which the Court previously granted relief and worked in cooperation with the Canadian Court to protect various privilege and confidentiality interests, it would be appropriate for the Court to grant the further relief sought by this Motion.

**D.      The Court Should Issue A Further Protective Order As To Debtors' Documents.**

101.    The Court already has entered orders protecting Debtors' privileged and confidential documents and information.  The relief sought by this Motion would be in furtherance of those prior orders.

102.    Also, upon request of a party in interest, Section 107(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9018 authorize and direct the Court to protect confidential information.[81]  In addition to the sensitive proprietary information that the Courts have protected throughout the Insolvency Proceedings, there is likely to be personal information on the PCs in Rockstar's possession that are subject to U.S. and Canadian privacy law protections.

103.    A further protective order would be appropriate under the circumstances.

**E.      The Court Should Enter Related Relief Under Section 105(a) Of The Bankruptcy Code.**

104.    Section 105(a) of the Bankruptcy Code gives the Court the power to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the

---

[81]     *See, e.g.*, 11 U.S.C. § 107(b)(1) ("On request of a party in interest, the bankruptcy court shall . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information").

Bankruptcy Code]."[82]

105.    In an analogous case, *Residential Capital*, the Bankruptcy Court for the Southern District of New York used its power under Section 105 to extend the automatic stay to protect a debtor from burdensome third-party discovery.[83]    Importantly, that court determined that the relief sought did not require the filing of an adversary proceeding because extension of the stay to protect the debtors related to the administration of the bankruptcy case itself.[84]

106.    *Residential Capital* offers a persuasive model for these Chapter 11 Cases and one that is respectful of the district courts in which the third-party litigations are pending and those in which the third-party subpoenas may be enforced.  In *Residential Capital*, the court as a matter of Chapter 11 case management stayed all discovery from the debtor, but did not prohibit third parties from moving to lift the stay.  The court based its ruling on the principles of Rules 26 and 45 of the Federal Rules of Civil Procedure and the required balancing of burdens and benefits.[85] The court identified six factors relevant to whether the stay should be modified upon future request to permit third-party discovery.  With respect to the factors of (1) scope, (2) context, and (3) need, the court placed the burden of coming forward with evidence on the third party seeking discovery from the debtor.  With respect to the factors of (4) burden and (5) expense, the court imposed the burden of submitting evidence on the debtor.  With respect to factor (6) concerning timing, both parties bore the burden of production.[86]

107.    As to the balancing of burdens and benefits and the six *Residential Capital* factors, the analysis will have to be conducted on a case-by-case basis should any of the relevant

---

[82]      11 U.S.C. § 105(a).

[83]      *See Residential Capital*, 480 B.R. 529.

[84]      *Id.* at 539.

[85]      *Id.* at 542-43.

[86]      *Id.* at 544-50.

litigants seek relief from this Court pursuant to Debtors' proposed order.  Nevertheless, NNI initially states as follows, based on the subpoenas issued thus far:[87]

a. **Scope**.  Although NNI has engaged with the requesting parties in an attempt to narrow their discovery requests, the issue of scope has not been resolved.  NNI has stated its intent to produce redacted deposition designations from the Allocation Litigation and the public versions of the Allocation Trial exhibits, which (in combination with the patent-related documents in Rockstar's possession) are fairly representative of the body of likely responsive documents and which have been or will be reviewed and redacted by the various stakeholders for privilege and confidentiality issues.

b. **Context**.  As was the case in *Residential Capital*, there is little doubt about the importance of the pending (and likely future) patent litigations or of the district courts' dealing with their dockets in an efficient manner.  However, the vast majority of likely relevant documents were delivered to Rockstar in connection with closing of the patent sale.  Moreover, the potential impact of an inadvertent disclosure of privileged or confidential information could be severe if, for example, Rockstar or a business line purchaser were then to assert liability claims against Debtors or their professionals.  Also, although Debtors are not reorganizing, their few remaining contract-based human resources are needed to assist Debtors and ultimately the Court in bringing these five-year old Insolvency Proceedings to a conclusion for the benefit of Debtors' creditors.

---

[87]    Debtors reserve the right to supplement their arguments and evidence and/or to offer additional evidence in reply to any objections to this Motion and in opposition to future motions for relief from the stay.

c. *Need*. Given that (i) Debtors delivered to Rockstar many patent-related documents, (ii) NNI intends to produce redacted deposition designations from the Allocation Litigation and the public versions of the Allocation Trial exhibits, and (iii) most of the other documents remaining in NNI's possession, custody, or control would not be relevant and/or would be privileged or confidential, it appears that the third parties actually have little need for NNI to undertake the significant burdens of searching for potentially responsive, non-privileged documents. As is always the case with third-party subpoenas, Debtors' non-party status is an important consideration in balancing the competing needs.[88]

d. *Timing*. Debtors are in the midst of preparing public versions of the Allocation Trial exhibits and for final argument in the Allocation Trial. Debtors' review of claims and other administrative matters in these proceedings is ongoing. After the rulings in the Allocation Trial have become final, Debtors must negotiate and prepare a plan of liquidation and related disclosure statement. In light of the foregoing, Debtors should not be made to also undertake the very substantial burden of responding to the third-party subpoenas.

e. *Burden*. As detailed in the Ross Declaration, it would be a heavy burden for NNI to respond to the pending third-party subpoenas as well as future subpoenas. Debtors' professionals and handful of former employees who are now independent contractors are already stretched thin responding to the other

---

[88]      *See, e.g., Cusumano v. Microsoft Corp.*, 209 F.R.D. 708,717 (1st Cir. 1998) ("Although discovery is by definition invasive, the parties to a law suit must accept its travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs").

demands on their time.  Importantly, none of the independent contractors ever held a technical or legal position with Debtors that related in any way to the subject matter of the patent litigations.  As a result, Debtors will rely even more heavily on their professionals, at significant cost as discussed below.  Although NNI has vast stores of paper and electronic records, as explained above, due to the nature of how those records have been maintained it would be extremely difficult, if not impossible, to identify where any particular category of documents may be located.  Not only do the catalogs for these records provide little, if any, information regarding the contents of the items stored, searching for documents in NNI's only somewhat functional LiveLink document management system is no less burdensome because the system does not include any capability for effectively searching and efficiently downloading documents returned in a search.[89]  In addition, NNI has significant ongoing confidentiality obligations and concerns about privilege issues, all of which would have to be resolved before any documents could be produced.  Thus, it would be extremely burdensome and time-consuming – and in some cases impractical, given the absence of individuals with the requisite technical expertise and knowledge of the business lines and assets – for NNI to search for, review, categorize, redact, and log millions of documents, assuming NNI could even locate the proverbial needle in a haystack.[90]

---

[89]     Courts have quashed subpoenas requesting data on backup tapes on grounds of undue burden, despite the requesting party's offer to bear the costs of production.  *See, e.g., United States v. Amerigroup Illinois, Inc.*, 2005 WL 3111972, at *5 (N.D. Ill. Oct. 21, 2005) ("Here, the 'unique burden' of restoring the email records and the 'special weight' to be accorded [the target's] non-party status combine to require that the defendants' subpoena be quashed under Rule 45(c)(3)(A)(iv).").

[90]     It may also be necessary for Debtors, the Canadian Debtors, and the EMEA Debtors to sort out which documents in the record of the Allocation Litigation were produced by and/or belonged to each of

f. ***Expense***.  If Debtors are required to locate documents and then review them for responsiveness, confidentiality, and privilege (whether those documents are in the database maintained for the Allocation Trial, stored with Iron Mountain, or maintained as part of the LiveLink document management system), Debtors' discovery-related expenses easily could exceed $2 million.  If Debtors must respond to pending and likely future subpoenas on a seriatim basis, those expenses are likely to multiply.  These expense estimates do not include the expense burden that would be placed on the Canadian and EMEA estates, as well as other third parties such as the purchasers.  Debtors should not have to bear the massive cost of responding to third-party discovery.[91]  The mere fact that $7.3 billion in Sale Proceeds exists should not be dispositive of the expense factor, because the interests of creditors must be considered.  Also, as the Courts carefully consider the allocation of the Sale Proceeds, it would be inequitable for Debtors to bear a higher expense ratio for responding to and producing documents in which the Canadian or EMEA Debtors may also have an interest.  NNI is not a clearinghouse for all Nortel documents and should not be burdened with ongoing document management and maintenance expenses, particularly when a significant

---

them, so that the proper estate can assert privilege.  Thus, responding to the subpoenas likely will pose burdens not only on NNI and the other Debtors but also the Canadian Debtors and EMEA Debtors.

[91]      It would be appropriate to condition any future relief from a stay on the requesting party agreeing to reimburse Debtors' costs of responding to discovery.  As observed in *Linder v. Calero-Portocarrero*, 183 F.R.D. 314 (D.D.C. 1998), "[w]hen nonparties are forced to pay the costs of discovery, the requesting party has no incentive to deter it from engaging in fishing expeditions for marginally relevant material.  Requesters forced to internalize the costs of discovery will be more inclined to make narrowly-tailored requests reflecting a reasonable balance between the likely relevance of the evidence that will be discovered and the costs of compliance."  *Id.* at 322-23.

percentage of the documents sought were collected and delivered to Rockstar in

connection with the closing of the patent sale.

108.    An order under Section 105(a) also would be appropriate to confirm that the

automatic stay of Section 362(a)(3) protects NNI documents that may be in the possession,

custody, or control of third parties, such as estate professionals and former NNI employees.

Indeed, NNI has agreed to provide counsel for former employees in order to help protect NNI's

privilege and confidentiality interests.  Moreover, former Nortel employees may have personal

privacy interests in some of the information on the PCs in Rockstar's possession that constitute

non-transferred items.

109.    Section 541 of the Bankruptcy Code provides that property of the estate includes

Debtors' interests in property "wherever located and by whomever held. . . ."[92]  Thus, NNI's

interests in the documents and information in the possession of Rockstar and the former

employees and professionals of Nortel are property of the estate.  Even if the documents

themselves fall outside the broad definition of property of the estate, Debtors' confidentiality and

privilege rights – and the confidentiality and privacy rights and interests of third parties – in

those documents must be protected.

110.    Principles of comity also justify entry of a Section 105 order.[93]  In addition to

recognizing the Canadian and EMEA Proceedings, this Court has approved cross-border

protocols and worked in concert with the Canadian Court in hearing the Allocation Trial.  The

---

[92]    11 U.S.C. § 541(a).  *Cf.* 11 U.S.C. § 542(e) (the court may order third parties that hold recorded information relating to the debtor's property or financial affairs to turn over the information to the debtors).

[93]    *Cf. Stonington Partners, Inc. v. Lernout & Hauspie Speech Products N.V.*, 310 F.3d 118 (3d Cir. 2002) ("The principles of comity are particularly appropriately applied in the bankruptcy context because of the challenges posed by transnational insolvencies and because Congress specifically listed 'comity' as an element to be considered in the context of such insolvencies"); 11 U.S.C. § 1507(b) (listing "principles of comity" as a consideration for whether to provide additional assistance under Chapter 15).

Court also has extended comity by denying attempts by parties to obtain relief from the Initial

Order of the Canadian Court to serve a document preservation subpoena on the Canadian

Debtors.[94]

111.    Some of the documents now in NNI's possession or control may have been

authored or created by current and/or former employees of the Canadian and/or EMEA Debtors.

In some instances, they were produced to NNI only for purposes of the Allocation Litigation.

Third parties should not be able to obtain from NNI that which they may not obtain directly from

the Canadian or EMEA Debtors.  In addition, the Canadian and EMEA Debtors should have an

opportunity to be heard in this Court to the extent they have an interest in any production by or

other discovery sought from NNI.

112.    Finally, relief from this Court would help protect NNI against the risk of being

subjected to inconsistent rulings.  Google and Time Warner may seek to enforce their subpoenas

in various district courts.  There is a potential for inconsistent rulings from those courts regarding

the application and scope of the automatic stay and the document production efforts that NNI,

estate professionals, and NNI's former employees may be required to make.  The various patent

litigations are pending in the Eastern District of Texas, the Northern District of California, the

District of Delaware, and the Eastern District of Virginia.  To date, NNI has been served with

subpoenas in Delaware and North Carolina.  NNI's professionals and former employees have

been served with subpoenas in the Eastern District of Texas, the Northern District of Texas, the

Northern District of California, the Northern District of Illinois, the District of Massachusetts,

and the Southern District of New York.  The potential for inconsistent adjudications is manifest.

---

[94]    *See* Order [09-10164, D.I. 265] (denying motion to intervene and to modify stay pursuant to Section 1522(c)); Order Denying Lead Plaintiffs' Renewed Motion For Limited Modification Of The Recognition Order To Pursue The Securities Litigation Under 11 U.S.C. § 1522(c) [09-10164, D.I. 585].

113.    It is consistent with the bankruptcy policy of centralizing litigation against a debtor to have this Court exercise control over all of Debtors' documents and all third-party requests to obtain copies of them; in addition, no other court has the ability or responsibility to take account of the impact the subpoenas may have on Debtors' estates and creditors.

## NOTICE

114.    Notice of this Motion has been given via electronic transmission, first-class mail, hand delivery, or overnight mail to: (i) the Core Parties; (ii) the U.S. Trustee; (iii) all creditors and interest holders who have filed claims or have scheduled claims against Debtors that have not been disallowed;[95] (iv) Rockstar; (v) the other eight purchasers and any other "Responding Parties" as defined in the confidentiality orders entered in connection with the Allocation Trial; (vi) the other parties in the litigations with Rockstar or its assignees, including Constellation Technologies LLC, Spherix Inc., Charter Communications, Inc., Google, Time Warner Cable, Inc., and Verizon; and (vii) the general service list established in these Chapter 11 cases. Accordingly, Debtors submit that under the circumstances no other or further notice is necessary.

## NO PRIOR REQUEST

115.    No prior request for the relief sought herein has been made to this or any other court.

---

[95]    Such creditors and interest holders will receive service of a notice of the filing of this Motion in lieu of receiving copies of the Motion. As indicated in the notice being provided, the Motion is available for download from the website of Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC ("Epic") at http://chapter11.epiqsystems.com/nortel, or upon telephonic or e-mail request to Epiq at (646) 282-2400 or nortel@epiqsystems.com.

## LOCAL RULE 7026-1(c) CERTIFICATION OF
## ATTEMPTS TO RESOLVE DISCOVERY DISPUTE

116.    The undersigned counsel for NNI certifies that they and/or their co-counsel

conferred, unsuccessfully, with counsel for Time Warner, Google, and Verizon in an attempt to

resolve issues concerning the third-party subpoenas described in this Motion.

WHEREFORE, Debtors respectfully request that this Court (i) grant this Motion and the

relief requested herein; (ii) enter the proposed order attached as Exhibit A hereto; and (iii) grant

such other and further relief as it deems just and proper.

Dated:  September 26, 2014

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Lisa M. Schweitzer (admitted *pro hac vice*)
David H. Herrington (admitted *pro hac vice*)
Inna Rozenberg (admitted *pro hac vice*)
One Liberty Plaza
New York, NY  100006
Telephone: (212) 225-2000
Facsimile:  (212) 225-3999

– and –

MORRIS, NICHOLS, ARSHT & TUNNEL LLP


/s/ Ann C. Cordo
Derek C. Abbott (No. 3376)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for Debtors and Debtors in
Possession only with respect to
Time Warner Cable, Inc.*

CROWELL & MORING LLP
Mark D. Plevin (*pro hac vice* pending)
Mark S. Supko (*pro hac vice* pending)
James J. Regan
Matthew W. Cheney
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116

– and –

BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP


/s/ Jennifer R. Hoover
Jennifer R. Hoover (No. 5111)
Michael J. Barrie (No.4684)
222 Delaware Ave., Suite 801
Wilmington, Delaware  19801
Telephone:  (302) 442-7010
Facsimile:  (302) 442-7012

*Counsel for Debtors and Debtors in
Possession*