**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* <br><br> Nortel Networks Inc., *et al.*, <br><br> Debtors. | Chapter 11 <br><br> Case No. 09-10138 (KG) <br><br> Jointly Administered |

**DECLARATION OF TIMOTHY C. ROSS IN SUPPORT OF DEBTORS' MOTION FOR (A) AN ORDER ENFORCING AND/OR EXTENDING THE AUTOMATIC STAY, (B) AN ORDER ENFORCING THE COURT'S PRIOR ORDERS, (C) A PROTECTIVE ORDER, AND (D) RELATED RELIEF UNDER SECTION 105(A)**

I, Timothy C. Ross, state and declare as follows:

1.  I am the Chief Financial Officer and Corporate Secretary for Nortel Networks Inc. ("NNI"), and I have served in this role since May 31, 2013. I have primary management responsibility for the day-to-day operations of the company as it winds down in connection with its pending bankruptcy.

**Third-Party Discovery Demands on NNI**

2.  In the past few months, NNI has been served with third-party subpoenas seeking production of a broad range of documents in connection with the following lawsuits involving patents that NNI and the other Nortel corporate entities (collectively, "Nortel") sold to Rockstar Bidco, LP pursuant to an Asset Sale Agreement dated June 30, 2011 (the "ASA"):

    a.  *Constellation Techs. LLC v. Time Warner Cable, Inc. et al.*, No. 2:13-cv-01079-RSP (E.D. Tex.) ("the '1079 Litigation"), with the subpoena having been served by Time Warner Cable, Inc. ("TWC") on June 9, 2014 (Appendix, Tab 1);

    b. *Google Inc. v. Rockstar Consortium US LP et al.*, No. 4:13-cv-05933-CW (N.D. Cal.) ("the '5933 Litigation"), with the subpoena having been served by Google on July 17, 2014 (Appendix, Tab 2);

    c. *Rockstar Consortium US LP et al. v. Google Inc.*, No. 2:13-cv-00893-JRG (E.D. Tex.) ("the '893 Litigation"), with the subpoena having been served by Google, Inc. ("Google") on July 18, 2014 (Appendix, Tab 3);

    d. *Rockstar Consortium US LP et al. v. ASUSTek Computer, Inc. et al.*, No. 2:13-cv-00894-JRG (E.D. Tex.) ("the '894 Litigation"), with the subpoena having been served jointly by Google and Samsung Electronics Co., Ltd. on August 11, 2014 (Appendix, Tab 4); and

    e. *Spherix Inc. v. Verizon Services Corp. et al.*, No. 1:14-cv-721-GBL (E.D. Va.), with the subpoena having been served jointly by numerous Verizon entities on or around September 5, 2014 (Appendix, Tab 5).

  3. The subpoenas served on NNI are remarkable in terms of the number and breadth of the document requests to which NNI must respond.  The three Google subpoenas, for example, each contain more than one hundred and fifteen (115) separate document requests, the vast majority of which are not limited in time and seek documents that have little or no direct relationship to the small number of patents at issue in those cases.  More particularly, the subpoenas seek production of virtually every document in NNI's possession, custody or control relating to the valuation and sale of Nortel's patent portfolio and business lines in connection with these bankruptcy proceedings, including documents protected from disclosure by the attorney-client privilege and attorney work-product immunity as well as documents subject to confidentiality obligations to numerous other parties.

4. In addition to the foregoing subpoenas to NNI, I am aware that in connection with the '893 Litigation, Google has issued subpoenas to the following former Nortel employees seeking documents and, in at least one case, deposition testimony:

    a. Christopher C. Cianciolo, former IP Counsel for Nortel who later became Chief IP Counsel for Rockstar (Appendix, Tab 6);

    b. Art Fisher, former Vice President, IP Law for Nortel (Appendix, Tab 7);

    c. Peter A. Fortman, a former Nortel engineer who is the named inventor on an alleged prior art patent (Appendix, Tab 8);

    d. Raj Krishnan, former IP Counsel for Nortel who later became an Assertion Attorney for Rockstar (Appendix, Tab 9); and

    e. Richard Weiss, former Deputy IP Counsel for Nortel (Appendix, Tab 10).

5. I understand that, notwithstanding Nortel having timely reminded the former employees of their obligations under their respective employment agreements to return and deliver all writings, documents, materials, and other property owned or leased by or relating to Debtors, certain of these former Nortel employees may be in possession of NNI documents.

6. Several of these individuals have requested that NNI represent them or otherwise assist them in responding to Google's subpoenas. Thus far, NNI has agreed to provide counsel for Mr. Cianciolo and Mr. Fortman in order to help protect NNI's privilege and confidentiality interests. The document requests in these subpoenas are very extensive, again seeking not only documents specifically related to the patents at issue in the '893 Litigation, but also virtually any and all documents relating to Nortel's past patent licensing and enforcement practices, as well as the auction and eventual sale of its patent portfolio and business lines.

7. I am also aware that Google has served several subpoenas in connection with the pending Litigations on at least two of Nortel's legal and business advisors, Global IP Law Group ("Global IP") and Lazard Freres & Co. LLC ("Lazard"), as well as three former Lazard employees (Appendix, Tabs 11-18). Again, the document requests in these subpoenas are wide-ranging, seeking virtually any and all documents relating to Nortel's auction and eventual sale of its patent portfolio and business lines. Both Global IP and Lazard have contacted NNI for assistance in connection with responding to these subpoenas.

### NNI Has Extremely Limited Resources to Respond to Third-Party Discovery

8. As of today, in addition to having sold the majority of its patent portfolio to Rockstar, NNI has divested all of its various business operations. Accordingly, NNI's operations, such as they are, exist only to facilitate resolution of the ongoing bankruptcy proceedings.

9. NNI has only one (1) remaining business facility, located in Research Triangle Park, North Carolina, and no remaining employees. The company's ongoing administrative operations are being handled by a group of only seven (7) former Nortel employees working on a contract basis, including me. None of us ever held a technical or legal position in the company that related in any relevant way to what I generally understand to be the subject matter of the various patent infringement suits in connection with which NNI has been subpoenaed.

### NNI's Remaining Document Stores Are Difficult to Search

10. In part due to standard disaster recovery procedures in place when NNI was actively operating its businesses and in part due to litigation-related holds, including in the context of the ongoing bankruptcy proceedings, NNI has vast stores of paper and electronic records. Due to the nature of how those records have been maintained, however, it is extremely

difficult, and in many cases essentially impossible, to determine whether any particular category of documents exists or where such documents may be located.

11. NNI has control over more than a decade's worth of digital media archives, comprising more than 142,000 physical items (mostly magnetic tapes), that are presently maintained by Iron Mountain at approximately six (6) different locations around the country. Iron Mountain maintains a high-level online catalog of these digital media archives, but that catalog does not contain any information regarding the contents of the particular media stored. In at least some cases, it may be possible with a substantial degree of effort to trace portions of the archives back to the Nortel organization that provided them to Iron Mountain, but that would only enable identification of the system or server to which a backup tape corresponds. In order to view the contents of any given tape, it would be necessary to load the tape onto whichever system/server it came from, if it still exists, and use the corresponding computer application to review the contents. Of course, this assumes that the magnetic tape is still readable, which is by no means a given due to the physical degradation that magnetic tape undergoes over time.

12. Iron Mountain is also holding more than 171,000 boxes of documents and other physical items (*e.g.*, laptops, computer hard drives, books, etc.) at more than fifteen (15) warehouses across the country. Some of this material comprises records put in off-site storage for safekeeping in the ordinary course of Nortel's business operations, but much of it was sent to Iron Mountain as Nortel was shutting down its operations in the course of the bankruptcy proceedings. As with the digital media archives discussed above, Iron Mountain maintains a high-level online catalog for these physical items, but that catalog provides little or no information regarding the contents of the items stored. Again, in at least some cases, it may be possible with a substantial degree of effort to trace a particular pallet of boxes back to the Nortel

organization that provided them to Iron Mountain, but in order to determine the contents of any particular box it would be necessary to retrieve the box from Iron Mountain and physically inspect the contents.

13. Any effort to locate particular documents, or even broad categories of documents, within the physical and electronic stores under NNI's control is made all the more complicated by the fact that the personnel remaining at NNI have little or no personal knowledge of the relevant business and/or legal operations of the company. Accordingly, even a seemingly simple request such as "find all of John Smith's documents" requires a laborious effort that begins with searching human resource records to determine who "John Smith" was, which organization he worked for and in which facility, scouring any accessible paper and/or computer records for that organization to try to determine whether and where it may have archived its documents, calling back from Iron Mountain potentially thousands of boxes of documents associated with the organization, and then physically inspecting each box to determine whether any of them contain "John Smith's" documents. Quite literally, this is like looking for the proverbial needle in a haystack.

14. In addition to the above-described archives, NNI has kept a small number of its computer systems operational in order to assist with the administrative aspects of the company's wind-down. These include a human resources/personnel system, certain financial systems, and the "LiveLink" document management system.

    a. The LiveLink system was available to the various Nortel business organizations to use, on a largely voluntary basis, as a document repository that could be accessed by the members of the organization regardless of where they were physically working. However, there was no standard method by which documents and information were posted to or

organized on LiveLink. Furthermore, at one time, there was a physical instance of the LiveLink system residing on each of several Nortel servers located around the world, and these various instances were logically connected so that users could access documents seamlessly regardless of where the documents were physically stored. Today, however, as a result of the divestitures, NNI has possession of, and access to, only the U.S.-based instance of the LiveLink system.

        b.      The LiveLink system to which NNI has access has not been actively maintained for at least three (3) years, but it does provide some rudimentary searching capabilities. The system supports a relatively crude (by today's standards) Boolean search syntax that enables AND/OR/NOT type searches on specified text strings (*e.g.*, "patent AND infring* AND NOT trademark"), but it does not support proximity searches (*e.g.*, "patent w/5 infring*). Consequently, it is often not possible to structure a search in a way that returns a manageable number of reasonably relevant "hits."

        c.      When a search is run in the LiveLink system, the hits can be viewed online in various formats, including a preview mode that will highlight search terms in the document. However, the system does not include any facility for efficiently downloading documents returned in a search. Rather, it is necessary to open each individual document desired to be downloaded and save that document to a storage location (*e.g.*, a Windows folder resident on the computer on which the search was run or a portable drive). This is an extremely tedious and time-consuming task if any substantial number of documents needs to be downloaded, as it typically takes at least 15-20 seconds to access and download each individual document.

        d.      The documents maintained in LiveLink include some basic metadata fields, including the date a document was created and the name of the individual who first stored the document in the system. The metadata does not identify the business unit with which that

individual was associated, nor does it associate the document with any particular Nortel entity. Accordingly, in order to determine whether any particular document "belongs to" NNI or one of the other Nortel estates (*i.e.*, for purposes of assessing NNI's confidentiality obligations and/or who owns any privilege), it would be necessary to trace the individual who stored the document in LiveLink back to the Nortel entity by whom he or she was employed using the available human resources records.

**Most of the Documents Sought by the Subpoenas Were Previously Searched for, Collected, and Transferred to Others**

15.     The various third-party subpoenas that have been served on NNI and related third-parties to date seek documents falling into two broad categories: (i) "patent documents," including documents relating not only to the particular patents being asserted in the respective litigations, but also documents relating more broadly to Nortel's entire portfolio of thousands of patents, most but not all of which were sold to Rockstar, and (ii) "valuation documents," including documents relating to Nortel's effort to assess the potential value of its patents and business lines prior to putting those assets up for sale, and documents relating to the sales themselves, including documents submitted to Nortel by both the successful and unsuccessful bidders.  As discussed further below, the vast majority of responsive documents in category (i) should now be in Rockstar's possession, custody or control; and the vast majority of the responsive documents in category (ii) were collected for purposes of the allocation litigation among the various Nortel estates.

16.     In connection with the various asset sales pursuant to the bankruptcy proceedings, Nortel maintained electronic data rooms with confidential diligence materials.  As each data room was created, NNI and the other Nortel entities searched for, collected, and included in the electronic data rooms relevant documents and information for each respective sale process.

Access to the confidential diligence materials and the data rooms was limited to persons covered by confidentiality and non-disclosure agreements. NNI has transferred to the purchasers a large percentage of the paper and electronic documents relating to its former business operations.

      a.      For example, in connection with the sale of more than 7,000 patents and patent applications to Rockstar, NNI transferred to Rockstar a vast collection of records designated "Patent Related Documentation" under the Nortel/Rockstar ASA, including: (i) all of the physical and electronic patent prosecution files relating to the transferred patents, (ii) documents relating to licensing of the transferred patents, including copies of all license agreements and all statements to standards-setting organizations regarding licensing; (iii) all litigation files relating to assertions of the transferred patents; (iv) all infringement charts relating to the transferred patents; (v) all books, records, files, ledgers and similar documents stored in Nortel's document management systems used to track, organize or maintain the patents; (vi) all documents at any time contained in the electronic data room that was made available to Rockstar and other bidders in connection with the auction of Nortel's patent portfolio and business lines; (vii) copies of acquisition agreements for any transferred patents that had previously been purchased by Nortel; and (viii) all assignment agreements relating to the transferred patents.

      b.      In addition, approximately twenty-six (26) former Nortel employees, most of whom worked in Nortel's IP Legal department, transitioned to Rockstar in connection with the transaction, and those employees were authorized and instructed to transfer to Rockstar any paper or electronic documents in their possession that related to the transferred patents. Rockstar also took possession of approximately twenty-six (26) desktop and laptop computers previously used by Nortel personnel, again for the purpose of transferring any electronic documents on those computers related to the transferred patents.

      c.      Accordingly, Rockstar should have at least a copy, and in many if not most instances the original, of virtually every document previously in NNI's possession, custody or control relating to the patents transferred to Rockstar, including all of the patents now being asserted in the above-identified litigations.

      d.      In addition to the sale of patents to Rockstar, Nortel sold eight (8) specific business lines to separate purchasers, including Avaya, Ciena, Ericsson, Genband, Hitachi, Kapsch, and Radware.  Similar to the Nortel/Rockstar ASA, the asset transfer agreements for these business line sales included provisions for transferring to the purchasers Nortel's paper and electronic documents relating to the transferred business lines.

17.      In connection with the ongoing litigation among the various Nortel estates regarding allocation of the proceeds from the sale of Nortel's patent portfolio and business lines, each of the Nortel estates was tasked with searching for and collecting broad categories of documents potentially relevant to the allocation dispute, including documents concerning valuation of the patents and other business assets that were sold.  These documents were collected not only from each of the Nortel estates, but also from Nortel's legal and business advisors, including the Global IP Law Group and Lazard Freres.  This effort resulted in the collection of approximately 3,000,000 documents, all of which were loaded into a database accessible by the Nortel estates and their counsel.  I understand that the original source of many of these 3,000,000 documents is not readily identifiable or easily obtainable at this time.  I also understand that there ended up being approximately 2,200 exhibits cited in submissions or otherwise used at trial.  Most of these trial exhibits include highly confidential information, and many of them include attorney-client privileged information.

18. To the extent NNI still has in its possession, custody or control certain of the "patent documents" and "valuation documents" as described above, the vast majority of those documents are subject to confidentiality obligations and/or claims of attorney-client privilege and work-product immunity, rendering any effort to review such documents for possible production in response to discovery requests extremely burdensome. This is because:

    a. the asset purchase agreements between Nortel and the purchasers, including Rockstar, include extensive confidentiality restrictions that obligate NNI to take all reasonably appropriate steps to preserve the confidentiality and privileged status of such documents;

    b. NNI has confidentiality and privilege obligations with respect to each of the other Nortel estates and the other "Core Parties" to the allocation litigation, as well as to Rockstar and the business line purchasers, to the extent documents exchanged and/or used in connection with the allocation trial relate to the assets each of them acquired or otherwise implicate their interests.

19. In view of these various obligations, it is extremely burdensome and time-consuming for NNI to review, designate and produce documents sought by the above-described subpoenas. For instance, in order to avoid breaching its contractual obligations, NNI must have its counsel review each document to identify both attorney-client privileged information and confidential information. As to each category of protected information, NNI must then determine whether that information relates to assets sold to Rockstar or one of the business line purchasers. Once the interested third-parties are identified, NNI is required to give them notice and an opportunity to object before any such documents are disclosed to others. In addition, the information in the requested valuation documents that were collected for the allocation litigation


are subject to protective orders and confidentiality orders issued by the Delaware Bankruptcy Court and therefore NNI would have to consult extensively with the other Nortel estates and Core Parties. Moreover, the documents sought include highly technical business information, and outside counsel or third parties may not be able to identify readily which buyers or other third parties may have an interest therein.

### The Majority of the Subpoenaed Documents Can Be Obtained More Efficiently from Sources Other than NNI

20.     Based on my understanding of the scope of the document requests that have been served on NNI to date, as well as my general knowledge of the identification, availability, and accessibility of the documents remaining in NNI's possession, custody or control, I believe that the documents being sought can be obtained in a far more efficient, more cost-effective and less burdensome manner from sources other than NNI.

21.     With respect to the requested patent documents, as noted above, substantially all of those documents should be in Rockstar's possession. Rockstar is in a far better position than NNI to undertake the burden and expense of searching for, reviewing and producing such documents. Moreover, for the following reasons, Rockstar would seem to be the more appropriate entity to be making determinations as to the confidential and/or privileged status of those documents.

a.      Prompted by the subpoena that TWC issued to NNI, Rockstar warned NNI not to disclose any of Rockstar's confidential and/or privileged information in response to subpoenas served in litigations involving the patents that Rockstar purchased from Nortel. Indeed, Rockstar indicated that it would seek damages against NNI in connection with any allegedly unauthorized disclosure of Rockstar's confidential and/or privileged information,

confirming that protection of such information was a material term of the Asset Purchase Agreement between Rockstar and Nortel.

        b.      In connection with the sale of patents to Rockstar, the Nortel sellers entered into Common Interest Agreements, dated July 29, 2011, with each of Rockstar and Rockstar Consortium Inc.  Under the Common Interest Agreements, the Nortel sellers are obligated to not disclose "Common Interest Information" and not waive any privilege applicable to any such information.  The parties also agreed that Common Interest Information shall be "Purchaser Confidential Information" under the ASA and, therefore, subject to the ongoing confidentiality obligations under the ASA.

      22.     With respect to the valuation documents, again as noted above, all such documents were collected not only from each of the Nortel estates, but also from Nortel's legal and business advisers, for purposes of the allocation litigation among the estates.  As required by the Bankruptcy Court, and consistent with the protective and confidentiality orders entered by the Bankruptcy Court, the roughly 2,200 trial exhibits that were prepared from this collection are now being reviewed for confidentiality and privilege by counsel for the respective Nortel estates, in consultation with the other Core Parties and certain purchasers, licensees and tax authorities, in order to prepare public versions. On information and belief, those trial exhibits are likely to contain most of the valuation-related documents that are reasonably, or at least arguably, relevant to the issues in the above-identified patent litigations.  NNI intends to produce all of the public versions of the trial exhibits to the parties who have issued subpoenas to NNI seeking such documents.

### Rockstar Retained Certain NNI Documents and Information

23. In connection with the closing of the sale of patents to Rockstar, three Nortel entities – NNI, Nortel Networks Corporation, and Nortel Networks Limited – entered into an Amended and Restated Employee Transfer Side Agreement and a Transition Services Agreement, both dated as of July 29, 2011, with Rockstar Consortium Inc. These agreements governed certain transition services related to the assets and transferred employees for the patent sale transaction.

24. Given the short period of time available to segregate documents and information held by a Nortel entity that was not related to the patents Rockstar purchased (the "Unrelated Information"), Rockstar agreed in the Transition Services Agreement to ensure that former Nortel employees who transitioned to Rockstar did not deliberately access any Unrelated Information and that any unintentionally disclosed Unrelated Information would not be used or further disclosed.

25. Most of the Unrelated Information and other non-transferred items resided on certain personal computers and workstations of the transferred employees, which Rockstar purchased. Under the Transition Services Agreement, Rockstar agreed to delete all non-transferred items from those computers.

26. Rockstar has advised NNI that it failed to delete non-transferred items from the computers of former Nortel employees, including those of former in-house counsel.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Signed this 18th day of September, 2014.

_____
Timothy C. Ross