# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re*: | Chapter 11 |
|  |  |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) (Jointly Administered) |
|  |  |
| Debtors. | **Re: Dkt. Nos. 14076 & 14117** |
|  | Hearing date: November 4, 2014 at 10:00 a.m. (EST) |

## MONITOR'S AND CANADIAN DEBTORS' SUPPLEMENTAL OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 APPROVING POST-PETITION INTEREST AGREEMENT

**BUCHANAN INGERSOLL & ROONEY PC**
Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

**ALLEN & OVERY LLP**
Ken Coleman
Daniel J. Guyder
John Kibler
Jacob S. Pultman
1221 Avenue of the Americas
New York, New York 10020
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
ken.coleman@allenovery.com
daniel.guyder@allenovery.com
john.kibler@allenovery.com
jacob.pultman@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian Debtors*

Dated:   October 3, 2014

---

[1]      The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226) (collectively, the "**Debtors**").

## TABLE OF CONTENTS

Table of Authorities ...................................................................................................... ii

Preliminary Statement .................................................................................................. 2

Background .................................................................................................................... 5

Argument ....................................................................................................................... 9

I.      The Debtors Cannot Abrogate NNL's Rights Under Section 1129 Under the Guise of a Settlement Agreement ......................................................................... 9

II.     The Proposed Settlement Was Agreed to by a Compliant Debtor that Was Largely Divorced from the US PPI Dispute and Uninformed as to Both the Law and Facts ......... 12

III.    The Proposed Agreement Offers No Meaningful Compromise of the US PPI Dispute for the Benefit of the Estates .............................................................. 20

IV.     The Settlement Does Not Satisfy the Standards for Approval of Settlements Under Bankruptcy Rule 9019 .......................................................................... 25

        A.      The Settlement Does Not Satisfy the *Martin* Factors ........................... 25
                i.      The Probability of Success in Litigation Is Decidedly in Favor of the Canadian Interests ............................................................. 26
                ii.     The US PPI Dispute Is Not Complex, Has Been Fully Briefed, and Should Be Decided on its Merits By this Court ....................... 28
                iii.    The Paramount Interests of Creditors and Shareholders Support Denial of the Motion ...................................................... 31
                        a.      While the Proposed Agreement Maximizes Value for the Bondholders, the Proposed Agreement Is Not in the Best Interests of Other Unsecured Creditors ........................... 32
                        b.      The Proposed Agreement Is Not in the Best Interests of Equity ............................................................................. 33

        B.      The Proposed Agreement Is Not Fair and Equitable ............................. 34
                i.      The Debtors Have Failed to Fulfill Their Duties to Equity ...................... 35
                ii.     The Debtors Have Failed to Demonstrate that the Proposed Agreement Was Negotiated at Arm's Length ............................. 36

V.      The Solus/Macquarie Statement ....................................................................... 38

Conclusion ................................................................................................................... 39

# TABLE OF AUTHORITIES

## CASES

*Citibank, N.A. v. Andros*,
  666 F.2d 1192 (8th Cir. 1981) .............................................................................35

*Commodity Futures Trading Comm'n v. Weintraub*,
  471 U.S. 343 (1985)...........................................................................................35

*Crawford v. Zambrano (In re Zambrano)*,
  No. 09-20453-JAD, 2014 Bankr. LEXIS 592 (Bankr. W.D. Pa. Feb. 13, 2014) ...................29

*Eddy v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. (In re Med. Asset Mgmt., Inc)*,
  249 B.R. 659 (Bankr. W.D. Pa. 2000) ...................................................................35

*In re Angelos*,
  No. 10-01507, 2011 WL 917720 (Bankr. D. Haw. Mar. 15, 2011)........................................32

*In re Braniff Airways, Inc.*,
  700 F.2d 935 (5th Cir. 1983) ...............................................................................11

*In re Capmark Fin. Grp. Inc.*,
  438 B.R. 471 (Bankr. D. Del. 2010) .......................................................................27

*In re Coastal Grp. Inc.*,
  13 F.3d 81 (3d Cir. 1994) ....................................................................................37

*In re Crowthers McCall Pattern, Inc.*,
  114 B.R. 877 (Bankr. S.D.N.Y. 1990).....................................................................11

*In re Devon Capital Mgmt.*,
  261 B.R. 619 ( Bankr. W.D. Pa. 2001) ...................................................................36

*In re Eagle-Picher Indus., Inc.*,
  203 B.R. 256 (S.D. Ohio 1996) ............................................................................37

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) ..................................................................26, 29, 36, 37

*In re Forty-Eight Insulations, Inc.*,
  149 B.R. 860 (Bankr. N.D. Ill. 1992) ....................................................................37

*In re Foster Mortg. Corp.*,
  68 F.3d 914 (5th Cir. 1995) .................................................................................37

*In re Genesis Health Ventures*,
   266 B.R. 591 (Bankr. D. Del. 2001) ....................................................................10

*In re GunnAllen Fin., Inc.*,
   443 B.R. 908 (Bankr. M.D. Fla. 2011) ...............................................................32

*In re Louise's, Inc.*,
   211 B.R. 798 (D. Del. 1997) ..............................................................................11

*In re Nutritional Sourcing Corp.*,
   398 B.R. 816 (Bankr. D. Del. 2008) ....................................................................37

*In re Penn Cent. Transp. Co.*,
   596 F.2d 1127 (3d Cir. 1979)..............................................................................27

*In re Present Co.*,
   141 B.R. 18 (Bankr. W.D.N.Y. 1992) ................................................................37

*In re RNI Wind Down Corp.*,
   348 B.R. 286 (Bankr. D. Del. 2006) .............................................................26, 28

*In re Resorts Int'l*,
   145 B.R. 412 (Bankr. D.N.J. 1990) ....................................................................26

*In re Spansion, Inc.*,
   Case No. 09-10690 (KJC), 2009 Bankr. LEXIS 1283 (Bankr. D. Del. June 2, 2009) ............28

*In re Spielfogel*,
   211 B.R. 133 (Bankr. E.D.N.Y. 1997)................................................................35

*In re Texaco, Inc.*,
   84 B.R. 893 (Bankr. S.D.N.Y. 1988)..................................................................36

*In re Trans World Airlines, Inc.*,
   185 B.R. 302 (Bankr. E.D. Mo. 1995).................................................................37

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012).................................................................................27

*In re Wash. Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ....................................................................10

*Jeffrey v. Desmond*,
   70 F.3d 183 (1st Cir. 1995).................................................................................32

*Kranzdorf v. Green*,
   76 B.R. 974 (E.D. Pa. 1987) ..............................................................................29

*LaSalle Nat'l Bank v. Perelman*,
    82 F. Supp. 2d 279 (D. Del. 2000) ........................................................................35

*Martinson v. Michael (In re Michael)*,
    183 B.R. 230 (Bankr. D. Mont. 1995) ..................................................................30

*Myers v. Martin (In re Martin)*,
    91 F.3d 389 (3d Cir. 1996) .................................................................... *passim*

*Pepper v. Litton*,
    308 U.S. 295 (1939) ............................................................................................35

*Porter Drywall Co. v. Haven, Inc. (In re Haven, Inc.)*,
    No. 04-8058, 2005 Bankr. LEXIS 541 (B.A.P. 6th Cir. Apr. 7, 2005) ..................30

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*,
390 U.S. 414 (1968) ..............................................................................27, 29, 34

*Sherr v. Winkler*,
    552 F.2d 1367 (10th Cir. 1977) ..........................................................................36

*United States v. AWECO, Inc. (In re AWECO, Inc.)*,
    725 F.2d 293 (5th Cir. 1984), *cert. denied*, 469 U.S. 880 (1984)......................35, 36

*Will v. Northwestern Univ. (In re Nutraquest, Inc.)*,
    434 F.3d 639 (3d Cir. 2006)...............................................................................29, 34

## RULES & STATUTES

11 U.S.C. § 105(a) ....................................................................................................9

11 U.S.C. § 502.........................................................................................................9

11 U.S.C. § 502(b)(2) ...............................................................................................2, 9

11 U.S.C. § 726(a)(5)................................................................................................9

11 U.S.C. § 1106(a)(5)..............................................................................................37

11 U.S.C. § 1124.......................................................................................................9

11 U.S.C. § 1129.......................................................................................................2, 9, 10, 11

11 U.S.C. § 1129(a) ..................................................................................................2, 10

11 U.S.C. § 1129(a)(7)..............................................................................................2, 9, 10

11 U.S.C. § 1129(b) ....................................................................................................................9

Fed. R. Bankr. P. 9019 ........................................................................................... *passim*

Ernst & Young Inc., the Monitor (the "**Monitor**") and foreign representative of Nortel Networks Corporation ("**NNC**"), Nortel Networks Limited ("**NNL**"), and certain of their direct and indirect subsidiaries (collectively, the "**Canadian Debtors**," and with the Monitor, the "**Canadian Interests**") in proceedings (the "**Canadian Proceedings**") under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), pending before the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**," and with this Court, the "**Courts**"), hereby files this supplemental objection to the *Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement by and among Nortel Networks Inc., the Supporting Bondholders, and The Bank of New York Mellon with Respect to the NNI Post Petition Interest Dispute and Related Issues* [Dkt. No. 14076], dated July 24, 2014 (the "**Motion**"),[1] and the proposed agreement annexed thereto as Exhibit B (the "**Proposed Agreement**") by and among Nortel Networks Inc. ("**NNI**"), certain holders of bonds (collectively, the "**Bondholders**") issued by NNC and NNL and guaranteed by NNI (collectively, the "**Guaranteed Bonds**"), and the Bank of New York Mellon, as indenture trustee (the "**Indenture Trustee**").[2]  In support of this supplemental objection, the Canadian Interests have filed contemporaneously herewith the *Declaration of Daniel J. Guyder* (the "**Guyder Declaration**") and the expert report of Dr. Paul Wertheim, each dated October 3, 2014 (the "**Wertheim Report**").

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

[2]    Certain of the Bondholders are organized as an ad hoc committee and are represented by counsel as a group in these cases (the "**Bondholder Group**").

## PRELIMINARY STATEMENT

The proposed settlement between NNI and the Bondholders is *not* a settlement between adverse parties.  It is an artifice agreed to by like-minded parties that abrogates NNI's sole equity holder's statutory rights under section 1129 of the Bankruptcy Code.  Any plan of reorganization that does not pay NNL what it would receive in a chapter 7 liquidation of NNI – *i.e.*, all amounts that remain in the estate after payment in full of the allowed claims of unsecured creditors, *plus* post-petition interest at the federal judgment rate – is unconfirmable as a matter of law *absent NNL's consent*.  Section 1129(a) is clear that a court may confirm a plan *only* if all of the requirements of section 1129(a) are met, including section 1129(a)(7).  An agreement between NNI and the Bondholders cannot override this statutory requirement that protects NNL.

If the proposed settlement was limited to resolving the principal amount of the Bondholders' claims, then settling those claims under Rule 9019 might be appropriate. However, under section 502(b)(2) of the Bankruptcy Code, an unsecured creditor's allowed claim *cannot* include post-petition interest, and, at any rate, it is only through section 1129 of the Bankruptcy Code that unsecured creditors are entitled to receive post-petition interest.  A consensual resolution of that issue requires the consent of NNL.  Here, NNL was never asked to participate in the so-called settlement discussions, much less provide its consent.

The timing and substance of the discussions that took place between the Bondholder Group and the Debtors are troubling.  The Bondholder Group, with the aid of the Debtors, scrambled over the course of a week starting on July 15, 2014, to construct a purported settlement that gives the Bondholders $1.01 billion of post-petition interest through June 30, 2015 – or nearly $900 million *over and above* the post-petition interest they would receive if paid at the federal judgment rate.  While the Debtors represent that the Proposed Agreement was

"vigorously negotiated," the evidence obtained through court-ordered discovery demonstrates that the agreement is not the result of vigorous, arm's length negotiations among the parties:

- The proposed settlement was reached between parties who are not adverse—the Bondholders and NNI. The Debtors have taken no substantive position on the merits of the US PPI Dispute. It is therefore telling that the Debtors led the hurried negotiations for a settlement while excluding altogether the real party in interest to that dispute—NNI's sole equity holder, NNL.

- The proposed settlement was negotiated by the Debtors through their principal officer, John Ray, whose actions were at best inadequate. There is clear evidence showing that Mr. Ray undertook no meaningful analysis of (i) the financial impact of the proposed settlement on the NNI estate, (ii) the relative merits of the underlying legal issues, (iii) the probabilities of success in litigation, (iv) the expense that would be saved as a result of settlement, and (v) how the settlement could be in the best interests of NNI's creditors, equity holders and the estate. Mr. Ray's testimony confirms that he simply agreed with and assumed the success of the Bondholders' legal position, and this baseline position tainted all subsequent settlement discussions, including Mr. Ray's determination of what would be a reasonable settlement of the dispute based on the contract rate of interest.

- Given Mr. Ray's predisposition in favor of the contract rate of interest, and the *ad hoc* approach to negotiating the proposed settlement, no deference should be paid to the supposedly vigorous settlement discussions that pointedly excluded the Canadian Interests. Nor can any assurance be found in the scrutiny of the proposed settlement by a creditors committee comprised of only one non-bondholder-related creditor.

In reality, the proposed settlement is not a meaningful compromise by the Bondholders. Even under the most optimistic scenario for the Bondholders, the maximum surplus available for payment of post-petition interest for *all* creditors of NNI would be less than $1 billion. NNI would never have available funds to pay the full $1.657 billion to which the Bondholders assert they are entitled, and thus the alleged concession of some $650 million of entitlements to post-petition interest is illusory. Indeed, in the almost certain scenario where the NNI estate has insufficient funds to pay the proposed settlement amount of $1.01 billion, *plus* all post-petition interest payable to other unsecured creditors, the proposed settlement gives the Bondholders a remarkable "deemed" claim for post-petition interest *determined at their full contract rates of*

*interest*, while reserving for a later determination the allocation and rate of post-petition interest payable to all other unsecured creditors (who are bound by the Bondholders' "deemed" claim for post-petition interest at contract rates). This outcome gives the Bondholders the same result they would have obtained had they actually prevailed in litigating the US PPI Dispute.

Finally, even if one were to consider the proposed settlement as a *bona fide* settlement subject to resolution under Bankruptcy Rule 9019, the Debtors have utterly failed to provide any evidence to allow the Court to make the requisite factual findings to approve it. None of the factors used by courts in the Third Circuit to evaluate settlement agreements is met here:

- *Probability of Success in Litigation.* There is no evidence in the record that reflects the Debtors' consideration of the relative merits of the parties' positions in the US PPI Dispute. Nonetheless, the Court need only consult the briefs already filed by the parties in that dispute to determine that the probability of success on the merits strongly favors the Canadian Interests. Here, a proposed settlement that would provide the Bondholders with gift of nearly $900 million above the amount payable under the federal judgment rate simply does not reflect the probability of success on the merits.

- *Complexity and Expense of Litigation.* The legal issues are fully briefed and the parties were, as of July 24, prepared for argument on the US PPI Dispute. All that remained was for this Court to hear argument and decide a question of law. The Debtors and the Bondholders have needlessly complicated that dispute by seeking to resolve it under the guise of a Bankruptcy Rule 9019 settlement, thereby introducing various factual considerations. The proposed settlement avoids no litigation and, if approved, will not resolve the disputed legal issues with respect to any unsecured creditors other than the Bondholders. Nor does the settlement resolve disputes between the Bondholders and the Canadian Interests, as appeals are likely to be taken regardless of whether the matter is settled or resolved on its merits. Thus, the Court can expect continued litigation over the same legal issues, no matter the outcome of the Motion, and any suggestion of potential cost savings from the proposed settlement is unfounded.

- *Paramount Interest of Creditors and Equity Holders.* While the Proposed Agreement clearly benefits the Bondholders in numerous ways, the Debtors have not and cannot offer any evidence that a settlement where NNI gives away nearly $900 million of value provides a material benefit to any other stakeholders, much less the sole equity holder of NNI, whose interests are being compromised even though it was excluded entirely from the negotiations that led to the proposed settlement. Given the requirements of the Bankruptcy Code and the significant impact that the proposed agreement will have on other stakeholders, there is no

legal basis or other rationale for the Debtors to proceed with the proposed settlement outside the strictures and protections of the plan confirmation process.

The proposed settlement does not meet the requirements for approval as a compromise under Bankruptcy Rule 9019, much less the more stringent requirements of the plan confirmation process, and cannot be approved in the circumstances.

The Motion must therefore be denied.

## **BACKGROUND**

1.      On June 30, 2014, the Courts entered orders establishing a briefing schedule on the following two legal issues, and scheduled a joint hearing for consideration of such issues for July 25, 2014 [Dkt. No. 13910]:

- whether the holders of the Crossover Bonds Claims are legally entitled in each jurisdiction to receive any amounts under the relevant indentures above and beyond the outstanding principal debt and pre-petition interest (namely, above and beyond US $4.092 billion); and

- if determined that the holders of the Crossover Bonds Claims are so entitled, what additional amounts are such holders entitled to so claim and receive.[3]

2.      The relevant parties filed their initial briefs with the Courts on July 15, 2014, and their reply briefs on July 22, 2014.[4]  During the late evening of July 23, 2014, counsel for the

---

[3]      *Nortel Canadian and US Insolvency Proceedings – Bondholder Claims Issues*, [Dkt. No. 13880].

[4]      **Opening Briefs:** *Opening Brief of the Monitor and the Canadian Debtors Regarding Post-Petition Interest and Related Issues* [Dkt. No. 14023]; *Written Submissions of the Canadian Creditors' Committee (Motion re Cross-Over Bonds)* [Dkt. No. 14027]; *Brief of Wilmington Trust, National Association, as Successor Indenture Trustee, Addressing the Interest Issues* [Dkt. No. 14021]; *Brief of the UK Pension Claimants Regarding Post-Petition Interest Issues* [Dkt. No. 14022]; *US Debtors' Submission on the Interest Issues* [Dkt. No. 14019]; *Opening Brief of the Ad Hoc Group of Bondholders, Law Debenture Trust Company of New York, as Trustee, and the Bank of New York Mellon, as Trustee, with Respect to Monitor's Request that the Court Determine Bondholder Entitlement to Post-Petition Interest and Additional Bondholder Claims Issues Under U.S. Law* [Dkt. No. 14025]; *Memorandum of Law of the Official Committee of Unsecured Creditors Regarding Entitlement of US Creditors to Postpetition Interest* [Dkt. No. 14024]; *Supplemental Opening Brief of Law Debenture Trust Company of New York, as Indenture Trustee for the NNCC Notes, with Respect to Monitor's Request that the Court Determine Bondholder Entitlement to Post-Petition Interest and Additional Bondholder Claims Issues Under U.S. Law* [Dkt. No. 14028]; *Joinder of*

*Footnote continued on next page…*

Bondholder Group advised counsel to the Monitor—for the first time—that settlement discussions had taken place and a settlement had been reached.  On July 24, 2014, at the request of the Debtors, this Court convened a telephonic status conference during which the Debtors announced that NNI had settled the US PPI Dispute with respect to the Guaranteed Bonds.  This was surprising news given that the Debtors had excluded the Canadian Interests entirely from all negotiations that led to the settlement and the Debtors had, up to that point, never taken a position adverse to the Bondholders in the US PPI Dispute.  Yet, the Debtors suddenly purported, on behalf of their estates and all stakeholders, to compromise the US PPI Dispute between the Canadian Interests and the Bondholders.  The Debtors filed the Motion during the July 24 telephonic conference with the Court, following which the Court adjourned further consideration of the US PPI Dispute, including the oral argument on the US PPI Dispute that was scheduled for the next day, July 25, 2014.

3.      On July 30, 2014, the Canadian Interests filed their preliminary objection to the Motion and moved for expedited discovery regarding the Motion (the "**Discovery Motion**"), as the Motion is devoid of any facts that support approval of the Proposed Agreement  [Dkt. No. 14117].  The Debtors objected to the Canadian Interests' request for expedited discovery on

---

*Solus Alternative Asset Management LP and Macquarie Capital (USA) Inc. in Bondholder Pleading* [Dkt. No. 14029].

         **Reply Briefs:** *Reply Brief of the Monitor and the Canadian Debtors Regarding Post-Petition Interest and Related Issues* [Dkt. No. 14054]; *Reply of the Canadian Creditors' Committee (Motion Re Cross-Over Bonds)* [Dkt. No. 14061]; *Reply Brief of Wilmington Trust, National Association, as Successor Indenture Trustee, Addressing the Interest Issues* [Dkt. No. 14055]; *Responding Brief of the UK Pension Claimants Regarding Post-Petition Interest Issues* [Dkt. No. 14052]; *Response of the Ad Hoc Group of Bondholders, Law Debenture Trust Company of New York, as Trustee, and the Bank of New York Mellon, as Trustee, to the Opening Briefs of the Monitor and Canadian Debtors, U.K. Pension Claimants, Canadian Creditors Committee, and Wilmington Trust Regarding Bondholder Entitlement to Post-Petition Interest and Additional Bondholder Claims Issues Under U.S. Law* [Dkt. No. 14053]; *Reply Brief of the Official Committee of Unsecured Creditors Regarding Entitlement of US Creditors to Postpetition Interest* [Dkt. No. 14058]; *Supplemental Reply Brief of Law Debenture Trust Company of New York, as Indenture Trustee for the NNCC Notes, with Respect to Monitor's Request that the Court Determine Bondholder Entitlement to Post-Petition Interest and Additional Bondholder Claims Issues Under U.S. Law* [Dkt. No. 14057].

August 4, 2014  [Dkt. No. 14161].  The Canadian Interests' filed reply papers to the Debtors' objection on August 7, 2014  [Dkt. No. 14173].

4.      On August 8, 2014, the Court considered the Discovery Motion during a telephonic hearing.  In that hearing the Court determined that the Canadian Interests were entitled to take certain limited discovery related to the Motion.  The parties subsequently negotiated an agreed discovery schedule which the Debtors filed with the Court the *Certification of Counsel Submitting Order Establishing Discovery Schedule and other Procedures in Connection with the U.S. Debtors' 9019 Motion* (the "**Certification**") [Dkt. No. 14339].  Upon consideration of the Certification, on September 2, 2014, the Court entered its *Order Establishing Discovery Schedule and Other Procedures in Connection with the U.S. Debtors' 9019 Motion* (the "**Discovery Order**") [Dkt. No. 14345].

5.      On August 29, 2014, Solus Alternative Asset Management LP and Macquarie Capital (USA) Inc. (together, "**Solus/Macquarie**"), in their capacities as holders of certain notes issued by NNL and NNCC and guaranteed by NNI (the "**7.875% Notes**"), submitted a statement with respect to the Motion (the "**Solus/Macquarie Statement**")  [Dkt. No. 14340].

6.      On September 2, 2014, pursuant to the Discovery Order, the Debtors and the Bondholders designated, respectively, Mr. Ray and Michael Katzenstein, a principal at FTI Consulting ("**FTI**"), the financial advisor to the Bondholders, as the witnesses they would call at the hearing on the Motion to provide testimony in support of the Motion.  On that same day, pursuant to the Discovery Order, the Debtors and Bondholders also produced all documents they considered necessary to establish and/or support their affirmative case in connection with the Motion.  Acting on an expedited basis, the Canadian Interests proceeded to take the depositions of Mr. Ray and Mr. Katzenstein on September 15 and 18, 2014, respectively.  The transcripts of

the depositions of Mr. Ray and Mr. Katzenstein are annexed to the Guyder Declaration as Exhibits A and B, respectively.

7.      On September 8, 2014, the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") filed a statement in support of the Motion (the "**Committee Statement**") [Dkt. No. 14189].

8.      On September 22, 2014, pursuant to the Discovery Order, the Canadian Interests served their limited follow-up discovery requests on the Debtors and counsel to the Bondholder Group.  The Canadian Interests' requests to the Debtors included requests for the materials that Mr. Ray reviewed and relied upon in performing a supposed assessment of whether the Proposed Agreement was in the best interests of the NNI estate.   In addition, the Canadian Interests requested, from both the Debtors and the Bondholder Group, production of the financial information that was exchanged or discussed between the Debtors and the Bondholder Group in the course of the negotiation of the Proposed Agreement.

9.      On September 29, 2014, the Debtors and the Bondholder Group responded to the Canadian Interests' discovery requests.   The Bondholder Group produced a single page of heavily-redacted notes from a meeting with the Debtors.   Despite the requests to the Debtors seeking the bases for Mr. Ray's assumptions in relation to the settlement, the Debtors produced nothing more than a series of transcripts from proceedings in these cases and legal documents filed with the Courts.   Tellingly, not one piece of information was produced by either the Debtors or the Bondholder Group indicating that any serious negotiations took place.[5]

---

[5]      The Debtors informed the Canadian Interests that they have produced all non-privileged responsive documents.  The Canadian Interests reserve the right to further supplement this supplemental objection based on any further discovery produced in respect of the Motion.

## ARGUMENT

I. **THE DEBTORS CANNOT ABROGATE NNL'S RIGHTS UNDER SECTION 1129 UNDER THE GUISE OF A SETTLEMENT AGREEMENT**

10.     The Proposed Agreement purports to resolve the US PPI Dispute between the Canadian Interests and the Bondholders, even though the Canadian Interests were never consulted during the supposed settlement negotiations, and do not consent to the payment of any post-petition interest to the Bondholders from NNI above the federal judgment rate. Because the Canadian Interests are not a party to the Proposed Agreement, the agreement reached by NNI and the Bondholders is not a true settlement and cannot be approved by this Court.

11.     The Proposed Agreement does not concern the settlement of a disputed claim by or against NNI, which would be suitable for determination under Bankruptcy Rule 9019. Section 502(b)(2) of the Bankruptcy Code unambiguously provides that an unsecured creditor's allowed claim *cannot* include post-petition interest. The Bondholders' purported entitlement to post-petition interest is not a "claim," and NNI and the Bondholders are not "compromising" that claim. Rather, the Debtors and the Bondholders are seeking through a settlement to determine the amount of post-petition interest that the Bondholders are legally entitled to receive under section 1129 of the Bankruptcy Code, and as a result, the amount of residual value NNL is entitled to receive from NNI under section 1129(a)(7). Indeed, the Debtors cite almost exclusively to plan confirmation provisions of the Bankruptcy Code as the statutory predicates for the relief sought in the Motion, stating that "the relief requested in this Motion is authorized by sections 105(a), 502, 726(a)(5), 1124, 1129(a)(7), and 1129(b) of the Bankruptcy Code and Bankruptcy Rule 9019." Motion ¶ 23. The Debtors offer only their bare citation to these standards. The Motion lacks any meaningful discussion of their application to the relief requested in the Motion.

12.     Section 1129(a) of the Bankruptcy Code provides that "[t]he court shall confirm a plan *only* if all of the [requirements listed in section 1129(a)] are met." 11 U.S.C. § 1129(a) (emphasis added).  Section 1129(a)(7) of the Bankruptcy Code requires that each holder of a claim or equity interest in a non-accepting class of claims or interests receive or retain "value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of this title on such date."  11 U.S.C. § 1129(a)(7).  This is one of the most fundamental prerequisites to confirmation of any proposed chapter 11 plan.  As has been fully briefed by the Canadian Interests and other parties in the underlying US PPI Dispute, section 1129(a)(7) requires that NNL, as the sole equity holder of NNI, receive all amounts that remain in the NNI estate after payment in full of the allowed claims of unsecured creditors, *plus* post-petition interest at the federal judgment rate  [Dkt. Nos. 14021, 14022, 14023, 14027, 14052, 14054, 14055,14061].  Absent NNL's consent, any plan of reorganization that would provide otherwise is unconfirmable as a matter of law, and no agreement between the Bondholders and NNI can change that result.

13.     The court's duty to determine that the requirements of section 1129 are satisfied in a given case cannot be usurped by an agreement of parties.  *In re Genesis Health Ventures, Inc.,* 266 B.R. 591, 599 (Bankr. D. Del. 2001) ("The Code imposes an independent duty upon the court to determine whether a plan satisfies each element of § 1129, regardless of the absence of valid objections to confirmation.").  Indeed, the proponents of a plan bear the burden of proving that those standards are met.  *See, e.g., In re Wash. Mut., Inc.*, 442 B.R. 314, 328 (Bankr. D. Del. 2011) ("[T]he Plan Supporters bear the burden of proving that the Plan complies with all of the requirements of the Bankruptcy Code for confirmation.").

14.     The Proposed Agreement attempts to hard-wire that issue now and shield it from this Court's scrutiny as part of the plan confirmation process.  If approved, it would fix

10

distributions for the payment of post-petition interest under a future plan regardless of whether or not the Canadian Interests consent.  This is a wholly inappropriate use of the bankruptcy settlement process.  *See In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted.").

15.     Further, this blatant attempt to circumvent applicable confirmation standards is all the more egregious because, in this liquidating chapter 11 case where substantially all of the Debtors' assets have been reduced to cash, the main purpose of a plan of reorganization would be to determine how that cash should be distributed.  Thus, the Proposed Agreement not only predetermines a plan issue, it predetermines the principal plan issue, and, if approved, the primary effect of the Proposed Agreement would be to prevent the Court from making the required determination on the merits regarding the clear limitations on post-petition interest imposed by section 1129 of the Bankruptcy Code.  *See In re Braniff Airways, Inc.,* 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with the sale of assets."); *In re Louise's, Inc.*, 211 B.R. 798, 802 (D. Del. 1997) (declining to approve settlement that "pre-determined" the terms of a plan, "thereby circumventing a meaningful consideration of the requirements of Chapter 11 regarding confirmation of a reorganization plan").

16.     These limitations, as well as issues of post-petition interest under the Bankruptcy Code more generally, have already been the subject of extensive briefing in the context of the US PPI Dispute.  For the purposes of the Motion, the Proposed Agreement must be considered within the rubric of the payment of post-petition interest under a plan.  The Court is respectfully

referred to the initial and reply briefs of the Monitor and the other relevant parties in the US PPI Dispute for a more detailed discussion thereof.[6]

## II.    THE PROPOSED SETTLEMENT WAS AGREED TO BY A COMPLIANT DEBTOR THAT WAS LARGELY DIVORCED FROM THE US PPI DISPUTE AND UNINFORMED AS TO BOTH THE LAW AND FACTS

17.    The Proposed Agreement between NNI and the Bondholders cannot be said to be a *bona fide* settlement based on the available evidence and should not be treated as such by this Court.  The Canadian Interests (*i.e.*, one entire side of the US PPI Dispute) were pointedly excluded from the "vigorous" negotiations touted by the Debtors, which took place over just a few days in July solely between the Debtors and the Bondholder Group.  Motion ¶¶ 1, 21, 31.  The Debtors never took a formal position on the merits of the US PPI Dispute, which prior to such negotiations had progressed largely as a bilateral dispute between the Bondholders and the Canadian Interests.  Their absence from the dispute might explain the Debtors' lack of any meaningful analysis of either the law or facts relevant to a settlement of the US PPI Dispute before Mr. Ray entered into the Proposed Agreement on behalf of NNI and its creditors and interest holders and without making any presentation to or consulting with NNI's board of directors.

18.    From the deposition testimony, it is clear that Mr. Ray did not undertake, or even seek, any analysis of the practical effects of the settlement on the NNI estate, NNI's non-settling unsecured creditors, or NNI's residual interest holders.  Mr. Ray testified:

> There was discussions about, you know, whether or not parties might be successful in arguing for a lesser amount that people were then entitled to. And while I didn't necessarily have the view that the court would -- in the US would find an amount less than the full entitlement, certainly, there were opposing positions taken and, you know, I guess I considered that --

---

[6] *See supra* note  4.

> that you had to give some weight of authority to those positions, so that,
> you know, the outcome, ultimately, was not something that was really
> possible to be determined absent, you know, ultimately a court ruling and
> presumably appeals that might follow.

Ray Dep. Transcript, 39:5-19, September 15, 2014.  Mr. Ray did not receive any advice from

counsel as to whether the Bondholders were likely to recover more through litigation than the

over-$1 billion settlement amount determined by Mr. Ray alone to be reasonable:

> Q.    *Did you receive, without revealing the substance of any legal*
> *advice, did you receive any legal advice about whether the bonds would*
> *actually recover through litigation more than $1.01 billion?*
>
> A.    No.

Ray Dep. Transcript, 115:13-18, September 15, 2014.  Indeed, from the above testimony, it is

clear that Mr. Ray simply agreed with the Bondholders' legal position, making the settlement

negotiations one-sided at best.

> 19.    Equally alarming, the Debtors undertook no financial modeling with the

assistance of the Debtors' court-approved financial advisors or otherwise to determine the effects

of the proposed settlement on the NNI estate, the outcomes for creditors (other than the

Bondholders), or its impact on equity interest holders:

> Q.    *Did you at any point in time, do an analysis as to whether the*
> *proposed settlement that's reflected in Ray Exhibit 1 [the Proposed*
> *Agreement] would benefit any of the other creditors with whom you didn't*
> *communicate?*
>
> A.    Yes.  I mean, I did -- there is an analysis I went through, which is I
> thought it was beneficial for the creditor group at large to have the
> bondholder claim, you know, fully and finally determined, both as to the
> principal amount and also as to the PPI portion.  I thought it would benefit
> the estate to have, you know, certainty as to those amounts.  And so to that
> extent, I believed it was beneficial.   And I also believe that it was
> beneficial to, you know, avoid any further disputes about the amount of
> the PPI.
>
> Q.    *Did you do any financial modeling to determine whether the*
> *proposed settlement was beneficial to the creditor group as a whole?*

A.      I didn't need any financial modeling to determine that it would be beneficial to have an allowed claim.  That's one of the jobs of an officer of a bankrupt Chapter 11 entity, is to -- to administer claims, and to get a final determination of the claim amount, and I believe that not doing so was detrimental and doing so was beneficial.

*Q.      And when you said you didn't need any financial modeling, is it fair to say that you didn't, in fact, have any financial modeling done?*

A.  Because I didn't need any, right.

Ray Dep. Transcript, 70:16-72:10, September 15, 2014.  Mr. Ray did not actually model the impact of the Proposed Agreement, or obtain advice from the Debtors' financial advisors, or even keep a written record of his analysis.  Instead, Mr. Ray relied solely on his own "financially orientated" thinking:

*Q.      To your knowledge, was any financial modeling done to determine whether the proposed settlement was beneficial to the equity?*

A.      I did some, my own thinking about it.  I believe that there was potential outcomes of the ultimate resolution of the estates under which there would be cash available in the US, and depending on the cash availability, there would be amounts available to pay post-petition interest to all creditors of the US estate, not just the bonds and then -- and that the range of outcomes were numerous, but there's possibilities that PPI would not only be available, but would be available in a significant amount such that, in those scenarios where cash was available to PPI, I believed it was beneficial to entertain, you know, the concept of capping the amount such that if additional proceeds were available, that they would -- you know, in effect, you know, be available to flow to equity.

*Q.      And you say you did your own thinking.  Did you do any financial modeling of those potential outcomes?*

A.      That would be the thinking I was doing, was financially orientated, yes.

*Q.      When you say it was financially orientated, did you ask Chilmark to run any kind of financial models as to the range of potential outcomes in available cash?*

>   A.      No, we didn't do any of the type of modeling that you're
>   suggesting, partly because the range of potential, you know, outcomes
>   really depends on numerous factors . . . .

Ray Dep. Transcript, 72:17-74:4, September 15, 2014.

>   *Q.      And beyond the thinking that you did, your financial analysts
>   haven't done any modeling of the maximum amount of surplus available
>   for NNI to distribute, to your knowledge?*
>
>   A.      No.

Ray Dep. Transcript, 76:6-11, September 15, 2014.

>   *Q.      Okay. Can you tell me what that scenario would be in which an
>   excess of that cap would be available?*
>
>   A.      I don't -- I mean, I don't have the calculations here, but I can tell
>   you the inputs, some of the inputs I was considering.  I might not recall all
>   of them.
>
>   *Q.      Did you actually put this pen to paper or computer?*
>
>   A.      No.  Actually, I believe I did all of this mathematically at the time
>   based on, you know, whatever documents were in front of me.  *So I don't
>   have any independent recording of the calculation.*

Ray Dep. Transcript, 96:25-97:14, September 15, 2014 (emphasis added).

>   20.     The Debtors' apparent failure to perform basic diligence and analysis with the
>
>   benefit of input from their capable financial advisors, coupled with their deference to Mr. Ray's
>
>   "financially orientated" thinking as the sole basis on which to enter into the Proposed
>
>   Agreement, stands in stark contrast to the Bondholder Group.  From the testimony of Mr.
>
>   Katzenstein of FTI, it is clear that the Bondholder Group actually utilized and were well-served
>
>   by their counsel and financial advisors.  The Bondholder Group was thoroughly conversant with
>
>   the legal issues involved in the US PPI Dispute, given their involvement in litigating the issue
>
>   and their stake in the outcome of such litigation.  Moreover, its financial advisors continually

modeled expected distributions and were fully aware of the effects of any settlement on such

potential distributions.

> Q.      *If the bonds won the motion and got an award of contract rate PPI, when was the first time that FTI prepared a financial analysis of that potential recovery?*
>
> Counsel to the Witness:  Object to the form, assumes facts not in evidence.
>
> A.      I mean, I don't know, but *we have been modeling potential outcomes for years*.

Katzenstein Dep. Transcript, 51:11-18, September 18, 2014, (emphasis added).

> Q.      *Okay. Prior to June of 2014 --*
>
> A.      Yes.
>
> Q.      *-- had you done any modeling of what potential recoveries the bonds could make on the PPI issue?*
>
> Counsel to the Witness:  That's a yes or no.
>
> A.      Yes.

Katzenstein Dep. Transcript, 88:24-89:6, September 18, 2014.[7]

21.     In contrast, the Debtors' approach was misguided.  Without having either the

legal or factual knowledge necessary to consider the range of potential settlements, the Debtors

through Mr. Ray adopted a simplistic view that any cap on the amount of post-petition interest

payable to the Bondholders based on their contract rates must be good for the NNI estate.  Mr.

Ray appears to have independently come to the conclusion that capping the Bondholders at 60%

of their claimed entitlement to post-petition interest at the contract rate was a good result (an

---

[7]      The Bondholder Group has asserted privilege over the contents and outputs of the models constructed by FTI in order to model potential recoveries of post-petition interest in these cases.

amount that was a mere 10% less than the 70% cap apparently put forward by the Bondholder

Group as its initial offer at the July 15 settlement meeting). As Mr. Ray testified:

> Ultimately, you know, we thought that a number that was around 60
> percent, we thought, you know, was a fair settlement of it. You know, we
> thought 70 was too high.

Ray Dep. Transcript, 51:20-23, September 15, 2014. Mr. Ray's rationale for coming to this

conclusion is unclear. As he testified, beyond the "analysis" conducted in his head, no

meaningful analysis of his settlement position was undertaken. The only reasonable conclusion

based on the evidence in the record is that Mr. Ray considered a 60% cap (based on contract rate

of interest) acceptable because it was 40% less than the claimed entitlement and avoiding further

litigation would be beneficial. There is no evidence that Mr. Ray gave serious consideration to

the real economic value to the NNI estate of a 40% reduction of the nominal entitlement payable

to the Bondholders (which is zero).[8]

22.     Given the Debtors' simplistic view, there is unsurprisingly little evidence of

meaningful negotiations. Tellingly, the Debtors did not start negotiations based on the federal

judgment rate, because Mr. Ray agreed with the Bondholder Group's baseline legal position:

> I think the contracts provided for interest. I believe that the -- in Chapter
> 11, if a debtor was solvent, that post-petition interest was payable. So
> there was not much of a debate in my mind around that view. I had taken

---

[8]     The decision to settle was apparently made by Mr. Ray alone without approval by the NNI board of directors, as the decision to agree to hand over approximately $1 billion of estate funds to the Bondholders was never presented to the Debtors' board of directors for their approval:

> *Q.     Did the board of directors of NNI consider that settlement?*
>
> A.     No.
> . . .
> *Q.     Can you tell me why the board of directors of NNI didn't consider the proposed settlement?*
>
> A.     I believe I was authorized to make those decisions on behalf of the estate.

Ray Dep. Transcript, 107:11-108:8, September 15, 2014.

a view that that was the correct point of view from a Chapter 11 perspective. There was discussions about, you know, whether or not parties might be successful in arguing for a lesser amount that people were then entitled to. *And while I didn't necessarily have the view that the court would -- in the US would find an amount less than the full entitlement*, certainly, there were opposing positions taken and, you know, I guess I considered that -- that you had to give some weight of authority to those positions . . . .

Ray Dep. Transcript, 38:22-39:14, September 15, 2014 (emphasis added).

23.    Given their agreement on the legal issues, negotiations between Mr. Ray and the Bondholder Group went quickly. Their first substantive discussions took place on the afternoon of July 15, 2014 at the New York office of Debtors' counsel Cleary Gottlieb Steen & Hamilton LLP. Katzenstein Dep. Transcript, 22-26, September 18, 2014; Ray Dep. Transcript, 21-33, September 15, 2014. That meeting began with the Bondholder Group submitting a proposal to settle the post-petition interest entitlements of the Bondholders for 70% of their claimed contractual entitlement. Ray Dep. Transcript, 34:18, September 15, 2014. The Debtors responded with a counter-proposal of 30% of the claimed entitlement. Ray Dep. Transcript, 35, September 15, 2014.

24.    Following the July 15 meeting, the Debtors and the Bondholder Group next spoke on July 17, when the Bondholder Group submitted to the Debtors a draft of the Proposed Agreement reflecting a settlement at approximately 60% of the total post-petition interest accrual. Katzenstein Dep. Transcript, 55:8-56:16, September 18, 2014. By the end of that day, after one or two brief telephone calls and without exchanging any financial information or calculations, the Debtors and the Bondholder Group had reached agreement on a settlement at 55% of the total post-petition interest accrual. Katzenstein Dep. Transcript, 51-61, September 18, 2014. On July 18, 2014, the Bondholder Group submitted a revised draft of the Proposed Agreement that reflected such agreement for NNI to pay 55% of the contractual post-petition

interest amount.  Ray Deposition Exhibit 4; Exhibit D to Guyder Declaration.  On July 24, 2014, the Bondholders and the Indenture Trustee executed the final form of the Proposed Agreement. Ray Deposition Exhibit 1; Exhibit C to the Guyder Declaration.

25.     To put these hurried negotiations in perspective, based upon the June 30, 2015 cutoff date in the Proposed Agreement, the amount of post-petition interest that would be payable to the Bondholders under the applicable federal judgment rate would be approximately $114 million.  The starting point for Mr. Ray's negotiations, 30% of contract rate or roughly $497 million, was more than four times that amount.  By the end of the first day of discussions the proposed settlement, 50% of contract rate or roughly $828 million, had already grown to more than seven times that amount.  Three days later, Mr. Ray had settled on a number of $1.01 billion, or nearly nine times the amount that the Bondholders would be entitled to if this Court determined that the federal judgment rate represents the maximum rate of post-petition interest they are entitled to.  In effect, Mr. Ray agreed to give away nearly $900 million of estate funds. The final agreement also provides the Bondholders with a "deemed" claim for post-petition interest to wield against other unsecured creditors in the ensuing litigations over the allocation of any available surplus for payment of post-petition interest.[9]  It strains credulity to suggest that the risks and potential costs and delay of litigating the US PPI Dispute are greater than the nearly $900 million of value given to the Bondholders by the Debtors along with their extraordinary "deemed" claim for contract rate of interest.

---

[9]          As discussed further below, the Proposed Agreement in effect is two "agreements".  In the first, where there are sufficient funds for NNI to pay the PPI Settlement Amount, plus post-petition interest in full to all other unsecured creditors, NNI has agreed to pay $1.01 billion on account of post-petition interest to the Bondholders.  In the second, where there are insufficient funds for NNI to pay the PPI Settlement Amount and post-petition interest in full to all other unsecured creditors, NNI has granted the Bondholders a "deemed claim" for post-petition interest at the full contract rate, while deferring to another day the rate applicable for all other unsecured creditors as well as allocation among creditors.  The Debtors provide no rationale for this in the Motion.  That NNI would enter into these agreements without knowing the likelihood of the second option occurring, or include in the Motion any information, much less sufficient information, to allow the Court to determine such likelihood is astounding.  The absence of such critical information alone is a sufficient basis to deny the Motion.

26.     Mr. Ray's apparent belief that the contract rate of interest is the appropriate rate of interest payable in a liquidating chapter 11 case perhaps explains Mr. Ray's ill-considered assessment of the US PPI Dispute, his framing of a settlement proposal without obtaining relevant financial and legal inputs from the Debtors' advisors, and his apparent failure to meaningfully negotiate with the Bondholder Group before accepting the final settlement amount. No deference should be paid to the Debtors' business judgment under these circumstances. Hundreds of millions of dollars of potential value in the NNI estate was surrendered to the Bondholders in a matter of days without the participation of the party whose interests are most clearly impacted by that transfer of value and without meaningful consideration of the legal stakes and outcomes.

## III.    THE PROPOSED AGREEMENT OFFERS NO MEANINGFUL COMPROMISE OF THE US PPI DISPUTE FOR THE BENEFIT OF THE ESTATES

27.     Had Mr. Ray and the Debtors actually modeled the projected recoveries in these cases, they would have recognized that the Bondholders have given up nothing in connection with the settlement, and that the Bondholders' supposed concession of their entitlement from $1.657 billion to $1.01 billion is illusory[10] and a far cry from a "middle of the field" compromise as has been suggested by the Creditors' Committee.  Committee Statement at 4.  There is no likely scenario where the NNI estate would have enough surplus funds to pay the full $1.01 billion PPI Settlement Amount, much less the $1.657 billion to which the Bondholders claim they are entitled.  So the supposed $650 million concession by the Bondholders is no concession

---

[10]     The US PPI Dispute involves one of the single largest disputes to arise in these cases.  The Canadian Interests' opposition to the Motion is fully consistent with the Monitor's prior statements regarding the significance of the PPI Dispute and the size of the Bondholders' claimed entitlement to payment of post-petition interest.  Presented as a settlement under Bankruptcy Rule 9019, the Motion raises numerous factual considerations, not the least of which is the assessment of the real economic value of such settlement to the NNI estate.  As discussed below, the Wertheim Report demonstrates that the settlement provides no meaningful value to the NNI estate in all possible scenarios where the NNI estate has any surplus available to make distributions on account of post-petition interest on allowed unsecured claims.

at all and has zero value to the NNI estate.  Wertheim Report at 19.  Indeed, under the Proposed

Agreement, if the NNI estate has insufficient funds to pay the full PPI Settlement Amount, *plus*

all post-petition interest payable to other unsecured creditors, the Bondholders alternatively

receive a "deemed" claim for post-petition interest determined at their full contract rates of

interest for any subsequent allocation of post-petition interest among unsecured creditors.  Given

the virtual certainty that NNI will not have sufficient funds to pay the full PPI Settlement

Amount, the Proposed Agreement is in effect simply an agreement by the Debtors to provide the

Bondholders with a deemed claim for post-petition interest at their full contract rates of interest.

28.    As set forth in the Wertheim Report, in the "best case" scenario, the *maximum*

amount of net assets that could be available to NNI for the payment of post-petition interest to all

unsecured creditors that may be entitled to such interest is approximately $971 million.

Wertheim Report at 5.  As of November 4, 2014, the hearing date for the Motion, the post-

petition interest entitlement of the Bondholders pursuant to the terms of the Proposed Agreement

would already reach approximately $922.6 million, and $1.01 billion as of the June 30, 2015

payment deadline,[11] an amount that would entirely deplete the expected surplus of the NNI estate

---

[11]    The headline settlement amount touted by the Debtors in support of approval of the Proposed Agreement is $876 million.  However, in reality the post-petition interest cap is greater than that baseline number by operation of section 2.2 of the Proposed Agreement, which provides in full:

> The "PPI Settlement Amount" shall be an amount equal to (a) $876 million *plus* (b) an additional amount, equal to 3.50% per annum times the then outstanding principal balance of the Guaranteed Bonds, up to a maximum amount of $134 million, which additional amount shall accrue on the unpaid and outstanding principal balance of the Guaranteed Bonds that remains unpaid and outstanding during the time of accrual for the period from July 1, 2014 until the earlier of (x) June 30, 2015 or (y) the date of the final distribution in respect of the Guaranteed Bonds.  For the avoidance of doubt, absent any distribution, the cap of $1.01 billion will be reached on June 30, 2015.

Additional post-petition interest began accruing under section 2.2 of the Proposed Agreement from the date of its execution on July 24, 2014.  On November 4, 2014, the currently scheduled date of the hearing to consider the Motion, the PPI Settlement Amount set out in section 2.2 will have already increased from $876 million to $922,581,164.38.  Given the past history of these cases, it is highly unlikely that distributions will be made to the Bondholders, either on their allowed claims or on account of entitlement to post-petition interest, until after June 30,

*Footnote continued on next page…*

in even the most extremely favorable scenario.  Further, for the purpose of creating this "best case" scenario, Dr. Wertheim purposefully made a number of assumptions that are designed to be unrealistically optimistic so as to maximize the amount of surplus available to NNI after payment of all allowed claims.  Wertheim Report at 4-6.  If any one of those assumptions is incorrect, NNI's surplus would be further reduced, in some cases drastically so.  Four of Dr. Wertheim's assumptions are of particular importance.

29.    First, Dr. Wertheim's "best case" includes the assumption that the Debtors will receive 100% of the $5.302B that they have argued in the allocation litigation is their lawful entitlement to the Nortel asset sale proceeds.  While the allocation litigation remains pending, other parties in that litigation have presented strong arguments that the Debtors are entitled to far less than their claimed allocation.

30.    Second, Dr. Wertheim has assumed in his "best case" that the Canadian Debtors will be the first to make payments on account of the outstanding principal amount of the Crossover Bonds.  As described by Dr. Wertheim, if that assumption is wrong and NNI is the first to make distributions on account of the outstanding principal amount of the Crossover Bonds the surplus available for distribution after payment of all allowed claims in the U.S. would be reduced by $286.3 million from a "best case" $971 million to $684.7 million.  Wertheim Report at 5, 7, 17-18.  The issue of which estate will pay first has not been resolved.

31.    Third, Dr. Wertheim has assumed in his "best case" that NNI's post-petition U.S. tax liability will be no more than $133.3 million.  Wertheim Report at 12, 15-16.  As discussed by Dr. Wertheim, this assumption may substantially undervalue the amount of the additional

---

2015, at which time the PPI Settlement Amount will have ballooned to the full $1.01 billion.  For all intents and purposes the Debtors have therefore settled the US PPI Dispute with respect to the Bondholders for $1.01 billion, not the advertised $876 million.

U.S. tax liability facing NNI based on representations made by NNI's counsel to this Court and the Canadian Court at the allocation trial, which estimated the scope of the liability as anywhere between $400 million and $1 billion. Wertheim Report at 15. Any increase in the amount of the tax liability from the "best case" $133.3 million would result in a dollar-for-dollar reduction of the surplus.

32.     Fourth, Dr. Wertheim has assumed in his "best case" that the claims of the Pension Benefit Guaranty Corporation (the "**PBGC**") will be allowed at $593 million. Wertheim Report at 11. This amount does not account for an additional $115 million claimed by the PBGC in amended claims filed on July 7, 2014, on account of underfunded benefit liabilities and pension insurance premiums, nor does it account for two unliquidated claims asserted by the PBGC against the Debtors on account of minimum funding contributions and shortfall and waiver of amortization charges. Wertheim Report at 16.

33.     Even assuming the assumptions Dr. Wertheim has built into his "best case" scenario for NNI are true, Dr. Wertheim demonstrates that: (i) NNI is exceedingly unlikely to have enough surplus to satisfy the PPI Settlement Amount, and the as-yet-undetermined post-petition interest entitlements of all other unsecured creditors, and (ii) even if payable, the PPI Settlement Amount would absorb substantially all excess value in the NNI estate. Notwithstanding the supposed concessions of the Bondholders, the Proposed Agreement does not effect a true compromise because, even in the best case scenario, it is designed to provide the maximum possible return to the Bondholders.

34.     While the Debtors and their respective professionals claim that the Proposed Agreement is a full and final settlement of post-petition interest issues with respect to the Guaranteed Bonds, it does so only in the unrealistic circumstance where NNI has sufficient

surplus after the payment of allowed administrative, priority, secured, and general unsecured claims to pay post-petition interest to all unsecured creditors in full:

> Subject to Section 4.2, in the event that NNI at any time has more than sufficient funds to pay all of its allowed administrative, priority, secured and general unsecured claims in full, holders of Guaranteed Bonds shall be entitled to payment from NNI of PPI in the PPI Settlement Amount and shall be paid PPI from such funds available for such distributions (together with any other creditors of NNI entitled to payments of PPI) in accordance with a confirmed chapter 11 plan until the PPI Settlement Amount is paid in full.

Proposed Agreement § 2.1. Under section 2.1, the PPI Settlement Amount is payable by NNI where the NNI estate has sufficient surplus to pay the full PPI Settlement Amount, *plus* the *as-yet-undetermined* post-petition interest entitlements of all other unsecured creditors. Section 2.1 however must be read in conjunction with Section 4.2, which while titled "Reservation of Rights", has a more substantive effect on NNI's creditors and estate. Section 4.2 provides that where NNI does not have such surplus, the Proposed Agreement defers allocation of post-petition interest for later determination and further provides in that context that the Bondholders will receive a *"deemed" claim for post-petition interest accrued at the full contract rates* under the applicable indentures for each of the Guaranteed Bonds:

> Nothing in this . . . Agreement shall constitute a settlement, release, waiver or discharge (in whole or in part) of the ability of any unsecured creditor of the US Debtors' estates (other than the Bondholders) to assert a claim for PPI against the US Debtors' estates at the contract rate (if any) applicable to such creditor's claims or any alternative theories; *provided, however, that if there are insufficient funds available to pay PPI to all unsecured creditors of the US Debtors' estates entitled to such amounts (including the Bondholders), then, solely for purposes of determining any allocation of available PPI among such creditors, the holders of the Guaranteed Bonds shall be deemed to have a claim for PPI equal to the amount of post-petition interest that would have accrued at the applicable contract rate of PPI set forth in the applicable Indentures for each of the Guaranteed Bonds.* Further, this . . . Agreement does not settle the manner in which any funds available for distribution shall be allocated among the creditors of the applicable US Debtors in the event that less than the full amount of PPI can be paid to all creditors owed such amounts and such application shall be determined by later agreement of the parties whether

24

as part of the chapter 11 plan(s) of the US Debtors in the chapter 11 cases
or by subsequent agreement among the relevant affected creditors.

Proposed Agreement § 4.2 (emphasis added).    Thus, the PPI Settlement Amount—the headline amount that caps post-petition interest on account of the Guaranteed Bonds—is only truly relevant where NNI has sufficient funds to pay all unsecured creditors full post-petition interest. As the Wertheim Report shows, this scenario is practically unachievable.

35.    The Proposed Agreement ensures that, in every likely scenario, the Bondholders will effectively be paid the highest possible distribution they could ever practically expect to receive under reasonable projections of the maximum potential surplus at NNI, regardless of whether their entitlement is $1.657 billion, as calculated under the contract rates, or $1.01 billion, as provided under section 2.2 of the Proposed Agreement.    In the almost certain scenario where the PPI Settlement Amount cannot be paid because the surplus at NNI is not sufficient to pay full post-petition interest to all unsecured creditors, the Proposed Agreement grants the Bondholders a "deemed" claim for post-petition interest at the full contract rate as against other creditors and leaves the residual interest holders with nothing.    Where the PPI Settlement Amount does apply, payment of the PPI Settlement Amount will absorb substantially all remaining value in the estates and again leave the residual interest holders with nothing. Accordingly, the only fair conclusion is that the Proposed Agreement is not so much a negotiated resolution on the question of post-petition interest that may be owing to the Bondholders as it is a wholesale capitulation by Mr. Ray and the Debtors.

## IV.    THE SETTLEMENT DOES NOT SATISFY THE STANDARDS FOR APPROVAL OF SETTLEMENTS UNDER BANKRUPTCY RULE 9019

### A.    The Settlement Does Not Satisfy the *Martin* Factors

36.    Even if the Proposed Agreement were a *bona fide* settlement, this Court may still only approve it if it finds "after considering all the factors involved, and only if it is in the best

interests of the estate." *In re Resorts Int'l*, 145 B.R. 412, 451 (Bankr. D.N.J. 1990).  Such

consideration requires evaluating, as a threshold matter, the factors articulated by the Third

Circuit in *In re Martin*:  (1) the probability of success in litigation; (2) the likely difficulties in

collection; (3) the complexity of the litigation involved, and the expense, inconvenience and

delay necessarily attending it; and (4) the paramount interest of the creditors.  *Myers v. Martin*

*(In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also In re Exide Techs.*, 303 B.R. 48, 67

(Bankr. D. Del. 2003).  In cases where there is a likelihood of recovery for equity, a "Court can

and should consider the interest of equity holders in applying the fourth *Martin* factor."  *In re*

*RNI Wind Down Corp.*, 348 B.R. 286, 298 (Bankr. D. Del. 2006).  The Proposed Agreement

satisfies none of the *Martin* factors.[12]

> i.    The Probability of Success in Litigation Is Decidedly in Favor of the Canadian
>       Interests

37.     The first *Martin* factor requires this Court to evaluate the probabilities of success

in litigation.  Mr. Ray and the Debtors have made no effort to appraise the relative probabilities

of success in litigation, noting only the obvious—that the extensive briefing revealed the

opposing positions taken by the parties.  Ray Dep. Transcript, 39:5-19, September 15, 2014;

Motion ¶¶ 20, 29.  While the *Martin* test does not require a court to actually decide the issues on

the merits, it still requires, at a minimum, that the Debtors show—and that the Court make a

reasoned judgment—as to the probabilities of the possible litigation outcomes.  *See, e.g.*,

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 434

("Litigation and delay are always the alternative to settlement, and whether that alternative is

worth pursuing necessarily depends upon a reasoned judgment as to the probable outcome of

---

[12]     The Debtors do not specifically suggest that there is any serious risk of collection element in the
circumstances of these cases; however, the Canadian Interests reserve all rights and arguments specifically with
respect to the second *Martin* factor, including the right to supplement this supplemental objection as needed should
such circumstances change.

litigation."); *In re W.R. Grace & Co.*, 475 B.R. 34, 78 (D. Del. 2012) ("Under the first factor, the Court is required to consider the likelihood of successful litigation if Grace and CNA continued to litigate their disputes outside the framework of the Settlement Agreement."); *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 514 (Bankr. D. Del. 2010) (noting that a bankruptcy court must "'apprise[] itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated'" and examining the merits of the dispute) (quoting *In re Penn Cent. Transp. Co.*, 596 F.2d 1127, 1146 (3d Cir. 1979)).

38.    The Debtors do not even attempt to meet this burden or otherwise weigh the relative merits of the arguments that have been raised and extensively briefed in the context of the US PPI Dispute. The Motion is devoid of any real consideration of the US PPI Dispute or the practical effect the potential outcomes of such dispute could have on the NNI estate. To the extent the settlement reflects any consideration of the merits of the US PPI Dispute by the Debtors, it assigns no weight to the Canadian Interests' position. Rather, the Proposed Agreement reflects the views and legal position of the Bondholders as adopted by Mr. Ray on behalf of the Debtors.

39.    Nonetheless, the Court must consider the relative merits of the parties' positions under applicable law to determine whether the settlement reflects the relative probabilities of success in further litigation. The Motion and the record from the court-ordered discovery provide no factual evidence that supports such a determination. The Court need only weigh the merits of the legal arguments based on the extensive briefing that the parties submitted in the US PPI Dispute. For the reasons stated in the briefs submitted by the Monitor and other parties, given the applicable requirements of the Bankruptcy Code and well-established law in this District, post-petition interest on the Guaranteed Bonds, if payable, must be limited to interest accrued at the applicable federal judgment rate as of the January 14, 2009 petition date.

40.     The Proposed Agreement does not reflect a consideration of the range of potential outcomes at all, but rather amounts to a complete victory by the Bondholders, who will receive either (i) "deemed" claims to post-petition interest at their full contract rates in the ensuing disputes that are sure to follow with the Debtors' other creditors, or (ii) through the payment of the PPI Settlement Amount, substantially all surplus value in the NNI estate.  In either case, the Bondholders receive exactly what they would if they had won the US PPI Dispute on the merits. In light of the legal arguments in respect of the US PPI Dispute, as set forth in the briefs of Canadian Interests and other parties, regarding the requirement that any post-petition interest paid by NNI must be determined using the relevant federal judgment rate rather than the contract rate, the Proposed Agreement simply does not reflect the probability of success on the merits. *See In re RNI Wind Down Corp.*, 348 B.R. 286, 298 (Bankr. D. Del. 2006) (approving settlement to return a portion of attorneys fees because the amount "fairly and accurately reflect[ed] the possibility" of the debtor's potential recoveries in litigation).

ii.     <u>The US PPI Dispute Is Not Complex, Has Been Fully Briefed, and Should Be Decided On Its Merits By This Court</u>

41.     The third *Martin* factor requires this Court to examine the complexity of the dispute and the attendant expense, inconvenience, and delay to determine whether a settlement avoids the need for the parties to incur additional time and expense.  *See*, *e.g.*, *In re Spansion, Inc.,* Case No. 09-10690 (KJC), 2009 Bankr. LEXIS 1283, at *26 (Bankr. D. Del. June 2, 2009) ("There is insufficient information upon which to make a reasoned decision as to the likelihood of success of the Actions. This likewise makes it difficult to conclude that the settlement is preferable to the expense, inconvenience and delay of litigation."); *Crawford v. Zambrano (In re Zambrano),* No. 09-20453-JAD, 2014 Bankr. LEXIS 592, at *15-16 (Bankr. W.D. Pa. Feb. 13, 2014) ("The Trustee has not averred any specific estimation of the complexity, expense, or likely duration of such litigation. In light of this fact, coupled with the Court's belief in the likely

28

success of the outstanding litigation, the Court finds that this factor does not support approval of the Trustee's Motion.").

42.    The third *Martin* factor typically weighs in favor of settlement approval if a dispute raises the specter of complex factual questions such that a determination on the merits would require additional discovery and a lengthy trial process.  *See*, *e.g.*, *In re Exide Techs.*, 303 B.R. 48, 70 (Bankr. D. Del. 2003) (expressing concern that litigation would involve a "variety of topics that will require costly and time-consuming discovery in addition to a potentially lengthy trial"); *Kranzdorf v. Green*, 76 B.R. 974, 978 (E.D. Pa. 1987) (noting that "[b]efore the issues could be brought to trial, extensive additional discovery would be required").  It is not enough to merely adopt the unremarkable proposition (as Mr. Ray and the Debtors have) that a compromise avoids burdensome litigation and expense, as "[i]t is axiomatic that settlement will almost always reduce the complexity and inconvenience of litigation."  *Will v. Northwestern Univ. (In re Nutraquest, Inc.),* 434 F.3d 639, 646 (3d Cir. 2006); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson,* 390 U.S. 414, 434 (U.S. 1968).  Rather, the proponents of a settlement must prove, and a court must find, that litigation of the settled dispute will be sufficiently complex and expensive to warrant compromise.

43.    The US PPI Dispute presents a discrete legal issue to resolve, which the parties have already fully briefed.  The only remaining step to resolve that dispute is for this Court to decide whether the Bankruptcy Code requires that in a solvent liquidating case unsecured creditors may receive post-petition interest at the federal judgment rate and no more.  Indeed, the US PPI Dispute raises no material issues of fact that require further discovery or trial, and is a pure legal question that can be decided under a plain-meaning interpretation of the Bankruptcy Code and with reference to recent jurisprudence in this District.  *See Porter Drywall Co. v. Haven, Inc. (In re Haven, Inc.),* No. 04-8058, 2005 Bankr. LEXIS 541, at *13-14 (B.A.P. 6th

29

Cir. Apr. 7, 2005) (noting that because the parties "had filed cross-motions for summary judgment and those motions had been fully briefed, the prosecution of the litigation to its conclusion would involve little or no additional expense, inconvenience and delay") (internal quotations omitted); *Martinson v. Michael (In re Michael)*, 183 B.R. 230, 239 (Bankr. D. Mont. 1995) ("This litigation is near its end, and little complexity remains. The facts are simple and stipulated. The law has been to a large part researched, except for the final briefs. While there may be further delay upon appeal, this Court finds that the third factor weighs against settlement.").

44.    Moreover, the "settlement" does not even resolve this core legal issue.  For all other creditors it leaves it open for later determination.  The Debtors' assertion that the Proposed Agreement will limit appellate delays and costs is equally misplaced.  Motion ¶¶ 2, 30.  Whether the Court renders a decision on the merits of the US PPI Dispute or renders a decision after considering the same issues in the context of the Motion and the Proposed Agreement, the risk of an appeal and further litigation over the same legal issues exists no matter the outcome.[13]  The Proposed Agreement provides no meaningful relief with respect to the efficient administration of these cases or the reduction of the complexity or continuation of litigation.  Approval of the proposed settlement will not achieve finality with respect to the US PPI Dispute because the same legal issues and disputes will continue, albeit among other parties.[14]

---

[13]    Indeed, on September 9, 2014, the Bondholder Group filed a motion in the Canadian Proceedings for leave to appeal the Canadian Court's determination of the post-petition interest issue under Canadian law.  *See* Guyder Declaration Exhibit E.

[14]    The Proposed Agreement expressly reserves for the Bondholders and the Indenture Trustee potential other "Contractual Entitlements" with respect to the Guaranteed Bonds, including the "entitlement to make-whole payments." Proposed Agreement § 2.3. However, none of the Parties have articulated a basis on which any make-whole payments or similar prepayment or redemption amounts would be due under the applicable indentures. None of the optional redemption rights under such indentures have been—or ever will be—exercised, the applicable redemption periods for such rights have all expired by their terms, and the indentures do not otherwise contain make-whole provisions triggered by prepayment or acceleration. As such, there is no basis for a determination to

*Footnote continued on next page…*

45.    Finally, there can be no argument that the expense of litigating the US PPI Dispute can somehow justify the nearly $900 million giveaway to the Bondholders under the Proposed Agreement.  Indeed, Mr. Ray did not even consider the expense of litigating the US PPI Dispute in arriving at the conclusion that settling that dispute would be in the best interests of the estate:

> Q:    *Did you take into account the expense of litigating that dispute?*
>
> Counsel to the Witness:    Just say yes or a no.
>
> A:    No.

Ray Dep. Transcript, 105:9-12, September 15, 2014.  This admission conflicts with the Debtors' numerous statements in the Motion regarding cost savings which appear to have been created out of whole cloth to support an argument that the costs associated with continuing to litigate the US PPI Dispute (costs primarily paid by the Canadian Interests) were so great as to justify the surrender of hundreds of millions of dollars that could potentially, absent the Proposed Agreement, be payable as a dividend to equity.  Motion ¶¶ 27-30.  Based on Mr. Ray's testimony, there is simply no basis in the record to show the potential costs savings and to give any weight to the Debtors' position under this *Martin* factor.

iii.    The Paramount Interests of Creditors and Shareholders Support Denial of the Motion

46.    Finally, the fourth *Martin* factor requires this Court to determine that the settlement is in the best interests of creditors, which requires a determination that the settlement confers a benefit to the estate.  *See, e.g.*, *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995)

---

ever be made that prepayment or redemption premiums would be payable with respect to the Guaranteed Bonds.  Nevertheless, the reservation for Contractual Entitlements reinforces the risk of continued litigation over the merits of such entitlements, notwithstanding the implication that the PPI Settlement Amount is all the more "reasonable" because it also caps such Contractual Entitlements.  Motion ¶ 29.  The Canadian Interests reserve all rights, defenses, and arguments with respect to any allowance and payment of Contractual Entitlements with respect the Guaranteed Bonds and the claims of the Indenture Trustee for reimbursement of fees and expenses.

(finding bankruptcy courts must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal") (internal quotations omitted).  A settlement that by its terms constitutes a complete concession of all value to one creditor to the detriment of the estate cannot be in the best interests of the estate. *See In re Martin*, 91 F.3d at 394 (denying "settlement agreement favoring one creditor but otherwise detrimental to the estate"); *In re Angelos*, No. 10-01507, 2011 WL 917720, at *2 (Bankr. D. Haw. Mar. 15, 2011) (denying approval to a settlement proposed by a chapter 7 trustee that did not offer any benefit to creditors and that was "highly prejudicial" to the debtor). In broad terms, a party whose rights are being "compromised" should in some way benefit from the deal.  *In re GunnAllen Fin., Inc.*, 443 B.R. 908 (Bankr. M.D. Fla. 2011) (denying approval of a bankruptcy settlement that effectively cut off valuable rights of non-settling third parties and that provided no benefit to any party other than individuals accused of causing substantial losses through improper conduct).  The Proposed Agreement effectively assures that the Bondholders will maximize their recovery out of the NNI estate, just as if they had prevailed on the merits in the US PPI Dispute in the first place.  This cannot be called a compromise.

       a.       ***While the Proposed Agreement Maximizes Value for the Bondholders, the Proposed Agreement Is Not in the Best Interests of Other Unsecured Creditors***

      47.     For unsecured creditors other than the Bondholders, the only benefit the Debtors offer is that the Proposed Agreement avoids the time and expense of litigating the post-petition interest issue.  The Debtors' perfunctory recitation of this position provides a wholly insufficient basis to conclude the Proposed Agreement is in the best interests of creditors, particularly given Mr. Ray's testimony that saving time and expense did not factor into his decision to settle.  Ray Dep. Transcript, 105:9-12, September 15, 2014.  Moreover, approval of the Proposed Agreement does not resolve the dispute over post-petition interest which will continue among other parties.

The Proposed Agreement merely defers these disputes.  What the Debtors fail to highlight is that in almost every conceivable distribution scenario, there will be insufficient funds to pay the PPI Settlement Amount plus all other post-petition interest payable to other unsecured creditors.  The Debtors do not explain how in such circumstances unsecured creditors benefit at all from the fact that Bondholders, in the ensuing disputes over the rate and allocation of post-petition interest that are sure to follow if the Motion is granted, are given a "deemed" claim to post-petition interest determined at their full contract rates for the purposes of distribution of NNI's surplus.  In short, the only parties who benefit from the settlement are the Bondholders.

### b.    The Proposed Agreement Is Not in the Best Interests of Equity

48.    The Debtors make absolutely no comment in the Motion with respect to the impact of the PPI Settlement Amount on the interests of NNI's equity, much less a showing that the Proposed Agreement is in equity's interest.  The reason for this is simple—there is *no* benefit to equity here.  As detailed in the Wertheim Report, the Proposed Agreement is structured so that the Bondholders will absorb all excess value and deprive equity of a recovery in every practical scenario.  In his deposition, Mr. Ray, without providing specifics, offered that there are "certain scenarios" in which equity would receive an amount up to $300 million after payment of the PPI Settlement Amount.   Mr. Ray's statements should be taken for what they are, a post-hoc rationale for why the settlement is something other than a giveaway to the Bondholders and a guarantee that the equity in these cases will be out of the money.[15]  Indeed, Mr. Ray testified at his deposition that:

> if there were *any* scenarios, *any* scenarios that were possible under which the PPI could be greater than the cap, I thought it was beneficial for the estate and its creditors, including equity, to get a cap which was under that

---

[15]    Ray Dep. Transcript, 96:17-100:9, September 15, 2014 (discussing calculations of potential scenarios based on certain claim amount estimates).

> amount, such that in those eventualities, there would be, you know, savings by virtue of the settlement.

Ray Dep. Transcript, 101:7-14, September 15, 2014 (emphasis added).  While the Canadian Interests requested the documents upon which Mr. Ray relied for purposes of his calculations, the Debtors provided no responsive documents.[16]  The Debtors have offered no evidence to indicate that the "any scenarios" on which Mr. Ray was basing his decision to enter into the settlement were possible, let alone *likely* in the circumstances of these cases.  The Wertheim Report clearly shows they are not.

**B.      The Proposed Agreement Is Not Fair and Equitable**

49.      Satisfaction of the *Martin* factors alone does not end the inquiry, as the Third Circuit requires the bankruptcy court to also determine whether a settlement is "fair and equitable," with particular emphasis on "the fairness of the settlement to other persons, *i.e.*, the parties who did not settle."  *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 645 (3d Cir. 2006) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 434 (1968)).  Ignoring the effects of a proposed settlement on the rights of third parties "contravenes a basic notion of fairness."  *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir. 1984), *cert. denied*, 469 U.S. 880 (1984); *see also Eddy v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. (In re Med. Asset Mgmt., Inc)*, 249 B.R. 659, 663 (Bankr. W.D. Pa. 2000) ("The fairness to the settling parties of a proposed settlement agreement may not warrant its approval if the rights of others who are not parties to the settlement agreement are unduly prejudiced.").  As discussed above, it is difficult to imagine a result that could be more prejudicial to the Canadian Interests than a settlement where there are

---

[16]      As noted above, despite the Canadian Interests' requests to the Debtors, the Debtors produced a series of transcripts from proceedings in these cases and pleadings filed with the Courts, but not a single page of calculations or documents.

no real concessions with respect to the post-petition interest issue and the Bondholders take all value at the expense of equity.

i.    The Debtors Have Failed to Fulfill Their Duties to Equity

50.    There is no question that "the fiduciary duty of the trustee runs to *shareholders* as well as to creditors." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) (emphasis added); *see also Pepper v. Litton*, 308 U.S. 295, 307 (1939) (explaining that fiduciary duties continue in bankruptcy and are "designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders."); *LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 292 (D. Del. 2000) ("The debtor in a Chapter 11 bankruptcy has a fiduciary duty to act in the best interest of the estate as a whole, including its creditors, equity interest holders and other parties in interest."); *In re Spielfogel*, 211 B.R. 133, 145 (Bankr. E.D.N.Y. 1997) (holding that "it is clear that not only does the Trustee have a fiduciary duty to the Debtor in his capacity as residual claimant with respect to the proposed settlement, but he is disregarding that duty by not considering the Debtors' residuary interest in any settlement.").

51.    The Debtors, as representatives not of a single constituency of stakeholders but as estate fiduciaries, owe a duty to treat *all* parties impartially and fairly.  *See, e.g.*, *Citibank, N.A. v. Andros*, 666 F.2d 1192, 1194 (8th Cir. 1981) (finding the trustee should treat all parties fairly); *Sherr v. Winkler*, 552 F.2d 1367, 1374 (10th Cir. 1977) ("A trustee appointed and serving in a reorganization proceeding is a fiduciary who has an obligation to treat all parties fairly."). Ignoring the effects of a proposed settlement on the rights of third parties "contravenes a basic notion of fairness."  *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984).  As one court in this Circuit has observed, "[e]ven if a settlement is fair and equitable to the parties to the settlement, approval is not appropriate if the rights of others who are not parties to the settlement will be

unduly prejudiced. [The court] must determine that no one has been set apart for unfair treatment." *In re Devon Capital Mgmt.*, 261 B.R. 619, 623 (Bankr. W.D. Pa. 2001). Thus, insofar as the Debtors may ultimately be solvent, in evaluating whether the Proposed Agreement is fair and equitable, the Debtors and the Court are obligated to consider the impact of the proposed settlement on equity holders' residual rights in the estate.

52.     As noted above, there is no evidence, other than post-hoc rationalizations offered by Mr. Ray, that the Debtors considered the impact of the Proposed Agreement on the rights of NNI's sole equity holder. Dr. Wertheim's report clearly demonstrates that the impact of the Proposed Agreement is to completely eliminate any residual value for NNL. Such a "compromise" cannot be fair and equitable.

ii.     The Debtors Have Failed to Demonstrate that the Proposed Agreement Was Negotiated at Arm's Length

53.     Courts also consider whether the negotiations leading to a settlement were conducted at arm's length in their evaluation of a settlement proposal. *See, e.g.*, *In re Texaco, Inc.*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988) (setting out a seven-factor test for considering Bankruptcy Rule 9019 settlements, including the "extent to which the settlement is truly the product of 'arms-length' bargaining, and not of fraud or collusion"); *In re Exide Techs.*, 303 B.R. 48, 67-68 (Bankr. D. Del. 2003) (considering the *Texaco* factors in the context of a plan settlement); *In re Foster Mortg. Corp.*, 68 F.3d 914, 919 (5th Cir. 1995) ("In examining such a compromise, the bankruptcy court must consider . . . the nature of the negotiations [as a] factor[] bearing on the wisdom of the compromise.").

54.     That the Proposed Agreement will result in no residual value to the equity in all likely scenarios already evidences a complete lack of arm's length dealing. The fact that the Canadian Interests were also entirely frozen out of negotiations aimed towards compromising their rights is further proof on this point. *See, e.g.*, *In re Nutritional Sourcing Corp.*, 398 B.R.

816, 837 (Bankr. D. Del. 2008) (determining that a plan settlement was not fair and equitable when creditors whose rights would be directly impacted by the proposed settlement 'were not afforded meaningful participation" in the settlement negotiations); *In re Exide Techs.*, 303 B.R. 48, 71 (Bankr. D. Del. 2003) (concluding that a proposed settlement was not the result of arm's length bargaining where the parties whose rights were compromised by the settlement were not involved in negotiations leading to the settlement); *In re Forty-Eight Insulations, Inc.*, 149 B.R. 860, 865 (Bankr. N.D. Ill. 1991) ("[S]ettlement agreements work efficiently and fairly only when all parties with an interest in the conflict are represented in the settlement."); *In re Foster Mortg. Corp.*, 68 F.3d 914, 919 (5th Cir. 1995) (vacating order approving Chapter 11 settlement in part because of close relationship between debtor and settling party and because objecting parties were not part of settlement discussions); *In re Present Co.*, 141 B.R. 18, 24 (Bankr. W.D.N.Y. 1992) (disapproving settlement where only testimony as to arm's-length bargaining was by insiders, and where objecting party was excluded from negotiations).[17]

55.    For all the reasons already discussed, there is no evidence that the Proposed Agreement was negotiated in good faith. The Proposed Agreement was reached between parties who are not adverse. The negotiations were hurriedly concluded by Debtors who have taken no substantive position on the merits of the US PPI Dispute. The negotiations were led by a

---

[17]    In the context of plan confirmation, the law similarly recognizes that a debtor in possession must consider all parties in interest. *In re Coastal Grp. Inc.*, 13 F.3d 81, 86 (3d Cir. 1994) ("Therefore . . . a debtor-in-possession, must negotiate and cooperate with the creditors who will vote to accept or reject the plan. The legislative history of § 1106(a)(5) reveals that Congress expected a [debtor-in-possession] to work with the creditors in formulating a plan"). In fact, a proponent of a plan will be unable to satisfy the "good faith" requirement unless it engages in extensive arm's-length negotiations with all of the parties in interest. *In re Eagle Picher Indus., Inc.*, 203 B.R. 256, 264 (S.D. Ohio 1996) (debtor-asbestos manufacturer's Chapter 11 plan was proposed in good faith where plan was based on extensive arm's-length negotiations among all parties in interest plan was proposed with legitimate and honest purpose maximizing value available to creditors); *In re Trans World Airlines, Inc.*, 185 B.R. 302, 314 (Bankr. E.D.Mo. 1995) (plan found to be proposed in good faith, in part, where debtor exhibited "enduring commitment to negotiate its provisions with its creditors and stockholders" and plan had "objective of preserving the [d]ebtor's business while maximizing the return available to [h]olders of [c]laims and [i]nterests").

principal who failed to meaningfully analyze the financial impact of the Proposed Agreement, the relative merits of the underlying legal issues, the probabilities of success in litigation, or the expenses that would be saved.    Indeed, Mr. Ray's testimony shows he agreed with the Bondholders on the merits of the contract rate of interest over the much lower federal judgment rate.    All of this strongly evinces a lack of good faith (or at least the appearance thereof) and cannot support the conclusion that the Proposed Agreement was negotiated at arm's length. Accordingly, the Proposed Agreement cannot be fair and equitable.

## V.    THE SOLUS/MACQUARIE STATEMENT

56.    On August 29, 2014, Solus/Macquarie filed their statement.    As explained in the Solus/Macquarie Statement, the Proposed Agreement does not cover the 7.875% Notes and the issue of post-petition interest remains unresolved with respect to the NNCC estate and its creditors.    Solus/Macquarie submitted their statement apparently to clarify potential claims arising from the Support Agreement (as defined in the Solus/Macquarie Statement) against NNI. As discussed in the Canadian Interests' reply brief filed in connection with the US PPI Dispute [Dkt. No. 14054; ¶ 29], the Support Agreement is a bilateral agreement between NNCC and NNI and any claim arising thereunder is a claim of NNCC against NNI.    Solus/Macquarie now assert the right to assert claims against NNI directly as purported third-party beneficiaries under the Support Agreement.    The Motion does not implicate the question of liability under the Support Agreement, which is not properly before this Court, whether in the context of the underlying US PPI Dispute or the Motion.    In any case, neither Law Debenture Trust Company of New York, as trustee of the 7.875% Notes, nor Solus/Macquarie, filed a proof of claim against NNI for any claim arising from the Support Agreement before the September 30, 2009, general claims bar date in these cases.    Moreover, the Support Agreement by its terms expressly provides that NNI shall bear no liability for NNCC's obligations, and the Support Agreement is not itself a guaranty

of any NNCC obligation.  Support Agreement ¶ 3; Exhibit B the Solus/Macquarie Statement.

The Canadian Interests reserve all rights, defenses, arguments, and objections of any kind

whatsoever with respect to any claim or claims arising against NNI from the Support Agreement.

## CONCLUSION

WHEREFORE, the Monitor respectfully requests that the Court enter an order (i)

denying the Motion and (ii) granting such other and further relief as deemed just and proper.

Dated: October 3, 2014
Wilmington, Delaware

**BUCHANAN INGERSOLL & ROONEY PC**

/s/    Kathleen A. Murphy
Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

-and-

**ALLEN & OVERY LLP**

Ken Coleman
Daniel J. Guyder
John Kibler
Jacob S. Pultman
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
ken.coleman@allenovery.com
daniel.guyder@allenovery.com
john.kibler@allenovery.com
jacob.pultman@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor*
*and Foreign Representative of the Canadian*
*Debtors*