## EXHIBIT B

1   UNITED STATES BANKRUPTCY COURT

2   FOR THE DISTRICT OF DELAWARE
    ----------------------------------------X
3   In re

4        NORTEL NETWORKS INC., et al.,

5                        Debtors.,

6   Chapter 11 Case No.: 09-10138(KG)
    ----------------------------------------X
7

8           * * * HIGHLY CONFIDENTIAL * * *

9

10                       One Liberty Plaza
                         New York, New York
11
                         September 18, 2014
12                       1:11 p.m.

13

14           VIDEOTAPED DEPOSITION of MICHAEL

15   KATZENSTEIN, before Melissa Gilmore, a Notary

16   Public of the State of New York.

17

18

19

20

21

22

23       ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24            New York, New York 10022
                    212-750-6434
25                   REF:  108012

```
 1   A P P E A R A N C E S :

 2

 3   ALLEN & OVERY LLP

 4   Attorneys for Canadian Debtors and Canadian Monitor

 5        1221 Avenue of the Americas

 6        New York, New York 10020

 7   BY:  JACOB S. PULTMAN, ESQ.

 8        BRADLEY S. PENSYL, ESQ.

 9        DANIEL GUYDER, ESQ.

10        PHONE 212-610-6340

11        FAX 212-610-6399

12        E-MAIL jacob.pultman@allenovery.com

13

14

15   CLEARY GOTTLIEB STEEN & HAMILTON LLP

16   Attorneys for US Debtor

17        One Liberty Plaza

18        New York, New York 10006-1470

19   BY:  JEFFREY ROSENTHAL, ESQ.

20        BENJAMIN S. BELLER, ESQ.

21        PHONE 212-225-2086

22        FAX 212-225-3999

23        E-MAIL jrosenthal@cgsh.com

24

25
```

```
 1   A P P E A R A N C E S:  (Cont'd)

 2

 3   WILLKIE FARR & GALLAGHER LLP

 4   Attorneys for UK Pension Claimants

 5        787 Seventh Avenue

 6        New York, New York 10019-6099

 7   BY:  ANDREW HANRAHAN, ESQ.

 8        PHONE 212-728-8170

 9        FAX 212-728-9170

10        E-MAIL ahanrahan@willkie.com

11

12

13   AKIN GUMP STRAUSS HAUER & FELD LLP

14   Attorneys for US Official Committee of Unsecured

15   Creditors

16        One Bryant Park

17        New York, New York 10036-6745

18   BY:  ROBERT JOHNSON, ESQ.

19        ANNE M. EVANS, ESQ.

20        PHONE 212-872-1077

21        FAX 212-872-1002

22        E-MAIL rajohnson@akingump.com

23

24

25
```

```
 1   A P P E A R A N C E S:  (Cont'd)

 2

 3   MILBANK, TWEED, HADLEY & McCLOY LLP

 4   Attorneys for US Bondholder Group

 5        1850 K Street, NW, Suite 100

 6        Washington, DC 20006

 7   BY:  ANDREW M. LEBLANC, ESQ.

 8        NICHOLAS A. BASSETT, ESQ.

 9        PHONE 202-835-7574

10        FAX 202-263-7574

11        E-MAIL aleblanc@milbank.com

12

13

14   KATTEN MUCHIN ROSENMAN LLP

15   Attorneys for Wilmington Trust

16        575 Madison Avenue

17        New York, New York 10022-2585

18   BY:  KAREN B. DINE, ESQ.

19        PHONE 212-940-8722

20        FAX 212-940-5512

21        E-MAIL karen.dine@kattenlaw.com

22

23   ALSO PRESENT:

24        MELKER SANDBERG, FTI

25        DAN MACOM, Videographer
```

1    ------------------ I N D E X -------------------

2    WITNESS                    EXAMINATION BY           PAGE

3    MICHAEL KATZENSTEIN   MR. PULTMAN              10

4

5

6    DIRECTIONS:  PAGES 38, 49, 50, 91, 92, 93

7

8

9    --------------- E X H I B I T S ----------------

10   KATZENSTEIN     DESCRIPTION              FOR I.D.

11   Exhibit 1      E-Mail Chain, Bates           27

12                  Stamped BHG-PPI-0000233

13   Exhibit 2      E-Mail Chain, Bates           34

14                  Stamped BHG-PPI-0000251

15                  through 252

16   Exhibit 3      E-Mail Chain, Bates           60

17                  Stamped BHG-PPI-0000013

18                  through 16

19   Exhibit 4      E-Mail with Schedule,         68

20                  Bates Stamped

21                  BHG-PPI-000009 through 12

22   Exhibit 5      E-Mail Bates Stamped          75

23                  BHG-PPI-0000226

24

25            (EXHIBITS TO BE PRODUCED)

1                    S T I P U L A T I O N S

2

3    1.  Upon completion of the transcription of today's

4    session, the original transcript shall be sent to

5    counsel for the witness by the court reporter.

6    Counsel shall promptly forward it to the witness

7    for review, correction and signature under penalty

8    of perjury.  The witness shall have 30 days from

9    the day of receipt within which to review, make any

10   corrections, sign the deposition transcript under

11   penalty of perjury, and return it to counsel.  The

12   witness' counsel shall then forward the original

13   transcript plus corrections to the court reporter,

14   who will promptly notify all counsel of its receipt

15   and any changes to testimony made by the witness.

16   2.  If the witness is not represented by counsel,

17   the original transcript will be sent to the witness

18   by the court reporter.  After review, correction

19   and signature within 30 days from the date of

20   receipt, the witness shall return the original

21   transcript to the court reporter, who will notify

22   all counsel of its receipt and any changes to

23   testimony by the witness.

24

25

1    3.   The court reporter will retain the original

2    transcript, including exhibits.  If, for any

3    reason, the original is lost, misplaced, not

4    returned, not signed, or unavailable, a certified

5    copy may be used in its place for all purposes.

6    The court reporter is otherwise relieved of any

7    statutory duties.

8

9                        - oOo -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2                   *   *   *   *

3          THE VIDEOGRAPHER:  This is tape one.

4    We are now on the record.  The time is

5    1:11 p.m.  Today is Thursday,

6    September 18, 2014.  This is the opening

7    of the deposition of Mr. Michael

8    Katzenstein in the matter of In re Nortel

9    Networks, Incorporated, et al.

10         This deposition is being held at the

11   offices of Cleary, Gottlieb, Steen &

12   Hamilton, which is located at One Liberty

13   Plaza, in New York, New York.

14         Our court reporter today is

15   Ms. Melissa Gilmore, with Ellen Grauer

16   Court Reporting.  I'm the legal

17   videographer, Dan Macom, also with Ellen

18   Grauer Court Reporting.

19         Would counsel please introduce

20   themselves and state whom they represent

21   for the record.

22         MR. PULTMAN:  Jacob Pultman, of

23   Allen & Overy, LLP.  Along with me are my

24   colleagues, Daniel Guyder and Bradley

25   Pensyl.  We represent the monitor and the

1       Canadian debtors.

2              MR. LEBLANC:  Andrew Leblanc, of

3       Milbank, Tweed, Hadley & McCloy, on behalf

4       of the ad hoc group of bondholders, and

5       with me is my colleague, Nick Bassett, and

6       to his right is Melker Sandberg of FTI.

7              MR. JOHNSON:  Robert Johnson and Ann

8       Evans, from Akin, Gump, Strauss, Hauer &

9       Feld, on behalf of the official committee

10      of unsecured creditors of NNI.

11             MS. DINE:  Karen Dine, from Katten,

12      Muchin & Rosenman, LLP, on behalf of

13      Wilmington Trust National Association.

14             MR. HANRAHAN:  Andrew Hanrahan, from

15      Willkie, Farr & Gallagher, on behalf of

16      the UK pension claimants.

17             MR. ROSENTHAL:  And Jeff Rosenthal,

18      along with Benjamin Beller, of Cleary,

19      Gottlieb, Steen & Hamilton, on behalf of

20      the US debtors.

21             THE VIDEOGRAPHER:  Will our court

22      reporter please swear in the witness?

23   M I C H A E L    K A T Z E N S T E I N,

24      called as a witness, having been duly sworn

25      by a Notary Public, was examined and

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2         testified as follows:

3    EXAMINATION BY

4    MR. PULTMAN:

5         Q.    Mr. Katzenstein, my name is Jacob

6    Pultman.  I'm here to ask you some questions

7    about a 9019 proposed settlement.

8              Have you been deposed before?

9         A.    I have.

10        Q.    But not in the Nortel case?

11        A.    I have not.

12        Q.    On how many occasions have you been

13   deposed?

14        A.    Multiple.

15        Q.    More than five?

16        A.    Yes.

17        Q.    If you need a break for any reason,

18   let me know.

19        A.    Thank you.

20        Q.    If you don't understand a question

21   for any reason, let me know, and I will try to

22   correct the question.

23        A.    Thank you.

24        Q.    Also, we will all try hard not to

25   speak over you, and I ask that you speak -- if

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2    you do your best not to speak over me.

3         A.    Yes, sir.

4         Q.    Can you give us your educational

5    background?

6         A.    Sure.  I have an undergraduate

7    degree from the State University of New York in

8    Binghamton in 1981.

9         Q.    What was that degree in?

10        A.    Political science.

11        Q.    Okay.  Do you have any other

12   degrees?

13        A.    I do.  I have a law degree from the

14   Boston University School of Law, 1985.

15        Q.    Do you have any other degrees?

16        A.    I do not.

17        Q.    After 1985, can you lay out your

18   employment history for us?

19        A.    Yes, sir.  After 1985?

20        Q.    Yes, please.

21        A.    I went directly to a law firm in New

22   York, then called Kronish, Lieb, Weiner &

23   Hellman, which is now Cooley Godward.  I

24   practiced there until late 1995, I believe.

25   Was an associate and then a partner in the

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2    corporate department.

3         Q.    Can you generally describe the type

4    of work that you did?

5         A.    Sure.  I was a corporate finance

6    securities, M&A lawyer.

7         Q.    Did you do any bankruptcy work?

8         A.    I did.  I did a fair amount of

9    purchase and sales of distressed assets and

10   worked on a number of large restructurings.

11              Also, when I was a more junior

12   lawyer, I was seconded to the bankruptcy

13   department for a large restructuring for about

14   a year, I think.

15        Q.    Where were you based during the ten

16   years you were at Kronish?

17        A.    All in New York City.

18        Q.    And what was your next job after

19   1995?

20        A.    I left -- I left the law firm to

21   become general counsel and head of development

22   at a client called Optel, and Optel was a

23   roll-up of telecommunications, media, cable,

24   telecom and high-speed internet services across

25   the United States, and was a subsidiary of a

1           KATZENSTEIN - HIGHLY CONFIDENTIAL

2    Canadian multi-national, so I worked -- did

3    work for the multi-national as well.

4           Q.    What was the name of the parent

5    company?

6           A.    Le Grupe Videotron.  Le Grupe,

7    G-R-U-P-E.  Videotron is V-I-D-E-O-T-R-O-N.

8           Q.    How long were you at Optel?

9           A.    I want -- I believe about five and a

10   half years, maybe a little bit longer, maybe

11   six years.

12          Q.    Did your position change at any

13   point in time?

14          A.    It did.  I was -- I became the CEO

15   of the company and -- but I had other roles

16   added to my original responsibilities

17   progressively.

18          Q.    What were the other roles?

19          A.    I was doing development, M&A, just

20   other administrative functions, took on more

21   responsibilities.

22          Q.    Did you continue to hold the general

23   counsel role during your five and a half years?

24          A.    No.  When I became CEO, we promoted

25   the associate general counsel to general

1                KATZENSTEIN - HIGHLY CONFIDENTIAL

2      counsel.

3          Q.    And do you recall when that was?

4          A.    I think in '98 or '99.

5          Q.    And where were you based during your

6      five and a half years?

7          A.    All in Dallas.  It may have been as

8      long as seven years.  I'm getting old and

9      forget these things.

10         Q.    In 1985, were you admitted to the

11     Bar?

12         A.    I was.

13         Q.    And of what state were you admitted?

14         A.    New York.

15         Q.    Any other states?

16         A.    No, sir.

17         Q.    Are you currently admitted to the

18     Bar in New York?

19         A.    I -- yeah, I have never withdrawn my

20     membership in the Bar.  I have gone inactive,

21     and so I think I still send them money, but I

22     don't do the CLE and don't practice law.

23         Q.    At some point in time, did you let

24     your membership in the Bar of New York become

25     inactive?

1         KATZENSTEIN - HIGHLY CONFIDENTIAL

2         A.    I did.  And it was years and years

3    ago, so I don't remember exactly when.

4         Q.    Were you ever admitted to any other

5    Bars other than the state of New York?

6         A.    I was not.

7         Q.    So you weren't admitted to the Bar

8    in the state of Texas?

9         A.    No, I was not.

10        Q.    After your position at Optel, what

11   was your next employment?

12        A.    I started a business called CXO,

13   which was -- and I had a partner in that

14   business, and, ultimately, had a couple other

15   partners.  It was a -- specialized in TMT

16   restructurings, turnaround management work.

17        Q.    And where were you based?

18        A.    In Dallas at that point.

19        Q.    And how long did you work at CXO?

20        A.    I worked at CXO until FTI bought

21   CXO, which would have been at the beginning of

22   2009, end of 2008.  So about seven or eight

23   years, I think.

24        Q.    And can you describe what work you

25   did while you were at CXO?

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2          A.    Yeah.  We were a turnaround

3    management and restructuring business, focused

4    almost exclusively on telecom, media,

5    technology internationally.

6          Q.    And you said you thought FTI bought

7    CXO somewhere in 2008 to 2009?

8          A.    Yeah, at the end of 2008, last -- in

9    December 2008.

10         Q.    Beginning in 2009, were you employed

11   by FTI?

12         A.    I was.

13         Q.    In what capacity?

14         A.    Senior managing director.

15         Q.    And what is your title today?

16         A.    Senior managing director.

17         Q.    Have you remained senior managing

18   director throughout your six years at the

19   company?

20         A.    Yeah, there's no other -- it's

21   the -- it's the senior-most position you can

22   have other than in the senior suite.

23         Q.    What were your responsibilities in

24   2009 when you took on the position at FTI?

25         A.    I was one of six or seven senior

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2     managing directors in the global TMT practice

3     in the restructuring group, which is housed in

4     corporate finance, the division of corporate

5     finance in FTI.

6          Q.    And where were you based when you

7     started in 2009?

8          A.    I started in Dallas, but FTI wanted

9     me to move to New York, and I moved back to New

10    York.

11         Q.    And when was that, that you moved

12    back to New York?

13         A.    In 2010, I believe.

14         Q.    Have you been based in New York

15    continuously since that time?

16         A.    I have.

17         Q.    Can you describe what your

18    responsibilities are today at FTI?

19         A.    Sure.  I am the national leader of

20    our interim management practice, and I am also

21    an SMD in the TMT group.  So we have a group

22    within corporate finance that specializes in

23    telecom, media and technology.

24         Q.    Is there any way to estimate the

25    number of telecom, media, technology companies

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2    you have worked with over the course of your

3    time at FTI?

4          A.    In FTI or in general?

5          Q.    At FTI.

6          A.    Oh, I would say dozens, but I don't

7    know exactly.

8          Q.    And your time at CXO?

9          A.    The same.

10         Q.    At some point in time, were you --

11   was FTI retained to provide services to the

12   bondholders in connection with the Nortel

13   litigation?

14         A.    Yes.

15         Q.    And when was that?

16         A.    I believe in January of 2010, if I'm

17   not mistaken.

18         Q.    And can you tell me, were you one of

19   the people who were --

20         A.    I'm sorry '09, January '09.  It was

21   in the early part of the case.

22         Q.    Okay.  And who specifically retained

23   FTI?  Was it the bondholders?  Was it the

24   bondholders' counsel?  Was it someone else?

25         A.    Well, the specific letter of

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2     retention, I believe, was through Milbank and

3     was also signed by NNL, if I'm not mistaken.  I

4     don't recall the particularities of the letter,

5     but the -- are you asking who signed the letter

6     or who was the client?

7          Q.    Who was the client of FTI,

8     essentially?

9          A.    So, we were acting for an ad hoc

10    group of what we refer to as the guaranteed or

11    the cross-border bonds.

12         Q.    And were you on the team that was

13    initially brought on to work --

14         A.    Yes, I was.

15         Q.    Were there other professionals

16    besides you at FTI who were part of the team?

17         A.    Yes, we have had other professionals

18    over the years work on the matter.  I have been

19    continuously on it from the beginning.

20         Q.    How large a team has worked on it?

21         A.     I mean, I imagine we have had more

22    than ten professionals work on it over -- some

23    in specialized and limited roles over time.

24    There has been a core team of three

25    professionals who have been on it continuously

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2    from the beginning.

3         Q.    Can you describe your own role in

4    connection with the representation?

5         A.    Sure.  I have been the engagement

6    leader in the representation, and have been

7    involved in virtually every interaction that

8    FTI has had with the ad hoc bond group as it

9    has been constituted over time, and with

10   Milbank and Bennett Jones, who are the counsel

11   to the ad hoc group in the US and Canada,

12   respectively.

13        Q.    Are there particular groups within

14   FTI that have been part of the representation

15   team?

16        A.    Can you rephrase?

17        Q.    Sure.  You told us earlier about a

18   group that you described as working on telecom

19   matters.

20        A.    Yeah.  So let me see if I can be

21   helpful.

22             So the persons who are -- have been

23   the regular and consistent providers of

24   services are all housed in the telecom, media

25   and technology group within corporate finance

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2    and restructuring at FTI.

3         Q.    In connection with your work for the

4    ad hoc bondholders, are you familiar with a

5    proposed settlement of the PPI issue?

6         A.    I am.

7         Q.    And did you have involvement in

8    connection with the negotiation of that

9    settlement?

10        A.    I did.

11        Q.    Can you describe generally what

12   responsibilities you have had relating to that

13   issue?

14             MR. LEBLANC:  In connection --

15        A.    Certainly.  I participated in

16   negotiations with the responsible person and --

17   of the US entities, NNI, and his financial

18   advisor and counsel over the negotiation period

19   and, you know, and related work.

20        Q.    I'm going to ask you to take a look

21   at the document that we have previously marked

22   as Ray Exhibit 1.  It's in the book before you.

23   And we have copies for any counsel who may not

24   have brought along their prior copies of that.

25             And just so the record is clear, and

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2     that you're clear, Mr. Katzenstein, it's a

3     document that contains several pieces.

4          A.     Sure.

5          Q.     The first is a notice of debtors'

6     motion for entry.  The second is debtors'

7     motion for entry of an order pursuant to the

8     Bankruptcy Rule 9019, which is a 20-page

9     document.

10         A.     Right.

11         Q.     There is then an Exhibit A, which is

12    a five-page document with a proposed order, and

13    the document in particular I'm going to ask you

14    questions about is Exhibit B, which is a

15    43-page draft agreement settling the NNI

16    post-petition interest dispute.

17               Have you seen this document before?

18         A.     I have.

19         Q.     And can you tell me when was your

20    first involvement in connection with

21    negotiations with the NNI responsible

22    individuals?

23         A.     My first personal involvement in the

24    negotiations occurred on Tuesday, July 15.

25         Q.     And earlier, you indicated that you

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2      participated in negotiations with the

3      responsible person of NNI.

4              Can you tell us who that is?

5      A.      John Ray.

6      Q.      And you indicated that you

7      participated in negotiations with his or NNI's

8      financial advisor?

9      A.      Yes.

10     Q.      And who was the financial advisor or

11     what was the name of the entity?

12     A.      The name of the entity was Chilmark.

13     Q.      Were there more than one individual

14     from Chilmark?

15     A.      There have been -- there are more

16     than one person at Chilmark who have been

17     involved, but the principal person that I

18     interacted with was Mike Kennedy.

19     Q.      Was there anyone else from Chilmark

20     involved in these negotiations that you

21     interacted with?

22     A.      I don't believe so.

23     Q.      And you indicated that also involved

24     were counsel for NNI; is that correct?

25     A.      Yes.

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2          Q.    Can you tell us who was involved?

3          A.    Lisa Schweitzer, principally.  Now

4     that -- can I just go back?

5          Q.    If you need to clarify anything.

6          A.    Matt Rosenberg may have been

7     involved in the first meeting.  I don't recall.

8     But my interactions principally were with Mike

9     Kennedy.

10         Q.    And Matt Rosenberg is at Chilmark?

11         A.    Yes, sir.

12         Q.    Were there other professionals from

13    FTI involved in the negotiations alongside you?

14         A.    Melker Sandberg, my colleague.

15         Q.    And just so we're clear,

16    Mr. Sandberg is sitting three persons to your

17    right?

18         A.    The guy in the purple shirt, yeah.

19         Q.    As he is not on video, we will

20    stipulate that he is, in fact, wearing a fine

21    purple shirt.

22              What's Mr. Sandberg's title?

23         A.    Mr. Sandberg is a managing director

24    in our TMT group housed in corporate finance at

25    FTI.

1            KATZENSTEIN - HIGHLY CONFIDENTIAL

2        Q.    Other than you and Mr. Sandberg,

3    were there other professionals at FTI who were

4    involved in the negotiation of the proposed

5    settlement?

6        A.    I believe that my partner, Mark

7    Spragg, S-P-R-A-G-G, who is a senior managing

8    director at FTI, also in the TMT group of

9    corporate finance, was involved in certain of

10   the negotiations.

11       Q.    Any other professionals at FTI who

12   were involved?

13       A.    Not to my knowledge, no.

14       Q.    And of the three people you have

15   mentioned, yourself, Mr. Sandberg and

16   Mr. Spragg, is one person at a more senior

17   level than the other?

18            MR. LEBLANC:  Object to the form.

19            You can answer.

20       A.    So Mark and I are both senior

21   managing directors, and Melker is a managing

22   director.  So the senior managing director, the

23   senior was put in front of there to denote a

24   higher level than managing director.  It's a

25   little different than many other professional

1             KATZENSTEIN - HIGHLY CONFIDENTIAL

2    firms.

3         Q.    So it's fair to say that your

4    position and Mr. Spragg's position is elevated

5    from Mr. Sandberg's position?

6         A.    Yes.  He doesn't agree sometimes,

7    but it is.

8         Q.    Was someone leading the

9    representation as between the group of you?

10        A.    I was.

11        Q.    Now, you indicated that your first

12   participation was on Tuesday, July 15?

13        A.    Yes.

14        Q.    I'm going to ask you questions about

15   what led up to that, your participation.

16        A.    Sure.

17        Q.    So I'm going to mark, as Katzenstein

18   Exhibit 1, a one-page document bearing Bates

19   numbers BHG-PPI-0000233.  I'm going to hand

20   that to you and a copy to your counsel and ask

21   you to take a moment to review.

22             (Katzenstein Exhibit 1, E-Mail

23        Chain, Bates Stamped BHG-PPI-0000233,

24        marked for identification.)

25        A.    (Perusing.)  Right.

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2          Q.    And just so the record is clear, I

3     will give counsel a chance to get the document

4     in hand.

5               It appears to be an e-mail chain

6     from Melker Sandberg to Mike Kennedy --

7          A.    Yes.

8          Q.    -- on July 10?

9          A.    Yes.

10         Q.    Then there is a second e-mail on

11    July 11 from Mike Kennedy, and then one at the

12    top from Mr. Sandberg.

13         A.    Yes.

14         Q.    With cc's that include Mr. Kennedy,

15    Mr. Spragg and Mike Katzenstein?

16         A.    Yes.

17         Q.    The title of it is Time to Chat?

18         A.    Right.

19         Q.    Have you seen this e-mail before?

20         A.    I mean, I'm cc'd on it, so I

21    probably did.  I don't recall it with

22    specificity.

23         Q.    Sitting here today, do you have any

24    reason to believe you didn't receive this

25    e-mail?

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2        A.    No, not at all.

3        Q.    Can you tell us what the first

4   contact was to you with respect to a potential

5   settlement negotiation?

6        A.    Just -- can I clarify by --

7   independent of this e-mail?

8        Q.    Sure.

9        A.    Yeah.  So I was aware that Andy

10  Leblanc had spoken with lawyers from Cleary

11  Gottlieb sometime in mid June, I believe, to

12  discuss whether the US debtors might be willing

13  to engage in a negotiation to settle the issue

14  of PPI accrual in the NNI estate claim or

15  potential claim of the US bondholders, the

16  cross-over bondholders against the US estates.

17       Q.    Were you aware that that issue was

18  being briefed in June of 2014?

19       A.    Was I aware that the issue was being

20  briefed?  Yes, I was aware that counsel to the

21  monitor, counsel to NNL, had made --

22  represented statements to the courts that the

23  existence of the approximately $1.6 billion PPI

24  accrual was an impediment to settlement, and I

25  was aware that the courts had ordered

1          KATZENSTEIN - HIGHLY CONFIDENTIAL
2    consideration of the PPI interest in the
3    respective courts.  So I was -- to that extent,
4    I was aware.
5          Q.    Between the middle of June, the 16th
6    of June, when the issue first came up, and the
7    e-mail that we are looking at that's been
8    marked as Katzenstein Exhibit 1, with the date
9    of the 10th of July, did you have any
10   conversations beyond what you just described
11   about the PPI issue?
12              MR. LEBLANC:  Excluding --
13        Q.    Just did you have conversations?
14              MR. LEBLANC:  So that's a yes or no
15        question.  To the extent it involves
16        communications with counsel --
17        A.    Yes.
18        Q.    Let's take it slow.
19              Were those conversations with anyone
20   other than counsel at Milbank?
21        A.    No.  To the extent they were
22   conversations, we may have had internal
23   discussions at FTI, but I did not speak, to the
24   best of my recollection, with anyone outside of
25   FTI or Milbank.

1      KATZENSTEIN - HIGHLY CONFIDENTIAL

2      Q.    Okay.  And prior to the e-mail that

3   we have looked at that's on or around the 10th

4   and the 11th of July --

5      A.    Yes.

6      Q.    -- you didn't have conversations

7   with any of the lawyers at Cleary about the

8   issue?

9      A.    I did not.

10     Q.    Do you know whether anyone else at

11  FTI had conversations with anyone at Cleary

12  about the issue?

13     A.    I am not aware of any.

14     Q.    To your knowledge, had you had

15  conversations, prior to the 10th of July, with

16  anyone from Chilmark about the PPI issue?

17     A.    I did not.

18     Q.    Do you know whether anyone else at

19  FTI had such conversations?

20     A.    To the best of my knowledge, there

21  were none before then.

22     Q.    Now, did you know Mr. Kennedy from

23  before the middle of July of 2014?

24     A.    Oh, yeah.

25     Q.    You'd had dealings with him

```
 1            KATZENSTEIN - HIGHLY CONFIDENTIAL
 2    previously?
 3         A.    Yes.
 4         Q.    From the nature of your response, it
 5    seems like it was more than one or two?
 6         A.    Yes.
 7         Q.    You had extensive dealings with him
 8    historically?
 9         A.    Yes.
10         Q.    On Nortel?
11         A.    Nortel.
12         Q.    Any on other matters?
13         A.    I did not.
14         Q.    Did you have dealings with the
15    lawyers from Cleary Gottlieb on any other
16    matters prior to Nortel?
17         A.    Yes.
18         Q.    Did you have dealings with the
19    Cleary lawyers on the Nortel matter prior to
20    July of 2014?
21              MR. ROSENTHAL:  Objection to form.
22         A.    Yes.
23         Q.    Did you know the lawyers at the
24    official committee, the Akin Gump lawyers?
25         A.    Yes.
```

1        KATZENSTEIN - HIGHLY CONFIDENTIAL

2        Q.    Did you know them from prior to the

3    Nortel matter?

4        A.    Yes.

5        Q.    Did you know the Milbank lawyers

6    prior to the Nortel matter?

7        A.    Some of them.

8        Q.    Prior to the meeting on the 14th --

9    sorry, prior to the meeting on the 15th of

10   July, can you tell us what conversations you

11   had with anyone on the NNI side about the PPI

12   issue?

13       A.    None personally.

14       Q.    Did you have any indirect

15   conversations?

16       A.    I don't know what that means.

17       Q.    You said none personally.

18             What did you mean, none personally?

19       A.    I know that I see, from the e-mail

20   that you handed me, that there was a

21   discussion.  I was not on that call.

22       Q.    Okay.  Do you know whether, in fact,

23   the call took place?

24       A.    To my recollection, there was a

25   call, but I don't recall the substance.

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2         Q.    Did Mr. Sandberg participate in the

3    call?

4         A.    To my recollection, he did.

5         Q.    Did he report to you as to what

6    occurred?

7         A.    It's possible.  I don't recall with

8    specificity.

9              (Katzenstein Exhibit 2, E-Mail

10        Chain, Bates Stamped BHG-PPI-0000251

11        through 252, marked for identification.)

12        Q.    I'm going to show you an e-mail that

13   we have marked as Katzenstein Exhibit 2.  I

14   will give you that and a copy for your counsel.

15              For the record, the document bears

16   Bates numbers BHG-PPI-0000251.  I ask that you

17   take a moment to review it.

18        A.    (Perusing.)  Yes.

19        Q.    It appears to be a chain of e-mails

20   dated the 14th of July of this year, between

21   and among Ms. Schweitzer, who you mentioned, a

22   Dennis Dunne.

23              Do you see that?

24        A.    Yes.

25        Q.    Do you know Mr. Dunne?

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2        A.    I do.

3        Q.    Who is Mr. Dunne?

4        A.    He is a partner in the restructuring

5   group at Milbank.

6        Q.    Did you know him prior to the Nortel

7   matter?

8        A.    I did.

9        Q.    Have you worked with him on the

10  Nortel matter?

11       A.    I have.

12       Q.    And there's a cc, a Lisa

13  Giambatista.

14              Do you know who that is?

15       A.    I don't.

16       Q.    And there is John J. Ray, who you

17  mentioned earlier.

18       A.    Yes.

19       Q.    If I can point you to the e-mail in

20  the middle of the first page, which indicates

21  Mr. Dunne sending an e-mail to Ms. Schweitzer.

22       A.    Yes.

23       Q.    It says, "Here's the list," and

24  provides Dennis Dunne, Andy Leblanc, Al Pisa,

25  Mike Katzenstein, Melker Sandberg, "See you

1              KATZENSTEIN - HIGHLY CONFIDENTIAL
2    tomorrow."
3                    Do you see that?
4         A.    I do.
5         Q.    Do you have an understanding as to
6    what that's a reference to?
7         A.    Yes.
8         Q.    And what is it a reference to?
9         A.    It's a reference to a meeting that
10   had been organized to be held at Cleary's
11   offices on the following day, the 15th.
12        Q.    And is that the meeting that you
13   attended on Tuesday, the 15th of July?
14        A.    It is to my knowledge.
15        Q.    Did Mr. Dunne attend that meeting?
16        A.    Yes.
17        Q.    Did Mr. Leblanc attend the meeting?
18        A.    Yes.
19        Q.    Did Mr. Pisa attend the meeting?
20        A.    Yes.
21        Q.    Did Melker Sandberg attend the
22   meeting?
23        A.    He did.
24        Q.    Who is Al Pisa?
25        A.    Al Pisa is a partner at Milbank as

1               KATZENSTEIN - HIGHLY CONFIDENTIAL

2    well.

3         Q.    Had you worked with him prior to the

4    Nortel matter?

5         A.    I did not -- I had not.

6         Q.    Did you work with him in connection

7    with the Nortel matter?

8         A.    Oh, yes.

9         Q.    The e-mail above that, from

10   Ms. Schweitzer to Mr. Dunne with cc, says,

11   "Thanks, Dennis.  Do you expect to send a

12   proposal over today?"

13             Do you have an understanding as to

14   what that's a reference to?

15             MR. LEBLANC:  Objection.

16             You can answer.

17        A.    I believe I do.

18        Q.    What do you understand that to be a

19   reference to?

20        A.    To my recollection, we were asked to

21   and submitted -- to submit a written form of

22   settlement agreement proposal to reflect a

23   proposal for settlement that had been made

24   orally earlier to the US debtors.

25        Q.    And when you say it was made orally

1            KATZENSTEIN - HIGHLY CONFIDENTIAL

2    earlier to the US debtors, when was that

3    proposal first made?

4        A.    I don't know the specific date, but

5    to my expectation, Andy Leblanc had made a

6    proposal for settlement through Cleary during

7    earlier discussions, and it may have been days

8    or even weeks preceding the July 15 meeting.

9        Q.    And are you familiar with what the

10   terms of this oral proposal were?

11       A.    I am familiar with what I would

12   consider the most salient term.

13       Q.    Can you tell us what the salient

14   terms were?

15       A.    The proposal was that the crossover

16   bonds would agree to discount to 70 percent of

17   the post-petition interest accrual, their claim

18   for post-petition interest against the US

19   entities, the US estate.

20       Q.    Okay.  Were there any other salient

21   terms that you recall?

22       A.    I know there were other salient

23   terms, but I don't recall, with specificity,

24   one of them.

25       Q.    When you say one of them, do you

1           KATZENSTEIN - HIGHLY CONFIDENTIAL

2    mean any of the others?

3           A.    The others, yes.

4           Q.    And when you say 70 percent of the

5    PPI accrual, sitting here today, do you recall

6    if, at that point in time, you knew what the

7    total PPI accrual was?

8           A.    Well, we were working with the

9    approximately $1.6 billion of PPI accrual that

10   was represented by the monitor's counsel to the

11   courts as the post-petition accrual at the time

12   that the representation was made.

13          Q.    Prior to July, mid July of 2014, did

14   FTI do anything to determine whether that

15   $1.6 billion number was approximate, was it

16   correct?

17              MR. LEBLANC:  You can answer that

18         yes or no.

19          A.    Yes.

20          Q.    And did you have a view as to

21   whether it was correct?

22   DI             MR. LEBLANC:  To the extent that

23         that calls for analysis that was conducted

24         on behalf of or at the direction of

25         counsel, I'm going to instruct you not to

HIGHLY CONFIDENTIAL                    39

1           KATZENSTEIN - HIGHLY CONFIDENTIAL

2       answer that.

3       A.    I wouldn't be able to answer that.

4       Q.    Because you're following the

5   direction of your counsel?

6       A.    Yes.

7       Q.    Okay.  So just so that we're clear,

8   FTI had done a calculation; is that right?

9       A.    Yes.

10       Q.    That calculation was done at the

11   direction of counsel?

12       A.    Yes.

13       Q.    Can you tell me when that

14   calculation was done?

15       A.    Calculations have been done

16   throughout the case.

17       Q.    And in July, mid July of 2014,

18   coming into the negotiation, you had a view as

19   to whether the $1.6 billion number that the

20   monitor had put out there, you had a view as to

21   whether that was approximate or correct?

22       A.    Yes.

23       Q.    But you can't tell me because that

24   was done at the direction of your counsel?

25       A.    Yes.

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2         Q.    You indicated that the oral proposal

3    that was made by Mr. Leblanc, you believe, was

4    made or communicated to Cleary.

5              Do you recall who at Cleary it was

6    communicated to?

7         A.    I believe it was initially

8    communicated to Jim Bromley.

9         Q.    And Mr. Bromley is a partner in

10   Cleary?

11        A.    Yeah.  Doesn't everybody know that?

12        Q.    Did you know Mr. Bromley from before

13   the Nortel matter?

14        A.    Not closely, but I did know.

15        Q.    Do you know approximately when this

16   oral proposal was communicated?

17        A.    I believe it was several weeks

18   before our meeting.

19        Q.    Do you know where -- whether it was

20   on a telephone call?

21        A.    I think they had a meeting, to my

22   recollection.

23        Q.    Do you recall where the meeting took

24   place?

25        A.    My recollection is that it was in

1              KATZENSTEIN - HIGHLY CONFIDENTIAL
2       Toronto.
3              Q.    Do you recall where in Toronto it
4       took place?
5              A.    I do not.
6              Q.    Do you know whether it was at the
7       bar at the Ritz Hotel?
8              A.    Well, it's hard to get Andy out of
9       there.
10             Q.    But sitting here today, do you know
11      whether that, in fact, was where the
12      communication took place?
13             A.    It's possible that it was.
14             Q.    Now, I'm going to ask you to take a
15      look at the document that's in front of you in
16      the book of Ray exhibits, which is Ray
17      Exhibit 2.
18             A.    Yes.
19                   MR. LEBLANC:  Do you have a copy of
20          that?
21             A.    I'm not finding an Exhibit 2, and I
22      apologize.  I have an Exhibit 2 that leads
23      directly to an Exhibit 3.
24                   Is this another one of the monitor's
25      tricks?

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL
 2         Q.    Let me hand you what's been marked
 3    previously as Ray Exhibit 2, which bears Bates
 4    numbers BHG-PPI-0000018 through 21.
 5         A.    Thank you.  (Perusing.)
 6         Q.    For the record, it appears to be a
 7    term sheet?
 8         A.    Yes, sir.
 9         Q.    Have you seen this document before?
10         A.    I believe I saw it at the -- at the
11    meeting on the 15th.
12         Q.    Do you recall whether you had seen
13    that draft before the meeting on the 15th?
14         A.    No.  I remember that I had not seen
15    it before.
16         Q.    Can you tell us who was in
17    attendance from the NNI side at the meeting on
18    the 15th?
19         A.    Yes.
20         Q.    And who was in attendance?
21         A.    John Ray, Mike Kennedy, Lisa
22    Schweitzer, and I don't recall with specificity
23    if Matt Rosenberg was there, but it's possible
24    he was there.  I don't remember.
25         Q.    And do you recall what time of day
```

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2    the meeting took place?

3         A.    I believe it started around noon.

4         Q.    Do you recall how long it lasted?

5         A.    It lasted most of the afternoon, I

6    would say.  Maybe four, four to five hours, I

7    believe.

8         Q.    Was it one long meeting or were

9    there a series of breakouts?

10        A.    There were breakouts.

11        Q.    Did the ad hoc bonds have its own

12   room?

13        A.    We had a room where we stayed and

14   the US debtors came in and would leave.

15        Q.    Do you recall which conference room

16   the meeting took place in?

17        A.    I recall the conference room, but I

18   don't recall the number.  I think I have been

19   in every one of them.

20        Q.    Did someone take the lead for the US

21   in the meeting?

22        A.    John Ray.

23        Q.    And did someone take the lead for

24   the bonds in the meeting?

25        A.    To my recollection, Dennis and Andy

1              KATZENSTEIN - HIGHLY CONFIDENTIAL
2      did most of the speaking, but...
3          Q.    Just so we're clear, when you say
4      Dennis, you're referring to Dennis Dunne?
5          A.    Yes.
6          Q.    And when you say Andy, you're
7      referring to Mr. Leblanc?
8          A.    The guy in the Ritz bar, yeah.
9          Q.    The person sitting immediately to
10     your right?
11         A.    Yes.
12         Q.    To the best of your recollection,
13     sitting here today, can you tell us what --
14     what occurred at the meeting?
15              MR. LEBLANC:  Object to the form.
16              You can answer.
17         A.    In litany form, like timeline?
18         Q.    Best you can recall.
19         A.    As I recall, we -- the bond group
20     was in the conference room for some time, and
21     John Ray and Lisa and Mike Kennedy came in, and
22     John said, okay, it's your meeting, what do you
23     want to discuss, and we said we want to discuss
24     the PPI accrual issue.  And he said, do you
25     have a proposal for me.  And we said, we had

```
1              KATZENSTEIN - HIGHLY CONFIDENTIAL
2     already made you a proposal.  Well, would you
3     restate your proposal.  And we did, and -- go
4     ahead.
5          Q.    And what was that proposal?
6          A.    It was to discount to 70 percent the
7     post-petition accrual.
8          Q.    Okay.  Now, the term sheet that we
9     just looked at, that was Ray Exhibit 2.
10         A.    Yes.
11         Q.    To your knowledge, did that contain
12    the 70 percent proposal number that you just
13    referenced?
14         A.    (Perusing.)  It appears that the
15    settlement rate is noted as TBD on this.
16         Q.    Do you know who drafted the document
17    that's reflected in Ray Exhibit 2?
18         A.    Milbank.
19         Q.    It wasn't FTI that drafted the term
20    sheet, to your knowledge?
21         A.    No.
22         Q.    Now, when you were asked to have a
23    proposal and you gave the 70 percent proposal,
24    do you recall who gave that proposal?
25         A.    Who said it?
```

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL
 2        Q.     Who said it?
 3        A.     I think it was -- it was either Andy
 4   or Dennis.
 5        Q.     And do you recall what the response
 6   was from Mr. Ray?
 7        A.     Mr. Ray said our proposal is a
 8   70 percent discount to 30 percent.
 9        Q.     So your proposal was 70 percent,
10   their proposal was 30 percent?
11        A.     Yeah.
12        Q.     How long was that part of the
13   discussion, to your recollection sitting here
14   today?
15        A.     I don't recall.  I mean, there was
16   some discussion around it, you know, argument
17   of some sort, which is what you would expect
18   from John.
19        Q.     Let's stay on that.
20               When you say argument of some sort,
21   argument with respect to what?
22        A.     That we should accept that and it
23   was -- we -- you know, his reasoning why -- you
24   know, if we wanted a settlement and everybody
25   wanted a settlement, why.
```

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2          Q.    Do you recall, sitting here today,

3     what his reasoning was?

4          A.    His reasoning was, you know -- I

5     don't recall all the reasons, but, you know, we

6     have trials coming up, you want certainty, here

7     is the deal I will give you, and that was

8     basically it.

9          Q.    Was there any discussion at that

10    point in time about what the maximum amount

11    that the bonds could possibly recover --

12              MR. LEBLANC:  Object to the form.

13         Q.    -- on the PPI accrual issue?

14              MR. LEBLANC:  Object to the form.

15         A.    No, we didn't -- we didn't share

16    calculations at that time.

17         Q.    At some point in time, did you and

18    the US share calculations concerning that

19    issue?

20         A.    Can you restate the question so I

21    understand it?

22         Q.    Sure.  You said Mr. Ray made

23    arguments as to why you should accept the

24    30 percent.

25         A.    Right.

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2          Q.    And my next question was, was

3     there -- did Mr. Ray communicate to you what he

4     thought you were likely, you, the bonds, were

5     likely to be able to recover on your PPI

6     accrual claim?

7          A.    No, he did not.

8          Q.    At some point in time, did the US

9     communicate to the bonds what they thought was

10    likely that the bonds were going to be able to

11    recover on the PPI accrual issue?

12         A.    No.

13         Q.    At some point in time, did the bonds

14    communicate to NNI what the bonds thought they

15    could recover on the PPI accrual issue?

16         A.    No.

17         Q.    At any point in time, were there

18    internal discussions between FTI and counsel or

19    just at FTI about what the bonds would be

20    likely to recover on the PPI accrual issue?

21    And that's yes or no?

22         A.    Yes.

23         Q.    And can you tell us --

24              MR. LEBLANC:  Just to clarify, do

25         you mean in connection with this

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2         settlement or generally?

3         Q.    Let's step back.

4              MR. PULTMAN:   Thank you for the

5         clarification.

6         Q.    In connection with the motion, the

7    motion about the PPI issue, if the bonds won

8    the motion outright and had an order that

9    allowed them to get the contract rate on all

10   post-petition interest --

11        A.    Yes.

12        Q.    -- was there a discussion on the FTI

13   side as to what the bonds would be likely to

14   recover?

15        A.    Yes.

16        Q.    Can you tell me what that discussion

17   was?

18   DI         MR. LEBLANC:   I'm going to instruct

19        you not to answer that.

20        Q.    Let's drill down, then.

21              Was that discussion with counsel?

22        A.    Yes, analyses requested by counsel.

23        Q.    Was there any analysis that was done

24   that was just FTI's analysis, done in response

25   to a request by counsel, but just FTI's

```
 1            KATZENSTEIN - HIGHLY CONFIDENTIAL
 2    analysis, not reflecting work done by Milbank?
 3              MR. LEBLANC:  Just so I understand,
 4         you mean directed by Milbank, but not done
 5         by Milbank?
 6              MR. PULTMAN:  Exactly.
 7         A.    Yes.
 8         Q.    Okay.  And are you able to tell me
 9    what that analysis was?
10    DI        MR. LEBLANC:  I'm going to instruct
11         you not to answer that.
12         Q.    Are there written documents
13    reflecting that analysis?
14              MR. LEBLANC:  You mean, just to be
15         clear, the analysis being what possible
16         outcomes there are from PPI?
17         Q.    FTI's analysis of what --
18              MR. LEBLANC:  You can answer that.
19         A.    Yes.
20         Q.    And did you model what the potential
21    outcomes could be under the PPI recovery?
22              MR. ROSENTHAL:  Objection to form.
23              MR. LEBLANC:  Object to the form.
24              Again, that's a yes or no.
25         A.    Yes.
```

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL

 2         Q.     More than once?

 3         A.     Yes.

 4         Q.     When was the first time that FTI

 5    prepared financial analysis of what that

 6    recovery could be?

 7                MR. LEBLANC:  Object to the form.

 8         A.     Can you explain what that means?

 9         Q.     Sure.  Let's go back to the PPI

10    recovery.

11                If the bonds won the motion and got

12    an award of contract rate PPI, when was the

13    first time that FTI prepared a financial

14    analysis of the potential recovery?

15                MR. LEBLANC:  Object to the form,

16         assumes facts not in evidence.

17         A.     I mean, I don't know, but we have

18    been modeling potential outcomes for years.

19         Q.     Now, you were in the middle of

20    telling us about the meeting that you had with

21    Mr. Ray.  You told us about his argument that

22    you should accept the 30 percent.

23                What was the response to his

24    argument?

25         A.     I think that we may have had a break
```

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2      at that point, and when we were ready, we --

3      John Ray, I believe, and Lisa and Mike returned

4      to the room, and we countered at 65 percent.

5      So a 35 percent discount, 65 percent off our

6      70.

7           Q.    Was there a follow-up

8      counterproposal from the US?

9           A.    Yes.  I mean, there was, again, a

10     break.  I don't remember.  And then John Ray

11     returned, and I think proposed a 60 percent

12     discount to 40 percent.

13          Q.    So you moved from 70 to 65, they

14     moved from 30 to 40?

15          A.    Right.

16          Q.    Did you make any further

17     counterproposal?

18          A.    I don't believe there were any

19     further counterproposals at that meeting.

20          Q.    Were there any further discussions

21     or arguments about why you should accept the

22     counterproposal?

23          A.    I believe there were.

24          Q.    Can you tell me what the arguments

25     were made?

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2         A.    I don't remember with specificity,

3    but there were -- they were saying, you know,

4    that the certainty and the expediency that we

5    wanted, you know, John Ray advocated that we

6    take it, and we indicated that we would not

7    accept it, but I don't believe we countered at

8    that time.

9              I think there was discussion of some

10   more, but not a lot of flexibility between the

11   parties, you know, negotiation stuff, and we

12   broke.

13        Q.    So we're on the 15th of July.

14              How was the meeting left?

15        A.    By foot.

16        Q.    By -- were there any parting words

17   between the participants at the meeting on the

18   15th?

19              MR. LEBLANC:  Object to the form.

20        A.    My recollection was that, okay, we

21   will keep talking.  It was clearly my

22   impression that there was some remaining

23   flexibility, and that we had some remaining

24   flexibility, and we -- I don't believe there

25   was a definitive agreement on when we would

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2      reschedule or how.

3           Q.    Were there any discussions about

4      drafting a proposed settlement agreement at the

5      meeting?

6           A.    I don't recall.

7           Q.    I'm going to ask that you take a

8      look at the document that hopefully is in the

9      collection I have put before you, and I'm going

10     to ask you to take a look at Ray Exhibit 3.

11          A.    Yes.

12          Q.    Can you tell me what date that is?

13          A.    Monday, the 14th.

14          Q.    I think you're looking at Ray

15     Exhibit 2, actually.  If you look on -- I know

16     it's behind tab three, but it has got --

17          A.    Okay.  I'm sorry.  Yeah, this is the

18     one you showed me earlier.  I'm sorry.  So the

19     next one or --

20          Q.    The next one behind that should be

21     Ray Exhibit 3.

22               MR. LEBLANC:  Ray Exhibit 3 or 4?

23               MR. PULTMAN:  Ray Exhibit 3.

24               MR. LEBLANC:  It should look like

25          this.

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2                    THE WITNESS:  Is this it?

3                    MR. PULTMAN:  No.

4         Q.    If you hand this back to me, I will

5    hand you Ray Exhibit 3.

6         A.    So it is 3.  I see it.  It's just

7    mistabbed.  Right.

8         Q.    And for the record, Ray Exhibit 3 is

9    dated Thursday, July 17, 2014, at 11:26 a.m.,

10   and it's from a Mr. Tom Matz.  It bears Bates

11   numbers BHG-PPI-0000153 through 164.

12        A.    Yes, sir.

13        Q.    It indicates, in the substance of

14   the cover e-mail.

15        A.    Yes.

16        Q.    "Lisa, further to our discussions on

17   Tuesday, attached is a draft settlement

18   agreement regarding PPI."

19              Have you seen this document before?

20        A.    I don't know.  I don't know.

21        Q.    Did you, at some point, learn that a

22   draft settlement agreement had been sent from

23   Milbank to Cleary?

24        A.    Yes, I believe I did.

25        Q.    And did you know it was going to be

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2    sent before it was sent?

3        A.    It's possible.  I don't recall.

4        Q.    And if you look at the settlement

5    agreement, and in particular you look at

6    Section 2.2, a section entitled PPI Settlement

7    Amount?

8        A.    Yes.

9        Q.    Says, "Shall be in amount up to,"

10   and it has in brackets, "60 percent."

11             Do you see that?

12       A.    Yes.

13       Q.    Do you know how the 60 percent

14   number came to be in this draft?

15       A.    I don't, but I would assume it was

16   the leave-off point from the Tuesday meeting.

17       Q.    Going back to what you testified to

18   earlier.  You told us about numbers that were

19   thrown out at 40 percent for NNI and 65 percent

20   as the counter.

21       A.    Yeah.  No, I believe there was a

22   counter at 60.  We left the meeting at 60/40.

23   If I misstated that, I would like to correct

24   that.

25       Q.    So just so the record is very clear,

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2     you started at 70, they started at 30.

3          A.     Right.

4          Q.     They moved up to 40.

5          A.     Right, right.

6          Q.     You went to 65.  And then you ended

7     up at 60?

8          A.     Yes.

9                 MR. LEBLANC:  Object to the form.

10         Q.     And just so, again, the record is

11    clear, the bonds were proposing the 60 percent

12    number?

13         A.     Yes, sir.

14         Q.     And that is reflected in the

15    document that was the draft of Thursday?

16         A.     Yes.

17         Q.     Were there further discussions in

18    which you participated between the parties

19    which moved the parties off of their 40/60

20    respective numbers?

21         A.     No.

22         Q.     Were there any meetings that moved

23    the parties from their 40/60 numbers?

24         A.     That I attended?

25         Q.     That you attended.

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2         A.    No.

3         Q.    Did you come to learn that there

4    were other discussions in which the parties

5    moved off of their 40/60 numbers?

6              MR. ROSENTHAL:  Objection to form.

7         A.    I did learn, yes.

8         Q.    Sitting here today, do you know

9    whether or not there is a proposed agreement --

10   settlement agreement, that has a number that's

11   somewhere between the 40 and 60 percent number?

12        A.    Let me see if I can be helpful.  I

13   know there were discussions which resulted in a

14   change in the parties' position, and ultimately

15   an agreement on percentage discount.

16              I don't recall seeing that proposal

17   in writing until it was in the form of the

18   settlement agreement that was...

19        Q.    Can you tell me what your role was

20   in settlement communications from -- after the

21   meeting on the 15th until the agreement that we

22   have looked at that's Ray Exhibit 1, which was

23   put to the court on the 24th of July?

24        A.    Yes.

25        Q.    What was your participation?

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2       A.    My participation was --

3             MR. LEBLANC:   In answering this,

4       just exclude discussions you may have had

5       with counsel.

6             THE WITNESS:   Thank you.

7       A.    My discussions were with -- with

8   Mike Kennedy at Chilmark and, to my

9   recollection, I spoke with Mike Kennedy on the

10  evening of Monday -- is that the 22nd or the

11  21st?

12      Q.    Monday is the 21st.

13      A.    The 21st.   And then I had subsequent

14  discussions with Mike Kennedy and John Ray on

15  the morning of the 22nd.   I believe I have

16  those dates right.

17            (Katzenstein Exhibit 3, E-Mail

18      Chain, Bates Stamped BHG-PPI-0000013

19      through 16, marked for identification.)

20      Q.    I'm going to show you a document we

21  have had marked as Katzenstein Exhibit 3, and a

22  copy for your counsel.

23            So the record is clear, the document

24  bears Bates numbers BHG-PPI-0000013 through 16.

25      A.    Yes.

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2          Q.    And appears to be a chain of e-mails

3     that start with the 17th of July and going

4     back -- going through the 19th of July.

5          A.    (Perusing.)  Uh-huh.

6          Q.    Let's start with the one on the 17th

7     of July.

8                Does that appear to you to be the

9     same document as the settlement agreement

10    version of Thursday, the 17th?

11         A.    It does.

12         Q.    And above that is an e-mail from a

13    Jennifer Harris to Ms. Schweitzer, dated the

14    18th of July.

15               Do you see that?

16         A.    Yes.

17         Q.    Which indicates, "Enclosed please

18    find a revised draft of the PPI settlement

19    agreement."

20         A.    Yes.

21         Q.    Do you know whether a revised draft

22    of the settlement agreement was circulated on

23    Friday, the 18th?

24         A.    Yes, I believe there was one.

25         Q.    And do you know whether the version

1        KATZENSTEIN - HIGHLY CONFIDENTIAL

2    that was -- the version of the settlement

3    agreement that was circulated on the 18th

4    contained a number of 55 percent?

5        A.    To my knowledge, it did.

6        Q.    And that 55 percent number, did that

7    equate to an actual number of $907.5 million?

8        A.    Yes.  At the time, that would have

9    been the number.

10        Q.    Were you aware that the parties were

11    discussing, on the 18th, a 55 percent or

12    $907.5 million number?

13        A.    Yes.

14        Q.    Did you know whether or not the

15    parties had agreed on that number?

16        A.    To my knowledge, we had an oral

17    agreement at 55 percent.

18        Q.    And do you know who that oral

19    agreement was between?

20        A.    I believe there were discussions

21    between Mr. Dunne, Mr. Ray and Lisa Schweitzer.

22        Q.    Do you know when those discussions

23    took place?

24        A.    To the best of my recollection, on

25    that Thursday.

1           KATZENSTEIN - HIGHLY CONFIDENTIAL

2           Q.    Do you know whether those

3    discussions took place in person?

4           A.    I think they were by phone.

5           Q.    If we can just work our way back in

6    the chain on the document that's been marked

7    Katzenstein Exhibit 3, there appears to be a

8    response from Ms. Schweitzer to Ms. Harris,

9    thanking Jennifer, "We will review and come

10   back to you on the draft."

11              Do you see that?  It's on the top of

12   the second page.

13          A.    Yes, I see that.  Thank you.

14          Q.    And above that is an e-mail from

15   Mr. Leblanc to Ms. Schweitzer, with various

16   cc's, with an indication, "Lisa, just to warn

17   you in advance, we have a call at 5 p.m. with

18   Akin on a number of topics, and expect this

19   will come up."

20              Do you see that?

21          A.    I do.

22          Q.    Do you have any understanding as to

23   what the balance of that e-mail is a reference

24   to?

25              Just so the record is clear, it

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL
 2    indicates, "We probably need to do that anyway.
 3    We've been talking with the IT, but have sworn
 4    them to secrecy.  I know it will create
 5    problems, but are you okay with that if we need
 6    to?"
 7              MR. LEBLANC:  Object to the form,
 8         lacks foundation.
 9              THE WITNESS:  Am I free to answer?
10              MR. LEBLANC:  Yeah.
11         A.   I think -- I believe I have an
12    understanding about what the references are.
13         Q.   Tell us what your understanding is,
14    please.
15         A.   Our negotiations on this subject, on
16    the subject of the -- settling the
17    post-petition accrual, were exclusively between
18    the ad hoc bondholders and the US debtors, and
19    we had not yet involved Akin Gump, who were
20    counsel for the official committee of
21    creditors, and represent, in addition to our
22    interest, the interest of the other US GUCs,
23    general unsecured creditors, and to the best of
24    my knowledge, this discussed the timing of
25    bringing them into the fold on the
```

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2     negotiations.

3          Q.    Did you have any involvement in

4     discussions with parties other than the US and

5     the ad hoc bondholders about the proposed

6     settlement at any point in time?

7          A.    No.

8          Q.    At any point in time, did you have

9     discussions with anyone representing the

10    Canadian debtors about the proposed settlement?

11         A.    I did not.

12         Q.    Did you have any discussions with

13    anyone else about the proposed settlement?

14              MR. LEBLANC:   Object to the form.

15         A.    Anyone else?

16         Q.    You have told us about discussions

17    with NNI and NNI's representatives.

18         A.    Right.

19         Q.    You have told us you have not had

20    conversations with any of the other creditors

21    or their representatives.

22         A.    Other than the bondholders.

23         Q.    Other than the bondholders.

24         A.    Okay.  No one else.

25         Q.    You had no conversations or

1           KATZENSTEIN - HIGHLY CONFIDENTIAL

2     communications with representatives of the

3     official committee?

4           A.    No, I did not.

5           Q.    And you had no conversations with

6     representatives of the PBGC?

7           A.    I did not.

8           Q.    You had no conversations or

9     communications with any other creditors of NNI?

10                MR. LEBLANC:  Object to the form.

11          A.    I did not.

12          Q.    You had no conversations with anyone

13    at the Canadian debtors?

14          A.    I did not.

15          Q.    Did you have conversations with

16    anyone else?

17          A.    Not to my knowledge, no.

18          Q.    Do you know whether anyone else from

19    FTI had conversations with anyone other than

20    NNI or the bondholders about this subject

21    matter?

22          A.    To my knowledge, there were none.

23          Q.    Now, the top e-mail between

24    Ms. Schweitzer and Mr. Leblanc on Saturday,

25    July 19, 2014, indicates, "They reached out to

1              KATZENSTEIN - HIGHLY CONFIDENTIAL
2      John, so we going to send them your latest
3      draft telling them it's a working draft subject
4      to comments by everyone.  Also, Mike has asked
5      FTI for a calculation of how you get to the
6      $1.6 billion interest number.  Can you have
7      them send that over to us through you?
8      Thanks."
9                  Do you see that?
10          A.    I do.
11          Q.    Do you have an understanding as to
12     what that's a reference to?
13                  MR. LEBLANC:  Object to the form,
14          lack of foundation.
15                  You can answer.
16          A.    I believe I do.
17          Q.    And what's your understanding?
18          A.    I believe that, at some point, Mike
19     Kennedy is the Mike that's being referenced,
20     had asked that we send over a schedule showing
21     the calculation of post-petition interest
22     accrual, and I guess the sum of that accrual.
23          Q.    And when you say we there, are you
24     referring to FTI?
25          A.    Yes.

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2          Q.     Did FTI, in fact, send over a

3     schedule of how it got to the $1.6 billion

4     interest number?

5          A.     I believe we did.

6                 (Katzenstein Exhibit 4, E-Mail with

7          Schedule, Bates Stamped BHG-PPI-0000009

8          through 12, marked for identification.)

9          Q.     I'm going to show you a document

10    that we've had marked as Katzenstein Exhibit 4,

11    a document bearing Bates numbers BHG-PPI-000009

12    through 12.  And I will give you a copy for

13    your counsel as well.

14                In a minute, Mr. Katzenstein, I'm

15    going to ask you to identify the document, and

16    then, if it's appropriate, we're going to take

17    a few minute break, if that works for you.

18         A.     Fine with me.  Maybe I can find some

19    reading glasses during that period.

20                MR. LEBLANC:  Is there a question?

21         Q.     The question, Mr. Katzenstein, is

22    have you seen the document that is the

23    attachment to the e-mail that's a three-page

24    document which says, "Prepared at the request

25    of counsel, prepared in contemplation of

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2     litigation," and the heading of the document

3     says Post-Petition Interest Calculations?

4          A.    I have seen this.

5          Q.    And can you tell me what this is?

6          A.    This is a calculation prepared by --

7     by issuance of post-petition interest accruals

8     on the guaranteed bonds.  It includes, at some

9     point, a tally of the post-petition interest as

10    of July 1 -- June 30, July 1.

11         Q.    And is that tally contained on the

12    document that ends in Bates number 12?

13         A.    It is.

14         Q.    And is that something in the order

15    of $1.656 billion?

16         A.    Yes.

17         Q.    Is this the document that was sent

18    in response to Katzenstein Exhibit 3?

19         A.    To my knowledge, it is.

20              MR. PULTMAN:  Can we take a few

21         minutes?

22              THE WITNESS:  My pleasure.

23              THE VIDEOGRAPHER:  We are now off

24         the record.  The time is 2:18 p.m.,

25         September 18, 2014.

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL

 2                   (Recess taken.)

 3                   THE VIDEOGRAPHER:  This is tape two

 4         of the deposition of Mr. Michael

 5         Katzenstein.  We are now back on the

 6         record.  The time is 2:38 p.m.,

 7         September 18, 2014.

 8   BY MR. PULTMAN:

 9         Q.    Mr. Katzenstein, we were looking at

10   Katzenstein Exhibit 4, the cover e-mail dated

11   Saturday, July 19, 2014, and then the

12   three-page schedule.

13         A.    Yes, sir.

14         Q.    That three-page schedule, I believe

15   you said was prepared by FTI.

16         A.    Yes.

17         Q.    Do you recall who at FTI prepared

18   the schedule?

19         A.    Melker Sandberg.

20         Q.    Were you involved at all in

21   approving the schedule?

22         A.    I don't recall with particularity if

23   I approved this one, but it's consistent with

24   analyses I have seen.

25         Q.    Do you believe the schedule prepared
```

```
 1            KATZENSTEIN - HIGHLY CONFIDENTIAL
 2   by FTI to be accurate?
 3        A.    Yes.
 4        Q.    Did you authorize sending this to
 5   counsel at NNI?
 6        A.    I don't recall if I approved
 7   specifically, but it was consistent with the
 8   expectation that we would send this over to our
 9   counsel for distribution.
10        Q.    And when you say for distribution by
11   your counsel, that meant to NNI's counsel?
12        A.    Yes.
13        Q.    And Mr. Sandberg wasn't in trouble
14   for sending this out, was he?
15        A.    Not yet.  Let's see what you ask.
16        Q.    Sitting here today, to your
17   knowledge, the number that's reflected on the
18   last page of 1.656 billion, is that consistent
19   with the number that the monitor had raised?
20        A.    It is, yes.
21        Q.    And did anyone from NNI raise any
22   concern with respect to that schedule?
23             MR. ROSENTHAL:  Objection to form.
24        A.    Not to my knowledge.
25        Q.    There is a reference on the last
```

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2    page of the document to what's indicated as NNC

3    notes?

4               MR. LEBLANC:  NNCC?

5         Q.    I'm sorry.  NNCC notes?

6         A.    Yes.

7         Q.    Do you have an understanding as to

8    what the NNCC notes were?

9         A.    Yes.

10        Q.    And what were the NNCC notes?

11        A.    They were notes issued by NNCC,

12   which was a financing entity, US financing

13   entity, I believe, in the principal amount of

14   150 million, if I'm not mistaken.  Yes, that's

15   what is there.

16               And these are the only notes that

17   were not issued by NNI and guaranteed by NNL.

18   So it was just a different issuing mechanism.

19        Q.    And were the holders of the NNCC

20   notes included in the earlier versions of the

21   proposed settlement agreement, to your

22   knowledge?

23               MR. LEBLANC:  Object to the form.

24               You can answer.

25        A.    Well, to my knowledge, the early

1           KATZENSTEIN - HIGHLY CONFIDENTIAL

2    versions of the settlement agreement were

3    drafted assuming that the NNCC notes would

4    become a party to the settlement agreement and

5    would compromise their claim for accrued

6    post-petition interest in the same proportion

7    as the other crossover bondholders.

8           Q.    To your knowledge, were the NNCC

9    noteholders ultimately a part of the proposed

10   settlement that is reflected in Ray Exhibit 1?

11          A.    No, they were not.

12          Q.    And do you have an understanding as

13   to how they became excluded from that document?

14                MR. LEBLANC:  Object to the form.

15          A.    I do.

16          Q.    Can you tell us what your

17   understanding is?

18          A.    My understanding was that they were

19   asked and invited to participate and that they

20   declined.

21          Q.    Were you involved in any

22   communications with the NNCC noteholders?

23          A.    I was.

24          Q.    And can you tell me who you were

25   involved with communications -- with whom were

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL
 2    you involved?
 3         A.    Direct involvement, I spoke with one
 4    of the principal holders of the NNCC bonds --
 5    with a principal at one of the principal
 6    holders of the NNCC bonds, and asked for his
 7    fund to participate.
 8         Q.    And who was that principal?
 9         A.    Steve Blauner.
10         Q.    Is he the principal of Solus?
11         A.    Solus, a principal of Solus, yes.
12         Q.    And when did you have these
13    communications with Solus?
14         A.    To the best of my recollection, it
15    was on Tuesday -- the Tuesday following the
16    first Wednesday meeting.
17         Q.    And when you say --
18         A.    The Tuesday following the Tuesday
19    meeting.  I'm sorry.
20              MR. LEBLANC:  The 22nd.
21         A.    The 22nd.
22              THE WITNESS:  Thank you, Andy.
23              MR. LEBLANC:  Just to give you the
24         dates.
25         Q.    I appreciate that.  So that's
```

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2      July 22?

3           A.    Yes, sir.

4                (Katzenstein Exhibit 5, E-Mail,

5           Bates Stamped BHG-PPI-0000226, marked for

6           identification.)

7           Q.    I want to show you a document we

8      have marked as Katzenstein Exhibit 5, which is

9      a one-page document, dated July 23, 2014, and I

10     have a copy for your counsel there as well.

11               For the record, the document is a

12     one-page document bearing Bates numbers

13     BHG-PPI-0000226.

14          A.    Yes.

15          Q.    It appears to be an e-mail chain

16     involving Mike Kennedy, Melker Sandberg, you

17     and John Ray.

18               Do you see that?

19          A.    Yes, yes.

20               MR. LEBLANC:  Just make sure he gets

21          his question out so she can record both of

22          you.

23               THE WITNESS:  Thanks, Andy.

24          Q.    Have you seen this document before?

25          A.    I don't specifically recall, but...

```
1              KATZENSTEIN - HIGHLY CONFIDENTIAL
2         Q.    Okay.  Mr. Kennedy's e-mail
3    indicates, "Mike/Melker, we need a quick call
4    regarding our discussion last night."
5         A.    Yes.
6         Q.    "Can we have a conversation in the
7    next 40 minutes (before 9 Central)?"
8              Do you see that?
9         A.    I do.
10        Q.    Do you know whether you had a
11   conversation with Mr. Kennedy on the 22nd, on
12   Tuesday, of July?
13        A.    I did.
14        Q.    And can you tell us about that
15   conversation?
16        A.    Yes.  I -- Melker and I spoke with
17   Mike Kennedy.  Mike told us that John Ray was
18   uncomfortable and did not want to have any
19   continuing accrual or post-petition interest
20   from and after the -- the June 30 date,
21   essentially.
22        Q.    When you say June 30, is that 2015?
23        A.    Fourteen.
24        Q.    Okay.  Did he explain why?
25        A.    He wanted to have a fixed amount of
```

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2     PPI accrual, and didn't want it to continue to

3     grow as the case continued to go on.  We felt

4     very strongly -- our holders felt very strongly

5     that there needed to be a continuing accrual

6     for reasons that we explained to Mr. Ray, or I

7     explained to Mr. Kennedy.

8               And Mike Kennedy said he would

9     discuss it with John, and --

10         Q.    How long was that conversation?

11         A.    I think it was about a half hour, if

12    I'm not mistaken.

13         Q.    And was Mr. Sandberg on the call as

14    well?

15         A.    He was.

16         Q.    And other than you, Mr. Sandberg and

17    Mr. Kennedy, was there anyone else on the call?

18         A.    To my knowledge, no.

19         Q.    Did you take any notes of the call?

20         A.    I did not.

21         Q.    Do you know whether Mr. Sandberg

22    took notes of the call?

23         A.    I don't.

24         Q.    Prior to this time on Monday, the

25    21st of July, had you seen a revised draft of

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2    the settlement agreement that was prepared by

3    counsel for NNI?

4          A.    I don't specifically recall, but

5    it's possible that I did.

6          Q.    Okay.  Do you recall a change from

7    the percentage to a specific number?

8          A.    I do.

9          Q.    And what do you recall about that?

10         A.    I recall that John Ray wanted a

11   specific agreement on a specific number of the

12   accrual because he did not want any

13   misunderstandings or further negotiations or

14   arguments or any associated potential delays

15   that might result from differences among the

16   bondholders, individually or collectively, and

17   the US estate as to how to calculate the

18   post-petition interest that was accruing.

19         Q.    Was that issue ultimately resolved

20   prior to the July 24 final proposed agreement?

21         A.    It was.  It was.

22         Q.    How was it resolved?

23         A.    It was resolved by liquidating to a

24   number, 876 million, the amount of the total

25   allowed claim in respect of post-petition

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL
 2    interest and accruals of any sort, make whole,
 3    interest, however calculated, to the June 30,
 4    2014 date.
 5         Q.    When you say, "liquidating the
 6    $876 million number," that was as at June 30,
 7    2014?
 8         A.    Yes, sir.
 9              MR. LEBLANC:  Object to the form.
10         Q.    Was there a continuing accrual of
11    some kind after the June 30, 2014 date?
12         A.    Yes, sir.
13         Q.    And was it specified in the final
14    proposed agreement?
15         A.    It was.
16         Q.    And do you know what the percentage
17    was it was specified at?
18         A.    I do.
19         Q.    And what is that?
20         A.    3.5 percent to run for a period from
21    July 1 to June 30, July 1, 2014, to June 30,
22    2015.
23         Q.    And that's something in the order of
24    $366,780.82 a day; is that correct?
25         A.    Are you looking for a job?
```

1        KATZENSTEIN - HIGHLY CONFIDENTIAL

2              I don't know, but I do know -- I do

3    know the monthly and the -- or the total amount

4    that it could -- and it was also explicitly

5    stated, if I'm -- if I'm not mistaken, that

6    that interest rate would only be borne on the

7    then outstanding principal amount of the bonds.

8        Q.    So that the $876 million number

9    wasn't the total number of the PPI interest

10   even on the date of July 24, when this was

11   submitted to the court, was it?

12       A.    Well, interest -- prior to the

13   agreement, interest was running at an

14   approximate rate of $25 million a month on the

15   aggregate affected bonds.  So you pick a date

16   and liquidate as of that date, and then there

17   was a continuing interest agreement at a rate

18   significantly below the effective date prior to

19   the -- prior to the agreement, and that ran for

20   up to one year.

21       Q.    So am I correct that on the date

22   that this was submitted to the court, July 24,

23   the approximate number of the PPI interest

24   under the proposed settlement agreement was

25   nearly $885 million?

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2        A.    As I sit here, that sounds like it's

3   probably right, but I am -- you know, without a

4   calculator, I'm useless these days.

5        Q.    The cap at June 30, 2014, sitting

6   here today, do you recall what that is?

7        A.    876.

8        Q.    And as at June 30, 2015, what is

9   that cap?

10        A.    1,010,000,000.

11        Q.    Now, let's go back to Katzenstein

12   Exhibit 5.

13              You told us about the conversations

14   that you had with Mr. Kennedy about the issue

15   that Mr. Ray had raised.

16        A.    Yes.

17              MR. LEBLANC:  Object to the form.

18        Q.    Do you recall whether there was a

19   follow-up conversation on the 23rd with respect

20   to that issue?

21        A.    Yes, there was.

22        Q.    Were you a participant in that

23   conversation?

24        A.    I was.

25        Q.    Who else was?

1            KATZENSTEIN - HIGHLY CONFIDENTIAL

2        A.     Melker Sandberg and Mike Kennedy,

3    John Ray.

4        Q.     Mr. Ray participated in this call?

5        A.     Mr. Ray did participate.

6        Q.     Was it a telephone call?

7        A.     It was.

8        Q.     And how long did it last?

9        A.     Less than a half hour, I think.

10       Q.     Okay.  Can you tell us what was said

11   on this call?

12       A.     I think we -- Melker or I or one of

13   us restated our client's requirement for a

14   continuing accrual of interest, that that was a

15   critical component of any -- of willingness to

16   do the settlement, and we thought, otherwise,

17   we were vulnerable to continuing delays by the

18   Canadian, by NNL in making distributions or

19   settlements, because it would be essentially on

20   our nickel, that we needed to have an interest

21   component which would, we hope, continue to

22   motivate the parties to settle and agree on

23   allocation and distributions.

24            Mr. Ray said, okay, as a best and

25   final, I will agree to let interest continue to

```
1              KATZENSTEIN - HIGHLY CONFIDENTIAL
2     accrue for up to one year, and at 3.5 percent,
3     and that's it.  So take it or leave it.
4          Q.    And what was the response?
5          A.    I said we will take it back to our
6     group.
7          Q.    And did you have a follow-up
8     conversation or communication with Mr. Ray?
9          A.    I don't recall if I did.  I may not
10    have personally.  That conversation may have
11    taken place between Milbank and Cleary.
12         Q.    Do you have an understanding as to
13    whether or not this issue was agreed between
14    the bondholders and NNI?
15         A.    Yes, I believe we agreed to that
16    proposal without any additional changes.
17         Q.    Do you recall when the NNCC
18    bondholders came out of the settlement
19    agreement?
20              MR. LEBLANC:  Object to the form.
21         A.    I don't recall with specificity, but
22    if I'm not mistaken, it was that Tuesday, the
23    23rd -- the 22nd, I'm sorry, that I learned
24    about it.
25         Q.    So looking at the document that's
```

```
 1            KATZENSTEIN - HIGHLY CONFIDENTIAL
 2    been marked Katzenstein Exhibit 5, which refers
 3    to the Wednesday, July 23, 2014.
 4         A.    Yes.
 5         Q.    At that point in time, by Wednesday,
 6    had the NNCC noteholders come out of the
 7    settlement?
 8         A.    To my knowledge, they told us that
 9    they would not participate.
10         Q.    Once the issue relating to the
11    timing for the running of the interest issue,
12    when that issue was resolved, were there any
13    other open issues between the bondholders and
14    NNI?
15              MR. LEBLANC:  Object to the form.
16         A.    I'm not -- I'm not certain.  I know
17    there were two issues that were being resolved
18    concurrently, but I am not certain at what
19    point in time they were taken off the table.
20         Q.    Okay.  Can you tell us what those
21    two issues were?
22         A.    There was -- the two matters that
23    were being negotiated were indemnity or
24    advances that were required by certain of the
25    indenture trustees in order for them to come
```

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2    along with the settlement.

3         Q.    Was that for their legal fees?

4         A.    Covering costs, and I don't know if

5    it was only for legal fees, but I believe there

6    was -- it was ultimately liquidated to a

7    number.

8         Q.    Do you recall what that number was?

9         A.    I believe $6 million of advances.

10        Q.    Okay.

11        A.    Those were, I believe, styled as

12   advances against ultimate recoveries by the

13   bonds covered by the -- monies that would

14   ultimately come to the trustee for

15   distribution.  And the other issue was language

16   that was being negotiated to cover how the

17   affected bonds and the other GUCs in the US

18   estate would fare vis-a-vis any amounts

19   available to be distributed on account of

20   post-petition interest in the event that there

21   were insufficient funds to pay the full amount

22   of the allowed compromised bond claim for

23   post-petition interest.

24        Q.    And if you look at the document

25   that's been marked Ray Exhibit 1, in particular

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2    the settlement agreement, Section 4.2.

3          A.    Yeah.  Yes.

4          Q.    Is that the issue that you just

5    referenced, the second issue under the,

6    "provided, however, that if there are

7    insufficient funds available"?

8          A.    Yes, yes, I believe that is it.

9          Q.    And is 4.2 that provision, the

10   resolution that was agreed by the parties?

11         A.    Yes, I believe.

12         Q.    When was the settlement agreement

13   that's proposed in this document agreed between

14   NNI and the bondholders?

15         A.    The individual bondholders or --

16         Q.    Let's talk about the group of

17   bondholders.  Were there --

18         A.    I'm sorry.  I didn't hear that.

19         Q.    Did it take time to get various

20   bondholders on board?

21         A.    Yes.  There was a period where we

22   were, through Milbank -- I said we, meaning the

23   professional team, collecting signatures and

24   getting our clients on board and bound to the

25   agreement.

1         KATZENSTEIN - HIGHLY CONFIDENTIAL

2        Q.    Do you recall when the first of the

3    bondholders was on board?

4        A.    I don't.  I'm sorry.

5        Q.    Do you know when the last of the

6    bondholders got on board?

7        A.    I think it was shortly before we

8    filed the agreement.

9        Q.    And that was on the 24th of July?

10       A.    I believe so.

11       Q.    In the period from the 14th of July

12   through the 24th of July, did you have any

13   other conversations that you haven't told us

14   about today with John Ray?

15       A.    No, I don't recall it.

16       Q.    Did you have any conversations that

17   you haven't told us about with Michael Kennedy?

18       A.    Personally, no.

19       Q.    Do you know whether anyone else at

20   FTI had any other conversations with

21   Mr. Kennedy?

22       A.    If I'm not mistaken, there may have

23   been one or two calls between Mark and/or

24   Melker and Mike Kennedy concerning elements of

25   the negotiations, but I was not a party to

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL
 2   them.
 3       Q.    Did you get a report back on those
 4   calls?
 5       A.    I may have.
 6       Q.    Do you recall what the substance of
 7   those calls were?
 8       A.    I don't specifically, but they are
 9   consistent with -- I'm sorry.  Go ahead.
10       Q.    I was going to ask, do you recall
11   generally?
12       A.    I believe they were just to affect
13   matters that have already -- with respect to
14   which I have already given deposition
15   testimony.
16       Q.    Now, earlier, you told us, and your
17   counsel directed you not to get into the
18   substance of the financial modeling that you
19   did.
20              In all the financial modeling that
21   you did with respect to the PPI accrual, did
22   you ever share that PPI accrual modeling with
23   Chilmark?
24       A.    No.
25       Q.    Did you ever share the PPI
```

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2    calculation modeling with Cleary Gottlieb?

3         A.    No.

4         Q.    Did you ever share the PPI

5    calculations with NNI?

6         A.    No.

7         Q.    So you never shared it with John

8    Ray?

9         A.    No.

10        Q.    Did you ever communicate the

11   substance of your calculations to anyone else?

12             MR. LEBLANC:  Just to be clear, in

13        connection with this settlement or at any

14        time over the last five years?

15        Q.    Let's start with the settlement, in

16   connection with the settlement --

17        A.    No.

18        Q.    At any time prior to the discussions

19   of the settlement, did you share your

20   calculations -- your calculations with anyone

21   else?

22        A.    I don't know how to answer that.

23   Can you rephrase the question?

24        Q.    Okay.  Prior to June of 2014 --

25        A.    Yes.

1                   KATZENSTEIN - HIGHLY CONFIDENTIAL

2        Q.     -- had you done any modeling of what

3    potential recoveries the bonds could make on

4    the PPI issue?

5              MR. LEBLANC:  That's a yes or no.

6        A.     Yes.

7        Q.     And did you ever share those

8    calculations with anyone else?

9              MR. LEBLANC:  Can we be clear, the

10         output of it or the model itself or both?

11       Q.     Let's start with the output.

12       A.     From time to time, in connection

13   with negotiations, we had synced up models with

14   the US debtor, the Canadian constituencies on

15   possible puts and takes and outputs and inputs,

16   but we did not share our model or -- with

17   anybody at any time.

18       Q.     Did you have any conversations with

19   John Ray about whether Mr. Ray had done any

20   modeling of the potential result of the PPI

21   accrual?

22             MR. LEBLANC:  In connection with the

23         settlement?

24       Q.     In connection with the settlement.

25       A.     No.  I mean, we all -- we know the

1        KATZENSTEIN - HIGHLY CONFIDENTIAL

2   numbers, right?  We've been living with this

3   case for years.  So I don't think -- the answer

4   is no.

5        Q.    Did you ever calculate -- did

6   Mr. Ray ever tell you that he had calculated

7   what the maximum amount of notional surplus

8   would be available to NNI after distribution

9   for the payment of post-petition interest?

10             MR. LEBLANC:  Object to the form.

11        A.    He did not.

12        Q.    Did anyone from Chilmark ever tell

13   you that they had calculated the maximum amount

14   of notional surplus available to NNI after

15   distribution for the payment of post-petition

16   interest?

17             MR. LEBLANC:  Object to the form.

18        A.    No.

19        Q.    I'm going to ask you a series of

20   questions going not to Chilmark and NNI, but to

21   calculations that you performed.  So I'm going

22   to take this slowly and one at a time.

23        A.    Okay.

24        Q.    Did you do any modeling or analysis

25   of what the burn rate would be on the NNI

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL
 2    estate from July 1, 2014 forward?
 3              MR. LEBLANC:  Object to the form.
 4              MR. ROSENTHAL:  Objection to form.
 5    DI        MR. LEBLANC:  I'm going to instruct
 6         you not to answer that to the extent that
 7         it involves direction from counsel.
 8              MR. PULTMAN:  Well, my only question
 9         is whether you did it.  I'm not asking
10         what the number is.  I'm not asking for
11         the disclosure.  I just want to know
12         whether he looked at that issue.
13              MR. LEBLANC:  You're getting -- when
14         you get that specific, it really does
15         invade the work product privilege, if we
16         have asked him to model particular things.
17         I think you're getting too close to the
18         substance.
19              MR. PULTMAN:  So is that a direction
20         to the witness not to answer?
21              MR. LEBLANC:  Yes.
22              MR. PULTMAN:  I'm going to ask a
23         series of questions and if you can give
24         the same direction, that's fine.
25    BY MR. PULTMAN:
```

1       KATZENSTEIN - HIGHLY CONFIDENTIAL

2       Q.    I assume you'll follow your

3   counsel's direction?

4       A.    It served me well so far.

5       Q.    Okay.  Did you do any modeling or

6   analysis of what receivables were due to the

7   NNI estate?

8   DI        MR. LEBLANC:  Instruct the witness

9       not to answer.

10      Q.    Did you do any analysis of what the

11  cash balance would be in the NNI estate?

12            MR. LEBLANC:  That one, you can

13      answer yes or no.

14      A.    Yes.

15      Q.    And when did you do your last

16  analysis of the cash balance?

17      A.    I don't recall.

18      Q.    Did you have any conversations with

19  Mike Kennedy on or about the 22nd of July with

20  respect to the cash balance in the US estate?

21      A.    I don't recall.

22      Q.    Do you recall Mr. Kennedy telling

23  you that he had, in fact, spent several hours

24  on the 22nd of July looking at the cash

25  balances in the US estate?

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2        A.    I don't recall.

3        Q.    Did you -- did FTI ever do any

4   modeling or valuation of the tax claim?

5              MR. LEBLANC:  You could answer that

6        yes or no.

7        A.    Yes.

8        Q.    Can you disclose what work you did

9   with respect to the valuation of the tax claim?

10  DI             MR. LEBLANC:  That, I will instruct

11       you not to answer.

12             THE WITNESS:  Yeah.

13       Q.    Did you ever do any valuation or

14  modeling of specific claims within the US

15  estate?

16             MR. LEBLANC:  You can answer yes or

17       no.

18       A.    Yes.

19       Q.    Did you ever look at and value the

20  PBGC claim?

21  DI             MR. LEBLANC:  I will instruct you

22       not to answer that.

23       Q.    At any point in time, did any

24  representative of NNI disclose to you what

25  modeling or analysis they had done of the

```
1              KATZENSTEIN - HIGHLY CONFIDENTIAL
2     possible notional surplus available to NNI
3     after distribution for the payment of
4     post-petition interest?
5          A.    Can you repeat the question, please?
6          Q.    Sure.  At any point in time did
7     anyone from NNI, any representative or employee
8     of NNI disclose to you what modeling or
9     analysis they had done of potential notional
10    surplus available to NNI after distribution for
11    the payment of post-petition interest?
12              MR. LEBLANC:  This is at any time?
13         Q.    Anytime.
14         A.    Yes.
15              MR. ROSENTHAL:  Hold on.  I'm going
16         to object to this.  To the extent that
17         there are discussions during the course of
18         the allocation litigation in which the
19         bondholder group is part of the group
20         litigating with the US debtors, I don't
21         think that that's appropriate.
22              MR. PULTMAN:  And I'm not interested
23         in invading that privilege.  I don't want
24         to get to that privilege.  Let's take that
25         off the table.
```

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL
 2                   MR. LEBLANC:  Just to be clear, do
 3            you want to invade the confidentiality of
 4            mediations to the extent that we've had
 5            mediations where these have been the topic
 6            of mediation discussions?
 7            Q.    Let me carve out mediations, common
 8      interest discussions, if you believe that
 9      there's something that's potentially
10      privileged.
11            A.    Then I think no.  I believe
12      everything has been shared that's been in the
13      context of settlement discussions, mediations
14      or in the allocation dispute or related.
15            Q.    Have you had, after July 23, 2014,
16      any further conversations with the US with
17      respect to the proposed 9019 settlement?
18            A.    No.
19            Q.    Were you involved at all in the
20      production of documents to us with respect to
21      this motion?
22            A.    No.
23            Q.    Can you tell us what you did to
24      prepare for today's deposition?
25            A.    Yes.
```

1                KATZENSTEIN - HIGHLY CONFIDENTIAL

2          Q.     What did you do?

3          A.     I met two days ago at Milbank with

4     Andy Leblanc, Tom Matz, Nick Bassett, and Atara

5     Miller was on the phone for a short period.

6     Melker Sandberg joined, and we spoke.

7                MR. LEBLANC:  Don't get into the

8          substance of any of those discussions.

9                THE WITNESS:  Right.

10         A.     And I looked at the motion and the

11    settlement agreement to refresh myself.

12         Q.     Have you read any deposition

13    transcripts to prepare for this deposition?

14         A.     I have not.

15         Q.     So you haven't read the John Ray

16    deposition of earlier this week?

17         A.     No, I have not.

18         Q.     Did you review any documents?

19                MR. LEBLANC:  Just answer that yes

20         or no.

21         A.     Yes.

22         Q.     Any of the documents you have seen

23    today?

24         A.     A couple of them, yeah.

25         Q.     Did you have any discussions with

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2    any representatives of NNI about whether the

3    proposed settlement is in the interest of the

4    creditors of the US estate?

5          A.    Yes, I believe so.

6          Q.    Okay.  With whom did you have such

7    conversations?

8          A.    I think those discussions occurred

9    during the Tuesday, July 15 meeting, and they

10   may have occurred also in subsequent calls that

11   I had with Mike Kennedy and John Ray.

12         Q.    Let's start with the July 15

13   meeting.

14               Can you tell us what was said with

15   respect to that issue?

16         A.    To my knowledge, and I can't

17   specifically recall whether I said it or

18   Milbank representatives said it, but was that

19   this presents an opportunity to resolve an

20   issue that if not resolved might result in

21   extended, expensive, time-consuming,

22   resource-wasting litigation like we have seen

23   in other elements of this case, that we had an

24   interest, and we believe the US debtor had an

25   interest in resolving this issue, that although

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2    we strongly disagreed with the Canadian view

3    that the aggregate amount of US accruals -- of

4    our claim against the US estate for continued

5    accruals of post-petition interest, which they

6    styled in the amount of 1.6 billion, we

7    strongly disagreed that that was an impediment

8    to settlement, as represented to the courts.

9              Nonetheless, if it were, then this

10   was an opportunity to take that issue off the

11   table and enhance the ability to make a

12   settlement, then we should do that.

13        Q.    Were there any comments made with

14   respect to -- you talked about your interest

15   and the US debtor's interest.

16             Was there any discussion about other

17   creditors to the NNI estate's interest?

18        A.    Yes.

19        Q.    What was said about that?

20        A.    We argued that a settlement at any

21   amount that we reduced the interest exposure or

22   the claim for interest in the United States

23   would specifically be for the benefit of the

24   GUCs and potentially, ultimately, for the

25   equity holder of NNI.

KATZENSTEIN - HIGHLY CONFIDENTIAL

1

2      Q.    Can you tell me if there was

3   anything else said about the equity holder of

4   NNI's interest?

5      A.    I don't recall anything else.

6      Q.    Now, you told us about the July 15

7   conversation.

8            You mentioned that there was another

9   call at which this issue was discussed.

10     A.    We -- I think I had mentioned

11  earlier that our clients believed it was

12  important to have a continuing accrual of

13  interest beyond the initial haircut, if you

14  would, and they believed it both because of the

15  need to fairly treat them economically, but

16  also to not -- to make sure there wasn't an

17  attractive nuisance, and that attractive

18  nuisance is a non-accruing claim in a set of

19  proceedings where delay, extensive litigation,

20  potential appeals and the continuous burning of

21  a pot have been evident, and that is the

22  opposite of what our clients want, and they

23  believe very strongly that a continuing accrual

24  of interest was important to keep motivation,

25  particularly in NNL to affect a settlement

1            KATZENSTEIN - HIGHLY CONFIDENTIAL

2    sooner rather than later that might result in

3    an ending of these cases.

4            Q.    Okay.  And other than that, was

5    there any discussion of the interest of other

6    creditors to the NNI estate?

7            A.    Well, I believe that the argument

8    was stated during the initial meeting that this

9    settlement benefited everyone in the US estate,

10   because to the extent there were resolutions of

11   matters, again, that could take years and cost

12   millions of dollars, which is what litigation

13   in this case costs, that avoiding that,

14   providing an expedient path to a plan and to

15   distributions, once there's an agreement on

16   allocation or an order on allocation that

17   results in distributions, is in the interest of

18   everybody, including the GUCs.

19            MR. PULTMAN:  If we could take a

20        minute to go off the record.

21            MR. LEBLANC:  Sure.

22            THE VIDEOGRAPHER:  We are now off

23        the record.  The time is 3:15 p.m.,

24        September 18, 2014.

25            (Recess taken.)

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2               THE VIDEOGRAPHER:  We are now back

3          on the record.  The time is 3:17 p.m.,

4          September 18, 2014.

5    BY MR. PULTMAN:

6          Q.    Earlier, you told us about your

7    preparation session.

8               Was there anyone else at that

9    meeting that you haven't told us about?

10         A.    No, I don't think so.

11         Q.    Were there any lawyers from --

12   representing NNI at that meeting?

13         A.    No.

14         Q.    You also told us that the proposed

15   settlement that's reflected in Ray Exhibit 1 --

16         A.    Right.

17         Q.    -- was acceptable to the bondholders

18   other than the NNCC bondholders?

19         A.    Yes, sir.

20         Q.    Do you know whether they all signed

21   on to the proposed settlement agreement?

22         A.    To my knowledge, they did, yes.

23         Q.    Are there any others that have not

24   signed on besides the NNCC?

25         A.    That are in our group?  To my

```
 1           KATZENSTEIN - HIGHLY CONFIDENTIAL
 2    knowledge, at the time we did the settlement,
 3    all members who are participants in our ad hoc
 4    group signed on, other than the NNCC holders.
 5    Since that date, others have joined the group.
 6    I don't know what their status is.
 7              MR. PULTMAN:  Those are all the
 8         questions I have for you today, subject to
 9         resolution of some of the potential issues
10         on the privilege.  I thank you very much
11         for your time.
12              THE WITNESS:  Yes, sir.  Thank you
13         very much.
14              MR. LEBLANC:  No questions.
15              MR. PULTMAN:  Thank you.  We are off
16         the record.
17              THE VIDEOGRAPHER:  This concludes
18         today's deposition of Mr. Michael
19         Katzenstein.  We are now off the record.
20         The time is 3:19 p.m., September 18, 2014.
21         Thank you.
22              (Time noted:  3:19 p.m.)
23
24
25
```

1          A C K N O W L E D G M E N T

2

3   STATE OF NEW YORK      )

4                          :ss

5   COUNTY OF              )

6

7          I, MICHAEL KATZENSTEIN, hereby

8   certify that I have read the transcript of my

9   testimony taken under oath in my deposition of

10  September 19, 2014; that the transcript is a

11  true, complete and correct record of my

12  testimony, and that the answers on the record

13  as given by me are true and correct.

14

15                _____

16                  MICHAEL KATZENSTEIN

17

18  Signed and subscribed to before me

19  this _____ day of _____, 20__.

20

21  _____

22  Notary Public, State of New York

23

24

25

1                 C E R T I F I C A T E

2

3    STATE OF NEW YORK )

4                              :ss

5    COUNTY OF RICHMOND)

6

7              I, MELISSA GILMORE, a Notary Public

8    within and for the State of New York, do hereby

9    certify:

10             That MICHAEL KATZENSTEIN, the

11   witness whose deposition is hereinbefore set

12   forth, was duly sworn by me and that such

13   deposition is a true record of the testimony

14   given by such witness.

15             I further certify that I am not

16   related to any of the parties to this action by

17   blood or marriage; and that I am in no way

18   interested in the outcome of this matter.

19             IN WITNESS WHEREOF, I have hereunto

20   set my hand this 19th day of September, 2014.

21

22   _____

23

24   MELISSA GILMORE

25

```
              *** ERRATA SHEET ***

      ELLEN GRAUER COURT REPORTING CO. LLC
        126 East 56th Street, Fifth Floor
             New York, New York 10022
                  212-750-6434


NAME OF CASE: IN RE NORTEL NETWORKS, INC.
DATE OF DEPOSITION: SEPTEMBER 18, 2014
NAME OF WITNESS: MICHAEL KATZENSTEIN

PAGE  LINE      FROM          TO         REASON

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

                    _____

Subscribed and sworn before me

this____day of_____,20__.

_____    _____

(Notary Public)          My Commission Expires:
```

## $

**$1.6 (6)**
28:23;38:9,15;
39:19;66:6;67:3
**$1.656 (1)**
68:15
**$25 (1)**
79:14
**$366,780.82 (1)**
78:24
**$6 (1)**
84:9
**$876 (2)**
78:6;79:8
**$885 (1)**
79:25
**$907.5 (2)**
61:7,12

## A

**ability (1)**
98:11
**able (4)**
39:3;48:5,10;50:8
**above (3)**
36:9;60:12;62:14
**accept (5)**
46:22;47:23;51:22;
52:21;53:7
**acceptable (1)**
101:17
**account (1)**
84:19
**accrual (28)**
28:14,24;37:17;
38:5,7,9,11;44:24;
45:7;47:13;48:6,11,
15,20;63:17;66:22,
22;75:19;76:2,5;
77:12;78:10;81:14;
87:21,22;89:21;
99:12,23
**accruals (4)**
68:7;78:2;98:3,5
**accrue (1)**
82:2
**accrued (1)**
72:5
**accruing (1)**
77:18
**accurate (1)**
70:2
**across (1)**
12:24
**acting (1)**
19:9
**actual (1)**
61:7
**actually (1)**
54:15

**ad (9)**
9:4;19:9;20:8,11;
21:4;43:11;63:18;
64:5;102:3
**added (1)**
13:16
**addition (1)**
63:21
**additional (1)**
82:16
**administrative (1)**
13:20
**admitted (5)**
14:10,13,17;15:4,7
**advance (1)**
62:17
**advances (3)**
83:24;84:9,12
**advisor (3)**
21:18;23:8,10
**advocated (1)**
53:5
**affect (2)**
87:12;99:25
**affected (2)**
79:15;84:17
**afternoon (1)**
43:5
**Again (4)**
50:24;52:9;57:10;
100:11
**against (4)**
28:16;37:18;84:12;
98:4
**aggregate (2)**
79:15;98:3
**ago (2)**
15:3;96:3
**agree (4)**
26:6;37:16;81:22,
25
**agreed (5)**
61:15;82:13,15;
85:10,13
**agreement (37)**
22:15;36:22;53:25;
54:4;55:18,22;56:5;
58:9,10,15,18,21;
60:9,19,22;61:3,17,
19;71:21;72:2,4;
77:2,11,20;78:14;
79:13,17,19,24;
82:19;85:2,12,25;
86:8;96:11;100:15;
101:21
**ahanrahan@willkiecom (1)**
3:10
**ahead (2)**
45:4;87:9
**AKIN (5)**
3:13;9:8;31:24;
62:18;63:19
**al (4)**

**8:9;34:24;35:24,25**
**Allen (1)**
8:23
**allocation (5)**
81:23;94:18;95:14;
100:16,16
**allowed (3)**
49:9;77:25;84:22
**almost (1)**
16:4
**Along (4)**
8:23;9:18;21:24;
84:2
**alongside (1)**
24:13
**although (1)**
97:25
**among (2)**
33:21;77:15
**amount (15)**
12:8;47:10;56:7,9;
71:13;75:25;77:24;
79:3,7;84:21;90:7,
13;98:3,6,21
**amounts (1)**
84:18
**analyses (2)**
49:22;69:24
**analysis (16)**
38:23;49:23,24;
50:2,9,13,15,17;51:5,
14;90:24;92:6,10,16;
93:25;94:9
**and/or (1)**
86:23
**ANDREW (3)**
3:7;9:2,14
**Andy (10)**
28:9;34:24;37:5;
41:8;43:25;44:6;
46:3;73:22;74:23;
96:4
**Ann (1)**
9:7
**ANNE (1)**
3:19
**apologize (1)**
41:22
**appeals (1)**
99:20
**appear (1)**
60:8
**appears (7)**
27:5;33:19;42:6;
45:14;60:2;62:7;
74:15
**appreciate (1)**
73:25
**appropriate (2)**
67:16;94:21
**approved (2)**
69:23;70:6
**approving (1)**

**69:21**
**approximate (4)**
38:15;39:21;79:14,
23
**approximately (3)**
28:23;38:9;40:15
**argued (1)**
98:20
**argument (6)**
46:16,20,21;51:21,
24;100:7
**arguments (4)**
47:23;52:21,24;
77:14
**around (3)**
30:3;43:3;46:16
**assets (1)**
12:9
**associate (2)**
11:25;13:25
**associated (1)**
77:14
**Association (1)**
9:13
**assume (2)**
56:15;92:2
**assumes (1)**
51:16
**assuming (1)**
72:3
**Atara (1)**
96:4
**attached (1)**
55:17
**attachment (1)**
67:23
**attend (4)**
35:15,17,19,21
**attendance (2)**
42:17,20
**attended (4)**
35:13;57:24,25
**Attorneys (2)**
3:4,14
**attractive (2)**
99:17,17
**authorize (1)**
70:4
**available (6)**
84:19;85:7;90:8,
14;94:2,10
**Avenue (1)**
3:5
**avoiding (1)**
100:13
**award (1)**
51:12
**aware (8)**
28:9,17,19,20,25;
29:4;30:13;61:10

## B

**back (15)**
17:9,12;24:4;49:3;
51:9;55:4;56:17;
60:4;62:5,10;69:5;
80:11;82:5;87:3;
101:2
**background (1)**
11:5
**balance (4)**
62:23;92:11,16,20
**balances (1)**
92:25
**bankruptcy (3)**
12:7,12;22:8
**Bar (7)**
14:11,18,20,24;
15:7;41:7;44:8
**Bars (1)**
15:5
**based (5)**
12:15;14:5;15:17;
17:6,14
**basically (1)**
47:8
**Bassett (2)**
9:5;96:4
**Bates (13)**
26:18,23;33:10,16;
42:3;55:10;59:18,24;
67:7,11;68:12;74:5,
12
**bearing (3)**
26:18;67:11;74:12
**bears (4)**
33:15;42:3;55:10;
59:24
**became (3)**
13:14,24;72:13
**become (3)**
12:21;14:24;72:4
**beginning (4)**
15:21;16:10;19:19;
20:2
**behalf (6)**
9:3,9,12,15,19;
38:24
**behind (2)**
54:16,20
**Beller (1)**
9:18
**below (1)**
79:18
**benefit (1)**
98:23
**benefited (1)**
100:9
**Benjamin (1)**
9:18
**Bennett (1)**
20:10
**besides (2)**
19:16;101:24
**best (9)**

11:2;29:24;30:20;
44:12,18;61:24;
63:23;73:14;81:24
**beyond (2)**
29:10;99:13
**BHG-PPI-0000009 (1)**
67:7
**BHG-PPI-0000013 (2)**
59:18,24
**BHG-PPI-0000018 (1)**
42:4
**BHG-PPI-000009 (1)**
67:11
**BHG-PPI-0000153 (1)**
55:11
**BHG-PPI-0000226 (2)**
74:5,13
**BHG-PPI-0000233 (2)**
26:19,23
**BHG-PPI-0000251 (2)**
33:10,16
**billion (9)**
28:23;38:9,15;
39:19;66:6;67:3;
68:15;70:18;98:6
**Binghamton (1)**
11:8
**bit (1)**
13:10
**Blauner (1)**
73:9
**board (4)**
85:20,24;86:3,6
**bond (3)**
20:8;44:19;84:22
**bondholder (1)**
94:19
**bondholders (24)**
9:4;18:12,23;21:4;
28:15,16;63:18;64:5,
22,23;65:20;72:7;
77:16;82:14,18;
83:13;85:14,15,17,
20;86:3,6;101:17,18
**bondholders' (1)**
18:24
**bonds (23)**
19:11;37:16;43:11,
24;47:11;48:4,9,10,
13,14,19;49:7,13;
51:11;57:11;68:8;
73:4,6;79:7,15;84:13,
17;89:3
**book (2)**
21:22;41:16
**borne (1)**
79:6
**Boston (1)**
11:14
**both (4)**
25:20;74:21;89:10;
99:14
**bought (2)**

15:20;16:6
**bound (1)**
85:24
**brackets (1)**
56:10
**Bradley (1)**
8:24
**break (4)**
10:17;51:25;52:10;
67:17
**breakouts (2)**
43:9,10
**briefed (2)**
28:18,20
**bringing (1)**
63:25
**broke (1)**
53:12
**Bromley (3)**
40:8,9,12
**brought (2)**
19:13;21:24
**Bryant (1)**
3:16
**burn (1)**
90:25
**burning (1)**
99:20
**business (3)**
15:12,14;16:3


**C**


**cable (1)**
12:23
**calculate (2)**
77:17;90:5
**calculated (3)**
78:3;90:6,13
**calculation (7)**
39:8,10,14;66:5,
21;68:6;88:2
**Calculations (10)**
39:15;47:16,18;
68:3;88:5,11,20,20;
89:8;90:21
**calculator (1)**
80:4
**call (15)**
32:21,23,25;33:3;
40:20;62:17;75:3;
76:13,17,19,22;81:4,
6,11;99:9
**called (5)**
9:24;11:22;12:22;
15:12
**calls (5)**
38:23;86:23;87:4,
7;97:10
**came (5)**
29:6;43:14;44:21;
56:14;82:18
**Can (61)**

11:4,17;12:3;
15:24;16:21;17:17;
18:18;20:3,16,20;
21:11;22:19;23:4;
24:2,4;25:19;28:3,6;
32:10;34:19;36:16;
37:13;38:17;39:13;
42:16;44:13,16,18;
47:20;48:23;49:16;
50:18;51:8;52:24;
54:12;58:12,19;62:5;
66:6,15;67:18;68:5,
20;71:24;72:16,24;
74:21;75:6,14;81:10;
83:20;88:23;89:9;
91:23;92:12;93:8,16;
94:5;95:23;97:14;
99:2
**Canada (1)**
20:11
**Canadian (7)**
9:1;13:2;64:10;
65:13;81:18;89:14;
98:2
**cap (2)**
80:5,9
**capacity (1)**
16:13
**carve (1)**
95:7
**case (7)**
10:10;18:21;39:16;
76:3;90:3;97:23;
100:13
**cases (1)**
100:3
**cash (4)**
92:11,16,20,24
**cc (2)**
34:12;36:10
**cc'd (1)**
27:20
**cc's (2)**
27:14;62:16
**Central (1)**
75:7
**CEO (2)**
13:14,24
**certain (4)**
25:9;83:16,18,24
**Certainly (1)**
21:15
**certainty (2)**
47:6;53:4
**Chain (8)**
26:23;27:5;33:10,
19;59:18;60:2;62:6;
74:15
**chance (1)**
27:3
**change (3)**
13:12;58:14;77:6
**changes (1)**

82:16
**Chat (1)**
27:17
**Chilmark (10)**
23:12,14,16,19;
24:10;30:16;59:8;
87:23;90:12,20
**circulated (2)**
60:22;61:3
**City (1)**
12:17
**claim (13)**
28:14,15;37:17;
48:6;72:5;77:25;
84:22;93:4,9,20;98:4,
22;99:18
**Claimants (2)**
3:4;9:16
**claims (1)**
93:14
**clarification (3)**
49:5
**clarify (3)**
24:5;28:6;48:24
**CLE (1)**
14:22
**clear (14)**
21:25;22:2;24:15;
27:2;39:7;44:3;
50:15;56:25;57:11;
59:23;62:25;88:12;
89:9;95:2
**clearly (1)**
53:21
**Cleary (14)**
8:11;9:18;28:10;
30:7,11;31:15,19;
37:6;40:4,5,10;
55:23;82:11;88:2
**Cleary's (1)**
35:10
**client (3)**
12:22;19:6,7
**clients (3)**
85:24;99:11,22
**client's (1)**
81:13
**close (1)**
91:17
**closely (1)**
40:14
**colleague (2)**
9:5;24:14
**colleagues (1)**
8:24
**collecting (1)**
85:23
**collection (1)**
54:9
**collectively (1)**
77:16
**coming (2)**
39:18;47:6

**comments (2)**
66:4;98:13
**Committee (5)**
3:14;9:9;31:24;
63:20;65:3
**common (1)**
95:7
**communicate (2)**
48:3,9,14;88:10
**communicated (4)**
40:4,6,8,16
**communication (2)**
41:12;82:8
**communications (7)**
29:16;58:20;65:2,
9;72:22,25;73:13
**companies (1)**
17:25
**company (3)**
13:5,15;16:19
**component (2)**
81:15,21
**compromise (1)**
72:5
**compromised (1)**
84:22
**concern (1)**
70:22
**concerning (2)**
47:18;86:24
**concludes (1)**
102:17
**concurrently (1)**
83:18
**conducted (1)**
38:23
**conference (3)**
43:15,17;44:20
**CONFIDENTIAL (93)**
10:1;11:1;12:1;
13:1;14:1;15:1;16:1;
17:1;18:1;19:1;20:1;
21:1;22:1;23:1;24:1;
25:1;26:1;27:1;28:1;
29:1;30:1;31:1;32:1;
33:1;34:1;35:1;36:1;
37:1;38:1;39:1;40:1;
41:1;42:1;43:1;44:1;
45:1;46:1;47:1;48:1;
49:1;50:1;51:1;52:1;
53:1;54:1;55:1;56:1;
57:1;58:1;59:1;60:1;
61:1;62:1;63:1;64:1;
65:1;66:1;67:1;68:1;
69:1;70:1;71:1;72:1;
73:1;74:1;75:1;76:1;
77:1;78:1;79:1;80:1;
81:1;82:1;83:1;84:1;
85:1;86:1;87:1;88:1;
89:1;90:1;91:1;92:1;
93:1;94:1;95:1;96:1;
97:1;98:1;99:1;
100:1;101:1;102:1

**confidentiality (1)**
95:3
**connection (14)**
18:12;20:4;21:3,8,
14;22:20;36:6;48:25;
49:6;88:13,16;89:12,
22,24
**consider (1)**
37:12
**consideration (1)**
29:2
**consistent (5)**
20:23;69:23;70:7,
18;87:9
**constituencies (1)**
89:14
**constituted (1)**
20:9
**contact (1)**
28:4
**contain (1)**
45:11
**contained (2)**
61:4;68:11
**contains (1)**
22:3
**Cont'd (1)**
3:1
**contemplation (1)**
67:25
**context (1)**
95:13
**continue (4)**
13:22;76:2;81:21,
25
**continued (2)**
76:3;98:4
**continuing (8)**
75:19;76:5;78:10;
79:17;81:14,17;
99:12,23
**continuous (1)**
99:20
**continuously (3)**
17:15;19:19,25
**contract (2)**
49:9;51:12
**conversation (9)**
75:6,11,15;76:10;
80:19,23;82:8,10;
99:7
**conversations (25)**
29:10,13,19,22;
30:6,11,15,19;32:10,
15;64:20,25;65:5,8,
12,15,19;80:13;
86:13,16,20;89:18;
92:18;95:16;97:7
**Cooley (1)**
11:23
**copies (2)**
21:23,24
**copy (6)**

26:20;33:14;41:19;
59:22;67:12;74:10
**core (1)**
19:24
**corporate (8)**
12:2,5;17:4,4,22;
20:25;24:24;25:9
**cost (1)**
100:11
**costs (2)**
84:4;100:13
**counsel (39)**
8:19;12:21;13:23,
25;14:2;18:24;20:10;
21:18,23;23:24;
26:20;27:3;28:20,21;
29:16,20;33:14;
38:10,25;39:5,11,24;
48:18;49:21,22,25;
59:5,22;63:20;67:13,
25;70:5,9,11,11;
74:10;77:3;87:17;
91:7
**counsel's (1)**
92:3
**counter (2)**
56:20,22
**countered (2)**
52:4;53:7
**counterproposal (3)**
52:8,17,22
**counterproposals (1)**
52:19
**couple (2)**
15:14;96:24
**course (2)**
18:2;94:17
**court (7)**
8:14,16,18;9:21;
58:23;79:11,22
**courts (5)**
28:22,25;29:3;
38:11;98:8
**cover (3)**
55:14;69:10;84:16
**covered (1)**
84:13
**Covering (1)**
84:4
**create (1)**
63:4
**Creditors (9)**
3:15;9:10;63:21,
23;64:20;65:9;97:4;
98:17;100:6
**critical (1)**
81:15
**cross-border (1)**
19:11
**crossover (2)**
37:15;72:7
**cross-over (1)**
28:16

**currently (1)**
14:17
**CXO (7)**
15:12,19,20,21,25;
16:7;18:8

# D

**Dallas (3)**
14:7;15:18;17:8
**Dan (1)**
8:17
**Daniel (1)**
8:24
**date (12)**
29:8;37:4;54:12;
75:20;78:4,11;79:10,
15,16,18,21;102:5
**dated (5)**
33:20;55:9;60:13;
69:10;74:9
**dates (2)**
59:16;73:24
**day (3)**
35:11;42:25;78:24
**days (3)**
37:7;80:4;96:3
**deal (1)**
47:7
**dealings (4)**
30:25;31:7,14,18
**debtor (2)**
89:14;97:24
**debtors (10)**
9:1,20;28:12;
36:24;37:2;43:14;
63:18;64:10;65:13;
94:20
**debtors' (2)**
22:5,6
**debtor's (1)**
98:15
**December (1)**
16:9
**declined (1)**
72:20
**definitive (1)**
53:25
**degree (3)**
11:7,9,13
**degrees (2)**
11:12,15
**delay (1)**
99:19
**delays (2)**
77:14;81:17
**Dennis (7)**
33:22;34:24;36:11;
43:25;44:4,4;46:4
**denote (1)**
25:23
**department (2)**
12:2,13

**deposed (2)**
10:8,13
**deposition (9)**
8:7,10;69:4;87:14;
95:24;96:12,13,16;
102:18
**describe (5)**
12:3;15:24;17:17;
20:3;21:11
**described (2)**
20:18;29:10
**determine (1)**
38:14
**development (2)**
12:21;13:19
**DI (7)**
38:22;49:18;50:10;
91:5;92:8;93:10,21
**differences (1)**
77:15
**different (2)**
25:25;71:18
**Dine (2)**
9:11,11
**Direct (1)**
73:3
**directed (2)**
50:4;87:17
**direction (8)**
38:24;39:5,11,24;
91:7,19,24;92:3
**directly (2)**
11:21;41:23
**director (8)**
16:14,16,18;24:23;
25:8,22,22,24
**directors (2)**
17:2;25:21
**disagreed (2)**
98:2,7
**disclose (3)**
93:8,24;94:8
**disclosure (1)**
91:11
**discount (6)**
37:16;45:6;46:8;
52:5,12;58:15
**discuss (4)**
28:12;44:23,23;
76:9
**discussed (2)**
63:24;99:9
**discussing (1)**
61:11
**discussion (11)**
32:21;46:13,16;
47:9;49:12,16,21;
53:9;75:4;98:16;
100:5
**discussions (27)**
29:23;37:7;48:18;
52:20;54:3;55:16;
57:17;58:4,13;59:4,7,

14;61:20,22;62:3;
64:4,9,12,16;88:18;
94:17;95:6,8,13;96:8,
25;97:8
**dispute (2)**
22:16;95:14
**distressed (1)**
12:9
**distributed (1)**
84:19
**distribution (7)**
70:9,10;84:15;
90:8,15;94:3,10
**distributions (4)**
81:18,23;100:15,
17
**division (1)**
17:4
**document (37)**
21:21;22:3,9,12,13,
17;26:18;27:3;33:15;
41:15;42:9;45:16;
54:8;55:19;57:15;
59:20,23;60:9;62:6;
67:9,11,15,22,24;
68:2,12,17;71:2;
72:13;74:7,9,11,12,
24;82:25;84:24;
85:13
**documents (4)**
50:12;95:20;96:18,
22
**dollars (1)**
100:12
**done (13)**
39:8,10,14,15,24;
49:23,24;50:2,4;89:2,
19;93:25;94:9
**down (1)**
49:20
**dozens (1)**
18:6
**draft (12)**
22:15;42:13;55:17,
22;56:14;57:15;
60:18,21;62:10;66:3,
3;76:25
**drafted (3)**
45:16,19;72:3
**drafting (1)**
54:4
**drill (1)**
49:20
**due (1)**
92:6
**duly (1)**
9:24
**Dunne (9)**
33:22,25;34:3,21,
24;35:15;36:10;44:4;
61:21
**during (8)**
12:15;13:23;14:5;

37:6;67:19;94:17;
97:9;100:8

**E**

**earlier (13)**
20:17;22:25;34:17;
36:24;37:2,7;54:18;
56:18;71:20;87:16;
96:16;99:11;101:6
**early (2)**
18:21;71:25
**economically (1)**
99:15
**educational (1)**
11:4
**effective (1)**
79:18
**eight (1)**
15:22
**either (1)**
46:3
**elements (2)**
86:24;97:23
**elevated (1)**
26:4
**Ellen (2)**
8:15,17
**else (18)**
18:24;23:19;30:10,
18;64:13,15,24;
65:16,18;76:17;
80:25;86:19;88:11,
21;89:8;99:3,5;101:8
**E-MAIL (28)**
3:10,22;26:22;
27:5,10,19,25;28:7;
29:7;30:2;32:19;
33:9,12;34:19,21;
36:9;55:14;59:17;
60:12;62:14,23;
65:23;67:6,23;69:10;
74:4,15;75:2
**e-mails (2)**
33:19;60:2
**employed (1)**
16:10
**employee (1)**
94:7
**employment (2)**
11:18;15:11
**Enclosed (1)**
60:17
**end (2)**
15:22;16:8
**ended (1)**
57:6
**ending (1)**
100:3
**ends (1)**
68:12
**engage (1)**
28:13

**engagement (1)**
20:5
**enhance (1)**
98:11
**entities (2)**
21:17;37:19
**entitled (1)**
56:6
**entity (4)**
23:11,12;71:12,13
**entry (2)**
22:6,7
**equate (1)**
61:7
**equity (2)**
98:25;99:3
**ESQ (3)**
3:7,18,19
**essentially (3)**
19:8;75:21;81:19
**estate (14)**
28:14;37:19;77:17;
84:18;91:2;92:7,11,
20,25;93:15;97:4;
98:4;100:6,9
**estates (1)**
28:16
**estate's (1)**
98:17
**estimate (1)**
17:24
**et (1)**
8:9
**EVANS (2)**
3:19;9:8
**even (2)**
37:8;79:10
**evening (1)**
59:10
**event (1)**
84:20
**everybody (3)**
40:11;46:24;
100:18
**everyone (2)**
66:4;100:9
**evidence (1)**
51:16
**evident (1)**
99:21
**exactly (3)**
15:3;18:7;50:6
**EXAMINATION (1)**
10:3
**examined (1)**
9:25
**exclude (1)**
59:4
**excluded (1)**
72:13
**Excluding (1)**
29:12
**exclusively (2)**

16:4;63:17
**Exhibit (37)**
21:22;22:11,14;
26:18,22;29:8;33:9,
13;41:17,21,22,23;
42:3;45:9,17;54:10,
15,21,22,23;55:5,8;
58:22;59:17,21;62:7;
67:6,10;68:18;69:10;
72:10;74:4,8;80:12;
83:2;84:25;101:15
**exhibits (1)**
41:16
**existence (1)**
28:23
**expect (3)**
36:11;46:17;62:18
**expectation (2)**
37:5;70:8
**expediency (1)**
53:4
**expedient (1)**
100:14
**expensive (1)**
97:21
**explain (2)**
51:8;75:24
**explained (2)**
76:6,7
**explicitly (1)**
79:4
**exposure (1)**
98:21
**extended (1)**
97:21
**extensive (2)**
31:7;99:19
**extent (8)**
29:3,15,21;38:22;
91:6;94:16;95:4;
100:10

**F**

**fact (5)**
24:20;32:22;41:11;
67:2;92:23
**facts (1)**
51:16
**fair (2)**
12:8;26:3
**fairly (1)**
99:15
**familiar (3)**
21:4;37:9,11
**far (1)**
92:4
**fare (1)**
84:18
**FARR (2)**
3:3;9:15
**FAX (2)**
3:9,21

**fees (2)**
84:3,5
**FELD (2)**
3:13;9:9
**felt (2)**
76:3,4
**few (2)**
67:17;68:20
**filed (1)**
86:8
**final (3)**
77:20;78:13;81:25
**finance (7)**
12:5;17:4,5,22;
20:25;24:24;25:9
**financial (7)**
21:17;23:8,10;
51:5,13;87:18,20
**financing (2)**
71:12,12
**find (2)**
60:18;67:18
**finding (1)**
41:21
**fine (3)**
24:20;67:18;91:24
**firm (2)**
11:21;12:20
**firms (1)**
26:2
**first (13)**
22:5,20,23;24:7;
26:11;28:3;29:6;
34:20;37:3;51:4,13;
73:16;86:2
**five (5)**
10:15;13:9,23;
14:6;43:6;88:14
**five-page (1)**
22:12
**fixed (1)**
75:25
**flexibility (3)**
53:10,23,24
**focused (1)**
16:3
**fold (1)**
63:25
**follow (1)**
92:2
**following (4)**
35:11;39:4;73:15,
18
**follows (1)**
10:2
**follow-up (3)**
52:7;80:19;82:7
**foot (1)**
53:15
**forget (1)**
14:9
**form (30)**
25:18;31:21;36:21;

44:15,17;47:12,14;
50:22,23;51:7,15;
53:19;57:9;58:6,17;
63:7;64:14;65:10;
66:13;70:23;71:23;
72:14;78:9;80:17;
82:20;83:15;90:10,
17;91:3,4
**forward (1)**
91:2
**foundation (2)**
63:8;66:14
**four (2)**
43:6,6
**Fourteen (1)**
75:23
**free (1)**
63:9
**Friday (1)**
60:23
**front (2)**
25:23;41:15
**FTI (44)**
9:6;15:20;16:6,11,
24;17:5,8,18;18:3,4,
5,11,23;19:7,16;20:8,
14;21:2;24:13,25;
25:3,8,11;29:23,25;
30:11,19;38:14;39:8;
45:19;48:18,19;
49:12;51:4,13;65:19;
66:5,24;67:2;69:15,
17;70:2;86:20;93:3
**FTI's (3)**
49:24,25;50:17
**full (1)**
84:21
**functions (1)**
13:20
**fund (1)**
73:7
**funds (2)**
84:21;85:7
**further (7)**
52:16,19,20;55:16;
57:17;77:13;95:16

**G**

**GALLAGHER (2)**
3:3;9:15
**gave (2)**
45:23,24
**general (6)**
12:21;13:22,25,25;
18:4;63:23
**generally (4)**
12:3;21:11;49:2;
87:11
**gets (1)**
74:20
**Giambatista (1)**
34:13

**Gilmore (1)**
8:15
**given (1)**
87:14
**glasses (1)**
67:19
**global (1)**
17:2
**Godward (1)**
11:23
**Gottlieb (5)**
8:11;9:19;28:11;
31:15;88:2
**Grauer (2)**
8:15,18
**group (21)**
9:4;17:3,21,21;
19:10;20:8,11,18,25;
24:24;25:8;26:9;
34:5;44:19;82:6;
85:16;94:19,19;
101:25;102:4,5
**groups (1)**
20:13
**grow (1)**
76:3
**Grupe (2)**
13:6,6
**G-R-U-P-E (1)**
13:7
**guaranteed (3)**
19:10;68:8;71:17
**GUCs (4)**
63:22;84:17;98:24;
100:18
**guess (1)**
66:22
**GUMP (4)**
3:13;9:8;31:24;
63:19
**guy (2)**
24:18;44:8
**Guyder (1)**
8:24

**H**

**Hadley (1)**
9:3
**haircut (1)**
99:13
**half (5)**
13:10,23;14:6;
76:11;81:9
**Hamilton (2)**
8:12;9:19
**hand (5)**
26:19;27:4;42:2;
55:4,5
**handed (1)**
32:20
**HANRAHAN (3)**
3:7;9:14,14

**hard (2)**
10:24;41:8
**Harris (1)**
60:13;62:8
**HAUER (2)**
3:13;9:8
**head (1)**
12:21
**heading (1)**
68:2
**hear (1)**
85:18
**held (2)**
8:10;35:10
**Hellman (1)**
11:23
**helpful (2)**
20:21;58:12
**Here's (1)**
34:23
**higher (1)**
25:24
**HIGHLY (93)**
10:1;11:1;12:1;
13:1;14:1;15:1;16:1;
17:1;18:1;19:1;20:1;
21:1;22:1;23:1;24:1;
25:1;26:1;27:1;28:1;
29:1;30:1;31:1;32:1;
33:1;34:1;35:1;36:1;
37:1;38:1;39:1;40:1;
41:1;42:1;43:1;44:1;
45:1;46:1;47:1;48:1;
49:1;50:1;51:1;52:1;
53:1;54:1;55:1;56:1;
57:1;58:1;59:1;60:1;
61:1;62:1;63:1;64:1;
65:1;66:1;67:1;68:1;
69:1;70:1;71:1;72:1;
73:1;74:1;75:1;76:1;
77:1;78:1;79:1;80:1;
81:1;82:1;83:1;84:1;
85:1;86:1;87:1;88:1;
89:1;90:1;91:1;92:1;
93:1;94:1;95:1;96:1;
97:1;98:1;99:1;
100:1;101:1;102:1
**high-speed (1)**
12:24
**historically (1)**
31:8
**history (1)**
11:18
**hoc (9)**
9:4;19:9;20:8,11;
21:4;43:11;63:18;
64:5;102:3
**hold (2)**
13:22;94:15
**holder (2)**
98:25;99:3
**holders (5)**
71:19;73:4,6;76:4;

102:4
**hope (1)**
81:21
**hopefully (1)**
54:8
**Hotel (1)**
41:7
**hour (2)**
76:11;81:9
**hours (2)**
43:6;92:23
**housed (3)**
17:3;20:24;24:24

**I**

**identification (5)**
26:24;33:11;59:19;
67:8;74:6
**identify (1)**
67:15
**imagine (1)**
19:21
**immediately (1)**
44:9
**impediment (2)**
28:24;98:7
**important (2)**
99:12,24
**impression (1)**
53:22
**inactive (2)**
14:20,25
**include (1)**
27:14
**included (1)**
71:20
**includes (1)**
68:8
**including (1)**
100:18
**Incorporated (1)**
8:9
**indemnity (1)**
83:23
**indenture (1)**
83:25
**independent (1)**
28:7
**indicated (7)**
22:25;23:6,23;
26:11;40:2;53:6;71:2
**indicates (6)**
34:20;55:13;60:17;
63:2;65:25;75:3
**indication (1)**
62:16
**indirect (1)**
32:14
**individual (2)**
23:13;85:15
**individually (1)**
77:16

**individuals (1)**
22:22
**initial (2)**
99:13;100:8
**initially (2)**
19:13;40:7
**inputs (1)**
89:15
**instruct (7)**
38:25;49:18;50:10;
91:5;92:8;93:10,21
**insufficient (2)**
84:21;85:7
**interacted (2)**
23:18,21
**interaction (1)**
20:7
**interactions (1)**
24:8
**interest (49)**
22:16;29:2;37:17,
18;49:10;63:22,22;
66:6,21;67:4;68:3,7,
9;72:6;75:19;77:18;
78:2,3;79:6,9,12,13,
17,23;81:14,20,25;
83:11;84:20,23;90:9,
16;94:4,11;95:8;
97:3,24,25;98:5,14,
15,17,21,22;99:4,13,
24;100:5,17
**interested (1)**
94:22
**interim (1)**
17:20
**internal (1)**
29:22;48:18
**internationally (1)**
16:5
**internet (1)**
12:24
**into (4)**
39:18;63:25;87:17;
96:7
**introduce (1)**
8:19
**invade (2)**
91:15;95:3
**invading (1)**
94:23
**invited (1)**
72:19
**involved (16)**
20:7;23:17,20,23;
24:2,7,13;25:4,9,12;
63:19;69:20;72:21,
25;73:2;95:19
**involvement (5)**
21:7;22:20,23;
64:3;73:3
**involves (2)**
29:15;91:7
**involving (1)**

74:16
**issuance (1)**
68:7
**issue (35)**
21:5,13;28:13,17,
19;29:6,11;30:8,12,
16;32:12;44:24;
47:13,19;48:11,15,
20;49:7;77:19;80:14,
20;82:13;83:10,11,
12;84:15;85:4,5;
89:4;91:12;97:15,20,
25;98:10;99:9
**issued (2)**
71:11,17
**issues (2)**
83:13,17,21;102:9
**issuing (1)**
71:18

**J**

**Jacob (2)**
8:22;10:5
**January (2)**
18:16,20
**Jeff (1)**
9:17
**Jennifer (2)**
60:13;62:9
**Jim (1)**
40:8
**job (2)**
12:18;78:25
**John (22)**
23:5;34:16;42:21;
43:22;44:21,22;
46:18;52:3,10;53:5;
59:14;66:2;74:17;
75:17;76:9;77:10;
81:3;86:14;88:7;
89:19;96:15;97:11
**JOHNSON (3)**
3:18;9:7,7
**joined (2)**
96:6;102:5
**Jones (1)**
20:10
**July (48)**
22:24;26:12;27:8,
11;29:9;30:4,15,23;
31:20;32:10;33:20;
35:13;37:8;38:13,13;
39:17,17;53:13;55:9;
58:23;60:3,4,7,14;
65:25;68:10,10;
69:11;74:2,9;75:12;
76:25;77:20;78:21,
21;79:10,22;83:3;
86:9,11,12;91:2;
92:19,24;95:15;97:9,
12;99:6
**June (15)**

28:11,18;29:5,6;
68:10;75:20,22;78:3,
6,11,21,21;80:5,8;
88:24
**junior (1)**
12:11

## K

**Karen (1)**
9:11
**Katten (1)**
9:11
**Katzenstein (119)**
8:8;10:1,5;11:1;
12:1;13:1;14:1;15:1;
16:1;17:1;18:1;19:1;
20:1;21:1;22:1,2;
23:1;24:1;25:1;26:1,
17,22;27:1,15;28:1;
29:1,8;30:1;31:1;
32:1;33:1,9,13;34:1,
25;35:1;36:1;37:1;
38:1;39:1;40:1;41:1;
42:1;43:1;44:1;45:1;
46:1;47:1;48:1;49:1;
50:1;51:1;52:1;53:1;
54:1;55:1;56:1;57:1;
58:1;59:1,17,21;
60:1;61:1;62:1,7;
63:1;64:1;65:1;66:1;
67:1,6,10,14,21;68:1,
18;69:1,5,9,10;70:1;
71:1;72:1;73:1;74:1,
4,8;75:1;76:1;77:1;
78:1;79:1;80:1,11;
81:1;82:1;83:1,2;
84:1;85:1;86:1;87:1;
88:1;89:1;90:1;91:1;
92:1;93:1;94:1;95:1;
96:1;97:1;98:1;99:1;
100:1;101:1;102:1,
19
**keep (2)**
53:21;99:24
**Kennedy (26)**
23:18;24:9;27:6,
11,14;30:22;42:21;
44:21;59:8,9,14;
66:19;74:16;75:11,
17;76:7,8,17;80:14;
81:2;86:17,21,24;
92:19,22;97:11
**Kennedy's (1)**
75:2
**kind (1)**
78:11
**knew (1)**
38:6
**knowledge (22)**
25:13;30:14,20;
35:14;45:11,20;61:5,
16;63:24;65:17,22;

68:19;70:17,24;
71:22,25;72:8;76:18;
83:8;97:16;101:22;
102:2
**Kronish (2)**
11:22;12:16

## L

**lack (1)**
66:14
**lacks (1)**
63:8
**language (1)**
84:15
**large (3)**
12:10,13;19:20
**last (8)**
16:8;70:18,25;
75:4;81:8;86:5;
88:14;92:15
**lasted (2)**
43:4,5
**late (1)**
11:24
**later (1)**
100:2
**latest (1)**
66:2
**law (5)**
11:13,14,21;12:20;
14:22
**lawyer (2)**
12:6,12
**lawyers (8)**
28:10;30:7;31:15,
19,23,24;32:5;101:11
**lay (1)**
11:17
**Le (2)**
13:6,6
**lead (2)**
43:20,23
**leader (2)**
17:19;20:6
**leading (1)**
26:8
**leads (1)**
41:22
**learn (3)**
55:21;58:3,7
**learned (1)**
82:23
**leave (2)**
43:14;82:3
**leave-off (1)**
56:16
**LEBLANC (74)**
9:2,2;21:14;25:18;
28:10;29:12,14;
34:24;35:17;36:15;
37:5;38:17,22;40:3;
41:19;44:7,15;47:12,

14;48:24;49:18;50:3,
10,14,18,23;51:7,15;
53:19;54:22,24;57:9;
59:3;62:15;63:7,10;
64:14;65:10,24;
66:13;67:20;71:4,23;
72:14;73:20,23;
74:20;78:9;80:17;
82:20;83:15;88:12;
89:5,9,22;90:10,17;
91:3,5,13,21;92:8,12;
93:5,10,16,21;94:12;
95:2;96:4,7,19;
100:21;102:14
**led (1)**
26:15
**left (4)**
12:20,20;53:14;
56:22
**legal (3)**
8:16;84:3,5
**Less (1)**
81:9
**letter (3)**
18:25;19:4,5
**level (2)**
25:17,24
**Liberty (1)**
8:12
**Lieb (1)**
11:22
**likely (5)**
48:4,5,10,20;49:13
**limited (1)**
19:23
**liquidate (1)**
79:16
**liquidated (1)**
84:6
**liquidating (2)**
77:23;78:5
**Lisa (8)**
24:3;34:12;42:21;
44:21;52:3;55:16;
61:21;62:16
**list (1)**
34:23
**litany (1)**
44:17
**litigating (1)**
94:20
**litigation (6)**
18:13;68:2;94:18;
97:22;99:19;100:12
**little (2)**
13:10;25:25
**living (1)**
90:2
**LLP (4)**
3:3,13;8:23;9:12
**located (1)**
8:12
**long (8)**

13:8;14:8;15:19;
43:4,8;46:12;76:10;
81:8
**longer (1)**
13:10
**look (10)**
21:20;41:15;54:8,
10,15,24;56:4,5;
84:24;93:19
**looked (5)**
30:3;45:9;58:22;
91:12;96:10
**looking (6)**
29:7;54:14;69:9;
78:25;82:25;92:24
**lot (1)**
53:10

## M

**M&A (2)**
12:6;13:19
**Macom (1)**
8:17
**making (1)**
81:18
**management (3)**
15:16;16:3;17:20
**managing (10)**
16:14,16,17;17:2;
24:23;25:7,21,21,22,
24
**many (2)**
10:12;25:25
**Mark (4)**
25:6,20;26:17;
86:23
**marked (15)**
21:21;26:24;29:8;
33:11,13;42:2;59:19,
21;62:6;67:8,10;
74:5,8;83:2;84:25
**Matt (3)**
24:6,10;42:23
**matter (11)**
8:8;19:18;31:19;
32:3,6;34:7,10;36:4,
7;40:13;65:21
**matters (6)**
20:19;31:12,16;
83:22;87:13;100:11
**Matz (2)**
55:10;96:4
**maximum (3)**
47:10;90:7,13
**may (12)**
14:7;21:23;24:6;
29:22;37:7;51:25;
59:4;82:9,10;86:22;
87:5;97:10
**maybe (4)**
13:10,10;43:6;
67:18

**McCloy (1)**
9:3
**mean (7)**
19:21;27:20;32:18;
38:2;46:15;48:25;
50:4,14;51:17;52:9;
89:25
**meaning (1)**
85:22
**means (2)**
32:16;51:8
**meant (1)**
70:11
**mechanism (1)**
71:18
**media (5)**
12:23;16:4;17:23,
25;20:24
**mediation (1)**
95:6
**mediations (4)**
95:4,5,7,13
**meeting (38)**
24:7;32:8,9;35:9,
12,15,17,19,22;37:8;
40:18,21,23;42:11,
13,17;43:2,8,16,21,
24;44:14,22;51:20;
52:19;53:14,17;54:5;
56:16,22;58:21;
73:16,19;97:9,13;
100:8;101:9,12
**meetings (1)**
57:22
**Melissa (1)**
8:15
**Melker (13)**
9:6;24:14;25:21;
27:6;34:25;35:21;
69:19;74:16;75:16;
81:2,12;86:24;96:6
**members (1)**
102:3
**membership (2)**
14:20,24
**mentioned (5)**
25:15;33:21;34:17;
99:8,10
**met (1)**
96:3
**Michael (4)**
8:7;69:4;86:17;
102:18
**mid (3)**
28:11;38:13;39:17
**middle (4)**
29:5;30:23;34:20;
51:19
**might (4)**
28:12;77:15;97:20;
100:2
**Mike (23)**
23:18;24:8;27:6,

11,15;34:25;42:21;
44:21;52:3;59:8,9,
14;66:4,18,19;74:16;
75:17,17;76:8;81:2;
86:24;92:19;97:11
**Mike/Melker (1)**
75:3
**Milbank (17)**
9:3;19:2;20:10;
29:20,25;32:5;34:5;
35:25;45:18;50:2,4,
5;55:23;82:11;85:22;
96:3;97:18
**Miller (1)**
96:5
**million (9)**
61:7,12;71:14;
77:24;78:6;79:8,14,
25;84:9
**millions (1)**
100:12
**minute (3)**
67:14,17;100:20
**minutes (2)**
68:21;75:7
**misstated (1)**
56:23
**mistabbed (1)**
55:7
**mistaken (7)**
18:17;19:3;71:14;
76:12;79:5;82:22;
86:22
**misunderstandings (1)**
77:13
**model (4)**
50:20;89:10,16;
91:16
**modeling (13)**
51:18;87:18,20,22;
88:2;89:2,20;90:24;
92:5;93:4,14,25;94:8
**models (1)**
89:13
**moment (2)**
26:21;33:17
**Monday (4)**
54:13;59:10,12;
76:24
**money (1)**
14:21
**monies (1)**
84:13
**monitor (4)**
8:25;28:21;39:20;
70:19
**monitor's (2)**
38:10;41:24
**month (1)**
79:14
**monthly (1)**
79:3
**More (10)**

10:15;12:11;13:20;
19:21;23:13,15;
25:16;31:5;51:2;
53:10
**morning (1)**
59:15
**most (3)**
37:12;43:5;44:2
**motion (8)**
22:6,7;49:6,7,8;
51:11;95:21;96:10
**motivate (1)**
81:22
**motivation (1)**
99:24
**move (1)**
17:9
**moved (8)**
17:9,11;52:13,14;
57:4,19,22;58:5
**much (2)**
102:10,13
**Muchin (1)**
9:12
**multi-national (2)**
13:2,3
**Multiple (1)**
10:14
**myself (1)**
96:11

## N

**name (4)**
10:5;13:4;23:11,12
**National (2)**
9:13;17:19
**nature (1)**
31:4
**nearly (1)**
79:25
**need (6)**
10:17;24:5;63:2,5;
75:3;99:15
**needed (2)**
76:5;81:20
**negotiated (2)**
83:23;84:16
**negotiation (7)**
21:8,18;25:4;28:5,
13;39:18;53:11
**negotiations (13)**
21:16;22:21,24;
23:2,7,20;24:13;
25:10;63:15;64:2;
77:13;86:25;89:13
**Networks (1)**
8:9
**New (17)**
3:6,6,17,17;8:13,
13;11:7,21;12:17;
14:14,18,24;15:5;
17:9,9,12,14

**next (6)**
12:18;15:11;48:2;
54:19,20;75:7
**Nick (2)**
9:5;96:4
**nickel (1)**
81:20
**night (1)**
75:4
**NNC (1)**
71:2
**NNCC (16)**
71:4,5,8,10,11,19;
72:3,8,22;73:4,6;
82:17;83:6;101:18,
24;102:4
**NNI (38)**
9:10;21:17;22:15,
21;23:3,24;28:14;
32:11;42:17;48:14;
56:19;64:17;65:9,20;
70:5,21;71:17;77:3;
82:14;83:14;85:14;
88:5;90:8,14,20,25;
92:7,11;93:24;94:2,7,
8,10;97:2;98:17,25;
100:6;101:12
**NNI's (4)**
23:7;64:17;70:11;
99:4
**NNL (5)**
19:3;28:21;71:17;
81:18;99:25
**non-accruing (1)**
99:18
**none (5)**
30:21;32:13,17,18;
65:22
**Nonetheless (1)**
98:9
**noon (1)**
43:3
**Nortel (14)**
8:8;10:10;18:12;
31:10,11,16,19;32:3,
6;34:6,10;36:4,7;
40:13
**Notary (1)**
9:25
**noted (2)**
45:15;102:22
**noteholders (3)**
72:9,22;83:6
**notes (10)**
71:3,5,8,10,11,16,
20;72:3;76:19,22
**notice (1)**
22:5
**notional (4)**
90:7,14;94:2,9
**nuisance (2)**
99:17,18
**number (32)**

12:10;17:25;38:15;
39:19;43:18;45:12;
56:14;57:12;58:10,
11;61:4,6,7,9,12,15;
62:18;66:6;67:4;
68:12;70:17,19;77:7,
11,24;78:6;79:8,9,23;
84:7,8;91:10
**numbers (12)**
26:19;33:16;42:4;
55:11;56:18;57:20,
23;58:5;59:24;67:11;
74:12;90:2

## O

**Object (23)**
25:18;44:15;47:12,
14;50:23;51:7,15;
53:19;57:9;63:7;
64:14;65:10;66:13;
71:23;72:14;78:9;
80:17;82:20;83:15;
90:10,17;91:3;94:16
**Objection (6)**
31:21;36:15;50:22;
58:6;70:23;91:4
**occasions (1)**
10:12
**occurred (5)**
22:24;33:6;44:14;
97:8,10
**off (11)**
52:5;57:19;58:5;
68:23;83:19;94:25;
98:10;100:20,22;
102:15,19
**offices (2)**
8:11;35:11
**Official (5)**
3:14;9:9;31:24;
63:20;65:3
**old (1)**
14:8
**once (3)**
51:2;83:10;100:15
**One (30)**
3:16;8:3,12;16:25;
18:18;23:13,16;
25:16;27:11;31:5;
37:24,25;41:24;43:8,
19;54:18,19,20;60:6,
24;64:24;69:23;73:3,
5;79:20;81:12;82:2;
86:23;90:22;92:12
**one-page (3)**
26:18;74:9,12
**only (4)**
71:16;79:6;84:5;
91:8
**open (1)**
83:13
**opening (1)**

8:6
**opportunity (2)**
97:19;98:10
**opposite (1)**
99:22
**Optel (4)**
12:22,22;13:8;
15:10
**oral (5)**
37:10;40:2,16;
61:16,18
**orally (2)**
36:24,25
**order (7)**
22:7,12;49:8;
68:14;78:23;83:25;
100:16
**ordered (1)**
28:25
**organized (1)**
35:10
**original (1)**
13:16
**others (4)**
38:2,3;101:23;
102:5
**otherwise (1)**
81:16
**out (10)**
11:17;39:20;41:8;
56:19;65:25;70:14;
74:21;82:18;83:6;
95:7
**outcomes (3)**
50:16,21;51:18
**output (2)**
89:10,11
**outputs (1)**
89:15
**outright (1)**
49:8
**outside (1)**
29:24
**outstanding (1)**
79:7
**over (14)**
10:25;11:2;18:2;
19:18,22,23;20:9;
21:18;36:12;66:7,20;
67:2;70:8;88:14
**Overy (1)**
8:23
**own (2)**
20:3;43:11

## P

**page (4)**
34:20;62:12;70:18;
71:2
**parent (1)**
13:4
**Park (1)**

3:16
**part (6)**
18:21;19:16;20:14;
46:12;72:9;94:19
**participant (1)**
80:22
**participants (2)**
53:17;102:3
**participate (5)**
33:2;72:19;73:7;
81:5;83:9
**participated (5)**
21:15;23:2,7;
57:18;81:4
**participation (4)**
26:12,15;58:25;
59:2
**particular (5)**
20:13;22:13;56:5;
84:25;91:16
**particularities (1)**
19:4
**particularity (1)**
69:22
**particularly (1)**
99:25
**parties (10)**
53:11;57:18,19,23;
58:4;61:10,15;64:4;
81:22;85:10
**parties' (1)**
58:14
**parting (1)**
53:16
**partner (6)**
11:25;15:13;25:6;
34:4;35:25;40:9
**partners (1)**
15:15
**party (2)**
72:4;86:25
**path (1)**
100:14
**pay (1)**
84:21
**payment (4)**
90:9,15;94:3,11
**PBGC (2)**
65:6;93:20
**Pension (2)**
3:4;9:16
**Pensyl (1)**
8:25
**people (2)**
18:19;25:14
**percent (28)**
37:16;38:4;45:6,
12,23;46:8,8,9,10;
47:24;51:22;52:4,5,5,
11,12;56:10,13,19,
19;57:11;58:11;61:4,
6,11,17;78:20;82:2
**percentage (3)**

58:15;77:7;78:16
**performed (1)**
90:21
**period (6)**
21:18;67:19;78:20;
85:21;86:11;96:5
**person (7)**
21:16;23:3,16,17;
25:16;44:9;62:3
**personal (1)**
22:23
**personally (5)**
32:13,17,18;82:10;
86:18
**persons (2)**
20:22;24:16
**Perusing (5)**
26:25;33:18;42:5;
45:14;60:5
**PHONE (4)**
3:8,20;62:4;96:5
**pick (1)**
79:15
**pieces (1)**
22:3
**Pisa (4)**
34:24;35:19,24,25
**place (9)**
32:23;40:24;41:4,
12;43:2,16;61:23;
62:3;82:11
**plan (1)**
100:14
**Plaza (1)**
8:13
**please (6)**
8:19;9:22;11:20;
60:17;63:14;94:5
**pleasure (1)**
68:22
**pm (8)**
8:5;62:17;68:24;
69:6;100:23;101:3;
102:20,22
**point (22)**
13:13;14:23;15:18;
18:10;34:19;38:6;
47:10,17;48:8,13,17;
52:2;55:21;56:16;
64:6,8;66:18;68:9;
83:5,19;93:23;94:6
**Political (1)**
11:10
**position (8)**
13:12;15:10;16:21,
24;26:4,4,5;58:14
**possible (8)**
33:7;41:13;42:23;
50:15;56:3;77:5;
89:15;94:2
**possibly (1)**
47:11
**post-petition (22)**

22:16;37:17,18;
38:11;45:7;49:10;
63:17;66:21;68:3,7,
9;72:6;75:19;77:18,
25;84:20,23;90:9,15;
94:4,11;98:5
**pot (1)**
99:21
**potential (11)**
28:4,15;50:20;
51:14,18;77:14;89:3,
20;94:9;99:20;102:9
**potentially (2)**
95:9;98:24
**PPI (33)**
21:5;28:14,23;
29:2,11;30:16;32:11;
38:5,7,9;44:24;
47:13;48:5,11,15,20;
49:7;50:16,21;51:9,
12;55:18;56:6;60:18;
76:2;79:9,23;87:21,
22,25;88:4;89:4,20
**practice (3)**
14:22;17:2,20
**practiced (1)**
11:24
**preceding (1)**
37:8
**preparation (1)**
101:7
**prepare (2)**
95:24;96:13
**prepared (9)**
51:5,13;67:24,25;
68:6;69:15,17,25;
77:2
**presents (1)**
97:19
**previously (3)**
21:21;31:2;42:3
**principal (9)**
23:17;71:13;73:4,
5,5,8,10,11;79:7
**principally (2)**
24:3,8
**prior (19)**
21:24;30:2,15;
31:16,19;32:2,6,8,9;
34:6;36:3;38:13;
76:24;77:20;79:12,
18,19;88:18,24
**privilege (4)**
91:15;94:23,24;
102:10
**privileged (1)**
95:10
**probably (3)**
27:21;63:2;80:3
**problems (1)**
63:5
**proceedings (1)**
99:19

**product (1)**
91:15
**production (1)**
95:20
**professional (2)**
25:25;85:23
**professionals (7)**
19:15,17,22,25;
24:12;25:3,11
**progressively (1)**
13:17
**promoted (1)**
13:24
**proportion (1)**
72:6
**proposal (22)**
36:12,22,23;37:3,6,
10,15;40:2,16;44:25;
45:2,3,5,12,23,23,24;
46:7,9,10;58:16;
82:16
**proposed (20)**
10:7;21:5;22:12;
25:4;52:11;54:4;
58:9;64:5,10,13;
71:21;72:9;77:20;
78:14;79:24;85:13;
95:17;97:3;101:14,
21
**proposing (1)**
57:11
**provide (1)**
18:11
**provided (1)**
85:6
**providers (1)**
20:23
**provides (1)**
34:24
**providing (1)**
100:14
**provision (1)**
85:9
**Public (1)**
9:25
**PULTMAN (19)**
8:22,22;10:4,6;
49:4;50:6;54:23;
55:3;68:20;69:8;
91:8,19,22,25;94:22;
100:19;101:5;102:7,
15
**purchase (1)**
12:9
**purple (2)**
24:18,21
**pursuant (1)**
22:7
**put (4)**
25:23;39:20;54:9;
58:23
**puts (1)**
89:15

## Q

**quick (1)**
75:3

## R

**raise (1)**
70:21
**raised (2)**
70:19;80:15
**rajohnson@akingumpcom (1)**
3:22
**ran (1)**
79:19
**rate (7)**
45:15;49:9;51:12;
79:6,14,17;90:25
**rather (1)**
100:2
**Ray (49)**
21:22;23:5;34:16;
41:16,16;42:3,21;
43:22;44:21;45:9,17;
46:6,7;47:22;48:3;
51:21;52:3,10;53:5;
54:10,14,21,22,23;
55:5,8;58:22;59:14;
61:21;72:10;74:17;
75:17;76:6;77:10;
80:15;81:3,4,5,24;
82:8;84:25;86:14;
88:8;89:19,19;90:6;
96:15;97:11;101:15
**re (1)**
8:8
**reached (1)**
65:25
**read (2)**
96:12,15
**reading (1)**
67:19
**ready (1)**
52:2
**really (1)**
91:14
**reason (3)**
10:17,21;27:24
**reasoning (3)**
46:23;47:3,4
**reasons (2)**
47:5;76:6
**recall (53)**
14:3;19:4;24:7;
27:21;32:25;33:7;
37:21,23;38:5;40:5,
23;41:3;42:12,22,25;
43:4,15,17,18;44:18,
19;45:24;46:5,15;
47:2,5;54:6;56:3;
58:16;69:17,22;70:6;
74:25;77:4,6,9,10;

80:6,18;82:9,17,21;
84:8;86:2,15;87:6,
10;92:17,21,22;93:2;
97:17;99:5
**receivables (1)**
92:6
**receive (1)**
27:24
**Recess (2)**
69:2;100:25
**recollection (13)**
29:24;32:24;33:4;
36:20;40:22,25;
43:25;44:12;46:13;
53:20;59:9;61:24;
73:14
**record (20)**
8:4,21;21:25;27:2;
33:15;42:6;55:8;
56:25;57:10;59:23;
62:25;68:24;69:6;
74:11,21;100:20,23;
101:3;102:16,19
**recover (6)**
47:11;48:5,11,15,
20;49:14
**recoveries (2)**
84:12;89:3
**recovery (4)**
50:21;51:6,10,14
**reduced (1)**
98:21
**refer (1)**
19:10
**reference (8)**
35:6,8,9;36:14,19;
62:23;66:12;70:25
**referenced (3)**
45:13;66:19;85:5
**references (1)**
63:12
**referring (3)**
44:4,7;66:24
**refers (1)**
83:2
**reflect (1)**
36:22
**reflected (5)**
45:17;57:14;70:17;
72:10;101:15
**reflecting (2)**
50:2,13
**refresh (1)**
96:11
**regarding (2)**
55:18;75:4
**regular (1)**
20:23
**related (2)**
21:19;95:14
**relating (2)**
21:12;83:10
**remained (1)**

16:17
**remaining (2)**
53:22,23
**remember (5)**
15:3;42:14,24;
52:10;53:2
**repeat (1)**
94:5
**rephrase (2)**
20:16;88:23
**report (2)**
33:5;87:3
**reporter (2)**
8:14;9:22
**Reporting (2)**
8:16,18
**represent (3)**
8:20,25;63:21
**representation (5)**
20:4,6,14;26:9;
38:12
**representative (2)**
93:24;94:7
**representatives (6)**
64:17,21;65:2,6;
97:2,18
**represented (3)**
28:22;38:10;98:8
**representing (2)**
64:9;101:12
**request (2)**
49:25;67:24
**requested (1)**
49:22
**required (1)**
83:24
**requirement (1)**
81:13
**reschedule (1)**
54:2
**resolution (2)**
85:10;102:9
**resolutions (1)**
100:10
**resolve (1)**
97:19
**resolved (6)**
77:19,22,23;83:12,
17;97:20
**resolving (1)**
97:25
**resource-wasting (1)**
97:22
**respect (13)**
28:4;46:21;70:22;
77:25;80:19;87:13,
21;92:20;93:9;95:17,
20;97:15;98:14
**respective (2)**
29:3;57:20
**respectively (1)**
20:12
**response (7)**

31:4;46:5;49:24;
51:23;62:8;68:18;
82:4
**responsibilities (5)**
13:16,21;16:23;
17:18;21:12
**responsible (3)**
21:16;22:21;23:3
**restate (2)**
45:3;47:20
**restated (1)**
81:13
**restructuring (5)**
12:13;16:3;17:3;
21:2;34:4
**restructurings (2)**
12:10;15:16
**result (4)**
77:15;89:20;97:20;
100:2
**resulted (1)**
58:13
**results (1)**
100:17
**retained (2)**
18:11,22
**retention (1)**
19:2
**returned (2)**
52:3,11
**review (4)**
26:21;33:17;62:9;
96:18
**revised (3)**
60:18,21;76:25
**right (19)**
9:6;22:10;24:17;
26:25;27:18;39:8;
44:10;47:25;52:15;
55:7;57:3,5,5;59:16;
64:18;80:3;90:2;
96:9;101:16
**Ritz (2)**
41:7;44:8
**ROBERT (2)**
3:18;9:7
**role (3)**
13:23;20:3;58:19
**roles (3)**
13:15,18;19:23
**roll-up (1)**
12:23
**room (6)**
43:12,13,15,17;
44:20;52:4
**Rosenberg (3)**
24:6,10;42:23
**Rosenman (1)**
9:12
**ROSENTHAL (8)**
9:17,17;31:21;
50:22;58:6;70:23;
91:4;94:15

**Rule (1)**
22:8
**run (1)**
78:20
**running (2)**
79:13;83:11

**S**

**sales (1)**
12:9
**salient (4)**
37:12,13,20,22
**same (4)**
18:9;60:9;72:6;
91:24
**Sandberg (19)**
9:6;24:14,16,23;
25:2,15;27:6,12;
33:2;34:25;35:21;
69:19;70:13;74:16;
76:13,16,21;81:2;
96:6
**Sandberg's (2)**
24:22;26:5
**Saturday (2)**
65:24;69:11
**saw (1)**
42:10
**saying (1)**
53:3
**schedule (9)**
66:20;67:3,7;
69:12,14,18,21,25;
70:22
**School (1)**
11:14
**Schweitzer (10)**
24:3;33:21;34:21;
36:10;42:22;60:13;
61:21;62:8,15;65:24
**science (1)**
11:10
**second (4)**
22:6;27:10;62:12;
85:5
**seconded (1)**
12:12
**secrecy (1)**
63:4
**Section (3)**
56:6,6;85:2
**securities (1)**
12:6
**seeing (1)**
58:16
**seems (1)**
31:5
**send (7)**
14:21;36:11;66:2,
7,20;67:2;70:8
**sending (2)**
34:21;70:4,14

**Senior (10)**
16:14,16,17,22,25;
25:7,16,20,22,23
**senior-most (1)**
16:21
**sent (2)**
55:22;56:2,2;68:17
**September (5)**
8:6;68:25;69:7;
100:24;101:4;102:20
**series (3)**
43:9;90:19;91:23
**served (1)**
92:4
**services (3)**
12:24;18:11;20:24
**session (1)**
101:7
**set (1)**
99:18
**settle (2)**
28:13;81:22
**settlement (58)**
10:7;21:5,9;25:5;
28:5,24;36:22,23;
37:6;45:15;46:24,25;
49:2;54:4;55:17,22;
56:4,6;58:10,18,20;
60:9,18,22;61:2;64:6,
10,13;71:21;72:2,4,
10;77:2;79:24;81:16;
82:18;83:7;84:2;
85:2,12;88:13,15,16,
19;89:23,24;95:13,
17;96:11;97:3;98:8,
12,20;99:25;100:9;
101:15,21;102:2
**settlements (1)**
81:19
**settling (2)**
22:15;63:16
**seven (3)**
14:8;15:22;16:25
**Seventh (1)**
3:5
**several (3)**
22:3;40:17;92:23
**Shall (1)**
56:9
**share (8)**
47:15,18;87:22,25;
88:4,19;89:7,16
**shared (2)**
88:7;95:12
**sheet (3)**
42:7;45:8,20
**shirt (1)**
24:18,21
**short (1)**
96:5
**shortly (1)**
86:7
**show (4)**

33:12;59:20;67:9;
74:7
**showed (1)**
54:18
**showing (1)**
66:20
**side (3)**
32:11;42:17;49:13
**signatures (1)**
85:23
**signed (5)**
19:3,5;101:20,24;
102:4
**significantly (1)**
79:18
**sit (1)**
80:2
**sitting (11)**
24:16;27:23;38:5;
41:10;44:9,13;46:13;
47:2;58:8;70:16;80:5
**six (3)**
13:11;16:18,25
**slow (1)**
29:18
**slowly (1)**
90:22
**SMD (1)**
17:21
**Solus (4)**
73:10,11,11,13
**someone (4)**
18:24;26:8;43:20,
23
**sometime (1)**
28:11
**sometimes (1)**
26:6
**somewhere (2)**
16:7;58:11
**sooner (1)**
100:2
**sorry (10)**
18:20;32:9;54:17,
18;71:5;73:19;82:23;
85:18;86:4;87:9
**sort (3)**
46:17,20;78:2
**sounds (1)**
80:2
**speak (4)**
10:25,25;11:2;
29:23
**speaking (1)**
44:2
**specialized (2)**
15:15;19:23
**specializes (1)**
17:22
**specific (7)**
18:25;37:4;77:7,
11,11;91:14;93:14
**specifically (7)**

18:22;70:7;74:25;
77:4;87:8;97:17;
98:23
**specificity (6)**
27:22;33:8;37:23;
42:22;53:2;82:21
**specified (2)**
78:13,17
**spent (1)**
92:23
**spoke (4)**
59:9;73:3;75:16;
96:6
**spoken (1)**
28:10
**Spragg (3)**
25:7,16;27:15
**S-P-R-A-G-G (1)**
25:7
**Spragg's (1)**
26:4
**Stamped (5)**
26:23;33:10;59:18;
67:7;74:5
**start (5)**
60:3,6;88:15;
89:11;97:12
**started (6)**
15:12;17:7,8;43:3;
57:2,2
**state (5)**
8:20;11:7;14:13;
15:5,8
**stated (2)**
79:5;100:8
**statements (1)**
28:22
**States (3)**
12:25;14:15;98:22
**status (1)**
102:6
**stay (1)**
46:19
**stayed (1)**
43:13
**Steen (2)**
8:11;9:19
**step (1)**
49:3
**Steve (1)**
73:9
**still (1)**
14:21
**stipulate (1)**
24:20
**STRAUSS (2)**
3:13;9:8
**strongly (5)**
76:4,4;98:2,7;
99:23
**stuff (1)**
53:11
**styled (2)**

84:11;98:6
**subject (5)**
63:15,16;65:20;
66:3;102:8
**submit (1)**
36:21
**submitted (3)**
36:21;79:11,22
**subsequent (2)**
59:13;97:10
**subsidiary (1)**
12:25
**substance (7)**
32:25;55:13;87:6,
18;88:11;91:18;96:8
**suite (1)**
16:22
**sum (1)**
66:22
**Sure (14)**
11:6;12:5;17:19;
20:5,17;22:4;26:16;
28:8;47:22;51:9;
74:20;94:6;99:16;
100:21
**surplus (1)**
90:7,14;94:2,10
**swear (1)**
9:22
**sworn (2)**
9:24;63:3
**synced (1)**
89:13

**T**

**tab (1)**
54:16
**table (3)**
83:19;94:25;98:11
**talk (1)**
85:16
**talked (1)**
98:14
**talking (2)**
53:21;63:3
**tally (2)**
68:9,11
**tape (2)**
8:3;69:3
**tax (2)**
93:4,9
**TBD (1)**
45:15
**team (6)**
19:12,16,20,24;
20:15;85:23
**technology (4)**
16:5;17:23,25;
20:25
**telecom (6)**
12:24;16:4;17:23,
25;20:18,24

**telecommunications (1)**
12:23
**telephone (2)**
40:20;81:6
**telling (3)**
51:20;66:3;92:22
**ten (2)**
12:15;19:22
**term (4)**
37:12;42:7;45:8,19
**terms (4)**
37:10,14,21,23
**testified (2)**
10:2;56:17
**testimony (1)**
87:15
**Texas (1)**
15:8
**thanking (1)**
62:9
**Thanks (3)**
36:11;66:8;74:23
**thought (5)**
16:6;48:4,9,14;
81:16
**three (4)**
19:24;24:16;25:14;
54:16
**three-page (3)**
67:23;69:12,14
**throughout (2)**
16:18;39:16
**thrown (1)**
56:19
**Thursday (5)**
8:5;55:9;57:15;
60:10;61:25
**time-consuming (1)**
97:21
**timeline (1)**
44:17
**timing (2)**
63:24;83:11
**title (3)**
16:15;24:22;27:17
**TMT (5)**
15:15;17:2,21;
24:24;25:8
**Today (17)**
8:5,14;16:15;
17:18;27:23;36:12;
38:5;41:10;44:13;
46:14;47:2;58:8;
70:16;80:6;86:14;
96:23;102:8
**today's (2)**
95:24;102:18
**told (15)**
20:17;51:21;56:18;
64:16,19;75:17;
80:13;83:8;86:13,17;
87:16;99:6;101:6,9,
14

**Tom (2)**
55:10;96:4
**tomorrow (1)**
35:2
**took (11)**
13:20;16:24;32:23;
40:23;41:4,12;43:2,
16;61:23;62:3;76:22
**top (3)**
27:12;62:11;65:23
**topic (1)**
95:5
**topics (1)**
62:18
**Toronto (2)**
41:2,3
**total (4)**
38:7;77:24;79:3,9
**transcripts (1)**
96:13
**treat (1)**
99:15
**trials (1)**
47:6
**tricks (1)**
41:25
**trouble (1)**
70:13
**Trust (1)**
9:13
**trustee (1)**
84:14
**trustees (1)**
83:25
**try (2)**
10:21,24
**Tuesday (12)**
22:24;26:12;35:13;
55:17;56:16;73:15,
15,18,18;75:12;
82:22;97:9
**turnaround (2)**
15:16;16:2
**Tweed (1)**
9:3
**two (7)**
31:5;69:3;83:17,
21,22;86:23;96:3
**type (1)**
12:3

**U**

**UK (2)**
3:4;9:16
**ultimate (1)**
84:12
**ultimately (7)**
15:14;58:14;72:9;
77:19;84:6,14;98:24
**uncomfortable (1)**
75:18
**under (3)**

50:21;79:24;85:5
**undergraduate (1)**
11:6
**United (2)**
12:25;98:22
**University (2)**
11:7,14
**Unsecured (2)**
3:14;9:10;63:23
**up (10)**
26:15;29:6;47:6;
56:9;57:4,7;62:19;
79:20;82:2;89:13
**useless (1)**
80:4

**V**

**valuation (3)**
93:4,9,13
**value (1)**
93:19
**various (2)**
62:15;85:19
**version (3)**
60:10,25;61:2
**versions (2)**
71:20;72:2
**video (1)**
24:19
**VIDEOGRAPHER (8)**
8:3,17;9:21;68:23;
69:3;100:22;101:2;
102:17
**Videotron (2)**
13:6,7
**V-I-D-E-O-T-R-O-N (1)**
13:7
**view (4)**
38:20;39:18,20;
98:2
**virtually (1)**
20:7
**vis-a-vis (1)**
84:18
**vulnerable (1)**
81:17

**W**

**warn (1)**
62:16
**way (2)**
17:24;62:5
**wearing (1)**
24:20
**Wednesday (3)**
73:16;83:3,5
**week (1)**
96:16
**weeks (2)**
37:8;40:17
**Weiner (1)**

11:22
**weren't (1)**
15:7
**What's (4)**
24:22;42:2;66:17;
71:2
**whole (1)**
78:2
**willing (1)**
28:12
**willingness (1)**
81:15
**WILLKIE (2)**
3:3;9:15
**Wilmington (1)**
9:13
**withdrawn (1)**
14:19
**within (4)**
17:22;20:13,25;
93:14
**without (2)**
80:3;82:16
**witness (13)**
9:22,24;55:2;59:6;
63:9;68:22;73:22;
74:23;91:20;92:8;
93:12;96:9;102:12
**won (2)**
49:7;51:11
**words (1)**
53:16
**work (16)**
12:4,7;13:3;15:16,
19,24;19:13,18,22;
21:3;19;36:6;50:2;
62:5;91:15;93:8
**worked (7)**
12:10;13:2;15:20;
18:2;19:20;34:9;36:3
**working (3)**
20:18;38:8;66:3
**works (1)**
67:17
**writing (1)**
58:17
**written (2)**
36:21;50:12

**Y**

**year (4)**
12:14;33:20;79:20;
82:2
**years (15)**
12:16;13:10,11,23;
14:6,8;15:2,2,23;
16:18;19:18;51:18;
88:14;90:3;100:11
**York (17)**
3:6,6,17,17;8:13,
13;11:7,22;12:17;
14:14,18,24;15:5;

17:9,10,12,14

**0**

**09 (2)**
18:20,20

**1**

**1 (13)**
21:22;26:18,22;
29:8;58:22;68:10,10;
72:10;78:21,21;
84:25;91:2;101:15
**1,010,000,000 (1)**
80:10
**1.6 (1)**
98:6
**1.656 (1)**
70:18
**1:11 (1)**
8:5
**10 (1)**
27:8
**10019-6099 (1)**
3:6
**10036-6745 (1)**
3:17
**10th (3)**
29:9;30:3,15
**11 (1)**
27:11
**11:26 (1)**
55:9
**11th (1)**
30:4
**12 (3)**
67:8,12;68:12
**14th (1)**
32:8;33:20;54:13;
86:11
**15 (6)**
22:24;26:12;37:8;
97:9,12;99:6
**150 (1)**
71:14
**15th (9)**
32:9;35:11,13;
42:11,13,18;53:13,
18;58:21
**16 (2)**
59:19,24
**164 (1)**
55:11
**16th (1)**
29:5
**17 (1)**
55:9
**17th (3)**
60:3,6,10
**18 (6)**
8:6;68:25;69:7;
100:24;101:4;102:20

**18th (4)**
60:14,23;61:3,11
**19 (2)**
65:25;69:11
**1981 (1)**
11:8
**1985 (4)**
11:14,17,19;14:10
**1995 (2)**
11:24;12:19
**19th (1)**
60:4

**2**

**2 (9)**
33:9,13;41:17,21,
22;42:3;45:9,17;
54:15
**2.2 (1)**
56:6
**2:18 (1)**
68:24
**2:38 (1)**
69:6
**2008 (4)**
15:22;16:7,8,9
**2009 (5)**
15:22;16:7,10,24;
17:7
**2010 (2)**
17:13;18:16
**2014 (24)**
8:6;28:18;30:23;
31:20;38:13;39:17;
55:9;65:25;68:25;
69:7,11;74:9;78:4,7,
11,21;80:5;83:3;
88:24;91:2;95:15;
100:24;101:4;102:20
**2015 (3)**
75:22;78:22;80:8
**20-page (1)**
22:8
**21 (1)**
42:4
**212-728-8170 (1)**
3:8
**212-728-9170 (1)**
3:9
**212-872-1002 (1)**
3:21
**212-872-1077 (1)**
3:20
**21st (4)**
59:11,12,13;76:25
**22 (1)**
74:2
**22nd (8)**
59:10,15;73:20,21;
75:11;82:23;92:19,
24
**23 (3)**

74:9;83:3;95:15
**23rd (2)**
80:19;82:23
**24 (3)**
77:20;79:10,22
**24th (3)**
58:23;86:9,12
**252 (1)**
33:11

**3**

**3 (12)**
41:23;54:10,21,22,
23;55:5,6,8;59:17,21;
62:7;68:18
**3.5 (2)**
78:20;82:2
**3:15 (1)**
100:23
**3:17 (1)**
101:3
**3:19 (2)**
102:20,22
**30 (16)**
46:8,10;47:24;
51:22;52:14;57:2;
68:10;75:20,22;78:3,
6,11,21,21;80:5,8
**35 (1)**
52:5

**4**

**4 (4)**
54:22;67:6,10;
69:10
**4.2 (2)**
85:2,9
**40 (6)**
52:12,14;56:19;
57:4;58:11;75:7
**40/60 (3)**
57:19,23;58:5
**43-page (1)**
22:15

**5**

**5 (5)**
62:17;74:4,8;
80:12;83:2
**55 (4)**
61:4,6,11,17

**6**

**60 (7)**
52:11;56:10,13,22;
57:7,11;58:11
**60/40 (1)**
56:22
**65 (5)**

HIGHLY CONFIDENTIAL

52:4,5,13;56:19;
57:6

### 7

**70 (10)**
37:16;38:4;45:6,
12,23;46:8,9;52:6,13;
57:2
**787 (1)**
3:5

### 8

**876 (2)**
77:24;80:7

### 9

**9 (1)**
75:7
**9019 (3)**
10:7;22:8;95:17
**98 (1)**
14:4
**99 (1)**
14:4

**Ellen Grauer Court Reporting Co. LLC**