## **<u>EXHIBIT C</u>**

## AGREEMENT SETTLING THE NNI POST-PETITION INTEREST DISPUTE AND RELATED MATTERS

This agreement (the "PPI Settlement Agreement"), dated as of July 24, 2014, is entered into by and among Nortel Networks Inc. ("NNI"), the bondholders who are signatories hereto (each a "Supporting Bondholder" and, collectively, the "Supporting Bondholders") holding Guaranteed Bonds (defined *infra*), and The Bank of New York Mellon, as indenture trustee (the "Indenture Trustee,") (with NNI, each Supporting Bondholder, and the Indenture Trustee being a "Party" and collectively, the "Parties").

## RECITALS

WHEREAS, on January 14, 2009 (the "Filing Date"), NNI and certain of its United States affiliates (the "US Debtors") other than Nortel Networks (CALA) Inc. ("NN CALA")[1] filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") (together with the NN CALA Case, the "US Proceedings") before the United States Bankruptcy Court for the District of Delaware (the "US Court"). On January 22, 2009, the Office of the United States Trustee for the District of Delaware appointed the official committee of unsecured creditors of the US Debtors.

WHEREAS, on the Filing Date, the US Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL"), and certain of NNC's and NNL's Canadian affiliates (collectively, the "Canadian Debtors") commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor").

WHEREAS, prior to the Filing Date, the US Debtors, the EMEA Debtors,[2] the Canadian Debtors (collectively, the "Nortel Debtors"), and certain of their non-debtor affiliates around the world were part of the Nortel group of companies (the "Nortel Group"), of which NNC was the ultimate corporate parent.

WHEREAS, pursuant to the Indenture dated as of July 5, 2006 (the "2006 Indenture"),[3] NNL issued multiple series of senior notes guaranteed by NNC and NNI, including two series of

---

[1] NN CALA filed its voluntary petition for protection under chapter 11 of the Bankruptcy Code on July 14, 2009 (the "NN CALA Case") [D.I. 1098].

[2] The EMEA Debtors are: Nortel Networks U.K. Ltd., Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

[3] Supplemented by the First Supplemental Indenture, dated July 5, 2006, the Second Supplemental Indenture dated May 1, 2007, and the Third Supplemental Indenture dated May 28, 2008 (collectively the "2006 Supplemental Indentures").

fixed rate 10.75% senior notes in the aggregate principal amounts of $450 million and $675 million due 2016 (together, the "10.75% Notes"), a series of fixed rate 10.125% senior notes in the aggregate principal amount of $550 million due 2013 (the "10.125% Notes"), and a series of floating rate senior notes in the aggregate principal amount of $1 billion due 2011 (the "Floating Rate Notes" and, together with the 10.75% Notes and the 10.125% Notes, the "2006 Indenture Notes").

WHEREAS, as provided in Section 1001 of the 2006 Indenture, "[t]he Issuer covenants and agrees for the benefit of each particular series of Debt Securities that it will duly and punctually pay the principal of (and premium, if any) and interest on the Debt Securities of such series in accordance with their terms and this Indenture." The 2006 Supplemental Indentures establish the applicable rate of interest for each series of 2006 Indenture Notes. Moreover, Section 312 of the 2006 Indenture provides for interest payable to noteholders and that interest not punctually paid or duly provided for on any interest payment date constitutes defaulted interest.

WHEREAS, on September 25, 2009, the Indenture Trustee filed a timely proof of claim on behalf of the holders of the 2006 Indenture Notes preserving, among others, their claim for "an unliquidated amount for the continuing post-petition (a) accrual of interest (including interest upon the overdue installments of interest). . . ."[4]

WHEREAS, pursuant to the Indenture dated as of March 28, 2007 (the "2007 Indenture"), NNC issued 2.125% convertible senior notes due 2014 (the "2.125% Notes") in an aggregate principal amount of $575 million and 1.75% convertible senior notes due 2012 (the "1.75% Notes" and, together with the 2.125% Notes, the "2007 Indenture Notes" and, together with the 2006 Indenture Notes, the "Guaranteed Bonds")[5] in an aggregate principal amount of $575 million. The 2007 Indenture Notes are each guaranteed by NNI and NNL.

WHEREAS, pursuant to Section 4.01 of the 2007 Indenture, "[t]he Issuer shall pay the principal of and interest (including Additional Interest, if any) on the Notes on the dates and in the manner provided in the Notes . . . . To the extent lawful, the Issuer shall pay interest (including post-petition interest in any proceeding under any bankruptcy, insolvency or other similar applicable law) on (i) overdue principal, at the rate borne by Notes; and (ii) overdue installments of interest (without regard to any applicable grace period) at the same rate." Additionally, pursuant to Section 2.11 of the 2007 Indenture, "[i]f the Issuer (and the Guarantors) fail to make a payment of interest on the Notes, it (and the Guarantors) shall pay such defaulted interest plus, to the extent lawful, any interest payable on the defaulted interest." The 2007 Indenture establishes the applicable rate of interest for each series of 2007 Indenture Notes.

WHEREAS, on September 25, 2009, the Indenture Trustee filed a timely proof of claim on behalf of the holders of the 2007 Indenture Notes for, among others, "a claim in an

---

[4]       See Attachment to Proof of Claim No. 3972 ¶ 8.

[5]       All holders of the Guaranteed Bonds are collectively defined as "Bondholders".

unliquidated amount for the continuing post-petition (a) accrual of interest (including interest upon the overdue installments of interest). . . ."[6]

WHEREAS, after the Filing Date, the Nortel Debtors entered into various agreements for the coordinated sale of the Nortel Group's businesses and assets. The various Nortel estates further agreed that all sale proceeds would be held in escrow accounts corresponding to each sale transaction, pending later agreement by the parties on allocation or a litigated resolution of any allocation dispute. This agreement among the US Debtors, the Canadian Debtors and certain of the EMEA Debtors was memorialized in the Interim Funding and Settlement Agreement, dated as of June 9, 2009 (the "IFSA").[7] Following a joint hearing on June 29, 2009, the IFSA was approved by each of the US Court [D.I. 993] and the Canadian Court.

WHEREAS, from 2009 to 2011, the Nortel Debtors conducted a series of court-approved sale transactions that generated in excess of $7.3 billion in sale proceeds (together with accrued interest, the "Sale Proceeds"). Each Nortel Group entity that satisfied the definition of "Nortel Seller" (as defined in the IFSA) was entitled to participate in the distribution of the Sale Proceeds.

WHEREAS, after three failed mediation attempts regarding the allocation of the Sale Proceeds among the Nortel Sellers, litigation to resolve the allocation issues (the "Allocation Litigation") was ordered by the US Court by an Order dated April 3, 2013 [D.I. 9947] (as supplemented by further orders) and directed by endorsements of the Canadian Court dated March 8, 2013 and April 3, 2013.[8]

WHEREAS, after extensive fact and expert discovery, on May 12, 2014, the parties commenced joint hearings (together, the "Allocation Trial") before the US Court and the Canadian Court (collectively, the "Courts"). The evidentiary portion of the Allocation Trial concluded on June 24, 2014, and the litigation remains pending before each of the Courts.

WHEREAS, at the request of the Monitor in the Memorandum of the Monitor Regarding Bondholder Claims Issues, dated June 19, 2014 [D.I. 13880], on June 30, 2014, the Courts issued an order directing briefing and argument (the "PPI Dispute") on two issues relating to post-petition interest ("PPI") on the Guaranteed Bonds (and other bonds with claims against both US Debtors and Canadian Debtors):

    i)        whether the holders of the Guaranteed Bonds are legally entitled in each jurisdiction to claim or receive any amounts under the relevant indentures above and beyond the outstanding principal debt and pre-petition interest; and

---

[6]      *See* Attachment to Proof of Claim No. 3971 ¶ 8.

[7]      *See* Exhibit B to the Motion Pursuant to 11 U.S.C. § 105(a), § 363, § 503 and Fed. R. Bankr. P. 9019 for an Order (A) Approving the Interim Funding and Settlement Agreement, and (B) Granting Related Relief [D.I. 874].

[8]      *See* Exhibits C and D to Notice of Filing of Items Designated for Record on Appeal dated May 1, 2013 [D.I. 10414].

ii)    if determined that the holders of the Guaranteed Bonds are so entitled, what additional amounts are such holders entitled to so claim and receive.

WHEREAS, on July 15, 2014, certain of the parties to the Allocation Litigation filed and exchanged opening briefs with respect to the PPI Dispute in the US Court and the Canadian Court and further filed reply briefs on July 22, 2014.  The briefs advance the parties' divergent and competing positions regarding the PPI Dispute.

WHEREAS, the PPI Dispute requires the determination of separate and distinct legal issues in the United States (the "US PPI Dispute") and Canada (the "Canada PPI Dispute"), and as such can and should be resolved independently in each jurisdiction.  This PPI Settlement Agreement relates solely to the US PPI Dispute with respect to the Guaranteed Bonds.

WHEREAS, the Parties all acknowledge and agree that the entry into any settlement of the US PPI Dispute shall not be deemed an acknowledgement or acceptance of the position of any party to the US PPI Dispute, the Canada PPI Dispute or the Allocation Litigation.  The Parties also acknowledge and agree that the ultimate outcome of the US PPI Dispute is uncertain, that appeals in respect of such litigation are likely, that the cost of such litigation and associated delays may be both substantial and burdensome on the Parties and that such costs will continue to increase absent a final and binding resolution of the US PPI Dispute.  The approval of the PPI Settlement Agreement would end a contentious and potentially costly litigation regarding the entitlement of Bondholders to PPI in the US Proceedings; resolve an issue which could have significantly delayed the confirmation of the US Debtors' chapter 11 plan(s) and the ultimate distribution of plan proceeds to the US Debtors' creditors; and further the efficient administration of the US Debtors' estates generally.  As a result of the compromises embodied in this PPI Settlement Agreement, the US Debtors have substantially reduced the potential size of the PPI claim of the Bondholders and have mitigated the risk to their unsecured creditors and other parties in interest of a costly and protracted appeals process on these issues, thereby preserving significant value for all of the US Debtors' stakeholders.

NOW THEREFORE, IN LIGHT OF THE FOREGOING RECITALS, AND FOR GOOD AND VALUABLE CONSIDERATION, THE VALUE OF WHICH IS HEREBY AGREED, THE PARTIES HEREBY FURTHER AGREE, SUBJECT TO THE SATISFACTION OF ALL CONDITIONS SET FORTH HEREIN THAT:

## 1.    **INTERPRETATION**

1.1.    The Recitals set forth above form an integral part of this PPI Settlement Agreement and are incorporated fully herein.

## 2.    **PPI SETTLEMENT**

2.1.    Subject to Section 4.2, in the event that NNI at any time has more than sufficient funds to pay all of its allowed administrative, priority, secured and general unsecured claims in full, holders of Guaranteed Bonds shall be entitled to payment from NNI of PPI in the PPI Settlement Amount and shall be paid PPI from such funds available for such

distributions (together with any other creditors of NNI entitled to payments of PPI) in accordance with a confirmed chapter 11 plan until the PPI Settlement Amount is paid in full.

2.2.    The "PPI Settlement Amount" shall be an amount equal to (a) $876 million plus (b) an additional amount, equal to 3.50% per annum times the then outstanding principal balance of the Guaranteed Bonds, up to a maximum amount of $134 million, which additional amount shall accrue on the unpaid and outstanding principal balance of the Guaranteed Bonds that remains unpaid and outstanding during the time of accrual for the period from July 1, 2014 until the earlier of (x) June 30, 2015 or (y) the date of the final distribution in respect of the Guaranteed Bonds.  For the avoidance of doubt, absent any distribution, the cap of $1.01 billion will be reached on June 30, 2015.

2.3.    The Indenture Trustee has asserted in the proofs of claim filed in NNI's case specific and varying contractual entitlements with respect to the Guaranteed Bonds, including, without limitation, entitlement to make-whole payments, and, except as expressly provided herein, different methods of calculating any post-petition amounts or rates (those claims and issues being referred to collectively herein as "Contractual Entitlements").  Nothing in this PPI Settlement Agreement shall constitute a settlement, release, waiver or discharge of any such Contractual Entitlements, other than the agreements with respect to the total PPI Settlement Amount contained in this Section 2 and the establishment of the amount of the allowed claims to which the Indenture Trustee and Bondholders are entitled to as against NNI, as provided in Section 3.1 and Schedule A hereto.  All such Contractual Entitlements are expressly reserved by the Bondholders and the Indenture Trustee; _provided_, _however_, that to the extent that any Bondholder or the Indenture Trustee is determined to be entitled to any Contractual Entitlement against NNI (whether by order of the US Court or a settlement or plan approved by the US Court) (i) the sole source of funds available for distributions on behalf of such allowed Contractual Entitlement shall be funds available to make distributions to the Bondholders under Section 2.1 hereof, and (ii) such allowed Contractual Entitlements shall be subject to and not added to the limitation on the total PPI Settlement Amount as defined in this Section 2.  For the avoidance of doubt, any Contractual Entitlement of the Indenture Trustee to payment or reimbursement of fees and expenses, if any, due it in accordance with the applicable Indenture shall not be included in the PPI Settlement Amount; _provided_, _however_ that the US Debtors reserve all rights and defenses in respect of any such claim for reimbursement of fees and expenses by the Indenture Trustee, and generally with respect to any other such Guaranteed Bond claim asserted by either the Indenture Trustee or the Bondholders.

## 3.    RESOLUTION OF NNI PPI DISPUTE AND GUARANTEED BOND CLAIMS

3.1.    The PPI Settlement Agreement is intended to be a full and final settlement of (i) the US PPI Dispute with respect to the Guaranteed Bonds currently pending before the US Court and all of the related submissions and requests for relief, and (ii) the allowed claims for outstanding principal obligations and accrued prepetition interest obligations (each as set forth on Schedule A hereto), and any entitlement to PPI (calculated pursuant to Section 2.1 herein) arising under the Guaranteed Bonds.  For the avoidance of doubt, any

additional amounts claimed by and allowed in favor of the Indenture Trustee or any Bondholders in respect of Guaranteed Bonds as against NNI, if any, shall only be eligible for allowance or the right to receive distributions in accordance with Section 2.3 hereof. Nothing in this PPI Settlement Agreement is or shall be deemed to be a settlement of the Canada PPI Dispute or any part thereof or otherwise a settlement of any claim of the Indenture Trustee or any Bondholder against any of the Canadian Debtors' estates.

## 4.   **RESERVATION OF RIGHTS**

4.1.   Nothing in this PPI Settlement Agreement shall constitute a settlement, release, waiver or discharge (in whole or in part) of (i) any right of any Party to assert or defend against any allocation position or advance or defend against any arguments as to entitlement to Sale Proceeds in the Allocation Litigation, including in connection with any appeal(s) of any court ruling made in connection with the Allocation Litigation; or (ii) any claim, right or entitlement of any entity to Sale Proceeds in the Allocation Litigation; or (iii) any aspect of the Canada PPI Dispute or any other matter pending now or in the future in the Canadian Debtors' cases.

4.2.   Nothing in this PPI Settlement Agreement shall constitute a settlement, release, waiver or discharge (in whole or in part) of the ability of any unsecured creditor of the US Debtors' estates (other than the Bondholders) to assert a claim for PPI against the US Debtors' estates at the contract rate (if any) applicable to such creditor's claims or any alternative theories; *provided*, *however*, that if there are insufficient funds available to pay PPI to all unsecured creditors of the US Debtors' estates entitled to such amounts (including the Bondholders), then, solely for purposes of determining any allocation of available PPI among such creditors, the holders of the Guaranteed Bonds shall be deemed to have a claim for PPI equal to the amount of post-petition interest that would have accrued at the applicable contract rate of PPI set forth in the applicable Indentures for each of the Guaranteed Bonds.  Further, this PPI Settlement Agreement does not settle the manner in which any funds available for distribution shall be allocated among the creditors of the applicable US Debtors in the event that less than the full amount of PPI can be paid to all creditors owed such amounts and such application shall be determined by later agreement of the parties whether as part of the chapter 11 plan(s) of the US Debtors in the chapter 11 cases or by subsequent agreement among the relevant affected creditors.

4.3.   For the avoidance of any doubt, nothing in this PPI Settlement Agreement shall constitute a settlement, release, waiver or discharge of any rights created under this PPI Settlement Agreement, any claim of any Party to enforce such rights, or a release of any claims for facts or events occurring or actions taken after the date of this PPI Settlement Agreement, nor shall this PPI Settlement Agreement be used, referred to or contended by any person or entity to have any relevance or probative value in connection with any claims not released herein.

## 5.   **EFFECTIVENESS**

5.1.   The agreements, acknowledgments and obligations contained herein (other than the obligations contained in Section 5.3 hereof) are expressly contingent upon, and shall

become effective only upon the occurrence of all of the conditions to effectiveness set forth in this Section 5 (the "Effective Date").

5.2.   Approval of NNI's entry into and performance under this PPI Settlement Agreement by an order of the US Court in the US Proceedings, substantially in the form attached as Schedule B hereto (the "Approval Order"), which binds all Bondholders and all other parties in interest in the US Debtors' cases to the terms of this PPI Settlement Agreement, is a condition precedent to the effectiveness of this PPI Settlement Agreement. In the event that the US Court does not enter the Approval Order by September 30, 2014, any Party may terminate this PPI Settlement Agreement by notice in writing to the other Parties.

5.3.   NNI will move promptly for, and use its commercially reasonable efforts to obtain, approval of this PPI Settlement Agreement under Rule 9019(a) of the Federal Rules of Bankruptcy Procedure; *provided* that, in order to permit the Indenture Trustee to provide notice to all Bondholders, NNI will seek to have the hearing on this PPI Settlement Agreement 45 days after the date the motion to approve the PPI Settlement Agreement. The other Parties agree to use their commercially reasonable efforts to support the Nortel Parties in obtaining US Court approval of this PPI Settlement Agreement.

## 6.   **BINDING EFFECT OF PPI SETTLEMENT AGREEMENT**

6.1.   Upon the execution of this PPI Settlement Agreement and, in the case of the U.S. Debtors, subject to Section 5 hereof, this PPI Settlement Agreement is binding on the Parties.  Upon the occurrence of the Effective Date, this PPI Settlement Agreement and the Approval Order shall be binding upon the Parties to this PPI Settlement Agreement and the Bondholders and any successors or assigns of the Parties.

6.2.   Each Supporting Bondholder represents and warrants, severally and not jointly, that, (i) as of the date hereof, such Supporting Bondholder is the legal owner, beneficial owner and/or holder of investment and voting authority over, the aggregate amount of obligations outstanding under the Guaranteed Bonds as set forth on its signature pages hereto, (ii) there are no claims against the US Debtors in respect of the Guaranteed Bonds of which it is the holder of record that are not on the signature pages hereto unless such Supporting Bondholder does not possess the full power to vote and dispose of such claims, (iii) it does not hold any claims against any US Debtor with respect to the Guaranteed Bonds (other than as listed on the signature pages hereto), and (iv) the execution and delivery of this PPI Settlement Agreement and the performance of its obligations have been duly authorized by all necessary action on its part.

6.3.   A Supporting Bondholder may (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Supporting Bondholder's interest in a Guaranteed Bond, in whole or in part, or (ii) grant any proxies, deposit any of such Supporting Bondholder's interests in a Guaranteed Bond, into a voting trust, or enter into a voting agreement with respect to any such interest, *provided* that the transferee thereof agrees in writing to be bound by the terms of this PPI Settlement Agreement until the earlier of (i) the entry of the Approval

Order in accordance with Section 5.2 and (ii) the termination of this PPI Settlement Agreement with respect to such holder in accordance with Section 5.2.

## 7. **MISCELLANEOUS**

7.1. **Acknowledgements**.  Each Party acknowledges that this PPI Settlement Agreement is not, and shall not be deemed to be, a solicitation of a vote for the acceptance of a chapter 11 plan of the US Debtors pursuant to section 1125 of the Bankruptcy Code.

7.2. **Confidentiality**.  Unless otherwise agreed by the Parties, the substance and existence of this PPI Settlement Agreement shall be kept strictly confidential until the filing of a motion with the US Court to seek approval of this PPI Settlement Agreement.

7.3. **Further Assurances**.  The Parties will cooperate in good faith to effectuate the terms of this PPI Settlement Agreement, including working in good faith to obtain the necessary court approvals.  No Party shall take any action with the purpose or effect of evading the terms of this PPI Settlement Agreement.

7.4. **Reimbursement of Costs**.  The Parties agree that upon receipt of a written request by the Indenture Trustee or any other Covered Person (as defined below), NNI shall reimburse, up to an aggregate limit of $6 million, the reasonable costs and expenses (including fees and disbursements of legal counsel) (collectively referred to herein as "Costs") that are incurred or suffered by the Indenture Trustee and each director, officer and employee of the Indenture Trustee (the Indenture Trustee and each such other person being an "Covered Person") arising out of, related to or connected with (i) this PPI Settlement Agreement, (ii) the Indenture Trustee's execution of this PPI Settlement Agreement, (iii) any review, consideration, analysis or discussion of this PPI Settlement Agreement by the Indenture Trustee or any other Covered Person, (iv) any action or activity by the Indenture Trustee or any other Covered Person in connection with this PPI Settlement Agreement or in support or furtherance of approval of this PPI Settlement Agreement by the US Court or (v) any failure or omission by the Indenture Trustee or any other Covered Person to act or to assist in the actions described in (iii) and (iv) above, including, without limitation, Costs relating to any claim, cause of action, litigation, proceeding, action or investigation (whether such Covered Person is a party to such litigation, proceeding or investigation) arising out of, related to or connected with, (A) any one or more of the matters described in (i) through (v) above or (B) the enforcement of the foregoing.

NNI shall reimburse Costs on a monthly basis as provided in this Section 7.4 following presentation of documentation supporting such Costs to NNI.  NNI shall have no duty or obligation to investigate or ascertain the validity of any Costs for which reimbursement is requested of NNI, nor shall NNI have any duty or obligation to investigate or ascertain whether any Covered Person is legally entitled to reimbursement of any such costs.

All payments made pursuant to this Section 7.4 shall constitute an advance against, and will be deducted from, any distributions to which the Bondholders are

entitled in respect of the applicable series of Guaranteed Bonds on a pro rata basis unless otherwise indicated by the Indenture Trustee at the time of such distributions.

The Indenture Trustee's and each other Covered Person's right to reimbursement of Costs hereunder shall be in addition to any other remedies, relief or indemnification available to them.  For the avoidance of doubt, nothing in this PPI Settlement Agreement shall be construed to limit the Indenture Trustee's or any other Covered Person's available rights or remedies under the 2006 Indenture, the 2007 Indenture or any chapter 11 plan that may be confirmed in the US Proceedings, or any of the US Debtors' rights, claims and defenses in respect of any rights and remedies asserted against them.  The rights and remedies conferred hereunder shall be cumulative of each other and all other rights and remedies of the Indenture Trustee and any other Covered Person, and the exercise or waiver of any such right or remedy shall not preclude or inhibit the exercise of additional rights or remedies or the subsequent exercise of such rights or remedies; _provided_, _however_, that the US Debtors reserve all available rights, claims and defenses in respect of any claim asserted against the US Debtors in respect of such rights and remedies.

7.5.   **Governing Law**.  This PPI Settlement Agreement shall be governed and construed in accordance with the laws of the State of New York without giving effect to the conflict of laws principles thereof.

7.6.   **Integration**.  This PPI Settlement Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior or contemporaneous written or oral communications, understandings, and agreements with respect to the subject matter hereof.  This PPI Settlement Agreement may not be amended, supplemented or modified except by a written instrument executed by each of the Parties to this PPI Settlement Agreement.

7.7.   **Jurisdiction**.  The Parties agree to the exclusive jurisdiction of the US Court and, solely to the extent the US Court does not have jurisdiction, the United States District Court for the District of Delaware in respect of any dispute arising out of or in connection with this PPI Settlement Agreement or its subject matter or formation.

7.8.   **Manner of Execution**.  The Parties may execute this PPI Settlement Agreement in counterparts, each of which shall be an original, and all executed counterparts shall collectively be deemed to be one and the same instrument.  Facsimile or pdf signatures shall be deemed original signatures, and the Parties may exchange signature pages via mail, courier, facsimile or email.

7.9.   **No Admissions**.  This PPI Settlement Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.  No Party shall have, by reason of this PPI Settlement Agreement, a fiduciary relationship in respect of any other Party or any person or entity, and nothing in this PPI Settlement Agreement, expressed or implied, is intended

to or shall be so construed as to impose upon any Party any obligations in respect of this PPI Settlement Agreement except as expressly set forth herein.  This PPI Settlement Agreement is part of a proposed settlement of a dispute among the Parties.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this PPI Settlement Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding involving enforcement of the terms of this PPI Settlement Agreement.

7.10.   **No Third-Party Beneficiaries**.   The US Debtors that are not a Party to this PPI Settlement Agreement shall be beneficiaries hereof.  This PPI Settlement Agreement is not intended to, and shall not, create rights in any other person or entity not a Party hereto.

7.11.   **Non-Effectiveness**.   In the event this PPI Settlement Agreement does not become effective, the Parties reserve all of their rights and defenses with respect to the US PPI Dispute resolved by this PPI Settlement Agreement and this proposed settlement shall not constitute an admission by any Party regarding the validity of the claims or defenses resolved by this PPI Settlement Agreement or that they have any liability in connection with such claims or defenses.

7.12.   **Non-Severability**.   Each of the provisions of this PPI Settlement Agreement is an integrated, essential and non-severable part of this PPI Settlement Agreement.

7.13.   **Sophisticated Party**.   Each Party represents and warrants that it has participated in preparation of this PPI Settlement Agreement and has been represented by sophisticated and experienced counsel in so doing.  In any construction of this PPI Settlement Agreement, the PPI Settlement Agreement shall not be construed for or against any Party, but the same shall be construed fairly according to its plain meaning.

7.14.   **Representative Capacity**.   Each person executing this PPI Settlement Agreement in a representative capacity represents and warrants that he or she is empowered to do so.

7.15.   **Successors and Assigns**.   This PPI Settlement Agreement shall inure to the benefit of, and shall be binding upon, each Party and its respective agents, successors and assigns.

*[Signature Pages to Follow]*

IN WITNESS WHEREOF, and intending to be legally bound hereby, the Parties have executed this PPI Settlement Agreement.

**NORTEL NETWORKS INC**.

By: _____
Name:  John Ray
Title:  Principal Officer

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of**:

10.75% Notes: $ 146,189,000
10.125% Notes: $ 16,900,000
Floating Rate Notes: $ 21,700,000
2.125% Notes: $_____
1.75% Notes: $_____
7.875% Notes: $_____

Name of Institution:
_Angelo Gordon & Co_____

By _____

Name: _Michael Gordon_
Title:

For bondholders requiring a second signature
line:

By _____

Name:
Title:

[Signature Page to PPI Settlement Agreement]

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of:**

10.75% Notes:  $102,000,000
10.125% Notes:  $0
Floating Rate Notes:  $0
2.125% Notes:  $0
1.75% Notes:  $0
7.875% Notes:  $0

Aurelius Capital Management, LP, solely as
    investment manager on behalf of its managed
    entities and not in its individual capacity

By _____
    Name: Mark D. Brodsky
    Title: Chairman

[Signature Page to PPI Settlement Agreement]

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of:**

10.75% Notes:  $4,780,000.00
10.125% Notes:
Floating Rate Notes:  $14,448,000.00
2.125% Notes:
1.75% Notes:  $3,940,000.00
7.875% Notes:

Name of Institution:

CVF Lux Securities Trading S.a. r.l.
By CarVal Investors, LLC Its Attorney-in-Fact

By _____
        Name: Dax Atkinson
        Title: Authorized Signatory

**Aggregate Face Amounts Beneficially Owned**
**or Managed on Account of:**

10.75% Notes:  $13,884,000.00
10.125% Notes:
Floating Rate Notes:  $13,383,000.00
2.125% Notes:
1.75% Notes:
7.875% Notes:

Name of Institution:

CVI CVF II Lux Securities Trading S.a r.l.
By CarVal Investors, LLC Its Attorney-in-Fact

By _____
      Name: Dax Atkinson
      Title: Authorized Signatory

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of:**

10.75% Notes:  $1,910,000.00
10.125% Notes: $616,000.00
Floating Rate Notes:  $5,188,000.00
2.125% Notes:
1.75% Notes:
7.875% Notes:

Name of Institution:

CarVal GCF Lux Securities S.a r.l.
By CarVal Investors, LLC Its Attorney-in-Fact

By _____
        Name: Dax Atkinson
        Title: Authorized Signatory

**Aggregate Face Amounts Beneficially Owned**
**or Managed on Account of**:

10.75% Notes:  $3,873,000.00
10.125% Notes:
Floating Rate Notes:  $6,334,000.00
2.125% Notes:
1.75% Notes:
7.875% Notes:

Name of Institution:

CVIC Lux Securities Trading S.a r.l
By CarVal Investors, LLC Its Attorney-in-Fact

By _____
     Name: Dax Atkinson
     Title: Authorized Signatory

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of:**

10.75% Notes:  $2,121,000.00
10.125% Notes:
Floating Rate Notes:  $2,124,000.00
2.125% Notes:
1.75% Notes:  $400,000.00
7.875% Notes:

Name of Institution:

CVIC II Lux Securities Trading S.a r.l.
By CarVal Investors, LLC Its Attorney-In-Fact

By _____
     Name: Dax Atkinson
     Title: Authorized Signatory

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of**:

10.75% Notes:  $518,000.00
10.125% Notes:
Floating Rate Notes:  $774,000.00
2.125% Notes:
1.75% Notes:  $165,000.00
7.875% Notes:

Name of Institution:

CVI CHVF Lux Securities S.a r.l.
By CarVal Investors, LLC Its Attorney-in-Fact

By  _____

Name: Dax Atkinson
Title: Authorized Signatory

[Signature Page to PPI Settlement Agreement]

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of**:

10.75% Notes: $12,384,000.00
10.125% Notes: $3,996,000.00
Floating Rate Notes: $33,620,000.00
2.125% Notes:
1.75% Notes:
7.875% Notes:

Name of Institution:

CVI GVF (Lux) Master S.a r.l.
By CarVal Investors, LLC Its Attorney-in-Fact

By _____
Name: Dax Atkinson
Title: Authorized Signatory

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of:**

10.75% Notes:  $1,508,000.00
10.125% Notes:
Floating Rate Notes:  $2,129,000.00
2.125% Notes:
1.75% Notes:  $495,000.00
7.875% Notes:

Name of Institution:

CVI AA Lux Securities S.a r.l.
By CarVal Investors, LLC Its Attorney-in-Fact

By _____
       Name: Dax Atkinson
       Title: Authorized Signatory

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of:**

10.75% Notes: $___11,796,000____
10.125% Notes: $___40,521,000____
Floating Rate Notes: $_____
2.125% Notes: $___2,544,000 (144A)____
2.125% Notes: $___7,247,000 (REG S)
1.75% Notes: $_____2,766,000_
7.875% Notes: $_____


Name of Institution:
___Centerbridge Special Credit Partners, L.P.

By  _____
    Name: Susanne V. Clark
    Title: Authorized Signatory


For bondholders requiring a second signature
   line:


By  _____
    Name:
    Title:


[Signature Page to PPI Settlement Agreement]

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of:**

10.75% Notes:  $___33,581,000_____
10.125% Notes:  $__17,390,000_____
Floating Rate Notes:  $_____
2.125% Notes:  $_____
1.75% Notes:  $_____5,000,000___
7.875% Notes:  $_____

Name of Institution:
 _Centerbridge Special Credit Partners II, L.P._

By _____
     Name: Susanne V. Clark
     Title: Authorized Signatory

For bondholders requiring a second signature
     line:

By _____
     Name:
     Title:

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of:**

10.75% Notes: $__30,115,000__
10.125% Notes: $_77,251,000__
Floating Rate Notes: $_____
2.125% Notes: $____858,000____ (144A)
                $___9,222,000__ (REGS)
1.75% Notes: $__2,422,000_____
7.875% Notes: $_____

Name of Institution:
_Centerbridge Credit Partners Master, L.P._

By _____
     Name: Susanne V. Clark
     Title: Authorized Signatory

For bondholders requiring a second signature
   line:

By _____
     Name:
     Title:

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of:**

10.75% Notes: $ 17,335,000
10.125% Notes: $ 42,664,000
Floating Rate Notes: $
2.125% Notes: $ 493,000      (144A)
              $ 5,297,000   (REGS)
1.75% Notes: $ 1,427,000
7.875% Notes: $

Name of Institution:
    Centerbridge Credit Partners, L.P.

By   _Susanne V. Clark_
      Name: Susanne V. Clark
      Title: Authorized Signatory

For bondholders requiring a second signature
    line:

By   _____
      Name:
      Title:

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of**:

10.75% Notes:  $__30,000,000__
10.125% Notes:  $_____
Floating Rate Notes:  $__4,250,000__
2.125% Notes:  $_____
1.75% Notes:  $_____
7.875% Notes:  $_____

Name of Institution:
Brevan Howard Credit Catalysts Master Fund
   Limited

By _____

On behalf of Brevan Howard Credit
   Catalysts Master Fund Limited by its
   Investment Manager, DW Investment
   Management, LP
Name: Shawn R. Singh
Title: General Counsel

For bondholders requiring a second signature
   line:

By _____
   Name:
   Title:

[Signature Page to PPI Settlement Agreement]

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of**:

10.75% Notes:  $__10,000,000__
10.125% Notes:  $_____
Floating Rate Notes:  $__ ___
2.125% Notes:  $_____
1.75% Notes:  $_____
7.875% Notes:  $_____

Name of Institution:

Brevan  Howard  Credit  Value  Master  Fund
   Limited

By  _____

On  behalf  of  Brevan  Howard  Credit
   Value  Master  Fund  Limited  by  its
   Investment  Manager,  DW  Investment
   Management, LP
Name: Shawn R. Singh, Esq.
Title: General Counsel

For bondholders requiring a second signature
   line:

By  _____
   Name:
   Title:

[Signature Page to PPI Settlement Agreement]

**Aggregate Face Amounts Beneficially Owned or
Managed on Account of**:

10.75% Notes:  $__10,000,000__
10.125% Notes:  $_____
Floating Rate Notes:  $_750,000__
2.125% Notes:  $_____
1.75% Notes:  $_____
7.875% Notes:  $_____

Name of Institution:
Brevan Howard Master Fund Limited

By

_____
On behalf of Brevan Howard Master Fund
   Limited by its Investment Manager, DW
   Investment Management, LP
Name: Shawn Singh

Title: General Counsel

For bondholders requiring a second signature
   line:

By  _____
   Name:
   Title:

[Signature Page to PPI Settlement Agreement]

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of:**

| | |
|---|---|
| 10.75% Notes: | $20,500,000 |
| 10.125% Notes: | $45,000,000 |
| Floating Rate Notes: | $_____ |
| 2.125% Notes: | $12,968,000 |
| 1.75% Notes: | $78,224,000 |
| 7.875% Notes: | $_____ |

Franklin Mutual Advisers, LLC on behalf of
   its advisory clients:

By  _____
       Name:  Shawn Tumulty
       Title:   Vice President

For bondholders requiring a second signature
   line:

By  _____
       Name:
       Title:

[Signature Page to PPI Settlement Agreement]

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of:**

10.75% Notes:  $76,835,000
10.125% Notes:  $_____
Floating Rate Notes:  $28,330,000
2.125% Notes:  $_____
1.75% Notes:  $_____
7.875% Notes:  $_____

Name of Institution:
GoldenTree Asset Management LP (on behalf
   of funds and accounts for which it serves as
   investment manager)

By _____
   Name:
   Title:   **Peter Alderman
       Vice President**

For bondholders requiring a second signature
   line:

By _____
   Name:
   Title:

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of:**

10.75% Notes:  $ _N A_
10.125% Notes:  $ _9,611,000_
Floating Rate Notes:  $ _44,732,000_
2.125% Notes:  $ _52,490,000_
1.75% Notes:  $ _195,634,000_
7.875% Notes:  $ _N A_

Name of Institution:
_GS Investment Strategies, LLC, on behalf of its funds and accounts_

By _Philip J. Pallone_
   Name: PHILIP T. PALLONE
   Title: MANAGING DIRECTOR

For bondholders requiring a second signature
   line:

By _____
   Name:
   Title:

[Signature Page to PPI Settlement Agreement]

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of:**

10.75% Notes: $_____
10.125% Notes: $_____
Floating Rate Notes: $ 97,500,000
2.125% Notes: $ 6,300,000
1.75% Notes: $ 14,000,000
7.875% Notes: $_____

Name of Institution: King Street Capital Management, L.P.
_____ By: King Street Capital Management GP, L.L.C.
                             Its General Partner

By _____
   Name: Bruce Darringer
   Title: Chief Operating Officer

For bondholders requiring a second signature
   line:

By _____
   Name:
   Title:

**Aggregate Face Amounts Beneficially Owned or
Managed on Account of**:

10.75% Notes:  $13,000,000
10.125% Notes:  $58,000,000
Floating Rate Notes:  $41,000,000
2.125% Notes:  $_____
1.75% Notes:  $_____
7.875% Notes:  $_____

Name of Institution:
Monarch Alternative Capital LP, as investment
   manager of the following entities:

Monarch Debt Recovery Master Fund Ltd
Monarch Opportunities Master Fund Ltd
Monarch Capital Masters Partners II-A LP
Monarch Capital Master Partners II LP
P Monarch Recovery Ltd
Monarch Alternative Solutions Master Fund Ltd

By _____
        Name:   Michael A. Weinstock
        Title:      Chief Executive Officer

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of:**

10.75% Notes:  $40,005,000
10.125% Notes:  $_____
Floating Rate Notes:  $94,075,000
2.125% Notes:  $130,123,000
1.75% Notes:  $81,000,000
7.875% Notes:  $_____

Name of Institution:

QUANTUM PARTNERS LP

By:  QP GP LLC, its General Partner

By  _____
    Name:  THOMAS L. O'GRADY
               Attorney-in-Fact
    Title:

For bondholders requiring a second signature
    line:

By  _____
    Name:
    Title:

[Signature Page to PPI Settlement Agreement]

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of:**

10.75% Notes:  $_____
10.125% Notes: $13,500,000
Floating Rate Notes: $ 112,971,000
2.125% Notes: $ 224,000
1.75% Notes: $ 9,800,000
7.875% Notes:  $_____


Name of Institution:

Tenor Capital Management Company, L.P.

By _____
     Name: Daniel H. Kochav
     Title: Partner & COO


For bondholders requiring a second signature
     line:


By _____
     Name:
     Title:


[Signature Page to PPI Settlement Agreement]

**THE BANK OF NEW YORK MELLON, AS INDENTURE TRUSTEE**

By: _____

Name:   Loretta A. Lundberg

Title:   Managing Director

**SCHEDULE A**

| Claim No. | Indenture Trustee | Debtor | Notes | Principal Amount | Pre-petition Interest | Unamortized OID | Total Allowed Claim |
|---|---|---|---|---|---|---|---|
| 3971 | Bank of New York Mellon | NNI | 1.750% Convertible Notes | 575,000,000 | 2,487,674 | - | 577,487,674 |
| 3971 | Bank of New York Mellon | NNI | 2.125% Convertible Notes | 575,000,000 | 3,020,746 | - | 578,020,746 |
| **Subtotal – Claim No. 3971 – 2007 Indenture Notes** | | | | **1,150,000,000** | **5,508,420** | **-** | **1,155,508,420** |
| 3972 | Bank of New York Mellon | NNI | L+4.25% Floating Rate Notes | 1,000,000,000 | 22,419,965 | - | 1,022,419,965 |
| 3972 | Bank of New York Mellon | NNI | 10.125% Notes | 550,000,000 | 27,689,063 | - | 577,689,063 |
| 3972 | Bank of New York Mellon | NNI | 10.750% Notes | 1,125,000,000 | 60,132,812 | (6,228,818) | 1,178,903,994 |
| **Subtotal – Claim No. 3972 – 2006 Indenture Notes** | | | | **2,675,000,000** | **110,241,840** | **(6,228,818)** | **2,779,013,022** |
| **TOTAL – GUARANTEED BONDS** | | | | **3,825,000,000** | **115,750,260** | **(6,228,818)** | **3,934,521,442** |

## **SCHEDULE B**

**Form of Approval Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------X
                                            :
                                            :        Chapter 11
                                            :
In re                                       :
                                            :        Case No. 09-10138 (KG)
Nortel Networks Inc., et al.,9              :
                                            :        Jointly Administered
                       Debtors.             :
                                            :        RE: D.I. _____
                                            :
------------------------------------------------------X
```

## ORDER APPROVING SETTLEMENT AGREEMENT BY AND AMONG NORTEL NETWORKS INC., THE SUPPORTING BONDHOLDERS, AND THE BANK OF NEW YORK MELLON WITH RESPECT TO THE NNI POST-PETITION INTEREST DISPUTE AND RELATED MATTERS

Upon the motion dated July 24, 2014 (the "Motion"), of Nortel Networks Inc. ("NNI"), and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (the "Debtors"), for entry of an order, as more fully described in the Motion, pursuant to sections 105(a), 502, 726(a)(5), 1124, 1129(a)(7), and 1129(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (i) authorizing the entry of NNI into and approving the Settlement Agreement[10] attached to the Motion as Exhibit B, and (ii) granting them such other and further relief as the Court deems just and proper; and the Court having determined that adequate notice of the Motion has been given as set forth in the Motion; and that no other or further notice is necessary;

---

[9]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the U.S. Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[10]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion and/or the Settlement Agreement.

and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the District Court dated February 29, 2012; and the Court having determined that consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having determined that the Debtors have demonstrated sound business justifications for entering into the Settlement Agreement and the legal and factual bases set forth in the Motion and presented on the record establish just cause for the relief requested in the Motion; and taking into account the complexity of the issues being settled by the Settlement Agreement and the anticipated costs and delays of resolving the US PPI Dispute by litigation, the Settlement Agreement and the related relief requested in the Motion is fair, reasonable and in the best interests of the Debtors, their estates, their creditors and the parties in interest;[11] and upon the record in these proceedings; and after due deliberation;

IT IS HEREBY ORDERED THAT:

1.      The Motion is **GRANTED** as set forth herein and all objections to the relief requested herein are hereby overruled.

2.      The Debtors are authorized to enter into the Settlement Agreement, and the Settlement Agreement is approved in its entirety.

3.      The Debtors are authorized pursuant to sections 105(a), 502, 726(a)(5), 1124, 1129(a)(7), and 1129(b) of the Bankruptcy Code and Bankruptcy Rule 9019, to enter into the Settlement Agreement and to take any and all actions that may be reasonably necessary or appropriate to perform their obligations arising under the Settlement Agreement, and to enforce their rights arising under the Settlement Agreement.

---

[11]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.  See Fed. R. Bankr. P. 7052.

4.       The Settlement Agreement, including, without limitation, the PPI Settlement

Amount and the allowance of the Bondholder claims, and this Order shall be binding upon the

Debtors, the Bondholders, the Indenture Trustee, and all parties-in-interest in these Chapter 11

Cases, and any of their respective successors and assigns, including, without limitation, any

transferees, purchasers or other acquirers of claims in respect of the Guaranteed Bonds.

5.       The Settlement Agreement shall constitute a full and final settlement of (i) the PPI

Dispute with respect to the Guaranteed Bonds currently pending before this Court and all of the

related submissions and requests for relief, (ii) the allowed claims for outstanding principal

obligations and accrued prepetition interest obligations (each as set forth on Schedule A to the

Settlement Agreement), and (iii) any entitlement to post-petition interest arising under the

Guaranteed Bonds pursuant to the terms of the Settlement Agreement; provided, however that

nothing in this Order or the Settlement Agreement is or shall be deemed to be a settlement of the

Canada PPI Dispute or any part thereof or otherwise a settlement of any claims of any the

Indenture Trustee or any Bondholder against any of the Canadian Debtors' estates.

6.       Nothing in the Settlement Agreement or this Order shall constitute settlement,

release, waiver or discharge (in whole or in part) of the ability of any unsecured creditor of the

Debtors' estates (other than the Bondholders) to assert a claim for PPI against the Debtors'

estates at the contract rate (if any) applicable to such creditor's claims or any alternative theories,

and all of the Debtors' rights regarding any such assertion are preserved; provided, however, that

if there are insufficient funds available to pay PPI to all unsecured creditors of the Debtors'

estates entitled to such amounts (including the Bondholders), then, solely for purposes of

determining any allocation of available PPI among such creditors, the holders of the Guaranteed

Bonds shall be deemed to have a claim for PPI equal to the amount of post-petition interest that

3

would have accrued at the applicable contract rate of PPI set forth in the applicable indentures for each of the Guaranteed Bonds.

7.      Nothing in the Settlement Agreement or this Order shall constitute a settlement of the manner in which any funds available for distribution shall be allocated among the creditors of the Debtors in the event that less than the full amount of PPI can be paid to all creditors owed such amounts.  Such application shall be determined by later agreement of the parties or order of this Court, whether in connection with the chapter 11 plan(s) of the Debtors in the Chapter 11 Cases or by subsequent agreement among the relevant affected creditors.

8.      In light of the Settlement Agreement, the Monitor's Request currently pending before this Court and all related submissions are hereby deemed resolved, denied or otherwise overruled as they relate to the Guaranteed Bonds.

9.      The Debtors, the Debtors' claim agent, Epiq Bankruptcy Solutions, LLC, and the Clerk of the Court are authorized to take all necessary and appropriate actions to give effect to the Settlement Agreement.

10.     The failure specifically to describe or include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such a provision, it being the intent of this Court that the Settlement Agreement be approved in its entirety.

11.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.  To the extent any provisions of this Order shall be inconsistent with the Motion or Settlement Agreement, the terms of this Order shall control.

Dated: _____, 2014
          Wilmington, Delaware

_____
THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE