**<u>EXHIBIT E</u>**

Court of Appeal File No.

## COURT OF APPEAL FOR ONTARIO

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

## NOTICE OF MOTION FOR LEAVE TO APPEAL

The Ad Hoc Group of Bondholders (the "**Leave Applicant**") seeks leave of the Court of Appeal to appeal the order of Mr. Justice Newbould dated August 19, 2014 (the "**Order**"), holding and declaring that the Leave Applicant and other holders of bonds issued and/or guaranteed by Nortel Networks Limited or its affiliates (the "**Guaranteed Bondholders**") are not legally entitled to claim or receive any amounts under the relevant bond indentures above and beyond the outstanding principal debt and pre-petition interest (namely, above and beyond U.S.$4.092 billion).

**THE LEAVE APPLICANT ASKS:**

    a)   that leave be granted to appeal from the Order, with costs; and

    b)   such further or other relief as this Honourable Court deems just.

**PROPOSED METHOD OF HEARING**:

The motion will be heard in writing, 36 days after service of the Leave Applicant's motion record, factum and transcripts, if any, or on the filing of the Leave Applicant's reply factum, if any, whichever is earlier, pursuant to Rule 61.03.1(1) of the *Rules of Civil Procedure.*

## THE GROUNDS FOR THE MOTION ARE:

### Overview

1.  The proposed appeal, which arises in the context of the Nortel *Companies' Creditors Arrangement Act* ("**CCAA**") proceedings, concerns a significant issue the value of which is potentially in excess of US$1.6 billion − namely, whether contractual interest on Nortel's Guaranteed Bonds "stops" for CCAA purposes on the initial CCAA filing date.

2.  The Court below, in the midst of a cross-border trial heard jointly with the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") to allocate US$7.3 billion of sales proceeds arising from the sales of the business lines and assets of the Nortel group of companies (the "**Allocation Trial**"), made a joint direction (at the request of the Monitor, which is acting as a party-litigant in the Allocation Trial) that the following questions be argued and determined, notwithstanding that they were in no way relevant to the Allocation Trial:

    a)  whether the holders of the [Guaranteed Bond] claims [i.e. claims on bonds issued by one Nortel entity and guaranteed by another Nortel entity in another jurisdiction] are legally entitled in each jurisdiction [i.e. Ontario and the United States] to claim or receive any amounts under the relevant indentures above and beyond the outstanding principal debt and pre-petition interest (namely, above and beyond US$4.092 billion); and

b)      if it is determined that the holders are so entitled, what additional amounts are such holders entitled to so claim and receive.

3.      The Court below made the direction to hear and determine these questions following and based upon unsolicited and improper disclosures made by counsel to the Monitor in a Chambers conference about the status of without prejudice settlement discussions concerning allocation.  A number of parties immediately objected to the improper disclosure in breach of settlement privilege and also disputed the veracity and completeness of such disclosure. The U.S. Court has already found that these disclosures by the Monitor were a breach of settlement privilege and therefore inappropriate.

4.      The Leave Applicant and other parties objected to the Monitor's request for a hearing with respect to these questions on a number of grounds, including the breach of settlement privilege and the fact that the parties had not yet commenced negotiations in earnest on a potential plan of compromise and arrangement ("**CCAA Plan**" or "**Plan**").  This latter fact made the questions premature and unripe for determination (for example, the parties might negotiate a Plan that either does not provide for post-filing interest or in respect of which there is a broad consensus on post-filing interest).  No other issues of potential relevance to settlement discussions were singled out for summary determination, despite it having been made clear that there were a number of key issues concerning potential settlement.  The only issue singled out for determination was one affecting the Guaranteed Bondholders, as opposed to other issues that could have negatively impacted other parties.

5.      On the eve of hearing, the U.S. Court indicated that it had "begun to feel manipulated" into directing for determination the Guaranteed Bond interest questions, and was seriously

considering not proceeding with the hearing (the U.S. hearing on the questions became unnecessary with the U.S. settlement of the questions). Justice Newbould, however, forged ahead with the hearing the following day, July 25, 2014, and released a decision on August 19, 2014, in which he held that the Leave Applicant and other Guaranteed Bondholders are not legally entitled to claim or receive any amounts above and beyond the outstanding principal debt and pre-petition interest owing under the relevant indentures. This conclusion is directly contrary to binding decisions of both the Ontario Court of Appeal and Supreme Court of Canada precisely on point.

6.      In addition, although not one of the questions before him, Justice Newbould expressed the view that a court could make a final distribution to competing unsecured creditors under the CCAA in the absence of a duly approved Plan. That conclusion was apparently intended to blunt the legal proposition, accepted by all parties, that post-filing interest could be allowed under a Plan, and to discourage any possible future motion to effect a transition to a bankruptcy and the scheme of distribution under the *Bankruptcy and Insolvency Act,* R.S.C. 1985, c. B-3 ("**BIA**").

**Background**

7.      On January 14, 2009, the Canadian Debtors[1], the U.S. Debtors[2] and the EMEA Debtors[3] filed for insolvency protection in their respective jurisdictions. The Canadian debtors filed

---

[1] Comprised of Nortel Networks Corporation, Nortel Networks Limited, and several related Canadian companies (collectively, the "**Canadian Debtors**").
[2] Comprised of Nortel Networks Inc., an American subsidiary of Nortel Networks Corporation, as well as other related American companies (collectively, the "**U.S. Debtors**").
[3] Comprised of the Joint Administrators of Nortel Networks UK Limited, on behalf of 24 Nortel entities in Europe, the Middle East and Africa (collectively, the "**EMEA Debtors**").

under the CCAA, in a proceeding supervised by Regional Senior Justice Morawetz from 2009-2014.

8.    Nortel Networks Limited, one of the Canadian Debtor entities, is liable (either directly or through guarantee) for Guaranteed Bonds in excess of US$4 billion. The Leave Applicant is a group consisting of substantial holders of Guaranteed Bonds. It has participated actively in these proceedings to date, including in the Allocation Trial. Holders of Guaranteed Bonds represent the largest creditor group by value in these proceedings.

9.    When the insolvency proceedings were commenced in January 2009, it was believed that a restructuring of the Nortel companies that would see them emerge from insolvency protection might be possible.  However, since approximately June of 2009, it has been known that the companies would not be restructured and would not emerge from the insolvency proceedings in their various jurisdictions as going-concerns, but rather that the business lines and assets of the Nortel companies would be sold on a going-concern basis.

10.    The estates and key creditor groups, including the Leave Applicant, were able to agree on a mechanism for cooperating on the sale of the business lines and assets of the Nortel companies through an agreement known as the Interim Funding and Settlement Agreement (the "**IFSA**").

11.    The IFSA was entered into and approved by the CCAA court and, in concurrent Chapter 11 proceedings,[4] by the U.S. Court in June of 2009 (together, the Ontario Superior Court and the U.S. Court are referred to as the "**Courts**").

---

[4] United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

12.     Approximately US$7.3 billion of sales proceeds were generated from the sales. The parties tried, but failed, over the course of years and through multiple mediations to settle the allocation of those sales proceeds between the debtor estates.

**The Procedural History of the Allocation Trial**

13.     On June 7, 2011, in a joint hearing of the Courts, the Canadian Debtors and Monitor and the U.S. Debtors brought motions seeking approval of an Allocation Protocol by which the two Courts would determine the allocation of the sales proceeds, as well as certain specific inter-company claims advanced by the EMEA Debtors and the UKPC[5] that are intertwined with, and impacted on, the allocation determination.

14.     All other creditor claims issues, including the issues giving rise to the Order, were expressly excluded from the Allocation Protocol.

15.     On March 7, 2013, after further unsuccessful efforts to mediate a resolution to the allocation dispute, both Courts approved the Allocation Protocol and dismissed a cross-motion by the EMEA Debtors to direct the allocation dispute to arbitration.

16.     Orders were subsequently made by the Courts directing a 21-day trial to deal solely with the issue of the allocation of the sales proceeds between the debtor estates, followed by a 15 day trial on the related EMEA Debtor and UKPC inter-company claims issues.  Shortly before the Allocation Trial began, the Court advised that Justice Newbould rather than Regional Senior Justice Morawetz would preside over the trial in the Ontario Court.

---

[5] "**UKPC**" refers to Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund.

17.   The Allocation Trial began on May 12, 2014 and continued for 21 days thereafter, during which evidence was heard before the two Courts on the sole issue before them: the allocation of sale proceeds between the various debtor estates.

18.   The parties to the Allocation Trial have now put in their affirmative cases and submitted written closing arguments, and will submit written closing reply arguments on September 10, 2014 and make oral closing submissions on September 22-23, 2014.

19.   Once the decisions of the U.S. Court and the Canadian Court have been rendered and the sales proceeds are allocated between the debtor estates, as was anticipated by the Monitor and the parties and as is the practice in such cases, the creditors of the Canadian debtor estates were expected to attempt to negotiate and vote on a CCAA Plan to deal with the funds then in the Canadian estate. The Monitor has continually, and as recently as March 14, 2014 in its 104th Report, represented to the CCAA court that a Plan of arrangement was being diligently and in good faith worked on and that progress was being made towards such a Plan. If the requisite majorities of creditors vote in favour of the Plan, it will be brought before the CCAA court for approval in accordance with the provisions of the CCAA.

20.   If a Plan is not filed, or is not accepted by the requisite majorities of creditors, or is not approved by the CCAA court, and it appears that a duly approved Plan is not possible, then the purpose of the CCAA is spent, other than to foster an orderly transition to a subsequent bankruptcy and distribution in accordance with the priority scheme set out under the BIA.

-8-

**The Order Appealed From**

21.     During a mid-trial Chambers Conference on June 16, 2014, counsel for the Monitor improperly breached settlement privilege to tell the Court (incorrectly) that the post-filing interest claims of Guaranteed Bondholders were the "elephant in the room" during the prior week's settlement discussions. As a result of this breach of settlement privilege, the questions articulated in paragraphs 2 (a) and (b) above were directed for determination. A hearing was held on July 25, 2014 in the Ontario Superior Court, and Justice Newbould issued his decision on August 19, 2014, the penultimate paragraph of which reads as follows (at para. 62):

> I hold and declare that holders of the crossover bond claims are not legally entitled to claim or receive any amounts under the relevant indentures above and beyond the outstanding principal debt and pre-petition interest (namely, above and beyond US$4.092 billion).

22.     The cornerstone of Justice Newbould's decision was his determination that a so-called "interest stops" rule automatically applied upon commencement of this CCAA proceeding. He reached this determination notwithstanding binding authority to the contrary – a 2007 decision of this Court that held that "there is no persuasive authority that supports an Interest Stops Rule in a *CCAA* proceeding"[6]. The Court of Appeal's decision relied upon a 2006 Supreme Court of Canada judgment in which the Court unanimously and expressly held that "a *CCAA* filing does not stop the accrual of interest".[7] Justice Newbould's refusal to follow this Supreme Court of Canada was explained by him on the basis that (at para. 46): "It may be fair to say that the statement of Binnie J. was *per incuriam*."

---

[6] *Re Stelco Inc.,* 2007 ONCA 483 at para. 67.
[7] *Re Canada 3000 Inc.,* [2006] 1 S.C.R. 865 at para. 96.

23.    While not one of the questions directed for determination, Justice Newbould also found
that a final non-consensual distribution to unsecured creditors could be made under the
CCAA in the absence of a Plan of arrangement or compromise.

**The Leave Applicant Should be Granted Leave to Appeal**

<u>Errors in the Decision from which Leave is Sought</u>

24.    In coming to his conclusions, Justice Newbould made a number of errors, including:

a)    he erred in holding that there is an "interest stops" rule that stops the accrual of
interest upon a CCAA filing;

b)    he erred in refusing to follow recent, authoritative and binding decisions of the
Supreme Court of Canada and this Court unanimously and expressly holding that
there is no "interest stops" rule under the CCAA;

c)    he erred in failing to appreciate, as this Court has held, that a lower court is not
allowed to disregard a higher court decision on the basis that it thinks the higher
court made its decision *per incuriam*;

d)    he erred in seeking to distinguish this Court's 2006 decision in *Stelco* on the basis
that the claim for post-filing interest in *Stelco* was not made against the debtor, but
simply relative to a competing creditor.    That is not correct.    The senior
bondholders in *Stelco* could not have succeeded in that case unless the Court found
that they would have been entitled to maintain their claim for post-filing interest
against Stelco. That finding was critical to the success of their claim under the

subordination clause at issue, and the Court explicitly held that a CCAA filing does not stop the accrual of interest;

e)      he erred in failing to recognize that if a CCAA Plan could not be agreed upon, and proceedings under the BIA ensued (as is the natural outcome of failed CCAA proceedings), the claims of the creditors would be determined as of the date of the initiation of the BIA proceedings;

f)      he erred in basing his conclusion that the Guaranteed Bondholders could not recover post-filing interest in this case on the incorrect premise that Nortel's other creditors, including another major creditor group, the pensioners,[8] do not have a right to receive interest on their claims;

g)      he erred in failing to defer consideration of the question of whether amounts in excess of the principal and interest owing as of the date of filing could ever be received by creditors in a CCAA proceeding until such question became ripe for determination.  Dealing with entitlement to "receive" payment of such amounts prior to the promulgation of a Plan is unprecedented under the CCAA;

h)      having decided to pronounce on the availability of post-filing interest in a hypothetical scenario, he further erred in failing to conclude that the Guaranteed Bondholders', and any other creditor's, ability to recover compensation for interest accruing after the date of the commencement of this CCAA proceeding would depend upon the terms of any duly approved CCAA Plan;

---

[8] As per the Compensation Claims Procedure Order.

i)      he erred in failing to appreciate that the focus of the CCAA is on Plans negotiated as between creditors, which invariably contain provisions compromising certain creditor entitlements, and that the CCAA, unlike other statutes such as the BIA and the *Winding-up and Restructuring Act,* R.S.C. 1985, c. W-11 (the "**WURA**"), does not contain any provisions allowing for debts owed to creditors to be compromised outside of a duly approved CCAA Plan, or for any mechanism of non-consensual final distribution like that of the BIA;

j)      he erred in concluding that a court under the CCAA would have the authority to order a final distribution to creditors in the absence of a duly approved CCAA Plan;

k)      he erred in holding that the Guaranteed Bondholders are not entitled to claim or receive any amounts in excess of U.S.$4.092 billion, which would preclude recovery of other contractual entitlements such as Indenture Trustee fees and costs and make-whole provisions, notwithstanding that no arguments were advanced before him with respect to any amounts other than post-filing interest; and

l)      he erred in ordering the hearing in the first place and ignored the fact that:

    i.      the entire basis for the expedited summary hearing was a statement made in breach of settlement privilege by counsel to the Monitor (as found by the U.S. Court) in the context of a Chambers conference;

    ii.      the post-filing interest question, even if it had been properly raised, was not the impediment to settlement, and no other unresolved

issues under without prejudice settlement discussion among the parties were directed for immediate determination; and

iii.    the U.S. Court originally, but admittedly reluctantly, supported the idea of a hearing to determine the same questions under U.S. law in the U.S. proceedings.   However, upon reconsideration, the U.S. Court indicated that it had "...begun to feel manipulated" into ordering the hearing based on "...inappropriate disclosure of settlement discussions".

## The Proposed Appeal is Meritorious and not Frivolous

25.    Justice Newbould has declared an "interest stops" rule to be applicable in CCAA proceedings notwithstanding the absence of any statutory provisions to that effect in the CCAA (unlike in the BIA) and notwithstanding the existence of binding higher court decisions expressly holding that no "interest stops" rule applies in CCAA proceedings.  He has further decided, without it being one of the questions with respect to which the hearing was directed, that a CCAA court now and for the first time can order a final non-consensual distribution to unsecured creditors in the absence of a CCAA Plan, even though the CCAA (unlike the BIA and the WURA) has no provisions authorizing such distributions, and even though the natural outcome of a failed CCAA proceeding is bankruptcy under the BIA.

## The Proposed Appeal Involves Issues that are Significant to the Practice

26.    Justice Newbould made a determination on the availability of post-filing amounts beyond principal and pre-filing interest, in the absence of any provisions in the CCAA excluding

such claims and in the face of binding appellate case law to the contrary.  This is an issue of significance to all CCAA proceedings and therefore the insolvency practice as a whole.

27.     Justice Newbould also expressed a conclusion on the jurisdiction of a court to make a final distribution order under the CCAA, something that is not contemplated by the statute. The jurisdiction of the court to make such a distribution involves the interpretation of the authority granted to courts under the CCAA, and is a novel determination that would also impact all CCAA proceedings and therefore the insolvency practice as a whole.

The Proposed Appeal is of Significance to the Proceeding

28.     The decision of Justice Newbould disentitles the Leave Applicant and other holders of the Guaranteed Bonds of the right to claim or receive in this proceeding post-petition interest. The Monitor advised the Court in seeking this determination that the issue has a value potentially in excess of US$1.6 billion.  The determination of the right to claim and receive these amounts is of great significance to the Nortel CCAA proceeding.

29.     Directing and deciding the questions to be determined based on inaccurate disclosures by counsel for a Court appointed officer in breach of settlement privilege in proceedings under a statute aimed at encouraging settlement, and supervised by the Commercial List in which the "three C's" are continually encouraged – especially in light of the far-reaching nature of the determinations made with the virtually expressed objective of affecting the settlement position of one party in particular – would undermine the willingness of parties to take part fully and unreservedly in future negotiations under the CCAA.

30. In addition, the comments of Justice Newbould regarding the ability to order a distribution of the proceeds of the Nortel sale without a Plan upset the contemplated CCAA process that the parties have been working towards for more than five years, a structure mandated by the statute and adhered to under the supervision of Regional Senior Justice Morawetz, who presided over every aspect of these proceedings but for the Allocation Trial. The Leave Applicant, other interested parties and even the Monitor (who has represented as recently as March 14, 2014 that a Plan of arrangement was being diligently and in good faith worked on and that progress was being made towards such a Plan) have been progressing towards the ultimate outcome of a CCAA Plan. Justice Newbould's comments that a Plan can be sidestepped by a non-consensual distribution order are contrary to the very purpose of the CCAA and the expectations of the parties, and therefore are of significance to this proceeding.

The Proposed Appeal will not Hinder the Progress of the Action

31. There are many issues that must be decided as part of claims administration and the Plan negotiation process before a Plan is brought before the Court. A predicate to all of them is that the Courts render a decision on allocation that will help frame the boundaries within which the creditors of the Canadian estate may negotiate a Plan. This appeal will not hinder the progress of the CCAA proceeding.

32. Rules 1.04, 37 and 61 of the *Rules of Civil Procedure*;

33. Sections 13 and 14 of the CCAA; and

34. Such further and other grounds as counsel may advise.

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the motion:

1.      The materials that were before Justice Newbould on the Motion;

2.      The Transcripts of the Allocation Trial dated June 19, 20, 23, 24 and 27, 2014;

3.      The Transcript of the telephonic hearing of the U.S. Court dated July 24, 2014; and

4.      Such further and other evidence as counsel may advise and this Honourable Court may permit.

September 9, 2014                    **BENNETT JONES LLP**
                                     3400 One First Canadian Place
                                     P.O. Box 130
                                     Toronto, Ontario
                                     M5X 1A4

                                     **Richard B. Swan (#32076A)**
                                     Email:  swanr@bennettjones.com

                                     **S. Richard Orzy (#23181I)**
                                     Email:  orzyr@bennettjones.com

                                     **Gavin H. Finlayson (#44126D)**
                                     Email:  finlaysong@bennettjones.com

                                     Telephone:    (416) 863-1200
                                     Facsimile:    (416) 863-1716

                                     Canadian Lawyers for the Bondholder Group
SEE ATTACHED SERVICE LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

t

Court File No.

| | |
|---|---|
| | **COURT OF APPEAL FOR ONTARIO**<br><br>Proceeding Commenced At Toronto |
| | **NOTICE OF MOTION FOR LEAVE TO APPEAL** |
| | **BENNETT JONES LLP**<br>3400 One First Canadian Place<br>P.O. Box 130<br>Toronto, Ontario  M5X 1A4<br><br>**Richard B. Swan (#32076A)**<br>Email:          swanr@bennettjones.com<br>**S. Richard Orzy (#23181I)**<br>Email:          orzyr@bennettjones.com<br>**Gavin H. Finlayson (#44126D)**<br>Email:          finlaysong@bennettjones.com<br><br>Telephone:     (416) 863-1200<br>Facsimile:     (416) 863-1716<br><br>Canadian Lawyers for the Bondholder Group |