UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

---------------------------------------------------------------- x
In re:                                                           : Chapter 11

Nortel Networks, Inc., et al.                                    : Case No. 09-10138 (KG)

                       Debtors.                           : (Jointly Administered)

                                                     Re: Docket No. 14076
---------------------------------------------------------------- x

**OBJECTION OF WILMINGTON TRUST, NATIONAL ASSOCIATION, AS SUCCESSOR INDENTURE TRUSTEE TO DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 APPROVING SETTLEMENT AGREEMENT BY AND AMONG NORTEL NETWORKS INC., THE SUPPORTING BONDHOLDERS, AND THE BANK OF NEW YORK MELLON WITH RESPECT TO THE NNI POST-PETITION INTEREST DISPUTE AND RELATED ISSUES**

Wilmington Trust, National Association, exclusively in its capacity as indenture trustee for the Notes[1] (in such capacity, "Wilmington Trust" or the "Trustee"), by and through its undersigned attorneys, submits this objection (the "Objection") to the US Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement by and among Nortel Networks Inc., the Supporting Bondholders, and The Bank of New York Mellon with Respect to the NNI Post-Petition Interest Dispute And Related Issues (the "Settlement Motion"), and in furtherance thereof, respectfully submits as follows:

PRELIMINARY STATEMENT

1.    The Proposed Settlement[2] by NNI and certain of its affiliates, as debtors and debtors in possession (collectively, the "US Debtors") and the Ad Hoc Committee of

---

[1] Nortel Networks Limited 6.875% Notes due 2023, issued pursuant to that certain Indenture, dated as of November 30, 1988 (as amended, supplemented or modified) between Nortel Networks Limited and the Trustee, as successor trustee to The Bank of New York Mellon (formerly known as The Bank of New York) as successor trustee to the Toronto-Dominion Bank Trust Company.

[2] Capitalized terms used but not defined herein have the meaning ascribed to them in the Settlement Motion. Emphasis herein is ours unless otherwise noted.

Bondholders (the "US Bondholders") does not meet the standards for approval of a 9019 settlement and must be rejected by this Court. The Proposed Settlement is not "fair and equitable," as it provides no meaningful value for the US Debtors, and awards the US Bondholders the highest recovery for which they could have hoped if they were successful in the litigation being "settled" – given the finite amount of funds available to the US Debtors. There really is no "settlement" at all, just a resolution completely in favor of the US Bondholders by the US Debtors. The Proposed Settlement was not, as the testimony of John Ray makes clear, reached through a vigorous and arms-length negotiation, but instead was essentially dictated by the request of the US Bondholders to ensure themselves a maximum recovery. As a result, the Proposed Settlement is below the lowest point of reasonableness. This Court cannot approve the supposed compromise as "[t]he purported benefits to the estate are illusory and [therefore] the proposed compromise is against public policy." *In re Shankman*, 2010 WL 743297, at *4 (Bankr. S.D. Tex. 2010).

2. On its face, the Proposed Settlement of $876 million appears to be a potentially reasonable compromise between the various US parties on the question of the US Bondholders' entitlement to post-petition interest. However, a closer look at the economic reality of the settlement belies that apparent reasonableness. *First*, the settlement amount is not capped at $876 million, but rather $1.01 billion, if the Guaranteed Bondholders are not paid in full before June 30, 2015.[3] Given the pace of these proceedings, a $1.01 billion payment seems all but guaranteed. *Second*, in the words of the US Debtors' CEO John Ray: "if we looked at the amount available, and it was less than what the cap was, in effect, **the amount of [the US**

---

[3] The Trustee notes that, even if the Proposed Settlement was approved, and all funds were distributed to the Bondholders on the day of the Settlement Hearing, November 4, 2014, the US Bondholders would receive $922 million dollars. (J. Ray Dep. Tr. 44:4-16.)

2

**Estate's] available cash works as its own cap related to the availability of PPI."** (J. Ray Dep. Tr. 101:2-6)  The reality, acknowledged by all parties, is that the assets available for distribution to US Bondholders could not satisfy a PPI claim of $1.6 billion and growing.  The US Debtors estimate this cap to be approximately $1.3 billion,[4] while, by the Monitor's expert's calculation,[5] even under the best case scenario for the US Bondholders, there would less than $1 billion available to satisfy the claims of the US Bondholders for post-petition interest.[6]

3.    Thus, in reality, the purported "compromise" payment of up to $1.01 billion means that the US Bondholders will likely capture every, or nearly every, cent that NNI will have after paying its allowed claims.  That is not a compromise by the US Bondholders; it is a complete capitulation by the US Debtors.  In return for this complete surrender, the US Debtors receive nothing:

- no appropriate discount on the payment to account for the possibility that the US Bondholders might lose its PPI argument if it was decided on the merits (the probability of which occurrence, remarkably, Mr. Ray testified that he never received advice of counsel);

- no elimination of litigation costs, as the costs of briefing the PPI issue had already been incurred by the time the Proposed Settlement was presented to the Court, and now additional costs have shifted from the post-petition interest controversy to the legitimacy of the settlement; and

- no guarantee of funds with which it can meet its fiduciary obligations to its shareholders.

---

[4] Notably Mr. Ray could not provide his specific assumptions in reaching that number as he relied, not on an analysis done by his financial advisors, but rather on having "done some analysis in my own mind...." (J. Ray, Dep. Tr. 96:19-20).

[5] See detailed discussion in the Monitor's Objection to the Proposed Settlement.

[6] The Trustee notes that it did not explore the US Estate's ability to pay the US Bondholders' $1.6 billion PPI claim in its briefing on the US Bondholders' entitlement to PPI. It is still, of course, unclear exactly how much money will be available to the US Estates after the allocation proceedings, and thus considerable uncertainty exists on that score. Additionally, the total amount of allowed claims against the US Debtors has not been finally determined. In order to simplify the question put to the Court regarding the interest rate to which the US Bondholders are legally entitled, the Trustee, along with the Monitor and the CCC, accepted the US Bondholders' claim without challenge.

4. Not surprisingly, given the lack of actual compromise reflected by the Proposed Settlement Amount, the discussions resulting in that proposal lack the hallmarks of a vigorous or arms-length negotiation. The Board of Directors of NNI was not consulted during the negotiation of the settlement (a settlement capped at over a billion dollars), nor did it approve the settlement prior to it being offered to the Court for approval. Moreover, while it is essential to any negotiation to understand the position from which one is negotiating, the US Debtors did not consult with counsel to understand the potential outcomes of the PPI dispute. Nor did the US Debtors choose to engage a financial advisor to assist them in calculating a range of potential outcomes to inform their negotiation posture. Instead, John Ray testified that he alone simply did some vague calculations based on unspecified assumptions "in [his] own mind." (J. Ray, Dep. Tr. 96:19-20). In fact, John Ray as further testified in his deposition, he did not calculate various outcomes prior to entering negotiations, nor did he consider the entire range of outcomes in his personal financial calculations; instead: "**I was solving for those alternatives where there was a possibility that the amounts would exceed the cap that we negotiated.**" (J. Ray Dep. Tr. 101:15-23.) Such *post hoc* rationalization cannot serve to justify the US Debtors' capitulation poorly disguised as a settlement.

5. Based on the lack of actual compromise (which strips NNI's equity holder of any chance at a recovery, without providing any actual value to the US Estate) and the flawed negotiation process, the Proposed Settlement falls below the lowest point in the range of reasonableness required for bankruptcy court approval. Analysis of the settlement under the factors mandated by the Third Circuit in *Myers v. Martin, (In re Martin)*, demonstrates that, under the applicable law, the Court cannot approve the Proposed Settlement. 91 F.3d 389, 393 (3d Cir. 1996).

## STANDARD OF REVIEW

6. Before approving a settlement under Bankruptcy Rule 9019, a court must determine that the proposed settlement is in the best interests of the debtor's estate. *See In re Martin*, 91 F.3d at 394; *In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry … [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'" (quoting *In re Louise's Inc.*, 211 B.R. 798, 801 (Bankr. D. Del. 1997))). In order to do so, bankruptcy courts in the Third Circuit are duty-bound to engage in the same fact-intensive analysis as set out by Supreme Court in *TMT Trailer*. *See In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979) (quoting the Supreme Court standard for reviewing a 9019 settlement that a court must "apprise[ ] [it]self of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated . . . [and] form an educated estimate of the complexity, expense and likely duration of such litigation. . . , and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry*, 290 U.S. 414, 424-25 (1968)).

7. The factors for evaluating compromises in the Third Circuit are: "(1) the probability of success in ligation; (2) the estimate of the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; (3) the likely difficulties in collecting on any judgment; and (4) all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *In re TSIC, Inc.*, 393 B.R. 71, 78 (2008) (Gross, J.) (citing *TMT Trailer Ferry*, 290 U.S. at 424); *In re Martin*, 91 F.3d at 393; *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006)).[7]

---

[7] This four-part test is practically identical to the test used to evaluate the reasonableness of proposed settlements in other Circuit Courts of Appeal. *See S. Med. Arts Cos., Inc.*, 343 B.R. 250, 256 (10th Cir. BAP 2006); *In re Moore*,

8.    Bankruptcy Rule 9019(a) requires that a bankruptcy court must decide whether a settlement is "fair and equitable" by balancing the value of the claim that is being compromised against the value to the estate of accepting the compromise. *See In re ID Liquidation One, LLC*, 555 F. App'x 202, 205 (3d Cir. 2014) (citation omitted); *see also In re Nutraquest, Inc.*, 434 F.3d at 644. That "fair and equitable" standard also mandates that a court "look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle." *In re Nutraquest, Inc.*, 434 F.3d at 645.

9.    As the proponents of the Settlement Motion, the US Debtors carry the burden of persuading the court that the compromise falls above the lowest point in the range of reasonableness. *See In re Key3Media Group, Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005) ("While a court generally gives deference to a Debtors' business judgment in deciding whether to settle a matter, the Debtors have the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved." (citations omitted)); *see also In re Spansion, Inc.*, 2009 WL 1531788, at *4 (Bankr. D. Del. 2009). The US Debtors will not be able to carry this burden, as the Proposed Settlement harms NNI's equity holders in violation of NNI's fiduciary duties and the absolute priority rules, and provides no value to the US Estates.

10.    Additionally, if approved, the Proposed Settlement, which would award creditors with unmatured interest above and beyond their full recovery at the expense of the Debtors' equity holder, NNL, and NNL's creditors, would violate both the Bankruptcy Code and Delaware law. Such a violation would amount to a breach by the US Debtors of their fiduciary duty to maximize the value of their estates for all of their stakeholders. Moreover, the Proposed Settlement violates the absolute priority rule imposed on all bankruptcy settlements, which

---

608 F.3d 253, 263 (5th Cir. 2010); *United States v. Edwards*, 595 F.3d 1004, 1012 (9th Cir. 2010); *see also In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

6

*"mandates that senior creditors not receive more than 100% of their claim before junior classes receive a distribution."* In re Wash. Mut., Inc., 461 B.R. 200, 241 n.34 (Bankr. D. Del. 2011) (citing *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003)), *vacated on other grounds*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012).

### OBJECTION

A. **The Proposed Settlement Fails To Meet The *Martin* Test, As It Provides No Value To NNI and Was Not the Product of Arms-Length Negotiation.**

11. The US Debtors will be unable to meet the Third Circuit's four-part *Martin* test for evaluating compromises, because: (1) the probability of success in litigation is low; (2) the Proposed Settlement, in fact, increases delay and expenses; (3) there are no collection difficulties; and (4) the Proposed Settlement is not fair and equitable as the facts show that, despite a large decrease in the amount to which the US Bondholders claim they are entitled, the total amount to which the US Bondholders *could* receive on account of post-petition interest is lower than the settlement amount. The US Debtors, as the party seeking approval of the Settlement Motion, cannot demonstrate by a preponderance of the evidence that the Proposed Settlement satisfies Bankruptcy Rule 9019. The US Debtors weakly attempt to justify the settlement by suggesting that the settlement (a) will avoid litigation delays and costs and provide "certainty" for all parties, and thus aid settlement talks, (b) will mitigate the risk that the PPI dispute will "result in a greater amount of entitlement to PPI than the capped amount," and (c) was vigorously negotiated and the result of arms-length dealing. Such perfunctory justifications will not withstand this Court's scrutiny.

12. *First*, the US Debtors knew when discussing the settlement that the very agreement, which they argue will end litigation over the PPI issue, will merely shift the litigation

costs and delays from a fully briefed question of law[8] to the mixed legal and factual questions required for an approval of a settlement. The Proposed Settlement introduced the need for additional briefing of objections, document productions, depositions, conflicts regarding discovery, a hearing on the merits, and potential appeals of the Court's decision. All of this has, and will continue to, cost money and additional delay, which would not be required if the Court were simply given the opportunity to determine the legal rate of post-petition interest as a matter of law.

13.  *Second*, the US Debtors know that no matter what the adjudicated entitlement of the US Bondholders, they cannot expect to recover the full amounts of those claims that they assert they are entitled to, because the US Estates will simply not have the assets to distribute more than $1 billion after payment of allowed claims. Because there is little to no risk that the US Bondholders, even if successful in their argument for PPI at the contract rate, might recover an amount over the $1.01 billion settlement cap amount, the "compromise" does not in fact mitigate any risk to the US Estates.[9]

14.  *Third*, while the US Debtors assert that the Proposed Settlement was the result of a vigorously negotiated and arms-length discussion, the lack of value that the settlement provides to the US Estates casts doubt on that contention. The process, which began just as the parties exchanged their briefs on the appropriate legal rate of PPI under both U.S. and Canadian law, lacked oversight and approval from NNI's Board of Directors, as well as input from counsel or a financial advisor to determine a range of potential outcomes from which the US Debtors could

---

[8] The Trustee notes that the US Debtors did not submit a brief addressing the legal issue though the estate nonetheless they do have expenses relating to this briefing as the fees of the US Bondholders are being paid on a current basis.

[9] The US Debtors' argument, that the US Estate's ability to pay the full amount of the US Bondholder's claim is irrelevant to the question of the value of the compromise, is ridiculous, as is the attempt to conflate the Canadian Interests' **calculation** of the US Bondholder's claim for post-petition interest as over $1.6 billion, with a **judicial admission** that the US Estates could satisfy such a claim.

negotiate. The US Debtors instead relied on "some analysis in [Mr. Ray's] own mind, calculating some of the potential outcomes under which [Mr. Ray] believed there were certain scenarios under which the amount that would be in excess of the cap would be available for equity." (J. Ray Dep. Tr. 96:18-24.) No matter how formidable Mr. Ray's financial acumen, or how familiar he is with the US Estates, it defies belief that he entered into a truly arms-length negotiation over a $1.6 billion dispute, armed only with his own back-of-the-envelope estimates. Such a process lends itself to rejection of the Settlement under 9019 standards.

          1.    <u>The US Bondholders have a Minimal Chance of Success in the Litigation</u>

15. A settlement is generally undertaken to manage the risks attendant with litigation, including the risk of an adverse ruling; as such, it is up to the US Debtors to demonstrate that the Proposed Settlement manages the risk that it might lose at trial. When a debtor does not suffer much risk of loss in the litigation, payment of a substantial settlement is not appropriate. *See In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004) ("The fact that the settlement is reasonable to [a settling claimant] does not mean that it is reasonable to the Debtors and their creditors. In fact, a one-sided settlement would be cheered by the side it favors even though it is a terrible deal for the side it disfavors."); *see also In re Exide Techs.*, 303 B.R. at 69 (concluding that the first *Martin* factor weighed against approval of a proposed settlement where the evidence presented was inconclusive with respect to the settling parties' probability of success on the merits, and the Debtors otherwise failed to demonstrate that the adverse party was not likely to succeed at trial.).

16. Even without considering the merits of the PPI Dispute, a review of the PPI figures to which the US Bondholders might be entitled – $100 million if calculated at the FJR, $1.3 billion if calculated at the contract rate (and capped by the highest amount that the US

Debtors' CEO[10] calculated may be available to pay the PPI) – the $1.01 billion settlement amount cap is clearly out of line. It cannot be reasonable for the US Debtors to forfeit $900 million, while the US Bondholders give up a range of $0-300 million.

17. Such disparity is even less appropriate given the fact that the US Bondholders do not have a high probability of success on the merits in the PPI Dispute.[11] As discussed at length in the Trustee's previous briefs addressing the post-petition interest rate issues,[12] the great weight of legal authority and recent case law in the Third Circuit, and every other Circuit Court of Appeals to have considered this issue, overwhelmingly supports the conclusion that the Crossover Bond Claims are not entitled to accrue post-petition interest at the contract rate, whether in the U.S., Canada or other jurisdictions. The Bankruptcy Code limits the accrual of post-petition interest on unsecured claims to the federal judgment rate (the "FJR"). In the case of a solvent debtor,[13] the FJR—not the claimant's contract rate or even the relevant state statutory rate—is the rate applied over the past nine (9) years by *every* judge in the Third Circuit and every court nationwide. The Proposed Settlement fails to reflect this likely outcome, and improperly promises the US Bondholders that the US Debtors will pay them **as much post-petition interest as the US Debtors possibly can** up to a billion dollars, over and above their allowed claims. The Proposed Settlement provides the US Bondholders with as much as they could hope for with a complete victory and *no* discount for the US Bondholders' risk that the Court will follow every

---

[10] (J. Ray Dep. Tr. 97:17-21. *See* discussion of the adequacy of Mr. Ray's analysis *supra* at section A(4).)

[11] While the focus of a 9019 analysis would normally be on the probability of success of a debtor's litigation position (which could be expected to prioritize preventing the depletion of estate by avoiding an inflated rate of PPI), in this case the US Debtors chose not to take a position in the litigation with respect to the appropriate rate of PPI and left it to their stakeholders to defend their interests, only to settle out without consultation with the non-settling stakeholders.

[12] (*See* Trustee PPI Brief ¶¶ 14-22; Trustee PPI Reply Brief ¶¶ 6-13.)

[13] The Trustee does not concede that any US Debtor is, or will be, solvent.

case in this district in the last nine years and not allow the US Bondholders' claim for post-petition interest at the contract rate.

> 2. <u>The Proposed Settlement Will Actually Increase Litigation Delay and Expense, as the Post-Petition Interest Briefs are Already Fully Presented to the Court</u>

18. The PPI Dispute has been fully briefed by the interested parties and there are no outstanding issues of fact. All that remains is for the Court to issue a ruling on the merits of the PPI Dispute as a matter of law. The remaining litigation involved in the PPI Dispute is not complex, and the expense, inconvenience and delay necessarily attending it is minimal. Any costs of a possible appeal should not be considered, as appeals are just as likely after the Court issues its order on the US Debtors' Proposed Settlement, irrespective of its outcome.

19. The considerable expense, inconvenience and delay that will necessarily attend the litigation involving this Settlement Motion is unequivocally greater than it would have been had the US Debtors simply allowed the Court to reach judgment on the merits of the PPI Dispute as a matter of law. The protocol set out by this Court, in order to fairly avail itself of relevant information to evaluate the Proposed Settlement, consists of briefings for objections, multiple rounds of reciprocal document discovery, opportunities for depositions and a hearing. Ironically, as part of the Court's inquiry, it will need to make precisely the same determination – the rate at which the US Bondholders are entitled to post-petition interest – that this Proposed Settlement purports to render unnecessary. Thus, the Proposed Settlement has, and will continue to, substantially increase costs to all parties, and unquestionably add considerable delay to the process.

3.  **There are No Potential Collection Difficulties**

20. The third *Martin* factor is irrelevant to the Proposed Settlement; any concerns over collection are not implicated, as the funds that are the subject of the PPI Dispute are currently held in escrow.

4.  **All Other Relevant Factors Weigh Against Approval of the Proposed Settlement**

21. The ultimate question in a *Martin* analysis is whether the estate is receiving value for the settlement. *See TMT Trailer*, 390 U.S. at 424-25 ("Basic to [the settlement approval] process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation."); *In re Martin*, 91 F.3d at 393 ("[B]ankruptcy court approval requires a bankruptcy judge to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal."); *In re Roqumore*, 393 B.R. 474, 482 (Bankr. S.D. Tex. 2008) ("The material value provided to the estate is an important factor to consider when evaluating a compromise.") (citing the preceding language from *In re Martin*, 91 F.3d at 393). In this case the answer is no.

22. The "compromise" in the Proposed Settlement, and the value to the US Debtors in this case, is merely illusory. The US Bondholders would receive a guarantee of $876 million to $1.01 billion, which is all (or almost all) they could have hoped to receive even under their own plan, given the likelihood that less than $1 billion will be left in the US Estates after distributions of all the allowed claims. This very Court has rejected just such a proposed settlement stating that: "In effect, the [plan proponents] have requested that the Court approve a settlement where [creditor] would receive payment from the Debtors estates of approximately 100% of its documented claim. While that may be an appropriate ruling on the merits of the

claim after trial, it is not a reasonable settlement." *In re RNI Wind Down Corp.*, 2007 WL 949647, at *7 (Bankr. D. Del. 2007).

23. The US Debtors are not operating an on-going business, and so their only interest is ensuring that all their constituents, both creditors and equity holders, receive recoveries consistent with the Bankruptcy Code's precepts. *See TMT Trailer*, 390 U.S. at 424, 441 ("The fact that courts do not ordinarily scrutinize the merits of compromises involved in suits between individual litigants cannot affect the duty of a bankruptcy court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable.. . . . [A] bankruptcy court is not to approve or confirm a plan of reorganization unless it is found to be 'fair and equitable.' This standard incorporates the absolute priority doctrine."); *see also*; *In re Rosenberg*, 495 B.R. 196, 201 (Bankr. E.D.N.Y. 2010) (rejecting a proposed settlement in conflict with the Bankruptcy Code, where it would have forced the chapter 11 trustee to choose between violating a court order or breaching a fiduciary duty owed to the bankruptcy estate.).

24. As this Court has previously stated: "the Court can and should consider the interest of equity holders in applying the fourth *Martin* factor." *In re RNI Wind Down Corp.*, 2007 WL 949647, at *7 (Bankr. D. Del. 2007) (Gross, J.). Confirmation of the Proposed Settlement would deplete the US Estates entirely, violating the absolute priority rule by gutting the recovery that should be made to NNL, and its creditors, and thus should be rejected. *See, e.g., In re Shankman*, 2010 WL 743297, at *4. ("[T]he Court cannot approve the compromise. The purported benefits to the estate are illusory and the proposed compromise is against public policy.") Ultimately, NNI is choosing to appease its bondholders at the expense of its equity holders. If the US Debtors are potentially solvent, then the US Debtors have an obligation to consider the interests of NNL as fulcrum security, yet based on the Proposed Settlement, it

appears no such consideration was given. Instead, NNI gives all of the possible value to the US Bondholders with apparent disregard for its responsibilities to its shareholder NNL. Approving the Settlement Motion would afford the US Debtors the ability to unilaterally settle the PPI Dispute, which does not affect the US Debtors outside of delay, and yet potentially affects other non-parties to the Proposed Settlement to the tune of almost a billion dollars.

25. Moreover, contrary to the concept of arms-length negotiation, it does not appear that NNI took any action to preserve estate value for all of its stakeholders, including its equity holders, which it is obligated to do. (*See* discussion in Section B *supra*.) Not only have the US Debtors failed to put forward evidence of their "arms-length" and "vigorous" negotiation with the US Bondholders, they have demonstrated a remarkable lack of diligence – having failed to brief its board of directors about the proposed settlement, let alone procure its approval (J. Ray Dep. Tr. 15:4 – 16:4), and basing its decisions not on the basis of a detailed analysis by a financial advisor, but on "an analysis in [Mr. Ray's] own mind" without "any independent recording of the calculation." (J. Ray Dep. Tr. 96:19-20, 97:10-14.)

26. The PPI issue concerns amounts greater than the value of some of the Nortel business line sales, and constitutes a significant fraction of the potential recovery of the US Debtors. It is therefore surprising that, while weighing the reasonableness of the Proposed Settlement to the US Estates and its constituents, the US Debtors did not seek advice from its counsel as to "whether the bonds would actually recover through litigation more than $1.01 billion." (J. Ray Dep. Tr. 115:13-18.) Not only did the US Debtors negotiate with no understanding of the likelihood that the US Bondholders might succeed in its legal argument to receive PPI at the contract rate, they negotiated with scarcely more information as to the amount of assets that might be distributable by the US Estates after payment of the allowed claims.

Instead of seeking a systematic analysis with varying assumptions created by financial advisors, the only financial analysis undertaken by the US Debtors were calculations reportedly done in its CEO's head.

27.  Mr. Ray's calculations were, by his own admission, quite complex, as "the analysis wasn't exclusively dependent on one input. Because there are so many inputs in this calculation, you could change, you know, some of them negatively, some could move positively...." (J. Ray Dep. Tr. 100:21-25.) Not only did Mr. Ray admit that he failed to record his calculations,[14] he also explained that he did not undertake to understand the range of potential outcomes prior to the negotiation, in order to inform his bargaining position, but instead completed his calculations to justify the settlement amount he had already negotiated:

> [N]ow, there may be some scenarios where, by virtue of one of the many inputs into this calculation, that there's not sufficient cash to – to have an issue with the cap, but I wasn't really solving necessarily for – exclusively for those alternative. **I was solving for those alternative where there was a possibility that the amount would exceed the cap that we negotiated**. (*Id*. at 101:15-23.)

In evaluating this Proposed Settlement, we urge the Court to put more thought into the fairness of the proposal than the US Debtors ever did.

B.  The Proposed Settlement is Not "Fair and Equitable" Because it Violates the Absolute Priority Rule of the Bankruptcy Code.

28.  In determining whether a proposed settlement is "fair and equitable," courts must be guided by the Supreme Court's articulation of that standard, which "incorporates the absolute priority doctrine under which creditors and stockholders may participate only in accordance with their respective priorities, and 'in any plan of corporate reorganization unsecured creditors are

---

[14] Not only does it appear that Mr. Ray came to a cursory judgment as to what an appropriate settlement might be, but he also appears to have based his calculations on at least one incorrect assumption – that the US tax claim "would need to be under a hundred million." (J. Ray Dep. Tr. 98: 21-22.) At opening statements, US Debtors' counsel made clear that the IRS claim was likely to be "between 400 million and a billion dollars, depending on when the money comes in, how it gets distributed and so on." (S. Block, Trial Tr. 172:1-4.)

entitled to priority over stockholders to the full extent of their debts.'" *TMT Trailer*, 390 U.S. at 441 (quoting *SEC v. United States Realty & Improvement Co.*, 310 U.S. 434, 452 (1940)). The Proposed Settlement violates the absolute priority rule because it prioritizes the US Bondholders over stockholders **far in excess** of the "full extent of their debts."

29. Bankruptcy courts in the Third Circuit continue to abide by the Supreme Court's Bankruptcy *Act*-era holding that "the requirements [of former Chapter X], that plans of reorganization be both 'fair and equitable,' apply to compromises just as to other aspects of reorganizations." *TMT Trailer*, 390 U.S. at 424; *see In re Nutraquest, Inc.*, 434 F.3d at 645 ("Under the 'fair and equitable' standard, we look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle."). Accordingly, in the Third Circuit, proposed bankruptcy settlements under Rule 9019 must comply with the absolute priority scheme of the Bankruptcy Code. In *In re TSIC, Inc.*, this Court held that settlement agreements must comply with the absolute priority rule, which applies to both chapter 7 and chapter 11 cases. 393 B.R. 71, 75 (Gross, J.) ("The Bankruptcy Code creates a hierarchy of claims enforced by adherence to what is referred to as the 'absolute priority rule,' and codified as part of the 'fair and equitable' requirement of [section] 1129.").

30. Although, to date, the Third Circuit has not issued a decision directly on point, in *In re Armstrong World Industries, Inc.*, the Third Circuit affirmed the rejection of a proposed plan because it violated absolute priority by treating the creditors too favorably, and stated that "Creditors must also be guided by the statutory prohibitions of the absolute priority rule, as codified in 11 U.S.C. § 1129(b)(2)(B)." 432 F.3d 507, 514 (3d Cir. 2005).[15] The Second and

---

[15] Two District of Delaware cases, both dealing with secured creditors holding perfect security interests in property not otherwise subject to distribution under the Bankruptcy Code, have held that absolute priority was not applicable in the Chapter 11 context. *In re Capmark*, 438 B.R. 471 (Bankr. D. Del. 2010); *In re World Health Alt., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006). However, both of these cases are factually inapposite.

Fifth Circuits have held that distribution contemplated in a pre-plan settlement proposal must comply with the absolute priority rule of the Bankruptcy Code to the same extent that a settlement proposed simultaneously with a plan of reorganization must comply with it. *See Motorola, Inc. v. JPMorgan Chase Bank, N.A. (In re Iridium Operating LLC)*, 478 F.3d 452, 464 (2d Cir. 2007) ("[W]hether a particular settlement's distribution scheme complies with the Code's priority scheme must be the most important factor for the bankruptcy court to consider when determining whether a settlement is 'fair and equitable' under Rule 9019. ... In the Chapter 11 context, whether a settlement's distribution plan complies with the Bankruptcy Code's priority scheme will often be the dispositive factor."); *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir. 1984) (In holding that the absolute priority rule applies to pre-plan settlements, the court stated, "As soon as a Debtor files a petition for relief, fair and equitable settlement of creditors' claims becomes a goal of the proceedings. The goal does not suddenly appear during the process of approving a plan of compromise.").

31. The PPI Settlement Amount of $876 million to $1.01 billion is explicitly above the "allowed amount" of the US Bondholders' claims. Payment of such a sum would be at the expense of junior classes, and would therefore violate absolute priority, because "[c]ourts have decided that 'a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.'" *Genesis Health Ventures*, 266 B.R. 591, 612 (Bankr. D. Del. 2001) (citing *In re MCorp Financial, Inc.*, 137 B.R. 219, 225 (Bankr. S.D. Tex. 1992)).

32. "Although [section 1129(b)] embodies the absolute priority rule, which forbids junior classes of creditors or equity from receiving any distribution until senior creditors are paid in full, *it also mandates that senior creditors not receive more than 100% of their claim before junior classes receive a distribution.*" *In re Wash. Mut.*, 461 B.R. at 241 n.34 (citing *In re Exide*

*Techs.*, 303 B.R. at 61). Judge Walrath's admonition, that the absolute priority rule may not be used to permit senior creditors to receive an amount in excess of their allowed claims to the detriment of junior classes, is directly applicable here, where the US Bondholders are seeking post-petition interest at the contract rate on the Crossover Bond Claims far in excess of their entitlement under the Bankruptcy Code. Accordingly, application of the contract rate to the Crossover Bond Claims would be in violation of the absolute priority rule, as that rate would provide many of the US Bondholders with a far greater recovery than that to which they are entitled, at the expense of all of Nortel's other creditors.

## CONCLUSION

For the aforementioned reasons, the Trustee respectfully submits that the Settlement Motion should be denied. The Proposed Settlement violates applicable bankruptcy law, and, therefore, cannot be approved, and the US Debtors cannot meet its burden of showing that the settlement does not fall below the lowest point in the range of reasonableness.

**WHEREFORE**, the Trustee respectfully requests that this Court enter an order denying the Settlement Motion in full, and grant such other relief as is necessary or appropriate.

Dated:  October 3, 2014
          Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

  */s/ William E Chipman*
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Ann M. Kashishian (No. 5622)
1007 North Orange Street, Suite 1110
Wilmington, Delaware 19801
Telephone:   (302) 295-0191
Facsimile:   (302) 295-0199
Email:        chipman@chipmanbrown.com
              olivere@chipmanbrown.com
              kashishian@chipmanbrown.com

– and –

Craig A. Barbarosh
David A. Crichlow
Karen B. Dine
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022-2585
Telephone: (212) 940-8800
Facsimile: (212) 940-8776
Email: craig.barbarosh@kattenlaw.com
       david.crichlow@kattenlaw.com
       karen.dine@kattenlaw.com