## EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

**In Re: Nortel Networks Inc., et al.**

**Case No. 09-10138 (KG)**

# REPORT OF PAUL WERTHEIM, Ph.D., CPA, CMA, CFM, CFE
# NERA Economic Consulting

**October 03, 2014**

NERA Economic Consulting

# Contents

1.    Mandate and Qualifications.                                    1
       1.1.    Mandate.                                              1
       1.2.    Qualifications.                                       2

2.    Scope of Review.                                              4

3.    Summary of Opinions.                                          4

4.    Calculations and Analysis.                                    6

5.    Discussion and Conclusions.                                   12

6.    Restrictions.                                                 20

Appendix A.  C.V                                                    21

Appendix B.  Materials Relied Upon                                 31

# 1.    Mandate and Qualifications.

## 1.1.    Mandate.

1.    On July 24, 2014, Nortel Networks Inc. ("**NNI**") and certain of its affiliates (collectively, the "**U.S. Debtors**") filed the *Debtor's Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among NNI, the Supporting Bondholders, and the Bank of New York Mellon With Respect to the NNI PPI Dispute and Related Issues* (the "**Motion**").  The Motion seeks the approval of a proposed settlement of certain post-petition interest ("**PPI**") issues (the "**Proposed Agreement**") among NNI, certain holders of bonds issued by Nortel Networks Corporation ("**NNC**") and Nortel Networks Limited ("**NNL**") and guaranteed by NNI (the "**Guaranteed Bonds**"), and Bank of New York Mellon, as indenture trustee in respect of the Guaranteed Bonds.[1]

2.    Counsel for Ernst & Young Inc., in its capacity as the Monitor for NNC, NNL, and certain of their direct and indirect subsidiaries (collectively, the "**Canadian Debtors**"), requested that I prepare this report setting out my opinions and calculations in regards to the notional surplus that would be available to NNI to pay PPI to its unsecured creditors.

3.    Specifically, I have been asked to consider and review the Proposed Agreement and to provide my opinions with respect to the following issues:

a.    in the event that NNI is found by the U.S. Bankruptcy Court to be solvent, to analyze the range of notional surplus available after distributions on account of allowed claims that would be available for the payment of PPI to the Bondholders; and

b.    based on the analysis of the surplus available in the NNI estate, to analyze the value claimed to be given up by the Bondholders pursuant to the Proposed Agreement.

4.    This report contains my opinions and calculations regarding the above request and is prepared in anticipation of a hearing scheduled to be held on the Motion on November 4, 2014.

---

[1]    Holders of the Guaranteed Bonds are hereinafter referred to collectively as the "**Bondholders**."

## 1.2.   Qualifications.

5.      I am a Professor of Accounting at Abilene Christian University, where I currently teach courses in financial accounting, accounting research and advanced auditing.  I have previously served as a professor at Pepperdine University and East Carolina University, where I have taught courses in financial statement analysis, accounting information systems, accounting fraud, accounting theory, corporate tax, cost accounting and auditing.

6.      I hold both a Master of Science in Accounting and a Ph.D. in Accounting and Finance from the University of Kansas.  I obtained a BBA degree in Accounting from Texas A&M University and an MBA from Abilene Christian University.  I am a Certified Public Accountant (CPA), Certified Management Accountant (CMA), Certified Fraud Examiner (CFE) and Certified Financial Manager (CFM).  I am a member of the American Institute of Certified Public Accountants, the American Accounting Association, the Institute of Management Accountants, the Texas Society of CPAs, and the Association of Certified Fraud Examiners.

7.      I am also a Special Consultant for NERA Economic Consulting ("**NERA**").  I provide GAAP, SEC and IFRS analyses for complex transactions, examinations of financial disclosures, analyses of financial reporting, and econometric studies.  My work is often in the context of providing expert assistance for complex litigation and class actions.

8.      Among other accounting and finance related issues, I have provided expertise in the presentation and interpretation of financial statements as they relate to insolvency and bankruptcy matters, the interpretation of GAAP, and the use of financial data in the analysis of corporate transactions.  I have been retained and have provided consulting services for leading insolvency and bankruptcy cases including matters related to the bankruptcy of Enron, the Stanford Investment Bank, Homestore, Inc., Adelphia, and Nortel Networks Corporation. [2]

---

[2] Expert Report of Paul Wertheim, filed February 28, 2014, Ontario Superior Court of Justice, in the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended, and in the Matter of a Plan of Compromise or Arrangement of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation, Court File No. 09-CL-7950. (On behalf of Counsel for Ernst & Young Inc., in its capacity as the Monitor for Nortel Networks Corporation,  Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, and Nortel Networks Technology Corporation).

9.      My prior consulting experience has included a variety of accounting and financial analysis related issues.  For a large financial services holding company, I examined the cash flow forecasts of the company and other liquidity events in order to determine the impact on management's responsibility to discuss liquidity issues as part of Management's Discussion and Analysis.  As part of the same case, I also examined the deferred tax asset account in order to determine if the current level of income was sufficient to utilize the full amount of the tax loss carryforwards, and to what extent, if any, an asset impairment would be required.

10.      For another client, in the context of business combinations and consolidated financial statements, I assessed the appropriateness of the cost basis to be used in accounting for subsidiaries, including the appropriate asset values and goodwill to be recorded on the books of each entity.  I also examined various company events and Board discussions to identify the various SEC "triggering" events that affect the timing of when a company should disclose that its financial statements should no longer be relied upon.

11.      Other selected consulting activities have included: comparison of US GAAP and IFRS accounting treatment for a large multinational financial services company in order to determine compliance with accounting reporting requirements; advised client on matters related to GAAP and SEC reporting requirements for loan loss estimation and loan loss reserves; performed a detailed cost accounting analysis to determine cost-of-goods-sold for products provided by a large Canadian retail services company; determined the financial statement impact of alleged fraudulent accounting transactions; performed forensic accounting on the point of origin of accounting entries; calculated lost revenue/income from breach of contract; and performed an assessment of the reasonableness of management's accounting estimates.

12.      My C.V. is provided in Appendix A.  Included in my C.V. is a list of all publications I have authored in the previous 10 years (and beyond) and a list of all cases in which I have testified as an expert in the last four years.

13.      NERA is being paid $750 per hour for my work on this matter, with lower rates for staff working under my supervision.  Our payment is not contingent on my opinions nor on the outcome on this matter.

## 2.  Scope of Review.

14.    In preparing this report, I have relied upon various court filings, testimony, depositions, and selected financial information, including the following:

a.    various filings made in the Canadian and U.S. insolvency proceedings;
b.    certain publicly available financial information for NNC, NNL, and NNI;
c.    transcripts of certain depositions, trial testimony, and opening and closing statements.

15.    A detailed list of the documents upon which I have relied is provided in Appendix B to this report.

## 3.  Summary of Opinions.

16.    The Proposed Agreement purports to settle the PPI dispute by reducing the PPI that the Bondholders would receive from a total accrual of $1.657B (as of June 30, 2015) to a maximum of $1.01B,[3] or a decrease of $647M as a result of the Proposed Agreement.

17.    Using financial information for NNI, NNL, and NNC I have calculated the maximum net assets (*i.e.*, maximum surplus cash) that would be available to NNI for payment of PPI.  In order to calculate the maximum surplus cash that would be available, I have had to assume certain outcomes that may be considered to be the "best case" scenario for NNI—specifically, outcomes that would maximize NNI's net assets for distribution.

18.    At the heart of these assumptions is the outcome of the pending allocation dispute.  In order to calculate the maximum surplus cash available to NNI, I assumed that the U.S. Debtors' position will prevail in the allocation litigation and the U.S. Debtors will receive 100% of their requested allocation of the Nortel asset sale proceeds.  Therefore, allocation proceeds were based on the publicly filed version of the Expert Report of Jeffrey Kinrich, (the "**Kinrich Report**"), dated January 24, 2014, which was filed by the U.S. Debtors in support of their allocation position.  In his

---

[3] The Debtors have contended that the Proposed Agreement is an $876 million settlement.  However, the Proposed Agreement actually provides the Bondholders with up to $1.01 billion in PPI.  Specifically, Section 2.2 of the Proposed Agreement provides the Bondholders with $876 million "plus an additional amount, equal to 3.50% per annum times the then outstanding principal balance of the Guaranteed Bonds, up to a maximum amount of $134 million, which additional amount shall accrue on the unpaid and outstanding principal balance of the Guaranteed Bonds that remains unpaid and outstanding during the time of accrual for the period from July 1, 2014 until the earlier of (x) June 30, 2015 or (y) the date of the final distribution in respect of the Guaranteed Bonds."  Pursuant to Section 2.2 of the Proposed Agreement the true cap on PPI is $1.01B.

report (Exhibit 33), Mr. Kinrich presents the case for an allocation of sales proceeds to the U.S. Debtors in the amount of $5.302B.[4]  This and other assumptions I have made for the purpose of performing my analysis are detailed in Sections 4 and 5 of this report.  Results of the distribution analysis for NNI show the following:

| | |
|---|---:|
| Total Cash Available to NNI for Distribution to Creditors[5] | $6,209.0M |
| Less: Claims to be Settled by the Distribution, excluding PPI | $5,238.0M |
| Net Assets Available to NNI to Pay Total PPI | $971M |

19.    Based on this analysis and assuming the best outcome of events for NNI (outcomes that maximize net assets for distribution), only approximately $971M of net cash would exist with which to pay PPI.  *In other words, even if you stretch the outcome of events in all cases in favor of NNI such that surplus cash is maximized, NNI would still have less than the settlement amount of $1.01B with which to pay PPI.*

20.    Furthermore, in addition to the claims that are included in the amounts shown above, several additional potential claims and deductions are identified that could further reduce surplus cash available to NNI for distribution.  As detailed in Section 5.1 (and Table 5), these additional amounts relate to:

| | |
|---|---:|
| Reduction in surplus cash if NNI pays towards the Guaranteed Bonds and the NNCC Notes (non-settling bonds) first: | $286.3M |
| Reduction in surplus cash if the NNUK pension claims are not dismissed: [6] | 45.5M |
| Additional PPI attributable to the NNCC Notes: | 30.5M |
| Additional post-petition U.S. tax liability yet to be settled: [7] | 266.7M |
| Additional claims filed by the Pension Benefit Guaranty Corporation: | 115.0M |
| Total potential reduction in surplus cash available to NNI to PPI to the Bondholders pursuant to the Proposed Agreement | $744.0M |

---

[4] Specifically, the allocation of $5.302B to the U.S. Debtors presented in the Kinrich Report consists of a $5,259,681,444 allocation to NNI, $40,625,788 to NN CALA, and $2,238,887 to NNII, for a total of $5.302B. For my analysis, I have assumed the full $5.302B would be available to NNI for distribution. To the extent that amounts allocated to NN CALA and NNII are not available to NNI for distribution, surplus cash could be reduced.

[5] As stated above, the amount of cash available to NNI for distribution is based on the full $5.302B as given in the Kinrich Report for allocation to the U.S. debtors.  If this full amount is not available to NNI for distribution, "cash available to NNI" in this calculation could be reduced.

[6] This reduction assumes that the NNUK pension claims total $670.

[7] The range for the potential tax liability (discussed in Section 5.1) has been stated by NNI to be $400M to $1B. The calculation of the additional post-petition tax liability (over what is included in my analysis of NNI surplus cash) shown here is based on the low end of the range.  To the extent that the U.S. tax liability is greater than $400M, surplus cash would be decreased even further.

21.     These deductions could have the effect of reducing surplus cash for NNI by an additional $744M or more.  ***Thus, even if a portion of the currently existing claims subject to compromise for NNI are reduced or eliminated, the net cash available for payment of PPI to the Bondholders that are part of the Proposed Agreement would still be less than $1B.***

22.     Based on my analysis, I conclude that the Bondholders would not have been able to receive on account of PPI more than $1B in payments from NNI, even absent the settlement. Therefore, in my opinion, the value of the Proposed Agreement to the NNI estate is $0, given that the Bondholders did not "concede" anything of value when they settled for a decrease in PPI from $1.657B to $1.01B.  The settlement value of $1.01B is outside the range of extremes that the Bondholders could have received, even under the most optimistic assumptions.

# 4.     Calculations and Analysis.

## 4.1    Methodology.

23.     I have been instructed to assume, for purposes of this report, that PPI in a chapter 11 case in the U.S. may sometimes become payable in the event that there is a surplus in the estate, *i.e.*, when the assets in the estate upon distribution are greater than the allowed claims.  This surplus cash, after payment of allowed claims, may be used to satisfy PPI owing to unsecured creditors.  In the current case, the U.S. entity, NNI, is a guarantor of the Guaranteed Bonds.  At the time of the Chapter 11 filing in the U.S., the principal amount of the Guaranteed Bonds was $3.825B and the pre-petition interest that was owed on those bonds amounted to $115.7M.[8]  I understand that the dispute over legal entitlement to PPI is whether PPI is to be calculated at the contract rate, under which the PPI that has accrued since the Chapter 11 filing date would total $1.657B (calculated as of June 30, 2015), versus the federal judgment rate.  The Proposed Agreement purports to settle the PPI dispute by capping the Bondholders' entitlement to PPI at $1.01B, or a decrease in PPI of approximately $647M from the Bondholders' claimed contract-rate entitlement of $1.657B.

24.     I have been asked to calculate the maximum amount of net assets that would be available to NNI to pay PPI under the best-case scenario for NNI, with all major assumptions

---

[8] See Schedule A of the Proposed Settlement.

construed in NNI's favor.  The basic formula for determining the net assets of NNI at the time of distribution is as follows:

| | |
|---|---|
| Total Cash Available to NNI for Distribution to Creditors | $XX |
| Less: Claims to be Settled by the Distribution | XX |
| Net Assets Available to Pay Total PPI | $XX |

25.    The "Total Cash Available to NNI for Distribution to Creditors" is calculated as the sum of (1) cash received by NNI from the allocation of the $7.3B sales proceeds, (2) NNI's current cash balance at the time of distribution, and (3) cash received from NNI's recovery of its allowed $2,062.7M claim against NNL in the CCAA proceedings.

26.    "Claims to be settled by the distribution" is calculated as the sum of (1) liabilities not subject to compromise, (2) the various liabilities subject to compromise, and (3) certain other claims. The remaining net assets after distribution, *i.e.*, the surplus cash, is what would be available to NNI for payment of PPI to the Bondholders and other non-settling unsecured creditors of NNI.

**4.2    Assumptions Used in the Analysis.**

27.    The dollar amounts for both "cash available to NNI for distribution to creditors" and "claims to be settled by the distribution" are affected by various scenarios that have possible alternative outcomes.  For purposes of this analysis, three main individual outcome alternatives have been identified that will materially affect the amount of net assets that NNI would have following distributions on account of allowed claims.  The three outcome alternatives, in the form of questions, are:

a.    Which entity is the first to make a payment towards the Guaranteed Bonds and the NNCC Notes?

This issue addresses whether NNI or NNC/NNL are the first to make a payment towards the Guaranteed Bonds and the NNCC Notes.  If either NNC or NNL pays first, the amount required to be paid by NNI (pursuant to NNI's guarantee obligations) would be decreased, thereby increasing the amount of net assets available to NNI for payment of PPI.  Thus, an outcome where NNC or NNL pays towards the Guaranteed Bonds and the NNCC Notes first will maximize the net assets available to NNI.  My understanding is that the question of which entity makes the first payment toward the Guaranteed Bonds and the NNCC Notes is an unresolved issue.  Solely for the limited

purposes of the analysis set forth herein, my calculations were performed based on the assumption that the first payment toward the Guaranteed Bonds and the NNCC Notes would flow from NNC and NNL.  This assumption should not be read to reflect any legal analysis or opinion.  Rather, it is a mere assumption that I have made in order to perform my calculations based on the scenario that would maximize the net assets available to NNI to pay PPI.

b.    What percentage of their requested allocation of sale proceeds do the U.S. Debtors receive?

Exhibit 33 of the Kinrich Report sets forth the U.S. Debtors' position on the appropriate allocation of the $7.3B in Nortel asset sale proceeds among the U.S, Canadian and EMEA Debtors.  In the Kinrich Report, the amount that is argued to be allocated to the U.S. Debtors is $5.302B.  For the limited purposes of this report, I have assumed that the U.S. Debtors receive 100% of the requested allocation.  An outcome where the U.S. Nortel estates receive 100% of their requested allocation would maximize the net assets available to NNI.

c.    Are the NNUK pension claims against the Canadian Debtors dismissed?

If the NNUK pension claims against the Canadian Debtors are dismissed, the Canadian Debtors will have more assets, *i.e.*, cash, to distribute to other claimants, including NNI.  Thus, an outcome where the NNUK pension claims against Canada are dismissed would in turn maximize the net assets available to NNI.

28.    For purposes of my analysis, in order to calculate the maximum amount that could be available to NNI for the payment of PPI, I have assumed what I consider to be the "best case" scenario for NNI in regards to each of the above situations.  In other words, I have assumed that: (1) NNC or NNL make first payment towards the Guaranteed Bonds, (2) the U.S. Debtors receive 100% of their requested allocation of sale proceeds, and (3) the NNUK pension claims against NNL are fully dismissed.

29.    In addition to the above, an assumption was also required regarding the estimated cash burn rate for both NNL and NNI for the time period up until the distribution of the proceeds to creditors.  As the cash burn rate increases for either or both estates, the "net" cash that NNI would have available for payment of PPI decreases.

30.     For NNL, I have assumed a $0 cash burn rate from the April 2015 estimated cash balance through the date of distribution of the assets to creditors.  Based on the date that was used in the Proposed Agreement as the cut-off date for accrued interest, I have used June 30, 2015, in my analysis as the estimated date of distribution to creditors.

31.     For purposes of the distribution analysis for NNI, I have assumed a cash burn rate of $5M per month through the date of distribution.  Use of a cash burn assumption in calculating surplus cash is both realistic and appropriate, and has also been incorporated into the analysis performed by John Ray.[9]  An examination of historical cash burn for the U.S. Debtors revealed an average monthly cash burn in excess of $10M per month.[10]  Using a low burn rate is to the advantage of NNI, as a low burn rate assumption increases the surplus cash available for payment of PPI.  If future cash burn is estimated at a conservative $5M per month going forward, this would total $47.5M of cash burn through the date of distribution.

**4.3     Calculation of Net Cash Available to NNL for Payment of Claims.**

32.     Using relevant financial information, the analysis below presents calculations for the cash available for distribution and the claims to be settled by the distribution from NNL.  Formulas and assumptions are disclosed in the relevant footnotes when necessary.  Because the cash available to NNI is dependent on the distributions made by NNL, the distribution analysis for NNL is performed first, and is shown in Table 1 below.

---

[9] Transcript of the deposition of John Ray, dated September 15, 2014 ("**Ray Tr.**"), page 99:17-19.

[10] Using Monthly Operating Reports Nos. 51 through 60 (for the periods April 30, 2013 through January 31, 2014), the Cash Summary Worksheet, dated September 12, 2014, and fee/expense information submitted by Cleary Gottlieb Steen & Hamilton LLP, I calculated monthly cash burn for the 10 month period ending January 31, 2014, as well as the 10 month period ending September 12, 2014.  Average historical monthly cash burn for those time periods has exceeded $10M per month.  Although it is reasonable that cash burn might decrease going forward, there are still many potential activities (development of a distribution plan, appeals, continuing work on outstanding disputes, *etc.*) that will require cash outlays.  I have conservatively estimated a cash burn going forward of $5M per month, or less than half of the recent historical monthly cash burn.

**TABLE 1**
**Detailed Distribution Analysis for NNL (in millions):**

NNL Cash Available for Distribution:

| | |
|---|---|
| Allocation from the sale proceeds [11] | $772.8M |
| Current cash balance at distribution [12] | 329.4M |
| Total cash available for distribution | 1,102.2M |
| Less: $62.7M priority payment on "Payment to US Subsidiaries" [13] | 62.7M |
| Net cash available for distribution | $1,039.5M |

Claims to be Settled by the Distribution:

| | |
|---|---|
| Payable to NNI ($2,062.7M - $62.7M) | $2,000.0M |
| Long-term debt [14] | 3,975.0M |
| Interest on long-term debt (Pre-petition) [15] | 116.7M |
| Other [16] | 3,235.0M |
| Total liabilities subject to compromise | $9,326.7M |

**Percentage paid to claims upon distribution (the "payout ratio") [17]         11.15%**

33.     Based on the assets available for distribution ($1,039.5M) and total claims to be paid ($9,326.7M), NNL will be able to pay approximately $.1115 per dollar of claim, after the $62.7M first paid to NNI as a priority claim.

34.     In addition to the base calculations presented in Table 1 above, I performed a sensitivity analysis to measure the effect on the payout ratio for NNL and the effect on surplus cash for NNI assuming either a decrease in NNL claims of $100M or an increase in NNL assets of $100M.  For illustrative purposes, results from this sensitivity analysis are presented below:

---

[11] The Kinrich Report, Exhibit 33.

[12] Equals the estimated cash balance at April 2015, per the 108th Monitor's Report, Appendix B, excluding restricted cash, and assuming a zero cash burn rate going forward. Given that the majority of receivables are "intercompany" receivables and have a low, if not zero probability of collection, and given that all asset sales have virtually been completed, I have assumed a $0 recovery on receivables and other assets.

[13] NNL has a $62.7M priority payment that is due to NNI.  [35th Monitor's Report, dated January 18, 2010, paragraph 37(j)(2)]. Therefore, this payment is assumed to be made prior to other claims.

[14] Includes debt with crossover claims against certain of the U.S. Debtors.

[15] See BHG-PPI-0000071.

[16] The sum of other claims as identified in the 10-Q for NNC, dated June 30, 2012, footnote 15, plus $125M for a payable to EMEA.

[17] This percentage equals the NNL net cash available for distribution divided by the total liabilities to be paid.  It represents the percentage of each claim dollar that will be paid upon distribution.

- If total claims for NNL are decreased by $100M, the payout ratio increases to 11.27% and the surplus cash for NNI increases by $7.4M.

- If total assets for NNL are increased by $100M, the payout ratio increases to 12.22% and the surplus cash for NNI increases by $65.3M.

**4.4    Calculation of Net Cash Available to NNI for Payment of PPI.**

35.    Using relevant financial information for NNI, Table 2 presents calculations for the cash available for distribution and the claims to be settled by the distribution for NNI. Formulas and assumptions are disclosed in the relevant footnotes when necessary.

**TABLE 2**
**Detailed Distribution Analysis for NNI (in millions):**

NNI Cash Available for Distribution:

| | |
|---|---|
| Allocation from the sale proceeds | $5,302.5M |
| Current cash balance at distribution [18] | 620.9M |
| NNI recovery from the $2,062.7 claim against NNL [19] | 285.6M |
| Total cash available for distribution | $6,209.0M |

Less: Claims settled by the distribution:

| | |
|---|---|
| Liabilities not subject to compromise [20] | 54.6M |
| Liabilities subject to compromise: | |
| Contingent liability for NNI's debt guarantee [21] | 3,532.0M |
| Contingent liability for interest on NNI's debt guarantee [22] | 103.7M |
| Pension obligations | 593.0M |

---

[18] Equals the estimated cash balance at September, 2014 (see Cash Summary Worksheet, dated September 12, 2014, "Country" tab, NNC-NNL-PPI-000001), minus any assumed cash burn from September, 2014 through the date of distribution. For purposes of this analysis, a cash burn rate of $5 per month is assumed from September 12, 2014 through the date of distribution.

[19] Represents the total amount paid by NNL to NNI related to NNI's $2,062.7M claim against NNL. The total amount collected by NNI equals the $62.7M priority payment from NNL plus any additional amount paid by NNL upon distribution. [$62.7 + (($2,062.7 - $62.7) X .1115) ].

[20] Monthly Operating Report No. 60, dated January 31, 2014, page 3.

[21] This represents the amount paid by NNI related to NNI's guarantee of the bonds issued by NNL. If NNI pays first, then the amount equals $3,975M (see BHG-PPI-0000071). If NNL pays first, then the amount paid by NNI equals $3,975M minus the amount paid by NNL. For purposes of this analysis, it is assumed that NNL pays first. Therefore, the amount to be paid by NNI = [$3,975 - (3,975 x .1115) ].

[22] This represents the amount paid by NNI related to NNI's guarantee of the bonds issued by NNL. If NNI pays first, then the amount equals $116.7M (see BHG-PPI-0000071). If NNL pays first, then the amount paid by NNI equals $116.7M minus the amount paid by NNL. For purposes of this analysis, it is assumed that NNL pays first. Therefore, the amount to be paid by NNI = [ $116.7 - (116.7 x .1115) ].

| | |
|---|---:|
| Other [23] | 736.3M |
| Other claims: [24] | |
|     PPI attributable to the NNCC Notes | 45.8M |
|     PPI attributable to non-bondholder U.S. Creditors | 39.3M |
|     <u>Post-petition tax liability</u> | <u>133.3M</u> |
| Total liabilities to be settled by the distribution | $5,238.0M |
| | |
| **Surplus Cash Available to Pay PPI Attributable to the Bondholders** | **$971.0M** |

36.     As shown in the above analysis (using outcomes and assumptions that maximize net assets after distribution), only approximately $971M of surplus cash would exist with which to pay PPI to the Bondholders pursuant to the Proposed Agreement.  Further discussion related to certain components of the surplus cash is presented in Section 5 below.

# 5.   Discussion and Conclusions.

## 5.1    Other Variables Which Could Further Decrease Cash Available to NNI.

37.     Based on the assumptions used in the above analysis, NNI would have surplus cash of $971M available for the payment of PPI to the Bondholders.  The assumptions used were those that would benefit NNI, *i.e.*, conditions which would maximize the amount of available surplus cash to NNI.  As discussed in Section 4.2 above, these assumptions are:

- NNI receives 100% of its requested allocation of sale proceeds;
- NNL/NNC makes the first payment towards the $3,975M of Guaranteed Bonds;
- NNUK pension claims against NNL are fully dismissed;
- NNI has a $5M cash burn from September 2014 through distribution;
- NNL has a $0 cash burn from April 2015 through distribution.

38.     If any of the assumptions above are not met, the amount of surplus cash available to NNI would decrease.  In addition, there are also other amounts that, although not included in the $971M surplus cash calculation, could further reduce the net cash available to NNI.  These amounts relate to:

---

[23] Equals the sum of other claims not already included in the analysis, as identified in Monthly Operating Report No. 60, dated January 31, 2014, footnote 4.  Monthly Operating Report No. 60, for the period ended January 31, 2014, was the last report made publicly available.

[24] See discussion in Section 5.1.

    a.    any additional PPI that would need to be paid to holders of the NNCC Notes, who are not part of the Proposed Agreement;

    b.    any additional U.S. tax liability that might need to be paid by NNI;

    c.    any additional PBGC pension claims that might need to be paid by NNI.

39.    <u>PPI attributable to the NNCC Notes</u>.  The Proposed Agreement does not apply to all Nortel bonds.  There are $150M of 7.875% notes issued by Northern Telecom Capital Corporation and guaranteed by NNL (the "**NNCC Notes**") that are not part of the settlement.[25]  Therefore, to the extent the NNCC Notes are entitled to PPI, this amount of PPI may also need to be paid by NNI, and would reduce the amount of surplus cash that NNI would have available to pay PPI to the Bondholders.

40.    I have calculated PPI for the NNCC Notes at the contract rate (7.875%) for the period January 14, 2009, through June 30, 2015, the estimated distribution date.  For comparative purposes, I have also calculated accrued interest at 4%, 2%, and the applicable federal judgment rate of .44%, in the event that PPI on the NNCC Notes is paid at an amount lower than the contract rate.

41.    For the NNCC Notes, total PPI at the contract rate amounts to $76.3M.  For purposes of the distribution analysis performed in Table 2, I have assumed that PPI would be paid to the holders of the NNCC Notes at only 60% of the contract rate, a discount comparable to the discount offered to other bonds in the Proposed Agreement.  If paid at distribution by NNI, this payment to the holders of the NNCC Notes would reduce surplus cash by $45.8M.  If payment was required to be at the full contract rate, surplus cash could be reduced by another $30.5M, thus further reducing the cash that would be available to NNI to pay PPI to the Bondholders pursuant to the Proposed Agreement.

42.    In addition to the NNCC Notes, other U.S. non-bondholder creditors might also be entitled to PPI.  This fact is acknowledged in the Proposed Agreement:

> "*holders of Guaranteed Bonds shall be entitled to payment from NNI of PPI in the PPI Settlement Amount and shall be paid PPI from such funds available for such distributions (together with any other creditors of NNI entitled to payments of PPI) in accordance with a confirmed chapter 11 plan until the PPI Settlement Amount is paid in full.*" [26]

---

[25] Motion, paragraph 21, footnote 17.

[26] Proposed Agreement, Section 2.1, Exhibit B to the Motion.

43.     A situation where PPI may be attributable to non-bondholder U.S. creditors was also acknowledged in the deposition of John Ray:

> *I believe that there was potential outcomes of the ultimate resolution of the estates under which there would be cash available in the US, and depending on the cash availability, there would be amounts available to pay PPI to all creditors of the US estate, not just the bonds....*" [27]

44.     Assuming that PPI on non-bondholder U.S. unsecured liabilities accrues at the applicable federal judgment rate of .44%, total PPI through the estimated date of distribution amounts to $39.3M (see Table 3 below).  For purposes of the distribution analysis performed in Table 2, I have assumed payment of PPI to non-bondholder debt at this amount.

**TABLE 3**
**Calculation of PPI Attributable to NNCC Notes and Non-Bondholder U.S. Creditors:**

| Claim | Principal Amount of Claim | Total Post-Petition Interest from January 14, 2009 through June 30, 2015: | | | |
|---|---|---|---|---|---|
| | | At the Federal Judgment Rate of .44% per year | At 2% Per Year | At 4% Per Year | At the Contract Rate (for the NNCC Notes) of 7.875% Per Year |
| NNCC 7.875% Notes Due 2026 | $150,000,000 | $4,263,781 | $19,380,000 | $38,760,000 | $76,308,750 |
| U.S. Unsecured Claims Other Than Guaranteed Bonds | $1,383,900,000 | $39,337,642 | $178,807,463 | $357,614,926 | N/A |

45.     Total PPI is payable out of the surplus cash following distribution to NNI's creditors. Thus, in order for the Bondholders to be able to receive their full PPI up to the cap provided in the Proposed Agreement ($1.01B), there must be enough total surplus cash to also be able to pay the PPI that would be attributable to all other parties that are also entitled to PPI.  I have been informed by

---

[27] Ray Tr. at 72:21-73:3.

counsel that to the extent that there is any surplus, all unsecured creditors, including non-bondholder U.S. unsecured creditors, would be entitled to assert an entitlement to PPI.

46.    <u>Additional U.S. tax liability</u>.  Another potentially significant claim that could further reduce the cash surplus available for payment of PPI is a post-petition U.S. tax liability for NNI. This tax liability is due to the fact that NNI has unfinished tax reporting for the post-petition period, the finalization of which is dependent on outcomes of the allocation process.  The existence of a future U.S. tax liability for NNI was acknowledged by NNI during the allocation trial.  For example, consider the following statements by NNI counsel Lisa Schweitzer and Sheila Block: [28]

> Ms. Block: "In the case of NNI, it is liable to account for claims of over $5 billion, claims that run the gamut of guarantees, of loans, of trade accounts, long term debt, pension and retiree medical, employee obligations.  That's pre-petition.  And then, in addition, the tax liability is as yet undetermined." (p.171:7-13)

> Ms. Block: "I don't know what the specifics are.  Ms. Schweitzer could give you chapter and verse.  All I know is that [the tax claim] could be between 400 million and a billion dollars, depending on when the money comes in, how it gets distributed and so on." (p.171:24-172:4)

> Ms. Schweitzer: "So NNI hasn't yet finalized its tax reporting for the post-petition periods, so without getting into the details of any claim, this is post-petition taxes that would be owed to the government at the end of the sale process." (p.172:20-24)

47.    Based on the statements made by NNI counsel to the Courts, the post-petition NNI tax claim is estimated to be between $400M and $1B.  For purposes of the distribution analysis performed in Table 2, I have assumed a conservatively low estimate of only one-third of the lower end of the range identified by NNI's counsel, or $133M.  Although a $133M estimate may be unrealistically low, using an optimistically low estimate of the tax liability is to the advantage of NNI, as a low tax liability increases the surplus cash available for payment of PPI.  Incorporating some amount for the post-petition tax liability in calculating surplus cash for NNI, however, is appropriate, and has also been incorporated into the analysis performed by John Ray.[29]

48.    NNI's counsel placed the low end of the estimate at $400M.  The distribution analysis I performed in Table 2 includes an estimate of $133M for the tax liability.  Thus, realistically the tax

---

[28] Transcript of Nortel Trial, Day 1, May 12, 2014.

[29] Ray Tr. at 98:19-22.

liability could be $267M greater than the amount incorporated into Table 2, and possibly even more, thus reducing surplus cash by $267M or more.

49.    <u>Additional PBGC pension claims</u>.  On July 7, 2014, the Pension Benefit Guaranty Corporation ("**PBGC**") filed amended claims against the U.S. Debtors, asserting *inter alia* a revised estimated claim of approximately $624.6M for unfunded benefit liabilities and an estimated claim of approximately $83.4M for pension insurance premiums.[30]  Together these amended claims represent an additional estimated pension related liability of $115M, which liability is not included in the calculation of surplus cash in Table 2.  Thus, if paid during the distribution process, these additional PBGC claim amounts could reduce the surplus cash available for the payment of PPI by an additional $115M.

**5.2    Conclusions on the Net Cash Available to NNI for Payment of PPI.**

50.    Based on the analysis performed in this report, the **<u>maximum</u>** amount of net assets available to NNI for the payment of PPI to the Bondholders pursuant to the Proposed Agreement would be approximately $971M (Table 2).  In an attempt to determine the maximum surplus cash, the $971M amount assumes the following outcomes in favor of maximizing NNI's net assets upon distribution:

**TABLE 4**
**Assumptions Used in the Calculation of Surplus Cash for NNI (from Table 2):**

- NNL or NNC are first to make payments towards the Guaranteed Bonds, thereby reducing the payment required by NNI as guarantor;

- NNI receives 100% of its requested allocation of the $7.3B in Nortel asset sale proceeds;

- The NNUK pension claims against Canadian debtors are fully dismissed, thereby increasing the amount that NNL can pay towards both the bonds and the $2.0627B claim that NNI has against NNL;

- NNI has a $5M cash burn rate from September, 2014, through the date of distribution;

- NNI has a $0 cash burn rate from April, 2015, through the date of distribution;

---

[30] The PBGC initially filed four proofs of claims on September 29, 2009, against the U.S. Debtors: (i) a claim for unfunded benefit liabilities (claim number 4735), which the PBGC estimated at $593,100,000; (ii) an unliquidated claim for minimum funding contributions (claim number 4736); (iii) an unliquidated claim for pension insurance premiums (claim number 4737); and (iv) an unliquidated claim for shortfall and waiver of amortization charges (claim number 4738).  The PBGC filed claims amending all of the above claims on July 7, 2014.  Claim number 8763 amended original claim number 4735 and revised the estimated claim amount upwards from $593,100,000 to $624,601,972.  Claim number 8762 amended original claim number 4737 to assert an estimated claim amount of $83,392,500.  Claim numbers 8760 and 8761 amended original claim numbers 4736 and 4738 although those two claims remain unliquidated.

- NNI pays only 60% of contact-rate PPI to the holders of the NNCC Notes;

- NNI pays $39.3M of PPI in connection with non-bondholder unsecured claims, calculated using the federal judgment rate;

- NNI pays only $133M related to a post-petition tax liability (which could be as large as $1B), and

- NNI pays $0 related to the updated PBGC pension claims.

51.     Even with all of these variables in favor of maximizing surplus cash, NNI would still not have enough surplus cash to pay the settlement amount of $1.01B.  Furthermore, additional variables could reduce surplus cash even further.  For example, the items discussed in this section, which include amounts that have not been incorporated into the $971M, have the potential to reduce surplus cash by another $744M, if not more, as shown below:

| | |
|---|---:|
| Reduction in surplus cash if NNI pays towards the Guaranteed Bonds first | $286.3M |
| Reduction in surplus cash if the NNUK pension claims are not dismissed | 45.5M |
| Additional PPI attributable to the NNCC Notes (non-settling bonds) | 30.5M |
| Additional post-petition U.S. tax liability yet to be settled[31] | 266.7M |
| Amended claims filed by the Pension Benefit Guaranty Corporation | 115.0M |
| Total potential reduction in surplus cash available to NNI to pay post-petition interest to the Bondholders pursuant to the Proposed Agreement | $744.0M |

52.     In the event that non-bondholder U.S. claims are below the amount included in my analysis, this decrease in claims would have the effect of increasing surplus cash.  However, in my opinion, there are several reasons why the $971M from my analysis still represents an upper limit to the amount of surplus cash:

a.   I included only $133M as an estimate of the post-petition tax liability.  I included such a low estimate to illustrate that even in optimistic circumstance, NNI would have less than $1B in surplus cash.  However, the $133M estimate may be unrealistically low; it represents only one-third of the low end of the estimate ($400M) given by NNI's counsel during trial and I have made that estimate notwithstanding the fact I have also assumed that the U.S. Debtors receive 100% of their requested allocation of sale proceeds.  Assuming the representations of NNI's counsel, and given that the tax liability amount I have used is at the low end of the range, this additional tax liability could offset decreases in allowed claims up to that amount.

b.   My analysis included PPI payable to non-bondholder U.S. creditors calculated at the federal judgment rate, and PPI payable to the NNCC bondholders at only 60% of the

---

[31] As discussed above, the range for the potential tax liability (discussed in Section 5.1) has been presented at $400M to $1B.  The calculation of the additional post-petition tax liability shown here is based on the low end of the range.  To the extent that the U.S. tax liability is greater than $400M, surplus cash would be decreased even further.

contract rate.  If non-bondholder PPI was at a rate higher than the federal judgement rate, and/or if NNCC bondholders were entitled to more than 60% of the contract rate, surplus cash would be reduced.

c.   My analysis included $0 for the amended PBGC claims.  To the extent that these claims exist at an amount greater than $0, surplus cash would be further reduced.

53.   ***Thus, in my opinion, the economics of the NNI estate are such that any PPI that could be available to be paid by NNI to the Bondholders pursuant to the Proposed Agreement would be less than the settlement amount of $1.01B.***

54.   For comparative purposes, and in order to test the sensitivity of surplus cash to changes in the underlying assumptions, in Table 5 I have re-calculated the surplus cash total from Table 2 after changing, one at a time, each underlying assumption.  As demonstrated in Table 5, because the assumptions were initially all set in favor of NNI, any change in assumptions decreases surplus cash.   In Table 5, I show the dollar **decrease** in surplus cash that would occur if a particular assumption is changed, while holding the other assumptions constant.

**TABLE 5**
**Calculation of the Decrease in Surplus Cash Due to Changes in Assumptions:**

| <u>Various Payout Scenarios:</u> | Assumptions from the "Initial" Scenario in Table 2 | Potential Change to Each Individual Assumption in Table 2 | Dollar Decrease in Surplus Cash Due to a Change in Each Individual Assumption |
|---|---|---|---|
| Does NNL/NNC make payment on account of the Guaranteed Bonds first (y or n)? | Y | N | ($286.3M) |
| What dollar amount of the NNUK pension claims against NNL are dismissed? | $670M | $0 | ($45.5M) |
| What amount of PPI attributable to the NNCC Notes does NNI pay? | $45.8M | $76.3M | ($30.5M) |
| What is NNI's post-petition tax liability? | $133M | $400M | ($266.7M) |
| What amount of the $115M amended PBGC claims does NNI pay? | $0 | $115M | ($115M) |

55.     As demonstrated in this Table 5, as the assumptions begin to move away from those that maximize surplus cash for NNI, the surplus begins to decrease significantly. ***In other words, even if you stretch the outcome of events in favor of NNI such that surplus cash is maximized, NNI would still have less than the settlement amount of $1.01B with which to pay PPI.***

### 5.3     Comments on the Economics of the Settlement.

56.     The Proposed Agreement purports to settle the PPI dispute by reducing PPI payable on account of the Guaranteed Bonds from $1.657B to a maximum of $1.01B, or a decrease of approximately $647M as a result of the settlement. However, the maximum amount of PPI that the Bondholders would have received from NNI even absent the settlement would have been approximately $971M, and most likely less. Therefore, in my opinion, the value of the settlement to the NNI estate is $0, given that the Bondholders did not concede anything of value when they "settled" for a decrease in PPI entitlement from $1.657B to $1.01B.

57.     In the transcript of the telephonic status conference with Judge Kevin Gross, United States Bankruptcy Judge held on July 24, 2014, the U.S. Debtors (and other aligned parties) make a number of claims in respect of the value of the settlement, including:

- the settlement "*has the benefit of being a quite substantial concession by the Bondholders with respect to the potential claim they could be seeking or as importantly the distributions that they can take out of the U.S. estate with respect to PPI*," page 10:20-24.

- the settlement is a really substantial step forward for the U.S. Debtors because of the "*substantial concessions certainly by the Bondholders of over $600 million of potential PPI distributions being taken off the table*," page 14:11-13.

- "*our clients have conceded more than $600 million in interest entitlements to get to this point*," page 18:22-24.

- "*Directionally what has been accomplished here is what the Committee has been hoping to see ever since Your Honor made the observation at the end of the allocation hearings that between 90 million at the low end and 1.6 billion at the high end is quite a range within which a mediator could have a field day*," page 21:4-8.

58.     In my opinion:

- the Bondholders did not make a "substantial concession" with respect to the potential claim they could be seeking, given that, even under the most favorable outcomes for NNI, the Bondholders would not have received the additional $657 of PPI that was eliminated in the settlement;

- there was not "over $600 million of potential PPI distributions being taken off the table," given that there would not be enough net assets for NNI to pay that amount of PPI anyway;

- the Bondholders could not have "conceded more than $600 million in interest entitlements," given that the value of what was conceded was $0; and

- there was not "1.6 billion at the high end" of the range of potential outcomes, given that $971M was the maximum amount of net assets that would be available for payment of PPI.

59.     Given that the maximum amount of net assets available for payment of PPI is $971M, in my opinion the settlement value of $1.01B for PPI is outside the range of realistic values that could occur.

## 6. Restrictions.

60.     In this report, I focus on the amounts that could be available to NNI for payment of total PPI, including an economic analysis of the value of the settlement, i.e., the value of the PPI purported entitlement that was "conceded" by the Bondholders.   I do not express any opinion on any legal issues related to the appropriateness of payment of PPI.

61.     This concludes the body of my report.

_Paul Wertheim_
_____

Paul Wertheim
Special Consultant
NERA Economic Consulting

**Appendix A.    C.V.**

## NERA
Economic Consulting

**Dr. Paul Wertheim**
Special Consultant

3301 South 14th Street
Suite 16, #187
Abilene, TX 79605
Office: 325-674-2071
Cell: 325-725-5492

# Dr. Paul Wertheim
## *Special Consultant*

Dr. Wertheim's expertise is in the areas of US and international accounting regulations, financial reporting requirements, auditing regulations, corporate finance, capital market theory, cost accounting, and statistical analysis. He provides GAAP, SEC and IFRS analyses for complex transactions, examinations of financial disclosures, and financial reporting in relation to loss causation for securities fraud litigations. Dr. Wertheim also conducts cost accounting analyses and econometric studies for complex litigations and class actions.

Selected consulting activities have included: comparison of US GAAP and IFRS accounting treatment for a large multinational financial services company in order to determine compliance with accounting reporting requirements, advised client on matters related to GAAP and SEC reporting requirements for loan loss estimation and loan loss reserves, detailed cost accounting analysis to determine cost-of-goods-sold for products provided by a large Canadian retail services company, determined the adequacy of the financial statement audit performed by a large national public accounting firm, determined the financial statement impact of alleged fraudulent accounting transactions, investigated financial statement presentation issues in connection with defense of public company CEO indicted by the DOJ, performed forensic accounting on the point of origin of accounting entries, calculated lost revenue/income from breach of contract, performed assessment of management accounting estimates, analyzed corporate transactions for compliance with GAAP, performed comparative analysis of corporate financial misstatements, and identified accounting issues related to financial statement misstatements.

Dr. Wertheim has presented papers at numerous professional accounting and finance conferences and has authored numerous articles published in a number of leading professional and academic journals. He is a member of the American Accounting Association, the American Institute of Certified Public Accountants, the Texas Society of CPAs, the Association of Certified Fraud Examiners, and the Institute of Management Accountants.

Dr. Wertheim is a Certified Public Accountant, Certified Management Accountant, Certified Forensic Accountant, Certified Fraud Examiner, and is certified in Financial Management. Dr. Wertheim has a BBA in Accounting from Texas A&M University, an MBA in Business from Abilene Christian University, and both an M.S. in Accounting and Ph.D. in Accounting and Finance from the University of Kansas. He is currently a Special Consultant for National Economic Research Associates, Inc., and is also a Professor of Accounting at Abilene Christian University, where he teaches courses in Advanced Auditing, Financial Accounting, Accounting, and Accounting Research.

## Education.

### University of Kansas

- *Ph.D., Accounting and Finance, 1986*
- *M.S., Accounting, 1987*

### University of Manchester, Summer Institute in Business and Management

- *Certificate in International Business, 1983*

### Abilene Christian University

- *MBA, Business and Accounting, 1982*

### Texas A&M University

- *B.A., Accounting, 1979*

## Professional Certifications and Activities.

- *Certified Public Accountant, CPA*
- *Certified Management Accountant, CMA*
- *Certified in Financial Management, CFM*
- *Certified Fraud Examiner, CFE*
- *Certified Forensic Accountant, Cr.FA*
- *Member, American Accounting Association*
- *Member, American Institute of Certified Public Accountants*
- *Member, Texas Society of Certified Public Accountants*
- *Member, Association of Certified Fraud Examiners*
- *Member, Institute of Management Accountants*

## Professional Experience.

- 2008-present   **NERA Economic Consulting**
  *Special Consultant*
  Conduct financial investigation, financial accounting, GAAP, SEC, cost accounting, and loss causation analyses, auditing, and econometric studies for complex litigations and class actions.

- 2005-2008 **Berenblut Consulting, Inc.**
  *Principal*
  Business valuation, financial investigation, economic analysis, and SEC and accounting regulation compliance for complex claims for the legal and business communities and to government.

- 2000-present **Abilene Christian University**
  *Professor of Accounting, College of Business Administration*
  Teach undergraduate classes in financial accounting and intermediate accounting, and graduate classes in advanced auditing and accounting research.

- 1994-2000 **CMA Review Preparation**
  *Corporate Instructor*
  Taught courses to corporate executives related to preparation for the CMA and CFM certification exams. Areas of instruction included all areas covered on the CMA and CFM exams. Clients included Los Angeles Dept. of Water and Power and Los Angeles Chapters of the Inst. of Management Accountants.

- 1993-2000 **Pepperdine University**
  *Professor of Accounting, Division of Business*
  Taught undergraduate classes in financial accounting, cost accounting, accounting information systems, intermediate accounting, corporate tax, and auditing. Also served as Faculty Advisor for the Student Accounting Society.

- 1990-1993 **East Carolina University**
  *Assistant Professor of Accounting, Department of Accounting*
  Taught undergraduate classes in financial accounting, intermediate accounting, financial statement analysis, and advanced accounting. Taught graduate class in Accounting Theory.

- 1986-1990 **Abilene Christian University**
  *Assistant Professor of Accounting, College of Business Administration*
  Taught undergraduate classes in financial accounting, managerial accounting and intermediate accounting. Served as faculty sponsor for the Accounting Society.

- 1982-1985 **University of Kansas**
  *Instructor, School of Business*
  Taught classes in introductory financial and managerial accounting. Also served as Graduate Research Advisor and worked on research projects commissioned by the Department of Revenue for the State of Kansas.

- 1980-1982 **Dixon Drilling Company**
  *Company Controller*
  Cost accounting and cost analysis, financial statement preparation, supervision of payroll and receivables personnel, coordination with the Parent Company of all inter-company transactions, internal auditing, and coordination of activities with external auditors.

## Selected Project Experience.

- Advised clients on matters related to various GAAP and IFRS requirements, including:
  - Determination of proper accounting treatment under both US GAAP and IFRS
  - GAAP and SEC accounting and reporting requirements for estimation of loan loss reserves, impairment of related assets, and releases of reserves
  - Requirements involved in accounting and reporting for special purpose entities
  - Revenue recognition from barter transactions and other nonmonetary transactions
  - Direct and indirect guarantees of indebtedness of others
  - Contingent liabilities
  - Related party transactions
  - Application of SFAS 133 as it relates to accounting for and reporting of derivative/hedging activities
  - Analyzing the "judgment" allowed in both the general and specific application of accounting principles
  - Revenue recognition criteria for deferred revenue transactions
  - General revenue recognition criteria

- Determined the financial statement impact of alleged fraudulent accounting transactions

- Investigated financial statement presentation issues in connection with defense of public company CEO indicted by the DOJ

- Performed forensic accounting on the point of origin of accounting entries

- Calculated lost revenue/income from breach of contract

- Assessment of management accounting estimates

- Analyzed transaction accounting for compliance with US GAAP and IFRS

- Performed comparative analysis of corporate financial misstatements

- Identified accounting issues related to financial statement misstatements

- Performed restatement of financial statements subject to accounting errors

- Performed cost accounting analysis to determine average costs of services for a retail financial services company

- Examined management reliance on external accounting guidance and internal controls

- Assisted counsel with witness depositions on topics involving auditing and accounting

# Publications.

**Journal Articles:**

"The Effect of Multiple Directorships on a Board of Directors' Corporate Governance
     Effectiveness." *International Journal of Corporate Governance*, (2013).

"Evidence on the Effect of Financial Distress on Type II Audit Errors," *Journal of Applied Business
     Research*, (2011).

"Audit Firm Differences in the Issuance of Going Concern Opinions Prior to Client Bankruptcy,"
     *Journal of Accounting and Finance Research*, (2007).

"Market Reactions to Company Layoffs: Evidence on the Financial Distress Versus Potential Benefit
     Hypotheses and the Effect of Predisclosure Information" *Journal of Applied Business
     Research*, (2004).

"The Effect of a Firm's Financial Condition on the Market Reaction to Company Layoffs,"
     *Journal of Applied Business Research*, (2000).

"The Market Perception of Convertible Debt Versus Straight Debt: Some Empirical Evidence from
     US Firms and Non-US Firms Listed in the US," *Journal of International Financial
     Management and Accounting*, (1999).

"Institutional Portfolio Composition: An Examination of the Prudent Investment Hypothesis,"
     *Quarterly Review of Economics and Finance*, (1998).

"Corporate Downsizing and Shareholder Wealth: An Examination of the Short-Term and Long-
     Term Stock Price Reactions to Announcements of Company Layoffs," *Distresses Business
     and Real Estate Newsletter*, (1998).

"Earnings Forecasts and Institutional Demand for Common Stock," *Journal of Applied Business
     Research*, (1997).

"The Future of Redeemable Preferred Stock," *Bank Investor*, (1997).

"Examining the Impact from the Repeal of the Stock-for-Debt Exception," *American Bankruptcy
     Institute Law Review*, (1995).

"An Intuitive Appeal for the Correct Calculation of Present Value-Based Measurements in
     Accounting," *Journal of Accounting Education*, (1995).

"The Common Stock Equivalency of Liquid Yield Option Notes: Some Surprising Results," *Journal
     of Corporate Accounting and Finance*, (1994).

"An Examination of the Effect of the Repeal of the Stock-For-Debt Exception," *Tax Notes*, (1993).

"Redeemable Preferred Stock:  An Endangered Financial Instrument?" *Journal of Business and
     Economic Perspectives*, (1994).

"Key Financial Ratios Foretell Hospital Closure," *Healthcare Financial Management*, (1993).

"Issues in Forecasting Company Liquidity," *Business Credit*, (1993).

"Earnings Versus Cash Flow: The Information Provided About Changes in Company Liquidity," *Journal of Applied Business Research*, (1993).

"Development of a Prediction Model for Hospital Closure Using Financial Accounting Data," *Decision Sciences*, (1993).

"Proposed Reclassification of Redeemable Preferred Stock: The Impact on Financial Ratios," *Journal of Corporate Accounting and Finance*, (1992).

"Redeemable Preferred Stock: Proposed Changes Could Affect Key Ratios," *Business Credit*, (1992).

"Characteristics That Affect the Market Value of Beach Lot Property," *The Real Estate Appraiser*, (1992).

"A Test of the Accuracy of State Tax Valuation Models for Depreciable Assets," *The Journal of the American Taxation Association*, (1990).

"Accounting Policy Choice:  An Examination of the Relationship Between Selected Variables and Inventory Accounting Method," *The Midwestern Journal of Business and Economics*, (1990).  "Forecasting Cash Flow by Industry," *The Journal of Business Forecasting*, (1990).

**Academic Textbooks:**

*Managerial Accounting I*, a study manual used by students in the correspondence course for Managerial Accounting at the University of Kansas, 1984.  Manual covered topics in cost accounting, managerial accounting and cost analysis.

## Speeches, Academic Presentations, and Reports.

"The Effect of Time Requirements on a Board of Directors' Corporate Governance Effectiveness." Annual International Vincentian Business Ethics Conference, October, 2010.

"Evidence on the Effect of Financial Distress on Type II Audit Errors."  Annual Meeting of the Southwest Region Decision Sciences Institute, Dallas, TX, March, 2010.

"Industry Differences in the Level of Auditor Conservatism."  Annual Meeting of the Academy of Accounting, Finance and Economics, December, 2009.

"Reasonableness of the Auditor's Responsibility to Assess Going Concern for a Period Not to Exceed One Year." Annual Meeting of the Academy of Accounting, Finance and Economics, December, 2009.

"The Association Between Financial Distress and Going Concern Opinions."  Annual Meeting of the Academy of Accounting, Finance and Economics, December, 2008.

"Evidence on the Persistence of Increased Auditor Conservatism Post Sarbanes-Oxley." Annual Meeting of the Academy of Accounting, Finance and Economics, December, 2008.

"A Descriptive Study of Differences Among Audit Firms Whose Clients Issue Financial Statement Restatements." Institute for Business and Finance Research, 2007.

"Did the Sarbanes-Oxley Act Improve Auditor Effectiveness in Issuing Going Concern Opinions for Clients Filing Bankruptcy?" Institute for Business and Finance Research, 2007.

"Examination of Cross-Sectional Differences in Financial Performance of Public Companies Emerging from Chapter 11 Bankruptcy." American Academy of Accounting and Finance, 2005.

"Auditor Independence and the Issuance of Going Concern Opinions Prior to Client Bankruptcy: Did the Sarbanes-Oxley Act Improve Audit Independence?" American Academy of Accounting and Finance, 2005.

"Does the Chapter 11 Process Really Provide an Opportunity for Companies to Succeed?" American Academy of Accounting and Finance, 2004.

"Application of a Genetic Programming Model in Analyzing Audit Firm Differences in the Propensity to Issue Going Concern Audit Opinions Prior to Client Bankruptcy," American Academy of Accounting and Finance, 2004.

"Market Reactions to Company Layoffs: Evidence on the Financial Distress Versus Potential Benefit Hypotheses." Southwest Regional Meeting of the American Accounting Association, 2003.

"Is Arthur Andersen Alone: A Descriptive Study of Audit Firm Differences in the Propensity to Issue Going Concern Opinions Prior to Client Bankruptcy." Southwest Regional Meeting of the American Accounting Association, 2003.

"Stock Price Reactions to Corporate Downsizing: The Effect of Predisclosure Information." Southwest Regional Meeting of the American Accounting Association, 2001.

"Layoff Announcements and Shareholder Wealth: Evidence Concerning the Financial Distress Versus Potential Benefits Hypotheses." Western Regional Meeting of the American Accounting Association, 1999.

"Using Equity Valuation Models to Measure the Underlying Characteristics of Intangibles and Financial Instruments: Providing Guidance in Resolving Differences in Multi-National Reporting." Internal Accounting Research Conference of the International Association for Accounting and Education Research, Warwick Business School, Warwick, England, 1996.

"Using Equity Valuation Models to Measure the Underlying Characteristics of Intangibles and Financial Instruments." Annual Meeting of the American Accounting Association, 1996.

"Equity Valuation: Measuring the Market's Perception of Redeemable Preferred Stock as Debt Versus Equity." Annual Meeting of the Western American Accounting Association, 1996.

"Debt Versus Equity: The Market's Perception of Redeemable Preferred Stock." Annual Meeting of the Decision Sciences Institute, 1995.

"The Market Perception of Convertible Debt: Some Empirical Evidence." Annual Meeting of the American Accounting Association, 1995.

"Examining the Usefulness of Alternative Measure used in Determining Owner Versus Management Control." Decision Sciences Institute, 1995.

"Convertible Bonds and the Impact on Equity Valuation: Evidence on the Issue of Debt Versus Equity." Western Region Decision Sciences Institute, 1994.

"Earnings Forecasts and Institutional Demand for Common Stock." Southern Finance Association Meeting, 1994.

"Institutional Demand for Common Stock." Western Economic Association International Annual Conference, Vancouver, BC, 1994.

"Institutional Demand for Common Stocks: An Examination of the Financial Characteristics Affecting Investment Decisions." National Meeting of the Decision Sciences Institute, 1993.

"Debt Versus Equity Instruments and the Potential Impact of Reclassification: The Case of Redeemable Preferred Stock." National Meeting of the Decision Sciences Institute, 1993.

"Accounting for Redeemable Preferred Stock:  The Financial Statement Impact of Proposed Reclassification." Southeast Regional Meeting of the American Accounting Association, 1993.

"The Effect of Earnings Announcement Date on the Relationship Between Unexpected Earnings and Unexpected Security Returns." Southeast Regional Meeting of the American Accounting Association, 1993.

"Changes in Company Liquidity and the Information Provided by Earnings Versus Cash Flow." Research Forum of the Annual Meeting of the American Accounting Association, 1992.

"The Relative Performance of Alternative Measures Used in Determining Owner Versus Management Control." Southeast Regional Meeting of the American Accounting Association, 1992.

"The Effect of Firm Specific Characteristics on the Relationship Between Earnings and Cash Flow." Annual Meeting of the American Accounting Association, 1991.

"The Information Content of Earnings Versus Cash Flow in Explaining Changes in Company Liquidity." Annual Meeting of the Decision Sciences Institute, 1990.

"The Effect of Firm Specific Characteristics on the Relationship Between Earnings and Cash Flow." Southeast Regional Meeting of the American Accounting Association, 1991.

"Development of a Prediction Model for Hospital Closure Using Financial Accounting Data." Annual Meeting of the Decision Sciences Institute, 1990.

"The Relationship Between Actual Reported Cash Flow From Operations and Common Accounting Proxies for Cash Flow." Northeast Regional Meeting of the American Acct. Association, 1990.

"Forecasting Annual Cash Flow From Operations Using Naïve Prediction Models." Southwest Regional Meeting of the American Accounting Association, 1990.

"Industry Classification and the Relative Performance of Naive Prediction Models in Forecasting Cash Flow From Operations." Annual Conference of the International Association of Business Forecasting, 1989.

"Selected Variables and the Use of Multi-Year versus Single-Year Data in the Analysis of Inventory Method Choice." Northeast Regional Meeting of the American Accounting Association, 1989.

"Trending:  An Evaluation of the Effectiveness of State Asset Valuation Models." Regional Meeting of the Decision Sciences Institute, 1988.

"Non-Constant Variables and the LIFO-FIFO Decision." Midwest Regional Meeting of the American Accounting Association, 1985.


## Expert Depositions

Deposition of Paul Wertheim in In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended, and in the Matter of a Plan of Compromise or Arrangement of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation, on behalf of Ernst & Young, Inc., Superior Court of Justice, Ontario, Canada, Court File No. 09-CL-7950 (April 3, 2014).

Deposition of Paul Wertheim in Nordion Inc. v. Applied BioSystems (Canada) Limited and Applied BioSystems, LLC, on behalf of Nordion, Inc., Superior Court of Justice, Ontario, Canada, Court File No. CV-11-436281 (May 30, 2014).

# Appendix B.    Materials Relied Upon

APPENDIX B – MATERIALS RELIED UPON

Below is a list of documents I have relied upon for the purpose of preparing this report.

1.   Debtor's Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement by and Among Nortel Networks Inc., the Supporting Bondholders, and the Bank of New York Mellon with Respect to the NNI Post Petition Interest Dispute and Related Issues.

2.   Preliminary Objection and Motion of the Monitor and the Canadian Debtors for an Adjournment of the Objection Deadline Concerning the U.S. Debtor's 9019 Motion and for Expedited Discovery.

3.   U.S. Debtors' Objection to the Motion of the Monitor and the Canadian Debtors for an Adjournment of the Objection Deadline Concerning the U.S. Debtors' 9019 Motion and for Expedited Discovery.

4.   Memorandum of Law of the Official Committee of Unsecured Creditors Regarding Entitlement of U.S. Creditors to PPI.

5.   Notice Pursuant to Section 12(d) of the Cross-Border Protocol of Filing of the Canadian Court's Endorsement Regarding Certain PPI Issues.

6.   Debtors' Request for Production of Documents Directed to the Monitors and the Canadian Debtors.

7.   Order Establishing Discovery Schedule and Other Procedures in Connection with the U.S. Debtors' 9019 Motion.

8.   Opening Brief of the Monitor and the Canadian Debtors Regarding PPI and Related Issues.

9.   Thirty-Fifth Report of the Monitor, dated January 28, 2010.

10.  Supplement to the Thirty-Fifth Report of the Monitor, dated January 21, 2010.

11.  One Hundred and Fourth Report of the Monitor, dated March 14, 2014.

12.  One Hundred and Eighth Report of the Monitor, dated September 24, 2014.

13.  Nortel Networks Corporation, Form 10-Q, for the Quarterly Period Ended June 30, 2012.

14.  Deposition of John Ray, September 15, 2014.

15.  Deposition of Michael Katzenstein, September 18, 2014.

16.  Expert Report of Jeffrey H. Kinrich, dated January 24, 2014.

17.  Expert Report on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtors Group, Report of Thomas Britven, dated January 24, 2014.

18.  Allocation of Sales Proceeds to the Nortel Debtor Groups, Rebuttal Report of Thomas Britven, dated February 28, 2014.

19. Demonstrative of Thomas Britven, dated June 5, 2014.

20. Excel Spreadsheet titled "Cash Summary," dated September 12, 2014, Bates-stamped NNC-NNL-PPI-000001.

21. Transcript of Telephonic Proceedings Before the Honorable Judge Kevin Gross, United States Bankruptcy Judge, dated July 24, 2014.

22. Monthly Operating Report No. 51, Nortel Networks Inc. et al, filed June 17, 2013.

23. Monthly Operating Report No. 52, Nortel Networks Inc. et al, filed August 12, 2013.

24. Monthly Operating Report No. 53, Nortel Networks Inc. et al, filed September 25, 2013.

25. Monthly Operating Report No. 54, Nortel Networks Inc. et al, filed October 24, 2013.

26. Monthly Operating Report No. 55, Nortel Networks Inc. et al, filed January 7, 2014.

27. Monthly Operating Report No. 56, Nortel Networks Inc. et al, filed February 21, 2014.

28. Monthly Operating Report No. 57, Nortel Networks Inc. et al, filed March 3, 2014.

29. Monthly Operating Report No. 58, Nortel Networks Inc. et al, filed March 24, 2014.

30. Monthly Operating Report No. 59, Nortel Networks Inc. et al, filed April 4, 2014.

31. Monthly Operating Report No. 60, Nortel Networks Inc. et al, filed April 30, 2014.

32. Transcript for Day 1 of the Proceedings of the Nortel Trial, dated May 12, 2014.

33. Transcript for Day 14 of the Proceedings of the Nortel Trial, dated June 6, 2014.

34. Transcript for Day 22 of the Proceedings of the Nortel Trial, dated September 22, 2014.

35. Transcript for Day 23 of the Proceedings of the Nortel Trial, dated September 23, 2014.

36. Transcript for Day 24 of the Proceedings of the Nortel Trial, dated September 24, 2014.

37. Documents Produced by Cleary Gottlieb Steen & Hamilton LLP in Response to a Request for Documents Concerning the U.S. Debtor's Proposed Settlement Agreement Relating to the Bondholder PPI Issues, Bates-stamped NNI-PPI-00000001 to NNI-PPI-00002097.

38. Documents Produced by Milbank, Tweed, Hadley & McCloy LLP in Response to a Request for Documents Concerning the U.S. Debtor's Proposed Settlement Agreement Relating to the Bondholder PPI Issues, Bates-stamped BHG-PPI-0000001 to BHG-PPI-0000253.

39. Sixty-Seventh Interim Application of Cleary Gottlieb Steen & Hamilton LLP, as Attorneys for Debtors and Debtors-in-Possession, for Allowance of Interim Compensation and for Interim Reimbursement of all Actual and Necessary Expenses Incurred for the Period July 1, 2014 through July 31, 2014, filed August 28, 2014.

40. Proof of Claim #8761 filed by the Pension Benefit Guaranty Corporation on July 7, 2014, amending Proof of Claim #4736, on September 29, 2009.

41. Proof of Claim #8762 filed by the Pension Benefit Guaranty Corporation on July 7, 2014, amending Proof of Claim #4737, on September 29, 2009.

42. Proof of Claim #8763 filed by the Pension Benefit Guaranty Corporation on July 7, 2014, amending Proof of Claim #4735, on September 29, 2009.

43. Proof of Claim #8760 filed by the Pension Benefit Guaranty Corporation on July 7, 2014, amending Proof of Claim #4738, filed on September 29, 2009.

44. Statement of Solus Alternative Asset Management LP and Macquarie Capital (USA) Inc., filed August 29, 2014.