## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
                                       :
In re                                  :        Chapter 11
                                       :
Nortel Networks Inc., et al.,          :        Case No. 09-10138(KG)
                                       :        Jointly Administered
                                       :
                    Debtors.           :        Re D.I. 14476, 14535
                                       :        Hearing Date: Nov. 7, 2014 at 12:00 p.m.
                                       :
-----------------------------------------------------------x
```

## OBJECTIONS TO NORTEL'S MOTION FOR RELIEF UNDER SECTION 105(a) BY TIME WARNER CABLE INC. AND TIME WARNER CABLE ENTERPRISES LLC

Time Warner Cable Inc. and Time Warner Cable Enterprises LLC (together, "TWC"), by and through their undersigned counsel, hereby oppose the motion filed by Nortel Networks, Inc. ("NNI"),[1] pursuant to Sections 105(a), 107(b), 362(a), and 541 of the Bankruptcy Code and Bankruptcy Rule 9018, for the entry of an order: (a) enforcing and/or extending the automatic stay, (b) enforcing, in the context of these third-party subpoenas, provisions in the Court's previous sale orders, protective orders, and  confidentiality orders, (c) entering a protective order, and (d) granting related relief under Section 105(a) of the Bankruptcy Code.

### INTRODUCTION

NNI requests that this Court grant *hundreds* of injunctions under the guise of requesting a stay of third-party discovery, which is on its own an unwarranted and extraordinary request. NNI's proposed order would enjoin TWC from requesting document discovery and deposition

---

[1] D.I. 14476.

testimony necessary to defend itself against patent infringement claims based entirely on patents that NNI sold to a patent assertion entity *with full knowledge that those patents would soon be asserted in litigation*.  That patent assertion entity, Rockstar,[2] was designed to litigate NNI's patents and it has unsurprisingly filed lawsuits based on technology that NNI and its affiliates (collectively, "Nortel") allegedly developed and patented, including a lawsuit against TWC in the Eastern District of Texas (the "Rockstar Litigation").[3]    Because Nortel originated the patents-in-suit and held them for many years,[4] TWC served a third-party subpoena on NNI on June 9, 2014.    TWC sought documents concerning Nortel's alleged development and commercialization of the technology described in the patents-in-suit and Nortel's valuation and historical enforcement of the patents.  The evidence that TWC seeks from NNI is central to the claims and defenses in the Rockstar Litigation, and NNI has decided that it does not want to produce it.

Instead of requesting that this Court stay the Rockstar Litigation until NNI completes the bankruptcy process, NNI requests that this Court let the Rockstar Litigation proceed but block TWC from acquiring necessary document discovery and deposition testimony from NNI, its affiliates, and many other non-debtor parties central to the Rockstar Litigation.[5]  NNI's proposed order would interfere significantly with the Rockstar Litigation by burdening TWC to the benefit of Rockstar, the entity that is run by several former Nortel executives and that paid Nortel

---

[2] "Rockstar" refers to five interconnected companies:  Rockstar Bidco LP, Rockstar Bidco GP LLC, Rockstar Consortium US LP, Rockstar Consortium LLC, and Rockstar Consortium US LP's litigation subsidiary, Constellation Technologies LLC.

[3] *Constellation Techs. LLC v. Time Warner Cable Inc., et al.*, No. 2:13-cv-01079-RSP (E.D. Tex.).

[4] Nortel held certain patents for *more than a decade*.  *See*. U.S. Patent No. 6,128,649.

[5] Counsel to NNI has confirmed that it intentionally omitted any duration for the "stay" because it intends for the "stay" to remain in place until the "wind-down of NNI is complete."  Guzior Decl. Ex. 14.

$4.5 billion of the $7.3 billion raised in liquidation. That proposed order would thwart TWC's development of a full factual record in its defense just as fact discovery in the Rockstar Litigation is ramping up:  an ESI order was only recently entered in the Rockstar Litigation,[6] substantial completion of document discovery is required in January 2015, and all fact discovery ends in May 2015.[7]

TWC is not prosecuting *any* claims against NNI, its affiliates, or even a non-debtor party with some relationship to NNI.  TWC is not asking this Court to lift any stay or for any other relief in these Chapter 11 proceedings.  TWC is *defending* itself against patents – and, in reality, lawsuits – that NNI sold to Rockstar.  TWC has no control over the prosecution of the Rockstar Litigation and therefore is not the originating source of the need for discovery from NNI.  In the context of the Rockstar Litigation, a stay of discovery from NNI – tantamount to an injunction that blocks the defendants from fully defending themselves – is unconscionable, and the numerous other substantive limitations that NNI's proposed order would impose on TWC are even more unconscionable and raise serious Due Process concerns because they deprive TWC of defenses.

Critically, if NNI truly wants only a *delay* of its discovery obligations until its bankruptcy is complete, ***TWC has no objection to this Court staying the Rockstar Litigation until NNI is ready to proceed***.  TWC has offered to join NNI in requesting a stay of the Rockstar Litigation, but NNI declined that offer because it does not "wish" to seek that relief, ***although it does not "oppose" it***.[8]  Presumably, NNI's historical and financial relationship with Rockstar prevents it

---

[6] The ESI Order is Exhibit 6 to the Guzior Decl.

[7] The Docket Control Order, which provides relevant deadlines in the Rockstar Litigation, is Exhibit 5 to the Guzior Decl.

[8] Guzior Decl. Ex. 14.

from seeking that more common and fair remedy. This Court, however, should not stay discovery from NNI without staying or enjoining the Rockstar Litigation. [9]

## SUMMARY OF THE ARGUMENT

There are four specific reasons why this Court should deny NNI's motion:

*First*, NNI misrepresents TWC's discovery requests and omits important information about the advanced negotiations between NNI and TWC concerning NNI's response to TWC's subpoena. As described in detail below, TWC has substantially narrowed its document requests to *five categories* of documents that, to the extent any responsive documents exist, are uniquely in the possession of Nortel: (1) trial exhibits from the allocation proceedings, (2) five relevant deposition transcripts from the allocation proceedings, (3) internal bid evaluation documents, (4) internal documents concerning historical enforcement of Nortel's patents and valuation of Nortel's patents, and (5) technical documents concerning development and commercialization of technologies related to the patents-in-suit. TWC has also *already agreed* to seek Patent Related Documentation, as defined in NNI's proposed order, from Rockstar, and so paragraph 5 of the proposed order and many of NNI's complaints in its motion[10] are moot. But TWC's defenses to liability and remedies are not limited to what NNI has defined as Patent Related Documentation, and that is why TWC seeks the additional material referenced above. Moreover, in response to the categories of documents that TWC identified, NNI submitted to TWC a protocol for document production and a search of electronically stored information ("ESI") that is significantly broader than what NNI discloses in its motion. TWC's *actual* discovery requests

---

[9] As discussed in detail below, this Court has authority to enjoin the Rockstar Litigation because it has authority to enforce its own orders, and this Court's order approving the Asset Sale Agreement expressly provides that this Court can "provide any further relief that is necessary or appropriate in furtherance of this Order or the Transactions." *See* D.I. 5935 ¶ 39. Also, if NNI's arguments are correct, this Court can simply "extend the automatic stay" to the Rockstar Litigation as an administrative matter that does not require an adversary proceeding.

[10] *See* D.I. 14476 ¶¶ 3, 9, 20, 23, 61-66, 74.

do not impose a significant burden on NNI, and TWC has already made great efforts to address every concern that NNI now raises in its motion.

*Second*, NNI provides no sound statutory authority or precedent for the Court to enter NNI's proposed order, even assuming NNI genuinely sought only a *stay* of discovery.  NNI argues that the Court's authority derives from: (1) the automatic stay, pursuant to Section 362(a) of the Bankruptcy Code, (2) the Court's existing protective order and/or case management orders, (3) section 107(b)(1) of the Bankruptcy Code and/or Bankruptcy Rule 9018, which concern the Court's authority to protect confidential information, (4) Section 105(a) of the Bankruptcy Code, or (5) "international comity".  Each argument fails for the reasons explained below.  Most importantly, however, NNI is not entitled to equitable relief under Section 105(a) because it has not established that this case presents "unusual circumstances" or that fulfilling its third-party discovery obligations will "thwart or frustrate [its] reorganization" – the burden NNI must carry for this Court to grant stay or other injunctive relief directed at non-debtor litigation.[11] Additionally, no statutory authority or precedent supports an order that *substantively limits* the discovery that TWC is allowed to receive in an unrelated patent litigation in the Eastern District of Texas.  *Residential Capital*,[12] the centerpiece of NNI's motion, did not grant such an order; conversely, that decision stands for the opposite proposition that the bankruptcy court must defer to the district court on the appropriate scope of discovery.[13]

---

[11] Again, TWC is not asking this Court to lift any stay and TWC does not require any relief from this court to proceed with third-party discovery. In this case, NNI is requesting affirmative relief under Section 105(a), and the burden falls entirely on NNI.  *See In re Residential Capital, LLC*, 480 B.R. 529, 541, 544 (Bankr. S.D.N.Y. 2012); *Wedgewood Investment Fund, Ltd v. Wedgewood Realty Group, Ltd. (In re Wedgewood Realty Group, Ltd.)*, 878 F.2d 693, 700-701 (3d Cir. 1989).

[12] *In re Residential Capital, LLC*, 480 B.R. 529, 541, 544 (Bankr. S.D.N.Y. 2012).

[13] Discovery from NNI is relevant to, at least: (1) invalidity of the patents-in-suit, (2) identification of prior art systems and products, (3) notice and marking, (4) a laches defense to patent infringement, (5) damages, including application of the so-called *Georgia-Pacific* factors to determine a reasonable royalty, (6) claim construction,

*Third*, the scope of NNI's proposed order is not rationally connected to the factual assertions and legal arguments that NNI makes in its motion.  Apart from not providing any legal support for the Court to substantively limit TWC's discovery, NNI does not provide any factual or legal support for extending the proposed order to hundreds of former Nortel employees, many of which are central to the Rockstar Litigation.  If NNI's proposed order is granted, TWC would be barred from deposing: (1) ***each named inventor*** of the six patents-in-suit, (2) Nortel, the entity that purportedly developed the technology described by the patents-in-suit and that owned the patents-in-suit for many years, and (3) several executives and employees of Rockstar, the current owner of the patents-in-suit, including its CEO, John Veschi.  In total, the proposed order, through the definition of "Former Employee," would block TWC from deposing at least *thirty* individuals that Rockstar disclosed to TWC as relevant witnesses pursuant to Federal Rule of Civil Procedure 26.[14]  NNI provides no reason why TWC should not be able to depose, unimpeded, those highly relevant witnesses.  NNI's proposed order also mandates cost shifting to TWC without *any* analysis of the three-factor test that federal courts uniformly apply to determine whether cost shifting is appropriate under Federal Rule of Civil Procedure 45.  Under a proper analysis, as discussed below, complete cost shifting is not warranted here, and that question should be reserved for the district court in light of the scope of the discovery that NNI ultimately provides.

*Fourth*, equitable considerations militate against granting relief under Section 105(a).  NNI does not truly request only a *delay* of its discovery obligations in order to focus on the

---

(7) non-infringement defenses, (8) prior art analysis, (9) inequitable conduct, and (10) secondary considerations for patent obviousness.

[14] The initial disclosures document is Exhibit 7 to the Guzior Decl.  Constellation's Disclosure of the Most Significant Email Custodians is Exhibit 15 to the Guzior Decl.  At least *nine* of the fifteen listed custodians on that second document are "Former Employees" of Nortel.

bankruptcy proceedings.  That is plain from NNI rejecting TWC's proposal that the parties jointly request that that the Court "extend the automatic stay" to the Rockstar Litigation.  Instead, NNI wants the Court to enter an order that will harm TWC in discovery and help Rockstar in its litigation against TWC.  It would be unconscionable for this Court to force TWC to proceed as a defendant in a patent infringement lawsuit **on patents that NNI sold to Rockstar for the purpose of litigation** while blocking TWC's access to important evidence from NNI and other parties. That is particularly true because NNI can provide unique discovery that is critical to certain of TWC's equitable and legal defenses, *e.g.*, invalidity, laches, and damages.

Additionally, it is important to note that any burden that NNI bears in responding to these subpoenas is entirely NNI's own making.  Nearly two-thirds of the funds NNI has raised in liquidation are attributable to NNI's sale of its patent portfolio to Rockstar, an entity that was created for the *purpose of litigation*.  That Rockstar would bring suit against many entities that would need discovery from NNI was entirely foreseeable at the time this Court ratified the sale. There is nothing unfair about NNI responding to entirely foreseeable discovery requests.

*Finally*, if the Court is inclined to grant relief to NNI due to the pending bankruptcy, the Court should simply stay or enjoin the Rockstar Litigation.  A stay of the Rockstar Litigation addresses NNI's purported concerns – NNI will not need to respond to third-party discovery requests during the conclusion of its bankruptcy – and addresses TWC's grave concerns that it will have to defend against patent infringement claims without important evidence from NNI and other non-debtor parties.   Additionally, Rockstar is a patent monetization vehicle, not a productive company, and so a stay of the Rockstar Litigation will merely delay Rockstar's monetization of Nortel's patents for a matter of months.

Moreover, as opposed to NNI's unprecedented proposed order, it is clear that this Court can enjoin or stay the Rockstar Litigation by exercising its authority to enforce its own orders.[15] In this Court's order approving the Asset Sale Agreement between Rockstar and Nortel, this Court expressly reserved the power to "provide any further relief that is necessary or appropriate in furtherance of this Order or the Transactions."[16]  NNI has told this Court in its motion that Rockstar *threatened* NNI with "post-petition liability" because compliance with third-party discovery requests could be a "material" breach of "the Asset Sale Agreement between Rockstar and Nortel" and that "Rockstar clearly has raised the risk of potential post-petition liability for NNI's estate should NNI fail, *even inadvertently*, to shield from disclosure information *that Rockstar **considers** confidential and/or privileged*."[17]  Given those threats, which raise serious questions about the Asset Sale Agreement, this Court plainly has authority to enter an order to show cause why the Rockstar Litigation should not be stayed pending: (1) the completion of Nortel's bankruptcy process and (2) a further order from this Court on how NNI can provide full and fair discovery, safe from Rockstar's obstructionist threats that NNI's compliance with legitimate discovery requests is a "material" breach of the Asset Sale Agreement.  To be clear, the Court's authority to do that derives entirely from its prior order approving the Asset Sale Agreement and the Court could award that relief *sua sponte* by virtue of its express reservation of jurisdiction and power to grant remedies related to the Asset Sale Agreement.  In addition to advancing the interests of the Asset Sale Agreement, a stay or injunction that merely delays the Rockstar Litigation until the conclusion of Nortel's bankruptcy is the *simplest and fairest* way to

---

[15] NNI agrees in its motion that the Court has authority to enforce its own orders.  D.I. 14476 ¶¶ 95-100.

[16] D.I. 5935 ¶ 39.

[17] D.I. 14476 ¶¶ 77-78 (emphasis added).

accommodate all parties if the Court were inclined to grant NNI any relief. It is not fair to obstruct fair and full discovery from NNI – and, in essence, enjoin TWC from defending itself in the Eastern District of Texas – in capitulation to Rockstar's bad faith threats. [18]

If the Court were to conclude that third-party discovery from NNI should proceed, this Court can facilitate NNI's response to TWC's subpoena by at least addressing the spurious confidentiality objections that have prevented full and fair discovery from NNI. Rockstar's threats, described above, are unwarranted and inappropriate, especially because Rockstar has agreed to the protective order that was entered in the Rockstar Litigation, and TWC has agreed that all of NNI's productions could be blanket designated for the highest level of confidential treatment under that order.[19] Furthermore, that protective order contains a standard clawback provision for inadvertently produced material. TWC has raised those issues with NNI many times and TWC has also explained to NNI that this Court's protective order[20] provides clear guidance on how NNI should deal with "Producing Parties," as defined in this Court's protective order. In response, NNI has expressly refused to follow the procedure set forth in Section 9 of this Court's protective order. TWC respectfully submits that this Court's input on those issues could be beneficial to alleviating any burden that NNI perceives because of purported "confidentiality" issues.

TWC will address each of those points in detail below, but TWC first provides an introduction to the Rockstar Litigation and the importance of discovery from Nortel.

---

[18] Additionally, if NNI's argument is correct, this Court can "extend the automatic stay" to the Rockstar Litigation as an administrative matter without an adversary proceeding.

[19] A copy of the protective order that was entered in the Rockstar Litigation is Exhibit 4 to the Guzior Decl.

[20] D.I. 10805-3.

## I. NORTEL IS A CENTRAL FIGURE IN THE ROCKSTAR LITIGATION AND POSSESSES UNIQUE EVIDENCE CRITICAL TO TWC'S DEFENSES.

Unsurprisingly, Nortel is a central figure in the Rockstar Litigation despite not being a party to it. Rockstar boasts about the innovations at Nortel and claims to inherit its legacy, including its facilities in the United States. Indeed, those representations are a central feature in its patent enforcement campaign.[21] The complaint that Rockstar filed in the Rockstar Litigation states the following:[22]

> 9.     Nortel was a multinational telecommunications and data networking equipment manufacturer headquartered in Ontario, Canada. It was founded in Montreal, Quebec in 1895. At its peak, Nortel employed over 94,500 workers worldwide.
>
> 10.     Nortel was the source of many of the most important innovations in history in the field of telecommunications and networking. Between 1992 and 2009, Nortel spent over 34 billion dollars on research and development conducted at centers across North America.
>
> 11.     In 2011, a group of some of the most respected high technology companies in the world, including Apple, Microsoft, Ericsson, Sony, and Blackberry, stepped in to preserve as much of Nortel's exceptional patent portfolio as possible. This group created a consortium that would serve as the steward of the portfolio.

Similarly, Rockstar's opposition to TWC's motion to dismiss in the Rockstar Litigation opens as follows:[23]

> Constellation is a wholly-owned subsidiary of Rockstar Consortium US LP ("Rockstar"), the successor to a large portion of intellectual property that resulted from research and development at Nortel Networks ("Nortel"). Rockstar was formed by Apple, BlackBerry, Ericsson, Microsoft, and Sony.

---

[21] *See, e.g.,* Guzior Decl. Ex. 8.

[22] The complete complaint is Exhibit 2 to the Guzior Decl.

[23] The complete brief is Exhibit 3 to the Guzior Decl.

Nortel was a prolific innovator in the telecommunications industry.  As an example, Nortel was one of the first companies to envision telecommunications over fiber optics, and it led the industry's move to the current era of digital telecommunications.  Nortel's patent portfolio resulted from billions of dollars of research conducted by tens of thousands of employees over a period of decades.  In the year 2000 alone, Nortel spent nearly $4 billion on research and development with over 25,000 research-and-development employees (nearly 10,000 in the United States alone).

Nortel, due in no small part to its enormous research and development expenditures, eventually entered bankruptcy.  As part of that process, in 2011, a consortium of highly sophisticated technology companies (including Rockstar's founders) paid $4.5 billion for the Nortel patent portfolio, outbidding other technology giants including Google and Intel.  That cash infusion has helped Nortel discharge its commitments to its former employees.

Rockstar's owners assigned the majority of the patent portfolio to Rockstar.  Given the breadth and depth of Nortel's patent portfolio, Rockstar assigned certain groups of patents relating to particular technologies to different subsidiaries.  Rockstar assigned to Constellation many of the patents related to provisioning cable, telecommunications, and other multimedia services.  Constellation and its parent, Rockstar, are committed to ensuring that Nortel's innovations are available for licensing.

A substantial number of former Nortel employees and executives are current or former employees or executives of Rockstar.[24]  As but two examples, John Veschi, the current CEO of Rockstar, was the former Chief Intellectual Property Officer of Nortel and Gillian McColgan, the current CTO of Rockstar, was the former CTO of Nortel.[25]  Both Mr. Veschi and Ms. McColgan were heavily involved in the "stewardship" of the Nortel patents at Nortel and are currently heavily involved in the "stewardship" of the Nortel patents at Rockstar.  In total, *thirty* of the

---

[24] *See* D.I. 13551, 13553.

[25] *See* Guzior Decl. Ex. 9.

individuals identified by Rockstar on its initial disclosures of relevant witnesses in the Rockstar Litigation are former employees of Nortel.  To say that Nortel and Rockstar are related or that Nortel is an important third-party witness in the Rockstar Litigation is a significant understatement.[26]

TWC does not doubt the veracity of NNI's assertions that it transferred Patent Related Documentation, as defined in the Asset Sale Agreement,[27] to Rockstar.[28]  *But those assertions are irrelevant*.  As discussed below, TWC has agreed to seek Patent Related Documentation from Rockstar and to seek specific documents within Patent Related Documentation from NNI only if Rockstar cannot or will not produce them.   Given that agreement, TWC seeks from NNI that set of evidence that NNI refers to in its motion as the "percentage" of documents that it *did not* transfer to Rockstar.[29]

Documents that NNI did not transfer to Rockstar are likely to be particularly relevant to the claims and issues in the Rockstar Litigation.   Each of the six patents-in-suit in the Rockstar Litigation issued from patent applications filed from 1997 to 2004.  The patents-in-suit name Nortel employees as inventors and the patent applications were originally assigned to Nortel. With respect to those patents, TWC is entitled to the evidence in NNI's possession, custody, or control concerning: (1) the purported development by Nortel of the technology described in the patents and related technology, (2) Nortel's commercialization, if any, of the technology described in the patents and related technology, (3) Nortel's attempts to enforce or license the

---

[26] In the third-party discovery process there has also been a high level of coordination between NNI and Rockstar and a near-instantaneous transfer of information between Rockstar and NNI.  *See* Guzior Decl. Ex. 16 (highlighted).

[27] *See* D.I. 5935-1.

[28] *See* D.I. 14476 ¶¶ 3, 9, 20, 23, 61-66, 74.

[29] D.I. 14476 ¶ 2.

patents or its portfolio of patents, and (4) Nortel's valuation of the patents or its portfolio of patents. That is standard discovery in any patent litigation, and Nortel must have anticipated such discovery when it sold its patent portfolio to Rockstar for the purposes of litigation. It is common sense that Nortel must have *some* internal documents concerning its patents that it generated in the *twelve years* between 1997 and filing for bankruptcy protection and the additional two years between filing for bankruptcy and sale of the Nortel patent portfolio to Rockstar.[30]

Those categories of information are highly relevant, if not critical, to at least the following substantive issues in the Rockstar Litigation: (1) invalidity of the patents-in-suit, (2) identification of prior art systems and products, (3) notice and marking, (4) a laches defense to patent infringement, (5) damages, including application of the so-called *Georgia-Pacific* factors to determine a reasonable royalty, (6) claim construction, (7) non-infringement defenses, (8) prior art analysis, (9) inequitable conduct, and (10) secondary considerations for patent obviousness.

*Additionally, NNI has already produced to TWC unique evidence that is critical to its laches defense*, which evidences the need for further discovery from NNI. In an August 2010 presentation prepared by Nortel, Nortel makes the extraordinary admissions that: (1) Nortel historically ███████████████████████████████████████████████ (2) Nortel *decided* to make ████████████████████████████████████ (3) Nortel ██████████████████████████████████████████████ and, most importantly, (4) Nortel ███████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[30] Notably, during a September 23, 2014 meet and confer, NNI's counsel was unwilling to represent that all of Nortel's documents concerning the four topics listed above were transferred to Rockstar. Guzior Decl ¶¶ 30-31.

████████████████████████████████[31]  Those admissions are highly material to the proper amount and limitation of damages for any alleged infringement, and TWC would not have that evidence but for third-party discovery from NNI.  This type of material is only available from NNI, is not part of the "Patent Related Documentation" that TWC is obtaining from Rockstar, and is critical to TWC's defenses.

## II. TWC'S REQUESTS TO NNI ARE NARROWLY TAILORED TO IDENTIFY RELEVANT EVIDENCE THAT CANNOT BE OBTAINED FROM OTHERS.[32]

NNI devotes the vast majority of its motion to creating the appearance that TWC has made extraordinary discovery demands and that the discovery process is unmanageably complicated.  TWC, however, conscious of the fact that NNI is a debtor in bankruptcy, has suggested a manageable path forward to NNI, as outlined below.

Although NNI does not mention it anywhere in its motion, NNI and TWC have engaged in extensive conversations concerning the scope of NNI's response to TWC's subpoena over the past three months.  After extensive conversations, on September 14, 2014, NNI sent to TWC a proposal on the documents it was willing to produce and the ESI search it was willing to perform.[33]  On October 3, 2014, TWC sent NNI a counterproposal and a request for additional information.[34]  That counterproposal contains all of the details of where the parties stand as of the filing of this motion.  In summary, however, TWC seeks production of the following five categories of documents:

---

[31] Guzior Decl. Ex. 10 at NNI_TWC_00001934-5.

[32] Throughout its motion, NNI conflates discovery requests from TWC with discovery requests from other parties, such as Google, Inc. ("Google").  TWC does not know what positions Google has taken with respect to discovery from NNI, but, as explained in the following two sections of these objections, TWC has consistently narrowed its document requests and granted to NNI whatever accommodations it could consistent with its need to defend itself.

[33] NNI's document production proposal is Exhibit 11 to the Guzior Decl.

[34] TWC's document production counterproposal is Exhibit 12 to the Guzior Decl.  The cover e-mail is Exhibit 12A to the Guzior Decl.

1) <u>Trial exhibits from the allocation proceedings</u>.  NNI volunteered to produce all of the trial exhibits from the allocation proceedings, and NNI has already produced ten exhibits.  To alleviate any burden on NNI, TWC has agreed that NNI can produce the "public versions" of those exhibits and that TWC will identify specific confidentiality redactions that need to be lifted.[35]

2) <u>Deposition transcripts of Rockstar employees</u>.  NNI has represented that five current or former employees of Rockstar were deposed in the allocation proceedings.  NNI has *already* produced the deposition designations, but NNI's proposal includes production of the full transcripts.[36]  Those transcripts are highly relevant to the Rockstar Litigation because the depositions concern Nortel's patents and those same five individuals are likely to be deposed in the Rockstar Litigation.

3) <u>Bid evaluation documents</u>.  NNI has already identified three documents responsive to this request that it can produce.[37]  TWC requested that NNI additionally run a *single* search term as part of the ESI Search, as defined and described below.  Those documents are necessary because they relate to damages analysis and encumbrances on the Nortel patents.

4) <u>Patent valuation and enforcement documents</u>.  NNI and TWC agree that relevant documents should be identified following an ESI Search, as defined and described below, although they have not yet agreed on the full scope of the search.[38]  Those documents are necessary because they relate to (1) a laches defense to patent

---

[35] Guzior Decl. Ex. 12, pp. 1-2.

[36] Guzior Decl. Ex. 12, p. 2.

[37] Guzior Decl. Ex. 12, pp. 2-3.

[38] Guzior Decl. Ex. 12, pp. 3-6.

infringement, (2) damages analysis, including application of the so-called *Georgia-Pacific* factors, (3) claim construction, (4) non-infringement defenses, (5) prior art analysis, (6) secondary considerations for patent obviousness, and (7) encumbrances on the Nortel patents.

5) <u>Technical documents concerning development and commercialization of the technology described in the patents-in-suit and related technology</u>.   During a September 23, 2014 meet and confer concerning NNI's proposal, counsel to NNI explained that NNI did not have any employees remaining with technical knowledge sufficient to identify relevant documents.[39] *NNI requested* that TWC develop a list of technology search terms that could identify potentially relevant documents.[40]  NNI agreed to identify an appropriate data set against which to run those technology search terms, but it has not yet done so. TWC believes that this request can be integrated into the ESI Search, as defined and described below.  Those documents are necessary for: (1) damages analysis, including application of the so-called *Georgia-Pacific* factors and patent marking issues, (2) claim construction, (3) non-infringement defenses, (4) prior art analysis, (5) secondary considerations for patent obviousness, and (6) inequitable conduct.

With respect to the ESI Search, TWC's counterproposal suggests that the ESI Search should begin with the approximately 3 million documents that were collected for the allocation proceedings (the "Allocation Database"), a database to which NNI has easy access and that has

---

[39] Guzior Decl. ¶ 32.

[40] Guzior Decl. Ex. 12, p. 6.

robust searching and review capabilities.[41] TWC suggests that NNI run the General Search Terms[42] and Technology Search Terms,[43] which is a set of highly specific search terms related to the relevant technology that NNI *requested that TWC create*, against the Allocation Database. That might result in ten documents or that might result in one hundred thousand documents. Once the parties understand the volume of potentially relevant documents, TWC has agreed to work with NNI to narrow search terms, as appropriate, and craft privilege search terms that could alleviate any burden on NNI.[44] Whatever explanations NNI might raise for not searching additional data repositories available to it, there is no explanation for why NNI cannot quickly and efficiently search the Allocation Database, which was relied upon for the allocation proceedings and contains ESI for highly relevant custodians, such as John Veschi, Gillian McColgan, and Christopher Cianciolo.[45]

With respect to additional data repositories available to NNI – magnetic tapes and documents at Iron Mountain and data stored on Nortel's LiveLink system[46]– TWC has merely

---

[41] D.I. 14476 ¶¶ 32, 75.  NNI suggests that it cannot search that database to the extent material was produced by other parties.  That argument fails, however, because Section 9 of this Court's protective order specifically contemplates third-party subpoenas.  TWC is consistently baffled that NNI's document production has not simply followed Section 9 of this Court's protective order, which provides a sensible and efficient way to resolve these disputes.  Moreover, counsel to the Canadian Nortel entities at Allen & Overy have represented to TWC that they are fully cooperating with NNI for production of material from the Allocation Database.  Guzior Decl. ¶ 33, Ex. 17.

[42] Guzior Decl. Ex. 12, p. 13.  Notably, TWC's proposed search terms is a shorter and more focused list than NNI's proposed search terms.  *See* Guzior Decl. Ex. 12, pp. 12-13.

[43] Guzior Decl. Ex. 12, pp. 14-15.

[44] Guzior Decl. Ex. 12, pp. 4-5.

[45] NNI has identified to TWC the set of custodians for which it provided data to the Allocation Database.  *See* Guzior Decl. Ex. 12, pp. 3, 10.  TWC has requested that NNI identify whether it has access to a broader set of data for those custodians than was submitted to the Allocation Database.  If so, TWC wants to understand whether NNI can easily search that data.  TWC does not presently have any information that suggests a search would have to go beyond the Allocation Database.

[46] D.I. 14476 ¶¶ 53, 54, 57, 107(e).

asked for additional information about those repositories.[47] Contrary to the suggestions throughout NNI's motion, TWC has not made any demands that 142,000 magnetic tapes be restored or that 171,000 boxes of documents be scanned. TWC simply wants to understand: (1) what data has been destroyed or was not preserved, (2) what data has been retained, (3) what information the "catalogs" from Iron Mountain provide, and (4) why data from the LiveLink system cannot be searched and then extracted to a more manageable technology platform. With that information, TWC might be able to identify discrete sets of material that should be retrieved and searched, or might conclude that none of that material is sufficiently likely to be relevant to warrant the expense of retrieving, restoring, and searching it.[48] Moreover, that information standing alone (*e.g.*, the fact that data has been destroyed, as NNI suggests in its motion[49]) is highly relevant to TWC's laches defense and uniquely discoverable from Nortel.

## III. TWC HAS ALREADY MADE GREAT EFFORTS TO ADDRESS EACH OF THE CONCERNS THAT NNI NOW RAISES IN ITS MOTION.

As discussed above, TWC has significantly limited the scope of its discovery requests to five categories of documents. TWC has also proposed a manageable process for identifying responsive material. TWC's proposal addresses the vast majority of the concerns that NNI now raises in its motion, as explained below.

---

[47] Guzior Decl. Ex. 12, p. 5.

[48] As discussed above, NNI has also agreed to identify a relevant set of data against which to run the Technology Search Terms. To the extent NNI identifies a data set broader than the data in the Allocation Database, TWC would expect NNI to run the Technology Search Terms against that additional data.

[49] D.I. 14476 ¶ 53.

1. <u>The "number and breadth" of TWC's requests is not overwhelming.</u>[50]

As discussed above, TWC's document requests are limited to five categories of documents, the vast majority of which will be identified pursuant to an ESI Search protocol. TWC also requests limited sets of information concerning the additional data repositories available to NNI.

2. <u>NNI does not face "technical and practical limitations" to comply with TWC's requests.</u>[51]

As discussed above, TWC's ESI Search focuses on the Allocation Database, which provides robust search and review capabilities. Indeed, NNI's proposed search terms to TWC include advanced proximity search strings (*e.g.*, NEAR10) and NNI has represented that it can identify data in the Allocation Database on a custodian level.[52]

3. <u>TWC's requests will not burden NNI's remaining employees or bankruptcy counsel.</u>[53]

As discussed above, TWC's ESI Search focuses on the Allocation Database, which has already been assembled and extensively used in the allocation proceedings. NNI's employees will not be burdened with identifying sets of data to collect because all of the data has already been collected and posted to that database. Moreover, TWC's ESI Search will not burden NNI's bankruptcy counsel. TWC was notified on October 7, 2014, that Crowell & Moring LLP was retained to handle responses to third-party subpoenas and would be dealing with TWC moving forward.[54] NNI's bankruptcy counsel is thus free to focus entirely on "wrapping up" NNI's liquidation. Indeed, NNI concedes that NNI will rely "heavily on their professionals."[55]

---

[50] D.I. 14476 ¶¶ 3, 40.

[51] D.I. 14476 ¶¶ 3, 32, 57, 75.

[52] Guzior Decl. Ex. 12, pp. 3, 12.

[53] D.I. 14476 ¶¶ 3, 50, 51.

[54] Guzior Decl. Ex. 13.

Additionally, NNI neglects to mention that TWC has been incredibly respectful of NNI in terms of the timing of its discovery requests. After TWC served its subpoena on NNI on June 9, 2014, NNI explained to TWC that it was in the middle of a labor intensive portion of the allocation proceedings before this Court. TWC immediately granted to NNI an extension for responses and objections until July 14, 2014 (when NNI was comfortable responding consistent with the demands of the Chapter 11 proceedings) and TWC wished NNI "good luck with the trial."[56]

4.  <u>NNI will not necessarily need to construct "voluminous privilege logs."</u>[57]

As expressed in TWC's counterproposal letter to NNI, TWC has agreed to discuss methods for limiting the burden on NNI associated with privilege review and logging. TWC has suggested that the parties consider application of privilege search terms and is willing to discuss whether an "auto-generated privilege log," which would shift the burden to TWC to identify specific documents for closer review, is feasible.[58] TWC has also agreed that NNI does not need to re-review documents that were deemed privileged in the allocation proceedings.[59] If NNI would simply run search terms and gather information on approximate data volume, the parties could discuss – with numbers in front of them – how to limit any burden on NNI.

---

[55] D.I. 14476 ¶ 107(e).

[56] Guzior Decl. Ex. 1.

[57] D.I. 14476 ¶¶ 4, 19, 67-71.

[58] Guzior Decl. Ex. 12, p. 5.

[59] Guzior Decl. Ex. 12, p. 5.

5.  "Confidentiality" should not continue to obstruct this process.[60]

TWC takes seriously the protective and confidentiality orders entered in this Court and NNI's confidentiality obligations to certain other parties.  To that end, TWC has never requested that NNI violate any of those obligations.  Rather, TWC requests that NNI produce documents to TWC following the procedure set forth in paragraph 9 of this Court's protective order.[61]  NNI has refused to do that.[62]

NNI is also fully aware that there is a robust protective order in the Rockstar Litigation.  To further alleviate any purported burden on NNI, TWC has agreed that *every document* that NNI produces to TWC can be blanket designated for the highest level of confidential treatment under the protective order in the Rockstar Litigation.[63]  TWC has also agreed that inadvertently produced privileged *and confidential* documents can be clawed back under that same order.[64]

6.  TWC is not requesting that NNI produce Patent Related Documentation.[65]

As discussed above, NNI's repeated concerns that TWC is requesting documents from NNI that TWC can receive from Rockstar is wholly without merit.  TWC makes its position clear in its counterproposal letter to NNI.[66]

---

[60] D.I. 14476 ¶¶ 4, 26, 33-35, 37, 77-78.

[61] D.I. 10805-2.

[62] Guzior Decl. Ex. 18 (highlighted).

[63] Guzior Decl. Exs. 16, 19 (highlighted).

[64] Moreover, it appears that NNI's confidentiality concerns stem from highly inappropriate and obstructionist threats made by Rockstar, who agreed to the protective order that was entered in the Rockstar Litigation.  To the extent "confidentiality" is placing a burden on NNI and creating anxiety for NNI, that burden and anxiety is created solely by Rockstar.  Throughout this process, "confidentiality" has frankly been an incredibly obstructionist tactic, notwithstanding that there are legitimate confidentiality concerns that should be thoughtfully addressed.  As but one example, Rockstar has been "reviewing for confidentiality" for almost three months a set of approximately *nineteen* documents that TWC requested that NNI produce as a priority.  Guzior Decl. Exs. 20-21 (highlighted).

[65] D.I. 14476 ¶¶ 3, 9, 20, 23, 61-66, 74.

[66] Guzior Decl. Ex. 12, pp. 7-8.

7. <u>NNI will not be subject to "piecemeal litigation" or "inconsistent rulings."</u>[67]

Any motion to compel against NNI should be commenced in the Middle District of North Carolina because that is NNI's only remaining place of business.[68]  Accordingly, a single court would decide the scope of NNI's discovery obligations unless NNI *consents* to having another court decide the issue.[69]

8. <u>NNI does not need to restore 142,000 magnetic tapes or scan 171,000 boxes of documents.</u>[70]

As discussed above, TWC requests additional information about the Iron Mountain and LiveLink data sources available to NNI.  TWC has not made any demand that NNI restore hundreds of thousands of magnetic tapes or scan hundreds of thousands of boxes of documents. Indeed, NNI never even *disclosed* those data sources to TWC, and TWC learned about them for the first time when NNI filed its motion.  NNI's suggestion that TWC has somehow already demanded that – when TWC has merely requested additional information – is the most egregious of NNI's  many misstatements concerning TWC's discovery requests.

9. <u>TWC can subpoena the inventors of the patents-in-suit in the Rockstar Litigation.</u>[71]

NNI raises entirely speculative concerns that its former employees, including *all* of the named inventors of the patents-in-suit, "may be in possession of NNI documents."  NNI uses that speculation to justify its request that TWC be blocked from seeking document and deposition discovery from every inventor of the patents asserted against TWC in the Rockstar Litigation,

---

[67] D.I. 14476 ¶¶ 5, 49, 112.

[68] D.I. 14476 ¶ 51.

[69] *See* Fed. R. Civ. P. 45(f).

[70] D.I. 14476 ¶¶ 53-54.

[71] D.I. 14476 ¶¶ 42, 44.

which is some of the most basic and important discovery in a patent case.  NNI uses the same slim reed to justify blocking TWC from seeking discovery from many of Rockstar's executives and employees.  NNI has no concrete basis for its speculative concerns, and certainly none that would justify blocking TWC from that highly relevant evidence.  TWC's subpoenas to the inventors of the patents-in-suit are standard, customary, and they cannot be blocked without staying the Rockstar Litigation entirely.  Moreover, TWC has not yet issued any subpoena to either Lazard or Global IP, NNI's advisers.  TWC's ESI Search protocol would capture the documents that Lazard or Global IP produced in the allocation proceedings, and TWC believes it is efficient to start with that set of material that can be produced by NNI.

10. <u>TWC cannot control the number of complaints that Rockstar will file in the future.</u>[72]

While Rockstar might file additional patent infringement complaints in the future, this is not a mass tort case or a mortgage-backed securities crisis that will lead to thousands of litigations being filed in rapid succession.[73]  TWC is also *not a plaintiff* that is filing one of thousands of lawsuits; indeed, TWC would be happy not to be involved in the Rockstar Litigation and not to need discovery from NNI.  Moreover, even if the number of patent litigations filed by Rockstar were to exceed ten, each defendant that is accused by Rockstar of infringing Nortel's patents is entitled to the highly relevant evidence that Nortel has to provide, as discussed above.  NNI's response to TWC's subpoena is an opportunity to create a base set of documents that NNI can produce in any future litigation, if future litigation is as inevitable as NNI predicts.  TWC's General Search Terms are designed to catch documents that would be of interest to any defendant that is defending itself against Nortel's patents.  That set of material

---

[72] D.I. 14476 ¶ 49.

[73] *In re Residential Capital, LLC*, 480 B.R. at 539-40.

could be produced quickly to any future defendant at marginal cost.   It is also misleading for NNI to suggest that the five third-party subpoenas it has received from various litigations related to Rockstar are *cumulative*.   The parties that issued the subpoenas largely seek the same core set of material, with variation for only the most specific issues related to the particular technology of each case.   Accordingly, a single document collection and search will generate significant economies even within the set of subpoenas that NNI has already received.   Conversely, a ruling that NNI is entitled to injunctive relief to prevent TWC from seeking discovery from NNI and other non-debtor third parties is tantamount to providing Rockstar with an indefensible advantage in any future litigation in addition to the litigation against TWC.

In sum, NNI's many concerns with respect to the TWC subpoena – repeated at length in a 45-page motion that is designed to create the appearance of unmanageability – amount to only two plausible issues: (1) costs associated with outside counsel creating a privilege log and (2) concern about treating confidential material appropriately.   Those are the standard concerns in *any* document review process in a *patent* case.   TWC has granted all available concessions to alleviate those two concerns, as discussed above, and Rockstar has made inappropriate threats against NNI to heighten them.   When NNI provides TWC with additional information about the other data sources available to NNI – Iron Mountain and LiveLink – the parties will revisit if a search of additional data sources is necessary and how to minimize any burden.   By the time that happens, however, NNI might already have submitted a plan of liquidation.

## IV.    NNI REQUESTS UNPRECEDENTED RELIEF WITHOUT PROVIDING A SOUND LEGAL BASIS FOR THE COURT TO GRANT IT.

NNI presents five unavailing arguments for why the Court has authority to enter its unprecedented proposed order: (1) the automatic stay, pursuant to Section 362(a) of the Bankruptcy Code, (2) the Court's existing protective order and/or case management orders,

(3) section 107(b)(1) of the Bankruptcy Code and/or Bankruptcy Rule 9018, which concern the Court's authority to protect confidential information, (4) Section 105(a) of the Bankruptcy Code, or (5) "international comity." Each of those unavailing arguments is analyzed below.

1. Section 362(a) of the Bankruptcy Code.

NNI's first argument is *legally* deficient. With only cursory analysis in its motion, and citation to three irrelevant cases that concern, for example, physical repossession of a 500 gallon propane tank,[74] NNI asks this Court to engage in statutory interpretation and adopt an *unprecedented* interpretation of Section 362(a)(3). In particular, NNI asks the Court to conclude that a request for deposition testimony or document discovery is "an act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]"[75] That interpretation is contrary to: (1) over a dozen well-reasoned opinions from federal bankruptcy and district courts throughout the country, which hold that the automatic stay does not apply to third-party discovery requests – *every* court to analyze that question – and (2) contrary to precedent from the Court of Appeals for the Third Circuit and relevant legislative history for Section 362(a)(3).

The "generally accepted view is that § 362(a) does not prevent third-party discovery from a debtor which is directed to the claims asserted against non-debtor parties."[76] That

---

[74] D.I. 14476 ¶ 91 n. 2.

[75] D.I. 14476 ¶¶ 90-94.

[76] *Kenoyer v. Cardinale, et al. (In re Kenoyer)*, 489 B.R. 103, 118 (Bankr. N.D. Cal. 2013). *Accord Le Metier Beauty Investment Partners LLC v. Metier Tribeca, LLC*, No. 13 Civ. 4650(JFK), 2014 WL 4783008, at *5 (S.D.N.Y. Sept. 25, 2014) (citing *Residential Capital* for that principle); *Fratelli Cosulich Unipessoal, S.A. v. Specialty Fuels Bunkering, LLC*, No. 13-00545-KD-C, 2014 WL 2611547, at *10 (S.D. Ala. June 11, 2014); *In re Miller*, 262 B.R. 499, 505 (B.A.P. 9th Cir. 2001); *Pride Family Brands, Inc. v. Carls Patio, Inc.*, No. 12–21783– CIV, 2013 WL 4647216, at *3 (S.D.Fla. Aug. 29, 2013); *United Nat. Funding, LLC v. JetDirect Aviation, Inc.*, 2:08–CV–00993–JCM, 2012 WL 2514929, at *2–3 (D.Nev. Jun. 28, 2012); *Green v. Brotman Med. Ctr., Inc. (In re Brotman Med. Ctr., Inc.)*, BAP.CC–08–1056–DKMO, 2008 WL 8444797, at *7 (9th Cir. BAP Aug. 15, 2008) (not published); *Yates v. Delano Retail Partners, LLC*, No. C 10–3073 CW, 2012 WL 1094444, at *1 (N.D.Cal. Mar. 29, 2012) ("discovery can proceed against a [debtor] to same extent as it can against any other party"); *Am. Online, Inc.*

conclusion has been reached by at least a dozen federal bankruptcy and district courts in jurisdictions throughout the country,[77] and even the centerpiece of NNI's motion, *Residential Capital*, adopts that view after explicitly listing the text of Sections 362(a)(1) and 362(a)(3), although finding that only the phrase "process" in Section 362(a)(1) warranted serious analysis.[78] Those opinions conclude that Section 362(a) does not stay third-party subpoenas for deposition testimony and/or document discovery directed to a debtor.  As stated in many of those opinions, it does not appear that a *single* court has ever adopted a contrary view.[79]  While addressing the contrary view, the Bankruptcy Appellate Panel for the Ninth Circuit concisely summarized its view as follows:

> **Such an interpretation of section 362(a) defies common sense and the spirit of the Code. Information is information, and we believe the discovery of it as part of the development of a case against non-debtor parties is permissible[.][80]**

Against that uniform and well-reasoned precedent, NNI asks this Court to adopt a contrary and unprecedented interpretation of Section 362(a).  NNI's statutory interpretation – made in 18 lines of text – directs this Court to three irrelevant cases, each of which concerns indisputable acts "to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]"  The first of the cases cited by NNI concerns

---

[77] *Supra*, n. 76.

[78] *In re Residential Capital, LLC*, 480 B.R. at 535-37.

[79] The conclusions reached by each of those courts is also stated as black letter law in Collier on Bankruptcy.  *See* 3 COLLIER ON BANKRUPTCY ¶ 362.03[3].

[80] *In re Miller*, 262 B.R. 499, 505 (B.A.P. 9th Cir. 2001) (emphasis added).

*v. CN Prods., Inc.,* 272 B.R. 879, 882 n.6 (E.D.Va.2002); *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litigation,* 140 B.R. 969, 977-79 (N.D.Ill.1992); *In re Hillsborough Holdings Corp.,* 130 B.R. 603, 605 (Bankr.M.D.Fla.1991); *In re Richard B. Vance & Co.,* 289 B.R. 692, 697 (Bankr.C.D.Ill.2003).

*physical* repossession of a 500 gallon propane tank.[81]   The other two cases cited by NNI concern requests for *physical return* of a company's "books and records" and a subpoena to take control of a company's books and records that would prevent the company from complying with Section 521(4) of the Bankruptcy Code.[82]   One of those opinions concerning "books and records" is actually an opinion about an attorney's requests for fees, and it only briefly addresses the automatic stay issue without any analysis.[83]   TWC does not dispute that Section 362(a)(3) covers tangible and intangible property of a debtor's estate, including "books and records," but that principle – especially as applied in the cases cited by NNI – does not have *any* relevance to third-party subpoenas for discovery, which do not request possession of or control over any debtor property.

Even if the Court were to engage in full statutory interpretation to decide whether Section 362(a)(3) automatically stays third-party discovery requests, the answer is that it does not for the reasons provided below.   Application of 362(a)(3) requires an analysis of whether the action involves "property of the estate" as "defined by 11 U. S. C. § 541" and then a further analysis of whether the challenged action "constitutes an act to obtain possession" or control of that property.[84]   TWC addresses those requirements in reverse order because the Court can resolve the dispute by finding that a third-party discovery request does not constitute an act to obtain possession of or control over property of NNI's estate.

---

[81] D.I. 14476 ¶ 91 n. 72.

[82] D.I. 14476 ¶ 91 n. 73.

[83] D.I. 14476 ¶ 91 n. 73 (*In re Greenlife, Inc.*, 1990 WL 10091748 (Bankr. E.D. Va. July 16, 1990).

[84] *Acands, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260-61 (3d Cir. 2006) (Alito, J.).

Section 362(a)(3) has been interpreted to preclude any action that would "diminish" the property of the debtor's estate.[85]  That is consistent with the relevant legislative history, which provides:

> THE PURPOSE OF THIS PROVISION IS TO PREVENT <u>DISMEMBERMENT OF THE ESTATE</u>. LIQUIDATION MUST PROCEED IN AN ORDERLY FASHION.  <u>ANY DISTRIBUTION</u> OF PROPERTY MUST BE BY THE TRUSTEE AFTER HE HAS HAD AN OPPORTUNITY TO FAMILIARIZE HIMSELF WITH THE VARIOUS RIGHTS AND INTERESTS INVOLVED AND WITH THE PROPERTY AVAILABLE FOR DISTRIBUTION.[86]

A third-party subpoena that seeks *information* – whether deposition testimony or document discovery – does not in any way "diminish" or "dismember" the bankruptcy estate.  A third-party subpoena is not a replevin or repossession action (such as repossession of a 500 gallon propane tank), nor is it an action that diminishes the value of any intangible property of the debtors estate (such as an action that affects an executory contract or insurance policy). Consistent with precedent from the Court of Appeals for the Third Circuit and relevant legislative history for Section 362(a)(3), the Court should conclude that a third-party subpoena seeking deposition testimony or document discovery is not an act to obtain possession of or control over property of a debtor's estate.

NNI's argument fails for the independently sufficient reason that deposition testimony and document discovery cannot rationally be understood to be property of the estate. Evidentiary information belongs to the public, not NNI's estate.  As explained by the Supreme Court, "[f]or more than three centuries it has now been recognized as a fundamental maxim that

---

[85] *Id.* at 261.

[86] S. Rep. No. 95-989, 95th Cong., 2d Sess. 50 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5836 (emphasis added).

the public . . . has a right to every man's evidence."[87]  TWC has no desire to take possession or control of any of NNI's property; rather, TWC requests that NNI produce evidentiary information.

### 2.  The Court's Existing Orders, Confidentiality, and International Comity.

NNI additionally argues that the Court has authority to enter its unprecedented proposed order due to: (1) the Court's existing protective order and/or case management orders, (2) section 107(b)(1) of the Bankruptcy Code and/or Bankruptcy Rule 9018, which concern the Court's authority to protect confidential information, and (3) "international comity."[88]  Those arguments are addressed together because each fails due to the same *factual* deficiency.

TWC does not dispute in general that this Court has authority to: (1) enforce its own orders, (2) protect "a trade secret or confidential research, development, or commercial information" in a "paper filed in a case under [the Bankruptcy Code],"[89] or (3) respect principles of international comity.  TWC is perplexed, however, by NNI's position that any of that provides authority for the Court to enter its proposed order.

NNI's argument fails completely because NNI can comply with its discovery obligations in the Rockstar Litigation in a manner that is *entirely consistent* with this Court's existing orders, which already provide extensive protection for confidential information and consideration for international comity.  Indeed, as discussed briefly above and in more detail below, TWC has repeatedly requested that NNI follow this Court's protective order,[90] which provides excellent guidance on how NNI should produce to TWC the discovery that it requests.  NNI has refused to

---

[87] *Residential Capital*, 480 B.R. at 531 (quoting *Jaffee v. Redmond*, 518 U.S. 1, 9 (1996)).

[88] D.I. 14476 ¶¶ 95-103, 110.

[89] *See* 11 U.S.C. § 107.

[90] D.I. 10805-2.

follow this Court's prescribed procedures and yet audaciously asks the Court to enforce "its prior orders" and enter NNI's unprecedented discovery blockade under the name of a "further protective order."

Moreover, with respect to "international comity," NNI's concerns appear to be largely manufactured. Counsel for the Canadian Nortel entities stated that the Canadian Nortel entities are cooperating fully with NNI to ensure efficient production of material from the Allocation Database.[91] The Canadian Nortel entities have even stated that they will produce, without compulsory process, redacted versions of all submissions made to the U.S. Department of Justice concerning Rockstar.[92] It is clear to TWC that NNI's dramatic overstatements about international comity and premonitions of a U.S. war with Canada if NNI complies with its discovery obligations are misplaced and manufactured. To address any such concern – whether manufactured or real – NNI should follow Section 9 of this Court's protective order.

### 3. Section 105(a) of the Bankruptcy Code

NNI's proposed order requests *far more* than a genuine stay of discovery and this Court should decline to exercise its equitable power under Section 105(a) as a sword and a shield for NNI. Specifically, the Court should deny each of NNI's requests to: (1) grant a *genuine stay* of discovery from NNI in the Rockstar Litigation, (2) define substantive limitations on the scope of discovery that TWC can receive related to patent issues in the Rockstar Litigation,[93] (3) extend the proposed order to hundreds of parties other than NNI, including every inventor of the

---

[91] Guzior Decl. ¶ 33.

[92] Guzior Decl. Ex. 17.

[93] D.I. 14476-2 ¶¶ 3-5.

patents-in-suit and many of Rockstar's executives and employees,[94] or (4) order mandatory cost shifting without analyzing any of the relevant factors under Fed. R. Civ. P. 45.

a.  This Court Should Not Stay Discovery From NNI.

NNI contends that the Court should exercise its authority under Section 105(a) to grant a stay of its discovery obligations, which were completely foreseeable under the circumstances of the patent sale to Rockstar.  NNI's motion, however, is *factually* and *procedurally* deficient and does not support the relief that it requests.  The Court should not exercise its authority under Section 105(a) to stay third-party discovery from NNI because: (1) NNI has not and cannot meet its burden of persuading the Court that "unusual circumstances" exist and that "protection is *essential* to [its] reorganization efforts" and/or (2) NNI has not filed an adversary proceeding, which is required for NNI to obtain the injunctions that it requests under § 105(a).[95]  On those bases, this Court should not grant NNI any relief from third-party discovery, which – as a default and absent a compelling showing of evidence from NNI – must go forward fully.

The Court of Appeals for the Third Circuit has directed that remedies under Section 105(a) that affect non-debtor litigations should be reserved for "unusual circumstances" or when "protection is *essential* to the debtor's efforts of reorganization"[96] and that the debtor bears the burden of demonstrating that it is entitled to relief under Section 105(a).[97]  Even *Residential Captial*, the centerpiece of NNI's motion, establishes that the "ultimate burden" falls on the debtor to demonstrate that relief under Section 105(a) is necessary to avoid thwarting or frustrating reorganization, and that the "touchstone for granting injunctive relief against third-

---

[94] D.I. 14476-2 ¶¶ 2-7.

[95] Fed. R. Bankr. P. 7001(7).

[96] *See, e.g.*, *McCartney v. Integra Nat'l Bank North*, 106 F.3d 506, 509-10 (3d Cir. 1997) (emphasis added).

[97] *See, e.g.*, *In re Wedgewood Realty Group, Ltd,* 878 F.2d at 701.

party actions" and "discovery from a debtor in third-party actions" is whether the action or "proposed discovery will thwart or frustrate the debtor's reorganization."[98]   While different courts have used different phrases – "unusual circumstances,"[99] "essential to reorganization,"[100] "threaten to thwart or frustrate reorganization,"[101] "potential to destroy a debtor's ability to reorganize,"[102] "important for effective reorganization,"[103] "necessary to protect bankruptcy proceeding,"[104] "discovery would seriously impact [debtor's] ability to proceed to rehabilitate under Chapter 11"[105] – two basic principles emerge from the relevant precedent: (1) when the debtor seeks relief from the Court under Section 105(a), the burden falls entirely on the debtor to demonstrate that it is entitled to that relief[106] and (2) when the relief that the debtor requests "may interfere with the prosecution or defense of third-party litigation pending in other courts," the debtor must carry a heavy burden to demonstrate that protection is *essential* to protect its reorganization.  *Residential Capital* has even gone a step further and explained: "The greater the limitations or conditions the debtor seeks to impose on discovery, and the greater the interference

---

[98] *In re Residential Capital, LLC*, 480 B.R. 529, 541, 544 (Bankr. S.D.N.Y. 2012).

[99] *McCartney*, 106 F.3d at 509-10.

[100] *Id.*

[101] *In re Granite Partners, L.P.,* 194 B.R. 318, 337 (Bankr. S.D.N.Y. 1996); *Residential Capital*, 480 B.R. at 541.

[102] *Residential Capital*, 480 B.R. 539.

[103] *The 1031 Tax Grp, LLC v. Alvarez, et al. (In re The 1031 Tax Grp., LLC)*, 397 B.R. 670, 684 (Bankr. S.D.N.Y. 2008).

[104] *Le Metier Beauty Inv. Partners, LLC*, 2014 WL 4783008, at *5.

[105] *In re Kenoyer*, 489 B.R. at 118 (quoting *In re Hillsborough Holdings Corp.*, 130 B.R. at 607).

[106] *See also Le Metier Beauty Inv. Partners, LLC*, 2014 WL 4783008, at *5 ("in situations where third-party discovery of a debtor could burden the bankruptcy proceeding, courts have generally placed the onus on the debtor to seek injunctive relief").

that will result in the nonbankruptcy matter if limitations and conditions are imposed, the stronger the debtor's evidence and arguments will need to be."[107]

While TWC acknowledges the significant obstacles that NNI, its affiliates, and this Court faced during Nortel's international insolvency proceedings, NNI has not demonstrated a compelling reason why its liquidation will fail – or even be seriously impacted – if it responds to third-party discovery requests in the Rockstar Litigation.  NNI puts forth only the following arguments: (1) NNI is "in the midst of preparing public versions" of approximately 2,000 allocation trial exhibits,[108] (2) NNI is waiting for this Court's allocation ruling, (3) NNI will prepare a plan of liquidation along the lines of the allocation ruling, (4) vaguely, NNI has "other administrative matters," and, vaguely, (5) NNI is "responding to the other demands on their time."[109]  NNI "has not conducted the rigorous analysis required to show entitlement to [relief under Section 105(a)], and the Court [should] decline to make those arguments for it."[110]  To grant the relief that NNI requests, this Court would have to conclude that every moment of NNI's five-year bankruptcy proceedings is an "unusual" moment in which any distraction could "destroy [NNI's] ability to reorganize."[111] Such a finding would eviscerate the standard.  NNI has not and cannot meet its burden for the Court to award it any relief under Section 105(a), let alone its extraordinary proposed order.

---

[107] *Residential Capital*, 480 B.R. at 544.

[108] This argument is curious because: (1) NNI is partially undertaking that activity to respond to TWC's requests and (2) NNI has previously represented to TWC that it has completed its review and any delay is caused by *Rockstar's* review.  Guzior Decl. Exs. 20-22 (highlighted).

[109] D.I. 14476 at ¶¶ 107(d)-(e).

[110] *Fratelli Cosulich Unipessoal*, 2014 WL 2611547, at *5.

[111] TWC notes also that NNI has not been genuinely "reorganizing" – in the rehabilitative sense – since June of 2009.  NNI is not an operating company, nor has it been an operating company in a long time.  NNI has sold all of itself and is almost completely liquidated.  TWC is still mindful that NNI needs to successfully liquidate, but there is nothing critical to that process on the horizon.

NNI's citation to this Court's orders declining to lift the automatic stay for securities litigation to proceed against the Canadian Nortel entities is irrelevant to the issue of whether NNI is entitled to new, affirmative relief and can block the very third party discovery requests it created by selling its patents.[112]  First, NNI seeks affirmative relief and the heavy burden *in this instance is on NNI* to establish need for the Court to grant it, which it has not done.  Second, the Court issued those orders concerning the securities litigation at a critical time in the bankruptcy process, *i.e.*, when Nortel was about to start a 30-day allocation trial.  That allocation trial is now over and no similarly important event is on the horizon.  Finally, the Court issued those orders concerning the securities litigation, which operate to block the plaintiff from actively pursuing securities litigation against the Canadian Nortel entities.  TWC is not pressing claims against any Nortel entity and this Court has already entered a protective order that accounts for international comity concerns.

Apart from failing to carry its substantive burden, NNI has also failed to follow the appropriate procedure to receive the broad injunctive relief that it requests.  Assuming that this Court can "extend the automatic stay" to non-debtor litigation and third-party discovery requests without an adversary proceeding – and it is not at all clear that the Court can do that consistent with Fed. R. Bankr. P. 7001(7)[113] – NNI's proposed order does far more than simply extend the automatic stay.  NNI's numerous additional injunctions – restricting the substantive scope of discovery that TWC can request, restricting TWC's ability to depose hundreds of parties other than NNI, and ordering TWC to cover all costs for hundreds of parties – must be requested by adversary proceeding.  Even the *Residential Capital* court – which adopted an unprecedented

---

[112] D.I. 14476 ¶ 110 n. 94.

[113] *See In re Ripon Self Storage, LLC,* Slip Op., Case No. 2011 WL 3300087, *6 (9th Cir. BAP 2011) (citing *Boucher v. Shaw,* 572 F.3d at 1093 n. 3); *Patton v. Bearden,* 8 F.3d 343, 349 (6th Cir.1993).

view of what the court could order without an adversary proceeding – explained:  "***The order***

***extending the stay to discovery from the Debtors absent further court order*** is one that relates

to the administration of the bankruptcy case itself; like other case administration orders, it does

not require filing an adversary proceeding."[114]  In *Residential Captial*, the court *only* "extended

the automatic stay" to third-party discovery requests *to the debtor* and did not order *any other*

relief.  NNI's proposed order is dramatically broader and the Court lacks authority to enter those

additional injunctions without an adversary proceeding and a full hearing on the merits.  NNI's

failure to file an adversary proceeding is "alone sufficient reason for the Bankruptcy Court to

deny [NNI's] requested for an injunction."[115]

> **b.**  *Residential Capital* <u>Is Highly Distinguishable And Militates Against Granting</u>
> <u>NNI's Proposed Order .</u>

As discussed above, this Court should deny NNI's motion for the simple reasons that:

(1) NNI has failed to meet its substantive burden of showing circumstances that warrant a stay of

third-party discovery under Section 105(a) – let alone the numerous other injunctions it requests

– and (2) NNI's motion is procedurally defective.  If the Court were inclined to engage in the

six-factor test employed in *Residential Capital*, however, the Court should still deny NNI's

motion.

As an initial matter, *Residential Capital* is a highly distinguishable case.  *Residential*

*Capital* arose under the exigent circumstances of the residential mortgage-backed securities

crisis when the debtor and its affiliates faced "thousands" of securities litigations that would be

filed in rapid succession.  The debtor faced breathtaking document requests only *two months*

after debtor filed for Chapter 11 protection.  Debtor was attempting to rehabilitate and reorganize

---

[114] *Residential Capital*, 480 B.R. at 539 (emphasis added).

[115] *In re Conxus Comm's, Inc.*, 262 B.R. 893, 899 (Bankr. D. Del. 2001).

as a going concern, and it has, in fact, successfully done so.  In the months following the court's decision, the debtor had numerous "make or break" events – auctions of its principal assets, hearings to approve an $8.7 billion settlement, an examiner investigation, and management of day-to-day affairs because the company continued operating as a going concern.  Debtor sought to stay discovery requests from a *plaintiff* that was prosecuting securities cases against debtor's affiliates, and the bankruptcy court – with a high level of coordination and communication with the district court – concluded that the worst that could happen to the *plaintiff* if the court stayed discovery was that prosecution of its case would be delayed.[116]  The court concluded that debtors were entitled to a "respite, not an exemption from discovery," and ordered the parties to agree on a future date when the debtors could provide the requested discovery.[117]

The facts here are markedly different.  First, the scope of requested discovery is different.  NNI has received five third-party subpoenas – which largely seek the same core set of material – almost *five years* after NNI filed for Chapter 11 protection.  Second, the timing of the requests is different.  NNI is not facing the critical first steps of Chapter 11 reorganization.   In fact, in June of 2009 NNI abandoned attempts to rehabilitate and reorganize as a going concern, and decided to liquidate.[118]  NNI has already sold all of its assets, it does not deal with day-to-day business as an operating company, and it concedes that it exists only to complete bankruptcy.[119]  While NNI has recently gone through a 30-day allocation trial, that trial is over, and NNI concedes that it has

---

[116] *Residential Capital*, 480 B.R. at 546.

[117] *Id.* at 550.

[118] One of the seminal cases on using Section 105(a) to stay non-debtor litigation explained: "The trustee's proof falls well short of what he must show; he has not shown that the [non-debtor action] will frustrate or thwart the reorganization . . . More important, there are substantial differences between this case and the *Manville* and *Robins* cases which militate against injunctive relief. **Granite does not operate, and the trustee is liquidating their assets. He does not need the Askin Parties to focus on the reorganization.**" *In re Granite Partners, L.P.*, 194 B.R. at 338 (emphasis added).

[119] D.I. 14476 ¶¶ 50-51.

36

no major bankruptcy events on the horizon.[120]  NNI's liquidation will be successful at this point, regardless of whether NNI responds to third-party discovery requests.  Finally, the context of the discovery requests is entirely different.  TWC is a *defendant* in an ongoing patent infringement lawsuit concerning patents that NNI sold to Rockstar. TWC has entered a critical stage of fact discovery, which must be substantially complete in less than three months.  TWC will not merely suffer delay if NNI's proposed order is granted or discovery from NNI is stayed, but TWC will be stripped of discovery necessary to *defend* against the patent infringement claims asserted against it in the Rockstar Litigation.   In effect, NNI asks for an "exemption," not merely a "respite," from discovery, and NNI remarkably asks that the exemption be extended to many other non-debtor parties central to the Rockstar Litigation.

Against that backdrop, the six-factor test employed in *Residential Capital* overwhelmingly supports denying NNI any relief, and certainly supports denying the proposed order.

With respect to the first three factors – scope, context, and need – TWC has explained in great detail, above, the extraordinary need for the five categories of documents it requests from NNI (*see* Section I, *supra*) and its significant efforts to limit the scope of its requests and accommodate NNI's concerns (*see* Section II, *supra*).   With respect to context, TWC re-emphasizes that it is a *defendant* in a patent infringement lawsuit that NNI sold to Rockstar, and it has no control over prosecution of the case.   TWC would join NNI in a request to stay the Rockstar Litigation, but it *cannot proceed in that litigation stripped by NNI of certain defenses*. TWC is a patent infringement defendant in the Eastern District of Texas, substantial completion of fact discovery is required in January 2015 and fact discovery (all document production and

---

[120] D.I. 14476 ¶ 107(d).

fact depositions) must be completed in May 2015.[121]    Scope, context, and need weigh overwhelmingly against a stay.

The fourth and fifth factors, timing and burden, also weigh against granting any relief to NNI.  As explained above, a full case schedule — including a trial date — has been ordered by the Eastern District of Texas.  Also as explained above, NNI gives only vague explanations for why NNI must focus on its bankruptcy proceedings, and identifies no critical bankruptcy events on the horizon.  Indeed, there is no reason at all that NNI or its bankruptcy counsel will be distracted from bankruptcy issues.  NNI has retained new outside counsel to handle the subpoenas – Crowell & Moring LLP – and the Allocation Database is already compiled for its outside counsel to search. That is also consistent with modern realities of document review; in particular, it is a fiction that companies do document review because most companies hire outside counsel to do the entire review.

The final factor, expense, also weighs against NNI.  As explained above (*see* Section II, *supra*), the expense to NNI reduces, at present, to the cost of *review* for privilege and confidentiality.  TWC has granted all available concessions to NNI to reduce privilege and confidentiality review burden.  If NNI insists on an extraordinary privilege and confidentiality review, that is self-inflicted and also due to inappropriate threats from Rockstar, as discussed above.  Most importantly, because NNI has been unwilling to run search terms against *any* data set, the parties have no data on the volume of documents that NNI will need to review, if it chooses to review them.  At this point, expense is entirely speculative, and NNI has no basis for its "$2 million" projection.

Every one of the six factors considered in *Residential Capital* overwhelmingly supports denying NNI any relief and allowing third-party discovery to proceed unimpeded.

---

[121] Guzior Decl. Ex. 5.

c. <u>This Court Should Not Substantively Limit The Discovery That TWC Is Entitled To Receive From Hundreds Of Parties In A Patent Infringement Case.</u>

As discussed above, NNI's proposed order does much more than stay third-party discovery from NNI. NNI's proposed order substantively limits the discovery that TWC can receive from Nortel, all of the inventors of the patents-in-suit, and many of Rockstar's executives and employees.[122] In particular, TWC could receive from those witnesses only: (1) the designated portions of deposition transcripts from the allocation proceedings and (2) the public versions of the trial exhibits from the allocation proceedings.[123] TWC would be barred from seeking anything further without NNI's permission or successful motion practice in this Court.

NNI provides no precedent for the Court to substantively limit TWC's discovery in that manner. Indeed, *Residential Capital*, the centerpiece of NNI's motion, states: "The scope of the requested discovery is something that must be resolved in the district court."[124] The *Residential Capital* court also stated: (1) "the power to stay discovery against a debtor must be exercised cautiously, particularly where a stay of discovery may interfere with the prosecution or defense of third-party litigation" and (2) the bankruptcy court and the district court must "to the fullest extent possible, try to accommodate the needs of parallel proceedings [and] court-to-court communication may be a useful way to accomplish that goal."[125] In *Residential Capital*, the Court ultimately did not limit or condition discovery in any substantive manner. The Court only "extended the automatic stay" to third-party discovery and ordered that the parties "meet and

---

[122] D.I. 14476-2 ¶ 3-4. NNI's addition of the phrase "in which Debtors have an interest," is entirely unhelpful. In practice, the proposed order would operate to block virtually all discovery from those parties because it raises numerous questions concerning what documents can be produced without violating the Court's order.

[123] Since those two categories of documents were generated for the allocation proceedings, NNI is not actually proposing that it do anything to respond to TWC's discovery request.

[124] *Residential Capital*, 480 B.R. at 545.

[125] *Id.* at 539, 543.

confer on a targeted schedule for production of documents, consistent with the demands of the chapter 11 cases."[126]   In *Residential Capital*, discovery from the debtor was not *substantively* limited, it was merely *delayed*.  Tellingly, NNI's proposed order bears none of the qualities of a *stay*; most obviously, it is not temporally limited and extends forward for all time.[127]

This Court should follow the guidance in *Residential Capital* and defer to the district court on the appropriate scope of discovery or at least communicate closely with Judge Payne of the Eastern District of Texas to understand the affect that substantive limitations will have on TWC's defenses.  As explained in detail above, the five categories of documents that TWC seeks from NNI are critical to certain of TWC's defenses in the Rockstar Litigation.  If this Court were inclined to rule on the appropriate substantive scope of discovery – and it should not do that – the Court should at least request additional briefing on the various patent law issues that will be seriously impacted by the Court's order.

> d.   This Court Should Not Foreclose Depositions Of All Former Nortel Employees.

While NNI's proposed order overreaches in many respects, it grossly overreaches in the impact it would have on TWC's ability to depose highly relevant witnesses to the Rockstar Litigation.[128]   If paragraph 6 of NNI's proposed order is granted, TWC would be prohibited from deposing – without NNI's approval and possibly motion practice before this Court – ***every named inventor of the patents-in-suit*** and several current and former executives and employees of Rockstar.  In total, TWC would be prohibited from deposing *thirty* of the individuals that Rockstar identifies as relevant witnesses on its initial disclosures in the Rockstar Litigation.

---

[126] *Id.* at 550.

[127] Presumably NNI hopes that any "stay" will simply extend until fact discovery is over in the Rockstar Litigation and the damage cannot be undone.

[128] D.I. 14476-2 ¶ 6.

NNI's concerns about the purported burden of third-party depositions are entirely unwarranted. The district court has already imposed strict limitations on third-party depositions. Under the court's Discovery Order:

> Third-party depositions shall be limited to 40 hours for Plaintiff and 60 hours for Defendants jointly, absent leave of Court. For the avoidance of doubt, the 31 named inventors of the patents-in-suit shall be deemed third-parties, unless they are employees of Constellation at the time of the deposition.[129]

Moreover, NNI does not provide this Court with any legal authority for granting an injunction that prohibits TWC from deposing hundreds of non-debtor parties, and the only conceivable explanation for it is a bare desire to disadvantage TWC in the Rockstar Litigation and the negotiations with NNI. In a patent infringement case, depositions of inventors and licensing and other executives are routine and often the source of highly relevant evidence on claim construction, invalidity, infringement, and damages. This Court could not grant paragraph 6 of NNI's proposed order without staying the Rockstar Litigation or ensuring through "court-to-court communication" that Judge Payne would stay the Rockstar Litigation until NNI can fulfill its discovery obligations.

    e.   <u>This Court Should Not Order That All Costs Are Shifted To TWC.</u>

Without any analysis whatsoever, NNI requests that this Court order that TWC covers all costs associated with document discovery and deposition testimony from NNI and hundreds of other parties.[130] This Court need not resolve that issue, as it is more appropriately resolved by the district court that will ultimately enforce the subpoena against NNI pursuant to Fed. R. Civ. P. 45. Even if the Court did not defer to the district court on this issue, it is not appropriate to decide this issue without any sense of the substantive scope of NNI's production. Indeed, until

---

[129] The Discovery Order is Exhibit 6A to the Guzior Decl.

[130] D.I. 14476-2 ¶ 7.

NNI runs search terms against *any* data set, the parties do not know the volume of potentially relevant documents.  TWC respectfully submits that the Court should defer ruling on this issue, if it is inclined to rule on it at all, until the scope of NNI's response is better defined and NNI is able to generate a well-reasoned cost estimate.  Separate from document production costs, NNI provides no authority for the remarkable proposition that TWC should be forced to bear all costs associated with preparing witnesses for depositions and defending those depositions.  That remedy would break new ground.

If the Court were inclined to take up this issue with respect to document production, however, the Court should employ the proper standard to determine if any cost shifting is warranted.  Federal courts have developed a uniform three-factor test for determining whether the costs associated with complying with a third-party subpoena should be shifted to the issuing party.  The three factors to be considered are "whether the nonparty actually has an interest in the outcome of the case, whether the nonparty can more readily bear the costs than the requesting party and whether the litigation is of public importance."[131] The cases of *Behrend v. Comcast Corp.*[132] and *Bell Inc. v. GE Lighting, LLC*[133] are particularly instructive since they also presented heightened confidentiality and privilege issues.

In *Behrend*, a case that involved complex confidentiality and privilege issues, the court declined to grant a nonparty the costs of reviewing documents for privileged or confidential

---

[131] *In re Wesco Dist., Inc.*, Nos. 13-mc-37, 11-cv-739, 2013 WL 432932, at *2 (W.D. Pa. Feb. 4, 2013).  *See also Wells Fargo Bank, N.A. v. Konover*, 259 F.R.D. 206 (D. Conn. 2009); *Behrend v. Comcast Corp.*, 248 F.R.D. 84 (D. Mass. 2008); *In re Subpoenas to Folliard*, No. 10-mc-789(ESH)(AK), 2012 WL 907763 (D.D.C. Mar. 16, 2012); *Bell Inc. v. GE Lighting, LLC*, No. 14-cv-00012, 2014 WL 1630754 (W.D. Va. Apr. 23, 2014); *In re Honeywell Int'l, Inc. Secs. Litig.*, 230 F.R.D. 293 (S.D.N.Y. 2003); *US Bank Nat'l Assoc. v. PHL Variable Ins. Co.*, No. 12 Civ. 6811(CM)(JCF), 2012 WL 55395249 (S.D.N.Y. Nov. 5, 2012); *In re World Trade Center Disaster Site Litig.*, No. 21 MC 100(AKH), 2010 WL 3582921(S.D.N.Y. Sept. 14, 2010).

[132] 248 F.R.D. 84 (D. Mass. 2008).

[133] No. 14-cv-00012, 2014 WL 1630754 (W.D. Va. Apr. 23, 2014).

information before producing them.  The court found that the nonparty had an interest in the transaction that helped spawn the underlying litigation.  Although the nonparty was no longer involved in that industry and claimed the document production would involve great financial burden, the court approved a plan to produce the documents, and said that if the nonparty wished to "conduct a privilege review [itself] before production, despite greater expense," this would be "purely [the nonparty's] decision to make."[134]

In *Bell Inc.*, the court engaged in a nuanced analysis of the modern techniques available in electronic discovery, such as search terms, privilege search terms, and clawback provisions. The court found persuasive that the producing party should have to bear the cost of extensive confidentiality and privilege review because the requesting party offered many accommodations to reduce any burden, and the decision to decline those accommodations in favor of a full-scale document search and review was the producing party's own.  The court explained that the requesting party: "also offered to have outside counsel sort through this material for responsiveness, allowing iPack to object to and formally withhold any identified materials on grounds of privilege, confidentiality, or protected content. iPack refused this option, preferring to load the documents onto a database and search the documents itself."[135] Other courts have similarly required the producing party to bear the costs of privilege and confidentiality review because the decision to perform the review and the scope of the review rests entirely with the producing party.[136]

---

[134] *Behrend*, 248 F.R.D. at 87.

[135] *Bell Inc.*, 2014 WL 1630754 at *14.

[136] *See US Bank Nat'l Assoc. v. PHL Variable Ins. Co.*, No. 12 Civ. 6811(CM)(JCF), 2012 WL 55395249 (S.D.N.Y. Nov. 5, 2012).

As discussed above, TWC has already granted NNI every available concession to alleviate the burden of privilege and confidentiality review, including blanket confidentiality designations, clawback agreements, search terms, privilege search terms, and even auto-generated privilege logging, if feasible. Any decision that NNI makes to do a full-scale review for privilege and confidentiality is, in light of those concessions, entirely NNI's decision and the costs should be carried by NNI and its creditors.

NNI also is not entitled to cost shifting under a straight-forward application of the relevant three-factor rest. First and foremost, NNI is not a "disinterested party" because it was an interested party to the transaction that gave rise to the Rockstar Litigation. NNI was or should have been keenly aware that upon selling its patent portfolio to Rockstar for $4.5 billion it would receive discovery requests from accused infringers. In connection with marketing its patent portfolio, Nortel developed an "IP Co" patent assertion vehicle prior to selling its patents, identified possible enforcement targets, mapped its patents to products, and marketed potential lawsuits connected to those patents to Rockstar and other bidders.[137] The Asset Sale Agreement between Nortel and Rockstar, pursuant to the definitions of Patent Related Documentation and Transferring Employees, contemplates that Nortel did not merely transfer patents to Rockstar, but also transferred pre-packaged lawsuits, including individuals knowledgeable about prosecuting those lawsuits and certain pre-prepared litigation documents.[138] NNI must have contemplated lawsuits and third-party subpoenas at the time that it entered into the lucrative transaction with Rockstar, and it is entirely fair for NNI and its creditors to bear the cost of producing documents in litigations that it sold to Rockstar.

---

[137] D.I. 14476 ¶ 20.

[138] *See* D.I. 5935-1.

NNI is also in a financial position to bear the cost of responding to TWC's subpoena. Nortel received $4.5 billion for the sale of patents and patent infringement lawsuits to Rockstar. Those proceeds amount to more than 60% of the $7.3 billion that Nortel has aggregated in liquidation.  Nortel's creditors are benefitting greatly from the proceeds of the patents and patent infringement lawsuits that Nortel sold to Rockstar, including the Rockstar Litigation, and it is not at all unfair for Nortel and its creditors to bear the modest costs of providing documents in Rockstar's lawsuits.

While the Rockstar Litigation might appear to involve only private companies, the issues in the Rockstar Litigation – and, in particular, TWC's laches, F/RAND, and license defenses – are of public importance.  TWC's defenses raise fundamental questions about what should happen when a large public utility company, such as Nortel, collapses and sells a large number of patents that it has historically not enforced against the industry to a patent assertion vehicle, which has dramatically different incentives from an operating company.  In that context, a company like Nortel "pulls the rug out from under" entire industries.  That is especially true because Nortel had a high level of involvement in standards development organizations and committed to license a large number of patents on fair, reasonable, and non-discriminatory ("F/RAND") terms.  The standards development process and observation of F/RAND commitments is of extreme public importance, which this Court acknowledged in its order approving the sale to Rockstar.[139]  If the Rockstar Litigation is ultimately successful, it stands to increase the price of goods and services to millions of American consumers.

After balancing all of the relevant factors, it is entirely fair for Nortel to bear the cost of responding to TWC's subpoena.  In its motion, NNI repeatedly argues that: "because Rockstar is

---

[139] D.I. 5935 ¶ 8.

the party that owns the patents in issue and because it is the one that initiated the litigations giving rise to the subpoenas, it is more equitable for Rockstar rather than NNI and Debtors' estates to bear the cost of responding to the document requests."[140] TWC agrees whole-heartedly that, in equity, it is Rockstar that should pay for all of Nortel's discovery expenses.  Given how strenuously NNI argues that point in its motion, TWC is perplexed by NNI's proposed order that seeks to shift all costs to TWC.  Whether the costs are transferred to Rockstar, stay with NNI, or are split between Rockstar and Nortel, it is clear that they should not, in equity, be borne by TWC.[141]

## V.    NNI'S PROPOSED ORDER IS UNCONSCIONABLE.

An injunction granted under Section 105(a) is subject to equitable considerations like any other injunction.[142]  As discussed above, there will be no serious harm to NNI if it is required to fulfill its discovery obligations in the Rockstar Litigation.  NNI has already sold all of its assets and NNI has completed the allocation trial.  NNI has no major bankruptcy events on the horizon that will be "thwarted" by responding to modest third-party discovery requests.  Moreover, responding to discovery obligations in the Rockstar Litigation will not burden NNI's remaining employees or outside bankruptcy counsel because NNI has retained specific outside counsel to handle discovery in the Rockstar Litigation.  At most, NNI will incur modest costs associated with a review of documents for privilege and confidentiality.

---

[140] D.I. 14476 ¶¶ 3, 9, 74.

[141] If TWC ultimately requests that NNI restore any magnetic tapes or scan any hardcopy documents from Iron Mountain or transfer any data from LiveLink, TWC would be happy to negotiate with NNI whether any modest amount of cost shifting is appropriate for the data retrieval and restoration, as opposed to any review for privilege or confidentiality in which NNI chooses to engage.

[142] *In re Smith*, 111 B.R. 102, 104-105 (Bankr. E.D. Pa. 1990).

In contrast, as discussed above, TWC will be denied access to evidence that is critical to its defenses in the Rockstar Litigation. Apart from being enjoined from seeking document discovery from NNI, which is a serious harm on its own, NNI's proposed order would needlessly burden TWC by enjoining TWC from seeking deposition testimony from the inventors of the patents-in-suit and many Rockstar employees and executives. TWC faces a "rocket docket" in the Eastern District of Texas, with substantial completion of fact discovery in January 2015, and it will be severely prejudiced if NNI is exempted or relieved from its discovery obligations. After balancing the harm that TWC will suffer if the Court enters NNI's proposed order against the purported inconvenience that NNI will face if the Court does not enter NNI's proposed order, the facts overwhelmingly support denying NNI any relief.

NNI has also acted inequitably in the third-party discovery process, throughout which there has been a high level of coordination between Rockstar and NNI and a near-instantaneous transfer of information between them.[143] NNI has twice prevented TWC from seeking relief from the district court. In the first instance, TWC stated that it believed and NNI and TWC were at an impasse with respect to NNI's document production, contacted local counsel in the Middle District of North Carolina, and prepared to file a motion to compel.[144] NNI urged TWC not to file that motion and stated that it wanted to continue negotiations with TWC and offer to TWC a proposal. After NNI sent to TWC its proposal, it filed its motion with this Court before TWC could send a counterproposal and while the parties were actively engaged in negotiations.[145] NNI presumably hoped that this Court would be more charitable to its position.

---

[143]*See* Guzior Decl. Ex. 16 (highlighted).

[144] Guzior Decl. Exs. 16 (highlighted), 23.

[145]Guzior Decl. Ex. 24.

In the second instance, NNI prevented TWC from seeking a remedy from the Eastern District of Texas concerning Rockstar's inappropriate threats to hold NNI liable for disclosure of purportedly confidential material.  When NNI first alerted TWC to this fact – stating that NNI would not "stick its neck out" given the threats from Rockstar – TWC informed NNI that Rockstar's threats were inappropriate and obstructionist and that TWC might need to seek relief from the Eastern District of Texas to ensure that Rockstar would not continue to obstruct third-party discovery.[146]  When TWC sent NNI correspondence on that issue, NNI *denied* ever representing that Rockstar had made threats to hold NNI liable for anything, and stated that its concerns arose solely from Rockstar's formal objections to the subpoena that TWC sent to NNI. Curiously, NNI now represents in its motion to this Court that Rockstar has threatened it with liability and made other suggestions concerning material breaches of the Asset Sale Agreement.[147]  Had NNI not protected Rockstar, TWC could have sought relief from the district court that might ameliorate some of NNI's concerns surrounding confidential material.

This Court should not countenance that behavior and should deny NNI's transparent effort to have this Court decide issues that could and should have been decided by the district court.

## VI.    THE COURT SHOULD STAY THE ROCKSTAR LITIGATION.

Even if the Court were inclined to grant NNI some form of relief, the only equitable relief that this Court could grant is a stay of the Rockstar Litigation pending completion of NNI's bankruptcy.  On October 10, 2014, TWC proposed to NNI that the parties jointly request, through the correct bankruptcy procedures, that this Court stay the Rockstar Litigation until

---

[146] Guzior Decl. Ex. 25 (highlighted)

[147] D.I. 14476 ¶¶ 4, 77-78.

NNI's bankruptcy concludes.[148]  TWC explained that a stay of the litigation addresses NNI's purported concerns – responding to discovery requests while it concludes its bankruptcy – and TWC's concerns – defending against patent infringement claims without important discovery. NNI responded that it did not "wish" to seek that relief, *but that it would not "oppose" that relief*.[149]  NNI's position evidences that NNI would likely *welcome* that relief but cannot practically seek it due to the historical and financial relationship between NNI and Rockstar.  A stay of the Rockstar Litigation, however, is the only *fair and neutral* remedy the Court could provide if it were to conclude that relief is warranted.  The most harm that flows from that remedy is that the Rockstar Litigation will be delayed for a matter of months.

This Court's authority to enjoin or stay the Rockstar Litigation derives from: (1) the Court's authority to enforce its own orders and its express reservation of jurisdiction over and power to provide remedies related to the Asset Sale Agreement, (2) an administrative "extension of the automatic stay" to the Rockstar Litigation, or (3) Section 105(a).

First, this Court expressly retained jurisdiction over its order approving the Asset Sale Agreement and matters "relating to" the Asset Sale Agreement.  In particular, in the order approving the Asset Sale Agreement, the Court stated:

> The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including the authority to: (a) interpret, implement and enforce the terms and provisions of this Order (including the injunctive relief provided in this Order) and the terms of the Sale Agreement, the ancillary agreements contemplated thereby, all amendments thereto and any waivers and consents thereunder; (b) protect the Purchaser, or the Purchased Assets, from and against any Claims, Interests or Excluded Liabilities; (c) compel delivery of all Purchased Assets to the Purchaser; (d) compel the Purchaser and the Debtors to perform all of their obligations under the Sale Agreement; (e) resolve any disputes arising under or related to the Sale Agreement, the ancillary

---

[148] Guzior Decl. Ex. 14.

[149] Guzior Decl. Ex. 14.

agreements contemplated thereby, the Sale or the Transactions; and (t) provide any further relief that is necessary or appropriate in furtherance of this Order or the Transactions.[150]

The Asset Sale Agreement expressly contemplates that Nortel sold to Rockstar certain patent infringement litigations – that is clear from the definition of "Patent Related Documentation" and "Transferring Employee".[151]    Notwithstanding that Rockstar and NNI contemplated future patent infringement lawsuits, the parties do not seem to have appropriately addressed what NNI's responsibilities will be with respect to those future litigations and responding to entirely foreseeable third-party subpoenas.  NNI has told this Court in its motion that Rockstar *threatened* NNI with "post-petition liability" because compliance with third-party discovery requests could be a "material" breach of "the Asset Sale Agreement between Rockstar and Nortel" and that "Rockstar clearly has raised the risk of potential post-petition liability for NNI's estate should NNI fail, *even inadvertently*, to shield from disclosure information *that Rockstar **considers** confidential and/or privileged*."[152] Given those threats, which raise serious questions about the Asset Sale Agreement, this Court plainly has authority to enter an order to show cause why the Rockstar Litigation should not be stayed pending: (1) the completion of Nortel's bankruptcy process and (2) a further order from this Court on how NNI can provide full and fair discovery safe from Rockstar's obstructionist threats that NNI's compliance with legitimate discovery requests is a "material" breach of the Asset Sale Agreement.  To be clear, the Court's authority to do that derives entirely from its prior order approving the Asset Sale

---

[150] D.I. 5935 ¶ 39.

[151]*See, e.g.*, D.I. 5935-2, definition of "Patent Related Documentation."

[152] D.I. 14476 ¶¶ 77-78 (emphasis added).

Agreement and the Court could award that relief *sua sponte* by virtue of its express reservation of jurisdiction and power to grant remedies related to the Asset Sale Agreement.[153]

Second, as NNI argues in its motion, "extension of the stay to protect the debtors relate[s] to the administration of the bankruptcy case itself" and therefore does "not require the filing of an adversary proceeding."[154]  Given the central role that Nortel plays in the Rockstar Litigation – Nortel is not an ancillary third-party; rather, Nortel was the origination point of the patents-in-suit and the steward of the patents for many years – the Court should extend the automatic stay to the Rockstar Litigation in an order that relates to the administration of the bankruptcy proceedings.  ***The Rockstar Litigation cannot continue without NNI's full participation in discovery***.  Indeed, NNI has made that apparent by arguing that it needs relief with respect to almost every deposition in the Rockstar Litigation.[155]

Finally, it is well established that the bankruptcy court has authority to enjoin non-debtor litigations through Section 105(a).[156]  The parties, however, would need to request that the Court enjoin the Rockstar Litigation through an adversary proceeding pursuant to Fed. R. Bankr. P. 7001(7).  If the correct procedure is followed, it is uncontroversial that this Court has the power to enjoin the Rockstar Litigation.  TWC respectfully submits that if the Court were inclined to grant any relief to NNI – and again, it is TWC's position that NNI is not entitled to *any* relief under the applicable legal standards – it should deny the present motion and instruct NNI to file

---

[153] NNI concedes in its motion that the Court has authority to enforce its own orders.  D.I. 14476 ¶¶ 95-100.

[154] D.I. 14476 ¶ 105.  As noted above, TWC has doubts as to whether the bankruptcy court can extend the automatic stay without an adversary proceeding.  However, if the Court concludes that NNI's arguments are correct, then the Court also has authority to "administratively extend the automatic stay" to the Rockstar Litigation.

[155] D.I. 14476-2 ¶ 6.

[156] *See, e.g.*, *In re Residential Capital, LLC*, 480 B.R. at 540-41.

an adversary proceeding seeking a stay of the Rockstar Litigation, which TWC has agreed to join. TWC is perplexed by NNI's gross deviation from established procedural rules.

At base, it is unconscionable for NNI to request a stay of discovery – and certainly to request the broad injunctive relief in NNI's proposed order – while the Rockstar Litigation charges forward. This Court should either: (1) stay the Rockstar Litigation or ensure that the Eastern District of Texas will stay the Rockstar Litigation pending completion of NNI's bankruptcy or (2) deny NNI relief from its third-party discovery obligations and allow the defendants in Rockstar's patent infringement actions to fully and fairly defend themselves. [157]

If the Court were to decide that third-party discovery should go forward, there is an important concern for this Court to address to ease NNI's anxiety surrounding inadvertent disclosure of confidential information and Rockstar's inappropriate threats to hold NNI liable for such disclosures, if any. Whether genuine or not, NNI's counsel apparently has been paralyzed by the fear of disclosing confidential information and seems to be unwarrantedly adverse to any amount of document review. TWC respectfully submits that this Court has already provided the appropriate procedure – paragraph 9 of this Court's protective order – for NNI to follow. TWC respectfully welcomes, however, whatever guidance this Court may be willing to provide to facilitate efficient document production from NNI.

Dated  October 14, 2014
      Wilmington, Delaware

BIFFERATO LLC

*/s/ Ian Connor Bifferato*
Ian Connor Bifferato (No. 3273)
J. Zachary Haupt (No. 5344)
800 N. King St., First Floor
Wilmington, DE 19801
Phone: (302) 225-7600

---

[157] The Court could also simply deny NNI's motion and explain that if NNI truly needs relief from third-party discovery obligations it should join TWC in filing an adversary proceeding in this court, pursuant to Fed. R. Bankr. P. 7001(7), seeking a stay of the Rockstar Litigation pending completion of NNI's bankruptcy.

Facsimile: (302) 792-7470

- and –

John M. Desmarais
Dustin F. Guzior
DESMARAIS LLP
230 Park Avenue
New York, New York 10169
DGuzior@desmaraisllp.com
*Time Warner Cable Inc. and Time Warner
Cable Enterprises LLC*