# Exhibit 12



www.desmaraisllp.com

| | Dustin F. Guzior | |
|---|---|---|
| 230 Park Avenue | Direct: 212-808-2944 | P: 212-351-3400 |
| New York, NY 10169 | dguzior@desmaraisllp.com | F: 212-351-3401 |

October 3, 2014

**Via E-Mail: irozenberg@cgsh.com**

Inna Rozenberg
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006

> Re: *Constellation Technologies LLC v. Time Warner Cable*
> Subpoena for Documents to Nortel Networks Inc.

Dear Inna,

I write on behalf of our client Time Warner Cable ("TWC") concerning Nortel Networks Inc.'s response to TWC's subpoena for documents, which was served on Nortel Networks Inc. ("NNI") on June 9, 2014 (the "Subpoena"). We received NNI's proposal on the steps it is willing to take, subject to certain conditions, to provide additional documents in response to the Subpoena (the "NNI Proposal"). We considered the NNI Proposal, along with the information that you provided on our September 23, 2014 teleconference, and our counterproposal is provided below.

I. Trial Exhibits

On September 23, 2014, you explained that the set of trial exhibits in the bankruptcy allocation proceedings is not yet finalized but that it will likely consist of 2,000 to 2,5000 documents. We expressed concern that NNI would produce those documents with confidential information redacted – including confidential information that Rockstar Consortium US LP identified as confidential – even if the documents are designated Attorneys' Eyes Only under the protective order in our case. While we disagree that NNI has any basis for redacting confidential information, we can accept a compromise approach in order to get a timely production of those documents from NNI.

**NNI Proposal**: NNI produces the public versions of all trial exhibits.[1]

**Counterproposal:** We can accept your proposal, subject to a commitment that the documents will be produced by November 3, 2014. TWC will review those documents, identify

---

[1] NNI has already agreed to produce the trial exhibits to TWC, but we now understand that NNI is only willing to produce the public versions of the trial exhibits, which will be redacted .

**DESMARAIS** LLP

Inna Rozenberg, Esq.
October 2, 2014
Page | 2

specific redactions that need to be lifted, and notify NNI promptly of those identified redactions, if any. NNI will send notification letters to any interested party within one week of receiving notice from TWC and will copy TWC on those notification letters. Those notification letters will provide any interested party with one week to object to production, and the letters will explain that TWC has agreed that confidential information can be produced to TWC under the designation Attorneys' Eyes Only. NNI will inform TWC if any party objects to production of the redacted information and the basis for the objection. TWC can then address any outstanding issues with the interested party or parties that raise objections.

We continue to dispute that the bankruptcy order concerning public use of trial exhibits, as opposed to the bankruptcy court's protective order, has any applicability to any documents that NNI produces to TWC. We are willing to accept the NNI Proposal as a compromise.

II. Deposition Transcripts

On September 23, 2014, you confirmed that Christopher Cianciolo, Michelle Lee, John Veschi, and Gillian McColgan are the only deponents from the bankruptcy proceedings that are or have been employed by a Rockstar entity. You explained that Riedel has not been employed by Rockstar, but that he was on the "IP Co Steering Committee" at NNI. Please confirm by October 10, 2014 that none of the other individuals listed on Schedule I to this letter (Lists A-G) were deposed in the allocation proceedings.

**NNI Proposal**: NNI will produce the entire deposition transcripts for Cianciolo, Lee, McColgan, Riedel and Veschi.

**Counterproposal**: We can accept your proposal, subject to one clarification. NNI will produce full deposition transcripts for Cianciolo, Lee, Veschi, McColgan, and Riedel by November 3, 2014. NNI will redact privileged or work product information (including any joint privileged information), but will not redact any information on the basis of confidentiality. Each transcript can be produced under the protective order in our case as Attorneys' Eyes Only. If NNI identifies additional individuals from Schedule I to this letter that were deposed in the allocation proceedings, TWC reserves the right to request the transcripts of those depositions.

III. Bid Evaluation Documents

**NNI Proposal**: NNI will produce three responsive documents to TWC's request for bid evaluation documents.

**Counterproposal:** We can accept your proposal, subject to one clarification and the addition of one search term to the ESI search that NNI performs (*see* Section IV, *infra*). NNI will produce the three documents identified in the NNI Proposal. NNI will redact privileged or work product information (including any joint privileged information), but will not redact any

Inna Rozenberg, Esq.
October 2, 2014
Page | 3

information on the basis of confidentiality. Each document can be produced under the protective order in our case as Attorneys' Eyes Only.

    IV.    <u>Patent Enforcement and Valuation Documents</u>

    <u>ESI Custodians</u>

On September 23, 2014, you explained to me that NNI was tasked with producing documents for certain custodians in the bankruptcy allocation proceedings. You explained that: (1) NNI collected documents for the List A custodians listed on Schedule I to this letter, (2) NNI employed but did not collect documents for the List B custodians listed on Schedule I to this letter, (3) Nortel Networks Limited ("NNL") employed the List D custodians listed on Schedule I to this letter, (4) Nortel Neworks UK Limited employed the List E custodian listed on Schedule I to this letter, (5) Nortel Networks S.A. employed the List F custodian listed on Schedule I to this letter, and (6) NNI was not able to ascertain which Nortel entity employed the List C custodians listed on Schedule I to this letter.[2] With respect to the List A custodians, you explained that NNI has already collected documents for those custodians in the bankruptcy allocation proceedings.

With respect to the List G custodians listed on Schedule I to this letter, we did not discuss whether any of those custodians were employed by NNI and/or if NNI collected documents for any of those custodians for the allocation proceedings. We have come to learn from documents produced by other parties in our case, however, that the List G custodians might have been employed by NNI.

**NNI Custodian Proposal:** NNI proposed to search all documents that were produced in the bankruptcy allocation proceedings for Veschi and Riedel (post-filing period) and for Cicanciolo and Weiss (pre-filing period). We understand from our September 23, 2014 teleconference, however, that NNI is willing to extend the search to all data for Veschi and Riedel, pre- and post-filing. NNI proposed to withhold any documents that were previously determined to be privileged in the review for the allocation proceedings.

**Counterproposal**: Based on the motion that NNI filed with the U.S. Bankruptcy Court for the District of Delaware, Case No. 09-10138(KG), Doc. 14476 (the "NNI Motion"), we understand that NNI has access to approximately 3 million documents that NNI, the other Nortel estates, and Nortel's legal and financial advisers (including Lazard and Global IP) collected in the allocation proceedings. We understand that pool of documents includes the material that NNI collected for the List A custodians listed on Schedule I to this letter.

---

[2] Please let us know if you have any corrections to make to those representations; in particular, if NNI collected documents in the allocation proceedings for any custodians on List B or if NNI employed and/or collected documents for any of the custodians on Lists C-F.

**DESMARAIS**LLP

Inna Rozenberg, Esq.
October 2, 2014
Page | 4

      We require additional information on that set of documents to determine the extent of any purported burden on NNI from review of that set of material. Please let us know by next Friday, October 10:

1. The custodians from Lists B-G on Schedule I to this letter for which *NNI* collected data in the allocation proceedings;

2. The date range of the data that NNI collected for the allocation proceedings for each of the custodians from Lists A-G on Schedule I, and whether NNI has access to data going back to an earlier date for each custodian;

3. Whether all of the data that *NNI* collected in the allocation proceedings is included in the set of approximately 3 million documents;

4. The custodians from Lists A-G on Schedule I to this letter, other than those identified in response to item 1 of this list, for which any other Nortel estate collected data for the allocation proceedings;

5. The date range of the data collected for the custodians identified in response to item 4 of this list;

6. Whether all of the data collected for the custodians identified in response to item 4 of this list is included in the set of approximately 3 million documents;

7. To the extent not identified by items 1 and 4 to this list, the other custodians for which data is included in the set of approximately 3 million documents; and

8. The approximate volume of documents from each of Lazard and Global IP in the set of approximately 3 million documents.

    That information will help us understand the extent to which NNI has easy access to potentially relevant data that can be searched, and will further help us segregate the NNI data from the data produced by other, potentially foreign entities.

    TWC believes that it is appropriate to focus, as a priority, on the set of approximately 3 million documents to which NNI has easy access. We propose that the appropriate custodian set consists of: (1) all custodians on List A on Schedule I to this letter for which NNI collected data for the allocation proceedings, (2) all other custodians from Lists B-G on Schedule I to this letter for which NNI or any other Nortel estate collected data for the allocation proceedings, and (3) Lazard and Global IP. All data for those custodians that is part of the set of approximately 3 million documents should be searched regardless of date. To prioritize even further, NNI

**DESMARAIS**LLP

Inna Rozenberg, Esq.
October 2, 2014
Page | 5

should start with the set of material that was collected by NNI and then move to the set of data collected by other parties.[3]

As a second priority, we welcome a conversation with NNI concerning the availability of a greater date range of data for the custodians for which NNI collected data for the allocation proceedings (List A plus any new custodians identified from List G). We understand that the set of 3 million documents might not contain data for the full date range that is relevant to the TWC case. Ideally, the date range for any additional collection would be 1997-Present (the lower bound is the earliest priority date for the patents-in-suit). We welcome a conversation on whether that data, to the extent it ever existed, still exists and the feasibility of gathering it together to be searched.

With respect to privilege, TWC can accept NNI's proposal to withhold documents that were withheld[4] as privileged in the allocation proceedings as long as NNI will produce any applicable privilege logs that it produced in the allocation proceedings. We welcome a conversation with NNI on how to further treat potentially privilege material, including use of privilege search terms, to reduce any burden associated with potentially privileged material.

<u>Iron Mountain and LiveLink System</u>

While reviewing the NNI Motion, we learned for the first time that NNI and/or other Nortel entities have stored a large volume of electronic and hard copy documents with Iron Mountain. We also learned that the data is, as a practical matter, inaccessible because, as NNI explains in the NNI motion, the data and documents have not been stored and cataloged in a way that permits identification of specific data sets. We also learned that NNI has concern that data and documents have been destroyed. Finally, we also learned that NNI has access to a LiveLink system, but that the system is very difficult to operate.

While TWC does not currently believe it is necessary to search all of that data, please let us know by next Friday, October 10 the lower-bound *year* of data stored at each of Iron Mountain and the LiveLink system. Please also produce to us documents sufficient to understand how data was preserved and stored, including all catalogs or other lists referenced in the NNI Motion. Please also produce or explain all historical Nortel data preservation policies so that TWC can understand the scope of data that NNI likely preserved or destroyed as a matter of course, and produce or explain Nortel's data preservation policy after filing for bankruptcy.

---

[3] There is some confusion surrounding what was "collected" for the allocation proceedings versus what was "produced." When you respond on October 10, 2014 with clarifications, please let us know if the set of approximately 3 million documents is the set of *collected* documents or the set of *produced* documents. If it is only the set of *produced* documents, we are interested to learn more about the set of *collected* documents.

[4] If a document was redacted in the allocation proceedings, TWC still expects to receive the redacted document.

Inna Rozenberg, Esq.
October 2, 2014
Page | 6

Search Terms

**NNI Proposal:** Schedule II to this letter lists the search terms that NNI proposed.

**Counterproposal:** Schedule III to this letter lists the general search terms that TWC proposes, which is a shorter list than the one that NNI proposed. Schedule IV lists the technology search terms that NNI requested that TWC construct. TWC proposes that all search terms listed on Schedules III and IV to this letter be run against the custodian data set to identify potentially relevant documents.

V.  Technical Documents

When we spoke on September 23, 2014, I explained to you that TWC has grave concerns that NNI and the other Nortel estates have possession of an important set of technical documents related to the patents-in-suit. I explained to you that all of the patents-in-suit originated at Nortel, and I also explained to you that we were not looking for NNI or the other Nortel estates to produce the electronic Data Room ("EDR") documents or other Patent Related Documentation, as defined in the Asset Sale Agreement. I explained to you that we have taken seriously your comments that we should get that material from Rockstar, but that the Rockstar entities are obviously unable to tell us what relevant technical documents NNI has in its possession that were not transferred to Rockstar. I explained to you that, as the origination point for the patents-in-suit, Nortel is likely to have highly relevant documents regarding the: (1) development of technologies described in the patents-in-suit, (2) efforts to commercialize the technologies described in the patents-in-suit, (3) alleged conception and reduction to practice of the claimed inventions disclosed in the patents-in-suit, (4) construction of the claim terms and the embodiments of the patents-in-suit,(5) relevant prior art, (6) the prosecution history of the patents-in-suit, and (7) encumbrances on the patents-in-suit among other knowledge.

You explained to me that Nortel no longer has employees with knowledge of the technologies in the patents-in-suit, the development of those technologies, whether the technology was ever commercialized, or whether the company ever attempted to commercialize the technology. Accordingly, you explained that Nortel no longer had available employees that could identify documents relevant to the technologies described in the patents-in-suit. We discussed that: (1) TWC would, at your request, create a list of specific technology search terms for each patent-in-suit and the categories of technologies that Constellation Technologies LLC identified as relevant to enforcement of Nortel's patents and (2) that NNI would consider internally what data set the technology search terms could be run against to yield potentially responsive documents.

The technology search terms that NNI requested are listed on Schedule IV to this letter. Please let me know by next Friday, October 10, what conclusions NNI has come to concerning the appropriate data set against which to run the search terms.

Inna Rozenberg, Esq.
October 2, 2014
Page | 7

      VI.    Rockstar Documents

TWC reiterates plainly that it is not seeking to have NNI produce documents that Rockstar and/or its litigation subsidiaries can produce to TWC.  NNI demanded that TWC get the EDR documents, relevant transaction documents between Nortel and Rockstar, and Patent Related Documentation, as defined in the Asset Sale Agreement, from Rockstar.  TWC capitulated to that demand.  Given TWC's capitulation, TWC is both concerned and perplexed by the position that NNI took in the NNI Motion; in particular, that TWC is seeking from NNI documents that it should seek from Rockstar.  The history of negotiations between TWC and NNI reveals a narrowing process in which TWC has consistently narrowed its requests to only the set of material that is uniquely in the possession, custody, or control of NNI.  That narrowing process has led to five categories of documents being requested of NNI:

1) Trial Exhibits – NNI has never maintained that these documents can be produced by Rockstar.

2) Deposition Transcripts - NNI has never maintained that these documents can be produced by Rockstar;

3) Bid Evaluation Documents – TWC has repeatedly explained that it is seeking only the set of Nortel internal documents that related to the bids that various companies entered for the Nortel patent portfolio.  NNI has never explained why Rockstar would have that material.

4) Patent Enforcement and Valuation Documents - TWC has repeatedly explained that it is seeking only the set of Nortel internal documents that relate to enforcement of Nortel's patents and Nortel's valuation of its patent portfolio.  TWC has explained that the patent enforcement material is not only important to its defenses, but critical to its laches defense.  TWC provided NNI with specific examples – from the documents that NNI already produced – of material that is highly relevant to TWC's defenses.  NNI has never explained why Rockstar would have any of that material, and the NNI Motion, in fact, states plainly that Rockstar *would not* have that material.

5) Technical Documents – TWC has explained that it does not want NNI to produce copies of the EDR documents and Patent Related Documentation that it can get from Rockstar.  TWC is looking, for example, to receive the internal Nortel documents related to development of the relevant technology and commercialization of that technology.  NNI has never explained why Rockstar would have that material, and NNI was unwilling, during our September 23, 2014 teleconference, to represent that all such documents were transferred to Rockstar.

**DESMARAIS**LLP

Inna Rozenberg, Esq.
October 2, 2014
Page | 8

      Given that TWC is, by the definition of each requested category of documents, seeking documents that are not in the possession, custody, or control of Rockstar, TWC is perplexed as to how it can receive those documents from Rockstar or how NNI's proposed discovery process in the NNI Motion makes sense with respect to TWC. We welcome NNI's views on why it believes any of that material is available from Rockstar.

      VII.    <u>Conditions in NNI Proposal</u>

      As discussed on September 23, 2014, TWC is willing to accept conditions (a) and (b) to the NNI Proposal. With respect to condition (d) to the NNI Proposal, TWC is willing to agree to that condition once NNI and TWC have come to an agreement on the appropriate protocol that NNI should follow in the first instance to respond to TWC's subpoena. So that the purpose of condition (d) can be fully realized, TWC would not want to agree to it until it better understands the nature of the data stored with Iron Mountain and on LiveLink, and is comfortable that those data sources should not be searched. As explained above, that should not be understood as a demand that NNI search those data sources. TWC simply wants to better understand them in order to make an informed decision to forego them or demand that they be searched.

      Also as discussed on September 23, 2014, TWC cannot agree to reimburse NNI for costs and fees at this time. TWC is willing to revisit this topic if NNI and TWC come to an agreement on the appropriate protocol that NNI should follow to respond to TWC's subpoena. Once we understand the scope of what NNI is going to do, we can discuss the work items, if any, for which TWC might reimburse or partially reimburse NNI. TWC is concerned, however, that NNI is simultaneously represented by Cleary, Gottlieb, Steen & Hamilton LLP (with respect to the TWC subpoena) and Crowell & Moring LLP (with respect to Google's subpoena and the subpoenas from the Android OEMs). When we spoke on September 23, 2014, you were not able to tell me anything about the level of coordination between Cleary and Crowell, and you could not even guarantee that the firms would not be doing the same work twice. NNI itself, in the NNI Motion, has emphasized the similarity among the subpoenas that have been served on NNI, and we do not think it is reasonable for NNI to pay two law firms to do the same work. Any conversation we have with NNI regarding reimbursement, if any, would need to provide us comfort that work is not being done twice and that NNI is not "double dipping" by seeking duplicative reimbursement from TWC, Google, and the Android OEMs.

      \*      \*      \*

**DESMARAIS**LLP

Inna Rozenberg, Esq.
October 2, 2014
Page | 9

      I look forward to hearing your responses to certain of TWC's requests by October 10, 2014, and I would welcome a call to discuss our counterproposal.

      Regards,

      */s/ Dustin F. Guzior*
      Dustin F. Guzior

**DESMARAIS**LLP

Inna Rozenberg, Esq.
October 2, 2014
Page | 10

## Schedule I
## Custodian Lists

**Asterisk (*) denotes custodian was listed as a relevant witness in Constellation Technologies LLC's initial disclosures. All other custodians are from Nortel's disclosure related to the Asset Sale Agreement of relevant individuals with knowledge about the Nortel patent portfolio.**

### List A

1. John Veschi*
2. George Riedel*
3. Christopher Cianciolo*
4. Richard Weiss*
5. Gillian McColgan*
6. Donald Powers*
7. Art Fisher*

### List B

1. Bernard Tiegerman*
2. Randy Mishler*
3. Sanjoy Sen*
4. Venon Shaw*
5. Robert Pfeffer*
6. Andre Fredette*
7. Naganand Doraswamy*
8. Anoop Ghanwani*

### List C

1. Russel W. Pretty*
2. Liangyu L. Jia*

### List D

1. Keith M. Smith*
2. Hrishikesh Gossain*
3. Thinh Nguyen*
4. Guo Qiang Q. Wang*
5. Kent Felske*
6. Wenfeng Chen*

DESMARAIS LLP

Inna Rozenberg, Esq.
October 2, 2014
Page | 11


7. Chenjiang Hu*
8. David Mann*
9. Rolf Meier*
10. Tim. J. Rahrer*

**List E**

1. Brian Unitt*

**List F**

1. Loa Andersson*

**List G**

1. Afzal Dean
2. Alfi Guindi*
3. Atulan Navarantnam
4. Hinta Chambers
5. Danny Lingman
6. Hamid Ould Brahim
7. Jerome Chiabaut
8. Scott Widowson
9. Raj Krishnan
10. Peter Lorenz
11. Lewis Lockhart
12. Claire Adams
13. David Berten
14. Lugay Blanscet Chiang
15. Alexander Brkich
16. Liam Casey
17. Holly Creamer
18. J Erik Fako
19. John Mark Hearn
20. Fabrice Jestin
21. C William Junkin
22. Stanley Kopec
23. Amie Kosabek
24. Michelle Lee
25. Nancy McEwan
26. Christine Orlando

**DESMARAIS**LLP

Inna Rozenberg, Esq.
October 2, 2014
Page | 12

## Schedule II
## NNI Proposal Search Terms

1. ("intellectual property" or "IP" or "patent*") and "licens*"
2. ("intellectual property" or "IP" or "patent*") and ("sublicens*" or "sub-licens*")
3. ("intellectual property" or "IP" or "patent*") and "cash flow"
4. ("intellectual property" or "IP" or "patent*") and "royalt*"
5. ("intellectual property" or "IP" or "patent*") and ("projection*" or projected)
6. ("intellectual property" or "IP" or "patent*") and "valu*"
7. ("intellectual property" or "IP" or "patent*") and "sale"
8. ("intellectual property" or "IP" or "patent*") and "revenue"
9. ("intellectual property" or "IP" or "patent*") and "monetiz*"
10. ("intellectual property" or "IP" or "patent*") and "strateg*"
11. ("intellectual property" or "IP" or "patent*") and "patent portfolio"
12. ("intellectual property" or "IP" or "patent*") and "enforc*"
13. ("intellectual property" or "IP" or "patent*") and "litigat*"
14. ("intellectual property" or "IP" or "patent*") and "Harvest"
15. ("intellectual property" or "IP" or "patent*") and "claim*"
16. ("intellectual property" or "IP" or "patent*") and "auction*"
17. ("intellectual property" or "IP" or "patent*") and ("FMV" or "fair market value")
18. ("intellectual property" or "IP" or "patent*") and "discount rate*"
19. ("intellectual property" or "IP" or "patent*") and "predomin*"
20. ("intellectual property" or "IP" or "patent*") and "Lazard"
21. ("intellectual property" or "IP" or "patent*") and ("Global IP" or "*giplg.com")
22. ("intellectual property" or "IP" or "patent*") and "working group*"
23. ("intellectual property" or "IP" or "patent*") and ("IPCO" or "IP Co")
24. ("intellectual property" or "IP" or "patent*") and "regist* NEAR10 patent"
25. ("intellectual property" or "IP" or "patent*") and Iceberg
26. ("intellectual property" or "IP" or "patent*") and "evolution"
27. ("intellectual property" or "IP" or "patent*") and "defend*"
28. ("intellectual property" or "IP" or "patent*") and "infring*"

Inna Rozenberg, Esq.
October 2, 2014
Page | 13

## Schedule III
## General Search Terms

1. "intellectual property" or "IP" or "patent*" or iceberg or portfolio* or residu*
2. "licens*" or cross-licens* or "cross licens*" or crosslicens*or sublicens*" or "sub-licens*
3.  royalt*
4. Monetiz*
5. IPCo or "IP Co" or "NPE" or troll or "PAV"
6. *enforc* or *assert* or negotiat*
7. Commercial* w/3 (technolog*)
8. Harvest
9. Lazard or *lazard*
10. "Global IP" or *giplg.com
11. Defen*
12. TWC or "time warner" or Cisco or Arris or Suddenlink OR Charter OR Cable OR WOW* OR (wide w/3 west) OR knology OR cequel
13. Standard* or IETF or IEEE or ITU or ATIS or ETSI or W3C or TIA or "broadband forum"
14.  bid* and  (Google or Apple or RPX or Norpax OR Ranger or Ericsson or blackberry or "RIM" or Sony or EMC or Oracle or Microsoft or Intel or IBM)
15. Rockstar

**DESMARAIS**LLP

Inna Rozenberg, Esq.
October 2, 2014
Page | 14

## Schedule IV
## Technology Search Terms

Search Terms for U.S. Patent Nos. 6,128,649 and 8,464,299

1. Video w/2 conferenc!
2. (Video w/3 demand) or video-on-demand or VOD
3. (switched* w/3 video) or switched-digital or SDV or SDB
4. (video or media or stream or channel or content) w/s (determin* or choos* or select* or indicat*) w/s (policy or condition or bandwidth or resources or load)
5. (video or media or stream or channel or content) w/s (conserve* or reclaim* or regain*) w/s (resource* or bandwidth)
6. (video or media or stream or channel or content or data) w/s (real-time or realtime or "real time")
7. "adaptive bitrate*" or "adaptive bit rate*" or "adaptive bit-rate*" or ABR or HLS or HSS or Silverlight or "HTTP live streaming" or "Smooth Streaming"
8. "Scientific Atlanta" or ARRIS or Motorola or "Big Band" or "BigBand" or seachange or concurrent or "digital rapids" or invivo or velocix or ncube or broadbus or arroyo
9. "set-top box" OR "set top box" OR STB OR "video server" or QAM or "video groomer"
10. Pegasus or "full service network" or "interactive service*" or interactiveservice*

Search Terms for U.S. Patent Nos. 6,901,048 and 8,134,917

1. Fast-rerout! or (fast w/2 rerout!) or "FRR"
2. MPLS or "multiprotocol label switching" or "multi-protocol label switching"
3. Protection path* or protection cycle* or p-cycle*
4. (link or node or router) w/s protect!
5. "Tunnel packet*" or header w/3 packet* or encapsulat! w/s packet* or label! w/3 packet*
6. Protect w/s link fail!
7. "Label Switched Path*" or "LSP"
8. Routing /s (backup w/5 path*)
9. "Label Distribution Protocol" or "LDP" or "Resource Reservation Protocol" or "RSVP" or ("Resource Reservation Protocol" w/2 "Traffic Engineering") or "RSVP-TE"

Search Terms for U.S. Patent Nos. 6,845,389 and 7,154,879

1. PacketCable
2. "SIP" or "SAP"
3. precondition! /3 "SIP"
4. resource! /3 reserv! & (SIP or call)

Inna Rozenberg, Esq.
October 2, 2014
Page | 15

5.  (QoS or "quality of service") /3 "SIP"
6.  (passive /1 optical /1 network!) or EPON
7.  guard /1 band & (TDM! or "time division multiple access" or "time division multiplexing")
8.  (ethernet /3 ("first mile" or "last mile")) or (802* & (efm or elm)) or ETTH or ("ethernet to the home") or FTTx or FTTH
9.  ethernet /5 (TDMA or TDM or "time division multiple access" or "time division multiplexing")
10. (IP or "internet protocol" or ethernet) & (TDM! or "time division multiple access" or "time division multiplexing")

Search Terms for Constellation Technology Categories

1. "link failure"
2. "protection-cycles" or "p-cycles" or "protection cycles" or "p cycles"
3. "optical line terminal" or "optical line terminals" or "OLT" or "OLTs" or "optical network unit" or "optical network units" or "ONU" or "ONUs"
4. "bandwidth" and (strand or stranded or recovery)
5. DIA or EPL or EVPL or ELAN or CAREN
6. "session resource manager" or "staging processor" or "edge switch" or "QAM" or "mini carousel" or "guide carousel"
7. "dynamic ad insertion" or "dynamic ad inserting" or "dynamic ad insert"
8. ("dynamic switching" and ("SD" or "HD")) or "dynamic stream switching"
9. "video streaming" or "video stream" or ("alternate streams" and bit)
10. IMS or SDP or "bit stream file" or VoIP or QoS
11. "set-top box" OR "set top box" OR STB or playstation OR "play station" OR PS* OR Xbox