## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

*In re*

Nortel Networks Inc., *et al.*

        Debtors.

Chapter 11

Case No. 09-10138(KG)
Jointly Administered

Re: D.I. 14776, 14535
**Hearing Date: Nov. 7, 2014 at 12:00 p.m.**
**Objection Deadline: Oct. 21, 2014[1] at 4:00**
**p.m.**

---

### OBJECTIONS OF GOOGLE INC. TO DEBTORS' AMENDED MOTION FOR
### (A) AN ORDER ENFORCING AND/OR EXTENDING THE AUTOMATIC STAY,
### (B) AN ORDER ENFORCING THE COURT'S PRIOR ORDERS,
### (C) A PROTECTIVE ORDER, AND
### (D) RELATED RELIEF UNDER SECTION 105(a)

FRIEDLANDER & GORRIS, P.A.

Jeffrey M. Gorris (Bar No. 5012)
Christopher M. Foulds (Bar No. 5169)
222 Delaware Ave., Suite 1400
Wilmington, DE 19801
(302) 573-3500
(302) 573-3501 facsimile

QUINN EMANUEL URQUHART &
SULLIVAN LLP

Charles K. Verhoeven
David Eiseman
David Perlson
Matthew D. Cannon
quinn-google-n.d.cal.-13-
05933@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
(415) 875-6600
(415) 875-6700 facsimile

(additional counsel listed on signature page)

---

[1]   NNI and Google agreed that Google could timely serve these objections on or before October 21, 2014, notwithstanding NNI's initial notice that objections would be due on October 14, 2014.

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iv

I.      Introduction ...............................................................................................................1

II.     Jurisdiction ................................................................................................................4

III.    Statement of Facts .....................................................................................................4

      A.     Nortel's Bankruptcy and Patent Sale ............................................................4

      B.     Rockstar's Litigation Campaign ....................................................................6

            1.     The Rockstar-Google Patent Litigation ............................................7

            2.     Rockstar Puts Nortel's Information at Issue in the Google Patent Cases ...............................................................................................8

      C.     Rockstar's Resistance to Google's Discovery Efforts ..................................12

      D.     Google's Subpoenas to NNI and Related Entities .......................................13

IV.    Legal Rule ...............................................................................................................16

      A.     Parties Are Entitled to Relevant Third Party Discovery ..............................16

      B.     The Party Opposing Discovery Bears the Burden of Proving Why Discovery Should Not Be Allowed ...............................................................17

V.     Argument ................................................................................................................19

      A.     Google's Subpoenas Seek Relevant Information .........................................19

            1.     NNI Has Admitted It Possesses Relevant Information, Including "Patent Documents" and "Valuation Documents" ...............19

            2.     Rockstar Has Acknowledged NNI Possesses Relevant Information ........................................................................................22

      B.     Google's Subpoenas Impose No Undue Burden on NNI .............................23

            1.     Google Is Willing to Make Reasonable Accommodations to Minimize NNI's Obligations .............................................................23

            2.     NNI's Proposed Relief Would Deprive Google of Relevant Information Possessed Only by NNI .................................................25

3.      NNI Cannot Prove It Would Suffer Any Undue Burden by
Responding to Google's Subpoenas ..........................................................27

C.      The Bankruptcy Code Does Not Shield Nortel from Reasonable
Discovery ...............................................................................................31

1.      The Automatic Stay of § 362 Does Not Apply to Google's
Subpoenas ...............................................................................32

2.      Responding to Google's Subpoenas Would Not Force NNI
to Violate Any Court Orders......................................................33

3.      NNI Has Not Justified Entry of a Protective Order Under
Section 107(b)(1) of the Bankruptcy Code or Bankruptcy
Rule 9018 ...............................................................................34

4.      NNI Has Not Satisfied the Injunction Standards Under
§ 105(a) ..................................................................................35

D.      No Stay of Discovery Should Apply to NNI's Advisors or Former
Employees...............................................................................................38

E.      NNI Has Not Justified Its Request for Discovery Cost-Shifting ...........................39

VI.     Conclusion ...........................................................................................................41

# TABLE OF AUTHORITIES

**Page**

## CASES

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014)........................................................................... 23

*AsymmetRx, Inc. v. Biocare Med., LLC*,
  582 F.3d 1314 (Fed. Cir. 2009)........................................................................... 20

*Callwave Commc'ns, LLC v. Wavemarket, Inc.*,
  C 14-80112 JSW (LB), 2014 WL 2918218 (N.D. Cal. June 26, 2014)............... 39

*Conopco, Inc. v. Warner-Lambert Co.*,
  No. Civ. A. 99-101 (KSH), 2000 WL 342872 (D.N.H. Jan. 26, 2000) ............... 21

*Constitution Bank v. Levine*,
  151 F.R.D. 278 (E.D. Pa. 1993)........................................................................... 38

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
  318 F. Supp. 1116  (S.D.N.Y. 1970)............................................................... 20, 21

*Groner v. Miller (In re Miller)*,
  262 B.R. 499 (B.A.P. 9th Cir. 2001)................................................................... 33

*High Point SARL v. Sprint Nextel Corp.*,
  No. 09-2269-CM-DJW, 2011 WL 3241432 (D. Kan. Jul. 29, 2011) ............. 18, 20

*Holguin v. Cnty. of Los Angeles*,
  No. CV 10-8011-GW (PLAx), 2011 WL 7128640 (C.D. Cal. Oct. 12, 2011) ........... 17

*In re Alem*,
  No. 13-00119, 2013 WL 4840486 (Bankr. D.D.C. Sep. 11, 2013) ..................... 33

*In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*,
  140 B.R. 969 (N.D. Ill. 1992) ............................................................................. 38

*In re Nat'l Med. Imaging, L.L.C.*,
  No. 05-12714 DWS, 2005 WL 3299712 (E.D. Pa. Oct. 31, 2005) ..................... 18

*In re Residential Capital, LLC*,
  480 B.R. 529 (Bankr. S.D.N.Y. 2012)............................................... 16, 17, 33, 37

*Kenoyer v. Cardinale (In re Kenoyer)*,
  489 B.R. 103 (Bankr. N.D. Cal. 2013) ............................................................... 33

*Khasin v. Hershey Co.*,
  No. 5:12-cv-01862-EJD-PSG, 2014 WL 690278 (N.D. Cal. Feb. 21, 2014)..........18, 29

*Lane v. Philadelphia Newspapers, LLC (In re Philadelphia Newspapers, LLC)*,
  423 B.R. 98 (E.D. Pa. 2010) ............................................................................... 36

*Linder v. Calero-Portocarrero,*
    183 F.R.D. 314 (D.D.C. 1998)................................................................................ 39

*Ormco Corp. v. Align Tech., Inc.,*
    498 F.3d 1307 (Fed. Cir. 2007)............................................................................ 20

*Painters Joint Comm. v. Emp. Painters Trust Health & Welfare Fund,*
    No. 2:10-cv-01385-JCM-PAL, 2011 WL 4573349 (D. Nev. Sept. 29,
    2011) ...................................................................................................................... 17

*Peter Rosenbaum Photography Corp. v. Otto Doosan Mail Order Ltd.,*
    No. 04 C 0767, 2004 WL 2973822 (N.D. Ill. Nov. 30, 2004).............................. 33

*Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.,*
    813 F.2d 1207 (Fed. Cir. 1987)............................................................................ 17

*Wells Fargo Bank, N.A. v. Konover,*
    259 F.R.D. 206 (D. Conn. 2009).......................................................................... 40

## STATUTES

FED. R. CIV. P. 26(b)(1) ..................................................................................................... 16

Fed. R. Civ. P. 45(d)(1)...................................................................................................... 17

Local Rule 7026-3(i).......................................................................................................... 39

## I.    INTRODUCTION

1.      In its motion, Debtor Nortel Networks Inc. ("NNI") seeks to block Google Inc. ("Google") from obtaining meaningful discovery of the facts relating to NNI's sale of over 6,000 patents at auction conducted as part of the bankruptcy proceedings in this Court.  Nortel concedes that the "valuation documents" sought by the Google subpoenas are uniquely within its possession, custody, and control, and that the requested documents are highly relevant to the claims and defenses in the three currently-pending litigations between Google and Rockstar Consortium US LP and related entities (collectively, "Rockstar").  Instead, NNI's motion is premised entirely on the alleged burden in responding to Google and other third-party subpoenas.  But NNI is not just an ordinary third party here.  The Rockstar litigations, and the subpoenas served on NNI and related entities in those litigations, arise directly from NNI's auction of its patents in June 2011. Rockstar has filed numerous litigations against numerous defendants, including Google, asserting various NNI patents.  It should come as no surprise to NNI that it would be subpoenaed in those cases.[2]  Yet, in response, NNI has made every effort to preclude Google from obtaining even the most basic discovery of relevant documents that are within NNI's control and can be found nowhere else.  In that context, NNI's objections based on undue burden ring hollow—particularly in light of the $4.5 billion that NNI obtained from the sale to Rockstar.

2.      Google's subpoenas are directed to unique NNI documents that relate to virtually every claim at issue in the Rockstar cases, both with respect to liability and

---

[2]    In addition to the subpoenas issued by Google in the three cases pending between Google and Rockstar, NNI's motion addresses subpoenas served by Time Warner Cable Inc. and Verizon entities in other Rockstar infringement suits.  Mot. at 16.

damages.  For example, statements by the patent owner regarding the alleged scope,

novelty, and value of asserted patents are directly relevant to core issues in the pending

patent infringement cases, including claim interpretation, infringement, invalidity, and

damages.  Nortel's efforts to commercialize its patents (if any)—whether by developing

patent-practicing products or licensing the patents to others—are particularly important to

the invalidity of the asserted patents and Rockstar's demands for "reasonable royalty"

damages from Google.  In fact, in one of the pending Rockstar cases against Google, the

District Court recognized the relevance of exactly this type of information when it

recently ordered Rockstar to produce certain NNI documents on an expedited basis—

over NNI's objections.

3.     Moreover, it is Rockstar, not Google, that has repeatedly put NNI's

auction-related activities at issue in the pending cases against Google.  (*See* Sec. III.B.2

*infra*.)  In addition to including allegations based on the NNI auction in its various

pleadings, Rockstar has repeatedly alleged in pleadings and other filings that the NNI

patent auction is relevant to the alleged value of the patents Rockstar has asserted against

Google.  In that regard, Rockstar has identified NNI, NNI's affiliates, Nortel's advisors,

and Nortel's former employees as likely to possess relevant information relating to NNI's

pre-auction and auction-related activities.  Google therefore requires discovery from NNI

in order to defend itself against these allegations.

4.     Notably absent from NNI's motion is any reference to the extensive

discussions between the parties before NNI filed its motion.  Contrary to NNI's

suggestion, Google has never insisted that NNI retrieve and search archived hard copy

files or outdated electronic backup systems for responsive documents.  Those arguments

are merely an attempt to raise as many irrelevant objections as possible on issues that are fundamentally beside the point.  Instead, Google has repeatedly attempted to discuss ways to streamline NNI's responses to the subpoenas, while still providing the discovery that Google requires.  Indeed, only after filing its motion, NNI for the first time disclosed to Google the existence of the electronic database (comprising approximately 3 million documents) that had been compiled in connection with the Allocation Proceeding.  In response, Google has continued to engage NNI in discussions, including a proposal for searching the electronic database for responsive information using a set of suggested search terms.  To date, Google's proposal remains unanswered.

5.      Moreover, in addition to the Protective Orders in place in the Rockstar cases and NNI's bankruptcy proceedings, Google has repeatedly made plain that it is also willing to consider any reasonable proposals from NNI to further protect allegedly confidential or privileged information in the requested documents.  With these compromises, Google's subpoenas impose no significant burden.

6.      Timing is essential in this instance.  Under the Scheduling Orders in the pending Rockstar cases, the deadline for the completion of all fact discovery, including the production of documents and any depositions, is January 2015.  Thus, NNI's proposal regarding the production of heavily redacted transcripts and exhibits from the Allocation Proceeding is not only unworkable, but also would effectively prevent Google from obtaining any meaningful discovery from NNI.

7.      NNI made billions of dollars by selling its patents to Rockstar, enabling Rockstar to file these lawsuits against Google.  Google is entitled to discovery of all relevant information relating to the asserted patents—information that only NNI

possesses.  There is no basis in the Federal Rules of Civil Procedure or the Bankruptcy

Code for denying Google access to this highly relevant discovery.  Accordingly, Google

objects to NNI's requested relief and respectfully requests that NNI's motion be denied in

its entirety.

## II.     JURISDICTION

8.      For the limited purpose of this motion, Google does not dispute that the

Court has jurisdiction under 28 U.S.C. § 1334 to rule on NNI's motion for relief under 11

U.S.C. § 105.

9.      Google denies that this Court has any other basis for exercising

jurisdiction over Google's subpoenas.  This is not a core proceeding, as it does not

concern or materially affect the disposition of any Nortel assets.  Google's subpoenas

also do not implicate any orders in core proceedings that have been issued by this Court.

Google will address those issues further in its discussion of the merits below.

## III.    STATEMENT OF FACTS

### A.     Nortel's Bankruptcy and Patent Sale

10.     NNI, along with many of its corporate affiliates (collectively, "Nortel"),

filed for bankruptcy relief in 2009.  Mot. at ¶ 13.  To liquidate and satisfy creditors,

Nortel sold off its various assets in a series of nine major transactions from 2009 through

2011.  Mot. at ¶ 18.

11.     The divested assets included a portfolio more than 6,000 patents and

patent applications.  Under the aegis of an "IP Steering Committee," Nortel contemplated

completing its liquidation by (1) forming a new entity (the "IPCo Business") that would

pursue royalty income from licensing and litigating Nortel's patents or (2) selling all of

the patents to a third party.  *See* D.I. 13601 at ¶¶ 49-63.  To make the business decision as

to which course to pursue, NNI engaged in extensive preparation.  *See id.*  It reviewed its

patent assets and related documentation, prepared claim charts mapping Nortel's patents

against potentially infringing products, and produced valuations of the Nortel patents.

*See id.*  NNI also retained the Global IP Law Group and Lazard Fréres & Co. LLC to

advise it on the potential IPCo Business.  *See id.*  And NNI consulted law firms regarding

the cost of pursuing infringement litigation in the United States.  *See id.* at ¶¶ 57-58.

12.     There is no doubt that had NNI chosen to file patent infringement cases

itself, all of the information Google seeks would be required to be produced by NNI as a

party.  NNI, however, determined that it should auction off its patents rather than form a

patent litigation entity itself.  To facilitate the auction, NNI collected information about

the patents that remained in its portfolio and provided that information to various

potential bidders in an electronic data room.  Mot. at ¶ 20.  NNI did not include

documents from its IPCo Business in the materials it provided to potential bidders.  *Id.*

13.     Rockstar Bidco made the $4.5 billion winning bid at the June 2011

auction.  The sale closed on July 29, 2011.  Mot. at ¶ 23.  At closing, NNI delivered

certain patent-related documents to Rockstar Bidco.  *Id.*  NNI did not keep records of

what documents it transferred to Rockstar Bidco (*see* Cannon Decl. at ¶ 2), although NNI

represents that no "confidential and privileged IPCo Business documents and

information" was included (Mot. at ¶ 23).

14.     The patent sale to Rockstar Bidco was governed by an Asset Sale

Agreement that this Court approved on July 11, 2011.  *See* D.I. 5935.  Among other

provisions, that agreement defines NNI's obligations with respect to Rockstar's

"Purchaser Confidential Information."  The agreement permits disclosure of confidential

information "as may otherwise be required, based on the advice of legal counsel, under applicable Law."  D.I. 5935-2 at § 5.11(b).  The only condition on such disclosure is the provision of notice to Rockstar Bidco "so that, where possible, the Purchaser [Rockstar Bidco] may seek a protective order or other appropriate remedy."  *Id.*  In the event that Rockstar desires to contest disclosure of the requested discovery, NNI is obligated to "cooperate with the Interested Party in taking steps to resist or narrow the scope of such request or legal process (at the expense of the Purchaser)."  *Id.*  If no protective order is obtained, NNI "may without liability" produce the information that it is legally required to produce.  *Id.*

15.     It is Google's understanding that the sale proceeds have been retained by NNI's estate pending resolution of allocation disputes.  The various Nortel estates have been litigating the allocation of proceeds from Nortel's asset sales in this Court.  Google is unaware of any restriction on NNI's ability to use the sale proceeds to respond to subpoenas served on NNI.

16.     In connection with the allocation proceeding, NNI has access to a searchable litigation database containing roughly 3 million documents relating to the value of Nortel's liquidated assets, including the 6,000 patents and patent applications sold to Rockstar Bidco.  *See* Mot. at ¶ 75.

**B.     Rockstar's Litigation Campaign**

17.     Rockstar Bidco LP purchased the patents from NNI.  But rather than assert the patents itself, Rockstar Bidco transferred or licensed the Nortel patents to a dizzying array of other entities, including Rockstar shareholders such as Apple, Microsoft and

Ericsson (*see, e.g.*, Exh. 1[3] at ¶ 14), and newly-formed Rockstar affiliate Rockstar

Consortium US LP ("Rockstar") (*see, e.g.*, Exh. 1 at Counterclaim ¶¶ 15-21; Exh. 2 at

¶ 3).  Rockstar, along with certain affiliated entities, has asserted Nortel patents against

Google and its customers.

### 1. The Rockstar-Google Patent Litigation

18.     Rockstar filed its first case against Google on October 31, 2013 in the

United States District Court for the Eastern District of Texas.  *See* Exh. 2.  In that case,

Rockstar and its affiliate NetStar Technologies LLC allege that Google's online search

and advertising technology infringes seven patents that Rockstar Bidco acquired from

NNI.[4]  *See id.*

19.     On the same day and in the same Texas court, Rockstar and its affiliate

MobileStar Technologies, LLC filed a series of suits against Google customers—

companies that utilize Google's Android platform in mobile devices they manufacture

and sell—including Samsung, HTC, ASUS, LG, ZTE, Pantech, and Huawei.  Rockstar

asserted a different set of seven NNI patents against Google's customers.

20.     To protect itself and its customers against Rockstar's NNI patent-based

litigation campaign, Google filed a declaratory judgment action on December 23, 2013 in

the Northern District of California seeking a declaration of non-infringement of

Rockstar's seven mobile device patents.  Rockstar counterclaimed, asserting that certain

Google-branded Android devices infringe.  *See* Exh. 1.

---

[3]   Citations to "Exh. __" refer to the exhibits attached to the Declaration of
Matthew D. Cannon in support of Google's objections to NNI's Motion, filed
concurrently.

[4]   Although it has not yet amended its complaint, Rockstar has withdrawn its
infringement contentions regarding one of the patents asserted, U.S. Patent No.
6,098,065.

21.     On December 31, 2013, Rockstar added Google as a defendant in Rockstar's Texas case against Samsung.  *See* Exh. 3.  Rockstar eventually accused certain Google-branded mobile devices of infringing the same seven NNI patents it had asserted against Samsung and the other Android device makers.  *See* Exh. 4.

22.     On October 9, 2014, the United States Court of Appeals for the Federal Circuit ordered the Texas cases against the Android device makers stayed pending the outcome of Google's declaratory judgment action.  *See* Exh. 5.  The Federal Circuit based its ruling on what it termed the "significant overlap" between Google's declaratory judgment action and Rockstar's cases against the device makers.  *Id.* at 6.  Because most of the evidence regarding Google's Android platform is located in Northern California, the Federal Circuit stayed the Texas actions involving Android devices in favor of Google's declaratory judgment action.  *See id.* at 7-9.  At present, only the Texas case involving Google's search and advertising technologies ("Texas Case") and Google's Northern District of California declaratory judgment action regarding the Android platform ("California Case") remain active.

### 2.     Rockstar Puts Nortel's Information at Issue in the Google Patent Cases

23.     Rockstar has put NNI's conduct and information at issue in its patent litigation against Google.  In each of these cases, Rockstar has affirmatively relied upon NNI's patent auction to support its claims.

24.     For example, in the Texas Case, Rockstar's complaint repeatedly references the NNI patent auction.  *See* Exh. 2 at ¶¶ 5-9, 33.  Rockstar alleges that Google's participation in the NNI auction is evidence that Google has willfully infringed the asserted patents.  *See id.* at ¶ 33 ("**Despite losing in its attempt to acquire the**

**patents-in-suit at auction**, Google has infringed and continues to infringe the patents-in-suit despite its knowledge of the patents-in-suit and the objectively high likelihood that its actions constitute patent infringement.") (emphasis added).

25.     Rockstar also relied on the NNI auction in its amended complaints against Google and Samsung in the now-stayed cases involving Google's customers.  In Rockstar's amended complaints, Rockstar repeatedly mentioned Google's participation in the NNI auction.  The amended complaints emphasized the amount of Google's bids in the NNI patent auction, as well as the amount of Rockstar Bidco's winning bid, in an obvious foreshadowing of Rockstar's damages contentions.  *See* Exh. 3 at ¶¶ 7-12, 137, 142, 146, 153, 158, 161, 169, 173, 176, 182; Exh. 4 at ¶¶ 7-13, 137, 140, 147, 152, 156, 163, 168, 171, 178, 182, 186, 193, 198, 201, 209, 213, 216, 223, 226, 233.

26.     Similarly, Rockstar invoked the NNI auction to support its counterclaims in the California Case.  Again, Rockstar repeatedly relied on Google's participation in the NNI patent auction.  *See* Exh. 1 at Counterclaims ¶¶ 4-10, 28, 31, 38, 43, 47, 54, 59, 62, 69, 73, 77, 84, 89, 92, 100, 104, 107, 115, 118, 126.  For example, Rockstar identified both Google and Rockstar's bids at the NNI auction as allegedly relevant "Background Facts" for its counterclaims, hinting at its likely damages arguments:

> 8.     Google placed an initial bid of $900,000,000 for the Patents-in-Suit and the rest of the Nortel portfolio. Google subsequently increased its bid multiple times, ultimately bidding as high as $4.4 billion. That price was insufficient to win the auction, as a group led by the current shareholders of Rockstar Consortium purchased the portfolio for $4.5 billion.

*Id.* at ¶ 8.  Rockstar also relied on Google's participation in the NNI auction to support its indirect infringement allegations:

> 31.    Google indirectly infringes the '551 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Devices.  Google had actual notice of the '551 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, was further aware of the '551 patent as a result of Rockstar's October 31, 2013 filing of the action against the Eastern District Defendants, was further aware of the '551 patent prior to filing its complaint for declaratory relief in this case, and further has knowledge of its infringement of the '551 patent by way of this Complaint.

*Id.* at ¶ 31 (highlighting added).

27.    That Rockstar intends to rely on the NNI auction to support its claims is further evident from its presentation on technical issues (the "Technology Tutorial") submitted in the Texas Case.  Judges in patent cases routinely request briefing or other submissions so that the parties can educate the court regarding the often complicated technologies involved in patent litigation.  As part of such a tutorial in the Texas Case, one of the opening slides in Rockstar's presentation (reproduced below) featured not technical issues, but the money spent at the NNI patent auction.



Plaintiff Rockstar Consortium US LP is a company that owns and manages a portfolio of more than 4,000 patents, including the patents-in-suit. Rockstar is the owner of these patents because its shareholders purchased the patent portfolio of Nortel Networks in a 2011 auction for $4.5 billion. Prior to the auction, Nortel had met with Google about the patents-in-suit. Google and its partners unsuccessfully bid $4.4 billion for the portfolio.

Exh. 6 at 2. Rockstar's decision to feature the NNI auction at a proceeding to which it could have no substantive relevance demonstrates Rockstar's intent to refer to the NNI auction whenever possible.

28.    Given Rockstar's decision to rely upon NNI's patent auction to support its claims against Google, Rockstar cannot and does not dispute that NNI and other related entities are likely to possess relevant information. In fact, Rockstar's initial disclosures in the Texas Case and the California Case identify numerous Nortel entities, advisors, and former employees as likely to possess relevant, discoverable information regarding NNI's pre-auction and auction-related activities. *See* Exhs. 22-23. These persons and entities include NNI, its Canadian affiliates, its advisors leading up to the auction (Kshitij

Bhatia, David Descoteaux, Global IP Law Group, Edouard Gueyffier, Colin Keenan, Lazard, Justin Lux), outside patent counsel (Bruce E. Garlick), and former Nortel employees (Art Fisher, Jasper Harit, Phil Terrett, Richard Weiss), many of whom are now or have been employed by Rockstar (Christopher J. Cianciolo, Hinta Chambers, Mark Hearn, Bill Junkin, Raj Krishnan, Danny Lingman, Gillian McColgan, Don Powers, Ron Steeves, Bernard Tiegerman, John Veschi, Vernon E. Williams). *See id.*

### C.    Rockstar's Resistance to Google's Discovery Efforts

29.    In light of Rockstar's contentions and disclosures, Google promptly sought the information in Rockstar's possession relating to NNI and the patent auction. Google employed appropriate party-discovery tools, including requests for production under Rule 34 of the Federal Rules of Civil Procedure, to pursue relevant information from Rockstar. *See, e.g.*, Exhs. 7, 8.  Google also served subpoenas on Rockstar Bidco, which was the Rockstar entity that actually participated in the NNI auction. *See* Exhs. 9, 10.  Additionally, Google served subpoenas on other Rockstar affiliates including Rockstar Bidco GP, LLC and Rockstar Consortium LLC, as well as Rockstar shareholders Apple, Microsoft, Ericsson, EMC, Sony, and Blackberry. *See* Cannon Decl. at ¶ 3.  In each set of discovery requests, Google sought all information regarding the patents-in-suit that Rockstar had obtained from Nortel, either during the auction itself or afterwards in connection with the patent transaction. *See, e.g.*, Exh 7 at No. 116; Exh. 8 at Nos. 117, 122, 128-132; Exhs. 9, 10 at Topic Nos. 5, 10-11.

30.    To date, Google has not received confirmation that the various Rockstar entities have produced all relevant documents they received from NNI.  Instead, Google has confronted a labyrinthine Rockstar corporate structure in which possession of former NNI documents and other relevant information appears widely scattered, making efforts

to obtain needed discovery difficult at best.[5]  Rockstar has compounded this difficulty by

impeding Google's ability to pursue discovery from NNI via subpoena as well.

### D.    Google's Subpoenas to NNI and Related Entities

31.    To ensure it obtained the relevant documents important to its defenses,

Google also served subpoenas directed to NNI.  *See* Exhs. 11-13.  Google subpoenaed

Nortel advisors including Global IP Law Group and Lazard, both of which were named

in Rockstar's initial disclosures.  *See* Cannon Decl. at ¶ 4.  Additionally, Google

subpoenaed former Nortel employees identified by Rockstar including Messrs. Ciancolo,

Weiss, and Fisher.  *See id.*  And Google requested that the district courts in the Texas and

California Cases issue letters rogatory directed to Nortel's Canadian affiliates and former

Nortel employees who reside in Canada.  *See* Exhs. 14-15.

32.    Given the sheer volume of Nortel entities, advisors, and associates

identified by Rockstar as likely to possess relevant information, Google's subpoenas to

NNI and its affiliates were reasonably calculated to lead to the discovery of admissible

evidence.  By seeking highly relevant documents from entities likely to possess them,

Google's subpoenas seek categories of information necessary for Google to develop its

defenses to Rockstar's assertion of NNI patents, including:  (1) the conception and

reduction to practice of each asserted patent; (2) potential prior art to each asserted

---

[5]    This Court is no stranger to the complexities of the Rockstar organizational
structure.  Prior to the allocation trial, counsel for Rockstar Bidco appeared to urge the
Court to shield its confidential information from public disclosure.  D.I. 13555.
Significantly, however, Rockstar Bidco's counsel expressly disclaimed any
representation of Rockstar Consortium, which is the entity that actually filed the cases
against Google and its customers.  *Id.* at 57:1-4.  NNI ignores that distinction in the
instant Motion, incorrectly asserting that the "Rockstar Bidco" to whom NNI allegedly
transferred certain documents regarding the asserted patents is a party to the various cases
filed by Rockstar.  Mot. at ¶ 2.

patent; (3) statements regarding the scope or applicability of each asserted patent to any accused products; (4) efforts to license, commercialize, or otherwise monetize the asserted patents; and (5) any assessments or valuations of the asserted patents. Because Rockstar affirmatively relied on the NNI patent auction to support its claims in the Texas and California Cases, Google also requested information regarding the auction.

33.    Although Google served its first subpoena in July, NNI has not produced the documents requested. This is not for want of effort on Google's part. After NNI served objections to Google's subpoenas, Google attempted to meet and confer with NNI to discuss ways to mitigate any potential burden on NNI while ensuring that Google received the necessary discovery. *See, e.g.*, Exhs. 16-18. For example, Google granted NNI a three-week extension of time to respond to its subpoena in the Texas case. *See id.* Google responded in writing after it received NNI's objections and initiated multiple conference calls to discuss Google's subpoenas in the weeks leading up to NNI's Motion. *See* Exh. 19. NNI completely ignores Google's efforts to resolve its objections without court intervention, focusing instead on an imagined list of burdensome discovery tasks that Google readily agreed NNI need not undertake.

34.    Google has continued its efforts to reach an acceptable compromise since NNI filed its Motion. For example, once NNI disclosed the existence of the document database prepared for the allocation proceedings, Google immediately suggested that NNI's search for responsive documents focus initially on those already-assembled documents, rather than paper documents or electronic archives. *See* Exh. 20. Google even proposed search terms that NNI could use to identify responsive documents in the allocation litigation database. *See id.* Those terms were designed to focus on the

"valuation documents" that NNI admits having never transferred to Rockstar.  *See id.*
But NNI never responded to Google's proposal.  To date, NNI has produced only eight
heavily redacted deposition transcripts and 57 pages of exhibits from the bankruptcy
proceeding.  *See id.*  NNI has also offered to produce a limited set of heavily redacted
documents, including certain transcripts of depositions in the Nortel Bankruptcy
proceedings and some of the public versions of trial exhibits from the Bankruptcy
allocation trial.  *See* Mot. at ¶ 4.  But under this NNI proposal, relevant documents,
including documents regarding NNI's efforts to license the asserted patents, will be
withheld, redacted or never searched for at all.  *See* D.I. 13554 at ¶ 8 (authorizing
withholding of, *inter alia*, patent license documents and information regarding licensing
including "royalty rates or royalty amounts"); D.I. 13729 (amending D.I. 13554).

35.    Moreover, despite NNI's offer, it is unclear when Google will receive
even the small—and incomplete—set of documents NNI has identified.  Rockstar
apparently has threatened NNI with civil liability if it produces documents responsive to
Google's subpoenas.  Mot. at ¶¶ 76-78.  Additionally, NNI recently notified Google that
Rockstar has also demanded to review any NNI documents before they are produced.
*See* Exh. 21.  The scope and timing of any further NNI production, manipulated by
Rockstar as it apparently will be, is at best unclear.[6]

36.    In addition to the restrictions on NNI's own production, NNI's proposed
relief in its Motion would bar Google from obtaining discovery from all other NNI-
related entities and individuals.  Specifically, NNI's proposed relief would prevent

---

[6]    Google strenuously objects to Rockstar's interference with NNI's production of
documents.  There is no basis for Rockstar's insistence on a second-round review, which
appears to be nothing more than an attempt to further limit and delay discovery of
documents that should have been produced weeks, if not months, ago.

Google from obtaining discovery in response to its subpoenas to Nortel's former

employees (including Christopher Cianciolo, Arthur Fisher, Richard Weiss and Raj

Krishnan), and Nortel's former advisors (including Global IP Law Group and Lazard

Frères & Co. LLC)—individuals and entities that Rockstar has identified as likely to have

relevant information.  *See* Proposed Order at ¶¶ 2-4, 6.

37.    Other than the conditional, limited and inadequate document production it

has offered to make, NNI takes the position that Google can obtain additional documents

from NNI or related entities (or unredacted versions of the documents it says it will

produce, but has not) only with leave of this Court, and only after Google has exhausted

any possibility of obtaining such documents from Rockstar.  Mot. at ¶ 6.  But time is of

the essence here.  The deadlines for completing fact discovery in the Rockstar-Google

patent cases is imminent—January 7, 2005 in the Texas Case and January 23, 2015 in the

California Case.  Thus, as a practical matter, NNI's proposed relief would prevent Google

from obtaining the necessary documents in time to use them in either case.

## IV.    LEGAL RULE

### A.    Parties Are Entitled to Relevant Third Party Discovery

38.    The Federal Rules of Civil Procedure provide litigants with broad rights to

discover information relevant to pending cases.  "Parties may obtain discovery regarding

any nonprivileged matter that is relevant to any party's claim or defense."  FED. R. CIV. P.

26(b)(1).  Even in the context of bankruptcy proceedings the "starting point for the

analysis" of whether the Debtor should be obligated to respond to certain discovery

"should in all cases be the long recognized policy that the public has the right to every

man's evidence."  *In re Residential Capital, LLC*, 480 B.R. 529, 544 (Bankr. S.D.N.Y.

2012) (internal citations omitted).  "Where relevance is in doubt, the rule indicates that

the court should be permissive." *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d

1207, 1212 (Fed. Cir. 1987).

39.     "It is well established that the scope of discovery under a subpoena issued

pursuant to Rule 45 is the same as the scope of discovery allowed under Rule 26(b)(1)."

*Painters Joint Comm. v. Emp. Painters Trust Health & Welfare Fund*, No. 2:10-cv-

01385-JCM-PAL, 2011 WL 4573349, at *5 (D. Nev. Sept. 29, 2011).  The only

constraint unique to non-party discovery is that counsel issuing subpoenas to non-parties

"must take reasonable steps to avoid imposing undue burden or expense on a person

subject to the subpoena."  Fed. R. Civ. P. 45(d)(1).

**B.     The Party Opposing Discovery Bears the Burden of Proving Why Discovery Should Not Be Allowed**

40.     Given the scope of permissible discovery in civil litigation, parties seeking

to avoid responding to discovery requests—including subpoenas—generally bear the

burden of persuading the court why the discovery should not be permitted.  *See, e.g.*,

*Holguin v. Cnty. of Los* Angeles, No. CV 10-8011-GW (PLAx), 2011 WL 7128640 (C.D.

Cal. Oct. 12, 2011) ("The party seeking to limit discovery has the burden of establishing

grounds for issuance of a protective order.").

41.     When the party responding to discovery objects to doing so on the grounds

that providing a response would impose an undue burden, that party must establish the

nature of the burden.  *In re Residential Capital, LLC*, 480 B.R. at 544 ("With respect to

burden and expense, the debtor has the burden of coming forward with evidence since the

debtor is in the best position to produce evidence."); *Painters Joint Comm.*, 2011 WL

4573349, at *5 ("The party resisting discovery has the burden of clarifying, explaining

and supporting its objections.").  Assertions, not backed by evidence, do not suffice to

prove that responding to discovery requests would impose an undue burden.  *See In re Nat'l Med. Imaging, L.L.C.*, No. 05-12714 DWS, 2005 WL 3299712, at *1 (E.D. Pa. Oct. 31, 2005) ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, will not satisfy the Rule 26(c) test.").

42.    Parties resisting discovery requests because those requests call for privileged information are similarly obligated to establish that the privilege applies to responsive materials.  *Khasin v. Hershey Co.*, No. 5:12-cv-01862-EJD-PSG, 2014 WL 690278, at *2 (N.D. Cal. Feb. 21, 2014) ("When a party withholds information otherwise discoverable by claiming that the information is privileged, the party must describe the nature of the documents, communications, or tangible things not produced or disclosed— and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.").  The burden is on the responding party to prove that the privilege applies.  *See Nat'l Med. Imaging*, 2005 WL 3299712, at *3 ("The party asserting the privilege bears the burden . . . .").

43.    "Confidentiality" of information generally is not a permissible basis for withholding discovery responses.  *High Point SARL v. Sprint Nextel Corp.*, No. 09-2269-CM-DJW, 2011 WL 3241432, at *2 (D. Kan. Jul. 29, 2011) ("The federal rules simply provide no basis on which High Point may refuse to disclose relevant, nonprivileged discovery merely because the discovery request seeks information it considers confidential.").   In the Northern District of California, where the California Case is based, Patent Local Rule 2-2 expressly provides that "[d]iscovery cannot be withheld on the basis of confidentiality absent court order."

## V.    ARGUMENT

44.    Google is entitled to the discovery it needs to develop its defenses to Rockstar's assertion of NNI's patents.  Because Google's subpoenas to NNI seek information that is relevant and can be produced with minimal effort, NNI must provide complete responses, and not a piecemeal selection of documents and transcripts in redacted form.

### A.    Google's Subpoenas Seek Relevant Information

45.    There can be no dispute that NNI has relevant information regarding the patents that Rockstar has now asserted against Google.  Although NNI asserts that the "vast majority" of topics in Google's subpoenas "seek documents that have little or no direct relationship to the small number of patents at issue in those cases" (Mot. at ¶ 40), NNI's Motion does not contain any meaningful analysis of the relevance of the information sought by Google's subpoenas in light of the parties' claims and defenses in the Texas and California Cases.  This is not surprising, however, given that both NNI and Rockstar have acknowledged that NNI is likely to possess discoverable information.

### 1.    NNI Has Admitted It Possesses Relevant Information, Including "Patent Documents" and "Valuation Documents"

46.    NNI admits to having two categories of documents responsive to Google's subpoenas: "patent documents" and "valuation documents."  Both are relevant to the Texas and California Cases and should be produced.

47.    While the precise contours of NNI's "patent documents" category are unspecified, that category includes at least "documents relating . . . to the particular patents being asserted in the respective litigations."  Mot. at ¶ 61.  Such documents are plainly relevant to Rockstar's infringement claims and Google's defenses to those claims.

NNI does not argue otherwise.  Nor could it, as the relevance of the various categories of documents discussed in NNI's Motion cannot credibly be disputed.  For example:

- "Patent prosecution files relating to the transferred patents" are relevant to the interpretation of the patent claims.  *See* Mot. at ¶ 63.  In particular, statements made by the patent applicant during prosecution of a patent can narrow the scope of the patent claims, either directly or by limiting the range of technology protected under the "doctrine of equivalents."  *See, e.g.*, *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007).

- "Documents relating to licensing of the transferred patents" are relevant to the amount of any reasonable royalty damages.  *See* Mot. at ¶ 63.  Under 35 U.S.C. § 284, Rockstar may seek at least a "reasonable royalty" as damages for any adjudged infringement of the NNI patents it has asserted.  Royalties received under licenses as well as NNI's licensing policies may be relevant to determining reasonable royalty damages. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (identifying past royalties and the licensor's practices as factors relevant to reasonable royalty damages).

- "Assignment agreements relating to the transferred patents" are relevant to ownership of the patents and Rockstar Consortium's standing to sue.  *See* Mot. at ¶ 63.  Only entities with title or an exclusive license to a patent have standing to file an infringement action.  *See, e.g.*, *AsymmetRx, Inc. v. Biocare Med., LLC*, 582 F.3d 1314, 1318-19 (Fed. Cir. 2009).

48.    NNI's "valuation documents" are also relevant and discoverable.  NNI defines "valuation documents" to include "documents relating to Nortel's effort to assess the potential value of its patents" as part of its IPCo Business prior to its asset sales and "documents relating to the sales themselves."  Mot. at ¶ 61.  Documents relating to both categories are likely to contain relevant information.

49.    To value its patents prior to their sale to Rockstar Bidco, NNI generated documents relevant to multiple issues in the Google-Rockstar patent cases.  For example:

- "There were numerous in-bound inquiries about the Patent Portfolio, even as early as January 2009."  D.I. 13601 at ¶ 52.  Such license discussions are discoverable in patent litigation because they may shed light on the measure of "reasonable royalty" damages.  *See, e.g.*, *High Point SARL*, 2011 WL 3241432, at *5-*6 (collecting cases).

- The NNI participants in the IPCo Business "carefully considered potential royalty rates and addressable markets." D.I. 13601 at ¶ 58. These analyses may inform the measure of reasonable royalty damages if Rockstar proves that Google has infringed. *See Georgia-Pacific*, 318 F. Supp. at 1120.

- NNI's advisors "assembled claim charts and conducted infringement analyses to better understand [the patents'] value." D.I. 13601 at ¶ 58. These claim charts may contain representations about the scope of the patents that are relevant to claim construction, infringement, and/or invalidity. *See, e.g.*, *Conopco, Inc. v. Warner-Lambert Co.*, No. Civ. A. 99-101 (KSH), 2000 WL 342872, at *6 (D.N.H. Jan. 26, 2000) (ordering production of licensing documents because they may contain statements against interest regarding patent scope, infringement, or validity).

50.    The creation of documents related to NNI's patents was not an isolated occurrence. "[T]he IPCo Business Model was frequently revised and re-circulated to address Committee and Bondholders Group comments, update clam charts, update assumptions, and make other adjustments to the projections." D.I. 13601 at ¶ 59. As a result, there are likely many pre-sale NNI "valuation documents" containing information that may be relevant to the claims and defenses in the Google-Rockstar patent litigations.

51.    NNI also has admitted the existence of multiple relevant documents created during the asset sale process itself. For example, NNI created "an electronic data room containing both public and confidential diligence materials regarding the patents" to share with potential bidders. Mot. at ¶ 20. These "diligence materials" likely contain information regarding the scope, applicability, and value of the Nortel patents, as that is some of the information a potential purchaser would consider in deciding whether to buy the patents. It is also the sort of information a party facing a charge of patent infringement, such as Google, would want to analyze in formulating its defense.[7]

---

[7]    Rockstar has produced certain documents that it identifies as having come from the electronic data room. But it is not clear whether a complete copy of all documents from the electronic data room was transferred to Rockstar or whether a complete set of

### 2.    Rockstar Has Acknowledged NNI Possesses Relevant Information

52.     Rockstar also has acknowledged repeatedly that it believes NNI and its related Nortel entities possess relevant and discoverable information.  For example, Rockstar did not oppose Google's requests for letters rogatory to Rockstar's Canadian affiliate and former employees in Canada, which the U.S. District Court for the Northern District of California ruled seek "relevant and discoverable" information.  Exh. 15 at 3.

53.     More explicitly, in its initial disclosures in both the Texas and California Cases, Rockstar identified NNI, NNI's corporate affiliates, former NNI employees, and NNI advisors as likely to possess relevant and discoverable information regarding damages and other issues.  *See* Section III.B.2, *supra*.  With respect to NNI, for example, Rockstar states in the Texas Case that it "is likely to have relevant information regarding the 2011 auction of Nortel's patent assets and of Nortel-related information as the United States entity whose sister corporations held the patents-in-suit."  *See* Exh. 22.

54.     These statements by Rockstar are significant.  As a party to the patent infringement cases from which the subpoenas at issue originate, Rockstar can make an informed determination that NNI and related Nortel entities likely possess relevant and discoverable evidence.  Indeed, it is at least in part Rockstar's allegations regarding the NNI auction that put NNI's information at issue.  *See* Section III.B.2, *supra*.

---

those documents has been produced.  In the California Case, Rockstar has refused to confirm that it has produced all documents from the electronic data room that are in its possession, custody, or control.  *See* Exhs. 28, 29.  And in the Texas Case, Rockstar has withheld certain documents on the grounds of privilege, even though those documents were made available to all bidders in connection with the auction.  *See* Exh. 30 at 3.

**B.    Google's Subpoenas Impose No Undue Burden on NNI**

55.    There is no factual or legal support for NNI's argument that it would be unduly burdensome to respond to Google's subpoenas.  NNI analyzes no specific topics from Google's subpoenas, no specific documents that would be responsive to those subpoenas, and no specific burdens posed by Google's subpoenas.  The only evidence NNI cites is a single declaration of a NNI representative whose duties are to administer the wind-down of the estate, which necessarily includes responding to discovery.  As a result, NNI's generalized, unsupported allegations of burden do not justify depriving Google of relevant information that Google needs to mount its defenses to Rockstar's infringement claims on the asserted NNI patents.

**1.    Google Is Willing to Make Reasonable Accommodations to Minimize NNI's Obligations**

56.    Mindful of the obligation to minimize the burden on a non-party responding to a subpoena, Google is willing to take steps to mitigate any potential burden on NNI as long as Google still obtains the information it needs.

57.    First, Google agrees that NNI may produce only documents related to the NNI-Rockstar Bidco patent sale.  NNI may refrain from producing documents relating to the eight other asset sales that comprise its liquidation, subject to those other sales not being placed at issue in the Texas or California Cases.  Google cannot, however, agree to restrict NNI's production to documents related solely to the asserted patents.  In light of NNI's allegations regarding the auction, the relative value of the patents that comprise the NNI portfolio may be relevant to rebut Rockstar's damages claims against Google.  *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1325 (Fed. Cir. 2014).  Thus, Google is

entitled to discovery regarding the totality of the circumstances concerning the NNI-Rockstar Bidco transaction.

58.     Second, Google agrees that NNI need not produce documents in its possession that have been produced by one or more Rockstar entities in both the Texas and California Cases.  NNI should not be permitted to withhold production of all "patent documents" as duplicative, however, unless NNI and Rockstar Consortium verify, in writing and under oath, that all of NNI's "patent documents" have been produced or logged to Google in the Texas and California Cases.

59.     Third, Google agrees that NNI may limit its search for responsive documents to the documents contained in the database created for the allocation proceedings.  For the sake of clarity, NNI would not need to search backup tapes, paper documents, or its LiveLink system at this time.  Google would retain the right to request a search of such systems in the future, should evidence indicate the presence of additional responsive documents not contained in the allocation database.

60.     Fourth, Google is willing to negotiate acceptable search terms for identifying relevant documents, as well as lists of search terms that can be used to screen privileged and/or confidential documents.  To facilitate this production and review, Google would also be willing to negotiate a non-waiver agreement that would allow NNI to effectively claw back any inadvertently produced privileged documents.

61.     Fifth, Google is willing to be bound by appropriate provisions of this Court's protective orders.  Such provisions would augment the protective orders already in place in the Texas Case (Exh. 24) and California Case (Exh. 25), both of which extend to third parties such as NNI.  To the extent that Google's subpoenas call for potentially

privileged documents, Google would also be willing to enter into an appropriate non-waiver agreement that would facilitate document production without NNI having to review documents for privilege or risking waiver thereof.

62.    Google's proposed compromises respond more than fairly to NNI's objections.  Confining NNI's subpoena responses to documents existing in an already-established computer database prevents NNI from sorting through paper records or data archives.  Limiting NNI's response to documents concerning the patents sold to Rockstar Bidco should avoid significant third-party confidentiality concerns.  Use of search terms enables ready identification of relevant documents and streamlines any privilege or confidentiality review that is required.  And narrowing the production to only documents that have not been produced by Rockstar avoids needless duplication.  Especially with these limitations, Google's subpoenas impose no significant burden on NNI.

## 2.    NNI's Proposed Relief Would Deprive Google of Relevant Information Possessed Only by NNI

63.    Unlike Google's proposed compromises, which balance Google and NNI's respective interests, NNI's requested relief would significantly prejudice Google.  As demonstrated above, NNI possesses unique documents that are highly relevant to the claims and defenses in the pending Rockstar patent cases against Google.  NNI's proposal would unacceptably deprive Google of these documents indefinitely, offering only public documents with most, if not all, relevant information redacted.

64.    The first major problem with NNI's proposal is that it limits NNI's immediate production obligations to documents redacted to remove relevant information.  Specifically, NNI proposes that it produce only deposition designations and exhibits with any allegedly confidential information.  Mot. at ¶ 6.  For example, all information related

to Nortel's efforts to license its patents will be withheld from the public versions of the allocation trial materials that NNI will produce.  *See* D.I. 13554 at ¶ 8(a); D.I. 13729-3 (a three-page list of Nortel license agreements withheld from public trial exhibits).  As explained above, Nortel's efforts to license its patents may be relevant to rebut Rockstar's claim for reasonable royalty damages.  *See* Section V.A.1, *supra*.  Thus, NNI's proposal that Google accept only public, redacted documents would prevent Google from obtaining even the most basic information contained in the allocation trial materials.  At a minimum, NNI should produce unredacted versions of those allocation trial materials that relate to the Rockstar Bidco patent sale.

65.    The second major problem with NNI's proposal is that it indefinitely deprives Google of admittedly relevant information possessed only by NNI.  Under NNI's proposal, other than the public versions of the allocation trial materials, NNI would produce no documents until (1) Google exhausts all efforts to obtain discovery from the Rockstar entities, and (2) Google seeks and obtains an order from this Court permitting further discovery.  Mot. at ¶ 6.  NNI's proposal is both unworkable and unnecessary.  It is unworkable because the various Rockstar entities have neither confirmed that they have produced to Google all documents received from NNI, nor committed to a date by which they will complete discovery.  *See* Section III.C, *supra*.  Given the imminent close of fact discovery in the Texas and California Cases (*see id.*), Google may not have time to obtain responsive documents from NNI unless NNI begins reviewing and producing documents immediately.  NNI's proposal is unnecessary because it requires Google to petition this Court for an order directing NNI to produce

responsive documents, even though NNI has admitted that it has such documents and that the bulk of responsive documents are not available from any other source.  *See id.*

66.     As explained above, Google is willing to narrow the scope of its subpoenas to mitigate any potential burden on NNI in responding.  Google, however, is entitled to obtain relevant documents that only NNI possesses, and NNI's proposed relief would unjustifiably prevent Google from obtaining them.

> **3.     NNI Cannot Prove It Would Suffer Any Undue Burden by Responding to Google's Subpoenas**

67.     To demonstrate that Google's subpoenas are unduly burdensome, NNI must come forward with specific evidence identifying the undue burdens that it would face if it was forced to respond.  *See* Section IV.B, *supra*.  Because NNI has failed to make such a showing—especially given the reasonable accommodations Google proposes above—NNI's Motion should be denied.

68.     NNI asserts, without substantial evidence, a laundry list of potential reasons why it would suffer an undue burden in responding to Google's subpoenas, including: (1) the alleged need to review responsive documents to omit third-party confidential information (*see* Mot. at ¶¶ 67-72); (2) the alleged need to review responsive documents to omit privileged information (*see id.*); (3) the alleged duplication of discovery served on Rockstar (*see id.* at ¶¶ 73-75); (4) NNI's purported lack of resources to conduct a document search or review responsive documents, especially as concerns paper and electronic documents that are difficult to access (*see id.* at ¶¶ 50-60); and (5) the expense entailed in the extensive document review and production effort NNI imagines would be required to respond to Google's subpoenas (*see id.* at ¶ 107).  None of

these unsupported assertions are valid objections to Google's subpoenas, especially with respect to the "patent documents" and "valuation documents" that Google is seeking.

69.    <u>Third-Party Confidentiality.</u>  NNI asserts that it would be forced to undertake a burdensome review of any potentially responsive documents to avoid producing third-party confidential information.  *See, e.g.*, Mot. at ¶¶ 67-72.  But NNI does not identify any topic of Google's subpoenas that would call for third-party confidential information, nor does NNI identify any confidential documents that would be responsive to Google's subpoenas.  NNI also fails to quantify the proportion of its documents that would be subject to these unspecified confidentiality obligations or the difficulty it would have in sequestering such documents (a task made considerably easier by Google's willingness to limit NNI's response to documents from the allocation litigation database).  Indeed, little review would appear to be necessary, given that the Orders governing the sale of Nortel's assets typically permit production of purportedly confidential information when that production is required by law.  *See, e.g.*, D.I. 539 (incorporating D.I. 353-3 at § 9.14(d)(i)); D.I. 5935-2 at § 5.11(b).

70.    In any event, "confidentiality" of documents is not a valid basis for refusing to respond to discovery—especially not where, as here, there are protective orders in place to prevent public disclosure of information that needs to be protected.  *See High Point SARL*, 2011 WL 3241432, at *2 (overruling confidentiality objection in part due to the presence of protective orders).  NNI's unsupported assertion that review for confidentiality would be onerous does not suffice to establish an undue burden in responding to Google's subpoenas, especially given Google's reasonable accommodations.

71.     <u>Attorney-Client Privilege.</u>  NNI makes a similarly vague assertion that many documents sought by Google that remain in NNI's possession are privileged, requiring another allegedly burdensome level of review.  *See, e.g.*, Mot. at ¶ 67.  Again, though, NNI does not attempt to quantify the proportion of its documents that are privileged or the burden of identifying such documents (made easier by use of the searchable allocation database).  Moreover, NNI does not establish any of the elements of the privilege:  Nowhere does NNI identify its attorneys, what legal advice they provided, what documents or categories of documents reflect that advice, or that the documents containing that advice were kept confidential.  Without establishing any of those elements, NNI has not established the existence of any privileged documents.  *See Khasin*, 2014 WL 690278, at *2.  On the contrary, NNI has admitted that it performed its own internal analysis of the scope and value of its patents—without the assistance of outside advisors—which may not be privileged.  *See* D.I. 133601 at ¶ 58 (noting that review by Global IP "took place after Nortel's internal IP team conducted a similarly thorough review of the patents to determine which were likely to be of high interest and most valuable").  The admitted existence of relevant, non-privileged information, coupled with NNI's failure to establish the privilege for any specific documents, eliminates this basis for NNI's requested relief.

72.     <u>Duplication.</u>  NNI's next allegation, that "Rockstar should have at least a copy, and in many if not most instances the original, of virtually every document previously in NNI's possession, custody, or control relating to the patents transferred to Rockstar" similarly provides no basis for excusing NNI from responding to Google's subpoenas.  For one thing, NNI refers to the wrong "Rockstar."  NNI alleges that it

transferred relevant documents to Rockstar Bidco, but it is Rockstar Consortium that has

sued Google and its customers.  Additionally, the fact that a party may be able to obtain

discovery from a party (or, in this case, an entity related to a party) does not necessarily

excuse a non-party from producing potentially duplicative documents.  Given that NNI

maintained no records of what documents it transferred to Rockstar Bidco (*see* Cannon

Decl. at ¶ 2), there is no way for Google or even NNI to verify the completeness of any

Rockstar entity's production.  Furthermore, this objection—that Google may be able to

obtain some of NNI's documents from some Rockstar entity—is at most a partial answer

to Google's subpoena.  NNI admits in its Motion that it did not transfer its valuation

documents to Rockstar.  Mot. at ¶ 24.  As a result, Google can **only** obtain those relevant

documents from NNI.  As indicated above, though, Google does not need to receive the

same document more than once.  To the extent that NNI can ensure that the Rockstar

entities have actually produced or logged NNI documents, NNI need not re-produce such

documents in response to Google's subpoenas.

73.    <u>Lack of Resources.</u>  NNI's purported lack of resources cannot justify

excusing it from responding to Google's subpoenas.  To the extent NNI contends that its

only personnel, seven contractors, are all needed to windup its bankruptcy proceedings,

NNI offers no support for that claim.  NNI does not explain who those seven contractors

are, what their responsibilities are, or how engaging in some amount of limited document

review would prevent them from participating in the bankruptcy proceedings.  Given that

NNI has decided to sell off all of its assets rather than reorganize as a going concern, it is

difficult to imagine why its group of seven contractors would be so time-constrained.

Moreover, NNI has claimed that it would be necessary for outside professionals to

conduct the document review (Mot. at ¶ 107(e)-(f))—something made easier by restricting NNI's response to the searchable allocation litigation database—so any burden on NNI's bankruptcy contractors presumably would be minimal.

74.    Cost.  Finally, NNI asserts that to conduct a privilege and confidentiality review of responsive documents would be prohibitively expensive because it could cost more than $2 million.  Mot. at ¶ 107(e)-(f).  This objection, too, rings hollow.  As a threshold matter, NNI has failed to establish the scale of any necessary confidentiality and/or privilege review, for the reasons discussed above.  Without knowing the scale of review required—which is likely to be minimal if the parties agree to any of Google's proposals above for minimizing NNI's obligations—there is no evidentiary basis for calculating the $2 million figure.  This failure of proof alone undercuts NNI's objections based on cost.

75.    NNI's cost objection fails for an additional reason:  Even if NNI is correct that it would cost $2 million to provide responses to the subpoenas issued by Google and other Rockstar litigation targets, that sum hardly constitutes an "undue" imposition.  NNI earned $4.5 billion on the Rockstar Bidco patent sale alone.  Two million dollars in litigation costs represents a miniscule 0.04% of NNI's earnings on the deal.  Thus, NNI's cost objection, like its other objections, does not withstand scrutiny.

**C.    The Bankruptcy Code Does Not Shield Nortel from Reasonable Discovery**

76.    Given its lack of specific evidence establishing any burden, NNI chose not to seek a protective order under Rule 26 or move to quash Google's subpoenas in the courts that issued them.  Instead, NNI asks this Court to use the Bankruptcy Code to shield it from discovery into its $4.5 billion asset sale.  But the fact that NNI is in

bankruptcy does not give it a "free pass" to avoid providing relevant, necessary discovery in litigation arising directly from NNI's sale of its patent assets.  Were debtors allowed to avoid discovery into liquidated assets simply by virtue of being in bankruptcy, the Bankruptcy Code would become a powerful tool for circumventing the Federal Rules of Civil Procedure.  This is not and cannot be the law.

77.     It would be exceptionally unfair if NNI—the patent owner—were able to insulate itself in bankruptcy with an indefinite stay of discovery necessary for Google to defend itself in multiple lawsuits brought by Rockstar—the purchaser of the assets sold by NNI.  Indeed, if this were the result, patent owners in bankruptcy could effectively block from discovery all documents concerning any patents sold to third party purchasers, allowing the purchaser asserting the patents in subsequent litigation to start with a completely clean slate.  A purchaser, like Rockstar, would have every reason to simply take title to any purchased patents and let all related documents sit, safe from all discovery, in the debtor's possession.  That result is completely inconsistent with the purposes for which bankruptcy proceedings were intended.  None of the Bankruptcy Code provisions invoked by NNI justifies immunizing NNI from responding to Google's subpoenas.

### 1.     The Automatic Stay of § 362 Does Not Apply to Google's Subpoenas

78.     NNI contends that "all of the pending third-party subpoenas violate the automatic stay" of Section 362(a).  Mot. at ¶ 93.  That is wrong.  Section 362(a) automatically stays certain actions **against** a debtor or a debtor's estate.  No provision of that section addresses actions to which a debtor is a third party.  Even the case on which NNI principally relies, *Residential Capital*, holds that "section 362(a) does not, standing

alone, protect the Debtors from discovery in third party actions." 480 B.R. at 537. The automatic stay simply does not apply to Google's subpoenas.

79. Numerous courts have held that discovery served on a debtor as a third party does **not** violate section 362(a) if the third-party discovery related to claims against non-debtors. *See, e.g.*, *Groner v. Miller (In re Miller)*, 262 B.R. 499, 503-507 (B.A.P. 9th Cir. 2001); *see also See Kenoyer v. Cardinale (In re Kenoyer)*, 489 B.R. 103, 121-22 (Bankr. N.D. Cal. 2013) (following *Miller* and citing cases); *In re Alem*, No. 13-00119, 2013 WL 4840486, at \*2 (Bankr. D.D.C. Sep. 11, 2013) ("Although it would violate the automatic stay of 11 U.S.C. § 362(a)(1) for the Movants to subpoena the debtor in his capacity as a party-defendant to the Superior Court litigation, § 362 *does not* bar litigants from serving a subpoena on and deposing a debtor in his capacity as a non-party witness, even if the debtor happens also to be a defendant in a related action that has been stayed as to the debtor under § 362(a)(1).") (emphasis in original); *Peter Rosenbaum Photography Corp. v. Otto Doosan Mail Order Ltd.*, No. 04 C 0767, 2004 WL 2973822, at \*2-\*3 (N.D. Ill. Nov. 30, 2004).

80. NNI does not cite a single case in which a court ruled that the automatic stay of Section 362(a) was found to prohibit enforcement of a third-party subpoena. That provision, which is designed to protect debtors' estates to facilitate orderly bankruptcy, does not preclude discovery of relevant evidence from a debtor in actions to which the debtor is a third party.

### 2. Responding to Google's Subpoenas Would Not Force NNI to Violate Any Court Orders

81. NNI argues that its proposed relief is "in furtherance of" this Court's prior orders, including the orders authorizing NNI's various asset sales, its protective orders

and its orders coordinating the international aspects of the Nortel bankruptcy.  *See* Mot. at

¶¶ 95-100.  But NNI does not identify any provision of any sale order or protective order

that would be violated if NNI responded to Google's subpoenas.  In fact, the NNI asset

sale agreements and this Court's protective orders generally authorize production of

documents as required by law (*i.e.*, pursuant to subpoena).  *See, e.g.*, D.I. 539

(incorporating D.I. 3533 at § 9.14(d)(i)); D.I. 5935-2 at § 5.11(b); D.I. 10805-3 at

§ 5(b)(xii).

    82.    Similarly, considerations of international comity do not support staying

enforcement of Google's subpoenas to NNI.  The fact that the Canadian debtors took no

position on NNI's motion indicates that they do not believe that Google's subpoenas

threaten their interests.  *See* D.I. 14555.  Indeed, the Canadian debtors are cooperating to

produce information responsive to discovery requests from other third parties.  *See* D.I.

14551 at 17 n. 41.  And two U.S. courts have issued letters rogatory for NNI's Canadian

affiliate, apparently finding no threat to international comity in Google's discovery

requests.  *See* Exhs. 14, 15.

    83.    Because responding to Google's subpoenas would not require NNI to

violate any provision of this Court's orders, those orders do not justify excusing NNI

from responding to Google's subpoenas.

### 3.    NNI Has Not Justified Entry of a Protective Order Under Section 107(b)(1) of the Bankruptcy Code or Bankruptcy Rule 9018

    84.    Again without explanation, NNI claims that excusing it from responding

to Google's subpoenas "would be in furtherance of" unspecified orders, supposedly

entered by this Court, regarding "Debtors' privileged and confidential documents and

information."  Mot. at ¶¶ 101-103.  For the reasons described in Section V.B.3, *supra*,

NNI has not proven that any privileged or confidential documents are responsive to Google's subpoenas.  In fact, in the Texas Case, NNI already has sought and obtained protection for the potentially privileged information contained on the Rockstar computers.  (*See* Exh. 26 at 3.)  NNI has not explained why the protective orders in the Texas and California Cases would be inadequate to protect any confidential and/or privileged information that is contained in responsive documents.

85.     NNI also claims that there may be "personal information" on computers in Rockstar Bidco's possession.  Even if that is the case, it is unclear how Google's subpoenas would call for such "personal information" or why it would not be covered by the protective orders in the Texas and California Cases.  Again, NNI has already filed a motion for a protective order regarding those computers in the Texas Case.  The protocol adopted by the Texas Court for Rockstar's search and production of information contained on these computers adequately protects the interests of NNI and its employees.  *See id*   There is thus no need for a supplemental order protecting such information in this Court.

86.     Having not identified any confidential information that would be responsive to Google's subpoenas, NNI has not established any basis for a protective order under § 107(b)(1) of the Bankruptcy Code or Bankruptcy Rule 9018.

### 4.     NNI Has Not Satisfied the Injunction Standards Under § 105(a)

87.     NNI also requests that this Court issue an injunction under Bankruptcy Code § 105(a) against discovery served on NNI as a third party.  In making this request, NNI heavily relies on *Residential Capital*, a Chapter 11 case involving strikingly

dissimilar facts.  *See* Mot. at ¶¶ 104-107.  Neither that case, nor § 105(a) more generally,

support enjoining the third-party subpoenas Google served on NNI.

88.     In limited circumstances, courts will enjoin third party discovery of a

debtor or a debtor's employees pursuant to § 105(a) if such discovery would either

substantially frustrate a debtor's ability to reorganize or would otherwise economically

harm a debtor.  For example, in *Lane v. Philadelphia Newspapers, LLC (In re*

*Philadelphia Newspapers, LLC)*, 423 B.R. 98 (E.D. Pa. 2010), the court affirmed a

bankruptcy court order extending the stay to enjoin discovery of one of the debtor's

current employees.  The court explained that the debtor owed potential indemnification

obligations to its employees such that the interests of the debtor and the employee were

identical and that "the diversion of resources involved with defending the pending state

court litigation would divert the Debtors' resources and adversely impact the Debtors'

attempted reorganization."  *Id.* at 104.

89.     Here, Google served third-party subpoenas on NNI relating to claims by

Rockstar that were asserted against Google; Google asserts no claims against NNI.  In no

meaningful way will NNI's liquidation be affected by the litigation between Google and

Rockstar or by Google's discovery efforts.

90.     NNI's reliance on *Residential Capital* is entirely misplaced.  In

*Residential Capital*, the debtors filed their Chapter 11 cases on May 14, 2012.  Two

months later, the debtors commenced an adversary proceeding against 27 defendants,

each of whom had sued the debtors and the debtors' parent company prior to the

bankruptcy filing, to enjoin discovery against the debtors and the debtors' parent while

the debtors sought to sell assets and to seek approval of a settlement pursuant to which

the parent company would contribute hundreds of millions of dollars to satisfy claims against the debtors.  *See Residential Capital*, 480 B.R. at 533.  One defendant subsequently served third-party discovery on the debtors seeking production of 43,000 loan files; the debtors responded that the discovery violated the automatic stay or, alternatively, should be enjoined under § 105(a).  *Id.* at 532-533.

91.    The bankruptcy court rejected the debtors' argument that serving discovery violated the automatic stay.  *See id.* at 537.  Nonetheless, the court did grant a temporary injunction under § 105(a), based on six factors it considered in deciding whether the "third-party action would threaten to thwart or frustrate the debtor's reorganization efforts."  *Id.* at 541 (internal quotations omitted).  The court "weigh[ed] heavily in favor of maintaining the stay" the fact that the debtors would have "a very difficult few months ahead" as they prepared to auction principal assets, seek approval of a settlement involving its parent, and assist an examiner in an investigation into various prepetition transactions.  *Id.* at 546-47.  Even despite these heavy obligations in the bankruptcy proceedings, the court still required the debtors to produce a set of the loan files the debtors had complained would be burdensome to produce.  *Id.* at 545, 549.[8]

92.    The facts here are entirely different, and do not warrant imposition of a stay.  Nortel's chapter 11 cases have been pending for over five years.  At this stage, virtually all of Nortel's assets have been sold, it has no ongoing business operations, and the only remaining employees are contractors administering an estate in liquidation.  *See* Mot. at ¶¶ 13, 17-23.  The primary remaining issue in the bankruptcy is the allocation of

---

[8]    The bankruptcy court also declined to address whether the scope of the discovery sought was appropriate and who should pay for discovery, leaving those issues to the non-bankruptcy court where the litigation was pending.  *Id.* at 545.

sale proceeds, and the trial on that has already concluded.  *Id.* at ¶¶ 29-37.  The remaining

windup activities for the Nortel entities will not be disrupted by responding to Google's

subpoenas.

93.     Moreover, Google's motivation for serving its subpoenas is far different

than that of the subpoena-serving third-party creditor in *Residential Capital*.  Google did

not desire this litigation; the Rockstar entities, as purchaser of patents from NNI, are

responsible.[9]  Google and its customers have been sued by Rockstar, and fact discovery

cut-offs are mere months away.  These facts present a circumstance that is a far cry from

the facts presented in *Residential Capital* and do not warrant a stay of discovery.

> **D.     No Stay of Discovery Should Apply to NNI's Advisors or Former
> Employees**

94.     For the reasons identified above, the Bankruptcy Code does not shield

NNI from responding to Google's subpoenas.  *See* Section V.C, *supra*.  If NNI itself is

not protected, there is no bankruptcy protection to extend to NNI's former advisors or

employees.  Indeed, even if NNI was protected by the Bankruptcy Code from responding

to Google's subpoenas, multiple courts have held that those protections would not extend

to NNI's advisors or employees.  *See Constitution Bank v. Levine*, 151 F.R.D. 278, 280

(E.D. Pa. 1993) (denying motions to quash subpoenas directed to bankruptcy debtor's

banks and associates because such subpoenas "did not constitute an action against" the

debtor); *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R.

969, 977 (N.D. Ill. 1992) (finding subpoenas to former employees were not in violation

---

[9]  Had NNI itself brought patent infringement claims against Google, NNI would
have no grounds on which to complain about Google's discovery requests.  The fact that
NNI sold the patents—instead of asserting them against Google—should not insulate
NNI from routine discovery requests relating to those patents.

of the stay because they were related to ongoing patent litigation rather than claims against the debtor).

95.     Google subpoenaed the Nortel affiliates that Rockstar states are likely to have relevant information, including the Global IP Law Group, Lazard, and a handful of former Nortel employees.  NNI's speculation that its advisors and former employees might possess sensitive information does not justify excusing those individuals from responding to Google's subpoenas.

**E.     NNI Has Not Justified Its Request for Discovery Cost-Shifting**

96.     If NNI's efforts to evade its discovery obligations are unsuccessful, it seeks the alternative relief of a cost-shifting order that would require Google to pay for NNI's search for and production of responsive information.  There is no basis for such cost-shifting in this case.

97.     As a general matter, the costs of responding to discovery requests are to be borne by the responding party.  That is the default rule in this Court.  *See* Local Rule 7026-3(i) (providing that each party bears its own e-discovery costs absent good cause for another arrangement).  There is no basis for deviating from the default rule in this case for three reasons.

98.     First, NNI bears the burden of proving that the costs of responding would be "significant."  *See Callwave Commc'ns, LLC v. Wavemarket, Inc.*, C 14-80112 JSW (LB), 2014 WL 2918218, at *6 (N.D. Cal. June 26, 2014) (declining to order cost-shifting without clear evidence of significant costs).  Only **_significant_** costs should be shifted to the party seeking discovery.  Even the case cited by NNI recognizes as much.  *See Linder v. Calero-Portocarrero*, 183 F.R.D. 314, 321-22 (D.D.C. 1998) (holding that some or all costs may be shifted to the party serving the subpoena if the costs of responding are

significant).  NNI claims that responding to the subpoenas identified in its Motion could

cost more than $2 million, but NNI offers no evidence to support that claim.  Mot. at

¶ 107(f).  Bare assertions are insufficient to carry NNI's burden.

99.      Second, $2 million is not "significant" in this context.  On the Rockstar

patent sale alone, NNI made $4.5 billion.  A $2 million expense represents just **0.04%** of

that purchase price.  This is the proverbial drop in the bucket—not a significant expense

that Google should have to bear.

100.      Third, cost-shifting is inappropriate where responding to discovery is part

of the respondent's ordinary course of business.  *See, e.g.*, *Wells Fargo Bank, N.A. v.

Konover*, 259 F.R.D. 206, 207 (D. Conn. 2009) (declining to shift costs to requesting

party where "the non-party was substantially involved in the underlying transaction and

could have anticipated that such transaction could potentially spawn litigation or

discovery").  That NNI and Rockstar expected to respond to subpoenas is clear.  In its

Motion, NNI states that it expects subpoenas as Rockstar continues to litigate the NNI

patents.  *See* Mot. at ¶ 107(f) (referencing "likely future subpoenas").  The Asset Sale

Agreement between NNI and Rockstar explicitly recognizes the possibility of third-party

discovery—and provides that Rockstar should pay for any cooperation it receives from

NNI in opposing discovery requests.  *See* D.I. 5935-2 at § 5.11(b).  NNI is litigating the

discovery of its documents cooperatively with Rockstar:  With NNI's acquiescence,

Rockstar has helped itself to an *ex parte* review of NNI's responsive documents before

they are produced to Google.  *See* Exh. 21.  Moreover, just yesterday, NNI asserted that it

could not produce certain documents in the Texas Case based on an allegedly "identical

legal interest" shared with Rockstar (*see* Exh. 27 at 4 n.2). Google should not be forced to foot the bill for NNI's efforts to resist discovery on Rockstar's behalf.

101.    NNI's bare assertions that it may be expensive to respond to Google's subpoenas do not justify shifting the cost of NNI's response to Google. NNI's request for cost-shifting should be denied.

## VI.    CONCLUSION

102.    For the foregoing reasons, Google objects to Nortel's Motion and respectfully requests that the Court deny the Motion in its entirety.

DATED: October 21, 2014                FRIEDLANDER & GORRIS, P.A.


By /s/ Jeffrey M. Gorris
    Jeffrey  M. Gorris
    Attorneys for Google Inc.


    Jeffrey M. Gorris (Bar No. 5012)
    Christopher M. Foulds (Bar No.5169)
222 Delaware Ave., Suite 1400
Wilmington, DE  19801
(302) 573-3500

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
    Charles K. Verhoeven
    David Eiseman
    David A. Perlson
    Sean Pak
    Kristin J. Madigan
    Matthew D. Cannon
    Sam Stake
quinn-google-n.d.cal.-13-
05933@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
(415) 875-6600
(415) 875-6700 facsimile

    Victoria F. Maroulis
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
(650) 801-5000
(650) 801-5100 facsimile

    Robert B. Wilson
    Patrick D. Curran
    Michelle Ernst
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
(212) 849-7100 facsimile