## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
:
*In re*                                              :          Chapter 11
:
Nortel Networks Inc., *et al.*,[1]                   :          Case No. 09-10138(KG)
:          Jointly Administered
Debtors.                       :
:
:          **Hearing Date: TBD**
:          **Objections Due: Nov. 17, 2014 at 4:00 p.m.**
-------------------------------------------------------------x

## DEBTORS' AMENDED[2] MOTION PURSUANT TO 11 U.S.C. §§ 105 AND 363 FOR ENTRY OF AN ORDER APPROVING THE SHARING OF COSTS RELATED TO THIRD-PARTY DISCOVERY

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A, directing that NNI, Nortel Networks Limited ("NNL"), and Nortel Networks UK Limited ("NNUK") (together, the "Nortel Parties") pay in equal shares all reasonable and documented past and future costs incurred and/or paid by them in responding to formal or informal third-party subpoenas or other disclosure and/or discovery requests seeking production of documents and/or testimony, whether from the Debtors, any other Nortel entity, or any current or former advisors or employees of such entities

---

[1]    Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the U.S. Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[2]    This amended Motion does not substantively change the initial Motion [D.I. 14478].  It amends the signature block.  Debtors will request that the amended Motion be heard jointly before the U.S. and Canadian Courts at a date to be determined.

("Third-Party Discovery Requests"), relating to the patent portfolio sold by the Debtors and other

Nortel entities to Rockstar Bidco, LP ("Rockstar"), including but not limited to reasonable and

documented attorneys' costs and fees and other out-of pocket expenses, that the Nortel Parties

have incurred or will incur and/or pay associated with responding to or otherwise resulting from

the Third-Party Discovery Requests, not including any such costs paid by the party making the

Third-Party Discovery Request ("Discovery Costs") and including but not limited to the Debtors'

costs in preparing the Debtors' Motion For (A) An Order Enforcing And/Or Extending The

Automatic Stay, (B) An Order Enforcing The Court's Prior Orders, (C) A Protective Order, And

(D) Related Relief Under Section 105(A) (the "Third-Party Subpoenas Motion") filed

concurrently with the initial version of this Motion and the Debtors' motion for a protective

order filed in the Eastern District of Texas in response to a Third-Party Discovery Request; and

granting them such other and further relief as the Court deems just and proper.  In support of this

Motion, the Debtors represent as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the February 29, 2012 Amended Standing Order of Reference from the U.S. District Court

for the District of Delaware.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are Sections 105(a) and 363 of

title 11 of the United States Code (the "Bankruptcy Code").

## BACKGROUND

### A.      Procedural Background

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel

Networks (CALA) Inc. ("NN CALA"),[3] filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only. The Debtors continue to operate as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.      The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized.

5.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent NNL (together with NNC and their affiliates, including Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[4] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.

6.      Also on the Petition Date, the High Court of Justice in England and Wales placed nineteen of Nortel's European affiliates, including NNUK and certain of its affiliates located in Europe, the Middle East, and Africa (collectively, the "EMEA Debtors"),[5] into administration

---

[3]      NN CALA filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' Chapter 11 cases for procedural purposes [D.I. 1098].

[4]      The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation.

[5]      The EMEA Debtors include the following entities: NNUK, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

29484748.2
8332726 v1

(the "UK Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").

7.    Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency, and dissolution proceedings around the world.

8.    Since the Petition Date, Nortel has sold its business units and other assets to various purchasers, including the Patent Portfolio described in greater detail below.  For further information regarding these Chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the Debtors at http://dm.epiq11.com/nortel.

**B.    Expenses Related To The Patent Portfolio Sale**

9.    On July 11, 2011, the Court entered an order (the "Patent Sale Order") [D.I. 5935] approving the sale of over 7,000 patents and patent applications (the "Patent Sale") to Rockstar pursuant to an Asset Sale Agreement by and among Rockstar and various Nortel entities (the "Asset Sale Agreement").

10.    Prior to the Patent Sale, the Nortel Parties hired professional advisors to assist and advise with the sales of Nortel's assets.

11.    For instance,  the Nortel Parties hired Lazard Frères & Co. LLC ("Lazard") for such assistance and advice.  In their motion to this Court seeking an order approving Lazard's retention, the Debtors set forth the terms of Lazard's compensation and stated that "[w]hile the Debtors have agreed to pay these fees and expenses, the Debtors reserve their right to seek contribution or allocation of these fees and expenses with their affiliates as may be appropriate." See D.I. 294 ¶ 27 n.8; see also D.I. 294 Ex. C (Jan. 13 2009 Lazard retention letter executed by both NNC and NNI).  In a subsequent motion seeking to amend the terms of Lazard's compensation, the Debtors explained that "Lazard was jointly retained by the Debtors, the Canadian Debtors and the EMEA Debtors at the beginning of the creditor protection proceedings

- 4 -

in the U.S., Canada and Europe.  The fees paid and expenses reimbursed to date have been borne collectively by the various Nortel sellers as the fees and expenses have been paid from the sale escrow accounts.  Payment of the remaining fees and expenses will also be made out of the relevant sale escrow accounts, and as such borne by the relevant Nortel sellers in proportion to their ultimate pro rata share of the sale proceeds." See D.I. 6567 ¶ 12.

12.    Similarly, the Nortel Parties agreed to and this Court approved the joint retention of Global IP Law Group, LLC ("Global IP") to provide advice and assistance to Nortel in connection with the Patent Sale.  See D.I. 1928; D.I. 2787.

13.    Pursuant to the IP Transaction Side Agreement dated April 4, 2011 by and between NNI, NNC, NNL, NNUK, the Joint Administrators, the French Liquidator (as defined therein) and certain other Nortel entities (the "Patent Sale Signing Side Agreement"), which agreement was approved by this Court in an order dated May 2, 2011 [D.I. 5359], the Nortel Parties and the other parties thereto agreed that amounts paid by NNL related to Global IP's fees and expenses would be reimbursed from the proceeds of any patent sale transaction.

14.    The Patent Sale Signing Side Agreement defined several "Transaction costs" that would ultimately be shared amongst the Nortel Parties.  See Patent Sale Signing Agreement ¶ 2. These Transaction Costs included:  the payment of Global IP's fees; fees incurred in defending various types of claims as defined in the Asset Sale Agreement entered into by various Nortel entities, Ranger Inc., and Google, Inc. (together, the "Stalking Horse Bidder"); any amounts owed to the Stalking Horse Bidder in respect of the Expense Reimbursement and/or Break-Up Fee (as defined in the Patent Sale Signing Side Agreement); and any amount paid to the Stalking Horse Bidder from an indemnification escrow account funded by various Nortel entities.  See id. Pursuant to the Patent Sale Signing Agreement, these cost sharing agreements applied to the final

transaction with Rockstar as well, with the exception that there was no indemnification escrow account with respect to the Asset Sale Agreement with Rockstar.

15.    The same parties further confirmed in the Supplemental IP Transaction Side Agreement re Certain Transaction Costs and Related Matters dated July 27, 2011 (the "Patent Sale Closing Side Agreement"), which agreement was approved by this Court in an order dated August 22, 2011 [D.I.6186], that NNI and NNUK, in addition to NNL, would be reimbursed out of the proceeds of the Patent Sale for amounts paid (or reimbursed to NNL) related to Global IP's fees and expenses in connection with the Patent Sale and confirmed the amounts to be reimbursed to NNL, NNI and NNUK.  See Patent Sale Closing Side Agreement ¶ 8.

16.    Consistent with the Patent Sale Closing Side Agreement, the Debtors moved for Entry of an Order Approving the Reimbursement of the Costs of the Professional Services Rendered And Expenses Incurred by Global IP [D.I. 6277].   The Court granted the motion and entered an Order Approving the Reimbursement of NNL for NNI's Share of the Costs Of the Professional Services Rendered and Expenses Incurred by Global IP [D.I. 6417].

17.    The parties to the Patent Sale Closing Side Agreement reserved "all rights in respect of expenses, damages, and all other liabilities, incurred in connection with the performance of their obligations under or pursuant to the Sale Agreement and/or the Transaction Documents."  See Patent Sale Closing Side Agreement ¶ 6.

**C.    Patent Infringement Suits Involving Rockstar And Third-Party Discovery Requests**

18.    Beginning in 2013, Rockstar and its affiliates or assignees initiated patent infringement litigation against several entities, including Google Inc. ("Google"), Samsung Electronics Co., Ltd ("Samsung"), Time Warner Cable Inc. ("TWC"), and numerous Verizon entities (collectively, "Verizon").

- 6 -

19.    In the past few months, Google, Samsung, TWC and Verizon have served NNI with subpoenas seeking production of a broad range of documents in connection with the following lawsuits involving patents that NNI and other Nortel entities sold to Rockstar:

a.    <u>Constellation Techs. LLC v. Time Warner Cable, Inc., et al.</u>, No. 2:13-cv-01079-RSP (E.D. Tex.) (the " <u>'1079 Litigation</u>"), with the subpoena having been served by TWC on June 9, 2014;

b.    <u>Google Inc. v. Rockstar Consortium US LP, et al.</u>, No. 4:13-cv-05933-CW (N.D. Cal.) (the " <u>'5933 Litigation</u>"), with the subpoena having been served by Google on July 17, 2014;

c.    <u>Rockstar Consortium US LP, et al. v. Google Inc.</u>, No. 2:13-cv-00893-JRG (E.D. Tex.) (the " <u>'893 Litigation</u>"), with the subpoena having been served by Google on July 18, 2014;

d.    <u>Rockstar Consortium US LP, et al. v. ASUSTek Computer, Inc., et al.</u>, No. 2:13-cv-00894-JRG (E.D. Tex.) (the " <u>'894 Litigation</u>"), with the subpoena having been served jointly by Google and Samsung on August 11, 2014; and

e.    <u>Spherix Inc. v. Verizon Services Corp. et al.</u>, No. 1:14-cv-721-GBL (E.D. Va.), with the subpoena having been served by Verizon on or around September 5, 2014.[6]

---

[6]    Declaration of Timothy C. Ross (the "Ross Decl."), ¶ 2, App. Tabs 1-5 (copies of subpoenas). All citations to the Declaration of Timothy C. Ross are to the declaration filed as Exhibit B to the Third-Parties Subpoenas Motion [D.I. 14476].

29484748.2
8332726 v1

20.     The subpoenas served on NNI are remarkable in terms of both the number and breadth of the document requests to which NNI must respond.  The three Google subpoenas, for example, each contain more than 115 separate document requests, the vast majority of which are not limited in time and seek documents that have little or no direct relationship to the small number of patents at issue in those cases.  More particularly, the subpoenas seek production of virtually every document in NNI's possession, custody, or control relating to the valuation and sale of Nortel's patent portfolio and business lines in connection with these bankruptcy proceedings, including documents protected from disclosure by the attorney-client privilege and attorney work-product immunity as well as documents subject to confidentiality obligations to numerous third parties, including Rockstar and other purchasers of Nortel's assets.  See the Declaration of Timothy C. Ross (the "Ross Decl.") ¶ 3.  As another example, the TWC subpoena has over sixty document requests, including many requests for documents produced and/or used in the allocation litigation (the "Allocation Litigation Documents") and many requests for documents that may be in the possession of other Nortel estates, may have been created by other Nortel estates, or in which the other estates may otherwise have an interest.

21.     In connection with the '893 Litigation, Google has also issued subpoenas to the following former Nortel employees seeking documents and, in at least one case, deposition testimony:

     a.   Christopher C. Cianciolo, former IP Counsel for Nortel who later became Chief IP Counsel for Rockstar;

     b.   Art Fisher, former Vice President, IP Law for Nortel;

     c.   Peter A. Fortman, a former Nortel engineer who is the named inventor on an alleged prior art patent;

     d.   Raj Krishnan, former IP Counsel for Nortel who later became an Assertion Attorney for Rockstar; and

29484748.2
8332726 v1

     e.  Richard Weiss, former Deputy IP Counsel for Nortel.  <u>See</u> Ross Decl., ¶ 4, App. Tabs 6-10 (copies of subpoenas).

22.    Several of these individuals have requested that NNI represent them or otherwise assist them in responding to Google's subpoenas.  Thus far, NNI has agreed to provide counsel for Mr. Cianciolo and Mr. Fortman in order to help protect NNI's privilege and confidentiality interests.  The document requests in those subpoenas are very extensive, again seeking not only documents specifically related to the patents at issue in the '893 Litigation, but also virtually any and all documents relating to Nortel's past patent licensing and enforcement practices, as well as the auction and eventual sale of its patent portfolio and business lines.  <u>See</u> Ross Decl., ¶ 6.

23.    Google has also served subpoenas in connection with the pending litigations on Global IP and Lazard, and three former Lazard employees.  Again, the document requests in these subpoenas are wide-ranging, seeking virtually any and all documents relating to Nortel's auction and eventual sale of its patent portfolio and business lines.  Both Global IP and Lazard have asked NNI to assist them with responding to these subpoenas.  <u>See</u> Ross Decl., ¶ 7, App. Tabs 11-18 (copies of subpoenas).

24.    In addition, upon information and belief, TWC has issued subpoenas to former Nortel employees.  TWC has not provided NNI with a full list of the names of such former employees or with copies of any of the subpoenas.

25.    Rockstar also is a defendant in *Charter Communications, Inc., et al. v. Rockstar Consortium US LP, et al.*, No. 14-055-SLR (D. Del.), in which Charter Communications has sought leave to serve subpoenas on various Nortel debtors, allegedly to preserve evidence. Charter's motion is pending.

26.    Given that Rockstar acquired more than 7,000 patents and patent applications in the Patent Sale, NNI anticipates that there may be a significant number of additional Rockstar

29484748.2
8332726 v1

patent infringement suits filed and attendant Third-Party Discovery Requests issued to NNI and its professionals and former employees in the future.

### D.    NNI's Reasonable Response To The Subpoenas

27.    In response to the first subpoenas served by TWC and Google, NNI attempted to negotiate reasonable limitations on the scope of its response to the document requests. Specifically, NNI directed the requesting parties to Rockstar for production of documents relating to the particular patents at issue in the respective cases and any other patents acquired by Rockstar.

28.    In light of the serious privilege and confidentiality issues and the burdens associated with searching for, redacting, and logging documents, NNI has sought to limit its response to the subpoenas to producing redacted deposition designations from the Allocation Litigation and public versions of the Allocation Trial exhibits.  However, NNI has worked with the parties issuing the subpoenas to explore the possibility of searching for and producing documents in addition to the Allocation Trial exhibits, and has taken the position that the requesting party shall be required to pay all costs of any searches and productions without conceding any further searches or productions of documents are feasible.

29.    It appears unlikely that NNI's proposal will be accepted by TWC or Google. Although no motions to compel have been filed yet, TWC recently threatened to seek such relief against NNI in North Carolina.

30.    Further, as described more fully in the Third-Party Subpoenas Motion, in connection with the closing of the Patent Sale, three Nortel entities – NNI, NNC, and NNL – entered into an Amended and Restated Employee Transfer Side Agreement and a Transition Services Agreement, both dated as of July 29, 2011, with Rockstar Consortium Inc.  Pursuant to these agreements, Rockstar agreed to ensure that former Nortel employees who transitioned to

- 10 -

Rockstar, and took their Nortel computers with them, did not deliberately access any documents and/or information not related to the patents Rockstar purchased (the "Unrelated Information") or that the Unrelated Information would not be further disclosed.

31.    Rockstar has advised NNI that it is still in possession of certain Unrelated Information that may be subject to discovery in the '893 litigation.  To prevent such discovery, NNI has filed a motion for a protective order in the U.S. District Court for the Eastern District of Texas, which motion was joined by the Canadian Debtors, to prevent the further disclosure of the Unrelated Information that Rockstar should not have in their custody or possession but believe they are obligated to produce.

32.    On September 22, 2014 NNI contacted both NNL and NNUK to try to reach an agreement on the sharing of costs associated with responding to the Third-Party Discovery Requests.  NNI proposed that all costs, including attorneys' fees and out-of-pocket expenses, associated with responding to the Third-Party Discovery Requests be shared equally among the Nortel Parties.  NNI did not receive a response to their proposal.  NNI contacted NNL and NNUK again on September 25, 2014 and informed NNL and NNUK of the Debtors' intent to file this Motion seeking the relief proposed by NNI.

**E.    NNI's Motion Seeking Relief From Third-Party Discovery**

33.    The Debtors filed concurrently with the initial version of this Motion the Third-Party Subpoenas Motion, seeking relief from this Court in responding to the numerous Third-Party Discovery Requests described above.

34.    The Third-Party Subpoenas Motion asks this Court to enter an order, pursuant to Sections 105(a), 107(b), 362(a), and 541 of the Bankruptcy Code and Bankruptcy Rule 9018, (a) enforcing and/or extending the automatic stay to third-party subpoenas seeking production of documents and testimony relating to the patent portfolio sold to Rockstar, (b) enforcing, in the

context of these third-party subpoenas, provisions in the Court's previous sale orders, protective orders, and confidentiality orders that protect confidential and privileged information of the Debtors and other Nortel entities, (c) entering a protective order, (d) granting related relief under Section 105(a) of the Bankruptcy Code, and (e) granting such other and further relief as the Court deems just and proper.

### RELIEF REQUESTED

35.    By this Motion, Debtors seek the entry of an order, pursuant to Sections 105(a) and 363 of the Bankruptcy Code, (a) directing NNI, NNL, and NNUK to pay in equal shares all reasonable and documented past and future costs incurred and/or paid by them in responding to the Third-Party Discovery Requests, which are not otherwise paid by the party making the Third-Party Discovery Request and (b) granting such other and further relief as the Court deems just and proper.

36.    The Court has the power to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Further, this Court has jurisdiction and inherent authority to enforce its own orders, particularly orders entered in "core proceedings" such as orders approving sales and orders entered in the Allocation Litigation and other matters concerning the administration of the estate. See, e.g., Travelers Indem. Co. v. Bailey, 557 U.S. 137 (2009) (holding that "the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders").

37.    The Third-Party Discovery Requests are broad, and to the extent the Debtors are required to respond to them, the Debtors cannot and should not carry the burden alone in responding to these requests.  Indeed, many of the Third-Party Discovery Requests seek documents and/or testimony from the entire Nortel group and not just the Debtors.  For example,

the TWC subpoena requests "[d]ocuments sufficient to identify any membership agreement, by-law or policy of a stand-setting body in which <u>any of the Nortel Sellers</u> was a member or a participant." <u>See</u> Ross. Decl., App. Tab 1 (TWC Subpoena Req. # 36 (emphasis added)).

38.     Further, the Third-Party Discovery Requests seek Allocation Litigation Documents that were jointly collected and produced by the Nortel Parties and other Nortel entities.  Many of the Allocation Litigation Documents contain information that is privileged between one or more of the Nortel estates.  The Debtors could not and would not produce anything without first consulting with the other debtor estates regarding privilege and work-product concerns.

39.     The Nortel Parties used the Allocation Litigation Documents for purposes of litigating the dispute regarding the allocation of the sales proceeds among the Nortel estates.  It is still unresolved how much of the sale proceeds each of the estates will receive; however, the Nortel Parties are subject to confidentiality obligations to several third-parties as previously recognized by this Court when it entered an order providing direction for protecting confidential information from public disclosure during the Allocation Trial [D.I. 13554].  Responding to the Third-Party Discovery Requests and satisfying the Nortel Parties' ongoing confidentiality obligations will be difficult to do and is a burden and expense that the Nortel Parties should share equally.

40.     As discussed in greater detail in the Third-Party Subpoenas Motion, when analyzing the appropriate relief from discovery obligations, the Court should consider six factors that were adopted by the Bankruptcy Court for the Southern District of New York in <u>In re Residential Capital</u>.  <u>See</u> <u>In re Residential Capital, LLC</u>, 480 B.R. 529 (Bankr. S.D.N.Y.  2012) (extending the automatic stay to anyone seeking discovery from the debtor, absent further order

29484748.2
8332726 v1

of the bankruptcy court).  One of the <u>Residential Capital</u> factors this Court should consider is the expense that the Debtors will face if required to locate documents and then review them for responsiveness, confidentiality and privilege.  The Debtors expect that costs associated with responding to the Third-Party Discovery Requests could easily exceed $2 million.  <u>See</u> Third-Party Subpoenas Motion ¶ 107(f).

41.    As detailed above, the Nortel Parties agreed to share certain expenses in connection with the Patent Sale and reserved their rights with regard to other expenses.  The Discovery Costs faced by the Nortel Parties relating to the Third-Party Discovery Requests are directly tied to their roles as sellers under the Asset Sale Agreement with Rockstar, which agreement was approved by this Court [D.I. 5935], and therefore should be shared to the extent they are not paid by the third-parties making Third-Party Discovery Requests.

42.    It would be inequitable for Debtors to bear a higher expense ratio of the Discovery Costs for responding to and producing documents in which NNL or NNUK may also have an interest.  NNI is not a clearinghouse for all Nortel documents and should not be burdened with ongoing document management and maintenance expenses to which NNL and NNUK are not subject.  Accordingly, the Debtors have sought the relief requested in the Third-Party Subpoenas Motion, including requiring the party making the Third-Party Discovery Request to pay NNI's costs in responding.  However, if such relief does not result in the Debtors' Discovery Costs being fully reimbursed, the Debtors should not be required to bear a disproportionate amount of Discovery Costs for these matters.

43.    The Discovery Costs that the Nortel Parties have incurred and will continue to incur and/or pay in responding to the Third-Party Discovery Requests are growing daily.  As such, to the extent such costs are not borne by the parties making such requests, a mechanism

must be put in place by which the Nortel Parties equally share this burden until all of the Third-Party Discovery Requests are resolved.

**NOTICE**

44.     Notice of this amended Motion has been given via electronic transmission, first-class mail, hand delivery, or overnight mail to:  (i) the Core Parties; (ii) the U.S. Trustee; (iii) Rockstar; (iv) the other parties in the litigations with Rockstar or its assignees, including Constellation Technologies LLC, Spherix Inc., Charter Communications, Inc., Google, Time Warner Cable, Inc., and Verizon; and (v) the general service list established in these Chapter 11 cases.  Accordingly, Debtors submit that under the circumstances no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

29484748.2
8332726 v1

## **NO PRIOR REQUEST**

45.     No prior request for the relief sought herein has been made to this or any other

court.

Dated:  October 23, 2014

CROWELL & MORING LLP
Mark D. Plevin (admitted *pro hac vice*)
Mark S. Supko (admitted *pro hac vice*)
James J. Regan
Matthew W. Cheney
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116

– and –

BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP

*/s/ Jennifer R. Hoover*
Jennifer R. Hoover (No. 5111)
Michael J. Barrie (No.4684)
222 Delaware Ave., Suite 801
Wilmington, Delaware  19801
Telephone:  (302) 442-7010
Facsimile:  (302) 442-7012

*Counsel for Debtors and Debtors in Possession*

29484748.2
8332726 v1