**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ----------------------------------------------------------x | | Chapter 11 |
| *In re* | : | Case No. 09-10138 (KG) |
| | : | (Jointly Administered) |
| **NORTEL NETWORKS, INC., et al.,**[1] | : | |
| | : | Hearing Date: |
| **Debtors.** | : | December 4, 2014 at 10:00 a.m. |
| | : | Response Deadline: |
| ----------------------------------------------------------x | | November 17, 2014 at 5:00 p.m. |

**MOTION OF SOLUS ALTERNATIVE ASSET MANAGEMENT LP AND MACQUARIE CAPITAL (USA) INC. FOR ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 105(a), 502(c), 521(a), FED. R. BANKR. P. 1009(a) AND L.R. BANKR. P. 1009-2, ESTIMATING NORTEL NETWORKS CAPITAL CORPORATION'S SUPPORT AGREEMENT CLAIM AND DIRECTING NNI TO AMEND ITS SCHEDULES WITH RESPECT TO INTERCOMPANY LOAN CLAIM**

Solus Alternative Asset Management LP, on behalf of certain funds and managed accounts ("Solus"), and Macquarie Capital (USA) Inc. ("Macquarie"), in their capacities as holders of certain fixed rate senior notes due June 15, 2026 (the "7.875% Notes") issued by Nortel Networks Capital Corporation f/k/a Northern Telecom Capital Corporation ("NNCC") and Nortel Networks Limited f/k/a Northern Telecom Limited ("NNL"), and guaranteed by NNL, file this motion for the entry of an Order, pursuant to sections 105(a), 502(c), and 521(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), Rule 1009(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 1009-2 of the Local Rules of Bankruptcy Procedure (the "Local Rules")—(I) estimating, for purposes of allowance and distribution, the claim for amounts owing to NNCC from Nortel Networks, Inc. ("NNI") under or related to the Support Agreement, dated as of

---

[1] The debtors in the above-captioned chapter 11 cases (the "Bankruptcy Cases"), along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769),Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortea Networks Cable Solutions Inc. (0567), and Nortel Networks (CALA) Inc. (4226) ) (collectively, the "Debtors").

February 15, 1996 (the "Support Agreement") (attached as Exhibit A), among NNCC (then known as Northern Telecom Capital Corporation) and NNI (then known as Northern Telecom Inc. ("NTI")) (hereinafter, the "Support Agreement Claim") in an amount not less than $72,989,050.42, and (II) directing NNI to amend its Schedules with respect to the intercompany claim styled "Intercompany Payables – Loans" (Schedule No. 100789550) (the "Intercompany Loan Claim"), so it is scheduled as an undisputed, general unsecured claim of NNCC that is allowed against NNI in the stated amount ($147,602,830)—and respectfully represent as follows:

## I.     PRELIMINARY STATEMENT

1. NNCC's most significant assets consist of the Intercompany Loan Claim and the Support Agreement Claim. NNCC must resolve the allowance and fix the amount of both claims before it can propose a chapter 11 plan. Consequently, the liquidation of NNCC's claims against NNI is a necessary step towards NNCC's emergence from chapter 11.

2. NNCC's balance sheet is simple—but linked inextricably to NNI. Substantially all of NNCC's scheduled assets and liabilities relate to transactions between NNCC and NNI. NNCC issued the 7.875% Notes and distributed the proceeds to NNI under a Revolving Loan Agreement (as defined below) with NNI as Borrower and NNCC as Lender. The Intercompany Loan Claim scheduled by NNI presumably reflects NNI's obligations under the Revolving Loan Agreement, although the Schedules are silent.[2]

3. NNI and NNCC entered into the Support Agreement in connection with NNCC's issuance of the 7.875% Notes. It requires NNI to cause NNCC to have a net worth (determined in accordance with generally accepted accounting principles) at all times of at least $1.00. Under the Support Agreement, NNI must continually maintain NNCC's solvency and ensure that all of

---

[2] The scheduled Intercompany Loan Claim (Scheduled Claim No. 100789550) does not specifically reference the Revolving Loan Agreement, but the outstanding amounts are similar. To the extent it is revealed that the scheduled Intercompany Loan Claim does not relate to the Revolving Loan Agreement, then Solus and Macquarie reserve any and all rights to amend the requested relief appropriately.

NNCC's liabilities are capable of being satisfied in full, including amounts owing with respect to the 7.875% Notes.

4.     NNCC's scheduled liabilities consist exclusively of the 7.875% Notes and an approximately $6.2 million intercompany claim payable to NNI. The proceeds from the Intercompany Loan Claim and the Support Agreement Claim should fund distributions under a plan for NNCC that satisfies those liabilities in full. Without explanation, however, NNI has scheduled the Intercompany Loan Claim as "disputed." NNI should amend the schedules to remove this cloud and allow the Intercompany Loan Claim. There is no basis for NNI to dispute the Intercompany Loan Claim, and knowing its fixed amount will play a dispositive role in estimating the Support Agreement Claim.

5.     Specifically, NNCC first must determine the amount of the proceeds that will flow from NNI to NNCC on account of the Intercompany Loan Claim. To the extent those proceeds are insufficient to cause NNCC to have a net worth of at least $1.00 on the plan effective date—and therefore to satisfy all of NNCC's liabilities, including all amounts owing with respect to the 7.875% Notes—then the Support Agreement requires NNI to fund the balance. Thus, as a precursor to NNCC's chapter 11 plan, NNCC must fix and liquidate *both* of these intercompany claims and thereby confirm the extent of NNCC's rights as a general unsecured creditor of NNI.

6.     Section 502(c) of the Bankruptcy Code states claims "*shall* be estimated for purposes of allowance" and, to that end, mandates estimation of the Support Agreement Claim because its fixing and liquidation will avoid undue delay in the administration of NNCC's chapter 11 case and because NNCC is entitled to a right of payment arising from an equitable remedy for breach of NNI's ongoing performance obligations under the Support Agreement. Solus and Macquarie therefore seek straightforward application of the Bankruptcy Code

consistent with Congressional intent that section 502(c) be used to facilitate claims reconciliation to avoid delaying the administration of a chapter 11 case.

7. These issues are ripe for resolution. The allocation trial has concluded, and NNI is attempting to resolve the other significant hurdle to its emergence through the NNI-PPI Settlement Agreement.[3] Attention in these cases logically will turn toward plan confirmation.[4] But a chapter 11 plan for NNCC cannot be proposed without allowance of the Intercompany Loan Claim and liquidation of the Support Agreement Claim.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    7.875% NOTES AND INTERCOMPANY AGREEMENTS

#### 1.    7.875% NOTES

8. NNCC issued $150,000,000 in 7.875% Notes, due June 15, 2026, pursuant to an Indenture, dated February 15, 1996 (the "Indenture") (attached as Exhibit B). NNL co-issued and guaranteed the 7.875% Notes. According to the proof of claim timely filed by Law Debenture Trust Company of New York, as successor indenture trustee (the "7.875% Notes Indenture Trustee"), as of the Petition Date, the amount owing under the Indenture included $150,000,000 in principal and $984,375 in interest. (See Proof of Claim No. 3946 filed in the Bankruptcy Cases, as amended January 10, 2013 (the "7.875% Notes Proof of Claim") at 3).

---

[3] Agreement Settling The NNI Post-Petition Interest Dispute And Related Matters (the "NNI-PPI Settlement Agreement"), submitted for Court approval pursuant to the Debtors' Motion For Entry Of An Order Pursuant To Bankruptcy Rule 9019 Approving Settlement Agreement By And Among Nortel Networks Inc., The Supporting Bondholders And The Bank Of New York Mellon With Respect To NNI Post-Petition Interest Dispute And Related Issues (Docket No. 14076) (the "9019 Motion"), which resolves disputes among NNI and the holders of crossover bonds issued by Nortel Networks Corporation and/or NNL and guaranteed by NNI (the "Settling Bondholders").

[4] See 9019 Mot. at 3 (¶ 2) (noting NNI-PPI Settlement Agreement "resolve[d] an issue that could otherwise significantly delay the confirmation of the Debtor's chapter 11 plan or the ultimate distribution of plan proceeds to the Debtors' creditors due to prolonged litigation."); at 16 (¶ 28) ("These agreements provide the Parties and other parties in interest with certainty in respect of such claims removing a potential impediment to the final resolution of the Chapter 11 Cases.").

4

## 2. SUPPORT AGREEMENT

9. NNCC and NNI entered into the Support Agreement in connection with the issuance of the 7.875% Notes. Through the Support Agreement, the parties intended to ensure that NNCC—a finance subsidiary with no operations or significant assets other than its intercompany claims against NNI—would remain solvent and have the financial ability to satisfy its liabilities, including the expressly-referenced 7.875% Notes.

10. The Support Agreement states specifically that "[NNI] and … [NNCC] desire to provide certain assurances with respect to performance of [NNCC's] obligations in connection with [NNCC's] offer of debt securities … under an Indenture dated as of February 15, 1996." (Ex. A (Support Agreement) at 1). Similarly, the corresponding Resolution of the NNI Board of Directors (the "Board Resolution") authorizes NNI to enter into the Support Agreement and "make contributions to the capital of [NNCC] in such form and in such amounts as may be approved by any one of the President or any Vice-President of [NNI]." The Board Resolution reflects an intent that NNI would satisfy its obligations through periodic contributions of cash. (See Exhibit C (Board Resolution)).

11. Section 2 of the Support Agreement (the "Net-Worth Maintenance Provision") provides as follows:

> Maintenance of Net Worth. At all times prior to the termination of this Agreement, [NNI] shall cause [NNCC] to have and to maintain a net worth of at least $1.00. For purposes hereof, "net worth" shall mean a sum equal to [NNCC's] tangible net worth, as determined in accordance with generally accepted accounting principles.

(Ex. A (Support Agreement) § 2). Thus, the Net-Worth Maintenance Provision imposes an affirmative obligation on NNI to cause NNCC to have and to maintain a net worth equal to at least $1.00, based on the value of NNCC's tangible assets and liabilities as measured in accordance with generally accepted accounting principles ("GAAP"). Stated differently, the

Support Agreement is a pre-petition obligation of NNI requiring NNI to ensure NNCC's solvency at all times.

### 3. REVOLVING LOAN AGREEMENT

12. NNCC was a financing company for its affiliates. It issued the 7.785% Notes and distributed the proceeds to NNI pursuant to the Revolving Loan Agreement, dated as of June 15, 2008 (the "Revolving Loan Agreement") among NNCC (as "Lender") and NNI (as "Borrower") (attached as Exhibit D). The Revolving Loan Agreement replaced and superseded earlier lending arrangements between NNCC, as lender, and NNI, as borrower.

13. The agreement provides that "Lender desires to make periodic loan advances to the Borrower to support on-going working capital funding for general corporate purposes in exchange for an interest bearing obligation payable to the Lender at a future date." (Ex. D. (Revolving Loan Agreement) at 1). As of June 15, 2008, NNI had drawn the amount of $146,671,383 against the credit facility. NNCC has a general unsecured claim against NNI for amounts owing under the Revolving Loan Agreement.

14. The relationships among NNCC and NNI with respect to the 7.875% Notes, the Support Agreement, and the Revolving Loan Agreement are displayed below.



B.  **NNCC'S AND NNI'S SCHEDULES OF ASSETS AND LIABILITIES**

15.     On May 29, 2009, NNI filed its initial Schedules of Assets and Liabilities (Docket Nos. 801-807, 810) (the "NNI Schedules"), which include the Intercompany Loan Claim, scheduled in the amount of $147,602,830. (See Exhibit E (relevant portions of NNI Schedules, Schedule F)). While the NNI Schedules do not contain any description of the Intercompany Loan Claim, it appears to reflect the unpaid principal and interest that NNI owes NNCC under

7

the Revolving Loan Agreement as of the petition date. NNI scheduled the claim as "disputed" without explanation.

16. On the same day, NNCC filed its Schedules of Assets and Liabilities (Docket No. 808) (the "NNCC Schedules"). The NNCC Schedules list assets consisting of personal property valued at $8,533,270. (See Exhibit F (relevant portions of NNCC Schedules (Schedule B)). The NNCC Schedules do not list as assets the amounts NNI owes NNCC with respect to the Intercompany Loan Claim and the Support Agreement Claim—even though those claims are NNCC's primary assets.

17. The NNCC Schedules list liabilities as of the petition date of $150,951,562 on account of "bond debt guarantees" (i.e., the 7.875% Notes), and a $6,192,048 intercompany claim payable to NNI. (See id. (Schedule F)). While unscheduled creditors have filed proofs of claim against NNCC, the scheduled liabilities consist exclusively of amounts owing with respect to the 7.875% Notes and the intercompany payable to NNI.

    **C.**    **NNI-PPI SETTLEMENT AGREEMENT**

18. On June 30, 2014, the Court issued an Order establishing a briefing schedule for disputed issues regarding the payment of post-petition interest (the "PPI Dispute").[5] NNI ultimately negotiated the NNI-PPI Settlement Agreement resolving the PPI Dispute as it relates to the Settling Bondholders and capping, at a fixed amount, claims under the Crossover Bonds[6] to post-petition interest. (See 9019 Mot. at 11 (¶ 11)).

---

[5] Solus and Macquarie submitted their own briefs in connection with the PPI Dispute. See, e.g., Opening Brief Of The Ad Hoc Group Of Bondholders, Law Debenture Trust Company Of New York, As Trustee, And The Bank Of New York Mellon, As Trustee With Respect To Monitor's Request That The Court Determine Bondholder Entitlement To Post-Petition Interest And Additional Bondholder Claims Issues Under U.S. Law, dated July 15, 2014 (Docket No. 14025) (the "Bondholder Pleading"); Joinder Of Solus Alternative Asset Management LP And Macquarie Capital (USA) Inc. In Bondholder Pleading, dated July 15, 2014 (Docket No. 14029); Supplemental Opening Brief Of Law Debenture Trust Company Of New York, dated July 15, 2014 (Docket No. 14028).

[6] The Crossover Bonds are the (a) senior notes issued by NNL, guaranteed by NNC and NNI, including two series of fixed rate 10.75% senior notes in the aggregate principal amounts of $450 million and $675 million due 2016, a series of fixed rate 10.125% senior notes in the aggregate principal amount of $550 million due 2013, and a series of floating rate senior notes in the aggregate principal amount of the $1

19.    The NNI-PPI Settlement Agreement provides that NNI will pay post-petition interest to the Settling Bondholders to the extent NNI is solvent, that is, "in the event that NNI at any time has more than sufficient funds to pay all of its allowed administrative, priority, secured, and general unsecured claims in full." (NNI-PPI Settlement Agreement at 4 (§ 2.1)). NNCC's Support Agreement Claim and Intercompany Loan Claim are general unsecured claims against NNI and must be paid in full before the Settling Bondholders will be entitled to post-petition interest.

### III.    JURISDICTION AND VENUE

20.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### IV.    RELIEF REQUESTED

21.    Solus and Macquarie request the entry of an Order pursuant to sections 105(a), 502(c), and 521(a) of the Bankruptcy Code, Bankruptcy Rule 1009(a), and Local Rule 1009-2 (a) estimating, for allowance and distribution purposes, the Support Agreement Claim at an amount not less than $72,989,050.42; and (b) directing NNI to amend its Schedules so that the Intercompany Loan Claim is scheduled as an undisputed, allowed claim, reflecting unpaid principal and interest owing as of the petition date under the Revolving Loan Agreement of $147,602,830, subject to NNCC's right to file a proof of claim with respect to the Intercompany Loan Claim.

---

billion due 2011 (the "2006 Notes"); and (b) 2.125% convertible senior notes due 2014 issued by NNC and guaranteed by NNI and NNL and 1.75% convertible senior notes due 2012 (the "2007 Notes.").

## V.  ARGUMENT

### A.  ESTIMATION OF SUPPORT AGREEMENT CLAIM IS MANDATORY

22. Section 502(c) of the Bankruptcy Code provides that "[t]here shall be estimated for purposes of allowance under this section—(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or (2) any right to payment arising from a right to an equitable remedy for breach of performance." 11 U.S.C. § 502(c)(1)-(2).

23. "The object of … [an estimation] proceeding is to establish the estimated value of a creditor's claim for purposes of formulating a reorganization plan." Kool, Mann, Coffee & Co. v. Coffey, 300 F.3d 340, 347 (3d Cir. 2002). See also In re C.F. Smith & Assocs., Inc., 235 B.R. 153, 157 (Bankr. D. Mass. 1999) (purpose of estimation "[is] to facilitate an early reorganization"); In re Teigen, 228 B.R. 720, 722 (Bankr. D.S.D. 1998) (purpose of section 502(c) "is to further the requirement that all claims against a debtor be converted into dollar amounts"). Cf., O'Neill v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.), 981 F.2d 1450, 1461 (5th Cir. 1993) (section 502(c)(1) "is designed to avoid the need to await the conclusion of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions, and … promote a fair distribution to creditors through a realistic assessment of uncertain claims.").

24. Estimation is mandatory for any claim that falls within either paragraph (1) or (2) of section 502(c). Any claim against NNI satisfying those criteria must be estimated. See In re Chateaugay Corp., 10 F.3d 944, 957 (2d Cir. 1993) ("A bankruptcy court must estimate any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case.") (internal quotation omitted); In re G-I Holdings, Inc., 2006 WL 2403531, at *3 (Bankr. D.N.J. Aug. 11, 2006) ("Section 502(c) of the Bankruptcy Code is drafted in mandatory terms."); In re Lane, 68 B.R. 609, 611 (Bankr. D. Haw. 1986)

("This duty of the bankruptcy court is mandatory, since the language of [section 502(c)] states 'shall.'"); In re Evans Prods. Co., 60 B.R. 863, 868 (S.D. Fla. 1986) (estimation "is the duty of the bankruptcy court."); 4 Collier On Bankruptcy ¶ 502.04[2] ("The language of section 502(c) is mandatory.").

25.     Moreover, the Court has broad discretion with respect to the procedure used to estimate the claim, so long as the process comports with the "policy underlying reorganization proceedings," a key aspect of which is that a "reorganization must be accomplished quickly and efficiently."  Bittner v. Borne Chem. Co., 691 F.2d 134, 136-37 (3d Cir.1982) ("Congress intended the procedure to be undertaken ... using whatever method is best suited to the particular contingencies at issue."); In re FV Steel and Wire Co., 372 B.R. 446, 453 (Bankr. E.D. Wis. 2007) ("The substance of the claim rather than overly formalized procedural rules should be the paramount consideration.").

   **B.**  **ESTIMATION OF SUPPORT AGREEMENT CLAIM WILL AVOID UNDUE DELAY IN ADMINISTRATION OF NNCC'S BANKRUPTCY CASE (§ 502(C)(1))**

     **1.**  **CLAIM IS CONTINGENT AND UNLIQUIDATED**

26.     The Support Agreement requires that NNI maintain NNCC's solvency at all times.  Because the agreement imposes an ongoing obligation on NNI, the Support Agreement Claim is contingent and will remain contingent unless and until all the claims of NNCC's creditors are satisfied in full under NNCC's chapter 11 plan.  See, e.g., SNTL Corp. v. Centre Ins. Co., 571 F.3d 826, 838-40 (9th Cir. 2009) (finding contingent claim cannot be disallowed "simply because the contingency arose post-petition;" claims under guaranty that creditor released under settlement agreement were revived post-petition—when a portion of settlement consideration was returned as a preference:  "those claims accrued (even if they were contingent and not fixed) as of the petition date, even if the Release were still effective as of that date.").

27. Under the Support Agreement, NNI must provide NNCC with sufficient funds to maintain a GAAP tangible net worth—which is the extent to which the fair market value of NNCC's assets exceeds NNCC's liabilities—of not less than $1.00. See Friedman, Jack P., Dictionary of Business Terms at 401 (2d ed 1994) (defining "net worth" as "the amount by which the fair market value of all assets exceeds liabilities.").

28. NNCC's claim under the Support Agreement encompasses all of its GAAP liabilities. Thus, the liabilities relevant to the net worth calculation include the outstanding principal owing with respect to the 7.875% Notes and all accrued and unpaid interest through the plan effective date. See Statement of Financial Accounting Concepts No. 6 ("[L]ong-term debt, interest and dividends payable, and similar requirements to pay cash so obviously qualify as liabilities that they need no further comment."). (A copy of the relevant portions are attached as Exhibit G1); id. at 62 (¶ 209) ("[B]orrowing agreements specify interest rates, periods involved, and timing of payments .... The occurrence of the specified event or events results in liability …. [I]nterest accrues with the passage of time."); Joanne M. Flood, Interpretation and Application of Generally Accepted Accounting Principles at 647-48 (Wiley 2013) ("Commonly accrued liabilities include ... accrued interest."). (A copy of the relevant portion is attached as Exhibit G2).

29. The amount of the Support Agreement Claim totals at least $72,989,050.42, calculated as follows:

| |
|---|
| • the total principal and interest owing with respect to the 7.875% Notes as of the effective date of a chapter 11 plan for NNCC (that is, the date on which the Support Agreement Claim is paid in full)—assumed to be June 30, 2015: **$227,273,437.50** (excluding, but subject to increase for amounts that may be owing because of NNCC's breach of any no-call provision);[7] |
| • *plus* NNCC's intercompany payable to NNI in the scheduled amount of: **$6,192,048.68**; |
| • *plus* the allowed amount of any proofs of claim filed against NNCC by other creditors and any other intercompany claims asserted against NNCC: **unknown**; |
| • *minus* the amount of NNCC's recovery under the Intercompany Loan Claim: **$147,602,830.30** (scheduled pre-petition amount); |
| • *minus* other intercompany claims allowed and payable to NNCC from NNI: **$4,340,334** (Scheduled Claim No. 100789560); and |
| • *minus* liquidated personal property assets of NNCC: **$8,533,270.88** (scheduled amount). |

30.  The amount of the Support Agreement Claim depends on certain variable inputs, including the amount required to maintain NNCC's solvency.  The final amount of the Support Agreement Claim is presently unknown, and therefore the claim is unliquidated for purposes of section 502(c).  See, e.g., In re Chemtura Corp., 436 B.R. 286, 297 (Bankr. S.D.N.Y. 2010) (describing an unliquidated claim as a "right ... subject only to uncertainty ... as to the final size of the claim."); In re RNI Wind Down, 396 B.R. 174, 183 (Bankr. D. Del. 2007) (unliquidated claims are claims for which "the amount owed has not been determined."); In re C.F. Smith & Assocs., Inc., 235 B.R. at 157 (estimating claim that while scheduled as contingent and unliquidated, nonetheless had already been reduced to a dollar amount by a state court judgment pending appeal); In re Evans Prods. Co., 60 B.R. at 868-69 & n.6 (estimating FTC's $67 million claims when awaiting outcome of pending FTC litigation against debtors).  Cf., In re Corey, 892 F.2d 829, 834 (9th Cir. 1989) (finding estimation appropriate "[g]iven the highly speculative nature of appellants' claims").

---

[7]  See Supplemental Opening Brief Of Law Debenture Trust Company Of New York, dated July 15, 2014 (Docket No. 14028) (setting forth claim for breach of no-call provision).

13

## 2. ESTIMATION WILL AVOID UNDUE DELAY IN ESTATE ADMINISTRATION

31. When a plan of reorganization cannot be confirmed absent the liquidation of a claim, the "undue delay" element of 502(c)(1) is met. See, e.g., In re Fed.-Mogul Global, Inc., 330 B.R. 133, 154 (D. Del. 2005) (because parties were "attempting a plan of reorganization," estimation would serve "underlying principles in bankruptcy of promoting the quick and efficient administration of the estate"); In re Lane, 68 B.R. at 611 (estimating claim since "[n]o plan of reorganization can be confirmed so long as this claim remains unliquidated and not estimated").

32. In assessing undue delay, the court "considers all the circumstances in the case and, in particular, how long the liquidation process would take compared with the uncertainty due to the contingency in question [as well as] [t]he costs and benefits associated with both liquidation and estimation." In re Teigen, 228 B.R. at 723. See In re Interco Inc., 137 B.R. 993, 997 (Bankr. E.D. Mo. 1992) ("Undue delay is ... a problem 'whose solution ultimately rests on the exercise of judicial discretion in light of the circumstances of the case.'") (quoting 3 Collier On Bankruptcy ¶ 502.023 (15th rev. ed. 1991)).

33. The contours of a chapter 11 plan for NNCC cannot be ascertained unless and until NNCC determines the fixed amount of the Support Agreement Claim. NNCC's scheduled liabilities consist exclusively of the amounts payable to holders of the 7.875% Notes and an intercompany claim payable to NNI. While the proceeds from the Intercompany Loan Claim (when allowed) will fund a significant portion of the distributions to satisfy those liabilities, the Support Agreement requires NNI to make up for any shortfall because it obligates NNI to maintain NNCC's solvency at all times.

34. Similarly, estimation of the Support Agreement Claim also will facilitate administration of the NNI estate. NNI must be solvent before it can pay any post-petition interest to the Settling Bondholders. It must pay all of its pre-petition claims in full, including the Support Agreement Claim, before the relief sought in the NNI-PPI Settlement Agreement

becomes relevant. Without estimation of the Support Agreement Claim, NNI will be unable to determine the extent of its pre-petition obligations.

35.  Accordingly, section 502(c)(1) mandates estimation of the Support Agreement Claim. See, e.g., In re Ralph Lauren Menswear, 197 B.R. 771, 773 (Bankr. S.D.N.Y. 1996) (estimating unsecured creditor claim when "the debtor cannot win [an] affirmative vote of the unsecured class because [creditor] is not in favor of the plan."); In re Eagle Bus Mfg., 158 B.R. 421, 436-37 (S.D. Tex. 1993) (estimating NLRB claims when "reorganization could not be effected without the NLRB's proof of claim being addressed;" noting estimation was "essential to the Chapter 11 proceedings"); In re C.F. Smith & Assocs., Inc., 235 B.R. at 157-58 (noting "meaningful plan" could not be proposed without resolution of litigation concerning claim); In re Interco Inc., 137 B.R. at 998 (estimating ERISA claim when deferring determination until arbitration "would leave a void in the Debtor's plan formulation equation" and make it difficult to determine "feasibility of a plan"); In re Lane, 68 B.R. at 611 (estimating claim when "no plan of reorganization can [otherwise] be confirmed").

### C. SUPPORT AGREEMENT ENTITLES NNCC TO RIGHT TO PAYMENT ARISING FROM AN EQUITABLE REMEDY OF SPECIFIC PERFORMANCE (§ 502(C)(2))

36.  The Support Agreement Claim is subject to mandatory estimation under section 502(c)(2), which requires the estimation of "any right to payment arising from a right to an equitable remedy for breach of performance." 11 U.S.C. § 502(c)(2). The Net-Worth Maintenance Provision requires NNI "at all times" to cause NNCC "to have and to maintain a net worth of at least $1.00." NNI assumed a continuing obligation, which (as reflected in the Board Resolution) required NNI to make continual contributions in the amount and form necessary to keep NNCC solvent. (See Ex. C).

37.  Monetary damages are insufficient to compensate NNCC for NNI's breach of ***ongoing*** obligations, which instead should give rise to a claim for specific performance. See Cho v. 401-403 57th St. Realty Corp., N.Y.S.2d 55, 57 (App. Div. 1st Dep't 2002) ("In

determining whether to grant specific performance, the trial court must determine, in the first instance, whether money damages would be an adequate remedy by considering, among other factors, the difficulty of proving damages with reasonable certainty and of procuring a suitable substitute performance with a damage award.").

38. Alternatively, even if the equitable remedy of specific performance could be quantified and satisfied by the payment of money damages, the claim still would be subject to estimation under section 502(c)(2). <u>Cf.</u>, <u>In re Udall</u>, 18 F.3d 403, 408 & n.2 (9th Cir. 1994) (examining claim definition (§ 101(5)(b)); holding "a right to an equitable remedy for breach of performance is a 'claim' if the same breach also gives rise to a right to a payment 'with respect to' the equitable remedy;" noting that interpretation of § 101(5)(b) is consistent with § 502(c)(2)). Accordingly, estimation is appropriate under section 502(c)(2) of the Bankruptcy Code.

### D. NNI SHOULD AMEND ITS SCHEDULES TO ALLOW INTERCOMPANY LOAN CLAIM

39. Section 521(a) of the Bankruptcy Code requires NNI to, among other things, file schedules of assets and liabilities. Bankruptcy Rule 1009(a) provides in part that "[o]n motion of a party in interest, after notice and a hearing, the court may order any … schedule … to be amended." Fed. R. Bankr. P. 1009(a).

40. The allowed amount of the Intercompany Loan Claim must be known in order to estimate the Support Agreement Claim. But NNI inexplicably scheduled the Intercompany Loan Claim owing to NNCC as "disputed." The Schedules neither contain information concerning the claim nor indentify the purported basis upon which NNI disputes its obligations under the Revolving Loan Agreement.

41. The Revolving Loan Agreement is a valid and binding contract the Debtors filed with their July 2011 Monthly Operating Report (Docket No. 6290) and otherwise is enforceable against NNI. There simply is no reason for the potential disallowance of the Intercompany Loan

Claim against NNI. Accordingly, NNI should be directed to amend its schedules to allow the Intercompany Loan Claim in the scheduled amount of $147,602,830. The amendment should be made without any waiver of NNCC's right to file a proof of claim pursuant to Local Rule 1009-2.[8]

### VI.  RESERVATION OF RIGHTS

42. Nothing contained herein shall constitute a waiver of any rights or remedies of Solus or Macquarie under the Bankruptcy Code or applicable law, including, without limitation, the right to supplement this motion, to file a reply in further support hereof, to take discovery in connection with this motion, or to submit evidence in support hereof.

### VII.  NOTICE

43. Notice of this motion has been given via electronic transmission, first class mail, hand delivery, or overnight mail to: (i) counsel to the Debtors; (ii) the U.S. Trustee; (iii) counsel to the Committee; (iv) counsel to the Ad Hoc Bondholder Group; and (v) all parties that have requested to receive notice in these Bankruptcy Cases pursuant to Bankruptcy Rule 2002. Accordingly, Solus and Macquarie submit that under the circumstances, no other further notice is necessary.

### VIII.  NO PRIOR REQUEST

44. No prior request for the relief sought herein has been made to this or any other Court.

---

[8] See L.R. Civ. P. 1009-2 ("Whenever the debtor … amends the debtor's schedules to change the amount, nature, classification or characterization of a debt owing to a creditor, the debtor or trustee shall, within fourteen (14) days, transmit notice of the amendment to the creditor and notice of the creditor's right to file a proof of claim by the later of the bar date (if any) or twenty-one (21) days from the date of notice.").

## IX. CONCLUSION

WHEREFORE, Solus and Macquarie respectfully request that the Court enter an Order (i) estimating, for purposes of allowance and distribution, the Support Agreement Claim at no less than $72,989,050.42, (ii) directing NNI to amend the Schedules to list the Intercompany Loan Claim as undisputed and allowed in the amount of $147,602,830.30, reflecting principal and interest owing as of the petition date under the Revolving Loan Agreement, subject to NNCC's right to file a proof of claim with respect to the Intercompany Loan Claim, and (iii) awarding such other relief as is just and appropriate.

Dated: Wilmington, Delaware
October 27, 2014

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani
James C. Tecce
Daniel Holzman
Kate Scherling

51 Madison Avenue
New York, New York 10010
(212) 849-7000

 */s/ Joanne P. Pinckney*
**PINCKNEY, URBAN, WEIDENGER & JOYCE, LLC**
Joanne P. Pinckney, Esq. (DE No. 3344)
1220 Market Street, Suite 950
Wilmington, DE  19801
Telephone: (302) 504-1497
Facsimile: (302) 655-5213
jpinckney@pwujlaw.com

*Co-Counsel to Solus Alternative Asset Management LP and Macquarie Capital (USA) Inc.*