## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X
                :

*In re*                     :    Chapter 11
                :

Nortel Networks Inc., *et al.*,[1]   :    Case No. 09-10138 (KG)
                :

            Debtors.    :    Jointly Administered
                :

                :    **Hearing date: November 4, 2014 at 10:00 a.m. (ET)**
                :

-------------------------------------------------------- X

### REPLY IN FURTHER SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 APPROVING SETTLEMENT AGREEMENT BY AND AMONG NORTEL NETWORKS INC., THE SUPPORTING BONDHOLDERS, AND THE BANK OF NEW YORK MELLON WITH RESPECT TO THE NNI POST-PETITION INTEREST DISPUTE AND RELATED ISSUES

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iii

**PRELIMINARY STATEMENT** ............................................................................................2

**ARGUMENT**.................................................................................................................................4

I. THE SETTLEMENT SHOULD BE APPROVED  BECAUSE IT SATISFIES THE MARTIN FACTORS ...............................................................................................................4

    A.    The Settlement Compromises a Substantial Bondholder Claim to Entitlement of Post-Petition Interest at the Contract Rate...................................................................................5

    B.    The Settlement is the Most Effective Manner of Resolving Costs and Delays in these Cases ...................................................................................................................................9

    C.    The Settlement is in the Best Interests of the Debtors' Creditors and Interest Holders . ............................................................................................................................................11

II. THE CANADIAN INTERESTS' REMAINING OBJECTIONS LACK LEGAL AND FACTUAL MERIT .........................................................................................................17

III. THE CANADIAN INTERESTS' EXPERT SUPPORTS  THE VALUE OF THE PROPOSED SETTLEMENT ...............................................................................................21

    A.    The Wertheim Report Understates the Recovery to NNL Creditors Such as NNI and the Bondholders ...............................................................................................................24

    B.    The Wertheim Report Undervalues NNL's Assets ...................................................28

    C.    The Wertheim Report Makes Similar Errors with Respect to NNI's Assets and Claims...................................................................................................................................31

    D.    The Wertheim Report Demonstrates the Difficulty of Estimating Available Assets for Payment of Post-petition Interest ..........................................................................................32

IV. THE SETTLEMENT AGREEMENT IS THE PRODUCT OF GOOD FATIH NEGOTIATION AMONG THE SETTLING PARTIES .......................................................33

V. SEVERAL OBJECTING PARTIES LACK STANDING AS PARTIES IN INTEREST ...........................................................................................................................36

**CONCLUSION** ...........................................................................................................................39

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

Am. Can Co. v. Herpel (In re Jackson Brewing Co.),
624 F.2d. 605 (5th Cir. 1980) ............................................................. 6

In re 3D Resorts-Bluegrass, LLC,
No. 11-41599-ACS, 2013 WL 6019117 (Bankr. W.D. Ky. Nov. 13, 2013)..................... 9

In re ASARCO LLC,
No. 05-21207, 2009 WL 8176641 (Bankr. S.D. Tex. June 5, 2009)................................ 6-7

In re Braniff Airways, Inc.,
700 F.2d 935 (5th Cir. 1983) ............................................................. 19

In re Capmark Fin. Grp. Inc.,
438 B.R. 471 (Bankr. D. Del. 2010) .......................................... 7, 9, 17-18, 20

In re Cellular Info. Sys., Inc.,
171 B.R. 926 (Bankr. S.D.N.Y. 1994) ............................................... 6

In re Coram Healthcare Corp.,
315 B.R. 321 (Bankr. D. Del. 2004) ............................................... 4

In re Crowthers McCall Pattern, Inc.,
114 B.R. 877 (Bankr. S.D.N.Y 1990) ............................................. 18

In re Exide Techs. Inc.,
303 B.R. 48 (Bankr. D. Del. 2003) ............................................... 33

In re Genesis Health Ventures, Inc.,
266 B.R. 591 (Bankr. D. Del. 2001) ............................................. 18

In re Innkeepers USA Trust,
448 B.R. 131 (Bankr. S.D.N.Y. 2011) ........................................... 37

In re Ionosphere Clubs, Inc.,
101 B.R. 844 (Bankr. S.D.N.Y. 1989) ...................................... 36, 38

In re Iridium Operating, LLC.,
478 F.3d 452 (2d Cir. 2007) ................................................... 18-19

In re Jevic Holding Corp.,
Bank. No. 08-11006 (BLS), 2014 WL 268613 ............................... 6, 17

In re Key3Media Grp., Inc.,
336 B.R. 87 (Bankr. D. Del. 2005), aff'd, No. 03-10323 (MFW), 2006 WL 2842462
(D. Del. Oct. 2, 2006) ...................................................................................................  5, 20

In re Lifeco Inv. Grp., Inc.,
173 B.R. 478 (Bankr. D. Del. 1994) ..............................................................................  37, 38

In re Louise's, Inc.,
211 B.R. 798 (Bankr. D. Del. 1997) ..............................................................................  18

In re Martin,
91 F.3d 389 (3d Cir. 1996) .............................................................................................  4, 11

In re Mirant Corp.,
348 B.R. 725 (Bankr. N.D. Tex. 2006) ..........................................................................  20

In re MQVP, Inc.,
477 F. App'x 310 (6th Cir. 2012) ...................................................................................  9

In re Newcare Health Corp.,
244 B.R. 167 (B.A.P. 1st Cir. 2000) ..............................................................................  37

In re Overseas Shipholding Grp., Inc.,
No. 12-20000-PJW, 2014 WL 4782704 (Bankr. D. Del. July 18, 2014) .........................  8, 18

In re Pa. Truck Lines, Inc.,
150 B.R. 595 (E.D. Pa. 1992), aff'd, 8 F.3d 812 (3d Cir.1993) ......................................  5

In re Residential Capital, LLC,
497 B.R. 720 (Bankr. S.D.N.Y. 2013) ............................................................................  20

In re Sea Containers, Ltd.,
No. 06–11156(KJC), 2008 WL 4296562 (Bankr. D. Del. Sept.19, 2008) ........................  20

In re W.R. Grace & Co.,
475 B.R. 34 (D. Del. 2012) (D. Del. 2012), aff'd, 729 F.3d 332 (3d Cir. 2013),
aff'd, 532 F. App'x 264 (3d Cir. 2013), aff'd, 729 F.3d 311 (3d Cir. 2013),
aff'd, 729 F.3d 332 (3d Cir. 2013) ..................................................................................  4, 7, 18

In re Washington Mutual, Inc.,
442 B.R. 314 (Bankr. D. Del. 2011) ..............................................................................  18

In re World Health Alt., Inc.,
344 B.R. 291 (Bankr. D. Del. 2006) ..............................................................................  17

Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.,
337 F.3d 314 (3d Cir. 2003) ...........................................................................................  15, 16

New Hampshire v. Maine,
532 U.S. 742 (2001) .......................................................................................................   15

Travelers Cas. & Sur. Co. v. Future Claimants Representative,
Civil Action No. 07–2785 (FLW), 2008 WL 821088 (D.N.J. Mar. 25, 2008) ..................   4-5

The Debtors respectfully submit this memorandum of law in reply (the "Reply") to the

Preliminary Objection and Motion of the Monitor and the Canadian Debtors for an Adjournment

of the Objection Deadline Concerning the U.S. Debtors 9019 Motion and for Expedited

Discovery [D.I. 14117] (the "Preliminary Objection"), the Monitor's and Canadian Debtors'

Supplemental Objection to Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule

9019 Approving Post-Petition Interest Agreement [D.I. 14496] (the "Supplemental Objection"),

the Objection of Wilmington Trust, National Association, as Successor Indenture Trustee to

Debtors Motion For Entry Of An Order Pursuant To Bankruptcy Rule 9019 Approving

Settlement Agreement By And Among Nortel Networks Inc., The Supporting Bondholders, And

The Bank Of New York Mellon With Respect To The NNI Post Petition Interest Dispute And

Related Issues [D.I. 14498] (the "Wilmington Objection"), the Joinder of UK Pension Claimants

in Objections to Debtors Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019

Approving Settlement Agreement by and among Nortel Networks Inc., The Supporting

Bondholders, and the Bank of New York Mellon with Respect to the NNI Post-Petition Interest

Dispute and Related Issues [D.I. 14534] (the "UKP Joinder"), and the Joinder of the Canadian

Creditors Committee in the Objections to the Debtors Motion for Entry of an Order Pursuant to

Bankruptcy Rule 9019 Approving Settlement Agreement By and Among Nortel Networks Inc.,

the Supporting Bondholders, and the Bank of New York Mellon With Respect to NNI Post-

Petition Interest Dispute and Related Issues [D.I. 14076] (the "CCC Joinder"), and in further

support of the Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019

Approving Settlement Agreement By And Among Nortel Networks Inc., The Supporting

Bondholders, And The Bank Of New York Mellon With Respect To The NNI Post-Petition

Interest Dispute And Related Issues, filed on July 24, 2014 [D.I. 14076] (the "Motion").[2]  In

---

[2]          Capitalized terms used herein shall have the same meaning as set forth in the Motion.

support of this Reply, the Debtors rely upon the Declaration of Brent M. Tunis, dated October 30, 2014, being filed contemporaneously herewith.[3]  The Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors are seeking approval of a settlement of various claims asserted by their bondholders at a time when the Debtors have just completed a six week cross-border trial on the allocation of approximately $7.3 billion in sale proceeds, and the Debtors are fully focused on bringing their cases to final resolution so that they can begin to distribute their assets to their stakeholders.  The proposed settlement with the bondholders, which provides for the allowance of unsecured claims against NNI and a substantial compromise on their asserted claims for post-petition interest to the extent that NNI ultimately proves to be solvent, is a positive step towards the narrowing of disputes and resolution of the remaining issues in these cases.

2.      The Canadian Interests, including the Monitor and Canadian Debtors and a legion of their creditors (who have no claims against the Debtors), Wilmington Trust, the CCC and the UKP Pension Parties, have shown up in force to object to the proposed settlement.[4]  Their objections, including the complaints about process and gratuitous attacks laced throughout their pleadings, are emblematic of the challenges the Debtors have faced in trying to build consensus

---

[3]      Further detail regarding the negotiations leading to the settlement and other factual background is set forth in the reply of the Ad Hoc Group of Bondholders in support of the Motion, which is being filed contemporaneously herewith.

[4]      For purposes of this Motion, the "Canadian Interests" are the Monitor, the Canadian Debtors, and Wilmington Trust, N.A. ("Wilmington Trust"), the Canadian Creditors Committee (the "CCC"), and the Nortel Networks UK Pension Trust Limited and the Board of the UK Pension Protection Fund (together, the "UK Pension Parties") insofar as Wilmington Trust, the CCC and the UK Pension Parties' sole interest in the Motion relates to their status as creditors of NNL and desire to maximize the value of NNL's estate.  As explained in Section V below, Wilmington Trust, the CCC, and the UK Pension Parties lack standing to object to the Motion, and nothing in this Reply is intended as a waiver of the Debtors' argument that these parties lack standing to be heard with respect to the Motion.

and secure compromises in these cases.  Three months ago, the Canadian Interests demanded that

the bondholders' post-petition interest claims be resolved immediately because they were

allegedly creating a "logjam" to reaching larger settlements (the very reason this settlement came

about).  Now they must not be settled.  Three months ago, the Canadian Interests presented the

post-petition interest issue to the Court as a $1.6 billion dispute (an amount the settlement

compromises significantly).  Now it's under $1 billion, at most.  For the past five months,

including as recently as last month (well after this settlement motion had been filed), the Court

was presented with expert testimony and argument by Canadian Interests that if certain

allocation theories were adopted, NNI would have more than $1.3 billion available to pay post-

petition interest claims.  Their new expert conveniently rejects that.

      3.     The objections of the Canadian Interests should be seen for what they are –

arguments of convenience made to further their goal *du jour*, control of the manner and timing in

which issues get litigated and resolved in the Debtors' cases.  As the Debtors will show at the

hearing, the Canadian Interests' arguments lack merit, and the only evidence they purport to

offer in support of the objection – the expert testimony of Dr. Paul Wertheim – actually supports

the Debtors' argument that substantial concessions and compromises have been made by the

bondholders and thus has been value obtained by the Debtors.  The settlement should be

approved both because it is well within the range of reasonableness, and as the first step towards

a resolution of the remaining issues in the Debtors' cases.

**ARGUMENT**

**I.**
**THE SETTLEMENT SHOULD BE APPROVED**
**BECAUSE IT SATISFIES THE MARTIN FACTORS**

4.     The Canadian Interests raise various purported concerns and complaints regarding

the Settlement Agreement, insisting that the issue of the bondholders' entitlement to post-petition

interest should either be exhaustively litigated (including through appeals if necessary) or

otherwise settled only with the Canadian Debtors' and Monitor's (and possibly other Canadian

Interests') consent.  Such arguments are inconsistent with the relevant legal standards for the

Court's approval of the settlement and are misguided at best in light of the history and current

status of the Debtors' cases.  In fact, the proposed settlement falls well within the standards for

approval of the settlement as set forth in the <u>Martin</u> decision and its progeny.

5.     Compromises are generally favored in bankruptcy to minimize litigation, which

can be uncertain and costly, and to expedite the administration of a bankruptcy estate.  <u>In re</u>

<u>Martin</u>, 91 F.3d 389, 393 (3d Cir. 1996) (<u>citing</u> 9 <u>Collier on Bankruptcy</u> ¶ 9019.03[1] (15th

ed.1993)).  Analyzing a compromise or settlement agreement under the <u>Martin</u> factors does not

require "a mini-trial on the merits."  <u>In re W.R. Grace & Co.</u>, 475 B.R. 34, 77-78 (D. Del. 2012)

(D. Del. 2012), <u>aff'd</u>, 729 F.3d 332 (3d Cir. 2013), <u>aff'd</u>, 532 F. App'x 264 (3d Cir. 2013), <u>aff'd</u>,

729 F.3d 311 (3d Cir. 2013), <u>aff'd</u>, 729 F.3d 332 (3d Cir. 2013) (<u>citing</u> <u>In re Jasmine, Ltd.</u>, 258

B.R. 119, 123 (Bankr. D.N.J. 2000)).  Consistent with the goal of fostering settlements, and

contrary to the Canadian Interests' assertions,[5] "the court does not have to be convinced that the

settlement is the best possible compromise."  <u>In re Coram Healthcare Corp.</u>, 315 B.R. 321, 330

(Bankr. D. Del. 2004).  Rather the court need only "canvass the issues and see whether the

settlement falls below the lowest point in the range of reasonableness."  <u>Travelers Cas. & Sur.</u>

---

[5]     Supplemental Objection ¶13-14.

<u>Co. v. Future Claimants Representative</u>, Civil Action No. 07–2785 (FLW), 2008 WL 821088, at
*5 (D.N.J. Mar. 25, 2008) (<u>citing</u> <u>In re Jasmine</u>, 258 B.R. at 123); see also <u>In re Pa. Truck Lines,</u>
<u>Inc.</u>, 150 B.R. 595, 598 (E.D. Pa. 1992), <u>aff'd</u>, 8 F.3d 812 (3d Cir.1993).  Courts generally
evaluate proposed settlements "giv[ing] deference to a Debtor's business judgment."  <u>In re</u>
<u>Key3Media Grp., Inc.</u>, 336 B.R. 87, 93 (Bankr. D. Del. 2005), <u>aff'd</u>, No. 03-10323 (MFW), 2006
WL 2842462 (D. Del. Oct. 2, 2006).

> 6.      The settlement falls well within the range of reasonableness and satisfies the
<u>Martin</u> factors for approval.  In particular, the uncertainty of the outcome of the litigation; the
risks, time, and necessary costs of pursuing litigation; and the best interests of the creditors and
interest holders all weigh in favor of approving the settlement.[6]

## A.      The Settlement Compromises a Substantial Bondholder Claim to Entitlement of Post-Petition Interest at the Contract Rate

> 7.      While the Canadian Interests' objections misguidedly dwell on the expected
economics of the proposed Settlement Agreement – an issue their sole witness focuses
exclusively on – they also challenge whether the Debtors have sufficiently analyzed the
likelihood that the bondholders would succeed in obtaining a favorable legal ruling on their
entitlement to post-petition interest.  As amply demonstrated by the various briefs submitted on
these legal issues,[7] the bondholders have asserted a substantial claim for post-petition contractual

---

[6]      The Debtors and Canadian Interests agree that the second <u>Martin</u> factor, difficulty in collection, is not a
driving consideration in this case.  Supplemental Objection n.12; Wilmington Objection ¶ 20.

[7]      Opening Brief of the Ad Hoc Group of Bondholders, Law Debenture Trust Company of New York, as
Trustee, and the Bank of New York Mellon, as Trustee, with Respect to Monitor's Request That the Court
Determine Bondholder Entitlement to Post-Petition Interest and Additional Bondholder Claims Issues Under U.S.
Law, July 15, 2014 [D.I. 14025] (the "<u>Bondholder PPI Brief</u>"); Memorandum of Law of the Official Committee of
Unsecured Creditors Regarding Entitlement of US Creditors to Postpetition Interest, July 15, 2014 [D.I. 14024] (the
"<u>Committee PPI Brief</u>"); Opening Brief of the Monitor and the Canadian Debtors Regarding Post-Petition Interest
and Related Issues, July 15, 2014 [D.I. 14023] (the "<u>Monitor PPI Brief</u>"); US Debtors Submission on the Interest
Issue, July 15, 2014 [D.I. 14019]; Response of the Ad Hoc Group of Bondholders, Law Debenture Trust Company
of New York, As Trustee, and the Bank of New York Mellon, As Trustee, to the Opening Briefs of the Monitor and
Canadian Debtors, U.K. Pension Claimants, Canadian Creditors Committee, and Wilmington Trust Regarding
Bondholder Entitlement to Post-Petition Interest and Additional Bondholder Claims Issues Under U.S. Law, July 22,

interest which cannot be disregarded; the fact that other plans and settlements have allowed contractual interest supports the legitimacy of their claim and weighs in favor of a settlement that compromises these issues.

8.     The Canadian Interests are wrong to suggest that the Debtors were required to form – and share with the Court and other parties – their own view of the precise likelihood that the bondholders would win on the underlying legal issue.  Supplemental Objection ¶¶ 37-39; Wilmington Objection ¶ 15.  Rather, under the first Martin factor, the Settlement Agreement may be approved as long as the probability of success in litigation of the post-petition interest issue – i.e., the probability that the Court will find that the bondholders are not entitled to post-petition interest at a rate greater than the federal judgment rate – is "not 'a slam dunk.'"  In re Jevic Holding Corp., Bank. No. 08-11006 (BLS), 2014 WL 268613 (D. Del Jan. 24, 2014) at *3 (approving settlement where "litigation was . . . not 'a slam dunk'"); see also In re Cellular Info. Sys., Inc., 171 B.R. 926, 950 (Bankr. S.D.N.Y. 1994) (holding that the purpose is "not to make findings of fact and conclusions of law, but to canvass the issues to assess the risk associated with prosecuting the various claims").  In evaluating the probability that the bondholders would have prevailed in the litigation, it is sufficient for the court to conclude that a substantial controversy with an uncertain outcome exists.  Am. Can Co. v. Herpel (In re Jackson Brewing Co.), 624 F.2d. 605, 610 (5th Cir. 1980) (affirming approval of settlement where "the Court concluded that there was a substantial controversy between the Trustee and the [defendant] with an uncertain resolution."); In re ASARCO LLC, No. 05-21207, 2009 WL 8176641, at *10, *13

---

2014 [D.I. 14053]; Supplemental Reply Brief of Law Debenture Trust Company of New York, as Indenture Trustee for the NNCC Notes, with Respect to Monitor's Request that the Court Determine Bondholder Entitlement to Post-Petition Interest and Additional Bondholder Claims Issues Under U.S. Law, July 22, 2014 [D.I. 14057]; Reply of the Monitor and the Canadian Debtors Regarding Post-Petition Interest and Related Issues, July 22, 2014 [D.I. 14054]; Responding Brief of the UK Pension Claimants Regarding Post-Petition Interest Issues, July 22, 2014 [D.I. 14052]; Reply Brief of Wilmington Trust, National Association, as Successor Indenture Trustee, Addressing the Interest Issues, July 22, 2014 [D.I. 14055] (the "Wilmington PPI Reply Brief").

(Bankr. S.D. Tex. June 5, 2009) (approving settlement whereby the debtors avoided "the litigation risk of adverse determinations" regarding the disputed issues).

9.      The standard set forth in the caselaw is amply met with respect to the PPI Dispute. Courts in the Third Circuit have approved settlements, both in the context of contested pre-plan settlements and plans of reorganization, that pay creditors post-petition interest at a rate higher than the federal judgment rate.  See, e.g., In re W.R. Grace & Co., 475 B.R. at 34, 161 n.119 (approving payment pursuant to settlement embodied in plan of reorganization of post-petition interest at a rate above federal judgment rate); In re Capmark Fin. Grp. Inc., 438 B.R. 471, 513 (Bankr. D. Del. 2010) (approving settlement providing for post-petition interest at the contract rate); see also Committee PPI Brief at 3; Bondholder PPI Brief § III.A (identifying other precedents).  In light of these precedents, the Wilmington Objection, which insists that the federal judgment rate "is the rate applied over the past nine (9) years by *every* judge in the Third Circuit and every court nationwide," is flatly wrong.  Wilmington Objection ¶ 17.  Tellingly, Wilmington Trust has refused to provide documents or evidence to support its assertion.[8]  In prior submissions, even the Monitor argued only that the "majority" of courts had held that the federal judgment rate is the "legal rate" specified by 28 U.S.C. § 1961, implicitly conceding that other courts had held otherwise, the precise definition of a substantial controversy with an uncertain outcome.  Monitor Brief ¶ 7.

10.      The Canadian Interests wrongly criticize Mr. Ray, the Principal Officer of the Debtors, for not seeking legal advice on the actual probability of success in the PPI Dispute.  Mr.

---

[8]      Because this statement was made without citing any relevant authority, the Debtors requested the basis for Wilmington's support for that assertion; in return, the Debtors received only a reference to previous Wilmington Trust pleadings on the PPI Dispute and a purported concession on that point by the Bondholder Group, neither of which actually support Wilmington's contention.  Objection and Responses of Wilmington Trust, National Association, as Successor Indenture Trustee to Debtors' Request for Production of Documents, Oct. 17, 2014 (the "Wilmington Objection and Responses"), at 4.  A true and correct copy of the Wilmington Objection and Responses is attached to the Tunis Declaration as Exhibit A.

Ray has personal familiarity with these issues, including from his role as Chief Reorganization Officer of Overseas Shipholding Group, Inc., a debtor with a Chapter 11 plan recently confirmed in this District that paid not only contractual post-petition interest, but also interest-on-interest to debt holders, even where an official equity committee had been appointed to represent the interests of shareholders.  In re Overseas Shipholding Grp., Inc., No. 12-20000-PJW, 2014 WL 4782704, at *16 (Bankr. D. Del. July 18, 2014) (confirming plan of reorganization which paid unsecured creditors post-petition interest at the contract rate).[9]  The Canadian Interests also mischaracterize Mr. Ray's deposition testimony to the extent they suggest he hadn't given any consideration to the probability of success on the merits.  Supplemental Objection ¶ 18.  Rather, their questions of him focused only on (1) the likelihood of *actual recovery* of more than the PPI Settlement Amount, which would depend on the allocation of sale proceeds and other factors beyond the amount of post-petition interest to which the Supporting Bondholders are legally entitled, and (2) his *personal* analysis of US law, without regard to advice he sought or received from counsel.[10]  In any event, the Court's finding that a substantial controversy exists does not turn on the testimony of Mr. Ray, particularly in light of the substantial record evidence in these cases.

---

[9]     Ironically, in that case, Wilmington Trust successfully argued for the payment of interest on overdue interest owed to holders of certain notes for which it served as indenture trustee.  See Memorandum Of Law Of Wilmington Trust, National Association, As Indenture Trustee, Regarding The Interest On Overdue Interest Dispute, In re Overseas Shipholding Grp., Inc., No. 12-20000-PJW, 2014 WL 4782704 (Bankr. D. Del. August 6, 2014) [D.I. 3758] (as attached to the Tunis Declaration as Exhibit B, the "Wilmington OSG Brief"); Order Granting Claimants' Entitlement to Interest on Overdue Interest, In re Overseas Shipholding Grp., Inc., No. 12-20000-PJW, 2014 wl 4782704 (Bankr. D. Del. August 21, 2014) (D.I. 3838) (as attached to the Tunis Declaration as Exhibit C, the "OSG Interest on Interest Order").

[10]    See Supplemental Objection ¶ 18 (citing Transcript of Deposition of John J. Ray, III, Sept. 15, 2014 (the "Ray Dep. Tr.") 115:13-18 ("Did you receive, without revealing the substance of any legal advice, did you receive any legal advice about whether the bonds would *actually recover* through litigation more than $1.01 billion?")(emphasis added); see also Ray Dep. Tr. 39:20 – 40:5 ("Q .  And when you said that I believe there's an entitlement under the contract, did you analyze the US law with respect to that entitlement? . . . . *I'm not asking what advice you received.*  A. No, *not personally*, no.")(emphasis added). A copy of the Ray Dep. Tr. is attached to the Tunis Declaration as Exhibit D.

**B.      The Settlement is the Most Effective Manner of Resolving Costs and Delays in these Cases**

11.      Given the uncertainty of the outcome of the PPI Dispute, the attendant risks and the necessary time and costs of litigation, the Settlement Agreement easily satisfies the third Martin factor relating to the cost, complexity and delay avoided by a settlement.  In re Capmark, 438 B.R. at 518 ("[T]aking into account the costs, risks, and uncertainty that would arise from denying the Settlement Motion in favor of pursuing litigation, the Court . . . approv[es] the Settlement.").  As one court put it in assessing the complexity of litigation, "[t]his case is not a 'normal' bankruptcy case" and "[t]o put it simply, there are a multitude of moving pieces involved."  In re 3D Resorts-Bluegrass, LLC, No. 11-41599-ACS, 2013 WL 6019117, at *7 (Bankr. W.D. Ky. Nov. 13, 2013).  In assessing the complexity, expense and delay of litigation avoided by a settlement, the Court also may consider the likelihood of appeal.  In re MQVP, Inc., 477 F. App'x 310, 314 (6th Cir. 2012).

12.      As discussed in further detail below, just four months ago, the Canadian Interests argued vociferously that the uncertainty of the bondholders' entitlement to a contractual claim of $1.6 billion[11] of post-petition interest was creating a "logjam" to settlement of the larger allocation disputes, such that those issues had to be decided "as soon as reasonably practical," proposing that a hearing be held on the issue less than a week from the date of their submission. Nortel Canadian And US Insolvency Proceedings – Bondholder Claims Issues, June 19, 2014 [D.I. 13880] (the "Monitor Request") at 3-4.  Having used this supposed urgency to motivate the

---

[11]      $1.6 billion represents the amount of interest accrued on the bonds that are the subject of the settlement since the Petition Date as calculated pursuant to the applicable indenture.  See Indenture dated as of July 5, 2006, as supplemented as of July 5, 2006, May 1, 2007, and May 28, 2008 (US $1B LIBOR + 4.25% due 2011; US $550M 10.125% due 2013; and US $1.125B 10.75% due 2016) (as attached as Exhibit A to Claim No. 3972 filed by The Bank of New York Mellon, as Indenture Trustee, the "2006 Indenture"); Indenture dated as of March 28, 2007 (US $575M 1.75% due 2012 and US $575M 2.125% due 2014) (as attached as Exhibit A to Claim No. 3971 filed by The Bank of New York Mellon, as Indenture Trustee, the "2007 Indenture" and, together with the 2006 Indenture, the "Indentures").

Debtors and bondholders to settle rather than litigate, the Canadian Interests now reverse

themselves entirely, arguing that the settlement does not aid resolution of the larger allocation

dispute and further litigation should be required.

13.     While the Debtors believe that the sheer dollar discount of the settlement relative

to the full claim for contractual interest (over $700 million as of June 30, 2014 and growing

daily) is compelling, the structure of the settlement also is designed to incentivize settlement of

the allocation litigation.  Whereas if they litigate and prevail, the bondholders would be entitled

to contract-rate interest (of approximately 7.5% on a blended basis) in perpetuity until paid, the

settlement cuts that to 3.5% retroactive to June 30, 2014 and then eliminates further interest

entirely after June 30, 2015.  Settlement Agreement § 2.2.  The cessation of the accrual of

interest on June 30, 2015 will save the Debtors roughly one million dollars per day, according to

the Monitor's representations.[12]  This plainly incentivizes prompt settlement.

14.     The Canadian Interests' other attempts to discount the savings in cost, complexity

and delay of the settlement miss the mark.  First, their argument that the settlement does not

resolve bondholders' other claims for contractual entitlements (such as make-whole payments) is

irrelevant, because any such claims are subordinated and subject to the overall recovery cap

imposed by the settlement.  See Supplemental Objection n.14; Settlement Agreement § 2.3.

Second, the Canadian Interests' argument that the settlement does not avoid costs because the

question of entitlement to contractual post-petition interest still must be litigated for other parties

is disingenuous since approval of the settlement may foster settlements with other creditors at the

appropriate time; ironically, in their own cases, the Canadian Debtors have chosen to litigate

post-petition interest issues piecemeal – requesting a determination on the question of

entitlement to post-petition interest only as against the cross-over bond claims, rather than also as

---

[12]     Transcript of Proceedings Before the Bankruptcy Court, Aug. 8, 2014 (the "Aug. 8 Hr'g Tr.") 42:24-43:3.

against other Canadian creditors, including the bonds for which Wilmington Trust serves as indenture trustee.  Monitor Request at 1.[13]  Third, the Canadian Interests also argue that the cost of appeals of a ruling on the PPI Dispute should not be considered in assessing the savings brought about by the settlement because they will appeal any approval of the Settlement Agreement, just as they would an adverse ruling on the PPI Dispute.  Supplemental Objection ¶ 44; Wilmington Objection ¶ 18.  Accepting that cynical argument would allow any creditor in any bankruptcy to undermine the cost savings of settlement by threatening to appeal.  In any event, the costs and delay of an appeal of the approval of a settlement – conducted with deference to this Court's findings of fact as applied to a business judgment standard – pale in comparison to full-fledged litigation followed by a potentially *de novo* appellate review of a decision on the merits of the issue.

**C.    The Settlement is in the Best Interests of the Debtors' Creditors and Interest Holders**

15.    The final <u>Martin</u> factor requires consideration of the "paramount interest of the creditors," which would be well served by the approval of the Settlement Agreement.  <u>In re Martin</u>, 91 F.3d at 393.  The Settlement Agreement is in the best interests of the Debtors' stakeholders because it allows the bondholder claims at an amount equal to the principal and pre-petition interest amount for each series of notes, and places a maximum cap on their entitlement to be paid post-petition interest by the Debtors.  The cap on the settlement amount, whether measured as of June 30, 2014 ($876 million) or as of June 30, 2015 and thereafter ($1.01 billion) is a substantial compromise by the bondholders compared to the total interest to which they otherwise would be contractually entitled.  The hard cap on post-petition interest, which stops

---

[13]    The Debtors reserve all rights with respect to the effects of the Canadian ruling on post-petition interest, which is subject to a pending appeal, on the question of whether other Canadian creditors are entitled to claim post-petition interest.

accruing at June 30, 2015, would result in an even larger compromise of the bondholders' legal

claim to the extent distributions ultimately are made at a later date, as demonstrated in Table 1

below.

**TABLE 1: SETTLEMENT AGREEMENT INTEREST ACCRUAL VERSUS CONTRACT RATE**[14]

*In Millions of $*

| Date | Post-petition Interest at Contract Rate | PPI Settlement Amount | Savings from Settlement Agreement Versus Contract Rate |
|---|---|---|---|
| June 30, 2014 | 1,592 | 876 | 716 |
| November 4, 2014 | 1,694 | 923 | 771 |
| June 30, 2015 | 1,883 | 1,010 | 873 |
| December 31, 2015 | 2,032 | 1,010 | 1,022 |
| June 30, 2016 | 2,178 | 1,010 | 1,168 |
| June 30, 2017 | 2,470 | 1,010 | 1,460 |

16.    To the extent that the Canadian Interests suggest that a settlement should account

for the risk of uncertainty attendant to the underlying law on entitlement to post-petition interest,

a settlement that provides bondholders the right to receive no more (and potentially much less)

than 55% of their contractual entitlement is in fact a substantial compromise of such rights.  This

compromise benefits other stakeholders of the Debtors who may be entitled to share in any

surplus cash of NNI, including NNL, who would only be entitled to recover on its equity position

after payment in full of all post-petition interest owed to creditors.  While it is too early to predict

with certainty the total assets that ultimately will be available for payment of post-petition

interest, the settlement substantively improves the possibility that funds could be left for

distribution to equity compared to an award of full contractual post-petition interest.  The

perceived benefits of the settlement to the Debtors' cases is further exemplified by the

unequivocal support of the Committee as a statutory representative of all unsecured creditors in

---

[14]    Settlement Agreement § 2.2 (PPI Settlement Amount); Post-petition Interest Calculations, July 19, 2014, as produced by the Debtors to the Monitor and Canadian Debtors at NNI-PPI-00000119-121 (basis for calculation of post-petition interest at contract rate), as attached to the Tunis Declaration at Exhibit M.

the Debtors' cases.  <u>See</u> Statement of the Official Committee of Unsecured Creditors of Nortel

Networks, Inc. et al. in Support of Debtors Motion For Entry Of An Order Pursuant To

Bankruptcy Rule 9019 Approving Settlement Agreement By And Among Nortel Networks Inc.,

The Supporting Bondholders, And The Bank Of New York Mellon With Respect To The NNI

Post Petition Interest Dispute And Related Issues, Aug. 8, 2014 [D.I. 14189].

17.     The settlement also strikes a balance between the interests of the bondholders and

the Debtors' other unsecured creditors.  While the Canadian Interests criticize the provisions of

Section 4.2 of the Settlement Agreement, which provides the Supporting Bondholders with a

deemed claim for post-petition interest at the contract rate in the event that there are insufficient

funds to pay post-petition interest to all unsecured creditors in full, their criticisms

mischaracterize the Settlement Agreement.  <u>See</u> Supplemental Objection ¶¶ 34-35; Settlement

Agreement § 4.2.  Section 4.2 does not provide an exception to the cap on post-petition interest

payments that can be made to the bondholders (the PPI Settlement Amount); rather, the deemed

claim is provided "solely for purposes of determining any allocation of available PPI among such

creditors."  Settlement Agreement § 4.2.  The ultimate effect of the provision on the payment of

post-petition interest to other unsecured creditors is left for another day, as is a determination of

such other unsecured creditors' right to post-petition interest.  <u>Id.</u>  The Debtors assert that this

resolution is more beneficial to their creditors than the continued litigation path advocated by the

Canadian Interests where, although initially presented to the Court as resolving a bondholder

issue, the Canadian Interests sought a final determination of the rights of <u>all</u> unsecured creditors

to claim post-petition interest against the Debtors.  <u>See</u> Wilmington PPI Reply Brief  ¶ 21

("WHEREFORE, the Trustee respectfully requests that these Courts enter an order : (a) In the

U.S. Court, holding that, if the U.S. Debtors are found to be solvent, ***any post-petition interest***

*granted to the U.S. Unsecured Creditors* be calculated at the federal judgment rate as of the Petition Date (0.44% )") (emphasis added).  The rights of these other creditors can and should be determined at a later time, upon proper notice to them, and not through the rejection of a settlement to which they are not even parties.

18.    The settlement also advances these Chapter 11 cases by resolving an issue identified by the Monitor as a "logjam" to resolution of the allocation dispute.  Monitor Request at 4; see supra ¶ 15.  While the Canadian Interests now claim that approval of the settlement should be denied as an inadequate compromise because "there is no likely scenario where the NNI estate would have enough surplus funds to pay the full $1.01 billion PPI Settlement Amount," Supplemental Objection ¶ 27, the Monitor previously urged both this Court and the Ontario Court to determine the merits of the PPI Dispute at a joint hearing because, among other things, "[t]he Monitor calculates that the post-petition interest portion alone of the Post-Petition Interest and Additional Amounts Claims, absent insolvency law considerations, approximates US$1.6 billion as of December 31, 2013." Monitor Request at 2; see also Reply Memorandum of the Monitor to the Memorandum of the US Parties Regarding Bondholder Claims Issues, June 23, 2014 [D.I. 13886] at 4 (claiming that "the amounts at issue are greater than the proceeds from each of the line of business sales approved by both Courts").  The Monitor further argued to this Court and the Canadian Court that resolution of the PPI Dispute "would assist in breaking the logjam" of settlement negotiations between the Nortel estates, and that "[t]he *amounts* in dispute that flow from the Common Bond Claim Issues [the principal,  pre-petition interest and post-petition interest bondholder claims issues] and the cross-border nature of such issues create a legal and practical impediment to moving the Nortel insolvency proceedings to the point of the Estates being in a position to make a meaningful distribution to creditors."  Monitor Request at 4.

19.     In light of these prior representations to the Court regarding the significance and size of the post-petition interest dispute, which led the Court to order immediate briefing on the issue, the Monitor and Canadian Debtors should be judicially estopped from arguing that this issue is much smaller.  Supplemental Objection ¶ 28.  This Court shared the Debtors' reaction when it stated on August 8, 2014, "I am surprised to hear the Monitor now arguing that the potential interest to be paid, based upon all of its arguments and all of the pressure placed, is not $1.6 billion and around a million dollars a day. . . . [T]here is such a thing, you know, as estoppel."  Aug. 8 Hr'g Tr. 52:7-14.

20.     As the Supreme Court has explained, "[u]nder the judicial estoppel doctrine, where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . " New Hampshire v. Maine, 532 U.S. 742, 742-43 (2001) (citing Davis v. Wakelee, 156 U.S. 680, 689 (1895)).  The equitable doctrine of judicial estoppel is widely recognized and has been used in the Third Circuit to prevent a party from arguing inconsistent positions in the same or different legal proceedings, thereby "playing fast and loose with the courts."  See, e.g., Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 319 (3d Cir. 2003) (quoting Scarano v. Central R. Co. of N.J., 203 F.2d 510, 513 (3d Cir. 1953)).

21.     Both this Court and the Canadian Court relied on the representations made by the Monitor that the PPI Dispute was a $1.6 billion issue and growing in ruling that the PPI Dispute would be heard on the merits at this time.  Allocation Trial Transcript. 5097:15-20 (Judge Newbould, ruling together with this Court that the PPI Dispute should be heard at this time, stated, "[t]he amount of postpetition interest claimed is of crucial significance.  To the end of 2013, it is $1.6 billion, so it is growing beyond that now.  That's to be put in context of the assets

in the lockbox of $7.3 billion that is apparently not earning much interest at all.").  Indeed, this

Court's reliance on the Monitor's representations led it to advise, "perhaps the parties can use the

$1.6 billion spread between no interest and interest at the contract rate to come to some

accommodation." Id. 5104:2-4.  The proposed settlement is the result of the Debtors' successful

efforts to negotiate just such a compromise.

      22.     The Monitor's and Canadian Debtors' prior representations to the Court about the

magnitude of post-petition interest at issue in these cases are irreconcilably inconsistent with the

arguments they now advance through a purported expert regarding the maximum amount of

funds purportedly available for post-petition interest payments.  The Debtors have been focused

on reaching a final conclusion of these cases through a thorough but efficient process for

resolving legal disputes.  The Canadian Interests should not be allowed to hold the Debtors'

cases hostage while the Canadian Interests play fast and loose by demanding resolution of

cherry-picked issues in the Debtors' cases under one purported set of facts and then assert a

blocking position to the Debtors' ability to compromise such issues based on a directly contrary

position – in this case the magnitude of the issue at stake.  See Krystal, 337 F.3d at 324 (holding

judicial estoppel does not require that the estopped party "actually benefitted from its attempt to

play fast and loose with the court," but that the presence or absence of any such benefit is a

"factor in determining whether the evidence would support a conclusion of bad faith").  The

settlement is a fair compromise and an efficient way to resolve the pending post-petition interest

issues, and as such should be approved.[15]

---

[15]     To the extent the Canadian Interests argue that they did not "succeed" in their argument that this was a $1.6 billion issue because the hearing ultimately did not proceed in this Court, that was ultimately due to the settlement and not because the Canadian Interests' request was not initially granted.  But in any event, the Court need not apply judicial estoppel, or find that this is a $1.6 billion dispute, in order to find the settlement reasonable.  Indeed, as discussed below, even the Canadian Interests' expert's analysis – when adjusted for best case assumptions – could support the Monitor's prior statements to this Court as to amount.

**II.**
**THE CANADIAN INTERESTS' REMAINING**
**OBJECTIONS LACK LEGAL AND FACTUAL MERIT**

23.      The Canadian Interests' further objections to the proposed settlement – based on

purported creditor recoveries and plan confirmation standards – are baseless under the law and

not supported by the factual record.  The Canadian Interests offer no factual support for their

arguments, and the opinions offered by their "expert" further prove that a wide range of

outcomes exist that could significantly affect the amount of post-petition interest available for

distribution to US creditors (including potentially amounts in excess of the settlement cap) and

thus settlement is appropriate.

24.      For starters, the Canadian Interests are incorrect in their assertion that the

Settlement Agreement must satisfy certain plan confirmation requirements as set forth in Section

1129 of the Bankruptcy Code in order to be approved by the Court.  See, e.g., Supplemental

Objection ¶¶ 11-16.  Bankruptcy courts, including courts in the Third Circuit, frequently have

approved settlement agreements outside of Chapter 11 plans based on the satisfaction of the

Martin factors without examining absolute priority and other plan standards.  See, e.g., In re

Jevic Holding Corp., 2014 WL 268613, at *3 (affirming bankruptcy court approval of a

settlement agreement between the debtors and junior creditors over the objection of secured

creditors without examining whether the settlement agreement violated the absolute priority

rule); In re World Health Alt., Inc., 344 B.R. 291, 298 (Bankr. D. Del. 2006) (holding that

"Section 1129(b)(2)(B) and the absolute priority rule . . . [is] not implicated . . . because the

settlement does not arise in the context of a plan of reorganization."); In re Capmark, 438 B.R. at

520 (approving a settlement agreement between the debtors and secured creditors over the

objection of unsecured creditors because the arrangement contemplated by the settlement was

not prohibited by law, and because it was fair and equitable, in the best interests of the estate and satisfied the <u>Martin</u> factors).

25.    Most relevant to the settlement at hand, bankruptcy courts have even approved settlements of claims for post-petition interest above the federal judgment rate based on the <u>Martin</u> factors without a separate analysis of whether the settlement itself satisfied plan standards. <u>See, e.g.</u>, <u>In re W.R. Grace & Co.</u>, 475 B.R. at 161 n.29, 119 (approving payment pursuant to a plan of post-petition interest at a rate above federal judgment rate and contract rate, but below default rate, and noting that approval of a settlement agreement and confirmation of a reorganization plan are entirely distinct matters, governed by different provisions of law and sections of the Bankruptcy Code); <u>see also</u> <u>In re Capmark</u> , 438 B.R. at 513 (approving settlement granting post-petition interest at the contract rate and holding that section 1129(a)(7) was inapplicable to the settlement review); <u>see also</u> <u>In re Overseas Shipholding Group, Inc.</u>, 2014 WL 4782704, at *16 (confirming plan of reorganization which paid bondholder creditors post-petition interest at the contract rate).  The cases the Canadian Interests cite for the proposition that section 1129 precludes approval of the Settlement Agreement are facially distinguishable from the facts at hand.[16]

---

[16]    Specifically, both <u>In re Genesis Health Ventures, Inc.</u>, 266 B.R. 591 (Bankr. D. Del. 2001) and <u>In re Washington Mutual, Inc.</u>, 442 B.R. 314 (Bankr. D. Del. 2011) were decisions in which the bankruptcy court was considering approval of a Chapter 11 plan.  Moreover, the court in <u>In re Genesis</u> confirmed the plan of reorganization, finding that debtors satisfied the "best interest of creditors" test, and that the plan was proposed in good faith and did not unfairly discriminate. <u>In re Genesis</u>, 266 B.R. at 621.  Similarly, in <u>In re Crowthers McCall Pattern, Inc.</u>, 114 B.R. 877 (Bankr. S.D.N.Y 1990), the bankruptcy court approved the debtor's motion to merge over the objections that the transaction was a <i>de facto</i> plan.  The cases cited in the Wilmington Objection also fail to demonstrate that a settlement must meet plan standards to be approved.  For example, in <u>In re Iridium Operating LLC</u>, a decision outside the Third Circuit, the court specified that "the bankruptcy court, in its discretion, could endorse a settlement that does not comply in some minor respects with the priority rule" if other factors weigh heavily in favor of approving the settlement. <u>In re Iridium Operating, LLC.</u>, 478 F.3d 452, 464 (2d Cir. 2007).  In <u>Iridium</u>, the court expressly noted that its decision, which remanded the case to the bankruptcy court, "is not a repudiation [of the settlement] . . . it seeks only clarification of why the settlement need require a possible deviation from the [absolute priority] rule in one regard." <u>Id.</u> at 466.  The Debtors in this case have made their satisfaction of that requirement abundantly clear.

26.     Here, as in the above-cited cases, this Court may approve the Settlement Agreement based on the evidence that the <u>Martin</u> factors have been satisfied without need for a separate inquiry into the standards for plan confirmation under section 1129.  An analysis of the settlement from this perspective is consistent not only with applicable law, but also with the Court's approval of other similar material settlements in these cases, such as the multi-billion dollar claims filed by the EMEA Debtors and the UK Pension Parties that were settled in consideration for cash payments from the Debtors' estates.[17]  The Canadian Interests' attempt to characterize the post-petition interest dispute as different from other claims settlements is baseless; in each instance, the Debtors agreed to use their estate funds to pay claims that are senior in priority to the equity interests of the Canadian Debtors.[18]  In any event, as discussed in Section III, <u>infra</u>, the opinions and testimony offered by the Canadian Interests' expert only serve to support the conclusion that the proposed settlement would satisfy any relevant plan standards even if they applied, which they do not.

27.     The Monitor and Canadian Debtors are similarly wrong in their argument that the settlement cannot be approved because they are not a party to the Settlement Agreement and object to its terms.  Supplemental Objection ¶ 10.  The Debtors are not required to include all creditors as parties to a settlement agreement in order for such settlement agreement to be valid and binding.  <u>See, e.g., In re Capmark</u>, 438 B.R. at 520 (approving debtors' settlement with secured lenders regarding plan treatment over the objection of unsecured creditors' committee).

---

[17]     <u>See</u> Order Approving the US Claims Litigation Settlement Agreement By and Among The Debtors, The Creditors' Committee, the Joint Administrator, the EMEA Debtors, Nortel Networks Optical Components Limited, Nortel Telecom France SA, The Liquidator, The French Liquidator, the UK Pension Parties and Certain Affiliates, Jan. 7, 2014 [D.I. 12785].

[18]     The Monitor's suggestion that the Settlement Agreement is a <i>sub rosa</i> plan similarly fails on this basis. Supplemental Objection ¶ 15.  The cases relied upon by the Monitor are readily distinguishable, where the decision in <u>In re Braniff Airways, Inc.</u>, 700 F.2d 935, 940 (5th Cir. 1983) involved a 363(b) dispute that included restrictions on creditors' voting rights, and in <u>In re Louise's, Inc.</u>, 211 B.R. 798, 802 (Bankr. D. Del. 1997), the court's heightened concern resulted from its finding that there had been a transfer of control of the debtor.

28.    Courts routinely approve settlements pursuant to Rule 9019 that do not involve all parties in interest, including where non-parties to the settlement agreement object to the settlement terms.  See, e.g., id.; In re Key3Media, 336 B.R. at 97 (approving settlement of avoidance claims by debtor over objection of largest creditors and noting that, while creditors' interests are relevant to the approval of the settlement, they "cannot be permitted to predominate over the best interests of the estate as a whole"); see also In re Sea Containers, Ltd., No. 06–11156(KJC), 2008 WL 4296562, at *11 (Bankr. D. Del. Sept.19, 2008) (approving settlement over objection of creditors most impacted by settlement where creditors failed to convince court "the settlement so affects their position as to be unfair.").  That the amount of post-petition interest to which the bondholders are entitled is uncertain as a legal matter weighs in favor of approval of the Settlement Agreement; it is not a reason to require heightened showings or obtain consent of the Canadian Interests.  See In re Mirant Corp., 348 B.R. 725, 741-42 (Bankr. N.D. Tex. 2006) (approving a settlement between a debtor and one creditor over the objection of a similarly situated creditor invoking absolute priority concerns because the value of the settling creditor's potential claim was uncertain and the settlement resolved the claim within the range of reasonable potential values); In re Capmark, 438 B.R. at 518 (citing the high degree of uncertainty of the outcome of litigation to be a reason to approve a settlement over the objection of creditors that the settlement did not satisfy the fair and equitable requirement); In re Residential Capital, LLC, 497 B.R. 720, 752 (Bankr. S.D.N.Y. 2013) (approving a settlement where there was substantial uncertainty whether the settling creditor's claims would be subordinated on the basis that the compromise of the subordination issue is "no different than the multitude of other difficult issues that are settled in litigation all the time").

29.     In this case, a requirement that the Canadian Interests either be a party or provide their consent to this and other settlements could have a particularly paralyzing effect on the Debtors' cases. The Debtors and the Canadian Interests are direct adversaries in the pending allocation dispute, and the Canadian Interests have improperly attempted to use the proposed settlement as a platform for seeking discovery of the Debtors on matters in which they are adverse (such as the Debtors' analysis of likely outcomes to allocation litigation). These facts, considered together with the Canadian Interests' objections as well as their pursuit of this objection by renouncing several of their prior representations and evidentiary presentations to the Court, reveal the Canadian Interests' intent to co-opt the administration of the Debtors' estates by controlling the timing and order in which legal and factual issues will be litigated and may be settled in the Debtors' cases, even though the Canadian Debtors are the most junior interest holder in the Debtors' cases. Such strategic conduct should not be rewarded by withholding approval of the settlement.

### III.
### THE CANADIAN INTERESTS' EXPERT SUPPORTS
### THE VALUE OF THE PROPOSED SETTLEMENT

30.     A key thrust of the Canadian Interests' entire objection – indeed, the only aspect on which they offer any fact or expert testimony – is that the settlement should not be approved because it exceeds the maximum surplus cash that could be available to pay post-petition interest. In reality, when certain glaring errors and omissions in the Canadian Interests' expert's analysis are corrected, even he concedes that this is incorrect.

31.     As an initial matter, the Canadian Interests' challenge of the settlement is far off base because it presumes that ultimate distributions to NNI's creditors can and should be calculated with mathematical precision. As discussed above, the prevailing caselaw does not require such a demonstration, see supra ¶¶ 10, 12, and, in truth, it would be impossible to do so.

The settlement compromises a substantial legal issue – the amount of post-petition interest that may be claimed by the bondholders – and the value of that compromise can be measured independent of a determination of the exact funds that may be available for payment of such claims at the end of these cases, or the amount of other competing claims for post-petition interest that may exist.

32.    As John Ray testified at his deposition and will testify at the hearing, there are simply too many variables impacting the ultimate payout to creditors and available surplus cash to handicap and calculate all such outcomes in order to reach settlement.  Dr. Wertheim's failed attempt to do precisely that only confirms Mr. Ray's belief.  While purporting to "stretch the outcome of events in all cases in favor of NNI such that surplus cash is maximized," Report of Paul Wertheim, Ph.D., CPA, CMA, CFM, CFE, Oct. 3, 2014, as attached as Exhibit A to the Notice of Filing of the Expert Report of Paul Wertheim In Support of the Monitor's and Canadian Debtors' Supplemental Objection To Debtors' Motion For Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Post-Petition Interest Agreement [D.I. 14499] (the "Wertheim Report") ¶ 19, in fact Dr. Wertheim omitted the following from his analysis:

- NNL's IP addresses, with a potential value of up to $178 million;

- NNL's equity interest in NN Ireland, potentially worth up to $241 million;

- NNL's equity interest in NNSA, potentially worth up to $133 million;

- Both NNI's and NNL's interest in the D&O Trust, estimated at up to $30 million for NNI and $5 million for NNL;

- Tens of millions of dollars of additional cash residing in certain NNI subsidiaries potentially available to partially satisfy the PBGC claim against NNI and those subsidiaries;

- The value of NNL's intercompany claims, including against the "4th estate" CALA and APAC subsidiaries, which potentially include more than $100 million of cash available to pay those claims or equity; and

- The impact on NNL's claims pool of trusts (such as the Health and Welfare Trust) that were funded to pay, and have paid, certain Canadian employee-related creditor claims.

33.     While calculating maximum available surplus cash to NNI at $971 million in his report, Dr. Wertheim acknowledged that 100% of any NNI proceeds and 65% of any NNL proceeds he omitted from his analysis ultimately would accrue to NNI's surplus cash, either directly as a result of NNI's $2 billion allowed claim against NNL or indirectly as a result of NNL's additional satisfaction of cross-over bondholder claims.  Not only did Dr. Wertheim omit numerous potential sources of recovery for NNI and NNL (which, as noted, accrues to NNI), but he also did the opposite of what he set out to do in his calculation of NNL claims – rather than assume a "best case" outcome for NNI (which entails minimizing allowed claims against NNL), Dr. Wertheim made the following errors:

- Dr. Wertheim used data from *NNC's* consolidated financials and assumed that NNL was liable for 100% of the claims listed therein;

- Other than excluding the UKP's claim and the bondholder interest claims against NNL, Dr. Wertheim assumed that the Monitor would achieve zero claims reduction from the amounts listed in NNC's 2012 10-Q filing; and

- Dr. Wertheim assumed substantive consolidation of NNL with the other Canadian Debtors, thereby diluting recoveries to NNL-only creditors such as NNI.

34.     Not only did Dr. Wertheim concede that correction of nearly any one of these errors or omissions would increase his calculation of NNI's maximum surplus cash above the maximum PPI settlement – let alone the enormous impact of correcting all of them – but he acknowledged that he could draw no conclusions about the reasonableness of the settlement in the event surplus cash exceeded the settlement amount.  Wertheim Dep. Tr. 144:10-25, 147:2-8, 52:12-17.[19]

---

[19]     A copy of the Wertheim Dep. Tr. is attached to the Tunis Declaration as Exhibit E.

35.     In presenting Dr. Wertheim as an expert witness, the Canadian Interests are speaking out of both sides of their mouths.  On one hand, when opposing the Debtors' attempt to discover information about NNL claims in their motion to compel the deposition of the Monitor's representative, Murray McDonald, counsel to the Monitor argued that the Debtors were "getting into [NNL] claims issues that have absolutely nothing to do with the 9019 [Motion]."  Transcript of Proceedings Before the Bankruptcy Court, Oct. 21, 2014 (the "Oct. 21 Hr'g Tr.")17:15-19, 19:2-4.  The Monitor, Canadian Debtors and Wilmington Trust each also opposed the production of documents relating to the bases and assumptions underlying their assertions regarding potential bondholder recoveries from NNL on the grounds that such documents are subject to privilege or are irrelevant.  Wilmington Objection and Responses at 6; Responses and Objections of the Monitor and the Canadian Debtors to the Debtors' Document Production Requests, Oct. 17, 2014 (the "Monitor and Canadian Debtor Responses and Objections") ¶¶ 10-15.[20]  However, when asked at his deposition, "[w]ithout knowing or assuming NNL's and NNC's distributions to creditors, you can't reach a conclusion about how much surplus cash NNI would have to pay PPI, correct?", Dr. Wertheim responded, "[c]orrect."  Wertheim Dep. Tr. 67:18-23.  The Canadian Interests cannot have it both ways, and the Debtors agree that a trial on these issues is not required to consider the merits of the settlement.  As such, Dr. Wertheim's report – in addition to containing many errors and omissions – is irrelevant and should either be excluded or given no weight.

## A.     The Wertheim Report Understates the Recovery to NNL Creditors Such as NNI and the Bondholders

36.     While purporting to maximize NNI's (and the bondholders') recoveries, Dr. Wertheim in fact does the precise opposite with respect to his analysis of NNL creditor

---

[20]     A true and correct copy of the Monitor and Canadian Debtor Responses and Objections is attached to the Tunis Declaration as Exhibit F.

recoveries – he makes numerous major assumptions in favor of minimizing NNL creditor recoveries and thus cash available to NNI.  Certain of these errors and omissions are the product of one inexcusable decision – Dr. Wertheim elected not to obtain any information from the Monitor and Canadian Debtors about NNL's claims, the success of their publicized efforts to reduce claims, their unrealized assets or which claims were actually asserted against NNL as opposed to other Canadian Debtors.  Compounding Dr. Wertheim's threshold error in judgment and execution, the Monitor and Canadian Debtors (presumably fully aware of this litany of errors and omissions) simply presented his report to this Court without undertaking any effort to provide Dr. Wertheim with the necessary information for accuracy, and later refusing to allow discovery on such matters.

37.     Demonstrating ostrich-like behavior, Dr. Wertheim relies only on publicly available reports in estimating the amount of claims that will be allowed against NNL while refusing to seek better data from the Monitor and Canadian Debtors, even though he recognized the shortcomings of such reports for his purposes.  As an example, Dr. Wertheim relies on NNC's 10-Q dated June 30, 2012 (the "2012 NNC 10-Q") for his assumption that the amount of "Other" liabilities (i.e., claims) that exist against NNL equal $3.235 billion.  His source document is (i) more than two years old, (ii) listed the claims that NNC then estimated but were subject to compromise, and (iii) included claims owed by any of the Canadian Debtors, not necessarily NNL.  Dr. Wertheim acknowledged at his deposition these limitations of the data, but used the report as the basis for his assumption because the "information that I got from the 10-Q was what was available for the Canadian Entity."[21]

---

[21]     See Wertheim Dep. Tr. 74:8-75:11 (Dr. Wertheim testified that he consolidated the Canadian Debtors simply because "[t]he information that I got from the 10-Q was what was available for the Canadian entity and so although the 10-Q is for, as stated on the 10-Q cover page, Nortel Networks Corporation, NNC, it includes NNL and

38.    Dr. Wertheim testified that he attempted to "get comfort" with the numbers in the 2012 NNC 10-Q by reviewing the claims summaries contained in the One Hundred and Eighth Report of the Monitor, dated September 24, 2014 (the "108th Monitor's Report"),[22] but acknowledges that the Monitor Report "doesn't update the amounts in the 10-Q line by line." Transcript of Deposition of Paul Wertheim, Oct. 22, 2014 (the "Wertheim Dep. Tr."), 81:22-82:9.  More egregiously, as Dr. Wertheim conceded, the 108th Monitor's Report shows that less than 5% of the claims filed against NNL (excluding the Debtors' $2 billion claim) have been accepted, id. 99:10-14, and that the *entire* remaining claims against NNL (unallowed at this point), totaling approximately CAD 8.5 billion, would have to be allowed in their asserted amounts in order for the claims assumptions contained in his report to be correct. Id. at 99:7-9; id. at 85:7-15  ("Q. Okay. So when you -- when you added up the claims against NNL . . . you were counting at 100 percent all of the claims that are listed as under review, correct? A. Yes. Q. So you were assuming complete allowance of all of those? A. Yes.").  Such assumptions are simply not consistent with Dr. Wertheim's statement that he "had to assume certain outcomes that may be considered to be the 'best case' scenario for NNI – specifically, outcomes that would maximize NNI's net assets for distribution,"  Wertheim Report ¶ 17, and rather suggest that Canadian creditor recoveries likely would be higher than Dr. Wertheim's calculations (perhaps significantly so), which in turn would increase bondholder recoveries in Canada, reduce the bondholder claims against NNI and increase the recovery on NNI's claim against NNL, all of which would result in additional funds being available to NNI to pay post-petition interest to its

---

so I treated that as a consolidated entity without making a judgment as to which individual entity within the Canadian group would be individually responsible for individual liabilities.").

[22]    A true and correct copy of the 108th Monitor's Report is attached to the Tunis Declaration as Exhibit G.

creditors.[23]  Dr. Wertheim similarly did not adjust his calculations to account for other sources of

payments that have been received by certain Canadian creditors that would lower their

entitlement to distributions from NNL, adjustments which would increase the distributions made

to NNI and the bondholders on their claims in NNL's case.  Wertheim Dep. Tr. 101:15 – 101:17

("Q. Are you aware of any of the trusts and funds that the monitor has already paid out, such as

the Health and Welfare Trust?  A. No.").

39.    Dr. Wertheim similarly could not provide any basis for his reliance on

consolidated claims estimates for the Canadian Debtors, rather than claims figures for NNL

alone, other than that he never sought better information from the Monitor and Canadian Debtors

and they never provided it to him.  The Wertheim Report assumes that the amount of "Other"

claims to be settled at distribution by NNL is the full amount of claims made against *all* of the

Canadian Debtor entities or, in other words, that NNL is liable for all claims asserted against any

of the Canadian Debtors.  Wertheim Report Table 1 n.16; Wertheim Dep. Tr. 73:13-75:15.  Dr.

Wertheim did not undertake any analysis or provide any evidentiary basis for the consolidation

of the Canadian Debtors' claims and estates.  Wertheim Dep. Tr. at 74:8-75:15.  Dr. Wertheim

acknowledged that he is not familiar with the concept of substantive consolidation in bankruptcy

proceedings and that he had "no basis" to make a judgment whether the Canadian Debtors'

estates would be substantively consolidated.  Wertheim Dep. Tr. 151:24-153:14.

40.    There is no question that the NNL creditor recoveries were material to Dr.

Wertheim's analysis.  As he testified at his deposition, "the percentage payout on the Canadian

claims is the material input into [his] calculation of the amount of surplus cash available to NNI

for PPI."  Wertheim Dep. Tr. 63:18-23.  Notwithstanding that materiality, that analysis of NNL

---

[23]    The 108th Monitor's Report itself cautioned that, "[a]ll amounts (other than Accepted) are subject to potential *material* change (i.e. negotiation, appeal, etc.) as the process for the determination of the claims proceeds." 108th Monitor's Report at App. D (emphasis added).

creditor recoveries (and thus the Canadian Interests' reliance on it for their objection) is utterly premature.  At the October 21, 2014 telephonic hearing with the Court, the Monitor and Canadian Debtors not only conceded that they did not provide Dr. Wertheim with the most accurate claims information available (and would not allow Mr. McDonald to testify on that subject), but that "we still have, outstanding in Canada, claims and those claims are being considered by the Canadian Court. . . . it is a sensitive negotiation and sensitive analysis in Canada."  Oct. 21 Hr'g Tr. 16:25-17:5; see also id. 18:15-18 ("[T]his is a sensitive area, given the claims area, given that its ongoing, given that they're going to being asking for information that hasn't even yet been given to the Canadian Court.").  To the extent the Monitor chose not to make such claims information available, and to rather have Dr. Wertheim rely solely on outdated, consolidated reports as the basis for his conclusions, his opinions should be rejected or discounted accordingly.

**B.    The Wertheim Report Undervalues NNL's Assets**

41.    In addition to the size of the allowed claims pool against NNL, also directly impacting NNL creditor recoveries (and thus NNI and bondholder recoveries) is the size of NNL's asset pool.  Once again, while purporting to demonstrate a "best case" scenario for NNI, the Wertheim Report inexcusably fails to account for various NNL assets that may be available for distribution to its creditors.  The cumulative effect of these errors is to potentially reduce the calculated maximum amount of assets available to NNI to pay post-petition interest by hundreds of millions of dollars.[24]

42.    Dr. Wertheim conceded at deposition that he either ignored or was not even made aware of a number of assets of NNL that, if accounted for would lead to material increases in the

---

[24]    The Wertheim Expert Report indicates that "[i]f total assets for NNL are increased by $100M . . . the surplus cash for NNI increases by $65.3M."  Wertheim Report ¶ 34.

amount of funds available for NNI to pay post-petition interest to its creditors, including the

following examples:

- <u>NNL Equity Interests</u>: The Wertheim Report does not assign any value to potential recoveries by NNL on account of its equity investments in Nortel Networks (Ireland) Limited ("<u>NN Ireland</u>") or Nortel Networks S.A. ("<u>NNSA</u>"), a France-based entity; Dr. Wertheim indicated that he was not aware of NNL's equity interests in NN Ireland or NNSA. Wertheim Dep. Tr. 133:7-9, 142:21-23. This assumption appears to understate NNL's assets, given that the Expert Report of Jeffrey H. Kinrich, Jan. 24, 2014 [D.I. 13659] (the "<u>Kinrich Report</u>"), and the Kinrich Report (which Dr. Wertheim purports to rely upon) provides that, based on its analysis of value relinquished in the asset sales, NN Ireland should receive approximately $244 million in sale proceeds and NNSA should receive $333 million. Kinrich Report at Ex. 33. NNL owns 100% of the equity of NN Ireland, and 91.17% of the equity of NNSA, such that any residual value of those entities would go to NNL.[25] <u>See</u> Initial Post-Trial Brief (Allocation) of the Monitor and Canadian Debtors, Aug. 25, 2014 [D.I. 14252] at Sch. B. An allocation of proceeds as indicated in the Kinrich Report could, based on Joint Administrator's reports, leave these entities with approximately $374 million for distribution to NNL.

- <u>D&O Trust</u>: On March 31, 2010, this Court authorized the Debtors to enter into an indenture and related side agreement providing for a $35 million trust for the benefit of directors and officers of certain subsidiaries of the Debtors and Canadian Debtors to facilitates the sale transactions and liquidation of those entities. Order (I) Authorizing and Approving Nortel Network Inc.'s Entry Into the Cascading Directors' Trust Indenture, (II) Authorizing and Approving the Related Side Agreement and (III) Granting Relating Relief, Mar. 31, 2010 [D.I. 2815]. Under the terms of the trust, the balance of the $35 million remaining in the trust will be divided between the Debtors and Canadian Debtors in proportion to the allocation of the sale proceeds. Trust Indenture and Side Agreement, as attached as Ex. B to Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 363 for an Order (I) Authorizing and Approving Nortel Network Inc.'s Entry Into the Cascading Directors' Trust Indenture, (II) Authorizing and Approving the Related Side Agreement and (III) Granting Relating Relief, Mar. 10, 2010 [D.I. 2683] at § 2.3. Dr. Wertheim confirmed that he did not include these funds in his analysis, and that even though the D&O trust was referenced in a September 12, 2014 cash summary document upon which he relied, he did not investigate the trust as an asset of NNL or NNI. Wertheim

---

[25]     The most recent publicly available accounting of the assets of NN Ireland and NNSA indicates that, prior to any allocation of sale proceeds, the estimated assets of NN Ireland were $120 million against liabilities of $124 million, for a deficiency of $4 million, while the assets of NNSA were $122 million with liabilities of $308 million for a deficiency of $186 million. Joint Administrator Report – Nortel Networks (Ireland) Limited (in administration), Aug. 12, 2009 (the "<u>NN Ireland Joint Administrator Report</u>") at App. 4; Joint Administrator Report – Nortel Networks S.A. (in administration and in *liquidation judiciare*), Aug. 12, 2009 (the "<u>NNSA Joint Administrator Report</u>") at App. 4. True and correct copies of the NN Ireland Joint Administrator Report and the NNSA Joint Administrator Report are attached to the Tunis Declaration as Exhibits H and I, respectively.

Dep. Tr. 149:17-150:24.

- Recovery of Receivables: The Wertheim Report assumes – without a stated basis – a $0 recovery on receivables of the Canadian Debtors, including on substantial intercompany receivables. Wertheim Report at n.12. Dr. Wertheim admitted that he did not undertake any analysis to support that assumption. Wertheim Dep. Tr. 105:19-107:17. The September 12, 2014 cash summary relied upon by Dr. Wertheim indicates that cash balances at wholly-owned NNL subsidiaries amounted to $158 million in the Asia region and another $32 million in Latin America, which ultimately could become available for payment of intercompany receivables or equity distributions. Sept. 12 Cash Summary Report, NNC-NNL-PPI000014-17.

- IP Addresses/Other Assets: The Wertheim Report assumes the "other assets" of the Canadian Debtors have zero value. Wertheim Report at n.12. Dr. Wertheim admitted that he was aware that NNL still has other assets to sell, but that he assigned zero value to them because he claimed he had no basis for calculating their value. Wertheim Dep. Tr. 112:12-113:16. As one example, Dr. Wertheim did not make any effort to value the IP addresses owned by the Canadian Debtors or even make any basic inquiries as to their value, even though he knew that NNL had received $13 million for the sale of at least some of those addresses. Wertheim Dep. Tr. 122:15-123:7. Publicly available information, including the price paid for IP addresses sold by NNI, suggests that the additional IP Addresses could be worth $191 million.[26]

For some of these asset classes, Dr. Wertheim was aware of their existence, but consciously

chose to make no effort to ascertain their value (preferring instead to assign zero value to them).

For other categories, Dr. Wertheim was ignorant of them and, presumably having at least

reviewed a draft of his report, the Monitor and Canadian Debtors elected to keep him in the dark.

Either way, Dr. Wertheim's failure to account for these various potential asset sources directly

undercuts his opinion that he had calculated the maximum amount of post-petition interest funds

available to NNI.

---

[26]    The Sixty-First Report of the Monitor indicated that, as of March 2011, "[t]he [Canadian Debtors] are the registered holders of approximately 17 million IP Addresses." Sixty-First Report of the Monitor, Mar. 21, 2011 (the "61st Monitor's Report") ¶ 16. A true and correct copy of the 61st Monitor's Report is attached to the Tunis Declaration as Exhibit J. In order to value these addresses, one could plausibly look to the $11.25 price per address that the Debtors were able to secure in the March 2011 sale of the IP addresses that they owned. See Motion to Approve Motion For Entry Of An Order (i) Authorizing And Approving The Sale Of Internet Numbers Free And Clear Of All Liens, Claims, Encumbrances And Interests; (ii) Authorizing And Approving Entry Into A Purchase And Sale Agreement; (iii) Authorizing The Filing Of Certain Documents Under Seal And (iv) Granting Related Relief, Mar. 21, 2011 [D.I. 5143] at 5-6. Applying that $11.25/address rate to the Canadian Debtors' 17 million addresses yields $191.25 million.

**C.    The Wertheim Report Makes Similar Errors with Respect to NNI's Assets and Claims**

43.    While less inexcusable than his errors and omissions with respect to NNL creditor recoveries (and thus NNI surplus cash) that were blissfully submitted by the Monitor and Canadian Debtors, the Wertheim Report contains additional assumptions regarding NNI's available assets and expected claims contrary to his statement that he calculated the "outcomes that may be considered to be the "best case" scenario for NNI—specifically, outcomes that would maximize NNI's net assets for distribution."  Wertheim Report ¶ 17.

44.    By way of one example, the Wertheim Report identifies the claims filed against NNI by the Pension Benefit Guaranty Corporation ("PBGC"), and simply assumes that its claim will be paid only from NNI's assets.  Wertheim Report Table 2.  Dr. Wertheim admitted at his deposition that he never actually reviewed the PBGC claims and had no basis to determine "whether to look at the individual other [Debtor] entities on what they would pay" in respect of the PBGC Claims, even though the PBGC has filed claims and asserted joint and several liability against each of the Debtors.  Wertheim Dep. Tr. 165:14-166:12.  As a result, Dr. Wertheim disregards cash held by certain NNI affiliates, such as Nortel Alteon Websystems International, Inc. ("Alteon"), which may be used to satisfy in part the PBGC claim, thus saving NNI from paying that amount.  Wertheim Dep. Tr. 163:4-164:14.[27]  By failing to account for these issues, Dr. Wertheim has not in fact calculated the maximum available post-petition interest that could be available for distributions.

---

[27]    According to the Debtors' last-field Monthly Operating Report, Alteon had approximately $56 million in cash.  Monthly Operating Report No. 60, Apr. 30, 2014 [D.I. 13431] at 8.

**D.     The Wertheim Report Demonstrates the Difficulty of Estimating Available Assets for Payment of Post-petition Interest**

45.     Beyond any specific adjustments that could be made to Dr. Wertheim's conclusions to account for the above errors, the Wertheim Report demonstrates the inherent fallacy in the Canadian Interests' core premise that approval of the settlement should turn on specific findings regarding the amount of cash expected to be available for payment of post-petition interest by NNI.  Rather than serving as either an objective or accurate opinion on such calculations, the Wertheim Report instead provides an overview of the myriad variables that could affect such ultimate results, which could be drastically different than what Dr. Wertheim projects.[28]

46.     Indeed, depending on their objective, the Canadian Interests have presented to the Courts drastically different projected recoveries.  Just one month ago, the Canadian Interests paraded before the Courts during closing arguments (as they did in opening statements, during direct testimony and in pre- and post-trial briefing) a chart in which their allocation expert Thomas Britven opined that under Mr. Kinrich's proposed allocation, NNI would have $1.304 billion in surplus cash to pay post-petition interest.  Allocation of Sales Proceeds to the Nortel Debtor Groups Rebuttal to Reports of Messrs. Kinrich, Zenich, Malackowski, Huffard, Bazelon, Green, and Berenblut and Cox, Feb. 28, 2014 [D.I. 13801] (the "Britven Rebuttal Report") at 5.  Recognizing that the PPI Settlement Amount is a significant discount to that calculation, the Canadian Interests now claim the number to be hundreds of millions of dollars lower.  Neither figure is necessarily correct, nor necessarily is the Monitor's representation to this Court that this is a $1.6 billion dispute; at this stage, the parties simply do not and cannot

---

[28]     Thus Mr. Ray testified that the Debtors "didn't do any of the type of modeling [of creditor recoveries] that you're suggesting, partly because the range of potential . . . outcomes really depends on numerous factors."  Ray Dep. Tr. 73:25-74:4.

definitively know and thus the repeated presentations by the Canadian Interests of theoretical creditor recoveries and surplus cash is nothing more than the presentation of hypothetical calculations based upon their particular objective on a given day.

47.     For the reasons above, if admitted in the first place, the Wertheim Report should be accorded no weight by this Court in support of the Canadian Interests' arguments.  The Wertheim Report fails to prove its stated conclusion, but it does prove another – that, absent a fuller understanding of the Canadian Debtors' and US Debtors' claims and assets, it is impossible to calculate the precise amount of assets that will be available for post-petition interest with certainty.  For that reason, the Debtors proposed settlement may be approved as a reasonable exercise of their business judgment, and certainly as a settlement at a point well above the lowest reasonable point in the range of possible outcomes, as the prevailing law requires.

<u>**IV.**</u>
**THE SETTLEMENT AGREEMENT IS THE PRODUCT OF GOOD FATIH NEGOTIATION AMONG THE SETTLING PARTIES**

48.     As noted in the Motion, and as demonstrated by the testimony of Mr. Ray and Michael Katzenstein of FTI and the documents produced by the parties, the Settlement was the result of extensive discussions between the Debtors and the Supporting Bondholders, where the Debtors obtained significant concessions from the bondholder group regarding the proposed settlement terms.  These negotiations were, as required by the court in <u>In re Exide Technologies, Inc.</u>, "truly the product of 'arms-length' bargaining, and not of fraud or collusion,"  303 B.R. 48, 67 (Bankr. D. Del. 2003).

49.     The Monitor and Canadian Debtors' arguments appear focused purely on the number of days spent negotiating the settlement, rather than the benefits negotiated during that process for the Debtors' stakeholders and estates.  A comparison of the terms of the draft as

initially proposed by the Supporting Bondholders against the terms ultimately agreed upon

demonstrate the following significant changes in favor of the Debtors:

- **PPI Settlement Amount**:  The bondholders' claim for post-petition interest was reduced from their initial settlement proposal of 70 percent of the contract rate (approximately $1.114 billion), Ray Dep. Tr. 34:15-18, to $876 million as of June 30, 2014, more than $284 million lower than the Supporting Bondholders' initial ask. Settlement Agreement § 2.2.

- **Cap on Further Accruals**: The Draft Agreement Settling the US Post-Petition Interest Dispute, July 17, 2014 (the "July 17 Draft")[29] provided that interest at up to 60% of the contract rate of interest would continue to accrue "up to and including the date or dates of distribution" to the Supporting Bondholders.  July 17 Draft § 2.2.  The final agreement included a continued accrual of interest at a significantly reduced rate (approximately 46% of the contract rate) and no further accruals as of the earlier of June 30, 2015 or the date of final distribution in respect of the guaranteed bonds. Settlement Agreement § 2.2.

- **Allowance of the Bondholder Claims**:  In consideration for allowance of the bondholder claims at the amount of principal plus accrued pre-petition interest, the Debtors required that any further claims the bondholders may have (other than any rights of the Indenture Trustees under the Indentures for reimbursement of fees and expenses) would be subordinated and subject to the hard dollar cap applicable to the payment of post-petition interest.  Settlement Agreement § 2.3.

- **Reservation of Rights on Other Post-Petition Interest Issues**: The Debtors successfully bargained for the terms contained in § 4.2 of the Settlement Agreement, which reserve for another day the rights of other unsecured creditors to claim post-petition interest, and the manner in which any funds available for the payment of post-petition interest will be allocated among the various creditors, which provisions protect the interests of the Debtors' other unsecured creditors.  Settlement Agreement § 4.2.[30]

50.    The concessions outlined above, and the various other terms of the Settlement

Agreement, were secured because of the Debtors' hard bargaining, as evidenced by the various

meetings and exchanges of drafts between the Debtors' representatives and bondholder

---

[29]    A true and correct copy of the July 17 Draft, as produced by the Ad Hoc Group of Bondholders to the Monitor and Canadian Debtors with Bates Number BHG-PPI-0000154 and designated by counsel to the Monitor as Ray Deposition Exhibit 3, is attached to the Tunis Declaration as Exhibit K.

[30]    The Canadian Interests take note of the reservation of rights with respect to contractual entitlements in § 2.3 of the PPI Settlement Agreement while ignoring altogether the fact that, later in the sentence they cite regarding reservation of rights, any such entitlements are capped at the PPI Settlement Amount.  Supplemental Objection n.14; Settlement Agreement § 2.3.

representatives.[31] The Canadian Interests' inappropriate attempts to paint Mr. Ray as aligned with the bondholders are simply not supported by the record, including by the concessions he was able to extract.[32]

51.     Contrary to the invitation of the Canadian Interests, the robustness of the settlement should not be measured by the number of days or weeks or months it took to reach settlement. The Debtors' cases have been pending for over five years, and as Mr. Katzenstein testified, the parties have considered the allocation and interest issues over time during the pendency of these cases, even outside of the current settlement context. Transcript of Deposition of Michael Katzenstein, Sept. 18, 2014 (the "Katzenstein Dep. Tr.") 88:24-89:6. The law requires arm's length bargaining, not bargaining for a specific minimum length of time, and the evidence reflects that such bargaining occurred between experienced professionals who have invested substantial time in, and are extremely knowledgeable about, these cases.[33] In the same vein, while the Canadian Interests suggest the negotiations were not conducted in good faith

---

[31]     The Debtors also shared a copy of the draft settlement agreement with counsel to the Committee, for their consideration. NNI-PPI-000000306 at 1. A true and correct copy of NNI-PPI-00000306 is attached to the Tunis Declaration as Exhibit L.

[32]     While the Canadian Debtors selectively quote Mr. Ray's statement at deposition that "I didn't necessarily have the view that the court would – in the US would find an amount less than the full entitlement," Supplemental Objection ¶ 22, the Monitor ignores Mr. Ray's clear position just moments later in his deposition when actually asked about the Debtors' position:

> Q.     And is it your position that  you have expressed to the bankruptcy court that the bonds are entitled to NNI -- the PPI at the contract rate?
> A.     The settlement embodies what we believe is entitlement to PPI.  The amount is a settled amount, **not at the contract rate**.

Ray Dep. Tr. 41:16-24 (emphasis added) (objection omitted).

[33]     While the Monitor also criticizes Mr. Ray for not seeking approval of the settlement from the NNI Board of Directors, as Mr. Ray indicated at his deposition, Mr. Ray is not only authorized to enter into these types of settlements, he was retained with the express court-approved mandate of "supporting and defending the interests of the US Debtors' estate and their creditors on issues including. . . claims resolution. . . and any other issues that may affect recoveries to creditors of the US Debtors' estates," and is the representative of the Debtors most familiar with these issues based on his participation in prior mediations and oversight of the allocation litigation. See Letter Agreement, Dec. 7, 2009, at 1, as attached as Exhibit C to the Debtors' Motion for an Order Pursuant to 11 U.S.C. § 363 Authorizing and Approving the Employment and Retention of John Ray as the Debtors' Principal Officer, Nunc Pro Tunc to December 7, 2009, Dec. 8, 2009 [D.I. 2095]; Order Pursuant to 11 U.S.C. § 363 Authorizing and Approving the Employment and Retention of John Ray as the Debtors' Principal Officer, Nunc Pro Tunc to December 7, 2009, Jan. 6, 2010 [D.I. 2249].

because they "were also entirely frozen out of negotiations," that protest rings hollow.  In the

ensuing three months since the announcement of the settlement, the Canadian Interests have

revealed what they would have done with more advance notice – litigate rather than negotiate.

The Canadian Interests are not entitled to veto NNI's settlements, particularly as the most junior

stakeholder, when the settlement is in the best interests of the Debtors and their stakeholders as a

whole.

**V.**
**SEVERAL OBJECTING PARTIES LACK STANDING AS PARTIES IN INTEREST**

52.    The objections filed by the CCC, Wilmington Trust and the UK Pension Parties

also should be disregarded as these entities and groups are not parties in interest in the Debtors'

cases.  Not every person or entity has a right to be heard on all matters in the Debtors' cases.[34]

Rather, standing to be heard is limited to a "party in interest," defined under section 1109(b) of

the Bankruptcy Code to include "a creditors' committee, an equity security holders' committee, a

creditor, an equity security holder, or any indenture trustee" as examples thereof.  See 11 U.S.C.

§ 1109(b).

53.    The CCC, Wilmington Trust and the UK Pension Parties lack standing to be heard

on the approval of the proposed settlement because they are not parties in interest under section

1109(b).  See In re Ionosphere Clubs, Inc., 101 B.R. 844, 849 (Bankr. S.D.N.Y. 1989)

(concluding that in order to have standing under section 1109(b), a party must have some direct

or potentially direct claim against the debtor).  In the case of Wilmington Trust, the Indenture

Trustee for a series of notes issued by NNL and not guaranteed by NNI, their status as a creditor

of an affiliate does not serve as a basis for granting them standing in the Debtors' bankruptcy

---

[34]     In addition, the UK Pension Parties filed their response on October 6, three days after the court-ordered deadline for objections, and the CCC filed the CCC Joinder on October 14, 11 days after that deadline.  Each of these responses may be disregarded on the basis that they were not timely filed.

proceedings.  See In re Newcare Health Corp., 244 B.R. 167, 171 (B.A.P. 1st Cir. 2000) (holding

that indenture trustee who had not filed a proof of claim and who asserted a security interest only

in assets alleged to be owned by debtor's non-debtor affiliates, did not have standing as an

"indenture trustee" under section 1109(b)); see also In re Lifeco Inv. Grp., Inc., 173 B.R. 478,

487-88 (Bankr. D. Del. 1994) (holding that a statutory receiver of a creditor is not a party in

interest and finding no support to conclude that a creditor of a creditor has standing in a

bankruptcy case); In re Innkeepers USA Trust, 448 B.R. 131, 142-43 (Bankr. S.D.N.Y. 2011)

(holding that an investor in a creditor of the debtor lacked standing in the debtor's proceeding).

54.    The CCC likewise has no basis to assert standing.  The CCC consists of a select

group of representatives of unrelated creditors holding claims against one or more of the

Canadian Debtors.  Verified Statement of DLA Piper LLP (US) Regarding Canadian Creditors

Committee Pursuant to Bankruptcy Rule 2019, Apr. 30, 2013 [D.I. 10385]. Similarly, the UK

Pension Parties are not recognized creditors of the Canadian Debtors, where their claims against

the Canadian Debtors have been the recent subject of a trial before the Canadian Court.  Neither

the UK Pension Parties nor the members of the CCC hold claims against the Debtors.[35]

55.    Even if they had standing, and even were their objections all timely filed, the

CCC, Wilmington Trust and UK Pension Parties' responses do not contribute anything to this

Court's consideration of the Motion, other than to add additional cost to the process.  At best,

Wilmington Trust and the CCC raise the same arguments as the Monitor and Canadian

---

[35] The UK Pension Parties previously settled their proofs of claim against the Debtors for a cash payment and provided broad releases as part of that settlement.  See Agreement Settling US Claims Litigation, as attached as Exhibit B to the Debtors Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 503(b) and 507(a)(2) and Bankruptcy Rules 6004(h) and 9019 Approving the US Claims Litigation Settlement Agreement by and among the Debtors, the Creditors' Committee, the Joint Administrators, the EMEA Debtors, Nortel Networks Optical Components Limited, Nortel Telecom France SA, the Liquidator, the French Liquidator, the UK Pension Parties and Certain Affiliates, Dec. 17, 2013 [D.I. 12618].

Debtors.[36]  The UKP Joinder cryptically advises that "[t]he UK Pension Claimants join in the Objections [of the Canadian Debtors, the Monitor, and Wilmington Trust] without, for the avoidance of doubt, agreeing with all assertions contained in the Objections and any accompanying declarations and expert reports," leaving it a mystery as to exactly which arguments the UK Pension Parties are actually joining.  UKP Joinder at 1.  Their objection should be struck on this basis alone.


*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

---

[36]    Courts are generally willing to limit standing when doing otherwise would unnecessarily burden case administration or delay resolution. See, e.g., In re Lifeco, 173 B.R. at 488 (holding that if that creditors of creditors had a right to participate in the bankruptcy, it "would not only burden the case administration but could also create confusion and conflict"); In re Ionosphere, 101 B.R. at 851 ("Granting peripheral parties status as parties in interest thwarts the traditional purpose of bankruptcy laws which is to provide 'reasonably expeditious rehabilitation of financially distressed debtors with a consequent distribution to creditors who have acted diligently.'").

## CONCLUSION

WHEREFORE, the Movants respectfully request that the Court (i) grant the Motion and

enter the proposed order attached as Exhibit A thereto; (ii) deny the request for relief contained

in the Objections; and (iii) grant such other and further relief as the Court deems just and proper.


Dated:  October 30, 2014
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Howard Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Jeffrey A. Rosenthal (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

    – and –

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


_____/s/ Ann C. Cordo_____
Derek C. Abbott (No. 3376)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*