## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| -------------------------------------------------------- | x | |
| | : | Chapter 11 |
| *In re* | : | |
| | : | Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.*,[1] | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | **Hearing date: Nov. 4, 2014 at 10:00 a.m. (ET)** |
| -------------------------------------------------------- | x | |

## REPLY OF THE SUPPORTING BONDHOLDERS IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 APPROVING SETTLEMENT AGREEMENT BY AND AMONG NORTEL NETWORKS INC., THE SUPPORTING BONDHOLDERS, AND THE BANK OF NEW YORK MELLON WITH RESPECT TO THE NNI POST-PETITION INTEREST DISPUTE AND RELATED ISSUES

**Pachulski Stang Ziehl & Jones LLP**
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

**Milbank, Tweed, Hadley & McCloy LLP**
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

*Attorneys for Supporting Bondholders*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ........................................................................ 2

II.     FACTUAL BACKGROUND RELEVANT TO REPLY ARGUMENTS ...................... 6

    A.      Initiation of the PPI Dispute ................................................................. 6

    B.      The Debtors and Bondholder Group Negotiate an Alternative to Litigation of the PPI Dispute ................................................................. 8

    C.      The Debtors Seek Approval of the Settlement Agreement and the Monitor Changes its Position ........................................................................... 11

III.    REPLY ................................................................................................ 12

    A.      The Monitor Should be Estopped From Taking Positions Inconsistent with Positions it has Previously Advocated and Convinced the Court to Adopt .......... 12

        i.      The Monitor Should be Estopped From Arguing that the PPI Dispute is Anything Less than a $1.6 Billion Issue Growing Every Day .................................................................................. 14

        ii.     The Monitor Should be Estopped From Arguing that Section 1129 Prevents the Court from Approving the 9019 Motion .......................... 15

    B.      The Debtors' Motion is an Appropriate Use of Rule 9019 ................................. 16

        i.      Rule 9019 is Applicable to Any Settlement or Compromise .................... 17

        ii.     The Settlement Agreement does not Abrogate the Monitor's Rights Under Section 1129(a)(7) ....................................................... 17

        iii.    The Settlement Agreement is not a *Sub Rosa* Plan ................................. 19

    C.      The Settlement Agreement is a *Bona Fide* Compromise Negotiated in Good Faith ......................................................................................... 21

        i.      The Settlement Agreement is the Product of Vigorous Negotiations Between Adverse Parties ....................................................... 22

        ii.     The Settlement Agreement is a Meaningful Compromise of the PPI Dispute ...................................................................................... 23

        iii.    The Monitor Need Not Have Been Included in Settlement Discussions ......................................................................... 31

i

D. The Settlement Agreement Satisfies the Martin Factors ...................................... 32

      i. The Uncertainty of Success in Litigation Favors Approval of the Settlement Agreement............................................................................... 33

      ii. The Settlement Agreement Benefits All Parties in Interest ...................... 35

E. The CCC, UKPC, and Wilmington Trust Do Not Have Standing to Be Heard in the PPI Dispute in This Court ................................................................ 36

IV. CONCLUSION.............................................................................................................. 39

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Allegheny Int'l, Inc.*,
118 B.R. 282 (Bankr. W.D. Pa. 1990) ...................................................................17

*In re Amatex*,
755 F.2d 1034 (3rd Cir. 1985) ...........................................................................37

*In re Braniff Airways, Inc.*,
700 F.2d 935 (5th Cir. 1983) ............................................................................20

*In re Capmark Fin. Group Inc.*,
438 B.R. 471 (Bankr. D. Del. 2010) ......................................................19, 31, 32

*In re Crowthers McCall Pattern, Inc.*,
114 B.R. 877 (Bankr. S.D.N.Y. 1990) ..................................................................20

*DeBenedictus v. Truesdell* (*In re Global Vision Prods.*),
No. 9 Cv. 347 (BSJ), 2009 U.S. Dist. LEXIS 64213 (S.D.N.Y. July 13, 2009) ....................20

*In re Global Industrial Technologies, Inc.*,
645 F.3d 201 (3d Cir.2011)...............................................................................37

*In re James Wilson Assocs.*,
965 F.2d (7th Cir. 1992) ...................................................................................37

*Key3Media Grp., Inc. v. Pulver.com, Inc.* (*In re Key3Media Grp., Inc.*),
336 B.R. 87 (Bankr. D. Del. 2005) ......................................................................32

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corporation*,
337 F.3d 314 (3d Cir. 2003)................................................................................13

*In re Lehman Bros. Holdings*, *Inc.*,
2012 WL 1057952 (Bankr. S.D.N.Y. Mar. 26, 2012) ...........................................37

*In re Lifeco Inv. Grp.*, *Inc.*,
173 B.R. 478 (Bankr. D. Del. 1994) ...................................................................37

*In re Louise's, Inc.*,
211 B.R. 798 (D. Del. 1997)...............................................................................20

*Myers v. Martin* (*In re Martin*),
91 F.3d 389 (3d Cir. 1996)................................................................17, 32, 33, 35

*New Hampshire v. Maine*,
　　532 U.S. 742 (2001)...............................................................................13

*In re Nutraquest, Inc.*,
　　434 F.3d 639 (3d Cir. 2006)..................................................................33

*Official Comm. of Unsecured Creditors of Tower Auto. v. Tower Auto.* (*In re Tower Auto. Inc.*),
　　No. 06cv7877, 2006 U.S. Dist. LEXIS 91958 (S.D.N.Y. Dec. 15, 2006)............20

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop.* (*In re Cajun Elec. Power Coop.*),
　　119 F.3d 349 (5th Cir. 1997) ................................................................20

*In re Refco Inc.*,
　　505 F.3d 109 (2d Cir. 2007)..................................................................37

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
　　81 F.3d 355 (3d Cir. 1996)...................................................................13

*In re Sea Containers, Ltd.*,
　　No. 06-11156, 2008 Bankr. LEXIS 2363 (Bankr. D. Del. Sept. 19, 2008)............32

*Unofficial Committee of Zero Coupon Noteholders v. Grand Union Co.*,
　　179 B.R. 56 (D. Del. 1995)...................................................................38

*In re W.R. Grace & Co.*,
　　475 B.R. 34 (D. Del. 2012)...................................................32, 33, 35

*In re W.R. Grace & Co.*,
　　No. 01-01139 (Bankr. D. Del.) ..............................................................34

*In re Wash. Mut., Inc.*,
　　442 B.R. 314 (Bankr. D. Del. 2011) .......................................................32

*Yetter v. Wise Power Systems, Inc.*,
　　929 F.Supp.2d 329 (D. Del. 2013) .........................................................13

**Statutes**

11 U.S.C. § 1109(b) ..............................................................................36, 37

11 U.S.C. § 1129..................................................................................*passim*

11 U.S.C. § 1129(a)(7)........................................................................*passim*

11 U.S.C. § 1129(b) .................................................................................18, 19

**Other Authorities**

Fed. R. Bankr. P. 9019 ............................................................................................................. *passim*

Fed. R. Evid. 702(a) ...................................................................................................................26

**TO THE HONORABLE KEVIN GROSS, UNITED STATES BANKRUPTCY JUDGE:**

The Supporting Bondholders[2] hereby deliver to the United States Bankruptcy Court for the District of Delaware (the "U.S. Court" or the "Court") this reply to:  (i) Monitor's and Canadian Debtors' Supplemental Objection to Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Post-Petition Interest Agreement [D.I. 14496] (the "Monitor's Supplemental Objection"); (ii) Objection of Wilmington Trust, National Association, as Successor Indenture Trustee to Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among Nortel Networks Inc., the Supporting Bondholders, and The Bank of New York Mellon With Respect to the NNI Post-Petition Interest Dispute and Related Issues [D.I. 14498] (the "WT Objection"); (iii) Joinder of UK Pension Claimants in Objections to Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among Nortel Networks Inc., the Supporting Bondholders, and The Bank of New York Mellon With Respect to the NNI Post-Petition Interest Dispute and Related Issues [D.I. 14534] (the "UKPC Joinder"); and (iv) Joinder of the Canadian Creditors Committee in the Objections to Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among Nortel Networks Inc., the Supporting Bondholders, and The Bank of New York Mellon With Respect to the NNI Post-Petition Interest Dispute and Related Issues [D.I. 14564] (the "CCC Joinder").[3]

---

[2]    The term "Supporting Bondholders" refers to those entities holding certain bonds issued or guaranteed by NNC, NNL, and NNI that executed the Settlement Agreement.  The term "Bondholder Group," as used elsewhere herein, includes the Supporting Bondholders as well as the holders of certain fixed rate senior notes due June 15, 2026 issued by NNL (f/k/a Northern Telecom Limited) and Nortel Networks Capital Corporation (f/k/a Northern Telecom Capital Corporation) ("NNCC"), and guaranteed by NNL (the "NNCC Bonds").

[3]    Terms used but not defined herein have the meaning ascribed to them in the Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among Nortel Networks Inc., the Supporting Bondholders, and The Bank of New York Mellon With Respect to the NNI Post-Petition Interest Dispute and Related Issues [D.I. 14076] (the "9019 Motion").

## I.    PRELIMINARY STATEMENT

1.    The Settlement Agreement is a substantial achievement in these cases, resolving conclusively an issue that the Monitor argued to the Court was ***the*** impediment to a global settlement:  the dispute (the "PPI Dispute") over whether the Bondholders are entitled to receive post-petition interest at the rates provided for in the contracts that were negotiated and executed by NNL, on whose behalf the Monitor now operates.  Remarkably, the Monitor seeks to derail the resolution of that paramount issue on grounds that are entirely contradicted by its own prior representations to the Courts.

2.    In June 2014, the Monitor urged the U.S. and Canadian Courts (together, the "Courts") to decide the PPI Dispute immediately—on a briefing schedule measured in days— repeatedly representing to the Courts that the PPI Dispute was a $1.6 billion issue that was growing by more than $1 million per day and insisting that resolution of the PPI Dispute would open the door to a global settlement.  In reliance on the Monitor's representations regarding the magnitude and ripeness of the PPI Dispute and the need for a prompt resolution thereof, and overruling the Bondholder Group's arguments that the dispute was not ripe for adjudication, the Courts agreed to hear the PPI Dispute, on an expedited basis and largely in the manner suggested by the Monitor.  Thus, the Monitor successfully foisted the PPI Dispute on the Courts and the parties.

3.    Faced with the uncertainty, costs, and complexity of that litigation (including subsequent appeals), the Debtors and the Bondholder Group engaged in good faith, spirited negotiations that resulted in the Settlement Agreement now before this Court for approval.  The Settlement Agreement reflects a huge concession by the Supporting Bondholders.  It will result in an immediate reduction as of June 30, 2014 of more than $700 million from the post-petition interest accruals under the contract rates negotiated by NNL, as well as a mechanism that

2

increases these concessions over time—first through a reduction in the rate at which interest accrues and then by stopping the accrual of interest altogether after one year.  As a result of these concessions and the clear benefits they provide to the Debtors' estates, the Settlement Agreement plainly satisfies the standards of Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and should be approved by the Court.

4.    The Monitor's objection to the Settlement Agreement is truly remarkable.  Having imposed the PPI Dispute on the Courts and the parties as an issue that not only *can*, but indeed *must*, be resolved immediately, the Monitor now insists that resolution of that issue can only be achieved through full-fledged litigation and not through settlement by the Debtors with its creditors.  In its simplest terms, the Monitor's objection is a model of hypocrisy that is almost hard to imagine a litigant seriously advancing to this Court:

- The Monitor's first argument is that the Settlement Agreement cannot be approved because the issues resolved can only be resolved through a plan process under section 1129 of the Bankruptcy Code.  If that argument sounds familiar to the Court, it is because the Bondholder Group advanced the very same argument to suggest to the Court that these issues could not be adjudicated in a vacuum, as was being proposed by the Monitor.  At that time, the Monitor vigorously, and successfully, argued the completely contrary position—that the PPI Dispute could be resolved as a discrete legal issue that did not depend upon the larger context of a plan process.

- The Monitor's core argument against the settlement is that there will never be more than $971 million available to pay post-petition interest to the Supporting Bondholders, and that the amount that is available will decrease with every dollar spent.  It is impossible to reconcile this new-found position with the Monitor's previous insistence to both Courts that the PPI Dispute is a $1.6 billion issue growing by $1 million a day.

- In summary, the Monitor now claims the PPI Dispute:  (i) has gone from a discrete legal issue that can be determined by the Courts in isolation to an issue that now must be considered in a chapter 11 plan context; (ii) was a $1.6 billion and growing issue that suddenly will never exceed $971 million; and (iii) is an issue that can be determined by the Courts but somehow cannot be settled by the parties.

5.      The Court need not tolerate this kind of chicanery, and the doctrine of judicial estoppel forbids it.  These are the perfect examples of expedient litigation tactics that judicial estoppel was designed to address.  But even if the Court ignores the Monitor's "about face" and considers the arguments, they are fundamentally flawed.

6.      *First*, contrary to the Monitor's arguments, the Settlement Agreement does not violate section 1129 of the Bankruptcy Code.  Nothing in section 1129 or any other provision of the Bankruptcy Code gives any party in interest a veto right over settlements of disputes.  Rule 9019 permits the Debtor—in its capacity as fiduciary for all stakeholders—to resolve disputes subject to the approval of the Court after notice and a hearing.  That is exactly what has happened here.[4]

7.      *Second*, the Monitor's arguments regarding the assets available to pay post-petition interest are pure sophistry.  To begin with, they are irrelevant.  The PPI Dispute is over a claim for more than $1.6 billion in post-petition interest.  The balance of assets that may or may not in the future become available for distribution is not the dispute being settled.  Even if relevant, the Monitor has no credible evidence on this topic.  The Court will hear the Monitor's retained "expert," Dr. Paul Wertheim, in this regard at the hearing.  His evidence will be remarkable.  Most noteworthy is the fact that, despite opining that he has made every assumption in favor of the Supporting Bondholders and NNI to determine that the "***maximum***" amount this dispute could involve is $971 million, he has done nothing of the sort.  In fact, the Canadian Interests presented another expert, Thomas Britven, during the Allocation Trial—and repeated his position during closing arguments just over a month ago—who opined that there would be

---

[4]      In addition, the protections of section 1129(a)(7), cited to by the Monitor, only apply to classes of creditors or equity holders whose claims or interests are impaired under a plan.  While there is no plan presently before the Court, it is entirely possible that NNL's equity interests in NNI will not be impaired under a future plan, such that the protections of section 1129(a)(7) will not apply to that class.

approximately $1.3 billion available for post-petition interest if the NNI position prevailed at trial.  When faced with the obvious discrepancy of over $330 million between Britven's analysis and his own, Wertheim, the Monitor's current expert, had no meaningful explanation other than to say that Britven's assumption were unreasonable.  Summarized below are the myriad ways in which the Wertheim Report (defined *infra*) is unreliable, but what is clear from Wertheim's testimony is that there is a very real prospect that, even if the Monitor's counsel was referring to the amount of dollars available for post-petition interest, he may have been right when he described this as $1.6 billion issue.

8.      Devoid of any substantive objection to the Settlement Agreement, the Monitor resorts to contending that the Settlement Agreement is not the product of *bona fide*, arm's-length negotiations.  It is clear, however, that to be at arm's length, a settlement does not have to come after five years of acrimony, multiple failed mediations, and hundreds of millions of dollars of expense.  The settlement negotiations that led to the Settlement Agreement were rigorous, involved numerous back-and-forth discussions, and the exchange of several settlement offers. The fact that parties came to agreement on a settlement that reflected a compromise between the extremes that either could have achieved in litigation is not remarkable, except maybe in these cases, and should not be used as a cudgel to argue for denial of a plainly appropriate settlement.

9.      *Finally*, the Settlement Agreement plainly satisfies the Martin Factors that courts use to evaluate settlements under Rule 9019.  The Martin Factors are applied liberally, with the overriding question being whether the Settlement Agreement falls within the lowest range of reasonableness of the Debtors' business judgment.  The Settlement Agreement unquestionably meets this standard.  It resolves a more than $1.6 billion (and growing) legal dispute at a fraction of its claimed amount, thus avoiding the risk of an adverse outcome and all attendant litigation

costs for the benefit of all parties in interest, including NNL.[5]  For these reasons, the Settlement

Agreement should be approved by the Court under Rule 9019.

## II.      FACTUAL BACKGROUND RELEVANT TO REPLY ARGUMENTS

### A.      Initiation of the PPI Dispute

10.      The PPI Dispute was first brought to the attention of the Courts during a chambers

conference on June 16, 2014, after the Core Parties had just concluded court-ordered settlement

discussions in the Allocation Dispute.  In plain breach of the confidentiality of those settlement

discussions, counsel for the Monitor represented to the Courts that the failure to reach a

compromise was a direct result of the PPI Dispute, describing the dispute as a $1.6 billion

"elephant in the room" that was "growing by $1 million a day" and in urgent need of immediate

resolution.  The Monitor therefore asked the Courts to hear the PPI Dispute as soon as possible,

contending that it was ripe for adjudication and could be resolved as a discrete, and purely legal,

issue.  The Courts took the Monitor's request under advisement and asked the Core Parties to

submit letter briefs on whether the Courts should hear the PPI Dispute at that time.

11.      In the letter briefing that followed, the Monitor continued to emphasize the

magnitude of the PPI Dispute in support of its position that it could and should be resolved

immediately.  The Monitor told the Courts that the size of the PPI Dispute "***approximates***

***US$1.6 billion as of December 31, 2013*** . . . ."  (Monitor's Request at 2 (emphasis added).)

Until the dispute was resolved, the Monitor stated, "it will be virtually impossible for the

respective estates and their creditors to meaningfully anticipate potential recoveries and therefore

to evaluate effectively any settlement proposal regarding the Current Trial Issues."  (*Id*. at 3.)

---

[5]      Wilmington Trust, the UKPC, and the CCC purport to object to the 9019 Motion, but they lack standing to
do so.  Those parties are merely creditors of NNL and have no direct relationship with NNI.  As discussed
*infra* section III.E., the law is clear that such parties have no standing in these chapter 11 cases.

12.     In response to the Monitor's arguments, the Bondholder Group (along with the other U.S. Interests) took the position that the PPI Dispute was not yet resolvable by the Courts because it depended on the outcome of future events that were then unknown, including, *inter alia*, whether the Debtors' estates will be solvent.  (Memorandum of the US Parties Regarding Interest Issues [D.I. 13883] at 3.)  The Bondholder Group noted that "the relevant legal standard . . . depends on what a plan says and how creditors react to that plan."  (Trial Tr. 4940:13-4941:13, June 23, 2014.)  In other words, the Bondholder Group argued that it was premature for the Courts to decide the PPI Dispute outside the context of a proposed chapter 11 plan.

13.     The Monitor vehemently disagreed.  It argued that the Bondholder Group's concerns were unfounded, accusing the Bondholder Group and the other U.S. Interests of seeking to avoid resolution of the PPI Dispute by "elevat[ing] process and form over substance." (Reply Memorandum of the Monitor to the Memorandum of the US Parties Regarding Bondholder Claims Issues [D.I. 13886] at 1.)  In the Monitor's view, the PPI Issue was not premature; it could and should be resolved immediately as a straightforward matter of law and arguments about the applicable plan provisions of section 1129 were red herrings.

14.     The Monitor prevailed in its procedural arguments.  Over the objection of the Bondholder Group and the other U.S. Interests, the Courts scheduled a joint hearing on the PPI Dispute for July 24, 2014.  The Monitor's representations regarding the size of the PPI Dispute were a critical factor in the Courts' decision.  In his comments setting the hearing, Justice Newbould stated that ***"[t]he amount of postpetition interest claimed is of crucial significance***. To the end of 2013, it is ***$1.6 billion***, so it is ***growing beyond that now***."  (Trial Tr. at 5097:15-18, June 24, 2014 (emphasis added).)  This Court agreed, stating hopefully that "before we can

render our decision on these interest issues, perhaps the parties can use the *$1.6 billion spread*

between no interest and interest at the contract rate to come to some accommodation." (*Id.* at

5104:25-5104:4 (emphasis added).)

**B.     The Debtors and Bondholder Group Negotiate an Alternative to Litigation of the PPI Dispute**

15.     Following the Monitor's first contention that the PPI Dispute was *the* impediment

to settlement, and consistent with this Court's recommendation, the Bondholder Group and the

Debtors, against whom the claims for post-petition interest have been asserted, began to explore

the possibility of settling the PPI Dispute in the very context in which it had been framed by the

Monitor.  Not surprisingly, they endeavored to "use the $1.6 billion spread between no interest

and interest at the contract rate to come to some accommodation." (Trial Tr. 5103:25-5104:4,

June 24, 2014.)

16.     The Debtors and the Bondholder Group understood that their only alternative to

litigating the PPI Dispute (including any possible appeals) was to try to negotiate a settlement

quickly, given the short time before the scheduled hearing.  Accordingly, on June 16, the same

day as the chamber's conference, the Bondholder Group reached out to the Debtors to

communicate its willingness to "consider alternatives to litigating" the PPI Dispute.  (BHG-PPI-

0000046-048 at BHG-PPI-0000047.)

17.     Over the days that followed that initial contact, the parties began preliminary

negotiations.  The Bondholder Group made an opening settlement proposal that called for NNI,

to the extent that in the future it had funds available to pay post-petition interest, to pay the

holders of Guaranteed Bonds 70% of the total post-petition interest that would be due under the

application of the contract rates of interest at the time of distribution, meaning interest would

continue to accrue indefinitely until distributions were made.  (Katzenstein Dep. Tr. 36:25-

37:19.)  The Debtors rejected this proposal but indicated a willingness to have further discussions.

18.     On July 15, 2014, representatives of the Bondholder Group and Debtors held an in-person negotiating session for several hours in New York.  During that meeting, the parties exchanged settlement offers that reflected significant movements from their respective opening positions.  (Ray Dep. Tr. 33:5-34:20; 35:17-36:23; Katzenstein Dep. Tr. 44:12-45:7, 46:5-11, 51:19-52:15.)[6]  Again, no settlement was reached, but the parties agreed to continue discussions. (Katzenstein Dep. Tr. 53:16-54:2.)  Given the progress that had been made, at the conclusion of the meeting it was agreed that the Bondholder Group would prepare a draft settlement agreement that could form the basis for further discussions.

19.     On July 17, 2014, the Bondholder Group sent a draft settlement agreement to the Debtors.  (BHG-PPI-0000153-164.)  This draft reflected a proposal by the Bondholder Group to settle the PPI Dispute at 60% of the contract rate, with interest accruing through the date of payment.  (*Id.* at BHG-PPI-0000159.)  Later that day, attorneys for the parties held a conference call to discuss the draft proposal.  (BHG-PPI-0000056-058 at 056.)  Ultimately, the Debtors rejected it.

20.     The next day, on July 18, the Bondholder Group sent a revised draft of the agreement to the Debtors, along with a new offer to settle the PPI Dispute for an amount of post-petition interest calculated at 55% of the contract rate, again accruing through the date of payment.  (*See* BHG-PPI-0000116-147.)  Negotiations continued over the next several days.

21.     On July 21, 2014, the Debtors sent a revised draft of the agreement to the Bondholder Group that proposed to settle the PPI Dispute for a one-time payment to the holders

---

[6]     References to "Ray Dep. Tr." and "Katzenstein Dep. Tr." followed by a page number are to the transcript of the depositions of the John Ray, taken on September 15, 2014, and Michael Katzenstein, taken on September 18, 2014, respectively, in connection with the above captioned proceedings.

of the Guaranteed Bonds of up to $907 million, or approximately 55% of the interest that had

accrued on the Guaranteed Bonds at the contract rate as of June 30, 2014.  (BHG-PPI-0000082-

115 at BHG-PPI-0000105.)  This counter-offer from the Debtors highlighted what had emerged

as a significant remaining obstacle in the negotiations:  the amount of future post-petition interest

accruals that would be paid to the Bondholders following the execution of the settlement.  (*See*

Ray Dep. Tr. 57:4-58:9; 92:6-93:24; *see also* Katzenstein Dep. Tr. 75:14-76:9, 81:10-82:3.)  The

Bondholder Group sought unlimited accruals at 55% of the contract rate until the date of

payment.  The Debtors, however, took the position that the Bondholders should accept no further

interest accruals.

22.      The parties continued settlement discussions through July 23.  Eventually, the

Bondholder Group, in an effort to bridge the gap between the parties, proposed a settlement

consisting of:  (a) an initial cap of ***$876 million*** (representing approximately 55% of the post-

petition interest accrued through June 30, 2014, the date the parties had used as a reference date

in their negotiations);[7] ***plus*** (b) up to ***one year*** of additional post-petition interest accruals

(through June 30, 2015) at 3.5% of the outstanding principal amount, for a maximum additional

payment of $134 million, or a total of $1.01 billion if no payments are made prior to June 30,

2015.  (*See* Settlement Agreement § 2.2; *see also* Ray Dep. Tr. 92:6-93:24; Katzenstein Dep. Tr.

77:6-78:22.)  This proposal provided the Bondholders with continued accruals at a reduced rate

---

[7]      The 55% settlement rate did not change between the draft settlement agreements exchanged on July 21 and
July 23, but the settlement amount was reduced from $907 million to $876 million.  This change reflected
the fact that the holders of the NNCC Bonds chose not to be parties to the Settlement Agreement, thus
reducing the initial cap amount by 55% of the accrued post-petition interest in respect of the NNCC Bonds.
Accordingly, the NNCC Bonds do not form part of the Settlement Agreement.  (*See* Statement of Solus
Alternative Asset Management LP and Macquarie Capital (USA) Inc. With Respect to Debtors' Motion for
Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among
Nortel Networks Inc., the Supporting Bondholders, and The Bank of New York Mellon With Respect to the
NNI Post-Petition Interest Dispute and Related Issues [D.I. 14340] ¶ 1.)

for a one year period, but also ensured that, if the parties agreed to make a principal payment to the Bondholders, it would reduce the accrual of interest immediately.

23.    The Debtors accepted this proposal during the afternoon of July 23, 2014.  The Settlement Agreement was then executed by NNI, the Supporting Bondholders, and The Bank of New York Mellon, as indenture trustee for the Guaranteed Bonds that were part of the settlement (the "Settling Parties").

**C.    The Debtors Seek Approval of the Settlement Agreement and the Monitor Changes its Position**

24.    The Debtors announced the Settlement Agreement during a July 24, 2014 status conference, appropriately describing it as a "substantial concession by the Bondholders with respect to the potential claim they could be seeking or as importantly the distributions that they can take out of the U.S. estate."  (Hr'g Tr. 10:20-24, June 24, 2014.)  Also on July 24, the Debtors filed the 9019 Motion.

25.    On July 30, 2014, the Monitor filed a preliminary objection to the 9019 Motion, calling the Settlement Agreement a "full-fledged surrender of the post-petition interest dispute."[8] The Monitor also requested an adjournment of the objection deadline and expedited discovery.[9] The Debtors and the Supporting Bondholders opposed the Monitor's request.[10]  On August 7, 2014, the Monitor replied and, for the first time, argued that, for purposes of challenging the Settlement Agreement, it would now contend that the PPI Dispute is not a $1.6 billion issue,

---

[8]    Preliminary Objection and Motion of the Monitor and the Canadian Debtors for an Adjournment of the Objection Deadline Concerning the U.S. Debtors' 9019 Motion and for Expedited Discovery [D.I. 14117] (the "Motion to Adjourn") ¶ 5.

[9]    *Id.* ¶¶ 2, 7.

[10]    U.S. Debtors' Objection to the Motion of the Monitor and the Canadian Debtors for an Adjournment of the Objection Deadline Concerning the U.S. Debtors' 9019 Motion and for Expedited Discovery [D.I. 14161]; Joinder of the *Ad Hoc* Group of Bondholders to the Objection of the U.S. Debtors to the Motion of the Monitor and the Canadian Debtors for an Adjournment of the Objection Deadline Concerning the U.S. Debtors' 9019 Motion and for Expedited Discovery [D.I. 14165].

growing by $1 million a day, but something much smaller, and shrinking with every dollar spent in litigating these cases.[11]

26.     The Court held a telephonic hearing with respect to the Motion to Adjourn on August 8, 2014.  Although the Monitor had previously, and repeatedly, referred to the PPI Dispute as a $1.6 billion "gating issue," it continued to take the remarkable position that the PPI Dispute was suddenly worth much less than $1.6 billion.  The Court recognized and acknowledged this inconsistency:

> *I am surprised to hear the Monitor now arguing that the potential interest to be paid, based upon all of its arguments and all of the pressure placed, is not $1.6 billion and around a million dollars a day*.
> So I'm going to go back and re-read that . . . but there is such a thing, you know, as *estoppel* and . . . that may be where I come down on it if I'm forced to make a ruling . . . .

(Hr'g Tr. 52:9-16, Aug. 8, 2014 (emphasis added).)  This Court also stated:  "I didn't think this was an issue because I thought, essentially, *the Monitor already conceded that the issue was $1.6 billion and growing*; that that was the whole purpose for the initial briefing and potential argument on the . . . post-Petition interest issue."  (*Id.* at 38:7-12. (emphasis added).)

## III.    REPLY

### A.     The Monitor Should be Estopped From Taking Positions Inconsistent with Positions it has Previously Advocated and Convinced the Court to Adopt

27.     The Monitor's Supplemental Objection rests largely on two arguments that are wholly irreconcilable with the arguments the Monitor previously made to this Court to persuade the Court to hear the PPI Dispute:  (i) that the PPI Dispute is, at a "maximum," a $971 million issue declining with every dollar spent and, as a result, the Supporting Bondholders' agreement to limit their recovery of post-petition interest to a maximum of $876 million as of June 30, 2014

---

[11]     Reply in Further Support of the Preliminary Objection and Motion of the Monitor and the Canadian Debtors for an Adjournment of the Objection Deadline Concerning the U.S. Debtors' 9019 Motion and for Expedited Discovery [D.I. 14173] ¶ 10.

is "illusory," "not a meaningful compromise" and of "zero" value; and (ii) that the Settlement Agreement improperly usurps the role of section 1129 of the Bankruptcy Code and is a *sub rosa* plan.  (Monitor's Supplemental Objection at 3, 9, 12, 21.)  The Monitor should be judicially estopped from raising both of these arguments.

28.     The doctrine of judicial estoppel "bars a party that has previously asserted a legal position from asserting an inconsistent or contrary legal position in a later proceeding."  *Yetter v. Wise Power Systems, Inc.*, 929 F.Supp.2d 329, 331 (D. Del. 2013) (citation omitted).  "The basic principle of judicial estoppel . . . is that absent any good explanation, a party should not be allowed to gain advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."  *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996) (citation omitted); *see also New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001).

29.     The Third Circuit has established a three-part test for determining when judicial estoppel is warranted:  (i) "the party to be estopped must have taken two positions that are ***irreconcilably inconsistent***"; (ii) the party to be estopped "has ***changed his or her position in bad faith***—i.e., with intent to play fast and loose with the court"; and (iii) judicial estoppel is "tailored to address the harm identified and ***no lesser sanction would adequately remedy the damage*** done by the litigant's misconduct."  *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corporation*, 337 F.3d 314, 319-20 (3d Cir. 2003) (emphasis in original) (citation and internal quotations omitted).  Both of the Monitor's inconsistent arguments should be estopped under this test.

13

i.    **The Monitor Should be Estopped From Arguing that the PPI Dispute is Anything Less than a $1.6 Billion Issue Growing Every Day**

30.    The Monitor's argument that the PPI Dispute is worth a "maximum" of $971 million, subject to a reduction for additional dollars spent, easily meets all three criteria for judicial estoppel.

31.    *First*, as discussed *supra* in section II.A., the Monitor represented to this Court and the Canadian Court on several occasions prior to the execution of the Settlement Agreement that the PPI Dispute is a ***$1.6 billion issue that was growing with the continued accrual of interest***.  The Monitor used this argument to convince the Courts that the issue had to be heard and resolved immediately; it could not wait to be decided after an allocation decision.  The Courts were led to believe that even waiting for closing arguments—which were scheduled more than three months from the date of the Monitor's initial disclosure—would add an additional $100 million to the PPI Dispute.

32.    The Monitor's current position that the PPI Dispute is worth a "maximum" of $971 million simply cannot be reconciled with these prior representations.  In reversing course, the Monitor has not suggested that anything has happened between the middle of June and the end of July to cause this issue to be much less important, and to be less important every day.  Instead, the Monitor has made a strategic decision and adopted an argument that it now believes is more beneficial to its interests than the argument upon which it already prevailed.

33.    *Second*, the Monitor has acted in bad faith.  The Monitor's initial statements with respect to the size of the PPI Dispute have been referred to by this Court as "inappropriate disclosures of settlement discussions." (Hr'g Tr. 16:16-18, July 24, 2014.)  Following these inappropriate disclosures, the Monitor used the $1.6 billion figure to convince the Courts to hear the PPI Dispute.  Now that the Debtors and the Supporting Bondholders have settled the PPI

14

Dispute, the Monitor has conveniently changed its position to suit its objection to the settlement. This sort of gamesmanship by the Monitor is the very definition of playing "fast and loose" with the Court.

34.     *Third*, estoppel is the only adequate means to remedy the damage done by the Monitor's misconduct.  The Settling Parties entered into the Settlement Agreement as a direct result of the chain of events set in motion by the Monitor's conduct, including its repeated assertions that the PPI Dispute is worth $1.6 billion and growing.  The Monitor cannot now challenge the Settlement Agreement by reversing course on the very arguments that initiated the litigation that is being settled.  Thus, estoppel is the only adequate remedy.

### ii.     The Monitor Should be Estopped From Arguing that Section 1129 Prevents the Court from Approving the 9019 Motion

35.     As detailed above, the Monitor argued strenuously that the PPI Dispute was ripe for immediate adjudication by the Courts as a discrete legal issue that could be resolved in isolation, and that the Courts need not wait for the plan process to unfold under section 1129 of the Bankruptcy Code.  The Bondholders argued equally as strenuously that the Courts did not have authority to issue an advisory opinion because they would be ruling based on as yet unknown, hypothetical facts.  Nevertheless, the Monitor prevailed on the issue, and the Court scheduled the PPI Dispute for hearing.

36.     Remarkably, the Monitor now claims that a consensual resolution of the PPI Dispute would improperly "predetermine[] the principal plan issue" and would usurp the Monitor's alleged rights under section 1129 to negotiate for different treatment under a plan. (Monitor's Supplemental Objection ¶ 15.)  The Monitor is wrong, but equally importantly, it cannot reverse itself and make that argument now.  This contention is wholly irreconcilable with

15

the Monitor's earlier theory that the PPI Dispute may be, and in fact should be, adjudicated in advance of the plan process.

37.     Under that theory, the Monitor convinced the Courts that they had the authority to decide the PPI Dispute now, and the Courts agreed.  The Monitor cannot now contend that section 1129, which the Monitor was so quick to disregard when its protections were being invoked by the Bondholders, can suddenly spring into play to protect the Monitor by preventing the Court from approving a settlement of the very issue that the Monitor has foisted on the Court and the parties.

38.     Each component of the test for judicial estoppel is satisfied:  (i) the Monitor's two positions are wholly inconsistent with one another; (ii) once again, the Monitor is playing fast and loose with its arguments to the Court, without any regard for consistency; and, (iii) no other remedy would cure the prejudice.  Accordingly, the Monitor cannot be permitted to argue that the Settlement Agreement is prohibited by section 1129.

**B.    The Debtors' Motion is an Appropriate Use of Rule 9019**

39.     Even if the Court does not find that the Monitor is judicially estopped from taking the inconsistent position that the PPI Dispute cannot be resolved at this time, the arguments it makes are meritless.  The Monitor claims, *inter alia*, that the Settlement Agreement (i) "does not concern the settlement of a disputed claim by or against NNI, which would be suitable for determination under Bankruptcy Rule 9019,"[12] (ii) abrogates the Monitor's rights under section 1129(a)(7) of the Bankruptcy Code; and (iii) constitutes an improper *sub rosa* plan that prematurely decides a plan issue.  To the extent the Court considers these arguments, they must each be rejected.

---

[12]     Monitor's Supplemental Objection ¶ 11.

i.       **Rule 9019 is Applicable to Any Settlement or Compromise**

40.    The Monitor's argument that Rule 9019 cannot be used to approve the settlement because there is no "claim" being compromised misstates the plain words of the rule.  Rule 9019 broadly allows bankruptcy courts to approve ***any*** "settlement or compromise" by a debtor.  It does not limit itself to settlements of a "claim."  *See* Fed. R. Bankr. P. 9019(a) (providing that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement").  In the present case, NNI and the Bondholders are plainly seeking to "settle" and "compromise" the PPI Dispute, which the Court had scheduled for hearing based on the Monitor's argument that it was ripe for adjudication.  Rule 9019 is squarely applicable and is frequently used to settle disputes of this nature.  *See, e.g.*, *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 314 (Bankr. W.D. Pa. 1990) (approving over objection a settlement that provided for post-petition interest for unsecured creditors under Bankruptcy Rule 9019).

ii.      **The Settlement Agreement does not Abrogate the Monitor's Rights Under Section 1129(a)(7)**

41.    The Monitor's argument that the Settlement Agreement violates what it contends are its rights under section 1129(a)(7) of the Bankruptcy Code is nothing more than a rehashing of their flawed arguments in opposition to the payment of post-petition interest at the Bondholders contract rate—the very dispute that is being settled.[13]  In effect, the Monitor's position is that it has an absolute veto right over any settlement of an issue that might affect its distributions.  The Monitor is wrong.

---

[13]    As an initial matter, the Monitor provides no support for the position that the Settlement Agreement must be reviewed under section 1129.  As discussed *infra*, the Settlement Agreement is a compromise properly reviewable under the standards applicable to motions made pursuant to Rule 9019.  Indeed, the Monitor has recognized as much, noting that "in the context of a 9019 settlement, the Court would need to apply the Third Circuit's *Martin* factors to determine the appropriateness of settlement . . . ."  (Reply Brief of the Monitor and Canadian Debtors Regarding Post-Petition Interest and Related Issues ¶ 34, n.15.)

42.      As discussed in the Bondholder Group's prior briefing in connection with the PPI

Dispute,[14] there are a number of different legal standards that may be applicable in examining

creditors' entitlement to post-petition interest.  Section 1129(a)(7) and the best interest of

creditors test—the only provision the Monitor cites—applies only to classes that are impaired

under a plan.  (Bondholder PPI Brief ¶ 42.)  It is entirely possible, however, that NNL's equity

interests in NNI would not be impaired under a liquidating plan, and that NNL would simply

retain ownership of the equity in NNI and await any residual distribution that might flow to NNL

after NNI's creditors are paid in full.  If that is the case, section 1129(a)(7) does not apply in a

manner that would give NNL the "veto right" that the Monitor is attempting to assert.

43.      Moreover, if a proposed plan is rejected by at least one class of unsecured

creditors, the Court would also need to consider the fair and equitable standard with respect to

such class, as required by Bankruptcy Code section 1129(b), which includes compliance with the

absolute priority rule.[15]  (Bondholder PPI Brief ¶¶ 59, 60.)  The Monitor does not have a veto

under either standard.

44.      If the PPI Dispute were to be litigated, and not settled, the Court would be

required to review and analyze these issues.  The Monitor's argument simply assumes that the

Court's analysis of the PPI Dispute is limited to the "best interests of creditors" test contained in

---

[14]    *See* Opening Brief of the *Ad Hoc* Group of Bondholders, Law Debenture Trust Company of New York, as
Trustee, and The Bank of New York Mellon, as Trustee, With Respect to Monitor's Request that the Court
Determine Bondholder Entitlement to Post-Petition Interest and Additional Bondholder Claims Issues
Under U.S. Law [D.I. 14025] (the "Bondholder PPI Brief"); Response of the *Ad Hoc* Group of
Bondholders, Law Debenture Trust Company of New York, as Trustee, and The Bank of New York
Mellon, as Trustee, to the Opening Briefs of the Monitor and Canadian Debtors, U.K. Pension Claimants,
Canadian Creditors Committee, and Wilmington Trust Regarding Bondholder Entitlement to Post-Petition
Interest and Additional Bondholder Claims Issues Under U.S. Law [D.I. 14053] (the "Bondholder PPI
Reply").

[15]    Because the terms of a proposed plan are not, and cannot be known at this time, the Bondholder Group
objected to the Courts' determination of the PPI Dispute at this time on grounds that the issues were not yet
ripe.  The Courts, at the Monitor's urging, overruled the Bondholder Group's objection and ordered the
parties to brief the PPI Dispute.

section 1129(a)(7) and further assumes that, under that test, it will prevail in its argument that

Bondholders are only entitled to PPI at the federal judgment rate.  (Monitor's Supplemental

Objection ¶ 12.)  The PPI Dispute, however, has not yet been resolved by the Court and has not

been the subject of the inevitable appeals that would follow.  The Bondholders established in

their prior briefing on the PPI Dispute that the Court should conclude that section 1129(a)(7) and

section 1129(b) not only permit, but indeed require, payment of post-petition interest to the

Bondholders at their contract rates of interest before a distribution to equity occurs.  (*See*

Bondholder PPI Reply ¶ 40.)  The fact of the parties' dispute makes a settlement appropriate; it

does not prevent a settlement.

      **iii.    The Settlement Agreement is not a *Sub Rosa* Plan**

      45.    Contrary to the Monitor's assertions, the settlement neither constitutes a *sub rosa*

plan nor improperly "predetermines a plan issue."  (Monitor's Supplemental Objection ¶¶ 14,

15.)  The Settlement Agreement cannot be considered a chapter 11 plan, because it merely

resolves the limited issue of the amount of post-petition interest that the Bondholders would

receive if NNI has sufficient funds to pay post-petition interest.  Indeed, the Settlement

Agreement does not have any of the hallmarks that courts have used to determine whether a

settlement constitutes a plan:  it does not take away any party's plan voting rights; it does not

improperly dispose of any third party's claims, and it does not dispose of all or even a substantial

portion of the Debtors' assets.  Courts have routinely held that if a proposed settlement lacks the

foregoing characteristics, then it does not constitute an improper *sub rosa* plan.  *See, e.g.*, *In re*

*Capmark Fin. Group Inc.*, 438 B.R. 471, 513-14 (Bankr. D. Del. 2010) (noting that "[t]o be

found to dictate the terms of a plan, the settlement must either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote").[16]

46.    The cases the Monitor cites in an attempt to cast the Settlement Agreement as a *sub rosa* plan are all distinguishable and do not support its position.  For instance, in *In re Crowthers McCall Pattern, Inc.*, the court **approved** a proposed settlement over a creditor's objection that the settlement constituted a *sub rosa* plan on the grounds the settlement did not take away any parties' right to vote on a plan. 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990).  The *Braniff* case cited by the Monitor is also distinguishable.  The settlement at issue in that case disposed of substantially all of the debtor's assets and claims against it and also restricted creditors' rights to vote.  *See In re Braniff Airways, Inc.*, 700 F.2d 935, 939-40 (5th Cir. 1983).  Finally, the Monitor's citation to *In re Louise's* is inapposite because the proposed settlement in that case—a dispute regarding the debtor's exclusivity period—contained terms constituting the "*de facto* transfer of control of the Debtor to a creditor outside the plan confirmation process." *See In re Louise's, Inc.*, 211 B.R. 798, 802 (D. Del. 1997).

47.    None of the factors examined by these courts in evaluating whether the transaction in question was an improper *sub rosa* plan are present in this case.  The Settlement Agreement does not dispose of the Debtors' assets; it does not call for a change in control of the Debtors; it does not restrict any party's right, including the Monitor's right, to object to or vote

---

[16]    *See also DeBenedictus v. Truesdell* (*In re Global Vision Prods.*), No. 9 Cv. 347 (BSJ), 2009 U.S. Dist. LEXIS 64213, at *20 (S.D.N.Y. July 13, 2009) (holding that settlement did not constitute a *sub rosa* plan where it "resolve[d] all disputes between Plaintiffs and [the debtor], [bound] only those parties, and preserve[d] all other claims that either party may have [had] against other individuals"); *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop.* (*In re Cajun Elec. Power Coop.*), 119 F.3d 349, 355 (5th Cir. 1997) (approving settlement and noting that it did not constitute a *sub rosa* plan because it did not "alter creditors' rights, dispose of assets, and release claims") (citation omitted); *Official Comm. of Unsecured Creditors of Tower Auto. v. Tower Auto.* (*In re Tower Auto. Inc.*), No. 06cv7877, 2006 U.S. Dist. LEXIS 91958, at *21-22 (S.D.N.Y. Dec. 15, 2006) (approving settlement and noting that courts have "approved even large and important settlements prior to confirmation of a plan, notwithstanding a '*sub rosa* plan' objection, where the settlements did not dispose of all of the debtor's assets, restrict creditors' rights to vote as they deem fit on a plan of reorganization, or dictate the terms of a plan . . .").

on a chapter 11 plan, if so entitled; and it does not dictate the terms of the plan or include a broad

release of claims.  The fact that the Settlement Agreement may ultimately be incorporated into a

chapter 11 plan for the Debtors does not change this result.  Any such plan will still be subject to

the standards of section 1129 of the Bankruptcy Code and, in accordance with section 1129, all

parties in interest will be entitled to be heard with respect to its approval.

48.    Additionally, despite the Monitor's protests, the Settlement Agreement does not

"predetermine[] a plan issue."  (Monitor's Supplemental Objection ¶ 14.)  While the terms of the

Settlement Agreement may be incorporated into a proposed chapter 11 plan, these terms do not

state that the Supporting Bondholders **shall** or **must** be paid post-petition interest.  Instead, the

Settlement Agreement simply caps the amount of post-petition interest to which the Supporting

Bondholders will be entitled "in the event that NNI . . . has more than sufficient funds to pay all

of its allowed administrative, priority, secured and general unsecured claims in full . . . **in**

**accordance with a confirmed chapter 11 plan.**"  (Settlement Agreement § 2.1 (emphasis

added).)  In short, any plan that incorporates the terms of the Settlement Agreement is still

subject to the same confirmation requirements as any other plan under section 1129.

## C.    The Settlement Agreement is a *Bona Fide* Compromise Negotiated in Good Faith

49.    The Monitor tellingly devotes a substantial portion of its Supplemental Objection

to its procedural objections because it cannot meaningfully attack the substance of the 9019

Motion and cannot seriously question the appropriateness of the Settlement Agreement.  Indeed,

the Settlement Agreement carved more than $716 million off of the claimed PPI Dispute today,

and will represent an even larger concession in the future.  The Monitor is left to contend that the

Bondholder Group strong-armed the Debtors into an "ill-conceived" settlement that was not

meaningfully negotiated or evaluated.  The evidence flatly contradicts these assertions.

### i.    The Settlement Agreement is the Product of Vigorous Negotiations Between Adverse Parties

50.    The Monitor is wrong in suggesting that "[t]he proposed settlement was reached between parties who are not adverse—the Bondholders and NNI." (Monitor's Supplemental Objection at 3.)[17]  At all times during their negotiations with the Bondholder Group, the Debtors maintained a fiduciary duty to protect the interests of **all** creditors (not just Bondholders) **and** their equity holder, NNL.  The Monitor admits as much in its objection.  (*See* Monitor's Supplemental Objection ¶ 51 (stating that "[t]he Debtors, as representatives not of a single constituency of stakeholders but as estate fiduciaries, owe a duty to treat **all** parties impartially and fairly") (citation omitted) (emphasis in original).)  Contrary to the Monitor's suggestions, the Debtors did not ignore this fiduciary duty during negotiations.

51.    In fact, the negotiation of the Settlement Agreement was vigorous and meaningful.  As described *supra* section II.B., the Settlement Agreement was the product of five weeks of vigorous negotiation between sophisticated parties, both represented by counsel, pressing their competing interests.  Indeed, the evidence shows that the Debtors' representatives carefully considered each offer and counter-offer and weighed the settlement against the potential outcomes of the PPI Dispute.[18]  (Ray Dep. Tr. 36:24-39:19, 70:21-10; Katzenstein Dep.

---

[17]    To be sure, the Bondholders and NNI agree on certain issues (such as the proper allocation of the Sale Proceeds), but their interests differ with respect to the entitlement of the Bondholders to post-petition interest from the Debtors' estate.  The fact that parties in a bankruptcy may be aligned as to some issues and opposed as to others should not be surprising to the Monitor, given that the Bondholders fully supported the Monitor's challenges to the claims of the UKPC and EMEA Debtors, but disagreed with the Monitor as to other issues.

[18]    The Monitor makes much of John Ray's testimony that he believed a court would likely award post-petition interest at the full contract rate as evidence that the Debtors were in some way "compliant" with the Bondholder Group during the settlement negotiations.  (*See* Monitor's Supplemental Objection ¶¶ 18, 22.)  But John Ray's personal view of the law underlying the PPI Dispute is not relevant to the Court's evaluation of the reasonableness of the Settlement Agreement; only the law itself is relevant.  In any event, the fact remains that Ray negotiated a nearly *50% discount* from the contract rate of interest. As of July 1, 2014, this discount represents a reduction of over $716 in the Supporting Bondholders' claim for post-petition interest and is a significant compromise by both parties to the settlement.

Tr. 97:12-98:25.)  As such, there is simply no truth to the Monitor's suggestion that the

Bondholder Group controlled the negotiations and dictated the terms of the settlement.  It is a

fallacy to suggest that settlement negotiations that do not last years and do not go through

multiple rounds of failed mediation are not hard fought and at arm's length—it would be useful

for that concept to be made clear to the Monitor.

### ii.    The Settlement Agreement is a Meaningful Compromise of the PPI Dispute

52.    On its face, the Settlement Agreement benefits all of the Debtors' stakeholders,

including NNL, by resolving the Supporting Bondholders' claim of more than $1.6 billion (as of

June 30, 2014) in post-petition interest at a little more than half of that amount and avoiding the

cost and expense of further litigation.  If the PPI Dispute were litigated to conclusion and the

Bondholders prevailed, all stakeholders of the Debtors, other than the Bondholders, could have

suffered losses in the hundreds of millions of dollars.  In fact, NNL, as the sole equity holder of

NNI, would have been at least $716 million further "out of the money," as of July 1, 2014, if the

Court had awarded post-petition interest at the full contract rate and other unsecured creditors

would have been worse off.[19]

53.    In a sudden reversal of course from its previous arguments, however, the Monitor

contends that "the Bondholders' supposed concession of their entitlement from $1.657 billion to

$1.01 billion is illusory. . . . ."  (Monitor's Supplemental Objection ¶ 27.)  The Monitor bases

this argument on the Expert Report of Paul Wertheim [D.I. 14499] (the "Wertheim Report"),

---

[19]    The Monitor complains that a distribution to Bondholders before June 30, 2015 is "highly unlikely" and, as a result, "the Debtors have therefore settled the US PPI Dispute with respect to the Bondholders for $1.01 billion, <u>not</u> the advertised $876 million."  (Monitor's Supplemental Objection ¶ 28, n.11 (emphasis in original).)  Even assuming this to be true, the Monitor's argument fails to account for the continuing accrual of interest on the Guaranteed Bonds at their contract rates.  As the Monitor has repeatedly informed this Court, interest on the Guaranteed Bonds is accruing at nearly $24 million per month in aggregate— more than double the rate that interest will accrue, for just one year, under the terms of the Settlement Agreement—and the total accrual will reach $1.885 billion on July 1, 2015.  Thus, any delay in distribution will cause the Supporting Bondholders' concession to grow, from approximately $716 million on July 1, 2014 to approximately $875 million on July 1, 2015.

which contends that "in the 'best case' scenario, the **maximum** amount of net assets that could be available to NNI for the payment of post-petition interest to all unsecured creditors that may be entitled to such interest is approximately $971 million." (Monitor's Supplemental Objection ¶ 28 (emphasis in original) (citing Wertheim Report at 5).) As discussed *supra*, the Monitor should be judicially estopped from raising this argument. Even if the Court permits the assertion of this argument, it is simply wrong.

54.     As an initial matter, the amount of net assets that may in the future be available to pay post-petition interest is not relevant to the determination of an appropriate settlement of the PPI Dispute. The PPI Dispute was framed as a litigation over whether the contract rate or some other rate of interest would apply to distributions of post-petition interest. The parties settled that dispute for 55% of the claimed amount as of June 30, 3014, with a much larger concession as time passes. The issue for the Court to consider is whether that settlement falls above the lowest end of the range of reasonable outcomes, which it plainly does. (*See infra* section III.D(i).) Indeed, as has been argued to the Court, in other instances parties have settled that same dispute at amounts exceeding 70% of the default rate of interest. (*See id.*)

55.     There is no reason for the Court to consider how much cash might in the future be available to pay post-petition interest as part of this analysis. The Monitor's current argument would suggest that a settlement of even $11 million—*i.e.*, a 99.5% discount from the amount of post-petition interest payable at the contract rate—would be "illusory" if Wertheim had predicted that only $10 million in surplus cash would be available at NNI to pay post-petition interest. This analysis is flawed and the Monitor's effort to focus the Court on its estimate of the "maximum" cash available for post-petition interest is another effort at misdirection.

56.     Even if it were relevant how much cash may be left to pay post-petition interest, the Monitor has no reliable evidence to support its position.  The Court will recall that the Canadian Interests presented evidence during the Allocation Trial from Britven that suggested that, if the NNI position prevails, the amount available to pay post-petition interest would be more than $1.3 billion.  (Trial Tr. 3486:13-17, June 6, 2014.)  The Canadian Interests deemed that evidence reliable enough that they made reference to a chart, created by Britven, throughout the Allocation Trial, including during their closing arguments, which took place several months after the Settlement Agreement was executed.  (*See, e.g.*, Trial Tr. 5243:1-14, Sept. 22, 2014; *see also* DEM00016 at 35.)  But Britven's analysis is wholly inconsistent with what the Monitor now seeks to argue, so it has simply changed its argument, yet again, by proffering the Wertheim Report.  This change does not help them.

57.     The Wertheim Report is riddled with errors.  The very first substantive paragraph of the Wertheim Report, which does nothing more than summarize the Settlement Agreement, has multiple errors.  Wertheim writes "[t]he Proposed Agreement purports to settle the PPI dispute by reducing the PPI that the Bondholders would receive from a total accrual of $1.657B (as of June 30, 2015) to a maximum of $1.01B or a decrease of $647M as a result of the Proposed Agreement."  (Wertheim Report ¶ 16.)  Wertheim began his deposition by noting a single correction he wanted to make to his report, which was to reduce the $1.657 billion number to "[$]1.657 minus the interest that had accrued on the NNCC notes" which he claimed is "still over [$]1.6 billion."  (Wertheim Dep. Tr. 30:23-31:24.)[20]  But he did not correct his other glaring mistakes in that single sentence, including the fact that the $1.657 billion number was accurate *as of June 30, 2014, not 2015*.  As a result of this error, Wertheim was comparing the accrual of

_____

[20]     References to "Wertheim Dep. Tr." followed by a page number are to the transcript of the deposition of Paul Wertheim, taken on October 22, 2014, in connection with the above captioned proceedings.

interest, as of June 30, 2014, at the contract rate of interest ($1.657 billion) to the accrual of

interest, as of June 30, 2015, pursuant to the terms of the Settlement Agreement ($1.01 billion).

By doing so, Wertheim understated, apparently unknowingly, the value of the Supporting

Bondholders' concession—which, as of June 30, 2015, would amount to nearly $900 million—

by several hundreds of millions of dollars.

58.     The Wertheim Report does not improve for the Monitor after that first paragraph.

Wertheim claims to calculate the maximum potential surplus cash available at NNI for payment

of post-petition interest based on a variety of purported "best case" assumptions about the assets

and claims pools of NNI and NNL.  (Wertheim Report ¶¶ 2, 17).[21]  At his deposition, however,

Wertheim conceded that a number of his assumptions were in fact "worst case" assumptions for

NNI or, at a minimum, could have been more favorable to NNI.  Because the Supporting

Bondholders expect the Debtors to more thoroughly catalog these errors, they are highlighted

here in summary form only.

59.     As outlined in his report, Wertheim calculates surplus cash available at NNI using

a mathematical formula that relies on four sets of inputs:  (i) total allowed claims against NNL;

(ii) total assets of NNL available for distribution; (iii) total allowed claims against NNI; and (iv)

total assets of NNI available for distribution.  (Wertheim Report ¶¶ 32-36.)  Under Wertheim's

formula, for every dollar decrease in claims against NNL, surplus cash at NNI would increase by

seven cents.  (Wertheim Report ¶ 34.)  For every dollar increase in assets of NNL, surplus cash

at NNI would increase by sixty-five cents. (Wertheim Dep. Tr. 103:15-104:3; *see also* Wertheim

---

[21]     In reality, the Wertheim Report is nothing more than a mathematical exercise and should not be considered "expert" testimony at all.  Indeed, Wertheim conceded that the bulk of his analysis involved taking numbers supplied by counsel to the Monitor and punching them into a calculator.  Wertheim Dep. Tr. 55:12-23, 56:21-57:13, 58:4-60:2, 63:19-72:9.  This is not "scientific, technical, or other specialized knowledge" that will help the Court "understand the evidence or to determine a fact in issue" and, accordingly, the Wertheim Report and testimony should be excluded for that reason alone.  Fed. R. Evid. 702(a).

Report ¶ 34.)  Finally, for every dollar decrease in claims against NNI or increase in assets of NNI, surplus cash at NNI would increase by one dollar.  (*See* Wertheim Dep. Tr. 45:19-45:23.) Thus, although each of the four inputs to Wertheim's formula affect the total surplus cash available at NNI, assets and claims at NNI have the greatest impact.

      60.      During Wertheim's deposition, it became clear that the assumptions he used for each of the four inputs were deeply flawed and without basis.  For example, with respect to the estimated level of allowed claims against NNL, Wertheim assumed $3.235 billion in "other" claims against NNL based on *NNC's* consolidated financial statements, dated August 9, 2012. (Wertheim Report ¶ 32, Table 1, n.16.)  Wertheim testified that he simply assumed NNL was liable for the entire $3.235 billion without bothering to investigate what portion of that amount, if any, was actually a liability of NNL and not another Canadian Debtor entity.  (*See* Wertheim Dep. Tr. 74:4-74:7, 74:17-75:15.)  Moreover, he provided no convincing explanation for why it made sense to rely on a *2012* estimate of claims against *NNC* to determine *current* claims against *NNL*.  Wertheim also blindly assumed that 100% of the $3.235 billion in claims reflected on the 2012 financial statement would be allowed against NNL despite acknowledging that:  (i) fewer than 5% of claims against NNL have been accepted; and (ii) the Monitor has stated that the $3.235 billion figure could materially change.  (*Id.* at 85:7-85:19; 87:5-88:8; 99:10-99:14.)[22] Indeed, in the most recent Monitor's report, on which Wertheim relied, the Monitor stated that it has accepted 967 claims with a claim value of CAD 2.9 billion (of which the NNI intercompany claim is more than CAD 2.5 billion) that originally had a face amount of CAD 12.2 billion. Thus, excluding NNI's claim, the Monitor has accepted only CAD 400 million of CAD 9.7 billion, for an acceptance rate of 4%.  (*See* One Hundred and Eighth Report of the Monitor, dated

---

[22]      Indeed, counsel to the Monitor stated that the amount of claims in Canada is a "sensitive" matter because they "have not yet even been proposed to the Canadian Court" and "those claims are broad."  (Hr'g Tr. 29:10-15, Oct. 21, 2014.)

September 24, 2014 ¶ 30.)  Despite reviewing and relying on this report, Wertheim relied on

numbers that were unchanged from 2012.

61.    Wertheim made similar errors in arriving at his assumptions with respect to the

assets of NNL.  For example, Wertheim admitted during his deposition that he either failed to

consider or simply ascribed no value to the following additional potential assets:

- The value of Nortel's more than 17 million unsold IP addresses, which could increase surplus cash available at NNI by hundreds of millions of dollars and which Wertheim said he could not estimate;[23]

- The value of NNL's equity interests in NN Ireland and NNSA, which could increase distributions to NNL's creditors, including NNI, by approximately $374 million[24]—an issue of which Wertheim conceded he was unaware;[25]

- The potential repatriation of approximately $190 million in cash to NNL based on its equity interests in the ASIAPAC, CALA, and Greater China debtor estates;[26] and,

- NNL's rights to a portion of the $35 million in cash remaining in a trust established for directors and officers of the Nortel Debtors' estates (the "D&O Trust") that will be divided among NNL and NNI in the same relative shares as the allocation decision.[27]

62.    Wertheim made comparable errors when looking at the assets and claims of NNI,

an even more glaring omission given that his conclusions on the total dollars available for post-

---

[23]    Wertheim Dep. Tr. 118:24-120:8, 122:14-124:22, 168:25-169:4, 238:7-14.

[24]    This figure is based on the Joint Administrator's Progress Reports, issued in 2009.  If claims against the NN Ireland and NNSA debtor estates are reduced from their 2009 levels, additional cash could be repatriated by NNL, further increasing surplus cash to NNI.

[25]    Wertheim Dep. Tr. at 132:19-133:6, 133:17-25, 141:9-142:5, 142:21-143:11.  In the past, the Monitor has often underestimated future cash receivables from its affiliates.  For example, in the One Hundred and Eighth Report of the Monitor, the Monitor noted that it had experienced "a favourable permanent variance" of $13.2 million as a result of recoveries on a receivable from Nortel Networks (India) Private Limited that were not reflected in previous forecasts.  (One Hundred and Eighth Report of the Monitor, dated September 24, 2014 ¶ 17.)  In his deposition, Wertheim admitted that he did not consider the possibility of additional such recoveries in the future, even though the Monitor noted in its report that it had retained a workforce specifically for the purpose of generating such recoveries.  (Id. ¶¶ 91-101 (describing the 2015 Nortel Retention Plan as existing for the purpose of facilitating, among other things, the "continued repatriation of cash from affiliates in APAC and CALA"); Wertheim Dep. Tr. 254:13-255:10; 256:19-259:3.)

[26]    See NNC-NNL-PPI000001; see also Wertheim Dep. Tr. 149:10-16.

[27]    Wertheim Dep. Tr. 149:17-150:24.

petition interest are 100% sensitive to any additional assets or claims reductions in NNI. For example, on the asset side, Wertheim failed to consider that NNI had asserted an interest in some or all of the proceeds from the sale of Nortel's IP address (to which he ascribed a $0 value, without any analysis at all) and NNI's rights to a portion of any cash remaining in the D&O Trust (of which he was simply unaware).[28] On the claims side, Wertheim failed even to consider a number of outcomes that could reduce NNI's claims pool, including:

- The possibility that the Court could agree with the Monitor's position that the holders of the NNCC Bonds are not entitled to **any** PPI from NNI, rather than the $45.8 million assumed by Wertheim;[29]

- The possibility that the U.S. government's tax claim against NNI could be less than $133 million, a figure which Wertheim conceded he calculated arbitrarily as being one-third of the potential claim amount referenced by counsel for the Debtors during opening statements in the Allocation Trial. When pressed on this point, Wertheim admitted that he chose $133 million simply because "it's just a round number," and not by reference to any evidence in these cases;[30]

- The possibility that the Bondholders could successfully appeal the Canadian Court's decision rejecting the Bondholders' claim for post-petition interest against NNL, thus increasing their claims against NNL and, by extension, the surplus cash available at NNI after both NNL and NNI make distributions to creditors;[31] and

- The possibility that the claim of the Pension Benefit Guaranty Corporation (the "PBGC") will be allowed in an amount less than the asserted claim amount of $593 million, in spite of the fact that the Debtors have estimated that the claim would be settled for $437 million or less.[32]

63.    Wertheim's treatment of the PBGC claim bears particular emphasis as an example of Wertheim's result-oriented approach which is clearly designed to support the Monitor's position. For all claim amounts asserted against NNI—except for those asserted by the

---

[28]    *Id.* at 118:24-120:8, 122:14-124:22, 149:17-150:24, 155:2-12; 168:25-169:4, 238:7-14.

[29]    *Id.* at 202:06-21, 204:16-205:19; *see also* Monitor's Supplemental Objection ¶ 56.

[30]    Wertheim Dep. Tr. at 207:13-24; 208:19-209:22, 213:19-216:6. As noted *infra*, Britven estimated the tax claim at $0.

[31]    *Id.* at 271:6-24.

[32]    *Id.* at 221:14-223:18, 226:13-228:9.

Bondholders, NNCC, and the PBGC—Wertheim relied on the Debtor's Monthly Operating Report No. 60 [D.I. 13431] (the "60th MOR"), issued in January of 2014 because, as he testified, those were estimates of how much would be paid using GAAP.  (*See* Wertheim Dep. Tr. 217:19-219:10.)  For the Bondholders' claims, Wertheim relied on undisputed numbers.  For the PBGC's claim, by contrast, Wertheim used $593 million, which is the amount of the claim as originally filed by the PBGC.  (Wertheim Report ¶ 35, Table 2; *see also* Claim No. 4735.)  In the 60th MOR, however, the Debtors estimated that their obligation in respect of the PBGC's $593 million claim would be $437 million.  (60th MOR at 6.)  Wertheim testified that he did not view the $437 million number as reliable anymore because the PBGC had subsequently amended their claim to assert additional claims of $115 million.  (Wertheim Dep. Tr. 225:25-226:5.)  Wertheim could not explain why he thought it was appropriate to add $156 million to the Debtors' estimate because the PBCG had added $115 million to his claim.  Moreover, Wertheim ignored the fact that the PBGC has asserted claims against entities other than NNI that have cash available to satisfy such claims and which should further reduce NNI's actual payment to the PBGC.  (*See* Wertheim Dep. Tr. 157:17-159:9.)  Far from making all assumptions in favor of NNI and the Bondholders, he appeared to be trying to do anything to keep the total cash available to less than $1.01 billion so he could make his argument.  As if these errors were not bad enough, Wertheim actually cites to the PBGC claim as one of the three "Other Variables Which Could Further *Decrease* Cash Available to NNI" because, in his view, it could be allowed in an amount greater than $593 million.  (Wertheim Report ¶ 49.)

64.    Although the flawed assumptions discussed above are numerous, Wertheim admitted that, if his analysis were adjusted to account for *only* the sale of Nortel's additional IP addresses and the value of NNL's equity in NN Ireland and NNSA, ***NNI's surplus cash would***

**be over $1.3 billion, not $971 million**.  (Wertheim Dep. Tr. 144:10-25, 146:25-147:8.)  When

corrected for the other mistakes, the available dollars to NNI could plainly exceed even the $1.6

billion issue that the Monitor's counsel originally described the PPI Dispute to be.  This fact

alone fatally undermines the Monitor's Supplemental Objection.

65.    As noted above, Wertheim's report is also undermined by the fact that it is

inconsistent with Britven's expert testimony.  Performing an analysis similar to Wertheim's,

Britven opined that NNI will have approximately $1.3 billion in cash available for distribution if

the Courts adopt the allocation position advanced by the Debtors.  (Trial Tr. 3486:13-17, June 6,

2014; *see also* DEM00016 at 35.)  This represents approximately $329 million more in cash

available for distribution than the $971 million figure referenced in the Wertheim Report.

Wertheim testified that he disagreed with Britven on four key assumptions: (i) whether or not

PPI is payable on the NNCC bonds; (ii) whether or not non-bondholder unsecured creditors will

be entitled to PPI; (iii) the size of NNI's tax liability (which Britven estimated at $0); and (iv)

NNI's projected cash "burn rate" going forward.  (Wertheim Dep. Tr. 178:22-179:4.)  In each

case, Britven assumed an outcome more favorable for NNI than Wertheim in spite of

Wertheim's claim that he consistently assumed "the best outcome of events for NNI."  (*Id.* at

172:6-10.)  Thus, the Britven report provides yet another reason to disregard Wertheim's

conclusions.

### iii.    The Monitor Need Not Have Been Included in Settlement Discussions

66.    Contrary to the Monitor's arguments, the Settlement Agreement may be approved

under Rule 9019 even though the Monitor was not involved in its negotiation.  Indeed, courts

routinely approve settlements of creditor claims reached through one-on-one negotiations even

though such settlements will necessarily impact other parties in interest.  *See, e.g.*, *In re Capmark*

*Fin. Grp. Inc.*, 438 B.R. 471, 520 (Bankr. D. Del. 2010) (approving a proposed settlement and

noting that "there is no requirement that . . . creditors be actively involved in the settlement

negotiations [and] it is within the debtors prerogative to exclude them").[33]  Further, courts

routinely approve settlement agreements over the objections of creditors.  *See, e.g.*, *id.* at 519

(approving the settlement and noting that "a debtor may seek approval of a settlement over major

creditor objections as long as it carries the burden of establishing that the balance of the *Martin*

factors . . . weighs in favor of settlement").[34]

       67.     Rule 9019's very purpose is to protect the interests of parties in interest who were

not part of the discussions.  Although the Monitor was not involved in the negotiation of the

Settlement Agreement, it has taken full advantage of its rights under Rule 9019 to voice its

concerns with the Settlement Agreement.  *See* Fed. R. Bankr. P. 9019(a).  Among other things,

the Monitor has requested and received document discovery, deposed the Settling Parties'

witnesses, and filed an objection to be considered at a public hearing.  Under these

circumstances, there can be no question that the Monitor has received a sufficient opportunity to

be heard.  To suggest that the 9019 Motion cannot be approved because an objector was not part

of the discussions is pure sophistry.

## D.      The Settlement Agreement Satisfies the Martin Factors

       68.     Although the Monitor attempts to distract the Court with a host of other

arguments, the Martin Factors provide the only framework within which to review the Settlement

---

[33]    *See also In re W.R. Grace & Co.*, 475 B.R. 34, 90 (D. Del. 2012) (approving the proposed settlement and asserting that "the Bankruptcy Code does not require that all creditors participate in plan negotiations"); *In re Wash. Mut., Inc.*, 442 B.R. 314, 364 (Bankr. D. Del. 2011) (noting that excluding the equity committee from plan negotiations, which included a negotiated settlement, did not evince the debtors' lack of good faith).

[34]    *See also Key3Media Grp., Inc. v. Pulver.com, Inc.* (*In re Key3Media Grp., Inc.*), 336 B.R. 87, 97 (Bankr. D. Del. 2005) (approving a settlement over creditors' objections because such objections "cannot be permitted to predominate over the best interests of the estates as a whole"); *In re Sea Containers, Ltd.*, No. 06-11156, 2008 Bankr. LEXIS 2363, at *33 (Bankr. D. Del. Sept. 19, 2008) (approving a settlement despite impacted creditors' objections where "the [s]ettlement so affects their position as to be unfair").

Agreement under Rule 9019.[35]  The Settlement Agreement readily satisfies each of the Martin

Factors and, accordingly, should be approved by the Court.[36]

> **i.    The Uncertainty of Success in Litigation Favors Approval of the Settlement Agreement**

69.    Under the first Martin Factor, the Court must consider the likelihood of successful

litigation "outside the framework of the Settlement Agreement."  *See In re W.R. Grace*, 475 B.R.

34, 78 (D. Del. 2012).  Although this factor necessarily requires the Court to consider, to some

extent, the merits of the underlying dispute, "[i]n analyzing the compromise or settlement

agreement under the *Martin* factors, courts should not have a mini-trial on the merits, but rather

should canvass the issues and see whether the settlement falls below the lowest point in the range

of reasonableness."  *In re W.R. Grace*, 475 B.R. at 77-78 (internal quotations and citations

omitted).  "For practical purposes, this factor is considered in conjunction with *Martin*'s third

factor—the complexity, expense, inconvenience, and delay of the litigation involved—because

'[t]he balancing of the complexity and delay of litigation with the benefits of settlement is related

to the likelihood of success in that litigation.'"  *In re W.R. Grace & Co.*, 475 B.R. 34, 78 (D. Del.

2012) (citing *In re Nutraquest, Inc.*, 434 F.3d 639, 646 (3d Cir. 2006)).

70.    As the vigorous briefing and arguments advanced with respect to the PPI Dispute

demonstrate, the Settlement Agreement reflects the significant legal risk that either this Court or

an appellate court might award the Supporting Bondholders post-petition interest at the full

---

[35]    Counsel to the Monitor acknowledged as much during the hearing before this Court on October 21, 2014. *See supra* n.13.  The Martin Factors are listed in paragraph 26 of the 9019 Motion.  For the Court's convenience, they are as follows: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 393 (3d Cir. 1996) (citation omitted).

[36]    Although the Bondholder Group does not contend that there are any likely difficulties in collection implicated in this case, this is not an impediment to approval of the 9019 Motion. *See, e.g.*, *In re Nutraquest, Inc.*, 434 F.3d 639, 646 (3d Cir. 2006) (approving a settlement agreement pursuant to the Martin Factors in spite of the fact that the parties agreed that the "ease of collection" factor was not relevant).

contract rate.  The Supporting Bondholders' concession of more than $700 million of their contractual entitlement to post-petition interest, as of July 1, 2014, removed significant downside risk to the Debtors' estate, its creditors, and its equity holder, NNL, and is well within the range of reasonableness.

71.      The Monitor argues that the settlement is not reasonable because it is "well-established" in this District that PPI on the Guaranteed Bonds must be limited to interest accrued at the federal judgment rate.  (Monitor's Supplemental Objection ¶ 39.)  Contrary to the Monitor's position, the law is far from settled.  In fact, as discussed in the Bondholder Group's earlier submissions, the better view, consistent with numerous court rulings, is that contractual entitlements of creditors, including the right to receive interest, take absolute priority over any distributions on account of residual equity interests.  (*See, e.g.*, Bondholder PPI Brief ¶ 13.)

72.      The settlement reached in *W.R. Grace* is instructive.  In *W.R. Grace* the parties were litigating whether post-petition interest should be applied at the "settlement" rate (which was below the default rate but ***above*** the non-default contract rate) or at the full default rate of interest.  The dispute was appealed, briefed, and argued to the Third Circuit Court of Appeals. Prior to any ruling from the Third Circuit, the dispute was settled, with the debtor agreeing to pay the lenders approximately 70% of the difference between the above-contract settlement rate and the full default rate.[37]  In the instant case, the Settlement Agreement provides for the payment of PPI well ***below*** the contractual rate of interest.

---

[37]      *See* Order Pursuant to Sections 105, 363, 1107, and 1108 of the Bankr. Code and Rules 2002, 6004, 9014, and 9019 of the Fed. Rules of Bankr. Procedure Approving the Settlement Agreement Between W.R. Grace & Co. and the CNA Cos., *In re W.R. Grace & Co., et al.*, No. 01-01139 (Bankr. D. Del. Dec. 23, 2013, Dkt. No. 31504); Mem. Op. Regarding Objections to Confirmation of First Am. Joint Plan of Reorganization and Recommended Supplemental Findings of Fact and Conclusions of Law, *In re W.R. Grace & Co., et al.*, No. 01-01139 (D. Del. Jan. 17, 2014), Dkt. No. 31604.

73.     The Monitor also argues that, because the merits of the PPI Dispute have been briefed and teed up for determination, a settlement at this stage would not avoid future litigation and is therefore inappropriate.  (Monitor's Supplemental Objection ¶ 43.)  The absurdity of this argument is clear, as it would instruct courts to be progressively less willing to consider a settlement of an issue (or case) the closer the date of the settlement is to an anticipated ruling. For example, under the Monitor's reasoning, settlement of the entire Allocation Trial (without a final judicial determination on the merits) would be inappropriate at this time because the parties have already conducted extensive fact and expert discovery and participated in a multi-week trial.  This is so plainly wrong it merits no response other than to recognize that even if the Court issued a decision on July 25, 2014, when the PPI Dispute was scheduled, the litigation would not be the end of the litigation over the PPI Dispute, as the *WR Grace* example demonstrates.

74.     Finally, the Monitor argues that "[a]pproval of the proposed settlement will not achieve finality with respect to the US PPI Dispute because the same legal issues and disputes will continue, albeit among other parties."  (Monitor's Supplemental Objection ¶ 44.)  The Settlement Agreement resolves the PPI Dispute with respect to ***more than 95% of the bonds by principal amount*** at issue.  (*See* 9019 Motion ¶ 21.)  Thus, the Settlement Agreement will resolve the vast majority of all disputes relating to PPI.  Simply stated, the settlement provides significant benefits and cost savings for NNI's estate, and the Monitor's arguments to the contrary should be rejected.

### ii.     The Settlement Agreement Benefits All Parties in Interest

75.     The fourth *Martin* factor requires the Court to consider the impact that the Settlement Agreement would have on creditors of the Debtors' estates.  *See In re W.R. Grace*, 475 B.R. 34, 79 (D. Del. 2012).  This factor weighs heavily in favor of approval of the Settlement Agreement because, as discussed above, an adverse ruling on the PPI Dispute would

mean a loss to the Debtors' estates in the ***hundreds of millions of dollars***.  Such a result would harm all creditors, as well as NNL, the sole equity holder of NNI.

76.    It is telling that no party-in-interest other than the Monitor has objected to the Settlement Agreement.  The UCC, which represents the unsecured creditors of the Debtors' estates, clearly views the benefit of avoiding continued costs and delay as outweighing any purported harms caused by the Settlement Agreement.  In fact, in its statement in support of the Settlement Agreement, the UCC notes, among other things, that the Settlement Agreement "represents a substantial compromise of the Bondholders' entitlement that is the subject of the PPI Dispute, while achieving a number of other benefits to the US estates."[38]

77.    For all of these reasons, the Martin Factors are satisfied.  As such, the Settlement Agreement should be approved by the Court pursuant to Rule 9019.

## E.    The CCC, UKPC, and Wilmington Trust Do Not Have Standing to Be Heard in the PPI Dispute in This Court

78.    Although they are not creditors of the Debtors' estates, Wilmington Trust has filed an objection to the 9019 Motion, and the UKPC and CCC have filed joinders to the Monitor's Supplemental Objection and WT Objection.  None are parties in interest in U.S.-only claims issues and, as such, each lacks standing to be heard regarding the 9019 Motion.  Accordingly, the arguments of these parties should not be considered by the Court.

79.    For standing purposes, the Court must be guided by the statutory predicate, which is contained in section 1109 of the Bankruptcy Code.  11 U.S.C. § 1109(b) ("[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be

---

[38]    Statement of the Official Committee of Unsecured Creditors of Nortel Networks, Inc. *et al.* in Support of Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among Nortel Networks Inc., the Supporting Bondholders, and The Bank of New York Mellon With Respect to the NNI Post-Petition Interest Dispute and Related Issues [D.I. 14189] ¶ 1.

heard on any issue in a case under this chapter.")  The Third Circuit has explained that a "party

in interest" is "'anyone who has a legally protected interest that could be affected by a

bankruptcy proceeding.'"  *In re Global Industrial Technologies, Inc.*, 645 F.3d 201, 210 (3d

Cir.2011) (quoting *In re James Wilson Assocs.*, 965 F.2d, 160, 169 (7th Cir. 1992); *see also In re*

*Amatex*, 755 F.2d 1034, 1042 (3rd Cir. 1985) (a "party in interest" is one who "has a sufficient

stake in the proceeding so as to require representation.").  While the definition of a party in

interest may seem broad, it is not without limits.  Party-in-interest standing "does not arise if a

party seeks to assert some right that is purely derivative of another party's rights in the

bankruptcy proceeding."  *In re Lehman Bros. Holdings*, *Inc.*, 2012 WL 1057952, *3 (Bankr.

S.D.N.Y. Mar. 26, 2012) (quoting *In re Refco Inc.*, 505 F.3d 109, 117 n. 10 (2d Cir. 2007).

80.      As such, courts have found that a creditor of a debtor's creditor is not a party in

interest and does not have standing in the debtor's bankruptcy case, even though such creditor

may have a substantial financial interest in the outcome of the case.  *See*, *e.g.*, *In re Lifeco Inv.*

*Grp.*, *Inc.*, 173 B.R. 478, 487-88 (Bankr. D. Del. 1994) (finding "no statutory or judicial support

to conclude that a creditor of a creditor has standing in a bankruptcy case.").[39]

81.      In the present case, it is clear and undisputed that both the CCC and WT are only

creditors of the Canadian Debtors.  Neither is a creditor of the Debtors.  Indeed, in previous

filings, the CCC has defined itself as an "ad hoc group of officially authorized representatives of

employee and employee benefits creditors asserting direct claims **solely against the Canadian**

---

[39]      Similarly, investors in a creditor of a debtor are not parties in interest in the debtor's bankruptcy case.  *In re*
*Refco Inc.*, 505 F.3d 109, 117 n.10 (2d Cir. 2007) (investors' objection to settlement between estate and the
creditor in which they were investors dismissed as investors were not "parties in interest" within the
meaning of § 1109(b) because they were not seeking to enforce any rights distinct from those of the
creditor).

*parent and certain Canadian affiliates*."[40]  The CCC has not asserted any direct claims against

any of the Debtors.  (*See* DLA Amended 2019 Statement at 1-3.)[41]  Similarly, WT is the

successor indenture trustee for the 6.875% Notes due 2023, issued by NNL (the "NNL Notes"), a

Canadian Debtor.  None of the Debtors has any obligations, direct or indirect, in respect of the

NNL Notes, and, in fact, none have been alleged.

82.    The UKPC also lacks standing.  Like the CCC and WT, the UKPC is a creditor of

only the Canadian Debtors.  The UKPC previously asserted claims against the Debtors, but when

those claims were settled over seven months ago, the UKPC agreed to "release and forever

discharge the US Interests . . . from any and all liability" in respect of its claims in exchange for

an indefeasible cash payment from the Debtors.  (Agreement Settling US Claims Litigation,

§ 4.4 [D.I. 12618-3].)  Thus, the UKPC is no longer a creditor of the Debtors and no longer has

standing in the chapter 11 cases.

83.    Because none of the CCC, UKPC, nor Wilmington Trust has standing in the

chapter 11 cases, the Court must disregard the CCC Joinder, UKPC Joinder, and WT Objection

and not allow such parties the opportunity to be heard at the hearing on the 9019 Motion.[42]

---

[40]    Amended Verified Statement Pursuant to Bankruptcy Rule 2019 of DLA Piper LLP (US), dated June 5, 2013 [D.I. 10761] ("DLA Amended 2019 Statement") at 1 (emphasis added); *see also* Allocation Protocol, Appendix A (defining the CCC as an "ad hoc committee of major creditors having claims **only against the Canadian Debtors**.") (emphasis added).

[41]    The CCC has previously relied on *Unofficial Committee of Zero Coupon Noteholders v. Grand Union Co.*, 179 B.R. 56 (D. Del. 1995) in support of its position that, as a "creditor of a debtor's parent and sole equity holder who may receive nothing under the debtor's plan," it has a "sufficient, practical stake in the outcome of the debtor's chapter 11 case to be a party in interest as defined by the Third Circuit."  (Reply of the Canadian Creditors' Committee (Motion re Cross-Over Bonds) [D.I. 14061] ¶ 3.)  In sharp contrast to *Grand Union*, however, NNL is more than adequately representing the interests of its creditors, including the CCC.  *But see Grand Union*, 179 B.R. at 59.  Moreover, unlike in *Grand Union*, the CCC, Wilmington Trust, and the UKPC will recover meaningful sums from their own respective jurisdictions and will not be "wiped out."  *But see id.*  Accordingly, there is simply no reason for the CCC, Wilmington Trust, or the UKPC to be heard independently.

[42]    Setting aside Wilmington Trust's lack of standing, its objection sets forth essentially the same arguments as those advanced by the Monitor's Supplemental Objection.  Accordingly, the WT Objection should also be rejected for the reasons discussed *supra*.

## IV.    <u>CONCLUSION</u>

WHEREFORE, the Supporting Bondholders respectfully request that this Court (i) grant the 9019 Motion and the relief requested therein; (ii) enter the proposed order attached as Exhibit A to the 9019 Motion thereto; and (iii) grant such other and further relief as it deems just and proper.

[*Remainder of page intentionally left blank*]

Dated:  October 30, 2014

PACHULSKI STANG ZIEHL & JONES LLP

/s/ *Peter J. Keane*
Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

-and-

MILBANK, TWEED, HADLEY & McCLOY LLP
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Atara Miller
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:  (213) 892-4463
Facsimile:  (213) 629-5063

*Attorneys for Supporting Bondholders*