# **<u>Exhibit D</u>**

*IN RE: NORTEL NETWORKS INC., et al.*

---

*JOHN RAY*

*September 15, 2014*

*HIGHLY CONFIDENTIAL*

---



**CourT REPORTING** Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022

PHONE: (212) 750-6434   FAX: (212) 750-1097

**www.ELLENGRAUER.com**

*Original File 108011.TXT*

*Min-U-Script® with Word Index*

1   UNITED STATES BANKRUPTCY COURT

2   FOR THE DISTRICT OF DELAWARE
    ----------------------------------------X
3   In re

4       NORTEL NETWORKS INC., et al.,

5                       Debtors.,

6   Chapter 11 Case No.: 09-10138(KG)
    ----------------------------------------X
7

8           * * * HIGHLY CONFIDENTIAL * * *

9

10                  One Liberty Plaza
                    New York, New York

11                  September 15, 2014
                    1:15 p.m.

12

13

14          VIDEOTAPED DEPOSITION of JOHN RAY,

15   before Melissa Gilmore, a Notary Public of the

16   State of New York.

17

18

19

20

21

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor
24             New York, New York 10022
                    212-750-6434
25                  REF:  108011

 1  A P P E A R A N C E S:

 2

 3  ALLEN & OVERY LLP

 4  Attorneys for Canadian Debtors and Canadian Monitor

 5       1221 Avenue of the Americas

 6       New York, New York 10020

 7  BY:  JACOB S. PULTMAN, ESQ.

 8       BRADLEY S. PENSYL, ESQ.

 9       KEN COLEMAN, ESQ.

10       JOSEPH BADTKE-BERKOW, ESQ.

11       PHONE 212-610-6340

12       FAX 212-610-6399

13       E-MAIL jacob.pultman@allenovery.com

14

15  CLEARY GOTTLIEB STEEN & HAMILTON LLP

16  Attorneys for US Debtor and the Witness

17       One Liberty Plaza

18       New York, New York 10006-1470

19  BY:  JEFFREY ROSENTHAL, ESQ.

20       LISA SCHWEITZER, ESQ.

21       RUSSELL ECKENROD, ESQ.

22       PHONE 212-225-2086

23       FAX 212-225-3999

24       E-MAIL jrosenthal@cgsh.com

25

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

 4   Attorneys for US Debtors

 5        1201 North Market Street, 16th Floor

 6        P.O. Box 1347

 7        Wilmington, Delaware 19899-1347

 8   BY:  DEREK C. ABBOTT, ESQ.

 9        PHONE 302-351-9357

10        FAX 302-425-4664

11        E-MAIL dabbott@mnat.com

12

13

14   WILLKIE FARR & GALLAGHER LLP

15   Attorneys for UK Pension Claimants

16        787 Seventh Avenue

17        New York, New York 10019-6099

18   BY:  ANDREW HANRAHAN, ESQ.

19        PHONE 212-728-8170

20        FAX 212-728-9170

21        E-MAIL ahanrahan@willkie.com

22

23

24

25
```

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   AKIN GUMP STRAUSS HAUER & FELD LLP

 4   Attorneys for US Official Committee of Unsecured

 5   Creditors

 6        One Bryant Park

 7        New York, New York 10036-6745

 8   BY:  ABID QURESHI, ESQ.

 9        ANNE M. EVANS, ESQ.

10        PHONE 212-872-8027

11        FAX 212-872-1002

12        E-MAIL aqureshi@akingump.com

13

14

15   MILBANK, TWEED, HADLEY & McCLOY LLP

16   Attorneys for US Bondholder Group

17        One Chase Manhattan Plaza

18        New York, New York 10005

19   BY:  ATARA MILLER, ESQ.

20        NICHOLAS A. BASSETT, ESQ.

21        PHONE 212-530-5421

22        FAX 212-822-5421

23        E-MAIL amiller@milbank.com

24

25
```

HIGHLY CONFIDENTIAL                    5

1   A P P E A R A N C E S (Cont'd):

2

3   KATTEN MUCHIN ROSENMAN LLP

4   Attorneys for Wilmington Trust

5        575 Madison Avenue

6        New York, New York 10022-2585

7   BY:  DAVID A. CRICHLOW, ESQ.

8        PHONE 212-940-8941

9        FAX 212-940-8776

10       E-MAIL david.crichlow@kattenlaw.com

11

12

13  QUINN EMANUEL URQUHART & SULLIVAN, LLP

14  Attorneys for Solus Alternative Asset Management,

15  LLP and Macquarie Capital (USA), Inc.

16       51 Madison Avenue, 22nd Floor

17       New York, New York 10010

18  BY:  JAMES C. TECCE, ESQ.

19       PHONE 212-849-7199

20       FAX 212-849-7100

21       E-MAIL jamestecce@quinnemanuel.com

22

23  ALSO PRESENT:

24       DAN MACOM, Videographer

25

1    ------------------ I N D E X ------------------

2    WITNESS                EXAMINATION BY            PAGE

3    JOHN RAY               MR. PULTMAN            12, 116

4                          MR. ROSENTHAL            115

5

6    DIRECTIONS:  PAGES 102, 113, 115

7

8    ---------------- E X H I B I T S ----------------

9    RAY               DESCRIPTION              FOR I.D.

10   Exhibit 1         Notice of Debtors' Motion      13

11                     for Entry of an Order

12   Exhibit 2         E-Mail with Draft Term         21

13                     Sheet, Bates Stamped

14                     BHG-PPI-0000018 through

15                     21

16   Exhibit 3         E-Mail with Draft              47

17                     Settlement Agreement,

18                     Bates Stamped

19                     BHG-PPI-0000153 through

20                     164

21   Exhibit 4         E-Mail with Draft PPI          54

22                     Settlement Agreement,

23                     Bates Stamped

24                     BHG-PPI-0000116 through

25                     147

```
 1    ----------- E X H I B I T S (Cont'd) -----------

 2    RAY                DESCRIPTION              FOR I.D.

 3    Exhibit 5          E-Mail, Bates Stamped        62

 4                       NNI-PPI0000306 through

 5                       321

 6    Exhibit 6          E-Mail with Revised PPI       78

 7                       Settlement Agreement,

 8                       Bates Stamped

 9                       BHG-PPI-000082 through

10                       115

11

12

13            (EXHIBITS TO BE PRODUCED)

14

15

16

17

18

19

20

21

22

23

24

25
```

1              S T I P U L A T I O N S

2

3    1.  Upon completion of the transcription of today's

4    session, the original transcript shall be sent to

5    counsel for the witness by the court reporter.

6    Counsel shall promptly forward it to the witness

7    for review, correction and signature under penalty

8    of perjury.  The witness shall have 30 days from

9    the day of receipt within which to review, make any

10   corrections, sign the deposition transcript under

11   penalty of perjury, and return it to counsel.  The

12   witness' counsel shall then forward the original

13   transcript plus corrections to the court reporter,

14   who will promptly notify all counsel of its receipt

15   and any changes to testimony made by the witness.

16

17   2.  If the witness is not represented by counsel,

18   the original transcript will be sent to the witness

19   by the court reporter.  After review, correction

20   and signature within 30 days from the date of

21   receipt, the witness shall return the original

22   transcript to the court reporter, who will notify

23   all counsel of its receipt and any changes to

24   testimony by the witness. (CONT'D ON NEXT PAGE)

25

1   3.   The court reporter will retain the orig

2   transcript, including exhibits.  If, for any

3   reason, the original is lost, misplaced, not

4   returned, not signed, or unavailable, a certified

5   copy may be used in its place for all purposes.

6   The court reporter is otherwise relieved of any

7   statutory duties.

8

9                    - oOo -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2               THE VIDEOGRAPHER:  This is tape one.

3       We are now on the record.  The time is

4       1:15 p.m.  Today is Monday, September 15,

5       2014.

6               This is the opening of the

7       deposition of Mr. John Ray in the matter

8       of In Re Nortel Networks, Incorporated, et

9       al.

10              This deposition is being held at the

11      offices of Cleary, Gottlieb, Steen &

12      Hamilton, which is located at One Liberty

13      Plaza, in New York, New York.

14              Our court reporter today is

15      Ms. Melissa Gilmore with Ellen Grauer

16      Court Reporting.  I'm the legal

17      videographer, Dan Macom, also with Ellen

18      Grauer Court Reporting.

19              Will counsel please introduce

20      themselves and state whom they represent

21      for the record?

22              MR. PULTMAN:  Jacob Pultman, of

23      Allen & Overy, together with my

24      colleagues, Bradley Pensyl, Ken Coleman,

25      and Joe Badtke-Berkow.  We are here on

1                    PROCEEDINGS

2        behalf of the Canadian debtors and the

3        monitor.

4             MR. CRICHLOW:  David Crichlow,

5        Katten Muchin Rosenman, on behalf of

6        Wilmington Trust National Association.

7             MR. TECCE:  James Tecce, of Quinn

8        Emanuel, on behalf of Solus Alternative

9        Asset Management and Macquarie Bank (USA),

10       Inc.

11            MR. HANRAHAN:  Andrew Hanrahan, from

12       Willkie, Farr & Gallagher, on behalf of

13       the UK pension claimants.

14            MR. QURESHI:  Abid Qureshi and Annie

15       Evans, from Akin Gump, on behalf of the

16       official creditors committee.

17            MS. MILLER:  Atara Miller and

18       Nicholas Bassett, from Milbank, Tweed,

19       Hadley & McCloy, on behalf of the ad hoc

20       group of bondholders.

21            MR. ROSENTHAL:  Jeff Rosenthal,

22       along with Lisa Schweitzer and Russell

23       Eckenrod, on behalf of the US debtors and

24       the witness.

25            THE VIDEOGRAPHER:  Will our court

1          reporter please swear in the witness?

2               (Witness sworn.)

3

4     EXAMINATION BY

5     MR. PULTMAN:

6          Q.   Good afternoon, Mr. Ray.  You have

7     been deposed in this case before?

8               MR. ROSENTHAL:  Jay, before you

9          begin, I just wanted to say, until the

10         parties have a chance to review the

11         transcript, we would like this to be

12         considered highly confidential, and also

13         that we consider the transcript only to be

14         used in connection with the PPI motion

15         before the US court.

16              And anybody has any disagreement,

17         let us know, and we could seek guidance

18         from the US court on that.

19              MR. PULTMAN:  Sure.

20    BY MR. PULTMAN:

21         Q.   Mr. Ray, going back to my question,

22    you have been deposed in this case before?

23         A.   Yes.

24         Q.   Do you understand that you have been

25    designated as a witness in connection with an

1               RAY - HIGHLY CONFIDENTIAL

2    upcoming hearing on November 4, 2014?

3        A.    Yes.

4        Q.    And do you understand that that

5    testimony relates to a proposed settlement

6    agreement in a matter we will call the PPI

7    matter?

8        A.    Yes.

9        Q.    I'm going to have marked and show

10   you a document entitled Notice of Debtors'

11   Motion for Entry of an Order, and we will have

12   it marked as Ray Exhibit 1, and it's a

13   multi-page document.

14               (Ray Exhibit 1, Notice of Debtors'

15          Motion for Entry of an Order, marked for

16          identification.)

17               MR. ROSENTHAL:  Just to be clear,

18          Jay, it's the notice of motion and the

19          notice together?

20               MR. PULTMAN:  Just so we're all

21          clear, it's a document that, at the top

22          bears the document number 14076-3 filed on

23          7/24/14.  The first two pages are a notice

24          of motion.  The next 20 pages are debtors'

25          motion for entry of an order, and the next

```
 1              RAY - HIGHLY CONFIDENTIAL
 2         43 pages -- sorry -- the next five pages
 3         are a proposed order, and the next 43
 4         pages are Exhibit B, a proposed settlement
 5         agreement.
 6         Q.    Mr. Ray, have you seen this document
 7    before?
 8         A.    Yes.
 9         Q.    Did you see it before it was filed
10    with the court in Wilmington, Delaware?
11         A.    Yes.
12         Q.    And did you see it in your role as
13    principal officer of NNI?
14         A.    Yes.
15         Q.    Did you approve the filing of this
16    document before it was filed?
17         A.    Yes.
18         Q.    Have you had an opportunity to
19    review it since that time?
20         A.    Yes.
21         Q.    To your knowledge, are there any
22    errors or misstatements in this document?
23         A.    No.
24         Q.    In your role as principal officer of
25    NNI, were you involved in approving the filing
```

1              RAY - HIGHLY CONFIDENTIAL

2    of this document, Ray Exhibit 1?

3         A.    Yes.

4         Q.    Was the board of directors of NNI

5    involved in approving the filing of this

6    document, Ray Exhibit 1?

7         A.    No.

8         Q.    Does NNI currently have a board of

9    directors?

10        A.    Yes.

11        Q.    And does it have more than one

12   director?

13        A.    No.

14        Q.    Is the director a Fernando Guerra

15   Saenz?

16        A.    Yes.

17        Q.    Did I mispronounce that?

18        A.    He is otherwise known as Luiz

19   Guerra, yes.

20        Q.    Is he the sole board member of NNI

21   currently?

22        A.    Yes.

23        Q.    To your knowledge, did he review the

24   document that's been marked Ray Exhibit 1?

25        A.    No.

```
1              RAY - HIGHLY CONFIDENTIAL
2       Q.    To your knowledge, did he approve
3  the filing of Ray Exhibit 1?
4       A.    No.
5       Q.    Can you describe what your
6  involvement was in connection with the proposed
7  PPI settlement?
8              MR. ROSENTHAL:  Objection, vague.
9              You can answer.
10      A.    I negotiated the basic terms of the
11 document.
12      Q.    And when you say you negotiated the
13 basic terms, can you tell me when the
14 negotiation of the basic terms began?
15      A.    For me, I think the first
16 discussion, I can't be exact around the dates,
17 but I believe it was the week of the 14th of
18 July, 2014.
19      Q.    Prior to July 2014, did you have any
20 discussions with anyone at Milbank relating to
21 a potential PPI settlement?
22      A.    No.
23      Q.    Did you have discussions with anyone
24 else on behalf of the bonds prior to July 2014
25 about a potential settlement of the PPI issue?
```

```
 1                RAY - HIGHLY CONFIDENTIAL
 2        A.     No.
 3        Q.     And to your knowledge, did the board
 4   of directors of NNI approve the proposed
 5   settlement, the PPI settlement?
 6        A.     No.
 7        Q.     To your knowledge, was there ever a
 8   presentation to the board about the proposed
 9   settlement?
10        A.     No.
11        Q.     Other than you, was there any other
12   employee of NNI or representative of NNI
13   involved in the negotiation of the proposed
14   settlement?
15        A.     What do you mean by --
16               MR. ROSENTHAL:  Objection to form.
17        A.     Can you define what you mean by
18   representative?
19        Q.     Sure.  Let's start with employees.
20   Were there any other people employed by NNI who
21   were involved in negotiating the proposed
22   settlement?
23        A.     No.
24        Q.     Now, is it fair to say, on a
25   day-to-day basis, you make the decisions for
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   NNI?
 3        A.    Yes.
 4        Q.    And you consult with and report to
 5   the NNI board member as necessary?
 6        A.    Only as necessary.
 7        Q.    Do you think proposing a $1 billion
 8   settlement is something in which the board of
 9   NNI was necessary?
10        A.    No.
11        Q.    Now, we asked about employees of NNI
12   and we asked about the board of NNI.
13              Were there outside attorneys for NNI
14   involved in the negotiation of the proposed
15   settlement?
16        A.    When you say -- could you be more
17   specific when you say involved?  Repeat the
18   question.
19        Q.    Sure.  You said you were involved in
20   negotiating the proposed PPI settlement.
21        A.    Yes.
22        Q.    And you said that that began
23   somewhere in the middle of July of 2014.
24        A.    Correct.
25        Q.    Were there any lawyers for NNI who
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   were also involved in the negotiations?
 3        A.    There was lawyers at Cleary that
 4   were involved in attendance during those
 5   negotiations.
 6        Q.    Were there lawyers for NNI from any
 7   other firm involved?
 8        A.    No.
 9        Q.    And other than the attorneys from
10   Cleary, did you have any financial advisors who
11   were involved on behalf of NNI in the
12   negotiation of the settlement agreement?
13        A.    Cleary had, in its attendance, a
14   representative of Chilmark.
15        Q.    Who was the representative of
16   Chilmark?
17        A.    Michael Kennedy.
18        Q.    Anyone else from Chilmark involved
19   in the negotiation?
20        A.    No.
21        Q.    Beyond the Cleary people, yourself
22   and Michael Kennedy, was there anyone else
23   involved on behalf of NNI in the negotiation of
24   the PPI settlement?
25        A.    No.
```

1              RAY - HIGHLY CONFIDENTIAL

2        Q.    To your knowledge, are there board

3   resolutions of the NNI board approving the

4   proposed settlement?

5        A.    No.

6        Q.    To your knowledge, was the board

7   member of NNI in any way contacted with respect

8   to the proposed NNI settlement?

9        A.    No.

10        Q.    Were there drafts of the settlement

11   agreement prior to the final draft?

12        A.    Yes.

13        Q.    And can you tell me, sitting here

14   today, how many drafts there were of the

15   agreement?

16        A.    It's hard to be certain from

17   recollection, but I can recall at least three

18   drafts.

19        Q.    Between June 16 of 2014 and July 14

20   of 2014, did you have any involvement in

21   communications with respect to a potential PPI

22   settlement?

23        A.    I had conversations with counsel for

24   the company.

25        Q.    And you are referring to outside

**HIGHLY CONFIDENTIAL**                    21

1              RAY - HIGHLY CONFIDENTIAL

2      counsel for NNI?

3          A.    Yes.

4          Q.    Okay.  For the moment, let's not get

5      into the substance of those conversations.  We

6      will talk about that later.

7              Did you have conversations with

8      anyone representing the bonds prior to the

9      July 14, 2014 time frame?

10         A.    No.

11             MR. PULTMAN:  I'm going to have

12         marked, as Ray Exhibit 2, a draft term

13         sheet.  And I will put the Bates Numbers

14         and the Bates range on the record.  And

15         for the record, the document bears Bates

16         numbers BHG-PPI-0000018 through 21.

17             (Ray Exhibit 2, E-Mail with Draft

18         Term Sheet, Bates Stamped BHG-PPI-0000018

19         through 21, marked for identification.)

20         A.    (Perusing.)

21         Q.    Mr. Ray, have you had an opportunity

22     to review the document that's been marked Ray

23     Exhibit 2?

24         A.    Yes.

25         Q.    Have you seen this document before?

```
1              RAY - HIGHLY CONFIDENTIAL
2              MR. ROSENTHAL:  I'm going to just
3         instruct the witness, that for all
4         questions, when you're asked about seeing
5         documents in the past, that he exclude
6         anything he has seen in connection with
7         the preparation for this deposition.
8         Q.   Let me take on board your counsel's
9    direction.  I'm not asking you, at the moment,
10   whether you were prepared with this document,
11   sat down and reviewed the document.
12              I'm asking you, prior to your
13   preparation for the deposition, have you seen
14   Ray Exhibit 2 before?
15              MR. ROSENTHAL:  Could he just have
16         that instruction for all questions, unless
17         you say otherwise?
18              MR. PULTMAN:  Happy to have that as
19         a standing direction.
20         A.   I may have.  I can't be certain.  I
21   don't have a specific recollection of it,
22   but...
23         Q.   Did you attend a meeting on July 15,
24   2014, at the offices of Cleary Gottlieb with
25   respect to a PPI settlement discussion?
```

1              RAY - HIGHLY CONFIDENTIAL

2        A.     Yes.

3        Q.     And in advance of that meeting, did

4   you look at a draft term sheet in connection

5   with the settlement discussion you were going

6   to have?

7        A.     Yes.

8        Q.     Does this appear to be that draft

9   term sheet that you reviewed?

10       A.     I believe I had indicated, I don't

11  recall whether this was the specific document

12  that I had looked at in advance of that

13  meeting.

14       Q.     Did you look at a term sheet that

15  was drafted by someone other than the Milbank

16  firm prior to that meeting?

17       A.     No.

18       Q.     Did your lawyers draft any term

19  sheets prior to the July 15 meeting?

20       A.     No.

21       Q.     How did you come to learn of the

22  July 15 meeting?

23       A.     Dennis Dunne from Milbank and I

24  talked prior to the meeting to essentially set

25  the meeting up for that Tuesday.

1                    RAY - HIGHLY CONFIDENTIAL

2          Q.     Dennis Dunne is a lawyer at Milbank?

3          A.     Yes, he is.

4          Q.     And who did Dennis Dunne represent?

5          A.     He represents the bondholders.

6          Q.     Did you know Dennis Dunne prior to

7     this conversation that you had with him?

8          A.     Yes.

9          Q.     From where?

10                MR. ROSENTHAL:  Objection to form.

11                You can answer.

12         A.     From this case.

13         Q.     Did you know Dennis Dunne at Milbank

14    from any other case prior to the Nortel matter?

15         A.     Yes.  He was also involved in the

16    OSG matter where I was the CRO, and he has been

17    involved in other cases.

18         Q.     When did you first become acquainted

19    with Mr. Dunne?

20         A.     December 1999.

21         Q.     So that's almost 15 years ago?

22         A.     Correct.

23         Q.     And the OSG case you referred to, is

24    that the Overseas Shipholding Group case?

25         A.     Yes, it is.

```
 1                RAY - HIGHLY CONFIDENTIAL
 2        Q.     And that's the one where you're the
 3   chief restructuring officer?
 4        A.     Not presently.
 5        Q.     You were previously the chief
 6   restructuring officer for OSG?
 7        A.     Correct.
 8        Q.     And you still have some role with
 9   respect to the OSG bankruptcy?
10        A.     Correct.
11        Q.     And Mr. Dunne's role with respect to
12   that bankruptcy is what?
13        A.     Mr. Dunne represented the agent for
14   the pre-petition bank group.
15        Q.     Fifteen years ago, when you first
16   met Mr. Dunne, in what context was that?
17        A.     In connection with the Fruit of the
18   Loom Chapter 11 case.
19        Q.     And Fruit of the Loom is where you
20   were general counsel and held other positions
21   previously?
22        A.     That's correct.
23        Q.     And what was Mr. Dunne's connection
24   with the Fruit of the Loom matter?
25        A.     Debtors' counsel.
```

```
 1                RAY - HIGHLY CONFIDENTIAL
 2        Q.    You said that there were others.
 3              Are there others that you can
 4   remember sitting here today?
 5        A.    Yes, Enron.
 6        Q.    And you had a role in the Enron
 7   bankruptcy?
 8        A.    Yes, I did.
 9        Q.    And what was Mr. Dunne's role in the
10   Enron bankruptcy?
11        A.    He was counsel for the creditors
12   committee.
13        Q.    Any other cases that you had
14   interactions with Mr. Dunne?
15        A.    Not that I can recall.
16        Q.    Are you familiar with a matter
17   called -- let me withdraw that.
18              Did you reach out to Mr. Dunne or
19   did Mr. Dunne reach out to you in this first
20   conversation?
21              MR. ROSENTHAL:  Objection to form.
22        A.    I don't recall if -- who reached out
23   to whom, and I don't recall whether or not it
24   was specifically about this matter or another
25   matter or a different topic within this matter.
```

```
1                RAY - HIGHLY CONFIDENTIAL
2        Q.    Are you familiar with a matter
3   called ACB?
4        A.    No.
5        Q.    At the time that you had a
6   conversation with Mr. Dunne, was counsel for
7   NNI on the phone?
8        A.    The initial call, no.  No counsel
9   was involved.
10        Q.    Do you know whether Mr. Dunne sought
11   agreement of your counsel to have a
12   conversation with you even though you were
13   represented by counsel?
14        A.    I don't know.
15        Q.    Are you familiar with the
16   disciplinary rules in New York, Disciplinary
17   Rule 4.2?
18             MS. MILLER:  Objection.
19        A.    No, I am not.
20        Q.    At any point in time, did Mr. Dunne
21   seek permission of your -- of you or your
22   counsel to have a communication with someone
23   represented by counsel?
24             MS. MILLER:  Objection.
25        A.    I don't know whether he communicated
```

1              RAY - HIGHLY CONFIDENTIAL

2    with counsel.  Had he communicated to me, I

3    would have consented to it.

4         Q.    The conversation you had with

5    Mr. Dunne setting up the meeting on the 15th of

6    July, can you describe that conversation to the

7    best of your recollection sitting here today?

8         A.    Yes, he asked if -- if Cleary and I

9    would be available for a meeting on Tuesday,

10   the 15th, or either Monday or Tuesday, the 14th

11   or 15th, to discuss a proposal related to the

12   settlement of the PPI dispute.  And the entire

13   conversation, it was very brief, and it was

14   really more or less around the mechanics,

15   meeting location.  So just mostly a logistical

16   call.

17        Q.    Can you estimate the length of the

18   call?

19        A.    It couldn't have been more than five

20   minutes, ten minutes, maybe.  Maybe.  I don't

21   know.

22        Q.    Was there any discussion of the

23   substance of the PPI dispute?

24        A.    No.

25        Q.    Was there any discussion of the

```
1                RAY - HIGHLY CONFIDENTIAL
2    status of the PPI matter before the Canadian
3    and US courts?
4         A.    No.
5         Q.    Was there anyone else on the phone
6    besides you and Mr. Dunne?
7         A.    No.
8         Q.    Did he place the call or did you
9    place the call?
10              MR. ROSENTHAL:  Objection to form.
11        A.    I don't recall.  I thought I said
12   that I didn't recall who called whom, and
13   whether it was about this matter or some other
14   matter or a different matter within this
15   matter.  I think I said that, didn't I?
16        Q.    I think you may have.  My apologies.
17              Were you an a cell phone or a
18   landline?
19        A.    I don't recall.
20        Q.    Was Mr. Dunne on a cell phone or a
21   landline?
22        A.    I don't know.
23        Q.    Now, the meeting that took place on
24   the 15th of July at Cleary Gottlieb -- did that
25   take place at Cleary Gottlieb's offices?
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2        A.    Yes.
 3        Q.    And who attended on behalf of NNI?
 4        A.    Lisa Schweitzer.  There may have
 5   been other lawyers at Cleary, but I don't
 6   recall.  And then Lisa had invited Mike Kennedy
 7   to the meeting.
 8        Q.    Were you in attendance at the
 9   meeting as well?
10        A.    Yes.
11        Q.    Anyone else on the NNI side?
12        A.    No.
13        Q.    Was Mr. Dunne in attendance at the
14   meeting?
15        A.    Yes, he was.
16        Q.    And was he the only one from the
17   Milbank firm in attendance?
18        A.    No.  There were two others, Andrew
19   Leblanc and Albert Pisa.
20        Q.    Did you know Mr. Leblanc prior to
21   this meeting?
22        A.    Yes.
23        Q.    Did you mow Mr. Pisa prior to this
24   meeting?
25        A.    Yes.
```

```
 1                RAY - HIGHLY CONFIDENTIAL
 2         Q.    Did you communicate with either one
 3    of them prior to this meeting?
 4                MR. ROSENTHAL:  Objection to form.
 5         About PPI?
 6         Q.    About the PPI matter.
 7         A.    No.
 8         Q.    Did you know Mr. Pisa from other
 9    matters?
10         A.    No.  I knew him from NNI.
11         Q.    And did you know Mr. Leblanc from
12    other matters prior to Nortel?
13         A.    No, I did not.
14         Q.    Anyone else there from the Milbank
15    firm?
16         A.    No.
17         Q.    Anyone else there on behalf of the
18    bonds?
19         A.    Yes, Mike Katzenstein from FTI.
20         Q.    And just so we're clear,
21    Mr. Katzenstein is at an outside financial
22    consulting group?
23         A.    He is with the FTI.
24         Q.    And FTI works with the bonds?
25         A.    I believe they're the financial
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2    consultant to Milbank.
 3         Q.    Okay.  Anyone else there for the
 4    bonds?
 5         A.    I believe Melker Sandberg from FTI
 6    was there as well.
 7         Q.    And his last name, Sandor?
 8         A.    Sandberg.
 9         Q.    Sandberg.
10               Anyone else there for the bonds?
11         A.    I believe that was the attendance
12    list.  I don't think there was anyone else.
13         Q.    When you say that was the attendance
14    list, was there no one else at the meeting at
15    all?
16         A.    I don't think so.  I don't think so.
17         Q.    Do you recall what time of day the
18    meeting took place?
19         A.    I would say it was somewhere around
20    noon or 1 o'clock in the afternoon.
21         Q.    How long did the meeting last?
22         A.    I believe it lasted the balance of
23    the day.
24         Q.    Can you estimate the number of
25    hours?
```

```
 1                   RAY - HIGHLY CONFIDENTIAL
 2        A.      I think we were probably done by
 3   5 o'clock, but I can't be certain.  It may have
 4   been a little longer.
 5        Q.      Okay.  To the best of your
 6   recollection, can you describe what was said at
 7   the meeting?
 8        A.      Yes.  There was a desire on their
 9   part to, on behalf of the bonds, to settle, to
10   allow their claim amount, which was previously
11   not allowed, meaning the exact amount of the
12   claim had not been set or established.  So they
13   were seeking to set the amount of the claim,
14   and they also desired to settle the dispute as
15   to how much in PPI that they were entitled to.
16              That was the beginning of the
17   meeting.  And they put a demand, if you will,
18   on the table related to the amount of the PPI
19   entitlement.
20              I don't recall discussing at great
21   length the amount of the actual pre-petition
22   balance, but that was largely a number that,
23   you know, within a range people had an
24   understanding about.  The conversation centered
25   mostly on the PPI amount, and they put a demand
```

1           RAY - HIGHLY CONFIDENTIAL

2    on the table orally.  It was not in the term

3    sheet related to what they were entitled to.

4           Q.    Did they put a demand on the table

5    with respect to the claim that they sought to

6    have as an allowed claim?

7           A.    I believe they -- yes, they did.

8    They told us what that allowed claim was.  I

9    think we left it for discussion, a subsequent

10   discussion, as I recall, so that we could, you

11   know, compare that to our number and -- but it

12   wasn't -- it wasn't a complete focus of the

13   meeting.  The meeting mostly centered on the

14   amount of the claim.

15          Q.    So let's start with what did they

16   express to you as their demand on the allowed

17   claim?

18          A.    They asked for 70 percent of the

19   estimated PPI balance, you know, as of June 30,

20   an approximate amount.

21          Q.    And was there any discussion as to

22   what 70 percent -- 70 percent of what?

23          A.    Yes.  The amount that was estimated

24   was -- was the same amount as the monitor had

25   been using, 1.6 billion.

```
1                   RAY - HIGHLY CONFIDENTIAL
2        Q.     Is that 1.6 or is it 1.65?
3        A.     There may have been -- that's just a
4   rounded number.  There was an amount in excess
5   of a billion six.  Whether that was a few
6   hundred thousand or half a million dollars, I
7   don't quite recall, but it was over a billion
8   six.
9        Q.     And did NNI have a response to their
10  proposal or their demand?
11       A.     Well, we -- we did have a response,
12  ultimately.  I broke in the meeting, and we had
13  a separate break-out room, and I discussed with
14  counsel and, also the financial advisor,
15  Chilmark, Mike Kennedy, the potential
16  counteroffer.
17       Q.     Did you make a counteroffer?
18       A.     We did.  We counteroffered at
19  30 percent of the $1.6 billion amount.
20       Q.     So if I understand it, their demand
21  was 70 percent.  Your response was 30 percent?
22       A.     Yes.
23       Q.     And that counteroffer was
24  communicated at the meeting?
25       A.     Yes, it was.  We went back into the
```

1              RAY - HIGHLY CONFIDENTIAL

2    room and communicated our counteroffer.

3        Q.    Okay.  Was that the end of the

4    meeting or were there continued discussions

5    after that?

6        A.    There were continued discussions.

7    They took some time to discuss it amongst

8    themselves, and then came back and there was

9    further negotiation, you know, back and forth,

10   ultimately, over a, you know, the time period

11   that afternoon.  And then, ultimately, the

12   meeting broke up without resolution.

13       Q.    Can you tell me what the back and

14   forth was after the 70 percent demand, the

15   30 percent counteroffer?

16       A.    Yes.  As I recall, and I may miss an

17   iteration in here on the back and forth, but I

18   think their counteroffer was a number that was

19   60 or above.  We moved to a number that was 40

20   or above.

21            There was discussions about trying

22   to close the gap, but as I recall, we didn't

23   achieve it, you know, at that meeting.

24       Q.    Was there any discussion in the

25   communications between the bonds and NNI about

1              RAY - HIGHLY CONFIDENTIAL

2    the status of the PPI dispute in front of the

3    court in Wilmington?

4         A.    Well, at that meeting, I mean, there

5    was discussions about why the bonds felt they

6    were entitled to the full contractual amount of

7    PPI to support their demand.

8         Q.    Was there any response by NNI as to

9    what NNI believed was likely to occur?

10        A.    There was discussions by the group

11   about the various positions that had been taken

12   in the briefing on PPI.  There were discussions

13   about the monitor's and the Canadian debtors'

14   position relative to PPI, and the other

15   briefings that were done, certainly, and,

16   basically, in effect, being the range of, you

17   know, potential outcomes in both the

18   entitlement and the amount of PPI.

19        Q.    And can you tell me, to the best of

20   your recollection, what was said with respect

21   to the potential outcomes?

22        A.    There was discussion about the bonds

23   indicated that they felt firmly in their view,

24   both as to the entitlement and the amount of

25   the PPI which, you know, at that point, was

1               RAY - HIGHLY CONFIDENTIAL

2    continuing to grow as, you know, as accruals

3    continued.

4               And, you know, we simply, you know,

5    discussed, you know, the positions taken by,

6    you know, by other parties that were in the

7    papers with mostly the Canadian debtors and the

8    monitor, you know, as well as other entrusted

9    parties that had filed papers, and was more or

10   less a dialogue around those positions.

11       Q.    Other than communicating what the

12   position was that was expressed by the Canadian

13   monitor and the Canadian debtors, did you

14   express the view that you thought the bonds

15   were going to get less than 100 percent?

16       A.    First of all, I think you can kind

17   of split this discussion into kind of two

18   pieces.  I believe that there was entitlement

19   to post-petition interest.  So, in my mind,

20   that was not really a debate.

21               I believe that the entitlement was

22   there.  I think the contracts provided for

23   interest.  I believed that the -- in Chapter

24   11, if a debtor was solvent, that post-petition

25   interest was payable.  So there was not much of

1              RAY - HIGHLY CONFIDENTIAL

2    a debate in my mind around that view.  I had

3    taken a view that that was the correct point of

4    view from a Chapter 11 perspective.

5                 There was discussions about, you

6    know, whether or not parties might be

7    successful in arguing for a lesser amount that

8    people were then entitled to.  And while I

9    didn't necessarily have the view that the court

10   would -- in the US would find an amount less

11   than the full entitlement, certainly, there

12   were opposing positions taken and, you know, I

13   guess I considered that -- that you had to give

14   some weight of authority to those positions, so

15   that, you know, the outcome, ultimately, was

16   not something that was really possible to be

17   determined absent, you know, ultimately, a

18   court ruling and presumably appeals that might

19   follow.

20        Q.    And when you said that I believe

21   there's an entitlement under the contract, did

22   you analyze the US law with respect to that

23   entitlement?

24                 MR. ROSENTHAL:  Objection to form.

25                 Are you asking did he personally or

```
 1                 RAY - HIGHLY CONFIDENTIAL
 2          did he receive advice?
 3          Q.    No.  Did you personally?  I'm not
 4    asking what advice you received.
 5          A.    No, not personally, no.
 6          Q.    But you had a view as to the
 7    entitlement?
 8          A.    Yes.
 9          Q.    And is it fair to say NNI never
10    expressed that view to the court as to what the
11    entitlement would be of the bonds to contract
12    rate PPI?
13          A.    Are you asking, did NNI submit a
14    position paper to the court related to NNI?
15          Q.    Well, let's divide it between the
16    procedure as to when the issue should be heard,
17    and what position NNI took with respect to
18    that.
19          A.    I don't recall what was said or not
20    said in front of the US court related to that
21    issue.
22          Q.    Do you know whether or not NNI has
23    taken a position as to the bond's entitlement
24    to PPI?
25                 MR. ROSENTHAL:  In court, or you're
```

1           RAY - HIGHLY CONFIDENTIAL

2       not talking about in court anymore?

3       Q.    I'm talking about in court.  Do you

4   know what position NNI has taken with the

5   bankruptcy court in Delaware as to the bond's

6   entitlement of PPI?

7               MR. ROSENTHAL:  Objection to form.

8               You can answer.

9       A.    I don't believe we have taken a

10  position until the settlement.

11      Q.    Well, in the settlement, is it your

12  understanding that NNI has taken the position

13  as to the bond's legal entitlement to the

14  contract rate PPI?

15      A.    Yes, I believe that is our position.

16      Q.    And is it your position that you

17  have expressed to the bankruptcy court that the

18  bonds are entitled to NNI -- the PPI at the

19  contract rate?

20              MR. ROSENTHAL:  Objection, asked and

21      answered.

22      A.    The settlement embodies what we

23  believe is entitlement to PPI.  The amount is a

24  settled amount, not at the contract rate.

25      Q.    Just so I'm clear, that's the

1                    RAY - HIGHLY CONFIDENTIAL

2       settled amount that goes up to the cap of

3       $1.01 billion?

4            A.    It starts at 847 million.

5            Q.    When you say it starts at

6       $847 million, under the proposed settlement

7       agreement, when does that start at

8       $847 million?

9                    MR. ROSENTHAL:  Objection to form.

10                   You can answer.

11           A.    There is an ability to continue to

12      accrue interest from the date of settlement or

13      the date of approval of the court order.  I

14      would have to go back and read it, but it's

15      ultimately capped out at June 15, 2015.

16                   However, the accrual only occurs

17      with respect to undistributed amounts prior to

18      that date.

19                   So if the full amount of principal

20      was not distributed to the bonds prior to

21      June 15 of 2015, then the accrual would occur

22      on the full balance until such date, at which

23      point the accrual would cease.

24           Q.    Let's take that in pieces.  Is it

25      possible that the actual date is June 30, 2015?

1                    RAY - HIGHLY CONFIDENTIAL

2          A.    Yes, it could be.

3          Q.    On the day of the filing of the

4    motion that's been marked as Ray Exhibit 1,

5    July 24, 2014, if you calculated that accrued

6    interest, was it a number already in excess of

7    $847 million?

8               MR. ROSENTHAL:  Objection to form.

9          A.    I don't recall.

10         Q.    Well, do you recall when the accrual

11   of interest began under the settlement

12   agreement?

13         A.    I would have to -- I would have to

14   go back and figure out the -- the number.

15         Q.    Is it fair to say that NNI sought to

16   have a hearing on the proposed 9019 motion, the

17   proposed settlement motion on September 15,

18   2014?

19         A.    I believe so.  I believe that's the

20   date we requested initially, yes.

21              MR. ROSENTHAL:  Today, coincidently.

22         Q.    And is it correct to say that, under

23   the settlement agreement that was proposed,

24   with the accrual of interest, the amount of the

25   settled PPI interest, if the decision had come

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   down today, would be in excess of $904 million?
 3        A.    I have not done that math myself.
 4        Q.    Is it fair to say that if the date
 5   that the hearing is currently scheduled,
 6   November 4, 2014, it's approved -- if the
 7   proposed settlement agreement is approved that
 8   day, the settlement amount, and paid that day,
 9   will be in excess of 922 and a half million
10   dollars?
11        A.    I'd have to go back and do that
12   calculation.
13        Q.    Do you have any reason to believe
14   that those numbers are inaccurate?
15        A.    I have no reason to believe they are
16   accurate or inaccurate.
17        Q.    In the discussions at the offices of
18   Cleary Gottlieb on the 15th of July --
19        A.    Uh-huh.
20        Q.    -- how were things left?
21             MR. ROSENTHAL:  You're referring to
22        discussions with the bonds specifically?
23        Q.    Bonds specifically, yes.
24             MR. PULTMAN:  Thank you.
25        A.    It was just left that both sides
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   would think about it, discuss it with
 3   themselves, and I believe that there was a --
 4   we would look at the draft term sheet, and I
 5   think we were going to go back and redraft or
 6   make our comments on the term sheet, and that's
 7   how it was left.
 8        Q.    To your knowledge, were comments on
 9   the term sheet ever communicated to Milbank?
10        A.    Yes, there would have been.  I mean,
11   there was an exchange of drafts and black
12   lines, two or three versions that went back and
13   forth, and I don't recall -- I think Cleary may
14   have generated one, and I think Milbank
15   generated one or two.  I don't remember, you
16   know, what the order of that was as I sit here,
17   you know, two months later, but there was a few
18   drafts.
19        Q.    And when you say a few drafts,
20   you're referring to specifically drafts of a
21   term sheet?
22        A.    Either a term sheet or -- I don't
23   want to get hung up in terminology, if there's
24   some trick to that, but whether it's a term
25   sheet, a document which embodied the
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2    settlement, a draft settlement agreement, you
 3    know, I don't -- I don't want to get too cute
 4    with the words.
 5         Q.    There's no trick to the language.
 6    We've only been provided with the July 15 term
 7    sheet, when it comes to term sheets.  So if
 8    there are other draft term sheets that you
 9    recall, I would like to know that, so I can
10    make the request.
11         A.    There would have been a couple
12    drafts of a term sheet with markups.  I think
13    it's the same term sheet, but...
14         Q.    Okay.  After the meeting on the
15    15th, what were the next communications that
16    you had with anyone on the bond side?
17         A.    I don't recall, you know, the dates
18    specifically.  There were conversations that --
19    that I would have had with Dennis Dunne after
20    the meeting.  There were conversations that --
21    I think there was at least -- I believe one
22    phone call that they had multiple people on the
23    call.  It could have been Dennis Dunne, Andy
24    Leblanc, Al Pisa.  I didn't take record
25    necessarily of everybody on the call, but I
```

1                RAY - HIGHLY CONFIDENTIAL

2      think we had a group call, and I would have had

3      counsel for the company on the call.

4           Q.   Do you recall when that conversation

5      took place?

6           A.   No, I don't have a recollection.  It

7      would have been sometime between July 14 and

8      ultimately the 23rd, when the settlement was

9      finalized.

10          Q.   Okay.  But let's see if we can drill

11     down on that.

12               You told us about a meeting on the

13     15th at Cleary's offices, which was a Tuesday.

14               Do you recall that?

15          A.   Yes.

16               MR. PULTMAN:  I'm going to have

17          marked, as Ray Exhibit 3, a document, an

18          e-mail and draft settlement agreement

19          regarding PPI bearing Bates numbers

20          BHG-PPI-0000153 through 164.

21               (Ray Exhibit 3, E-Mail with Draft

22          Settlement Agreement, Bates Stamped

23          BHG-PPI-0000153 through 164, marked for

24          identification.)

25          A.   (Perusing.)

```
1              RAY - HIGHLY CONFIDENTIAL
2         Q.    Have you had an opportunity to
3    review the document we have marked as Ray
4    Exhibit 3?
5         A.    Yes.
6         Q.    Have you seen this document before?
7         A.    Yes.
8         Q.    Can you tell me when you first saw
9    this document?
10        A.    It would presumably either have been
11   the 17th or the 18th.
12        Q.    Is this the first draft of a
13   settlement agreement of the PPI matter that was
14   exchanged, to your knowledge?
15        A.    I believe so.
16        Q.    Were there other term sheets that
17   led up to the drafting of this draft settlement
18   agreement?
19        A.    Other than the summary of indicative
20   terms that you provided, I think this was the
21   only -- this was the next thing, I believe,
22   that followed.
23        Q.    And when you say summary of
24   indicative terms, you're referring to Ray
25   Exhibit 2?
```

1                 RAY - HIGHLY CONFIDENTIAL

2         A.    Yes.

3         Q.    Which is the term sheet that came

4    around on Monday, the 14th?

5         A.    It came to Lisa Schweitzer on the

6    14th, yes.

7         Q.    And then you had the meeting on the

8    15th?

9         A.    Yes.

10        Q.    And the first -- the next document

11   to come to be exchanged was the draft agreement

12   on the 17th?

13        A.    I believe so, yes.

14        Q.    How did the numbers in Sections 2.1

15   and 2.2 come to be in this draft agreement?

16             MR. ROSENTHAL:  Objection to form.

17        Q.    Let's take 2.2.  Do you see the

18   provision 2.2 that says, "The PPI settlement

19   amount shall be an amount up to 60 percent of

20   the aggregate amount of accrued PPI"?

21        A.    Yes.

22        Q.    And how did that 60 percent come to

23   be in this draft, to your knowledge?

24             MR. ROSENTHAL:  Objection to form.

25        A.    It was put in the document by the

1                RAY - HIGHLY CONFIDENTIAL

2    author of the document.

3        Q.    Did you have any conversations with

4    the folks at Milbank about the numbers after

5    the meeting on the 15th, prior to receipt of

6    this on the 17th?

7        A.    I don't recall specifically when,

8    you know, I had calls.  I'm probably certain I

9    probably had a call between the sit-down

10   meeting and when this draft was produced, but

11   this number is consistent with the demand they

12   made on Tuesday, the 15th.  It's the

13   60 percent.

14       Q.    And when you say consistent with

15   demand, you're referring to the last demand

16   that came from the bond side at the meeting on

17   the 15th?

18       A.    Yes.

19       Q.    And if I recall correctly, you said

20   that the last number that was offered by NNI at

21   that meeting was something in the order of

22   40 percent or above?

23       A.    Yeah.  I don't recall whether we had

24   moved, at that meeting, above the 40 percent.

25   We may have moved up at that meeting to as high

1                  RAY - HIGHLY CONFIDENTIAL

2    as a number, you know, that approximated 50

3    during that meeting, but I don't -- I don't

4    recall whether it was at that meeting or

5    whether it was the subsequent calls that we may

6    have had.

7         Q.   Is it fair to say, at some point in

8    time, NNI moved its number up from the

9    40 percent and above number to 50 percent and

10   above?

11        A.   It's fair to say that because that's

12   ultimately where we ended up, is north of that.

13   I don't recall exactly what point in the

14   negotiations we did that relative to time or

15   date specific, but at that time of this

16   document, we had not agreed to a number.

17        Q.   What led NNI to move off of the

18   40 percent number that it was at, at the

19   meeting on Tuesday, the 15th?

20        A.   Ultimately, you know, we thought

21   that a number that was around 60 percent, we

22   thought, you know, was a fair settlement of it.

23   You know, we thought 70 was too high.

24             So our negotiating, you know,

25   strategy was to, you know, counteroffer with a

1              RAY - HIGHLY CONFIDENTIAL

2     much lower number, so that we could end up at a

3     number that we felt comfortable with, and so

4     that was just part of a back and forth, but,

5     ultimately, you know, based on the movement

6     down to 60, we felt comfortable we could get to

7     a spot that was -- was something that was

8     acceptable to us and, therefore, didn't have a

9     problem moving up to -- to 50.

10         Q.    You said, I believe, "Ultimately,

11    you know, we thought that a number that was

12    around 60 percent, we thought, you know, was a

13    fair settlement."

14              Is that what you said?

15         A.    Yes.

16              MR. ROSENTHAL:  Objection, speaks

17         for itself.

18              You have the transcript in front of

19         you.  He doesn't.  You don't need to ask

20         him what the transcript says.

21         Q.    I want to make sure it's not

22    mistranscribed and that, in fact, you said that

23    you thought 60 percent was a fair settlement in

24    your view.

25         A.    We thought a number that was

1              RAY - HIGHLY CONFIDENTIAL

2    approximately 60 percent was a fair settlement.

3         Q.    Now, the number 60 percent of

4    1.65 billion, did you have an understanding as

5    to what that yields?

6              MR. ROSENTHAL:  Objection to form.

7         A.    I could do the math.  I think this

8    document indicates that it would have yielded

9    990, so that sounds right from looking at the

10   math.

11        Q.    And the 990 million that is

12   60 percent of the $1.65 billion number, in the

13   negotiation, did that include all of the series

14   of bonds at this juncture on the 17th?

15        A.    Yes, it did.

16        Q.    At some point in time, did that

17   change?

18        A.    It did.

19        Q.    The next day, on the 18th, I'm going

20   to show you a document that we'll mark as Ray

21   Exhibit 4, which is another draft settlement

22   agreement.

23              To your knowledge, how was it left

24   after you reviewed this draft agreement?  Did

25   you have further conversations with Milbank?

1              RAY - HIGHLY CONFIDENTIAL

2              MR. ROSENTHAL:  Objection to form.

3        A.    I don't recall whether I had

4   conversations with Milbank or whether I had

5   conversations with Cleary, who may have spoken

6   to Milbank.  I'm sorry.  I just can't get that

7   granular on the time of day.

8        Q.    Okay.  We will mark this as Ray

9   Exhibit 4, and see if this can refresh your

10  recollection.

11             MR. PULTMAN:  For the record, the

12       document bears Bates numbers

13       BHG-PPI-0000116 through 147.

14             (Ray Exhibit 4, E-Mail with Draft

15       PPI Settlement Agreement, Bates Stamped

16       BHG-PPI-0000116 through 147, marked for

17       identification.)

18       A.    (Perusing.)

19       Q.    And just for the record, Mr. Ray,

20  while you review the document, the cover e-mail

21  goes from a Jennifer Harris, at Milbank, to

22  Lisa M. Schweitzer, with a group of CCs, and it

23  indicates, "Lisa, enclosed please find a

24  revised draft of the PPI settlement agreement,

25  clean and blacklined against the version sent

```
1                RAY - HIGHLY CONFIDENTIAL
2    to you yesterday."  It goes on from there.
3         A.    (Perusing.)  Okay.
4         Q.    Have you seen this document before?
5         A.    Yes.
6         Q.    When did you first see it?
7         A.    It may have been the 18th.  It may
8    have been as early as the 19th, because I know
9    I was traveling the afternoon of the 18th.
10        Q.    And when you say you were traveling,
11   where were you traveling from, where were you
12   traveling to?
13        A.    On a train from the great city of
14   Wilmington, Delaware, to New York City.
15        Q.    Did you have conversations with
16   anyone at Milbank that led to the revised
17   number that is contained in Section 2.2 of this
18   agreement?
19             MR. ROSENTHAL:  Objection to form.
20             You can answer.
21        A.    Yes.  I mean, whether I did it or at
22   my direction, counsel communicated to Milbank,
23   sometime between the initial draft and this
24   current draft, we told them that the 60 percent
25   was -- was still not acceptable, and we wanted
```

1                RAY - HIGHLY CONFIDENTIAL

2    a lower number, and while I don't think we

3    specified 55 percent, that's ultimately what

4    they came back with, as I recall.

5        Q.    And, Mr. Ray, I misspoke.  I said it

6    was in Section 2.2.  It's actually in Section

7    2.3 of the document.

8        A.    Yes, I see that.

9        Q.    Sitting here today, do you have a

10   recollection as to how the number, 55 percent,

11   was arrived at?

12       A.    It was 60 less -- five points less

13   than 60.  We told them 60 was unacceptable, and

14   they came back to try to move the number closer

15   to our number, and at the time, as I recall, we

16   were at 50, and this was, for them, an attempt

17   to sort of meet -- reach, you know, a

18   resolution down the middle, if you will, at the

19   then current points in the negotiation, as I

20   recall.

21       Q.    Okay.  And to your knowledge, the

22   55 percent of the 1.65 billion, did it yield a

23   907 and a half million dollar number?

24       A.    I believe that's right.

25       Q.    And is that reflected anywhere in

1              RAY - HIGHLY CONFIDENTIAL

2    this document?

3         A.    It's in 2.3.2.

4         Q.    Were there further conversations

5    over the weekend of the 19th and the 20th

6    concerning the overall number?

7         A.    At some point, and I don't recall

8    whether it was that weekend or whether that was

9    the subsequent Monday or later, but at some

10   point, there was a -- some negotiation and

11   communication around, you know, effectively, a

12   few other sort of demands that NNI had related

13   to the amount, including we wanted to make sure

14   that there would be no other contractual asks

15   related to the amount.

16              So, if someone, for example, had a

17   make-whole argument or some other argument to a

18   contractual entitlement, we wanted those

19   arguments, in effect, those entitlements, if

20   you will, to be embodied in the agreed-upon

21   number.

22              And we also wanted to have that as

23   an absolute cap.  In other words, the interest

24   would not, you know, continue to accrue.  And I

25   think it would have come up, in the first

1              RAY - HIGHLY CONFIDENTIAL

2     instance, out of this draft, and materialized

3     over the period from the 18th to the, you know,

4     to the 23rd.  And I don't recall, you know,

5     exactly, you know, how many calls it took to

6     get to that level, and who communicated them,

7     but there was a communication by NNI that these

8     were additional needs that we had in order to

9     get closer to a resolution.

10         Q.    Let me ask you about the addition of

11    Section 2.2, which relates to NNCC in Section

12    2.1, which refers to NNCC and the holders of

13    the 7.875 percent notes.

14              Do you see that?

15         A.    Yes.

16         Q.    How did that come to be added to

17    this draft?

18         A.    As I understand it, Milbank inserted

19    this to address the peculiarities of the NNCC

20    bonds.

21         Q.    And when you say the peculiarities

22    of the bonds, what are you referring to?

23         A.    Well, just that I think it's quite

24    articulated in the NNCC papers, their

25    entitlement to full, you know, principal amount

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   of their claim plus PPI.  I can't restate it
 3   better than the position that's embodied in
 4   their pleadings, but they take a view that the
 5   NNCC bonds are entitled to be paid in full
 6   before any PPI could be paid, and I think this
 7   was some attempt to address the PPI for the
 8   NNCC bonds.
 9              I didn't, you know, discuss this
10   particular provision, but this is what I
11   understood from my conversations with -- with
12   Cleary about how this paragraph arose in the
13   document and why.
14        Q.    You also made reference to something
15   called a make-whole argument.
16              What were you referring to there?
17        A.    That just the contractual right of
18   bonds that have certain provisions in them
19   which require that, on any payment of the
20   bonds, that they're entitled to the full
21   benefits which they bargained for over the life
22   of that issue.
23              So any prepayment, if you will, that
24   reduces the amount that they otherwise would
25   have been paid had the bond existed until its
```

1              RAY - HIGHLY CONFIDENTIAL

2    maturity, that the bonds would have to forego

3    any sort of arguments that they might be

4    entitled to those kind -- which are sort of

5    interest arguments in a way, but they're also

6    arguments to premiums or payments that would be

7    required as a result of early payment of a

8    bond, for example.

9        Q.    Prior to the weekend of the 19th of

10   July, had you communicated the existence of

11   these negotiations to any other creditors of

12   NNI?

13       A.    I had not, no.

14       Q.    To your knowledge, had the existence

15   of those -- of these settlement communications

16   been communicated to any other creditors?

17       A.    By anyone?

18       Q.    Yeah, to your knowledge.

19       A.    I don't know exactly.  At some

20   point, I believe Milbank and/or Cleary

21   communicated with -- with Akin Gump.  I don't

22   specifically know when they did that.

23            MR. PULTMAN:  Would now be an

24       appropriate time to take a break?

25            MR. ROSENTHAL:  Sure.

```
1                    RAY - HIGHLY CONFIDENTIAL
2                    THE VIDEOGRAPHER:  We are now off
3          the record.  The time is 2:18 p.m.,
4          September 15, 2014.
5                    (Recess taken.)
6                    THE VIDEOGRAPHER:  This is tape two
7          of the deposition of Mr. John Ray.  We are
8          now back on the record.  The time is
9          2:40 p.m., September 15, 2014.
10   BY MR. PULTMAN:
11        Q.    Mr. Ray, did you want to clarify
12   something on the record?
13        A.    Yes, I did.  Seeing Mr. Abbott walk
14   in reminded me, when you were asking about NNI
15   counsel being involved, and I was remiss in not
16   mentioning that that also included Mr. Abbott's
17   firm.
18        Q.    Is that the Akin Gump firm?
19        A.    Mr. Abbott's firm here.
20        Q.    I thought you were talking about
21   Mr. Qureshi.
22        A.    No.
23        Q.    Thank you for clarifying.
24                    MR. ROSENTHAL:  We don't call him
25          Mr. Abbott.
```

HIGHLY CONFIDENTIAL                    62

```
 1              RAY - HIGHLY CONFIDENTIAL
 2      A.    We have another word for him.
 3            Derek Abbott was also on several
 4   calls we had.
 5      Q.    Anything else that you want to
 6   clarify?
 7      A.    No, that's it.
 8      Q.    Now, earlier, we were talking about
 9   whether you had had communications with other
10   creditors prior to the weekend of the 19th and
11   20th of July.
12            Do you recall that discussion?
13      A.    Yes, I did.
14      Q.    I'm going to show you a document
15   that we'll mark as Ray Exhibit 5, which bears
16   Bates numbers NNI-PPI0000306 through 321.
17            (Ray Exhibit 5, E-Mail, Bates
18       Stamped NNI-PPI0000306 through 321, marked
19       for identification.)
20      Q.    And while you're reviewing the
21   document, Mr. Ray, for the record, I will
22   indicate it's a cover e-mail from
23   Ms. Schweitzer on Saturday, July 19th, 2014, to
24   a Mr. Hodara at Akin Gump, a D. Botter at Akin
25   Gump, and it appears to cc a J.R. Avidity at
```

1              RAY - HIGHLY CONFIDENTIAL

2    Earthlink.net.

3              Have you seen this document before?

4        A.    Yes.

5        Q.    And is the e-mail address that's on

6    the cc J.R. Avidity at Earthlink.net one you're

7    familiar with?

8        A.    Yes, that is my e-mail address.

9        Q.    Did you receive this document on or

10   about July 19, 2014?

11       A.    Yes.

12       Q.    Did you understand, prior to

13   receiving it, that there was going to be a

14   communication to counsel for the UCC?

15       A.    I'm sorry.  I'm confused by your

16   question.

17       Q.    Sure.  Prior to receiving the

18   e-mail, did anyone let you know that a draft

19   agreement was going to the lawyers at Akin

20   Gump?

21       A.    Yes.  I think, as I recall, I would

22   have seen Fred, I think, in the course of the

23   day on the 18th, and I think he -- I think he

24   and I discussed that he should reach out to

25   Lisa or that Lisa would reach out to him to

1                    RAY - HIGHLY CONFIDENTIAL

2      provide a draft of the settlement agreement.

3           Q.    Okay.  And when you said Fred, are

4      you referring to Mr. Hodara?

5           A.    Yes.  Fred Hodara of Akin Gump and

6      Lisa Schweitzer of Cleary Gottlieb.

7           Q.    In the conversation with Mr. Hodara

8      did you talk about the potential for a

9      settlement agreement with the bonds?

10          A.    Well, I certainly told him that's

11     what the topic was.  I didn't get into any

12     details with him about the terms of it.  The

13     conversation would have occurred in connection

14     with seeing him involved in another matter.

15          Q.    And when you say in another matter,

16     unrelated to Nortel?

17          A.    Yes.

18          Q.    And what was that matter?

19          A.    The OSG, Overseas Shipping Group

20     confirmation hearing.

21          Q.    And that was on Friday, the 18th?

22          A.    Yes.

23          Q.    And that took place in Wilmington,

24     Delaware?

25          A.    It did.

1              RAY - HIGHLY CONFIDENTIAL

2       Q.    And that's why you traveled back

3  from Wilmington to New York?

4       A.    You're getting this.  Yes.

5       Q.    Prior to that point in time, prior

6  to the 19th or -- let's go back.

7              Prior to the 18th, had you

8  communicated to anyone at Akin Gump that there

9  were settlement communications ongoing between

10  the bonds and NNI?

11      A.    I don't believe I did.  I don't

12  recall having done that.

13      Q.    Any point in time after July 19, did

14  you have conversations with anyone at Akin Gump

15  about the effect of the settlement agreement on

16  Akin Gump's clients?

17      A.    There was a conversation that I had

18  with Fred that would have been sometime after

19  the 19th, I believe, and sometime on or before

20  the 23rd related to a request by the indenture

21  trustees to reimburse, be reimbursed for some

22  of their costs, and I remember talking briefly

23  to Fred as to whether or not that was something

24  his committee found acceptable or not, and I

25  believe the answer was in the affirmative, that

```
 1              RAY - HIGHLY CONFIDENTIAL
 2    they found it acceptable.
 3              We didn't talk specific amounts or
 4    terms, you know, or decide anything on the
 5    call, but -- and I forget who placed the call,
 6    and it may have been in the course of talking
 7    about something else that I mentioned that this
 8    was an open issue, and I think was trying to
 9    feel his sentiment and views about it.
10              And his response, as I recall, was
11    that -- that, you know, some advance expense
12    reimbursement would be acceptable.  And I think
13    I left it for Fred to talk to Milbank to
14    formulate the ask, if you will, from the
15    indenture trustee's perspective.
16        Q.    In that conversation with Mr. Hodara
17    about the question of advancing expense
18    reimbursement for the indenture trustees, did
19    you have the conversation at all about whether
20    the underlying PPI settlement that was being
21    proposed was one that his clients would be
22    supportive of?
23        A.    We didn't talk about that at that
24    point in time.  I don't know that he had formed
25    a view, and I don't recall asking about it.
```

1              RAY - HIGHLY CONFIDENTIAL

2         Q.    At any point in time, did you have

3    conversations with counsel at Akin Gump about

4    whether they were supportive of the proposed

5    9019 settlement?

6         A.    No.

7         Q.    Do you have an understanding as to

8    whether any of your representatives had such

9    conversations with counsel at Akin Gump?

10        A.    Yeah, I believe that Cleary and

11   perhaps Morris Nichols may have discussed with

12   Akin Gump the settlement agreement, their

13   position, but I don't -- I don't specifically,

14   you know, know when and how they did that, but

15   at some point, it was communicated to me that

16   the committee was on board for the settlement.

17        Q.    Okay.  And do you recall, is there a

18   way to specify when that was?  Was it before

19   you reached agreement with the bonds?

20        A.    Well, we didn't reach agreement

21   until July 23, and I believe that we had

22   heard -- heard -- I mean, our agreement, you

23   know, it's really at the last minute we formed

24   an agreement.  So this would be pure

25   conjecture, but --

1              RAY - HIGHLY CONFIDENTIAL

2        Q.    I'm not asking you to engage in

3   conjecture.

4        A.    As to when -- my understanding was

5   that when we agreed, which was at the last

6   minute, that they had already agreed to the

7   form of the settlement agreement, so.

8        Q.    And when you say they had already

9   agreed, you're referring to --

10       A.    The committee.

11       Q.    I'm sorry.  I'm going to try not to

12  speak over you.  I apologize.  I ask that you

13  extend me the same courtesy.

14             Other than Akin Gump, did you reach

15  out to counsel for any other parties, talk to

16  any other creditors about whether they would be

17  supportive of the proposed settlement with the

18  bonds?

19       A.    Yes.

20       Q.    Okay.  And with whom did you speak?

21       A.    I spoke to a creditor of the

22  company.

23       Q.    And who was the creditor of the

24  committee -- of the company?

25       A.    Solus.

```
1                  RAY - HIGHLY CONFIDENTIAL
2         Q.    And Solus is a holder of bonds?
3         A.    Yes.
4         Q.    And they're a substantial holder in
5    the 7.875 bond series?
6         A.    Yes.
7         Q.    Did you speak to any other
8    creditors?
9         A.    No.
10        Q.    Did you speak to the PBGC?
11        A.    No.
12        Q.    Did you speak to the equity?  Did
13   you speak to NNL?
14        A.    No.
15        Q.    Did you speak to counsel for the
16   monitor about the proposed settlement?
17        A.    No.
18        Q.    Do you know whether your lawyers
19   reached out to any other creditors beyond the
20   one you identified, Solus?
21             MR. ROSENTHAL:  Objection to form.
22        A.    No, I don't know whether they
23   reached out.
24        Q.    Do you know whether they
25   communicated with any other creditors about the
```

```
1                  RAY - HIGHLY CONFIDENTIAL
2    proposed settlement?
3         A.    I don't believe they did.
4         Q.    Do you know whether your lawyers
5    communicated with counsel for the monitor about
6    the proposed settlement?
7         A.    No, I don't.
8         Q.    At any point in time, did you do an
9    analysis of whether the proposed settlement
10   would benefit the PBGC?
11              MR. ROSENTHAL:  Objection to form.
12        A.    The PBGC specifically?
13        Q.    Yeah.
14        A.    No.
15        Q.    And let's put Solus to the side.
16              Did you, at any point in time, do an
17   analysis as to whether the proposed settlement
18   that's reflected in Ray Exhibit 1 would benefit
19   any of the other creditors with whom you didn't
20   communicate?
21        A.    Yes.  I mean, I did -- there is an
22   analysis I went through, which is I thought it
23   was beneficial for the creditor group at large
24   to have the bondholder claim, you know, fully
25   and finally determined, both as to the
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   principal amount and also as to the PPI
 3   portion.
 4              I thought it would benefit the
 5   estate to have, you know, certainty as to those
 6   amounts.  And so to that extent, I believed it
 7   was beneficial.
 8              And I also believe that it was
 9   beneficial to, you know, avoid any further
10   disputes about the amount of the PPI.
11        Q.    Can you tell me -- can you describe,
12   in any more detail, the analysis that you went
13   through?  How you did it?
14              MR. ROSENTHAL:  Objection to form.
15        A.    How I did what?
16        Q.    You said you went through an
17   analysis which you thought it was beneficial
18   for the creditor group as a whole.
19              Did you do any financial modeling to
20   determine whether the proposed settlement was
21   beneficial to the creditor group as a whole?
22        A.    I didn't need any financial modeling
23   to determine that it would be beneficial to
24   have an allowed claim.  That's one of the jobs
25   of an officer of a bankrupt Chapter 11 entity,
```

1                 RAY - HIGHLY CONFIDENTIAL

2    is to -- to administer claims, and to get a

3    final determination of the claim amount, and I

4    believe that not doing so was detrimental and

5    doing so was beneficial.

6         Q.    And when you said you didn't need

7    any financial modeling, is it fair to say that

8    you didn't, in fact, have any financial

9    modeling done?

10        A.    Because I didn't need any, right.

11        Q.    I just want to ensure I understand

12   the underlying answer to the question, which is

13   no financial modeling was done, and it wasn't

14   done because you didn't believe it was

15   necessary.

16        A.    Yes, I believe that's my testimony.

17        Q.    To your knowledge, was any financial

18   modeling done to determine whether the proposed

19   settlement was beneficial to the equity?

20        A.    I did some, my own thinking about

21   it.  I believe that there was potential

22   outcomes of the ultimate resolution of the

23   estates under which there would be cash

24   available in the US, and depending on the cash

25   availability, there would be amounts available

1                RAY - HIGHLY CONFIDENTIAL

2    to pay post-petition interest to all creditors

3    of the US estate, not just the bonds and

4    then -- and that the range of outcomes were

5    numerous, but there's possibilities that PPI

6    would not only be available, but would be

7    available in a significant amount such that, in

8    those scenarios where cash was available to

9    PPI, I believed it was beneficial to entertain,

10   you know, the concept of capping the amount

11   such that if additional proceeds were

12   available, that they would -- you know, in

13   effect, you know, be available to flow to

14   equity.

15       Q.    And you say you did your own

16   thinking.

17             Did you do any financial modeling of

18   those potential outcomes?

19       A.    That would be the thinking I was

20   doing, was financially orientated, yes.

21       Q.    When you say it was financially

22   orientated, did you ask Chilmark to run any

23   kind of financial models as to the range of

24   potential outcomes in available cash?

25       A.    No, we didn't do any of the type of

1               RAY - HIGHLY CONFIDENTIAL

2    modeling that you're suggesting, partly because

3    the range of potential, you know, outcomes

4    really depends on numerous factors.  It depends

5    on the claims from the UK estate against the

6    Canadian estate.  It depends on the level of

7    assets and liabilities of the Canadian estate,

8    which -- which I don't have a complete

9    transparency to, nor is the asset value in the

10   Canadian estate even known at this time.

11              So that would have required a lot of

12   speculation, and it also would have required

13   determination of, ultimately, our assets and

14   liabilities in the United States, which are

15   not, you know, fully defined and certain at

16   this time.

17              In addition, you know, we don't know

18   what the ultimate allocation awards will be,

19   which will drive the assets and liabilities of

20   the various estates, but I did analysis on my

21   own which would have concluded that, based on

22   certain outcomes in the allocation, that there

23   could be excess cash available, not only in --

24   to meet the PPI, but in excess of the caps that

25   we had agreed upon such that there was a

```
 1              RAY - HIGHLY CONFIDENTIAL
 2    possibility without, you know, necessarily
 3    quantifying, you know, the likelihood or
 4    potential for that outcome, to have those
 5    amounts be in excess of the cap and, therefore,
 6    flow to equity.
 7         Q.    So, in considering the excess cash,
 8    have you considered the maximum amount of the
 9    surplus that would be available for NNI to
10    distribute?
11         A.    No.
12         Q.    Have you -- you're familiar with
13    Mr. Kinrich's report?
14         A.    Yes.
15         Q.    And that's the US allocation
16    position?
17         A.    Yes.
18         Q.    And under that US allocation
19    position, NNI would receive some $5.3 billion?
20         A.    You know, I can sit here and try to
21    do the math, but I think Mr. Kinrich's report,
22    the foundation of that is 74.3 percent
23    allocation to the US, and if you did the math
24    against the amount that's in the black box,
25    that would be part of the answer.
```

1                    RAY - HIGHLY CONFIDENTIAL

2                    I can't do that math in my head.

3    Maybe someone else can, but that would be how

4    you would at least derive part of the answer,

5    but not the full answer.

6        Q.    And beyond the thinking that you

7    did, your financial analysts haven't done any

8    modeling of the maximum amount of surplus

9    available for NNI to distribute, to your

10   knowledge?

11       A.    No.

12       Q.    Have you done any analysis of the

13   tax claim that's out there?

14       A.    I personally?  No.

15       Q.    To your knowledge, has an analysis

16   been done by NNI?

17            MR. ROSENTHAL:  Just yes or no.

18       A.    No.

19       Q.    Do you know -- you were at opening

20   statements in the allocation trial in

21   Wilmington, weren't you?

22       A.    I was.

23       Q.    And Ms. Block stood up in court and

24   said that the range of potential outcomes there

25   was somewhere between 400 million and a billion

1              RAY - HIGHLY CONFIDENTIAL

2     dollars, depending on when money would come in

3     and the timing of distribution.

4              Were you there for those comments by

5     Ms. Block?

6        A.    I believe so, yes.

7        Q.    Is that analysis correct?  Were

8     those statements correct?

9              MR. ROSENTHAL:  Objection to form.

10       A.    I don't know -- exactly know where

11    she derived the numbers.

12       Q.    Just so I'm clear, on July 24, there

13    was a telephonic conference in front of Judge

14    Gross concerning the proposed 9019 motion.

15             Are you familiar with that?

16       A.    Yeah.

17       Q.    And were you on the call for that

18    conference?

19       A.    Yes.

20       Q.    And the transcript indicates that

21    you were.  I just want to make sure you were.

22       A.    Yes.

23       Q.    Was anything said by your counsel,

24    any representations made to the court on

25    that -- in that hearing that were incorrect, to

1              RAY - HIGHLY CONFIDENTIAL

2    your knowledge?

3          A.    I don't believe so, no.

4          Q.    I want to go back to the negotiation

5    of the agreement, and we will mark, as Ray

6    Exhibit 6, a document bearing Bates numbers

7    BHG-PPI-000082 through 115, and ask that you

8    take a few moments to review it.

9              (Ray Exhibit 6, E-Mail with Revised

10         PPI Settlement Agreement, Bates Stamped

11         BHG-PPI-000082 through 115, marked for

12         identification.)

13         A.    (Perusing.)

14         Q.    Just for the record, it is a cover

15   e-mail from Russell D. Eckenrod to a group of

16   people, re: Nortel revised US PPI settlement

17   agreement, and it's Monday, July 21, 2014.

18         A.    (Perusing.)

19         Q.    Mr. Ray, my first question will be

20   the one you've heard before.

21              Have you seen this document before?

22         A.    This document referring to what

23   document?

24         Q.    The draft settlement agreement that

25   is the CGSH draft of 7/21/2014.

```
 1              RAY - HIGHLY CONFIDENTIAL
 2        A.    I'm sorry.  I apologize.  I was
 3   still on the e-mail that was attached to this.
 4   I haven't gotten to the document yet.
 5        Q.    Take your time.
 6        A.    (Perusing.)
 7              MR. ROSENTHAL:  Jay, just for
 8         clarity, you're only referring to has he
 9         seen the attachment, not the cover e-mail?
10              MR. PULTMAN:  Let's start with the
11         agreement itself, and then we will come to
12         the cover e-mail.
13        A.    (Perusing.)  Okay.
14        Q.    Mr. Ray, have you seen the draft
15   settlement agreement that is the July 21, 2014
16   agreement that says CGSH draft?
17        A.    Yes.
18        Q.    And you have seen that before today?
19        A.    Yes.
20        Q.    And did you see it on or around the
21   21st of July 2014?
22        A.    Yes.
23        Q.    The document appears to be behind an
24   e-mail from counsel at Cleary Gottlieb.
25              Have you seen that e-mail before,
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   the cover e-mail?
 3        A.    I don't recall.  I don't seem to be
 4   copied on it, so.
 5        Q.    Okay.  Well, it indicates that,
 6   "This draft remains subject to further internal
 7   and client review, but is being circulated now
 8   in the interests of time."
 9              Had you seen this draft prior to it
10   being circulated?
11        A.    Yes, I believe so.
12        Q.    So over the weekend of the 19th and
13   20th of July, did you see a Cleary Gottlieb
14   draft of the settlement agreement?
15        A.    I believe so, yes.
16        Q.    And on or around Monday, the 21st of
17   July, did you see this draft?
18        A.    Yes.
19        Q.    Okay.  Let's look at the blackline
20   version.  In particular, I'm looking at Section
21   2.1 and 2.2.
22        A.    (Perusing.)
23        Q.    There are references in those two
24   sections to NNCC, and to the 7.875 notes.
25              Do you see that?
```

1                    RAY - HIGHLY CONFIDENTIAL

2        A.    Yes.

3        Q.    And as of this time, the 21st of

4   July, was NNCC and those 7.875 -- those 7.875

5   notes, were they still a part of the draft

6   settlement agreement?

7        A.    I believe they were a part of it.  I

8   mean, to the extent that the agreement

9   contemplated that they would be a part of the

10  agreement.

11       Q.    Ultimately, was the 7.875 notes

12  excluded from the settlement agreement?

13       A.    Yes, it was.

14       Q.    And when did that happen?

15       A.    I think it really -- it would have

16  to be either pretty shortly before the

17  agreement was -- was finalized, there was a

18  decision to take out references to the NNCC

19  bonds in terms of their inclusion in this

20  settlement.

21             I don't recall whether that was the

22  22nd or 23rd, but sometime between now -- the

23  date, July 21, and when we actually penned the

24  settlement agreement, it became clear to us

25  that NNCC chose not to be a part of the

1              RAY - HIGHLY CONFIDENTIAL

2    settlement agreement.

3         Q.    And when you say NNCC, you're

4    referring to the bondholders of those bonds?

5         A.    Yes.

6         Q.    You earlier discussed or indicated

7    that you had conversations with one creditor

8    who you identified as Solus.

9         A.    Yes.

10         Q.    Was that with respect to these

11    bonds?

12         A.    Yes, it was.

13         Q.    And when was that conversation?

14         A.    I believe it may have been the

15    21st -- the 21st would be Monday.  Yeah, I

16    believe it was the 21st, because I had -- and I

17    don't recall when, but I had a call from Dennis

18    Dunne, under which Dennis expressed that the

19    NNCC bondholders may not participate in the

20    settlement.

21              Dennis -- I was surprised by that,

22    and so I told Dennis that I would call Solus

23    to -- to see what the understanding or

24    misunderstanding was and whether they would

25    participate in the settlement.  And so I

1              RAY - HIGHLY CONFIDENTIAL

2    think -- I believe it was the 21st.  Again, I

3    can't be precise on these times and dates, but

4    I believe it was the 21st, I contacted Solus

5    and asked them if they were going to

6    participate in the settlement.

7         Q.    Who did you speak to at Solus?

8         A.    Steven Blauner.  And I didn't

9    discuss the terms at all of the settlement.  It

10   was a quick call, and I asked him whether he

11   would participate in the settlement, and he

12   just expressed his view that the NNCC bonds

13   were, you know, entitled to their full par

14   claim, and that any settlement would have to

15   acknowledge that, and I told him, you know, I

16   would talk again to Milbank, but -- which I

17   did, and I may have had one other conversation

18   with Solus sometime between the 21st and the

19   23rd, just to -- just to confirm that they

20   weren't going to participate in the settlement.

21              And, again, a very short phone call,

22   which Mr. Blauner indicated they would not be a

23   party to the agreement.

24        Q.    As to the date of -- as of the draft

25   of the 21st that we're looking at that's been

1              RAY - HIGHLY CONFIDENTIAL

2    marked as Ray Exhibit 6, NNCC bonds were still

3    included within the draft settlement agreement;

4    is that fair?

5        A.    Well, it's fair in one context and

6    not fair in another.  I mean, it's fair in the

7    sense that this document contemplated that they

8    would participate, but we weren't having -- you

9    know, it's not like it was -- that we had the

10   consent of NNCC to put their inclusion into the

11   document.  I mean, we did so on the assumption,

12   again, our assumption, it turned out to be a

13   wrong assumption, that all of the bonds would

14   be included in the settlement, and when we

15   found out that Solus decided not to

16   participate, we ultimately took them out, and I

17   think we were, you know, we were indifferent to

18   that, and so, ultimately, their inclusion came

19   out of the, you know, the settlement agreement.

20              I didn't debate with Mr. Blauner his

21   rationale or reasons or -- nor did I even

22   discuss the terms of the settlement.

23       Q.    I'm sorry.  Have you finished your

24   answer?  I didn't want to cut you off.

25       A.    Yes.

1                    RAY - HIGHLY CONFIDENTIAL

2        Q.     You said you were indifferent to

3    that.  Ultimately, less than the entirety of

4    the outstanding bonds were then in the

5    settlement agreement; isn't that fair?

6        A.     That's correct.

7        Q.     Let's talk about Section 2.3, which

8    indicates that the PPI settlement amount shall

9    be equal to $907 million, in the draft of the

10   21st.

11               Do you see that?

12       A.     Yes.

13       Q.     How did that change come to be?

14       A.     I think the change came in our

15   wanting to have a specific number, a dollar

16   amount number as opposed to a formula.  There

17   was -- depending on, you know, on how you

18   calculated the total accrued and what the

19   interest would be on each bond indebtedness, I

20   think there were variations that were somewhat

21   immaterial that were, you know, somewhere in

22   the billion six to a billion six five range.

23   They could have been off by dollar amounts that

24   were sort of in the tens of millions.

25               And the drafting, we just preferred,

1              RAY - HIGHLY CONFIDENTIAL

2     from a drafting perspective, to, rather than

3     just put a formula in, and then have people

4     debate about what the product of that -- of the

5     multiplication of those two numbers might be,

6     we thought it would be cleaner, from a drafting

7     perspective, just to put a dollar number in

8     there, and that's what ultimately was dropped

9     into the draft.

10         Q.    Is it fair to say that the number

11    that was in that draft, the Monday draft of

12    907 million, is roughly 55 percent of the

13    $1.65 billion total number?

14         A.    I think if you want to say roughly

15    55 percent, yes, I think it's roughly

16    55 percent.

17         Q.    And in the draft we looked at that

18    was circulated by Milbank on the 18th, when it

19    had the 55 percent, that indicated it was

20    $907.5 million?

21         A.    I believe that's right, yes.

22         Q.    Ultimately, the number that made it

23    into the final proposed settlement agreement on

24    the 24th of July had a cap number of

25    $1.01 billion; isn't that right?

1                    RAY - HIGHLY CONFIDENTIAL

2          A.    Yes.

3          Q.    And that $1.01 billion is a little

4    in excess of the 1.65 billion, isn't it?

5                MR. ROSENTHAL:  Objection to form.

6          A.    Could you repeat that question?

7          Q.    My question is whether the

8    1.01 billion, is it in excess of 60 percent of

9    1.65 billion?

10               MR. ROSENTHAL:  Do you have a

11         calculator?

12         A.    Yeah, I don't have a calculator with

13   me.

14               MR. ROSENTHAL:  You're just asking

15         him to do a mathematical calculation of --

16         Q.    I'm asking if the ultimate number

17   that we came to, the cap number, came out to

18   approximately 60 percent rather than the

19   55 percent number.  And I'm happy to have your

20   lawyers do the math.

21               MR. ROSENTHAL:  But, you know,

22         you're comparing different denominators

23         now.

24               MR. PULTMAN:  I'm perfectly happy to

25         have the witness tell me that my math is

```
 1              RAY - HIGHLY CONFIDENTIAL

 2        incorrect.

 3              MR. ROSENTHAL:  You're asking him is

 4        something a certain percentage of

 5        something else, and the two numbers are

 6        not comparable, and I don't think that's a

 7        fair thing.

 8        A.    Could you tell me what the numerator

 9   is and what the denominator is?

10        Q.    I'm asking whether the $907 million

11   number that we looked at was 55 percent of the

12   1.65 billion.  That was the first question I

13   asked you.

14        A.    I believe I answered yes to that.

15        Q.    Okay.  And when we look at the one

16   point --

17        A.    I believe you said roughly, I

18   believe is what you said.

19        Q.    Yes.

20        A.    Okay.

21        Q.    And if, in the draft of the 18th, it

22   indicated that the 55 percent of 1.65 billion

23   was, in fact, 907.5 million, that was my second

24   question to you on that.  And I'm happy to have

25   you look at the actual document.
```

```
 1                RAY - HIGHLY CONFIDENTIAL
 2       A.      Maybe that would be helpful.
 3       Q.      Sure.  Why don't we look at the
 4  draft that was Ray Exhibit 4.
 5               MR. ROSENTHAL:  What's the question?
 6       Q.      Whether it indicated that the
 7  55 percent of the $1.65 billion was, in fact,
 8  $907.5 million.
 9       A.      Yes, that's what the document
10  indicates.
11       Q.      And how did the $907 million come to
12  be in Section 2.3 of the draft of Monday that
13  we've marked Ray Exhibit 6?
14       A.      Because it was the product of
15  55 percent times 1.65 billion.
16       Q.      Now, why don't we go back to Ray
17  Exhibit 1, which was the notice of motion,
18  together with the final version that's been
19  proposed as the settlement under the 9019
20  motion.
21               And just so I'm clear, on page 12 of
22  the document, there's a signature of the --
23  this is of the settlement agreement.  It
24  appears to be your signature.
25       A.      Yes.
```

```
1                RAY - HIGHLY CONFIDENTIAL
2         Q.    And you signed that on or around the
3    24th of July?
4         A.    Yes.
5         Q.    I would like to turn you to
6    section -- before we get to 2.2, is it fair to
7    say that the NNCC bonds were removed from the
8    final version of the agreement?
9         A.    Yes.
10        Q.    And are there any other
11   communications that you had with Solus as to
12   the removal, their removal of those bonds from
13   this final agreement?
14        A.    No.
15        Q.    Did you have any conversations with
16   counsel for -- counsel at Milbank about the
17   removal of Solus and its effect on the
18   agreement?
19        A.    I did contact Dennis Dunne and tell
20   him that I had had the conversation with Solus,
21   and that they wanted to be taken out of the
22   settlement agreement, or didn't want to be part
23   of the settlement agreement.  I did not discuss
24   with them the effect of that.  And then I
25   communicated the same to Cleary and Morris
```

1             RAY - HIGHLY CONFIDENTIAL

2    Nichols.

3         Q.    I'm sorry.  You said Cleary and --

4         A.    Morris Nichols.

5         Q.    Did you have any further

6    conversations with the UCC or their counsel

7    about the changes to the settlement agreement?

8         A.    I did not.

9         Q.    I would like you to turn to Section

10   2.2.  It's on page six of 43.

11        A.    Okay.

12        Q.    Section 2.2 reads, and I quote, "The

13   PPI settlement amount shall be an amount equal

14   to (a) 876 million plus (b) an additional

15   amount, equal to 3.50 percent per annum times

16   the then outstanding principal balance of the

17   Guaranteed Bonds, up to a maximum amount of

18   134 million, which additional amount shall

19   accrue on the unpaid and outstanding principal

20   balance of the Guaranteed Bonds that remain

21   unpaid and outstanding during the time of

22   accrual for the period from July 1, 2014 until

23   the earlier of (x) June 30, 2015, or (y) the

24   date of the final distribution in respect of

25   the Guaranteed Bonds.  For the avoidance of

1           RAY - HIGHLY CONFIDENTIAL

2    doubt, absent any distribution, the cap of

3    1.01 billion will be reached on June 30, 2015."

4           Do you see that, sir?

5    A.    Yes.

6    Q.    How did section -- the PPI

7    settlement amount section, how did it come to

8    change to that formulation?

9    A.    The formulation was derived in a

10   couple different ways.  The 876 million was a

11   reduction from the previous draft amount to

12   reflect the removal of PPI that would have been

13   attributable to the NNCC bonds in the prior

14   version of the settlement agreement.  So that's

15   the first adjustment that was made to derive

16   the 876 number.

17          Then the remainder of the formula is

18   a function of our insistence that there be an

19   absolute cap, and the view by the bondholders,

20   as communicated to the NNI estate through

21   Milbank and FTI, that they wanted some

22   additional accrual so long as the estate, the

23   NNI estate, had not paid distributions to the

24   bondholders from the NNI estate.

25          So, ultimately, the NNI estate

1                RAY - HIGHLY CONFIDENTIAL

2    agreed to give additional accruals for some

3    period of time through June 30, 2015, but,

4    ultimately, there would be a finite cap on that

5    additional accrual and, therefore, the entire

6    PPI.

7              And we also bargained for a reduced

8    accrual rate at 3.5 percent rather than the

9    full contract rates of each of the, you know,

10   various bonds.

11             And, lastly, we -- we agreed that

12   the accrual would only happen with respect to

13   amounts that had not been paid to the

14   bondholders, such that if there were

15   distributions in the time period between the

16   date of the settlement and June 30, you would

17   not accrue unpaid amounts to the bondholders.

18   So it would actually be on the actual unpaid

19   balance as opposed to the full balance.

20             And this concept also, you know,

21   continued to preserve the provisions which I

22   think appear in 2.3, under which other

23   contractual entitlements were not in a position

24   to be added on to these numbers.

25        Q.   Is it fair to say that, even as of

1              RAY - HIGHLY CONFIDENTIAL

2     July 24, 2014, the day that this proposed

3     settlement was filed with the court, the base

4     number of 876 million had already increased by

5     an accrual?

6          A.    Yes.  I believe there was some

7     accrual, because I think these amounts were --

8     as I recall, you know, without sitting down

9     doing the math right now, as I recall, I think

10    they were determined, you know, as of a date

11    prior to the settlement agreement.  So I think

12    parties agreed to sort of work off of constant

13    numbers, you know, rather than change it as

14    every day went by.

15              So there had been some accrual.  In

16    the absence of the ability to accrue additional

17    amounts under this paragraph, we would have had

18    to ultimately adjust the 876 to another amount.

19          Q.    So then it's fair to say that the

20    876 -- $876 million number wasn't complete

21    without taking into account the accrual, even

22    on July 24, of the time period between July 21,

23    2014 and July 24, 2014?

24              MR. ROSENTHAL:  Objection to form.

25          He never said that it's complete.  It's a

1                   RAY - HIGHLY CONFIDENTIAL

2           formula.

3           A.      The number was not complete.   I

4    mean, you know, we would have -- but,

5    ultimately, we hadn't agreed to anything until

6    we put the final numbers in.   So could it have

7    been that 876 would have been a different

8    number?   It's possible, but that's not what

9    happened.

10          Q.      Well, I asked the question because

11   you indicated that you reduced the 907 million

12   number to 876 to account for the removal of the

13   NNCC bonds.

14          A.      Right.

15          Q.      And my question is, is that apples

16   to apples if the 876 number on July 24 even, is

17   not 876, it's 876 plus the accruals of three

18   and a half weeks?

19                  MR. ROSENTHAL:   Objection to form.

20          A.      Well, I think what you're asking me

21   to do is sort of speculate what the 907 would

22   have changed to had we not taken out the NNCC

23   bonds, and I don't know the answer to that.

24          Q.      Just so we're clear, the cap number

25   that we referred to is the $1.01 billion cap

1            RAY - HIGHLY CONFIDENTIAL

2   number, and that's as of June 30, 2015?

3            MR. ROSENTHAL:  Objection.  You

4        misstate 2.2.

5        A.    The only way I can answer your

6   question is to just to really restate the

7   formula.  It's 876 plus 3 and a half percent

8   times the outstanding balance up to a maximum

9   of 134.  876 and 134, if you had the full

10  accrual and there had been no distributions

11  between now and June 30, then those two numbers

12  would, in fact, total 1.01 billion.

13       Q.    Have you done any analysis to

14  consider whether the maximum of the surplus

15  available of excess cash for NNI to distribute

16  would be in excess of $1.01 billion?

17       A.    I believe -- I guess we can ask the

18  court reporter to go back.  I believe I

19  testified that I had done some analysis in my

20  own mind, calculating some of the potential

21  outcomes under which I believed there were

22  certain scenarios under which the amount that

23  would be in excess of the cap would be

24  available for equity.

25       Q.    Okay.  Can you tell me what that

1              RAY - HIGHLY CONFIDENTIAL
2    scenario would be in which an excess of that
3    cap would be available?
4         A.    I don't -- I mean, I don't have the
5    calculations here, but I can tell you the
6    inputs, some of the inputs I was considering.
7    I might not recall all of them.
8         Q.    Did you actually put this pen to
9    paper or computer?
10        A.    No.  Actually, I believe I did all
11   of this mathematically at the time based on,
12   you know, whatever documents were in front of
13   me.  So I don't have any independent recording
14   of the calculation.
15        Q.    Okay.  To the best of your
16   recollection, if you could tell us.
17        A.    I believe under, you know, certain
18   scenarios, I calculated that the number, you
19   know, might be as high as 300 million or in
20   excess of 300 million, approximately, of excess
21   P and I that could benefit the equity holders,
22   and that was derived, as I think I testified,
23   as a product of Mr. Kinrich's 74.3 percent
24   allocation multiplied by the amount that is in
25   the black box, the product of which, when added

1               RAY - HIGHLY CONFIDENTIAL

2    to NNI's cash, after considering the claims in

3    the US estate and the derivation of those

4    numbers, when added to the distribution to the

5    bonds and the $2 billion claim from Canada,

6    based on Canada's recoveries, which under

7    Mr. Kinrich's allocation was approximately

8    16 percent.

9               Again, without knowing what the full

10   potential outcome of the assets and liabilities

11   are in Canada, because we believe that the

12   Canadian assets are understated, and we think

13   their liabilities are maybe overstated, but

14   based on expected outcomes of output from the

15   Canadian estate, when added to the previous

16   numbers, I believe yielded numbers that were,

17   you know, in the 300 or more range in excess of

18   both the 876 and, ultimately, the 101 cap.

19        Q.   And for that calculation, what did

20   you attribute to the tax claim, what number?

21        A.   The tax claim in that calculation

22   would need to be under a hundred million.

23        Q.   And what did you attribute to the

24   claims in the US estate?

25        A.   The claims in the US estate, I

1               RAY - HIGHLY CONFIDENTIAL

2    modeled at roughly 1.2 billion.

3        Q.    And that accounts for the trade

4    claims?

5        A.    Accounts for all the claims, other

6    than the tax claims, yes.

7        Q.    It includes the PBGC claims?

8        A.    Yes.

9        Q.    It includes the July updated PBGC

10   claims?

11       A.    It does not include the July updated

12   PBGC claims.

13       Q.    And what's --

14       A.    Which we don't think are valid.

15       Q.    Okay.  Is there an assumption for

16   cash burn for that analysis?

17       A.    I don't recall.  There was

18   assumption for cash burn.  I don't recall what

19   it was.

20       Q.    Has there been an operating

21   statement submitted to the court since the 60th

22   report back in April?

23       A.    I believe the last report is the

24   April 30 MOR.  I believe that's the most

25   current.  I don't know whether that's the 60th

```
 1              RAY - HIGHLY CONFIDENTIAL
 2    or the 61st or 59th.
 3         Q.    And that was April 30, 2014,
 4    covering up through January 30, 2014?
 5         A.    Yes.
 6         Q.    And is there any updated report
 7    being prepared?
 8         A.    There would be a report for May.  I
 9    don't believe I have seen that yet.
10         Q.    And just so I'm clear, in that
11    assumption that you built in, you assumed that
12    the US allocation, according to Mr. Kinrich,
13    was the one that the court was going to find?
14         A.    Yes, although, you know, there's
15    certain sensitivities that you could do where
16    that allocation was not achieved.  Yet, there
17    was still allocation amounts available in
18    excess of the cap.
19              It would just -- it would be -- the
20    end product would be different.  But,
21    nonetheless, the analysis wasn't exclusively
22    dependent on one input.  Because there are so
23    many inputs in this calculation, you could
24    change, you know, some of them negatively, some
25    could move positively, and, you know, our
```

1              RAY - HIGHLY CONFIDENTIAL

2    approach on this was that, you know, that if we

3    looked at the amount available, and it was less

4    than what the cap was, in effect, the amount of

5    available cash works as its own cap related to

6    the availability of PPI.

7              On the other hand, if there were any

8    scenarios, any scenarios that were possible

9    under which the PPI could be greater than the

10   cap, I thought it was beneficial for the estate

11   and its creditors, including equity, to get a

12   cap which was under that amount, such that in

13   those eventualities, there would be, you know,

14   savings by virtue of the settlement.

15             Now, there may be some scenarios

16   where, by virtue of one of the many inputs into

17   this calculation, that there's not sufficient

18   cash to -- to have an issue with the cap, but I

19   wasn't really solving necessarily for --

20   exclusively for those alternatives.  I was

21   solving for those alternatives where there was

22   a possibility that the amounts would exceed the

23   cap that we negotiated.

24        Q.   Did you account for the likelihood

25   of each of those inputs?

1          RAY - HIGHLY CONFIDENTIAL

2               MR. ROSENTHAL:  Objection.  I mean,

3          you're treading on to areas in which now

4          you're talking about his analysis of the

5          outcome of the allocation dispute, and I

6          don't think that's appropriate.

7          Q.    I'm asking, generally, about the

8     variety of those inputs that you put in from

9     the tax claim being under $100 million to your

10    claim on the PBGC and the variety of claims.

11              Did you put a range of likelihood in

12    considering it?

13    DI         MR. ROSENTHAL:  I'm not going to let

14         him answer that, because that is asking

15         him, essentially, how he handicaps, among

16         other things, the outcome of the

17         allocation dispute.

18              MR. PULTMAN:  Let me take that off

19         the table.

20    Q.    Putting to one side the allocation

21    dispute, did you do any modeling of all the

22    other factors that you said were your inputs to

23    that analysis to that scenario that created a

24    $300 million surplus?

25              MR. ROSENTHAL:  Just hold on one

```
1              RAY - HIGHLY CONFIDENTIAL
2         second.
3              I will let him answer that to the
4         extent that he did independent modeling of
5         those issues, not the allocation issues,
6         other than through consultation with
7         counsel or advisors hired by counsel.
8              MS. SCHWEITZER:  One second.
9              MR. ROSENTHAL:  Or that obviously
10        takes the input of counsel or counsel's
11        advisors.
12   BY MR. PULTMAN:
13        Q.   So let's start with the first
14   question.
15             Can you do this without violating
16   the instructions you just got from your lawyer?
17        A.   I'm not sure what this is.
18             MR. ROSENTHAL:  Can you answer the
19        question of have you done that
20        independently of anything you have been
21        advised by counsel or advisors to counsel?
22        A.   Well, you have referenced the word
23   "modeling."  I took a view of what I thought
24   the assets and liabilities were of the
25   particular -- of the various estates.  I gave
```

1             RAY - HIGHLY CONFIDENTIAL

2    you those inputs.

3             That was my business judgment about

4    what those were.  And implied in my estimation

5    for purposes of the analysis was my informed

6    view of what I thought those numbers were.

7             So to that extent, you know, my

8    analysis factored in certain probabilities that

9    I assumed in my calculation.

10        Q.   So if I understand what you're

11   saying is, those weren't just the range of

12   possibilities.  That's what you thought was

13   likely in those various inputs that you have

14   given me.

15        A.   I don't think I would use the word

16   likely.

17             MR. ROSENTHAL:  Objection to form.

18        A.   I took a view of what I thought the

19   assets and liabilities were, and based on that

20   calculation, I determined that there was excess

21   PPI available in certain scenarios, the

22   scenario that I was thinking of, and based on

23   that, there was advantages to having the amount

24   of PPI be less than the number.

25        Q.   And in recommending the 9019, this

1              RAY - HIGHLY CONFIDENTIAL

2    proposed settlement, did you come up with a

3    range of possible outcomes as to the PPI?

4         A.    No, I didn't.

5         Q.    Did you take into account the

6    complexity of the underlying PPI dispute?

7              MR. ROSENTHAL:  It's just yes or no.

8         A.    Yes.

9         Q.    Did you take into account the

10   expense of litigating that dispute?

11             MR. ROSENTHAL:  Just yes or a no.

12        A.    No.

13        Q.    I'm correct that you told us earlier

14   that NNI hadn't taken a substantive position on

15   that prior to the settlement; isn't that

16   correct?

17        A.    I think that's yes, that's the

18   answer.

19        Q.    And you are aware that the monitor

20   and the Canadian debtors were litigating that

21   issue with the bonds?

22        A.    Yes.

23        Q.    Did you take into account -- let me

24   withdraw that question.

25             Did you consider what the bonds

1          RAY - HIGHLY CONFIDENTIAL

2    could have recovered if they won the issue

3    outright and gotten an order saying they were

4    entitled to $1.65 billion in PPI?

5              MR. ROSENTHAL:  Objection to form,

6         and I think it's asked and answered.

7         A.    Are you asking for what my view

8    would have been or what the bondholder view

9    would have been?

10        Q.    Your view.

11             MR. ROSENTHAL:  Asked and answered.

12        Objection to form.

13        A.    Could you repeat it?

14        Q.    Sure.  Did you consider what the

15   bonds could have recovered if they had won the

16   PPI motion, not the 9019 motion, but the PPI,

17   the underlying dispute, that the Canadian

18   monitor and debtors were disputing the bonds

19   on?

20        A.    I believe that's what I have just

21   walked through for the last 20 minutes.

22        Q.    Under that scenario that you laid

23   out?

24        A.    Yes.

25        Q.    Okay.  Now, were you involved in the

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   settlement of the EMEA dispute, the EMEA
 3   claims?
 4        A.    Which EMEA claims?
 5        Q.    The EMEA claims against the US
 6   estate.
 7        A.    Yes.
 8        Q.    And did you approve that proposed
 9   settlement?
10        A.    Yes.
11        Q.    Did the board of directors of NNI
12   consider that settlement?
13        A.    No.
14        Q.    In your view, was the EMEA
15   settlement material?
16              MR. ROSENTHAL:  Objection to form.
17        A.    Material to what?
18        Q.    Material to the estate of NNI.
19              MR. ROSENTHAL:  Objection to form.
20        A.    I believe the claims were material.
21   I don't -- I don't know -- I haven't formed a
22   view of what materiality is relative to what
23   was settled for.
24        Q.    Do you believe the PPI dispute was a
25   material dispute to the NNI estate?
```

1          RAY - HIGHLY CONFIDENTIAL

2          MR. ROSENTHAL:  Objection to form.

3     A.    It's a material claim, yes.

4     Q.    Can you tell me why the board of

5  directors of NNI didn't consider the proposed

6  settlement?

7     A.    I believe I was authorized to make

8  those decisions on behalf of the estate.

9     Q.    By what authority are you so

10 authorized?

11    A.    I believe by the -- my agreement

12 that charges me with the responsibility for

13 being the principal officer in the US estate.

14    Q.    Anything else?

15    A.    No.

16    Q.    Can you tell me what you did to

17 prepare for this deposition?

18    A.    I didn't do anything to prepare for

19 it.

20    Q.    You didn't talk to the cab driver on

21 the way over about your upcoming deposition?

22    A.    No.

23    Q.    You didn't review any documents in

24 preparation for this deposition?

25    A.    No.

1              RAY - HIGHLY CONFIDENTIAL

2        Q.    Since signing the proposed agreement

3   that's part of Ray Exhibit 1, have you had any

4   further conversations with the bonds about the

5   proposed motion?

6        A.    No, I haven't.

7        Q.    I would like you to look at Section

8   4.2 of the proposed agreement on page seven.

9        A.    (Perusing.)  Page 7 of 20 or where

10  are you?

11            MR. ROSENTHAL:  7 of 43.

12       Q.    7 of 43.  It's at the top.  It says

13  7 of 43.

14       A.    Okay.

15       Q.    And you should take your time to

16  review the whole thing.  I'm going to ask you

17  about the provision that begins with the,

18  "provided, however."

19       A.    (Perusing.)  Okay.

20       Q.    Can you tell me who drafted that

21  provision or at whose insistence was this

22  drafted or request?

23       A.    I don't recall who drafted this

24  particular paragraph, but I do recall that it

25  was a provision that both the bonds and NNI

1              RAY - HIGHLY CONFIDENTIAL

2    agreed to as a provision of this settlement

3    agreement as it relates to the non-bond

4    unsecured creditors of the US estate.

5         Q.    And at whose request was it?

6         A.    I don't recall if there was a

7    request or whose it was.  There was a

8    discussion that was had under which both the

9    bonds and the NNI estate agreed that we would

10   have a complete reservation of rights relative

11   to the -- to the non-bond unsecured creditors

12   and -- so that's ultimately what was drafted.

13        Q.    Did you talk to the other creditors

14   about that provision?

15        A.    I personally didn't, but counsel for

16   the company, and I believe the bonds' counsel,

17   Milbank, would have discussed this term with

18   the official committee's counsel.

19        Q.    Okay.  So that would have been with

20   counsel for the official committee, but what

21   about the other creditors?

22        A.    Well, the official committee who

23   represents the non-bond creditors.

24        Q.    What's the effect of this provision

25   if there are insufficient funds to pay the PPI

1              RAY - HIGHLY CONFIDENTIAL

2    to all the unsecured creditors?

3        A.    This provision is designed to say

4    whatever is available for PPI, if that's a

5    dollar or it's some other amount.  It does not

6    determine the amount of PPI available to the

7    non-bond, unsecured creditors and leaves open

8    for future debate, discussion, resolution, how

9    the available PPI will be allocated between the

10   bond creditors on the one hand, and the

11   non-bond US creditors on the other hand.

12              It doesn't -- it neither determines

13   the amount of PPI nor it determines necessarily

14   how that PPI is split between the bonds or

15   particular bondholders, on the one hand, and

16   other unsecured creditors who may claim

17   post-petition interest, you know, either at a

18   contract rate or some alternative rate.

19       Q.    But the $1.01 billion cap won't be

20   the cap for purposes of that analysis; is that

21   fair to say?

22       A.    Well, the PPI is the PPI, and the

23   bondholders, you know, are capped at that

24   amount.  This is designed as to deal with how

25   you then allocate the amount of PPI that's

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   available to the US non-bond creditors as well
 3   as the bondholders.
 4              So the bondholders have no guarantee
 5   that whatever PPI is available will actually be
 6   received by those bondholders because of the
 7   claims against that PPI by the non-bond
 8   creditors.
 9        Q.    Okay.
10              MR. PULTMAN:  You want to take a
11        couple of minutes and then we can wrap it
12        up?
13              MR. ROSENTHAL:  Sure.
14              THE VIDEOGRAPHER:  We are now off
15        the record at 3:49 p.m., September 15,
16        2014.
17              (Recess taken.)
18              THE VIDEOGRAPHER:  This is tape
19        three of the deposition of Mr. John Ray.
20        We are now back on the record.  The time
21        is 4:04 p.m., September 15, 2014.
22   BY MR. PULTMAN:
23        Q.    Mr. Ray, I'm going to ask you a
24   series of questions about conversations that
25   you've had with counsel for NNI.
```

1           RAY - HIGHLY CONFIDENTIAL

2               Did you have any conversations with

3    counsel for NNI about the likelihood of the

4    bonds obtaining more than $1.01 billion?

5        A.    No.

6        Q.    Did you have any conversations with

7    counsel about the modeling that you described

8    earlier that you did with respect to the

9    potential range of outcomes, including the

10   allocation issue?

11   DI          MR. ROSENTHAL:  I'm going to direct

12       him not to answer that, because of, as I

13       told you before, now you're going into

14       conversations regarding allocation

15       outcomes.

16            MR. PULTMAN:  Is that a privilege

17       objection?

18            MR. ROSENTHAL:  Yeah.

19       Q.    I assume you're following your

20   counsel's direction?

21       A.    Yes.

22       Q.    Did you have any conversations with

23   your counsel about the likely outcome of the

24   allocation trial?

25   DI          MR. ROSENTHAL:  I'm going to direct

```
1              RAY - HIGHLY CONFIDENTIAL
2         him not to answer.
3         Q.    And I assume you're following your
4    counsel's direction, Mr. Ray?
5         A.    Yes.
6         Q.    Mr. Ray, is your view that the
7    reasonableness of the proposed PPI settlement
8    is wholly unrelated to the allocation dispute?
9              MR. ROSENTHAL:  Objection to form.
10        I don't understand that question.
11        Q.    Sir, do you understand?
12        A.    I don't actually know.  I don't
13   understand.
14        Q.    In the 9019 motion, there was a
15   reference to the proposed PPI settlement being
16   unrelated to the results of the allocation
17   dispute.
18             MR. ROSENTHAL:  Do you have a
19        paragraph number so we can understand the
20        context?
21             MR. PULTMAN:  Sure.  Let me pull
22        that up.
23        Q.    This is Ray Exhibit 1.  And it's on
24   page -- let me withdraw that question.
25             Mr. Ray, did you have conversations
```

1          RAY - HIGHLY CONFIDENTIAL

2    with your counsel about the probability of the

3    bonds succeeding in their litigation with the

4    monitor over the PPI issue?

5    DI         MR. ROSENTHAL:  I'm going to direct

6         him not to answer that.

7              You can ask questions about

8         conversations with counsel broadly

9         speaking, but when you go into very

10        specific, detailed questions, you're

11        starting to subsume the issues of advice.

12             MR. PULTMAN:  Okay.

13        Q.   Did you receive, without revealing

14   the substance of any legal advice, did you

15   receive any legal advice about whether the

16   bonds would actually recover through litigation

17   more than $1.01 billion?

18        A.   No.

19             MR. PULTMAN:  I have no further

20        questions at this time, subject to

21        whatever further motion practice may exist

22        on the privilege issue.  I thank you for

23        your time, Mr. Ray.

24   EXAMINATION BY

25   MR. ROSENTHAL:

**HIGHLY CONFIDENTIAL**          116

1                    RAY - HIGHLY CONFIDENTIAL

2        Q.    I have just one question, actually.

3    Sorry, John, I see the surprise on your face.

4              I just want to clear up something to

5    make sure there's no confusion, because earlier

6    in Mr. Pultman's examination, you were

7    instructed to exclude conversations with

8    counsel.

9              You had testified, at one point,

10   that you didn't do anything to prepare for your

11   deposition, and while you didn't do anything

12   independent of counsel to prepare for your

13   deposition, did you meet with counsel to

14   prepare for your deposition?

15       A.    Oh, yes.

16             MR. ROSENTHAL:  Okay.  I have

17       nothing further.

18   FURTHER EXAMINATION

19   BY MR. PULTMAN:

20       Q.    I have a follow-up question.

21             When was that meeting?

22       A.    This morning.

23       Q.    And who attended that meeting?

24       A.    Let's see.  Let's see.  Let's see.

25   I would say Ms. Schweitzer attended,

1              RAY - HIGHLY CONFIDENTIAL

2      Mr. Rosenthal attended, Mr. Eckenrod attended.

3      Mr. Zelbo came in, but I think solely to eat a

4      lemon bar.  I think that was his purpose.  I

5      could detect none other.

6                  And I think that may have been it.

7          Q.    So other than the three, maybe four

8      lawyers from Cleary Gottlieb you've mentioned,

9      were there any other lawyers there?

10         A.    Not that I recall.

11              MR. PULTMAN:  Okay.  Thank you very

12         much for your time.

13              MR. ROSENTHAL:  Thank you.

14              MR. PULTMAN:  We are off the record.

15              THE VIDEOGRAPHER:  This concludes

16         today's deposition of Mr. John Ray.  We

17         are now off the record.  The time is

18         4:10 p.m., September 15, 2014.  Thank you.

19              (Time noted:  4:10 p.m.)

20

21

22

23

24

25

```
 1              A C K N O W L E D G M E N T

 2

 3   STATE OF              )

 4                         :ss

 5   COUNTY OF             )

 6

 7              I, JOHN RAY, hereby certify that I

 8   have read the transcript of my testimony taken

 9   under oath in my deposition of September 15,

10   2014; that the transcript is a true, complete

11   and correct record of my testimony, and that

12   the answers on the record as given by me are

13   true and correct.

14

15                   _____

16                        JOHN RAY

17

18   Signed and subscribed to before me

19   this _____ day of _____, 20__.

20

21   _____
     Notary Public, State of New York
22

23

24

25
```

1                      C E R T I F I C A T E

2

3    STATE OF NEW YORK   )

4                             :ss

5    COUNTY OF RICHMOND  )

6

7              I, MELISSA GILMORE, a Notary Public

8    within and for the State of New York, do hereby

9    certify:

10             That JOHN RAY, the witness whose

11   deposition is hereinbefore set forth, was duly

12   sworn by me and that such deposition is a true

13   record of the testimony given by such witness.

14             I further certify that I am not

15   related to any of the parties to this action by

16   blood or marriage; and that I am in no way

17   interested in the outcome of this matter.

18             IN WITNESS WHEREOF, I have hereunto

19   set my hand this 16th day of September, 2014.

20

21

22

23   *Melissa Gilmore*

24

25   _____
     MELISSA GILMORE

```
1              *** ERRATA SHEET ***

2        ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
3              New York, New York 10022
                   212-750-6434
4

5  NAME OF CASE: IN RE NORTEL NETWORKS, INC.
   DATE OF DEPOSITION: SEPTEMBER 15, 2014
6  NAME OF WITNESS: JOHN RAY

7  PAGE  LINE     FROM          TO         REASON

8  ____|_____|_____|_____|_____

9  ____|_____|_____|_____|_____

10 ____|_____|_____|_____|_____

11 ____|_____|_____|_____|_____

12 ____|_____|_____|_____|_____

13 ____|_____|_____|_____|_____

14 ____|_____|_____|_____|_____

15 ____|_____|_____|_____|_____

16 ____|_____|_____|_____|_____

17 ____|_____|_____|_____|_____

18 ____|_____|_____|_____|_____

19 ____|_____|_____|_____|_____

20

21                    _____

22  Subscribed and sworn before me
    this____day of_____,20__.
23

24  _____    _____

25  (Notary Public)          My Commission Expires:
```

IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

| | | | | |
|---|---|---|---|---|
| | **99:3,5** | **19:10;103:7,11,21** | **17,20;103:5;113:10,** | **11** |

**$**

**$1 (1)**
18:7
**$1.01 (8)**
42:3;86:25;87:3;
95:25;96:16;111:19;
113:4;115:17
**$1.6 (1)**
35:19
**$1.65 (4)**
53:12;86:13;89:7;
106:4
**$100 (1)**
102:9
**$2 (1)**
98:5
**$300 (1)**
102:24
**$5.3 (1)**
75:19
**$847 (3)**
42:6,8;43:7
**$876 (1)**
94:20
**$904 (1)**
44:2
**$907 (3)**
85:9;88:10;89:11
**$907.5 (2)**
86:20;89:8

**A**

**ABBOTT (4)**
3:8;61:13,25;62:3
**Abbott's (2)**
61:16,19
**Abid (1)**
11:14
**ability (2)**
42:11;94:16
**above (6)**
36:19,20;50:22,24;
51:9,10
**absence (1)**
94:16
**absent (2)**
39:17;92:2
**absolute (2)**
57:23;92:19
**ACB (1)**
27:3
**acceptable (5)**
52:8;55:25;65:24;
66:2,12
**according (1)**
100:12
**account (6)**
94:21;95:12;
101:24;105:5,9,23
**accounts (2)**

**accrual (15)**
42:16,21,23;43:10,
24;91:22;92:22;93:5,
8,12;94:5,7,15,21;
96:10
**accruals (3)**
38:2;93:2;95:17
**accrue (5)**
42:12;57:24;91:19;
93:17;94:16
**accrued (3)**
43:5;49:20;85:18
**accurate (1)**
44:16
**achieve (1)**
36:23
**achieved (1)**
100:16
**acknowledge (1)**
83:15
**acquainted (1)**
24:18
**actual (4)**
33:21;42:25;88:25;
93:18
**actually (9)**
56:6;81:23;93:18;
97:8,10;112:5;
114:12;115:16;116:2
**ad (1)**
11:19
**added (5)**
58:16;93:24;97:25;
98:4,15
**addition (2)**
58:10;74:17
**additional (8)**
58:8;73:11;91:14,
18;92:22;93:2,5;
94:16
**address (4)**
58:19;59:7;63:5,8
**adjust (1)**
94:18
**adjustment (1)**
92:15
**administer (1)**
72:2
**advance (3)**
23:3,12;66:11
**advancing (1)**
66:17
**advantages (1)**
104:23
**advice (5)**
40:2,4;115:11,14,
15
**advised (1)**
103:21
**advisor (1)**
35:14
**advisors (4)**

**affirmative (1)**
65:25
**afternoon (4)**
12:6;32:20;36:11;
55:9
**Again (5)**
83:2,16,21;84:12;
98:9
**against (5)**
54:25;74:5;75:24;
107:5;112:7
**agent (1)**
25:13
**aggregate (1)**
49:20
**ago (2)**
24:21;25:15
**agreed (11)**
51:16;68:5,6,9;
74:25;93:2,11;94:12;
95:5;110:2,9
**agreed-upon (1)**
57:20
**agreement (65)**
13:6;14:5;19:12;
20:11,15;27:11;42:7;
43:12,23;44:7;46:2;
47:18,22;48:13,18;
49:11,15;53:22,24;
54:15,24;55:18;
63:19;64:2,9;65:15;
67:12,19,20,22,24;
68:7;78:5,10,17,24;
79:11,15,16;80:14;
81:6,8,10,12,17,24;
82:2;83:23;84:3,19;
85:5;86:23;89:23;
90:8,13,18,22,23;
91:7;92:14;94:11;
108:11;109:2,8;
110:3
**ahanrahan@willkiecom (1)**
3:21
**Akin (14)**
11:15;60:21;61:18;
62:24,24;63:19;64:5;
65:8,14,16;67:3,9,12;
68:14
**al (2)**
10:9;46:24
**Albert (1)**
30:19
**Allen (1)**
10:23
**allocate (1)**
111:25
**allocated (1)**
111:9
**allocation (20)**
74:18,22;75:15,18,
23;76:20;97:24;98:7;
100:12,16,17;102:5,

**allow (1)**
33:10
**allowed (5)**
33:11;34:6,8,16;
71:24
**almost (1)**
24:21
**along (1)**
11:22
**Alternative (3)**
5:14;11:8;111:18
**alternatives (2)**
101:20,21
**although (1)**
100:14
**among (1)**
102:15
**amongst (1)**
36:7
**amount (59)**
33:10,11,13,18,21,
25;34:14,20,23,24;
35:4,19;37:6,18,24;
39:7,10;41:23,24;
42:2,19;43:24;44:8;
49:19,19,20;57:13,
15;58:25;59:24;71:2,
10;72:3;73:7,10;
75:8,24;76:8;85:8,
16;91:13,13,15,17,
18;92:7,11;94:18;
96:22;97:24;101:3,4,
12;104:23;111:5,6,
13,24,25
**amounts (12)**
42:17;66:3;71:6;
72:25;75:5;85:23;
93:13,17;94:7,17;
100:17;101:22
**analysis (18)**
70:9,17,22;71:12,
17;74:20;76:12,15;
77:7;96:13,19;99:16;
100:21;102:4,23;
104:5,8;111:20
**analysts (1)**
76:7
**analyze (1)**
39:22
**and/or (1)**
60:20
**ANDREW (3)**
3:18;11:11;30:18
**Andy (1)**
46:23
**Annie (1)**
11:14
**annum (1)**
91:15
**answered (4)**
41:21;88:14;106:6,

**anymore (1)**
41:2
**apologies (1)**
29:16
**apologize (2)**
68:12;79:2
**appeals (1)**
39:18
**appear (2)**
23:8;93:22
**appears (3)**
62:25;79:23;89:24
**apples (2)**
95:15,16
**approach (1)**
101:2
**appropriate (2)**
60:24;102:6
**approval (1)**
42:13
**approve (4)**
14:15;16:2;17:4;
107:8
**approved (2)**
44:6,7
**approving (3)**
14:25;15:5;20:3
**approximate (1)**
34:20
**approximated (1)**
51:2
**approximately (4)**
53:2;87:18;97:20;
98:7
**April (3)**
99:22,24;100:3
**areas (1)**
102:3
**arguing (1)**
39:7
**argument (3)**
57:17,17;59:15
**arguments (4)**
57:19;60:3,5,6
**arose (1)**
59:12
**around (12)**
16:16;28:14;32:19;
38:10;39:2;49:4;
51:21;52:12;57:11;
79:20;80:16;90:2
**arrived (1)**
56:11
**ARSHT (1)**
3:3
**articulated (1)**
58:24
**Asset (3)**
5:14;11:9;74:9
**assets (4)**
74:7,13,19;98:10,
12;103:24;104:19

Case 09-10138-MFW    Doc 14654-4    Filed 10/30/14    Page 124 of 137

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

**Association (1)**
11:6
**assume (2)**
113:19;114:3
**assumed (2)**
100:11;104:9
**assumption (6)**
84:11,12,13;99:15,
18;100:11
**Atara (1)**
11:17
**attached (1)**
79:3
**attachment (1)**
79:9
**attempt (2)**
56:16;59:7
**attend (1)**
22:23
**attendance (7)**
19:4,13;30:8,13,
17;32:11,13
**attended (5)**
30:3;116:23,25;
117:2,2
**Attorneys (6)**
3:4,15;5:4,14;
18:13;19:9
**attributable (1)**
92:13
**attribute (2)**
98:20,23
**author (1)**
50:2
**authority (2)**
39:14;108:9
**authorized (2)**
108:7,10
**availability (2)**
72:25;101:6
**available (24)**
28:9;72:24,25;
73:6,7,8,12,13,24;
74:23;75:9;76:9;
96:15,24;97:3;
100:17;101:3,5;
104:21;111:4,6,9;
112:2,5
**Avenue (3)**
3:16;5:5,16
**Avidity (2)**
62:25;63:6
**avoid (1)**
71:9
**avoidance (1)**
91:25
**awards (1)**
74:18
**aware (1)**
105:19

**B**

**back (22)**
12:21;35:25;36:8,
9,13,17;42:14;43:14;
44:11;45:5,12;52:4;
56:4,14;61:8;65:2,6;
78:4;89:16;96:18;
99:22;112:20
**Badtke-Berkow (1)**
10:25
**balance (9)**
32:22;33:22;34:19;
42:22;91:16,20;
93:19,19;96:8
**Bank (2)**
11:9;25:14
**bankrupt (1)**
71:25
**bankruptcy (6)**
25:9,12;26:7,10;
41:5,17
**bar (1)**
117:4
**bargained (2)**
59:21;93:7
**base (1)**
94:3
**based (7)**
52:5;74:21;97:11;
98:6,14;104:19,22
**basic (3)**
16:10,13,14
**basically (1)**
37:16
**basis (1)**
17:25
**Bassett (1)**
11:18
**Bates (12)**
21:13,14,15,18;
47:19,22;54:12,15;
62:16,17;78:6,10
**bearing (2)**
47:19;78:6
**bears (4)**
13:22;21:15;54:12;
62:15
**became (1)**
81:24
**become (1)**
24:18
**began (3)**
16:14;18:22;43:11
**begin (1)**
12:9
**beginning (1)**
33:16
**begins (1)**
109:17
**behalf (14)**
11:2,5,8,12,15,19,
23;16:24;19:11,23;
30:3;31:17;33:9;
108:8

**behind (1)**
79:23
**beneficial (10)**
70:23;71:7,9,17,21,
23;72:5,19;73:9;
101:10
**benefit (4)**
70:10,18;71:4;
97:21
**benefits (1)**
59:21
**besides (1)**
29:6
**best (4)**
28:7;33:5;37:19;
97:15
**better (1)**
59:3
**Beyond (3)**
19:21;69:19;76:6
**BHG-PPI-0000018 (2)**
21:16,18
**BHG-PPI-0000116 (2)**
54:13,16
**BHG-PPI-0000153 (2)**
47:20,23
**BHG-PPI-000082 (2)**
78:7,11
**billion (33)**
18:7;34:25;35:5,7,
19;42:3;53:4,12;
56:22;75:19;76:25;
85:22,22;86:13,25;
87:3,4,8,9;88:12,22;
89:7,15;92:3;95:25;
96:12,16;98:5;99:2;
106:4;111:19;113:4;
115:17
**black (3)**
45:11;75:24;97:25
**blackline (1)**
80:19
**blacklined (1)**
54:25
**Blauner (3)**
83:8,22;84:20
**Block (2)**
76:23;77:5
**board (15)**
15:4,8,20;17:3,8;
18:5,8,12;20:2,3,6;
22:8;67:16;107:11;
108:4
**bond (7)**
46:16;50:16;59:25;
60:8;69:5;85:19;
111:10
**bondholder (2)**
70:24;106:8
**bondholders (13)**
11:20;24:5;82:4,
19;92:19,24;93:14,
17;111:15,23;112:3,

4,6
**bonds (58)**
16:24;21:8;31:18,
24;32:4,10;33:9;
36:25;37:5,22;38:14;
40:11;41:18;42:20;
44:22,23;53:14;
58:20,22;59:5,8,18,
20;60:2;64:9;65:10;
67:19;68:18;69:2;
73:3;81:19;82:4,11;
83:12;84:2,13;85:4;
90:7,12;91:17,20,25;
92:13;93:10;95:13,
23;98:5;105:21,25;
106:15,18;109:4,25;
110:9;111:14;113:4;
115:3,16
**bonds' (1)**
110:16
**bond's (3)**
40:23;41:5,13
**both (7)**
37:17,24;44:25;
70:25;98:18;109:25;
110:8
**Botter (1)**
62:24
**Box (3)**
3:6;75:24;97:25
**Bradley (1)**
10:24
**break (1)**
60:24
**break-out (1)**
35:13
**brief (1)**
28:13
**briefing (1)**
37:12
**briefings (1)**
37:15
**briefly (1)**
65:22
**broadly (1)**
115:8
**broke (2)**
35:12;36:12
**built (1)**
100:11
**burn (2)**
99:16,18
**business (1)**
104:3

**C**

**cab (1)**
108:20
**calculated (3)**
43:5;85:18;97:18
**calculating (1)**
96:20

**calculation (9)**
44:12;87:15;97:14;
98:19,21;100:23;
101:17;104:9,20
**calculations (1)**
97:5
**calculator (2)**
87:11,12
**call (20)**
13:6;27:8;28:16,
18;29:8,9;46:22,23,
25;47:2,3;50:9;
61:24;66:5,5;77:17;
82:17,22;83:10,21
**called (4)**
26:17;27:3;29:12;
59:15
**calls (4)**
50:8;51:5;58:5;
62:4
**came (11)**
36:8;49:3,5;50:16;
56:4,14;84:18;85:14;
87:17,17;117:3
**Can (39)**
16:5,9,13;17:17;
20:13,17;24:11;26:3,
15;28:6,17;32:24;
33:6;36:13;37:19;
38:16;41:8;42:10;
46:9;47:10;48:8;
54:9;55:20;71:11,11;
75:20;76:3;96:5,17,
25;97:5;103:15,18;
108:4,16;109:20;
112:11;114:19;115:7
**Canada (2)**
98:5,11
**Canada's (1)**
98:6
**Canadian (13)**
11:2;29:2;37:13;
38:7,12,13;74:6,7,10;
98:12,15;105:20;
106:17
**cap (22)**
42:2;57:23;75:5;
86:24;87:17;92:2,19;
93:4;95:24,25;96:23;
97:3;98:18;100:18;
101:4,5,10,12,18,23;
111:19,20
**Capital (1)**
5:15
**capped (2)**
42:15;111:23
**capping (1)**
73:10
**caps (1)**
74:24
**case (7)**
12:7,22;24:12,14,
23,24;25:18

Case 09-10138-MFW    Doc 14654-4    Filed 10/30/14    Page 125 of 137

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

cases (2)
24:17;26:13
cash (12)
72:23,24;73:8,24;
74:23;75:7;96:15;
98:2;99:16,18;101:5,
18
cc (2)
62:25;63:6
CCs (1)
54:22
cease (1)
42:23
cell (2)
29:17,20
centered (2)
33:24;34:13
certain (13)
20:16;22:20;33:3;
50:8;59:18;74:15,22;
88:4;96:22;97:17;
100:15;104:8,21
certainly (3)
37:15;39:11;64:10
certainty (1)
71:5
CGSH (2)
78:25;79:16
chance (1)
12:10
change (6)
53:17;85:13,14;
92:8;94:13;100:24
changed (1)
95:22
changes (1)
91:7
Chapter (4)
25:18;38:23;39:4;
71:25
charges (1)
108:12
chief (2)
25:3,5
Chilmark (5)
19:14,16,18;35:15;
73:22
chose (1)
81:25
circulated (3)
80:7,10;86:18
city (2)
55:13,14
claim (21)
33:10,12,13;34:5,6,
8,14,17;59:2;70:24;
71:24;72:3;76:13;
83:14;98:5,20,21;
102:9,10;108:3;
111:16
Claimants (2)
3:15;11:13
claims (17)

72:2;74:5;98:2,24,
25;99:4,5,6,7,10,12;
102:10;107:3,4,5,20;
112:7
clarify (2)
61:11;62:6
clarifying (1)
61:23
clarity (1)
79:8
clean (1)
54:25
cleaner (1)
86:6
clear (10)
13:17,21;31:20;
41:25;77:12;81:24;
89:21;95:24;100:10;
116:4
Cleary (22)
10:11;19:3,10,13,
21;22:24;28:8;29:24,
25;30:5;44:18;45:13;
54:5;59:12;60:20;
64:6;67:10;79:24;
80:13;90:25;91:3;
117:8
Cleary's (1)
47:13
client (1)
80:7
clients (2)
65:16;66:21
close (1)
36:22
closer (2)
56:14;58:9
coincidently (1)
43:21
Coleman (1)
10:24
colleagues (1)
10:24
comfortable (1)
52:3,6
comments (3)
45:6,8;77:4
committee (8)
11:16;26:12;65:24;
67:16;68:10,24;
110:20,22
committee's (1)
110:18
communicate (2)
31:2;70:20
communicated (16)
27:25;28:2;35:24;
36:2;45:9;55:22;
58:6;60:10,16,21;
65:8;67:15;69:25;
70:5;90:25;92:20
communicating (1)
38:11

communication (4)
27:22;57:11;58:7;
63:14
communications (7)
20:21;36:25;46:15;
60:15;62:9;65:9;
90:11
company (5)
20:24;47:3;68:22,
24;110:16
comparable (1)
88:6
compare (1)
34:11
comparing (1)
87:22
complete (6)
34:12;74:8;94:20,
25;95:3;110:10
complexity (1)
105:6
computer (1)
97:9
concept (2)
73:10;93:20
concerning (2)
57:6;77:14
concluded (1)
74:21
concludes (1)
117:15
conference (2)
77:13,18
confidential (106)
12:12;13:1;14:1;
15:1;16:1;17:1;18:1;
19:1;20:1;21:1;22:1;
23:1;24:1;25:1;26:1;
27:1;28:1;29:1;30:1;
31:1;32:1;33:1;34:1;
35:1;36:1;37:1;38:1;
39:1;40:1;41:1;42:1;
43:1;44:1;45:1;46:1;
47:1;48:1;49:1;50:1;
51:1;52:1;53:1;54:1;
55:1;56:1;57:1;58:1;
59:1;60:1;61:1;62:1;
63:1;64:1;65:1;66:1;
67:1;68:1;69:1;70:1;
71:1;72:1;73:1;74:1;
75:1;76:1;77:1;78:1;
79:1;80:1;81:1;82:1;
83:1;84:1;85:1;86:1;
87:1;88:1;89:1;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1;107:1;
108:1;109:1;110:1;
111:1;112:1;113:1;
114:1;115:1;116:1;
117:1

confirm (1)
83:19
confirmation (1)
64:20
confused (1)
63:15
confusion (1)
116:5
conjecture (2)
67:25;68:3
connection (8)
12:14,25;16:6;
22:6;23:4;25:17,23;
64:13
consent (1)
84:10
consented (1)
28:3
consider (6)
12:13;96:14;
105:25;106:14;
107:12;108:5
considered (3)
12:12;39:13;75:8
considering (4)
75:7;97:6;98:2;
102:12
consistent (2)
50:11,14
constant (1)
94:12
consult (1)
18:4
consultant (1)
32:2
consultation (1)
103:6
consulting (1)
31:22
contact (1)
90:19
contacted (2)
20:7;83:4
contained (1)
55:17
Cont'd (2)
3:1;5:1
contemplated (2)
81:9;84:7
context (3)
25:16;84:5;114:20
continue (2)
42:11;57:24
continued (4)
36:4,6;38:3;93:21
continuing (1)
38:2
contract (7)
39:21;40:11;41:14,
19,24;93:9;111:18
contracts (1)
38:22
contractual (5)

37:6;57:14,18;
59:17;93:23
conversation (17)
24:7;26:20;27:6,
12;28:4,6,13;33:24;
47:4;64:7,13;65:17;
66:16,19;82:13;
83:17;90:20
conversations (27)
20:23;21:5,7;
46:18,20;50:3;53:25;
54:4,5;55:15;57:4;
59:11;65:14;67:3,9;
82:7;90:15;91:6;
109:4;112:24;113:2,
6,14,22;114:25;
115:8;116:7
copied (1)
80:4
correctly (1)
50:19
costs (1)
65:22
counsel (46)
10:19;20:23;21:2;
25:20,25;26:11;27:6,
8,11,13,22,23;28:2;
35:14;47:3;55:22;
61:15;63:14;67:3,9;
68:15;69:15;70:5;
77:23;79:24;90:16,
16;91:6;103:7,7,10,
21,21;110:15,16,18,
20;112:25;113:3,7,
23;115:2,8;116:8,12,
13
counsel's (4)
22:8;103:10;
113:20;114:4
counteroffer (7)
35:16,17,23;36:2,
15,18;51:25
counteroffered (1)
35:18
couple (3)
46:11;92:10;
112:11
course (2)
63:22;66:6
court (25)
10:14,16,18;11:25;
12:15,18;14:10;37:3;
39:9,18;40:10,14,20,
25;41:2,3,5,17;42:13;
76:23;77:24;94:3;
96:18;99:21;100:13
courtesy (1)
68:13
courts (1)
29:3
cover (5)
54:20;62:22;78:14;
79:9,12;80:2

Case 09-10138-MFW    Doc 14654-4    Filed 10/30/14    Page 126 of 137
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

**covering (1)**
100:4
**created (1)**
102:23
**creditor (6)**
68:21,23;70:23;
71:18,21;82:7
**creditors (24)**
11:16;26:11;60:11,
16;62:10;68:16;69:8,
19,25;70:19;73:2;
101:11;110:4,11,13,
21,23;111:2,7,10,11,
16;112:2,8
**CRICHLOW (3)**
5:7;11:4,4
**CRO (1)**
24:16
**current (3)**
55:24;56:19;99:25
**currently (3)**
15:8,21;44:5
**cut (1)**
84:24
**cute (1)**
46:3

**D**

**dabbott@mnatcom (1)**
3:11
**DAN (2)**
5:24;10:17
**date (13)**
42:12,13,18,22,25;
43:20;44:4;51:15;
81:23;83:24;91:24;
93:16;94:10
**dates (3)**
16:16;46:17;83:3
**DAVID (2)**
5:7;11:4
**davidcrichlow@kattenlawcom (1)**
5:10
**day (10)**
32:17,23;43:3;
44:8,8;53:19;54:7;
63:23;94:2,14
**day-to-day (1)**
17:25
**deal (1)**
111:24
**debate (5)**
38:20;39:2;84:20;
86:4;111:8
**debtor (1)**
38:24
**Debtors (7)**
3:4;11:2,23;38:7,
13;105:20;106:18
**Debtors' (5)**
13:10,14,24;25:25;
37:13

**December (1)**
24:20
**decide (1)**
66:4
**decided (1)**
84:15
**decision (2)**
43:25;81:18
**decisions (2)**
17:25;108:8
**define (1)**
17:17
**defined (1)**
74:15
**Delaware (5)**
3:7;14:10;41:5;
55:14;64:24
**demand (11)**
33:17,25;34:4,16;
35:10,20;36:14;37:7;
50:11,15,15
**demands (1)**
57:12
**Dennis (12)**
23:23;24:2,4,6,13;
46:19,23;82:17,18,
21,22;90:19
**denominator (1)**
88:9
**denominators (1)**
87:22
**dependent (1)**
100:22
**depending (3)**
72:24;77:2;85:17
**depends (3)**
74:4,4,6
**deposed (2)**
12:7,22
**deposition (13)**
10:7,10;22:7,13;
61:7;108:17,21,24;
112:19;116:11,13,14;
117:16
**DEREK (2)**
3:8;62:3
**derivation (1)**
98:3
**derive (2)**
76:4;92:15
**derived (3)**
77:11;92:9;97:22
**describe (4)**
16:5;28:6;33:6;
71:11
**described (1)**
113:7
**designated (1)**
12:25
**designed (2)**
111:3,24
**desire (1)**
33:8

**desired (1)**
33:14
**detail (1)**
71:12
**detailed (1)**
115:10
**details (1)**
64:12
**detect (1)**
117:5
**determination (2)**
72:3;74:13
**determine (4)**
71:20,23;72:18;
111:6
**determined (4)**
39:17;70:25;94:10;
104:20
**determines (2)**
111:12,13
**detrimental (1)**
72:4
**DI (4)**
102:13;113:11,25;
115:5
**dialogue (1)**
38:10
**different (6)**
26:25;29:14;87:22;
92:10;95:7;100:20
**direct (3)**
113:11,25;115:5
**direction (5)**
22:9,19;55:22;
113:20;114:4
**director (2)**
15:12,14
**directors (5)**
15:4,9;17:4;
107:11;108:5
**disagreement (1)**
12:16
**Disciplinary (2)**
27:16,16
**discuss (7)**
28:11;36:7;45:2;
59:9;83:9;84:22;
90:23
**discussed (6)**
35:13;38:5;63:24;
67:11;82:6;110:17
**discussing (1)**
33:20
**discussion (14)**
16:16;22:25;23:5;
28:22,25;34:9,10,21;
36:24;37:22;38:17;
62:12;110:8;111:8
**discussions (11)**
16:20,23;36:4,6,
21;37:5,10,12;39:5;
44:17,22
**dispute (15)**

28:12,23;33:14;
37:2;102:5,17,21;
105:6,10;106:17;
107:2,24,25;114:8,17
**disputes (1)**
71:10
**disputing (1)**
106:18
**distribute (3)**
75:10;76:9;96:15
**distributed (1)**
42:20
**distribution (4)**
77:3;91:24;92:2;
98:4
**distributions (3)**
92:23;93:15;96:10
**divide (1)**
40:15
**document (49)**
13:10,13,21,22;
14:6,16,22;15:2,6,24;
16:11;21:15,22,25;
22:10,11;23:11;
45:25;47:17;48:3,6,
9;49:10,25;50:2;
51:16;53:8,20;54:12,
20;55:4;56:7;57:2;
59:13;62:14,21;63:3,
9;78:6,21,22,23;79:4,
23;84:7,11;88:25;
89:9,22
**documents (3)**
22:5;97:12;108:23
**dollar (5)**
56:23;85:15,23;
86:7;111:5
**dollars (3)**
35:6;44:10;77:2
**done (14)**
33:2;37:15;44:3;
65:12;72:9,13,14,18;
76:7,12,16;96:13,19;
103:19
**doubt (1)**
92:2
**down (6)**
22:11;44:2;47:11;
52:6;56:18;94:8
**draft (47)**
20:11;21:12,17;
23:4,8,18;45:4;46:2,
8;47:18,21;48:12,17;
49:11,15,23;50:10;
53:21,24;54:14,24;
55:23,24;58:2,17;
63:18;64:2;78:24,25;
79:14,16;80:6,9,14,
17;81:5;83:24;84:3;
85:9;86:9,11,11,17;
88:21;89:4,12;92:11
**drafted (5)**
23:15;109:20,22,

23;110:12
**drafting (4)**
48:17;85:25;86:2,6
**drafts (8)**
20:10,14,18;45:11,
18,19,20;46:12
**drill (1)**
47:10
**drive (1)**
74:19
**driver (1)**
108:20
**dropped (1)**
86:8
**Dunne (22)**
23:23;24:2,4,6,13,
19;25:13,16;26:14,
18,19;27:6,10,20;
28:5;29:6,20;30:13;
46:19,23;82:18;
90:19
**Dunne's (3)**
25:11,23;26:9
**during (3)**
19:4;51:3;91:21

**E**

**earlier (6)**
62:8;82:6;91:23;
105:13;113:8;116:5
**early (2)**
55:8;60:7
**Earthlinknet (2)**
63:2,6
**eat (1)**
117:3
**Eckenrod (1)**
11:23;78:15;117:2
**effect (8)**
37:16;57:19;65:15;
73:13;90:17,24;
101:4;110:24
**effectively (1)**
57:11
**either (6)**
28:10;31:2;45:22;
48:10;81:16;111:17
**Ellen (2)**
10:15,17
**else (16)**
16:24;19:18,22;
29:5;30:11;31:14,17;
32:3,10,12,14;62:5;
66:7;76:3;88:5;
108:14
**E-MAIL (22)**
3:11,21;5:10,21;
21:17;47:18,21;
54:14,20;62:17,22;
63:5,8,18;78:9,15;
79:3,9,12,24,25;80:2
**EMANUEL (2)**

Case 09-10138-MFW    Doc 14654-4    Filed 10/30/14    Page 127 of 137
IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

5:13;11:8
**embodied (3)**
45:25;57:20;59:3
**embodies (1)**
41:22
**EMEA (5)**
107:2,2,4,5,14
**employed (1)**
17:20
**employee (1)**
17:12
**employees (2)**
17:19;18:11
**enclosed (1)**
54:23
**end (3)**
36:3;52:2;100:20
**ended (1)**
51:12
**engage (1)**
68:2
**Enron (3)**
26:5,6,10
**ensure (1)**
72:11
**entertain (1)**
73:9
**entire (2)**
28:12;93:5
**entirety (1)**
85:3
**entitled (11)**
13:10;33:15;34:3;
37:6;39:8;41:18;
59:5,20;60:4;83:13;
106:4
**entitlement (16)**
33:19;37:18,24;
38:18,21;39:11,21,
23;40:7,11,23;41:6,
13,23;57:18;58:25
**entitlements (2)**
57:19;93:23
**entity (1)**
71:25
**entrusted (1)**
38:8
**Entry (3)**
13:11,15,25
**equal (3)**
85:9;91:13,15
**equity (7)**
69:12;72:19;73:14;
75:6;96:24;97:21;
101:11
**errors (1)**
14:22
**ESQ (4)**
3:8,18;5:7,18
**essentially (2)**
23:24;102:15
**established (1)**
33:12

**estate (23)**
71:5;73:3;74:5,6,7,
10;92:20,22,23,24,
25;98:3,15,24,25;
101:10;107:6,18,25;
108:8,13;110:4,9
**estates (3)**
72:23;74:20;
103:25
**estimate (2)**
28:17;32:24
**estimated (2)**
34:19,23
**estimation (1)**
104:4
**et (1)**
10:8
**Evans (1)**
11:15
**even (6)**
27:12;74:10;84:21;
93:25;94:21;95:16
**eventualities (1)**
101:13
**everybody (1)**
46:25
**exact (2)**
16:16;33:11
**exactly (4)**
51:13;58:5;60:19;
77:10
**EXAMINATION (4)**
12:4;115:24;116:6,
18
**example (2)**
57:16;60:8
**exceed (1)**
101:22
**excess (19)**
35:4;43:6;44:2,9;
74:23,24;75:5,7;87:4,
8;96:15,16,23;97:2,
20,20;98:17;100:18;
104:20
**exchange (1)**
45:11
**exchanged (2)**
48:14;49:11
**exclude (2)**
22:5;116:7
**excluded (1)**
81:12
**exclusively (2)**
100:21;101:20
**Exhibit (30)**
13:12,14;14:4;
15:2,6,24;16:3;21:12,
17,23;22:14;43:4;
47:17,21;48:4,25;
53:21;54:9,14;62:15,
17;70:18;76:6,9;
84:2;89:4,13,17;
109:3;114:23

**exist (1)**
115:21
**existed (1)**
59:25
**existence (2)**
60:10,14
**expected (1)**
98:14
**expense (3)**
66:11,17;105:10
**express (2)**
34:16;38:14
**expressed (5)**
38:12;40:10;41:17;
82:18;83:12
**extend (1)**
68:13
**extent (4)**
71:6;81:8;103:4;
104:7

## F

**face (1)**
116:3
**fact (5)**
52:22;72:8;88:23;
89:7;96:12
**factored (1)**
104:8
**factors (2)**
74:4;102:22
**fair (22)**
17:24;40:9;43:15;
44:4;51:7,11,22;
52:13,23;53:2;72:7;
84:4,5,6,6;85:5;
86:10;88:7;90:6;
93:25;94:19;111:21
**familiar (6)**
26:16;27:2,15;
63:7;75:12;77:15
**FARR (2)**
3:14;11:12
**FAX (4)**
3:10,20;5:9,20
**feel (1)**
66:9
**felt (4)**
37:5,23;52:3,6
**Fernando (1)**
15:14
**few (5)**
35:5;45:17,19;
57:12;78:8
**Fifteen (1)**
25:15
**figure (1)**
43:14
**filed (5)**
13:22;14:9,16;
38:9;94:3
**filing (5)**

14:15,25;15:5;
16:3;43:3
**final (8)**
20:11;72:3;86:23;
89:18;90:8,13;91:24;
95:6
**finalized (2)**
47:9;81:17
**finally (1)**
70:25
**financial (13)**
19:10;31:21,25;
35:14;71:19,22;72:7,
8,13,17;73:17,23;
76:7
**financially (2)**
73:20,21
**find (3)**
39:10;54:23;
100:13
**finished (1)**
84:23
**finite (1)**
93:4
**firm (7)**
19:7;23:16;30:17;
31:15;61:17,18,19
**firmly (1)**
37:23
**first (15)**
13:23;16:15;24:18;
25:15;26:19;38:16;
48:8,12;49:10;55:6;
57:25;78:19;88:12;
92:15;103:13
**five (4)**
14:2;28:19;56:12;
85:22
**Floor (2)**
3:5;5:16
**flow (2)**
73:13;75:6
**focus (1)**
34:12
**folks (1)**
50:4
**follow (1)**
39:19
**followed (1)**
48:22
**following (2)**
113:19;114:3
**follow-up (1)**
116:20
**forego (1)**
60:2
**forget (1)**
66:5
**form (29)**
17:16;24:10;26:21;
29:10;31:4;39:24;
41:7;42:9;43:8;
49:16,24;53:6;54:2;

55:19;68:7;69:21;
70:11;71:14;77:9;
87:5;94:24;95:19;
104:17;106:5,12;
107:16,19;108:2;
114:9
**formed (3)**
66:24;67:23;
107:21
**formula (5)**
85:16;86:3;92:17;
95:2;96:7
**formulate (1)**
66:14
**formulation (2)**
92:8,9
**forth (5)**
36:9,14,17;45:13;
52:4
**found (3)**
65:24;66:2;84:15
**foundation (1)**
75:22
**four (1)**
117:7
**frame (1)**
21:9
**Fred (6)**
63:22;64:3,5;
65:18,23;66:13
**Friday (1)**
64:21
**front (5)**
37:2;40:20;52:18;
77:13;97:12
**Fruit (3)**
25:17,19,24
**FTI (5)**
31:19,23,24;32:5;
92:21
**full (13)**
37:6;39:11;42:19,
22;58:25;59:5,20;
76:5;83:13;93:9,19;
96:9;98:9
**fully (2)**
70:24;74:15
**function (1)**
92:18
**funds (1)**
110:25
**further (11)**
36:9;53:25;57:4;
71:9;80:6;91:5;
109:4;115:19,21;
116:17,18
**future (1)**
111:8

## G

**GALLAGHER (2)**
3:14;11:12

Case 09-10138-MFW    Doc 14654-4    Filed 10/30/14    Page 128 of 137
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

gap (1)
36:22
gave (1)
103:25
general (1)
25:20
generally (1)
102:7
generated (2)
45:14,15
Gilmore (1)
10:15
given (1)
104:14
goes (3)
42:2;54:21;55:2
Good (1)
12:6
Gottlieb (8)
10:11;22:24;29:24;
44:18;64:6;79:24;
80:13;117:8
Gottlieb's (1)
29:25
granular (1)
54:7
Grauer (2)
10:15,18
great (2)
33:20;55:13
greater (1)
101:9
Gross (1)
77:14
group (12)
11:20;24:24;25:14;
31:22;37:10;47:2;
54:22;64:19;70:23;
71:18,21;78:15
grow (1)
38:2
guarantee (1)
112:4
Guaranteed (3)
91:17,20,25
Guerra (2)
15:14,19
guess (2)
39:13;96:17
guidance (1)
12:17
Gump (13)
11:15;60:21;61:18;
62:24,25;63:20;64:5;
65:8,14;67:3,9,12;
68:14
Gump's (1)
65:16

**H**

Hadley (1)
11:19

half (5)
35:6;44:9;56:23;
95:18;96:7
Hamilton (1)
10:12
hand (4)
101:7;111:10,11,
15
handicaps (1)
102:15
HANRAHAN (3)
3:18;11:11,11
happen (2)
81:14;93:12
happened (1)
95:9
Happy (4)
22:18;87:19,24;
88:24
hard (1)
20:16
Harris (1)
54:21
head (1)
76:2
heard (4)
40:16;67:22,22;
78:20
hearing (5)
13:2;43:16;44:5;
64:20;77:25
held (2)
10:10;25:20
helpful (1)
89:2
high (3)
50:25;51:23;97:19
highly (106)
12:12;13:1;14:1;
15:1;16:1;17:1;18:1;
19:1;20:1;21:1;22:1;
23:1;24:1;25:1;26:1;
27:1;28:1;29:1;30:1;
31:1;32:1;33:1;34:1;
35:1;36:1;37:1;38:1;
39:1;40:1;41:1;42:1;
43:1;44:1;45:1;46:1;
47:1;48:1;49:1;50:1;
51:1;52:1;53:1;54:1;
55:1;56:1;57:1;58:1;
59:1;60:1;61:1;62:1;
63:1;64:1;65:1;66:1;
67:1;68:1;69:1;70:1;
71:1;72:1;73:1;74:1;
75:1;76:1;77:1;78:1;
79:1;80:1;81:1;82:1;
83:1;84:1;85:1;86:1;
87:1;88:1;89:1;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1;107:1;

108:1;109:1;110:1;
111:1;112:1;113:1;
114:1;115:1;116:1;
117:1
hired (1)
103:7
hoc (1)
11:19
Hodara (5)
62:24;64:4,5,7;
66:16
hold (1)
102:25
holder (2)
69:2,4
holders (2)
58:12;97:21
hours (1)
32:25
hundred (2)
35:6;98:22
hung (1)
45:23

**I**

identification (6)
13:16;21:19;47:24;
54:17;62:19;78:12
identified (2)
69:20;82:8
immaterial (1)
85:21
implied (1)
104:4
inaccurate (2)
44:14,16
Inc (2)
5:15;11:10
include (2)
53:13;99:11
included (3)
61:16;84:3,14
includes (2)
99:7,9
including (3)
57:13;101:11;
113:9
inclusion (3)
81:19;84:10,18
Incorporated (1)
10:8
incorrect (2)
77:25;88:2
increased (1)
94:4
indebtedness (1)
85:19
indenture (3)
65:20;66:15,18
independent (3)
97:13;103:4;
116:12

independently (1)
103:20
indicate (1)
62:22
indicated (8)
23:10;37:23;82:6;
83:22;86:19;88:22;
89:6;95:11
indicates (6)
53:8;54:23;77:20;
80:5;85:8;89:10
indicative (2)
48:19,24
indifferent (2)
84:17;85:2
informed (1)
104:5
initial (2)
27:8;55:23
initially (1)
43:20
input (2)
100:22;103:10
inputs (9)
97:6,6;100:23;
101:16,25;102:8,22;
104:2,13
inserted (1)
58:18
insistence (2)
92:18;109:21
instance (1)
58:2
instruct (1)
22:3
instructed (1)
116:7
instruction (1)
22:16
instructions (1)
103:16
insufficient (1)
110:25
interactions (1)
26:14
interest (13)
38:19,23,25;42:12;
43:6,11,24,25;57:23;
60:5;73:2;85:19;
111:17
interests (1)
80:8
internal (1)
80:6
into (14)
21:5;35:25;38:17;
64:11;84:10;86:9,23;
94:21;101:16;105:5,
9,23;113:13;115:9
introduce (1)
10:19
invited (1)
30:6

involved (19)
14:25;15:5;17:13,
21;18:14,17,19;19:2,
4,7,11,18,23;24:15,
17;27:9;61:15;64:14;
106:25
involvement (2)
16:6;20:20
issue (11)
16:25;40:16,21;
59:22;66:8;101:18;
105:21;106:2;
113:10;115:4,22
issues (3)
103:5,5;115:11
iteration (1)
36:17

**J**

Jacob (1)
10:22
JAMES (2)
5:18;11:7
jamestecce@quinnemanuelcom (1)
5:21
January (1)
100:4
Jay (3)
12:8;13:18;79:7
Jeff (1)
11:21
Jennifer (1)
54:21
jobs (1)
71:24
Joe (1)
10:25
John (5)
10:7;61:7;112:19;
116:3;117:16
JR (2)
62:25;63:6
Judge (1)
77:13
judgment (1)
104:3
July (39)
16:18,19,24;18:23;
20:19;21:9;22:23;
23:19,22;28:6;29:24;
43:5;44:18;46:6;
47:7;60:10;62:11,23;
63:10;65:13;67:21;
77:12;78:17;79:15,
21;80:13,17;84:4,23;
86:24;90:3;91:22;
94:2,22,22,23;95:16;
99:9,11
juncture (1)
53:14
June (11)
20:19;34:19;42:15,

Case 09-10138-MFW    Doc 14654-4    Filed 10/30/14    Page 129 of 137
IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

21,25;91:23;92:3;
93:3,16;96:2,11

**K**

**KATTEN (2)**
5:3;11:5
**Katzenstein (2)**
31:19,21
**Ken (1)**
10:24
**Kennedy (4)**
19:17,22;30:6;
35:15
**kind (4)**
38:16,17;60:4;
73:23
**Kinrich (1)**
100:12
**Kinrich's (4)**
75:13,21;97:23;
98:7
**knew (1)**
31:10
**knowing (1)**
98:9
**knowledge (18)**
14:21;15:23;16:2;
17:3,7;20:2,6;45:8;
48:14;49:23;53:23;
56:21;60:14,18;
72:17;76:10,15;78:2
**known (2)**
15:18;74:10

**L**

**laid (1)**
106:22
**landline (2)**
29:18,21
**language (1)**
46:5
**large (1)**
70:23
**largely (1)**
33:22
**last (8)**
32:7,21;50:15,20;
67:23;68:5;99:23;
106:21
**lasted (1)**
32:22
**lastly (1)**
93:11
**later (3)**
21:6;45:17;57:9
**law (1)**
39:22
**lawyer (2)**
24:2;103:16
**lawyers (11)**
18:25;19:3,6;

23:18;30:5;63:19;
69:18;70:4;87:20;
117:8,9
**learn (1)**
23:21
**least (3)**
20:17;46:21;76:4
**leaves (1)**
111:7
**Leblanc (4)**
30:19,20;31:11;
46:24
**led (3)**
48:17;51:17;55:16
**left (6)**
34:9;44:20,25;
45:7;53:23;66:13
**legal (4)**
10:16;41:13;
115:14,15
**lemon (1)**
117:4
**length (2)**
28:17;33:21
**less (9)**
28:14;38:10,15;
39:10;56:12,12;85:3;
101:3;104:24
**lesser (1)**
39:7
**level (2)**
58:6;74:6
**liabilities (7)**
74:7,14,19;98:10,
13;103:24;104:19
**Liberty (1)**
10:12
**life (1)**
59:21
**likelihood (4)**
75:3;101:24;
102:11;113:3
**likely (4)**
37:9;104:13,16;
113:23
**lines (1)**
45:12
**Lisa (9)**
11:22;30:4,6;49:5;
54:22,23;63:25,25;
64:6
**list (2)**
32:12,14
**litigating (2)**
105:10,20
**litigation (2)**
115:3,16
**little (2)**
33:4;87:3
**LLP (5)**
3:3,14;5:3,13,15
**located (1)**
10:12

**location (1)**
28:15
**logistical (1)**
28:15
**long (2)**
32:21;92:22
**longer (1)**
33:4
**look (8)**
23:4,14;45:4;
80:19;88:15,25;89:3;
109:7
**looked (4)**
23:12;86:17;88:11;
101:3
**looking (3)**
53:9;80:20;83:25
**Loom (3)**
25:18,19,24
**lot (1)**
74:11
**lower (2)**
52:2;56:2
**Luiz (1)**
15:18

**M**

**MACOM (2)**
5:24;10:17
**Macquarie (2)**
5:15;11:9
**Madison (2)**
5:5,16
**make-whole (2)**
57:17;59:15
**Management (2)**
5:14;11:9
**many (4)**
20:14;58:5;100:23;
101:16
**mark (4)**
53:20;54:8;62:15;
78:5
**marked (16)**
13:9,12,15;15:24;
21:12,19,22;43:4;
47:17,23;48:3;54:16;
62:18;78:11;84:2;
89:13
**Market (1)**
3:5
**markups (1)**
46:12
**material (6)**
107:15,17,18,20,
25;108:3
**materiality (1)**
107:22
**materialized (1)**
58:2
**math (9)**
44:3;53:7,10,

75:21,23;76:2;87:20,
25;94:9
**mathematical (1)**
87:15
**mathematically (1)**
97:11
**matter (21)**
10:7;13:6,7;24:14,
16;25:24;26:16,24,
25,25;27:2;29:2,13,
14,14,15;31:6;48:13;
64:14,15,18
**matters (2)**
31:9,12
**maturity (1)**
60:2
**maximum (5)**
75:8;76:8;91:17;
96:8,14
**may (22)**
22:20;29:16;30:4;
33:3;35:3;36:16;
45:13;50:25;51:5;
54:5;55:7,7;66:6;
67:11;82:14,19;
83:17;100:8;101:15;
111:16;115:21;117:6
**maybe (6)**
28:20,20;76:3;
89:2;98:13;117:7
**McCloy (1)**
11:19
**mean (13)**
17:15,17;37:4;
45:10;55:21;67:22;
70:21;81:8;84:6,11;
95:4;97:4;102:2
**meaning (1)**
33:11
**mechanics (1)**
28:14
**meet (3)**
56:17;74:24;
116:13
**meeting (46)**
22:23;23:3,13,16,
19,22,24,25;28:5,9,
15;29:23;30:7,9,14,
21,24;31:3;32:14,18,
21;33:7,17;34:13,13;
35:12,24;36:4,12,23;
37:4;46:14,20;47:12;
49:7;50:5,10,16,21,
24,25;51:3,4,19;
116:21,23
**Melissa (1)**
10:15
**Melker (1)**
32:5
**member (3)**
15:20;18:5;20:7
**mentioned (2)**
66:7;117:8

**mentioning (1)**
61:16
**met (1)**
25:16
**Michael (2)**
19:17,22
**middle (2)**
18:23;56:18
**might (6)**
39:6,18;60:3;86:5;
97:7,19
**Mike (3)**
30:6;31:19;35:15
**Milbank (26)**
11:18;16:20;23:15,
23;24:2,13;30:17;
31:14;32:2;45:9,14;
50:4;53:25;54:4,6,
21;55:16,22;58:18;
60:20;66:13;83:16;
86:18;90:16;92:21;
110:17
**MILLER (24)**
11:17,17;27:18,24
**million (28)**
35:6;42:4,6,8;43:7;
44:2,9;53:11;56:23;
76:25;85:9;86:12,20;
88:10,23;89:8,11;
91:14,18;92:10;94:4,
20;95:11;97:19,20;
98:22;102:9,24
**millions (1)**
85:24
**mind (3)**
38:19;39:2;96:20
**minute (2)**
67:23;68:6
**minutes (4)**
28:20,20;106:21;
112:11
**mispronounce (1)**
15:17
**miss (1)**
36:16
**misspoke (1)**
56:5
**misstate (1)**
96:4
**misstatements (1)**
14:22
**mistranscribed (1)**
52:22
**misunderstanding (1)**
82:24
**modeled (1)**
99:2
**modeling (13)**
71:19,22;72:7,9,13,
18;73:17;74:2;76:8;
102:21;103:4,23;
113:7
**models (1)**

**IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL**

73:23

**moment (2)**
21:4;22:9

**moments (1)**
78:8

**Monday (9)**
10:4;28:10;49:4;
57:9;78:17;80:16;
82:15;86:11;89:12

**money (1)**
77:2

**monitor (9)**
11:3;34:24;38:8,
13;69:16;70:5;
105:19;106:18;115:4

**monitor's (1)**
37:13

**months (1)**
45:17

**MOR (1)**
99:24

**more (9)**
15:11;18:16;28:14,
19;38:9;71:12;98:17;
113:4;115:17

**morning (1)**
116:22

**MORRIS (4)**
3:3;67:11;90:25;
91:4

**most (1)**
99:24

**mostly (4)**
28:15;33:25;34:13;
38:7

**motion (17)**
12:14;13:11,15,18,
24,25;43:4,16,17;
77:14;89:17,20;
106:16,16;109:5;
114:14;115:21

**move (3)**
51:17;56:14;
100:25

**moved (4)**
36:19;50:24,25;
51:8

**movement (1)**
52:5

**moving (1)**
52:9

**mow (1)**
30:23

**much (4)**
33:15;38:25;52:2;
117:12

**MUCHIN (2)**
5:3;11:5

**multi-page (1)**
13:13

**multiple (1)**
46:22

**multiplication (1)**

86:5

**multiplied (1)**
97:24

**myself (1)**
44:3

## N

**name (1)**
32:7

**National (1)**
11:6

**necessarily (5)**
39:9;46:25;75:2;
101:19;111:13

**necessary (4)**
18:5,6,9;72:15

**need (5)**
52:19;71:22;72:6,
10;98:22

**needs (1)**
58:8

**negatively (1)**
100:24

**negotiated (3)**
16:10,12;101:23

**negotiating (3)**
17:21;18:20;51:24

**negotiation (11)**
16:14;17:13;18:14;
19:12,19,23;36:9;
53:13;56:19;57:10;
78:4

**negotiations (4)**
19:2,5;51:14;60:11

**neither (1)**
111:12

**Networks (1)**
10:8

**New (11)**
3:17,17;5:6,6,17,
17;10:13,13;27:16;
55:14;65:3

**next (8)**
13:24,25;14:2,3;
46:15;48:21;49:10;
53:19

**Nicholas (1)**
11:18

**NICHOLS (4)**
3:3;67:11;91:2,4

**NNCC (19)**
58:11,12,19,24;
59:5,8;80:24;81:4,18,
25;82:3,19;83:12;
84:2,10;90:7;92:13;
95:13,22

**NNI (66)**
14:13,25;15:4,8,
20;17:4,12,12,20;
18:2,5,9,11,12,13,25;
19:6,11,23;20:3,7,8;
21:2;27:7;30:3,11;

31:10;35:9;36:25;
37:8,9;40:9,13,14,17,
22;41:4,12,18;43:15;
50:20;51:8,17;57:12;
58:7;60:12;61:14;
65:10;75:9,19;76:9,
16;92:20,23,24,25;
96:15;105:14;
107:11,18,25;108:5;
109:25;110:9;
112:25;113:3

**NNI-PPI0000306 (2)**
62:16,18

**NNI's (1)**
98:2

**NNL (1)**
69:13

**non-bond (7)**
110:3,11,23;111:7,
11;112:2,7

**none (1)**
117:5

**nonetheless (1)**
100:21

**noon (1)**
32:20

**nor (3)**
74:9;84:21;111:13

**Nortel (5)**
10:8;24:14;31:12;
64:16;78:16

**North (1)**
3:5;51:12

**noted (1)**
117:19

**notes (4)**
58:13;80:24;81:5,
11

**Notice (6)**
13:10,14,18,19,23;
89:17

**November (2)**
13:2;44:6

**number (8)**
13:22;32:24;33:22;
34:11;35:4;36:18,19;
43:6,14;50:11,20;
51:2,8,9,16,18,21;
52:2,3,11,25;53:3,12;
55:17;56:2,10,14,15,
23;57:6,21;85:15,16;
86:7,10,13,22,24;
87:16,17,19;88:11;
92:16;94:4,20;95:3,8,
12,16,24;96:2;97:18;
98:20;104:24;114:19

**Numbers (20)**
21:13,16;44:14;
47:19;49:14;50:4;
54:12;62:16;77:11;
78:6;86:5;88:5;
93:24;94:13;95:6;
96:11;98:4,16,16;

104:6

**numerator (1)**
88:8

**numerous (2)**
73:5;74:4

## O

**Objection (36)**
16:8;17:16;24:10;
26:21;27:18,24;
29:10;31:4;39:24;
41:7,20;42:9;43:8;
49:16,24;52:16;53:6;
54:2;55:19;69:21;
70:11;71:14;77:9;
87:5;94:24;95:19;
96:3;102:2;104:17;
106:5,12;107:16,19;
108:2;113:17;114:9

**obtaining (1)**
113:4

**obviously (1)**
103:9

**occur (2)**
37:9;42:21

**occurred (1)**
64:13

**occurs (1)**
42:16

**o'clock (2)**
32:20;33:3

**off (9)**
51:17;61:2;84:24;
85:23;94:12;102:18;
112:14;117:14,17

**offered (1)**
50:20

**officer (6)**
14:13,24;25:3,6;
71:25;108:13

**offices (5)**
10:11;22:24;29:25;
44:17;47:13

**official (4)**
11:16;110:18,20,
22

**one (29)**
10:2,12;15:11;
25:2;30:16;31:2;
32:14;45:14,15;
46:21;63:6;66:21;
69:20;71:24;78:20;
82:7;83:17;84:5;
88:15;100:13,22;
101:16;102:20,25;
103:8;111:10,15;
116:2,9

**ongoing (1)**
65:9

**only (11)**
12:13;18:6;30:16;
42:16;46:6;48:21;

73:6;74:23;79:8;
93:12;96:5

**open (2)**
66:8;111:7

**opening (2)**
10:6;76:19

**operating (1)**
99:20

**opportunity (3)**
14:18;21:21;48:2

**opposed (2)**
85:16;93:19

**opposing (1)**
39:12

**orally (1)**
34:2

**Order (9)**
13:11,15,25;14:3;
42:13;45:16;50:21;
58:8;106:3

**orientated (2)**
73:20,22

**OSG (5)**
24:16,23;25:6,9;
64:19

**others (3)**
26:2,3;30:18

**otherwise (3)**
15:18;22:17;59:24

**out (21)**
26:18,19,22;42:15;
43:14;58:2;63:24,25;
68:15;69:19,23;
76:13;81:18;84:12,
15,16,19;87:17;
90:21;95:22;106:23

**outcome (6)**
39:15;75:4;98:10;
102:5,16;113:23

**outcomes (14)**
37:17,21;72:22;
73:4,18,24;74:3,22;
76:24;96:21;98:14;
105:3;113:9,15

**output (1)**
98:14

**outright (1)**
106:3

**outside (3)**
18:13;20:25;31:21

**outstanding (5)**
85:4;91:16,19,21;
96:8

**over (9)**
35:7;36:10;57:5;
58:3;59:21;68:12;
80:12;108:21;115:4

**overall (1)**
57:6

**Overseas (2)**
24:24;64:19

**overstated (1)**
98:13

Case 09-10138-MFW    Doc 14654-4    Filed 10/30/14    Page 131 of 137
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

**Overy (1)**
10:23
**own (5)**
72:20;73:15;74:21;
96:20;101:5

**P**

**page (5)**
89:21;91:10;109:8,
9;114:24
**pages (5)**
13:23,24;14:2,2,4
**paid (6)**
44:8;59:5,6,25;
92:23;93:13
**paper (2)**
40:14;97:9
**papers (3)**
38:7,9;58:24
**par (1)**
83:13
**paragraph (4)**
59:12;94:17;
109:24;114:19
**part (10)**
33:9;52:4;75:25;
76:4;81:5,7,9,25;
90:22;109:3
**participate (7)**
82:19,25;83:6,11,
20;84:8,16
**particular (5)**
59:10;80:20;
103:25;109:24;
111:15
**parties (6)**
12:10;38:6,9;39:6;
68:15;94:12
**partly (1)**
74:2
**party (1)**
83:23
**past (1)**
22:5
**pay (2)**
73:2;110:25
**payable (1)**
38:25
**payment (2)**
59:19;60:7
**payments (1)**
60:6
**PBGC (7)**
69:10;70:10,12;
99:7,9,12;102:10
**peculiarities (2)**
58:19,21
**pen (1)**
97:8
**penned (1)**
81:23
**Pension (2)**

3:15;11:13
**Pensyl (1)**
10:24
**people (7)**
17:20;19:21;33:23;
39:8;46:22;78:16;
86:3
**per (1)**
91:15
**percent (45)**
34:18,22,22;35:19,
21,21;36:14,15;
38:15;49:19,22;
50:13,22,24;51:9,9,
18,21;52:12,23;53:2,
3,12;55:24;56:3,10,
22;58:13;75:22;
86:12,15,16,19;87:8,
18,19;88:11,22;89:7,
15;91:15;93:8;96:7;
97:23;98:8
**percentage (1)**
88:4
**perfectly (1)**
87:24
**perhaps (1)**
67:11
**period (6)**
36:10;58:3;91:22;
93:3,15;94:22
**permission (1)**
27:21
**personally (5)**
39:25;40:3,5;
76:14;110:15
**perspective (4)**
39:4;66:15;86:2,7
**Perusing (11)**
21:20;47:25;54:18;
55:3;78:13,18;79:6,
13;80:22;109:9,19
**PHONE (10)**
3:9,19;5:8,19;27:7;
29:5,17,20;46:22;
83:21
**pieces (2)**
38:18;42:24
**Pisa (4)**
30:19,23;31:8;
46:24
**place (4)**
29:8,9,23,25;
32:18;47:5;64:23
**placed (1)**
66:5
**Plaza (1)**
10:13
**pleadings (1)**
59:4
**please (3)**
10:19;12:1;54:23
**plus (4)**
59:2;91:14;95:17;

96:7
**pm (7)**
10:4;61:3,9;
112:15,21;117:18,19
**PO (1)**
3:6
**point (19)**
27:20;37:25;39:3;
42:23;51:7,13;53:16;
57:7,10;60:20;65:5,
13;66:24;67:2,15;
70:8,16;88:16;116:9
**points (2)**
56:12,19
**portion (1)**
71:3
**position (16)**
37:14;38:12;40:14,
17,23;41:4,10,12,15,
16;59:3;67:13;75:16,
19;93:23;105:14
**positions (6)**
25:20;37:11;38:5,
10;39:12,14
**positively (1)**
100:25
**possibilities (2)**
73:5;104:12
**possibility (2)**
75:2;101:22
**possible (5)**
39:16;42:25;95:8;
101:8;105:3
**post-petition (4)**
38:19,24;73:2;
111:17
**potential (16)**
16:21,25;20:21;
35:15;37:17,21;64:8;
72:21;73:18,24;74:3;
75:4;76:24;96:20;
98:10;113:9
**PPI (78)**
12:14;13:6;16:7,
21,25;17:5;18:20;
19:24;20:21;22:25;
28:12,23;29:2;31:5,
6;33:15,18,25;34:19;
37:2,7,12,14,18,25;
40:12,24;41:6,14,18,
23;43:25;47:19;
48:13;49:18,20;
54:15,24;59:2,6,7;
66:20;71:2,10;73:5,
9;74:24;78:10,16;
85:8;91:13;92:6,12;
93:6;101:6,9;104:21,
24;105:3,6;106:4,16,
16;107:24;110:25;
111:4,6,9,13,14,22,
22,25;112:5,7;114:7,
15;115:4
**practice (1)**

115:21
**precise (1)**
83:3
**preferred (1)**
85:25
**premiums (1)**
60:6
**preparation (3)**
22:7,13;108:24
**prepare (5)**
108:17,18;116:10,
12,14
**prepared (2)**
22:10;100:7
**prepayment (1)**
59:23
**pre-petition (2)**
25:14;33:21
**PRESENT (1)**
5:23
**presentation (1)**
17:8
**presently (1)**
25:4
**preserve (1)**
93:21
**presumably (2)**
39:18;48:10
**pretty (1)**
81:16
**previous (2)**
92:11;98:15
**previously (3)**
25:5,21;33:10
**principal (8)**
14:13,24;42:19;
58:25;71:2;91:16,19;
108:13
**Prior (28)**
16:19,24;20:11;
21:8;22:12;23:16,19,
24;24:6,14;30:20,23;
31:3,12;42:17,20;
50:5;60:9;62:10;
63:12,17;65:5,5,7;
80:9;92:13;94:11;
105:15
**privilege (2)**
113:16;115:22
**probabilities (1)**
104:8
**probability (1)**
115:2
**probably (3)**
33:2;50:8,9
**problem (1)**
52:9
**procedure (1)**
40:16
**PROCEEDINGS (1)**
11:1
**proceeds (1)**
73:11

**produced (1)**
50:10
**product (5)**
86:4;89:14;97:23,
25;100:20
**proposal (2)**
28:11;35:10
**proposed (39)**
13:5;14:3,4;16:6;
17:4,8,13,21;18:14,
20;20:4,8;42:6;
43:16,17,23;44:7;
66:21;67:4;68:17;
69:16;70:2,6,9,17;
71:20;72:18;77:14;
86:23;89:19;94:2;
105:2;107:8;108:5;
109:2,5,8;114:7,15
**proposing (1)**
18:7
**provide (1)**
64:2
**provided (4)**
38:22;46:6;48:20;
109:18
**provision (9)**
49:18;59:10;
109:17,21,25;110:2,
14,24;111:3
**provisions (2)**
59:18;93:21
**pull (1)**
114:21
**PULTMAN (26)**
10:22,22;12:5,19,
20;13:20;21:11;
22:18;44:24;47:16;
54:11;60:23;61:10;
79:10;87:24;102:18;
103:12;112:10,22;
113:16;114:21;
115:12,19;116:19;
117:11,14
**Pultman's (1)**
116:6
**pure (1)**
67:24
**purpose (1)**
117:4
**purposes (2)**
104:5;111:20
**put (13)**
21:13;33:17,25;
34:4;49:25;70:15;
84:10;86:3,7;95:6;
97:8;102:8,11
**Putting (1)**
102:20

**Q**

**quantifying (1)**
75:3

Case 09-10138-MFW    Doc 14654-4    Filed 10/30/14    Page 132 of 137
IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

**quick (1)**
83:10
**QUINN (2)**
5:13;11:7
**quite (2)**
35:7;58:23
**quote (1)**
91:12
**QURESHI (3)**
11:14,14;61:21

**R**

**range (13)**
21:14;33:23;37:16;
73:4,23;74:3;76:24;
85:22;98:17;102:11;
104:11;105:3;113:9
**rate (7)**
40:12;41:14,19,24;
93:8;111:18,18
**rates (1)**
93:9
**rather (4)**
86:2;87:18;93:8;
94:13
**rationale (1)**
84:21
**Ray (153)**
10:7;12:6,21;13:1,
12,14;14:1,6;15:1,2,
6,24;16:1,3;17:1;
18:1;19:1;20:1;21:1,
12,17,21,22;22:1,14;
23:1;24:1;25:1;26:1;
27:1;28:1;29:1;30:1;
31:1;32:1;33:1;34:1;
35:1;36:1;37:1;38:1;
39:1;40:1;41:1;42:1;
43:1,4;44:1;45:1;
46:1;47:1,17,21;48:1,
3,24;49:1;50:1;51:1;
52:1;53:1,20;54:1,8,
14,19;55:1;56:1,5;
57:1;58:1;59:1;60:1;
61:1,7,11;62:1,15,17,
21;63:1;64:1;65:1;
66:1;67:1;68:1;69:1;
70:1,18;71:1;72:1;
73:1;74:1;75:1;76:1;
77:1;78:1,5,9,19;
79:1,14;80:1;81:1;
82:1;83:1;84:1,2;
85:1;86:1;87:1;88:1;
89:1,4,13,16;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1;107:1;
108:1;109:1,3;110:1;
111:1;112:1,19,23;
113:1;114:1,4,6,23,

25;115:1,23;116:1;
117:1,16
**Re (2)**
10:8;78:16
**reach (7)**
26:18,19;56:17;
63:24,25;67:20;
68:14
**reached (5)**
26:22;67:19;69:19,
23;92:3
**read (1)**
42:14
**reads (1)**
91:12
**really (8)**
28:14;38:20;39:16;
67:23;74:4;81:15;
96:6;101:19
**reason (2)**
44:13,15
**reasonableness (1)**
114:7
**reasons (1)**
84:21
**recall (52)**
20:17;23:11;26:15,
22,23;29:11,12,19;
30:6;32:17;33:20;
34:10;35:7;36:16,22;
40:19;43:9,10;45:13;
46:9,17;47:4,14;50:7,
19,23;51:4,13;54:3;
56:4,15,20;57:7;
58:4;62:12;63:21;
65:12;66:10,25;
67:17;80:3;81:21;
82:17;94:8,9;97:7;
99:17,18;109:23,24;
110:6;117:10
**receipt (1)**
50:5
**receive (5)**
40:2;63:9;75:19;
115:13,15
**received (2)**
40:4;112:6
**receiving (2)**
63:13,17
**Recess (2)**
61:5;112:17
**recollection (9)**
20:17;22:21;28:7;
33:6;37:20;47:6;
54:10;56:10;97:16
**recommending (1)**
104:25
**record (16)**
10:3,21;21:14,15;
46:24;54:11,19;61:3,
8,12;62:21;78:14;
112:15,20;117:14,17
**recording (1)**

97:13
**recover (1)**
115:16
**recovered (2)**
106:2,15
**recoveries (1)**
98:6
**redraft (1)**
45:5
**reduced (2)**
93:7;95:11
**reduces (1)**
59:24
**reduction (1)**
92:11
**reference (2)**
59:14;114:15
**referenced (1)**
103:22
**references (2)**
80:23;81:18
**referred (2)**
24:23;95:25
**referring (12)**
20:25;44:21;45:20;
48:24;50:15;58:22;
59:16;64:4;68:9;
78:22;79:8;82:4
**refers (1)**
58:12
**reflect (1)**
92:12
**reflected (2)**
56:25;70:18
**refresh (1)**
54:9
**regarding (2)**
47:19;113:14
**reimburse (1)**
65:21
**reimbursed (1)**
65:21
**reimbursement (2)**
66:12,18
**related (9)**
28:11;33:18;34:3;
40:14,20;57:12,15;
65:20;101:5
**relates (3)**
13:5;58:11;110:3
**relating (1)**
16:20
**relative (4)**
37:14;51:14;
107:22;110:10
**remain (1)**
91:20
**remainder (1)**
92:17
**remains (1)**
80:6
**remember (3)**
26:4;45:15;65:22

**reminded (1)**
61:14
**remiss (1)**
61:15
**removal (5)**
90:12,12,17;92:12;
95:12
**removed (1)**
90:7
**Repeat (3)**
18:17;87:6;106:13
**report (7)**
18:4;75:13,21;
99:22,23;100:6,8
**reporter (3)**
10:14;12:1;96:18
**Reporting (2)**
10:16,18
**represent (2)**
10:20;24:4
**representations (1)**
77:24
**representative (4)**
17:12,18;19:14,15
**representatives (1)**
67:8
**represented (3)**
25:13;27:13,23
**representing (1)**
21:8
**represents (2)**
24:5;110:23
**request (5)**
46:10;65:20;
109:22;110:5,7
**requested (1)**
43:20
**require (1)**
59:19
**required (3)**
60:7;74:11,12
**reservation (1)**
110:10
**resolution (5)**
36:12;56:18;58:9;
72:22;111:8
**resolutions (1)**
20:3
**respect (14)**
20:7,21;22:25;
25:9,11;34:5;37:20;
39:22;40:17;42:17;
82:10;91:24;93:12;
113:8
**response (5)**
35:9,11,21;37:8;
66:10
**responsibility (1)**
108:12
**restate (2)**
59:2;96:6
**restructuring (2)**
25:3,6

**result (1)**
60:7
**results (1)**
114:16
**revealing (1)**
115:13
**review (10)**
12:10;14:19;15:23;
21:22;48:3;54:20;
78:8;80:7;108:23;
109:16
**reviewed (3)**
22:11;23:9;53:24
**reviewing (1)**
62:20
**revised (4)**
54:24;55:16;78:9,
16
**right (8)**
53:9;56:24;59:17;
72:10;86:21,25;94:9;
95:14
**rights (1)**
110:10
**role (6)**
14:12,24;25:8,11;
26:6,9
**room (2)**
35:13;36:2
**ROSENMAN (2)**
5:3;11:5
**ROSENTHAL (68)**
11:21,21;12:8;
13:17;16:8;17:16;
22:2,15;24:10;26:21;
29:10;31:4;39:24;
40:25;41:7,20;42:9;
43:8,21;44:21;49:16,
24;52:16;53:6;54:2;
55:19;60:25;61:24;
69:21;70:11;71:14;
76:17;77:9;79:7;
87:5,10,14,21;88:3;
89:5;94:24;95:19;
96:3;102:2,13,25;
103:9,18;104:17;
105:7,11;106:5,11;
107:16,19;108:2;
109:11;112:13;
113:11,18,25;114:9,
18;115:5,25;116:16;
117:2,13
**roughly (5)**
86:12,14,15;88:17;
99:2
**rounded (1)**
35:4
**Rule (1)**
27:17
**rules (1)**
27:16
**ruling (1)**
39:18

Case 09-10138-MFW   Doc 14654-4   Filed 10/30/14   Page 133 of 137
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

**run (1)**
73:22
**Russell (2)**
11:22;78:15

## S

**Saenz (1)**
15:15
**same (4)**
34:24;46:13;68:13;
90:25
**Sandberg (3)**
32:5,8,9
**Sandor (1)**
32:7
**sat (1)**
22:11
**Saturday (1)**
62:23
**savings (1)**
101:14
**saw (1)**
48:8
**saying (2)**
104:11;106:3
**scenario (4)**
97:2;102:23;
104:22;106:22
**scenarios (7)**
73:8;96:22;97:18;
101:8,8,15;104:21
**scheduled (1)**
44:5
**Schweitzer (8)**
11:22;30:4;49:5;
54:22;62:23;64:6;
103:8;116:25
**second (3)**
88:23;103:2,8
**Section (14)**
55:17;56:6,6;
58:11,11;80:20;85:7;
89:12;90:6;91:9,12;
92:6,7;109:7
**Sections (2)**
49:14;80:24
**seeing (3)**
22:4;61:13;64:14
**seek (2)**
12:17;27:21
**seeking (1)**
33:13
**seem (1)**
80:3
**sense (1)**
84:7
**sensitivities (1)**
100:15
**sent (1)**
54:25
**sentiment (1)**
66:9

**separate (1)**
35:13
**September (7)**
10:4;43:17;61:4,9;
112:15,21;117:18
**series (3)**
53:13;69:5;112:24
**set (3)**
23:24;33:12,13
**setting (1)**
28:5
**settle (2)**
33:9,14
**settled (4)**
41:24;42:2;43:25;
107:23
**settlement (111)**
13:5;14:4;16:7,21,
25;17:5,5,9,14,22;
18:8,15,20;19:12,24;
20:4,8,10,22;22:25;
23:5;28:12;41:10,11,
22;42:6,12;43:11,17,
23;44:7,8;46:2,2;
47:8,18,22;48:13,17;
49:18;51:22;52:13,
23;53:2,21;54:15,24;
60:15;64:2,9;65:9,
15;66:20;67:5,12,16;
68:7,17;69:16;70:2,6,
9,17;71:20;72:19;
78:10,16,24;79:15;
80:14;81:6,12,20,24;
82:2,20,25;83:6,9,11,
14,20;84:3,14,19,22;
85:5,8;86:23;89:19,
23;90:22,23;91:7,13;
92:7,14;93:16;94:3,
11;101:14;105:2,15;
107:2,9,12,15;108:6;
110:2;114:7,15
**seven (1)**
109:8
**Seventh (1)**
3:16
**several (1)**
62:3
**shall (4)**
49:19;85:8;91:13,
18
**sheet (16)**
21:13,18;23:4,9,
14;34:3;45:4,6,9,21,
22,25;46:7,12,13;
49:3
**sheets (4)**
23:19;46:7,8;48:16
**Shipholding (1)**
24:24
**Shipping (1)**
64:19
**short (1)**
83:21

**shortly (1)**
81:16
**show (3)**
13:9;53:20;62:14
**side (5)**
30:11;46:16;50:16;
70:15;102:20
**sides (1)**
44:25
**signature (2)**
89:22,24
**signed (1)**
90:2
**significant (1)**
73:7
**signing (1)**
109:2
**simply (1)**
38:4
**sit (2)**
45:16;75:20
**sit-down (1)**
50:9
**sitting (5)**
20:13;26:4;28:7;
56:9;94:8
**six (5)**
35:5,8;85:22,22;
91:10
**sole (1)**
15:20
**solely (1)**
117:3
**Solus (15)**
5:14;11:8;68:25;
69:2,20;70:15;82:8,
22;83:4,7,18;84:15;
90:11,17,20
**solvent (1)**
38:24
**solving (2)**
101:19,21
**someone (4)**
23:15;27:22;57:16;
76:3
**sometime (6)**
47:7;55:23;65:18,
19;81:22;83:18
**somewhat (1)**
85:20
**somewhere (4)**
18:23;32:19;76:25;
85:21
**sorry (8)**
14:2;54:6;63:15;
68:11;79:2;84:23;
91:3;116:3
**sort (7)**
56:17;57:12;60:3,
4;85:24;94:12;95:21
**sought (3)**
27:10;34:5;43:15
**sounds (1)**

53:9
**speak (8)**
68:12,20;69:7,10,
12,13,15;83:7
**speaking (1)**
115:9
**speaks (1)**
52:16
**specific (7)**
18:17;22:21;23:11;
51:15;66:3;85:15;
115:10
**specifically (9)**
26:24;44:22,23;
45:20;46:18;50:7;
60:22;67:13;70:12
**specified (1)**
56:3
**specify (1)**
67:18
**speculate (1)**
95:21
**speculation (1)**
74:12
**split (2)**
38:17;111:14
**spoke (1)**
68:21
**spoken (1)**
54:5
**spot (1)**
52:7
**Stamped (5)**
21:18;47:22;54:15;
62:18;78:10
**standing (1)**
22:19
**start (5)**
17:19;34:15;42:7;
79:10;103:13
**starting (1)**
115:11
**starts (2)**
42:4,5
**state (1)**
10:20
**statement (1)**
99:21
**statements (2)**
76:20;77:8
**States (1)**
74:14
**status (2)**
29:2;37:2
**Steen (1)**
10:11
**Steven (1)**
83:8
**still (6)**
25:8;55:25;79:3;
81:5;84:2;100:17
**stood (1)**
76:23

**strategy (1)**
51:25
**Street (1)**
3:5
**subject (2)**
80:6;115:20
**submit (1)**
40:13
**submitted (1)**
99:21
**subsequent (3)**
34:9;51:5;57:9
**substance (3)**
21:5;28:23;115:14
**substantial (1)**
69:4
**substantive (1)**
105:14
**subsume (1)**
115:11
**succeeding (1)**
115:3
**successful (1)**
39:7
**sufficient (1)**
101:17
**suggesting (1)**
74:2
**SULLIVAN (1)**
5:13
**summary (2)**
48:19,23
**support (1)**
37:7
**supportive (3)**
66:22;67:4;68:17
**Sure (14)**
12:19;17:19;18:19;
52:21;57:13;60:25;
63:17;77:21;89:3;
103:17;106:14;
112:13;114:21;116:5
**surplus (4)**
75:9;76:8;96:14;
102:24
**surprise (1)**
116:3
**surprised (1)**
82:21
**swear (1)**
12:1
**sworn (1)**
12:2

## T

**table (4)**
33:18;34:2,4;
102:19
**talk (10)**
21:6;64:8;66:3,13,
23;68:15;83:16;85:7;
108:20;110:13

Case 09-10138-MFW    Doc 14654-4    Filed 10/30/14    Page 134 of 137
IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

**talked (1)**
  23:24
**talking (7)**
  41:2,3;61:20;62:8;
  65:22;66:6;102:4
**tape (5)**
  10:2;61:6;112:18
**tax (5)**
  76:13;98:20,21;
  99:6;102:9
**TECCE (1)**
  5:18;11:7,7
**telephonic (1)**
  77:13
**ten (1)**
  28:20
**tens (1)**
  85:24
**term (21)**
  21:12,18;23:4,9,14,
  18;34:2;45:4,6,9,21,
  22,24;46:6,7,8,12,13;
  48:16;49:3;110:17
**terminology (1)**
  45:23
**terms (10)**
  16:10,13,14;48:20,
  24;64:12;66:4;81:19;
  83:9;84:22
**testified (3)**
  96:19;97:22;116:9
**testimony (2)**
  13:5;72:16
**therefore (3)**
  52:8;75:5;93:5
**thinking (5)**
  72:20;73:16,19;
  76:6;104:22
**though (1)**
  27:12
**thought (19)**
  29:11;38:14;51:20,
  22,23;52:11,12,23,
  25;61:20;70:22;71:4,
  17;86:6;101:10;
  103:23;104:6,12,18
**thousand (1)**
  35:6
**three (5)**
  20:17;45:12;95:17;
  112:19;117:7
**times (4)**
  83:3;89:15;91:15;
  96:8
**timing (1)**
  77:3
**Today (9)**
  10:4,14;20:14;
  26:4;28:7;43:21;
  44:2;56:9;79:18
**today's (1)**
  117:16
**together (3)**

  10:23;13:19;89:18
**told (9)**
  34:8;47:12;55:24;
  56:13;64:10;82:22;
  83:15;105:13;113:13
**took (10)**
  29:23;32:18;36:7;
  40:17;47:5;58:5;
  64:23;84:16;103:23;
  104:18
**top (2)**
  13:21;109:12
**topic (2)**
  26:25;64:11
**total (3)**
  85:18;86:13;96:12
**trade (1)**
  99:3
**train (1)**
  55:13
**transcript (5)**
  12:11,13;52:18,20;
  77:20
**transparency (1)**
  74:9
**traveled (1)**
  65:2
**traveling (4)**
  55:9,10,11,12
**treading (1)**
  102:3
**trial (2)**
  76:20;113:24
**trick (2)**
  45:24;46:5
**Trust (2)**
  5:4;11:6
**trustees (2)**
  65:21;66:18
**trustee's (1)**
  66:15
**try (3)**
  56:14;68:11;75:20
**trying (2)**
  36:21;66:8
**Tuesday (5)**
  23:25;28:9,10;
  47:13;50:12;51:19
**TUNNELL (1)**
  3:3
**turn (2)**
  90:5;91:9
**turned (1)**
  84:12
**Tweed (1)**
  11:18
**two (11)**
  13:23;30:18;38:17;
  45:12,15,17;61:6;
  80:23;86:5;88:5;
  96:11
**type (1)**
  73:25

---

**U**

**UCC (2)**
  63:14;91:6
**UK (3)**
  3:15;11:13;74:5
**ultimate (3)**
  72:22;74:18;87:16
**ultimately (25)**
  35:12;36:10,11;
  39:15,17;42:15;47:8;
  51:12,20;52:5,10;
  56:3;74:13;81:11;
  84:16,18;85:3;86:8,
  22;92:25;93:4;94:18;
  95:5;98:18;110:12
**unacceptable (1)**
  56:13
**under (20)**
  39:21;42:6;43:11,
  22;72:23;75:18;
  82:18;89:19;93:22;
  94:17;96:21,22;
  97:17;98:6,22;101:9,
  12;102:9;106:22;
  110:8
**underlying (4)**
  66:20;72:12;105:6;
  106:17
**understated (1)**
  98:12
**understood (1)**
  59:11
**undistributed (1)**
  42:17
**United (1)**
  74:14
**unless (1)**
  22:16
**unpaid (4)**
  91:19,21;93:17,18
**unrelated (3)**
  64:16;114:8,16
**unsecured (5)**
  110:4,11;111:2,7,
  16
**up (21)**
  23:25;28:5;36:12;
  42:2;45:23;48:17;
  49:19;50:25;51:8,12;
  52:2,9;57:25;76:23;
  91:17;96:8;100:4;
  105:2;112:12;
  114:22;116:4
**upcoming (2)**
  13:2;108:21
**updated (3)**
  99:9,11;100:6
**upon (1)**
  74:25
**URQUHART (1)**
  5:13

**USA (2)**
  5:15;11:9
**use (1)**
  104:15
**used (1)**
  12:14
**using (1)**
  34:25

---

**V**

**vague (1)**
  16:8
**valid (1)**
  99:14
**value (1)**
  74:9
**variations (1)**
  85:20
**variety (2)**
  102:8,10
**various (5)**
  37:11;74:20;93:10;
  103:25;104:13
**version (5)**
  54:25;80:20;89:18;
  90:8;92:14
**versions (1)**
  45:12
**Videographer (9)**
  5:24;10:2,17;
  11:25;61:2,6;112:14,
  18;117:15
**view (22)**
  37:23;38:14;39:2,
  3,4,9;40:6,10;52:24;
  59:4;66:25;83:12;
  92:19;103:23;104:6,
  18;106:7,8,10;
  107:14,22;114:6
**views (1)**
  66:9
**violating (1)**
  103:15
**virtue (2)**
  101:14,16

---

**W**

**walk (1)**
  61:13
**walked (1)**
  106:21
**way (5)**
  20:7;60:5;67:18;
  96:5;108:21
**ways (1)**
  92:10
**week (1)**
  16:17
**weekend (5)**
  57:5,8;60:9;62:10;
  80:12

**weeks (1)**
  95:18
**weight (1)**
  39:14
**weren't (4)**
  76:21;83:20;84:8;
  104:11
**What's (3)**
  89:5;99:13;110:24
**whole (3)**
  71:18,21;109:16
**wholly (1)**
  114:8
**whose (3)**
  109:21;110:5,7
**WILLKIE (2)**
  3:14;11:12
**Wilmington (9)**
  3:7;5:4;11:6;
  14:10;37:3;55:14;
  64:23;65:3;76:21
**withdraw (3)**
  26:17;105:24;
  114:24
**within (4)**
  26:25;29:14;33:23;
  84:3
**without (7)**
  36:12;75:2;94:8,
  21;98:9;103:15;
  115:13
**witness (6)**
  11:24;12:1,2,25;
  22:3;87:25
**won (2)**
  106:2,15
**word (3)**
  62:2;103:22;
  104:15
**words (2)**
  46:4;57:23
**work (1)**
  94:12
**works (2)**
  31:24;101:5
**wrap (1)**
  112:11
**wrong (1)**
  84:13

---

**Y**

**years (2)**
  24:21;25:15
**yesterday (1)**
  55:2
**yield (1)**
  56:22
**yielded (2)**
  53:8;98:16
**yields (1)**
  53:5
**York (11)**

Case 09-10138-MFW    Doc 14654-4    Filed 10/30/14    Page 135 of 137
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

3:17,17;5:6,6,17,
17;10:13,13;27:16;
55:14;65:3

**Z**

**Zelbo (1)**
117:3

**1**

**1 (13)**
13:12,14;15:2,6,
24;16:3;32:20;43:4;
70:18;89:17;91:22;
109:3;114:23
**1.01 (3)**
87:8;92:3;96:12
**1.2 (1)**
99:2
**1.6 (2)**
34:25;35:2
**1.65 (8)**
35:2;53:4;56:22;
87:4,9;88:12,22;
89:15
**1:15 (1)**
10:4
**100 (1)**
38:15
**10010 (1)**
5:17
**10019-6099 (1)**
3:17
**10022-2585 (1)**
5:6
**101 (1)**
98:18
**11 (4)**
25:18;38:24;39:4;
71:25
**115 (2)**
78:7,11
**12 (1)**
89:21
**1201 (1)**
3:5
**134 (3)**
91:18;96:9,9
**1347 (1)**
3:6
**14 (3)**
20:19;21:9;47:7
**14076-3 (1)**
13:22
**147 (2)**
54:13,16
**14th (4)**
16:17;28:10;49:4,6
**15 (14)**
10:4;22:23;23:19,
22;24:21;42:15,21;
43:17;46:6;61:4,9;

112:15,21;117:18
**15th (12)**
28:5,10,11;29:24;
44:18;46:15;47:13;
49:8;50:5,12,17;
51:19
**16 (2)**
20:19;98:8
**164 (2)**
47:20,23
**16th (1)**
3:5
**17th (4)**
48:11;49:12;50:6;
53:14
**18th (10)**
48:11;53:19;55:7,
9;58:3;63:23;64:21;
65:7;86:18;88:21
**19 (2)**
63:10;65:13
**19899-1347 (1)**
3:7
**1999 (1)**
24:20
**19th (8)**
55:8;57:5;60:9;
62:10,23;65:6,19;
80:12

**2**

**2 (5)**
21:12,17,23;22:14;
48:25
**2.1 (3)**
49:14;58:12;80:21
**2.2 (11)**
49:15,17,18;55:17;
56:6;58:11;80:21;
90:6;91:10,12;96:4
**2.3 (4)**
56:7;85:7;89:12;
93:22
**2.3.2 (1)**
57:3
**2:18 (1)**
61:3
**2:40 (1)**
61:9
**20 (3)**
13:24;106:21;
109:9
**2014 (29)**
10:5;13:2;16:18,
19,24;18:23;20:19,
20;21:9;22:24;43:5,
18;44:6;61:4,9;
62:23;63:10;78:17;
79:15,21;91:22;94:2,
23,23;100:3,4;
112:16,21;117:18
**2015 (7)**

42:15,21,25;91:23;
92:3;93:3;96:2
**20th (3)**
57:5;62:11;80:13
**21 (6)**
21:16,19;78:17;
79:15;81:23;94:22
**212-728-8170 (1)**
3:19
**212-728-9170 (1)**
3:20
**212-849-7100 (1)**
5:20
**212-849-7199 (1)**
5:19
**212-940-8776 (1)**
5:9
**212-940-8941 (1)**
5:8
**21st (11)**
79:21;80:16;81:3;
82:15,15,16;83:2,4,
18,25;85:10
**22nd (2)**
5:16;81:22
**23 (1)**
67:21
**23rd (5)**
47:8;58:4;65:20;
81:22;83:19
**24 (6)**
43:5;77:12;94:2,
22,23;95:16
**24th (2)**
86:24;90:3

**3**

**3 (4)**
47:17,21;48:4;96:7
**3.5 (1)**
93:8
**3.50 (1)**
91:15
**3:49 (1)**
112:15
**30 (14)**
34:19;35:19,21;
36:15;42:25;91:23;
92:3;93:3,16;96:2,
11;99:24;100:3,4
**300 (3)**
97:19,20;98:17
**302-351-9357 (1)**
3:9
**302-425-4664 (1)**
3:10
**321 (2)**
62:16,18

**4**

**4 (6)**

13:2;44:6;53:21;
54:9,14;89:4
**4.2 (2)**
27:17;109:8
**4:04 (1)**
112:21
**4:10 (2)**
117:18,19
**40 (5)**
36:19;50:22,24;
51:9,18
**400 (1)**
76:25
**43 (6)**
14:2,3;91:10;
109:11,12,13

**5**

**5 (3)**
33:3;62:15,17
**50 (4)**
51:2,9;52:9;56:16
**51 (1)**
5:16
**55 (12)**
56:3,10,22;86:12,
15,16,19;87:19;
88:11,22;89:7,15
**575 (1)**
5:5
**59th (1)**
100:2

**6**

**6 (4)**
78:6,9;84:2;89:13
**60 (17)**
36:19;49:19,22;
50:13;51:21;52:6,12,
23;53:2,3,12;55:24;
56:12,13,13;87:8,18
**60th (2)**
99:21,25
**61st (1)**
100:2

**7**

**7 (4)**
109:9,11,12,13
**7.875 (6)**
58:13;69:5;80:24;
81:4,4,11
**7/21/2014 (1)**
78:25
**7/24/14 (1)**
13:23
**70 (6)**
34:18,22,22;35:21;
36:14;51:23
**74.3 (2)**

75:22;97:23
**787 (1)**
3:16

**8**

**847 (1)**
42:4
**876 (14)**
91:14;92:10,16;
94:4,18,20;95:7,12,
16,17,17;96:7,9;
98:18

**9**

**9019 (7)**
43:16;67:5;77:14;
89:19;104:25;
106:16;114:14
**907 (4)**
56:23;86:12;95:11,
21
**907.5 (1)**
88:23
**922 (1)**
44:9
**990 (2)**
53:9,11

# ERRATA SHEET

## ELLEN GRAUER COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor

New York, New York 10022

212-750-6434

NAME OF CASE:      In re Nortel Networks Inc., et al., Case No. 09-10138

DATE OF DEPOSITION:      September 15, 2014

NAME OF WITNESS:      John Ray

| PAGE | LINE | FROM | TO | REASON |
|---|---|---|---|---|
| 15 | 18-19 | A. He is otherwise known as Luiz | A. He is otherwise known as **Luis** | Spelling error |
| 38 | 8 | monitor, you know, as well as other entrusted | monitor, you know, as well as other **interested** | Transcription error |
| 43 | 21 | MR. ROSENTHAL: Today, coincidently. | MR. ROSENTHAL: Today, **coincidentally**. | Spelling error |
| 31 | 23 | A. He is with the FTI | A. He is with FTI | Transcription error |
| 35 | 12 | ultimately.  I broke in the meeting, and we had | ultimately.  I broke the meeting, and we had | Transcription error |
| 51 | 15 | date specific, but at that time of this | date **specifically**, but at that time of this | Transcription error |
| 59 | 17 | A. That just the contractual right of | A. **Just that** the contractual right of | Transcription error |

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

| PAGE | LINE | FROM | TO | REASON |
|------|------|------|-----|--------|
| 76 | 18 | A. No. | A. **Yes.** | In light of the prior questions, at the time of my deposition I had understood this question to inquire about any tax claim analysis in the context of the PPI settlement, in which case the answer was correctly "no." However, to the extent that the question is not limited to the context of the PPI settlement, the answer would be "yes." |

## ACKNOWLEDGMENT

I, John Ray, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of September 15, 2014; that, subject to the above corrections, the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

_____

JOHN RAY

Signed and subscribed to before me, this _____ day of _____, 2014.

Notary Public, State of _____