# Exhibit E

*IN RE: NORTEL NETWORKS INC., et al.*

---

*PAUL WERTHEIM, Ph.D.*
*October 22, 2014*
*HIGHLY CONFIDENTIAL*

---



**COURT REPORTING** Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 108264.TXT*
*Min-U-Script® with Word Index*

1  UNITED STATES BANKRUPTCY COURT

2  FOR THE DISTRICT OF DELAWARE
   ----------------------------------------X
3  In re

4        NORTEL NETWORKS INC., et al.,

5                          Debtors.,

6  Chapter 11 Case No.: 09-10138(KG)
   ----------------------------------------X
7

8           * * * HIGHLY CONFIDENTIAL * * *

9

10                      450 Park Avenue
                        New York, New York
11
                        October 22, 2014
12                      9:11 a.m.

13

14            VIDEOTAPED DEPOSITION of PAUL

15  WERTHEIM, Ph.D., before Melissa Gilmore, a

16  Notary Public of the State of New York.

17

18

19

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
24                New York, New York 10022
                        212-750-6434
25                      REF:  108264

HIGHLY CONFIDENTIAL                    2

```
 1   A P P E A R A N C E S:

 2

 3   CLEARY GOTTLIEB STEEN & HAMILTON LLP

 4   Attorneys for US Debtor

 5        One Liberty Plaza

 6        New York, New York 10006-1470

 7   BY:  JEFFREY ROSENTHAL, ESQ.

 8        BRENT TUNIS, ESQ.

 9        LISA SCHWEITZER, ESQ.

10        PHONE 212-225-2086

11        FAX 212-225-3999

12        E-MAIL jrosenthal@cgsh.com

13

14   ALLEN & OVERY LLP

15   Attorneys for Canadian Debtors and Canadian Monitor

16        1221 Avenue of the Americas

17        New York, New York 10020

18   BY:  JACOB S. PULTMAN, ESQ.

19        BRADLEY S. PENSYL, ESQ.

20        JOSEPH BADTKE-BERKOW, ESQ.

21        PHONE 212-610-6340

22        FAX 212-610-6399

23        E-MAIL jacob.pultman@allenovery.com

24

25
```

HIGHLY CONFIDENTIAL                    3

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   WILLKIE FARR & GALLAGHER LLP

 4   Attorneys for UK Pension Claimants

 5        787 Seventh Avenue

 6        New York, New York 10019-6099

 7   BY:  ANDREW HANRAHAN, ESQ.

 8        PHONE 212-728-8170

 9        FAX 212-728-9170

10        E-MAIL ahanrahan@willkie.com

11

12

13   AKIN GUMP STRAUSS HAUER & FELD LLP

14   Attorneys for US Official Committee of Unsecured

15   Creditors

16        One Bryant Park

17        New York, New York 10036-6745

18   BY:  ABID QURESHI, ESQ.

19        DAVID BOTTER, ESQ.

20        ANNE M. EVANS, ESQ.

21        PHONE 212-872-8027

22        FAX 212-872-1002

23        E-MAIL aqureshi@akingump.com

24

25
```

HIGHLY CONFIDENTIAL                    4

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   MILBANK, TWEED, HADLEY & McCLOY LLP

 4   Attorneys for US Bondholder Group

 5        1850 K Street, NW, Suite 100

 6        Washington, DC 20006

 7   BY:  ANDREW M. LEBLANC, ESQ.

 8        NICHOLAS A. BASSETT, ESQ.

 9        PHONE 202-835-7574

10        FAX 202-263-7574

11        E-MAIL aleblanc@milbank.com

12

13

14   KATTEN MUCHIN ROSENMAN LLP

15   Attorneys for Wilmington Trust

16        575 Madison Avenue

17        New York, New York 10022-2585

18   BY:  DAVID A. CRICHLOW, ESQ.

19        PHONE 212-940-8941

20        FAX 212-940-8776

21        E-MAIL david.crichlow@kattenlaw.com

22

23   ALSO PRESENT:

24        MICHAEL KENNEDY, Chilmark

25        DAN MACOM, Videographer
```

```
 1   ------------------- I N D E X -------------------

 2   WITNESS                 EXAMINATION BY             PAGE

 3   PAUL WERTHEIM      MR. ROSENTHAL                    10

 4                      MR. LEBLANC                     195

 5                      MR. PULTMAN                     273

 6

 7   DIRECTIONS:  PAGE 15

 8

 9

10   --------------- E X H I B I T S ----------------

11   WERTHEIM           DESCRIPTION              FOR I.D.

12   Exhibit 1     Expert Report                      29

13   Exhibit 2     10-Q of Nortel Networks            73

14                 Corporation

15   Exhibit 3     One Hundred and Eighth             81

16                 Monitor Report, dated

17                 September 24, 2014

18   Exhibit 4     Sixty-First Report of             119

19                 Monitor, dated March 21,

20                 2011

21   Exhibit 5     Cash Summary Worksheet,           120

22                 Bates Stamped

23                 NNC-NNL-PPI000001 through

24                 21

25
```

```
 1   ----------- E X H I B I T S (Cont'd) -----------
 2   WERTHEIM              DESCRIPTION            FOR I.D.
 3   Exhibit 6         Expert Report of Jeffrey     131
 4                     Kinrich together with
 5                     exhibits to report
 6   Exhibit 7         Monthly Operating Report     168
 7                     No. 60
 8   Exhibit 8         Thomas Britven's Rebuttal    169
 9                     Report, dated February
10                     28, 2014
11   Exhibit 9         Document Bates Stamped       186
12                     NNI-PPI-118 to 121
13   Exhibit 10        Expert Report of Thomas      230
14                     Britven, dated January
15                     24, 2014, Bates Stamped
16                     000001 through 150
17   Exhibit 11        One Hundred and Seventh      235
18                     Report of the Monitor,
19                     dated September 2, 2014
20
21
22            (EXHIBITS TO BE PRODUCED)
23
24
25
```

S T I P U L A T I O N S

1.  Upon completion of the transcription of today's
session, the original transcript shall be sent to
counsel for the witness by the court reporter.
Counsel shall promptly forward it to the witness
for review, correction and signature under penalty
of perjury.  The witness shall have 30 days from
the day of receipt within which to review, make any
corrections, sign the deposition transcript under
penalty of perjury, and return it to counsel.  The
witness' counsel shall then forward the original
transcript plus corrections to the court reporter,
who will promptly notify all counsel of its receipt
and any changes to testimony made by the witness.

2.  If the witness is not represented by counsel,
the original transcript will be sent to the witness
by the court reporter.  After review, correction
and signature within 30 days from the date of
receipt, the witness shall return the original
transcript to the court reporter, who will notify
all counsel of its receipt and any changes to
testimony by the witness.

1   3.   The court reporter will retain the original

2   transcript, including exhibits.  If, for any

3   reason, the original is lost, misplaced, not

4   returned, not signed, or unavailable, a certified

5   copy may be used in its place for all purposes.

6   The court reporter is otherwise relieved of any

7   statutory duties.

8

9                    - oOo -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2            THE VIDEOGRAPHER:  This is tape one.

3      We are now on the record.  The time is

4      9:11 a.m., October 22, 2014.

5            This is the opening of the

6      deposition of Mr. Paul Wertheim in the

7      matter of In re Nortel Networks,

8      Incorporated, et al.

9            This deposition is being held at the

10      offices of Cleary, Gottlieb, Steen &

11      Hamilton, which is located at 450 Park

12      Avenue in New York, New York.

13            Our court reporter today is

14      Ms. Melissa Gilmore with Ellen Grauer

15      Court Reporting.  I am the legal

16      videographer, Dan Macom, also with Ellen

17      Grauer Court Reporting.

18            Would counsel please introduce

19      themselves and state whom they represent

20      for the record?

21            MR. ROSENTHAL:  Jeff Rosenthal of

22      Cleary, Gottlieb, Steen & Hamilton.  I'm

23      here with Brent Tunis, and also Mike

24      Kennedy of Chilmark, assisting us, and we

25      represent the US debtors.

1              P R O C E E D I N G S

2              MR. LEBLANC:  Andrew Leblanc of

3       Milbank, Tweed, Hadley & McCloy, and I'm

4       here with my colleague, Nick Bassett, also

5       with Milbank, and we represent the ad hoc

6       group of bondholders.

7              MR. QURESHI:  Abid Qureshi, along

8       with David Botter and Annie Evans, from

9       Akin, Gump, Strauss, Hauer & Feld, on

10      behalf of the official committee of

11      unsecured creditors of the US debtor.

12             MR. CRICHLOW:  David Crichlow of

13      Katten Muchin Rosenman, on behalf of

14      Wilmington Trust National Association.

15             MR. HANRAHAN:  Andrew Hanrahan from

16      Willkie, Farr & Gallagher on behalf of the

17      UK pension claimants.

18             MR. PULTMAN:  Jacob Pultman of Allen

19      & Overy, LLP, on behalf of the Canadian

20      debtors, the monitor and the witness.

21      With me are my colleagues, Joseph

22      Berkow-Badtke and Bradley Pensyl.

23             THE VIDEOGRAPHER:  Will our court

24      reporter please swear in the witness?

25  P A U L    W E R T H E I M,    called as a

1          witness, having been duly sworn by a Notary

2          Public, was examined and testified as

3          follows:

4

5    EXAMINATION BY

6    MR. ROSENTHAL:

7          Q.    Good morning, Dr. Wertheim.

8          A.    Good morning.

9          Q.    I introduced myself earlier today,

10   but, again, my name is Jeff Rosenthal with the

11   law firm of Cleary Gottlieb, and we represent

12   the US debtors.

13               I presume you have been deposed

14   before?

15         A.    Yes.

16         Q.    Can you estimate how many times?

17         A.    Two.

18         Q.    You have probably heard these same

19   general ground rules in your prior depositions,

20   but just for clarity, I will just go over them

21   again real briefly.

22               You know today is a deposition in

23   which I'm going to ask questions and your

24   responsibility is to answer them as truthfully

25   as you can.

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          A.    Yes.

3          Q.    It's important that you answer

4    audibly because the court reporter can't

5    interpret if you just nod your head.

6                    Is that acceptable?

7          A.    Yes.

8          Q.    Okay.  If there is an objection,

9    unless your counsel instructs you not to

10   answer, please answer the question.

11                   If at any time you feel you need a

12   break, just let us know.  I will be happy to

13   take a break.  My only request is that you

14   don't do it in the middle of a question without

15   answering it, unless your counsel says that

16   there is a privilege concern.

17                   Is that acceptable?

18         A.    Yes.

19         Q.    Okay.  If at any time you don't

20   understand a question I ask, please let me

21   know.  I will be happy to rephrase it or repeat

22   it if you didn't hear it.  And, otherwise, we

23   will assume that you understood the question.

24                   Is that acceptable?

25         A.    Yes.

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2         Q.    Okay.  And also if at any time you
 3    feel cut off, please let me know.  It's
 4    important that only one person speak at a time.
 5    Make life a lot easier for Melissa if you could
 6    wait until I finish my questions before
 7    answering, and I'll do the same, and like I
 8    said, if you're cut off, please let me know and
 9    I will let you finish an answer.
10         A.    Okay.
11         Q.    Okay.  Do you have an understanding
12    of what this current dispute is about?
13         A.    Yes.
14         Q.    Okay.  And how did you get that
15    understanding?
16         A.    Through discussions with counsel and
17    through reading of documents.
18         Q.    And when you say reading of
19    documents, are those the documents that you
20    cite in Appendix B to your report?
21         A.    Yes.
22         Q.    Can you tell me what you did to
23    prepare for your deposition today?
24         A.    Well, it includes everything I have
25    done since day one on this case.
```

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.      Putting aside the preparation of the

3    report itself, since the report, have you done

4    anything to prepare specifically for today's

5    deposition?

6          A.      Yes.

7          Q.      What have you done?

8          A.      Gone through my report, gone through

9    other documents.  I met with counsel.

10         Q.      When you say other documents, do you

11   mean the documents that you have cited in your

12   report?

13         A.      Yes.

14         Q.      Anything else?

15         A.      No.

16         Q.      And when you say you met with

17   counsel, with whom did you meet?

18         A.      With Mr. Pultman and his colleagues.

19         Q.      The ones who are sitting to his

20   left?

21         A.      Yes.

22         Q.      Anybody else?

23         A.      There were others in the room.

24         Q.      Why don't we take a step backwards.

25                 When did you meet with counsel to

```
 1                 WERTHEIM - HIGHLY CONFIDENTIAL
 2    prepare for your deposition?
 3         A.    Yesterday morning.
 4         Q.    Was that the only time?
 5         A.    Yes.
 6         Q.    Was that at Allen & Overy's offices?
 7         A.    Yes.
 8         Q.    Can you tell me how many people were
 9    there participating in your preparation?
10         A.    Seven, maybe eight.
11         Q.    Besides the three Allen & Overy
12    lawyers who are here today, who else was
13    present?
14         A.    I'm terrible enough at names that I
15    can't name them.  Yeah.
16         Q.    Can you name any of them?
17         A.    I can name one or two first names.
18         Q.    Okay.  Who are the first names?
19         A.    There's a Joe and a Jodat.
20         Q.    Is that Joe Pasquariello?
21         A.    I'm not certain.
22         Q.    Were they with the Goodmans firm?
23         A.    No.
24         Q.    Was anybody from the Goodmans firm
25    present at the preparation for your deposition?
```

```
1                  WERTHEIM - HIGHLY CONFIDENTIAL
2          A.    Not that I'm aware of.
3          Q.    Were they all lawyers who were
4     present?
5          A.    I don't know for sure if they were
6     all lawyers.  I really can't say.  I don't
7     believe they were all lawyers.
8               MR. ROSENTHAL:  Jay, are you able to
9          represent whether it was all lawyers in
10         his preparation?
11              MR. PULTMAN:  I'm not being deposed.
12         Q.    Then I will ask you, what was
13    discussed during your preparation?
14    DI         MR. PULTMAN:  Objection, calls for
15         privileged information, direct the witness
16         not to answer.
17              MR. ROSENTHAL:  If you're not going
18         to represent that it was all lawyers in
19         his preparation, then what's the basis for
20         your objection?
21              MR. PULTMAN:  Because he had a
22         privileged communication with counsel in
23         preparation for his deposition.  That's
24         why.  He can have conversations with
25         counsel.  He can have conversations
```

 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2          together with others who are helping
 3          counsel.  And there's no question that
 4          that's still a privileged communication.
 5              MR. ROSENTHAL:  If you are the one
 6          invoking privilege, it becomes your burden
 7          to establish the basis for the privilege.
 8          And without disclosing the roles of the
 9          people who were there --
10              MR. PULTMAN:  You haven't asked him
11          the roles of the people who were there.
12              MR. ROSENTHAL:  He doesn't know, he
13          said.  Okay, fine.
14              MR. PULTMAN:  I will represent to
15          you that the people who were there were
16          lawyers and the client.
17              MR. ROSENTHAL:  Okay.
18     BY MR. ROSENTHAL:
19          Q.    Do you know who from the monitor was
20     present?
21          A.    No.
22          Q.    Do you know what the role of the
23     person at the monitor was in connection with
24     your preparation?
25          A.    What the role of the person there

HIGHLY CONFIDENTIAL                    18

1                 WERTHEIM - HIGHLY CONFIDENTIAL
2     was?  Other than being -- other than
3     representing the monitor, I'm not sure what
4     their role was.
5          Q.    Did they provide you with any
6     factual information to assist you in your
7     preparation?
8          A.    No.
9          Q.    Do you know why they were there?
10         A.    I would assume to -- since my report
11    was at the request of counsel on behalf of the
12    monitor, they had an interest.
13         Q.    Did they speak at this meeting or
14    just listen?
15         A.    They spoke.
16         Q.    But they didn't provide you with any
17    factual information?
18         A.    Nothing in addition that I already
19    had in documents and conversations with
20    counsel.
21         Q.    How long was the meeting?
22         A.    Five, four and a half to five hours.
23         Q.    Are you aware that during the course
24    of the meeting there was a conference call with
25    the court yesterday?

1               WERTHEIM - HIGHLY CONFIDENTIAL

2         A.    Yes.

3         Q.    Okay.  Were you online listening to

4    the court conference call?

5         A.    No.

6         Q.    Did you review any documents at the

7    meeting yesterday?

8         A.    Yes.

9         Q.    Did you review any documents other

10   than those listed in Appendix B to your report?

11        A.    No.

12        Q.    When was the last time you were

13   deposed?

14        A.    It would have been, I'm thinking, in

15   March.

16        Q.    Of this year?

17        A.    This year.

18        Q.    Was that in connection with another

19   Nortel case?

20        A.    Yes.

21        Q.    Can you just describe in a sentence

22   or two what the general subject matter of your

23   testimony was?

24        A.    It dealt with the issues regarding

25   solvency and the zone of insolvency of Nortel.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    Was that in connection with the UK

3   pension claims?

4        A.    Yes.

5        Q.    Did you ultimately testify in the UK

6   pension trial?

7        A.    No.

8        Q.    What was the other time that you

9   were deposed?

10       A.    It was in April related to a totally

11  different case.

12       Q.    What was the name of that case?

13       A.    Nordion, N-O-R-D-I-O-N.

14       Q.    It's a Canadian case?

15       A.    V. Life -- versus Life.  Apologies.

16       Q.    Is that a Canadian case?

17       A.    Yes.

18       Q.    Did you ultimately testify in court

19  in that case?

20       A.    I haven't yet.  It hasn't come to

21  trial yet.

22       Q.    Can you describe the general subject

23  matter of your expert opinion in that case?

24       A.    To determine -- I'm trying to

25  summarize it here briefly without getting into

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    too many details.
 3              One company had an amount of
 4    unearned revenue on their financial statements.
 5    The company was sold, and the question was --
 6    and the issue was whether the unearned revenue
 7    should be counted as revenue and when and under
 8    what circumstances.
 9         Q.    Has your testimony ever been
10    excluded from any case, whether it be an
11    arbitration or a court case?
12         A.    No.
13         Q.    Have you ever been, to your
14    knowledge, the subject of a motion to exclude
15    any of your testimony, either in whole or in
16    part?
17         A.    No.
18         Q.    Did you ever submit a report in a
19    case called United States versus Stuart Wolfe?
20         A.    Yes.
21         Q.    Do you know what happened in that
22    case?
23         A.    He was sentenced.  He was convicted
24    and sentenced.
25         Q.    Did you testify in court in that
```

1            WERTHEIM - HIGHLY CONFIDENTIAL

2   case?

3        A.    I didn't.

4        Q.    Do you know whether there were any

5   court proceedings in that case about the

6   admissibility of your testimony?

7        A.    I don't remember.  I'm not sure.

8        Q.    What year was that?

9        A.    It seems long ago -- longer ago than

10  it probably was, but I'm going to say 2007 or

11  8.

12       Q.    Isn't it true that in the Wolf case

13  the government sought to exclude your report?

14       A.    They may have.  I ended up not

15  testifying.

16       Q.    And nobody told you why not?

17       A.    It was during trial.  I wasn't told.

18       Q.    Did anybody tell you that the

19  government had sought to exclude your

20  testimony?

21       A.    Not that I'm aware of, no.

22       Q.    In the middle of that case, you

23  wound up changing your report, correct?

24       A.    I don't know what you mean by

25  change.  I don't remember changing my report.

1                 WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    Well, originally -- strike that.

3              That case involved allegations of

4    fraud, correct?

5        A.    Yes.

6        Q.    It involved an entity called Home

7    Store?

8        A.    Yes.

9        Q.    And you monitored the government's

10   case in chief during the fraud trial before --

11   before you were to testify, correct?

12             MR. PULTMAN:  Object to the form of

13        the question.

14             You can answer.

15       Q.    Did you monitor?

16       A.    Could you explain what you mean by

17   that question?

18       Q.    Well, you were originally going to

19   testify about Home Store's payments in

20   connection with round trip transactions,

21   correct?

22       A.    Yes.

23       Q.    And you relied upon a memo for a

24   transaction prepared by a woman named Jessica

25   McLellan, correct?  Even if you don't remember

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2     her name, you relied upon a company memo?
 3          A.    I relied on a lot of documents.  I
 4     can't -- I don't know what specific memo you're
 5     referring to.
 6          Q.    Well, do you recall, during the
 7     course of that case, that after the author of a
 8     memo that you relied upon testified at trial
 9     and admitted that her memo was false, you
10     modified your report?
11          A.    I honestly don't remember that.
12          Q.    Do you recall that, after you
13     modified your report, there was a challenge to
14     the modified report?
15              MR. PULTMAN:  Objection, no
16          foundation.
17              You can answer.
18          A.    I don't remember that.  I don't
19     remember changing my report.
20          Q.    Sitting here today, you have no idea
21     that there's a published court opinion
22     specifically talking about your report in that
23     case?
24          A.    There may be, but I haven't read it.
25          Q.    Have you ever heard of it?  I mean,
```

1              WERTHEIM - HIGHLY CONFIDENTIAL
2    have you ever heard that there is one?
3         A.    No.
4         Q.    And you're unaware even today that
5    the court ultimately excluded your report?
6              MR. PULTMAN:  Objection.  It has
7         been asked and answered.
8              You can answer it again.
9         A.    I was not asked to testify.  I am
10   not aware of the underlying reasons.
11        Q.    Did anybody ever inform you that the
12   court in that case specifically found that your
13   report would confuse and mislead the jury?
14             MR. PULTMAN:  Objection.  It has
15        been asked and answered.
16             You can answer.
17        A.    Again, I'm unaware of that.
18        Q.    When were you first contacted about
19   providing assistance to the monitor in
20   connection with the post-petition interest
21   dispute?
22        A.    I think it was around the first week
23   in August, early August.  I'm not sure of the
24   exact day.
25        Q.    Is that the first time you had any

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    discussion with any representatives of the

3    monitor or the Canadian debtors about the

4    post-petition interest issue?

5         A.    I believe so, yes.

6         Q.    Are you aware whether anybody at

7    NERA had discussions with the monitor or

8    Canadian debtors or their representatives prior

9    to early August?

10        A.    I'm not aware that they have.

11        Q.    Were you engaged at that time?

12              MR. PULTMAN:  Object to the form.

13              What do you mean at that time?

14        Q.    Were you engaged to serve as an

15   expert in early August?

16        A.    I would assume that was the intent

17   of the initial discussion.

18        Q.    Do you have an engagement letter?

19        A.    NERA does.

20        Q.    Have you seen the engagement letter?

21        A.    No.

22        Q.    Do you know when the engagement

23   letter was dated?

24        A.    No.

25        Q.    Who signed the engagement letter for

1              WERTHEIM - HIGHLY CONFIDENTIAL

2  NERA?

3        A.     Well, my understanding is that this

4  portion of the case falls under the sort of a

5  bigger umbrella of work that NERA is doing,

6  so -- on other aspects of the case.  So in that

7  case, it would be Mark Berenblut that would

8  have signed the letter.

9        Q.     Is he in charge of this engagement

10 on behalf of NERA?

11       A.     No -- well, I don't know what you

12 mean by in charge of.

13       Q.     Does he supervise the engagement?

14       A.     This specific engagement for the

15 post-petition interest?

16       Q.     Well, you said it's -- all falls

17 within the umbrella of a larger engagement.

18              So I'm talking about the larger

19 engagement that you referred to.

20       A.     Yes.

21       Q.     Is Mr. Berenblut the one at NERA in

22 charge of that?

23       A.     Yes.

24       Q.     Does Mr. Berenblut have any

25 responsibilities with respect to the PPI

```
 1                WERTHEIM - HIGHLY CONFIDENTIAL
 2    engagement?
 3          A.    No.
 4          Q.    By the way, if I use the term "PPI,"
 5    you understand that to refer --
 6          A.    Yes.
 7          Q.    -- to the post-petition interest
 8    dispute?
 9          A.    Yes.
10          Q.    Has Mr. Berenblut spent any time in
11    connection with the PPI dispute?
12          A.    No.
13          Q.    Have you submitted any bills yet to
14    the monitor or Canadian debtors in connection
15    with the PPI dispute?
16          A.    Yes.
17          Q.    Through what date?
18          A.    Through September 30.
19          Q.    Through September 30, can you give
20    me an estimate of how many hours you have
21    spent?
22          A.    Excuse me while I take a moment and
23    try to add it up.
24          Q.    Sure.
25          A.    Through that date, I would say 60,
```

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2     give or take.

3          Q.    Can you give me an estimate through

4     that date --

5          A.    Could be more.

6          Q.    -- of how many hours your team as a

7     whole spent?

8          A.    I have no idea what other hours

9     other staff did.

10          Q.    How much was billed to the monitor

11    or Canadian debtors through the September 30

12    bill on this engagement?

13          A.    I don't know.

14          Q.    Can you tell me, since September 30,

15    what the accrued fees have been?

16          A.    I can't.

17          Q.    How about your hours since

18    September 30?

19          A.    Maybe another 30.

20          Q.    Why don't we mark as Exhibit 1 a

21    copy of your report.

22                (Wertheim Exhibit 1, Expert Report,

23          marked for identification.)

24          Q.    Is this the report that you

25    submitted on behalf of the monitor and Canadian

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2       debtors in connection with this PPI dispute?

3            A.    (Perusing.)  Yes.

4            Q.    And if we look at page 20, and I'm

5       referring to the pages in the bottom right-hand

6       corner, is that your signature?

7            A.    Yes.

8            Q.    Do you agree that, by signing this

9       report, you were personally signing off on all

10      of the statements and opinions in the report?

11           A.    Yes.

12           Q.    Sitting here today, do you continue

13      to stand by all of the statements and opinions

14      in your report?

15           A.    Are you asking if there is any

16      corrections I would like to make?

17           Q.    I will ask that next.  The first is,

18      is there anything that you disagree with,

19      sitting here today, that's in your report?

20           A.    No, other than one correction I

21      would like to make.

22           Q.    That's my next question.

23                 Are there any corrections that you

24      would like to make to the report?

25           A.    Yes.  It's not a material amount,

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    but I wanted to do the correction.  If you turn

3    to paragraph 16 --

4          Q.    Yes.

5          A.    -- I state that, "The proposed

6    agreement purports to settle the PPI dispute by

7    reducing the PPI that the bondholders would

8    receive from a total accrual of 1.657 billion

9    to a maximum of 1.01 billion."

10              I had defined the bondholders

11    previously as the guaranteed bondholders.  The

12    1.657 billion accrual interest actually

13    includes what I later refer to as the NNCC

14    notes interest.  And so given that I'm making

15    that statement in regards to the guaranteed

16    bondholders, the total accrual of interest is

17    not 1.657, but 1.657 minus the interest that

18    had accrued on the NNCC notes.

19          Q.    Do you know what that calculation

20    comes out to?

21          A.    I would have to look at the

22    document, but it brings the total interest

23    accrual for just the guaranteed bonds to still

24    over 1.6 billion instead of 1.657.

25          Q.    We will come back to that later.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2              Any other changes, modifications,

3    corrections, disagreements with anything in the

4    report?

5         A.    No.

6         Q.    Have you formulated -- strike that.

7              Let's take a look at paragraphs two

8    to three.  Is this an accurate statement of

9    your assignment?

10        A.    Yes.

11        Q.    Have you been requested to make any

12   other opinions?

13        A.    No.

14        Q.    Is all of your analysis on this

15   mandate contained in this report?

16        A.    All of my analysis?

17        Q.    Do you explain it all in the report

18   here?

19        A.    Yes.

20        Q.    Have you formulated any other

21   opinions related to the PPI matter that's not

22   in this report?

23        A.    No.

24        Q.    Have you done any additional work on

25   the subject matter of your report since

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    submitting the report?

3              MR. PULTMAN:  Object to the form of

4        the question.

5              You can answer.

6        Q.    Other than preparing for the

7    deposition itself, have you done any other work

8    on the subject of the report?

9        A.    Not that's different in the report.

10   I have reviewed and reread some of the

11   documents, redid my calculations, checked math,

12   but if you consider that additional work or

13   not.

14       Q.    When you say you have reviewed and

15   reread some of the documents, you're talking

16   about specifically the documents listed in

17   Appendix B?

18       A.    Yes.

19       Q.    And Appendix B is a complete list of

20   materials you relied upon?

21       A.    Yes.

22       Q.    Is it fair to say that the report

23   contains all of the assumptions that you made

24   in connection with your report?

25       A.    It should.  That was my intent.

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.     In terms of sources for the

3     assumptions, were they all -- strike that.

4                 Were the sources for all of your

5     assumptions confined to the documents listed in

6     Appendix B?

7          A.     I would have to say no.

8          Q.     What other sources did you have for

9     assumptions?

10         A.     Just my understanding of the math

11    that would be necessary to -- to answer the

12    questions in my mandate.

13         Q.     What do you mean by that?

14         A.     Well, for example, I made, as an

15    example, made certain assumptions about cash

16    burn.  There's nothing in the documents that

17    told me to make an assumption about cash burn

18    in my calculations, but, yet, it was an

19    assumption that had to be made -- although I

20    take that back.

21                For instance, the deposition of John

22    Ray, he brought up his use of an assumption

23    about cash burn.  So in that case, that

24    assumption would be something that would be in

25    the -- in the documents, but there might be

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2      some examples of some assumptions that I had to

3      make just to go through the math.  When I would

4      get to a certain point, I would have to make an

5      assumption about what a certain event's outcome

6      was.

7           Q.    Other than your own assumptions that

8      you made that you disclosed in the report that

9      you were making, such as the example you just

10     gave and the documents listed in Appendix B,

11     was there any other source for any of your

12     assumptions?

13          A.    I'm trying to think of all my

14     assumptions individually instead of making a

15     blanket statement.

16          Q.    Sure.

17          A.    Counsel did want me to make one

18     specific assumption related to the allocation

19     outcome.  They wanted me to assume that the US

20     estate received the full requested allocation

21     based on the Kinrich report.

22          Q.    To take that a step further, you

23     were actually requested to assume that all of

24     the competing parties got the Kinrich

25     allocation, correct?

1              WERTHEIM - HIGHLY CONFIDENTIAL

2       A.    Well, I assumed the Canadian estate

3  and the US estate got their requested.  The

4  other entities didn't particularly affect my

5  calculations.

6       Q.    Other than counsel's assumption to

7  assume the Canadian and US allocations based

8  upon the Kinrich report, are there any other

9  assumptions that you were instructed to make by

10 counsel or any representative of the monitor or

11 the Canadian debtors?

12      A.    (Perusing.)  I believe there was one

13 other that counsel suggested I make, and I

14 honestly can't remember if I asked them about

15 this first or if they suggested that I do it,

16 but it deals with the NNUK pension claims, on

17 whether those should be dismissed.

18            I believe I may have asked them

19 first, because since I was involved in that

20 part of the case regarding the NNUK pension

21 claims, and I knew they were at issue, setting

22 aside the legal issues of that outcome, again,

23 making an assumption to the benefit of the US

24 estate, I assumed that those NNUK pension

25 claims were dismissed.

1          WERTHEIM - HIGHLY CONFIDENTIAL

2      Q.    So just so I understand, you asked

3  counsel what you should do with the UK pension

4  claims and were instructed to assume that

5  there's no -- there's no payment made to the

6  NNUK parties?

7           MR. PULTMAN:  I'm going to

8       caution --

9      Q.    To the UK pension parties?

10          MR. PULTMAN:  Sorry.  I'm going to

11      caution the witness not to get into the

12      substance of conversations with counsel

13      other than assumptions we asked you to

14      make, which I think is fair game for

15      inquiry.

16     A.    Right.  It's just for purposes of my

17  calculation.  I make a statement that these

18  assumptions don't -- are not meant to reflect

19  any legal analysis or opinion, but in order to

20  calculate the net assets upon distribution, I

21  had to make an assumption, and it was in the

22  favor of the US estate.

23          So to take the optimistic approach,

24  I assumed, for purposes of my calculation, that

25  those pension claims were dismissed.

1                 WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    I'm just trying to get an idea of

3    the source.

4              Is your best recollection is that

5    you asked counsel what you should assume

6    regarding that, and were instructed, assume

7    that claim is zero?

8         A.    Yes, I believe they said you can

9    assume it's zero for optimistic purposes.

10        Q.    Other than the assumption that you

11   have identified with regard to the Kinrich

12   allocations and the assumption you just

13   identified about the UK pension recovery, are

14   there any other assumptions you were told to

15   make by counsel or any other representative of

16   the monitor or Canadian debtors?

17             MR. PULTMAN:  Objection.  I believe

18        it mischaracterizes the testimony, but you

19        can answer.

20        A.    Not that I can remember.

21        Q.    Did you ever seek any information in

22   connection with the preparation of your report

23   that you didn't receive?

24        A.    No.

25        Q.    Did you ever ask to talk to anybody

1                 WERTHEIM - HIGHLY CONFIDENTIAL

2      that you didn't talk to?

3            A.    No.

4            Q.    Besides counsel, did you ever talk

5      to any representatives of the monitor or

6      Canadian debtors in connection with the

7      preparation of your report?

8            A.    Yes, with counsel.

9            Q.    Other than counsel, did you ever

10     have any communications with any

11     representatives of the monitor or Canadian

12     debtors?

13                 MR. PULTMAN:  Objection.  It was

14           just answered.

15                 You can answer it again.

16                 MR. ROSENTHAL:  It could be

17           interpreted both ways.

18           A.    Can I re-ask a question to see if I

19     think you -- what you're asking?

20           Q.    Sure.  I'm not asking whether it was

21     inside or outside the presence of counsel.

22                 I'm just asking, excluding counsel,

23     are there any representatives of the monitor or

24     Canadian debtors with whom you had

25     communications in connection with the

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    preparation of your report?

3         A.    Did I talk with the monitor without

4    counsel present?  I'm not following.

5         Q.    No, whether or not -- we know, for

6    example, that in connection with the

7    preparation of your report --

8         A.    Yes.

9         Q.    -- you did have some communications

10   with counsel, correct?

11        A.    Yes.

12        Q.    What I would like to know is,

13   besides your communications with counsel, did

14   you have any communications with anybody else

15   representing the monitor or Canadian debtors?

16        A.    Oh.  No.  Sorry.  I just didn't

17   understand.

18        Q.    No problem.

19              Do you know who Thomas Britven is?

20        A.    Vaguely.

21        Q.    Did you talk to him in connection

22   with your report?

23        A.    No.

24        Q.    Did you seek to talk to him in

25   connection with your report?

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    No.

3        Q.    So if we look now at paragraph three

4   of your report, part of your mandate is based

5   on the analysis of the surplus available in the

6   NNI estate to analyze the value claimed to be

7   given up by the bondholders pursuant to the

8   proposed agreement, correct?

9        A.    Yes.

10       Q.    And you assumed certain outcomes

11  that may be considered to be the best case

12  scenario for NNI, specifically outcomes that

13  would maximize NNI's net assets for

14  distribution, correct?

15       A.    What I considered the best realistic

16  cases.

17       Q.    Let's look at paragraph 17.  You

18  wrote here, "I have calculated the maximum net

19  assets (i.e., maximum surplus cash) that would

20  be available to NNI for the payment of PPI.  In

21  order to calculate the maximum surplus cash

22  that would be available, I have had to assume

23  certain outcomes that may be considered the

24  best case scenario for NNI -- specifically,

25  outcomes that would maximize NNI's net assets

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    for distribution."

3              Do you agree with that statement?

4         A.    Yes.

5         Q.    If we look at paragraph 24, would

6    you agree with me that that task that was just

7    described entailed calculating the maximum

8    amount of net assets that would be available to

9    pay PPI under the best case scenario for NNI

10   with all major assumptions construed in NNI's

11   favor?

12        A.    With the assumptions that I made in

13   NNI's favor.

14        Q.    So are you saying there are other

15   assumptions that you didn't make that were not

16   necessarily in NNI's favor?

17              MR. PULTMAN:  Object to the form of

18       the question.

19              You can answer.

20        A.    Assumptions that I didn't make that

21   were not necessarily in NNI's favor.

22              Well, the assumptions that I'm

23   referring to, going back to your question based

24   on paragraph 18, I believe -- no, the first

25   paragraph that you referred to where I made the

HIGHLY CONFIDENTIAL                    43

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    statement -- paragraph 17.  I have had to

3    assume certain outcomes that may be considered

4    to be the best case scenario, and those

5    assumptions, I then list in Section 4.2,

6    specifically 4.2a, b and c.  Those are my main

7    assumptions, and those were all assumed to be

8    in the best case scenario for the US estate.

9          Q.    Are there any major assumptions that

10   you avoided making?

11         A.    No.

12         Q.    Now, you also, if we look at

13   paragraph 19, you agree that your conclusions

14   is that assuming the best outcome of the events

15   for NNI, outcomes that maximize net assets for

16   distribution, only approximately $971 million

17   of net cash would exist with which to pay PPI.

18         A.    Are you asking, is that my

19   conclusion?

20         Q.    Yes.

21         A.    Yes.

22         Q.    Did you endeavor to seek out

23   outcomes that maximize net assets for

24   distribution?

25              MR. PULTMAN:  Object to the form.

**HIGHLY CONFIDENTIAL**                    44

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    When you wrote your report, did you

3   try to maximize net assets for distribution?

4        A.    Using realistic assumptions, yes.

5        Q.    So you made value judgments about

6   what assumptions were realistic and which ones

7   weren't?

8              MR. PULTMAN:  Object to the form.

9              You can answer.

10       A.    Yes, there were some judgments in

11  there.

12       Q.    Are they all disclosed in this

13  report?

14       A.    Yes.

15       Q.    Would you agree also in paragraph 19

16  that even if you stretched the outcome of

17  events in all cases in favor of NNI, such that

18  surplus cash is maximized, NNI would still have

19  less than the settlement amount of 1.01 billion

20  with which to pay PPI?

21       A.    That's my conclusion.

22       Q.    And you did a sensitivity analysis;

23  is that right?

24       A.    Yes.

25       Q.    Under your sensitivity analysis, if

HIGHLY CONFIDENTIAL                    45

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2     there's $100 million in additional assets
 3     belonging to NNI, you would agree with me that
 4     that's $100 million more of cash with which to
 5     pay PPI, fair to say?
 6          A.    Well, if you're referring to the
 7     sensitivity analysis that I did in paragraph
 8     34, that was a sensitivity analysis regarding
 9     NNL.
10          Q.    Correct.
11          A.    Not NNI.
12          Q.    I understand that.  You don't have a
13     sensitivity analysis with respect to NNI.  So I
14     just want to see if we're in agreement on what
15     I think is a pretty basic principle --
16          A.    Yes.
17          Q.    -- that if NNI's assets were --
18     strike that.
19              For every hundred million dollars
20     more in NNI's assets that are not in your
21     report, that would be a hundred million dollars
22     more in cash with which to pay PPI, correct?
23          A.    Mathematically, yes.
24          Q.    You're not a lawyer, are you?
25          A.    No.
```

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2         Q.    And in your report, you did not
 3    endeavor to handicap the likelihood of any
 4    outcomes, did you?
 5         A.    No.
 6         Q.    Your job was to see if it's even
 7    possible for NNI to have more assets to
 8    distribute than the amount of the PPI
 9    settlement, correct?
10              MR. PULTMAN:  Object to the form.
11         A.    Well, again, I would -- I would say
12    if it's realistically possible for NNI to have
13    a surplus net assets.  For instance, I might
14    make an assumption on the potential tax
15    liability, where I assume a certain amount, and
16    in my report I say that I have chosen a low
17    estimate to be optimistic on the outcome for
18    NNI.
19              Now, could I have assumed a lower
20    amount for the tax liability and, therefore,
21    would that have increased NNI's cash available
22    for distribution?  Yes.
23              So, mathematically, could that have
24    been done?  Yes.  But, again, I chose realistic
25    assumptions in my judgment.
```

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    But, again, other than where you --

3     strike that.

4               Other than where your assumptions

5     were not the most optimistic because you viewed

6     something else as more realistic, and you

7     discussed it specifically in your report, in

8     all other circumstances, you endeavored to --

9     to see if it's possible for NNI to have more

10    assets to distribute than the amount of the PPI

11    settlement, correct?

12              MR. PULTMAN:  Object to the form.

13         A.    If there were -- if there were

14    circumstances where I needed to make an

15    assumption, and I made that assumption, I have

16    listed it in the report.  I think that answers

17    your question.

18         Q.    But every assumption that you made

19    that was not the most favorable for NNI, you

20    discussed in your report and you explain why,

21    correct?

22         A.    Correct.

23         Q.    And other than with respect to those

24    circumstances that you disclosed and discussed

25    in your report, your mission here was to see

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    whether the maximum cash that NNI had could be

3    greater than the amount of the PPI settlement,

4    right?

5              MR. PULTMAN:  Same objection.

6              You can answer.

7         A.    I believe, if I understand your

8    question, then, yes, I was trying to calculate

9    the maximum net assets available.

10        Q.    And you concluded that that maximum

11   did not rise to the level of the PPI

12   settlement, correct?

13        A.    Correct.

14        Q.    And that's the sole basis for your

15   conclusion that the value claimed to be given

16   up by the bondholders in this proposed

17   agreement is zero, correct?

18        A.    I'm hung up on that word "sole," but

19   I don't think that bothers me.  That's my basis

20   for my opinion.

21        Q.    It's the sole basis for your opinion

22   that the proposed settlement is worth zero to

23   the US debtors' estate, correct?

24        A.    In my opinion, the bondholders gave

25   up nothing of value, because they would not

1                 WERTHEIM - HIGHLY CONFIDENTIAL

2      have received more than the settlement amount

3      anyway.

4           Q.    Because the maximum amount of the

5      assets available to the US debtors would not

6      have exceeded the amount of the PPI settlement?

7           A.    Correct.

8           Q.    You didn't evaluate the legal risks

9      in this PPI dispute, did you?

10          A.    No.

11          Q.    And you have no basis for evaluating

12     the risk that the court might find that PPI

13     should be paid at the contract rate, fair to

14     say?

15          A.    The PPI for the bondholders?

16          Q.    Correct.  You have no basis to

17     evaluate who would have won this dispute if it

18     got litigated?

19          A.    Correct, correct.

20          Q.    And you didn't evaluate the value of

21     avoiding this risk as well, correct?

22          A.    Correct.

23          Q.    And you didn't provide any opinion

24     to the court on the complexity of this

25     litigation, correct?

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2                         MR. PULTMAN:  Object to the form.

3                         You can answer.

4          A.      Regarding the complexity of the

5     legal issues?

6          Q.      Correct.

7          A.      No.

8          Q.      And you didn't provide any opinion

9     on the value of avoiding the complexity of the

10    legal issues, correct?

11         A.      Correct.

12         Q.      Is it fair to assume that if NNI has

13    more than $1.01 billion in cash, then your

14    conclusion that the settlement is worth zero to

15    NNI would be incorrect?

16                      MR. PULTMAN:  Object to the form.

17         A.      I wouldn't necessarily agree with

18    that, because it would also -- my conclusion

19    would also need to incorporate the magnitude of

20    the excess if it was over 1.01, and the

21    realistic -- the realistic likelihood of that.

22                      For instance, let me just give an

23    example.  If there was a one out of a thousand

24    chance that they would have 1.011 billion, then

25    is it possible that they could have more than

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2   1.01 billion?  Yes.  But I would consider it
 3   highly unlikely, and I would consider that
 4   excess so insignificant that, in my opinion, it
 5   still wouldn't have resulted in anything of
 6   value being given up.
 7              So I will leave it at that.
 8        Q.    Is it fair to say that if NNI could
 9   end up with more than $1.1 billion in surplus
10   cash, then your conclusion that the settlement
11   was worth zero to NNI would be incorrect?
12              MR. PULTMAN:  Object to the form.
13              You can answer.
14        A.    I'm not going to put a dollar amount
15   on materiality at this point.  I haven't
16   studied that as part of my report on what --
17   what amount over 1.01 billion would be
18   significant, because my conclusion was it's not
19   going to be.
20        Q.    We will come back to that in a
21   moment.
22              I'm not asking you for measures of
23   materiality.  I'm just asking -- you made an
24   absolute statement of the settlement being
25   worth zero, not a dollar, not ten cents.  You
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    said it's worth zero, correct?

3         A.    Correct.

4         Q.    Okay.  And are you saying that, even

5    if one assumes that NNI would have more than

6    $1.1 billion in surplus cash, then you may

7    still stand by your conclusion that the

8    settlement is worth zero?

9         A.    Possibly, yes, because it would

10   still depend on the realistic likelihood of

11   that.

12        Q.    Is it fair to say that if we assume

13   NNI could have more than $1.01 billion to

14   distribute to creditors in surplus cash, you

15   didn't endeavor to undertake any calculation of

16   what the value of the settlement would be to

17   NNI?

18        A.    Correct.

19        Q.    I want to start now by getting an

20   understanding of your math, your mathematical

21   calculations.

22              You were not asked to opine, by the

23   way, on materiality in any respect in your

24   opinion, correct?

25        A.    No.

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    No, I'm not correct, or no, you were

3    not asked to opine?

4          A.     I was not asked to opine on levels

5    of materiality.

6          Q.    And you did not opine on levels of

7    materiality, correct?

8          A.      Levels of materiality -- I'm trying

9    to think if levels of materiality would have

10   affected any of my assumptions.  In other

11   words, did I have to make any judgments related

12   to materiality.  And there might be -- there

13   are situations where my judgment regarding the

14   effect of a variance might have come into play.

15              For instance, when I made my

16   assumption on cash burn, if cash burn was a

17   little bit higher or a little bit lower, would

18   that -- would that have materially affected my

19   conclusion.  And so just given the nature of

20   numbers and given the nature of, well, if this

21   is a little higher or a little lower, there

22   might be judgments I have to make about

23   materiality in that sense, but I was not asked

24   to opine on any levels of materiality.

25          Q.    And other than as you just

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    described, you didn't, correct?
 3         A.    Didn't opine?
 4         Q.    Correct.  Other than as you just
 5    described.
 6         A.    I don't believe so.
 7         Q.    Okay.  So if we look at Table 2 to
 8    start with, you have what you call a detailed
 9    distribution analysis for NNI.
10              Do you see that?
11         A.    Yes.
12         Q.    And for that calculation, you took
13    the total cash NNI would have to distribute,
14    and you performed a simple subtraction with the
15    total allowed claims, correct?
16         A.    Allowed claims including what I list
17    as other claims.
18         Q.    Claims that you ultimately would
19    expect to be allowed?
20         A.    Yes.
21         Q.    So the calculation is A minus B
22    gives you the remainder of surplus cash
23    available to pay PPI, correct?
24              MR. PULTMAN:  Object to the form.
25         A.    If A is total cash available for
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    distribution and B is total liabilities to be

3    settled by distribution, then yes.

4         Q.   Do you believe that Judge Gross has

5    sufficient expertise to perform that

6    calculation of cash minus claims equals

7    surplus?

8              MR. PULTMAN:  Object to the form.

9         Objection, foundation.

10             You can answer.

11        A.   I don't know what his expertise is.

12        Q.   Do you believe that any -- do you

13   believe that a Ph.D. is required to perform the

14   calculation of if I give you a cash number and

15   I give you a claimed number, to subtract the

16   latter from the former to get the surplus?

17             MR. PULTMAN:  Objection to form.

18             You can answer.

19        A.   Well, a certain level of expertise

20   is required to come up with the numbers.

21   Probably, there's a lot of people that could do

22   the math on a calculator if they were given the

23   numbers.

24        Q.   All I'm doing is I'm focusing on

25   just the calculation part of it.  We're going

1               WERTHEIM - HIGHLY CONFIDENTIAL

2    to explore later in the deposition the

3    underlying basis for the numbers, but for the

4    calculation part of it, if given the numbers,

5    do you believe that Judge Gross has sufficient

6    expertise to perform that calculation?

7               MR. PULTMAN:  Objection.  There's no

8          foundation.

9               You can answer.

10     A.     If he has the expertise to punch

11   numbers in a calculator and do one number minus

12   another number, I would assume he can do that,

13   but there's a lot more that goes into doing

14   this analysis than just addition and

15   subtraction.

16     Q.     We're going to talk about how you

17   got to each of those numbers shortly.  I'm just

18   right now trying to focus on the mathematical

19   calculation itself.

20     A.     Okay.

21     Q.     So let's break down the components.

22               So, for the net cash side of this

23   equation, you performed simple addition of the

24   allocation of the sale proceeds, plus current

25   cash balance at distribution, plus NNI recovery

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2       from the 2.062.7 claim against NNL, correct?

3            A.     Correct.

4            Q.     And for that mathematical

5       calculation of those -- of the sum of those

6       three components, you performed the

7       calculation, correct?  You added them together?

8            A.     Yes.

9            Q.     And if we focus on the first of

10      those three numbers, allocation of sale

11      proceeds, you didn't perform a calculation to

12      get to that 5,302.5 million dollars, did you?

13           A.     No.

14           Q.     And, in fact, not only does Judge

15      Gross have sufficient expertise to take that as

16      a starting number, but you understand that that

17      number is going to ultimately come from his

18      decision, correct?

19                  MR. PULTMAN:  Object to the form of

20           the question.  Objection, foundation.

21                  You can answer.

22           A.     I don't know who ultimately decides

23      the outcome of the allocation case, so it may

24      be Judge Gross.  I don't know.

25           Q.     You know it will come from a court

1              WERTHEIM - HIGHLY CONFIDENTIAL

2      decision, correct?

3           A.    Yes.

4           Q.    Let's look at the second component,

5      the current cash balance.

6                 You took the reported cash balance

7      as of September 2014 and assumed a $5 million

8      per month cash burn, right?

9           A.    Yes.

10          Q.    Do you believe that Judge Gross has

11     sufficient expertise to perform that same

12     calculation of cash balance?

13          A.    I don't know.  That involved looking

14     at underlying documents and cash flows to

15     determine a historical average cash burn rate,

16     used judgment to -- to make an estimate of

17     future cash burn.

18                So I don't know if -- what his

19     expertise is in accounting.

20          Q.    If he is told to assume a $5 million

21     a month cash burn going forward through next

22     June, do you believe he has sufficient

23     expertise to perform that calculation that you

24     did of cash balance?

25          A.    If he is given the number, yes.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    And for the third input of NNI

3    recoveries, we would look at your projection of

4    NNL creditor recoveries, correct?

5         A.    Yes.

6         Q.    And we will come back to that later.

7    Let's look at your mathematical calculation on

8    the claims side.

9              You simply added the liabilities of

10   claims not subject to compromise, the

11   liabilities subject to compromise and other

12   claims, correct?

13        A.    Correct.

14        Q.    And for the liabilities not subject

15   to compromise, you just took that number right

16   out of Monthly Operating Report No. 60, right?

17        A.    Yes.

18        Q.    You didn't need any expertise to do

19   that?

20        A.    Whatever expertise was needed to

21   understand financial statements and know what

22   those numbers meant.

23        Q.    Other than that, did you apply any

24   expertise to come up with that $54.6 million

25   number?

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2          A.     No.

3          Q.     So for the -- some of the

4    liabilities subject to compromise, you took

5    them also right out of the debtors' monthly

6    operating reports without any analysis or

7    calculation, correct?

8          A.     No.

9          Q.     For some of them?

10         A.     There was --

11         Q.     You didn't take any of them out of

12   the debtors' monthly operating reports?

13         A.     Well, for some of them, yes.

14         Q.     That's what I said.  My question was

15   some.

16         A.     You had asked for the sum of the

17   liabilities.

18              MR. PULTMAN:  Just so we're clear,

19       that it was transcribed one way based on

20       what you said.  If we can clarify the

21       question --

22         Q.     You might want to listen to my

23   questions rather than focus on the screen,

24   unless there's something you didn't hear, then

25   I will repeat it, because it is a rough

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    transcript that you're getting, and it actually
 3    could cause more confusion.
 4         A.    Okay.  I see, some versus -- S-U-M
 5    versus S-O-M-E.
 6         Q.    Why don't you listen to me.  If you
 7    want a clarification from me, ask me for it,
 8    rather than looking at the screen.
 9         A.    When you said sum, I interpreted
10    S-O-M-E -- I interpreted S-U-M.
11         Q.    For some portion of the liabilities
12    subject to compromise, you just took them right
13    out of the debtors' monthly operating reports
14    without any analysis or calculation, correct?
15              MR. PULTMAN:  Object to the form.
16         A.    A portion of those numbers came from
17    the monthly operating report, yes.
18         Q.    And other than that, you just have
19    the contingent liabilities for the debt
20    guarantees, correct?  Do you need me to clarify
21    that?
22         A.    I think I understand your question.
23    Yes.
24         Q.    And you agree with that?
25         A.    Yes.
```

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    And to figure out the amount of the

3    contingent liabilities for the debt guarantees,

4    we would also have to go look at your

5    projection of NNL recoveries, correct?

6         A.    Correct.  That's why I did the NNL

7    recoveries first, because the outcome of that

8    dictated the amount that NNI would recover on

9    those claims.

10        Q.    And for your category called other

11   claims, you just calculated the PPI on the NNCC

12   notes at the same rate as the present

13   settlement, and on the non-bondholder

14   creditors, at the federal judgment rate,

15   correct?

16        A.    When you say calculated the PPI on

17   NNCC notes at the same rate, the interest rate

18   was different on the NNCC notes.  So it wasn't

19   the same interest rate as the other.

20        Q.    Fair point.  You calculated the PPI

21   on the NNCC notes at the same compromise

22   percentage as the present settlement, correct?

23        A.    Correct.

24        Q.    And for the non-bondholder

25   creditors, you just calculated post-petition

1          WERTHEIM - HIGHLY CONFIDENTIAL

2     interest at the federal judgment rate, correct?

3          A.    Correct.

4          Q.    Is there anything that you found

5     complicated about either of those two

6     calculations that you believe Judge Gross

7     couldn't do?

8               MR. PULTMAN:  Object to the form.

9          A.    I didn't find them complicated.

10    Again, I don't know what Judge Gross' expertise

11    is.

12         Q.    Okay.  And, finally, for

13    post-petition tax liability, you didn't perform

14    any calculation, did you?

15         A.    Other than the assumption that I

16    made, no.

17         Q.    So now, let's look at the Canadian

18    claim part of your report.  For starters, would

19    you agree that the percentage payout on the

20    Canadian claims is the material input into your

21    calculation of the amount of surplus cash

22    available to NNI for PPI?

23         A.    I'm going to say yes.

24         Q.    And, in fact, it influences both

25    NNI's cash available, the A in our equation

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    before, and the claims, the B part of the

3    equation before?

4         A.    Yes.

5         Q.    On the cash available part, NNI, you

6    know, has a $2 billion plus claim against NNL.

7    So the amount that NNL pays its creditors will

8    directly influence NNI's available cash, right?

9         A.    Yes.  The amount NNL pays its

10   creditors -- well, the distribution payout

11   ratio affects NNI's receipt of the cash, but

12   it's the payout ratio that also affects what

13   NNL pays to its creditors.

14              So it's not what NNL pays to its

15   creditors directly that affects NNI's available

16   cash.  It's that both NNI's available cash and

17   NNL's payment to the creditors are both

18   affected by the payout ratio.

19        Q.    I'm just trying to break up the two

20   portions.

21        A.    I'm just making sure, because you

22   stated it that this affects this, and it

23   doesn't.  They are both affected by something

24   else.

25        Q.    And I'm just trying to break up the

1                   WERTHEIM - HIGHLY CONFIDENTIAL

2       two components, because we said earlier you've

3       got both NNI's assets are affected by NNL's

4       payments, and NNI's liabilities are affected by

5       NNL's payments.

6            A.    Yes.

7            Q.    So I want to break up and first look

8       at the asset side of it.

9            A.    Okay.

10           Q.    So NNI's assets is directly

11      influenced by the amount of cash NNL pays to

12      its creditors such as NNI, correct?

13           A.    Yes.

14           Q.    If NNL pays its creditors more cash,

15      NNI's assets increase, correct?

16           A.    Correct.

17           Q.    And now if we look at NNI's claim

18      side, its claims are affected by -- claims

19      against NNI.

20           A.    I'm sorry.  You mean NNL's claims?

21      You said if we look at NNI's claim.

22           Q.    Yes.  NNI's claims are influenced by

23      how much its creditors, such as the

24      bondholders, are collecting against NNL,

25      correct?

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          A.      Correct.

3          Q.      Because the more NNL pays the

4    guaranteed bondholders, the lower the

5    bondholders' claims against NNI, correct?

6          A.      Correct.

7          Q.      Is it fair to say that you're not

8    able to reach any conclusion whatsoever on the

9    amount of surplus cash NNI would have to pay

10   PPI without reaching some conclusion on the

11   amounts of NNL's and NNC's distributions to

12   their creditors?

13                 MR. PULTMAN:  Object to the form.

14         A.      I'm trying to run through the math

15   to see if that was possible.  For instance, are

16   you asking if I only looked at the NNI side,

17   without looking at the NNL side, could I have

18   reached some conclusions, and I would, again,

19   have to have made certain assumptions.

20         Q.      I'm just saying if you took the NNL

21   distributions out of the equation, if I told

22   you complete black box, you have no idea what

23   NNL and NNC are going to pay to its creditors,

24   are you able to reach any conclusion about the

25   amount of surplus cash NNI would have to pay

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL

 2   PPI?

 3        A.    If I had no knowledge about NNL's

 4   payout ratio, whether it was 0 percent or a

 5   hundred percent, then just mathematically it

 6   would be difficult to do a distribution

 7   analysis for NNI.

 8        Q.    In fact, it would be impossible,

 9   right?

10              MR. PULTMAN:  Objection.  It has

11         been asked and answered.

12        A.    Again, it's not impossible.  It

13   would require some assumptions.

14        Q.    I'm not asking you about making

15   assumptions with regards to -- I'm just saying

16   if you -- if you don't know -- let me just

17   rephrase the question.

18              Without knowing or assuming NNL's

19   and NNC's distributions to creditors, you can't

20   reach a conclusion about how much surplus cash

21   NNI would have to pay PPI, correct?

22        A.    Correct.  If I couldn't make any

23   assumptions and knew nothing, and that's, to

24   me, an unrealistic question, but the answer is

25   yes.
```

1          WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    You can't determine whether the

3     settlement is reasonable or not without making

4     some conclusions with regards to the NNL and

5     NNC distributions, right?

6               MR. PULTMAN:  Object to the form of

7          the question.  Objection to foundation.

8               You can answer.

9          A.    And I made assumptions regarding

10    NNL's distributions, and I listed those

11    assumptions in my report.

12         Q.    I understand that.  All I'm saying

13    is you would agree with me that you could not

14    determine whether the settlement is reasonable

15    or not without making assumptions on the NNL

16    and NNC distributions, correct?

17         A.    At the beginning of my report, I

18    stated that there were certain assumptions I

19    had to make.  So, yes, I had to make certain

20    assumptions.

21              MR. ROSENTHAL:  Why don't we change

22         the tape?

23              THE VIDEOGRAPHER:  We are now off

24         the record.  The time is 10:21 a.m.,

25         October 22, 2014.

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2                   (Recess taken.)
 3              THE VIDEOGRAPHER:  This is tape two
 4       of the deposition of Dr. Paul Wertheim.
 5       We are now back on the record.  The time
 6       is 10:36 a.m., October 22, 2014.
 7  BY MR. ROSENTHAL:
 8       Q.    Do you pronounce your name Wertheim
 9  or Wertheim?
10       A.    Wertheim.
11       Q.    Okay.  I just want to make sure that
12  I don't offend you and mispronounce it during
13  the deposition.
14       A.    I think both are acceptable.
15       Q.    So if we turn now to Table 1, that's
16  your detailed distribution analysis for NNL,
17  correct?
18       A.    Yes.
19       Q.    And that calculation is done by
20  taking the cash available for distribution,
21  dividing it by claims to be settled, correct?
22              MR. PULTMAN:  Object to the form.
23       A.    To determine the payout ratio, yes.
24       Q.    And for the numerator of the payout
25  ratio, which is cash available, you added NNL's
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2     allocation to its current cash balance and then

3     subtracted the $62 million priority payment,

4     correct?

5          A.    Yes.

6          Q.    So if we look at those particular

7     inputs, the allocation from the sale proceeds

8     is not something you calculated, right?

9          A.    Correct.

10         Q.    Your understanding is that number is

11    going to come from the courts?

12         A.    Yes.

13         Q.    And the current cash balance is not

14    something that you calculated either, is it?

15         A.    Correct.

16         Q.    That came from the monitor's one

17    hundred and eighth report and excluded

18    restricted cash?

19         A.    Yes.

20         Q.    And, finally, the $62.7 million

21    priority payment just came from the

22    thirty-fifth monitor's report, correct?

23         A.    Yes.

24         Q.    You didn't perform any calculation

25    to come up with that number?

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2          A.     No.

3          Q.     Let's look at the denominator now.

4    You added the NNI claim, the long-term debt,

5    pre-petition interest and other claims,

6    correct?

7          A.     Correct.

8          Q.     You didn't need to perform any

9    calculation to know that NNI had a $2 billion

10   claim, did you?

11         A.     Other than to do the calculation

12   that that's the excess over the 62.7.

13         Q.     You saw the claim was two million --

14   two billion sixty-two point seven million, but

15   the 62.7 million was a priority payment, which

16   you were counting for elsewhere, so that left

17   $2 billion?

18         A.     Correct.

19         Q.     And you didn't need to perform any

20   calculation to come up with the long-term debt

21   number, did you?

22         A.     I added up the various bond issues,

23   the different series.

24         Q.     And for the interest number, you

25   just took that straight from a

HIGHLY CONFIDENTIAL                72

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2       bondholder-produced document, correct?

3            A.    Yes.

4            Q.    And then finally for the other

5       claims, did you perform any calculation?

6            A.    Well, as I state in my footnote,

7       that that represents other claims as identified

8       in the 10-Q for NNC, dated June 30, plus a

9       recent 125 million payable to EMEA.

10           Q.    So when you state in footnote 16

11      that the source is the NNC 10-Q, note 15,

12      you're referring to the notes to NNC's

13      financials?

14           A.    The notes to the 10-Q for NNC dated

15      June 30.

16           Q.    And would you agree that the other

17      category is the second largest category of

18      liabilities in your table?

19           A.    Yes, but it's composed of a number

20      of individual items.

21           Q.    Why don't we mark, as Exhibit 2, the

22      10-Q that you're referring to.

23                 (Wertheim Exhibit 2, 10-Q of Nortel

24          Networks Corporation, marked for

25          identification.)

```
1                WERTHEIM - HIGHLY CONFIDENTIAL
2         Q.    Is the note 15 that you are
3    referring to in your report what starts on the
4    page BHG160742?
5         A.    Yes.
6         Q.    Let me back up for a second.  Table
7    1 is entitled Detailed Distribution Analysis
8    for NNL, correct?
9         A.    Correct.
10        Q.    Is that an accurate description of
11   Table 1?
12        A.    In my opinion, yes.
13        Q.    Were you aware, when you did your
14   detailed distribution analysis for NNL, that
15   your source document for the $2.235 billion in
16   claims is NNC's consolidated financials?
17        A.    Yes.
18        Q.    So if we look on the next page here
19   that ends in 743.
20             MR. PULTMAN:  I'm sorry.  Are you
21        now moving away from Wertheim 1 and going
22        to Wertheim 2?
23             MR. ROSENTHAL:  Yes.
24        Q.    There's a chart of liabilities
25   subject to compromise on page 29 of the 10-Q,
```

1                WERTHEIM - HIGHLY CONFIDENTIAL

2    correct?

3         A.    Correct.

4         Q.    Isn't it true that you assumed, when

5    you did your report, that NNL was responsible

6    for all of them?

7         A.    Yes.

8         Q.    Do you have any reason to believe

9    that NNL is fully liable for those claims when

10   they are presented as claims against the

11   consolidated estate?

12             MR. PULTMAN:  Object to the form.

13             You can answer.

14        A.    That's a legal issue I can't answer.

15        Q.    Well, what was the basis for your

16   assumption that -- strike that.

17             Was it an assumption that you made

18   that NNL would be fully liable for all of the

19   claims listed here against the consolidated

20   estate?

21        A.    (Perusing.)  Yes.

22        Q.    What is the basis for that

23   assumption?

24        A.    The information that I got from the

25   10-Q was what was available for the Canadian

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2     entity, and so although the 10-Q is for, as

3     stated on the 10-Q cover page, Nortel Networks

4     Corporation, NNC, it includes NNL, and so I

5     treated that as a consolidated entity without

6     making a judgment as to which individual entity

7     within the Canadian group would be individually

8     responsible for individual liabilities.

9          Q.    Why did you do it that way?

10         A.    It was just an assumption I needed

11    to make.

12         Q.    Why did you need to make it?

13         A.    To treat this as -- as -- as a

14    total.  Here's -- here's the total assets and

15    here's the total liabilities for the estate.

16         Q.    Would you say that the assumption

17    that you made, that NNL would be liable for

18    every liability that any of NNC's consolidated

19    entities had accrued, is the most favorable

20    assumption you could have made for NNI?

21              MR. PULTMAN:  Object to the form.

22              You can answer.

23         A.    I'm assuming that, yes.

24         Q.    The most favorable assumption that

25    you could have made for NNI is that NNL has

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    100 percent liability for the consolidated

3    entities' liabilities?

4         A.     Again, I'm not making an assumption

5    on which entity is specifically liable for

6    individual liabilities.  I'm looking at the

7    reporting entity for the Canadian group.

8         Q.     Is NNI's claim that is in Table 2

9    against -- that you have listed against --

10   strike that.

11              Is the claim that NNI has for

12   $2 billion against the entire group or is it

13   specifically against NNL?

14              MR. PULTMAN:  Object to the form of

15      the question.

16              You can answer.

17        A.     Are you talking about the

18   $2 million?

19        Q.     The $2 billion that you're referring

20   to in Table 2.

21        A.     $2 billion.  (Perusing.)

22              Offhand, I can't remember if it's

23   solely NNL or if it's NNL guaranteed by NNL

24   and -- or if it's a liability to NNL and NNC.

25        Q.     Isn't it true that the assumption

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2      that you made that NNL would be liable for

3      every single dollar of consolidated Canadian

4      estate liabilities is actually the worst

5      assumption you could have made from NNI's

6      perspective?

7            A.     I don't know that, no.

8            Q.     Can you explain that answer?

9            A.     I can't say whether it's the worst.

10           Q.     Can you think of a single worst

11     assumption you could have made with respect to

12     the consolidated entities' liabilities than NNL

13     being liable for all of them?

14                  MR. PULTMAN:  Object to the form.

15           A.     My calculations were done for the

16     reporting group, for the -- the Canadian -- the

17     Canadian estate.  So in my Table 1 analysis,

18     when I do the cash available for distribution

19     and the liability subject to compromise, that's

20     the total for the Canadian -- the Canadian

21     group.

22           Q.     Let's say I were to ask you,

23     Dr. Wertheim, I just want you to tell me what

24     is the -- what is the payout projected to be in

25     a best case scenario for NNI of only NNL, have

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2      you done that?

3           A.    No.

4           Q.    Did you ever ask any representative

5      of the monitor for information about claims

6      against NNL on an unconsolidated basis?

7           A.    No.

8           Q.    Do you know if the monitor possesses

9      information about claims against NNL on an

10     unconsolidated basis?

11          A.    Do I know if they possess the

12     information?  I don't know.  They may.

13          Q.    Based upon your experience in

14     working in bankruptcy situations, do you

15     believe that the monitor has information about

16     NNL's specific liabilities?

17                MR. PULTMAN:  Objection, no

18          foundation.

19                You can answer.

20          A.    I don't know.  I would assume they

21     may.

22          Q.    By the way, do you know how old the

23     document that we have marked as Exhibit 2 is?

24          A.    Yes.

25          Q.    When was it filed?

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    Well, it's for the period ended

3   June 30.  It was filed -- usually, there is a

4   filing date.  It would have been within 90 days

5   following June 30, 2012.  I don't see the exact

6   date of when it was filed.

7        Q.    Would it help you to look at page

8   765 in the bottom right corner?

9        A.    Okay.  It was filed August 9, 2012.

10       Q.    Have you sought to obtain any

11  updated information from any source?

12       A.    I have some updated information.

13       Q.    Other than the amount of the EMEA

14  settlement that you have added to this, do you

15  have any other updated information?

16            MR. PULTMAN:  On what?

17       Q.    With regard to the liability chart.

18       A.    To the liability side?

19       Q.    Yeah.

20       A.    Yes.

21       Q.    What updated information do you

22  have?

23       A.    It would be coming from Appendix D

24  of the one hundred and eighth monitor's report

25  dated last month.

```
 1                WERTHEIM - HIGHLY CONFIDENTIAL
 2        Q.    Did Appendix D of the one hundred
 3   and eighth monitor's report update all of the
 4   numbers in the chart at the top of page 29 that
 5   you relied upon?
 6        A.    Not line by line, no.
 7        Q.    So we will come back to that
 8   question in a moment.  Okay.
 9              So can you tell me how you
10   calculated your 2.2 -- strike that -- the
11   $3.235 billion in other claims against the
12   consolidated Canadian estates?
13        A.    Sure.  Do you want me to do the math
14   right now or just explain it?
15        Q.    Why don't you tell me the
16   components, then we can drill down afterwards.
17        A.    Okay.  Using the table on the top of
18   page 29 of the form 10-Q, I took the -- and I'm
19   just going to list the amounts -- the 167, plus
20   186, plus 200 million from the long-term debt
21   line, plus 176, plus 1548, plus 564, plus 20,
22   plus 126, plus 21, plus 7, plus 8, plus 34,
23   plus 53, and then as I stated in my footnote, I
24   also added an additional 125 million for the
25   payable to EMEA.
```

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.     And if you add those numbers, you

3    get to 3.235 billion?

4          A.     Yes.

5          Q.     So does Appendix D to the one

6    hundred and eighth monitor report -- why don't

7    we mark that as Exhibit 3, so you have that in

8    front of you as well.  I'm not looking to play

9    a memory game here.

10                 (Wertheim Exhibit 3, One Hundred and

11          Eighth Monitor Report, dated September 24,

12          2014, marked for identification.)

13         Q.     Is Exhibit 3 I just handed you the

14   one hundred and eighth monitor report that you

15   referred to a moment ago?

16         A.     Yes.

17         Q.     So if you could turn to Appendix D

18   that you referred to.  Does this document

19   provide with you any updated information with

20   regard to the $167 million in trade and other

21   accounts payable?

22         A.     Not specifically line by line.  I

23   already stated that it doesn't update the

24   amounts in the 10-Q line by line, but I used

25   this, which is the current claim status as

1              WERTHEIM - HIGHLY CONFIDENTIAL

2      of -- well, it's dated September 3, 2014, so

3      last month, to get comfort, I used this to get

4      comfort for the total of my claims compared to

5      the total of the current claims, and they're

6      not meant -- the two documents are not meant to

7      line up line by line, but based on the current

8      total claims, it was not materially different

9      than what I show as total claims in Table 1.

10         Q.    We will come back to that in one

11     second, but I just have one preliminary

12     question.

13              When you read Appendix D in

14     Exhibit 3, you understood that the monitor was

15     recording claims against the separate Canadian

16     debtors separately, didn't you?

17         A.    Yes.

18         Q.    You understood that it wasn't being

19     recorded as one single consolidated entity,

20     correct?

21         A.    Correct.

22         Q.    So is there anything in Appendix D

23     that indicates that your use of a

24     $3.235 billion estimate for other claims is

25     correct?

**HIGHLY CONFIDENTIAL**                    83

```
 1               WERTHEIM - HIGHLY CONFIDENTIAL
 2        A.    It gives me comfort that it is.
 3        Q.    Show me how.
 4        A.    Okay.  And, again, it doesn't match
 5   line by line.  I didn't use it for that
 6   purpose.  What I wanted comfort on is my total
 7   claims, which I list on my Table 1 as total
 8   liabilities subject to compromise, nine million
 9   three hundred twenty-six point seven million.
10        Q.    9 billion, you mean?
11        A.    Well --
12        Q.    You said nine million three hundred.
13        A.    I said 9,326 million.
14        Q.    Okay.
15        A.    Which is 9.326 billion.
16              Looking at -- and, again, I did this
17   just to get comfort in the total, not to verify
18   any line-by-line item, and so to do that, given
19   that there are duplicate claims on particular
20   entities, for instance, the pension claim shows
21   up on each entity as an example, I looked at
22   just NNL, and so if you look at the total
23   claims under review for NNL, 8,495.8, plus the
24   total accepted claims, 2,837.4, if you add
25   those, now these are amounts in Canadian
```

1               WERTHEIM - HIGHLY CONFIDENTIAL

2     dollars, if you add those, that represents the

3     total claims either under review or accepted

4     for NNL, apply the exchange rate that was

5     applicable to translate to US dollars, if I

6     remember my numbers, that total comes out to

7     about 37 million more in claims than my

8     9,326 million, and given that, in my

9     sensitivity analysis, $100 million reduction in

10    claims on NNL resulted in only a 7.4 million

11    increase in net assets for NNI, then a

12    $37 million -- if I'm recording 37 million

13    difference in claims compared to the current

14    amount, the effect on NNI's cash if, again, if

15    I remember my numbers correctly, was only 2.7.

16               So had I used the most current total

17    claim numbers, my analysis for NNI's available

18    cash, instead of 971, which I show in Table 2,

19    it would have been 973.7, I believe.  So that

20    gave me comfort that even though the numbers I

21    used from the 10-Q are a couple years old, it

22    was almost identical in total dollar amount to

23    the total claims that are stated as of last

24    month.

25         Q.    So when you -- when you say you

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    compared the numbers and the monitor report

3    comes out just $37 million higher for NNL --

4           A.    No, its total claims -- its total

5    claims came out 37 million less than the claims

6    I show, so 37 million less.

7           Q.    Okay.  So when you -- when you added

8    up the claims against NNL in the monitor

9    report, and came out to $37 million less, you

10   were counting at 100 percent all of the claims

11   that are listed as under review, correct?

12          A.    Yes.

13          Q.    So you were assuming complete

14   allowance of all of those?

15          A.    Yes.

16          Q.    Do you have any idea of the

17   percentage of those claims that are under

18   review that have actually been allowed?

19          A.    The percentage offhand, no.

20          Q.    Is your assumption that to include

21   at 100 percent claims that have not yet been

22   allowed the most favorable assumption that you

23   believe you could have made for NNI?

24          A.    As a realistic assumption, yes.

25          Q.    You think it's realistic to assume

```
 1                  WERTHEIM - HIGHLY CONFIDENTIAL
 2    that -- strike that.
 3                  You think the most favorable to NNI,
 4    realistic assumption, is that claims against
 5    NNL will be allowed 100 percent?
 6         A.    Well, the most favorable assumption
 7    would be to assume 0 percent are allowed, but
 8    that's not --
 9         Q.    That's not --
10               MR. PULTMAN:  He hasn't finished.
11         Q.    I'm sorry.
12         A.    But that's unrealistic to me.  And
13    the numbers, again, I used for my analysis the
14    numbers listed in the 10-Q to get comfort with
15    the current amounts, that they had not
16    significantly changed.  And so the numbers in
17    the 10-Q are stated -- if you look at the 10-Q,
18    the numbers are stated in accordance with
19    Accounting Standard 852, which states that,
20    just from an accounting standpoint, the numbers
21    listed in the 10-Q for liabilities are listed
22    at the amounts expected to be settled.
23               So that tells me that the amounts
24    that I look at in the 10-Q, even though they
25    may be settled for less, they may be settled
```

1          WERTHEIM - HIGHLY CONFIDENTIAL

2     for an amount different, but those are the

3     amounts that are expected to be settled, so

4     that's what I used.

5          Q.    Do you have any understanding as to

6     whether it was the monitor's view that all of

7     the amounts listed as under review in this one

8     hundred and eighth monitor report was subject

9     to potential material change?

10              If you need me to repeat it or the

11     court reporter, it's better than reading there,

12     because it's a rough transcript.

13          A.    I don't know if it was -- what the

14     monitor's view is on those, but they are -- my

15     understanding is they're under review, so, by

16     definition, they're subject to change.

17          Q.    Not just change.  Are you aware that

18     it was the monitor's view that it was subject

19     to potential material change?

20          A.    Could be, yes.

21          Q.    Going -- well, could be or that was

22     the monitor's view at the time?  Are you aware

23     of that?

24          A.    Do I remember seeing that in a

25     document that states that that's the monitor's

1              WERTHEIM - HIGHLY CONFIDENTIAL

2   view?  It may be stated in the monitor's

3   report.  I think it is stated in the monitor's

4   report, but, again, the amounts are those

5   expected to be settled.

6              Could they be settled for an amount

7   materially different?  Possibly.  But that's

8   what they expect.

9        Q.   So, for example, then, you're saying

10  that the monitor had an expectation of paying

11  the bonds five billion two hundred forty-three

12  point one million dollars?

13       A.   That was the expected claim to be

14  settled, not that NNL would have the assets

15  available to pay that.

16       Q.   I'm just talking about the

17  expectation of what the allowed amount of the

18  claim was.

19              Are you saying that you interpreted

20  this document as the monitor's view that the

21  reasonable allowed amount for this claim is

22  five billion two hundred forty-three point one

23  billion dollars?

24              MR. PULTMAN:  Objection.

25       Q.   That that was how you interpreted

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    this?

3              MR. PULTMAN:  Sorry.  Objection, no

4         foundation.  Objection to the form of the

5         question.

6         Q.    I will fix it.  Let me ask you a

7    predicate question.

8              Look at the under review column.

9         A.    You're misinterpreting how I used

10   Appendix D.  I used the numbers from the 10-Q,

11   and I simply used Appendix D to get comfort on

12   whether my total hadn't materially changed.

13   The numbers from the 10-Q, by definition, are

14   listed at amounts that are expected to be

15   settled.

16        Q.    Let's go back to the 10-Q.  Let's go

17   to page 29 again.

18              So when you read this document, the

19   10-Q, and decided to rely upon it, you

20   interpreted the $670 million UK pension

21   guarantee claim listed here as, by definition,

22   the amount that is expected to be settled?

23        A.    According to what the 10-Q states,

24   yes.

25        Q.    And did you subsequently -- strike

1                    WERTHEIM - HIGHLY CONFIDENTIAL
2      that.
3                    It is your expert opinion, is it
4      not, that, in fact, that expectation that the
5      monitor had is unreasonable, correct?
6                    MR. PULTMAN:  Objection,
7            mischaracterizes.
8            Q.    Let's use the words that you used.
9      Realistic.
10                   Do you, sitting here today, with
11     everything that you know, believe that
12     $670 million assumption was realistic?
13                   MR. PULTMAN:  Objection,
14           mischaracterizes his report.
15                   MR. ROSENTHAL:  I'm not asking about
16           his report.
17                   MR. PULTMAN:  Same objection.
18                   You can answer.
19           A.    I'm not making a judgment as to
20     whether the 670 million assumption was
21     realistic.  I'm making an assumption that the
22     10-Q, based on accounting standards, says that
23     the 670 million was what was expected to be
24     settled.
25           Q.    And you, in October of 2014, are

1                   WERTHEIM - HIGHLY CONFIDENTIAL

2      relying upon the 2012 10-Q and the numbers in

3      there for your determination that, in a best

4      case scenario, what cash would be available to

5      NNI, correct?

6                   MR. PULTMAN:  Objection,

7            mischaracterizes the testimony.

8                   You can answer.

9            A.     Again, best realistic case, yes.

10     But, for instance, on the -- on the NNUK

11     pension claims, I excluded those.  That was one

12     of my assumptions.

13                  So right off the top, if you look at

14     the numbers in the 10-Q, footnote 15, the

15     numbers that they list, I knock 670 million off

16     of that total to begin with.

17           Q.     Why did you exclude it?

18           A.     Just to give an optimistic scenario

19     for the case of NNI.  Now, I could have assumed

20     that all of them were zero.  Would that be

21     realistic?  No.

22                  So did I make some judgment calls?

23     Yes.  But I was trying to balance being

24     optimistic versus also trying to be realistic.

25           Q.     Did you have any basis for your

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2        assumption that the trade and other accounts

3        payable would be 100 cents on the dollar?

4                    MR. PULTMAN:  Objection.  It has

5             been asked and answered.

6                    You can answer again.

7             A.    Other than that line item was listed

8        at the amount expected to be settled.

9             Q.    Did you have any basis that the

10       $186 million in restructuring liabilities would

11       be payable at 100 cents on the dollar?

12                   MR. PULTMAN:  Same objection.

13            Q.    Other than the fact that it's listed

14       here?

15                   MR. PULTMAN:  Same objection.

16                   You can answer.

17            A.    And same answer as before, that it's

18       listed at the amount expected to be settled.

19            Q.    Did you have any basis, other than

20       the fact that it's listed in the 10-Q, for

21       including the NNL lease guarantees at

22       $126 million?

23                   MR. PULTMAN:  Same objection.

24            A.    I assume that was listed at the

25       amount expected to be settled.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    Are you aware, by the way, that the

3    interest on long-term debt is listed here at

4    $1.193 billion?

5         A.    I'm aware of that, yes.

6         Q.    Is it your understanding that it's

7    listed there because that's also the amount at

8    the time that NNC and its subsidiaries were

9    expecting that to be settled for?

10              MR. PULTMAN:  Same objection.

11         A.    And same answer.  It's listed there

12   under the same assumptions that the -- that the

13   other line items are listed at.  Whether the

14   ultimate outcome is different, I don't know.

15         Q.    So you made a qualitative decision

16   to remove from your calculations the interest

17   on long-term debt payable, and the UK pension

18   guarantees, but to accept unchallenged the

19   assumptions on all of the others that you have

20   listed, correct?

21         A.    I used the others that were listed,

22   yes.

23         Q.    Did you have any basis to

24   distinguish between those you accepted and

25   those you didn't accept?

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          A.     That was an assumption I made in my

3    calculation.  It was my assumption.

4          Q.     Well, did you have any basis,

5    though, to distinguish between those that you

6    accepted or those you didn't or you just made

7    that assumption without explanation?

8          A.     I made that assumption.  I knew the

9    UK pension guarantees were in dispute.  That

10   was a material amount.  I chose to eliminate

11   those.

12         Q.     Anything else to your answer?

13         A.     No.

14         Q.     Do you know if the $1.548 billion in

15   pension obligations is an allowed claim?

16         A.     Well, according to Appendix D,

17   that's still under review.

18         Q.     In fact, that's one of those that's

19   a duplicative claim against multiple entities,

20   correct?

21         A.     Correct.

22         Q.     Do you know who ultimately bears

23   responsibility for that claim, if at all?

24         A.     No.

25         Q.     You had just assumed it would be

```
1                    WERTHEIM - HIGHLY CONFIDENTIAL
2    NNL?
3         A.    Yes.
4         Q.    Do you know whether there is any
5    dispute over that, given that it's under
6    review?
7         A.    I don't know the legal status of
8    that.
9         Q.    Did you ask anybody?
10        A.    No.
11        Q.    Do you consider the 1.548 to be a
12   material amount?
13        A.    Yes.
14        Q.    With respect to the restructuring
15   liabilities that are listed here, does Appendix
16   B of the monitor report or any other document
17   give you any basis to believe which Nortel
18   entity ultimately bears liability?
19        A.    Not that I'm aware of.
20        Q.    Would the same be true with respect
21   to the trade and other accounts payable?
22        A.    Yes.
23        Q.    Would the same be true for
24   post-retirement obligations other than
25   pensions?
```

HIGHLY CONFIDENTIAL                              96

1                WERTHEIM - HIGHLY CONFIDENTIAL

2        A.     Yes.

3        Q.     Would the same be true for the

4    environmental liabilities?

5        A.     As far as I'm aware.

6        Q.     Did you undertake any investigation

7    to find out which entity bore liability to the

8    extent those claims were allowed?

9        A.     No.

10               MR. PULTMAN:  Objection.  It has

11         been asked and answered.

12               You can answer it again.

13       A.     No.

14       Q.     Are you aware that on yesterday's

15   call with the US court that the monitor stated

16   that it still has outstanding, in Canada,

17   claims, and those claims are subject to

18   sensitive negotiation and sensitive analysis in

19   Canada?

20       A.     I'm not aware of any part of

21   yesterday's call.

22       Q.     Is that consistent with your

23   understanding?

24               MR. PULTMAN:  Is what consistent?

25       Q.     That the outstanding Canadian claims

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    are the subject of sensitive negotiation and

3    sensitive analysis in Canada.

4              You should just listen rather than

5    reading it, because I can -- if you don't hear

6    something, I will repeat it or the court

7    reporter can.  I just don't want you to, since

8    it's a rough transcript, to be focused on the

9    rough transcript rather than --

10        A.    Okay.  I'm sorry.  In my previous

11   deposition, they told me if I didn't understand

12   the question and wanted to reread it, to feel

13   free to do that to get clarity.  So that's why

14   I was doing that.

15        Q.    Probably easier just to ask me, just

16   in case there's-- it's a rough transcript.  So

17   I wasn't the one who deposed you previously,

18   but that's not the advice I would have given.

19        A.    Okay.  Could you repeat the question

20   again?  Sorry.

21        Q.    Yes.  Is it consistent with your

22   understanding if I were to say that the

23   outstanding Canadian claims are the subject of

24   sensitive negotiation and sensitive analysis in

25   Canada?

**HIGHLY CONFIDENTIAL**                    98

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2              MR. PULTMAN:  Objection.  There's no
 3      foundation.
 4              You can answer.
 5      A.    By outstanding Canadian claims, do
 6  you mean the claims under review?
 7      Q.    Correct.
 8      A.    I would assume that.
 9      Q.    If we could look now back at
10  Appendix D on Exhibit 3.  Against NNL, the
11  allowed claims are in the amount of
12  $2.8 billion, correct?
13      A.    I'm sorry.  Say that --
14      Q.    The allowed claims against NNL is
15  $2.8 billion; is that correct?
16      A.    Accepted claims?
17      Q.    Accepted.
18      A.    If that means allowed, then --
19      Q.    We will use the term "accepted"
20  then.
21              The accepted claims are
22  $2.8 billion?
23      A.    Canadian.
24      Q.    Yes.  And of that, 2.5 billion is
25  NNI's claim, correct?
```

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          A.      Correct.

3          Q.      If we were to look at accepted

4    claims, besides the NNI claim, fair to say it's

5    about $300 million Canadian?

6          A.      Yes.

7          Q.      Relative to under review claims of

8    about eight and a half billion dollars?

9          A.      Yes, including the bonds.

10         Q.      If my math is right, would you say

11   fewer than 5 percent of the Canadian claims

12   against NNL, besides the NNI claim, are still

13   under review -- are accepted?

14         A.      Yes.

15         Q.      Do you know, by the way, how many of

16   the -- you see down at the very bottom, the

17   total filed proofs of claims against all of the

18   Canadian entities are $36 billion?

19         A.      Correct.

20         Q.      Do you know how much of that are

21   duplicate claims?

22         A.      I haven't gone through the

23   calculation, so no.

24         Q.      Do you have information here that

25   would allow you to calculate the amount of

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    duplicative claims?

3         A.    Not necessarily.  It didn't affect

4    my use of the table, because I was looking at

5    just NNL.

6         Q.    Are you able to tell how many of the

7    claims against NNL are duplicative claims that

8    are really more appropriately claims against

9    other debtors?

10             MR. PULTMAN:  Object to the form.

11             You can answer.

12        A.    No.

13        Q.    Why did you, when you looked at

14   Appendix D of Exhibit 3, focus specifically on

15   NNL liabilities, but when you were relying on

16   the chart in appendix -- in Exhibit 2, you use

17   consolidated liabilities?

18        A.    To avoid the use of duplicate

19   claims.  So I had to look at just NNL and, in

20   fact, that -- that may underestimate the

21   consolidated liabilities to the extent that

22   there are claims under review or accepted in

23   other entities that are not also part of NNL's.

24             So, if anything, my use of the total

25   for just NNL might have underestimated the

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2    total claims, but, again, I just used that to

3    get comfort had my use of the 10-Q numbers

4    materially changed.

5          Q.    Well, the 10-Q numbers included all

6    of the Canadian debtors, correct?  You've

7    already said that.

8          A.    Correct.

9          Q.    Okay.  So if, out of that, if a

10   relatively high percentage is NNC or NNGC or

11   NNIC or NNTC, that could correspondingly lower

12   the actual ultimately accepted claims against

13   NNL, correct?  You just don't know?

14         A.    Don't know.

15         Q.    Are you aware of any of the trusts

16   and funds that the monitor has already paid

17   out, such as the Health and Welfare Trust?

18         A.    No.

19         Q.    Ever heard of the Termination Fund?

20         A.    No.

21         Q.    Ever heard of the Hardship Fund?

22         A.    I read something related to that in

23   the monitor's report, but I'm not familiar.  I

24   just heard the name.  If you're asking had I

25   ever seen the name, yes, but I don't know

HIGHLY CONFIDENTIAL                          102

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    details about it.

3        Q.    Do you know how much money has been

4    actually funded already into these trusts and

5    funds?

6        A.    No.

7        Q.    Do you know how they impact the

8    claims?

9        A.    No.

10        Q.    So fair to say that if I were to

11    tell you that $75 million has already been put

12    into the Health and Welfare Trust fund to pay

13    certain benefits that are the subject of some

14    of the claims that you have included, you

15    haven't taken that into account at all,

16    correct?

17            MR. PULTMAN:  Objection, no

18        foundation.

19            You can answer.

20        A.    Could you repeat that?

21        Q.    Sure.  If I were to tell you that

22    $75 million has already been put into a Health

23    and Welfare Trust and has paid some of the

24    claims against NNL, is it fair to say that you

25    haven't taken any deduction for that into

1                     WERTHEIM - HIGHLY CONFIDENTIAL

2      account?

3           A.     Correct.

4           Q.     Let's turn to the assets side now of

5      your calculation for NNL.

6           A.     Okay.

7           Q.     In your best case scenario for NNI,

8      you calculate that NNL's payout ratio would be

9      11.15 percent, correct?

10          A.     Based on the assumptions I made for

11     that table, correct.

12          Q.     And you call those best case

13     assumptions, correct?

14          A.     Correct.

15          Q.     And you have a sensitivity analysis,

16     which is at the top of page 11 of your report?

17          A.     Yes.

18          Q.     And you found that if NNL's assets

19     increased by $100 million, then the payout

20     ratio increases and ultimately the surplus cash

21     to NNI increases by 65.3 million, correct?

22          A.     Correct.

23          Q.     So, in other words, for every dollar

24     increase in NNL's assets, NNI's surplus cash is

25     going to increase by about two-thirds of that

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2      amount?

3           A.     Roughly, yes.

4           Q.     And that's not only because NNI

5      would receive more on its $2 billion claim, but

6      it would also owe less on its guarantee of the

7      crossover bonds?

8           A.     Yes.  Both are taken into account.

9           Q.     So let's start off by talking about

10     the cash receivables, if we look at Table 1 on

11     page ten of your report.

12                 So you have a footnote 12.  And you

13     cite to this Exhibit 3, which is the one

14     hundred and eighth monitor report?

15          A.     Uh-huh.

16                 MR. PULTMAN:  You have to answer --

17          Q.     You have to answer audibly.

18          A.     Yes.

19          Q.     And that's where you got the

20     $329.4 million cash balance, correct?

21          A.     Correct.

22          Q.     And in your footnote, you say,

23     "Given that the majority of receivables are

24     intercompany receivables and have a low, if not

25     zero probability of collection, and given that

```
 1                WERTHEIM - HIGHLY CONFIDENTIAL
 2   all asset sales have been virtually completed,
 3   I have assumed a zero dollar recovery on
 4   receivables and other assets."
 5                Do you see that footnote?
 6        A.     Yes.
 7        Q.     Do I understand correctly that you
 8   assigned zero dollar value to both intercompany
 9   receivables and to asset sales?
10        A.     Yes.
11        Q.     I'm going to talk about them
12   separately now.
13                Is the assumption that the
14   intercompany receivables would have a zero
15   dollar recovery an assumption that you made?
16        A.     Yes.
17        Q.     What's the basis for that
18   assumption?
19        A.     If we look at the -- if we look at
20   the cash summary worksheet, which has not been
21   introduced yet, it gives cash balances for
22   different groups.
23                And so to answer your question sort
24   of briefly, settlements have already been made
25   between NNL and EMEA and NNL and the US.  And
```

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2     so the intercompany receivables that were
 3     remaining were -- I'm sorry.  Did I -- yes.  I
 4     was making sure I made my statement right.
 5              Settlements have been made between
 6     NNL and the US and settlements have been made
 7     between NNL and EMEA.  And so the intercompany
 8     receivables that would remain relate to the
 9     other groups such as Asia, and based on the
10     cash balances that are available, for instance,
11     to that group, and based on my understanding
12     that that group would have to pay its outside
13     creditors first, I saw low, if not zero
14     probability of any eventual upflow to NNL based
15     on those receivables.
16              So that was the basis for my
17     assumption on assuming a zero receivable.
18         Q.    What's your basis for believing that
19     the intercompany receivables, in each and every
20     Asian country, is payable after outside
21     creditors?
22              MR. PULTMAN:  Object to the form.
23              You can answer.
24         A.    (Perusing.)  On page 43 of the 10-Q,
25     second to the bottom paragraph states, "Further
```

HIGHLY CONFIDENTIAL                                    107

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2      portions of the pre-petition intercompany debt

3      continue to be repayable from time to time only

4      to the" -- "only to the extent of any such APAC

5      agreement subsidiary's net cash balance at the

6      relevant time and subject to certain reserves

7      and provisions."

8           Q.    Have you looked at the solvency of

9      each of NNL's Asian subsidiaries?

10          A.    No.

11          Q.    Do you know whether there would or

12     would not be excess cash after all the outside

13     creditors were paid?

14          A.    I have not calculated the amount of

15     excess cash for each Asian subsidiary, no.

16          Q.    Have you calculated for any?

17          A.    No.

18          Q.    Well, what's the basis, then, for

19     assuming that there would be no excess cash for

20     any Asian subsidiary to pay to NNL?

21               MR. PULTMAN:  Objection.  It's been

22          asked answered.

23               You can answer it again.

24          Q.    You explained in your prior answer

25     that it was your understanding that NNL could

HIGHLY CONFIDENTIAL                    108

1              WERTHEIM - HIGHLY CONFIDENTIAL

2      only be paid after outside creditors with

3      respect to the Asian subsidiaries, correct?

4          A.    Correct.

5          Q.    And you made an assumption that, as

6      a result, there would be no cash, zero to low

7      probability are the words you used, I believe,

8      of cash going to NNL, correct?

9          A.    Correct.

10         Q.    And what is the basis for your

11     assumption that there would be no excess cash

12     after creditors in those countries were paid?

13         A.    When I looked at the cash balance

14     from the cash summary sheet, it was only -- I

15     forget the exact amount.  And so I didn't

16     assume zero liabilities.  I assumed that there

17     are some liabilities for those Asian

18     subsidiaries.  I assume that there are some

19     claims.

20              And so, in my opinion, given

21     available cash balance and given the existence

22     of claims on an intercompany basis, that was my

23     assumption, that there would be zero upflow to

24     NNL.

25         Q.    Did you have any other basis for

1                   **WERTHEIM - HIGHLY CONFIDENTIAL**

2      that assumption?

3           A.    No.

4           Q.    Are there any documents that you

5      looked at to reach that assumption other than

6      the 10-Q you just referred to and the cash

7      balance summary?

8           A.    No.

9           Q.    Fair to say that the assumption of a

10     zero dollar recovery from those intercompany

11     balances is the worst case assumption from

12     NNI's perspective?

13          A.    Again, I have to balance what you

14     call worst case versus what I call, on the flip

15     side, the optimistic case, with what I also

16     consider realistic.  And so could I have

17     assumed that they would have recovered

18     100 percent?  Yes.  If I would have assumed

19     they would have recovered 100 percent, that

20     would be in the best interest of NNI, but I

21     would not consider that a realistic assumption.

22          Q.    Let me just ask my question again.

23               Isn't it fair to say that the

24     assumption that you took, though, was the worst

25     case assumption from NNI's perspective?

1          WERTHEIM - HIGHLY CONFIDENTIAL

2              MR. PULTMAN:  Objection.  It has

3      been asked and answered.

4              You can answer it again.

5      A.    Mathematically, yes.

6      Q.    Now, one of the documents you said

7  you relied upon was the cash balance summary

8  sheet.

9              Did you go back and look at how

10  accurately the monitor had historically

11  forecasted its receivables relative to actual

12  receipts?

13      A.    No.

14      Q.    Would it surprise you to learn that,

15  in the last nine monitor forecasts over a

16  three-year period, the monitor has forecasted

17  receipts of $127 million less than it actually

18  received?

19              MR. PULTMAN:  Object to the form.

20              You can answer.

21      A.    Would I be surprised that the

22  forecasts are off?  No.  Forecasts, by

23  definition, are forecasts.

24      Q.    But when you decided to use the

25  current monitor forecast with regards to

HIGHLY CONFIDENTIAL                    111

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    intercompany receivables, were you aware that

3    virtually each and every time the monitor has

4    done a forecast over the last three years, it

5    has underforecasted?  Were you aware of that?

6         A.    When you say forecast of

7    intercompany receivables or forecast of the

8    cash balance?

9         Q.    The cash balance.

10        A.    Okay.  You had said forecast of

11   intercompany receivables.

12        Q.    We'll break it up.

13              Are you aware that it has

14   repeatedly, through each of the monitor reports

15   over the past three years, underforecasted cash

16   balances?

17        A.    I knew it wasn't exact, but I didn't

18   evaluate a detailed calculation of whether it

19   was over or under.

20        Q.    Okay.  When you relied on the most

21   recent cash balance report of the monitor, were

22   you aware that it has also, in those same

23   reports, repeatedly underforecasted

24   intercompany receivables?

25        A.    No.

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.     Let's now talk about the second half

3    of that footnote, which was the asset sales

4    that you referred to.

5                    When you say all asset sales have

6    virtually been completed, what are you

7    referring to?

8          A.     The asset sales that were part of

9    the -- I'll call it the business unit sales,

10   and the intellectual property of the Rockstar

11   transactions.

12         Q.     Are you aware that NNL has other

13   assets still to sell?

14         A.     Yes.

15         Q.     Okay.  Did you -- okay.  And you

16   valued those other assets at zero, correct?

17                    MR. PULTMAN:  Object to the form.

18         A.     For purposes of my analysis, I did

19   not include those, yes.

20         Q.     Okay.  So can you explain why, for

21   purposes of your best case analysis, you valued

22   other assets that you knew NNL still had to

23   sell at zero?

24         A.     Because, one, the fact that they

25   still have those available to sell, to some

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    extent, doesn't mean that they have been sold.

3    And, secondly, there were -- I didn't know

4    amounts to include.

5         Q.    So you didn't know how much they

6    were worth and, therefore, you decided, in a

7    best case scenario, you would value them at

8    zero?

9              MR. PULTMAN:  Object to the form.

10             You can answer.

11        A.    I had no basis on what to value them

12   at all, so I didn't -- they were not included

13   in my calculation.

14             Do they exist?  Yes.  Is it an

15   unknown?  Yes.  Could it possibly increase the

16   cash balance?  Yes.

17        Q.    Not just could it.  It's reasonable

18   to assume that, when they sell the assets, it

19   will increase the cash balance, correct?

20        A.    Correct.

21             MR. PULTMAN:  Objection, no

22        foundation.

23             You can answer.

24        Q.    Why did you not, when you wrote your

25   report and said that this was the maximum

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    amount under a best case scenario that NNI
 3    could receive, why didn't you say this is the
 4    maximum amount plus whatever percentage they
 5    got from the asset sales that I just don't know
 6    how to value?
 7         A.    Well, my conclusion that, as far as
 8    the maximum amount, isn't just based on the
 9    outcome of any one line item of asset or one
10    line item of liabilities.
11              In my Table 2, when I calculate the
12    distribution analysis for NNI, and I come to
13    the conclusion of 971 million, that 971 number
14    is based on the assumptions that went into
15    those two tables, but I further state that in
16    addition to that, that there are numerous
17    additional items that could further reduce
18    surplus cash which were not taken into account
19    in my NNI distribution analysis.
20              And I state that, when looking at
21    the picture as a whole, that my conclusion of
22    the maximum being less than a billion,
23    971 million, that that conclusion is based on
24    the totality of that, not just how one
25    individual line item moves.
```

1           WERTHEIM - HIGHLY CONFIDENTIAL

2                And so I specifically state that

3    even if a portion of the currently existing

4    claim subject to compromise, and you could also

5    include even if a portion of currently existing

6    assets end up being subject to change, that

7    given that, with the assumptions I made for the

8    971 million, plus the additional items that

9    could further reduce it by 744 million, that

10   even if there were some amounts that came from

11   asset sales, or even if there were certain

12   claims that ended up being reduced, in my

13   opinion, realistically, I couldn't envision the

14   totality of that resulting in excess cash of

15   more than a billion.

16        Q.    If I understand what you just said

17   correctly, you're saying that while even if

18   there are asset sales from assets that you know

19   still exist at NNL, that would have pushed the

20   number higher, while some of these assumptions

21   that you make on page 12 favorable to NNI, you

22   don't believe would have come to pass, and that

23   would have pushed the number back lower?

24        A.    I didn't understand that.

25        Q.    What you're saying is the end of the

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    day number wouldn't be higher for NNI due to
 3    asset sales at NNL or lower claims at NNL,
 4    because some of these other assumptions that
 5    you have already made for NNI were too
 6    optimistic, correct?
 7         A.    Possibly, yes.
 8         Q.    Let's assume with me that I want to
 9    have a report that says I'm going to assume
10    these five bullets that you have on page 12.  I
11    want to assume these are sacrosanct, okay?
12    We're not going to change those assumptions to
13    offset other events, okay?  So we're not going
14    to modify those assumptions.
15              Isn't it true that when you account
16    for the expectation of NNL receiving proceeds
17    from asset sales, even if we don't know what
18    the number is, the maximum recovery to NNI,
19    maximum cash available, is going to be higher
20    than 971?
21              MR. PULTMAN:  Objection, no
22         foundation.
23              You can answer.
24         A.    If all you changed was the cash
25    available line due to the increasing cash from
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2     the asset sales, then mathematically, yes.

3     But, again, that's assuming a change in only

4     that line.

5          Q.   Correct.  Correct.  All I want is

6     where, at the top of page 12, you have, based

7     on all these assumptions, you come up with

8     saying the maximum surplus cash available to

9     pay PPI is 971.

10              Do you see that on page 12?

11         A.   Yes.

12         Q.   And I'm saying all I want you to do

13    is to now account for the sales of assets that

14    you know NNL has.  And if we accounted for

15    that, you don't know how much that number would

16    increase, but you do know that that would

17    increase, correct?

18         A.   Correct.  But that's not what I

19    based my conclusion on.

20         Q.   Okay.

21              MR. PULTMAN:  I don't want to

22         interrupt the questioning, but we're

23         coming to the end of a tape.

24              MR. ROSENTHAL:  Okay.  This is

25         probably a good breaking point, then.

HIGHLY CONFIDENTIAL                    118

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2                  THE VIDEOGRAPHER:  We are now off
 3          the record.  The time is 11:44 a.m.,
 4          October 22, 2014.
 5                  (Recess taken.)
 6                  THE VIDEOGRAPHER:  This is tape
 7          three of the deposition of Dr. Paul
 8          Wertheim.  We are now back on the record.
 9          The time is 12:02 p.m., October 22, 2014.
10  BY MR. ROSENTHAL:
11          Q.    When you referred to asset sales
12  that you're aware that NNL will be undertaking,
13  can you tell me which ones you're referring to?
14                  MR. PULTMAN:  Object to the form of
15          the question.
16                  You can answer.
17          A.    I believe it just relates to, and I
18  don't know the technicalities or details, but
19  internet addresses.
20          Q.    If I refer to them using the
21  shorthand, IP addresses, would you be okay with
22  that?
23          A.    Sure.
24          Q.    Do you know how many IP addresses
25  the Canadian debtors own?
```

**HIGHLY CONFIDENTIAL**                              119

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    No.

3        Q.    Have you ever heard or read anywhere

4   that they own, or at some point they owned

5   17 million IP addresses?

6        A.    I have not heard that number.

7        Q.    How did you hear that they were

8   going to be selling IP addresses?

9        A.    I believe I read it in the monitor's

10  report.  There was a short discussion.

11       Q.    Why don't we mark as Exhibit 5 --

12  Exhibit 4, the sixty-first report of the

13  monitor.

14             (Wertheim Exhibit 4, Sixty-First

15       Report of Monitor, dated March 21, 2011,

16       marked for identification.)

17       Q.    Is this the monitor report where you

18  learned about the sale of the IP addresses?

19       A.    I don't remember the exact one.

20  (Perusing.)

21       Q.    Do you see, if you look at paragraph

22  16, it refers to the applicants owning

23  17 million IP addresses?

24             Do you see that?

25       A.    Yes.

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.     Does that refresh your recollection

3     as to the number of IP addresses that NNL owns?

4                  MR. PULTMAN:  Object to the form.

5                  You can answer.

6          A.     Okay.  It doesn't refresh my memory

7     because I didn't know the number to begin with,

8     but now I do.

9          Q.     Why don't we mark, as Exhibit 5, the

10    cash summary worksheet that you -- I believe

11    the one that you have been referring to.

12                 (Wertheim Exhibit 5, Cash Summary

13             Worksheet, Bates Stamped NNC-NNL-PPI000001

14             through 21, marked for identification.)

15                 MR. ROSENTHAL:  And for the record,

16             it bears the Bates number NNC-NNL-PPI1 to

17             21.

18         Q.     When you have referred to the cash

19    balance worksheet, is this the document you

20    have been referring to?

21         A.     (Perusing.)  As the cash summary

22    worksheet?

23         Q.     Yeah.

24         A.     It appears to be.  This is printed

25    out in a little bit different format, but it

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2      appears to be the same.

3          Q.    This was the hard copy that was

4      produced to us in connection with this dispute.

5          A.    Okay.

6          Q.    How did you get this document?

7          A.    I remember at one point, when I was

8      going through my analysis, I had asked

9      counsel --

10                MR. PULTMAN:  Okay.  Let me just

11            caution you about getting into the

12            substance of communications with counsel.

13                THE WITNESS:  Okay.  I'm sorry.

14                MR. PULTMAN:  If what you're asking

15            for is -- if what you're testifying to is

16            a request for documents, that's fine.  I

17            have no problem with that.  I just don't

18            want to get into the substance of any

19            communications beyond that.

20          A.    Yeah.  That's where I was going.  It

21      was a request for documents.  I was requesting

22      any information that they had on more

23      current -- current cash balances.  And also any

24      updated information on the cash -- yeah, the

25      cash balances for the entities.

**HIGHLY CONFIDENTIAL**                    122

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    Do you know where this document

3    comes from besides the fact that it was given

4    to you physically by counsel?

5         A.    Details, no.

6         Q.    Is this a publicly-available

7    document?

8              MR. PULTMAN:  Object to the form of

9         the question.

10         A.    I don't know to what extent it is.

11         Q.    Have you seen this document or this

12    information in any public filings?

13         A.    This particular document, no.

14         Q.    So let's look at page 18 of this

15    document.  I presume that you saw, when you

16    reviewed it, that NNL had received $13 million

17    from the sale of some IP addresses?

18         A.    Yes.

19         Q.    Did you -- in trying to see whether

20    you had the ability to put a value on the IP

21    addresses that NNL would be selling, did you

22    ask anybody how many IP addresses they sold to

23    generate the $13 million?

24              MR. PULTMAN:  Objection.  It has

25         been asked and answered.

1           WERTHEIM - HIGHLY CONFIDENTIAL

2                You can answer.

3      A.    No.

4      Q.    Did you ask anybody what percentage

5  of NNL's IP addresses generated the

6  $13 million?

7      A.    No.

8      Q.    Are you aware as to whether the US

9  debtors have sold any IP addresses?

10     A.    No.

11     Q.    If you knew that the IP addresses

12 that had been sold generated $13 million, why

13 did you assume, in a best case scenario, that

14 NNL would generate no revenue from additional

15 IP sales?

16            MR. PULTMAN:  Objection.  It has

17      been asked and answered.

18            You can answer.

19     A.    I had no basis to assume the

20 likelihood, probability or amount of future

21 sales.

22     Q.    Let me represent to you that the US

23 IP addresses sold for 1125 -- $11.25 per

24 address.  Okay?

25            If we assume that the US addresses

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    had the same value as the Canadian addresses,

3    and if we assume that the monitor report that I

4    just showed you as Exhibit 4 is correct, that

5    the Canadian debtors had 17 million IP

6    addresses, would you agree that an equivalent

7    sale would yield $191 million?  And I can give

8    you a calculator if you would like.

9              MR. PULTMAN:  Object to the form.

10             You can answer.

11        A.    If I assume the numbers that

12   multiply out to equal that, then I accept your

13   number, but I would have no basis for assuming

14   that that would be the actual value.

15        Q.    You explained to me why you

16   attributed no value to the IP addresses when

17   you did your best case calculation, but I want

18   to have an understanding as to why you took no

19   steps to try to find out a value of them.

20        A.    Because, again, I had no basis to

21   determine the likelihood or the amount of what

22   the value would be.

23        Q.    So why didn't you try to get a

24   basis?  Is there a reason why you didn't ask

25   somebody for a projected amount of what these

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    would be worth in a sale?
 3         A.    I assumed a zero value.
 4         Q.    But why?  Why didn't you try to find
 5    out what they were worth?
 6              MR. PULTMAN:  Objection.  It has
 7         been asked and answered.
 8         A.    I have answered.
 9         Q.    No, you told me what you assumed,
10    and you told me you assumed a zero.  I just --
11    I just want to find out why that's good enough
12    for you.
13              Why didn't you -- why didn't you ask
14    anybody or look through the documents to see
15    how many IP addresses are there, what are they
16    worth per IP address?
17              MR. PULTMAN:  Object to the form of
18         the question.  Objection, it's
19         argumentative.  Objection, it's asked and
20         answered.
21              MR. ROSENTHAL:  I'll break it up.
22         I'll break it up.
23              MR. PULTMAN:  I'm happy to have him
24         answer all three of your questions.
25              MR. ROSENTHAL:  I'll break it up.
```

1                   WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    Why didn't you make any effort to

3   find out how many IP addresses that they had

4   for sale, given that you knew that they had IP

5   addresses for sale?

6        A.    Because even if I had known the

7   number, I had no real basis to determine the

8   amount or probability or likelihood of a sale.

9        Q.    Well, why didn't you try to find out

10  the answers to those questions?

11              MR. PULTMAN:  Objection.

12       Q.    Strike that.

13              Did you want to know the answers to

14  those questions?

15       A.    I didn't feel I needed to.  I have

16  answered this several times.

17       Q.    Okay.  You didn't feel that you

18  needed to know the answers to those questions

19  so you didn't want to find out?

20              MR. PULTMAN:  Object to the form.

21       Objection, it has been asked and answered.

22              I will let you answer it again.

23       A.    Based on what I told you, no.

24       Q.    If we assume that the remaining IP

25  addresses sold for, let's say, $180 million,

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    would you agree with me, based on your

3    sensitivity analysis, that NNI's surplus cash

4    would increase by about $120 million?

5         A.    You're talking about the sale by NNL

6    and a result on flow through to NNI.

7         Q.    Correct.

8         A.    I will accept that math, but, again,

9    my conclusion wasn't based on movement in any

10   one particular line item.  If, even assuming

11   those numbers, as I stated earlier, when you

12   look at all the additional variables that

13   weren't even included in my 971 million

14   calculation, variables which total over

15   700 million, it was my opinion that those

16   items, when you look at the totality of the

17   reasonableness of the leftover net assets, that

18   it's still not going to be over a million.

19              So, for instance, the additional tax

20   liability, which, for purposes of my

21   calculation, I estimated at 133, even going on

22   the low end estimate of 400 million, that's an

23   additional 200 something million additional

24   claim that's not included.

25              MR. PULTMAN:  Can I just clarify one

1          WERTHEIM - HIGHLY CONFIDENTIAL

2      thing?  You said over a million in your

3      answer.  Did you mean to say over a

4      billion?

5              THE WITNESS:  Oh, yes, over a

6      billion.  Sorry.

7      Q.    Unless I change this assumption, for

8  purposes of this entire deposition, I would

9  like you to assume that you are going to

10  stretch the outcome of events in all cases in

11  favor of NNI, such that surplus cash is

12  maximized, okay?

13              Can you undertake that assumption as

14  the basis for my questions?

15      A.    Yes, as I qualified, realistically.

16      Q.    Realistically, okay.  I want you to

17  stretch the outcome of events in all cases in

18  favor of NNI, such that the surplus is

19  maximized.  So I don't need to have you say in

20  your answers that, well, you could have changed

21  the five assumptions that you have listed in

22  your bullets on page 12.

23              MR. PULTMAN:  Counsel, you're just

24      arguing with him.

25              MR. ROSENTHAL:  I'm not arguing.

1        WERTHEIM - HIGHLY CONFIDENTIAL
2            MR. PULTMAN:  I'm happy to have him
3       answer every one of your questions.
4            MR. ROSENTHAL:  Good.
5    BY MR. ROSENTHAL:
6        Q.    Let me ask you this.  Does your
7    report evaluate how realistic the five
8    assumptions that you make in the bullets on
9    page 12 are?
10        A.    As far as assigning a probability,
11   no.
12        Q.    Do you feel qualified to assign a
13   probability to the five bullets on page 12?
14        A.    I didn't have to because those are
15   assumed in the favor of NNI.
16        Q.    Do you know whether any of them --
17   have you, for purposes of writing your report,
18   formed an opinion as to the reasonableness or
19   unreasonableness of any of those assumptions or
20   you just accepted those as assumptions?
21        A.    Well, I evaluated the reasonableness
22   of my $5 million cash burn, because I came up
23   with that amount.  I made an assumption about
24   the reasonableness of a zero cash burn for NNL.
25   I determined that was really unreasonable, that

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    they're going to burn zero, but yet I assumed

3    that in favor of NNI.

4              And as far as the other three line

5    items, NNI receiving 100 percent of its

6    requested allocation, NNL making first payment

7    towards the bonds, and NNUK pension claims

8    being dismissed, those are all at the extreme

9    of being in favor of NNI.

10        Q.   Did you make any effort to evaluate

11   one way or the other how reasonable they were

12   or is that outside your area of expertise?

13        A.   It was outside of what I was -- the

14   purpose of my calculation.  I'm not going to

15   say it's outside the area of my expertise.

16        Q.   But you, for purposes of this

17   report, did not undertake an analysis to

18   determine whether those are reasonable or

19   unreasonable, correct?

20        A.   Correct.  I answered that.

21        Q.   If we accept your five assumptions

22   that you have made on page 12, and the only

23   thing to your report that gets changed is that

24   the IP addresses actually sell for an

25   additional $180 million, isn't it true that the

1               WERTHEIM - HIGHLY CONFIDENTIAL

2      surplus cash available to NNI to pay PPI would

3      be over $1.01 billion?

4               MR. PULTMAN:  Objection.  It has

5          been asked and answered.

6               You can answer again.

7               MR. ROSENTHAL:  Not that question.

8          A.    That's true, but that doesn't take

9      into account the totality of the variables.

10         Q.    I'm just asking for the variables

11     that you have put in your report.  If you make

12     all the same assumptions, you get over

13     $1.01 billion with just the IP sale, if you

14     assume the proceeds that I said, correct?

15         A.    Mathematically, yes.

16         Q.    Let me mark, as Exhibit 6, the

17     report of Jeffrey Kinrich.  And I'm going to

18     mark together as one exhibit the expert and the

19     exhibits to it.

20               (Wertheim Exhibit 6, Expert Report

21          of Jeffrey Kinrich together with exhibits

22          to report, marked for identification.)

23         Q.    You reviewed Mr. Kinrich's report in

24     connection with your expert report?

25         A.    To the extent I used the end results

1               WERTHEIM - HIGHLY CONFIDENTIAL

2    of his allocation analysis.

3        Q.    If we look at page -- Exhibit 33 to

4    his report, it's towards the very end.  In

5    fact, it is the very last page.

6        A.    Yes.

7        Q.    In the column, total value

8    relinquished, these are the numbers that you

9    used for purposes of your best case scenario

10   for NNI in your report, correct?

11       A.    Correct.

12       Q.    Do you see, under Mr. Kinrich's

13   proposed allocation, there is about

14   $245 million of sale proceeds allocated to NN

15   Ireland?

16       A.    (Perusing.)  Under the EMEA debtors?

17       Q.    Correct.

18       A.    Correct.

19       Q.    Are you aware that NN Ireland is

20   solvent, if you accept Mr. Kinrich's

21   allocation?

22       A.    Okay.

23       Q.    Were you aware of that?

24       A.    No.

25       Q.    Okay.  And, in fact, if you accept

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    Mr. Kinrich's allocation, are you aware that NN

3    Ireland would be solvent by about $241 million?

4         A.    I'm not aware of that.  I didn't do

5    a detailed analysis of the solvency of each

6    individual EMEA entity.

7         Q.    Do you know who owns the equity of

8    NN Ireland?

9         A.    No.

10         Q.    Would it surprise you to learn that

11    it was NNL?

12              MR. PULTMAN:  Object to the form.

13         Q.    Or that it is NNL?

14              MR. PULTMAN:  Object to the form of

15         the question.  Objection.

16         A.    Okay.

17         Q.    When doing the best case analysis

18    for NNL's assets from NNI's perspective, did

19    you take into account in any way the value of

20    NNL's interest in NN Ireland?

21         A.    No.

22         Q.    Why not?

23         A.    I didn't do a detailed analysis of

24    the individual EMEA entities to calculate on a

25    per entity basis the upflow.  I didn't do it.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    Why not?

3              MR. PULTMAN:  Objection.  It has

4        been asked and answered.

5              You can answer again.

6              MR. ROSENTHAL:  He just said he

7        didn't do it.  I'm asking why he didn't do

8        it.

9        A.    I had no basis to try to do those

10   calculations.  It wasn't part of my analysis.

11       Q.    Are you saying that you didn't have

12   information available to you to enable you to

13   calculate the value of NNL's interest?

14       A.    That's not what I said.

15       Q.    You said you had no basis to try to

16   do it.  What do you mean by that?

17       A.    I didn't assume that there would or

18   would not be any upflow from those entities.  I

19   just didn't include them.

20       Q.    But why did you decide not to

21   include them?  I'm not asking for what you did

22   or didn't do.  I'm just trying to get an

23   explanation.

24       A.    I didn't consider that I needed to.

25       Q.    Why not?

```
 1                    WERTHEIM - HIGHLY CONFIDENTIAL
 2                    MR. PULTMAN:  I object.
 3                    You can answer it again.
 4          A.    I feel I have answered it.
 5          Q.    Well, is it your -- strike that.
 6                    I missed the answer, then.  You say
 7     you have answered it, but I did not see a why
 8     to it.  So indulge me, please, and answer it
 9     again if you think you have.
10          A.    I had no basis for assuming one way
11     or the other the need to consider the upflow
12     from those individual EMEA entities, if any.
13          Q.    Well, the upflow from the EMEA
14     entities to NNL would ultimately inure to NNI's
15     surplus cash, correct?
16                    MR. PULTMAN:  Objection.  Those are
17          your assumptions.
18          Q.    Under your assumptions.
19          A.    Mathematically, if there was a
20     dollar upflow, and that was the only line item
21     that changed, conceivably, yes.
22          Q.    And if there were millions and
23     millions of dollars of upflow from NNL's
24     subsidiaries, and that was the only variable
25     that changed, it could have a material impact
```

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2      on NNI's surplus cash under your own analysis,

3      correct?

4           A.    Again, if you're assuming that's the

5      only variable --

6           Q.    Correct.

7           A.    -- that changes, and that I ignore

8      all the other variables that went into my

9      conclusion as a total, then, mathematically,

10     yes.

11          Q.    What I want you to do, actually, is

12     not ignore.  I want you to keep all of your

13     same assumptions that have gone into your

14     conclusion, and the only additional assumption

15     would be that you actually include upflow from

16     NNL's subsidiaries.

17               MR. PULTMAN:  Is there a question?

18          Q.    Yep.  That could have a material

19     impact on NNI's surplus cash, correct?

20               MR. PULTMAN:  Objection.  It has

21          been asked and answered.

22               You can answer it again.

23          A.    Not necessarily.

24          Q.    The one predicate, if there were

25     millions and millions of dollars in upflow from

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2       NNL's subsidiaries up to NNL, and we kept all

3       of your other assumptions exactly as you have

4       written in your report, that could have a

5       material impact on NNI's surplus cash under

6       your analysis, correct?

7              A.     It might have an impact on the

8       971 million number, but it may not have an

9       impact on my conclusion, and that would also be

10      ignoring other outcomes of that event, for

11      example, the tax consequences to NNI of the

12      upflow.

13             Q.     You haven't done any analysis to

14      ascertain whether or not there would be any tax

15      consequences, have you?

16             A.     No.

17             Q.     In fact, you also haven't done any

18      analysis to determine whether there are any tax

19      benefits to NNL that you haven't accounted for,

20      correct?

21                    MR. PULTMAN:   Object to the form.

22             A.     Correct.

23             Q.     You have put tax consequences and

24      benefits to the side in your report, correct?

25                    MR. PULTMAN:   Object to the form.

HIGHLY CONFIDENTIAL                    138

1           WERTHEIM - HIGHLY CONFIDENTIAL

2                 You can answer.

3      A.     Tax benefits and tax consequences as

4  they relate to what specifically?

5      Q.     To the extent that NNL had tax

6  losses that it had the ability to monetize in

7  any way, you haven't factored that into your

8  report, right?

9      A.     Correct.

10     Q.     So putting aside the word material

11 or immaterial, at the end of the day, if we

12 take all of your assumptions as they are, you

13 would agree with me that any upflow from NNL

14 subsidiaries up to NNL would have a 65 percent

15 increase in NNI's surplus cash, correct?

16     A.     Not necessarily.

17     Q.     Well, that's not what your --

18 doesn't your report say that on the top of page

19 11?

20     A.     Because if there's an upflow from

21 the subsidiaries, there could potentially be a

22 reduction in that amount before it gets to NNL

23 or NNI, for instance, for the tax effect of

24 that upflow.  And so to say that there is a

25 65 percent effect on NNI's bottom line would

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    not be correct.
 3         Q.   Let me restate my question, because
 4    I think you might not have heard it correctly.
 5              Whatever cash does get ultimately
 6    upflowed to NNL increases NNI's surplus cash by
 7    65 percent, correct?
 8         A.   Ignoring taxes on that, yes.
 9         Q.   And you don't know whether or not
10    there would be, correct?
11         A.   I don't know the effect.  I don't
12    know the exact effect.
13         Q.   So if we assume that NN Ireland has
14    $240 million of excess cash after it pays its
15    creditors under the Kinrich allocation, and it
16    is able to upflow that to its parent without
17    tax consequences, that would have a
18    $160 million positive effect on NNI's surplus
19    cash, correct?
20              MR. PULTMAN:  Object to the form of
21         the question.
22              You can answer.
23         A.   There seem to be a couple of parts
24    there.  Could you repeat that all?
25         Q.   Sure.
```

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          A.    If you're not allowing me to read

3    it.

4          Q.    Assume with me that NN Ireland has

5    $240 million after it has satisfied its

6    creditors under the Kinrich allocation.

7                Can you accept that assumption?

8          A.    Yes.

9          Q.    Assume with me, because we don't

10   know one way or the other, that there are no

11   tax consequences associated with its

12   shareholder receiving that money, okay?

13         A.    Okay.

14         Q.    Under your calculation and your

15   sensitivity analysis, that would increase

16   surplus cash to NNI by $160 million, right?

17         A.    Correct, but it may not change my

18   conclusion.

19         Q.    I'm not asking about your

20   conclusion.  Your conclusion is that maybe

21   you'll change other assumptions of yours.

22         A.    No, you said it.  I'm keeping my

23   assumptions the same, because part of my --

24                MR. PULTMAN:  I just want to make

25         sure you give him a chance to finish his

**HIGHLY CONFIDENTIAL**                    141

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         question --

3                THE WITNESS:  I'm sorry.

4                MR. PULTMAN:  -- and then I'm sure

5         he'll give you a chance to finish your

6         answer.  I'm not so sure, but I'm hopeful.

7                MR. ROSENTHAL:  You can be sure.

8    BY MR. ROSENTHAL:

9         Q.    If you take all of the assumptions

10   and you take your report exactly as written,

11   including the sensitivity analysis at the top

12   of page 11 --

13        A.    Uh-huh.

14        Q.    -- that $240 million upflow to NNL

15   would increase the surplus cash in NNI by

16   $160 million, correct?

17                MR. PULTMAN:  Same objection.

18                You can answer.

19        A.    Correct.  But as I was adding,

20   keeping my assumptions, part of my assumptions

21   are the other factors totaling over 700 million

22   that are included in the 971 million, which

23   would not change my opinion.

24        Q.    Correct, because -- strike that.

25                But without changing those five

1              WERTHEIM - HIGHLY CONFIDENTIAL

2      bullets, the impact would be a positive

3      160 million, correct?

4          A.    I have answered that three times.

5      Yes, I have said yes.

6          Q.    For my questions now, and the whole

7      series until I say otherwise, it is always to

8      keep your five bullet assumptions the same.

9      We're not changing those at all in my

10     questions.

11              Are you aware of -- have you ever

12     heard of an entity called NNSA?

13         A.    I have heard of it.

14         Q.    Do you know that that's one of the

15     French subsidiaries of NNL?

16         A.    I believe I knew that.

17         Q.    Are you aware that NNSA would be

18     solvent if they got the allocation in the

19     Kinrich report?

20         A.    No.

21         Q.    And are you aware that NNL has a

22     91 percent equity interest in NNSA?

23         A.    No.

24         Q.    If we assumed that NNSA had

25     $133 million of excess assets over liabilities

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2    to upflow to NNL, would you agree with me that,

3    under your sensitivity analysis, taking the

4    same five assumptions in your bullets, it would

5    be approximately $86 million more in surplus

6    cash for NNI?

7                  MR. PULTMAN:  Same objections as to

8          NN Ireland.

9                  You can answer the question.

10        A.    Mathematically, yes.  Without also

11   ignoring my other assumptions.

12        Q.    I'm not asking you to ignore them.

13   I'm asking you to make them.

14        A.    I am making them.  You're ignoring

15   the totality of my assumptions.  You said let's

16   keep my assumptions the same, and I am.  And my

17   assumptions include more than just those five

18   bullet points.

19        Q.    The assumptions that I want you to

20   make are stretching the outcome of events in

21   all cases in favor of NNI, such that surplus

22   cash is maximized, okay?

23        A.    Okay.

24        Q.    So if you make that assumption, and

25   you were to learn that NNSA were able to

**HIGHLY CONFIDENTIAL**                    144

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    upstream $133 million to NNL, the positive

3    impact on NNI would be about $86 million under

4    your calculations, correct?

5              MR. PULTMAN:  Same objections.

6         A.    Not necessarily.  Again, ignoring

7    taxes.  Ignoring other variables.  But if you

8    assume a straight 65 percent, mathematically,

9    yes.

10        Q.    Let's assume the numbers that I gave

11   you for just the IP addresses, NN Ireland and

12   NN France, NNSA, okay, just assume those three

13   numbers.

14              Isn't it true that if you stretch

15   the outcome of events in all cases in favor of

16   NNI, such that the surplus cash is maximized,

17   and your report were only adjusted for the sale

18   of the IP addresses, for NN Ireland's equity

19   value and for NNSA's equity value, putting

20   aside taxes that we don't know about one way or

21   the other, the surplus cash for NNI would, in

22   fact, be over $1.3 billion?

23              MR. PULTMAN:  Same objections.

24              You can answer.

25        A.    Mathematically, it could be.

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.     And, in fact, it would be under your

3    calculations, correct?

4         A.     Could be.  But let me add -- I want

5    to add to that, because you keep referring to

6    stretching the assumptions one at a time.  And

7    as I have stated, I have looked at the totality

8    of the reasonableness of this as a whole, and

9    yes, there are individual assumptions that are

10   made, but reasonableness includes the

11   likelihood of all of those outcomes occurring.

12              Just as an example, statistically,

13   if you were to flip a coin, the probability of

14   a head versus a tail is 50/50, 50 percent, but

15   if you want to say, okay, I'm going to hit a

16   head ten times, the probability of that is less

17   than one out of a thousand.

18              So, is it realistic that one of

19   those might be a head?  Yes.  Is it realistic

20   that all of those are going to be a head?  No.

21              And so you keep asking about

22   stretching each one at a time of these outcomes

23   in favor of NNI.  Mathematically, one at a

24   time, it might affect the bottom line.  But,

25   again, my conclusion is based on the totality

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2   of not only the assumptions that went into
 3   Table 2, but the totality of my assumptions on
 4   those other variables, that it could further
 5   reduce the net cash available to NNI.
 6        Q.    Do you have your report in front of
 7   you?
 8        A.    Yes.
 9        Q.    Let's look at paragraph 50.
10              Can you read the heading out loud of
11   5.2?
12        A.    Conclusions on the Net Cash
13   Available to NNI for Payment of PPI.
14        Q.    Okay.  And paragraph 50 says, "Based
15   on the analysis performed in this report, the
16   maximum," and you put that in bold and
17   underlined, "amount of net assets available to
18   NNI for the payment of PPI to the bondholders,
19   pursuant to the proposed agreement would be
20   approximately $971 million (Table 2)."
21              Do you see that?
22        A.    Yes.  Based on my calculations and
23   assumptions that went into Table 2, that's my
24   amount.
25        Q.    And all I want to know now is
```

1                WERTHEIM - HIGHLY CONFIDENTIAL

2    just -- I want to ask you the maximum, exactly

3    the same thing that you wrote as 971 in

4    paragraph 50, if we added in the three

5    assumptions I gave you for the IP addresses, NN

6    Ireland and NNSA, that number, 971, goes above

7    $1.3 billion in that sentence, correct?

8         A.    Correct.

9         Q.    Have you ever heard of the 4th

10   Estate?

11        A.    No.

12        Q.    Are you aware that there has been a

13   settlement with Asia and CALA subs?

14             MR. PULTMAN:  Object to the form of

15        the question.

16        A.    A settlement between who and the

17   subs?

18        Q.    Between NNL and NNI and EMEA and the

19   Asia and CALA subs, are you aware of that?

20        A.    I may be, but I'm not certain of

21   what you're referring to.

22        Q.    Let's look at the cash -- the cash

23   balance worksheet that you referred to before.

24   And could you turn to page 13?

25             Do you see that there's a cash

1                WERTHEIM - HIGHLY CONFIDENTIAL

2       balance for Asia in this worksheet and China of

3       $158 million?

4            A.    I'm sorry.  I'm not seeing the 158.

5            Q.    If you add 67 and 91, you get to

6       158, right?

7            A.    Oh, okay.  Yes.

8            Q.    By the way, so when you read the

9       10-Q that you referred to earlier, you didn't

10      notice what it said about the 4th Estate

11      settlement?

12              MR. PULTMAN:  I'm sorry.  Do you

13          want to bring him back to this?

14           Q.    You can pull up the 10-Q.  Let's

15      turn to the Bates number at the bottom, 766.

16              Are you aware of the settlement

17      that's referred to on this page?

18           A.    No.

19           Q.    So when you saw, going back to the

20      cash balance worksheet and the 158 million, did

21      you notice that $158 million on the worksheets

22      when you were doing your calculations?

23              MR. PULTMAN:  Object to the form.

24           A.    Excuse me while I try to see where

25      this page fits into the total picture, because,

HIGHLY CONFIDENTIAL                    149

1                WERTHEIM - HIGHLY CONFIDENTIAL

2   again, this is, as printed out, different than

3   mine.  (Perusing.)

4                Okay.  Could you repeat the

5   question?

6        Q.    Sure.  Were you aware of this when

7   you did your calculations?

8        A.    It was part of the worksheet I have

9   seen.

10        Q.    But were you aware of the

11   $158 million in cash in China and Asia-Pac?

12        A.    I was aware that, as looking at the

13   worksheet, that it exists.

14        Q.    Did you consider at all what the

15   entitlements of NNI and NNL were to that cash?

16        A.    No.

17        Q.    Let's turn to page 21 of the

18   worksheet that you have before you.  If you

19   look on line 16, there is a reference to D&O

20   Trust.

21                Do you see that?

22        A.    Yes.

23        Q.    $35 million.  Have you ever heard of

24   the D&O Trust?

25        A.    No.

1          WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    Okay.  When you saw it on the

3    worksheet, did you make any inquiries to

4    anybody as to what that $35 million was?

5          A.    No.

6          Q.    Do you know that there was a trust

7    for directors and officers that both the US and

8    Canadian debtors contributed to?

9          A.    No.

10         Q.    Are you aware that if no claims

11   continue to be made against that $35 million,

12   that gets divided up between the US and

13   Canadian debtors in proportion to their

14   ultimate allocations in this litigation?

15         A.    Okay.

16         Q.    You weren't aware of that?

17         A.    No.

18         Q.    Okay.  If you assume with me that

19   the Kinrich allocation is ultimately accepted,

20   are you aware that the US debtors could

21   receive, ultimately, another 30 plus million

22   dollars that you haven't accounted for as a

23   result of this?

24         A.    No.

25         Q.    Let's go back now to your

1           **WERTHEIM - HIGHLY CONFIDENTIAL**

2     3.235 billion of other claims against the

3     consolidated Nortel Canadian group.

4               Are you aware that a significant

5     portion of them are employee-related claims?

6        A.    Yes.

7        Q.    When you made the assumption to

8     consider all of the claims on a consolidated

9     basis, did you see any documents that would

10    have told you that NNL had any responsibility

11    for employees who did not work for NNL?

12       A.    I didn't see any documents related

13    to that.

14       Q.    Did anybody tell you to make that

15    assumption?

16       A.    No.

17       Q.    Would it surprise you to learn that

18    NNL was the employer of fewer than half of the

19    Canadian employees?

20               MR. PULTMAN:  Object to the form of

21          the question.

22               You can answer.

23       A.    Okay.  I will accept that.

24       Q.    Have you ever done any analysis of

25    the surplus cash available to NNI if we take

HIGHLY CONFIDENTIAL          152

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    all of your assumptions, but we assume that NNL

3    is only responsible for the employee-related

4    claims of its own employees?

5         A.    No.

6         Q.    Have you ever heard the term

7    "substantive consolidation"?

8         A.    I may have, depending on what you're

9    referring to.

10        Q.    The substantive consolidation in a

11   bankruptcy of multiple entities, so that their

12   assets and liabilities are considered as one --

13   one consolidated pool.

14              Have you heard that?

15        A.    No.

16        Q.    As I have defined it, do you have

17   any reason to believe that the various Canadian

18   debtors are going to be substantively

19   consolidated with each other?

20              MR. PULTMAN:  Objection, no

21         foundation.

22              You can answer.

23        A.    I have no basis to make that

24   judgment.

25        Q.    Do you know the legal standards for

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2     substantive consolidation in Canada?

3                  MR. PULTMAN:  Same objection.

4          A.     No.

5          Q.     Do you know whether the monitor is

6     even considering proposing substantive

7     consolidated?

8          A.     I don't know what the monitor is

9     considering.

10         Q.     Do you know whether substantive

11    consolidation of the Canadian debtors is a best

12    case assumption for NNI?

13                 MR. PULTMAN:  Same objection.

14         A.     No.

15         Q.     I want to turn briefly to the US

16    cash balance side of your calculation.

17                 So we have already discussed a few

18    minutes ago the D&O Trust asset that you didn't

19    take into account, but let's turn to Table 2 of

20    your report, which is on page 11.

21                 You list the current cash balance at

22    distribution for NNI at $620.9 million.

23                 Do you see?

24         A.     Yes.

25         Q.     And you cite, in footnote 18, the

HIGHLY CONFIDENTIAL                    154

1              WERTHEIM - HIGHLY CONFIDENTIAL
2    cash summary worksheet dated September 12; is
3    that true?
4         A.    Yes.
5         Q.    And that's the cash summary
6    worksheet that we have been looking at before?
7         A.    Yes.
8         Q.    Can you show us how you get to
9    620.9?
10        A.    Sure.  If you turn to the Bates
11   number at the bottom, page 14 of the cash
12   summary worksheet, column Q, showing the cash
13   balance under US controlled entities, if you
14   take the five -- and I'm just going to walk you
15   through the math.
16        Q.    Uh-huh.
17        A.    If you take the 575, plus 85, plus 2
18   for NNCC, and I believe 6 for NNII, and then
19   subtract out cash burn for nine and a half
20   months, you get 620.9, which I include in Table
21   2.
22        Q.    So 575, 85, 2 and 6.  Did I miss
23   anything?
24        A.    I believe that's it.  I believe
25   that's -- yes.

1             WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    And you excluded from this Alteon,

3   correct?

4        A.    Correct.

5        Q.    That's 56?

6        A.    Correct.

7        Q.    And you excluded NN Guatemala?

8        A.    Yes.

9        Q.    You also excluded NNIII, correct?

10       A.    Correct.

11       Q.    And that's 33?

12       A.    Correct.

13       Q.    So 56, 33 and 3, about $92 million

14   from those entities, correct?

15       A.    Correct.

16       Q.    Why did you exclude those three

17   entities?

18       A.    Can I request a document?

19       Q.    Sure.

20       A.    Monthly Operating Report No. 60.

21            MR. PULTMAN:  Do you want to do this

22       over the lunch break, if that works easier

23       for you?

24   BY MR. ROSENTHAL:

25       Q.    Yeah, after the lunch break, we will

1                WERTHEIM - HIGHLY CONFIDENTIAL

2      try to make copies of it.  If you could give us

3      a general answer, and then you can look at the

4      document.

5           A.     If you have another monthly

6      operating report handy, I can probably use it

7      to show you, just in a general sense.

8                MR. TUNIS:  The sixty-first, we gave

9           you.

10               THE WITNESS:  Yeah, the MOR.

11          Q.     Okay.  We'll try to get you one, but

12     do you have any understanding without the

13     document or you need the document to say it?

14          A.     Yeah, I'll try to explain without

15     it, but there's -- in the column where I pulled

16     my claims, there's also another column of

17     claims for other entities which have other

18     claims, and I excluded those, and that group,

19     for reporting requirements, is explained in the

20     monthly operating report, was Alteon and

21     NNIII -- excuse me -- yeah, Alteon and NNIII.

22     So the claims that I included for NNI excluded

23     the claims for Alteon and NNIII.

24          Q.     So stated another way, is it fair to

25     say that that cash for those three entities was

HIGHLY CONFIDENTIAL                          157

1                WERTHEIM - HIGHLY CONFIDENTIAL

2    going to be used to satisfy the creditors of

3    those specific entities?

4         A.    Yes.

5         Q.    And, therefore, you concluded it

6    wouldn't be available in any way for NNI,

7    correct?

8         A.    Correct.  Again, I may want to look

9    at the report to --

10        Q.    I'll get you one, but I just wanted

11   to get -- is that your general understanding?

12        A.    Yes.

13        Q.    If we go back to Table 2 of your

14   report, you have a PBGC claim against the US

15   debtors of $593 million, correct?

16        A.    Correct.

17        Q.    Are you aware that the PBGC claim

18   has also been asserted against Alteon?

19        A.    A lot of these are duplicate names,

20   yes.

21        Q.    Well, are you aware that, as to

22   whether, under the law, the PBGC has a right to

23   assert duplicate claims and collect from

24   multiple debtors?

25             MR. PULTMAN:  Objection, no

```
 1                WERTHEIM - HIGHLY CONFIDENTIAL
 2         foundation.
 3                You can answer.
 4         A.    It's my understanding that that's
 5   the case.  Although I'm not --
 6         Q.    And in fact --
 7         A.    I was not quite finished.
 8         Q.    Yep.
 9         A.    Although I'm not expressing a legal
10   opinion, but that was my understanding.
11         Q.    Are you aware as to whether, under
12   the law, the PBGC claim could even be asserted
13   against non-debtor subsidiaries like NN India
14   International and NN Guatemala?
15                MR. PULTMAN:  Same objection.
16                You can answer.
17         A.    I don't know that from a legal
18   standpoint.
19         Q.    So if we're looking at -- so, given
20   your knowledge, at least with respect to
21   Alteon, under a best case scenario for NNI,
22   isn't it true that some, if not most, of
23   Alteon's cash could be used to pay the
24   $593 million PBGC claim?
25         A.    I can't say that, because I don't
```

**HIGHLY CONFIDENTIAL**                159

1                   WERTHEIM - HIGHLY CONFIDENTIAL
2    know what other claims there would be that
3    would be paid before that.
4         Q.    You would have to look at Alteon's
5    claim to find out what the PBGC can collect
6    against Alteon, correct?
7         A.    Possibly, yes.
8         Q.    You didn't do that, did you?
9         A.    No.
10        Q.    You would agree with me that to
11   whatever extent the PBGC collected from
12   subsidiaries of NNI, like Alteon and NN India
13   International and NN Guatemala, that would
14   reduce the $593 million PBGC claim against NNI,
15   correct?
16        A.    Mathematically, it could, but the
17   593 isn't even the total of the claim.  I'm not
18   even including the total PBGC claim in my
19   calculation.
20        Q.    But the amount of the claim that you
21   have decided for your calculation to use would
22   be reduced by whatever amount of payment it got
23   from these other subsidiaries.  Mathematically
24   true, correct?
25        A.    There would have to be a lot of

1              WERTHEIM - HIGHLY CONFIDENTIAL

2     assumptions made.  For instance, if Alteon paid

3     first and if other things happened.  But is it

4     mathematically feasible that, ultimately, that

5     could flow up?  Mathematically, yes.

6          Q.    But we're not just talking

7     mathematical feasibility.  It's reasonable to

8     you, isn't it, that if Alteon pays its cash to

9     the PBGC, that NNI needs to pay fewer, less of

10    its cash to the PBGC, correct?

11              MR. PULTMAN:  Object to the form.

12         Objection, foundation.

13              You can answer again.

14         A.    I don't know what other claims

15    Alteon has, and what other things it would pay

16    first, and what excess cash it would have to

17    pay PBGC.

18         Q.    I'm not asking you for what other

19    claims.  Just for each dollar that Alteon pays

20    to the PBGC is one less dollar that NNI has to

21    pay to the PBGC.

22              You understand that, correct?

23         A.    Mathematically, yes.

24         Q.    And you have done no analysis other

25    than to simply exclude Alteon's cash

1          WERTHEIM - HIGHLY CONFIDENTIAL

2   altogether, correct?

3          A.    But I have also excluded all of

4   Alteon's other claims.

5          Q.    You don't know, though -- do you

6   know whether Alteon's other claimants have any

7   claims against NNI?

8          A.    The issue on Alteon is whether they

9   would have additional claims against Alteon,

10  but I have answered that several times.  That's

11  not included in my analysis.

12         Q.    When you decided to exclude this

13  cash, the $92 million that Alteon, NN Guatemala

14  and NN India International have, why did you

15  not factor in the possibility or even

16  probability that some of the PBGC claim could

17  be satisfied through that cash?

18              MR. PULTMAN:  Objection.  It has

19         been asked and answered several times now.

20              MR. ROSENTHAL:  No.  He's just

21         telling me what he didn't do as opposed to

22         why he didn't do it.

23              MR. PULTMAN:  And he's telling you

24         why he didn't do it, and he has told you

25         why he didn't do it.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2                   I'll let him answer it again.

3         A.    I didn't include the cash side

4    because I didn't include the claims side.

5         Q.    Is it your opinion that to include

6    the cash side, you have to include the claim

7    side?

8         A.    It would be --

9         Q.    You know, mathematically, that's not

10   true.

11               MR. PULTMAN:  He hasn't answered the

12        question.

13               MR. ROSENTHAL:  Fine.  Answer that

14        one.

15        Q.    You are the Ph.D., but, you know, go

16   ahead.

17        A.    Well, if I'm looking at net assets

18   available, I want to match entities' cash with

19   entities' claims.  And so if I have certain

20   entities that I'm not including, I'm not

21   including.

22        Q.    You know, finance 101, that's not

23   true, don't you?

24               MR. PULTMAN:  Now you're arguing

25        with him.

```
1              WERTHEIM - HIGHLY CONFIDENTIAL
2        Q.    Fine.  We will walk through it in
3   painstaking detail.  Okay.
4              Let's assume with me Alteon has
5   $56 million in cash, okay?  If you need to
6   write down these numbers, you can.  Assume
7   $56 million in cash.
8              Can you do that?
9        A.    Okay.
10       Q.    Let's assume that they have a PBGC
11  claim of $593 million.
12       A.    Okay.
13       Q.    And a -- other claims against it of,
14  let's say, $56 million.  Okay?
15             Can you give me a rough percentage
16  of what percent of the claims pool the PBGC is
17  going to comprise in that situation?
18       A.    56 -- 50 percent.
19       Q.    PBGC has a 593 million --
20       A.    I'm not following.
21       Q.    PBGC has a $593 million claim.
22       A.    Okay.  Okay.
23       Q.    Let's make it simple.  Alteon's
24  other claims are 60 million against it.
25             Can you give me the rough percentage
```

```
 1                    WERTHEIM - HIGHLY CONFIDENTIAL
 2      of the claim pool that PBGC has?
 3            A.    90 percent?  I'm not sure what
 4      you're asking.
 5            Q.    We will get to it, then, if you
 6      don't see it.
 7                  If PBGC has 90 percent of the claims
 8      pool, and Alteon has $56 million to go to its
 9      creditors, what's the rough percentage of that
10      $56 million that the PBGC would get?
11            A.    Whatever the number comes out to be,
12      and I understand that that would reduce, and I
13      have already said it, it would reduce the PBGC
14      claim to NNI.
15            Q.    And you don't need to combine
16      Alteon's creditors with NNI's creditors to
17      conclude that there should be a reduction for
18      what they pay the PBGC, do you?
19                  MR. PULTMAN:  Objection, no
20            foundation.
21                  You can answer this.
22            A.    Could you ask that again?
23            Q.    Well, you told me before, well, I
24      didn't take their assets because I didn't take
25      their liabilities, but for my questions, you
```

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2    don't need to do that.

3         A.    Right, for the flowup.

4         Q.    Correct.

5         A.    And I understand that.

6         Q.    I'm not looking at flowup.  I'm not

7    looking at flowup.  I'm looking for the --

8         A.    For the reduction in claims on NNI's

9    side.

10        Q.    Correct.  And for the reduction in

11   claims on NNI's side, we don't need to do any

12   consolidation of Alteon with NNI.

13        A.    That's true.

14        Q.    All we need to know is what

15   percentage of NNI -- of Alteon's and those

16   other entities' cash the PBGC is going to get,

17   correct?

18        A.    Correct.

19        Q.    So going back to my question, why

20   didn't you look at that question when you

21   decided to exclude all of the cash of those

22   three entities that totaled $92 million?

23             MR. PULTMAN:  Objection.  It has

24        been asked and answered several times.

25             You can answer it again.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    I had no basis to determine whether

3   to look at the individual other entities on

4   what they would pay.

5        Q.    Are you saying you couldn't get --

6   you had no access to that information?

7        A.    No.

8        Q.    Did you look to see whether the US

9   claims are publicly available?

10       A.    The claims for Alteon?

11       Q.    Yeah.  Did you look?

12       A.    No.

13            MR. PULTMAN:  Can we figure out what

14       an appropriate stopping point for lunch

15       would be?

16            MR. ROSENTHAL:  Let's go off the

17       record.

18            THE VIDEOGRAPHER:  We are now off

19       the record.  The time is 1:05 p.m.,

20       October 22, 2014.

21            (Luncheon recess taken at 1:05 p.m.)

22

23

24

25

 1              WERTHEIM - HIGHLY CONFIDENTIAL

 2         A F T E R N O O N      S E S S I O N

 3              (Time noted:  2:05 p.m.)

 4    P A U L    W E R T H E I M,    resumed and

 5         testified as follows:

 6              THE VIDEOGRAPHER:  This is tape four

 7         of the deposition of Dr. Paul Wertheim.

 8         We are now back on the record.  The time

 9         is 2:05 p.m., October 22, 2014.

10    CONTINUED EXAMINATION

11    BY MR. ROSENTHAL:

12         Q.   Dr. Wertheim, shortly before the

13    lunch break, you had asked whether you could

14    take a look at one of the monthly operating

15    reports in connection to some questions I asked

16    about Alteon.

17         A.   Yes.

18         Q.   And I just -- we made some copies of

19    one from earlier this year, and I wanted to

20    just give it to you to take a look at just to

21    see if that would change any of your answers

22    with respect to Alteon.  I think I asked just

23    why you didn't consider it, and you said you

24    wanted to take a look at it.

25              MR. ROSENTHAL:  So why don't we mark

1              WERTHEIM - HIGHLY CONFIDENTIAL

2          this as Exhibit 7.  It is the Monthly

3          Operating Report No. 60.

4                  (Wertheim Exhibit 7, Monthly

5          Operating Report No. 60, marked for

6          identification.)

7          Q.    My only question is whether this

8    document alters any of the testimony you gave

9    previously, since you said you were kind of

10   testifying based upon your recollections as

11   opposed to the document itself.

12         A.    (Perusing.)  No.

13                MR. LEBLANC:  This one only has

14         every other page.

15         Q.    Do any of the odd pages change your

16   testimony?

17         A.    No.

18         Q.    I think I have one that's -- we'll

19   get you one with the even pages and see if the

20   even pages change your testimony.

21                Before I move on to something else,

22   you had mentioned your awareness of the IP

23   address sales or the fact that they had those

24   to sell.

25                At the time you drafted your report,

1              WERTHEIM - HIGHLY CONFIDENTIAL

2     were you aware that NNL had IP addresses that

3     it was planning to sell?

4          A.    Yes.

5          Q.    So Appendix B, page 32 of your

6     report, you mention -- you list the materials

7     that you relied upon, and two of them are the

8     Britven expert report and the Britven rebuttal

9     report.

10              Do you recall reviewing those?

11         A.    Yes.

12              MR. ROSENTHAL:  I want to mark, as

13         Exhibit 8 -- Brent, can I have tab eight

14         to give out?

15         Q.    I'm going to give you and mark as

16    Exhibit 8 Britven's rebuttal report dated

17    February 28, 2014.

18              (Wertheim Exhibit 8, Thomas

19         Britven's Rebuttal Report, dated

20         February 28, 2014, marked for

21         identification.)

22         Q.    This is one of the reports that you

23    reviewed?

24         A.    Yes.

25         Q.    And you're aware that he did this

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2      report back at the very end of February?

3          A.    Yes.

4          Q.    Okay.  Now, do you see, if you turn

5      to page 35 of his report, he has a document

6      called Table 1?

7          A.    Okay.

8          Q.    And in Table 1, Mr. Britven states

9      that after doing his calculations, the US

10     interest will have $1.304 billion in

11     undistributed cash.

12               Do you see that?

13         A.    Yes.

14         Q.    Are you aware that in -- you're

15     aware that there was a trial on allocation

16     earlier this year?

17         A.    Yes.

18         Q.    Okay.  And are you aware that, in

19     opening statements in May, the Canadian

20     interests used the same chart with that same

21     number of $1.304 billion?

22         A.    Yes.

23         Q.    Are you aware that, when Mr. Britven

24     testified in June at the trial, the Canadian

25     interests used the same chart with the same

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    $1.304 billion in undistributed cash for NNI?

3         A.    Am I specifically aware that they

4    used it at that date?

5         Q.    Yeah.

6         A.    I don't know for sure, but I would

7    assume yes.

8         Q.    Are you aware that just four weeks

9    ago, in closing statements, the Canadian

10   interests again referred to the same chart with

11   the same $1.304 billion?

12        A.    Yes.

13        Q.    Okay.  Is it fair to say that you

14   disagree with Mr. Britven's calculation that

15   the US interests would have $1.304 billion in

16   undistributed cash under the Kinrich approach?

17        A.    I used different assumptions and so

18   my number is different.

19        Q.    Had you used the same assumptions as

20   Mr. Britven, do you know if you would have

21   agreed with his $1.304 billion ultimate

22   calculation?

23        A.    By definition, if I used the exact

24   same assumptions, I would get the exact same

25   number.

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    Do you believe that he used wrong

3    assumptions?

4          A.    I believe he omitted some

5    assumptions that I included.

6          Q.    So that he used certain assumptions

7    that ended up being more favorable to the -- to

8    NNI?

9          A.    More favorable, but not more

10   realistic.

11         Q.    Do you believe that his assumptions

12   were less realistic than yours?

13         A.    Certain assumptions, yes.

14         Q.    Do you believe that any of his

15   assumptions were unrealistic?

16         A.    I don't know if I could list every

17   assumption that he made and whether or not it's

18   realistic or not, but, for example, to the

19   extent that he excluded tax liability for NNI,

20   I consider that unrealistic.

21         Q.    The tax liability that he excluded

22   that you included, had how much of an impact on

23   your analysis?

24         A.    133.

25         Q.    Is there any other assumption that

HIGHLY CONFIDENTIAL

173

1          WERTHEIM - HIGHLY CONFIDENTIAL

2   Mr. Britven made that got him to $1.3 billion

3   that you, upon reviewing it, considered to be

4   unrealistic?

5          A.     From the detail that I could gather,

6   it also appears that he did not include PPI for

7   the NNCC notes, nor any PPI for other US

8   non-bondholder creditors.

9          Q.     Do you think it is an unrealistic

10   assumption not to include PPI for the NNCC

11   notes?

12          A.     I think it's more realistic to

13   include some amount than to include a zero

14   amount.

15          Q.     Do you think it's unrealistic to

16   include a zero amount?

17          A.     I'm going to say, for purposes of my

18   analysis, it would have been.

19          Q.     What about for purposes of his

20   analysis, would it -- was it unrealistic to

21   assume zero PPI for the NNCC notes?

22          A.     I'm not totally sure about the

23   ultimate purpose of his report, so I can't say

24   for purposes of his report whether his

25   exclusion would be reasonable or not.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    Do you believe that it was

3    unrealistic for him to exclude PPI for other

4    creditors?

5         A.    Same response.  It would depend on

6    his ultimate purpose of the report, and what --

7    what his basis was.

8         Q.    Did you -- do you know what the

9    ultimate purpose of his report was?

10             MR. PULTMAN:  Objection.  It has

11        been asked and answered.

12             You can answer it again.

13        A.    I think to look at and compare the

14   different allocation outcomes, the different

15   ultimate outcomes of the different allocation

16   scenarios.

17        Q.    So is it fair to say that, other

18   than the exclusion of the tax liability, the

19   assumptions that went into Mr. Britven's

20   calculation of the $1.3 billion may have been

21   reasonable, and you don't have an opinion as to

22   whether it was or wasn't?

23             MR. PULTMAN:  Object to the form.

24             You can answer.

25        A.    Again, I don't know the detailed

HIGHLY CONFIDENTIAL                          175

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    list of all of his assumptions.

3        Q.    Those assumptions that you were able

4    to see in reviewing his reports, is it fair to

5    say that none of them struck you as

6    unreasonable except for his exclusion of tax

7    liability?

8        A.    Well, as I said, his exclusion of

9    the tax liability, his exclusion of the PPI

10   interest on the NNCC notes, his exclusion of

11   the PPI on non-bondholder creditors, and he

12   also uses a larger cash balance than I use for

13   NNI.

14              And if you take the differences of

15   each of those, it adds up to the difference

16   between his number and my number.

17       Q.    Was he unreasonable to use his cash

18   balance?  Do you think he made a mistake?

19       A.    I think mine is more reasonable.

20       Q.    That wasn't my question.

21              Was Mr. Britven unreasonable to use

22   the cash balance that he used, in your expert

23   opinion?

24       A.    Well, unreasonable is a continuum.

25   He's -- I think it was less reasonable than

**HIGHLY CONFIDENTIAL**                      176

1                WERTHEIM - HIGHLY CONFIDENTIAL

2    mine.

3         Q.    Well, if we are looking for --

4         A.    I think it was unrealistic to assume

5    a zero cash burn rate, for example.

6         Q.    So you believe that that's an error

7    that Mr. Britven made in his calculation?

8         A.    I said it was more unrealistic than

9    my assumption that there would be some cash

10   burn.

11        Q.    Do you believe that the cash burn

12   rate is more likely to be closer to your number

13   than Mr. Britven's number?

14        A.    I think it's more likely to be.

15        Q.    Have you done any analysis that

16   enables you to say that?

17        A.    Well, my number is 5 million per

18   month.  His number is zero per month.

19               So based on my analysis of the

20   historical cash burn, I think it is more

21   reasonable to assume some cash burn than to

22   assume zero cash burn.

23        Q.    But that wasn't my question.

24               Do you conclude that it is more

25   likely to be closer to -- actually, that was

1              WERTHEIM - HIGHLY CONFIDENTIAL

2       two questions ago.

3              What analysis have you done to

4       conclude that it's more likely to be closer to

5       your number than closer to Mr. Britven's

6       number?

7       A.     The analysis that I did in my

8       report, because his -- when I did my analysis

9       to estimate the cash burn, I made the

10      assumption, is it reasonable to assume zero or

11      is it reasonable, more reasonable to assume

12      some cash burn.  And I found it more reasonable

13      to assume some cash burn.

14             And so I then did an analysis to

15      figure out, okay, what -- what amount am I

16      going to use.  If I'm going to use some cash

17      burn, what amount am I going to use.  And so I

18      did just a historical analysis to try to

19      calculate recently what an average actual cash

20      burn had been.

21             And so based on that, I made my

22      estimate conservatively, and I assume that

23      that -- and I believe that that's more

24      realistic than assuming a zero cash burn.

25      Q.     When you say you did a historical

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    analysis, you looked to see how much the US

3    debtors were spending in the runup to and then

4    at trial, right?  That was your comparison?

5                MR. PULTMAN:  Object to the form.

6                You can answer.

7        A.    Well, it includes -- it includes

8    that.

9        Q.    Doesn't it include basically only

10   that?  Did you look at cash burn for any period

11   other than after the end of the mediation up

12   through trial?

13       A.    Well, I state in my footnote exactly

14   what dates I used.  Historically, I looked at

15   the periods April 30, '13 through January 31,

16   '14, and then also for the ten-month period

17   ended September 12, 2014.

18       Q.    Are you aware that that entire

19   period that you included was trial preparation

20   and trial?

21       A.    Yes.

22       Q.    So just so I understand, you've

23   included -- you and Mr. Britven disagree on

24   four assumptions, you're saying, correct?  PPI

25   for NNCC bonds, PPI for other creditors, tax

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    liability, and cash burn?

3         A.    Those are the main ones that I'm

4    aware of.

5         Q.    And even though your report says

6    that you were taking the most favorable

7    assumptions for NNI in each of those four

8    situations, Mr. Britven had a more favorable

9    assumption that he took than you, correct?

10        A.    Again, I didn't look just at that.

11   I also balanced with, realistically, the

12   amount.  And so, mathematically, would the

13   assumption to exclude the tax liability be more

14   favorable to NNI?  Yes, it would be to exclude

15   it completely.  It would be more favorable to

16   NNI.  But, to me, that's totally unrealistic to

17   assume a zero tax liability.

18        Q.    We will come back to that in a

19   moment, but -- so it's your testimony now,

20   then, that with respect to these four

21   assumptions, not only do you disagree with

22   Mr. Britven, but the assumptions he made were

23   completely unrealistic?

24             MR. PULTMAN:  Object to the form,

25       mischaracterizes his testimony.

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.     Let me take a step backwards.

3                 You said you took the most favorable

4     assumptions, but you had to balance that with

5     what's realistic, right?

6          A.     Yes.

7          Q.     Okay.  And balancing that with

8     what's most realistic leads you to the four

9     assumptions that you made with respect to the

10    four issues where you diverge from Mr. Britven,

11    right?

12         A.     For those four.

13         Q.     So, by definition, aren't you saying

14    that the assumptions that Mr. Britven made on

15    those four issues, which are more favorable to

16    NNI, are all unrealistic?

17         A.     That's not what I said, and

18    that's -- you're assuming that that word is

19    binary, that's something is either realistic or

20    it's unrealistic.  I said my assumptions are

21    more realistic.

22         Q.     Well, I'm asking you whether you're

23    able to say whether the more favorable

24    assumptions that Mr. Britven made are

25    unrealistic, yes or no?  Are you able to say

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    that?

3          A.    I consider them unrealistic.

4          Q.    I now have the even pages.  Why

5    don't we mark, as a replacement Exhibit 7, was

6    it, we'll just mark it the Monthly Operating

7    Report No. 60 with odd and even pages.

8          A.    And I want to add one more thing to

9    that previous question.

10          When I said they are unrealistic,

11   and, again, it refers back to several questions

12   ago, a comment that I had added or I made, was

13   that his assumptions sort of depend on his

14   ultimate purpose, and in his comparison of the

15   different outcomes on allocation, different

16   scenarios, and so his -- his assumptions,

17   whether or not they are unrealistic, sort of

18   depend on his purpose.

19          My purpose was to calculate the net

20   assets available for distribution by NNI.  And

21   so that's why I considered my assumptions more

22   realistic and, therefore, included those.

23          Q.    So if Mr. Britven's purpose was to

24   show as much of an excess at NNI as possible,

25   that could have led him to make different

1                WERTHEIM - HIGHLY CONFIDENTIAL

2    assumptions than you did, correct?

3                MR. PULTMAN:  Object to foundation.

4                You can answer the question.

5        A.    Yeah, I don't know what it would

6    have caused him to do.

7        Q.    Do you know whether that was a

8    purpose of his?

9        A.    No.

10        Q.    One way or the other?

11        A.    No.

12                They are handing me the even pages,

13    I believe.

14        Q.    We are handing you odds and evens

15    together, so why don't you take a look at the

16    new Exhibit 7?

17        A.    You want to replace the exhibit?

18        Q.    Yeah.  Take a look at new Exhibit 7

19    and tell me if there is anything in here now

20    that would change your testimony with respect

21    to Alteon and the other subsidiaries.

22        A.    (Perusing.)  No, I'm fine.

23        Q.    Okay.  One more question on that

24    with regards to Mr. Britven.

25                If Mr. Britven had the same purpose

1    WERTHEIM - HIGHLY CONFIDENTIAL

2    as you have, then you would characterize his

3    assumptions as unrealistic, correct?

4         A.    For the purpose -- if the purpose

5    was the exact same as mine, had I excluded, for

6    instance, again, the tax liability, I would

7    have --

8              MR. PULTMAN:  You have to keep you

9         hand down.

10        A.    -- I would have considered that

11   unrealistic.

12        Q.    Just give me one moment.

13             (Discussion off the record.)

14        Q.    Have you done any analysis of what

15   NNI's undistributed cash or surplus cash,

16   actually, to use your term, what the surplus

17   cash would look like, if any, using any

18   allocation outcome other than Kinrich?

19        A.    No.

20        Q.    So let's turn to paragraph 16 now of

21   your report.  This is the paragraph that you

22   corrected at the beginning of your deposition

23   to say that the 1.657 includes the NNCC notes,

24   and it would be still over 1.6 billion, but not

25   quite 657, if we excluded the NNCC notes,

HIGHLY CONFIDENTIAL              184

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL

 2    correct?

 3         A.    I believe that's the math.

 4         Q.    And when did you realize that error?

 5         A.    Subsequent to submitting my report.

 6    Not exactly sure when.  Recently.  It's because

 7    of the use of the word "bondholder" and how I

 8    define that as opposed to the holders of the

 9    crossover bonds compared to the holders of the

10    guaranteed bonds.

11         Q.    Let's include for a moment the NNCC

12    notes as you did.

13              What was the source for that number

14    that you put into your report?

15         A.    I reference it -- (Perusing.)  I

16    would like to look at this particular document

17    before I say for sure this is the one.

18         Q.    Sure.

19         A.    But the document from my footnote

20    15.

21         Q.    Footnote 15.  BHG-PPI-71.

22              MR. ROSENTHAL:  Do you have that

23         document, Andy?

24              Why don't we just go off the record

25         for one second.  Brent may be tracking
```

1          WERTHEIM - HIGHLY CONFIDENTIAL

2       down the bondholder production.

3              THE VIDEOGRAPHER:  We are now off

4       the record.  The time is 2:32 p.m.,

5       October 22, 2014.

6              (Recess taken.)

7              THE VIDEOGRAPHER:  We are now back

8       on the record.  The time is 2:41 p.m.,

9       October 22, 2014.

10   BY MR. ROSENTHAL:

11      Q.    Dr. Wertheim, I just put before you

12   on the computer, since we don't have printouts

13   of it yet, the document you cite in footnote

14   15, which is BHG-PPI-71.

15              Is that the document you were

16   thinking of?

17      A.    No, but it may be a few pages below

18   or after.  It's within my scope, number 37 and

19   38.  And there was actually duplicate -- there

20   were numerous times within that range of

21   productions that the same table appeared.

22      Q.    Let me help you out.  Let me give

23   you a different document, which is NNI-PPI-118

24   to 121.  See if -- see if this is another

25   document that would have been your support for

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    this.

3         A.    Okay.

4              (Wertheim Exhibit 9, Document Bates

5         Stamped NNI-PPI-118 to 121, marked for

6         identification.)

7         A.    (Perusing.)

8         Q.    And we have marked it as Exhibit 9,

9    is it?

10             Have you seen Exhibit 9 before?

11        A.    Yes.

12        Q.    Does this contain information that

13   you used in your calculation of -- of the total

14   accrued interest for the bonds?

15        A.    Yes.

16        Q.    Is this the document you were

17   thinking of or one like it?

18        A.    One like it.

19        Q.    Okay.  Now, when you talk about,

20   though, the $1.6 billion of accrued interest in

21   paragraph 16, you use the date June 30, 2015.

22             How did you come up with that

23   calculation?

24        A.    As of June 30?

25        Q.    Well, paragraph 16 of your report --

HIGHLY CONFIDENTIAL                    187

1                WERTHEIM - HIGHLY CONFIDENTIAL
2        A.    Yes.
3        Q.    -- you wrote that your accrued
4   interest is as of June 30, 2015.  Let me just
5   ask a preliminary question.
6              Have you ever seen a document that
7   has accrued interest running until June 30,
8   2015?
9        A.    Well, that's the date that uses the
10  cutoff for the accrual of interest, and the
11  numbers in this table go through July 1 of
12  2014, and so June 30 versus July 1, it cuts off
13  one day.  I mean, that's -- to me, that's the
14  June 30 cutoff.
15       Q.    But they are different years.
16       A.    And then the -- correct.
17       Q.    So where did you get the -- so, in
18  fact, you saw documentation indicating that the
19  total accrued interest as of June 30, 2014
20  would be $1.6 billion, not 2015, correct?
21       A.    (Perusing.)  According to this,
22  correct.
23       Q.    That's consistent with your
24  recollection, right?  I mean, is this just a
25  mistake in paragraph 16 when you refer to

1              WERTHEIM - HIGHLY CONFIDENTIAL

2       June 30, 2015?  You should have referred to

3       June 30, 2014?

4              A.     It may be.

5              Q.     And as of June 30, 2014, if we want

6       to compare like dates to like dates, the

7       maximum interest would not have been

8       $1.01 billion, but it would have been less,

9       right?  Because the 1.01 goes through June 30,

10      2015, correct?

11             A.     Correct.

12             Q.     And, in fact, you understand from

13      the settlement, that if we want to compare

14      June 30, 2014 accrual versus settlement amount,

15      that the settlement amount would be 876 million

16      as of that date, correct?

17             A.     As of June 30, 2014.  Okay.

18             Q.     You agree with that?  I mean, that's

19      what you understand, from having read the

20      settlement documents, was the settlement amount

21      as of June 30, 2014?

22             A.     The assumed settlement date was

23      June 30, 2015.  Interest was accrued at

24      contract rate through a particular date.  I'm

25      not exactly sure what that date was, and then

**HIGHLY CONFIDENTIAL**          189

1              WERTHEIM - HIGHLY CONFIDENTIAL

2     following that date through June 30, 2015, it

3     was accrued at a lower rate with the cutoff of

4     accrual at June 30, 2015.

5          Q.     Let me help you out.  Let's look at

6     footnote three of your own report.

7          A.     Yes.

8          Q.     Having refreshed your recollection

9     by looking at footnote three, isn't it true

10    that the settlement, as of June 30, 2014, was

11    $876 million, with the possibility of accruing

12    additional interest at a reduced rate of three

13    and a half percent for one more year?

14         A.     Correct.

15         Q.     And if there was no payment for the

16    entire additional year, then that would yield a

17    maximum of $1.01 billion?  You could look at

18    your footnote.

19         A.     If there was no more accrual, the

20    cap is 1.01 billion.

21         Q.     And interest would cut off at that

22    absolute maximum, correct?

23         A.     Yes.

24         Q.     So if we want to compare, first,

25    just what do the 2014 numbers look like, you

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2      have an $876 million settlement on about a

3      $1.6 billion claim, correct?

4            A.    Well, the -- yes.

5            Q.    And if we then wanted to say, okay,

6      let's assume there's no payout all the way

7      until June 30, 2015, the settlement would rise

8      at that date to 1.01 billion, correct?

9            A.    Correct.

10           Q.    And you haven't done any calculation

11     to know what would the accrued interest have

12     risen to in the absence of a settlement as of

13     June 30, 2015, did you?

14           A.    No.

15           Q.    And if we want to do that

16     calculation, we would need to say, okay, let's

17     take a look at the full principal amount of the

18     bonds and continue to accrue it at about

19     7 percent, right?

20           A.    Whatever the contract rate on the

21     various series are, yes.

22           Q.    It blends out to roughly 7 percent

23     or so, correct?

24           A.    Yes.

25           Q.    So based on your familiarity with

```
1              WERTHEIM - HIGHLY CONFIDENTIAL
2    these bonds in this settlement, interest is
3    accruing at just under $300 million a year,
4    correct, in the absence of a settlement?
5         A.    Roughly, mathematically.
6         Q.    So in terms of what is the
7    percentage that the -- that NNI is settling for
8    as of June 30, 2015 would be 1.01 billion over
9    about 1.9 billion, correct?
10        A.    No, because that's not how I read
11   what they're settling for.  I base my opinion
12   on what they would have received anyway, and
13   so --
14        Q.    Let me withdraw that question,
15   because it was -- perhaps caused some
16   confusion.
17             Let's put aside the question of cash
18   availability and just focus on the what is the
19   percentage of the claimed amount that the
20   parties are settling for, okay?  We could --
21   obviously, the parties have their argument
22   about what's available and what's not, but if
23   we just wanted to look at what is the
24   percentage of the claimed amount, as of
25   June 30, 2014, it's 876 divided by about
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    1.6 billion, correct?

3         A.    Correct.

4         Q.    As of June 30, 2015, it's

5    1.01 billion divided by about 1.9 billion,

6    correct?

7         A.    Okay.

8         Q.    And if we don't reach a resolution

9    to this whole rigmarole by June 30, 2016, it's

10   still a payment of 1.01 billion, assuming they

11   have the money, correct?

12        A.    Assuming they have the money.

13        Q.    You agree with that?

14        A.    The settlement amount is still

15   1.01 billion.

16        Q.    And the accrued interest by that

17   point in time, if there were no settlement,

18   would have risen to about 2.2 billion, correct?

19        A.    The accrued interest amount would

20   have accrued to that.  That doesn't mean they

21   would have received it.

22        Q.    Doesn't mean they have it, right?

23        A.    Right.

24        Q.    But in the absence of a settlement,

25   that would be the accrued interest number.

1                WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    Mathematically, yes.

3        Q.    And if we go to June 30, 2017, it

4    would still be the same 1.01 billion, right?

5        A.    Yes.

6        Q.    And the accrued interest would have

7    risen up to about two and a half billion,

8    correct?

9        A.    Yes.

10       Q.    It's fair to say that as -- on a

11   purely percentage basis of the amount of the

12   interest claim, that number declines

13   significantly over time the longer there's a

14   delay in payment, correct?

15              MR. PULTMAN:  Object to the form of

16        the question.

17              You can answer.

18       A.    That assumes they would have

19   received that amount to begin with.

20       Q.    Correct.  Assuming they could

21   receive that amount, that the cash is there,

22   the percentage payout goes down with the

23   passage of time, correct?

24       A.    Correct.

25       Q.    When you talk about $1.01 billion

1                    WERTHEIM - HIGHLY CONFIDENTIAL
2          that's also -- that's only the number that it
3          rises to as of the end of next June, assuming
4          that all of the people that are fighting over
5          allocation can't get a resolution that results
6          in a payment before then, correct?
7               A.    Could you repeat the question?
8               Q.    Sure.  When you talk about a
9          $1.01 billion settlement, that's on the
10         assumption that all the parties fighting about
11         allocation can't get a resolution that results
12         in a payment before the end of next June,
13         correct?
14              A.    Right, that's based on an accrual,
15         assuming there's been no payment of the bonds
16         before that date.
17              Q.    Are you aware that if the parties
18         can reach a settlement in the month of
19         November, it's just over $900 million in terms
20         of the amount of the settlement?
21              A.    I don't know the exact amount, but
22         it would be less than 1.01 billion.
23              Q.    In fact, if the parties can, on
24         November 4 when the judge has ordered them to
25         come to his courtroom to try to resolve it, if

1                WERTHEIM - HIGHLY CONFIDENTIAL
2     the parties do resolve it on that day, the
3     amount of accrued interest under the settlement
4     would be lower than the number that you have in
5     paragraph 50.  You've done that calculation,
6     right?
7          A.    Yes.
8          Q.    And I'm correct?
9          A.    I don't know the total accrual on
10    any given date, but it would be less than the
11    1 billion.
12         Q.    But it would be less than the 971
13    that you put in paragraph 50, right?
14         A.    It could be.  I don't know the exact
15    interest calculation.
16              MR. ROSENTHAL:  I thank you for your
17         time, and I have no further questions.
18              THE WITNESS:  Okay.
19              THE VIDEOGRAPHER:  We are now off
20         the record.  The time is 2:55 p.m.,
21         October 22, 2014.
22              (Recess taken.)
23              THE VIDEOGRAPHER:  This is tape five
24         of the deposition of Dr. Paul Wertheim.
25         We are now back on the record.  The time

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         is 3:07 p.m.  Today is October 22, 2014.

3    EXAMINATION BY

4    MR. LEBLANC:

5         Q.    Good afternoon, Doctor.  I

6    introduced myself earlier from the other end of

7    the table, but my name is Andrew Leblanc, and I

8    represent the bondholders in this case.

9              I'm going to follow up on some of

10   the questions that Mr. Rosenthal asked, and

11   because of that, because I'm going second, I'm

12   going to be jumping around a fair bit, so let

13   me just start with where he ended, and the

14   discussion of the paragraph 16 of your report,

15   which is Exhibit 1 to this deposition.

16              Do you have it there?

17         A.    Yes.

18         Q.    So do I understand correctly that

19   you started the deposition by making a

20   correction to the $1.657 billion number,

21   correct?

22         A.    Yes.

23         Q.    As a result of Mr. Rosenthal's

24   questions, you also want to change, in the

25   parenthetical, as of June 30, 2015, that should

1                WERTHEIM - HIGHLY CONFIDENTIAL

2     be changed to 2014; is that correct?

3          A.    Yes, based on the chart.

4          Q.    Right.  And the chart, that's the

5     same chart you used to come up with the

6     $1.657 billion number, correct?

7          A.    Yes.

8          Q.    And then it says, "to a maximum of

9     1.01 billion."

10               Do you see that in your report?

11         A.    Yes.

12         Q.    Now, that needs to be changed to

13    876 million; is that correct?

14               MR. PULTMAN:  Object to the form of

15         the question.

16               You can answer.

17         A.    No, I wouldn't make that change,

18    because June 14 or June, excuse me, June 2014

19    has already passed, so the accrual is already

20    higher.

21         Q.    Okay.  But if you're comparing the

22    total accrual number to the settlement number,

23    you would want to use the same date for those,

24    wouldn't you?

25         A.    Well, I would change the accrual.

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    It's, I guess, a matter of semantics,
 3    partially, but I would change the accrual
 4    amount to be as of June 30, 2015 --
 5         Q.    Okay.  And I think --
 6         A.    -- to compare it to the 1.01.
 7         Q.    All right.  And I think you agreed
 8    with Mr. Rosenthal that that was about
 9    1.9 billion?
10         A.    It would be higher than the 1.6,
11    yes.
12         Q.    And higher by about 300 million a
13    year; is that right?
14         A.    Roughly.
15         Q.    So that would then change the 1.9
16    billion to a maximum, still, of 1.03 billion to
17    compare the same time period, correct?
18              MR. ROSENTHAL:  1.01.
19         Q.    1.01.  I'm sorry.  1.01, yes.
20         A.    If I understand the math right, yes.
21         Q.    So you would need to then change the
22    last clause of that sentence as well to say "or
23    a decrease of," and then it would be
24    $890 million?
25         A.    Well, again, that's assuming that
```

```
1              WERTHEIM - HIGHLY CONFIDENTIAL
2    they would have received it in the first part,
3    but whatever that difference is.
4         Q.    Right.  I'm just trying to use the
5    words that you've used here.
6         A.    Yes.
7         Q.    To be accurate, if you changed it
8    the way that we just talked about, that should
9    say a decrease of 890 million; is that right?
10        A.    Okay.  Yes.
11        Q.    Yes, okay.
12              Now, I want to talk about a few of
13   the items that are behind Section 5.1 of your
14   report.  And this is the section entitled Other
15   Variables Which Could Further Decrease Cash
16   Available to NNI.
17              Do you see that at page 12 of
18   Exhibit 1?
19        A.    Yes.
20        Q.    Now, and in particular, I want to
21   start at the top of page 13.  You have three
22   items there, item a, b and c.
23        A.    Yes.
24        Q.    The first is PPI attributable to the
25   NNCC notes; is that correct?
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2       A.      Correct.

3       Q.      Now, you made an assumption that the

4  PPI attributable to the NNCC notes, for the

5  purposes of your calculation, you assumed it to

6  be 60 percent of their contract accrual amount;

7  is that right?

8       A.      For what I included in my

9  distribution analysis, yes.

10      Q.      And are you aware of anyone

11 suggesting that NNCC is not entitled -- I'm

12 sorry.  Let me withdraw that.

13              Are you aware of anyone suggesting

14 that the NNCC bondholders are not entitled to

15 post-petition interest from NNI?

16      A.      Could you restate that or say that

17 again?

18      Q.      Are you aware of whether anyone has

19 suggested that the NNCC bondholders are not

20 entitled to post-petition interest from NNI?

21      A.      Am I aware of anyone that has

22 suggested that they're not entitled?

23      Q.      Yes.

24      A.      No.

25      Q.      Do you know if the monitor has taken

HIGHLY CONFIDENTIAL

```
 1                 WERTHEIM - HIGHLY CONFIDENTIAL
 2    a position on that issue?
 3         A.    I'm not aware.
 4         Q.    Okay.  Now, you submitted -- your
 5    report was in connection with the monitor's
 6    objection to the PPI settlement, correct?
 7         A.    Yes.
 8         Q.    And did you review that submission,
 9    the objection?
10         A.    Briefly, yes.
11         Q.    Did you review it to the end?
12         A.    I read through it briefly.
13         Q.    Okay.  Do you know if the -- if the
14    monitor has argued in these cases that neither
15    law debenture nor the bondholders have filed a
16    proof of claim against NNI?
17         A.    I don't remember that specifically.
18         Q.    Okay.  Do you know if the monitor
19    has argued in this case that the support
20    agreement between NNI and NNCC, by its terms,
21    expressly provides that NNI shall bear no
22    liability for NNCC's obligations?
23         A.    I'm not aware of that.
24               You asked was I aware of the
25    monitor --
```

**HIGHLY CONFIDENTIAL**                    202

1                WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    Yes.

3        A.    -- making that claim?

4        Q.    Yes.

5        A.    I'm not aware of that.

6        Q.    Okay.  Now -- but you think it would

7    be unreasonable to assume a zero dollar PPI

8    payment to the NNCC bondholders for the purpose

9    of your calculation; is that right?

10       A.    That was my assumption.

11       Q.    Now -- and the purpose of the

12   discussion at paragraphs 39 through 45 of your

13   report, the summary of that is you're

14   suggesting that the liability for NNCC

15   bondholders could be even higher than the

16   60 percent you assume; is that right?

17       A.    It could be.

18       Q.    You don't posit the possibility that

19   it could be less than the amount that you

20   assume; is that right?

21       A.    Correct.

22       Q.    Now, the amount that you assume for

23   that, if you turn back to page 12, to the chart

24   at the very top, which is the continuation of

25   your Table 2, that's $45.8 million, correct?

HIGHLY CONFIDENTIAL                    203

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.     Correct.

3        Q.     So you have discussion about how

4   that number could go up to the contract amount

5   in Section 5.1, but you don't anywhere identify

6   the fact that that 45.8 million could be zero,

7   do you?

8        A.     I make a reference in paragraph 21

9   that based, again, on the totality of my

10  variables, that even if a portion of the claim

11  subject to compromise or reduced or eliminated,

12  then the same would apply for the other claims

13  that I have included in my distribution

14  analysis mathematically, that even if a portion

15  of those are reduced or eliminated, I still

16  reach the same conclusion when I look at the

17  totality of the factors.

18       Q.     Right.  And the totality of the

19  factors to which you're referring there, those

20  are the three items in Section 5.1 where you

21  conclude that the claims might be higher,

22  right?

23       A.     Including the other -- the effect of

24  the other assumptions that I made such as

25  extinguishment of the NNUK pension claims.

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    Okay.  But this section is designed

3    to educate the court about other claims that

4    you may have overestimated the reductions that

5    may occur and, therefore, that may cause the

6    cash available to NNI to decrease, right?

7              MR. PULTMAN:  Object to the form of

8         the question.

9         A.    Could you repeat that?

10        Q.    Let me rephrase it.

11             The purpose of Section 5.1 is to

12   identify for the court other variables that

13   could decrease the cash available to NNI,

14   correct?

15        A.    Correct.

16        Q.    And one of those is the NNCC claims

17   which I think you would agree with me, it could

18   increase or decrease the amount of cash

19   available to NNI.

20        A.    It could.

21        Q.    Right.  And to the extent that the

22   monitor has said that there are no claims

23   against it, against -- no claims asserted

24   against NNI by the NNCC bondholders, then it's

25   not unrealistic to think that that might be a

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2   zero, is it?
 3         A.    Well, the way I read the statement,
 4   as you quoted from the monitor, is that no
 5   claims had been filed yet.  I don't know
 6   whether they would be or not.
 7         Q.    Do you know whether the monitor, in
 8   the next few words of that sentence, takes note
 9   of the fact that the bar date has passed?
10         A.    Not aware of that.
11         Q.    You just haven't -- you don't have
12   any recollection, as you sit here today, of
13   ever seeing a statement by the monitor with
14   respect to the NNCC bonds?
15         A.    No.
16         Q.    And that's true even if it's in the
17   objection that your report was submitted at the
18   same time as?
19         A.    Yes.
20         Q.    Okay.  All right.  Now, let me just
21   ask, just out of curiosity, Table 3 on page 14
22   of your report, which is Exhibit 1?
23         A.    Yes.
24         Q.    Why do you show the -- in the bottom
25   row, the US unsecured claims other than
```

```
 1                WERTHEIM - HIGHLY CONFIDENTIAL
 2   guaranteed bonds at interest rates of 2 percent
 3   and 4 percent per year?
 4        A.    Purely for comparative purposes,
 5   almost like a sensitivity analysis, to show
 6   what the amounts -- how the amounts would
 7   change if they were entitled to an interest
 8   rate higher than the FJR.
 9        Q.    Do you know of any argument that
10   they might be entitled to an interest rate
11   other than a federal judgment rate?
12        A.    No.
13        Q.    Do you know of any contract rates
14   that apply to any of those claims?
15        A.    No.
16        Q.    Then with respect to the NNCC bonds
17   there, you show it at federal judgment rate
18   2 percent, 4 percent, and then their contract
19   rate, right?
20        A.    Yes.
21        Q.    So you don't show it at a rate of
22   zero?
23        A.    Correct.
24        Q.    Okay.  Now, let's turn to the next
25   item.  And why don't we look back just for a
```

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    second, just to reorient ourselves.  Page 13
 3    again, at the very top.
 4              These are -- the second of the three
 5    items that you identify there relates to the
 6    additional US tax liability that might be paid
 7    by NNI.
 8              Do you see that?
 9        A.    Yes.
10        Q.    Now, you cover this in paragraphs 46
11    through 48 of your report, correct?
12        A.    Correct.
13        Q.    Just tell me, if you could, how did
14    you arrive at an estimate of 133 million for
15    the tax liability?
16        A.    I looked at the range that had been
17    given.  Information on exact amounts was
18    limited, but we do have testimony that I quoted
19    that states the range could be between
20    400 million and a billion.  Assuming a zero tax
21    was unrealistic.  Therefore, I wanted to assume
22    some amount.  I chose a third, because it's
23    just a round number.  It's yet conservative in
24    favor of NNI.
25              I even state that I consider it a
```

1               WERTHEIM - HIGHLY CONFIDENTIAL

2    conservatively low estimate, maybe even

3    unrealistically low, but using that low

4    estimate was to the advantage of NNI.  So I

5    just -- I chose a third.

6         Q.    Could you have chosen 20 percent?

7         A.    I could have.

8         Q.    Would that be --

9         A.    The lower I -- the lower I would

10   choose would make it less realistic to me,

11   given that I think 133 is already

12   unrealistically low.  Any amount lower would be

13   even more unrealistically low.

14        Q.    You referred in your answer, the

15   answer explaining why you did this to the

16   testimony that you understood was given at

17   trial.  Who was testifying?

18        A.    Counsel for the US debtors.

19        Q.    Do you understand these were

20   statements that were made in connection with

21   opening statements?

22        A.    Opening statements.  I don't know

23   the term "testimony," if it applies.

24        Q.    Okay.  Do you know if opening

25   statements are evidence?

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2              MR. PULTMAN:  Object to the form.
 3         Objection, foundation.
 4              You can answer.
 5    A.    My understanding is they are not.
 6    Q.    They are not evidence; is that --
 7    A.    Yes.
 8    Q.    Okay.  So do you cite to any
 9    evidence to support the number that you use?
10    A.    To the number, no.
11    Q.    Do you cite to any evidence to
12    support the range that you began with to then
13    do the analysis to reach the number that you
14    use?
15    A.    Evidence, no.
16    Q.    Okay.  Why did you choose Ms. Block
17    and Ms. Schweitzer's statements as the starting
18    point for the analysis that you conducted?
19    A.    One, because they acknowledge the
20    existence of a tax liability.  And, two,
21    because it gives statements as to the range of
22    amounts.
23    Q.    Now, am I right that while you were
24    at Pepperdine, you taught a course on corporate
25    tax; is that right?
```

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    I did not teach a course in

3   corporate tax.

4        Q.    Have you taught corporate tax

5   before?

6        A.    No.

7        Q.    You never taught corporate tax?

8        A.    No.

9        Q.    Are you able to -- do you know --

10  let me withdraw that.

11             Are you familiar with corporate tax

12  principles?

13       A.    Somewhat as a Ph.D.

14       Q.    I'm sorry?

15       A.    As a Ph.D. and a CPA.

16       Q.    Okay.  Do you have the capacity

17  to -- the ability, the expertise to think about

18  tax issues?

19             MR. PULTMAN:  Object to the form of

20        the question.

21       A.    To think about tax issues, yes.

22       Q.    Okay.  Did you apply any of that

23  expertise to the analysis that you conducted in

24  the three paragraphs of your report?

25             MR. PULTMAN:  Objection, no

**HIGHLY CONFIDENTIAL**                          211

1                **WERTHEIM - HIGHLY CONFIDENTIAL**

2          foundation.

3                You can answer.

4          A.     At a higher level, yes.

5          Q.     Okay.  And what expertise did you

6      apply to reach the -- to use the estimate of

7      one-third of the low end of the range that

8      Ms. block said at trial?

9          A.     Well, again, that -- that one-third

10     estimate was meant to be a conservatively low

11     estimate.

12               What basis do I have for assuming

13     that there's going to be a tax?  Again,

14     statements by counsel for the US debtors,

15     statements by John Ray, and just general

16     knowledge about tax, that there will be a tax

17     to the US estate based on the outcome of the

18     allocation process.

19         Q.     Explain that last part to me, the

20     general knowledge that there will be a tax to

21     the US estate based on the outcome of the

22     allocation process.  What do you mean by that?

23         A.     Similar to what Ms. Block states,

24     that there will be a tax depending on when the

25     money comes in and how it gets distributed.

1                     WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.     Right.  And which one of the

3    statements are you referring to, the first

4    quote from Ms. Block or the second?

5          A.     The second.

6          Q.     Okay.  And just to be precise, if we

7    could, what you report there is "All I know is

8    that the tax claim," your alteration, "could be

9    between 400 million and a billion dollars,

10   depending on when the money comes in, how it

11   gets distributed and so on."

12                Do you see that?

13         A.     Yes.

14         Q.     And, in fact, in the prior one, the

15   prior quote that you have, it says, "The tax

16   liability is as yet undetermined," right?

17         A.     Right.

18         Q.     So what from those statements led

19   you to conclude that there would be a tax claim

20   as opposed to there could be a tax claim?

21         A.     The statement, "In addition, the tax

22   liability is as yet undetermined," says to me

23   that there is a tax liability.  The amount is

24   undetermined.

25                And then a further later statement

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    that it could be between 400 million and a

3    billion.

4         Q.    Could be, right, she said?

5         A.    Could be.

6         Q.    Okay.  Now, what elements would go

7    into determining what that tax liability would

8    be?

9         A.    For one, the amount of the

10   distribution or the allocation to the US

11   estate.

12        Q.    What else?

13        A.    A wide variety of factors regarding

14   expenses and deductions.

15        Q.    Such as?

16        A.    Such as the variety of taxable

17   deductions that the US estate would have to

18   offset the allocation proceeds.

19        Q.    Okay.  So let me give just a couple

20   of examples and you tell me if these would be

21   factors in that determination.

22              Would one of the factors in that

23   determination be the tax assets that the US

24   estate is carrying?

25        A.    Listen, I didn't analyze the tax

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    consequences and try to calculate a tax amount.

3    I just used the numbers that they gave.  I took

4    a third of the low end of the estimate, and it

5    is just reasonable to me to assume, based on

6    their testimony, based on testimony of John

7    Ray, that first off there is going to be a tax

8    liability.

9          This is the range that they gave,

10   and to add to that, when Ms. Block states that,

11   depending on when the money comes in and how it

12   gets distributed, the reason there is a range

13   of a tax liability is because the allocation as

14   of yet had been undetermined, and that those

15   two are going to move together, just logically.

16   The higher the allocation is, in other words,

17   the more money that the US is going to receive,

18   the higher their tax liability is going to be.

19   That's just common sense.

20          And so I actually was ultra

21   conservative in that I took the high end of the

22   allocation assumption, where the US gets the

23   full allocation, but yet I assumed only

24   one-third of the low end of the range given for

25   the tax liability.

HIGHLY CONFIDENTIAL                    215

1                  WERTHEIM - HIGHLY CONFIDENTIAL
2          Q.     Did you do any analysis of what the
3    net operating loss carryforwards are for the US
4    estate?
5          A.     No.
6          Q.     Did you look at all at what tax
7    credits might be available?
8          A.     No.
9          Q.     Did you look at all about what
10   deductions might be available if the bonds are
11   paid by the US estate?
12         A.     No.
13         Q.     And, again, with respect to this
14   issue, this item b in your analysis in Section
15   5.1, your presentation here is to say that it
16   could be higher than 133 million and,
17   therefore, to say that your estimate is
18   conservative for that reason; is that right?
19         A.     I'm sorry.  That was kind of long.
20   Say that again.
21         Q.     The purpose of showing this
22   additional tax liability was to say that -- to
23   identify this as a variable which could
24   decrease cash available to NNI, correct?
25         A.     Correct.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    And you didn't even consider the

3    possibility that the tax liability could be

4    zero, correct?

5         A.    I did consider the possibility.  I

6    just considered it unrealistic.

7         Q.    And I know Mr. Rosenthal covered

8    this, so I'm not going to spend any time on it,

9    but you do understand that Mr. Britven, after

10   spending the time that he spent to prepare his

11   report, used a zero dollar for the tax claim.

12              You understand that?

13        A.    Yes.

14        Q.    All right.  Now, the third item is

15   the additional PBGC pension claims that might

16   be paid by NNI; is that right?

17        A.    Yes.

18        Q.    And that's, again, in the category

19   of variables that could decrease the cash

20   available to NNI; is that right?

21        A.    Correct.

22        Q.    Now, for the purposes of your claims

23   analysis for the NNI estate, you looked to --

24   for most of the claims, you looked to MOR 60;

25   is that right?

1          WERTHEIM - HIGHLY CONFIDENTIAL

2      A.    Yes.

3      Q.    Okay.  Do you want to look at that

4  in your report or you agree with that?

5      A.    Well, I -- in footnote 20, the

6  liability subject to compromise comes from MOR

7  60.  The other line item comes from MOR 60, and

8  those are the two -- those are the items that

9  specifically come from MOR 60.

10     Q.    Okay.  So you considered MOR 60, for

11 the purposes of those items, to be a reliable

12 source of information on the estimate of the

13 claims amounts, correct?

14          MR. PULTMAN:  Object to the form.

15          You can answer.

16     A.    I relied on those numbers, yes.

17     Q.    Why did you rely on those numbers?

18     A.    They --

19     Q.    Just so our record can follow along,

20 are you looking at Exhibit 7?

21     A.    Yes, I'm looking at Exhibit 7.

22 (Perusing.)

23          The items listed as liability

24 subject to compromise in footnote four, as well

25 as the line item on the combined -- on the

1           WERTHEIM - HIGHLY CONFIDENTIAL

2   condensed combined balance sheet for total

3   liabilities not subject to compromise of 54.6,

4   those were the numbers I used in my calculation

5   for the distribution analysis.

6        Q.    Right.  My question was simply why

7   did you choose to use those numbers from this

8   report?

9        A.    This was the most recent monthly

10  operating report that was available at the

11  time.

12       Q.    Okay.  And with respect to those

13  numbers, you took them exactly as they were

14  stated, right, in the MOR?

15       A.    I did.

16       Q.    You didn't assume that there would

17  be any reduction by -- in those claims through

18  the course of the claims reconciliation

19  process?

20       A.    Well, the monthly operating report,

21  on the basis of presentation, states that these

22  amounts follow the guidelines of ASC 852, which

23  states that liabilities are to be shown at the

24  amounts expected to be settled, even if they

25  may be settled for less.

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2                    So these then represent, according

3        to the statement and guidelines that they were

4        prepared, these represent the amounts that were

5        expected to be settled, and so that's why I

6        used those amounts to be a realistic estimate.

7                    Again, could they be settled for

8        less?  Yes.  But it was more realistic for me

9        to assume the amounts that were expected to be

10       settled.

11           Q.    Okay.

12           A.    So that was my basis.

13           Q.    Now, just to try to speed this up.

14       Just put a pin in this, if you could.

15                    You see under the line, pension

16       obligations on MOR -- Exhibit 7, which is MOR

17       60, page six, table four, you see pension

18       obligations?

19           A.    Yes.

20           Q.    $437.6 million?

21           A.    Yes.

22           Q.    Now, if we turn back now to your

23       report.

24           A.    Yes.

25           Q.    At Table 1 -- I'm sorry, table --

HIGHLY CONFIDENTIAL                                220

1              WERTHEIM - HIGHLY CONFIDENTIAL

2      Table 2.  That is not the number you use for

3      pension obligations, is it?

4           A.    Correct.

5           Q.    In fact, in pension obligations

6      here, you don't cite to anything on Table 2 as

7      to where you came up with the 593 million;

8      isn't that right?

9           A.    Not in Table 2.

10          Q.    Okay.  That's what brings us then

11     forward to table -- to paragraph 49 of your

12     report, correct?

13          A.    Correct.

14          Q.    All right.  Now, before we talk

15     about 49, you chose to use the MOR, as stated,

16     for every liability that you -- you cited to

17     it, exactly as stated, except for the pension

18     liability.  Why?

19          A.    Because the MOR was dated as of

20     January 31, 2014, and as of that time, the

21     updated pension claims had not been -- not yet

22     been filed, but as the date of my report, they

23     had been, updated claims had been filed.

24                And so I took -- given that the

25     updated amount was higher by a total of --

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    well, I would have to do the math, but whatever

3    the total of the updated claims were compared

4    to the initial, in my opinion, the original 593

5    represented a more realistic amount than the

6    4 --

7         Q.    37?

8         A.    -- 437 from the MOR simply because

9    the MOR was outdated for that line item

10   specifically.

11        Q.    Let's try to be precise.  And we're

12   going to have to do a little bit of math.

13   Okay.

14             The increase in the claims reflected

15   by the PBGC's amended claims was 115 million;

16   isn't that right?

17        A.    Yes.

18        Q.    That's paragraph 49 of your report?

19        A.    Yes.

20        Q.    Exhibit 1.  The reduction estimated

21   by the US estate to the PBGC claim was from

22   593 million to 437 million; is that correct?

23        A.    Correct.

24        Q.    All right.  So can you do that math

25   for me?

```
1              WERTHEIM - HIGHLY CONFIDENTIAL
2              MR. PULTMAN:  What math is it you
3        want him to do?
4              MR. LEBLANC:  I think he knows.
5              MR. PULTMAN:  Well, that's fine, but
6        I don't.  So it would be very helpful, if
7        I understood.
8              MR. LEBLANC:  593 minus 437.
9        A.    Okay.
10       Q.    So that is a reduction of
11   $156 million?
12       A.    Okay.
13       Q.    Does that math sound right?
14       A.    Yes.
15       Q.    Okay.  So the US debtor was
16   estimating, using the 852 standard that you
17   talked about a moment ago, that the amount that
18   the claim would be settled for was 156 million
19   less than it was asserted for at the time of
20   the MOR 60, right?
21       A.    Yes.
22       Q.    And the PBGC added 115 million to
23   their claims, correct?
24       A.    Correct.
25       Q.    But you don't know what the US
```

```
1              WERTHEIM - HIGHLY CONFIDENTIAL
2    debtors' estimate of the payment on those
3    claims is going to be, do you?
4         A.    Because I don't have an updated MOR.
5         Q.    Right.  And so, instead, you just
6    reverted back to the $593 million number,
7    right?
8         A.    Yes.
9         Q.    Now, you could have started at the
10   437 and then added the 115 million, right?
11        A.    I suppose I could have started at
12   437 and added any amount.  To give an objective
13   dollar amount, I based it on the original claim
14   at 593.
15        Q.    Right.  But the original claim at
16   593, you already knew that the US debtor
17   thought it could settle that for $156 million
18   less than that, right?
19        A.    Correct.
20        Q.    Now, what's the basis, just
21   generally, if you understand, what's the basis
22   for the PBGC claim?
23        A.    Well, that 593 was a claim for the
24   unfunded benefit liabilities.
25        Q.    Do you have any experience at all
```

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2        with pensions and accounting for pensions?

3             A.      Somewhat.

4             Q.      So just generally, to your

5        understanding, that that's the shortfall in the

6        pension liability as of the time of the

7        bankruptcy filing, right?

8             A.      Yes, in general.

9             Q.      In general, okay.  And I know you're

10       not a stock market expert or bond market

11       expert, but just generally, directionally,

12       what's happened in the stock market and the

13       bond market since January of 2009?

14                    MR. PULTMAN:  Object to the form of

15            the question.  Objection, foundation.

16                    You can answer the question.

17            Q.      Do you know, generally?

18            A.      Since 2009?

19            Q.      January of 2009.

20            A.      Well, to answer your question, the

21       stock market has gone up.  It's gone down.

22       It's gone up.

23            Q.      Where does it sit today relative to

24       where it was in January of 2009, just

25       directionally?

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         A.    Higher.

3         Q.    Much higher, isn't it?

4              MR. PULTMAN:  Object to the form.

5              You can answer.

6         A.    It's higher.  Much?  I don't know.

7         Q.    Did you give any thought to what

8    effect the performance of the stock market

9    might have on the PBGC's claims?

10        A.    No.

11        Q.    Did you give any thought to anything

12   that might affect the PBGC's claims?

13        A.    Yes.

14        Q.    What?

15        A.    The analysis done by the PBGC, which

16   led them to file the updated claim.

17        Q.    Okay.  But what about the analysis

18   done by the debtor that estimated at least

19   154 million -- 56 million dollar reduction in

20   it?  Did you consider that?

21              MR. PULTMAN:  Sorry.  Objection.  It

22        has been asked and answered.

23              You can answer.

24        A.    Again, that was an outdated number.

25        Q.    When you say it was an outdated

```
1              WERTHEIM - HIGHLY CONFIDENTIAL
2    number, it still was the estimate of what they
3    would have to pay on the $593 million claim,
4    wasn't it?
5         A.    It was their estimate at the time.
6         Q.    But you didn't take into account any
7    reduction to that claim from the stated amount
8    that was filed originally by the PBGC?
9              MR. PULTMAN:  Objection.  It has
10        been asked and answered.
11             You can answer it again.
12        A.    No.
13        Q.    And for the purposes of this
14   section, again, this Section 5.1, this claim is
15   shown as something that could reduce the amount
16   of cash available to NNI; is that right?
17        A.    Yes.
18        Q.    But it's entirely possible, isn't
19   it, that the PBGC claim could be reduced below
20   $593 million, isn't it?
21             MR. PULTMAN:  Object to the form.
22        A.    Is it possible?
23             MR. PULTMAN:  You can answer.
24        A.    Yes.  And I make a statement in an
25   earlier paragraph that allows for a reduction
```

1          WERTHEIM - HIGHLY CONFIDENTIAL
2    in a claim.
3          Q.    Are you aware Mr. Britven estimated
4    this claim?
5          A.    I know he would have included it.
6          Q.    Do you know what number he included
7    it at?
8          A.    No.
9          Q.    Would it surprise you to hear that
10   he included it at an unsecured claim of
11   $400 million?
12         A.    I don't know one way or the other
13   what his exact amount was.
14         Q.    And that would be a more
15   conservative estimate than your estimate; isn't
16   that right?  Let me withdraw that.
17              That would be an estimate that's
18   more favorable to NNI than your estimate; isn't
19   that right?
20         A.    Yes.
21         Q.    And that number alone, if that's his
22   estimate, that would be a $200 million -- let
23   me withdraw that.
24              That estimate alone would be a
25   $193 million swing in dollars available for PPI

```
 1                WERTHEIM - HIGHLY CONFIDENTIAL
 2   at NNI; isn't that right?
 3        A.     Mathematically.
 4        Q.     And because, again, you talked about
 5   this with Mr. Rosenthal, any change to the
 6   claims at the NNI entity, the sensitivity to
 7   the amount available for bondholders is
 8   100 percent, right?
 9        A.     Yes.
10        Q.     Let me ask about Mr. Britven.  Why
11   did you look at his report?  For what purpose?
12             MR. PULTMAN:  Object to the form of
13        the question.
14             You can answer.
15        Q.     Let me ask it in a way that may not
16   lead to the objection.
17             For what purpose did you look at
18   Mr. Britven's report?
19             MR. PULTMAN:  Same objection.
20             You can answer.
21        A.     I remember reading, and I can't cite
22   the source offhand, but I remember reading in
23   trial testimony several places where they
24   referred to, and I'm just going to say slide 35
25   of the Britven report, where excess cash was
```

1                WERTHEIM - HIGHLY CONFIDENTIAL

2     calculated, and so I wanted to investigate the

3     circumstances around the reference to the

4     Britven report.

5          Q.    Okay.  And I'm not going to go

6     through any detail with it, because

7     Mr. Rosenthal covered that all, but is it your

8     understanding that Mr. Britven does not assume

9     a cash burn?

10               MR. PULTMAN:  Is that the end of the

11          question?

12          Q.    Question mark.

13               MR. PULTMAN:  Object to the form.

14          A.    That was my understanding just based

15     on the limited information I could tell from

16     his analysis.

17          Q.    Did you read his rebuttal report or

18     his original report or both?

19          A.    Again, I briefly read both.

20               MR. LEBLANC:  Let me just have the

21          court reporter mark as the next exhibit,

22          Exhibit 10.

23               (Wertheim Exhibit 10, Expert Report

24          of Thomas Britven, dated January 24, 2014,

25          Bates Stamped 000001 through 150, marked

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         for identification.)

3              MR. LEBLANC:  For everybody else, I

4         just have the cover and the --

5         Q.    Dr. Wertheim, the court reporter has

6    handed you what's been marked as Exhibit 10.

7    And just for the benefit of our record, we're

8    handing out, for everybody else's benefit, just

9    the cover page and the chart that I want to

10   show you.

11        A.    Okay.

12        Q.    If you could turn to page 67, which

13   there's Bates numbers on the bottom of these.

14   You should be able to follow those along.

15             Do you have what's marked Schedule 5

16   there?

17        A.    Yes.

18        Q.    Okay.  And do you see Schedule 5 is

19   entitled -- well, actually, I'm not sure that

20   that's the real title, but you see it has an

21   asset side, and then it's got the Canadian, US

22   and EMEA entities on the left side?

23        A.    (Perusing.)  Yes.

24        Q.    Okay.  And it says -- has "Treasury

25   cash as of December 31, 2014."

```
 1                WERTHEIM - HIGHLY CONFIDENTIAL
 2                Do you see that?
 3        A.     Yes.
 4        Q.     And then it has, "Anticipated spend
 5   until end of litigation."
 6                Do you see that?
 7        A.     Yes.
 8        Q.     And that's a $326 million number?
 9        A.     Yes.
10        Q.     Okay.  So is this consistent with
11   your recollection that he doesn't take account
12   of anticipated burn rates?
13        A.     No.  In getting to the 744, then, he
14   started at a higher balance than I did, and
15   then reduced that by the burn that he assumed.
16        Q.     Okay.  But he starts at a -- he uses
17   an earlier starting --
18        A.     Earlier, December 31, 2013, whereas,
19   my cash balance that I use for NNI is dated
20   August 31, 2014.
21        Q.     Right.  But Mr. Britven's analysis
22   begins or uses a $326 million cash burn rate
23   for the purposes of calculating the numbers
24   that appear on his table 35, isn't that right,
25   what you referred to as table 35?
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    That's the amount that's listed

3   there.

4        Q.    Okay.  So do you believe that he

5   does have an assumed cash burn in his analysis?

6        A.    Yes.

7        Q.    And you don't know one way or the

8   other whether that's -- whether he's

9   understated it or overstated it.  You just

10  don't know, right?

11       A.    Correct.

12       Q.    But it would not be correct to say

13  that Mr. Britven did not include an estimated

14  cash burn in his analysis?

15            MR. PULTMAN:  Object to the form.

16            You can answer.

17       A.    Correct.

18       Q.    You can put that to the side.  I'm

19  going to go through a number of things that are

20  much likely to be much shorter.

21            Mr. Rosenthal had asked you a series

22  of questions about the IP addresses.  Do you

23  recall those questions?

24       A.    Yes.

25       Q.    Now -- and the questions were

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    concluded with his estimate or your discussion

3    of a calculation of how much money would be

4    added to NNI's surplus if the assets were sold

5    in a certain way.  I'm just trying to orient

6    you.

7              You remember you talked about

8    180 million, and then he said $120 million

9    addition to NNI?

10             Do you recall that, generally?

11        A.   Vaguely, yes.

12        Q.   Okay.  The question I wanted to get

13   to is, do you know if the US has asserted an

14   interest in any of those IP addresses?

15        A.   I don't know.

16        Q.   And that would have -- that could

17   have a material effect on where those assets

18   flow if the US has an interest in those IP

19   addresses; isn't that right?

20             MR. PULTMAN:  Object to the form.

21             You can answer.

22        A.   Could you repeat that?

23        Q.   Sure.  If NNI has an interest in the

24   proceeds from the IP address sales, that could

25   have a material impact on your analysis; isn't

HIGHLY CONFIDENTIAL                    234

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    that right?

3         A.    I don't know if it would be material

4    or not.

5         Q.    Okay.  Do you know whether the US

6    has asserted an interest in those assets?  The

7    US, meaning NNI.

8              MR. PULTMAN:  Objection, asked and

9         answered.

10             You can answer it again.

11        A.    I don't know.

12        Q.    Before I have the court reporter

13   mark this, how did you select which monitor

14   reports to review?

15        A.    I can't remember every reason.  I

16   think I picked the thirty-fifth because it

17   discussed the two million dollar --

18   2.067.2 million dollar claim.

19        Q.    Billion dollar?

20        A.    Billion dollar claim to the US.  The

21   108 because it's the more recent.

22        Q.    Any reason to review any one in

23   between those?

24        A.    Offhand, I can't remember.

25        Q.    Did somebody on your team, a

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2   nonlawyer on your team, summarize the monitor
 3   reports for you, for you to consider which ones
 4   to look at?
 5        A.    No.
 6              MR. LEBLANC:  If we could have the
 7        court reporter mark this as the next
 8        exhibit.
 9              (Wertheim Exhibit 11, One Hundred
10        and Seventh Report of the Monitor, dated
11        September 2, 2014, marked for
12        identification.)
13        Q.    Okay.  Dr. Wertheim, the court
14   reporter has handed you what's been marked as
15   Exhibit 11.  This is the one hundred and
16   seventh report of the monitor.
17        A.    Okay.
18        Q.    You see it's dated September 2,
19   2014?
20        A.    Yes.
21        Q.    And this is not something that you
22   considered in the context of your report; is
23   that right?
24        A.    I don't believe I listed that in my
25   scope.
```

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    All right.  Let me just see if I can

3    get you -- if you could look at page three,

4    paragraph nine, the purpose.  You see here it

5    says, "The purpose of this one hundred and

6    seventh report of the monitor is to provide

7    this court with information regarding the

8    monitor and Canadian debtors' motion seeking:

9    a) approval of an asset sale agreement, dated

10   July 14, 2014," and it lists the parties there.

11              Do you see that?

12         A.    Yes.

13         Q.    It ends with, "and to provide the

14   monitor's support in respect thereof."

15              Do you see that?

16         A.    Yes.

17         Q.    I will just represent to you that

18   this is in relation to a sale of certain IP

19   addresses, generally.  You can take as much

20   time as you would like to look at it, but I

21   want to get to a different point.

22              Can you accept my representation to

23   that effect?

24         A.    Yes.

25         Q.    If you turn to page ten of the

1              WERTHEIM - HIGHLY CONFIDENTIAL
2    report.
3         A.    There seems to be two sets of
4    numbers.
5         Q.    Oh, yeah.  I'm sorry.  The internal
6    page ten, which is page 17 of the right corner
7    stamp.
8         A.    Okay.
9         Q.    And right before paragraph 30, it
10   says, "Proceeds from the sale of IP addresses."
11             Do you see that, the heading just
12   between 30 and 29?
13        A.    Yes.
14        Q.    And it says, "The US debtors have
15   asserted an interest in the IP addresses and
16   any proceeds of sale derived therefrom."
17             Do you see that?
18        A.    Yes.
19        Q.    And then if you go down to the next
20   paragraph, right at the bottom, the fourth line
21   up, and I'm going to read just after the
22   parenthetical.
23             It says, "including NNI's right, if
24   any, to an allocation of the sale proceeds
25   shall be the subject of a joint hearing of this

HIGHLY CONFIDENTIAL                              238

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    Court and the US Court conducted pursuant to

3    the Cross-Border Insolvency Protocol," and it

4    goes on from there.

5              Do you see that?

6    A.    Yes.

7    Q.    So at the time you wrote your

8    report, were you aware that there was a dispute

9    as to the ownership of the proceeds of IP

10   address sales?

11             MR. PULTMAN:  Objection.  It has

12        been asked and answered.

13             You can answer.

14   A.    No.

15   Q.    And just to reorient ourselves, to

16   the extent that there was an IP -- that there

17   were $100 million in IP proceeds from IP

18   address sales, if the US estate was entitled to

19   those proceeds, then that would be an

20   additional hundred million dollars to the

21   bottom line number, the 971; is that right?

22   A.    No.

23   Q.    I'm sorry?

24   A.    No.

25   Q.    Why not?

```
1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    Because there could be, for example,

3   tax effects on that.

4        Q.    Okay.  Assuming that there was a

5   hundred million dollars of proceeds available

6   for distribution, net of taxes, then it

7   would -- and those proceeds were owned by NNI,

8   that -- again, the sensitivity would suggest

9   that it's 100 percent of that $100 million

10  addition to the NNI distribution to -- for PPI,

11  right?

12       A.    Well, there could also be costs

13  associated with carrying out the sales and

14  other costs associated with the sales process

15  and other transfer costs or whatever that would

16  reduce that in addiction to the taxes.

17            So I can't say exactly what the

18  amount would be, but whatever the ultimate

19  leftover proceeds from the sale, excluding

20  taxes and costs and whatever, then, yes, that

21  would affect the bottom line for NNI.

22       Q.    Okay.

23       A.    But it would not -- your initial

24  question was, would it translate to a

25  $100 million effect on the bottom line, and my
```

HIGHLY CONFIDENTIAL                                        240

1               WERTHEIM - HIGHLY CONFIDENTIAL
2   answer is no.
3       Q.    I think -- am I right that you
4   answered Mr. Rosenthal's question that you were
5   aware that there were IP addresses yet to be
6   sold by the estates at the time you wrote your
7   report?
8       A.    Yes.
9       Q.    Why didn't you reference that fact
10  in your report?
11              MR. PULTMAN:  Objection.  It has
12        been asked and answered multiple times.
13      A.    I answered that before.
14      Q.    Why don't you indulge me, then?
15      A.    Okay.  Because I had no basis for
16  assuming either the likelihood or the amount of
17  the sales.
18      Q.    But why not even say I know there
19  are IP addresses that have to be sold?
20              MR. PULTMAN:  Objection.  It has
21        been asked and answered.
22              You can answer it again.
23      A.    Because I had no basis to determine
24  the likelihood or the amount of the sales.
25      Q.    Are you aware of whether the monitor

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    has milestones for the monetization of the

3    remaining residual assets?

4           A.    I'm not sure what you mean by -- by

5    that, but okay.

6           Q.    My question is, do you know if the

7    monitor has certain milestones that it hopes to

8    achieve with respect to monetization of

9    remaining residual assets?

10          A.    In a vague sense, yes.  I remember

11   reading the idea of having milestones.  So I

12   do -- I am -- I know that that exists.

13          Q.    All right.  But you don't know what

14   those milestones might be?

15          A.    No.

16          Q.    Do you know whether the monitor has

17   milestones relating to the continued

18   repatriation of cash from affiliates in APAC

19   and CALA?

20          A.    No.

21          Q.    You don't know whether they do?

22          A.    That, I don't know.

23          Q.    Do you know whether they have --

24   your assumption is that, in the allocation

25   protocol litigation, that the monitors just

1            WERTHEIM - HIGHLY CONFIDENTIAL

2   loses their position, that the US wins?

3        A.    Could you repeat that?

4        Q.    Sure.  Your assumption -- you assume

5   that Kinrich wins his -- I'm sorry.  Let me

6   withdraw that.

7              You assume that NNI wins the

8   allocation dispute in that the Kinrich analysis

9   is the one that's adopted; isn't that right?

10       A.    Basically, yes.

11       Q.    And with respect to the completion

12  of the claims process and creditor

13  distributions, your assumption is, for that

14  category of other, the 3.2 billion Canadian in

15  claims, your assumption is that that's not

16  reduced by even a dollar, right?

17       A.    Well, I have already reduced it by

18  over 600 million based on what the claims were

19  as listed in the 10-Q and on the -- on the

20  Appendix D of the one hundred and eighth

21  report, so I have already reduced it by over

22  600 million.

23       Q.    But the 3.2 billion that's remaining

24  that's the subject of dispute, you assume no

25  reduction in that, right?

HIGHLY CONFIDENTIAL                          243

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         A.     Correct.

3         Q.     And you don't know if there are any

4    milestones relating to the completion of the

5    claims process?

6         A.     Correct.

7         Q.     Is it your expectation that the

8    monitor hopes to reduce claims against its

9    estate?

10              MR. PULTMAN:  Object to the form of

11         the question.

12        A.     I don't know what the monitor hopes

13   to do.

14        Q.     Is it your expectation that the

15   monitor hopes to monetize residual assets?

16        A.     Again, I don't know what the monitor

17   hopes to do.

18        Q.     Is it -- is your expectation that

19   the monitor hopes to -- let me ask it a

20   different way.

21              Is it your expectation that the

22   monitor expects to have continued repatriation

23   of assets from affiliates in APAC and CALA?

24        A.     I don't know what the monitor

25   expects.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    Okay.  All right.  One of the

3    reports that you did rely on was the one

4    hundred and eighth monitor report, right?

5    That's the most recent one?

6          A.    Yes.

7                MR. PULTMAN:  Do you want the

8          witness to have that in hand?

9                MR. LEBLANC:  I do.  That's

10         Exhibit 3 to this deposition.

11         A.    Okay.

12         Q.    Among the relief requested, if you

13   turn to page 24 at the bottom of this -- did

14   you read this whole report?

15         A.    Word for word, no.

16         Q.    Did you read every section of it?

17         A.    I skimmed through the sections to

18   see if I thought they might be relevant, but I

19   did not read every paragraph.

20         Q.    All right.  One of the -- the relief

21   that is requested by the monitor in the one

22   hundred and eighth report is -- this relates to

23   this 2015 Nortel retention plan.

24                Do you see that?

25         A.    Yes.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    And you can see that -- you can read

3    as much of it as you would like to, but I know

4    you're familiar with this report, but in this

5    section, the monitor is requesting authority

6    for a retention program to keep certain

7    employees to achieve certain milestones, and we

8    will walk through them in a second.

9              Do you understand that to be the

10   case?

11        A.    Yes.

12        Q.    Okay.  And the milestones that the

13   monitor has identified for these individuals to

14   do, identified in that first paragraph, 91, the

15   monitor writes, "While much progress has been

16   made by the applicants, there remain a number

17   of significant milestones that the applicants

18   must achieve to conclude the CCAA proceedings."

19   And it says, "including."

20             All right.  Let's just go through

21   these one by one.  One, "resolution of the

22   remaining aspects of the Allocation Protocol

23   Litigation."

24             Do you see that?

25        A.    Yes.

HIGHLY CONFIDENTIAL                                              246

1                   WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    All right.  And, again, your

3    assumption with respect to the allocation

4    protocol litigation is that the monitor loses

5    it --

6                MR. PULTMAN:  Objection.

7          Q.    -- for the purposes of your report?

8                MR. PULTMAN:  Asked and answered.

9                You can answer it again.

10         A.    Well, my assumption was that the

11   monitor -- that the Canadian estate received

12   the allocation that was specified in the

13   Kinrich report.

14         Q.    All right.  That's fair enough.

15         A.    I'm not going to classify whether

16   that is losing or not.

17         Q.    Fair enough.  You know that they're

18   asking the courts to do something other than

19   what's in the Kinrich report?

20         A.    Yes.

21         Q.    Okay.  Number two, "continued

22   repatriation of cash from affiliates and APAC

23   and CALA."

24                Do you see that?

25         A.    Yes.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    Now, it's your estimate that -- or

3    your analysis that that work that people are

4    sought to be retained for yields no value at

5    all, right?

6          A.    That was my assumption.

7          Q.    And it's your assumption,

8    notwithstanding the fact that you're including

9    the costs of this retention program in your

10   analysis, aren't you?

11         A.    In what part of my analysis?

12         Q.    Well, you use -- you rely entirely

13   on the monitor's estimates of cash as of April

14   of 2015, right?

15         A.    Right.

16         Q.    So if the monitor included the

17   program that he's seeking to implement, then

18   you would have included that in your analysis,

19   right?

20         A.    I'm still not certain of the

21   question.  If it's included in the estimate of

22   the cash balance forecast?

23         Q.    Right.  Let me just try to simplify

24   it.

25              The only thing you did with respect

```
 1                  WERTHEIM - HIGHLY CONFIDENTIAL
 2    to the cash balance forecast of the monitor's
 3    was just look at what the number was at the end
 4    of the day, right?
 5         A.    Correct.
 6         Q.    You didn't do any analysis of that
 7    whatsoever?
 8         A.    To analyze whether I thought that
 9    number was appropriate or not?
10         Q.    Correct.
11         A.    I did not do any detailed analysis
12    on the background of those estimates.
13         Q.    Did you do even any superficial
14    analysis at all?
15         A.    No.  I used that number as my
16    estimate, because that was the forecast that
17    was given.
18         Q.    Do you know what -- do you know why
19    the monitor might spend $8.9 million on
20    non-inventory purposes in the week between
21    April -- I'm sorry, March 29, 2015 and April 4,
22    2015?
23         A.    Do I know why?
24         Q.    Yeah.  Do you know what it's going
25    to buy?
```

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    No.

3        Q.    Do you know why that number would be

4    included in the monitor's estimate?

5              THE VIDEOGRAPHER:  I'm sorry I'm

6        getting a cell phone interference.  Is

7        your cell phone in your pocket?

8              MR. PULTMAN:  I have one in mine.

9        Apologies.

10       Q.    The question was, do you know why

11   the monitor was -- would show a forecast of

12   spending almost $9 million on non-inventory

13   purchases in the beginning of April of 2015?

14       A.    I didn't analyze that.

15       Q.    Did you even look at it?

16       A.    I don't know why he would -- I don't

17   know the answer -- I don't know why he would do

18   that.

19       Q.    If that's included in the monitor's

20   report, you just accepted it at face value?

21       A.    I accepted the cash forecast that

22   was given.

23       Q.    Before I mentioned that number to

24   you, you didn't know it was there, did you, the

25   8.9 million?

**HIGHLY CONFIDENTIAL**                                    250

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          A.     The details, no.

3          Q.     Okay.  I can show it to you if

4     you -- why don't we look at it?  It's page 39,

5     upper right corner of the report you have

6     there, Exhibit 3.

7          A.     Sorry.  Page what?

8          Q.     39.

9          A.     (Perusing.)

10         Q.     Okay.  Do you have that page in

11    front of you?

12         A.     Yes.

13         Q.     Okay.  And you can see there are

14    non-inventory purchases of $9 million,

15    $8.9 million in the last week of this forecast?

16         A.     Correct.

17         Q.     And the number you actually used is

18    just below that one, about six rows down, at

19    329.4 million?

20         A.     Correct.

21         Q.     You hadn't focused on that or seen

22    that number before today, had you?

23         A.     Like I said, I did not analyze the

24    individual line items comprising the forecast.

25         Q.     Okay.  All right.  Let's go back, if

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    we could, to paragraph 91, which is on internal

3    page 24, of the upper corners 33, the continued

4    repatriation of cash.

5               Are you aware of whether the monitor

6    repatriated cash in 2014 from any of its

7    foreign subsidiaries?

8        A.     Not familiar with the details.

9        Q.     Well, are you familiar generally

10   with whether it happened?

11       A.     Generally, I would say yes, but,

12   again, I know no details.

13       Q.     Do you know how much money was

14   repatriated?

15       A.     No.

16       Q.     And, again, you read or skimmed at

17   least this entire report, right?

18       A.     Yes.

19       Q.     You can look with me at paragraph

20   17, which is on page five internal, page 14 in

21   the upper right corner, still in Exhibit 3.

22       A.     Okay.

23       Q.     All right.  And 17a) -- the preamble

24   to 17 says, "Actual net cash flow was favorable

25   to forecast by 21.9 million.  Significant items

HIGHLY CONFIDENTIAL                252

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    contributing to this favorable variance were as
 3    follows: a) a favorable permanent variance of
 4    13.2 million primarily as a result of
 5    recoveries of intercompany receivables from
 6    Nortel Networks (India) Private, Limited, not
 7    previously reflected in the forecast."
 8              Do you see that?
 9       A.    Yes.
10       Q.    Okay.  So this, at least if this is
11    to be believed, there was a $13.2 million
12    repatriation of money from a foreign affiliate
13    that they had not forecast to happen.
14              Is that what your understanding is?
15       A.    Yes.
16       Q.    And it's your assumption that there
17    will be no further repatriations of any dollars
18    from any of the foreign affiliates, correct?
19       A.    Could you repeat that?
20       Q.    Sure.  It is your assumption that
21    there will be no further repatriation of any
22    dollars from any of the foreign affiliates of
23    NNL?
24       A.    After what date?
25       Q.    Well, as of the time of your report
```

1            WERTHEIM - HIGHLY CONFIDENTIAL

2    forward.

3        A.    Well, to the extent that they are

4    reflected in the forecasted cash balance as

5    of -- as of April 15, 2015, to the extent that

6    they are reflected in that forecasted cash

7    balance, they would be included.

8        Q.    Is it true that, given the majority

9    of receivables or intercompany receivables, and

10   have a low, if not zero probability of

11   collection, I have assumed a zero dollar

12   recovery on receivables and other assets?

13       A.    Referring to that receivable, yes.

14       Q.    I'm referring to your report.

15       A.    Yes.

16       Q.    Okay.  So you have assigned a zero

17   dollars to that receivable, to intercompany

18   receivables from foreign affiliates, and you

19   could see from the report that you relied upon

20   in the last six months, there has been a

21   receipt of cash from an affiliate?

22       A.    Yes, but that receipt of cash has

23   been included in the cash balance.  The line

24   item related to additional cash from

25   receivables, the additional receivables, that's

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    what I assumed was zero.
 3         Q.    So what number of -- what amount of
 4    cash do you believe is going to be repatriated
 5    in your assumption?
 6         A.    My -- I'm not trying to make this
 7    complicated or confusing, but I'm basing my
 8    cash estimate, as of April 15, at 329.4, and to
 9    the extent that that cash balance includes any
10    forecasted collection of receivables, then
11    those collections would be included in that
12    cash balance.
13         Q.    Why don't we just figure out if it
14    does?  Page 39 of Exhibit 3?
15         A.    Okay.
16         Q.    Okay.  Forecast for receivables?
17         A.    Okay.
18         Q.    You see receipts, other receivables,
19    and net intercompany receipts?
20         A.    Yes.
21         Q.    You assign zero dollars to that,
22    correct?  I'm sorry, not you.  There is no --
23    there is no estimated receivables, correct?
24         A.    They estimated it at zero.
25         Q.    And the last time they made a
```

1                 WERTHEIM - HIGHLY CONFIDENTIAL

2     forecast, if we're reading paragraph 17

3     correct, the last time they made a forecast

4     they hadn't forecast the 13.2 million that came

5     in from India, right?

6          A.    Correct.

7          Q.    And so that was a pleasant surprise,

8     right?

9          A.    Well, it was a change to their

10    forecast.

11         Q.    Right.  A positive variance, another

12    way to say it, correct?

13         A.    Yes.

14         Q.    And if you estimate, if you start

15    with zero, there's no place to go but up,

16    right?  It's only going to get better than

17    that, right?

18              MR. PULTMAN:  Objection to form.

19         A.    Not necessarily.

20         Q.    It could get worse than zero?

21         A.    No.  You said could it get better.

22    It could stay zero.

23         Q.    All right.  Now, going back to

24    paragraph 91.

25              MR. PULTMAN:  I don't want to

1          WERTHEIM - HIGHLY CONFIDENTIAL

2      interrupt you, but is there a good place

3      for a break?

4              MR. LEBLANC:  Sure.  That's fine.

5              THE VIDEOGRAPHER:  We are now off

6      the record.  The time is 4:12 p.m.,

7      October 22, 2014.

8              (Recess taken.)

9              THE VIDEOGRAPHER:  This is tape six

10      of the deposition of Dr. Paul Wertheim.

11      We are now back on the record.  The time

12      is 4:19 p.m., October 22, 2014.

13  BY MR. LEBLANC:

14      Q.    Dr. Wertheim, we were just -- just

15  to finish up on the retention plan.  If you

16  look two paragraphs forward in Exhibit 3,

17  paragraph 93?

18      A.    Okay.

19      Q.    Do you see, in the second sentence,

20  the monitor -- "The 2015 NRP will provide cash

21  incentive awards to eight employees of the

22  applicants and eight employees of their

23  affiliates in APAC and CALA in which the

24  applicants have an economic interest."

25              Do you see that?

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    I see that, yes.

3        Q.    You understand that the reason for a

4   retention program like this and the milestones

5   that are set is to try to bring money into the

6   NNL estates, right?

7        A.    Among other things, yes.

8        Q.    And -- or, among other things,

9   including the reduction of claims, the

10  completion of the claims process, right?

11       A.    Yes.

12       Q.    And it's your analysis that, at

13  least with respect to the two related to

14  bringing in additional assets, that it will be

15  completely ineffective; is that right?

16            MR. PULTMAN:  Object to the form of

17       the question.

18            You can answer it.

19       A.    By additional assets, can you

20  specify?

21       Q.    Sure.  It's your view that the NRP,

22  the Nortel retention plan, will have no

23  positive impact on repatriation of cash from

24  affiliates in APAC and CALA where some of the

25  participants are located, and no positive

**HIGHLY CONFIDENTIAL**                    258

1                WERTHEIM - HIGHLY CONFIDENTIAL

2    effect on the monetization of residual assets?

3         A.    Well, again, those, to the extent

4    that they would have been included in the cash

5    forecast, would be incorporated into the

6    forecasted cash balance at April 2015, and your

7    point that, in a previous forecast, there was

8    an underestimation, I have no basis to adjust a

9    future forecast and assume that that forecast

10   is also going to be an error.

11               My assumption is to use the

12   forecast, and just because a previous forecast

13   underestimated the cash collection gives me no

14   basis to just assume that a future forecast is

15   going to underestimate the cash balance.

16        Q.    But you understand the monitor is

17   willing to spend money to try to monetize

18   further assets and to repatriate funds from

19   APAC and CALA, right?

20        A.    Yes.

21        Q.    And you know that there is 150 plus

22   million dollars in APAC and CALA, right?  You

23   looked at that with Mr. Rosenthal?

24        A.    Yes.

25        Q.    And your estimate is that zero

1              WERTHEIM - HIGHLY CONFIDENTIAL

2     dollars come in?

3          A.    That was my estimate.

4          Q.    And with respect to the asset sales,

5     is it within your area of expertise to value

6     assets?

7          A.    Certain assets, yes.

8          Q.    Okay.  And --

9          A.    Do you want to be more specific?

10         Q.    Sure.  Do you have the ability to

11    look at comparable sales of IP addresses?

12         A.    That, I have not done.

13         Q.    But do you have the ability to?

14         A.    To look at comparable sales?

15    Possibly, yes.

16         Q.    Right.  To do a Google search to see

17    what IP addresses are selling for?

18         A.    Do I have the ability to do a Google

19    search?  Yes, to do that.

20         Q.    And you just didn't do that, though,

21    for that asset category of IP addresses in this

22    case, right?

23         A.    Correct.

24         Q.    All right.  Two other topics.

25               Mr. Rosenthal had asked you a series

1              WERTHEIM - HIGHLY CONFIDENTIAL

2     of questions about if the parties reach a

3     settlement before June 30 of 2015, and I want

4     to just modify that a little bit.

5              You understand that a payment of

6     principal to the bonds would reduce the

7     continued accrual of interest pursuant to the

8     settlement, right?

9         A.    Yes.

10        Q.    So, for example, if it's undisputed

11    that the bonds are going to get 70 cents on the

12    dollar, that amount could be paid to the bonds

13    today and the amount of accrual of interest

14    would be reduced, correct?

15        A.    The amount of interest that would

16    accrue on those bonds would cease.

17        Q.    Okay.  And if the parties agreed

18    that the bonds, under any circumstance, would

19    get a hundred cents on the dollar, then they

20    could make the payment today of the principal

21    amount and then the amount owing in PPI

22    pursuant to the settlement would stop at

23    whatever the accrued amount was as of the date

24    of the payment, right?

25        A.    For those bonds, yes.

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.     When you say for those bonds, what

3     do you mean by that?

4          A.     For whatever bonds were paid.

5          Q.     Okay.  So if the -- if the -- all

6     the estates agreed and said the bonds should

7     get paid now and that payment was made, then

8     even without a global settlement of anything

9     else, then the interest accrual would stop as

10    of the point of that payment?

11         A.     Correct.

12         Q.     And let's -- just to be a little bit

13    more precise because I know you said you didn't

14    know the math.  Let's try to do the math a

15    little bit.

16                You understand that there's

17    134 million that's to accrue over the one-year

18    period from June 30, 2014 to June 30, 2015,

19    right?

20         A.     Based on the three and a half

21    percent.

22         Q.     Right.  With a cap of 134 million,

23    right?

24         A.     Correct.

25         Q.     And so if we divide that by 12,

1                WERTHEIM - HIGHLY CONFIDENTIAL

2    that's roughly $11 million a month?

3         A.    Roughly, yes.

4         Q.    And so if $11 million a month

5    accrues by the end of October, can you just

6    calculate for us what the amount of the accrual

7    would be?  We can do it together.

8                So you would have July, August and

9    September and October, right?

10        A.    From July of 2014.

11        Q.    July 1, 2014 through November 1 of

12   2014.

13        A.    Yes.

14        Q.    Four months, $44 million, right?

15        A.    Correct.

16        Q.    And so if you add 44 million to

17   876 million, it's 920, roughly?

18        A.    Okay.

19        Q.    Okay?  So under your analysis with

20   the assumptions you have made, if a payment

21   were made to the bonds of their principal

22   amount, then the settlement would result in the

23   bondholders getting less than the 971 million

24   that you have calculated, correct?

25        A.    Well, my assumption was based on the

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    distribution dated June 30, 2015.

3           Q.    Right.  And using June 30, 2015,

4    from the perspective at least of NNL, that's

5    the worst possible date to make the

6    distributions, isn't it?

7                 MR. PULTMAN:  Object to the form.

8                 You can answer.

9           A.    What do you mean by worst?

10          Q.    Well, by November -- by June 30 of

11   2015, you would have had the full accrual

12   that's called for under the settlement, right?

13          A.    They will reach the cap.

14          Q.    Right.  And so you have assumed a

15   distribution date that is the point in time

16   where the cap is the maximum it could ever

17   possibly be, right?

18          A.    Yes.

19          Q.    And if you simply assumed an earlier

20   distribution date, then the cap could be

21   something less than the maximum?

22          A.    The cap is the cap.  The interest

23   accrual would be less.

24          Q.    I'm sorry.  If you assumed an

25   earlier distribution date, then the maximum

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    amount of interest paid would be less than

3    1.01 billion?

4           A.    Right.  But the cap would still be

5    the cap.

6           Q.    When you say the cap would still be

7    the cap --

8           A.    Well, you said the cap would be

9    reduced.

10          Q.    Okay.

11          A.    The cap wouldn't be reduced.  The

12   cap is the cap.  The accrual would be reduced.

13          Q.    Okay.  And if a full payment were

14   made, the accrual would be reduced to zero,

15   right?  So, in other words, if the full

16   principal amount was paid, there would be no

17   further accrual?

18          A.    No further accrual past that date.

19          Q.    All right.  Now, you are aware that

20   the -- there's a dispute in Canada over whether

21   or not interest post-petition could be included

22   or should be included in the bondholders'

23   claims there?

24          A.    Yes.

25          Q.    And your assumption is that it will

**HIGHLY CONFIDENTIAL**                    265

1              WERTHEIM - HIGHLY CONFIDENTIAL
2     not be included; is that right?
3          A.    State that again.
4          Q.    Sure.  Your assumption is that the
5     bondholders' claim in Canada will not include
6     the claim for post-petition interest.
7          A.    I don't understand your implication
8     that I'm making that assumption.
9          Q.    You use, for the bondholder claim in
10    Canada, you use or you begin with an assumption
11    that the bondholder claim is simply the
12    principal amount of the claim, right?
13         A.    Plus -- plus the pre-petition
14    interest.
15         Q.    Plus the pre-petition interest, but
16    you do not include any post-petition interest?
17         A.    Correct.
18         Q.    Right.  And that's one of the items
19    that you excluded from the 10-Q from the second
20    quarter of 2012, right?
21         A.    Correct.
22         Q.    Now, if you made a different
23    assumption as to that element, that would have
24    a material impact on your calculations,
25    wouldn't it?

**HIGHLY CONFIDENTIAL**                                    266

1        WERTHEIM - HIGHLY CONFIDENTIAL

2            MR. PULTMAN:  Object to the form of

3        the question.  Objection, foundation.

4            You can answer.

5        A.    No, that would be unrelated to what

6    the purpose of my calculation was because it's

7    my understanding that the post-petition

8    interest wouldn't be paid at all until there

9    was an excess.

10            So I can't include post-petition

11    interest as a claim to calculate a surplus to

12    then see if there's a surplus to pay the

13    positions.  That makes no sense.

14        Q.    Do you understand what the dispute

15    in Canada is as to post-petition interest?

16        A.    As to whether they're entitled to it

17    or not.

18        Q.    Do you understand that the

19    bondholders have taken an appeal of Justice

20    Newbould's decision as to whether or not

21    post-petition interest is included as part of

22    the claim that the bondholders have in Canada?

23        A.    Yes.

24        Q.    You understand that?

25        A.    I -- could you repeat that?

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    Do you understand that the

3    bondholders have taken an appeal of Justice

4    Newbould's decision that post-petition interest

5    is not included in their claim in Canada?

6         A.    That, I don't know about.

7         Q.    Now, assume with me that the

8    bondholders have taken such an appeal and have

9    asserted the position that the interest doesn't

10   stop accruing in Canada and, therefore, the

11   bondholders' claim should continue to accrue

12   interest even post-petition.

13            Can you assume that with me?

14        A.    Okay.

15        Q.    That would have a material impact on

16   your calculation, wouldn't it?

17        A.    I don't know because I don't know

18   what material would end up being or what the

19   effect of the dollar amount would be.  I

20   haven't done that analysis.

21        Q.    Well, you assume that the

22   bondholders and the US interests, US estate,

23   constitute 65.3 percent of the creditor body in

24   Canada, right?

25        A.    Yes.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    If the --

3         A.    Excuse me.  Repeat that.

4         Q.    Sure.  You conclude that the US

5    and -- I'm sorry, the US interest and the

6    bondholders constitute 65.3 percent of the

7    interest in Canada?

8         A.    No.

9         Q.    No.  Okay.  Your sensitivity

10   analysis reaches a conclusion of $65.3 million

11   for every hundred million dollars of --

12        A.    Right, but the question was --

13        Q.    Just let me finish my question.

14              -- incremental cash in Canada,

15   right?

16        A.    Right, but your question was

17   65 percent to the bondholders.

18        Q.    And the US interest.

19        A.    And part of that 65 percent is

20   related to the $2 million priority -- the two

21   million point sixty-seven claim.

22        Q.    Right.  But, in its simplest terms,

23   the sensitivity suggests that the bonds benefit

24   65 percent of -- for every 65 percent of every

25   dollar of additional assets in Canada, right?

HIGHLY CONFIDENTIAL                        269

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    Well, again, mathematically it

3   doesn't all go to the bonds.  It would go to

4   NNI's cash.

5              I think I know what you're asking,

6   but the bonds don't make up 65 percent of that.

7   The bonds plus the other 2062.7 make up

8   65 percent of that.

9        Q.    Okay.  I think we're on the same

10  page.

11             And if the bonds had, in addition to

12  their principal claim and their post --

13  pre-petition interest claim, had an additional

14  claim for $1.657 billion of interest

15  post-petition as of June 30, 2014, then the

16  bonds, just the bonds, would make up a

17  significantly larger portion of the Canadian

18  claims pool, right?

19       A.    Yes.

20       Q.    And you have assumed that the bonds

21  do not have that claim, right?

22       A.    I have assumed that there is not a

23  claim for post-petition interest in my

24  distribution analysis.

25       Q.    Okay.  And that assumption is less

1              WERTHEIM - HIGHLY CONFIDENTIAL

2       favorable to NNI and to the bonds generally,

3       correct?

4           A.    Correct, but in my report --

5       (perusing) -- paragraph 23, I state that I have

6       been instructed to assume for purposes of this

7       report that the PPI may be payable in the event

8       that there's a surplus.

9                 So, again, for purposes of this

10      report and for purposes of my calculation,

11      assuming, assuming that it can only be paid in

12      the event that there's a surplus, then I can't

13      include it as a claim to calculate the surplus

14      and then use that surplus to see if that claim

15      could be paid.

16          Q.    Okay.  You stopped reading before

17      maybe the important part of that assumption

18      that you were asked to make.  You were

19      instructed to assume for the purposes of this

20      report that PPI, in a Chapter 11 case in the

21      US, may sometimes become payable, and it goes

22      on from there, right?

23          A.    Right.

24          Q.    So you didn't make any assumptions

25      one way or the other and weren't instructed to

HIGHLY CONFIDENTIAL                                    271

1                   WERTHEIM - HIGHLY CONFIDENTIAL

2       assume anything one way or the other about the

3       effect of post-petition interest in Canada,

4       were you?

5            A.    No.

6            Q.    And you don't -- you didn't analyze

7       what might happen if the bondholders are

8       successful in their appeal and interest

9       actually does accrue on a post-petition basis

10      on their claim?

11           A.    No, I've stated that I haven't

12      analyzed it.

13           Q.    But you do agree with me that

14      directionally that would be more favorable for

15      the bonds than the assumptions that you have

16      made in your report, right?

17                 MR. PULTMAN:  Object to the form.

18                 You can answer.

19           A.    I haven't done the analysis to know

20      the impact, the materiality, so I can't say.

21           Q.    You can't say one way or the other,

22      directionally even?

23           A.    Directionally, it should increase

24      NNI's net assets.

25           Q.    Okay.  Last question -- last

```
 1                WERTHEIM - HIGHLY CONFIDENTIAL
 2    questions.
 3                  Were you aware, at the time you
 4    wrote your report, of the allocation by
 5    Mr. Kinrich to NNSA and NN Ireland?
 6         A.    Yes.
 7         Q.    You were aware of that?
 8         A.    The Kinrich's -- based on exhibit --
 9    may I turn to Exhibit 33 of his --
10         Q.    I don't need the numbers.  I just
11    want to know at the time you wrote your report
12    as opposed to now, were you aware of those --
13    those allocations?
14         A.    Can I look at the exhibit?  I'm
15    going to look at the exhibit because --
16         Q.    Sure.
17         A.    -- I'm making -- (Perusing.)
18               MR. PULTMAN:  Exhibit 6.
19         Q.    I think it's actually part of the
20    appendix of Exhibit 6, the last page of the
21    appendix.
22         A.    Oh, the appendix is separate.
23               So could you restate your question?
24         Q.    Sure.  Were you aware, at the time
25    you wrote your report, that Mr. Kinrich had
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2     allocated amounts to NNI and NNSA?

3         A.    Yes.

4         Q.    Did you reach a conclusion that

5     those would not redound to the benefit of NNL

6     at the time you wrote your report?

7              MR. PULTMAN:  Objection.  It has

8         been asked and answered.

9         A.    I answered that in the previous

10    testimony.

11        Q.    Well, can you answer it again?

12             MR. PULTMAN:  You can answer again.

13        Q.    Did you reach that as a conclusion

14    at the time you wrote your report?

15        A.    I knew those allocations existed at

16    the time of my report, but I did not

17    incorporate or do an analysis on any potential

18    upflow to NNI.

19        Q.    Okay.

20        A.    I think that's how I answered it

21    previously.

22        Q.    That's fine.  The question was

23    whether you had analyzed.

24        A.    I just wanted to make sure I --

25        Q.    My question was simply whether you

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2      analyzed, and I think you have answered that.

3                    You didn't analyze that?

4          A.    Yeah, and I said that earlier.  I

5      did not analyze it.

6                    MR. LEBLANC:  I have no further

7          questions.

8      EXAMINATION BY

9      MR. PULTMAN:

10         Q.    I have a question in one area which

11     is to follow up on Mr. Leblanc's questions to

12     you, which related to the issue of -- the tax

13     issue, the US tax issue, and, in particular, he

14     asked you about evidence that you were pointing

15     to and you made references to statements by

16     John Ray.

17                   Do you recall that?

18         A.    Yes.

19                   MR. LEBLANC:  Objection, leading.

20         Q.    What statements were you referring

21     to?

22         A.    I believe I reference John Ray's

23     testimony in relation to the tax liability in

24     footnote 29 of my report, and that was related

25     to his deposition.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    And when you say his deposition, was

3   that in connection with the PPI matter?

4        A.    Yes.

5              MR. PULTMAN:  I have no further

6        questions.

7              MR. ROSENTHAL:  No questions.  Thank

8        you.

9              MR. PULTMAN:  Thank you for your

10       time, Doctor.

11             Off the record.

12             THE VIDEOGRAPHER:  This concludes

13       today's deposition of Dr. Paul Wertheim --

14       Wertheim, excuse me.  We are now off the

15       record.  The time is 4:40 p.m.,

16       October 22, 2014.

17             (Time noted:  4:40 p.m.)

18

19

20

21

22

23

24

25

1          A C K N O W L E D G M E N T

2

3   STATE OF              )

4                         :ss

5   COUNTY OF             )

6

7          I, PAUL WERTHEIM, hereby certify

8   that I have read the transcript of my testimony

9   taken under oath in my deposition of

10  October 22, 2014; that the transcript is a

11  true, complete and correct record of my

12  testimony, and that the answers on the record

13  as given by me are true and correct.

14

15          _____

                    PAUL WERTHEIM

16

17

18  Signed and subscribed to before me

19  this _____ day of _____, 20__.

20

21  _____
    Notary Public, State of New York

22

23

24

25

1            C E R T I F I C A T E

2

3    STATE OF NEW YORK   )

4                        :ss

5    COUNTY OF RICHMOND )

6

7            I, MELISSA GILMORE, a Notary Public

8    within and for the State of New York, do hereby

9    certify:

10            That PAUL WERTHEIM, the witness

11    whose deposition is hereinbefore set forth, was

12    duly sworn by me and that such deposition is a

13    true record of the testimony given by such

14    witness.

15            I further certify that I am not

16    related to any of the parties to this action by

17    blood or marriage; and that I am in no way

18    interested in the outcome of this matter.

19            IN WITNESS WHEREOF, I have hereunto

20    set my hand this 24th day of October, 2014.

21

22    *Melissa Gilmore*

23

24    _____

25    MELISSA GILMORE

1                    *** ERRATA SHEET ***

2         ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
3                New York, New York 10022
                     212-750-6434
4

5    NAME OF CASE: IN RE NORTEL NETWORKS, INC.
     DATE OF DEPOSITION: OCTOBER 22, 2014
6    NAME OF WITNESS: PAUL WERTHEIM

7    PAGE  LINE      FROM          TO         REASON

8    ____|_____|_____|_____|_____

9    ____|_____|_____|_____|_____

10   ____|_____|_____|_____|_____

11   ____|_____|_____|_____|_____

12   ____|_____|_____|_____|_____

13   ____|_____|_____|_____|_____

14   ____|_____|_____|_____|_____

15   ____|_____|_____|_____|_____

16   ____|_____|_____|_____|_____

17   ____|_____|_____|_____|_____

18   ____|_____|_____|_____|_____

19   ____|_____|_____|_____|_____

20

21                      _____

22   Subscribed and sworn before me
     this_____day of_____,20___.
23

24   _____       _____

25   (Notary Public)          My Commission Expires:

## $

**$1.01 (8)**
50:13;52:13;131:3,
13;188:8;189:17;
193:25;194:9
**$1.1 (2)**
51:9;52:6
**$1.193 (1)**
93:4
**$1.3 (4)**
144:22;147:7;
173:2;174:20
**$1.304 (6)**
170:10,21;171:2,
11,15,21
**$1.548 (1)**
94:14
**$1.6 (3)**
186:20;187:20;
190:3
**$1.657 (3)**
196:20;197:6;
269:14
**$100 (7)**
45:2,4;84:9;
103:19;238:17;
239:9,25
**$11 (2)**
262:2,4
**$11.25 (1)**
123:23
**$120 (2)**
127:4;233:8
**$126 (1)**
92:22
**$127 (1)**
110:17
**$13 (4)**
122:16,23;123:6,
12
**$13.2 (1)**
252:11
**$133 (2)**
142:25;144:2
**$156 (2)**
222:11;223:17
**$158 (3)**
148:3,21;149:11
**$160 (3)**
139:18;140:16;
141:16
**$167 (1)**
81:20
**$180 (2)**
126:25;130:25
**$186 (1)**
92:10
**$191 (1)**
124:7
**$193 (1)**
227:25

**$2 (9)**
64:6;71:9,17;
76:12,18,19,21;
104:5;268:20
**$2.235 (1)**
73:15
**$2.8 (3)**
98:12,15,22
**$200 (1)**
227:22
**$240 (3)**
139:14;140:5;
141:14
**$241 (1)**
133:3
**$245 (1)**
132:14
**$3.235 (2)**
80:11;82:24
**$300 (2)**
99:5;191:3
**$326 (2)**
231:8,22
**$329.4 (1)**
104:20
**$35 (3)**
149:23;150:4,11
**$36 (1)**
99:18
**$37 (3)**
84:12;85:3,9
**$400 (1)**
227:11
**$437.6 (1)**
219:20
**$44 (1)**
262:14
**$45.8 (1)**
202:25
**$5 (3)**
58:7;20;129:22
**$54.6 (1)**
59:24
**$56 (5)**
163:5,7,14;164:8,
10
**$593 (8)**
157:15;158:24;
159:14;163:11,21;
223:6;226:3,20
**$62 (1)**
70:3
**$62.7 (1)**
70:20
**$620.9 (1)**
153:22
**$65.3 (1)**
268:10
**$670 (2)**
89:20;90:12
**$75 (2)**
102:11,22
**$8.9 (2)**

**248:19;250:15**
**$86 (2)**
143:5;144:3
**$876 (2)**
189:11;190:2
**$890 (1)**
198:24
**$9 (2)**
249:12;250:14
**$900 (1)**
194:19
**$92 (3)**
155:13;161:13;
165:22
**$971 (2)**
43:16;146:20

## A

**ABID (2)**
3:18;10:7
**ability (6)**
122:20;138:6;
210:17;259:10,13,18
**able (11)**
16:8;66:8,24;
100:6;139:16;
143:25;175:3;
180:23,25;210:9;
230:14
**above (1)**
147:6
**absence (3)**
190:12;191:4;
192:24
**absolute (2)**
51:24;189:22
**accept (10)**
93:18,25;124:12;
127:8;130:21;
132:20,25;140:7;
151:23;236:22
**acceptable (4)**
12:6,17,24;69:14
**accepted (16)**
83:24;84:3;93:24;
94:6;98:16,17,19,21;
99:3,13;100:22;
101:12;129:20;
150:19;249:20,21
**access (1)**
166:6
**accordance (1)**
86:18
**According (4)**
89:23;94:16;
187:21;219:2
**account (11)**
102:15;103:2;
104:8;114:18;
116:15;117:13;
131:9;133:19;
153:19;226:6;231:11

**accounted (3)**
117:14;137:19;
150:22
**accounting (5)**
58:19;86:19,20;
90:22;224:2
**accounts (3)**
81:21;92:2;95:21
**accrual (25)**
31:8,12,16,23;
187:10;188:14;
189:4,19;194:14;
195:9;197:19,22,25;
198:3;200:6;260:7,
13;261:9;262:6;
263:11,23;264:12,14,
17,18
**accrue (5)**
190:18;260:16;
261:17;267:11;271:9
**accrued (18)**
29:15;31:18;75:19;
186:14,20;187:3,7,
19;188:23;189:3;
190:11;192:16,19,20,
25;193:6;195:3;
260:23
**accrues (1)**
262:5
**accruing (3)**
189:11;191:3;
267:10
**accurate (3)**
32:8;73:10;199:7
**accurately (1)**
110:10
**achieve (3)**
241:8;245:7,18
**acknowledge (1)**
209:19
**actual (5)**
101:12;110:11;
124:14;177:19;
251:24
**actually (18)**
31:12;35:23;61:2;
77:4;85:18;102:4;
110:17;130:24;
136:11,15;176:25;
183:16;185:19;
214:20;230:19;
250:17;271:9;272:19
**ad (1)**
10:5
**add (10)**
28:23;81:2;83:24;
84:2;145:4,5;148:5;
181:8;214:10;262:16
**added (14)**
57:7;59:9;69:25;
71:4,22;79:14;80:24;
85:7;147:4;181:12;
222:22;223:10,12;

**233:4**
**addiction (1)**
239:16
**adding (1)**
141:19
**addition (8)**
18:18;56:14,23;
114:16;212:21;
233:9;239:10;269:11
**additional (26)**
32:24;33:12;45:2;
80:24;114:17;115:8;
123:14;127:12,19,23,
23;130:25;136:14;
161:9;189:12,16;
207:6;215:22;
216:15;238:20;
253:24,25;257:14,19;
268:25;269:13
**address (6)**
123:24;125:16;
168:23;233:24;
238:10,18
**addresses (39)**
118:19,21,24;
119:5,8,18,23;120:3;
122:17,21,22;123:5,
9,11,23,25;124:2,6,
16;125:15;126:3,5,
25;130:24;144:11,
18;147:5;169:2;
232:22;233:14,19;
236:19;237:10,15;
240:5,19;259:11,17,
21
**adds (1)**
175:15
**adjust (1)**
258:8
**adjusted (1)**
144:17
**admissibility (1)**
22:6
**admitted (1)**
24:9
**adopted (1)**
242:9
**advantage (1)**
208:4
**advice (1)**
97:18
**affect (5)**
36:4;100:3;145:24;
225:12;239:21
**affected (7)**
53:10,18;64:18,23;
65:3,4,18
**affects (4)**
64:11,12,15,22
**affiliate (2)**
252:12;253:21
**affiliates (8)**
241:18;243:23;

Case 09-10138-MFW    Doc 14654-5    Filed 10/30/14    Page 282 of 306
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

246:22;252:18,22;
253:18;256:23;
257:24
**afternoon (1)**
196:5
**afterwards (1)**
80:16
**again (81)**
11:10,21;25:8,17;
36:22;39:15;46:11,
24;47:2;63:10;66:18;
67:12;76:4;83:4,16;
84:14;86:13;88:4;
89:17;91:9;92:6;
96:12;97:20;101:2;
107:23;109:13,22;
110:4;117:3;124:20;
126:22;127:8;131:6;
134:5;135:3,9;136:4,
22;144:6;145:25;
149:2;157:8;160:13;
162:2;164:22;
165:25;171:10;
174:12,25;179:10;
181:11;183:6;
198:25;200:17;
203:9;207:3;211:9,
13;215:13,20;
216:18;219:7;
225:24;226:11,14;
228:4;229:19;
234:10;239:8;
240:22;243:16;
246:2,9;251:12,16;
258:3;265:3;269:2;
270:9;273:11,12
**against (42)**
57:2;64:6;65:19,
24;66:5;74:10,19;
76:9,9,12,13;78:6,9;
80:11;82:15;85:8;
86:4;94:19;98:10,14;
99:12,17;100:7,8;
101:12;102:24;
150:11;151:2;
157:14,18;158:13;
159:6,14;161:7,9;
163:13,24;201:16;
204:23,23,24;243:8
**ago (8)**
22:9;9;81:15;
153:18;171:9;177:2;
181:12;222:17
**agree (21)**
30:8;42:3,6;43:13;
44:15;45:3;50:17;
61:24;63:19;68:13;
72:16;124:6;127:2;
138:13;143:2;
159:10;188:18;
192:13;204:17;
217:4;271:13
**agreed (4)**

171:21;198:7;
260:17;261:6
**agreement (8)**
31:6;41:8;45:14;
48:17;107:5;146:19;
201:20;236:9
ahanrahan@willkiecom (1)
3:10
**ahead (1)**
162:16
**AKIN (2)**
3:13;10:9
**allegations (1)**
23:3
**Allen (3)**
10:18;15:6,11
**allocated (2)**
132:14;273:2
**allocation (39)**
35:18,20,25;56:24;
57:10,23;70:2,7;
130:6;132:2,13,21;
133:2;139:15;140:6;
142:18;150:19;
170:15;174:14,15;
181:15;183:18;
194:5,11;211:18,22;
213:10,18;214:13,16,
22,23;237:24;
241:24;242:8;
245:22;246:3,12;
272:4
**allocations (5)**
36:7;38:12;150:14;
272:13;273:15
**allow (1)**
99:25
**allowance (1)**
85:14
**allowed (14)**
54:15,16,19;85:18,
22;86:5,7;88:17,21;
94:15;96:8;98:11,14,
18
**allowing (1)**
140:2
**allows (1)**
226:25
**almost (3)**
84:22;206:5;
249:12
**alone (2)**
227:21,24
**along (3)**
10:7;217:19;
230:14
**Alteon (22)**
155:2;156:20,21,
23;157:18;158:21;
159:6,12;160:2,8,15,
19;161:8,9,13;163:4;
164:8;165:12;
166:10;167:16,22;

182:21
**Alteon's (8)**
158:23;159:4;
160:25;161:4,6;
163:23;164:16;
165:15
**alteration (1)**
212:8
**alters (1)**
168:8
**although (4)**
34:19;75:2;158:5,9
**altogether (1)**
161:2
**always (1)**
142:7
**amended (1)**
221:15
**Among (3)**
244:12;257:7,8
**amount (111)**
21:3;30:25;42:8;
44:19;46:8,15,20;
47:10;48:3;49:2,4,6;
51:14,17;62:2,8;
63:21;64:7,9;65:11;
66:9,25;79:13;84:14,
22;87:2;88:6,17,21;
89:22;92:8,18,25;
93:7;94:10;95:12;
98:11;99:25;104:2;
107:14;108:15;
114:2,4,8;123:20;
124:21,25;126:8;
129:23;138:22;
146:17,24;159:20,22;
173:13,14,16;177:15,
17;179:12;188:14,15,
20;190:17;191:19,
24;192:14,19;193:11,
19,21;194:20,21;
195:3;198:4;200:6;
202:19,22;203:4;
204:18;207:22;
208:12;212:23;
213:9;214:2;220:25;
221:5;222:17;
223:12,13;226:7,15;
227:13;228:7;232:2;
239:18;240:16,24;
254:3;260:12,13,15,
21,21,23;262:6,22;
264:2,16;265:12;
267:19
**amounts (24)**
66:11;80:19;81:24;
83:25;86:15,22,23;
87:3,7;88:4;89:14;
113:4;115:10;206:6,
6;207:17;209:22;
217:13;218:22,24;
219:4,6,9;273:2
**analysis (92)**

32:14,16;37:19;
41:5;44:22,25;45:7,8,
13;54:9;56:14;60:6;
61:14;67:7;69:16;
73:7,14;77:17;84:9,
17;86:13;96:18;97:3,
24;103:15;112:18,
21;114:12,19;121:8;
127:3;130:17;132:2;
133:5,17,23;134:10;
136:2;137:6,13,18;
140:15;141:11;
143:3;146:15;
151:24;160:24;
161:11;172:23;
173:18,20;176:15,19;
177:3,7,8,14,18;
178:2;183:14;200:9;
203:14;206:5;
209:13,18;210:23;
215:2,14;216:23;
218:5;225:15,17;
229:16;231:21;
232:5,14;233:25;
242:8;247:3,10,11,
18;248:6,11,14;
257:12;262:19;
267:20;268:10;
269:24;271:19;
273:17
**analyze (8)**
41:6;213:25;248:8;
249:14;250:23;
271:6;274:3,5
**analyzed (3)**
271:12;273:23;
274:2
**ANDREW (4)**
3:7;10:2,15;196:7
**Andy (1)**
184:23
**ANNE (1)**
3:20
**Annie (1)**
10:8
**answered (40)**
25:7,15;39:14;
67:11;92:5;96:11;
107:22;110:3;
122:25;123:17;
125:7,8,20;126:16,
21;130:20;131:5;
134:4;135:4,7;
136:21;142:4;
161:10,19;162:11;
165:24;174:11;
225:22;226:10;
234:9;238:12;240:4,
12,13,21;246:8;
273:8,9,20;274:2
**Anticipated (2)**
231:4,12
**APAC (8)**

107:4;241:18;
243:23;246:22;
256:23;257:24;
258:19,22
**Apologies (2)**
20:15;249:9
**appeal (4)**
266:19;267:3,8;
271:8
**appear (1)**
231:24
**appeared (1)**
185:21
**appears (3)**
120:24;121:2;
173:6
**Appendix (24)**
13:20;19:10;33:17,
19;34:6;35:10;79:23;
80:2;81:5,17;82:13,
22;89:10,11;94:16;
95:15;98:10;100:14,
16;169:5;242:20;
272:20,21,22
**applicable (1)**
84:5
**applicants (5)**
119:22;245:16,17;
256:22,24
**applies (1)**
208:23
**apply (6)**
59:23;84:4;203:12;
206:14;210:22;211:6
**approach (2)**
37:23;171:16
**appropriate (2)**
166:14;248:9
**appropriately (1)**
100:8
**approval (1)**
236:9
**approximately (3)**
43:16;143:5;
146:20
**April (9)**
20:10;178:15;
247:13;248:21,21;
249:13;253:5;254:8;
258:6
aqureshi@akingumpcom (1)
3:23
**arbitration (1)**
21:11
**area (4)**
130:12,15;259:5;
274:10
**argued (2)**
201:14,19
**arguing (3)**
128:24,25;162:24
**argument (2)**
191:21;206:9

Case 09-10138-MFW    Doc 14654-5    Filed 10/30/14    Page 283 of 306
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

**argumentative (1)**
125:19
**around (3)**
25:22;196:12;
229:3
**arrive (1)**
207:14
**ASC (1)**
218:22
**ascertain (1)**
137:14
**Asia (4)**
106:9;147:13,19;
148:2
**Asian (6)**
106:20;107:9,15,
20;108:3,17
**Asia-Pac (1)**
149:11
**aside (5)**
14:2;36:22;138:10;
144:20;191:17
**aspects (2)**
27:6;245:22
**assert (1)**
157:23
**asserted (8)**
157:18;158:12;
204:23;222:19;
233:13;234:6;
237:15;267:9
**asset (19)**
65:8;105:2,9;
112:3,5,8;114:5,9;
115:11,18;116:3,17;
117:2;118:11;
153:18;230:21;
236:9;259:4,21
**assets (58)**
37:20;41:13,19,25;
42:8;43:15,23;44:3;
45:2,17,20;46:7,13;
47:10;48:9;49:5;
65:3,10,15;75:14;
84:11;88:14;103:4,
18,24;105:4;112:13,
16,22;113:18;115:6,
18;117:13;127:17;
133:18;142:25;
146:17;152:12;
162:17;164:24;
181:20;213:23;
233:4,17;234:6;
241:3,9;243:15,23;
253:12;257:14,19;
258:2,18;259:6,7;
268:25;271:24
**assign (2)**
129:12;254:21
**assigned (2)**
105:8;253:16
**assigning (1)**
129:10

**assignment (1)**
32:9
**assist (1)**
18:6
**assistance (1)**
25:19
**associated (3)**
140:11;239:13,14
**Association (1)**
10:14
**assume (79)**
12:23;18:10;26:16;
35:19,23;36:7;37:4;
38:5,6,9;41:22;43:3;
46:15;50:12;52:12;
56:12;58:20;78:20;
85:25;86:7;92:24;
98:8;108:16,18;
113:18;116:8,9,11;
123:13,19,25;124:3,
11;126:24;128:9;
131:14;134:17;
139:13;140:4,9;
144:8,10,12;150:18;
152:2;163:4,6,10;
171:7;173:21;176:4,
21,22;177:10,11,13,
22;179:17;190:6;
202:7,16,20,22;
207:21;214:5;
218:16;219:9;229:8;
242:4,7,24;258:9,14;
267:7,13,21;270:6,
19;271:2
**assumed (32)**
36:2,24;37:24;
41:10;43:7;46:19;
58:7;74:4;91:19;
94:25;105:3;108:16;
109:17,18;125:3,9,
10;129:15;130:2;
142:24;188:22;
200:5;214:23;
231:15;232:5;
253:11;254:2;
263:14,19,24;269:20,
22
**assumes (2)**
52:5;193:18
**assuming (25)**
43:14;67:18;75:23;
85:13;106:17;
107:19;117:3;
124:13;127:10;
135:10;136:4;
177:24;180:18;
192:10,12;193:20;
194:3,15;198:25;
207:20;211:12;
239:4;240:16;
270:11,11
**assumption (95)**
34:17,19,22,24;

35:5,18;36:6,23;
37:21;38:10,12;
46:14;47:15,15,18;
53:16;63:15;74:16,
17,23;75:10,16,20,
24;76:4,25;77:5,11;
85:20,22,24;86:4,6;
90:12,20,21;92:2;
94:2,3,7,8;105:13,15,
18;106:17;108:5,11,
23;109:2,5,9,11,21,
24,25;128:7,13;
129:23;136:14;
140:7;143:24;151:7,
15;153:12;172:17,
25;173:10;176:9;
177:10;179:9,13;
194:10;200:3;
202:10;214:22;
241:24;242:4,13,15;
246:3,10;247:6,7;
252:16,20;254:5;
258:11;262:25;
264:25;265:4,8,10,
23;269:25;270:17
**assumptions (108)**
33:23;34:3,5,9,15;
35:2,7,12,14;36:9;
37:13,18;38:14;
42:10,12,15,20,22;
43:5,7,9;44:4,6;
46:25;47:4;53:10;
66:19;67:13,15,23;
68:9,11,15,18,20;
91:12;93:12,19;
103:10,13;114:14;
115:7,20;116:4,12,
14;117:7;128:21;
129:8,19,20;130:21;
131:12;135:17,18;
136:13;137:3;
138:12;140:21,23;
141:9,20,20;142:8;
143:4,11,15,16,17,
19;145:6,9;146:2,3,
23;147:5;152:2;
160:2;171:17,19,24;
172:3,5,6,11,13,15;
174:19;175:2,3;
178:24;179:7,21,22;
180:4,9,14,20,24;
181:13,16,21;182:2;
183:3;203:24;
262:20;270:24;
271:15
**Attorneys (2)**
3:4,14
**attributable (2)**
199:24;200:4
**attributed (1)**
124:16
**audibly (2)**
12:4;104:17

**August (7)**
25:23,23;26:9,15;
79:9;231:20;262:8
**author (1)**
24:7
**authority (1)**
245:5
**availability (1)**
191:18
**available (52)**
41:5,20,22;42:8;
46:21;48:9;49:5;
54:23,25;63:22,25;
64:5,8,15,16;69:20,
25;74:25;77:18;
84:17;88:15;91:4;
106:10;108:21;
112:25;116:19,25;
117:8;131:2;134:12;
146:5,13,17;151:25;
157:6;162:18;166:9;
181:20;191:22;
199:16;204:6,13,19;
215:7,10,24;216:20;
218:10;226:16;
227:25;228:7;239:5
**Avenue (1)**
3:5
**average (2)**
58:15;177:19
**avoid (1)**
100:18
**avoided (1)**
43:10
**avoiding (2)**
49:21;50:9
**awards (1)**
256:21
**aware (73)**
16:2;18:23;22:21;
25:10;26:6,10;73:13;
87:17,22;93:2,5;
95:19;96:5,14,20;
101:15;111:2,5,13,
22;112:12;118:12;
123:8;132:19,23;
133:2,4;142:11,17,
21;147:12,19;
148:16;149:6,10,12;
150:10,16,20;151:4;
157:17,21;158:11;
169:2,25;170:14,15,
18,23;171:3,8;
178:18;179:4;
194:17;200:10,13,18,
21;201:3,23,24;
202:5;205:10;227:3;
238:8;240:5,25;
251:5;264:19;272:3,
7,12,24
**awareness (1)**
168:22
**away (1)**

73:21

**B**

**back (32)**
31:25;34:20;42:23;
51:20;59:6;69:5;
73:6;80:7;82:10;
89:16;98:9;110:9;
115:23;118:8;
148:13,19;150:25;
157:13;165:19;
167:8;170:2;179:18;
181:11;185:7;
195:25;202:23;
206:25;219:22;
223:6;250:25;
255:23;256:11
**background (1)**
248:12
**backwards (2)**
14:24;180:2
**balance (43)**
56:25;58:5,6,12,
24;70:2,13;91:23;
104:20;107:5;
108:13,21;109:7,13;
110:7;111:8,9,21;
113:16,19;120:19;
147:23;148:2,20;
153:16,21;154:13;
175:12,18,22;180:4;
218:2;231:14,19;
247:22;248:2;253:4,
7,23;254:9,12;258:6,
15
**balanced (1)**
179:11
**balances (6)**
105:21;106:10;
109:11;111:16;
121:23,25
**balancing (1)**
180:7
**bankruptcy (3)**
78:14;152:11;
224:7
**bar (1)**
205:9
**base (1)**
191:11
**based (40)**
35:21;36:7;41:4;
42:23;60:19;78:13;
82:7;90:22;103:10;
106:9,11,14;114:8,
14,23;117:6,19;
126:23;127:2,9;
145:25;146:14,22;
168:10;176:19;
177:21;190:25;
194:14;197:3;203:9;
211:17,21;214:5,6;

Case 09-10138-MFW    Doc 14654-5    Filed 10/30/14    Page 284 of 306
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

223:13;229:14;
242:18;261:20;
262:25;272:8
**basic (1)**
45:15
**basically (2)**
178:9;242:10
**basing (1)**
254:7
**basis (51)**
16:19;17:7;48:14,
19,21;49:11,16;56:3;
74:15,22;78:6,10;
91:25;92:9,19;93:23;
94:4;95:17;105:17;
106:16,18;107:18;
108:10,22,25;113:11;
123:19;124:13,20,24;
126:7;128:14;
133:25;134:9,15;
135:10;151:9;
152:23;166:2;174:7;
193:11;211:12;
218:21;219:12;
223:20,21;240:15,23;
258:8,14;271:9
**Bassett (1)**
10:4
**Bates (7)**
120:13,16;148:15;
154:10;186:4;
229:25;230:13
**bear (1)**
201:21
**bears (3)**
94:22;95:18;
120:16
**become (1)**
270:21
**becomes (1)**
17:6
**began (1)**
209:12
**begin (4)**
91:16;120:7;
193:19;265:10
**beginning (3)**
68:17;183:22;
249:13
**begins (1)**
231:22
**behalf (7)**
10:10,13,16,19;
18:11;27:10;29:25
**behind (1)**
199:13
**believing (1)**
106:18
**belonging (1)**
45:3
**below (3)**
185:17;226:19;
250:18

**benefit (6)**
36:23;223:24;
230:7,8;268:23;
273:5
**benefits (4)**
102:13;137:19,24;
138:3
**Berenblut (1)**
27:7,21,24;28:10
**Berkow-Badtke (1)**
10:22
**Besides (6)**
15:11;39:4;40:13;
99:4,12;122:3
**best (23)**
38:4;41:11,15,24;
42:9;43:4,8,14;
77:25;91:3,9;103:7,
12;109:20;112:21;
113:7;114:2;123:13;
124:17;132:9;
133:17;153:11;
158:21
**better (3)**
87:11;255:16,21
**beyond (1)**
121:19
**BHG160742 (1)**
73:4
**BHG-PPI-71 (2)**
184:21;185:14
**bigger (1)**
27:5
**bill (1)**
29:12
**billed (1)**
29:10
**billion (91)**
31:8,9,12,24;
44:19;50:13,24;51:2,
9,17;52:6,13;64:6;
71:9,14,17;73:15;
76:12,19,21;80:11;
81:3;82:24;83:10,15;
88:11,22,23;93:4;
94:14;98:12,15,22,
24;99:8,18;104:5;
114:22;115:15;
128:4,6;131:3,13;
144:22;147:7;151:2;
170:10,21;171:2,11,
15,21;173:2;174:20;
183:24;186:20;
187:20;188:8;
189:17,20;190:3,8;
191:8,9;192:2,5,5,10,
15,18;193:4,7,25;
194:9,22;195:11;
196:20;197:6,9;
198:9,16,16;207:20;
212:9;213:3;234:19,
20;242:14,23;264:3;
269:14

**bills (1)**
28:13
**binary (1)**
180:19
**bit (8)**
53:17,17;120:25;
196:12;221:12;
260:4;261:12,15
**black (1)**
66:22
**blanket (1)**
35:15
**blends (1)**
190:22
**Block (5)**
209:16;211:8,23;
212:4;214:10
**body (1)**
267:23
**bold (1)**
146:16
**bond (3)**
71:22;224:10,13
**bondholder (4)**
184:7;185:2;265:9,
11
**bondholder-produced (1)**
72:2
**bondholders (29)**
10:6;31:7,10,11,
16;41:7;48:16,24;
49:15;65:24;66:4;
146:18;196:8;
200:14,19;201:15;
202:8,15;204:24;
228:7;262:23;
266:19,22;267:3,8,
22;268:6,17;271:7
**bondholders' (4)**
66:5;264:22;265:5;
267:11
**bonds (36)**
31:23;88:11;99:9;
104:7;130:7;178:25;
184:9,10;186:14;
190:18;191:2;
194:15;205:14;
206:2,16;215:10;
260:6,11,12,16,18,
25;261:2,4,6;262:21;
268:23;269:3,6,7,11,
16,16,20;270:2;
271:15
**bore (1)**
96:7
**both (12)**
39:17;63:24;64:16,
17,23;65:3;69:14;
104:8;105:8;150:7;
229:18,19
**bothers (1)**
48:19
**BOTTER (2)**

3:19;10:8
**bottom (15)**
30:5;79:8;99:16;
106:25;138:25;
145:24;148:15;
154:11;205:24;
230:13;237:20;
238:21;239:21,25;
244:13
**box (1)**
66:22
**Bradley (1)**
10:22
**break (14)**
12:12,13;56:21;
64:19,25;65:7;
111:12;125:21,22,25;
155:22,25;167:13;
256:3
**breaking (1)**
117:25
**Brent (2)**
169:13;184:25
**briefly (7)**
11:21;20:25;
105:24;153:15;
201:10,12;229:19
**bring (2)**
148:13;257:5
**bringing (1)**
257:14
**brings (2)**
31:22;220:10
**Britven (25)**
40:19;169:8,8;
170:8,23;171:20;
173:2;175:21;176:7;
178:23;179:8,22;
180:10,14,24;182:24,
25;216:9;227:3;
228:10,25;229:4,8,
24;232:13
**Britven's (9)**
169:16,19;171:14;
174:19;176:13;
177:5;181:23;
228:18;231:21
**brought (1)**
34:22
**Bryant (1)**
3:16
**bullet (2)**
142:8;143:18
**bullets (6)**
116:10;128:22;
129:8,13;142:2;
143:4
**burden (1)**
17:6
**burn (33)**
34:16,17,23;53:16,
16;58:8,15,17,21;
129:22,24;130:2;

154:19;176:5,10,11,
20,21,22;177:9,12,
13,17,20,24;178:10;
179:2;229:9;231:12,
15,22;232:5,14
**business (1)**
112:9
**buy (1)**
248:25

## C

**CALA (9)**
147:13,19;241:19;
243:23;246:23;
256:23;257:24;
258:19,22
**calculate (14)**
37:20;41:21;48:8;
99:25;103:8;114:11;
133:24;134:13;
177:19;181:19;
214:2;262:6;266:11;
270:13
**calculated (12)**
41:18;62:11,16,20,
25;70:8,14;80:10;
107:14,16;229:2;
262:24
**calculating (2)**
42:7;231:23
**calculation (58)**
31:19;37:17,24;
52:15;54:12,21;55:6,
14,25;56:4,6,19;57:5,
7,11;58:12,23;59:7;
60:7;61:14;63:14,21;
69:19;70:24;71:9,11,
20;72:5;94:3;99:23;
103:5;111:18;
113:13;124:17;
127:14,21;130:14;
140:14;153:16;
159:19,21;171:14,22;
174:20;176:7;
186:13,23;190:10,16;
195:5,15;200:5;
202:9;218:4;233:3;
266:6;267:16;270:10
**calculations (15)**
33:11;34:18;36:5;
52:21;63:6;77:15;
93:16;134:10;144:4;
145:3;146:22;
148:22;149:7;170:9;
265:24
**calculator (3)**
55:22;56:11;124:8
**call (9)**
18:24;19:4;54:8;
96:15,21;103:12;
109:14,14;112:9
**called (7)**

Case 09-10138-MFW    Doc 14654-5    Filed 10/30/14    Page 285 of 306
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

10:25;21:19;23:6;
62:10;142:12;170:6;
263:12
**calls (2)**
16:14;91:22
**came (9)**
61:16;70:16,21;
85:5,9;115:10;
129:22;220:7;255:4
**Can (148)**
11:16,25;13:22;
15:8,16,17;16:24,25;
19:21;20:22;23:14;
24:17;25:8,16;28:19;
29:3,14;33:5;38:8,19,
20;39:15,18;42:19;
44:9;48:6;50:3;
51:13;55:10,18;56:9,
12;57:21;60:20;68:8;
74:13;75:22;76:16;
77:8,10;78:19;80:9,
16;90:18;91:8;92:6,
16;96:12;97:5,7;
98:4;100:11;102:19;
106:23;107:23;
110:4,20;112:20;
113:10,23;116:23;
118:13,16;120:5;
123:2,18;124:7,10;
127:25;128:13;
131:6;134:5;135:3;
136:22;138:2;
139:22;140:7;141:7,
18;143:9;144:24;
146:10;148:14;
151:22;152:22;
154:8;155:18;156:3,
6;158:3,16;159:5;
160:13;163:6,8,15,
25;164:21;165:25;
166:13;169:13;
174:12,24;178:6;
182:4;193:17;
194:18,23;197:16;
209:4;211:3;217:15,
19;221:24;224:16;
225:5,23;226:11,23;
228:14,20;232:16,18;
233:21;234:10;
236:2,19,22;238:13;
240:22;245:2,2;
246:9;250:3,13;
251:19;257:18,19;
262:5,7;263:8;266:4;
267:13;270:11;
271:18;272:14;
273:11,12
**Canada (17)**
96:16,19;97:3,25;
153:2;264:20;265:5,
10;266:15,22;267:5,
10,24;268:7,14,25;
271:3

**Canadian (54)**
10:19;20:14,16;
26:3,8;28:14;29:11,
25;36:2,7,11;38:16;
39:6,11,24;40:15;
63:17,20;74:25;75:7;
76:7;77:3,16,17,20,
20;80:12;82:15;
83:25;96:25;97:23;
98:5,23;99:5,11,18;
101:6;118:25;124:2,
5;150:8,13;151:3,19;
152:17;153:11;
170:19,24;171:9;
230:21;236:8;
242:14;246:11;
269:17
**cap (15)**
189:20;261:22;
263:13,16,20,22,22;
264:4,5,6,7,8,11,12,
12
**capacity (1)**
210:16
**carryforwards (1)**
215:3
**carrying (2)**
213:24;239:13
**case (58)**
13:25;19:19;20:11,
12,14,16,19,23;
21:10,11,19,22;22:2,
5,12,22;23:3,10;24:7,
23;25:12;27:4,6,7;
34:23;36:20;41:11,
24;42:9;43:4,8;
57:23;77:25;91:4,9,
19;97:16;103:7,12;
109:11,14,15,25;
112:21;113:7;114:2;
123:13;124:17;
132:9;133:17;
153:12;158:5,21;
196:8;201:19;
245:10;259:22;
270:20
**cases (7)**
41:16;44:17;
128:10,17;143:21;
144:15;201:14
**cash (209)**
34:15,17,23;41:19,
21;43:17;44:18;45:4,
22;46:21;48:2;50:13;
51:10;52:6,14;53:16,
16;54:13,22,25;55:6,
14;56:22,25;58:5,6,8,
12,14,15,17,21,24;
63:21,25;64:5,8,11,
16,16;65:11,14;66:9,
25;67:20;69:20,25;
70:2,13,18;77:18;
84:14,18;91:4;

103:20,24;104:10,20;
105:20,21;106:10;
107:5,12,15,19;
108:6,8,11,13,14,21;
109:6;110:7;111:8,9,
15,21;113:16,19;
114:18;115:14;
116:19,24,25;117:8;
120:10,12,18,21;
121:23,24,25;127:3;
128:11;129:22,24;
131:2;135:15;136:2,
19;137:5;138:15;
139:5,6,14,19;
140:16;141:15;
143:6,22;144:16,21;
146:5,12;147:22,22,
25;148:20;149:11,
15;151:25;153:16,
21;154:2,5,11,12,19;
156:25;158:23;
160:8,10,16,25;
161:13,17;162:3,6,
18;163:5,7;165:16,
21;170:11;171:2,16;
175:12,17,22;176:5,
9,11,20,21,22;177:9,
12,13,16,19,24;
178:10;179:2;
183:15,15,17;191:17;
193:21;199:15;
204:6,13,18;215:24;
216:19;226:16;
216:19;229:9;
230:25;231:19,22;
232:5,14;241:18;
246:22;247:13,22;
248:2;249:21;251:4,
6,24;253:4,6,21,22,
23,24;254:4,8,9,12;
256:20;257:23;
258:4,6,13,15;
268:14;269:4
**category (6)**
62:10;72:17,17;
216:18;242:14;
259:21
**cause (2)**
61:3;204:5
**caused (2)**
182:6;191:15
**caution (3)**
37:8,11;121:11
**CCAA (1)**
245:18
**cease (1)**
260:16
**cell (2)**
249:6,7
**cents (5)**
51:25;92:3,11;
260:11,19
**certain (26)**

15:21;34:15;35:4,
5;41:10,23;43:3;
46:15;55:19;66:19;
68:18,19;102:13;
107:6;115:11;
147:20;162:19;
172:6,13;233:5;
236:18;241:7;245:6,
7;247:20;259:7
**challenge (1)**
24:13
**chance (3)**
50:24;140:25;
141:5
**change (26)**
22:25;68:21;87:9,
16,17,19;115:6;
116:12;117:3;128:7;
140:17,21;141:23;
167:21;168:15,20;
182:20;196:24;
197:17,25;198:3,15,
21;206:7;228:5;
255:9
**changed (11)**
86:16;89:12;101:4;
116:24;128:20;
130:23;135:21,25;
197:2,12;199:7
**changes (2)**
32:2;136:7
**changing (5)**
22:23,25;24:19;
141:25;142:9
**Chapter (1)**
270:20
**characterize (1)**
183:2
**charge (3)**
27:9,12,22
**chart (12)**
73:24;79:17;80:4;
100:16;170:20,25;
171:10;197:3,4,5;
202:23;230:9
**checked (1)**
33:11
**chief (1)**
23:10
**China (2)**
148:2;149:11
**choose (3)**
208:10;209:16;
218:7
**chose (5)**
46:24;94:10;
207:22;208:5;220:15
**chosen (2)**
46:16;208:6
**circumstance (1)**
260:18
**circumstances (5)**
21:8;47:8,14,24;

229:3
**cite (8)**
13:20;104:13;
153:25;185:13;
209:8,11;220:6;
228:21
**cited (2)**
14:11;220:16
**claim (85)**
38:7;57:2;63:18;
64:6;65:17,21;71:4,
10,13;76:8,11;81:25;
83:20;84:17;88:13,
18,21;89:21;94:15,
19,23;98:25;99:4,12;
104:5;115:4;127:24;
157:14,17;158:12,24;
159:5,14,17,18,20;
161:16;162:6;
163:11,21;164:2,14;
190:3;193:12;
201:16;202:3;
203:10;212:8,19,20;
216:11;221:21;
222:18;223:13,15,22,
23;225:16;226:3,7,
14,19;227:2,4,10;
234:18,20;265:5,6,9,
11,12;266:11,12;
267:5,11;268:21;
269:12,13,14,21,23;
270:13,14;271:10
**Claimants (3)**
3:4;10:17;161:6
**claimed (5)**
41:6;48:15;55:15;
191:19,24
**claims (152)**
20:3;36:16,21,25;
37:4,25;54:15,16,17,
18;55:6;59:8,10,12;
62:9,11;63:20;64:2;
65:18,18,20,22;66:5;
69:21;71:5;72:5,7;
73:16;74:9,10,19;
78:5,9;80:11;82:4,5,
8,9,15,24;83:7,19,23,
24;84:3,7,10,13,23;
85:4,5,5,8,10,17,21;
86:4;91:11;96:8,17,
17,25;97:23;98:5,6,
11,14,16,21;99:4,7,
11,17,21;100:2,7,7,8,
19,22;101:2,12;
102:8,14,24;108:19,
22;115:12;116:3;
130:7;150:10;151:2,
5,8;152:4;156:16,17,
18,22,23;157:23;
159:2;160:14,19;
161:4,7,9;162:4,19;
163:13,16,24;164:7;
165:8,11;166:9,10;

203:12,21,25;204:3,
16,22,23;205:5,25;
206:14;216:15,22,24;
217:13;218:17,18;
220:21,23;221:3,14,
15;222:23;223:3;
225:9,12;228:6;
242:12,15,18;243:5,
8;257:9,10;264:23;
269:18
**clarification (1)**
61:7
**clarify (3)**
60:20;61:20;
127:25
**clarity (2)**
11:20;97:13
**classify (1)**
246:15
**clause (1)**
198:22
**clear (1)**
60:18
**Cleary (1)**
11:11
**client (1)**
17:16
**closer (4)**
176:12,25;177:4,5
**closing (1)**
171:9
**coin (1)**
145:13
**colleague (1)**
10:4
**colleagues (2)**
10:21;14:18
**collect (2)**
157:23;159:5
**collected (1)**
159:11
**collecting (1)**
65:24
**collection (4)**
104:25;253:11;
254:10;258:13
**collections (1)**
254:11
**column (5)**
89:8;132:7;154:12;
156:15,16
**combine (1)**
164:15
**combined (2)**
217:25;218:2
**comfort (9)**
82:3,4;83:2,6,17;
84:20;86:14;89:11;
101:3
**coming (2)**
79:23;117:23
**comment (1)**
181:12

**Committee (2)**
3:14;10:10
**common (1)**
214:19
**communication (2)**
16:22;17:4
**communications (7)**
39:10,25;40:9,13,
14;121:12,19
**company (3)**
21:3,5;24:2
**comparable (1)**
259:11,14
**comparative (1)**
206:4
**compare (6)**
174:13;188:6,13;
189:24;198:6,17
**compared (5)**
82:4;84:13;85:2;
184:9;221:3
**comparing (1)**
197:21
**comparison (2)**
178:4;181:14
**competing (1)**
35:24
**complete (3)**
33:19;66:22;85:13
**completed (2)**
105:2;112:6
**completely (3)**
179:15,23;257:15
**completion (3)**
242:11;243:4;
257:10
**complexity (3)**
49:24;50:4,9
**complicated (3)**
63:5,9;254:7
**component (1)**
58:4
**components (4)**
56:21;57:6;65:2;
80:16
**composed (1)**
72:19
**comprise (1)**
163:17
**comprising (1)**
250:24
**compromise (14)**
59:10,11,15;60:4;
61:12;62:21;73:25;
77:19;83:8;115:4;
203:11;217:6,24;
218:3
**computer (1)**
185:12
**conceivably (1)**
135:21
**concern (1)**
12:16

**conclude (7)**
164:17;176:24;
177:4;203:21;
212:19;245:18;268:4
**concluded (3)**
48:10;157:5;233:2
**concludes (1)**
275:12
**conclusion (30)**
43:19;44:21;48:15;
50:14,18;51:10,18;
52:7;53:19;66:8,10,
24;67:20;114:7,13,
21,23;117:19;127:9;
136:9,14;137:9;
140:18,20,20;145:25;
203:16;268:10;
273:4,13
**conclusions (4)**
43:13;66:18;68:4;
146:12
**condensed (1)**
218:2
**conducted (3)**
209:18;210:23;
238:2
**conference (2)**
18:24;19:4
**CONFIDENTIAL (264)**
12:1;13:1;14:1;
15:1;16:1;17:1;18:1;
19:1;20:1;21:1;22:1;
23:1;24:1;25:1;26:1;
27:1;28:1;29:1;30:1;
31:1;32:1;33:1;34:1;
35:1;36:1;37:1;38:1;
39:1;40:1;41:1;42:1;
43:1;44:1;45:1;46:1;
47:1;48:1;49:1;50:1;
51:1;52:1;53:1;54:1;
55:1;56:1;57:1;58:1;
59:1;60:1;61:1;62:1;
63:1;64:1;65:1;66:1;
67:1;68:1;69:1;70:1;
71:1;72:1;73:1;74:1;
75:1;76:1;77:1;78:1;
79:1;80:1;81:1;82:1;
83:1;84:1;85:1;86:1;
87:1;88:1;89:1;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1;107:1;
108:1;109:1;110:1;
111:1;112:1;113:1;
114:1;115:1;116:1;
117:1;118:1;119:1;
120:1;121:1;122:1;
123:1;124:1;125:1;
126:1;127:1;128:1;
129:1;130:1;131:1;
132:1;133:1;134:1;

135:1;136:1;137:1;
138:1;139:1;140:1;
141:1;142:1;143:1;
144:1;145:1;146:1;
147:1;148:1;149:1;
150:1;151:1;152:1;
153:1;154:1;155:1;
156:1;157:1;158:1;
159:1;160:1;161:1;
162:1;163:1;164:1;
165:1;166:1;167:1;
168:1;169:1;170:1;
171:1;172:1;173:1;
174:1;175:1;176:1;
177:1;178:1;179:1;
180:1;181:1;182:1;
183:1;184:1;185:1;
186:1;187:1;188:1;
189:1;190:1;191:1;
192:1;193:1;194:1;
195:1;196:1;197:1;
198:1;199:1;200:1;
201:1;202:1;203:1;
204:1;205:1;206:1;
207:1;208:1;209:1;
210:1;211:1;212:1;
213:1;214:1;215:1;
216:1;217:1;218:1;
219:1;220:1;221:1;
222:1;223:1;224:1;
225:1;226:1;227:1;
228:1;229:1;230:1;
231:1;232:1;233:1;
234:1;235:1;236:1;
237:1;238:1;239:1;
240:1;241:1;242:1;
243:1;244:1;245:1;
246:1;247:1;248:1;
249:1;250:1;251:1;
252:1;253:1;254:1;
255:1;256:1;257:1;
258:1;259:1;260:1;
261:1;262:1;263:1;
264:1;265:1;266:1;
267:1;268:1;269:1;
270:1;271:1;272:1;
273:1;274:1;275:1
**confined (1)**
34:5
**confuse (1)**
25:13
**confusing (1)**
254:7
**confusion (2)**
61:3;191:16
**connection (21)**
17:23;19:18;20:2;
23:20;25:20;28:11,
14;30:2;33:24;38:22;
39:6,25;40:6,21,25;
121:4;131:24;
167:15;201:5;
208:20;275:3

**consequences (7)**
137:11,15,23;
138:3;139:17;
140:11;214:2
**conservative (4)**
207:23;214:21;
215:18;227:15
**conservatively (3)**
177:22;208:2;
211:10
**consider (18)**
33:12;51:2,3;
95:11;109:16,21;
134:24;135:11;
149:14;151:8;
167:23;172:20;
181:3;207:25;216:2,
5;225:20;235:3
**considered (11)**
41:11,15,23;43:3;
152:12;173:3;
181:21;183:10;
216:6;217:10;235:22
**considering (2)**
153:6,9
**consistent (5)**
96:22,24;97:21;
187:23;231:10
**consolidated (17)**
73:16;74:11,19;
75:5,18;76:2;77:3,
12;80:12;82:19;
100:17,21;151:3,8;
152:13,19;153:7
**consolidation (5)**
152:7,10;153:2,11;
165:12
**constitute (1)**
267:23;268:6
**construed (1)**
42:10
**contacted (1)**
25:18
**contain (1)**
186:12
**contained (1)**
32:15
**contains (1)**
33:23
**Cont'd (1)**
3:1
**context (1)**
235:22
**contingent (2)**
61:19;62:3
**continuation (1)**
202:24
**continue (5)**
30:12;107:3;
150:11;190:18;
267:11
**CONTINUED (6)**
167:10;241:17;

243:22;246:21;
251:3;260:7
**continuum (1)**
175:24
**contract (7)**
49:13;188:24;
190:20;200:6;203:4;
206:13,18
**contributed (1)**
150:8
**contributing (1)**
252:2
**controlled (1)**
154:13
**conversations (4)**
16:24,25;18:19;
37:12
**convicted (1)**
21:23
**copies (2)**
156:2;167:18
**copy (2)**
29:21;121:3
**corner (5)**
30:6;79:8;237:6;
250:5;251:21
**corners (1)**
251:3
**corporate (5)**
209:24;210:3,4,7,
11
**Corporation (2)**
72:24;75:4
**corrected (1)**
183:22
**correction (3)**
30:20;31:2;196:20
**corrections (3)**
30:16,23;32:3
**correctly (5)**
84:15;105:7;
115:17;139:4;196:18
**correspondingly (1)**
101:11
**costs (5)**
239:12,14,15,20;
247:9
**counsel (32)**
12:9,15;13:16;
14:9,17,25;16:22,25;
17:3;18:11,20;35:17;
36:10,13;37:3,12;
38:5,15;39:4,8,9,21,
22;40:4,10,13;121:9,
12;122:4;128:23;
208:18;211:14
**counsel's (1)**
36:6
**counted (1)**
21:7
**counting (2)**
71:16;85:10
**countries (1)**

108:12
**country (1)**
106:20
**couple (3)**
84:21;139:23;
213:19
**course (5)**
18:23;24:7;209:24;
210:2;218:18
**court (27)**
10:23;12:4;18:25;
19:4;20:18;21:11,25;
22:5;24:21;25:5,12;
49:12,24;57:25;
87:11;96:15;97:6;
204:3,12;229:21;
230:5;234:12;235:7,
13;236:7;238:2,2
**courtroom (1)**
194:25
**courts (2)**
70:11;246:18
**cover (4)**
75:3;207:10;230:4,
9
**covered (2)**
216:7;229:7
**CPA (1)**
210:15
**creditor (3)**
59:4;242:12;
267:23
**Creditors (31)**
3:15;10:11;52:14;
62:14,25;64:7,10,13,
15,17;65:12,14,23;
66:12,23;67:19;
106:13,21;107:13;
108:2,12;139:15;
140:6;157:2;164:9,
16,16;173:8;174:4;
175:11;178:25
**credits (1)**
215:7
**CRICHLOW (2)**
10:12,12
**Cross-Border (1)**
238:3
**crossover (2)**
104:7;184:9
**curiosity (1)**
205:21
**current (15)**
13:12;56:24;58:5;
70:2,13;81:25;82:5,
7;84:13,16;86:15;
110:25;121:23,23;
153:21
**currently (2)**
115:3,5
**cut (3)**
13:3,8;189:21
**cutoff (3)**

187:10,14;189:3
**cuts (1)**
187:12

# D

**D&O (3)**
149:19,24;153:18
**date (26)**
28:17,25;29:4;
79:4,6;171:4;186:21;
187:9;188:16,22,24,
25;189:2;190:8;
194:16;195:10;
197:23;205:9;
220:22;252:24;
260:23;263:5,15,20,
25;264:18
**dated (17)**
26:23;72:8,14;
79:25;81:11;82:2;
119:15;154:2;
169:16,19;220:19;
229:24;231:19;
235:10,18;236:9;
263:2
**dates (3)**
178:14;188:6,6
**DAVID (3)**
3:19;10:8,12
**day (7)**
13:25;25:24;116:2;
138:11;187:13;
195:2;248:4
**days (1)**
79:4
**deals (1)**
36:16
**dealt (1)**
19:24
**debenture (1)**
201:15
**debt (8)**
61:19;62:3;71:4,
20;80:20;93:3,17;
107:2
**debtor (4)**
10:11;222:15;
223:16;225:18
**debtors (32)**
10:20;11:12;26:3,
8;28:14;29:11;30:2;
36:11;38:16;39:6,12,
24;40:15;49:5;82:16;
100:9;101:6;118:25;
123:9;124:5;132:16;
150:8,13,20;152:18;
153:11;157:15,24;
178:3;208:18;
211:14;237:14
**debtors' (6)**
48:23;60:5,12;
61:13;223:2;236:8

**December (2)**
230:25;231:18
**decide (1)**
134:20
**decided (6)**
89:19;110:24;
113:6;159:21;
161:12;165:21
**decides (1)**
57:22
**decision (5)**
57:18;58:2;93:15;
266:20;267:4
**declines (1)**
193:12
**decrease (8)**
198:23;199:9,15;
204:6,13,18;215:24;
216:19
**deduction (1)**
102:25
**deductions (3)**
213:14,17;215:10
**define (1)**
184:8
**defined (2)**
31:10;152:16
**definition (6)**
87:16;89:13,21;
110:23;171:23;
180:13
**delay (1)**
193:14
**denominator (1)**
71:3
**depend (4)**
52:10;174:5;
181:13,18
**depending (4)**
152:8;211:24;
212:10;214:11
**deposed (5)**
11:13;16:11;19:13;
20:9;97:17
**deposition (24)**
11:22;13:23;14:5;
15:2,25;16:23;33:7;
34:21;56:2;69:4,13;
97:11;118:7;128:8;
167:7;183:22;
195:24;196:15,19;
244:10;256:10;
274:25;275:2,13
**depositions (1)**
11:19
**derived (1)**
237:16
**describe (2)**
19:21;20:22
**described (3)**
42:7;54:2,5
**description (1)**
73:10

**designed (1)**
204:2
**detail (3)**
163:3;173:5;229:6
**detailed (9)**
54:8;69:16;73:7,
14;111:18;133:5,23;
174:25;248:11
**details (7)**
21:2;102:2;118:18;
122:5;250:2;251:8,
12
**determination (3)**
91:3;213:21,23
**determine (11)**
20:24;58:15;68:2,
14;69:23;124:21;
126:7;130:18;
137:18;166:2;240:23
**determined (1)**
129:25
**determining (1)**
213:7
**DI (1)**
16:14
**dictated (1)**
62:8
**difference (3)**
84:13;175:15;
199:3
**differences (1)**
175:14
**different (24)**
20:11;33:9;62:18;
71:23;82:8;87:2;
88:7;93:14;105:22;
120:25;149:2;
171:17,18;174:14,14,
15;181:15,15,25;
185:23;187:15;
236:21;243:20;
265:22
**difficult (1)**
67:6
**direct (1)**
16:15
**directionally (5)**
224:11,25;271:14,
22,23
**directly (3)**
64:8,15;65:10
**directors (1)**
150:7
**disagree (4)**
30:18;171:14;
178:23;179:21
**disagreements (1)**
32:3
**disclosed (3)**
35:8;44:12;47:24
**disclosing (1)**
17:8
**discussed (6)**

16:13;47:7,20,24;
153:17;234:17
**discussion (8)**
26:2,17;119:10;
183:13;196:14;
202:12;203:3;233:2
**discussions (2)**
13:16;26:7
**dismissed (4)**
36:17,25;37:25;
130:8
**dispute (17)**
13:12;25:21;28:8,
11,15;30:2;31:6;
49:9,17;94:9;95:5;
121:4;238:8;242:8,
24;264:20;266:14
**distinguish (2)**
93:24;94:5
**distribute (4)**
46:8;47:10;52:14;
54:13
**distributed (3)**
211:25;212:11;
214:12
**distribution (33)**
37:20;41:14;42:2;
43:16,24;44:3;46:22;
54:9;55:2,3;56:25;
64:10;67:6;69:16,20;
73:7,14;77:18;
114:12,19;153:22;
181:20;200:9;
203:13;213:10;
218:5;239:6,10;
263:2,15,20,25;
269:24
**distributions (8)**
66:11,21;67:19;
68:5,10,16;242:13;
263:6
**diverge (1)**
180:10
**divide (1)**
261:25
**divided (3)**
150:12;191:25;
192:5
**dividing (1)**
69:21
**Doctor (2)**
196:5;275:10
**document (33)**
31:22;72:2;73:15;
78:23;81:18;87:25;
88:20;89:18;95:16;
120:19;121:6;122:2,
7,11,13,15;155:18;
156:4,13,13;168:8,
11;170:5;184:16,19,
23;185:13,15,23,25;
186:4,16;187:6
**documentation (1)**

187:18
**documents (27)**
13:17,19,19;14:9,
10,11;18:19;19:6,9;
24:3;33:11,15,16;
34:5,16,25;35:10;
58:14;82:6;109:4;
110:6;121:16,21;
125:14;151:9,12;
188:20
**dollar (28)**
51:14,25;77:3;
84:22;92:3,11;
103:23;105:3,8,15;
109:10;135:20;
160:19,20;202:7;
216:11;223:13;
225:19;234:17,18,19,
20;242:16;253:11;
260:12,19;267:19;
268:25
**dollars (22)**
45:19,21;57:12;
84:2,5;88:12,23;
99:8;135:23;136:25;
150:22;212:9;
227:25;238:20;
239:5;252:17,22;
253:17;254:21;
258:22;259:2;268:11
**done (24)**
13:25;14:3,7;
32:24;33:7;46:24;
69:19;77:15;78:2;
111:4;137:13,17;
151:24;160:24;
176:15;177:3;
183:14;190:10;
195:5;225:15,18;
259:12;267:20;
271:19
**down (10)**
56:21;80:16;99:16;
163:6;183:9;185:2;
193:22;224:21;
237:19;250:18
**Dr (13)**
11:7;69:4;77:23;
118:7;167:7,12;
185:11;195:24;
230:5;235:13;
256:10,14;275:13
**drafted (1)**
168:25
**drill (1)**
80:16
**due (2)**
116:2,25
**duly (1)**
11:1
**duplicate (6)**
83:19;99:21;
100:18;157:19,23;

185:19
**duplicative (3)**
94:19;100:2,7
**during (6)**
16:13;18:23;22:17;
23:10;24:6;69:12

**E**

**earlier (13)**
11:9;65:2;127:11;
148:9;167:19;
170:16;196:6;
226:25;231:17,18;
263:19,25;274:4
**early (3)**
25:23;26:9,15
**easier (1)**
13:5;97:15;155:22
**economic (1)**
256:24
**educate (1)**
204:3
**effect (15)**
53:14;84:14;
138:23,25;139:11,12,
18;203:23;225:8;
233:17;236:23;
239:25;258:2;
267:19;271:3
**effects (1)**
239:3
**effort (2)**
126:2;130:10
**eight (5)**
15:10;99:8;169:13;
256:21,22
**eighth (11)**
70:17;79:24;80:3;
81:6,11,14;87:8;
104:14;242:20;
244:4,22
**either (6)**
21:15;63:5;70:14;
84:3;180:19;240:16
**element (1)**
265:23
**elements (1)**
213:6
**eliminate (1)**
94:10
**eliminated (2)**
203:11,15
**else (11)**
14:14,22;15:12;
40:14;47:6;64:24;
94:12;168:21;
213:12;230:3;261:9
**else's (1)**
230:8
**elsewhere (1)**
71:16
**E-MAIL (2)**

3:10,23
**EMEA (12)**
72:9;79:13;80:25;
105:25;106:7;
132:16;133:6,24;
135:12,13;147:18;
230:22
**employee-related (2)**
151:5;152:3
**employees (6)**
151:11,19;152:4;
245:7;256:21,22
**employer (1)**
151:18
**enable (1)**
134:12
**enables (1)**
176:16
**end (23)**
51:9;115:6,25;
117:23;127:22;
131:25;132:4;
138:11;170:2;
178:11;194:3,12;
196:6;201:11;211:7;
214:4,21,24;229:10;
231:5;248:3;262:5;
267:18
**endeavor (3)**
43:22;46:3;52:15
**endeavored (1)**
47:8
**ended (6)**
22:14;79:2;115:12;
172:7;178:17;196:13
**ends (2)**
73:19;236:13
**engaged (2)**
26:11,14
**engagement (11)**
26:18,20,22,25;
27:9,13,14,17,19;
28:2;29:12
**enough (4)**
15:14;125:11;
246:14,17
**entailed (1)**
42:7
**entire (5)**
76:12;128:8;
178:18;189:16;
251:17
**entirely (2)**
226:18;247:12
**entities (22)**
36:4;75:19;83:20;
94:19;99:18;100:23;
121:25;133:24;
134:18;135:12,14;
152:11;154:13;
155:14,17;156:17,25;
157:3;162:20;
165:22;166:3;230:22

**entities' (5)**
76:3;77:12;162:18,
19;165:16
**entitled (11)**
73:7;199:14;
200:11,14,20,22;
206:7,10;230:19;
238:18;266:16
**entitlements (1)**
149:15
**entity (14)**
23:6;75:2,5,6;76:5,
7;82:19;83:21;95:18;
96:7;133:6,25;
142:12;228:6
**environmental (1)**
96:4
**envision (1)**
115:13
**equal (1)**
124:12
**equals (1)**
55:6
**equation (4)**
56:23;63:25;64:3;
66:21
**equity (4)**
133:7;142:22;
144:18,19
**equivalent (1)**
124:6
**error (3)**
176:6;184:4;
258:10
**ESQ (4)**
3:7,18,19,20
**establish (1)**
17:7
**estate (28)**
35:20;36:2,3,24;
37:22;41:6;43:8;
48:23;74:11,20;
75:15;77:4,17;
147:10;148:10;
211:17,21;213:11,17,
24;215:4,11;216:23;
221:21;238:18;
243:9;246:11;267:22
**estates (4)**
80:12;240:6;257:6;
261:6
**estimate (37)**
11:16;28:20;29:3;
46:17;58:16;82:24;
127:22;177:9,22;
207:14;208:2,4;
211:6,10,11;214:4;
215:17;217:12;
219:6;223:2;226:2,5;
227:15,15,17,18,22,
24;233:2;247:2,21;
248:16;249:4;254:8;
255:14;258:25;259:3

Case 09-10138-MFW    Doc 14654-5    Filed 10/30/14    Page 289 of 306
IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

**estimated (7)**
127:21;221:20;
225:18;227:3;
232:13;254:23,24
**estimates (2)**
247:13;248:12
**estimating (1)**
222:16
**evaluate (6)**
49:8,17,20;111:18;
129:7;130:10
**evaluated (1)**
129:21
**evaluating (1)**
49:11
**EVANS (2)**
3:20;10:8
**Even (44)**
23:25;25:4;44:16;
46:6;52:4;84:20;
86:24;115:3,5,10,11,
17;116:17;126:6;
127:10,13,21;153:6;
158:12;159:17,18;
161:15;168:19,20;
179:5;181:4,7;
182:12;202:15;
203:10,14;205:16;
207:25;208:2,13;
216:2;218:24;
240:18;242:16;
248:13;249:15;
261:8;267:12;271:22
**evens (1)**
182:14
**event (3)**
137:10;270:7,12
**events (7)**
43:14;44:17;
116:13;128:10,17;
143:20;144:15
**event's (1)**
35:5
**eventual (1)**
106:14
**everybody (2)**
230:3,8
**evidence (6)**
208:25;209:6,9,11,
15;274:14
**exact (13)**
25:24;79:5;108:15;
111:17;119:19;
139:12;171:23,24;
183:5;194:21;
195:14;207:17;
227:13
**exactly (9)**
137:3;141:10;
147:2;178:13;184:6;
188:25;218:13;
220:17;239:17
**EXAMINATION (4)**

11:5;167:10;196:3;
274:8
**examined (1)**
11:2
**example (13)**
34:14,15;35:9;
40:6;50:23;83:21;
88:9;137:11;145:12;
172:18;176:5;239:2;
260:10
**examples (2)**
35:2;213:20
**exceeded (1)**
49:6
**except (2)**
175:6;220:17
**excess (14)**
50:20;51:4;71:12;
107:12,15,19;108:11;
115:14;139:14;
142:25;160:16;
181:24;228:25;266:9
**exchange (1)**
84:4
**exclude (11)**
21:14;22:13,19;
91:17;155:16;
160:25;161:12;
165:21;174:3;
179:13,14
**excluded (15)**
21:10;25:5;70:17;
91:11;155:2,7,9;
156:18,22;161:3;
172:19,21;183:5,25;
265:19
**excluding (2)**
39:22;239:19
**exclusion (6)**
173:25;174:18;
175:6,8,9,10
**Excuse (6)**
28:22;148:24;
156:21;197:18;
268:3;275:14
**Exhibit (60)**
29:20,22;72:21,23;
78:23;81:7,10,13;
82:14;98:10;100:14,
16;104:13;119:11,12,
14;120:9,12;124:4;
131:16,18,20;132:3;
168:2,4;169:13,16,
18;181:5;182:16,17,
18;186:4,8,10;
196:15;199:18;
205:22;217:20,21;
219:16;221:20;
229:21,22,23;230:6;
235:8,9,15;244:10;
250:6;251:21;
254:14;256:16;
272:8,9,14,15,18,20
**EXAMINATION (4)**

**exhibits (2)**
131:19,21
**exist (3)**
43:17;113:14;
115:19
**existed (1)**
273:15
**existence (2)**
108:21;209:20
**existing (2)**
115:3,5
**exists (2)**
149:13;241:12
**expect (2)**
54:19;88:8
**expectation (8)**
88:10,17;90:4;
116:16;243:7,14,18,
21
**expected (13)**
86:22;87:3;88:5,
13;89:14,22;90:23;
92:8,18,25;218:24;
219:5,9
**expecting (1)**
93:9
**expects (2)**
243:22,25
**expenses (1)**
213:14
**experience (2)**
78:13;223:25
**expert (12)**
20:23;26:15;29:22;
90:3;131:18,20,24;
169:8;175:22;
224:10,11;229:23
**expertise (19)**
55:5,11,19;56:6,
10;57:15;58:11,19,
23;59:18,20,24;
63:10;130:12,15;
210:17,23;211:5;
259:5
**explain (8)**
23:16;32:17;47:20;
77:8;80:14;112:20;
156:14;211:19
**explained (3)**
107:24;124:15;
156:19
**explaining (1)**
208:15
**explanation (2)**
94:7;134:23
**explore (1)**
56:2
**expressing (1)**
158:9
**expressly (1)**
201:21
**extent (15)**
96:8;100:21;107:4;

113:2;122:10;
131:25;138:5;
159:11;172:19;
204:21;238:16;
253:3,5;254:9;258:3
**extinguishment (1)**
203:25
**extreme (1)**
130:8

**F**

**face (1)**
249:20
**fact (26)**
57:14;63:24;67:8;
90:4;92:13,20;94:18;
100:20;112:24;
122:3;132:5,25;
137:17;144:22;
145:2;158:6;168:23;
187:18;188:12;
194:23;203:6;205:9;
212:14;220:5;240:9;
247:8
**factor (1)**
161:15
**factored (1)**
138:7
**factors (6)**
141:21;203:17,19;
213:13,21,22
**factual (2)**
18:6,17
**fair (22)**
33:22;37:14;45:5;
49:13;50:12;51:8;
52:12;62:20;66:7;
99:4;102:10,24;
109:9,23;156:24;
171:13;174:17;
175:4;193:10;
196:12;246:14,17
**falls (2)**
27:4,16
**false (1)**
24:9
**familiar (5)**
101:23;210:11;
245:4;251:8,9
**familiarity (1)**
190:25
**far (4)**
96:5;114:7;129:10;
130:4
**FARR (2)**
3:3;10:16
**favor (15)**
37:22;42:11,13,16,
21;44:17;128:11,18;
129:15;130:3,9;
143:21;144:15;
145:23;207:24

**favorable (7)**
47:19;75:19,24;
85:22;86:3,6;115:21;
172:7,9;179:6,8,14,
15;180:3,15,23;
227:18;251:24;
252:2,3;270:2;
271:14
**FAX (2)**
3:9,22
**feasibility (1)**
160:7
**feasible (1)**
160:4
**February (3)**
169:17,20;170:2
**federal (4)**
62:14;63:2;206:11,
17
**feel (7)**
12:11;13:3;97:12;
126:15,17;129:12;
135:4
**fees (1)**
29:15
**FELD (2)**
3:13;10:9
**few (4)**
153:17;185:17;
199:12;205:8
**fewer (3)**
99:11;151:18;
160:9
**fighting (2)**
194:4,10
**figure (4)**
62:2;166:13;
177:15;254:13
**file (1)**
225:16
**filed (10)**
78:25;79:3,6,9;
99:17;201:15;205:5;
220:22,23;226:8
**filing (2)**
79:4;224:7
**filings (1)**
122:12
**finally (3)**
63:12;70:20;72:4
**finance (1)**
162:22
**financial (2)**
21:4;59:21
**financials (2)**
72:13;73:16
**find (10)**
49:12;63:9;96:7;
124:19;125:4,11;
126:3,9,19;159:5
**fine (8)**
17:13;121:16;
162:13;163:2;

Case 09-10138-MFW    Doc 14654-5    Filed 10/30/14    Page 290 of 306
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

182:22;222:5;256:4;
273:22
**finish (6)**
13:6,9;140:25;
141:5;256:15;268:13
**finished (2)**
86:10;158:7
**firm (3)**
11:11;15:22,24
**first (22)**
15:17,18;25:18,22,
25;30:17;36:15,19;
42:24;57:9;62:7;
65:7;106:13;130:6;
160:3,16;189:24;
199:2,24;212:3;
214:7;245:14
**fits (1)**
148:25
**Five (16)**
18:22,22;88:11,22;
116:10;128:21;
129:7,13;130:21;
141:25;142:8;143:4,
17;154:14;195:23;
251:20
**fix (1)**
89:6
**FJR (1)**
206:8
**flip (2)**
109:14;145:13
**flow (3)**
127:6;160:5;
233:18;251:24
**flows (1)**
58:14
**flowup (3)**
165:3,6,7
**focus (5)**
56:18;57:9;60:23;
100:14;191:18
**focused (2)**
97:8;250:21
**focusing (1)**
55:24
**follow (5)**
196:9;217:19;
218:22;230:14;
274:11
**following (4)**
40:4;79:5;163:20;
189:2
**follows (3)**
11:3;167:5;252:3
**footnote (19)**
72:6,10;80:23;
91:14;104:12,22;
105:5;112:3;153:25;
178:13;184:19,21;
185:13;189:6,9,18;
217:5,24;274:24
**forecast (27)**

110:25;111:4,6,7,
10;247:22;248:2,16;
249:11,21;250:15,24;
251:25;252:7,13;
254:16;255:2,3,4,10;
258:5,7,9,9,12,12,14
**forecasted (6)**
110:11,16;253:4,6;
254:10;258:6
**forecasts (4)**
110:15,22,22,23
**foreign (5)**
251:7;252:12,18,
22;253:18
**forget (1)**
108:15
**form (68)**
23:12;26:12;33:3;
42:17;43:25;44:8;
46:10;47:12;50:2,16;
51:12;54:24;55:8,17;
57:19;61:15;63:8;
66:13;68:6;69:22;
74:12;75:21;76:14;
77:14;80:18;89:4;
100:10;106:22;
110:19;112:17;
113:9;118:14;120:4;
122:8;124:9;125:17;
126:20;133:12,14;
137:21,25;139:20;
147:14;148:23;
151:20;160:11;
174:23;178:5;
179:24;193:15;
197:14;204:7;209:2;
210:19;217:14;
224:14;225:4;
226:21;228:12;
229:13;232:15;
233:20;243:10;
255:18;257:16;
263:7;266:2;271:17
**format (1)**
120:25
**formed (1)**
129:18
**former (1)**
55:16
**formulated (2)**
32:6,20
**forty-three (2)**
88:11,22
**forward (4)**
58:21;220:11;
253:2;256:16
**found (4)**
25:12;63:4;103:18;
177:12
**foundation (20)**
24:16;55:9;56:8;
57:20;68:7;78:18;
89:4;98:3;102:18;

113:22;116:22;
152:21;158:2;
160:12;164:20;
182:3;209:3;211:2;
224:15;266:3
**four (13)**
18:22;167:6;171:8;
178:24;179:7,20;
180:8,10,12,15;
217:24;219:17;
262:14
**fourth (1)**
237:20
**France (1)**
144:12
**fraud (2)**
23:4,10
**free (1)**
97:13
**French (1)**
142:15
**front (3)**
81:8;146:6;250:11
**full (6)**
35:20;190:17;
214:23;263:11;
264:13,15
**fully (2)**
74:9,18
**Fund (3)**
101:19,21;102:12
**funded (1)**
102:4
**funds (3)**
101:16;102:5;
258:18
**further (16)**
35:22;106:25;
114:15,17;115:9;
146:4;195:17;
199:15;212:25;
252:17,21;258:18;
264:17,18;274:6;
275:5
**future (4)**
58:17;123:20;
258:9,14

---

## G

**GALLAGHER (2)**
3:3;10:16
**game (2)**
37:14;81:9
**gather (1)**
173:5
**gave (9)**
35:10;48:24;84:20;
144:10;147:5;156:8;
168:8;214:3,9
**general (10)**
11:19;19:22;20:22;
156:3,7;157:11;

211:15,20;224:8,9
**generally (9)**
223:21;224:4,11,
17;233:10;236:19;
251:9,11;270:2
**generate (2)**
122:23;123:14
**generated (2)**
123:5,12
**gets (7)**
130:23;138:22;
150:12;211:25;
212:11;214:12,22
**given (30)**
31:14;41:7;48:15;
51:6;53:19,20;55:22;
56:4;58:25;83:18;
84:8;95:5;97:18;
104:23,25;108:20,21;
115:7;122:3;126:4;
158:19;195:10;
207:17;208:11,16;
214:24;220:24;
248:17;249:22;253:8
**gives (5)**
54:22;83:2;105:21;
209:21;258:13
**global (1)**
261:8
**goes (6)**
56:13;147:6;188:9;
193:22;238:4;270:21
**Good (7)**
11:7,8;117:25;
125:11;129:4;196:5;
256:2
**Goodmans (2)**
15:22,24
**Google (2)**
259:16,18
**Gottlieb (1)**
11:11
**government (2)**
22:13,19
**government's (1)**
23:9
**greater (1)**
48:3
**Gross (6)**
55:4;56:5;57:15,
24;58:10;63:6
**Gross' (1)**
63:10
**ground (1)**
11:19
**group (10)**
10:6;75:7;76:7,12;
77:16,21;106:11,12;
151:3;156:18
**groups (2)**
105:22;106:9
**guarantee (2)**
89:21;104:6

**guaranteed (7)**
31:11,15,23;66:4;
76:23;184:10;206:2
**guarantees (5)**
61:20;62:3;92:21;
93:18;94:9
**Guatemala (4)**
155:7;158:14;
159:13;161:13
**guess (1)**
198:2
**guidelines (2)**
218:22;219:3
**GUMP (2)**
3:13;10:9

---

## H

**Hadley (1)**
10:3
**half (5)**
18:22;99:8;112:2;
151:18;154:19;
189:13;193:7;261:20
**hand (2)**
183:9;244:8
**handed (3)**
81:13;230:6;
235:14
**handicap (1)**
46:3
**handing (3)**
182:12,14;230:8
**handy (1)**
156:6
**HANRAHAN (3)**
3:7;10:15,15
**happen (2)**
252:13;271:7
**happened (4)**
21:21;160:3;
224:12;251:10
**happy (4)**
12:12,21;125:23;
129:2
**hard (1)**
121:3
**Hardship (1)**
101:21
**HAUER (2)**
3:13;10:9
**head (5)**
12:5;145:14,16,19,
20
**heading (2)**
146:10;237:11
**Health (3)**
101:17;102:12,22
**hear (5)**
12:22;60:24;97:5;
119:7;227:9
**heard (15)**
11:18;24:25;25:2;

101:19,21,24;119:3,
6;139:4;142:12,13;
147:9;149:23;152:6,
14
**hearing (1)**
237:25
**help (3)**
79:7;185:22;189:5
**helpful (1)**
222:6
**helping (1)**
17:2
**Here's (3)**
75:14,14,15
**high (2)**
101:10;214:21
**higher (21)**
53:17,21;85:3;
115:20;116:2,19;
197:20;198:10,12;
202:15;203:21;
206:8;211:4;214:16,
18;215:16;220:25;
225:2,3,6;231:14
**HIGHLY (265)**
12:1;13:1;14:1;
15:1;16:1;17:1;18:1;
19:1;20:1;21:1;22:1;
23:1;24:1;25:1;26:1;
27:1;28:1;29:1;30:1;
31:1;32:1;33:1;34:1;
35:1;36:1;37:1;38:1;
39:1;40:1;41:1;42:1;
43:1;44:1;45:1;46:1;
47:1;48:1;49:1;50:1;
51:1,3;52:1;53:1;
54:1;55:1;56:1;57:1;
58:1;59:1;60:1;61:1;
62:1;63:1;64:1;65:1;
66:1;67:1;68:1;69:1;
70:1;71:1;72:1;73:1;
74:1;75:1;76:1;77:1;
78:1;79:1;80:1;81:1;
82:1;83:1;84:1;85:1;
86:1;87:1;88:1;89:1;
90:1;91:1;92:1;93:1;
94:1;95:1;96:1;97:1;
98:1;99:1;100:1;
101:1;102:1;103:1;
104:1;105:1;106:1;
107:1;108:1;109:1;
110:1;111:1;112:1;
113:1;114:1;115:1;
116:1;117:1;118:1;
119:1;120:1;121:1;
122:1;123:1;124:1;
125:1;126:1;127:1;
128:1;129:1;130:1;
131:1;132:1;133:1;
134:1;135:1;136:1;
137:1;138:1;139:1;
140:1;141:1;142:1;
143:1;144:1;145:1;

146:1;147:1;148:1;
149:1;150:1;151:1;
152:1;153:1;154:1;
155:1;156:1;157:1;
158:1;159:1;160:1;
161:1;162:1;163:1;
164:1;165:1;166:1;
167:1;168:1;169:1;
170:1;171:1;172:1;
173:1;174:1;175:1;
176:1;177:1;178:1;
179:1;180:1;181:1;
182:1;183:1;184:1;
185:1;186:1;187:1;
188:1;189:1;190:1;
191:1;192:1;193:1;
194:1;195:1;196:1;
197:1;198:1;199:1;
200:1;201:1;202:1;
203:1;204:1;205:1;
206:1;207:1;208:1;
209:1;210:1;211:1;
212:1;213:1;214:1;
215:1;216:1;217:1;
218:1;219:1;220:1;
221:1;222:1;223:1;
224:1;225:1;226:1;
227:1;228:1;229:1;
230:1;231:1;232:1;
233:1;234:1;235:1;
236:1;237:1;238:1;
239:1;240:1;241:1;
242:1;243:1;244:1;
245:1;246:1;247:1;
248:1;249:1;250:1;
251:1;252:1;253:1;
254:1;255:1;256:1;
257:1;258:1;259:1;
260:1;261:1;262:1;
263:1;264:1;265:1;
266:1;267:1;268:1;
269:1;270:1;271:1;
272:1;273:1;274:1;
275:1
**historical (4)**
58:15;176:20;
177:18,25
**historically (2)**
110:10;178:14
**hit (1)**
145:15
**hoc (1)**
10:5
**holders (2)**
184:8,9
**Home (2)**
23:6,19
**honestly (2)**
24:11;36:14
**hopeful (1)**
141:6
**hopes (6)**
241:7;243:8,12,15,

17,19
**hours (5)**
18:22;28:20;29:6,
8,17
**hundred (25)**
45:19,21;67:5;
70:17;79:24;80:2;
81:6,10,14;83:9,12;
87:8;88:11,22;
104:14;235:9,15;
236:5;238:20;239:5;
242:20;244:4,22;
260:19;268:11
**hung (1)**
48:18

# I

**idea (6)**
24:20;29:8;38:2;
66:22;85:16;241:11
**identical (1)**
84:22
**identification (11)**
29:23;72:25;81:12;
119:16;120:14;
131:22;168:6;
169:21;186:6;230:2;
235:12
**identified (5)**
38:11,13;72:7;
245:13,14
**identify (4)**
203:5;204:12;
207:5;215:23
**ie (1)**
41:19
**ignore (3)**
136:7,12;143:12
**ignoring (6)**
137:10;139:8;
143:11,14;144:6,7
**immaterial (1)**
138:11
**impact (14)**
102:7;135:25;
136:19;137:5,7,9;
142:2;144:3;172:22;
233:25;257:23;
265:24;267:15;
271:20
**implement (1)**
247:17
**implication (1)**
265:7
**important (3)**
12:3;13:4;270:17
**impossible (2)**
67:8,12
**incentive (1)**
256:21
**include (25)**
85:20;112:19;

113:4;115:5;134:19,
21;136:15;143:17;
154:20;162:3,4,5,6;
173:6,10,13,13,16;
178:9;184:11;
232:13;265:5,16;
266:10;270:13
**included (32)**
101:5;102:14;
113:12;127:13,24;
141:22;156:22;
161:11;172:5,22;
178:19,23;181:22;
200:8;203:13;227:5,
6,10;247:16,18,21;
249:4,19;253:7,23;
254:11;258:4;
264:21,22;265:2;
266:21;267:5
**includes (8)**
13:24;31:13;75:4;
145:10;178:7,7;
183:23;254:9
**including (12)**
54:16;92:21;99:9;
141:11;159:18;
162:20,21;203:23;
237:23;245:19;
247:8;257:9
**incorporate (2)**
50:19;273:17
**incorporated (1)**
258:5
**incorrect (2)**
50:15;51:11
**increase (15)**
65:15;84:11;
103:24,25;113:15,19;
117:16,17;127:4;
138:15;140:15;
141:15;204:18;
221:14;271:23
**increased (2)**
46:21;103:19
**increases (3)**
103:20,21;139:6
**increasing (1)**
116:25
**incremental (1)**
268:14
**India (5)**
158:13;159:12;
161:14;252:6;255:5
**indicates (1)**
82:23
**indicating (1)**
187:18
**individual (11)**
72:20;75:6,8;76:6;
114:25;133:6,24;
135:12;145:9;166:3;
250:24
**individually (2)**

35:14;75:7
**individuals (1)**
245:13
**indulge (2)**
135:8;240:14
**ineffective (1)**
257:15
**influence (1)**
64:8
**influenced (2)**
65:11,22
**influences (1)**
63:24
**inform (1)**
25:11
**information (25)**
16:15;18:6,17;
38:21;74:24;78:5,9,
12,15;79:11,12,15,
21;81:19;99:24;
121:22,24;122:12;
134:12;166:6;
186:12;207:17;
217:12;229:15;236:7
**initial (3)**
26:17;221:4;
239:23
**input (2)**
59:2;63:20
**inputs (1)**
70:7
**inquiries (1)**
150:3
**inquiry (1)**
37:15
**inside (1)**
39:21
**insignificant (1)**
51:4
**insolvency (2)**
19:25;238:3
**instance (12)**
34:21;46:13;50:22;
53:15;66:15;83:20;
91:10;106:10;
127:19;138:23;
160:2;183:6
**instead (4)**
31:24;35:14;84:18;
223:5
**instructed (6)**
36:9;37:4;38:6;
270:6,19,25
**instructs (1)**
12:9
**intellectual (1)**
112:10
**intent (2)**
26:16;33:25
**intercompany (17)**
104:24;105:8,14;
106:2,7,19;107:2;
108:22;109:10;

111:2,7,11,24;252:5;
253:9,17;254:19
**interest (79)**
18:12;25:20;26:4;
27:15;28:7;31:12,14,
16,17,22;62:17,19;
63:2;71:5,24;93:3,
16;109:20;133:20;
134:13;142:22;
170:10;175:10;
186:14,20;187:4,7,
10,19;188:7,23;
189:12,21;190:11;
191:2;192:16,19,25;
193:6,12;195:3,15;
200:15,20;206:2,7,
10;233:14,18,23;
234:6;237:15;
256:24;260:7,13,15;
261:9;263:22;264:2,
21;265:6,14,15,16;
266:8,11,15,21;
267:4,9,12;268:5,7,
18;269:13,14,23;
271:3,8
**interests (5)**
170:20,25;171:10,
15;267:22
**interference (1)**
249:6
**internal (3)**
237:5;251:2,20
**International (3)**
158:14;159:13;
161:14
**internet (1)**
118:19
**interpret (1)**
12:5
**interpreted (6)**
39:17;61:9,10;
88:19,25;89:20
**interrupt (2)**
117:22;256:2
**into (30)**
20:25;37:11;53:14;
56:13;63:20;102:4,
12,15,22,25;104:8;
114:14,18;121:11,18;
131:9;133:19;136:8,
13;138:7;146:2,23;
148:25;153:19;
174:19;184:14;
213:7;226:6;257:5;
258:5
**introduced (3)**
11:9;105:21;196:6
**inure (1)**
135:14
**investigate (1)**
229:2
**investigation (1)**
96:6

**invoking (1)**
17:6
**involved (4)**
23:3,6;36:19;58:13
**IP (45)**
118:21,24;119:5,8,
18,23;120:3;122:17,
20,22;123:5,9,11,15,
23;124:5,16;125:15,
16;126:3,4,24;
130:24;131:13;
144:11,18;147:5;
168:22;169:2;
232:22;233:14,18,24;
236:18;237:10,15;
238:9,16,17,17;
240:5,19;259:11,17,
21
**Ireland (11)**
132:15,19;133:3,8,
20;139:13;140:4;
143:8;144:11;147:6;
272:5
**Ireland's (1)**
144:18
**issue (10)**
21:6;26:4;36:21;
74:14;161:8;201:2;
215:14;274:12,13,13
**issues (9)**
19:24;36:22;50:5,
10;71:22;180:10,15;
210:18,21
**item (15)**
83:18;92:7;114:9,
10,25;127:10;
135:20;199:22;
206:25;215:14;
216:14;217:7,25;
221:9;253:24
**items (16)**
72:20;93:13;
114:17;115:8;
127:16;130:5;
199:13,22;203:20;
207:5;217:8,11,23;
250:24;251:25;
265:18

**J**

**Jacob (1)**
10:18
**January (6)**
178:15;220:20;
224:13,19,24;229:24
**Jay (1)**
16:8
**Jeff (1)**
11:10
**Jeffrey (2)**
131:17,21
**Jessica (1)**

23:24
**job (1)**
46:6
**Jodat (1)**
15:19
**Joe (2)**
15:19,20
**John (5)**
34:21;211:15;
214:6;274:16,22
**joint (1)**
237:25
**Joseph (1)**
10:21
**Judge (8)**
55:4;56:5;57:14,
24;58:10;63:6,10;
194:24
**judgment (11)**
46:25;53:13;58:16;
62:14;63:2;75:6;
90:19;91:22;152:24;
206:11,17
**judgments (4)**
44:5,10;53:11,22
**July (5)**
187:11,12;236:10;
262:8,10,11
**jumping (1)**
196:12
**June (45)**
58:22;72:8,15;
79:3,5;170:24;
186:21,24;187:4,7,
12,14,19;188:2,3,5,9,
14,17,21,23;189:2,4,
10;190:7,13;191:8,
25;192:4,9;193:3;
194:3,12;196:25;
197:18,18,18;198:4;
260:3;261:18,18;
263:2,3,10;269:15
**jury (1)**
25:13
**Justice (2)**
266:19;267:3

**K**

**Katten (1)**
10:13
**keep (7)**
136:12;142:8;
143:16;145:5,21;
183:8;245:6
**keeping (2)**
140:22;141:20
**kept (1)**
137:2
**kind (2)**
168:9;215:19
**Kinrich (18)**
35:21,24;36:8;

38:11;131:17,21;
139:15;140:6;
142:19;150:19;
171:16;183:18;
242:5,8;246:13,19;
272:5,25
**Kinrich's (5)**
131:23;132:12,20;
133:2;272:8
**knew (10)**
36:21;67:23;94:8;
111:17;112:22;
123:11;126:4;
142:16;223:16;
273:15
**knock (1)**
91:15
**knowing (1)**
67:18
**knowledge (5)**
21:14;67:3;158:20;
211:16,20
**known (1)**
126:6
**knows (1)**
222:4

**L**

**larger (4)**
27:17,18;175:12;
269:17
**largest (1)**
72:17
**last (16)**
19:12;79:25;82:3;
84:23;110:15;111:4;
132:5;198:22;
211:19;250:15;
253:20;254:25;
255:3;271:25,25;
272:20
**later (5)**
31:13,25;56:2;
59:6;212:25
**latter (1)**
55:16
**law (4)**
11:11;157:22;
158:12;201:15
**lawyer (1)**
45:24
**lawyers (7)**
15:12;16:3,6,7,9,
18;17:16
**lead (1)**
228:16
**leading (1)**
274:19
**leads (1)**
180:8
**learn (4)**
110:14;133:10;

143:25;151:17
**learned (1)**
119:18
**lease (1)**
92:21
**least (6)**
158:20;225:18;
251:17;252:10;
257:13;263:4
**leave (1)**
51:7
**LEBLANC (15)**
10:2,2;168:13;
196:4,7;222:4,8;
229:20;230:3;235:6;
244:9;256:4,13;
274:6,19
**Leblanc's (1)**
274:11
**led (3)**
181:25;212:18;
225:16
**left (3)**
14:20;71:16;
230:22
**leftover (2)**
127:17;239:19
**legal (10)**
36:22;37:19;49:8;
50:5,10;74:14;95:7;
152:25;158:9,17
**less (28)**
44:19;85:5,6,9;
86:25;104:6;110:17;
114:22;145:16;
160:9,20;172:12;
175:25;188:8;
194:22;195:10,12;
202:19;208:10;
218:25;219:8;
222:19;223:18;
262:23;263:21,23;
264:2;269:25
**letter (2)**
26:18,20,23,25;
27:8
**level (3)**
48:11;55:19;211:4
**levels (5)**
53:4,6,8,9,24
**liabilities (36)**
55:2;59:9,11,14;
60:4,17;61:11,19;
62:3;65:4;72:18;
73:24;75:8,15;76:3,
6;77:4,12;78:16;
83:8;86:21;92:10;
95:15;96:4;100:15,
17,21;108:16,17;
114:10;142:25;
152:12;164:25;
218:3,23;223:24
**liability (42)**

46:15,20;63:13;
75:18;76:2,24;77:19;
79:17,18;95:18;96:7;
127:20;172:19,21;
174:18;175:7,9;
179:2,13,17;183:6;
201:22;202:14;
207:6,15;209:20;
212:16,22,23;213:7;
214:8,13,18,25;
215:22;216:3;217:6,
23;220:16,18;224:6;
274:23

**liable (6)**
74:9,18;75:17;
76:5;77:2,13

**life (3)**
13:5;20:15,15

**likelihood (9)**
46:3;50:21;52:10;
123:20;124:21;
126:8;145:11;
240:16,24

**likely (5)**
176:12,14,25;
177:4;232:20

**limited (3)**
207:18;229:15;
252:6

**line (35)**
80:6,6,21;81:22,22,
24,24;82:7,7,7;83:5,
5;92:7;93:13;114:9,
10,25;116:25;117:4;
127:10;130:4;
135:20;138:25;
145:24;149:19;
217:7,25;219:15;
221:9;237:20;
238:21;239:21,25;
250:24;253:23

**line-by-line (1)**
83:18

**list (10)**
33:19;43:5;54:16;
80:19;83:7;91:15;
153:21;169:6;
172:16;175:2

**listed (32)**
19:10;33:16;34:5;
35:10;47:16;68:10;
74:19;76:9;85:11;
86:14,21,21;87:7;
89:14,21;92:7,13,18,
20,24;93:3,7,11,13,
20,21;95:15;128:21;
217:23;232:2;
235:24;242:19

**listen (5)**
18:14;60:22;61:6;
97:4;213:25

**listening (1)**
19:3

**lists (1)**
236:10

**litigated (1)**
49:18

**litigation (6)**
49:25;150:14;
231:5;241:25;
245:23;246:4

**little (9)**
53:17,17,21,21;
120:25;221:12;
260:4;261:12,15

**LLP (3)**
3:3,13;10:19

**located (1)**
257:25

**logically (1)**
214:15

**long (3)**
18:21;22:9;215:19

**longer (2)**
22:9;193:13

**long-term (5)**
71:4,20;80:20;
93:3,17

**look (82)**
30:4;31:21;32:7;
41:3,17;42:5;43:12;
54:7;58:4;59:3,7;
62:4;63:17;65:7,17,
21;70:6;71:3;73:18;
79:7;83:22;86:17,24;
89:8;91:13;98:9;
99:3;100:19;104:10;
105:19,19;110:9;
119:21;122:14;
125:14;127:12,16;
132:3;146:9;147:22;
149:19;156:3;157:8;
159:4;165:20;166:3,
8,11;167:14,20,24;
174:13;178:10;
179:10;182:15,18;
183:17;184:16;
189:5,17,25;190:17;
191:23;203:16;
206:25;215:6,9;
217:3;228:11,17;
235:4;236:3,20;
248:3;249:15;250:4;
251:19;256:16;
259:11,14;272:14,15

**looked (13)**
66:16;83:21;
100:13;107:8;
108:13;109:5;145:7;
178:2,14;207:16;
216:23,24;258:23

**looking (18)**
58:13;61:8;66:17;
76:6;81:8;83:16;
100:4;114:20;
149:12;154:6;

158:19;162:17;
165:6,7,7;176:3;
189:9;217:20,21

**loses (2)**
242:2;246:4

**losing (1)**
246:16

**loss (1)**
215:3

**losses (1)**
138:6

**lot (6)**
13:5;24:3;55:21;
56:13;157:19;159:25

**loud (1)**
146:10

**low (15)**
46:16;104:24;
106:13;108:6;
127:22;208:2,3,3,12,
13;211:7,10;214:4,
24;253:10

**lower (12)**
46:19;53:17,21;
66:4;101:11;115:23;
116:3;189:3;195:4;
208:9,9,12

**lunch (4)**
155:22,25;166:14;
167:13

**Luncheon (1)**
166:21

---

## M

**magnitude (1)**
50:19

**main (2)**
43:6;179:3

**major (2)**
42:10;43:9

**majority (2)**
104:23;253:8

**makes (1)**
266:13

**making (20)**
31:14;35:9,14;
36:23;43:10;64:21;
67:14;68:3,15;75:6;
76:4;90:19,21;106:4;
130:6;143:14;
196:19;202:3;265:8;
272:17

**mandate (3)**
32:15;34:12;41:4

**many (11)**
11:16;15:8;21:2;
28:20;29:6;99:15;
100:6;118:24;
122:22;125:15;126:3

**March (3)**
19:15;119:15;
248:21

**Mark (17)**
27:7;29:20;72:21;
81:7;119:11;120:9;
131:16,18;167:25;
169:12,15;181:5,6;
229:12,21;234:13;
235:7

**marked (6)**
29:23;72:24;78:23;
81:12;119:16;
120:14;131:22;
168:5;169:20;186:5,
8;229:25;230:6,15;
235:11,14

**market (6)**
224:10,10,12,13,
21;225:8

**match (2)**
83:4;162:18

**material (16)**
30:25;63:20;87:9,
19;94:10;95:12;
135:25;136:18;
137:5;138:10;
233:17,25;234:3;
265:24;267:15,18

**materiality (11)**
51:15,23;52:23;
53:5,7,8,9,12,23,24;
271:20

**materially (5)**
53:18;82:8;88:7;
89:12;101:4

**materials (2)**
33:20;169:6

**math (19)**
33:11;34:10;35:3;
52:20;55:22;66:14;
80:13;99:10;127:8;
154:15;184:3;
198:20;221:2,12,24;
222:2,13;261:14,14

**mathematical (5)**
52:20;56:18;57:4;
59:7;160:7

**Mathematically (24)**
45:23;46:23;67:5;
110:5;117:2;131:15;
135:19;136:9;
143:10;144:8,25;
145:23;159:16,23;
160:4,5,23;162:9;
179:12;191:5;193:2;
203:14;228:3;269:2

**matter (6)**
19:22;20:23;32:21,
25;198:2;275:3

**maximize (5)**
41:13,25;43:15,23;
44:3

**maximized (5)**
44:18;128:12,19;
143:22;144:16

**Mark (17)**
[second Mark column continues]

**maximum (26)**
31:9;41:18,19,21;
42:7;48:2,9,10;49:4;
113:25;114:4,8,22;
116:18,19;117:8;
146:16;147:2;188:7;
189:17,22;197:8;
198:16;263:16,21,25

**may (32)**
22:14;24:24;36:18;
41:11,23;43:3;52:6;
57:23;78:12,21;
86:25,25;88:2;
100:20;137:8;
140:17;147:20;
152:8;157:8;170:19;
174:20;184:25;
185:17;188:4;204:4,
5,5;218:25;228:15;
270:7,21;272:9

**maybe (5)**
15:10;29:19;
140:20;208:2;270:17

**McCloy (1)**
10:3

**McLellan (1)**
23:25

**mean (22)**
14:11;22:24;23:16;
24:25;26:13;27:12;
34:13;65:20;83:10;
98:6;113:2;128:3;
134:16;187:13,24;
188:18;192:20,22;
211:22;241:4;261:3;
263:9

**meaning (1)**
234:7

**means (1)**
98:18

**meant (5)**
37:18;59:22;82:6,
6;211:10

**measures (1)**
51:22

**mediation (1)**
178:11

**meet (2)**
14:17,25

**meeting (4)**
18:13,21,24;19:7

**Melissa (1)**
13:5

**memo (5)**
23:23;24:2,4,8,9

**memory (2)**
81:9;120:6

**mention (1)**
169:6

**mentioned (2)**
168:22;249:23

**met (2)**
14:9,16

**middle (2)**
12:14;22:22
**might (25)**
34:25;46:13;49:12;
53:12,14,22;60:22;
100:25;137:7;139:4;
145:19,24;203:21;
204:25;206:10;
207:6;215:7,10;
216:15;225:9,12;
241:14;244:18;
248:19;271:7
**Milbank (2)**
10:3,5
**milestones (10)**
241:2,7,11,14,17;
243:4;245:7,12,17;
257:4
**million (182)**
43:16;45:2,4,19,
21;57:12;58:7,20;
59:24;70:3,20;71:13,
14,15;72:9;76:18;
80:20,24;81:20;83:8,
9,12,13;84:7,8,9,10,
12,12;85:3,5,6,9;
88:12;89:20;90:12,
20,23;91:15;92:10,
22;99:5;102:11,22;
103:19,21;104:20;
110:17;114:13,23;
115:8,9;119:5,23;
122:16,23;123:6,12;
124:5,7;126:25;
127:4,13,15,18,22,
23;128:2;129:22;
130:25;132:14;
133:3;137:8;139:14,
18;140:5,16;141:14,
16,21,22;142:3,25;
143:5;144:2,3;
146:20;148:3,20,21;
149:11,23;150:4,11,
21;153:22;155:13;
157:15;158:24;
159:14;161:13;
163:5,7,11,14,19,21,
24;164:8,10;165:22;
176:17;188:15;
189:11;190:2;191:3;
194:19;197:13;
198:12,24;199:9;
202:25;203:6;
207:14,20;212:9;
213:2;215:16;
219:20;220:7;
221:15,22,22;222:11,
18,22;223:6,10,17;
225:19,19;226:3,20;
227:11,22,25;231:8,
22;233:8,8;234:17,
18;238:17,20;239:5,
9,25;242:18,22;

248:19;249:12,25;
250:14,15,19;251:25;
252:4,11;255:4;
258:22;261:17,22;
262:2,4,14,16,17,23;
268:10,11,20,21
**millions (4)**
135:22,23;136:25,
25
**mine (5)**
149:3;175:19;
176:2;183:5;249:8
**minus (5)**
31:17;54:21;55:6;
56:11;222:8
**minutes (1)**
153:18
**mischaracterizes (5)**
38:18;90:7,14;
91:7;179:25
**misinterpreting (1)**
89:9
**mislead (1)**
25:13
**mispronounce (1)**
69:12
**miss (1)**
154:22
**missed (1)**
135:6
**mission (1)**
47:25
**mistake (2)**
175:18;187:25
**modifications (1)**
32:2
**modified (3)**
24:10,13,14
**modify (2)**
116:14;260:4
**moment (8)**
28:22;51:21;80:8;
81:15;179:19;
183:12;184:11;
222:17
**monetization (3)**
241:2,8;258:2
**monetize (3)**
138:6;243:15;
258:17
**money (13)**
102:3;140:12;
192:11,12;211:25;
212:10;214:11,17;
233:3;251:13;
252:12;257:5;258:17
**monitor (85)**
10:20;17:19,23;
18:3,12;23:15;25:19;
26:3,7;28:14;29:10,
25;36:10;38:16;39:5,
11,23;40:3,15;78:5,8,
15;81:6,11,14;82:14;

85:2,8;87:8;88:10;
90:5;95:16;96:15;
101:16;104:14;
110:10,15,16,25;
111:3,14,21;119:13,
15,17;124:3;153:5,8;
200:25;201:14,18,25;
204:22;205:4,7,13;
234:13;235:2,10,16;
236:6,8;240:25;
241:7,16;243:8,12,
15,16,19,22,24;
244:4,21;245:5,13,
15;246:4,11;247:16;
248:19;249:11;
251:5;256:20;258:16
**monitored (1)**
23:9
**monitors (1)**
241:25
**monitor's (20)**
70:16,22;79:24;
80:3;87:6,14,18,22,
25;88:2,3,20;101:23;
119:9;201:5;236:14;
247:13;248:2;249:4,
19
**month (10)**
58:8,21;79:25;
82:3;84:24;176:18,
18;194:18;262:2,4
**Monthly (14)**
59:16;60:5,12;
61:13,17;155:20;
156:5,20;167:14;
168:2,4;181:6;218:9,
20
**months (3)**
154:20;253:20;
262:14
**MOR (15)**
156:10;216:24;
217:6,7,9,10;218:14;
219:16,16;220:15,19;
221:8,9;222:20;
223:4
**more (59)**
29:5;45:4,20,22;
46:7;47:6,9;49:2;
50:13,25;51:9;52:5,
13;56:13;61:3;65:14;
66:3;84:7;100:8;
104:5;115:15;
121:22;143:5,17;
172:7,9,9;173:12;
175:19;176:8,12,14,
20,24;177:4,11,12,
23;179:8,13,15;
180:15,21,23;181:8,
21;182:23;189:13,
19;208:13;214:17;
219:8;221:5;227:14,
18;234:21;259:9;

261:13;271:14
**morning (3)**
11:7,8;15:3
**most (16)**
47:5,19;75:19,24;
84:16;85:22;86:3,6;
111:20;158:22;
179:6;180:3,8;
216:24;218:9;244:5
**motion (2)**
21:14;236:8
**move (2)**
168:21;214:15
**movement (1)**
127:9
**moves (1)**
114:25
**moving (1)**
73:21
**much (19)**
29:10;65:23;67:20;
99:20;102:3;113:5;
117:15;172:22;
178:2;181:24;225:3,
6;232:20,20;233:3;
236:19;245:3,15;
251:13
**Muchin (1)**
10:13
**multiple (4)**
94:19;152:11;
157:24;240:12
**multiply (1)**
124:12
**must (1)**
245:18
**myself (2)**
11:9;196:6

## N

**name (10)**
11:10;15:15,16,17;
20:12;24:2;69:8;
101:24,25;196:7
**named (1)**
23:24
**names (4)**
15:14,17,18;
157:19
**National (1)**
10:14
**nature (2)**
53:19,20
**necessarily (8)**
42:16,21;50:17;
100:3;136:23;
138:16;144:6;255:19
**necessary (1)**
34:11
**need (9)**
12:11;50:19;59:18;
61:20;71:8,19;75:12;

87:10;128:19;
135:11;156:13;
163:5;164:15;165:2,
11,14;190:16;
198:21;272:10
**needed (6)**
47:14;59:20;75:10;
126:15,18;134:24
**needs (2)**
160:9;197:12
**negotiation (3)**
96:18;97:2,24
**neither (1)**
201:14
**NERA (6)**
26:7,19;27:2,5,10,
21
**net (25)**
37:20;41:13,18,25;
42:8;43:15,17,23;
44:3;46:13;48:9;
56:22;84:11;107:5;
127:17;146:5,12,17;
162:17;181:19;
215:3;239:6;251:24;
254:19;271:24
**Networks (3)**
72:24;75:3;252:6
**New (6)**
3:6,6,17,17;182:16,
18
**Newbould's (2)**
266:20;267:4
**next (11)**
30:17,22;58:21;
73:18;194:3,12;
205:8;206:24;
229:21;235:7;237:19
**Nick (1)**
10:4
**nine (8)**
83:8,12;110:15;
154:19;236:4
**NN (20)**
132:14,19;133:2,8,
20;139:13;140:4;
143:8;144:11,12,18;
147:5;155:7;158:13,
14;159:12,13;161:13,
14;272:5
**NNC (10)**
66:23;68:5,16;
72:8,11,14;75:4;
76:24;93:8;101:10
**NNCC (27)**
31:13,18;62:11,17,
18,21;154:18;173:7,
10,21;175:10;
178:25;183:23,25;
184:11;199:25;
200:4,11,14,19;
201:20;202:8,14;
204:16,24;205:14;

206:16
**NNCC's (1)**
201:22
**NNC-NNL-PPI000001 (1)**
120:13
**NNC-NNL-PPI1 (1)**
120:16
**NNC's (5)**
66:11;67:19;72:12;
73:16;75:18
**NNGC (1)**
101:10
**NNI (144)**
41:6,12,20,24;
42:9;43:15;44:17,18;
45:3,11,13;46:7,12,
18;47:9,19;48:2;
50:12,15;51:8,11;
52:5,13,17;54:9,13;
56:25;59:2;62:8;
63:22;64:5;65:12,19;
66:5,9,16,25;67:7,21;
71:4,9;75:20,25;
76:11;77:25;84:11;
85:23;86:3;91:5,19;
99:4,12;103:7,21;
104:4;109:20;114:2,
12,19;115:21;116:2,
5,18;127:6;128:11,
18;129:15;130:3,5,9;
131:2;132:10;
137:11;138:23;
140:16;141:15;
143:6,21;144:3,16,
21;145:23;146:5,13,
18;147:18;149:15;
151:25;153:12,22;
156:22;157:6;
158:21;159:12,14;
160:9,20;161:7;
164:14;165:12,15;
171:2;172:8,19;
175:13;179:7,14,16;
180:16;181:20,24;
191:7;199:16;
200:15,20;201:16,20,
21;204:6,13,19,24;
207:7,24;208:4;
215:24;216:16,20,23;
226:16;227:18;
228:2,6;231:19;
233:9,23;234:7;
239:7,10,21;242:7;
270:2;273:2,18
**NNIC (1)**
101:11
**NNII (1)**
154:18
**NNIII (4)**
155:9;156:21,21,
23
**NNI-PPI-118 (2)**
185:23;186:5

**NNI's (47)**
41:13,25;42:10,13,
16,21;45:17,20;
46:21;63:25;64:8,11,
15,16;65:3,4,10,15,
17,21,22;76:8;77:5;
84:14,17;98:25;
103:24;109:12,25;
127:3;133:18;
135:14;136:2,19;
137:5;138:15,25;
139:6,18;164:16;
165:8,11;183:15;
233:4;237:23;269:4;
271:24
**NNL (109)**
45:9;57:2;59:4;
62:5,6;64:6,7,9,13,
14;65:11,14,24;66:3,
17,20,23;68:4,15;
69:16;73:8,14;74:5,9,
18;75:4,17,25;76:13,
23,23,23,24;77:2,12,
25;78:6,9;83:22,23;
84:4,10;85:3,8;86:5;
88:14;92:21;95:2;
98:10,14;99:12;
100:5,7,15,19,25;
101:13;102:24;
103:5;105:25,25;
106:6,7,14;107:20,
25;108:8,24;112:12,
22;115:19;116:3,3,
16;117:14;118:12;
120:3;122:16,21;
123:14;127:5;
129:24;130:6;
133:11,13;135:14;
137:2,19;138:5,13,
14,22;139:6;141:14;
142:15,21;143:2;
144:2;147:18;
149:15;151:10,11,18;
152:2;169:2;252:23;
257:6;263:4;273:5
**NNL's (22)**
64:17;65:3,5,20;
66:11;67:3,18;68:10;
69:25;78:16;100:23;
103:8,18,24;107:9;
123:5;133:18,20;
134:13;135:23;
136:16;137:2
**NNSA (9)**
142:12,17,22,24;
143:25;144:12;
147:6;272:5;273:2
**NNSA's (1)**
144:19
**NNTC (1)**
101:11
**NNUK (7)**
36:16,20,24;37:6;

91:10;130:7;203:25
**nobody (1)**
22:16
**nod (1)**
12:5
**non-bondholder (4)**
62:13,24;173:8;
175:11
**non-debtor (1)**
158:13
**none (1)**
175:5
**non-inventory (3)**
248:20;249:12;
250:14
**nonlawyer (1)**
235:2
**nor (2)**
173:7;201:15
**Nordion (1)**
20:13
**N-O-R-D-I-O-N (1)**
20:13
**Nortel (9)**
19:19,25;72:23;
75:3;95:17;151:3;
244:23;252:6;257:22
**Notary (1)**
11:1
**note (3)**
72:11;73:2;205:8
**noted (2)**
167:3;275:17
**notes (17)**
31:14,18;62:12,17,
18,21;72:12,14;
173:7,11,21;175:10;
183:23,25;184:12;
199:25;200:4
**notice (2)**
148:10,21
**notwithstanding (1)**
247:8
**November (4)**
194:19,24;262:11;
263:10
**NRP (2)**
256:20;257:21
**number (76)**
55:14,15;56:11,12;
57:16,17;58:25;
59:15,25;70:10,25;
71:21,24;72:19;
114:13;115:20,23;
116:2,18;117:15;
119:6;120:3,7,16;
124:13;126:7;137:8;
147:6;148:15;
154:11;164:11;
170:21;171:18,25;
175:16,16;176:12,13,
17,18;177:5,6;
184:13;185:18;

192:25;193:12;
194:2;195:4;196:20;
197:6,22,22;203:4;
207:23;209:9,10,13;
220:2;223:6;225:24;
226:2;227:6,21;
231:8;232:19;
238:21;245:16;
246:21;248:3,9,15;
249:3,23;250:17,22;
254:3
**numbers (47)**
53:20;55:20,23;
56:3,4,11,17;57:10;
59:22;61:16;80:4;
81:2;84:6,15,17,20;
85:2;86:13,14,16,18,
20;89:10,13;91:2,14,
15;101:3,5;124:11;
127:11;132:8;
144:10,13;163:6;
187:11;189:25;
214:3;217:16,17;
218:4,7,13;230:13;
231:23;237:4;272:10
**numerator (1)**
69:24
**numerous (2)**
114:16;185:20

**O**

**Object (66)**
23:12;26:12;33:3;
42:17;43:25;44:8;
46:10;47:12;50:2,16;
51:12;54:24;55:8;
57:19;61:15;63:8;
66:13;68:6;69:22;
74:12;75:21;76:14;
77:14;100:10;
106:22;110:19;
112:17;113:9;
118:14;120:4;122:8;
124:9;125:17;
126:20;133:12,14;
135:2;137:21,25;
139:20;147:14;
148:23;151:20;
160:11;174:23;
178:5;179:24;182:3;
193:15;197:14;
204:7;209:2;210:19;
217:14;224:14;
225:4;226:21;
228:12;229:13;
232:15;233:20;
243:10;257:16;
263:7;266:2;271:17
**objection (77)**
12:8;16:14,20;
24:15;25:6,14;38:17;
39:13;48:5;55:9,17;

56:7;57:20;67:10;
68:7;78:17;88:24;
89:3,4;90:6,13,17;
91:6;92:4,12,15,23;
93:10;96:10;98:2;
102:17;107:21;
110:2;113:21;
116:21;122:24;
123:16;125:6,18,19;
126:11,21;131:4;
133:15;134:3;
135:16;136:20;
141:17;152:20;
153:3,13;157:25;
158:15;160:12;
161:18;164:19;
165:23;174:10;
201:6,9;205:17;
209:3;210:25;
224:15;225:21;
226:9;228:16,19;
234:8;238:11;
240:11,20;246:6;
255:18;266:3;273:7;
274:19
**objections (3)**
143:7;144:5,23
**objective (1)**
223:12
**obligations (7)**
94:15;95:24;
201:22;219:16,18;
220:3,5
**obtain (1)**
79:10
**obviously (1)**
191:21
**occur (1)**
204:5
**occurring (1)**
145:11
**October (16)**
68:25;69:6;90:25;
118:4,9;166:20;
167:9;185:5,9;
195:21;196:2;256:7,
12;262:5,9;275:16
**odd (2)**
168:15;181:7
**odds (1)**
182:14
**off (21)**
13:3,8;30:9;68:23;
91:13,15;104:9;
110:22;118:2;
166:16,18;183:13;
184:24;185:3;
187:12;189:21;
195:19;214:7;256:5;
275:11,14
**offend (1)**
69:12
**Offhand (4)**

Case 09-10138-MFW   Doc 14654-5   Filed 10/30/14   Page 296 of 306
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

76:22;85:19;
228:22;234:24
**officers (1)**
150:7
**offices (1)**
15:6
**Official (2)**
3:14;10:10
**offset (2)**
116:13;213:18
**old (2)**
78:22;84:21
**omitted (1)**
172:4
**One (105)**
3:16;13:4,25;
15:17;17:5;21:3;
25:2;27:21;30:20;
35:17;36:12;50:23;
52:5;56:11;60:19;
70:16;79:24;80:2;
81:5,10,14;82:10,11,
19;87:7;88:12,22;
91:11;94:18;97:17;
104:13;110:6;
112:24;114:9,9,24;
119:19;120:11;
121:7;127:10,25;
129:3;130:11;
131:18;135:10;
136:24;140:10;
142:14;144:20;
145:6,17,18,22,23;
152:12,13;156:11;
157:10;160:20;
162:14;167:14,19;
168:13,18,19;169:22;
181:8;182:10,23;
183:12;184:17,25;
186:17,18;187:13;
189:13;204:16;
209:19;212:2,14;
213:9,22;227:12;
232:7;234:22;235:9,
15;236:5;242:9,20;
244:2,3,5,20,21;
245:21,21,21;249:8;
250:18;265:18;
270:25;271:2,21;
274:10
**ones (5)**
14:19;44:6;118:13;
179:3;235:3
**one-third (3)**
211:7,9;214:24
**one-year (1)**
261:17
**online (1)**
19:3
**only (32)**
12:13;13:4;15:4;
43:16;57:14;66:16;
77:25;84:10,15;

104:4;107:3,4;108:2,
14;117:3;130:22;
135:20,24;136:5,14;
144:17;146:2;152:3;
168:7,13;178:9;
179:21;194:2;
214:23;247:25;
255:16;270:11
**opening (4)**
170:19;208:21,22,
24
**Operating (15)**
59:16;60:6,12;
61:13,17;155:20;
156:6,20;167:14;
168:3,5;181:6;215:3;
218:10,20
**opine (6)**
52:22;53:3,4,6,24;
54:3
**opinion (23)**
20:23;24:21;37:19;
48:20,21,24;49:23;
50:8;51:4;52:24;
73:12;90:3;108:20;
115:13;127:15;
129:18;141:23;
158:10;162:5;
174:21;175:23;
191:11;221:4
**opinions (4)**
30:10,13;32:12,21
**opposed (5)**
161:21;168:11;
184:8;212:20;272:12
**optimistic (8)**
37:23;38:9;46:17;
47:5;91:18,24;
109:15;116:6
**order (2)**
37:19;41:21
**ordered (1)**
194:24
**orient (1)**
233:5
**original (4)**
221:4;223:13,15;
229:18
**originally (3)**
23:2,18;226:8
**others (4)**
14:23;17:2;93:19,
21
**otherwise (2)**
12:22;142:7
**ourselves (2)**
207:2;238:15
**out (40)**
31:20;43:22;50:23;
59:16;60:5,11;61:13;
62:2;66:21;84:6;
85:3,5,9;96:7;101:9,
17;120:25;124:12,

19;125:5,11;126:3,9,
19;145:17;146:10;
149:2;154:19;159:5;
164:11;166:13;
169:14;177:15;
185:22;189:5;
190:22;205:21;
230:8;239:13;254:13
**outcome (17)**
35:5,19;36:22;
43:14;44:16;46:17;
57:23;62:7;93:14;
114:9;128:10,17;
143:20;144:15;
183:18;211:17,21
**outcomes (14)**
41:10,12,23,25;
43:3,15,23;46:4;
137:10;145:11,22;
174:14,15;181:15
**outdated (3)**
221:9;225:24,25
**outside (8)**
39:21;106:12,20;
107:12;108:2;
130:12,13,15
**outstanding (4)**
96:16,25;97:23;
98:5
**over (30)**
11:20;31:24;50:20;
51:17;71:12;95:5;
110:15;111:4,15,19;
127:14,18;128:2,3,5;
131:3,12;141:21;
142:25;144:22;
155:22;183:24;
191:8;193:13;194:4,
19;242:18,21;
261:17;264:20
**overestimated (1)**
204:4
**overstated (1)**
232:9
**Overy (2)**
10:19;15:11
**Overy's (1)**
15:6
**owe (1)**
104:6
**owing (1)**
260:21
**own (6)**
35:7;118:25;119:4;
136:2;152:4;189:6
**owned (2)**
119:4;239:7
**ownership (1)**
238:9
**owning (1)**
119:22
**owns (2)**
120:3;133:7

**P**

**page (56)**
30:4;73:4,18,25;
75:3;79:7;80:4,18;
89:17;103:16;
104:11;106:24;
115:21;116:10;
117:6,10;122:14;
128:22;129:9,13;
130:22;132:3,5;
138:18;141:12;
147:24;148:17,25;
149:17;153:20;
154:11;168:14;
169:5;170:5;199:17,
21;202:23;205:21;
207:2;219:17;230:9,
12;236:3,25;237:6,6;
244:13;250:4,7,10;
251:3,20,20;254:14;
269:10;272:20
**pages (8)**
30:5;168:15,19,20;
181:4,7;182:12;
185:17
**paid (19)**
49:13;101:16;
102:23;107:13;
108:2,12;159:3;
160:2;207:6;215:11;
216:16;260:12;
261:4,7;264:2,16;
266:8;270:11,15
**painstaking (1)**
163:3
**paragraph (38)**
31:3;41:3,17;42:5,
24,25;43:2,13;44:15;
45:7;106:25;119:21;
146:9,14;147:4;
183:20,21;186:21,25;
187:25;195:5,13;
196:14;203:8;
220:11;221:18;
226:25;236:4;237:9,
20;244:19;245:14;
251:2,19;255:2,24;
256:17;270:5
**paragraphs (5)**
32:7;202:12;
207:10;210:24;
256:16
**parent (1)**
139:16
**parenthetical (2)**
196:25;237:22
**Park (1)**
3:16
**part (23)**
21:16;36:20;41:4;
51:16;55:25;56:4;

63:18;64:2,5;96:20;
100:23;112:8;
134:10;140:23;
141:20;149:8;199:2;
211:19;247:11;
266:21;268:19;
270:17;272:19
**partially (1)**
198:3
**participants (1)**
257:25
**participating (1)**
15:9
**particular (8)**
70:6;83:19;122:13;
127:10;184:16;
188:24;199:20;
274:13
**particularly (1)**
36:4
**parties (12)**
35:24;37:6,9;
191:20,21;194:10,17,
23;195:2;236:10;
260:2,17
**parts (1)**
139:23
**Pasquariello (1)**
15:20
**pass (1)**
115:22
**passage (1)**
193:23
**passed (2)**
197:19;205:9
**past (2)**
111:15;264:18
**Paul (6)**
69:4;118:7;167:7;
195:24;256:10;
275:13
**pay (25)**
42:9;43:17;44:20;
45:5,22;54:23;66:9,
23,25;67:21;88:15;
102:12;106:12;
107:20;117:9;131:2;
158:23;160:9,15,17,
21;164:18;166:4;
226:3;266:12
**payable (10)**
72:9;80:25;81:21;
92:3,11;93:17;95:21;
106:20;270:7,21
**paying (1)**
88:10
**payment (25)**
37:5;41:20;64:17;
70:3,21;71:15;130:6;
146:13,18;159:22;
189:15;192:10;
193:14;194:6,12,15;
202:8;223:2;260:5,

20,24;261:7,10;
262:20;264:13
**payments (3)**
23:19;65:4,5
**payout (12)**
63:19;64:10,12,18;
67:4;69:23,24;77:24;
103:8,19;190:6;
193:22
**pays (10)**
64:7,9,13,14;65:11,
14;66:3;139:14;
160:8,19
**PBGC (32)**
157:14,17,22;
158:12,24;159:5,11,
14,18;160:9,10,17,
20,21;161:16;163:10,
16,19,21;164:2,7,10,
13,18;165:16;
216:15;221:21;
222:22;223:22;
225:15;226:8,19
**PBGC's (3)**
221:15;225:9,12
**Pension (27)**
3:4;10:17;20:3,6;
36:16,20,24;37:3,9,
25;38:13;83:20;
89:20;91:11;93:17;
94:9,15;130:7;
203:25;216:15;
219:15,17;220:3,5,
17,21;224:6
**pensions (3)**
95:25;224:2,2
**Pensyl (1)**
10:22
**people (7)**
15:8;17:9,11,15;
55:21;194:4;247:3
**Pepperdine (1)**
209:24
**per (7)**
58:8;123:23;
125:16;133:25;
176:17,18;206:3
**percent (43)**
67:4,5;76:2;85:10,
21;86:5,7;99:11;
103:9;109:18,19;
130:5;138:14,25;
139:7;142:22;144:8;
145:14;163:16,18;
164:3,7;189:13;
190:19,22;200:6;
202:16;206:2,3,18,
18;208:6;228:8;
239:9;261:21;
267:23;268:6,17,19,
24,24;269:6,8
**percentage (16)**
62:22;63:19;85:17,

19;101:10;114:4;
123:4;163:15,25;
164:9;165:15;191:7,
19,24;193:11,22
**perform (11)**
55:5,13;56:6;
57:11;58:11,23;
63:13;70:24;71:8,19;
72:5
**performance (1)**
225:8
**performed (4)**
54:14;56:23;57:6;
146:15
**perhaps (1)**
191:15
**period (7)**
79:2;110:16;
178:10,16,19;198:17;
261:18
**periods (1)**
178:15
**permanent (1)**
252:3
**person (3)**
13:4;17:23,25
**personally (1)**
30:9
**perspective (5)**
77:6;109:12,25;
133:18;263:4
**Perusing (19)**
30:3;36:12;74:21;
76:21;106:24;
119:20;120:21;
132:16;149:3;
168:12;182:22;
184:15;186:7;
187:21;217:22;
230:23;250:9;270:5;
272:17
**PhD (4)**
55:13;162:15;
210:13,15
**PHONE (4)**
3:8,21;249:6,7
**physically (1)**
122:4
**picked (1)**
234:16
**picture (2)**
114:21;148:25
**pin (1)**
219:14
**place (2)**
255:15;256:2
**places (1)**
228:23
**plan (3)**
244:23;256:15;
257:22
**planning (1)**
169:3

**play (2)**
53:14;81:8
**pleasant (1)**
255:7
**please (6)**
10:24;12:10,20;
13:3,8;135:8
**plus (27)**
56:24,25;64:6;
72:8;80:19,20,21,21,
21,21,22,22,22,22,22,
23;83:23;114:4;
115:8;150:21;
154:17,17;258:21;
265:13,13,15;269:7
**pm (13)**
118:9;166:19,21;
167:3,9;185:4,8;
195:20;196:2;256:6,
12;275:15,17
**pocket (1)**
249:7
**point (18)**
35:4;51:15;62:20;
71:14;83:9;88:12,22;
117:25;119:4;121:7;
166:14;192:17;
209:18;236:21;
258:7;261:10;
263:15;268:21
**pointing (1)**
274:14
**points (1)**
143:18
**pool (5)**
152:13;163:16;
164:2,8;269:18
**portion (9)**
27:4;61:11,16;
115:3,5;151:5;
203:10,14;269:17
**portions (2)**
64:20;107:2
**posit (1)**
202:18
**position (3)**
201:2;242:2;267:9
**positions (1)**
266:13
**positive (6)**
139:18;142:2;
144:2;255:11;
257:23,25
**possess (1)**
78:11
**possesses (1)**
78:8
**possibility (5)**
161:15;189:11;
202:18;216:3,5
**possible (9)**
46:7,12;47:9;
50:25;66:15;181:24;

226:18,22;263:5
**Possibly (7)**
52:9;88:7;113:15;
116:7;159:7;259:15;
263:17
**post (1)**
269:12
**post-petition (21)**
25:20;26:4;27:15;
28:7;62:25;63:13;
200:15,20;264:21;
265:6,16;266:7,10,
15,21;267:4,12;
269:15,23;271:3,9
**post-retirement (1)**
95:24
**potential (4)**
46:14;87:9,19;
273:17
**potentially (1)**
138:21
**PPI (53)**
27:25;28:4,11,15;
30:2;31:6,7;32:21;
41:20;42:9;43:17;
44:20;45:5,22;46:8;
47:10;48:3,11;49:6,9,
12,15;54:23;62:11,
16,20;63:22;66:10;
67:2,21;117:9;131:2;
146:13,18;173:6,7,
10,21;174:3;175:9,
11;178:24,25;
199:24;200:4;201:6;
202:7;227:25;
239:10;260:21;
270:7,20;275:3
**preamble (1)**
251:23
**precise (3)**
212:6;221:11;
261:13
**predicate (2)**
89:7;136:24
**preliminary (2)**
82:11;187:5
**preparation (14)**
14:2;15:9,25;
16:10,13,19,23;
17:24;18:7;38:22;
39:7;40:2,7;178:19
**prepare (4)**
13:23;14:4;15:2;
216:10
**prepared (2)**
23:24;219:4
**preparing (1)**
33:6
**pre-petition (5)**
71:5;107:2;265:13,
15;269:13
**presence (1)**
39:21

**present (7)**
15:13,25;16:4;
17:20;40:4;62:12,22
**presentation (2)**
215:15;218:21
**presented (1)**
74:10
**presume (2)**
11:13;122:15
**pretty (1)**
45:15
**previous (5)**
97:10;181:9;258:7,
12;273:9
**previously (5)**
31:11;97:17;168:9;
252:7;273:21
**primarily (1)**
252:4
**principal (7)**
190:17;260:6,20;
262:21;264:16;
265:12;269:12
**principle (1)**
45:15
**principles (1)**
210:12
**printed (2)**
120:24;149:2
**printouts (1)**
185:12
**prior (5)**
11:19;26:8;107:24;
212:14,15
**priority (4)**
70:3,21;71:15;
268:20
**Private (1)**
252:6
**privilege (3)**
12:16;17:6,7
**privileged (3)**
16:15,22;17:4
**probability (5)**
104:25;106:14;
108:7;123:20;126:8;
129:10,13;145:13,16;
161:16;253:10
**probably (6)**
11:18;22:10;55:21;
97:15;117:25;156:6
**problem (2)**
40:18;121:17
**proceedings (2)**
22:5;245:18
**proceeds (17)**
56:24;57:11;70:7;
116:16;131:14;
132:14;213:18;
233:24;237:10,16,24;
238:9,17,19;239:5,7,
19
**process (7)**

211:18,22;218:19;
239:14;242:12;
243:5;257:10
**produced (1)**
121:4
**production (1)**
185:2
**productions (1)**
185:21
**program (4)**
245:6;247:9,17;
257:4
**progress (1)**
245:15
**projected (2)**
77:24;124:25
**projection (2)**
59:3;62:5
**pronounce (1)**
69:8
**proof (1)**
201:16
**proofs (1)**
99:17
**property (1)**
112:10
**proportion (1)**
150:13
**proposed (6)**
31:5;41:8;48:16,
22;132:13;146:19
**proposing (1)**
153:6
**Protocol (4)**
238:3;241:25;
245:22;246:4
**provide (8)**
18:5,16;49:23;
50:8;81:19;236:6,13;
256:20
**provides (1)**
201:21
**providing (1)**
25:19
**provisions (1)**
107:7
**Public (2)**
11:2;122:12
**publicly (1)**
166:9
**publicly-available (1)**
122:6
**published (1)**
24:21
**pull (1)**
148:14
**pulled (1)**
156:15
**PULTMAN (172)**
10:18,18;14:18;
16:11,14,21;17:10,
14;23:12;24:15;25:6,
14;26:12;33:3;37:7,

10;38:17;39:13;
42:17;43:25;44:8;
46:10;47:12;48:5;
50:2,16;51:12;54:24;
55:8,17;56:7;57:19;
60:18;61:15;63:8;
66:13;67:10;68:6;
69:22;73:20;74:12;
75:21;76:14;77:14;
78:17;79:16;86:10;
88:24;89:3;90:6,13,
17;91:6;92:4,12,15,
23;93:10;96:10,24;
98:2;100:10;102:17;
104:16;106:22;
107:21;110:2,19;
112:17;113:9,21;
116:21;117:21;
118:14;120:4;
121:10,14;122:8,24;
123:16;124:9;125:6,
17,23;126:11,20;
127:25;128:23;
129:2;131:4;133:12,
14;134:3;135:2,16;
136:17,20;137:21,25;
139:20;140:24;
141:4,17;143:7;
144:5,23;147:14;
148:12,23;151:20;
152:20;153:3,13;
155:21;157:25;
158:15;160:11;
161:18,23;162:11,24;
164:19;165:23;
166:13;174:10,23;
178:5;179:24;182:3;
183:8;193:15;
197:14;204:7;209:2;
210:19,25;217:14;
222:2,5;224:14;
225:4,21;226:9,21,
23;228:12,19;229:10,
13;232:15;233:20;
234:8;238:11;
240:11,20;243:10;
244:7;246:6,8;249:8;
255:18,25;257:16;
263:7;266:2;271:17;
272:18;273:7,12;
274:9;275:5,9
**punch (1)**
56:10
**purchases (2)**
249:13;250:14
**purely (2)**
193:11;206:4
**purports (1)**
31:6
**purpose (22)**
83:6;130:14;
173:23;174:6,9;
181:14,18,19,23;

182:8,25;183:4,4;
202:8,11;204:11;
215:21;228:11,17;
236:4,5;266:6
**purposes (25)**
37:16,24;38:9;
112:18,21;127:20;
128:8;129:17;
130:16;132:9;
173:17,19,24;200:5;
206:4;216:22;
217:11;226:13;
231:23;246:7;
248:20;270:6,9,10,19
**pursuant (5)**
41:7;146:19;238:2;
260:7,22
**pushed (2)**
115:19,23
**put (13)**
51:14;102:11,22;
122:20;131:11;
137:23;146:16;
184:14;185:11;
191:17;195:13;
219:14;232:18
**Putting (3)**
14:2;138:10;
144:19

## Q

**qualified (2)**
128:15;129:12
**qualitative (1)**
93:15
**quarter (1)**
265:20
**quite (2)**
158:7;183:25
**quote (2)**
212:4,15
**quoted (2)**
205:4;207:18
**QURESHI (3)**
3:18;10:7,7

## R

**range (9)**
185:20;207:16,19;
209:12,21;211:7;
214:9,12,24
**rate (22)**
49:13;58:15;62:12,
14,17,17,19;63:2;
84:4;176:5,12;
188:24;189:3,12;
190:20;206:8,10,11,
17,19,21;231:22
**rates (3)**
206:2,13;231:12
**rather (4)**

60:23;61:8;97:4,9
**ratio (8)**
64:11,12,18;67:4;
69:23,25;103:8,20
**Ray (4)**
34:22;211:15;
214:7;274:16
**Ray's (1)**
274:22
**reach (13)**
66:8,24;67:20;
109:5;192:8;194:18;
203:16;209:13;
211:6;260:2;263:13;
273:4,13
**reached (1)**
66:18
**reaches (1)**
268:10
**reaching (1)**
66:10
**read (21)**
24:24;82:13;89:18;
101:22;119:3,9;
140:2;146:10;148:8;
188:19;191:10;
201:12;205:3;
229:17,19;237:21;
244:14,16,19;245:2;
251:16
**reading (9)**
13:17,18;87:11;
97:5;228:21,22;
241:11;255:2;270:16
**real (3)**
11:21;126:7;
230:20
**realistic (36)**
41:15;44:4,6;
46:24;47:6;50:21,21;
52:10;85:24,25;86:4;
90:9,12,21;91:9,21,
24;109:16,21;129:7;
145:18,19;172:10,12,
18;173:12;177:24;
180:5,8,19,21;
181:22;208:10;
219:6,8;221:5
**realistically (5)**
46:12;115:13;
128:15,16;179:11
**realize (1)**
184:4
**really (3)**
16:6;100:8;129:25
**re-ask (1)**
39:18
**reason (8)**
74:8;124:24;
152:17;214:12;
215:18;234:15,22;
257:3
**reasonable (17)**

68:3,14;88:21;
113:17;130:11,18;
160:7;173:25;
174:21;175:19,25;
176:21;177:10,11,11,
12;214:5
**reasonableness (6)**
127:17;129:18,21,
24;145:8,10
**reasons (1)**
25:10
**rebuttal (4)**
169:8,16,19;
229:17
**recall (6)**
24:6,12;169:10;
232:23;233:10;
274:17
**receipt (3)**
64:11;253:21,22
**receipts (4)**
110:12,17;254:18,
19
**receivable (3)**
106:17;253:13,17
**receivables (26)**
104:10,23,24;
105:4,9,14;106:2,8,
15,19;110:11;111:2,
7,11,24;252:5;253:9,
9,12,18,25,25;
254:10,16,18,23
**receive (7)**
31:8;38:23;104:5;
114:3;150:21;
193:21;214:17
**received (9)**
35:20;49:2;110:18;
122:16;191:12;
192:21;193:19;
199:2;246:11
**receiving (3)**
116:16;130:5;
140:12
**recent (5)**
72:9;111:21;218:9;
234:21;244:5
**recently (2)**
177:19;184:6
**Recess (6)**
69:2;118:5;166:21;
185:6;195:22;256:8
**recollection (6)**
38:4;120:2;187:24;
189:8;205:12;231:11
**recollections (1)**
168:10
**reconciliation (1)**
218:18
**record (20)**
68:24;69:5;118:3,
8;120:15;166:17,19;
167:8;183:13;

184:24;185:4,8;
195:20,25;217:19;
230:7;256:6,11;
275:11,15
**recorded (1)**
82:19
**recording (2)**
82:15;84:12
**recover (1)**
62:8
**recovered (2)**
109:17,19
**recoveries (5)**
59:3,4;62:5,7;
252:5
**recovery (7)**
38:13;56:25;105:3,
15;109:10;116:18;
253:12
**redid (1)**
33:11
**redound (1)**
273:5
**reduce (10)**
114:17;115:9;
146:5;159:14;
164:12,13;226:15;
239:16;243:8;260:6
**reduced (15)**
115:12;159:22;
189:12;203:11,15;
226:19;231:15;
242:16,17,21;260:14;
264:9,11,12,14
**reducing (1)**
31:7
**reduction (13)**
84:9;138:22;
164:17;165:8,10;
218:17;221:20;
222:10;225:19;
226:7,25;242:25;
257:9
**reductions (1)**
204:4
**refer (4)**
28:5;31:13;118:20;
187:25
**reference (6)**
149:19;184:15;
203:8;229:3;240:9;
274:22
**references (1)**
274:15
**referred (16)**
27:19;42:25;81:15,
18;109:6;112:4;
118:11;120:18;
147:23;148:9,17;
171:10;188:2;
208:14;228:24;
231:25
**referring (20)**

24:5;30:5;42:23;
45:6;72:12,22;73:3;
76:19;112:7;118:13;
120:11,20;145:5;
147:21;152:9;
203:19;212:3;
253:13,14;274:20
**refers (2)**
119:22;181:11
**reflect (1)**
37:18
**reflected (4)**
221:14;252:7;
253:4,6
**refresh (2)**
120:2,6
**refreshed (1)**
189:8
**regard (3)**
38:11;79:17;81:20
**regarding (9)**
19:24;36:20;38:6;
45:8;50:4;53:13;
68:9;213:13;236:7
**regards (5)**
31:15;67:15;68:4;
110:25;182:24
**relate (2)**
106:8;138:4
**related (11)**
20:10;32:21;35:18;
53:11;101:22;
151:12;253:24;
257:13;268:20;
274:12,24
**relates (3)**
118:17;207:5;
244:22
**relating (2)**
241:17;243:4
**relation (2)**
236:18;274:23
**Relative (3)**
99:7;110:11;
224:23
**relatively (1)**
101:10
**relevant (2)**
107:6;244:18
**reliable (1)**
217:11
**relied (11)**
23:23;24:2,3,8;
33:20;80:5;110:7;
111:20;169:7;
217:16;253:19
**relief (2)**
244:12,20
**relinquished (1)**
132:8
**rely (4)**
89:19;217:17;
244:3;247:12

**relying (2)**
91:2;100:15
**remain (2)**
106:8;245:16
**remainder (1)**
54:22
**remaining (6)**
106:3;126:24;
241:3,9;242:23;
245:22
**remember (21)**
22:7,25;23:25;
24:11,18,19;36:14;
38:20;76:22;84:6,15;
87:24;119:19;121:7;
201:17;228:21,22;
233:7;234:15,24;
241:10
**remove (1)**
93:16
**reorient (2)**
207:2;238:15
**repatriate (1)**
258:18
**repatriated (3)**
251:6,14;254:4
**repatriation (7)**
241:18;243:22;
246:22;251:4;
252:12,21;257:23
**repatriations (1)**
252:17
**repayable (1)**
107:3
**repeat (15)**
12:21;60:25;87:10;
97:6,19;102:20;
139:24;149:4;194:7;
204:9;233:22;242:3;
252:19;266:25;268:3
**repeatedly (2)**
111:14,23
**rephrase (3)**
12:21;67:17;
204:10
**replace (1)**
182:17
**replacement (1)**
181:5
**report (199)**
13:20;14:3,3,8,12;
18:10;19:10;21:18;
22:13,23,25;24:10,
13,14,19,22,25;5,13;
29:21,22,24;30:9,10,
14,19,24;32:4,15,17,
22,25;33:2,8,9,22,24;
35:8,21;36:8;38:22;
39:7;40:2,7,22,25;
41:4;44:2,13;45:21;
46:2,16;47:7,16,20,
25;51:16;59:16;
61:17;63:18;68:11,

17;70:17,22;73:3;
74:5;79:24;80:3;
81:6,11,14;85:2,9;
87:8;88:3,4;90:14,
16;95:16;101:23;
103:16;104:11,14;
111:21;113:25;
116:9;119:10,12,15,
17;124:3;129:7,17;
130:17,23;131:11,17,
20,22,23,24;132:4,
10;137:4,24;138:8,
18;141:10;142:19;
144:17;146:6,15;
153:20;155:20;
156:6,20;157:9,14;
168:3,5,25;169:6,8,9,
16,19;170:2,5;
173:23,24;174:6,9;
177:8;179:5;181:7;
183:21;184:5,14;
186:25;189:6;
196:14;197:10;
199:14;201:5;
202:13;205:17,22;
207:11;210:24;
212:7;216:11;217:4;
218:8,10,20;219:23;
220:12,22;221:18;
228:11,18,25;229:4,
17,18,23;235:10,16,
22;236:6;237:2;
238:8;240:7,10;
242:21;244:4,14,22;
245:4;246:7,13,19;
249:20;250:5;
251:17;252:25;
253:14,19;270:4,7,
10,20;271:16;272:4,
11,25;273:6,14,16;
274:24
**reported (1)**
58:6
**reporter (9)**
10:24;12:4;87:11;
97:7;229:21;230:5;
234:12;235:7,14
**reporting (3)**
76:7;77:16;156:19
**reports (11)**
60:6,12;61:13;
111:14,23;167:15;
169:22;175:4;
234:14;235:3;244:3
**represent (10)**
10:5;11:11;16:9,
18;17:14;123:22;
196:8;219:2,4;
236:17
**representation (1)**
236:22
**representative (3)**
36:10;38:15;78:4

**representatives (5)**
26:2,8;39:5,11,23
**represented (1)**
221:5
**representing (2)**
18:3;40:15
**represents (2)**
72:7;84:2
**request (5)**
12:13;18:11;
121:16,21;155:18
**requested (7)**
32:11;35:20,23;
36:3;130:6;244:12,
21
**requesting (2)**
121:21;245:5
**require (1)**
67:13
**required (2)**
55:13,20
**requirements (1)**
156:19
**reread (3)**
33:10,15;97:12
**reserves (1)**
107:6
**residual (4)**
241:3,9;243:15;
258:2
**resolution (4)**
192:8;194:5,11;
245:21
**resolve (2)**
194:25;195:2
**respect (24)**
27:25;45:13;47:23;
52:23;77:11;95:14,
20;108:3;158:20;
167:22;179:20;
180:9;182:20;
205:14;206:16;
215:13;218:12;
236:14;241:8;
242:11;246:3;
247:25;257:13;259:4
**response (1)**
174:5
**responsibilities (1)**
27:25
**responsibility (3)**
11:24;94:23;
151:10
**responsible (3)**
74:5;75:8;152:3
**restate (3)**
139:3;200:16;
272:23
**restricted (1)**
70:18
**restructuring (2)**
92:10;95:14
**result (6)**

108:6;127:6;
150:23;196:23;
252:4;262:22
**resulted (2)**
51:5;84:10
**resulting (1)**
115:14
**results (3)**
131:25;194:5,11
**resumed (1)**
167:4
**retained (1)**
247:4
**retention (6)**
244:23;245:6;
247:9;256:15;257:4,
22
**revenue (4)**
21:4,6,7;123:14
**reverted (1)**
223:6
**review (19)**
19:6,9;83:23;84:3;
85:11,18;87:7,15;
89:8;94:17;95:6;
98:6;99:7,13;100:22;
201:8,11;234:14,22
**reviewed (5)**
33:10,14;122:16;
131:23;169:23
**reviewing (3)**
169:10;173:3;
175:4
**Right (159)**
37:16;44:23;48:4;
56:18;58:8;59:15,16;
60:5;61:12;64:8;
67:9;68:5;70:8;79:8;
80:14;91:13;99:10;
106:4;138:8;140:16;
148:6;157:22;165:3;
178:4;180:5,11;
187:24;188:9;
190:19;192:22,23;
193:4;194:14;195:6,
13;197:4;198:7,13,
20;199:4,9;200:7;
202:9,16,20;203:18,
22;204:6,21;205:20;
206:19;209:23,25;
212:2,16,17;213:4;
215:18;216:14,16,20,
25;218:6,14;220:8,
14;221:16,24;222:13,
20;223:5,7,10,15,18;
224:7;226:16;
227:16,19;228:2,8;
231:21,24;232:10;
233:19;234:2;
235:23;236:2;237:6,
9,20,23;238:21;
239:11;240:3;
241:13;242:9,16,25;

244:2,4,20;245:20;
246:2,14;247:5,14,
15,19,23;248:4;
250:5,25;251:17,21,
23;255:5,8,11,16,17,
23;257:6,10,15;
258:19,22;259:16,22,
24;260:8,24;261:19,
22,23;262:9,14;
263:3,12,14,17;
264:4,15,19;265:2,
12,18,20;267:24;
268:12,15,16,22,25;
269:18,21;270:22,23;
271:16
**right-hand (1)**
30:5
**rigmarole (1)**
192:9
**rise (2)**
48:11;190:7
**risen (3)**
190:12;192:18;
193:7
**rises (1)**
194:3
**risk (2)**
49:12,21
**risks (1)**
49:8
**Rockstar (1)**
112:10
**role (3)**
17:22,25;18:4
**roles (2)**
17:8,11
**room (1)**
14:23
**Rosenman (1)**
10:13
**ROSENTHAL (45)**
11:6,10;16:8,17;
17:5,12,17,18;39:16;
68:21;69:7;73:23;
90:15;117:24;
118:10;120:15;
125:21,25;128:25;
129:4,5;131:7;134:6;
141:7,8;155:24;
161:20;162:13;
166:16;167:11,25;
169:12;184:22;
185:10;195:16;
196:10;198:8,18;
216:7;228:5;229:7;
232:21;258:23;
259:25;275:7
**Rosenthal's (2)**
196:23;240:4
**rough (8)**
60:25;87:12;97:8,
9,16;163:15,25;164:9
**Roughly (7)**

104:3;190:22;
191:5;198:14;262:2,
3,17
**round (2)**
23:20;207:23
**row (1)**
205:25
**rows (1)**
250:18
**rules (1)**
11:19
**run (1)**
66:14
**running (1)**
187:7
**runup (1)**
178:3

## S

**sacrosanct (1)**
116:11
**sale (20)**
56:24;57:10;70:7;
119:18;122:17;
124:7;125:2;126:4,5,
8;127:5;131:13;
132:14;144:17;
236:9,18;237:10,16,
24;239:19
**sales (27)**
105:2,9;112:3,5,8,
9;114:5;115:11,18;
116:3,17;117:2,13;
118:11;123:15,21;
168:23;233:24;
238:10,18;239:13,14;
240:17,24;259:4,11,
14
**same (58)**
11:18;13:7;48:5;
58:11;62:12,17,19,
21;90:17;92:12,15,
17,23;93:10,11,12;
95:20,23;96:3;
111:22;121:2;124:2;
131:12;136:13;
140:23;141:17;
142:8;143:4,7,16;
144:5,23;147:3;
153:3,13;158:15;
170:20,20,25,25;
171:10,11,19,24,24;
174:5;182:25;183:5;
185:21;193:4;197:5,
23;198:17;203:12,
16;205:18;228:19;
269:9
**satisfied (2)**
140:5;161:17
**satisfy (1)**
157:2
**saw (6)**

71:13;106:13;
122:15;148:19;
150:2;187:18
**saying (15)**
42:14;52:4;66:20;
67:15;68:12;88:9,19;
115:17,25;117:8,12;
134:11;166:5;
178:24;180:13
**scenario (14)**
41:12,24;42:9;
43:4,8;77:25;91:4,
18;103:7;113:7;
114:2;123:13;132:9;
158:21
**scenarios (2)**
174:16;181:16
**Schedule (2)**
230:15,18
**Schweitzer's (1)**
209:17
**scope (2)**
185:18;235:25
**screen (2)**
60:23;61:8
**search (2)**
259:16,19
**second (15)**
58:4;72:17;73:6;
82:11;106:25;112:2;
184:25;196:11;
207:2,4;212:4,5;
245:8;256:19;265:19
**secondly (1)**
113:3
**Section (12)**
43:5;199:13,14;
203:5,20;204:2,11;
215:14;226:14,14;
244:16;245:5
**sections (1)**
244:17
**seeing (3)**
87:24;148:4;
205:13
**seek (3)**
38:21;40:24;43:22
**seeking (2)**
236:8;247:17
**seem (1)**
139:23
**seems (2)**
22:9;237:3
**select (1)**
234:13
**sell (7)**
112:13,23,25;
113:18;130:24;
168:24;169:3
**selling (3)**
119:8;122:21;
259:17
**semantics (1)**

198:2
**sense (5)**
53:23;156:7;
214:19;241:10;
266:13
**sensitive (6)**
96:18,18;97:2,3,24,
24
**sensitivity (16)**
44:22,25;45:7,8,
13;84:9;103:15;
127:3;140:15;
141:11;143:3;206:5;
228:6;239:8;268:9,
23
**sentence (5)**
19:21;147:7;
198:22;205:8;256:19
**sentenced (2)**
21:23,24
**separate (2)**
82:15;272:22
**separately (2)**
82:16;105:12
**September (13)**
28:18,19;29:11,14,
18;58:7;81:11;82:2;
154:2;178:17;
235:11,18;262:9
**series (5)**
71:23;142:7;
190:21;232:21;
259:25
**serve (1)**
26:14
**set (1)**
257:5
**sets (1)**
237:3
**setting (1)**
36:21
**settle (2)**
31:6;223:17
**settled (22)**
55:3;69:21;86:22,
25,25;87:3;88:5,6,14;
89:15,22;90:24;92:8,
18,25;93:9;218:24,
25;219:5,7,10;222:18
**settlement (49)**
44:19;46:9;47:11;
48:3,12,22;49:2,6;
50:14;51:10,24;52:8,
16;62:13,22;68:3,14;
79:14;147:13,16;
148:11,16;188:13,14,
15,20,20,22;189:10;
190:2,7,12;191:2,4;
192:14,17,24;194:9,
18,20;195:3;197:22;
201:6;260:3,8,22;
261:8;262:22;263:12
**settlements (3)**

Case 09-10138-MFW    Doc 14654-5    Filed 10/30/14    Page 301 of 306
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

105:24;106:5,6
**settling (3)**
191:7,11,20
**Seven (3)**
15:10;71:14;83:9
**Seventh (4)**
3:5;235:10,16;
236:6
**several (6)**
126:16;161:10,19;
165:24;181:11;
228:23
**shall (2)**
201:21;237:25
**shareholder (1)**
140:12
**sheet (3)**
108:14;110:8;
218:2
**short (1)**
119:10
**shorter (1)**
232:20
**shortfall (1)**
224:5
**shorthand (1)**
118:21
**shortly (2)**
56:17;167:12
**show (14)**
82:9;83:3;84:18;
85:6;154:8;156:7;
181:24;205:24;
206:5,17,21;230:10;
249:11;250:3
**showed (1)**
124:4
**showing (2)**
154:12;215:21
**shown (2)**
218:23;226:15
**shows (1)**
83:20
**side (20)**
56:22;59:8;65:8,
18;66:16,17;79:18;
103:4;109:15;
137:24;153:16;
162:3,4,6,7;165:9,11;
230:21,22;232:18
**signature (1)**
30:6
**signed (2)**
26:25;27:8
**significant (4)**
51:18;151:4;
245:17;251:25
**significantly (3)**
86:16;193:13;
269:17
**signing (2)**
30:8,9
**Similar (1)**

211:23
**simple (3)**
54:14;56:23;
163:23
**simplest (1)**
268:22
**simplify (1)**
247:23
**simply (8)**
59:9;89:11;160:25;
218:6;221:8;263:19;
265:11;273:25
**single (3)**
77:3,10;82:19
**sit (2)**
205:12;224:23
**sitting (5)**
14:19;24:20;30:12,
19;90:10
**situation (1)**
163:17
**situations (3)**
53:13;78:14;179:8
**six (4)**
219:17;250:18;
253:20;256:9
**sixty-first (3)**
119:12,14;156:8
**sixty-seven (1)**
268:21
**sixty-two (1)**
71:14
**skimmed (2)**
244:17;251:16
**slide (1)**
228:24
**sold (10)**
21:5;113:2;122:22;
123:9,12,23;126:25;
233:4;240:6,19
**sole (3)**
48:14,18,21
**solely (1)**
76:23
**solvency (3)**
19:25;107:8;133:5
**solvent (3)**
132:20;133:3;
142:18
**S-O-M-E (2)**
61:5,10
**somebody (2)**
124:25;234:25
**sometimes (1)**
270:21
**Somewhat (2)**
210:13;224:3
**Sorry (30)**
37:10;40:16;65:20;
73:20;86:11;89:3;
97:10,20;98:13;
106:3;121:13;128:6;
141:3;148:4,12;

198:19;200:12;
210:14;215:19;
219:25;225:21;
237:5;238:23;242:5;
248:21;249:5;250:7;
254:22;263:24;268:5
**sort (4)**
27:4;105:23;
181:13,17
**sought (4)**
22:13,19;79:10;
247:4
**sound (1)**
222:13
**source (8)**
35:11;38:3;72:11;
73:15;79:11;184:13;
217:12;228:22
**sources (3)**
34:2,4,8
**speak (2)**
13:4;18:13
**specific (6)**
24:4;27:14;35:18;
78:16;157:3;259:9
**specifically (18)**
14:4;24:22;25:12;
33:16;41:12,24;43:6;
47:7;76:5,13;81:22;
100:14;115:2;138:4;
171:3;201:17;217:9;
221:10
**specified (1)**
246:12
**specify (1)**
257:20
**speed (1)**
219:13
**spend (4)**
216:8;231:4;
248:19;258:17
**spending (3)**
178:3;216:10;
249:12
**spent (4)**
28:10,21;29:7;
216:10
**spoke (1)**
18:15
**staff (1)**
29:9
**stamp (1)**
237:7
**Stamped (3)**
120:13;186:5;
229:25
**stand (2)**
30:13;52:7
**Standard (2)**
86:19;222:16
**standards (2)**
90:22;152:25
**standpoint (2)**

86:20;158:18
**start (6)**
52:19;54:8;104:9;
196:13;199:21;
255:14
**started (4)**
196:19;223:9,11;
231:14
**starters (1)**
63:18
**starting (3)**
57:16;209:17;
231:17
**starts (2)**
73:3;231:16
**state (10)**
31:5;72:6,10;
114:15,20;115:2;
178:13;207:25;
265:3;270:5
**stated (19)**
64:22;68:18;75:3;
80:23;81:23;84:23;
86:17,18;88:2,3;
96:15;127:11;145:7;
156:24;218:14;
220:15,17;226:7;
271:11
**statement (14)**
31:15;32:8;35:15;
37:17;42:3;43:2;
51:24;106:4;205:3,
13;212:21,25;219:3;
226:24
**statements (18)**
21:4;30:10,13;
59:21;170:19;171:9;
208:20,21,22,25;
209:17,21;211:14,15;
212:3,18;274:15,20
**States (11)**
21:19;86:19;87:25;
89:23;106:25;170:8;
207:19;211:23;
214:10;218:21,23
**statistically (1)**
145:12
**status (2)**
81:25;95:7
**stay (1)**
255:22
**step (3)**
14:24;35:22;180:2
**steps (1)**
124:19
**still (25)**
17:4;31:23;44:18;
51:5;52:7,10;94:17;
96:16;99:12;112:13,
22,25;115:19;
127:18;183:24;
192:10,14;193:4;
198:16;203:15;

226:2;247:20;
251:21;264:4,6
**stock (4)**
224:10,12,21;
225:8
**stop (3)**
260:22;261:9;
267:10
**stopped (1)**
270:16
**stopping (1)**
166:14
**Store (1)**
23:7
**Store's (1)**
23:19
**straight (2)**
71:25;144:8
**STRAUSS (2)**
3:13;10:9
**stretch (3)**
128:10,17;144:14
**stretched (1)**
44:16
**stretching (3)**
143:20;145:6,22
**strike (13)**
23:2;32:6;34:3;
45:18;47:3;74:16;
76:10;80:10;86:2;
89:25;126:12;135:5;
141:24
**struck (1)**
175:5
**Stuart (1)**
21:19
**studied (1)**
51:16
**subject (29)**
19:22;20:22;21:14;
32:25;33:8;59:10,11,
14;60:4;61:12;73:25;
77:19;83:8;87:8,16,
18;96:17;97:2,23;
102:13;107:6;115:4,
6;203:11;217:6,24;
218:3;237:25;242:24
**submission (1)**
201:8
**submit (1)**
21:18
**submitted (4)**
28:13;29:25;201:4;
205:17
**submitting (2)**
33:2;184:5
**subs (3)**
147:13,17,19
**Subsequent (1)**
184:5
**subsequently (1)**
89:25
**subsidiaries (15)**

Case 09-10138-MFW    Doc 14654-5    Filed 10/30/14    Page 302 of 306
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

93:8;107:9;108:3,
18;135:24;136:16;
137:2;138:14,21;
142:15;158:13;
159:12,23;182:21;
251:7
**subsidiary (2)**
107:15,20
**subsidiary's (1)**
107:5
**substance (3)**
37:12;121:12,18
**substantive (5)**
152:7,10;153:2,6,
10
**substantively (1)**
152:18
**subtract (2)**
55:15;154:19
**subtracted (1)**
70:3
**subtraction (2)**
54:14;56:15
**successful (1)**
271:8
**sufficient (5)**
55:5;56:5;57:15;
58:11,22
**suggest (1)**
239:8
**suggested (4)**
36:13,15;200:19,
22
**suggesting (3)**
200:11,13;202:14
**suggests (1)**
268:23
**sum (3)**
57:5;60:16;61:9
**S-U-M (2)**
61:4,10
**summarize (2)**
20:25;235:2
**summary (11)**
105:20;108:14;
109:7;110:7;120:10,
12,21;154:2,5,12;
202:13
**superficial (1)**
248:13
**supervise (1)**
27:13
**support (5)**
185:25;201:19;
209:9,12;236:14
**suppose (1)**
223:11
**sure (42)**
16:5;18:3;22:7;
25:23;28:24;35:16;
39:20;64:21;69:11;
80:13;102:21;106:4;
118:23;139:25;

140:25;141:4,6,7;
149:6;154:10;
155:19;164:3;171:6;
173:22;184:6,17,18;
188:25;194:8;
230:19;233:23;
241:4;242:4;252:20;
256:4;257:21;
259:10;265:4;268:4;
272:16,24;273:24
**surplus (46)**
41:5,19,21;44:18;
46:13;51:9;52:6,14;
54:22;55:7,16;63:21;
66:9,25;67:20;
103:20,24;114:18;
117:8;127:3;128:11,
18;131:2;135:15;
136:2,19;137:5;
138:15;139:6,18;
140:16;141:15;
143:5,21;144:16,21;
151:25;183:15,16;
233:4;266:11,12;
270:8,12,13,14
**surprise (5)**
110:14;133:10;
151:17;227:9;255:7
**surprised (1)**
110:21
**swear (1)**
10:24
**swing (1)**
227:25
**sworn (1)**
11:1

**T**

**tab (1)**
169:13
**Table (38)**
54:7;69:15;72:18;
73:6,11;76:8,20;
77:17;80:17;82:9;
83:7;84:18;100:4;
103:11;104:10;
114:11;146:3,20,23;
153:19;154:20;
157:13;170:6,8;
185:21;187:11;
196:7;202:25;
205:21;219:17,25,25;
220:2,6,9,11;231:24,
25
**tables (1)**
114:15
**tail (1)**
145:14
**talk (14)**
38:25;39:2,4;40:3,
21,24;56:16;105:11;
112:2;186:19;

193:25;194:8;
199:12;220:14
**talked (4)**
199:8;222:17;
228:4;233:7
**talking (8)**
24:22;27:18;33:15;
76:17;88:16;104:9;
127:5;160:6
**tape (7)**
68:22;69:3;117:23;
118:6;167:6;195:23;
256:9
**task (1)**
42:6
**taught (3)**
209:24;210:4,7
**tax (61)**
46:14,20;63:13;
127:19;137:11,14,18,
23;138:3,3,5,23;
139:17;140:11;
172:19,21;174:18;
175:6,9;178:25;
179:13,17;183:6;
207:6,15,20;209:20,
25;210:3,4,7,11,18,
21;211:13,16,16,20,
24;212:8,15,19,20,
21,23;213:7,23,25;
214:2,7,13,18,25;
215:6,22;216:3,11;
239:3;274:12,13,23
**taxable (1)**
213:16
**taxes (6)**
139:8;144:7,20;
239:6,16,20
**teach (1)**
210:2
**team (3)**
29:6;234:25;235:2
**technicalities (1)**
118:18
**telling (2)**
161:21,23
**tells (1)**
86:23
**ten (5)**
51:25;104:11;
145:16;236:25;237:6
**ten-month (1)**
178:16
**term (5)**
28:4;98:19;152:6;
183:16;208:23
**Termination (1)**
101:19
**terms (5)**
34:2;191:6;194:19;
201:20;268:22
**terrible (1)**
15:14

**testified (4)**
11:2;24:8;167:5;
170:24
**testify (6)**
20:5,18;21:25;
23:11,19;25:9
**testifying (4)**
22:15;121:15;
168:10;208:17
**testimony (21)**
19:23;21:9,15;
22:6,20;38:18;91:7;
168:8,16,20;179:19,
25;182:20;207:18;
208:16,23;214:6,6;
228:23;273:10;
274:23
**therefore (8)**
46:20;113:6;157:5;
181:22;204:5;
207:21;215:17;
267:10
**therefrom (1)**
237:16
**thereof (1)**
236:14
**there's- (1)**
97:16
**thinking (3)**
19:14;185:16;
186:17
**third (5)**
59:2;207:22;208:5;
214:4;216:14
**thirty-fifth (2)**
70:22;234:16
**Thomas (3)**
40:19;169:18;
229:24
**though (8)**
84:20;86:24;94:5;
109:24;161:5;179:5;
186:20;259:20
**thought (5)**
223:17;225:7,11;
244:18;248:8
**thousand (2)**
50:23;145:17
**three (27)**
15:11;32:8;41:3;
57:6,10;83:9,12;
111:4,15;118:7;
125:24;130:4;142:4;
144:12;147:4;
155:16;156:25;
165:22;189:6,9,12;
199:21;203:20;
207:4;210:24;236:3;
261:20
**three-year (1)**
110:16
**times (9)**
11:16;126:16;

142:4;145:16;
161:10,19;165:24;
185:20;240:12
**title (1)**
230:20
**today (15)**
11:9,22;13:23;
15:12;24:20;25:4;
30:12,19;90:10;
196:2;205:12;
224:23;250:22;
260:13,20
**today's (2)**
14:4;275:13
**together (7)**
17:2;57:7;131:18,
21;182:15;214:15;
262:7
**told (13)**
22:16,17;34:17;
38:14;58:20;66:21;
97:11;125:9,10;
126:23;151:10;
161:24;164:23
**took (16)**
54:12;58:6;59:15;
60:4;61:12;66:20;
71:25;80:18;109:24;
124:18;179:9;180:3;
214:3,21;218:13;
220:24
**top (10)**
80:4,17;91:13;
103:16;117:6;
138:18;141:11;
199:21;202:24;207:3
**topics (1)**
259:24
**total (45)**
31:8,16,22;54:13,
15,25;55:2;75:14,14,
15;77:20;82:4,5,8,9;
83:6,7,17,22,24;84:3,
6,16,22,23;85:4,4;
89:12;91:16;99:17;
100:24;101:2;
127:14;132:7;136:9;
148:25;159:17,18;
186:13;187:19;
195:9;197:22;218:2;
220:25;221:3
**totaled (1)**
165:22
**totaling (1)**
141:21
**totality (11)**
114:24;115:14;
127:16;131:9;
143:15;145:7,25;
146:3;203:9,17,18
**totally (3)**
20:10;173:22;
179:16

Case 09-10138-MFW    Doc 14654-5    Filed 10/30/14    Page 303 of 306
IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

**towards (2)**
130:7;132:4
**tracking (1)**
184:25
**trade (3)**
81:20;92:2;95:21
**transaction (1)**
23:24
**transactions (2)**
23:20;112:11
**transcribed (1)**
60:19
**transcript (5)**
61:2;87:12;97:8,9,
16
**transfer (1)**
239:15
**translate (2)**
84:5;239:24
**Treasury (1)**
230:24
**treat (1)**
75:13
**treated (1)**
75:5
**trial (14)**
20:6;21;22:17;
23:10;24:8;170:15,
24;178:4,12,19,20;
208:17;211:8;228:23
**trip (1)**
23:20
**true (19)**
22:12;74:4;76:25;
95:20,23;96:3;
116:15;130:25;
131:8;144:14;154:3;
158:22;159:24;
162:10,23;165:13;
189:9;205:16;253:8
**Trust (8)**
10:14;101:17;
102:12,23;149:20,24;
150:6;153:18
**trusts (2)**
101:15;102:4
**truthfully (1)**
11:24
**try (21)**
28:23;44:3;124:19,
23;125:4;126:9;
134:9,15;148:24;
156:2,11,14;177:18;
194:25;214:2;
219:13;221:11;
247:23;257:5;
258:17;261:14
**trying (16)**
20:24;35:13;38:2;
48:8;53:8;56:18;
64:19,25;66:14;
91:23,24;122:19;
134:22;199:4;233:5;

254:6
**TUNIS (1)**
156:8
**turn (19)**
31:2;69:15;81:17;
103:4;147:24;
148:15;149:17;
153:15,19;154:10;
170:4;183:20;
202:23;206:24;
219:22;230:12;
236:25;244:13;272:9
**Tweed (1)**
10:3
**twenty-six (1)**
83:9
**Two (27)**
11:17;15:17;19:22;
32:7;63:5;64:19;
65:2;69:3;71:13,14;
82:6;88:11,22;
114:15;169:7;177:2;
193:7;209:20;
214:15;217:8;
234:17;237:3;
246:21;256:16;
257:13;259:24;
268:20
**two-thirds (1)**
103:25

## U

**UK (10)**
3:4;10:17;20:2,5;
37:3,9;38:13;89:20;
93:17;94:9
**ultimate (9)**
93:14;150:14;
171:21;173:23;
174:6,9,15;181:14;
239:18
**ultimately (15)**
20:5,18;25:5;
54:18;57:17,22;
94:22;95:18;101:12;
103:20;135:14;
139:5;150:19,21;
160:4
**ultra (1)**
214:20
**umbrella (2)**
27:5,17
**unaware (2)**
25:4,17
**unchallenged (1)**
93:18
**unconsolidated (2)**
78:6,10
**under (42)**
21:7;27:4;42:9;
44:25;83:23;84:3;
85:11,17;87:7,15;

89:8;93:12;94:17;
95:5;98:6;99:7,13;
100:22;111:19;
114:2;132:12,16;
135:18;136:2;137:5;
139:15;140:6,14;
143:3;144:3;145:2;
154:13;157:22;
158:11,21;171:16;
191:3;195:3;219:15;
260:18;262:19;
263:12
**underestimate (2)**
100:20;258:15
**underestimated (2)**
100:25;258:13
**underestimation (1)**
258:8
**underforecasted (3)**
111:5,15,23
**underlined (1)**
146:17
**underlying (3)**
25:10;56:3;58:14
**understated (1)**
232:9
**understood (5)**
12:23;82:14,18;
208:16;222:7
**undertake (4)**
52:15;96:6;128:13;
130:17
**undertaking (1)**
118:12
**undetermined (4)**
212:16,22,24;
214:14
**undisputed (1)**
260:10
**undistributed (4)**
170:11;171:2,16;
183:15
**unearned (2)**
21:4,6
**unfunded (1)**
223:24
**unit (1)**
112:9
**United (1)**
21:19
**unknown (1)**
113:15
**unless (4)**
12:9,15;60:24;
128:7
**unlikely (1)**
51:3
**unrealistic (24)**
67:24;86:12;
172:15,20;173:4,9,
15,20;174:3;176:4,8;
179:16,23;180:16,20,
25;181:3,10,17;

183:3,11;204:25;
207:21;216:6
**unrealistically (3)**
208:3,12,13
**unreasonable (8)**
90:5;129:25;
130:19;175:6,17,21,
24;202:7
**unreasonableness (1)**
129:19
**unrelated (1)**
266:5
**Unsecured (4)**
3:14;10:11;205:25;
227:10
**up (55)**
22:14,23;28:23;
34:22;41:7;48:16,18,
25;51:6,9;55:20;
59:24;64:19,25;65:7;
70:25;71:20,22;73:6;
82:7;83:21;85:8;
111:12;115:6,12;
117:7;125:21,22,25;
129:22;137:2;
138:14;148:14;
150:12;160:5;172:7;
175:15;178:11;
186:22;193:7;196:9;
197:5;203:4;219:13;
220:7;224:21,22;
237:21;255:15;
256:15;267:18;
269:6,7,16;274:11
**update (2)**
80:3;81:23
**updated (12)**
79:11,12,15,21;
81:19;121:24;
220:21,23,25;221:3;
223:4;225:16
**upflow (18)**
106:14;108:23;
133:25;134:18;
135:11,13,20,23;
136:15,25;137:12;
138:13,20,24;139:16;
141:14;143:2;273:18
**upflowed (1)**
139:6
**upon (15)**
23:23;24:2,8;
33:20;36:8;37:20;
78:13;80:5;89:19;
91:2;110:7;168:10;
169:7;173:3;253:19
**upper (3)**
250:5;251:3,21
**upstream (1)**
144:2
**use (37)**
28:4;34:22;82:23;
83:5;90:8;98:19;

183:3,11;204:25;
207:21;216:6
**unrealistically (3)**
208:3,12,13

100:4,16,18,24;
101:3;110:24;156:6;
159:21;175:12,17,21;
177:16,16,17;183:16;
184:7;186:21;
197:23;199:4;209:9,
14;211:6;218:7;
220:2,15;231:19;
247:12;258:11;
265:9,10;270:14
**used (37)**
58:16;81:24;82:3;
84:16,21;86:13;87:4;
89:9,10,11;90:8;
93:21;101:2;108:7;
131:25;132:9;157:2;
158:23;170:20,25;
171:4,17,19,23;
172:2,6;175:22;
178:14;186:13;
197:5;199:5;214:3;
216:11;218:4;219:6;
248:15;250:17
**uses (4)**
175:12;187:9;
216,16,22
**Using (7)**
44:4;80:17;118:20;
183:17;208:3;
222:16;263:3
**usually (1)**
79:3

## V

**vague (1)**
241:10
**Vaguely (2)**
40:20;233:11
**value (27)**
41:6;44:5;48:15,
25;49:20;50:9;51:6;
52:16;105:8;113:7,
11;114:6;122:20;
124:2,14,16,19,22;
125:3;132:7;133:19;
134:13;144:19,19;
247:4;249:20;259:5
**valued (2)**
112:16,21
**variable (3)**
135:24;136:5;
215:23
**variables (11)**
127:12,14;131:9,
10;136:8;144:7;
146:4;199:15;
203:10;204:12;
216:19
**variance (4)**
53:14;252:2,3;
255:11
**variety (2)**

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.

October 22, 2014

213:13,16
**various (3)**
71:22;152:17;
190:21
**verify (1)**
83:17
**versus (9)**
20:15;21:19;61:4,
5;91:24;109:14;
145:14;187:12;
188:14
**VIDEOGRAPHER (15)**
10:23;68:23;69:3;
118:2,6;166:18;
167:6;185:3,7;
195:19,23;249:5;
256:5,9;275:12
**view (7)**
87:6,14,18,22;88:2,
20;257:21
**viewed (1)**
47:5
**virtually (3)**
105:2;111:3;112:6

## W

**wait (1)**
13:6
**walk (3)**
154:14;163:2;
245:8
**way (29)**
28:4;52:23;60:19;
75:9;78:22;93:2;
99:15;130:11;
133:19;135:10;
138:7;140:10;
144:20;148:8;
156:24;157:6;
182:10;190:6;199:8;
205:3;227:12;
228:15;232:7;233:5;
243:20;255:12;
270:25;271:2,21
**ways (1)**
39:17
**week (3)**
25:22;248:20;
250:15
**weeks (1)**
171:8
**Welfare (3)**
101:17;102:12,23
**weren't (4)**
44:7;127:13;
150:16;270:25
**Wertheim (294)**
11:7;12:1;13:1;
14:1;15:1;16:1;17:1;
18:1;19:1;20:1;21:1;
22:1;23:1;24:1;25:1;
26:1;27:1;28:1;29:1,

22;30:1;31:1;32:1;
33:1;34:1;35:1;36:1;
37:1;38:1;39:1;40:1;
41:1;42:1;43:1;44:1;
45:1;46:1;47:1;48:1;
49:1;50:1;51:1;52:1;
53:1;54:1;55:1;56:1;
57:1;58:1;59:1;60:1;
61:1;62:1;63:1;64:1;
65:1;66:1;67:1;68:1;
69:1,4,8,9,10;70:1;
71:1;72:1,23;73:1,21,
22;74:1;75:1;76:1;
77:1,23;78:1;79:1;
80:1;81:1,10;82:1;
83:1;84:1;85:1;86:1;
87:1;88:1;89:1;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1;107:1;
108:1;109:1;110:1;
111:1;112:1;113:1;
114:1;115:1;116:1;
117:1;118:1,8;119:1,
14;120:1,12;121:1;
122:1;123:1;124:1;
125:1;126:1;127:1;
128:1;129:1;130:1;
131:1,20;132:1;
133:1;134:1;135:1;
136:1;137:1;138:1;
139:1;140:1;141:1;
142:1;143:1;144:1;
145:1;146:1;147:1;
148:1;149:1;150:1;
151:1;152:1;153:1;
154:1;155:1;156:1;
157:1;158:1;159:1;
160:1;161:1;162:1;
163:1;164:1;165:1;
166:1;167:1,7,12;
168:1,4;169:1,18;
170:1;171:1;172:1;
173:1;174:1;175:1;
176:1;177:1;178:1;
179:1;180:1;181:1;
182:1;183:1;184:1;
185:1,11;186:1,4;
187:1;188:1;189:1;
190:1;191:1;192:1;
193:1;194:1;195:1,
24;196:1;197:1;
198:1;199:1;200:1;
201:1;202:1;203:1;
204:1;205:1;206:1;
207:1;208:1;209:1;
210:1;211:1;212:1;
213:1;214:1;215:1;
216:1;217:1;218:1;
219:1;220:1;221:1;
222:1;223:1;224:1;

225:1;226:1;227:1;
228:1;229:1,23;
230:1,5;231:1;232:1;
233:1;234:1;235:1,9,
13;236:1;237:1;
238:1;239:1;240:1;
241:1;242:1;243:1;
244:1;245:1;246:1;
247:1;248:1;249:1;
250:1;251:1;252:1;
253:1;254:1;255:1;
256:1,10,14;257:1;
258:1;259:1;260:1;
261:1;262:1;263:1;
264:1;265:1;266:1;
267:1;268:1;269:1;
270:1;271:1;272:1;
273:1;274:1;275:1,
13,14
**what's (16)**
16:19;105:17;
106:18;107:18;
164:9;180:5,8;
191:22,22;223:20,21;
224:12;230:6,15;
235:14;246:19
**whatsoever (2)**
66:8;248:7
**whereas (1)**
231:18
**whole (7)**
21:15;29:7;114:21;
142:6;145:8;192:9;
244:14
**wide (1)**
213:13
**willing (1)**
258:17
**WILLKIE (2)**
3:3;10:16
**Wilmington (1)**
10:14
**wins (3)**
242:2,5,7
**withdraw (6)**
191:14;200:12;
210:10;227:16,23;
242:6
**within (6)**
27:17;75:7;79:4;
185:18,20;259:5
**without (19)**
12:14;17:8;20:25;
40:3;60:6;61:14;
66:10,17;67:18;68:3,
15;75:5;94:7;139:16;
141:25;143:10;
156:12,14;261:8
**witness (11)**
10:20,24;11:1;
16:15;37:11;121:13;
128:5;141:3;156:10;
195:18;244:8

**Wolf (1)**
22:12
**Wolfe (1)**
21:19
**woman (1)**
23:24
**won (1)**
49:17
**word (6)**
48:18;138:10;
180:18;184:7;
244:15,15
**words (8)**
53:11;90:8;103:23;
108:7;199:5;205:8;
214:16;264:15
**work (6)**
27:5;32:24;33:7,
12;151:11;247:3
**working (1)**
78:14
**works (1)**
155:22
**worksheet (15)**
105:20;120:10,13,
19,22;147:23;148:2,
20;149:8,13,18;
150:3;154:2,6,12
**worksheets (1)**
148:21
**worse (1)**
255:20
**worst (8)**
77:4,9,10;109:11,
14,24;263:5,9
**worth (10)**
48:22;50:14;51:11,
25;52:2,8;113:6;
125:2,5,16
**wound (1)**
22:23
**write (1)**
163:6
**writes (1)**
245:15
**writing (1)**
129:17
**written (2)**
137:4;141:10
**wrong (1)**
172:2
**wrote (12)**
41:18;44:2;113:24;
147:3;187:3;238:7;
240:6;272:4,11,25;
273:6,14

## Y

**year (10)**
19:16,17;22:8;
167:19;170:16;
189:13,16;191:3;

198:13;206:3
**years (4)**
84:21;111:4,15;
187:15
**Yep (2)**
136:18;158:8
**Yesterday (3)**
15:3;18:25;19:7
**yesterday's (2)**
96:14,21
**yield (2)**
124:7;189:16
**yields (1)**
247:4
**York (4)**
3:6,6,17,17

## Z

**zero (54)**
38:7,9;48:17,22;
50:14;51:11,25;52:2,
8;91:20;104:25;
105:3,8,14;106:13,
17;108:6,16,23;
109:10;112:16,23;
113:8;125:3,10;
129:24;130:2;
173:13,16,21;176:5,
18,22;177:10,24;
179:17;202:7;203:6;
205:2;206:22;
207:20;216:4,11;
253:10,11,16;254:2,
21,24;255:15,20,22;
258:25;264:14
**zone (1)**
19:25

## 0

**0 (2)**
67:4;86:7
**000001 (1)**
229:25

## 1

**1 (22)**
29:20,22;69:15;
73:7,11,21;77:17;
82:9;83:7;104:10;
170:6,8;187:11,12;
195:11;196:15;
199:18;205:22;
219:25;221:20;
262:11,11
**1.01 (20)**
31:9;44:19;50:20;
51:2,17;188:9;
189:20;190:8;191:8;
192:5,10,15;193:4;
194:22;197:9;198:6,

IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.

October 22, 2014

18,19,19;264:3
**1.011 (1)**
  50:24
**1.03 (1)**
  198:16
**1.548 (1)**
  95:11
**1.6 (4)**
  31:24;183:24;
  192:2;198:10
**1.657 (6)**
  31:8,12,17,17,24;
  183:23
**1.9 (4)**
  191:9;192:5;198:9,
  15
**1:05 (2)**
  166:19,21
**10 (3)**
  229:22,23;230:6
**10:21 (1)**
  68:24
**10:36 (1)**
  69:6
**100 (11)**
  76:2;85:10,21;
  86:5;92:3,11;109:18,
  19;130:5;228:8;
  239:9
**10019-6099 (1)**
  3:6
**10036-6745 (1)**
  3:17
**101 (1)**
  162:22
**108 (1)**
  234:21
**10-Q (34)**
  72:8,11,14,22,23;
  73:25;74:25;75:2,3;
  80:18;81:24;84:21;
  86:14,17,17,21,24;
  89:10,13,16,19,23;
  90:22;91:2,14;92:20;
  101:3,5;106:24;
  109:6;148:9,14;
  242:19;265:19
**11 (7)**
  103:16;138:19;
  141:12;153:20;
  235:9,15;270:20
**11.15 (1)**
  103:9
**11:44 (1)**
  118:3
**1125 (1)**
  123:23
**115 (3)**
  221:15;222:22;
  223:10
**12 (14)**
  104:12;115:21;
  116:10;117:6,10;

128:22;129:9,13;
130:22;154:2;
178:17;199:17;
202:23;261:25
**12:02 (1)**
  118:9
**121 (2)**
  185:24;186:5
**125 (2)**
  72:9;80:24
**126 (1)**
  80:22
**13 (4)**
  147:24;178:15;
  199:21;207:2
**13.2 (2)**
  252:4;255:4
**133 (5)**
  127:21;172:24;
  207:14;208:11;
  215:16
**134 (2)**
  261:17,22
**14 (6)**
  154:11;178:16;
  197:18;205:21;
  236:10;251:20
**15 (8)**
  72:11;73:2;91:14;
  184:20,21;185:14;
  253:5;254:8
**150 (2)**
  229:25;258:21
**154 (1)**
  225:19
**1548 (1)**
  80:21
**156 (1)**
  222:18
**158 (3)**
  148:4,6,20
**16 (9)**
  31:3;72:10;119:22;
  149:19;183:20;
  186:21,25;187:25;
  196:14
**160 (1)**
  142:3
**167 (1)**
  80:19
**17 (9)**
  41:17;43:2;119:5,
  23;124:5;237:6;
  251:20,24;255:2
**176 (1)**
  80:21
**17a (1)**
  251:23
**18 (3)**
  42:24;122:14;
  153:25
**180 (1)**
  233:8

**186 (1)**
  80:20
**19 (2)**
  43:13;44:15

## 2

**2 (26)**
  54:7;72:21,23;
  73:22;76:8,20;78:23;
  84:18;100:16;
  114:11;146:3,20,23;
  153:19;154:17,21,22;
  157:13;202:25;
  206:2,18;220:2,6,9;
  235:11,18
**2,837.4 (1)**
  83:24
**2.062.7 (1)**
  57:2
**2.067.2 (1)**
  234:18
**2.2 (2)**
  80:10;192:18
**2.5 (1)**
  98:24
**2.7 (1)**
  84:15
**2:05 (2)**
  167:3,9
**2:32 (1)**
  185:4
**2:41 (1)**
  185:8
**2:55 (1)**
  195:20
**20 (4)**
  30:4;80:21;208:6;
  217:5
**200 (2)**
  80:20;127:23
**2007 (1)**
  22:10
**2009 (4)**
  224:13,18,19,24
**2011 (1)**
  119:15
**2012 (4)**
  79:5,9;91:2;265:20
**2013 (1)**
  231:18
**2014 (45)**
  58:7;68:25;69:6;
  81:12;82:2;90:25;
  118:4,9;166:20;
  167:9;169:17,20;
  178:17;185:5,9;
  187:12,19;188:3,5,
  14,17,21;189:10,25;
  191:25;195:21;
  196:2;197:2,18;
  220:20;229:24;
  230:25;231:20;

235:11,19;236:10;
251:6;256:7,12;
261:18;262:10,11,12;
269:15;275:16
**2015 (28)**
  186:21;187:4,8,20;
  188:2,10,23;189:2,4;
  190:7,13;191:8;
  192:4;196:25;198:4;
  244:23;247:14;
  248:21,22;249:13;
  253:5;256:20;258:6;
  260:3;261:18;263:2,
  3,11
**2016 (1)**
  192:9
**2017 (1)**
  193:3
**2062.7 (1)**
  269:7
**21 (6)**
  80:22;119:15;
  120:14,17;149:17;
  203:8
**21.9 (1)**
  251:25
**212-728-8170 (1)**
  3:8
**212-728-9170 (1)**
  3:9
**212-872-1002 (1)**
  3:22
**212-872-8027 (1)**
  3:21
**22 (13)**
  68:25;69:6;118:4,
  9;166:20;167:9;
  185:5,9;195:21;
  196:2;256:7,12;
  275:16
**23 (1)**
  270:5
**24 (5)**
  42:5;81:11;229:24;
  244:13;251:3
**28 (2)**
  169:17,20
**29 (7)**
  73:25;80:4,18;
  89:17;237:12;
  248:21;274:24

## 3

**3 (15)**
  81:7,10,13;82:2,
  14;98:10;100:14;
  104:13;155:13;
  205:21;244:10;
  250:6;251:21;
  254:14;256:16
**3.2 (2)**
  242:14,23

**3.235 (2)**
  81:3;151:2
**3:07 (1)**
  196:2
**30 (48)**
  28:18,19;29:11,14,
  18,19;72:8,15;79:3,5;
  150:21;178:15;
  186:21,24;187:4,7,
  12,14,19;188:2,3,5,9,
  14,17,21,23;189:2,4,
  10;190:7,13;191:8,
  25;192:4,9;193:3;
  196:25;198:4;237:9,
  12;260:3;261:18,18;
  263:2,3,10;269:15
**300 (1)**
  198:12
**31 (5)**
  178:15;220:20;
  230:25;231:18,20
**32 (1)**
  169:5
**329.4 (2)**
  250:19;254:8
**33 (5)**
  132:3;155:11,13;
  251:3;272:9
**34 (2)**
  45:8;80:22
**35 (4)**
  170:5;228:24;
  231:24,25
**37 (6)**
  84:7,12;85:5,6;
  185:18;221:7
**38 (1)**
  185:19
**39 (4)**
  202:12;250:4,8;
  254:14

## 4

**4 (8)**
  119:12,14;124:4;
  194:24;206:3,18;
  221:6;248:21
**4.2 (1)**
  43:5
**4.2a (1)**
  43:6
**4:12 (1)**
  256:6
**4:19 (1)**
  256:12
**4:40 (2)**
  275:15,17
**400 (4)**
  127:22;207:20;
  212:9;213:2
**43 (1)**
  106:24

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

**437 (5)**
221:8,22;222:8;
223:10,12
**44 (1)**
262:16
**45 (1)**
202:12
**45.8 (1)**
203:6
**46 (1)**
207:10
**48 (1)**
207:11
**49 (3)**
220:11,15;221:18
**4th (2)**
147:9;148:10

## 5

**5 (7)**
99:11;119:11;
120:9,12;176:17;
230:15,18
**5,302.5 (1)**
57:12
**5.1 (6)**
199:13;203:5,20;
204:11;215:15;
226:14
**5.2 (1)**
146:11
**50 (7)**
145:14;146:9,14;
147:4;163:18;195:5,
13
**50/50 (1)**
145:14
**53 (1)**
80:23
**54.6 (1)**
218:3
**56 (4)**
155:5,13;163:18;
225:19
**564 (1)**
80:21
**575 (2)**
154:17,22
**593 (9)**
159:17;163:19;
220:7;221:4,22;
222:8;223:14,16,23

## 6

**6 (6)**
131:16,20;154:18,
22;272:18,20
**60 (16)**
28:25;59:16;
155:20;163:24;
168:3,5;181:7;200:6;

202:16;216:24;
217:7,7,9,10;219:17;
222:20
**600 (2)**
242:18,22
**62.7 (2)**
71:12,15
**620.9 (2)**
154:9,20
**65 (10)**
138:14,25;139:7;
144:8;268:17,19,24,
24;269:6,8
**65.3 (3)**
103:21;267:23;
268:6
**657 (1)**
183:25
**67 (2)**
148:5;230:12
**670 (3)**
90:20,23;91:15

## 7

**7 (11)**
80:22;168:2,4;
181:5;182:16,18;
190:19,22;217:20,21;
219:16
**7.4 (1)**
84:10
**70 (1)**
260:11
**700 (2)**
127:15;141:21
**743 (1)**
73:19
**744 (2)**
115:9;231:13
**765 (1)**
79:8
**766 (1)**
148:15
**787 (1)**
3:5

## 8

**8 (5)**
22:11;80:22;
169:13,16,18
**8,495.8 (1)**
83:23
**8.9 (1)**
249:25
**85 (2)**
154:17,22
**852 (3)**
86:19;218:22;
222:16
**876 (4)**
188:15;191:25;

197:13;262:17
**890 (1)**
199:9

## 9

**9 (5)**
79:9;83:10;186:4,
8,10
**9,326 (2)**
83:13;84:8
**9.326 (1)**
83:15
**90 (3)**
79:4;164:3,7
**91 (5)**
142:22;148:5;
245:14;251:2;255:24
**920 (1)**
262:17
**93 (1)**
256:17
**971 (15)**
84:18;114:13,13,
23;115:8;116:20;
117:9;127:13;137:8;
141:22;147:3,6;
195:12;238:21;
262:23
**973.7 (1)**
84:19