# Exhibit G

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### ONE HUNDRED AND EIGHTH REPORT OF THE MONITOR
### DATED SEPTEMBER 24, 2014

## INTRODUCTION

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to October 3, 2014 by this Court in its Order dated March 21, 2014.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official committee of unsecured creditors (the "Committee") was established in January, 2009.



3.   An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Court, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries (collectively, "Representative Counsel") and each of these groups is participating in the CCAA proceedings.

4.   Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.   Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively, the "Joint Administrators").

6.   Subsequent to the filing date, Nortel Networks S.A. ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator were appointed by the Versailles Commercial Court (the "French Court").

7.   The CCAA proceedings and the UK Administration proceedings of NNUK and the other EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.   Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

2

## PURPOSE

9.    The purpose of this One Hundred and Eighth Report of the Monitor (the "One Hundred and Eighth Report") is to report to this Court on the following matters:

   a)  consolidated cash position and liquidity of the Applicants as at September 13, 2014;

   b)  actual receipts and disbursements of the Applicants from March 2, 2014 to September 13, 2014;

   c)  cash flow forecast of the Applicants for the period September 14, 2014 to April 4, 2015;

   d)  status of the Applicants' claims process;

   e)  status of the Applicants' Compensation Claims Process;

   f)  information in support of the motion for an Order permitting the Monitor to review and adjudicate certain Compensation Claims in respect of which Form C Proofs of Claim were received after the relevant bar date;

   g)  status of the Health and Welfare Trust (the "HWT");

   h)  status of the Termination Fund;

   i)  status of the Employee Hardship Application Process and Fund and provide information to the Court in support of the request to extend the Hardship Application Process through the stay extension period;

   j)  status of allocation and related claim matters pending under the Allocation Protocol approved by this Court and the U.S. Court on April 3, 2013 (the "Allocation Protocol" and all litigation and claims subject thereto, the "Allocation Protocol Litigation");

   k)  various other ongoing matters relevant to the CCAA proceedings;

l)   status of foreign proceedings;

m)  the Applicants' proposed 2015 employee retention plan (the "2015 NRP"); and

n)  request for an order that the stay of proceedings be extended up to and including April 3, 2015.

## TERMS OF REFERENCE

10.  In preparing this One Hundred and Eighth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the Company. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of this information. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

11.  Capitalized terms not defined in this One Hundred and Eighth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009, the Pre-Filing Report or previous reports of the Monitor. Capitalized terms relating to the Compensation Claims Process are as defined in the Compensation Claims Procedure Order.

12.  The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

## CONSOLIDATED CASH POSITION AND LIQUIDITY OF THE APPLICANTS AS AT SEPTEMBER 13, 2014

13.  As at September 13, 2014, the Applicants had cash available of approximately $143.6 million.

14.  As at September 13, 2014, the Applicants had Restricted Cash and Unavailable Cash of $258.5 million. None of the Applicants' Restricted Cash and Unavailable Cash is presently available to fund the estate. Restricted Cash relates primarily to: (i) $11.0 million held in the D&O Trust as detailed in the Pre-Filing Report; and (ii) $9.7 million

held in escrow related to the settlement of the Global Class Action. Unavailable Cash relates primarily to: (i) $7.8 million of net proceeds from the sale of the Strandherd Lands; (ii) $229 million from the sale of NNL's interest in the LGN joint venture held in a single purpose bank account; and (iii) $1 million from the sale of NNL's interest in the Relay business held in a single purpose bank account.

15.   As discussed in prior Monitor's Reports, divestiture proceeds are being held in escrow by various escrow agents (the "Divestiture Proceeds"). As at September 13, 2014, approximately $7.3 billion of Divestiture Proceeds are held in escrow until a determination is made regarding allocation of these proceeds among the various Nortel legal entities, including the Applicants. Other Divestiture Proceeds totalling approximately $22 million are held in separate escrows in support of related TSA, succession tax and other adjustments and $35 million is held in a separate trust account pursuant to the Cascade Trust Indenture.

## ACTUAL RECEIPTS AND DISBURSEMENTS OF THE APPLICANTS FROM MARCH 2, 2014 TO SEPTEMBER 13, 2014

16.   The Applicants' actual consolidated net cash outflow for the period March 2, 2014 to September 13, 2014 was $68.6 million.

17.   Actual net cash flow was favourable to forecast by $21.9 million. Significant items contributing to this favourable variance were as follows:

     a)  a favourable permanent variance of $13.2 million primarily as a result of recoveries of intercompany receivables from Nortel Networks (India) Private Limited not previously reflected in the forecast;

     b)  a favourable timing variance of $2.5 million in Restructuring Costs – Advisor Fees as certain professional fees are anticipated to settle later than originally forecast; and

    c) a favourable permanent variance of $4.8 million in Restructuring Costs – Allocation Dispute Support Services as a result of lower than forecast fees incurred as the Allocation Protocol Litigation nears its end.

18. Available Cash was positively impacted compared to forecast by approximately $3.0 million as a result of a favourable exchange translation on funds held in Canadian dollars due to the appreciation of the Canadian dollar relative to the U.S. dollar.

19. Unavailable Cash and Restricted Cash were higher than forecast by approximately $0.5 million as a result of a favourable exchange translation on funds held in Canadian dollars due to the appreciation of the Canadian dollar relative to the U.S. dollar.

20. A summary of the actual receipts and disbursements as compared to the forecast filed with the One Hundred and Fourth Report is attached as Appendix "A".

## CASH FLOW FORECAST OF THE APPLICANTS FOR THE PERIOD SEPTEMBER 14, 2014 TO APRIL 4, 2015

21. The Applicants, with the assistance of the Monitor, have prepared an updated 29-week cash flow forecast for the period September 14, 2014 to April 4, 2015 (the "September 14th Forecast" and the "Forecast Period", respectively). A copy of the September 14th Forecast is attached as Appendix "B".

22. Based on the September 14th Forecast, it is anticipated the Applicants will have no receipts and total disbursements of $52.0 million resulting in a net cash outflow of $52.0 million during the Forecast Period.

23. Significant assumptions used in preparing the September 14th Forecast include the following:

    a) Divestiture Proceeds from the Layer 4-7, CDMA/LTE Access, Enterprise, Next Generation Packet Core, MEN, MSS, GSM/GSM-R, CVAS and Residual IP transactions are held in escrow and are not reflected in the September 14th Forecast;

    b) all pre-filing amounts owed to suppliers are stayed and post-filing amounts are paid on regular credit terms;

    c) payroll disbursements include amounts anticipated to be paid during the Forecast Period in respect of the 2014 Nortel Retention Plan (the "2014 NRP") and annual incentive plan;

    d) pursuant to the terms of the Amended and Restated Employee Settlement Agreement approved by this Court on March 31, 2010, there are no further current funding contributions to the Applicants' defined benefit pension plans. Funding related to current employees' retirement savings plans are reflected in benefits disbursements. Funding for non-registered pension or other retirement plans is stayed;

    e) all interest payments relating to the Applicants' pre-filing indebtedness are stayed; and

    f) Restructuring Costs – Advisor Fees and Restructuring Costs – Allocation Dispute Support Services have been forecast based on current and anticipated run rates.

24. The Court has previously requested the Monitor provide a supplementary schedule with details of restructuring costs incurred relating to the Allocation Protocol Litigation. A summary of the actual restructuring costs incurred as compared to the March 2nd Forecast and further details with respect to the September 14th Forecast restructuring costs are attached as Appendix "C".

25. The September 14th Forecast estimates total restructuring costs over the Forecast Period to be approximately $36.2 million of which the Monitor estimates approximately $9.0 million relates to restructuring costs already incurred but not yet paid. At this point in the litigation process, the Monitor anticipates and has reflected in the September 14th Forecast, a substantial reduction in the restructuring cost run rate over the Forecast Period. However, uncertainty regarding the possible next steps in the litigation and timing of an ultimate resolution of the Allocation Dispute and the UK Pension claims (as defined below) may increase restructuring costs relative to forecast.

26. The Monitor remains concerned about the significant costs, relating to the Allocation Dispute and UK Pension Claims. The Monitor will continue to work to streamline the process in the most efficient and cost effective manner possible having regard to the overarching objective of successfully advancing the interests of the Canadian estate.

27. Based on an analysis prepared by the Monitor, the Applicants have sufficient cash resources to fund the CCAA proceedings through April 3, 2015.

## STATUS OF THE APPLICANTS' CLAIMS PROCESS

28. Attached as Appendix "D" is an update as to the status of claims filed against the Applicants as of September 3, 2014 pursuant to the Claims Procedure Order (the "Claims Report") (which does not include claims filed pursuant to the Compensation Claims Procedure Order dated October 6, 2011). All claim amounts are in Canadian dollars (in millions) using January 14, 2009 exchange rates.

29. To date, 1,138 claims with a cumulative value of approximately CAD 36.1 billion have been filed against the Applicants pursuant to the Claims Procedure Order. This includes potential duplicative claims filed against multiple Applicants and claims filed subsequent to the Claims Bar Date. The Monitor, in conjunction with the Applicants, has initially reviewed all 1,138 claims filed to date.

30. As at September 3, 2014, the Monitor has provisionally accepted 967 claims with a claim value of approximately CAD 2.9 billion (original filed claim amount of approximately CAD 12.2 billion). In addition, 28 claims with a current claim value of CAD 9.4 billion have been either partially or fully disallowed and a Notice of Dispute has been filed by the creditor.

31. The remaining 142 claims, representing a claim value of approximately CAD 23.7 billion, primarily relate to bond claims, certain pension claims, litigation claims, real estate claims and claims filed subsequent to the Claims Bar Date. These claims require further review, analysis, negotiation and possibly litigation prior to finalization.

32. Between March 6, 2014 and September 3, 2014, the Applicants, in conjunction with the Monitor, resolved 91 claims comprised of:

   a) 84 EMEA Claims representing a total quantified claim amount in excess of $9.8 billion for $100 million (subject to a potential increase of $25 million upon satisfaction of certain conditions, as discussed in more detail below); and

   b) 7 claims representing a total claim amount of approximately CAD 122.3 million for CAD 12.5 million.

A copy of the Claims Report has been posted on the Monitor's website.

33. The Monitor, in conjunction with the Applicants, continues to advance the resolution of claims. The Monitor will report to this Court further on this process in subsequent reports.

*Update on EMEA Settlement*

34. On July 9, 2014, the Applicants and Monitor entered into an Agreement Settling EMEA Canadian Claims and Related Claims (the "EMEA Settlement Agreement") with, among others, the Joint Administrators, NNUK and the other EMEA Debtors, and the French Liquidator. The EMEA Settlement Agreement provides for a comprehensive resolution of claims as between, among others, the Applicants and the EMEA Debtors (including the claims filed by the EMEA Debtors against the Applicants representing a total quantified claim value in excess of $9.8 billion) for:

   a) an allowed general unsecured claim by Nortel Networks SpA against NNL of $2.3 million; and

   b) an allowed general unsecured claim by NNUK against NNL of $97.7 million, subject to a potential increase by $25 million to $122.7 million upon the satisfaction of certain conditions which have not been satisfied as yet.

35. Further details in respect of the EMEA Settlement Agreement can be found in the One-Hundred and Sixth Report of the Monitor dated July 11, 2014.

36. This Court approved the EMEA Settlement Agreement on July 16, 2014 and the UK Court approved the Joint Administrators entry into the EMEA Settlement Agreement on July 17, 2014. On July 19, 2014, the Monitor served and filed a Monitor's Certificate confirming the occurrence of the "Effective Date" under the EMEA Settlement Agreement, being the date upon which the settlements, agreements and releases as between (among others) the Applicants and Monitor, on the one hand, and the Joint Administrators and EMEA Debtors (but excluding NNSA in the French Secondary Proceedings), on the other, became effective.

37. As contemplated by the EMEA Settlement Agreement, the French Liquidator sought approval from the French Supervisory Judge to withdraw the CCAA claims it filed and the Joint Administrators filed an application seeking the dismissal of the mismanagement claims brought by the French Liquidator against, among others, NNC and NNL pursuant to Articles L.651-1 et seq. of the Commercial Code (France). On July 21, 2014, the French Supervisory Judge approved the withdrawal of the CCAA claims filed by the French Liquidator. On September 16, 2014, the French Court heard the Joint Administrator's application to dismiss the mismanagement claims. The Monitor is advised by the Joint Administrators that they expect a decision from the French Court in respect of the application on September 30, 2014. Receipt of an order of the French Court in form and substance satisfactory to the Applicants and Monitor dismissing the mismanagement claims is the final remaining condition precedent to the effectiveness of the agreements between, among others, the Applicants and the Monitor, on the one hand, and the French Liquidator and NNSA (as under the control of the French Liquidator), on the other, under the EMEA Settlement Agreement.

## STATUS OF THE APPLICANTS' COMPENSATION CLAIMS PROCESS

38. As previously reported, the Monitor has concluded the majority of its review of both the Requests for Corrections and Form C Proofs of Claim filed in the Compensation Claims Process.

10

39. There remain certain claimants who provided both a Request for Correction and also filed a Form C Proof of Claim where the Form C Proof of Claim remains under review by the Monitor.

40. The Monitor continues to review disputes regarding the various notices issued by the Monitor. Since the last report, there have been no new disputes referred to the Claims Officer.

*Requests for Corrections and Form C Proofs of Claim received after the relevant Bar Date*

41. The Compensation Claims Process is in part a "reverse" claims process in that the Monitor sent Information Statements to claimants detailing the personal information of such claimant, which personal information in turn generated the claimant's applicable Compensation Claims (and amounts thereof) based on a Court approved methodology.

42. Claimants had the opportunity to file: (i) requests for correction to correct personal information contained in information statements; and (ii) Proofs of Claim in respect of other Compensation Claims they wished to assert ("Form C Proofs of Claim").

43. Such requests for correction and Form C Proofs of Claim were to be filed by the applicable bar date, being in some cases on January 6, 2012 and in other cases a "rolling" bar date as determined under the Compensation Claims Procedure Order.

44. The Compensation Claims Procedure Order did not grant the Monitor discretion to extend the bar dates.

45. Pursuant to prior Orders of this Court, the Monitor was permitted to review and adjudicate certain specified Form C Proofs of Claim that were filed in the Compensation Claims Process and received after the applicable bar date.

46. Since the last update provided, the Monitor has received 5 additional Form C Proofs of Claim, totalling approximately CAD 600,000, after the relevant bar date.

47. The Monitor is of the view it should be permitted to review and adjudicate these Form C Proofs of Claim as the claims relate either to new information received by the claimant

through circumstances outside of their control or represent an additional claim of a previously recognized claimant under the Compensation Claims Procedure Order.

48.  The relief requested by the Monitor with respect to these Form C Proofs of Claim will facilitate the timely resolution of the Compensation Claims of the relevant claimants.

49.  Accordingly, the Monitor requests authorization to review and adjudicate the additional Form C Proofs of Claim specified above.

## STATUS OF THE HWT

50.  Pursuant to a series of Orders, this Court approved interim distributions from the HWT to the Participating Beneficiaries culminating with an order dated November 19, 2013 approving a final distribution and providing for an upward or downward adjustment to Estate Distributions as the result of the resolution of outstanding HWT matters.  Processes for addressing outstanding matters, including the establishment of reserves, Trustee Claims and tax matters were also included in the November 19, 2013 order.

51.  During the period from January 2011 through August 31, 2014, cumulative distributions in the amount of approximately CAD 74 million were made to approximately 9,000 individuals on account of Participating Benefits at a rate of 38%[1].  Beneficiaries whose Compensation Claims are not yet resolved or for whom the Monitor does not have up to date address information have yet to receive their distributions.  These beneficiaries will be paid from the HWT or the appropriate reserves as provided for in the November 19, 2013 order.

52.  The November 19, 2013 order also provided for a process for reissuance of Stale-Dated Cheques related to group benefits to Non-Creditor Payees.  The Monitor implemented the process and the deadline for responses from Non-Creditor Payees is September 26, 2014.

53.  Distributions, other than those on account of LTD Income (the "Taxable HWT Distributions"), were considered to be taxable and subject to withholding of applicable

---

[1] With the distribution on account of Pensioner Life being reduced as a result of actual 2010 Pensioner Life premiums for all Participating Beneficiaries with the exception of LTD Beneficiaries.

taxes at source. Koskie Minsky LLP, as Court appointed representative counsel, is appealing the taxability of these amounts to the Tax Court of Canada. The appeal is not yet resolved. A determination by the Tax Court of Canada that some or all of the Taxable HWT Distributions are not taxable may result in removal of the tax gross-up component of the related estate claims as provided for in the Compensation Claim Methodology.

54.   The Monitor continues to work diligently with the Applicants, Trustee, LTD Beneficiaries' Representative and her advisors, Former Employees' Representatives and their advisors, Unifor (formerly CAW) and others to finalize outstanding matters to allow the wind-up of the HWT.

## STATUS OF THE TERMINATION FUND

55.   In accordance with the Employee Settlement Agreement, the Applicants established a fund for the benefit of former employees of the Applicants (the "Termination Fund"). By Court Order dated February 25, 2011, this Court extended the eligibility criteria for the Termination Fund to a group of former employees defined as Additional Eligible Former Employees. The February 25, 2011 Order also amended the Employee Hardship Application Process to permit the use of a portion of the funds allocated to the Employee Hardship Application Process, in combination with the remaining funds in the Termination Fund, to make payments to the Additional Eligible Former Employees.

56.   As of September 13, 2014, 1,467 former terminated employees have received payments totalling approximately CAD 4.4 million. The remaining former employees have a potential combined entitlement of CAD 165,000.

57.   The Applicants will deal with any further applications and make payments to eligible former employees pursuant to the above Orders as received.

## STATUS OF THE EMPLOYEE HARDSHIP APPLICATION PROCESS AND FUND

58.   On July 30, 2009, this Court issued an Order approving an employee hardship application process (the "Hardship Process") as more fully described in the Sixteenth Report and the Affidavit of John Doolittle dated July 24, 2009.

59.   Subsequently, this Court form time to time ordered certain amendments to the eligibility criteria including the extension of the eligibility time period. In July 2012, the funds available to the Hardship Process were increased from the original CAD 750,000 to CAD 1,000,000. On May 1, 2013, this Court issued an Order approving a further increase of funds available through the Hardship Fund to CAD 1,200,000. Pursuant to an Order dated March 21, 2014, the Hardship Process was extended to October 3, 2014.

60.   As of September 5, 2014 there is currently approximately CAD 71,000 remaining to satisfy future hardship application requests.

61.   The Monitor is continuing to administer the hardship payment application process and report thereon to Representative Counsel.

62.   The Monitor believes access to the hardship application procedure remains necessary as applications asserting financial hardship resulting from illness, healthcare costs, pension reductions or other reasons continue to be received as a result of the cessation of benefits to Former Employees, LTD Beneficiaries, Nortel pensioners and survivors' of Nortel pensioners.

63.   The Monitor believes that funding under the Hardship Process will continue to provide some relief to those holding Compensation Claims and who are experiencing financial difficulties.  Any payments received by an individual as part of the Hardship Process will be a reduction against any distributions to which the individual may be entitled pursuant to the Compensation Claims Process.

64.   Accordingly, the Monitor supports an extension of the deadline for submitting hardship applications to April 3, 2015 and amending the Eligibility Requirements and Procedure with Respect to Hardship Payment Applications attached as Appendix "E", accordingly.

14

## STATUS OF ALLOCATION AND RELATED CLAIM MATTERS

65.    The Allocation Protocol Litigation continues to be the central focus of the Applicants and
       Monitor at this stage of the Applicants' restructuring proceedings.  In addition to resolution
       of the allocation of the approximately $7.3 billion of sale proceeds held in escrow (the
       "Allocation Dispute"), the Allocation Protocol Litigation also encapsulated the significant
       claims advanced by the Trustee of the Nortel Networks UK Pension Trust Limited and the
       Board of the UK Pension Protection Fund (the "UK Pension Claimants") and the EMEA
       Debtors, against the Applicants that have been at the forefront of these proceedings.

66.    As a result of the EMEA Settlement Agreement, the trial of the EMEA Claims asserted by
       the EMEA Debtors against the Applicants and certain of their former directors and officers
       did not proceed; however, the evidentiary phase of the Allocation Dispute and the trial of
       the claims asserted by the UK Pension Claimants against the Applicants (the "UK Pension
       Claims") took place over the course of the summer of 2014.

67.    The One Hundred and Fourth Report of the Monitor dated March 14, 2014, included a
       summary of various steps taken in the pre-trial discovery and litigation process up to the
       date of that Report.

68.    From March 14, 2014 up to the commencement of the Allocation Dispute trial, the parties
       completed the pre-trial discovery and litigation process, which included the following:

       a)   the completion of expert witness depositions;

       b)   the delivery of initial and reply affidavits for each of the Allocation Dispute and
            the trials of the EMEA Claims and the UK Pension Claims;

       c)   the designation of fact and expert deposition testimony and exhibits for the trials,
            as well as objections to the foregoing;

       d)   pre-trial motions, objections and replies to pre-trial motions; and

e) the exchange of pre-trial briefs for each of the Allocation Dispute and the trials of the EMEA Claims and the UK Pension Claims.

69.  Opening statements for the Allocation Dispute took place on May 12 and 13, 2014. The evidentiary phase of the Allocation Dispute, consisting primarily of cross-examination of fact and expert witnesses, took place over the course of the balance of May and June, concluding on June 24, 2014. Initial and reply closing briefs, including proposed findings of fact and conclusions of law, were exchanged on August 7, 2014 and September 10, 2014, respectively. Closing arguments were heard by this Court and the U.S. Court from September 22 to 24, 2014.

70.  Opening statements for the trial of the UK Pension Claims took place on July 7 and 8, 2014. The evidentiary phase of the trial, consisting primarily of cross-examination of fact and expert witnesses, took place over the course of July, concluding on July 22, 2014. Initial responding and reply closing briefs were exchanged on August 19, 2013, September 12, 2014 and September 22, 2014. Closing arguments for the trial of the UK Pension Claims are scheduled for September 29 and 30, 2014.

***Crossover Bondholder Claims***

71.  By direction dated June 24, 2014, this Court and the U.S. Court ordered a joint hearing for July 25, 2014 to determine the following legal issues:

a) whether the holders of bond claims asserted against both the Canadian Estate and the U.S. Estate (the "Crossover Bondholders") are legally entitled in each jurisdiction to claim or receive any amounts under the relevant indentures above and beyond the outstanding principal debt and pre-petition interest (namely, above and beyond $4.092 billion); and

b) if it is determined the Crossover Bondholders are so entitled, what additional amounts are such holders entitled to so claim and receive.

72.  The hearing in the U.S. Court with respect to these matters was scheduled to proceed at the same time as the hearing in this Court, but was adjourned due to the U.S. Debtors

announcing on July 24, 2014, they had entered into a settlement agreement with certain bondholders resolving the post-petition interest claims of certain of the Crossover Bondholders as against the U.S. Debtors. The Monitor and Applicants have filed a preliminary objection to the settlement. The U.S. Court has fixed a discovery schedule and a hearing to consider the U.S. Debtors' motion seeking approval of the proposed settlement is scheduled before the U.S. Court for November 4, 2014.

73. On July 25, 2014, this Court proceeded with the scheduled hearing in respect of the above noted matters and on August 19, 2014, issued an Endorsement holding and declaring that the Crossover Bondholders are not legally entitled to claim or receive any amounts under the relevant indentures above and beyond the outstanding principal debt and pre-petition interest (namely, above and beyond $4.092 billion). On September 9, 2014, the Bondholder Group filed a motion seeking leave to appeal this Court's Order in respect of the claims of the Crossover Bondholders.

## OTHER MATTERS

### Status of Environmental Appeal/ERT Proceedings

74. On March 9, 2012, this Court issued an Order granting certain relief in respect of the Applicants' environmental obligations pertaining to properties in Belleville, Kingston, Brockville and London, Ontario and a property NNL continues to own in London, Ontario (the "London Retained Lands"). The Order also confirmed that various Orders (the "MOE Orders") issued by the Ontario Ministry of the Environment (the "MOE") against NNL in respect of such properties and related proceedings before the Ontario Environmental Review Tribunal (the "ERT Proceedings") were subject to the stay of proceedings granted by this Court.

75. Her Majesty the Queen in Right of Ontario as represented by the MOE, sought and obtained leave to appeal this Order. On June 19, 2013, the Ontario Court of Appeal heard the MOE's appeal and on October 3, 2013 released its decision granting the MOE's appeal with respect to all of the properties with the exception of the London Retained Lands. On

December 2, 2013, the Applicants and Monitor sought leave to appeal the Ontario Court of Appeal's decision to the Supreme Court of Canada. On April 17, 2014 the Supreme Court of Canada denied the Applicants' and Monitor's leave to appeal application.

76.   Following the denial of the leave to appeal application, status hearings were held in the various ERT Proceedings and each was adjourned to October 7, 2014, with NNL required to file appeal materials in respect of the MOE Orders by no later than September 15, 2014 (NNL having previously filed placeholder appeals in respect of the MOE Orders when they were issued in 2011).

77.   Over the course of the past five months the Applicants and Monitor have engaged in discussions with the MOE and other interested parties regarding the status of the various MOE Orders and the subject properties with a view to consensually resolving or advancing matters, including the various claims filed against the Applicants in relation to environmental matters at the subject properties.  The status of those efforts to date is as follows:

a)   Belleville – NNL began performing certain investigatory work at the Belleville property in May 2014. NNL and the MOE, with the consent of the other orderees under the MOE Order, have now reached agreement on a remedial action plan which will see NNL commence certain investigatory and risk assessment work at the Belleville property. NNL estimates that such work could cost up to CAD 1.9 million over the next 2 years. NNL, the MOE and the current property owner have agreed to seek an adjournment of the Belleville property ERT Proceedings for approximately nine months and hold NNL's appeal in abeyance during that time.

b)   Kingston – NNL, the Monitor and Taggart (Gardiners) Corporation ("Taggart") (the current owner of the Kingston property) have entered into a Kingston Property Settlement Agreement dated September 11, 2014 which would see NNL pay $300,000 to Taggart and NNL and the Monitor accept a general unsecured claim by Taggart for CAD 2.9 million in connection with remediation work at the Kingston property in exchange for, *inter alia*, a full and final release from Taggart. These agreements are subject to various conditions precedent, including: (i) the

MOE Order for the Kingston property is amended to remove NNL and the other orderees and name Taggart as the sole orderee; (ii) the MOE releases the Applicants, Monitor and each of their respective directors and officers from any liability in connection with the MOE Order or the Kingston Property; and (iii) that various proofs of claim filed against the Applicants relating to the Kingston Property are withdrawn and released. NNL, the Monitor and Taggart have been in discussions with the MOE with respect to the Kingston Property Settlement Agreement. Taggart has also delivered a remediation work plan to the MOE and is in discussions with the MOE regarding same. Given the status of matters, the MOE has agreed it is not necessary for NNL to file an appeal in respect of the Kingston MOE Order at this time and has advised it is amenable to a brief adjournment of the ERT Proceedings in order to advance settlement discussions.

c) Brockville – the MOE and SCI Brockville Corporation ("SCI") have reached agreement on a remedial action plan for the Brockville site and the Monitor understands SCI is prepared to commence work under such plan. The parties intend to seek an adjournment of the Brockville property ERT Proceedings for approximately nine months and hold NNL's appeal in abeyance during that time. The MOE has confirmed that a notice of appeal will not be required from NNL at this time.

d) London – the MOE has requested further time to consider matters and has confirmed that the parties need not file appeal notices at this time. The MOE and NNL have agreed an adjournment of the London ERT Proceedings will be sought to allow for the parties to confer.

### French Employee Proceedings

78.  Over the course of 2010 through 2013, approximately 160 former employees of NNSA (the "French Employees") commenced actions (collectively, the "French Employee Proceedings") against, *inter alia*, NNC, NNL and the Monitor before the Versailles Employment Tribunal in France (the "Tribunal"). A further additional claim was

commenced by a French Employee on or about July 4, 2014, with an initial hearing scheduled before the Tribunal on November 26, 2014.[2]

79.    Although the specific relief claimed by the French Employees varies on a case by case basis, the central claim alleges that NNC and NNL are liable for various employment related claims of the French Employees on the grounds they were "co-employers" with NNSA. To the best of the knowledge of the Monitor, the aggregate amount claimed by the French Employees against NNC and NNL in the French Employee Proceedings is approximately €24.5 million.

80.    The Monitor is of the view that the commencement of the French Employee Proceedings and the service of process on each of NNC, NNL and the Monitor in Canada is a breach of the stay of proceedings provided for in the Initial Order.

81.    In addition to commencing the French Employee Proceedings, on or about March 18, 2011, counsel to the French Employees purported to file a letter asserting an omnibus claim in the CCAA proceedings on behalf of 131 French Employees in an amount up to €21 million (the "French Employee Claim"). On July 30, 2014, the Monitor issued a Notice of Disallowance disallowing the French Employee Claim in full.  No Dispute Notice has been received in respect of the disallowance and the time period for delivering same under the Claims Resolution Order of this Court dated September 16, 2010 has expired.

*Closing of Beyond Excellent Technology IP Address Transaction*

82.    On September 9, 2014, this Court granted an Approval and Vesting Order which, among other things, approved the transaction contemplated by an asset sale agreement dated July 14, 2014, amongst NNL and NNTC, as seller, and Beyond Excellent Technology Ltd., as purchaser, in respect of the sale of NNL and NNTC's rights in a certain number of IP Addresses.  Further details in respect of this transaction are provided in the One Hundred

---

[2] Further details in respect of the French Employee Proceedings can be found in the Supplement to the One Hundred and Fourth Report of the Monitor dated July 4, 2014. As at the writing of this Report, aside from the additional action commenced, the Monitor is not aware of any further developments in respect of the status of the French Employee Proceedings beyond the update provided in the Supplement to the One Hundred and Fourth Report.

and Seventh Report of the Monitor dated September 2, 2014. The transaction closed on September 16, 2014.

### Authorized Representatives of the Applicants

83. Pursuant to prior Orders of this Court, the Monitor's powers have been expanded, most recently by an Order (Monitor's Expansion of Power Order # 2) dated October 3, 2012 (the "Second Expansion of Power Order"), which authorized the Monitor to exercise any powers which may be properly exercised by a board of directors of any of the Applicants. The Second Expansion of Power Order also contemplated "Authorized Representatives" of the Applicants whose sole responsibility would be to act on behalf of the Applicants as the Monitor may direct. This includes having sole authority to sign agreements, instruments and other documents on behalf of each of the Applicants as the Monitor may direct, but no authority to direct the management and policy of the Applicants or any entity affiliated with any of the Applicants.

84. The sole Authorized Representative of the Applicants from January 2013 until September 2014 was Allan Bifield (the other original Authorized Representative having completed her employment with NNL at the end of 2012).

85. The Second Expansion of Power Order contemplates that the Monitor may designate additional Authorized Representatives from time to time by filing a Monitor's Certificate with the Court. The Monitor has appointed Ms. Tanecia Wong Ken as an Authorized Representative with effect from September 22, 2014. Ms. Wong Ken has been employed by NNL since 2006 in various roles and has consented to acting as an Authorized Representative. Allan Bifield also continues as an Authorized Representative.

## STATUS OF FOREIGN PROCEEDINGS

### Chapter 11

86. The following is a summary of certain court orders that have been issued and the financial information filed in the Chapter 11 Proceedings since the last update provided in the Monitor's One Hundred and Fourth Report:

a) On March 14, 2014, the U.S. Court entered an order approving joint instructions and certain modifications to the sale proceeds escrow agreements to permit escrow funds to be invested directly in U.S. Treasury bills;

b) On March 31, 2014, the U.S. Court denied the Ad Hoc Committee of Canadian Employee's Terminated Pre-Petition request for oral argument on April 22, 2014 regarding its motion for leave to file claims in the U.S. Chapter 11 proceedings after the general bar date imposed on claims by the U.S. Court on the basis that the April 22, 2014 hearing would be related exclusively to the Allocation Dispute. The U.S. Court has adjourned consideration of the Ad Hoc Committee of Canadian Employee's Pre-Petition's motion until after the conclusion of the Allocation Dispute trial;

c) The U.S. Debtors filed Debtor-in-Possession Monthly Operating Reports for November 2013, December 2013, and January 2014 on March 24, 2014, April 4, 2014, and April 30, 2014, respectively; and

d) The U.S. Court entered additional orders resolving certain claims, approving certain settlements, authorizing and amending the retention and payment of professionals and addressing other matters involving professionals, setting future hearing dates and granting other related relief.

## *Chapter 15*

87. The following is a summary of the filings in the Chapter 15 proceedings of the Applicants since the last update provided in the Monitor's One Hundred and Fourth Report:

a) On April 21, 2014, the U.S. Court entered an order denying the renewed motion of lead plaintiffs (the "Lead Plaintiffs") in the securities class action captioned David Lucescu, Individually and on Behalf of All Others Similarly Situated v. Mike Zafirovski, et al. (the "Securities Litigation") pending in the United States District Court for the Southern District of New York seeking modification of the stay provided by the U.S Court's order dated February 27, 2009 (the "Recognition Order"), to pursue the Securities Litigation based on alleged changed

22

circumstances from when the U.S. Court denied the Lead Plaintiffs' initial motion in March 2, 2010. The U.S. Court concluded, *inter alia*, that the Lead Plaintiffs were effectively requesting modification of the injunctive relief that has been provided by this Court in connection with the applicants' CCAA proceedings and that it was more appropriate for the Lead Plaintiffs to seek such relief from the Canadian Court in the first instance;

b) On July 24, 2014, the Monitor filed a motion for an order enforcing this Court's Order Approving Agreement Settling EMEA Canadian Claims and Related Claims dated July 16, 2014. The U.S. Court granted the Monitor's motion and entered an order enforcing this Court's order on August 15, 2014; and

c) The Monitor has continued to file with the U.S. Court and serve on required parties notices of each of its reports to this Court.

## APPLICANTS' PROPOSED 2015 EMPLOYEE RETENTION PLAN

### *2014 Nortel Retention Plan*

88.   The 2014 NRP, described in more detail in the Ninety-Eighth Report, covers the period January 1, 2014 to December 31, 2014 (the "2014 NRP Plan Period") and was implemented to incentivize key employees to remain with the Applicants and certain of their affiliates during the restructuring period.

89.   During 2014, the Applicants have focused on divesting their remaining miscellaneous other assets, preparing for and advancing the Allocation Protocol Litigation, resolving the EMEA Claims and various other claims filed against the Applicants, preparing for and commencing the liquidation and wind-up of several foreign subsidiaries and other restructuring activities. The Applicants have made significant progress with respect to these activities.

90.   The aggregate cost to the Applicants of the 2014 NRP, net of recoveries from certain affiliates, is estimated to be approximately CAD 0.9 million.

*2015 Nortel Retention Plan*

91.  While much progress has been made by the Applicants, there remain a number of significant milestones the Applicants must achieve to conclude the CCAA proceedings, including resolution of the remaining aspects of the Allocation Protocol Litigation, continued repatriation of cash from affiliates in APAC and CALA, monetization of remaining residual assets and completion of the claims processes and creditor distributions. Retaining certain employees is critical for achieving these milestones.

92.  As the time frame for achieving these milestones has extended beyond the period contemplated by the 2014 NRP, the Applicants, in consultation with the Monitor, have designed a retention plan to retain and incentivize employees of the Applicants and certain of their affiliates in respect of the period January 1, 2015 to December 31, 2015 (the "Plan Period").

93.  The 2015 NRP is modelled on and is consistent with the 2014 NRP and is designed to incentivize employees of NNL and certain of its affiliates to remain with Nortel such that the milestones identified above and other goals can be accomplished. The 2015 NRP will provide cash incentive awards (the "Retention Payments") to 8 employees of the Applicants and 8 employees of their affiliates in the APAC and CALA regions in which the Applicants have an economic interest (collectively, the "Plan Participants").

94.  Retention Payments will be funded by the Nortel entity that employs a particular employee.

95.  Each Plan Participant will be entitled to receive a Retention Payment depending on their actual termination date and the circumstances surrounding their termination.

96.  If all of the Applicants' participants were retained for the full year, the aggregate cost to the Applicants of the 2015 NRP is forecast to be approximately CAD 0.5 million.

97.  The 2015 NRP is scalable and should milestones be achieved earlier than anticipated, the net cost for the Applicants' participants may be reduced. Further details of the 2015 NRP as it relates to employees of the Applicants are provided in Confidential Appendix "F" attached hereto.

98. Confidential Appendix "F" contains personal information and individual compensation details of the Applicants' employees. This information is sensitive and confidential. As such, the Applicants and Monitor request the Confidential Appendix "F" attached hereto be sealed pending further Order of this Court.

99. For a complete understanding of the terms governing the plan, reference should be made directly to the 2015 NRP, a copy of which is attached as Appendix "G" to this One Hundred and Eighth Report.

100. The Monitor does not believe the tasks being performed by the Plan Participants could be performed by other individuals as efficiently or at a lower cost.

101. The Monitor is of the view the 2015 NRP is appropriate having regard to the Applicants' needs and recommends this Court approve the 2015 NRP.

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

102. The Monitor has and continues to assist the Applicants in their efforts to efficiently realize maximum value from their remaining assets, advance the interests of the Canadian estate in the Allocation Protocol Litigation, wind down the Applicants' corporate, operational and IT infrastructure and conduct the claims processes for the purpose of preparing for a distribution to creditors.

103. An extension of the Stay Period is required to permit these and other restructuring efforts to continue such that resolution of these matters can be concluded and the Applicants can progress toward a distribution to their creditors. The Monitor believes the Applicants are working diligently and in good faith and continue to progress towards these goals.

104. For the reasons outlined in this One Hundred and Eighth Report, the Monitor supports:

    a) an extension of the stay up to and including April 3, 2015;

b) permitting the Monitor to review and adjudicate certain Compensation Claims in respect of which Form C Proofs of Claim were received after the applicable bar date;

c) an extension of the Employee Hardship Application Process through April 3, 2015 and the Eligibility Requirements and the Procedure with Respect to Hardship Payments Applications being amended accordingly; and

d) approval of the 2015 NRP as it relates to employees of the Applicants and sealing of the Confidential Appendix "F" pending further Order of this Court.

All of which is respectfully submitted this 24th day of September, 2014.

**ERNST & YOUNG INC.**
**in its capacity as Monitor of Nortel Networks Corporation et al.**
**and not its personal capacity**

Per:

Murray A. McDonald
President



**Nortel Networks - March 2, 2014 to September 13, 2014**
**CCAA Applicants**
**Forecast Cash Flow - Variances**
USD (Millions)

|  | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 02-Mar-14 | 02-Mar-14 | 02-Mar-14 |
| End of period | 13-Sep-14 | 13-Sep-14 | 13-Sep-14 |

### 1 . Receipts & Disbursements

| | Forecast | Actuals | Variances |
|---|---|---|---|
| **Receipts** | | | |
| Other Receipts | - | 0.1 | 0.1 |
| Net Intercompany Receipts | - | 13.2 | 13.2 |
| **Total Receipts** | - | 13.3 | 13.3 |
| **Disbursements** | | | |
| Payroll (Gross) | 1.4 | 1.0 | 0.4 |
| Benefits | 0.1 | 0.1 | - |
| Non-Inventory Purchases | 2.8 | 1.9 | 0.9 |
| Net Intercompany Disbursements | - | - | - |
| Restructuring Costs - Advisor Fees | 70.0 | 67.5 | 2.5 |
| Restructuring Costs - Allocation Dispute Support Services | 16.2 | 11.4 | 4.8 |
| **Total Disbursements** | 90.5 | 81.9 | 8.6 |
| **Net Cash Flow** | (90.5) | (68.6) | 21.9 |
| FX Impact | - | 3.0 | 3.0 |
| **Opening Available Cash Balance** | 209.2 | 209.2 | - |
| **Closing Available Cash Balance** | 118.7 | 143.6 | 24.9 |
| Unavailable Cash | 237.6 | 237.8 | 0.2 |
| **Total Cash** | 356.3 | 381.4 | 25.1 |
| Restricted Cash | 20.4 | 20.7 | 0.3 |
| **Total Cash + Restricted Cash** | 376.7 | 402.1 | 25.4 |



APPENDIX B

| Nortel Networks - September 14, 2014 | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CCAA Applicants | | Sep-14 | | | | Oct-14 | | | | Nov-14 | | |
| Forecast Cash Flow | Start of period | 14-Sep-14 | 21-Sep-14 | 28-Sep-14 | 05-Oct-14 | 12-Oct-14 | 19-Oct-14 | 26-Oct-14 | 02-Nov-14 | 09-Nov-14 | 16-Nov-14 | 23-Nov-14 |
| USD (Millions) | End of period | 20-Sep-14 | 27-Sep-14 | 04-Oct-14 | 11-Oct-14 | 18-Oct-14 | 25-Oct-14 | 01-Nov-14 | 08-Nov-14 | 15-Nov-14 | 22-Nov-14 | 29-Nov-14 |
| **Receipts** | | | | | | | | | | | | |
| Other Receipts | | - | - | - | - | - | - | - | - | - | - | - |
| Net Intercompany Receipts | | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | | - | - | - | - | - | - | - | - | - | - | - |
| **Disbursements** | | | | | | | | | | | | |
| Payroll (Gross) | | 0.1 | - | 0.1 | - | 0.1 | - | 0.1 | - | 0.1 | - | 0.1 |
| Benefits | | - | - | - | - | 0.1 | - | - | - | - | - | - |
| Inventory Purchases | | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.3 | 0.1 | 0.1 | 0.1 | 0.1 | 0.3 |
| Net Intercompany Disbursements | | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs - Advisor Fees | | 2.5 | 2.5 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.0 | 1.0 | 1.0 | 1.0 |
| Restructuring Costs - Allocation Dispute Support Services | | 0.3 | 0.3 | - | - | - | 0.1 | - | - | - | - | 0.1 |
| **Total Disbursements** | | 3.0 | 2.9 | 1.8 | 1.7 | 1.9 | 2.0 | 1.8 | 1.1 | 1.2 | 1.1 | 1.5 |
| **Net Cash Flow** | | (3.0) | (2.9) | (1.8) | (1.7) | (1.9) | (2.0) | (1.8) | (1.1) | (1.2) | (1.1) | (1.5) |
| FX Impact | | | | | | | | | | | | |
| **Opening Available Cash Balance** | | 143.6 | 140.6 | 137.7 | 135.9 | 134.2 | 132.3 | 130.3 | 128.5 | 127.4 | 126.2 | 125.1 |
| **Closing Available Cash Balance** | | 140.6 | 137.7 | 135.9 | 134.2 | 132.3 | 130.3 | 128.5 | 127.4 | 126.2 | 125.1 | 123.6 |
| LG & Strandherd Proceeds | | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 |
| **Total Cash** | | 378.4 | 375.5 | 373.7 | 372.0 | 370.1 | 368.1 | 366.3 | 365.2 | 364.0 | 362.9 | 361.4 |
| Restricted Cash | | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 |
| **Total Cash + Restricted Cash** | | 399.1 | 396.2 | 394.4 | 392.7 | 390.8 | 388.8 | 387.0 | 385.9 | 384.7 | 383.6 | 382.1 |

APPENDIX B

| Nortel Networks - September 14, 2014 | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CCAA Applicants | | | | Dec-14 | | | | | Jan-15 | | | |
| Forecast Cash Flow | Start of period | 30-Nov-14 | 07-Dec-14 | 14-Dec-14 | 21-Dec-14 | 28-Dec-14 | 04-Jan-15 | 11-Jan-15 | 18-Jan-15 | 25-Jan-15 | 01-Feb-15 | 08-Feb-15 |
| USD (Millions) | End of period | 06-Dec-14 | 13-Dec-14 | 20-Dec-14 | 27-Dec-14 | 03-Jan-15 | 10-Jan-15 | 17-Jan-15 | 24-Jan-15 | 31-Jan-15 | 07-Feb-15 | 14-Feb-15 |
| **Receipts** | | | | | | | | | | | | |
| Other Receipts | | - | - | - | - | - | - | - | - | - | - | - |
| Net Intercompany Receipts | | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | | - | - | - | - | - | - | - | - | - | - | - |
| **Disbursements** | | | | | | | | | | | | |
| Payroll (Gross) | | - | 0.1 | - | 0.1 | - | 0.1 | - | 0.1 | - | 1.3 | - |
| Benefits | | - | - | - | - | - | - | - | - | - | 0.1 | - |
| Inventory Purchases | | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | | 0.1 | 0.1 | 0.3 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.3 | 0.1 | 0.1 |
| Net Intercompany Disbursements | | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs - Advisor Fees | | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Restructuring Costs - Allocation Dispute Support Services | | - | - | 0.1 | - | - | - | - | - | 0.1 | - | - |
| **Total Disbursements** | | 1.1 | 1.2 | 1.4 | 1.2 | 1.1 | 1.2 | 1.1 | 1.2 | 1.4 | 2.5 | 1.1 |
| **Net Cash Flow** | | (1.1) | (1.2) | (1.4) | (1.2) | (1.1) | (1.2) | (1.1) | (1.2) | (1.4) | (2.5) | (1.1) |
| FX Impact | | | | | | | | | | | | |
| **Opening Available Cash Balance** | | 123.6 | 122.5 | 121.3 | 119.9 | 118.7 | 117.6 | 116.4 | 115.3 | 114.1 | 112.7 | 110.2 |
| **Closing Available Cash Balance** | | 122.5 | 121.3 | 119.9 | 118.7 | 117.6 | 116.4 | 115.3 | 114.1 | 112.7 | 110.2 | 109.1 |
| LG & Strandherd Proceeds | | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 |
| **Total Cash** | | 360.3 | 359.1 | 357.7 | 356.5 | 355.4 | 354.2 | 353.1 | 351.9 | 350.5 | 348.0 | 346.9 |
| Restricted Cash | | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 |
| **Total Cash + Restricted Cash** | | 381.0 | 379.8 | 378.4 | 377.2 | 376.1 | 374.9 | 373.8 | 372.6 | 371.2 | 368.7 | 367.6 |

| Nortel Networks - September 14, 2014 | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|
| CCAA Applicants | | Feb-15 | | | Mar-15 | | | | |
| Forecast Cash Flow | Start of period | 15-Feb-15 | 22-Feb-15 | 01-Mar-15 | 08-Mar-15 | 15-Mar-15 | 22-Mar-15 | 29-Mar-15 | 14-Sep-14 |
| USD (Millions) | End of period | 21-Feb-15 | 28-Feb-15 | 07-Mar-15 | 14-Mar-15 | 21-Mar-15 | 28-Mar-15 | 04-Apr-15 | 04-Apr-15 |
| **Receipts** | | | | | | | | | |
| Other Receipts | | - | - | - | - | - | - | - | - |
| Net Intercompany Receipts | | - | - | - | - | - | - | - | - |
| **Total Receipts** | | - | - | - | - | - | - | - | - |
| **Disbursements** | | | | | | | | | |
| Payroll (Gross) | | 0.1 | - | 0.1 | - | 0.1 | - | 0.1 | 2.7 |
| Benefits | | - | - | - | - | - | - | - | 0.2 |
| Inventory Purchases | | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | | 0.1 | 0.3 | 0.1 | 0.1 | 0.1 | 0.3 | 8.9 | 12.9 |
| Net Intercompany Disbursements | | - | - | - | - | - | - | - | - |
| Restructuring Costs - Advisor Fees | | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 35.0 |
| Restructuring Costs - Allocation Dispute Support Services | | - | 0.1 | - | - | - | 0.1 | - | 1.2 |
| **Total Disbursements** | | 1.2 | 1.4 | 1.2 | 1.1 | 1.2 | 1.4 | 10.0 | 52.0 |
| **Net Cash Flow** | | (1.2) | (1.4) | (1.2) | (1.1) | (1.2) | (1.4) | (10.0) | (52.0) |
| FX Impact | | | | | | | | | |
| **Opening Available Cash Balance** | | 109.1 | 107.9 | 106.5 | 105.3 | 104.2 | 103.0 | 101.6 | 143.6 |
| **Closing Available Cash Balance** | | 107.9 | 106.5 | 105.3 | 104.2 | 103.0 | 101.6 | 91.6 | 91.6 |
| LG & Strandherd Proceeds | | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 | 237.8 |
| **Total Cash** | | 345.7 | 344.3 | 343.1 | 342.0 | 340.8 | 339.4 | 329.4 | 329.4 |
| Restricted Cash | | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 | 20.7 |
| **Total Cash + Restricted Cash** | | 366.4 | 365.0 | 363.8 | 362.7 | 361.5 | 360.1 | 350.1 | 350.1 |



Nortel CCAA Applicants
Advisor and Allocation Dispute Support Service Costs
All Figures in USD

| Restructuring Costs - Advisory Fees (All figures in USD) | Mar 2, 2014 - Sept 13, 2014 Weekly Forecast | Mar 2, 2014 - Sept 13, 2014 Total Forecast | Mar 2, 2014 - Sept 13, 2014 Total Actual | Sept 14, 2014 - Apr 4, 2015 Avg Weekly Forecast [2] | Sept 14, 2014 - Apr 4, 2015 Total Forecast |
|---|---|---|---|---|---|
| **Canadian Debtors' Advisors** | | | | | |
| Davies Ward Phillips & Vineberg LLP (Environmental) | | | | | |
| Gowling Lafleur Henderson LLP | | | | | |
| Mercer Human Resources Co | | | | | |
| Norton Rose Fulbright Canada LLP | | | | | |
| Buchanan Ingersol & Rooney | | | | | |
| Freshfields Bruckhaus Deringer | | | | | |
| Other Foreign Legal Advisors | | | | | |
| | 450,000 | 12,600,000 | 9,480,484 | 106,249 | 3,081,210 |
| **Monitor and Advisors** | | | | | |
| Allen & Overy LLP | | | | | |
| Ernst & Young Inc. | | | | | |
| Goodmans LLP | | | | | |
| | 1,340,000 | 37,520,000 | 35,309,988 | 661,724 | 19,190,000 |
| **Canadian Estate Allocation Dispute Support Services** [1] | 510,000 | 13,770,000 | 8,138,529 | 38,707 | 1,122,500 |
| **Canadian Debtors / Monitor Subtotal** | 2,300,000 | 63,890,000 | 52,929,000 | 806,680 | 23,393,710 |
| **Employee Advisors** | | | | | |
| 6038441 Canada Inc. (Financial Advisor) | | | | | |
| Koskie Minsky LLP | | | | | |
| DLA Piper LLP | | | | | |
| Wardle Daley Bernstein LLP | | | | | |
| Nelligan O'Brien Payne | | | | | |
| Shepell FGI | | | | | |
| Shibley Righton LLP | | | | | |
| The Segal Company | | | | | |
| Allocation Dispute Support Services [1] | | | | | |
| | 320,000 | 8,870,000 | 6,916,902 | 123,017 | 3,567,500 |
| **Directors and Officers Advisors** | | | | | |
| Osler Hoskin & Harcourt LLP | | | | | |
| | 60,000 | 1,680,000 | 2,789,896 | 10,517 | 305,000 |
| **Ad Hoc Bondholder Group Advisors** | | | | | |
| Bennett Jones LLP | | | | | |
| FTI Capital Advisors LLC | | | | | |
| Milbank Tweed Hadley & McCloy LLP | | | | | |
| | 420,000 | 11,760,000 | 16,251,674 | 308,252 | 8,939,310 |
| **Total** | 3,100,000 | 86,200,000 | 78,887,472 | 1,248,466 | 36,205,520 |

1. Certain vendors that were presented as part of Allocation Dispute Support Services in prior Monitor's Reports are now presented in the Advisor Fees. This new presentation better reflects the nature of services these vendors provide to the Estate.
2. Represents average weekly run-rate for the Forecast Period.



# Nortel Networks - CCAA Applicants Overall Claims Status

September 3, 2014
All amounts in CAD millions

| Debtor / Claim Category | Filed Proof of Claim # | $ | Under Review # | $ | Accepted or Reviewed and unadjusted # | $ | Value per Notice of Disallowance # | $ | Value per Notice of Dispute # | $ |
|---|---|---|---|---|---|---|---|---|---|---|
| **Nortel Networks Corporation** | | | | | | | | | | |
| Trade | 76 | 1,614.7 | 24 | 24.3 | 50 | 3.1 | - | - | 2 | 20.8 |
| Bonds | 2 | 4,808.7 | 2 | 4,808.7 | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 7 | 2,514.0 | 4 | 2,510.3 | 1 | - | - | - | 2 | 9,242.6 |
| EMEA Claims | 63 | - | - | - | 58 | - | - | - | 5 | - |
| Other | 165 | 812.2 | 11 | 314.3 | 150 | 0.1 | - | - | 4 | 4.6 |
| Total | 313 | 9,749.6 | 41 | 7,657.6 | 259 | 3.1 | - | - | 13 | 9,267.9 |
| **Nortel Networks Global Corporation** | | | | | | | | | | |
| Trade | 11 | 1,493.3 | 3 | 9.2 | 8 | 0.8 | - | - | - | - |
| Bonds | - | - | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,510.3 | 6 | 2,510.3 | - | - | - | - | - | - |
| EMEA Claims | 1 | - | - | - | 1 | - | - | - | - | - |
| Other | 36 | 213.6 | 1 | 0.0 | 34 | - | - | - | 1 | 3.4 |
| Total | 54 | 4,217.2 | 10 | 2,519.5 | 43 | 0.8 | - | - | 1 | 3.4 |
| **Nortel Networks International Corporation** | | | | | | | | | | |
| Trade | 8 | 1,492.4 | 4 | 9.2 | 4 | - | - | - | - | - |
| Bonds | - | - | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,510.3 | 6 | 2,510.3 | - | - | - | - | - | - |
| EMEA Claims | - | - | - | - | - | - | - | - | - | - |
| Other | 36 | 213.6 | 1 | 0.0 | 34 | - | - | - | 1 | 3.4 |
| Total | 50 | 4,216.4 | 11 | 2,519.5 | 38 | - | - | - | 1 | 3.4 |
| **Nortel Networks Limited** | | | | | | | | | | |
| Trade | 328 | 1,599.2 | 39 | 98.5 | 284 | 134.9 | - | - | 5 | 22.1 |
| Bonds | 4 | 5,243.1 | 4 | 5,243.1 | - | - | - | - | - | - |
| Inter-company (NNI claim) | 1 | 2,517.0 | - | - | 1 | 2,517.0 | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 7 | 2,510.7 | 7 | 2,510.7 | - | - | - | - | - | - |
| EMEA Claims | 21 | - | - | - | 20 | 122.0 | 1 | - | 1 | - |
| Other | 168 | 1,826.4 | 14 | 643.4 | 151 | 63.4 | 1 | - | 2 | 76.8 |
| Total | 529 | 13,696.5 | 64 | 8,495.8 | 456 | 2,837.4 | 1 | - | 8 | 98.8 |
| **Nortel Networks Technology Corporation** | | | | | | | | | | |
| Trade | 143 | 1,545.4 | 9 | 9.4 | 131 | 22.1 | - | - | 3 | 21.0 |
| Bonds | - | - | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,510.3 | 6 | 2,510.3 | - | - | - | - | - | - |
| EMEA Claims | 6 | - | - | - | 5 | - | - | - | 1 | - |
| Other | 37 | 213.7 | 1 | 0.0 | 35 | - | - | - | 1 | 3.4 |
| Total | 192 | 4,269.4 | 16 | 2,519.7 | 171 | 22.1 | - | - | 5 | 24.4 |
| **Grand Total** | 1,138 | 36,149.0 | 142 | 23,712.1 | 967 | 2,863.3 | 1 | - | 28 | 9,398.0 |

Current claim value - most recent stage [1] [2] [3]

Notes:
Note 1. The estimated value of individual claims by category is aggregated and shown in one claim stage only.
Note 2. All amounts (other than Accepted) are subject to potential material change (i.e. negotiation, appeal, etc.) as the process for the determination of claims proceeds.
Note 3. Excludes claims filed in the employee compensation claim process.



Appendix E

**Eligibility Requirements and Procedure with Respect to Hardship Payment Applications**

1. **Eligibility**

    (a) A former employee would be eligible for hardship payments if he or she is resident in Canada and has no available source of income, being all monies receivable by the former employee including, without limitation, employment income such as wages, salary or bonuses, consulting income, or pension or disability payments or income replacement payments ("Income"), or Income of a spouse, as of the date of the application and has no reasonable expectation of being in receipt of Income during the Application Period (referred to below) and:

        i.   The former employee is unable to work due to illness or is incurring costs in excess of 25% of his or her EI payments as a result of treatment for illness or healthcare costs, or as a result of the illness of a family member who is dependent on the former employee for support; **or**

        ii.  During the Application Period the former employee is not receiving a Nortel pension or employment insurance (EI) as a result of ineligibility for EI or exhaustion of EI benefits, and demonstrates some other significant hardship in dealing with financial obligations.

    (b) Notwithstanding 1(a) above, the following individuals would also be eligible for hardship payments:

        (i) a Nortel pensioner and/or a survivor of a Nortel pensioner:
- who is a member of one of the defined benefit pension plans; AND
- was subjected to the reduction in monthly pension payments announced by Morneau and effective August 2011.

        (ii) a former employee who prior to December 31, 2010 was in receipt of long term disability payments from Nortel and who despite having access to other sources of income such as; Canada Pension Plan Disability, Quebec Pension Plan Disability Payments, Ontario Disability Support Program payments, or other similar government program payments, otherwise satisfies the hardship eligibility requirements.

IN ALL CASES:

1. There must be a Monitor recognized Compensation Claim against Nortel relating to the former employee, pensioner and/or survivor of a Nortel pensioner. If an Information Statement setting out such Compensation Claim on Form A was not provided, there is no Monitor recognized Compensation Claim against Nortel and therefore there is no eligibility for hardship payments.

2. The Applicant must demonstrate urgent or immediate hardship in dealing with financial obligations.

43

Appendix E

2.    **Application and Adjudication Process**

Notice of the application process will be posted on the Monitor's website, the website of the Nortel Retiree Protection Committee (NRPC) and the websites of Representative Counsel. An applicant is required to complete and submit the attached application form to the Monitor at the contact information listed below. The Monitor will make an initial determination to approve or reject the application within 21 days of receipt of the completed application. The first payment will proceed within seven business days subject to the payment parameters set out below. If not approved, the applicant has the right to be heard by an informal committee composed of one company appointee, one appointee of the Monitor and one appointee chosen by the Representatives, who will be compensated for his time on an hourly basis. A further appeal may be brought to the Court or an officer of the Court designated by the presiding judge, costs to be determined by the Court on the application.

3.   **Payment Parameters**

(a) former employees (including LTD Beneficiaries): Any successful applicant may be approved for a maximum payment of up to 8 weeks salary based on a maximum weekly salary of up to $1,200 per week payable in monthly instalments. The hardship committee will also have discretion to approve additional amounts in cases of medical and other emergencies in an amount up to $2,500.

(b) Pensioner/Survivor: Any successful applicant may be approved for a maximum payment of $5,000. This payment will be a one-time payment made as a lump sum.

All hardship payments are subject to all applicable tax and other withholdings.

4.  **Application Period** – From the date of application to April 3, 2015.

5.  **Miscellaneous**

(a) Hardship Payments are advances against distributions on Compensation Claims, and will be deducted from any payments on Compensation Claims that may be allowed in the ultimate claims process in these proceedings.

(b) The aggregate maximum amount available for hardship payments is $1,200,000, including the $750,000 amount approved by this Court on July 30, 2009, less the total Required Funds (as defined by paragraph 4 of the February 25, 2011 Court order and by paragraph 3 of the April 8, 2011 Court Order).

Contact information for the Monitor:

**ERNST & YOUNG INC.**
Court-appointed Monitor of Nortel Networks Corporation & others
222 Bay Street, P.O. Box 251
Toronto, Ontario
Canada M5K 1J7

Attention:      Nortel Claims
Telephone:     1-416-943-4439 or 1-866-942-7177
E-mail  nortel.monitor@ca.ey.com
Fax:    1-416-943-2808



**CONFIDENTIAL APPENDIX "F"**

**[CONFIDENTIAL]**



## NORTEL 2015 RETENTION PLAN

### I.  PLAN OBJECTIVE

The Nortel 2015 Retention Plan (the "Plan") is designed to provide cash incentive payments (the "Retention Payments") to certain employees of Nortel Networks Limited ("NNL") and certain of its direct and indirect subsidiaries and affiliates participating in the Plan (each a "Participating Employer" and collectively, the "Company") to encourage the achievement of certain business goals important to the Company and its stakeholders, including a conclusion of NNL's and certain of its affiliates' proceedings under the *Companies' Creditors Arrangement Act* (Canada) (the "Proceedings") and the wind down of various Company entities during the Plan Period (as defined below).

### II.  PARTICIPATING EMPLOYEES

(a)  Only those employees who will be actively employed by a Participating Employer for any portion of 2015 will be eligible to participate in the Plan, subject to the discretion of management.

(b)  Each employee of a Participating Employer selected for participation in the Plan shall receive a letter (each, a "Participation Letter") that sets forth the Annual Award Amount (as defined below) that he or she may be eligible to receive under the Plan with respect to the Plan Period. The Participation Letter will require such employee to agree to be bound by the terms and conditions of the Plan, including any amendments thereto, in order to obtain the benefits of the Plan. Upon execution and timely return of the Participation Letter in accordance with its terms, such selected employee shall become a participant in the Plan (a "Plan Participant") and will be eligible to receive a Retention Payment.

### III. AWARD AMOUNTS

(a)  Each Plan Participant's Participation Letter will designate an individual Annual Award Amount ("Annual Award Amount") that will have been determined by the Company in accordance with criteria approved by NNL's monitor, Ernst & Young Inc. (the "Monitor").

(b)  Each Plan Participant will be eligible to receive a Retention Payment in respect of the Plan Period in an amount determined in accordance with section V (such Retention Payment, the "Award Payment Amount"). Retention Payments under this Plan are available to Plan Participants solely and exclusively in the form of Award Payment Amounts, to be paid in accordance with the terms of this Plan.

(c)  Except as required by applicable law or the terms of Company benefit plans or programs, Retention Payments will not be taken into account for purposes of Company benefits in which a Plan Participant may participate and will not be included in "eligible earnings" for purposes of capital accumulation and retirement plans offered in various jurisdictions by the Company.  Where required, deductions

- 2 -

will be made from the Retention Payments paid in accordance with the specific capital accumulation and retirement plan in which the Plan Participant participates.

## IV. PLAN PERIOD

The Plan shall commence on January 1, 2015 and end on December 31, 2015 (the "Plan Period").

## V. PAYMENT PROCESS

(a) The Plan Participants are those Plan Participants that are advised in their Participation Letter that they are Plan Participants.

(b) The intended termination date of the employment of a particular Plan Participant shall be set out in the Participation Letter provided to that Plan Participant (as may be adjusted in accordance with the terms of this Plan, the "Termination Date").

(c) Subject to section VI, the Plan Participant's Termination Date shall determine each Plan Participant's Award Payment Amount, as follows:

  (i)   if the Plan Participant's Termination Date is in January 2015, the Plan Participant's Award Payment Amount will be one-twelfth ($^1/_{12}$) of his/her Annual Award Amount;

  (ii)  if the Plan Participant's Termination Date is in February 2015, the Plan Participant's Award Payment Amount will be two-twelfths ($^2/_{12}$) of his/her Annual Award Amount;

  (iii) if the Plan Participant's Termination Date is in March 2015, the Plan Participant's Award Payment Amount will be three-twelfths ($^3/_{12}$) of his/her Annual Award Amount;

  (iv)  if the Plan Participant's Termination Date is in April 2015, the Plan Participant's Award Payment Amount will be four twelfths ($^4/_{12}$) of his/her Annual Award Amount;

  (v)   if the Plan Participant's Termination Date is in May or June 2015, the Plan Participant's Award Payment Amount will be sixty percent (60%) of his/her Annual Award Amount;

  (vi)  if the Plan Participant's Termination Date is in July or August 2015, the Plan Participant's Award Payment Amount will be seventy-five percent (75%) of his/her Annual Award Amount;

  (vii) if the Plan Participant's Termination Date is in September or October 2015, the Plan Participant's Award Payment Amount will be ninety percent (90%) of his/her Annual Award Amount; and

(viii) if the Plan Participant's Termination Date is in November or December 2015, the Plan Participant's Award Payment Amount will be one hundred percent (100%) of his/her Annual Award Amount.

(d) A Plan Participant's Termination Date may be changed upon at least ninety (90) days prior written notice of such change to that Plan Participant. Upon the provision to the Plan Participant of at least ninety (90) days written notice of the change of Termination Date, the Plan Participant's Award Payment Amount will be adjusted in accordance with section V(c), subject to section V(e), and the Termination Date of such Plan Participant shall be adjusted for all purposes of this Plan. For greater certainty, if a Plan Participant's Termination Date is adjusted in accordance with this section V(d) and such Plan Participant elects to terminate his/her employment with the Participating Employer prior to the adjusted Termination Date, then section VII(a) hereof shall apply to such termination of employment.

(e) If the Plan Participant's Participation Letter provided for an original Termination Date between and including May 1, 2015 and December 31, 2015 and the Termination Date is changed in accordance with section V(d), the Plan Participant's adjusted Award Payment Amount will be the greater of: i) the entitlement described under section V(c) using the adjusted Termination Date, or ii) the entitlement described below:

  (i)   50% of the Plan Participant's Annual Award Amount, if the original Termination Date was in May or June 2015;

  (ii)  55% of the Plan Participant's Annual Award Amount, if the original Termination Date was in July or August 2015;

  (iii) 60% of the Plan Participant's Annual Award Amount, if the original Termination Date was in September or October 2015; or

  (iv)  66 2/3% of the Plan Participant's Annual Award Amount, if the original Termination Date was in November or December 2015.

(f) Less than (90) days prior to a Plan Participant's Termination Date, a request may be made to a Plan Participant to extend his/her Termination Date. In such a case, the Plan Participant has the option to either accept or reject this request within the time period set out in the extension request received. If the Plan Participant accepts the requested extension by written notice to the applicable Participating Employer within the time period set out in the extension request, his/her Termination Date will be adjusted accordingly and the revised Award Payment Amount determined in accordance with section V(c). If the Plan Participant rejects a requested extension made pursuant to this section V(f), there is no change to his/her Termination Date or Award Payment Amount.

(g) Subject to sections VII(a) through (e):

(i) for Plan Participants employed outside of Asia ("Non-Asia Plan Participants"), the Award Payment Amount shall be conclusively determined upon the Non-Asia Plan Participant's termination of employment with the Participating Employer and payment of a Non-Asia Plan Participant's entire Award Payment Amount shall be made as soon as practicable following such Non-Asia Plan Participant's Termination Date, but, in any event, no later than forty-five (45) days following such Termination Date.

(ii) for Plan Participants employed in Asia (an "Asia Plan Participant"), the Award Payment Amount shall be conclusively determined upon the Asia Plan Participant's termination of employment with the Participating Employer, it being understood that:

> i.   the Award Payment Amount will be paid in installments (the "Installment Payments") on: (a) the first regularly scheduled pay date following the end of each calendar quarter that ends prior to the Asia Plan Participant's Termination Date; and (b) a date that is as soon as practicable following an Asia Plan Participant's Termination Date, but, in any event, no later than forty-five (45) days following such Termination Date; and

> ii.  the amount of a particular Installment Payment shall be calculated as follows:

>> A.  the Asia Plan Participant's expected Award Payment Amount based upon the Asia Plan Participant's expected Termination Date as at the time of the particular Installment Payment, less the Installment Payments previously made to such Asia Plan Participant;

>> divided by:

>> B.  the number of Installment Payments remaining based upon the Asia Plan Participant's expected Termination Date as at the time of the particular Installment Payment.

(h) Notwithstanding anything in the Plan to the contrary, if the Monitor, in its sole discretion, concludes that a Plan Participant has committed intentional misconduct, as defined in the Policy Regarding Recoupment of Incentive Compensation relating to the forfeiture and/or recoupment of incentive compensation, the Plan Participant will forfeit his/her entire Award Payment Amount and promptly reimburse his/her Participating Employer the amount of any Retention Payment received to date.

## VI. PLAN ADMINISTRATION

The Monitor shall have full discretionary authority to administer the Plan, including discretionary authority to interpret and construe any and all provisions of the Plan.

## VII. TERMINATION OF EMPLOYMENT

(a) Notwithstanding anything in the Plan to the contrary, upon the involuntary termination of employment of a Plan Participant for Cause (as defined below) or the voluntary termination of employment by a Plan Participant for any reason, in each case during the Plan Period, the right to any unpaid portion of the Award Payment Amount of such Plan Participant will be forfeited on the date of such employment termination and such Plan Participant will have no further rights under the Plan.

(b) Upon the termination of employment of a Plan Participant during the Plan Period due to such Plan Participant's death, the Retention Payment shall be deemed to be the Award Payment Amount (as may have been adjusted in accordance with the provisions of section V, prior to the termination of such Plan Participant's employment) and will be accelerated and any remaining balance thereof will be paid as soon as practicable, but, in any event, no later than forty-five (45) days following the date the Company becomes aware of the Plan Participant's death.

(c) Upon the involuntary termination of employment of a Plan Participant other than for Cause, the Retention Payment shall be deemed to be the Award Payment Amount (as may have been adjusted in accordance with the provisions of section V, prior to the termination of such Plan Participant's employment) and will be accelerated and any remaining balance thereof will be paid as soon as practicable, but, in any event, no later than forty-five (45) days following such Termination Date,

(d) For the purposes of the Plan, "Cause" shall mean inappropriate actions or inactions, misconduct, breach of an agreement with the Company or unsatisfactory performance by a Plan Participant or cause (as "cause" is legally defined, if at all, in the relevant jurisdiction) as determined by the Monitor in its sole discretion.

## VIII. EFFECTIVE DATE; TERMINATION DATE OF THE PLAN

Subject to receiving the approval of the Ontario Superior Court of Justice (Commercial List), the Plan shall be effective as of January 1, 2015 and shall expire on the date on which all Retention Payments under the Plan have been made.

## IX. NO PROMISE OF CONTINUED EMPLOYMENT

The Plan and any Plan Participant's selection as a participant in the Plan does not, and is in no manner intended to, constitute a promise of employment for any period of time or change a Plan Participant's employment status, if applicable, as an at will employee subject to employment termination at any time for any reason.

## X. TAXES

All payments made pursuant to the Plan shall be subject to applicable taxes and standard withholding and deductions as determined by the relevant Participating Employer.

Neither the Company nor its officers or agents makes or has made any representation about the tax consequences of any payments made or offered to any Plan Participant under the Plan.

## XI. CONFIDENTIALITY

Subject to applicable law, a Plan Participant's participation in the Plan, the Participation Letter, the Award Payment Amount, the Retention Payment and any other documents contemplated to be delivered hereunder are confidential and a Plan Participant may not disclose, publicize or discuss his/her participation in the Plan, the Participation Letter, the Award Payment Amount, the Retention Payment or any other documents contemplated to be delivered hereunder with any current or former employee of the Company or any other person except a Plan Participant's spouse, accountant, financial advisor or attorney, who must be informed by the Plan Participant not to further disclose such confidential information. Notwithstanding the foregoing, the Company may disclose Participants' participation in the Plan, Participation Letter, Award Payment Amounts, Retention Payments and any other documents contemplated to be delivered hereunder as required under applicable law or as it deems necessary in the implementation and administration of the Plan and in the conduct of the Company's business.

## XII. SEVERABILITY

If any provision of the Plan is determined to be invalid or unenforceable, in whole or in part, this determination shall not affect any other provision of the Plan and the provision in question shall be modified so as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible. Any waiver of a breach of any of the terms of the Plan shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision.

## XIII. CHOICE OF LAW AND VENUE

The Plan shall be governed by the laws of Ontario and the laws of Canada applicable therein. With respect to any Plan Participant who is an employee of a Participating Employer that is subject to the Proceedings, as a condition of such Plan Participant being entitled to participate in the Plan such Plan Participant (a) irrevocably and unconditionally consents to the exclusive jurisdiction of the Ontario Superior Court of Justice (Commercial List) with respect to any disputes arising from or connected to the Plan or any Retention Payment hereunder, (b) irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of or related to the Plan or any Retention Payment in such court and (c) irrevocably and unconditionally waives and agrees not to plead or claim that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

## XIV. ENTIRE AGREEMENT AND AMENDMENT

- 7 -

This Plan document (together with the Participation Letters and any other document contemplated to be delivered hereunder) constitutes the complete, final and exclusive embodiment of the terms and conditions of the Plan. Any amendments or modifications of the Plan must be authorized by the Monitor or a person specifically authorized by the Monitor to take action with respect to the Plan; subject, in each case, to any approvals which may be required in light of the Proceedings. Any agreement between any Plan Participant and any Participating Employer with regard to the Plan and its subject matter is hereby superseded.

## XV.   NO ASSIGNMENT

The rights of a Plan Participant or any other person to any payment or other benefits under the Plan may not be assigned, transferred, pledged or encumbered except by will or the laws of descent and distribution.

## XVI.   FUNDING

The Plan is an unfunded plan and any and all amounts payable to a Plan Participant under the Plan shall be paid from the general assets of his/her Participating Employer. The obligation under the Plan with respect to any specific Plan Participant shall be the several obligation of his/her Participating Employer and will not be a joint obligation of any other Company entity.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No: 09-CL-7950

---

### *ONTARIO* SUPERIOR COURT OF JUSTICE (COMMERCIAL LIST)

Proceeding commenced at Toronto

---

### ONE HUNDRED AND EIGHTH REPORT OF THE MONITOR DATED SEPTEMBER 24, 2014

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC#: 22293T)
jcarfagnini@goodmans.ca
Joseph Pasquariello (LSUC# 38390C)
jpasquariello@goodmans.ca
Christopher G. Armstrong (LSUC# 55148B)
carmstrong@goodmans.ca

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.