# Exhibit I



**Ernst & Young LLP**
1 More London Place
London SE1 2AF

Tel  020 7951 2000
Fax  020 7951 1345
www.ey.com/uk

TO ALL KNOWN CREDITORS                                    13 August 2009

Ref: MLP 7E/CH/ NA/CC/LO3540/

Direct line: +44 (0)121 535  2394
Direct fax:  +44 (0)121 535 2447

E-mail: ccolev@uk.ey.com

Dear Sirs

## Nortel Networks S.A. (in administration and in *liquidation judiciaire*) (the "Company")

### High Court of Justice of England and Wales, Chancery Division, Companies Court – case number 539 of 2009

I write, in accordance with Rule 2.47 of The Insolvency Rules 1986, to provide creditors with a report on the progress of the administration (the "**Report**"). This report covers the period from 14 January 2009 to 13 July 2009 and should be read in conjunction with the Administrators' Statement of Proposals dated 27 February 2009 (the "**Proposals**") and the Notice of Outcome of Meeting dated 2 April 2009. A copy of the Proposals can be obtained at www.nortel.com/corporate/restructuring_emea.html.

The Company entered administration on 14 January 2009 when AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London SE1 2AF, were appointed to act as joint administrators (the "**Joint Administrators**") by an order (the "**Order**") of the High Court of Justice of England and Wales (the "**Court**"), following an application made by the Company's directors. Under the terms of the Order, any act required or authorised to be done by the Joint Administrators can be done by any of them. Further information on the Company and details of the Administrators' appointment are set out in Appendix 1 to the Report.

On the same day that the Company entered administration, the Court, following applications made by the directors of each company, made administration orders in respect of 18 other Nortel group companies based in the Europe, Middle East and Africa region ("**EMEA**"). Details of the 19 companies are at Appendix 1 of this Report. In accordance with Article 3 of the EC Regulation on Insolvency Proceedings 2000 (the "**EC Regulation**"), the court of the EC member state in which the centre of main interests ("**COMI**") of a company is situated has jurisdiction to open main insolvency proceedings in respect of that company. In the case of the 19 EMEA group companies (the "**EMEA Companies**"), the Court was satisfied that their COMI was in England and as such it had jurisdiction to open main insolvency proceedings, namely administration, in respect of each company.

The Joint Administrators on 20 May 2009 filed an application at the French Tribunal de Commerce in Versailles (the "**Tribunal**") requesting that the Company be placed into liquidation judiciaire ("**Liquidation**"), a French insolvency procedure and secondary proceedings under the EC Regulation. The Tribunal placed the Company into Liquidation with authorisation to continue to trade (poursuite d'activités) on 28 May 2009. Section 2 gives further details.

The UK firm Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member firm of Ernst & Young Global Limited. A list of members' names is available for inspection at 1 More London Place London SE1 2AF, the firm's principal place of business and registered office

The Nortel group of companies (the "**Group**") reports in US dollars ("**US$**"), and accordingly all amounts referred to in this report are in US$ unless otherwise stated.

The official version of this Report is in English. Where a translation has been provided, it is for convenience only and the English language version always prevails.

## 1.    Executive Summary of Progress of the Administration

The Joint Administrators were appointed over the EMEA Companies in January 2009 as part of a global restructuring process that was initiated concurrently across the Group. Since that time, they have stabilised the businesses, continued to trade, maintained client and supplier relationships and implemented restructuring plans in certain entities as necessary. The Joint Administrators' proposals for the administration were approved without modification by creditors of each of the EMEA Companies at meetings held in March 2009.

The Group's businesses are currently the subject of disposal processes, and the Joint Administrators are working closely with the North American entities to maintain the value of the businesses and pursue sales for the benefit of creditors. Certain disposals have already been announced, and other processes are ongoing. The disposals are being conducted on a Group-wide basis, following a stalking horse procedure in line with the US Bankruptcy Code.

The Joint Administrators have negotiated significant agreements with the rest of the Group in respect of transfer pricing and intercompany services for the duration of 2009, which will facilitate the trading of the EMEA entities and provide greater certainty of obligations for each company during this time. The Joint Administrators believe that a sale of the Company's ongoing businesses represents the best way to create value for the Company's creditors.

Further information is contained in the sections below.

## 2.    Background to the Administration

The Group is a globally integrated business providing hi-tech telecommunications equipment and services to telecommunications carriers and large enterprise customers operating in a highly competitive industry.  The Group consists of over 240 entities across four regions - North America, Caribbean and Latin America ("**CALA**"), Asia Pacific and EMEA - and as at the date of administration had approximately 24,000 employees. The Group generated revenue of US$10.4 billion in 2008, although it incurred a net loss of US$5.8 billion in that period. This reported loss includes depreciation and other non-cash charges.

The Group had been incurring trading losses over a number of years, which were predominantly the result of its high cost base and financial obligations including bond debt of approximately $4.2 billion in North America and various defined benefit pension schemes, the most significant of which is the Nortel Networks UK Ltd defined benefit pension scheme. As global economic conditions worsened during 2008, the Group experienced significant trading pressure and faced a deterioration in its trading and liquidity, on a global as well as a regional basis. In addition, the

worsening economic conditions and the deterioration in the stock market meant that the Group's defined benefit pension schemes' deficits widened significantly. After extensive consideration of all other alternatives, the Group concluded that a comprehensive financial and business restructuring could be most effectively achieved within the framework of creditor protection proceedings in a number of jurisdictions.

On 14 January 2009, the directors of the Canadian parent company (Nortel Networks Corporation) and certain other companies applied to the Canadian Court for creditor protection under the Companies' Creditors Arrangement Act ("**CCAA**"). Simultaneously, certain US companies filed for protection in the United States Courts under Chapter 11 of the US Bankruptcy Code.

The structure of the Group is such that the EMEA Companies and other Group companies in North America and worldwide are heavily interdependent. Accordingly, upon the North American companies filing for creditor protection, the directors of the Company and the 18 other EMEA Companies made applications for administration orders.

Group companies in CALA and Asia Pacific, including LG-Nortel (a joint venture), as well as the Nortel Governmental Services business in North America were not included in the filing process. Nortel Networks (CALA) Inc and the Israeli entities have since filed for creditor protection. Some of the Group's non-EU EMEA entities have not filed for creditor protection and remain under the control of their directors.

### French Proceedings

On 17 February 2009, at the request of the Joint Administrators, the *Tribunal* appointed *Maître* Frank Michel as *Mandataire ad-Hoc* to oversee the administration of the Company and to report to the *Tribunal* as necessary.

The Joint Administrators continued to trade the Company during administration with a view to a sale of its businesses as part of the global sales process (see section 9). Owing to high overheads (notably in respect of research and development), the Company was loss-making during this time. The Joint Administrators considered that notwithstanding these losses, benefits from business disposals would outweigh the losses being incurred, and therefore continuation to trade would be in the best interests of the creditors and other stakeholders of the Company.

The Company had circa 700 employees at the date of the administration. It was apparent that this number of employees could not be sustained by the Company and significant redundancies would be crucial to permit the survival of the business. After due consideration, the Joint Administrators believed that the best way to implement a restructuring plan would be through a French process of Liquidation. As such, and following an extensive consultation process with the Company's employees (in accordance with local law), the Joint Administrators made a request to the *Tribunal*, which placed the Company into Liquidation with authorisation to continue to trade on 28 May 2009. This is a secondary proceeding under the EC Regulation. *Maître* Cosme Rogeau was appointed as *liquidateur judiciaire* (the "**Liquidator**"). *Maître* Michel was appointed as *administrateur judiciaire* (the "**French Administrator**") (together, the "**French Officeholders**") with responsibility for the ongoing trading of the business. Upon the opening of the Liquidation, the French Officeholders became responsible for the business and assets of the Company situated in France, including the ongoing trading of the Company. The Joint Administrators retain control of assets located outside of France.

The French Officeholders have continued to trade the Company in Liquidation. The Joint Administrators have liaised closely with the French Officeholders during this time. In accordance with the terms of a protocol between the Joint Administrators and the French Officeholders, the Joint Administrators, with the cooperation of the French Officeholders, continue to pursue the sale of the Company's businesses as part of the global business disposals process. Such disposals will be carried out in accordance with French law and are likely to require the approval of the *Tribunal*.

### 3.       Approval of the Joint Administrators' Proposals

A meeting of creditors was held on 23 March 2009. At the meeting the Proposals were approved by creditors without modification and a creditors' committee (the "**Committee**") was appointed. In March 2009, the proposals of the Joint Administrators in respect of the other EMEA Companies were also approved without modification.

The purpose of the administration is to achieve one of three objectives, namely:

a)       rescuing the Company as a going concern; or

b)       achieving a better result for the Company's creditors as a whole than would be likely if the Company were wound up (without first being in administration); or

c)       realising the property in order to make a distribution to one or more secured or preferential creditors.

The Joint Administrators' strategy was to continue to trade the Company's businesses with a view to achieving objectives (a) or (b) above. The EMEA and North American companies are extremely interdependent and, accordingly, the Joint Administrators continue to work with the North American estates and the other estates with a view to the sale of the Group's business units as going concerns.

### 4.       Customers

The Company deals with its customers through direct and indirect sales channels in the EMEA region. For the largest of the EMEA customers, the relationships are global in nature and underlying contracts are occasionally with Group companies outside of the EMEA region, usually in North America.

The Joint Administrators worked with the rest of the Group to assess and stabilise its customer base by working 'hand-in-hand' with Group-wide customer account teams. This involved communicating with Group customers at the outset of the administration process to provide reassurance that service levels would be maintained in a "business as usual" fashion. Indeed, throughout the administration period, the Company (and the rest of the Group) continued to provide uninterrupted support and service to its customers and to further build its customer base by close liaison between the customer and supplier teams. The Group's customer base has to a large extent remained loyal and supportive of the restructuring in a global context.

The Joint Administrators undertook a detailed review of the Company's customers' terms and conditions to enable new contracts and contract renewals to be entered into during the administration. Consequently, the Group has maintained its market presence and won new customer contracts as well as renewing important existing customer relationships.

The Joint Administrators continued to work with the Company's management to ensure the ongoing collection of receivables due by its customers in the normal course of business. At the date of the Liquidation, some 90% of pre-appointment receivable balances had been collected. Where customers were slow in making payment the Joint Administrators entered into discussions with the relevant party to resolve any outstanding issues and speed up payment.

## 5.    Suppliers

Following the making of the Order, all key suppliers were contacted in person. Follow up meetings were held to give suppliers certainty over the Company's (and the Group's) ongoing trading plans and requirements to service the customers. As a result, key suppliers continue to be supportive of the restructuring process, which facilitates the present trading strategy.

## 6.    Trading Overview

The Group principally operates in three business segments: Enterprise Solutions, Metro Ethernet Networks (MEN) and Carrier Networks, which comprises Global System for Mobile Communications (GSM), Carrier VoIP Application Solutions (CVAS) and Code Division Multiple Access (CDMA).

The Enterprise Solutions business, accounting for just under a quarter of global revenue, is loss-making. The losses are attributable to the tough economic climate, in which corporate customers have reduced or delayed investments in capital expenditure, combined with the Group's high employee headcount and significant infrastructure cost. Nevertheless, the Enterprise Solutions business has continued to secure valuable customer contracts.

The underlying MEN and Carrier Networks businesses continue to make a profitable contribution towards the Group's overheads.

The Company's trading results for the first quarter comprised revenue of US$49.6 million, with a gross margin of US$10.5 million and a net loss of US$18.4 million.

This is before transfer pricing adjustments (see section 8 of this Report). The net loss is driven by extremely high payroll costs of US$16.2 million and FX losses of US$3 million.

The French Officeholders, with the approval of the *Tribunal*, are continuing to trade the Company with a view to a sale of the Company's businesses. The Joint Administrators continue to believe that the potential realisation of the Company's various businesses as going concerns

will result in a better return than if the businesses ceased to trade and the assets of the Company were sold on a break-up basis.

## 7.    Restructuring Measures

Prior to the administration, the Group had taken measures globally to reduce its cost base including reviewing employee headcount. On 5 February 2009, as a result of the review, it was announced that the Group intended to reduce its global employee headcount by 3,200. This was in addition to completing a reduction of 1,300 previously announced by the Group (in turn, part of a restructuring plan in February 2008).

Following a consultation process with the Company's employee works council, the French Officeholders have implemented a restructuring social plan affecting 446 of the Company's employees, and as a result 408 employees were made redundant in the two weeks prior to the date of this report.

### Tax Matters

The size, complexity and interdependent nature of the Group has necessitated careful consideration of the Company's tax matters. The Joint Administrators established the tax position of the Company to ensure continued compliance, to manage tax risk given the administration overlay, and to plan the business disposal transactions. The Joint Administrators have made the French Officeholders aware of the tax issues encountered during the administration.

A similar analysis of the Company's VAT position was carried out.

## 8.    Transfer Pricing and Trading Position

The Group, prior to the filings, has operated certain transfer pricing arrangements which aim to compensate certain companies for the activities carried out by them and costs incurred for the benefit of the Group as a whole. This process is intended, inter alia, to allow for risk-taking activities and to take account of aspects of the intellectual property development within the Group.

Certain entities - limited risk entities ("**LRE**"s) - receive a fixed 1% return on third party sales. Group sales support entities - or cost plus entities ("**CPE**"s) - receive a cost plus 10% margin for their sales support activities. Residual profit entities ("**RPE**"s) receive a fixed 1% return on third party sales, a 15% return on certain excess expenses that benefit the Group, plus a share of the residual group profit or loss. Prior to the filings, transfer pricing adjustments (**"TPA"**) were calculated quarterly to determine the required position under the transfer pricing mechanism.

The Company is an RPE and based on historical and expected trading is a net payer of quarterly adjustments.

The other EMEA countries have entered a Group-wide arrangement considered and approved by the English High Court, the Ontario Court in Canada and the Delaware Court in the U.S, to fix the TPA commitments in 2009, providing certainty to each entity of their obligations. The French Officeholders, having sought the approval of the *Tribunal*, have agreed that the Company should accede to that arrangement and have authorised the Joint Administrators to sign an accession agreement to that effect.

## 9.    Business Disposal Strategy

The Joint Administrators believe that a sale of the business will result in an enhanced realisation for creditors of the Company.

All major sales of the businesses are intended to be dealt with on a global basis. The disposals follow a "stalking horse" auction process under Section 363 of the US Bankruptcy Code. A bidder is selected and contractually committed to purchase the business, unless a better offer is made in a subsequent auction process. After a bidder is selected, there is a period during which certain conditions need to be met (e.g. competition clearances) before the sale completes. If the conditions are not met, then the sale will not complete. The process provides relative certainty whilst maintaining competitive tension in the process, thereby maximizing value. The auction process is conducted in accordance with US and Canadian court-approved auction parameters and is a common process in North America.

The Joint Administrators liaise with the French Officeholders in respect of the business disposals. Sales involving assets of the Company will be conducted in accordance with local law and are likely to require the approval of the *Tribunal* prior to their completion.

### Announced disposals

The following stalking horse transactions have been entered into at the date of this Report. The sales values reported are headline global values and are before possible transaction costs. The methodology and allocation of the global sales proceeds to respective seller estates is currently being considered. As such, no proceeds have yet been received by the Company. To the extent that the Company is party to a transaction it will be subject to a process in which the global proceeds of the transaction will be placed into escrow until the allocation of proceeds between individual Group companies is determined by mutual consent or binding arbitration. The mechanism of allocating disposal proceeds between Group companies is currently under negotiation.

### Radware Ltd

On 31 March 2009, certain Group companies concluded the divestiture for US$18 million of certain parts of the Group's Virtual Service Switches business to Radware Ltd, a telecoms company with headquarters in Israel. The proceeds of sale have been placed in escrow for distribution once an allocation formula has been agreed between the Group.

The Company is a party to this agreement.

### Ericsson AB

On 19 June 2009, the Group announced that it had entered into a stalking horse asset sale agreement with Nokia Siemens Networks B. V. for the sale of substantially all of its North American CDMA business and parts of its LTE Access assets. Subsequently, on 25 July 2009, and following an auction process, the Group announced that Ericsson AB will purchase these assets for US$1.13 billion subject to approval by the U.S. and Canadian bankruptcy courts.

Neither the Company nor the other EMEA Companies are parties to this sale. However, EMEA Companies continue to supply services and undertake certain actions to support the sale for the benefit of the EMEA estates and they will participate in any purchase price allocation process.

### Avaya Inc

On 21 July 2009, the Group announced that it had entered into a stalking horse asset and share sale agreement with Avaya Inc for its North American, CALA and Asia Pacific Enterprise Solutions business, and an asset sale agreement with Avaya Inc for the EMEA portion of the Enterprise Solutions business, for a total purchase price of US$475 million. The agreements include the sale of substantially all of the assets of the Group's Enterprise Solutions business globally.

Given the integrated nature of the Group's businesses, the Joint Administrators (in conjunction with the French Officeholders) continue to work closely with the North American management team to explore interests from external parties to acquire the remaining businesses of the Group in which the Company has an interest. Opportunities for the sale of other business units are currently being evaluated. The Group is undertaking disposal processes for a further three businesses.

### 10.     Receipts and Payments Account

Attached at Appendix 2 is the Joint Administrators' receipts and payments (**"R & P"**) account for the period 14 January 2009 to 13 July 2009, which shows total receipts of US$96.2 million and payments of US$80.9 million. The trading results are described in section 6 above. The R & P is separated between the pre- and post-Liquidation periods. Upon the opening of the Liquidation, control of the Company's bank accounts passed to the French Officeholders. The Joint Administrators maintained accounts at the Royal Bank of Scotland in the UK on behalf of the Company. The balance of these accounts at 13 July 2009 was US$18.4m. Since 13 July 2009, the balance of these accounts has been transferred to the accounts controlled by the French Officeholders. The R & P shows only the cash and transactions in the control of the Joint Administrators.

Neither the transfer pricing contribution nor the proceeds from the sale of the businesses referred to in section 9 above are reflected in the R & P.

The R & P account is a statement of cash received and cash paid out and does not reflect estimated future realisations or costs.

For further information, see the detailed notes provided at Appendix 2.


## 11.    Joint Administrators' Remuneration and Disbursements

The Joint Administrators' remuneration was fixed on a time-cost basis by the creditors. For the period to 31 May 2009 the Joint Administrators have incurred time costs of GB£1,922,499, of which GB£1,499,752 has been drawn on account in accordance with the court order dated 28 February 2009. It is the responsibility of the Committee to approve fees incurred. An analysis of the time spent is at Appendix 3 and includes a statement of the Joint Administrators' policy in relation to charging time and disbursements.

### Payments to Other Professionals

The Joint Administrators have engaged the following professional advisors to assist them in the administration. They were chosen on the basis of their experience in dealing with similar assignments and have been paid the following as at 13 July 2009:

Herbert Smith LLP – US$896,864 (Legal Advisors)


## 12.    Other Matters

### The Committee

A Committee was formed on 23 March 2009 at the creditors' meeting. The Joint Administrators provide detailed information (including an analysis of their time costs for approval by the Committee) to the members of the Committee as the administration progresses and matters evolve. The Committee is constituted by virtue of the rules relating to the administration and is not affected by the opening of secondary proceedings. The Joint Administrators continue to keep the Committee appraised of developments.

### Directors' Statement of Affairs

The Joint Administrators had indicated in the Proposals that they were considering seeking a court order in accordance with Rule 2.30 of the Insolvency Rules 1986 to limit disclosure of the Directors' Statement of Affairs ("SoA") on the basis that such information may have been sensitive and prejudicial to maximising creditor recovery. Having further considered this matter, the Joint Administrators decided that the SoA should be filed with the Registrar of Companies for England and Wales ("Companies House") in its entirety. A full copy of the SoA can be obtained either from Companies House or on written request to the Joint Administrators. A summary of the SoA is at Appendix 4. The SoA was completed in Euros being the currency used for local statutory accounts purposes. However, as stated above, the Group accounts between its entities in US$. Accordingly, in the summary provided at Appendix 4 the Joint Administrators have provided the value in US$ using the exchange rate as at the date of the signing of the SoA.

The SoA represents the directors' estimates of the realisable value of the Company's assets at the time of preparation and actual realisations may differ. Similarly, creditors' claims have yet to be quantified and may be higher than indicated. All values are shown before applicable costs associated with realisations. The figures have been compiled by the Company's management and have not been subject to independent review or any audit by the Joint Administrators, their staff or anybody else.

### The Prescribed Part

The Prescribed Part is a proportion of floating charge assets set aside for unsecured creditors pursuant to Section 176(A) of the Insolvency Act 1986. The Prescribed Part applies to floating charge assets created on or after 15 September 2003. Given that there are no floating charges granted by the Company, the prescribed part does not apply in this Administration.

### Claims Process

The Liquidator has called for creditors to make their claims against the Company, as at 14 January 2009, in accordance with French law. The Liquidator can be contacted at 26 rue Hoche, Cedex 3533, 78035 Versailles CX, France.

The Joint Administrators have not commenced a formal process of claims admittance/adjudication and there is no requirement at this stage for creditors to provide details of their claim to the Joint Administrators.

### North American Claims Process

In North America, the Canadian applicants and the US debtors have obtained orders approving formal claims processes in each jurisdiction. In both jurisdictions there will be a call for claims, including supplier claims, which arose prior to 14 January 2009, as well as claims pursuant to contracts that were repudiated or rejected on or after that date. Where relevant, the Joint Administrators are submitting claims on behalf of the Company and the EMEA Companies. Creditors with claims in either of the jurisdictions outlined above should seek separate legal advice in relation to submitting such claims against Nortel entities.

### Distributions to Creditors

Given the opening of the Liquidation, It is likely that any distributions to creditors will be made by the Liquidator in accordance with French law. Any distributions would be highly dependent on the outcome of the ongoing sales processes. The Joint Administrators are unable to give an indication of the potential quantum or timing of any dividend payment.

### Potential Outcomes of the Administration

The Joint Administrators now believe that it is unlikely that they will achieve the first purpose of the administration being the rescue of the Company (i.e. as a legal entity). However, the Joint Administrators do believe that the business will be sold to the advantage of creditors.

Under the Insolvency Act 1986, the administration will automatically come to an end after one year, unless an extension is granted by the Court or creditors.  Due to the complexity of the administration, the Joint Administrators are likely to apply to the Court for an extension of the administration, although that will depend on the circumstances at the time.

The Joint Administrators will report to you again at the conclusion of the administration or in six months' time, whichever is the sooner.

Yours faithfully
for Nortel Networks S.A. (in administration and in *liquidation judiciaire*)

SJ Harris
Joint Administrator

Enc:    Company information
        Joint Administrators' Receipts and Payments Account
        Summary of Joint Administrators' Time-Costs and Category 2 Disbursements
        Joint Administrators' Policy on Fees and Disbursements
        Summary of Statement of Affairs

*For the Companies listed below, The Institute of Chartered Accountants in England and Wales authorises AR Bloom, SJ Harris and CJW Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.*

*The affairs, business and property of the Companies are being managed by the Joint Administrators, AR Bloom, SJ Harris, AM Hudson and CJW Hill who act as agents of the Companies only and without personal liability*

*The Companies are Nortel Networks UK Limited, Nortel Networks SA; Nortel GmbH; Nortel Networks France SAS, Nortel Networks NV, Nortel Networks SpA, Nortel Networks BV, Nortel Networks Polska SP Zoo, Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH, Nortel Networks sro, Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA, Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL, Nortel Networks AB; Nortel Networks International Finance & Holding BV*

*The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, AR Bloom and DM Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.*

*Nortel Networks SA was placed into French liquidation judiciaire on 28 May 2009  The business and assets of the company that are situated in France are now under the control of an administrateur judiciaire.*

## Appendix 1

## Nortel Networks S.A. (in administration and in *liquidation judiciaire*)

Company information

| | |
|---|---|
| Registered number: | FR62389516741 / 389516741 |
| Company name: | Nortel Networks S.A. |
| Registered office address: | Parc d'Activités de Magny-Châteaufort, 78928 Yvelines Cedex 9, France |
| Previous name: | Nortel Matra Cellular |

Details of the Administrators and of their appointment

| | |
|---|---|
| Administrators: | AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London, SE1 2AF |
| Date of appointment: | 14 January 2009 |
| By whom appointed: | The appointment was made by the High Court of Justice, Chancery Division, Companies Court on the application of the Company's directors |
| Court reference: | High Court of Justice, Chancery Division, Companies Court - case 539 of 2009 |
| Division of the Administrators' responsibility: | Any of the functions to be performed or powers exercisable by the administrators may be carried out/exercised by any one of them acting alone or by any or all of them acting jointly |

**Statement Concerning the EC Regulation**

The EC Council Regulation on Insolvency Proceedings 2000 applies to this administration and the proceedings are main proceedings. This means that this administration is conducted according to English insolvency legislation and is not governed by the insolvency law of any other European Union Member State.

**Share Capital**

| Class | Authorised | | Issued & Fully paid | |
|---|---|---|---|---|
| | Number | € | Number | £ |
| Ordinary | 91,308,951 | 136,963,426.50 | 91,308,951 | 136,963,426.50 |

**Shareholders**

Nortel Networks International Finance & Holdings B.V. – 8.83%
Nortel Networks Limited – 91.168%
Jean Marie-Lesur – 0.001%
Darry Edwards – 0.001%
Michel Clement – 0.001%
Jean-Luc Khayat – 0.001%

**Directors (current and for the last three years) and company secretary (current)**

| Directors and secretary and their shareholdings name | Director or secretary | Date appointed | Date resigned | Current shareholding |
|---|---|---|---|---|
| Michel Clement | Director | 30/11/2000 | - | 1 share (held on loan) |
| Nortel Networks International Finance and Holdings B.V. | Director | 30/11/2000 | 14/01/2009 | 8,064,326 shares |
| Pascal Debon | Director | 11/03/2002 | 20/02/2006 | - |
| Darryl Edwards | Director | 28/09/2006 | 14/01/2009 | 1 share (held on loan) |
| Jean-Marie Lesur | Director | 19/12/2006 | 14/01/2009 | 1 share (held on loan) |
| Alan Biston | Director | 08/09/2006 | 19/12/2006 | - |
| Steve Pusey | Director | 20/02/2006 | 04/10/2006 | - |
| Jean-Luc Khayat | Secretary | 06/12/2007 | - | 1 share (held on loan) |
| Sharon Rolston | Director | 14/01/2009 | - | - |
| Simon Freemantle | Director | 14/01/2009 | - | - |

# Summary of Nortel Group Corporate Structure



The EMEA Companies in UK administration proceedings:

| Legal Entity | Country of Incorporation |
| --- | --- |
| Nortel Networks UK Limited | England |
| Nortel Networks S.A. | France |
| Nortel Networks France S.A.S. | France |
| Nortel Networks (Ireland) Limited | Ireland |
| Nortel GmbH | Germany |
| Nortel Networks Oy | Finland |
| Nortel Networks Romania SRL | Romania |
| Nortel Networks AB | Sweden |
| Nortel Networks N.V. | Belgium |
| Nortel Networks S.p.A. | Italy |
| Nortel Networks B.V. | Netherlands |
| Nortel Networks International Finance & Holding B.V. | Netherlands |
| Nortel Networks Polska Sp. z.o.o. | Poland |
| Nortel Networks (Austria) GmbH | Austria |
| Nortel Networks s.r.o. | Czech Republic |
| Nortel Networks Engineering Service Kft | Hungary |
| Nortel Networks Portugal S.A. | Portugal |
| Nortel Networks Hispania S.A. | Spain |
| Nortel Networks Slovensko s.r.o. | Slovakia |

## Appendix 2

## Nortel Networks S.A. (in administration and in *liquidation judiciaire*)

### Joint Administrators' Abstract of Receipts and Payments from 14 January 2009 to 13 July 2009

| Statement of affairs Total - EUR | | Total - EUR | Total - US $ | | Total - EUR | Total - US $ |
|---|---|---|---|---|---|---|
| 2,251,793 | Opening balance - 14 January 2009 (close of business) | 2,453,000 | 3,100,118 | Brought forward balance 20 May 2009 (close of business) | 15,010,003 | 20,000,915 |
| | **Receipts** | | | **Receipts** | | |
| | *Trading* | | | *Trading* | | |
| - | - Post appointment sales | 32,217,041 | 42,402,340 | - Post appointment sales | - | - |
| - | - Other receipts | 123,544 | 162,505 | - Other receipts | - | - |
| | *Other* | | | *Other* | | |
| 34,000,000 | - Pre appointment sales | 39,758,490 | 52,243,000 | - Pre appointment sales | - | - |
| - | - FX translation movement | - | 549,387 | - FX translation movement | - | 827,366 |
| - | - Bank interest | 1,944 | 2,567 | - Bank interest | 1,278 | 1,709 |
| 58,700,000 | - Asset sales | - | - | - Asset sales | - | - |
| 94,951,793 | | 72,101,019 | 95,359,799 | | 1,278 | 829,145 |
| | **Payments** | | | **Payments** | | |
| | *Trading* | | | *Trading* | | |
| | - Payroll, employee benefits, and payroll taxes | 20,757,848 | 27,317,197 | - Payroll, employee benefits, and payroll taxes | - | - |
| | - Accounts payable - inventory related | 13,826,534 | 18,147,777 | - Accounts payable - inventory related | - | - |
| | - Property costs | 3,706,981 | 4,876,015 | - Property costs | - | - |
| | - Intercompany | 3,118,756 | 4,528,064 | - Intercompany | - | - |
| | - Other taxes | 2,824,084 | 3,714,587 | - Other taxes | - | - |
| | - Pension contributions | 2,511,193 | 3,303,123 | - Pension contributions | - | - |
| | - Other payments | 1,556,335 | 2,247,145 | - Other payments | - | - |
| | - Trade payables | 1,032,995 | 1,368,315 | - Trade payables | - | - |
| | - FX translation movement on FX transactions within the entity | 128,758 | 132,457 | - FX translation movement on FX transactions within the entity | - | - |
| | - Utilities | 13,513 | 18,331 | - Utilities | - | - |
| | *Other* | | | *Other* | | |
| | - Transfer to Liquidators accounts | 7,557,542 | 9,534,436 | - Transfer to Liquidators accounts | 2,200,044 | 3,081,536 |
| | - Joint Administrators' fees and disbursements | 1,044,594 | 1,374,217 | - Joint Administrators' fees and disbursements | - | - |
| | - Legal fees | 674,220 | 862,896 | - Legal fees | - | - |
| | - Other professional services costs | 94,990 | 124,948 | - Other professional services costs | - | - |
| | - Restructuring costs | 38,529 | 50,811 | - Restructuring costs | - | - |
| | - Bank charges and interest | 9,590 | 12,745 | - Bank charges and interest | - | - |
| | - FX translation movement | 79,761 | - | - FX translation movement | 358,077 | - |
| | | 58,543,834 | 77,829,991 | | 2,558,121 | 3,081,536 |
| | Closing balance - 20 May 2009 | 15,010,003 | 20,000,915 | Closing balance - 13 July 2009 | 13,054,030 | 18,437,524 |
| | | | | Account reconciliations: | | |
| | | | | Current accounts | | |
| | | | | Local deposit accounts | | |
| | | | | Administration deposit accounts | 13,054,030 | 18,437,524 |
| | | | | | 13,054,030 | 18,437,524 |

ADM09F03

# Receipts and payments comments

**Notes to R & P**

*Note 1*

Account balances have all been converted into a local currency, EUR, in addition to a common currency across all entities, US$.

Opening balances have been converted using January month end spot rates and closing balances converted using June month end spot rates which have been provided by the Company. This approach is line with the Company's internal reporting procedures.

Transactions that have taken place through the accounts over the course of the reporting period have been converted at average spot rates over this period, which have been sourced from the foreign exchange website Oanda.

*Note 2*

The numbers used to prepare the receipts and payments summary have been provided by the Company and are unaudited. Material items have been reviewed for accuracy and reasonableness.

*Note 3*

All items within the Receipts & Payments analysis are recorded gross of VAT where applicable.

VAT repaid or claimed back by the entity is recorded in a separate line within the Receipts & Payments analysis.

*Note 4*

All amounts referred to are in US$ unless stated otherwise.

**Note 5**

On 28 May 2009 the Company entered into secondary proceedings. Consequently, control of the Company's bank accounts, except the Royal Bank of Scotland ("RBS") deposit accounts set up by the Joint Administrators, passed to the French Officeholders. Balances of these accounts as at 28 May 2009 are shown in the R & P as transfers to the Liquidators' accounts. Furthermore, from this point onwards, only transactions that occurred through the RBS accounts have been recorded in the receipts and payments analysis. This predominantly related to bank charges and interest in addition to subsequent transfers that took place from the RBS accounts to the French Officeholders.

**Cash on appointment**

There was cash on appointment held in Euro, Algerian Dinar, Moroccan Dirham and US$ current and deposit accounts which totalled US$3.16 million.

## RECEIPTS

Total receipts up to 13 July 2009 equate to US$96.2 million. This primarily relates to pre and post appointment sales receipts of US$94.6 million.

### *Sales receipts*

Pre appointment sales receipts total US$52.2 million as at 28 May 2009. This is against a collectible balance on appointment of US$58.1million and represents 89.8% of the ledger.

Post appointment sales receipts total US$42.4 million.

Due to the Company entering into secondary proceedings, sale receipts post 28 May 2009 are not recorded in the analysis.

## PAYMENTS

Total payments up to 13 July 2009 equate to US$80.9 million. This primarily relates to payroll associated costs of US$27.3 million, inventory related payments of US$18.1 million, property costs of US$4.9 million and intercompany payments of US$4.5 million.

There is also a transfer made to the French Officeholders of US$9.9 million.

### *Payroll*

Payroll costs total US$27.3 million and include net pay in addition to employee expenses, employee benefits and payroll taxes.

### *Inventory*

Accounts payable, inventory related payments total US$18.1 million.

### *Transfer to Liquidator accounts*

As mentioned previously, on 28 May 2009 the Company entered into secondary proceedings. Consequently, funds held in all bank accounts, except the RBS deposit accounts set up by the Joint Administrators, were transferred to the French Officeholders. This totalled US$9.9 million.

Since 28 May 2009, further transfers have taken place from the RBS accounts to the French Officeholders' accounts totalling US$3.1 million. This brings total transfers for the period 14 January 2009 to 13 July 2009 to US$13.0 million.

The remaining funds held as at 13 July 2009 total US$18.4 million split between an RBS US$ and RBS Euro account.

It should be noted that since 13 July 2009, the remaining funds held in the RBS US$ and Euro accounts have been transferred to the French Officeholders.

### Property

Property costs total US$4.9 million and predominantly relate to rental costs for premises at Châteaufort in addition to property service management costs.

### Intercompany

Net intercompany payments total US$4.5 million.  The majority of these payments are made through the Citinetting process to Nortel Networks UK Limited and Nortel Networks B.V.

### Other payments

Other payments total US$2.0 million.  This relates to leased equipment, marketing and advertising, temporary staff and training costs.

## Appendix 3

## Nortel Networks S.A. (in administration and in *liquidation judiciaire*)

### Summary of Joint Administrators' Time-Costs from 14 January 2009 to 31 May 2009 (GB£)

| Activity | Partner / Executive Director | Director | Assistant Director | Manager | Executive | Analyst | Total Time of Hours | Average Hourly Rate | Time costs for period |
|---|---|---|---|---|---|---|---|---|---|
| Administration application and planning | 18.0 | - | 6.0 | - | 12.0 | 18.0 | 54.0 | 397.78 | 21,480.00 |
| Strategy | 4.0 | - | 12.0 | 3.6 | - | 6.0 | 25.6 | 414.09 | 10,600.40 |
| Canada / USA | - | - | 2.7 | - | - | - | 2.7 | 490.00 | 1,323.00 |
| Case Management | 62.4 | - | 12.3 | 11.6 | 143.2 | 69.7 | 299.4 | 302.67 | 90,618.69 |
| Creditors | 0.5 | - | - | 20.5 | 18.0 | 3.0 | 42.0 | 280.19 | 11,768.12 |
| Creditors Committee | 9.0 | - | - | 26.0 | 14.5 | 59.5 | 119.0 | 233.56 | 27,793.30 |
| Customers | 25.8 | 13.0 | 4.3 | 3.0 | 96.0 | - | 171.9 | 357.40 | 61,436.98 |
| Debtors | - | 8.0 | 6.9 | 22.5 | 66.4 | - | 123.8 | 302.20 | 37,412.66 |
| Employees | 157.9 | 2.7 | 13.6 | - | 59.0 | 2.0 | 235.2 | 491.81 | 115,604.85 |
| Finance accounting and administration | 24.3 | 0.1 | 40.2 | - | 331.6 | 182.0 | 578.4 | 222.19 | 128,507.21 |
| Intra Group & Netting | - | - | - | - | 5.5 | - | 5.5 | 194.94 | 1,072.19 |
| Legal | 119.9 | - | 10.0 | 1.0 | 24.5 | 7.0 | 162.4 | 530.54 | 86,159.00 |
| Liaising Directors/Communications | 6.5 | - | - | - | - | - | 6.5 | 650.02 | 4,225.07 |
| M&A | 144.3 | 157.3 | 362.3 | 289.1 | 274.6 | - | 1,227.3 | 477.12 | 564,492.78 |
| Other Assets | 44.5 | - | - | 2.0 | 33.0 | - | 81.5 | 327.04 | 26,654.40 |
| PR/Media | 1.5 | 1.0 | 2.9 | - | - | - | 5.4 | 527.04 | 2,846.00 |
| Property | 6.0 | 0.2 | 2.6 | - | 6.0 | - | 14.8 | 426.80 | 6,316.67 |
| Reports to Creditors | - | - | - | 9.5 | 1.0 | 10.9 | 21.4 | 245.70 | 5,257.96 |
| Stabilisation | 16.5 | - | 27.0 | - | 33.0 | - | 76.5 | 420.74 | 32,166.41 |
| Statutory | 19.0 | - | 1.5 | - | 30.1 | 16.0 | 66.6 | 320.85 | 21,369.51 |
| Strategy Care | 99.5 | - | 59.0 | 111.0 | 1.0 | - | 281.3 | 406.57 | 108,965.62 |
| Suppliers | 27.0 | - | 71.0 | 79.5 | 269.1 | 443.0 | 889.6 | 219.54 | 195,316.97 |
| Tax (VAT advisory and compliance) | 70.0 | 5.5 | 46.7 | 11.3 | 93.3 | 51.5 | 278.8 | 395.24 | 110,182.93 |
| Trading Cash flow / Forecast | 6.0 | - | - | 79.3 | 293.0 | 292.5 | 667.8 | 223.53 | 149,271.33 |
| Trading Outcome (Profit) | - | - | 1.0 | - | - | - | 1.0 | 490.00 | 490.00 |
| Treasury / Banks | 0.5 | - | 1.5 | - | 22.5 | 2,590 | 286.5 | 171.18 | 13,266.75 |
| **Grand Total** | **931.4** | **187.8** | **684.3** | **847.3** | **1,947.5** | **1,446.7** | **5,818.1** | **332.44** | **1,822,416.99** |
| | | | | | | | | | |
| Average hourly rate | 614.58 | 645.54 | 493.85 | 355.21 | 229.77 | 169.00 | | | |
| Time costs for period | 553,840.29 | 121,222.08 | 337,937.70 | 228,941.58 | 447,482.54 | 231,981.70 | | | |

A3M09P03

# Nortel Networks S.A. (in administration and in *liquidation judiciaire*)

### *Officeholders' Charging Policy for Fees*

The statutory provisions relating to remuneration are set out in Rule 2.106 of the Rules. Further information is given in the Association of Business Recovery Professionals' publication "*A Creditors' Guide to Administrators' Fees*", a copy of which may be accessed from the web site of the Insolvency Practitioners Association at http://www.insolvency-practitioners.org.uk (follow 'Regulation and Guidance' then 'Creditors' Guides to Fees'), or is available in hard copy upon written request to the Administrators.

The creditors have determined that the Administrators' remuneration should be fixed on the basis of time properly spent by the Administrators and their staff in attending to matters arising in the Administration.

The Administrators have engaged managers and other staff to work on the cases. The work required is delegated to the most appropriate level of staff taking account of the nature of the work and the individual's experience. Additional assistance is provided by accounting and treasury executives. Work carried out by all staff is subject to the overall supervision of the Administrators.

All time spent by staff working directly on case-related matters is charged to a separate time code established for each case. Each member of staff has a specific hourly rate, which is subject to change over time. The average hourly rate for each category of staff over the period as shown above, are the current hourly rates used. The current hourly rates may be higher than the average rates, if hourly rates have increased over the period covered by this report.

### *Office Holders' Charging Policy for Disbursements*

Statement of Insolvency Practice No. 9 ("SIP 9") published by R3 (The Association of Business Recovery Professionals) divides disbursements into two categories.

Category 1 disbursements comprise payments made by the office holders' firm, which comprise specific expenditure relating to the administration of the insolvent's affairs and referable to payment to an independent third party. These disbursements can be paid from the insolvent's assets without approval from the Committee. In line with SIP 9, it is our policy to disclose such disbursements drawn but not to seek approval for their payment.

Category 2 disbursements comprise payments made by the office holders' firm which include elements of shared or overhead costs. Such disbursements are subject to approval from Creditors' Committee as if they were remuneration. It is our policy, in line with SIP 9, to seek approval for this category of disbursement before they are drawn.

## Appendix 4

## Nortel Networks S.A. (in administration and in *liquidation judiciaire*)
## Summary of the Directors' Statement of Affairs as at 14 January 2009

| A - Summary of Assets | Book Value (US$) | Estimated to Realise (US$) | Conversion rate (US$1=) | 0.77733297 |
|---|---|---|---|---|
| Assets subject to a fixed charge: | | | | |
| Assets subject to a floating charge: | | | | |
| Uncharged Assets: | | | | |
| Accounts receivable net | 56,194,618 | 43,739,300 | | |
| Inter company receivables | 17,159,680 | Unknown | | |
| Inventory net | 1,034,211 | 257,290 | | |
| Other current assets | 81,005,469 | 74,614,100 | | |
| Property, plant and equipment | 10,140,353 | 643,225 | | |
| Investments and intangibles | | | | |
| Cash | 2,896,819 | 2,896,819 | | |
| Estimated total assets available for preferential creditors | 168,431,150 | 122,150,734 | | |

| A1 - Summary of liabilities | Book Value (US$) | Estimated to Realise (US$) |
|---|---|---|
| Estimated total assets available for preferential creditors (carried from A) | | 122,150,734 |
| Liabilities | | |
| Preferential creditors | | |
| Employment related | (22,119,654) | |
| Tax related | (4,972,282) | (27,091,936) |
| Estimated deficiency/surplus as regards preferential creditors | | 95,058,798 |
| Estimated prescribed part of net property where applicable (to carry forward) | | |
| Estimated total assets available for floating charge holders | | 95,058,798 |
| Debts secured by floating charges | | |
| Estimated deficiency/surplus of assets after floating charges | | 95,058,798 |
| Estimated prescribed part of net property where applicable (brought down) | | |
| Total assets available to unsecured creditors | | |
| Unsecured non-preferential claims (excluding any shortfall to floating charge holders) | | |
| Trade and other payables | (17,737,699) | |
| Inter company payables | (150,277,900) | |
| Accrued liabilities | (35,961,646) | |
| Pensions | (423,937) | |
| Financial debt | (75,461,869) | |
| Other long term liabilities | (996,819) | (280,859,869) |
| Estimated deficiency/surplus as regards non-preferential creditors (excluding any shortfall to floating charge holders) | | (185,801,071) |
| Shortfall to floating charge holders (brought down) | | |
| Estimated deficiency/surplus as regards creditors | | (176,196,601) |
| Issued and called up capital | | |
| Estimated deficiency/surplus as regards members | | (361,997,671) |

ADM09F03