# Exhibit J

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION (the
"Applicants")

SIXTY-FIRST REPORT OF THE MONITOR
DATED MARCH 21, 2011

INTRODUCTION

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to June 30, 2011 by this Honourable Court in its Order dated February 25, 2011.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January



14, 2009. As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

3. An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries and each of these groups is participating in the CCAA proceedings.

4. Nortel Networks (CALA) Inc. filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5. Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed.

6. Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7. The CCAA proceedings and the UK Administration proceedings of NNUK and the other EMEA Debtors have each been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8. Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

**PURPOSE**

9. The purpose of this Sixty-First Report of the Monitor (the "Sixty-First Report") is to provide support for the Applicants' motion for approval of a sale process (the "Sale Process") to market their remaining information technology infrastructure assets (the "Residual IT Assets").

**TERMS OF REFERENCE**

10. In preparing this Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Sixty-First Report.

11. Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

12. Capitalized terms not defined in this Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report or previous reports of the Monitor.

**GENERAL BACKGROUND**

13. As set out in previous reports of the Monitor, Nortel has undertaken a process to divest itself of substantially all of its operations. A sale of Nortel's last remaining business unit, the MSS business, was approved by this Honourable Court on September 30, 2010 and closed on March 11, 2011. Currently, the Applicants continue to focus on realizing on their remaining residual assets, which includes the Residual IT Assets as described below.

**RESIDUAL IT ASSETS**

14. The Applicants' portfolio of Residual IT Assets includes the following:

    a) Information technology hardware assets which include, *inter alia*, computers, servers, hard drives, data storage frames and other networking devices (the "IT Hardware Assets");

    b) Internet protocol addresses (the " IP Addresses"); and

    c) Skilled employees with experience in engineering, deploying and managing Nortel's global information technology infrastructure (the "IT Personnel Assets").

15. A portion of the Applicants' IT Hardware Assets are presently being utilized to support Nortel's obligations under various transition service agreements ("TSAs") with buyers of Nortel's previous business units as well as Nortel's own information systems. Accordingly, the portfolio of IT Hardware Assets available for sale is expected to increase as the TSAs expire and Nortel's information technology needs continue to decline as a result of the ongoing wind-down of its operations.

16. The Applicants are the registered holders of approximately 17 million IP Addresses, including, a contiguous Class A block of approximately 16.7 million IP Addresses. The Monitor understands that all or substantially all of the IP Addresses in this offering were allocated before July 1990, and as such, are classified as "Legacy" addresses that pre-date the formation of the five Regional Internet Registries ("RIRs") which since 1998 have been in charge of managing, assigning and allocating blocks of internet addresses. A portion of these addresses are presently being used in delivering TSA services or to support Nortel's own information technology infrastructure.

17. The Applicants presently have approximately 150 employees that support Nortel's information technology infrastructure. A subset of these highly skilled employees could potentially be transferred to a prospective buyer as part of a transaction that includes either a portion or the entirety of the Residual IT Assets.

18. The Applicants continue to consider the full range of assets that are related to and therefore appropriately constitute the Residual IT Assets. Accordingly, the Applicants expect that the scope of the assets to be sold may evolve as the Sale Process (detailed below) proceeds and based on feedback from potential bidders.

**THE SALE PROCESS**

19. The Sale Process for the Residual IT Assets contemplates the following steps to be undertaken:

    - The Monitor will administer, supervise, facilitate and oversee the Sale Process;

    - NNL and the Monitor together shall lead the Sale Process and negotiations with potential buyers with a view to maximizing value for the Residual IT Assets in a timely manner;

    - NNL and the Monitor will jointly agree on a list of potential buyers to be contacted. The parties will ensure the list is sufficiently robust to provide for a competitive process;

    - NNL and the Monitor will contact all of the potential buyers on the list and provide them with a form of non-disclosure agreement ("NDA");

    - Additional potential buyers that contact NNL or the Monitor will also be provided with the NDA;

    - Interested parties that execute the NDA will be provided with a package of information with respect to the Residual IT Assets (the "Information Package") and will receive access to a limited electronic data room;

    - Based on the above, interested parties will be asked to submit a non-binding expression of interest by a specified deadline containing information with respect to the potential buyer's proposal including scope of assets to be purchased, transaction

5

structure, purchase price, source of financing, specific conditions or approvals required and other information as may be requested by NNL and the Monitor. This deadline will be established by NNL and the Monitor after having contacted parties on the potential buyer list.

- NNL and the Monitor will evaluate the preliminary expressions of interest based on the information contained in the proposals and NNL's and the Monitor's assessment of the ability of the potential buyers to complete due diligence and consummate a transaction on a timely basis. Based on this evaluation, all or a limited number of these bidders may be invited to continue to the second phase of the Sale Process;

- Bidders invited to continue to the second phase will be provided with additional information including NNL's proposed form of purchase and sale agreement and other key ancillary agreements;

- A deadline will be established for bidders to provide a revised bid along with their mark-up of the purchase and sale agreement and related documents; and

- NNL and the Monitor will review the revised bids and may either request that all or a limited number of potential bidders submit one or more rounds of further revised bids or select one or more parties with which to negotiate a definitive agreement, such agreement to be conditional upon this Honourable Court's approval.

**PROCEEDS FROM THE SALE OF RESIDUAL IT ASSETS**

20. NNL shall deposit the net sale proceeds (the "Sale Proceeds") received in connection with the sale of Residual IT Assets into a single purpose NNL bank account to be established prior to the consummation of such sale, which bank account shall hold only the Sale Proceeds and interest earned thereon. The funds in such account shall not be used to fund ongoing operations, or for any purpose other than distribution to creditors generally, without the prior approval of this Honourable Court.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

21. The Sale Process described above is designed to provide a commercially reasonable approach for NNL to attempt to maximize value for its Residual IT Assets. The Sale Process will be conducted by the Applicants with the extensive involvement of the Monitor.

22. Accordingly, the Monitor recommends that the Applicants' motion for approval of the Sale Process be approved by this Honourable Court.

All of which is respectfully submitted this 21st day of March 2011.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**
**and not in its personal capacity**

Per:

*[signature]*

Murray A. McDonald
President

7

| | |
|---|---|
| IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED<br><br>AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.* | Court File No: 09-CL-7950 |

***ONTARIO*<br>SUPERIOR COURT OF JUSTICE<br>(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**SIXTY-FIRST REPORT OF THE MONITOR<br>DATED MARCH 21, 2011**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.