## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
:
*In re*                                          :        Chapter 11
                                                 :
Nortel Networks Inc., *et al.*,[1]               :        Case No. 09-10138(KG)
                                                 :        Jointly Administered
                     Debtors.                    :
                                                 :        **Re: D.I.  14476, 14535, 14551, 14553,**
                                                 :                   **14555, 14556, 14558, 14564,**
                                                 :                   **14614**
------------------------------------------------------------x

### DEBTORS' REPLY IN SUPPORT OF AMENDED MOTION FOR
### (A) AN ORDER ENFORCING AND/OR EXTENDING THE AUTOMATIC STAY,
### (B) AN ORDER ENFORCING THE COURT'S PRIOR ORDERS, (C) A
### PROTECTIVE ORDER, AND (D) RELATED RELIEF UNDER SECTION 105(a)

Debtors face an untenable situation and need this Court's assistance.  A number of parties

to patent lawsuits throughout the country involving patents Nortel sold to Rockstar have served

Debtors with subpoenas for documents allegedly relevant to those suits.  Other parties to other

lawsuits against Rockstar have not served Debtors with subpoenas yet, but have indicated they

plan to.  And there is a significant risk that still more parties will in the future serve Debtors with

still more subpoenas.  Debtors believe that the majority of the requested documents are in the

possession of Rockstar, which purchased the patents involved in those lawsuits from Debtors.

Debtors believe that the requesting parties should, in the first instance, seek production of the

---

[1]      Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the U.S. Debtors and their petitions are available at http://dm.epiq11.com/nortel.

documents from Rockstar, which—as the party asserting the patent rights at issue in the lawsuits—is the most appropriate party to bear the costs and burdens of document production. The parties objecting to Debtors' motion say they have sought documents from Rockstar, but that Rockstar refuses to produce documents and/or refuses to certify the completeness of the productions it has made. (Curiously, the objectors do not explain why they have been apparently unable to obtain orders from the courts presiding over the patent lawsuits compelling Rockstar to produce the relevant documents.) As a result, they say, they must seek production from Debtors. They also argue that there are some relevant documents that only Debtors have.

To be sure, Debtors retain some documents that are likely responsive to the subpoenas— perhaps large numbers of such documents. But, as shown in Debtors' Motion,[2] the vast majority of those documents are privileged and/or subject to confidentiality provisions in the sale agreements with Rockstar and others who purchased patents from Debtors (some by purchasing entire lines of business from Debtors). It would require a massive effort for Debtors to respond to dozens of subpoenas—not only do Debtors not have any remaining staff with any knowledge of the documents, the business lines involved, or the technology at issue, Debtors also lack any efficient means of searching through several of their remaining stores of hard copy and electronic documents to find the ones that each requesting party is looking for. The fact that multiple parties are asking Debtors to undertake this task serves to multiply the burden on Debtors.

It is tempting to think that Debtors could simply avoid the burdens of searching for responsive documents by placing all of their remaining documents in a warehouse and inviting

---

[2]    The "Motion" refers to the Debtors' Amended Motion for (A) an Order Enforcing and/or Extending the Automatic Stay, (B) an Order Enforcing the Court's Prior Orders, (C) a Protective Order, and (D) Related Relief under Section 105(a) [D.I. 14476, 14477, 14535] initially filed on September 26, 2014 and amended on October 7, 2014. Capitalized terms used but not otherwise defined in this Reply have the meanings given to them in the Motion.

29559098.3
8346322 v1

anyone who wants to search the warehouse to do so to their hearts' content.  Or Debtors could consider seeking an order from this Court requesting permission to abandon the documents under Bankruptcy Code § 554 to all of the parties in litigation involving patents sold by Debtors during this bankruptcy case.  But there is a very serious reason why these options are not actually available:  Rockstar and the others who purchased patent rights from Debtors for billions of dollars are insistent that nondisclosure provisions in the sale agreements and this Court's orders be scrupulously adhered to.  Rockstar has made clear that it would seek to hold Debtors liable should Debtors violate any of those provisions.  Given the value of the patent transactions at issue, the potential liability claim against the estates, their representatives, and professionals could be significant.

As a consequence, before Debtors can make any production of documents in response to subpoenas, Debtors must painstakingly review each and every document to ensure that all confidentiality obligations are being strictly honored.  Those efforts will necessitate a significant expenditure of time and effort by Debtors' professionals, because each and every document must be carefully reviewed in order to identify the third parties whose confidential and/or privileged information may be implicated, and then provide reasonably specific notice to such third parties so they can appear and object if they so desire.  The result is that the subpoenas threaten a material cost burden to the estates, as well as a significant liability risk.  Those burdens and risks are multiplied by the seemingly ever-increasing number of subpoenas, given that each subpoena addresses a different set of patents and thus necessitates a separate customized document search.

In these circumstances, in order to control costs and avoid liability, Debtors are asking this Court to exercise its case management authority to provide measured, limited protection from excessive, burdensome third-party subpoenas for documents and testimony served in

connection with the pending (and likely future) patent lawsuits involving Rockstar or its assignees. Under Debtors' approach, the parties litigating against Rockstar or others who purchased Debtors' patents would not be barred or enjoined from obtaining documentary discovery from Debtors. But to pursue such discovery, they would first have to seek production of documents from Rockstar. If Rockstar's production were regarded as insufficient, then instead of serving subpoenas the requesting parties would be required to initiate meet-and-confer efforts with Debtors, with the goal of reaching an agreement pursuant to which Debtors could provide the requesting parties with needed materials at no or limited cost to Debtors. If no agreement were reached, the requesting parties would have a safety valve: they could ask this Court to lift the automatic stay to allow them to serve subpoenas on Debtors.

Under this approach, the barrage of subpoenas from far-flung courts would cease. Parties seeking documents would presumably redouble their efforts to obtain needed documents first from Rockstar. If after such efforts they believed there was still a need for production by Debtors, the first step would be negotiations between the requesting parties and Debtors—not formal process. If the requesting parties believed that Debtors were acting unreasonably in those negotiations, they could come to this Court and ask for permission to serve Debtors with subpoenas.

It is thus evident that, contrary to the arguments presented by the objectors, Debtors' Motion does not seek an outright bar of third-party discovery against Nortel for all time. Nor does it seek one or more injunctions. Rather, the Motion seeks only to put in place a procedure that regulates discovery against Debtors and incentivizes requesting parties to seek production elsewhere first and then to make narrow rather than blunderbuss requests to Debtors, with appropriate cost-shifting from Debtors to the requesting parties.

After Debtors served their Motion on a large list of parties in interest, only a handful of objections were filed. Time Warner and Google, the primary parties requesting production by Debtors, opposed the Motion.[3] So did a few other companies represented by Time Warner's counsel, who say they plan to serve Debtors with subpoenas even though they have not done so yet.

In contrast, Verizon—which, like Time Warner and Google, has served Debtors with a subpoena—did not oppose the Motion. Instead, Verizon appears content to engage Debtors in a meet and confer process to limit the scope and burdens of its request, knowing that even if the Motion is granted, it would still be able to seek relief from this Court in the future if necessary.[4]

In addition, Debtors' Motion has spurred meaningful meet-and-confer discussions between Debtors and those who have already served subpoenas on Debtors. While no agreements have been reached yet, Debtors are committed to negotiating right up to the hearing on this Motion, and even afterwards. But even if agreements are reached with all of those who have already served subpoenas, Debtors still require the relief sought by the Motion, given the additional subpoenas that are undoubtedly coming in the future.

---

[3]    The objections filed appear in the case docket as follows: Time Warner Cable Inc. and Time Warner Cable Enterprises LLC [D.I. 14551, 14552]; ARRIS Group, Inc., ARRIS Enterprises, Inc., ARRIS Solutions, Inc., and General Instrument Corp. [D.I. 14553, 14554]; Cisco Systems, Inc. [D.I. 14556, 14557]; the so-called "MSO Declaratory Judgment Plaintiffs" [D.I. 14558, 14559]; and Google Inc. [D.I. 14614, 14615].

[4]    The Monitor and Canadian Debtors do not oppose the Motion. *See* D.I. 14555. They will soon be dealing with Google's attempt to enforce letters rogatory before the Canadian Court. On October 22, 2014, Justice Newbould held a scheduling conference requested by Google. Google's as yet unfiled motion to lift the Canadian stay and enforce letters rogatory will be heard by the Canadian Court on December 17, 2014.

## ARGUMENT[5]

1.    The Motion presents an overarching question based on the core of equity jurisprudence, which underpins this Court's exclusive jurisdiction over Debtors' property.  The question is this:  Given the costs, burdens, and risks the existing and likely future subpoenas would impose upon Debtors, as well as the greater availability of documents from Rockstar, which purchased patent rights from Debtors and is in most cases the litigant opposing the parties issuing the subpoenas, should this Court enforce and/or extend the automatic stay to regulate, in a limited and measured fashion, third-party discovery requested from Debtors, their former employees, and advisors?

2.    The answer is obvious:  Yes, the Court should do so.[6]  The challenge is in crafting the appropriate relief in a balanced and reasonable manner.  Debtors believe the relief requested by the Motion meets that challenge, and it closely follows the process adopted by the Bankruptcy Court in *Residential Capital*.[7]

---

[5]    In this Reply, Debtors address what they perceive to be the fundamental matters presented by the objectors.  By not replying in a strict point-counterpoint fashion, Debtors do not admit, concede, or waive any arguments or matters.  For example, Time Warner and Google present extended discussions of the purported relevance and necessity of the documents they are seeking from Debtors.  But those arguments miss the point of the Motion:  Debtors are not seeking to bar such discovery, and are not asking this Court to decide whether the subpoenas are appropriate in the context of the underlying patent lawsuits; rather, Debtors wish only to regulate the demands being made on them in the manner discussed herein and in the Motion.  In addition, the objectors engage in wild-eyed speculation about Debtors' motives underlying the Motion and allege, without any evidentiary basis or other support, that in seeking to protect the estates Debtors are really doing Rockstar's bidding in order to assist Rockstar's litigation efforts.  While Debtors dispute these points, there is no need to respond to them.

[6]    There is long-standing jurisprudence concerning the broad equitable powers of bankruptcy courts. *See, e.g., Pepper v. Litton*, 308 U.S. 295, 304-05 (1939) ("The bankruptcy courts have exercised these equitable powers in passing on a wide range of problems arising out of the administration of bankrupt estates."); *Bardes v. Hawarden Bank*, 178 U.S. 524, 535 (1900) (acknowledging that bankruptcy proceedings "are in the nature of proceedings in equity").

[7]    *See In re Residential Capital, LLC*, 480 B.R. 529 (Bankr. S.D.N.Y.  2012) (extending the automatic stay to anyone seeking discovery from the debtor, absent further order of the bankruptcy court). *See also Kenoyer v. Cardinale (In re Kenoyer)*, 489 B.R. 103, 121 (Bankr. N.D. Cal. 2013)
(continued . . .)

3.      The crux of the dispute is who should pay for any patent-related discovery from the Debtors, their former employees, and advisors.  Here, the expense is greater given the volume of documents collected and produced in the Allocation Litigation and the significant confidentiality and privilege concerns explained in detail in the Motion.  Whether expenses are paid by the requesting parties, Rockstar, or some combination thereof, Debtors' answer is anyone but the Debtors' estates.[8]

4.      As the Motion states, Debtors have already agreed to produce public versions of the Allocation Trial exhibits and certain redacted deposition designations.  This is a significant production that will benefit all of the requesting parties, and it can be done without imposing too much additional burden or expense on Debtors because the required confidentiality review and notice to third parties must be completed by all of the Nortel estates in order to prepare the public trial record.  If, however, Debtors are required to do more, then additional relief is needed to protect Debtors, the estates, their representatives, and professionals from both significant discovery costs and the risk of post-petition liability.

**A.      Many of the subpoenaed documents can be obtained elsewhere at much less expense and risk to the estates.**

5.      The various third-party subpoenas seek documents falling into two broad categories:  (i) "patent documents," including documents relating not only to the particular

---

(. . . continued)
(acknowledging that a bankruptcy court has power under § 105 to prevent third-party discovery from debtors).

[8]      Given the possibility that the Canadian and EMEA Debtors may not be subjected to the burdens and expense of responding to discovery of documents produced in the Allocation Litigation, Debtors filed their cost sharing motion [D.I. 14478, 14633] and requested a joint hearing on the motion with this Court and the Canadian Court [D.I. 14636].  If costs are not shifted to non-debtor requesting parties such as Google and Time Warner, then the other estates should share appropriately in discovery expenses.  Debtors alone should not bear the burden and expense of being a document clearinghouse for all of Nortel just because they are easier to target in discovery than the Canadian and EMEA Debtors.

patents being asserted in the respective litigations, but also documents relating more broadly to Nortel's entire portfolio of thousands of patents, most of which were sold to Rockstar; and (ii) "valuation documents," including (a) documents relating to Nortel's effort to assess the potential value of its patents and business lines before putting those assets up for sale (*e.g.*, certain IPCo Business documents) and (b) documents relating to the sales themselves, including documents submitted to Nortel by both the successful and unsuccessful bidders.

6.      The vast majority of responsive "patent documents" should now be in Rockstar's possession, custody, or control.[9]  Rockstar should have at least a copy, and in many if not most instances the original, of virtually every document previously in Debtors' possession, custody, or control relating to the patents transferred to Rockstar, including all of the patents now being asserted in the pending litigations.[10]

7.      In addition to the sale of patents to Rockstar, Nortel sold eight specific business lines to separate purchasers, including Avaya, Ciena, Ericsson, Genband, Hitachi, Kapsch, and Radware.  Similar to the Nortel/Rockstar Asset Sale Agreement, the asset transfer agreements for these business line sales included provisions for transferring to the purchasers Nortel's paper and electronic documents relating to the transferred business lines.[11]  To the extent there were licenses or cross licenses, the patent documents also may be in the hands of the business line purchasers or licensees.

8.      Therefore, there are likely to be multiple sources—primarily Rockstar—for the vast majority of the subpoenaed patent-related documents.  Debtors do not maintain a library of individual files for each patent, and thus would have to search all of their documents in response

---

[9]      Declaration of Timothy C. Ross [D.I. 14477] (the "Ross Decl."), ¶ 15.

[10]      Ross Decl., ¶ 16.c.

[11]      Ross Decl., ¶ 16.d.

- 8 -

to requests related to individual patents. As a result, patent documents are likely to be obtained more efficiently from non-Debtor sources. Further, to the extent the patent lawsuits arise from the assertion of patent rights by entities like Rockstar that purchased the patents from Debtors, it is equitable and appropriate to require that requesting parties seek those documents from those non-Debtor sources in the first instance.

9.      The vast majority of the "valuation documents" were collected for purposes of the Allocation Litigation among the various Nortel estates.[12]  These valuation documents are subject to this Court's protective and case management orders, designed to protect a variety of significant privilege and confidentiality interests. Most of these valuation documents are expected to be protected by the attorney-client privilege, the work-product rule, and previous confidentiality orders entered by this Court.

10.      As explained in the Motion, to the extent Debtors still have in their possession, custody, or control certain of the "patent documents" and "valuation documents," the vast majority of those documents are undoubtedly subject to confidentiality obligations and/or claims of attorney-client privilege and work-product immunity, rendering any effort to review such documents for possible production in response to the discovery requests extremely burdensome and expensive.[13]  More specifically:

      a.      The asset purchase agreements between Nortel and the purchasers include extensive confidentiality restrictions that obligate NNI to take all reasonably appropriate steps to preserve the confidentiality and privileged status of documents related to the

---

[12]      Ross Decl., ¶ 15.

[13]      Ross Decl., ¶ 18.

- 9 -

assets that were sold.[14]   In connection with the Time Warner subpoena, Rockstar

indicated that it would seek damages from NNI in connection with any allegedly

unauthorized disclosure of Rockstar's confidential and/or privileged information.[15]

b.      NNI also has confidentiality and privilege obligations with respect to each

of the other Nortel estates and the other Core Parties, as a result of the Allocation

Litigation and the protective and confidentiality orders entered therein.[16]

c.      In view of these various obligations and the potentially significant post-

petition liability the estates would face if Debtors were to breach those obligations, even

inadvertently, it would be necessary for Debtors to undertake an extremely burdensome,

time-consuming, and costly process to review, designate, and produce the documents

sought by the subpoenas.   Importantly, in order to avoid breaching its contractual

obligations, NNI must have its counsel review each document to identify both attorney-

client privileged information and confidential information.

d.      The time-consuming and costly nature of this kind of confidentiality and

privilege review is demonstrated by the ongoing, months-long process for creating a set

of public versions of exhibits from the Allocation Trial for this Court's public trial

---

[14]     Ross Decl., ¶ 18.a.  This threat of liability establishes that, unlike the nonparties in the *Behrend* and *Bell* cases cited by Time Warner, Debtors have no choice but to perform a painstaking review of documents before they are produced.  *See* Time Warner obj. at 42-43, citing *Behrend v. Comcast Corp.*, 248 F.R.D. 84 (D. Mass. 2008), and *Bell, Inc. v. GE Lighting, LLC*, 2014 WL 1630754 (W.D. Va. Apr. 23, 2014).

[15]     Ross Decl., ¶ 21.a.  The objectors suggest that the protective orders in the underlying patent cases should be sufficient to protect third-party confidential (not privileged) information.   Debtors do not necessarily disagree—but the problem is that at least Rockstar has refused to agree that Debtors would not be violating their contractual nondisclosure obligations by making a production under such circumstances.  This reality forces Debtors to undertake painstaking, document-by-document reviews in order to avoid exposing their estates to significant post-petition liability.

[16]     Ross Decl., ¶ 18.b.

- 10 -

record.[17]

11.     Unlike the Allocation Trial, here the litigants seeking production of such documents likely will not receive many documents, but rather only a small number of documents culled at great expense and an extensive privilege log.  In other words, the burden the subpoenas will impose on Debtors is likely to substantially outweigh any benefit obtained by the requesting parties, particularly taking into account the availability of many of the documents from non-Debtor sources.

12.     Under any scenario, notwithstanding the likelihood that they have responsive documents in their possession, it is appropriate for this Court to protect its Debtors from undue burden and expense and the risk of significant post-petition liability.

**B.      The automatic stay protects Debtors' property.**

13.     The objectors argue that because they are not pursuing pre-bankruptcy claims against Debtors, the automatic stay of Section 362(a)(1) does not prohibit them from obtaining discovery from Debtors.  That argument relies on a bankruptcy appellate panel decision in *Miller* and its progeny, including *Kenoyer*.[18]  But those cases are distinguishable.

14.     First, those cases involved discovery requesting "information" from the debtors in the form of testimony from fact witnesses—not, as here, production of vast stores of documents.

---

[17]     The objectors challenge Debtors' burden claims, suggesting that they lack evidentiary support, but in doing so they overlook the fact that the Ross Declaration constitutes admissible evidence of the burdens that compliance with the subpoenas would impose on Debtors.  It is true that Debtors have been unable to accurately quantify the specific volume of documents that might need to be reviewed for confidentiality and privilege, but this cannot be done unless and until searches are run to generate hit counts.  Given the indisputably large number of documents in the various repositories that Google and TWC want searched (as detailed in the Ross Declaration), it's obvious that the required effort will be substantial, as evidenced by the lengthy process required to clear only 2,500 allocation trial exhibits.  It is also true that Debtors have not yet prepared privilege logs, but that cannot be done until after documents are located and reviewed—which would require the exact effort Debtors are seeking to avoid having to undertake, unless compensated for those efforts.

[18]     *Groner v. Miller (In re Miller)*, 262 B.R. 499 (B.A.P. 9th Cir. 2001); *Kenoyer*, 489 B.R. 103.

- 11 -

Mere requests for testimony from debtor-affiliated witnesses present vastly different issues than onerous demands that debtors search voluminous document collections and make extensive productions of documents.

15.    Second, in those cases production of the debtors' information did not carry any liability or indemnity risk to the debtors or their property.    In contrast, Debtors here have ongoing contractual obligations with respect to many of the documents sought.    In addition to the material expense and burdens associated with reviewing any document production to protect the estates' interests, any misstep could create significant post-petition liability.    This risk is particularly acute since Rockstar and the business line purchasers paid billions of dollars for the patents and other assets they acquired from Nortel.

16.    Moreover, *Kenoyer* expressly acknowledged that the bankruptcy court has the power under Section 105(a) to prevent discovery in response to a debtor's request.[19]

17.    Indeed, under circumstances far more similar to what Debtors are facing here, other courts have acted to protect their debtors by enforcing or extending the automatic stay to regulate discovery against non-debtors.    For example, in *Philadelphia Newspapers*, a case cited by Google, the district court affirmed a bankruptcy court injunction which had extended the stay, through confirmation of a plan, to block litigation (including discovery) against several of the debtors' employees.    The district court noted that, due to indemnity obligations running from the debtors to the employees, litigation and discovery against the employees "would affect the property of the Debtors' estates."[20]    The court further noted that "in the absence of an injunction

---

[19]    *Kenoyer*, 489 B.R. at 120-21.

[20]    *Lane v. Philadelphia Newspapers, LLC (In re Philadelphia Newspapers, LLC)*, 423 B.R. 98, 105 (E.D. Pa. 2010). On this basis, the district court found *Miller* to be "distinguishable," because the litigation in *Miller* would not affect the debtor in that case or its property. *Id.*

- 12 -

the Debtors would be forced to spend time, money, and effort with respect to each pending suit," that allowing discovery to proceed in the underlying action "could open the floodgates to allow all other litigants to pursue the same course," and that the "'cumulative effect' of the litigation" made it appropriate to stay the litigation."[21]  Last, the district court noted that the appellant "is not without a potential avenue of relief to proceed with the requested discovery," which the appellant represented would have only a *de minimis* impact on the debtors, because she could always ask the bankruptcy court to modify the injunction to permit the requested discovery to go forward.[22]  Thus, *Philadelphia Newspapers* stands for the proposition that a bankruptcy court may appropriately extend the automatic stay to regulate discovery that otherwise could adversely impact the debtor's estate.

18.     In *Residential Capital*, as in *Miller*, *Kenoyer*, and *Philadelphia Newspapers*, the debtor did not face the specter of post-petition liability.  Even so, the court extended the stay to avoid a situation that ultimately could have been detrimental to creditors.[23]

19.     As the *Residential Capital* decision observed, there is surprisingly little authority addressing whether document subpoenas to a debtor are subject to the automatic stay.[24] However, there are several apposite principles of law establishing that the stay does bar document discovery from a nonparty debtor:

---

[21]     *Id*. at 106.

[22]     *Id*. at 108.  The district court also explained that under jurisprudence within the Third Circuit it was not important whether the bankruptcy court's action was more properly characterized as extending the stay under § 362(a) or issuing a separate injunction, because "the practical effect (*i.e.*, the staying of an action) is the same regardless of the means employed".  *Id*. at 102 n.8.

[23]     *Residential Capital*, 480 B.R. at 539.

[24]     *Residential Capital*, 480 B.R. at 536.

- As a fundamental debtor protection, the scope of the automatic stay is broad.[25]

- Section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[26]

- Mere possession or control of Debtors' documents is sufficient to invoke the protection of the automatic stay.[27]

- Debtors' books and records are "property of the estate," protected by § 362(a)(3).[28]

20.     Because "property of the estate" includes Debtors' documents "wherever located and by whomever held,"[29] the automatic stay of § 362(a)(3) extends to Debtors' documents in the possession of their professionals, former employees, and even (to an extent) Rockstar.[30]

21.     Time Warner argues that its subpoena does not seek possession or control over any of Debtors' property in a manner requiring the physical return of property like repossession. But that argument misses the point.

---

[25]     *Midlantic Nat'l Bank v. N.J. Dept of Envt'l. Protection*, 474 U.S. 494 (1986) (acknowledging the broad scope of the automatic stay under the 1978 Bankruptcy Code).

[26]     11 U.S.C. § 362(a)(3).

[27]     *See, e.g., In re Zartun*, 30 B.R. 543, 545 (B.A.P. 9th Cir. 1983) (citing legislative history in support of a ruling that Section 362(a)(3) protects "property over which the estate has control or possession").

[28]     *See, e.g., In re Integrated Resources, Inc.*, 1992 WL 8335 (S.D.N.Y. Jan. 14, 1992) (affirming a bankruptcy court's decision that a debtor's books and records are property of the estate and denying a motion for relief from the automatic stay); *In re Greenlife, Inc.*, 1990 WL 10091748, at *3 (Bankr. E.D. Va. July 16, 1990) (acknowledging that a debtor's books and records are protected by the automatic stay and stating that "the party seeking issuance or enforcement of a subpoena would be precluded from taking further action in the absence of relief from the stay").

[29]     11 U.S.C. § 541(a).

[30]     As explained in the Motion, Rockstar failed to delete "non-transferred items" from the PCs of former Nortel employees, including those of former in-house counsel. Motion, ¶¶ 79-85. The Eastern District of Texas is currently considering whether Rockstar's possession of the non-transferred items constitutes a privilege waiver.

29559098.3
8346322 v1

22.     First, the subpoena commands NNI to produce documents and electronically-stored information to Time Warner.  What more is necessary to demonstrate that Time Warner's subpoena attempts to exercise control over property of the estate?

23.     Second and more importantly, Debtors' cash on hand and their share of the sales proceeds also are property of the estate in need of protection.  Although arising in the context of insurance policies, the Third Circuit's *ACandS* decision cited by Time Warner supports Debtors' argument.  The *ACandS* court said:  "The possession or control language of Section 362(a)(3) has consistently been interpreted to prevent acts that diminish future recoveries . . . ."[31]

24.     Even setting aside the risk of significant post-petition liability, Debtors' property interests would be materially diminished if they are forced to bear the considerable expense of responding to, and producing documents in connection with, each pending and future third-party subpoena.[32]

25.     As one federal district court recognized in the context of a discovery dispute, requesting parties have no incentive to limit the burdens imposed by their subpoenas requests if they are not bearing the costs of responding to those subpoenas.  "When nonparties are forced to pay the costs of discovery, the requesting party has no incentive to deter it from engaging in fishing expeditions for marginally relevant material.  Requesters forced to internalize the costs of discovery will be more inclined to make narrowly-tailored requests reflecting a reasonable

---

[31]    *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d. 252, 261 (3d Cir. 2006).

[32]    Time Warner and Google focus myopically on their own subpoenas, attempting in each case to demonstrate how reasonable they are purportedly being.  But the point of Debtor's motion is that they are subject to many existing and future subpoenas, justifying a level of protection that might not be warranted if Debtors were subject to only one subpoena.  Indeed, Cisco, Arris, and the MSO Plaintiffs have not served subpoenas on Debtors, but say they plan to do so shortly.  And with the possibility that many more of the thousands of former Nortel patents will be litigated in the future, Debtors need protection on an global basis.

balance between the likely relevance of the evidence that will be discovered and the costs of compliance."[33]   Thus, requiring parties like Google, Time Warner, Verizon, and others to bear Debtors' reasonable costs of responding to subpoenas would not only reduce the cost burden on Debtors and their estates but also incentivize the requesting parties to be more surgical in framing their requests.

26.     Nearly six years into this case, Debtors are keenly aware that delay and additional administrative expenses harm creditors.[34]   It is not, as Time Warner and Google argue, the calculation of the expense of subpoena compliance as a percentage of the patent sale proceeds that matters.   Rather, Debtors are concerned that any material expense reduces the amount ultimately available for distribution to creditors.   The amount available for distribution could be further diminished by any post-petition liability resulting from the production of one or more documents subject to non-disclosure obligations.

27.     For these reasons, the Court can, and should, extend the automatic stay to protect Debtors' property and the interests of their estates.

### C.     Debtors' motion is procedurally proper.

28.     Contrary to the objectors' arguments, Debtors' Motion does not seek entry of injunctive relief.   Instead, the Section 105(a) relief sought relates to extending the automatic stay to the extent necessary to protect Debtors and their property.

29.     As *Residential Capital* explained, "[t]he provisions of the Bankruptcy Code are intended to marshal and protect the assets and the property of the estate throughout the

---

[33]     *Linder v. Calero-Portocarrero*, 183 F.R.D. 314, 322-23 (D.D.C. 1998)

[34]     *Residential Capital*, 480 B.R. at 539 (acknowledging that uncontrolled burden and expense of third-party discovery would be to the substantial detriment of all creditors and other parties in interest).

- 16 -

administration of the case."[35]  Thus, a complaint is not required for this relief as it is more in the nature of case management.[36]

30.     Even if the relief affords protection to non-debtors, such as estate professionals and former Nortel employees, that relief would be limited to Debtors' property of the estate in the hands of those parties and to protecting that estate property from claims by Rockstar or others of any breach of confidentiality or privilege.

31.     To be clear, Debtors do not seek to stay depositions of named inventors who no longer have Debtors' documents.   However, most of the former employees served with subpoenas are former in-house attorneys for Nortel who have privileged and confidential information and copies of Debtors' documents.   Such depositions are problematic for Debtors because if they fail to appear in order to object to disclosure of privileged communications regarding assets sold to others, there is a risk that Debtors would later be found to have not done enough to fulfill their obligations to protect such information, potentially exposing Debtors to liability claims.  As long as there is a risk of such liability, Debtors are therefore forced to attend such depositions.

32.     Thus, Debtors do not seek the typical Section 105(a) injunction that protects non-debtor parties on a wholesale basis.   Rather, they seek merely to enforce and/or extend the automatic stay to protect their own property interests.

**D.     The Court has jurisdiction to grant the requested relief.**

33.     Again, contrary to the objectors' arguments, Debtors do not ask the Court to quash any subpoenas or otherwise address any specific subpoenas.   Thus, the long-winded

---

[35]     *Id.* at 537.

[36]     *Id.* at 539.

arguments by Time Warner and Google concerning the relevance of the documents sought by their subpoenas and the purported narrow scope of their requests is beside the point.  The issue is not their need, but rather the burden on the Debtors.

34.    In substance, the Motion is designed to conserve the estates' resources.[37]  Doing so implicates several "core" bankruptcy matters over which this Court has jurisdiction, including administration of the estates, motions relating to the automatic stay, and other proceedings affecting the liquidation of the assets or the adjustment of debtor-creditor relationships.[38]

35.    The automatic stay is, by design, prospective in nature and broad in scope.[39] There is no dispute that this Court has jurisdiction to enforce and/or extend the stay.

36.    The relief sought by Debtors does little more than seek to require that the objectors and other parties wishing to subpoena Debtors' documents must first seek lift-stay relief from this Court before any other court that does not have jurisdiction over Debtors' property enters an order purporting to compel Debtors to incur the burden and expense of producing documents or issues process to Debtors purporting to compel the production of documents.

**E.    The scope of the relief requested is reasonable and appropriate.**

37.    Debtors are asking for this Court's help.  Absent relief, the numerous pending and likely future third-party subpoenas will result in Debtors incurring significant expense.

---

[37]    This Court has exclusive jurisdiction pursuant to 28 U.S.C. § 1334(e) over Debtors' property and property of the estate, including Debtors' books and records, their cash on hand, and their share of the sales proceeds.

[38]    *See* 28 U.S.C. § 157(b)(2)(A), (G), and (O), each describing a "core proceeding" over which this Court has jurisdiction pursuant to 28 U.S.C. § 1334.

[39]    *See, e.g., Midlantic Nat'l Bank* 474 U.S. 494.

- 18 -

38.     As noted in the Motion, there is the ever-looming possibility that a simple misstep by Debtors in responding to the subpoenas could result in the estates suffering significant post-petition liability.  With patent sale proceeds exceeding billions of dollars, it is not inconceivable that any future damages claims asserted for an inadvertent production of privileged or confidential documents could be significant, should Rockstar or another purchaser of patents from the Debtors later contend that the disclosure of such information substantially affected the value of their patent rights.

39.     Debtor's Motion therefore seeks to impose reasonable limitations on the process by which litigants can attempt to obtain documents from Debtors.  The relief sought merely would require that such litigants first go to other, better sources of the documents.  In the event that such efforts prove unsatisfactory, the litigants would be free to meet and confer with the Debtors about obtaining production from the Debtors.  If the litigants were to conclude that the Debtors were being unreasonable, the litigants would have the safety valve of coming to this Court and seeking leave to serve the Debtors with a subpoena.  In other words, third parties would not be barred from subpoenaing the Debtors; however, in order to do so, they would have to show cause to this Court why they should be permitted to serve Debtors with a subpoena demanding that Debtors produce specific documents.  If this Court were to allow service of such a subpoena, Debtors would still have the right to object to the subpoena, and the requesting party could then seek enforcement of the subpoena by the appropriate court.  The fact that such a structure was adopted in both *Philadelphia Newspapers* and *Residential Capital* demonstrates that it is a reasonable way to proceed.

40.     However, before the estates are forced to incur significant expense, Google, Time Warner, and other similarly situated parties first should review the redacted deposition

- 19 -

transcripts and public versions of trial exhibits from the Allocation Litigation that Debtors have produced or will produce and determine if those materials adequately address their discovery needs.[40]  The requesting parties should also use all of the considerable means and arguments at their disposal to obtain documents from Rockstar in the pending patent litigations against Rockstar.  Then, after all attempts to obtain documents from Rockstar are exhausted (including the resolution of discovery disputes with Rockstar), the requesting parties should—after first engaging in good-faith meet and confer discussions with Debtors—be made to file a motion in this Court for relief from the stay and to demonstrate in support of that motion why Debtors' estates should be forced to incur the expense of searching for, reviewing, and logging documents.  It also is appropriate to require that third parties pay Debtors' reasonable costs of responding to any requests for documents.[41]

41.    Again, although Debtors' case is not typical, the relief requested is not unfounded.

*    *    *

42.    Before filing the Motion, Debtors tried—so far, without success—to work out issues related to the pending subpoenas with the requesting parties.  Despite insinuations to the contrary in their opposition papers, Time Warner and Google in fact have not yet agreed to make any significant concessions concerning the scope of their requests and the burdens they seek to

---

[40]    The objectors suggest that their efforts to obtain production from Rockstar have been effectively stymied by, *inter alia*, Rockstar's use of a "labyrinthine Rockstar corporate structure."  (Google Obj. at 12.)  But it is unclear why such sophisticated parties as Google and Time Warner believe themselves to be unable to overcome Rockstar's alleged machinations, given that their counsel have the ability to file motions to compel in the underlying patent litigations.

[41]    *See, e.g., Residential Capital*, 480 B.R. at 541, citing *In re Dakotas' Farm Mfg. Co.*, 31 B.R. 92, 94-95 (Bankr. D.S.D. 1983) (modifying the automatic stay to permit third-party discovery from a debtor on the condition that the third party pay the debtor's costs).

impose on Debtors.[42]  Yet, Debtors have continued in good faith to negotiate with Time Warner,

Google, and Verizon, and Debtors believe that meaningful progress is still possible.  To date,

however, the requesting parties remain steadfast in their opposition to paying Debtors' costs

associated with the subpoenas.[43]  But even if Debtors are able to reach agreements with one or

more of the requesting parties regarding subpoenas already served on Debtors, there remains a

clear need for a uniform approach that, while affording requesting parties a reasonable

opportunity to access documents that are truly necessary to their litigation cases, minimizes the

costs and burdens of such third-party discovery on Debtors and their estates.  Thus, even if

individual agreements are reached with respect to specific pending subpoenas, Debtors still

request that the Court enter their proposed order.

**CONCLUSION**

For the reasons stated above and in the Motion, and based on the evidence submitted with

the Motion and any additional evidence adduced at the hearing, Debtors respectfully request that

the Court grant the Motion to protect Debtors and aid in the preservation of the estates' assets.[44]

---

[42]     For example, Google offers the meaningless "concession" that Debtors need not product documents that have already been produced by one of the Rockstar entities.  (Google obj. at 24.)  But it would take an enormous and costly effort for Debtors to compare their potentially responsive documents against those produced by Rockstar.

[43]     In response to claims by Time Warner and Google that they cannot agree in the abstract to pay NNI's discovery costs, NNI has offered to run reasonable searches against a number of different document repositories and provide Time Warner and Google with the number of "hits" so that they can better assess the possible magnitude of the costs that would imposed on NNI by their discovery requests.

[44]     Debtors take no position on whether this Court can or should grant Time Warner's request that it issue a stay of the "Rockstar Litigation."  Debtors acknowledge that such a stay would appear to protect Debtors from burden, expense, and potential liability, at least while such a stay remained in effect.

29559098.3
8346322 v1

Dated:  November 4, 2014         Respectfully submitted,

CROWELL & MORING LLP
Mark D. Plevin (admitted *pro hac vice*)
Mark S. Supko (admitted *pro hac vice*)
James J. Regan
Matthew W. Cheney
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116

– and –

BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP


/s/ Jennifer R. Hoover
Jennifer R. Hoover (No. 5111)
Michael J. Barrie (No. 4684)
222 Delaware Ave., Suite 801
Wilmington, Delaware  19801
Telephone:  (302) 442-7010
Facsimile:  (302) 442-7012

*Counsel for Debtors and Debtors in Possession*

- 22 -