**<u>EXHIBIT 1</u>**

**EXHIBIT**

**105**

*IN RE: NORTEL NETWORKS INC., et al.*

*JOHN RAY*

*September 15, 2014*

*HIGHLY CONFIDENTIAL*



**ELLEN Grauer**
**COURT REPORTING** Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022

PHONE: (212) 750-6434   FAX: (212) 750-1097

www.ELLENGRAUER.com

*Original File 108011.TXT*

*Min-U-Script® with Word Index*

1  UNITED STATES BANKRUPTCY COURT

2  FOR THE DISTRICT OF DELAWARE

   ----------------------------------------X

3  In re

4      NORTEL NETWORKS INC., et al.,

5                      Debtors.,

6  Chapter 11 Case No.: 09-10138(KG)

   ----------------------------------------X

7

8          * * * HIGHLY CONFIDENTIAL * * *

9

10                 One Liberty Plaza
                   New York, New York

11                 September 15, 2014
                   1:15 p.m.

12

13

14         VIDEOTAPED DEPOSITION of JOHN RAY,

15  before Melissa Gilmore, a Notary Public of the

16  State of New York.

17

18

19

20

21

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor

24             New York, New York 10022
                   212-750-6434

25                 REF:  108011

**HIGHLY CONFIDENTIAL**                          2

```
 1   A P P E A R A N C E S:

 2

 3   ALLEN & OVERY LLP

 4   Attorneys for Canadian Debtors and Canadian Monitor

 5        1221 Avenue of the Americas

 6        New York, New York 10020

 7   BY:  JACOB S. PULTMAN, ESQ.

 8        BRADLEY S. PENSYL, ESQ.

 9        KEN COLEMAN, ESQ.

10        JOSEPH BADTKE-BERKOW, ESQ.

11        PHONE 212-610-6340

12        FAX 212-610-6399

13        E-MAIL jacob.pultman@allenovery.com

14

15   CLEARY GOTTLIEB STEEN & HAMILTON LLP

16   Attorneys for US Debtor and the Witness

17        One Liberty Plaza

18        New York, New York 10006-1470

19   BY:  JEFFREY ROSENTHAL, ESQ.

20        LISA SCHWEITZER, ESQ.

21        RUSSELL ECKENROD, ESQ.

22        PHONE 212-225-2086

23        FAX 212-225-3999

24        E-MAIL jrosenthal@cgsh.com

25
```

HIGHLY CONFIDENTIAL                     3

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

 4   Attorneys for US Debtors

 5        1201 North Market Street, 16th Floor

 6        P.O. Box 1347

 7        Wilmington, Delaware 19899-1347

 8   BY:  DEREK C. ABBOTT, ESQ.

 9        PHONE 302-351-9357

10        FAX 302-425-4664

11        E-MAIL dabbott@mnat.com

12

13

14   WILLKIE FARR & GALLAGHER LLP

15   Attorneys for UK Pension Claimants

16        787 Seventh Avenue

17        New York, New York 10019-6099

18   BY:  ANDREW HANRAHAN, ESQ.

19        PHONE 212-728-8170

20        FAX 212-728-9170

21        E-MAIL ahanrahan@willkie.com

22

23

24

25
```

HIGHLY CONFIDENTIAL                    4

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   AKIN GUMP STRAUSS HAUER & FELD LLP

 4   Attorneys for US Official Committee of Unsecured

 5   Creditors

 6        One Bryant Park

 7        New York, New York 10036-6745

 8   BY:  ABID QURESHI, ESQ.

 9        ANNE M. EVANS, ESQ.

10        PHONE 212-872-8027

11        FAX 212-872-1002

12        E-MAIL aqureshi@akingump.com

13

14

15   MILBANK, TWEED, HADLEY & McCLOY LLP

16   Attorneys for US Bondholder Group

17        One Chase Manhattan Plaza

18        New York, New York 10005

19   BY:  ATARA MILLER, ESQ.

20        NICHOLAS A. BASSETT, ESQ.

21        PHONE 212-530-5421

22        FAX 212-822-5421

23        E-MAIL amiller@milbank.com

24

25
```

**HIGHLY CONFIDENTIAL**                              5

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   KATTEN MUCHIN ROSENMAN LLP

 4   Attorneys for Wilmington Trust

 5        575 Madison Avenue

 6        New York, New York 10022-2585

 7   BY:  DAVID A. CRICHLOW, ESQ.

 8        PHONE 212-940-8941

 9        FAX 212-940-8776

10        E-MAIL david.crichlow@kattenlaw.com

11

12

13   QUINN EMANUEL URQUHART & SULLIVAN, LLP

14   Attorneys for Solus Alternative Asset Management,

15   LLP and Macquarie Capital (USA), Inc.

16        51 Madison Avenue, 22nd Floor

17        New York, New York 10010

18   BY:  JAMES C. TECCE, ESQ.

19        PHONE 212-849-7199

20        FAX 212-849-7100

21        E-MAIL jamestecce@quinnemanuel.com

22

23   ALSO PRESENT:

24        DAN MACOM, Videographer

25
```

**HIGHLY CONFIDENTIAL**                    **6**

```
 1   ------------------ I N D E X ------------------

 2   WITNESS                 EXAMINATION BY            PAGE

 3   JOHN RAY                MR. PULTMAN            12, 116

 4                           MR. ROSENTHAL            115

 5

 6   DIRECTIONS:  PAGES 102, 113, 115

 7

 8   ---------------- E X H I B I T S ----------------

 9   RAY                 DESCRIPTION              FOR I.D.

10   Exhibit 1           Notice of Debtors' Motion     13

11                       for Entry of an Order

12   Exhibit 2           E-Mail with Draft Term        21

13                       Sheet, Bates Stamped

14                       BHG-PPI-0000018 through

15                       21

16   Exhibit 3           E-Mail with Draft             47

17                       Settlement Agreement,

18                       Bates Stamped

19                       BHG-PPI-0000153 through

20                       164

21   Exhibit 4           E-Mail with Draft PPI         54

22                       Settlement Agreement,

23                       Bates Stamped

24                       BHG-PPI-0000116 through

25                       147
```

```
 1   ----------- E X H I B I T S (Cont'd) -----------

 2   RAY                 DESCRIPTION              FOR I.D.

 3   Exhibit 5           E-Mail, Bates Stamped        62

 4                       NNI-PPI0000306 through

 5                       321

 6   Exhibit 6           E-Mail with Revised PPI      78

 7                       Settlement Agreement,

 8                       Bates Stamped

 9                       BHG-PPI-000082 through

10                       115

11

12

13                  (EXHIBITS TO BE PRODUCED)

14

15

16

17

18

19

20

21

22

23

24

25
```

HIGHLY CONFIDENTIAL                    8

S T I P U L A T I O N S

1.  Upon completion of the transcription of today's
session, the original transcript shall be sent to
counsel for the witness by the court reporter.
Counsel shall promptly forward it to the witness
for review, correction and signature under penalty
of perjury.  The witness shall have 30 days from
the day of receipt within which to review, make any
corrections, sign the deposition transcript under
penalty of perjury, and return it to counsel.  The
witness' counsel shall then forward the original
transcript plus corrections to the court reporter,
who will promptly notify all counsel of its receipt
and any changes to testimony made by the witness.

2.  If the witness is not represented by counsel,
the original transcript will be sent to the witness
by the court reporter.  After review, correction
and signature within 30 days from the date of
receipt, the witness shall return the original
transcript to the court reporter, who will notify
all counsel of its receipt and any changes to
testimony by the witness. (CONT'D ON NEXT PAGE)

1  3.  The court reporter will retain the orig

2  transcript, including exhibits.  If, for any

3  reason, the original is lost, misplaced, not

4  returned, not signed, or unavailable, a certified

5  copy may be used in its place for all purposes.

6  The court reporter is otherwise relieved of any

7  statutory duties.

8

9                      - oOo -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  This is tape one.

3    We are now on the record.  The time is

4    1:15 p.m.  Today is Monday, September 15,

5    2014.

6              This is the opening of the

7    deposition of Mr. John Ray in the matter

8    of In Re Nortel Networks, Incorporated, et

9    al.

10             This deposition is being held at the

11   offices of Cleary, Gottlieb, Steen &

12   Hamilton, which is located at One Liberty

13   Plaza, in New York, New York.

14             Our court reporter today is

15   Ms. Melissa Gilmore with Ellen Grauer

16   Court Reporting.  I'm the legal

17   videographer, Dan Macom, also with Ellen

18   Grauer Court Reporting.

19             Will counsel please introduce

20   themselves and state whom they represent

21   for the record?

22             MR. PULTMAN:  Jacob Pultman, of

23   Allen & Overy, together with my

24   colleagues, Bradley Pensyl, Ken Coleman,

25   and Joe Badtke-Berkow.  We are here on

1                           PROCEEDINGS

2          behalf of the Canadian debtors and the

3          monitor.

4                MR. CRICHLOW:  David Crichlow,

5          Katten Muchin Rosenman, on behalf of

6          Wilmington Trust National Association.

7                MR. TECCE:  James Tecce, of Quinn

8          Emanuel, on behalf of Solus Alternative

9          Asset Management and Macquarie Bank (USA),

10         Inc.

11               MR. HANRAHAN:  Andrew Hanrahan, from

12         Willkie, Farr & Gallagher, on behalf of

13         the UK pension claimants.

14               MR. QURESHI:  Abid Qureshi and Annie

15         Evans, from Akin Gump, on behalf of the

16         official creditors committee.

17               MS. MILLER:  Atara Miller and

18         Nicholas Bassett, from Milbank, Tweed,

19         Hadley & McCloy, on behalf of the ad hoc

20         group of bondholders.

21               MR. ROSENTHAL:  Jeff Rosenthal,

22         along with Lisa Schweitzer and Russell

23         Eckenrod, on behalf of the US debtors and

24         the witness.

25               THE VIDEOGRAPHER:  Will our court

HIGHLY CONFIDENTIAL                    12

1           reporter please swear in the witness?

2                    (Witness sworn.)

3

4    EXAMINATION BY

5    MR. PULTMAN:

6           Q.    Good afternoon, Mr. Ray.  You have

7    been deposed in this case before?

8                    MR. ROSENTHAL:  Jay, before you

9           begin, I just wanted to say, until the

10          parties have a chance to review the

11          transcript, we would like this to be

12          considered highly confidential, and also

13          that we consider the transcript only to be

14          used in connection with the PPI motion

15          before the US court.

16                    And anybody has any disagreement,

17          let us know, and we could seek guidance

18          from the US court on that.

19                    MR. PULTMAN:  Sure.

20   BY MR. PULTMAN:

21          Q.    Mr. Ray, going back to my question,

22   you have been deposed in this case before?

23          A.    Yes.

24          Q.    Do you understand that you have been

25   designated as a witness in connection with an

1              RAY - HIGHLY CONFIDENTIAL

2    upcoming hearing on November 4, 2014?

3         A.    Yes.

4         Q.    And do you understand that that

5    testimony relates to a proposed settlement

6    agreement in a matter we will call the PPI

7    matter?

8         A.    Yes.

9         Q.    I'm going to have marked and show

10   you a document entitled Notice of Debtors'

11   Motion for Entry of an Order, and we will have

12   it marked as Ray Exhibit 1, and it's a

13   multi-page document.

14              (Ray Exhibit 1, Notice of Debtors'

15         Motion for Entry of an Order, marked for

16         identification.)

17              MR. ROSENTHAL:  Just to be clear,

18         Jay, it's the notice of motion and the

19         notice together?

20              MR. PULTMAN:  Just so we're all

21         clear, it's a document that, at the top

22         bears the document number 14076-3 filed on

23         7/24/14.  The first two pages are a notice

24         of motion.  The next 20 pages are debtors'

25         motion for entry of an order, and the next

1              RAY - HIGHLY CONFIDENTIAL

2         43 pages -- sorry -- the next five pages

3         are a proposed order, and the next 43

4         pages are Exhibit B, a proposed settlement

5         agreement.

6         Q.    Mr. Ray, have you seen this document

7    before?

8         A.    Yes.

9         Q.    Did you see it before it was filed

10   with the court in Wilmington, Delaware?

11        A.    Yes.

12        Q.    And did you see it in your role as

13   principal officer of NNI?

14        A.    Yes.

15        Q.    Did you approve the filing of this

16   document before it was filed?

17        A.    Yes.

18        Q.    Have you had an opportunity to

19   review it since that time?

20        A.    Yes.

21        Q.    To your knowledge, are there any

22   errors or misstatements in this document?

23        A.    No.

24        Q.    In your role as principal officer of

25   NNI, were you involved in approving the filing

1                  RAY - HIGHLY CONFIDENTIAL

2     of this document, Ray Exhibit 1?

3          A.    Yes.

4          Q.    Was the board of directors of NNI

5     involved in approving the filing of this

6     document, Ray Exhibit 1?

7          A.    No.

8          Q.    Does NNI currently have a board of

9     directors?

10         A.    Yes.

11         Q.    And does it have more than one

12    director?

13         A.    No.

14         Q.    Is the director a Fernando Guerra

15    Saenz?

16         A.    Yes.

17         Q.    Did I mispronounce that?

18         A.    He is otherwise known as Luiz

19    Guerra, yes.

20         Q.    Is he the sole board member of NNI

21    currently?

22         A.    Yes.

23         Q.    To your knowledge, did he review the

24    document that's been marked Ray Exhibit 1?

25         A.    No.

1                RAY - HIGHLY CONFIDENTIAL

2        Q.    To your knowledge, did he approve

3    the filing of Ray Exhibit 1?

4        A.    No.

5        Q.    Can you describe what your

6    involvement was in connection with the proposed

7    PPI settlement?

8                MR. ROSENTHAL:  Objection, vague.

9                You can answer.

10       A.    I negotiated the basic terms of the

11   document.

12       Q.    And when you say you negotiated the

13   basic terms, can you tell me when the

14   negotiation of the basic terms began?

15       A.    For me, I think the first

16   discussion, I can't be exact around the dates,

17   but I believe it was the week of the 14th of

18   July, 2014.

19       Q.    Prior to July 2014, did you have any

20   discussions with anyone at Milbank relating to

21   a potential PPI settlement?

22       A.    No.

23       Q.    Did you have discussions with anyone

24   else on behalf of the bonds prior to July 2014

25   about a potential settlement of the PPI issue?

RAY - HIGHLY CONFIDENTIAL

2    A.    No.

3    Q.    And to your knowledge, did the board

4    of directors of NNI approve the proposed

5    settlement, the PPI settlement?

6    A.    No.

7    Q.    To your knowledge, was there ever a

8    presentation to the board about the proposed

9    settlement?

10   A.    No.

11   Q.    Other than you, was there any other

12   employee of NNI or representative of NNI

13   involved in the negotiation of the proposed

14   settlement?

15   A.    What do you mean by --

16         MR. ROSENTHAL:  Objection to form.

17   A.    Can you define what you mean by

18   representative?

19   Q.    Sure.  Let's start with employees.

20   Were there any other people employed by NNI who

21   were involved in negotiating the proposed

22   settlement?

23   A.    No.

24   Q.    Now, is it fair to say, on a

25   day-to-day basis, you make the decisions for

HIGHLY CONFIDENTIAL                        18

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   NNI?
 3         A.    Yes.
 4         Q.    And you consult with and report to
 5   the NNI board member as necessary?
 6         A.    Only as necessary.
 7         Q.    Do you think proposing a $1 billion
 8   settlement is something in which the board of
 9   NNI was necessary?
10         A.    No.
11         Q.    Now, we asked about employees of NNI
12   and we asked about the board of NNI.
13               Were there outside attorneys for NNI
14   involved in the negotiation of the proposed
15   settlement?
16         A.    When you say -- could you be more
17   specific when you say involved?  Repeat the
18   question.
19         Q.    Sure.  You said you were involved in
20   negotiating the proposed PPI settlement.
21         A.    Yes.
22         Q.    And you said that that began
23   somewhere in the middle of July of 2014.
24         A.    Correct.
25         Q.    Were there any lawyers for NNI who
```

HIGHLY CONFIDENTIAL                    19

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   were also involved in the negotiations?
 3        A.    There was lawyers at Cleary that
 4   were involved in attendance during those
 5   negotiations.
 6        Q.    Were there lawyers for NNI from any
 7   other firm involved?
 8        A.    No.
 9        Q.    And other than the attorneys from
10   Cleary, did you have any financial advisors who
11   were involved on behalf of NNI in the
12   negotiation of the settlement agreement?
13        A.    Cleary had, in its attendance, a
14   representative of Chilmark.
15        Q.    Who was the representative of
16   Chilmark?
17        A.    Michael Kennedy.
18        Q.    Anyone else from Chilmark involved
19   in the negotiation?
20        A.    No.
21        Q.    Beyond the Cleary people, yourself
22   and Michael Kennedy, was there anyone else
23   involved on behalf of NNI in the negotiation of
24   the PPI settlement?
25        A.    No.
```

1              RAY - HIGHLY CONFIDENTIAL

2        Q.    To your knowledge, are there board

3    resolutions of the NNI board approving the

4    proposed settlement?

5        A.    No.

6        Q.    To your knowledge, was the board

7    member of NNI in any way contacted with respect

8    to the proposed NNI settlement?

9        A.    No.

10        Q.    Were there drafts of the settlement

11    agreement prior to the final draft?

12        A.    Yes.

13        Q.    And can you tell me, sitting here

14    today, how many drafts there were of the

15    agreement?

16        A.    It's hard to be certain from

17    recollection, but I can recall at least three

18    drafts.

19        Q.    Between June 16 of 2014 and July 14

20    of 2014, did you have any involvement in

21    communications with respect to a potential PPI

22    settlement?

23        A.    I had conversations with counsel for

24    the company.

25        Q.    And you are referring to outside

1                    RAY - HIGHLY CONFIDENTIAL

2      counsel for NNI?

3          A.    Yes.

4          Q.    Okay.  For the moment, let's not get

5      into the substance of those conversations.  We

6      will talk about that later.

7                Did you have conversations with

8      anyone representing the bonds prior to the

9      July 14, 2014 time frame?

10         A.    No.

11               MR. PULTMAN:  I'm going to have

12         marked, as Ray Exhibit 2, a draft term

13         sheet.  And I will put the Bates Numbers

14         and the Bates range on the record.  And

15         for the record, the document bears Bates

16         numbers BHG-PPI-0000018 through 21.

17               (Ray Exhibit 2, E-Mail with Draft

18         Term Sheet, Bates Stamped BHG-PPI-0000018

19         through 21, marked for identification.)

20         A.    (Perusing.)

21         Q.    Mr. Ray, have you had an opportunity

22     to review the document that's been marked Ray

23     Exhibit 2?

24         A.    Yes.

25         Q.    Have you seen this document before?

```
 1              RAY - HIGHLY CONFIDENTIAL
 2              MR. ROSENTHAL:  I'm going to just
 3         instruct the witness, that for all
 4         questions, when you're asked about seeing
 5         documents in the past, that he exclude
 6         anything he has seen in connection with
 7         the preparation for this deposition.
 8         Q.    Let me take on board your counsel's
 9    direction.  I'm not asking you, at the moment,
10    whether you were prepared with this document,
11    sat down and reviewed the document.
12              I'm asking you, prior to your
13    preparation for the deposition, have you seen
14    Ray Exhibit 2 before?
15              MR. ROSENTHAL:  Could he just have
16         that instruction for all questions, unless
17         you say otherwise?
18              MR. PULTMAN:  Happy to have that as
19         a standing direction.
20         A.    I may have.  I can't be certain.  I
21    don't have a specific recollection of it,
22    but...
23         Q.    Did you attend a meeting on July 15,
24    2014, at the offices of Cleary Gottlieb with
25    respect to a PPI settlement discussion?
```

1                 RAY - HIGHLY CONFIDENTIAL

2          A.     Yes.

3          Q.     And in advance of that meeting, did

4     you look at a draft term sheet in connection

5     with the settlement discussion you were going

6     to have?

7          A.     Yes.

8          Q.     Does this appear to be that draft

9     term sheet that you reviewed?

10         A.     I believe I had indicated, I don't

11    recall whether this was the specific document

12    that I had looked at in advance of that

13    meeting.

14         Q.     Did you look at a term sheet that

15    was drafted by someone other than the Milbank

16    firm prior to that meeting?

17         A.     No.

18         Q.     Did your lawyers draft any term

19    sheets prior to the July 15 meeting?

20         A.     No.

21         Q.     How did you come to learn of the

22    July 15 meeting?

23         A.     Dennis Dunne from Milbank and I

24    talked prior to the meeting to essentially set

25    the meeting up for that Tuesday.

```
 1              RAY - HIGHLY CONFIDENTIAL
 2      Q.    Dennis Dunne is a lawyer at Milbank?
 3      A.    Yes, he is.
 4      Q.    And who did Dennis Dunne represent?
 5      A.    He represents the bondholders.
 6      Q.    Did you know Dennis Dunne prior to
 7  this conversation that you had with him?
 8      A.    Yes.
 9      Q.    From where?
10            MR. ROSENTHAL:  Objection to form.
11            You can answer.
12      A.    From this case.
13      Q.    Did you know Dennis Dunne at Milbank
14  from any other case prior to the Nortel matter?
15      A.    Yes.  He was also involved in the
16  OSG matter where I was the CRO, and he has been
17  involved in other cases.
18      Q.    When did you first become acquainted
19  with Mr. Dunne?
20      A.    December 1999.
21      Q.    So that's almost 15 years ago?
22      A.    Correct.
23      Q.    And the OSG case you referred to, is
24  that the Overseas Shipholding Group case?
25      A.    Yes, it is.
```

1                  RAY - HIGHLY CONFIDENTIAL

2          Q.     And that's the one where you're the

3     chief restructuring officer?

4          A.     Not presently.

5          Q.     You were previously the chief

6     restructuring officer for OSG?

7          A.     Correct.

8          Q.     And you still have some role with

9     respect to the OSG bankruptcy?

10         A.     Correct.

11         Q.     And Mr. Dunne's role with respect to

12    that bankruptcy is what?

13         A.     Mr. Dunne represented the agent for

14    the pre-petition bank group.

15         Q.     Fifteen years ago, when you first

16    met Mr. Dunne, in what context was that?

17         A.     In connection with the Fruit of the

18    Loom Chapter 11 case.

19         Q.     And Fruit of the Loom is where you

20    were general counsel and held other positions

21    previously?

22         A.     That's correct.

23         Q.     And what was Mr. Dunne's connection

24    with the Fruit of the Loom matter?

25         A.     Debtors' counsel.

```
 1                RAY - HIGHLY CONFIDENTIAL
 2        Q.    You said that there were others.
 3               Are there others that you can
 4   remember sitting here today?
 5        A.    Yes, Enron.
 6        Q.    And you had a role in the Enron
 7   bankruptcy?
 8        A.    Yes, I did.
 9        Q.    And what was Mr. Dunne's role in the
10   Enron bankruptcy?
11        A.    He was counsel for the creditors
12   committee.
13        Q.    Any other cases that you had
14   interactions with Mr. Dunne?
15        A.    Not that I can recall.
16        Q.    Are you familiar with a matter
17   called -- let me withdraw that.
18               Did you reach out to Mr. Dunne or
19   did Mr. Dunne reach out to you in this first
20   conversation?
21               MR. ROSENTHAL:  Objection to form.
22        A.    I don't recall if -- who reached out
23   to whom, and I don't recall whether or not it
24   was specifically about this matter or another
25   matter or a different topic within this matter.
```

```
 1                RAY - HIGHLY CONFIDENTIAL
 2        Q.    Are you familiar with a matter
 3   called ACB?
 4        A.    No.
 5        Q.    At the time that you had a
 6   conversation with Mr. Dunne, was counsel for
 7   NNI on the phone?
 8        A.    The initial call, no.  No counsel
 9   was involved.
10        Q.    Do you know whether Mr. Dunne sought
11   agreement of your counsel to have a
12   conversation with you even though you were
13   represented by counsel?
14        A.    I don't know.
15        Q.    Are you familiar with the
16   disciplinary rules in New York, Disciplinary
17   Rule 4.2?
18             MS. MILLER:  Objection.
19        A.    No, I am not.
20        Q.    At any point in time, did Mr. Dunne
21   seek permission of your -- of you or your
22   counsel to have a communication with someone
23   represented by counsel?
24             MS. MILLER:  Objection.
25        A.    I don't know whether he communicated
```

1              RAY - HIGHLY CONFIDENTIAL

2    with counsel.  Had he communicated to me, I

3    would have consented to it.

4         Q.    The conversation you had with

5    Mr. Dunne setting up the meeting on the 15th of

6    July, can you describe that conversation to the

7    best of your recollection sitting here today?

8         A.    Yes, he asked if -- if Cleary and I

9    would be available for a meeting on Tuesday,

10   the 15th, or either Monday or Tuesday, the 14th

11   or 15th, to discuss a proposal related to the

12   settlement of the PPI dispute.  And the entire

13   conversation, it was very brief, and it was

14   really more or less around the mechanics,

15   meeting location.  So just mostly a logistical

16   call.

17        Q.    Can you estimate the length of the

18   call?

19        A.    It couldn't have been more than five

20   minutes, ten minutes, maybe.  Maybe.  I don't

21   know.

22        Q.    Was there any discussion of the

23   substance of the PPI dispute?

24        A.    No.

25        Q.    Was there any discussion of the

1              RAY - HIGHLY CONFIDENTIAL

2     status of the PPI matter before the Canadian

3     and US courts?

4          A.    No.

5          Q.    Was there anyone else on the phone

6     besides you and Mr. Dunne?

7          A.    No.

8          Q.    Did he place the call or did you

9     place the call?

10              MR. ROSENTHAL:  Objection to form.

11         A.    I don't recall.  I thought I said

12    that I didn't recall who called whom, and

13    whether it was about this matter or some other

14    matter or a different matter within this

15    matter.  I think I said that, didn't I?

16         Q.    I think you may have.  My apologies.

17              Were you an a cell phone or a

18    landline?

19         A.    I don't recall.

20         Q.    Was Mr. Dunne on a cell phone or a

21    landline?

22         A.    I don't know.

23         Q.    Now, the meeting that took place on

24    the 15th of July at Cleary Gottlieb -- did that

25    take place at Cleary Gottlieb's offices?

HIGHLY CONFIDENTIAL

```
1                RAY - HIGHLY CONFIDENTIAL
2         A.    Yes.
3         Q.    And who attended on behalf of NNI?
4         A.    Lisa Schweitzer.  There may have
5    been other lawyers at Cleary, but I don't
6    recall.  And then Lisa had invited Mike Kennedy
7    to the meeting.
8         Q.    Were you in attendance at the
9    meeting as well?
10        A.    Yes.
11        Q.    Anyone else on the NNI side?
12        A.    No.
13        Q.    Was Mr. Dunne in attendance at the
14   meeting?
15        A.    Yes, he was.
16        Q.    And was he the only one from the
17   Milbank firm in attendance?
18        A.    No.  There were two others, Andrew
19   Leblanc and Albert Pisa.
20        Q.    Did you know Mr. Leblanc prior to
21   this meeting?
22        A.    Yes.
23        Q.    Did you mow Mr. Pisa prior to this
24   meeting?
25        A.    Yes.
```

HIGHLY CONFIDENTIAL                    31

```
1                   RAY - HIGHLY CONFIDENTIAL
2          Q.    Did you communicate with either one
3    of them prior to this meeting?
4                 MR. ROSENTHAL:  Objection to form.
5          About PPI?
6          Q.    About the PPI matter.
7          A.    No.
8          Q.    Did you know Mr. Pisa from other
9    matters?
10         A.    No.  I knew him from NNI.
11         Q.    And did you know Mr. Leblanc from
12   other matters prior to Nortel?
13         A.    No, I did not.
14         Q.    Anyone else there from the Milbank
15   firm?
16         A.    No.
17         Q.    Anyone else there on behalf of the
18   bonds?
19         A.    Yes, Mike Katzenstein from FTI.
20         Q.    And just so we're clear,
21   Mr. Katzenstein is at an outside financial
22   consulting group?
23         A.    He is with the FTI.
24         Q.    And FTI works with the bonds?
25         A.    I believe they're the financial
```

```
 1                RAY - HIGHLY CONFIDENTIAL
 2  consultant to Milbank.
 3        Q.    Okay.  Anyone else there for the
 4  bonds?
 5        A.    I believe Melker Sandberg from FTI
 6  was there as well.
 7        Q.    And his last name, Sandor?
 8        A.    Sandberg.
 9        Q.    Sandberg.
10              Anyone else there for the bonds?
11        A.    I believe that was the attendance
12  list.  I don't think there was anyone else.
13        Q.    When you say that was the attendance
14  list, was there no one else at the meeting at
15  all?
16        A.    I don't think so.  I don't think so.
17        Q.    Do you recall what time of day the
18  meeting took place?
19        A.    I would say it was somewhere around
20  noon or 1 o'clock in the afternoon.
21        Q.    How long did the meeting last?
22        A.    I believe it lasted the balance of
23  the day.
24        Q.    Can you estimate the number of
25  hours?
```

```
 1            RAY - HIGHLY CONFIDENTIAL
 2       A.     I think we were probably done by
 3   5 o'clock, but I can't be certain.  It may have
 4   been a little longer.
 5       Q.     Okay.  To the best of your
 6   recollection, can you describe what was said at
 7   the meeting?
 8       A.     Yes.  There was a desire on their
 9   part to, on behalf of the bonds, to settle, to
10   allow their claim amount, which was previously
11   not allowed, meaning the exact amount of the
12   claim had not been set or established.  So they
13   were seeking to set the amount of the claim,
14   and they also desired to settle the dispute as
15   to how much in PPI that they were entitled to.
16            That was the beginning of the
17   meeting.  And they put a demand, if you will,
18   on the table related to the amount of the PPI
19   entitlement.
20            I don't recall discussing at great
21   length the amount of the actual pre-petition
22   balance, but that was largely a number that,
23   you know, within a range people had an
24   understanding about.  The conversation centered
25   mostly on the PPI amount, and they put a demand
```

HIGHLY CONFIDENTIAL                        34

1                  RAY - HIGHLY CONFIDENTIAL

2     on the table orally.  It was not in the term

3     sheet related to what they were entitled to.

4          Q.    Did they put a demand on the table

5     with respect to the claim that they sought to

6     have as an allowed claim?

7          A.    I believe they -- yes, they did.

8     They told us what that allowed claim was.  I

9     think we left it for discussion, a subsequent

10    discussion, as I recall, so that we could, you

11    know, compare that to our number and -- but it

12    wasn't -- it wasn't a complete focus of the

13    meeting.  The meeting mostly centered on the

14    amount of the claim.

15         Q.    So let's start with what did they

16    express to you as their demand on the allowed

17    claim?

18         A.    They asked for 70 percent of the

19    estimated PPI balance, you know, as of June 30,

20    an approximate amount.

21         Q.    And was there any discussion as to

22    what 70 percent -- 70 percent of what?

23         A.    Yes.  The amount that was estimated

24    was -- was the same amount as the monitor had

25    been using, 1.6 billion.

```
 1              RAY - HIGHLY CONFIDENTIAL
 2      Q.    Is that 1.6 or is it 1.65?
 3      A.    There may have been -- that's just a
 4  rounded number.  There was an amount in excess
 5  of a billion six.  Whether that was a few
 6  hundred thousand or half a million dollars, I
 7  don't quite recall, but it was over a billion
 8  six.
 9      Q.    And did NNI have a response to their
10  proposal or their demand?
11      A.    Well, we -- we did have a response,
12  ultimately.  I broke in the meeting, and we had
13  a separate break-out room, and I discussed with
14  counsel and, also the financial advisor,
15  Chilmark, Mike Kennedy, the potential
16  counteroffer.
17      Q.    Did you make a counteroffer?
18      A.    We did.  We counteroffered at
19  30 percent of the $1.6 billion amount.
20      Q.    So if I understand it, their demand
21  was 70 percent.  Your response was 30 percent?
22      A.    Yes.
23      Q.    And that counteroffer was
24  communicated at the meeting?
25      A.    Yes, it was.  We went back into the
```

HIGHLY CONFIDENTIAL                    36

1                RAY - HIGHLY CONFIDENTIAL

2   room and communicated our counteroffer.

3        Q.    Okay.  Was that the end of the

4   meeting or were there continued discussions

5   after that?

6        A.    There were continued discussions.

7   They took some time to discuss it amongst

8   themselves, and then came back and there was

9   further negotiation, you know, back and forth,

10  ultimately, over a, you know, the time period

11  that afternoon.  And then, ultimately, the

12  meeting broke up without resolution.

13       Q.    Can you tell me what the back and

14  forth was after the 70 percent demand, the

15  30 percent counteroffer?

16       A.    Yes.  As I recall, and I may miss an

17  iteration in here on the back and forth, but I

18  think their counteroffer was a number that was

19  60 or above.  We moved to a number that was 40

20  or above.

21            There was discussions about trying

22  to close the gap, but as I recall, we didn't

23  achieve it, you know, at that meeting.

24       Q.    Was there any discussion in the

25  communications between the bonds and NNI about

1                RAY - HIGHLY CONFIDENTIAL

2    the status of the PPI dispute in front of the

3    court in Wilmington?

4         A.    Well, at that meeting, I mean, there

5    was discussions about why the bonds felt they

6    were entitled to the full contractual amount of

7    PPI to support their demand.

8         Q.    Was there any response by NNI as to

9    what NNI believed was likely to occur?

10        A.    There was discussions by the group

11   about the various positions that had been taken

12   in the briefing on PPI.  There were discussions

13   about the monitor's and the Canadian debtors'

14   position relative to PPI, and the other

15   briefings that were done, certainly, and,

16   basically, in effect, being the range of, you

17   know, potential outcomes in both the

18   entitlement and the amount of PPI.

19        Q.    And can you tell me, to the best of

20   your recollection, what was said with respect

21   to the potential outcomes?

22        A.    There was discussion about the bonds

23   indicated that they felt firmly in their view,

24   both as to the entitlement and the amount of

25   the PPI which, you know, at that point, was

1              RAY - HIGHLY CONFIDENTIAL

2    continuing to grow as, you know, as accruals

3    continued.

4              And, you know, we simply, you know,

5    discussed, you know, the positions taken by,

6    you know, by other parties that were in the

7    papers with mostly the Canadian debtors and the

8    monitor, you know, as well as other entrusted

9    parties that had filed papers, and was more or

10   less a dialogue around those positions.

11        Q.    Other than communicating what the

12   position was that was expressed by the Canadian

13   monitor and the Canadian debtors, did you

14   express the view that you thought the bonds

15   were going to get less than 100 percent?

16        A.    First of all, I think you can kind

17   of split this discussion into kind of two

18   pieces.  I believe that there was entitlement

19   to post-petition interest.  So, in my mind,

20   that was not really a debate.

21             I believe that the entitlement was

22   there.  I think the contracts provided for

23   interest.  I believed that the -- in Chapter

24   11, if a debtor was solvent, that post-petition

25   interest was payable.  So there was not much of

**HIGHLY CONFIDENTIAL**                          39

1                  RAY - HIGHLY CONFIDENTIAL

2    a debate in my mind around that view.  I had

3    taken a view that that was the correct point of

4    view from a Chapter 11 perspective.

5                    There was discussions about, you

6    know, whether or not parties might be

7    successful in arguing for a lesser amount that

8    people were then entitled to.  And while I

9    didn't necessarily have the view that the court

10   would -- in the US would find an amount less

11   than the full entitlement, certainly, there

12   were opposing positions taken and, you know, I

13   guess I considered that -- that you had to give

14   some weight of authority to those positions, so

15   that, you know, the outcome, ultimately, was

16   not something that was really possible to be

17   determined absent, you know, ultimately, a

18   court ruling and presumably appeals that might

19   follow.

20        Q.    And when you said that I believe

21   there's an entitlement under the contract, did

22   you analyze the US law with respect to that

23   entitlement?

24                  MR. ROSENTHAL:  Objection to form.

25                  Are you asking did he personally or

```
 1              RAY - HIGHLY CONFIDENTIAL
 2        did he receive advice?
 3        Q.    No.  Did you personally?  I'm not
 4   asking what advice you received.
 5        A.    No, not personally, no.
 6        Q.    But you had a view as to the
 7   entitlement?
 8        A.    Yes.
 9        Q.    And is it fair to say NNI never
10   expressed that view to the court as to what the
11   entitlement would be of the bonds to contract
12   rate PPI?
13        A.    Are you asking, did NNI submit a
14   position paper to the court related to NNI?
15        Q.    Well, let's divide it between the
16   procedure as to when the issue should be heard,
17   and what position NNI took with respect to
18   that.
19        A.    I don't recall what was said or not
20   said in front of the US court related to that
21   issue.
22        Q.    Do you know whether or not NNI has
23   taken a position as to the bond's entitlement
24   to PPI?
25              MR. ROSENTHAL:  In court, or you're
```

```
1                RAY - HIGHLY CONFIDENTIAL
2        not talking about in court anymore?
3        Q.    I'm talking about in court.  Do you
4    know what position NNI has taken with the
5    bankruptcy court in Delaware as to the bond's
6    entitlement of PPI?
7                MR. ROSENTHAL:  Objection to form.
8                You can answer.
9        A.    I don't believe we have taken a
10   position until the settlement.
11       Q.    Well, in the settlement, is it your
12   understanding that NNI has taken the position
13   as to the bond's legal entitlement to the
14   contract rate PPI?
15       A.    Yes, I believe that is our position.
16       Q.    And is it your position that you
17   have expressed to the bankruptcy court that the
18   bonds are entitled to NNI -- the PPI at the
19   contract rate?
20                MR. ROSENTHAL:  Objection, asked and
21        answered.
22       A.    The settlement embodies what we
23   believe is entitlement to PPI.  The amount is a
24   settled amount, not at the contract rate.
25       Q.    Just so I'm clear, that's the
```

1              RAY - HIGHLY CONFIDENTIAL

2    settled amount that goes up to the cap of

3    $1.01 billion?

4         A.    It starts at 847 million.

5         Q.    When you say it starts at

6    $847 million, under the proposed settlement

7    agreement, when does that start at

8    $847 million?

9              MR. ROSENTHAL:  Objection to form.

10             You can answer.

11        A.    There is an ability to continue to

12   accrue interest from the date of settlement or

13   the date of approval of the court order.  I

14   would have to go back and read it, but it's

15   ultimately capped out at June 15, 2015.

16             However, the accrual only occurs

17   with respect to undistributed amounts prior to

18   that date.

19             So if the full amount of principal

20   was not distributed to the bonds prior to

21   June 15 of 2015, then the accrual would occur

22   on the full balance until such date, at which

23   point the accrual would cease.

24        Q.    Let's take that in pieces.  Is it

25   possible that the actual date is June 30, 2015?

1                  RAY - HIGHLY CONFIDENTIAL

2          A.     Yes, it could be.

3          Q.     On the day of the filing of the

4    motion that's been marked as Ray Exhibit 1,

5    July 24, 2014, if you calculated that accrued

6    interest, was it a number already in excess of

7    $847 million?

8                  MR. ROSENTHAL:  Objection to form.

9          A.     I don't recall.

10         Q.     Well, do you recall when the accrual

11   of interest began under the settlement

12   agreement?

13         A.     I would have to -- I would have to

14   go back and figure out the -- the number.

15         Q.     Is it fair to say that NNI sought to

16   have a hearing on the proposed 9019 motion, the

17   proposed settlement motion on September 15,

18   2014?

19         A.     I believe so.  I believe that's the

20   date we requested initially, yes.

21                MR. ROSENTHAL:  Today, coincidently.

22         Q.     And is it correct to say that, under

23   the settlement agreement that was proposed,

24   with the accrual of interest, the amount of the

25   settled PPI interest, if the decision had come

**HIGHLY CONFIDENTIAL**                           44

1                    RAY - HIGHLY CONFIDENTIAL

2     down today, would be in excess of $904 million?

3          A.    I have not done that math myself.

4          Q.    Is it fair to say that if the date

5     that the hearing is currently scheduled,

6     November 4, 2014, it's approved -- if the

7     proposed settlement agreement is approved that

8     day, the settlement amount, and paid that day,

9     will be in excess of 922 and a half million

10    dollars?

11         A.    I'd have to go back and do that

12    calculation.

13         Q.    Do you have any reason to believe

14    that those numbers are inaccurate?

15         A.    I have no reason to believe they are

16    accurate or inaccurate.

17         Q.    In the discussions at the offices of

18    Cleary Gottlieb on the 15th of July --

19         A.    Uh-huh.

20         Q.    -- how were things left?

21               MR. ROSENTHAL:  You're referring to

22         discussions with the bonds specifically?

23         Q.    Bonds specifically, yes.

24               MR. PULTMAN:  Thank you.

25         A.    It was just left that both sides

HIGHLY CONFIDENTIAL                           45

```
 1              RAY - HIGHLY CONFIDENTIAL
 2    would think about it, discuss it with
 3    themselves, and I believe that there was a --
 4    we would look at the draft term sheet, and I
 5    think we were going to go back and redraft or
 6    make our comments on the term sheet, and that's
 7    how it was left.
 8         Q.    To your knowledge, were comments on
 9    the term sheet ever communicated to Milbank?
10         A.    Yes, there would have been.  I mean,
11    there was an exchange of drafts and black
12    lines, two or three versions that went back and
13    forth, and I don't recall -- I think Cleary may
14    have generated one, and I think Milbank
15    generated one or two.  I don't remember, you
16    know, what the order of that was as I sit here,
17    you know, two months later, but there was a few
18    drafts.
19         Q.    And when you say a few drafts,
20    you're referring to specifically drafts of a
21    term sheet?
22         A.    Either a term sheet or -- I don't
23    want to get hung up in terminology, if there's
24    some trick to that, but whether it's a term
25    sheet, a document which embodied the
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2    settlement, a draft settlement agreement, you
 3    know, I don't -- I don't want to get too cute
 4    with the words.
 5         Q.    There's no trick to the language.
 6    We've only been provided with the July 15 term
 7    sheet, when it comes to term sheets.  So if
 8    there are other draft term sheets that you
 9    recall, I would like to know that, so I can
10    make the request.
11         A.    There would have been a couple
12    drafts of a term sheet with markups.  I think
13    it's the same term sheet, but...
14         Q.    Okay.  After the meeting on the
15    15th, what were the next communications that
16    you had with anyone on the bond side?
17         A.    I don't recall, you know, the dates
18    specifically.  There were conversations that --
19    that I would have had with Dennis Dunne after
20    the meeting.  There were conversations that --
21    I think there was at least -- I believe one
22    phone call that they had multiple people on the
23    call.  It could have been Dennis Dunne, Andy
24    Leblanc, Al Pisa.  I didn't take record
25    necessarily of everybody on the call, but I
```

```
1              RAY - HIGHLY CONFIDENTIAL
2    think we had a group call, and I would have had
3    counsel for the company on the call.
4         Q.    Do you recall when that conversation
5    took place?
6         A.    No, I don't have a recollection.  It
7    would have been sometime between July 14 and
8    ultimately the 23rd, when the settlement was
9    finalized.
10        Q.    Okay.  But let's see if we can drill
11   down on that.
12              You told us about a meeting on the
13   15th at Cleary's offices, which was a Tuesday.
14              Do you recall that?
15        A.    Yes.
16              MR. PULTMAN:  I'm going to have
17        marked, as Ray Exhibit 3, a document, an
18        e-mail and draft settlement agreement
19        regarding PPI bearing Bates numbers
20        BHG-PPI-0000153 through 164.
21              (Ray Exhibit 3, E-Mail with Draft
22        Settlement Agreement, Bates Stamped
23        BHG-PPI-0000153 through 164, marked for
24        identification.)
25        A.    (Perusing.)
```

1                  RAY - HIGHLY CONFIDENTIAL

2         Q.    Have you had an opportunity to

3    review the document we have marked as Ray

4    Exhibit 3?

5         A.    Yes.

6         Q.    Have you seen this document before?

7         A.    Yes.

8         Q.    Can you tell me when you first saw

9    this document?

10        A.    It would presumably either have been

11   the 17th or the 18th.

12        Q.    Is this the first draft of a

13   settlement agreement of the PPI matter that was

14   exchanged, to your knowledge?

15        A.    I believe so.

16        Q.    Were there other term sheets that

17   led up to the drafting of this draft settlement

18   agreement?

19        A.    Other than the summary of indicative

20   terms that you provided, I think this was the

21   only -- this was the next thing, I believe,

22   that followed.

23        Q.    And when you say summary of

24   indicative terms, you're referring to Ray

25   Exhibit 2?

1                    RAY - HIGHLY CONFIDENTIAL

2          A.    Yes.

3          Q.    Which is the term sheet that came

4    around on Monday, the 14th?

5          A.    It came to Lisa Schweitzer on the

6    14th, yes.

7          Q.    And then you had the meeting on the

8    15th?

9          A.    Yes.

10         Q.    And the first -- the next document

11   to come to be exchanged was the draft agreement

12   on the 17th?

13         A.    I believe so, yes.

14         Q.    How did the numbers in Sections 2.1

15   and 2.2 come to be in this draft agreement?

16              MR. ROSENTHAL:  Objection to form.

17         Q.    Let's take 2.2.  Do you see the

18   provision 2.2 that says, "The PPI settlement

19   amount shall be an amount up to 60 percent of

20   the aggregate amount of accrued PPI"?

21         A.    Yes.

22         Q.    And how did that 60 percent come to

23   be in this draft, to your knowledge?

24              MR. ROSENTHAL:  Objection to form.

25         A.    It was put in the document by the

1                RAY - HIGHLY CONFIDENTIAL

2    author of the document.

3         Q.    Did you have any conversations with

4    the folks at Milbank about the numbers after

5    the meeting on the 15th, prior to receipt of

6    this on the 17th?

7         A.    I don't recall specifically when,

8    you know, I had calls.  I'm probably certain I

9    probably had a call between the sit-down

10   meeting and when this draft was produced, but

11   this number is consistent with the demand they

12   made on Tuesday, the 15th.  It's the

13   60 percent.

14        Q.    And when you say consistent with

15   demand, you're referring to the last demand

16   that came from the bond side at the meeting on

17   the 15th?

18        A.    Yes.

19        Q.    And if I recall correctly, you said

20   that the last number that was offered by NNI at

21   that meeting was something in the order of

22   40 percent or above?

23        A.    Yeah.  I don't recall whether we had

24   moved, at that meeting, above the 40 percent.

25   We may have moved up at that meeting to as high

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   as a number, you know, that approximated 50
 3   during that meeting, but I don't -- I don't
 4   recall whether it was at that meeting or
 5   whether it was the subsequent calls that we may
 6   have had.
 7        Q.    Is it fair to say, at some point in
 8   time, NNI moved its number up from the
 9   40 percent and above number to 50 percent and
10   above?
11        A.    It's fair to say that because that's
12   ultimately where we ended up, is north of that.
13   I don't recall exactly what point in the
14   negotiations we did that relative to time or
15   date specific, but at that time of this
16   document, we had not agreed to a number.
17        Q.    What led NNI to move off of the
18   40 percent number that it was at, at the
19   meeting on Tuesday, the 15th?
20        A.    Ultimately, you know, we thought
21   that a number that was around 60 percent, we
22   thought, you know, was a fair settlement of it.
23   You know, we thought 70 was too high.
24              So our negotiating, you know,
25   strategy was to, you know, counteroffer with a
```

HIGHLY CONFIDENTIAL                    52

1            RAY - HIGHLY CONFIDENTIAL

2    much lower number, so that we could end up at a

3    number that we felt comfortable with, and so

4    that was just part of a back and forth, but,

5    ultimately, you know, based on the movement

6    down to 60, we felt comfortable we could get to

7    a spot that was -- was something that was

8    acceptable to us and, therefore, didn't have a

9    problem moving up to -- to 50.

10         Q.    You said, I believe, "Ultimately,

11   you know, we thought that a number that was

12   around 60 percent, we thought, you know, was a

13   fair settlement."

14              Is that what you said?

15         A.    Yes.

16              MR. ROSENTHAL:  Objection, speaks

17        for itself.

18              You have the transcript in front of

19        you.  He doesn't.  You don't need to ask

20        him what the transcript says.

21         Q.    I want to make sure it's not

22   mistranscribed and that, in fact, you said that

23   you thought 60 percent was a fair settlement in

24   your view.

25         A.    We thought a number that was

1              RAY - HIGHLY CONFIDENTIAL

2    approximately 60 percent was a fair settlement.

3         Q.    Now, the number 60 percent of

4    1.65 billion, did you have an understanding as

5    to what that yields?

6              MR. ROSENTHAL:  Objection to form.

7         A.    I could do the math.  I think this

8    document indicates that it would have yielded

9    990, so that sounds right from looking at the

10   math.

11        Q.    And the 990 million that is

12   60 percent of the $1.65 billion number, in the

13   negotiation, did that include all of the series

14   of bonds at this juncture on the 17th?

15        A.    Yes, it did.

16        Q.    At some point in time, did that

17   change?

18        A.    It did.

19        Q.    The next day, on the 18th, I'm going

20   to show you a document that we'll mark as Ray

21   Exhibit 4, which is another draft settlement

22   agreement.

23              To your knowledge, how was it left

24   after you reviewed this draft agreement?  Did

25   you have further conversations with Milbank?

1              RAY - HIGHLY CONFIDENTIAL

2              MR. ROSENTHAL:  Objection to form.

3         A.    I don't recall whether I had

4    conversations with Milbank or whether I had

5    conversations with Cleary, who may have spoken

6    to Milbank.  I'm sorry.  I just can't get that

7    granular on the time of day.

8         Q.    Okay.  We will mark this as Ray

9    Exhibit 4, and see if this can refresh your

10   recollection.

11             MR. PULTMAN:  For the record, the

12        document bears Bates numbers

13        BHG-PPI-0000116 through 147.

14             (Ray Exhibit 4, E-Mail with Draft

15        PPI Settlement Agreement, Bates Stamped

16        BHG-PPI-0000116 through 147, marked for

17        identification.)

18        A.    (Perusing.)

19        Q.    And just for the record, Mr. Ray,

20   while you review the document, the cover e-mail

21   goes from a Jennifer Harris, at Milbank, to

22   Lisa M. Schweitzer, with a group of CCs, and it

23   indicates, "Lisa, enclosed please find a

24   revised draft of the PPI settlement agreement,

25   clean and blacklined against the version sent

1              RAY - HIGHLY CONFIDENTIAL

2    to you yesterday."  It goes on from there.

3         A.    (Perusing.)  Okay.

4         Q.    Have you seen this document before?

5         A.    Yes.

6         Q.    When did you first see it?

7         A.    It may have been the 18th.  It may

8    have been as early as the 19th, because I know

9    I was traveling the afternoon of the 18th.

10        Q.    And when you say you were traveling,

11   where were you traveling from, where were you

12   traveling to?

13        A.    On a train from the great city of

14   Wilmington, Delaware, to New York City.

15        Q.    Did you have conversations with

16   anyone at Milbank that led to the revised

17   number that is contained in Section 2.2 of this

18   agreement?

19              MR. ROSENTHAL:  Objection to form.

20              You can answer.

21        A.    Yes.  I mean, whether I did it or at

22   my direction, counsel communicated to Milbank,

23   sometime between the initial draft and this

24   current draft, we told them that the 60 percent

25   was -- was still not acceptable, and we wanted

1              RAY - HIGHLY CONFIDENTIAL

2    a lower number, and while I don't think we

3    specified 55 percent, that's ultimately what

4    they came back with, as I recall.

5         Q.    And, Mr. Ray, I misspoke.  I said it

6    was in Section 2.2.  It's actually in Section

7    2.3 of the document.

8         A.    Yes, I see that.

9         Q.    Sitting here today, do you have a

10   recollection as to how the number, 55 percent,

11   was arrived at?

12        A.    It was 60 less -- five points less

13   than 60.  We told them 60 was unacceptable, and

14   they came back to try to move the number closer

15   to our number, and at the time, as I recall, we

16   were at 50, and this was, for them, an attempt

17   to sort of meet -- reach, you know, a

18   resolution down the middle, if you will, at the

19   then current points in the negotiation, as I

20   recall.

21        Q.    Okay.  And to your knowledge, the

22   55 percent of the 1.65 billion, did it yield a

23   907 and a half million dollar number?

24        A.    I believe that's right.

25        Q.    And is that reflected anywhere in

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   this document?
 3        A.    It's in 2.3.2.
 4        Q.    Were there further conversations
 5   over the weekend of the 19th and the 20th
 6   concerning the overall number?
 7        A.    At some point, and I don't recall
 8   whether it was that weekend or whether that was
 9   the subsequent Monday or later, but at some
10   point, there was a -- some negotiation and
11   communication around, you know, effectively, a
12   few other sort of demands that NNI had related
13   to the amount, including we wanted to make sure
14   that there would be no other contractual asks
15   related to the amount.
16              So, if someone, for example, had a
17   make-whole argument or some other argument to a
18   contractual entitlement, we wanted those
19   arguments, in effect, those entitlements, if
20   you will, to be embodied in the agreed-upon
21   number.
22              And we also wanted to have that as
23   an absolute cap.  In other words, the interest
24   would not, you know, continue to accrue.  And I
25   think it would have come up, in the first
```

1              RAY - HIGHLY CONFIDENTIAL

2    instance, out of this draft, and materialized

3    over the period from the 18th to the, you know,

4    to the 23rd.  And I don't recall, you know,

5    exactly, you know, how many calls it took to

6    get to that level, and who communicated them,

7    but there was a communication by NNI that these

8    were additional needs that we had in order to

9    get closer to a resolution.

10         Q.    Let me ask you about the addition of

11   Section 2.2, which relates to NNCC in Section

12   2.1, which refers to NNCC and the holders of

13   the 7.875 percent notes.

14              Do you see that?

15         A.    Yes.

16         Q.    How did that come to be added to

17   this draft?

18         A.    As I understand it, Milbank inserted

19   this to address the peculiarities of the NNCC

20   bonds.

21         Q.    And when you say the peculiarities

22   of the bonds, what are you referring to?

23         A.    Well, just that I think it's quite

24   articulated in the NNCC papers, their

25   entitlement to full, you know, principal amount

```
 1            RAY - HIGHLY CONFIDENTIAL
 2   of their claim plus PPI.  I can't restate it
 3   better than the position that's embodied in
 4   their pleadings, but they take a view that the
 5   NNCC bonds are entitled to be paid in full
 6   before any PPI could be paid, and I think this
 7   was some attempt to address the PPI for the
 8   NNCC bonds.
 9            I didn't, you know, discuss this
10   particular provision, but this is what I
11   understood from my conversations with -- with
12   Cleary about how this paragraph arose in the
13   document and why.
14       Q.    You also made reference to something
15   called a make-whole argument.
16            What were you referring to there?
17       A.    That just the contractual right of
18   bonds that have certain provisions in them
19   which require that, on any payment of the
20   bonds, that they're entitled to the full
21   benefits which they bargained for over the life
22   of that issue.
23            So any prepayment, if you will, that
24   reduces the amount that they otherwise would
25   have been paid had the bond existed until its
```

HIGHLY CONFIDENTIAL                                    60

```
 1            RAY - HIGHLY CONFIDENTIAL
 2   maturity, that the bonds would have to forego
 3   any sort of arguments that they might be
 4   entitled to those kind -- which are sort of
 5   interest arguments in a way, but they're also
 6   arguments to premiums or payments that would be
 7   required as a result of early payment of a
 8   bond, for example.
 9        Q.    Prior to the weekend of the 19th of
10   July, had you communicated the existence of
11   these negotiations to any other creditors of
12   NNI?
13        A.    I had not, no.
14        Q.    To your knowledge, had the existence
15   of those -- of these settlement communications
16   been communicated to any other creditors?
17        A.    By anyone?
18        Q.    Yeah, to your knowledge.
19        A.    I don't know exactly.  At some
20   point, I believe Milbank and/or Cleary
21   communicated with -- with Akin Gump.  I don't
22   specifically know when they did that.
23            MR. PULTMAN:  Would now be an
24        appropriate time to take a break?
25            MR. ROSENTHAL:  Sure.
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2              THE VIDEOGRAPHER:  We are now off
 3        the record.  The time is 2:18 p.m.,
 4        September 15, 2014.
 5              (Recess taken.)
 6              THE VIDEOGRAPHER:  This is tape two
 7        of the deposition of Mr. John Ray.  We are
 8        now back on the record.  The time is
 9        2:40 p.m., September 15, 2014.
10   BY MR. PULTMAN:
11        Q.    Mr. Ray, did you want to clarify
12   something on the record?
13        A.    Yes, I did.  Seeing Mr. Abbott walk
14   in reminded me, when you were asking about NNI
15   counsel being involved, and I was remiss in not
16   mentioning that that also included Mr. Abbott's
17   firm.
18        Q.    Is that the Akin Gump firm?
19        A.    Mr. Abbott's firm here.
20        Q.    I thought you were talking about
21   Mr. Qureshi.
22        A.    No.
23        Q.    Thank you for clarifying.
24              MR. ROSENTHAL:  We don't call him
25        Mr. Abbott.
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2        A.    We have another word for him.
 3              Derek Abbott was also on several
 4   calls we had.
 5        Q.    Anything else that you want to
 6   clarify?
 7        A.    No, that's it.
 8        Q.    Now, earlier, we were talking about
 9   whether you had had communications with other
10   creditors prior to the weekend of the 19th and
11   20th of July.
12              Do you recall that discussion?
13        A.    Yes, I did.
14        Q.    I'm going to show you a document
15   that we'll mark as Ray Exhibit 5, which bears
16   Bates numbers NNI-PPI0000306 through 321.
17              (Ray Exhibit 5, E-Mail, Bates
18        Stamped NNI-PPI0000306 through 321, marked
19        for identification.)
20        Q.    And while you're reviewing the
21   document, Mr. Ray, for the record, I will
22   indicate it's a cover e-mail from
23   Ms. Schweitzer on Saturday, July 19th, 2014, to
24   a Mr. Hodara at Akin Gump, a D. Botter at Akin
25   Gump, and it appears to cc a J.R. Avidity at
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2    Earthlink.net.
 3              Have you seen this document before?
 4        A.    Yes.
 5        Q.    And is the e-mail address that's on
 6    the cc J.R. Avidity at Earthlink.net one you're
 7    familiar with?
 8        A.    Yes, that is my e-mail address.
 9        Q.    Did you receive this document on or
10    about July 19, 2014?
11        A.    Yes.
12        Q.    Did you understand, prior to
13    receiving it, that there was going to be a
14    communication to counsel for the UCC?
15        A.    I'm sorry.  I'm confused by your
16    question.
17        Q.    Sure.  Prior to receiving the
18    e-mail, did anyone let you know that a draft
19    agreement was going to the lawyers at Akin
20    Gump?
21        A.    Yes.  I think, as I recall, I would
22    have seen Fred, I think, in the course of the
23    day on the 18th, and I think he -- I think he
24    and I discussed that he should reach out to
25    Lisa or that Lisa would reach out to him to
```

1                   RAY - HIGHLY CONFIDENTIAL

2    provide a draft of the settlement agreement.

3         Q.    Okay.  And when you said Fred, are

4    you referring to Mr. Hodara?

5         A.    Yes.  Fred Hodara of Akin Gump and

6    Lisa Schweitzer of Cleary Gottlieb.

7         Q.    In the conversation with Mr. Hodara

8    did you talk about the potential for a

9    settlement agreement with the bonds?

10        A.    Well, I certainly told him that's

11   what the topic was.  I didn't get into any

12   details with him about the terms of it.  The

13   conversation would have occurred in connection

14   with seeing him involved in another matter.

15        Q.    And when you say in another matter,

16   unrelated to Nortel?

17        A.    Yes.

18        Q.    And what was that matter?

19        A.    The OSG, Overseas Shipping Group

20   confirmation hearing.

21        Q.    And that was on Friday, the 18th?

22        A.    Yes.

23        Q.    And that took place in Wilmington,

24   Delaware?

25        A.    It did.

HIGHLY CONFIDENTIAL                    65

1            RAY - HIGHLY CONFIDENTIAL

2        Q.    And that's why you traveled back

3    from Wilmington to New York?

4        A.    You're getting this.  Yes.

5        Q.    Prior to that point in time, prior

6    to the 19th or -- let's go back.

7              Prior to the 18th, had you

8    communicated to anyone at Akin Gump that there

9    were settlement communications ongoing between

10   the bonds and NNI?

11       A.    I don't believe I did.  I don't

12   recall having done that.

13       Q.    Any point in time after July 19, did

14   you have conversations with anyone at Akin Gump

15   about the effect of the settlement agreement on

16   Akin Gump's clients?

17       A.    There was a conversation that I had

18   with Fred that would have been sometime after

19   the 19th, I believe, and sometime on or before

20   the 23rd related to a request by the indenture

21   trustees to reimburse, be reimbursed for some

22   of their costs, and I remember talking briefly

23   to Fred as to whether or not that was something

24   his committee found acceptable or not, and I

25   believe the answer was in the affirmative, that

```
 1            RAY - HIGHLY CONFIDENTIAL
 2   they found it acceptable.
 3            We didn't talk specific amounts or
 4   terms, you know, or decide anything on the
 5   call, but -- and I forget who placed the call,
 6   and it may have been in the course of talking
 7   about something else that I mentioned that this
 8   was an open issue, and I think was trying to
 9   feel his sentiment and views about it.
10            And his response, as I recall, was
11   that -- that, you know, some advance expense
12   reimbursement would be acceptable.  And I think
13   I left it for Fred to talk to Milbank to
14   formulate the ask, if you will, from the
15   indenture trustee's perspective.
16       Q.   In that conversation with Mr. Hodara
17   about the question of advancing expense
18   reimbursement for the indenture trustees, did
19   you have the conversation at all about whether
20   the underlying PPI settlement that was being
21   proposed was one that his clients would be
22   supportive of?
23       A.   We didn't talk about that at that
24   point in time.  I don't know that he had formed
25   a view, and I don't recall asking about it.
```

1              RAY - HIGHLY CONFIDENTIAL

2        Q.    At any point in time, did you have

3   conversations with counsel at Akin Gump about

4   whether they were supportive of the proposed

5   9019 settlement?

6        A.    No.

7        Q.    Do you have an understanding as to

8   whether any of your representatives had such

9   conversations with counsel at Akin Gump?

10        A.    Yeah, I believe that Cleary and

11   perhaps Morris Nichols may have discussed with

12   Akin Gump the settlement agreement, their

13   position, but I don't -- I don't specifically,

14   you know, know when and how they did that, but

15   at some point, it was communicated to me that

16   the committee was on board for the settlement.

17        Q.    Okay.  And do you recall, is there a

18   way to specify when that was?  Was it before

19   you reached agreement with the bonds?

20        A.    Well, we didn't reach agreement

21   until July 23, and I believe that we had

22   heard -- heard -- I mean, our agreement, you

23   know, it's really at the last minute we formed

24   an agreement.  So this would be pure

25   conjecture, but --

1                 RAY - HIGHLY CONFIDENTIAL

2        Q.      I'm not asking you to engage in

3    conjecture.

4        A.      As to when -- my understanding was

5    that when we agreed, which was at the last

6    minute, that they had already agreed to the

7    form of the settlement agreement, so.

8        Q.      And when you say they had already

9    agreed, you're referring to --

10       A.      The committee.

11       Q.      I'm sorry.  I'm going to try not to

12   speak over you.  I apologize.  I ask that you

13   extend me the same courtesy.

14              Other than Akin Gump, did you reach

15   out to counsel for any other parties, talk to

16   any other creditors about whether they would be

17   supportive of the proposed settlement with the

18   bonds?

19       A.      Yes.

20       Q.      Okay.  And with whom did you speak?

21       A.      I spoke to a creditor of the

22   company.

23       Q.      And who was the creditor of the

24   committee -- of the company?

25       A.      Solus.

```
 1              RAY - HIGHLY CONFIDENTIAL
 2       Q.    And Solus is a holder of bonds?
 3       A.    Yes.
 4       Q.    And they're a substantial holder in
 5  the 7.875 bond series?
 6       A.    Yes.
 7       Q.    Did you speak to any other
 8  creditors?
 9       A.    No.
10       Q.    Did you speak to the PBGC?
11       A.    No.
12       Q.    Did you speak to the equity?  Did
13  you speak to NNL?
14       A.    No.
15       Q.    Did you speak to counsel for the
16  monitor about the proposed settlement?
17       A.    No.
18       Q.    Do you know whether your lawyers
19  reached out to any other creditors beyond the
20  one you identified, Solus?
21            MR. ROSENTHAL:  Objection to form.
22       A.    No, I don't know whether they
23  reached out.
24       Q.    Do you know whether they
25  communicated with any other creditors about the
```

```
 1                  RAY - HIGHLY CONFIDENTIAL
 2   proposed settlement?
 3        A.    I don't believe they did.
 4        Q.    Do you know whether your lawyers
 5   communicated with counsel for the monitor about
 6   the proposed settlement?
 7        A.    No, I don't.
 8        Q.    At any point in time, did you do an
 9   analysis of whether the proposed settlement
10   would benefit the PBGC?
11             MR. ROSENTHAL:  Objection to form.
12        A.    The PBGC specifically?
13        Q.    Yeah.
14        A.    No.
15        Q.    And let's put Solus to the side.
16             Did you, at any point in time, do an
17   analysis as to whether the proposed settlement
18   that's reflected in Ray Exhibit 1 would benefit
19   any of the other creditors with whom you didn't
20   communicate?
21        A.    Yes.  I mean, I did -- there is an
22   analysis I went through, which is I thought it
23   was beneficial for the creditor group at large
24   to have the bondholder claim, you know, fully
25   and finally determined, both as to the
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   principal amount and also as to the PPI
 3   portion.
 4              I thought it would benefit the
 5   estate to have, you know, certainty as to those
 6   amounts.  And so to that extent, I believed it
 7   was beneficial.
 8              And I also believe that it was
 9   beneficial to, you know, avoid any further
10   disputes about the amount of the PPI.
11       Q.   Can you tell me -- can you describe,
12   in any more detail, the analysis that you went
13   through?  How you did it?
14              MR. ROSENTHAL:  Objection to form.
15       A.   How I did what?
16       Q.   You said you went through an
17   analysis which you thought it was beneficial
18   for the creditor group as a whole.
19              Did you do any financial modeling to
20   determine whether the proposed settlement was
21   beneficial to the creditor group as a whole?
22       A.   I didn't need any financial modeling
23   to determine that it would be beneficial to
24   have an allowed claim.  That's one of the jobs
25   of an officer of a bankrupt Chapter 11 entity,
```

```
1              RAY - HIGHLY CONFIDENTIAL
2    is to -- to administer claims, and to get a
3    final determination of the claim amount, and I
4    believe that not doing so was detrimental and
5    doing so was beneficial.
6         Q.    And when you said you didn't need
7    any financial modeling, is it fair to say that
8    you didn't, in fact, have any financial
9    modeling done?
10        A.    Because I didn't need any, right.
11        Q.    I just want to ensure I understand
12   the underlying answer to the question, which is
13   no financial modeling was done, and it wasn't
14   done because you didn't believe it was
15   necessary.
16        A.    Yes, I believe that's my testimony.
17        Q.    To your knowledge, was any financial
18   modeling done to determine whether the proposed
19   settlement was beneficial to the equity?
20        A.    I did some, my own thinking about
21   it.  I believe that there was potential
22   outcomes of the ultimate resolution of the
23   estates under which there would be cash
24   available in the US, and depending on the cash
25   availability, there would be amounts available
```

1                 RAY - HIGHLY CONFIDENTIAL

2    to pay post-petition interest to all creditors

3    of the US estate, not just the bonds and

4    then -- and that the range of outcomes were

5    numerous, but there's possibilities that PPI

6    would not only be available, but would be

7    available in a significant amount such that, in

8    those scenarios where cash was available to

9    PPI, I believed it was beneficial to entertain,

10   you know, the concept of capping the amount

11   such that if additional proceeds were

12   available, that they would -- you know, in

13   effect, you know, be available to flow to

14   equity.

15        Q.    And you say you did your own

16   thinking.

17              Did you do any financial modeling of

18   those potential outcomes?

19        A.    That would be the thinking I was

20   doing, was financially orientated, yes.

21        Q.    When you say it was financially

22   orientated, did you ask Chilmark to run any

23   kind of financial models as to the range of

24   potential outcomes in available cash?

25        A.    No, we didn't do any of the type of

1                    RAY - HIGHLY CONFIDENTIAL

2     modeling that you're suggesting, partly because

3     the range of potential, you know, outcomes

4     really depends on numerous factors.  It depends

5     on the claims from the UK estate against the

6     Canadian estate.  It depends on the level of

7     assets and liabilities of the Canadian estate,

8     which -- which I don't have a complete

9     transparency to, nor is the asset value in the

10    Canadian estate even known at this time.

11                    So that would have required a lot of

12    speculation, and it also would have required

13    determination of, ultimately, our assets and

14    liabilities in the United States, which are

15    not, you know, fully defined and certain at

16    this time.

17                    In addition, you know, we don't know

18    what the ultimate allocation awards will be,

19    which will drive the assets and liabilities of

20    the various estates, but I did analysis on my

21    own which would have concluded that, based on

22    certain outcomes in the allocation, that there

23    could be excess cash available, not only in --

24    to meet the PPI, but in excess of the caps that

25    we had agreed upon such that there was a

HIGHLY CONFIDENTIAL                    75

1              RAY - HIGHLY CONFIDENTIAL

2    possibility without, you know, necessarily

3    quantifying, you know, the likelihood or

4    potential for that outcome, to have those

5    amounts be in excess of the cap and, therefore,

6    flow to equity.

7         Q.    So, in considering the excess cash,

8    have you considered the maximum amount of the

9    surplus that would be available for NNI to

10   distribute?

11        A.    No.

12        Q.    Have you -- you're familiar with

13   Mr. Kinrich's report?

14        A.    Yes.

15        Q.    And that's the US allocation

16   position?

17        A.    Yes.

18        Q.    And under that US allocation

19   position, NNI would receive some $5.3 billion?

20        A.    You know, I can sit here and try to

21   do the math, but I think Mr. Kinrich's report,

22   the foundation of that is 74.3 percent

23   allocation to the US, and if you did the math

24   against the amount that's in the black box,

25   that would be part of the answer.

HIGHLY CONFIDENTIAL                76

```
 1                RAY - HIGHLY CONFIDENTIAL
 2                I can't do that math in my head.
 3      Maybe someone else can, but that would be how
 4      you would at least derive part of the answer,
 5      but not the full answer.
 6           Q.   And beyond the thinking that you
 7      did, your financial analysts haven't done any
 8      modeling of the maximum amount of surplus
 9      available for NNI to distribute, to your
10      knowledge?
11           A.   No.
12           Q.   Have you done any analysis of the
13      tax claim that's out there?
14           A.   I personally?  No.
15           Q.   To your knowledge, has an analysis
16      been done by NNI?
17                MR. ROSENTHAL:  Just yes or no.
18           A.   No.
19           Q.   Do you know -- you were at opening
20      statements in the allocation trial in
21      Wilmington, weren't you?
22           A.   I was.
23           Q.   And Ms. Block stood up in court and
24      said that the range of potential outcomes there
25      was somewhere between 400 million and a billion
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   dollars, depending on when money would come in
 3   and the timing of distribution.
 4              Were you there for those comments by
 5   Ms. Block?
 6        A.    I believe so, yes.
 7        Q.    Is that analysis correct?  Were
 8   those statements correct?
 9              MR. ROSENTHAL:  Objection to form.
10        A.    I don't know -- exactly know where
11   she derived the numbers.
12        Q.    Just so I'm clear, on July 24, there
13   was a telephonic conference in front of Judge
14   Gross concerning the proposed 9019 motion.
15              Are you familiar with that?
16        A.    Yeah.
17        Q.    And were you on the call for that
18   conference?
19        A.    Yes.
20        Q.    And the transcript indicates that
21   you were.  I just want to make sure you were.
22        A.    Yes.
23        Q.    Was anything said by your counsel,
24   any representations made to the court on
25   that -- in that hearing that were incorrect, to
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   your knowledge?
 3        A.    I don't believe so, no.
 4        Q.    I want to go back to the negotiation
 5   of the agreement, and we will mark, as Ray
 6   Exhibit 6, a document bearing Bates numbers
 7   BHG-PPI-000082 through 115, and ask that you
 8   take a few moments to review it.
 9              (Ray Exhibit 6, E-Mail with Revised
10         PPI Settlement Agreement, Bates Stamped
11         BHG-PPI-000082 through 115, marked for
12         identification.)
13        A.    (Perusing.)
14        Q.    Just for the record, it is a cover
15   e-mail from Russell D. Eckenrod to a group of
16   people, re: Nortel revised US PPI settlement
17   agreement, and it's Monday, July 21, 2014.
18        A.    (Perusing.)
19        Q.    Mr. Ray, my first question will be
20   the one you've heard before.
21              Have you seen this document before?
22        A.    This document referring to what
23   document?
24        Q.    The draft settlement agreement that
25   is the CGSH draft of 7/21/2014.
```

1                RAY - HIGHLY CONFIDENTIAL

2        A.    I'm sorry.  I apologize.  I was

3    still on the e-mail that was attached to this.

4    I haven't gotten to the document yet.

5        Q.    Take your time.

6        A.    (Perusing.)

7              MR. ROSENTHAL:  Jay, just for

8        clarity, you're only referring to has he

9        seen the attachment, not the cover e-mail?

10             MR. PULTMAN:  Let's start with the

11       agreement itself, and then we will come to

12       the cover e-mail.

13       A.    (Perusing.)  Okay.

14       Q.    Mr. Ray, have you seen the draft

15   settlement agreement that is the July 21, 2014

16   agreement that says CGSH draft?

17       A.    Yes.

18       Q.    And you have seen that before today?

19       A.    Yes.

20       Q.    And did you see it on or around the

21   21st of July 2014?

22       A.    Yes.

23       Q.    The document appears to be behind an

24   e-mail from counsel at Cleary Gottlieb.

25             Have you seen that e-mail before,

1                    RAY - HIGHLY CONFIDENTIAL

2    the cover e-mail?

3         A.    I don't recall.  I don't seem to be

4    copied on it, so.

5         Q.    Okay.  Well, it indicates that,

6    "This draft remains subject to further internal

7    and client review, but is being circulated now

8    in the interests of time."

9              Had you seen this draft prior to it

10   being circulated?

11        A.    Yes, I believe so.

12        Q.    So over the weekend of the 19th and

13   20th of July, did you see a Cleary Gottlieb

14   draft of the settlement agreement?

15        A.    I believe so, yes.

16        Q.    And on or around Monday, the 21st of

17   July, did you see this draft?

18        A.    Yes.

19        Q.    Okay.  Let's look at the blackline

20   version.  In particular, I'm looking at Section

21   2.1 and 2.2.

22        A.    (Perusing.)

23        Q.    There are references in those two

24   sections to NNCC, and to the 7.875 notes.

25              Do you see that?

1                   RAY - HIGHLY CONFIDENTIAL

2          A.     Yes.

3          Q.     And as of this time, the 21st of

4    July, was NNCC and those 7.875 -- those 7.875

5    notes, were they still a part of the draft

6    settlement agreement?

7          A.     I believe they were a part of it.  I

8    mean, to the extent that the agreement

9    contemplated that they would be a part of the

10   agreement.

11         Q.     Ultimately, was the 7.875 notes

12   excluded from the settlement agreement?

13         A.     Yes, it was.

14         Q.     And when did that happen?

15         A.     I think it really -- it would have

16   to be either pretty shortly before the

17   agreement was -- was finalized, there was a

18   decision to take out references to the NNCC

19   bonds in terms of their inclusion in this

20   settlement.

21                I don't recall whether that was the

22   22nd or 23rd, but sometime between now -- the

23   date, July 21, and when we actually penned the

24   settlement agreement, it became clear to us

25   that NNCC chose not to be a part of the

```
 1                RAY - HIGHLY CONFIDENTIAL
 2    settlement agreement.
 3         Q.    And when you say NNCC, you're
 4    referring to the bondholders of those bonds?
 5         A.    Yes.
 6         Q.    You earlier discussed or indicated
 7    that you had conversations with one creditor
 8    who you identified as Solus.
 9         A.    Yes.
10         Q.    Was that with respect to these
11    bonds?
12         A.    Yes, it was.
13         Q.    And when was that conversation?
14         A.    I believe it may have been the
15    21st -- the 21st would be Monday.  Yeah, I
16    believe it was the 21st, because I had -- and I
17    don't recall when, but I had a call from Dennis
18    Dunne, under which Dennis expressed that the
19    NNCC bondholders may not participate in the
20    settlement.
21              Dennis -- I was surprised by that,
22    and so I told Dennis that I would call Solus
23    to -- to see what the understanding or
24    misunderstanding was and whether they would
25    participate in the settlement.  And so I
```

1          RAY - HIGHLY CONFIDENTIAL

2    think -- I believe it was the 21st.  Again, I

3    can't be precise on these times and dates, but

4    I believe it was the 21st, I contacted Solus

5    and asked them if they were going to

6    participate in the settlement.

7          Q.    Who did you speak to at Solus?

8          A.    Steven Blauner.  And I didn't

9    discuss the terms at all of the settlement.  It

10   was a quick call, and I asked him whether he

11   would participate in the settlement, and he

12   just expressed his view that the NNCC bonds

13   were, you know, entitled to their full par

14   claim, and that any settlement would have to

15   acknowledge that, and I told him, you know, I

16   would talk again to Milbank, but -- which I

17   did, and I may have had one other conversation

18   with Solus sometime between the 21st and the

19   23rd, just to -- just to confirm that they

20   weren't going to participate in the settlement.

21             And, again, a very short phone call,

22   which Mr. Blauner indicated they would not be a

23   party to the agreement.

24        Q.    As to the date of -- as of the draft

25   of the 21st that we're looking at that's been

1              RAY - HIGHLY CONFIDENTIAL

2    marked as Ray Exhibit 6, NNCC bonds were still

3    included within the draft settlement agreement;

4    is that fair?

5         A.    Well, it's fair in one context and

6    not fair in another.  I mean, it's fair in the

7    sense that this document contemplated that they

8    would participate, but we weren't having -- you

9    know, it's not like it was -- that we had the

10   consent of NNCC to put their inclusion into the

11   document.  I mean, we did so on the assumption,

12   again, our assumption, it turned out to be a

13   wrong assumption, that all of the bonds would

14   be included in the settlement, and when we

15   found out that Solus decided not to

16   participate, we ultimately took them out, and I

17   think we were, you know, we were indifferent to

18   that, and so, ultimately, their inclusion came

19   out of the, you know, the settlement agreement.

20              I didn't debate with Mr. Blauner his

21   rationale or reasons or -- nor did I even

22   discuss the terms of the settlement.

23        Q.    I'm sorry.  Have you finished your

24   answer?  I didn't want to cut you off.

25        A.    Yes.

```
1              RAY - HIGHLY CONFIDENTIAL
2        Q.     You said you were indifferent to
3   that.  Ultimately, less than the entirety of
4   the outstanding bonds were then in the
5   settlement agreement; isn't that fair?
6        A.     That's correct.
7        Q.     Let's talk about Section 2.3, which
8   indicates that the PPI settlement amount shall
9   be equal to $907 million, in the draft of the
10  21st.
11              Do you see that?
12       A.     Yes.
13       Q.     How did that change come to be?
14       A.     I think the change came in our
15  wanting to have a specific number, a dollar
16  amount number as opposed to a formula.  There
17  was -- depending on, you know, on how you
18  calculated the total accrued and what the
19  interest would be on each bond indebtedness, I
20  think there were variations that were somewhat
21  immaterial that were, you know, somewhere in
22  the billion six to a billion six five range.
23  They could have been off by dollar amounts that
24  were sort of in the tens of millions.
25              And the drafting, we just preferred,
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   from a drafting perspective, to, rather than
 3   just put a formula in, and then have people
 4   debate about what the product of that -- of the
 5   multiplication of those two numbers might be,
 6   we thought it would be cleaner, from a drafting
 7   perspective, just to put a dollar number in
 8   there, and that's what ultimately was dropped
 9   into the draft.
10        Q.   Is it fair to say that the number
11   that was in that draft, the Monday draft of
12   907 million, is roughly 55 percent of the
13   $1.65 billion total number?
14        A.   I think if you want to say roughly
15   55 percent, yes, I think it's roughly
16   55 percent.
17        Q.   And in the draft we looked at that
18   was circulated by Milbank on the 18th, when it
19   had the 55 percent, that indicated it was
20   $907.5 million?
21        A.   I believe that's right, yes.
22        Q.   Ultimately, the number that made it
23   into the final proposed settlement agreement on
24   the 24th of July had a cap number of
25   $1.01 billion; isn't that right?
```

```
 1                  RAY - HIGHLY CONFIDENTIAL
 2         A.     Yes.
 3         Q.     And that $1.01 billion is a little
 4    in excess of the 1.65 billion, isn't it?
 5                MR. ROSENTHAL:  Objection to form.
 6         A.     Could you repeat that question?
 7         Q.     My question is whether the
 8    1.01 billion, is it in excess of 60 percent of
 9    1.65 billion?
10                MR. ROSENTHAL:  Do you have a
11         calculator?
12         A.     Yeah, I don't have a calculator with
13    me.
14                MR. ROSENTHAL:  You're just asking
15         him to do a mathematical calculation of --
16         Q.     I'm asking if the ultimate number
17    that we came to, the cap number, came out to
18    approximately 60 percent rather than the
19    55 percent number.  And I'm happy to have your
20    lawyers do the math.
21                MR. ROSENTHAL:  But, you know,
22         you're comparing different denominators
23         now.
24                MR. PULTMAN:  I'm perfectly happy to
25         have the witness tell me that my math is
```

```
 1            RAY - HIGHLY CONFIDENTIAL

 2       incorrect.

 3            MR. ROSENTHAL:  You're asking him is

 4       something a certain percentage of

 5       something else, and the two numbers are

 6       not comparable, and I don't think that's a

 7       fair thing.

 8       A.    Could you tell me what the numerator

 9  is and what the denominator is?

10       Q.    I'm asking whether the $907 million

11  number that we looked at was 55 percent of the

12  1.65 billion.  That was the first question I

13  asked you.

14       A.    I believe I answered yes to that.

15       Q.    Okay.  And when we look at the one

16  point --

17       A.    I believe you said roughly, I

18  believe is what you said.

19       Q.    Yes.

20       A.    Okay.

21       Q.    And if, in the draft of the 18th, it

22  indicated that the 55 percent of 1.65 billion

23  was, in fact, 907.5 million, that was my second

24  question to you on that.  And I'm happy to have

25  you look at the actual document.
```

```
 1                RAY - HIGHLY CONFIDENTIAL
 2        A.     Maybe that would be helpful.
 3        Q.     Sure.  Why don't we look at the
 4   draft that was Ray Exhibit 4.
 5               MR. ROSENTHAL:  What's the question?
 6        Q.     Whether it indicated that the
 7   55 percent of the $1.65 billion was, in fact,
 8   $907.5 million.
 9        A.     Yes, that's what the document
10   indicates.
11        Q.     And how did the $907 million come to
12   be in Section 2.3 of the draft of Monday that
13   we've marked Ray Exhibit 6?
14        A.     Because it was the product of
15   55 percent times 1.65 billion.
16        Q.     Now, why don't we go back to Ray
17   Exhibit 1, which was the notice of motion,
18   together with the final version that's been
19   proposed as the settlement under the 9019
20   motion.
21               And just so I'm clear, on page 12 of
22   the document, there's a signature of the --
23   this is of the settlement agreement.  It
24   appears to be your signature.
25        A.     Yes.
```

1               RAY - HIGHLY CONFIDENTIAL

2        Q.     And you signed that on or around the

3   24th of July?

4        A.     Yes.

5        Q.     I would like to turn you to

6   section -- before we get to 2.2, is it fair to

7   say that the NNCC bonds were removed from the

8   final version of the agreement?

9        A.     Yes.

10       Q.     And are there any other

11  communications that you had with Solus as to

12  the removal, their removal of those bonds from

13  this final agreement?

14       A.     No.

15       Q.     Did you have any conversations with

16  counsel for -- counsel at Milbank about the

17  removal of Solus and its effect on the

18  agreement?

19       A.     I did contact Dennis Dunne and tell

20  him that I had had the conversation with Solus,

21  and that they wanted to be taken out of the

22  settlement agreement, or didn't want to be part

23  of the settlement agreement.  I did not discuss

24  with them the effect of that.  And then I

25  communicated the same to Cleary and Morris

```
 1              RAY - HIGHLY CONFIDENTIAL
 2    Nichols.
 3         Q.    I'm sorry.  You said Cleary and --
 4         A.    Morris Nichols.
 5         Q.    Did you have any further
 6    conversations with the UCC or their counsel
 7    about the changes to the settlement agreement?
 8         A.    I did not.
 9         Q.    I would like you to turn to Section
10    2.2.  It's on page six of 43.
11         A.    Okay.
12         Q.    Section 2.2 reads, and I quote, "The
13    PPI settlement amount shall be an amount equal
14    to (a) 876 million plus (b) an additional
15    amount, equal to 3.50 percent per annum times
16    the then outstanding principal balance of the
17    Guaranteed Bonds, up to a maximum amount of
18    134 million, which additional amount shall
19    accrue on the unpaid and outstanding principal
20    balance of the Guaranteed Bonds that remain
21    unpaid and outstanding during the time of
22    accrual for the period from July 1, 2014 until
23    the earlier of (x) June 30, 2015, or (y) the
24    date of the final distribution in respect of
25    the Guaranteed Bonds.  For the avoidance of
```

HIGHLY CONFIDENTIAL                        92

1              RAY - HIGHLY CONFIDENTIAL

2      doubt, absent any distribution, the cap of

3      1.01 billion will be reached on June 30, 2015."

4              Do you see that, sir?

5      A.      Yes.

6      Q.      How did section -- the PPI

7      settlement amount section, how did it come to

8      change to that formulation?

9      A.      The formulation was derived in a

10     couple different ways.  The 876 million was a

11     reduction from the previous draft amount to

12     reflect the removal of PPI that would have been

13     attributable to the NNCC bonds in the prior

14     version of the settlement agreement.  So that's

15     the first adjustment that was made to derive

16     the 876 number.

17              Then the remainder of the formula is

18     a function of our insistence that there be an

19     absolute cap, and the view by the bondholders,

20     as communicated to the NNI estate through

21     Milbank and FTI, that they wanted some

22     additional accrual so long as the estate, the

23     NNI estate, had not paid distributions to the

24     bondholders from the NNI estate.

25              So, ultimately, the NNI estate

1                RAY - HIGHLY CONFIDENTIAL

2    agreed to give additional accruals for some

3    period of time through June 30, 2015, but,

4    ultimately, there would be a finite cap on that

5    additional accrual and, therefore, the entire

6    PPI.

7                And we also bargained for a reduced

8    accrual rate at 3.5 percent rather than the

9    full contract rates of each of the, you know,

10   various bonds.

11               And, lastly, we -- we agreed that

12   the accrual would only happen with respect to

13   amounts that had not been paid to the

14   bondholders, such that if there were

15   distributions in the time period between the

16   date of the settlement and June 30, you would

17   not accrue unpaid amounts to the bondholders.

18   So it would actually be on the actual unpaid

19   balance as opposed to the full balance.

20               And this concept also, you know,

21   continued to preserve the provisions which I

22   think appear in 2.3, under which other

23   contractual entitlements were not in a position

24   to be added on to these numbers.

25        Q.    Is it fair to say that, even as of

1             RAY - HIGHLY CONFIDENTIAL

2    July 24, 2014, the day that this proposed

3    settlement was filed with the court, the base

4    number of 876 million had already increased by

5    an accrual?

6         A.    Yes.  I believe there was some

7    accrual, because I think these amounts were --

8    as I recall, you know, without sitting down

9    doing the math right now, as I recall, I think

10   they were determined, you know, as of a date

11   prior to the settlement agreement.  So I think

12   parties agreed to sort of work off of constant

13   numbers, you know, rather than change it as

14   every day went by.

15             So there had been some accrual.  In

16   the absence of the ability to accrue additional

17   amounts under this paragraph, we would have had

18   to ultimately adjust the 876 to another amount.

19        Q.    So then it's fair to say that the

20   876 -- $876 million number wasn't complete

21   without taking into account the accrual, even

22   on July 24, of the time period between July 21,

23   2014 and July 24, 2014?

24             MR. ROSENTHAL:  Objection to form.

25        He never said that it's complete.  It's a

1                    RAY - HIGHLY CONFIDENTIAL

2         formula.

3         A.    The number was not complete.  I

4    mean, you know, we would have -- but,

5    ultimately, we hadn't agreed to anything until

6    we put the final numbers in.  So could it have

7    been that 876 would have been a different

8    number?  It's possible, but that's not what

9    happened.

10        Q.    Well, I asked the question because

11   you indicated that you reduced the 907 million

12   number to 876 to account for the removal of the

13   NNCC bonds.

14        A.    Right.

15        Q.    And my question is, is that apples

16   to apples if the 876 number on July 24 even, is

17   not 876, it's 876 plus the accruals of three

18   and a half weeks?

19             MR. ROSENTHAL:  Objection to form.

20        A.    Well, I think what you're asking me

21   to do is sort of speculate what the 907 would

22   have changed to had we not taken out the NNCC

23   bonds, and I don't know the answer to that.

24        Q.    Just so we're clear, the cap number

25   that we referred to is the $1.01 billion cap

1              RAY - HIGHLY CONFIDENTIAL

2     number, and that's as of June 30, 2015?

3              MR. ROSENTHAL:  Objection.  You

4         misstate 2.2.

5         A.    The only way I can answer your

6     question is to just to really restate the

7     formula.  It's 876 plus 3 and a half percent

8     times the outstanding balance up to a maximum

9     of 134.  876 and 134, if you had the full

10    accrual and there had been no distributions

11    between now and June 30, then those two numbers

12    would, in fact, total 1.01 billion.

13        Q.    Have you done any analysis to

14    consider whether the maximum of the surplus

15    available of excess cash for NNI to distribute

16    would be in excess of $1.01 billion?

17        A.    I believe -- I guess we can ask the

18    court reporter to go back.  I believe I

19    testified that I had done some analysis in my

20    own mind, calculating some of the potential

21    outcomes under which I believed there were

22    certain scenarios under which the amount that

23    would be in excess of the cap would be

24    available for equity.

25        Q.    Okay.  Can you tell me what that

1              RAY - HIGHLY CONFIDENTIAL
2    scenario would be in which an excess of that
3    cap would be available?
4          A.    I don't -- I mean, I don't have the
5    calculations here, but I can tell you the
6    inputs, some of the inputs I was considering.
7    I might not recall all of them.
8          Q.    Did you actually put this pen to
9    paper or computer?
10         A.    No.  Actually, I believe I did all
11   of this mathematically at the time based on,
12   you know, whatever documents were in front of
13   me.  So I don't have any independent recording
14   of the calculation.
15         Q.    Okay.  To the best of your
16   recollection, if you could tell us.
17         A.    I believe under, you know, certain
18   scenarios, I calculated that the number, you
19   know, might be as high as 300 million or in
20   excess of 300 million, approximately, of excess
21   P and I that could benefit the equity holders,
22   and that was derived, as I think I testified,
23   as a product of Mr. Kinrich's 74.3 percent
24   allocation multiplied by the amount that is in
25   the black box, the product of which, when added

HIGHLY CONFIDENTIAL                        98

1                RAY - HIGHLY CONFIDENTIAL

2    to NNI's cash, after considering the claims in

3    the US estate and the derivation of those

4    numbers, when added to the distribution to the

5    bonds and the $2 billion claim from Canada,

6    based on Canada's recoveries, which under

7    Mr. Kinrich's allocation was approximately

8    16 percent.

9                Again, without knowing what the full

10   potential outcome of the assets and liabilities

11   are in Canada, because we believe that the

12   Canadian assets are understated, and we think

13   their liabilities are maybe overstated, but

14   based on expected outcomes of output from the

15   Canadian estate, when added to the previous

16   numbers, I believe yielded numbers that were,

17   you know, in the 300 or more range in excess of

18   both the 876 and, ultimately, the 101 cap.

19        Q.    And for that calculation, what did

20   you attribute to the tax claim, what number?

21        A.    The tax claim in that calculation

22   would need to be under a hundred million.

23        Q.    And what did you attribute to the

24   claims in the US estate?

25        A.    The claims in the US estate, I

**HIGHLY CONFIDENTIAL**                    99

```
 1              RAY - HIGHLY CONFIDENTIAL
 2    modeled at roughly 1.2 billion.
 3         Q.    And that accounts for the trade
 4    claims?
 5         A.    Accounts for all the claims, other
 6    than the tax claims, yes.
 7         Q.    It includes the PBGC claims?
 8         A.    Yes.
 9         Q.    It includes the July updated PBGC
10    claims?
11         A.    It does not include the July updated
12    PBGC claims.
13         Q.    And what's --
14         A.    Which we don't think are valid.
15         Q.    Okay.  Is there an assumption for
16    cash burn for that analysis?
17         A.    I don't recall.  There was
18    assumption for cash burn.  I don't recall what
19    it was.
20         Q.    Has there been an operating
21    statement submitted to the court since the 60th
22    report back in April?
23         A.    I believe the last report is the
24    April 30 MOR.  I believe that's the most
25    current.  I don't know whether that's the 60th
```

HIGHLY CONFIDENTIAL                    100

1                RAY - HIGHLY CONFIDENTIAL

2    or the 61st or 59th.

3         Q.    And that was April 30, 2014,

4    covering up through January 30, 2014?

5         A.    Yes.

6         Q.    And is there any updated report

7    being prepared?

8         A.    There would be a report for May.  I

9    don't believe I have seen that yet.

10         Q.    And just so I'm clear, in that

11    assumption that you built in, you assumed that

12    the US allocation, according to Mr. Kinrich,

13    was the one that the court was going to find?

14         A.    Yes, although, you know, there's

15    certain sensitivities that you could do where

16    that allocation was not achieved.  Yet, there

17    was still allocation amounts available in

18    excess of the cap.

19              It would just -- it would be -- the

20    end product would be different.  But,

21    nonetheless, the analysis wasn't exclusively

22    dependent on one input.  Because there are so

23    many inputs in this calculation, you could

24    change, you know, some of them negatively, some

25    could move positively, and, you know, our

1          RAY - HIGHLY CONFIDENTIAL

2    approach on this was that, you know, that if we

3    looked at the amount available, and it was less

4    than what the cap was, in effect, the amount of

5    available cash works as its own cap related to

6    the availability of PPI.

7               On the other hand, if there were any

8    scenarios, any scenarios that were possible

9    under which the PPI could be greater than the

10   cap, I thought it was beneficial for the estate

11   and its creditors, including equity, to get a

12   cap which was under that amount, such that in

13   those eventualities, there would be, you know,

14   savings by virtue of the settlement.

15              Now, there may be some scenarios

16   where, by virtue of one of the many inputs into

17   this calculation, that there's not sufficient

18   cash to -- to have an issue with the cap, but I

19   wasn't really solving necessarily for --

20   exclusively for those alternatives.  I was

21   solving for those alternatives where there was

22   a possibility that the amounts would exceed the

23   cap that we negotiated.

24        Q.   Did you account for the likelihood

25   of each of those inputs?

1           RAY - HIGHLY CONFIDENTIAL

2               MR. ROSENTHAL:  Objection.  I mean,

3           you're treading on to areas in which now

4           you're talking about his analysis of the

5           outcome of the allocation dispute, and I

6           don't think that's appropriate.

7      Q.    I'm asking, generally, about the

8  variety of those inputs that you put in from

9  the tax claim being under $100 million to your

10 claim on the PBGC and the variety of claims.

11              Did you put a range of likelihood in

12 considering it?

13 DI         MR. ROSENTHAL:  I'm not going to let

14         him answer that, because that is asking

15         him, essentially, how he handicaps, among

16         other things, the outcome of the

17         allocation dispute.

18              MR. PULTMAN:  Let me take that off

19         the table.

20     Q.    Putting to one side the allocation

21 dispute, did you do any modeling of all the

22 other factors that you said were your inputs to

23 that analysis to that scenario that created a

24 $300 million surplus?

25              MR. ROSENTHAL:  Just hold on one

```
 1             RAY - HIGHLY CONFIDENTIAL
 2        second.
 3             I will let him answer that to the
 4        extent that he did independent modeling of
 5        those issues, not the allocation issues,
 6        other than through consultation with
 7        counsel or advisors hired by counsel.
 8             MS. SCHWEITZER:  One second.
 9             MR. ROSENTHAL:  Or that obviously
10        takes the input of counsel or counsel's
11        advisors.
12   BY MR. PULTMAN:
13        Q.    So let's start with the first
14   question.
15             Can you do this without violating
16   the instructions you just got from your lawyer?
17        A.    I'm not sure what this is.
18             MR. ROSENTHAL:  Can you answer the
19        question of have you done that
20        independently of anything you have been
21        advised by counsel or advisors to counsel?
22        A.    Well, you have referenced the word
23   "modeling."  I took a view of what I thought
24   the assets and liabilities were of the
25   particular -- of the various estates.  I gave
```

HIGHLY CONFIDENTIAL
104

```
 1                  RAY - HIGHLY CONFIDENTIAL
 2    you those inputs.
 3                  That was my business judgment about
 4    what those were.  And implied in my estimation
 5    for purposes of the analysis was my informed
 6    view of what I thought those numbers were.
 7                  So to that extent, you know, my
 8    analysis factored in certain probabilities that
 9    I assumed in my calculation.
10        Q.    So if I understand what you're
11    saying is, those weren't just the range of
12    possibilities.  That's what you thought was
13    likely in those various inputs that you have
14    given me.
15        A.    I don't think I would use the word
16    likely.
17                  MR. ROSENTHAL:  Objection to form.
18        A.    I took a view of what I thought the
19    assets and liabilities were, and based on that
20    calculation, I determined that there was excess
21    PPI available in certain scenarios, the
22    scenario that I was thinking of, and based on
23    that, there was advantages to having the amount
24    of PPI be less than the number.
25        Q.    And in recommending the 9019, this
```

HIGHLY CONFIDENTIAL                    105

```
1                RAY - HIGHLY CONFIDENTIAL
2      proposed settlement, did you come up with a
3      range of possible outcomes as to the PPI?
4           A.   No, I didn't.
5           Q.   Did you take into account the
6      complexity of the underlying PPI dispute?
7                MR. ROSENTHAL:  It's just yes or no.
8           A.   Yes.
9           Q.   Did you take into account the
10     expense of litigating that dispute?
11               MR. ROSENTHAL:  Just yes or a no.
12          A.   No.
13          Q.   I'm correct that you told us earlier
14     that NNI hadn't taken a substantive position on
15     that prior to the settlement; isn't that
16     correct?
17          A.   I think that's yes, that's the
18     answer.
19          Q.   And you are aware that the monitor
20     and the Canadian debtors were litigating that
21     issue with the bonds?
22          A.   Yes.
23          Q.   Did you take into account -- let me
24     withdraw that question.
25               Did you consider what the bonds
```

1               RAY - HIGHLY CONFIDENTIAL

2    could have recovered if they won the issue

3    outright and gotten an order saying they were

4    entitled to $1.65 billion in PPI?

5               MR. ROSENTHAL:  Objection to form,

6         and I think it's asked and answered.

7         A.    Are you asking for what my view

8    would have been or what the bondholder view

9    would have been?

10        Q.    Your view.

11              MR. ROSENTHAL:  Asked and answered.

12        Objection to form.

13        A.    Could you repeat it?

14        Q.    Sure.  Did you consider what the

15   bonds could have recovered if they had won the

16   PPI motion, not the 9019 motion, but the PPI,

17   the underlying dispute, that the Canadian

18   monitor and debtors were disputing the bonds

19   on?

20        A.    I believe that's what I have just

21   walked through for the last 20 minutes.

22        Q.    Under that scenario that you laid

23   out?

24        A.    Yes.

25        Q.    Okay.  Now, were you involved in the

1              RAY - HIGHLY CONFIDENTIAL

2    settlement of the EMEA dispute, the EMEA

3    claims?

4         A.    Which EMEA claims?

5         Q.    The EMEA claims against the US

6    estate.

7         A.    Yes.

8         Q.    And did you approve that proposed

9    settlement?

10        A.    Yes.

11        Q.    Did the board of directors of NNI

12   consider that settlement?

13        A.    No.

14        Q.    In your view, was the EMEA

15   settlement material?

16             MR. ROSENTHAL:  Objection to form.

17        A.    Material to what?

18        Q.    Material to the estate of NNI.

19             MR. ROSENTHAL:  Objection to form.

20        A.    I believe the claims were material.

21   I don't -- I don't know -- I haven't formed a

22   view of what materiality is relative to what

23   was settled for.

24        Q.    Do you believe the PPI dispute was a

25   material dispute to the NNI estate?

1                  RAY - HIGHLY CONFIDENTIAL

2                  MR. ROSENTHAL:  Objection to form.

3        A.    It's a material claim, yes.

4        Q.    Can you tell me why the board of

5   directors of NNI didn't consider the proposed

6   settlement?

7        A.    I believe I was authorized to make

8   those decisions on behalf of the estate.

9        Q.    By what authority are you so

10  authorized?

11       A.    I believe by the -- my agreement

12  that charges me with the responsibility for

13  being the principal officer in the US estate.

14       Q.    Anything else?

15       A.    No.

16       Q.    Can you tell me what you did to

17  prepare for this deposition?

18       A.    I didn't do anything to prepare for

19  it.

20       Q.    You didn't talk to the cab driver on

21  the way over about your upcoming deposition?

22       A.    No.

23       Q.    You didn't review any documents in

24  preparation for this deposition?

25       A.    No.

1              RAY - HIGHLY CONFIDENTIAL

2         Q.    Since signing the proposed agreement

3    that's part of Ray Exhibit 1, have you had any

4    further conversations with the bonds about the

5    proposed motion?

6         A.    No, I haven't.

7         Q.    I would like you to look at Section

8    4.2 of the proposed agreement on page seven.

9         A.    (Perusing.)  Page 7 of 20 or where

10   are you?

11              MR. ROSENTHAL:  7 of 43.

12        Q.    7 of 43.  It's at the top.  It says

13   7 of 43.

14        A.    Okay.

15        Q.    And you should take your time to

16   review the whole thing.  I'm going to ask you

17   about the provision that begins with the,

18   "provided, however."

19        A.    (Perusing.)  Okay.

20        Q.    Can you tell me who drafted that

21   provision or at whose insistence was this

22   drafted or request?

23        A.    I don't recall who drafted this

24   particular paragraph, but I do recall that it

25   was a provision that both the bonds and NNI

1              RAY - HIGHLY CONFIDENTIAL

2    agreed to as a provision of this settlement

3    agreement as it relates to the non-bond

4    unsecured creditors of the US estate.

5         Q.    And at whose request was it?

6         A.    I don't recall if there was a

7    request or whose it was.  There was a

8    discussion that was had under which both the

9    bonds and the NNI estate agreed that we would

10   have a complete reservation of rights relative

11   to the -- to the non-bond unsecured creditors

12   and -- so that's ultimately what was drafted.

13        Q.    Did you talk to the other creditors

14   about that provision?

15        A.    I personally didn't, but counsel for

16   the company, and I believe the bonds' counsel,

17   Milbank, would have discussed this term with

18   the official committee's counsel.

19        Q.    Okay.  So that would have been with

20   counsel for the official committee, but what

21   about the other creditors?

22        A.    Well, the official committee who

23   represents the non-bond creditors.

24        Q.    What's the effect of this provision

25   if there are insufficient funds to pay the PPI

1              RAY - HIGHLY CONFIDENTIAL

2    to all the unsecured creditors?

3         A.    This provision is designed to say

4    whatever is available for PPI, if that's a

5    dollar or it's some other amount.  It does not

6    determine the amount of PPI available to the

7    non-bond, unsecured creditors and leaves open

8    for future debate, discussion, resolution, how

9    the available PPI will be allocated between the

10   bond creditors on the one hand, and the

11   non-bond US creditors on the other hand.

12              It doesn't -- it neither determines

13   the amount of PPI nor it determines necessarily

14   how that PPI is split between the bonds or

15   particular bondholders, on the one hand, and

16   other unsecured creditors who may claim

17   post-petition interest, you know, either at a

18   contract rate or some alternative rate.

19        Q.    But the $1.01 billion cap won't be

20   the cap for purposes of that analysis; is that

21   fair to say?

22        A.    Well, the PPI is the PPI, and the

23   bondholders, you know, are capped at that

24   amount.  This is designed as to deal with how

25   you then allocate the amount of PPI that's

HIGHLY CONFIDENTIAL          112

1              RAY - HIGHLY CONFIDENTIAL

2      available to the US non-bond creditors as well

3      as the bondholders.

4              So the bondholders have no guarantee

5      that whatever PPI is available will actually be

6      received by those bondholders because of the

7      claims against that PPI by the non-bond

8      creditors.

9          Q.    Okay.

10             MR. PULTMAN:  You want to take a

11         couple of minutes and then we can wrap it

12         up?

13             MR. ROSENTHAL:  Sure.

14             THE VIDEOGRAPHER:  We are now off

15         the record at 3:49 p.m., September 15,

16         2014.

17             (Recess taken.)

18             THE VIDEOGRAPHER:  This is tape

19         three of the deposition of Mr. John Ray.

20         We are now back on the record.  The time

21         is 4:04 p.m., September 15, 2014.

22     BY MR. PULTMAN:

23         Q.    Mr. Ray, I'm going to ask you a

24     series of questions about conversations that

25     you've had with counsel for NNI.

1          RAY - HIGHLY CONFIDENTIAL

2          Did you have any conversations with

3    counsel for NNI about the likelihood of the

4    bonds obtaining more than $1.01 billion?

5        A.    No.

6        Q.    Did you have any conversations with

7    counsel about the modeling that you described

8    earlier that you did with respect to the

9    potential range of outcomes, including the

10   allocation issue?

11   DI          MR. ROSENTHAL:  I'm going to direct

12        him not to answer that, because of, as I

13        told you before, now you're going into

14        conversations regarding allocation

15        outcomes.

16             MR. PULTMAN:  Is that a privilege

17        objection?

18             MR. ROSENTHAL:  Yeah.

19        Q.    I assume you're following your

20   counsel's direction?

21        A.    Yes.

22        Q.    Did you have any conversations with

23   your counsel about the likely outcome of the

24   allocation trial?

25   DI          MR. ROSENTHAL:  I'm going to direct

```
1              RAY - HIGHLY CONFIDENTIAL
2         him not to answer.
3         Q.    And I assume you're following your
4    counsel's direction, Mr. Ray?
5         A.    Yes.
6         Q.    Mr. Ray, is your view that the
7    reasonableness of the proposed PPI settlement
8    is wholly unrelated to the allocation dispute?
9              MR. ROSENTHAL:  Objection to form.
10        I don't understand that question.
11        Q.    Sir, do you understand?
12        A.    I don't actually know.  I don't
13   understand.
14        Q.    In the 9019 motion, there was a
15   reference to the proposed PPI settlement being
16   unrelated to the results of the allocation
17   dispute.
18             MR. ROSENTHAL:  Do you have a
19        paragraph number so we can understand the
20        context?
21             MR. PULTMAN:  Sure.  Let me pull
22        that up.
23        Q.    This is Ray Exhibit 1.  And it's on
24   page -- let me withdraw that question.
25             Mr. Ray, did you have conversations
```

```
 1              RAY - HIGHLY CONFIDENTIAL
 2   with your counsel about the probability of the
 3   bonds succeeding in their litigation with the
 4   monitor over the PPI issue?
 5   DI           MR. ROSENTHAL:  I'm going to direct
 6        him not to answer that.
 7              You can ask questions about
 8        conversations with counsel broadly
 9        speaking, but when you go into very
10        specific, detailed questions, you're
11        starting to subsume the issues of advice.
12              MR. PULTMAN:  Okay.
13        Q.   Did you receive, without revealing
14   the substance of any legal advice, did you
15   receive any legal advice about whether the
16   bonds would actually recover through litigation
17   more than $1.01 billion?
18        A.   No.
19              MR. PULTMAN:  I have no further
20        questions at this time, subject to
21        whatever further motion practice may exist
22        on the privilege issue.  I thank you for
23        your time, Mr. Ray.
24   EXAMINATION BY
25   MR. ROSENTHAL:
```

```
1              RAY - HIGHLY CONFIDENTIAL
2       Q.    I have just one question, actually.
3    Sorry, John, I see the surprise on your face.
4              I just want to clear up something to
5    make sure there's no confusion, because earlier
6    in Mr. Pultman's examination, you were
7    instructed to exclude conversations with
8    counsel.
9              You had testified, at one point,
10   that you didn't do anything to prepare for your
11   deposition, and while you didn't do anything
12   independent of counsel to prepare for your
13   deposition, did you meet with counsel to
14   prepare for your deposition?
15      A.    Oh, yes.
16            MR. ROSENTHAL:  Okay.  I have
17      nothing further.
18   FURTHER EXAMINATION
19   BY MR. PULTMAN:
20      Q.    I have a follow-up question.
21            When was that meeting?
22      A.    This morning.
23      Q.    And who attended that meeting?
24      A.    Let's see.  Let's see.  Let's see.
25   I would say Ms. Schweitzer attended,
```

1              RAY - HIGHLY CONFIDENTIAL

2    Mr. Rosenthal attended, Mr. Eckenrod attended.

3    Mr. Zelbo came in, but I think solely to eat a

4    lemon bar.  I think that was his purpose.  I

5    could detect none other.

6              And I think that may have been it.

7         Q.    So other than the three, maybe four

8    lawyers from Cleary Gottlieb you've mentioned,

9    were there any other lawyers there?

10        A.    Not that I recall.

11             MR. PULTMAN:  Okay.  Thank you very

12        much for your time.

13             MR. ROSENTHAL:  Thank you.

14             MR. PULTMAN:  We are off the record.

15             THE VIDEOGRAPHER:  This concludes

16        today's deposition of Mr. John Ray.  We

17        are now off the record.  The time is

18        4:10 p.m., September 15, 2014.  Thank you.

19             (Time noted:  4:10 p.m.)

20

21

22

23

24

25

1          A C K N O W L E D G M E N T

2

3  STATE OF                )

4                          :ss

5  COUNTY OF               )

6

7          I, JOHN RAY, hereby certify that I

8  have read the transcript of my testimony taken

9  under oath in my deposition of September 15,

10  2014; that the transcript is a true, complete

11  and correct record of my testimony, and that

12  the answers on the record as given by me are

13  true and correct.

14

15          _____

16                    JOHN RAY

17

18  Signed and subscribed to before me

19  this _____ day of _____, 20__.

20

21  _____
   Notary Public, State of New York

22

23

24

25

1            C E R T I F I C A T E

2

3   STATE OF NEW YORK  )

4                      :ss

5   COUNTY OF RICHMOND )

6

7            I, MELISSA GILMORE, a Notary Public

8   within and for the State of New York, do hereby

9   certify:

10           That JOHN RAY, the witness whose

11   deposition is hereinbefore set forth, was duly

12   sworn by me and that such deposition is a true

13   record of the testimony given by such witness.

14           I further certify that I am not

15   related to any of the parties to this action by

16   blood or marriage; and that I am in no way

17   interested in the outcome of this matter.

18           IN WITNESS WHEREOF, I have hereunto

19   set my hand this 16th day of September, 2014.

20

21

22

23   *Melissa Gilmore*

24   _____

25   MELISSA GILMORE

```
                    *** ERRATA SHEET ***

          ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
                New York, New York 10022
                     212-750-6434


NAME OF CASE: IN RE NORTEL NETWORKS, INC.
DATE OF DEPOSITION: SEPTEMBER 15, 2014
NAME OF WITNESS: JOHN RAY

PAGE  LINE       FROM           TO          REASON
____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____


                        _____

Subscribed and sworn before me
this_____day of_____,20__.


_____      _____

(Notary Public)              My Commission Expires:
```

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

**$**

**$1 (1)**
18:7
**$1.01 (8)**
42:3;86:25;87:3;
95:25;96:16;111:19;
113:4;115:17
**$1.6 (1)**
35:19
**$1.65 (4)**
53:12;86:13;89:7;
106:4
**$100 (1)**
102:9
**$2 (1)**
98:5
**$300 (1)**
102:24
**$5.3 (1)**
75:19
**$847 (3)**
42:6,8;43:7
**$876 (1)**
94:20
**$904 (1)**
44:2
**$907 (3)**
85:9;88:10;89:11
**$907.5 (2)**
86:20;89:8

**A**

**ABBOTT (4)**
3:8;61:13,25;62:3
**Abbott's (2)**
61:16,19
**Abid (1)**
11:14
**ability (2)**
42:11;94:16
**above (6)**
36:19,20;50:22,24;
51:9,10
**absence (1)**
94:16
**absent (2)**
39:17;92:2
**absolute (2)**
57:23;92:19
**ACB (1)**
27:3
**acceptable (5)**
52:8;55:25;65:24;
66:2,12
**according (1)**
100:12
**account (6)**
94:21;95:12;
101:24;105:5,9,23
**accounts (2)**
99:3,5
**accrual (15)**
42:16,21,23;43:10,
24;91:22;92:22;93:5,
8,12;94:5,7,15,21;
96:10
**accruals (3)**
38:2;93:2;95:17
**accrue (5)**
42:12;57:24;91:19;
93:17;94:16
**accrued (3)**
43:5;49:20;85:18
**accurate (1)**
44:16
**achieve (1)**
36:23
**achieved (1)**
100:16
**acknowledge (1)**
83:15
**acquainted (1)**
24:18
**actual (4)**
33:21;42:25;88:25;
93:18
**actually (9)**
56:6;81:23;93:18;
97:8,10;112:5;
114:12;115:16;116:2
**ad (1)**
11:19
**added (5)**
58:16;93:24;97:25;
98:4,15
**addition (2)**
58:10;74:17
**additional (8)**
58:8;73:11;91:14,
18;92:22;93:2,5;
94:16
**address (4)**
58:19;59:7;63:5,8
**adjust (1)**
94:18
**adjustment (1)**
92:15
**administer (1)**
72:2
**advance (3)**
23:3,12;66:11
**advancing (1)**
66:17
**advantages (1)**
104:23
**advice (5)**
40:2,4;115:11,14,
15
**advised (1)**
103:21
**advisor (1)**
35:14
**advisors (4)**
99:3,5
**affirmative (1)**
65:25
**afternoon (4)**
12:6;32:20;36:11;
55:9
**Again (5)**
83:2,16,21;84:12;
98:9
**against (5)**
54:25;74:5;75:24;
107:5;112:7
**agent (1)**
25:13
**aggregate (1)**
49:20
**ago (2)**
24:21;25:15
**agreed (11)**
51:16;68:5,6,9;
74:25;93:2,11;94:12;
95:5;110:2,9
**agreed-upon (1)**
57:20
**agreement (65)**
13:6;14:5;19:12;
20:11,15;27:11;42:7;
43:12,23;44:7;46:2;
47:18,22;48:13,18;
49:11,15;53:22,24;
54:15,24;55:18;
63:19;64:2,9;65:15;
67:12,19,20,22,24;
68:7;78:5,10,17,24;
79:11,15,16;80:14;
81:6,8,10,12,17,24;
82:2;83:23;84:3,19;
85:5;86:23;89:23;
90:8,13,18,22,23;
91:7;92:14;94:11;
108:11;109:2,8;
110:3
**ahanrahan@willkiecom (1)**
3:21
**Akin (14)**
11:15;60:21;61:18;
62:24,24;63:19;64:5;
65:8,14,16;67:3,9,12;
68:14
**al (2)**
10:9;46:24
**Albert (1)**
30:19
**Allen (1)**
10:23
**allocate (1)**
111:25
**allocated (1)**
111:9
**allocation (20)**
74:18,22;75:15,18,
23;76:20;97:24;98:7;
100:12,16,17;102:5,
19:10;103:7,11,21
**allow (1)**
33:10
**allowed (5)**
33:11;34:6,8,16;
71:24
**almost (1)**
24:21
**along (1)**
11:22
**Alternative (3)**
5:14;11:8;111:18
**alternatives (2)**
101:20,21
**although (1)**
100:14
**among (1)**
102:15
**amongst (1)**
36:7
**amount (59)**
33:10,11,13,18,21,
25;34:14,20,23,24;
35:4,19;37:6,18,24;
39:7,10;41:23,24;
42:2,19;43:24;44:8;
49:19,19,20;57:13,
15;58:25;59:24;71:2,
10;72:3;73:7,10;
75:8,24;76:8;85:8,
16;91:13,13,15,17,
18;92:7,11;94:18;
96:22;97:24;101:3,4,
12;104:23;111:5,6,
13,24,25
**amounts (12)**
42:17;66:3;71:6;
72:25;75:5;85:23;
93:13,17;94:7,17;
100:17;101:22
**analysis (18)**
70:9,17,22;71:12,
17;74:20;76:12,15;
77:7;96:13,19;99:16;
100:21;102:4,23;
104:5,8;111:20
**analysts (1)**
76:7
**analyze (1)**
39:22
**and/or (1)**
60:20
**ANDREW (3)**
3:18;11:11;30:18
**Andy (1)**
46:23
**Annie (1)**
11:14
**annum (1)**
91:15
**answered (4)**
41:21;88:14;106:6,
17,20;103:5;113:10,
14,24;114:8,16
**anymore (1)**
41:2
**apologies (1)**
29:16
**apologize (2)**
68:12;79:2
**appeals (1)**
39:18
**appear (2)**
23:8;93:22
**appears (3)**
62:25;79:23;89:24
**apples (2)**
95:15,16
**approach (1)**
101:2
**appropriate (2)**
60:24;102:6
**approval (1)**
42:13
**approve (4)**
14:15;16:2;17:4;
107:8
**approved (2)**
44:6,7
**approving (3)**
14:25;15:5;20:3
**approximate (1)**
34:20
**approximated (1)**
51:2
**approximately (4)**
53:2;87:18;97:20;
98:7
**April (3)**
99:22,24;100:3
**areas (1)**
102:3
**arguing (1)**
39:7
**argument (3)**
57:17,17;59:15
**arguments (4)**
57:19;60:3,5,6
**arose (1)**
59:12
**around (12)**
16:16;28:14;32:19;
38:10;39:2;49:4;
51:21;52:12;57:11;
79:20;80:16;90:2
**arrived (1)**
56:11
**ARSHT (1)**
3:3
**articulated (1)**
58:24
**Asset (3)**
5:14;11:9;74:9
**assets (3)**
74:7,13,19;98:10,
12;103:24;104:19

Case 09-10138-MFW    Doc 15043-1    Filed 01/13/15    Page 124 of 562

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

**Association (1)**
11:6
**assume (2)**
113:19;114:3
**assumed (2)**
100:11;104:9
**assumption (6)**
84:11,12,13;99:15,
18;100:11
**Atara (1)**
11:17
**attached (1)**
79:3
**attachment (1)**
79:9
**attempt (2)**
56:16;59:7
**attend (1)**
22:23
**attendance (7)**
19:4,13;30:8,13,
17;32:11,13
**attended (5)**
30:3;116:23,25;
117:2,2
**Attorneys (6)**
3:4,15;5:4,14;
18:13;19:9
**attributable (1)**
92:13
**attribute (2)**
98:20,23
**author (1)**
50:2
**authority (2)**
39:14;108:9
**authorized (2)**
108:7,10
**availability (2)**
72:25;101:6
**available (24)**
28:9;72:24,25;
73:6,7,8,12,13,24;
74:23;75:9;76:9;
96:15,24;97:3;
100:17;101:3,5;
104:21;111:4,6,9;
112:2,5
**Avenue (3)**
3:16;5:5,16
**Avidity (2)**
62:25;63:6
**avoid (1)**
71:9
**avoidance (1)**
91:25
**awards (1)**
74:18
**aware (1)**
105:19

**B**

**back (22)**
12:21;35:25;36:8,
9,13,17;42:14;43:14;
44:11;45:5,12;52:4;
56:4,14;61:8;65:2,6;
78:4;89:16;96:18;
99:22;112:20
**Badtke-Berkow (1)**
10:25
**balance (9)**
32:22;33:22;34:19;
42:22;91:16,20;
93:19,19;96:8
**Bank (2)**
11:9;25:14
**bankrupt (1)**
71:25
**bankruptcy (6)**
25:9,12;26:7,10;
41:5,17
**bar (1)**
117:4
**bargained (2)**
59:21;93:7
**base (1)**
94:3
**based (7)**
52:5;74:21;97:11;
98:6,14;104:19,22
**basic (3)**
16:10,13,14
**basically (1)**
37:16
**basis (1)**
17:25
**Bassett (1)**
11:18
**Bates (12)**
21:13,14,15,18;
47:19,22;54:12,15;
62:16,17;78:6,10
**bearing (2)**
47:19;78:6
**bears (4)**
13:22;21:15;54:12;
62:15
**became (1)**
81:24
**become (1)**
24:18
**began (3)**
16:14;18:22;43:11
**begin (1)**
12:9
**beginning (1)**
33:16
**begins (1)**
109:17
**behalf (14)**
11:2,5,8,12,15,19,
23;16:24;19:11,23;
30:3;31:17;33:9;
108:8

**behind (1)**
79:23
**beneficial (10)**
70:23;71:7,9,17,21,
23;72:5,19;73:9;
101:10
**benefit (4)**
70:10,18;71:4;
97:21
**benefits (1)**
59:21
**besides (1)**
29:6
**best (4)**
28:7;33:5;37:19;
97:15
**better (1)**
59:3
**Beyond (3)**
19:21;69:19;76:6
**BHG-PPI-0000018 (2)**
21:16,18
**BHG-PPI-0000116 (2)**
54:13,16
**BHG-PPI-0000153 (2)**
47:20,23
**BHG-PPI-000082 (2)**
78:7,11
**billion (33)**
18:7;34:25;35:5,7,
19;42:3;53:4,12;
56:22;75:19;76:25;
85:22,22;86:13,25;
87:3,4,4,8,9;88:12,22;
89:7,15;92:3;95:25;
96:12,16;98:5;99:2;
106:4;111:19;113:4;
115:17
**black (3)**
45:11;75:24;97:25
**blackline (1)**
80:19
**blacklined (1)**
54:25
**Blauner (3)**
83:8,22;84:20
**Block (2)**
76:23;77:5
**board (15)**
15:4,8,20;17:3,8;
18:5,8,12;20:2,3,6;
22:8;67:16;107:11;
108:4
**bond (7)**
46:16;50:16;59:25;
60:8;69:5;85:19;
111:10
**bondholder (2)**
70:24;106:8
**bondholders (13)**
11:20;24:5;82:4,
19;92:19,24;93:14,
17;111:15,23;112:3,

4,6
**bonds (58)**
16:24;21:8;31:18,
24;32:4,10;33:9;
36:25;37:5,22;38:14;
40:11;41:18;42:20;
44:22,23;53:14;
58:20,22;59:5,8,18,
20;60:2;64:9;65:10;
67:19;68:18;69:2;
73:3;81:19;82:4,11;
83:12;84:2,13;85:4;
90:7,12;91:17,20,25;
92:13;93:10;95:13,
23;98:5;105:21,25;
106:15,18;109:4,25;
110:9;111:14;113:4;
115:3,16
**bonds' (1)**
110:16
**bond's (3)**
40:23;41:5,13
**both (7)**
37:17,24;44:25;
70:25;98:18;109:25;
110:8
**Botter (1)**
62:24
**Box (3)**
3:6;75:24;97:25
**Bradley (1)**
10:24
**break (1)**
60:24
**break-out (1)**
35:13
**brief (1)**
28:13
**briefing (1)**
37:12
**briefings (1)**
37:15
**briefly (1)**
65:22
**broadly (1)**
115:8
**broke (2)**
35:12;36:12
**built (1)**
100:11
**burn (2)**
99:16,18
**business (1)**
104:3

**C**

**cab (1)**
108:20
**calculated (3)**
43:5;85:18;97:18
**calculating (1)**
96:20

**calculation (9)**
44:12;87:15;97:14;
98:19,21;100:23;
101:17;104:9,20
**calculations (1)**
97:5
**calculator (2)**
87:11,12
**call (20)**
13:6;27:8;28:16,
18;29:8,9;46:22,23,
25;47:2,3;50:9;
61:24;66:5,5;77:17;
82:17,22;83:10,21
**called (4)**
26:17;27:3;29:12;
59:15
**calls (2)**
50:8;51:5;58:5;
62:4
**came (11)**
36:8;49:3,5;50:16;
56:4,14;84:18;85:14;
87:17,17;117:3
**Can (39)**
16:5,9,13;17:17;
20:13,17;24:11;26:3,
15;28:6,17;32:24;
33:6;36:13;37:19;
38:16;41:8;42:10;
46:9;47:10;48:8;
54:9;55:20;71:11,11;
75:20;76:3;96:5,17,
25;97:5;103:15,18;
108:4,16;109:20;
112:11;114:19;115:7
**Canada (2)**
98:5,11
**Canada's (1)**
98:6
**Canadian (13)**
11:2;29:2;37:13;
38:7,12,13;74:6,7,10;
98:12,15;105:20;
106:17
**cap (22)**
42:2;57:23;75:5;
86:24;87:17;92:2,19;
93:4;95:24,25;96:23;
97:3;98:18;100:18;
101:4,5,10,12,18,23;
111:19,20
**Capital (1)**
5:15
**capped (2)**
42:15;111:23
**capping (1)**
73:10
**caps (1)**
74:24
**case (7)**
12:7,22;24:12,14,
23,24;25:18

Case 09-10138-MFW   Doc 15043-1   Filed 01/13/15   Page 125 of 562

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

**cases (2)**
24:17;26:13
**cash (12)**
72:23,24;73:8,24;
74:23;75:7;96:15;
98:2;99:16,18;101:5,
18
**cc (2)**
62:25;63:6
**CCs (1)**
54:22
**cease (1)**
42:23
**cell (2)**
29:17,20
**centered (2)**
33:24;34:13
**certain (13)**
20:16;22:20;33:3;
50:8;59:18;74:15,22;
88:4;96:22;97:17;
100:15;104:8,21
**certainly (2)**
37:15;39:11;64:10
**certainty (1)**
71:5
**CGSH (2)**
78:25;79:16
**chance (1)**
12:10
**change (6)**
53:17;85:13,14;
92:8;94:13;100:24
**changed (1)**
95:22
**changes (1)**
91:7
**Chapter (4)**
25:18;38:23;39:4;
71:25
**charges (1)**
108:12
**chief (2)**
25:3,5
**Chilmark (5)**
19:14,16,18;35:15;
73:22
**chose (1)**
81:25
**circulated (3)**
80:7,10;86:18
**city (2)**
55:13,14
**claim (21)**
33:10,12,13;34:5,6,
8,14,17;59:2;70:24;
71:24;72:3;76:13;
83:14;98:5,20,21;
102:9,10;108:3;
111:16
**Claimants (2)**
3:15;11:13
**claims (17)**

72:2;74:5;98:2,24,
25;99:4,5,6,7,10,12;
102:10;107:3,4,5,20;
112:7
**clarify (2)**
61:11;62:6
**clarifying (1)**
61:23
**clarity (1)**
79:8
**clean (1)**
54:25
**cleaner (1)**
86:6
**clear (10)**
13:17,21;31:20;
41:25;77:12;81:24;
89:21;95:24;100:10;
116:4
**Cleary (22)**
10:11;19:3,10,13,
21;22:24;28:8;29:24,
25;30:5;44:18;45:13;
54:5;59:12;60:20;
64:6;67:10;79:24;
80:13;90:25;91:3;
117:8
**Cleary's (1)**
47:13
**client (1)**
80:7
**clients (2)**
65:16;66:21
**close (1)**
36:22
**closer (2)**
56:14;58:9
**coincidently (1)**
43:21
**Coleman (1)**
10:24
**colleagues (1)**
10:24
**comfortable (1)**
52:3,6
**comments (3)**
45:6,8;77:4
**committee (8)**
11:16;26:12;65:24;
67:16;68:10,24;
110:20,22
**committee's (1)**
110:18
**communicate (2)**
31:2;70:20
**communicated (16)**
27:25;28:2;35:24;
36:2;45:9;55:22;
58:6;60:10,16,21;
65:8;67:15;69:25;
70:5;90:25;92:20
**communicating (1)**
38:11

**communication (4)**
27:22;57:11;58:7;
63:14
**communications (7)**
20:21;36:25;46:15;
60:15;62:9;65:9;
90:11
**company (5)**
20:24;47:3;68:22,
24;110:16
**comparable (1)**
88:6
**compare (1)**
34:11
**comparing (1)**
87:22
**complete (6)**
34:12;74:8;94:20,
25;95:3;110:10
**complexity (1)**
105:6
**computer (1)**
97:9
**concept (2)**
73:10;93:20
**concerning (2)**
57:6;77:14
**concluded (1)**
74:21
**concludes (1)**
117:15
**conference (2)**
77:13,18
**confidential (106)**
12:12;13:1;14:1;
15:1;16:1;17:1;18:1;
19:1;20:1;21:1;22:1;
23:1;24:1;25:1;26:1;
27:1;28:1;29:1;30:1;
31:1;32:1;33:1;34:1;
35:1;36:1;37:1;38:1;
39:1;40:1;41:1;42:1;
43:1;44:1;45:1;46:1;
47:1;48:1;49:1;50:1;
51:1;52:1;53:1;54:1;
55:1;56:1;57:1;58:1;
59:1;60:1;61:1;62:1;
63:1;64:1;65:1;66:1;
67:1;68:1;69:1;70:1;
71:1;72:1;73:1;74:1;
75:1;76:1;77:1;78:1;
79:1;80:1;81:1;82:1;
83:1;84:1;85:1;86:1;
87:1;88:1;89:1;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1;107:1;
108:1;109:1;110:1;
111:1;112:1;113:1;
114:1;115:1;116:1;
117:1

**confirm (1)**
83:19
**confirmation (1)**
64:20
**confused (1)**
63:15
**confusion (1)**
116:5
**conjecture (2)**
67:25;68:3
**connection (8)**
12:14,25;16:6;
22:6;23:4;25:17,23;
64:13
**consent (1)**
84:10
**consented (1)**
28:3
**consider (6)**
12:13;96:14;
105:25;106:14;
107:12;108:5
**considered (3)**
12:12;39:13;75:8
**considering (4)**
75:7;97:6;98:2;
102:12
**consistent (2)**
50:11,14
**constant (1)**
94:12
**consult (1)**
18:4
**consultant (1)**
32:2
**consultation (1)**
103:6
**consulting (1)**
31:22
**contact (1)**
90:19
**contacted (2)**
20:7;83:4
**contained (1)**
55:17
**Cont'd (2)**
3:1;5:1
**contemplated (2)**
81:9;84:7
**context (3)**
25:16;84:5;114:20
**continue (2)**
42:11;57:24
**continued (4)**
36:4,6;38:3;93:21
**continuing (1)**
38:2
**contract (7)**
39:21;40:11;41:14,
19,24;93:9;111:18
**contracts (1)**
38:22
**contractual (5)**

37:6;57:14,18;
59:17;93:23
**conversation (17)**
24:7;26:20;27:6,
12;28:4,6,13;33:24;
47:4;64:7,13;65:17;
66:16,19;82:13;
83:17;90:20
**conversations (27)**
20:23;21:5,7;
46:18,20;50:3;53:25;
54:4,5;55:15;57:4;
59:11;65:14;67:3,9;
82:7;90:15;91:6;
109:4;112:24;113:2,
6,14,22;114:25;
115:8;116:7
**copied (1)**
80:4
**correctly (1)**
50:19
**costs (1)**
65:22
**counsel (46)**
10:19;20:23;21:2;
25:20,25;26:11;27:6,
8,11,13,22,23;28:2;
35:14;47:3;55:22;
61:15;63:14;67:3,9;
68:15;69:15;70:5;
77:23;79:24;90:16,
16;91:6;103:7,7,10,
21,21;110:15,16,18,
20;112:25;113:3,7,
23;115:2,8;116:8,12,
13
**counsel's (4)**
22:8;103:10;
113:20;114:4
**counteroffer (7)**
35:16,17,23;36:2,
15,18;51:25
**counteroffered (1)**
35:18
**couple (3)**
46:11;92:10;
112:11
**course (2)**
63:22;66:6
**court (25)**
10:14,16,18;11:25;
12:15,18;14:10;37:3;
39:9,18;40:10,14,20,
25;41:2,3,5,17;42:13;
76:23;77:24;94:3;
96:18;99:21;100:13
**courtesy (1)**
68:13
**courts (1)**
29:3
**cover (6)**
54:20;62:22;78:14;
79:9,12;80:2

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

**covering (1)**
100:4
**created (1)**
102:23
**creditor (6)**
68:21,23;70:23;
71:18,21;82:7
**creditors (24)**
11:16;26:11;60:11,
16;62:10;68:16;69:8,
19,25;70:19;73:2;
101:11;110:4,11,13,
21,23;111:2,7,10,11,
16;112:2,8
**CRICHLOW (3)**
5:7;11:4,4
**CRO (1)**
24:16
**current (3)**
55:24;56:19;99:25
**currently (3)**
15:8,21;44:5
**cut (1)**
84:24
**cute (1)**
46:3

## D

**dabbott@mnatcom (1)**
3:11
**DAN (2)**
5:24;10:17
**date (13)**
42:12,13,18,22,25;
43:20;44:4;51:15;
81:23;83:24;91:24;
93:16;94:10
**dates (3)**
16:16;46:17;83:3
**DAVID (2)**
5:7;11:4
**davidcrichlow@kattenlawcom (1)**
5:10
**day (10)**
32:17,23;43:3;
44:8,8;53:19;54:7;
63:23;94:2,14
**day-to-day (1)**
17:25
**deal (1)**
111:24
**debate (5)**
38:20;39:2;84:20;
86:4;111:8
**debtor (1)**
38:24
**Debtors (7)**
3:4;11:2,23;38:7,
13;105:20;106:18
**Debtors' (5)**
13:10,14,24;25:25;
37:13

**December (1)**
24:20
**decide (1)**
66:4
**decided (1)**
84:15
**decision (2)**
43:25;81:18
**decisions (2)**
17:25;108:8
**define (1)**
17:17
**defined (1)**
74:15
**Delaware (5)**
3:7;14:10;41:5;
55:14;64:24
**demand (11)**
33:17,25;34:4,16;
35:10,20;36:14;37:7;
50:11,15,15
**demands (1)**
57:12
**Dennis (12)**
23:23;24:2,4,6,13;
46:19,23;82:17,18,
21,22;90:19
**denominator (1)**
88:9
**denominators (1)**
87:22
**dependent (1)**
100:22
**depending (3)**
72:24;77:2;85:17
**depends (3)**
74:4,4,6
**deposed (2)**
12:7,22
**deposition (13)**
10:7,10;22:7,13;
61:7;108:17,21,24;
112:19;116:11,13,14;
117:16
**DEREK (2)**
3:8;62:3
**derivation (1)**
98:3
**derive (2)**
76:4;92:15
**derived (3)**
77:11;92:9;97:22
**describe (4)**
16:5;28:6;33:6;
71:11
**described (1)**
113:7
**designated (1)**
12:25
**designed (2)**
111:3,24
**desire (1)**
33:8

**desired (1)**
33:14
**detail (1)**
71:12
**detailed (1)**
115:10
**details (1)**
64:12
**detect (1)**
117:5
**determination (2)**
72:3;74:13
**determine (4)**
71:20,23;72:18;
111:6
**determined (4)**
39:17;70:25;94:10;
104:20
**determines (2)**
111:12,13
**detrimental (1)**
72:4
**DI (4)**
102:13;113:11,25;
115:5
**dialogue (1)**
38:10
**different (6)**
26:25;29:14;87:22;
92:10;95:7;100:20
**direct (3)**
113:11,25;115:5
**direction (5)**
22:9,19;55:22;
113:20;114:4
**director (2)**
15:12,14
**directors (5)**
15:4,9;17:4;
107:11;108:5
**disagreement (1)**
12:16
**Disciplinary (2)**
27:16,16
**discuss (7)**
28:11;36:7;45:2;
59:9;83:9;84:22;
90:23
**discussed (6)**
35:13;38:5;63:24;
67:11;82:6;110:17
**discussing (1)**
33:20
**discussion (14)**
16:16;22:25;23:5;
28:22,25;34:9,10,21;
36:24;37:22;38:17;
62:12;110:8;111:8
**discussions (11)**
16:20,23;36:4,6,
21;37:5,10,12;39:5;
44:17,22
**dispute (15)**

28:12,23;33:14;
37:2;102:5,17,21;
105:6,10;106:17;
107:2,24,25;114:8,17
**disputes (1)**
71:10
**disputing (1)**
106:18
**distribute (3)**
75:10;76:9;96:15
**distributed (1)**
42:20
**distribution (4)**
77:3;91:24;92:2;
98:4
**distributions (3)**
92:23;93:15;96:10
**divide (1)**
40:15
**document (49)**
13:10,13,21,22;
14:6,16,22;15:2,6,24;
16:11;21:15,22,25;
22:10,11;23:11;
45:25;47:17;48:3,6,
9;49:10,25;50:2;
51:16;53:8,20;54:12,
20;55:4;56:7;57:2;
59:13;62:14,21;63:3,
9;78:6,21,22,23;79:4,
23;84:7,11;88:25;
89:9,22
**documents (3)**
22:5;97:12;108:23
**dollar (5)**
56:23;85:15,23;
86:7;111:5
**dollars (3)**
35:6;44:10;77:2
**done (14)**
33:2;37:15;44:3;
65:12;72:9,13,14,18;
76:7,12,16;96:13,19;
103:19
**doubt (1)**
92:2
**down (6)**
22:11;44:2;47:11;
52:6;56:18;94:8
**draft (47)**
20:11;21:12,17;
23:4,8,18;45:4;46:2,
8;47:18,21;48:12,17;
49:11,15,23;50:10;
53:21,24;54:14,24;
55:23,24;58:2,17;
63:18;64:2;78:24,25;
79:14,16;80:6,9,14,
17;81:5;83:24;84:3;
85:9;86:9,11,11,17;
88:21;89:4,12;92:11
**drafted (5)**
23:15;109:20,22,

23;110:12
**drafting (4)**
48:17;85:25;86:2,6
**drafts (8)**
20:10,14,18;45:11,
18,19,20;46:12
**drill (1)**
47:10
**drive (1)**
74:19
**driver (1)**
108:20
**dropped (1)**
86:8
**Dunne (22)**
23:23;24:2,4,6,13,
19;25:13,16;26:14,
18,19;27:6,10,20;
28:5;29:6,20;30:13;
46:19,23;82:18;
90:19
**Dunne's (3)**
25:11,23;26:9
**during (3)**
19:4;51:3;91:21

## E

**earlier (6)**
62:8;82:6;91:23;
105:13;113:8;116:5
**early (2)**
55:8;60:7
**Earthlinknet (2)**
63:2,6
**eat (1)**
117:3
**Eckenrod (3)**
11:23;78:15;117:2
**effect (8)**
37:16;57:19;65:15;
73:13;90:17,24;
101:4;110:24
**effectively (1)**
57:11
**either (6)**
28:10;31:2;45:22;
48:10;81:16;111:17
**Ellen (2)**
10:15,17
**else (16)**
16:24;19:18,22;
29:5;30:11;31:14,17;
32:3,10,12,14;62:5;
66:7;76:3;88:5;
108:14
**E-MAIL (22)**
3:11,21;5:10,21;
21:17;47:18,21;
54:14,20;62:17,22;
63:5,8,18;78:9,15;
79:3,9,12,24,25;80:2
**EMANUEL (2)**

5:13;11:8
**embodied (3)**
45:25;57:20;59:3
**embodies (1)**
41:22
**EMEA (5)**
107:2,2,4,5,14
**employed (1)**
17:20
**employee (1)**
17:12
**employees (2)**
17:19;18:11
**enclosed (1)**
54:23
**end (3)**
36:3;52:2;100:20
**ended (1)**
51:12
**engage (1)**
68:2
**Enron (3)**
26:5,6,10
**ensure (1)**
72:11
**entertain (1)**
73:9
**entire (2)**
28:12;93:5
**entirety (1)**
85:3
**entitled (11)**
13:10;33:15;34:3;
37:6;39:8;41:18;
59:5,20;60:4;83:13;
106:4
**entitlement (16)**
33:19;37:18,24;
38:18,21;39:11,21,
23;40:7,11,23;41:6,
13,23;57:18;58:25
**entitlements (2)**
57:19;93:23
**entity (1)**
71:25
**entrusted (1)**
38:8
**Entry (3)**
13:11,15,25
**equal (3)**
85:9;91:13,15
**equity (7)**
69:12;72:19;73:14;
75:6;96:24;97:21;
101:11
**errors (1)**
14:22
**ESQ (4)**
3:8,18;5:7,18
**essentially (2)**
23:24;102:15
**established (1)**
33:12

**estate (23)**
71:5;73:3;74:5,6,7,
10;92:20,22,23,24,
25;98:3,15,24,25;
101:10;107:6,18,25;
108:8,13;110:4,9
**estates (3)**
72:23;74:20;
103:25
**estimate (2)**
28:17;32:24
**estimated (2)**
34:19,23
**estimation (1)**
104:4
**et (1)**
10:8
**Evans (1)**
11:15
**even (6)**
27:12;74:10;84:21;
93:25;94:21;95:16
**eventualities (1)**
101:13
**everybody (1)**
46:25
**exact (2)**
16:16;33:11
**exactly (4)**
51:13;58:5;60:19;
77:10
**EXAMINATION (4)**
12:4;115:24;116:6,
18
**example (2)**
57:16;60:8
**exceed (1)**
101:22
**excess (19)**
35:4;43:6;44:2,9;
74:23,24;75:5,7;87:4,
8;96:15,16,23;97:2,
20,20;98:17;100:18;
104:20
**exchange (1)**
45:11
**exchanged (2)**
48:14;49:11
**exclude (2)**
22:5;116:7
**excluded (1)**
81:12
**exclusively (2)**
100:21;101:20
**Exhibit (30)**
13:12,14;14:4;
15:2,6,24;16:3;21:12,
17,23;22:14;43:4;
47:17,21;48:4,25;
53:21;54:9,14;62:15,
17;70:18;78:6,9;
84:2;89:4,13,17;
109:3;114:23

**exist (1)**
115:21
**existed (1)**
59:25
**existence (2)**
60:10,14
**expected (1)**
98:14
**expense (3)**
66:11,17;105:10
**express (2)**
34:16;38:14
**expressed (5)**
38:12;40:10;41:17;
82:18;83:12
**extend (1)**
68:13
**extent (4)**
71:6;81:8;103:4;
104:7

## F

**face (1)**
116:3
**fact (5)**
52:22;72:8;88:23;
89:7;96:12
**factored (1)**
104:8
**factors (2)**
74:4;102:22
**fair (22)**
17:24;40:9;43:15;
44:4;51:7,11,22;
52:13,23;53:2;72:7;
84:4,5,6,6;85:5;
86:10;88:7;90:6;
93:25;94:19;111:21
**familiar (6)**
26:16;27:2,15;
63:7;75:12;77:15
**FARR (2)**
3:14;11:12
**FAX (4)**
3:10,20;5:9,20
**feel (1)**
66:9
**felt (4)**
37:5,23;52:3,6
**Fernando (1)**
15:14
**few (5)**
35:5;45:17,19;
57:12;78:8
**Fifteen (1)**
25:15
**figure (1)**
43:14
**filed (5)**
13:22;14:9,16;
38:9;94:3
**filing (5)**

14:15,25;15:5;
16:3;43:3
**final (8)**
20:11;72:3;86:23;
89:18;90:8,13;91:24;
95:6
**finalized (2)**
47:9;81:17
**finally (1)**
70:25
**financial (13)**
19:10;31:21,25;
35:14;71:19,22;72:7,
8,13,17;73:17,23;
76:7
**financially (2)**
73:20,21
**find (3)**
39:10;54:23;
100:13
**finished (1)**
84:23
**finite (1)**
93:4
**firm (7)**
19:7;23:16;30:17;
31:15;61:17,18,19
**firmly (1)**
37:23
**first (15)**
13:23;16:15;24:18;
25:15;26:19;38:16;
48:8,12;49:10;55:6;
57:25;78:19;88:12;
92:15;103:13
**five (4)**
14:2;28:19;56:12;
85:22
**Floor (2)**
3:5;5:16
**flow (2)**
73:13;75:6
**focus (1)**
34:12
**folks (1)**
50:4
**follow (1)**
39:19
**followed (1)**
48:22
**following (2)**
113:19;114:3
**follow-up (1)**
116:20
**forego (1)**
60:2
**forget (1)**
66:5
**form (29)**
17:16;24:10;26:21;
29:10;31:4;39:24;
41:7;42:9;43:8;
49:16,24;53:6;54:2;

55:19;68:7;69:21;
70:11;71:14;77:9;
87:5;94:24;95:19;
104:17;106:5,12;
107:16,19;108:2;
114:9
**formed (3)**
66:24;67:23;
107:21
**formula (5)**
85:16;86:3;92:17;
95:2;96:7
**formulate (1)**
66:14
**formulation (2)**
92:8,9
**forth (5)**
36:9,14,17;45:13;
52:4
**found (3)**
65:24;66:2;84:15
**foundation (1)**
75:22
**four (1)**
117:7
**frame (1)**
21:9
**Fred (6)**
63:22;64:3,5;
65:18,23;66:13
**Friday (1)**
64:21
**front (5)**
37:2;40:20;52:18;
77:13;97:12
**Fruit (3)**
25:17,19,24
**FTI (5)**
31:19,23,24;32:5;
92:21
**full (13)**
37:6;39:11;42:19,
22;58:25;59:5,20;
76:5;83:13;93:9,19;
96:9;98:9
**fully (2)**
70:24;74:15
**function (1)**
92:18
**funds (1)**
110:25
**further (11)**
36:9;53:25;57:4;
71:9;80:6;91:5;
109:4;115:19,21;
116:17,18
**future (1)**
111:8

## G

**GALLAGHER (2)**
3:14;11:12

**gap (1)**
36:22
**gave (1)**
103:25
**general (1)**
25:20
**generally (1)**
102:7
**generated (2)**
45:14,15
**Gilmore (1)**
10:15
**given (1)**
104:14
**goes (3)**
42:2;54:21;55:2
**Good (1)**
12:6
**Gottlieb (8)**
10:11;22:24;29:24;
44:18;64:6;79:24;
80:13;117:8
**Gottlieb's (1)**
29:25
**granular (1)**
54:7
**Grauer (2)**
10:15,18
**great (2)**
33:20;55:13
**greater (1)**
101:9
**Gross (1)**
77:14
**group (12)**
11:20;24:24;25:14;
31:22;37:10;47:2;
54:22;64:19;70:23;
71:18,21;78:15
**grow (1)**
38:2
**guarantee (1)**
112:4
**Guaranteed (3)**
91:17,20,25
**Guerra (2)**
15:14,19
**guess (2)**
39:13;96:17
**guidance (1)**
12:17
**Gump (13)**
11:15;60:21;61:18;
62:24,25;63:20;64:5;
65:8,14;67:3,9,12;
68:14
**Gump's (1)**
65:16

**H**

**Hadley (1)**
11:19

**half (5)**
35:6;44:9;56:23;
95:18;96:7
**Hamilton (1)**
10:12
**hand (4)**
101:7;111:10,11,
15
**handicaps (1)**
102:15
**HANRAHAN (3)**
3:18;11:11,11
**happen (2)**
81:14;93:12
**happened (1)**
95:9
**Happy (4)**
22:18;87:19,24;
88:24
**hard (1)**
20:16
**Harris (1)**
54:21
**head (1)**
76:2
**heard (4)**
40:16;67:22,22;
78:20
**hearing (5)**
13:2;43:16;44:5;
64:20;77:25
**held (2)**
10:10;25:20
**helpful (1)**
89:2
**high (3)**
50:25;51:23;97:19
**highly (106)**
12:12;13:1;14:1;
15:1;16:1;17:1;18:1;
19:1;20:1;21:1;22:1;
23:1;24:1;25:1;26:1;
27:1;28:1;29:1;30:1;
31:1;32:1;33:1;34:1;
35:1;36:1;37:1;38:1;
39:1;40:1;41:1;42:1;
43:1;44:1;45:1;46:1;
47:1;48:1;49:1;50:1;
51:1;52:1;53:1;54:1;
55:1;56:1;57:1;58:1;
59:1;60:1;61:1;62:1;
63:1;64:1;65:1;66:1;
67:1;68:1;69:1;70:1;
71:1;72:1;73:1;74:1;
75:1;76:1;77:1;78:1;
79:1;80:1;81:1;82:1;
83:1;84:1;85:1;86:1;
87:1;88:1;89:1;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1;107:1;

108:1;109:1;110:1;
111:1;112:1;113:1;
114:1;115:1;116:1;
117:1
**hired (1)**
103:7
**hoc (1)**
11:19
**Hodara (5)**
62:24;64:4,5,7;
66:16
**hold (1)**
102:25
**holder (2)**
69:2,4
**holders (2)**
58:12;97:21
**hours (1)**
32:25
**hundred (2)**
35:6;98:22
**hung (1)**
45:23

**I**

**identification (6)**
13:16;21:19;47:24;
54:17;62:19;78:12
**identified (2)**
69:20;82:8
**immaterial (1)**
85:21
**implied (1)**
104:4
**inaccurate (2)**
44:14,16
**Inc (2)**
5:15;11:10
**include (2)**
53:13;99:11
**included (3)**
61:16;84:3,14
**includes (2)**
99:7,9
**including (3)**
57:13;101:11;
113:9
**inclusion (3)**
81:19;84:10,18
**Incorporated (1)**
10:8
**incorrect (2)**
77:25;88:2
**increased (1)**
94:4
**indebtedness (1)**
85:19
**indenture (3)**
65:20;66:15,18
**independent (3)**
97:13;103:4;
116:12

**independently (1)**
103:20
**indicate (1)**
62:22
**indicated (8)**
23:10;37:23;82:6;
83:22;86:19;88:22;
89:6;95:11
**indicates (6)**
53:8;54:23;77:20;
80:5;85:8;89:10
**indicative (2)**
48:19,24
**indifferent (2)**
84:17;85:2
**informed (1)**
104:5
**initial (2)**
27:8;55:23
**initially (1)**
43:20
**input (2)**
100:22;103:10
**inputs (9)**
97:6,6;100:23;
101:16,25;102:8,22;
104:2,13
**inserted (1)**
58:18
**insistence (2)**
92:18;109:21
**instance (1)**
58:2
**instruct (1)**
22:3
**instructed (1)**
116:7
**instruction (1)**
22:16
**instructions (1)**
103:16
**insufficient (1)**
110:25
**interactions (1)**
26:14
**interest (13)**
38:19,23,25;42:12;
43:6,11,24,25;57:23;
60:5;73:2;85:19;
111:17
**interests (1)**
80:8
**internal (1)**
80:6
**into (14)**
21:5;35:25;38:17;
64:11;84:10;86:9,23;
94:21;101:16;105:5,
9,23;113:13;115:9
**introduce (1)**
10:19
**invited (1)**
30:6

**involved (19)**
14:25;15:5;17:13,
21;18:14,17,19;19:2,
4,7,11,18,23;24:15,
17;27:9;61:15;64:14;
106:25
**involvement (2)**
16:6;20:20
**issue (11)**
16:25;40:16,21;
59:22;66:8;101:18;
105:21;106:2;
113:10;115:4,22
**issues (3)**
103:5,5;115:11
**iteration (1)**
36:17

**J**

**Jacob (1)**
10:22
**JAMES (2)**
5:18;11:7
jamestecce@quinnemanuelcom (1)
5:21
**January (1)**
100:4
**Jay (3)**
12:8;13:18;79:7
**Jeff (1)**
11:21
**Jennifer (1)**
54:21
**jobs (1)**
71:24
**Joe (1)**
10:25
**John (5)**
10:7;61:7;112:19;
116:3;117:16
**JR (2)**
62:25;63:6
**Judge (1)**
77:13
**judgment (1)**
104:3
**July (39)**
16:18,19,24;18:23;
20:19;21:9;22:23;
23:19,22;28:6;29:24;
43:5;44:18;46:6;
47:7;60:10;62:11,23;
63:10;65:13;67:21;
77:12;78:17;79:15,
21;80:13,17;84:4,23;
86:24;90:3;91:22;
94:2,22,22,23;95:16;
99:9,11
**juncture (1)**
53:14
**June (11)**
20:19;34:19;42:15,

Case 09-10138-MFW    Doc 15043-1    Filed 01/13/15    Page 129 of 562

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

21,25;91:23;92:3;
93:3,16;96:2,11

**K**

**KATTEN (2)**
5:3;11:5
**Katzenstein (2)**
31:19,21
**Ken (1)**
10:24
**Kennedy (4)**
19:17,22;30:6;
35:15
**kind (4)**
38:16,17;60:4;
73:23
**Kinrich (1)**
100:12
**Kinrich's (4)**
75:13,21;97:23;
98:7
**knew (1)**
31:10
**knowing (1)**
98:9
**knowledge (18)**
14:21;15:23;16:2;
17:3,7;20:2,6;45:8;
48:14;49:23;53:23;
56:21;60:14,18;
72:17;76:10,15;78:2
**known (2)**
15:18;74:10

**L**

**laid (1)**
106:22
**landline (2)**
29:18,21
**language (1)**
46:5
**large (1)**
70:23
**largely (1)**
33:22
**last (8)**
32:7,21;50:15,20;
67:23;68:5;99:23;
106:21
**lasted (1)**
32:22
**lastly (1)**
93:11
**later (3)**
21:6;45:17;57:9
**law (1)**
39:22
**lawyer (2)**
24:2;103:16
**lawyers (11)**
18:25;19:3,6;

23:18;30:5;63:19;
69:18;70:4;87:20;
117:8,9
**learn (1)**
23:21
**least (3)**
20:17;46:21;76:4
**leaves (1)**
111:7
**Leblanc (4)**
30:19,20;31:11;
46:24
**led (3)**
48:17;51:17;55:16
**left (6)**
34:9;44:20,25;
45:7;53:23;66:13
**legal (4)**
10:16;41:13;
115:14,15
**lemon (1)**
117:4
**length (2)**
28:17;33:21
**less (9)**
28:14;38:10,15;
39:10;56:12,12;85:3;
101:3;104:24
**lesser (1)**
39:7
**level (2)**
58:6;74:6
**liabilities (7)**
74:7,14,19;98:10,
13;103:24;104:19
**Liberty (1)**
10:12
**life (1)**
59:21
**likelihood (4)**
75:3;101:24;
102:11;113:3
**likely (4)**
37:9;104:13,16;
113:23
**lines (1)**
45:12
**Lisa (9)**
11:22;30:4,6;49:5;
54:22,23;63:25,25;
64:6
**list (2)**
32:12,14
**litigating (2)**
105:10,20
**litigation (2)**
115:3,16
**little (2)**
33:4;87:3
**LLP (5)**
3:3,14;5:3,13,15
**located (1)**
10:12

**location (1)**
28:15
**logistical (1)**
28:15
**long (2)**
32:21;92:22
**longer (1)**
33:4
**look (8)**
23:4,14;45:4;
80:19;88:15,25;89:3;
109:7
**looked (4)**
23:12;86:17;88:11;
101:3
**looking (3)**
53:9;80:20;83:25
**Loom (3)**
25:18,19,24
**lot (1)**
74:11
**lower (2)**
52:2;56:2
**Luiz (1)**
15:18

**M**

**MACOM (2)**
5:24;10:17
**Macquarie (2)**
5:15;11:9
**Madison (2)**
5:5,16
**make-whole (2)**
57:17;59:15
**Management (2)**
5:14;11:9
**many (4)**
20:14;58:5;100:23;
101:16
**mark (4)**
53:20;54:8;62:15;
78:5
**marked (16)**
13:9,12,15;15:24;
21:12,19,22;43:4;
47:17,23;48:3;54:16;
62:18;78:11;84:2;
89:13
**Market (1)**
3:5
**markups (1)**
46:12
**material (6)**
107:15,17,18,20,
25;108:3
**materiality (1)**
107:22
**materialized (1)**
58:2
**math (9)**
44:3;53:7,10,

75:21,23;76:2;87:20,
25;94:9
**mathematical (1)**
87:15
**mathematically (1)**
97:11
**matter (21)**
10:7;13:6,7;24:14,
16;25:24;26:16,24,
25,25;27:2;29:2,13,
14,14,15;31:6;48:13;
64:14,15,18
**matters (2)**
31:9,12
**maturity (1)**
60:2
**maximum (5)**
75:8;76:8;91:17;
96:8,14
**may (22)**
22:20;29:16;30:4;
33:3;35:3;36:16;
45:13;50:25;51:5;
54:5;55:7,7;66:6;
67:11;82:14,19;
83:17;100:8;101:15;
111:16;115:21;117:6
**maybe (6)**
28:20,20;76:3;
89:2;98:13;117:7
**McCloy (1)**
11:19
**mean (13)**
17:15,17;37:4;
45:10;55:21;67:22;
70:21;81:8;84:6,11;
95:4;97:4;102:2
**meaning (1)**
33:11
**mechanics (1)**
28:14
**meet (3)**
56:17;74:24;
116:13
**meeting (46)**
22:23;23:3,13,16,
19,22,24,25;28:5,9,
15;29:23;30:7,9,14,
21,24;31:3;32:14,18,
21;33:7,17;34:13,13;
35:12,24;36:4,12,23;
37:4;46:14,20;47:12;
49:7;50:5,10,16,21,
24,25;51:3,4,19;
116:21,23
**Melissa (1)**
10:15
**Melker (1)**
32:5
**member (3)**
15:20;18:5;20:7
**mentioned (1)**
66:7;117:8

**mentioning (1)**
61:16
**met (1)**
25:16
**Michael (2)**
19:17,22
**middle (2)**
18:23;56:18
**might (6)**
39:6,18;60:3;86:5;
97:7,19
**Mike (3)**
30:6;31:19;35:15
**Milbank (26)**
11:18;16:20;23:15,
23;24:2,13;30:17;
31:14;32:2;45:9,14;
50:4;53:25;54:4,6,
21;55:16,22;58:18;
60:20;66:13;83:16;
86:18;90:16;92:21;
110:17
**MILLER (2)**
11:17,17;27:18,24
**million (28)**
35:6;42:4,6,8;43:7;
44:2,9;53:11;56:23;
76:25;85:9;86:12,20;
88:10,23;89:8,11;
91:14,18;92:10;94:4,
20;95:11;97:19,20;
98:22;102:9,24
**millions (1)**
85:24
**mind (3)**
38:19;39:2;96:20
**minute (2)**
67:23;68:6
**minutes (4)**
28:20,20;106:21;
112:11
**mispronounce (1)**
15:17
**miss (1)**
36:16
**misspoke (1)**
56:5
**misstate (1)**
96:4
**misstatements (1)**
14:22
**mistranscribed (1)**
52:22
**misunderstanding (1)**
82:24
**modeled (1)**
99:2
**modeling (13)**
71:19,22;72:7,9,13,
18;73:17;74:2;76:8;
102:21;103:4,23;
113:7
**models (1)**

Case 09-10138-MFW   Doc 15043-1   Filed 01/13/15   Page 130 of 562

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

73:23
**moment (2)**
21:4;22:9
**moments (1)**
78:8
**Monday (9)**
10:4;28:10;49:4;
57:9;78:17;80:16;
82:15;86:11;89:12
**money (1)**
77:2
**monitor (9)**
11:3;34:24;38:8,
13;69:16;70:5;
105:19;106:18;115:4
**monitor's (1)**
37:13
**months (1)**
45:17
**MOR (1)**
99:24
**more (9)**
15:11;18:16;28:14,
19;38:9;71:12;98:17;
113:4;115:17
**morning (1)**
116:22
**MORRIS (4)**
3:3;67:11;90:25;
91:4
**most (1)**
99:24
**mostly (4)**
28:15;33:25;34:13;
38:7
**motion (17)**
12:14;13:11,15,18,
24,25;43:4,16,17;
77:14;89:17,20;
106:16,16;109:5;
114:14;115:21
**move (3)**
51:17;56:14;
100:25
**moved (4)**
36:19;50:24,25;
51:8
**movement (1)**
52:5
**moving (1)**
52:9
**mow (1)**
30:23
**much (4)**
33:15;38:25;52:2;
117:12
**MUCHIN (2)**
5:3;11:5
**multi-page (1)**
13:13
**multiple (1)**
46:22
**multiplication (1)**

86:5
**multiplied (1)**
97:24
**myself (1)**
44:3

# N

**name (1)**
32:7
**National (1)**
11:6
**necessarily (5)**
39:9;46:25;75:2;
101:19;111:13
**necessary (4)**
18:5,6,9;72:15
**need (5)**
52:19;71:22;72:6,
10;98:22
**needs (1)**
58:8
**negatively (1)**
100:24
**negotiated (3)**
16:10,12;101:23
**negotiating (3)**
17:21;18:20;51:24
**negotiation (11)**
16:14;17:13;18:14;
19:12,19,23;36:9;
53:13;56:19;57:10;
78:4
**negotiations (4)**
19:2,5;51:14;60:11
**neither (1)**
111:12
**Networks (1)**
10:8
**New (11)**
3:17,17;5:6,6,17,
17;10:13,13;27:16;
55:14;65:3
**next (8)**
13:24,25;14:2,3;
46:15;48:21;49:10;
53:19
**Nicholas (1)**
11:18
**NICHOLS (4)**
3:3;67:11;91:2,4
**NNCC (19)**
58:11,12,19,24;
59:5,8;80:24;81:4,18,
25;82:3,19;83:12;
84:2,10;90:7;92:13;
95:13,22
**NNI (66)**
14:13,25;15:4,8,
20;17:4,12,12,20;
18:2,5,9,11,12,13,25;
19:6,11,23;20:3,7,8;
21:2;27:7;30:3,11;

31:10;35:9;36:25;
37:8,9;40:9,13,14,17,
22;41:4,12,18;43:15;
50:20;51:8,17;57:12;
58:7;60:12;61:14;
65:10;75:9,19;76:9,
16;92:20,23,24,25;
96:15;105:14;
107:11,18,25;108:5;
109:25;110:9;
112:25;113:3
**NNI-PPI0000306 (2)**
62:16,18
**NNI's (1)**
98:2
**NNL (1)**
69:13
**non-bond (7)**
110:3,11,23;111:7,
11;112:2,7
**none (1)**
117:5
**nonetheless (1)**
100:21
**noon (1)**
32:20
**nor (3)**
74:9;84:21;111:13
**Nortel (5)**
10:8;24:14;31:12;
64:16;78:16
**North (2)**
3:5;51:12
**noted (1)**
117:19
**notes (4)**
58:13;80:24;81:5,
11
**Notice (6)**
13:10,14,18,19,23;
89:17
**November (2)**
13:2;44:6
**number (55)**
13:22;32:24;33:22;
34:11;35:4;36:18,19;
43:6,14;50:11,20;
51:2,8,9,16,18,21;
52:2,3,11,25;53:3,12;
55:17;56:2,10,14,15,
23;57:6,21;85:15,16;
86:7,10,13,22,24;
87:16,17,19;88:11;
92:16;94:4,20;95:3,8,
12,16,24;96:2;97:18;
98:20;104:24;114:19
**Numbers (20)**
21:13,16;44:14;
47:19;49:14;50:4;
54:12;62:16;77:11;
78:6;86:5;88:5;
93:24;94:13;95:6;
96:11;98:4,16,16;

104:6
**numerator (1)**
88:8
**numerous (2)**
73:5;74:4

# O

**Objection (36)**
16:8;17:16;24:10;
26:21;27:18,24;
29:10;31:4;39:24;
41:7,20;42:9;43:8;
49:16,24;52:16;53:6;
54:2;55:19;69:21;
70:11;71:14;77:9;
87:5;94:24;95:19;
96:3;102:2;104:17;
106:5,12;107:16,19;
108:2;113:17;114:9
**obtaining (1)**
113:4
**obviously (1)**
103:9
**occur (2)**
37:9;42:21
**occurred (1)**
64:13
**occurs (1)**
42:16
**o'clock (2)**
32:20;33:3
**off (9)**
51:17;61:2;84:24;
85:23;94:12;102:18;
112:14;117:14,17
**offered (1)**
50:20
**officer (6)**
14:13,24;25:3,6;
71:25;108:13
**offices (5)**
10:11;22:24;29:25;
44:17;47:13
**official (4)**
11:16;110:18,20,
22
**one (29)**
10:2,12;15:11;
25:2;30:16;31:2;
32:14;45:14,15;
46:21;63:6;66:21;
69:20;71:24;78:20;
82:7;83:17;84:5;
88:15;100:13,22;
101:16;102:20,25;
103:8;111:10,15;
116:2,9
**ongoing (1)**
65:9
**only (11)**
12:13;18:6;30:16;
42:16;46:6;48:21;

73:6;74:23;79:8;
93:12;96:5
**open (2)**
66:8;111:7
**opening (2)**
10:6;76:19
**operating (1)**
99:20
**opportunity (3)**
14:18;21:21;48:2
**opposed (2)**
85:16;93:19
**opposing (1)**
39:12
**orally (1)**
34:2
**Order (9)**
13:11,15,25;14:3;
42:13;45:16;50:21;
58:8;106:3
**orientated (2)**
73:20,22
**OSG (5)**
24:16,23;25:6,9;
64:19
**others (3)**
26:2,3;30:18
**otherwise (3)**
15:18;22:17;59:24
**out (21)**
26:18,19,22;42:15;
43:14;58:2;63:24,25;
68:15;69:19,23;
76:13;81:18;84:12,
15,16,19;87:17;
90:21;95:22;106:23
**outcome (6)**
39:15;75:4;98:10;
102:5,16;113:23
**outcomes (14)**
37:17,21;72:22;
73:4,18,24;74:3,22;
76:24;96:21;98:14;
105:3;113:9,15
**output (1)**
98:14
**outright (1)**
106:3
**outside (3)**
18:13;20:25;31:21
**outstanding (5)**
85:4;91:16,19,21;
96:8
**over (9)**
35:7;36:10;57:5;
58:3;59:21;68:12;
80:12;108:21;115:4
**overall (1)**
57:6
**Overseas (2)**
24:24;64:19
**overstated (1)**
98:13

**Overy (1)**
10:23

**own (5)**
72:20;73:15;74:21;
96:20;101:5

## P

**page (5)**
89:21;91:10;109:8,
9;114:24

**pages (5)**
13:23,24;14:2,2,4

**paid (6)**
44:8;59:5,6,25;
92:23;93:13

**paper (2)**
40:14;97:9

**papers (3)**
38:7,9;58:24

**par (1)**
83:13

**paragraph (4)**
59:12;94:17;
109:24;114:19

**part (10)**
33:9;52:4;75:25;
76:4;81:5,7,9,25;
90:22;109:3

**participate (7)**
82:19,25;83:6,11,
20;84:8,16

**particular (5)**
59:10;80:20;
103:25;109:24;
111:15

**parties (6)**
12:10;38:6,9;39:6;
68:15;94:12

**partly (1)**
74:2

**party (1)**
83:23

**past (1)**
22:5

**pay (2)**
73:2;110:25

**payable (1)**
38:25

**payment (2)**
59:19;60:7

**payments (1)**
60:6

**PBGC (7)**
69:10;70:10,12;
99:7,9,12;102:10

**peculiarities (2)**
58:19,21

**pen (1)**
97:8

**penned (1)**
81:23

**Pension (2)**

3:15;11:13

**Pensyl (1)**
10:24

**people (7)**
17:20;19:21;33:23;
39:8;46:22;78:16;
86:3

**per (1)**
91:15

**percent (45)**
34:18,22,22;35:19,
21,21;36:14,15;
38:15;49:19,22;
50:13,22,24;51:9,9,
18,21;52:12,23;53:2,
3,12;55:24;56:3,10,
22;58:13;75:22;
86:12,15,16,19;87:8,
18,19;88:11,22;89:7,
15;91:15;93:8;96:7;
97:23;98:8

**percentage (1)**
88:4

**perfectly (1)**
87:24

**perhaps (1)**
67:11

**period (6)**
36:10;58:3;91:22;
93:3,15;94:22

**permission (1)**
27:21

**personally (1)**
39:25;40:3,5;
76:14;110:15

**perspective (4)**
39:4;66:15;86:2,7

**Perusing (11)**
21:20;47:25;54:18;
55:3;78:13,18;79:6,
13;80:22;109:9,19

**PHONE (10)**
3:9,19;5:8,19;27:7;
29:5,17,20;46:22;
83:21

**pieces (2)**
38:18;42:24

**Pisa (4)**
30:19,23;31:8;
46:24

**place (7)**
29:8,9,23,25;
32:18;47:5;64:23

**placed (1)**
66:5

**Plaza (1)**
10:13

**pleadings (1)**
59:4

**please (3)**
10:19;12:1;54:23

**plus (4)**
59:2;91:14;95:17;

96:7

**pm (7)**
10:4;61:3,9;
112:15,21;117:18,19

**PO (1)**
3:6

**point (19)**
27:20;37:25;39:3;
42:23;51:7,13;53:16;
57:7,10;60:20;65:5,
13;66:24;67:2,15;
70:8,16;88:16;116:9

**points (2)**
56:12,19

**portion (1)**
71:3

**position (16)**
37:14;38:12;40:14,
17,23;41:4,10,12,15,
16;59:3;67:13;75:16,
19;93:23;105:14

**positions (6)**
25:20;37:11;38:5,
10;39:12,14

**positively (1)**
100:25

**possibilities (2)**
73:5;104:12

**possibility (2)**
75:2;101:22

**possible (5)**
39:16;42:25;95:8;
101:8;105:3

**post-petition (4)**
38:19,24;73:2;
111:17

**potential (16)**
16:21,25;20:21;
35:15;37:17,21;64:8;
72:21;73:18,24;74:3;
75:4;76:24;96:20;
98:10;113:9

**PPI (78)**
12:14;13:6;16:7,
21,25;17:5;18:20;
19:24;20:21;22:25;
28:12,23;29:2;31:5,
6;33:15,18,25;34:19;
37:2,7,12,14,18,25;
40:12,24;41:6,14,18,
23;43:25;47:19;
48:13;49:18,20;
54:15,24;59:2,6,7;
66:20;71:2,10;73:5,
9;74:24;78:10,16;
85:8;91:13;92:6,12;
93:6;101:6,9;104:21,
24;105:3,6;106:4,16,
16;107:24;110:25;
111:4,6,9,13,14,22,
22,25;112:5,7;114:7,
15;115:4

**practice (1)**

115:21

**precise (1)**
83:3

**preferred (1)**
85:25

**premiums (1)**
60:6

**preparation (3)**
22:7,13;108:24

**prepare (5)**
108:17,18;116:10,
12,14

**prepared (2)**
22:10;100:7

**prepayment (1)**
59:23

**pre-petition (2)**
25:14;33:21

**PRESENT (1)**
5:23

**presentation (1)**
17:8

**presently (1)**
25:4

**preserve (1)**
93:21

**presumably (2)**
39:18;48:10

**pretty (1)**
81:16

**previous (2)**
92:11;98:15

**previously (3)**
25:5,21;33:10

**principal (8)**
14:13,24;42:19;
58:25;71:2;91:16,19;
108:13

**Prior (28)**
16:19,24;20:11;
21:8;22:12;23:16,19,
24;24:6,14;30:20,23;
31:3,12;42:17,20;
50:5;60:9;62:10;
63:12,17;65:5,5,7;
80:9;92:13;94:11;
105:15

**privilege (2)**
113:16;115:22

**probabilities (1)**
104:8

**probability (1)**
115:2

**probably (3)**
33:2;50:8,9

**problem (1)**
52:9

**procedure (1)**
40:16

**PROCEEDINGS (1)**
11:1

**proceeds (1)**
73:11

**produced (1)**
50:10

**product (5)**
86:4;89:14;97:23,
25;100:20

**proposal (2)**
28:11;35:10

**proposed (39)**
13:5;14:3,4;16:6;
17:4,8,13,21;18:14,
20;20:4,8;42:6;
43:16,17,23;44:7;
66:21;67:4;68:17;
69:16;70:2,6,9,17;
71:20;72:18;77:14;
86:23;89:19;94:2;
105:2;107:8;108:5;
109:2,5,8;114:7,15

**proposing (1)**
18:7

**provide (1)**
64:2

**provided (4)**
38:22;46:6;48:20;
109:18

**provision (9)**
49:18;59:10;
109:17,21,25;110:2,
14,24;111:3

**provisions (2)**
59:18;93:21

**pull (1)**
114:21

**PULTMAN (26)**
10:22,22;12:5,19,
20;13:20;21:11;
22:18;44:24;47:16;
54:11;60:23;61:10;
79:10;87:24;102:18;
103:12;112:10,22;
113:16;114:21;
115:12,19;116:19;
117:11,14

**Pultman's (1)**
116:6

**pure (1)**
67:24

**purpose (1)**
117:4

**purposes (2)**
104:5;111:20

**put (13)**
21:13;33:17,25;
34:4;49:25;70:15;
84:10;86:3,7;95:6;
97:8;102:8,11

**Putting (1)**
102:20

## Q

**quantifying (1)**
75:3

Case 09-10138-MFW    Doc 15043-1    Filed 01/13/15    Page 132 of 562

IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

**quick (1)**
83:10
**QUINN (2)**
5:13;11:7
**quite (2)**
35:7;58:23
**quote (1)**
91:12
**QURESHI (3)**
11:14,14;61:21

**R**

**range (13)**
21:14;33:23;37:16;
73:4,23;74:3;76:24;
85:22;98:17;102:11;
104:11;105:3;113:9
**rate (7)**
40:12;41:14,19,24;
93:8;111:18,18
**rates (1)**
93:9
**rather (4)**
86:2;87:18;93:8;
94:13
**rationale (1)**
84:21
**Ray (153)**
10:7;12:6,21;13:1,
12,14;14:1,6;15:1,2,
6,24;16:1,3;17:1;
18:1;19:1;20:1;21:1,
12,17,21,22;22:1,14;
23:1;24:1;25:1;26:1;
27:1;28:1;29:1;30:1;
31:1;32:1;33:1;34:1;
35:1;36:1;37:1;38:1;
39:1;40:1;41:1;42:1;
43:1,4;44:1;45:1;
46:1;47:1,17,21;48:1,
3,24;49:1;50:1;51:1;
52:1;53:1,20;54:1,8,
14,19;55:1;56:1,5;
57:1;58:1;59:1;60:1;
61:1,7,11;62:1,15,17,
21;63:1;64:1;65:1;
66:1;67:1;68:1;69:1;
70:1,18;71:1;72:1;
73:1;74:1;75:1;76:1;
77:1;78:1,5,9,19;
79:1,14;80:1;81:1;
82:1;83:1;84:1,2;
85:1;86:1;87:1;88:1;
89:1,4,13,16;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1;107:1;
108:1;109:1,3;110:1;
111:1;112:1,19,23;
113:1;114:1,4,6,23,

25;115:1,23;116:1;
117:1,16
**Re (2)**
10:8;78:16
**reach (7)**
26:18,19;56:17;
63:24,25;67:20;
68:14
**reached (5)**
26:22;67:19;69:19,
23;92:3
**read (1)**
42:14
**reads (1)**
91:12
**really (8)**
28:14;38:20;39:16;
67:23;74:4;81:15;
96:6;101:19
**reason (2)**
44:13,15
**reasonableness (1)**
114:7
**reasons (1)**
84:21
**recall (52)**
20:17;23:11;26:15,
22,23;29:11,12,19;
30:6;32:17;33:20;
34:10;35:7;36:16,22;
40:19;43:9,10;45:13;
46:9,17;47:4,14;50:7,
19,23;51:4,13;54:3;
56:4,15,20;57:7;
58:4;62:12;63:21;
65:12;66:10,25;
67:17;80:3;81:21;
82:17;94:8,9;97:7;
99:17,18;109:23,24;
110:6;117:10
**receipt (1)**
50:5
**receive (5)**
40:2;63:9;75:19;
115:13,15
**received (2)**
40:4;112:6
**receiving (2)**
63:13,17
**Recess (2)**
61:5;112:17
**recollection (9)**
20:17;22:21;28:7;
33:6;37:20;47:6;
54:10;56:10;97:16
**recommending (1)**
104:25
**record (16)**
10:3,21;21:14,15;
46:24;54:11,19;61:3,
8,12;62:21;78:14;
112:15,20;117:14,17
**recording (1)**

97:13
**recover (1)**
115:16
**recovered (2)**
106:2,15
**recoveries (1)**
98:6
**redraft (1)**
45:5
**reduced (2)**
93:7;95:11
**reduces (1)**
59:24
**reduction (1)**
92:11
**reference (2)**
59:14;114:15
**referenced (1)**
103:22
**references (2)**
80:23;81:18
**referred (2)**
24:23;95:25
**referring (12)**
20:25;44:21;45:20;
48:24;50:15;58:22;
59:16;64:4;68:9;
78:22;79:8;82:4
**refers (1)**
58:12
**reflect (1)**
92:12
**reflected (2)**
56:25;70:18
**refresh (1)**
54:9
**regarding (2)**
47:19;113:14
**reimburse (1)**
65:21
**reimbursed (1)**
65:21
**reimbursement (2)**
66:12,18
**related (9)**
28:11;33:18;34:3;
40:14,20;57:12,15;
65:20;101:5
**relates (3)**
13:5;58:11;110:3
**relating (1)**
16:20
**relative (4)**
37:14;51:14;
107:22;110:10
**remain (1)**
91:20
**remainder (1)**
92:17
**remains (1)**
80:6
**remember (3)**
26:4;45:15;65:22

**reminded (1)**
61:14
**remiss (1)**
61:15
**removal (5)**
90:12,12,17;92:12;
95:12
**removed (1)**
90:7
**Repeat (3)**
18:17;87:6;106:13
**report (7)**
18:4;75:13,21;
99:22,23;100:6,8
**reporter (3)**
10:14;12:1;96:18
**Reporting (2)**
10:16,18
**represent (2)**
10:20;24:4
**representations (1)**
77:24
**representative (4)**
17:12,18;19:14,15
**representatives (1)**
67:8
**represented (3)**
25:13;27:13,23
**representing (1)**
21:8
**represents (2)**
24:5;110:23
**request (5)**
46:10;65:20;
109:22;110:5,7
**requested (1)**
43:20
**require (1)**
59:19
**required (3)**
60:7;74:11,12
**reservation (1)**
110:10
**resolution (5)**
36:12;56:18;58:9;
72:22;111:8
**resolutions (1)**
20:3
**respect (14)**
20:7,21;22:25;
25:9,11;34:5;37:20;
39:22;40:17;42:17;
82:10;91:24;93:12;
113:8
**response (5)**
35:9,11,21;37:8;
66:10
**responsibility (1)**
108:12
**restate (2)**
59:2;96:6
**restructuring (2)**
25:3,6

**result (1)**
60:7
**results (1)**
114:16
**revealing (1)**
115:13
**review (10)**
12:10;14:19;15:23;
21:22;48:3;54:20;
78:8;80:7;108:23;
109:16
**reviewed (3)**
22:11;23:9;53:24
**reviewing (1)**
62:20
**revised (4)**
54:24;55:16;78:9,
16
**right (8)**
53:9;56:24;59:17;
72:10;86:21,25;94:9;
95:14
**rights (1)**
110:10
**role (6)**
14:12,24;25:8,11;
26:6,9
**room (2)**
35:13;36:2
**ROSENMAN (2)**
5:3;11:5
**ROSENTHAL (68)**
11:21,21;12:8;
13:17;16:8;17:16;
22:2,15;24:10;26:21;
29:10;31:4;39:24;
40:25;41:7,20;42:9;
43:8,21;44:21;49:16,
24;52:16;53:6;54:2;
55:19;60:25;61:24;
69:21;70:11;71:14;
76:17;77:9;79:7;
87:5,10,14,21;88:3;
89:5;94:24;95:19;
96:3;102:2,13,25;
103:9,18;104:17;
105:7,11;106:5,11;
107:16,19;108:2;
109:11;112:13;
113:11,18,25;114:9,
18;115:5,25;116:16;
117:2,13
**roughly (5)**
86:12,14,15;88:17;
99:2
**rounded (1)**
35:4
**Rule (1)**
27:17
**rules (1)**
27:16
**ruling (1)**
39:18

Case 09-10138-MFW    Doc 15043-1    Filed 01/13/15    Page 133 of 562

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

**run (1)**
73:22
**Russell (2)**
11:22;78:15

## S

**Saenz (1)**
15:15
**same (4)**
34:24;46:13;68:13;
90:25
**Sandberg (3)**
32:5,8,9
**Sandor (1)**
32:7
**sat (1)**
22:11
**Saturday (1)**
62:23
**savings (1)**
101:14
**saw (1)**
48:8
**saying (2)**
104:11;106:3
**scenario (4)**
97:2;102:23;
104:22;106:22
**scenarios (7)**
73:8;96:22;97:18;
101:8,8,15;104:21
**scheduled (1)**
44:5
**Schweitzer (8)**
11:22;30:4;49:5;
54:22;62:23;64:6;
103:8;116:25
**second (3)**
88:23;103:2,8
**Section (14)**
55:17;56:6,6;
58:11,11;80:20;85:7;
89:12;90:6;91:9,12;
92:6,7;109:7
**Sections (2)**
49:14;80:24
**seeing (3)**
22:4;61:13;64:14
**seek (2)**
12:17;27:21
**seeking (1)**
33:13
**seem (1)**
80:3
**sense (1)**
84:7
**sensitivities (1)**
100:15
**sent (1)**
54:25
**sentiment (1)**
66:9

**separate (1)**
35:13
**September (7)**
10:4;43:17;61:4,9;
112:15,21;117:18
**series (3)**
53:13;69:5;112:24
**set (3)**
23:24;33:12,13
**setting (1)**
28:5
**settle (2)**
33:9,14
**settled (4)**
41:24;42:2;43:25;
107:23
**settlement (111)**
13:5;14:4;16:7,21,
25;17:5,5,9,14,22;
18:8,15,20;19:12,24;
20:4,8,10,22;22:25;
23:5;28:12;41:10,11,
22;42:6,12;43:11,17,
23;44:7,8;46:2,2;
47:8,18,22;48:13,17;
49:18;51:22;52:13,
23;53:2,21;54:15,24;
60:15;64:2,9;65:9,
15;66:20;67:5,12,16;
68:7,17;69:16;70:2,6,
9,17;71:20;72:19;
78:10,16,24;79:15;
80:14;81:6,12,20,24;
82:2,20,25;83:6,9,11,
14,20;84:3,14,19,22;
85:5,8;86:23;89:19,
23;90:22,23;91:7,13;
92:7,14;93:16;94:3,
11;101:14;105:2,15;
107:2,9,12,15;108:6;
110:2;114:7,15
**seven (1)**
109:8
**Seventh (1)**
3:16
**several (1)**
62:3
**shall (4)**
49:19;85:8;91:13,
18
**sheet (16)**
21:13,18;23:4,9,
14;34:3;45:4,6,9,21,
22,25;46:7,12,13;
49:3
**sheets (4)**
23:19;46:7,8;48:16
**Shipholding (1)**
24:24
**Shipping (1)**
64:19
**short (1)**
83:21

**shortly (1)**
81:16
**show (3)**
13:9;53:20;62:14
**side (5)**
30:11;46:16;50:16;
70:15;102:20
**sides (1)**
44:25
**signature (2)**
89:22,24
**signed (1)**
90:2
**significant (1)**
73:7
**signing (1)**
109:2
**simply (1)**
38:4
**sit (2)**
45:16;75:20
**sit-down (1)**
50:9
**sitting (5)**
20:13;26:4;28:7;
56:9;94:8
**six (5)**
35:5,8;85:22,22;
91:10
**sole (1)**
15:20
**solely (1)**
117:3
**Solus (15)**
5:14;11:8;68:25;
69:2,20;70:15;82:8,
22;83:4,7,18;84:15;
90:11,17,20
**solvent (1)**
38:24
**solving (2)**
101:19,21
**someone (4)**
23:15;27:22;57:16;
76:3
**sometime (6)**
47:7;55:23;65:18,
19;81:22;83:18
**somewhat (1)**
85:20
**somewhere (4)**
18:23;32:19;76:25;
85:21
**sorry (8)**
14:2;54:6;63:15;
68:11;79:2;84:23;
91:3;116:3
**sort (7)**
56:17;57:12;60:3,
4;85:24;94:12;95:21
**sought (3)**
27:10;34:5;43:15
**sounds (1)**

53:9
**speak (8)**
68:12,20;69:7,10,
12,13,15;83:7
**speaking (1)**
115:9
**speaks (1)**
52:16
**specific (7)**
18:17;22:21;23:11;
51:15;66:3;85:15;
115:10
**specifically (9)**
26:24;44:22,23;
45:20;46:18;50:7;
60:22;67:13;70:12
**specified (1)**
56:3
**specify (1)**
67:18
**speculate (1)**
95:21
**speculation (1)**
74:12
**split (2)**
38:17;111:14
**spoke (1)**
68:21
**spoken (1)**
54:5
**spot (1)**
52:7
**Stamped (5)**
21:18;47:22;54:15;
62:18;78:10
**standing (1)**
22:19
**start (5)**
17:19;34:15;42:7;
79:10;103:13
**starting (1)**
115:11
**starts (2)**
42:4,5
**state (1)**
10:20
**statement (1)**
99:21
**statements (2)**
76:20;77:8
**States (1)**
74:14
**status (2)**
29:2;37:2
**Steen (1)**
10:11
**Steven (1)**
83:8
**still (6)**
25:8;55:25;79:3;
81:5;84:2;100:17
**stood (1)**
76:23

**strategy (1)**
51:25
**Street (1)**
3:5
**subject (2)**
80:6;115:20
**submit (1)**
40:13
**submitted (1)**
99:21
**subsequent (3)**
34:9;51:5;57:9
**substance (3)**
21:5;28:23;115:14
**substantial (1)**
69:4
**substantive (1)**
105:14
**subsume (1)**
115:11
**succeeding (1)**
115:3
**successful (1)**
39:7
**sufficient (1)**
101:17
**suggesting (1)**
74:2
**SULLIVAN (1)**
5:13
**summary (2)**
48:19,23
**support (1)**
37:7
**supportive (3)**
66:22;67:4;68:17
**Sure (14)**
12:19;17:19;18:19;
52:21;57:13;60:25;
63:17;77:21;89:3;
103:17;106:14;
112:13;114:21;116:5
**surplus (4)**
75:9;76:8;96:14;
102:24
**surprise (1)**
116:3
**surprised (1)**
82:21
**swear (1)**
12:1
**sworn (1)**
12:2

## T

**table (4)**
33:18;34:2,4;
102:19
**talk (10)**
21:6;64:8;66:3,13,
23;68:15;83:16;85:7;
108:20;110:13

Case 09-10138-MFW    Doc 15043-1    Filed 01/13/15    Page 134 of 562
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN RAY
September 15, 2014

talked (1)
23:24
talking (7)
41:2,3;61:20;62:8;
65:22;66:6;102:4
tape (5)
10:2;61:6;112:18
tax (5)
76:13;98:20,21;
99:6;102:9
TECCE (3)
5:18;11:7,7
telephonic (1)
77:13
ten (1)
28:20
tens (1)
85:24
term (21)
21:12,18;23:4,9,14,
18;34:2;45:4,6,9,21,
22,24;46:6,7,8,12,13;
48:16;49:3;110:17
terminology (1)
45:23
terms (10)
16:10,13,14;48:20,
24;64:12;66:4;81:19;
83:9;84:22
testified (3)
96:19;97:22;116:9
testimony (2)
13:5;72:16
therefore (3)
52:8;75:5;93:5
thinking (5)
72:20;73:16,19;
76:6;104:22
though (1)
27:12
thought (19)
29:11;38:14;51:20,
22,23;52:11,12,23,
25;61:20;70:22;71:4,
17;86:6;101:10;
103:23;104:6,12,18
thousand (1)
35:6
three (5)
20:17;45:12;95:17;
112:19;117:7
times (4)
83:3;89:15;91:15;
96:8
timing (1)
77:3
Today (9)
10:4,14;20:14;
26:4;28:7;43:21;
44:2;56:9;79:18
today's (1)
117:16
together (3)

10:23;13:19;89:18
told (9)
34:8;47:12;55:24;
56:13;64:10;82:22;
83:15;105:13;113:13
took (10)
29:23;32:18;36:7;
40:17;47:5;58:5;
64:23;84:16;103:23;
104:18
top (2)
13:21;109:12
topic (2)
26:25;64:11
total (3)
85:18;86:13;96:12
trade (1)
99:3
train (1)
55:13
transcript (5)
12:11,13;52:18,20;
77:20
transparency (1)
74:9
traveled (1)
65:2
traveling (4)
55:9,10,11,12
treading (1)
102:3
trial (2)
76:20;113:24
trick (2)
45:24;46:5
Trust (2)
5:4;11:6
trustees (2)
65:21;66:18
trustee's (1)
66:15
try (3)
56:14;68:11;75:20
trying (2)
36:21;66:8
Tuesday (6)
23:25;28:9,10;
47:13;50:12;51:19
TUNNELL (1)
3:3
turn (2)
90:5;91:9
turned (1)
84:12
Tweed (1)
11:18
two (11)
13:23;30:18;38:17;
45:12,15,17;61:6;
80:23;86:5;88:5;
96:11
type (1)
73:25

## U

UCC (2)
63:14;91:6
UK (3)
3:15;11:13;74:5
ultimate (3)
72:22;74:18;87:16
ultimately (25)
35:12;36:10,11;
39:15,17;42:15;47:8;
51:12,20;52:5,10;
56:3;74:13;81:11;
84:16,18;85:3;86:8,
22;92:25;93:4;94:18;
95:5;98:18;110:12
unacceptable (1)
56:13
under (20)
39:21;42:6;43:11,
22;72:23;75:18;
82:18;89:19;93:22;
94:17;96:21,22;
97:17;98:6,22;101:9,
12;102:9;106:22;
110:8
underlying (4)
66:20;72:12;105:6;
106:17
understated (1)
98:12
understood (1)
59:11
undistributed (1)
42:17
United (1)
74:14
unless (1)
22:16
unpaid (4)
91:19,21;93:17,18
unrelated (3)
64:16;114:8,16
unsecured (5)
110:4,11;111:2,7,
16
up (21)
23:25;28:5;36:12;
42:2;45:23;48:17;
49:19;50:25;51:8,12;
52:2,9;57:25;76:23;
91:17;96:8;100:4;
105:2;112:12;
114:22;116:4
upcoming (2)
13:2;108:21
updated (3)
99:9,11;100:6
upon (1)
74:25
URQUHART (1)
5:13

USA (2)
5:15;11:9
use (1)
104:15
used (1)
12:14
using (1)
34:25

## V

vague (1)
16:8
valid (1)
99:14
value (1)
74:9
variations (1)
85:20
variety (2)
102:8,10
various (5)
37:11;74:20;93:10;
103:25;104:13
version (5)
54:25;80:20;89:18;
90:8;92:14
versions (1)
45:12
Videographer (9)
5:24;10:2,17;
11:25;61:2,6;112:14,
18;117:15
view (22)
37:23;38:14;39:2,
3,4,9;40:6,10;52:24;
59:4;66:25;83:12;
92:19;103:23;104:6,
18;106:7,8,10;
107:14,22;114:6
views (1)
66:9
violating (1)
103:15
virtue (2)
101:14,16

## W

walk (1)
61:13
walked (1)
106:21
way (5)
20:7;60:5;67:18;
96:5;108:21
ways (1)
92:10
week (1)
16:17
weekend (5)
57:5,8;60:9;62:10;
80:12

weeks (1)
95:18
weight (1)
39:14
weren't (4)
76:21;83:20;84:8;
104:11
What's (3)
89:5;99:13;110:24
whole (3)
71:18,21;109:16
wholly (1)
114:8
whose (3)
109:21;110:5,7
WILLKIE (2)
3:14;11:12
Wilmington (9)
3:7;5:4;11:6;
14:10;37:3;55:14;
64:23;65:3;76:21
withdraw (3)
26:17;105:24;
114:24
within (4)
26:25;29:14;33:23;
84:3
without (7)
36:12;75:2;94:8,
21;98:9;103:15;
115:13
witness (6)
11:24;12:1,2,25;
22:3;87:25
won (2)
106:2,15
word (3)
62:2;103:22;
104:15
words (2)
46:4;57:23
work (1)
94:12
works (2)
31:24;101:5
wrap (1)
112:11
wrong (1)
84:13

## Y

years (2)
24:21;25:15
yesterday (1)
55:2
yield (1)
56:22
yielded (2)
53:8;98:16
yields (1)
53:5
York (11)

3:17,17;5:6,6,17,
17;10:13,13;27:16;
55:14;65:3

**Z**

**Zelbo (1)**
117:3

**1**

**1 (13)**
13:12,14;15:2,6,
24;16:3;32:20;43:4;
70:18;89:17;91:22;
109:3;114:23
**1.01 (3)**
87:8;92:3;96:12
**1.2 (1)**
99:2
**1.6 (2)**
34:25;35:2
**1.65 (8)**
35:2;53:4;56:22;
87:4,9;88:12,22;
89:15
**1:15 (1)**
10:4
**100 (1)**
38:15
**10010 (1)**
5:17
**10019-6099 (1)**
3:17
**10022-2585 (1)**
5:6
**101 (1)**
98:18
**11 (4)**
25:18;38:24;39:4;
71:25
**115 (2)**
78:7,11
**12 (1)**
89:21
**1201 (1)**
3:5
**134 (3)**
91:18;96:9,9
**1347 (1)**
3:6
**14 (3)**
20:19;21:9;47:7
**14076-3 (1)**
13:22
**147 (2)**
54:13,16
**14th (4)**
16:17;28:10;49:4,6
**15 (14)**
10:4;22:23;23:19,
22;24:21;42:15,21;
43:17;46:6;61:4,9;

112:15,21;117:18
**15th (12)**
28:5,10,11;29:24;
44:18;46:15;47:13;
49:8;50:5,12,17;
51:19
**16 (2)**
20:19;98:8
**164 (2)**
47:20,23
**16th (1)**
3:5
**17th (4)**
48:11;49:12;50:6;
53:14
**18th (10)**
48:11;53:19;55:7,
9;58:3;63:23;64:21;
65:7;86:18;88:21
**19 (2)**
63:10;65:13
**19899-1347 (1)**
3:7
**1999 (1)**
24:20
**19th (8)**
55:8;57:5;60:9;
62:10,23;65:6,19;
80:12

**2**

**2 (5)**
21:12,17,23;22:14;
48:25
**2.1 (3)**
49:14;58:12;80:21
**2.2 (11)**
49:15,17,18;55:17;
56:6;58:11;80:21;
90:6;91:10,12;96:4
**2.3 (4)**
56:7;85:7;89:12;
93:22
**2.3.2 (1)**
57:3
**2:18 (1)**
61:3
**2:40 (1)**
61:9
**20 (3)**
13:24;106:21;
109:9
**2014 (29)**
10:5;13:2;16:18,
19,24;18:23;20:19,
20;21:9;22:24;43:5,
18;44:6;61:4,9;
62:23;63:10;78:17;
79:15,21;91:22;94:2,
23,23;100:3,4;
112:16,21;117:18
**2015 (7)**

42:15,21,25;91:23;
92:3;93:3;96:2
**20th (3)**
57:5;62:11;80:13
**21 (6)**
21:16,19;78:17;
79:15;81:23;94:22
**212-728-8170 (1)**
3:19
**212-728-9170 (1)**
3:20
**212-849-7100 (1)**
5:20
**212-849-7199 (1)**
5:19
**212-940-8776 (1)**
5:9
**212-940-8941 (1)**
5:8
**21st (11)**
79:21;80:16;81:3;
82:15,15,16;83:2,4,
18,25;85:10
**22nd (2)**
5:16;81:22
**23 (1)**
67:21
**23rd (5)**
47:8;58:4;65:20;
81:22;83:19
**24 (6)**
43:5;77:12;94:2,
22,23;95:16
**24th (2)**
86:24;90:3

**3**

**3 (4)**
47:17,21;48:4;96:7
**3.5 (1)**
93:8
**3.50 (1)**
91:15
**3:49 (1)**
112:15
**30 (14)**
34:19;35:19,21;
36:15;42:25;91:23;
92:3;93:3,16;96:2,
11;99:24;100:3,4
**300 (3)**
97:19,20;98:17
**302-351-9357 (1)**
3:9
**302-425-4664 (1)**
3:10
**321 (2)**
62:16,18

**4**

**4 (6)**

13:2;44:6;53:21;
54:9,14;89:4
**4.2 (2)**
27:17;109:8
**4:04 (1)**
112:21
**4:10 (2)**
117:18,19
**40 (5)**
36:19;50:22,24;
51:9,18
**400 (1)**
76:25
**43 (6)**
14:2,3;91:10;
109:11,12,13

**5**

**5 (3)**
33:3;62:15,17
**50 (4)**
51:2,9;52:9;56:16
**51 (1)**
5:16
**55 (12)**
56:3,10,22;86:12,
15,16,19;87:19;
88:11,22;89:7,15
**575 (1)**
5:5
**59th (1)**
100:2

**6**

**6 (4)**
78:6,9;84:2;89:13
**60 (17)**
36:19;49:19,22;
50:13;51:21;52:6,12,
23;53:2,3,12;55:24;
56:12,13,13;87:8,18
**60th (2)**
99:21,25
**61st (1)**
100:2

**7**

**7 (4)**
109:9,11,12,13
**7.875 (6)**
58:13;69:5;80:24;
81:4,4,11
**7/21/2014 (1)**
78:25
**7/24/14 (1)**
13:23
**70 (6)**
34:18,22,22;35:21;
36:14;51:23
**74.3 (2)**

75:22;97:23
**787 (1)**
3:16

**8**

**847 (1)**
42:4
**876 (14)**
91:14;92:10,16;
94:4,18,20;95:7,12,
16,17,17;96:7,9;
98:18

**9**

**9019 (7)**
43:16;67:5;77:14;
89:19;104:25;
106:16;114:14
**907 (4)**
56:23;86:12;95:11,
21
**907.5 (1)**
88:23
**922 (1)**
44:9
**990 (2)**
53:9,11

# ERRATA SHEET

## ELLEN GRAUER COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor

New York, New York 10022

212-750-6434

NAME OF CASE:    In re Nortel Networks Inc., et al., Case No. 09-10138

DATE OF DEPOSITION:    September 15, 2014

NAME OF WITNESS:    John Ray

| PAGE | LINE | FROM | TO | REASON |
|------|------|------|------|--------|
| 15 | 18-19 | A. He is otherwise known as Luiz | A. He is otherwise known as **Luis** | Spelling error |
| 38 | 8 | monitor, you know, as well as other entrusted | monitor, you know, as well as other **interested** | Transcription error |
| 43 | 21 | MR. ROSENTHAL: Today, coincidently. | MR. ROSENTHAL: Today, **coincidentally**. | Spelling error |
| 31 | 23 | A. He is with the FTI | A. He is with FTI | Transcription error |
| 35 | 12 | ultimately.  I broke in the meeting, and we had | ultimately.  I broke the meeting, and we had | Transcription error |
| 51 | 15 | date specific, but at that time of this | date **specifically**, but at that time of this | Transcription error |
| 59 | 17 | A. That just the contractual right of | A. **Just that** the contractual right of | Transcription error |

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

| PAGE | LINE | FROM | TO | REASON |
|------|------|------|-----|--------|
| 76 | 18 | A. No. | A. **Yes.** | In light of the prior questions, at the time of my deposition I had understood this question to inquire about any tax claim analysis in the context of the PPI settlement, in which case the answer was correctly "no."  However, to the extent that the question is not limited to the context of the PPI settlement, the answer would be "yes." |

## ACKNOWLEDGMENT

I, John Ray, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of September 15, 2014; that, subject to the above corrections, the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

_____

JOHN RAY

Signed and subscribed to before me, this _____ day of _____, 2014.

Notary Public, State of _____

**<u>EXHIBIT 2</u>**

EXHIBIT

106

exhibitsticker.com

*IN RE: NORTEL NETWORKS INC., ET AL.*

*MICHAEL KATZENSTEIN*
*September 18, 2014*
*HIGHLY CONFIDENTIAL*



**Ellen Grauer**
**COURT REPORTING** Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 108012.TXT*
*Min-U-Script® with Word Index*

1    UNITED STATES BANKRUPTCY COURT

2    FOR THE DISTRICT OF DELAWARE
     ----------------------------------------X
3    In re

4          NORTEL NETWORKS INC., et al.,

5                          Debtors.,

6    Chapter 11 Case No.: 09-10138(KG)
     ----------------------------------------X
7

8            * * * HIGHLY CONFIDENTIAL * * *

9

10                        One Liberty Plaza
                          New York, New York
11
                          September 18, 2014
12                        1:11 p.m.

13

14           VIDEOTAPED DEPOSITION of MICHAEL

15   KATZENSTEIN, before Melissa Gilmore, a Notary

16   Public of the State of New York.

17

18

19

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24              New York, New York 10022
                    212-750-6434
25                   REF:  108012

```
 1   A P P E A R A N C E S :

 2

 3   ALLEN & OVERY LLP

 4   Attorneys for Canadian Debtors and Canadian Monitor

 5        1221 Avenue of the Americas

 6        New York, New York 10020

 7   BY:  JACOB S. PULTMAN, ESQ.

 8        BRADLEY S. PENSYL, ESQ.

 9        DANIEL GUYDER, ESQ.

10        PHONE 212-610-6340

11        FAX 212-610-6399

12        E-MAIL jacob.pultman@allenovery.com

13

14

15   CLEARY GOTTLIEB STEEN & HAMILTON LLP

16   Attorneys for US Debtor

17        One Liberty Plaza

18        New York, New York 10006-1470

19   BY:  JEFFREY ROSENTHAL, ESQ.

20        BENJAMIN S. BELLER, ESQ.

21        PHONE 212-225-2086

22        FAX 212-225-3999

23        E-MAIL jrosenthal@cgsh.com

24

25
```

HIGHLY CONFIDENTIAL                    3

```
 1   A P P E A R A N C E S:  (Cont'd)

 2

 3   WILLKIE FARR & GALLAGHER LLP

 4   Attorneys for UK Pension Claimants

 5        787 Seventh Avenue

 6        New York, New York 10019-6099

 7   BY:  ANDREW HANRAHAN, ESQ.

 8        PHONE 212-728-8170

 9        FAX 212-728-9170

10        E-MAIL ahanrahan@willkie.com

11

12

13   AKIN GUMP STRAUSS HAUER & FELD LLP

14   Attorneys for US Official Committee of Unsecured

15   Creditors

16        One Bryant Park

17        New York, New York 10036-6745

18   BY:  ROBERT JOHNSON, ESQ.

19        ANNE M. EVANS, ESQ.

20        PHONE 212-872-1077

21        FAX 212-872-1002

22        E-MAIL rajohnson@akingump.com

23

24

25
```

HIGHLY CONFIDENTIAL                    4

```
 1   A P P E A R A N C E S:  (Cont'd)

 2

 3   MILBANK, TWEED, HADLEY & McCLOY LLP

 4   Attorneys for US Bondholder Group

 5        1850 K Street, NW, Suite 100

 6        Washington, DC 20006

 7   BY:  ANDREW M. LEBLANC, ESQ.

 8        NICHOLAS A. BASSETT, ESQ.

 9        PHONE 202-835-7574

10        FAX 202-263-7574

11        E-MAIL aleblanc@milbank.com

12

13

14   KATTEN MUCHIN ROSENMAN LLP

15   Attorneys for Wilmington Trust

16        575 Madison Avenue

17        New York, New York 10022-2585

18   BY:  KAREN B. DINE, ESQ.

19        PHONE 212-940-8722

20        FAX 212-940-5512

21        E-MAIL karen.dine@kattenlaw.com

22

23   ALSO PRESENT:

24        MELKER SANDBERG, FTI

25        DAN MACOM, Videographer
```

**HIGHLY CONFIDENTIAL**                    5

```
1   ------------------ I N D E X ------------------

2   WITNESS                  EXAMINATION BY        PAGE

3   MICHAEL KATZENSTEIN   MR. PULTMAN              10

4

5

6   DIRECTIONS:  PAGES 38, 49, 50, 91, 92, 93

7

8

9   --------------- E X H I B I T S ---------------

10  KATZENSTEIN    DESCRIPTION              FOR I.D.

11  Exhibit 1     E-Mail Chain, Bates            27

12                Stamped BHG-PPI-0000233

13  Exhibit 2     E-Mail Chain, Bates            34

14                Stamped BHG-PPI-0000251

15                through 252

16  Exhibit 3     E-Mail Chain, Bates            60

17                Stamped BHG-PPI-0000013

18                through 16

19  Exhibit 4     E-Mail with Schedule,          68

20                Bates Stamped

21                BHG-PPI-000009 through 12

22  Exhibit 5     E-Mail Bates Stamped           75

23                BHG-PPI-0000226

24

25               (EXHIBITS TO BE PRODUCED)
```

1                    S T I P U L A T I O N S

2

3    1.  Upon completion of the transcription of today's

4    session, the original transcript shall be sent to

5    counsel for the witness by the court reporter.

6    Counsel shall promptly forward it to the witness

7    for review, correction and signature under penalty

8    of perjury.  The witness shall have 30 days from

9    the day of receipt within which to review, make any

10   corrections, sign the deposition transcript under

11   penalty of perjury, and return it to counsel.  The

12   witness' counsel shall then forward the original

13   transcript plus corrections to the court reporter,

14   who will promptly notify all counsel of its receipt

15   and any changes to testimony made by the witness.

16   2.  If the witness is not represented by counsel,

17   the original transcript will be sent to the witness

18   by the court reporter.  After review, correction

19   and signature within 30 days from the date of

20   receipt, the witness shall return the original

21   transcript to the court reporter, who will notify

22   all counsel of its receipt and any changes to

23   testimony by the witness.

24

25

1    3.    The court reporter will retain the original

2    transcript, including exhibits.    If, for any

3    reason, the original is lost, misplaced, not

4    returned, not signed, or unavailable, a certified

5    copy may be used in its place for all purposes.

6    The court reporter is otherwise relieved of any

7    statutory duties.

8

9                           - oOo -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1               P R O C E E D I N G S

 2                    *    *    *    *

 3             THE VIDEOGRAPHER:  This is tape one.

 4     We are now on the record.  The time is

 5     1:11 p.m.  Today is Thursday,

 6     September 18, 2014.  This is the opening

 7     of the deposition of Mr. Michael

 8     Katzenstein in the matter of In re Nortel

 9     Networks, Incorporated, et al.

10             This deposition is being held at the

11     offices of Cleary, Gottlieb, Steen &

12     Hamilton, which is located at One Liberty

13     Plaza, in New York, New York.

14             Our court reporter today is

15     Ms. Melissa Gilmore, with Ellen Grauer

16     Court Reporting.  I'm the legal

17     videographer, Dan Macom, also with Ellen

18     Grauer Court Reporting.

19             Would counsel please introduce

20     themselves and state whom they represent

21     for the record.

22             MR. PULTMAN:  Jacob Pultman, of

23     Allen & Overy, LLP.  Along with me are my

24     colleagues, Daniel Guyder and Bradley

25     Pensyl.  We represent the monitor and the
```

1          Canadian debtors.

2               MR. LEBLANC:  Andrew Leblanc, of

3          Milbank, Tweed, Hadley & McCloy, on behalf

4          of the ad hoc group of bondholders, and

5          with me is my colleague, Nick Bassett, and

6          to his right is Melker Sandberg of FTI.

7               MR. JOHNSON:  Robert Johnson and Ann

8          Evans, from Akin, Gump, Strauss, Hauer &

9          Feld, on behalf of the official committee

10          of unsecured creditors of NNI.

11               MS. DINE:  Karen Dine, from Katten,

12          Muchin & Rosenman, LLP, on behalf of

13          Wilmington Trust National Association.

14               MR. HANRAHAN:  Andrew Hanrahan, from

15          Willkie, Farr & Gallagher, on behalf of

16          the UK pension claimants.

17               MR. ROSENTHAL:  And Jeff Rosenthal,

18          along with Benjamin Beller, of Cleary,

19          Gottlieb, Steen & Hamilton, on behalf of

20          the US debtors.

21               THE VIDEOGRAPHER:  Will our court

22          reporter please swear in the witness?

23  M I C H A E L     K A T Z E N S T E I N,

24          called as a witness, having been duly sworn

25          by a Notary Public, was examined and

HIGHLY CONFIDENTIAL                    10

1                KATZENSTEIN - HIGHLY CONFIDENTIAL

2          testified as follows:

3    EXAMINATION BY

4    MR. PULTMAN:

5          Q.    Mr. Katzenstein, my name is Jacob

6    Pultman.  I'm here to ask you some questions

7    about a 9019 proposed settlement.

8                Have you been deposed before?

9          A.    I have.

10         Q.    But not in the Nortel case?

11         A.    I have not.

12         Q.    On how many occasions have you been

13   deposed?

14         A.    Multiple.

15         Q.    More than five?

16         A.    Yes.

17         Q.    If you need a break for any reason,

18   let me know.

19         A.    Thank you.

20         Q.    If you don't understand a question

21   for any reason, let me know, and I will try to

22   correct the question.

23         A.    Thank you.

24         Q.    Also, we will all try hard not to

25   speak over you, and I ask that you speak -- if

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2       you do your best not to speak over me.

3              A.     Yes, sir.

4              Q.     Can you give us your educational

5       background?

6              A.     Sure.  I have an undergraduate

7       degree from the State University of New York in

8       Binghamton in 1981.

9              Q.     What was that degree in?

10             A.     Political science.

11             Q.     Okay.  Do you have any other

12      degrees?

13             A.     I do.  I have a law degree from the

14      Boston University School of Law, 1985.

15             Q.     Do you have any other degrees?

16             A.     I do not.

17             Q.     After 1985, can you lay out your

18      employment history for us?

19             A.     Yes, sir.  After 1985?

20             Q.     Yes, please.

21             A.     I went directly to a law firm in New

22      York, then called Kronish, Lieb, Weiner &

23      Hellman, which is now Cooley Godward.  I

24      practiced there until late 1995, I believe.

25      Was an associate and then a partner in the

HIGHLY CONFIDENTIAL                    12

1                KATZENSTEIN - HIGHLY CONFIDENTIAL
2    corporate department.
3        Q.    Can you generally describe the type
4    of work that you did?
5        A.    Sure.  I was a corporate finance
6    securities, M&A lawyer.
7        Q.    Did you do any bankruptcy work?
8        A.    I did.  I did a fair amount of
9    purchase and sales of distressed assets and
10   worked on a number of large restructurings.
11              Also, when I was a more junior
12   lawyer, I was seconded to the bankruptcy
13   department for a large restructuring for about
14   a year, I think.
15       Q.    Where were you based during the ten
16   years you were at Kronish?
17       A.    All in New York City.
18       Q.    And what was your next job after
19   1995?
20       A.    I left -- I left the law firm to
21   become general counsel and head of development
22   at a client called Optel, and Optel was a
23   roll-up of telecommunications, media, cable,
24   telecom and high-speed internet services across
25   the United States, and was a subsidiary of a

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2       Canadian multi-national, so I worked -- did

3       work for the multi-national as well.

4              Q.    What was the name of the parent

5       company?

6              A.    Le Grupe Videotron.  Le Grupe,

7       G-R-U-P-E.  Videotron is V-I-D-E-O-T-R-O-N.

8              Q.    How long were you at Optel?

9              A.    I want -- I believe about five and a

10      half years, maybe a little bit longer, maybe

11      six years.

12             Q.    Did your position change at any

13      point in time?

14             A.    It did.  I was -- I became the CEO

15      of the company and -- but I had other roles

16      added to my original responsibilities

17      progressively.

18             Q.    What were the other roles?

19             A.    I was doing development, M&A, just

20      other administrative functions, took on more

21      responsibilities.

22             Q.    Did you continue to hold the general

23      counsel role during your five and a half years?

24             A.    No.  When I became CEO, we promoted

25      the associate general counsel to general

HIGHLY CONFIDENTIAL                    14

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL
 2      counsel.
 3          Q.    And do you recall when that was?
 4          A.    I think in '98 or '99.
 5          Q.    And where were you based during your
 6      five and a half years?
 7          A.    All in Dallas.  It may have been as
 8      long as seven years.  I'm getting old and
 9      forget these things.
10          Q.    In 1985, were you admitted to the
11      Bar?
12          A.    I was.
13          Q.    And of what state were you admitted?
14          A.    New York.
15          Q.    Any other states?
16          A.    No, sir.
17          Q.    Are you currently admitted to the
18      Bar in New York?
19          A.    I -- yeah, I have never withdrawn my
20      membership in the Bar.  I have gone inactive,
21      and so I think I still send them money, but I
22      don't do the CLE and don't practice law.
23          Q.    At some point in time, did you let
24      your membership in the Bar of New York become
25      inactive?
```

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2          A.    I did.  And it was years and years

3     ago, so I don't remember exactly when.

4          Q.    Were you ever admitted to any other

5     Bars other than the state of New York?

6          A.    I was not.

7          Q.    So you weren't admitted to the Bar

8     in the state of Texas?

9          A.    No, I was not.

10         Q.    After your position at Optel, what

11    was your next employment?

12         A.    I started a business called CXO,

13    which was -- and I had a partner in that

14    business, and, ultimately, had a couple other

15    partners.  It was a -- specialized in TMT

16    restructurings, turnaround management work.

17         Q.    And where were you based?

18         A.    In Dallas at that point.

19         Q.    And how long did you work at CXO?

20         A.    I worked at CXO until FTI bought

21    CXO, which would have been at the beginning of

22    2009, end of 2008.  So about seven or eight

23    years, I think.

24         Q.    And can you describe what work you

25    did while you were at CXO?

HIGHLY CONFIDENTIAL                16

1            KATZENSTEIN - HIGHLY CONFIDENTIAL

2        A.    Yeah.  We were a turnaround

3   management and restructuring business, focused

4   almost exclusively on telecom, media,

5   technology internationally.

6        Q.    And you said you thought FTI bought

7   CXO somewhere in 2008 to 2009?

8        A.    Yeah, at the end of 2008, last -- in

9   December 2008.

10       Q.    Beginning in 2009, were you employed

11  by FTI?

12       A.    I was.

13       Q.    In what capacity?

14       A.    Senior managing director.

15       Q.    And what is your title today?

16       A.    Senior managing director.

17       Q.    Have you remained senior managing

18  director throughout your six years at the

19  company?

20       A.    Yeah, there's no other -- it's

21  the -- it's the senior-most position you can

22  have other than in the senior suite.

23       Q.    What were your responsibilities in

24  2009 when you took on the position at FTI?

25       A.    I was one of six or seven senior

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2     managing directors in the global TMT practice

3     in the restructuring group, which is housed in

4     corporate finance, the division of corporate

5     finance in FTI.

6          Q.    And where were you based when you

7     started in 2009?

8          A.    I started in Dallas, but FTI wanted

9     me to move to New York, and I moved back to New

10    York.

11         Q.    And when was that, that you moved

12    back to New York?

13         A.    In 2010, I believe.

14         Q.    Have you been based in New York

15    continuously since that time?

16         A.    I have.

17         Q.    Can you describe what your

18    responsibilities are today at FTI?

19         A.    Sure.  I am the national leader of

20    our interim management practice, and I am also

21    an SMD in the TMT group.  So we have a group

22    within corporate finance that specializes in

23    telecom, media and technology.

24         Q.    Is there any way to estimate the

25    number of telecom, media, technology companies

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2      you have worked with over the course of your

3      time at FTI?

4           A.    In FTI or in general?

5           Q.    At FTI.

6           A.    Oh, I would say dozens, but I don't

7      know exactly.

8           Q.    And your time at CXO?

9           A.    The same.

10          Q.    At some point in time, were you --

11     was FTI retained to provide services to the

12     bondholders in connection with the Nortel

13     litigation?

14          A.    Yes.

15          Q.    And when was that?

16          A.    I believe in January of 2010, if I'm

17     not mistaken.

18          Q.    And can you tell me, were you one of

19     the people who were --

20          A.    I'm sorry '09, January '09.  It was

21     in the early part of the case.

22          Q.    Okay.  And who specifically retained

23     FTI?  Was it the bondholders?  Was it the

24     bondholders' counsel?  Was it someone else?

25          A.    Well, the specific letter of

1        KATZENSTEIN - HIGHLY CONFIDENTIAL

2   retention, I believe, was through Milbank and

3   was also signed by NNL, if I'm not mistaken.  I

4   don't recall the particularities of the letter,

5   but the -- are you asking who signed the letter

6   or who was the client?

7        Q.    Who was the client of FTI,

8   essentially?

9        A.    So, we were acting for an ad hoc

10  group of what we refer to as the guaranteed or

11  the cross-border bonds.

12       Q.    And were you on the team that was

13  initially brought on to work --

14       A.    Yes, I was.

15       Q.    Were there other professionals

16  besides you at FTI who were part of the team?

17       A.    Yes, we have had other professionals

18  over the years work on the matter.  I have been

19  continuously on it from the beginning.

20       Q.    How large a team has worked on it?

21       A.     I mean, I imagine we have had more

22  than ten professionals work on it over -- some

23  in specialized and limited roles over time.

24  There has been a core team of three

25  professionals who have been on it continuously

1              KATZENSTEIN - HIGHLY CONFIDENTIAL
2    from the beginning.
3         Q.    Can you describe your own role in
4    connection with the representation?
5         A.    Sure.  I have been the engagement
6    leader in the representation, and have been
7    involved in virtually every interaction that
8    FTI has had with the ad hoc bond group as it
9    has been constituted over time, and with
10   Milbank and Bennett Jones, who are the counsel
11   to the ad hoc group in the US and Canada,
12   respectively.
13        Q.    Are there particular groups within
14   FTI that have been part of the representation
15   team?
16        A.    Can you rephrase?
17        Q.    Sure.  You told us earlier about a
18   group that you described as working on telecom
19   matters.
20        A.    Yeah.  So let me see if I can be
21   helpful.
22              So the persons who are -- have been
23   the regular and consistent providers of
24   services are all housed in the telecom, media
25   and technology group within corporate finance

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2    and restructuring at FTI.

3         Q.    In connection with your work for the

4    ad hoc bondholders, are you familiar with a

5    proposed settlement of the PPI issue?

6         A.    I am.

7         Q.    And did you have involvement in

8    connection with the negotiation of that

9    settlement?

10        A.    I did.

11        Q.    Can you describe generally what

12   responsibilities you have had relating to that

13   issue?

14             MR. LEBLANC:  In connection --

15        A.    Certainly.  I participated in

16   negotiations with the responsible person and --

17   of the US entities, NNI, and his financial

18   advisor and counsel over the negotiation period

19   and, you know, and related work.

20        Q.    I'm going to ask you to take a look

21   at the document that we have previously marked

22   as Ray Exhibit 1.  It's in the book before you.

23   And we have copies for any counsel who may not

24   have brought along their prior copies of that.

25             And just so the record is clear, and

1        KATZENSTEIN - HIGHLY CONFIDENTIAL

2    that you're clear, Mr. Katzenstein, it's a

3    document that contains several pieces.

4        A.    Sure.

5        Q.    The first is a notice of debtors'

6    motion for entry.  The second is debtors'

7    motion for entry of an order pursuant to the

8    Bankruptcy Rule 9019, which is a 20-page

9    document.

10        A.    Right.

11        Q.    There is then an Exhibit A, which is

12    a five-page document with a proposed order, and

13    the document in particular I'm going to ask you

14    questions about is Exhibit B, which is a

15    43-page draft agreement settling the NNI

16    post-petition interest dispute.

17            Have you seen this document before?

18        A.    I have.

19        Q.    And can you tell me when was your

20    first involvement in connection with

21    negotiations with the NNI responsible

22    individuals?

23        A.    My first personal involvement in the

24    negotiations occurred on Tuesday, July 15.

25        Q.    And earlier, you indicated that you

1                KATZENSTEIN - HIGHLY CONFIDENTIAL

2      participated in negotiations with the

3      responsible person of NNI.

4                 Can you tell us who that is?

5           A.    John Ray.

6           Q.    And you indicated that you

7      participated in negotiations with his or NNI's

8      financial advisor?

9           A.    Yes.

10          Q.    And who was the financial advisor or

11     what was the name of the entity?

12          A.    The name of the entity was Chilmark.

13          Q.    Were there more than one individual

14     from Chilmark?

15          A.    There have been -- there are more

16     than one person at Chilmark who have been

17     involved, but the principal person that I

18     interacted with was Mike Kennedy.

19          Q.    Was there anyone else from Chilmark

20     involved in these negotiations that you

21     interacted with?

22          A.    I don't believe so.

23          Q.    And you indicated that also involved

24     were counsel for NNI; is that correct?

25          A.    Yes.

HIGHLY CONFIDENTIAL                24

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2         Q.    Can you tell us who was involved?

3         A.    Lisa Schweitzer, principally.  Now

4    that -- can I just go back?

5         Q.    If you need to clarify anything.

6         A.    Matt Rosenberg may have been

7    involved in the first meeting.  I don't recall.

8    But my interactions principally were with Mike

9    Kennedy.

10        Q.    And Matt Rosenberg is at Chilmark?

11        A.    Yes, sir.

12        Q.    Were there other professionals from

13   FTI involved in the negotiations alongside you?

14        A.    Melker Sandberg, my colleague.

15        Q.    And just so we're clear,

16   Mr. Sandberg is sitting three persons to your

17   right?

18        A.    The guy in the purple shirt, yeah.

19        Q.    As he is not on video, we will

20   stipulate that he is, in fact, wearing a fine

21   purple shirt.

22              What's Mr. Sandberg's title?

23        A.    Mr. Sandberg is a managing director

24   in our TMT group housed in corporate finance at

25   FTI.

**HIGHLY CONFIDENTIAL**                    25

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2         Q.    Other than you and Mr. Sandberg,

3    were there other professionals at FTI who were

4    involved in the negotiation of the proposed

5    settlement?

6         A.    I believe that my partner, Mark

7    Spragg, S-P-R-A-G-G, who is a senior managing

8    director at FTI, also in the TMT group of

9    corporate finance, was involved in certain of

10   the negotiations.

11        Q.    Any other professionals at FTI who

12   were involved?

13        A.    Not to my knowledge, no.

14        Q.    And of the three people you have

15   mentioned, yourself, Mr. Sandberg and

16   Mr. Spragg, is one person at a more senior

17   level than the other?

18             MR. LEBLANC:  Object to the form.

19             You can answer.

20        A.    So Mark and I are both senior

21   managing directors, and Melker is a managing

22   director.  So the senior managing director, the

23   senior was put in front of there to denote a

24   higher level than managing director.  It's a

25   little different than many other professional

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2    firms.

3         Q.    So it's fair to say that your

4    position and Mr. Spragg's position is elevated

5    from Mr. Sandberg's position?

6         A.    Yes.  He doesn't agree sometimes,

7    but it is.

8         Q.    Was someone leading the

9    representation as between the group of you?

10        A.    I was.

11        Q.    Now, you indicated that your first

12   participation was on Tuesday, July 15?

13        A.    Yes.

14        Q.    I'm going to ask you questions about

15   what led up to that, your participation.

16        A.    Sure.

17        Q.    So I'm going to mark, as Katzenstein

18   Exhibit 1, a one-page document bearing Bates

19   numbers BHG-PPI-0000233.  I'm going to hand

20   that to you and a copy to your counsel and ask

21   you to take a moment to review.

22             (Katzenstein Exhibit 1, E-Mail

23        Chain, Bates Stamped BHG-PPI-0000233,

24        marked for identification.)

25        A.    (Perusing.)  Right.

1        KATZENSTEIN - HIGHLY CONFIDENTIAL

2        Q.    And just so the record is clear, I

3    will give counsel a chance to get the document

4    in hand.

5            It appears to be an e-mail chain

6    from Melker Sandberg to Mike Kennedy --

7        A.    Yes.

8        Q.    -- on July 10?

9        A.    Yes.

10        Q.    Then there is a second e-mail on

11    July 11 from Mike Kennedy, and then one at the

12    top from Mr. Sandberg.

13        A.    Yes.

14        Q.    With cc's that include Mr. Kennedy,

15    Mr. Spragg and Mike Katzenstein?

16        A.    Yes.

17        Q.    The title of it is Time to Chat?

18        A.    Right.

19        Q.    Have you seen this e-mail before?

20        A.    I mean, I'm cc'd on it, so I

21    probably did.  I don't recall it with

22    specificity.

23        Q.    Sitting here today, do you have any

24    reason to believe you didn't receive this

25    e-mail?

```
1              KATZENSTEIN - HIGHLY CONFIDENTIAL
2         A.    No, not at all.
3         Q.    Can you tell us what the first
4    contact was to you with respect to a potential
5    settlement negotiation?
6         A.    Just -- can I clarify by --
7    independent of this e-mail?
8         Q.    Sure.
9         A.    Yeah.  So I was aware that Andy
10   Leblanc had spoken with lawyers from Cleary
11   Gottlieb sometime in mid June, I believe, to
12   discuss whether the US debtors might be willing
13   to engage in a negotiation to settle the issue
14   of PPI accrual in the NNI estate claim or
15   potential claim of the US bondholders, the
16   cross-over bondholders against the US estates.
17        Q.    Were you aware that that issue was
18   being briefed in June of 2014?
19        A.    Was I aware that the issue was being
20   briefed?  Yes, I was aware that counsel to the
21   monitor, counsel to NNL, had made --
22   represented statements to the courts that the
23   existence of the approximately $1.6 billion PPI
24   accrual was an impediment to settlement, and I
25   was aware that the courts had ordered
```

HIGHLY CONFIDENTIAL                        29

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2      consideration of the PPI interest in the

3      respective courts.  So I was -- to that extent,

4      I was aware.

5              Q.    Between the middle of June, the 16th

6      of June, when the issue first came up, and the

7      e-mail that we are looking at that's been

8      marked as Katzenstein Exhibit 1, with the date

9      of the 10th of July, did you have any

10     conversations beyond what you just described

11     about the PPI issue?

12                  MR. LEBLANC:  Excluding --

13          Q.    Just did you have conversations?

14                  MR. LEBLANC:  So that's a yes or no

15          question.  To the extent it involves

16          communications with counsel --

17          A.    Yes.

18          Q.    Let's take it slow.

19                  Were those conversations with anyone

20     other than counsel at Milbank?

21          A.    No.  To the extent they were

22     conversations, we may have had internal

23     discussions at FTI, but I did not speak, to the

24     best of my recollection, with anyone outside of

25     FTI or Milbank.

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2       Q.    Okay.  And prior to the e-mail that

3  we have looked at that's on or around the 10th

4  and the 11th of July --

5       A.    Yes.

6       Q.    -- you didn't have conversations

7  with any of the lawyers at Cleary about the

8  issue?

9       A.    I did not.

10      Q.    Do you know whether anyone else at

11  FTI had conversations with anyone at Cleary

12  about the issue?

13      A.    I am not aware of any.

14      Q.    To your knowledge, had you had

15  conversations, prior to the 10th of July, with

16  anyone from Chilmark about the PPI issue?

17      A.    I did not.

18      Q.    Do you know whether anyone else at

19  FTI had such conversations?

20      A.    To the best of my knowledge, there

21  were none before then.

22      Q.    Now, did you know Mr. Kennedy from

23  before the middle of July of 2014?

24      A.    Oh, yeah.

25      Q.    You'd had dealings with him

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2      previously?

3           A.    Yes.

4           Q.    From the nature of your response, it

5      seems like it was more than one or two?

6           A.    Yes.

7           Q.    You had extensive dealings with him

8      historically?

9           A.    Yes.

10          Q.    On Nortel?

11          A.    Nortel.

12          Q.    Any on other matters?

13          A.    I did not.

14          Q.    Did you have dealings with the

15     lawyers from Cleary Gottlieb on any other

16     matters prior to Nortel?

17          A.    Yes.

18          Q.    Did you have dealings with the

19     Cleary lawyers on the Nortel matter prior to

20     July of 2014?

21               MR. ROSENTHAL:  Objection to form.

22          A.    Yes.

23          Q.    Did you know the lawyers at the

24     official committee, the Akin Gump lawyers?

25          A.    Yes.

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2          Q.    Did you know them from prior to the

3    Nortel matter?

4          A.    Yes.

5          Q.    Did you know the Milbank lawyers

6    prior to the Nortel matter?

7          A.    Some of them.

8          Q.    Prior to the meeting on the 14th --

9    sorry, prior to the meeting on the 15th of

10   July, can you tell us what conversations you

11   had with anyone on the NNI side about the PPI

12   issue?

13         A.    None personally.

14         Q.    Did you have any indirect

15   conversations?

16         A.    I don't know what that means.

17         Q.    You said none personally.

18               What did you mean, none personally?

19         A.    I know that I see, from the e-mail

20   that you handed me, that there was a

21   discussion.  I was not on that call.

22         Q.    Okay.  Do you know whether, in fact,

23   the call took place?

24         A.    To my recollection, there was a

25   call, but I don't recall the substance.

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2          Q.    Did Mr. Sandberg participate in the

3     call?

4          A.    To my recollection, he did.

5          Q.    Did he report to you as to what

6     occurred?

7          A.    It's possible.  I don't recall with

8     specificity.

9               (Katzenstein Exhibit 2, E-Mail

10         Chain, Bates Stamped BHG-PPI-0000251

11         through 252, marked for identification.)

12         Q.    I'm going to show you an e-mail that

13    we have marked as Katzenstein Exhibit 2.  I

14    will give you that and a copy for your counsel.

15              For the record, the document bears

16    Bates numbers BHG-PPI-0000251.  I ask that you

17    take a moment to review it.

18         A.    (Perusing.)  Yes.

19         Q.    It appears to be a chain of e-mails

20    dated the 14th of July of this year, between

21    and among Ms. Schweitzer, who you mentioned, a

22    Dennis Dunne.

23              Do you see that?

24         A.    Yes.

25         Q.    Do you know Mr. Dunne?

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2      A.    I do.

3      Q.    Who is Mr. Dunne?

4      A.    He is a partner in the restructuring

5  group at Milbank.

6      Q.    Did you know him prior to the Nortel

7  matter?

8      A.    I did.

9      Q.    Have you worked with him on the

10  Nortel matter?

11      A.    I have.

12      Q.    And there's a cc, a Lisa

13  Giambatista.

14            Do you know who that is?

15      A.    I don't.

16      Q.    And there is John J. Ray, who you

17  mentioned earlier.

18      A.    Yes.

19      Q.    If I can point you to the e-mail in

20  the middle of the first page, which indicates

21  Mr. Dunne sending an e-mail to Ms. Schweitzer.

22      A.    Yes.

23      Q.    It says, "Here's the list," and

24  provides Dennis Dunne, Andy Leblanc, Al Pisa,

25  Mike Katzenstein, Melker Sandberg, "See you

```
 1            KATZENSTEIN - HIGHLY CONFIDENTIAL
 2    tomorrow."
 3              Do you see that?
 4       A.    I do.
 5       Q.    Do you have an understanding as to
 6    what that's a reference to?
 7       A.    Yes.
 8       Q.    And what is it a reference to?
 9       A.    It's a reference to a meeting that
10    had been organized to be held at Cleary's
11    offices on the following day, the 15th.
12       Q.    And is that the meeting that you
13    attended on Tuesday, the 15th of July?
14       A.    It is to my knowledge.
15       Q.    Did Mr. Dunne attend that meeting?
16       A.    Yes.
17       Q.    Did Mr. Leblanc attend the meeting?
18       A.    Yes.
19       Q.    Did Mr. Pisa attend the meeting?
20       A.    Yes.
21       Q.    Did Melker Sandberg attend the
22    meeting?
23       A.    He did.
24       Q.    Who is Al Pisa?
25       A.    Al Pisa is a partner at Milbank as
```

1                KATZENSTEIN - HIGHLY CONFIDENTIAL

2     well.

3          Q.    Had you worked with him prior to the

4     Nortel matter?

5          A.    I did not -- I had not.

6          Q.    Did you work with him in connection

7     with the Nortel matter?

8          A.    Oh, yes.

9          Q.    The e-mail above that, from

10    Ms. Schweitzer to Mr. Dunne with cc, says,

11    "Thanks, Dennis.  Do you expect to send a

12    proposal over today?"

13              Do you have an understanding as to

14    what that's a reference to?

15              MR. LEBLANC:  Objection.

16              You can answer.

17         A.    I believe I do.

18         Q.    What do you understand that to be a

19    reference to?

20         A.    To my recollection, we were asked to

21    and submitted -- to submit a written form of

22    settlement agreement proposal to reflect a

23    proposal for settlement that had been made

24    orally earlier to the US debtors.

25         Q.    And when you say it was made orally

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2    earlier to the US debtors, when was that

3    proposal first made?

4          A.    I don't know the specific date, but

5    to my expectation, Andy Leblanc had made a

6    proposal for settlement through Cleary during

7    earlier discussions, and it may have been days

8    or even weeks preceding the July 15 meeting.

9          Q.    And are you familiar with what the

10   terms of this oral proposal were?

11         A.    I am familiar with what I would

12   consider the most salient term.

13         Q.    Can you tell us what the salient

14   terms were?

15         A.    The proposal was that the crossover

16   bonds would agree to discount to 70 percent of

17   the post-petition interest accrual, their claim

18   for post-petition interest against the US

19   entities, the US estate.

20         Q.    Okay.  Were there any other salient

21   terms that you recall?

22         A.    I know there were other salient

23   terms, but I don't recall, with specificity,

24   one of them.

25         Q.    When you say one of them, do you

HIGHLY CONFIDENTIAL                          38

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2    mean any of the others?

3          A.     The others, yes.

4          Q.     And when you say 70 percent of the

5    PPI accrual, sitting here today, do you recall

6    if, at that point in time, you knew what the

7    total PPI accrual was?

8          A.     Well, we were working with the

9    approximately $1.6 billion of PPI accrual that

10   was represented by the monitor's counsel to the

11   courts as the post-petition accrual at the time

12   that the representation was made.

13         Q.     Prior to July, mid July of 2014, did

14   FTI do anything to determine whether that

15   $1.6 billion number was approximate, was it

16   correct?

17              MR. LEBLANC:  You can answer that

18         yes or no.

19         A.     Yes.

20         Q.     And did you have a view as to

21   whether it was correct?

22   DI            MR. LEBLANC:  To the extent that

23         that calls for analysis that was conducted

24         on behalf of or at the direction of

25         counsel, I'm going to instruct you not to

1          KATZENSTEIN - HIGHLY CONFIDENTIAL
2          answer that.
3          A.    I wouldn't be able to answer that.
4          Q.    Because you're following the
5     direction of your counsel?
6          A.    Yes.
7          Q.    Okay.  So just so that we're clear,
8     FTI had done a calculation; is that right?
9          A.    Yes.
10         Q.    That calculation was done at the
11    direction of counsel?
12         A.    Yes.
13         Q.    Can you tell me when that
14    calculation was done?
15         A.    Calculations have been done
16    throughout the case.
17         Q.    And in July, mid July of 2014,
18    coming into the negotiation, you had a view as
19    to whether the $1.6 billion number that the
20    monitor had put out there, you had a view as to
21    whether that was approximate or correct?
22         A.    Yes.
23         Q.    But you can't tell me because that
24    was done at the direction of your counsel?
25         A.    Yes.

1            KATZENSTEIN - HIGHLY CONFIDENTIAL

2        Q.    You indicated that the oral proposal

3    that was made by Mr. Leblanc, you believe, was

4    made or communicated to Cleary.

5             Do you recall who at Cleary it was

6    communicated to?

7        A.    I believe it was initially

8    communicated to Jim Bromley.

9        Q.    And Mr. Bromley is a partner in

10   Cleary?

11       A.    Yeah.  Doesn't everybody know that?

12       Q.    Did you know Mr. Bromley from before

13   the Nortel matter?

14       A.    Not closely, but I did know.

15       Q.    Do you know approximately when this

16   oral proposal was communicated?

17       A.    I believe it was several weeks

18   before our meeting.

19       Q.    Do you know where -- whether it was

20   on a telephone call?

21       A.    I think they had a meeting, to my

22   recollection.

23       Q.    Do you recall where the meeting took

24   place?

25       A.    My recollection is that it was in

1              KATZENSTEIN - HIGHLY CONFIDENTIAL
2     Toronto.
3          Q.    Do you recall where in Toronto it
4     took place?
5          A.    I do not.
6          Q.    Do you know whether it was at the
7     bar at the Ritz Hotel?
8          A.    Well, it's hard to get Andy out of
9     there.
10         Q.    But sitting here today, do you know
11    whether that, in fact, was where the
12    communication took place?
13         A.    It's possible that it was.
14         Q.    Now, I'm going to ask you to take a
15    look at the document that's in front of you in
16    the book of Ray exhibits, which is Ray
17    Exhibit 2.
18         A.    Yes.
19              MR. LEBLANC:  Do you have a copy of
20         that?
21         A.    I'm not finding an Exhibit 2, and I
22    apologize.  I have an Exhibit 2 that leads
23    directly to an Exhibit 3.
24              Is this another one of the monitor's
25    tricks?

1                 KATZENSTEIN - HIGHLY CONFIDENTIAL

2          Q.     Let me hand you what's been marked

3     previously as Ray Exhibit 2, which bears Bates

4     numbers BHG-PPI-0000018 through 21.

5          A.     Thank you.  (Perusing.)

6          Q.     For the record, it appears to be a

7     term sheet?

8          A.     Yes, sir.

9          Q.     Have you seen this document before?

10         A.     I believe I saw it at the -- at the

11    meeting on the 15th.

12         Q.     Do you recall whether you had seen

13    that draft before the meeting on the 15th?

14         A.     No.  I remember that I had not seen

15    it before.

16         Q.     Can you tell us who was in

17    attendance from the NNI side at the meeting on

18    the 15th?

19         A.     Yes.

20         Q.     And who was in attendance?

21         A.     John Ray, Mike Kennedy, Lisa

22    Schweitzer, and I don't recall with specificity

23    if Matt Rosenberg was there, but it's possible

24    he was there.  I don't remember.

25         Q.     And do you recall what time of day

1            KATZENSTEIN - HIGHLY CONFIDENTIAL

2   the meeting took place?

3        A.    I believe it started around noon.

4        Q.    Do you recall how long it lasted?

5        A.    It lasted most of the afternoon, I

6   would say.  Maybe four, four to five hours, I

7   believe.

8        Q.    Was it one long meeting or were

9   there a series of breakouts?

10       A.    There were breakouts.

11       Q.    Did the ad hoc bonds have its own

12   room?

13       A.    We had a room where we stayed and

14   the US debtors came in and would leave.

15       Q.    Do you recall which conference room

16   the meeting took place in?

17       A.    I recall the conference room, but I

18   don't recall the number.  I think I have been

19   in every one of them.

20       Q.    Did someone take the lead for the US

21   in the meeting?

22       A.    John Ray.

23       Q.    And did someone take the lead for

24   the bonds in the meeting?

25       A.    To my recollection, Dennis and Andy

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL
 2   did most of the speaking, but...
 3        Q.    Just so we're clear, when you say
 4   Dennis, you're referring to Dennis Dunne?
 5        A.    Yes.
 6        Q.    And when you say Andy, you're
 7   referring to Mr. Leblanc?
 8        A.    The guy in the Ritz bar, yeah.
 9        Q.    The person sitting immediately to
10   your right?
11        A.    Yes.
12        Q.    To the best of your recollection,
13   sitting here today, can you tell us what --
14   what occurred at the meeting?
15              MR. LEBLANC:  Object to the form.
16              You can answer.
17        A.    In litany form, like timeline?
18        Q.    Best you can recall.
19        A.    As I recall, we -- the bond group
20   was in the conference room for some time, and
21   John Ray and Lisa and Mike Kennedy came in, and
22   John said, okay, it's your meeting, what do you
23   want to discuss, and we said we want to discuss
24   the PPI accrual issue.  And he said, do you
25   have a proposal for me.  And we said, we had
```

1        KATZENSTEIN - HIGHLY CONFIDENTIAL

2   already made you a proposal.  Well, would you

3   restate your proposal.  And we did, and -- go

4   ahead.

5        Q.    And what was that proposal?

6        A.    It was to discount to 70 percent the

7   post-petition accrual.

8        Q.    Okay.  Now, the term sheet that we

9   just looked at, that was Ray Exhibit 2.

10       A.    Yes.

11       Q.    To your knowledge, did that contain

12   the 70 percent proposal number that you just

13   referenced?

14       A.    (Perusing.)  It appears that the

15   settlement rate is noted as TBD on this.

16       Q.    Do you know who drafted the document

17   that's reflected in Ray Exhibit 2?

18       A.    Milbank.

19       Q.    It wasn't FTI that drafted the term

20   sheet, to your knowledge?

21       A.    No.

22       Q.    Now, when you were asked to have a

23   proposal and you gave the 70 percent proposal,

24   do you recall who gave that proposal?

25       A.    Who said it?

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2          Q.    Who said it?

3          A.    I think it was -- it was either Andy

4    or Dennis.

5          Q.    And do you recall what the response

6    was from Mr. Ray?

7          A.    Mr. Ray said our proposal is a

8    70 percent discount to 30 percent.

9          Q.    So your proposal was 70 percent,

10   their proposal was 30 percent?

11         A.    Yeah.

12         Q.    How long was that part of the

13   discussion, to your recollection sitting here

14   today?

15         A.    I don't recall.  I mean, there was

16   some discussion around it, you know, argument

17   of some sort, which is what you would expect

18   from John.

19         Q.    Let's stay on that.

20               When you say argument of some sort,

21   argument with respect to what?

22         A.    That we should accept that and it

23   was -- we -- you know, his reasoning why -- you

24   know, if we wanted a settlement and everybody

25   wanted a settlement, why.

HIGHLY CONFIDENTIAL                    47

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2        Q.    Do you recall, sitting here today,

3   what his reasoning was?

4        A.    His reasoning was, you know -- I

5   don't recall all the reasons, but, you know, we

6   have trials coming up, you want certainty, here

7   is the deal I will give you, and that was

8   basically it.

9        Q.    Was there any discussion at that

10  point in time about what the maximum amount

11  that the bonds could possibly recover --

12            MR. LEBLANC:  Object to the form.

13       Q.    -- on the PPI accrual issue?

14            MR. LEBLANC:  Object to the form.

15       A.    No, we didn't -- we didn't share

16  calculations at that time.

17       Q.    At some point in time, did you and

18  the US share calculations concerning that

19  issue?

20       A.    Can you restate the question so I

21  understand it?

22       Q.    Sure.  You said Mr. Ray made

23  arguments as to why you should accept the

24  30 percent.

25       A.    Right.

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2          Q.     And my next question was, was

3     there -- did Mr. Ray communicate to you what he

4     thought you were likely, you, the bonds, were

5     likely to be able to recover on your PPI

6     accrual claim?

7          A.     No, he did not.

8          Q.     At some point in time, did the US

9     communicate to the bonds what they thought was

10    likely that the bonds were going to be able to

11    recover on the PPI accrual issue?

12         A.     No.

13         Q.     At some point in time, did the bonds

14    communicate to NNI what the bonds thought they

15    could recover on the PPI accrual issue?

16         A.     No.

17         Q.     At any point in time, were there

18    internal discussions between FTI and counsel or

19    just at FTI about what the bonds would be

20    likely to recover on the PPI accrual issue?

21    And that's yes or no?

22         A.     Yes.

23         Q.     And can you tell us --

24              MR. LEBLANC:  Just to clarify, do

25         you mean in connection with this

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2         settlement or generally?

3         Q.    Let's step back.

4              MR. PULTMAN:  Thank you for the

5         clarification.

6         Q.    In connection with the motion, the

7    motion about the PPI issue, if the bonds won

8    the motion outright and had an order that

9    allowed them to get the contract rate on all

10   post-petition interest --

11        A.    Yes.

12        Q.    -- was there a discussion on the FTI

13   side as to what the bonds would be likely to

14   recover?

15        A.    Yes.

16        Q.    Can you tell me what that discussion

17   was?

18   DI         MR. LEBLANC:  I'm going to instruct

19        you not to answer that.

20        Q.    Let's drill down, then.

21              Was that discussion with counsel?

22        A.    Yes, analyses requested by counsel.

23        Q.    Was there any analysis that was done

24   that was just FTI's analysis, done in response

25   to a request by counsel, but just FTI's

```
 1           KATZENSTEIN - HIGHLY CONFIDENTIAL
 2    analysis, not reflecting work done by Milbank?
 3               MR. LEBLANC:  Just so I understand,
 4         you mean directed by Milbank, but not done
 5         by Milbank?
 6               MR. PULTMAN:  Exactly.
 7         A.    Yes.
 8         Q.    Okay.  And are you able to tell me
 9    what that analysis was?
10    DI         MR. LEBLANC:  I'm going to instruct
11         you not to answer that.
12         Q.    Are there written documents
13    reflecting that analysis?
14               MR. LEBLANC:  You mean, just to be
15         clear, the analysis being what possible
16         outcomes there are from PPI?
17         Q.    FTI's analysis of what --
18               MR. LEBLANC:  You can answer that.
19         A.    Yes.
20         Q.    And did you model what the potential
21    outcomes could be under the PPI recovery?
22               MR. ROSENTHAL:  Objection to form.
23               MR. LEBLANC:  Object to the form.
24               Again, that's a yes or no.
25         A.    Yes.
```

```
1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2         Q.    More than once?

3         A.    Yes.

4         Q.    When was the first time that FTI

5    prepared financial analysis of what that

6    recovery could be?

7              MR. LEBLANC:  Object to the form.

8         A.    Can you explain what that means?

9         Q.    Sure.  Let's go back to the PPI

10   recovery.

11             If the bonds won the motion and got

12   an award of contract rate PPI, when was the

13   first time that FTI prepared a financial

14   analysis of the potential recovery?

15             MR. LEBLANC:  Object to the form,

16        assumes facts not in evidence.

17        A.    I mean, I don't know, but we have

18   been modeling potential outcomes for years.

19        Q.    Now, you were in the middle of

20   telling us about the meeting that you had with

21   Mr. Ray.  You told us about his argument that

22   you should accept the 30 percent.

23             What was the response to his

24   argument?

25        A.    I think that we may have had a break
```

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2    at that point, and when we were ready, we --

3    John Ray, I believe, and Lisa and Mike returned

4    to the room, and we countered at 65 percent.

5    So a 35 percent discount, 65 percent off our

6    70.

7          Q.    Was there a follow-up

8    counterproposal from the US?

9          A.    Yes.  I mean, there was, again, a

10   break.  I don't remember.  And then John Ray

11   returned, and I think proposed a 60 percent

12   discount to 40 percent.

13         Q.    So you moved from 70 to 65, they

14   moved from 30 to 40?

15         A.    Right.

16         Q.    Did you make any further

17   counterproposal?

18         A.    I don't believe there were any

19   further counterproposals at that meeting.

20         Q.    Were there any further discussions

21   or arguments about why you should accept the

22   counterproposal?

23         A.    I believe there were.

24         Q.    Can you tell me what the arguments

25   were made?

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2        A.    I don't remember with specificity,

3   but there were -- they were saying, you know,

4   that the certainty and the expediency that we

5   wanted, you know, John Ray advocated that we

6   take it, and we indicated that we would not

7   accept it, but I don't believe we countered at

8   that time.

9              I think there was discussion of some

10  more, but not a lot of flexibility between the

11  parties, you know, negotiation stuff, and we

12  broke.

13       Q.    So we're on the 15th of July.

14             How was the meeting left?

15       A.    By foot.

16       Q.    By -- were there any parting words

17  between the participants at the meeting on the

18  15th?

19             MR. LEBLANC:  Object to the form.

20       A.    My recollection was that, okay, we

21  will keep talking.  It was clearly my

22  impression that there was some remaining

23  flexibility, and that we had some remaining

24  flexibility, and we -- I don't believe there

25  was a definitive agreement on when we would

1            KATZENSTEIN - HIGHLY CONFIDENTIAL

2    reschedule or how.

3        Q.    Were there any discussions about

4    drafting a proposed settlement agreement at the

5    meeting?

6        A.    I don't recall.

7        Q.    I'm going to ask that you take a

8    look at the document that hopefully is in the

9    collection I have put before you, and I'm going

10   to ask you to take a look at Ray Exhibit 3.

11       A.    Yes.

12       Q.    Can you tell me what date that is?

13       A.    Monday, the 14th.

14       Q.    I think you're looking at Ray

15   Exhibit 2, actually.  If you look on -- I know

16   it's behind tab three, but it has got --

17       A.    Okay.  I'm sorry.  Yeah, this is the

18   one you showed me earlier.  I'm sorry.  So the

19   next one or --

20       Q.    The next one behind that should be

21   Ray Exhibit 3.

22            MR. LEBLANC:  Ray Exhibit 3 or 4?

23            MR. PULTMAN:  Ray Exhibit 3.

24            MR. LEBLANC:  It should look like

25       this.

**HIGHLY CONFIDENTIAL**                    55

1        KATZENSTEIN - HIGHLY CONFIDENTIAL

2              THE WITNESS:  Is this it?

3              MR. PULTMAN:  No.

4        Q.    If you hand this back to me, I will

5    hand you Ray Exhibit 3.

6        A.    So it is 3.  I see it.  It's just

7    mistabbed.  Right.

8        Q.    And for the record, Ray Exhibit 3 is

9    dated Thursday, July 17, 2014, at 11:26 a.m.,

10   and it's from a Mr. Tom Matz.  It bears Bates

11   numbers BHG-PPI-0000153 through 164.

12       A.    Yes, sir.

13       Q.    It indicates, in the substance of

14   the cover e-mail.

15       A.    Yes.

16       Q.    "Lisa, further to our discussions on

17   Tuesday, attached is a draft settlement

18   agreement regarding PPI."

19             Have you seen this document before?

20       A.    I don't know.  I don't know.

21       Q.    Did you, at some point, learn that a

22   draft settlement agreement had been sent from

23   Milbank to Cleary?

24       A.    Yes, I believe I did.

25       Q.    And did you know it was going to be

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2    sent before it was sent?

3         A.    It's possible.  I don't recall.

4         Q.    And if you look at the settlement

5    agreement, and in particular you look at

6    Section 2.2, a section entitled PPI Settlement

7    Amount?

8         A.    Yes.

9         Q.    Says, "Shall be in amount up to,"

10   and it has in brackets, "60 percent."

11              Do you see that?

12        A.    Yes.

13        Q.    Do you know how the 60 percent

14   number came to be in this draft?

15        A.    I don't, but I would assume it was

16   the leave-off point from the Tuesday meeting.

17        Q.    Going back to what you testified to

18   earlier.  You told us about numbers that were

19   thrown out at 40 percent for NNI and 65 percent

20   as the counter.

21        A.    Yeah.  No, I believe there was a

22   counter at 60.  We left the meeting at 60/40.

23   If I misstated that, I would like to correct

24   that.

25        Q.    So just so the record is very clear,

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2    you started at 70, they started at 30.

3         A.    Right.

4         Q.    They moved up to 40.

5         A.    Right, right.

6         Q.    You went to 65.  And then you ended

7    up at 60?

8         A.    Yes.

9              MR. LEBLANC:  Object to the form.

10        Q.    And just so, again, the record is

11   clear, the bonds were proposing the 60 percent

12   number?

13        A.    Yes, sir.

14        Q.    And that is reflected in the

15   document that was the draft of Thursday?

16        A.    Yes.

17        Q.    Were there further discussions in

18   which you participated between the parties

19   which moved the parties off of their 40/60

20   respective numbers?

21        A.    No.

22        Q.    Were there any meetings that moved

23   the parties from their 40/60 numbers?

24        A.    That I attended?

25        Q.    That you attended.

KATZENSTEIN - HIGHLY CONFIDENTIAL

2    A.    No.

3    Q.    Did you come to learn that there

4  were other discussions in which the parties

5  moved off of their 40/60 numbers?

6          MR. ROSENTHAL:  Objection to form.

7    A.    I did learn, yes.

8    Q.    Sitting here today, do you know

9  whether or not there is a proposed agreement --

10  settlement agreement, that has a number that's

11  somewhere between the 40 and 60 percent number?

12    A.    Let me see if I can be helpful.  I

13  know there were discussions which resulted in a

14  change in the parties' position, and ultimately

15  an agreement on percentage discount.

16          I don't recall seeing that proposal

17  in writing until it was in the form of the

18  settlement agreement that was...

19    Q.    Can you tell me what your role was

20  in settlement communications from -- after the

21  meeting on the 15th until the agreement that we

22  have looked at that's Ray Exhibit 1, which was

23  put to the court on the 24th of July?

24    A.    Yes.

25    Q.    What was your participation?

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2      A.    My participation was --

3            MR. LEBLANC:  In answering this,

4      just exclude discussions you may have had

5      with counsel.

6            THE WITNESS:  Thank you.

7      A.    My discussions were with -- with

8  Mike Kennedy at Chilmark and, to my

9  recollection, I spoke with Mike Kennedy on the

10 evening of Monday -- is that the 22nd or the

11 21st?

12     Q.    Monday is the 21st.

13     A.    The 21st.  And then I had subsequent

14 discussions with Mike Kennedy and John Ray on

15 the morning of the 22nd.  I believe I have

16 those dates right.

17            (Katzenstein Exhibit 3, E-Mail

18     Chain, Bates Stamped BHG-PPI-0000013

19     through 16, marked for identification.)

20     Q.    I'm going to show you a document we

21 have had marked as Katzenstein Exhibit 3, and a

22 copy for your counsel.

23            So the record is clear, the document

24 bears Bates numbers BHG-PPI-0000013 through 16.

25     A.    Yes.

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2         Q.    And appears to be a chain of e-mails

3    that start with the 17th of July and going

4    back -- going through the 19th of July.

5         A.    (Perusing.)  Uh-huh.

6         Q.    Let's start with the one on the 17th

7    of July.

8              Does that appear to you to be the

9    same document as the settlement agreement

10   version of Thursday, the 17th?

11        A.    It does.

12        Q.    And above that is an e-mail from a

13   Jennifer Harris to Ms. Schweitzer, dated the

14   18th of July.

15             Do you see that?

16        A.    Yes.

17        Q.    Which indicates, "Enclosed please

18   find a revised draft of the PPI settlement

19   agreement."

20        A.    Yes.

21        Q.    Do you know whether a revised draft

22   of the settlement agreement was circulated on

23   Friday, the 18th?

24        A.    Yes, I believe there was one.

25        Q.    And do you know whether the version

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2      that was -- the version of the settlement

3      agreement that was circulated on the 18th

4      contained a number of 55 percent?

5          A.    To my knowledge, it did.

6          Q.    And that 55 percent number, did that

7      equate to an actual number of $907.5 million?

8          A.    Yes.  At the time, that would have

9      been the number.

10         Q.    Were you aware that the parties were

11     discussing, on the 18th, a 55 percent or

12     $907.5 million number?

13         A.    Yes.

14         Q.    Did you know whether or not the

15     parties had agreed on that number?

16         A.    To my knowledge, we had an oral

17     agreement at 55 percent.

18         Q.    And do you know who that oral

19     agreement was between?

20         A.    I believe there were discussions

21     between Mr. Dunne, Mr. Ray and Lisa Schweitzer.

22         Q.    Do you know when those discussions

23     took place?

24         A.    To the best of my recollection, on

25     that Thursday.

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2          Q.    Do you know whether those

3     discussions took place in person?

4          A.    I think they were by phone.

5          Q.    If we can just work our way back in

6     the chain on the document that's been marked

7     Katzenstein Exhibit 3, there appears to be a

8     response from Ms. Schweitzer to Ms. Harris,

9     thanking Jennifer, "We will review and come

10    back to you on the draft."

11               Do you see that?  It's on the top of

12    the second page.

13         A.    Yes, I see that.  Thank you.

14         Q.    And above that is an e-mail from

15    Mr. Leblanc to Ms. Schweitzer, with various

16    cc's, with an indication, "Lisa, just to warn

17    you in advance, we have a call at 5 p.m. with

18    Akin on a number of topics, and expect this

19    will come up."

20               Do you see that?

21         A.    I do.

22         Q.    Do you have any understanding as to

23    what the balance of that e-mail is a reference

24    to?

25               Just so the record is clear, it

1               KATZENSTEIN - HIGHLY CONFIDENTIAL

2      indicates, "We probably need to do that anyway.

3      We've been talking with the IT, but have sworn

4      them to secrecy.  I know it will create

5      problems, but are you okay with that if we need

6      to?"

7                   MR. LEBLANC:  Object to the form,

8          lacks foundation.

9                   THE WITNESS:  Am I free to answer?

10                  MR. LEBLANC:  Yeah.

11         A.    I think -- I believe I have an

12     understanding about what the references are.

13         Q.    Tell us what your understanding is,

14     please.

15         A.    Our negotiations on this subject, on

16     the subject of the -- settling the

17     post-petition accrual, were exclusively between

18     the ad hoc bondholders and the US debtors, and

19     we had not yet involved Akin Gump, who were

20     counsel for the official committee of

21     creditors, and represent, in addition to our

22     interest, the interest of the other US GUCs,

23     general unsecured creditors, and to the best of

24     my knowledge, this discussed the timing of

25     bringing them into the fold on the

**HIGHLY CONFIDENTIAL**                         64

1              KATZENSTEIN - HIGHLY CONFIDENTIAL
2     negotiations.
3          Q.    Did you have any involvement in
4     discussions with parties other than the US and
5     the ad hoc bondholders about the proposed
6     settlement at any point in time?
7          A.    No.
8          Q.    At any point in time, did you have
9     discussions with anyone representing the
10    Canadian debtors about the proposed settlement?
11         A.    I did not.
12         Q.    Did you have any discussions with
13    anyone else about the proposed settlement?
14              MR. LEBLANC:  Object to the form.
15         A.    Anyone else?
16         Q.    You have told us about discussions
17    with NNI and NNI's representatives.
18         A.    Right.
19         Q.    You have told us you have not had
20    conversations with any of the other creditors
21    or their representatives.
22         A.    Other than the bondholders.
23         Q.    Other than the bondholders.
24         A.    Okay.  No one else.
25         Q.    You had no conversations or

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2    communications with representatives of the

3    official committee?

4          A.    No, I did not.

5          Q.    And you had no conversations with

6    representatives of the PBGC?

7          A.    I did not.

8          Q.    You had no conversations or

9    communications with any other creditors of NNI?

10               MR. LEBLANC:  Object to the form.

11         A.    I did not.

12         Q.    You had no conversations with anyone

13   at the Canadian debtors?

14         A.    I did not.

15         Q.    Did you have conversations with

16   anyone else?

17         A.    Not to my knowledge, no.

18         Q.    Do you know whether anyone else from

19   FTI had conversations with anyone other than

20   NNI or the bondholders about this subject

21   matter?

22         A.    To my knowledge, there were none.

23         Q.    Now, the top e-mail between

24   Ms. Schweitzer and Mr. Leblanc on Saturday,

25   July 19, 2014, indicates, "They reached out to

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2    John, so we going to send them your latest

3    draft telling them it's a working draft subject

4    to comments by everyone.  Also, Mike has asked

5    FTI for a calculation of how you get to the

6    $1.6 billion interest number.  Can you have

7    them send that over to us through you?

8    Thanks."

9              Do you see that?

10       A.    I do.

11       Q.    Do you have an understanding as to

12   what that's a reference to?

13              MR. LEBLANC:  Object to the form,

14         lack of foundation.

15              You can answer.

16       A.    I believe I do.

17       Q.    And what's your understanding?

18       A.    I believe that, at some point, Mike

19   Kennedy is the Mike that's being referenced,

20   had asked that we send over a schedule showing

21   the calculation of post-petition interest

22   accrual, and I guess the sum of that accrual.

23       Q.    And when you say we there, are you

24   referring to FTI?

25       A.    Yes.

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2          Q.     Did FTI, in fact, send over a

3     schedule of how it got to the $1.6 billion

4     interest number?

5          A.     I believe we did.

6               (Katzenstein Exhibit 4, E-Mail with

7          Schedule, Bates Stamped BHG-PPI-0000009

8          through 12, marked for identification.)

9          Q.     I'm going to show you a document

10    that we've had marked as Katzenstein Exhibit 4,

11    a document bearing Bates numbers BHG-PPI-000009

12    through 12.  And I will give you a copy for

13    your counsel as well.

14               In a minute, Mr. Katzenstein, I'm

15    going to ask you to identify the document, and

16    then, if it's appropriate, we're going to take

17    a few minute break, if that works for you.

18         A.     Fine with me.  Maybe I can find some

19    reading glasses during that period.

20               MR. LEBLANC:  Is there a question?

21         Q.     The question, Mr. Katzenstein, is

22    have you seen the document that is the

23    attachment to the e-mail that's a three-page

24    document which says, "Prepared at the request

25    of counsel, prepared in contemplation of

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2     litigation," and the heading of the document

3     says Post-Petition Interest Calculations?

4          A.    I have seen this.

5          Q.    And can you tell me what this is?

6          A.    This is a calculation prepared by --

7     by issuance of post-petition interest accruals

8     on the guaranteed bonds.  It includes, at some

9     point, a tally of the post-petition interest as

10    of July 1 -- June 30, July 1.

11         Q.    And is that tally contained on the

12    document that ends in Bates number 12?

13         A.    It is.

14         Q.    And is that something in the order

15    of $1.656 billion?

16         A.    Yes.

17         Q.    Is this the document that was sent

18    in response to Katzenstein Exhibit 3?

19         A.    To my knowledge, it is.

20              MR. PULTMAN:  Can we take a few

21         minutes?

22              THE WITNESS:  My pleasure.

23              THE VIDEOGRAPHER:  We are now off

24         the record.  The time is 2:18 p.m.,

25         September 18, 2014.

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL

 2                   (Recess taken.)

 3                   THE VIDEOGRAPHER:  This is tape two

 4          of the deposition of Mr. Michael

 5          Katzenstein.  We are now back on the

 6          record.  The time is 2:38 p.m.,

 7          September 18, 2014.

 8    BY MR. PULTMAN:

 9          Q.    Mr. Katzenstein, we were looking at

10    Katzenstein Exhibit 4, the cover e-mail dated

11    Saturday, July 19, 2014, and then the

12    three-page schedule.

13          A.    Yes, sir.

14          Q.    That three-page schedule, I believe

15    you said was prepared by FTI.

16          A.    Yes.

17          Q.    Do you recall who at FTI prepared

18    the schedule?

19          A.    Melker Sandberg.

20          Q.    Were you involved at all in

21    approving the schedule?

22          A.    I don't recall with particularity if

23    I approved this one, but it's consistent with

24    analyses I have seen.

25          Q.    Do you believe the schedule prepared
```

HIGHLY CONFIDENTIAL                70

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2    by FTI to be accurate?

3          A.    Yes.

4          Q.    Did you authorize sending this to

5    counsel at NNI?

6          A.    I don't recall if I approved

7    specifically, but it was consistent with the

8    expectation that we would send this over to our

9    counsel for distribution.

10         Q.    And when you say for distribution by

11   your counsel, that meant to NNI's counsel?

12         A.    Yes.

13         Q.    And Mr. Sandberg wasn't in trouble

14   for sending this out, was he?

15         A.    Not yet.  Let's see what you ask.

16         Q.    Sitting here today, to your

17   knowledge, the number that's reflected on the

18   last page of 1.656 billion, is that consistent

19   with the number that the monitor had raised?

20         A.    It is, yes.

21         Q.    And did anyone from NNI raise any

22   concern with respect to that schedule?

23               MR. ROSENTHAL:  Objection to form.

24         A.    Not to my knowledge.

25         Q.    There is a reference on the last

1           KATZENSTEIN - HIGHLY CONFIDENTIAL

2    page of the document to what's indicated as NNC

3    notes?

4              MR. LEBLANC:  NNCC?

5         Q.    I'm sorry.  NNCC notes?

6         A.    Yes.

7         Q.    Do you have an understanding as to

8    what the NNCC notes were?

9         A.    Yes.

10        Q.    And what were the NNCC notes?

11        A.    They were notes issued by NNCC,

12   which was a financing entity, US financing

13   entity, I believe, in the principal amount of

14   150 million, if I'm not mistaken.  Yes, that's

15   what is there.

16              And these are the only notes that

17   were not issued by NNI and guaranteed by NNL.

18   So it was just a different issuing mechanism.

19        Q.    And were the holders of the NNCC

20   notes included in the earlier versions of the

21   proposed settlement agreement, to your

22   knowledge?

23              MR. LEBLANC:  Object to the form.

24              You can answer.

25        A.    Well, to my knowledge, the early

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2      versions of the settlement agreement were

3      drafted assuming that the NNCC notes would

4      become a party to the settlement agreement and

5      would compromise their claim for accrued

6      post-petition interest in the same proportion

7      as the other crossover bondholders.

8          Q.    To your knowledge, were the NNCC

9      noteholders ultimately a part of the proposed

10     settlement that is reflected in Ray Exhibit 1?

11         A.    No, they were not.

12         Q.    And do you have an understanding as

13     to how they became excluded from that document?

14              MR. LEBLANC:  Object to the form.

15         A.    I do.

16         Q.    Can you tell us what your

17     understanding is?

18         A.    My understanding was that they were

19     asked and invited to participate and that they

20     declined.

21         Q.    Were you involved in any

22     communications with the NNCC noteholders?

23         A.    I was.

24         Q.    And can you tell me who you were

25     involved with communications -- with whom were

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL
 2    you involved?
 3         A.    Direct involvement, I spoke with one
 4    of the principal holders of the NNCC bonds --
 5    with a principal at one of the principal
 6    holders of the NNCC bonds, and asked for his
 7    fund to participate.
 8         Q.    And who was that principal?
 9         A.    Steve Blauner.
10         Q.    Is he the principal of Solus?
11         A.    Solus, a principal of Solus, yes.
12         Q.    And when did you have these
13    communications with Solus?
14         A.    To the best of my recollection, it
15    was on Tuesday -- the Tuesday following the
16    first Wednesday meeting.
17         Q.    And when you say --
18         A.    The Tuesday following the Tuesday
19    meeting.  I'm sorry.
20              MR. LEBLANC:  The 22nd.
21         A.    The 22nd.
22              THE WITNESS:  Thank you, Andy.
23              MR. LEBLANC:  Just to give you the
24         dates.
25         Q.    I appreciate that.  So that's
```

1           KATZENSTEIN - HIGHLY CONFIDENTIAL

2    July 22?

3           A.    Yes, sir.

4                 (Katzenstein Exhibit 5, E-Mail,

5           Bates Stamped BHG-PPI-0000226, marked for

6           identification.)

7           Q.    I want to show you a document we

8    have marked as Katzenstein Exhibit 5, which is

9    a one-page document, dated July 23, 2014, and I

10   have a copy for your counsel there as well.

11                For the record, the document is a

12   one-page document bearing Bates numbers

13   BHG-PPI-0000226.

14          A.    Yes.

15          Q.    It appears to be an e-mail chain

16   involving Mike Kennedy, Melker Sandberg, you

17   and John Ray.

18                Do you see that?

19          A.    Yes, yes.

20                MR. LEBLANC:  Just make sure he gets

21          his question out so she can record both of

22          you.

23                THE WITNESS:  Thanks, Andy.

24          Q.    Have you seen this document before?

25          A.    I don't specifically recall, but...

1      KATZENSTEIN - HIGHLY CONFIDENTIAL

2      Q.    Okay.  Mr. Kennedy's e-mail

3  indicates, "Mike/Melker, we need a quick call

4  regarding our discussion last night."

5      A.    Yes.

6      Q.    "Can we have a conversation in the

7  next 40 minutes (before 9 Central)?"

8            Do you see that?

9      A.    I do.

10     Q.    Do you know whether you had a

11 conversation with Mr. Kennedy on the 22nd, on

12 Tuesday, of July?

13     A.    I did.

14     Q.    And can you tell us about that

15 conversation?

16     A.    Yes.  I -- Melker and I spoke with

17 Mike Kennedy.  Mike told us that John Ray was

18 uncomfortable and did not want to have any

19 continuing accrual or post-petition interest

20 from and after the -- the June 30 date,

21 essentially.

22     Q.    When you say June 30, is that 2015?

23     A.    Fourteen.

24     Q.    Okay.  Did he explain why?

25     A.    He wanted to have a fixed amount of

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2     PPI accrual, and didn't want it to continue to

3     grow as the case continued to go on.  We felt

4     very strongly -- our holders felt very strongly

5     that there needed to be a continuing accrual

6     for reasons that we explained to Mr. Ray, or I

7     explained to Mr. Kennedy.

8               And Mike Kennedy said he would

9     discuss it with John, and --

10         Q.    How long was that conversation?

11         A.    I think it was about a half hour, if

12    I'm not mistaken.

13         Q.    And was Mr. Sandberg on the call as

14    well?

15         A.    He was.

16         Q.    And other than you, Mr. Sandberg and

17    Mr. Kennedy, was there anyone else on the call?

18         A.    To my knowledge, no.

19         Q.    Did you take any notes of the call?

20         A.    I did not.

21         Q.    Do you know whether Mr. Sandberg

22    took notes of the call?

23         A.    I don't.

24         Q.    Prior to this time on Monday, the

25    21st of July, had you seen a revised draft of

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2    the settlement agreement that was prepared by

3    counsel for NNI?

4         A.    I don't specifically recall, but

5    it's possible that I did.

6         Q.    Okay.  Do you recall a change from

7    the percentage to a specific number?

8         A.    I do.

9         Q.    And what do you recall about that?

10        A.    I recall that John Ray wanted a

11   specific agreement on a specific number of the

12   accrual because he did not want any

13   misunderstandings or further negotiations or

14   arguments or any associated potential delays

15   that might result from differences among the

16   bondholders, individually or collectively, and

17   the US estate as to how to calculate the

18   post-petition interest that was accruing.

19        Q.    Was that issue ultimately resolved

20   prior to the July 24 final proposed agreement?

21        A.    It was.  It was.

22        Q.    How was it resolved?

23        A.    It was resolved by liquidating to a

24   number, 876 million, the amount of the total

25   allowed claim in respect of post-petition

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2    interest and accruals of any sort, make whole,

3    interest, however calculated, to the June 30,

4    2014 date.

5          Q.    When you say, "liquidating the

6    $876 million number," that was as at June 30,

7    2014?

8          A.    Yes, sir.

9               MR. LEBLANC:  Object to the form.

10         Q.    Was there a continuing accrual of

11   some kind after the June 30, 2014 date?

12         A.    Yes, sir.

13         Q.    And was it specified in the final

14   proposed agreement?

15         A.    It was.

16         Q.    And do you know what the percentage

17   was it was specified at?

18         A.    I do.

19         Q.    And what is that?

20         A.    3.5 percent to run for a period from

21   July 1 to June 30, July 1, 2014, to June 30,

22   2015.

23         Q.    And that's something in the order of

24   $366,780.82 a day; is that correct?

25         A.    Are you looking for a job?

1      KATZENSTEIN - HIGHLY CONFIDENTIAL

2              I don't know, but I do know -- I do

3   know the monthly and the -- or the total amount

4   that it could -- and it was also explicitly

5   stated, if I'm -- if I'm not mistaken, that

6   that interest rate would only be borne on the

7   then outstanding principal amount of the bonds.

8       Q.    So that the $876 million number

9   wasn't the total number of the PPI interest

10  even on the date of July 24, when this was

11  submitted to the court, was it?

12      A.    Well, interest -- prior to the

13  agreement, interest was running at an

14  approximate rate of $25 million a month on the

15  aggregate affected bonds.  So you pick a date

16  and liquidate as of that date, and then there

17  was a continuing interest agreement at a rate

18  significantly below the effective date prior to

19  the -- prior to the agreement, and that ran for

20  up to one year.

21      Q.    So am I correct that on the date

22  that this was submitted to the court, July 24,

23  the approximate number of the PPI interest

24  under the proposed settlement agreement was

25  nearly $885 million?

1      KATZENSTEIN - HIGHLY CONFIDENTIAL

2      A.    As I sit here, that sounds like it's

3  probably right, but I am -- you know, without a

4  calculator, I'm useless these days.

5      Q.    The cap at June 30, 2014, sitting

6  here today, do you recall what that is?

7      A.    876.

8      Q.    And as at June 30, 2015, what is

9  that cap?

10     A.    1,010,000,000.

11     Q.    Now, let's go back to Katzenstein

12  Exhibit 5.

13          You told us about the conversations

14  that you had with Mr. Kennedy about the issue

15  that Mr. Ray had raised.

16     A.    Yes.

17          MR. LEBLANC:  Object to the form.

18     Q.    Do you recall whether there was a

19  follow-up conversation on the 23rd with respect

20  to that issue?

21     A.    Yes, there was.

22     Q.    Were you a participant in that

23  conversation?

24     A.    I was.

25     Q.    Who else was?

1               KATZENSTEIN - HIGHLY CONFIDENTIAL

2        A.      Melker Sandberg and Mike Kennedy,

3   John Ray.

4        Q.      Mr. Ray participated in this call?

5        A.      Mr. Ray did participate.

6        Q.      Was it a telephone call?

7        A.      It was.

8        Q.      And how long did it last?

9        A.      Less than a half hour, I think.

10       Q.      Okay.  Can you tell us what was said

11   on this call?

12       A.      I think we -- Melker or I or one of

13   us restated our client's requirement for a

14   continuing accrual of interest, that that was a

15   critical component of any -- of willingness to

16   do the settlement, and we thought, otherwise,

17   we were vulnerable to continuing delays by the

18   Canadian, by NNL in making distributions or

19   settlements, because it would be essentially on

20   our nickel, that we needed to have an interest

21   component which would, we hope, continue to

22   motivate the parties to settle and agree on

23   allocation and distributions.

24            Mr. Ray said, okay, as a best and

25   final, I will agree to let interest continue to

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2      accrue for up to one year, and at 3.5 percent,

3      and that's it.  So take it or leave it.

4           Q.    And what was the response?

5           A.    I said we will take it back to our

6      group.

7           Q.    And did you have a follow-up

8      conversation or communication with Mr. Ray?

9           A.    I don't recall if I did.  I may not

10     have personally.  That conversation may have

11     taken place between Milbank and Cleary.

12          Q.    Do you have an understanding as to

13     whether or not this issue was agreed between

14     the bondholders and NNI?

15          A.    Yes, I believe we agreed to that

16     proposal without any additional changes.

17          Q.    Do you recall when the NNCC

18     bondholders came out of the settlement

19     agreement?

20               MR. LEBLANC:  Object to the form.

21          A.    I don't recall with specificity, but

22     if I'm not mistaken, it was that Tuesday, the

23     23rd -- the 22nd, I'm sorry, that I learned

24     about it.

25          Q.    So looking at the document that's

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2     been marked Katzenstein Exhibit 5, which refers

3     to the Wednesday, July 23, 2014.

4          A.    Yes.

5          Q.    At that point in time, by Wednesday,

6     had the NNCC noteholders come out of the

7     settlement?

8          A.    To my knowledge, they told us that

9     they would not participate.

10         Q.    Once the issue relating to the

11    timing for the running of the interest issue,

12    when that issue was resolved, were there any

13    other open issues between the bondholders and

14    NNI?

15              MR. LEBLANC:  Object to the form.

16         A.    I'm not -- I'm not certain.  I know

17    there were two issues that were being resolved

18    concurrently, but I am not certain at what

19    point in time they were taken off the table.

20         Q.    Okay.  Can you tell us what those

21    two issues were?

22         A.    There was -- the two matters that

23    were being negotiated were indemnity or

24    advances that were required by certain of the

25    indenture trustees in order for them to come

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2      along with the settlement.

3          Q.    Was that for their legal fees?

4          A.    Covering costs, and I don't know if

5      it was only for legal fees, but I believe there

6      was -- it was ultimately liquidated to a

7      number.

8          Q.    Do you recall what that number was?

9          A.    I believe $6 million of advances.

10         Q.    Okay.

11         A.    Those were, I believe, styled as

12     advances against ultimate recoveries by the

13     bonds covered by the -- monies that would

14     ultimately come to the trustee for

15     distribution.  And the other issue was language

16     that was being negotiated to cover how the

17     affected bonds and the other GUCs in the US

18     estate would fare vis-a-vis any amounts

19     available to be distributed on account of

20     post-petition interest in the event that there

21     were insufficient funds to pay the full amount

22     of the allowed compromised bond claim for

23     post-petition interest.

24         Q.    And if you look at the document

25     that's been marked Ray Exhibit 1, in particular

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2     the settlement agreement, Section 4.2.

3          A.    Yeah.  Yes.

4          Q.    Is that the issue that you just

5     referenced, the second issue under the,

6     "provided, however, that if there are

7     insufficient funds available"?

8          A.    Yes, yes, I believe that is it.

9          Q.    And is 4.2 that provision, the

10    resolution that was agreed by the parties?

11         A.    Yes, I believe.

12         Q.    When was the settlement agreement

13    that's proposed in this document agreed between

14    NNI and the bondholders?

15         A.    The individual bondholders or --

16         Q.    Let's talk about the group of

17    bondholders.  Were there --

18         A.    I'm sorry.  I didn't hear that.

19         Q.    Did it take time to get various

20    bondholders on board?

21         A.    Yes.  There was a period where we

22    were, through Milbank -- I said we, meaning the

23    professional team, collecting signatures and

24    getting our clients on board and bound to the

25    agreement.

1        KATZENSTEIN - HIGHLY CONFIDENTIAL

2        Q.    Do you recall when the first of the

3   bondholders was on board?

4        A.    I don't.  I'm sorry.

5        Q.    Do you know when the last of the

6   bondholders got on board?

7        A.    I think it was shortly before we

8   filed the agreement.

9        Q.    And that was on the 24th of July?

10       A.    I believe so.

11       Q.    In the period from the 14th of July

12  through the 24th of July, did you have any

13  other conversations that you haven't told us

14  about today with John Ray?

15       A.    No, I don't recall it.

16       Q.    Did you have any conversations that

17  you haven't told us about with Michael Kennedy?

18       A.    Personally, no.

19       Q.    Do you know whether anyone else at

20  FTI had any other conversations with

21  Mr. Kennedy?

22       A.    If I'm not mistaken, there may have

23  been one or two calls between Mark and/or

24  Melker and Mike Kennedy concerning elements of

25  the negotiations, but I was not a party to

1              KATZENSTEIN - HIGHLY CONFIDENTIAL

2    them.

3         Q.    Did you get a report back on those

4    calls?

5         A.    I may have.

6         Q.    Do you recall what the substance of

7    those calls were?

8         A.    I don't specifically, but they are

9    consistent with -- I'm sorry.  Go ahead.

10        Q.    I was going to ask, do you recall

11   generally?

12        A.    I believe they were just to affect

13   matters that have already -- with respect to

14   which I have already given deposition

15   testimony.

16        Q.    Now, earlier, you told us, and your

17   counsel directed you not to get into the

18   substance of the financial modeling that you

19   did.

20              In all the financial modeling that

21   you did with respect to the PPI accrual, did

22   you ever share that PPI accrual modeling with

23   Chilmark?

24        A.    No.

25        Q.    Did you ever share the PPI

1              KATZENSTEIN - HIGHLY CONFIDENTIAL
2     calculation modeling with Cleary Gottlieb?
3          A.    No.
4          Q.    Did you ever share the PPI
5     calculations with NNI?
6          A.    No.
7          Q.    So you never shared it with John
8     Ray?
9          A.    No.
10         Q.    Did you ever communicate the
11    substance of your calculations to anyone else?
12              MR. LEBLANC:  Just to be clear, in
13         connection with this settlement or at any
14         time over the last five years?
15         Q.    Let's start with the settlement, in
16    connection with the settlement --
17         A.    No.
18         Q.    At any time prior to the discussions
19    of the settlement, did you share your
20    calculations -- your calculations with anyone
21    else?
22         A.    I don't know how to answer that.
23    Can you rephrase the question?
24         Q.    Okay.  Prior to June of 2014 --
25         A.    Yes.

1        KATZENSTEIN - HIGHLY CONFIDENTIAL

2        Q.    -- had you done any modeling of what

3    potential recoveries the bonds could make on

4    the PPI issue?

5             MR. LEBLANC:  That's a yes or no.

6        A.    Yes.

7        Q.    And did you ever share those

8    calculations with anyone else?

9             MR. LEBLANC:  Can we be clear, the

10            output of it or the model itself or both?

11       Q.    Let's start with the output.

12       A.    From time to time, in connection

13   with negotiations, we had synced up models with

14   the US debtor, the Canadian constituencies on

15   possible puts and takes and outputs and inputs,

16   but we did not share our model or -- with

17   anybody at any time.

18       Q.    Did you have any conversations with

19   John Ray about whether Mr. Ray had done any

20   modeling of the potential result of the PPI

21   accrual?

22            MR. LEBLANC:  In connection with the

23            settlement?

24       Q.    In connection with the settlement.

25       A.    No.  I mean, we all -- we know the

**HIGHLY CONFIDENTIAL**                    90

1            KATZENSTEIN - HIGHLY CONFIDENTIAL
2    numbers, right?  We've been living with this
3    case for years.  So I don't think -- the answer
4    is no.
5         Q.    Did you ever calculate -- did
6    Mr. Ray ever tell you that he had calculated
7    what the maximum amount of notional surplus
8    would be available to NNI after distribution
9    for the payment of post-petition interest?
10              MR. LEBLANC:  Object to the form.
11        A.    He did not.
12        Q.    Did anyone from Chilmark ever tell
13   you that they had calculated the maximum amount
14   of notional surplus available to NNI after
15   distribution for the payment of post-petition
16   interest?
17              MR. LEBLANC:  Object to the form.
18        A.    No.
19        Q.    I'm going to ask you a series of
20   questions going not to Chilmark and NNI, but to
21   calculations that you performed.  So I'm going
22   to take this slowly and one at a time.
23        A.    Okay.
24        Q.    Did you do any modeling or analysis
25   of what the burn rate would be on the NNI

1           KATZENSTEIN - HIGHLY CONFIDENTIAL

2    estate from July 1, 2014 forward?

3              MR. LEBLANC:  Object to the form.

4              MR. ROSENTHAL:  Objection to form.

5    DI         MR. LEBLANC:  I'm going to instruct

6         you not to answer that to the extent that

7         it involves direction from counsel.

8              MR. PULTMAN:  Well, my only question

9         is whether you did it.  I'm not asking

10        what the number is.  I'm not asking for

11        the disclosure.  I just want to know

12        whether he looked at that issue.

13             MR. LEBLANC:  You're getting -- when

14        you get that specific, it really does

15        invade the work product privilege, if we

16        have asked him to model particular things.

17        I think you're getting too close to the

18        substance.

19             MR. PULTMAN:  So is that a direction

20        to the witness not to answer?

21             MR. LEBLANC:  Yes.

22             MR. PULTMAN:  I'm going to ask a

23        series of questions and if you can give

24        the same direction, that's fine.

25    BY MR. PULTMAN:

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2      Q.     I assume you'll follow your

3  counsel's direction?

4      A.     It served me well so far.

5      Q.     Okay.  Did you do any modeling or

6  analysis of what receivables were due to the

7  NNI estate?

8  DI          MR. LEBLANC:  Instruct the witness

9      not to answer.

10      Q.     Did you do any analysis of what the

11  cash balance would be in the NNI estate?

12              MR. LEBLANC:  That one, you can

13      answer yes or no.

14      A.     Yes.

15      Q.     And when did you do your last

16  analysis of the cash balance?

17      A.     I don't recall.

18      Q.     Did you have any conversations with

19  Mike Kennedy on or about the 22nd of July with

20  respect to the cash balance in the US estate?

21      A.     I don't recall.

22      Q.     Do you recall Mr. Kennedy telling

23  you that he had, in fact, spent several hours

24  on the 22nd of July looking at the cash

25  balances in the US estate?

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2      A.     I don't recall.

3      Q.     Did you -- did FTI ever do any

4  modeling or valuation of the tax claim?

5          MR. LEBLANC:  You could answer that

6      yes or no.

7      A.     Yes.

8      Q.     Can you disclose what work you did

9  with respect to the valuation of the tax claim?

10 DI          MR. LEBLANC:  That, I will instruct

11     you not to answer.

12          THE WITNESS:  Yeah.

13     Q.     Did you ever do any valuation or

14  modeling of specific claims within the US

15  estate?

16          MR. LEBLANC:  You can answer yes or

17     no.

18     A.     Yes.

19     Q.     Did you ever look at and value the

20  PBGC claim?

21 DI          MR. LEBLANC:  I will instruct you

22     not to answer that.

23     Q.     At any point in time, did any

24  representative of NNI disclose to you what

25  modeling or analysis they had done of the

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL
 2      possible notional surplus available to NNI
 3      after distribution for the payment of
 4      post-petition interest?
 5          A.    Can you repeat the question, please?
 6          Q.    Sure.  At any point in time did
 7      anyone from NNI, any representative or employee
 8      of NNI disclose to you what modeling or
 9      analysis they had done of potential notional
10      surplus available to NNI after distribution for
11      the payment of post-petition interest?
12              MR. LEBLANC:  This is at any time?
13          Q.    Anytime.
14          A.    Yes.
15              MR. ROSENTHAL:  Hold on.  I'm going
16          to object to this.  To the extent that
17          there are discussions during the course of
18          the allocation litigation in which the
19          bondholder group is part of the group
20          litigating with the US debtors, I don't
21          think that that's appropriate.
22              MR. PULTMAN:  And I'm not interested
23          in invading that privilege.  I don't want
24          to get to that privilege.  Let's take that
25          off the table.
```

1      KATZENSTEIN - HIGHLY CONFIDENTIAL

2              MR. LEBLANC:  Just to be clear, do

3          you want to invade the confidentiality of

4          mediations to the extent that we've had

5          mediations where these have been the topic

6          of mediation discussions?

7      Q.    Let me carve out mediations, common

8  interest discussions, if you believe that

9  there's something that's potentially

10 privileged.

11     A.    Then I think no.  I believe

12 everything has been shared that's been in the

13 context of settlement discussions, mediations

14 or in the allocation dispute or related.

15     Q.    Have you had, after July 23, 2014,

16 any further conversations with the US with

17 respect to the proposed 9019 settlement?

18     A.    No.

19     Q.    Were you involved at all in the

20 production of documents to us with respect to

21 this motion?

22     A.    No.

23     Q.    Can you tell us what you did to

24 prepare for today's deposition?

25     A.    Yes.

**HIGHLY CONFIDENTIAL**                    96

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL
 2        Q.    What did you do?
 3        A.    I met two days ago at Milbank with
 4   Andy Leblanc, Tom Matz, Nick Bassett, and Atara
 5   Miller was on the phone for a short period.
 6   Melker Sandberg joined, and we spoke.
 7              MR. LEBLANC:  Don't get into the
 8        substance of any of those discussions.
 9              THE WITNESS:  Right.
10        A.    And I looked at the motion and the
11   settlement agreement to refresh myself.
12        Q.    Have you read any deposition
13   transcripts to prepare for this deposition?
14        A.    I have not.
15        Q.    So you haven't read the John Ray
16   deposition of earlier this week?
17        A.    No, I have not.
18        Q.    Did you review any documents?
19              MR. LEBLANC:  Just answer that yes
20        or no.
21        A.    Yes.
22        Q.    Any of the documents you have seen
23   today?
24        A.    A couple of them, yeah.
25        Q.    Did you have any discussions with
```

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL
 2     any representatives of NNI about whether the
 3     proposed settlement is in the interest of the
 4     creditors of the US estate?
 5         A.    Yes, I believe so.
 6         Q.    Okay.  With whom did you have such
 7     conversations?
 8         A.    I think those discussions occurred
 9     during the Tuesday, July 15 meeting, and they
10     may have occurred also in subsequent calls that
11     I had with Mike Kennedy and John Ray.
12         Q.    Let's start with the July 15
13     meeting.
14               Can you tell us what was said with
15     respect to that issue?
16         A.    To my knowledge, and I can't
17     specifically recall whether I said it or
18     Milbank representatives said it, but was that
19     this presents an opportunity to resolve an
20     issue that if not resolved might result in
21     extended, expensive, time-consuming,
22     resource-wasting litigation like we have seen
23     in other elements of this case, that we had an
24     interest, and we believe the US debtor had an
25     interest in resolving this issue, that although
```

```
 1              KATZENSTEIN - HIGHLY CONFIDENTIAL
 2    we strongly disagreed with the Canadian view
 3    that the aggregate amount of US accruals -- of
 4    our claim against the US estate for continued
 5    accruals of post-petition interest, which they
 6    styled in the amount of 1.6 billion, we
 7    strongly disagreed that that was an impediment
 8    to settlement, as represented to the courts.
 9              Nonetheless, if it were, then this
10    was an opportunity to take that issue off the
11    table and enhance the ability to make a
12    settlement, then we should do that.
13         Q.   Were there any comments made with
14    respect to -- you talked about your interest
15    and the US debtor's interest.
16              Was there any discussion about other
17    creditors to the NNI estate's interest?
18         A.   Yes.
19         Q.   What was said about that?
20         A.   We argued that a settlement at any
21    amount that we reduced the interest exposure or
22    the claim for interest in the United States
23    would specifically be for the benefit of the
24    GUCs and potentially, ultimately, for the
25    equity holder of NNI.
```

1                KATZENSTEIN - HIGHLY CONFIDENTIAL

2        Q.    Can you tell me if there was

3   anything else said about the equity holder of

4   NNI's interest?

5        A.    I don't recall anything else.

6        Q.    Now, you told us about the July 15

7   conversation.

8              You mentioned that there was another

9   call at which this issue was discussed.

10       A.    We -- I think I had mentioned

11  earlier that our clients believed it was

12  important to have a continuing accrual of

13  interest beyond the initial haircut, if you

14  would, and they believed it both because of the

15  need to fairly treat them economically, but

16  also to not -- to make sure there wasn't an

17  attractive nuisance, and that attractive

18  nuisance is a non-accruing claim in a set of

19  proceedings where delay, extensive litigation,

20  potential appeals and the continuous burning of

21  a pot have been evident, and that is the

22  opposite of what our clients want, and they

23  believe very strongly that a continuing accrual

24  of interest was important to keep motivation,

25  particularly in NNL to affect a settlement

1         KATZENSTEIN - HIGHLY CONFIDENTIAL

2    sooner rather than later that might result in

3    an ending of these cases.

4         Q.    Okay.  And other than that, was

5    there any discussion of the interest of other

6    creditors to the NNI estate?

7         A.    Well, I believe that the argument

8    was stated during the initial meeting that this

9    settlement benefited everyone in the US estate,

10   because to the extent there were resolutions of

11   matters, again, that could take years and cost

12   millions of dollars, which is what litigation

13   in this case costs, that avoiding that,

14   providing an expedient path to a plan and to

15   distributions, once there's an agreement on

16   allocation or an order on allocation that

17   results in distributions, is in the interest of

18   everybody, including the GUCs.

19             MR. PULTMAN:  If we could take a

20        minute to go off the record.

21             MR. LEBLANC:  Sure.

22             THE VIDEOGRAPHER:  We are now off

23        the record.  The time is 3:15 p.m.,

24        September 18, 2014.

25             (Recess taken.)

1                KATZENSTEIN - HIGHLY CONFIDENTIAL

2                    THE VIDEOGRAPHER:  We are now back

3          on the record.  The time is 3:17 p.m.,

4          September 18, 2014.

5    BY MR. PULTMAN:

6          Q.    Earlier, you told us about your

7    preparation session.

8                Was there anyone else at that

9    meeting that you haven't told us about?

10         A.    No, I don't think so.

11         Q.    Were there any lawyers from --

12   representing NNI at that meeting?

13         A.    No.

14         Q.    You also told us that the proposed

15   settlement that's reflected in Ray Exhibit 1 --

16         A.    Right.

17         Q.    -- was acceptable to the bondholders

18   other than the NNCC bondholders?

19         A.    Yes, sir.

20         Q.    Do you know whether they all signed

21   on to the proposed settlement agreement?

22         A.    To my knowledge, they did, yes.

23         Q.    Are there any others that have not

24   signed on besides the NNCC?

25         A.    That are in our group?  To my

1          KATZENSTEIN - HIGHLY CONFIDENTIAL

2     knowledge, at the time we did the settlement,

3     all members who are participants in our ad hoc

4     group signed on, other than the NNCC holders.

5     Since that date, others have joined the group.

6     I don't know what their status is.

7               MR. PULTMAN:  Those are all the

8          questions I have for you today, subject to

9          resolution of some of the potential issues

10          on the privilege.  I thank you very much

11          for your time.

12               THE WITNESS:  Yes, sir.  Thank you

13          very much.

14               MR. LEBLANC:  No questions.

15               MR. PULTMAN:  Thank you.  We are off

16          the record.

17               THE VIDEOGRAPHER:  This concludes

18          today's deposition of Mr. Michael

19          Katzenstein.  We are now off the record.

20          The time is 3:19 p.m., September 18, 2014.

21          Thank you.

22               (Time noted:  3:19 p.m.)

23

24

25

1              A C K N O W L E D G M E N T

2

3    STATE OF NEW YORK        )

4                             :ss

5    COUNTY OF                )

6

7            I, MICHAEL KATZENSTEIN, hereby

8    certify that I have read the transcript of my

9    testimony taken under oath in my deposition of

10   September 19, 2014; that the transcript is a

11   true, complete and correct record of my

12   testimony, and that the answers on the record

13   as given by me are true and correct.

14

15              _____

                      MICHAEL KATZENSTEIN
16

17

18   Signed and subscribed to before me

19   this _____ day of _____, 20__.

20

21   _____

22   Notary Public, State of New York

23

24

25

```
 1              C E R T I F I C A T E
 2
 3   STATE OF NEW YORK )
 4                        :ss
 5   COUNTY OF RICHMOND)
 6
 7            I, MELISSA GILMORE, a Notary Public
 8   within and for the State of New York, do hereby
 9   certify:
10            That MICHAEL KATZENSTEIN, the
11   witness whose deposition is hereinbefore set
12   forth, was duly sworn by me and that such
13   deposition is a true record of the testimony
14   given by such witness.
15            I further certify that I am not
16   related to any of the parties to this action by
17   blood or marriage; and that I am in no way
18   interested in the outcome of this matter.
19            IN WITNESS WHEREOF, I have hereunto
20   set my hand this 19th day of September, 2014.
21
22
23   _____
24   MELISSA GILMORE
25
```

```
 1              *** ERRATA SHEET ***

 2         ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
 3               New York, New York 10022
                    212-750-6434
 4

 5   NAME OF CASE: IN RE NORTEL NETWORKS, INC.
     DATE OF DEPOSITION: SEPTEMBER 18, 2014
 6   NAME OF WITNESS: MICHAEL KATZENSTEIN

 7   PAGE  LINE      FROM          TO         REASON

 8   ____|_____|_____|_____|_____

 9   ____|_____|_____|_____|_____

10   ____|_____|_____|_____|_____

11   ____|_____|_____|_____|_____

12   ____|_____|_____|_____|_____

13   ____|_____|_____|_____|_____

14   ____|_____|_____|_____|_____

15   ____|_____|_____|_____|_____

16   ____|_____|_____|_____|_____

17   ____|_____|_____|_____|_____

18   ____|_____|_____|_____|_____

19   ____|_____|_____|_____|_____

20   ____|_____|_____|_____|_____

21                       _____

22   Subscribed and sworn before me

23   this____day of_____,20__.

24   _____      _____

25   (Notary Public)          My Commission Expires:
```

## $

**$1.6 (6)**
28:23;38:9,15;
39:19;66:6;67:3
**$1.656 (1)**
68:15
**$25 (1)**
79:14
**$366,780.82 (1)**
78:24
**$6 (1)**
84:9
**$876 (2)**
78:6;79:8
**$885 (1)**
79:25
**$907.5 (2)**
61:7,12

## A

**ability (1)**
98:11
**able (4)**
39:3;48:5,10;50:8
**above (3)**
36:9;60:12;62:14
**accept (5)**
46:22;47:23;51:22;
52:21;53:7
**acceptable (1)**
101:17
**account (1)**
84:19
**accrual (28)**
28:14,24;37:17;
38:5,7,9,11;44:24;
45:7;47:13;48:6,11,
15,20;63:17;66:22,
22;75:19;76:2,5;
77:12;78:10;81:14;
87:21,22;89:21;
99:12,23
**accruals (4)**
68:7;78:2;98:3,5
**accrue (1)**
82:2
**accrued (1)**
72:5
**accruing (1)**
77:18
**accurate (1)**
70:2
**across (1)**
12:24
**acting (1)**
19:9
**actual (1)**
61:7
**actually (1)**
54:15

**ad (9)**
9:4;19:9;20:8,11;
21:4;43:11;63:18;
64:5;102:3
**added (1)**
13:16
**addition (1)**
63:21
**additional (1)**
82:16
**administrative (1)**
13:20
**admitted (5)**
14:10,13,17;15:4,7
**advance (1)**
62:17
**advances (3)**
83:24;84:9,12
**advisor (3)**
21:18;23:8,10
**advocated (1)**
53:5
**affect (2)**
87:12;99:25
**affected (2)**
79:15;84:17
**afternoon (1)**
43:5
**Again (4)**
50:24;52:9;57:10;
100:11
**against (4)**
28:16;37:18;84:12;
98:4
**aggregate (2)**
79:15;98:3
**ago (2)**
15:3;96:3
**agree (4)**
26:6;37:16;81:22,
25
**agreed (5)**
61:15;82:13,15;
85:10,13
**agreement (37)**
22:15;36:22;53:25;
54:4;55:18,22;56:5;
58:9,10,15,18,21;
60:9,19,22;61:3,17,
19;71:21;72:2,4;
77:2,11,20;78:14;
79:13,17,19,24;
82:19;85:2,12,25;
86:8;96:11;100:15;
101:21
**ahanrahan@willkiecom (1)**
3:10
**ahead (2)**
45:4;87:9
**AKIN (5)**
3:13;9:8;31:24;
62:18;63:19
**al (4)**

**8:9;34:24;35:24,25**
**Allen (1)**
8:23
**allocation (5)**
81:23;94:18;95:14;
100:16,16
**allowed (3)**
49:9;77:25;84:22
**almost (1)**
16:4
**Along (4)**
8:23;9:18;21:24;
84:2
**alongside (1)**
24:13
**although (1)**
97:25
**among (2)**
33:21;77:15
**amount (15)**
12:8;47:10;56:7,9;
71:13;75:25;77:24;
79:3,7;84:21;90:7,
13;98:3,6,21
**amounts (1)**
84:18
**analyses (2)**
49:22;69:24
**analysis (16)**
38:23;49:23,24;
50:2,9,13,15,17;51:5,
14;90:24;92:6,10,16;
93:25;94:9
**and/or (1)**
86:23
**ANDREW (3)**
3:7;9:2,14
**Andy (10)**
28:9;34:24;37:5;
41:8;43:25;44:6;
46:3;73:22;74:23;
96:4
**Ann (1)**
9:7
**ANNE (1)**
3:19
**apologize (1)**
41:22
**appeals (1)**
99:20
**appear (1)**
60:8
**appears (7)**
27:5;33:19;42:6;
45:14;60:2;62:7;
74:15
**appreciate (1)**
73:25
**appropriate (2)**
67:16;94:21
**approved (2)**
69:23;70:6
**approving (1)**

**69:21**
**approximate (4)**
38:15;39:21;79:14,
23
**approximately (3)**
28:23;38:9;40:15
**argued (1)**
98:20
**argument (6)**
46:16,20,21;51:21,
24;100:7
**arguments (4)**
47:23;52:21,24;
77:14
**around (3)**
30:3;43:3;46:16
**assets (1)**
12:9
**associate (2)**
11:25;13:25
**associated (1)**
77:14
**Association (1)**
9:13
**assume (2)**
56:15;92:2
**assumes (1)**
51:16
**assuming (1)**
72:3
**Atara (1)**
96:4
**attached (1)**
55:17
**attachment (1)**
67:23
**attend (4)**
35:15,17,19,21
**attendance (2)**
42:17,20
**attended (3)**
35:13;57:24,25
**Attorneys (2)**
3:4,14
**attractive (2)**
99:17,17
**authorize (1)**
70:4
**available (6)**
84:19;85:7;90:8,
14;94:2,10
**Avenue (1)**
3:5
**avoiding (1)**
100:13
**award (1)**
51:12
**aware (8)**
28:9,17,19,20,25;
29:4;30:13;61:10

## B

**back (15)**
17:9,12;24:4;49:3;
51:9;55:4;56:17;
60:4;62:5,10;69:5;
80:11;82:5;87:3;
101:2
**background (1)**
11:5
**balance (4)**
62:23;92:11,16,20
**balances (1)**
92:25
**bankruptcy (3)**
12:7,12;22:8
**Bar (7)**
14:11,18,20,24;
15:7;41:7;44:8
**Bars (1)**
15:5
**based (5)**
12:15;14:5;15:17;
17:6,14
**basically (1)**
47:8
**Bassett (2)**
9:5;96:4
**Bates (13)**
26:18,23;33:10,16;
42:3;55:10;59:18,24;
67:7,11;68:12;74:5,
12
**bearing (3)**
26:18;67:11;74:12
**bears (4)**
33:15;42:3;55:10;
59:24
**became (3)**
13:14,24;72:13
**become (3)**
12:21;14:24;72:4
**beginning (4)**
15:21;16:10;19:19;
20:2
**behalf (6)**
9:3,9,12,15,19;
38:24
**behind (2)**
54:16,20
**Beller (1)**
9:18
**below (1)**
79:18
**benefit (1)**
98:23
**benefited (1)**
100:9
**Benjamin (1)**
9:18
**Bennett (1)**
20:10
**besides (2)**
19:16;101:24
**best (9)**

11:2;29:24;30:20;
  44:12,18;61:24;
  63:23;73:14;81:24
**beyond (2)**
  29:10;99:13
**BHG-PPI-0000009 (1)**
  67:7
**BHG-PPI-0000013 (2)**
  59:18,24
**BHG-PPI-0000018 (1)**
  42:4
**BHG-PPI-000009 (1)**
  67:11
**BHG-PPI-0000153 (1)**
  55:11
**BHG-PPI-0000226 (2)**
  74:5,13
**BHG-PPI-0000233 (2)**
  26:19,23
**BHG-PPI-0000251 (2)**
  33:10,16
**billion (9)**
  28:23;38:9,15;
  39:19;66:6;67:3;
  68:15;70:18;98:6
**Binghamton (1)**
  11:8
**bit (1)**
  13:10
**Blauner (1)**
  73:9
**board (4)**
  85:20,24;86:3,6
**bond (3)**
  20:8;44:19;84:22
**bondholder (1)**
  94:19
**bondholders (24)**
  9:4;18:12,23;21:4;
  28:15,16;63:18;64:5,
  22,23;65:20;72:7;
  77:16;82:14,18;
  83:13;85:14,15,17,
  20;86:3,6;101:17,18
**bondholders' (1)**
  18:24
**bonds (23)**
  19:11;37:16;43:11,
  24;47:11;48:4,9,10,
  13,14,19;49:7,13;
  51:11;57:11;68:8;
  73:4,6;79:7,15;84:13,
  17;89:3
**book (2)**
  21:22;41:16
**borne (1)**
  79:6
**Boston (1)**
  11:14
**both (4)**
  25:20;74:21;89:10;
  99:14
**bought (2)**

15:20;16:6
**bound (1)**
  85:24
**brackets (1)**
  56:10
**Bradley (1)**
  8:24
**break (4)**
  10:17;51:25;52:10;
  67:17
**breakouts (2)**
  43:9,10
**briefed (2)**
  28:18,20
**bringing (1)**
  63:25
**broke (1)**
  53:12
**Bromley (3)**
  40:8,9,12
**brought (2)**
  19:13;21:24
**Bryant (1)**
  3:16
**burn (1)**
  90:25
**burning (1)**
  99:20
**business (3)**
  15:12,14;16:3

# C

**cable (1)**
  12:23
**calculate (2)**
  77:17;90:5
**calculated (3)**
  78:3;90:6,13
**calculation (7)**
  39:8,10,14;66:5,
  21;68:6;88:2
**Calculations (10)**
  39:15;47:16,18;
  68:3;88:5,11,20,20;
  89:8;90:21
**calculator (1)**
  80:4
**call (15)**
  32:21,23,25;33:3;
  40:20;62:17;75:3;
  76:13,17,19,22;81:4,
  6,11;99:9
**called (5)**
  9:24;11:22;12:22;
  15:12
**calls (5)**
  38:23;86:23;87:4,
  7;97:10
**came (5)**
  29:6;43:14;44:21;
  56:14;82:18
**Can (61)**

11:4,17;12:3;
  15:24;16:21;17:17;
  18:18;20:3,16,20;
  21:11;22:19;23:4;
  24:2,4;25:19;28:3,6;
  32:10;34:19;36:16;
  37:13;38:17;39:13;
  42:16;44:13,16,18;
  47:20;48:23;49:16;
  50:18;51:8;52:24;
  54:12;58:12,19;62:5;
  66:6,15;67:18;68:5,
  20;71:24;72:16,24;
  74:21;75:6,14;81:10;
  83:20;88:23;89:9;
  91:23;92:12;93:8,16;
  94:5;95:23;97:14;
  99:2
**Canada (1)**
  20:11
**Canadian (7)**
  9:1;13:2;64:10;
  65:13;81:18;89:14;
  98:2
**cap (2)**
  80:5,9
**capacity (1)**
  16:13
**carve (1)**
  95:7
**case (7)**
  10:10;18:21;39:16;
  76:3;90:3;97:23;
  100:13
**cases (1)**
  100:3
**cash (4)**
  92:11,16,20,24
**cc (2)**
  34:12;36:10
**cc'd (1)**
  27:20
**cc's (2)**
  27:14;62:16
**Central (1)**
  75:7
**CEO (2)**
  13:14,24
**certain (4)**
  25:9;83:16,18,24
**Certainly (1)**
  21:15
**certainty (2)**
  47:6;53:4
**Chain (8)**
  26:23;27:5;33:10,
  19;59:18;60:2;62:6;
  74:15
**chance (1)**
  27:3
**change (3)**
  13:12;58:14;77:6
**changes (1)**

82:16
**Chat (1)**
  27:17
**Chilmark (10)**
  23:12,14,16,19;
  24:10;30:16;59:8;
  87:23;90:12,20
**circulated (2)**
  60:22;61:3
**City (1)**
  12:17
**claim (13)**
  28:14,15;37:17;
  48:6;72:5;77:25;
  84:22;93:4,9,20;98:4,
  22;99:18
**Claimants (2)**
  3:4;9:16
**claims (1)**
  93:14
**clarification (1)**
  49:5
**clarify (3)**
  24:5;28:6;48:24
**CLE (1)**
  14:22
**clear (14)**
  21:25;22:2;24:15;
  27:2;39:7;44:3;
  50:15;56:25;57:11;
  59:23;62:25;88:12;
  89:9;95:2
**clearly (1)**
  53:21
**Cleary (14)**
  8:11;9:18;28:10;
  30:7,11;31:15,19;
  37:6;40:4,5,10;
  55:23;82:11;88:2
**Cleary's (1)**
  35:10
**client (3)**
  12:22;19:6,7
**clients (3)**
  85:24;99:11,22
**client's (1)**
  81:13
**close (1)**
  91:17
**closely (1)**
  40:14
**colleague (2)**
  9:5;24:14
**colleagues (1)**
  8:24
**collecting (1)**
  85:23
**collection (1)**
  54:9
**collectively (1)**
  77:16
**coming (2)**
  39:18;47:6

**comments (2)**
  66:4;98:13
**Committee (5)**
  3:14;9:9;31:24;
  63:20;65:3
**common (1)**
  95:7
**communicate (4)**
  48:3,9,14;88:10
**communicated (4)**
  40:4,6,8,16
**communication (2)**
  41:12;82:8
**communications (7)**
  29:16;58:20;65:2,
  9;72:22,25;73:13
**companies (1)**
  17:25
**company (3)**
  13:5,15;16:19
**component (2)**
  81:15,21
**compromise (1)**
  72:5
**compromised (1)**
  84:22
**concern (1)**
  70:22
**concerning (2)**
  47:18;86:24
**concludes (1)**
  102:17
**concurrently (1)**
  83:18
**conducted (1)**
  38:23
**conference (3)**
  43:15,17;44:20
**CONFIDENTIAL (93)**
  10:1;11:1;12:1;
  13:1;14:1;15:1;16:1;
  17:1;18:1;19:1;20:1;
  21:1;22:1;23:1;24:1;
  25:1;26:1;27:1;28:1;
  29:1;30:1;31:1;32:1;
  33:1;34:1;35:1;36:1;
  37:1;38:1;39:1;40:1;
  41:1;42:1;43:1;44:1;
  45:1;46:1;47:1;48:1;
  49:1;50:1;51:1;52:1;
  53:1;54:1;55:1;56:1;
  57:1;58:1;59:1;60:1;
  61:1;62:1;63:1;64:1;
  65:1;66:1;67:1;68:1;
  69:1;70:1;71:1;72:1;
  73:1;74:1;75:1;76:1;
  77:1;78:1;79:1;80:1;
  81:1;82:1;83:1;84:1;
  85:1;86:1;87:1;88:1;
  89:1;90:1;91:1;92:1;
  93:1;94:1;95:1;96:1;
  97:1;98:1;99:1;
  100:1;101:1;102:1

**confidentiality (1)**
95:3
**connection (14)**
18:12;20:4;21:3,8,
14;22:20;36:6;48:25;
49:6;88:13,16;89:12,
22,24
**consider (1)**
37:12
**consideration (1)**
29:2
**consistent (5)**
20:23;69:23;70:7,
18;87:9
**constituencies (1)**
89:14
**constituted (1)**
20:9
**contact (1)**
28:4
**contain (1)**
45:11
**contained (2)**
61:4;68:11
**contains (1)**
22:3
**Cont'd (1)**
3:1
**contemplation (1)**
67:25
**context (1)**
95:13
**continue (4)**
13:22;76:2;81:21,
25
**continued (2)**
76:3;98:4
**continuing (8)**
75:19;76:5;78:10;
79:17;81:14,17;
99:12,23
**continuous (1)**
99:20
**continuously (3)**
17:15;19:19,25
**contract (2)**
49:9;51:12
**conversation (9)**
75:6,11,15;76:10;
80:19,23;82:8,10;
99:7
**conversations (25)**
29:10,13,19,22;
30:6,11,15,19;32:10,
15;64:20,25;65:5,8,
12,15,19;80:13;
86:13,16,20;89:18;
92:18;95:16;97:7
**Cooley (1)**
11:23
**copies (2)**
21:23,24
**copy (6)**

26:20;33:14;41:19;
59:22;67:12;74:10
**core (1)**
19:24
**corporate (8)**
12:2,5;17:4,4,22;
20:25;24:24;25:9
**cost (1)**
100:11
**costs (2)**
84:4;100:13
**counsel (39)**
8:19;12:21;13:23,
25;14:2;18:24;20:10;
21:18,23;23:24;
26:20;27:3;28:20,21;
29:16,20;33:14;
38:10,25;39:5,11,24;
48:18;49:21,22,25;
59:5,22;63:20;67:13,
25;70:5,9,11,11;
74:10;77:3;87:17;
91:7
**counsel's (1)**
92:3
**counter (2)**
56:20,22
**countered (2)**
52:4;53:7
**counterproposal (3)**
52:8,17,22
**counterproposals (1)**
52:19
**couple (2)**
15:14;96:24
**course (2)**
18:2;94:17
**court (7)**
8:14,16,18;9:21;
58:23;79:11,22
**courts (5)**
28:22,25;29:3;
38:11;98:8
**cover (3)**
55:14;69:10;84:16
**covered (1)**
84:13
**Covering (1)**
84:4
**create (1)**
63:4
**Creditors (9)**
3:15;9:10;63:21,
23;64:20;65:9;97:4;
98:17;100:6
**critical (1)**
81:15
**cross-border (1)**
19:11
**crossover (2)**
37:15;72:7
**cross-over (1)**
28:16

**currently (1)**
14:17
**CXO (7)**
15:12,19,20,21,25;
16:7;18:8

### D

**Dallas (3)**
14:7;15:18;17:8
**Dan (1)**
8:17
**Daniel (1)**
8:24
**date (12)**
29:8;37:4;54:12;
75:20;78:4,11;79:10,
15,16,18,21;102:5
**dated (5)**
33:20;55:9;60:13;
69:10;74:9
**dates (2)**
59:16;73:24
**day (3)**
35:11;42:25;78:24
**days (3)**
37:7;80:4;96:3
**deal (1)**
47:7
**dealings (4)**
30:25;31:7,14,18
**debtor (2)**
89:14;97:24
**debtors (10)**
9:1,20;28:12;
36:24;37:2;43:14;
63:18;64:10;65:13;
94:20
**debtors' (2)**
22:5,6
**debtor's (1)**
98:15
**December (1)**
16:9
**declined (1)**
72:20
**definitive (1)**
53:25
**degree (3)**
11:7,9,13
**degrees (2)**
11:12,15
**delay (1)**
99:19
**delays (2)**
77:14;81:17
**Dennis (7)**
33:22;34:24;36:11;
43:25;44:4,4;46:4
**denote (1)**
25:23
**department (2)**
12:2,13

**deposed (2)**
10:8,13
**deposition (9)**
8:7,10;69:4;87:14;
95:24;96:12,13,16;
102:18
**describe (5)**
12:3;15:24;17:17;
20:3;21:11
**described (2)**
20:18;29:10
**determine (1)**
38:14
**development (2)**
12:21;13:19
**DI (7)**
38:22;49:18;50:10;
91:5;92:8;93:10,21
**differences (1)**
77:15
**different (2)**
25:25;71:18
**Dine (2)**
9:11,11
**Direct (1)**
73:3
**directed (2)**
50:4;87:17
**direction (8)**
38:24;39:5,11,24;
91:7,19,24;92:3
**directly (2)**
11:21;41:23
**director (8)**
16:14,16,18;24:23;
25:8,22,22,24
**directors (2)**
17:2;25:21
**disagreed (2)**
98:2,7
**disclose (3)**
93:8,24;94:8
**disclosure (1)**
91:11
**discount (6)**
37:16;45:6;46:8;
52:5,12;58:15
**discuss (4)**
28:12;44:23,23;
76:9
**discussed (2)**
63:24;99:9
**discussing (1)**
61:11
**discussion (11)**
32:21;46:13,16;
47:9;49:12,16,21;
53:9;75:4;98:16;
100:5
**discussions (27)**
29:23;37:7;48:18;
52:20;54:3;55:16;
57:17;58:4,13;59:4,7,

14;61:20,22;62:3;
64:4,9,12,16;88:18;
94:17;95:6,8,13;96:8,
25;97:8
**dispute (2)**
22:16;95:14
**distressed (1)**
12:9
**distributed (1)**
84:19
**distribution (7)**
70:9,10;84:15;
90:8,15;94:3,10
**distributions (4)**
81:18,23;100:15,
17
**division (1)**
17:4
**document (37)**
21:21;22:3,9,12,13,
17;26:18;27:3;33:15;
41:15;42:9;45:16;
54:8;55:19;57:15;
59:20,23;60:9;62:6;
67:9,11,15,22,24;
68:2,12,17;71:2;
72:13;74:7,9,11,12,
24;82:25;84:24;
85:13
**documents (4)**
50:12;95:20;96:18,
22
**dollars (1)**
100:12
**done (13)**
39:8,10,14,15,24;
49:23,24;50:2,4;89:2,
19;93:25;94:9
**down (1)**
49:20
**dozens (1)**
18:6
**draft (12)**
22:15;42:13;55:17,
22;56:14;57:15;
60:18,21;62:10;66:3,
3;76:25
**drafted (3)**
45:16,19;72:3
**drafting (1)**
54:4
**drill (1)**
49:20
**due (1)**
92:6
**duly (1)**
9:24
**Dunne (9)**
33:22,25;34:3,21,
24;35:15;36:10;44:4;
61:21
**during (8)**
12:15;13:23;14:5;

37:6;67:19;94:17;
97:9;100:8

**E**

**earlier (13)**
20:17;22:25;34:17;
36:24;37:2,7;54:18;
56:18;71:20;87:16;
96:16;99:11;101:6
**early (2)**
18:21;71:25
**economically (1)**
99:15
**educational (1)**
11:4
**effective (1)**
79:18
**eight (1)**
15:22
**either (1)**
46:3
**elements (2)**
86:24;97:23
**elevated (1)**
26:4
**Ellen (2)**
8:15,17
**else (18)**
18:24;23:19;30:10,
18;64:13,15,24;
65:16,18;76:17;
80:25;86:19;88:11,
21;89:8;99:3,5;101:8
**E-MAIL (28)**
3:10,22;26:22;
27:5,10,19,25;28:7;
29:7;30:2;32:19;
33:9,12;34:19,21;
36:9;55:14;59:17;
60:12;62:14,23;
65:23;67:6,23;69:10;
74:4,15;75:2
**e-mails (2)**
33:19;60:2
**employed (1)**
16:10
**employee (1)**
94:7
**employment (2)**
11:18;15:11
**Enclosed (1)**
60:17
**end (2)**
15:22;16:8
**ended (1)**
57:6
**ending (1)**
100:3
**ends (1)**
68:12
**engage (1)**
28:13

**engagement (1)**
20:5
**enhance (1)**
98:11
**entities (2)**
21:17;37:19
**entitled (1)**
56:6
**entity (4)**
23:11,12;71:12,13
**entry (2)**
22:6,7
**equate (1)**
61:7
**equity (2)**
98:25;99:3
**ESQ (3)**
3:7,18,19
**essentially (3)**
19:8;75:21;81:19
**estate (14)**
28:14;37:19;77:17;
84:18;91:2;92:7,11,
20,25;93:15;97:4;
98:4;100:6,9
**estates (1)**
28:16
**estate's (1)**
98:17
**estimate (1)**
17:24
**et (1)**
8:9
**EVANS (2)**
3:19;9:8
**even (2)**
37:8;79:10
**evening (1)**
59:10
**event (1)**
84:20
**everybody (3)**
40:11;46:24;
100:18
**everyone (2)**
66:4;100:9
**evidence (1)**
51:16
**evident (1)**
99:21
**exactly (3)**
15:3;18:7;50:6
**EXAMINATION (1)**
10:3
**examined (1)**
9:25
**exclude (1)**
59:4
**excluded (1)**
72:13
**Excluding (1)**
29:12
**exclusively (2)**

16:4;63:17
**Exhibit (37)**
21:22;22:11,14;
26:18,22;29:8;33:9,
13;41:17,21,22,23;
42:3;45:9,17;54:10,
15,21,22,23;55:5,8;
58:22;59:17,21;62:7;
67:6,10;68:18;69:10;
72:10;74:4,8;80:12;
83:2;84:25;101:15
**exhibits (1)**
41:16
**existence (1)**
28:23
**expect (3)**
36:11;46:17;62:18
**expectation (2)**
37:5;70:8
**expediency (1)**
53:4
**expedient (1)**
100:14
**expensive (1)**
97:21
**explain (2)**
51:8;75:24
**explained (2)**
76:6,7
**explicitly (1)**
79:4
**exposure (1)**
98:21
**extended (1)**
97:21
**extensive (2)**
31:7;99:19
**extent (8)**
29:3,15,21;38:22;
91:6;94:16;95:4;
100:10

**F**

**fact (5)**
24:20;32:22;41:11;
67:2;92:23
**facts (1)**
51:16
**fair (2)**
12:8;26:3
**fairly (1)**
99:15
**familiar (3)**
21:4;37:9,11
**far (1)**
92:4
**fare (1)**
84:18
**FARR (2)**
3:3;9:15
**FAX (2)**
3:9,21

**fees (2)**
84:3,5
**FELD (2)**
3:13;9:9
**felt (2)**
76:3,4
**few (2)**
67:17;68:20
**filed (1)**
86:8
**final (3)**
77:20;78:13;81:25
**finance (7)**
12:5;17:4,5,22;
20:25;24:24;25:9
**financial (7)**
21:17;23:8,10;
51:5,13;87:18,20
**financing (2)**
71:12,12
**find (2)**
60:18;67:18
**finding (1)**
41:21
**fine (3)**
24:20;67:18;91:24
**firm (2)**
11:21;12:20
**firms (1)**
26:2
**first (13)**
22:5,20,23;24:7;
26:11;28:3;29:6;
34:20;37:3;51:4,13;
73:16;86:2
**five (5)**
10:15;13:9,23;
14:6;43:6;88:14
**five-page (1)**
22:12
**fixed (1)**
75:25
**flexibility (3)**
53:10,23,24
**focused (1)**
16:3
**fold (1)**
63:25
**follow (1)**
92:2
**following (4)**
35:11;39:4;73:15,
18
**follows (1)**
10:2
**follow-up (2)**
52:7;80:19;82:7
**foot (1)**
53:15
**forget (1)**
14:9
**form (30)**
25:18;31:21;36:21;

44:15,17;47:12,14;
50:22,23;51:7,15;
53:19;57:9;58:6,17;
63:7;64:14;65:10;
66:13;70:23;71:23;
72:14;78:9;80:17;
82:20;83:15;90:10,
17;91:3,4
**forward (1)**
91:2
**foundation (2)**
63:8;66:14
**four (2)**
43:6,6
**Fourteen (1)**
75:23
**free (1)**
63:9
**Friday (1)**
60:23
**front (2)**
25:23;41:15
**FTI (44)**
9:6;15:20;16:6,11,
24;17:5,8,18;18:3,4,
5,11,23;19:7,16;20:8,
14;21:2;24:13,25;
25:3,8,11;29:23,25;
30:11,19;38:14;39:8;
45:19;48:18,19;
49:12;51:4,13;65:19;
66:5,24;67:2;69:15,
17;70:2;86:20;93:3
**FTI's (3)**
49:24,25;50:17
**full (1)**
84:21
**functions (1)**
13:20
**fund (1)**
73:7
**funds (2)**
84:21;85:7
**further (7)**
52:16,19,20;55:16;
57:17;77:13;95:16

**G**

**GALLAGHER (2)**
3:3;9:15
**gave (2)**
45:23,24
**general (6)**
12:21;13:22,25,25;
18:4;63:23
**generally (4)**
12:3;21:11;49:2;
87:11
**gets (1)**
74:20
**Giambatista (1)**
34:13

**Gilmore (1)**
8:15
**given (1)**
87:14
**glasses (1)**
67:19
**global (1)**
17:2
**Godward (1)**
11:23
**Gottlieb (5)**
8:11;9:19;28:11;
31:15;88:2
**Grauer (2)**
8:15,18
**group (21)**
9:4;17:3,21,21;
19:10;20:8,11,18,25;
24:24;25:8;26:9;
34:5;44:19;82:6;
85:16;94:19,19;
101:25;102:4,5
**groups (1)**
20:13
**grow (1)**
76:3
**Grupe (2)**
13:6,6
**G-R-U-P-E (1)**
13:7
**guaranteed (3)**
19:10;68:8;71:17
**GUCs (4)**
63:22;84:17;98:24;
100:18
**guess (1)**
66:22
**GUMP (4)**
3:13;9:8;31:24;
63:19
**guy (2)**
24:18;44:8
**Guyder (1)**
8:24

**H**

**Hadley (1)**
9:3
**haircut (1)**
99:13
**half (5)**
13:10,23;14:6;
76:11;81:9
**Hamilton (2)**
8:12;9:19
**hand (5)**
26:19;27:4;42:2;
55:4,5
**handed (1)**
32:20
**HANRAHAN (3)**
3:7;9:14,14

**hard (2)**
10:24;41:8
**Harris (1)**
60:13;62:8
**HAUER (2)**
3:13;9:8
**head (1)**
12:21
**heading (1)**
68:2
**hear (1)**
85:18
**held (2)**
8:10;35:10
**Hellman (1)**
11:23
**helpful (2)**
20:21;58:12
**Here's (1)**
34:23
**higher (1)**
25:24
**HIGHLY (93)**
10:1;11:1;12:1;
13:1;14:1;15:1;16:1;
17:1;18:1;19:1;20:1;
21:1;22:1;23:1;24:1;
25:1;26:1;27:1;28:1;
29:1;30:1;31:1;32:1;
33:1;34:1;35:1;36:1;
37:1;38:1;39:1;40:1;
41:1;42:1;43:1;44:1;
45:1;46:1;47:1;48:1;
49:1;50:1;51:1;52:1;
53:1;54:1;55:1;56:1;
57:1;58:1;59:1;60:1;
61:1;62:1;63:1;64:1;
65:1;66:1;67:1;68:1;
69:1;70:1;71:1;72:1;
73:1;74:1;75:1;76:1;
77:1;78:1;79:1;80:1;
81:1;82:1;83:1;84:1;
85:1;86:1;87:1;88:1;
89:1;90:1;91:1;92:1;
93:1;94:1;95:1;96:1;
97:1;98:1;99:1;
100:1;101:1;102:1
**high-speed (1)**
12:24
**historically (1)**
31:8
**history (1)**
11:18
**hoc (9)**
9:4;19:9;20:8,11;
21:4;43:11;63:18;
64:5;102:3
**hold (2)**
13:22;94:15
**holder (2)**
98:25;99:3
**holders (5)**
71:19;73:4,6;76:4;

102:4
**hope (1)**
81:21
**hopefully (1)**
54:8
**Hotel (1)**
41:7
**hour (2)**
76:11;81:9
**hours (2)**
43:6;92:23
**housed (3)**
17:3;20:24;24:24

**I**

**identification (5)**
26:24;33:11;59:19;
67:8;74:6
**identify (1)**
67:15
**imagine (1)**
19:21
**immediately (1)**
44:9
**impediment (2)**
28:24;98:7
**important (2)**
99:12,24
**impression (1)**
53:22
**inactive (2)**
14:20,25
**include (1)**
27:14
**included (1)**
71:20
**includes (1)**
68:8
**including (1)**
100:18
**Incorporated (1)**
8:9
**indemnity (1)**
83:23
**indenture (1)**
83:25
**independent (1)**
28:7
**indicated (7)**
22:25;23:6,23;
26:11;40:2;53:6;71:2
**indicates (6)**
34:20;55:13;60:17;
63:2;65:25;75:3
**indication (1)**
62:16
**indirect (1)**
32:14
**individual (2)**
23:13;85:15
**individually (1)**
77:16

**individuals (1)**
22:22
**initial (2)**
99:13;100:8
**initially (2)**
19:13;40:7
**inputs (1)**
89:15
**instruct (7)**
38:25;49:18;50:10;
91:5;92:8;93:10,21
**insufficient (2)**
84:21;85:7
**interacted (2)**
23:18,21
**interaction (1)**
20:7
**interactions (1)**
24:8
**interest (49)**
22:16;29:2;37:17,
18;49:10;63:22,22;
66:6,21;67:4;68:3,7,
9;72:6;75:19;77:18;
78:2,3;79:6,9,12,13,
17,23;81:14,20,25;
83:11;84:20,23;90:9,
16;94:4,11;95:8;
97:3,24,25;98:5,14,
15,17,21,22;99:4,13,
24;100:5,17
**interested (1)**
94:22
**interim (1)**
17:20
**internal (2)**
29:22;48:18
**internationally (1)**
16:5
**internet (1)**
12:24
**into (4)**
39:18;63:25;87:17;
96:7
**introduce (1)**
8:19
**invade (2)**
91:15;95:3
**invading (1)**
94:23
**invited (1)**
72:19
**involved (16)**
20:7;23:17,20,23;
24:2,7,13;25:4,9,12;
63:19;69:20;72:21,
25;73:2;95:19
**involvement (5)**
21:7;22:20,23;
64:3;73:3
**involves (2)**
29:15;91:7
**involving (1)**

74:16
**issuance (1)**
68:7
**issue (35)**
21:5,13;28:13,17,
19;29:6,11;30:8,12,
16;32:12;44:24;
47:13,19;48:11,15,
20;49:7;77:19;80:14,
20;82:13;83:10,11,
22,25;85:4,5;
89:4;91:12;97:15,20,
25;98:10;99:9
**issued (2)**
71:11,17
**issues (2)**
83:13,17,21;102:9
**issuing (1)**
71:18

**J**

**Jacob (2)**
8:22;10:5
**January (2)**
18:16,20
**Jeff (1)**
9:17
**Jennifer (2)**
60:13;62:9
**Jim (1)**
40:8
**job (2)**
12:18;78:25
**John (22)**
23:5;34:16;42:21;
43:22;44:21,22;
46:18;52:3,10;53:5;
59:14;66:2;74:17;
75:17;76:9;77:10;
81:3;86:14;88:7;
89:19;96:15;97:11
**JOHNSON (3)**
3:18;9:7,7
**joined (2)**
96:6;102:5
**Jones (1)**
20:10
**July (48)**
22:24;26:12;27:8,
11;29:9;30:4,15,23;
31:20;32:10;33:20;
35:13;37:8;38:13,13;
39:17,17;53:13;55:9;
58:23;60:3,4,7,14;
65:25;68:10,10;
69:11;74:2,9;75:12;
76:25;77:20;78:21,
21;79:10,22;83:3;
86:9,11,12;91:2;
92:19,24;95:15;97:9,
12;99:6
**June (15)**

28:11,18;29:5,6;
68:10;75:20,22;78:3,
6,11,21,21;80:5,8;
88:24
**junior (1)**
12:11

**K**

**Karen (1)**
9:11
**Katten (1)**
9:11
**Katzenstein (119)**
8:8;10:1,5;11:1;
12:1;13:1;14:1;15:1;
16:1;17:1;18:1;19:1;
20:1;21:1;22:1,2;
23:1;24:1;25:1;26:1,
17,22;27:1,15;28:1;
29:1,8;30:1;31:1;
32:1;33:1,9,13;34:1,
25;35:1;36:1;37:1;
38:1;39:1;40:1;41:1;
42:1;43:1;44:1;45:1;
46:1;47:1;48:1;49:1;
50:1;51:1;52:1;53:1;
54:1;55:1;56:1;57:1;
58:1;59:1,17,21;
60:1;61:1;62:1,7;
63:1;64:1;65:1;66:1;
67:1,6,10,14,21;68:1,
18;69:1,5,9,10;70:1;
71:1;72:1;73:1;74:1,
4,8;75:1;76:1;77:1;
78:1;79:1;80:1,11;
81:1;82:1;83:1,2;
84:1;85:1;86:1;87:1;
88:1;89:1;90:1;91:1;
92:1;93:1;94:1;95:1;
96:1;97:1;98:1;99:1;
100:1;101:1;102:1,
19
**keep (2)**
53:21;99:24
**Kennedy (26)**
23:18;24:9;27:6,
11,14;30:22;42:21;
44:21;59:8,9,14;
66:19;74:16;75:11,
17;76:7,8,17;80:14;
81:2;86:17,21,24;
92:19,22;97:11
**Kennedy's (1)**
75:2
**kind (1)**
78:11
**knew (1)**
38:6
**knowledge (22)**
25:13;30:14,20;
35:14;45:11,20;61:5,
16;63:24;65:17,22;

68:19;70:17,24;
71:22,25;72:8;76:18;
83:8;97:16;101:22;
102:2
**Kronish (2)**
11:22;12:16

**L**

**lack (1)**
66:14
**lacks (1)**
63:8
**language (1)**
84:15
**large (3)**
12:10,13;19:20
**last (8)**
16:8;70:18,25;
75:4;81:8;86:5;
88:14;92:15
**lasted (2)**
43:4,5
**late (1)**
11:24
**later (1)**
100:2
**latest (1)**
66:2
**law (5)**
11:13,14,21;12:20;
14:22
**lawyer (2)**
12:6,12
**lawyers (8)**
28:10;30:7;31:15,
19,23,24;32:5;101:11
**lay (1)**
11:17
**Le (2)**
13:6,6
**lead (2)**
43:20,23
**leader (2)**
17:19;20:6
**leading (1)**
26:8
**leads (1)**
41:22
**learn (3)**
55:21;58:3,7
**learned (1)**
82:23
**leave (2)**
43:14;82:3
**leave-off (1)**
56:16
**LEBLANC (74)**
9:2,2;21:14;25:18;
28:10;29:12,14;
34:24;35:17;36:15;
37:5;38:17,22;40:3;
41:19;44:7,15;47:12,

14;48:24;49:18;50:3,
10,14,18,23;51:7,15;
53:19;54:22,24;57:9;
59:3;62:15;63:7,10;
64:14;65:10,24;
66:13;67:20;71:4,23;
72:14;73:20,23;
74:20;78:9;80:17;
82:20;83:15;88:12;
89:5,9,22;90:10,17;
91:3,5,13,21;92:8,12;
93:5,10,16,21;94:12;
95:2;96:4,7,19;
100:21;102:14
**led (1)**
26:15
**left (4)**
12:20,20;53:14;
56:22
**legal (3)**
8:16;84:3,5
**Less (1)**
81:9
**letter (3)**
18:25;19:4,5
**level (2)**
25:17,24
**Liberty (1)**
8:12
**Lieb (1)**
11:22
**likely (5)**
48:4,5,10,20;49:13
**limited (1)**
19:23
**liquidate (1)**
79:16
**liquidated (1)**
84:6
**liquidating (2)**
77:23;78:5
**Lisa (8)**
24:3;34:12;42:21;
44:21;52:3;55:16;
61:21;62:16
**list (1)**
34:23
**litany (1)**
44:17
**litigating (1)**
94:20
**litigation (6)**
18:13;68:2;94:18;
97:22;99:19;100:12
**little (2)**
13:10;25:25
**living (1)**
90:2
**LLP (4)**
3:3,13;8:23;9:12
**located (1)**
8:12
**long (8)**

13:8;14:8;15:19;
43:4,8;46:12;76:10;
81:8
**longer (1)**
13:10
**look (10)**
21:20;41:15;54:8,
10,15,24;56:4,5;
84:24;93:19
**looked (5)**
30:3;45:9;58:22;
91:12;96:10
**looking (6)**
29:7;54:14;69:9;
78:25;82:25;92:24
**lot (1)**
53:10

**M**

**M&A (2)**
12:6;13:19
**Macom (1)**
8:17
**making (1)**
81:18
**management (3)**
15:16;16:3;17:20
**managing (10)**
16:14,16,17;17:2;
24:23;25:7,21,21,22,
24
**many (2)**
10:12;25:25
**Mark (4)**
25:6,20;26:17;
86:23
**marked (15)**
21:21;26:24;29:8;
33:11,13;42:2;59:19,
21;62:6;67:8,10;
74:5,8;83:2;84:25
**Matt (3)**
24:6,10;42:23
**matter (11)**
8:8;19:18;31:19;
32:3,6;34:7,10;36:4,
7;40:13;65:21
**matters (6)**
20:19;31:12,16;
83:22;87:13;100:11
**Matz (2)**
55:10;96:4
**maximum (3)**
47:10;90:7,13
**may (12)**
14:7;21:23;24:6;
29:22;37:7;51:25;
59:4;82:9,10;86:22;
87:5;97:10
**maybe (4)**
13:10,10;43:6;
67:18

**McCloy (1)**
9:3
**mean (7)**
19:21;27:20;32:18;
38:2;46:15;48:25;
50:4,14;51:17;52:9;
89:25
**meaning (1)**
85:22
**means (2)**
32:16;51:8
**meant (1)**
70:11
**mechanism (1)**
71:18
**media (5)**
12:23;16:4;17:23,
25;20:24
**mediation (1)**
95:6
**mediations (4)**
95:4,5,7,13
**meeting (38)**
24:7;32:8,9;35:9,
12,15,17,19,22;37:8;
40:18,21,23;42:11,
13,17;43:2,8,16,21,
24;44:14,22;51:20;
52:19;53:14,17;54:5;
56:16,22;58:21;
73:16,19;97:9,13;
100:8;101:9,12
**meetings (1)**
57:22
**Melissa (1)**
8:15
**Melker (13)**
9:6;24:14;25:21;
27:6;34:25;35:21;
69:19;74:16;75:16;
81:2,12;86:24;96:6
**members (1)**
102:3
**membership (2)**
14:20,24
**mentioned (5)**
25:15;33:21;34:17;
99:8,10
**met (1)**
96:3
**Michael (4)**
8:7;69:4;86:17;
102:18
**mid (3)**
28:11;38:13;39:17
**middle (4)**
29:5;30:23;34:20;
51:19
**might (4)**
28:12;77:15;97:20;
100:2
**Mike (23)**
23:18;24:8;27:6,

11,15;34:25;42:21;
44:21;52:3;59:8,9,
14;66:4,18,19;74:16;
75:17,17;76:8;81:2;
86:24;92:19;97:11
**Mike/Melker (1)**
75:3
**Milbank (17)**
9:3;19:2;20:10;
29:20,25;32:5;34:5;
35:25;45:18;50:2,4,
5;55:23;82:11;85:22;
96:3;97:18
**Miller (1)**
96:5
**million (9)**
61:7,12;71:14;
77:24;78:6;79:8,14,
25;84:9
**millions (1)**
100:12
**minute (3)**
67:14,17;100:20
**minutes (2)**
68:21;75:7
**misstated (1)**
56:23
**mistabbed (1)**
55:7
**mistaken (7)**
18:17;19:3;71:14;
76:12;79:5;82:22;
86:22
**misunderstandings (1)**
77:13
**model (4)**
50:20;89:10,16;
91:16
**modeling (13)**
51:18;87:18,20,22;
88:2;89:2,20;90:24;
92:5;93:4,14,25;94:8
**models (1)**
89:13
**moment (2)**
26:21;33:17
**Monday (4)**
54:13;59:10,12;
76:24
**money (1)**
14:21
**monies (1)**
84:13
**monitor (4)**
8:25;28:21;39:20;
70:19
**monitor's (2)**
38:10;41:24
**month (1)**
79:14
**monthly (1)**
79:3
**More (10)**

10:15;12:11;13:20;
19:21;23:13,15;
25:16;31:5;51:2;
53:10
**morning (1)**
59:15
**most (3)**
37:12;43:5;44:2
**motion (8)**
22:6,7;49:6,7,8;
51:11;95:21;96:10
**motivate (1)**
81:22
**motivation (1)**
99:24
**move (1)**
17:9
**moved (8)**
17:9,11;52:13,14;
57:4,19,22;58:5
**much (2)**
102:10,13
**Muchin (1)**
9:12
**multi-national (2)**
13:2,3
**Multiple (1)**
10:14
**myself (1)**
96:11

## N

**name (4)**
10:5;13:4;23:11,12
**National (2)**
9:13;17:19
**nature (1)**
31:4
**nearly (1)**
79:25
**need (6)**
10:17;24:5;63:2,5;
75:3;99:15
**needed (2)**
76:5;81:20
**negotiated (2)**
83:23;84:16
**negotiation (7)**
21:8,18;25:4;28:5,
13;39:18;53:11
**negotiations (13)**
21:16;22:21,24;
23:2,7,20;24:13;
25:10;63:15;64:2;
77:13;86:25;89:13
**Networks (1)**
8:9
**New (17)**
3:6,6,17,17;8:13,
13;11:7,21;12:17;
14:14,18,24;15:5;
17:9,9,12,14

**next (6)**
12:18;15:11;48:2;
54:19,20;75:7
**Nick (2)**
9:5;96:4
**nickel (1)**
81:20
**night (1)**
75:4
**NNC (1)**
71:2
**NNCC (16)**
71:4,5,8,10,11,19;
72:3,8,22;73:4,6;
82:17;83:6;101:18,
24;102:4
**NNI (38)**
9:10;21:17;22:15,
21;23:3,24;28:14;
32:11;42:17;48:14;
56:19;64:17;65:9,20;
70:5,21;71:17;77:3;
82:14;83:14;85:14;
88:5;90:8,14,20,25;
92:7,11;93:24;94:2,7,
8,10;97:2;98:17,25;
100:6;101:12
**NNI's (4)**
23:7;64:17;70:11;
99:4
**NNL (5)**
19:3;28:21;71:17;
81:18;99:25
**non-accruing (1)**
99:18
**none (5)**
30:21;32:13,17,18;
65:22
**Nonetheless (1)**
98:9
**noon (1)**
43:3
**Nortel (14)**
8:8;10:10;18:12;
31:10,11,16,19;32:3,
6;34:6,10;36:4,7;
40:13
**Notary (1)**
9:25
**noted (2)**
45:15;102:22
**noteholders (3)**
72:9,22;83:6
**notes (10)**
71:3,5,8,10,11,16,
20;72:3;76:19,22
**notice (1)**
22:5
**notional (4)**
90:7,14;94:2,9
**nuisance (2)**
99:17,18
**number (32)**

12:10;17:25;38:15;
39:19;43:18;45:12;
56:14;57:12;58:10,
11;61:4,6,7,9,12,15;
62:18;66:6;67:4;
68:12;70:17,19;77:7,
11,24;78:6;79:8,9,23;
84:7,8;91:10
**numbers (12)**
26:19;33:16;42:4;
55:11;56:18;57:20,
23;58:5;59:24;67:11;
74:12;90:2

## O

**Object (23)**
25:18;44:15;47:12,
14;50:23;51:7,15;
53:19;57:9;63:7;
64:14;65:10;66:13;
71:23;72:14;78:9;
80:17;82:20;83:15;
90:10,17;91:3;94:16
**Objection (6)**
31:21;36:15;50:22;
58:6;70:23;91:4
**occasions (1)**
10:12
**occurred (5)**
22:24;33:6;44:14;
97:8,10
**off (11)**
52:5;57:19;58:5;
68:23;83:19;94:25;
98:10;100:20,22;
102:15,19
**offices (2)**
8:11;35:11
**Official (5)**
3:14;9:9;31:24;
63:20;65:3
**old (1)**
14:8
**once (3)**
51:2;83:10;100:15
**One (30)**
3:16;8:3,12;16:25;
18:18;23:13,16;
25:16;27:11;31:5;
37:24,25;41:24;43:8,
19;54:18,19,20;60:6,
24;64:24;69:23;73:3,
5;79:20;81:12;82:2;
86:23;90:22;92:12
**one-page (3)**
26:18;74:9,12
**only (4)**
71:16;79:6;84:5;
91:8
**open (1)**
83:13
**opening (1)**

8:6
**opportunity (2)**
97:19;98:10
**opposite (1)**
99:22
**Optel (4)**
12:22,22;13:8;
15:10
**oral (5)**
37:10;40:2,16;
61:16,18
**orally (2)**
36:24,25
**order (7)**
22:7,12;49:8;
68:14;78:23;83:25;
100:16
**ordered (1)**
28:25
**organized (1)**
35:10
**original (1)**
13:16
**others (4)**
38:2,3;101:23;
102:5
**otherwise (1)**
81:16
**out (10)**
11:17;39:20;41:8;
56:19;65:25;70:14;
74:21;82:18;83:6;
95:7
**outcomes (3)**
50:16,21;51:18
**output (2)**
89:10,11
**outputs (1)**
89:15
**outright (1)**
49:8
**outside (1)**
29:24
**outstanding (1)**
79:7
**over (14)**
10:25;11:2;18:2;
19:18,22,23;20:9;
21:18;36:12;66:7,20;
67:2;70:8;88:14
**Overy (1)**
8:23
**own (2)**
20:3;43:11

## P

**page (4)**
34:20;62:12;70:18;
71:2
**parent (1)**
13:4
**Park (1)**

3:16
**part (6)**
18:21;19:16;20:14;
46:12;72:9;94:19
**participant (1)**
80:22
**participants (2)**
53:17;102:3
**participate (5)**
33:2;72:19;73:7;
81:5;83:9
**participated (5)**
21:15;23:2,7;
57:18;81:4
**participation (4)**
26:12,15;58:25;
59:2
**particular (5)**
20:13;22:13;56:5;
84:25;91:16
**particularities (1)**
19:4
**particularity (1)**
69:22
**particularly (1)**
99:25
**parties (10)**
53:11;57:18,19,23;
58:4;61:10,15;64:4;
81:22;85:10
**parties' (1)**
58:14
**parting (1)**
53:16
**partner (6)**
11:25;15:13;25:6;
34:4;35:25;40:9
**partners (1)**
15:15
**party (2)**
72:4;86:25
**path (1)**
100:14
**pay (1)**
84:21
**payment (4)**
90:9,15;94:3,11
**PBGC (2)**
65:6;93:20
**Pension (2)**
3:4;9:16
**Pensyl (1)**
8:25
**people (2)**
18:19;25:14
**percent (28)**
37:16;38:4;45:6,
12,23;46:8,8,9,10;
47:24;51:22;52:4,5,5,
11,12;56:10,13,19,
19;57:11;58:11;61:4,
6,11,17;78:20;82:2
**percentage (3)**

58:15;77:7;78:16
**performed (1)**
90:21
**period (6)**
21:18;67:19;78:20;
85:21;86:11;96:5
**person (7)**
21:16;23:3,16,17;
25:16;44:9;62:3
**personal (1)**
22:23
**personally (5)**
32:13,17,18;82:10;
86:18
**persons (2)**
20:22;24:16
**Perusing (5)**
26:25;33:18;42:5;
45:14;60:5
**PHONE (4)**
3:8,20;62:4;96:5
**pick (1)**
79:15
**pieces (1)**
22:3
**Pisa (4)**
34:24;35:19,24,25
**place (9)**
32:23;40:24;41:4,
12;43:2,16;61:23;
62:3;82:11
**plan (1)**
100:14
**Plaza (1)**
8:13
**please (6)**
8:19;9:22;11:20;
60:17;63:14;94:5
**pleasure (1)**
68:22
**pm (8)**
8:5;62:17;68:24;
69:6;100:23;101:3;
102:20,22
**point (22)**
13:13;14:23;15:18;
18:10;34:19;38:6;
47:10,17;48:8,13,17;
52:2;55:21;56:16;
64:6,8;66:18;68:9;
83:5,19;93:23;94:6
**Political (1)**
11:10
**position (8)**
13:12;15:10;16:21,
24;26:4,4,5;58:14
**possible (8)**
33:7;41:13;42:23;
50:15;56:3;77:5;
89:15;94:2
**possibly (1)**
47:11
**post-petition (22)**

22:16;37:17,18;
38:11;45:7;49:10;
63:17;66:21;68:3,7,
9;72:6;75:19;77:18,
25;84:20,23;90:9,15;
94:4,11;98:5
**pot (1)**
99:21
**potential (11)**
28:4,15;50:20;
51:14,18;77:14;89:3,
20;94:9;99:20;102:9
**potentially (2)**
95:9;98:24
**PPI (33)**
21:5;28:14,23;
29:2,11;30:16;32:11;
38:5,7,9;44:24;
47:13;48:5,11,15,20;
49:7;50:16,21;51:9,
12;55:18;56:6;60:18;
76:2;79:9,23;87:21,
22,25;88:4;89:4,20
**practice (3)**
14:22;17:2,20
**practiced (1)**
11:24
**preceding (1)**
37:8
**preparation (1)**
101:7
**prepare (2)**
95:24;96:13
**prepared (9)**
51:5,13;67:24,25;
68:6;69:15,17,25;
77:2
**presents (1)**
97:19
**previously (3)**
21:21;31:2;42:3
**principal (9)**
23:17;71:13;73:4,
5,5,8,10,11;79:7
**principally (2)**
24:3,8
**prior (19)**
21:24;30:2,15;
31:16,19;32:2,6,8,9;
34:6;36:3;38:13;
76:24;77:20;79:12,
18,19;88:18,24
**privilege (4)**
91:15;94:23,24;
102:10
**privileged (1)**
95:10
**probably (3)**
27:21;63:2;80:3
**problems (1)**
63:5
**proceedings (1)**
99:19

**product (1)**
91:15
**production (1)**
95:20
**professional (2)**
25:25;85:23
**professionals (7)**
19:15,17,22,25;
24:12;25:3,11
**progressively (1)**
13:17
**promoted (1)**
13:24
**proportion (1)**
72:6
**proposal (22)**
36:12,22,23;37:3,6,
10,15;40:2,16;44:25;
45:2,3,5,12,23,23,24;
46:7,9,10;58:16;
82:16
**proposed (20)**
10:7;21:5;22:12;
25:4;52:11;54:4;
58:9;64:5,10,13;
71:21;72:9;77:20;
78:14;79:24;85:13;
95:17;97:3;101:14,
21
**proposing (1)**
57:11
**provide (1)**
18:11
**provided (1)**
85:6
**providers (1)**
20:23
**provides (1)**
34:24
**providing (1)**
100:14
**provision (1)**
85:9
**Public (1)**
9:25
**PULTMAN (19)**
8:22,22;10:4,6;
49:4;50:6;54:23;
55:3;68:20;69:8;
91:8,19,22,25;94:22;
100:19;101:5;102:7,
15
**purchase (1)**
12:9
**purple (2)**
24:18,21
**pursuant (1)**
22:7
**put (4)**
25:23;39:20;54:9;
58:23
**puts (1)**
89:15

**Q**

**quick (1)**
75:3

**R**

**raise (1)**
70:21
**raised (2)**
70:19;80:15
rajohnson@akingumpcom (1)
3:22
**ran (1)**
79:19
**rate (7)**
45:15;49:9;51:12;
79:6,14,17;90:25
**rather (1)**
100:2
**Ray (49)**
21:22;23:5;34:16;
41:16,16;42:3,21;
43:22;44:21;45:9,17;
46:6,7;47:22;48:3;
51:21;52:3,10;53:5;
54:10,14,21,22,23;
55:5,8;58:22;59:14;
61:21;72:10;74:17;
75:17;76:6;77:10;
80:15;81:3,4,5,24;
82:8;84:25;86:14;
88:8;89:19,19;90:6;
96:15;97:11;101:15
**re (1)**
8:8
**reached (1)**
65:25
**read (2)**
96:12,15
**reading (1)**
67:19
**ready (1)**
52:2
**really (1)**
91:14
**reason (3)**
10:17,21;27:24
**reasoning (3)**
46:23;47:3,4
**reasons (2)**
47:5;76:6
**recall (53)**
14:3;19:4;24:7;
27:21;32:25;33:7;
37:21,23;38:5;40:5,
23;41:3;42:12,22,25;
43:4,15,17,18;44:18,
19;45:24;46:5,15;
47:2,5;54:6;56:3;
58:16;69:17,22;70:6;
74:25;77:4,6,9,10;

80:6,18;82:9,17,21;
84:8;86:2,15;87:6,
10;92:17,21,22;93:2;
97:17;99:5
**receivables (1)**
92:6
**receive (1)**
27:24
**Recess (2)**
69:2;100:25
**recollection (13)**
29:24;32:24;33:4;
36:20;40:22,25;
43:25;44:12;46:13;
53:20;59:9;61:24;
73:14
**record (20)**
8:4,21;21:25;27:2;
33:15;42:6;55:8;
56:25;57:10;59:23;
62:25;68:24;69:6;
74:11,21;100:20,23;
101:3;102:16,19
**recover (6)**
47:11;48:5,11,15,
20;49:14
**recoveries (2)**
84:12;89:3
**recovery (4)**
50:21;51:6,10,14
**reduced (1)**
98:21
**refer (1)**
19:10
**reference (8)**
35:6,8,9;36:14,19;
62:23;66:12;70:25
**referenced (3)**
45:13;66:19;85:5
**references (1)**
63:12
**referring (3)**
44:4,7;66:24
**refers (1)**
83:2
**reflect (1)**
36:22
**reflected (5)**
45:17;57:14;70:17;
72:10;101:15
**reflecting (2)**
50:2,13
**refresh (1)**
96:11
**regarding (2)**
55:18;75:4
**regular (1)**
20:23
**related (2)**
21:19;95:14
**relating (2)**
21:12;83:10
**remained (1)**

16:17
**remaining (2)**
53:22,23
**remember (5)**
15:3;42:14,24;
52:10;53:2
**repeat (1)**
94:5
**rephrase (2)**
20:16;88:23
**report (2)**
33:5;87:3
**reporter (2)**
8:14;9:22
**Reporting (2)**
8:16,18
**represent (3)**
8:20,25;63:21
**representation (5)**
20:4,6,14;26:9;
38:12
**representative (2)**
93:24;94:7
**representatives (6)**
64:17,21;65:2,6;
97:2,18
**represented (3)**
28:22;38:10;98:8
**representing (2)**
64:9;101:12
**request (2)**
49:25;67:24
**requested (1)**
49:22
**required (1)**
83:24
**requirement (1)**
81:13
**reschedule (1)**
54:2
**resolution (2)**
85:10;102:9
**resolutions (1)**
100:10
**resolve (1)**
97:19
**resolved (6)**
77:19,22,23;83:12,
17;97:20
**resolving (1)**
97:25
**resource-wasting (1)**
97:22
**respect (13)**
28:4;46:21;70:22;
77:25;80:19;87:13,
21;92:20;93:9;95:17,
20;97:15;98:14
**respective (2)**
29:3;57:20
**respectively (1)**
20:12
**response (7)**

31:4;46:5;49:24;
51:23;62:8;68:18;
82:4
**responsibilities (5)**
13:16,21;16:23;
17:18;21:12
**responsible (3)**
21:16;22:21;23:3
**restate (2)**
45:3;47:20
**restated (1)**
81:13
**restructuring (5)**
12:13;16:3;17:3;
21:2;34:4
**restructurings (2)**
12:10;15:16
**result (4)**
77:15;89:20;97:20;
100:2
**resulted (1)**
58:13
**results (1)**
100:17
**retained (2)**
18:11,22
**retention (1)**
19:2
**returned (2)**
52:3,11
**review (4)**
26:21;33:17;62:9;
96:18
**revised (3)**
60:18,21;76:25
**right (19)**
9:6;22:10;24:17;
26:25;27:18;39:8;
44:10;47:25;52:15;
55:7;57:3,5,5;59:16;
64:18;80:3;90:2;
96:9;101:16
**Ritz (2)**
41:7;44:8
**ROBERT (2)**
3:18;9:7
**role (3)**
13:23;20:3;58:19
**roles (3)**
13:15,18;19:23
**roll-up (1)**
12:23
**room (6)**
43:12,13,15,17;
44:20;52:4
**Rosenberg (3)**
24:6,10;42:23
**Rosenman (1)**
9:12
**ROSENTHAL (8)**
9:17,17;31:21;
50:22;58:6;70:23;
91:4;94:15

**Rule (1)**
22:8
**run (1)**
78:20
**running (2)**
79:13;83:11

## S

**sales (1)**
12:9
**salient (4)**
37:12,13,20,22
**same (4)**
18:9;60:9;72:6;
91:24
**Sandberg (19)**
9:6;24:14,16,23;
25:2,15;27:6,12;
33:2;34:25;35:21;
69:19;70:13;74:16;
76:13,16,21;81:2;
96:6
**Sandberg's (2)**
24:22;26:5
**Saturday (2)**
65:24;69:11
**saw (1)**
42:10
**saying (1)**
53:3
**schedule (9)**
66:20;67:3,7;
69:12,14,18,21,25;
70:22
**School (1)**
11:14
**Schweitzer (10)**
24:3;33:21;34:21;
36:10;42:22;60:13;
61:21;62:8,15;65:24
**science (1)**
11:10
**second (4)**
22:6;27:10;62:12;
85:5
**seconded (1)**
12:12
**secrecy (1)**
63:4
**Section (3)**
56:6,6;85:2
**securities (1)**
12:6
**seeing (1)**
58:16
**seems (1)**
31:5
**send (7)**
14:21;36:11;66:2,
7,20;67:2;70:8
**sending (1)**
34:21;70:4,14

**Senior (10)**
16:14,16,17,22,25;
25:7,16,20,22,23
**senior-most (1)**
16:21
**sent (4)**
55:22;56:2,2;68:17
**September (3)**
8:6;68:25;69:7;
100:24;101:4;102:20
**series (3)**
43:9;90:19;91:23
**served (1)**
92:4
**services (3)**
12:24;18:11;20:24
**session (1)**
101:7
**set (1)**
99:18
**settle (2)**
28:13;81:22
**settlement (58)**
10:7;21:5,9;25:5;
28:5,24;36:22,23;
37:6;45:15;46:24,25;
49:2;54:4;55:17,22;
56:4,6;58:10,18,20;
60:9,18,22;61:2;64:6,
10,13;71:21;72:2,4,
10;77:2;79:24;81:16;
82:18;83:7;84:2;
85:2,12;88:13,15,16,
19;89:23,24;95:13,
17;96:11;97:3;98:8,
12,20;99:25;100:9;
101:15,21;102:2
**settlements (1)**
81:19
**settling (2)**
22:15;63:16
**seven (3)**
14:8;15:22;16:25
**Seventh (1)**
3:5
**several (3)**
22:3;40:17;92:23
**Shall (1)**
56:9
**share (8)**
47:15,18;87:22,25;
88:4,19;89:7,16
**shared (2)**
88:7;95:12
**sheet (3)**
42:7;45:8,20
**shirt (1)**
24:18,21
**short (1)**
96:5
**shortly (1)**
86:7
**show (4)**

33:12;59:20;67:9;
74:7
**showed (1)**
54:18
**showing (1)**
66:20
**side (3)**
32:11;42:17;49:13
**signatures (1)**
85:23
**signed (5)**
19:3,5;101:20,24;
102:4
**significantly (1)**
79:18
**sit (1)**
80:2
**sitting (11)**
24:16;27:23;38:5;
41:10;44:9,13;46:13;
47:2;58:8;70:16;80:5
**six (3)**
13:11;16:18,25
**slow (1)**
29:18
**slowly (1)**
90:22
**SMD (1)**
17:21
**Solus (4)**
73:10,11,11,13
**someone (4)**
18:24;26:8;43:20,
23
**sometime (1)**
28:11
**sometimes (1)**
26:6
**somewhere (2)**
16:7;58:11
**sooner (1)**
100:2
**sorry (10)**
18:20;32:9;54:17,
18;71:5;73:19;82:23;
85:18;86:4;87:9
**sort (3)**
46:17,20;78:2
**sounds (1)**
80:2
**speak (4)**
10:25,25;11:2;
29:23
**speaking (1)**
44:2
**specialized (2)**
15:15;19:23
**specializes (1)**
17:22
**specific (7)**
18:25;37:4;77:7,
11,11;91:14;93:14
**specifically (7)**

18:22;70:7;74:25;
77:4;87:8;97:17;
98:23
**specificity (6)**
27:22;33:8;37:23;
42:22;53:2;82:21
**specified (2)**
78:13,17
**spent (1)**
92:23
**spoke (4)**
59:9;73:3;75:16;
96:6
**spoken (1)**
28:10
**Spragg (3)**
25:7,16;27:15
**S-P-R-A-G-G (1)**
25:7
**Spragg's (1)**
26:4
**Stamped (5)**
26:23;33:10;59:18;
67:7;74:5
**start (5)**
60:3,6;88:15;
89:11;97:12
**started (6)**
15:12;17:7,8;43:3;
57:2,2
**state (5)**
8:20;11:7;14:13;
15:5,8
**stated (2)**
79:5;100:8
**statements (1)**
28:22
**States (3)**
12:25;14:15;98:22
**status (1)**
102:6
**stay (1)**
46:19
**stayed (1)**
43:13
**Steen (2)**
8:11;9:19
**step (1)**
49:3
**Steve (1)**
73:9
**still (1)**
14:21
**stipulate (1)**
24:20
**STRAUSS (2)**
3:13;9:8
**strongly (5)**
76:4,4;98:2,7;
99:23
**stuff (1)**
53:11
**styled (2)**

84:11;98:6
**subject (5)**
63:15,16;65:20;
66:3;102:8
**submit (1)**
36:21
**submitted (3)**
36:21;79:11,22
**subsequent (2)**
59:13;97:10
**subsidiary (1)**
12:25
**substance (7)**
32:25;55:13;87:6,
18;88:11;91:18;96:8
**suite (1)**
16:22
**sum (1)**
66:22
**Sure (14)**
11:6;12:5;17:19;
20:5,17;22:4;26:16;
28:8;47:22;51:9;
74:20;94:6;99:16;
100:21
**surplus (1)**
90:7,14;94:2,10
**swear (1)**
9:22
**sworn (2)**
9:24;63:3
**synced (1)**
89:13

## T

**tab (1)**
54:16
**table (3)**
83:19;94:25;98:11
**talk (1)**
85:16
**talked (1)**
98:14
**talking (2)**
53:21;63:3
**tally (2)**
68:9,11
**tape (2)**
8:3;69:3
**tax (2)**
93:4,9
**TBD (1)**
45:15
**team (6)**
19:12,16,20,24;
20:15;85:23
**technology (4)**
16:5;17:23,25;
20:25
**telecom (5)**
12:24;16:4;17:23,
25;20:18,24

**telecommunications (1)**
12:23
**telephone (2)**
40:20;81:6
**telling (3)**
51:20;66:3;92:22
**ten (2)**
12:15;19:22
**term (4)**
37:12;42:7;45:8,19
**terms (4)**
37:10,14,21,23
**testified (2)**
10:2;56:17
**testimony (1)**
87:15
**Texas (1)**
15:8
**thanking (1)**
62:9
**Thanks (3)**
36:11;66:8;74:23
**thought (5)**
16:6;48:4,9,14;
81:16
**three (4)**
19:24;24:16;25:14;
54:16
**three-page (3)**
67:23;69:12,14
**throughout (2)**
16:18;39:16
**thrown (1)**
56:19
**Thursday (5)**
8:5;55:9;57:15;
60:10;61:25
**time-consuming (1)**
97:21
**timeline (1)**
44:17
**timing (2)**
63:24;83:11
**title (3)**
16:15;24:22;27:17
**TMT (5)**
15:15;17:2,21;
24:24;25:8
**Today (17)**
8:5,14;16:15;
17:18;27:23;36:12;
38:5;41:10;44:13;
46:14;47:2;58:8;
70:16;80:6;86:14;
96:23;102:8
**today's (2)**
95:24;102:18
**told (15)**
20:17;51:21;56:18;
64:16,19;75:17;
80:13;83:8;86:13,17;
87:16;99:6;101:6,9,
14

**Tom (2)**
55:10;96:4
**tomorrow (1)**
35:2
**took (11)**
13:20;16:24;32:23;
40:23;41:4,12;43:2,
16;61:23;62:3;76:22
**top (3)**
27:12;62:11;65:23
**topic (1)**
95:5
**topics (1)**
62:18
**Toronto (2)**
41:2,3
**total (4)**
38:7;77:24;79:3,9
**transcripts (1)**
96:13
**treat (1)**
99:15
**trials (1)**
47:6
**tricks (1)**
41:25
**trouble (1)**
70:13
**Trust (1)**
9:13
**trustee (1)**
84:14
**trustees (1)**
83:25
**try (2)**
10:21,24
**Tuesday (12)**
22:24;26:12;35:13;
55:17;56:16;73:15,
15,18,18;75:12;
82:22;97:9
**turnaround (2)**
15:16;16:2
**Tweed (1)**
9:3
**two (7)**
31:5;69:3;83:17,
21,22;86:23;96:3
**type (1)**
12:3

## U

**UK (2)**
3:4;9:16
**ultimate (1)**
84:12
**ultimately (7)**
15:14;58:14;72:9;
77:19;84:6,14;98:24
**uncomfortable (1)**
75:18
**under (3)**

50:21;79:24;85:5
**undergraduate (1)**
11:6
**United (2)**
12:25;98:22
**University (2)**
11:7,14
**Unsecured (2)**
3:14;9:10;63:23
**up (10)**
26:15;29:6;47:6;
56:9;57:4,7;62:19;
79:20;82:2;89:13
**useless (1)**
80:4

**V**

**valuation (3)**
93:4,9,13
**value (1)**
93:19
**various (2)**
62:15;85:19
**version (3)**
60:10,25;61:2
**versions (2)**
71:20;72:2
**video (1)**
24:19
**VIDEOGRAPHER (8)**
8:3,17;9:21;68:23;
69:3;100:22;101:2;
102:17
**Videotron (2)**
13:6,7
**V-I-D-E-O-T-R-O-N (1)**
13:7
**view (4)**
38:20;39:18,20;
98:2
**virtually (1)**
20:7
**vis-a-vis (1)**
84:18
**vulnerable (1)**
81:17

**W**

**warn (1)**
62:16
**way (2)**
17:24;62:5
**wearing (1)**
24:20
**Wednesday (3)**
73:16;83:3,5
**week (1)**
96:16
**weeks (2)**
37:8;40:17
**Weiner (1)**

11:22
**weren't (1)**
15:7
**What's (4)**
24:22;42:2;66:17;
71:2
**whole (1)**
78:2
**willing (1)**
28:12
**willingness (1)**
81:15
**WILLKIE (2)**
3:3;9:15
**Wilmington (1)**
9:13
**withdrawn (1)**
14:19
**within (4)**
17:22;20:13,25;
93:14
**without (2)**
80:3;82:16
**witness (13)**
9:22,24;55:2;59:6;
63:9;68:22;73:22;
74:23;91:20;92:8;
93:12;96:9;102:12
**won (2)**
49:7;51:11
**words (1)**
53:16
**work (16)**
12:4,7;13:3;15:16,
19,24;19:13,18,22;
21:3;19;36:6;50:2;
62:5;91:15;93:8
**worked (7)**
12:10;13:2;15:20;
18:2;19:20;34:9;36:3
**working (3)**
20:18;38:8;66:3
**works (1)**
67:17
**writing (1)**
58:17
**written (2)**
36:21;50:12

**Y**

**year (4)**
12:14;33:20;79:20;
82:2
**years (15)**
12:16;13:10,11,23;
14:6,8;15:2,2,23;
16:18;19:18;51:18;
88:14;90:3;100:11
**York (17)**
3:6,6,17,17;8:13,
13;11:7,22;12:17;
14:14,18,24;15:5;

17:9,10,12,14

**0**

**09 (2)**
18:20,20

**1**

**1 (13)**
21:22;26:18,22;
29:8;58:22;68:10,10;
72:10;78:21,21;
84:25;91:2;101:15
**1,010,000,000 (1)**
80:10
**1.6 (1)**
98:6
**1.656 (1)**
70:18
**1:11 (1)**
8:5
**10 (1)**
27:8
**10019-6099 (1)**
3:6
**10036-6745 (1)**
3:17
**10th (3)**
29:9;30:3,15
**11 (1)**
27:11
**11:26 (1)**
55:9
**11th (1)**
30:4
**12 (3)**
67:8,12;68:12
**14th (4)**
32:8;33:20;54:13;
86:11
**15 (6)**
22:24;26:12;37:8;
97:9,12;99:6
**150 (1)**
71:14
**15th (9)**
32:9;35:11,13;
42:11,13,18;53:13,
18;58:21
**16 (2)**
59:19,24
**164 (1)**
55:11
**16th (1)**
29:5
**17 (1)**
55:9
**17th (3)**
60:3,6,10
**18 (6)**
8:6;68:25;69:7;
100:24;101:4;102:20

**18th (4)**
60:14,23;61:3,11
**19 (2)**
65:25;69:11
**1981 (1)**
11:8
**1985 (4)**
11:14,17,19;14:10
**1995 (2)**
11:24;12:19
**19th (1)**
60:4

**2**

**2 (9)**
33:9,13;41:17,21,
22;42:3;45:9,17;
54:15
**2.2 (1)**
56:6
**2:18 (1)**
68:24
**2:38 (1)**
69:6
**2008 (4)**
15:22;16:7,8,9
**2009 (5)**
15:22;16:7,10,24;
17:7
**2010 (2)**
17:13;18:16
**2014 (24)**
8:6;28:18;30:23;
31:20;38:13;39:17;
55:9;65:25;68:25;
69:7,11;74:9;78:4,7,
11,21;80:5;83:3;
88:24;91:2;95:15;
100:24;101:4;102:20
**2015 (3)**
75:22;78:22;80:8
**20-page (1)**
22:8
**21 (1)**
42:4
**212-728-8170 (1)**
3:8
**212-728-9170 (1)**
3:9
**212-872-1002 (1)**
3:21
**212-872-1077 (1)**
3:20
**21st (4)**
59:11,12,13;76:25
**22 (1)**
74:2
**22nd (8)**
59:10,15;73:20,21;
75:11;82:23;92:19,
24
**23 (3)**

74:9;83:3;95:15
**23rd (2)**
80:19;82:23
**24 (3)**
77:20;79:10,22
**24th (3)**
58:23;86:9,12
**252 (1)**
33:11

**3**

**3 (12)**
41:23;54:10,21,22,
23;55:5,6,8;59:17,21;
62:7;68:18
**3.5 (2)**
78:20;82:2
**3:15 (1)**
100:23
**3:17 (1)**
101:3
**3:19 (2)**
102:20,22
**30 (16)**
46:8,10;47:24;
51:22;52:14;57:2;
68:10;75:20,22;78:3,
6,11,21,21;80:5,8
**35 (1)**
52:5

**4**

**4 (4)**
54:22;67:6,10;
69:10
**4.2 (2)**
85:2,9
**40 (6)**
52:12,14;56:19;
57:4;58:11;75:7
**40/60 (3)**
57:19,23;58:5
**43-page (1)**
22:15

**5**

**5 (5)**
62:17;74:4,8;
80:12;83:2
**55 (4)**
61:4,6,11,17

**6**

**60 (7)**
52:11;56:10,13,22;
57:7,11;58:11
**60/40 (1)**
56:22
**65 (5)**

52:4,5,13;56:19;
57:6

### 7

**70 (10)**
37:16;38:4;45:6,
12,23;46:8,9;52:6,13;
57:2
**787 (1)**
3:5

### 8

**876 (2)**
77:24;80:7

### 9

**9 (1)**
75:7
**9019 (3)**
10:7;22:8;95:17
**98 (1)**
14:4
**99 (1)**
14:4

**EXHIBIT 3**

**EXHIBIT**

**107**

*IN RE: NORTEL NETWORKS INC., et al.*

---

*PAUL WERTHEIM, Ph.D.*
*October 22, 2014*
*HIGHLY CONFIDENTIAL*

---



**CORT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 108264.TXT*
*Min-U-Script® with Word Index*

1    UNITED STATES BANKRUPTCY COURT

2    FOR THE DISTRICT OF DELAWARE
     ----------------------------------------X
3    In re

4         NORTEL NETWORKS INC., et al.,

5                         Debtors.,

6    Chapter 11 Case No.: 09-10138(KG)
     ----------------------------------------X
7

8         * * * HIGHLY CONFIDENTIAL * * *

9

10                   450 Park Avenue
                     New York, New York
11
                     October 22, 2014
12                   9:11 a.m.

13

14            VIDEOTAPED DEPOSITION of PAUL

15   WERTHEIM, Ph.D., before Melissa Gilmore, a

16   Notary Public of the State of New York.

17

18

19

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24             New York, New York 10022
                    212-750-6434
25                  REF:  108264

HIGHLY CONFIDENTIAL                              2

```
 1   A P P E A R A N C E S:

 2

 3   CLEARY GOTTLIEB STEEN & HAMILTON LLP

 4   Attorneys for US Debtor

 5         One Liberty Plaza

 6         New York, New York 10006-1470

 7   BY:  JEFFREY ROSENTHAL, ESQ.

 8         BRENT TUNIS, ESQ.

 9         LISA SCHWEITZER, ESQ.

10         PHONE 212-225-2086

11         FAX 212-225-3999

12         E-MAIL jrosenthal@cgsh.com

13

14   ALLEN & OVERY LLP

15   Attorneys for Canadian Debtors and Canadian Monitor

16         1221 Avenue of the Americas

17         New York, New York 10020

18   BY:  JACOB S. PULTMAN, ESQ.

19         BRADLEY S. PENSYL, ESQ.

20         JOSEPH BADTKE-BERKOW, ESQ.

21         PHONE 212-610-6340

22         FAX 212-610-6399

23         E-MAIL jacob.pultman@allenovery.com

24

25
```

HIGHLY CONFIDENTIAL                    3

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   WILLKIE FARR & GALLAGHER LLP

 4   Attorneys for UK Pension Claimants

 5        787 Seventh Avenue

 6        New York, New York 10019-6099

 7   BY:  ANDREW HANRAHAN, ESQ.

 8        PHONE 212-728-8170

 9        FAX 212-728-9170

10        E-MAIL ahanrahan@willkie.com

11

12

13   AKIN GUMP STRAUSS HAUER & FELD LLP

14   Attorneys for US Official Committee of Unsecured

15   Creditors

16        One Bryant Park

17        New York, New York 10036-6745

18   BY:  ABID QURESHI, ESQ.

19        DAVID BOTTER, ESQ.

20        ANNE M. EVANS, ESQ.

21        PHONE 212-872-8027

22        FAX 212-872-1002

23        E-MAIL aqureshi@akingump.com

24

25
```

HIGHLY CONFIDENTIAL                          4

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   MILBANK, TWEED, HADLEY & McCLOY LLP

 4   Attorneys for US Bondholder Group

 5         1850 K Street, NW, Suite 100

 6         Washington, DC 20006

 7   BY:   ANDREW M. LEBLANC, ESQ.

 8         NICHOLAS A. BASSETT, ESQ.

 9         PHONE 202-835-7574

10         FAX 202-263-7574

11         E-MAIL aleblanc@milbank.com

12

13

14   KATTEN MUCHIN ROSENMAN LLP

15   Attorneys for Wilmington Trust

16         575 Madison Avenue

17         New York, New York 10022-2585

18   BY:   DAVID A. CRICHLOW, ESQ.

19         PHONE 212-940-8941

20         FAX 212-940-8776

21         E-MAIL david.crichlow@kattenlaw.com

22

23   ALSO PRESENT:

24         MICHAEL KENNEDY, Chilmark

25         DAN MACOM, Videographer
```

```
 1   ------------------ I N D E X ------------------

 2   WITNESS                 EXAMINATION BY           PAGE

 3   PAUL WERTHEIM       MR. ROSENTHAL                 10

 4                       MR. LEBLANC                  195

 5                       MR. PULTMAN                  273

 6

 7   DIRECTIONS:  PAGE 15

 8

 9

10   --------------- E X H I B I T S ---------------

11   WERTHEIM            DESCRIPTION            FOR I.D.

12   Exhibit 1           Expert Report              29

13   Exhibit 2           10-Q of Nortel Networks    73

14                       Corporation

15   Exhibit 3           One Hundred and Eighth      81

16                       Monitor Report, dated

17                       September 24, 2014

18   Exhibit 4           Sixty-First Report of      119

19                       Monitor, dated March 21,

20                       2011

21   Exhibit 5           Cash Summary Worksheet,    120

22                       Bates Stamped

23                       NNC-NNL-PPI000001 through

24                       21

25
```

```
 1    ----------- E X H I B I T S (Cont'd) -----------
 2    WERTHEIM          DESCRIPTION            FOR I.D.
 3    Exhibit 6         Expert Report of Jeffrey    131
 4                      Kinrich together with
 5                      exhibits to report
 6    Exhibit 7         Monthly Operating Report    168
 7                      No. 60
 8    Exhibit 8         Thomas Britven's Rebuttal   169
 9                      Report, dated February
10                      28, 2014
11    Exhibit 9         Document Bates Stamped      186
12                      NNI-PPI-118 to 121
13    Exhibit 10        Expert Report of Thomas     230
14                      Britven, dated January
15                      24, 2014, Bates Stamped
16                      000001 through 150
17    Exhibit 11        One Hundred and Seventh     235
18                      Report of the Monitor,
19                      dated September 2, 2014
20
21
22            (EXHIBITS TO BE PRODUCED)
23
24
25
```

HIGHLY CONFIDENTIAL                    7

```
 1              S T I P U L A T I O N S

 2

 3   1.  Upon completion of the transcription of today's

 4   session, the original transcript shall be sent to

 5   counsel for the witness by the court reporter.

 6   Counsel shall promptly forward it to the witness

 7   for review, correction and signature under penalty

 8   of perjury.  The witness shall have 30 days from

 9   the day of receipt within which to review, make any

10   corrections, sign the deposition transcript under

11   penalty of perjury, and return it to counsel.  The

12   witness' counsel shall then forward the original

13   transcript plus corrections to the court reporter,

14   who will promptly notify all counsel of its receipt

15   and any changes to testimony made by the witness.

16

17   2.  If the witness is not represented by counsel,

18   the original transcript will be sent to the witness

19   by the court reporter.  After review, correction

20   and signature within 30 days from the date of

21   receipt, the witness shall return the original

22   transcript to the court reporter, who will notify

23   all counsel of its receipt and any changes to

24   testimony by the witness.

25
```

**HIGHLY CONFIDENTIAL**                    **8**

1   3.   The court reporter will retain the original

2   transcript, including exhibits.  If, for any

3   reason, the original is lost, misplaced, not

4   returned, not signed, or unavailable, a certified

5   copy may be used in its place for all purposes.

6   The court reporter is otherwise relieved of any

7   statutory duties.

8

9                          - oOo -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2              THE VIDEOGRAPHER:  This is tape one.

3      We are now on the record.  The time is

4      9:11 a.m., October 22, 2014.

5              This is the opening of the

6      deposition of Mr. Paul Wertheim in the

7      matter of In re Nortel Networks,

8      Incorporated, et al.

9              This deposition is being held at the

10     offices of Cleary, Gottlieb, Steen &

11     Hamilton, which is located at 450 Park

12     Avenue in New York, New York.

13              Our court reporter today is

14     Ms. Melissa Gilmore with Ellen Grauer

15     Court Reporting.  I am the legal

16     videographer, Dan Macom, also with Ellen

17     Grauer Court Reporting.

18              Would counsel please introduce

19     themselves and state whom they represent

20     for the record?

21          MR. ROSENTHAL:  Jeff Rosenthal of

22     Cleary, Gottlieb, Steen & Hamilton.  I'm

23     here with Brent Tunis, and also Mike

24     Kennedy of Chilmark, assisting us, and we

25     represent the US debtors.

1              P R O C E E D I N G S

2              MR. LEBLANC:  Andrew Leblanc of

3         Milbank, Tweed, Hadley & McCloy, and I'm

4         here with my colleague, Nick Bassett, also

5         with Milbank, and we represent the ad hoc

6         group of bondholders.

7              MR. QURESHI:  Abid Qureshi, along

8         with David Botter and Annie Evans, from

9         Akin, Gump, Strauss, Hauer & Feld, on

10        behalf of the official committee of

11        unsecured creditors of the US debtor.

12             MR. CRICHLOW:  David Crichlow of

13        Katten Muchin Rosenman, on behalf of

14        Wilmington Trust National Association.

15             MR. HANRAHAN:  Andrew Hanrahan from

16        Willkie, Farr & Gallagher on behalf of the

17        UK pension claimants.

18             MR. PULTMAN:  Jacob Pultman of Allen

19        & Overy, LLP, on behalf of the Canadian

20        debtors, the monitor and the witness.

21        With me are my colleagues, Joseph

22        Berkow-Badtke and Bradley Pensyl.

23             THE VIDEOGRAPHER:  Will our court

24        reporter please swear in the witness?

25   P A U L    W E R T H E I M,    called as a

1          witness, having been duly sworn by a Notary

2          Public, was examined and testified as

3          follows:

4

5    EXAMINATION BY

6    MR. ROSENTHAL:

7          Q.    Good morning, Dr. Wertheim.

8          A.    Good morning.

9          Q.    I introduced myself earlier today,

10   but, again, my name is Jeff Rosenthal with the

11   law firm of Cleary Gottlieb, and we represent

12   the US debtors.

13              I presume you have been deposed

14   before?

15         A.    Yes.

16         Q.    Can you estimate how many times?

17         A.    Two.

18         Q.    You have probably heard these same

19   general ground rules in your prior depositions,

20   but just for clarity, I will just go over them

21   again real briefly.

22              You know today is a deposition in

23   which I'm going to ask questions and your

24   responsibility is to answer them as truthfully

25   as you can.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         A.    Yes.

3         Q.    It's important that you answer

4    audibly because the court reporter can't

5    interpret if you just nod your head.

6              Is that acceptable?

7         A.    Yes.

8         Q.    Okay.  If there is an objection,

9    unless your counsel instructs you not to

10   answer, please answer the question.

11             If at any time you feel you need a

12   break, just let us know.  I will be happy to

13   take a break.  My only request is that you

14   don't do it in the middle of a question without

15   answering it, unless your counsel says that

16   there is a privilege concern.

17             Is that acceptable?

18        A.    Yes.

19        Q.    Okay.  If at any time you don't

20   understand a question I ask, please let me

21   know.  I will be happy to rephrase it or repeat

22   it if you didn't hear it.  And, otherwise, we

23   will assume that you understood the question.

24             Is that acceptable?

25        A.    Yes.

**HIGHLY CONFIDENTIAL**                    13

1              WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    Okay.  And also if at any time you

3    feel cut off, please let me know.  It's

4    important that only one person speak at a time.

5    Make life a lot easier for Melissa if you could

6    wait until I finish my questions before

7    answering, and I'll do the same, and like I

8    said, if you're cut off, please let me know and

9    I will let you finish an answer.

10         A.    Okay.

11         Q.    Okay.  Do you have an understanding

12   of what this current dispute is about?

13         A.    Yes.

14         Q.    Okay.  And how did you get that

15   understanding?

16         A.    Through discussions with counsel and

17   through reading of documents.

18         Q.    And when you say reading of

19   documents, are those the documents that you

20   cite in Appendix B to your report?

21         A.    Yes.

22         Q.    Can you tell me what you did to

23   prepare for your deposition today?

24         A.    Well, it includes everything I have

25   done since day one on this case.

HIGHLY CONFIDENTIAL                    14

1          WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    Putting aside the preparation of the

3     report itself, since the report, have you done

4     anything to prepare specifically for today's

5     deposition?

6          A.    Yes.

7          Q.    What have you done?

8          A.    Gone through my report, gone through

9     other documents.  I met with counsel.

10         Q.    When you say other documents, do you

11    mean the documents that you have cited in your

12    report?

13         A.    Yes.

14         Q.    Anything else?

15         A.    No.

16         Q.    And when you say you met with

17    counsel, with whom did you meet?

18         A.    With Mr. Pultman and his colleagues.

19         Q.    The ones who are sitting to his

20    left?

21         A.    Yes.

22         Q.    Anybody else?

23         A.    There were others in the room.

24         Q.    Why don't we take a step backwards.

25               When did you meet with counsel to

HIGHLY CONFIDENTIAL                    15

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    prepare for your deposition?
 3         A.    Yesterday morning.
 4         Q.    Was that the only time?
 5         A.    Yes.
 6         Q.    Was that at Allen & Overy's offices?
 7         A.    Yes.
 8         Q.    Can you tell me how many people were
 9    there participating in your preparation?
10         A.    Seven, maybe eight.
11         Q.    Besides the three Allen & Overy
12    lawyers who are here today, who else was
13    present?
14         A.    I'm terrible enough at names that I
15    can't name them.  Yeah.
16         Q.    Can you name any of them?
17         A.    I can name one or two first names.
18         Q.    Okay.  Who are the first names?
19         A.    There's a Joe and a Jodat.
20         Q.    Is that Joe Pasquariello?
21         A.    I'm not certain.
22         Q.    Were they with the Goodmans firm?
23         A.    No.
24         Q.    Was anybody from the Goodmans firm
25    present at the preparation for your deposition?
```

```
 1            WERTHEIM - HIGHLY CONFIDENTIAL
 2       A.    Not that I'm aware of.
 3       Q.    Were they all lawyers who were
 4  present?
 5       A.    I don't know for sure if they were
 6  all lawyers.  I really can't say.  I don't
 7  believe they were all lawyers.
 8            MR. ROSENTHAL:  Jay, are you able to
 9       represent whether it was all lawyers in
10       his preparation?
11            MR. PULTMAN:  I'm not being deposed.
12       Q.    Then I will ask you, what was
13  discussed during your preparation?
14  DI        MR. PULTMAN:  Objection, calls for
15       privileged information, direct the witness
16       not to answer.
17            MR. ROSENTHAL:  If you're not going
18       to represent that it was all lawyers in
19       his preparation, then what's the basis for
20       your objection?
21            MR. PULTMAN:  Because he had a
22       privileged communication with counsel in
23       preparation for his deposition.  That's
24       why.  He can have conversations with
25       counsel.  He can have conversations
```

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2         together with others who are helping
 3         counsel.  And there's no question that
 4         that's still a privileged communication.
 5              MR. ROSENTHAL:  If you are the one
 6         invoking privilege, it becomes your burden
 7         to establish the basis for the privilege.
 8         And without disclosing the roles of the
 9         people who were there --
10              MR. PULTMAN:  You haven't asked him
11         the roles of the people who were there.
12              MR. ROSENTHAL:  He doesn't know, he
13         said.  Okay, fine.
14              MR. PULTMAN:  I will represent to
15         you that the people who were there were
16         lawyers and the client.
17              MR. ROSENTHAL:  Okay.
18    BY MR. ROSENTHAL:
19         Q.   Do you know who from the monitor was
20    present?
21         A.   No.
22         Q.   Do you know what the role of the
23    person at the monitor was in connection with
24    your preparation?
25         A.   What the role of the person there
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    was?  Other than being -- other than

3    representing the monitor, I'm not sure what

4    their role was.

5         Q.    Did they provide you with any

6    factual information to assist you in your

7    preparation?

8         A.    No.

9         Q.    Do you know why they were there?

10        A.    I would assume to -- since my report

11   was at the request of counsel on behalf of the

12   monitor, they had an interest.

13        Q.    Did they speak at this meeting or

14   just listen?

15        A.    They spoke.

16        Q.    But they didn't provide you with any

17   factual information?

18        A.    Nothing in addition that I already

19   had in documents and conversations with

20   counsel.

21        Q.    How long was the meeting?

22        A.    Five, four and a half to five hours.

23        Q.    Are you aware that during the course

24   of the meeting there was a conference call with

25   the court yesterday?

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         A.    Yes.

3         Q.    Okay.  Were you online listening to

4    the court conference call?

5         A.    No.

6         Q.    Did you review any documents at the

7    meeting yesterday?

8         A.    Yes.

9         Q.    Did you review any documents other

10   than those listed in Appendix B to your report?

11        A.    No.

12        Q.    When was the last time you were

13   deposed?

14        A.    It would have been, I'm thinking, in

15   March.

16        Q.    Of this year?

17        A.    This year.

18        Q.    Was that in connection with another

19   Nortel case?

20        A.    Yes.

21        Q.    Can you just describe in a sentence

22   or two what the general subject matter of your

23   testimony was?

24        A.    It dealt with the issues regarding

25   solvency and the zone of insolvency of Nortel.

```
 1                WERTHEIM - HIGHLY CONFIDENTIAL
 2        Q.     Was that in connection with the UK
 3   pension claims?
 4        A.     Yes.
 5        Q.     Did you ultimately testify in the UK
 6   pension trial?
 7        A.     No.
 8        Q.     What was the other time that you
 9   were deposed?
10        A.     It was in April related to a totally
11   different case.
12        Q.     What was the name of that case?
13        A.     Nordion, N-O-R-D-I-O-N.
14        Q.     It's a Canadian case?
15        A.     V. Life -- versus Life.  Apologies.
16        Q.     Is that a Canadian case?
17        A.     Yes.
18        Q.     Did you ultimately testify in court
19   in that case?
20        A.     I haven't yet.  It hasn't come to
21   trial yet.
22        Q.     Can you describe the general subject
23   matter of your expert opinion in that case?
24        A.     To determine -- I'm trying to
25   summarize it here briefly without getting into
```

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2   too many details.
 3              One company had an amount of
 4   unearned revenue on their financial statements.
 5   The company was sold, and the question was --
 6   and the issue was whether the unearned revenue
 7   should be counted as revenue and when and under
 8   what circumstances.
 9        Q.    Has your testimony ever been
10   excluded from any case, whether it be an
11   arbitration or a court case?
12        A.    No.
13        Q.    Have you ever been, to your
14   knowledge, the subject of a motion to exclude
15   any of your testimony, either in whole or in
16   part?
17        A.    No.
18        Q.    Did you ever submit a report in a
19   case called United States versus Stuart Wolfe?
20        A.    Yes.
21        Q.    Do you know what happened in that
22   case?
23        A.    He was sentenced.  He was convicted
24   and sentenced.
25        Q.    Did you testify in court in that
```

HIGHLY CONFIDENTIAL                    22

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    case?

3         A.    I didn't.

4         Q.    Do you know whether there were any

5    court proceedings in that case about the

6    admissibility of your testimony?

7         A.    I don't remember.  I'm not sure.

8         Q.    What year was that?

9         A.    It seems long ago -- longer ago than

10   it probably was, but I'm going to say 2007 or

11   8.

12        Q.    Isn't it true that in the Wolf case

13   the government sought to exclude your report?

14        A.    They may have.  I ended up not

15   testifying.

16        Q.    And nobody told you why not?

17        A.    It was during trial.  I wasn't told.

18        Q.    Did anybody tell you that the

19   government had sought to exclude your

20   testimony?

21        A.    Not that I'm aware of, no.

22        Q.    In the middle of that case, you

23   wound up changing your report, correct?

24        A.    I don't know what you mean by

25   change.  I don't remember changing my report.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    Well, originally -- strike that.

3              That case involved allegations of

4   fraud, correct?

5        A.    Yes.

6        Q.    It involved an entity called Home

7   Store?

8        A.    Yes.

9        Q.    And you monitored the government's

10  case in chief during the fraud trial before --

11  before you were to testify, correct?

12             MR. PULTMAN:  Object to the form of

13        the question.

14             You can answer.

15       Q.    Did you monitor?

16       A.    Could you explain what you mean by

17  that question?

18       Q.    Well, you were originally going to

19  testify about Home Store's payments in

20  connection with round trip transactions,

21  correct?

22       A.    Yes.

23       Q.    And you relied upon a memo for a

24  transaction prepared by a woman named Jessica

25  McLellan, correct?  Even if you don't remember

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2   her name, you relied upon a company memo?
 3        A.    I relied on a lot of documents.  I
 4   can't -- I don't know what specific memo you're
 5   referring to.
 6        Q.    Well, do you recall, during the
 7   course of that case, that after the author of a
 8   memo that you relied upon testified at trial
 9   and admitted that her memo was false, you
10   modified your report?
11        A.    I honestly don't remember that.
12        Q.    Do you recall that, after you
13   modified your report, there was a challenge to
14   the modified report?
15              MR. PULTMAN:  Objection, no
16         foundation.
17              You can answer.
18        A.    I don't remember that.  I don't
19   remember changing my report.
20        Q.    Sitting here today, you have no idea
21   that there's a published court opinion
22   specifically talking about your report in that
23   case?
24        A.    There may be, but I haven't read it.
25        Q.    Have you ever heard of it?  I mean,
```

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2    have you ever heard that there is one?

3         A.    No.

4         Q.    And you're unaware even today that

5    the court ultimately excluded your report?

6              MR. PULTMAN:  Objection.  It has

7         been asked and answered.

8              You can answer it again.

9         A.    I was not asked to testify.  I am

10   not aware of the underlying reasons.

11        Q.    Did anybody ever inform you that the

12   court in that case specifically found that your

13   report would confuse and mislead the jury?

14             MR. PULTMAN:  Objection.  It has

15        been asked and answered.

16             You can answer.

17        A.    Again, I'm unaware of that.

18        Q.    When were you first contacted about

19   providing assistance to the monitor in

20   connection with the post-petition interest

21   dispute?

22        A.    I think it was around the first week

23   in August, early August.  I'm not sure of the

24   exact day.

25        Q.    Is that the first time you had any

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2      discussion with any representatives of the

3      monitor or the Canadian debtors about the

4      post-petition interest issue?

5          A.    I believe so, yes.

6          Q.    Are you aware whether anybody at

7      NERA had discussions with the monitor or

8      Canadian debtors or their representatives prior

9      to early August?

10         A.    I'm not aware that they have.

11         Q.    Were you engaged at that time?

12               MR. PULTMAN:  Object to the form.

13               What do you mean at that time?

14         Q.    Were you engaged to serve as an

15     expert in early August?

16         A.    I would assume that was the intent

17     of the initial discussion.

18         Q.    Do you have an engagement letter?

19         A.    NERA does.

20         Q.    Have you seen the engagement letter?

21         A.    No.

22         Q.    Do you know when the engagement

23     letter was dated?

24         A.    No.

25         Q.    Who signed the engagement letter for

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2    NERA?

3         A.    Well, my understanding is that this

4    portion of the case falls under the sort of a

5    bigger umbrella of work that NERA is doing,

6    so -- on other aspects of the case.  So in that

7    case, it would be Mark Berenblut that would

8    have signed the letter.

9         Q.    Is he in charge of this engagement

10   on behalf of NERA?

11        A.    No -- well, I don't know what you

12   mean by in charge of.

13        Q.    Does he supervise the engagement?

14        A.    This specific engagement for the

15   post-petition interest?

16        Q.    Well, you said it's -- all falls

17   within the umbrella of a larger engagement.

18              So I'm talking about the larger

19   engagement that you referred to.

20        A.    Yes.

21        Q.    Is Mr. Berenblut the one at NERA in

22   charge of that?

23        A.    Yes.

24        Q.    Does Mr. Berenblut have any

25   responsibilities with respect to the PPI

HIGHLY CONFIDENTIAL                    28

1              WERTHEIM - HIGHLY CONFIDENTIAL
2     engagement?
3          A.    No.
4          Q.    By the way, if I use the term "PPI,"
5     you understand that to refer --
6          A.    Yes.
7          Q.    -- to the post-petition interest
8     dispute?
9          A.    Yes.
10          Q.    Has Mr. Berenblut spent any time in
11     connection with the PPI dispute?
12          A.    No.
13          Q.    Have you submitted any bills yet to
14     the monitor or Canadian debtors in connection
15     with the PPI dispute?
16          A.    Yes.
17          Q.    Through what date?
18          A.    Through September 30.
19          Q.    Through September 30, can you give
20     me an estimate of how many hours you have
21     spent?
22          A.    Excuse me while I take a moment and
23     try to add it up.
24          Q.    Sure.
25          A.    Through that date, I would say 60,

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2     give or take.

3          Q.    Can you give me an estimate through

4     that date --

5          A.    Could be more.

6          Q.    -- of how many hours your team as a

7     whole spent?

8          A.    I have no idea what other hours

9     other staff did.

10         Q.    How much was billed to the monitor

11    or Canadian debtors through the September 30

12    bill on this engagement?

13         A.    I don't know.

14         Q.    Can you tell me, since September 30,

15    what the accrued fees have been?

16         A.    I can't.

17         Q.    How about your hours since

18    September 30?

19         A.    Maybe another 30.

20         Q.    Why don't we mark as Exhibit 1 a

21    copy of your report.

22              (Wertheim Exhibit 1, Expert Report,

23         marked for identification.)

24         Q.    Is this the report that you

25    submitted on behalf of the monitor and Canadian

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    debtors in connection with this PPI dispute?

3         A.    (Perusing.)  Yes.

4         Q.    And if we look at page 20, and I'm

5    referring to the pages in the bottom right-hand

6    corner, is that your signature?

7         A.    Yes.

8         Q.    Do you agree that, by signing this

9    report, you were personally signing off on all

10   of the statements and opinions in the report?

11        A.    Yes.

12        Q.    Sitting here today, do you continue

13   to stand by all of the statements and opinions

14   in your report?

15        A.    Are you asking if there is any

16   corrections I would like to make?

17        Q.    I will ask that next.  The first is,

18   is there anything that you disagree with,

19   sitting here today, that's in your report?

20        A.    No, other than one correction I

21   would like to make.

22        Q.    That's my next question.

23              Are there any corrections that you

24   would like to make to the report?

25        A.    Yes.  It's not a material amount,

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    but I wanted to do the correction.  If you turn

3    to paragraph 16 --

4         Q.    Yes.

5         A.    -- I state that, "The proposed

6    agreement purports to settle the PPI dispute by

7    reducing the PPI that the bondholders would

8    receive from a total accrual of 1.657 billion

9    to a maximum of 1.01 billion."

10              I had defined the bondholders

11   previously as the guaranteed bondholders.  The

12   1.657 billion accrual interest actually

13   includes what I later refer to as the NNCC

14   notes interest.  And so given that I'm making

15   that statement in regards to the guaranteed

16   bondholders, the total accrual of interest is

17   not 1.657, but 1.657 minus the interest that

18   had accrued on the NNCC notes.

19        Q.    Do you know what that calculation

20   comes out to?

21        A.    I would have to look at the

22   document, but it brings the total interest

23   accrual for just the guaranteed bonds to still

24   over 1.6 billion instead of 1.657.

25        Q.    We will come back to that later.

1          WERTHEIM - HIGHLY CONFIDENTIAL

2               Any other changes, modifications,

3   corrections, disagreements with anything in the

4   report?

5        A.    No.

6        Q.    Have you formulated -- strike that.

7               Let's take a look at paragraphs two

8   to three.  Is this an accurate statement of

9   your assignment?

10       A.    Yes.

11       Q.    Have you been requested to make any

12  other opinions?

13       A.    No.

14       Q.    Is all of your analysis on this

15  mandate contained in this report?

16       A.    All of my analysis?

17       Q.    Do you explain it all in the report

18  here?

19       A.    Yes.

20       Q.    Have you formulated any other

21  opinions related to the PPI matter that's not

22  in this report?

23       A.    No.

24       Q.    Have you done any additional work on

25  the subject matter of your report since

1              WERTHEIM - HIGHLY CONFIDENTIAL

2      submitting the report?

3              MR. PULTMAN:  Object to the form of

4          the question.

5              You can answer.

6          Q.    Other than preparing for the

7      deposition itself, have you done any other work

8      on the subject of the report?

9          A.    Not that's different in the report.

10     I have reviewed and reread some of the

11     documents, redid my calculations, checked math,

12     but if you consider that additional work or

13     not.

14         Q.    When you say you have reviewed and

15     reread some of the documents, you're talking

16     about specifically the documents listed in

17     Appendix B?

18         A.    Yes.

19         Q.    And Appendix B is a complete list of

20     materials you relied upon?

21         A.    Yes.

22         Q.    Is it fair to say that the report

23     contains all of the assumptions that you made

24     in connection with your report?

25         A.    It should.  That was my intent.

HIGHLY CONFIDENTIAL                                    34

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.     In terms of sources for the

3    assumptions, were they all -- strike that.

4                  Were the sources for all of your

5    assumptions confined to the documents listed in

6    Appendix B?

7          A.     I would have to say no.

8          Q.     What other sources did you have for

9    assumptions?

10         A.     Just my understanding of the math

11   that would be necessary to -- to answer the

12   questions in my mandate.

13         Q.     What do you mean by that?

14         A.     Well, for example, I made, as an

15   example, made certain assumptions about cash

16   burn.  There's nothing in the documents that

17   told me to make an assumption about cash burn

18   in my calculations, but, yet, it was an

19   assumption that had to be made -- although I

20   take that back.

21                For instance, the deposition of John

22   Ray, he brought up his use of an assumption

23   about cash burn.  So in that case, that

24   assumption would be something that would be in

25   the -- in the documents, but there might be

HIGHLY CONFIDENTIAL                    35

1              WERTHEIM - HIGHLY CONFIDENTIAL

2       some examples of some assumptions that I had to

3       make just to go through the math.  When I would

4       get to a certain point, I would have to make an

5       assumption about what a certain event's outcome

6       was.

7            Q.    Other than your own assumptions that

8       you made that you disclosed in the report that

9       you were making, such as the example you just

10      gave and the documents listed in Appendix B,

11      was there any other source for any of your

12      assumptions?

13           A.    I'm trying to think of all my

14      assumptions individually instead of making a

15      blanket statement.

16           Q.    Sure.

17           A.    Counsel did want me to make one

18      specific assumption related to the allocation

19      outcome.  They wanted me to assume that the US

20      estate received the full requested allocation

21      based on the Kinrich report.

22           Q.    To take that a step further, you

23      were actually requested to assume that all of

24      the competing parties got the Kinrich

25      allocation, correct?

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    Well, I assumed the Canadian estate

3    and the US estate got their requested.  The

4    other entities didn't particularly affect my

5    calculations.

6        Q.    Other than counsel's assumption to

7    assume the Canadian and US allocations based

8    upon the Kinrich report, are there any other

9    assumptions that you were instructed to make by

10   counsel or any representative of the monitor or

11   the Canadian debtors?

12       A.    (Perusing.)  I believe there was one

13   other that counsel suggested I make, and I

14   honestly can't remember if I asked them about

15   this first or if they suggested that I do it,

16   but it deals with the NNUK pension claims, on

17   whether those should be dismissed.

18             I believe I may have asked them

19   first, because since I was involved in that

20   part of the case regarding the NNUK pension

21   claims, and I knew they were at issue, setting

22   aside the legal issues of that outcome, again,

23   making an assumption to the benefit of the US

24   estate, I assumed that those NNUK pension

25   claims were dismissed.

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    So just so I understand, you asked

3     counsel what you should do with the UK pension

4     claims and were instructed to assume that

5     there's no -- there's no payment made to the

6     NNUK parties?

7                  MR. PULTMAN:  I'm going to

8          caution --

9          Q.    To the UK pension parties?

10                 MR. PULTMAN:  Sorry.  I'm going to

11         caution the witness not to get into the

12         substance of conversations with counsel

13         other than assumptions we asked you to

14         make, which I think is fair game for

15         inquiry.

16         A.    Right.  It's just for purposes of my

17    calculation.  I make a statement that these

18    assumptions don't -- are not meant to reflect

19    any legal analysis or opinion, but in order to

20    calculate the net assets upon distribution, I

21    had to make an assumption, and it was in the

22    favor of the US estate.

23                 So to take the optimistic approach,

24    I assumed, for purposes of my calculation, that

25    those pension claims were dismissed.

**HIGHLY CONFIDENTIAL**                    38

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    I'm just trying to get an idea of

3    the source.

4              Is your best recollection is that

5    you asked counsel what you should assume

6    regarding that, and were instructed, assume

7    that claim is zero?

8         A.    Yes, I believe they said you can

9    assume it's zero for optimistic purposes.

10        Q.    Other than the assumption that you

11   have identified with regard to the Kinrich

12   allocations and the assumption you just

13   identified about the UK pension recovery, are

14   there any other assumptions you were told to

15   make by counsel or any other representative of

16   the monitor or Canadian debtors?

17             MR. PULTMAN:  Objection.  I believe

18        it mischaracterizes the testimony, but you

19        can answer.

20        A.    Not that I can remember.

21        Q.    Did you ever seek any information in

22   connection with the preparation of your report

23   that you didn't receive?

24        A.    No.

25        Q.    Did you ever ask to talk to anybody

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    that you didn't talk to?
 3         A.    No.
 4         Q.    Besides counsel, did you ever talk
 5    to any representatives of the monitor or
 6    Canadian debtors in connection with the
 7    preparation of your report?
 8         A.    Yes, with counsel.
 9         Q.    Other than counsel, did you ever
10    have any communications with any
11    representatives of the monitor or Canadian
12    debtors?
13              MR. PULTMAN:  Objection.  It was
14         just answered.
15              You can answer it again.
16              MR. ROSENTHAL:  It could be
17         interpreted both ways.
18         A.    Can I re-ask a question to see if I
19    think you -- what you're asking?
20         Q.    Sure.  I'm not asking whether it was
21    inside or outside the presence of counsel.
22              I'm just asking, excluding counsel,
23    are there any representatives of the monitor or
24    Canadian debtors with whom you had
25    communications in connection with the
```

1                 WERTHEIM - HIGHLY CONFIDENTIAL

2    preparation of your report?

3         A.    Did I talk with the monitor without

4    counsel present?  I'm not following.

5         Q.    No, whether or not -- we know, for

6    example, that in connection with the

7    preparation of your report --

8         A.    Yes.

9         Q.    -- you did have some communications

10   with counsel, correct?

11        A.    Yes.

12        Q.    What I would like to know is,

13   besides your communications with counsel, did

14   you have any communications with anybody else

15   representing the monitor or Canadian debtors?

16        A.    Oh.  No.  Sorry.  I just didn't

17   understand.

18        Q.    No problem.

19              Do you know who Thomas Britven is?

20        A.    Vaguely.

21        Q.    Did you talk to him in connection

22   with your report?

23        A.    No.

24        Q.    Did you seek to talk to him in

25   connection with your report?

1          WERTHEIM - HIGHLY CONFIDENTIAL

2      A.    No.

3      Q.    So if we look now at paragraph three

4  of your report, part of your mandate is based

5  on the analysis of the surplus available in the

6  NNI estate to analyze the value claimed to be

7  given up by the bondholders pursuant to the

8  proposed agreement, correct?

9      A.    Yes.

10      Q.    And you assumed certain outcomes

11  that may be considered to be the best case

12  scenario for NNI, specifically outcomes that

13  would maximize NNI's net assets for

14  distribution, correct?

15      A.    What I considered the best realistic

16  cases.

17      Q.    Let's look at paragraph 17.  You

18  wrote here, "I have calculated the maximum net

19  assets (i.e., maximum surplus cash) that would

20  be available to NNI for the payment of PPI.  In

21  order to calculate the maximum surplus cash

22  that would be available, I have had to assume

23  certain outcomes that may be considered the

24  best case scenario for NNI -- specifically,

25  outcomes that would maximize NNI's net assets

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    for distribution."

3              Do you agree with that statement?

4        A.    Yes.

5        Q.    If we look at paragraph 24, would

6    you agree with me that that task that was just

7    described entailed calculating the maximum

8    amount of net assets that would be available to

9    pay PPI under the best case scenario for NNI

10   with all major assumptions construed in NNI's

11   favor?

12       A.    With the assumptions that I made in

13   NNI's favor.

14       Q.    So are you saying there are other

15   assumptions that you didn't make that were not

16   necessarily in NNI's favor?

17             MR. PULTMAN:  Object to the form of

18        the question.

19             You can answer.

20       A.    Assumptions that I didn't make that

21   were not necessarily in NNI's favor.

22             Well, the assumptions that I'm

23   referring to, going back to your question based

24   on paragraph 18, I believe -- no, the first

25   paragraph that you referred to where I made the

HIGHLY CONFIDENTIAL                43

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    statement -- paragraph 17.  I have had to

3    assume certain outcomes that may be considered

4    to be the best case scenario, and those

5    assumptions, I then list in Section 4.2,

6    specifically 4.2a, b and c.  Those are my main

7    assumptions, and those were all assumed to be

8    in the best case scenario for the US estate.

9         Q.    Are there any major assumptions that

10   you avoided making?

11        A.    No.

12        Q.    Now, you also, if we look at

13   paragraph 19, you agree that your conclusions

14   is that assuming the best outcome of the events

15   for NNI, outcomes that maximize net assets for

16   distribution, only approximately $971 million

17   of net cash would exist with which to pay PPI.

18        A.    Are you asking, is that my

19   conclusion?

20        Q.    Yes.

21        A.    Yes.

22        Q.    Did you endeavor to seek out

23   outcomes that maximize net assets for

24   distribution?

25              MR. PULTMAN:  Object to the form.

HIGHLY CONFIDENTIAL                    44

1          WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    When you wrote your report, did you

3    try to maximize net assets for distribution?

4          A.    Using realistic assumptions, yes.

5          Q.    So you made value judgments about

6    what assumptions were realistic and which ones

7    weren't?

8                MR. PULTMAN:   Object to the form.

9                You can answer.

10         A.    Yes, there were some judgments in

11   there.

12         Q.    Are they all disclosed in this

13   report?

14         A.    Yes.

15         Q.    Would you agree also in paragraph 19

16   that even if you stretched the outcome of

17   events in all cases in favor of NNI, such that

18   surplus cash is maximized, NNI would still have

19   less than the settlement amount of 1.01 billion

20   with which to pay PPI?

21         A.    That's my conclusion.

22         Q.    And you did a sensitivity analysis;

23   is that right?

24         A.    Yes.

25         Q.    Under your sensitivity analysis, if

```
 1            WERTHEIM - HIGHLY CONFIDENTIAL
 2   there's $100 million in additional assets
 3   belonging to NNI, you would agree with me that
 4   that's $100 million more of cash with which to
 5   pay PPI, fair to say?
 6        A.    Well, if you're referring to the
 7   sensitivity analysis that I did in paragraph
 8   34, that was a sensitivity analysis regarding
 9   NNL.
10        Q.    Correct.
11        A.    Not NNI.
12        Q.    I understand that.  You don't have a
13   sensitivity analysis with respect to NNI.  So I
14   just want to see if we're in agreement on what
15   I think is a pretty basic principle --
16        A.    Yes.
17        Q.    -- that if NNI's assets were --
18   strike that.
19            For every hundred million dollars
20   more in NNI's assets that are not in your
21   report, that would be a hundred million dollars
22   more in cash with which to pay PPI, correct?
23        A.    Mathematically, yes.
24        Q.    You're not a lawyer, are you?
25        A.    No.
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.      And in your report, you did not

3   endeavor to handicap the likelihood of any

4   outcomes, did you?

5        A.      No.

6        Q.      Your job was to see if it's even

7   possible for NNI to have more assets to

8   distribute than the amount of the PPI

9   settlement, correct?

10              MR. PULTMAN:  Object to the form.

11       A.      Well, again, I would -- I would say

12  if it's realistically possible for NNI to have

13  a surplus net assets.  For instance, I might

14  make an assumption on the potential tax

15  liability, where I assume a certain amount, and

16  in my report I say that I have chosen a low

17  estimate to be optimistic on the outcome for

18  NNI.

19              Now, could I have assumed a lower

20  amount for the tax liability and, therefore,

21  would that have increased NNI's cash available

22  for distribution?  Yes.

23              So, mathematically, could that have

24  been done?  Yes.  But, again, I chose realistic

25  assumptions in my judgment.

1           WERTHEIM - HIGHLY CONFIDENTIAL

2       Q.     But, again, other than where you --

3   strike that.

4              Other than where your assumptions

5   were not the most optimistic because you viewed

6   something else as more realistic, and you

7   discussed it specifically in your report, in

8   all other circumstances, you endeavored to --

9   to see if it's possible for NNI to have more

10  assets to distribute than the amount of the PPI

11  settlement, correct?

12             MR. PULTMAN:  Object to the form.

13      A.     If there were -- if there were

14  circumstances where I needed to make an

15  assumption, and I made that assumption, I have

16  listed it in the report.  I think that answers

17  your question.

18      Q.     But every assumption that you made

19  that was not the most favorable for NNI, you

20  discussed in your report and you explain why,

21  correct?

22      A.     Correct.

23      Q.     And other than with respect to those

24  circumstances that you disclosed and discussed

25  in your report, your mission here was to see

1          WERTHEIM - HIGHLY CONFIDENTIAL

2   whether the maximum cash that NNI had could be

3   greater than the amount of the PPI settlement,

4   right?

5               MR. PULTMAN:  Same objection.

6               You can answer.

7        A.    I believe, if I understand your

8   question, then, yes, I was trying to calculate

9   the maximum net assets available.

10        Q.    And you concluded that that maximum

11   did not rise to the level of the PPI

12   settlement, correct?

13        A.    Correct.

14        Q.    And that's the sole basis for your

15   conclusion that the value claimed to be given

16   up by the bondholders in this proposed

17   agreement is zero, correct?

18        A.    I'm hung up on that word "sole," but

19   I don't think that bothers me.  That's my basis

20   for my opinion.

21        Q.    It's the sole basis for your opinion

22   that the proposed settlement is worth zero to

23   the US debtors' estate, correct?

24        A.    In my opinion, the bondholders gave

25   up nothing of value, because they would not

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    have received more than the settlement amount

3    anyway.

4         Q.    Because the maximum amount of the

5    assets available to the US debtors would not

6    have exceeded the amount of the PPI settlement?

7         A.    Correct.

8         Q.    You didn't evaluate the legal risks

9    in this PPI dispute, did you?

10        A.    No.

11        Q.    And you have no basis for evaluating

12   the risk that the court might find that PPI

13   should be paid at the contract rate, fair to

14   say?

15        A.    The PPI for the bondholders?

16        Q.    Correct.  You have no basis to

17   evaluate who would have won this dispute if it

18   got litigated?

19        A.    Correct, correct.

20        Q.    And you didn't evaluate the value of

21   avoiding this risk as well, correct?

22        A.    Correct.

23        Q.    And you didn't provide any opinion

24   to the court on the complexity of this

25   litigation, correct?

**HIGHLY CONFIDENTIAL**                    50

1          WERTHEIM - HIGHLY CONFIDENTIAL

2              MR. PULTMAN:  Object to the form.

3              You can answer.

4      A.    Regarding the complexity of the

5  legal issues?

6      Q.    Correct.

7      A.    No.

8      Q.    And you didn't provide any opinion

9  on the value of avoiding the complexity of the

10  legal issues, correct?

11     A.    Correct.

12     Q.    Is it fair to assume that if NNI has

13  more than $1.01 billion in cash, then your

14  conclusion that the settlement is worth zero to

15  NNI would be incorrect?

16             MR. PULTMAN:  Object to the form.

17     A.    I wouldn't necessarily agree with

18  that, because it would also -- my conclusion

19  would also need to incorporate the magnitude of

20  the excess if it was over 1.01, and the

21  realistic -- the realistic likelihood of that.

22             For instance, let me just give an

23  example.  If there was a one out of a thousand

24  chance that they would have 1.011 billion, then

25  is it possible that they could have more than

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    1.01 billion?  Yes.  But I would consider it

3    highly unlikely, and I would consider that

4    excess so insignificant that, in my opinion, it

5    still wouldn't have resulted in anything of

6    value being given up.

7          So I will leave it at that.

8          Q.    Is it fair to say that if NNI could

9    end up with more than $1.1 billion in surplus

10   cash, then your conclusion that the settlement

11   was worth zero to NNI would be incorrect?

12          MR. PULTMAN:  Object to the form.

13          You can answer.

14          A.    I'm not going to put a dollar amount

15   on materiality at this point.  I haven't

16   studied that as part of my report on what --

17   what amount over 1.01 billion would be

18   significant, because my conclusion was it's not

19   going to be.

20          Q.    We will come back to that in a

21   moment.

22          I'm not asking you for measures of

23   materiality.  I'm just asking -- you made an

24   absolute statement of the settlement being

25   worth zero, not a dollar, not ten cents.  You

1              WERTHEIM - HIGHLY CONFIDENTIAL

2   said it's worth zero, correct?

3        A.    Correct.

4        Q.    Okay.  And are you saying that, even

5   if one assumes that NNI would have more than

6   $1.1 billion in surplus cash, then you may

7   still stand by your conclusion that the

8   settlement is worth zero?

9        A.    Possibly, yes, because it would

10  still depend on the realistic likelihood of

11  that.

12       Q.    Is it fair to say that if we assume

13  NNI could have more than $1.01 billion to

14  distribute to creditors in surplus cash, you

15  didn't endeavor to undertake any calculation of

16  what the value of the settlement would be to

17  NNI?

18       A.    Correct.

19       Q.    I want to start now by getting an

20  understanding of your math, your mathematical

21  calculations.

22              You were not asked to opine, by the

23  way, on materiality in any respect in your

24  opinion, correct?

25       A.    No.

HIGHLY CONFIDENTIAL                    53

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    No, I'm not correct, or no, you were

3   not asked to opine?

4        A.    I was not asked to opine on levels

5   of materiality.

6        Q.    And you did not opine on levels of

7   materiality, correct?

8        A.    Levels of materiality -- I'm trying

9   to think if levels of materiality would have

10  affected any of my assumptions.  In other

11  words, did I have to make any judgments related

12  to materiality.  And there might be -- there

13  are situations where my judgment regarding the

14  effect of a variance might have come into play.

15             For instance, when I made my

16  assumption on cash burn, if cash burn was a

17  little bit higher or a little bit lower, would

18  that -- would that have materially affected my

19  conclusion.  And so just given the nature of

20  numbers and given the nature of, well, if this

21  is a little higher or a little lower, there

22  might be judgments I have to make about

23  materiality in that sense, but I was not asked

24  to opine on any levels of materiality.

25        Q.    And other than as you just

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2    described, you didn't, correct?

3         A.    Didn't opine?

4         Q.    Correct.  Other than as you just

5    described.

6         A.    I don't believe so.

7         Q.    Okay.  So if we look at Table 2 to

8    start with, you have what you call a detailed

9    distribution analysis for NNI.

10                 Do you see that?

11        A.    Yes.

12        Q.    And for that calculation, you took

13   the total cash NNI would have to distribute,

14   and you performed a simple subtraction with the

15   total allowed claims, correct?

16        A.    Allowed claims including what I list

17   as other claims.

18        Q.    Claims that you ultimately would

19   expect to be allowed?

20        A.    Yes.

21        Q.    So the calculation is A minus B

22   gives you the remainder of surplus cash

23   available to pay PPI, correct?

24                 MR. PULTMAN:  Object to the form.

25        A.    If A is total cash available for

1              WERTHEIM - HIGHLY CONFIDENTIAL

2      distribution and B is total liabilities to be

3      settled by distribution, then yes.

4          Q.    Do you believe that Judge Gross has

5      sufficient expertise to perform that

6      calculation of cash minus claims equals

7      surplus?

8              MR. PULTMAN:  Object to the form.

9          Objection, foundation.

10             You can answer.

11         A.    I don't know what his expertise is.

12         Q.    Do you believe that any -- do you

13     believe that a Ph.D. is required to perform the

14     calculation of if I give you a cash number and

15     I give you a claimed number, to subtract the

16     latter from the former to get the surplus?

17             MR. PULTMAN:  Objection to form.

18             You can answer.

19         A.    Well, a certain level of expertise

20     is required to come up with the numbers.

21     Probably, there's a lot of people that could do

22     the math on a calculator if they were given the

23     numbers.

24         Q.    All I'm doing is I'm focusing on

25     just the calculation part of it.  We're going

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    to explore later in the deposition the

3    underlying basis for the numbers, but for the

4    calculation part of it, if given the numbers,

5    do you believe that Judge Gross has sufficient

6    expertise to perform that calculation?

7              MR. PULTMAN:  Objection.  There's no

8         foundation.

9              You can answer.

10        A.    If he has the expertise to punch

11   numbers in a calculator and do one number minus

12   another number, I would assume he can do that,

13   but there's a lot more that goes into doing

14   this analysis than just addition and

15   subtraction.

16        Q.    We're going to talk about how you

17   got to each of those numbers shortly.  I'm just

18   right now trying to focus on the mathematical

19   calculation itself.

20        A.    Okay.

21        Q.    So let's break down the components.

22              So, for the net cash side of this

23   equation, you performed simple addition of the

24   allocation of the sale proceeds, plus current

25   cash balance at distribution, plus NNI recovery

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    from the 2.062.7 claim against NNL, correct?

3         A.    Correct.

4         Q.    And for that mathematical

5    calculation of those -- of the sum of those

6    three components, you performed the

7    calculation, correct?  You added them together?

8         A.    Yes.

9         Q.    And if we focus on the first of

10   those three numbers, allocation of sale

11   proceeds, you didn't perform a calculation to

12   get to that 5,302.5 million dollars, did you?

13        A.    No.

14        Q.    And, in fact, not only does Judge

15   Gross have sufficient expertise to take that as

16   a starting number, but you understand that that

17   number is going to ultimately come from his

18   decision, correct?

19             MR. PULTMAN:  Object to the form of

20        the question.  Objection, foundation.

21             You can answer.

22        A.    I don't know who ultimately decides

23   the outcome of the allocation case, so it may

24   be Judge Gross.  I don't know.

25        Q.    You know it will come from a court

**HIGHLY CONFIDENTIAL**                    58

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    decision, correct?

3         A.    Yes.

4         Q.    Let's look at the second component,

5    the current cash balance.

6              You took the reported cash balance

7    as of September 2014 and assumed a $5 million

8    per month cash burn, right?

9         A.    Yes.

10        Q.    Do you believe that Judge Gross has

11   sufficient expertise to perform that same

12   calculation of cash balance?

13        A.    I don't know.  That involved looking

14   at underlying documents and cash flows to

15   determine a historical average cash burn rate,

16   used judgment to -- to make an estimate of

17   future cash burn.

18              So I don't know if -- what his

19   expertise is in accounting.

20        Q.    If he is told to assume a $5 million

21   a month cash burn going forward through next

22   June, do you believe he has sufficient

23   expertise to perform that calculation that you

24   did of cash balance?

25        A.    If he is given the number, yes.

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.     And for the third input of NNI

3    recoveries, we would look at your projection of

4    NNL creditor recoveries, correct?

5          A.     Yes.

6          Q.     And we will come back to that later.

7    Let's look at your mathematical calculation on

8    the claims side.

9                  You simply added the liabilities of

10   claims not subject to compromise, the

11   liabilities subject to compromise and other

12   claims, correct?

13         A.     Correct.

14         Q.     And for the liabilities not subject

15   to compromise, you just took that number right

16   out of Monthly Operating Report No. 60, right?

17         A.     Yes.

18         Q.     You didn't need any expertise to do

19   that?

20         A.     Whatever expertise was needed to

21   understand financial statements and know what

22   those numbers meant.

23         Q.     Other than that, did you apply any

24   expertise to come up with that $54.6 million

25   number?

1                   WERTHEIM - HIGHLY CONFIDENTIAL

2          A.      No.

3          Q.      So for the -- some of the

4    liabilities subject to compromise, you took

5    them also right out of the debtors' monthly

6    operating reports without any analysis or

7    calculation, correct?

8          A.      No.

9          Q.      For some of them?

10         A.      There was --

11         Q.      You didn't take any of them out of

12   the debtors' monthly operating reports?

13         A.      Well, for some of them, yes.

14         Q.      That's what I said.  My question was

15   some.

16         A.      You had asked for the sum of the

17   liabilities.

18                 MR. PULTMAN:  Just so we're clear,

19         that it was transcribed one way based on

20         what you said.  If we can clarify the

21         question --

22         Q.      You might want to listen to my

23   questions rather than focus on the screen,

24   unless there's something you didn't hear, then

25   I will repeat it, because it is a rough

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    transcript that you're getting, and it actually

3    could cause more confusion.

4         A.    Okay.  I see, some versus -- S-U-M

5    versus S-O-M-E.

6         Q.    Why don't you listen to me.  If you

7    want a clarification from me, ask me for it,

8    rather than looking at the screen.

9         A.    When you said sum, I interpreted

10   S-O-M-E -- I interpreted S-U-M.

11        Q.    For some portion of the liabilities

12   subject to compromise, you just took them right

13   out of the debtors' monthly operating reports

14   without any analysis or calculation, correct?

15             MR. PULTMAN:  Object to the form.

16        A.    A portion of those numbers came from

17   the monthly operating report, yes.

18        Q.    And other than that, you just have

19   the contingent liabilities for the debt

20   guarantees, correct?  Do you need me to clarify

21   that?

22        A.    I think I understand your question.

23   Yes.

24        Q.    And you agree with that?

25        A.    Yes.

1          WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    And to figure out the amount of the

3    contingent liabilities for the debt guarantees,

4    we would also have to go look at your

5    projection of NNL recoveries, correct?

6          A.    Correct.  That's why I did the NNL

7    recoveries first, because the outcome of that

8    dictated the amount that NNI would recover on

9    those claims.

10         Q.    And for your category called other

11   claims, you just calculated the PPI on the NNCC

12   notes at the same rate as the present

13   settlement, and on the non-bondholder

14   creditors, at the federal judgment rate,

15   correct?

16         A.    When you say calculated the PPI on

17   NNCC notes at the same rate, the interest rate

18   was different on the NNCC notes.  So it wasn't

19   the same interest rate as the other.

20         Q.    Fair point.  You calculated the PPI

21   on the NNCC notes at the same compromise

22   percentage as the present settlement, correct?

23         A.    Correct.

24         Q.    And for the non-bondholder

25   creditors, you just calculated post-petition

1              WERTHEIM - HIGHLY CONFIDENTIAL

2   interest at the federal judgment rate, correct?

3        A.    Correct.

4        Q.    Is there anything that you found

5   complicated about either of those two

6   calculations that you believe Judge Gross

7   couldn't do?

8              MR. PULTMAN:  Object to the form.

9        A.    I didn't find them complicated.

10  Again, I don't know what Judge Gross' expertise

11  is.

12       Q.    Okay.  And, finally, for

13  post-petition tax liability, you didn't perform

14  any calculation, did you?

15       A.    Other than the assumption that I

16  made, no.

17       Q.    So now, let's look at the Canadian

18  claim part of your report.  For starters, would

19  you agree that the percentage payout on the

20  Canadian claims is the material input into your

21  calculation of the amount of surplus cash

22  available to NNI for PPI?

23       A.    I'm going to say yes.

24       Q.    And, in fact, it influences both

25  NNI's cash available, the A in our equation

HIGHLY CONFIDENTIAL

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    before, and the claims, the B part of the

3    equation before?

4          A.    Yes.

5          Q.    On the cash available part, NNI, you

6    know, has a $2 billion plus claim against NNL.

7    So the amount that NNL pays its creditors will

8    directly influence NNI's available cash, right?

9          A.    Yes.  The amount NNL pays its

10   creditors -- well, the distribution payout

11   ratio affects NNI's receipt of the cash, but

12   it's the payout ratio that also affects what

13   NNL pays to its creditors.

14               So it's not what NNL pays to its

15   creditors directly that affects NNI's available

16   cash.  It's that both NNI's available cash and

17   NNL's payment to the creditors are both

18   affected by the payout ratio.

19         Q.    I'm just trying to break up the two

20   portions.

21         A.    I'm just making sure, because you

22   stated it that this affects this, and it

23   doesn't.  They are both affected by something

24   else.

25         Q.    And I'm just trying to break up the

1              WERTHEIM - HIGHLY CONFIDENTIAL

2     two components, because we said earlier you've

3     got both NNI's assets are affected by NNL's

4     payments, and NNI's liabilities are affected by

5     NNL's payments.

6          A.    Yes.

7          Q.    So I want to break up and first look

8     at the asset side of it.

9          A.    Okay.

10         Q.    So NNI's assets is directly

11    influenced by the amount of cash NNL pays to

12    its creditors such as NNI, correct?

13         A.    Yes.

14         Q.    If NNL pays its creditors more cash,

15    NNI's assets increase, correct?

16         A.    Correct.

17         Q.    And now if we look at NNI's claim

18    side, its claims are affected by -- claims

19    against NNI.

20         A.    I'm sorry.  You mean NNL's claims?

21    You said if we look at NNI's claim.

22         Q.    Yes.  NNI's claims are influenced by

23    how much its creditors, such as the

24    bondholders, are collecting against NNL,

25    correct?

**HIGHLY CONFIDENTIAL**                    66

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.      Correct.

3        Q.      Because the more NNL pays the

4    guaranteed bondholders, the lower the

5    bondholders' claims against NNI, correct?

6        A.      Correct.

7        Q.      Is it fair to say that you're not

8    able to reach any conclusion whatsoever on the

9    amount of surplus cash NNI would have to pay

10   PPI without reaching some conclusion on the

11   amounts of NNL's and NNC's distributions to

12   their creditors?

13              MR. PULTMAN:   Object to the form.

14       A.      I'm trying to run through the math

15   to see if that was possible.   For instance, are

16   you asking if I only looked at the NNI side,

17   without looking at the NNL side, could I have

18   reached some conclusions, and I would, again,

19   have to have made certain assumptions.

20       Q.      I'm just saying if you took the NNL

21   distributions out of the equation, if I told

22   you complete black box, you have no idea what

23   NNL and NNC are going to pay to its creditors,

24   are you able to reach any conclusion about the

25   amount of surplus cash NNI would have to pay

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    PPI?

3         A.    If I had no knowledge about NNL's

4    payout ratio, whether it was 0 percent or a

5    hundred percent, then just mathematically it

6    would be difficult to do a distribution

7    analysis for NNI.

8         Q.    In fact, it would be impossible,

9    right?

10              MR. PULTMAN:  Objection.  It has

11         been asked and answered.

12         A.    Again, it's not impossible.  It

13    would require some assumptions.

14         Q.    I'm not asking you about making

15    assumptions with regards to -- I'm just saying

16    if you -- if you don't know -- let me just

17    rephrase the question.

18              Without knowing or assuming NNL's

19    and NNC's distributions to creditors, you can't

20    reach a conclusion about how much surplus cash

21    NNI would have to pay PPI, correct?

22         A.    Correct.  If I couldn't make any

23    assumptions and knew nothing, and that's, to

24    me, an unrealistic question, but the answer is

25    yes.

1          WERTHEIM - HIGHLY CONFIDENTIAL

2      Q.    You can't determine whether the

3  settlement is reasonable or not without making

4  some conclusions with regards to the NNL and

5  NNC distributions, right?

6          MR. PULTMAN:  Object to the form of

7      the question.  Objection to foundation.

8          You can answer.

9      A.    And I made assumptions regarding

10  NNL's distributions, and I listed those

11  assumptions in my report.

12      Q.    I understand that.  All I'm saying

13  is you would agree with me that you could not

14  determine whether the settlement is reasonable

15  or not without making assumptions on the NNL

16  and NNC distributions, correct?

17      A.    At the beginning of my report, I

18  stated that there were certain assumptions I

19  had to make.  So, yes, I had to make certain

20  assumptions.

21          MR. ROSENTHAL:  Why don't we change

22      the tape?

23          THE VIDEOGRAPHER:  We are now off

24      the record.  The time is 10:21 a.m.,

25      October 22, 2014.

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2                   (Recess taken.)
 3                   THE VIDEOGRAPHER:  This is tape two
 4         of the deposition of Dr. Paul Wertheim.
 5         We are now back on the record.  The time
 6         is 10:36 a.m., October 22, 2014.
 7  BY MR. ROSENTHAL:
 8         Q.    Do you pronounce your name Wertheim
 9  or Wertheim?
10         A.    Wertheim.
11         Q.    Okay.  I just want to make sure that
12  I don't offend you and mispronounce it during
13  the deposition.
14         A.    I think both are acceptable.
15         Q.    So if we turn now to Table 1, that's
16  your detailed distribution analysis for NNL,
17  correct?
18         A.    Yes.
19         Q.    And that calculation is done by
20  taking the cash available for distribution,
21  dividing it by claims to be settled, correct?
22              MR. PULTMAN:  Object to the form.
23         A.    To determine the payout ratio, yes.
24         Q.    And for the numerator of the payout
25  ratio, which is cash available, you added NNL's
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2      allocation to its current cash balance and then

3      subtracted the $62 million priority payment,

4      correct?

5          A.    Yes.

6          Q.    So if we look at those particular

7      inputs, the allocation from the sale proceeds

8      is not something you calculated, right?

9          A.    Correct.

10         Q.    Your understanding is that number is

11     going to come from the courts?

12         A.    Yes.

13         Q.    And the current cash balance is not

14     something that you calculated either, is it?

15         A.    Correct.

16         Q.    That came from the monitor's one

17     hundred and eighth report and excluded

18     restricted cash?

19         A.    Yes.

20         Q.    And, finally, the $62.7 million

21     priority payment just came from the

22     thirty-fifth monitor's report, correct?

23         A.    Yes.

24         Q.    You didn't perform any calculation

25     to come up with that number?

1           WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    No.

3        Q.    Let's look at the denominator now.

4   You added the NNI claim, the long-term debt,

5   pre-petition interest and other claims,

6   correct?

7        A.    Correct.

8        Q.    You didn't need to perform any

9   calculation to know that NNI had a $2 billion

10  claim, did you?

11       A.    Other than to do the calculation

12  that that's the excess over the 62.7.

13       Q.    You saw the claim was two million --

14  two billion sixty-two point seven million, but

15  the 62.7 million was a priority payment, which

16  you were counting for elsewhere, so that left

17  $2 billion?

18       A.    Correct.

19       Q.    And you didn't need to perform any

20  calculation to come up with the long-term debt

21  number, did you?

22       A.    I added up the various bond issues,

23  the different series.

24       Q.    And for the interest number, you

25  just took that straight from a

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    bondholder-produced document, correct?

3         A.    Yes.

4         Q.    And then finally for the other

5    claims, did you perform any calculation?

6         A.    Well, as I state in my footnote,

7    that that represents other claims as identified

8    in the 10-Q for NNC, dated June 30, plus a

9    recent 125 million payable to EMEA.

10        Q.    So when you state in footnote 16

11   that the source is the NNC 10-Q, note 15,

12   you're referring to the notes to NNC's

13   financials?

14        A.    The notes to the 10-Q for NNC dated

15   June 30.

16        Q.    And would you agree that the other

17   category is the second largest category of

18   liabilities in your table?

19        A.    Yes, but it's composed of a number

20   of individual items.

21        Q.    Why don't we mark, as Exhibit 2, the

22   10-Q that you're referring to.

23             (Wertheim Exhibit 2, 10-Q of Nortel

24        Networks Corporation, marked for

25        identification.)

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    Is the note 15 that you are

3    referring to in your report what starts on the

4    page BHG160742?

5         A.    Yes.

6         Q.    Let me back up for a second.  Table

7    1 is entitled Detailed Distribution Analysis

8    for NNL, correct?

9         A.    Correct.

10         Q.    Is that an accurate description of

11    Table 1?

12         A.    In my opinion, yes.

13         Q.    Were you aware, when you did your

14    detailed distribution analysis for NNL, that

15    your source document for the $2.235 billion in

16    claims is NNC's consolidated financials?

17         A.    Yes.

18         Q.    So if we look on the next page here

19    that ends in 743.

20              MR. PULTMAN:  I'm sorry.  Are you

21         now moving away from Wertheim 1 and going

22         to Wertheim 2?

23              MR. ROSENTHAL:  Yes.

24         Q.    There's a chart of liabilities

25    subject to compromise on page 29 of the 10-Q,

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2      correct?

3           A.    Correct.

4           Q.    Isn't it true that you assumed, when

5      you did your report, that NNL was responsible

6      for all of them?

7           A.    Yes.

8           Q.    Do you have any reason to believe

9      that NNL is fully liable for those claims when

10     they are presented as claims against the

11     consolidated estate?

12               MR. PULTMAN:  Object to the form.

13               You can answer.

14          A.    That's a legal issue I can't answer.

15          Q.    Well, what was the basis for your

16     assumption that -- strike that.

17               Was it an assumption that you made

18     that NNL would be fully liable for all of the

19     claims listed here against the consolidated

20     estate?

21          A.    (Perusing.)  Yes.

22          Q.    What is the basis for that

23     assumption?

24          A.    The information that I got from the

25     10-Q was what was available for the Canadian

1               WERTHEIM - HIGHLY CONFIDENTIAL

2    entity, and so although the 10-Q is for, as

3    stated on the 10-Q cover page, Nortel Networks

4    Corporation, NNC, it includes NNL, and so I

5    treated that as a consolidated entity without

6    making a judgment as to which individual entity

7    within the Canadian group would be individually

8    responsible for individual liabilities.

9         Q.    Why did you do it that way?

10        A.    It was just an assumption I needed

11   to make.

12        Q.    Why did you need to make it?

13        A.    To treat this as -- as -- as a

14   total.  Here's -- here's the total assets and

15   here's the total liabilities for the estate.

16        Q.    Would you say that the assumption

17   that you made, that NNL would be liable for

18   every liability that any of NNC's consolidated

19   entities had accrued, is the most favorable

20   assumption you could have made for NNI?

21             MR. PULTMAN:  Object to the form.

22             You can answer.

23        A.    I'm assuming that, yes.

24        Q.    The most favorable assumption that

25   you could have made for NNI is that NNL has

HIGHLY CONFIDENTIAL                76

1          WERTHEIM - HIGHLY CONFIDENTIAL

2   100 percent liability for the consolidated

3   entities' liabilities?

4        A.     Again, I'm not making an assumption

5   on which entity is specifically liable for

6   individual liabilities.  I'm looking at the

7   reporting entity for the Canadian group.

8        Q.     Is NNI's claim that is in Table 2

9   against -- that you have listed against --

10  strike that.

11           Is the claim that NNI has for

12  $2 billion against the entire group or is it

13  specifically against NNL?

14           MR. PULTMAN:  Object to the form of

15      the question.

16           You can answer.

17       A.     Are you talking about the

18  $2 million?

19       Q.     The $2 billion that you're referring

20  to in Table 2.

21       A.     $2 billion.  (Perusing.)

22           Offhand, I can't remember if it's

23  solely NNL or if it's NNL guaranteed by NNL

24  and -- or if it's a liability to NNL and NNC.

25       Q.     Isn't it true that the assumption

1              WERTHEIM - HIGHLY CONFIDENTIAL

2     that you made that NNL would be liable for

3     every single dollar of consolidated Canadian

4     estate liabilities is actually the worst

5     assumption you could have made from NNI's

6     perspective?

7          A.     I don't know that, no.

8          Q.     Can you explain that answer?

9          A.     I can't say whether it's the worst.

10         Q.     Can you think of a single worst

11    assumption you could have made with respect to

12    the consolidated entities' liabilities than NNL

13    being liable for all of them?

14              MR. PULTMAN:  Object to the form.

15         A.     My calculations were done for the

16    reporting group, for the -- the Canadian -- the

17    Canadian estate.  So in my Table 1 analysis,

18    when I do the cash available for distribution

19    and the liability subject to compromise, that's

20    the total for the Canadian -- the Canadian

21    group.

22         Q.     Let's say I were to ask you,

23    Dr. Wertheim, I just want you to tell me what

24    is the -- what is the payout projected to be in

25    a best case scenario for NNI of only NNL, have

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    you done that?
 3         A.    No.
 4         Q.    Did you ever ask any representative
 5    of the monitor for information about claims
 6    against NNL on an unconsolidated basis?
 7         A.    No.
 8         Q.    Do you know if the monitor possesses
 9    information about claims against NNL on an
10    unconsolidated basis?
11         A.    Do I know if they possess the
12    information?  I don't know.  They may.
13         Q.    Based upon your experience in
14    working in bankruptcy situations, do you
15    believe that the monitor has information about
16    NNL's specific liabilities?
17              MR. PULTMAN:  Objection, no
18         foundation.
19              You can answer.
20         A.    I don't know.  I would assume they
21    may.
22         Q.    By the way, do you know how old the
23    document that we have marked as Exhibit 2 is?
24         A.    Yes.
25         Q.    When was it filed?
```

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2            A.    Well, it's for the period ended

3     June 30.  It was filed -- usually, there is a

4     filing date.  It would have been within 90 days

5     following June 30, 2012.  I don't see the exact

6     date of when it was filed.

7            Q.    Would it help you to look at page

8     765 in the bottom right corner?

9            A.    Okay.  It was filed August 9, 2012.

10           Q.    Have you sought to obtain any

11    updated information from any source?

12           A.    I have some updated information.

13           Q.    Other than the amount of the EMEA

14    settlement that you have added to this, do you

15    have any other updated information?

16                 MR. PULTMAN:  On what?

17           Q.    With regard to the liability chart.

18           A.    To the liability side?

19           Q.    Yeah.

20           A.    Yes.

21           Q.    What updated information do you

22    have?

23           A.    It would be coming from Appendix D

24    of the one hundred and eighth monitor's report

25    dated last month.

**HIGHLY CONFIDENTIAL**                    80

1          WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.     Did Appendix D of the one hundred

3     and eighth monitor's report update all of the

4     numbers in the chart at the top of page 29 that

5     you relied upon?

6          A.     Not line by line, no.

7          Q.     So we will come back to that

8     question in a moment.  Okay.

9                 So can you tell me how you

10    calculated your 2.2 -- strike that -- the

11    $3.235 billion in other claims against the

12    consolidated Canadian estates?

13         A.     Sure.  Do you want me to do the math

14    right now or just explain it?

15         Q.     Why don't you tell me the

16    components, then we can drill down afterwards.

17         A.     Okay.  Using the table on the top of

18    page 29 of the form 10-Q, I took the -- and I'm

19    just going to list the amounts -- the 167, plus

20    186, plus 200 million from the long-term debt

21    line, plus 176, plus 1548, plus 564, plus 20,

22    plus 126, plus 21, plus 7, plus 8, plus 34,

23    plus 53, and then as I stated in my footnote, I

24    also added an additional 125 million for the

25    payable to EMEA.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    And if you add those numbers, you

3    get to 3.235 billion?

4         A.    Yes.

5         Q.    So does Appendix D to the one

6    hundred and eighth monitor report -- why don't

7    we mark that as Exhibit 3, so you have that in

8    front of you as well.  I'm not looking to play

9    a memory game here.

10             (Wertheim Exhibit 3, One Hundred and

11         Eighth Monitor Report, dated September 24,

12         2014, marked for identification.)

13        Q.    Is Exhibit 3 I just handed you the

14   one hundred and eighth monitor report that you

15   referred to a moment ago?

16        A.    Yes.

17        Q.    So if you could turn to Appendix D

18   that you referred to.  Does this document

19   provide with you any updated information with

20   regard to the $167 million in trade and other

21   accounts payable?

22        A.    Not specifically line by line.  I

23   already stated that it doesn't update the

24   amounts in the 10-Q line by line, but I used

25   this, which is the current claim status as

HIGHLY CONFIDENTIAL                    82

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    of -- well, it's dated September 3, 2014, so

3    last month, to get comfort, I used this to get

4    comfort for the total of my claims compared to

5    the total of the current claims, and they're

6    not meant -- the two documents are not meant to

7    line up line by line, but based on the current

8    total claims, it was not materially different

9    than what I show as total claims in Table 1.

10        Q.    We will come back to that in one

11   second, but I just have one preliminary

12   question.

13              When you read Appendix D in

14   Exhibit 3, you understood that the monitor was

15   recording claims against the separate Canadian

16   debtors separately, didn't you?

17        A.    Yes.

18        Q.    You understood that it wasn't being

19   recorded as one single consolidated entity,

20   correct?

21        A.    Correct.

22        Q.    So is there anything in Appendix D

23   that indicates that your use of a

24   $3.235 billion estimate for other claims is

25   correct?

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2         A.     It gives me comfort that it is.

3         Q.     Show me how.

4         A.     Okay.  And, again, it doesn't match

5    line by line.  I didn't use it for that

6    purpose.  What I wanted comfort on is my total

7    claims, which I list on my Table 1 as total

8    liabilities subject to compromise, nine million

9    three hundred twenty-six point seven million.

10        Q.     9 billion, you mean?

11        A.     Well --

12        Q.     You said nine million three hundred.

13        A.     I said 9,326 million.

14        Q.     Okay.

15        A.     Which is 9.326 billion.

16               Looking at -- and, again, I did this

17   just to get comfort in the total, not to verify

18   any line-by-line item, and so to do that, given

19   that there are duplicate claims on particular

20   entities, for instance, the pension claim shows

21   up on each entity as an example, I looked at

22   just NNL, and so if you look at the total

23   claims under review for NNL, 8,495.8, plus the

24   total accepted claims, 2,837.4, if you add

25   those, now these are amounts in Canadian

**HIGHLY CONFIDENTIAL**          84

1              WERTHEIM - HIGHLY CONFIDENTIAL

2     dollars, if you add those, that represents the

3     total claims either under review or accepted

4     for NNL, apply the exchange rate that was

5     applicable to translate to US dollars, if I

6     remember my numbers, that total comes out to

7     about 37 million more in claims than my

8     9,326 million, and given that, in my

9     sensitivity analysis, $100 million reduction in

10    claims on NNL resulted in only a 7.4 million

11    increase in net assets for NNI, then a

12    $37 million -- if I'm recording 37 million

13    difference in claims compared to the current

14    amount, the effect on NNI's cash if, again, if

15    I remember my numbers correctly, was only 2.7.

16              So had I used the most current total

17    claim numbers, my analysis for NNI's available

18    cash, instead of 971, which I show in Table 2,

19    it would have been 973.7, I believe.  So that

20    gave me comfort that even though the numbers I

21    used from the 10-Q are a couple years old, it

22    was almost identical in total dollar amount to

23    the total claims that are stated as of last

24    month.

25         Q.    So when you -- when you say you

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    compared the numbers and the monitor report

3    comes out just $37 million higher for NNL --

4         A.    No, its total claims -- its total

5    claims came out 37 million less than the claims

6    I show, so 37 million less.

7         Q.    Okay.  So when you -- when you added

8    up the claims against NNL in the monitor

9    report, and came out to $37 million less, you

10   were counting at 100 percent all of the claims

11   that are listed as under review, correct?

12        A.    Yes.

13        Q.    So you were assuming complete

14   allowance of all of those?

15        A.    Yes.

16        Q.    Do you have any idea of the

17   percentage of those claims that are under

18   review that have actually been allowed?

19        A.    The percentage offhand, no.

20        Q.    Is your assumption that to include

21   at 100 percent claims that have not yet been

22   allowed the most favorable assumption that you

23   believe you could have made for NNI?

24        A.    As a realistic assumption, yes.

25        Q.    You think it's realistic to assume

HIGHLY CONFIDENTIAL                    86

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2    that -- strike that.

3                You think the most favorable to NNI,

4    realistic assumption, is that claims against

5    NNL will be allowed 100 percent?

6         A.    Well, the most favorable assumption

7    would be to assume 0 percent are allowed, but

8    that's not --

9         Q.    That's not --

10               MR. PULTMAN:  He hasn't finished.

11        Q.    I'm sorry.

12        A.    But that's unrealistic to me.  And

13   the numbers, again, I used for my analysis the

14   numbers listed in the 10-Q to get comfort with

15   the current amounts, that they had not

16   significantly changed.  And so the numbers in

17   the 10-Q are stated -- if you look at the 10-Q,

18   the numbers are stated in accordance with

19   Accounting Standard 852, which states that,

20   just from an accounting standpoint, the numbers

21   listed in the 10-Q for liabilities are listed

22   at the amounts expected to be settled.

23               So that tells me that the amounts

24   that I look at in the 10-Q, even though they

25   may be settled for less, they may be settled

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    for an amount different, but those are the

3    amounts that are expected to be settled, so

4    that's what I used.

5         Q.    Do you have any understanding as to

6    whether it was the monitor's view that all of

7    the amounts listed as under review in this one

8    hundred and eighth monitor report was subject

9    to potential material change?

10             If you need me to repeat it or the

11   court reporter, it's better than reading there,

12   because it's a rough transcript.

13        A.    I don't know if it was -- what the

14   monitor's view is on those, but they are -- my

15   understanding is they're under review, so, by

16   definition, they're subject to change.

17        Q.    Not just change.  Are you aware that

18   it was the monitor's view that it was subject

19   to potential material change?

20        A.    Could be, yes.

21        Q.    Going -- well, could be or that was

22   the monitor's view at the time?  Are you aware

23   of that?

24        A.    Do I remember seeing that in a

25   document that states that that's the monitor's

1               WERTHEIM - HIGHLY CONFIDENTIAL

2     view?  It may be stated in the monitor's

3     report.  I think it is stated in the monitor's

4     report, but, again, the amounts are those

5     expected to be settled.

6               Could they be settled for an amount

7     materially different?  Possibly.  But that's

8     what they expect.

9          Q.   So, for example, then, you're saying

10    that the monitor had an expectation of paying

11    the bonds five billion two hundred forty-three

12    point one million dollars?

13         A.   That was the expected claim to be

14    settled, not that NNL would have the assets

15    available to pay that.

16         Q.   I'm just talking about the

17    expectation of what the allowed amount of the

18    claim was.

19               Are you saying that you interpreted

20    this document as the monitor's view that the

21    reasonable allowed amount for this claim is

22    five billion two hundred forty-three point one

23    billion dollars?

24               MR. PULTMAN:  Objection.

25         Q.   That that was how you interpreted

**HIGHLY CONFIDENTIAL**                    89

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2   this?
 3              MR. PULTMAN:  Sorry.  Objection, no
 4         foundation.  Objection to the form of the
 5         question.
 6         Q.   I will fix it.  Let me ask you a
 7   predicate question.
 8              Look at the under review column.
 9         A.   You're misinterpreting how I used
10   Appendix D.  I used the numbers from the 10-Q,
11   and I simply used Appendix D to get comfort on
12   whether my total hadn't materially changed.
13   The numbers from the 10-Q, by definition, are
14   listed at amounts that are expected to be
15   settled.
16         Q.   Let's go back to the 10-Q.  Let's go
17   to page 29 again.
18              So when you read this document, the
19   10-Q, and decided to rely upon it, you
20   interpreted the $670 million UK pension
21   guarantee claim listed here as, by definition,
22   the amount that is expected to be settled?
23         A.   According to what the 10-Q states,
24   yes.
25         Q.   And did you subsequently -- strike
```

```
 1                WERTHEIM - HIGHLY CONFIDENTIAL
 2   that.
 3                It is your expert opinion, is it
 4   not, that, in fact, that expectation that the
 5   monitor had is unreasonable, correct?
 6                MR. PULTMAN:  Objection,
 7           mischaracterizes.
 8        Q.    Let's use the words that you used.
 9   Realistic.
10                Do you, sitting here today, with
11   everything that you know, believe that
12   $670 million assumption was realistic?
13                MR. PULTMAN:  Objection,
14           mischaracterizes his report.
15                MR. ROSENTHAL:  I'm not asking about
16           his report.
17                MR. PULTMAN:  Same objection.
18                You can answer.
19        A.    I'm not making a judgment as to
20   whether the 670 million assumption was
21   realistic.  I'm making an assumption that the
22   10-Q, based on accounting standards, says that
23   the 670 million was what was expected to be
24   settled.
25        Q.    And you, in October of 2014, are
```

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2   relying upon the 2012 10-Q and the numbers in
 3   there for your determination that, in a best
 4   case scenario, what cash would be available to
 5   NNI, correct?
 6              MR. PULTMAN:  Objection,
 7        mischaracterizes the testimony.
 8              You can answer.
 9        A.    Again, best realistic case, yes.
10   But, for instance, on the -- on the NNUK
11   pension claims, I excluded those.  That was one
12   of my assumptions.
13              So right off the top, if you look at
14   the numbers in the 10-Q, footnote 15, the
15   numbers that they list, I knock 670 million off
16   of that total to begin with.
17        Q.    Why did you exclude it?
18        A.    Just to give an optimistic scenario
19   for the case of NNI.  Now, I could have assumed
20   that all of them were zero.  Would that be
21   realistic?  No.
22              So did I make some judgment calls?
23   Yes.  But I was trying to balance being
24   optimistic versus also trying to be realistic.
25        Q.    Did you have any basis for your
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2     assumption that the trade and other accounts

3     payable would be 100 cents on the dollar?

4              MR. PULTMAN:  Objection.  It has

5         been asked and answered.

6              You can answer again.

7         A.    Other than that line item was listed

8     at the amount expected to be settled.

9         Q.    Did you have any basis that the

10    $186 million in restructuring liabilities would

11    be payable at 100 cents on the dollar?

12             MR. PULTMAN:  Same objection.

13        Q.    Other than the fact that it's listed

14    here?

15             MR. PULTMAN:  Same objection.

16             You can answer.

17        A.    And same answer as before, that it's

18    listed at the amount expected to be settled.

19        Q.    Did you have any basis, other than

20    the fact that it's listed in the 10-Q, for

21    including the NNL lease guarantees at

22    $126 million?

23             MR. PULTMAN:  Same objection.

24        A.    I assume that was listed at the

25    amount expected to be settled.

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    Are you aware, by the way, that the

3   interest on long-term debt is listed here at

4   $1.193 billion?

5          A.    I'm aware of that, yes.

6          Q.    Is it your understanding that it's

7   listed there because that's also the amount at

8   the time that NNC and its subsidiaries were

9   expecting that to be settled for?

10                    MR. PULTMAN:  Same objection.

11         A.    And same answer.  It's listed there

12   under the same assumptions that the -- that the

13   other line items are listed at.  Whether the

14   ultimate outcome is different, I don't know.

15         Q.    So you made a qualitative decision

16   to remove from your calculations the interest

17   on long-term debt payable, and the UK pension

18   guarantees, but to accept unchallenged the

19   assumptions on all of the others that you have

20   listed, correct?

21         A.    I used the others that were listed,

22   yes.

23         Q.    Did you have any basis to

24   distinguish between those you accepted and

25   those you didn't accept?

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    That was an assumption I made in my

3   calculation.  It was my assumption.

4        Q.    Well, did you have any basis,

5   though, to distinguish between those that you

6   accepted or those you didn't or you just made

7   that assumption without explanation?

8        A.    I made that assumption.  I knew the

9   UK pension guarantees were in dispute.  That

10  was a material amount.  I chose to eliminate

11  those.

12       Q.    Anything else to your answer?

13       A.    No.

14       Q.    Do you know if the $1.548 billion in

15  pension obligations is an allowed claim?

16       A.    Well, according to Appendix D,

17  that's still under review.

18       Q.    In fact, that's one of those that's

19  a duplicative claim against multiple entities,

20  correct?

21       A.    Correct.

22       Q.    Do you know who ultimately bears

23  responsibility for that claim, if at all?

24       A.    No.

25       Q.    You had just assumed it would be

1                WERTHEIM - HIGHLY CONFIDENTIAL

2    NNL?

3         A.    Yes.

4         Q.    Do you know whether there is any

5    dispute over that, given that it's under

6    review?

7         A.    I don't know the legal status of

8    that.

9         Q.    Did you ask anybody?

10        A.    No.

11        Q.    Do you consider the 1.548 to be a

12   material amount?

13        A.    Yes.

14        Q.    With respect to the restructuring

15   liabilities that are listed here, does Appendix

16   B of the monitor report or any other document

17   give you any basis to believe which Nortel

18   entity ultimately bears liability?

19        A.    Not that I'm aware of.

20        Q.    Would the same be true with respect

21   to the trade and other accounts payable?

22        A.    Yes.

23        Q.    Would the same be true for

24   post-retirement obligations other than

25   pensions?

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2         A.    Yes.
 3         Q.    Would the same be true for the
 4    environmental liabilities?
 5         A.    As far as I'm aware.
 6         Q.    Did you undertake any investigation
 7    to find out which entity bore liability to the
 8    extent those claims were allowed?
 9         A.    No.
10              MR. PULTMAN:  Objection.  It has
11         been asked and answered.
12              You can answer it again.
13         A.    No.
14         Q.    Are you aware that on yesterday's
15    call with the US court that the monitor stated
16    that it still has outstanding, in Canada,
17    claims, and those claims are subject to
18    sensitive negotiation and sensitive analysis in
19    Canada?
20         A.    I'm not aware of any part of
21    yesterday's call.
22         Q.    Is that consistent with your
23    understanding?
24              MR. PULTMAN:  Is what consistent?
25         Q.    That the outstanding Canadian claims
```

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    are the subject of sensitive negotiation and
 3    sensitive analysis in Canada.
 4              You should just listen rather than
 5    reading it, because I can -- if you don't hear
 6    something, I will repeat it or the court
 7    reporter can.  I just don't want you to, since
 8    it's a rough transcript, to be focused on the
 9    rough transcript rather than --
10         A.   Okay.  I'm sorry.  In my previous
11    deposition, they told me if I didn't understand
12    the question and wanted to reread it, to feel
13    free to do that to get clarity.  So that's why
14    I was doing that.
15         Q.   Probably easier just to ask me, just
16    in case there's-- it's a rough transcript.  So
17    I wasn't the one who deposed you previously,
18    but that's not the advice I would have given.
19         A.   Okay.  Could you repeat the question
20    again?  Sorry.
21         Q.   Yes.  Is it consistent with your
22    understanding if I were to say that the
23    outstanding Canadian claims are the subject of
24    sensitive negotiation and sensitive analysis in
25    Canada?
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2                   MR. PULTMAN:  Objection.  There's no

3         foundation.

4                   You can answer.

5         A.    By outstanding Canadian claims, do

6    you mean the claims under review?

7         Q.    Correct.

8         A.    I would assume that.

9         Q.    If we could look now back at

10   Appendix D on Exhibit 3.  Against NNL, the

11   allowed claims are in the amount of

12   $2.8 billion, correct?

13        A.    I'm sorry.  Say that --

14        Q.    The allowed claims against NNL is

15   $2.8 billion; is that correct?

16        A.    Accepted claims?

17        Q.    Accepted.

18        A.    If that means allowed, then --

19        Q.    We will use the term "accepted"

20   then.

21                   The accepted claims are

22   $2.8 billion?

23        A.    Canadian.

24        Q.    Yes.  And of that, 2.5 billion is

25   NNI's claim, correct?

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          A.     Correct.

3          Q.     If we were to look at accepted

4    claims, besides the NNI claim, fair to say it's

5    about $300 million Canadian?

6          A.     Yes.

7          Q.     Relative to under review claims of

8    about eight and a half billion dollars?

9          A.     Yes, including the bonds.

10         Q.     If my math is right, would you say

11   fewer than 5 percent of the Canadian claims

12   against NNL, besides the NNI claim, are still

13   under review -- are accepted?

14         A.     Yes.

15         Q.     Do you know, by the way, how many of

16   the -- you see down at the very bottom, the

17   total filed proofs of claims against all of the

18   Canadian entities are $36 billion?

19         A.     Correct.

20         Q.     Do you know how much of that are

21   duplicate claims?

22         A.     I haven't gone through the

23   calculation, so no.

24         Q.     Do you have information here that

25   would allow you to calculate the amount of

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    duplicative claims?

3         A.    Not necessarily.  It didn't affect

4    my use of the table, because I was looking at

5    just NNL.

6         Q.    Are you able to tell how many of the

7    claims against NNL are duplicative claims that

8    are really more appropriately claims against

9    other debtors?

10              MR. PULTMAN:  Object to the form.

11              You can answer.

12        A.    No.

13        Q.    Why did you, when you looked at

14   Appendix D of Exhibit 3, focus specifically on

15   NNL liabilities, but when you were relying on

16   the chart in appendix -- in Exhibit 2, you use

17   consolidated liabilities?

18        A.    To avoid the use of duplicate

19   claims.  So I had to look at just NNL and, in

20   fact, that -- that may underestimate the

21   consolidated liabilities to the extent that

22   there are claims under review or accepted in

23   other entities that are not also part of NNL's.

24              So, if anything, my use of the total

25   for just NNL might have underestimated the

1                WERTHEIM - HIGHLY CONFIDENTIAL

2    total claims, but, again, I just used that to

3    get comfort had my use of the 10-Q numbers

4    materially changed.

5         Q.    Well, the 10-Q numbers included all

6    of the Canadian debtors, correct?  You've

7    already said that.

8         A.    Correct.

9         Q.    Okay.  So if, out of that, if a

10   relatively high percentage is NNC or NNGC or

11   NNIC or NNTC, that could correspondingly lower

12   the actual ultimately accepted claims against

13   NNL, correct?  You just don't know?

14        A.    Don't know.

15        Q.    Are you aware of any of the trusts

16   and funds that the monitor has already paid

17   out, such as the Health and Welfare Trust?

18        A.    No.

19        Q.    Ever heard of the Termination Fund?

20        A.    No.

21        Q.    Ever heard of the Hardship Fund?

22        A.    I read something related to that in

23   the monitor's report, but I'm not familiar.  I

24   just heard the name.  If you're asking had I

25   ever seen the name, yes, but I don't know

HIGHLY CONFIDENTIAL                    102

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    details about it.

3         Q.    Do you know how much money has been

4    actually funded already into these trusts and

5    funds?

6         A.    No.

7         Q.    Do you know how they impact the

8    claims?

9         A.    No.

10        Q.    So fair to say that if I were to

11   tell you that $75 million has already been put

12   into the Health and Welfare Trust fund to pay

13   certain benefits that are the subject of some

14   of the claims that you have included, you

15   haven't taken that into account at all,

16   correct?

17             MR. PULTMAN:  Objection, no

18        foundation.

19             You can answer.

20        A.    Could you repeat that?

21        Q.    Sure.  If I were to tell you that

22   $75 million has already been put into a Health

23   and Welfare Trust and has paid some of the

24   claims against NNL, is it fair to say that you

25   haven't taken any deduction for that into

WERTHEIM - HIGHLY CONFIDENTIAL

1

2     account?

3         A.    Correct.

4         Q.    Let's turn to the assets side now of

5     your calculation for NNL.

6         A.    Okay.

7         Q.    In your best case scenario for NNI,

8     you calculate that NNL's payout ratio would be

9     11.15 percent, correct?

10        A.    Based on the assumptions I made for

11    that table, correct.

12        Q.    And you call those best case

13    assumptions, correct?

14        A.    Correct.

15        Q.    And you have a sensitivity analysis,

16    which is at the top of page 11 of your report?

17        A.    Yes.

18        Q.    And you found that if NNL's assets

19    increased by $100 million, then the payout

20    ratio increases and ultimately the surplus cash

21    to NNI increases by 65.3 million, correct?

22        A.    Correct.

23        Q.    So, in other words, for every dollar

24    increase in NNL's assets, NNI's surplus cash is

25    going to increase by about two-thirds of that

```
 1                  WERTHEIM - HIGHLY CONFIDENTIAL
 2      amount?
 3           A.     Roughly, yes.
 4           Q.     And that's not only because NNI
 5      would receive more on its $2 billion claim, but
 6      it would also owe less on its guarantee of the
 7      crossover bonds?
 8           A.     Yes.  Both are taken into account.
 9           Q.     So let's start off by talking about
10      the cash receivables, if we look at Table 1 on
11      page ten of your report.
12                  So you have a footnote 12.  And you
13      cite to this Exhibit 3, which is the one
14      hundred and eighth monitor report?
15           A.     Uh-huh.
16                  MR. PULTMAN:  You have to answer --
17           Q.     You have to answer audibly.
18           A.     Yes.
19           Q.     And that's where you got the
20      $329.4 million cash balance, correct?
21           A.     Correct.
22           Q.     And in your footnote, you say,
23      "Given that the majority of receivables are
24      intercompany receivables and have a low, if not
25      zero probability of collection, and given that
```

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    all asset sales have been virtually completed,

3    I have assumed a zero dollar recovery on

4    receivables and other assets."

5              Do you see that footnote?

6         A.    Yes.

7         Q.    Do I understand correctly that you

8    assigned zero dollar value to both intercompany

9    receivables and to asset sales?

10        A.    Yes.

11        Q.    I'm going to talk about them

12   separately now.

13             Is the assumption that the

14   intercompany receivables would have a zero

15   dollar recovery an assumption that you made?

16        A.    Yes.

17        Q.    What's the basis for that

18   assumption?

19        A.    If we look at the -- if we look at

20   the cash summary worksheet, which has not been

21   introduced yet, it gives cash balances for

22   different groups.

23             And so to answer your question sort

24   of briefly, settlements have already been made

25   between NNL and EMEA and NNL and the US.  And

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2        so the intercompany receivables that were

3        remaining were -- I'm sorry.  Did I -- yes.  I

4        was making sure I made my statement right.

5                    Settlements have been made between

6        NNL and the US and settlements have been made

7        between NNL and EMEA.  And so the intercompany

8        receivables that would remain relate to the

9        other groups such as Asia, and based on the

10       cash balances that are available, for instance,

11       to that group, and based on my understanding

12       that that group would have to pay its outside

13       creditors first, I saw low, if not zero

14       probability of any eventual upflow to NNL based

15       on those receivables.

16                    So that was the basis for my

17       assumption on assuming a zero receivable.

18            Q.    What's your basis for believing that

19       the intercompany receivables, in each and every

20       Asian country, is payable after outside

21       creditors?

22                    MR. PULTMAN:  Object to the form.

23                    You can answer.

24            A.    (Perusing.)  On page 43 of the 10-Q,

25       second to the bottom paragraph states, "Further

1                WERTHEIM - HIGHLY CONFIDENTIAL

2      portions of the pre-petition intercompany debt

3      continue to be repayable from time to time only

4      to the" -- "only to the extent of any such APAC

5      agreement subsidiary's net cash balance at the

6      relevant time and subject to certain reserves

7      and provisions."

8           Q.    Have you looked at the solvency of

9      each of NNL's Asian subsidiaries?

10          A.    No.

11          Q.    Do you know whether there would or

12     would not be excess cash after all the outside

13     creditors were paid?

14          A.    I have not calculated the amount of

15     excess cash for each Asian subsidiary, no.

16          Q.    Have you calculated for any?

17          A.    No.

18          Q.    Well, what's the basis, then, for

19     assuming that there would be no excess cash for

20     any Asian subsidiary to pay to NNL?

21               MR. PULTMAN:  Objection.  It's been

22          asked answered.

23               You can answer it again.

24          Q.    You explained in your prior answer

25     that it was your understanding that NNL could

HIGHLY CONFIDENTIAL                                 108

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2    only be paid after outside creditors with

3    respect to the Asian subsidiaries, correct?

4         A.    Correct.

5         Q.    And you made an assumption that, as

6    a result, there would be no cash, zero to low

7    probability are the words you used, I believe,

8    of cash going to NNL, correct?

9         A.    Correct.

10        Q.    And what is the basis for your

11   assumption that there would be no excess cash

12   after creditors in those countries were paid?

13        A.    When I looked at the cash balance

14   from the cash summary sheet, it was only -- I

15   forget the exact amount.  And so I didn't

16   assume zero liabilities.  I assumed that there

17   are some liabilities for those Asian

18   subsidiaries.  I assume that there are some

19   claims.

20             And so, in my opinion, given

21   available cash balance and given the existence

22   of claims on an intercompany basis, that was my

23   assumption, that there would be zero upflow to

24   NNL.

25        Q.    Did you have any other basis for

1              WERTHEIM - HIGHLY CONFIDENTIAL

2     that assumption?

3          A.    No.

4          Q.    Are there any documents that you

5     looked at to reach that assumption other than

6     the 10-Q you just referred to and the cash

7     balance summary?

8          A.    No.

9          Q.    Fair to say that the assumption of a

10    zero dollar recovery from those intercompany

11    balances is the worst case assumption from

12    NNI's perspective?

13         A.    Again, I have to balance what you

14    call worst case versus what I call, on the flip

15    side, the optimistic case, with what I also

16    consider realistic.  And so could I have

17    assumed that they would have recovered

18    100 percent?  Yes.  If I would have assumed

19    they would have recovered 100 percent, that

20    would be in the best interest of NNI, but I

21    would not consider that a realistic assumption.

22         Q.    Let me just ask my question again.

23              Isn't it fair to say that the

24    assumption that you took, though, was the worst

25    case assumption from NNI's perspective?

1          WERTHEIM - HIGHLY CONFIDENTIAL

2               MR. PULTMAN:  Objection.  It has

3          been asked and answered.

4               You can answer it again.

5     A.     Mathematically, yes.

6     Q.     Now, one of the documents you said

7     you relied upon was the cash balance summary

8     sheet.

9               Did you go back and look at how

10    accurately the monitor had historically

11    forecasted its receivables relative to actual

12    receipts?

13    A.     No.

14    Q.     Would it surprise you to learn that,

15    in the last nine monitor forecasts over a

16    three-year period, the monitor has forecasted

17    receipts of $127 million less than it actually

18    received?

19               MR. PULTMAN:  Object to the form.

20               You can answer.

21    A.     Would I be surprised that the

22    forecasts are off?  No.  Forecasts, by

23    definition, are forecasts.

24    Q.     But when you decided to use the

25    current monitor forecast with regards to

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    intercompany receivables, were you aware that

3    virtually each and every time the monitor has

4    done a forecast over the last three years, it

5    has underforecasted?  Were you aware of that?

6         A.    When you say forecast of

7    intercompany receivables or forecast of the

8    cash balance?

9         Q.    The cash balance.

10        A.    Okay.  You had said forecast of

11   intercompany receivables.

12        Q.    We'll break it up.

13              Are you aware that it has

14   repeatedly, through each of the monitor reports

15   over the past three years, underforecasted cash

16   balances?

17        A.    I knew it wasn't exact, but I didn't

18   evaluate a detailed calculation of whether it

19   was over or under.

20        Q.    Okay.  When you relied on the most

21   recent cash balance report of the monitor, were

22   you aware that it has also, in those same

23   reports, repeatedly underforecasted

24   intercompany receivables?

25        A.    No.

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    Let's now talk about the second half

3    of that footnote, which was the asset sales

4    that you referred to.

5                  When you say all asset sales have

6    virtually been completed, what are you

7    referring to?

8          A.    The asset sales that were part of

9    the -- I'll call it the business unit sales,

10   and the intellectual property of the Rockstar

11   transactions.

12         Q.    Are you aware that NNL has other

13   assets still to sell?

14         A.    Yes.

15         Q.    Okay.  Did you -- okay.  And you

16   valued those other assets at zero, correct?

17                  MR. PULTMAN:  Object to the form.

18         A.    For purposes of my analysis, I did

19   not include those, yes.

20         Q.    Okay.  So can you explain why, for

21   purposes of your best case analysis, you valued

22   other assets that you knew NNL still had to

23   sell at zero?

24         A.    Because, one, the fact that they

25   still have those available to sell, to some

HIGHLY CONFIDENTIAL
113

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    extent, doesn't mean that they have been sold.

3    And, secondly, there were -- I didn't know

4    amounts to include.

5         Q.    So you didn't know how much they

6    were worth and, therefore, you decided, in a

7    best case scenario, you would value them at

8    zero?

9              MR. PULTMAN:  Object to the form.

10             You can answer.

11        A.    I had no basis on what to value them

12   at all, so I didn't -- they were not included

13   in my calculation.

14             Do they exist?  Yes.  Is it an

15   unknown?  Yes.  Could it possibly increase the

16   cash balance?  Yes.

17        Q.    Not just could it.  It's reasonable

18   to assume that, when they sell the assets, it

19   will increase the cash balance, correct?

20        A.    Correct.

21             MR. PULTMAN:  Objection, no

22        foundation.

23             You can answer.

24        Q.    Why did you not, when you wrote your

25   report and said that this was the maximum

HIGHLY CONFIDENTIAL                    114

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    amount under a best case scenario that NNI

3    could receive, why didn't you say this is the

4    maximum amount plus whatever percentage they

5    got from the asset sales that I just don't know

6    how to value?

7        A.    Well, my conclusion that, as far as

8    the maximum amount, isn't just based on the

9    outcome of any one line item of asset or one

10   line item of liabilities.

11             In my Table 2, when I calculate the

12   distribution analysis for NNI, and I come to

13   the conclusion of 971 million, that 971 number

14   is based on the assumptions that went into

15   those two tables, but I further state that in

16   addition to that, that there are numerous

17   additional items that could further reduce

18   surplus cash which were not taken into account

19   in my NNI distribution analysis.

20             And I state that, when looking at

21   the picture as a whole, that my conclusion of

22   the maximum being less than a billion,

23   971 million, that that conclusion is based on

24   the totality of that, not just how one

25   individual line item moves.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2                    And so I specifically state that

3      even if a portion of the currently existing

4      claim subject to compromise, and you could also

5      include even if a portion of currently existing

6      assets end up being subject to change, that

7      given that, with the assumptions I made for the

8      971 million, plus the additional items that

9      could further reduce it by 744 million, that

10     even if there were some amounts that came from

11     asset sales, or even if there were certain

12     claims that ended up being reduced, in my

13     opinion, realistically, I couldn't envision the

14     totality of that resulting in excess cash of

15     more than a billion.

16          Q.    If I understand what you just said

17     correctly, you're saying that while even if

18     there are asset sales from assets that you know

19     still exist at NNL, that would have pushed the

20     number higher, while some of these assumptions

21     that you make on page 12 favorable to NNI, you

22     don't believe would have come to pass, and that

23     would have pushed the number back lower?

24          A.    I didn't understand that.

25          Q.    What you're saying is the end of the

1          WERTHEIM - HIGHLY CONFIDENTIAL

2     day number wouldn't be higher for NNI due to

3     asset sales at NNL or lower claims at NNL,

4     because some of these other assumptions that

5     you have already made for NNI were too

6     optimistic, correct?

7          A.    Possibly, yes.

8          Q.    Let's assume with me that I want to

9     have a report that says I'm going to assume

10    these five bullets that you have on page 12.  I

11    want to assume these are sacrosanct, okay?

12    We're not going to change those assumptions to

13    offset other events, okay?  So we're not going

14    to modify those assumptions.

15          Isn't it true that when you account

16    for the expectation of NNL receiving proceeds

17    from asset sales, even if we don't know what

18    the number is, the maximum recovery to NNI,

19    maximum cash available, is going to be higher

20    than 971?

21          MR. PULTMAN:  Objection, no

22       foundation.

23          You can answer.

24          A.    If all you changed was the cash

25    available line due to the increasing cash from

HIGHLY CONFIDENTIAL

117

1          WERTHEIM - HIGHLY CONFIDENTIAL
2    the asset sales, then mathematically, yes.
3    But, again, that's assuming a change in only
4    that line.
5         Q.   Correct.  Correct.  All I want is
6    where, at the top of page 12, you have, based
7    on all these assumptions, you come up with
8    saying the maximum surplus cash available to
9    pay PPI is 971.
10             Do you see that on page 12?
11        A.   Yes.
12        Q.   And I'm saying all I want you to do
13   is to now account for the sales of assets that
14   you know NNL has.  And if we accounted for
15   that, you don't know how much that number would
16   increase, but you do know that that would
17   increase, correct?
18        A.   Correct.  But that's not what I
19   based my conclusion on.
20        Q.   Okay.
21             MR. PULTMAN:  I don't want to
22        interrupt the questioning, but we're
23        coming to the end of a tape.
24             MR. ROSENTHAL:  Okay.  This is
25        probably a good breaking point, then.

HIGHLY CONFIDENTIAL                    118

1              WERTHEIM - HIGHLY CONFIDENTIAL

2                  THE VIDEOGRAPHER:   We are now off

3          the record.   The time is 11:44 a.m.,

4          October 22, 2014.

5                  (Recess taken.)

6                  THE VIDEOGRAPHER:   This is tape

7          three of the deposition of Dr. Paul

8          Wertheim.   We are now back on the record.

9          The time is 12:02 p.m., October 22, 2014.

10     BY MR. ROSENTHAL:

11         Q.     When you referred to asset sales

12     that you're aware that NNL will be undertaking,

13     can you tell me which ones you're referring to?

14                 MR. PULTMAN:   Object to the form of

15         the question.

16                 You can answer.

17         A.     I believe it just relates to, and I

18     don't know the technicalities or details, but

19     internet addresses.

20         Q.     If I refer to them using the

21     shorthand, IP addresses, would you be okay with

22     that?

23         A.     Sure.

24         Q.     Do you know how many IP addresses

25     the Canadian debtors own?

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         A.    No.

3         Q.    Have you ever heard or read anywhere

4    that they own, or at some point they owned

5    17 million IP addresses?

6         A.    I have not heard that number.

7         Q.    How did you hear that they were

8    going to be selling IP addresses?

9         A.    I believe I read it in the monitor's

10   report.  There was a short discussion.

11        Q.    Why don't we mark as Exhibit 5 --

12   Exhibit 4, the sixty-first report of the

13   monitor.

14              (Wertheim Exhibit 4, Sixty-First

15        Report of Monitor, dated March 21, 2011,

16        marked for identification.)

17        Q.    Is this the monitor report where you

18   learned about the sale of the IP addresses?

19        A.    I don't remember the exact one.

20   (Perusing.)

21        Q.    Do you see, if you look at paragraph

22   16, it refers to the applicants owning

23   17 million IP addresses?

24              Do you see that?

25        A.    Yes.

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    Does that refresh your recollection

3    as to the number of IP addresses that NNL owns?

4                  MR. PULTMAN:  Object to the form.

5                  You can answer.

6          A.    Okay.  It doesn't refresh my memory

7    because I didn't know the number to begin with,

8    but now I do.

9          Q.    Why don't we mark, as Exhibit 5, the

10   cash summary worksheet that you -- I believe

11   the one that you have been referring to.

12                  (Wertheim Exhibit 5, Cash Summary

13          Worksheet, Bates Stamped NNC-NNL-PPI000001

14          through 21, marked for identification.)

15                  MR. ROSENTHAL:  And for the record,

16          it bears the Bates number NNC-NNL-PPI1 to

17          21.

18          Q.    When you have referred to the cash

19   balance worksheet, is this the document you

20   have been referring to?

21          A.    (Perusing.)  As the cash summary

22   worksheet?

23          Q.    Yeah.

24          A.    It appears to be.  This is printed

25   out in a little bit different format, but it

HIGHLY CONFIDENTIAL                    121

1              WERTHEIM - HIGHLY CONFIDENTIAL
2   appears to be the same.
3        Q.    This was the hard copy that was
4   produced to us in connection with this dispute.
5        A.    Okay.
6        Q.    How did you get this document?
7        A.    I remember at one point, when I was
8   going through my analysis, I had asked
9   counsel --
10            MR. PULTMAN:  Okay.  Let me just
11        caution you about getting into the
12        substance of communications with counsel.
13            THE WITNESS:  Okay.  I'm sorry.
14            MR. PULTMAN:  If what you're asking
15        for is -- if what you're testifying to is
16        a request for documents, that's fine.  I
17        have no problem with that.  I just don't
18        want to get into the substance of any
19        communications beyond that.
20        A.    Yeah.  That's where I was going.  It
21   was a request for documents.  I was requesting
22   any information that they had on more
23   current -- current cash balances.  And also any
24   updated information on the cash -- yeah, the
25   cash balances for the entities.

```
 1                    WERTHEIM - HIGHLY CONFIDENTIAL
 2          Q.     Do you know where this document
 3    comes from besides the fact that it was given
 4    to you physically by counsel?
 5          A.     Details, no.
 6          Q.     Is this a publicly-available
 7    document?
 8                 MR. PULTMAN:  Object to the form of
 9          the question.
10          A.     I don't know to what extent it is.
11          Q.     Have you seen this document or this
12    information in any public filings?
13          A.     This particular document, no.
14          Q.     So let's look at page 18 of this
15    document.  I presume that you saw, when you
16    reviewed it, that NNL had received $13 million
17    from the sale of some IP addresses?
18          A.     Yes.
19          Q.     Did you -- in trying to see whether
20    you had the ability to put a value on the IP
21    addresses that NNL would be selling, did you
22    ask anybody how many IP addresses they sold to
23    generate the $13 million?
24                 MR. PULTMAN:  Objection.  It has
25          been asked and answered.
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2                   You can answer.

3         A.    No.

4         Q.    Did you ask anybody what percentage

5    of NNL's IP addresses generated the

6    $13 million?

7         A.    No.

8         Q.    Are you aware as to whether the US

9    debtors have sold any IP addresses?

10        A.    No.

11        Q.    If you knew that the IP addresses

12   that had been sold generated $13 million, why

13   did you assume, in a best case scenario, that

14   NNL would generate no revenue from additional

15   IP sales?

16             MR. PULTMAN:  Objection.  It has

17        been asked and answered.

18             You can answer.

19        A.    I had no basis to assume the

20   likelihood, probability or amount of future

21   sales.

22        Q.    Let me represent to you that the US

23   IP addresses sold for 1125 -- $11.25 per

24   address.  Okay?

25             If we assume that the US addresses

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2   had the same value as the Canadian addresses,
 3   and if we assume that the monitor report that I
 4   just showed you as Exhibit 4 is correct, that
 5   the Canadian debtors had 17 million IP
 6   addresses, would you agree that an equivalent
 7   sale would yield $191 million?  And I can give
 8   you a calculator if you would like.
 9              MR. PULTMAN:  Object to the form.
10              You can answer.
11        A.    If I assume the numbers that
12   multiply out to equal that, then I accept your
13   number, but I would have no basis for assuming
14   that that would be the actual value.
15        Q.    You explained to me why you
16   attributed no value to the IP addresses when
17   you did your best case calculation, but I want
18   to have an understanding as to why you took no
19   steps to try to find out a value of them.
20        A.    Because, again, I had no basis to
21   determine the likelihood or the amount of what
22   the value would be.
23        Q.    So why didn't you try to get a
24   basis?  Is there a reason why you didn't ask
25   somebody for a projected amount of what these
```

HIGHLY CONFIDENTIAL                                    125

```
 1            WERTHEIM - HIGHLY CONFIDENTIAL

 2   would be worth in a sale?

 3        A.    I assumed a zero value.

 4        Q.    But why?  Why didn't you try to find

 5   out what they were worth?

 6            MR. PULTMAN:  Objection.  It has

 7        been asked and answered.

 8        A.    I have answered.

 9        Q.    No, you told me what you assumed,

10   and you told me you assumed a zero.  I just --

11   I just want to find out why that's good enough

12   for you.

13            Why didn't you -- why didn't you ask

14   anybody or look through the documents to see

15   how many IP addresses are there, what are they

16   worth per IP address?

17            MR. PULTMAN:  Object to the form of

18        the question.  Objection, it's

19        argumentative.  Objection, it's asked and

20        answered.

21            MR. ROSENTHAL:  I'll break it up.

22        I'll break it up.

23            MR. PULTMAN:  I'm happy to have him

24        answer all three of your questions.

25            MR. ROSENTHAL:  I'll break it up.
```

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.     Why didn't you make any effort to

3    find out how many IP addresses that they had

4    for sale, given that you knew that they had IP

5    addresses for sale?

6          A.     Because even if I had known the

7    number, I had no real basis to determine the

8    amount or probability or likelihood of a sale.

9          Q.     Well, why didn't you try to find out

10   the answers to those questions?

11                MR. PULTMAN:  Objection.

12         Q.     Strike that.

13                Did you want to know the answers to

14   those questions?

15         A.     I didn't feel I needed to.  I have

16   answered this several times.

17         Q.     Okay.  You didn't feel that you

18   needed to know the answers to those questions

19   so you didn't want to find out?

20                MR. PULTMAN:  Object to the form.

21         Objection, it has been asked and answered.

22                I will let you answer it again.

23         A.     Based on what I told you, no.

24         Q.     If we assume that the remaining IP

25   addresses sold for, let's say, $180 million,

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2      would you agree with me, based on your

3      sensitivity analysis, that NNI's surplus cash

4      would increase by about $120 million?

5           A.    You're talking about the sale by NNL

6      and a result on flow through to NNI.

7           Q.    Correct.

8           A.    I will accept that math, but, again,

9      my conclusion wasn't based on movement in any

10     one particular line item.  If, even assuming

11     those numbers, as I stated earlier, when you

12     look at all the additional variables that

13     weren't even included in my 971 million

14     calculation, variables which total over

15     700 million, it was my opinion that those

16     items, when you look at the totality of the

17     reasonableness of the leftover net assets, that

18     it's still not going to be over a million.

19                So, for instance, the additional tax

20     liability, which, for purposes of my

21     calculation, I estimated at 133, even going on

22     the low end estimate of 400 million, that's an

23     additional 200 something million additional

24     claim that's not included.

25                MR. PULTMAN:  Can I just clarify one

1        WERTHEIM - HIGHLY CONFIDENTIAL

2       thing?  You said over a million in your

3       answer.  Did you mean to say over a

4       billion?

5              THE WITNESS:  Oh, yes, over a

6       billion.  Sorry.

7       Q.    Unless I change this assumption, for

8  purposes of this entire deposition, I would

9  like you to assume that you are going to

10  stretch the outcome of events in all cases in

11  favor of NNI, such that surplus cash is

12  maximized, okay?

13             Can you undertake that assumption as

14  the basis for my questions?

15      A.    Yes, as I qualified, realistically.

16      Q.    Realistically, okay.  I want you to

17  stretch the outcome of events in all cases in

18  favor of NNI, such that the surplus is

19  maximized.  So I don't need to have you say in

20  your answers that, well, you could have changed

21  the five assumptions that you have listed in

22  your bullets on page 12.

23             MR. PULTMAN:  Counsel, you're just

24       arguing with him.

25             MR. ROSENTHAL:  I'm not arguing.

1      WERTHEIM - HIGHLY CONFIDENTIAL

2          MR. PULTMAN:  I'm happy to have him

3      answer every one of your questions.

4          MR. ROSENTHAL:  Good.

5   BY MR. ROSENTHAL:

6      Q.    Let me ask you this.  Does your

7   report evaluate how realistic the five

8   assumptions that you make in the bullets on

9   page 12 are?

10     A.    As far as assigning a probability,

11  no.

12     Q.    Do you feel qualified to assign a

13  probability to the five bullets on page 12?

14     A.    I didn't have to because those are

15  assumed in the favor of NNI.

16     Q.    Do you know whether any of them --

17  have you, for purposes of writing your report,

18  formed an opinion as to the reasonableness or

19  unreasonableness of any of those assumptions or

20  you just accepted those as assumptions?

21     A.    Well, I evaluated the reasonableness

22  of my $5 million cash burn, because I came up

23  with that amount.  I made an assumption about

24  the reasonableness of a zero cash burn for NNL.

25  I determined that was really unreasonable, that

HIGHLY CONFIDENTIAL          130

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    they're going to burn zero, but yet I assumed
 3    that in favor of NNI.
 4              And as far as the other three line
 5    items, NNI receiving 100 percent of its
 6    requested allocation, NNL making first payment
 7    towards the bonds, and NNUK pension claims
 8    being dismissed, those are all at the extreme
 9    of being in favor of NNI.
10        Q.   Did you make any effort to evaluate
11    one way or the other how reasonable they were
12    or is that outside your area of expertise?
13        A.   It was outside of what I was -- the
14    purpose of my calculation.  I'm not going to
15    say it's outside the area of my expertise.
16        Q.   But you, for purposes of this
17    report, did not undertake an analysis to
18    determine whether those are reasonable or
19    unreasonable, correct?
20        A.   Correct.  I answered that.
21        Q.   If we accept your five assumptions
22    that you have made on page 12, and the only
23    thing to your report that gets changed is that
24    the IP addresses actually sell for an
25    additional $180 million, isn't it true that the
```

1            WERTHEIM - HIGHLY CONFIDENTIAL

2    surplus cash available to NNI to pay PPI would

3    be over $1.01 billion?

4            MR. PULTMAN:  Objection.  It has

5        been asked and answered.

6            You can answer again.

7            MR. ROSENTHAL:  Not that question.

8        A.    That's true, but that doesn't take

9    into account the totality of the variables.

10        Q.    I'm just asking for the variables

11   that you have put in your report.  If you make

12   all the same assumptions, you get over

13   $1.01 billion with just the IP sale, if you

14   assume the proceeds that I said, correct?

15        A.    Mathematically, yes.

16        Q.    Let me mark, as Exhibit 6, the

17   report of Jeffrey Kinrich.  And I'm going to

18   mark together as one exhibit the expert and the

19   exhibits to it.

20            (Wertheim Exhibit 6, Expert Report

21        of Jeffrey Kinrich together with exhibits

22        to report, marked for identification.)

23        Q.    You reviewed Mr. Kinrich's report in

24   connection with your expert report?

25        A.    To the extent I used the end results

1              WERTHEIM - HIGHLY CONFIDENTIAL
2    of his allocation analysis.
3         Q.    If we look at page -- Exhibit 33 to
4    his report, it's towards the very end.  In
5    fact, it is the very last page.
6         A.    Yes.
7         Q.    In the column, total value
8    relinquished, these are the numbers that you
9    used for purposes of your best case scenario
10   for NNI in your report, correct?
11        A.    Correct.
12        Q.    Do you see, under Mr. Kinrich's
13   proposed allocation, there is about
14   $245 million of sale proceeds allocated to NN
15   Ireland?
16        A.    (Perusing.)  Under the EMEA debtors?
17        Q.    Correct.
18        A.    Correct.
19        Q.    Are you aware that NN Ireland is
20   solvent, if you accept Mr. Kinrich's
21   allocation?
22        A.    Okay.
23        Q.    Were you aware of that?
24        A.    No.
25        Q.    Okay.  And, in fact, if you accept

HIGHLY CONFIDENTIAL                                133

1                WERTHEIM - HIGHLY CONFIDENTIAL

2    Mr. Kinrich's allocation, are you aware that NN

3    Ireland would be solvent by about $241 million?

4         A.    I'm not aware of that.  I didn't do

5    a detailed analysis of the solvency of each

6    individual EMEA entity.

7         Q.    Do you know who owns the equity of

8    NN Ireland?

9         A.    No.

10        Q.    Would it surprise you to learn that

11   it was NNL?

12             MR. PULTMAN:  Object to the form.

13        Q.    Or that it is NNL?

14             MR. PULTMAN:  Object to the form of

15        the question.  Objection.

16        A.    Okay.

17        Q.    When doing the best case analysis

18   for NNL's assets from NNI's perspective, did

19   you take into account in any way the value of

20   NNL's interest in NN Ireland?

21        A.    No.

22        Q.    Why not?

23        A.    I didn't do a detailed analysis of

24   the individual EMEA entities to calculate on a

25   per entity basis the upflow.  I didn't do it.

HIGHLY CONFIDENTIAL                              134

1                WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    Why not?

3              MR. PULTMAN:  Objection.  It has

4        been asked and answered.

5              You can answer again.

6              MR. ROSENTHAL:  He just said he

7        didn't do it.  I'm asking why he didn't do

8        it.

9        A.    I had no basis to try to do those

10   calculations.  It wasn't part of my analysis.

11       Q.    Are you saying that you didn't have

12   information available to you to enable you to

13   calculate the value of NNL's interest?

14       A.    That's not what I said.

15       Q.    You said you had no basis to try to

16   do it.  What do you mean by that?

17       A.    I didn't assume that there would or

18   would not be any upflow from those entities.  I

19   just didn't include them.

20       Q.    But why did you decide not to

21   include them?  I'm not asking for what you did

22   or didn't do.  I'm just trying to get an

23   explanation.

24       A.    I didn't consider that I needed to.

25       Q.    Why not?

1        WERTHEIM - HIGHLY CONFIDENTIAL

2            MR. PULTMAN:  I object.

3            You can answer it again.

4    A.    I feel I have answered it.

5    Q.    Well, is it your -- strike that.

6            I missed the answer, then.  You say

7    you have answered it, but I did not see a why

8    to it.  So indulge me, please, and answer it

9    again if you think you have.

10   A.    I had no basis for assuming one way

11   or the other the need to consider the upflow

12   from those individual EMEA entities, if any.

13   Q.    Well, the upflow from the EMEA

14   entities to NNL would ultimately inure to NNI's

15   surplus cash, correct?

16           MR. PULTMAN:  Objection.  Those are

17       your assumptions.

18   Q.    Under your assumptions.

19   A.    Mathematically, if there was a

20   dollar upflow, and that was the only line item

21   that changed, conceivably, yes.

22   Q.    And if there were millions and

23   millions of dollars of upflow from NNL's

24   subsidiaries, and that was the only variable

25   that changed, it could have a material impact

HIGHLY CONFIDENTIAL          136

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2    on NNI's surplus cash under your own analysis,

3    correct?

4         A.    Again, if you're assuming that's the

5    only variable --

6         Q.    Correct.

7         A.    -- that changes, and that I ignore

8    all the other variables that went into my

9    conclusion as a total, then, mathematically,

10   yes.

11        Q.    What I want you to do, actually, is

12   not ignore.  I want you to keep all of your

13   same assumptions that have gone into your

14   conclusion, and the only additional assumption

15   would be that you actually include upflow from

16   NNL's subsidiaries.

17              MR. PULTMAN:  Is there a question?

18        Q.    Yep.  That could have a material

19   impact on NNI's surplus cash, correct?

20              MR. PULTMAN:  Objection.  It has

21        been asked and answered.

22              You can answer it again.

23        A.    Not necessarily.

24        Q.    The one predicate, if there were

25   millions and millions of dollars in upflow from

1           WERTHEIM - HIGHLY CONFIDENTIAL

2   NNL's subsidiaries up to NNL, and we kept all

3   of your other assumptions exactly as you have

4   written in your report, that could have a

5   material impact on NNI's surplus cash under

6   your analysis, correct?

7           A.    It might have an impact on the

8   971 million number, but it may not have an

9   impact on my conclusion, and that would also be

10  ignoring other outcomes of that event, for

11  example, the tax consequences to NNI of the

12  upflow.

13          Q.    You haven't done any analysis to

14  ascertain whether or not there would be any tax

15  consequences, have you?

16          A.    No.

17          Q.    In fact, you also haven't done any

18  analysis to determine whether there are any tax

19  benefits to NNL that you haven't accounted for,

20  correct?

21              MR. PULTMAN:  Object to the form.

22          A.    Correct.

23          Q.    You have put tax consequences and

24  benefits to the side in your report, correct?

25              MR. PULTMAN:  Object to the form.

1                   WERTHEIM - HIGHLY CONFIDENTIAL

2                   You can answer.

3         A.       Tax benefits and tax consequences as

4    they relate to what specifically?

5         Q.       To the extent that NNL had tax

6    losses that it had the ability to monetize in

7    any way, you haven't factored that into your

8    report, right?

9         A.       Correct.

10        Q.       So putting aside the word material

11   or immaterial, at the end of the day, if we

12   take all of your assumptions as they are, you

13   would agree with me that any upflow from NNL

14   subsidiaries up to NNL would have a 65 percent

15   increase in NNI's surplus cash, correct?

16        A.       Not necessarily.

17        Q.       Well, that's not what your --

18   doesn't your report say that on the top of page

19   11?

20        A.       Because if there's an upflow from

21   the subsidiaries, there could potentially be a

22   reduction in that amount before it gets to NNL

23   or NNI, for instance, for the tax effect of

24   that upflow.  And so to say that there is a

25   65 percent effect on NNI's bottom line would

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    not be correct.

3         Q.    Let me restate my question, because

4    I think you might not have heard it correctly.

5              Whatever cash does get ultimately

6    upflowed to NNL increases NNI's surplus cash by

7    65 percent, correct?

8         A.    Ignoring taxes on that, yes.

9         Q.    And you don't know whether or not

10   there would be, correct?

11        A.    I don't know the effect.  I don't

12   know the exact effect.

13        Q.    So if we assume that NN Ireland has

14   $240 million of excess cash after it pays its

15   creditors under the Kinrich allocation, and it

16   is able to upflow that to its parent without

17   tax consequences, that would have a

18   $160 million positive effect on NNI's surplus

19   cash, correct?

20             MR. PULTMAN:  Object to the form of

21        the question.

22             You can answer.

23        A.    There seem to be a couple of parts

24   there.  Could you repeat that all?

25        Q.    Sure.

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          A.     If you're not allowing me to read

3    it.

4          Q.     Assume with me that NN Ireland has

5    $240 million after it has satisfied its

6    creditors under the Kinrich allocation.

7                 Can you accept that assumption?

8          A.     Yes.

9          Q.     Assume with me, because we don't

10   know one way or the other, that there are no

11   tax consequences associated with its

12   shareholder receiving that money, okay?

13         A.     Okay.

14         Q.     Under your calculation and your

15   sensitivity analysis, that would increase

16   surplus cash to NNI by $160 million, right?

17         A.     Correct, but it may not change my

18   conclusion.

19         Q.     I'm not asking about your

20   conclusion.  Your conclusion is that maybe

21   you'll change other assumptions of yours.

22         A.     No, you said it.  I'm keeping my

23   assumptions the same, because part of my --

24                 MR. PULTMAN:  I just want to make

25        sure you give him a chance to finish his

**HIGHLY CONFIDENTIAL**                    141

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         question --

3                  THE WITNESS:  I'm sorry.

4                  MR. PULTMAN:  -- and then I'm sure

5         he'll give you a chance to finish your

6         answer.  I'm not so sure, but I'm hopeful.

7                  MR. ROSENTHAL:  You can be sure.

8    BY MR. ROSENTHAL:

9         Q.    If you take all of the assumptions

10   and you take your report exactly as written,

11   including the sensitivity analysis at the top

12   of page 11 --

13        A.    Uh-huh.

14        Q.    -- that $240 million upflow to NNL

15   would increase the surplus cash in NNI by

16   $160 million, correct?

17                 MR. PULTMAN:  Same objection.

18                 You can answer.

19        A.    Correct.  But as I was adding,

20   keeping my assumptions, part of my assumptions

21   are the other factors totaling over 700 million

22   that are included in the 971 million, which

23   would not change my opinion.

24        Q.    Correct, because -- strike that.

25                 But without changing those five

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    bullets, the impact would be a positive

3    160 million, correct?

4         A.    I have answered that three times.

5    Yes, I have said yes.

6         Q.    For my questions now, and the whole

7    series until I say otherwise, it is always to

8    keep your five bullet assumptions the same.

9    We're not changing those at all in my

10   questions.

11              Are you aware of -- have you ever

12   heard of an entity called NNSA?

13        A.    I have heard of it.

14        Q.    Do you know that that's one of the

15   French subsidiaries of NNL?

16        A.    I believe I knew that.

17        Q.    Are you aware that NNSA would be

18   solvent if they got the allocation in the

19   Kinrich report?

20        A.    No.

21        Q.    And are you aware that NNL has a

22   91 percent equity interest in NNSA?

23        A.    No.

24        Q.    If we assumed that NNSA had

25   $133 million of excess assets over liabilities

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2     to upflow to NNL, would you agree with me that,
 3     under your sensitivity analysis, taking the
 4     same five assumptions in your bullets, it would
 5     be approximately $86 million more in surplus
 6     cash for NNI?
 7              MR. PULTMAN:  Same objections as to
 8         NN Ireland.
 9              You can answer the question.
10        A.    Mathematically, yes.  Without also
11     ignoring my other assumptions.
12        Q.    I'm not asking you to ignore them.
13     I'm asking you to make them.
14        A.    I am making them.  You're ignoring
15     the totality of my assumptions.  You said let's
16     keep my assumptions the same, and I am.  And my
17     assumptions include more than just those five
18     bullet points.
19        Q.    The assumptions that I want you to
20     make are stretching the outcome of events in
21     all cases in favor of NNI, such that surplus
22     cash is maximized, okay?
23        A.    Okay.
24        Q.    So if you make that assumption, and
25     you were to learn that NNSA were able to
```

HIGHLY CONFIDENTIAL                                    144

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2    upstream $133 million to NNL, the positive

3    impact on NNI would be about $86 million under

4    your calculations, correct?

5                    MR. PULTMAN:  Same objections.

6         A.    Not necessarily.  Again, ignoring

7    taxes.  Ignoring other variables.  But if you

8    assume a straight 65 percent, mathematically,

9    yes.

10        Q.    Let's assume the numbers that I gave

11   you for just the IP addresses, NN Ireland and

12   NN France, NNSA, okay, just assume those three

13   numbers.

14                    Isn't it true that if you stretch

15   the outcome of events in all cases in favor of

16   NNI, such that the surplus cash is maximized,

17   and your report were only adjusted for the sale

18   of the IP addresses, for NN Ireland's equity

19   value and for NNSA's equity value, putting

20   aside taxes that we don't know about one way or

21   the other, the surplus cash for NNI would, in

22   fact, be over $1.3 billion?

23                    MR. PULTMAN:  Same objections.

24                    You can answer.

25        A.    Mathematically, it could be.

 1                WERTHEIM - HIGHLY CONFIDENTIAL

 2        Q.    And, in fact, it would be under your

 3   calculations, correct?

 4        A.    Could be.  But let me add -- I want

 5   to add to that, because you keep referring to

 6   stretching the assumptions one at a time.  And

 7   as I have stated, I have looked at the totality

 8   of the reasonableness of this as a whole, and

 9   yes, there are individual assumptions that are

10   made, but reasonableness includes the

11   likelihood of all of those outcomes occurring.

12             Just as an example, statistically,

13   if you were to flip a coin, the probability of

14   a head versus a tail is 50/50, 50 percent, but

15   if you want to say, okay, I'm going to hit a

16   head ten times, the probability of that is less

17   than one out of a thousand.

18             So, is it realistic that one of

19   those might be a head?  Yes.  Is it realistic

20   that all of those are going to be a head?  No.

21             And so you keep asking about

22   stretching each one at a time of these outcomes

23   in favor of NNI.  Mathematically, one at a

24   time, it might affect the bottom line.  But,

25   again, my conclusion is based on the totality

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    of not only the assumptions that went into
 3    Table 2, but the totality of my assumptions on
 4    those other variables, that it could further
 5    reduce the net cash available to NNI.
 6         Q.    Do you have your report in front of
 7    you?
 8         A.    Yes.
 9         Q.    Let's look at paragraph 50.
10              Can you read the heading out loud of
11    5.2?
12         A.    Conclusions on the Net Cash
13    Available to NNI for Payment of PPI.
14         Q.    Okay.  And paragraph 50 says, "Based
15    on the analysis performed in this report, the
16    maximum," and you put that in bold and
17    underlined, "amount of net assets available to
18    NNI for the payment of PPI to the bondholders,
19    pursuant to the proposed agreement would be
20    approximately $971 million (Table 2)."
21              Do you see that?
22         A.    Yes.  Based on my calculations and
23    assumptions that went into Table 2, that's my
24    amount.
25         Q.    And all I want to know now is
```

1               WERTHEIM - HIGHLY CONFIDENTIAL

2       just -- I want to ask you the maximum, exactly

3       the same thing that you wrote as 971 in

4       paragraph 50, if we added in the three

5       assumptions I gave you for the IP addresses, NN

6       Ireland and NNSA, that number, 971, goes above

7       $1.3 billion in that sentence, correct?

8           A.    Correct.

9           Q.    Have you ever heard of the 4th

10      Estate?

11          A.    No.

12          Q.    Are you aware that there has been a

13      settlement with Asia and CALA subs?

14              MR. PULTMAN:  Object to the form of

15          the question.

16          A.    A settlement between who and the

17      subs?

18          Q.    Between NNL and NNI and EMEA and the

19      Asia and CALA subs, are you aware of that?

20          A.    I may be, but I'm not certain of

21      what you're referring to.

22          Q.    Let's look at the cash -- the cash

23      balance worksheet that you referred to before.

24      And could you turn to page 13?

25              Do you see that there's a cash

1              WERTHEIM - HIGHLY CONFIDENTIAL

2      balance for Asia in this worksheet and China of

3      $158 million?

4           A.    I'm sorry.  I'm not seeing the 158.

5           Q.    If you add 67 and 91, you get to

6      158, right?

7           A.    Oh, okay.  Yes.

8           Q.    By the way, so when you read the

9      10-Q that you referred to earlier, you didn't

10     notice what it said about the 4th Estate

11     settlement?

12              MR. PULTMAN:  I'm sorry.  Do you

13         want to bring him back to this?

14         Q.    You can pull up the 10-Q.  Let's

15     turn to the Bates number at the bottom, 766.

16              Are you aware of the settlement

17     that's referred to on this page?

18         A.    No.

19         Q.    So when you saw, going back to the

20     cash balance worksheet and the 158 million, did

21     you notice that $158 million on the worksheets

22     when you were doing your calculations?

23              MR. PULTMAN:  Object to the form.

24         A.    Excuse me while I try to see where

25     this page fits into the total picture, because,

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    again, this is, as printed out, different than
 3    mine.  (Perusing.)
 4              Okay.  Could you repeat the
 5    question?
 6         Q.   Sure.  Were you aware of this when
 7    you did your calculations?
 8         A.   It was part of the worksheet I have
 9    seen.
10         Q.   But were you aware of the
11    $158 million in cash in China and Asia-Pac?
12         A.   I was aware that, as looking at the
13    worksheet, that it exists.
14         Q.   Did you consider at all what the
15    entitlements of NNI and NNL were to that cash?
16         A.   No.
17         Q.   Let's turn to page 21 of the
18    worksheet that you have before you.  If you
19    look on line 16, there is a reference to D&O
20    Trust.
21              Do you see that?
22         A.   Yes.
23         Q.   $35 million.  Have you ever heard of
24    the D&O Trust?
25         A.   No.
```

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2         Q.    Okay.  When you saw it on the
 3    worksheet, did you make any inquiries to
 4    anybody as to what that $35 million was?
 5         A.    No.
 6         Q.    Do you know that there was a trust
 7    for directors and officers that both the US and
 8    Canadian debtors contributed to?
 9         A.    No.
10         Q.    Are you aware that if no claims
11    continue to be made against that $35 million,
12    that gets divided up between the US and
13    Canadian debtors in proportion to their
14    ultimate allocations in this litigation?
15         A.    Okay.
16         Q.    You weren't aware of that?
17         A.    No.
18         Q.    Okay.  If you assume with me that
19    the Kinrich allocation is ultimately accepted,
20    are you aware that the US debtors could
21    receive, ultimately, another 30 plus million
22    dollars that you haven't accounted for as a
23    result of this?
24         A.    No.
25         Q.    Let's go back now to your
```

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    3.235 billion of other claims against the

3    consolidated Nortel Canadian group.

4              Are you aware that a significant

5    portion of them are employee-related claims?

6         A.    Yes.

7         Q.    When you made the assumption to

8    consider all of the claims on a consolidated

9    basis, did you see any documents that would

10   have told you that NNL had any responsibility

11   for employees who did not work for NNL?

12        A.    I didn't see any documents related

13   to that.

14        Q.    Did anybody tell you to make that

15   assumption?

16        A.    No.

17        Q.    Would it surprise you to learn that

18   NNL was the employer of fewer than half of the

19   Canadian employees?

20              MR. PULTMAN:  Object to the form of

21        the question.

22              You can answer.

23        A.    Okay.  I will accept that.

24        Q.    Have you ever done any analysis of

25   the surplus cash available to NNI if we take

**HIGHLY CONFIDENTIAL**                  152

1           WERTHEIM - HIGHLY CONFIDENTIAL
2    all of your assumptions, but we assume that NNL
3    is only responsible for the employee-related
4    claims of its own employees?
5           A.    No.
6           Q.    Have you ever heard the term
7    "substantive consolidation"?
8           A.    I may have, depending on what you're
9    referring to.
10          Q.    The substantive consolidation in a
11   bankruptcy of multiple entities, so that their
12   assets and liabilities are considered as one --
13   one consolidated pool.
14                Have you heard that?
15          A.    No.
16          Q.    As I have defined it, do you have
17   any reason to believe that the various Canadian
18   debtors are going to be substantively
19   consolidated with each other?
20                MR. PULTMAN:  Objection, no
21        foundation.
22                You can answer.
23          A.    I have no basis to make that
24   judgment.
25          Q.    Do you know the legal standards for

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    substantive consolidation in Canada?

3              MR. PULTMAN:  Same objection.

4         A.    No.

5         Q.    Do you know whether the monitor is

6    even considering proposing substantive

7    consolidated?

8         A.    I don't know what the monitor is

9    considering.

10         Q.    Do you know whether substantive

11    consolidation of the Canadian debtors is a best

12    case assumption for NNI?

13              MR. PULTMAN:  Same objection.

14         A.    No.

15         Q.    I want to turn briefly to the US

16    cash balance side of your calculation.

17              So we have already discussed a few

18    minutes ago the D&O Trust asset that you didn't

19    take into account, but let's turn to Table 2 of

20    your report, which is on page 11.

21              You list the current cash balance at

22    distribution for NNI at $620.9 million.

23              Do you see?

24         A.    Yes.

25         Q.    And you cite, in footnote 18, the

1              WERTHEIM - HIGHLY CONFIDENTIAL

2     cash summary worksheet dated September 12; is

3     that true?

4          A.    Yes.

5          Q.    And that's the cash summary

6     worksheet that we have been looking at before?

7          A.    Yes.

8          Q.    Can you show us how you get to

9     620.9?

10         A.    Sure.  If you turn to the Bates

11    number at the bottom, page 14 of the cash

12    summary worksheet, column Q, showing the cash

13    balance under US controlled entities, if you

14    take the five -- and I'm just going to walk you

15    through the math.

16         Q.    Uh-huh.

17         A.    If you take the 575, plus 85, plus 2

18    for NNCC, and I believe 6 for NNII, and then

19    subtract out cash burn for nine and a half

20    months, you get 620.9, which I include in Table

21    2.

22         Q.    So 575, 85, 2 and 6.  Did I miss

23    anything?

24         A.    I believe that's it.  I believe

25    that's -- yes.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    And you excluded from this Alteon,

3   correct?

4        A.    Correct.

5        Q.    That's 56?

6        A.    Correct.

7        Q.    And you excluded NN Guatemala?

8        A.    Yes.

9        Q.    You also excluded NNIII, correct?

10       A.    Correct.

11       Q.    And that's 33?

12       A.    Correct.

13       Q.    So 56, 33 and 3, about $92 million

14   from those entities, correct?

15       A.    Correct.

16       Q.    Why did you exclude those three

17   entities?

18       A.    Can I request a document?

19       Q.    Sure.

20       A.    Monthly Operating Report No. 60.

21            MR. PULTMAN:  Do you want to do this

22       over the lunch break, if that works easier

23       for you?

24   BY MR. ROSENTHAL:

25       Q.    Yeah, after the lunch break, we will

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2        try to make copies of it.  If you could give us

3        a general answer, and then you can look at the

4        document.

5             A.    If you have another monthly

6        operating report handy, I can probably use it

7        to show you, just in a general sense.

8                  MR. TUNIS:  The sixty-first, we gave

9             you.

10                 THE WITNESS:  Yeah, the MOR.

11            Q.    Okay.  We'll try to get you one, but

12       do you have any understanding without the

13       document or you need the document to say it?

14            A.    Yeah, I'll try to explain without

15       it, but there's -- in the column where I pulled

16       my claims, there's also another column of

17       claims for other entities which have other

18       claims, and I excluded those, and that group,

19       for reporting requirements, is explained in the

20       monthly operating report, was Alteon and

21       NNIII -- excuse me -- yeah, Alteon and NNIII.

22       So the claims that I included for NNI excluded

23       the claims for Alteon and NNIII.

24            Q.    So stated another way, is it fair to

25       say that that cash for those three entities was

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    going to be used to satisfy the creditors of

3    those specific entities?

4         A.    Yes.

5         Q.    And, therefore, you concluded it

6    wouldn't be available in any way for NNI,

7    correct?

8         A.    Correct.  Again, I may want to look

9    at the report to --

10        Q.    I'll get you one, but I just wanted

11   to get -- is that your general understanding?

12        A.    Yes.

13        Q.    If we go back to Table 2 of your

14   report, you have a PBGC claim against the US

15   debtors of $593 million, correct?

16        A.    Correct.

17        Q.    Are you aware that the PBGC claim

18   has also been asserted against Alteon?

19        A.    A lot of these are duplicate names,

20   yes.

21        Q.    Well, are you aware that, as to

22   whether, under the law, the PBGC has a right to

23   assert duplicate claims and collect from

24   multiple debtors?

25             MR. PULTMAN:  Objection, no

1              WERTHEIM - HIGHLY CONFIDENTIAL

2          foundation.

3                  You can answer.

4          A.      It's my understanding that that's

5      the case.   Although I'm not --

6          Q.      And in fact --

7          A.      I was not quite finished.

8          Q.      Yep.

9          A.      Although I'm not expressing a legal

10     opinion, but that was my understanding.

11         Q.      Are you aware as to whether, under

12     the law, the PBGC claim could even be asserted

13     against non-debtor subsidiaries like NN India

14     International and NN Guatemala?

15                 MR. PULTMAN:   Same objection.

16                 You can answer.

17         A.      I don't know that from a legal

18     standpoint.

19         Q.      So if we're looking at -- so, given

20     your knowledge, at least with respect to

21     Alteon, under a best case scenario for NNI,

22     isn't it true that some, if not most, of

23     Alteon's cash could be used to pay the

24     $593 million PBGC claim?

25         A.      I can't say that, because I don't

```
 1                    WERTHEIM - HIGHLY CONFIDENTIAL
 2     know what other claims there would be that
 3     would be paid before that.
 4          Q.    You would have to look at Alteon's
 5     claim to find out what the PBGC can collect
 6     against Alteon, correct?
 7          A.    Possibly, yes.
 8          Q.    You didn't do that, did you?
 9          A.    No.
10          Q.    You would agree with me that to
11     whatever extent the PBGC collected from
12     subsidiaries of NNI, like Alteon and NN India
13     International and NN Guatemala, that would
14     reduce the $593 million PBGC claim against NNI,
15     correct?
16          A.    Mathematically, it could, but the
17     593 isn't even the total of the claim.  I'm not
18     even including the total PBGC claim in my
19     calculation.
20          Q.    But the amount of the claim that you
21     have decided for your calculation to use would
22     be reduced by whatever amount of payment it got
23     from these other subsidiaries.  Mathematically
24     true, correct?
25          A.    There would have to be a lot of
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    assumptions made.  For instance, if Alteon paid

3    first and if other things happened.  But is it

4    mathematically feasible that, ultimately, that

5    could flow up?  Mathematically, yes.

6         Q.    But we're not just talking

7    mathematical feasibility.  It's reasonable to

8    you, isn't it, that if Alteon pays its cash to

9    the PBGC, that NNI needs to pay fewer, less of

10   its cash to the PBGC, correct?

11              MR. PULTMAN:  Object to the form.

12        Objection, foundation.

13              You can answer again.

14        A.    I don't know what other claims

15   Alteon has, and what other things it would pay

16   first, and what excess cash it would have to

17   pay PBGC.

18        Q.    I'm not asking you for what other

19   claims.  Just for each dollar that Alteon pays

20   to the PBGC is one less dollar that NNI has to

21   pay to the PBGC.

22              You understand that, correct?

23        A.    Mathematically, yes.

24        Q.    And you have done no analysis other

25   than to simply exclude Alteon's cash

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    altogether, correct?
 3         A.    But I have also excluded all of
 4    Alteon's other claims.
 5         Q.    You don't know, though -- do you
 6    know whether Alteon's other claimants have any
 7    claims against NNI?
 8         A.    The issue on Alteon is whether they
 9    would have additional claims against Alteon,
10    but I have answered that several times.  That's
11    not included in my analysis.
12         Q.    When you decided to exclude this
13    cash, the $92 million that Alteon, NN Guatemala
14    and NN India International have, why did you
15    not factor in the possibility or even
16    probability that some of the PBGC claim could
17    be satisfied through that cash?
18              MR. PULTMAN:  Objection.  It has
19         been asked and answered several times now.
20              MR. ROSENTHAL:  No.  He's just
21         telling me what he didn't do as opposed to
22         why he didn't do it.
23              MR. PULTMAN:  And he's telling you
24         why he didn't do it, and he has told you
25         why he didn't do it.
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2                  I'll let him answer it again.

3        A.    I didn't include the cash side

4   because I didn't include the claims side.

5        Q.    Is it your opinion that to include

6   the cash side, you have to include the claim

7   side?

8        A.    It would be --

9        Q.    You know, mathematically, that's not

10  true.

11             MR. PULTMAN:  He hasn't answered the

12       question.

13             MR. ROSENTHAL:  Fine.  Answer that

14       one.

15       Q.    You are the Ph.D., but, you know, go

16  ahead.

17       A.    Well, if I'm looking at net assets

18  available, I want to match entities' cash with

19  entities' claims.  And so if I have certain

20  entities that I'm not including, I'm not

21  including.

22       Q.    You know, finance 101, that's not

23  true, don't you?

24             MR. PULTMAN:  Now you're arguing

25       with him.

1          WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    Fine.  We will walk through it in

3    painstaking detail.  Okay.

4               Let's assume with me Alteon has

5    $56 million in cash, okay?  If you need to

6    write down these numbers, you can.  Assume

7    $56 million in cash.

8               Can you do that?

9          A.    Okay.

10         Q.    Let's assume that they have a PBGC

11   claim of $593 million.

12         A.    Okay.

13         Q.    And a -- other claims against it of,

14   let's say, $56 million.  Okay?

15               Can you give me a rough percentage

16   of what percent of the claims pool the PBGC is

17   going to comprise in that situation?

18         A.    56 -- 50 percent.

19         Q.    PBGC has a 593 million --

20         A.    I'm not following.

21         Q.    PBGC has a $593 million claim.

22         A.    Okay.  Okay.

23         Q.    Let's make it simple.  Alteon's

24   other claims are 60 million against it.

25               Can you give me the rough percentage

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    of the claim pool that PBGC has?

3         A.    90 percent?  I'm not sure what

4    you're asking.

5         Q.    We will get to it, then, if you

6    don't see it.

7              If PBGC has 90 percent of the claims

8    pool, and Alteon has $56 million to go to its

9    creditors, what's the rough percentage of that

10   $56 million that the PBGC would get?

11        A.    Whatever the number comes out to be,

12   and I understand that that would reduce, and I

13   have already said it, it would reduce the PBGC

14   claim to NNI.

15        Q.    And you don't need to combine

16   Alteon's creditors with NNI's creditors to

17   conclude that there should be a reduction for

18   what they pay the PBGC, do you?

19             MR. PULTMAN:  Objection, no

20        foundation.

21             You can answer this.

22        A.    Could you ask that again?

23        Q.    Well, you told me before, well, I

24   didn't take their assets because I didn't take

25   their liabilities, but for my questions, you

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    don't need to do that.
 3         A.    Right, for the flowup.
 4         Q.    Correct.
 5         A.    And I understand that.
 6         Q.    I'm not looking at flowup.  I'm not
 7    looking at flowup.  I'm looking for the --
 8         A.    For the reduction in claims on NNI's
 9    side.
10         Q.    Correct.  And for the reduction in
11    claims on NNI's side, we don't need to do any
12    consolidation of Alteon with NNI.
13         A.    That's true.
14         Q.    All we need to know is what
15    percentage of NNI -- of Alteon's and those
16    other entities' cash the PBGC is going to get,
17    correct?
18         A.    Correct.
19         Q.    So going back to my question, why
20    didn't you look at that question when you
21    decided to exclude all of the cash of those
22    three entities that totaled $92 million?
23              MR. PULTMAN:  Objection.  It has
24         been asked and answered several times.
25              You can answer it again.
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    I had no basis to determine whether

3    to look at the individual other entities on

4    what they would pay.

5        Q.    Are you saying you couldn't get --

6    you had no access to that information?

7        A.    No.

8        Q.    Did you look to see whether the US

9    claims are publicly available?

10       A.    The claims for Alteon?

11       Q.    Yeah.  Did you look?

12       A.    No.

13             MR. PULTMAN:  Can we figure out what

14        an appropriate stopping point for lunch

15        would be?

16             MR. ROSENTHAL:  Let's go off the

17        record.

18             THE VIDEOGRAPHER:  We are now off

19        the record.  The time is 1:05 p.m.,

20        October 22, 2014.

21             (Luncheon recess taken at 1:05 p.m.)

22

23

24

25

1              WERTHEIM - HIGHLY CONFIDENTIAL

2          A F T E R N O O N     S E S S I O N

3              (Time noted:  2:05 p.m.)

4    P A U L    W E R T H E I M,    resumed and

5              testified as follows:

6              THE VIDEOGRAPHER:  This is tape four

7         of the deposition of Dr. Paul Wertheim.

8         We are now back on the record.  The time

9         is 2:05 p.m., October 22, 2014.

10   CONTINUED EXAMINATION

11   BY MR. ROSENTHAL:

12        Q.    Dr. Wertheim, shortly before the

13   lunch break, you had asked whether you could

14   take a look at one of the monthly operating

15   reports in connection to some questions I asked

16   about Alteon.

17        A.    Yes.

18        Q.    And I just -- we made some copies of

19   one from earlier this year, and I wanted to

20   just give it to you to take a look at just to

21   see if that would change any of your answers

22   with respect to Alteon.  I think I asked just

23   why you didn't consider it, and you said you

24   wanted to take a look at it.

25              MR. ROSENTHAL:  So why don't we mark

1          WERTHEIM - HIGHLY CONFIDENTIAL

2      this as Exhibit 7.  It is the Monthly

3      Operating Report No. 60.

4          (Wertheim Exhibit 7, Monthly

5      Operating Report No. 60, marked for

6      identification.)

7      Q.    My only question is whether this

8  document alters any of the testimony you gave

9  previously, since you said you were kind of

10 testifying based upon your recollections as

11 opposed to the document itself.

12     A.    (Perusing.)  No.

13         MR. LEBLANC:  This one only has

14     every other page.

15     Q.    Do any of the odd pages change your

16 testimony?

17     A.    No.

18     Q.    I think I have one that's -- we'll

19 get you one with the even pages and see if the

20 even pages change your testimony.

21         Before I move on to something else,

22 you had mentioned your awareness of the IP

23 address sales or the fact that they had those

24 to sell.

25         At the time you drafted your report,

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    were you aware that NNL had IP addresses that

3    it was planning to sell?

4         A.    Yes.

5         Q.    So Appendix B, page 32 of your

6    report, you mention -- you list the materials

7    that you relied upon, and two of them are the

8    Britven expert report and the Britven rebuttal

9    report.

10             Do you recall reviewing those?

11        A.    Yes.

12             MR. ROSENTHAL:  I want to mark, as

13        Exhibit 8 -- Brent, can I have tab eight

14        to give out?

15        Q.    I'm going to give you and mark as

16   Exhibit 8 Britven's rebuttal report dated

17   February 28, 2014.

18             (Wertheim Exhibit 8, Thomas

19        Britven's Rebuttal Report, dated

20        February 28, 2014, marked for

21        identification.)

22        Q.    This is one of the reports that you

23   reviewed?

24        A.    Yes.

25        Q.    And you're aware that he did this

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    report back at the very end of February?

3         A.    Yes.

4         Q.    Okay.  Now, do you see, if you turn

5    to page 35 of his report, he has a document

6    called Table 1?

7         A.    Okay.

8         Q.    And in Table 1, Mr. Britven states

9    that after doing his calculations, the US

10   interest will have $1.304 billion in

11   undistributed cash.

12             Do you see that?

13        A.    Yes.

14        Q.    Are you aware that in -- you're

15   aware that there was a trial on allocation

16   earlier this year?

17        A.    Yes.

18        Q.    Okay.  And are you aware that, in

19   opening statements in May, the Canadian

20   interests used the same chart with that same

21   number of $1.304 billion?

22        A.    Yes.

23        Q.    Are you aware that, when Mr. Britven

24   testified in June at the trial, the Canadian

25   interests used the same chart with the same

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    $1.304 billion in undistributed cash for NNI?

3         A.    Am I specifically aware that they

4    used it at that date?

5         Q.    Yeah.

6         A.    I don't know for sure, but I would

7    assume yes.

8         Q.    Are you aware that just four weeks

9    ago, in closing statements, the Canadian

10   interests again referred to the same chart with

11   the same $1.304 billion?

12        A.    Yes.

13        Q.    Okay.  Is it fair to say that you

14   disagree with Mr. Britven's calculation that

15   the US interests would have $1.304 billion in

16   undistributed cash under the Kinrich approach?

17        A.    I used different assumptions and so

18   my number is different.

19        Q.    Had you used the same assumptions as

20   Mr. Britven, do you know if you would have

21   agreed with his $1.304 billion ultimate

22   calculation?

23        A.    By definition, if I used the exact

24   same assumptions, I would get the exact same

25   number.

1                WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.     Do you believe that he used wrong

3    assumptions?

4        A.     I believe he omitted some

5    assumptions that I included.

6        Q.     So that he used certain assumptions

7    that ended up being more favorable to the -- to

8    NNI?

9        A.     More favorable, but not more

10   realistic.

11       Q.     Do you believe that his assumptions

12   were less realistic than yours?

13       A.     Certain assumptions, yes.

14       Q.     Do you believe that any of his

15   assumptions were unrealistic?

16       A.     I don't know if I could list every

17   assumption that he made and whether or not it's

18   realistic or not, but, for example, to the

19   extent that he excluded tax liability for NNI,

20   I consider that unrealistic.

21       Q.     The tax liability that he excluded

22   that you included, had how much of an impact on

23   your analysis?

24       A.     133.

25       Q.     Is there any other assumption that

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    Mr. Britven made that got him to $1.3 billion

3    that you, upon reviewing it, considered to be

4    unrealistic?

5          A.    From the detail that I could gather,

6    it also appears that he did not include PPI for

7    the NNCC notes, nor any PPI for other US

8    non-bondholder creditors.

9          Q.    Do you think it is an unrealistic

10   assumption not to include PPI for the NNCC

11   notes?

12         A.    I think it's more realistic to

13   include some amount than to include a zero

14   amount.

15         Q.    Do you think it's unrealistic to

16   include a zero amount?

17         A.    I'm going to say, for purposes of my

18   analysis, it would have been.

19         Q.    What about for purposes of his

20   analysis, would it -- was it unrealistic to

21   assume zero PPI for the NNCC notes?

22         A.    I'm not totally sure about the

23   ultimate purpose of his report, so I can't say

24   for purposes of his report whether his

25   exclusion would be reasonable or not.

HIGHLY CONFIDENTIAL                              174

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    Do you believe that it was

3    unrealistic for him to exclude PPI for other

4    creditors?

5          A.    Same response.  It would depend on

6    his ultimate purpose of the report, and what --

7    what his basis was.

8          Q.    Did you -- do you know what the

9    ultimate purpose of his report was?

10                MR. PULTMAN:  Objection.  It has

11          been asked and answered.

12                You can answer it again.

13         A.    I think to look at and compare the

14   different allocation outcomes, the different

15   ultimate outcomes of the different allocation

16   scenarios.

17         Q.    So is it fair to say that, other

18   than the exclusion of the tax liability, the

19   assumptions that went into Mr. Britven's

20   calculation of the $1.3 billion may have been

21   reasonable, and you don't have an opinion as to

22   whether it was or wasn't?

23                MR. PULTMAN:  Object to the form.

24                You can answer.

25         A.    Again, I don't know the detailed

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    list of all of his assumptions.

3          Q.    Those assumptions that you were able

4    to see in reviewing his reports, is it fair to

5    say that none of them struck you as

6    unreasonable except for his exclusion of tax

7    liability?

8          A.    Well, as I said, his exclusion of

9    the tax liability, his exclusion of the PPI

10   interest on the NNCC notes, his exclusion of

11   the PPI on non-bondholder creditors, and he

12   also uses a larger cash balance than I use for

13   NNI.

14               And if you take the differences of

15   each of those, it adds up to the difference

16   between his number and my number.

17         Q.    Was he unreasonable to use his cash

18   balance?  Do you think he made a mistake?

19         A.    I think mine is more reasonable.

20         Q.    That wasn't my question.

21               Was Mr. Britven unreasonable to use

22   the cash balance that he used, in your expert

23   opinion?

24         A.    Well, unreasonable is a continuum.

25   He's -- I think it was less reasonable than

1                WERTHEIM - HIGHLY CONFIDENTIAL

2   mine.

3        Q.    Well, if we are looking for --

4        A.    I think it was unrealistic to assume

5   a zero cash burn rate, for example.

6        Q.    So you believe that that's an error

7   that Mr. Britven made in his calculation?

8        A.    I said it was more unrealistic than

9   my assumption that there would be some cash

10  burn.

11       Q.    Do you believe that the cash burn

12  rate is more likely to be closer to your number

13  than Mr. Britven's number?

14       A.    I think it's more likely to be.

15       Q.    Have you done any analysis that

16  enables you to say that?

17       A.    Well, my number is 5 million per

18  month.  His number is zero per month.

19            So based on my analysis of the

20  historical cash burn, I think it is more

21  reasonable to assume some cash burn than to

22  assume zero cash burn.

23       Q.    But that wasn't my question.

24            Do you conclude that it is more

25  likely to be closer to -- actually, that was

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    two questions ago.

3              What analysis have you done to

4    conclude that it's more likely to be closer to

5    your number than closer to Mr. Britven's

6    number?

7         A.    The analysis that I did in my

8    report, because his -- when I did my analysis

9    to estimate the cash burn, I made the

10   assumption, is it reasonable to assume zero or

11   is it reasonable, more reasonable to assume

12   some cash burn.  And I found it more reasonable

13   to assume some cash burn.

14              And so I then did an analysis to

15   figure out, okay, what -- what amount am I

16   going to use.  If I'm going to use some cash

17   burn, what amount am I going to use.  And so I

18   did just a historical analysis to try to

19   calculate recently what an average actual cash

20   burn had been.

21              And so based on that, I made my

22   estimate conservatively, and I assume that

23   that -- and I believe that that's more

24   realistic than assuming a zero cash burn.

25         Q.    When you say you did a historical

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2       analysis, you looked to see how much the US

3       debtors were spending in the runup to and then

4       at trial, right?  That was your comparison?

5                    MR. PULTMAN:  Object to the form.

6                    You can answer.

7            A.    Well, it includes -- it includes

8       that.

9            Q.    Doesn't it include basically only

10      that?  Did you look at cash burn for any period

11      other than after the end of the mediation up

12      through trial?

13           A.    Well, I state in my footnote exactly

14      what dates I used.  Historically, I looked at

15      the periods April 30, '13 through January 31,

16      '14, and then also for the ten-month period

17      ended September 12, 2014.

18           Q.    Are you aware that that entire

19      period that you included was trial preparation

20      and trial?

21           A.    Yes.

22           Q.    So just so I understand, you've

23      included -- you and Mr. Britven disagree on

24      four assumptions, you're saying, correct?  PPI

25      for NNCC bonds, PPI for other creditors, tax

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    liability, and cash burn?

3        A.    Those are the main ones that I'm

4    aware of.

5        Q.    And even though your report says

6    that you were taking the most favorable

7    assumptions for NNI in each of those four

8    situations, Mr. Britven had a more favorable

9    assumption that he took than you, correct?

10       A.    Again, I didn't look just at that.

11   I also balanced with, realistically, the

12   amount.  And so, mathematically, would the

13   assumption to exclude the tax liability be more

14   favorable to NNI?  Yes, it would be to exclude

15   it completely.  It would be more favorable to

16   NNI.  But, to me, that's totally unrealistic to

17   assume a zero tax liability.

18       Q.    We will come back to that in a

19   moment, but -- so it's your testimony now,

20   then, that with respect to these four

21   assumptions, not only do you disagree with

22   Mr. Britven, but the assumptions he made were

23   completely unrealistic?

24           MR. PULTMAN:  Object to the form,

25       mischaracterizes his testimony.

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.     Let me take a step backwards.

3                 You said you took the most favorable

4    assumptions, but you had to balance that with

5    what's realistic, right?

6          A.     Yes.

7          Q.     Okay.  And balancing that with

8    what's most realistic leads you to the four

9    assumptions that you made with respect to the

10   four issues where you diverge from Mr. Britven,

11   right?

12         A.     For those four.

13         Q.     So, by definition, aren't you saying

14   that the assumptions that Mr. Britven made on

15   those four issues, which are more favorable to

16   NNI, are all unrealistic?

17         A.     That's not what I said, and

18   that's -- you're assuming that that word is

19   binary, that's something is either realistic or

20   it's unrealistic.  I said my assumptions are

21   more realistic.

22         Q.     Well, I'm asking you whether you're

23   able to say whether the more favorable

24   assumptions that Mr. Britven made are

25   unrealistic, yes or no?  Are you able to say

1                      WERTHEIM - HIGHLY CONFIDENTIAL

2    that?

3          A.     I consider them unrealistic.

4          Q.     I now have the even pages.  Why

5    don't we mark, as a replacement Exhibit 7, was

6    it, we'll just mark it the Monthly Operating

7    Report No. 60 with odd and even pages.

8          A.     And I want to add one more thing to

9    that previous question.

10               When I said they are unrealistic,

11   and, again, it refers back to several questions

12   ago, a comment that I had added or I made, was

13   that his assumptions sort of depend on his

14   ultimate purpose, and in his comparison of the

15   different outcomes on allocation, different

16   scenarios, and so his -- his assumptions,

17   whether or not they are unrealistic, sort of

18   depend on his purpose.

19               My purpose was to calculate the net

20   assets available for distribution by NNI.  And

21   so that's why I considered my assumptions more

22   realistic and, therefore, included those.

23         Q.     So if Mr. Britven's purpose was to

24   show as much of an excess at NNI as possible,

25   that could have led him to make different

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    assumptions than you did, correct?

3              MR. PULTMAN:  Object to foundation.

4              You can answer the question.

5         A.    Yeah, I don't know what it would

6    have caused him to do.

7         Q.    Do you know whether that was a

8    purpose of his?

9         A.    No.

10        Q.    One way or the other?

11        A.    No.

12             They are handing me the even pages,

13   I believe.

14        Q.    We are handing you odds and evens

15   together, so why don't you take a look at the

16   new Exhibit 7?

17        A.    You want to replace the exhibit?

18        Q.    Yeah.  Take a look at new Exhibit 7

19   and tell me if there is anything in here now

20   that would change your testimony with respect

21   to Alteon and the other subsidiaries.

22        A.    (Perusing.)  No, I'm fine.

23        Q.    Okay.  One more question on that

24   with regards to Mr. Britven.

25             If Mr. Britven had the same purpose

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2      as you have, then you would characterize his

3      assumptions as unrealistic, correct?

4           A.     For the purpose -- if the purpose

5      was the exact same as mine, had I excluded, for

6      instance, again, the tax liability, I would

7      have --

8                    MR. PULTMAN:  You have to keep you

9           hand down.

10          A.     -- I would have considered that

11     unrealistic.

12          Q.     Just give me one moment.

13                 (Discussion off the record.)

14          Q.     Have you done any analysis of what

15     NNI's undistributed cash or surplus cash,

16     actually, to use your term, what the surplus

17     cash would look like, if any, using any

18     allocation outcome other than Kinrich?

19          A.     No.

20          Q.     So let's turn to paragraph 16 now of

21     your report.  This is the paragraph that you

22     corrected at the beginning of your deposition

23     to say that the 1.657 includes the NNCC notes,

24     and it would be still over 1.6 billion, but not

25     quite 657, if we excluded the NNCC notes,

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2      correct?

3           A.     I believe that's the math.

4           Q.     And when did you realize that error?

5           A.     Subsequent to submitting my report.

6      Not exactly sure when.  Recently.  It's because

7      of the use of the word "bondholder" and how I

8      define that as opposed to the holders of the

9      crossover bonds compared to the holders of the

10     guaranteed bonds.

11          Q.     Let's include for a moment the NNCC

12     notes as you did.

13                 What was the source for that number

14     that you put into your report?

15          A.     I reference it -- (Perusing.)  I

16     would like to look at this particular document

17     before I say for sure this is the one.

18          Q.     Sure.

19          A.     But the document from my footnote

20     15.

21          Q.     Footnote 15.  BHG-PPI-71.

22                 MR. ROSENTHAL:  Do you have that

23          document, Andy?

24                 Why don't we just go off the record

25          for one second.  Brent may be tracking

**HIGHLY CONFIDENTIAL**                    185

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          down the bondholder production.

3                    THE VIDEOGRAPHER:  We are now off

4          the record.  The time is 2:32 p.m.,

5          October 22, 2014.

6                    (Recess taken.)

7                    THE VIDEOGRAPHER:  We are now back

8          on the record.  The time is 2:41 p.m.,

9          October 22, 2014.

10   BY MR. ROSENTHAL:

11        Q.    Dr. Wertheim, I just put before you

12   on the computer, since we don't have printouts

13   of it yet, the document you cite in footnote

14   15, which is BHG-PPI-71.

15               Is that the document you were

16   thinking of?

17        A.    No, but it may be a few pages below

18   or after.  It's within my scope, number 37 and

19   38.  And there was actually duplicate -- there

20   were numerous times within that range of

21   productions that the same table appeared.

22        Q.    Let me help you out.  Let me give

23   you a different document, which is NNI-PPI-118

24   to 121.  See if -- see if this is another

25   document that would have been your support for

1              WERTHEIM - HIGHLY CONFIDENTIAL
2     this.
3          A.    Okay.
4               (Wertheim Exhibit 9, Document Bates
5          Stamped NNI-PPI-118 to 121, marked for
6          identification.)
7          A.    (Perusing.)
8          Q.    And we have marked it as Exhibit 9,
9     is it?
10              Have you seen Exhibit 9 before?
11         A.    Yes.
12         Q.    Does this contain information that
13    you used in your calculation of -- of the total
14    accrued interest for the bonds?
15         A.    Yes.
16         Q.    Is this the document you were
17    thinking of or one like it?
18         A.    One like it.
19         Q.    Okay.  Now, when you talk about,
20    though, the $1.6 billion of accrued interest in
21    paragraph 16, you use the date June 30, 2015.
22              How did you come up with that
23    calculation?
24         A.    As of June 30?
25         Q.    Well, paragraph 16 of your report --

1          WERTHEIM - HIGHLY CONFIDENTIAL

2      A.    Yes.

3      Q.    -- you wrote that your accrued

4  interest is as of June 30, 2015.  Let me just

5  ask a preliminary question.

6          Have you ever seen a document that

7  has accrued interest running until June 30,

8  2015?

9      A.    Well, that's the date that uses the

10  cutoff for the accrual of interest, and the

11  numbers in this table go through July 1 of

12  2014, and so June 30 versus July 1, it cuts off

13  one day.  I mean, that's -- to me, that's the

14  June 30 cutoff.

15      Q.    But they are different years.

16      A.    And then the -- correct.

17      Q.    So where did you get the -- so, in

18  fact, you saw documentation indicating that the

19  total accrued interest as of June 30, 2014

20  would be $1.6 billion, not 2015, correct?

21      A.    (Perusing.)  According to this,

22  correct.

23      Q.    That's consistent with your

24  recollection, right?  I mean, is this just a

25  mistake in paragraph 16 when you refer to

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    June 30, 2015?  You should have referred to

3    June 30, 2014?

4         A.    It may be.

5         Q.    And as of June 30, 2014, if we want

6    to compare like dates to like dates, the

7    maximum interest would not have been

8    $1.01 billion, but it would have been less,

9    right?  Because the 1.01 goes through June 30,

10   2015, correct?

11        A.    Correct.

12        Q.    And, in fact, you understand from

13   the settlement, that if we want to compare

14   June 30, 2014 accrual versus settlement amount,

15   that the settlement amount would be 876 million

16   as of that date, correct?

17        A.    As of June 30, 2014.  Okay.

18        Q.    You agree with that?  I mean, that's

19   what you understand, from having read the

20   settlement documents, was the settlement amount

21   as of June 30, 2014?

22        A.    The assumed settlement date was

23   June 30, 2015.  Interest was accrued at

24   contract rate through a particular date.  I'm

25   not exactly sure what that date was, and then

HIGHLY CONFIDENTIAL                    189

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    following that date through June 30, 2015, it

3    was accrued at a lower rate with the cutoff of

4    accrual at June 30, 2015.

5         Q.    Let me help you out.  Let's look at

6    footnote three of your own report.

7         A.    Yes.

8         Q.    Having refreshed your recollection

9    by looking at footnote three, isn't it true

10   that the settlement, as of June 30, 2014, was

11   $876 million, with the possibility of accruing

12   additional interest at a reduced rate of three

13   and a half percent for one more year?

14        A.    Correct.

15        Q.    And if there was no payment for the

16   entire additional year, then that would yield a

17   maximum of $1.01 billion?  You could look at

18   your footnote.

19        A.    If there was no more accrual, the

20   cap is 1.01 billion.

21        Q.    And interest would cut off at that

22   absolute maximum, correct?

23        A.    Yes.

24        Q.    So if we want to compare, first,

25   just what do the 2014 numbers look like, you

1                   WERTHEIM - HIGHLY CONFIDENTIAL

2    have an $876 million settlement on about a

3    $1.6 billion claim, correct?

4         A.    Well, the -- yes.

5         Q.    And if we then wanted to say, okay,

6    let's assume there's no payout all the way

7    until June 30, 2015, the settlement would rise

8    at that date to 1.01 billion, correct?

9         A.    Correct.

10        Q.    And you haven't done any calculation

11   to know what would the accrued interest have

12   risen to in the absence of a settlement as of

13   June 30, 2015, did you?

14        A.    No.

15        Q.    And if we want to do that

16   calculation, we would need to say, okay, let's

17   take a look at the full principal amount of the

18   bonds and continue to accrue it at about

19   7 percent, right?

20        A.    Whatever the contract rate on the

21   various series are, yes.

22        Q.    It blends out to roughly 7 percent

23   or so, correct?

24        A.    Yes.

25        Q.    So based on your familiarity with

HIGHLY CONFIDENTIAL                    191

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    these bonds in this settlement, interest is

3    accruing at just under $300 million a year,

4    correct, in the absence of a settlement?

5         A.     Roughly, mathematically.

6         Q.     So in terms of what is the

7    percentage that the -- that NNI is settling for

8    as of June 30, 2015 would be 1.01 billion over

9    about 1.9 billion, correct?

10        A.     No, because that's not how I read

11   what they're settling for.  I base my opinion

12   on what they would have received anyway, and

13   so --

14        Q.     Let me withdraw that question,

15   because it was -- perhaps caused some

16   confusion.

17             Let's put aside the question of cash

18   availability and just focus on the what is the

19   percentage of the claimed amount that the

20   parties are settling for, okay?  We could --

21   obviously, the parties have their argument

22   about what's available and what's not, but if

23   we just wanted to look at what is the

24   percentage of the claimed amount, as of

25   June 30, 2014, it's 876 divided by about

1      WERTHEIM - HIGHLY CONFIDENTIAL

2    1.6 billion, correct?

3         A.    Correct.

4         Q.    As of June 30, 2015, it's

5    1.01 billion divided by about 1.9 billion,

6    correct?

7         A.    Okay.

8         Q.    And if we don't reach a resolution

9    to this whole rigmarole by June 30, 2016, it's

10   still a payment of 1.01 billion, assuming they

11   have the money, correct?

12        A.    Assuming they have the money.

13        Q.    You agree with that?

14        A.    The settlement amount is still

15   1.01 billion.

16        Q.    And the accrued interest by that

17   point in time, if there were no settlement,

18   would have risen to about 2.2 billion, correct?

19        A.    The accrued interest amount would

20   have accrued to that.  That doesn't mean they

21   would have received it.

22        Q.    Doesn't mean they have it, right?

23        A.    Right.

24        Q.    But in the absence of a settlement,

25   that would be the accrued interest number.

HIGHLY CONFIDENTIAL                 193

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.      Mathematically, yes.

3        Q.      And if we go to June 30, 2017, it

4   would still be the same 1.01 billion, right?

5        A.      Yes.

6        Q.      And the accrued interest would have

7   risen up to about two and a half billion,

8   correct?

9        A.      Yes.

10       Q.      It's fair to say that as -- on a

11  purely percentage basis of the amount of the

12  interest claim, that number declines

13  significantly over time the longer there's a

14  delay in payment, correct?

15              MR. PULTMAN:  Object to the form of

16       the question.

17              You can answer.

18       A.      That assumes they would have

19  received that amount to begin with.

20       Q.      Correct.  Assuming they could

21  receive that amount, that the cash is there,

22  the percentage payout goes down with the

23  passage of time, correct?

24       A.      Correct.

25       Q.      When you talk about $1.01 billion

1              WERTHEIM - HIGHLY CONFIDENTIAL

2     that's also -- that's only the number that it

3     rises to as of the end of next June, assuming

4     that all of the people that are fighting over

5     allocation can't get a resolution that results

6     in a payment before then, correct?

7          A.    Could you repeat the question?

8          Q.    Sure.  When you talk about a

9     $1.01 billion settlement, that's on the

10    assumption that all the parties fighting about

11    allocation can't get a resolution that results

12    in a payment before the end of next June,

13    correct?

14         A.    Right, that's based on an accrual,

15    assuming there's been no payment of the bonds

16    before that date.

17         Q.    Are you aware that if the parties

18    can reach a settlement in the month of

19    November, it's just over $900 million in terms

20    of the amount of the settlement?

21         A.    I don't know the exact amount, but

22    it would be less than 1.01 billion.

23         Q.    In fact, if the parties can, on

24    November 4 when the judge has ordered them to

25    come to his courtroom to try to resolve it, if

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    the parties do resolve it on that day, the

3    amount of accrued interest under the settlement

4    would be lower than the number that you have in

5    paragraph 50.  You've done that calculation,

6    right?

7         A.    Yes.

8         Q.    And I'm correct?

9         A.    I don't know the total accrual on

10   any given date, but it would be less than the

11   1 billion.

12        Q.    But it would be less than the 971

13   that you put in paragraph 50, right?

14        A.    It could be.  I don't know the exact

15   interest calculation.

16             MR. ROSENTHAL:  I thank you for your

17        time, and I have no further questions.

18             THE WITNESS:  Okay.

19             THE VIDEOGRAPHER:  We are now off

20        the record.  The time is 2:55 p.m.,

21        October 22, 2014.

22             (Recess taken.)

23             THE VIDEOGRAPHER:  This is tape five

24        of the deposition of Dr. Paul Wertheim.

25        We are now back on the record.  The time

```
1              WERTHEIM - HIGHLY CONFIDENTIAL
2         is 3:07 p.m.  Today is October 22, 2014.
3    EXAMINATION BY
4    MR. LEBLANC:
5         Q.    Good afternoon, Doctor.  I
6    introduced myself earlier from the other end of
7    the table, but my name is Andrew Leblanc, and I
8    represent the bondholders in this case.
9              I'm going to follow up on some of
10   the questions that Mr. Rosenthal asked, and
11   because of that, because I'm going second, I'm
12   going to be jumping around a fair bit, so let
13   me just start with where he ended, and the
14   discussion of the paragraph 16 of your report,
15   which is Exhibit 1 to this deposition.
16             Do you have it there?
17        A.    Yes.
18        Q.    So do I understand correctly that
19   you started the deposition by making a
20   correction to the $1.657 billion number,
21   correct?
22        A.    Yes.
23        Q.    As a result of Mr. Rosenthal's
24   questions, you also want to change, in the
25   parenthetical, as of June 30, 2015, that should
```

**HIGHLY CONFIDENTIAL**                    197

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2     be changed to 2014; is that correct?

3          A.    Yes, based on the chart.

4          Q.    Right.  And the chart, that's the

5     same chart you used to come up with the

6     $1.657 billion number, correct?

7          A.    Yes.

8          Q.    And then it says, "to a maximum of

9     1.01 billion."

10              Do you see that in your report?

11         A.    Yes.

12         Q.    Now, that needs to be changed to

13    876 million; is that correct?

14              MR. PULTMAN:  Object to the form of

15         the question.

16              You can answer.

17         A.    No, I wouldn't make that change,

18    because June 14 or June, excuse me, June 2014

19    has already passed, so the accrual is already

20    higher.

21         Q.    Okay.  But if you're comparing the

22    total accrual number to the settlement number,

23    you would want to use the same date for those,

24    wouldn't you?

25         A.    Well, I would change the accrual.

1           WERTHEIM - HIGHLY CONFIDENTIAL
2    It's, I guess, a matter of semantics,
3    partially, but I would change the accrual
4    amount to be as of June 30, 2015 --
5           Q.    Okay.  And I think --
6           A.    -- to compare it to the 1.01.
7           Q.    All right.  And I think you agreed
8    with Mr. Rosenthal that that was about
9    1.9 billion?
10          A.    It would be higher than the 1.6,
11   yes.
12          Q.    And higher by about 300 million a
13   year; is that right?
14          A.    Roughly.
15          Q.    So that would then change the 1.9
16   billion to a maximum, still, of 1.03 billion to
17   compare the same time period, correct?
18                MR. ROSENTHAL:  1.01.
19          Q.    1.01.  I'm sorry.  1.01, yes.
20          A.    If I understand the math right, yes.
21          Q.    So you would need to then change the
22   last clause of that sentence as well to say "or
23   a decrease of," and then it would be
24   $890 million?
25          A.    Well, again, that's assuming that

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2       they would have received it in the first part,

3       but whatever that difference is.

4              Q.    Right.  I'm just trying to use the

5       words that you've used here.

6              A.    Yes.

7              Q.    To be accurate, if you changed it

8       the way that we just talked about, that should

9       say a decrease of 890 million; is that right?

10             A.    Okay.  Yes.

11             Q.    Yes, okay.

12                  Now, I want to talk about a few of

13      the items that are behind Section 5.1 of your

14      report.  And this is the section entitled Other

15      Variables Which Could Further Decrease Cash

16      Available to NNI.

17                  Do you see that at page 12 of

18      Exhibit 1?

19             A.    Yes.

20             Q.    Now, and in particular, I want to

21      start at the top of page 13.  You have three

22      items there, item a, b and c.

23             A.    Yes.

24             Q.    The first is PPI attributable to the

25      NNCC notes; is that correct?

**HIGHLY CONFIDENTIAL**                    200

1              WERTHEIM - HIGHLY CONFIDENTIAL

2       A.      Correct.

3       Q.      Now, you made an assumption that the

4    PPI attributable to the NNCC notes, for the

5    purposes of your calculation, you assumed it to

6    be 60 percent of their contract accrual amount;

7    is that right?

8       A.      For what I included in my

9    distribution analysis, yes.

10      Q.      And are you aware of anyone

11   suggesting that NNCC is not entitled -- I'm

12   sorry.  Let me withdraw that.

13              Are you aware of anyone suggesting

14   that the NNCC bondholders are not entitled to

15   post-petition interest from NNI?

16      A.      Could you restate that or say that

17   again?

18      Q.      Are you aware of whether anyone has

19   suggested that the NNCC bondholders are not

20   entitled to post-petition interest from NNI?

21      A.      Am I aware of anyone that has

22   suggested that they're not entitled?

23      Q.      Yes.

24      A.      No.

25      Q.      Do you know if the monitor has taken

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2   a position on that issue?
 3        A.    I'm not aware.
 4        Q.    Okay.  Now, you submitted -- your
 5   report was in connection with the monitor's
 6   objection to the PPI settlement, correct?
 7        A.    Yes.
 8        Q.    And did you review that submission,
 9   the objection?
10        A.    Briefly, yes.
11        Q.    Did you review it to the end?
12        A.    I read through it briefly.
13        Q.    Okay.  Do you know if the -- if the
14   monitor has argued in these cases that neither
15   law debenture nor the bondholders have filed a
16   proof of claim against NNI?
17        A.    I don't remember that specifically.
18        Q.    Okay.  Do you know if the monitor
19   has argued in this case that the support
20   agreement between NNI and NNCC, by its terms,
21   expressly provides that NNI shall bear no
22   liability for NNCC's obligations?
23        A.    I'm not aware of that.
24              You asked was I aware of the
25   monitor --
```

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.     Yes.

3          A.     -- making that claim?

4          Q.     Yes.

5          A.     I'm not aware of that.

6          Q.     Okay.  Now -- but you think it would

7    be unreasonable to assume a zero dollar PPI

8    payment to the NNCC bondholders for the purpose

9    of your calculation; is that right?

10         A.     That was my assumption.

11         Q.     Now -- and the purpose of the

12   discussion at paragraphs 39 through 45 of your

13   report, the summary of that is you're

14   suggesting that the liability for NNCC

15   bondholders could be even higher than the

16   60 percent you assume; is that right?

17         A.     It could be.

18         Q.     You don't posit the possibility that

19   it could be less than the amount that you

20   assume; is that right?

21         A.     Correct.

22         Q.     Now, the amount that you assume for

23   that, if you turn back to page 12, to the chart

24   at the very top, which is the continuation of

25   your Table 2, that's $45.8 million, correct?

1                   WERTHEIM - HIGHLY CONFIDENTIAL

2          A.     Correct.

3          Q.     So you have discussion about how

4    that number could go up to the contract amount

5    in Section 5.1, but you don't anywhere identify

6    the fact that that 45.8 million could be zero,

7    do you?

8          A.     I make a reference in paragraph 21

9    that based, again, on the totality of my

10   variables, that even if a portion of the claim

11   subject to compromise or reduced or eliminated,

12   then the same would apply for the other claims

13   that I have included in my distribution

14   analysis mathematically, that even if a portion

15   of those are reduced or eliminated, I still

16   reach the same conclusion when I look at the

17   totality of the factors.

18         Q.     Right.  And the totality of the

19   factors to which you're referring there, those

20   are the three items in Section 5.1 where you

21   conclude that the claims might be higher,

22   right?

23         A.     Including the other -- the effect of

24   the other assumptions that I made such as

25   extinguishment of the NNUK pension claims.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    Okay.  But this section is designed

3   to educate the court about other claims that

4   you may have overestimated the reductions that

5   may occur and, therefore, that may cause the

6   cash available to NNI to decrease, right?

7              MR. PULTMAN:  Object to the form of

8         the question.

9        A.    Could you repeat that?

10       Q.    Let me rephrase it.

11             The purpose of Section 5.1 is to

12  identify for the court other variables that

13  could decrease the cash available to NNI,

14  correct?

15       A.    Correct.

16       Q.    And one of those is the NNCC claims

17  which I think you would agree with me, it could

18  increase or decrease the amount of cash

19  available to NNI.

20       A.    It could.

21       Q.    Right.  And to the extent that the

22  monitor has said that there are no claims

23  against it, against -- no claims asserted

24  against NNI by the NNCC bondholders, then it's

25  not unrealistic to think that that might be a

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2   zero, is it?
 3         A.    Well, the way I read the statement,
 4   as you quoted from the monitor, is that no
 5   claims had been filed yet.  I don't know
 6   whether they would be or not.
 7         Q.    Do you know whether the monitor, in
 8   the next few words of that sentence, takes note
 9   of the fact that the bar date has passed?
10         A.    Not aware of that.
11         Q.    You just haven't -- you don't have
12   any recollection, as you sit here today, of
13   ever seeing a statement by the monitor with
14   respect to the NNCC bonds?
15         A.    No.
16         Q.    And that's true even if it's in the
17   objection that your report was submitted at the
18   same time as?
19         A.    Yes.
20         Q.    Okay.  All right.  Now, let me just
21   ask, just out of curiosity, Table 3 on page 14
22   of your report, which is Exhibit 1?
23         A.    Yes.
24         Q.    Why do you show the -- in the bottom
25   row, the US unsecured claims other than
```

1               WERTHEIM - HIGHLY CONFIDENTIAL

2     guaranteed bonds at interest rates of 2 percent

3     and 4 percent per year?

4          A.    Purely for comparative purposes,

5     almost like a sensitivity analysis, to show

6     what the amounts -- how the amounts would

7     change if they were entitled to an interest

8     rate higher than the FJR.

9          Q.    Do you know of any argument that

10    they might be entitled to an interest rate

11    other than a federal judgment rate?

12         A.    No.

13         Q.    Do you know of any contract rates

14    that apply to any of those claims?

15         A.    No.

16         Q.    Then with respect to the NNCC bonds

17    there, you show it at federal judgment rate

18    2 percent, 4 percent, and then their contract

19    rate, right?

20         A.    Yes.

21         Q.    So you don't show it at a rate of

22    zero?

23         A.    Correct.

24         Q.    Okay.  Now, let's turn to the next

25    item.  And why don't we look back just for a

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    second, just to reorient ourselves.  Page 13
 3    again, at the very top.
 4              These are -- the second of the three
 5    items that you identify there relates to the
 6    additional US tax liability that might be paid
 7    by NNI.
 8              Do you see that?
 9       A.    Yes.
10       Q.    Now, you cover this in paragraphs 46
11    through 48 of your report, correct?
12       A.    Correct.
13       Q.    Just tell me, if you could, how did
14    you arrive at an estimate of 133 million for
15    the tax liability?
16       A.    I looked at the range that had been
17    given.  Information on exact amounts was
18    limited, but we do have testimony that I quoted
19    that states the range could be between
20    400 million and a billion.  Assuming a zero tax
21    was unrealistic.  Therefore, I wanted to assume
22    some amount.  I chose a third, because it's
23    just a round number.  It's yet conservative in
24    favor of NNI.
25              I even state that I consider it a
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2       conservatively low estimate, maybe even

3       unrealistically low, but using that low

4       estimate was to the advantage of NNI.  So I

5       just -- I chose a third.

6              Q.    Could you have chosen 20 percent?

7              A.    I could have.

8              Q.    Would that be --

9              A.    The lower I -- the lower I would

10      choose would make it less realistic to me,

11      given that I think 133 is already

12      unrealistically low.  Any amount lower would be

13      even more unrealistically low.

14             Q.    You referred in your answer, the

15      answer explaining why you did this to the

16      testimony that you understood was given at

17      trial.  Who was testifying?

18             A.    Counsel for the US debtors.

19             Q.    Do you understand these were

20      statements that were made in connection with

21      opening statements?

22             A.    Opening statements.  I don't know

23      the term "testimony," if it applies.

24             Q.    Okay.  Do you know if opening

25      statements are evidence?

1          WERTHEIM - HIGHLY CONFIDENTIAL

2               MR. PULTMAN:  Object to the form.

3          Objection, foundation.

4               You can answer.

5     A.     My understanding is they are not.

6     Q.     They are not evidence; is that --

7     A.     Yes.

8     Q.     Okay.  So do you cite to any

9     evidence to support the number that you use?

10    A.     To the number, no.

11    Q.     Do you cite to any evidence to

12    support the range that you began with to then

13    do the analysis to reach the number that you

14    use?

15    A.     Evidence, no.

16    Q.     Okay.  Why did you choose Ms. Block

17    and Ms. Schweitzer's statements as the starting

18    point for the analysis that you conducted?

19    A.     One, because they acknowledge the

20    existence of a tax liability.  And, two,

21    because it gives statements as to the range of

22    amounts.

23    Q.     Now, am I right that while you were

24    at Pepperdine, you taught a course on corporate

25    tax; is that right?

**HIGHLY CONFIDENTIAL**                    210

1                 WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    I did not teach a course in

3   corporate tax.

4        Q.    Have you taught corporate tax

5   before?

6        A.    No.

7        Q.    You never taught corporate tax?

8        A.    No.

9        Q.    Are you able to -- do you know --

10  let me withdraw that.

11             Are you familiar with corporate tax

12  principles?

13       A.    Somewhat as a Ph.D.

14       Q.    I'm sorry?

15       A.    As a Ph.D. and a CPA.

16       Q.    Okay.  Do you have the capacity

17  to -- the ability, the expertise to think about

18  tax issues?

19             MR. PULTMAN:  Object to the form of

20        the question.

21       A.    To think about tax issues, yes.

22       Q.    Okay.  Did you apply any of that

23  expertise to the analysis that you conducted in

24  the three paragraphs of your report?

25             MR. PULTMAN:  Objection, no

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         foundation.

3              You can answer.

4         A.    At a higher level, yes.

5         Q.    Okay.  And what expertise did you

6    apply to reach the -- to use the estimate of

7    one-third of the low end of the range that

8    Ms. block said at trial?

9         A.    Well, again, that -- that one-third

10   estimate was meant to be a conservatively low

11   estimate.

12              What basis do I have for assuming

13   that there's going to be a tax?  Again,

14   statements by counsel for the US debtors,

15   statements by John Ray, and just general

16   knowledge about tax, that there will be a tax

17   to the US estate based on the outcome of the

18   allocation process.

19        Q.    Explain that last part to me, the

20   general knowledge that there will be a tax to

21   the US estate based on the outcome of the

22   allocation process.  What do you mean by that?

23        A.    Similar to what Ms. Block states,

24   that there will be a tax depending on when the

25   money comes in and how it gets distributed.

```
1                WERTHEIM - HIGHLY CONFIDENTIAL
2         Q.    Right.  And which one of the
3    statements are you referring to, the first
4    quote from Ms. Block or the second?
5         A.    The second.
6         Q.    Okay.  And just to be precise, if we
7    could, what you report there is "All I know is
8    that the tax claim," your alteration, "could be
9    between 400 million and a billion dollars,
10   depending on when the money comes in, how it
11   gets distributed and so on."
12              Do you see that?
13        A.    Yes.
14        Q.    And, in fact, in the prior one, the
15   prior quote that you have, it says, "The tax
16   liability is as yet undetermined," right?
17        A.    Right.
18        Q.    So what from those statements led
19   you to conclude that there would be a tax claim
20   as opposed to there could be a tax claim?
21        A.    The statement, "In addition, the tax
22   liability is as yet undetermined," says to me
23   that there is a tax liability.  The amount is
24   undetermined.
25              And then a further later statement
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2      that it could be between 400 million and a

3      billion.

4           Q.    Could be, right, she said?

5           A.    Could be.

6           Q.    Okay.  Now, what elements would go

7      into determining what that tax liability would

8      be?

9           A.    For one, the amount of the

10     distribution or the allocation to the US

11     estate.

12          Q.    What else?

13          A.    A wide variety of factors regarding

14     expenses and deductions.

15          Q.    Such as?

16          A.    Such as the variety of taxable

17     deductions that the US estate would have to

18     offset the allocation proceeds.

19          Q.    Okay.  So let me give just a couple

20     of examples and you tell me if these would be

21     factors in that determination.

22               Would one of the factors in that

23     determination be the tax assets that the US

24     estate is carrying?

25          A.    Listen, I didn't analyze the tax

1          WERTHEIM - HIGHLY CONFIDENTIAL

2     consequences and try to calculate a tax amount.

3     I just used the numbers that they gave.  I took

4     a third of the low end of the estimate, and it

5     is just reasonable to me to assume, based on

6     their testimony, based on testimony of John

7     Ray, that first off there is going to be a tax

8     liability.

9              This is the range that they gave,

10    and to add to that, when Ms. Block states that,

11    depending on when the money comes in and how it

12    gets distributed, the reason there is a range

13    of a tax liability is because the allocation as

14    of yet had been undetermined, and that those

15    two are going to move together, just logically.

16    The higher the allocation is, in other words,

17    the more money that the US is going to receive,

18    the higher their tax liability is going to be.

19    That's just common sense.

20              And so I actually was ultra

21    conservative in that I took the high end of the

22    allocation assumption, where the US gets the

23    full allocation, but yet I assumed only

24    one-third of the low end of the range given for

25    the tax liability.

**HIGHLY CONFIDENTIAL**                    215

1              WERTHEIM - HIGHLY CONFIDENTIAL
2         Q.    Did you do any analysis of what the
3    net operating loss carryforwards are for the US
4    estate?
5         A.    No.
6         Q.    Did you look at all at what tax
7    credits might be available?
8         A.    No.
9         Q.    Did you look at all about what
10   deductions might be available if the bonds are
11   paid by the US estate?
12        A.    No.
13        Q.    And, again, with respect to this
14   issue, this item b in your analysis in Section
15   5.1, your presentation here is to say that it
16   could be higher than 133 million and,
17   therefore, to say that your estimate is
18   conservative for that reason; is that right?
19        A.    I'm sorry.  That was kind of long.
20   Say that again.
21        Q.    The purpose of showing this
22   additional tax liability was to say that -- to
23   identify this as a variable which could
24   decrease cash available to NNI, correct?
25        A.    Correct.

1                WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    And you didn't even consider the

3     possibility that the tax liability could be

4     zero, correct?

5          A.    I did consider the possibility.  I

6     just considered it unrealistic.

7          Q.    And I know Mr. Rosenthal covered

8     this, so I'm not going to spend any time on it,

9     but you do understand that Mr. Britven, after

10    spending the time that he spent to prepare his

11    report, used a zero dollar for the tax claim.

12                You understand that?

13         A.    Yes.

14         Q.    All right.  Now, the third item is

15    the additional PBGC pension claims that might

16    be paid by NNI; is that right?

17         A.    Yes.

18         Q.    And that's, again, in the category

19    of variables that could decrease the cash

20    available to NNI; is that right?

21         A.    Correct.

22         Q.    Now, for the purposes of your claims

23    analysis for the NNI estate, you looked to --

24    for most of the claims, you looked to MOR 60;

25    is that right?

**HIGHLY CONFIDENTIAL**                              217

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    Yes.

3        Q.    Okay.  Do you want to look at that

4    in your report or you agree with that?

5        A.    Well, I -- in footnote 20, the

6    liability subject to compromise comes from MOR

7    60.  The other line item comes from MOR 60, and

8    those are the two -- those are the items that

9    specifically come from MOR 60.

10       Q.    Okay.  So you considered MOR 60, for

11   the purposes of those items, to be a reliable

12   source of information on the estimate of the

13   claims amounts, correct?

14            MR. PULTMAN:  Object to the form.

15            You can answer.

16       A.    I relied on those numbers, yes.

17       Q.    Why did you rely on those numbers?

18       A.    They --

19       Q.    Just so our record can follow along,

20   are you looking at Exhibit 7?

21       A.    Yes, I'm looking at Exhibit 7.

22   (Perusing.)

23            The items listed as liability

24   subject to compromise in footnote four, as well

25   as the line item on the combined -- on the

HIGHLY CONFIDENTIAL                        218

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    condensed combined balance sheet for total

3    liabilities not subject to compromise of 54.6,

4    those were the numbers I used in my calculation

5    for the distribution analysis.

6         Q.    Right.  My question was simply why

7    did you choose to use those numbers from this

8    report?

9         A.    This was the most recent monthly

10   operating report that was available at the

11   time.

12        Q.    Okay.  And with respect to those

13   numbers, you took them exactly as they were

14   stated, right, in the MOR?

15        A.    I did.

16        Q.    You didn't assume that there would

17   be any reduction by -- in those claims through

18   the course of the claims reconciliation

19   process?

20        A.    Well, the monthly operating report,

21   on the basis of presentation, states that these

22   amounts follow the guidelines of ASC 852, which

23   states that liabilities are to be shown at the

24   amounts expected to be settled, even if they

25   may be settled for less.

WERTHEIM - HIGHLY CONFIDENTIAL

1

2              So these then represent, according

3     to the statement and guidelines that they were

4     prepared, these represent the amounts that were

5     expected to be settled, and so that's why I

6     used those amounts to be a realistic estimate.

7              Again, could they be settled for

8     less?  Yes.  But it was more realistic for me

9     to assume the amounts that were expected to be

10    settled.

11         Q.    Okay.

12         A.    So that was my basis.

13         Q.    Now, just to try to speed this up.

14    Just put a pin in this, if you could.

15              You see under the line, pension

16    obligations on MOR -- Exhibit 7, which is MOR

17    60, page six, table four, you see pension

18    obligations?

19         A.    Yes.

20         Q.    $437.6 million?

21         A.    Yes.

22         Q.    Now, if we turn back now to your

23    report.

24         A.    Yes.

25         Q.    At Table 1 -- I'm sorry, table --

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    Table 2.   That is not the number you use for

3    pension obligations, is it?

4          A.     Correct.

5          Q.     In fact, in pension obligations

6    here, you don't cite to anything on Table 2 as

7    to where you came up with the 593 million;

8    isn't that right?

9          A.     Not in Table 2.

10         Q.     Okay.   That's what brings us then

11   forward to table -- to paragraph 49 of your

12   report, correct?

13         A.     Correct.

14         Q.     All right.   Now, before we talk

15   about 49, you chose to use the MOR, as stated,

16   for every liability that you -- you cited to

17   it, exactly as stated, except for the pension

18   liability.   Why?

19         A.     Because the MOR was dated as of

20   January 31, 2014, and as of that time, the

21   updated pension claims had not been -- not yet

22   been filed, but as the date of my report, they

23   had been, updated claims had been filed.

24                And so I took -- given that the

25   updated amount was higher by a total of --

1        WERTHEIM - HIGHLY CONFIDENTIAL

2    well, I would have to do the math, but whatever

3    the total of the updated claims were compared

4    to the initial, in my opinion, the original 593

5    represented a more realistic amount than the

6    4 --

7        Q.    37?

8        A.    -- 437 from the MOR simply because

9    the MOR was outdated for that line item

10   specifically.

11       Q.    Let's try to be precise.  And we're

12   going to have to do a little bit of math.

13   Okay.

14           The increase in the claims reflected

15   by the PBGC's amended claims was 115 million;

16   isn't that right?

17       A.    Yes.

18       Q.    That's paragraph 49 of your report?

19       A.    Yes.

20       Q.    Exhibit 1.  The reduction estimated

21   by the US estate to the PBGC claim was from

22   593 million to 437 million; is that correct?

23       A.    Correct.

24       Q.    All right.  So can you do that math

25   for me?

```
1              WERTHEIM - HIGHLY CONFIDENTIAL
2                  MR. PULTMAN:  What math is it you
3         want him to do?
4                  MR. LEBLANC:  I think he knows.
5                  MR. PULTMAN:  Well, that's fine, but
6         I don't.  So it would be very helpful, if
7         I understood.
8                  MR. LEBLANC:  593 minus 437.
9         A.    Okay.
10        Q.    So that is a reduction of
11   $156 million?
12        A.    Okay.
13        Q.    Does that math sound right?
14        A.    Yes.
15        Q.    Okay.  So the US debtor was
16   estimating, using the 852 standard that you
17   talked about a moment ago, that the amount that
18   the claim would be settled for was 156 million
19   less than it was asserted for at the time of
20   the MOR 60, right?
21        A.    Yes.
22        Q.    And the PBGC added 115 million to
23   their claims, correct?
24        A.    Correct.
25        Q.    But you don't know what the US
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    debtors' estimate of the payment on those

3    claims is going to be, do you?

4         A.    Because I don't have an updated MOR.

5         Q.    Right.  And so, instead, you just

6    reverted back to the $593 million number,

7    right?

8         A.    Yes.

9         Q.    Now, you could have started at the

10   437 and then added the 115 million, right?

11        A.    I suppose I could have started at

12   437 and added any amount.  To give an objective

13   dollar amount, I based it on the original claim

14   at 593.

15        Q.    Right.  But the original claim at

16   593, you already knew that the US debtor

17   thought it could settle that for $156 million

18   less than that, right?

19        A.    Correct.

20        Q.    Now, what's the basis, just

21   generally, if you understand, what's the basis

22   for the PBGC claim?

23        A.    Well, that 593 was a claim for the

24   unfunded benefit liabilities.

25        Q.    Do you have any experience at all

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    with pensions and accounting for pensions?

3         A.    Somewhat.

4         Q.    So just generally, to your

5    understanding, that that's the shortfall in the

6    pension liability as of the time of the

7    bankruptcy filing, right?

8         A.    Yes, in general.

9         Q.    In general, okay.  And I know you're

10   not a stock market expert or bond market

11   expert, but just generally, directionally,

12   what's happened in the stock market and the

13   bond market since January of 2009?

14              MR. PULTMAN:  Object to the form of

15        the question.  Objection, foundation.

16              You can answer the question.

17        Q.    Do you know, generally?

18        A.    Since 2009?

19        Q.    January of 2009.

20        A.    Well, to answer your question, the

21   stock market has gone up.  It's gone down.

22   It's gone up.

23        Q.    Where does it sit today relative to

24   where it was in January of 2009, just

25   directionally?

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.     Higher.

3        Q.     Much higher, isn't it?

4               MR. PULTMAN:  Object to the form.

5               You can answer.

6        A.     It's higher.  Much?  I don't know.

7        Q.     Did you give any thought to what

8    effect the performance of the stock market

9    might have on the PBGC's claims?

10       A.     No.

11       Q.     Did you give any thought to anything

12   that might affect the PBGC's claims?

13       A.     Yes.

14       Q.     What?

15       A.     The analysis done by the PBGC, which

16   led them to file the updated claim.

17       Q.     Okay.  But what about the analysis

18   done by the debtor that estimated at least

19   154 million -- 56 million dollar reduction in

20   it?  Did you consider that?

21               MR. PULTMAN:  Sorry.  Objection.  It

22       has been asked and answered.

23               You can answer.

24       A.     Again, that was an outdated number.

25       Q.     When you say it was an outdated

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    number, it still was the estimate of what they

3    would have to pay on the $593 million claim,

4    wasn't it?

5          A.    It was their estimate at the time.

6          Q.    But you didn't take into account any

7    reduction to that claim from the stated amount

8    that was filed originally by the PBGC?

9               MR. PULTMAN:  Objection.  It has

10         been asked and answered.

11              You can answer it again.

12         A.    No.

13         Q.    And for the purposes of this

14   section, again, this Section 5.1, this claim is

15   shown as something that could reduce the amount

16   of cash available to NNI; is that right?

17         A.    Yes.

18         Q.    But it's entirely possible, isn't

19   it, that the PBGC claim could be reduced below

20   $593 million, isn't it?

21              MR. PULTMAN:  Object to the form.

22         A.    Is it possible?

23              MR. PULTMAN:  You can answer.

24         A.    Yes.  And I make a statement in an

25   earlier paragraph that allows for a reduction

```
1              WERTHEIM - HIGHLY CONFIDENTIAL
2    in a claim.
3         Q.    Are you aware Mr. Britven estimated
4    this claim?
5         A.    I know he would have included it.
6         Q.    Do you know what number he included
7    it at?
8         A.    No.
9         Q.    Would it surprise you to hear that
10   he included it at an unsecured claim of
11   $400 million?
12        A.    I don't know one way or the other
13   what his exact amount was.
14        Q.    And that would be a more
15   conservative estimate than your estimate; isn't
16   that right?  Let me withdraw that.
17             That would be an estimate that's
18   more favorable to NNI than your estimate; isn't
19   that right?
20        A.    Yes.
21        Q.    And that number alone, if that's his
22   estimate, that would be a $200 million -- let
23   me withdraw that.
24             That estimate alone would be a
25   $193 million swing in dollars available for PPI
```

1               WERTHEIM - HIGHLY CONFIDENTIAL

2      at NNI; isn't that right?

3          A.    Mathematically.

4          Q.    And because, again, you talked about

5      this with Mr. Rosenthal, any change to the

6      claims at the NNI entity, the sensitivity to

7      the amount available for bondholders is

8      100 percent, right?

9          A.    Yes.

10         Q.    Let me ask about Mr. Britven.  Why

11     did you look at his report?  For what purpose?

12              MR. PULTMAN:  Object to the form of

13          the question.

14              You can answer.

15         Q.    Let me ask it in a way that may not

16     lead to the objection.

17              For what purpose did you look at

18     Mr. Britven's report?

19              MR. PULTMAN:  Same objection.

20              You can answer.

21         A.    I remember reading, and I can't cite

22     the source offhand, but I remember reading in

23     trial testimony several places where they

24     referred to, and I'm just going to say slide 35

25     of the Britven report, where excess cash was

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    calculated, and so I wanted to investigate the

3    circumstances around the reference to the

4    Britven report.

5        Q.    Okay.  And I'm not going to go

6    through any detail with it, because

7    Mr. Rosenthal covered that all, but is it your

8    understanding that Mr. Britven does not assume

9    a cash burn?

10           MR. PULTMAN:  Is that the end of the

11       question?

12       Q.    Question mark.

13           MR. PULTMAN:  Object to the form.

14       A.    That was my understanding just based

15    on the limited information I could tell from

16    his analysis.

17       Q.    Did you read his rebuttal report or

18    his original report or both?

19       A.    Again, I briefly read both.

20           MR. LEBLANC:  Let me just have the

21       court reporter mark as the next exhibit,

22       Exhibit 10.

23           (Wertheim Exhibit 10, Expert Report

24       of Thomas Britven, dated January 24, 2014,

25       Bates Stamped 000001 through 150, marked

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2          for identification.)
 3              MR. LEBLANC:  For everybody else, I
 4          just have the cover and the --
 5          Q.    Dr. Wertheim, the court reporter has
 6     handed you what's been marked as Exhibit 10.
 7     And just for the benefit of our record, we're
 8     handing out, for everybody else's benefit, just
 9     the cover page and the chart that I want to
10     show you.
11          A.    Okay.
12          Q.    If you could turn to page 67, which
13     there's Bates numbers on the bottom of these.
14     You should be able to follow those along.
15              Do you have what's marked Schedule 5
16     there?
17          A.    Yes.
18          Q.    Okay.  And do you see Schedule 5 is
19     entitled -- well, actually, I'm not sure that
20     that's the real title, but you see it has an
21     asset side, and then it's got the Canadian, US
22     and EMEA entities on the left side?
23          A.    (Perusing.)  Yes.
24          Q.    Okay.  And it says -- has "Treasury
25     cash as of December 31, 2014."
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2                  Do you see that?

3         A.    Yes.

4         Q.    And then it has, "Anticipated spend

5    until end of litigation."

6                  Do you see that?

7         A.    Yes.

8         Q.    And that's a $326 million number?

9         A.    Yes.

10        Q.    Okay.  So is this consistent with

11   your recollection that he doesn't take account

12   of anticipated burn rates?

13        A.    No.  In getting to the 744, then, he

14   started at a higher balance than I did, and

15   then reduced that by the burn that he assumed.

16        Q.    Okay.  But he starts at a -- he uses

17   an earlier starting --

18        A.    Earlier, December 31, 2013, whereas,

19   my cash balance that I use for NNI is dated

20   August 31, 2014.

21        Q.    Right.  But Mr. Britven's analysis

22   begins or uses a $326 million cash burn rate

23   for the purposes of calculating the numbers

24   that appear on his table 35, isn't that right,

25   what you referred to as table 35?

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.     That's the amount that's listed

3   there.

4        Q.     Okay.  So do you believe that he

5   does have an assumed cash burn in his analysis?

6        A.     Yes.

7        Q.     And you don't know one way or the

8   other whether that's -- whether he's

9   understated it or overstated it.  You just

10  don't know, right?

11       A.     Correct.

12       Q.     But it would not be correct to say

13  that Mr. Britven did not include an estimated

14  cash burn in his analysis?

15            MR. PULTMAN:  Object to the form.

16            You can answer.

17       A.     Correct.

18       Q.     You can put that to the side.  I'm

19  going to go through a number of things that are

20  much likely to be much shorter.

21            Mr. Rosenthal had asked you a series

22  of questions about the IP addresses.  Do you

23  recall those questions?

24       A.     Yes.

25       Q.     Now -- and the questions were

HIGHLY CONFIDENTIAL                          233

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    concluded with his estimate or your discussion

3    of a calculation of how much money would be

4    added to NNI's surplus if the assets were sold

5    in a certain way.  I'm just trying to orient

6    you.

7              You remember you talked about

8    180 million, and then he said $120 million

9    addition to NNI?

10             Do you recall that, generally?

11        A.    Vaguely, yes.

12        Q.    Okay.  The question I wanted to get

13   to is, do you know if the US has asserted an

14   interest in any of those IP addresses?

15        A.    I don't know.

16        Q.    And that would have -- that could

17   have a material effect on where those assets

18   flow if the US has an interest in those IP

19   addresses; isn't that right?

20             MR. PULTMAN:  Object to the form.

21             You can answer.

22        A.    Could you repeat that?

23        Q.    Sure.  If NNI has an interest in the

24   proceeds from the IP address sales, that could

25   have a material impact on your analysis; isn't

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    that right?

3         A.    I don't know if it would be material

4    or not.

5         Q.    Okay.  Do you know whether the US

6    has asserted an interest in those assets?  The

7    US, meaning NNI.

8              MR. PULTMAN:  Objection, asked and

9         answered.

10             You can answer it again.

11        A.    I don't know.

12        Q.    Before I have the court reporter

13   mark this, how did you select which monitor

14   reports to review?

15        A.    I can't remember every reason.  I

16   think I picked the thirty-fifth because it

17   discussed the two million dollar --

18   2.067.2 million dollar claim.

19        Q.    Billion dollar?

20        A.    Billion dollar claim to the US.  The

21   108 because it's the more recent.

22        Q.    Any reason to review any one in

23   between those?

24        A.    Offhand, I can't remember.

25        Q.    Did somebody on your team, a

HIGHLY CONFIDENTIAL                            235

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    nonlawyer on your team, summarize the monitor

3    reports for you, for you to consider which ones

4    to look at?

5         A.    No.

6              MR. LEBLANC:  If we could have the

7         court reporter mark this as the next

8         exhibit.

9              (Wertheim Exhibit 11, One Hundred

10        and Seventh Report of the Monitor, dated

11        September 2, 2014, marked for

12        identification.)

13        Q.    Okay.  Dr. Wertheim, the court

14   reporter has handed you what's been marked as

15   Exhibit 11.  This is the one hundred and

16   seventh report of the monitor.

17        A.    Okay.

18        Q.    You see it's dated September 2,

19   2014?

20        A.    Yes.

21        Q.    And this is not something that you

22   considered in the context of your report; is

23   that right?

24        A.    I don't believe I listed that in my

25   scope.

1               WERTHEIM - HIGHLY CONFIDENTIAL

2          Q.    All right.  Let me just see if I can

3    get you -- if you could look at page three,

4    paragraph nine, the purpose.  You see here it

5    says, "The purpose of this one hundred and

6    seventh report of the monitor is to provide

7    this court with information regarding the

8    monitor and Canadian debtors' motion seeking:

9    a) approval of an asset sale agreement, dated

10   July 14, 2014," and it lists the parties there.

11              Do you see that?

12         A.    Yes.

13         Q.    It ends with, "and to provide the

14   monitor's support in respect thereof."

15              Do you see that?

16         A.    Yes.

17         Q.    I will just represent to you that

18   this is in relation to a sale of certain IP

19   addresses, generally.  You can take as much

20   time as you would like to look at it, but I

21   want to get to a different point.

22              Can you accept my representation to

23   that effect?

24         A.    Yes.

25         Q.    If you turn to page ten of the

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2    report.

3         A.    There seems to be two sets of

4    numbers.

5         Q.    Oh, yeah.  I'm sorry.  The internal

6    page ten, which is page 17 of the right corner

7    stamp.

8         A.    Okay.

9         Q.    And right before paragraph 30, it

10   says, "Proceeds from the sale of IP addresses."

11            Do you see that, the heading just

12   between 30 and 29?

13        A.    Yes.

14        Q.    And it says, "The US debtors have

15   asserted an interest in the IP addresses and

16   any proceeds of sale derived therefrom."

17            Do you see that?

18        A.    Yes.

19        Q.    And then if you go down to the next

20   paragraph, right at the bottom, the fourth line

21   up, and I'm going to read just after the

22   parenthetical.

23            It says, "including NNI's right, if

24   any, to an allocation of the sale proceeds

25   shall be the subject of a joint hearing of this

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    Court and the US Court conducted pursuant to

3    the Cross-Border Insolvency Protocol," and it

4    goes on from there.

5              Do you see that?

6        A.    Yes.

7        Q.    So at the time you wrote your

8    report, were you aware that there was a dispute

9    as to the ownership of the proceeds of IP

10   address sales?

11             MR. PULTMAN:  Objection.  It has

12        been asked and answered.

13             You can answer.

14       A.    No.

15       Q.    And just to reorient ourselves, to

16   the extent that there was an IP -- that there

17   were $100 million in IP proceeds from IP

18   address sales, if the US estate was entitled to

19   those proceeds, then that would be an

20   additional hundred million dollars to the

21   bottom line number, the 971; is that right?

22       A.    No.

23       Q.    I'm sorry?

24       A.    No.

25       Q.    Why not?

1                WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    Because there could be, for example,

3    tax effects on that.

4        Q.    Okay.  Assuming that there was a

5    hundred million dollars of proceeds available

6    for distribution, net of taxes, then it

7    would -- and those proceeds were owned by NNI,

8    that -- again, the sensitivity would suggest

9    that it's 100 percent of that $100 million

10   addition to the NNI distribution to -- for PPI,

11   right?

12       A.    Well, there could also be costs

13   associated with carrying out the sales and

14   other costs associated with the sales process

15   and other transfer costs or whatever that would

16   reduce that in addiction to the taxes.

17            So I can't say exactly what the

18   amount would be, but whatever the ultimate

19   leftover proceeds from the sale, excluding

20   taxes and costs and whatever, then, yes, that

21   would affect the bottom line for NNI.

22       Q.    Okay.

23       A.    But it would not -- your initial

24   question was, would it translate to a

25   $100 million effect on the bottom line, and my

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    answer is no.

3         Q.    I think -- am I right that you

4    answered Mr. Rosenthal's question that you were

5    aware that there were IP addresses yet to be

6    sold by the estates at the time you wrote your

7    report?

8         A.    Yes.

9         Q.    Why didn't you reference that fact

10   in your report?

11              MR. PULTMAN:  Objection.  It has

12        been asked and answered multiple times.

13        A.    I answered that before.

14        Q.    Why don't you indulge me, then?

15        A.    Okay.  Because I had no basis for

16   assuming either the likelihood or the amount of

17   the sales.

18        Q.    But why not even say I know there

19   are IP addresses that have to be sold?

20              MR. PULTMAN:  Objection.  It has

21        been asked and answered.

22              You can answer it again.

23        A.    Because I had no basis to determine

24   the likelihood or the amount of the sales.

25        Q.    Are you aware of whether the monitor

1              WERTHEIM - HIGHLY CONFIDENTIAL
2    has milestones for the monetization of the
3    remaining residual assets?
4         A.    I'm not sure what you mean by -- by
5    that, but okay.
6         Q.    My question is, do you know if the
7    monitor has certain milestones that it hopes to
8    achieve with respect to monetization of
9    remaining residual assets?
10        A.    In a vague sense, yes.  I remember
11   reading the idea of having milestones.  So I
12   do -- I am -- I know that that exists.
13        Q.    All right.  But you don't know what
14   those milestones might be?
15        A.    No.
16        Q.    Do you know whether the monitor has
17   milestones relating to the continued
18   repatriation of cash from affiliates in APAC
19   and CALA?
20        A.    No.
21        Q.    You don't know whether they do?
22        A.    That, I don't know.
23        Q.    Do you know whether they have --
24   your assumption is that, in the allocation
25   protocol litigation, that the monitors just

1                   WERTHEIM - HIGHLY CONFIDENTIAL

2    loses their position, that the US wins?

3         A.    Could you repeat that?

4         Q.    Sure.  Your assumption -- you assume

5    that Kinrich wins his -- I'm sorry.  Let me

6    withdraw that.

7               You assume that NNI wins the

8    allocation dispute in that the Kinrich analysis

9    is the one that's adopted; isn't that right?

10        A.    Basically, yes.

11        Q.    And with respect to the completion

12   of the claims process and creditor

13   distributions, your assumption is, for that

14   category of other, the 3.2 billion Canadian in

15   claims, your assumption is that that's not

16   reduced by even a dollar, right?

17        A.    Well, I have already reduced it by

18   over 600 million based on what the claims were

19   as listed in the 10-Q and on the -- on the

20   Appendix D of the one hundred and eighth

21   report, so I have already reduced it by over

22   600 million.

23        Q.    But the 3.2 billion that's remaining

24   that's the subject of dispute, you assume no

25   reduction in that, right?

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        A.    Correct.

3        Q.    And you don't know if there are any

4   milestones relating to the completion of the

5   claims process?

6        A.    Correct.

7        Q.    Is it your expectation that the

8   monitor hopes to reduce claims against its

9   estate?

10             MR. PULTMAN:   Object to the form of

11        the question.

12        A.    I don't know what the monitor hopes

13   to do.

14        Q.    Is it your expectation that the

15   monitor hopes to monetize residual assets?

16        A.    Again, I don't know what the monitor

17   hopes to do.

18        Q.    Is it -- is your expectation that

19   the monitor hopes to -- let me ask it a

20   different way.

21             Is it your expectation that the

22   monitor expects to have continued repatriation

23   of assets from affiliates in APAC and CALA?

24        A.    I don't know what the monitor

25   expects.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    Okay.  All right.  One of the

3    reports that you did rely on was the one

4    hundred and eighth monitor report, right?

5    That's the most recent one?

6         A.    Yes.

7              MR. PULTMAN:  Do you want the

8         witness to have that in hand?

9              MR. LEBLANC:  I do.  That's

10        Exhibit 3 to this deposition.

11        A.    Okay.

12        Q.    Among the relief requested, if you

13   turn to page 24 at the bottom of this -- did

14   you read this whole report?

15        A.    Word for word, no.

16        Q.    Did you read every section of it?

17        A.    I skimmed through the sections to

18   see if I thought they might be relevant, but I

19   did not read every paragraph.

20        Q.    All right.  One of the -- the relief

21   that is requested by the monitor in the one

22   hundred and eighth report is -- this relates to

23   this 2015 Nortel retention plan.

24              Do you see that?

25        A.    Yes.

1                WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    And you can see that -- you can read

3   as much of it as you would like to, but I know

4   you're familiar with this report, but in this

5   section, the monitor is requesting authority

6   for a retention program to keep certain

7   employees to achieve certain milestones, and we

8   will walk through them in a second.

9              Do you understand that to be the

10  case?

11       A.    Yes.

12       Q.    Okay.  And the milestones that the

13  monitor has identified for these individuals to

14  do, identified in that first paragraph, 91, the

15  monitor writes, "While much progress has been

16  made by the applicants, there remain a number

17  of significant milestones that the applicants

18  must achieve to conclude the CCAA proceedings."

19  And it says, "including."

20             All right.  Let's just go through

21  these one by one.  One, "resolution of the

22  remaining aspects of the Allocation Protocol

23  Litigation."

24             Do you see that?

25       A.    Yes.

**HIGHLY CONFIDENTIAL**                    246

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    All right.  And, again, your

3    assumption with respect to the allocation

4    protocol litigation is that the monitor loses

5    it --

6              MR. PULTMAN:  Objection.

7         Q.    -- for the purposes of your report?

8              MR. PULTMAN:  Asked and answered.

9              You can answer it again.

10        A.    Well, my assumption was that the

11   monitor -- that the Canadian estate received

12   the allocation that was specified in the

13   Kinrich report.

14        Q.    All right.  That's fair enough.

15        A.    I'm not going to classify whether

16   that is losing or not.

17        Q.    Fair enough.  You know that they're

18   asking the courts to do something other than

19   what's in the Kinrich report?

20        A.    Yes.

21        Q.    Okay.  Number two, "continued

22   repatriation of cash from affiliates and APAC

23   and CALA."

24              Do you see that?

25        A.    Yes.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2         Q.    Now, it's your estimate that -- or

3    your analysis that that work that people are

4    sought to be retained for yields no value at

5    all, right?

6         A.    That was my assumption.

7         Q.    And it's your assumption,

8    notwithstanding the fact that you're including

9    the costs of this retention program in your

10   analysis, aren't you?

11        A.    In what part of my analysis?

12        Q.    Well, you use -- you rely entirely

13   on the monitor's estimates of cash as of April

14   of 2015, right?

15        A.    Right.

16        Q.    So if the monitor included the

17   program that he's seeking to implement, then

18   you would have included that in your analysis,

19   right?

20        A.    I'm still not certain of the

21   question.  If it's included in the estimate of

22   the cash balance forecast?

23        Q.    Right.  Let me just try to simplify

24   it.

25              The only thing you did with respect

1                   WERTHEIM - HIGHLY CONFIDENTIAL

2      to the cash balance forecast of the monitor's

3      was just look at what the number was at the end

4      of the day, right?

5           A.     Correct.

6           Q.     You didn't do any analysis of that

7      whatsoever?

8           A.     To analyze whether I thought that

9      number was appropriate or not?

10          Q.     Correct.

11          A.     I did not do any detailed analysis

12     on the background of those estimates.

13          Q.     Did you do even any superficial

14     analysis at all?

15          A.     No.  I used that number as my

16     estimate, because that was the forecast that

17     was given.

18          Q.     Do you know what -- do you know why

19     the monitor might spend $8.9 million on

20     non-inventory purposes in the week between

21     April -- I'm sorry, March 29, 2015 and April 4,

22     2015?

23          A.     Do I know why?

24          Q.     Yeah.  Do you know what it's going

25     to buy?

1          WERTHEIM - HIGHLY CONFIDENTIAL

2       A.    No.

3       Q.    Do you know why that number would be

4    included in the monitor's estimate?

5            THE VIDEOGRAPHER:  I'm sorry I'm

6       getting a cell phone interference.  Is

7       your cell phone in your pocket?

8            MR. PULTMAN:  I have one in mine.

9       Apologies.

10       Q.    The question was, do you know why

11    the monitor was -- would show a forecast of

12    spending almost $9 million on non-inventory

13    purchases in the beginning of April of 2015?

14       A.    I didn't analyze that.

15       Q.    Did you even look at it?

16       A.    I don't know why he would -- I don't

17    know the answer -- I don't know why he would do

18    that.

19       Q.    If that's included in the monitor's

20    report, you just accepted it at face value?

21       A.    I accepted the cash forecast that

22    was given.

23       Q.    Before I mentioned that number to

24    you, you didn't know it was there, did you, the

25    8.9 million?

1          WERTHEIM - HIGHLY CONFIDENTIAL

2          A.     The details, no.

3          Q.     Okay.  I can show it to you if

4    you -- why don't we look at it?  It's page 39,

5    upper right corner of the report you have

6    there, Exhibit 3.

7          A.     Sorry.  Page what?

8          Q.     39.

9          A.     (Perusing.)

10         Q.     Okay.  Do you have that page in

11   front of you?

12         A.     Yes.

13         Q.     Okay.  And you can see there are

14   non-inventory purchases of $9 million,

15   $8.9 million in the last week of this forecast?

16         A.     Correct.

17         Q.     And the number you actually used is

18   just below that one, about six rows down, at

19   329.4 million?

20         A.     Correct.

21         Q.     You hadn't focused on that or seen

22   that number before today, had you?

23         A.     Like I said, I did not analyze the

24   individual line items comprising the forecast.

25         Q.     Okay.  All right.  Let's go back, if

HIGHLY CONFIDENTIAL                              251

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    we could, to paragraph 91, which is on internal

3    page 24, of the upper corners 33, the continued

4    repatriation of cash.

5              Are you aware of whether the monitor

6    repatriated cash in 2014 from any of its

7    foreign subsidiaries?

8         A.    Not familiar with the details.

9         Q.    Well, are you familiar generally

10   with whether it happened?

11        A.    Generally, I would say yes, but,

12   again, I know no details.

13        Q.    Do you know how much money was

14   repatriated?

15        A.    No.

16        Q.    And, again, you read or skimmed at

17   least this entire report, right?

18        A.    Yes.

19        Q.    You can look with me at paragraph

20   17, which is on page five internal, page 14 in

21   the upper right corner, still in Exhibit 3.

22        A.    Okay.

23        Q.    All right.  And 17a) -- the preamble

24   to 17 says, "Actual net cash flow was favorable

25   to forecast by 21.9 million.  Significant items

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    contributing to this favorable variance were as

3    follows: a) a favorable permanent variance of

4    13.2 million primarily as a result of

5    recoveries of intercompany receivables from

6    Nortel Networks (India) Private, Limited, not

7    previously reflected in the forecast."

8              Do you see that?

9        A.    Yes.

10       Q.    Okay.  So this, at least if this is

11   to be believed, there was a $13.2 million

12   repatriation of money from a foreign affiliate

13   that they had not forecast to happen.

14             Is that what your understanding is?

15       A.    Yes.

16       Q.    And it's your assumption that there

17   will be no further repatriations of any dollars

18   from any of the foreign affiliates, correct?

19       A.    Could you repeat that?

20       Q.    Sure.  It is your assumption that

21   there will be no further repatriation of any

22   dollars from any of the foreign affiliates of

23   NNL?

24       A.    After what date?

25       Q.    Well, as of the time of your report

HIGHLY CONFIDENTIAL                            253

1                WERTHEIM - HIGHLY CONFIDENTIAL

2      forward.

3          A.    Well, to the extent that they are

4      reflected in the forecasted cash balance as

5      of -- as of April 15, 2015, to the extent that

6      they are reflected in that forecasted cash

7      balance, they would be included.

8          Q.    Is it true that, given the majority

9      of receivables or intercompany receivables, and

10     have a low, if not zero probability of

11     collection, I have assumed a zero dollar

12     recovery on receivables and other assets?

13         A.    Referring to that receivable, yes.

14         Q.    I'm referring to your report.

15         A.    Yes.

16         Q.    Okay.  So you have assigned a zero

17     dollars to that receivable, to intercompany

18     receivables from foreign affiliates, and you

19     could see from the report that you relied upon

20     in the last six months, there has been a

21     receipt of cash from an affiliate?

22         A.    Yes, but that receipt of cash has

23     been included in the cash balance.  The line

24     item related to additional cash from

25     receivables, the additional receivables, that's

1              WERTHEIM - HIGHLY CONFIDENTIAL
2    what I assumed was zero.
3         Q.    So what number of -- what amount of
4    cash do you believe is going to be repatriated
5    in your assumption?
6         A.    My -- I'm not trying to make this
7    complicated or confusing, but I'm basing my
8    cash estimate, as of April 15, at 329.4, and to
9    the extent that that cash balance includes any
10   forecasted collection of receivables, then
11   those collections would be included in that
12   cash balance.
13        Q.    Why don't we just figure out if it
14   does?  Page 39 of Exhibit 3?
15        A.    Okay.
16        Q.    Okay.  Forecast for receivables?
17        A.    Okay.
18        Q.    You see receipts, other receivables,
19   and net intercompany receipts?
20        A.    Yes.
21        Q.    You assign zero dollars to that,
22   correct?  I'm sorry, not you.  There is no --
23   there is no estimated receivables, correct?
24        A.    They estimated it at zero.
25        Q.    And the last time they made a

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2      forecast, if we're reading paragraph 17
 3      correct, the last time they made a forecast
 4      they hadn't forecast the 13.2 million that came
 5      in from India, right?
 6              A.      Correct.
 7              Q.      And so that was a pleasant surprise,
 8      right?
 9              A.      Well, it was a change to their
10      forecast.
11              Q.      Right.  A positive variance, another
12      way to say it, correct?
13              A.      Yes.
14              Q.      And if you estimate, if you start
15      with zero, there's no place to go but up,
16      right?  It's only going to get better than
17      that, right?
18              MR. PULTMAN:  Objection to form.
19              A.      Not necessarily.
20              Q.      It could get worse than zero?
21              A.      No.  You said could it get better.
22      It could stay zero.
23              Q.      All right.  Now, going back to
24      paragraph 91.
25              MR. PULTMAN:  I don't want to
```

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2         interrupt you, but is there a good place
 3         for a break?
 4              MR. LEBLANC:  Sure.  That's fine.
 5              THE VIDEOGRAPHER:  We are now off
 6         the record.  The time is 4:12 p.m.,
 7         October 22, 2014.
 8              (Recess taken.)
 9              THE VIDEOGRAPHER:  This is tape six
10         of the deposition of Dr. Paul Wertheim.
11         We are now back on the record.  The time
12         is 4:19 p.m., October 22, 2014.
13   BY MR. LEBLANC:
14         Q.   Dr. Wertheim, we were just -- just
15   to finish up on the retention plan.  If you
16   look two paragraphs forward in Exhibit 3,
17   paragraph 93?
18         A.   Okay.
19         Q.   Do you see, in the second sentence,
20   the monitor -- "The 2015 NRP will provide cash
21   incentive awards to eight employees of the
22   applicants and eight employees of their
23   affiliates in APAC and CALA in which the
24   applicants have an economic interest."
25              Do you see that?
```

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2          A.     I see that, yes.

3          Q.     You understand that the reason for a

4     retention program like this and the milestones

5     that are set is to try to bring money into the

6     NNL estates, right?

7          A.     Among other things, yes.

8          Q.     And -- or, among other things,

9     including the reduction of claims, the

10    completion of the claims process, right?

11         A.     Yes.

12         Q.     And it's your analysis that, at

13    least with respect to the two related to

14    bringing in additional assets, that it will be

15    completely ineffective; is that right?

16              MR. PULTMAN:  Object to the form of

17         the question.

18              You can answer it.

19         A.     By additional assets, can you

20    specify?

21         Q.     Sure.  It's your view that the NRP,

22    the Nortel retention plan, will have no

23    positive impact on repatriation of cash from

24    affiliates in APAC and CALA where some of the

25    participants are located, and no positive

1                  WERTHEIM - HIGHLY CONFIDENTIAL

2    effect on the monetization of residual assets?

3         A.    Well, again, those, to the extent

4    that they would have been included in the cash

5    forecast, would be incorporated into the

6    forecasted cash balance at April 2015, and your

7    point that, in a previous forecast, there was

8    an underestimation, I have no basis to adjust a

9    future forecast and assume that that forecast

10   is also going to be an error.

11              My assumption is to use the

12   forecast, and just because a previous forecast

13   underestimated the cash collection gives me no

14   basis to just assume that a future forecast is

15   going to underestimate the cash balance.

16        Q.    But you understand the monitor is

17   willing to spend money to try to monetize

18   further assets and to repatriate funds from

19   APAC and CALA, right?

20        A.    Yes.

21        Q.    And you know that there is 150 plus

22   million dollars in APAC and CALA, right?  You

23   looked at that with Mr. Rosenthal?

24        A.    Yes.

25        Q.    And your estimate is that zero

1                    WERTHEIM - HIGHLY CONFIDENTIAL

2    dollars come in?

3         A.     That was my estimate.

4         Q.     And with respect to the asset sales,

5    is it within your area of expertise to value

6    assets?

7         A.     Certain assets, yes.

8         Q.     Okay.  And --

9         A.     Do you want to be more specific?

10        Q.     Sure.  Do you have the ability to

11   look at comparable sales of IP addresses?

12        A.     That, I have not done.

13        Q.     But do you have the ability to?

14        A.     To look at comparable sales?

15   Possibly, yes.

16        Q.     Right.  To do a Google search to see

17   what IP addresses are selling for?

18        A.     Do I have the ability to do a Google

19   search?  Yes, to do that.

20        Q.     And you just didn't do that, though,

21   for that asset category of IP addresses in this

22   case, right?

23        A.     Correct.

24        Q.     All right.  Two other topics.

25               Mr. Rosenthal had asked you a series

1            WERTHEIM - HIGHLY CONFIDENTIAL

2    of questions about if the parties reach a

3    settlement before June 30 of 2015, and I want

4    to just modify that a little bit.

5            You understand that a payment of

6    principal to the bonds would reduce the

7    continued accrual of interest pursuant to the

8    settlement, right?

9        A.    Yes.

10       Q.    So, for example, if it's undisputed

11   that the bonds are going to get 70 cents on the

12   dollar, that amount could be paid to the bonds

13   today and the amount of accrual of interest

14   would be reduced, correct?

15       A.    The amount of interest that would

16   accrue on those bonds would cease.

17       Q.    Okay.  And if the parties agreed

18   that the bonds, under any circumstance, would

19   get a hundred cents on the dollar, then they

20   could make the payment today of the principal

21   amount and then the amount owing in PPI

22   pursuant to the settlement would stop at

23   whatever the accrued amount was as of the date

24   of the payment, right?

25       A.    For those bonds, yes.

1           WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    When you say for those bonds, what

3   do you mean by that?

4        A.    For whatever bonds were paid.

5        Q.    Okay.  So if the -- if the -- all

6   the estates agreed and said the bonds should

7   get paid now and that payment was made, then

8   even without a global settlement of anything

9   else, then the interest accrual would stop as

10  of the point of that payment?

11       A.    Correct.

12       Q.    And let's -- just to be a little bit

13  more precise because I know you said you didn't

14  know the math.  Let's try to do the math a

15  little bit.

16             You understand that there's

17  134 million that's to accrue over the one-year

18  period from June 30, 2014 to June 30, 2015,

19  right?

20       A.    Based on the three and a half

21  percent.

22       Q.    Right.  With a cap of 134 million,

23  right?

24       A.    Correct.

25       Q.    And so if we divide that by 12,

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    that's roughly $11 million a month?

3         A.    Roughly, yes.

4         Q.    And so if $11 million a month

5    accrues by the end of October, can you just

6    calculate for us what the amount of the accrual

7    would be?  We can do it together.

8              So you would have July, August and

9    September and October, right?

10        A.    From July of 2014.

11        Q.    July 1, 2014 through November 1 of

12   2014.

13        A.    Yes.

14        Q.    Four months, $44 million, right?

15        A.    Correct.

16        Q.    And so if you add 44 million to

17   876 million, it's 920, roughly?

18        A.    Okay.

19        Q.    Okay?  So under your analysis with

20   the assumptions you have made, if a payment

21   were made to the bonds of their principal

22   amount, then the settlement would result in the

23   bondholders getting less than the 971 million

24   that you have calculated, correct?

25        A.    Well, my assumption was based on the

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    distribution dated June 30, 2015.

3         Q.    Right.  And using June 30, 2015,

4    from the perspective at least of NNL, that's

5    the worst possible date to make the

6    distributions, isn't it?

7              MR. PULTMAN:  Object to the form.

8              You can answer.

9         A.    What do you mean by worst?

10        Q.    Well, by November -- by June 30 of

11   2015, you would have had the full accrual

12   that's called for under the settlement, right?

13        A.    They will reach the cap.

14        Q.    Right.  And so you have assumed a

15   distribution date that is the point in time

16   where the cap is the maximum it could ever

17   possibly be, right?

18        A.    Yes.

19        Q.    And if you simply assumed an earlier

20   distribution date, then the cap could be

21   something less than the maximum?

22        A.    The cap is the cap.  The interest

23   accrual would be less.

24        Q.    I'm sorry.  If you assumed an

25   earlier distribution date, then the maximum

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2    amount of interest paid would be less than
 3    1.01 billion?
 4         A.    Right.  But the cap would still be
 5    the cap.
 6         Q.    When you say the cap would still be
 7    the cap --
 8         A.    Well, you said the cap would be
 9    reduced.
10         Q.    Okay.
11         A.    The cap wouldn't be reduced.  The
12    cap is the cap.  The accrual would be reduced.
13         Q.    Okay.  And if a full payment were
14    made, the accrual would be reduced to zero,
15    right?  So, in other words, if the full
16    principal amount was paid, there would be no
17    further accrual?
18         A.    No further accrual past that date.
19         Q.    All right.  Now, you are aware that
20    the -- there's a dispute in Canada over whether
21    or not interest post-petition could be included
22    or should be included in the bondholders'
23    claims there?
24         A.    Yes.
25         Q.    And your assumption is that it will
```

1          WERTHEIM - HIGHLY CONFIDENTIAL

2    not be included; is that right?

3          A.    State that again.

4          Q.    Sure.  Your assumption is that the

5    bondholders' claim in Canada will not include

6    the claim for post-petition interest.

7          A.    I don't understand your implication

8    that I'm making that assumption.

9          Q.    You use, for the bondholder claim in

10   Canada, you use or you begin with an assumption

11   that the bondholder claim is simply the

12   principal amount of the claim, right?

13         A.    Plus -- plus the pre-petition

14   interest.

15         Q.    Plus the pre-petition interest, but

16   you do not include any post-petition interest?

17         A.    Correct.

18         Q.    Right.  And that's one of the items

19   that you excluded from the 10-Q from the second

20   quarter of 2012, right?

21         A.    Correct.

22         Q.    Now, if you made a different

23   assumption as to that element, that would have

24   a material impact on your calculations,

25   wouldn't it?

HIGHLY CONFIDENTIAL                266

1               WERTHEIM - HIGHLY CONFIDENTIAL
2                    MR. PULTMAN:  Object to the form of
3           the question.  Objection, foundation.
4                    You can answer.
5           A.    No, that would be unrelated to what
6      the purpose of my calculation was because it's
7      my understanding that the post-petition
8      interest wouldn't be paid at all until there
9      was an excess.
10                    So I can't include post-petition
11      interest as a claim to calculate a surplus to
12      then see if there's a surplus to pay the
13      positions.  That makes no sense.
14           Q.    Do you understand what the dispute
15      in Canada is as to post-petition interest?
16           A.    As to whether they're entitled to it
17      or not.
18           Q.    Do you understand that the
19      bondholders have taken an appeal of Justice
20      Newbould's decision as to whether or not
21      post-petition interest is included as part of
22      the claim that the bondholders have in Canada?
23           A.    Yes.
24           Q.    You understand that?
25           A.    I -- could you repeat that?

1            WERTHEIM - HIGHLY CONFIDENTIAL
2        Q.    Do you understand that the
3   bondholders have taken an appeal of Justice
4   Newbould's decision that post-petition interest
5   is not included in their claim in Canada?
6        A.    That, I don't know about.
7        Q.    Now, assume with me that the
8   bondholders have taken such an appeal and have
9   asserted the position that the interest doesn't
10  stop accruing in Canada and, therefore, the
11  bondholders' claim should continue to accrue
12  interest even post-petition.
13            Can you assume that with me?
14       A.    Okay.
15       Q.    That would have a material impact on
16  your calculation, wouldn't it?
17       A.    I don't know because I don't know
18  what material would end up being or what the
19  effect of the dollar amount would be.  I
20  haven't done that analysis.
21       Q.    Well, you assume that the
22  bondholders and the US interests, US estate,
23  constitute 65.3 percent of the creditor body in
24  Canada, right?
25       A.    Yes.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2        Q.    If the --

3        A.    Excuse me.  Repeat that.

4        Q.    Sure.  You conclude that the US

5    and -- I'm sorry, the US interest and the

6    bondholders constitute 65.3 percent of the

7    interest in Canada?

8        A.    No.

9        Q.    No.  Okay.  Your sensitivity

10   analysis reaches a conclusion of $65.3 million

11   for every hundred million dollars of --

12       A.    Right, but the question was --

13       Q.    Just let me finish my question.

14             -- incremental cash in Canada,

15   right?

16       A.    Right, but your question was

17   65 percent to the bondholders.

18       Q.    And the US interest.

19       A.    And part of that 65 percent is

20   related to the $2 million priority -- the two

21   million point sixty-seven claim.

22       Q.    Right.  But, in its simplest terms,

23   the sensitivity suggests that the bonds benefit

24   65 percent of -- for every 65 percent of every

25   dollar of additional assets in Canada, right?

1                WERTHEIM - HIGHLY CONFIDENTIAL
2        A.    Well, again, mathematically it
3   doesn't all go to the bonds.  It would go to
4   NNI's cash.
5                I think I know what you're asking,
6   but the bonds don't make up 65 percent of that.
7   The bonds plus the other 2062.7 make up
8   65 percent of that.
9        Q.    Okay.  I think we're on the same
10  page.
11               And if the bonds had, in addition to
12  their principal claim and their post --
13  pre-petition interest claim, had an additional
14  claim for $1.657 billion of interest
15  post-petition as of June 30, 2014, then the
16  bonds, just the bonds, would make up a
17  significantly larger portion of the Canadian
18  claims pool, right?
19       A.    Yes.
20       Q.    And you have assumed that the bonds
21  do not have that claim, right?
22       A.    I have assumed that there is not a
23  claim for post-petition interest in my
24  distribution analysis.
25       Q.    Okay.  And that assumption is less

1           WERTHEIM - HIGHLY CONFIDENTIAL

2    favorable to NNI and to the bonds generally,

3    correct?

4        A.    Correct, but in my report --

5    (perusing) -- paragraph 23, I state that I have

6    been instructed to assume for purposes of this

7    report that the PPI may be payable in the event

8    that there's a surplus.

9              So, again, for purposes of this

10   report and for purposes of my calculation,

11   assuming, assuming that it can only be paid in

12   the event that there's a surplus, then I can't

13   include it as a claim to calculate the surplus

14   and then use that surplus to see if that claim

15   could be paid.

16       Q.    Okay.  You stopped reading before

17   maybe the important part of that assumption

18   that you were asked to make.  You were

19   instructed to assume for the purposes of this

20   report that PPI, in a Chapter 11 case in the

21   US, may sometimes become payable, and it goes

22   on from there, right?

23       A.    Right.

24       Q.    So you didn't make any assumptions

25   one way or the other and weren't instructed to

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    assume anything one way or the other about the

3    effect of post-petition interest in Canada,

4    were you?

5         A.    No.

6         Q.    And you don't -- you didn't analyze

7    what might happen if the bondholders are

8    successful in their appeal and interest

9    actually does accrue on a post-petition basis

10   on their claim?

11        A.    No, I've stated that I haven't

12   analyzed it.

13        Q.    But you do agree with me that

14   directionally that would be more favorable for

15   the bonds than the assumptions that you have

16   made in your report, right?

17             MR. PULTMAN:  Object to the form.

18             You can answer.

19        A.    I haven't done the analysis to know

20   the impact, the materiality, so I can't say.

21        Q.    You can't say one way or the other,

22   directionally even?

23        A.    Directionally, it should increase

24   NNI's net assets.

25        Q.    Okay.  Last question -- last

```
 1              WERTHEIM - HIGHLY CONFIDENTIAL
 2   questions.
 3              Were you aware, at the time you
 4   wrote your report, of the allocation by
 5   Mr. Kinrich to NNSA and NN Ireland?
 6        A.    Yes.
 7        Q.    You were aware of that?
 8        A.    The Kinrich's -- based on exhibit --
 9   may I turn to Exhibit 33 of his --
10        Q.    I don't need the numbers.  I just
11   want to know at the time you wrote your report
12   as opposed to now, were you aware of those --
13   those allocations?
14        A.    Can I look at the exhibit?  I'm
15   going to look at the exhibit because --
16        Q.    Sure.
17        A.    -- I'm making -- (Perusing.)
18              MR. PULTMAN:  Exhibit 6.
19        Q.    I think it's actually part of the
20   appendix of Exhibit 6, the last page of the
21   appendix.
22        A.    Oh, the appendix is separate.
23              So could you restate your question?
24        Q.    Sure.  Were you aware, at the time
25   you wrote your report, that Mr. Kinrich had
```

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    allocated amounts to NNI and NNSA?

3        A.    Yes.

4        Q.    Did you reach a conclusion that

5    those would not redound to the benefit of NNL

6    at the time you wrote your report?

7             MR. PULTMAN:  Objection.  It has

8         been asked and answered.

9        A.    I answered that in the previous

10   testimony.

11       Q.    Well, can you answer it again?

12            MR. PULTMAN:  You can answer again.

13       Q.    Did you reach that as a conclusion

14   at the time you wrote your report?

15       A.    I knew those allocations existed at

16   the time of my report, but I did not

17   incorporate or do an analysis on any potential

18   upflow to NNI.

19       Q.    Okay.

20       A.    I think that's how I answered it

21   previously.

22       Q.    That's fine.  The question was

23   whether you had analyzed.

24       A.    I just wanted to make sure I --

25       Q.    My question was simply whether you

1              WERTHEIM - HIGHLY CONFIDENTIAL

2    analyzed, and I think you have answered that.

3              You didn't analyze that?

4         A.    Yeah, and I said that earlier.  I

5    did not analyze it.

6              MR. LEBLANC:  I have no further

7         questions.

8    EXAMINATION BY

9    MR. PULTMAN:

10        Q.    I have a question in one area which

11   is to follow up on Mr. Leblanc's questions to

12   you, which related to the issue of -- the tax

13   issue, the US tax issue, and, in particular, he

14   asked you about evidence that you were pointing

15   to and you made references to statements by

16   John Ray.

17             Do you recall that?

18        A.    Yes.

19             MR. LEBLANC:  Objection, leading.

20        Q.    What statements were you referring

21   to?

22        A.    I believe I reference John Ray's

23   testimony in relation to the tax liability in

24   footnote 29 of my report, and that was related

25   to his deposition.

1              WERTHEIM - HIGHLY CONFIDENTIAL

2       Q.    And when you say his deposition, was

3    that in connection with the PPI matter?

4       A.    Yes.

5              MR. PULTMAN:  I have no further

6         questions.

7              MR. ROSENTHAL:  No questions.  Thank

8         you.

9              MR. PULTMAN:  Thank you for your

10        time, Doctor.

11             Off the record.

12             THE VIDEOGRAPHER:  This concludes

13        today's deposition of Dr. Paul Wertheim --

14        Wertheim, excuse me.  We are now off the

15        record.  The time is 4:40 p.m.,

16        October 22, 2014.

17             (Time noted:  4:40 p.m.)

18

19

20

21

22

23

24

25

1                    A C K N O W L E D G M E N T

2

3    STATE OF                    )

4                                :ss

5    COUNTY OF                   )

6

7            I, PAUL WERTHEIM, hereby certify

8    that I have read the transcript of my testimony

9    taken under oath in my deposition of

10   October 22, 2014; that the transcript is a

11   true, complete and correct record of my

12   testimony, and that the answers on the record

13   as given by me are true and correct.

14

15                    _____

                      PAUL WERTHEIM

16

17

18   Signed and subscribed to before me

19   this _____ day of _____, 20__.

20

21   _____

     Notary Public, State of New York

22

23

24

25

1                C E R T I F I C A T E

2

3    STATE OF NEW YORK   )

4                           :ss

5    COUNTY OF RICHMOND )

6

7            I, MELISSA GILMORE, a Notary Public

8    within and for the State of New York, do hereby

9    certify:

10           That PAUL WERTHEIM, the witness

11   whose deposition is hereinbefore set forth, was

12   duly sworn by me and that such deposition is a

13   true record of the testimony given by such

14   witness.

15           I further certify that I am not

16   related to any of the parties to this action by

17   blood or marriage; and that I am in no way

18   interested in the outcome of this matter.

19           IN WITNESS WHEREOF, I have hereunto

20   set my hand this 24th day of October, 2014.

21

22   *Melissa Gilmore*

23

24   _____

25   MELISSA GILMORE

1    *** ERRATA SHEET ***

2        ELLEN GRAUER COURT REPORTING CO. LLC
3           126 East 56th Street, Fifth Floor
             New York, New York 10022
                212-750-6434
4

5    NAME OF CASE: IN RE NORTEL NETWORKS, INC.
     DATE OF DEPOSITION: OCTOBER 22, 2014
6    NAME OF WITNESS: PAUL WERTHEIM

7    PAGE  LINE      FROM          TO          REASON

8    ____|_____|_____|_____|_____

9    ____|_____|_____|_____|_____

10   ____|_____|_____|_____|_____

11   ____|_____|_____|_____|_____

12   ____|_____|_____|_____|_____

13   ____|_____|_____|_____|_____

14   ____|_____|_____|_____|_____

15   ____|_____|_____|_____|_____

16   ____|_____|_____|_____|_____

17   ____|_____|_____|_____|_____

18   ____|_____|_____|_____|_____

19   ____|_____|_____|_____|_____

20

21                    _____

22   Subscribed and sworn before me
     this____day of_____,20__.
23

24   _____    _____

25   (Notary Public)          My Commission Expires:

Case 09-10138-MFW    Doc 15043-1    Filed 01/13/15    Page 537 of 562
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

## $

**$1.01 (8)**
50:13;52:13;131:3,
13;188:8;189:17;
193:25;194:9
**$1.1 (2)**
51:9;52:6
**$1.193 (1)**
93:4
**$1.3 (4)**
144:22;147:7;
173:2;174:20
**$1.304 (6)**
170:10,21;171:2,
11,15,21
**$1.548 (1)**
94:14
**$1.6 (3)**
186:20;187:20;
190:3
**$1.657 (3)**
196:20;197:6;
269:14
**$100 (7)**
45:2,4;84:9;
103:19;238:17;
239:9,25
**$11 (2)**
262:2,4
**$11.25 (1)**
123:23
**$120 (2)**
127:4;233:8
**$126 (1)**
92:22
**$127 (1)**
110:17
**$13 (4)**
122:16,23;123:6,
12
**$13.2 (1)**
252:11
**$133 (2)**
142:25;144:2
**$156 (2)**
222:11;223:17
**$158 (3)**
148:3,21;149:11
**$160 (3)**
139:18;140:16;
141:16
**$167 (1)**
81:20
**$180 (2)**
126:25;130:25
**$186 (1)**
92:10
**$191 (1)**
124:7
**$193 (1)**
227:25

**$2 (9)**
64:6;71:9,17;
76:12,18,19,21;
104:5;268:20
**$2.235 (1)**
73:15
**$2.8 (3)**
98:12,15,22
**$200 (1)**
227:22
**$240 (3)**
139:14;140:5;
141:14
**$241 (1)**
133:3
**$245 (1)**
132:14
**$3.235 (2)**
80:11;82:24
**$300 (2)**
99:5;191:3
**$326 (2)**
231:8,22
**$329.4 (1)**
104:20
**$35 (3)**
149:23;150:4,11
**$36 (1)**
99:18
**$37 (3)**
84:12;85:3,9
**$400 (1)**
227:11
**$437.6 (1)**
219:20
**$44 (1)**
262:14
**$45.8 (1)**
202:25
**$5 (3)**
58:7;20;129:22
**$54.6 (1)**
59:24
**$56 (5)**
163:5,7,14;164:8,
10
**$593 (8)**
157:15;158:24;
159:14;163:11,21;
223:6;226:3,20
**$62 (1)**
70:3
**$62.7 (1)**
70:20
**$620.9 (1)**
153:22
**$65.3 (1)**
268:10
**$670 (2)**
89:20;90:12
**$75 (2)**
102:11,22
**$8.9 (2)**

**248:19;250:15**
**$86 (2)**
143:5;144:3
**$876 (2)**
189:11;190:2
**$890 (1)**
198:24
**$9 (2)**
249:12;250:14
**$900 (1)**
194:19
**$92 (3)**
155:13;161:13;
165:22
**$971 (2)**
43:16;146:20

## A

**ABID (2)**
3:18;10:7
**ability (6)**
122:20;138:6;
210:17;259:10,13,18
**able (11)**
16:8;66:8,24;
100:6;139:16;
143:25;175:3;
180:23,25;210:9;
230:14
**above (1)**
147:6
**absence (3)**
190:12;191:4;
192:24
**absolute (2)**
51:24;189:22
**accept (10)**
93:18,25;124:12;
127:8;130:21;
132:20,25;140:7;
151:23;236:22
**acceptable (4)**
12:6,17,24;69:14
**accepted (16)**
83:24;84:3;93:24;
94:6;98:16,17,19,21;
99:3,13;100:22;
101:12;129:20;
150:19;249:20,21
**access (1)**
166:6
**accordance (1)**
86:18
**According (4)**
89:23;94:16;
187:21;219:2
**account (11)**
102:15;103:2;
104:8;114:18;
116:15;117:13;
131:9;133:19;
153:19;226:6;231:11

**accounted (3)**
117:14;137:19;
150:22
**accounting (5)**
58:19;86:19,20;
90:22;224:2
**accounts (3)**
81:21;92:2;95:21
**accrual (25)**
31:8,12,16,23;
187:10;188:14;
189:4,19;194:14;
195:9;197:19,22,25;
198:3;200:6;260:7,
13;261:9;262:6;
263:11,23;264:12,14,
17,18
**accrue (5)**
190:18;260:16;
261:17;267:11;271:9
**accrued (18)**
29:15;31:18;75:19;
186:14,20;187:3,7,
19;188:23;189:3;
190:11;192:16,19,20,
25;193:6;195:3;
260:23
**accrues (1)**
262:5
**accruing (3)**
189:11;191:3;
267:10
**accurate (3)**
32:8;73:10;199:7
**accurately (1)**
110:10
**achieve (3)**
241:8;245:7,18
**acknowledge (1)**
209:19
**actual (5)**
101:12;110:11;
124:14;177:19;
251:24
**actually (18)**
31:12;35:23;61:2;
77:4;85:18;102:4;
110:17;130:24;
136:11,15;176:25;
183:16;185:19;
214:20;230:19;
250:17;271:9;272:19
**ad (1)**
10:5
**add (10)**
28:23;81:2;83:24;
84:2;145:4,5;148:5;
181:8;214:10;262:16
**added (14)**
57:7;59:9;69:25;
71:4,22;79:14;80:24;
85:7;147:4;181:12;
222:22;223:10,12;

**233:4**
**addiction (1)**
239:16
**adding (1)**
141:19
**addition (8)**
18:18;56:14,23;
114:16;212:21;
233:9;239:10;269:11
**additional (26)**
32:24;33:12;45:2;
80:24;114:17;115:8;
123:14;127:12,19,23,
23;130:25;136:14;
161:9;189:12,16;
207:6;215:22;
216:15;238:20;
253:24,25;257:14,19;
268:25;269:13
**address (6)**
123:24;125:16;
168:23;233:24;
238:10,18
**addresses (39)**
118:19,21,24;
119:5,8,18,23;120:3;
122:17,21,22;123:5,
9,11,23,25;124:2,6,
16;125:15;126:3,5,
25;130:24;144:11,
18;147:5;169:2;
232:22;233:14,19;
236:19;237:10,15;
240:5,19;259:11,17,
21
**adds (1)**
175:15
**adjust (1)**
258:8
**adjusted (1)**
144:17
**admissibility (1)**
22:6
**admitted (1)**
24:9
**adopted (1)**
242:9
**advantage (1)**
208:4
**advice (1)**
97:18
**affect (5)**
36:4;100:3;145:24;
225:12;239:21
**affected (7)**
53:10,18;64:18,23;
65:3,4,18
**affects (4)**
64:11,12,15,22
**affiliate (2)**
252:12;253:21
**affiliates (8)**
241:18;243:23;

Case 09-10138-MFW    Doc 15043-1    Filed 01/13/15    Page 538 of 562
IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

246:22;252:18,22;
253:18;256:23;
257:24
**afternoon (1)**
196:5
**afterwards (1)**
80:16
**again (81)**
11:10,21;25:8,17;
36:22;39:15;46:11,
24;47:2;63:10;66:18;
67:12;76:4;83:4,16;
84:14;86:13;88:4;
89:17;91:9;92:6;
96:12;97:20;101:2;
107:23;109:13,22;
110:4;117:3;124:20;
126:22;127:8;131:6;
134:5;135:3,9;136:4,
22;144:6;145:25;
149:2;157:8;160:13;
162:2;164:22;
165:25;171:10;
174:12,25;179:10;
181:11;183:6;
198:25;200:17;
203:9;207:3;211:9,
13;215:13,20;
216:18;219:7;
225:24;226:11,14;
228:4;229:19;
234:10;239:8;
240:22;243:16;
246:2,9;251:12,16;
258:3;265:3;269:2;
270:9;273:11,12
**against (42)**
57:2;64:6;65:19,
24;66:5;74:10,19;
76:9,9,12,13;78:6,9;
80:11;82:15;85:8;
86:4;94:19;98:10,14;
99:12,17;100:7,8;
101:12;102:24;
150:11;151:2;
157:14,18;158:13;
159:6,14;161:7,9;
163:13,24;201:16;
204:23,23,24;243:8
**ago (8)**
22:9,9;81:15;
153:18;171:9;177:2;
181:12;222:17
**agree (21)**
30:8;42:3,6;43:13;
44:15;45:3;50:17;
61:24;63:19;68:13;
72:16;124:6;127:2;
138:13;143:2;
159:10;188:18;
192:13;204:17;
217:4;271:13
**agreed (4)**

171:21;198:7;
260:17;261:6
**agreement (8)**
31:6;41:8;45:14;
48:17;107:5;146:19;
201:20;236:9
ahanrahan@willkiecom (1)
3:10
**ahead (1)**
162:16
**AKIN (2)**
3:13;10:9
**allegations (1)**
23:3
**Allen (3)**
10:18;15:6,11
**allocated (2)**
132:14;273:2
**allocation (39)**
35:18,20,25;56:24;
57:10,23;70:2,7;
130:6;132:2,13,21;
133:2;139:15;140:6;
142:18;150:19;
170:15;174:14,15;
181:15;183:18;
194:5,11;211:18,22;
213:10,18;214:13,16,
22,23;237:24;
241:24;242:8;
245:22;246:3,12;
272:4
**allocations (5)**
36:7;38:12;150:14;
272:13;273:15
**allow (1)**
99:25
**allowance (1)**
85:14
**allowed (14)**
54:15,16,19;85:18,
22;86:5,7;88:17,21;
94:15;96:8;98:11,14,
18
**allowing (1)**
140:2
**allows (1)**
226:25
**almost (3)**
84:22;206:5;
249:12
**alone (2)**
227:21,24
**along (3)**
10:7;217:19;
230:14
**Alteon (22)**
155:2;156:20,21,
23;157:18;158:21;
159:6,12;160:2,8,15,
19;161:8,9,13;163:4;
164:8;165:12;
166:10;167:16,22;

182:21
**Alteon's (8)**
158:23;159:4;
160:25;161:4,6;
163:23;164:16;
165:15
**alteration (1)**
212:8
**alters (1)**
168:8
**although (4)**
34:19;75:2;158:5,9
**altogether (1)**
161:2
**always (1)**
142:7
**amended (1)**
221:15
**Among (3)**
244:12;257:7,8
**amount (111)**
21:3;30:25;42:8;
44:19;46:8,15,20;
47:10;48:3;49:2,4,6;
51:14,17;62:2,8;
63:21;64:7,9;65:11;
66:9,25;79:13;84:14,
22;87:2;88:6,17,21;
89:22;92:8,18,25;
93:7;94:10;95:12;
98:11;99:25;104:2;
107:14;108:15;
114:2,4,8;123:20;
124:21,25;126:8;
129:23;138:22;
146:17,24;159:20,22;
173:13,14,16;177:15,
17;179:12;188:14,15,
20;190:17;191:19,
24;192:14,19;193:11,
19,21;194:20,21;
195:3;198:4;200:6;
202:19,22;203:4;
204:18;207:22;
208:12;212:23;
213:9;214:2;220:25;
221:5;222:17;
223:12,13;226:7,15;
227:13;228:7;232:2;
239:18;240:16,24;
254:3;260:12,13,15,
21,21,23;262:6,22;
264:2,16;265:12;
267:19
**amounts (24)**
66:11;80:19;81:24;
83:25;86:15,22,23;
87:3,7;88:4;89:14;
113:4;115:10;206:6,
6;207:17;209:22;
217:13;218:22,24;
219:4,6,9;273:2
**analysis (92)**

32:14,16;37:19;
41:5;44:22,25;45:7,8,
13;54:9;56:14;60:6;
61:14;67:7;69:16;
73:7,14;77:17;84:9,
17;86:13;96:18;97:3,
24;103:15;112:18,
21;114:12,19;121:8;
127:3;130:17;132:2;
133:5,17,23;134:10;
136:2;137:6,13,18;
140:15;141:11;
143:3;146:15;
151:24;160:24;
161:11;172:23;
173:18,20;176:15,19;
177:3,7,8,14,18;
178:2;183:14;200:9;
203:14;206:5;
209:13,18;210:23;
215:2,14;216:23;
218:5;225:15,17;
229:16;231:21;
232:5,14;233:25;
242:8;247:3,10,11,
18;248:6,11,14;
257:12;262:19;
267:20;268:10;
269:24;271:19;
273:17
**analyze (8)**
41:6;213:25;248:8;
249:14;250:23;
271:6;274:3,5
**analyzed (3)**
271:12;273:23;
274:2
**ANDREW (4)**
3:7;10:2,15;196:7
**Andy (1)**
184:23
**ANNE (1)**
3:20
**Annie (1)**
10:8
**answered (40)**
25:7,15;39:14;
67:11;92:5;96:11;
107:22;110:3;
122:25;123:17;
125:7,8,20;126:16,
21;130:20;131:5;
134:4;135:4,7;
136:21;142:4;
161:10,19;162:11;
165:24;174:11;
225:22;226:10;
234:9;238:12;240:4,
12,13,21;246:8;
273:8,9,20;274:2
**Anticipated (2)**
231:4,12
**APAC (8)**

107:4;241:18;
243:23;246:22;
256:23;257:24;
258:19,22
**Apologies (2)**
20:15;249:9
**appeal (4)**
266:19;267:3,8;
271:8
**appear (1)**
231:24
**appeared (1)**
185:21
**appears (3)**
120:24;121:2;
173:6
**Appendix (24)**
13:20;19:10;33:17,
19;34:6;35:10;79:23;
80:2;81:5,17;82:13,
22;89:10,11;94:16;
95:15;98:10;100:14,
16;169:5;242:20;
272:20,21,22
**applicable (1)**
84:5
**applicants (5)**
119:22;245:16,17;
256:22,24
**applies (1)**
208:23
**apply (6)**
59:23;84:4;203:12;
206:14;210:22;211:6
**approach (2)**
37:23;171:16
**appropriate (2)**
166:14;248:9
**appropriately (1)**
100:8
**approval (1)**
236:9
**approximately (3)**
43:16;143:5;
146:20
**April (9)**
20:10;178:15;
247:13;248:21,21;
249:13;253:5;254:8;
258:6
aqureshi@akingumpcom (1)
3:23
**arbitration (1)**
21:11
**area (3)**
130:12,15;259:5;
274:10
**argued (2)**
201:14,19
**arguing (3)**
128:24,25;162:24
**argument (2)**
191:21;206:9

Case 09-10138-MFW Doc 15043-1 Filed 01/13/15 Page 539 of 562
IN RE: NORTEL NETWORKS INC., et al. HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

**argumentative (1)**
125:19
**around (3)**
25:22;196:12;
229:3
**arrive (1)**
207:14
**ASC (1)**
218:22
**ascertain (1)**
137:14
**Asia (4)**
106:9;147:13,19;
148:2
**Asian (6)**
106:20;107:9,15,
20;108:3,17
**Asia-Pac (1)**
149:11
**aside (5)**
14:2;36:22;138:10;
144:20;191:17
**aspects (2)**
27:6;245:22
**assert (1)**
157:23
**asserted (8)**
157:18;158:12;
204:23;222:19;
233:13;234:6;
237:15;267:9
**asset (19)**
65:8;105:2,9;
112:3,5,8;114:5,9;
115:11,18;116:3,17;
117:2;118:11;
153:18;230:21;
236:9;259:4,21
**assets (58)**
37:20;41:13,19,25;
42:8;43:15,23;44:3;
45:2,17,20;46:7,13;
47:10;48:9;49:5;
65:3,10,15;75:14;
84:11;88:14;103:4,
18,24;105:4;112:13,
16,22;113:18;115:6,
18;117:13;127:17;
133:18;142:25;
146:17;152:12;
162:17;164:24;
181:20;213:23;
233:4,17;234:6;
241:3,9;243:15,23;
253:12;257:14,19;
258:2,18;259:6,7;
268:25;271:24
**assign (2)**
129:12;254:21
**assigned (2)**
105:8;253:16
**assigning (1)**
129:10

**assignment (1)**
32:9
**assist (1)**
18:6
**assistance (1)**
25:19
**associated (3)**
140:11;239:13,14
**Association (1)**
10:14
**assume (79)**
12:23;18:10;26:16;
35:19,23;36:7;37:4;
38:5,6,9;41:22;43:3;
46:15;50:12;52:12;
56:12;58:20;78:20;
85:25;86:7;92:24;
98:8;108:16,18;
113:18;116:8,9,11;
123:13,19,25;124:3,
11;126:24;128:9;
131:14;134:17;
139:13;140:4,9;
144:8,10,12;150:18;
152:2;163:4,6,10;
171:7;173:21;176:4,
21,22;177:10,11,13,
22;179:17;190:6;
202:7,16,20,22;
207:21;214:5;
218:16;219:9;229:8;
242:4,7,24;258:9,14;
267:7,13,21;270:6,
19;271:2
**assumed (32)**
36:2,24;37:24;
41:10;43:7;46:19;
58:7;74:4;91:19;
94:25;105:3;108:16;
109:17,18;125:3,9,
10;129:15;130:2;
142:24;188:22;
200:5;214:23;
231:15;232:5;
253:11;254:2;
263:14,19,24;269:20,
22
**assumes (2)**
52:5;193:18
**assuming (25)**
43:14;67:18;75:23;
85:13;106:17;
107:19;117:3;
124:13;127:10;
135:10;136:4;
177:24;180:18;
192:10,12;193:20;
194:3,15;198:25;
207:20;211:12;
239:4;240:16;
270:11,11
**assumption (95)**
34:17,19,22,24;

35:5,18;36:6,23;
37:21;38:10,12;
46:14;47:15,15,18;
53:16;63:15;74:16,
17,23;75:10,16,20,
24;76:4,25;77:5,11;
85:20,22,24;86:4,6;
90:12,20,21;92:2;
94:2,3,7,8;105:13,15,
18;106:17;108:5,11,
23;109:2,5,9,11,21,
24,25;128:7,13;
129:23;136:14;
140:7;143:24;151:7,
15;153:12;172:17,
25;173:10;176:9;
177:10;179:9,13;
194:10;200:3;
202:10;214:22;
241:24;242:4,13,15;
246:3,10;247:6,7;
252:16,20;254:5;
258:11;262:25;
264:25;265:4,8,10,
23;269:25;270:17
**assumptions (108)**
33:23;34:3,5,9,15;
35:2,7,12,14;36:9;
37:13,18;38:14;
42:10,12,15,20,22;
43:5,7,9;44:4,6;
46:25;47:4;53:10;
66:19;67:13,15,23;
68:9,11,15,18,20;
91:12;93:12,19;
103:10,13;114:14;
115:7,20;116:4,12,
14;117:7;128:21;
129:8,19,20;130:21;
131:12;135:17,18;
136:13;137:3;
138:12;140:21,23;
141:9,20,20;142:8;
143:4,11,15,16,17,
19;145:6,9;146:2,3,
23;147:5;152:2;
160:2;171:17,19,24;
172:3,5,6,11,13,15;
174:19;175:2,3;
178:24;179:7,21,22;
180:4,9,14,20,24;
181:13,16,21;182:2;
183:3;203:24;
262:20;270:24;
271:15
**Attorneys (2)**
3:4,14
**attributable (2)**
199:24;200:4
**attributed (1)**
124:16
**audibly (2)**
12:4;104:17

**August (7)**
25:23,23;26:9,15;
79:9;231:20;262:8
**author (1)**
24:7
**authority (1)**
245:5
**availability (1)**
191:18
**available (52)**
41:5,20,22;42:8;
46:21;48:9;49:5;
54:23,25;63:22,25;
64:5,8,15,16;69:20,
25;74:25;77:18;
84:17;88:15;91:4;
106:10;108:21;
112:25;116:19,25;
117:8;131:2;134:12;
146:5,13,17;151:25;
157:6;162:18;166:9;
181:20;191:22;
199:16;204:6,13,19;
215:7,10,24;216:20;
218:10;226:16;
227:25;228:7;239:5
**Avenue (1)**
3:5
**average (2)**
58:15;177:19
**avoid (1)**
100:18
**avoided (1)**
43:10
**avoiding (2)**
49:21;50:9
**awards (1)**
256:21
**aware (73)**
16:2;18:23;22:21;
25:10;26:6,10;73:13;
87:17,22;93:2,5;
95:19;96:5,14,20;
101:15;111:2,5,13,
22;112:12;118:12;
123:8;132:19,23;
133:2,4;142:11,17,
21;147:12,19;
148:16;149:6,10,12;
150:10,16,20;151:4;
157:17,21;158:11;
169:2,25;170:14,15,
18,23;171:3,8;
178:18;179:4;
194:17;200:10,13,18,
21;201:3,23,24;
202:5;205:10;227:3;
238:8;240:5,25;
251:5;264:19;272:3,
7,12,24
**awareness (1)**
168:22
**away (1)**

73:21

**B**

**back (32)**
31:25;34:20;42:23;
51:20;59:6;69:5;
73:6;80:7;82:10;
89:16;98:9;110:9;
115:23;118:8;
148:13,19;150:25;
157:13;165:19;
167:8;170:2;179:18;
181:11;185:7;
195:25;202:23;
206:25;219:22;
223:6;250:25;
255:23;256:11
**background (1)**
248:12
**backwards (2)**
14:24;180:2
**balance (43)**
56:25;58:5,6,12,
24;70:2,13;91:23;
104:20;107:5;
108:13,21;109:7,13;
110:7;111:8,9,21;
113:16,19;120:19;
147:23;148:2,20;
153:16,21;154:13;
175:12,18,22;180:4;
218:2;231:14,19;
247:22;248:2;253:4,
7,23;254:9,12;258:6,
15
**balanced (1)**
179:11
**balances (6)**
105:21;106:10;
109:11;111:16;
121:23,25
**balancing (1)**
180:7
**bankruptcy (3)**
78:14;152:11;
224:7
**bar (1)**
205:9
**base (1)**
191:11
**based (40)**
35:21;36:7;41:4;
42:23;60:19;78:13;
82:7;90:22;103:10;
106:9,11,14;114:8,
14,23;117:6,19;
126:23;127:2,9;
145:25;146:14,22;
168:10;176:19;
177:21;190:25;
194:14;197:3;203:9;
211:17,21;214:5,6;

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

223:13;229:14;
242:18;261:20;
262:25;272:8
**basic (1)**
45:15
**basically (2)**
178:9;242:10
**basing (1)**
254:7
**basis (51)**
16:19;17:7;48:14,
19,21;49:11,16;56:3;
74:15,22;78:6,10;
91:25;92:9,19;93:23;
94:4;95:17;105:17;
106:16,18;107:18;
108:10,22,25;113:11;
123:19;124:13,20,24;
126:7;128:14;
133:25;134:9,15;
135:10;151:9;
152:23;166:2;174:7;
193:11;211:12;
218:21;219:12;
223:20,21;240:15,23;
258:8,14;271:9
**Bassett (1)**
10:4
**Bates (7)**
120:13,16;148:15;
154:10;186:4;
229:25;230:13
**bear (1)**
201:21
**bears (3)**
94:22;95:18;
120:16
**become (1)**
270:21
**becomes (1)**
17:6
**began (1)**
209:12
**begin (4)**
91:16;120:7;
193:19;265:10
**beginning (3)**
68:17;183:22;
249:13
**begins (1)**
231:22
**behalf (7)**
10:10,13,16,19;
18:11;27:10;29:25
**behind (1)**
199:13
**believing (1)**
106:18
**belonging (1)**
45:3
**below (3)**
185:17;226:19;
250:18

**benefit (6)**
36:23;223:24;
230:7,8;268:23;
273:5
**benefits (4)**
102:13;137:19,24;
138:3
**Berenblut (3)**
27:7,21,24;28:10
**Berkow-Badtke (1)**
10:22
**Besides (6)**
15:11;39:4;40:13;
99:4,12;122:3
**best (23)**
38:4;41:11,15,24;
42:9;43:4,8,14;
77:25;91:3,9;103:7,
12;109:20;112:21;
113:7;114:2;123:13;
124:17;132:9;
133:17;153:11;
158:21
**better (3)**
87:11;255:16,21
**beyond (1)**
121:19
**BHG160742 (1)**
73:4
**BHG-PPI-71 (2)**
184:21;185:14
**bigger (1)**
27:5
**bill (1)**
29:12
**billed (1)**
29:10
**billion (91)**
31:8,9,12,24;
44:19;50:13,24;51:2,
9,17;52:6,13;64:6;
71:9,14,17;73:15;
76:12,19,21;80:11;
81:3;82:24;83:10,15;
88:11,22,23;93:4;
94:14;98:12,15,22,
24;99:8,18;104:5;
114:22;115:15;
128:4,6;131:3,13;
144:22;147:7;151:2;
170:10,21;171:2,11,
15,21;173:2;174:20;
183:24;186:20;
187:20;188:8;
189:17,20;190:3,8;
191:8,9;192:2,5,5,10,
15,18;193:4,7,25;
194:9,22;195:11;
196:20;197:6,9;
198:9,16,16;207:20;
212:9;213:3;234:19,
20;242:14,23;264:3;
269:14

**bills (1)**
28:13
**binary (1)**
180:19
**bit (8)**
53:17,17;120:25;
196:12;221:12;
260:4;261:12,15
**black (1)**
66:22
**blanket (1)**
35:15
**blends (1)**
190:22
**Block (5)**
209:16;211:8,23;
212:4;214:10
**body (1)**
267:23
**bold (1)**
146:16
**bond (3)**
71:22;224:10,13
**bondholder (4)**
184:7;185:2;265:9,
11
**bondholder-produced (1)**
72:2
**bondholders (29)**
10:6;31:7,10,11,
16;41:7;48:16,24;
49:15;65:24;66:4;
146:18;196:8;
200:14,19;201:15;
202:8,15;204:24;
228:7;262:23;
266:19,22;267:3,8,
22;268:6,17;271:7
**bondholders' (4)**
66:5;264:22;265:5;
267:11
**bonds (36)**
31:23;88:11;99:9;
104:7;130:7;178:25;
184:9,10;186:14;
190:18;191:2;
194:15;205:14;
206:2,16;215:10;
260:6,11,12,16,18,
25;261:2,4,6;262:21;
268:23;269:3,6,7,11,
16,16,20;270:2;
271:15
**bore (1)**
96:7
**both (12)**
39:17;63:24;64:16,
17,23;65:3;69:14;
104:8;105:8;150:7;
229:18,19
**bothers (1)**
48:19
**BOTTER (2)**

3:19;10:8
**bottom (15)**
30:5;79:8;99:16;
106:25;138:25;
145:24;148:15;
154:11;205:24;
230:13;237:20;
238:21;239:21,25;
244:13
**box (1)**
66:22
**Bradley (1)**
10:22
**break (14)**
12:12,13;56:21;
64:19,25;65:7;
111:12;125:21,22,25;
155:22,25;167:13;
256:3
**breaking (1)**
117:25
**Brent (2)**
169:13;184:25
**briefly (7)**
11:21;20:25;
105:24;153:15;
201:10,12;229:19
**bring (2)**
148:13;257:5
**bringing (1)**
257:14
**brings (2)**
31:22;220:10
**Britven (25)**
40:19;169:8,8;
170:8,23;171:20;
173:2;175:21;176:7;
178:23;179:8,22;
180:10,14,24;182:24,
25;216:9;227:3;
228:10,25;229:4,8,
24;232:13
**Britven's (9)**
169:16,19;171:14;
174:19;176:13;
177:5;181:23;
228:18;231:21
**brought (1)**
34:22
**Bryant (1)**
3:16
**bullet (2)**
142:8;143:18
**bullets (6)**
116:10;128:22;
129:8,13;142:2;
143:4
**burden (1)**
17:6
**burn (33)**
34:16,17,23;53:16,
16;58:8,15,17,21;
129:22,24;130:2;

154:19;176:5,10,11,
20,21,22;177:9,12,
13,17,20,24;178:10;
179:2;229:9;231:12,
15,22;232:5,14
**business (1)**
112:9
**buy (1)**
248:25

## C

**CALA (9)**
147:13,19;241:19;
243:23;246:23;
256:23;257:24;
258:19,22
**calculate (14)**
37:20;41:21;48:8;
99:25;103:8;114:11;
133:24;134:13;
177:19;181:19;
214:2;262:6;266:11;
270:13
**calculated (12)**
41:18;62:11,16,20,
25;70:8,14;80:10;
107:14,16;229:2;
262:24
**calculating (2)**
42:7;231:23
**calculation (58)**
31:19;37:17,24;
52:15;54:12,21;55:6,
14,25;56:4,6,19;57:5,
7,11;58:12,23;59:7;
60:7;61:14;63:14,21;
69:19;70:24;71:9,11,
20;72:5;94:3;99:23;
103:5;111:18;
113:13;124:17;
127:14,21;130:14;
140:14;153:16;
159:19,21;171:14,22;
174:20;176:7;
186:13,23;190:10,16;
195:5,15;200:5;
202:9;218:4;233:3;
266:6;267:16;270:10
**calculations (15)**
33:11;34:18;36:5;
52:21;63:6;77:15;
93:16;134:10;144:4;
145:3;146:22;
148:22;149:7;170:9;
265:24
**calculator (3)**
55:22;56:11;124:8
**call (9)**
18:24;19:4;54:8;
96:15,21;103:12;
109:14,14;112:9
**called (7)**

Case 09-10138-MFW    Doc 15043-1    Filed 01/13/15    Page 541 of 562
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

10:25;21:19;23:6;
62:10;142:12;170:6;
263:12
**calls (2)**
16:14;91:22
**came (9)**
61:16;70:16,21;
85:5,9;115:10;
129:22;220:7;255:4
**Can (148)**
11:16,25;13:22;
15:8,16,17;16:24,25;
19:21;20:22;23:14;
24:17;25:8,16;28:19;
29:3,14;33:5;38:8,19,
20;39:15,18;42:19;
44:9;48:6;50:3;
51:13;55:10,18;56:9,
12;57:21;60:20;68:8;
74:13;75:22;76:16;
77:8,10;78:19;80:9,
16;90:18;91:8;92:6,
16;96:12;97:5,7;
98:4;100:11;102:19;
106:23;107:23;
110:4,20;112:20;
113:10,23;116:23;
118:13,16;120:5;
123:2,18;124:7,10;
127:25;128:13;
131:6;134:5;135:3;
136:22;138:2;
139:22;140:7;141:7,
18;143:9;144:24;
146:10;148:14;
151:22;152:22;
154:8;155:18;156:3,
6;158:3,16;159:5;
160:13;163:6,8,15,
25;164:21;165:25;
166:13;169:13;
174:12,24;178:6;
182:4;193:17;
194:18,23;197:16;
209:4;211:3;217:15,
19;221:24;224:16;
225:5,23;226:11,23;
228:14,20;232:16,18;
233:21;234:10;
236:2,19,22;238:13;
240:22;245:2,2;
246:9;250:3,13;
251:19;257:18,19;
262:5,7;263:8;266:4;
267:13;270:11;
271:18;272:14;
273:11,12
**Canada (17)**
96:16,19;97:3,25;
153:2;264:20;265:5,
10;266:15,22;267:5,
10,24;268:7,14,25;
271:3

**Canadian (54)**
10:19;20:14,16;
26:3,8;28:14;29:11,
25;36:2,7,11;38:16;
39:6,11,24;40:15;
63:17,20;74:25;75:7;
76:7;77:3,16,17,20,
20;80:12;82:15;
83:25;96:25;97:23;
98:5,23;99:5,11,18;
101:6;118:25;124:2,
5;150:8,13;151:3,19;
152:17;153:11;
170:19,24;171:9;
230:21;236:8;
242:14;246:11;
269:17
**cap (15)**
189:20;261:22;
263:13,16,20,22,22;
264:4,5,6,7,8,11,12,
12
**capacity (1)**
210:16
**carryforwards (1)**
215:3
**carrying (2)**
213:24;239:13
**case (58)**
13:25;19:19;20:11,
12,14,16,19,23;
21:10,11,19,22;22:2,
5,12,22;23:3,10;24:7,
23;25:12;27:4,6,7;
34:23;36:20;41:11,
24;42:9;43:4,8;
57:23;77:25;91:4,9,
19;97:16;103:7,12;
109:11,14,15,25;
112:21;113:7;114:2;
123:13;124:17;
132:9;133:17;
153:12;158:5,21;
196:8;201:19;
245:10;259:22;
270:20
**cases (7)**
41:16;44:17;
128:10,17;143:21;
144:15;201:14
**cash (209)**
34:15,17,23;41:19,
21;43:17;44:18;45:4,
22;46:21;48:2;50:13;
51:10;52:6,14;53:16,
16;54:13,22,25;55:6,
14;56:22,25;58:5,6,8,
12,14,15,17,21,24;
63:21,25;64:5,8,11,
16,16;65:11,14;66:9,
25;67:20;69:20,25;
70:2,13,18;77:18;
84:14,18;91:4;

103:20,24;104:10,20;
105:20,21;106:10;
107:5,12,15,19;
108:6,8,11,13,14,21;
109:6;110:7;111:8,9,
15,21;113:16,19;
114:18;115:14;
116:19,24,25;117:8;
120:10,12,18,21;
121:23,24,25;127:3;
128:11;129:22,24;
131:2;135:15;136:2,
19;137:5;138:15;
139:5,6,14,19;
140:16;141:15;
143:6,22;144:16,21;
146:5,12;147:22,22,
25;148:20;149:11,
15;151:25;153:16,
21;154:2,5,11,12,19;
156:25;158:23;
160:8,10,16,25;
161:13,17;162:3,6,
18;163:5,7;165:16,
21;170:11;171:2,16;
175:12,17,22;176:5,
9,11,20,21,22;177:9,
12,13,16,19,24;
178:10;179:2;
183:15,15,17;191:17;
193:21;199:15;
204:6,13,18;215:24;
216:19;226:16;
225:25;229:9;
230:25;231:19,22;
232:5,14;241:18;
246:22;247:13,22;
248:2;249:21;251:4,
6,24;253:4,6,21,22,
23,24;254:4,8,9,12;
256:20;257:23;
258:4,6,13,15;
268:14;269:4
**category (6)**
62:10;72:17,17;
216:18;242:14;
259:21
**cause (2)**
61:3;204:5
**caused (2)**
182:6;191:15
**caution (3)**
37:8,11;121:11
**CCAA (1)**
245:18
**cease (1)**
260:16
**cell (2)**
249:6,7
**cents (5)**
51:25;92:3,11;
260:11,19
**certain (26)**

15:21;34:15;35:4,
5;41:10,23;43:3;
46:15;55:19;66:19;
68:18,19;102:13;
107:6;115:11;
147:20;162:19;
172:6,13;233:5;
236:18;241:7;245:6,
7;247:20;259:7
**challenge (1)**
24:13
**chance (3)**
50:24;140:25;
141:5
**change (26)**
22:25;68:21;87:9,
16,17,19;115:6;
116:12;117:3;128:7;
140:17,21;141:23;
167:21;168:15,20;
182:20;196:24;
197:17,25;198:3,15,
21;206:7;228:5;
255:9
**changed (11)**
86:16;89:12;101:4;
116:24;128:20;
130:23;135:21,25;
197:2,12;199:7
**changes (2)**
32:2;136:7
**changing (5)**
22:23,25;24:19;
141:25;142:9
**Chapter (1)**
270:20
**characterize (1)**
183:2
**charge (3)**
27:9,12,22
**chart (12)**
73:24;79:17;80:4;
100:16;170:20,25;
171:10;197:3,4,5;
202:23;230:9
**checked (1)**
33:11
**chief (1)**
23:10
**China (2)**
148:2;149:11
**choose (3)**
208:10;209:16;
218:7
**chose (5)**
46:24;94:10;
207:22;208:5;220:15
**chosen (2)**
46:16;208:6
**circumstance (1)**
260:18
**circumstances (5)**
21:8;47:8,14,24;

229:3
**cite (8)**
13:20;104:13;
153:25;185:13;
209:8,11;220:6;
228:21
**cited (2)**
14:11;220:16
**claim (85)**
38:7;57:2;63:18;
64:6;65:17,21;71:4,
10,13;76:8,11;81:25;
83:20;84:17;88:13,
18,21;89:21;94:15,
19,23;98:25;99:4,12;
104:5;115:4;127:24;
157:14,17;158:12,24;
159:5,14,17,18,20;
161:16;162:6;
163:11,21;164:2,14;
190:3;193:12;
201:16;202:3;
203:10;212:8,19,20;
216:11;221:21;
222:18;223:13,15,22,
23;225:16;226:3,7,
14,19;227:2,4,10;
234:18,20;265:5,6,9,
11,12;266:11,12;
267:5,11;268:21;
269:12,13,14,21,23;
270:13,14;271:10
**Claimants (3)**
3:4;10:17;161:6
**claimed (5)**
41:6;48:15;55:15;
191:19,24
**claims (152)**
20:3;36:16,21,25;
37:4,25;54:15,16,17,
18;55:6;59:8,10,12;
62:9,11;63:20;64:2;
65:18,18,20,22;66:5;
69:21;71:5;72:5,7;
73:16;74:9,10,19;
78:5,9;80:11;82:4,5,
8,9,15,24;83:7,19,23,
24;84:3,7,10,13,23;
85:4,5,5,8,10,17,21;
86:4;91:11;96:8,17,
17,25;97:23;98:5,6,
11,14,16,21;99:4,7,
11,17,21;100:2,7,7,8,
19,22;101:2,12;
102:8,14,24;108:19,
22;115:12;116:3;
130:7;150:10;151:2,
5,8;152:4;156:16,17,
18,22,23;157:23;
159:2;160:14,19;
161:4,7,9;162:4,19;
163:13,14,24;164:7;
165:8,11;166:9,10;

**Ellen Grauer Court Reporting Co. LLC**

203:12,21,25;204:3,
16,22,23;205:5,25;
206:14;216:15,22,24;
217:13;218:17,18;
220:21,23;221:3,14,
15;222:23;223:3;
225:9,12;228:6;
242:12,15,18;243:5,
8;257:9,10;264:23;
269:18
**clarification (1)**
61:7
**clarify (3)**
60:20;61:20;
127:25
**clarity (2)**
11:20;97:13
**classify (1)**
246:15
**clause (1)**
198:22
**clear (1)**
60:18
**Cleary (1)**
11:11
**client (1)**
17:16
**closer (4)**
176:12,25;177:4,5
**closing (1)**
171:9
**coin (1)**
145:13
**colleague (1)**
10:4
**colleagues (2)**
10:21;14:18
**collect (2)**
157:23;159:5
**collected (1)**
159:11
**collecting (1)**
65:24
**collection (4)**
104:25;253:11;
254:10;258:13
**collections (1)**
254:11
**column (5)**
89:8;132:7;154:12;
156:15,16
**combine (1)**
164:15
**combined (2)**
217:25;218:2
**comfort (9)**
82:3,4;83:2,6,17;
84:20;86:14;89:11;
101:3
**coming (2)**
79:23;117:23
**comment (1)**
181:12

**Committee (2)**
3:14;10:10
**common (1)**
214:19
**communication (2)**
16:22;17:4
**communications (7)**
39:10,25;40:9,13,
14;121:12,19
**company (3)**
21:3,5;24:2
**comparable (1)**
259:11,14
**comparative (1)**
206:4
**compare (6)**
174:13;188:6,13;
189:24;198:6,17
**compared (5)**
82:4;84:13;85:2;
184:9;221:3
**comparing (1)**
197:21
**comparison (2)**
178:4;181:14
**competing (1)**
35:24
**complete (3)**
33:19;66:22;85:13
**completed (2)**
105:2;112:6
**completely (3)**
179:15,23;257:15
**completion (3)**
242:11;243:4;
257:10
**complexity (3)**
49:24;50:4,9
**complicated (1)**
63:5,9;254:7
**component (1)**
58:4
**components (4)**
56:21;57:6;65:2;
80:16
**composed (1)**
72:19
**comprise (1)**
163:17
**comprising (1)**
250:24
**compromise (14)**
59:10,11,15;60:4;
61:12;62:21;73:25;
77:19;83:8;115:4;
203:11;217:6,24;
218:3
**computer (1)**
185:12
**conceivably (1)**
135:21
**concern (1)**
12:16

**conclude (7)**
164:17;176:24;
177:4;203:21;
212:19;245:18;268:4
**concluded (3)**
48:10;157:5;233:2
**concludes (1)**
275:12
**conclusion (30)**
43:19;44:21;48:15;
50:14,18;51:10,18;
52:7;53:19;66:8,10,
24;67:20;114:7,13,
21,23;117:19;127:9;
136:9,14;137:9;
140:18,20,20;145:25;
203:16;268:10;
273:4,13
**conclusions (4)**
43:13;66:18;68:4;
146:12
**condensed (1)**
218:2
**conducted (3)**
209:18;210:23;
238:2
**conference (2)**
18:24;19:4
**CONFIDENTIAL (264)**
12:1;13:1;14:1;
15:1;16:1;17:1;18:1;
19:1;20:1;21:1;22:1;
23:1;24:1;25:1;26:1;
27:1;28:1;29:1;30:1;
31:1;32:1;33:1;34:1;
35:1;36:1;37:1;38:1;
39:1;40:1;41:1;42:1;
43:1;44:1;45:1;46:1;
47:1;48:1;49:1;50:1;
51:1;52:1;53:1;54:1;
55:1;56:1;57:1;58:1;
59:1;60:1;61:1;62:1;
63:1;64:1;65:1;66:1;
67:1;68:1;69:1;70:1;
71:1;72:1;73:1;74:1;
75:1;76:1;77:1;78:1;
79:1;80:1;81:1;82:1;
83:1;84:1;85:1;86:1;
87:1;88:1;89:1;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1;107:1;
108:1;109:1;110:1;
111:1;112:1;113:1;
114:1;115:1;116:1;
117:1;118:1;119:1;
120:1;121:1;122:1;
123:1;124:1;125:1;
126:1;127:1;128:1;
129:1;130:1;131:1;
132:1;133:1;134:1;

135:1;136:1;137:1;
138:1;139:1;140:1;
141:1;142:1;143:1;
144:1;145:1;146:1;
147:1;148:1;149:1;
150:1;151:1;152:1;
153:1;154:1;155:1;
156:1;157:1;158:1;
159:1;160:1;161:1;
162:1;163:1;164:1;
165:1;166:1;167:1;
168:1;169:1;170:1;
171:1;172:1;173:1;
174:1;175:1;176:1;
177:1;178:1;179:1;
180:1;181:1;182:1;
183:1;184:1;185:1;
186:1;187:1;188:1;
189:1;190:1;191:1;
192:1;193:1;194:1;
195:1;196:1;197:1;
198:1;199:1;200:1;
201:1;202:1;203:1;
204:1;205:1;206:1;
207:1;208:1;209:1;
210:1;211:1;212:1;
213:1;214:1;215:1;
216:1;217:1;218:1;
219:1;220:1;221:1;
222:1;223:1;224:1;
225:1;226:1;227:1;
228:1;229:1;230:1;
231:1;232:1;233:1;
234:1;235:1;236:1;
237:1;238:1;239:1;
240:1;241:1;242:1;
243:1;244:1;245:1;
246:1;247:1;248:1;
249:1;250:1;251:1;
252:1;253:1;254:1;
255:1;256:1;257:1;
258:1;259:1;260:1;
261:1;262:1;263:1;
264:1;265:1;266:1;
267:1;268:1;269:1;
270:1;271:1;272:1;
273:1;274:1;275:1
**confined (1)**
34:5
**confuse (1)**
25:13
**confusing (1)**
254:7
**confusion (2)**
61:3;191:16
**connection (21)**
17:23;19:18;20:2;
23:20;25:20;28:11,
14;30:2;33:24;38:22;
39:6,25;40:6,21,25;
121:4;131:24;
167:15;201:5;
208:20;275:3

**consequences (7)**
137:11,15,23;
138:3;139:17;
140:11;214:2
**conservative (4)**
207:23;214:21;
215:18;227:15
**conservatively (3)**
177:22;208:2;
211:10
**consider (18)**
33:12;51:2,3;
95:11;109:16,21;
134:24;135:11;
149:14;151:8;
167:23;172:20;
181:3;207:25;216:2,
5;225:20;235:3
**considered (11)**
41:11,15,23;43:3;
152:12;173:3;
181:21;183:10;
216:6;217:10;235:22
**considering (2)**
153:6,9
**consistent (5)**
96:22,24;97:21;
187:23;231:10
**consolidated (17)**
73:16;74:11,19;
75:5,18;76:2;77:3,
12;80:12;82:19;
100:17,21;151:3,8;
152:13,19;153:7
**consolidation (5)**
152:7,10;153:2,11;
165:12
**constitute (1)**
267:23;268:6
**construed (1)**
42:10
**contacted (1)**
25:18
**contain (1)**
186:12
**contained (1)**
32:15
**contains (1)**
33:23
**Cont'd (1)**
3:1
**context (1)**
235:22
**contingent (2)**
61:19;62:3
**continuation (1)**
202:24
**continue (5)**
30:12;107:3;
150:11;190:18;
267:11
**CONTINUED (6)**
167:10;241:17;

243:22;246:21;
251:3;260:7
**continuum (1)**
175:24
**contract (7)**
49:13;188:24;
190:20;200:6;203:4;
206:13,18
**contributed (1)**
150:8
**contributing (1)**
252:2
**controlled (1)**
154:13
**conversations (4)**
16:24,25;18:19;
37:12
**convicted (1)**
21:23
**copies (2)**
156:2;167:18
**copy (2)**
29:21;121:3
**corner (5)**
30:6;79:8;237:6;
250:5;251:21
**corners (1)**
251:3
**corporate (5)**
209:24;210:3,4,7,
11
**Corporation (2)**
72:24;75:4
**corrected (1)**
183:22
**correction (3)**
30:20;31:2;196:20
**corrections (3)**
30:16,23;32:3
**correctly (5)**
84:15;105:7;
115:17;139:4;196:18
**correspondingly (1)**
101:11
**costs (5)**
239:12,14,15,20;
247:9
**counsel (32)**
12:9,15;13:16;
14:9,17,25;16:22,25;
17:3;18:11,20;35:17;
36:10,13;37:3,12;
38:5,15;39:4,8,9,21,
22;40:4,10,13;121:9,
12;122:4;128:23;
208:18;211:14
**counsel's (1)**
36:6
**counted (1)**
21:7
**counting (2)**
71:16;85:10
**countries (1)**

108:12
**country (1)**
106:20
**couple (3)**
84:21;139:23;
213:19
**course (5)**
18:23;24:7;209:24;
210:2;218:18
**court (27)**
10:23;12:4;18:25;
19:4;20:18;21:11,25;
22:5;24:21;25:5,12;
49:12,24;57:25;
87:11;96:15;97:6;
204:3,12;229:21;
230:5;234:12;235:7,
13;236:7;238:2,2
**courtroom (1)**
194:25
**courts (2)**
70:11;246:18
**cover (4)**
75:3;207:10;230:4,
9
**covered (2)**
216:7;229:7
**CPA (1)**
210:15
**creditor (3)**
59:4;242:12;
267:23
**Creditors (31)**
3:15;10:11;52:14;
62:14,25;64:7,10,13,
15,17;65:12,14,23;
66:12,23;67:19;
106:13,21;107:13;
108:2,12;139:15;
140:6;157:2;164:9,
16,16;173:8;174:4;
175:11;178:25
**credits (1)**
215:7
**CRICHLOW (2)**
10:12,12
**Cross-Border (1)**
238:3
**crossover (2)**
104:7;184:9
**curiosity (1)**
205:21
**current (15)**
13:12;56:24;58:5;
70:2,13;81:25;82:5,
7;84:13,16;86:15;
110:25;121:23,23;
153:21
**currently (2)**
115:3,5
**cut (3)**
13:3,8;189:21
**cutoff (3)**

187:10,14;189:3
**cuts (1)**
187:12

**D**

**D&O (3)**
149:19,24;153:18
**date (26)**
28:17,25;29:4;
79:4,6;171:4;186:21;
187:9;188:16,22,24,
25;189:2;190:8;
194:16;195:10;
197:23;205:9;
220:22;252:24;
260:23;263:5,15,20,
25;264:18
**dated (17)**
26:23;72:8,14;
79:25;81:11;82:2;
119:15;154:2;
169:16,19;220:19;
229:24;231:19;
235:10,18;236:9;
263:2
**dates (3)**
178:14;188:6,6
**DAVID (3)**
3:19;10:8,12
**day (7)**
13:25;25:24;116:2;
138:11;187:13;
195:2;248:4
**days (1)**
79:4
**deals (1)**
36:16
**dealt (1)**
19:24
**debenture (1)**
201:15
**debt (8)**
61:19;62:3;71:4,
20;80:20;93:3,17;
107:2
**debtor (4)**
10:11;222:15;
223:16;225:18
**debtors (32)**
10:20;11:12;26:3,
8;28:14;29:11;30:2;
36:11;38:16;39:6,12,
24;40:15;49:5;82:16;
100:9;101:6;118:25;
123:9;124:5;132:16;
150:8,13,20;152:18;
153:11;157:15,24;
178:3;208:18;
211:14;237:14
**debtors' (6)**
48:23;60:5,12;
61:13;223:2;236:8

**December (2)**
230:25;231:18
**decide (1)**
134:20
**decided (6)**
89:19;110:24;
113:6;159:21;
161:12;165:21
**decides (1)**
57:22
**decision (5)**
57:18;58:2;93:15;
266:20;267:4
**declines (1)**
193:12
**decrease (8)**
198:23;199:9,15;
204:6,13,18;215:24;
216:19
**deduction (1)**
102:25
**deductions (3)**
213:14,17;215:10
**define (1)**
184:8
**defined (2)**
31:10;152:16
**definition (6)**
87:16;89:13,21;
110:23;171:23;
180:13
**delay (1)**
193:14
**denominator (1)**
71:3
**depend (4)**
52:10;174:5;
181:13,18
**depending (4)**
152:8;211:24;
212:10;214:11
**deposed (5)**
11:13;16:11;19:13;
20:9;97:17
**deposition (24)**
11:22;13:23;14:5;
15:2,25;16:23;33:7;
34:21;56:2;69:4,13;
97:11;118:7;128:8;
167:7;183:22;
195:24;196:15,19;
244:10;256:10;
274:25;275:2,13
**depositions (1)**
11:19
**derived (1)**
237:16
**describe (2)**
19:21;20:22
**described (3)**
42:7;54:2,5
**description (1)**
73:10

**designed (1)**
204:2
**detail (3)**
163:3;173:5;229:6
**detailed (9)**
54:8;69:16;73:7,
14;111:18;133:5,23;
174:25;248:11
**details (7)**
21:2;102:2;118:18;
122:5;250:2;251:8,
12
**determination (3)**
91:3;213:21,23
**determine (11)**
20:24;58:15;68:2,
14;69:23;124:21;
126:7;130:18;
137:18;166:2;240:23
**determined (1)**
129:25
**determining (1)**
213:7
**DI (1)**
16:14
**dictated (1)**
62:8
**difference (3)**
84:13;175:15;
199:3
**differences (1)**
175:14
**different (24)**
20:11;33:9;62:18;
71:23;82:8;87:2;
88:7;93:14;105:22;
120:25;149:2;
171:17,18;174:14,14,
15;181:15,15,25;
185:23;187:15;
236:21;243:20;
265:22
**difficult (1)**
67:6
**direct (1)**
16:15
**directionally (5)**
224:11,25;271:14,
22,23
**directly (3)**
64:8,15;65:10
**directors (1)**
150:7
**disagree (4)**
30:18;171:14;
178:23;179:21
**disagreements (1)**
32:3
**disclosed (3)**
35:8;44:12;47:24
**disclosing (1)**
17:8
**discussed (6)**

16:13;47:7,20,24;
153:17;234:17
**discussion (8)**
26:2,17;119:10;
183:13;196:14;
202:12;203:3;233:2
**discussions (2)**
13:16;26:7
**dismissed (4)**
36:17,25;37:25;
130:8
**dispute (17)**
13:12;25:21;28:8,
11,15;30:2;31:6;
49:9,17;94:9;95:5;
121:4;238:8;242:8,
24;264:20;266:14
**distinguish (2)**
93:24;94:5
**distribute (4)**
46:8;47:10;52:14;
54:13
**distributed (3)**
211:25;212:11;
214:12
**distribution (33)**
37:20;41:14;42:2;
43:16,24;44:3;46:22;
54:9;55:2,3;56:25;
64:10;67:6;69:16,20;
73:7,14;77:18;
114:12,19;153:22;
181:20;200:9;
203:13;213:10;
218:5;239:6,10;
263:2,15,20,25;
269:24
**distributions (8)**
66:11,21;67:19;
68:5,10,16;242:13;
263:6
**diverge (1)**
180:10
**divide (1)**
261:25
**divided (3)**
150:12;191:25;
192:5
**dividing (1)**
69:21
**Doctor (2)**
196:5;275:10
**document (33)**
31:22;72:2;73:15;
78:23;81:18;87:25;
88:20;89:18;95:16;
120:19;121:6;122:2,
7,11,13,15;155:18;
156:4,13,13;168:8,
11;170:5;184:16,19,
23;185:13,15,23,25;
186:4,16;187:6
**documentation (1)**

187:18
**documents (27)**
13:17,19,19;14:9,
10,11;18:19;19:6,9;
24:3;33:11,15,16;
34:5,16,25;35:10;
58:14;82:6;109:4;
110:6;121:16,21;
125:14;151:9,12;
188:20
**dollar (28)**
51:14,25;77:3;
84:22;92:3,11;
103:23;105:3,8,15;
109:10;135:20;
160:19,20;202:7;
216:11;223:13;
225:19;234:17,18,19,
20;242:16;253:11;
260:12,19;267:19;
268:25
**dollars (22)**
45:19,21;57:12;
84:2,5;88:12,23;
99:8;135:23;136:25;
150:22;212:9;
227:25;238:20;
239:5;252:17,22;
253:17;254:21;
258:22;259:2;268:11
**done (24)**
13:25;14:3,7;
32:24;33:7;46:24;
69:19;77:15;78:2;
111:4;137:13,17;
151:24;160:24;
176:15;177:3;
183:14;190:10;
195:5;225:15,18;
259:12;267:20;
271:19
**down (10)**
56:21;80:16;99:16;
163:6;183:9;185:2;
193:22;224:21;
237:19;250:18
**Dr (13)**
11:7;69:4;77:23;
118:7;167:7,12;
185:11;195:24;
230:5;235:13;
256:10,14;275:13
**drafted (1)**
168:25
**drill (1)**
80:16
**due (2)**
116:2,25
**duly (1)**
11:1
**duplicate (6)**
83:19;99:21;
100:18;157:19,23;

185:19
**duplicative (3)**
94:19;100:2,7
**during (6)**
16:13;18:23;22:17;
23:10;24:6;69:12

# E

**earlier (13)**
11:9;65:2;127:11;
148:9;167:19;
170:16;196:6;
226:25;231:17,18;
263:19,25;274:4
**early (3)**
25:23;26:9,15
**easier (1)**
13:5;97:15;155:22
**economic (1)**
256:24
**educate (1)**
204:3
**effect (15)**
53:14;84:14;
138:23,25;139:11,12,
18;203:23;225:8;
233:17;236:23;
239:25;258:2;
267:19;271:3
**effects (1)**
239:3
**effort (2)**
126:2;130:10
**eight (5)**
15:10;99:8;169:13;
256:21,22
**eighth (11)**
70:17;79:24;80:3;
81:6,11,14;87:8;
104:14;242:20;
244:4,22
**either (6)**
21:15;63:5;70:14;
84:3;180:19;240:16
**element (1)**
265:23
**elements (1)**
213:6
**eliminate (1)**
94:10
**eliminated (2)**
203:11,15
**else (11)**
14:14,22;15:12;
40:14;47:6;64:24;
94:12;168:21;
213:12;230:3;261:9
**else's (1)**
230:8
**elsewhere (1)**
71:16
**E-MAIL (2)**

3:10,23
**EMEA (12)**
72:9;79:13;80:25;
105:25;106:7;
132:16;133:6,24;
135:12,13;147:18;
230:22
**employee-related (2)**
151:5;152:3
**employees (6)**
151:11,19;152:4;
245:7;256:21,22
**employer (1)**
151:18
**enable (1)**
134:12
**enables (1)**
176:16
**end (23)**
51:9;115:6,25;
117:23;127:22;
131:25;132:4;
138:11;170:2;
178:11;194:3,12;
196:6;201:11;211:7;
214:4,21,24;229:10;
231:5;248:3;262:5;
267:18
**endeavor (3)**
43:22;46:3;52:15
**endeavored (1)**
47:8
**ended (6)**
22:14;79:2;115:12;
172:7;178:17;196:13
**ends (2)**
73:19;236:13
**engaged (2)**
26:11,14
**engagement (11)**
26:18,20,22,25;
27:9,13,14,17,19;
28:2;29:12
**enough (4)**
15:14;125:11;
246:14,17
**entailed (1)**
42:7
**entire (5)**
76:12;128:8;
178:18;189:16;
251:17
**entirely (2)**
226:18;247:12
**entities (22)**
36:4;75:19;83:20;
94:19;99:18;100:23;
121:25;133:24;
134:18;135:12,14;
152:11;154:13;
155:14,17;156:17,25;
157:3;162:20;
165:22;166:3;230:22

**entities' (5)**
76:3;77:12;162:18,
19;165:16
**entitled (11)**
73:7;199:14;
200:11,14,20,22;
206:7,10;230:19;
238:18;266:16
**entitlements (1)**
149:15
**entity (14)**
23:6;75:2,5,6;76:5,
7;82:19;83:21;95:18;
96:7;133:6,25;
142:12;228:6
**environmental (1)**
96:4
**envision (1)**
115:13
**equal (1)**
124:12
**equals (1)**
55:6
**equation (4)**
56:23;63:25;64:3;
66:21
**equity (4)**
133:7;142:22;
144:18,19
**equivalent (1)**
124:6
**error (3)**
176:6;184:4;
258:10
**ESQ (4)**
3:7,18,19,20
**establish (1)**
17:7
**estate (28)**
35:20;36:2,3,24;
37:22;41:6;43:8;
48:23;74:11,20;
75:15;77:4,17;
147:10;148:10;
211:17,21;213:11,17,
24;215:4,11;216:23;
221:21;238:18;
243:9;246:11;267:22
**estates (4)**
80:12;240:6;257:6;
261:6
**estimate (37)**
11:16;28:20;29:3;
46:17;58:16;82:24;
127:22;177:9,22;
207:14;208:2,4;
211:6,10,11;214:4;
215:17;217:12;
219:6;223:2;226:2,5;
227:15,15,17,18,22,
24;233:2;247:2,21;
248:16;249:4;254:8;
255:14;258:25;259:3

**estimated (7)**
127:21;221:20;
225:18;227:3;
232:13;254:23,24
**estimates (2)**
247:13;248:12
**estimating (1)**
222:16
**evaluate (6)**
49:8,17,20;111:18;
129:7;130:10
**evaluated (1)**
129:21
**evaluating (1)**
49:11
**EVANS (2)**
3:20;10:8
**Even (44)**
23:25;25:4;44:16;
46:6;52:4;84:20;
86:24;115:3,5,10,11,
17;116:17;126:6;
127:10,13,21;153:6;
158:12;159:17,18;
161:15;168:19,20;
179:5;181:4,7;
182:12;202:15;
203:10,14;205:16;
207:25;208:2,13;
216:2;218:24;
240:18;242:16;
248:13;249:15;
261:8;267:12;271:22
**evens (1)**
182:14
**event (3)**
137:10;270:7,12
**events (7)**
43:14;44:17;
116:13;128:10,17;
143:20;144:15
**event's (1)**
35:5
**eventual (1)**
106:14
**everybody (2)**
230:3,8
**evidence (6)**
208:25;209:6,9,11,
15;274:14
**exact (13)**
25:24;79:5;108:15;
111:17;119:19;
139:12;171:23,24;
183:5;194:21;
195:14;207:17;
227:13
**exactly (9)**
137:3;141:10;
147:2;178:13;184:6;
188:25;218:13;
220:17;239:17
**EXAMINATION (4)**

11:5;167:10;196:3;
274:8
**examined (1)**
11:2
**example (13)**
34:14,15;35:9;
40:6;50:23;83:21;
88:9;137:11;145:12;
172:18;176:5;239:2;
260:10
**examples (2)**
35:2;213:20
**exceeded (1)**
49:6
**except (2)**
175:6;220:17
**excess (14)**
50:20;51:4;71:12;
107:12,15,19;108:11;
115:14;139:14;
142:25;160:16;
181:24;228:25;266:9
**exchange (1)**
84:4
**exclude (11)**
21:14;22:13,19;
91:17;155:16;
160:25;161:12;
165:21;174:3;
179:13,14
**excluded (15)**
21:10;25:5;70:17;
91:11;155:2,7,9;
156:18,22;161:3;
172:19,21;183:5,25;
265:19
**excluding (2)**
39:22;239:19
**exclusion (6)**
173:25;174:18;
175:6,8,9,10
**Excuse (6)**
28:22;148:24;
156:21;197:18;
268:3;275:14
**Exhibit (60)**
29:20,22;72:21,23;
78:23;81:7,10,13;
82:14;98:10;100:14,
16;104:13;119:11,12,
14;120:9,12;124:4;
131:16,18,20;132:3;
168:2,4;169:13,16,
18;181:5;182:16,17,
18;186:4,8,10;
196:15;199:18;
205:22;217:20,21;
219:16;221:20;
229:21,22,23;230:6;
235:8,9,15;244:10;
250:6;251:21;
254:14;256:16;
272:8,9,14,15,18,20

**exhibits (2)**
131:19,21
**exist (3)**
43:17;113:14;
115:19
**existed (1)**
273:15
**existence (2)**
108:21;209:20
**existing (2)**
115:3,5
**exists (2)**
149:13;241:12
**expect (2)**
54:19;88:8
**expectation (8)**
88:10,17;90:4;
116:16;243:7,14,18,
21
**expected (13)**
86:22;87:3;88:5,
13;89:14,22;90:23;
92:8,18,25;218:24;
219:5,9
**expecting (1)**
93:9
**expects (2)**
243:22,25
**expenses (1)**
213:14
**experience (2)**
78:13;223:25
**expert (12)**
20:23;26:15;29:22;
90:3;131:18,20,24;
169:8;175:22;
224:10,11;229:23
**expertise (19)**
55:5,11,19;56:6,
10;57:15;58:11,19,
23;59:18,20,24;
63:10;130:12,15;
210:17,23;211:5;
259:5
**explain (8)**
23:16;32:17;47:20;
77:8;80:14;112:20;
156:14;211:19
**explained (3)**
107:24;124:15;
156:19
**explaining (1)**
208:15
**explanation (2)**
94:7;134:23
**explore (1)**
56:2
**expressing (1)**
158:9
**expressly (1)**
201:21
**extent (15)**
96:8;100:21;107:4;

113:2;122:10;
131:25;138:5;
159:11;172:19;
204:21;238:16;
253:3,5;254:9;258:3
**extinguishment (1)**
203:25
**extreme (1)**
130:8

**F**

**face (1)**
249:20
**fact (26)**
57:14;63:24;67:8;
90:4;92:13,20;94:18;
100:20;112:24;
122:3;132:5,25;
137:17;144:22;
145:2;158:6;168:23;
187:18;188:12;
194:23;203:6;205:9;
212:14;220:5;240:9;
247:8
**factor (1)**
161:15
**factored (1)**
138:7
**factors (6)**
141:21;203:17,19;
213:13,21,22
**factual (2)**
18:6,17
**fair (22)**
33:22;37:14;45:5;
49:13;50:12;51:8;
52:12;62:20;66:7;
99:4;102:10,24;
109:9,23;156:24;
171:13;174:17;
175:4;193:10;
196:12;246:14,17
**falls (2)**
27:4,16
**false (1)**
24:9
**familiar (5)**
101:23;210:11;
245:4;251:8,9
**familiarity (1)**
190:25
**far (4)**
96:5;114:7;129:10;
130:4
**FARR (2)**
3:3;10:16
**favor (15)**
37:22;42:11,13,16,
21;44:17;128:11,18;
129:15;130:3,9;
143:21;144:15;
145:23;207:24

**favorable (22)**
47:19;75:19,24;
85:22;86:3,6;115:21;
172:7,9;179:6,8,14,
15;180:3,15,23;
227:18;251:24;
252:2,3;270:2;
271:14
**FAX (2)**
3:9,22
**feasibility (1)**
160:7
**feasible (1)**
160:4
**February (3)**
169:17,20;170:2
**federal (4)**
62:14;63:2;206:11,
17
**feel (7)**
12:11;13:3;97:12;
126:15,17;129:12;
135:4
**fees (1)**
29:15
**FELD (2)**
3:13;10:9
**few (4)**
153:17;185:17;
199:12;205:8
**fewer (3)**
99:11;151:18;
160:9
**fighting (2)**
194:4,10
**figure (4)**
62:2;166:13;
177:15;254:13
**file (1)**
225:16
**filed (10)**
78:25;79:3,6,9;
99:17;201:15;205:5;
220:22,23;226:8
**filing (2)**
79:4;224:7
**filings (1)**
122:12
**finally (3)**
63:12;70:20;72:4
**finance (1)**
162:22
**financial (2)**
21:4;59:21
**financials (2)**
72:13;73:16
**find (10)**
49:12;63:9;96:7;
124:19;125:4,11;
126:3,9,19;159:5
**fine (5)**
17:13;121:16;
162:13;163:2;

Case 09-10138-MFW    Doc 15043-1    Filed 01/13/15    Page 546 of 562
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

182:22;222:5;256:4;
273:22
**finish (6)**
13:6,9;140:25;
141:5;256:15;268:13
**finished (2)**
86:10;158:7
**firm (3)**
11:11;15:22,24
**first (22)**
15:17,18;25:18,22,
25;30:17;36:15,19;
42:24;57:9;62:7;
65:7;106:13;130:6;
160:3,16;189:24;
199:2,24;212:3;
214:7;245:14
**fits (1)**
148:25
**Five (16)**
18:22,22;88:11,22;
116:10;128:21;
129:7,13;130:21;
141:25;142:8;143:4,
17;154:14;195:23;
251:20
**fix (1)**
89:6
**FJR (1)**
206:8
**flip (2)**
109:14;145:13
**flow (4)**
127:6;160:5;
233:18;251:24
**flows (1)**
58:14
**flowup (3)**
165:3,6,7
**focus (5)**
56:18;57:9;60:23;
100:14;191:18
**focused (2)**
97:8;250:21
**focusing (1)**
55:24
**follow (5)**
196:9;217:19;
218:22;230:14;
274:11
**following (4)**
40:4;79:5;163:20;
189:2
**follows (3)**
11:3;167:5;252:3
**footnote (19)**
72:6,10;80:23;
91:14;104:12,22;
105:5;112:3;153:25;
178:13;184:19,21;
185:13;189:6,9,18;
217:5,24;274:24
**forecast (27)**

110:25;111:4,6,7,
10;247:22;248:2,16;
249:11,21;250:15,24;
251:25;252:7,13;
254:16;255:2,3,4,10;
258:5,7,9,9,12,12,14
**forecasted (6)**
110:11,16;253:4,6;
254:10;258:6
**forecasts (4)**
110:15,22,22,23
**foreign (5)**
251:7;252:12,18,
22;253:18
**forget (1)**
108:15
**form (68)**
23:12;26:12;33:3;
42:17;43:25;44:8;
46:10;47:12;50:2,16;
51:12;54:24;55:8,17;
57:19;61:15;63:8;
66:13;68:6;69:22;
74:12;75:21;76:14;
77:14;80:18;89:4;
100:10;106:22;
110:19;112:17;
113:9;118:14;120:4;
122:8;124:9;125:17;
126:20;133:12,14;
137:21,25;139:20;
147:14;148:23;
151:20;160:11;
174:23;178:5;
179:24;193:15;
197:14;204:7;209:2;
210:19;217:14;
224:14;225:4;
226:21;228:12;
229:13;232:15;
233:20;243:10;
255:18;257:16;
263:7;266:2;271:17
**format (1)**
120:25
**formed (1)**
129:18
**former (1)**
55:16
**formulated (2)**
32:6,20
**forty-three (2)**
88:11,22
**forward (4)**
58:21;220:11;
253:2;256:16
**found (4)**
25:12;63:4;103:18;
177:12
**foundation (20)**
24:16;55:9;56:8;
57:20;68:7;78:18;
89:4;98:3;102:18;

113:22;116:22;
152:21;158:2;
160:12;164:20;
182:3;209:3;211:2;
224:15;266:3
**four (13)**
18:22;167:6;171:8;
178:24;179:7,20;
180:8,10,12,15;
217:24;219:17;
262:14
**fourth (1)**
237:20
**France (1)**
144:12
**fraud (2)**
23:4,10
**free (1)**
97:13
**French (1)**
142:15
**front (3)**
81:8;146:6;250:11
**full (6)**
35:20;190:17;
214:23;263:11;
264:13,15
**fully (2)**
74:9,18
**Fund (3)**
101:19,21;102:12
**funded (1)**
102:4
**funds (3)**
101:16;102:5;
258:18
**further (16)**
35:22;106:25;
114:15,17;115:9;
146:4;195:17;
199:15;212:25;
252:17,21;258:18;
264:17,18;274:6;
275:5
**future (4)**
58:17;123:20;
258:9,14

**G**

**GALLAGHER (2)**
3:3;10:16
**game (2)**
37:14;81:9
**gather (1)**
173:5
**gave (9)**
35:10;48:24;84:20;
144:10;147:5;156:8;
168:8;214:3,9
**general (10)**
11:19;19:22;20:22;
156:3,7;157:11;

211:15,20;224:8,9
**generally (9)**
223:21;224:4,11,
17;233:10;236:19;
251:9,11;270:2
**generate (2)**
122:23;123:14
**generated (2)**
123:5,12
**gets (7)**
130:23;138:22;
150:12;211:25;
212:11;214:12,22
**given (30)**
31:14;41:7;48:15;
51:6;53:19,20;55:22;
56:4;58:25;83:18;
84:8;95:5;97:18;
104:23,25;108:20,21;
115:7;122:3;126:4;
158:19;195:10;
207:17;208:11,16;
214:24;220:24;
248:17;249:22;253:8
**gives (5)**
54:22;83:2;105:21;
209:21;258:13
**global (1)**
261:8
**goes (6)**
56:13;147:6;188:9;
193:22;238:4;270:21
**Good (7)**
11:7,8;117:25;
125:11;129:4;196:5;
256:2
**Goodmans (2)**
15:22,24
**Google (2)**
259:16,18
**Gottlieb (1)**
11:11
**government (2)**
22:13,19
**government's (1)**
23:9
**greater (1)**
48:3
**Gross (6)**
55:4;56:5;57:15,
24;58:10;63:6
**Gross' (1)**
63:10
**ground (1)**
11:19
**group (10)**
10:6;75:7;76:7,12;
77:16,21;106:11,12;
151:3;156:18
**groups (2)**
105:22;106:9
**guarantee (2)**
89:21;104:6

**guaranteed (7)**
31:11,15,23;66:4;
76:23;184:10;206:2
**guarantees (5)**
61:20;62:3;92:21;
93:18;94:9
**Guatemala (4)**
155:7;158:14;
159:13;161:13
**guess (1)**
198:2
**guidelines (2)**
218:22;219:3
**GUMP (2)**
3:13;10:9

**H**

**Hadley (1)**
10:3
**half (9)**
18:22;99:8;112:2;
151:18;154:19;
189:13;193:7;261:20
**hand (2)**
183:9;244:8
**handed (3)**
81:13;230:6;
235:14
**handicap (1)**
46:3
**handing (3)**
182:12,14;230:8
**handy (1)**
156:6
**HANRAHAN (3)**
3:7;10:15,15
**happen (2)**
252:13;271:7
**happened (4)**
21:21;160:3;
224:12;251:10
**happy (4)**
12:12,21;125:23;
129:2
**hard (1)**
121:3
**Hardship (1)**
101:21
**HAUER (2)**
3:13;10:9
**head (5)**
12:5;145:14,16,19,
20
**heading (2)**
146:10;237:11
**Health (3)**
101:17;102:12,22
**hear (5)**
12:22;60:24;97:5;
119:7;227:9
**heard (15)**
11:18;24:25;25:2;

Case 09-10138-MFW    Doc 15043-1    Filed 01/13/15    Page 547 of 562
IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

101:19,21,24;119:3,
6;139:4;142:12,13;
147:9;149:23;152:6,
14
**hearing (1)**
    237:25
**help (3)**
    79:7;185:22;189:5
**helpful (1)**
    222:6
**helping (1)**
    17:2
**Here's (3)**
    75:14,14,15
**high (2)**
    101:10;214:21
**higher (21)**
    53:17,21;85:3;
    115:20;116:2,19;
    197:20;198:10,12;
    202:15;203:21;
    206:8;211:4;214:16,
    18;215:16;220:25;
    225:2,3,6;231:14
**HIGHLY (265)**
    12:1;13:1;14:1;
    15:1;16:1;17:1;18:1;
    19:1;20:1;21:1;22:1;
    23:1;24:1;25:1;26:1;
    27:1;28:1;29:1;30:1;
    31:1;32:1;33:1;34:1;
    35:1;36:1;37:1;38:1;
    39:1;40:1;41:1;42:1;
    43:1;44:1;45:1;46:1;
    47:1;48:1;49:1;50:1;
    51:1,3;52:1;53:1;
    54:1;55:1;56:1;57:1;
    58:1;59:1;60:1;61:1;
    62:1;63:1;64:1;65:1;
    66:1;67:1;68:1;69:1;
    70:1;71:1;72:1;73:1;
    74:1;75:1;76:1;77:1;
    78:1;79:1;80:1;81:1;
    82:1;83:1;84:1;85:1;
    86:1;87:1;88:1;89:1;
    90:1;91:1;92:1;93:1;
    94:1;95:1;96:1;97:1;
    98:1;99:1;100:1;
    101:1;102:1;103:1;
    104:1;105:1;106:1;
    107:1;108:1;109:1;
    110:1;111:1;112:1;
    113:1;114:1;115:1;
    116:1;117:1;118:1;
    119:1;120:1;121:1;
    122:1;123:1;124:1;
    125:1;126:1;127:1;
    128:1;129:1;130:1;
    131:1;132:1;133:1;
    134:1;135:1;136:1;
    137:1;138:1;139:1;
    140:1;141:1;142:1;
    143:1;144:1;145:1;

146:1;147:1;148:1;
149:1;150:1;151:1;
152:1;153:1;154:1;
155:1;156:1;157:1;
158:1;159:1;160:1;
161:1;162:1;163:1;
164:1;165:1;166:1;
167:1;168:1;169:1;
170:1;171:1;172:1;
173:1;174:1;175:1;
176:1;177:1;178:1;
179:1;180:1;181:1;
182:1;183:1;184:1;
185:1;186:1;187:1;
188:1;189:1;190:1;
191:1;192:1;193:1;
194:1;195:1;196:1;
197:1;198:1;199:1;
200:1;201:1;202:1;
203:1;204:1;205:1;
206:1;207:1;208:1;
209:1;210:1;211:1;
212:1;213:1;214:1;
215:1;216:1;217:1;
218:1;219:1;220:1;
221:1;222:1;223:1;
224:1;225:1;226:1;
227:1;228:1;229:1;
230:1;231:1;232:1;
233:1;234:1;235:1;
236:1;237:1;238:1;
239:1;240:1;241:1;
242:1;243:1;244:1;
245:1;246:1;247:1;
248:1;249:1;250:1;
251:1;252:1;253:1;
254:1;255:1;256:1;
257:1;258:1;259:1;
260:1;261:1;262:1;
263:1;264:1;265:1;
266:1;267:1;268:1;
269:1;270:1;271:1;
272:1;273:1;274:1;
275:1
**historical (4)**
    58:15;176:20;
    177:18,25
**historically (2)**
    110:10;178:14
**hit (1)**
    145:15
**hoc (1)**
    10:5
**holders (2)**
    184:8,9
**Home (2)**
    23:6,19
**honestly (2)**
    24:11;36:14
**hopeful (1)**
    141:6
**hopes (6)**
    241:7;243:8,12,15,

17,19
**hours (5)**
    18:22;28:20;29:6,
    8,17
**hundred (25)**
    45:19,21;67:5;
    70:17;79:24;80:2;
    81:6,10,14;83:9,12;
    87:8;88:11,22;
    104:14;235:9,15;
    236:5;238:20;239:5;
    242:20;244:4,22;
    260:19;268:11
**hung (1)**
    48:18

# I

**idea (6)**
    24:20;29:8;38:2;
    66:22;85:16;241:11
**identical (1)**
    84:22
**identification (11)**
    29:23;72:25;81:12;
    119:16;120:14;
    131:22;168:6;
    169:21;186:6;230:2;
    235:12
**identified (5)**
    38:11,13;72:7;
    245:13,14
**identify (4)**
    203:5;204:12;
    207:5;215:23
**ie (1)**
    41:19
**ignore (3)**
    136:7,12;143:12
**ignoring (6)**
    137:10;139:8;
    143:11,14;144:6,7
**immaterial (1)**
    138:11
**impact (14)**
    102:7;135:25;
    136:19;137:5,7,9;
    142:2;144:3;172:22;
    233:25;257:23;
    265:24;267:15;
    271:20
**implement (1)**
    247:17
**implication (1)**
    265:7
**important (3)**
    12:3;13:4;270:17
**impossible (2)**
    67:8,12
**incentive (1)**
    256:21
**include (25)**
    85:20;112:19;

113:4;115:5;134:19,
21;136:15;143:17;
154:20;162:3,4,5,6;
173:6,10,13,13,16;
178:9;184:11;
232:13;265:5,16;
266:10;270:13
**included (32)**
    101:5;102:14;
    113:12;127:13,24;
    141:22;156:22;
    161:11;172:5,22;
    178:19,23;181:22;
    200:8;203:13;227:5,
    6,10;247:16,18,21;
    249:4,19;253:7,23;
    254:11;258:4;
    264:21,22;265:2;
    266:21;267:5
**includes (8)**
    13:24;31:13;75:4;
    145:10;178:7,7;
    183:23;254:9
**including (12)**
    54:16;92:21;99:9;
    141:11;159:18;
    162:20,21;203:23;
    237:23;245:19;
    247:8;257:9
**incorporate (2)**
    50:19;273:17
**incorporated (1)**
    258:5
**incorrect (2)**
    50:15;51:11
**increase (15)**
    65:15;84:11;
    103:24,25;113:15,19;
    117:16,17;127:4;
    138:15;140:15;
    141:15;204:18;
    221:14;271:23
**increased (2)**
    46:21;103:19
**increases (3)**
    103:20,21;139:6
**increasing (1)**
    116:25
**incremental (1)**
    268:14
**India (5)**
    158:13;159:12;
    161:14;252:6;255:5
**indicates (1)**
    82:23
**indicating (1)**
    187:18
**individual (11)**
    72:20;75:6,8;76:6;
    114:25;133:6,24;
    135:12;145:9;166:3;
    250:24
**individually (2)**

35:14;75:7
**individuals (1)**
    245:13
**indulge (2)**
    135:8;240:14
**ineffective (1)**
    257:15
**influence (1)**
    64:8
**influenced (2)**
    65:11,22
**influences (1)**
    63:24
**inform (1)**
    25:11
**information (25)**
    16:15;18:6,17;
    38:21;74:24;78:5,9,
    12,15;79:11,12,15,
    21;81:19;99:24;
    121:22,24;122:12;
    134:12;166:6;
    186:12;207:17;
    217:12;229:15;236:7
**initial (3)**
    26:17;221:4;
    239:23
**input (2)**
    59:2;63:20
**inputs (1)**
    70:7
**inquiries (1)**
    150:3
**inquiry (1)**
    37:15
**inside (1)**
    39:21
**insignificant (1)**
    51:4
**insolvency (2)**
    19:25;238:3
**instance (12)**
    34:21;46:13;50:22;
    53:15;66:15;83:20;
    91:10;106:10;
    127:19;138:23;
    160:2;183:6
**instead (4)**
    31:24;35:14;84:18;
    223:5
**instructed (6)**
    36:9;37:4;38:6;
    270:6,19,25
**instructs (1)**
    12:9
**intellectual (1)**
    112:10
**intent (2)**
    26:16;33:25
**intercompany (17)**
    104:24;105:8,14;
    106:2,7,19;107:2;
    108:22;109:10;

111:2,7,11,24;252:5;
253:9,17;254:19
**interest (79)**
18:12;25:20;26:4;
27:15;28:7;31:12,14,
16,17,22;62:17,19;
63:2;71:5,24;93:3,
16;109:20;133:20;
134:13;142:22;
170:10;175:10;
186:14,20;187:4,7,
10,19;188:7,23;
189:12,21;190:11;
191:2;192:16,19,25;
193:6,12;195:3,15;
200:15,20;206:2,7,
10;233:14,18,23;
234:6;237:15;
256:24;260:7,13,15;
261:9;263:22;264:2,
21;265:6,14,15,16;
266:8,11,15,21;
267:4,9,12;268:5,7,
18;269:13,14,23;
271:3,8
**interests (5)**
170:20,25;171:10,
15;267:22
**interference (1)**
249:6
**internal (3)**
237:5;251:2,20
**International (3)**
158:14;159:13;
161:14
**internet (1)**
118:19
**interpret (1)**
12:5
**interpreted (6)**
39:17;61:9,10;
88:19,25;89:20
**interrupt (2)**
117:22;256:2
**into (30)**
20:25;37:11;53:14;
56:13;63:20;102:4,
12,15,22,25;104:8;
114:14,18;121:11,18;
131:9;133:19;136:8,
13;138:7;146:2,23;
148:25;153:19;
174:19;184:14;
213:7;226:6;257:5;
258:5
**introduced (3)**
11:9;105:21;196:6
**inure (1)**
135:14
**investigate (1)**
229:2
**investigation (1)**
96:6

**invoking (1)**
17:6
**involved (4)**
23:3,6;36:19;58:13
**IP (45)**
118:21,24;119:5,8,
18,23;120:3;122:17,
20,22;123:5,9,11,15,
23;124:5,16;125:15,
16;126:3,4,24;
130:24;131:13;
144:11,18;147:5;
168:22;169:2;
232:22;233:14,18,24;
236:18;237:10,15;
238:9,16,17,17;
240:5,19;259:11,17,
21
**Ireland (11)**
132:15,19;133:3,8,
20;139:13;140:4;
143:8;144:11;147:6;
272:5
**Ireland's (1)**
144:18
**issue (10)**
21:6;26:4;36:21;
74:14;161:8;201:2;
215:14;274:12,13,13
**issues (9)**
19:24;36:22;50:5,
10;71:22;180:10,15;
210:18,21
**item (15)**
83:18;92:7;114:9,
10,25;127:10;
135:20;199:22;
206:25;215:14;
216:14;217:7,25;
221:9;253:24
**items (16)**
72:20;93:13;
114:17;115:8;
127:16;130:5;
199:13,22;203:20;
207:5;217:8,11,23;
250:24;251:25;
265:18

**J**

**Jacob (1)**
10:18
**January (6)**
178:15;220:20;
224:13,19,24;229:24
**Jay (1)**
16:8
**Jeff (1)**
11:10
**Jeffrey (2)**
131:17,21
**Jessica (1)**

23:24
**job (1)**
46:6
**Jodat (1)**
15:19
**Joe (2)**
15:19,20
**John (5)**
34:21;211:15;
214:6;274:16,22
**joint (1)**
237:25
**Joseph (1)**
10:21
**Judge (8)**
55:4;56:5;57:14,
24;58:10;63:6,10;
194:24
**judgment (11)**
46:25;53:13;58:16;
62:14;63:2;75:6;
90:19;91:22;152:24;
206:11,17
**judgments (4)**
44:5,10;53:11,22
**July (6)**
187:11,12;236:10;
262:8,10,11
**jumping (1)**
196:12
**June (45)**
58:22;72:8,15;
79:3,5;170:24;
186:21,24;187:4,7,
12,14,19;188:2,3,5,9,
14,17,21,23;189:2,4,
10;190:7,13;191:8,
25;192:4,9;193:3;
194:3,12;196:25;
197:18,18,18;198:4;
260:3;261:18,18;
263:2,3,10;269:15
**jury (1)**
25:13
**Justice (2)**
266:19;267:3

**K**

**Katten (1)**
10:13
**keep (7)**
136:12;142:8;
143:16;145:5,21;
183:8;245:6
**keeping (2)**
140:22;141:20
**kept (1)**
137:2
**kind (2)**
168:9;215:19
**Kinrich (18)**
35:21,24;36:8;

38:11;131:17,21;
139:15;140:6;
142:19;150:19;
171:16;183:18;
242:5,8;246:13,19;
272:5,25
**Kinrich's (5)**
131:23;132:12,20;
133:2;272:8
**knew (10)**
36:21;67:23;94:8;
111:17;112:22;
123:11;126:4;
142:16;223:16;
273:15
**knock (1)**
91:15
**knowing (1)**
67:18
**knowledge (5)**
21:14;67:3;158:20;
211:16,20
**known (1)**
126:6
**knows (1)**
222:4

**L**

**larger (4)**
27:17,18;175:12;
269:17
**largest (1)**
72:17
**last (16)**
19:12;79:25;82:3;
84:23;110:15;111:4;
132:5;198:22;
211:19;250:15;
253:20;254:25;
255:3;271:25,25;
272:20
**later (5)**
31:13,25;56:2;
59:6;212:25
**latter (1)**
55:16
**law (4)**
11:11;157:22;
158:12;201:15
**lawyer (1)**
45:24
**lawyers (7)**
15:12;16:3,6,7,9,
18;17:16
**lead (1)**
228:16
**leading (1)**
274:19
**leads (1)**
180:8
**learn (4)**
110:14;133:10;

143:25;151:17
**learned (1)**
119:18
**lease (1)**
92:21
**least (6)**
158:20;225:18;
251:17;252:10;
257:13;263:4
**leave (1)**
51:7
**LEBLANC (15)**
10:2,2;168:13;
196:4,7;222:4,8;
229:20;230:3;235:6;
244:9;256:4,13;
274:6,19
**Leblanc's (1)**
274:11
**led (3)**
181:25;212:18;
225:16
**left (3)**
14:20;71:16;
230:22
**leftover (2)**
127:17;239:19
**legal (10)**
36:22;37:19;49:8;
50:5,10;74:14;95:7;
152:25;158:9,17
**less (28)**
44:19;85:5,6,9;
86:25;104:6;110:17;
114:22;145:16;
160:9,20;172:12;
175:25;188:8;
194:22;195:10,12;
202:19;208:10;
218:25;219:8;
222:19;223:18;
262:23;263:21,23;
264:2;269:25
**letter (2)**
26:18,20,23,25;
27:8
**level (3)**
48:11;55:19;211:4
**levels (5)**
53:4,6,8,9,24
**liabilities (36)**
55:2;59:9,11,14;
60:4,17;61:11,19;
62:3;65:4;72:18;
73:24;75:8,15;76:3,
6;77:4,12;78:16;
83:8;86:21;92:10;
95:15;96:4;100:15,
17,21;108:16,17;
114:10;142:25;
152:12;164:25;
218:3,23;223:24
**liability (42)**

Case 09-10138-MFW    Doc 15043-1    Filed 01/13/15    Page 549 of 562
IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

46:15,20;63:13;
75:18;76:2,24;77:19;
79:17,18;95:18;96:7;
127:20;172:19,21;
174:18;175:7,9;
179:2,13,17;183:6;
201:22;202:14;
207:6,15;209:20;
212:16,22,23;213:7;
214:8,13,18,25;
215:22;216:3;217:6,
23;220:16,18;224:6;
274:23

**liable (6)**
74:9,18;75:17;
76:5;77:2,13

**life (3)**
13:5;20:15,15

**likelihood (9)**
46:3;50:21;52:10;
123:20;124:21;
126:8;145:11;
240:16,24

**likely (5)**
176:12,14,25;
177:4;232:20

**limited (3)**
207:18;229:15;
252:6

**line (35)**
80:6,6,21;81:22,22,
24,24;82:7,7,7;83:5,
5;92:7;93:13;114:9,
10,25;116:25;117:4;
127:10;130:4;
135:20;138:25;
145:24;149:19;
217:7,25;219:15;
221:9;237:20;
238:21;239:21,25;
250:24;253:23

**line-by-line (1)**
83:18

**list (10)**
33:19;43:5;54:16;
80:19;83:7;91:15;
153:21;169:6;
172:16;175:2

**listed (32)**
19:10;33:16;34:5;
35:10;47:16;68:10;
74:19;76:9;85:11;
86:14,21,21;87:7;
89:14,21;92:7,13,18,
20,24;93:3,7,11,13,
20,21;95:15;128:21;
217:23;232:2;
235:24;242:19

**listen (5)**
18:14;60:22;61:6;
97:4;213:25

**listening (1)**
19:3

**lists (1)**
236:10

**litigated (1)**
49:18

**litigation (6)**
49:25;150:14;
231:5;241:25;
245:23;246:4

**little (9)**
53:17,17,21,21;
120:25;221:12;
260:4;261:12,15

**LLP (3)**
3:3,13;10:19

**located (1)**
257:25

**logically (1)**
214:15

**long (3)**
18:21;22:9;215:19

**longer (2)**
22:9;193:13

**long-term (5)**
71:4,20;80:20;
93:3,17

**look (82)**
30:4;31:21;32:7;
41:3,17;42:5;43:12;
54:7;58:4;59:3,7;
62:4;63:17;65:7,17,
21;70:6;71:3;73:14;
79:7;83:22;86:17,24;
89:8;91:13;98:9;
99:3;100:19;104:10;
105:19,19;110:9;
119:21;122:14;
125:14;127:12,16;
132:3;146:9;147:22;
149:19;156:3;157:8;
159:4;165:20;166:3,
8,11;167:14,20,24;
174:13;178:10;
179:10;182:15,18;
183:17;184:16;
189:5,17,25;190:17;
191:23;203:16;
206:25;215:6,9;
217:3;228:11,17;
235:4;236:3,20;
248:3;249:15;250:4;
251:19;256:16;
259:11,14;272:14,15

**looked (13)**
66:16;83:21;
100:13;107:8;
108:13;109:5;145:7;
178:2,14;207:16;
216:23,24;258:23

**looking (19)**
58:13;61:8;66:17;
76:6;81:8;83:16;
100:4;114:20;
149:12;154:6;

158:19;162:17;
165:6,7,7;176:3;
189:9;217:20,21

**loses (2)**
242:2;246:4

**losing (1)**
246:16

**loss (1)**
215:3

**losses (1)**
138:6

**lot (6)**
13:5;24:3;55:21;
56:13;157:19;159:25

**loud (1)**
146:10

**low (15)**
46:16;104:24;
106:13;108:6;
127:22;208:2,3,3,12,
13;211:7,10;214:4,
24;253:10

**lower (12)**
46:19;53:17,21;
66:4;101:11;115:23;
116:3;189:3;195:4;
208:9,9,12

**lunch (4)**
155:22,25;166:14;
167:13

**Luncheon (1)**
166:21

## M

**magnitude (1)**
50:19

**main (2)**
43:6;179:3

**major (2)**
42:10;43:9

**majority (2)**
104:23;253:8

**makes (1)**
266:13

**making (20)**
31:14;35:9,14;
36:23;43:10;64:21;
67:14;68:3,15;75:6;
76:4;90:19,21;106:4;
130:6;143:14;
196:19;202:3;265:8;
272:17

**mandate (3)**
32:15;34:12;41:4

**many (11)**
11:16;15:8;21:2;
28:20;29:6;99:15;
100:6;118:24;
122:22;125:15;126:3

**March (3)**
19:15;119:15;
248:21

**Mark (17)**
27:7;29:20;72:21;
81:7;119:11;120:9;
131:16,18;167:25;
169:12,15;181:5,6;
229:12,21;234:13;
235:7

**marked (6)**
29:23;72:24;78:23;
81:12;119:16;
120:14;131:22;
168:5;169:20;186:5,
8;229:25;230:6,15;
235:11,14

**market (6)**
224:10,10,12,13,
21;225:8

**match (2)**
83:4;162:18

**material (16)**
30:25;63:20;87:9,
19;94:10;95:12;
135:25;136:18;
137:5;138:10;
233:17,25;234:3;
265:24;267:15,18

**materiality (11)**
51:15,23;52:23;
53:5,7,8,9,12,23,24;
271:20

**materially (5)**
53:18;82:8;88:7;
89:12;101:4

**materials (2)**
33:20;169:6

**math (19)**
33:11;34:10;35:3;
52:20;55:22;66:14;
80:13;99:10;127:8;
154:15;184:3;
198:20;221:2,12,24;
222:2,13;261:14,14

**mathematical (5)**
52:20;56:18;57:4;
59:7;160:7

**Mathematically (24)**
45:23;46:23;67:5;
110:5;117:2;131:15;
135:19;136:9;
143:10;144:8,25;
145:23;159:16,23;
160:4,5,23;162:9;
179:12;191:5;193:2;
203:14;228:3;269:2

**matter (6)**
19:22;20:23;32:21,
25;198:2;275:3

**maximize (5)**
41:13,25;43:15,23;
44:3

**maximized (5)**
44:18;128:12,19;
143:22;144:16

**maximum (26)**
31:9;41:18,19,21;
42:7;48:2,9,10;49:4;
113:25;114:4,8,22;
116:18,19;117:8;
146:16;147:2;188:7;
189:17,22;197:8;
198:16;263:16,21,25

**may (32)**
22:14;24:24;36:18;
41:11,23;43:3;52:6;
57:23;78:12,21;
86:25,25;88:2;
100:20;137:8;
140:17;147:20;
152:8;157:8;170:19;
174:20;184:25;
185:17;188:4;204:4,
5,5;218:25;228:15;
270:7,21;272:9

**maybe (5)**
15:10;29:19;
140:20;208:2;270:17

**McCloy (1)**
10:3

**McLellan (1)**
23:25

**mean (22)**
14:11;22:24;23:16;
24:25;26:13;27:12;
34:13;65:20;83:10;
98:6;113:2;128:3;
134:16;187:13,24;
188:18;192:20,22;
211:22;241:4;261:3;
263:9

**meaning (1)**
234:7

**means (1)**
98:18

**meant (5)**
37:18;59:22;82:6,
6;211:10

**measures (1)**
51:22

**mediation (1)**
178:11

**meet (2)**
14:17,25

**meeting (4)**
18:13,21,24;19:7

**Melissa (1)**
13:5

**memo (5)**
23:23;24:2,4,8,9

**memory (2)**
81:9;120:6

**mention (1)**
169:6

**mentioned (2)**
168:22;249:23

**met (2)**
14:9,16

Case 09-10138-MFW    Doc 15043-1    Filed 01/13/15    Page 550 of 562
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

**middle (2)**
12:14;22:22
**might (25)**
34:25;46:13;49:12;
53:12,14,22;60:22;
100:25;137:7;139:4;
145:19,24;203:21;
204:25;206:10;
207:6;215:7,10;
216:15;225:9,12;
241:14;244:18;
248:19;271:7
**Milbank (2)**
10:3,5
**milestones (10)**
241:2,7,11,14,17;
243:4;245:7,12,17;
257:4
**million (182)**
43:16;45:2,4,19,
21;57:12;58:7,20;
59:24;70:3,20;71:13,
14,15;72:9;76:18;
80:20,24;81:20;83:8,
9,12,13;84:7,8,9,10,
12,12;85:3,5,6,9;
88:12;89:20;90:12,
20,23;91:15;92:10,
22;99:5;102:11,22;
103:19,21;104:20;
110:17;114:13,23;
115:8,9;119:5,23;
122:16,23;123:6,12;
124:5,7;126:25;
127:4,13,15,18,22,
23;128:2;129:22;
130:25;132:14;
133:3;137:8;139:14,
18;140:5,16;141:14,
16,21,22;142:3,25;
143:5;144:2,3;
146:20;148:3,20,21;
149:11,23;150:4,11,
21;153:22;155:13;
157:15;158:24;
159:14;161:13;
163:5,7,11,14,19,21,
24;164:8,10;165:22;
176:17;188:15;
189:11;190:2;191:3;
194:19;197:13;
198:12,24;199:9;
202:25;203:6;
207:14,20;212:9;
213:2;215:16;
219:20;220:7;
221:15,22,22;222:11,
18,22;223:6,10,17;
225:19,19;226:3,20;
227:11,22,25;231:8,
22;233:8,8;234:17,
18;238:17,20;239:5,
9,25;242:18,22;

248:19;249:12,25;
250:14,15,19;251:25;
252:4,11;255:4;
258:22;261:17,22;
262:2,4,14,16,17,23;
268:10,11,20,21
**millions (4)**
135:22,23;136:25,
25
**mine (5)**
149:3;175:19;
176:2;183:5;249:8
**minus (5)**
31:17;54:21;55:6;
56:11;222:8
**minutes (1)**
153:18
**mischaracterizes (5)**
38:18;90:7,14;
91:7;179:25
**misinterpreting (1)**
89:9
**mislead (1)**
25:13
**mispronounce (1)**
69:12
**miss (1)**
154:22
**missed (1)**
135:6
**mission (1)**
47:25
**mistake (2)**
175:18;187:25
**modifications (1)**
32:2
**modified (3)**
24:10,13,14
**modify (2)**
116:14;260:4
**moment (8)**
28:22;51:21;80:8;
81:15;179:19;
183:12;184:11;
222:17
**monetization (3)**
241:2,8;258:2
**monetize (3)**
138:6;243:15;
258:17
**money (13)**
102:3;140:12;
192:11,12;211:25;
212:10;214:11,17;
233:3;251:13;
252:12;257:5;258:17
**monitor (85)**
10:20;17:19,23;
18:3,12;23:15;25:19;
26:3,7;28:14;29:10,
25;36:10;38:16;39:5,
11,23;40:3,15;78:5,8,
15;81:6,11,14;82:14;

85:2,8;87:8;88:10;
90:5;95:16;96:15;
101:16;104:14;
110:10,15,16,25;
111:3,14,21;119:13,
15,17;124:3;153:5,8;
200:25;201:14,18,25;
204:22;205:4,7,13;
234:13;235:2,10,16;
236:6,8;240:25;
241:7,16;243:8,12,
15,16,19,22,24;
244:4,21;245:5,13,
15;246:4,11;247:16;
248:19;249:11;
251:5;256:20;258:16
**monitored (1)**
23:9
**monitors (1)**
241:25
**monitor's (20)**
70:16,22;79:24;
80:3;87:6,14,18,22,
25;88:2,3,20;101:23;
119:9;201:5;236:14;
247:13;248:2;249:4,
19
**month (10)**
58:8,21;79:25;
82:3;84:24;176:18,
18;194:18;262:2,4
**Monthly (14)**
59:16;60:5,12;
61:13,17;155:20;
156:5,20;167:14;
168:2,4;181:6;218:9,
20
**months (3)**
154:20;253:20;
262:14
**MOR (15)**
156:10;216:24;
217:6,7,9,10;218:14;
219:16,16;220:15,19;
221:8,9;222:20;
223:4
**more (59)**
29:5;45:4,20,22;
46:7;47:6,9;49:2;
50:13,25;51:9;52:5,
13;56:13;61:3;65:14;
66:3;84:7;100:8;
104:5;115:15;
121:22;143:5,17;
172:7,9,9;173:12;
175:19;176:8,12,14,
20,24;177:4,11,12,
23;179:8,13,15;
180:15,21,23;181:8,
21;182:23;189:13,
19;208:13;214:17;
219:8;221:5;227:14,
18;234:21;259:9;

261:13;271:14
**morning (3)**
11:7,8;15:3
**most (16)**
47:5,19;75:19,24;
84:16;85:22;86:3,6;
111:20;158:22;
179:6;180:3,8;
216:24;218:9;244:5
**motion (2)**
21:14;236:8
**move (2)**
168:21;214:15
**movement (1)**
127:9
**moves (1)**
114:25
**moving (1)**
73:21
**much (19)**
29:10;65:23;67:20;
99:20;102:3;113:5;
117:15;172:22;
178:2;181:24;225:3,
6;232:20,20;233:3;
236:19;245:3,15;
251:13
**Muchin (1)**
10:13
**multiple (4)**
94:19;152:11;
157:24;240:12
**multiply (1)**
124:12
**must (1)**
245:18
**myself (2)**
11:9;196:6

# N

**name (10)**
11:10;15:15,16,17;
20:12;24:2;69:8;
101:24,25;196:7
**named (1)**
23:24
**names (4)**
15:14,17,18;
157:19
**National (1)**
10:14
**nature (2)**
53:19,20
**necessarily (8)**
42:16,21;50:17;
100:3;136:23;
138:16;144:6;255:19
**necessary (1)**
34:11
**need (11)**
12:11;50:19;59:18;
61:20;71:8,19;75:12;

87:10;128:19;
135:11;156:13;
163:5;164:15;165:2,
11,14;190:16;
198:21;272:10
**needed (6)**
47:14;59:20;75:10;
126:15,18;134:24
**needs (2)**
160:9;197:12
**negotiation (3)**
96:18;97:2,24
**neither (1)**
201:14
**NERA (6)**
26:7,19;27:2,5,10,
21
**net (25)**
37:20;41:13,18,25;
42:8;43:15,17,23;
44:3;46:13;48:9;
56:22;84:11;107:5;
127:17;146:5,12,17;
162:17;181:19;
215:3;239:6;251:24;
254:19;271:24
**Networks (3)**
72:24;75:3;252:6
**New (6)**
3:6,6,17,17;182:16,
18
**Newbould's (2)**
266:20;267:4
**next (11)**
30:17,22;58:21;
73:18;194:3,12;
205:8;206:24;
229:21;235:7;237:19
**Nick (1)**
10:4
**nine (5)**
83:8,12;110:15;
154:19;236:4
**NN (20)**
132:14,19;133:2,8,
20;139:13;140:4;
143:8;144:11,12,18;
147:5;155:7;158:13,
14;159:12,13;161:13,
14;272:5
**NNC (10)**
66:23;68:5,16;
72:8,11,14;75:4;
76:24;93:8;101:10
**NNCC (27)**
31:13,18;62:11,17,
18,21;154:18;173:7,
10,21;175:10;
178:25;183:23,25;
184:11;199:25;
200:4,11,14,19;
201:20;202:8,14;
204:16,24;205:14;

206:16
**NNCC's (1)**
201:22
**NNC-NNL-PPI000001 (1)**
120:13
**NNC-NNL-PPI1 (1)**
120:16
**NNC's (5)**
66:11;67:19;72:12;
73:16;75:18
**NNGC (1)**
101:10
**NNI (144)**
41:6,12,20,24;
42:9;43:15;44:17,18;
45:3,11,13;46:7,12,
18;47:9,19;48:2;
50:12,15;51:8,11;
52:5,13,17;54:9,13;
56:25;59:2;62:8;
63:22;64:5;65:12,19;
66:5,9,16,25;67:7,21;
71:4,9;75:20,25;
76:11;77:25;84:11;
85:23;86:3;91:5,19;
99:4,12;103:7,21;
104:4;109:20;114:2,
12,19;115:21;116:2,
5,18;127:6;128:11,
18;129:15;130:3,5,9;
131:2;132:10;
137:11;138:23;
140:16;141:15;
143:6,21;144:3,16,
21;145:23;146:5,13,
18;147:18;149:15;
151:25;153:12,22;
156:22;157:6;
158:21;159:12,14;
160:9,20;161:7;
164:14;165:12,15;
171:2;172:8,19;
175:13;179:7,14,16;
180:16;181:20,24;
191:7;199:16;
200:15,20;201:16,20,
21;204:6,13,19,24;
207:7,24;208:4;
215:24;216:16,20,23;
226:16;227:18;
228:2,6;231:19;
233:9,23;234:7;
239:7,10,21;242:7;
270:2;273:2,18
**NNIC (1)**
101:11
**NNII (1)**
154:18
**NNIII (4)**
155:9;156:21,21,
23
**NNI-PPI-118 (2)**
185:23;186:5

**NNI's (47)**
41:13,25;42:10,13,
16,21;45:17,20;
46:21;63:25;64:8,11,
15,16;65:3,4,10,15,
17,21,22;76:8;77:5;
84:14,17;98:25;
103:24;109:12,25;
127:3;133:18;
135:14;136:2,19;
137:5;138:15,25;
139:6,18;164:16;
165:8,11;183:15;
233:4;237:23;269:4;
271:24
**NNL (109)**
45:9;57:2;59:4;
62:5,6;64:6,7,9,13,
14;65:11,14,24;66:3,
17,20,23;68:4,15;
69:16;73:8,14;74:5,9,
18;75:4,17,25;76:13,
23,23,23,24;77:2,12,
25;78:6,9;83:22,23;
84:4,10;85:3,8;86:5;
88:14;92:21;95:2;
98:10,14;99:12;
100:5,7,15,19,25;
101:13;102:24;
103:5;105:25,25;
106:6,7,14;107:20,
25;108:8,24;112:12,
22;115:19;116:3,3,
16;117:14;118:12;
120:3;122:16,21;
123:14;127:5;
129:24;130:6;
133:11,13;135:14;
137:2,19;138:5,13,
14,22;139:6;141:14;
142:15,21;143:2;
144:2;147:18;
149:15;151:10,11,18;
152:2;169:2;252:23;
257:6;263:4;273:5
**NNL's (22)**
64:17;65:3,5,20;
66:11;67:3,18;68:10;
69:25;78:16;100:23;
103:8,18,24;107:9;
123:5;133:18,20;
134:13;135:23;
136:16;137:2
**NNSA (9)**
142:12,17,22,24;
143:25;144:12;
147:6;272:5;273:2
**NNSA's (1)**
144:19
**NNTC (1)**
101:11
**NNUK (7)**
36:16,20,24;37:6;

91:10;130:7;203:25
**nobody (1)**
22:16
**nod (1)**
12:5
**non-bondholder (4)**
62:13,24;173:8;
175:11
**non-debtor (1)**
158:13
**none (1)**
175:5
**non-inventory (3)**
248:20;249:12;
250:14
**nonlawyer (1)**
235:2
**nor (2)**
173:7;201:15
**Nordion (1)**
20:13
**N-O-R-D-I-O-N (1)**
20:13
**Nortel (9)**
19:19,25;72:23;
75:3;95:17;151:3;
244:23;252:6;257:22
**Notary (1)**
11:1
**note (3)**
72:11;73:2;205:8
**noted (2)**
167:3;275:17
**notes (17)**
31:14,18;62:12,17,
18,21;72:12,14;
173:7,11,21;175:10;
183:23,25;184:12;
199:25;200:4
**notice (2)**
148:10,21
**notwithstanding (1)**
247:8
**November (4)**
194:19,24;262:11;
263:10
**NRP (2)**
256:20;257:21
**number (76)**
55:14,15;56:11,12;
57:16,17;58:25;
59:15,25;70:10,25;
71:21,24;72:19;
114:13;115:20,23;
116:2,18;117:15;
119:6;120:3,7,16;
124:13;126:7;137:8;
147:6;148:15;
154:11;164:11;
170:21;171:18,25;
175:16,16;176:12,13,
17,18;177:5,6;
184:13;185:18;

192:25;193:12;
194:2;195:4;196:20;
197:6,22,22;203:4;
207:23;209:9,10,13;
220:2;223:6;225:24;
226:2;227:6,21;
231:8;232:19;
238:21;245:16;
246:21;248:3,9,15;
249:3,23;250:17,22;
254:3
**numbers (47)**
53:20;55:20,23;
56:3,4,11,17;57:10;
59:22;61:16;80:4;
81:2;84:6,15,17,20;
85:2;86:13,14,16,18,
20;89:10,13;91:2,14,
15;101:3,5;124:11;
127:11;132:8;
144:10,13;163:6;
187:11;189:25;
214:3;217:16,17;
218:4,7,13;230:13;
231:23;237:4;272:10
**numerator (1)**
69:24
**numerous (2)**
114:16;185:20

**O**

**Object (66)**
23:12;26:12;33:3;
42:17;43:25;44:8;
46:10;47:12;50:2,16;
51:12;54:24;55:8;
57:19;61:15;63:8;
66:13;68:6;69:22;
74:12;75:21;76:14;
77:14;100:10;
106:22;110:19;
112:17;113:9;
118:14;120:4;122:8;
124:9;125:17;
126:20;133:12,14;
135:2;137:21,25;
139:20;147:14;
148:23;151:20;
160:11;174:23;
178:5;179:24;182:3;
193:15;197:14;
204:7;209:2;210:19;
217:14;224:14;
225:4;226:21;
228:12;229:13;
232:15;233:20;
243:10;257:16;
263:7;266:2;271:17
**objection (77)**
12:8;16:14,20;
24:15;25:6,14;38:17;
39:13;48:5;55:9,17;

56:7;57:20;67:10;
68:7;78:17;88:24;
89:3,4;90:6,13,17;
91:6;92:4,12,15,23;
93:10;96:10;98:2;
102:17;107:21;
110:2;113:21;
116:21;122:24;
123:16;125:6,18,19;
126:11,21;131:4;
133:15;134:3;
135:16;136:20;
141:17;152:20;
153:3,13;157:25;
158:15;160:12;
161:18;164:19;
165:23;174:10;
201:6,9;205:17;
209:3;210:25;
224:15;225:21;
226:9;228:16,19;
234:8;238:11;
240:11,20;246:6;
255:18;266:3;273:7;
274:19
**objections (3)**
143:7;144:5,23
**objective (1)**
223:12
**obligations (7)**
94:15;95:24;
201:22;219:16,18;
220:3,5
**obtain (1)**
79:10
**obviously (1)**
191:21
**occur (1)**
204:5
**occurring (1)**
145:11
**October (16)**
68:25;69:6;90:25;
118:4,9;166:20;
167:9;185:5,9;
195:21;196:2;256:7,
12;262:5,9;275:16
**odd (2)**
168:15;181:7
**odds (1)**
182:14
**off (21)**
13:3,8;30:9;68:23;
91:13,15;104:9;
110:22;118:2;
166:16,18;183:13;
184:24;185:3;
187:12;189:21;
195:19;214:7;256:5;
275:11,14
**offend (1)**
69:12
**Offhand (4)**

PAUL WERTHEIM, Ph.D.
October 22, 2014

76:22;85:19;
228:22;234:24
**officers (1)**
150:7
**offices (1)**
15:6
**Official (2)**
3:14;10:10
**offset (2)**
116:13;213:18
**old (2)**
78:22;84:21
**omitted (1)**
172:4
**One (105)**
3:16;13:4,25;
15:17;17:5;21:3;
25:2;27:21;30:20;
35:17;36:12;50:23;
52:5;56:11;60:19;
70:16;79:24;80:2;
81:5,10,14;82:10,11,
19;87:7;88:12,22;
91:11;94:18;97:17;
104:13;110:6;
112:24;114:9,9,24;
119:19;120:11;
121:7;127:10,25;
129:3;130:11;
131:18;135:10;
136:24;140:10;
142:14;144:20;
145:6,17,18,22,23;
152:12,13;156:11;
157:10;160:20;
162:14;167:14,19;
168:13,18,19;169:22;
181:8;182:10,23;
183:12;184:17,25;
186:17,18;187:13;
189:13;204:16;
209:19;212:2,14;
213:9,22;227:12;
232:7;234:22;235:9,
15;236:5;242:9,20;
244:2,3,5,20,21;
245:21,21,21;249:8;
250:18;265:18;
270:25;271:2,21;
274:10
**ones (5)**
14:19;44:6;118:13;
179:3;235:3
**one-third (3)**
211:7,9;214:24
**one-year (1)**
261:17
**online (1)**
19:3
**only (32)**
12:13;13:4;15:4;
43:16;57:14;66:16;
77:25;84:10,15;

104:4;107:3,4;108:2,
14;117:3;130:22;
135:20,24;136:5,14;
144:17;146:2;152:3;
168:7,13;178:9;
179:21;194:2;
214:23;247:25;
255:16;270:11
**opening (4)**
170:19;208:21,22,
24
**Operating (15)**
59:16;60:6,12;
61:13,17;155:20;
156:6,20;167:14;
168:3,5;181:6;215:3;
218:10,20
**opine (6)**
52:22;53:3,4,6,24;
54:3
**opinion (23)**
20:23;24:21;37:19;
48:20,21,24;49:23;
50:8;51:4;52:24;
73:12;90:3;108:20;
115:13;127:15;
129:18;141:23;
158:10;162:5;
174:21;175:23;
191:11;221:4
**opinions (4)**
30:10,13;32:12,21
**opposed (5)**
161:21;168:11;
184:8;212:20;272:12
**optimistic (8)**
37:23;38:9;46:17;
47:5;91:18,24;
109:15;116:6
**order (2)**
37:19;41:21
**ordered (1)**
194:24
**orient (1)**
233:5
**original (4)**
221:4;223:13,15;
229:18
**originally (3)**
23:2,18;226:8
**others (4)**
14:23;17:2;93:19,
21
**otherwise (2)**
12:22;142:7
**ourselves (2)**
207:2;238:15
**out (40)**
31:20;43:22;50:23;
59:16;60:5,11;61:13;
62:2;66:21;84:6;
85:3,5,9;96:7;101:9,
17;120:25;124:12,

19;125:5,11;126:3,9,
19;145:17;146:10;
149:2;154:19;159:5;
164:11;166:13;
169:14;177:15;
185:22;189:5;
190:22;205:21;
230:8;239:13;254:13
**outcome (17)**
35:5,19;36:22;
43:14;44:16;46:17;
57:23;62:7;93:14;
114:9;128:10,17;
143:20;144:15;
183:18;211:17,21
**outcomes (14)**
41:10,12,23,25;
43:3,15,23;46:4;
137:10;145:11,22;
174:14,15;181:15
**outdated (3)**
221:9;225:24,25
**outside (8)**
39:21;106:12,20;
107:12;108:2;
130:12,13,15
**outstanding (4)**
96:16,25;97:23;
98:5
**over (30)**
11:20;31:24;50:20;
51:17;71:12;95:5;
110:15;111:4,15,19;
127:14,18;128:2,3,5;
131:3,12;141:21;
142:25;144:22;
155:22;183:24;
191:8;193:13;194:4,
19;242:18,21;
261:17;264:20
**overestimated (1)**
204:4
**overstated (1)**
232:9
**Overy (2)**
10:19;15:11
**Overy's (1)**
15:6
**owe (1)**
104:6
**owing (1)**
260:21
**own (6)**
35:7;118:25;119:4;
136:2;152:4;189:6
**owned (2)**
119:4;239:7
**ownership (1)**
238:9
**owning (1)**
119:22
**owns (2)**
120:3;133:7

---

# P

**page (56)**
30:4;73:4,18,25;
75:3;79:7;80:4,18;
89:17;103:16;
104:11;106:24;
115:21;116:10;
117:6,10;122:14;
128:22;129:9,13;
130:22;132:3,5;
138:18;141:12;
147:24;148:17,25;
149:17;153:20;
154:11;168:14;
169:5;170:5;199:17,
21;202:23;205:21;
207:2;219:17;230:9,
12;236:3,25;237:6,6;
244:13;250:4,7,10;
251:3,20,20;254:14;
269:10;272:20
**pages (8)**
30:5;168:15,19,20;
181:4,7;182:12;
185:17
**paid (19)**
49:13;101:16;
102:23;107:13;
108:2,12;159:3;
160:2;207:6;215:11;
216:16;260:12;
261:4,7;264:2,16;
266:8;270:11,15
**painstaking (1)**
163:3
**paragraph (38)**
31:3;41:3,17;42:5,
24,25;43:2,13;44:15;
45:7;106:25;119:21;
146:9,14;147:4;
183:20,21;186:21,25;
187:25;195:5,13;
196:14;203:8;
220:11;221:18;
226:25;236:4;237:9,
20;244:19;245:14;
251:2,19;255:2,24;
256:17;270:5
**paragraphs (5)**
32:7;202:12;
207:10;210:24;
256:16
**parent (1)**
139:16
**parenthetical (2)**
196:25;237:22
**Park (1)**
3:16
**part (23)**
21:16;36:20;41:4;
51:16;55:25;56:4;

63:18;64:2,5;96:20;
100:23;112:8;
134:10;140:23;
141:20;149:8;199:2;
211:19;247:11;
266:21;268:19;
270:17;272:19
**partially (1)**
198:3
**participants (1)**
257:25
**participating (1)**
15:9
**particular (8)**
70:6;83:19;122:13;
127:10;184:16;
188:24;199:20;
274:13
**particularly (1)**
36:4
**parties (12)**
35:24;37:6,9;
191:20,21;194:10,17,
23;195:2;236:10;
260:2,17
**parts (1)**
139:23
**Pasquariello (1)**
15:20
**pass (1)**
115:22
**passage (1)**
193:23
**passed (2)**
197:19;205:9
**past (2)**
111:15;264:18
**Paul (6)**
69:4;118:7;167:7;
195:24;256:10;
275:13
**pay (25)**
42:9;43:17;44:20;
45:5,22;54:23;66:9,
23,25;67:21;88:15;
102:12;106:12;
107:20;117:9;131:2;
158:23;160:9,15,17,
21;164:18;166:4;
226:3;266:12
**payable (10)**
72:9;80:25;81:21;
92:3,11;93:17;95:21;
106:20;270:7,21
**paying (1)**
88:10
**payment (25)**
37:5;41:20;64:17;
70:3,21;71:15;130:6;
146:13,18;159:22;
189:15;192:10;
193:14;194:6,12,15;
202:8;223:2;260:5,

20,24;261:7,10;
262:20;264:13
**payments (3)**
23:19;65:4,5
**payout (12)**
63:19;64:10,12,18;
67:4;69:23,24;77:24;
103:8,19;190:6;
193:22
**pays (10)**
64:7,9,13,14;65:11,
14;66:3;139:14;
160:8,19
**PBGC (32)**
157:14,17,22;
158:12,24;159:5,11,
14,18;160:9,10,17,
20,21;161:16;163:10,
16,19,21;164:2,7,10,
13,18;165:16;
216:15;221:21;
222:22;223:22;
225:15;226:8,19
**PBGC's (3)**
221:15;225:9,12
**Pension (27)**
3:4;10:17;20:3,6;
36:16,20,24;37:3,9,
25;38:13;83:20;
89:20;91:11;93:17;
94:9,15;130:7;
203:25;216:15;
219:15,17;220:3,5,
17,21;224:6
**pensions (3)**
95:25;224:2,2
**Pensyl (1)**
10:22
**people (7)**
15:8;17:9,11,15;
55:21;194:4;247:3
**Pepperdine (1)**
209:24
**per (7)**
58:8;123:23;
125:16;133:25;
176:17,18;206:3
**percent (43)**
67:4,5;76:2;85:10,
21;86:5,7;99:11;
103:9;109:18,19;
130:5;138:14,25;
139:7;142:22;144:8;
145:14;163:16,18;
164:3,7;189:13;
190:19,22;200:6;
202:16;206:2,3,18,
18;208:6;228:8;
239:9;261:21;
267:23;268:6,17,19,
24,24;269:6,8
**percentage (16)**
62:22;63:19;85:17,

19;101:10;114:4;
123:4;163:15,25;
164:9;165:15;191:7,
19,24;193:11,22
**perform (11)**
55:5,13;56:6;
57:11;58:11,23;
63:13;70:24;71:8,19;
72:5
**performance (1)**
225:8
**performed (4)**
54:14;56:23;57:6;
146:15
**perhaps (1)**
191:15
**period (7)**
79:2;110:16;
178:10,16,19;198:17;
261:18
**periods (1)**
178:15
**permanent (1)**
252:3
**person (3)**
13:4;17:23,25
**personally (1)**
30:9
**perspective (5)**
77:6;109:12,25;
133:18;263:4
**Perusing (19)**
30:3;36:12;74:21;
76:21;106:24;
119:20;120:21;
132:16;149:3;
168:12;182:22;
184:15;186:7;
187:21;217:22;
230:23;250:9;270:5;
272:17
**PhD (4)**
55:13;162:15;
210:13,15
**PHONE (4)**
3:8,21;249:6,7
**physically (1)**
122:4
**picked (1)**
234:16
**picture (2)**
114:21;148:25
**pin (1)**
219:14
**place (2)**
255:15;256:2
**places (1)**
228:23
**plan (3)**
244:23;256:15;
257:22
**planning (1)**
169:3

**play (2)**
53:14;81:8
**pleasant (1)**
255:7
**please (6)**
10:24;12:10,20;
13:3,8;135:8
**plus (27)**
56:24,25;64:6;
72:8;80:19,20,21,21,
21,21,22,22,22,22,22,
23;83:23;114:4;
115:8;150:21;
154:17,17;258:21;
265:13,13,15;269:7
**pm (13)**
118:9;166:19,21;
167:3,9;185:4,8;
195:20;196:2;256:6,
12;275:15,17
**pocket (1)**
249:7
**point (18)**
35:4;51:15;62:20;
71:14;83:9;88:12,22;
117:25;119:4;121:7;
166:14;192:17;
209:18;236:21;
258:7;261:10;
263:15;268:21
**pointing (1)**
274:14
**points (1)**
143:18
**pool (5)**
152:13;163:16;
164:2,8;269:18
**portion (9)**
27:4;61:11,16;
115:3,5;151:5;
203:10,14;269:17
**portions (2)**
64:20;107:2
**posit (1)**
202:18
**position (3)**
201:2;242:2;267:9
**positions (1)**
266:13
**positive (6)**
139:18;142:2;
144:2;255:11;
257:23,25
**possess (1)**
78:11
**possesses (1)**
78:8
**possibility (5)**
161:15;189:11;
202:18;216:3,5
**possible (9)**
46:7,12;47:9;
50:25;66:15;181:24;

226:18,22;263:5
**Possibly (7)**
52:9;88:7;113:15;
116:7;159:7;259:15;
263:17
**post (1)**
269:12
**post-petition (21)**
25:20;26:4;27:15;
28:7;62:25;63:13;
200:15,20;264:21;
265:6,16;266:7,10,
15,21;267:4,12;
269:15,23;271:3,9
**post-retirement (1)**
95:24
**potential (4)**
46:14;87:9,19;
273:17
**potentially (1)**
138:21
**PPI (53)**
27:25;28:4,11,15;
30:2;31:6,7;32:21;
41:20;42:9;43:17;
44:20;45:5,22;46:8;
47:10;48:3,11;49:6,9,
12,15;54:23;62:11,
16,20;63:22;66:10;
67:2,21;117:9;131:2;
146:13,18;173:6,7,
10,21;174:3;175:9,
11;178:24,25;
199:24;200:4;201:6;
202:7;227:25;
239:10;260:21;
270:7,20;275:3
**preamble (1)**
251:23
**precise (3)**
212:6;221:11;
261:13
**predicate (2)**
89:7;136:24
**preliminary (2)**
82:11;187:5
**preparation (14)**
14:2;15:9,25;
16:10,13,19,23;
17:24;18:7;38:22;
39:7;40:2,7;178:19
**prepare (4)**
13:23;14:4;15:2;
216:10
**prepared (2)**
23:24;219:4
**preparing (1)**
33:6
**pre-petition (5)**
71:5;107:2;265:13,
15;269:13
**presence (1)**
39:21

**present (7)**
15:13,25;16:4;
17:20;40:4;62:12,22
**presentation (2)**
215:15;218:21
**presented (1)**
74:10
**presume (2)**
11:13;122:15
**pretty (1)**
45:15
**previous (5)**
97:10;181:9;258:7,
12;273:9
**previously (5)**
31:11;97:17;168:9;
252:7;273:21
**primarily (1)**
252:4
**principal (7)**
190:17;260:6,20;
262:21;264:16;
265:12;269:12
**principle (1)**
45:15
**principles (1)**
210:12
**printed (2)**
120:24;149:2
**printouts (1)**
185:12
**prior (5)**
11:19;26:8;107:24;
212:14,15
**priority (4)**
70:3,21;71:15;
268:20
**Private (1)**
252:6
**privilege (3)**
12:16;17:6,7
**privileged (3)**
16:15,22;17:4
**probability (5)**
104:25;106:14;
108:7;123:20;126:8;
129:10,13;145:13,16;
161:16;253:10
**probably (6)**
11:18;22:10;55:21;
97:15;117:25;156:6
**problem (2)**
40:18;121:17
**proceedings (2)**
22:5;245:18
**proceeds (17)**
56:24;57:11;70:7;
116:16;131:14;
132:14;213:18;
233:24;237:10,16,24;
238:9,17,19;239:5,7,
19
**process (7)**

Case 09-10138-MFW    Doc 15043-1    Filed 01/13/15    Page 554 of 562
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

211:18,22;218:19;
239:14;242:12;
243:5;257:10
**produced (1)**
121:4
**production (1)**
185:2
**productions (1)**
185:21
**program (4)**
245:6;247:9,17;
257:4
**progress (1)**
245:15
**projected (2)**
77:24;124:25
**projection (2)**
59:3;62:5
**pronounce (1)**
69:8
**proof (1)**
201:16
**proofs (1)**
99:17
**property (1)**
112:10
**proportion (1)**
150:13
**proposed (6)**
31:5;41:8;48:16,
22;132:13;146:19
**proposing (1)**
153:6
**Protocol (4)**
238:3;241:25;
245:22;246:4
**provide (8)**
18:5,16;49:23;
50:8;81:19;236:6,13;
256:20
**provides (1)**
201:21
**providing (1)**
25:19
**provisions (1)**
107:7
**Public (2)**
11:2;122:12
**publicly (1)**
166:9
**publicly-available (1)**
122:6
**published (1)**
24:21
**pull (1)**
148:14
**pulled (1)**
156:15
**PULTMAN (172)**
10:18,18;14:18;
16:11,14,21;17:10,
14;23:12;24:15;25:6,
14;26:12;33:3;37:7,

10;38:17;39:13;
42:17;43:25;44:8;
46:10;47:12;48:5;
50:2,16;51:12;54:24;
55:8,17;56:7;57:19;
60:18;61:15;63:8;
66:13;67:10;68:6;
69:22;73:20;74:12;
75:21;76:14;77:14;
78:17;79:16;86:10;
88:24;89:3;90:6,13,
17;91:6;92:4,12,15,
23;93:10;96:10,24;
98:2;100:10;102:17;
104:16;106:22;
107:21;110:2,19;
112:17;113:9,21;
116:21;117:21;
118:14;120:4;
121:10,14;122:8,24;
123:16;124:9;125:6,
17,23;126:11,20;
127:25;128:23;
129:2;131:4;133:12,
14;134:3;135:2,16;
136:17,20;137:21,25;
139:20;140:24;
141:4,17;143:7;
144:5,23;147:14;
148:12,23;151:20;
152:20;153:3,13;
155:21;157:25;
158:15;160:11;
161:18,23;162:11,24;
164:19;165:23;
166:13;174:10,23;
178:5;179:24;182:3;
183:8;193:15;
197:14;204:7;209:2;
210:19,25;217:14;
222:2,5;224:14;
225:4,21;226:9,21,
23;228:12,19;229:10,
13;232:15;233:20;
234:8;238:11;
240:11,20;243:10;
244:7;246:6,8;249:8;
255:18,25;257:16;
263:7;266:2;271:17;
272:18;273:7,12;
274:9;275:5,9
**punch (1)**
56:10
**purchases (2)**
249:13;250:14
**purely (2)**
193:11;206:4
**purports (1)**
31:6
**purpose (22)**
83:6;130:14;
173:23;174:6,9;
181:14,18,19,23;

182:8,25;183:4,4;
202:8,11;204:11;
215:21;228:11,17;
236:4,5;266:6
**purposes (25)**
37:16,24;38:9;
112:18,21;127:20;
128:8;129:17;
130:16;132:9;
173:17,19,24;200:5;
206:4;216:22;
217:11;226:13;
231:23;246:7;
248:20;270:6,9,10,19
**pursuant (5)**
41:7;146:19;238:2;
260:7,22
**pushed (2)**
115:19,23
**put (13)**
51:14;102:11,22;
122:20;131:11;
137:23;146:16;
184:14;185:11;
191:17;195:13;
219:14;232:18
**Putting (3)**
14:2;138:10;
144:19

## Q

**qualified (2)**
128:15;129:12
**qualitative (1)**
93:15
**quarter (1)**
265:20
**quite (2)**
158:7;183:25
**quote (2)**
212:4,15
**quoted (2)**
205:4;207:18
**QURESHI (3)**
3:18;10:7,7

## R

**range (9)**
185:20;207:16,19;
209:12,21;211:7;
214:9,12,24
**rate (22)**
49:13;58:15;62:12,
14,17,17,19;63:2;
84:4;176:5,12;
188:24;189:3,12;
190:20;206:8,10,11,
17,19,21;231:22
**rates (3)**
206:2,13;231:12
**rather (4)**

60:23;61:8;97:4,9
**ratio (8)**
64:11,12,18;67:4;
69:23,25;103:8,20
**Ray (4)**
34:22;211:15;
214:7;274:16
**Ray's (1)**
274:22
**reach (13)**
66:8,24;67:20;
109:5;192:8;194:18;
203:16;209:13;
211:6;260:2;263:13;
273:4,13
**reached (1)**
66:18
**reaches (1)**
268:10
**reaching (1)**
66:10
**read (21)**
24:24;82:13;89:18;
101:22;119:3,9;
140:2;146:10;148:8;
188:19;191:10;
201:12;205:3;
229:17,19;237:21;
244:14,16,19;245:2;
251:16
**reading (9)**
13:17,18;87:11;
97:5;228:21,22;
241:11;255:2;270:16
**real (3)**
11:21;126:7;
230:20
**realistic (36)**
41:15;44:4,6;
46:24;47:6;50:21,21;
52:10;85:24,25;86:4;
90:9,12,21;91:9,21,
24;109:16,21;129:7;
145:18,19;172:10,12,
18;173:12;177:24;
180:5,8,19,21;
181:22;208:10;
219:6,8;221:5
**realistically (5)**
46:12;115:13;
128:15,16;179:11
**realize (1)**
184:4
**really (3)**
16:6;100:8;129:25
**re-ask (1)**
39:18
**reason (8)**
74:8;124:24;
152:17;214:12;
215:18;234:15,22;
257:3
**reasonable (17)**

68:3,14;88:21;
113:17;130:11,18;
160:7;173:25;
174:21;175:19,25;
176:21;177:10,11,11,
12;214:5
**reasonableness (6)**
127:17;129:18,21,
24;145:8,10
**reasons (1)**
25:10
**rebuttal (4)**
169:8,16,19;
229:17
**recall (6)**
24:6,12;169:10;
232:23;233:10;
274:17
**receipt (3)**
64:11;253:21,22
**receipts (4)**
110:12,17;254:18,
19
**receivable (3)**
106:17;253:13,17
**receivables (26)**
104:10,23,24;
105:4,9,14;106:2,8,
15,19;110:11;111:2,
7,11,24;252:5;253:9,
9,12,18,25,25;
254:10,16,18,23
**receive (7)**
31:8;38:23;104:5;
114:3;150:21;
193:21;214:17
**received (9)**
35:20;49:2;110:18;
122:16;191:12;
192:21;193:19;
199:2;246:11
**receiving (3)**
116:16;130:5;
140:12
**recent (5)**
72:9;111:21;218:9;
234:21;244:5
**recently (2)**
177:19;184:6
**Recess (6)**
69:2;118:5;166:21;
185:6;195:22;256:8
**recollection (6)**
38:4;120:2;187:24;
189:8;205:12;231:11
**recollections (1)**
168:10
**reconciliation (1)**
218:18
**record (20)**
68:24;69:5;118:3,
8;120:15;166:17,19;
167:8;183:13;

184:24;185:4,8;
195:20,25;217:19;
230:7;256:6,11;
275:11,15
**recorded (1)**
82:19
**recording (2)**
82:15;84:12
**recover (1)**
62:8
**recovered (2)**
109:17,19
**recoveries (5)**
59:3,4;62:5,7;
252:5
**recovery (7)**
38:13;56:25;105:3,
15;109:10;116:18;
253:12
**redid (1)**
33:11
**redound (1)**
273:5
**reduce (10)**
114:17;115:9;
146:5;159:14;
164:12,13;226:15;
239:16;243:8;260:6
**reduced (15)**
115:12;159:22;
189:12;203:11,15;
226:19;231:15;
242:16,17,21;260:14;
264:9,11,12,14
**reducing (1)**
31:7
**reduction (13)**
84:9;138:22;
164:17;165:8,10;
218:17;221:20;
222:10;225:19;
226:7,25;242:25;
257:9
**reductions (1)**
204:4
**refer (4)**
28:5;31:13;118:20;
187:25
**reference (6)**
149:19;184:15;
203:8;229:3;240:9;
274:22
**references (1)**
274:15
**referred (16)**
27:19;42:25;81:15,
18;109:6;112:4;
118:11;120:18;
147:23;148:9,17;
171:10;188:2;
208:14;228:24;
231:25
**referring (20)**

24:5;30:5;42:23;
45:6;72:12,22;73:3;
76:19;112:7;118:13;
120:11,20;145:5;
147:21;152:9;
203:19;212:3;
253:13,14;274:20
**refers (2)**
119:22;181:11
**reflect (1)**
37:18
**reflected (4)**
221:14;252:7;
253:4,6
**refresh (2)**
120:2,6
**refreshed (1)**
189:8
**regard (3)**
38:11;79:17;81:20
**regarding (9)**
19:24;36:20;38:6;
45:8;50:4;53:13;
68:9;213:13;236:7
**regards (5)**
31:15;67:15;68:4;
110:25;182:24
**relate (2)**
106:8;138:4
**related (11)**
20:10;32:21;35:18;
53:11;101:22;
151:12;253:24;
257:13;268:20;
274:12,24
**relates (3)**
118:17;207:5;
244:22
**relating (2)**
241:17;243:4
**relation (2)**
236:18;274:23
**Relative (3)**
99:7;110:11;
224:23
**relatively (1)**
101:10
**relevant (2)**
107:6;244:18
**reliable (1)**
217:11
**relied (11)**
23:23;24:2,3,8;
33:20;80:5;110:7;
111:20;169:7;
217:16;253:19
**relief (2)**
244:12,20
**relinquished (1)**
132:8
**rely (4)**
89:19;217:17;
244:3;247:12

**relying (2)**
91:2;100:15
**remain (2)**
106:8;245:16
**remainder (1)**
54:22
**remaining (6)**
106:3;126:24;
241:3,9;242:23;
245:22
**remember (21)**
22:7,25;23:25;
24:11,18,19;36:14;
38:20;76:22;84:6,15;
87:24;119:19;121:7;
201:17;228:21,22;
233:7;234:15,24;
241:10
**remove (1)**
93:16
**reorient (2)**
207:2;238:15
**repatriate (1)**
258:18
**repatriated (3)**
251:6,14;254:4
**repatriation (7)**
241:18;243:22;
246:22;251:4;
252:12,21;257:23
**repatriations (1)**
252:17
**repayable (1)**
107:3
**repeat (15)**
12:21;60:25;87:10;
97:6,19;102:20;
139:24;149:4;194:7;
204:9;233:22;242:3;
252:19;266:25;268:3
**repeatedly (2)**
111:14,23
**rephrase (3)**
12:21;67:17;
204:10
**replace (1)**
182:17
**replacement (1)**
181:5
**report (199)**
13:20;14:3,3,8,12;
18:10;19:10;21:18;
22:13,23,25;24:10,
13,14,19,22,25;5,13;
29:21,22,24;30:9,10,
14,19,24;32:4,15,17,
22,25;33:2,8,9,22,24;
35:8,21;36:8;38:22;
39:7;40:2,7,22,25;
41:4;44:2,13;45:21;
46:2,16;47:7,16,20,
25;51:16;59:16;
61:17;63:18;68:11,

17;70:17,22;73:3;
74:5;79:24;80:3;
81:6,11,14;85:2,9;
87:8;88:3,4;90:14,
16;95:16;101:23;
103:16;104:11,14;
111:21;113:25;
116:9;119:10,12,15,
17;124:3;129:7,17;
130:17,23;131:11,17,
20,22,23,24;132:4,
10;137:4,24;138:8,
18;141:10;142:19;
144:17;146:6,15;
153:20;155:20;
156:6,20;157:9,14;
168:3,5,25;169:6,8,9,
16,19;170:2,5;
173:23,24;174:6,9;
177:8;179:5;181:7;
183:21;184:5,14;
186:25;189:6;
196:14;197:10;
199:14;201:5;
202:13;205:17,22;
207:11;210:24;
212:7;216:11;217:4;
218:8,10,20;219:23;
220:12,22;221:18;
228:11,18,25;229:4,
17,18,23;235:10,16,
22;236:6;237:2;
238:8;240:7,10;
242:21;244:4,14,22;
245:4;246:7,13,19;
249:20;250:5;
251:17;252:25;
253:14,19;270:4,7,
10,20;271:16;272:4,
11,25;273:6,14,16;
274:24
**reported (1)**
58:6
**reporter (9)**
10:24;12:4;87:11;
97:7;229:21;230:5;
234:12;235:7,14
**reporting (3)**
76:7;77:16;156:19
**reports (11)**
60:6,12;61:13;
111:14,23;167:15;
169:22;175:4;
234:14;235:3;244:3
**represent (10)**
10:5;11:11;16:9,
18;17:14;123:22;
196:8;219:2,4;
236:17
**representation (1)**
236:22
**representative (3)**
36:10;38:15;78:4

**representatives (5)**
26:2,8;39:5,11,23
**represented (1)**
221:5
**representing (2)**
18:3;40:15
**represents (2)**
72:7;84:2
**request (5)**
12:13;18:11;
121:16,21;155:18
**requested (7)**
32:11;35:20,23;
36:3;130:6;244:12,
21
**requesting (2)**
121:21;245:5
**require (1)**
67:13
**required (2)**
55:13,20
**requirements (1)**
156:19
**reread (3)**
33:10,15;97:12
**reserves (1)**
107:6
**residual (4)**
241:3,9;243:15;
258:2
**resolution (4)**
192:8;194:5,11;
245:21
**resolve (2)**
194:25;195:2
**respect (24)**
27:25;45:13;47:23;
52:23;77:11;95:14,
20;108:3;158:20;
167:22;179:20;
180:9;182:20;
205:14;206:16;
215:13;218:12;
236:14;241:8;
242:11;246:3;
247:25;257:13;259:4
**response (1)**
174:5
**responsibilities (1)**
27:25
**responsibility (3)**
11:24;94:23;
151:10
**responsible (3)**
74:5;75:8;152:3
**restate (3)**
139:3;200:16;
272:23
**restricted (1)**
70:18
**restructuring (2)**
92:10;95:14
**result (6)**

Case 09-10138-MFW    Doc 15043-1    Filed 01/13/15    Page 556 of 562
IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

108:6;127:6;
150:23;196:23;
252:4;262:22
**resulted (2)**
51:5;84:10
**resulting (1)**
115:14
**results (3)**
131:25;194:5,11
**resumed (1)**
167:4
**retained (1)**
247:4
**retention (6)**
244:23;245:6;
247:9;256:15;257:4,
22
**revenue (4)**
21:4,6,7;123:14
**reverted (1)**
223:6
**review (19)**
19:6,9;83:23;84:3;
85:11,18;87:7,15;
89:8;94:17;95:6;
98:6;99:7,13;100:22;
201:8,11;234:14,22
**reviewed (5)**
33:10,14;122:16;
131:23;169:23
**reviewing (3)**
169:10;173:3;
175:4
**Right (159)**
37:16;44:23;48:4;
56:18;58:8;59:15,16;
60:5;61:12;64:8;
67:9;68:5;70:8;79:8;
80:14;91:13;99:10;
106:4;138:8;140:16;
148:6;157:22;165:3;
178:4;180:5,11;
187:24;188:9;
190:19;192:22,23;
193:4;194:14;195:6,
13;197:4;198:7,13,
20;199:4,9;200:7;
202:9,16,20;203:18,
22;204:6,21;205:20;
206:19;209:23,25;
212:2,16,17;213:4;
215:18;216:14,16,20,
25;218:6,14;220:8,
14;221:16,24;222:13,
20;223:5,7,10,15,18;
224:7;226:16;
227:16,19;228:2,8;
231:21,24;232:10;
233:19;234:2;
235:23;236:2;237:6,
9,20,23;238:21;
239:11;240:3;
241:13;242:9,16,25;

244:2,4,20;245:20;
246:2,14;247:5,14,
15,19,23;248:4;
250:5,25;251:17,21,
23;255:5,8,11,16,17,
23;257:6,10,15;
258:19,22;259:16,22,
24;260:8,24;261:19,
22,23;262:9,14;
263:3,12,14,17;
264:4,15,19;265:2,
12,18,20;267:24;
268:12,15,16,22,25;
269:18,21;270:22,23;
271:16
**right-hand (1)**
30:5
**rigmarole (1)**
192:9
**rise (2)**
48:11;190:7
**risen (3)**
190:12;192:18;
193:7
**rises (1)**
194:3
**risk (2)**
49:12,21
**risks (1)**
49:8
**Rockstar (1)**
112:10
**role (3)**
17:22,25;18:4
**roles (2)**
17:8,11
**room (1)**
14:23
**Rosenman (1)**
10:13
**ROSENTHAL (45)**
11:6,10;16:8,17;
17:5,12,17,18;39:16;
68:21;69:7;73:23;
90:15;117:24;
118:10;120:15;
125:21,25;128:25;
129:4,5;131:7;134:6;
141:7,8;155:24;
161:20;162:13;
166:16;167:11,25;
169:12;184:22;
185:10;195:16;
196:10;198:8,18;
216:7;228:5;229:7;
232:21;258:23;
259:25;275:7
**Rosenthal's (2)**
196:23;240:4
**rough (8)**
60:25;87:12;97:8,
9,16;163:15,25;164:9
**Roughly (7)**

104:3;190:22;
191:5;198:14;262:2,
3,17
**round (2)**
23:20;207:23
**row (1)**
205:25
**rows (1)**
250:18
**rules (1)**
11:19
**run (1)**
66:14
**running (1)**
187:7
**runup (1)**
178:3

**S**

**sacrosanct (1)**
116:11
**sale (20)**
56:24;57:10;70:7;
119:18;122:17;
124:7;125:2;126:4,5,
8;127:5;131:13;
132:14;144:17;
236:9,18;237:10,16,
24;239:19
**sales (27)**
105:2,9;112:3,5,8,
9;114:5;115:11,18;
116:3,17;117:2,13;
118:11;123:15,21;
168:23;233:24;
238:10,18;239:13,14;
240:17,24;259:4,11,
14
**same (58)**
11:18;13:7;48:5;
58:11;62:12,17,19,
21;90:17;92:12,15,
17,23;93:10,11,12;
95:20,23;96:3;
111:22;121:2;124:2;
131:12;136:13;
140:23;141:17;
142:8;143:4,7,16;
144:5,23;147:3;
153:3,13;158:15;
170:20,20,25,25;
171:10,11,19,24,24;
174:5;182:25;183:5;
185:21;193:4;197:5,
23;198:17;203:12,
16;205:18;228:19;
269:9
**satisfied (2)**
140:5;161:17
**satisfy (1)**
157:2
**saw (6)**

71:13;106:13;
122:15;148:19;
150:2;187:18
**saying (15)**
42:14;52:4;66:20;
67:15;68:12;88:9,19;
115:17,25;117:8,12;
134:11;166:5;
178:24;180:13
**scenario (14)**
41:12,24;42:9;
43:4,8;77:25;91:4,
18;103:7;113:7;
114:2;123:13;132:9;
158:21
**scenarios (2)**
174:16;181:16
**Schedule (2)**
230:15,18
**Schweitzer's (1)**
209:17
**scope (2)**
185:18;235:25
**screen (2)**
60:23;61:8
**search (2)**
259:16,19
**second (15)**
58:4;72:17;73:6;
82:11;106:25;112:2;
184:25;196:11;
207:2,4;212:4,5;
245:8;256:19;265:19
**secondly (1)**
113:3
**Section (12)**
43:5;199:13,14;
203:5,20;204:2,11;
215:14;226:14,14;
244:16;245:5
**sections (1)**
244:17
**seeing (3)**
87:24;148:4;
205:13
**seek (3)**
38:21;40:24;43:22
**seeking (2)**
236:8;247:17
**seem (1)**
139:23
**seems (2)**
22:9;237:3
**select (1)**
234:13
**sell (7)**
112:13,23,25;
113:18;130:24;
168:24;169:3
**selling (3)**
119:8;122:21;
259:17
**semantics (1)**

198:2
**sense (5)**
53:23;156:7;
214:19;241:10;
266:13
**sensitive (6)**
96:18,18;97:2,3,24,
24
**sensitivity (16)**
44:22,25;45:7,8,
13;84:9;103:15;
127:3;140:15;
141:11;143:3;206:5;
228:6;239:8;268:9,
23
**sentence (5)**
19:21;147:7;
198:22;205:8;256:19
**sentenced (2)**
21:23,24
**separate (2)**
82:15;272:22
**separately (2)**
82:16;105:12
**September (13)**
28:18,19;29:11,14,
18;58:7;81:11;82:2;
154:2;178:17;
235:11,18;262:9
**series (5)**
71:23;142:7;
190:21;232:21;
259:25
**serve (1)**
26:14
**set (1)**
257:5
**sets (1)**
237:3
**setting (1)**
36:21
**settle (2)**
31:6;223:17
**settled (22)**
55:3;69:21;86:22,
25,25;87:3;88:5,6,14;
89:15,22;90:24;92:8,
18,25;93:9;218:24,
25;219:5,7,10;222:18
**settlement (49)**
44:19;46:9;47:11;
48:3,12,22;49:2,6;
50:14;51:10,24;52:8,
16;62:13,22;68:3,14;
79:14;147:13,16;
148:11,16;188:13,14,
15,20,20,22;189:10;
190:2,7,12;191:2,4;
192:14,17,24;194:9,
18,20;195:3;197:22;
201:6;260:3,8,22;
261:8;262:22;263:12
**settlements (3)**

105:24;106:5,6

**settling (3)**
191:7,11,20

**Seven (3)**
15:10;71:14;83:9

**Seventh (4)**
3:5;235:10,16;
236:6

**several (6)**
126:16;161:10,19;
165:24;181:11;
228:23

**shall (2)**
201:21;237:25

**shareholder (1)**
140:12

**sheet (3)**
108:14;110:8;
218:2

**short (1)**
119:10

**shorter (1)**
232:20

**shortfall (1)**
224:5

**shorthand (1)**
118:21

**shortly (2)**
56:17;167:12

**show (14)**
82:9;83:3;84:18;
85:6;154:8;156:7;
181:24;205:24;
206:5,17,21;230:10;
249:11;250:3

**showed (1)**
124:4

**showing (2)**
154:12;215:21

**shown (2)**
218:23;226:15

**shows (1)**
83:20

**side (20)**
56:22;59:8;65:8,
18;66:16,17;79:18;
103:4;109:15;
137:24;153:16;
162:3,4,6,7;165:9,11;
230:21,22;232:18

**signature (1)**
30:6

**signed (2)**
26:25;27:8

**significant (4)**
51:18;151:4;
245:17;251:25

**significantly (3)**
86:16;193:13;
269:17

**signing (2)**
30:8,9

**Similar (1)**

211:23

**simple (3)**
54:14;56:23;
163:23

**simplest (1)**
268:22

**simplify (1)**
247:23

**simply (8)**
59:9;89:11;160:25;
218:6;221:8;263:19;
265:11;273:25

**single (3)**
77:3,10;82:19

**sit (2)**
205:12;224:23

**sitting (5)**
14:19;24:20;30:12,
19;90:10

**situation (1)**
163:17

**situations (3)**
53:13;78:14;179:8

**six (4)**
219:17;250:18;
253:20;256:9

**sixty-first (3)**
119:12,14;156:8

**sixty-seven (1)**
268:21

**sixty-two (1)**
71:14

**skimmed (2)**
244:17;251:16

**slide (1)**
228:24

**sold (10)**
21:5;113:2;122:22;
123:9,12,23;126:25;
233:4;240:6,19

**sole (3)**
48:14,18,21

**solely (1)**
76:23

**solvency (3)**
19:25;107:8;133:5

**solvent (3)**
132:20;133:3;
142:18

**S-O-M-E (2)**
61:5,10

**somebody (2)**
124:25;234:25

**sometimes (1)**
270:21

**Somewhat (2)**
210:13;224:3

**Sorry (30)**
37:10;40:16;65:20;
73:20;86:11;89:3;
97:10,20;98:13;
106:3;121:13;128:6;
141:3;148:4,12;

198:19;200:12;
210:14;215:19;
219:25;225:21;
237:5;238:23;242:5;
248:21;249:5;250:7;
254:22;263:24;268:5

**sort (4)**
27:4;105:23;
181:13,17

**sought (4)**
22:13,19;79:10;
247:4

**sound (1)**
222:13

**source (8)**
35:11;38:3;72:11;
73:15;79:11;184:13;
217:12;228:22

**sources (3)**
34:2,4,8

**speak (2)**
13:4;18:13

**specific (6)**
24:4;27:14;35:18;
78:16;157:3;259:9

**specifically (18)**
14:4;24:22;25:12;
33:16;41:12,24;43:6;
47:7;76:5,13;81:22;
100:14;115:2;138:4;
171:3;201:17;217:9;
221:10

**specified (1)**
246:12

**specify (1)**
257:20

**speed (1)**
219:13

**spend (4)**
216:8;231:4;
248:19;258:17

**spending (3)**
178:3;216:10;
249:12

**spent (4)**
28:10,21;29:7;
216:10

**spoke (1)**
18:15

**staff (1)**
29:9

**stamp (1)**
237:7

**Stamped (3)**
120:13;186:5;
229:25

**stand (2)**
30:13;52:7

**Standard (2)**
86:19;222:16

**standards (2)**
90:22;152:25

**standpoint (2)**

86:20;158:18

**start (6)**
52:19;54:8;104:9;
196:13;199:21;
255:14

**started (4)**
196:19;223:9,11;
231:14

**starters (1)**
63:18

**starting (3)**
57:16;209:17;
231:17

**starts (2)**
73:3;231:16

**state (10)**
31:5;72:6,10;
114:15,20;115:2;
178:13;207:25;
265:3;270:5

**stated (19)**
64:22;68:18;75:3;
80:23;81:23;84:23;
86:17,18;88:2,3;
96:15;127:11;145:7;
156:24;218:14;
220:15,17;226:7;
271:11

**statement (14)**
31:15;32:8;35:15;
37:17;42:3;43:2;
51:24;106:4;205:3,
13;212:21,25;219:3;
226:24

**statements (18)**
21:4;30:10,13;
59:21;170:19;171:9;
208:20,21,22,25;
209:17,21;211:14,15;
212:3,18;274:15,20

**States (11)**
21:19;86:19;87:25;
89:23;106:25;170:8;
207:19;211:23;
214:10;218:21,23

**statistically (1)**
145:12

**status (2)**
81:25;95:7

**stay (1)**
255:22

**step (3)**
14:24;35:22;180:2

**steps (1)**
124:19

**still (25)**
17:4;31:23;44:18;
51:5;52:7,10;94:17;
96:16;99:12;112:13,
22,25;115:19;
127:18;183:24;
192:10,14;193:4;
198:16;203:15;

226:2;247:20;
251:21;264:4,6

**stock (4)**
224:10,12,21;
225:8

**stop (3)**
260:22;261:9;
267:10

**stopped (1)**
270:16

**stopping (1)**
166:14

**Store (1)**
23:7

**Store's (1)**
23:19

**straight (2)**
71:25;144:8

**STRAUSS (2)**
3:13;10:9

**stretch (3)**
128:10,17;144:14

**stretched (1)**
44:16

**stretching (3)**
143:20;145:6,22

**strike (13)**
23:2;32:6;34:3;
45:18;47:3;74:16;
76:10;80:10;86:2;
89:25;126:12;135:5;
141:24

**struck (1)**
175:5

**Stuart (1)**
21:19

**studied (1)**
51:16

**subject (29)**
19:22;20:22;21:14;
32:25;33:8;59:10,11,
14;60:4;61:12;73:25;
77:19;83:8;87:8,16,
18;96:17;97:2,23;
102:13;107:6;115:4,
6;203:11;217:6,24;
218:3;237:25;242:24

**submission (1)**
201:8

**submit (1)**
21:18

**submitted (4)**
28:13;29:25;201:4;
205:17

**submitting (2)**
33:2;184:5

**subs (3)**
147:13,17,19

**Subsequent (1)**
184:5

**subsequently (1)**
89:25

**subsidiaries (15)**

Case 09-10138-MFW    Doc 15043-1    Filed 01/13/15    Page 558 of 562
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

93:8;107:9;108:3,
18;135:24;136:16;
137:2;138:14,21;
142:15;158:13;
159:12,23;182:21;
251:7
**subsidiary (2)**
107:15,20
**subsidiary's (1)**
107:5
**substance (3)**
37:12;121:12,18
**substantive (5)**
152:7,10;153:2,6,
10
**substantively (1)**
152:18
**subtract (2)**
55:15;154:19
**subtracted (1)**
70:3
**subtraction (2)**
54:14;56:15
**successful (1)**
271:8
**sufficient (5)**
55:5;56:5;57:15;
58:11,22
**suggest (1)**
239:8
**suggested (4)**
36:13,15;200:19,
22
**suggesting (3)**
200:11,13;202:14
**suggests (1)**
268:23
**sum (3)**
57:5;60:16;61:9
**S-U-M (2)**
61:4,10
**summarize (2)**
20:25;235:2
**summary (11)**
105:20;108:14;
109:7;110:7;120:10,
12,21;154:2,5,12;
202:13
**superficial (1)**
248:13
**supervise (1)**
27:13
**support (5)**
185:25;201:19;
209:9,12;236:14
**suppose (1)**
223:11
**sure (42)**
16:5;18:3;22:7;
25:23;28:24;35:16;
39:20;64:21;69:11;
80:13;102:21;106:4;
118:23;139:25;

140:25;141:4,6,7;
149:6;154:10;
155:19;164:3;171:6;
173:22;184:6,17,18;
188:25;194:8;
230:19;233:23;
241:4;242:4;252:20;
256:4;257:21;
259:10;265:4;268:4;
272:16,24;273:24
**surplus (46)**
41:5,19,21;44:18;
46:13;51:9;52:6,14;
54:22;55:7,16;63:21;
66:9,25;67:20;
103:20,24;114:18;
117:8;127:3;128:11,
18;131:2;135:15;
136:2,19;137:5;
138:15;139:6,18;
140:16;141:15;
143:5,21;144:16,21;
151:25;183:15,16;
233:4;266:11,12;
270:8,12,13,14
**surprise (5)**
110:14;133:10;
151:17;227:9;255:7
**surprised (1)**
110:21
**swear (1)**
10:24
**swing (1)**
227:25
**sworn (1)**
11:1

## T

**tab (1)**
169:13
**Table (38)**
54:7;69:15;72:18;
73:6,11;76:8,20;
77:17;80:17;82:9;
83:7;84:18;100:4;
103:11;104:10;
114:11;146:3,20,23;
153:19;154:20;
157:13;170:6,8;
185:21;187:11;
196:7;202:25;
205:21;219:17,25,25;
220:2,6,9,11;231:24,
25
**tables (1)**
114:15
**tail (1)**
145:14
**talk (14)**
38:25;39:2,4;40:3,
21,24;56:16;105:11;
112:2;186:19;

193:25;194:8;
199:12;220:14
**talked (4)**
199:8;222:17;
228:4;233:7
**talking (8)**
24:22;27:18;33:15;
76:17;88:16;104:9;
127:5;160:6
**tape (7)**
68:22;69:3;117:23;
118:6;167:6;195:23;
256:9
**task (1)**
42:6
**taught (3)**
209:24;210:4,7
**tax (61)**
46:14,20;63:13;
127:19;137:11,14,18,
23;138:3,3,5,23;
139:17;140:11;
172:19,21;174:18;
175:6,9;178:25;
179:13,17;183:6;
207:6,15,20;209:20,
25;210:3,4,7,11,18,
21;211:13,16,16,20,
24;212:8,15,19,20,
21,23;213:7,23,25;
214:2,7,13,18,25;
215:6,22;216:3,11;
239:3;274:12,13,23
**taxable (1)**
213:16
**taxes (6)**
139:8;144:7,20;
239:6,16,20
**teach (1)**
210:2
**team (3)**
29:6;234:25;235:2
**technicalities (1)**
118:18
**telling (2)**
161:21,23
**tells (1)**
86:23
**ten (5)**
51:25;104:11;
145:16;236:25;237:6
**ten-month (1)**
178:16
**term (5)**
28:4;98:19;152:6;
183:16;208:23
**Termination (1)**
101:19
**terms (5)**
34:2;191:6;194:19;
201:20;268:22
**terrible (1)**
15:14

**testified (4)**
11:2;24:8;167:5;
170:24
**testify (6)**
20:5,18;21:25;
23:11,19;25:9
**testifying (4)**
22:15;121:15;
168:10;208:17
**testimony (21)**
19:23;21:9,15;
22:6,20;38:18;91:7;
168:8,16,20;179:19,
25;182:20;207:18;
208:16,23;214:6,6;
228:23;273:10;
274:23
**therefore (8)**
46:20;113:6;157:5;
181:22;204:5;
207:21;215:17;
267:10
**therefrom (1)**
237:16
**thereof (1)**
236:14
**there's- (1)**
97:16
**thinking (3)**
19:14;185:16;
186:17
**third (5)**
59:2;207:22;208:5;
214:4;216:14
**thirty-fifth (2)**
70:22;234:16
**Thomas (3)**
40:19;169:18;
229:24
**though (8)**
84:20;86:24;94:5;
109:24;161:5;179:5;
186:20;259:20
**thought (5)**
223:17;225:7,11;
244:18;248:8
**thousand (2)**
50:23;145:17
**three (27)**
15:11;32:8;41:3;
57:6,10;83:9,12;
111:4,15;118:7;
125:24;130:4;142:4;
144:12;147:4;
155:16;156:25;
165:22;189:6,9,12;
199:21;203:20;
207:4;210:24;236:3;
261:20
**three-year (1)**
110:16
**times (9)**
11:16;126:16;

142:4;145:16;
161:10,19;165:24;
185:20;240:12
**title (1)**
230:20
**today (15)**
11:9,22;13:23;
15:12;24:20;25:4;
30:12,19;90:10;
196:2;205:12;
224:23;250:22;
260:13,20
**today's (2)**
14:4;275:13
**together (7)**
17:2;57:7;131:18,
21;182:15;214:15;
262:7
**told (13)**
22:16,17;34:17;
38:14;58:20;66:21;
97:11;125:9,10;
126:23;151:10;
161:24;164:23
**took (16)**
54:12;58:6;59:15;
60:4;61:12;66:20;
71:25;80:18;109:24;
124:18;179:9;180:3;
214:3,21;218:13;
220:24
**top (10)**
80:4,17;91:13;
103:16;117:6;
138:18;141:11;
199:21;202:24;207:3
**topics (1)**
259:24
**total (45)**
31:8,16,22;54:13,
15,25;55:2;75:14,14,
15;77:20;82:4,5,8,9;
83:6,7,17,22,24;84:3,
6,16,22,23;85:4,4;
89:12;91:16;99:17;
100:24;101:2;
127:14;132:7;136:9;
148:25;159:17,18;
186:13;187:19;
195:9;197:22;218:2;
220:25;221:3
**totaled (1)**
165:22
**totaling (1)**
141:21
**totality (11)**
114:24;115:14;
127:16;131:9;
143:15;145:7,25;
146:3;203:9,17,18
**totally (3)**
20:10;173:22;
179:16

towards (2)
130:7;132:4
tracking (1)
184:25
trade (3)
81:20;92:2;95:21
transaction (1)
23:24
transactions (2)
23:20;112:11
transcribed (1)
60:19
transcript (5)
61:2;87:12;97:8,9,
16
transfer (1)
239:15
translate (2)
84:5;239:24
Treasury (1)
230:24
treat (1)
75:13
treated (1)
75:5
trial (14)
20:6,21;22:17;
23:10;24:8;170:15,
24;178:4,12,19,20;
208:17;211:8;228:23
trip (1)
23:20
true (19)
22:12;74:4;76:25;
95:20,23;96:3;
116:15;130:25;
131:8;144:14;154:3;
162:10,23;165:13;
189:9;205:16;253:8
Trust (8)
10:14;101:17;
102:12,23;149:20,24;
150:6;153:18
trusts (2)
101:15;102:4
truthfully (1)
11:24
try (21)
28:23;44:3;124:19,
23;125:4;126:9;
134:9,15;148:24;
156:2,11,14;177:18;
194:25;214:2;
219:13;221:11;
247:23;257:5;
258:17;261:14
trying (16)
20:24;35:13;38:2;
48:8;53:8;56:18;
64:19,25;66:14;
91:23,24;122:19;
134:22;199:4;233:5;

254:6
TUNIS (1)
156:8
turn (19)
31:2;69:15;81:17;
103:4;147:24;
148:15;149:17;
153:15,19;154:10;
170:4;183:20;
202:23;206:24;
219:22;230:12;
236:25;244:13;272:9
Tweed (1)
10:3
twenty-six (1)
83:9
Two (27)
11:17;15:17;19:22;
32:7;63:5;64:19;
65:2;69:3;71:13,14;
82:6;88:11,22;
114:15;169:7;177:2;
193:7;209:20;
214:15;217:8;
234:17;237:3;
246:21;256:16;
257:13;259:24;
268:20
two-thirds (1)
103:25

**U**

UK (10)
3:4;10:17;20:2,5;
37:3,9;38:13;89:20;
93:17;94:9
ultimate (9)
93:14;150:14;
171:21;173:23;
174:6,9,15;181:14;
239:18
ultimately (15)
20:5,18;25:5;
54:18;57:17,22;
94:22;95:18;101:12;
103:20;135:14;
139:5;150:19,21;
160:4
ultra (1)
214:20
umbrella (2)
27:5,17
unaware (2)
25:4,17
unchallenged (1)
93:18
unconsolidated (2)
78:6,10
under (42)
21:7;27:4;42:9;
44:25;83:23;84:3;
85:11,17;87:7,15;

89:8;93:12;94:17;
95:5;98:6;99:7,13;
100:22;111:19;
114:2;132:12,16;
135:18;136:2;137:5;
139:15;140:6,14;
143:3;144:3;145:2;
154:13;157:22;
158:11,21;171:16;
191:3;195:3;219:15;
260:18;262:19;
263:12
underestimate (2)
100:20;258:15
underestimated (2)
100:25;258:13
underestimation (1)
258:8
underforecasted (3)
111:5,15,23
underlined (1)
146:17
underlying (3)
25:10;56:3;58:14
understated (1)
232:9
understood (5)
12:23;82:14,18;
208:16;222:7
undertake (4)
52:15;96:6;128:13;
130:17
undertaking (1)
118:12
undetermined (4)
212:16,22,24;
214:14
undisputed (1)
260:10
undistributed (4)
170:11;171:2,16;
183:15
unearned (2)
21:4,6
unfunded (1)
223:24
unit (1)
112:9
United (1)
21:19
unknown (1)
113:15
unless (4)
12:9,15;60:24;
128:7
unlikely (1)
51:3
unrealistic (24)
67:24;86:12;
172:15,20;173:4,9,
15,20;174:3;176:4,8;
179:16,23;180:16,20,
25;181:3,10,17;

183:3,11;204:25;
207:21;216:6
unrealistically (3)
208:3,12,13
unreasonable (8)
90:5;129:25;
130:19;175:6,17,21,
24;202:7
unreasonableness (1)
129:19
unrelated (1)
266:5
Unsecured (4)
3:14;10:11;205:25;
227:10
up (55)
22:14,23;28:23;
34:22;41:7;48:16,18,
25;51:6,9;55:20;
59:24;64:19,25;65:7;
70:25;71:20,22;73:6;
82:7;83:21;85:8;
111:12;115:6,12;
117:7;125:21,22,25;
129:22;137:2;
138:14;148:14;
150:12;160:5;172:7;
175:15;178:11;
186:22;193:7;196:9;
197:5;203:4;219:13;
220:7;224:21,22;
237:21;255:15;
256:15;267:18;
269:6,7,16;274:11
update (2)
80:3;81:23
updated (12)
79:11,12,15,21;
81:19;121:24;
220:21,23,25;221:3;
223:4;225:16
upflow (18)
106:14;108:23;
133:25;134:18;
135:11,13,20,23;
136:15,25;137:12;
138:13,20,24;139:16;
141:14;143:2;273:18
upflowed (1)
139:6
upon (15)
23:23;24:2,8;
33:20;36:8;37:20;
78:13;80:5;89:19;
91:2;110:7;168:10;
169:7;173:3;253:19
upper (3)
250:5;251:3,21
upstream (1)
144:2
use (37)
28:4;34:22;82:23;
83:5;90:8;98:19;

100:4,16,18,24;
101:3;110:24;156:6;
159:21;175:12,17,21;
177:16,16,17;183:16;
184:7;186:21;
197:23;199:4;209:9,
14;211:6;218:7;
220:2,15;231:19;
247:12;258:11;
265:9,10;270:14
used (37)
58:16;81:24;82:3;
84:16,21;86:13;87:4;
89:9,10,11;90:8;
93:21;101:2;108:7;
131:25;132:9;157:2;
158:23;170:20,25;
171:4,17,19,23;
172:2,6;175:22;
178:14;186:13;
197:5;199:5;214:3;
216:11;218:4;219:6;
248:15;250:17
uses (4)
175:12;187:9;
131:16,22
Using (7)
44:4;80:17;118:20;
183:17;208:3;
222:16;263:3
usually (1)
79:3

**V**

vague (1)
241:10
Vaguely (2)
40:20;233:11
value (27)
41:6;44:5;48:15,
25;49:20;50:9;51:6;
52:16;105:8;113:7,
11;114:6;122:20;
124:2,14,16,19,22;
125:3;132:7;133:19;
134:13;144:19,19;
247:4;249:20;259:5
valued (2)
112:16,21
variable (3)
135:24;136:5;
215:23
variables (11)
127:12,14;131:9,
10;136:8;144:7;
146:4;199:15;
203:10;204:12;
216:19
variance (4)
53:14;252:2,3;
255:11
variety (2)

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

213:13,16

**various (3)**
71:22;152:17;
190:21

**verify (1)**
83:17

**versus (9)**
20:15;21:19;61:4,
5;91:24;109:14;
145:14;187:12;
188:14

**VIDEOGRAPHER (15)**
10:23;68:23;69:3;
118:2,6;166:18;
167:6;185:3,7;
195:19,23;249:5;
256:5,9;275:12

**view (7)**
87:6,14,18,22;88:2,
20;257:21

**viewed (1)**
47:5

**virtually (3)**
105:2;111:3;112:6

## W

**wait (1)**
13:6

**walk (3)**
154:14;163:2;
245:8

**way (29)**
28:4;52:23;60:19;
75:9;78:22;93:2;
99:15;130:11;
133:19;135:10;
138:7;140:10;
144:20;148:8;
156:24;157:6;
182:10;190:6;199:8;
205:3;227:12;
228:15;232:7;233:5;
243:20;255:12;
270:25;271:2,21

**ways (1)**
39:17

**week (3)**
25:22;248:20;
250:15

**weeks (1)**
171:8

**Welfare (3)**
101:17;102:12,23

**weren't (4)**
44:7;127:13;
150:16;270:25

**Wertheim (294)**
11:7;12:1;13:1;
14:1;15:1;16:1;17:1;
18:1;19:1;20:1;21:1;
22:1;23:1;24:1;25:1;
26:1;27:1;28:1;29:1;

22;30:1;31:1;32:1;
33:1;34:1;35:1;36:1;
37:1;38:1;39:1;40:1;
41:1;42:1;43:1;44:1;
45:1;46:1;47:1;48:1;
49:1;50:1;51:1;52:1;
53:1;54:1;55:1;56:1;
57:1;58:1;59:1;60:1;
61:1;62:1;63:1;64:1;
65:1;66:1;67:1;68:1;
69:1,4,8,9,10;70:1;
71:1;72:1,23;73:1,21,
22;74:1;75:1;76:1;
77:1,23;78:1;79:1;
80:1;81:1,10;82:1;
83:1;84:1;85:1;86:1;
87:1;88:1;89:1;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1;107:1;
108:1;109:1;110:1;
111:1;112:1;113:1;
114:1;115:1;116:1;
117:1;118:1,8;119:1,
14;120:1,12;121:1;
122:1;123:1;124:1;
125:1;126:1;127:1;
128:1;129:1;130:1;
131:1,20;132:1;
133:1;134:1;135:1;
136:1;137:1;138:1;
139:1;140:1;141:1;
142:1;143:1;144:1;
145:1;146:1;147:1;
148:1;149:1;150:1;
151:1;152:1;153:1;
154:1;155:1;156:1;
157:1;158:1;159:1;
160:1;161:1;162:1;
163:1;164:1;165:1;
166:1;167:1,7,12;
168:1,4;169:1,18;
170:1;171:1;172:1;
173:1;174:1;175:1;
176:1;177:1;178:1;
179:1;180:1;181:1;
182:1;183:1;184:1;
185:1,11;186:1,4;
187:1;188:1;189:1;
190:1;191:1;192:1;
193:1;194:1;195:1,
24;196:1;197:1;
198:1;199:1;200:1;
201:1;202:1;203:1;
204:1;205:1;206:1;
207:1;208:1;209:1;
210:1;211:1;212:1;
213:1;214:1;215:1;
216:1;217:1;218:1;
219:1;220:1;221:1;
222:1;223:1;224:1;

225:1;226:1;227:1;
228:1;229:1,23;
230:1,5;231:1;232:1;
233:1;234:1;235:1,9,
13;236:1;237:1;
238:1;239:1;240:1;
241:1;242:1;243:1;
244:1;245:1;246:1;
247:1;248:1;249:1;
250:1;251:1;252:1;
253:1;254:1;255:1;
256:1,10,14;257:1;
258:1;259:1;260:1;
261:1;262:1;263:1;
264:1;265:1;266:1;
267:1;268:1;269:1;
270:1;271:1;272:1;
273:1;274:1;275:1,
13,14

**what's (16)**
16:19;105:17;
106:18;107:18;
164:9;180:5,8;
191:22,22;223:20,21;
224:12;230:6,15;
235:14;246:19

**whatsoever (2)**
66:8;248:7

**whereas (1)**
231:18

**whole (7)**
21:15;29:7;114:21;
142:6;145:8;192:9;
244:14

**wide (1)**
213:13

**willing (1)**
258:17

**WILLKIE (2)**
3:3;10:16

**Wilmington (1)**
10:14

**wins (3)**
242:2,5,7

**withdraw (6)**
191:14;200:12;
210:10;227:16,23;
242:6

**within (6)**
27:17;75:7;79:4;
185:18,20;259:5

**without (19)**
12:14;17:8;20:25;
40:3;60:6;61:14;
66:10,17;67:18;68:3,
15;75:5;94:7;139:16;
141:25;143:10;
156:12,14;261:8

**witness (11)**
10:20,24;11:1;
16:15;37:11;121:13;
128:5;141:3;156:10;
195:18;244:8

**Wolf (1)**
22:12

**Wolfe (1)**
21:19

**woman (1)**
23:24

**won (1)**
49:17

**word (6)**
48:18;138:10;
180:18;184:7;
244:15,15

**words (8)**
53:11;90:8;103:23;
108:7;199:5;205:8;
214:16;264:15

**work (6)**
27:5;32:24;33:7,
12;151:11;247:3

**working (1)**
78:14

**works (1)**
155:22

**worksheet (15)**
105:20;120:10,13,
19,22;147:23;148:2,
20;149:8,13,18;
150:3;154:2,6,12

**worksheets (1)**
148:21

**worse (1)**
255:20

**worst (8)**
77:4,9,10;109:11,
14,24;263:5,9

**worth (10)**
48:22;50:14;51:11,
25;52:2,8;113:6;
125:2,5,16

**wound (1)**
22:23

**write (1)**
163:6

**writes (1)**
245:15

**writing (1)**
129:17

**written (2)**
137:4;141:10

**wrong (1)**
172:2

**wrote (12)**
41:18;44:2;113:24;
147:3;187:3;238:7;
240:6;272:4,11,25;
273:6,14

## Y

**year (10)**
19:16,17;22:8;
167:19;170:16;
189:13,16;191:3;

198:13;206:3

**years (4)**
84:21;111:4,15;
187:15

**Yep (2)**
136:18;158:8

**Yesterday (3)**
15:3;18:25;19:7

**yesterday's (2)**
96:14,21

**yield (2)**
124:7;189:16

**yields (1)**
247:4

**York (4)**
3:6,6,17,17

## Z

**zero (54)**
38:7,9;48:17,22;
50:14;51:11,25;52:2,
8;91:20;104:25;
105:3,8,14;106:13,
17;108:6,16,23;
109:10;112:16,23;
113:8;125:3,10;
129:24;130:2;
173:13,16,21;176:5,
18,22;177:10,24;
179:17;202:7;203:6;
205:2;206:22;
207:20;216:4,11;
253:10,11,16;254:2,
21,24;255:15,20,22;
258:25;264:14

**zone (1)**
19:25

## 0

**0 (2)**
67:4;86:7

**000001 (1)**
229:25

## 1

**1 (22)**
29:20,22;69:15;
73:7,11,21;77:17;
82:9;83:7;104:10;
170:6,8;187:11,12;
195:11;196:15;
199:18;205:22;
219:25;221:20;
262:11,11

**1.01 (20)**
31:9;44:19;50:20;
51:2,17;188:9;
189:20;190:8;191:8;
192:5,10,15;193:4;
194:22;197:9;198:6,

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

PAUL WERTHEIM, Ph.D.
October 22, 2014

18,19,19;264:3
**1.011 (1)**
50:24
**1.03 (1)**
198:16
**1.548 (1)**
95:11
**1.6 (4)**
31:24;183:24;
192:2;198:10
**1.657 (6)**
31:8,12,17,17,24;
183:23
**1.9 (4)**
191:9;192:5;198:9,
15
**1:05 (2)**
166:19,21
**10 (3)**
229:22,23;230:6
**10:21 (1)**
68:24
**10:36 (1)**
69:6
**100 (11)**
76:2;85:10,21;
86:5;92:3,11;109:18,
19;130:5;228:8;
239:9
**10019-6099 (1)**
3:6
**10036-6745 (1)**
3:17
**101 (1)**
162:22
**108 (1)**
234:21
**10-Q (34)**
72:8,11,14,22,23;
73:25;74:25;75:2,3;
80:18;81:24;84:21;
86:14,17,17,21,24;
89:10,13,16,19,23;
90:22;91:2,14;92:20;
101:3,5;106:24;
109:6;148:9,14;
242:19;265:19
**11 (7)**
103:16;138:19;
141:12;153:20;
235:9,15;270:20
**11.15 (1)**
103:9
**11:44 (1)**
118:3
**1125 (1)**
123:23
**115 (3)**
221:15;222:22;
223:10
**12 (14)**
104:12;115:21;
116:10;117:6,10;

128:22;129:9,13;
130:22;154:2;
178:17;199:17;
202:23;261:25
**12:02 (1)**
118:9
**121 (2)**
185:24;186:5
**125 (2)**
72:9;80:24
**126 (1)**
80:22
**13 (4)**
147:24;178:15;
199:21;207:2
**13.2 (2)**
252:4;255:4
**133 (5)**
127:21;172:24;
207:14;208:11;
215:16
**134 (2)**
261:17,22
**14 (6)**
154:11;178:16;
197:18;205:21;
236:10;251:20
**15 (8)**
72:11;73:2;91:14;
184:20,21;185:14;
253:5;254:8
**150 (2)**
229:25;258:21
**154 (1)**
225:19
**1548 (1)**
80:21
**156 (1)**
222:18
**158 (3)**
148:4,6,20
**16 (9)**
31:3;72:10;119:22;
149:19;183:20;
186:21,25;187:25;
196:14
**160 (1)**
142:3
**167 (1)**
80:19
**17 (9)**
41:17;43:2;119:5,
23;124:5;237:6;
251:20,24;255:2
**176 (1)**
80:21
**17a (1)**
251:23
**18 (3)**
42:24;122:14;
153:25
**180 (1)**
233:8

**186 (1)**
80:20
**19 (2)**
43:13;44:15

---

## 2

**2 (26)**
54:7;72:21,23;
73:22;76:8,20;78:23;
84:18;100:16;
114:11;146:3,20,23;
153:19;154:17,21,22;
157:13;202:25;
206:2,18;220:2,6,9;
235:11,18
**2,837.4 (1)**
83:24
**2.062.7 (1)**
57:2
**2.067.2 (1)**
234:18
**2.2 (2)**
80:10;192:18
**2.5 (1)**
98:24
**2.7 (1)**
84:15
**2:05 (2)**
167:3,9
**2:32 (1)**
185:4
**2:41 (1)**
185:8
**2:55 (1)**
195:20
**20 (4)**
30:4;80:21;208:6;
217:5
**200 (2)**
80:20;127:23
**2007 (1)**
22:10
**2009 (4)**
224:13,18,19,24
**2011 (1)**
119:15
**2012 (4)**
79:5,9;91:2;265:20
**2013 (1)**
231:18
**2014 (45)**
58:7;68:25;69:6;
81:12;82:2;90:25;
118:4,9;166:20;
167:9;169:17,20;
178:17;185:5,9;
187:12,19;188:3,5,
14,17,21;189:10,25;
191:25;195:21;
196:2;197:2,18;
220:20;229:24;
230:25;231:20;

235:11,19;236:10;
251:6;256:7,12;
261:18;262:10,11,12;
269:15;275:16
**2015 (28)**
186:21;187:4,8,20;
188:2,10,23;189:2,4;
190:7,13;191:8;
192:4;196:25;198:4;
244:23;247:14;
248:21,22;249:13;
253:5;256:20;258:6;
260:3;261:18;263:2,
3,11
**2016 (1)**
192:9
**2017 (1)**
193:3
**2062.7 (1)**
269:7
**21 (6)**
80:22;119:15;
120:14,17;149:17;
203:8
**21.9 (1)**
251:25
**212-728-8170 (1)**
3:8
**212-728-9170 (1)**
3:9
**212-872-1002 (1)**
3:22
**212-872-8027 (1)**
3:21
**22 (13)**
68:25;69:6;118:4,
9;166:20;167:9;
185:5,9;195:21;
196:2;256:7,12;
275:16
**23 (1)**
270:5
**24 (5)**
42:5;81:11;229:24;
244:13;251:3
**28 (2)**
169:17,20
**29 (7)**
73:25;80:4,18;
89:17;237:12;
248:21;274:24

---

## 3

**3 (15)**
81:7,10,13;82:2,
14;98:10;100:14;
104:13;155:13;
205:21;244:10;
250:6;251:21;
254:14;256:16
**3.2 (2)**
242:14,23

**3.235 (2)**
81:3;151:2
**3:07 (1)**
196:2
**30 (48)**
28:18,19;29:11,14,
18,19;72:8,15;79:3,5;
150:21;178:15;
186:21,24;187:4,7,
12,14,19;188:2,3,5,9,
14,17,21,23;189:2,4,
10;190:7,13;191:8,
25;192:4,9;193:3;
196:25;198:4;237:9,
12;260:3;261:18,18;
263:2,3,10;269:15
**300 (1)**
198:12
**31 (5)**
178:15;220:20;
230:25;231:18,20
**32 (1)**
169:5
**329.4 (2)**
250:19;254:8
**33 (5)**
132:3;155:11,13;
251:3;272:9
**34 (2)**
45:8;80:22
**35 (4)**
170:5;228:24;
231:24,25
**37 (6)**
84:7,12;85:5,6;
185:18;221:7
**38 (1)**
185:19
**39 (4)**
202:12;250:4,8;
254:14

---

## 4

**4 (8)**
119:12,14;124:4;
194:24;206:3,18;
221:6;248:21
**4.2 (1)**
43:5
**4.2a (1)**
43:6
**4:12 (1)**
256:6
**4:19 (1)**
256:12
**4:40 (2)**
275:15,17
**400 (4)**
127:22;207:20;
212:9;213:2
**43 (1)**
106:24

**437 (5)**
221:8,22;222:8;
223:10,12
**44 (1)**
262:16
**45 (1)**
202:12
**45.8 (1)**
203:6
**46 (1)**
207:10
**48 (1)**
207:11
**49 (3)**
220:11,15;221:18
**4th (2)**
147:9;148:10

**5**

**5 (7)**
99:11;119:11;
120:9,12;176:17;
230:15,18
**5,302.5 (1)**
57:12
**5.1 (6)**
199:13;203:5,20;
204:11;215:15;
226:14
**5.2 (1)**
146:11
**50 (7)**
145:14;146:9,14;
147:4;163:18;195:5,
13
**50/50 (1)**
145:14
**53 (1)**
80:23
**54.6 (1)**
218:3
**56 (4)**
155:5,13;163:18;
225:19
**564 (1)**
80:21
**575 (2)**
154:17,22
**593 (9)**
159:17;163:19;
220:7;221:4,22;
222:8;223:14,16,23

**6**

**6 (6)**
131:16,20;154:18,
22;272:18,20
**60 (16)**
28:25;59:16;
155:20;163:24;
168:3,5;181:7;200:6;

202:16;216:24;
217:7,7,9,10;219:17;
222:20
**600 (2)**
242:18,22
**62.7 (2)**
71:12,15
**620.9 (2)**
154:9,20
**65 (10)**
138:14,25;139:7;
144:8;268:17,19,24,
24;269:6,8
**65.3 (3)**
103:21;267:23;
268:6
**657 (1)**
183:25
**67 (2)**
148:5;230:12
**670 (3)**
90:20,23;91:15

**7**

**7 (11)**
80:22;168:2,4;
181:5;182:16,18;
190:19,22;217:20,21;
219:16
**7.4 (1)**
84:10
**70 (1)**
260:11
**700 (2)**
127:15;141:21
**743 (1)**
73:19
**744 (2)**
115:9;231:13
**765 (1)**
79:8
**766 (1)**
148:15
**787 (1)**
3:5

**8**

**8 (5)**
22:11;80:22;
169:13,16,18
**8,495.8 (1)**
83:23
**8.9 (1)**
249:25
**85 (2)**
154:17,22
**852 (3)**
86:19;218:22;
222:16
**876 (4)**
188:15;191:25;

197:13;262:17
**890 (1)**
199:9

**9**

**9 (5)**
79:9;83:10;186:4,
8,10
**9,326 (2)**
83:13;84:8
**9.326 (1)**
83:15
**90 (3)**
79:4;164:3,7
**91 (5)**
142:22;148:5;
245:14;251:2;255:24
**920 (1)**
262:17
**93 (1)**
256:17
**971 (15)**
84:18;114:13,13,
23;115:8;116:20;
117:9;127:13;137:8;
141:22;147:3,6;
195:12;238:21;
262:23
**973.7 (1)**
84:19